UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | | |
|---|---|---|
| ———————————————— ) | | |
| In re: | ) | Chapter 7 |
| | ) | Case No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| ————————————————) | | |

| | | |
|---|---|---|
| ———————————————— ) | | |
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Case No.16-01120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, TATIANA KAGAN, | ) | |
| KAGAN DEVELOPMENT KDC, CORP. | ) | |
| and PROEXCAVATION CORP. | ) | |
| | ) | |
| Defendants. | ) | |
| ————————————————) | | |

## DEFENDANTS' MEMORANDUM IN SUPPORT OF MOTION TO DISMISS ADVERSARY COMPLAINT AND SPECIAL MOTION TO DISMISS BASED ON THE MASSACHUSETTS ANTI-SLAPP STATUTE

### INTRODUCTION[1]

Debtor's[2] Complaint is the latest chapter in an ongoing dispute between members of the

Debtor, a Massachusetts limited liability company.  This filing is a "cut and paste" of an identical

complaint filed in the Middlesex Superior Court before the Debtor filed its Petition.   Two of the

---

[1] The Chapter 7 Trustee did not join in the filing of this adversary complaint and represented that he would be abandoning these claims.  As of the date of this filing, the trustee has not yet formally abandoned the claims.  On the assumption that he will do so before this Court rules on the instant motion, defendants have not argued that the Debtor, through private counsel, lacks standing to bring this adversary complaint.  Defendants reserve the right to challenge standing in the event the anticipated abandonment by the Chapter 7 trustee does not occur.

[2] Although the claims are asserted by the Debtor alone, there is no doubt that Alex Filippov and Nickolay Lipetsker are driving these proceedings.

claims in the state court action, re-asserted verbatim in this Complaint, were dismissed within a week of the Debtor filing its Petition. Undaunted, Debtor is seeking a third bite at the apple[3] hoping that this Court might be more lenient than the state court and overlook Debtor's deficient pleading. Despite the meandering, false and often contradictory recitation of facts and theories in the Complaint, the Defendants have made reasonable assumptions in an attempt to understand the underlying nature of the allegations. Even giving the Debtor the benefit of the doubt, the Complaint must be dismissed for many of the same reasons which convinced the state court to dismiss claims and for additional reasons as set forth below.

Although the factual allegations are directed at supposed misconduct by Vadim Kagan ("Kagan"), in an effort to manufacture leverage, Debtor included as defendants all persons and entities that have any connection whatsoever with him. Defendants have made no attempt whatsoever to articulate specific actionable conduct by <u>each</u> individual defendant which would subject them to individual or joint liability. Guilt by association is not a cognizable theory of liability – Debtor bears the burden of alleging specific facts and legal theories to establish a viable claim against <u>each</u> defendant. Debtor has failed to do so. It has failed to plead fraud with particularity as required by Rule 9(b) of the Federal Rules of Civil Procedure and failed to establish any reliance or damage as a result of the alleged fraud. Additionally, having received what it bargained for – two houses – the moving parties cannot see any relief that this Court can grant. If this action is merely an attempt to bolster the Claim Objections, it is the wrong forum. Those objections have been made and have their independent existence. Lastly, the allegations in many instances violate the anti-SLAPP statute and simply fail to state a cognizable claim.

---

[3] Debtor's original state court complaint was amended once and then subject to a motion to dismiss in the state court. This refiling, in form of an Adversary Complaint, is the third rendition of the same allegations.

According to the opening sentence of the Complaint, Debtor seeks "to recover property of the estate." Nowhere in the complaint does Debtor identify the property supposedly at issue. This sets the tone for the entire pleading. It is clearly a retaliatory action which is long on conclusions and short on facts. Reduced to its essence, this action is a transparent attempt to avoid paying for the construction services provided by Kagan Development KDC, Corp. ("KDC"), notwithstanding that KDC built the homes on Debtor's property, Debtor accepted KDC's services, and the homes have now been sold.

FACTS[4]

The Project

In October 2012, Nickolay Lipetsker ("Lipetsker") and Vadim Kagan ("Kagan") approached Alex Filippov ("Filippov") about investing in a real estate development project. (Complaint ("Comp."), ¶9). The plan was to purchase property in Brookline, MA, demolish the existing house, subdivide the property, and construct two new single family homes thereon (the "Project"). (Id., ¶10). On October 25, 2012, Kagan allegedly presented Lipetsker and Filippov with a budget and a "forecast of estimated returns." (Id., ¶12). A copy of the October presentation, which Debtor annexed as an exhibit to the identical state court proceeding, is attached hereto as **Exhibit A**.[5] In reliance on the forecast of estimated returns, Lipetsker and Kagan each contributed $250,000 to the Project, and Filippov contributed $2,000,000. (Id., ¶15).

---

[4] The Defendants do not concede the accuracy of the Debtor's allegations. However, for purposes of the present motion, well plead factual allegations must be presumed true. Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48-49 (1st Cir. 2009). Conclusory statements of fact and conclusions of law, however, do not enjoy the same presumption and should be disregarded. Ashcroft v. Iqbal, 556 U.S. 662, 681 (2009).

[5] "Where a plaintiff had notice of a document, relied on it when drafting the complaint and explicitly referenced the document in the pleading, attaching that document to a motion to dismiss does not convert the motion to one for summary judgment. See Marram v. Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996); Wong v. Resolve Tech., Civil Action No. 10-11642-DJC, 2011 WL 3157198, at *1 n.1 (D. Mass. July 25, 2011); Young v. Lepone, 305 F.3d 1, 11 (1st Cir. 2002) (allowing consideration of documents submitted by defendant on motion to dismiss where the complaint contained references to" the documents and "the factual allegations of [the] complaint revolve around" the documents).

Thereafter, in November, 2012, Lipetsker, Filippov and Kagan formed the Debtor to carry out the Project.[6] (Id., ¶14).

Although the Complaint claims that the Debtor's operating agreement named Filippov as Debtor's managing member, that is simply untrue. The operating agreement does not name a managing member or set forth a procedure for selecting one. (Id., ¶16); Ex. B (Op. Agr., §6.1).[7] Filippov did, however, purport to sign the Operating Agreement as "Managing *Manager*." Ex. B. (Emphasis added).

