UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| IN RE: | ) | |
| | ) | |
| LYMAN-CUTLER, LLC | ) | Chapter 11 |
| Debtor | ) | Case No. 15-13881 FJB |
| | ) | |

| | | |
|---|---|---|
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | Adv. Case No. 1:16-ap-01120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, TATIANA KAGAN, | ) | |
| KAGAN DEVELOPMENT KDC, CORP. and | ) | |
| PROEXCAVATION CORP. | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION TO DISMISS

Defendants' motion to dismiss is riddled with glaring omissions, half-truths, and distorted

facts – many of which are extrinsic to the pleadings and improperly injected into this stage of the

proceedings.  For example, the Defendants complain that they cannot properly defend the fraud

claim because the Adversary Complaint does not identify the "unnamed" witnesses who will

testify to the Defendants' fraud.  *See* Defendants' Memo (Doc. 14) at 8, 13.  The truth is that the

Plaintiffs have long since not only identified these witnesses, but produced signed affidavits by

each of them.[1]  Another example is the Defendants' contention that claims were "dismissed" in

---

[1]    Attached as **Exhibit A** hereto are the signed affidavits that were produced to the
Defendants' counsel.  Defendants' counsel has had this information for nearly a year, so its claim
that they are hampered by "unnamed witnesses" is disingenuous at best.

1

the state court litigation – the dismissal of two claims only was **without prejudice** and in no way cut back the gravamen of Plaintiffs' case; the state court **denied** the Defendants' motion with regard to all but two of the counts.  A copy of the state court decision is attached for the Court's convenience as **Exhibit B** hereto.  The Defendants, and not the Plaintiffs, seek multiple bites of the same apple.

Defendants' legal arguments are baseless.  The Complaint details the Defendants' fraudulent scheme to induce the Lyman-Cutler, LLC's (the "LLC") members to invest in the project, only to have the Defendants intentionally charge the LLC with false and fraudulent cost overruns that were designed for the sole purpose of lining the pockets of Defendant Vadim Kagan ("Kagan") and his family through the operation of one of his several construction companies, and by granting his wife, Defendant Tatiana Kagan ("Tatiana"), an exclusive listing agreement that both knew was never authorized by the LLC or its Managing Member, Alex Filippov ("Filippov").  This fraudulent scheme culminated in the filing of a fraudulent mechanics' lien, which forced the LLC into bankruptcy and caused it to sell the LLC's only two assets at a significant discount.  The Complaint more than adequately pleads the claims against each Defendant and the Court should deny their motion in all respects.

## FACTS

### *The Company*

Kagan is an experienced real estate developer.  In 2012, he approached Filippov and a mutual acquaintance, Nickolay Lipetsker ("Lipetsker"), with a proposal to invest in a real estate development project he planned for a property in Brookline, Massachusetts.  *Adversary Complaint ("Cmpt.")*, ¶ 9.  The project included purchasing a plot of land, razing the existing home, subdividing the property in two, and constructing a brand new luxury home on each

subdivided parcel (the "Project"). *Id.*, ¶ 10. To induce Filippov and Lipetsker to invest in his

project, Kagan knowingly presented a false budget and forecast of estimated returns (the "Kagan

Presentation"). *Id.*, ¶ 12. The Kagan Presentation represented that the homes would be built on

a fixed cost for each home, with a $75,000 contingency for cost overruns. *Id.*, ¶ 13. The

$75,000 contingency was later increased to $100,000 for each home, but there was never any

deviation from a fixed cost arrangement. *Id.*

Both Filippov and Lipetsker, as representatives of the LLC, reasonably relied on Kagan's

Presentation when deciding to invest and undertake the Project. *Id.*, ¶ 15. Filippov agreed to

invest $2 million. *Id.* Lipetsker and Kagan each agreed to invest $250,000. *Id.*; *Operating*

*Agreement*, Schedule A, attached as <u>Exhibit B</u> to the Defendants' motion.

In November 2012, the three investors formed the LLC for the purpose of completing the

Project. *Id.*, ¶ 17. In exchange for their respective investments, Filippov received an 80%

interest in the LLC, and Kagan and Lipetsker each received 10%. *Id.* As the majority owner,

Filippov was named the LLC's Manager. *Cmpt.*, ¶ 16; *Operating Agreement*, p. 13 ("Alex

Filippov, Managing Manager").[2] The Operating Agreement vested Filippov, as the Manager,

with the overall "management and control of the operations of the [LLC]," which powers "shall

include, but not be limited to," the authority to:

- engage, dismiss, and replace, personnel, including attorneys and brokers;

- execute all contracts; and

- "to take such other actions and incur such reasonable expenses on behalf of the
  Company as may be necessary or advisable in connection with the conduct of the
  affairs of the Company"

---

[2]     The reference to "Managing Manager" as opposed to "Managing Member" is clearly a
typographical error. The Defendants' insistence that it means something different is absurd.

*Operating Agreement*, § 6.1(a) and (b)(1), (2), (3), and (5); *Cmpt.*, ¶ 16.

