COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                                    SUPERIOR COURT
                                                                 CIVIL ACTION
                                                                 NO. 1581CV03977

_____

                        )
LYMAN-CUTLER, LLC, ALEX FILIPPOV,        )
AND NICKOLAY LIPETSKER,                  )
                        )
            Plaintiffs,              )
                        )
   V.       )
                        )
VADIM KAGAN, TATIANA KAGAN,         )
CENTURY 21 COMMONWEALTH,            )
KAGAN DEVELOPMENT KDC, CORP. and    )
PROEXCAVATION CORP.         )
                        )
            Defendants.              )
_____)

## AFFIDAVIT OF ALEXANDER FODYMANOW

I, Alexander Fodymanow, having been duly sworn, state and depose as follows:

1. My name is Alexander Fodymanow. I am a former member of Lyman Road, LLC (the "LLC"), a company in which I invested with Vadim Kagan ("Kagan").

2. In 2012, Kagan approached me and asked whether I wanted to invest in a construction project. He informed me that he had located a property at 10 Lyman Road in Brookline, Massachusetts, and that his plan was to tear down the house and replace it with a new multi-million luxury home.

3. Before I decided to invest, Kagan presented me with a budget that forecast total project costs at $3.6 million, of which $1.85 million was to be for the purchase of the land and the remaining balance to cover construction and carrying costs until the certificate of occupancy was received. Kagan promised that the costs would not exceed this budget.

4. Relying on Kagan's budget and representations, I decided to invest in the

project. In fact, I was the only person to invested money into the project. I invested $1.25 million and, in return, received a 50% ownership interest in the LLC. Kagan and his development company, Kagan Development KDC, Inc. ("KDC"), each owned 25% of the LLC. Kagan took out the mortgage that the LLC used to fund the project costs, and was responsible for paying all of the LLC's expenses during the course of the project.

5. The construction was completed in the spring of 2014. Tatiana Kagan, Kagan's wife, was the real estate broker for the new home.

6. Despite the fact that I was a 50% owner of the LLC, both Kagan and his wife never informed me about any offers on the property. Beginning in or around October 2014, Kagan stopped taking my telephone calls and refused to communicate with me further about the project.

7. In May 2015 (approximately two weeks before the closing), I received a letter from KDC informing me that there were additional construction costs in the amount of $418,495.00. Approximately 75% of this amount, $312,000, was purportedly owed to Kagan's companies. These costs were submitted in May 2015 despite the fact that construction had been completed for nearly a year.

8. The property sold in May 2015 for $5 million. I was not made aware of this sale price until after the closing. I have come to learn that Tatiana Kagan had previously received an offer for $5.1 million. This offer had never been presented to me for my input and approval.

9. Although I ultimately received a profit on this project, the profit was substantially smaller than I anticipated it to be based upon Kagan's budget and cost projections.

Signed under the pains and penalties of perjury on August __, 2015.

_____
Alexander Fodymanow

AFFIDAVIT OF DMITRIY ZHUKOVSKIY

I, Dmitriy Zhukovskiy, having been duly sworn, state and depose as follows:

1. My name is Dmitry Zhukovskiy. I am a former member of Hyde Avenue, LLC
(the "LLC"), a limited liability company in which I invested with Vadim Kagan ("Kagan"),
Tatiana Kagan ("Tatiana"), Kagan Development KDC, Corp. ("KDC") and Nickolay Lipetsker ("Lipetsker").

2. Early in 2012 Kagan offered an investment opportunity. During our meeting, Kagan informed me that
he operated a construction company, KDC, and portrayed himself as a successful builder sighting
numerous projects he completed in the past.

3. Kagan informed us that he wanted to buy an old house in Newton, remodel it, built an addition and
sell the house for profit. During our discussions, Kagan represented to me that the project could be
completed for $2.8 million, where:
(a) $1.6 million would go towards purchasing the old house;
(b) $1.2 million would cover the entire cost of construction, including interest on mortgage and
construction loan, real-estate taxes and insurance;

4. Kagan represented that, based on his experience and that of his wife's, Tatiana, whom I understood
to be a real estate broker, the property could be sold for a minimum of $3.7 million. Kagan assured me
in his ability to complete the construction in 12 months with the reasonable construction cost margin of
error (5%).

5. In exchange for 50% of the gross profit, Kagan asked to:
(a) invest 50% of the amount necessary to make a down payment on the old house;
(b) invest 50% of the amount necessary to cover legal and financing expenses associated with
purchasing the house and obtaining mortgage and construction loan;
(c) personally guarantee mortgage and construction loan;

4. Relying on Kagan's budget and representations, I decided to invest in the project. I agreed to
contribute 31% of the required initial investment and personally guarantee mortgage and construction
loan. In addition to me, Kagan, Tatiana, KDC and Lipetsker all invested and became members in the LLC.
I was elected and named the LLC's Managing Member. A copy of the LLC's Operating Agreement is
attached as **Exhibit A**.

