UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:* ) | |
| ) | |
| LYMAN-CUTLER, LLC ) | Chapter 7 |
| Debtor ) | Case No. 15-13881 FJB |
| ) | |
| ) | |
| LYMAN-CUTLER, LLC, ALEX ) | |
| FILIPPOV and NICKOLAY LIPETSKER, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Adv. Case No. 16-01120-FJB |
| v. ) | |
| ) | |
| VADIM KAGAN, TATIANA KAGAN, ) | |
| KAGAN DEVELOPMENT KDC, CORP. and ) | |
| PROEXCAVATION CORP. ) | |
| ) | |
| Defendants. ) | |

## AMENDED ADVERSARY COMPLAINT

**(Leave to File Granted 11/3/17)**

Plaintiffs Lyman-Cutler, LLC (the "Company"), Alex Filippov ("Filippov") and Nickolay Lipetsker ("Lipetsker") (collectively referred to as "Plaintiffs") bring this Amended Adversary Complaint to recover damages caused by, and as counterclaims against those that filed claims against the estate, the Defendants Vadim Kagan, Tatiana Kagan, Kagan Development KDC, Corp., and ProExcavation Corp (together, the "Defendants") and state as follows:

### INTRODUCTION

1. Plaintiffs bring this action to recover damages against the Defendants and as counterclaims to the proofs of claim filed by each of the Defendants against the Company. This

action is in the nature of breach of contract, breach of fiduciary duty, fraud and related claims arising out of the willful and intentional misconduct of husband and wife Vadim and Tatiana Kagan and entities they control.  The Defendants have acted together in a self-dealing conspiracy to defraud the Plaintiffs by knowingly and intentionally inflating purported construction charges and executing knowingly unauthorized and fraudulent contracts, including a purported contract between the Company and KDC and listing agreements for two homes formerly owned by the Company, which is a joint venture among Filippov, Lipetsker, and Defendant Vadim Kagan. The Kagans caused KDC to file a wholly false and fraudulent mechanic's lien for over $2 million against the Company's properties in a bad faith effort to force the Company to pay their fraudulent construction charges, which fraudulent conduct forced the Company to file for relief in this Court and to sell its only assets – two large single family homes – at a significant discount.

## **PARTIES**

2. The Company is a Massachusetts limited liability formed in November 2012 with a principal place of business in Belmont, Massachusetts.  The Company filed for relief under Chapter 11 of the United States Bankruptcy Code on October 7, 2015.  That case was converted to Chapter 7 on or about December 7, 2015.

3. Filippov is a natural person residing in Belmont, Massachusetts.  He is the Company's largest member and has served, and continues to serve, as the Company's Managing Member.  Filippov has standing pursuant to M.G.L. ch. 156C, § 56 to bring claims by the Company as well as to assert his own claims individually.

4. Lipetsker is a natural person residing in Newton, Massachusetts.  He is a member of the Company, along with Filippov and Kagan.

5.  Defendant Vadim Kagan is an individual residing at 239 Nahanton St., Newton, Massachusetts 02459.  Mr. Kagan filed proof of claim # 6 on May 3, 2016 in an undetermined amount.

6.  Defendant Tatiana Kagan is an individual residing at 239 Nahanton St., Newton, Massachusetts 02459.  Mrs. Kagan filed proof of claim # 5 on May 3, 2016 in an undetermined amount.

7.  Defendant Kagan Development KDC, Corp. ("KDC") is a Massachusetts corporation with a principal place of business at 239 Nahanton St., Newton, Massachusetts 02459.  On December 18, 2015, KDC filed proof of claim #1 in the amount of $2,095,985.23.

8.  Defendant ProExcavation is a Massachusetts corporation with a principal place of business at 239 Nahanton St., Newton, Massachusetts 02459.  ProExcavation filed proof of claim # 7 on May 3, 2016 in an undetermined amount.

