UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | ) | |
| LYMAN-CUTLER, LLC, ALEX | ) | |
| FILIPPOV AND NICKOLAY LIPETSKER | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adv. Proc. No.  16-01120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, TATIANA KAGAN, | ) | |
| KAGAN DEVELOPMENT KDC, CORP. | ) | |
| and PROEXCAVATION CORP. | ) | |
| | ) | |
| Defendants. | ) | |

MEMORANDUM OF TATIANA KAGAN IN SUPPORT OF
MOTION TO DISMISS AMENDED COMPLAINT

INTRODUCTION

On November 7, 2017, Lyman-Cutler, LLC (the "Debtor" or the "Company"), Alex

Filippov ("Filippov") and Nickolay Lipetsker ("Lipetsker," together with the Debtor and

Filippov, the "Plaintiffs") filed an Amended Complaint (the "Complaint")[Adv. Proc. Docket

No. 52].  This latest iteration of the Complaint represents the third attempt by the Plaintiffs to set

forth cognizable claims against Tatiana Kagan ("Tatiana").[1]  For almost three years, the

---

[1] Each of the Defendants in this proceeding has concurrently filed a separate Motion to Dismiss.  In a state court
proceeding amongst these same parties, the state court dismissed the Plaintiffs' claims of fraud and conspiracy.  An
earlier motion to dismiss filed in this case was never formally ruled upon.

Plaintiffs have been alleging "fraud" and insisting that they possess overwhelming evidence of malfeasance by Tatiana and the rest of the Defendants. The Defendants previously moved to dismiss the original Complaint, arguing, among other things, that the facts did not support the claims and that the action was a transparent attempt by Filippov and Lipetsker to avoid paying for construction services provided by Kagan Development KDC, Corp. ("KDC") and retain all proceeds from the Project (defined below) for their sole benefit. Now, based on their recent responses to interrogatories, it is confirmed that the Plaintiffs' claims truly are nothing more than unsubstantiated allegations intended to force the Defendants to capitulate on their valid proofs of claim. With the benefit of the Plaintiffs' interrogatory responses, Tatiana renews her motion to dismiss the Complaint. The instant motion to dismiss is not simply a rehashing of the prior motion. Rather, the Defendants now have irrefutable proof that this lawsuit is nothing more than a patent fishing expedition.

The gravamen of the Complaint is that Vadim Kagan ("Kagan") fraudulently induced Filippov and Lipetsker to join with him in a real estate development project by falsely representing its projected costs. Filippov and Lipetsker allege that Kagan claimed, months after the Project was completed, that the actual cost grossly exceeded the projected costs. Filippov and Lipetsker immediately concluded that there must be a fraud, even though they had no evidence beyond their unsupported suspicion. Using a shotgun approach, instead of simply suing Kagan, Plaintiffs have added Tatiana, KDC and ProExcavation Corp. ("ProExcavation") solely because of their relationship with Kagan – not because the Plaintiffs have any evidence of affirmative malfeasance. In recent interrogatory responses, discussed below, Plaintiffs admit they have no facts to support their claims against Tatiana or the other Defendants. At a minimum, the dearth of any specific facts to support Plaintiffs' fraud based allegations mandates

dismissal pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, made applicable to this
Proceeding by Rule 7009 of the Federal Rules of Bankruptcy Procedure.

## FACTS[2]

According to the Complaint, on October 25, 2012, Kagan made a presentation to
Lipetsker and Filippov wherein he falsely represented the costs to develop two homes on
property that he had located and planned to purchase (the "Project"). (Cmp., ¶¶11-15). There is
no allegation that his wife, Tatiana, had any role in this presentation and it predates the formation
of the Debtor, any construction on the Project, or the listing of any of the properties for sale. In
reliance on Kagan's presentation, Filippov and Lipetsker agreed to invest in the venture and
formed the Debtor. (Id., ¶16-17).[3] Kagan then allegedly convinced the Debtor to borrow $1.6
million for the construction and carrying costs for each of the two homes and supposedly assured
Plaintiffs that this would be sufficient to cover all costs. (Id., ¶21).

Under the Debtor's operating agreement (the "Operating Agreement"), Kagan was
solely responsible for constructing the homes for the Debtor. Op. Ag., ¶5.2.[4] To do so, Kagan
engaged construction contractors, had check-writing authority (using an account opened and
controlled by Filippov) and drew down the entirety of the $3.2 million construction loan by

---

[2] The Defendants do not concede the accuracy of the Plaintiffs' allegations. However, for purposes of the present motion to dismiss, the factual allegations contained in the Complaint are presumed to be true. Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48-49 (1st Cir. 2009). Conclusory statements, however, are not. Ashcroft v. Iqbal, 556 U.S. 662, 681 (2009).

[3] Although Plaintiffs plead that the Debtor too relied on the presentation, given that the presentation occurred several weeks before the Debtor was even formed, it is hard to comprehend how it could have relied on it. See Cmp., ¶¶16, 17.

[4] "Where a Plaintiff had notice of a document, relied on it when drafting the Complaint, and explicitly referenced the document in the pleading, attaching that document to a motion to dismiss does not convert the motion to one for summary judgment. See Marram v. Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996); Wong v. Resolve Tech, 2011 WL 3157198 at *1 n. 1 (D. Mass. 2011); Young v. Lepone,305 F.3d 1, 11 (1st Cir. 2002) (allowing consideration of documents submitted by defendant on motion to dismiss where the Complaint contained references to" the documents and "the factual allegations of [the] Complaint revolved around" the documents). A copy of the Operating Agreement is annexed hereto as Exhibit 1.

paying it to KDC, who was the Project general contractor, and its subcontractors, including

ProExcavation. (Cmp., ¶24). As KDC and its subcontractors constructed the homes, this should

certainly come as no surprise. In exchange for building the homes, Kagan agreed not to bill his

time and agreed to a greater percentage of the anticipated profits in lieu thereof. (Id., ¶25, Opr.

Agr., ¶¶5.2, 8.1). According to the Complaint, Kagan completed the Project several months late

and never advised anyone that there were cost overruns on the Project. (Cmp., ¶¶25-27). There

is no allegation that the Debtor paid any monies beyond the amount of the construction loans it

took out. The cost overruns were borne by KDC.

Tatiana is first mentioned in paragraph 28 of the Complaint, where she is identified as a

real estate agent affiliated with "Defendant Century 21"[5] and an officer and director of KDC.

(Id., ¶28). Filippov and Lipetsker agreed to list the new homes for sale with Tatiana. (Id., ¶29).

Plaintiffs claim that per the Operating Agreement, their obligation to list with Tatiana expired on

December 31, 2014. (Id.). In fact, the Operating Agreement does not say this. Rather, it

provides that "[i]n order to remove Tatiana as a listing broker by December 31, 2014 will require

a written consent of the Members owning at least eighty one (81%) of the Percentage Interests in

the Company [which functionally means unanimous consent]. After December 31, 2014, no

such consent shall be required." (Op. Agr., ¶6.1(b)(6)). There is no allegation in the Complaint

that anyone ever attempted to remove Tatiana. Instead, the issue raised by the Complaint is

whether the listing agreements with Century 21, signed by Kagan but not by Tatiana, were valid.

(Cmp., ¶¶33, 39, 40).

---

[5] Century 21 is not a defendant. It was, however, a defendant in the state court incarnation of this Complaint. The
pronoun "Defendant" appears to be a vestige from the earlier state court pleading.

Shortly after filing for Chapter 11 protection, the Debtor moved to reject the two Century 21 listing agreements as executory contracts. [Main Case Docket No. 6.] Copies of the two listing agreements were annexed to Debtor's motion as exhibits. Tatiana did not sign either of them, although she is listed therein as the "Designated Agent" appointed by Century 21 to sell the Debtor's properties. Prior to filing the Chapter 11 petition, the Debtor retained a different agent at Century 21 to sell its properties. (Filippov Int. Ans. No. 2;  Lipetsker Int. Ans. No. 2; Debtor Int. Ans. No. 2).[6] When the underlying properties were sold and one of the properties was sold to a buyer produced by Century 21, with the approval of this Court, Century 21 was paid a commission. Tatiana never asserted a claim for a commission in these proceedings.

Plaintiffs allege that Tatiana did little or nothing to market the homes. (Cmp., ¶33). They further allege that "the Kagans" set the listing price too high and without consulting anyone else. (Id., ¶30). Worse still, in March 2015, three months after Plaintiffs claim Tatiana no longer had the right to act as the Debtor's agent, she allegedly failed to transmit a "bona fide offer" to Filippov. We now know, based upon Plaintiffs' sworn interrogatory responses, that there was no "bona fide offer." Rather, another broker supposedly told Filippov that "she had made a verbal offer … for $4.5 million…"[7] (Filippov Int. Ans. No. 3; Lipetsker In. Ans. No. 3; Debtor Int. Ans. No. 3) which supposedly Tatiana countered at $5 million. In the real estate world, due to the statute of frauds, verbal offers are not "bona fide offers." See United Methodist Church v. Rogers, 1989 WL 1184012 (Massachusetts Land Court, 1989)("bona fide offer" means an "enforceable" offer). Notwithstanding that there never was a written offer, Plaintiffs claim that

---

[6] Copies of the answers to interrogatories propounded by Tatiana to Filippov, Lipetsker and the Debtor are annexed hereto as Exhibits 2, 3 and 4, respectively.

[7] According to Plaintiffs, the selling price was $4.9 million. (Cmp., ¶27). Thus, this "verbal offer" was a "lowball" solicitation.

by failing to pass along this "verbal offer," Tatiana allegedly "breached her duty to them as a real estate agent." (Cmp., ¶32).

Plaintiffs allege that in April, 2015, Kagan (not Tatiana), called Filippov to seek permission to enter into a new listing agreement with Tatiana.  Filippov supposedly refused. Despite his refusal, "Kagan **unilaterally** executed a purported listing agreement with his wife and Century 21…" (Emphasis added)(Id., ¶34).  Although Plaintiffs plead that Kagan acted unilaterally, they then plead "**upon information and belief, based on the fact that the Kagans are married and business partners**, Mrs. Kagan also knew or should have known that her husband did not have authority to sign the listing agreement and that Mr. Filippov had refused to sign it." (Emphasis added)( Id. ¶35).  This supposition is quite the leap of faith…and simply not true.

Plaintiffs' responses to Tatiana's interrogatories reveal that Tatiana had virtually nothing to do with the construction of the Project outside of her efforts as a real estate agent to sell the properties.  Lipetsker claims to never have spoken with Tatiana.  (Lipetsker Int. Ans. No. 1). The Debtor and Filippov claim to have had only two communications with Tatiana over the course of the entire Project.  The first was in July, 2014, wherein she allegedly told them that there was a lot of interest in the homes.  The second was in April, 2015, when Filippov and Tatiana "exchanged a text message that has been produced in discovery." (Filippov Int. Ans. No. 1; Debtor Int. Ans. No. 1).  Though in his interrogatory responses Filippov conveniently omits any description of the content of that text message, it is actually a <u>confirmation</u> by Filippov that he had approved extending the very listing agreement which he now claims was unauthorized.  <u>See Exhibit 5</u> ("I sent confirming e-mail to Dan"[8]).  These responses make clear not only that the allegation is patently false, but even though Plaintiffs seek to paint Tatiana with

---

[8] Dan worked for Kagan.

all the alleged transgressions attributed to her husband, other than two isolated communications, she was not involved with the Project in any capacity other than as an authorized real estate agent.

In May, 2015, Kagan (not Tatiana), through counsel, wrote to Filippov. (Cmp. ¶36). The letter states that it is sent on behalf of Kagan and KDC. (Id.).[9] It contains no claims by Tatiana. According to Plaintiffs, this letter represented the first time they learned that there had been cost overruns on the Project and that Kagan would no longer pay carrying costs. (Cmp., ¶37). Although Tatiana is not mentioned in the letter and no claims are asserted on her behalf therein, Plaintiffs plead that "upon information and belief, the Kagans knew that their demands in the May Letter would engender a dispute with the Plaintiffs…." (Emphasis added)( Id., ¶38). The averment that Tatiana asserted claims in the May letter is belied by the very document Plaintiffs reference.

