# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### (EASTERN DIVISION)

| | |
|---|---|
| In re: ) | Chapter 7 |
| ) | Case No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, ) | |
| ) | |
| Debtor. ) | |
| ) | |

| | |
|---|---|
| LYMAN-CUTLER, LLC, ALEX ) | |
| FILIPPOV AND NICKOLAY LIPETSKER ) | |
| ) | |
| Plaintiffs, ) | |
| ) | Adv. Proc. No.  16-01120 |
| v. ) | |
| ) | |
| VADIM KAGAN, TATIANA KAGAN, ) | |
| KAGAN DEVELOPMENT KDC, CORP. ) | |
| and PROEXCAVATION CORP. ) | |
| ) | |
| Defendants. ) | |

## KAGAN DEVELOPMENT KDC, CORP.'S MEMORANDUM IN SUPPORT OF MOTION TO DISMISS AMENDED COMPLAINT

### INTRODUCTION

On November 7, 2017, Lyman-Cutler, LLC (the "Debtor" or the "Company"), Alex

Filippov ("Filippov") and Nickolay Lipetsker ("Lipetsker," together with the Debtor and

Filippov, the "Plaintiffs") filed an Amended Complaint (the "Complaint")[Adv. Proc. Docket

No. 52].  This latest iteration of the Complaint represents the third attempt by the Plaintiffs to set

forth cognizable claims against Kagan Development KDC, Corp. ("KDC").[1]  For almost three

---

[1] Each of the Defendants in this proceeding has concurrently filed a separate Motion to Dismiss.  In a state court proceeding amongst these same parties, the state court dismissed the Plaintiffs' claims of fraud and conspiracy.  An earlier motion to dismiss filed in this case was never formally ruled upon.

years, the Plaintiffs have been alleging "fraud" and insisting that they possess overwhelming evidence of malfeasance by KDC and the rest of the Defendants. The Defendants previously moved to dismiss the original Complaint, arguing, among other things, that the facts did not support the claims and that the action was a transparent attempt by Filippov and Lipetsker to avoid paying for construction services provided by KDC and retain all proceeds from the Project (defined below) for their sole benefit. Now, based on their recent responses to interrogatories, it is confirmed that the Plaintiffs' claims truly are nothing more than unsubstantiated allegations intended to force the Defendants to capitulate on their valid proofs of claim. With the benefit of the Plaintiffs' recent interrogatory responses, KDC renews its motion to dismiss the Complaint. The instant motion to dismiss is not simply a rehashing of the prior motion. Rather, the Defendants now have irrefutable proof that this lawsuit is nothing more than a patent fishing expedition.

The gravamen of the Complaint is that Vadim Kagan ("Kagan") fraudulently induced Filippov and Lipetsker to join with him in a real estate development project by falsely representing its projected costs. Filippov and Lipetsker allege that Kagan claimed, months after the Project was completed, that the actual cost grossly exceeded the projected costs. Filippov and Lipetsker immediately concluded that there must be a fraud, even though they had no evidence beyond their unsupported suspicion. Using a shotgun approach, instead of simply suing Kagan, Plaintiffs have added Kagan's wife, Tatiana Kagan ("Tatiana"), KDC and ProExcavation Corp. ("ProExcavation") solely because of their relationship with Kagan – not because the Plaintiffs have any evidence of affirmative malfeasance. In recent interrogatory responses, discussed below, Plaintiffs admit they have no facts to support their claims against KDC or the other Defendants. At a minimum, the dearth of any specific facts to support

Plaintiffs' fraud based allegations mandates dismissal pursuant to Rule 9(b) of the Federal Rules of Civil Procedure, made applicable to this Proceeding by Rule 7009 of the Federal Rules of Bankruptcy Procedure.

FACTS[2]

According to the Complaint, on October 25, 2012, Kagan made a presentation to Lipetsker and Filippov wherein he falsely represented the costs to develop two homes on property that he had located and planned to purchase (the "Project"). (Cmp., ¶¶11-15). There is no allegation that KDC had any role in this presentation and it predates the formation of the Debtor or any construction on the Project. In reliance on Kagan's presentation, Filippov and Lipetsker agreed to invest in the venture and formed the Debtor. (Id., ¶16-17).[3] Kagan then allegedly convinced the Debtor to borrow $1.6 million for the construction and carrying costs for each of the two homes and supposedly guaranteed that this would be sufficient to cover all costs. (Id., ¶21).

Under the Debtor's operating agreement (the "Operating Agreement"), Kagan was solely responsible for constructing the homes for the Debtor. Op. Ag., ¶5.2.[4] To do so, Kagan engaged construction contractors, had check-writing authority (on an account opened by and

---

[2] The Defendants do not concede the accuracy of the Debtor's allegations. However, for purposes of the present motion to dismiss, the factual allegations contained in the Complaint are presumed to be true. Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48-49 (1st Cir. 2009). Conclusory statements, however, are not. Ashcroft v. Iqbal, 556 U.S. 662, 681 (2009).

[3] Although Plaintiffs plead that the Debtor too relied on the presentation, given that the presentation occurred several weeks before the Debtor was even formed, it is hard to comprehend how it could have relied on it. See Cmp., ¶¶16, 17.

[4] "Where a Plaintiff had notice of a document, relied on it when drafting the Complaint, and explicitly referenced the document in the pleading, attaching that document to a motion to dismiss does not convert the motion to one for summary judgment. See Marram v. Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996); Wong v. Resolve Tech., Civil Action No. 10-11642-DJC, 2011 WL 3157198, at *1 n.1 (D. Mass. July 25, 2011); Young v. Lepone, 305 F.3d 1, 11 (1st Cir. 2002) (allowing consideration of documents submitted by defendant on motion to dismiss where the Complaint contained references to" the documents and "the factual allegations of [the] Complaint revolve around" documents). A copy of the Operating Agreement is annexed hereto as Exhibit 1.

controlled by Fillipov), and drew down the entirety of the $3.2 million construction loan by

paying it to KDC, who was the Project general contractor, and its subcontractors, including

ProExcavation. (Cmp., ¶24). As KDC and the subcontractors constructed the homes, this should

certainly come as no surprise. In exchange for building the homes, Kagan agreed not to bill his

time and agreed to a greater percentage of the anticipated profits in lieu thereof. (Id., ¶25, Opr.

Agr., ¶¶5.2, 8.1). According to the Complaint, Kagan completed the Project several months late

and never advised anyone that there were cost overruns on the Project. (Cmp., ¶¶25-27). There

is no allegation that the Debtor paid any monies beyond the amount of the construction loans it

took out. The cost overruns were borne by KDC for which it has submitted a proof of claim.

The first substantive allegation against KDC in the Complaint is not found until

Paragraph 43, when Plaintiffs allege that "[o]n or about June 22, 2015, Kagan caused his

company, KDC, to file a mechanics lien against the Company's properties…" (Id., ¶43). Based

solely on the fact that the amount of the lien was significantly greater than the amount of the

projected Project costs, and more than the amount stated in a letter from KDC's counsel in May,

2015[5], Plaintiffs conclude that KDC must have committed fraud. (Id., ¶¶36-37). That is the sum

and substance of the allegations against KDC. Nothing more.

In conclusory fashion, based on this inability to understand how or why the expenses for

the Project so grossly exceeded the numbers that Kagan allegedly quoted them at the outset,

Plaintiffs plead that KDC perpetrated and participated in a conspiracy to defraud the Debtor by

double billing, overcharging for materials, charging for materials not used, seeking to enforce a

contract that Debtor does not recognize, falsifying its books and records, and filing an inflated

mechanics lien. (Id., ¶66). Presumably, having made these serious allegations, Plaintiffs have

---

[5] A copy of the May letter is attached hereto as Exhibit 2.

hard facts, other than simply a suspicion based on the magnitude of the billing, to support their allegations. Indeed, as set forth below, Rule 9(b) mandates that Plaintiffs plead specific facts.

### The Story Told Through Interrogatories

Plaintiffs interrogatory responses, however, tell a very different story and lay bare that Plaintiffs have nothing more than their unfounded conclusions to support their broad-brush allegations. KDC's interrogatories were narrowly tailored to get to the bottom of the allegations regarding the nefarious conduct alleged. In lieu of answering, Plaintiffs stonewall, deflect, and avoid providing any direct responses. Parsing through the double talk, their responses confirm what KDC and its co-defendants have known all along – that this is nothing more than a litigation tactic designed to impose costs on the Defendants and avoid payment of legitimate costs associated with the Project.

KDC's Interrogatory No. 1 propounded to each of the Plaintiffs asked for details of communications between Plaintiffs and KDC. Copies of these interrogatory responses are annexed hereto as Exhibits 3, 4 and 5, respectively. Each of the Plaintiffs objected, claimed the interrogatory was much too broad and "not reasonably calculated to lead to the discovery of admissible evidence, particularly as it relates to communications between two parties that are not related to any topic that is at issue in this case." Given that KDC's communications with Debtor, Filippov and Lipetsker are THE issue in the case, this evasiveness is telling.

In order to claim that KDC failed to perform its duties properly, it stands to reason that Plaintiffs must know what KDC was hired to do. Plaintiffs' responses are instructive. After objecting, Plaintiffs admit that they do not know specifically what KDC did. Their story is that Debtor entered into a contract with another Kagan entity for construction, Classic Homes Development & Construction, LLC ("Classic Homes"), and only later learned that KDC, not

Classic Homes, performed the construction for the Debtor. They *assume*, though they are not

sure, that KDC did the kind of things that a general contractor typically does. Plaintiffs' Int.

Ans. Nos. 3. When asked about conversations with Classic Homes, after again objecting that

this does not relate to any topic at issue in the case, Plaintiffs each responded that they had

"countless communications" with Kagan as the manager of Classic Homes, but since they now

know that KDC did the work, they speculate that when they were speaking with Kagan, he must

have been either acting individually or as a representative of KDC. They cannot , however,

identify a single pertinent conversation with KDC. Plaintiffs' Int. Ans. No. 2. In other words,

far from being able to point to anything that KDC said, the best that Plaintiffs can offer is that

they generally had communications with Kagan but have no idea whether Kagan was acting on

behalf of himself or KDC during those communications. This is not enough to support a fraud

claim.

Then, the most telling of the responses – aimed at getting the missing detail as to the

fraudulent conduct by KDC – Interrogatory No. 5 asked for detail of any expenses charged by

KDC that Plaintiffs deemed excessive or improper. The Complaint specifically pleads that

KDC's bills are "rife" with double billing, over billing, wrongful charges, and inflated costs.

(Cmp., ¶49). The first paragraph of Plaintiffs' response to Interrogatory No. 5 merely repeats

that Kagan promised a specific Project cost at the outset and then claimed that there were

overruns after completion of the Project. Nowhere is there any mention of the allegedly

improper expenses by KDC. Then, Plaintiffs repeat that their review of the Debtor's and

Kagan's records "supports the conclusion that a number of payments made to KDC or payments

made by KDC to others are fraudulent or otherwise improper, including the amount paid to

ProExcavation Corp. which is grossly in excess of what a fair market charge would be for the

type of site work that was involved in the Project." While stating this conclusion, the response still points to no facts. The reference to ProExcavation is very curious as in response to ProExcavation's interrogatories, Plaintiffs admit they have no idea what ProExcavation did, what it charged, and never saw a bill from ProExcavation.[6]

Apparently recognizing that they still have provided no facts to support the broad pleading, Plaintiffs then state "A detailed analysis of these charges is still being prepared by an expert(s), whose report will be produced in due course during this litigation and is incorporated herein by reference." Plaintiffs' Ans. Int. No. 5. This is the most telling admission. Despite specifically pleading that the billing is "rife" with fraud and having been provided with the supporting invoices for KDC's claim for well over a year, the best Plaintiffs can offer is that someday they may have an expert report that substantiates their allegations. For over two years, Plaintiffs have claimed to have an expert report, but apparently this was not true. How does one incorporate by reference a document which does not exist? This conduct highlights the complete lack of any basis for allegations of malfeasance by KDC.

Summing up the factual predicate for all of their claims, Plaintiffs plead that "Kagan **personally** misled the Plaintiffs into investing..." and mislead them throughout the project with respect to the costs. (Cmp., ¶50)(Emphasis added). Conspicuous by its omission, the summation says nothing about KDC. This case is all about what Kagan told Lipetsker and Filippov at the outset of the relationship, and whether he should be liable for the misrepresentations that he allegedly made at that time. It has nothing to do with KDC.

---

[6] ProExcavation has filed its own motion to dismiss which details Plaintiffs' responses to interrogatories, which are incorporated herein by reference.

## KDC's PROOFS OF CLAIM

KDC is the only party who has made a claim for additional Project monies. Its claim [Claim No. 1] is supported by four three inch binders containing all the back-up invoices. Pursuant to Bankruptcy Rule 3001(f), "[a] proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and amount of the claim." Fed. R. Bankr. P. 3001(f). A claim which comports with Rule 3001, such as KDC's claim, is entitled to a presumption of validity. Id. If a party in interest objects to a proof of claim, that party bears "the initial **burden of producing substantial evidence**" to overcome the presumption of validity to which a properly executed proof of claim is otherwise entitled. Juniper Dev. Group v. Kahn (In re Hemingway Transp. Inc.), 993 F.2d 915, 925 (1st Cir. 1993)(Emphasis added).

Plaintiffs' Complaint is filed as part of their objection to KDC's proof of claim. Given the extensive back-up that they received in support of KDC's claim, they now have the burden of producing "substantial evidence" to refute that claim. Plaintiffs' response, stated in open Court, is simply that they do not trust the back-up and therefore it must be fraudulent too. As the Complaint, as augmented through Plaintiffs' recent interrogatory responses, establishes, Plaintiffs have no "substantial evidence." All they have is a claim against Kagan for fraudulent inducement and a shotgun blast at every other Kagan related entity notwithstanding the lack of any specific facts. The Complaint should be dismissed if for no other reason than that it fails to set forth "substantial evidence" of malfeasance by KDC.

KDC has also asserted a claim for indemnity [Claim No. 4]. Insofar as Plaintiffs admit that KDC performed general contracting services on behalf of the Debtor, KDC is covered by the indemnity provisions of Section 10.2 of the Operating Agreement which provides indemnity for

the members and their agents.  The indemnity provision would be meaningless if it provides no

protection against meritless litigation that caused KDC to incur significant legal expenses.

