UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| LYMAN-CUTLER, LLC, ALEX | ) | |
| FILIPPOV AND NICKOLAY LIPETSKER | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adv. Proc. No.  16-01120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, TATIANA KAGAN, | ) | |
| KAGAN DEVELOPMENT KDC, CORP. | ) | |
| and PROEXCAVATION CORP. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**PROEXCAVATION CORP.'S MEMORANDUM IN SUPPORT OF
MOTION TO DISMISS AMENDED COMPLAINT**

INTRODUCTION

On November 7, 2017, Lyman-Cutler, LLC (the "Debtor" or the "Company"), Alex

Filippov ("Filippov") and Nickolay Lipetsker ("Lipetsker," together with the Debtor and

Filippov, the "Plaintiffs") filed an Amended Complaint (the "Complaint")[Adv. Proc. Docket

No. 52].  This latest iteration of the Complaint represents the third attempt by the Plaintiffs to set

forth cognizable claims against ProExcavation Corp. ("ProExcavation").[1]  For almost three years,

---

[1] Each of the Defendants in this proceeding has concurrently filed a separate Motion to Dismiss.  In a state court proceeding amongst these same parties, the state court dismissed the Plaintiffs' claims of fraud and conspiracy.  An earlier motion to dismiss filed in this case was never formally ruled upon.

the Plaintiffs have been alleging "fraud" and insisting that they possess overwhelming evidence of malfeasance by ProExcavation and the rest of the Defendants. The Defendants previously moved to dismiss the original Complaint, arguing, among other things, that the facts did not support the claims and that the action was a transparent attempt by Filippov and Lipetsker to avoid paying for construction services provided by Kagan Development KDC, Corp. ("KDC") and retain all proceeds from the Project (defined below) for their sole benefit. Now, based on their recent responses to interrogatories, it is confirmed that the Plaintiffs' claims truly are nothing more than unsubstantiated allegations intended to force the Defendants to capitulate on their valid proofs of claim. With the benefit of the Plaintiffs' interrogatory responses, ProExcavation renews its motion to dismiss the Complaint. The instant motion to dismiss is not simply a rehashing of the prior motion. Rather, the Defendants now have irrefutable proof that this lawsuit is nothing more than a patent fishing expedition.

The gravamen of the Complaint is that Vadim Kagan ("Kagan") fraudulently induced Filippov and Lipetsker to join with him in a real estate development project by falsely representing its projected costs. Filippov and Lipetsker allege that Kagan claimed, months after the Project was completed, that the actual cost grossly exceeded the projected costs. Filippov and Lipetsker immediately concluded that there must be a fraud, even though they had no evidence beyond their unsupported suspicion. Using a shotgun approach, instead of simply suing Kagan, plaintiffs have added Kagan's wife, Tatiana Kagan ("Tatiana"), KDC and ProExcavation solely because of their relationship with Kagan – not because the Plaintiffs have any evidence of affirmative malfeasance. In recent interrogatory responses, discussed below, Plaintiffs admit they have no facts to support their claims against ProExcavation or the other Defendants. At a minimum, the dearth of any specific facts to support Plaintiffs' fraud based

allegations mandates dismissal pursuant to Rule 9(b) of the Federal Rules of Civil Procedure,

made applicable to this Proceeding by Rule 7009 of the Federal Rules of Bankruptcy Procedure.

## FACTS[2]

According to the Complaint, on October 25, 2012, Kagan made a presentation to

Lipetsker and Filippov wherein he falsely represented the costs to develop two homes on

property that he had located and planned to purchase (the "Project"). (Cmp., ¶¶11-15). There is

no allegation that ProExcavaton, KDC or Kagan's wife, Tatiana, had any role in this presentation

and it predates the formation of the Debtor, any construction on the Project, or the listing of any

of the properties for sale. In reliance on Kagan's presentation, Filippov and Lipetsker agreed to

invest in the venture and formed the Debtor. (Id., ¶16-17).[3] Kagan then allegedly convinced the

Debtor to borrow $1.6 million for the construction and carrying costs for each of the two homes

and supposedly guaranteed that this would be sufficient to cover all costs. (Id., ¶21).

Under the Debtor's operating agreement (the "Operating Agreement"), Kagan was

solely responsible for constructing the homes for the Debtor. Op. Ag., ¶5.2.[4] To do so, Kagan

engaged construction contractors, had check-writing authority (on an account opened by and

controlled by Fillipov), and drew down the entirety of the $3.2 million construction loans by

---

[2] The Defendants do not concede the accuracy of the Debtor's allegations. However, for purposes of the present motion to dismiss, the factual allegations contained in the Complaint are presumed to be true. Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48-49 (1st Cir. 2009). Conclusory statements, however, are not. Ashcroft v. Iqbal, 556 U.S. 662, 681 (2009).

[3] Although plaintiffs plead that the Debtor too relied on the presentation, given that the presentation occurred several weeks before the Debtor was even formed, it is hard to comprehend how it could have relied on it. See Cmp., ¶¶16, 17.

[4] "Where a plaintiff had notice of a document, relied on it when drafting the Complaint, and explicitly referenced the document in the pleading, attaching that document to a motion to dismiss does not convert the motion to one for summary judgment. See Marram v. Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996); Wong v. Resolve Tech., Civil Action No. 10-11642-DJC, 2011 WL 3157198, at *1 n.1 (D. Mass. July 25, 2011); Young v. Lepone, 305 F.3d 1, 11 (1st Cir. 2002) (allowing consideration of documents submitted by defendant on motion to dismiss where the Complaint contained references to" the documents and "the factual allegations of [the] Complaint revolve around" the documents). A copy of the Operating Agreement is annexed hereto as Exhibit 1.

paying it to KDC, who was the Project general contractor, and its subcontractors, including

ProExcavation. (Cmp., ¶24). As KDC and the subcontractors constructed the homes, this should

certainly come as no surprise. In exchange for building the homes, Kagan agreed not to bill his

time and agreed to a greater percentage of the anticipated profits in lieu thereof. (Id., ¶25, Opr.

Agr., ¶¶5.2, 8.1). According to the Complaint, Kagan completed the Project several months late

and never advised anyone that there were cost overruns on the Project. (Cmp., ¶¶25-27). There

is no allegation that the Debtor paid any monies beyond the amount of the construction loans it

took out. The cost overruns were borne by KDC.

ProExcavation was a subcontractor to KDC. In their responses to interrogatories

propounded by ProExcavation, each of the Debtor, Lipetsker and Filippov stated **"I am not**

**aware of the specific work that ProExcavation purportedly performed on the Project."**

Debtor Int. Ans. No. 2; Filippov Int. Ans. No. 2; Filippov Int. Ans. No. 2. Copies of these

interrogatory responses are annexed hereto as Exhibits 2, 3, and 4, respectively. Despite these

sworn statements, Plaintiffs allege "ProExcavation's alleged charges on the Project are double

what any conceivably legitimate charges for the work it performed on the Project would be…"

(Cmp., ¶47). If, as the Plaintiffs assert, they do not know what services ProExcavation provided,

the allegations of excessive charges do not withstand scrutiny and lack good faith.

Undaunted, Plaintiffs further allege that "ProExcavation bills are rife with double billing,

false and inflated charges." (Id., ¶49). However, in their sworn interrogatory responses, each of

the Plaintiffs state that "ProExcavation has never provided an invoice, bill or other form of

payment…" Debtor Int. Ans. No. 7; Filippov Int. Ans. No. 7; Lipetsker Int. Ans. No. 7. If they

never received a bill, how can they possibly claim that "ProExcavation bills are rife with double

billing, false and inflated charges"? When asked in interrogatories to identify any "excessive or

somehow improper charges," Plaintiffs each responded that they do not know what

ProExcavation "may or may not have 'charged.'" Debtor Int. Ans. No. 4; Filippov Int. Ans. No.

4; Lipetsker Int. Ans. No. 4. Further, when asked for examples of "double billing" which

supposedly are "rife" in the [never seen] bills, Plaintiffs were unable to identify a single example

of double billing. Instead, they fell back on the mantra, repeated in multiple answers to

interrogatories, that the charges were clearly far in excess of what was reasonable and that "a

detailed analysis of these charges is still being prepared by an expert(s)" and "An expert report

will be produced in due course during this litigation, which report is incorporated herein by

reference." How one incorporates by reference a document which does not exist is unknown.

Debtor Int. Ans. No. 7; Filippov Int. Ans. No. 7; Lipetsker Int. Ans. No. 7. As discussed below

in greater detail, it is patently clear that despite their inflammatory pleading and liberal

allegations of fraud, and despite having received copies of all invoices relating to the

construction a year and a half ago, including ProExcavation invoices, copies of all checks written

by the Debtor, bank statements and loan disbursement documentation, and their repeated

insistence that they have expert reports confirming ProExcavation's alleged fraud, Plaintiffs have

nothing other than their suspicion that because the total claimed Project costs were significantly

higher than Kagan allegedly represented at the inception, everyone that had any role in the

Project must be tainted with fraud.

Summing up the factual predicate for all of their claims, plaintiffs plead that "Kagan [not

ProExcavation] **personally** misled the Plaintiffs into investing…" and mislead them throughout

the project with respect to the costs. (Cmp., ¶50)(Emphasis added).

## PROEXCAVATION'S PROOF OF CLAIM

ProExcavation has made no claim that it is entitled to any additional Project monies from Debtor. Although Plaintiffs claim in their interrogatory response that "ProExcavation is claiming an entitlement to nearly $455,000 more" than it already received, this is patently false as ProExcavation has asserted no such claim. Debtor Int. Ans. No. 7, Filippov Int. Ans. No. 7, Lipetsker Int. Ans. No. 7. Its sole claim [Claim No. 7] is for indemnity based on Section 10.2 of the Debtor's operating agreement which offers indemnity to members and their "authorized agents." As Kagan was charged with constructing the two homes, and ProExcavation was a subcontractor who worked on the Project, ProExcavation is covered by the indemnity provisions and indemnification is meaningless if it provides no protection against meritless litigation that causes it to incur significant legal expenses.

## COUNTS ASSERTED AGAINST PROEXCAVATION

ProExcavation is named in the following counts: Count III (Aiding and Abetting Breach of Fiduciary Duty); Count IV (Fraud); Count V (Conspiracy); Count VI (M.G.L. c. 93A); and Count VIII (Equitable Subordination).

## STANDARD ON A MOTION TO DISMISS

In determining a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), made applicable to this proceeding by Fed. R. Bankr. P. 7012, the Court accepts as true all well-pleaded facts in the Complaint and drawing all reasonable inferences in the plaintiffs' favor. Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48-49 (1st Cir. 2009). However, a court is not bound "to credit 'bald assertions, unsupportable conclusions, and opprobrious epithets' woven into the fabric of the Complaint." In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 15 (1st Cir. 2003). To successfully withstand a motion to dismiss, Plaintiffs must state a claim that is

plausible on its face. <u>Ashcroft v. Iqbal</u>, 556 U.S. 662 (2009) (citing <u>Bell Atl. Corp. v. Twombly</u>, 550 U.S. 544, 570 (2007)); <u>see also</u> <u>Gargano</u>, 572 F.3d at 48-49.