Debtor alleges that Kagan's October 25, 2012 presentation represented that the construction would be for a fixed price of $1.3 million, with an additional $300,000 to cover carrying costs and contingency. (Comp., ¶¶13, 17, 19). Although Debtor claims that through this document Kagan guaranteed the financial performance of the Project, it is clearly titled "**Estimated** Financials and Risk Analysis." (Emphasis added). See Ex. A. The Debtor also borrowed $1.6 million to finance the purchase of the land, for an aggregate Project borrowing of $4.8 million. (Id., ¶19).

The Operating Agreement delegated responsibility for the construction of the homes to Kagan. Ex. B (Op. Agr., §5.2). Pursuant to that authority, through his construction company, KDC, Kagan, in fact, effectuated the construction of the homes and they have now been sold. To keep costs down, KDC subcontracted some of the Project work to another of Kagan's companies, ProExcavation Corp. ("ProExcavation"). Filippov, as the alleged managing member, "monitored the withdrawal of funds from the account" and averred that the "lion's share of this sum was paid to KDC, ProExcavation and to subcontractors paid by KDC to perform the

---

[6] According to the Secretary of State records of which this Court can take judicial notice, the Debtor entity was actually formed on December 26, 2012.

[7] A copy of the operating agreement is annexed hereto as **Exhibit B** (the "Operating Agreement," cited as "Op. Agr.").

construction." (Comp., ¶21, 22).  Debtor does not allege that KDC performed substandard work,

that Filippov ever challenged payments to KDC, or that it objected in any manner to KDC as the

entity performing the construction.  Instead, Debtor alleges that months after the Project was

complete and the homes placed on the market for sale, Kagan advised Filippov and Lipetsker

that construction and carrying costs had exceeded the "budget." (Comp., ¶20).  Filippov alleges

that he was never told that the budget (upon which the construction loans were based) had been

exceeded. (Id.).  He claims that Kagan's demand for monies beyond the budget and construction

loans is based on fraudulent billing.[8]  Notably, there is no allegation that anyone other than

Kagan agreed to the "budget," no allegation that KDC or ProExcavation received monies from

the Debtor to which they were not entitled and no allegation that the Debtor entered into a fixed

price[9] construction contract.

Debtor alleges that the Operating Agreement obligated Kagan to complete construction

of the homes by March 30, 2014 and targeted a sale of the properties by November, 2014.  (Id.,

¶¶23, 25).[10]  According to Debtor, construction was not completed until October, 2014.  (Id.,

¶24).  Notwithstanding these averments, neither the date of final completion nor a deadline for

sale of the homes is stated anywhere in the Operating Agreement.

Lipetsker and Filippov agreed to list the homes for sale with Kagan's wife, Tatiana

Kagan, a real estate broker affiliated with Century 21.  (Id., ¶26); Ex. B (Op. Agr., §6.1(b)(6)).

---

[8] The monies to which the Debtor refers have **not** been paid by the Debtor, and reside in the Debtor's bankruptcy estate, under the control of the Chapter 7 trustee.  KDC has filed a proof of claim and Lipetsker and Filippov have filed an objection.  This issue rightfully should be solely considered therein.  Moreover, as these monies are not in the hands of the Defendants, even if the allegations are true, the Court could not order a disgorgement since the money was never paid.

[9] The Debtor has failed to annex any document which purports to provide for the Project being subject to a fixed budget.  In fact, neither of the two construction contracts annexed to the objection to KDC's proof of claim are fixed price contracts.

[10] The Operating Agreement actually says that "substantial completion" not "completion" is to occur by March 30, 2014.  (Op. Agr., ¶5.2).  "Substantial completion" is not a defined term in the Operating Agreement.

Although Debtor claims that the obligation to use Ms. Kagan as the broker expired on December 31, 2014, this too is contrary to what the Operating Agreement actually says. (Id.). The Operating Agreement does not place any term limits on the listing agreement with Ms. Kagan. Rather, it states that prior to December 31, 2014 Ms. Kagan could not be removed as the listing broker absent an 81% membership vote. Thereafter, she could be removed without consent. Ex. B (Op. Agr., §6.1(b)(6)). There is no allegation that the Debtor members ever exercised their right to remove her.

Debtor claims that the Kagans, without consulting Filippov or Lipetsker, listed the properties at $5,499,000 each notwithstanding that the "projected" sale price for each home was $4.9 million. (Comp., ¶25). Notwithstanding that as the putative managing member it was Filippov's responsibility to sell the homes, Ex. B (Op. Agr., §6.1(a)), Filippov claims that he only learned of the "inflated" listing price in May, 2015, a year and a half after the homes were completed and listed for sale, when Kagan's counsel wrote a letter suggesting that they lower the listing price. (Comp., ¶34). Assuming, *arguendo*, that this allegation is true, it has nothing to do with KDC and ProExcavation as it is undisputed that their involvement in the Project was limited to constructing the properties.

In April, 2015, Kagan called Filippov and asked him to extend the listing agreements with Ms. Kagan. However, Filippov now alleges that he wished to use someone else.[11] (Id., ¶31). Ignoring Filippov's wishes, Kagan allegedly executed a new listing agreement. (Comp., ¶32). The Debtor alleges that, "[u]pon information and belief" because Ms. Kagan is married to Kagan and is his business partner, she "knew or should have known" that Kagan was not authorized to sign the new listing agreement. (Id., ¶33).

---

[11] In the state action, Kagan produced text messages and e-mails from Filippov confirming that he approved Kagan's signing of the new listing agreement.

On May 7, 2015, Kagan's counsel sent a letter to Filippov and Lipetsker suggesting that the asking price for the properties be lowered.  (Id., ¶34).  A copy of this letter, which was also annexed to the state court complaint, is annexed hereto as **Exhibit C**.  It is through this letter that Filippov first claims to have learned of the cost overruns.  In the letter, Kagan's counsel also noted that Kagan, who had been handling payment of ongoing carrying costs through KDC, no longer wished to bear that responsibility alone.  (Id., ¶35).  Kagan offered to share those costs going forward.  Debtor claims that "[u]pon information and belief[,]" the purpose of having counsel send the letter was to "engender a dispute."  (Id., ¶36).  Rather than having any dialogue and without calling for a member vote, Filippov unilaterally caused the Debtor to immediately file suit in the state court.  True and accurate copies of the original state court complaint, verified by Filippov ostensibly on behalf of the Debtor, along with the amended state court complaint, are annexed hereto as **Exhibit D**, omitting the exhibits.