Before construction began, Kagan persuaded Filippov to increase the amount of funds

that the LLC would need to borrow by $200,000 for a total final budget of $1.5 million for each

home, with a $100,000 contingency for additional carrying costs.  *Cmpt.*, ¶¶ 17-18.  Based on

Kagan's revised budget, the LLC borrowed a total of $4.8 million ($1.6 million for the

construction and carrying costs of each property and to finance the balance of the land's

purchase price).  *Id.*, ¶ 19.

At no time since October 25, 2012 did Kagan ever provide an updated budget or forecast

for the costs of the project.  *Id.*, ¶ 20.  At no time during construction of the homes did Kagan

ever tell either Filippov or Lipetsker that there were any cost overruns on either of the houses.

*Id.*  As recently as April 2015, a full six (6) months after construction was completed, Kagan

expressly told the LLC (through Mr. Filippov) that the construction and carrying costs for the

two homes were within budget.  *Id.*

Under the express terms of the Operating Agreement, Kagan was responsible for

completing construction of the two new homes no later than March 30, 2014, so that the

properties could be sold no later than November 2014 for a projected selling price of $4.9

million each.  *Id.*, ¶¶ 23, 28.  Although Kagan, through his construction company, Defendant

Kagan Development KDC, Inc. ("KDC"), failed to complete construction by this mandated

deadline, and failed to provide Filippov and the LLC with any backup of its purported

construction costs, Kagan continuously insisted throughout the construction process that the

projects were within the forecasted budget.  *Id.*, ¶¶ 20, 23-25.

Meanwhile, throughout the life of the project, Kagan had check-writing authority on the

LLC's bank account and drew down funds from the account at will.  *Id.*, ¶ 21.  Although the

4

LLC, through Filippov, attempted to monitor the withdrawal of these funds and tried to keep the

books for the Project, Kagan failed and refused to provide any invoices, receipts, or other

documentation for his withdrawals from the account.  *Id.*  During construction, Kagan drew

down essentially all of the $3.2 million borrowed by the LLC, with the lion's share of this being

paid to KDC, one of his other companies, ProExcavation Corp. ("ProExcavation"), and Kagan's

long-time subcontractors.  *Id.*, ¶ 22.

*The Unauthorized Listing Agreements*

Kagan's wife, Tatiana, is a real estate agent for Century 21 Commonwealth, as well as an

officer and director of KDC and ProExcavation.  *Id.*, ¶ 26.  When the LLC was formed, Filippov

agreed to list the properties for sale with Tatiana **until December 31, 2014**.  *Id.*, ¶ 27; *Operating

Agreement*, § 6.1(b)(6).  Under the express terms of the Operating Agreement, Filippov had the

authority to unilaterally remove Tatiana as the listing agent any time after this date.  *Id.*, §

6.1(b)(6).

Despite knowing that the LLC had agreed to list the Properties for sale for $4.9 million

each, Tatiana and Kagan agreed, without consulting Filippov or Lipetsker, that she would set the

selling price at $5.49 million, nearly $600,000 higher than had been authorized.  *Cmpt.*, ¶ 28.  In

or about March 2015, she received an offer of $4.5 million for one of the properties.  *Id.*, ¶ 29.

Tatiana never informed Filippov of this offer and, working solely with her husband, countered at

$5 million, causing the buyer to look elsewhere.  *Id.*, ¶¶ 30, 34.

By April 2015, with neither home yet sold, and with little to no marketing being utilized,

Kagan asked Filippov to sign a new listing agreement to permit Tatiana to continue to serve as

the listing agent.  *Id.*, ¶ 31.  Exercising his right under Section 6.1(b)(6) of the Operating

Agreement, Filippov refused and stated his intention to engage an alternative broker.  *Id.*

5

However, without any authority, and with actual knowledge that Filippov had refused to sign the listing agreement, and that Tatiana was only authorized to list the properties until December 31, 2014, Kagan fraudulently signed a listing agreement purportedly on the LLC's behalf, purporting to grant Tatiana an 18-month exclusive listing. *Id.*, ¶¶ 32, 37. Tatiana knew that her husband lacked authority to sign this agreement, that Filippov, the individual that did have authority, had refused to sign it, and that her authorization to market the properties had already expired. *Id.*, ¶¶ 33, 37.

*The Fraudulent Cost Overruns*

On May 7, 2015, Kagan's counsel wrote to Filippov fabricating claims that it was Filippov, and not Kagan, who had refused to lower the asking price. *Id.*, ¶ 36. He also declared for the first time that there were significant cost overruns on the Project that exceeded **$1 million**. *Id.*, ¶¶ 38-39. Kagan and Tatiana sent this letter (through counsel) knowing that Tatiana had procured an unauthorized listing agreement from the Company and knowing that the demands made therein would engender a dispute with Filippov and Lipetsker. *Id.*, ¶ 36.

On June 5, 2015, the LLC filed a lawsuit against the Defendants in state court. *Id.*, ¶ 37. Prior to answering the Complaint, on June 22, 2015, Kagan caused his company, KDC, to file a mechanics lien against the LLC's properties, asserting in this lien that KDC was owed ***$2,095,985.23***, nearly triple the amount he had asserted when he claimed unreimbursed construction costs of $758,025.56 just six weeks earlier in May 2015. *Id.*, ¶ 41. The amounts claimed due, which somehow tripled in a six-week period some eight months after construction was completed, and which had never previously been reported to the LLC, are false and fraudulent, and purportedly arise out of a written contract between the LLC and KDC, which Filippov, as the Managing Member, never saw, approved, or signed. *Id.*, ¶ 42.