5. On May 10th, 2012 LLC purchased the old house for a consideration of the $1,630,000 of which
$1,140,000 was financed through Rockland Trust. During the following two month, Kagan provided
construction plans and budgets to Rockland Trust to secure an additional loan for the remaining
$1,200,000 necessary to complete the project. I personally guaranteed both of these loans.

DFZ

6. Throughout the project, I attempted to track the construction costs and carrying costs. Kagan sporadically provided me with some invoices, repeatedly sighting that he maintains complete records and copies of all of the invoices. When I asked him for a copies of the documentation supporting project expenditure, Kagan directed me to contact his bookkeeper ("Ryan"), who would in turn usually respond that he was too busy at the moment, promised me to send everything shortly or simply ignored my requests. Ultimately, neither Kagan nor his affiliates provided me with any invoices supporting most of the payments made by the LLC. To track down costs I was forced to rely on copies of cancelled checks included in the bank statements.

7. When filing annual tax returns for 2012 and 2013 Tax Years, I would provide Kagan a copy of my records and ask him to confirm their accuracy. While the information about amounts actually paid by the LLC was readily available through bank records, I would in particular ask Kagan to confirm that there were no outstanding liabilities (i.e. unpaid invoices) of the LLC. Kagan would always agree with my records without making any corrections. Kagan would confirm that everything was accurate and that all accounts were up-to date.

8. The property was completed sometimes during late summer of 2013. Kagan listed it for $4 million in the fall of 2013. By December of 2013, the funds of the LLC were depleted and members of the LLC began contributing towards the carrying costs. The property was sold in April of 2014 for $3.8 million.

9. During the period of shortly before and after the closing date, Kagan informed me that there was an additional amount of $510K in construction costs that had never previously been invoiced to the LLC:

(a) $170K for work allegedly performed by ProExcavation (company owned or closely affiliated with Kagan). Kagan did not provide any invoices for this work and simply told me that there was a lot of work which his company [ProExcavation] performed and for which LLC never paid.

(b) $126K for "unpaid" invoices from various outside contractors for work performed at different points in time. Kagan failed to show most of the invoices from these contractors and said that the invoices were "in boxes" and that he could find them later.

(c) $213K for invoices from various outside contractors for work performed at different points in time for which "KDC has paid out and was not reimbursed". Kagan told me that he forgot about these payments and that he had very poor bookkeeping stuff, who originally allocated these charges to other projects. He showed me the records of the checks he issued to contractors, most of which were written in the first half of 2013. Kagan failed to show most of the invoices from these contractors and said that the invoices were "in boxes" and he could find them later.

10. The total cost of construction, including bank interest, real estate taxes and carrying cost over the life of the project was $1.8 million, representing a $600K of additional costs relative the original budget of $1.2 million.

11. Throughout the project, Kagan:

(a) Continuously represented to me that the construction costs were in line with our initial budget;

(b) Never presented any evidence of competitive bidding;

(c) Failed to provide most of the invoices;


Signed under the pains and penalties of perjury on November 11, 2015.

Dmitry Zhukovskiy

**AFFIDAVIT OF DMITRIY ZHUKOVSKIY**

I, Dmitriy Zhukovskiy, having been duly sworn, state and depose as follows:

1. In October of 2012 Kagan asked for my help developing financial analysis of construction project to be included in the presentation for potential investors. Kagan explained to me that he was planning to purchase a lot, build a house and sell it for profit. He further told me that the investors would be required to make a portion of the initial cash contribution towards the purchase of the lot and secure the loan for the remaining amount necessary to purchase the lot and complete the project.

2. Kagan asked for the analysis illustrating the impact of two variable, Sale Price and Construction Timing, on the ultimate profit earned by investors. As an example of what Kagan wanted to highlight, he provided me with a simplistic financial analysis he used in the past for a different project.

3. Kagan provided the initial inputs for the analysis to be performed:
   - Purchase Price of the Lot ($2,000,000)
   - Construction Cost ($1,300,000)
   - Terms of the loan (interest rate of 4.750% + 1% at closing)
   - Target Sale Price ($4,900,000)
   - Duration of Construction and Sale (20 months)

4. I explained to Kagan that cost of construction was another major variable affecting the profitability of the project. Kagan told me that he was very experienced builder and that he knew exactly how much the cost of construction would be. He further told me that any deviations from his construction budget of $1,300,000 would be immaterial and would not significantly affect the profitability of the project.