## JURISDICTION AND VENUE

9.  Jurisdiction of this Court is premised upon 28 U.S.C. §1334(b) and 28 U.S.C. §157(a) and (b).

10.  This matter is a core proceeding pursuant to 28 USC §§157(b)(2)(A)(C) and (E). Venue is properly in the Bankruptcy Court for the District of Massachusetts.  The Court has jurisdiction over this matter for the reasons set forth in the Plaintiffs' Joint Statement Regarding the Court's Jurisdiction [Doc. 231], which is incorporated herein by reference, as well as the Court's Order dated November 3, 2017 (Doc. 48).  The Court also has jurisdiction because the Defendants expressly consented to jurisdiction in the Rule 26 report filed on or around September 16, 2016.

**FACTUAL BACKGROUND**

11. In October 2012, Mr. Lipetsker and Mr. Kagan approached Mr. Filippov and asked him to invest in a real estate development project they planned for a property in Brookline, Massachusetts (the "Project").

12. In general terms, the Project involved the purchase of land in Brookline, Massachusetts to subdivide into two parcels and then construct on each separate parcel a high-end single family home.

13. Mr. Lipetsker and Mr. Filippov were investors in the Project and Mr. Kagan was to serve as the general contractor for the Project.

14. On or about October 25, 2012, as an inducement to Mr. Filippov and Mr. Lipetsker to invest in the Project, Mr. Kagan presented to Mr. Filippov and Mr. Lipetsker a detailed budget and forecast of estimated returns on an investment in the Project (the "Kagan Presentation").

15. Mr. Filippov and Mr. Lipetsker were told through the Kagan Presentation that the homes would be built on a fixed cost basis for each home, with a $75,000 contingency for cost overruns. A few weeks after the initial presentation, Kagan requested that such contingency be increased by another $100,000 for each home, but never deviated from his promise of a fixed cost.

16. In November 2012, Mr. Kagan, Mr. Filippov and Mr. Lipetsker formed the Company to carry out the Project.

17. Mr. Filippov and Mr. Lipetsker, as representatives of the Company, reasonably relied upon the Kagan Presentation in making their decision to invest in and undertake the Project. Mr. Filippov invested $2 million and Mr. Lipetsker invested $250,000.

18. The Lyman Cutler Operating Agreement expressly names Mr. Filippov as the managing member and expressly enumerates his rights and authority as managing member, including the exclusive authority to control the sale of the two new homes and the retention of any real estate brokers to sell them.

19. Mr. Kagan's fixed budget for the Project required $1.3 million for the construction of each home. The budget forecasted the need for an additional $200,000 for the "carrying costs" for the properties until such time as they could be sold, for a total budget for the construction, carrying cost and sale of each new home of $1.5 million.

20. Before they sought bank financing to buy the land and build the houses, Mr. Kagan persuaded Mr. Filippov that they should borrow an additional $100,000 for each new home for unexpected costs over and above the budget. Mr. Filippov agreed.

21. Accordingly, the Company borrowed $1.6 million for the construction and carrying costs of each new home. The Company also borrowed an additional $1.6 million to finance the balance of the purchase price for the land for the Project. In the aggregate, the Company borrowed $4.8 million.

22. At no time since October 25, 2012 did Mr. Kagan ever provide to any of the Plaintiffs an updated budget or forecast for the costs of the Project. At no time during the construction of the homes did Mr. Kagan ever tell the Plaintiffs that there were any cost overruns on either of the new homes. In April 2015, a full six (6) months after construction was completed, Mr. Kagan expressly told the Plaintiffs, through Mr. Filippov, that the construction and carrying costs for the two new homes were within budget. At no time did Filippov or Lipetsker approve any change orders or cost overruns.

23. Throughout the life of the Project, Mr. Kagan had check-writing authority on the Company's bank account and drew funds from the account at will. The Company, through Mr. Filippov, monitored the withdrawal of funds from the account and tried to keep the books for the Project, but Mr. Kagan failed and refused to provide any invoices, receipts or other documentation for his withdrawals from the account.

24. During construction, Mr. Kagan drew down essentially all of the $3.2 million borrowed by the Company to finance the construction and carrying costs. The lion's share of this sum was paid to KDC, ProExcavation and to subcontractors hired by KDC to perform the construction of the Lyman-Cutler properties.