On June 5, 2015, the Debtor (only) filed suit against Kagan, Tatiana and Century 21 in the Middlesex Superior Court.   Through discovery, Plaintiffs claim to have learned about a listing agreement with Century 21 which had been signed by Kagan on August 12, 2014, which they claim was for an unreasonably long term.  (Id., ¶¶39-41).  Prior to receiving that document during the state court litigation, Plaintiffs claim to have been unaware that this agreement even existed.  (Id.)

On June 22, 2015, Plaintiffs allege that Kagan (not Tatiana) caused KDC to file a false and inflated mechanics lien. (Id., ¶¶43, 44).  ProExcavation, a subcontractor to KDC, also

---

[9] A copy of the May letter is annexed hereto as Exhibit 6.

allegedly submitted false charges.[10]  Although there has been virtually no allegation that Tatiana

had any role in the Project other than as a real estate agent, Plaintiffs added a new allegation in

the Complaint claiming that the "Kagans" had "complete control over both KDC and

ProExcavation and at all relevant times controlled the funds of the Company." (Emphasis

added)(Id., ¶48).  As the "Company" is defined as the Debtor (Id., p. 1) and Tatiana is not a

member or manager of the Debtor and had no check writing authority for the Debtor, it is hard to

comprehend how she could have controlled the Debtor's funds.  Moreover, Plaintiffs' own

pleading makes clear that it was Kagan, not Tatiana, who allegedly drained the Company coffers.

(Id., ¶¶23-24).  Plaintiffs then go on to allege that "[t]hey [Kagan and Tatiana] abused their

fiduciary position of power and trust to inflate charges...."  Assuming, *arguendo* that Kagan

owed a fiduciary duty as member of the Debtor, Plaintiffs provide no factual predicate to explain

how Tatiana, who is not a member of the Debtor, somehow owed a fiduciary duty to any of the

Plaintiffs.  Merely saying it, does not make it legally so.

Summing up the factual predicate for all of their claims, Plaintiffs conclude that "Kagan

**personally** misled the Plaintiffs into investing..." and mislead them throughout the project with

respect to the costs.  (Cmp., ¶50)(Emphasis added).  Conspicuous by its omission, the summation

says nothing about Tatiana.

<u>TATIANA'S PROOF OF CLAIM</u>

Tatiana has made no claim that she is entitled to any Project monies.  Her claim [Claim

No. 5] is for indemnity only based on Section 10.2 of the Operating Agreement which offers

indemnity to members and their "authorized agents."  There is no dispute that Tatiana acted as a

---

[10] As noted in ProExcavation's motion to dismiss, in their responses to interrogatories propounded by
ProExcavation, Plaintiffs admit they never saw a bill from ProExcavation,  never saw charges from ProExcavation,
and have no idea what ProExcavation did on the Project.  That notwithstanding, somehow they were able to
conclude that ProExcavation's billing was fraudulent.

real estate agent for the Debtor.  Clearly, she is covered by the indemnity provisions; and

indemnification is meaningless if it provides no protection against meritless litigation that causes

her to incur significant legal expenses.

## COUNTS ASSERTED AGAINST TATIANA

Tatiana is named in the following counts:  Count III (Aiding and Abetting Breach of

Fiduciary Duty); Count IV (Fraud); Count V (Conspiracy); Count VI (M.G.L. c. 93A); and

Count VIII (Equitable Subordination).

## STANDARD ON A MOTION TO DISMISS

In determining a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), made applicable

to this proceeding by Fed. R. Bankr. P. 7012, the Court accepts as true all well-pleaded facts in

the Complaint and drawing all reasonable inferences in the Plaintiffs' favor.  Gargano v. Liberty

Int'l Underwriters, Inc., 572 F.3d 45, 48-49 (1st Cir. 2009).  However, a court is not bound "to

credit 'bald assertions, unsupportable conclusions, and opprobrious epithets' woven into the

fabric of the Complaint."  In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 15 (1st Cir.

2003).  To successfully withstand a motion to dismiss, the Plaintiff must state a claim that is

plausible on its face.  Ashcroft v. Iqbal, 556 U.S. 662 (2009) (citing Bell Atl. Corp. v. Twombly,

550 U.S. 544, 570 (2007)); see also Gargano, 572 F.3d at 48-49.

"Factual allegations must be enough to raise a right to relief above the speculative level,

... on the assumption that all the allegations in the Complaint are true (even if doubtful in fact)."

Twombly, 550 U.S. at 555 (citations omitted).  According to the Supreme Court, "[t]he

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (quoting Twombly,

550 U.S. at 556).  As the Court stated, "[t]he need at the pleading stage for allegations plausibly

suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule

8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to

relief.'" Twombly, 550 U.S. at 557.  The Court also noted, however, that pleadings must contain

more than "labels, conclusions and formulaic recitation[s] of a cause of action's elements...."

Id. at 545.  To satisfy the general pleading requirement of Federal Rule of Civil Procedure 8(a), a

Plaintiff must plead enough facts to state a claim for relief that is plausible on its face." Id. at

570.  Otherwise, where Plaintiffs "have not nudged their claims across the line from conceivable

to plausible, their Complaint must be dismissed." Id. at 547.  In Iqbal, the Court cautioned that

allegations that are conclusory are not "entitled to be assumed true" for purposes of ruling on a

motion to dismiss. Iqbal, 556 U.S. at 681; see also Twombly, 550 U.S. at 554-55.  "Nor does a

Complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"

Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

ARGUMENT

I.   THE DEBTOR LACKS STANDING.

This Court has twice ruled that the Debtor lacks standing to object to Tatiana's proof of

claim [Main Case Docket Nos.132 and 152 and has recently ruled that the "Debtor no longer

exists." Adv. Proc. Docket Nos. 235-37.  These decisions are supported by the fact that the

Debtor has no remaining business and no pecuniary interest in the outcome of this action.  All

that is left to be done is for the Chapter 7 Trustee to distribute the proceeds from the sale of the

properties to the claimants and interest holders.  Moreover, the Operating Agreement itself

provides that the term of the Debtor "shall continue [only] until November 30, 2015."  (Opr.

Agr., ¶2.3).  The Plaintiffs assert that the Complaint is brought as "counterclaims to the proofs of

claim." (Cmp., ¶1).  But the Debtor cannot create standing in the form of a

counterclaim/objection to Tatiana's claim where it was already ruled not to exist.  Given the

Court's recent ruling that the Debtor no longer exists, all of the Debtor's claims must be

dismissed.

## II.   THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER LIPETSKER'S AND FILIPPOV'S AFFIRMATIVE CLAIMS.

It is not disputed that Filippov and Lipetsker have standing to object to the proofs of

claim, and this Court has jurisdiction over those pending matters.  But as set forth in the Reply to

Lyman-Cutler, Alex Filippov, and Nickolay Lipetsker's Joint Statement Regarding the Court's

Jurisdiction dated September 1, 2017 (the "Jurisdiction Statement")[Adv. Proc. Docket No. 44],

the Defendants maintain that the claims asserted in this proceeding are outside of the Court's

subject matter jurisdiction.[11]  As set forth more fully in the Jurisdiction Statement, the claims

asserted by Filippov and Lipetsker simply have no conceivable effect on the bankruptcy estate.

Specifically, any affirmative relief sought will neither change the bankruptcy case or the

distribution to creditors.

The jurisdiction of bankruptcy courts is grounded in and limited by statute.  Celotex

Corp. v. Edwards, 514 U.S. 300, 307 (1995); 28 U.S.C. § 1334(b); 28 U.S.C. § 157(a).  Section

1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all

civil proceedings arising under title 11, or arising in or related to cases under title 11."  In turn,

Section 157(a) permits the district court to refer "any or all proceedings arising under title 11 or

arising in or related to a case under title 11 . . . to the bankruptcy judges for the district."

Celotex, 514 U.S. at 307 (quoting 28 U.S.C. § 157(a)).

The statutory scheme creates three prongs of bankruptcy jurisdiction:  (1) proceedings

arising under the Bankruptcy Code; (2) proceedings arising in a case under the Bankruptcy Code;

---

[11] Tatiana incorporates herein by reference the Jurisdiction Statement.

and (3) proceedings related to a case under the Bankruptcy Code.  Since the claims asserted by

Filippov and Lipetsker do not arise under the Bankruptcy Code or arise from the underlying

bankruptcy case, the Court must examine whether the claims among non-debtors are "related to"

the case.  Celotex, 514 U.S. at 309-11.

To determine whether "related to" jurisdiction exists, courts have universally adopted the

test first articulated by the Third Circuit in Pacor, Inc. v. Higgins, 743 F.2d 984 (3d Cir. 1984):

> A matter is related to the bankruptcy case for §1334 purposes if the outcome
> of that proceeding could conceivably have any effect on the estate being
> administered in bankruptcy . . . .  Moreover, an action is related to
> bankruptcy if the outcome could alter the debtor's rights, liabilities, options
> or freedom of action (either positively or negatively) and in any way impacts
> upon the handling and administration of the bankruptcy estate.

Id. at 994.  The claims brought by Filippov and Lipetsker do not meet this standard.  If Filippov

and Lipetsker wish to raise certain objections to the proofs of claim, those matters are admittedly

before this Court.  If they wish to pursue affirmative relief against the Defendants, the relief

sought is outside of this Court's jurisdiction.[12]

It was Filippov's and Lipetsker's decision to put the Debtor in bankruptcy, but in doing

so they do not get the benefit of this Court to pursue non-debtor litigation that has no bearing on

the bankruptcy case.  To the extent they wish to seek a resolution of those disputes, which are

entirely based in state law, they should be forced to do so in state court after the bankruptcy

---

[12] Any argument that Tatiana or any of the Defendants have consented to or waived any defect in this Court's
subject matter jurisdiction is not correct.  "[P]arties cannot confer subject matter jurisdiction on a federal court by
waiver or consent."  Quinn v. City of Boston, 325 F.3d 18, 26 (1st Cir. 2003); see also Sheridan v. Michels (In re
Sheridan), 362 F.3d 96, 100 (1st Cir. 2004) (citing to Quinn).  Moreover, "[a] litigant generally may raise a court's
lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate
instance."  Kontrick v. Ryan, 540 U.S. 443, 455 (2004) (citing Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379,
382 (1884)).

claims are resolved.  This Court should dismiss Filippov's and Lipetsker's claims for lack of

subject matter jurisdiction.[13]

### III. PLAINTIFFS HAVE FAILED TO STATE A
### VIABLE CLAIM FOR FRAUD AGAINST TATIANA.

The Plaintiffs' fraud claim against Tatiana, Count IV, and all additional counts against

her which are based on the alleged fraud (Counts, III, V, VI and VIII), must be dismissed

because they fail to satisfy the particularity requirements of Fed. R. Civ. P 9(b), made applicable

to this adversary proceeding by Bankruptcy Rule 7009.  De Prins v. Michaeles, 189 F. Supp. 3d

209, 215 (D. Mass. 2016)( "Although here the claim itself is not for fraud, "[e]ven when a

plaintiff is not making a fraud claim, courts will require particularity in the pleading if the cause

of action is premised on fraudulent conduct." § 1297 Pleading Fraud With Particularity—In

General, 5A Fed. Prac. & Proc. Civ. § 1297 (3d ed.).  Therefore, to the extent that Plaintiff's

claims are grounded in fraud, the heightened pleading standards will apply.");  Natale v. Espy

Corp., 2 F. Supp. 3d 93, 99 (D. Mass. 2014) ("For claims where 'fraud lies at the core of the

action,' Rule 9(b) renders the pleading requirement more stringent.");  Shapiro v. Miami Oil

Producers, Inc., 84 F.R.D. 234, 236 (D. Mass. 1979)("… Rule 9(b)'s particularity requirement

"extends to averments of fraud or mistake, whatever may be the theory of legal duty -- statutory,

tort, contractual, or fiduciary.");  Enercon v. Global Computer Supplies, Inc., 675 F. Supp. 2d

188, 190 (D. Me. 2009) ("The United States Court of Appeals for the First Circuit reads Fed. R.