## COUNTS ASSERTED AGAINST KDC

KDC is named in the following counts:  Count III (Aiding and Abetting Breach of

Fiduciary Duty); Count IV (Fraud); Count V (Conspiracy); Count VI (M.G.L. c. 93A); Count

VII (Breach of Contract) and Count VIII (Equitable Subordination).

## STANDARD ON A MOTION TO DISMISS

In determining a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), made applicable

to this proceeding by Fed. R. Bankr. P. 7012, the Court accepts as true all well-pleaded facts in

the Complaint and drawing all reasonable inferences in the Plaintiffs' favor.  Gargano v. Liberty

Int'l Underwriters, Inc., 572 F.3d 45, 48-49 (1st Cir. 2009).  However, a court is not bound "to

credit 'bald assertions, unsupportable conclusions, and opprobrious epithets' woven into the

fabric of the Complaint."  In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 15 (1st Cir.

2003).  To successfully withstand a motion to dismiss, the Plaintiff must state a claim that is

plausible on its face.  Ashcroft v. Iqbal, 556 U.S. 662 (2009) (citing Bell Atl. Corp. v. Twombly,

550 U.S. 544, 570 (2007)); see also Gargano, 572 F.3d at 48-49.

"Factual allegations must be enough to raise a right to relief above the speculative level,

... on the assumption that all the allegations in the Complaint are true (even if doubtful in fact)."

Twombly, 550 U.S. at 555 (citations omitted).  According to the Supreme Court, "[t]he

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (quoting Twombly,

550 U.S. at 556).  As the Court stated, "[t]he need at the pleading stage for allegations plausibly

suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule

8(a)(2) that the 'plain statement' possess enough heft to 'sho[w] that the pleader is entitled to relief.'" Twombly, 550 U.S. at 557. The Court also noted, however, that pleadings must contain more than "labels, conclusions and formulaic recitation[s] of a cause of action's elements...." Id. at 545. To satisfy the general pleading requirement of Federal Rule of Civil Procedure 8(a), a Plaintiff must plead enough facts to state a claim for relief that is plausible on its face." Id. at 570. Otherwise, where Plaintiffs "have not nudged their claims across the line from conceivable to plausible, their Complaint must be dismissed." Id. at 547. In Iqbal, the Court cautioned that allegations that are conclusory are not "entitled to be assumed true" for purposes of ruling on a motion to dismiss. Iqbal, 556 U.S. at 681; see also Twombly, 550 U.S. at 554-55. "Nor does a Complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

ARGUMENT

## I. THE DEBTOR LACKS STANDING.

This Court has twice ruled that the Debtor lacks standing to object to KDC's proof of claim [Main Case Docket Nos. 131 and 151] and has recently ruled that the "Debtor no longer exists." Adv. Proc. Docket Nos. 235-37. These decisions are supported by the fact that the Debtor has no remaining business and no pecuniary interest in the outcome of this action. All that is left to be done is for the Chapter 7 Trustee to distribute the proceeds from the sale of the properties to the claimants and interest holders. Moreover, the Operating Agreement itself provides that the term of the Debtor "shall continue [only] until November 30, 2015." (Opr. Agr., ¶2.3). The Plaintiffs assert that the Complaint is brought as "counterclaims to the proofs of claim." (Cmp., ¶1). But the Debtor cannot create standing in the form of a counterclaim/objection to the KDC claim where it was already ruled not to exist. Given the

Court's recent ruling that the Debtor no longer exists, all of the Debtor's claims must be dismissed.

## II. THIS COURT LACKS SUBJECT MATTER JURISDICTION OVER LIPETSKER'S AND FILIPPOV'S AFFIRMATIVE CLAIMS.

It is not disputed that Filippov and Lipetsker have standing to object to the proofs of claim, and this Court has jurisdiction over those pending matters. But as set forth in the Reply to Lyman-Cutler, Alex Filippov, and Nickolay Lipetsker's Joint Statement Regarding the Court's Jurisdiction dated September 1, 2017 (the "Jurisdiction Statement")[Adv. Proc. Docket No. 44], the Defendants maintain that the claims asserted in this proceeding are outside of the Court's subject matter jurisdiction.[7] As set forth more fully in the Jurisdiction Statement, the claims asserted by Filippov and Lipetsker simply have no conceivable effect on the bankruptcy estate. Specifically, any affirmative relief sought will neither change the bankruptcy case or the distribution to creditors.

The jurisdiction of bankruptcy courts is grounded in and limited by statute. Celotex Corp. v. Edwards, 514 U.S. 300, 307 (1995); 28 U.S.C. § 1334(b); 28 U.S.C. § 157(a). Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." In turn, Section 157(a) permits the district court to refer "any or all proceedings arising under title 11 or arising in or related to a case under title 11 . . . to the bankruptcy judges for the district." Celotex, 514 U.S. at 307 (quoting 28 U.S.C. § 157(a)).

The statutory scheme creates three prongs of bankruptcy jurisdiction: (1) proceedings arising under the Bankruptcy Code; (2) proceedings arising in a case under the Bankruptcy Code; and (3) proceedings related to a case under the Bankruptcy Code. Since the claims asserted by

---

[7] KDC incorporates herein by reference the Jurisdiction Statement.

Filippov and Lipetsker do not arise under the Bankruptcy Code or arise from the underlying

bankruptcy case, the Court must examine whether the claims among non-debtors are "related to"

the case. Celotex, 514 U.S. at 309-11.

To determine whether "related to" jurisdiction exists, courts have universally adopted the

test first articulated by the Third Circuit in Pacor, Inc. v. Higgins, 743 F.2d 984 (3d Cir. 1984):

> A matter is related to the bankruptcy case for §1334 purposes if the outcome
> of that proceeding could conceivably have any effect on the estate being
> administered in bankruptcy . . . . Moreover, an action is related to
> bankruptcy if the outcome could alter the debtor's rights, liabilities, options
> or freedom of action (either positively or negatively) and in any way impacts
> upon the handling and administration of the bankruptcy estate.

Id. at 994. The claims brought by Filippov and Lipetsker do not meet this standard. If Filippov

and Lipetsker wish to raise certain objections to the proofs of claim, those matters are admittedly

before this Court. If they wish to pursue affirmative relief against the Defendants, the relief

sought is outside of this Court's jurisdiction.[8]

It was Filippov's and Lipetsker's decision to put the Debtor in bankruptcy, but in doing

so they do not get the benefit of this Court to pursue non-debtor litigation that has no bearing on

the bankruptcy case. To the extent they wish to seek a resolution of those disputes, which are

entirely based in state law, they should be forced to do so in state court after the bankruptcy

claims are resolved. This Court should dismiss Filippov's and Lipetsker's claims for lack of

---

[8] Any argument that KDC or any of the Defendants have consented to or waived any defect in this Court's subject
matter jurisdiction is not correct. "[P]arties cannot confer subject matter jurisdiction on a federal court by waiver or
consent." Quinn v. City of Boston, 325 F.3d 18, 26 (1st Cir. 2003); see also Sheridan v. Michels (In re Sheridan),
362 F.3d 96, 100 (1st Cir. 2004) (citing Quinn). Moreover, "[a] litigant generally may raise a court's lack of
subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance."
Kontrick v. Ryan, 540 U.S. 443, 455 (2004) (citing Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382
(1884)).

subject matter jurisdiction.[9]

### III. PLAINTIFFS HAVE FAILED TO STATE A VIABLE CLAIM FOR FRAUD AND FRAUD BASED CLAIMS AGAINST KDC.

The Plaintiffs' fraud claim against KDC, Count IV, and all additional counts against it

which are based on the alleged fraud (Counts, III, V, VI, VII and VIII), must be dismissed

because they fail to satisfy the particularity requirements of Fed. R. Civ. P 9(b), made applicable

to this adversary proceeding by Bankruptcy Rule 7009. De Prins v. Michaeles, 189 F. Supp. 3d

209, 215 (D. Mass. 2016)( "Although here the claim itself is not for fraud, "[e]ven when a

plaintiff is not making a fraud claim, courts will require particularity in the pleading if the cause

of action is premised on fraudulent conduct." § 1297 Pleading Fraud With Particularity—In

General, 5A Fed. Prac. & Proc. Civ. § 1297 (3d ed.).  Therefore, to the extent that Plaintiffs'

claims are grounded in fraud, the heightened pleading standards will apply."); Natale v. Espy

Corp., 2 F. Supp. 3d 93, 99 (D. Mass. 2014) ("For claims where "fraud lies at the core of the

action," Rule 9(b) renders the pleading requirement more stringent."); Shapiro v. Miami Oil

Producers, Inc., 84 F.R.D. 234, 236 (D. Mass. 1979)("… Rule 9(b)'s particularity requirement

"extends to averments of fraud or mistake, whatever may be the theory of legal duty -- statutory,

tort, contractual, or fiduciary."); Enercon v. Global Computer Supplies, Inc., 675 F. Supp. 2d

188, 190 (D. Me. 2009). ("The United States Court of Appeals for the First Circuit reads Fed. R.

Civ. P. 9(b) expansively to cover associated claims where a Complaint's core allegations

effectively charge fraud, even when those claims are for negligent misrepresentation and breach

of fiduciary duty.").  The Complaint must set out, **with specificity**, what KDC itself did in

---

[9] In response to its show cause request, this Court made clear that "any affirmative recovery, over and above what is necessary to wholly setoff the claim of a particular defendant, is less certain…" [Adv. Proc. Docket No. 48].  Thus, this Complaint should be treated solely as an objection to KDC's claim.  To the extent of an affirmative recovery is sought, these claims should be dismissed.

furtherance of the alleged fraud.  Plaintiffs have not satisfied Rule 9(b) simply by arguing that because KDC is owned by Kagan it must be part of the fraud he allegedly perpetrated.

Rule 9(b) of the Federal Rules of Civil Procedure requires pleading fraud with particularity.  See United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 226 (1st Cir. 2004) ("We have said that Rule 9(b) requires that a Plaintiff's averments of fraud specify the time, place, and content of the alleged false or fraudulent representations.") (internal citations omitted).  "The purpose of this requirement is to "give notice to defendants of the Plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant information during discovery."  Id. (internal citations and quotations omitted); see also United States ex rel. Kelly v. Novartis Pharms. Corp., No. 15-1470, 2016 U.S. App. LEXIS 11001, at *15 (1st Cir. June 17, 2016) ("Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").  "Conclusory allegations and references to plans and schemes are not sufficient."  Id. (internal quotations omitted).

Count IV recites, in conclusory fashion, that KDC "has specifically engaged in fraud by double billing the Company, knowing and intentionally overcharging for materials, charging the Company for materials not used on the Project, asserting a false and fraudulent contract as the basis for a claim for $625,221.52 in general contractor and overhead fees against the Company, falsifying books and records to cover for its fraud, and knowing and intentionally filing a false and fraudulent mechanic's lien of over $2 million against the Property." (Cmp., ¶66).  This allegation is new in the Complaint.  Presumably, Plaintiffs uncovered some facts to support these very serious allegations.  However, as demonstrated by their interrogatory responses, Plaintiffs

have been unable to identify a specific improper expense.  Rather, they fall back on their

conclusion that because Kagan defrauded them into investing and failed to stay within the

Project budget, KDC and all the other defendants must be part of his fraud.  This is not sufficient

to satisfy Rule 9(b).  If Plaintiffs are going to be alleging fraud against KDC, KDC is entitled to

facts, not conclusions, which support that pleading.

It is also not sufficient to say that Plaintiffs expect to find the missing detail during

discovery, and it certainly is not sufficient to say that the missing detail will be provided in an

expert report that may or may not someday exist.  Plaintiffs' interrogatory responses confirm that

they are engaging in an impermissible fishing expedition.  See Wayne Inv., Inc. v. Gulf Oil

Corp., 739 F.2d 11, 14 (1st Cir. 1984) (Rule 9(b) was not satisfied when support for allegation

consisted of "speculations from industry analysts" and allowing the allegations of fraud to stand

would be tantamount to "issu[ing] a license for a 'fishing expedition' in uncharted waters.");

Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996) (one purpose of Rule 9(b) is to "prevent

the filing of suits that simply hope to uncover relevant information during discovery").  All of

the counts against KDC relying upon the alleged fraud must be dismissed for failing to plead

with particularity.

IV.    PLAINTIFFS HAVE FAILED TO PLEAD DETRIMENTAL RELIANCE.

"[T]o recover in an action for deceit, 'the Plaintiff must prove that the defendant made a

false representation of a material fact with knowledge of its falsity for the purpose of inducing

the Plaintiff to act thereon, and that the Plaintiff relied upon the representation as true and acted

upon it to [its] damage.'"  International Totalizing Sys. v. PepsiCo, Inc., 29 Mass. App. Ct. 424 ,

431 (1990), citing, Danca v. Taunton Sav. Bank, 385 Mass. 1 (1982) (citations omitted);  see

also Restatement (Second) of Torts § 525 (1977) ("One who fraudulently makes a

misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or

to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary

loss caused to him by his justifiable reliance upon the misrepresentation").

Plaintiffs have failed to plead any reliance on the allegedly fraudulent acts by KDC.

Reliance is an essential element of the tort of fraud. See Sebago, Inc. v. Beazer E., Inc., 18 F.

Supp. 2d 70, 95 (D. Mass. 1998) (Plaintiff must "plead reliance with particularity."); Lambert v.

Leary, No. 05-3422, 2006 Mass. Super. LEXIS 63, at *12 (Feb. 14, 2006) (Plaintiff's fraud claim

failed because, inter alia, he failed to plead reliance); see also Collins v. Huculak, 57 Mass. App.