"Factual allegations must be enough to raise a right to relief above the speculative level, ... on the assumption that all the allegations in the Complaint are true (even if doubtful in fact)." <u>Twombly</u>, 550 U.S. at 555 (citations omitted). According to the Supreme Court, "[t]he plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer possibility that a defendant has acted unlawfully." <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 556). As the Court stated, "[t]he need at the pleading stage for allegations plausibly suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule 8(a)(2) that the 'plain statement' possess enough heft to 'sho[w]' that the pleader is entitled to relief.'" <u>Twombly</u>, 550 U.S. at 557. The Court also noted, however, that pleadings must contain more than "labels, conclusions and formulaic recitation[s] of a cause of action's elements...." <u>Id</u>. at 545. To satisfy the general pleading requirement of Federal Rule of Civil Procedure 8(a), a plaintiff must plead enough facts to state a claim for relief that is plausible on its face." <u>Id</u>. at 570. Otherwise, where plaintiffs "have not nudged their claims across the line from conceivable to plausible, their Complaint must be dismissed." <u>Id</u>. at 547. In <u>Iqbal</u>, the Court cautioned that allegations that are conclusory are not "entitled to be assumed true" for purposes of ruling on a motion to dismiss. <u>Iqbal</u>, 556 U.S. at 681; <u>see also</u> <u>Twombly</u>, 550 U.S. at 554-55. "Nor does a Complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'" <u>Iqbal</u>, 556 U.S. at 678 (quoting <u>Twombly</u>, 550 U.S. at 557).

<u>ARGUMENT</u>

I.   <u>THE DEBTOR LACKS STANDING.</u>

This Court has twice ruled that the Debtor lacks standing to object to ProExcavation's

proof of claim [Main Case Docket Nos.134 and 154] and has recently ruled that the "Debtor no

longer exists." Adv. Proc. Docket Nos. 235-37. These decisions are supported by the fact that

the Debtor has no remaining business and no pecuniary interest in the outcome of this action.

All that is left to be done is for the Chapter 7 Trustee to distribute the proceeds from the sale of

the properties to the claimants and interest holders. Moreover, the Operating Agreement itself

provides that the term of the Debtor "shall continue [only] until November 30, 2015." (Opr.

Agr., ¶2.3). The Plaintiffs assert that the Complaint is brought as "counterclaims to the proofs of

claim." (Cmp., ¶1). But, the Debtor cannot create standing in the form of a

counterclaim/objection to the ProExcavation claim where it was already ruled not to exist.

Given the Court's recent ruling that the Debtor no longer exists, all of the Debtor's claims must

be dismissed.

II.  THIS COURT LACKS SUBJECT MATTER JURISDICTION
     <u>OVER LIPETSKER'S AND FILIPPOV'S AFFIRMATIVE CLAIMS.</u>

It is not disputed that Filippov and Lipetsker have standing to object to the proofs of

claim, and this Court has jurisdiction over those pending matters. But as set forth in the Reply to

Lyman-Cutler, Alex Filippov, and Nickolay Lipetsker's Joint Statement Regarding the Court's

Jurisdiction dated September 1, 2017 (the "Jurisdiction Statement")[Adv. Proc. Docket No. 44],

the Defendants maintain that the claims asserted in this proceeding are outside of the Court's

subject matter jurisdiction.[5] As set forth more fully in the Jurisdiction Statement, the claims

asserted by Filippov and Lipetsker simply have no conceivable effect on the bankruptcy estate.

---

[5] ProExcavation incorporates herein by reference the Jurisdiction Statement.

Specifically, any affirmative relief sought will neither change the bankruptcy case or the distribution to creditors.

The jurisdiction of bankruptcy courts is grounded in and limited by statute. Celotex Corp. v. Edwards, 514 U.S. 300, 307 (1995); 28 U.S.C. § 1334(b); 28 U.S.C. § 157(a). Section 1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all civil proceedings arising under title 11, or arising in or related to cases under title 11." In turn, Section 157(a) permits the district court to refer "any or all proceedings arising under title 11 or arising in or related to a case under title 11 . . . to the bankruptcy judges for the district." Celotex, 514 U.S. at 307 (quoting 28 U.S.C. § 157(a)).

The statutory scheme creates three prongs of bankruptcy jurisdiction: (1) proceedings arising under the Bankruptcy Code; (2) proceedings arising in a case under the Bankruptcy Code; and (3) proceedings related to a case under the Bankruptcy Code. Since the claims asserted by Filippov and Lipetsker do not arise under the Bankruptcy Code or arise from the underlying bankruptcy case, the Court must examine whether the claims among non-debtors are "related to" the case. Celotex, 514 U.S. at 309-11.

To determine whether "related to" jurisdiction exists, courts have universally adopted the test first articulated by the Third Circuit in Pacor, Inc. v. Higgins, 743 F.2d 984 (3d Cir. 1984):

> A matter is related to the bankruptcy case for §1334 purposes if the outcome of that proceeding could conceivably have any effect on the estate being administered in bankruptcy . . . . Moreover, an action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options or freedom of action (either positively or negatively) and in any way impacts upon the handling and administration of the bankruptcy estate.

Id. at 994. The claims brought by Filippov and Lipetsker do not meet this standard. If Filippov and Lipetsker wish to raise certain objections to the proofs of claim, those matters are admittedly

before this Court.  If they wish to pursue affirmative relief against the Defendants, the relief

sought is outside of this Court's jurisdiction.[6]

It was Filippov's and Lipetsker's decision to put the Debtor in bankruptcy, but in doing

so they do not get the benefit of this Court to pursue non-debtor litigation that has no bearing on

the bankruptcy case.  To the extent they wish to seek a resolution of those disputes, which are

entirely based on state law, they should be forced to do so in state court after the bankruptcy

claims are resolved.  This Court should dismiss Filippov's and Lipetsker's claims for lack of

subject matter jurisdiction.[7]

### III. PLAINTIFFS HAVE FAILED TO STATE A VIABLE CLAIM FOR FRAUD AND FRAUD BASED CLAIMS AGAINST PROEXCAVATION.

The Plaintiffs' fraud claim against ProExcavation, Count IV, and all additional counts

against it which are based on the alleged fraud (Counts, III, V, VI and VIII), must be dismissed

because they fail to satisfy the particularity requirements of Fed. R. Civ. P 9(b), made applicable

to this adversary proceeding by Bankruptcy Rule 7009.  De Prins v. Michaeles, 189 F. Supp. 3d

209, 215 (D. Mass. 2016)( "Although here the claim itself is not for fraud, "[e]ven when a

plaintiff is not making a fraud claim, courts will require particularity in the pleading if the cause

of action is premised on fraudulent conduct." § 1297 Pleading Fraud With Particularity—In

General, 5A Fed. Prac. & Proc. Civ. § 1297 (3d ed.).  Therefore, to the extent that Plaintiffs'

---

[6] Any argument that any of the Defendants have consented to or waived any defect in this Court's subject matter jurisdiction is not correct.  "[P]arties cannot confer subject matter jurisdiction on a federal court by waiver or consent." Quinn v. City of Boston, 325 F.3d 18, 26 (1st Cir. 2003); see also Sheridan v. Michels (In re Sheridan), 362 F.3d 96, 100 (1st Cir. 2004) (citing to Quinn).  Moreover, "[a] litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance." Kontrick v. Ryan, 540 U.S. 443, 455 (2004) (citing Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)).

[7] In response to its show cause request, this Court made clear that "any affirmative recovery, over and above what is necessary to wholly setoff the claim of a particular defendant, is less certain…" [Adv. Proc. Docket No. 48].  Thus, this Complaint should be treated solely as an objection to ProExcavation's claim.  To the extent of an affirmative recovery is sought, these claims should be dismissed.

claims are grounded in fraud, the heightened pleading standards will apply."); Natale v. Espy Corp., 2 F. Supp. 3d 93, 99 (D. Mass. 2014) ("For claims where "fraud lies at the core of the action," Rule 9(b) renders the pleading requirement more stringent."); Shapiro v. Miami Oil Producers, Inc., 84 F.R.D. 234, 236 (D. Mass. 1979)("… Rule 9(b)'s particularity requirement "extends to averments of fraud or mistake, whatever may be the theory of legal duty -- statutory, tort, contractual, or fiduciary."); Enercon v. Global Computer Supplies, Inc., 675 F. Supp. 2d 188, 190 (D. Me. 2009)("The United States Court of Appeals for the First Circuit reads Fed. R. Civ. P. 9(b) expansively to cover associated claims where a Complaint's core allegations effectively charge fraud, even when those claims are for negligent misrepresentation and breach of fiduciary duty."). The Complaint must set out, **with specificity**, what ProExcavation itself did in furtherance of the alleged fraud. Plaintiffs have not satisfied Rule 9(b) simply by arguing that because ProExcavation is owned by Kagan it must be part of the fraud he allegedly perpetrated.

Rule 9(b) of the Federal Rules of Civil Procedure requires pleading fraud with particularity. See United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 226 (1st Cir. 2004) ("We have said that Rule 9(b) requires that a plaintiff's averments of fraud specify the time, place, and content of the alleged false or fraudulent representations.") (internal citations omitted). "The purpose of this requirement is to "give notice to defendants of the plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant information during discovery." Id. (internal citations and quotations omitted); see also United States ex rel. Kelly v. Novartis Pharms. Corp., No. 15-1470, 2016 U.S. App. LEXIS 11001, at *15 (1st Cir. June 17, 2016) ("Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.").

"Conclusory allegations and references to plans and schemes are not sufficient." Id. (internal quotations omitted).

Count IV recites that ProExcavation "has specifically engaged in fraud by submitting over 900,000 in charges to the Company for services worth only a fraction of that sum." (Cmp., ¶68). Because the remaining claims are predicated on this same foundation, given that the interrogatory responses confirm that Plaintiffs do not know what ProExcavation did on the Project, have never seen a ProExcavation bill, and cannot identify a single improper ProExcavation charge, this simple conclusory response is clearly not sufficient to support any of the fraud based claims.

Assuming for the purposes of this motion that the allegations of the Complaint are true, it is clear that Kagan, individually, not ProExcavation, allegedly misrepresented the cost of the Project so as to induce Filippov and Lipetsker to invest with him. There is no allegation that ProExcavation had anything to do with that presentation. The Complaint pleads that it is Kagan, not ProExcavation, who had the check-writing authority on the Debtor's accounts (Cmp., ¶23), and it was "Mr. Kagan," not ProExcavation who refused to provide Plaintiffs with back-up for the Debtor expenditures. (Id.). "Mr. Kagan," not ProExcavation, drew down all the Debtor funds. (Id., ¶24). "Mr. Kagan," not ProExcavation, failed to timely complete the Project. (Id., ¶26). "On May 7, 2015, Mr. Kagan, [not ProExcavation], through counsel, wrote to Mr. Filippov making fabricated claims… In addition, Mr. Kagan claimed for the first time that he had cost overruns on the Project…." (Cmp., ¶36-37). The May 7, 2015 letter asserts no claims by ProExcavation, and ProExcavation has submitted no claims for additional Project monies. Plaintiffs have been unable to point to a single affirmative act by ProExcavation that constitutes fraud.