In the state court action, Debtor moved for a preliminary injunction to set aside the allegedly unauthorized listing agreement.  The Middlesex Superior Court denied the injunction after a hearing on June 15, 2015.  In conjunction with that hearing Debtor claims to have received, for the first time, a copy of the "unauthorized" listing agreement that Kagan signed in August, 2014. (Id., ¶37, 39).

KDC has not been paid for the construction and related costs beyond the amounts financed by the construction loan.  On June 22, 2015, KDC recorded a mechanics lien to secure payment of the monies owed to it.  (Id., ¶41).  Debtor claims the lien is untimely, disagrees with the amount of the lien and claims that neither Filippov nor Lipetsker had ever seen the

underlying construction contract referenced in the lien document.[12]  (Id., ¶42, 45).  According to

the Debtor, the recording of this lien "forced" Debtor to file the Petition[13] and speculates that the

presence of the lien forced the sale "by the Chapter 7 trustee at below market value."[14]  (Id.).

After filing the action in June, 2015, Debtor claims to have interviewed several *unnamed*

"witnesses" who supposedly reported that they had experienced the same conduct by Kagan on

**other** projects, i.e. agreeing to a budget, not disclosing cost overruns, and threatening to lien

unless they agreed to pay the purported costs overruns.  (Id., ¶43).  In addition, Debtor claims to

have interviewed KDC's former *unnamed* bookkeeper who supposedly reported that Kagan uses

ProExcavation as a vehicle to double bill expenses, mixes expenses for projects on his American

Express card, pockets funds received for return of unused materials, keeps inaccurate records of

subcontracting costs, receives kickbacks from some subcontractors, and intentionally inflates

excavation charges.  (Id., ¶44).  Although it has failed to identify a single improper cost, based

on Debtor's rendition of the facts reported by these *unnamed* witnesses, "[u]pon information and

belief," Debtor concludes that the costs asserted in **this** Project must also be false and fraudulent.

(Id.).

## RELATED PROCEEDINGS

The Complaint is essentially a mirror image of the complaints filed by the Debtor in state

court.  Counsel in the state court proceeding is the same counsel who has entered his appearance

as counsel for Lipetsker and Filippov in the instant proceedings.  Notwithstanding his assurance

---

[12] Insofar as the Trustee appears to have collected enough funds to pay all creditors, whether the lien is valid or invalid is of no import as whether KDC is treated as a secured creditor or an unsecured creditor, it still should be paid in full.

[13] Defendants do not understand how the lien "forced" the filing of the Petition, especially as by any definition the Debtor was not insolvent.  Moreover, to the extent Debtor claims the lien is defective, it could have initiated an expedited proceeding under M.G.L. c. 254, §15A to dissolve it.  It did not.

[14] The Debtor did not object to the Chapter 7 trustee's sale on the grounds that it was at "below market value."

that he works independently for the Debtor and would consult with Kagan as to all substantive decisions, Debtor's private counsel apparently obtained a copy of the state court complaint from Filippov's and Lipetsker's private counsel, and simply recaptioned the state court complaint as an adversary complaint.  It is a wholesale "cut and paste" job.  <u>Compare</u> Ex. D to Complaint.

The state court properly dismissed Debtor's fraud claim for failure to plead with particularity.  It also dismissed Debtor's conspiracy claim, relying on First Circuit precedent, as duplicative of the aiding and abetting breach of fiduciary duty count.  A copy of the state court's decision on the motion to dismiss, without exhibits, is annexed hereto as **<u>Exhibit E</u>**.

One week after the issuance of the state court's decision on the motion to dismiss and several months after the recording of KDC's mechanics lien, on October 7, 2015, Debtor filed its petition under Chapter 11 of the United States Bankruptcy Code (the "Petition") in an effort to avoid paying KDC for the costs it incurred to complete the Project.  <u>See</u> Comp., ¶45 ("The mechanics lien forced the Plaintiff to seek relief in this Court…").  Debtor also sought to wipe out Kagan's membership so as to maximize Filippov's and Lipetsker's return of capital.  As calculated, by filing the Petition, the Debtor also halted the upcoming depositions of Lipetsker and Filippov which would have revealed the absence of any merit to the allegations.

Upon his appointment, the Chapter 11 trustee endorsed the Debtor's pending motion to reject the listing agreements as executory contracts, and this Court allowed it.  [*Docket Nos. 36, 38, and 42*][15] With the assent of the Debtor, however, the Court ordered that if a sale occurred to a purchaser procured by Century 21 (with whom Ms. Kagan was affiliated), Century 21 would still be entitled to a commission.  [*Docket No. 85*].  In fact, Century 21 did produce a buyer and

---

[15] On motion by the Chapter 11 trustee, this action was converted to Chapter 7.  <u>See</u> [*Docket No. 57*].  The Chapter 11 trustee was then appointed as the Chapter 7 trustee.  <u>See</u> [*Docket Nos. 30 and 62*].

received its commission from Debtor. Both homes have now sold, which sales were approved by this Court, without objection by Filippov, Lipetsker or the Debtor.

### STANDARD ON A MOTION TO DISMISS

When deciding a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), made applicable to this proceeding by Fed. R. Bankr. P. 7012, the Court accepts as true all well-pleaded facts in the complaint and drawing all reasonable inferences in the plaintiffs' favor. Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48-49 (1st Cir. 2009). However, a court is not bound "to credit 'bald assertions, unsupportable conclusions, and opprobrious epithets' woven into the fabric of the complaint." In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 15 (1st Cir. 2003). To successfully withstand a motion to dismiss, the plaintiff must state a claim that is plausible on its face. Ashcroft v. Iqbal, 556 U.S. 662 (2009) (citing Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007)); see also Gargano, 572 F.3d at 48-49.