Kagan's fraudulent cost overruns are no mere accident.  They are part of a scheme designed to defraud Filippov and Lipetsker.  Indeed, the LLC and its members have interviewed several witnesses who are former investors in Kagan's projects.  *Cmpt.*, ¶ 43.  All of them report that they have experienced the same type of fraudulent conduct by Kagan that the LLC has experienced.  *Id.*  Specifically, multiple witnesses report that Kagan presented them with a budget at the outset of the project, assured them that everything was within budget during and after construction, and then, contrary to his prior representations, announced extensive cost overruns shortly before the homes were sold and threatened to file a lien unless his former investors agreed to the payment of these last minute cost overruns.  *Id.*  The LLC has also learned from Kagan's former bookkeeper that Kagan uses ProExcavation as a vehicle to double-bill expenses to his projects, mixes expenses for projects on his credit card, pockets for himself returns received on unused materials, and receives kickbacks from some of his subcontractors.  *Id.*, ¶ 44.  Kagan, KDC, and ProExcavation use these extortionate tactics to intentionally mislead investors and to wrongfully force them to pay falsified and fraudulent charges.  *Id.*, ¶ 44-46.  This is precisely the scheme Kagan, KDC, and ProExcavation deployed here.  *Id.*

The fraudulent scheme set forth above ultimately forced the LLC to file for bankruptcy protection and sell the two homes at a significant discount.  *Id.*, ¶ 45.

## ARGUMENT

### I.    The LLC Has Sufficiently Plead A Claim of Fraud Against the Defendants

Defendants willfully mischaracterize the fraud claims against them, which they understand perfectly well.  The fraud alleged in the Adversary Complaint encompasses a comprehensive, fraudulent scheme, in which Vadim and Tatiana Kagan and Kagan's companies all participated.

7

**A.  The Defendants Have Repeated and Comprehensively Engaged in Fraud.**

The Defendants' comprehensively fraudulent conduct encompasses several different species of fraud.  The Complaint identifies each fraudulent act with the requisite particularity.  The purpose of Fed. R. Civ. P. 9(b) is simply to give the Defendants fair notice of the claims against them and ensure "the defendant is sufficiently informed of the misconduct of which he is charged." *Kaufman v. Magid*, 539 F. Supp. 1088, 1093 (D. Mass. 1982).  The Complaint here more than sufficiently informs the Defendants of the misconduct with which they are charged.

First – the facts and evidence support the conclusion that Kagan defrauded the LLC, Filippov and Lipetsker from the outset by knowingly and intentionally presenting a budget that Kagan had no intention of honoring.  *See Cmpt.*, ¶¶ 12-15, 34-35, 41, 43.  Kagan's established pattern of cheating his investors in precisely the same way, it is fair to conclude – and the allegations of the Complaint allege – that he committed from at the outset of the project.  *See Id.*, at ¶ 43.

Second, the Complaint clearly alleges that Kagan has engaged in fraudulent billing through his companies/co-Defendants KDC and ProExcavation.  *Id.*, at ¶¶ 35-36, 43-47, 50, 64, 71.  When all of the Defendants' rhetoric is set aside, the Defendants' primary challenge is that the LLC has failed to identify specifically which charges are fraudulent.  The Defendants, however, have not pointed to a single authority which requires this level of specificity to apply to the allegations of a complaint.  The heightened pleading standard set forth in Rule 9(b) is not the equivalent of an interrogatory demanding the plaintiff to state the entire factual basis for its allegations. *Bielski v. Cabletron Sys. (in Re Cabletron Sys.)*, 311 F.3d 11, 33 (1st Cir. 2002) ("this court has said repeatedly that the rigorous standards for pleading securities fraud do not require a plaintiff to plead evidence.  Defendants' argument that even more detail be required,

before there is any discovery, here amounts to requiring plaintiffs to plead evidence"). That is precisely what discovery is for.[3] The Plaintiffs are investigating which charges are fraudulent and by how much.[4] The Defendants are fully and completely on notice of the nature of the fraudulent billing claim alleged against them.

Third, the Defendants are charged with fraudulently executing self-dealing listing agreements between the LLC and Tatiana Kagan. *Id.*, at ¶¶ 30-34, 61-63. The Kagans executed these listing agreements knowing they did not have authority to do so. *Id.*

Fourth, Kagan caused his company, KDC, to file a knowingly false and fraudulent mechanics' lien against the Properties for over $2 million, forcing the LLC into bankruptcy, causing it to incur needless and extensive legal expenses, and leading to a forced sale of the properties at below market rates. *Id.*, at ¶¶ 41-45.

### B. All of the Defendants Participated in the Fraudulent Scheme.

As the Defendants well know, the claims of fraud are asserted against all of them, and each Defendant's participation in the fraud is identified with particularity. Vadim Kagan orchestrated the entire scheme. *Cmpt.,generally..* He caused KDC to fraudulently overbill the

---

[3]    Without citing to any authority, the Defendants baldly assert that Counts II (breach of fiduciary duty), III (aiding and abetting breach of fiduciary duty), V (conspiracy), and VI (Chapter 93A) are subject to the heightened pleading standard of Rule 9(b). The Appeals Court has ruled that this argument is "border[ing] on frivolous." *United States Funding, Inc. v. Bank Boston Corp.*, 28 Mass. App. Ct. 404, 407.