5. On October 23 I forwarded a copy of my analysis to Kagan, asking him to review it and confirm that all of the inputs (cost of construction, real-estate taxes, insurance, legal expenses, etc.) were correct. I explicitly indicated that based on these inputs and 20-months project duration, the total carrying cost including interest on loans would amount to $200,000.

6. On October 24, shortly before the meeting with investors, I asked Kagan if he reviewed my analysis. Kagan confirmed that he did. He confirmed that all of the inputs were correct and that my estimate of the profit was in line with his preliminary estimates.

7. On October 24, I participated in the initial investors meeting with Kagan. Kagan presented the scope of the project and went through the details of my financial analysis. He asked for my help explaining how the carrying cost of $200,000 was developed. He reassured investors that cost of construction would be $1,300,000 with the reasonable margin of error.

Signed under the pains and penalties of perjury on December 7, 2015.

Dmitry Zhukovskiy

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 1581CV03977

LYMAN-CUTLER, LLC, ALEX FILIPPOV, )
AND NICKOLAY LIPETSKER, )
)
Plaintiffs, )
)
v. )
)
VADIM KAGAN, TATIANA KAGAN, )
CENTURY 21 COMMONWEALTH, )
KAGAN DEVELOPMENT KDC, CORP. and )
PROEXCAVATION CORP. )
)
Defendants. )

## AFFIDAVIT OF ELENA LANDE

I, Elena Lande, having been duly sworn, state and depose as follows:

1. My name is Elena Lande. I am a former member of Yarmouth Road Development, LLC (the "LLC"), a company in which I invested with my husband, Yuriy Lande, and a developer named Vadim Kagan ("Mr. Kagan").

2. In January 2013, my husband and I began to discuss with Mr. Kagan investing in a project he had planned at 50 Yarmouth Road, Brookline Massachusetts. Attorney Boris Maiden introduced us to Mr. Kagan.

3. At the outset, my husband and I agreed to invest $700,000 each for a total of $1.4 million and Mr. Kagan invested $100,000. We formed the LLC with the assistance of Attorney Boris Maiden. We understood that Mr. Maiden was representing the LLC in preparing the documents.

*E.L*

4.      The LLC Agreement was sent back and forth and there was a problem with my scanner so that there were issues with the signature pages. The LLC Agreement I signed stated that my husband and I each owned 40% of the LLC membership interest for a total interest of 80%, and that Kagan owned 20% of the membership interest. Originally, the LLC Agreement provided that the profits would divided 30% each to my husband and me and 40% to Mr. Kagan, if construction was complete and a certificate of occupancy issued by May 30, 2014 and the property was sold by May 30, 2015. If either of those conditions was not met, then the profits were to be divided 35% each to my husband and me and 30% to Mr. Kagan. This share of the profits was supposed to be Mr. Kagan's compensation for managing the construction. We borrowed enough money to pay the carrying costs through May 30, 2014 after which we would split them 50/50 as long as the certificate of occupancy had issued. If the certificate of occupancy was not issued by May 30, 2014 (and it was not), then Mr. Kagan was supposed to pay the carrying costs. A true copy of the original LLC Agreement is attached as Exhibit A. That is the Agreement we operated under until the very end of the project when Kagan began to press for more money. Maiden drafted all of the documents.

5.      I was the Managing Member of the LLC and my husband and I were supposed to have control of the LLC through our combined 80% voting power. On March 27, 2013, the LLC filed a Certificate of Organization with the Secretary of the Commonwealth, which identified me as the Managing Member. A true copy is attached as Exhibit B. Attorney Maiden drafted this document and asked me to sign it and he took care of filing it with the Secretary of the Commonwealth.

6.      We purchased the property on or about April 3, 2013 for a purchase price of $2.4 million. The construction budget was $1.7 million. Mr. Kagan showed me a budget for the

*E.L*

construction before we agreed to invest in the project. Our projected sale price for the finished property was $6 million.

7.      The first bank we applied to turned us down, but we secured a mortgage from Rockland. We put in an extra $80,000 to have a cushion. We borrowed $2,770,000 in order to have funds for the carrying costs. The amount we borrowed plus the funds we put in was supposed to be sufficient to allow for $300,000 on top of the budget for carrying costs and any overruns.

8.      The agreement provided that construction would be completed by May 30, 2014 and obtain the CO, then the split of the profits was supposed to change to give a greater share to my husband and me. Mr. Kagan (Kagan Development) did not complete construction by May 30, 2014. In fact, by July 2014, he began promising us that he would finish in "two more weeks." He did not finish until December 2014.