25. Under the express terms of the LLC Agreement, Mr. Kagan was responsible for completing construction of the two new homes no later than March 30, 2014 in accordance with plans and drawings approved by Mr. Filippov. As the parties expressly negotiated and agreed and set forth in the LLC Agreement, Mr. Kagan's compensation for the construction was his interest in the profits from the LLC, which was higher than his ownership interest.

26. Mr. Kagan failed to complete the construction of the two new homes on or before March 30, 2014. On the contrary, construction was not complete until October 2014.

27. The Project plan was to sell the two new homes by no later than November 2014 for projected selling prices of $4,900,000 each.

28. Mr. Kagan's wife, Defendant Tatiana Kagan, is a real estate agent affiliated with Defendant Century 21. Mrs. Kagan is also an officer and director of KDC.

29. At Mr. Kagan's request, Mr. Filippov and Mr. Lipetsker agreed that the Company would list the new homes for sale with Mrs. Kagan. The Operating Agreement, however, provided that the obligation to use Mrs. Kagan expired on December 31, 2014 and that only Mr.

Filippov as managing member had the authority to retain real estate brokers for the sale of the new homes.

30. Without consulting the Plaintiffs, the Kagans set the selling price for each home at $5,499,000, or nearly $600,000 higher than the budgeted selling price for each home.

31. Upon information and belief, based upon a statement by another real estate broker in the Brookline area, in or about March 2015, a potential buyer made a bona fide offer of $4.5 million to buy the new home located at 88 Cutler Road, which Mrs. Kagan failed to present to Mr. Filippov to consider.

32. Upon information and belief, Mrs. Kagan rejected the offer and countered at $5 million, all without informing Mr. Filippov that an offer had been received. She thereby breached her duty to the Plaintiffs as a real estate agent.

33. By late April 2015, with the homes still unsold, and Mrs. Kagan doing little or nothing to market them actively, Mr. Kagan called Mr. Filippov and asked him to sign a new listing agreement with his wife to continue to try to sell the two new homes. Unhappy that the homes remained unsold months beyond the Project's planned completion date, Mr. Filippov refused and stated his intention to seek other assistance.

34. Without any authority whatsoever, and with actual knowledge that Mr. Filippov had the sole authority to retain real estate brokers and that he had refused to sign the listing agreement with Mrs. Kagan, Mr. Kagan unilaterally executed a purported listing agreement with his wife and Century 21 shortly after Mr. Filippov refused to sign the agreement.

35. Upon information and belief, based upon the fact that the Kagans are married and business partners, Mrs. Kagan also knew or should have known that her husband did not have authority to sign the listing agreement and that Mr. Filippov had refused to sign it.

36. Shortly after signing the unauthorized listing agreement, on May 7, 2015, Mr. Kagan, through counsel, wrote to Mr. Filippov making fabricated claims that Mr. Filippov had set the listing price for the two new homes and had refused to reduce the price. To the contrary, the Kagans set the selling price without ever consulting the Plaintiffs (and indeed responded to an offer in March 2015 without ever informing them).

37. In addition, Mr. Kagan claimed for the first time that he had cost overruns on the Project adding up to over $1 million and announced that he would no longer meet his obligation to pay for the carrying costs on the Project as required by Article 8.1 of the LLC Operating Agreement.

38. Upon information and belief, the Kagans knew that their demands in the May Letter would engender a dispute with the Plaintiffs and they knowingly and intentionally entered into the fraudulent, unauthorized listing agreement in order to give themselves unfair leverage shortly before sending the May Demand Letter.

39. After the Plaintiffs sued the Defendants in state court, the Defendants produced for the very first time another listing agreement, purportedly signed on August 12, 2014 by Vadim Kagan granting an exclusive listing to Century 21 and his wife, Tatiana, for a term of approximately 18 months, extending through March 1, 2016.

40. Mr. Kagan knew or should have known at the time that he executed this listing agreement that he had authority to retain his wife, Tatiana, as the exclusive agent to sell the properties only through December 31, 2014. Mrs. Kagan also knew or should have known that her husband had no authority to sign a listing agreement extending beyond December 31, 2014.