Civ. P. 9(b) expansively to cover associated claims where a Complaint's core allegations

effectively charge fraud, even when those claims are for negligent misrepresentation and breach

of fiduciary duty.").  The Complaint must set out, **with specificity**, what Tatiana personally did

---

[13] In response to its show cause request, this Court made clear that "any affirmative recovery, over and above what is necessary to wholly setoff the claim of a particular defendant, is less certain…" [Adv. Proc. Docket No. 48]. Thus, this Complaint should be treated solely as an objection to Tatiana's claim.  To the extent of an affirmative recovery is sought, these claims should be dismissed.

in furtherance of the alleged fraud. Plaintiffs have not satisfied Rule 9(b) simply by arguing that

because she is Kagan's wife and business partner she must be part of the fraud he allegedly

perpetrated.

Rule 9(b) of the Federal Rules of Civil Procedure requires pleading fraud with

particularity. See United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 226

(1st Cir. 2004) ("We have said that Rule 9(b) requires that a Plaintiff's averments of fraud

specify the time, place, and content of the alleged false or fraudulent representations.") (internal

citations omitted). "The purpose of this requirement is to 'give notice to defendants of the

Plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of

fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover

relevant information during discovery." Id. (internal citations and quotations omitted). See also

United States ex rel. Kelly v. Novartis Pharms. Corp., No. 15-1470, 2016 U.S. App. LEXIS

11001, at *15 (1st Cir. June 17, 2016) ("Rule 9(b) requires that "[i]n alleging fraud or mistake, a

party must state with particularity the circumstances constituting fraud or

mistake."). "Conclusory allegations and references to plans and schemes are not sufficient." Id.

(internal quotations omitted).

Count IV recites that Tatiana "individually participated in fraud by conspiring with her

husband to have him sign contracts with her when she knew that her husband did not have

authority to sign either of the listing agreements with her." (Cmp., ¶65). Plaintiffs are conflating

their fraud count (Count IV) with their conspiracy count (Count V). What facts support this

conclusion? The best Plaintiffs can come up with is that "upon information and belief, based

upon the fact that the Kagans are married and business partners, Mrs. Kagan also knew or should

have known that her husband did not have authority to sign the listing agreement and that Mr.

Filippov refused to sign it." (Id, ¶35). That is simply insufficient to comply with the

requirements of Rule 9(b). Moreover, as a simple review of the listing agreements reveals,

Tatiana did not sign the listing agreements.

In response to interrogatories propounded by Tatiana, none of the Plaintiffs were able to

provide any specific support for the allegations of fraud against her. As noted, Lipetsker never

spoke to her, and Filippov claims to have had two isolated communications over the course of

the entire Project. When pressed for specifics, Plaintiffs provided broad brush allegations of "an

agreement" and that she **signed** a "fraudulent listing agreement." (Debtor Int. Ans. No. 5;

Filippov Int. Ans. No. 5; Libetsker Int. Ans. No. 5). They point to her alleged failure to convey a

"bona fide offer," despite their interrogatory admission that there was no "bona fide offer." (Id.

Int. Ans. No. 3). They claim that the listing agreement was not authorized, despite the fact that

the very text message they referenced in interrogatory responses is a confirmation of that

authorization. (Debtor Int. Ans. No. 1; Filippov Int. Ans. No. 1).

Doubling down, Plaintiffs claim, "Tatiana is also individually responsible for the

fraudulent acts of KDC and ProExcavation because she is an owner and director of both

Companies." (Id.) Thus, it is clear that Plaintiffs' allegations against her are not based on

anything that Tatiana herself did with respect to the Project billing, but rather is based solely on

her status as an owner and director of the companies. Despite that fact that they have had over

two years to investigate, have copies of every check drawn by the Debtor and all bank

statements, have four binders which have copies of all the back-up for KDC's claim and have

been insisting that they have an expert that will support their position, in response to

interrogatories Plaintiffs were only able to regurgitate the broad conclusory allegations contained

in the Complaint. Moreover, as attested to in response to both ProExcavation's and KDC's

interrogatories, Plaintiffs do not know what those entities did on the Project, have not seen

ProExcavation bills, and still are unable to identify a single improper charge. The whole basis

for the fraud claim is that the total Project billings were significantly higher than Kagan allegedly

originally presented. That's all Plaintiffs have asserted in support of their claims, and it is

certainly not enough to support a fraud claim against Tatiana.

Assuming for the purposes of this motion that the allegations of the Complaint are true, it

is clear that it was Kagan, individually, not Tatiana, who allegedly misrepresented the cost of the

Project so as to induce Filippov and Lipetsker to invest with him. There is no allegation that

Tatiana had anything to do with that representation. The Complaint pleads that it is Kagan, not

Tatiana, who had the check-writing authority on the Debtor's accounts (Cmp., ¶23), and it was

"Mr. Kagan," not Tatiana who refused to provide Plaintiffs with back-up for the Debtor

expenditures. (Id.). "Mr. Kagan," not Tatiana, drew down all the Debtor funds. (Id., ¶24). "Mr.

Kagan," not Tatiana, failed to timely complete the Project. (Id., ¶26). And, it was Mr. Kagan

who "unilaterally" signed the listing agreements. (Id., 34). "On May 7, 2015, Mr. Kagan, [not

Tatiana], through counsel, wrote to Mr. Filippov making fabricated claims. In addition, Mr.

Kagan claimed for the first time that he had cost overruns on the Project…" (Id., ¶¶36-37). The

May 7, 2015 letter asserts no claims by Tatiana. Plaintiffs have been unable to point to a single

affirmative act by Tatiana that constitutes fraud.

It is also not sufficient to say that Plaintiffs expect to find the missing detail during

discovery, and it is certainly not sufficient to say the missing detail will be provided in an expert

report that may or may not someday exist. If that is Plaintiffs' response, this confirms that they

are engaging in an impermissible fishing expedition. See Wayne Inv., Inc. v. Gulf Oil Corp.,

739 F.2d 11, 14 (1st Cir. 1984) (Rule 9(b) was not satisfied when support for allegation consisted

of "speculations from industry analysts" and allowing the allegations of fraud to stand would be

tantamount to "issu[ing] a license for a 'fishing expedition' in uncharted waters."); Doyle v.

Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996) (one purpose of Rule 9(b) is to "prevent the filing

of suits that simply hope to uncover relevant information during discovery"). All of the counts

relying upon Defendants' alleged fraud must be dismissed for failing to plead with particularity.

## IV.    PLAINTIFFS HAVE FAILED TO PLEAD DETRIMENTAL RELIANCE

"[T]o recover in an action for deceit, 'the Plaintiff must prove that the defendant made a

false representation of a material fact with knowledge of its falsity for the purpose of inducing

the Plaintiff to act thereon, and that the Plaintiff relied upon the representation as true and acted

upon it to [its] damage.'" Totalizing Sys. v. PepsiCo, Inc., 29 Mass. App. Ct. 424 , 431 (1990),

citing, Danca v. Taunton Sav. Bank, 385 Mass. 1 (1982) (citations omitted). See also

Restatement (Second) of Torts § 525 (1977) ("One who fraudulently makes a misrepresentation

of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from

action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to

him by his justifiable reliance upon the misrepresentation").

### a)    There is No Allegation of Detrimental Reliance.

Plaintiffs have failed to plead any reliance on the allegedly fraudulent acts by Tatiana.

Reliance is an essential element of the tort of fraud. The only paragraph in the entire Complaint

that mentions reliance is paragraph 17, and that pleads reliance on Kagan's representations

during the parties' initial meeting in October, 2012. That has nothing to do with Tatiana.

Standing alone, Plaintiffs' failure to plead any reliance on Tatiana's acts is fatal to all the claims

based on the alleged fraud. See Sebago, Inc. v. Beazer E., Inc., 18 F. Supp. 2d 70, 95 (D. Mass.

1998) (Plaintiff must "plead reliance with particularity."); Lambert v. Leary, No. 05-3422, 2006

Mass. Super. LEXIS 63, at *12 (Feb. 14, 2006) (Plaintiff's fraud claim failed because, inter alia,

he failed to plead reliance); see also Collins v. Huculak, 57 Mass. App. Ct. 387, 389 (2003)

(fraud claim failed because could not establish justifiable reliance). See Masingill v. EMC

Corp., 449 Mass. 532, 541 (2007) (Plaintiff could not establish the necessary element of

reasonable reliance upon alleged oral misrepresentations that contradicted the terms of the

written contract); see also Sebago, Inc., 18 F. Supp. 2d at 95; Collins, 57 Mass. App. Ct. at 389.

Accordingly, the fraud and fraud based claims should be dismissed.

### V. PLAINTIFFS HAVE FAILED TO PROPERLY PLEAD A CLAIM FOR CIVIL CONSPIRACY.

Count V alleges, in conclusory fashion, that "Through the conduct described herein, the

Defendants have conspired to defraud the Plaintiffs." (Cmp., ¶70). The specific conduct by

Tatiana is not broken out. Because the conspiracy claim, on its face, is based in fraud, this claim

too fails to meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure. See

Section III above.

Massachusetts recognizes two different theories of civil conspiracy. First, there is a

"very limited cause of action" for a coercive type of civil conspiracy. Aetna Cas. Sur. Co. v.

P&B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994). To establish a claim civil conspiracy

through coercion, a "Plaintiff must allege that Defendants, acting in unison, had some peculiar

power of coercion over Plaintiff that they would not have had if they had been acting

independently." Id. (internal quotations omitted); see also Bartle v. Berry, 80 Mass App. Ct.

372, 383-84, rev. denied 460 Mass. 1116 (2011). Plaintiffs have not alleged that Defendants

have any "coercive" power over them. Therefore, if this is the basis for the conspiracy count, it

fails.

The other form of civil conspiracy "is more akin to a theory of common law joint liability in tort." <u>Aetna Cas. Sur. Co.</u>, 43 F.3d at 1564.  It requires "a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement." <u>Id.</u>  The Complaint is woefully inadequate in this respect.  The totality of the "facts" supporting the conspiracy claim amount to a generic, conclusory-based statement that Defendants "conspired" to "defraud" the Plaintiffs. <u>See</u> Cmp., ¶70.  Mere labels and conclusions are not sufficient to withstand a motion to dismiss pursuant to Mass. R. Civ. P. 12(b)(6).  <u>See</u> <u>Twombly</u>, 550 U.S. at 545; <u>Iqbal</u>, 556 U.S. at 681.

Plaintiffs' responses to interrogatories shed no light on this count.  In response to the question as to what predicate acts Tatiana took in furtherance of the conspiracy, Plaintiffs again fall back on their broad pleading, assuming the existence of an "agreement" from Tatiana's relationship with Kagan.  In lieu of providing specific detail, Plaintiffs merely regurgitated their conclusion that there must have been agreements, though they could not articulate exactly what the agreements were.  Debtor's Int. Ans. No. 5; Filippov Int. Ans. No. 5; Filippov Int. Ans. No. 5.  As to the listing agreements, they claim that she conspired with Kagan "by signing a fraudulent listing agreement," notwithstanding that neither of the actual listing agreements, which Plaintiffs placed before this Court, bear her signature.  They claim that her failure to convey the "bona fide offer" was another act in furtherance of the conspiracy, notwithstanding that this was a verbal offer and therefore not "bona fide."  As to the fraudulent billing, this is all based on the speculation that because she is the wife of Kagan and an officer of the company, she is deemed to be charged with whatever acts taken by the other Defendants in furtherance of the conspiracy, though there are no facts plead to support that she, individually, did anything. Accordingly, the conspiracy count must be dismissed.