Ct. 387, 389 (2003) (fraud claim failed because could not establish justifiable reliance).  The

only paragraph in the entire Complaint that mentions reliance is paragraph 17, and that pleads

reliance on Kagan's representations during the parties' initial meeting in October, 2012.  That

has nothing to do with KDC and predates KDC's involvement on the Project.  Lipetsker and

Filippov, individually, relied on nothing that KDC said or did.  They do not even know if they

ever spoke with KDC.  Standing alone, Plaintiffs' failure to plead any reliance on KDC's acts is

fatal to all the claims against it based on the alleged fraud.  See Masingill v. EMC Corp., 449

Mass. 532, 541 (2007) (Plaintiff could not establish the necessary element of reasonable reliance

upon alleged oral misrepresentations that contradicted the terms of the written contract); see also

Sebago, Inc., 18 F. Supp. 2d at 95; Collins, 57 Mass. App. Ct. at 389.  Accordingly, the fraud and

fraud based claims should be dismissed.

### V.  PLAINTIFFS HAVE FAILED TO PROPERLY PLEAD A CLAIM FOR CIVIL CONSPIRACY.

Count V alleges, in conclusory fashion, that "Through the conduct described herein, the

Defendants have conspired to defraud the Plaintiffs." (Cmp., ¶70).  The specific conduct by

KDC is not broken out.  Because the conspiracy claim, on its face, is based in fraud, this claim

too fails to meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  <u>See</u> Section III above.

Massachusetts recognizes two different theories of civil conspiracy.  First, there is a "very limited cause of action" for a coercive type of civil conspiracy.  <u>Aetna Cas. Sur. Co. v. P&B Autobody</u>, 43 F.3d 1546, 1563 (1st Cir. 1994).  To establish a claim civil conspiracy through coercion, a "Plaintiff must allege that Defendants, acting in unison, had some peculiar power of coercion over Plaintiff that they would not have had if they had been acting independently."  <u>Id</u>. (internal quotations omitted);  <u>see also</u> <u>Bartle v. Berry</u>, 80 Mass App. Ct. 372, 383-84, <u>rev. denied</u> 460 Mass. 1116 (2011).  Plaintiffs have not alleged that Defendants have any "coercive" power over them.  Therefore, if this is the basis for the conspiracy count, it fails.

The other form of civil conspiracy "is more akin to a theory of common law joint liability in tort."  <u>Aetna Cas. Sur. Co.</u>, 43 F.3d at 1564.  It requires "a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement."  <u>Id</u>.  The Complaint is woefully inadequate in this respect.  The totality of the "facts" supporting the conspiracy claim amounts to a generic, conclusory-based statement that Defendants "conspired" to "defraud" the Plaintiffs. <u>See</u> Cmp., ¶70.  Mere labels and conclusions are not sufficient to withstand a motion to dismiss pursuant to Mass. R. Civ. P. 12(b)(6).  <u>See</u> <u>Twombly</u>, 550 U.S. at 545; <u>Iqbal</u>, 556 U.S. at 681.

Plaintiffs' responses to interrogatories aimed at facts supporting the conspiracy allegation shed no additional light.  As noted above, Plaintiffs allege that in furtherance of a conspiracy "KDC, acting through Kagan, reached an agreement with ProExcavation whereby ProExcavation agreed to perform certain excavation and site work on the Project and knowingly and

intentionally submit falsely inflated requests for payment to KDC for the purpose of then

permitting KDC and Kagan to use these purported expenses to demand additional money from

the LLC…" Plaintiffs' Int. Ans. Nos. 10. Given that Plaintiffs do not know what work

ProExcavation performed, and claim to have never seen ProExcavation bills or requests for

payment, the falsity of this statement is monumental and cannot possibly form the basis for a

conspiracy Count. Plaintiffs' response continues: "KDC furthered this conspiracy by permitting

ProExcavation to perform the work, paying ProExcavation charges which it knew to be falsely

inflated, demanding that sum be repaid to it by the LLC." Plaintiffs' Ints. Ans. No. 10. Again,

given that Plaintiffs have seen no charges or bills from ProExcavation and cannot identify a

single improper charge, it is mind boggling how Plaintiffs can claim, with a straight face, that

their pleading is made in good faith or that they have a properly supportable fraudulent

conspiracy claim. It is apparent that this response and the support for the conspiracy count is

nothing but unsubstantiated conclusions.

Plaintiffs also claim that because KDC filed a proof of claim and a mechanics lien, that

too proves a conspiracy. Both of these filings are statutorily protected acts and, in any event

occurred post-conspiracy. Accordingly, the conspiracy count must be dismissed.

VI. <u>PLAINTIFFS HAVE FAILED TO PLEAD A CLAIM UNDER M.G.L. c. 93A.</u>

In Count VI, the Debtor claims that Defendants violated M.G.L. Chapter 93A. To the

extent that the Chapter 93A claim is predicated on fraud, it too must be dismissed for failing to

plead with particularity. See <u>Zak Law Offices, P.C. v. Reed</u>, No. CIV.A. 10-10333-LTS, 2010

WL 2802068, at *4 (D. Mass. July 13, 2010) ("Reed's claim, albeit brought pursuant to M.G.L.

c. 93A, is a claim for fraud, and as such it must satisfy the heightened pleading standards

applicable to such claims under Fed. R. Civ. P. 9(b)."). Other than the allegations of false

billing, which as demonstrated above is nothing more than idle speculation, no malfeasance by

KDC is established.  And, if it did improperly bill, that would be garden-variety breach of

contract claim.  "[I]t is well settled that a simple breach of contract is never enough, by itself, to

constitute a violation of Chapter 93A." Trent Partners & Associates, Inc. v. Digital Equip. Corp.,

120 F. Supp. 2d 84, 106 (D. Mass. 1999) (applying Mass. law); see also S. Worcester Cnty.

Reg'l Vocational Sch. Dist. v. Utica Mut. Ins. Co., CIV.A. 06-40230-FDS, 2010 WL 3222015

(D. Mass. Aug. 13, 2010); Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 100–101 (1979); E.

Bldg. Servs. Corp. v. Matzell, Richard & Watts, Inc., SUCV200302601C, 2008 WL 1868378

(Mass. Super. Jan. 23, 2008).  Rather, "to rise to the level of a c. 93A violation, a breach must be

both knowing and intended to secure 'unbargained-for benefits' to the detriment of the other

party." T. Butera Auburn, LLC v. Williams, 83 Mass. App. Ct. 496, 508, review denied, 465

Mass. 1109 (2013), quoting Zabin v. Picciotto, 73 Mass. App. Ct. 141, 169 (2008). "The

breaching party's conduct must exceed the level of mere self-interest, rising instead to the level

of 'commercial extortion' or a similar degree of culpable conduct." Zabin, 73 Mass. App. Ct.

141, 169 (2008) (internal citations and quotations omitted).   Even assuming, *arguendo*, that

KDC was motivated somehow by its own self-interest, there certainly is no allegation of

"commercial extortion," especially as Plaintiffs are not sure they ever even spoke to KDC and

know nothing about its work on the Project.  Nothing in the Complaint even suggests any

"culpable conduct." Accordingly, the Chapter 93A claim fails and Count VI should be

dismissed.[10]

---

[10] As noted in Section I, supra, this count should also be dismissed because the Debtor lacks standing.

## VII. COUNT III ALLEGING "AIDING AND ABETTING" BREACH OF FIDUCIARY DUTY FAILS AS A MATTER OF LAW.

Count III must also be dismissed because Plaintiffs fail to allege the necessary elements to support a claim for aiding and abetting breach of fiduciary duty.   "[T]he tort of aiding and abetting a fiduciary breach are: (1) there must be a breach of fiduciary duty, (2) the defendant must know of the breach, and (3) the defendant must actively participate or substantially assist in or encourage the breach to the degree that he or she could not reasonably be held to have acted in good faith."  Arcidi v. Nat'l Ass'n of Gov't Employees, Inc., 447 Mass. 616, 623-24 (2006).  In R. Wojtkun, 534, B.R. 435, 459 (D. MA 2015).  Even assuming, *arguendo*, that Kagan breached his fiduciary duty, no facts are alleged to establish that KDC knew of Kagan's breach – much less that it actively participated or substantially assisted in or encouraged the breach to the degree that it could not reasonably be held to have acted in good faith.  Again, KDC is being targeted not because of its knowledge, but because Kagan allegedly perpetrated a fraud and KDC is owned by him and worked on the Project.  That is not enough.  Because Plaintiffs failed to allege facts satisfying these elements, Count III must be dismissed.

## VIII.       COUNT VII, BREACH OF CONTRACT, SHOULD BE DISMISSED.

Plaintiffs claim that KDC breached its construction contract.  This is an audacious claim insofar as Plaintiffs are "talking out of both sides of their mouth" insofar as they deny that Debtor ever had a contract with KDC and has held up Debtor's contract with Classic Homes as the operative document.  Having denied any contract with KDC, Plaintiffs cannot then seek to hold KDC responsible under that same contract.

Plaintiffs claim that KDC failed to complete construction in a good and workmanlike manner, and "the Company has suffered and is suffering damages in connection with remedying the shoddy construction for which KDC is properly held liable."  Cmp., ¶80.  Given that both

properties have sold, the claim that Debtor is continuing to suffer damages is false. There is no allegation that any claims have been asserted for shoddy construction by either of the home buyers. If there were claims, those now belong to the new home owners and certainly not to Debtor. More importantly, as part of the property sales which were approved by this Court, the Chapter 7 Trustee requested, and KDC gave, a standard new home warranty. There has not been a single claim asserted against the Debtor or against KDC under the warranty. This claim is nothing more than more mudslinging and should be dismissed.

IX. COUNT VIII, EQUITABLE SUBORDINATION, FAILS TO STATE A CLAIM.

Filippov and Lipetsker have added an equitable subordination claim. Subordination is a remedy in which the order of payment rather than the existence of the debt is at issue. It is not an affirmative claim. Under Section 510(c) of the Bankruptcy Code, allowed claims may be subordinated to allowed claims, but allowed claims may not be subordinated to interests. 11 U.S.C. §510(c); see also Shubert v. Lucent Techs. Inc. (In re Winstar Communications, Inc.), 554 F.3d 382, 414 (3d Cir. 2009)("a creditor's claim can be subordinated only to the claims of other creditors, not equity interests"); Adelphia Recovery Trust v. Bank of America, N.A., 390 B.R. 80, 99 (S.D.N.Y. 2008)("a given claim may not be subordinated to an equity interest, but only to another claim").

The deadline for filing claims in the Debtor's case was May 3, 2016. Filippov and Lipetsker filed proofs of interest. However, Lipetsker did not file a proof of claim and Filippov only filed a late claim for a purported mortgage in the amount of $208,333. [Claim No. 9] against which an objection has been filed. [Docket No. 167]. Given that Lipetsker did not file a claim and Filippov's late-filed claim is the subject of an objection, neither Lipetsker nor Filippov have standing to assert equitable subordination claims, and the suggestion that the Defendants'

claims could be equitably subordinated to their interests is not authorized by Section 510(c).

Moreover, even if equitable subordination was appropriate (it is not), since the estate has more

than $3 million dollars to distribute for the payment of allowed claims, any re-ordering of the

payment of such claims is likely a meaningless exercise.

CONCLUSION

Based upon the foregoing, KDC respectfully requests that the Complaint be dismissed.

KAGAN DEVELOPMENT KDC, CORP.,

By its attorneys,


/s/ Christopher M. Candon, Esq.
Christopher M. Candon (BBO# 650855)
John H. Perten (BBO# 548728)
SHEEHAN PHINNEY BASS & GREEN, P.A.
255 State Street, Fifth Floor
Boston, MA 02109
(617) 897-5600
ccandon@sheehan.com
jperten@sheehan.com


Dated:  November 21, 2017

# EXHIBIT 1

# OPERATING AGREEMENT
## OF
# LYMAN-CUTLER, LLC

1.      THIS OPERATING AGREEMENT is entered into as of the 14  day of
November, 2012 by and between Vadim Kagan, Nickolay Lipetsker and Alex
Filippov.

WHEREAS, Mr. Kagan,  Mr. Lipetsker and Mr. Filippov wish to form a limited liability
company known as LYMAN-CUTLER, LLC (the "Company") pursuant to the
Massachusetts Limited Liability Company Act (as amended, the "Act") by filing a
Certificate of Organization of the Company with the Massachusetts Secretary of State's
Office and by entering into this Agreement;

NOW, THEREFORE, in consideration of the mutual agreements, promises and
conditions contained herein and for other good and valuable consideration, the receipt and
sufficiency of which are hereby acknowledged, Mr. Kagan,  Mr. Lipetsker and Mr.
Filippov as acknowledge and agree as follows:

## ARTICLE I - DEFINITIONS

1.1 Definitions.       Capitalized terms used in this Agreement and not otherwise
defined shall have the meanings assigned to them below:

(a) "Agreement" means this operating Agreement, as amended, modified,
supplemented or restated from time to time.

(b) "Certificate of Formation" means the Certificate of Formation of the
Company and any and all amendments thereto and restatements thereof
filed on behalf of the Company with the Commonwealth Secretary of
State's Office pursuant to the Act.

(c) "Member" means a member of the Company identified on Schedule A
attached hereto, as the same may be amended from time to time.

(d) "Percentage Interest" shall refer to the percentage ownership interest of
each Member in the Company.  The Percentage Interests of the
Members are set forth on Schedule A attached hereto and incorporated
herein for all purposes by this reference.

(e) "Date of Acquisition" shall refer to deed recording date for Lyman
Road Brookline property into the Company.

## ARTICLE II - THE COMPANY

2.1 Formation.

(a) The Members hereby agree to form the Company as a limited liability
company under and pursuant to the provisions of the Act and agree
that the rights, duties and liabilities of the Members shall be as
provided in the Act, except as otherwise provided herein. Upon the
execution of this Agreement, Mr. Kagan, Mr. Lipetsker and Mr.
Filippov shall be Members of the Company.

(b) The name and mailing address of each Member and the amount
contributed to the capital of the Company shall be listed on Schedule
A.

2.2 Name; Principal Place of Business. The name of the Company shall be
LYMAN-CUTLER, LLC. The principal office of the Company shall be
located at 130 Trapelo Road, Belmont, Massachusetts, or at such other place
as the Members may from time to time determine.

2.3 Term. The term of the Company shall commence on the date of the filing of
the Certificate of Organization in the Commonwealth of Massachusetts
Secretary of State's Office and shall continue until November 30, 2015 unless
dissolved before such date in accordance with the provisions of this
Agreement.