It is also not sufficient to say that Plaintiffs expect to find the missing detail during

discovery or that it will be based on an expert report that does not even exist. If that is Plaintiffs'

response, this confirms that they are engaging in an impermissible fishing expedition. See

Wayne Inv., Inc. v. Gulf Oil Corp., 739 F.2d 11, 14 (1st Cir. 1984) (Rule 9(b) was not satisfied

when support for allegation consisted of "speculations from industry analysts" and allowing the

allegations of fraud to stand would be tantamount to "issu[ing] a license for a 'fishing

expedition' in uncharted waters."); Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996) (one

purpose of Rule 9(b) is to "prevent the filing of suits that simply hope to uncover relevant

information during discovery"). All counts against ProExcavation relying upon Defendants'

alleged fraud must be dismissed for failing to plead with particularity.

## IV.    PLAINTIFFS HAVE FAILED TO PLEAD DETRIMENTAL RELIANCE

"[T]o recover in an action for deceit, 'the plaintiff must prove that the defendant made a

false representation of a material fact with knowledge of its falsity for the purpose of inducing

the plaintiff to act thereon, and that the plaintiff relied upon the representation as true and acted

upon it to [its] damage.'" International Totalizing Sys. v. PepsiCo, Inc., 29 Mass. App. Ct. 424 ,

431 (1990), citing, Danca v. Taunton Sav. Bank, 385 Mass. 1 (1982) (citations omitted); see also

Restatement (Second) of Torts § 525 (1977) ("One who fraudulently makes a misrepresentation

of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from

action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to

him by his justifiable reliance upon the misrepresentation").

Plaintiffs have failed to plead any reliance on the allegedly fraudulent acts by

ProExcavation. Reliance is an essential element of the tort of fraud. The only paragraph in the

entire Complaint that mentions reliance is paragraph 17, and that pleads reliance on Kagan's

representations during the parties' initial meeting in October, 2012. That has nothing to do with ProExcavation and predates its involvement on the Project. Lipetsker and Filippov, individually, relied on nothing that ProExcavation said or did. In fact, in response to interrogatories, Plaintiffs are not even sure that they ever even spoke with ProExcavation. "Though I had countless communications with ProExcavation's president, Vadim Kagan, regarding the Project, I am unaware if any of these conversations were with Kagan on ProExcavation's behalf." Filippov Int. Ans. No. 1; Lipetsker Int. Ans. No. 1; Debtor Int. Ans. No. 1. Standing alone, Plaintiffs' failure to plead any reliance on ProExcavation's acts is fatal to all the claims based on the alleged fraud. See Sebago, Inc. v. Beazer E., Inc., 18 F. Supp. 2d 70, 95 (D. Mass. 1998) (plaintiff must "plead reliance with particularity."); Lambert v. Leary, No. 05-3422, 2006 Mass. Super. LEXIS 63, at *12 (Feb. 14, 2006) (plaintiff's fraud claim failed because, inter alia, he failed to plead reliance); see also Collins v. Huculak, 57 Mass. App. Ct. 387, 389 (2003) (fraud claim failed because could not establish justifiable reliance).

The failure to plead the reliance is not just an oversight. Given that Plaintiffs claim that they do not know what ProExcavation did on the Project, never saw Project bills and back-up, and did not pay anything beyond what they thought they would pay (i.e. the balance of the construction loans), it is apparent that none of the Plaintiffs changed position in reliance on any representation by ProExcavation. The absence of any reasonable reliance is fatal to all claims based on the alleged fraud. See Masingill v. EMC Corp., 449 Mass. 532, 541 (2007)(plaintiff could not establish the necessary element of reasonable reliance upon alleged oral misrepresentations that contradicted the terms of the written contract); see also Sebago, Inc., 18 F. Supp. 2d at 95; Collins, 57 Mass. App. Ct. at 389. Accordingly, the fraud and fraud based claims against ProExcavation should be dismissed.

V.  PLAINTIFFS HAVE FAILED TO PROPERLY PLEAD
    A CLAIM FOR CIVIL CONSPIRACY.

Count V alleges, in conclusory fashion, that "Through the conduct described herein, the

Defendants have conspired to defraud the Plaintiffs." (Cmp., ¶70).  The specific conduct by

ProExcavation is not broken out.  Because the conspiracy claim, on its face, is based in fraud,

this claim too fails to meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure.

See Section III above.

Massachusetts recognizes two different theories of civil conspiracy.  First, there is a

"very limited cause of action" for a coercive type of civil conspiracy.  Aetna Cas. Sur. Co. v.

P&B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994).  To establish a claim civil conspiracy

through coercion, a "plaintiff must allege that Defendants, acting in unison, had some peculiar

power of coercion over plaintiff that they would not have had if they had been acting

independently."  Id. (internal quotations omitted); see also Bartle v. Berry, 80 Mass App. Ct.

372, 383-84, rev. denied 460 Mass. 1116 (2011).  Plaintiffs have not alleged that any of the

Defendants have any "coercive" power over them.  Therefore, if this is the basis for the

conspiracy count, it fails.

The other form of civil conspiracy "is more akin to a theory of common law joint liability

in tort."  Aetna Cas. Sur. Co., 43 F.3d at 1564.  It requires "a common design or an agreement,

although not necessarily express, between two or more persons to do a wrongful act and, second,

proof of some tortious act in furtherance of the agreement."  Id.  The Complaint is woefully

inadequate in this respect.  The totality of the "facts" supporting the conspiracy claim amount to

a generic, conclusory-based, statement that Defendants "conspired" to "defraud" the Plaintiffs.

See Cmp., ¶70.  Mere labels and conclusions are not sufficient to withstand a motion to dismiss

pursuant to Mass. R. Civ. P. 12(b)(6).  See Twombly, 550 U.S. at 545; Iqbal, 556 U.S. at 681.

Plaintiffs' responses to interrogatories shed no light on this count. They recite: "ProExcavation reached an agreement with KDC and Kagan whereby ProExcavation agreed to perform certain excavation and site work on the Project and knowingly and intentionally submit falsely inflated requests for payment to KDC for the purpose of then permitting KDC and Kagan to use these purported expenses to demand additional money from the LLC…" Plaintiffs' Int. Ans. No. 9. Given that Plaintiffs do not know what work ProExcavation performed and claim to have never seen ProExcavation bills or requests for payment, the falsity of this statement is monumental. Plaintiffs continue, "ProExcavation furthered this conspiracy by performing work, submitting charges which it knew to be falsely inflated, demanding that sum be repaid to it by KDC, and subsequently filing a proof of claim in the LLC's bankruptcy." Id. Again, given that they have allegedly seen no charges, cannot identify a single inflated charge, and rely on an expert report that has not yet been created, it is apparent that the conspiracy count is nothing but unsubstantiated conclusions. As to the proof of claim, ProExcavation did not submit a proof of claim for any additional Project monies. Its proof of claim was exclusively for indemnity. Because they cannot identify a specific improper charge by ProExcavation, and simply refer to an expert report that does not even exist, it is apparent that this claim, like all the rest, is based on mere speculation. Accordingly, the conspiracy count must be dismissed.

VI. <u>PLAINTIFFS HAVE FAILED TO PLEAD A CLAIM UNDER M.G.L. c. 93A.</u>

In Count VI, the Debtor claims that ProExcavation violated Chapter 93A. To the extent that the Chapter 93A claim is predicated on fraud, it too must be dismissed for failing to plead with particularity. See <u>Zak Law Offices, P.C. v. Reed</u>, No. CIV.A. 10-10333-LTS, 2010 WL 2802068, at *4 (D. Mass. July 13, 2010) ("Reed's claim, albeit brought pursuant to M.G.L. c. 93A, is a claim for fraud, and as such it must satisfy the heightened pleading standards applicable

to such claims under Fed. R. Civ. P. 9(b)."). Other than the allegations of false billing, which as demonstrated above is nothing more than idle speculation, no malfeasance by ProExcavation is established. And, if it did improperly bill, that would be garden-variety breach of contract for which KDC would have recourse. Debtor had no contract with ProExcavation. Even if Debtor somehow could claim to be a third-party beneficiary, "it is well settled that a simple breach of contract is never enough, by itself, to constitute a violation of Chapter 93A." Trent Partners & Associates, Inc. v. Digital Equip. Corp., 120 F. Supp. 2d 84, 106 (D. Mass. 1999) (applying Mass. law); see also S. Worcester Cnty. Reg'l Vocational Sch. Dist. v. Utica Mut. Ins. Co., CIV.A. 06-40230-FDS, 2010 WL 3222015 (D. Mass. Aug. 13, 2010); Whitinsville Plaza, Inc. v. Kotseas, 378 Mass. 85, 100–101 (1979); E. Bldg. Servs. Corp. v. Matzell, Richard & Watts, Inc., SUCV200302601C, 2008 WL 1868378 (Mass. Super. Jan. 23, 2008). Rather, "to rise to the level of a c. 93A violation, a breach must be both knowing and intended to secure 'unbargained-for benefits' to the detriment of the other party." T. Butera Auburn, LLC v. Williams, 83 Mass. App. Ct. 496, 508, review denied, 465 Mass. 1109 (2013), quoting, Zabin v. Picciotto, 73 Mass. App. Ct. 141, 169 (2008). "The breaching party's conduct must exceed the level of mere self-interest, rising instead to the level of 'commercial extortion' or a similar degree of culpable conduct." Zabin, 73 Mass. App. Ct. 141, 169 (2008)(internal citations and quotations omitted). Even assuming, arguendo, that ProExcavation was motivated somehow by its own self-interest, there certainly is no allegation of "commercial extortion," especially as Plaintiffs never even spoke to ProExcavation and know nothing about its work on the Project. Accordingly, the Chapter 93A claim fails and Count VI should be dismissed.[8]

---

[8] As noted in Section I, supra, this claim should also be dismissed because the Debtor lacks standing.

## VII. COUNT III ALLEGING "AIDING AND ABETTING" BREACH OF FIDUCIARY DUTY FAILS AS A MATTER OF LAW.

Count III must also be dismissed because Plaintiffs fail to allege the necessary elements

to support a claim for aiding and abetting breach of fiduciary duty.  "[T]he tort of aiding and

abetting a fiduciary breach are: (1) there must be a breach of fiduciary duty, (2) the defendant

must know of the breach, and (3) the defendant must actively participate or substantially assist in

or encourage the breach to the degree that he or she could not reasonably be held to have acted in

good faith."  Arcidi v. Nat'l Ass'n of Gov't Employees, Inc., 447 Mass. 616, 623-24 (2006).  In

R. Wojtkun, 534, B.R. 435, 459 (D. MA 2015).  Even assuming, *arguendo,* that Kagan breached

his fiduciary duty, no facts are alleged to establish that ProExcavation knew of Kagan's breach –

much less that it actively participated or substantially assisted in or encouraged the breach to the

degree that it could not reasonably be held to have acted in good faith.  Again, ProExcavation is

being targeted not because of its knowledge, but because Kagan allegedly perpetrated a fraud

and ProExcavation is owned by him and worked on the Project.  That is not enough.  Because

Plaintiffs failed to allege facts satisfying these elements, Count III must be dismissed.