"Factual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the complaint are true (even if doubtful in fact)." Twombly, 550 U.S. at 555 (citations omitted). According to the Supreme Court, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 556). As the Court stated, "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" Twombly, 550 U.S. at 557. The Court also noted, however, that pleadings must contain more than "labels, conclusions and formulaic recitation[s] of a cause of action's elements...." Id. at 545. To satisfy the general pleading requirement of Federal Rule of Civil Procedure 8(a), a

plaintiff must plead enough facts to state a claim for relief that is plausible on its face." Id. at

570.  Otherwise, where plaintiffs "have not nudged their claims across the line from conceivable

to plausible, their complaint must be dismissed." Id. at 547.  In Iqbal, the Court cautioned that

allegations that are conclusory are not "entitled to be assumed true" for purposes of ruling on a

motion to dismiss.  Iqbal, 556 U.S. at 681; see also Twombly, 550 U.S. at 554-55.  "Nor does a

complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"

Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

<u>ARGUMENT</u>

I.  <u>DEBTOR'S FRAUD CLAIMS MUST BE DISMISSED FOR FAILING TO PLEAD
    FRAUD WITH PARTICULARITY AND THE LACK OF ANY DETRIMENTAL
    RELIANCE OR DAMAGES.</u>

Debtor's fraud claim and all additional counts which are based on the alleged fraud

(Counts II, III, IV, V and VI) must be dismissed because they fail to satisfy the particularity

requirements of Fed. R. Civ. P 9(b), made applicable to this adversary proceeding by Bankruptcy

Rule 7009.  To the extent that the fraud counts are asserted against **all** defendants, the complaint

must set out, with specificity, what **each** defendant did in furtherance of the alleged fraud.  It is

not enough to merely say that because they are affiliated with Kagan, his fraud, if any, is

chargeable to them.  Moreover, the complaint fails to allege any detrimental reliance on the

alleged fraudulent acts or omissions, or that the Debtor suffered any damages.  Any one of these

defects is fatal to Debtor's fraud claim and any claim derived therefrom, as they highlight

Debtor's failure to plead essential elements of a fraud claim.

a)  <u>Elements of Fraud Required to Withstand a Motion to Dismiss</u>

"[T]o recover in an action for deceit, 'the plaintiff must prove "that the defendant made a

false representation of a material fact with knowledge of its falsity for the purpose of inducing

the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted

upon it to [its] damage.'" Totalizing Sys. v. PepsiCo, Inc., 29 Mass. App. Ct. 424 , 431 (1990),

citing, Danca v. Taunton Sav. Bank, 385 Mass. 1 (1982) (citations omitted). See also

Restatement (Second) of Torts § 525 (1977) ("One who fraudulently makes a misrepresentation

of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from

action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to

him by his justifiable reliance upon the misrepresentation").

Though pled as a single count against all of the defendants, Debtor relies on two

independent theories of fraudulent conduct as the basis for its fraud claim, Count IV: (1)

fraudulent execution of unauthorized listing agreements; and (2) fraudulent billing of

construction costs.  Although asserted against all Defendants, there is no allegation that

ProExcavation and KDC had anything to do with the listing agreements and no allegation that

Ms. Kagan has anything to do with the allegedly fraudulent construction billing.  As they are

discrete theories, Defendants will analyze each of these theories separately.

1)   "ASSERTION" OF FALSE AND FRAUDULENT CHARGES.

Debtor claims that Kagan (but not Ms. Kagan, KDC or ProExavation) "used KDC and

ProExcavation to **assert** false and fraudulent charges for construction costs against the Plaintiff

and caused KDC to file a false and fraudulent mechanics lien against the Plaintiff's properties."

(Comp., ¶64) (Emphasis added).  As a result, Debtor alleges it has suffered and "may suffer

further" damages "for which the Kagans should be held liable."  (Id.).

a)   Failure to Plead Fraud With Particularity.

The state court properly dismissed Debtor's identical fraud claim for failing to plead with

particularity as required by Rule 9(b) of the Massachusetts Rules of Civil Procedure.  Rule 9(b)

of the Federal Rules of Civil Procedure also requires pleading fraud with particularity.  <u>See</u>

<u>United States ex rel. Karvelas v. Melrose-Wakefield Hosp.</u>, 360 F.3d 220, 226 (1st Cir. 2004)

("We have said that Rule 9(b) requires that a plaintiff's averments of fraud specify the time,

place, and content of the alleged false or fraudulent representations.") (internal citations

omitted).   "The purpose of this requirement is to "give notice to defendants of the plaintiffs'

claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to

discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant

information during discovery."  <u>Id.</u> (internal citations and quotations omitted).  <u>See also</u> <u>United</u>

<u>States ex rel. Kelly v. Novartis Pharms. Corp.</u>, No. 15-1470, 2016 U.S. App. LEXIS 11001, at

*15 (1st Cir. June 17, 2016) ("Rule 9(b) requires that "[i]n alleging fraud or mistake, a party

must state with particularity the circumstances constituting fraud or mistake.").  "Conclusory

allegations and references to plans and schemes are not sufficient."  <u>Id.</u> (internal quotations

omitted).

Debtor makes conclusory allegations of fraudulent billing based solely on the allegation

that *Kagan*, (but not KDC or the other defendants,) did not disclose the cost overruns until after

the Project was completed and because some unnamed witnesses supposedly experienced similar

conduct on other unrelated projects.  This is not enough to pass muster under Rule 9(b).  Debtor

has failed to identify any improper charges. This is particularly inexcusable given that Debtor:

(1) has four binders of back-up invoices and analysis filed by KDC in support of its proof of

claim; (2) has all of Debtor's bank statements with copies of checks; (3) received over 1,000

pages of documents during discovery in the state court action; (4) represented to this Court that it

has a forensic accountant who has already reviewed the Project charges; and (5) claims to have

an expert who reviewed the charges by ProExcavation.[16] Debtor also fails to identify the persons

supposedly interviewed and how whatever allegedly happened on those other projects has

anything to do with this Project. The inability to identify a single improper expenditure or a

single witness, despite repeated assurances that they exist, speaks volumes. By any measure, the

pleading does not comply with Rule 9(b).

Fatal to the claims of fraud or conspiracy specifically as to KDC, ProExcavation and Ms.

Kagan is the lack of any specificity as to what any of them actually did in furtherance of the

fraud. Even if this Court were to conclude that the allegations against Kagan were sufficient, a

dubious proposition, that does not address the lack of any specificity as to KDC, ProExcavation

or Ms. Kagan in the alleged scheme to overcharge the Debtor. It is not enough to merely make

conclusory allegations. See Novartis Pharms. Corp., No. 15-1470, 2016 U.S. App. LEXIS

11001, at *15; see also Hayduk v. Lanna, 775 F.2d 441, 444 (1st Cir. 1985) ("mere allegations

of fraud, corruption and conspiracy, averments to conditions of mind, or referrals to plans and

schemes are too conclusional to satisfy the particularity requirement, no matter how many times

such accusations are repeated.").