[4]    Plaintiffs have retained a forensic accountant to investigate the Defendants' books and records, but to date the Defendants have failed and refused to produce their Quickbooks files in native format, which is necessary to perform a proper forensic audit. Nevertheless, although the Plaintiffs submit that the Defendants understand quite well the fraud alleged against them and that further delay is unnecessary, if the Court for some reason believes additional detail is needed, the Plaintiffs can file an amended complaint that provides further detail and respectfully request that if the Court dismisses any count(s), it do so without prejudice and with leave to amend within a reasonable time. *Fed. R. Civ. P. 15.*

LLC and file the fraudulent mechanic's lien. *Id.*, at ¶ 45. ProExcavation also fraudulently

overbilled the LLC and is expressly identified by Kagan's former bookkeeper as a vehicle for

double billing. *Id.*, at ¶¶ 44-45. Tatiana participated in the fraudulent scheme both as an officer

and director of KDC and ProExcavation and as a fraudulently retained real estate agent. *Id.*, at

¶¶ 26-34; *see LaClair v. Silberline Mfg. Co.*, 379 Mass. 21, 29 (1979) ("a corporate officer is

liable for torts in which he personally participated whether or not he was acting within the scope

of his authority").

### C.  Defendants Misapprehend the Scope of the Damages They Have Caused.

The Defendants misapprehend the damages they have caused in their arguments

concerning the Plaintiffs' damages and purported lack of detrimental reliance. "Fraud"

encompasses much more than fraudulent misrepresentation. As explained by Judge Posner of

the 7th Circuit, actual fraud is

> **any deceit, artifice, trick, or design involving direct and active
> operation of the mind, used to circumvent and cheat another**. . . No
> learned inquiry into the history of fraud is necessary to establish that it is
> not limited to misrepresentations and misleading omissions. Fraud is a
> generic term, which embraces all the multifarious means which human
> ingenuity can devise and which are resorted to by one individual to gain
> an advantage over another by false suggestions or by the suppression of
> truth. No definite and invariable rule can be laid down as a general
> proposition defining fraud, and it includes all surprise, trick, cunning,
> dissembling, and any unfair way by which another is cheated.

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (emphasis added); *see also In re:*

*Lawson*, 791 F.3d 214, 220 (1st Cir. 2015) (actual fraud "is not limited to fraud effected by

misrepresentation"). There is no doubt that the Plaintiffs have objected to the cost overruns since

first asserted in May 2015 (long after the completion of construction and after assurances that the

project was on budget). This does not mean that the fraudulent overbilling commenced in May

2015. Kagan controlled the bank account and paid himself during the construction without ever

providing any invoices or other documentation to the LLC, Filippov or Lipetsker.  *Cmpt.*, at ¶¶

21-22.  The LLC (and the bank) suffered a form of forced reliance during construction as Kagan

took money for himself and his companies at will.

But most important, a case of actual fraud does not require proof that one relied on a

fraudulent misstatement.  Otherwise, a fraudulent conveyance could never amount to fraud,

which is simply not correct.  *See e.g., In re: Lawson*, 791 F.3d at 225 (actual fraud includes

fraudulent conveyances); *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 69 (1st Cir. 1999) (same);

*Bailey v. Community Bank of Homewood-Flossmoor*, 145 B.R. 919, 927 (Bankr. N.D. Ill. 1992)

(denying debtor discharge based on actual fraud for his participation in fabricating fraudulent

mechanics' lien); *In re Maher*, 144 F. 503 (D. Mass. 1906) ("In a fraudulent transfer the fraud is

actual, the bankrupt has secured an advantage for himself out of what in law should belong to his

creditors, and not to him").  Asserting a false mechanic's lien is not only fraudulent, but it also

can carry with it criminal penalties.  *See e.g., Cordeck Sales, Inc. v. Construction Sys., Inc.*, 382

Ill. App. 3d 334, 399 (Ill. App. Ct. 2008) ("[w]hen there is evidence that a lien claimant

knowingly recorded a claim that contained a substantial overcharge, the claim will be defeated

on the basis of constructive fraud the effect of his actions is to give an appearance of a greater

encumbrance on the property than that to which he is entitled"); *Marsh v. Mick*, 159 Ill. App. 399

(Ill. App. Ct. 1911) ("in asserting that claim in his petition for a [mechanic's] lien, we think that

O'Meara was guilty of fraud"); *United States v. Joiner*, 418 F.3d 863, 867 (8th Cir. 2005)

(attempting to create fraudulent real estate lien is criminal); *Vasquez v. The State of Texas*, 2008

Tex. App. LEXIS 3948 (Ct. App. Tex. 2008) (affirming 7-year criminal sentence for filing a

fraudulent mechanics' lien).  By fraudulently overbilling, signing false contracts, recording the

fraudulent mechanic's lien (not to mention fraudulent proofs of claim in the bankruptcy

proceeding), Kagan, ProExcavation and KDC essentially fraudulently conveyed the properties'

value to themselves at the expense of Kagan's fellow members.  *See Bailey v. Community Bank*

*of Homewood-Flossmoor*, 145 B.R. 919, 927 (Bankr. N.D. Ill. 1992) ("In effect, the perfection of

the mechanic's lien caused a transfer of all of the Debtor's assets without reservation for

necessities").  This constitutes fraud under any definition.