9.      The Agreement provided that I would list the property with Tatiana Kagan. I know we listed the property with Mrs. Kagan. I do not recall for sure but I do not believe I actually signed any listing agreement.

10.     Mr. Kagan was slow getting construction started and the building permits were not issued until July 2013.

11.     The Company's annual report filed February 25, 2014 again identifies me as the Company's Manager. A true copy of the February 25, 2014 annual report is attached as Exhibit C. I believe Attorney Maiden made this filing. I did not.

12.     After the project started, Mr. Kagan forwarded a new draft of the LLC Agreement in which his company, Kagan Development KDC, LLC would become a member of the LLC instead of Mr. Kagan. We never signed that document. We never signed the Updated

*E.L.*

Agreement. Mr. Kagan never explained to me why he wanted to make this change. I specifically asked him why and he never responded. A true copy of the "updated" LLC Agreement is attached as <u>Exhibit D.</u>

13.    On June 3, 2014, Mr. Kagan's bookkeeper, Kristina, sent us a balance sheet as of May 19, 2014, which showed that the project was within budget. The construction line items looked all wrong to me and I asked for back up for them. A true copy of the balance sheet Mr. Kagan provided in June 2014 is attached as <u>Exhibit E.</u> As I demanded more information, the numbers did not get any clearer and I did not get any backup. But the numbers kept going up.

14.    In September 2014, as the numbers kept growing, I expressed concerns about cost overruns and we discussed how such overruns would be paid. He signed an undertaking to pay them and be reimbursed at closing. We insisted that he should only be reimbursed if he secured a selling price above the projected selling price, but Mr. Kagan did not sign that undertaking. True copies of the undertaking Mr. Kagan signed and the unsigned one are attached as <u>Exhibits F and G.</u> As the unsigned undertaking shows, however, we were not expecting the cost overruns to exceed $100,000. And even though he was supposed to cover all expenses to be reimbursed at closing he never did that and continued to spend all funds we had in the bank.

15.    In late October or early November 2014, we received an offer on the property and signed a purchase and sale agreement.

16.    Construction was not substantially completed until December 2014. The Town of Brookline did not issue the Certificate of Occupancy until December 10, 2014 (Permit OP-2014-0188). Under the terms of our deal, my husband and I should have each received 35% of the net profits each and Mr. Kagan only 30%. Also, he was supposed to cover the carrying costs after May 30, 2014. He did not do that.

*EL.*

17.    After we had the property under agreement, suddenly Mr. Kagan's claims of cost overruns exploded.  On or about December 15, 2014, Mr. Kagan presented a new balance sheet that claimed that the costs had skyrocketed since June 2014.  This short chart summarizes the claimed increases:

| Category | June 2014 | December 2014 | Claimed Increase |
|---|---|---|---|
| Contractor Expenses | $25,660 | $123,111.23 | $97,451.23 |
| Materials | $188,453.44 | $496,493.91 | $308,040.47 |
| Operating Expenses | $229,967.13 | $251,502.95 | $21,535.82 |
| Outside Service | $573,884.16 | $1,221,812.79 | $647,928.63 |
| TOTALS | $1,017,964.73 | $2,092,920.88 | $1,074,956.15 |

18.    In short, Mr. Kagan claimed that the project costs had more than doubled in 6 months. I asked many times for documentation of these expenses but Mr. Kagan never provided support for these charges. He sent me copies of some bills, but something was always missing. And his excavation explanations were always about some rocks, debris, and "few extra trees."

19.    When I objected to these last minute cost increases, Mr. Kagan's "Strategic Business Manager," Joseph Cohen, sent a letter to Attorney Maiden threatening to place mechanics liens against the Property.  He then sent me a letter offering to "settle" the dispute by reducing the allege unpaid overages from their claimed $939,808.61 to $704,856.46.  In order to close the transaction, we eventually agreed that Kagan Development would be paid $618,650.72 from the closing and that my husband and I would receive a total of $2,254.496.40.  This represented the return of our capital and a profit of $750,000, but we believe Mr. Kagan

*E.L.*

fraudulently asserted false costs against the project to take more than his share of the profits. He also did not honor the terms of the LLC Agreement.

20.    In order to force my husband and me to take this deal, Kagan started harassing us the week before the closing. He said they would not go through with the closing unless we agreed to their numbers. He threatened to put a lien on the property. Kagan contacted the buyers directly and started harassing them. He contacted Attorney Maiden and told him he would block the closing unless we agreed to their numbers. Kagan put us in a position where if we did not agree to his terms the deal would have fallen through. I was also in the last month of my pregnancy at this time and Mr. Kagan knew this and used it as a way to pressure me. My husband and I met face to face with Mr.Kagan when he started this game (sometime mid December) and he kept saying "we need to agree" because he disagrees to go with contract conditions for no particular reason. Mr. Kagan stopped taking my calls and I ended up speaking to his employee, Joseph Cohen. Cohen actually said to me, "you're not in a position to be nervous right now. Save yourself from all this." When I threatened suit, he said "you're not in a position to sue."