41. Prior to the service of this document upon counsel for the Plaintiffs in connection with the state court litigation on June 11, 2015, neither Mr. Filippov nor Mr. Lipetsker had ever seen or been informed about the terms of the purported August 2014 listing agreement.

42. Upon information and belief, eighteen months is three times as long as the industry standard for an exclusive listing agreement.

43. On or about June 22, 2015, Kagan caused his company, KDC, to file a mechanic's lien against the Company's properties, asserting a lien in the amount of $2,095,985.23 (the "Mechanics Lien") -- nearly triple the amount he had asserted in unreimbursed construction costs as of May 7, 2015 when he claimed that the unreimbursed construction costs amounted to $758,025.56.

44. In addition to falsely asserting that the unreimbursed construction costs tripled in a six-week period some eight months after construction had been completed, the Mechanic's Lien purports to arise out of a contract between the Company and KDC dated June 24, 2013. Before Kagan produced it in discovery, neither Mr. Filippov nor Mr. Lipetsker had ever seen the purported June 2013 contract. The first time they were ever informed about its alleged existence was in when it was cited in the Mechanic's Lien. The purported June 2013 contract directly contradicts the terms of the LLC Agreement and neither Mr. Filippov nor Mr. Lipetsker ever saw or approved or would have approved it.

45. Plaintiffs have interviewed several witnesses who are former investors in Kagan projects and who have reported that they experienced the same type of fraudulent conduct by Mr. Kagan in connection with their projects as the Plaintiffs are experiencing. Specifically, multiple witnesses report that Kagan presented them with a budget at the outset of the project, assured them that everything was within budget until after construction was complete and shortly before

the homes sold, and then announced extensive cost overruns and either filed a lien or threatened to file a lien unless they agreed to the payment of these last minute purported cost overruns.

46. In addition, Plaintiffs have interviewed KDC's former bookkeeper, who reports that Kagan uses ProExcavation as a vehicle to double-bill expenses to his projects, mixes expenses for projects on his American Express card and pockets himself funds received for return of unused materials, does not keep accurate records of his subcontracting costs, receives cash kickbacks from some of his subcontractors, and intentionally inflates excavation charges.

47. ProExcavation's alleged charges on the Project are double what any conceivably legitimate charges for the work it performed on the Project would be, and in aggregate exceed $900,000. Neither ProExcavation nor any of the Defendants have ever provided any meaningful support for these inflated charges.

48. The Kagans have complete control over both KDC and ProExcavation and at all relevant times controlled the funds of the Company. They abused their fiduciary position of power and trust to inflate charges and fraudulently milk the Project for their own unjust enrichment.

49. Upon information and belief based upon the facts recited above, the Mechanic's Lien and the cost overruns asserted by Kagan through KDC and ProExcavation are false and fraudulent. The KDC and ProExcavation bills are rife with double billing, false and inflated charges. The Mechanic's Lien forced the Company to file for bankruptcy in this Court and the Company's properties were sold by the Chapter 7 Trustee at below market value.

50. Kagan personally misled the Plaintiffs into investing in the Project and then into believing that the Project was within budget until long after construction was complete, while he

planned all along to inflate the construction costs and wrongfully force the Plaintiffs to accept those costs through falsified claims and an untimely and fraudulent mechanic's lien.

51. The Plaintiffs assert these claims both a counter-claims to the proofs of claim filed by each of the Defendants and to affirmatively recovery damages against the Defendants.

## COUNT I

### BREACH OF CONTRACT (PLAINTIFFS against VADIM KAGAN)

52. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

53. The LLC Agreement is a binding agreement among the parties, which states their rights, obligations and authority to act on behalf of the LLC.

54. Mr. Kagan has breached the LLC Agreement in multiple ways, including, without limitation by:

    a. Failing to complete construction of the new homes on time;

    b. Signing listing agreements with his wife, Tatiana Kagan, that he knew he lacked authority to sign;

    c. Signing a contract with KDC, which purports to contradict the terms of the LLC Agreement, without ever submitting it to the other members for review and approval;

    d. Asserting claims against the Plaintiffs for unauthorized, untimely and unsubstantiated cost overruns;

    e. Double billing the Company and otherwise falsifying claims for construction costs;

    f. Failing to obtain Mr. Filippov's approval for any cost overruns; and

      g. Refusing to honor his obligation to pay the monthly carrying costs when the new homes did not sell within 23 months of the date of acquisition.