## VI. AS TO TATIANA, NO UNFAIR AND DECEPTIVE
## PRACTICE IS PLED. THEREFORE, COUNT VI FAILS.

In Count VI, the Debtor claims that the defendants violated Chapter 93A. To the extent

that the Chapter 93A claim is predicated on fraud, it too must be dismissed for failing to plead

with particularity. See Zak Law Offices, P.C. v. Reed, No. CIV.A. 10-10333-LTS, 2010 WL

2802068, at *4 (D. Mass. July 13, 2010) ("Reed's claim, albeit brought pursuant to M.G.L. c.

93A, is a claim for fraud, and as such it must satisfy the heightened pleading standards applicable

to such claims under Fed. R. Civ. P. 9(b)."). Moreover, if the failure to convey the "bona fide

offer" is the basis for the Chapter 93A claim, as noted above, there is no obligation to convey an

oral offer. Alternatively, if the basis is the alleged failure to properly market the property, that is

a garden variety breach of contract claim which does not rise to the level of an unfair and

deceptive trade practice. "[I]t is well settled that a simple breach of contract is never enough, by

itself, to constitute a violation of Chapter 93A." Trent Partners & Associates, Inc. v. Digital

Equip. Corp., 120 F. Supp. 2d 84, 106 (D. Mass. 1999) (applying Mass. law); see also S.

Worcester Cnty. Reg'l Vocational Sch. Dist. v. Utica Mut. Ins. Co., CIV.A. 06-40230-FDS, 2010

WL 3222015 (D. Mass. Aug. 13, 2010); Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 100–

101 (1979); E. Bldg. Servs. Corp. v. Matzell, Richard & Watts, Inc., SUCV200302601C, 2008

WL 1868378 (Mass. Super. Jan. 23, 2008). Rather, "to rise to the level of a c. 93A violation, a

breach must be both knowing and intended to secure 'unbargained-for benefits' to the detriment

of the other party." T. Butera Auburn, LLC v. Williams, 83 Mass. App. Ct. 496, 508, review

denied, 465 Mass. 1109 (2013), quoting Zabin v. Picciotto, 73 Mass. App. Ct. 141, 169 (2008).

"The breaching party's conduct must exceed the level of mere self-interest, rising instead to the

level of 'commercial extortion' or a similar degree of culpable conduct." Zabin, 73 Mass. App.

Ct. 141, 169 (2008) (internal citations and quotations omitted). Even assuming, *arguendo*, that

Tatiana was motivated somehow by her own self-interest, there certainly is no allegation of

"commercial extortion" and nothing in the Complaint which even suggests any "culpable

conduct." Accordingly, the Chapter 93A claim fails and Count VI should be dismissed.[14]

## VII. COUNT III ALLEGING "AIDING AND ABETTING" BREACH OF FIDUCIARY DUTY FAILS AS A MATTER OF LAW.

Count III must also be dismissed because Plaintiffs fail to allege the necessary elements

to support a claim for aiding and abetting breach of fiduciary duty. "[T]he tort of aiding and

abetting a fiduciary breach are: (1) there must be a breach of fiduciary duty, (2) the defendant

must know of the breach, and (3) the defendant must actively participate or substantially assist in

or encourage the breach to the degree that he or she could not reasonably be held to have acted in

good faith." Arcidi v. Nat'l Ass'n of Gov't Employees, Inc., 447 Mass. 616, 623-24 (2006). In

R. Wojtkun, 534, B.R. 435, 459 (D. MA 2015). Even assuming, *arguendo,* that Kagan breached

his fiduciary duty, no facts are alleged to establish that Tatiana knew of Kagan's breach – much

less that she actively participated or substantially assisted in or encouraged the breach to the

degree that she could not reasonably be held to have acted in good faith. Again, she is being

targeted not because of her knowledge, but because her husband allegedly perpetrated a fraud

and she is an officer of the companies. Because Plaintiffs fail to allege facts satisfying these

elements, Count III must be dismissed.

## VIII.   COUNT VIII, EQUITABLE SUBORDINATION, FAILS TO STATE A CLAIM.

Filippov and Lipetsker have added an equitable subordination claim. Subordination is a

remedy in which the order of payment rather than the existence of the debt is at issue. It is not an

affirmative claim. Under Section 510(c) of the Bankruptcy Code, allowed claims may be

subordinated to allowed claims, but allowed claims may not be subordinated to interests. 11

---

[14] As argued in Section I, supra, this claim should also be dismissed because the Debtor lacks standing to bring claims.

U.S.C. §510(c); see also Shubert v. Lucent Techs. Inc. (In re Winstar Communications, Inc.),

554 F.3d 382, 414 (3d Cir. 2009)("a creditor's claim can be subordinated only to the claims of

other creditors, not equity interests"); Adelphia Recovery Trust v. Bank of America, N.A., 390

B.R. 80, 99 (S.D.N.Y. 2008)("a given claim may not be subordinated to an equity interest, but

only to another claim").

The deadline for filing claims in the Debtor's case was May 3, 2016. Filippov and

Lipetsker filed proofs of interest. However, Lipetsker did not file a proof of claim and Filippov

only filed a late claim for a purported mortgage in the amount of $208,333. [Claim No. 9]

against which an objection has been filed. [Docket No. 167]. Given that Lipetsker did not file a

claim and Filippov's late-filed claim is the subject of an objection, neither Lipetsker nor Filippov

have standing to assert equitable subordination claims, and the suggestion that the Defendants'

claims could be equitably subordinated to their interests is not authorized by Section 510(c).

Moreover, even if equitable subordination was appropriate (it is not), since the estate has more

than $3 million dollars to distribute for the payment of allowed claims, any re-ordering of the

payment of such claims is likely a meaningless exercise.

<u>CONCLUSION</u>

Based upon the foregoing, Tatiana Kagan respectfully requests that the Complaint be dismissed.

TATIANA KAGAN,

By her attorneys,


/s/ Christopher M. Candon, Esq.
Christopher M. Candon (BBO# 650855)
John H. Perten (BBO# 548728)
SHEEHAN PHINNEY BASS & GREEN, P.A.
255 State Street, Fifth Floor
Boston, MA 02109
(617) 897-5600
ccandon@sheehan.com
jperten@sheehan.com


Dated:  November 21, 2017

# EXHIBIT 1

# OPERATING AGREEMENT
## OF
## LYMAN-CUTLER, LLC

1. THIS OPERATING AGREEMENT is entered into as of the 14 day of November, 2012 by and between Vadim Kagan, Nickolay Lipetsker and Alex Filippov.

WHEREAS, Mr. Kagan, Mr. Lipetsker and Mr. Filippov wish to form a limited liability company known as LYMAN-CUTLER, LLC (the "Company") pursuant to the Massachusetts Limited Liability Company Act (as amended, the "Act") by filing a Certificate of Organization of the Company with the Massachusetts Secretary of State's Office and by entering into this Agreement;

NOW, THEREFORE, in consideration of the mutual agreements, promises and conditions contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Mr. Kagan, Mr. Lipetsker and Mr. Filippov as acknowledge and agree as follows:

## ARTICLE I - DEFINITIONS

1.1 <u>Definitions.</u> Capitalized terms used in this Agreement and not otherwise defined shall have the meanings assigned to them below:

 (a) "Agreement" means this operating Agreement, as amended, modified, supplemented or restated from time to time.

 (b) "Certificate of Formation" means the Certificate of Formation of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the Commonwealth Secretary of State's Office pursuant to the Act.

 (c) "Member" means a member of the Company identified on Schedule A attached hereto, as the same may be amended from time to time.

 (d) "Percentage Interest" shall refer to the percentage ownership interest of each Member in the Company. The Percentage Interests of the Members are set forth on Schedule A attached hereto and incorporated herein for all purposes by this reference.

1

(e) "Date of Acquisition" shall refer to deed recording date for Lyman
Road Brookline property into the Company.

## ARTICLE II - THE COMPANY

2.1 Formation.

    (a) The Members hereby agree to form the Company as a limited liability
company under and pursuant to the provisions of the Act and agree
that the rights, duties and liabilities of the Members shall be as
provided in the Act, except as otherwise provided herein. Upon the
execution of this Agreement, Mr. Kagan, Mr. Lipetsker and Mr.
Filippov shall be Members of the Company.

    (b) The name and mailing address of each Member and the amount
contributed to the capital of the Company shall be listed on Schedule
A.

2.2 Name; Principal Place of Business. The name of the Company shall be
LYMAN-CUTLER, LLC. The principal office of the Company shall be
located at 130 Trapelo Road, Belmont, Massachusetts, or at such other place
as the Members may from time to time determine.

2.3 Term. The term of the Company shall commence on the date of the filing of
the Certificate of Organization in the Commonwealth of Massachusetts
Secretary of State's Office and shall continue until November 30, 2015 unless
dissolved before such date in accordance with the provisions of this
Agreement.

2.4 Registered Agent and Office. The company's registered agent and office in
Massachusetts shall be as set forth in the Certificate of Organization of the
Company filed with Commonwealth of Massachusetts Secretary of State's
Office, as the same may from time to time be amended.

2.5 Fiscal Year. The Company's fiscal year (the "Fiscal Year") shall be the
calendar year.

2.6 Taxation as Partnership. The Company shall be treated as a partnership for
U.S. federal income tax purposes.

2

## ARTICLE III - PURPOSE AND POWERS OF THE COMPANY

Nature of Business.  The general character of the business of the LLC is to own (directly or through a nominee), invest in, develop, improve, operate, manage, lease and/or sell real estate in Commonwealth of Massachusetts.  To engage in any activities directly or indirectly related or incidental thereto including, but without limitation, everything necessary, suitable, convenient, or proper for the accomplishment of any of the foregoing activities, or the attainment of any one or more of the purposes, enumerated or incidental to the powers named, or which shall at any time appear conducive to or expedient for the production of benefit to the corporation, either as the holders of or interested in any property, or otherwise, with all the powers now or hereafter conferred by law, and for all lawful purposes.

3.1  Powers of the Company.  The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to or for the furtherance of the purpose set forth in Article 3., including, but not limited to the powers permitted under the Act.

## ARTICLE 1V - CAPITAL CONTRIBUTIONS AND ACCOUNTS

4.1  Capital Contributions.  Each Member has transferred and contributed to the capital of the Company the capital amounts (the "Capital Contributions") as set forth on Schedule A.  Furthermore, Purchase Money Loan and Construction Loan shall be taken from Rockland Trust Company to pay for construction and carrying costs until the issuance of Certificates of Occupancy (hereinafter "CO") but in no event for more then twenty three (23) months from the date of acquisition.

4.2  Carrying Costs.    Carrying costs shall be defined to include but not limited to mortgage payments, taxes and insurance for the subject property 77 Lyman Road, Brookline, Massachusetts.   In the event that a CO for each lot is not issued within twenty three (23) months from the date of acquisition, then Mr. Kagan will be responsible for all carrying costs until such time as CO's are issued.

3

4.3 Capital Accounts; Assets. An individual capital account (each a "Capital
Account") shall be established and maintained for each Member in accordance
with applicable regulations under the Internal Revenue Code of 1986 as from
time to time amended (the "Code"). A Member shall not be entitled to interest
on his or her Capital Contribution or Capital Account, or to withdraw any part
of his or her Capital Contribution or Capital Account. No Member shall have
any right in or to any asset or property of the Company, but shall only have a
right to the distributions as and when provided for in Sections 8.2 and 9.2
hereof.

4.4 Maintenance of Capital Accounts. To the extent consistent with such
regulations, there shall be credited to each Member's Capital Account the
amount of any contribution of capital and carrying costs made by such
Member to the Company, and such Member's share of the net profits of the
Company and there shall be charged against each Member's Capital Account
the amount of all distributions to such Member, and such member's share of
the net losses of the Company.