2.4 Registered Agent and Office. The company's registered agent and office in
Massachusetts shall be as set forth in the Certificate of Organization of the
Company filed with Commonwealth of Massachusetts Secretary of State's
Office, as the same may from time to time be amended.

2.5 Fiscal Year. The Company's fiscal year (the "Fiscal Year") shall be the
calendar year.

2.6 Taxation as Partnership. The Company shall be treated as a partnership for
U.S. federal income tax purposes.

2

## ARTICLE III - PURPOSE AND POWERS OF THE COMPANY

Nature of Business.  The general character of the business of the LLC is to own (directly or through a nominee), invest in, develop, improve, operate, manage, lease and/or sell real estate in Commonwealth of Massachusetts.  To engage in any activities directly or indirectly related or incidental thereto including, but without limitation, everything necessary, suitable, convenient, or proper for the accomplishment of any of the foregoing activities, or the attainment of any one or more of the purposes, enumerated or incidental to the powers named, or which shall at any time appear conducive to or expedient for the production of benefit to the corporation, either as the holders of or interested in any property, or otherwise, with all the powers now or hereafter conferred by law, and for all lawful purposes.

3.1  Powers of the Company.  The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to or for the furtherance of the purpose set forth in Article 3., including, but not limited to the powers permitted under the Act.

## ARTICLE 1V - CAPITAL CONTRIBUTIONS AND ACCOUNTS

4.1  Capital Contributions.  Each Member has transferred and contributed to the capital of the Company the capital amounts (the "Capital Contributions") as set forth on Schedule A.  Furthermore, Purchase Money Loan and Construction Loan shall be taken from Rockland Trust Company to pay for construction and carrying costs until the issuance of Certificates of Occupancy (hereinafter "CO") but in no event for more then twenty three (23) months from the date of acquisition.

4.2  Carrying Costs.    Carrying costs shall be defined to include but not limited to mortgage payments, taxes and insurance for the subject property 77 Lyman Road, Brookline, Massachusetts.   In the event that a CO for each lot is not issued within twenty three (23) months from the date of acquisition, then Mr. Kagan will be responsible for all carrying costs until such time as CO's are issued.

3

4.3 <u>Capital Accounts; Assets.</u> An individual capital account (each a "Capital Account") shall be established and maintained for each Member in accordance with applicable regulations under the Internal Revenue Code of 1986 as from time to time amended (the "Code"). A Member shall not be entitled to interest on his or her Capital Contribution or Capital Account, or to withdraw any part of his or her Capital Contribution or Capital Account. No Member shall have any right in or to any asset or property of the Company, but shall only have a right to the distributions as and when provided for in Sections 8.2 and 9.2 hereof.

4.4 <u>Maintenance of Capital Accounts.</u> To the extent consistent with such regulations, there shall be credited to each Member's Capital Account the amount of any contribution of capital and carrying costs made by such Member to the Company, and such Member's share of the net profits of the Company and there shall be charged against each Member's Capital Account the amount of all distributions to such Member, and such member's share of the net losses of the Company.

### ARTICLE V - MEMBERS

5.1 <u>Powers of Members.</u> The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms of this Agreement.

5.2 Duties of Members. It shall be Mr. Kagan's duty and obligation to construct two (2) homes at the location currently known as 77 Lyman Road, in Brookline, Massachusetts in accordance with the plans, including drawings, supplied by Mr. Kagan and approved by Managing Member. The construction shall be substantially completed no later than March 30, 2014. It is specifically understood by all Members that Mr. Kagan's compensation for this duty is outlined in Section 8.1 below.

5.3 <u>Admission of Members.</u> No person shall be admitted as a Member of the Company after the date of formation of the Company without the written consent or approval of the Members owning at least eighty (80%) of the

4

Percentage Interests in the Company at the time of such admission, regardless
of whether such person has previously acquired any rights in any existing
Member's interest in the Company by assignment, sale or otherwise.  A
Member's execution of a counterpart of this Agreement, or such other
instrument as the Members may require, shall  evidence his or her admission.

5.4    Transfer of Company Interest.  No Member may transfer, sell, assign, pledge,
mortgage, or dispose of or grant a security interest in his or her interest in the
Company (each, a "Transfer") without the prior written consent of the
Members owning at least eighty (80%) of the Percentage Interests in the
Company at the time of such Transfer.  Any purported Transfer in
contravention of this Section 5.3 shall be null and void and the Member
attempting such Transfer shall cease to be a Member of the Company shall be
forfeited and reallocated to the remaining Members in accordance with their
respective Percentage Interests.

5.5    Rights of Assignee.  The purchaser or other transferee of a Member's interest
in the Company shall have only the right to receive the distributions and
allocations of profits or losses to which the Member would have been entitled
under this Agreement with respect to the transferred interest and shall not have
or enjoy any right to participate in the management of the Company or to
receive any financial information or reports relating to the Company or any
other rights of a Member unless and until the purchaser or transferee is
admitted as a Member pursuant to Section 5.2.

5.6    Partition.  Each Member waives any and all rights that he or she may have to
maintain an action for partition of the Company's property.

### ARTICLE VI – MANAGEMENT

6.1    Management, duties, and Restrictions.

(a)    General Management.  The management and control of the operations
of the Company and the maintenance, development, sales and leasing
of the property of the Company shall rest with the Managing Members.

VK
A.F.  N.L.                              5

(b) <u>Powers of Managing Member.</u> Subject to such limitations as may be imposed pursuant to the terms of this Agreement, the Act or by operation of law, the Members are and shall be authorized and empowered to carry out and implement the purposes of the Company. In that connection, the powers of the Managing Member shall include, but not be limited to, the following:

(1) to engage, dismiss, and replace personnel, attorneys, accountants, brokers or such other persons as may be deemed necessary or advisable by Managing Member;

(2) to authorize or approve all actions with respect to distributions by the Company, dispositions of the assets of the Company or its nominee, execution of leases, mortgage contracts, bonds, promissory notes, loan agreements and other instruments on behalf of the Company or its nominee, and to execute any agreements, instruments or documents relating to or affecting such matters;

(3) to acquire, mortgage, improve and convey real property and interests therein, including, but not limited to, easements and rights-of-way, and to execute any agreements, instruments or documents relating to or affecting such matters;

(4) to open, maintain, and close bank accounts and to draw checks and other orders for the payment of money; and

(5) to take such other actions and to incur such reasonable expenses on behalf of the Company as may be necessary or advisable in connection with the conduct of the affairs of the Company.

(6) The Managing Member hereby agrees to list the properties with Tatiana Kagan. In order to remove Tatiana Kagan as a listing broker by December 31, 2014 will require a written consent of the Members owning at least eighty one (81%) of the

Percentage Interests in the Company.   After December 31, 2014 no such consent shall be required.

(c)  Liability of Managing Member.  In carrying out their duties, the Managing Member shall not be liable to the Company or to any other Members for any actions taken in good faith and reasonable believed to be in the best interest of the Company or which are taken upon the written advice of legal counsel for the Company.

(d)  Reliance on Act of Managing Member.  Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Managing Member.  Any person other than a Member may and shall be entitled to rely on certificates, instructions, agreements or assignments signed or purporting to be signed by a Managing Member for or on behalf of the Company, and on the statements and agreements set forth therein, without inquiry as to the due authorization thereof or the authority of the person signing or purporting to sign such certificates, instructions, agreements or assignments.

(e)  Delegation.  The Managing Member may appoint Members only with such titles as they may elect, including the titles of President, Vice President, Treasurer and Secretary, to act on behalf of the Company with such power and authority as the Members may delegate in writing to any such person.

(f)  Books and Records.  The Company's books and records shall be maintained in accordance with good record keeping practices and federal and state income tax laws and regulations.  All books and records of the Company shall be maintained at the principal office of the Company, and each of the Members shall have access thereto to review the same at any time upon reasonable notice and during normal business hours.

(g)  Reimbursement of Managing Member.  The Managing Member shall be reimbursed by the Company for all reasonable expenses (including attorney and accountant's fees) incurred or paid by them for or on behalf of the Company.

7

## ARTICLE VII - VOTING, MEMBER CONSENTS AND MEMBER GUARATEE, MEETINGS

7.1  Voting.  Each Member shall be entitled to vote in proportion to his or her Percentage Interest in the Company from time to time.  Such vote may be exercised by written or oral notification by a Member to the other Members.

7.2  Member Consents.  The amendment of this Agreement shall require the vote and unanimous approval of all the Members.  All other actions taken by the Company, including the admission of a new Member, shall require the vote and approval of Members owning eighty percent (80%) or more of the Percentage Interest at the time of such vote.

7.3  Member Guarantee.  **Mr. Filippov** shall, if required by institutional lender, provide that lender with a limited personal guarantee not to exceed $200,000.00 for all loans obtained by the Company related to the property located at 77 Lyman Road, Brookline, Massachusetts. Coincident with any provision by Mr. Filippov of such a guarantee, Messrs Kagan and Lipetsker shall each provide Mr. Filippov with a limited personal guarantee not to exceed, in the case of Mr. Kagan, $100,000.00 and in the case of Mr. Lipetsker, $20,000.00

7.4  Meetings of the Members.  The Members may, but shall not be required, to meet from time to time to consider the affairs of the Company and to take any action permitted to be taken by the Members by law or under this Agreement. Meetings of the Members may be called at any time by any Member.  Notice of any meeting shall be given to all Members not less than two (2) days nor more than thirty (30) days prior to the date of such meeting.  Each Member may authorize any person to act for it by proxy on all matters on which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting.  Every proxy must be signed by the Member or his or her attorney-in-fact.  A quorum for each meeting shall be one more than one-half the number of all Members.

8

## ARTICLE VIII - ALLOCATIONS AND DISTRIBUTIONS

8.1 _Allocations of Profits or Losses._ **_The net profits,_** net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows: Mr. Alex Filippov (40%) , Mr. Nickolay Lipetsker (10%) and Mr. Kagan (50%).  In the event that the demolition permit is not issued by June 30, 2013, then _the net profits,_ net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows:  Mr. Alex Filippov (60%) , Mr. Nickolay Lipetsker (10%) and Mr. Kagan (30%).  The net losses from any sale of any property of the Company or upon liquidation of the Company shall be allocated among the Members according to the Percentage Interests of Each Member.  Net profits and net losses shall, for both accounting and tax purposes, be net profits and net losses as determined for reporting on the Company's federal income tax return. _In the event that the property is not sold within twenty three (23) months from the date of acquisition,  then Mr. Kagan shall be responsible for all carrying costs until such time as the property is sold.   If Mr. Kagan fails to pays to pay monthly carrying costs, then Mr. Filippov shall be responsible to contribute the necessary carrying costs and subsequently his capital contribution and percentage interest in the Company shall increase by the same amount and  percentage and at the same time will trigger reduction of Mr. Kagan's share of capital contribution by the same amount and subsequently his/her percentage interest in the Company._ For tax purposes, all items of depreciation, gain, loss, deduction or credit shall be determined in accordance with the Code and, except to the extent otherwise required by the Code, allocated to and among the Members in the same percentages in which the Members share in net profits and net losses.   Any change to this paragraph will require a written consent of the Members owning at least eighty one (81%) of the Percentage Interests in the Company.

9

8.2 <u>Distribution to Members.</u> *The distribution to Members shall be in accordance with their respective Capital Contribution first, however, an additional five (5%) percent per annum payment based upon Members' respective Capital Contributions shall be paid out of Mr. Kagan's net profit share for each day that the property is not sold after twenty three (23) months of acquisition* For the purposes hereof, the term "Net Cash From Operations" shall mean the gross cash proceeds from Company operations less the portion thereof used to pay or establish reserves for Company expenses, debt payments, capital improvements, replacements, and guaranteed payments, all as determined by the Members. "Net Cash From Operations" shall not be reduced by depreciation , amortization, cost recovery deductions, or similar non-cash allowances, but shall be increased by any reductions of reserves previously established.

## ARTICLE IX – DISSOLUTION AND TERMINATION OF COMPANY

9.1 <u>Events of Dissolution.</u> The Company shall be dissolved and its affairs shall be would up upon the occurrence of any of the following events:

    (a) the death, insanity, dissolution, incompetency, bankruptcy, retirement, resignation or expulsion of a Member ("Retiring Member") unless there are at least two (2) remaining Members of the Company, and the remaining Members owning a "majority in interest" in the Company elect to continue the Company within ninety (90) days of the death, insanity, dissolution, bankruptcy, retirement, resignation or expulsion of the Retiring Member;

    (b) Notwithstanding the above paragraph, in the event of the death, insanity, dissolution, incompetency, bankruptcy, retirement or resignation of Mr. Filippov, his interest in this Company and control of this Company will automatically pass to his spouse by operation of this Agreement;

    (c) the conclusion of the term of the Company set forth in Section 2.3. hereof;

VK
A.F.  N.L.

(d) the sale or disposition of all or substantially all of the assets of the Company;

(e) the written consent of the Members owning eighty (80%) or more of the Percentage Interests in the Company; or

(f) the entry of a decree of judicial dissolution in accordance with the provisions of the Act.

For the purpose of Section 9.1 (a) above, the term "majority in interest" means eighty (80%) or more of the remaining Members' collective interest in profits and their respective Capital Accounts. For the purpose of the foregoing sentence, profits shall be determined and allocated based upon any reasonable estimate of profits from the date of the dissolution event to the projected termination of the Company taking into account present and future allocations of profits under this Agreement, and the Capital Account balances shall be determined upon the date of the dissolution event.

9.2   Winding Up.   Upon the dissolution of the Company, the remaining Member or, if more than one Member then remains, the Member selected by the remaining Members (in either case, the "Liquidating Member"), shall proceed with the winding up of the Company and apply and distribute the Company's assets as provided in this Section 9.2. The assets shall first be applied to the payment of the liabilities of the Company (other than any loans that may have been made by the Members to the Company) and to the expenses of liquidation. A reasonable time shall be allowed for the orderly liquidation of the Company and for the discharge of liabilities to creditors, so as to enable the Liquidating Member to minimize the normal losses attendant to a liquidation. The remaining assets shall next be applied to the repayment of any loans made by the Members to the Company. All assets then remaining shall be distributed to the Members in accordance with their respective Capital Accounts after giving effect to all contributions, distributions and allocations for all periods. Notwithstanding any of the foregoing, the Liquidating Member may retain a sum deemed necessary by him or her as a reserve for any

11

contingent liabilities, expenses and obligations of the Company. Upon the final distribution of assets to the Members, each of the Members shall be furnished with a statement which sets forth the assets and liabilities of the Company as of the date of the complete liquidation.