## VIII.      COUNT VIII, EQUITABLE SUBORDINATION, FAILS TO STATE A CLAIM.

Filippov and Lipetsker have added an equitable subordination claim.  Subordination is a

remedy in which the order of payment rather than the existence of the debt is at issue.  It is not an

affirmative claim.  Under Section 510(c) of the Bankruptcy Code, allowed claims may be

subordinated to allowed claims, but allowed claims may not be subordinated to interests.  11

U.S.C. §510(c); see also Shubert v. Lucent Techs. Inc. (In re Winstar Communications, Inc.),

554 F.3d 382, 414 (3d Cir. 2009)("a creditor's claim can be subordinated only to the claims of

other creditors, not equity interests"); Adelphia Recovery Trust v. Bank of America, N.A., 390

B.R. 80, 99 (S.D.N.Y. 2008)("a given claim may not be subordinated to an equity interest, but only to another claim").

The deadline for filing claims in the Debtor's case was May 3, 2016. Filippov and Lipetsker filed proofs of interest. However, Lipetsker did not file a proof of claim and Filippov only filed a late claim for a purported mortgage in the amount of $208,333. [Claim No. 9] against which an objection has been filed. [Docket No. 167]. Given that Lipetsker did not file a claim and Filippov's late-filed claim is the subject of an objection, neither Lipetsker nor Filippov have standing to assert equitable subordination claims, and the suggestion that the Defendants' claims could be equitably subordinated to their interests is not authorized by Section 510(c). Moreover, even if equitable subordination was appropriate (it is not), since the estate has more than $3 million dollars to distribute for the payment of allowed claims, any re-ordering of the payment of such claims is likely a meaningless exercise.

CONCLUSION

Based upon the foregoing, ProExcavation respectfully requests that the Complaint be dismissed.

> PROEXCAVATION CORP.,
>
> By its attorneys,
>
> /s/ Christopher M. Candon, Esq.
> Christopher M. Candon (BBO# 650855)
> John H. Perten (BBO# 548728)
> SHEEHAN PHINNEY BASS & GREEN, P.A.
> 255 State Street, Fifth Floor
> Boston, MA 02109
> (617) 897-5600
> ccandon@sheehan.com
> jperten@sheehan.com

Dated: November 21, 2017

{S1060158.1}                                    19

# EXHIBIT 1

# OPERATING AGREEMENT
# OF
# LYMAN-CUTLER, LLC

1.  THIS OPERATING AGREEMENT is entered into as of the 14  day of November, 2012 by and between Vadim Kagan, Nickolay Lipetsker and Alex Filippov.

WHEREAS, Mr. Kagan,  Mr. Lipetsker and Mr. Filippov wish to form a limited liability company known as LYMAN-CUTLER, LLC (the "Company") pursuant to the Massachusetts Limited Liability Company Act (as amended, the "Act") by filing a Certificate of Organization of the Company with the Massachusetts Secretary of State's Office and by entering into this Agreement;

NOW, THEREFORE, in consideration of the mutual agreements, promises and conditions contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Mr. Kagan,  Mr. Lipetsker and Mr. Filippov as acknowledge and agree as follows:

## ARTICLE I - DEFINITIONS

1.1 Definitions.        Capitalized terms used in this Agreement and not otherwise defined shall have the meanings assigned to them below:

(a) "Agreement" means this operating Agreement, as amended, modified, supplemented or restated from time to time.

(b) "Certificate of Formation" means the Certificate of Formation of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the Commonwealth Secretary of State's Office pursuant to the Act.

(c) "Member" means a member of the Company identified on Schedule A attached hereto, as the same may be amended from time to time.

(d) "Percentage Interest" shall refer to the percentage ownership interest of each Member in the Company.  The Percentage Interests of the Members are set forth on Schedule A attached hereto and incorporated herein for all purposes by this reference.

1

(e) "Date of Acquisition" shall refer to deed recording date for Lyman Road Brookline property into the Company.

### ARTICLE II - THE COMPANY

2.1 Formation.

    (a) The Members hereby agree to form the Company as a limited liability company under and pursuant to the provisions of the Act and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein. Upon the execution of this Agreement, Mr. Kagan, Mr. Lipetsker and Mr. Filippov shall be Members of the Company.

    (b) The name and mailing address of each Member and the amount contributed to the capital of the Company shall be listed on Schedule A.

2.2 Name; Principal Place of Business. The name of the Company shall be LYMAN-CUTLER, LLC. The principal office of the Company shall be located at 130 Trapelo Road, Belmont, Massachusetts, or at such other place as the Members may from time to time determine.

2.3 Term. The term of the Company shall commence on the date of the filing of the Certificate of Organization in the Commonwealth of Massachusetts Secretary of State's Office and shall continue until November 30, 2015 unless dissolved before such date in accordance with the provisions of this Agreement.

2.4 Registered Agent and Office. The company's registered agent and office in Massachusetts shall be as set forth in the Certificate of Organization of the Company filed with Commonwealth of Massachusetts Secretary of State's Office, as the same may from time to time be amended.

2.5 Fiscal Year. The Company's fiscal year (the "Fiscal Year") shall be the calendar year.

2.6 Taxation as Partnership. The Company shall be treated as a partnership for U.S. federal income tax purposes.

2

### ARTICLE III – PURPOSE AND POWERS OF THE COMPANY

Nature of Business.  The general character of the business of the LLC is to own (directly or through a nominee), invest in, develop, improve, operate, manage, lease and/or sell real estate in Commonwealth of Massachusetts.  To engage in any activities directly or indirectly related or incidental thereto including, but without limitation, everything necessary, suitable, convenient, or proper for the accomplishment of any of the foregoing activities, or the attainment of any one or more of the purposes, enumerated or incidental to the powers named, or which shall at any time appear conducive to or expedient for the production of benefit to the corporation, either as the holders of or interested in any property, or otherwise, with all the powers now or hereafter conferred by law, and for all lawful purposes.

3.1  Powers of the Company.  The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to or for the furtherance of the purpose set forth in Article 3., including, but not limited to the powers permitted under the Act.

### ARTICLE 1V – CAPITAL CONTRIBUTIONS AND ACCOUNTS

4.1  Capital Contributions.  Each Member has transferred and contributed to the capital of the Company the capital amounts (the "Capital Contributions") as set forth on Schedule A.  Furthermore, Purchase Money Loan and Construction Loan shall be taken from Rockland Trust Company to pay for construction and carrying costs until the issuance of Certificates of Occupancy (hereinafter "CO") but in no event for more then twenty three (23) months from the date of acquisition.

4.2  Carrying Costs.  Carrying costs shall be defined to include but not limited to mortgage payments, taxes and insurance for the subject property 77 Lyman Road, Brookline, Massachusetts.  In the event that a CO for each lot is not issued within twenty three (23) months from the date of acquisition, then Mr. Kagan will be responsible for all carrying costs until such time as CO's are issued.

3

4.3 Capital Accounts; Assets.  An individual capital account (each a "Capital Account") shall be established and maintained for each Member in accordance with applicable regulations under the Internal Revenue Code of 1986 as from time to time amended (the "Code").  A Member shall not be entitled to interest on his or her Capital Contribution or Capital Account, or to withdraw any part of his or her Capital Contribution or Capital Account.  No Member shall have any right in or to any asset or property of the Company, but shall only have a right to the distributions as and when provided for in Sections 8.2 and 9.2 hereof.

4.4 Maintenance of Capital Accounts.  To the extent consistent with such regulations, there shall be credited to each Member's Capital Account the amount of any contribution of capital and carrying costs made by such Member to the Company, and such Member's share of the net profits of the Company and there shall be charged against each Member's Capital Account the amount of all distributions to such Member, and such member's share of the net losses of the Company.

### ARTICLE V - MEMBERS

5.1 Powers of Members.  The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms of this Agreement.

5.2 Duties of Members.    It shall be Mr. Kagan's duty and obligation to construct two (2) homes at the location currently known as 77 Lyman Road, in Brookline, Massachusetts in accordance with the plans, including drawings, supplied by Mr. Kagan and approved by Managing Member.   The construction shall be substantially completed no later than March 30, 2014.  It is specifically understood by all Members that Mr. Kagan's compensation for this duty is outlined in Section 8.1 below.

5.3 Admission of Members.  No person shall be admitted as a Member of the Company after the date of formation of the Company without the written consent or approval of the Members owning at least eighty (80%) of the

4

Percentage Interests in the Company at the time of such admission, regardless of whether such person has previously acquired any rights in any existing Member's interest in the Company by assignment, sale or otherwise. A Member's execution of a counterpart of this Agreement, or such other instrument as the Members may require, shall evidence his or her admission.

5.4 Transfer of Company Interest. No Member may transfer, sell, assign, pledge, mortgage, or dispose of or grant a security interest in his or her interest in the Company (each, a "Transfer") without the prior written consent of the Members owning at least eighty (80%) of the Percentage Interests in the Company at the time of such Transfer. Any purported Transfer in contravention of this Section 5.3 shall be null and void and the Member attempting such Transfer shall cease to be a Member of the Company shall be forfeited and reallocated to the remaining Members in accordance with their respective Percentage Interests.

5.5 Rights of Assignee. The purchaser or other transferee of a Member's interest in the Company shall have only the right to receive the distributions and allocations of profits or losses to which the Member would have been entitled under this Agreement with respect to the transferred interest and shall not have or enjoy any right to participate in the management of the Company or to receive any financial information or reports relating to the Company or any other rights of a Member unless and until the purchaser or transferee is admitted as a Member pursuant to Section 5.2.

5.6 Partition. Each Member waives any and all rights that he or she may have to maintain an action for partition of the Company's property.

**ARTICLE VI – MANAGEMENT**

6.1 Management, duties, and Restrictions.

(a) General Management. The management and control of the operations of the Company and the maintenance, development, sales and leasing of the property of the Company shall rest with the Managing Members.

VK
A.F.  N.L.

5

(b) Powers of Managing Member. Subject to such limitations as may be imposed pursuant to the terms of this Agreement, the Act or by operation of law, the Members are and shall be authorized and empowered to carry out and implement the purposes of the Company. In that connection, the powers of the Managing Member shall include, but not be limited to, the following:

(1) to engage, dismiss, and replace personnel, attorneys, accountants, brokers or such other persons as may be deemed necessary or advisable by Managing Member;

(2) to authorize or approve all actions with respect to distributions by the Company, dispositions of the assets of the Company or its nominee, execution of leases, mortgage contracts, bonds, promissory notes, loan agreements and other instruments on behalf of the Company or its nominee, and to execute any agreements, instruments or documents relating to or affecting such matters;

(3) to acquire, mortgage, improve and convey real property and interests therein, including, but not limited to, easements and rights-of-way, and to execute any agreements, instruments or documents relating to or affecting such matters;

(4) to open, maintain, and close bank accounts and to draw checks and other orders for the payment of money; and

(5) to take such other actions and to incur such reasonable expenses on behalf of the Company as may be necessary or advisable in connection with the conduct of the affairs of the Company.

(6) The Managing Member hereby agrees to list the properties with Tatiana Kagan. In order to remove Tatiana Kagan as a listing broker by December 31, 2014 will require a written consent of the Members owning at least eighty one (81%) of the

Percentage Interests in the Company.   After December 31,
2014 no such consent shall be required.