It is also not sufficient to say that the Debtor expects to find the missing detail during

discovery. If that is Debtor's response, this confirms that it is engaging in an impermissible

fishing expedition. See Wayne Inv., Inc. v. Gulf Oil Corp., 739 F.2d 11, 14 (1st Cir. 1984) (Rule

9(b) was not satisfied when support for allegation consisted of "speculations from industry

analysts" and allowing the allegations of fraud to stand would be tantamount to "issu[ing] a

license for a 'fishing expedition' in uncharted waters."); Doyle v. Hasbro, Inc., 103 F.3d 186,

194 (1st Cir. 1996) (one purpose of Rule 9(b) is to "prevent the filing of suits that simply hope to

---

[16] These representations were made in Debtor's objection to KDC's proof of claim and in open court during the hearing on that objection. See Debtor's Objection to Claim of Kagan Development KDC, Corp. at p. 4.

uncover relevant information during discovery"). All of the counts relying upon Defendants'

alleged fraudulent billing must be dismissed for failing to plead with particularity.

> b) <u>Debtor Has Not Pled That it Suffered Any Damages Caused By the</u>
> <u>Alleged "Assertion" of False Claims and Has Not Asserted Any Fraud</u>
> <u>Claims Against ProExcavation or KDC.</u>

The Complaint does not allege, nor could it, that Debtor paid for the cost overruns and

should be reimbursed. The whole complaint is predicated on the allegation that the Debtor

should not be responsible for any costs beyond those covered by the construction loans – a

position espoused in Debtor's objection to KDC's proof of claim and which, if it survives KDC's

response thereto, will be litigated in that context. It does not, however, give rise to an

affirmative claim. Debtor's use of the word "assert" is telling. <u>See</u>, <u>e.g.</u>, (Comp., ¶42) (alleging

that defendants are "falsely asserting" unreimbursed construction costs); (¶45) (defendants

"asserted" false and fraudulent cost overruns); (¶50(d)) (Kagan breached contract by "asserting

claims"); (¶64) (Kagan used KDC and ProExcavation to "assert false and fraudulent charges");

(¶71) (defendants are "asserting" fraudulent charges). Debtor even concedes that it understands

that defendants are only seeking to recover "**unreimbursed** construction costs." (Comp., ¶42.)

Simply put, because Debtor never paid the monies allegedly claimed by fraudulent billing, it has

suffered no damages. This is a defect fatal to the Debtor's fraud claim.

Consistent with its obligation to plead with particularity, <u>each</u> defendant is entitled to

know how its acts or omissions damaged Debtor. Though captioned as seeking damages from

"**ALL DEFENDANTS**" (emphasis in the original), the actual pleadings are clear that Count IV

seeks to recover damages only against the Kagans. <u>See</u> <u>id.</u>, ¶65 ("as a result of this fraudulent

conduct by the **Kagans**, the Plaintiff has suffered… damages for which the **Kagans** should be

held liable…".) (Emphasis added). Because the complaint makes no allegation that conduct by

KDC or ProExcavation caused any damage, even if this count somehow survives as against the

Kagans, the fraud count must be dismissed as against KDC and ProExcavation.

### c) There is No Allegation of Detrimental Reliance.

Debtor has also failed to plead any acts in reliance on the allegedly fraudulent billing.

This is not surprising because Debtor never paid those bills and alleges that it did not even know

about the alleged cost overruns until months after completion of the Project when it received

counsel's May, 2015 letter and the subsequent mechanics lien.  Standing alone, Debtor's failure

to plead any reliance on the allegedly false assertion of additional charges is fatal.  See Sebago,

Inc. v. Beazer E., Inc., 18 F. Supp. 2d 70, 95 (D. Mass. 1998) (plaintiff must "plead reliance with

particularity."); Lambert v. Leary, No. 05-3422, 2006 Mass. Super. LEXIS 63, at *12 (Feb. 14,

2006) (plaintiff's fraud claim failed because, inter alia, he failed to plead reliance); see also

Collins v. Huculak, 57 Mass. App. Ct. 387, 389 (2003) (fraud claim failed because could not

establish justifiable reliance).  Moreover, far from detrimental reliance, if anything, the facts pled

demonstrate beneficial reliance.  Debtor sold the homes built by KDC, which sales were

conditioned the sale of those homes on KDC providing a builder's warranty[17], and approved by

this Court.  For all these reasons, Debtor's fraud count fails as a matter of law.

### 2) FRAUDULENT EXECUTION OF THE LISTING AGREEMENT.

The second alleged fraud is that Kagan, with the supposed complicity of Ms. Kagan,

fraudulently executed one listing agreement in August, 2014 and a second one in April, 2015

despite having no authority to do so.  (Comp., ¶¶60-63).  Debtor pleads that because she is

"married and business partners" with Kagan, "[u]pon information and belief, Tatiana Kagan

knew that her husband did not have authority to sign either of the listing agreements."  (Id., ¶¶33,

---

[17] See ¶22 of Purchase and Sale Agreement annexed to trustee's motion to sell [*Docket No. 67*] and Exhibit A to Purchase and Sale Agreement annexed to trustee's motion to sell [*Docket No. 75*].

63).  Without articulating which information it relies upon or how it forms its belief, Debtor

makes a quantum leap to equate a potentially unauthorized signing with a fraudulent signing.

The Court should view this conclusory allegation with appropriate skepticism.  As to KDC and

ProExcavation, the issue of the listing agreement is irrelevant.

> a)   The Complaint Fails to Allege Any Detrimental Reliance on the
>       Listing Agreements.

Nowhere in the Complaint is there any allegation of reliance by the Debtor on the

allegedly fraudulently executed listing agreements.  In fact, Debtor admits that it did not even

find out about the August, 2014 agreement until receiving a copy at the state court injunction

hearing in June, 2015.  (Id., ¶¶37, 39).  As to the agreement executed in April, 2015, Debtor's

whole premise is that it knew nothing about it.  Accepting Debtor's allegations as true, it is hard

to imagine how the Debtor changed its position in reliance on agreements that it did not even

know existed. The absence of any reasonable reliance is fatal to the fraud claim.  See Masingill

v. EMC Corp., 449 Mass. 532, 541 (2007) (plaintiff could not establish the necessary element of

reasonable reliance upon alleged oral misrepresentations that contradicted the terms of the

written contract); see also Sebago, Inc., 18 F. Supp. 2d at 95; Collins, 57 Mass. App. Ct. at 389.

Accordingly, the claim should be dismissed.

> b)   Debtor Sustained No Damages From the Execution Of The Listing
>       Agreement.