      With regard to damages, Defendants again (willfully?) misunderstand the consequences

of their actions.  The fraudulent billing practices, false self-dealing contracts, and fraudulent

mechanics' lien together forced the LLC to seek bankruptcy protection and, ultimately, sell off

its two assets at a significant discount.  *See Wilson Farm Cmty. Trust v. Marchegay*, 2014 Mass.

Super. LEXIS 115 (Mass. Super. Aug. 25, 2014) (rejecting defendant's motion for j.n.o.v. on

fraud claim based on purported lack of detrimental reliance when fraudulent request for money

was not paid, holding that "[t]his argument ignores the efforts the plaintiff was forced to

undertake as a result of [the defendant's] fraudulent act, including the request for a temporary

restraining order that set this case in motion."); *see also Restatement (Second) of Torts, § 871*

("One who intentionally deprives another of his legally protected property interest or causes

injury to the interest is subject to liability to the other").  The Plaintiffs seek not merely the

rejection of the Defendants' false proofs of claim, but also damages for the losses suffered as a

result of the Defendants' fraudulent scheme.

### D.  Defendants Tatiana and Vadim Kagan Are Liable for the Fraudulent Listing Agreements.

      The Complaint plainly alleges that Tatiana and Vadim Kagan knowingly and

intentionally entered into fraudulent, self-dealing listing agreements purportedly between the

LLC and Tatiana.  *Id.*, at ¶¶ 26-34.  Defendants' challenge to the Plaintiffs' claims predicated on

this self-dealing are meritless.

The Complaint clearly alleges that Kagan knew that Filippov, who owned 80% of the LLC, was the LLC's Managing Member.  The Operating Agreement, of which Kagan was a signatory, clearly specified that it was Filippov, as the Managing Member, who had the power to "engage, dismiss, and replace personnel . . . ***brokers*** or such other persons as may be deemed necessary or advisable . . .."  *Operating Agreement*, § 6.1(b)(1) (emphasis supplied).  It also provided that Filippov had the unilateral power to remove Tatiana as the listing broker after December 31, 2014.  *Id.*, § 6.1(b)(6).  Contrary to the express terms of the Operating Agreement, Kagan knowingly entered into an unauthorized listing agreement – after Filippov rejected the request – that purportedly provided his wife with the authority to exclusively list the properties for ***18 months***, well after the time permitted in the Operating Agreement and well in excess of any industry norm.  Because the LLC clearly alleges that both Kagan and Tatiana (who was not only his wife but also his business partner) knew that Kagan had no authority to enter into these contracts, it has sufficiently stated a claim for fraud based on the unauthorized listing agreements.

Contrary to the Defendants' assertions, the LLC was damaged by this fraudulent listing.  Based on this fraudulent listing, Tatiana and Kagan initially listed the houses far in excess of what they were worth.  *Cmpt.*, at ¶ 28.  When presented with an offer higher than what the LLC ultimately sold the properties for, Tatiana never informed Filippov of Lipetsker.  *Id.*, at ¶ 29.  Tatiana did little or nothing to market the properties.  *Id.*, at ¶ 31.  Tatiana's lack of diligence caused the properties to languish on the market, caused a significant increase in carrying costs, and ultimately contributed to the bankruptcy filing which further caused a decrease in the home's values.  Tatiana is now asserting additional claims against the LLC for presumably more commissions.  An agent who knows or should know she lacks authority to act for the principal is

liable for damages caused by her unauthorized conduct.  *See Chan v. Chen*, 70 Mass. App. Ct.

79, 85 (2007) ("Violation of an agent's duty against surreptitious self-dealing, regardless of

whether the agent intends to harm the principal, is a breach of the agency relationship. See id. at

comment a, which provides, in relevant part: 'The agent's failure to reveal that he has an interest

in the transaction is sometimes spoken of as fraudulent.'"); *Restatement (Second) of Agency* §§

399(b), 401 (agent who violates duties liable for losses and misuse of property); *Id.* § 403 (agent

liable for violation of duty of loyalty); *Id.* § 404 (agent liable for using principal's property for

own purposes).[5]

Nor is there any merit to the Defendants' argument that the LLC ratified the unlawful

listing agreements.  In the first place, there were two unauthorized listing agreements.  *Cmpt.*, at

¶¶ 32-40.  When Century 21 finally produced an offer for <u>one</u> of the properties, the LLC objected

insofar as any commission was going to be paid.  It ultimately agreed to the sale upon the

express condition, approved by the Court, that "no portion of [Century 21's] commission shall be

paid to Tatiana Kagan."  *See Order Approving Sale*, Doc. 86, ¶ 14.  The LLC is not pursuing any

claim against Century 21 and there was clearly never release of any claim against Tatiana.