21.    On December 29, 2014, we closed the sale of the property for a selling price of $5,988,000.

22.    On March 3, 2015, Mr. Kagan filed a Certificate of Amendment with the Secretary of the Commonwealth, designating himself as a manager of the LLC. I understood I was the Managing Member of the LLC. Mr. Kagan said he needed to be a co-manager to file taxes only, so we added him and then he did taxes and closed LLC without letting me know.

23.    On March 26, 2015, Mr. Kagan filed the annual report for the LLC, and omitted me as a manager of the LLC. My husband and I never agreed that I would be removed as

*E.L.*

Managing Member.   A true copy of the Company's March 26, 2015 annual report is attached as Exhibit H.

24.    When Kagan filed the tax returns for the LLC, he falsely reported the payout to my husband and me as ordinary income instead of a capital gain.  This cost us substantial additional sums in taxes.

25.    On April 13, 2015, Mr. Kagan filed a Certificate of Cancellation with the Secretary of the Commonwealth stating that the Company's business had concluded.  A true copy of this Certificate is attached as Exhibit I.

Signed under the pains and penalties of perjury on September 10, 2015.


E. Lande
Elena Lande


4825-1685-7127, v. 1

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS

SUPERIOR COURT DEPT.
C.A. No. 1581CV03977

|  |  |
|---|---|
| LYMAN-CUTLER, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| VADIM KAGAN, TATIANA KAGAN, and | ) |
| CENTURY 21 COMMONWEALTH | ) |
| | ) |
| Defendants. | ) |

## AFFIDAVIT OF KRISTINA BRUSENKOVA

I, Kristina Brusenkova, under oath, state as follows:

1.      I am over the age of 18 and make the following statements based upon my own personal knowledge.

2.      I formerly served as the bookkeeper for Kagan Development KDC Corp. ("KDC"). I started out working for a company that provided accounting services to KDC, and then joined KDC as its bookkeeper at or about the beginning of 2014. I served as the bookkeeper for KDC until October 2014, when Mr. Kagan and his wife Tatiana abruptly fired me when I informed them that I was pregnant with Mr. Kagan's child. I later lost the baby due to the stress of the way they treated me.

3.      As KDC's bookkeeper, I kept track of the expenses and the invoices for each of Vadim Kagan's projects, including the Lyman-Cutler LLC project. The Lyman-Cutler project involved building two new houses on Lyman Road and Cutler Avenue. I also kept the books for ProExcavation and for all of Mr. Kagan's and his wife, Tatiana's, personal accounts.

4.     Vadim Kagan had two main companies when I worked for him -- KDC and ProExcavation. Neither company had many employees.   When I worked at KDC, other than Vadim Kagan, and myself, the only other employees were Yegeniy Augureev and Ryan O'Grady (until he was fired).  ProExcavation's only employee was Mr. Kagan.  The actual construction and excavation work on the projects was done by subcontractors hired by Mr. Kagan.

5.     All records were kept only on the copy page in the checkbooks. Upon completion of construction, cost estimates were calculated based on data that had been recorded in the checkbooks KDC would create invoices from the amounts in the checkbook, but if the amount seemed too low to Mr. Kagan, he would cut another check and add it to the invoice. When I first started to do the bookkeeping, I found a lot of missed amounts and we issued a lot of additional invoices to the investors (example, Hyde Ave).

6.     Mr. Kagan's standard practice for each project was to form a limited liability company to own the property.  He usually had investors who would invest the cash necessary to fund the project, along with bank loans.  Sometimes Mr. Kagan did a project on his own without outside investors.

7.     On projects where Mr. Kagan had outside investors, he regularly double-billed those projects by submitting invoices from ProExcavation for work that he also billed to the Project through KDC or for which he also directly submitted the subcontractor's bills for payment by the Project.

8.     For example, all of the landscaping work was done through and billed to the projects by ProExcavation.  I have reviewed some Quickbooks reports for the Lyman-Cutler project and it appears to me that Mr. Kagan billed the project twice for excavation and landscaping work -- once through ProExcavation and once directly from KDC for the payments to the subcontractors who did

2

the work. The double billing increased in July 2014 when ProExcavation ran into financial trouble.