55. As a result of Mr. Kagan's breach of the LLC Agreement, the Plaintiffs have suffered damages in an amount to be determined at trial.

## COUNT II

### BREACH OF FIDUCIARY DUTY (PLAINTIFFS against VADIM KAGAN)

56. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

57. At all relevant times, Mr. Kagan has owed a fiduciary duty to the Plaintiffs.

58. Mr. Kagan has breached his fiduciary duty to the Plaintiffs by the conduct described in this Complaint.

59. As a result of Mr. Kagan's breaches of his fiduciary duty to them, Plaintiffs have suffered damages for which Mr. Kagan is liable in an amount to be determined at trial.

## COUNT III

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY (PLAINTIFFS against TATIANA KAGAN, KDC and PROEXCAVATION)

60. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

61. Tatiana Kagan, KDC and ProExcavation knowingly and intentionally aided and abetted Mr. Kagan's breach of his fiduciary duty to the Plaintiffs.

62. As a result of aiding and abetting Mr. Kagan's breach of fiduciary duty, Plaintiffs have suffered damages for which Tatiana Kagan, KDC and ProExcavation are liable in an amount to be determined at trial.

## COUNT IV

### FRAUD (PLAINTIFFS against ALL DEFENDANTS)

63. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

64. Mr. Kagan personally engaged in at least the following fraudulent acts:

(a) knowingly and intentionally presenting a false budget to Mr. Filippov and Mr. Lipetsker to induce them to invest in the Project, which he represented to them as fixed, with actual present knowledge and intent to defraud them by inflating the construction costs and pressuring them to acquiesce in the false additional charges through a false mechanic's lien, just as he has done to other investors in the past;

(b) over billing the Company for materials not used on the Project, which, upon information and belief, he used on other contemporaneous construction projects;

(c) using KDC and ProExcavation as vehicles to double bill the Company for services and materials;

(d) secretly signing a false and fraudulent construction contract while purporting to act for both the Company and KDC, which directly contradicts the terms of the deal he made with Filippov and Lipetsker as set forth in the LLC Agreement, and then submitting false claims for general contractor fees and overhead based on this fraudulent contract amounting to $625,221.52;

(e) knowingly and intentionally signing contracts with his own wife that he knew he did not have authority to sign for the purpose of extracting additional funds or other concessions from the Company, Filippov and Lipetsker;

(f) knowingly and intentionally using ProExcavation as a vehicle to submit false and fraudulent claims for payment in excess of $900,000, for services that were fairly worth only a fraction of that sum;

(g) falsifying books and records to cover for his fraud; and

(h) causing KDC to file a false and fraudulent mechanic's lien against the Project.

65. Tatiana Kagan has individually participated in fraud by conspiring with her husband to have him sign contracts with her when she knew that her husband did not have authority to sign either of the listing agreements with her. Tatiana is also individually responsible for the fraudulent acts of KDC and ProExcavation because she is an owner and director of both of the Companies. .

66. KDC has specifically engaged in fraud by double billing the Company, knowingly and intentionally overcharging for materials, charging the Company for materials not used on the Project, asserting a false and fraudulent contract as the basis for a claim for $625,221.52 in general contractor and overhead fees against the Company, falsifying books and records to cover for its fraud, and knowing and intentionally filing a false and fraudulent mechanic's lien of over $2 million against the Property.

67. ProExcavation has specifically engaged in fraud by submitting over $900,000 in charges to the Company for services worth only a fraction of that sum.

68. As a result of this fraudulent conduct by the Kagan Parties, the Plaintiffs have suffered and may suffer further damages for which the Kagans should be held liable in an amount to be determined at trial.