## ARTICLE V - MEMBERS

5.1 Powers of Members. The Members shall have the power to exercise any and
all rights or powers granted to the Members pursuant to the express terms of
this Agreement.

5.2 Duties of Members. It shall be Mr. Kagan's duty and obligation to construct
two (2) homes at the location currently known as 77 Lyman Road, in
Brookline, Massachusetts in accordance with the plans, including drawings,
supplied by Mr. Kagan and approved by Managing Member. The
construction shall be substantially completed no later than March 30, 2014. It
is specifically understood by all Members that Mr. Kagan's compensation for
this duty is outlined in Section 8.1 below.

5.3 Admission of Members. No person shall be admitted as a Member of the
Company after the date of formation of the Company without the written
consent or approval of the Members owning at least eighty (80%) of the

UK
J.F. N.L.

4

Percentage Interests in the Company at the time of such admission, regardless of whether such person has previously acquired any rights in any existing Member's interest in the Company by assignment, sale or otherwise. A Member's execution of a counterpart of this Agreement, or such other instrument as the Members may require, shall evidence his or her admission.

5.4   Transfer of Company Interest.   No Member may transfer, sell, assign, pledge, mortgage, or dispose of or grant a security interest in his or her interest in the Company (each, a "Transfer") without the prior written consent of the Members owning at least eighty (80%) of the Percentage Interests in the Company at the time of such Transfer. Any purported Transfer in contravention of this Section 5.3 shall be null and void and the Member attempting such Transfer shall cease to be a Member of the Company shall be forfeited and reallocated to the remaining Members in accordance with their respective Percentage Interests.

5.5   Rights of Assignee.   The purchaser or other transferee of a Member's interest in the Company shall have only the right to receive the distributions and allocations of profits or losses to which the Member would have been entitled under this Agreement with respect to the transferred interest and shall not have or enjoy any right to participate in the management of the Company or to receive any financial information or reports relating to the Company or any other rights of a Member unless and until the purchaser or transferee is admitted as a Member pursuant to Section 5.2.

5.6   Partition.   Each Member waives any and all rights that he or she may have to maintain an action for partition of the Company's property.

### ARTICLE VI – MANAGEMENT

6.1   Management, duties, and Restrictions.

  (a)   General Management.   The management and control of the operations of the Company and the maintenance, development, sales and leasing of the property of the Company shall rest with the Managing Members.

VK
A.F.   N.L.                        5

(b) <u>Powers of Managing Member.</u>  Subject to such limitations as may be imposed pursuant to the terms of this Agreement, the Act or by operation of law, the Members are and shall be authorized and empowered to carry out and implement the purposes of the Company. In that connection, the powers of the Managing Member shall include, but not be limited to, the following:

(1) to engage, dismiss, and replace personnel, attorneys, accountants, brokers or such other persons as may be deemed necessary or advisable by Managing Member;

(2) to authorize or approve all actions with respect to distributions by the Company, dispositions of the assets of the Company or its nominee, execution of leases, mortgage contracts, bonds, promissory notes, loan agreements and other instruments on behalf of the Company or its nominee, and to execute any agreements, instruments or documents relating to or affecting such matters;

(3) to acquire, mortgage, improve and convey real property and interests therein, including, but not limited to, easements and rights-of-way, and to execute any agreements, instruments or documents relating to or affecting such matters;

(4) to open, maintain, and close bank accounts and to draw checks and other orders for the payment of money; and

(5) to take such other actions and to incur such reasonable expenses on behalf of the Company as may be necessary or advisable in connection with the conduct of the affairs of the Company.

(6) The Managing Member hereby agrees to list the properties with Tatiana Kagan.  In order to remove Tatiana Kagan as a listing broker by December 31, 2014 will require a written consent of the Members owning at least eighty one (81%) of the

VK
A.F.  N.C.

6

Percentage Interests in the Company.   After December 31, 2014 no such consent shall be required.

(c)  Liability of Managing Member.  In carrying out their duties, the Managing Member shall not be liable to the Company or to any other Members for any actions taken in good faith and reasonable believed to be in the best interest of the Company or which are taken upon the written advice of legal counsel for the Company.

(d)  Reliance on Act of Managing Member.  Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Managing Member.  Any person other than a Member may and shall be entitled to rely on certificates, instructions, agreements or assignments signed or purporting to be signed by a Managing Member for or on behalf of the Company, and on the statements and agreements set forth therein, without inquiry as to the due authorization thereof or the authority of the person signing or purporting to sign such certificates, instructions, agreements or assignments.

(e)  Delegation.  The Managing Member may appoint Members only with such titles as they may elect, including the titles of President, Vice President, Treasurer and Secretary, to act on behalf of the Company with such power and authority as the Members may delegate in writing to any such person.

(f)  Books and Records.  The Company's books and records shall be maintained in accordance with good record keeping practices and federal and state income tax laws and regulations.  All books and records of the Company shall be maintained at the principal office of the Company, and each of the Members shall have access thereto to review the same at any time upon reasonable notice and during normal business hours.

(g)  Reimbursement of Managing Member.  The Managing Member shall be reimbursed by the Company for all reasonable expenses (including attorney and accountant's fees) incurred or paid by them for or on behalf of the Company.

7

## ARTICLE VII - VOTING, MEMBER CONSENTS AND MEMBER GUARATEE, MEETINGS

7.1 Voting. Each Member shall be entitled to vote in proportion to his or her Percentage Interest in the Company from time to time. Such vote may be exercised by written or oral notification by a Member to the other Members.

7.2 Member Consents. The amendment of this Agreement shall require the vote and unanimous approval of all the Members. All other actions taken by the Company, including the admission of a new Member, shall require the vote and approval of Members owning eighty percent (80%) or more of the Percentage Interest at the time of such vote.

7.3 Member Guarantee. Mr. Filippov shall, if required by institutional lender, provide that lender with a limited personal guarantee not to exceed $200,000.00 for all loans obtained by the Company related to the property located at 77 Lyman Road, Brookline, Massachusetts. Coincident with any provision by Mr. Filippov of such a guarantee, Messrs Kagan and Lipetsker shall each provide Mr. Filippov with a limited personal guarantee not to exceed, in the case of Mr. Kagan, $100,000.00 and in the case of Mr. Lipetsker, $20,000.00

7.4 Meetings of the Members. The Members may, but shall not be required, to meet from time to time to consider the affairs of the Company and to take any action permitted to be taken by the Members by law or under this Agreement. Meetings of the Members may be called at any time by any Member. Notice of any meeting shall be given to all Members not less than two (2) days nor more than thirty (30) days prior to the date of such meeting. Each Member may authorize any person to act for it by proxy on all matters on which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or his or her attorney-in-fact. A quorum for each meeting shall be one more than one-half the number of all Members.

8

### ARTICLE VIII - ALLOCATIONS AND DISTRIBUTIONS

8.1 Allocations of Profits or Losses. *The net profits,* net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows: Mr. Alex Filippov (40%) , Mr. Nickolay Lipetsker (10%) and Mr. Kagan (50%). In the event that the demolition permit is not issued by June 30, 2013, then *the net profits,* net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows: Mr. Alex Filippov (60%) , Mr. Nickolay Lipetsker (10%) and Mr. Kagan (30%). The net losses from any sale of any property of the Company or upon liquidation of the Company shall be allocated among the Members according to the Percentage Interests of Each Member. Net profits and net losses shall, for both accounting and tax purposes, be net profits and net losses as determined for reporting on the Company's federal income tax return. *In the event that the property is not sold within twenty three (23) months from the date of acquisition, then Mr. Kagan shall be responsible for all carrying costs until such time as the property is sold. If Mr. Kagan fails to pays to pay monthly carrying costs, then Mr. Filippov shall be responsible to contribute the necessary carrying costs and subsequently his capital contribution and percentage interest in the Company shall increase by the same amount and percentage and at the same time will trigger reduction of Mr. Kagan's share of capital contribution by the same amount and subsequently his/her percentage interest in the Company.* For tax purposes, all items of depreciation, gain, loss, deduction or credit shall be determined in accordance with the Code and, except to the extent otherwise required by the Code, allocated to and among the Members in the same percentages in which the Members share in net profits and net losses. Any change to this paragraph will require a written consent of the Members owning at least eighty one (81%) of the Percentage Interests in the Company.

9

8.2 <u>Distribution to Members.</u> *The distribution to Members shall be in accordance with their respective Capital Contribution first, however, an additional five (5%) percent per annum payment based upon Members' respective Capital Contributions shall be paid out of Mr. Kagan's net profit share for each day that the property is not sold after twenty three (23) months of acquisition* For the purposes hereof, the term "Net Cash From Operations" shall mean the gross cash proceeds from Company operations less the portion thereof used to pay or establish reserves for Company expenses, debt payments, capital improvements, replacements, and guaranteed payments, all as determined by the Members. "Net Cash From Operations" shall not be reduced by depreciation , amortization, cost recovery deductions, or similar non-cash allowances, but shall be increased by any reductions of reserves previously established.

### ARTICLE IX - DISSOLUTION AND TERMINATION OF COMPANY

9.1 <u>Events of Dissolution.</u>  The Company shall be dissolved and its affairs shall be would up upon the occurrence of any of the following events:

(a) the death, insanity, dissolution, incompetency, bankruptcy, retirement, resignation or expulsion of a Member ("Retiring Member") unless there are at least two (2) remaining Members of the Company, and the remaining Members owning a "majority in interest" in the Company elect to continue the Company within ninety (90) days of the death, insanity, dissolution, bankruptcy, retirement, resignation or expulsion of the Retiring Member;

(b) Notwithstanding the above paragraph, in the event of the death, insanity, dissolution, incompetency, bankruptcy, retirement or resignation of Mr. Filippov, his interest in this Company and control of this Company will automatically pass to his spouse by operation of this Agreement;

(c) the conclusion of the term of the Company set forth in Section 2.3. hereof;

VK
A.F.  N.L.

10

(d) the sale or disposition of all or substantially all of the assets of the
Company;

(e) the written consent of the Members owning eighty (80%) or more of
the Percentage Interests in the Company; or

(f) the entry of a decree of judicial dissolution in accordance with the
provisions of the Act.

For the purpose of Section 9.1 (a) above, the term "majority in interest" means
eighty (80%) or more of the remaining Members' collective interest in profits and
their respective Capital Accounts. For the purpose of the foregoing sentence,
profits shall be determined and allocated based upon any reasonable estimate of
profits from the date of the dissolution event to the projected termination of the
Company taking into account present and future allocations of profits under this
Agreement, and the Capital Account balances shall be determined upon the date
of the dissolution event.

9.2  Winding Up.  Upon the dissolution of the Company, the remaining Member
or, if more than one Member then remains, the Member selected by the
remaining Members (in either case, the "Liquidating Member"), shall proceed
with the winding up of the Company and apply and distribute the Company's
assets as provided in this Section 9.2. The assets shall first be applied to the
payment of the liabilities of the Company (other than any loans that may have
been made by the Members to the Company) and to the expenses of
liquidation. A reasonable time shall be allowed for the orderly liquidation of
the Company and for the discharge of liabilities to creditors, so as to enable
the Liquidating Member to minimize the normal losses attendant to a
liquidation. The remaining assets shall next be applied to the repayment of
any loans made by the Members to the Company. All assets then remaining
shall be distributed to the Members in accordance with their respective Capital
Accounts after giving effect to all contributions, distributions and allocations
for all periods. Notwithstanding any of the foregoing, the Liquidating
Member may retain a sum deemed necessary by him or her as a reserve for any

11

contingent liabilities, expenses and obligations of the Company. Upon the final distribution of assets to the Members, each of the Members shall be furnished with a statement which sets forth the assets and liabilities of the Company as of the date of the complete liquidation.