## ARTICLE X - LIABILITY AND INDEMNIFICATION

10.1 Liability. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

10.2 Indemnification. The Company shall indemnify and hold harmless the Members and their respective employees and authorized agents from and against any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member, employee or authorized agent in good faith on behalf of the Company and reasonable believed to be within the scope of authority conferred by this Agreement, except that no Member, employee or authorized agent shall be entitled to be indemnified or held harmless from or against any loss, damage or claim incurred by reason of such Member's, employee's or authorized agent's gross negligence or willful misconduct; provided, however, that any indemnity under this Section 10.2 shall be provided out of and to the extent of Company assets only, and no Member shall have any personal liability on account thereof.

## ARTICLE XI - MISCELLANEOUS

11.1 Governing Law. The Company and this Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts.

11.2 <u>Agreement Binding.</u> This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective next-of-kin, legatees, administrators, executors, legal representatives, successors, and assigns.

11.3 <u>Notices.</u> Notices to the Members or to the Company to be furnished hereunder shall be deemed to have been given when mailed, by prepaid registered or certified mail, or when deposited with an express courier service, addressed to the address set forth on Schedule A or as set forth in any notice of changes of address previously given in writing by the addressee to the addressor.

Executed as a Commonwealth of Massachusetts's instrument under seal on the day and year first above written.

Nickolay Lipetsker, Member

Vadim Kagan, Member

Alex Filippov, Managing Manager

## SCHEDULE A

### Capital Contributions and Percentage Interests

| Member | | Capital Contribution | Percentage Interest |
|---|---|---|---|
| **Name:** | Nickolay Lipetsker | $250,000.00 | 10% |
| **Address:** | 52 Stony Brae Road, Newton, MA, 02461 | | |
| **Name:** | Alex Filippov | $2,000,000.00 | 80% |
| **Address:** | 130 Trapelo Road, Belmont, Massachusetts | | |
| **Name:** | Vadim Kagan | $250,000.00 | 10% |
| **Address:** | 59 Needham Street, Unit 1402, Newton, MA, 02461 | | |

VK , N.L.

14

EXHIBIT 2

SHEEHAN
PHINNEY
BASS +
GREEN

PROFESSIONAL
ASSOCIATION



ATTORNEYS AT LAW

BOSTON
255 STATE STREET
BOSTON, MA
02109
T 617 897-5600
F 617 439-9363

MANCHESTER
1000 ELM STREET
MANCHESTER, NH
03101
T 603 668-0300
F 603 627-8121

CONCORD
TWO EAGLE SQUARE
CONCORD, NH
03301
T 603 223-2020
F 603 224-8899

HANOVER
½ LEBANON STREET
HANOVER, NH
03755
T 603 643-9070
F 603 643-3679

WWW.SHEEHAN.COM

Alexander H. Pyle
617-897-5642
apyle@sheehan.com

May 7, 2015

**VIA OVERNIGHT DELIVERY**

Mr. Alex Filippov
130 Trapelo Road
Belmont, MA 02478

Mr. Nickolay Lipetsker
52 Stony Brae Road
Newton, MA 02461

Mr. Vadim Kagan
239 Nahanton St.
Newton, MA 02459

Re:   **Lyman-Cutler, LLC**

Dear Messrs. Filippov, Lipetsker and Kagan:

I am writing on behalf of our clients, Vadim Kagan and Kagan Development Corporation, to open a discussion regarding several matters pertaining to Lyman Cutler, LLC (the "Company").

As you know, the three of you are the members of the Company, which is governed by an Operating Agreement dated as of November 14, 2012 (the "Operating Agreement"). In accordance with the terms of the Operating Agreement, Mr. Kagan and his company, Kagan Development Corporation ("KDC") have constructed two homes on the real property owned by the Company in Brookline, Massachusetts. The homes were completed in accordance with all the deadlines specified in the Operating Agreement and have been on the market for approximately ten months, but neither home has yet been sold. Under current market conditions, a reduction to the listing price is clearly necessary, but to date I understand that Mr. Filippov has refused to approve any price change.

The need for a price reduction is particularly important given the November 30, 2015 dissolution date of the Company, which is rapidly approaching. It is not in the interest of any of the members to have the homes sold as part of a liquidation, particularly when the liquidation would occur during the traditionally weak winter real estate market.

{80354940.1}

Mr. Alex Filippov
Mr. Nickolay Lipetsker
Mr. Vadim Kagan
May 7, 2015
Page 2

　　　To date, Mr. Kagan and KDC have incurred substantial costs and expenses in complying with their obligations under the Operating Agreement. KDC's best accounting as to the unreimbursed construction costs as of May 7, 2015 total $758,025.56, exclusive of interest charges, with approximately $50,000 of additional vendor costs anticipated. These construction costs are detailed on the accompanying spreadsheet, and will be payable after repayment of the existing bank debt and before any proceeds are available for distribution to the Company's members. In addition, since November 2013, Mr. Kagan has made additional capital contributions totaling over $251,000 to cover carrying costs associated with the homes. While these additional capital contributions do not bear interest, they do have the effect of increasing Mr. Kagan's capital account and thereby increasing his share of the proceeds available for distribution when the Company is liquidated.[1]

　　　Under the current circumstances, Mr. Kagan is not prepared to continue paying the carrying costs of the homes, which total approximately $28,000 per month. Section 8.1 of the Operating Agreement provides that if Mr. Kagan does not pay the carrying costs, then Mr. Filippov will be required to pay them. In such an event, Mr. Filippov's capital account would be increased by the amount of his contributions, which would increase his share of liquidation proceeds.[2] If, however, all members agree to a reduction in the listing price of each home from $5.5 million to $5.25 million (and to a reduction to $5.199 million if the houses do not sell within one month), Mr. Kagan would be willing to split equally with Mr. Filippov the carrying costs of the homes once Mr. Filippov has contributed carrying costs equal to those contributed by Mr. Kagan to date, until both homes are sold. Given the substantial costs already incurred by Mr. Kagan and KDC, we believe this approach is more than fair to the other members of the Company.

　　　If you are amenable to the foregoing compromise, I would be happy to prepare an amendment to the Operating Agreement which reflects this approach, and also extends the term of the Company until November, 30 2016 and clarifies the economic rights and obligations of the members.

---

[1] Section 9.2 of the Operating Agreement provides that the upon dissolution, Company's assets, after payment of liabilities to creditors and member loans, "shall be distributed to the Members in accordance with their respective Capital Accounts after giving effect to all contributions, distributions and allocations for all periods." Note that Capital Accounts, not Percentage Interests, determine how liquidation proceeds are allocated.

[2] Section 8.1 makes reference to a reduction of Mr. Kagan's share of capital contributions and percentage interest in the Company if Mr. Filippov pays the carrying costs. While the language is inartfully drafted, it simply states the same principle that applies to carrying costs paid by Mr. Kagan: The increase in Mr. Filippov's capital account has the effect of reducing the proportion of total capital contributed by Mr. Kagan and therefore, pursuant to Section 9.2, the proportion of liquidation proceeds he receives.

{50354989 4}

Mr. Alex Filippov
Mr. Nickolay Lipetsker
Mr. Vadim Kagan
May 7, 2015
Page 3


It is the desire of Mr. Kagan and KDC to arrive at a mutually acceptable path forward that is fair to all of the members and recognizes the contributions that each of them has made to the Company. I would be pleased to work with you or your counsel towards this goal in a cooperative and constructive manner.

Because the active spring real estate market is currently underway, I would ask that you give this matter your prompt attention.

I look forward to hearing from you.

Sincerely,

Alexander H. Pyle

cc: Mr. J. Joseph Cohen

{S0554989 4}

05/07/15

**Lyman-Cutler, LLC**
**A/P Aging Summary**
**All Transactions**

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| BST Plumbing | 39,340.00 | 0.00 | 0.00 | 0.00 | 0.00 | 39,340.00 |
| Decor Art | 11,250.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,250.00 |
| Dream Flooring | 15,460.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,460.00 |
| KDC | 5,928.72 | 0.00 | 47.78 | 8,272.73 | 230,027.33 | 244,276.56 |
| National Grid | 0.00 | 198.00 | 0.00 | 0.00 | 0.00 | 198.00 |
| ProExcavation | 0.00 | 0.00 | 0.00 | 0.00 | 325,000.00 | 325,000.00 |
| Sergey Nikolaev | 19,320.00 | 0.00 | 0.00 | 0.00 | 0.00 | 19,320.00 |
| Town of Brookline | 0.00 | 281.00 | 0.00 | 0.00 | 0.00 | 281.00 |
| Unicon Electric | 65,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 65,000.00 |
| V&D Heat | 37,900.00 | 0.00 | 0.00 | 0.00 | 0.00 | 37,900.00 |
| TOTAL | 194,198.72 | 479.00 | 47.78 | 8,272.73 | 555,027.33 | 758,025.56 |

Current Carrying costs
(per month - approximate)    $30,000

Estimated additional vendor
costs:    $50,000

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:* )<br><br>LYMAN-CUTLER, LLC, )<br>     Debtor, )<br>_____ )<br><br>LYMAN-CUTLER, LLC, )<br><br>     Plaintiff, )<br><br>v. )<br><br>VADIM KAGAN, TATIANA KAGAN, )<br>KAGAN DEVELOPMENT KDC CORP., )<br>and PROEXCAVACTION CORP., )<br><br>     Defendants. )<br>_____ ) | Chapter 7<br>No. 15-13881-FJB<br><br><br>A.P. No. 16-1120 |

**LYMAN-CUTLER, LLC'S ANSWERS TO KAGAN DEVELOPMENT KDC CORP.'S
FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Lyman-Cutler, LLC (the "LLC") responds to Kagan Development KDC Corp.'s ("KDC") First Set of

Interrogatories.  The LLC's responses are based upon information currently known.  It reserves the right

to amend, modify, or supplement each of the responses set forth below.

**GENERAL OBJECTION**

The LLC objects to the extent the "Instructions" section of KDC's First Set of Interrogatories

purport to impose on the LLC any obligation that exceeds those required by the Rules of Civil

Procedure.  The LLC will respond in accordance with any obligations imposed by the Rules.

1

## ANSWERS

### Interrogatory No. 1

Please set forth, with complete detail, each and every communication between Debtor and KDC regarding the Project.

### Answer No. 1

The LLC objects to this interrogatory. The term "Debtor" is defined to include each of its members, including Alex Filippov ("Filippov"), Nickolay Lipetsker ("Lipetsker"), and Vadim Kagan ("Kagan"). There were countless communications regarding the Project between the LLC's Managing Member, Filippov, and KDC's President, Kagan. There were also likely additional communications involving Lipetsker and Kagan. To require the LLC to identify each of them here is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, particularly as it relates to communications between the two parties that are not related to any topic that is at issue in this case. The LLC agrees to meet and confer regarding a potential narrowing and more focused request for information. With regard to written communications, the burden of deriving or ascertaining the answer is the same for KDC as it is for the LLC, and the LLC refers KDC to the documents produced pursuant to Fed. R. Civ. P. 33.

### Interrogatory No. 2

Please set forth, with complete detail, each and every communication between Debtor and Classic Homes Development & Construction, LLC.

### Answer No. 2

The LLC objects to this interrogatory. The term "Debtor" is defined to include each of its members, including Filippov, Lipetsker, and Kagan. There were countless communications between Filippov and Classic Homes Development & Construction, LLC's Manager, Kagan, regarding the Project. There were also likely additional communications involving Lipetsker and Kagan. To require the LLC to identify each of them here is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, particularly as it relates to communications between the two parties that are not related to any topic that is at issue in this case. Subject to and without waiving any of his foregoing objections, the LLC states that it entered into a written contract with Classic Homes Development & Construction, LLC, a copy of which has been produced. The LLC subsequently learned, however, that Classic Homes Development & Construction, LLC was *not* the party that actually performed the construction work on the Project; that it was KDC, another company that Kagan owned and controlled, that actually performed the work on the Project; and that any communications between the LLC and Kagan following the execution of the written contract referenced above would have been with Kagan individually or as a representative of KDC. With regard to written communications, the burden of deriving or ascertaining the answer is the same for KDC as it is for the LLC, and the LLC refers KDC to the documents produced pursuant to Fed. R. Civ. P. 33.

2

**Interrogatory No. 3**

Please identify the full scope of services provided by KDC for the Project.

**Answer No. 3**

The LLC objects to this interrogatory to the extent it seeks information that is in the hands of a third party; namely, KDC. Subject to and without waiving any of his foregoing objections, the LLC states that it never entered into a written contract with KDC for the Project. Instead, the LLC entered into a written contract with Classic Homes Development & Construction, LLC to serve as the general contractor for the Project. The LLC has learned, however, that Kagan actually had the general contractor work performed by KDC, another company he owned and controlled. In this role, KDC would have been required to generally manage the Project, including but not limited to the hiring and coordination of subcontractors, vendors, and suppliers, oversight of the construction work, potential self-performance of some of the work, coordination with and obtainment of the requisite approvals from the necessary municipal authorities, timely completion, and other like functions generally performed by similar general contractors on similarly sized jobs.

**Interrogatory No. 4**

Please itemize all monies paid to KDC for labor and material provided for the Project.