(c) Liability of Managing Member.  In carrying out their duties, the Managing
Member shall not be liable to the Company or to any other Members for any
actions taken in good faith and reasonable believed to be in the best interest of the
Company or which are taken upon the written advice of legal counsel for the
Company.

(d) Reliance on Act of Managing Member.  Third parties dealing with the
Company shall be entitled to rely conclusively upon the power and authority
of the Managing Member.  Any person other than a Member may and shall be
entitled to rely on certificates, instructions, agreements or assignments signed
or purporting to be signed by a Managing Member for or on behalf of the
Company, and on the statements and agreements set forth therein, without
inquiry as to the due authorization thereof or the authority of the person
signing or purporting to sign such certificates, instructions, agreements or
assignments.

(e) Delegation.  The Managing Member may appoint Members only with such
titles as they may elect, including the titles of President, Vice President,
Treasurer and Secretary, to act on behalf of the Company with such power and
authority as the Members may delegate in writing to any such person.

(f) Books and Records.  The Company's books and records shall be maintained in
accordance with good record keeping practices and federal and state income
tax laws and regulations.  All books and records of the Company shall be
maintained at the principal office of the Company, and each of the Members
shall have access thereto to review the same at any time upon reasonable
notice and during normal business hours.

(g) Reimbursement of Managing Member.  The Managing Member shall be
reimbursed by the Company for all reasonable expenses (including attorney
and accountant's fees) incurred or paid by them for or on behalf of the
Company.

7

## ARTICLE VII - VOTING, MEMBER CONSENTS  AND MEMBER GUARATEE, MEETINGS

7.1 Voting.  Each Member shall be entitled to vote in proportion to his or her Percentage Interest in the Company from time to time.  Such vote may be exercised by written or oral notification by a Member to the other Members.

7.2 Member Consents.  The amendment of this Agreement shall require the vote and unanimous approval of all the Members.  All other actions taken by the Company, including the admission of a new Member, shall require the vote and approval of Members owning eighty percent (80%) or more of the Percentage Interest at the time of such vote.

7.3 Member Guarantee.  **Mr. Filippov** shall, if required by institutional lender, provide that lender with a limited personal guarantee not to exceed $200,000.00 for all loans obtained by the Company related to the property located at 77 Lyman Road, Brookline, Massachusetts. Coincident with any provision by Mr. Filippov of such a guarantee, Messrs Kagan and Lipetsker shall each provide Mr. Filippov with a limited personal guarantee not to exceed, in the case of Mr. Kagan, $100,000.00 and in the case of Mr. Lipetsker, $20,000.00

7.4 Meetings of the Members.  The Members may, but shall not be required, to meet from time to time to consider the affairs of the Company and to take any action permitted to be taken by the Members by law or under this Agreement. Meetings of the Members may be called at any time by any Member.  Notice of any meeting shall be given to all Members not less than two (2) days nor more than thirty (30) days prior to the date of such meeting.  Each Member may authorize any person to act for it by proxy on all matters on which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting.  Every proxy must be signed by the Member or his or her attorney-in-fact.  A quorum for each meeting shall be one more than one-half the number of all Members.

8

## ARTICLE VIII - ALLOCATIONS AND DISTRIBUTIONS

8.1 <u>Allocations of Profits or Losses.</u> *The net profits,* net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows: Mr. Alex Filippov (40%) , Mr. Nickolay Lipetsker (10%) and Mr. Kagan (50%).   In the event that the demolition permit is not issued by June 30, 2013, then *the net profits,* net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows:  Mr. Alex Filippov (60%) , Mr. Nickolay Lipetsker (10%) and Mr. Kagan (30%).  The net losses from any sale of any property of the Company or upon liquidation of the Company shall be allocated among the Members according to the Percentage Interests of Each Member.  Net profits and net losses shall, for both accounting and tax purposes, be net profits and net losses as determined for reporting on the Company's federal income tax return. *In the event that the property is not sold within twenty three (23) months from the date of acquisition,  then Mr. Kagan shall be responsible for all carrying costs until such time as the property is sold.   If Mr. Kagan fails to pays to pay monthly carrying costs, then Mr. Filippov shall be responsible to contribute the necessary carrying costs and subsequently his capital contribution and percentage interest in the Company shall increase by the same amount and  percentage and at the same time will trigger reduction of Mr. Kagan's share of capital contribution by the same amount and subsequently his/her percentage interest in the Company.* For tax purposes, all items of depreciation, gain, loss, deduction or credit shall be determined in accordance with the Code and, except to the extent otherwise required by the Code, allocated to and among the Members in the same percentages in which the Members share in net profits and net losses.   Any change to this paragraph will require a written consent of the Members owning at least eighty one (81%) of the Percentage Interests in the Company.

9

8.2 Distribution to Members. *The distribution to Members shall be in accordance with their respective Capital Contribution first, however, an additional five (5%) percent per annum payment based upon Members' respective Capital Contributions shall be paid out of Mr. Kagan's net profit share for each day that the property is not sold after twenty three (23) months of acquisition* For the purposes hereof, the term "Net Cash From Operations" shall mean the gross cash proceeds from Company operations less the portion thereof used to pay or establish reserves for Company expenses, debt payments, capital improvements, replacements, and guaranteed payments, all as determined by the Members. "Net Cash From Operations" shall not be reduced by depreciation , amortization, cost recovery deductions, or similar non-cash allowances, but shall be increased by any reductions of reserves previously established.

## ARTICLE IX – DISSOLUTION AND TERMINATION OF COMPANY

9.1 Events of Dissolution. The Company shall be dissolved and its affairs shall be would up upon the occurrence of any of the following events:

(a) the death, insanity, dissolution, incompetency, bankruptcy, retirement, resignation or expulsion of a Member ("Retiring Member") unless there are at least two (2) remaining Members of the Company, and the remaining Members owning a "majority in interest" in the Company elect to continue the Company within ninety (90) days of the death, insanity, dissolution, bankruptcy, retirement, resignation or expulsion of the Retiring Member;

(b) Notwithstanding the above paragraph, in the event of the death, insanity, dissolution, incompetency, bankruptcy, retirement or resignation of Mr. Filippov, his interest in this Company and control of this Company will automatically pass to his spouse by operation of this Agreement;

(c) the conclusion of the term of the Company set forth in Section 2.3. hereof;

VK
A.V. N.L.

10

(d) the sale or disposition of all or substantially all of the assets of the Company;

(e) the written consent of the Members owning eighty (80%) or more of the Percentage Interests in the Company; or

(f) the entry of a decree of judicial dissolution in accordance with the provisions of the Act.

For the purpose of Section 9.1 (a) above, the term "majority in interest" means eighty (80%) or more of the remaining Members' collective interest in profits and their respective Capital Accounts. For the purpose of the foregoing sentence, profits shall be determined and allocated based upon any reasonable estimate of profits from the date of the dissolution event to the projected termination of the Company taking into account present and future allocations of profits under this Agreement, and the Capital Account balances shall be determined upon the date of the dissolution event.

9.2  Winding Up. Upon the dissolution of the Company, the remaining Member or, if more than one Member then remains, the Member selected by the remaining Members (in either case, the "Liquidating Member"), shall proceed with the winding up of the Company and apply and distribute the Company's assets as provided in this Section 9.2. The assets shall first be applied to the payment of the liabilities of the Company (other than any loans that may have been made by the Members to the Company) and to the expenses of liquidation. A reasonable time shall be allowed for the orderly liquidation of the Company and for the discharge of liabilities to creditors, so as to enable the Liquidating Member to minimize the normal losses attendant to a liquidation. The remaining assets shall next be applied to the repayment of any loans made by the Members to the Company. All assets then remaining shall be distributed to the Members in accordance with their respective Capital Accounts after giving effect to all contributions, distributions and allocations for all periods. Notwithstanding any of the foregoing, the Liquidating Member may retain a sum deemed necessary by him or her as a reserve for any

11

contingent liabilities, expenses and obligations of the Company.  Upon the final distribution of assets to the Members, each of the Members shall be furnished with a statement which sets forth the assets and liabilities of the Company as of the date of the complete liquidation.

## ARTICLE X – LIABILITY AND INDEMNIFICATION

10.1 Liability.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

10.2 Indemnification.  The Company shall indemnify and hold harmless the Members and their respective employees and authorized agents from  and against any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member, employee or authorized agent in good faith on behalf of the Company and reasonable believed to be within the scope of authority conferred by this Agreement, except that no Member, employee or authorized agent shall be entitled to be indemnified or held harmless from or against any loss, damage or claim incurred by reason of such Member's, employee's or authorized agent's gross negligence or willful misconduct; provided, however, that any indemnity under this Section 10.2 shall be provided out of and to the extent of Company assets only, and no Member shall have any personal liability on account thereof.

## ARTICLE XI – MISCELLANEOUS

11.1 Governing Law.  The Company and this Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts.

12

11.2 <u>Agreement Binding.</u>  This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective next-of-kin, legatees, administrators, executors, legal representatives, successors, and assigns.

11.3 <u>Notices.</u>  Notices to the Members or to the Company to be furnished hereunder shall be deemed to have been given when mailed, by prepaid registered or certified mail, or when deposited with an express courier service,

addressed to the address set forth on Schedule A or as set forth in any notice of changes of address previously given in writing by the addressee to the addressor.

Executed as a Commonwealth of Massachusetts's instrument under seal on the day and year first above written.

Nickolay Lipetsker, Member

Vadim Kagan, Member

Alex Filippov, Managing Manager

13

## SCHEDULE A

### Capital Contributions and Percentage Interests

| Member | | Capital Contribution | Percentage Interest |
|---|---|---|---|
| Name: | Nickolay Lipetsker | $250,000.00 | 10% |
| Address: | 52 Stony Brae Road, Newton, MA, 02461 | | |
| Name: | Alex Filippov | $2,000,000.00 | 80% |
| Address: | 130 Trapelo Road, Belmont, Massachusetts | | |
| Name: | Vadim Kagan | $250,000.00 | 10% |
| Address: | 99 Needham Street, Unit 1402, Newton, MA, 02461 | | |

VK , N.L.

14

# EXHIBIT 2

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| *In re:* | ) |
| | ) |
| | ) |
| LYMAN-CUTLER, LLC, | ) |
| Debtor, | ) |
| | ) |
| | ) Chapter 7 |
| | ) No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| | ) A.P. No. 16-1120 |
| v. | ) |
| | ) |
| VADIM KAGAN, TATIANA KAGAN, | ) |
| KAGAN DEVELOPMENT KDC CORP., | ) |
| and PROEXCAVACTION CORP., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**ALEX FILIPPOV'S ANSWERS TO PROEXCAVATION CORP.'S
FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order, Alex

Filippov ("Filippov") responds to ProExcavation Corp.'s ("ProExcavation") First Set of Interrogatories.

Filippov's responses are based upon information currently known.  Discovery is ongoing.  He reserves

the right to amend, modify, or supplement each of the responses set forth below.