In addition to the lack of any reliance, there is no allegation that Debtor sustained any

damage as a result of the unauthorized listing agreements.  In fact, far from sustaining damage,

Century 21 produced one of the eventual buyers and, with the assent of Debtor, received a

commission for its efforts.  If anything, Debtor benefitted because the "unauthorized" listing

agreement resulted in a sale.  The lack of any damage is fatal to the claim.

     c) <u>Debtor Has Ratified the Listing Agreements And Should Be Estopped
from Contesting Them.</u>

Post-Petition, Debtor moved to reject the listing agreements as executory contracts.

When Century 21 produced an offer for one of the homes, Debtor accepted the offer and paid the

commission due.  In so doing, Debtor effectively ratified the very agreement that it now claims

was unauthorized.  <u>See</u> <u>Linkage Corp. v. Trs. of Bos. Univ.</u>, 425 Mass. 1, 18,  204 (1997)

("Where an agent lacks actual authority to agree on behalf of his principal, the principal may still

be bound if the principal acquiesces in the agent's action, or fails promptly to disavow the

unauthorized conduct after disclosure of material facts.").  Ratification is particularly likely when

a principal accepts a benefit flowing from the allegedly unauthorized agreement.  <u>See</u> <u>Colony of

Wellfleet, Inc. v. Harris</u>, 71 Mass. App. Ct. 522, 529 (2008) ("If the principal benefits from the

unauthorized act, ratification may be implied pretty quickly from the lapse of time.") (internal

quotations omitted).  Having accepted the benefit of the listing agreement the Debtor should not

now be permitted to reverse course and should be estopped from challenging it.  <u>See</u> <u>Cont'l Ins.

Co. v. John Alden Transp. Co.</u>, 1981 Mass. App. Div. 89, 1981 Mass. App. Div. LEXIS 61

(Mass. App. Div. 1981) ("Ratification may be made by accepting the benefits of the

agreement."), citing <u>DiLorenzo v. Atlantic National Bank of Boston</u>, 278 Mass. 321, 327 (1932);

<u>Boice-Perrine Co. v. Kelley</u>, 243 Mass. 327, 330, 331 (1923).

    II.    <u>DEBTOR'S CLAIMS ARE BASED UPON THE "ASSERTION" OF CLAIMS
WHICH ARE PROTECTED BY THE LITIGATION PRIVILEGE AND THE
MASSACHUSETTS ANTI-SLAPP STATUTE, M.G.L. C. 231, §59H.</u>

As established above, Debtor has suffered no damages from any of Defendants' alleged

malfeasance.  Instead, its "harm" is wholly drawn from Defendants' "assertion" of claims, which

occurred in form of a letter from Kagan's counsel and assertion of an allegedly improper

mechanics lien.  This conduct is not actionable as a matter of law.

### a. Assertions in Counsel's May 7, 2015 Letter.

The assertions in counsel's May 7, 2015 letter cannot form the basis for any actionable conduct as they are protected by the litigation privilege. "Under Massachusetts law, an attorney's statements are absolutely privileged 'where such statements are made by an attorney engaged in his function as an attorney whether in the institution or conduct of litigation or in conferences and other communications preliminary to litigation.'" Blanchette v. Cataldo, 734 F.2d 869, 877 (1st Cir. 1984), quoting Sriberg v. Raymond, 370 Mass. 105, 109 (1976). This doctrine is motivated by "the public policy of permitting attorneys complete freedom of expression and candor in communications in their efforts to secure justice for their clients." Meltzer v. Grant, 193 F. Supp. 2d 373, 377 (D. Mass. 2002) (quotation omitted). The privilege is a general bar to all civil liability based upon an attorney's statements, and it applies even if the offensive statements were uttered maliciously or in bad faith. Doe v. Nutter, McClennen & Fish, 41 Mass. App. Ct. 137, 140 (1996). Thus, the letter from counsel and assertion of claims therein cannot give rise to any liability and should be disregarded.

### b. "Damages" Based on Defendants' Petitioning Activity.

Given that counsel's letter cannot form the basis for this lawsuit, this leaves the sole assertion of the "fraudulent" claims through KDC's recording of the mechanics lien. The assertion of a mechanics lien, however, is a petitioning activity protected by the Massachusetts anti-SLAPP statute and therefore also cannot form a proper basis for suit. M.G.L. c. 231, §59H.

A "petitioning activity" is broadly defined as:

> any written or oral statement made before or submitted to a legislative, executive, or judicial body, or any other governmental proceeding; any written or oral statement made in connection with an issue under consideration or review by a legislative, executive, or judicial body, or any other governmental proceeding; any statement reasonably likely to encourage consideration or review of an issue by a legislative, executive,

> or judicial body or any other governmental proceeding; any statement
> reasonably likely to enlist public participation in an effort to effect such
> consideration; or any other statement falling within constitutional
> protection of the right to petition government.

M.G.L. c. 231, §59H (emphasis added).  Recording a mechanics lien is a statutory right and a

prerequisite to filing suit to secure the payment of monies due for construction projects.  See

M.G.L. c. 254, §2.  Without question, it is a "petitioning activity" as a statement "reasonably

likely to encourage consideration or review of an issue by a …judicial body."  See  M.G.L. c.

231, §59H; F.W. Madigan Company, Inc. v. 89-93 Main Street, LLC, 23 Mass. L. Rep. 645,

2008 Mass. Super. LEXIS 91 (Hampshire Superior Court, Docket No. 07-00111, Feb. 13, 2008,

Rup, J) ("the filing of a mechanic's lien with the registry of deeds is permitted, by statute, as a

way for an aggrieved party to seek redress, see G.L. c. 254, and is 'petitioning activity' protected

by the Anti-SLAPP statute…"); see also Bargantine v. Mechs. Coop. Bank, Civil Action No. 13-

11132-NMG, 2013 U.S. Dist. LEXIS 169284, at *7-8 (D. Mass. Nov. 26, 2013) (the First Circuit

recognizes state Anti-SLAPP statutes as a substantive right that may be raised in federal court).

The filing of the Complaint seeking damages caused by an allegedly improper recording of a

mechanics lien is a clear violation of the anti-SLAPP statute.  Accordingly, the Complaint must

be dismissed and attorneys' fees awarded.  See M.G.L. c. 231, §59H (award of attorneys' fees

mandatory upon dismissal of claims).