(Tatiana, the Court should note, is still pursuing her personal claim for a commission against the

estate.)  The LLC is not seeking return of any commission.  It is seeking damages caused by

being fraudulently forced to retain an incompetent, negligent real estate agent whose dilatory

conduct and breach of her duties led to delayed sale of the properties, increased carrying costs

and a significantly reduced selling price for each.  The LLC has steadfastly maintained that these

---

[5]      As discussed above, "fraud" encompasses more than just a fraudulent misrepresentation
and so the assertion that the Plaintiffs did not "rely" on the listing agreements is a red herring.
Rather, the LLC has been encumbered by them due to the fraudulent, self-dealing execution of
them by the Kagans.

listing agreements are fraudulent, unauthorized, and self-dealing ever since learning of them.

Therefore, the LLC cannot be held to have ratified anything – particularly on a Rule 12(b)(6)

record – and should not be prevented from pursuing the damages the Kagans caused by

participating in this aspect of their fraudulent scheme because of an agreement to a partial

commission to Century 21 on one property.  *See Puritan Med. Ctr. v. Cashman*, 413 Mass. 167,

172-73 (1992) (ratification only occurs where principal has actual or constructive knowledge of

agent's acts and fails to repudiate).

**II.** **The Special Motion to Dismiss Should Be Denied Because The Defendants Have Failed to Show That it Is Based Solely on Petitioning Activity And Because It Arises From Knowingly Fraudulent Conduct.**

The Defendants' motion to dismiss the fraud claim under the anti-SLAPP statute is

meritless for several reasons.  First, the recording of a mechanic's lien is not petitioning activity

within the meaning of G.L. c. 231, § 59H.  The Defendants' contention that the filing of a lien

constitutes "any statement reasonably likely to encourage consideration or review of an issue by

a legislative, executive, or judicial body or any other governmental proceeding" makes no sense.

The recording of a lien is not reasonably likely to trigger any response or consideration of an

issue by any governmental agency – be it the courts, the legislative branch, or even the registry

of deeds.  The registry or the courts are not going to review it for potential enforcement,

investigate whether money is actually owed, or take any other action.  It is a purely

administrative filing that gets publicly filed upon payment of the mandatory fee.  Recording a

lien is no more of a petitioning activity than completing a driver's license application with the

RMV.  Whether the filing is permitted by statute is irrelevant.

Second, even if it was an act of petitioning activity, the anti-SLAPP statute does not

protect petitioning activity that is devoid of reasonable factual support or any arguable basis in

law, which causes actual injury. *G.L. c. 231, § 59H.* This is exactly the situation here and the

Complaint sets forth more than adequate detail. *Cmpt.*, at ¶¶ 20, 34-35 (no notice of cost

overruns until 8 months after construction complete), ¶ 41 (6 weeks later, Kagan files mechanics

lien **trebling** the asserted overruns from 6 weeks earlier), ¶¶ 43-44 (multiple witnesses testify to

being victimized by similar Kagan scheme and Kagan's former bookkeeper testifies to his

double billing and other fraudulent practices). The LLC's allegations that the mechanic's lien

was knowingly fraudulent and in furtherance of a scheme to defraud the LLC and its members

removes it from the reaches of the anti-SLAPP statute. *See Vezina v. Gormley*, 1998 Mass.

Super. LEXIS 718, at *1 (Mass. Super. Ct. Dec. 28, 1998) (denying anti-SLAPP motion to

dismiss where petitioning activity contained knowingly false information).

      Third, the Defendants cannot prevail on their anti-SLAPP argument because they have

failed to demonstrate that claim is based solely on the alleged petitioning activity. *See Duracraft*

*Corp. v. Holmes Prods. Corp.*, 427 Mass. 156, 167-168 (1998) ("The special movant who

'asserts' protection for its petitioning activities would have to make a threshold showing through

the pleadings and affidavits that the claims against it are 'based on' the petitioning activities

alone and have no substantial basis other than or in addition to the petitioning activities.") As

established above, the Defendants' fraud is not limited to the filing of a mechanics' lien. The

fraud is a comprehensive scheme perpetrated by the Defendants. It began with fraudulent

presentation by Kagan to induce Filippov and Lipetsker to invest. It continued with fraudulent

overbilling and the fraudulent, secret, self-dealing execution of the listing agreements with

Tatiana. It perhaps culminated with the fraudulent filing of the mechanic's lien, intended to

extort the Plaintiffs into paying some or all of the fraudulent charges in order to avoid the ruin of

the project.[6]   The filing of the lien was just the last step in the scheme.  *See Mansfield v. Neff*,

2014 Mass. Super. LEXIS 5, at *8 (Mass. Super. Ct. Jan. 22, 2014) (claim not barred by anti-

SLAPP statute where case was "based upon misrepresentations which occurred outside the scope

of petitioning activity").  Accordingly, the Court should deny Defendants' special motion to

dismiss.[7]

## III.    The Conspiracy Claim Is Supported By The Numerous Allegations Set Forth Throughout The Entire Complaint.

Under Massachusetts law, a conspiracy claim requires evidence of "an agreement

between two or more people to do a wrongful act and proof of some tortious act in furtherance of

the agreement."  *Metropolitan Prop. & Cas. Ins. v. Boston Reg. Phys. Therapy*, 550 F. Supp. 2d

199, 202 (D. Mass. 2008).  There can be no question that the Complaint alleges a conspiracy

among the Kagans and their co-defendant Companies.