9.     On projects where Mr. Kagan had investors, he paid more to the survey company for the same work that he would pay less for on his projects.

10.     Mr. Kagan was close personal friends with some of his subcontractors and he would some times pay them more than the job was worth and have them kick back some of the payment to him in cash.

11.     I also know of at least one instance in which Mr. Kagan submitted a claim to an insurance company for damage to a property in double the amount necessary for the repairs, then kept the extra insurance money and then also included the damage to the property in the project expenses to decrease the profit on the project. He said "now we have enough funds to travel." He also confessed to me that he had caused the damage to the property intentionally -- he had someone stuff a rag in the sink and leave the water on and claim it was accident.

12.     Mr. Kagan bought materials using his American Express card but did not keep track of which project the materials were for. He would arbitrarily assign costs to projects. He also would regularly get credits to his account for returns that he would keep for himself and not credit back to his projects. He used to refer to these credits as his "commissions."

13.     Mr. Kagan also received refunds from NStar or National Grid on all of his projects, which he kept for himself and did not credit back to the project.

14.     When Mr. Kagan submitted bills to projects for ProExcavation, he would arbitrarily charge whatever fee he felt like he could get away with. There was no direct connection between the charge submitted to the project and the costs that KDC or ProExcavation had incurred for materials or for paying the subcontractors. It started when he was doing a project on Florence Street and encountered a rock. He doubled the excavation price and noticed the investor did not

3

have enough force to confront him. After that, he started to bill instead of regular price of

$200,000.00 - 250,000.00 - more than $400,000.00 for every house.

15.     Mr. Kagan rarely had written invoices or estimates with his subcontractors. He

would agree with them on a price and pay them in installments as he had money. When I became

the bookkeeper I tried to insist on written proposals but I did not always succeed.

16.     Sometimes if Mr. Kagan did not have enough money to pay the subcontractors on

one project, but he had money on another project, he would pay them ahead of time for work they

had not yet done on the project where he had money in order to keep them happy. I have reviewed

some Quickbooks reports from the Lyman-Cutler project and it appears to me that he paid the

subcontractors before they did work on the Lyman-Cutler project.

17.     Mr. Kagan was responsible for paying the carrying costs on his deals, and would

borrow more money from the bank than the construction required in order to pay the carrying costs.

He did that on the Lyman-Cutler project. He would prepare one budget for the bank and another for

his investors. At some point in each project, he would ask investors to contribute toward the

carrying costs.

18.     When I was working for KDC, I used an email address,

Kagandevelopment@gmail.com, which should have a lot of emails with attachments that will help

document the costs on the project and should also include copies of Quickbooks files.


**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS** _4_ **DAY
OF JULY, 2015**.



Kristina Brusenkova

4

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                    SUPERIOR COURT
                                                 CIVIL ACTION
                                                 NO. 1581CV03977

_____
                                          )
LYMAN-CUTLER, LLC, ALEX FILIPPOV,         )
AND NICKOLAY LIPETSKER,                   )
                                          )
              Plaintiffs,                 )
                                          )
       v.                                 )
                                          )
VADIM KAGAN, TATIANA KAGAN,               )
CENTURY 21 COMMONWEALTH,                  )
KAGAN DEVELOPMENT KDC, CORP. and          )
PROEXCAVATION CORP.                       )
                                          )
              Defendants.                 )
_____)

## AFFIDAVIT OF MARK KAYSERMAN

I, Mark Kayserman, having been duly sworn, state and depose as follows:

1.      My name is Mark Kayserman.  I am a former member of Deborah Road, LLC

(the "LLC"), a company in which I invested with Vadim Kagan ("Kagan").

2.      In 2012, Kagan approached me and asked whether I wanted to invest in a

construction project.  He informed me that he had located a property at 6 Deborah Road in

Newton, Massachusetts, that he had already made an offer on the house, and that he was seeking

a "50/50 investor" to help finance the project.  The project included tearing down of the existing

house and building in its place a multi-million dollar luxury home.

3.      Before I decided to invest, Kagan presented me with a budget that forecast

construction costs at $850,000.00.  Kagan promised that construction costs would not exceed this

budget and will most likely be less.  He also promised that we would split payment of the real

estate broker fees 50/50 (that would go to his wife, Tatiana Kagan) with me.

4.      Relying on Kagan's budget and representations, I decided to invest in the project.

I invested around $150,000 and, along with my wife, became a 50% owner of the LLC.  Kagan

and his wife, Tatiana, owned the remaining 50% of the LLC.

5.      Although I attempted to manage some of the LLC's paperwork, it was Kagan who

was responsible for paying all of the LLC's expenses.