## COUNT V

### CONSPIRACY (PLAINTIFFS against ALL DEFENDANTS)

69. Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

70. Through the conduct described herein, the Defendants have conspired to defraud the Plaintiffs.

71. As a result of their unlawful conduct in furtherance of their conspiracy, each co-conspirator is jointly and severally liable to the Plaintiffs for damages in an amount to be determined at trial.

### COUNT VI

### VIOLATION OF M.G.L. ch. 93A by the COMPANY against TATIANA KAGAN, KDC and PROEXCAVATION

72. The Company repeats and realleges the foregoing allegations as if fully set forth herein.

73. By asserting two knowingly unauthorized and fraudulent listing agreements against the Company, Tatiana Kagan violated M.G.L. ch. 93A.

74. By asserting knowingly fraudulent charges against the Company and engaging in double billing, ProExcavation violated M.G.L. ch. 93A.

75. By double billing the Company, falsifying records, billing it for materials not used on the Project, falsifying a construction contract with the Company, and filing a fraudulent Mechanics Lien against the Properties based on false billing and a false contract, KDC has violated M.G.L. ch. 93A.

76. For their violations of M.G.L. ch. 93A, Defendants Tatiana Kagan, KDC and ProExcavation are liable to the Company in an amount to be determined at trial, together with multiple damages and attorneys' fees.

### COUNT VII

### BREACH OF CONTRACT by the COMPANY against KDC

77. The Company repeats and realleges the foregoing allegations as if fully set forth herein.

78. The Company entered into a contract with Defendant KDC that required, among other things, that KDC perform its work in a good and workmanlike manner.

79. KDC breached its contract by failing to complete its work in a good and workmanlike manner.

80. As a result of KDC's failure to complete construction in a good and workmanlike manner, the Company has suffered and is suffering damages in connection with remedying the shoddy construction for which KDC is properly held liable.

## COUNT VIII

### EQUITABLE SUBORDINATION by FILIPPOV and LIPETSKER against ALL DEFENDANTS

81. Filippov and Lipetsker repeat and reallege the foregoing allegations as if fully set forth herein.

82. Defendants have engaged in inequitable conduct as set forth herein.

83. Defendants' inequitable conduct has caused Filippov and Lipetsker to suffer damages and conferred an unfair advantage on the Defendants.

84. Defendants' claims should therefore be equitably subordinated to the claims Filippov and Lipetsker pursuant to 11 U.S.C. § 510(c)(1).

WHEREFORE, Plaintiffs ask that the Court:

A. Enter judgment in the Plaintiffs' favor and against all Defendants in an amount sufficient to compensate Plaintiffs fully, plus interest and costs;

B. Award the Company triple damages and attorneys' fees against Tatiana Kagan, KDC and ProExcavation;

C. Issue a declaratory judgment voiding the claims filed by each of the Defendants;

D. Reduce or eliminate the Defendants' proofs of claim;

E. Equitably subordinate all of the Defendants' claims to the claims and equity interests of Filippov and Lipetsker pursuant to 11 U.S.C. § 510(c)(1); and

F. Grant Plaintiffs such other and further relief as is just or appropriate.

    Respectfully Submitted,

    Lyman-Cutler, LLC
    By Its attorneys,
    The Tamposi Law Group, P.C.

    */s/ Peter N. Tamposi*
    Peter N. Tamposi (BBO #639497)
    The Tamposi Law Group, P.C.
    159 Main Street
    Nashua, NH 03060
    (603) 204-5513
    (603) 204-5515 (fax)

    ALEX FILIPPOV and
    NICKOLAY LIPETSKER,
    By their attorneys,

    */s/ Sean T. Carnathan*
    Sean T. Carnathan, BBO No. 636889
    scarnathan@ocmlaw.net
    Joseph P. Calandrelli, BBO No. 666128
    jcalandrelli@ocmlaw.net
    O'Connor, Carnathan and Mack, LLC
    1 Van de Graaff Dr. Suite 104
    Burlington, MA 01803
    T: 781-359-9000

Dated: November 7, 2017

<u>Certificate of Service</u>

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on November 7, 2017.

                                         */s/ Sean T. Carnathan*

4839-5584-9556, v. 1