## ARTICLE X - LIABILITY AND INDEMNIFICATION

10.1 Liability. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

10.2 Indemnification. The Company shall indemnify and hold harmless the Members and their respective employees and authorized agents from and against any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member, employee or authorized agent in good faith on behalf of the Company and reasonable believed to be within the scope of authority conferred by this Agreement, except that no Member, employee or authorized agent shall be entitled to be indemnified or held harmless from or against any loss, damage or claim incurred by reason of such Member's, employee's or authorized agent's gross negligence or willful misconduct; provided, however, that any indemnity under this Section 10.2 shall be provided out of and to the extent of Company assets only, and no Member shall have any personal liability on account thereof.

## ARTICLE XI - MISCELLANEOUS

11.1 Governing Law. The Company and this Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts.

UK
A.P.  N.L.

12

11.2 <u>Agreement Binding.</u>  This Agreement shall inure to the benefit of, and be
binding upon, the parties hereto and their respective next-of-kin, legatees,
administrators, executors, legal representatives, successors, and assigns.

11.3 <u>Notices.</u>  Notices to the Members or to the Company to be furnished
hereunder shall be deemed to have been given when mailed, by prepaid
registered or certified mail, or when deposited with an express courier service,

addressed to the address set forth on Schedule A or as set forth in any notice of
changes of address previously given in writing by the addressee to the addressor.

Executed as a Commonwealth of Massachusetts's instrument under seal on the
day and year first above written.

_____
Nickolay Lipetsker, Member

_____
Vadim Kagan, Member

_____
Alex Filippov, Managing Manager

13

## SCHEDULE A

### Capital Contributions and Percentage Interests

| Member | | Capital Contribution | Percentage Interest |
|---|---|---|---|
| **Name:** | Nickolay Lipetsker | $250,000.00 | 10% |
| **Address:** | 52 Stony Brae Road, Newton, MA, 02461 | | |
| **Name:** | Alex Filippov | $2,000,000.00 | 80% |
| **Address:** | 130 Trapelo Road, Belmont, Massachusetts | | |
| **Name:** | Vadim Kagan | $250,000.00 | 10% |
| **Address:** | 99 Needham Street, Unit 1402, Newton, MA, 02461 | | |

VK , N.L.

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:*<br><br>LYMAN-CUTLER, LLC,<br>Debtor, | Chapter 7<br>No. 15-13881-FJB |
| LYMAN-CUTLER, LLC,<br><br>Plaintiff,<br><br>v.<br><br>VADIM KAGAN, TATIANA KAGAN,<br>KAGAN DEVELOPMENT KDC CORP.,<br>and PROEXCAVACTION CORP.,<br><br>Defendants. | A.P. No. 16-1120 |

## ALEX FILIPPOV'S ANSWERS TO TATIANA KAGAN'S
## FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order, Alex

Filippov ("Filippov") responds to Tatiana Kagan's ("Tatiana") First Set of Interrogatories. Filippov's

responses are based upon information currently known. Discovery is ongoing. He reserves the right to

amend, modify, or supplement each of the responses set forth below.

## GENERAL OBJECTIONS

Filippov objects to the extent Tatiana's First Set of Interrogatories purport to require Filippov to

respond on his own behalf as well as "alleged managing member" of Lyman-Cutler, LLC (the "LLC").

Tatiana, and each of the other parties named above, has served separate discovery requests on the LLC.

Purporting to require Filippov to respond to these interrogatories on behalf of the LLC as well as on his

1

own individual behalf is unduly burdensome, needlessly duplicative, and in violation of the Court's Pre-
Trial Order. Filippov will respond to these interrogatories on his own behalf only.

Filippov further objects to the extent the "Instructions" section of Tatiana's First Set of
Interrogatories purport to impose on Filippov any obligation that exceeds those required by the Rules of
Civil Procedure. Filippov will respond in accordance with any obligations imposed by the Rules.

## ANSWERS

### Interrogatory No. 1

Please set forth, with complete detail, each and every communication between Filippov and
Tatiana regarding the Project.

### Answer No. 1

I met Tatiana in or around July 2014 while I was meeting with Vadim Kagan ("Kagan") at the
Project site. Tatiana assured me then that there was already a lot of interest in the Properties, even
though they had not yet been completed. Then, in or around April 2015, I had a telephone conversation
with Tatiana wherein she asked that I sign an additional listing agreement for 55 Lyman Road, which I
refused to do. We then exchanged a text message that has been produced in discovery.

### Interrogatory No. 2

Please set forth all actions that Filippov, either individually or as the alleged managing member
of the Debtor, took to market and sell the Properties.

### Answer No. 2

Filippov objects to this interrogatory because it is overly broad, irrelevant, and not reasonably
calculated to lead to the discovery of admissible evidence. The responsibility to "market and sell" the
Properties did not belong to Filippov or any other member of the LLC. That was Tatiana's
responsibility during the time she was authorized to serve as the LLC's real estate agent. Subject to and
without waiving his foregoing objections, Filippov states as follows: After I learned that Tatiana was
continuing without permission to hold herself out as the LLC's real estate agent, I contacted Deborah
Gordon, a real estate agent with Coldwell Banker Residential Brokerage, and Kathy Kronger from
Hammond Residential to inquire whether they would be interested in taking over the marketing from
Tatiana. During my discussion with Ms. Gordon, she mentioned that she had previously made an offer
on behalf of one of her clients for 88 Cutler Lane. I was surprised to hear this news as I had not
previously been made aware of any offers. I then gathered additional information from Ms. Gordon
about this offer. Around the same time, I had signed an agreement with Ms. Kronger to replace Century
21, but Century 21 refused to allow the LLC out of the fraudulent contract Kagan had signed. To be
able to sell the Properties and cut our losses, sometime after the state lawsuit was filed, I authorized the

2

LLC to retain Michelle Lane at Century 21 Commonwealth to market and sell the Properties on the
LLC's behalf.

## Interrogatory No. 3

Please identify, in complete detail, any and all offers received for the Properties.

## Answer No. 3

Filippov objects to this interrogatory because it seeks information from third parties; namely,
Tatiana and Vadim Kagan ("Kagan"). Subject to and without waiving his foregoing objections, Filippov
states as follows: According to Deborah Gordon, she had made a verbal offer on behalf of a buyer
named Franklin for 88 Cutler Lane in the amount of $4.5 million, that Tatiana had communicated a
counter offer of $5 million, and that the buyer proceeded to purchase another property. Tatiana never
communicated with me about this offer. On or around July 21, 2015, the LLC received an offer for $4.1
million. On or around October 8, 2015, the LLC received an offer of $4.2 million. Each of these offers
were rejected. The only other two offers I am aware of are the offers that ultimately turned into the sale
of both Properties out of the estate for $4.4 million each.

## Interrogatory No. 4

Please itemize all damages which you seek to recover from Tatiana, including in your response
any pertinent calculations and the factual basis for those damages.

## Answer No. 4

Filippov objects to this interrogatory as premature. Discovery is ongoing and damages are
subject to expert analysis and report, which will be produced in due course. In general terms, Tatiana is
liable for damages for failing to convey the offer for 88 Cutler, failing competently to market the
Properties, supporting the enforcement of listing agreements she knew to be fraudulent, and for
participating in the Defendants' fraudulent scheme to overbill the Project.

## Interrogatory No. 5

If you contend that Tatiana conspired with Kagan, KDC, and ProExcavation, or any one of them,
to defraud the Debtor, please identify all facts upon which you base that contention.

## Answer No. 5

Tatiana conspired with Kagan when they reached an agreement for Tatiana to continue to serve
as the LLC's agent far beyond the time permitted and authorized by the Operating Agreement, by
agreeing to list the Properties for sale at a price that was never approved or authorized by the LLC, and
by failing to communicate a bona fide offer she did receive to Filippov, the LLC's Managing Member.
Tatiana furthered this conspiracy by signing a fraudulent listing agreement with Kagan and by
participating in the decision to inflate the listing price and by knowingly failing to communicate a bona
fide offer to the LLC. Tatiana, as a partner with Kagan and an officer of KDC, reached an agreement

with KDC whereby KDC would hire subcontractors, vendors, and suppliers to perform certain work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC to use these purported expenses to demand additional money from the LLC and, indirectly, from me. Tatiana furthered this conspiracy by permitting the subcontractors, vendors, and suppliers to perform the work, causing KDC to pay them charges which Tatiana and KDC knew to be falsely inflated, causing KDC to demand that sum be repaid to it by the LLC, and subsequently causing KDC to file a mechanics' lien and a proof of claim seeking to recover that amount from the LLC. Tatiana and KDC also conspired to have KDC purportedly enter into a written contract with the LLC which was never authorized and which KDC now bases its claim for payment. Tatiana furthered this conspiracy by causing both KDC and the LLC to sign this fraudulent document and by causing KDC to seek to enforce the terms of that contract on the LLC when it knows that the LLC never agreed to the terms set forth therein.

Tatiana participated in the scheme with ProExcavation to overbill the Project through KDC, with regard to which Tatiana is an officer.

### Interrogatory No. 6

If you contend that Tatiana conspired with Kagan, KDC and ProExcavation, or any of them, to defraud the Debtor, please identify all facts upon which you base that contention. Include in your response each act taken by Tatiana in furtherance of the alleged conspiracy.

### Answer No. 6

Filippov objects to this interrogatory because it is duplicative of Interrogatory No. 5. Subject to and without waiving his foregoing objections, Filippov states: See Answer No. 5, which is incorporated by reference as if fully set forth herein.

### Interrogatory No. 7

For each and every person who you expect to call as an expert witness at trial, please state: (a) the identify of each expert by giving his/her name, address, specialty, and professional education and experience; (b) the subject matter on which each expert is expected to testify; (c) the substance of the facts and opinions to which each such expert is expected to testify; and (d) a summary of the grounds for each such opinion.

### Answer No. 7

Filippov objects to subparagraphs (b) through (d) of this interrogatory to the extent any expert witness identified is required to provide a written report under Fed. R. Civ. P. 26(b)(2)(B) as the requested information in those subparagraphs is duplicative of the information required to be identified in the written report. Filippov further objects because this interrogatory is premature as the Court has set an expert disclosure deadline of December 31, 2017. The identity of any expert Filippov intends to call as a witness at trial will be made in accordance with the Court's ordered deadline.

4

**Interrogatory No. 8**

If you contend that Tatiana acted with "gross negligence" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 8**

Filippov objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the gross negligence detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified. To the extent relevant, Tatiana was grossly negligent with regard to her marketing of the properties and grossly negligent as an officer of KDC in allowing gross cost overruns (to the extent those cost overruns are not willfully fraudulent).

**Interrogatory No. 9**

If you contend that Tatiana acted with "willful misconduct" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 9**

Filippov objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the willful misconduct detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified.

**Interrogatory No. 10**

If you contend that Tatiana did not act in "good faith" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 10**

Filippov objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the

foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the bad faith detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified.

Verification

I, Alex Filippov, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Alex Filippov

*As to objections:*


/s/ Sean T. Carnathan
Sean T. Carnathan, BBO No. 636889
scarnathan@ocmlaw.net
Joseph P. Calandrelli, BBO No. 666128
jcalandrelli@ocmlaw.net
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T:  (781) 359-9000


Dated:  October 2, 2017


Certificate of Service

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on October 2, 2017.

/s/ Sean T. Carnathan
Sean T. Carnathan

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| *In re:* | ) | |
| | ) | |
| LYMAN-CUTLER, LLC, | ) | |
| Debtor, | ) | |
| | ) | Chapter 7 |
| | ) | No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | A.P. No. 16-1120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, TATIANA KAGAN, | ) | |
| KAGAN DEVELOPMENT KDC CORP., | ) | |
| and PROEXCAVACTION CORP., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## NICKOLAY LIPETSKER'S ANSWERS TO TATIANA KAGAN'S
## FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Nickolay Lipetsker ("Lipetsker") responds to Tatiana Kagan's ("Tatiana") First Set of Interrogatories.