**Answer No. 4**

The LLC objects to this interrogatory to the extent it seeks information about payments received by KDC from any person or entity other than the LLC. The LLC further objects that this information is uniquely in the possession and control of the Defendants. Subject to and without waiving its foregoing objections, the LLC states that it lacks personal knowledge of the specific amounts and detailed itemization of all monies paid to KDC, or for what purpose it was paid, since it was Kagan who controlled the payment of the money to his own company until May 2015. Notwithstanding the above, the LLC states that a review of its financial records indicate that the LLC paid KDC a total of $664,882.53 between September 2013 and September 2014, mostly as reimbursements for certain expenses KDC allegedly incurred. This figure does not include the numerous payments made directly by the LLC to subcontractors, vendors, suppliers, and municipal authorities on KDC's behalf. The LLC's financial records indicate the payments to KDC included the following:

| Date | Check Number | Amount |
|---|---|---|
| 9/11/13 | 1060 | $37,894.33 |
| 9/12/13 | 1061 | $29,200 |
| 10/1/13 | 1078 | $23,972 |
| 10/4/13 | 1079 | $200,000.10 |
| 10/4/13 | 1080 | $12,344.73 |
| 10/21/13 | 1083 | $80,000 |
| 10/21/13 | 1084 | $20,000 |
| 11/15/13 | 1099 | $8,231.08 |
| 12/2/13 | 1001 | $30,000 |
| 12/30/13 | 1003 | $73,838.55 |

| 12/30/13 | 1005 | $10,137.61 |
| 3/3/14 | 1034 | $67,606.28 |
| 8/4/14 | 1105 | $5,000 |
| 8/5/14 | 1107 | $38,942.85 |
| 8/27/14 | 1116 | $19,315 |
| 9/8/14 | 1122 | $8,400 |

## Interrogatory No. 5

If Debtor contends that any expenses charged by KDC for labor and/or material provided for the Project was excessive or somehow improper, please identify, in complete detail, each such expense and set forth all facts upon which you base that contention.

## Answer No. 5

The LLC believes that much of the amount claimed due by KDC in the proof of claim it filed in this bankruptcy is fraudulent and otherwise improper. It bases this belief on a number of factors. Before the project began, Kagan presented to Filippov and his co-investor, Nickolay Lipetsker, a detailed budget that Kagan claimed would represent the true costs of construction. Kagan's substantial experience building homes further led the investors to believe that Kagan's assertions were well founded. Throughout the course of the project, the LLC continually asked Kagan whether the project remained on budget. He always said that it did. Then, when the homes were on the verge of selling and months after construction was complete, Kagan – for the very first time – claimed that there was suddenly a $758,026.56 shortfall in money the LLC owed to him, with another $50,000 of additional vendor costs anticipated, as well as additional "capital contributions" in the amount of $251,000. Just weeks later, after the LLC sued Kagan, Kagan's claimed entitlement rose dramatically to over $2 million, despite the fact that the homes had been substantially completed more than nine months before. The LLC also learned around this time that Kagan had been making a practice with other projects on which he worked to claim an entitlement to a significant amount of alleged overruns on the verge of a home's sale in an effort to pressure his co-investors to pay him more money.

A review of the LLC and Kagan's financial records also support the conclusion that a number of payments made to KDC or payments made by KDC to others are fraudulent or otherwise improper, including the amount paid to ProExcavation Corp. which is grossly in excess of what a fair market charge would be for the type of site work that was involved in the Project. A detailed analysis of these charges is still being prepared by an expert(s), whose report will be produced in due course during this litigation and is incorporated herein by reference. Where Kagan controls both KDC and ProExcavation, and the ProExcavation charges are so grossly in excess of reasonable, the obvious conclusion is that Kagan is engaged in knowing and intentional fraud.

Even if for some reason this obvious conclusion were to prove incorrect, it is grossly negligent for Kagan and KDC to incur cost overruns of over $2 million on a Project where the budget was $3.2 million (including carrying costs and $200,000 for cost overruns already built into that figure) without prior consultation with and approval by Filippov and Lipetsker. Because the LLC never approved charges above the original budget, as required by the LLC Agreement, even if Kagan and the other co-conspirator Defendants have not engaged in fraud, those charges are improper, unauthorized, grossly negligent, and not properly payable by the LLC.

Discovery is ongoing and expert reports will be produced in due course, which are incorporated herein by reference.

## Interrogatory No. 6

Please set forth what Debtor believes is the fair and reasonable value for the labor and material provided by KDC for the Project, and the complete factual basis for that belief.

## Answer No. 6

The LLC objects to this interrogatory. The LLC's subjective belief regarding the "fair and reasonable value" for labor or material provided by KDC for the Project is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence as KDC's alleged entitlement to any money from the LLC is not dependent on what is "fair and reasonable." Subject to and without waiving its foregoing objections, the LLC states that the amount originally budgeted by Kagan for the construction - $1.3 million for each home – represents what it considers to be fair and reasonable for the construction services rendered. This would include not only costs for what KDC actually performed, but also costs for any of KDC's subcontractors, vendors, or suppliers.

## Interrogatory No. 7

Please identify any and all communications which Debtor had with anyone regarding the value of labor and materials provided for the Project by KDC.

## Answer No. 7

The LLC objects to this interrogatory because it seeks communications between it and its counsel that are protected by the attorney-client privilege and/or the work-product doctrine. The LLC further objects because it seeks communications between the LLC or its counsel and any experts consulted or retained for purposes of this litigation. Any such communications are protected from disclosure by the work-product doctrine and Fed. R. Civ. P. 26(b)(4). Subject to and without waiving its foregoing objections, the LLC states the following: It has not had any non-privileged or non-protected communications with anybody concerning the value of the labor and materials provided for the Project.

## Interrogatory No. 8

If Debtor contends that KDC agreed to construct the Project at a fixed cost or lump sum, please set forth the complete factual basis for that contention, including the identity of any documents which you believe supports your contention.

## Answer No. 8

Kagan agreed, on behalf of whatever company he was intending to do the work, to construct the Project at a fixed cost of $1.3 million per home, plus $200,000 in carrying costs. This was represented to Filippov by Kagan personally during a meeting in October 2012 when Kagan made his financial presentation as part of his inducement for Filippov to invest in the Project. To the best of the LLC's knowledge, he said that the $1.3 million would be the true costs for construction, that he was able to state this based on his significant experience in the industry, and that any deviations from this would be extremely minor. The investors ultimately agreed to add $100,000 to the construction budget for each house for any potential overruns, but was told by Kagan that this money would be expected to be returned to the investors. The contract entered into between the LLC and Kagan's company, Classic Homes Development & Construction, LLC, also stated that the LLC would pay the contractor's costs and expenses, and nothing more. This referred to the $1.3 million represented by Kagan to be his company's "costs and expenses" for completing the construction. It is also apparent from Rockland Trust's Credit Approval Review that the Project's construction budget, as outlined to Filippov, was to cover 100% of the construction costs.

**Interrogatory No. 9**

Please itemize all damages which Debtor seeks to recover from KDC, including in your response any pertinent calculations and the factual basis for those damages.

**Answer No. 9**

The LLC objects to this interrogatory as premature. Discovery and expert analysis is ongoing. In general terms, the LLC asserts that the purported charges above the original budget are fabricated and fraudulent, are grossly negligent, and not authorized and not properly payable even if not intentionally false and fraudulent. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

**Interrogatory No. 10**

If you contend that KDC conspired with Kagan, ProExcavation and Tatiana, or any one of them, to defraud the Debtor, please identify all facts upon which you base that contention. Include in your response each act taken by KDC in furtherance of the alleged conspiracy.

**Answer No. 10**

KDC, acting through Kagan, reached an agreement with ProExcavation whereby ProExcavation agreed to perform certain excavation and site work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC to use these purported expenses to demand additional money from the LLC. KDC furthered this conspiracy by permitting ProExcavation to perform the work, paying ProExcavation charges which KDC knew to be falsely inflated, demanding that sum be repaid to it by the LLC, and subsequently filing a mechanics' lien and a proof of claim seeking to recover that amount from the LLC. KDC

6

similarly reached an agreement with Kagan personally whereby Kagan would cause subcontractors, vendors, and suppliers to contract with KDC to perform certain work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC to use these purported expenses to demand additional money from the LLC. KDC furthered this conspiracy by permitting the subcontractors, vendors, and suppliers to perform the work, paying them charges which KDC knew to be falsely inflated, demanding that sum be repaid to it by the LLC, and subsequently filing a mechanics' lien and a proof of claim seeking to recover that amount from the LLC. Kagan and KDC also conspired to have KDC purportedly enter into a written contract with the LLC which was never authorized, which violated the terms of the Rockland Bank loan agreement, and which KDC now bases its claim for payment. KDC furthered this conspiracy by seeking to enforce the terms of that contract on the LLC when it knows that the LLC never agreed to the terms set forth therein.

### Interrogatory No. 11

For each and every person who you expect to call as an expert witness at trial, please state: (a) the identify of each expert by giving his/her name, address, specialty, and professional education and experience; (b) the subject matter on which each expert is expected to testify; (c) the substance of the facts and opinions to which each such expert is expected to testify; and (d) a summary of the grounds for each such opinion.

### Answer No. 11

The LLC objects to subparagraphs (b) through (d) of this interrogatory to the extent any expert witness identified is required to provide a written report under Fed. R. Civ. P. 26(b)(2)(B) as the requested information in those subparagraphs is duplicative of the information required to be identified in the written report. The LLC further objects because this interrogatory is premature as the Court has set an expert disclosure deadline of December 31, 2017. The identity of any expert the LLC intends to call as a witness at trial will be made in accordance with the Court's ordered deadline.

### Interrogatory No. 12

If you contend that KDC acted with "gross negligence" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

### Answer No. 12

The LLC objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. KDC is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if KDC was somehow entitled to assert a claim for indemnification against the LLC, the gross negligence detailed in the Adversary Proceeding Complaint and Answer No. 10, above, would preclude KDC from being indemnified. In addition, to the extent the cost overruns are not knowingly false and fraudulent, KDC was grossly negligent in its failure to obtain competitive bids, control costs,

monitor costs, keep accurate and timely books and records, inform the LLC, Filippov and Lipetsker of anticipated cost overruns and obtain their approval before incurring costs grossly in excess of the construction budget.

**Interrogatory No. 13**

If you contend that KDC acted with "willful misconduct" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 13**

The LLC objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. KDC is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if KDC was somehow entitled to assert a claim for indemnification against the LLC, the willful misconduct detailed in the Adversary Proceeding Complaint and in Answer No. 10, above, would preclude KDC from being indemnified.

**Interrogatory No. 14**

If you contend that KDC did not act in "good faith" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 14**

The LLC objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. KDC is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and was not therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if KDC was somehow entitled to assert a claim for indemnification against the LLC, the bad faith detailed in the Adversary Proceeding Complaint and in Answer No. 10, above, would preclude KDC from being indemnified.

Verification

I, Alex Filippov, state under the pains and penalties of perjury that I am the Managing Member of the LLC; that I am authorized to answer these interrogatories on the LLC's behalf; and that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Alex Filippov

*As to objections:*

*/s/ Peter N. Tamposi*
_____
Peter N. Tamposi (BBO No. 639497)
The Tamposi Law Group, P.C.
159 Main Street
Nashua, NH 03060
T:  (603) 204-5513

Dated:  October 2, 2017

Certificate of Service

I, Peter Tamposi, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on October 2, 2017.

*/s/ Peter N. Tamposi*
_____
Peter N. Tamposi

9

# EXHIBIT 4

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| *In re:* | ) | |
| | ) | |
| LYMAN-CUTLER, LLC, | ) | |
| Debtor, | ) | |
| | ) | Chapter 7 |
| | ) | No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | A.P. No. 16-1120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, TATIANA KAGAN, | ) | |
| KAGAN DEVELOPMENT KDC CORP., | ) | |
| and PROEXCAVACTION CORP., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

### ALEX FILIPPOV'S AMENDED ANSWERS TO KAGAN DEVELOPMENT KDC CORP.'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order, Alex Filippov ("Filippov") provided his amended responses to Kagan Development KDC Corp.'s ("KDC") First Set of Interrogatories. Filippov's responses are based upon information currently known. Discovery is ongoing. He reserves the right to amend, modify, or supplement each of the responses set forth below.

### GENERAL OBJECTIONS

Filippov objects to the extent KDC's First Set of Interrogatories purport to require Filippov to respond on his own behalf as well as "alleged managing member" of Lyman-Cutler, LLC (the "LLC"). KDC, and each of the other parties named above, has served separate discovery requests on the LLC.

1

Purporting to require Filippov to respond to these interrogatories on behalf of the LLC as well as on his

own individual behalf is unduly burdensome, needlessly duplicative, and in violation of the Court's Pre-

Trial Order. Filippov will respond to these interrogatories on his own behalf only.

Filippov further objects to the extent the "Instructions" section of KDC's First Set of

Interrogatories purport to impose on Filippov any obligation that exceeds those required by the Rules of

Civil Procedure. Filippov will respond in accordance with any obligations imposed by the Rules.

## ANSWERS

### Interrogatory No. 1

Please set forth, with complete detail, each and every communication between Filippov and
KDC regarding the Project.

### Answer No. 1

Filippov objects to this interrogatory. There were countless communications regarding the
Project between Filippov and KDC's President, Vadim Kagan ("Kagan"). To require Filippov to
identify each of them here is overly broad, unduly burdensome, and not reasonably calculated to lead to
the discovery of admissible evidence, particularly as it relates to communications between the two
parties that are not related to any topic that is at issue in this case. Filippov agrees to meet and confer
regarding a potential narrowing and more focused request for information. With regard to written
communications, the burden of deriving or ascertaining the answer is the same for KDC as it is for
Filippov, and Filippov refers KDC to the documents produced pursuant to Fed. R. Civ. P. 33.

### Interrogatory No. 2

Please set forth, with complete detail, each and every communication between Filippov and
Classic Homes Development & Construction, LLC.

### Answer No. 2

Filippov objects to this interrogatory. There were countless communications between Filippov
and Classic Homes Development & Construction, LLC's Manager, Kagan, regarding the Project. To
require Filippov to identify each of them here is overly broad, unduly burdensome, and not reasonably
calculated to lead to the discovery of admissible evidence, particularly as it relates to communications
between the two parties that are not related to any topic that is at issue in this case. Subject to and
without waiving any of his foregoing objections, Filippov states that the LLC entered into a written
contract with Classic Homes Development & Construction, LLC, a copy of which has been produced.
Filippov subsequently learned, however, that Classic Homes Development & Construction, LLC was
*not* the party that actually performed the construction work on the Project; that it was KDC, another

2

company that Kagan owned and controlled, that actually performed the work on the Project; and that any communications between Filippov and Kagan following the execution of the written contract referenced above would have been with Kagan individually or as a representative of KDC. With regard to written communications, the burden of deriving or ascertaining the answer is the same for KDC as it is for Filippov, and Filippov refers KDC to the documents produced pursuant to Fed. R. Civ. P. 33.