**GENERAL OBJECTIONS**

Filippov objects to the extent ProExcavation's First Set of Interrogatories purport to require

Filippov to respond on his own behalf as well as "alleged managing member" of Lyman-Cutler, LLC

(the "LLC").  ProExcavation, and each of the other parties named above, has served separate discovery

requests on the LLC.  Purporting to require Filippov to respond to these interrogatories on behalf of the

1

LLC as well as on his own individual behalf is unduly burdensome, needlessly duplicative, and in violation of the Court's Pre-Trial Order. Filippov will respond to these interrogatories on his own behalf only.

Filippov further objects to the extent the "Instructions" section of ProExcavation's First Set of Interrogatories purport to impose on Filippov any obligation that exceeds those required by the Rules of Civil Procedure. Filippov will respond in accordance with any obligations imposed by the Rules.

## ANSWERS

### Interrogatory No. 1

Please set forth, with complete detail, each and every communication between Filippov and ProExcavation regarding the Project.

### Answer No. 1

Filippov objects to this interrogatory. There were countless communications regarding the Project between Filippov and ProExcavation's President, Vadim Kagan ("Kagan"). To require Filippov to identify each of them here is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, particularly as it relates to communications between the two parties that are not related to any topic that is at issue in this case. Subject to and without waiving any of the foregoing objections, Filippov states the following: Though I had countless communications with ProExcavation's President, Vadim Kagan, regarding the Project, I am unaware if any of these conversations were with Kagan on ProExcavation's behalf.

### Interrogatory No. 2

Please set forth the full scope of services provided by ProExcavation on the Project.

### Answer No. 2

Filippov objects to this interrogatory to the extent it seeks information that is in the hands of third parties; namely, Kagan Development KDC Corp. ("KDC") and ProExcavation. Subject to and without waiving any of his foregoing objections, Filippov states the following: The LLC never entered into a written contract with ProExcavation for the Project. Instead, the LLC entered into a written contract with Classic Homes Development & Construction, LLC to serve as the general contractor for the Project. I have learned, however, that Kagan actually had the general contractor work performed by KDC, another company he owned and controlled, and that it was KDC that supposedly retained ProExcavation to perform certain site and excavation work on the Project. I am not specifically aware of the work that ProExcavation purportedly performed on the Project.

2

**Interrogatory No. 3**

Please itemize all monies paid to ProExcavation for labor and material provided for the Project.

**Answer No. 3**

Filippov objects to this interrogatory to the extent it seeks information about payments received by ProExcavation from any person or entity other than the LLC. Filippov further objects that this interrogatory seeks information uniquely in the control of Kagan, KDC and ProExcavation. Subject to and without waiving his foregoing objections, Filippov states the following: I lack personal knowledge of the specific amounts and detailed itemization of all monies paid to ProExcavation, or for what purpose it was paid, since it was Kagan who controlled the payment of the money to his own company, KDC, who then purportedly paid ProExcavation. Notwithstanding the above, my review of the LLC's financial records indicate that the LLC paid ProExcavation at least $455,000.

**Interrogatory No. 4**

If you contend that the monies charged by ProExcavation for labor and material provided for the Project were excessive or somehow improper, please set forth, in complete detail, all facts upon which you base that contention.

**Answer No. 4**

I am unaware of what ProExcavation may or may not have "charged" KDC because ProExcavation has never provided an invoice, bill, or other form of request for payment reflecting what it charged for the labor or materials purportedly provided for the Project. Nonetheless, I am aware that the LLC paid ProExcavation at least $455,000, and that ProExcavation claims an entitlement to nearly $455,000 more. This total figure is grossly in excess of what a fair market charge would be for the type of site work that was involved in the Project. Discovery is ongoing and a detailed analysis of these charges is still being prepared by an expert(s), subject to completion of fact discovery. An expert report will be produced in due course during this litigation, which report is incorporated by reference herein.

**Interrogatory No. 5**

Please set forth what you believe is the fair and reasonable value for the labor and material provided by ProExcavation for the Project, and the complete factual basis for that belief.

**Answer No. 5**

Filippov objects to this interrogatory. Filippov's subjective belief regarding the "fair and reasonable value" for labor or material provided by ProExcavation for the Project is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence as ProExcavation's alleged entitlement to any money from the LLC is not dependent on what is "fair and reasonable." Subject to and without waiving his foregoing objections, Filippov states the following: I believe that the amounts originally budgeted by Kagan for the foundation work - $135,000 for each home – represents what I

3

consider to be fair and reasonable for the foundation services purportedly rendered by ProExcavation.
An expert report will be produced in due course in this litigation and is incorporated herein by reference.

## Interrogatory No. 6

Please identify any and all communications which you had with anyone regarding the value of
labor and materials provided for the Project by ProExcavation.

## Answer No. 6

Filippov objects to this interrogatory because it seeks communications between Filippov and his
counsel that are protected by the attorney-client privilege and/or the work-product doctrine. Filippov
further objects because it seeks communications between Filippov or his counsel and any experts
consulted or retained for purposes of this litigation. Any such communications are protected from
disclosure by the work-product doctrine and Fed. R. Civ. P. 26(b)(4). Subject to and without waiving
his foregoing objections, Filippov states the following: I have not had any non-privileged or non-
protected communications with anybody concerning the value of the labor and materials provided by
ProExcavation for the Project.

## Interrogatory No. 7

If you contend that any expenses charged by ProExcavation are "double charges" as alleged in
paragraph 44 of the Adversary Proceeding Complaint, please identify each such charge and the factual
basis for that contention.

## Answer No. 7

Kagan agreed, on behalf of whatever company he was intending to the work, to construct the
Project at a fixed cost of $1.3 million per home, plus soft carrying costs. This included a budget of
$135,000 to perform the foundation work on each home. Based on my understanding at the time, and I
do still continue to believe, that this represented the fair value and true arms' length cost for the type of
work that I believe ProExcavation to have performed on the Project. Though I am unaware of what
ProExcavation may or may not have "charged" KDC because ProExcavation has never provided an
invoice, bill, or other form of request for payment reflecting what it charged for the labor or materials
purportedly provided for the Project, I am aware that the LLC paid ProExcavation at least $455,000 for
the work it purportedly provided, and that ProExcavation is claiming an entitlement to nearly $455,000
more. It is my belief that all of the payments received and charged by ProExcavation above the amount
originally budgeted by Kagan were the result of fraud and were fabricated by Kagan, KDC and
ProExcavation. I am not aware of any site condition existing at the Project that should have increased
this budgeted cost, nor am I aware of any contemporaneous time record or payment request that would
have accurately captured or supported ProExavation's charges beyond this figure. The fact that Kagan
also controlled the payment of the cost from KDC to his other company, ProExcavation, and made
several large, unsupported payments, further causes me to believe that these payments were fraudulent.
Discovery is ongoing and an expert report on this topic is also expected in the due course of this
litigation and incorporated herein by reference.

**Interrogatory No. 8**

Please itemize all damages which you seek to recover from ProExcavation, including in your response any pertinent calculations and the factual basis for those damages.

**Answer No. 8**

Filippov objects to this interrogatory as premature.  Discovery and expert analysis is ongoing.  In general terms, Filippov asserts that the purported charges above the original budget are fabricated and fraudulent and not authorized or properly payable even if not intentionally false and fraudulent. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy.  The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

**Interrogatory No. 9**

If you contend that ProExcavation conspired with Kagan, KDC and Tatiana, or any one of them, to defraud the Debtor, please identify all facts upon which you base that contention.

**Answer No. 9**

ProExcavation reached an agreement with KDC and Kagan whereby ProExcavation agreed to perform certain excavation and site work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC and Kagan to use these purported expenses to demand additional money from the LLC and, indirectly, from me.  ProExcavation furthered this conspiracy by performing the work, submitting charges which it knew to be falsely inflated, demanding that sum be repaid to it by KDC, and subsequently filing a proof of claim in the LLC's bankruptcy.

Kagan and Tatiana are corporate officers of KDC and have actual knowledge of the false, inflated charges by ProExcavation and false demands for payment by KDC based upon those false, inflated charges.  They directly conspired to cause KDC and ProExcavation to orchestrate this fraudulent billing scheme.

**Interrogatory No. 10**

For each and every person who you expect to call as an expert witness at trial, please state: (a) the identity of each expert by giving his/her name, address, specialty, and professional education and experience; (b) the subject matter on which each expert is expected to testify; (c) the substance of the facts and opinions to which each such expert is expected to testify; and (d) a summary of the grounds for each such opinion.

**Answer No. 10**

Filippov objects to subparagraphs (b) through (d) of this interrogatory to the extent any expert witness identified is required to provide a written report under Fed. R. Civ. P. 26(b)(2)(B) as the requested information in those subparagraphs is duplicative of the information required to be identified in the written report. Filippov further objects because this interrogatory is premature as the Court has set an expert disclosure deadline of December 31, 2017. The identity of any expert Filippov intends to call as a witness at trial will be made in accordance with the Court's ordered deadline.

**Interrogatory No. 11**

If you contend that ProExcavation acted with "gross negligence" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 11**

Filippov objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. ProExcavation is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if ProExcavation was somehow entitled to assert a claim for indemnification against the LLC, the gross negligence detailed in the Adversary Proceeding Complaint and Answer No. 9, above, would preclude ProExcavation from being indemnified. In addition, to the extent that the Defendants did not intentionally defraud Filippov, Lipetsker and the LLC, incurring purported charges of approximately $900,000 for site work budgeted for $270,000 without prior consultation with and approval by Filippov and Lipetsker is grossly negligent.

**Interrogatory No. 12**

If you contend that ProExcavation acted with "willful misconduct" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 12**

Filippov objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. ProExcavation is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if ProExcavation was somehow entitled to assert a claim for indemnification against the LLC, the willful misconduct detailed in the Adversary Proceeding Complaint and in Answer No. 9, above, would preclude ProExcavation from being indemnified.

**Interrogatory No. 13**

If you contend that ProExcavation did not act in "good faith" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 13**

Filippov objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence.  Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members.  ProExcavation is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and was not and therefore is not entitled to any indemnification from the LLC.  Subject to and without waiving any of the foregoing objections, even if ProExcavation was somehow entitled to assert a claim for indemnification against the LLC, the bad faith detailed in the Adversary Proceeding Complaint and in Answer No. 9, above, would preclude ProExcavation from being indemnified.

<u>Verification</u>

I, Alex Filippov, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Alex Filippov

*As to objections:*


/s/ Sean T. Carnathan
Sean T. Carnathan, BBO No. 636889
scarnathan@ocmlaw.net
Joseph P. Calandrelli, BBO No. 666128
jcalandrelli@ocmlaw.net
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T: (781) 359-9000


Dated: October 2, 2017


<u>Certificate of Service</u>

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on October 2, 2017.

/s/ Sean T. Carnathan
Sean T. Carnathan

8

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| *In re:* ) | |
| ) | |
| LYMAN-CUTLER, LLC, ) | |
| Debtor, ) | Chapter 7 |
| ) | No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | A.P. No. 16-1120 |
| v. ) | |
| ) | |
| VADIM KAGAN, TATIANA KAGAN, ) | |
| KAGAN DEVELOPMENT KDC CORP., ) | |
| and PROEXCAVACTION CORP., ) | |
| ) | |
| Defendants. ) | |

**NICKOLAY LIPETSKER'S ANSWERS TO PROEXCAVATION CORP.'S
FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Nickolay Lipetsker ("Lipetsker") responds to ProExcavation Corp.'s ("ProExcavation") First Set of

Interrogatories. Lipetsker's responses are based upon information currently known. He reserves the

right to amend, modify, or supplement each of the responses set forth below.