### III.  DEBTOR HAS FAILED TO PROPERLY PLEAD A CLAIM FOR CIVIL CONSPIRACY.

Count V alleges, in conclusory fashion, that "Defendants have conspired to defraud the

Company."  (Comp., ¶67).  Because the claim, on its face, is based in fraud, this claim too fails

to meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure and violates the

anti-SLAPP statute for all the same reasons discussed above.  Additionally, Debtor fails to allege

sufficient facts to state a viable conspiracy claim.  As discussed below, Debtor must allege that

all of the Defendants acted in concert to harm Debtor pursuant to some type of underlying

agreement between them.  This is never pled, and, other than a vague conclusory allegation,

nowhere in the complaint is there any description of the alleged underlying agreement.

Massachusetts recognizes two different theories of civil conspiracy.  First, there is a

"very limited cause of action" for a coercive type of civil conspiracy.  Aetna Cas. Sur. Co. v.

P&B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994).  To establish a claim civil conspiracy

through coercion, a "plaintiff must allege that Defendants, acting in unison, had some peculiar

power of coercion over plaintiff that they would not have had if they had been acting

independently."  Id. (internal quotations omitted).  See also Bartle v. Berry, 80 Mass App. Ct.

372, 383-84, rev. denied 460 Mass. 1116 (2011).  Debtor has not alleged that Defendants have

any "coercive" power over them.  Therefore, if this is the basis for the conspiracy count, it fails.

The other form of civil conspiracy "is more akin to a theory of common law joint liability

in tort."  Aetna Cas. Sur. Co., 43 F.3d at 1564.  It requires "a common design or an agreement,

although not necessarily express, between two or more persons to do a wrongful act and, second,

proof of some tortious act in furtherance of the agreement."  Id.  Debtor's complaint is woefully

inadequate in this respect.  The totality of the "facts" supporting the conspiracy claim amount to

a generic, conclusory-based statement that Defendants "conspired" to "defraud" the Debtor.  See

Comp., ¶67.  Mere labels and conclusions are not sufficient to withstand a motion to dismiss

pursuant to Mass. R. Civ. P. 12(b)(6).  See Twombly, 550 U.S. at 545; Iqbal, 556 U.S. at 681.

What exactly was the agreement between the defendants and what predicate acts did each

defendant take in furtherance of that agreement?  The Court and Defendants should not be forced

to speculate in order to cobble together a viable conspiracy claim.  For these reasons, Count V

should be dismissed.

IV. <u>A PRIVATE DISPUTE SUCH AS ALLEGED IS NOT COGNIZABLE UNDER
CHAPTER 93A.</u>

In Count VI, the Debtor claims that the defendants violated Chapter 93A.  The law is well

established, however, that Chapter 93A does not apply to disputes between parties to a joint

venture.  <u>See</u> <u>Zimmerman v. Bogoff</u>, 402 Mass. 650, 662 (1988) (Chapter 93A does not apply to

dispute between shareholders of close corporation); <u>Riseman v. Orion Research, Inc.</u>, 394 Mass.

311, 313-14 (1985) (Chapter 93A does not apply to disputes between shareholder and

corporation regarding internal governance matters).  <u>Latucca v. Robsham</u>, 442 Mass. 205, 209

(2004); <u>Szalla v. Locke</u>, 421 Mass. 448, 451 (1995).

As to Kagan, there can be no question whatsoever that the instant action is a private

dispute and therefore outside of the purview of Chapter 93A.  Thus, the Chapter 93A claim as

against Kagan must be dismissed.  To the extent that liability against all other defendants is

predicated on some poorly articulated theory that they are somehow alter egos of Kagan, the

same analysis applies. As stated in <u>Lattuca</u>:

> Chapter 93A does not apply to internal disputes between parties who
> associated "in the interests of forming a business venture together." <u>Szalla
> v. Locke,</u> 421 Mass. 448, 451-453 (1995) (parties who serve different
> roles in formation of business are involved in "same venture" so long as
> they contributed to project). Interaction among parties involved in the
> same venture are "private" and therefore outside the scope of G. L. c. 93A,
> which is meant to recognize trade or commerce between separate entities
> where the public or other business persons or entities may be affected. <u>See
> Newton v. Moffie,</u> 13 Mass. App. Ct. 462, 469 (1982).

<u>Lattuca</u>, 442 Mass. at 209.

Moreover, to the extent that the Chapter 93A claim is predicated on fraud, it too must be

dismissed for failing to plead with particularity.  <u>See</u> <u>Zak Law Offices, P.C. v. Reed</u>, No. CIV.A.

10-10333-LTS, 2010 WL 2802068, at *4 (D. Mass. July 13, 2010) ("Reed's claim, albeit brought pursuant to M.G.L. c. 93A, is a claim for fraud, and as such it must satisfy the heightened pleading standards applicable to such claims under Fed. R. Civ. P. 9(b)."). Finally, for the same reasons as articulated above, the Chapter 93A claim also violates the anti-SLAPP statute. Accordingly, the Chapter 93A claims fail and Count VI should be dismissed.

V.    COUNTS II AND III ALLEGING BREACH OF FIDUCIARY DUTY AND "AIDING AND ABETTING" BREACH OF FIDUCIARY DUTY FAIL AS A MATTER OF LAW.

Count II alleges that Kagan breached the fiduciary duty he owed to the Debtor. (Comp., ¶¶52-55). Count III seeks recovery against all other defendants for the alleged aiding and abetting Kagan's breach of fiduciary duty. (Comp., ¶¶56-58). As with Debtor's other claims, Counts II and III are stated in a conclusory fashion. These claims offer nothing more than "labels and conclusions" that are insufficient to satisfy the pleadings standards set forth in Twombly, supra and Iqbal, supra .

Count III must also be dismissed because Debtor fails to allege the necessary elements to support a claim for aiding and abetting breach of fiduciary duty. "[T]he tort of aiding and abetting a fiduciary breach are: (1) there must be a breach of fiduciary duty, (2) the defendant must know of the breach, and (3) the defendant must actively participate or substantially assist in or encourage the breach to the degree that he or she could not reasonably be held to have acted in good faith." Arcidi v. Nat'l Ass'n of Gov't Employees, Inc., 447 Mass. 616, 623-24 (2006). Even assuming, *arguendo,* that Kagan breached his fiduciary duty, no facts are alleged to establish that each of the other defendants knew of the breach and actively participated or substantially assisted in or encouraged the breach to the degree that she or it could not reasonably be held to have acted in good faith. The lack of any allegation as to specific conduct by KDC

and ProExcavation is noteworthy. Because Debtor failed to allege facts satisfying these elements, Count III must be dismissed.[18]

## VI.  THE BREACH OF CONTRACT COUNT SHOULD BE DISMISSED.

Count I is predicated on a breach of the Operating Agreement.  The Complaint lists six discrete events that Debtor claims constitute a breach of the Operating Agreement.  None of these alleged breaches caused any damage, many do not even constitute a breach, and none state a claim.