The Defendants' state, incorrectly and without citation to authority, that each element of

a conspiracy claim based on fraud is subject to the heightened pleading requirements under Fed.

R. Civ. P. 9(b).  This is simply not the case.  In any event, the conspiracy alleged includes

allegations of coercion – the filing of a fraudulent mechanic's lien to force the Plaintiffs to accept

the fraudulent overbilling, but also encompasses much more, as detailed above.  These facts

readily support the assertion of a conspiracy claim.

---

[6]      It continues to this day with fraudulent proofs of claim and phony documentation.

[7]      The Defendants also attempt to isolate the recording of the lien by claiming that the May 7, 2015 letter from its counsel was protected by the litigation privilege.  As there is far more to the fraud claim than just the letter and the lien, the LLC does not believe that the Court need address this argument.  The referenced letter, however, makes no reference to any potential litigation.  The primary focus of the letter is to demand that Filippov agree to reduce the listed price of the home and share in carrying costs, and to inform him that there was allegedly additional money Kagan claimed to be owed.

**IV.     KDC, ProExcavation and Tatiana are Not Members of the LLC and Chapter 93A
Applies To Their Wrongdoing.**

Defendants' challenge to the Chapter 93A claims asserted Count VI is well wide of the

mark.  First, they argue that Chapter 93A does not apply to a "private dispute," and that,

therefore, Kagan is not subject to it.  Defendants' Memo (Doc. 14) at 22.  Plaintiffs agree that

Chapter 93A does not apply to an <u>internal</u> dispute, which is why Kagan is not named as a

Defendant to Count VI.  *Cmpt.*, at 13.[8]

The only attempt Defendants make to argue why Tatiana, KDC, and ProExcavation

should not be subject to the Chapter 93A claim is that it is based on some "poorly articulated

theory that they are somehow alter egos of Kagan."  *Motion to Dismiss*, p. 22.  This is not and

has never been the LLC's theory.  Rather, the LLC is asserting this claim against these

defendants for their own, independently unlawful conduct, including Tatiana's entering into the

fraudulent listing agreements (*Cmpt.*, ¶¶ 32-40, 70), KDC's fraudulent overbilling and filing of a

fraudulent mechanic's lien (*Cmpt.*, ¶¶ 44-45, 72), and ProExcavation's fraudulent charges it

seeks against the LLC (*Cmpt.*, ¶¶ 44-45, 71).

None of these defendants were members of the LLC and, therefore, are not subject to the

"intra-enterprise" exception.  *Linkage Corp. v. Trustees of Bos. Univ.*, 425 Mass. 1, 23 n.33

(1997) ("Included in this 'intra-enterprise' classification are disputes stemming from an

employment relationship, disputes between individual members of a partnership arising from

partnership business, and transactions and disputes between parties to a joint venture and

between fellow shareholders.").  To the contrary, KDC and ProExcavation are separately

---

[8]      There is a stray allegatios involving Kagan in the body of the count.  Count VI is not
asserted against Kagan individually but his misconduct is attributable to KDC and
ProExcavation, as applicable, when he caused each entity to engage in the fraudulent conduct
described in the Complaint.

incorporated businesses that purport to work on a multitude of separate projects. Tatiana is a

career real estate agent employed by Century 21 Commonwealth. They each assert (and base

their entire claims on the allegations) that they entered into arms-length contracts with the LLC

that entitles them to compensation. *Id.*, p. 23 ("The arrangement between Linkage and Boston

University was an arm's-length transaction between two corporations under which Linkage

provided services to Boston University and received compensation."). They are not exempt from

a claim under Chapter 93A.

**V.      The LLC Has Sufficiently Pleaded A Claim for Breach of Fiduciary Duty by Kagan
         and Aiding and Abetting that Breach by the Other Defendants.**

The Defendants offer no real argument as to why Count II --the breach of fiduciary duty

claim (pleaded against Kagan only) -- should be dismissed. One sentence asserting that the

claims are "stated in a conclusory fashion" is, ironically, too conclusory in itself to meet its

burden to offer an argument to dismiss the claim. There can be no genuine dispute that a

member of an LLC who intentionally engages in a self-dealing conspiracy to defraud his two

fellow members by knowingly inflating and fabricating construction charges owed to two

companies he owns and then drives the LLC into bankruptcy has violated his duty of utmost

good faith and loyalty to his fellow members. *See Demoulas v. Demoulas Super Mkts.*, 424

Mass. 501, 529 (1997) ("corporate directors and officers are bound by their duty of loyalty to

subordinate their self-interest to the well being of the corporation"); *NRT New England, Inc. v.

Moncure*, 78 Mass. App. Ct. 397, 402 (2012) (self-dealing is a breach of fiduciary duty). Any

argument to the contrary is absurd.

Count III – aiding and abetting breach of fiduciary duty by Tatiana, KDC and

ProExcavation -- is also sufficiently pleaded. As the Complaint expressly alleges, Tatiana, KDC,

and ProExcavation each knew about Kagan's breach and actively participated in it by fabricating

purported construction charges, and filing the fraudulent mechanic's lien to recover those

fraudulent charges (KDC and ProExcavation) and by knowingly entering into a fraudulent listing

agreement (Tatiana) in an attempt to siphon even more money into the Kagan family at the

expense of Kagan's two fellow members.  Kagan's breach of fiduciary duty and fraudulent

scheme could not have been completed without the active participation of each of the

Defendants.  *MAZ Partners LP v. Shear*, 2016 U.S. Dist. LEXIS 118191, at *32-33 (D. Mass.