6.      As the construction process grew to a close, I learned that the project was

significantly over budget.  I started to grow suspicious about the expenses Kagan paid on the

project.  I discovered that Kagan had written numerous checks to his own construction

companies, as well as a variety of contractors, with virtually no written back-up supporting the

expenses.  My suspicions increased when, just days before the closing, Kagan informed me that

there was an additional $111,000 in costs that needed to be paid, much of it to his own

companies despite asking him numerous times whether any additional costs are anticipated to

which he always replied that no other expenses are expected and everything was paid.  When I

questioned him about these expenses, he explained only that the work had been done and the

costs incurred, and that he was required to pay it out of the LLC.

7.      Kagan also mentioned to me that he was able to shift costs around on various

projects by use of his American Express credit card.  I witnessed this myself when, during the

course of our project, our lender was unwilling to extend additional payments to the LLC until it

received additional collateral for its loan.  Until this money came in, Kagan used an American

Express card from a different project to pay the LLC's expenses.

8.      There were several instances during the course of the project that led me to question Kagan's financial management of the project.  He initially dodged my inquiries when I attempted to contact Kagan to inquire about these decisions.  When I was finally able to speak with him to express my concerns about the project accounting, he offered to pay me $10,000 and told me to "take it or leave it."

9.      Kagan never split the real estate commission with me, as he promised.

10.     When I decided to invest in the project, I anticipated earning approximately a $200,000 profit.  Due to the purported cost overruns, I ended up earning only around $37,000 profit, including the $10,000 Kagan offered to assuage my concerns about the accounting issues.


Signed under the pains and penalties of perjury on October 25, 2015.


Mark Kayserman

4839-6339-0758, v.  1

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS                                                    SUPERIOR COURT DEPT.
                                                                C.A. No.

|  |  |
|---|---|
| LYMAN-CUTLER, LLC, | ) |
| Plaintiff. | ) |
| v. | ) |
| VADIM KAGAN, TATIANA KAGAN, and CENTURY 21 COMMONWEALTH | ) |
| Defendants. | ) |

## AFFIDAVIT OF NICKOLAY LIPETSKER

I, Nickolay Lipetsker, under oath, state as follows:

1.      I am over 18 years of age and make the statements in this affidavit based upon my own personal knowledge.

2.      I am an investor in Lyman-Cutler LLC, a joint venture among Alex Filippov, Vadim Kagan and myself. I have known Vadim Kagan for several years and have previously invested in other projects with him. I have known Alex Filippov since 1989. We have met during the emigration process from Russia to USA and have been maintaining friendly relations for the past 25 years. We never were involved in any business relations before Lyman-Cutler LLC project.

3.      In October 2012, Mr. Kagan and I approached Mr. Filippov and asked him to invest in a real estate development project we planned for a property in Brookline, Massachusetts (the "Project").

4.      We planned to purchase of land in Brookline, Massachusetts to subdivide into two parcels and then construct on each separate parcel a high-end single family home.  Mr. Kagan, through his company, Kagan Development, was to serve as the general contractor for the Project.

5.      On or about October 25, 2012, Mr. Kagan presented to Mr. Filippov and me a detailed budget and forecast of estimated returns on an investment in the Project (the "Kagan Presentation").  A true copy of the presentation is attached to the Verified Complaint as **Exhibit 1**.  We relied on that presentation in deciding to invest.  Mr. Filippov invested $2 million and I invested $250,000.

6.      In November 2012, we formed a Massachusetts limited liability company, Plaintiff Lyman-Cutler LLC.  A true copy of the LLC Operating Agreement is attached to the Complaint as **Exhibit 2**.  Mr. Fillipov received an 80% interest in LCLLC, and Mr. Kagan and Mr. Lipetsker each received 10%.  Mr. Filippov is the managing member.

7.      Mr. Kagan's wife, Defendant Tatiana Kagan, is a real estate agent affiliated with Defendant Century 21.  We agreed that she would be the broker for the sale of the properties through the end of 2014.  The clear plan for the Project was for construction to be complete by March 2014 and for the properties to be sold by November 2014.

8.      Mr. Kagan did not complete the houses on schedule.  He did not finish them until October 2014.  His wife did not sell the houses on schedule.  They are still unsold to this day.

9.      In late April 2015, I had a conversation with Mr. Filippov in which we discussed retaining a new broker and replacing Mrs. Kagan.  We had lost confidence in Mrs. Kagan's ability to sell the properties.

10.    Mr. Filippov told me during this conversation that Mr. Kagan had asked Mr. Filippov to sign a new listing agreement with Tatiana Kagan and Mr. Filippov refused.  We discussed how we would go about finding a new broker to sell the homes.