Lipetsker's responses are based upon information currently known.  Discovery is ongoing.  He reserves

the right to amend, modify, or supplement each of the responses set forth below.

## GENERAL OBJECTION

Lipetsker objects to the extent the "Instructions" section of Tatiana's First Set of Interrogatories

purport to impose on Lipetsker any obligation that exceeds those required by the Rules of Civil

Procedure.  Lipetsker will respond in accordance with any obligations imposed by the Rules.

1

## ANSWERS

### Interrogatory No. 1

Please set forth, with complete detail, each and every communication between Lipetsker and Tatiana regarding the Project.

### Answer No. 1

I do not recall having any communications with Tatiana regarding the Project.

### Interrogatory No. 2

Please set forth all actions that Lipetsker took to market and sell the Properties.

### Answer No. 2

Lipetsker objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. The responsibility to "market and sell" the Properties did not belong to Lipetsker or any other member of Lyman Cutler, LLC (the "LLC"). That was Tatiana's responsibility during the time she was authorized to serve as the LLC's real estate agent. Subject to and without waiving his foregoing objections, Lipetsker states as follows: I understand that after Filippov and I learned that Tatiana was continuing without permission to hold herself out as the LLC's real estate agent, Filippov contacted Deborah Gordon, a real estate agent with Coldwell Banker Residential Brokerage, and Kathy Kronger from Hammond Residential to inquire whether they would be interested in taking over the marketing from Tatiana. I understand that during Filippov's discussion with Ms. Gordon, she mentioned that she had previously made an offer on behalf of one of her clients for 88 Cutler Lane. I had not previously been made aware of any offers. Around the same time, the LLC signed an agreement with Ms. Kronger to replace Century 21, but Century 21 refused to allow the LLC out of the fraudulent contract Kagan had signed. To be able to sell the Properties and cut our losses, sometime after the state lawsuit was filed, the LLC retained Michelle Lane at Century 21 Commonwealth to market and sell the Properties on the LLC's behalf.

### Interrogatory No. 3

Please identify, in complete detail, any and all offers received for the Properties.

### Answer No. 3

Lipetsker objects to this interrogatory because it seeks information from third parties; namely, Tatiana and Vadim Kagan ("Kagan"). Subject to and without waiving his foregoing objections, Lipetsker states as follows: According to Deborah Gordon, she had made a verbal offer on behalf of a buyer named Franklin for 88 Cutler Lane in the amount of $4.5 million, that Tatiana had communicated a counter offer of $5 million, and that the buyer proceeded to purchase another property. Tatiana never communicated with Filippov or me about this offer. On or around July 21, 2015, the LLC received an offer for $4.1 million. On or around October 8, 2015, the LLC received an offer of $4.2 million. Each

2

of these offers were rejected. The only other two offers I am aware of are the offers that ultimately turned into the sale of both Properties out of the estate for $4.4 million each.

## Interrogatory No. 4

Please itemize all damages which you seek to recover from Tatiana, including in your response any pertinent calculations and the factual basis for those damages.

## Answer No. 4

Lipetsker objects to this interrogatory as premature. Discovery is ongoing and damages are subject to expert analysis and report, which will be produced in due course. In general terms, Tatiana is liable for damages for failing to convey the offer for 88 Cutler, failing competently to market the Properties, supporting the enforcement of listing agreements she knew to be fraudulent, and for participating in the Defendants' fraudulent scheme to overbill the Project.

## Interrogatory No. 5

If you contend that Tatiana conspired with Kagan, KDC, and ProExcavation, or any one of them, to defraud the Debtor, please identify all facts upon which you base that contention.

## Answer No. 5

Tatiana conspired with Kagan when they reached an agreement for Tatiana to continue to serve as the LLC's agent far beyond the time permitted and authorized by the Operating Agreement, by agreeing to list the Properties for sale at a price that was never approved or authorized by the LLC, and by failing to communicate a bona fide offer she did receive to Filippov, the LLC's Managing Member. Tatiana furthered this conspiracy by signing a fraudulent listing agreement with Kagan and by participating in the decision to inflate the listing price and by knowingly failing to communicate a bona fide offer to the LLC. Tatiana, as a partner with Kagan and an officer of KDC, reached an agreement with KDC whereby KDC would hire subcontractors, vendors, and suppliers to perform certain work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC to use these purported expenses to demand additional money from the LLC and, indirectly, from me. Tatiana furthered this conspiracy by permitting the subcontractors, vendors, and suppliers to perform the work, causing KDC to pay them charges which Tatiana and KDC knew to be falsely inflated, causing KDC to demand that sum be repaid to it by the LLC, and subsequently causing KDC to file a mechanics' lien and a proof of claim seeking to recover that amount from the LLC. Tatiana and KDC also conspired to have KDC purportedly enter into a written contract with the LLC which was never authorized and which KDC now bases its claim for payment. Tatiana furthered this conspiracy by causing both KDC and the LLC to sign this fraudulent document and by causing KDC to seek to enforce the terms of that contract on the LLC when it knows that the LLC never agreed to the terms set forth therein.

Tatiana participated in the scheme with ProExcavation to overbill the Project through KDC, with regard to which Tatiana is an officer.

3

**Interrogatory No. 6**

If you contend that Tatiana conspired with Kagan, KDC and ProExcavation, or any of them, to defraud the Debtor, please identify all facts upon which you base that contention. Include in your response each act taken by Tatiana in furtherance of the alleged conspiracy.

**Answer No. 6**

Lipetsker objects to this interrogatory because it is duplicative of Interrogatory No. 5. Subject to and without waiving his foregoing objections, Lipetsker states: See Answer No. 5, which is incorporated by reference as if fully set forth herein.

**Interrogatory No. 7**

For each and every person who you expect to call as an expert witness at trial, please state: (a) the identify of each expert by giving his/her name, address, specialty, and professional education and experience; (b) the subject matter on which each expert is expected to testify; (c) the substance of the facts and opinions to which each such expert is expected to testify; and (d) a summary of the grounds for each such opinion.

**Answer No. 7**

Lipetsker objects to subparagraphs (b) through (d) of this interrogatory to the extent any expert witness identified is required to provide a written report under Fed. R. Civ. P. 26(b)(2)(B) as the requested information in those subparagraphs is duplicative of the information required to be identified in the written report. Lipetsker further objects because this interrogatory is premature as the Court has set an expert disclosure deadline of December 31, 2017. The identity of any expert Lipetsker intends to call as a witness at trial will be made in accordance with the Court's ordered deadline.

**Interrogatory No. 8**

If you contend that Tatiana acted with "gross negligence" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 8**

Lipetsker objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the gross negligence detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified. To the extent relevant, Tatiana was grossly negligent with regard to her marketing of the properties and grossly negligent as an officer of KDC in allowing gross cost overruns (to the extent those cost overruns are not willfully fraudulent).

4

**Interrogatory No. 9**

If you contend that Tatiana acted with "willful misconduct" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 9**

Lipetsker objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the willful misconduct detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified.

**Interrogatory No. 10**

If you contend that Tatiana did not act in "good faith" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 10**

Lipetsker objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the bad faith detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified.

## Verification

I, Nickolay Lipetsker, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Nickolay Lipetsker

*As to objections:*


*/s/ Sean T. Carnathan*
_____
Sean T. Carnathan, BBO No. 636889
*scarnathan@ocmlaw.net*
Joseph P. Calandrelli, BBO No. 666128
*jcalandrelli@ocmlaw.net*
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T: (781) 359-9000


Dated: October 18, 2017




## Certificate of Service

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on October ___, 2017.


*/s/ Sean T. Carnathan*
_____
Sean T. Carnathan

# EXHIBIT 4

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| *In re:* | ) | |
| | ) | |
| LYMAN-CUTLER, LLC, | ) | |
| Debtor, | ) | |
| | ) | Chapter 7 |
| | ) | No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | A.P. No. 16-1120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, TATIANA KAGAN, | ) | |
| KAGAN DEVELOPMENT KDC CORP., | ) | |
| and PROEXCAVACTION CORP., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**LYMAN-CUTLER, LLC'S ANSWERS TO TATIANA KAGAN'S
FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Lyman-Cutler, LLC (the "LLC") responds to Tatiana Kagan's ("Tatiana") First Set of Interrogatories.

The LLC's responses are based upon information currently known.  It reserves the right to amend,

modify, or supplement each of the responses set forth below.

**GENERAL OBJECTION**

The LLC objects to the extent the "Instructions" section of Tatiana's First Set of Interrogatories

purport to impose on the LLC any obligation that exceeds those required by the Rules of Civil

Procedure.  The LLC will respond in accordance with any obligations imposed by the Rules.

1

## ANSWERS

### Interrogatory No. 1

Please set forth, with complete detail, each and every communication between Debtor and Tatiana regarding the Project.

### Answer No. 1

The LLC objects to this interrogatory. The word "Debtor" is defined to include its members, including Alex Filippov ("Filippov"), Nickolay Lipetsker ("Lipetsker"), and Vadim Kagan ("Kagan"). There were likely numerous communications between Kagan and Tatiana regarding the Project. This information is uniquely in the possession of the Defendants. Subject to and without waiving its foregoing objections, the LLC states: Filippov met Tatiana in or around July 2014 while he was meeting with Kagan at the Project site. Tatiana assured the LLC then that there was already a lot of interest in the Properties, even though they had not yet been completed. Then, in or around April 2015, Filippov had a telephone conversation with Tatiana wherein she asked that he sign an additional listing agreement for 55 Lyman Road, which he refused to do. They then exchanged a text message that has been produced in discovery.

### Interrogatory No. 2

Please set forth all actions that the Debtor took to market and sell the Properties.

### Answer No. 2

The LLC objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. The responsibility to "market and sell" the Properties did not belong to the LLC or any of its members. That was Tatiana's responsibility during the time she was authorized to serve as the LLC's real estate agent. Subject to and without waiving its foregoing objections, the LLC states as follows: After Filippov learned that Tatiana was continuing without permission to hold herself out as the LLC's real estate agent, the LLC contacted Deborah Gordon, a real estate agent with Coldwell Banker Residential Brokerage, and Kathy Kronger from Hammond Residential to inquire whether they would be interested in taking over the marketing from Tatiana. During Filippov's discussion with Ms. Gordon, she mentioned that she had previously made an offer on behalf of one of her clients for 88 Cutler Lane. He was surprised to hear this news as he had not previously been made aware of any offers. The LLC then gathered additional information from Ms. Gordon about this offer. Around the same time, the LLC had signed an agreement with Ms. Kronger to replace Century 21, but Century 21 refused to allow the LLC out of the fraudulent contract Kagan had signed. To be able to sell the Properties and cut its losses, sometime after the state lawsuit was filed, the LLC retained Michelle Lane at Century 21 Commonwealth to market and sell the Properties on the LLC's behalf.

### Interrogatory No. 3

Please identify, in complete detail, any and all offers received for the Properties.

**Answer No. 3**

The LLC objects to this interrogatory because it seeks information from third parties; namely, Tatiana and Vadim Kagan ("Kagan"). Subject to and without waiving its foregoing objections, the LLC states as follows: According to Deborah Gordon, she had made a verbal offer on behalf of a buyer named Franklin for 88 Cutler Lane in the amount of $4.5 million, that Tatiana had communicated a counter offer of $5 million, and that the buyer proceeded to purchase another property. Tatiana never communicated with the LLC about this offer. On or around July 21, 2015, the LLC received an offer for $4.1 million. On or around October 8, 2015, the LLC received an offer of $4.2 million. Each of these offers were rejected. The only other two offers the LLC is aware of are the offers that ultimately turned into the sale of both Properties out of the estate for $4.4 million each.

**Interrogatory No. 4**

Please itemize all damages which you seek to recover from Tatiana, including in your response any pertinent calculations and the factual basis for those damages.