### Interrogatory No. 3

Please identify the full scope of services provided by KDC for the Project.

### Answer No. 3

Filippov objects to this interrogatory to the extent it seeks information that is in the hands of a third party; namely, KDC. Subject to and without waiving any of his foregoing objections, Filippov states the following: The LLC never entered into a written contract with KDC for the Project. Instead, the LLC entered into a written contract with Classic Homes Development & Construction, LLC to serve as the general contractor for the Project. I have learned, however, that Kagan actually had the general contractor work performed by KDC, another company he owned and controlled. In this role, KDC would have been required to generally manage the Project, including but not limited to the hiring and coordination of subcontractors, vendors, and suppliers, oversight of the construction work, potential self-performance of some of the work, coordination with and obtainment of the requisite approvals from the necessary municipal authorities, timely completion, and other like functions generally performed by similar general contractors on similarly sized jobs.

### Interrogatory No. 4

Please itemize all monies paid to KDC for labor and material provided for the Project.

### Answer No. 4

Filippov objects to this interrogatory to the extent it seeks information about payments received by KDC from any person or entity other than the LLC. Filippov further objects that this information is uniquely in the possession and control of the Defendants. Subject to and without waiving his foregoing objections, Filippov states the following: I lack personal knowledge of the specific amounts and detailed itemization of all monies paid to KDC, or for what purpose it was paid, since it was Kagan who controlled the payment of the money to his own company until May 2015. Notwithstanding the above, a review of the LLC's financial records indicates that the LLC paid KDC a total of $664,882.53 between September 2013 and September 2014, mostly as reimbursements for certain expenses KDC allegedly incurred. This figure does not include the numerous payments made directly by the LLC to subcontractors, vendors, suppliers, and municipal authorities on KDC's behalf. The LLC's financial records indicate the payments to KDC included the following:

| Date | Check Number | Amount |
|---|---|---|
| 9/11/13 | 1060 | $37,894.33 |
| 9/12/13 | 1061 | $29,200 |
| 10/1/13 | 1078 | $23,972 |

| 10/4/13 | 1079 | $200,000.10 |
|---------|------|-------------|
| 10/4/13 | 1080 | $12,344.73 |
| 10/21/13 | 1083 | $80,000 |
| 10/21/13 | 1084 | $20,000 |
| 11/15/13 | 1099 | $8,231.08 |
| 12/2/13 | 1001 | $30,000 |
| 12/30/13 | 1003 | $73,838.55 |
| 12/30/13 | 1005 | $10,137.61 |
| 3/3/14 | 1034 | $67,606.28 |
| 8/4/14 | 1105 | $5,000 |
| 8/5/14 | 1107 | $38,942.85 |
| 8/27/14 | 1116 | $19,315 |
| 9/8/14 | 1122 | $8,400 |

**Interrogatory No. 5**

If you contend that any expenses charged by KDC for labor and/or material provided for the Project were excessive and somehow improper, please identify, in complete detail, each such expense and set forth all facts upon which you base that contention.

**Answer No. 5**

I believe that much of the amount claimed due by KDC in the proof of claim it filed in this bankruptcy is fraudulent and otherwise improper. I base this belief on a number of factors. Before the project began, Kagan presented to me and our co-investor, Nickolay Lipetsker, a detailed budget that Kagan claimed would represent the true costs of construction. Kagan's substantial experience building homes further led me to believe that Kagan's assertions were well founded. Throughout the course of the project, I continually asked Kagan whether the project remained on budget. He always said that it did. Then, when the homes were on the verge of selling and months after construction was complete, Kagan – for the very first time – claimed that there was suddenly a $758,026.56 shortfall in money the LLC owed to him, with another $50,000 of additional vendor costs anticipated, as well as additional "capital contributions" in the amount of $251,000. Just weeks later, after the LLC sued Kagan, Kagan's claimed entitlement rose dramatically to over $2 million, despite the fact that the homes had been substantially completed more than nine months before. I also learned around this time that Kagan had been making a practice with other projects on which he worked to claim an entitlement to a significant amount of alleged overruns on the verge of a home's sale in an effort to pressure his co-investors to pay him more money.

A review of the LLC and Kagan's financial records also support the conclusion that a number of payments made to KDC or payments made by KDC to others are fraudulent or otherwise improper, including the amount paid to ProExcavation Corp. which is grossly in excess of what a fair market charge would be for the type of site work that was involved in the Project. A detailed analysis of these charges is still being prepared by an expert(s), whose report will be produced in due course during this litigation and is incorporated herein by reference. Where Kagan controls both KDC and ProExcavation, and the ProExcavation charges are so grossly in excess of reasonable, the obvious conclusion is that Kagan is engaged in knowing and intentional fraud.

Even if for some reason this obvious conclusion were to prove incorrect, it is grossly negligent for Kagan and KDC to incur cost overruns of over $2 million on a Project where the budget was $3.2 million (including carrying costs and $200,000 for cost overruns already built into that figure) without prior consultation with and approval by me and Lipetsker. Because I never approved charges above the original budget, as required by the LLC Agreement, even if Kagan and the other co-conspirator Defendants have not engaged in fraud, those charges are improper, unauthorized, grossly negligent, and not properly payable by the LLC.

Discovery is ongoing and expert reports will be produced in due course, which are incorporated herein by reference.

**Interrogatory No. 6**

Please set forth what you believe is the fair and reasonable value for the labor and material provided by KDC for the Project, and the complete factual basis for that belief.

**Answer No. 6**

Filippov objects to this interrogatory. Filippov's subjective belief regarding the "fair and reasonable value" for labor or material provided by KDC for the Project is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence as KDC's alleged entitlement to any money from the LLC is not dependent on what is "fair and reasonable." Subject to and without waiving his foregoing objections, Filippov states the following: The amount originally budgeted by Kagan for the construction - $1.3 million for each home – represents what I consider to be fair and reasonable for the construction services rendered. This would include not only costs for what KDC actually performed, but also costs for any of KDC's subcontractors, vendors, or suppliers.

**Interrogatory No. 7**

Please identify any and all communications which you had with anyone regarding the value of labor and materials provided for the Project by KDC.

**Answer No. 7**

Filippov objects to this interrogatory because it seeks communications between Filippov and his counsel that are protected by the attorney-client privilege and/or the work-product doctrine. Filippov further objects because it seeks communications between Filippov or his counsel and any experts consulted or retained for purposes of this litigation. Any such communications are protected from disclosure by the work-product doctrine and Fed. R. Civ. P. 26(b)(4). Subject to and without waiving his foregoing objections, Filippov states the following: I have not had any non-privileged or non-protected communications with anybody concerning the value of the labor and materials provided for the Project.

**Interrogatory No. 8**

If you contend that KDC agreed to construct the Project at a fixed cost or lump sum, please set forth the complete factual basis for that contention, including the identity of any documents which you believe supports your contention.

**Answer No. 8**

Kagan agreed, on behalf of whatever company he was intending to do the work, to construct the Project at a fixed cost of $1.3 million per home, plus $200,000 in carrying costs. This was represented to me by Kagan personally during our meeting in October 2012 when Kagan made his financial presentation as part of his inducement for me to invest in the Project. It was also represented to me and my wife, Arina Rudyakova, during two tours of Kagan's construction projects in Newton that Kagan took us on before we agreed to invest. He said that the $1.3 million would be the true costs for construction, that he was able to state this based on his significant experience in the industry, and that any deviations from this would be extremely minor. We ultimately agreed to add $100,000 to the construction budget for each house for any potential overruns, but was told by Kagan that this money would be expected to be returned to the investors. The contract entered into between the LLC and Kagan's company, Classic Homes Development & Construction, LLC, also stated that the LLC would pay the contractor's costs and expenses, and nothing more. This referred to the $1.3 million represented by Kagan to be his company's "costs and expenses" for completing the construction. It is also apparent from Rockland Trust's Credit Approval Review that the Project's construction budget, as outlined to me, was to cover 100% of the construction costs.

**Interrogatory No. 9**

Please itemize all damages which you seek to recover from KDC, including in your response any pertinent calculations and the factual basis for those damages.

**Answer No. 9**

Filippov objects to this interrogatory as premature. Discovery and expert analysis is ongoing. In general terms, Filippov asserts that the purported charges above the original budget are fabricated and fraudulent, are grossly negligent, and not authorized and not properly payable even if not intentionally false and fraudulent. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

**Interrogatory No. 10**

If you contend that KDC conspired with Kagan, ProExcavation and Tatiana, or any one of them, to defraud the Debtor, please identify all facts upon which you base that contention. Include in your response each act taken by KDC in furtherance of the alleged conspiracy.

6

**Answer No. 10**

KDC, acting through Kagan, reached an agreement with ProExcavation whereby ProExcavation agreed to perform certain excavation and site work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC to use these purported expenses to demand additional money from the LLC and, indirectly, from me. KDC furthered this conspiracy by permitting ProExcavation to perform the work, paying ProExcavation charges which KDC knew to be falsely inflated, demanding that sum be repaid to it by the LLC, and subsequently filing a mechanics' lien and a proof of claim seeking to recover that amount from the LLC. KDC similarly reached an agreement with Kagan personally whereby Kagan would cause subcontractors, vendors, and suppliers to contract with KDC to perform certain work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC to use these purported expenses to demand additional money from the LLC and, indirectly, from me. KDC furthered this conspiracy by permitting the subcontractors, vendors, and suppliers to perform the work, paying them charges which KDC knew to be falsely inflated, demanding that sum be repaid to it by the LLC, and subsequently filing a mechanics' lien and a proof of claim seeking to recover that amount from the LLC. Kagan and KDC also conspired to have KDC purportedly enter into a written contract with the LLC which was never authorized, which violated the terms of the Rockland Bank loan agreement, and which KDC now bases its claim for payment. KDC furthered this conspiracy by seeking to enforce the terms of that contract on the LLC when it knows that the LLC never agreed to the terms set forth therein.

**Interrogatory No. 11**

For each and every person who you expect to call as an expert witness at trial, please state: (a) the identify of each expert by giving his/her name, address, specialty, and professional education and experience; (b) the subject matter on which each expert is expected to testify; (c) the substance of the facts and opinions to which each such expert is expected to testify; and (d) a summary of the grounds for each such opinion.

**Answer No. 11**

Filippov objects to subparagraphs (b) through (d) of this interrogatory to the extent any expert witness identified is required to provide a written report under Fed. R. Civ. P. 26(b)(2)(B) as the requested information in those subparagraphs is duplicative of the information required to be identified in the written report. Filippov further objects because this interrogatory is premature as the Court has set an expert disclosure deadline of December 31, 2017. The identity of any expert Filippov intends to call as a witness at trial will be made in accordance with the Court's ordered deadline.

**Interrogatory No. 12**

If you contend that KDC acted with "gross negligence" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 12**

Filippov objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. KDC is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if KDC was somehow entitled to assert a claim for indemnification against the LLC, the gross negligence detailed in the Adversary Proceeding Complaint and Answer No. 10, above, would preclude KDC from being indemnified. In addition, to the extent the cost overruns are not knowingly false and fraudulent, KDC was grossly negligent in its failure to obtain competitive bids, control costs, monitor costs, keep accurate and timely books and records, inform the LLC, Filippov and Lipetsker of anticipated cost overruns and obtain their approval before incurring costs grossly in excess of the construction budget.

**Interrogatory No. 13**

If you contend that KDC acted with "willful misconduct" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 13**

Filippov objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. KDC is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if KDC was somehow entitled to assert a claim for indemnification against the LLC, the willful misconduct detailed in the Adversary Proceeding Complaint and in Answer No. 10, above, would preclude KDC from being indemnified.

**Interrogatory No. 14**

If you contend that KDC did not act in "good faith" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 14**

Filippov objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. KDC is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and was not and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if KDC was somehow entitled to assert a claim for indemnification against the LLC, the bad faith detailed in the Adversary Proceeding Complaint and in Answer No. 10, above, would preclude KDC from being indemnified.

I, Alex Filippov, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Alex Filippov

*As to objections:*


*/s/ Sean T. Carnathan*
Sean T. Carnathan, BBO No. 636889
*scarnathan@ocmlaw.net*
Joseph P. Calandrelli, BBO No. 666128
*jcalandrelli@ocmlaw.net*
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T: (781) 359-9000


Dated: October 2, 2017



Certificate of Service

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on October 2, 2017.


*/s/ Sean T. Carnathan*
Sean T. Carnathan

9

# EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:* )<br><br>LYMAN-CUTLER, LLC, )<br>Debtor, )<br>)<br>LYMAN-CUTLER, LLC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>VADIM KAGAN, TATIANA KAGAN, )<br>KAGAN DEVELOPMENT KDC CORP., )<br>and PROEXCAVACTION CORP., )<br>)<br>Defendants. )<br>) | Chapter 7<br>No. 15-13881-FJB<br><br><br>A.P. No. 16-1120 |

**NICKOLAY LIPETSKER'S ANSWERS TO KAGAN DEVELOPMENT KDC CORP.'S
FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Nickolay Lipetsker ("Lipetsker") responds to Kagan Development KDC Corp.'s ("KDC") First Set of

Interrogatories.  Lipetsker's responses are based upon information currently known.  He reserves the

right to amend, modify, or supplement each of the responses set forth below.

**GENERAL OBJECTION**

Lipetsker objects to the extent the "Instructions" section of KDC's First Set of Interrogatories

purport to impose on Lipetsker any obligation that exceeds those required by the Rules of Civil

Procedure.  Lipetsker will respond in accordance with any obligations imposed by the Rules.

1

## ANSWERS

### Interrogatory No. 1

Please set forth, with complete detail, each and every communication between Lipetsker and KDC regarding the Project.