**GENERAL OBJECTION**

Lipetsker objects to the extent the "Instructions" section of ProExcavation's First Set of

Interrogatories purport to impose on Lipetsker any obligation that exceeds those required by the Rules of

Civil Procedure. Lipetsker will respond in accordance with any obligations imposed by the Rules.

1

## ANSWERS

### Interrogatory No. 1

Please set forth, with complete detail, each and every communication between Lipetsker and ProExcavation regarding the Project.

### Answer No. 1

Lipetsker objects to this interrogatory. There were countless communications regarding the Project between Lipetsker and ProExcavation's President, Vadim Kagan ("Kagan"). To require Lipetsker to identify each of them here is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, particularly as it relates to communications between the two parties that are not related to any topic that is at issue in this case. Subject to and without waiving any of the foregoing objections, Lipetsker states the following: Though I had countless communications with ProExcavation's President, Vadim Kagan, regarding the Project, I am unaware if any of these conversations were with Kagan on ProExcavation's behalf.

### Interrogatory No. 2

Please set forth the full scope of services provided by ProExcavation on the Project.

### Answer No. 2

Lipetsker objects to this interrogatory to the extent it seeks information that is in the hands of third parties; namely, Kagan Development KDC Corp. ("KDC") and ProExcavation. Subject to and without waiving any of his foregoing objections, Lipetsker states that Lyman Cutler, LLC (the "LLC") never entered into a written contract with ProExcavation for the Project. Instead, the LLC entered into a written contract with Classic Homes Development & Construction, LLC to serve as the general contractor for the Project. I have learned, however, that Kagan actually had the general contractor work performed by KDC, another company he owned and controlled, and that it was KDC that supposedly retained ProExcavation to perform certain site and excavation work on the Project. I am not aware of the specific work that ProExcavation purportedly performed on the Project.

### Interrogatory No. 3

Please itemize all monies paid to ProExcavation for labor and material provided for the Project.

### Answer No. 3

Lipetsker objects to this interrogatory to the extent it seeks information about payments received by ProExcavation from any person or entity other than the LLC. Lipetsker further objects that this interrogatory seeks information uniquely in the control of Kagan, KDC and ProExcavation. Subject to and without waiving his foregoing objections, Lipetsker states the following: I lack personal knowledge of the specific amounts and detailed itemization of all monies paid to ProExcavation, or for what purpose it was paid, since it was Kagan who controlled the payment of the money to his own company,

KDC, who then purportedly paid ProExcavation. Notwithstanding the above, I understand that the LLC's financial records indicate that the LLC paid ProExcavation at least $455,000.

## Interrogatory No. 4

If you contend that the monies charged by ProExcavation for labor and material provided for the Project were excessive or somehow improper, please set forth, in complete detail, all facts upon which you base that contention.

## Answer No. 4

I am unaware of what ProExcavation may or may not have "charged" KDC because ProExcavation has never provided an invoice, bill, or other form of request for payment reflecting what it charged for the labor or materials purportedly provided for the Project. Nonetheless, I am aware that the LLC paid ProExcavation at least $455,000, and that ProExcavation claims an entitlement to nearly $455,000 more. This total figure is grossly in excess of what a fair market charge would be for the type of site work that was involved in the Project. Discovery is ongoing and a detailed analysis of these charges is still being prepared by an expert(s), subject to completion of fact discovery. An expert report will be produced in due course during this litigation, which report is incorporated by reference herein.

## Interrogatory No. 5

Please set forth what you believe is the fair and reasonable value for the labor and material provided by ProExcavation for the Project, and the complete factual basis for that belief.

## Answer No. 5

Lipetsker objects to this interrogatory. Lipetsker's subjective belief regarding the "fair and reasonable value" for labor or material provided by ProExcavation for the Project is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence as ProExcavation's alleged entitlement to any money from the LLC is not dependent on what is "fair and reasonable." Subject to and without waiving his foregoing objections, Lipetsker states the following: I believe that the amounts originally budgeted by Kagan for the foundation work - $135,000 for each home – represents what I consider to be fair and reasonable for the foundation services purportedly rendered by ProExcavation. An expert report will be produced in due course in this litigation and is incorporated herein by reference.

## Interrogatory No. 6

Please identify any and all communications which you had with anyone regarding the value of labor and materials provided for the Project by ProExcavation.

## Answer No. 6

Lipetsker objects to this interrogatory because it seeks communications between Lipetsker and his counsel that are protected by the attorney-client privilege and/or the work-product doctrine. Lipetsker further objects because it seeks communications between Lipetsker or his counsel and any

3

experts consulted or retained for purposes of this litigation. Any such communications are protected from disclosure by the work-product doctrine and Fed. R. Civ. P. 26(b)(4). Subject to and without waiving his foregoing objections, Lipetsker states the following: I have not had any non-privileged or non-protected communications with anybody concerning the value of the labor and materials provided by ProExcavation for the Project.

### Interrogatory No. 7

If you contend that any expenses charged by ProExcavation are "double charges" as alleged in paragraph 44 of the Adversary Proceeding Complaint, please identify each such charge and the factual basis for that contention.

### Answer No. 7

Kagan agreed, on behalf of whatever company he was intending to the work, to construct the Project at a fixed cost of $1.3 million per home, plus soft carrying costs. This included a budget of $135,000 to perform the foundation work on each home. Based on my understanding at the time, and I do still continue to believe, that this represented the fair value and true arms' length cost for the type of work that I believe ProExcavation to have performed on the Project. Though I am unaware of what ProExcavation may or may not have "charged" KDC because ProExcavation has never provided an invoice, bill, or other form of payment reflecting what it charged for the labor or materials purportedly provided for the Project, I am aware that Lyman Cutler, LLC paid ProExcavation at least $455,000 for the work it purportedly provided, and that ProExcavation is claiming an entitlement to nearly $455,000 more. It is my belief that all of the payments received and charged by ProExcavation above the amount originally budgeted by Kagan were the result of fraud. I am not aware of any site condition existing at the Project that should have increased this budgeted cost, nor am I aware of any contemporaneous time record or payment request that would have accurately captured or supported ProExavation's charges beyond this figure. The fact that Kagan also controlled the payment of the cost from KDC to his other company, ProExcavation, and made several large, unsupported payments, further causes me to suspect that these payments were fraudulent. Discovery is ongoing and an expert report on this topic is also expected in the due course of this litigation and incorporated herein by reference.

### Interrogatory No. 8

Please itemize all damages which you seek to recover from ProExcavation, including in your response any pertinent calculations and the factual basis for those damages.

### Answer No. 8

Lipetsker objects to this interrogatory as premature. Discovery and expert analysis is ongoing. In general terms, Lipetsker asserts that the purported charges above the original budget are fabricated and fraudulent and not authorized or properly payable even if not intentionally false and fraudulent. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the

determinations of the experts, which will be produced in due course in this litigation and are
incorporated herein by reference.

## Interrogatory No. 9

If you contend that ProExcavation conspired with Kagan, KDC and Tatiana, or any one of them,
to defraud the Debtor, please identify all facts upon which you base that contention.

## Answer No. 9

ProExcavation reached an agreement with KDC and Kagan whereby ProExcavation agreed to
perform certain excavation and site work on the Project and knowingly and intentionally submit
fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC and
Kagan to use these purported expenses to demand additional money from the LLC and, indirectly, from
me. ProExcavation furthered this conspiracy by performing the work, submitting charges which it knew
to be falsely inflated, demanding that sum be repaid to it by KDC, and subsequently filing a proof of
claim in the LLC's bankruptcy.

Kagan and Tatiana are corporate officers of KDC and have actual knowledge of the false,
inflated charges by ProExcavation and false demands for payment by KDC based upon those false,
inflated charges. They directly conspired to cause KDC and ProExcavation to orchestrate this
fraudulent billing scheme.

## Interrogatory No. 10

For each and every person who you expect to call as an expert witness at trial, please state: (a)
the identity of each expert by giving his/her name, address, specialty, and professional education and
experience; (b) the subject matter on which each expert is expected to testify; (c) the substance of the
facts and opinions to which each such expert is expected to testify; and (d) a summary of the grounds for
each such opinion.

## Answer No. 10

Lipetsker objects to subparagraphs (b) through (d) of this interrogatory to the extent any expert
witness identified is required to provide a written report under Fed. R. Civ. P. 26(b)(2)(B) as the
requested information in those subparagraphs is duplicative of the information required to be identified
in the written report. Lipetsker further objects because this interrogatory is premature as the Court has
set an expert disclosure deadline of December 31, 2017. The identity of any expert Lipetsker intends to
call as a witness at trial will be made in accordance with the Court's ordered deadline.

## Interrogatory No. 11

If you contend that ProExcavation acted with "gross negligence" as that term is utilized in
Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that
contention.

**Answer No. 11**

Lipetsker objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. ProExcavation is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if ProExcavation was somehow entitled to assert a claim for indemnification against the LLC, the gross negligence detailed in the Adversary Proceeding Complaint and Answer No. 9, above, would preclude ProExcavation from being indemnified. In addition, to the extent that the Defendants did not intentionally defraud Filippov, Lipetsker and the LLC, incurring purported charges of approximately $900,000 for site work budgeted for $270,000 without prior consultation with and approval by Filippov and Lipetsker is grossly negligent.

**Interrogatory No. 12**

If you contend that ProExcavation acted with "willful misconduct" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 12**

Lipetsker objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. ProExcavation is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if ProExcavation was somehow entitled to assert a claim for indemnification against the LLC, the willful misconduct detailed in the Adversary Proceeding Complaint and in Answer No. 9, above, would preclude ProExcavation from being indemnified.

**Interrogatory No. 13**

If you contend that ProExcavation did not act in "good faith" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 13**

Lipetsker objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. ProExcavation is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and was not and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if ProExcavation was somehow entitled to assert a claim for indemnification against the LLC, the bad faith detailed in the Adversary Proceeding Complaint and in Answer No. 9, above, would preclude ProExcavation from being indemnified.

6

<u>Verification</u>

I, Nickolay Lipetsker, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Nickolay Lipetsker

*As to objections:*

*/s/ Sean T. Carnathan*
Sean T. Carnathan, BBO No. 636889
*scarnathan@ocmlaw.net*
Joseph P. Calandrelli, BBO No. 666128
*jcalandrelli@ocmlaw.net*
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T:  (781) 359-9000

Dated:  October 18, 2017

<u>Certificate of Service</u>

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on October ___, 2017.

*/s/ Sean T. Carnathan*
Sean T. Carnathan

# EXHIBIT 4

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| *In re:* | ) | |
| | ) | |
| LYMAN-CUTLER, LLC, | ) | |
| Debtor, | ) | |
| | ) | Chapter 7 |
| | ) | No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | A.P. No. 16-1120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, TATIANA KAGAN, | ) | |
| KAGAN DEVELOPMENT KDC CORP., | ) | |
| and PROEXCAVACTION CORP., | ) | |
| | ) | |
| Defendants. | ) | |

### LYMAN-CUTLER, LLC'S ANSWERS TO PROEXCAVATION CORP.'S
### FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Lyman-Cutler, LLC (the "LLC") responds to ProExcavation Corp.'s ("ProExcavation") First Set of

Interrogatories. The LLC's responses are based upon information currently known. Discovery is

ongoing. It reserves the right to amend, modify, or supplement each of the responses set forth below.