### a)  Failing to complete construction of the new homes on time. (Comp., ¶50(a)).

The Operating Agreement does not state a date for completion of construction.  Section 5.2 mandates that "substantial completion" occur by March 30, 2014.  "Substantial completion" is an undefined term but is certainly something less than final completion.  Debtor does not make any allegation regarding failure to timely achieve substantial completion.  Without more, the allegation that final completion did not timely occur does not state a claim for breach of contract. Moreover, Debtor fails to allege any damage caused by the allegedly late completion.

### b)  Signing the Listing Agreements Without Authority.  (Comp., ¶50(b)).

The Operating Agreement does not give exclusive authority to the managing members to enter into listing agreements.  It does provide that the managing member's non-exclusive authority shall include engaging brokers.  Ex. B (Op. Agr., §6.1).  The fact that Kagan allegedly entered into an unauthorized brokerage agreement may be actionable on other grounds, but it is not a breach of the Operating Agreement.  Moreover, as discussed, supra, there is no damage and the listing agreement was ratified.

---

[18] When reviewing the identical complaint, the state court dismissed the conspiracy count as wholly duplicative of the aiding and abetting breach of fiduciary duty count.  See Ex. E  at 4; Young v. Wells Fargo Bank N.A., 717 F.3d 224, 236-37 (1st Cir. 2013).

c) <u>Signing a contract with KDC Without Submitting it for Review to the Other Members (Comp., ¶50(c))</u>.

The Operating Agreement specifically delegates the responsibility for completing the construction to Kagan. Ex. B (Op. Agr., §5.2). Filippov concedes that he monitored all withdrawals from the Debtor's account. Nowhere does the Operating Agreement require approval of all construction contracts by the other members or submission of construction receipts to Filippov before payment. In fact, Debtor concedes that Kagan was given check-writing authority. (Comp., ¶21). Moreover, since Debtor accepted the construction services bestowed upon it by KDC, demanded that KDC provide a builder's warranty as a condition of the sale approved by this Court, and reaped a benefit by selling the homes, there is no damage.

d) <u>Asserting Claims for unauthorized, untimely and unsubstantial cost overruns. (Comp., ¶50(d))</u>.

As discussed above, "asserting" a claim is not actionable. Moreover, <u>Kagan</u> did not assert any claims for costs overruns, etc. Those claims were asserted by KDC, and KDC is not a party to the Operating Agreement. There are no facts asserted that would allow this Court to determine that KDC was some sort of an alter ego of Kagan. Moreover, because no payment has been made for these "asserted" claims there is no damage.

e) <u>Double billing and falsifying claims. (Comp., ¶50(e))</u>

As discussed above, the Operating Agreement does not speak to billing or construction costs. Moreover, as with the alleged cost overruns, it is KDC, not Kagan who has asserted claims for construction costs. KDC is not a party to the Operating Agreement. Mere assertion of a claim is not actionable, and certainly not as a breach of the Operating Agreement. As noted, these claims were never paid and therefore there is no damage.

f) <u>Refusing to pay carrying costs when the homes did not sell within 23 months.</u>

The Debtor bore responsibility for paying carrying costs for the first 23 months after property acquisition. (Ex. B, Op. Agr. §8.1).   The Operating Agreement obligated Debtor to obtain a loan that would cover construction <u>and</u> carrying costs.  (<u>Id.</u>, §4.1).  The bank loan obtained by Filippov for the Debtor, in breach of the obligations under the Operating Agreement, restricted the use of the loan proceeds for construction costs only.[19]  Therefore, the loan could not be used to pay carrying costs.  As a work-around, Kagan arranged for KDC to front the carrying costs as an expense of construction.  If the homes did not sell within that first 23 months, the obligation to pay carrying costs shifted from the Debtor to Kagan, followed by Filippov, who would responsible for ongoing payment of carrying costs thereafter. (<u>Id.</u> at §8.1).  Debtor simply does not want to give Kagan any credit for arranging to pay the carrying costs despite the fact that the Debtor was in breach for failing to pay those costs directly during the first 23 months.  Compounding Debtor's breach, Filippov too refused to pay carrying costs after December 2015, thereby breaching his own obligations under the Operating Agreement.  At a minimum, Debtor's breach of its own obligation to pay carrying cost, from the outset, excuses Kagan's obligation to perform even was one to disregard that he, in fact, arranged for payment carrying costs months before he had any legal obligation to do so.  <u>See</u> <u>Ward v. Am. Mut. Liab. Ins. Co.</u>, 15 Mass. App. Ct. 98, 100 (1983) ("It is well established that a material breach by one party excuses the other party from further performance under the contract.").   Moreover, to the extent the properties sold resulting in a surplus for the equity holders and Filippov has filed a proof of claim seeking to recover his equity interest and his alleged outlay of carrying costs, there is no damage.

---

[19] A copy of the construction loan restriction is annexed hereto as **Exhibit F**.

VII.     <u>THE REQUEST FOR DECLARATORY RELIEF CANNOT BE GRANTED.</u>

In its prayer for relief, Debtor seeks a declaratory judgment "voiding the claims filed by each of the Defendants." This seems a vestige from the amended complaint filed in state court which had a count for declaratory judgment. Because there is no longer a count for declaratory judgment, this Court cannot provide the relief sought by this prayer.

<u>CONCLUSION</u>

Based upon the foregoing, Defendants respectfully request that Debtor's Complaint be dismissed.

VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC, CORP. and
PROEXCAVATION CORP.

By their attorneys,

/s/ Christopher M. Candon, Esq.
Christopher M. Candon (BBO# 650855)
John H. Perten (BBO# 548728)
SHEEHAN PHINNEY BASS & GREEN, P.A.
255 State Street, Fifth Floor
Boston, MA 02109
(617) 897-5600
ccandon@sheehan.com
jperten@sheehan.com

Dated:  August 26, 2016