Sept. 1, 2016) ("defendant must actively participate or substantially assist in or encourage the

breach to the degree that he or she could not reasonably be held to have acted in good faith").

The Court should reject Defendant's challenge to Count III, aiding and abetting breach of

fiduciary duty.

## VI.     Kagan Breached The Express Terms of the Operating Agreement

Defendant's Challenge to Count I – Breach of Contract by Kagan – ignores the standard

of review on a motion to dismiss.  Kagan's failure to complete the homes timely does constitute

a breach of the Operating Agreement.  Specifically, the Operating Agreement states that "[i]t

***shall*** be Mr. Kagan's ***duty and obligation*** to construct two (2) homes . . ." and that "[t]he

construction ***shall*** be substantially completed no later than March 30, 2014."  *Operating*

*Agreement*, § 5.2; *see also Cmpt.*, ¶ 23 (emphasis supplied).  In breach of this obligation, Kagan

did not substantially complete the homes until at least October 2014.  *Cmpt.*, ¶ 24.[9]  The delayed

completion caused the carrying costs to increase, a missed prime selling season (during which

---

[9]     Defendants' distinction between substantial and final completion is a distinction without
a difference.  All construction contracts are measured by their substantial completion date.
Moreover, Kagan has claimed that certain of his subcontractors were at the property until at least
May 2015 completing the warranty work.  The Complaint's express allegations to March and
October 2014 is a clear reference to the substantial completion date.

the economy in China, a prime source of buyers, took a turn for the worse), and a further delay of the return of the members' investment.

Kagan's assertion that Filippov, as Managing Member, did not have exclusive authority to enter into listing agreements is also belied by the Operating Agreement, which provides that "the powers of the Managing Member shall include . . . to engage, dismiss, and replace . . . brokers . . . as may be deemed necessary or advisable by Managing Member." *Operating Agreement*, § 6.1(b)(1). So too is his claim that he was not required to have the KDC contract reviewed or approved. *See Operating Agreement*, § 6.1(b)(3) (Managing Member's authority to "improve . . . real property . . . and to execute any agreements, instruments or documents relating to or affecting such matters"); § 6.1(b)(2) (Managing Member's authority to "authorize or approve . . . instruments on behalf of the Company . . . and to execute any agreements"); § 6.1(b)(1) (Managing Member's authority to "engage . . . other persons as may be deemed necessary or advisable"). Nowhere in the Operating Agreement are these powers granted to Kagan as a minority member. As set forth above in Section I, these unlawful agreements purportedly permitted Kagan to fraudulently bill the LLC and record a mechanic's lien and for Tatiana to initially list the houses far in excess of what they were worth and cause them to languish, which forced the Company to seek bankruptcy protection and ultimately sell the homes at a significant discount and a decrease or complete elimination of any of the members' profits.

Finally, Kagan's claim that he did not breach the Operating Agreement by refusing to pay the carrying costs is specious. Section 8.1 of the Operating Agreement unambiguously provides, "***In the event that the property is not sold within twenty-three (23) months from the date of acquisition, then Mr. Kagan shall be responsible for all carrying costs until such time as the property is sold.***" *Operating Agreement*, § 8.1 (emphasis in original). Kagan does not dispute

that he failed to honor this obligation but instead seeks to avoid liability on this claim by arguing

that the claim should be precluded by the LLC's alleged breach by failing to arrange for a

construction loan that would pay carrying costs at the outset.  In other words, Kagan is not

arguing a Rule 12(b)(6) standard but is instead arguing on the merits of his (error riddled)

position at the motion to dismiss stage.  The LLC certainly disputes the assertion that it has

breached any section of the Operating Agreement, but this is a fact-based inquiry that cannot be

resolved on this record.[10]  Similarly, Kagan's unfounded assertion that any surplus in the sale

will reveal that there was no damage incurred is baseless.  The argument is speculative, lacks any

basis in fact, and ignores the allegations that the Defendants' conduct caused the properties to

sell for far less than what they should have sold without the unlawful conduct.  Accordingly,

Kagan's motion with respect to Count I should be denied.

## CONCLUSION

    For the foregoing reasons, the Court should deny the Defendants' Motion to Dismiss in

its entirety.

                                        LYMAN-CUTLER, LLC,
                                        By its attorney,


September 16, 2016                       */s/ Peter Tamposi*_____
                                        Peter N. Tamposi, BBO No. 639497
                                        The Tamposi Law Group, P.C.
                                        159 Main Street
                                        Nashua, NH 03060
                                        (603) 204-5513

---

[10]    The Defendants have littered their motion with extraneous allegations and documents that
were not referenced in or attached to the Complaint, such as the purported "construction loan
restriction" that is attached to the Defendants' motion as Exhibit F.  Each such allegation or
document that is not part of the Complaint should be stricken and disregarded by the Court.

Dated:  September 16, 2016

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on September 16, 2016.

*/s/ Peter Tamposi*

4816-7491-6152, v.  1