11.    Shortly after that, we learned that Mr. Kagan had signed a new listing agreement with his wife and claimed that Mr. Filippov had authorized him to sign it.  To my knowledge, this is false.  Mr. Kagan also recently has claimed that the Company owes him a lot of money for cost overruns.  These claims came out of the blue more than 8 months after construction was completed and he was never authorized to spend more than we borrowed from the bank for the Project.  I understand he is also refusing to pay the carrying costs for the properties, which the LLC Agreement requires that he pay.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 5th DAY OF JUNE, 2015**

_____
Nickolay Lipetsker

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 1581CV03977

```
                                          )
LYMAN-CUTLER, LLC, ALEX FILIPPOV,         )
AND NICKOLAY LIPETSKER,                   )
                                          )
            Plaintiffs,                   )
                                          )
   v.                                     )
                                          )
VADIM KAGAN, TATIANA KAGAN,               )
CENTURY 21 COMMONWEALTH,                  )
KAGAN DEVELOPMENT KDC, CORP. and          )
PROEXCAVATION CORP.                       )
                                          )
            Defendants.                   )
                                          )
```

## AFFIDAVIT OF VLADISLAV ABRAMSKIY

I, Vladislav Abramskiy, having been duly sworn, state as follows:

1.     My name is Vladislav Abramskiy.  I am a former member of Newton-Cynthia
Road, LLC (the "LLC"), a company in which I invested with Vadim Kagan ("Kagan") and Zina
Gassel ("Gassel").

2.     In 2012, Kagan approached me and inquired about whether I wanted to invest in a
construction project.  He had located at house at 137 Cynthia Road in Newton, Massachusetts
and had plans to tear down the existing house and replace it with a luxury home.

3.     Before I decided to invest, Kagan presented me with a budget that forecast out-of-
pocket costs at $850,000.00.  Kagan promised that this amount would be sufficient to cover both
construction and carrying costs, and that the total out-of-pocket costs would not exceed this
budget.

*V. A.*

4.     Gassel and I each invested $120,000 in exchange for a 40.5% ownership interest in the LLC. Kagan invested only $100.00, and received a 19% ownership interest. Because Kagan was to serve as general contractor on the project through his company, Kagan Development KDC, Inc. ("KDC"), Kagan was to receive 50% of the LLC's net profits. Gassel and I would each receive 25% of the net profits.

5.     I was designated as the LLC's Managing Member under the terms of the Operating Agreement.

6.     During the course of the project, Kagan informed me that he had encountered ledge and that the excavation costs would increase by close to $70,000. When I asked to come visit the project to inspect the ledge, Kagan persuaded me not to and represented to me that the LLC was getting the cheapest price possible because it was his own company that would perform the excavation. He said a third party would charge close to $100,000.

7.     On the afternoon of October 6, 2014, Kagan made me aware that the LLC had received an offer on the property. By its terms, the offer was set to expire in less than three hours. After speaking with Gassel, we informed Kagan that we, who together owned 81% of the LLC, wanted to accept the offer. Kagan told us that he had already made a counter-offer, that the prospective buyers had not responded, and that they had chosen to look for another property. We later learned that his wife, Tatiana Kagan, had been in possession of the offer for at least a full day before making us aware of it.

8.     The property sat unsold for months after Kagan, acting on his own, rejected the October 2014 offer. Then, in March 2015, we were told by KDC's business manager for the first time that KDC had incurred an additional $141,900 in construction costs that had not previously been charged to the LLC. Gassel and I requested a meeting with Kagan who told us that there

*V. A*

must have been a mistake and that he would take care of the charges. A short time later, *after* we had already accepted an offer on the property, Kagan informed us that KDC had $171,933.37 in outstanding construction costs, $30,000 more than had previously been requested, and that he was expecting to receive additional invoices, even though construction had been completed more than 6 months before. The vast majority of these alleged costs were for reimbursements to be made to Kagan's two construction companies, KDC and ProExcavation Corp. Kagan refused to communicate with us directly after we received this additional request for money.

9.     We initially refused to accept these additional charges. In response, Kagan threatened to charge the LLC with over $440,000 in additional construction charges and threatened to record a mechanics' lien on the subject property. Not wanting to jeopardize a pending offer that we had received for the property, we agreed to accept the additional $171,933.37 in charges.

10.     As a result of these additional "eleventh hour" charges, we did not receive any return on our investment. Kagan, on the other hand, was paid handsomely through the construction costs.

11.     Since the property sold in June, 2015, and after learning that I had spoken with counsel for Alex Filippov, Kagan has threatened to file criminal charges against me.

Signed under the pains and penalties of perjury on November 20, 2015.

Vladislav Abramskiy