**Answer No. 4**

The LLC objects to this interrogatory as premature. Discovery is ongoing and damages are subject to expert analysis and report, which will be produced in due course. In general terms, Tatiana is liable for damages for failing to convey the offer for 88 Cutler, failing competently to market the Properties, supporting the enforcement of listing agreements she knew to be fraudulent, and for participating in the Defendants' fraudulent scheme to overbill the Project.

**Interrogatory No. 5**

If you contend that Tatiana conspired with Kagan, KDC, and ProExcavation, or any one of them, to defraud the Debtor, please identify all facts upon which you base that contention.

**Answer No. 5**

Tatiana conspired with Kagan when they reached an agreement for Tatiana to continue to serve as the LLC's agent far beyond the time permitted and authorized by the Operating Agreement, by agreeing to list the Properties for sale at a price that was never approved or authorized by the LLC, and by failing to communicate a bona fide offer she did receive to Filippov, the LLC's Managing Member. Tatiana furthered this conspiracy by signing a fraudulent listing agreement with Kagan and by participating in the decision to inflate the listing price and by knowingly failing to communicate a bona fide offer to the LLC. Tatiana, as a partner with Kagan and an officer of KDC, reached an agreement with KDC whereby KDC would hire subcontractors, vendors, and suppliers to perform certain work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC to use these purported expenses to demand additional money from the LLC. Tatiana furthered this conspiracy by permitting the subcontractors, vendors, and suppliers to perform the work, causing KDC to pay them charges which Tatiana and KDC knew to be falsely inflated, causing KDC to demand that sum be repaid to it by the LLC, and

subsequently causing KDC to file a mechanics' lien and a proof of claim seeking to recover that amount from the LLC. Tatiana and KDC also conspired to have KDC purportedly enter into a written contract with the LLC which was never authorized and which KDC now bases its claim for payment. Tatiana furthered this conspiracy by causing both KDC and the LLC to sign this fraudulent document and by causing KDC to seek to enforce the terms of that contract on the LLC when it knows that the LLC never agreed to the terms set forth therein.

Tatiana participated in the scheme with ProExcavation to overbill the Project through KDC, with regard to which Tatiana is an officer.

**Interrogatory No. 6**

For each and every person who you expect to call as an expert witness at trial, please state: (a) the identify of each expert by giving his/her name, address, specialty, and professional education and experience; (b) the subject matter on which each expert is expected to testify; (c) the substance of the facts and opinions to which each such expert is expected to testify; and (d) a summary of the grounds for each such opinion.

**Answer No. 6**

The LLC objects to subparagraphs (b) through (d) of this interrogatory to the extent any expert witness identified is required to provide a written report under Fed. R. Civ. P. 26(b)(2)(B) as the requested information in those subparagraphs is duplicative of the information required to be identified in the written report. The LLC further objects because this interrogatory is premature as the Court has set an expert disclosure deadline of December 31, 2017. The identity of any expert the LLC intends to call as a witness at trial will be made in accordance with the Court's ordered deadline.

**Interrogatory No. 7**

If you contend that Tatiana acted with "gross negligence" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 7**

The LLC objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the gross negligence detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified. To the extent relevant, Tatiana was grossly negligent with regard to her marketing of the properties and grossly negligent as an officer of KDC in allowing gross cost overruns (to the extent those cost overruns are not willfully fraudulent)

**Interrogatory No. 8**

If you contend that Tatiana acted with "willful misconduct" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 8**

The LLC objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the willful misconduct detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified.

**Interrogatory No. 9**

If you contend that Tatiana did not act in "good faith" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 9**

The LLC objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the bad faith detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified.

<u>Verification</u>

I, Alex Filippov, state under the pains and penalties of perjury that I am the Managing Member of the LLC; that I am authorized to answer these interrogatories on the LLC's behalf; and that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Alex Filippov

*As to objections:*


*/s/ Peter N. Tamposi*
_____
Peter N. Tamposi (BBO No. 639497)
The Tamposi Law Group, P.C.
159 Main Street
Nashua, NH 03060
T: (603) 204-5513


Dated: October 2, 2017


<u>Certificate of Service</u>

I, Peter Tamposi, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on October 2, 2017.

*/s/ Peter N. Tamposi*
_____
Peter N. Tamposi

6

# EXHIBIT 5

●●●●○ Verizon 3G     4:21 PM        ✈ ⁑ 28% ▭

**New Message**          Cancel

To:  Alex Filipov

Text Message
Thu, Apr 23, 2:05 PM

Hello Alex,
This is Tatiana
Kagan.
Please give me a
call. This is
regarding 55
Lyman Ed

Tue, Apr 28, 9:20 AM

Tatiana_kagan@y

  Text Message          Send

●●●●○ Verizon  3G    **4:21 PM**    ⌖ ⅀ 28% ▭

**New Message**    Cancel

To:  Alex Filipov

regarding 55
Lyman Ed

Tue, Apr 28, 9:20 AM

Tatiana_kagan@y
ahoo.com

Tue, Apr 28, 11:30 AM

I sent confirming
email to Dan

Ok. Thank you

  Text Message    Send

EXHIBIT 6

SHEEHAN
PHINNEY
BASS +
GREEN

PROFESSIONAL
ASSOCIATION



ATTORNEYS AT LAW

BOSTON
255 STATE STREET
BOSTON, MA
02109
T 617 897-5600
F 617 439-9363

MANCHESTER
1000 ELM STREET
MANCHESTER, NH
03101
T 603 668-0300
F 603 627-8121

CONCORD
TWO EAGLE SQUARE
CONCORD, NH
03301
T 603 223-2020
F 603 224-8899

HANOVER
½ LEBANON STREET
HANOVER, NH
03755
T 603 643-9070
F 603 643-3679

WWW.SHEEHAN.COM

Alexander H. Pyle
617-897-5642
apyle@sheehan.com

May 7, 2015

**VIA OVERNIGHT DELIVERY**

Mr. Alex Filippov
130 Trapelo Road
Belmont, MA 02478

Mr. Nickolay Lipetsker
52 Stony Brae Road
Newton, MA 02461

Mr. Vadim Kagan
239 Nahanton St.
Newton, MA 02459

      Re:   <u>Lyman-Cutler, LLC</u>

Dear Messrs. Filippov, Lipetsker and Kagan:

      I am writing on behalf of our clients, Vadim Kagan and Kagan Development Corporation, to open a discussion regarding several matters pertaining to Lyman Cutler, LLC (the "Company").

      As you know, the three of you are the members of the Company, which is governed by an Operating Agreement dated as of November 14, 2012 (the "Operating Agreement"). In accordance with the terms of the Operating Agreement, Mr. Kagan and his company, Kagan Development Corporation ("KDC") have constructed two homes on the real property owned by the Company in Brookline, Massachusetts. The homes were completed in accordance with all the deadlines specified in the Operating Agreement and have been on the market for approximately ten months, but neither home has yet been sold. Under current market conditions, a reduction to the listing price is clearly necessary, but to date I understand that Mr. Filippov has refused to approve any price change.

      The need for a price reduction is particularly important given the November 30, 2015 dissolution date of the Company, which is rapidly approaching. It is not in the interest of any of the members to have the homes sold as part of a liquidation, particularly when the liquidation would occur during the traditionally weak winter real estate market.

Mr. Alex Filippov
Mr. Nickolay Lipetsker
Mr. Vadim Kagan
May 7, 2015
Page 2

To date, Mr. Kagan and KDC have incurred substantial costs and expenses in complying with their obligations under the Operating Agreement. KDC's best accounting as to the unreimbursed construction costs as of May 7, 2015 total $758,025.56, exclusive of interest charges, with approximately $50,000 of additional vendor costs anticipated. These construction costs are detailed on the accompanying spreadsheet, and will be payable after repayment of the existing bank debt and before any proceeds are available for distribution to the Company's members. In addition, since November 2013, Mr. Kagan has made additional capital contributions totaling over $251,000 to cover carrying costs associated with the homes. While these additional capital contributions do not bear interest, they do have the effect of increasing Mr. Kagan's capital account and thereby increasing his share of the proceeds available for distribution when the Company is liquidated.[1]

Under the current circumstances, Mr. Kagan is not prepared to continue paying the carrying costs of the homes, which total approximately $28,000 per month. Section 8.1 of the Operating Agreement provides that if Mr. Kagan does not pay the carrying costs, then Mr. Filippov will be required to pay them. In such an event, Mr. Filippov's capital account would be increased by the amount of his contributions, which would increase his share of liquidation proceeds.[2] If, however, all members agree to a reduction in the listing price of each home from $5.5 million to $5.25 million (and to a reduction to $5.199 million if the houses do not sell within one month), Mr. Kagan would be willing to split equally with Mr. Filippov the carrying costs of the homes once Mr. Filippov has contributed carrying costs equal to those contributed by Mr. Kagan to date, until both homes are sold. Given the substantial costs already incurred by Mr. Kagan and KDC, we believe this approach is more than fair to the other members of the Company.

If you are amenable to the foregoing compromise, I would be happy to prepare an amendment to the Operating Agreement which reflects this approach, and also extends the term of the Company until November, 30 2016 and clarifies the economic rights and obligations of the members.

---

[1] Section 9.2 of the Operating Agreement provides that the upon dissolution, Company's assets, after payment of liabilities to creditors and member loans, "shall be distributed to the Members in accordance with their respective Capital Accounts after giving effect to all contributions, distributions and allocations for all periods." Note that Capital Accounts, not Percentage Interests, determine how liquidation proceeds are allocated.

[2] Section 8.1 makes reference to a reduction of Mr. Kagan's share of capital contributions and percentage interest in the Company if Mr. Filippov pays the carrying costs. While the language is inartfully drafted, it simply states the same principle that applies to carrying costs paid by Mr. Kagan: The increase in Mr. Filippov's capital account has the effect of reducing the proportion of total capital contributed by Mr. Kagan and therefore, pursuant to Section 9.2, the proportion of liquidation proceeds he receives.

{S0354989 4}

Mr. Alex Filippov
Mr. Nickolay Lipetsker
Mr. Vadim Kagan
May 7, 2015
Page 3

It is the desire of Mr. Kagan and KDC to arrive at a mutually acceptable path forward that is fair to all of the members and recognizes the contributions that each of them has made to the Company. I would be pleased to work with you or your counsel towards this goal in a cooperative and constructive manner.

Because the active spring real estate market is currently underway, I would ask that you give this matter your prompt attention.

I look forward to hearing from you.

Sincerely,

Alexander H. Pyle

cc: Mr. J. Joseph Cohen

{30554989 4}

05/07/15

Lyman-Cutler, LLC
A/P Aging Summary
All Transactions

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| BST Plumbing | 39,340.00 | 0.00 | 0.00 | 0.00 | 0.00 | 39,340.00 |
| Decor Art | 11,250.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,250.00 |
| Dream Flooring | 15,460.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,460.00 |
| KDC | 5,928.72 | 0.00 | 47.78 | 8,272.73 | 230,027.33 | 244,276.56 |
| National Grid | 0.00 | 198.00 | 0.00 | 0.00 | 0.00 | 198.00 |
| ProExcavation | 0.00 | 0.00 | 0.00 | 0.00 | 325,000.00 | 325,000.00 |
| Sergey Nikolaev | 19,320.00 | 0.00 | 0.00 | 0.00 | 0.00 | 19,320.00 |
| Town of Brookline | 0.00 | 281.00 | 0.00 | 0.00 | 0.00 | 281.00 |
| Unicon Electric | 65,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 65,000.00 |
| V&D Heat | 37,900.00 | 0.00 | 0.00 | 0.00 | 0.00 | 37,900.00 |
| TOTAL | 194,198.72 | 479.00 | 47.78 | 8,272.73 | 555,027.33 | 758,025.56 |

Current Carrying costs
(per month - approximate)    $30,000

Estimated additional vendor
costs:    $50,000