### Answer No. 1

Lipetsker objects to Interrogatory No. 1. There were countless communications regarding the Project between Lipetsker and KDC's President, Vadim Kagan ("Kagan"). To require Lipetsker to identify each of them here is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, particularly as it relates to communications between the two parties that are not related to any topic that is at issue in this case. Lipetsker agrees to meet and confer regarding a potential narrowing and more focused request for information. With regard to written communications, the burden of deriving or ascertaining the answer is the same for KDC as it is for Lipetsker, and Lipetsker refers KDC to the documents produced pursuant to Fed. R. Civ. P. 33.

### Interrogatory No. 2

Please set forth, with complete detail, each and every communication between Lipetsker and Classic Homes Development & Construction, LLC.

### Answer No. 2

Lipetsker objects to this interrogatory. There were countless communications between Lipetsker and Classic Homes Development & Construction, LLC's Manager, Kagan, regarding the Project. To require Lipetsker to identify each of them here is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, particularly as it relates to communications between the two parties that are not related to any topic that is at issue in this case. Subject to and without waiving any of his foregoing objections, Lipetsker states that Lyman-Cutler, LLC (the "LLC") entered into a written contract with Classic Homes Development & Construction, LLC, a copy of which has been produced. Lipetsker subsequently learned, however, that Classic Homes Development & Construction, LLC was *not* the party that actually performed the construction work on the Project; that it was KDC, another company that Kagan owned and controlled, that actually performed the work on the Project; and that any communications between Lipetsker and Kagan following the execution of the written contract referenced above would have been with Kagan individually or as a representative of KDC.

### Interrogatory No. 3

Please identify the full scope of services provided by KDC for the Project.

## Answer No. 3

Lipetsker objects to this interrogatory to the extent it seeks information that is in the hands of a third party; namely, KDC. Subject to and without waiving any of his foregoing objections, Lipetsker states that the LLC never entered into a written contract with KDC for the Project. Instead, the LLC entered into a written contract with Classic Homes Development & Construction, LLC to serve as the general contractor for the Project. Lipetsker has learned, however, that Kagan actually had the general contractor work performed by KDC, another company he owned and controlled. In this role, KDC would have been required to generally manage the Project, including but not limited to the hiring and coordination of subcontractors, vendors, and suppliers, oversight of the construction work, potential self-performance of some of the work, coordination with and obtainment of the requisite approvals from the necessary municipal authorities, timely completion, and other like functions generally performed by similar general contractors on similarly sized jobs.

## Interrogatory No. 4

Please itemize all monies paid to KDC for labor and material provided for the Project.

## Answer No. 4

Lipetsker objects to this interrogatory to the extent it seeks information about payments received by KDC from any person or entity other than the LLC. Subject to and without waiving his foregoing objections, Lipetsker states that he lacks personal knowledge of the specific amounts and detailed itemization of all monies paid to KDC, or for what purpose it was paid, since it was Kagan who controlled the payment of the money to his own company until May 2015. After that point, it was Filippov who took over any payment of the money from the LLC. Notwithstanding the above, Lipetsker states that he understands that a review of the LLC's financial records indicate that the LLC paid KDC a total of $664,882.53 between September 2013 and September 2014, mostly as reimbursements for certain expenses KDC allegedly incurred. This figure does not include the numerous payments made directly by the LLC to subcontractors, vendors, suppliers, and municipal authorities on KDC's behalf. The LLC's financial records indicate the payments to KDC included the following:

| Date | Check Number | Amount |
|---|---|---|
| 9/11/13 | 1060 | $37,894.33 |
| 9/12/13 | 1061 | $29,200 |
| 10/1/13 | 1078 | $23,972 |
| 10/4/13 | 1079 | $200,000.10 |
| 10/4/13 | 1080 | $12,344.73 |
| 10/21/13 | 1083 | $80,000 |
| 10/21/13 | 1084 | $20,000 |
| 11/15/13 | 1099 | $8,231.08 |
| 12/2/13 | 1001 | $30,000 |
| 12/30/13 | 1003 | $73,838.55 |
| 12/30/13 | 1005 | $10,137.61 |
| 3/3/14 | 1034 | $67,606.28 |
| 8/4/14 | 1105 | $5,000 |
| 8/5/14 | 1107 | $38,942.85 |

| 8/27/14 | 1116 | $19,315 |
| 9/8/14 | 1122 | $8,400 |

## Interrogatory No. 5

If you contend that any expenses charged by KDC for labor and/or material provided for the Project were excessive and somehow improper, please identify, in complete detail, each such expense and set forth all facts upon which you base that contention.

## Answer No. 5

I believe that much of the amount claimed due by KDC in the proof of claim it filed in this bankruptcy is fraudulent and otherwise improper. I base this belief on a number of factors. Before the project began, Kagan presented to me and my co-investor, Alex Filippov, a detailed budget that Kagan claimed would represent the true costs of construction. Kagan's substantial experience building homes further led me to believe that Kagan's assertions were well founded. Throughout the course of the project, Kagan was continually asked whether the project remained on budget. He always said that it did. Then, when the homes were on the verge of selling and months after construction was complete, Kagan – for the very first time – claimed that there was suddenly a $758,026.56 shortfall in money the LLC owed to him, with another $50,000 of additional vendor costs anticipated, as well as additional "capital contributions" in the amount of $251,000. Just weeks later, after the LLC sued Kagan, Kagan's claimed entitlement rose dramatically to over $2 million, despite the fact that the homes had been substantially completed more than nine months before. I also learned around this time that Kagan had been making a practice with other projects on which he worked to claim an entitlement to a significant amount of alleged overruns on the verge of a home's sale in an effort to pressure his co-investors to pay him more money.

A review of the LLC and Kagan's financial records also support the conclusion that a number of payments made to KDC or payments made by KDC to others are fraudulent or otherwise improper, including the amount paid to ProExcavation Corp. which is grossly in excess of what a fair market charge would be for the type of site work that was involved in the Project. A detailed analysis of these charges is still being prepared by an expert(s), whose report will be produced in due course during this litigation and is incorporated herein by reference. Where Kagan controls both KDC and ProExcavation, and the ProExcavation charges are so grossly in excess of reasonable, the obvious conclusion is that Kagan is engaged in knowing and intentional fraud.

Even if for some reason this obvious conclusion were to prove incorrect, it is grossly negligent for Kagan and KDC to incur cost overruns of over $2 million on a Project where the budget was $3.2 million (including carrying costs and $200,000 for cost overruns already built into that figure) without prior consultation with and approval by me and Filippov. Because I never approved charges above the original budget, as required by the LLC Agreement, even if Kagan and the other co-conspirator Defendants have not engaged in fraud, those charges are improper, unauthorized, grossly negligent, and not properly payable by the LLC.

Discovery is ongoing and expert reports will be produced in due course, which are incorporated herein by reference.

**Interrogatory No. 6**

Please set forth what you believe is the fair and reasonable value for the labor and material provided by KDC for the Project, and the complete factual basis for that belief.

**Answer No. 6**

Lipetsker objects to this interrogatory. Lipetsker's subjective belief regarding the "fair and reasonable value" for labor or material provided by KDC for the Project is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence as KDC's alleged entitlement to any money from the LLC is not dependent on what is "fair and reasonable." Subject to and without waiving his foregoing objections, Lipetsker states the following: The amount originally budgeted by Kagan for the construction - $1.3 million for each home – represents what he considers to be fair and reasonable for the construction services rendered. This would include not only costs for what KDC actually performed, but also costs for any of KDC's subcontractors, vendors, or suppliers.

**Interrogatory No. 7**

Please identify any and all communications which you had with anyone regarding the value of labor and materials provided for the Project by KDC.

**Answer No. 7**

Lipetsker objects to this interrogatory because it seeks communications between Lipetsker and his counsel that are protected by the attorney-client privilege and/or the work-product doctrine. Lipetsker further objects because it seeks communications between Lipetsker or his counsel and any experts consulted or retained for purposes of this litigation. Any such communications are protected from disclosure by the work-product doctrine and Fed. R. Civ. P. 26(b)(4). Subject to and without waiving his foregoing objections, Lipetsker states the following: I have not had any non-privileged or non-protected communications with anybody concerning the value of the labor and materials provided for the Project.

**Interrogatory No. 8**

Please set forth any and all communications you had with Attorney Peter Tamposi regarding the Project and its development.

**Answer No. 8**

Lipetsker objects to this interrogatory because it seeks communications that are protected by the attorney-client privilege, the joint defense privilege, and the work-product doctrine. Subject to and without waiving any of his foregoing objections, Lipetsker states the following: I have never personally had any communications with Attorney Tamposi.

**Interrogatory No. 9**

If you contend that KDC agreed to construct the Project at a fixed cost or lump sum, please set forth the complete factual basis for that contention, including the identity of any documents which you believe supports your contention.

## Answer No. 9

Kagan agreed, on behalf of whatever company he was intending to do the work, to construct the Project at a fixed cost of $1.3 million per home, plus $200,000 in carrying costs. This was represented to me by Kagan personally during our meeting in October 2012 when Kagan made his financial presentation as part of his inducement for me to invest in the Project. To the best of my memory, he said that the $1.3 million would be the true costs for construction, that he was able to state this based on his significant experience in the industry, and that any deviations from this would be extremely minor. He also provided purported results from other projects that demonstrated he could stay on budget and deliver his promised financial returns. We ultimately agreed to add $100,000 to the construction budget for each house for any potential overruns, but was told by Kagan that this money would be expected to be returned to the investors. The contract entered into between the LLC and Kagan's company, Classic Homes Development & Construction, LLC, also stated that the LLC would pay the contractor's costs and expenses, and nothing more. This referred to the $1.3 million represented by Kagan to be his company's "costs and expenses" for completing the construction. It is also apparent from Rockland Trust's Credit Approval Review that the Project's construction budget, as outlined to me, was to cover 100% of the construction costs.

## Interrogatory No. 10

Please itemize all damages which you seek to recover from KDC, including in your response any pertinent calculations and the factual basis for those damages.

## Answer No. 10

Lipetsker objects to this interrogatory as premature. Discovery and expert analysis is ongoing. In general terms, Lipetsker asserts that the purported charges above the original budget are fabricated and fraudulent, are grossly negligent, and not authorized and not properly payable even if not intentionally false and fraudulent. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

## Interrogatory No. 11

If you contend that KDC conspired with Kagan, ProExcavation and Tatiana, or any one of them, to defraud the Debtor, please identify all facts upon which you base that contention. Include in your response each act taken by KDC in furtherance of the alleged conspiracy.

### Answer No. 11

KDC, acting through Kagan, reached an agreement with ProExcavation whereby ProExcavation agreed to perform certain excavation and site work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC to use these purported expenses to demand additional money from the LLC and, indirectly, from me. KDC furthered this conspiracy by permitting ProExcavation to perform the work, paying ProExcavation charges which KDC knew to be falsely inflated, demanding that sum be repaid to it by the LLC, and subsequently filing a mechanics' lien and a proof of claim seeking to recover that amount from the LLC. KDC similarly reached an agreement with Kagan personally whereby Kagan would cause subcontractors, vendors, and suppliers to contract with KDC to perform certain work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC to use these purported expenses to demand additional money from the LLC and, indirectly, from me. KDC furthered this conspiracy by permitting the subcontractors, vendors, and suppliers to perform the work, paying them charges which KDC knew to be falsely inflated, demanding that sum be repaid to it by the LLC, and subsequently filing a mechanics' lien and a proof of claim seeking to recover that amount from the LLC. Kagan and KDC also conspired to have KDC purportedly enter into a written contract with the LLC which was never authorized, which violated the terms of the Rockland Bank loan agreement, and which KDC now bases its claim for payment. KDC furthered this conspiracy by seeking to enforce the terms of that contract on the LLC when it knows that the LLC never agreed to the terms set forth therein.

### Interrogatory No. 12

For each and every person who you expect to call as an expert witness at trial, please state: (a) the identify of each expert by giving his/her name, address, specialty, and professional education and experience; (b) the subject matter on which each expert is expected to testify; (c) the substance of the facts and opinions to which each such expert is expected to testify; and (d) a summary of the grounds for each such opinion.

### Answer No. 12

Lipetsker objects to subparagraphs (b) through (d) of this interrogatory to the extent any expert witness identified is required to provide a written report under Fed. R. Civ. P. 26(b)(2)(B) as the requested information in those subparagraphs is duplicative of the information required to be identified in the written report. Lipetsker further objects because this interrogatory is premature as the Court has set an expert disclosure deadline of December 31, 2017. The identity of any expert Lipetsker intends to call as a witness at trial will be made in accordance with the Court's ordered deadline.

### Interrogatory No. 13

If you contend that KDC acted with "gross negligence" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 13**

Lipetsker objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. KDC is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if KDC was somehow entitled to assert a claim for indemnification against the LLC, the gross negligence detailed in the Adversary Proceeding Complaint and Answer No. 11, above, would preclude KDC from being indemnified. In addition, to the extent the cost overruns are not knowingly false and fraudulent, KDC was grossly negligent in its failure to obtain competitive bids, control costs, monitor costs, keep accurate and timely books and records, inform the LLC, Filippov and Lipetsker of anticipated cost overruns and obtain their approval before incurring costs grossly in excess of the construction budget.

**Interrogatory No. 14**

If you contend that KDC acted with "willful misconduct" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 14**

Lipetsker objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. KDC is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if KDC was somehow entitled to assert a claim for indemnification against the LLC, the willful misconduct detailed in the Adversary Proceeding Complaint and in Answer No. 11, above, would preclude KDC from being indemnified.

**Interrogatory No. 15**

If you contend that KDC did not act in "good faith" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 15**

Lipetsker objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. KDC is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and was not and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if KDC was somehow entitled to assert a claim for indemnification against the LLC, the bad faith detailed in the Adversary Proceeding Complaint and in Answer No. 11, above, would preclude KDC from being indemnified.

8

<u>Verification</u>

I, Nickolay Lipetsker, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Nickolay Lipetsker

*As to objections:*


/s/ Sean T. Carnathan
_____
Sean T. Carnathan, BBO No. 636889
scarnathan@ocmlaw.net
Joseph P. Calandrelli, BBO No. 666128
jcalandrelli@ocmlaw.net
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T: (781) 359-9000


Dated:  October 13 2017


<u>Certificate of Service</u>

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on October ___, 2017.

/s/ Sean T. Carnathan _____
Sean T. Carnathan

9