### GENERAL OBJECTION

The LLC objects to the extent the "Instructions" section of ProExcavation's First Set of

Interrogatories purport to impose on the LLC any obligation that exceeds those required by the Rules of

Civil Procedure. The LLC will respond in accordance with any obligations imposed by the Rules.

1

## ANSWERS

### Interrogatory No. 1

Please set forth, with complete detail, each and every communication between Debtor and ProExcavation regarding the Project.

### Answer No. 1

The LLC objects to this interrogatory. The word "Debtor" is defined to include the LLC's members, including Alex Filippov ("Filippov"), Nickolay Lipetsker ("Lipetsker"), and Vadim Kagan ("Kagan"). There were countless communications regarding the Project between Filippov and ProExcavation's President, Kagan. There were likely others involving Lipetsker and Kagan. To require the LLC to identify each of them here is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, particularly as it relates to communications between the two parties that are not related to any topic that is at issue in this case. Subject to and without waiving any of the foregoing objections, the LLC states the following: Though the LLC had countless communications with ProExcavation's President, Vadim Kagan, regarding the Project, it is unaware if any of these conversations were with Kagan on ProExcavation's behalf.

### Interrogatory No. 2

Please set forth the full scope of services provided by ProExcavation on the Project.

### Answer No. 2

The LLC objects to this interrogatory to the extent it seeks information that is in the hands of third parties; namely, Kagan Development KDC Corp. ("KDC") and ProExcavation. Subject to and without waiving any of the foregoing objections, the LLC states that it never entered into a written contract with ProExcavation for the Project. Instead, the LLC entered into a written contract with Classic Homes Development & Construction, LLC to serve as the general contractor for the Project. The LLC has learned, however, that Kagan actually had the general contractor work performed by KDC, another company he owned and controlled, and that it was KDC that supposedly retained ProExcavation to perform certain site and excavation work on the Project. The LLC is not aware of the specific work that ProExcavation purportedly performed on the Project.

### Interrogatory No. 3

Please itemize all monies paid to ProExcavation for labor and material provided for the Project.

### Answer No. 3

The LLC objects to this interrogatory to the extent it seeks information about payments received by ProExcavation from any person or entity other than the LLC. The LLC further objects that this interrogatory seeks information uniquely in the control of Kagan, KDC and ProExcavation. Subject to and without waiving the foregoing objections, the LLC states the following: It lacks personal

knowledge of the specific amounts and detailed itemization of all monies paid to ProExcavation, or for what purpose it was paid, since it was Kagan who controlled the payment of the money to his own company, KDC, who then purportedly paid ProExcavation. Notwithstanding the above, the LLC's financial records indicate that the LLC paid ProExcavation at least $455,000.

**Interrogatory No. 4**

If you contend that the monies charged by ProExcavation for labor and material provided for the Project were excessive or somehow improper, please set forth, in complete detail, all facts upon which you base that contention.

**Answer No. 4**

The LLC is unaware of what ProExcavation may or may not have "charged" KDC because ProExcavation has never provided an invoice, bill, or other form of request for payment reflecting what it charged for the labor or materials purportedly provided for the Project. Nonetheless, the LLC is aware that the LLC paid ProExcavation at least $455,000, and that ProExcavation claims an entitlement to nearly $455,000 more. This total figure is grossly in excess of what a fair market charge would be for the type of site work that was involved in the Project. Discovery is ongoing and a detailed analysis of these charges is still being prepared by an expert(s), subject to completion of fact discovery. An expert report will be produced in due course during this litigation, which report is incorporated by reference herein.

**Interrogatory No. 5**

Please set forth what you believe is the fair and reasonable value for the labor and material provided by ProExcavation for the Project, and the complete factual basis for that belief.

**Answer No. 5**

The LLC objects to this interrogatory. The LLC's subjective belief regarding the "fair and reasonable value" for labor or material provided by ProExcavation for the Project is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence as ProExcavation's alleged entitlement to any money from the LLC is not dependent on what is "fair and reasonable." Subject to and without waiving the foregoing objections, the LLC states the following: It believes that the amounts originally budgeted by Kagan for the foundation work - $135,000 for each home – represents what it considers to be fair and reasonable for the foundation services purportedly rendered by ProExcavation. An expert report will be produced in due course in this litigation and is incorporated herein by reference.

**Interrogatory No. 6**

Please identify any and all communications which you had with anyone regarding the value of labor and materials provided for the Project by ProExcavation.

3

### Answer No. 7

The LC objects to this interrogatory because it seeks communications between it and its counsel that are protected by the attorney-client privilege and/or the work-product doctrine. The LLC further objects because it seeks communications between it or its counsel and any experts consulted or retained for purposes of this litigation. Any such communications are protected from disclosure by the work-product doctrine and Fed. R. Civ. P. 26(b)(4). Subject to and without waiving its foregoing objections, the LLC states the following: It has not had any non-privileged or non-protected communications with anybody concerning the value of the labor and materials provided by ProExcavation for the Project.

### Interrogatory No. 7

If you contend that any expenses charged by ProExcavation are "double charges" as alleged in paragraph 44 of the Adversary Proceeding Complaint, please identify each such charge and the factual basis for that contention.

### Answer No. 7

Kagan agreed, on behalf of whatever company he was intending to the work, to construct the Project at a fixed cost of $1.3 million per home, plus soft carrying costs. This included a budget of $135,000 to perform the foundation work on each home. Based on the LLC's understanding at the time, and it does still continue to believe, that this represented the fair value and true arms' length cost for the type of work that the LLC believes ProExcavation to have performed on the Project. Though the LLC is unaware of what ProExcavation may or may not have "charged" KDC because ProExcavation has never provided an invoice, bill, or other form of request for payment reflecting what it charged for the labor or materials purportedly provided for the Project, the LLC is aware that the LLC paid ProExcavation at least $455,000 for the work it purportedly provided, and that ProExcavation is claiming an entitlement to nearly $455,000 more. It is the LLC's belief that all of the payments received and charged by ProExcavation above the amount originally budgeted by Kagan were the result of fraud and were fabricated by Kagan, KDC and ProExcavation. The LLC is not aware of any site condition existing at the Project that should have increased this budgeted cost, nor is it aware of any contemporaneous time record or payment request that would have accurately captured or supported ProExcavation's charges beyond this figure. The fact that Kagan also controlled the payment of the cost from KDC to his other company, ProExcavation, and made several large, unsupported payments, further causes the LLC to believe that these payments were fraudulent. Discovery is ongoing and an expert report on this topic is also expected in the due course of this litigation and incorporated herein by reference.

### Interrogatory No. 8

Please itemize all damages which you seek to recover from ProExcavation, including in your response any pertinent calculations and the factual basis for those damages.

### Answer No. 8

The LLC objects to this interrogatory as premature. Discovery and expert analysis is ongoing. In general terms, the LLC asserts that the purported charges above the original budget are fabricated and

fraudulent and not authorized or properly payable even if not intentionally false and fraudulent. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

**Interrogatory No. 9**

If you contend that ProExcavation conspired with Kagan, KDC and Tatiana, or any one of them, to defraud the Debtor, please identify all facts upon which you base that contention.

**Answer No. 9**

ProExcavation reached an agreement with KDC and Kagan whereby ProExcavation agreed to perform certain excavation and site work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC and Kagan to use these purported expenses to demand additional money from the LLC. ProExcavation furthered this conspiracy by performing the work, submitting charges which it knew to be falsely inflated, demanding that sum be repaid to it by KDC, and subsequently filing a proof of claim in the LLC's bankruptcy.

Kagan and Tatiana are corporate officers of KDC and have actual knowledge of the false, inflated charges by ProExcavation and false demands for payment by KDC based upon those false, inflated charges. They directly conspired to cause KDC and ProExcavation to orchestrate this fraudulent billing scheme.

**Interrogatory No. 10**

For each and every person who you expect to call as an expert witness at trial, please state: (a) the identity of each expert by giving his/her name, address, specialty, and professional education and experience; (b) the subject matter on which each expert is expected to testify; (c) the substance of the facts and opinions to which each such expert is expected to testify; and (d) a summary of the grounds for each such opinion.

**Answer No. 10**

The LLC objects to subparagraphs (b) through (d) of this interrogatory to the extent any expert witness identified is required to provide a written report under Fed. R. Civ. P. 26(b)(2)(B) as the requested information in those subparagraphs is duplicative of the information required to be identified in the written report. The LLC further objects because this interrogatory is premature as the Court has set an expert disclosure deadline of December 31, 2017. The identity of any expert the LLC intends to call as a witness at trial will be made in accordance with the Court's ordered deadline.

### Interrogatory No. 11

If you contend that ProExcavation acted with "gross negligence" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

### Answer No. 11

The LLC objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. ProExcavation is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if ProExcavation was somehow entitled to assert a claim for indemnification against the LLC, the gross negligence detailed in the Adversary Proceeding Complaint and Answer No. 9, above, would preclude ProExcavation from being indemnified. In addition, to the extent that the Defendants did not intentionally defraud Filippov, Lipetsker and the LLC, incurring purported charges of approximately $900,000 for site work budgeted for $270,000 without prior consultation with and approval by Filippov and Lipetsker is grossly negligent.

### Interrogatory No. 12

If you contend that ProExcavation acted with "willful misconduct" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

### Answer No. 12

The LLC objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. ProExcavation is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if ProExcavation was somehow entitled to assert a claim for indemnification against the LLC, the willful misconduct detailed in the Adversary Proceeding Complaint and in Answer No. 9, above, would preclude ProExcavation from being indemnified.

### Interrogatory No. 13

If you contend that ProExcavation did not act in "good faith" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

### Answer No. 13

The LLC objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating

6

Agreement provides for certain indemnification obligations to the LLC's members.  ProExcavation is not a member of the LLC and was never authorized to take any action on the LLC's behalf, and was not and therefore is not entitled to any indemnification from the LLC.  Subject to and without waiving any of the foregoing objections, even if ProExcavation was somehow entitled to assert a claim for indemnification against the LLC, the bad faith detailed in the Adversary Proceeding Complaint and in Answer No. 9, above, would preclude ProExcavation from being indemnified.

<u>Verification</u>

I, Alex Filippov, state under the pains and penalties of perjury that I am the Managing Member of the LLC; that I am authorized to answer these interrogatories on the LLC's behalf; and that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____

Alex Filippov

*As to objections:*

*/s/ Peter N. Tamposi*
Peter N. Tamposi (BBO No. 639497)
The Tamposi Law Group, P.C.
159 Main Street
Nashua, NH 03060
T:  (603) 204-5513

Dated:  October 2, 2017

<u>Certificate of Service</u>

I, Peter Tamposi, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on October 2, 2017.

*/s/ Peter N. Tamposi*
Peter N. Tamposi

8