# UNITED STATES BANKRUPTCY COURT
## DISTRICT OF MASSACHUSETTS
### (EASTERN DIVISION)

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | Case No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | | |
| | ) | |
| LYMAN-CUTLER, LLC, ALEX | ) | |
| FILIPPOV AND NICKOLAY LIPETSKER | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adv. Proc. No. 16-01120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, TATIANA KAGAN, | ) | |
| KAGAN DEVELOPMENT KDC, CORP. | ) | |
| and PROEXCAVATION CORP. | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

## VADIM KAGAN'S MEMORANDUM IN SUPPORT OF
## MOTION TO DISMISS AMENDED COMPLAINT

### INTRODUCTION

This should be a relatively straightforward case. In an effort to leverage settlement and conduct expansive and costly discovery, Plaintiffs have over-plead and added scandalous allegations against Vadim Kagan ("Kagan") which should be stricken. On November 7, 2017, Lyman-Cutler, LLC (the "Debtor" or the "Company"), Alex Filippov ("Filippov") and Nickolay Lipetsker ("Lipetsker," together with the Debtor and Filippov, the "Plaintiffs") filed an Amended Complaint (the "Complaint")[Adv. Proc. Docket No. 52]. This latest iteration of the Complaint

represents the third attempt by the Plaintiffs to set forth cognizable claims against Kagan.[1]  For

almost three years, the Plaintiffs have been alleging "fraud" and insisting that they possess

overwhelming evidence of malfeasance by Kagan and the rest of the Defendants.  The

Defendants previously moved to dismiss the original Complaint, arguing, among other things,

that the facts did not support the claims and that the action was a transparent attempt by Filippov

and Lipetsker to avoid paying for construction services provided by Kagan Development KDC,

Corp. ("KDC") and retain all proceeds from the Project (defined below) for their sole benefit.

Now, based on their recent responses to interrogatories, it is confirmed that the Plaintiffs' claims

truly are nothing more than unsubstantiated allegations intended to force the Defendants to

capitulate on their valid proofs of claim.  With the benefit of the Plaintiffs' interrogatory

responses, Kagan renews his motion to dismiss the Complaint.  The instant motion to dismiss is

not simply a rehashing of the prior motion.  Rather, the Defendants now have irrefutable proof

that this lawsuit is nothing more than a patent fishing expedition.

   The gravamen of the Complaint is that Kagan fraudulently induced Filippov and

Lipetsker to join with him in a real estate development project (the "Project") by falsely

representing its projected costs.  Filippov and Lipetsker allege that Kagan claimed, months after

the Project was completed, that the actual cost grossly exceeded the projected costs.  Filippov

and Lipetsker immediately concluded that there must be a fraud, even though they had no

evidence beyond their unsupported suspicion.  Using a shotgun approach, instead of simply

suing Kagan, Plaintiffs have added Kagan's wife, Tatiana Kagan ("Tatiana"), KDC and

ProExcavation Corp. ("ProExcavation") solely because of their relationship with Kagan – not

because the Plaintiffs have any evidence of affirmative malfeasance.  In recent interrogatory

---

[1] Each of the Defendants in this proceeding has concurrently filed a separate Motion to Dismiss.  In a state court proceeding amongst these same parties, the state court dismissed the Plaintiffs' claims of fraud and conspiracy.  An earlier motion to dismiss filed in this case was never formally ruled upon.

responses, discussed below, Plaintiffs admit they have no facts to support their claims against

Kagan or the other Defendants. At a minimum, the dearth of any specific facts to support

Plaintiffs' fraud based allegations mandates dismissal pursuant to Rule 9(b) of the Federal Rules

of Civil Procedure, made applicable to this Proceeding by Rule 7009 of the Federal Rules of

Bankruptcy Procedure.

## FACTS[2]

According to the Complaint, on October 25, 2012, Kagan made a presentation to

Lipetsker and Filippov wherein he provided them with a budget and a forecast of **"estimated"**

returns for the Project. (Cmp., ¶14). There was no guarantee of a fixed return. As part of the

budget, Kagan allegedly told them that $1.3 million would cover the construction costs for each

of the two homes, and "forecast" that an additional $200,000 would cover the carrying costs for

each home until they were sold, which the parties anticipated would be by November, 2014.

(Id., ¶¶15, 19). Sometime after the initial presentation, Kagan also suggested a $100,000

contingency for unexpected costs. (Id., ¶20). In reliance on the estimate and forecast, Lipetsker

and Filippov invested in the venture and formed the Debtor, who borrowed $1.6 million for each

of the homes (plus an additional $1.6 for the purchase of the underlying property). (Id., ¶17).

Under the Debtor's operating agreement (the "Operating Agreement"), Kagan was solely

---

[2] The Defendants do not concede the accuracy of Plaintiffs' allegations. However, for purposes of the present motion to dismiss, the factual allegations contained in the Complaint are presumed to be true. Gargano v. Liberty Int'l Underwriters, Inc., 572 F.3d 45, 48-49 (1st Cir. 2009). Conclusory statements, however, are not. Ashcroft v. Iqbal, 556 U.S. 662, 681 (2009).

responsible for constructing the homes for the Debtor.  Op. Ag., ¶5.2.[3]  To do so, Kagan engaged

construction contractors, had check-writing authority (on an account set up and controlled by

Filippov) and drew down the entirety of the $3.2 million construction loan by paying it to KDC,

who was the Project general contractor, and its subcontractors, including ProExcavation.  (Id.,

¶24)[4].  As KDC and the subcontractors constructed the homes, this should certainly come as no

surprise.  In exchange for building the homes, Kagan agreed not to bill for his time, agreeing

instead to a greater percentage of the anticipated profits in lieu thereof.  (Id., ¶25, Opr. Agr.,

¶¶5.2, 8.1).

Although Plaintiffs claim that Kagan never advised them that he had exceeded the

construction budget, at the end of the Project he advised them that the actual cost of construction

was well in excess of the alleged budget.  Plaintiffs refused to pay any additional monies, and

filed suit in a matter of weeks.  Thereafter, KDC filed a mechanics lien to recover its unpaid

construction costs.  Plaintiffs claim that that KDC's claim for additional money was based on

falsified business records, which was all part of a fraudulent conspiracy that Kagan orchestrated

with KDC, its subcontractor, ProExcavation, and his wife, Tatiana.

Separate and apart from the allegedly false claim for increased construction costs,

Plaintiffs claim that Kagan, without Debtor's authority, wrongfully listed the new homes for sale

with Century 21 where his wife, Tatiana, was a real estate broker.  The Operating Agreement,

---

[3] "Where a Plaintiff had notice of a document, relied on it when drafting the Complaint, and explicitly referenced the
document in the pleading, attaching that document to a motion to dismiss does not convert the motion to one for
summary judgment.  See Marram v. Shaw v. Digital Equip. Corp., 82 F.3d 1194, 1220 (1st Cir. 1996); Wong v.
Resolve Tech., Civil Action No. 10-11642-DJC, 2011 WL 3157198, at *1 n.1 (D. Mass. 2011); Young v. Lepone,
305 F.3d 1, 11 (1st Cir. 2002) (allowing consideration of documents submitted by defendant on motion to dismiss
where the Complaint contained references to" the documents and "the factual allegations of [the] Complaint revolve
around" the documents).  A copy of the Operating Agreement is annexed hereto as Exhibit 1.

[4] Plaintiffs claim that they signed a construction contract with Classic Homes & Development, Inc. ("Classic
Homes") which was the operative agreement.  The further claim that they knew nothing about KDC,
notwithstanding that they concede KDC acted as the general contractor for the Project.  See Plaintiffs' response to
KDC's interrogatory no. 3 attached to KDC's supporting memorandum.

however, requires that the listing be with Tatiana.  Op. Agr.¶ 6.1(b)(6).  Plaintiffs further claim

that the obligation to list with her expired on December 31, 2014, notwithstanding that the actual

verbiage of the Operating Agreement says no such thing.  Id.  Plaintiffs claim that Kagan and

Tatiana conspired to list the properties at a higher price than authorized and to extend the listing

agreements beyond the authorized December 31, 2014 date.  They also claim that Tatiana failed

to properly market the properties and failed to forward a "bona fide" offer that she received,

though we now know that the supposed "bona fide" offer was not in writing and therefore not a

"bona fide" offer.[5]

Summing up the factual predicate for all of their claims, Plaintiffs plead that "Kagan

personally misled the Plaintiffs into investing…." and mislead them throughout the Project with

respect to the costs.  (Cmp., ¶50).  Thus, this case is all about what Kagan told Lipetsker and

Filippov at the outset of the relationship, and whether he should be liable for the

misrepresentations that he allegedly made at that time.

<u>KAGAN'S PROOF OF CLAIM</u>

As noted above, Kagan agreed in the Operating Agreement not to bill for his time, and he

has not.  His sole proof of claim is for indemnity under Section 10.2 of the Operating Agreement.

[Claim No. 6].  Clearly, he is covered by the indemnity provisions and indemnification is

meaningless if it provides no protection against meritless litigation that causes him to incur

significant legal expenses.

---

[5] Through Plaintiffs' interrogatory responses, we now know that this "bona fide" offer was a verbal, unenforceable, one.  <u>See</u> Interrogatory responses and related argument as part of Tatiana's motion to dismiss, which are incorporated herein by reference.

## COUNTS ASSERTED AGAINST KAGAN

Kagan is named in the following counts:  Count I (Breach of Contract); Count II (Breach

of Fiduciary Duty); Count IV (Fraud); Count V (Conspiracy); and Count VIII (Equitable

Subordination).

## STANDARD ON A MOTION TO DISMISS

In determining a motion to dismiss pursuant to Fed. R. Civ. P. 12(b)(6), made applicable

to this proceeding by Fed. R. Bankr. P. 7012, the Court accepts as true all well-pleaded facts in

the Complaint and drawing all reasonable inferences in the Plaintiffs' favor.  Gargano v. Liberty

Int'l Underwriters, Inc., 572 F.3d 45, 48-49 (1st Cir. 2009).  However, a court is not bound "to

credit 'bald assertions, unsupportable conclusions, and opprobrious epithets' woven into the

fabric of the Complaint."  In re Colonial Mortgage Bankers Corp., 324 F.3d 12, 15 (1st Cir.

2003).  To successfully withstand a motion to dismiss, the Plaintiff must state a claim that is

plausible on its face.  Ashcroft v. Iqbal, 556 U.S. 662 (2009) (citing Bell Atl. Corp. v. Twombly,

550 U.S. 544, 570 (2007)); see also Gargano, 572 F.3d at 48-49.

"Factual allegations must be enough to raise a right to relief above the speculative level,

... on the assumption that all the allegations in the Complaint are true (even if doubtful in fact)."

Twombly, 550 U.S. at 555 (citations omitted).  According to the Supreme Court, "[t]he

plausibility standard is not akin to a 'probability requirement,' but it asks for more than a sheer

possibility that a defendant has acted unlawfully."  Iqbal, 556 U.S. at 678 (quoting Twombly,

550 U.S. at 556).  As the Court stated, "[t]he need at the pleading stage for allegations plausibly

suggesting (not merely consistent with) agreement reflects the threshold requirement of Rule

8(a)(2) that the 'plain statement' possess enough heft to 'sho[w]' that the pleader is entitled to

relief.'"  Twombly, 550 U.S. at 557.  The Court also noted, however, that pleadings must contain

more than "labels, conclusions and formulaic recitation[s] of a cause of action's elements...."

Id. at 545. To satisfy the general pleading requirement of Federal Rule of Civil Procedure 8(a), a

Plaintiff must plead enough facts to state a claim for relief that is plausible on its face." Id. at

570. Otherwise, where Plaintiffs "have not nudged their claims across the line from conceivable

to plausible, their Complaint must be dismissed." Id. at 547. In Iqbal, the Court cautioned that

allegations that are conclusory are not "entitled to be assumed true" for purposes of ruling on a

motion to dismiss. Iqbal, 556 U.S. at 681; see also Twombly, 550 U.S. at 554-55. "Nor does a

Complaint suffice if it tenders 'naked assertion[s]' devoid of 'further factual enhancement.'"

Iqbal, 556 U.S. at 678 (quoting Twombly, 550 U.S. at 557).

ARGUMENT

I.    THE DEBTOR LACKS STANDING.

This Court has twice ruled that the Debtor lacks standing to object to Kagan's proof of

claim [Main Case Docket Nos. 133 and 153] and has recently ruled that the "Debtor no longer

exists." Adv. Proc. Docket Nos. 235-37. These decisions are supported by the fact that the

Debtor has no remaining business and no pecuniary interest in the outcome of this action. All

that is left to be done is for the Chapter 7 Trustee to distribute the proceeds from the sale of the

properties to the claimants and interest holders. Moreover, the Operating Agreement itself

provides that the term of the Debtor "shall continue [only] until November 30, 2015." (Opr.

Agr., ¶2.3). The Plaintiffs assert that the Complaint is brought as "counterclaims to the proofs of

claim." (Cmp., ¶1). But the Debtor cannot create standing in the form of a

counterclaim/objection to Kagan's claim where it was already ruled not to exist. More

importantly, however, given the Court's recent ruling that the Debtor no longer exists, all of the

Debtor's claims must be dismissed.

## II. THIS COURT LACKS SUBJECT MATTER JURISDICTION
## OVER LIPETSKER'S AND FILIPPOV'S AFFIRMATIVE CLAIMS.

It is not disputed that Filippov and Lipetsker have standing to object to the proofs of

claim, and this Court has jurisdiction over those pending matters.  But as set forth in the Reply to

Lyman-Cutler, Alex Filippov, and Nickolay Lipetsker's Joint Statement Regarding the Court's

Jurisdiction dated September 1, 2017 (the "Jurisdiction Statement")[Adv. Proc. Docket No. 44],

the Defendants maintain that the claims asserted in this proceeding are outside of the Court's

subject matter jurisdiction.[6]  As set forth more fully in the Jurisdiction Statement, the claims

asserted by Filippov and Lipetsker simply have no conceivable effect on the bankruptcy estate.

Specifically, any affirmative relief sought will neither change the bankruptcy case or the

distribution to creditors.

The jurisdiction of bankruptcy courts is grounded in and limited by statute.  Celotex

Corp. v. Edwards, 514 U.S. 300, 307 (1995); 28 U.S.C. § 1334(b); 28 U.S.C. § 157(a).  Section

1334(b) provides that "the district courts shall have original but not exclusive jurisdiction of all

civil proceedings arising under title 11, or arising in or related to cases under title 11."  In turn,

Section 157(a) permits the district court to refer "any or all proceedings arising under title 11 or

arising in or related to a case under title 11 . . . to the bankruptcy judges for the district."

Celotex, 514 U.S. at 307 (quoting 28 U.S.C. § 157(a)).

The statutory scheme creates three prongs of bankruptcy jurisdiction:  (1) proceedings

arising under the Bankruptcy Code; (2) proceedings arising in a case under the Bankruptcy Code;

and (3) proceedings related to a case under the Bankruptcy Code.  Since the claims asserted by

Filippov and Lipetsker do not arise under the Bankruptcy Code or arise from the underlying

---

[6] Kagan incorporates herein by reference the Jurisdiction Statement.

bankruptcy case, the Court must examine whether the claims among non-debtors are "related to"

the case. Celotex, 514 U.S. at 309-11.

To determine whether "related to" jurisdiction exists, courts have universally adopted the

test first articulated by the Third Circuit in Pacor, Inc. v. Higgins, 743 F.2d 984 (3d Cir. 1984):

> A matter is related to the bankruptcy case for §1334 purposes if the outcome
> of that proceeding could conceivably have any effect on the estate being
> administered in bankruptcy . . . . Moreover, an action is related to
> bankruptcy if the outcome could alter the debtor's rights, liabilities, options
> or freedom of action (either positively or negatively) and in any way impacts
> upon the handling and administration of the bankruptcy estate.

Id. at 994. The claims brought by Filippov and Lipetsker do not meet this standard. If Filippov

and Lipetsker wish to raise certain objections to the proofs of claim, those matters are admittedly

before this Court. If they wish to pursue affirmative relief against the Defendants, the relief

sought is outside of this Court's jurisdiction.[7]

It was Filippov's and Lipetsker's decision to put the Debtor in bankruptcy, but in doing

so they do not get the benefit of this Court to pursue non-debtor litigation that has no bearing on

the bankruptcy case. To the extent they wish to seek a resolution of those disputes, which are

entirely based in state law, they should be forced to do so in state court after the bankruptcy

claims are resolved. This Court should dismiss Filippov's and Lipetsker's claims for lack of

subject matter jurisdiction.[8]

---

[7] Any argument that Kagan or any of the Defendants have consented to or waived any defect in this Court's subject matter jurisdiction is not correct. "[P]arties cannot confer subject matter jurisdiction on a federal court by waiver or consent." Quinn v. City of Boston, 325 F.3d 18, 26 (1st Cir. 2003); see also Sheridan v. Michels (In re Sheridan), 362 F.3d 96, 100 (1st Cir. 2004) (citing to Quinn). Moreover, "[a] litigant generally may raise a court's lack of subject-matter jurisdiction at any time in the same civil action, even initially at the highest appellate instance." Kontrick v. Ryan, 540 U.S. 443, 455 (2004) (citing Mansfield, C. & L.M.R. Co. v. Swan, 111 U.S. 379, 382 (1884)).

[8] In response to its show cause request, this Court made clear that "any affirmative recovery, over and above what is necessary to wholly setoff the claim of a particular defendant, is less certain…" [Adv. Proc. Docket No. 48]. Thus, this Complaint should be treated solely as an objection to Kagan's claim. To the extent of an affirmative recovery is sought, these claims should be dismissed.

### III. PLAINTIFFS HAVE FAILED TO STATE A VIABLE CLAIM
### FOR FRAUD AND FRAUD BASED CLAIMS AGAINST KAGAN.

The Plaintiffs' fraud claim against Kagan, Count IV, and all additional counts against

him which are based on the alleged fraud (Counts I, II, V and VIII), must be dismissed because

they fail to satisfy the particularity requirements of Fed. R. Civ. P 9(b), made applicable to this

adversary proceeding by Bankruptcy Rule 7009. De Prins v. Michaeles, 189 F. Supp. 3d 209,

215 (D. Mass. 2016)( "Although here the claim itself is not for fraud, "[e]ven when a plaintiff is

not making a fraud claim, courts will require particularity in the pleading if the cause of action is

premised on fraudulent conduct." § 1297 Pleading Fraud With Particularity—In General, 5A

Fed. Prac. & Proc. Civ. § 1297 (3d ed.). Therefore, to the extent that Plaintiff's claims are

grounded in fraud, the heightened pleading standards will apply."); Natale v. Espy Corp., 2 F.

Supp. 3d 93, 99 (D. Mass. 2014) ("For claims where "fraud lies at the core of the action," Rule

9(b) renders the pleading requirement more stringent."); Shapiro v. Miami Oil Producers, Inc.,

84 F.R.D. 234, 236 (D. Mass. 1979)("… Rule 9(b)'s particularity requirement "extends to

averments of fraud or mistake, whatever may be the theory of legal duty -- statutory, tort,

contractual, or fiduciary."); Enercon v. Global Computer Supplies, Inc., 675 F. Supp. 2d 188,

190 (D. Me. 2009)("The United States Court of Appeals for the First Circuit reads Fed. R. Civ.

P. 9(b) expansively to cover associated claims where a Complaint's core allegations effectively

charge fraud, even when those claims are for negligent misrepresentation and breach of fiduciary

duty."). The Complaint must set out, **with specificity**, what Kagan himself did in furtherance of

the alleged fraud.

Rule 9(b) of the Federal Rules of Civil Procedure requires pleading fraud with

particularity. See United States ex rel. Karvelas v. Melrose-Wakefield Hosp., 360 F.3d 220, 226

(1st Cir. 2004)("We have said that Rule 9(b) requires that a Plaintiff's averments of fraud specify

the time, place, and content of the alleged false or fraudulent representations.") (internal citations omitted). "The purpose of this requirement is to "give notice to defendants of the Plaintiffs' claim, to protect defendants whose reputation may be harmed by meritless claims of fraud, to discourage 'strike suits,' and to prevent the filing of suits that simply hope to uncover relevant information during discovery." Id. (internal citations and quotations omitted); see also United States ex rel. Kelly v. Novartis Pharms. Corp., No. 15-1470, 2016 U.S. App. LEXIS 11001, at *15 (1st Cir. 2016)("Rule 9(b) requires that "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake."). "Conclusory allegations and references to plans and schemes are not sufficient." Id. (internal quotations omitted).

Count IV recites a conclusory laundry list of allegedly fraudulent conduct by Kagan. It provides no particulars, however. Plaintiffs' allege that "Mr. Kagan personally engaged in at least the following fraudulent acts: (a) knowingly and intentionally presenting a false budget to Mr. Filippov and Mr. Lipetsker to induce them to invest in the Project which he represented to them as fixed." (Cmp., ¶64(a)). At first glance, this allegation may appear to meet the specificity requirement. However, even if taken as true for purposes of this motion only, these allegations still are not sufficient to support a fraud claim because fraud requires more than simply an alleged falsity. As argued below, Plaintiffs must also show that that they relied on the material misrepresentation to their detriment. Leaving aside that Plaintiffs' suffered no loss attributable to the alleged fraud because no return was guaranteed, the construction contract with Classic Homes which Filippov signed and claims is the operative contract is not a fixed price contract. Therefore, clearly, Plaintiffs could not have been relying on Kagan's alleged assurance that the construction costs were fixed in the alleged budget. See Classic Homes contract annexed hereto as Exhibit 2.

Next, Plaintiffs plead that "[b]efore they sought bank financing to buy the land and build the houses, Mr. Kagan persuaded Mr. Filippov that they should borrow an additional $100,000 for each new home for unexpected costs over and above the budget.  Mr. Filippov agreed."  Id., ¶20.  If the parties were still discussing costs months after the initial presentation (the construction loans did not close until approximately six months later), this further proves that there could not have been any reliance on Kagan's initial assurance to build at a "fixed" price. Conspicuous by its paucity of detail in this regard, the Operating Agreement too does not cap construction costs, even though Plaintiffs have pled that the failure to bring the Project in at budget is a breach of the Operating Agreement.  See Cmp., ¶64(d).  Finally, because the alleged misrepresentations had no material specificity, i.e. there was no representation as to the type of home to be built, the selling price, the date of sale, or the profit to be earned, there could not possibly be any reasonable reliance thereon and it is questionable whether these representations were even material.

Though claiming all sorts of malfeasance with respect to the billing and expenses, Plaintiffs have been unable or unwilling to identify any specific instances of improper billing. Paragraph 64, contains a laundry list of allegedly fraudulent conduct by Kagan which is almost entirely new in this latest version of the Complaint.  It makes very serious allegations, i.e. inflating construction costs, overbilling for unused materials, double billing.  Presumably, before amending the Complaint Plaintiffs uncovered some hard facts to support these new serious allegations.  However, as demonstrated by Plaintiffs' responses to Kagan's interrogatories, as well as their responses to interrogatories propounded to the other Defendants, Plaintiffs have

been unable to identify a specific improper expense.[9]

Interrogatory No. 3 propounded to each of the Plaintiffs asked for those specifics. Rather, than provide any details, Plaintiffs merely repeated the laundry list of conclusory statements contained in the Complaint. Plaintiffs accuse Kagan of conspiring to have ProExcavation fraudulently bill and overcharge, claim that ProExcavation's charges are grossly in excess of what is normal for the work it performed and that its billing is "rife" with errors and double billing. However, Plaintiffs admitted in their responses to ProExcavation's interrogatories that they know do not know what ProExcavation did on the Project, never saw its bills and have no understanding regarding its charges. See ProExcavation's motion to dismiss which addresses this argument and attaches the responses to ProExcavation's interrogatories. How then, can Plaintiffs claim to have facts that demonstrate that Kagan acted improperly as a result of ProExcavation's conduct? This does not come close to satisfying the requirements of Rule 9(b). If Plaintiffs are going to be alleging fraud against Kagan, Kagan is entitled to facts, not conclusions, which support that pleading.

It is also not sufficient to say that the Plaintiffs expect to find the missing detail during discovery, and it certainly is not sufficient to say that the missing detail will be provided in an expert report that may or may not someday exist. Plaintiffs' interrogatory responses confirm that they are engaging in an impermissible fishing expedition. See Wayne Inv., Inc. v. Gulf Oil Corp., 739 F.2d 11, 14 (1st Cir. 1984) (Rule 9(b) was not satisfied when support for allegation consisted of "speculations from industry analysts" and allowing the allegations of fraud to stand would be tantamount to "issu[ing] a license for a 'fishing expedition' in uncharted waters.");

---

[9] Copies of Plaintiffs' responses to interrogatories that Kagan propounded to Debtor, Lipetsker and Filippov are annexed hereto as Exhibits 3, 4 and 5, respectively. Copies of responses to interrogatories propounded by Kagan's co-defendants are annexed to the memoranda supporting their motions to dismiss and are incorporated herein by reference.

Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996) (one purpose of Rule 9(b) is to "prevent the filing of suits that simply hope to uncover relevant information during discovery"). All of the counts against Kagan relying upon the alleged fraud must be dismissed for failing to plead with particularity.

### IV.    PLAINTIFFS HAVE FAILED TO PLEAD DAMAGES OR DETRIMENTAL RELIANCE

"[T]o recover in an action for deceit, 'the Plaintiff must prove that the defendant made a false representation of a material fact with knowledge of its falsity for the purpose of inducing the Plaintiff to act thereon, and that the Plaintiff relied upon the representation as true and acted upon it to [its] damage.'" International Totalizing Sys. v. PepsiCo, Inc., 29 Mass. App. Ct. 424 , 431 (1990), citing, Danca v. Taunton Sav. Bank, 385 Mass. 1 (1982) (citations omitted); see also Restatement (Second) of Torts § 525 (1977)("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the purpose of inducing another to act or to refrain from action in reliance upon it, is subject to liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the misrepresentation"). Reliance is an essential element of the tort of fraud. See Sebago, Inc. v. Beazer E., Inc., 18 F. Supp. 2d 70, 95 (D. Mass. 1998)(Plaintiff must "plead reliance with particularity."); Lambert v. Leary, No. 05-3422, 2006 Mass. Super. LEXIS 63, at *12 (Feb. 14, 2006) (Plaintiff's fraud claim failed because, inter alia, he failed to plead reliance); see also Collins v. Huculak, 57 Mass. App. Ct. 387, 389 (2003) (fraud claim failed because could not establish justifiable reliance).

Plaintiffs have failed to plead any reliance on the allegedly fraudulent acts by Kagan, other than on his representation prior to the Project as to the anticipated construction costs. Cmp, ¶17. As discussed above, any reliance on the October, 2012 presentation was temporary, at best. Prior to commencing the Project, Plaintiffs ratified the cost basis of the Project (i.e. signed a

construction contract based on cost, not fixed price) and therefore no detrimental reliance could

have flowed from the initial presentation.  The Plaintiffs admit that they borrowed more than

what Kagan allegedly represented would be needed at the initial meeting, thereby demonstrating

that they understood that his representation as to price in October, 2012, were mere estimates or

projections.

As to any of the other alleged fraudulent conduct, no reliance is pled and therefore they

cannot possibly be the basis for any claim of fraud.  As to the pre-project representations, the

Debtor did not even exist at the time of the pre-project representations, so clearly it could not

have relied upon that representation.  Thus, Count IV should be dismissed.  See Masingill v.

EMC Corp., 449 Mass. 532, 541 (2007)(Plaintiff could not establish the necessary element of

reasonable reliance upon alleged oral misrepresentations that contradicted the terms of the

written contract); see also Sebago, Inc., 18 F. Supp. 2d at 95; Collins, 57 Mass. App. Ct. at 389.

In addition, any claim of damages is entirely speculative.  Given that there was no

guaranty of a selling price, no fixed selling date, no fixed rate of return, and no monies expended

beyond the construction loans earmarked for the Project, clearly no damages flowed from the

alleged misrepresentation.  Accordingly, the fraud and fraud based claims should be dismissed.

## V.  PLAINTIFFS HAVE FAILED TO PROPERLY PLEAD A CLAIM FOR CIVIL CONSPIRACY.

Count V alleges, in conclusory fashion, that "Through the conduct described herein, the

Defendants have conspired to defraud the Plaintiffs." (Cmp., ¶70).  The specific conduct by

Kagan is not broken out.  Because the conspiracy claim, on its face, is based in fraud, this claim

too fails to meet the requirements of Rule 9(b) of the Federal Rules of Civil Procedure.  See

Section III above.

Massachusetts recognizes two different theories of civil conspiracy.  First, there is a "very limited cause of action" for a coercive type of civil conspiracy.  Aetna Cas. Sur. Co. v. P&B Autobody, 43 F.3d 1546, 1563 (1st Cir. 1994).  To establish a claim civil conspiracy through coercion, a "Plaintiff must allege that Defendants, acting in unison, had some peculiar power of coercion over Plaintiff that they would not have had if they had been acting independently."  Id. (internal quotations omitted); see also Bartle v. Berry, 80 Mass App. Ct. 372, 383-84, rev. denied 460 Mass. 1116 (2011).  Plaintiffs have not alleged that Defendants have any "coercive" power over them.  Therefore, if this is the basis for the conspiracy count, it fails.

The other form of civil conspiracy "is more akin to a theory of common law joint liability in tort."  Aetna Cas. Sur. Co., 43 F.3d at 1564.  It requires "a common design or an agreement, although not necessarily express, between two or more persons to do a wrongful act and, second, proof of some tortious act in furtherance of the agreement."  Id.  Plaintiffs' Complaint is woefully inadequate in this respect.  The totality of the "facts" supporting the conspiracy claim amount to a generic, conclusory-based statement that Defendants "conspired" to "defraud" the Plaintiffs.  See Cmp., ¶70.  Mere labels and conclusions are not sufficient to withstand a motion to dismiss pursuant to Mass. R. Civ. P. 12(b)(6).  See Twombly, 550 U.S. at 545; Iqbal, 556 U.S. at 681.

Plaintiffs' responses to interrogatories aimed at facts supporting the conspiracy allegation shed no additional light.  As noted above, in response to Kagan's interrogatory, rather than provide specifics, Plaintiffs simply repeated the same conclusory allegations contained in the Complaint.  This does not meet their burden.  See Plaintiffs' Ans. Int. No. 3.  It is apparent that this response and the support for the conspiracy count is nothing but unsubstantiated conclusions.

## VI.   COUNT II BREACH OF FIDUCIARY DUTY FAILS AS A MATTER OF LAW.

Count II must also be dismissed because the breach of fiduciary duty, if any, is based on the alleged fraudulent conduct discussed above. The failure to identify any specific facts to support their fraud claim taints the fiduciary duty claim as well. More importantly, the alleged misrepresentation on which everything else is based occurred in October, 2012, prior to the formation of the Debtor. At that time, there was no partnership and no fiduciary duty. To the extent that everything relates to that event, the breach of fiduciary duty fails.

## VII.   COUNT I BREACH OF CONTRACT FAILS AS A MATTER OF LAW

Count I alleges that Kagan breached the Operating Agreement. The alleged breaches, however, do not state obligations under the Operating Agreement or are simply based on "facts" that do not exist. For example, Plaintiffs claim that Kagan asserted claims against Plaintiffs for cost over runs, made false claims for construction costs and did not obtain change orders for cost overruns. (Cmp., ¶54 d-f). The only claim for increased Project costs, however, in this matter was the proof of claim filed by KDC. Moreover, mere assertion of a claim is not a breach of contract.

The other alleged claims of breach also fail. Plaintiffs claim that Kagan did not complete construction of the homes "on time". (Id. , ¶54(a)). The Operating Agreement, however, does not specify a date for "completion" of the homes. See Op. Agr., ¶5.2 (providing a date for substantial completion, an undefined term, but not providing a date for final completion). As to the claim of an unauthorized listing agreement with Tatiana, the Operating Agreement specifically provides that the Debtor shall use Tatiana as the broker. Op. Agr., ¶6.1(b)(6). It also does not contain a specific a term as to how long Tatiana could be retained. More importantly,

the text message referenced in Plaintiffs' interrogatory responses to Tatiana confirms that Kagan was authorized to sign the listing agreement.[10]

As to Kagan's signature on the construction contract with KDC, (Cmp., ¶54(c)), the Operating Agreement specifically charges him with constructing the houses. Op. Agr., ¶5.2. Nowhere is there any obligation to have the construction contracts approved by the other members. More importantly, the Operating Agreement does not specify the terms of any construction contract so the allegation that the terms of the KDC contract contradicted the terms of the Operating Agreement is a complete falsehood. Count I should be dismissed.

VIII.      COUNT VIII, EQUITABLE SUBORDINATION, FAILS TO STATE A CLAIM.

Filippov and Lipetsker have added an equitable subordination claim. Subordination is a remedy in which the order of payment rather than the existence of the debt is at issue. It is not an affirmative claim for recovery. Under Section 510(c) of the Bankruptcy Code, allowed claims may be subordinated to allowed claims, but allowed claims may not be subordinated to interests. 11 U.S.C. §510(c); see also Shubert v. Lucent Techs. Inc. (In re Winstar Communications, Inc.), 554 F.3d 382, 414 (3d Cir. 2009)("a creditor's claim can be subordinated only to the claims of other creditors, not equity interests"); Adelphia Recovery Trust v. Bank of America, N.A., 390 B.R. 80, 99 (S.D.N.Y. 2008)("a given claim may not be subordinated to an equity interest, but only to another claim").

The deadline for filing claims in the Debtor's case was May 3, 2016. Filippov and Lipetsker filed proofs of interest. However, Lipetsker did not file a proof of claim and Filippov only filed a late claim for a purported mortgage in the amount of $208,333. [Claim No. 9] against which an objection has been filed. [Docket No. 167]. Given that Lipetsker did not file a claim and Filippov's late-filed claim is the subject of an objection, neither Lipetsker nor Filippov

---

[10] A copy of the text message is annexed to Tatiana's supporting memorandum as Exhibit 5

have standing to assert equitable subordination claims, and the suggestion that the Defendants'

claims could be equitably subordinated to their interests is not authorized by Section 510(c).

Moreover, even if equitable subordination was appropriate (it is not), since the estate has more

than $3 million dollars to distribute for the payment of allowed claims, any re-ordering of the

payment of such claims is likely a meaningless exercise.

CONCLUSION

Based upon the foregoing, Kagan respectfully requests that the Complaint be dismissed.


VADIM KAGAN,

By his attorneys,


/s/ Christopher M. Candon, Esq.
Christopher M. Candon (BBO# 650855)
John H. Perten (BBO# 548728)
SHEEHAN PHINNEY BASS & GREEN, P.A.
255 State Street, Fifth Floor
Boston, MA 02109
(617) 897-5600
ccandon@sheehan.com
jperten@sheehan.com


Dated:  November 21, 2017

# EXHIBIT 1

# OPERATING AGREEMENT
## OF
## LYMAN-CUTLER, LLC

1.    THIS OPERATING AGREEMENT is entered into as of the 14  day of November, 2012 by and between Vadim Kagan, Nickolay Lipetsker and Alex Filippov.

WHEREAS, Mr. Kagan, Mr. Lipetsker and Mr. Filippov wish to form a limited liability company known as LYMAN-CUTLER, LLC (the "Company") pursuant to the Massachusetts Limited Liability Company Act (as amended, the "Act") by filing a Certificate of Organization of the Company with the Massachusetts Secretary of State's Office and by entering into this Agreement;

NOW, THEREFORE, in consideration of the mutual agreements, promises and conditions contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Mr. Kagan, Mr. Lipetsker and Mr. Filippov as acknowledge and agree as follows:

### ARTICLE I - DEFINITIONS

1.1 Definitions.        Capitalized terms used in this Agreement and not otherwise defined shall have the meanings assigned to them below:

(a) "Agreement" means this operating Agreement, as amended, modified, supplemented or restated from time to time.

(b) "Certificate of Formation" means the Certificate of Formation of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the Commonwealth Secretary of State's Office pursuant to the Act.

(c) "Member" means a member of the Company identified on Schedule A attached hereto, as the same may be amended from time to time.

(d) "Percentage Interest" shall refer to the percentage ownership interest of each Member in the Company.  The Percentage Interests of the Members are set forth on Schedule A attached hereto and incorporated herein for all purposes by this reference.

1

(e) "Date of Acquisition" shall refer to deed recording date for Lyman Road Brookline property into the Company.

## ARTICLE II - THE COMPANY

2.1 Formation.

(a) The Members hereby agree to form the Company as a limited liability company under and pursuant to the provisions of the Act and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein. Upon the execution of this Agreement, Mr. Kagan, Mr. Lipetsker and Mr. Filippov shall be Members of the Company.

(b) The name and mailing address of each Member and the amount contributed to the capital of the Company shall be listed on Schedule A.

2.2 Name; Principal Place of Business. The name of the Company shall be LYMAN-CUTLER, LLC. The principal office of the Company shall be located at 130 Trapelo Road, Belmont, Massachusetts, or at such other place as the Members may from time to time determine.

2.3 Term. The term of the Company shall commence on the date of the filing of the Certificate of Organization in the Commonwealth of Massachusetts Secretary of State's Office and shall continue until November 30, 2015 unless dissolved before such date in accordance with the provisions of this Agreement.

2.4 Registered Agent and Office. The company's registered agent and office in Massachusetts shall be as set forth in the Certificate of Organization of the Company filed with Commonwealth of Massachusetts Secretary of State's Office, as the same may from time to time be amended.

2.5 Fiscal Year. The Company's fiscal year (the "Fiscal Year") shall be the calendar year.

2.6 Taxation as Partnership. The Company shall be treated as a partnership for U.S. federal income tax purposes.

2

### ARTICLE III – PURPOSE AND POWERS OF THE COMPANY

Nature of Business.  The general character of the business of the LLC is to own (directly or through a nominee), invest in, develop, improve, operate, manage, lease and/or sell real estate in Commonwealth of Massachusetts.  To engage in any activities directly or indirectly related or incidental thereto including, but without limitation, everything necessary, suitable, convenient, or proper for the accomplishment of any of the foregoing activities, or the attainment of any one or more of the purposes, enumerated or incidental to the powers named, or which shall at any time appear conducive to or expedient for the production of benefit to the corporation, either as the holders of or interested in any property, or otherwise, with all the powers now or hereafter conferred by law, and for all lawful purposes.

3.1  Powers of the Company.  The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to or for the furtherance of the purpose set forth in Article 3., including, but not limited to the powers permitted under the Act.

### ARTICLE 1V – CAPITAL CONTRIBUTIONS AND ACCOUNTS

4.1  Capital Contributions.  Each Member has transferred and contributed to the capital of the Company the capital amounts (the "Capital Contributions") as set forth on Schedule A.  Furthermore, Purchase Money Loan and Construction Loan shall be taken from Rockland Trust Company to pay for construction and carrying costs until the issuance of Certificates of Occupancy (hereinafter "CO") but in no event for more then twenty three (23) months from the date of acquisition.

4.2  Carrying Costs.    Carrying costs shall be defined to include but not limited to mortgage payments, taxes and insurance for the subject property 77 Lyman Road, Brookline, Massachusetts.   In the event that a CO for each lot is not issued within twenty three (23) months from the date of acquisition, then Mr. Kagan will be responsible for all carrying costs until such time as CO's are issued.

3

4.3 Capital Accounts; Assets. An individual capital account (each a "Capital Account") shall be established and maintained for each Member in accordance with applicable regulations under the Internal Revenue Code of 1986 as from time to time amended (the "Code"). A Member shall not be entitled to interest on his or her Capital Contribution or Capital Account, or to withdraw any part of his or her Capital Contribution or Capital Account. No Member shall have any right in or to any asset or property of the Company, but shall only have a right to the distributions as and when provided for in Sections 8.2 and 9.2 hereof.

4.4 Maintenance of Capital Accounts. To the extent consistent with such regulations, there shall be credited to each Member's Capital Account the amount of any contribution of capital and carrying costs made by such Member to the Company, and such Member's share of the net profits of the Company and there shall be charged against each Member's Capital Account the amount of all distributions to such Member, and such member's share of the net losses of the Company.

### ARTICLE V - MEMBERS

5.1 Powers of Members. The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms of this Agreement.

5.2 Duties of Members. It shall be Mr. Kagan's duty and obligation to construct two (2) homes at the location currently known as 77 Lyman Road, in Brookline, Massachusetts in accordance with the plans, including drawings, supplied by Mr. Kagan and approved by Managing Member. The construction shall be substantially completed no later than March 30, 2014. It is specifically understood by all Members that Mr. Kagan's compensation for this duty is outlined in Section 8.1 below.

5.3 Admission of Members. No person shall be admitted as a Member of the Company after the date of formation of the Company without the written consent or approval of the Members owning at least eighty (80%) of the

UK
J.K. N.L.

4

Percentage Interests in the Company at the time of such admission, regardless of whether such person has previously acquired any rights in any existing Member's interest in the Company by assignment, sale or otherwise.  A Member's execution of a counterpart of this Agreement, or such other instrument as the Members may require, shall  evidence his or her admission.

5.4 Transfer of Company Interest.  No Member may transfer, sell, assign, pledge, mortgage, or dispose of or grant a security interest in his or her interest in the Company (each, a "Transfer") without the prior written consent of the Members owning at least eighty (80%) of the Percentage Interests in the Company at the time of such Transfer.  Any purported Transfer in contravention of this Section 5.3 shall be null and void and the Member attempting such Transfer shall cease to be a Member of the Company shall be forfeited and reallocated to the remaining Members in accordance with their respective Percentage Interests.

5.5 Rights of Assignee.  The purchaser or other transferee of a Member's interest in the Company shall have only the right to receive the distributions and allocations of profits or losses to which the Member would have been entitled under this Agreement with respect to the transferred interest and shall not have or enjoy any right to participate in the management of the Company or to receive any financial information or reports relating to the Company or any other rights of a Member unless and until the purchaser or transferee is admitted as a Member pursuant to Section 5.2.

5.6 Partition.  Each Member waives any and all rights that he or she may have to maintain an action for partition of the Company's property.

## ARTICLE VI – MANAGEMENT

6.1 Management, duties, and Restrictions.

(a) General Management.  The management and control of the operations of the Company and the maintenance, development, sales and leasing of the property of the Company shall rest with the Managing Members.

VK
A.F.  N.L.

5

(b) Powers of Managing Member. Subject to such limitations as may be imposed pursuant to the terms of this Agreement, the Act or by operation of law, the Members are and shall be authorized and empowered to carry out and implement the purposes of the Company. In that connection, the powers of the Managing Member shall include, but not be limited to, the following:

(1) to engage, dismiss, and replace personnel, attorneys, accountants, brokers or such other persons as may be deemed necessary or advisable by Managing Member;

(2) to authorize or approve all actions with respect to distributions by the Company, dispositions of the assets of the Company or its nominee, execution of leases, mortgage contracts, bonds, promissory notes, loan agreements and other instruments on behalf of the Company or its nominee, and to execute any agreements, instruments or documents relating to or affecting such matters;

(3) to acquire, mortgage, improve and convey real property and interests therein, including, but not limited to, easements and rights-of-way, and to execute any agreements, instruments or documents relating to or affecting such matters;

(4) to open, maintain, and close bank accounts and to draw checks and other orders for the payment of money; and

(5) to take such other actions and to incur such reasonable expenses on behalf of the Company as may be necessary or advisable in connection with the conduct of the affairs of the Company.

(6) The Managing Member hereby agrees to list the properties with Tatiana Kagan. In order to remove Tatiana Kagan as a listing broker by December 31, 2014 will require a written consent of the Members owning at least eighty one (81%) of the

6

Percentage Interests in the Company.   After December 31, 2014 no such consent shall be required.

(c) Liability of Managing Member. In carrying out their duties, the Managing Member shall not be liable to the Company or to any other Members for any actions taken in good faith and reasonable believed to be in the best interest of the Company or which are taken upon the written advice of legal counsel for the Company.

(d) Reliance on Act of Managing Member. Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Managing Member. Any person other than a Member may and shall be entitled to rely on certificates, instructions, agreements or assignments signed or purporting to be signed by a Managing Member for or on behalf of the Company, and on the statements and agreements set forth therein, without inquiry as to the due authorization thereof or the authority of the person signing or purporting to sign such certificates, instructions, agreements or assignments.

(e) Delegation. The Managing Member may appoint Members only with such titles as they may elect, including the titles of President, Vice President, Treasurer and Secretary, to act on behalf of the Company with such power and authority as the Members may delegate in writing to any such person.

(f) Books and Records. The Company's books and records shall be maintained in accordance with good record keeping practices and federal and state income tax laws and regulations. All books and records of the Company shall be maintained at the principal office of the Company, and each of the Members shall have access thereto to review the same at any time upon reasonable notice and during normal business hours.

(g) Reimbursement of Managing Member. The Managing Member shall be reimbursed by the Company for all reasonable expenses (including attorney and accountant's fees) incurred or paid by them for or on behalf of the Company.

7

## ARTICLE VII – VOTING, MEMBER CONSENTS AND MEMBER GUARATEE, MEETINGS

7.1 Voting. Each Member shall be entitled to vote in proportion to his or her Percentage Interest in the Company from time to time. Such vote may be exercised by written or oral notification by a Member to the other Members.

7.2 Member Consents. The amendment of this Agreement shall require the vote and unanimous approval of all the Members. All other actions taken by the Company, including the admission of a new Member, shall require the vote and approval of Members owning eighty percent (80%) or more of the Percentage Interest at the time of such vote.

7.3 Member Guarantee. Mr. Filippov shall, if required by institutional lender, provide that lender with a limited personal guarantee not to exceed $200,000.00 for all loans obtained by the Company related to the property located at 77 Lyman Road, Brookline, Massachusetts. Coincident with any provision by Mr. Filippov of such a guarantee, Messrs Kagan and Lipetsker shall each provide Mr. Filippov with a limited personal guarantee not to exceed, in the case of Mr. Kagan, $100,000.00 and in the case of Mr. Lipetsker, $20,000.00

7.4 Meetings of the Members. The Members may, but shall not be required, to meet from time to time to consider the affairs of the Company and to take any action permitted to be taken by the Members by law or under this Agreement. Meetings of the Members may be called at any time by any Member. Notice of any meeting shall be given to all Members not less than two (2) days nor more than thirty (30) days prior to the date of such meeting. Each Member may authorize any person to act for it by proxy on all matters on which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or his or her attorney-in-fact. A quorum for each meeting shall be one more than one-half the number of all Members.

8

## ARTICLE VIII - ALLOCATIONS AND DISTRIBUTIONS

8.1 <u>Allocations of Profits or Losses.</u>  *The net profits,* net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows: Mr. Alex Filippov (40%) , Mr. Nickolay Lipetsker (10%) and Mr. Kagan (50%).   In the event that the demolition permit is not issued by June 30, 2013, then *the net profits,* net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows:  Mr. Alex Filippov (60%) , Mr. Nickolay Lipetsker (10%) and Mr. Kagan (30%).  The net losses from any sale of any property of the Company or upon liquidation of the Company shall be allocated among the Members according to the Percentage Interests of Each Member.  Net profits and net losses shall, for both accounting and tax purposes, be net profits and net losses as determined for reporting on the Company's federal income tax return. *In the event that the property is not sold within twenty three (23) months from the date of acquisition,  then Mr. Kagan shall be responsible for all carrying costs until such time as the property is sold.   If Mr. Kagan fails to pays to pay monthly carrying costs, then Mr. Filippov shall be responsible to contribute the necessary carrying costs and subsequently his capital contribution and percentage interest in the Company shall increase by the same amount and  percentage and at the same time will trigger reduction of Mr. Kagan's share of capital contribution by the same amount and subsequently his/her percentage interest in the Company.* For tax purposes, all items of depreciation, gain, loss, deduction or credit shall be determined in accordance with the Code and, except to the extent otherwise required by the Code, allocated to and among the Members in the same percentages in which the Members share in net profits and net losses.   Any change to this paragraph will require a written consent of the Members owning at least eighty one (81%) of the Percentage Interests in the Company.

9

8.2 <u>Distribution to Members.</u> *The distribution to Members shall be in accordance with their respective Capital Contribution first, however, an additional five (5%) percent per annum payment based upon Members' respective Capital Contributions shall be paid out of Mr. Kagan's net profit share for each day that the property is not sold after twenty three (23) months of acquisition* For the purposes hereof, the term "Net Cash From Operations" shall mean the gross cash proceeds from Company operations less the portion thereof used to pay or establish reserves for Company expenses, debt payments, capital improvements, replacements, and guaranteed payments, all as determined by the Members. "Net Cash From Operations" shall not be reduced by depreciation , amortization, cost recovery deductions, or similar non-cash allowances, but shall be increased by any reductions of reserves previously established.

## ARTICLE IX – DISSOLUTION AND TERMINATION OF COMPANY

9.1 <u>Events of Dissolution.</u> The Company shall be dissolved and its affairs shall be would up upon the occurrence of any of the following events:

    (a) the death, insanity, dissolution, incompetency, bankruptcy, retirement, resignation or expulsion of a Member ("Retiring Member") unless there are at least two (2) remaining Members of the Company, and the remaining Members owning a "majority in interest" in the Company elect to continue the Company within ninety (90) days of the death, insanity, dissolution, bankruptcy, retirement, resignation or expulsion of the Retiring Member;

    (b) Notwithstanding the above paragraph, in the event of the death, insanity, dissolution, incompetency, bankruptcy, retirement or resignation of Mr. Filippov, his interest in this Company and control of this Company will automatically pass to his spouse by operation of this Agreement;

    (c) the conclusion of the term of the Company set forth in Section 2.3. hereof;

10

(d) the sale or disposition of all or substantially all of the assets of the Company;

(e) the written consent of the Members owning eighty (80%) or more of the Percentage Interests in the Company; or

(f) the entry of a decree of judicial dissolution in accordance with the provisions of the Act.

For the purpose of Section 9.1 (a) above, the term "majority in interest" means eighty (80%) or more of the remaining Members' collective interest in profits and their respective Capital Accounts. For the purpose of the foregoing sentence, profits shall be determined and allocated based upon any reasonable estimate of profits from the date of the dissolution event to the projected termination of the Company taking into account present and future allocations of profits under this Agreement, and the Capital Account balances shall be determined upon the date of the dissolution event.

9.2 Winding Up. Upon the dissolution of the Company, the remaining Member or, if more than one Member then remains, the Member selected by the remaining Members (in either case, the "Liquidating Member"), shall proceed with the winding up of the Company and apply and distribute the Company's assets as provided in this Section 9.2. The assets shall first be applied to the payment of the liabilities of the Company (other than any loans that may have been made by the Members to the Company) and to the expenses of liquidation. A reasonable time shall be allowed for the orderly liquidation of the Company and for the discharge of liabilities to creditors, so as to enable the Liquidating Member to minimize the normal losses attendant to a liquidation. The remaining assets shall next be applied to the repayment of any loans made by the Members to the Company. All assets then remaining shall be distributed to the Members in accordance with their respective Capital Accounts after giving effect to all contributions, distributions and allocations for all periods. Notwithstanding any of the foregoing, the Liquidating Member may retain a sum deemed necessary by him or her as a reserve for any

11

contingent liabilities, expenses and obligations of the Company. Upon the final distribution of assets to the Members, each of the Members shall be furnished with a statement which sets forth the assets and liabilities of the Company as of the date of the complete liquidation.

## ARTICLE X - LIABILITY AND INDEMNIFICATION

10.1 Liability. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

10.2 Indemnification. The Company shall indemnify and hold harmless the Members and their respective employees and authorized agents from and against any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member, employee or authorized agent in good faith on behalf of the Company and reasonable believed to be within the scope of authority conferred by this Agreement, except that no Member, employee or authorized agent shall be entitled to be indemnified or held harmless from or against any loss, damage or claim incurred by reason of such Member's, employee's or authorized agent's gross negligence or willful misconduct; provided, however, that any indemnity under this Section 10.2 shall be provided out of and to the extent of Company assets only, and no Member shall have any personal liability on account thereof.

## ARTICLE XI - MISCELLANEOUS

11.1 Governing Law. The Company and this Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts.

12

11.2 <u>Agreement Binding.</u>  This Agreement shall inure to the benefit of, and be
binding upon, the parties hereto and their respective next-of-kin, legatees,
administrators, executors, legal representatives, successors, and assigns.

11.3 <u>Notices.</u>   Notices to the Members or to the Company to be furnished
hereunder shall be deemed to have been given when mailed, by prepaid
registered or certified mail, or when deposited with an express courier service,

addressed to the address set forth on Schedule A or as set forth in any notice of
changes of address previously given in writing by the addressee to the addressor.

Executed as a Commonwealth of Massachusetts's instrument under seal on the
day and year first above written.

Nickolay Lipetsker, Member

Vadim Kagan, Member

Alex Filippov, Managing Manager

13

## SCHEDULE A

### Capital Contributions and Percentage Interests

| Member | | Capital Contribution | Percentage Interest |
|---|---|---|---|
| Name: | Nickolay Lipetsker | $250,000.00 | 10% |
| Address: | 52 Stony Brae Road, Newton, MA, 02461 | | |
| Name: | Alex Filippov | $2,000,000.00 | 80% |
| Address: | 130 Trapelo Road, Belmont, Massachusetts | | |
| Name: | Vadim Kagan | $250,000.00 | 10% |
| Address: | 99 Needham Street, Unit 1402, Newton, MA, 02461 | | |

14

# EXHIBIT 2

### CONTRACT TO BUILD TWO HOUSES AT 55 Lyman Road, Brookline, Massachusetts and 88 Cutler Lane, Brookline, Massachusetts

**I. Contract Parties**

Now comes *CLASSIC HOMES DEVELOPMENT & CONSTRUCTION, LLC* of 239 Nahanton Street, Newton, Massachusetts and **LYMAN-CUTLER, LLC** of 130 Trapelo Road, Belmont, Massachusetts, *whereas* **CLASSIC HOMES DEVELOPMENT & CONSTRUCTION, LLC** hereby agree to build two houses at 55 Lyman Road, Brookline, Massachusetts and 88 Cutler Lane, Brookline, Massachusetts and legally described in Exhibit A

**II. Contract Documents**

The terms of this contract include all the documents specifically listed below, and constitute the entire terms of the agreement between the parties. The terms of this contract shall prevail over any conflicting provision in the documents incorporated by reference.

1. Architectural Plans and Drawings date _____ with _____ number of pages is hereby incorporated into this document.

**III. Building Plans**

The builder agrees to construct the home in accordance with the plans, including drawings, supplied by the *Owner* and incorporated by reference into paragraph II. The builder assumes no responsibility or liability for defects in the design or engineering in these plans.

The owner represents to the builder that the owner is the sole owner of the plans or has the legal right to use the plans. The owner agrees to indemnify and hold the builder harmless for any copyright action which may be asserted as a result of the use of the plans.

The owner warrants that the plans are adequate and that the builder can rely on them. The owner will be liable for any damages caused by defects in the plans, including, but not limited to, additional material costs, additional labor costs, pro rata overhead and profit.

Owner is solely responsible for completing, selecting all cabinetry, bathroom fixtures, finish work, paint colors, stucco color, stone, appliances, hardwood, carpet, tile, marble color of roof.  Builder will send owner to all of his suppliers.

**IV. Completion Time**

PLTF000445

Assuming all conditions are satisfied and weather permits, the work to be performed under the contract shall be substantially completed in a 44 week time frame. The work shall commence within 10 days after the permits necessary, to start work have been issued, and the owner shall have supplied the builder with a correct statement of the recorded legal title of the property and the owner's interest in the property.

Any time lost by reason of changes to the contract or changes in plans by the owner, other acts of the owner, strikes, weather conditions not reasonably anticipated, or any other condition not within builder's control shall be added to the specified time for completion. For any delays which are not the builder's responsibility, the contract time frame shall increase.

Owner has to stay on Builder's schedule with picking products out on time so there are no delays. Builder shall not be responsible for any delays due to weather, or hold ups by the owners or inspections from the Town of Brookline.

## V. Contract Price

The builder agrees to construct the house according to the plans. As consideration for the builder constructing the house, the owner agrees to pay the builder's contractors and trades, full costs and expenses, on a weekly basis.

The owner will make a regular payment to the builder and subcontractors on first Monday of each week

## VI. Permits and Surveys

The owner shall obtain and furnish all necessary surveys describing the physical characteristics of the property, the location of all utilities, and the location of all easements to the building that are necessary to allow the builder to complete his performance. If additional easements are necessary to complete the work, the owner shall obtain those easements promptly.

If no soil report is available, the owner shall provide one at his own expense.

The builder shall obtain building permits, licenses, building inspections and approvals required by local law.

If a covenant or architectural review committee requires the approval of plans and specifications, the owner shall be responsible for obtaining these approvals and paying for any fees connected with them.

## VII. Insurance and Risk Management

The builder shall obtain all workers' compensation, commercial general liability insurance and comprehensive liability insurance necessary to protect builder from claims

for damages due to bodily injury, including death, and for damages to property that may arise out of and during operations under this contract.

The owner shall purchase his own liability insurance including fire and casualty insurance to the full insurable value of the house and shall name the builder as an additional insured.

Each party shall issue a certificate of insurance to the other prior to the commencement of construction.

## VIII. Warranties

All warranties are limited to the implied warranties of habitability and workmanlike construction and are limited to a period of one year from the date of the issuance of a certificate of occupancy by the local building code enforcement authority. This limited warranty is the only express warranty provided by the builder.

If Owner wants to use a sub- contractor that builder has not used, the warranty on that item will not be covered by the Builder.

## IX. Disputes

Should any dispute arise relative to the performance of this contract that the parties cannot resolve, the dispute shall be referred to a single arbitrator acceptable to the builder and the owner. If the builder and the owner cannot agree upon an arbitrator, the dispute shall be referred to the American Arbitration Association for resolution.

All attorney fees that shall be incurred in the resolution of disputes shall be the responsibility of the party not prevailing in the dispute.

## X. The Governing Law and Assignment

This contract will be construed, interpreted, and applied according to the law of the state where the property is located. This contract shall not be assigned without the written consent of all parties.

## XI. Effective Date and Signature

This contract shall become effective on the date it is signed by both parties
We, the undersigned, have read, understood, and agree to each of the provisions of this contract and hereby acknowledge receipt of a copy of this contract.

By: Vadim Kagan on behalf of CLASSIC HOMES DEVELOPMENT & CONSTRUCTION, LLC

Title: _____   Date: 6.18.13 _____

By: Alex Filippov on behalf of LYMAN-CUTLER, LLC, LLC

Title: _____   Date: June 18, 2013 _____

PLTF000447

# EXHIBIT 3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:* )<br><br>LYMAN-CUTLER, LLC, )<br>Debtor, )<br>——————————————— )<br><br>LYMAN-CUTLER, LLC, )<br><br>Plaintiff, )<br><br>v. )<br><br>VADIM KAGAN, TATIANA KAGAN, )<br>KAGAN DEVELOPMENT KDC CORP., )<br>and PROEXCAVACTION CORP., )<br><br>Defendants. )<br>——————————————— ) | Chapter 7<br>No. 15-13881-FJB<br><br><br>A.P. No. 16-1120 |

## LYMAN-CUTLER, LLC'S ANSWERS TO VADIM KAGAN'S
## FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Lyman-Cutler, LLC (the "LLC") responds to Vadim Kagan's ("Kagan") First Set of Interrogatories.

The LLC's responses are based upon information currently known. It reserves the right to amend,

modify, or supplement each of the responses set forth below.

### GENERAL OBJECTION

The LLC objects to the extent the "Instructions" section of Kagan's First Set of Interrogatories

purport to impose on the LLC any obligation that exceeds those required by the Rules of Civil

Procedure. The LLC will respond in accordance with any obligations imposed by the Rules.

1

## ANSWERS

**Interrogatory No. 1**

Please set forth, with complete detail, each and every communication between the Debtor and Kagan regarding the Project.

**Answer No. 1**

The LLC objects to this interrogatory. The word "Debtor" is defined to include its members, including Alex Filippov ("Filippov"), Nickolay Lipetsker ("Lipetsker"), and Kagn. There were countless communications between Filippov and Kagan regarding the Project. There were likely others involving Lipetsker. To require the LLC to identify each of them here is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, particularly as it relates to communications between the two parties that are not related to any topic that is at issue in this case. The LLC agrees to meet and confer regarding a potential narrowing and more focused request for information. With regard to written communications, the burden of deriving or ascertaining the answer is the same for Kagan as it is for the LLC, and the LLC refers Kagan to the documents produced pursuant to Fed. R. Civ. P. 33(c).

**Interrogatory No. 2**

Please itemize all damages which the Debtor seeks to recover from Kagan, including in your response any pertinent calculations and the factual basis for those damages.

**Answer No. 2**

The LLC objects to this interrogatory as premature. Discovery and expert analysis is ongoing. In general terms, the LLC states the following: The purported charges above the original budget are fabricated and fraudulent, or at best the product of gross negligence. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

**Interrogatory No. 3**

If you contend that Kagan conspired with KDC, ProExcavation and Tatiana, or any one of them, to defraud the Debtor, please identify all facts upon which you base that contention. Include in your response each act taken by Kagan in furtherance of the alleged conspiracy.

**Answer No. 3**

Kagan controls ProExcavation Corp. ("ProExcavation") and Kagan Development KDC Corp. ("KDC"). Each entity has a separate legal existence and is treated as such. Kagan caused KDC to hire ProExcavation which agreed to perform certain excavation and site work on the Project. He then caused

ProExcavation to knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC and knowingly and intentionally paid excessive sums to ProExcavation and then demanded even more excessive sums from the LLC. Kagan furthered this conspiracy by permitting ProExcavation to perform the work, causing KDC to pay ProExcavation charges which Kagan and KDC knew to be falsely inflated, causing KDC to demand that sum be repaid to it by the LLC, and subsequently causing KDC to file a mechanics' lien and a proof of claim seeking to recover that amount from the LLC. Kagan similarly reached an agreement with KDC whereby KDC would hire subcontractors, vendors, and suppliers to perform certain work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC to use these purported expenses to demand additional money from the LLC. Kagan furthered this conspiracy by permitting the subcontractors, vendors, and suppliers to perform the work, causing KDC to pay them charges which Kagan and KDC knew to be falsely inflated, causing KDC to demand that sum be repaid to it by the LLC, and subsequently causing KDC to file a mechanics' lien based in part upon alleged work that was performed long before the statutory deadline and a proof of claim seeking to recover that amount from the LLC. Kagan furthered this conspiracy by failing to keep proper books and records for the LLC, KDC and ProExcavation, failing to produce documentation when requested in keeping with his obligations under the LLC Agreement and his fiduciary duties, and by subsequently fabricating these books and records for the purposes of this litigation. Kagan and KDC also conspired to have KDC purportedly enter into a self-dealing, surreptitious written contract with the LLC which was never authorized, which violated the terms of the Rockland Trust agreement, which changed the project details without proper authorization, and which KDC now bases its claim for payment. Kagan furthered this conspiracy by causing both KDC and the LLC to sign this fraudulent document, by submitting requests for payment to Rockland Trust that stated all bills have been paid to date, and by causing KDC to seek to enforce the terms of that contract on the LLC when it knows that the LLC never agreed to the terms set forth therein. Kagan conspired with Tatiana when they reached an agreement for Tatiana to continue to serve as the LLC's agent far beyond the time permitted and authorized by the Operating Agreement, by agreeing to list the Properties for sale at a price that was never approved or authorized by the LLC, and by refusing to communicate a bona fide offer she did receive to the LLC. Kagan furthered this conspiracy by signing a fraudulent listing agreement with Tatiana and by participating in the decision to inflate the listing price and by knowingly failing to communicate a bona fide offer to the LLC.

## Interrogatory No. 4

Please identify each and every communication by Debtor, its agents, servants or attorneys had with Kristina Brusenkova regarding the Project or Kagan, including the substance and dates of each such communication.

## Answer No. 4

The LLC's Managing Member, Filippov, first spoke with Ms. Brusenkova sometime in June or July 2015 after the original lawsuit was filed in state court. The LLC does not recall the specific date. The LLC understands that Ms. Brusenkova also spoke with its attorney following Filippov's conversation with her. The substance of what was communicated to the LLC by Ms. Brusenkova is contained in her Affidavit, a copy of which the LLC understands has been produced to Kagan's counsel. In or about July 2016, Filippov was contacted by Ms. Brusenkova's counsel who asked if he would be willing to sign an affidavit in connection with a lawsuit that Kagan had filed against her. Filippov

agreed to do so.  The LLC understands that a copy of Filippov's affidavit has been produced to Kagan's counsel in that case.

## Interrogatory No. 5

Please identify any and all communications between Filippov and the Debtor regarding the note and mortgage which forms the basis for Claim No. 9.  Include in your response the date of each such communication and the substance thereof.

## Answer No. 5

In or around September 6, 2015, Filippov had a conversation with Nickolay Lipetsker wherein they discussed the LLC's need for money.  They agreed that Filippov would loan another $200,000 to the LLC in exchange for a mortgage.

## Interrogatory No. 6

Please identify each and every communication the Debtor had with Rockland Trust Company regarding the Project.

## Answer No. 6

The LLC objects to this interrogatory because it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, particularly as it relates to communications between the LLC and Rockland Trust Company that are not related to any topic that is at issue in this case.  Subject to and without waiving its foregoing objections, the LLC states the following:  The LLC, through Filippov, had numerous communications with John McGregor at Rockland before construction on the Project began, mostly centered around the terms of the loans and the limits to Filippov's personal guarantees.  Once the loans were issued, the LLC spoke only sporadically to anybody at Rockland and it mostly had to do with the LLC's request to extend the loan because the Project had not yet been completed.  The LLC does not recall the specific dates of these communications.  Further answering, and in accordance with Fed. R. Civ. P. 33, the LLC refers to the emails between it and anybody at Rockland that have been produced during discovery.

## Interrogatory No. 7

Please identify any and all communications Debtor had with any attorneys from O'Connor, Carnathan & Mack, LLC regarding the Project or any of Debtor's members.

## Answer No. 7

The LLC objects to this interrogatory because it seeks information which is protected by the attorney-client privilege and/or joint defense privilege or common interest doctrine.

4

## Interrogatory No. 8

Please identify any and all communications Debtor had with Attorney Boris Maiden regarding the Project, including without limitation communications regarding the drafting of the Operating Agreement.

## Answer No. 8

The LLC objects to this interrogatory because it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, particularly as it relates to communications between the LLC and Attorney Maiden that are not related to any topic that is at issue in this case. Subject to and without waiving his foregoing objections, the LLC states the following: Filippov had numerous communications with Attorney Maiden before the construction on the Project began. One such communication occurred after he reviewed a draft of the Operating Agreement which provided for very little control he would have over the LLC's affairs. On November 1, 2012, after Filippov voiced these concerns to Kagan, Nickolay Lipetsker, and Attorney Maiden, Filippov received an email from Attorney Maiden asking whether he wanted to be appointed as the LLC's Manager. Further discussions between the members and Attorney Maiden confirmed that Filippov would serve as the LLC's Manager. Attorney Maiden then prepared a revised draft or drafts of the Operating Agreement which confirmed that Filippov would serve as the LLC's Manager. Further answering, and in accordance with Fed. R. Civ. P. 33, the LLC refers to the emails with Attorney Maiden that have been produced during discovery.

## Interrogatory No. 9

For each and every person who you expect to call as an expert witness at trial, please state: (a) the identify of each expert by giving his/her name, address, specialty, and professional education and experience; (b) the subject matter on which each expert is expected to testify; (c) the substance of the facts and opinions to which each such expert is expected to testify; and (d) a summary of the grounds for each such opinion.

## Answer No. 9

The LLC objects to subparagraphs (b) through (d) of this interrogatory to the extent any expert witness identified is required to provide a written report under Fed. R. Civ. P. 26(b)(2)(B) as the requested information in those subparagraphs is duplicative of the information required to be identified in the written report. The LLC further objects because this interrogatory is premature as the Court has set an expert disclosure deadline of December 31, 2017. The identity of any expert the LLC intends to call as a witness at trial will be made in accordance with the Court's ordered deadline.

## Interrogatory No. 10

If you contend that Kagan acted with "gross negligence" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 10**

Kagan's gross negligence consisted of the conduct generally described in the Adversary Proceeding Complaint and Answer No. 3, all of which is incorporated herein by reference as if fully set forth herein. In addition, to the extent that Kagan did not intentionally defraud Filippov, Lipetsker and the LLC, incurring purported cost overruns of some $2.1 million on a construction project budgeted to cost a total of $3.2 million (which already included carrying costs and $200,000 for unforeseen cost overruns) without prior consultation with and approval by Filippov and Lipetsker is grossly negligent. Kagan was further grossly negligent in failing to complete construction on time and thereby missing the selling season in 2014. He was also grossly negligent with regard to keeping proper books and records.

**Interrogatory No. 11**

If you contend that Kagan acted with "willful misconduct" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 11**

Kagan's willful misconduct consisted of the conduct generally described in the Adversary Proceeding Complaint and Answer No. 3, all of which is incorporated herein by reference as if fully set forth herein.

**Interrogatory No. 12**

If you contend that Kagan did not act in "good faith" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 12**

Kagan's bad faith consisted of the conduct generally described in the Adversary Proceeding Complaint and Answer No. 3, all of which is incorporated herein by reference as if fully set forth herein.

<u>Verification</u>

I, Alex Filippov, state under the pains and penalties of perjury that I am the Managing Member of the LLC; that I am authorized to answer these interrogatories on the LLC's behalf; and that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Alex Filippov

*As to objections:*

/s/ Peter N. Tamposi
Peter N. Tamposi (BBO No. 639497)
The Tamposi Law Group, P.C.
159 Main Street
Nashua, NH 03060
T: (603) 204-5513

Dated:  October 2, 2017

<u>Certificate of Service</u>

I, Peter Tamposi, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on October 2, 2017.

/s/ Peter N. Tamposi
Peter N. Tamposi

4841-1581-5249, v. 1

7

EXHIBIT 4

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:* ) <br> ) <br> LYMAN-CUTLER, LLC, ) <br>     Debtor, ) <br>                  ) <br> ) <br> LYMAN-CUTLER, LLC, ) <br> ) <br>     Plaintiff, ) <br> ) <br> v. ) <br> ) <br> VADIM KAGAN, TATIANA KAGAN, ) <br> KAGAN DEVELOPMENT KDC CORP., ) <br> and PROEXCAVACTION CORP., ) <br> ) <br>     Defendants. ) | Chapter 7 <br> No. 15-13881-FJB <br><br><br> A.P. No. 16-1120 |

### NICKOLAY LIPETSKER'S ANSWERS TO VADIM KAGAN'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Nickolay Lipetsker ("Lipetsker") responds to Vadim Kagan's ("Kagan") First Set of Interrogatories.

Lipetsker's responses are based upon information currently known. Discovery is ongoing. He reserves

the right to amend, modify, or supplement each of the responses set forth below.

### GENERAL OBJECTION

Lipetsker objects to the extent the "Instructions" section of Kagan's First Set of Interrogatories

purport to impose on Lipetsker any obligation that exceeds those required by the Rules of Civil

Procedure. Lipetsker will respond in accordance with any obligations imposed by the Rules.

1

## ANSWERS

**Interrogatory No. 1**

Please set forth, with complete detail, each and every communication between Lipetsker and Kagan regarding the Project.

**Answer No. 1**

Lipetsker objects to this interrogatory. There were countless communications between Lipetsker and Kagan regarding the Project. To require Lipetsker to identify each of them here is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, particularly as it relates to communications between the two parties that are not related to any topic that is at issue in this case. Lipetsker agrees to meet and confer regarding a potential narrowing and more focused request for information. With regard to written communications, the burden of deriving or ascertaining the answer is the same for Kagan as for Lipetsker, and Lipetsker refers Kagan to the documents produced pursuant to Fed. R. Civ. P. 33(c).

**Interrogatory No. 2**

Please itemize all damages which you seek to recover from Kagan, including in your response any pertinent calculations and the factual basis for those damages.

**Answer No. 2**

Lipetsker objects to this interrogatory as premature. Discovery and expert analysis is ongoing. In general terms, Lipetsker states the following: The purported charges above the original budget are fabricated and fraudulent. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

**Interrogatory No. 3**

If you contend that Kagan conspired with KDC, ProExcavation and Tatiana, or any one of them, to defraud the Debtor, please identify all facts upon which you base that contention. Include in your response each act taken by Kagan in furtherance of the alleged conspiracy.

**Answer No. 3**

Kagan controls ProExcavation Corp. ("ProExcavation") and Kagan Development KDC Corp. ("KDC"). Each entity has a separate legal existence and is treated as such. Kagan caused KDC to hire ProExcavation which agreed to perform certain excavation and site work on the Project. He then caused ProExcavation to knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC and knowingly and intentionally paid excessive sums to ProExcavation and then demanded

even more excessive sums from the LLC and, indirectly, from me. Kagan furthered this conspiracy by permitting ProExcavation to perform the work, causing KDC to pay ProExcavation charges which Kagan and KDC knew to be falsely inflated, causing KDC to demand that sum be repaid to it by the LLC, and subsequently causing KDC to file a mechanics' lien and a proof of claim seeking to recover that amount from the LLC. Kagan similarly reached an agreement with KDC whereby KDC would hire subcontractors, vendors, and suppliers to perform certain work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC to use these purported expenses to demand additional money from the LLC and, indirectly, from me. Kagan furthered this conspiracy by permitting the subcontractors, vendors, and suppliers to perform the work, causing KDC to pay them charges which Kagan and KDC knew to be falsely inflated, causing KDC to demand that sum be repaid to it by the LLC, and subsequently causing KDC to file a mechanics' lien based in part upon alleged work that was performed long before the statutory deadline and a proof of claim seeking to recover that amount from the LLC. Kagan furthered this conspiracy by failing to keep proper books and records for the LLC, KDC and ProExcavation, failing to produce documentation when requested in keeping with his obligations under the LLC Agreement and his fiduciary duties, and by subsequently fabricating these books and records for the purposes of this litigation. Kagan and KDC also conspired to have KDC purportedly enter into a self-dealing, surreptitious written contract with the LLC which was never authorized, which violated the terms of the Rockland Trust agreement, which changed the project details without proper authorization, and which KDC now bases its claim for payment. Kagan furthered this conspiracy by causing both KDC and the LLC to sign this fraudulent document, by submitting requests for payment to Rockland Trust that stated all bills have been paid to date, and by causing KDC to seek to enforce the terms of that contract on the LLC when it knows that the LLC never agreed to the terms set forth therein. Kagan conspired with Tatiana when they reached an agreement for Tatiana to continue to serve as the LLC's agent far beyond the time permitted and authorized by the Operating Agreement, by agreeing to list the Properties for sale at a price that was never approved or authorized by the LLC, and by refusing to communicate a bona fide offer she did receive to the LLC. Kagan furthered this conspiracy by signing a fraudulent listing agreement with Tatiana and by participating in the decision to inflate the listing price and by knowingly failing to communicate a bona fide offer to the LLC.

### Interrogatory No. 4

If you contend that Kagan defrauded Lipetsker, please identify all facts upon which you base that contention. Include in your response each act taken by Kagan in furtherance of the alleged fraud.

### Answer No. 4

Kagan induced me to invest in the LLC by presenting a budget in October 2012 that Kagan represented was the maximum cost of construction and that he either knew was false at the time or, by subsequent conduct, became wrong when Kagan began fraudulently billing the LLC as set forth in Answer No. 3, above.

### Interrogatory No. 5

Please identify each and every communication with Kristina Brusenkova regarding the Project or Kagan, including the substance and dates of each such communication.

## Answer No. 5

I spoke with Kristina Brusenkova once sometimes in June 2015. Filippov and I met with Kristina to ask her questions about Kagan business practices. After this Ms. Brusenkova has spoken with my attorney and that the substance of what was communicated by her is contained in her Affidavit, a copy of which I understand has been produced to Kagan's counsel.

## Interrogatory No. 6

Please identify any and all communications you had with Attorney Boris Maiden regarding the Project, including without limitation communications regarding the drafting of the Operating Agreement.

## Answer No. 6

Lipetsker objects to this interrogatory because it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, particularly as it relates to communications between Lipetsker and Attorney Maiden that are not related to any topic that is at issue in this case. Subject to and without waiving his foregoing objections, Lipetsker states the following: The only communications I had with Attorney Maiden were also in the presence of Kagan.

## Interrogatory No. 7

For each and every person who you expect to call as an expert witness at trial, please state: (a) the identify of each expert by giving his/her name, address, specialty, and professional education and experience; (b) the subject matter on which each expert is expected to testify; (c) the substance of the facts and opinions to which each such expert is expected to testify; and (d) a summary of the grounds for each such opinion.

## Answer No. 7

Lipetsker objects to subparagraphs (b) through (d) of this interrogatory to the extent any expert witness identified is required to provide a written report under Fed. R. Civ. P. 26(b)(2)(B) as the requested information in those subparagraphs is duplicative of the information required to be identified in the written report. Lipetsker further objects because this interrogatory is premature as the Court has set an expert disclosure deadline of December 31, 2017. The identity of any expert Lipetsker intends to call as a witness at trial will be made in accordance with the Court's ordered deadline.

## Interrogatory No. 8

Please identify all communications regarding the October 25, 2012 presentation referenced in paragraph 12 of the Adversary Complaint, including any follow-up communications. Include in your response, any communications you had with Dmitriy Zhukovskiy and/or Filippov.

**Answer No. 8**

Lipetsker objects to this interrogatory because it seeks communications between Lipetsker and his counsel that are protected by the attorney-client privilege and/or the work-product doctrine. Lipetsker further objects because it seeks communications between Lipetsker or his counsel and any experts consulted or retained for purposes of this litigation. Any such communications are protected from disclosure by the work-product doctrine and Fed. R. Civ. P. 26(b)(4). Subject to and without waiving his foregoing objections, Lipetsker states the following: Kagan agreed, on behalf of whatever company he was intending to do the work, to construct the Project at a fixed cost of $1.3 million per home, plus another $200,000 in carrying costs. This was represented to me by Kagan personally during our meeting in October 2012 when Kagan made his financial presentation as part of his inducement for me to invest in the Project. To the best of my memory, he said that the $1.3 million would be the true costs for construction, that he was able to state this based on his significant experience in the industry, and that any deviations from this would be extremely minor. He also presented his purported results from other projects to show how he was able to stay on budget and produce his promised financial return. We ultimately agreed to add $100,000 to the construction budget for each house for any potential overruns, but was told by Kagan that this money would be expected to be returned to the investors. In accordance with Fed. R. Civ. P. 33, I also refer to the emails that were produced.

**Interrogatory No. 9**

If you contend that Kagan acted with "gross negligence" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 9**

Kagan's gross negligence consisted of the conduct generally described in the Adversary Proceeding Complaint and Answer No. 3, all of which is incorporated herein by reference as if fully set forth herein. In addition, to the extent that Kagan did not intentionally defraud Filippov, Lipetsker and the LLC, incurring purported cost overruns of some $2.1 million on a construction project budgeted to cost a total of $3.2 million (which already included carrying costs and $200,000 for unforeseen cost overruns) without prior consultation with and approval by Filippov and Lipetsker is grossly negligent. Kagan was further grossly negligent in failing to complete construction on time and thereby missing the selling season in 2014. He was also grossly negligent with regard to keeping proper books and records.

**Interrogatory No. 10**

If you contend that Kagan acted with "willful misconduct" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 10**

Kagan's willful misconduct consisted of the conduct generally described in the Adversary Proceeding Complaint and Answer No. 3, all of which is incorporated herein by reference as if fully set forth herein.

**Interrogatory No. 11**

If you contend that Kagan did not act in "good faith" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 11**

Kagan's bad faith consisted of the conduct generally described in the Adversary Proceeding Complaint and Answer No. 3, all of which is incorporated herein by reference as if fully set forth herein.

Verification

I, Nickolay Lipetsker, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

N. Gilerey

Nickolay Lipetsker

*As to objections:*

/s/ Sean T. Carnathan
Sean T. Carnathan, BBO No. 636889
scarnathan@ocmlaw.net
Joseph P. Calandrelli, BBO No. 666128
jcalandrelli@ocmlaw.net
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T: (781) 359-9000

Dated: October 18, 2017

Certificate of Service

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on October ___, 2017.

/s/ Sean T. Carnathan
Sean T. Carnathan

# EXHIBIT 5

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| *In re:* | ) |
| | ) |
| LYMAN-CUTLER, LLC, | ) |
| Debtor, | ) |
| | ) |
| | ) Chapter 7 |
| | ) No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) A.P. No. 16-1120 |
| v. | ) |
| | ) |
| VADIM KAGAN, TATIANA KAGAN, | ) |
| KAGAN DEVELOPMENT KDC CORP., | ) |
| and PROEXCAVACTION CORP., | ) |
| | ) |
| Defendants. | ) |

### ALEX FILIPPOV'S ANSWERS TO VADIM KAGAN'S
### FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order, Alex

Filippov ("Filippov") responds to Vadim Kagan's ("Kagan") First Set of Interrogatories. Filippov's

responses are based upon information currently known. Discovery is ongoing. He reserves the right to

amend, modify, or supplement each of the responses set forth below.

### GENERAL OBJECTIONS

Filippov objects to the extent Kagan's First Set of Interrogatories purport to require Filippov to

respond on his own behalf as well as "alleged managing member" of Lyman-Cutler, LLC (the "LLC").

Kagan, and each of the other parties named above, has served separate discovery requests on the LLC.

Purporting to require Filippov to respond to these interrogatories on behalf of the LLC as well as on his

1

own individual behalf is unduly burdensome, needlessly duplicative, and in violation of the Court's Pre-Trial Order.  Filippov will respond to these interrogatories on his own behalf only.

Filippov further objects to the extent the "Instructions" section of Kagan's First Set of Interrogatories purport to impose on Filippov any obligation that exceeds those required by the Rules of Civil Procedure.  Filippov will respond in accordance with any obligations imposed by the Rules.

**ANSWERS**

**Interrogatory No. 1**

Please set forth, with complete detail, each and every communication between Filippov and Kagan regarding the Project.

**Answer No. 1**

Filippov objects to this interrogatory.  There were countless communications between Filippov and Kagan regarding the Project.  To require Filippov to identify each of them here is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, particularly as it relates to communications between the two parties that are not related to any topic that is at issue in this case.  Filippov agrees to meet and confer regarding a potential narrowing and more focused request for information.  With regard to written communications, the burden of deriving or ascertaining the answer is the same for Kagan as it is for Filippov, and Filippov refers Kagan to the documents produced pursuant to Fed. R. Civ. P. 33(c).

**Interrogatory No. 2**

Please itemize all damages which you seek to recover from Kagan, including in your response any pertinent calculations and the factual basis for those damages.

**Answer No. 2**

Filippov objects to this interrogatory as premature.  Discovery and expert analysis is ongoing.  In general terms, Filippov states the following:  The purported charges above the original budget are fabricated and fraudulent, or at best the product of gross negligence.  Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy.  The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

2

## Interrogatory No. 3

If you contend that Kagan conspired with KDC, ProExcavation and Tatiana, or any one of them, to defraud the Debtor, please identify all facts upon which you base that contention. Include in your response each act taken by Kagan in furtherance of the alleged conspiracy.

## Answer No. 3

Kagan controls ProExcavation Corp. ("ProExcavation") and Kagan Development KDC Corp. ("KDC"). Each entity has a separate legal existence and is treated as such. Kagan caused KDC to hire ProExcavation which agreed to perform certain excavation and site work on the Project. He then caused ProExcavation to knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC and knowingly and intentionally paid excessive sums to ProExcavation and then demanded even more excessive sums from the LLC and, indirectly, from me. Kagan furthered this conspiracy by permitting ProExcavation to perform the work, causing KDC to pay ProExcavation charges which Kagan and KDC knew to be falsely inflated, causing KDC to demand that sum be repaid to it by the LLC, and subsequently causing KDC to file a mechanics' lien and a proof of claim seeking to recover that amount from the LLC. Kagan similarly reached an agreement with KDC whereby KDC would hire subcontractors, vendors, and suppliers to perform certain work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC to use these purported expenses to demand additional money from the LLC and, indirectly, from me. Kagan furthered this conspiracy by permitting the subcontractors, vendors, and suppliers to perform the work, causing KDC to pay them charges which Kagan and KDC knew to be falsely inflated, causing KDC to demand that sum be repaid to it by the LLC, and subsequently causing KDC to file a mechanics' lien based in part upon alleged work that was performed long before the statutory deadline and a proof of claim seeking to recover that amount from the LLC. Kagan furthered this conspiracy by failing to keep proper books and records for the LLC, KDC and ProExcavation, failing to produce documentation when requested in keeping with his obligations under the LLC Agreement and his fiduciary duties, and by subsequently fabricating these books and records for the purposes of this litigation. Kagan and KDC also conspired to have KDC purportedly enter into a self-dealing, surreptitious written contract with the LLC which was never authorized, which violated the terms of the Rockland Trust agreement, which changed the project details without proper authorization, and which KDC now bases its claim for payment. Kagan furthered this conspiracy by causing both KDC and the LLC to sign this fraudulent document, by submitting requests for payment to Rockland Trust that stated all bills have been paid to date, and by causing KDC to seek to enforce the terms of that contract on the LLC when it knows that the LLC never agreed to the terms set forth therein. Kagan conspired with Tatiana when they reached an agreement for Tatiana to continue to serve as the LLC's agent far beyond the time permitted and authorized by the Operating Agreement, by agreeing to list the Properties for sale at a price that was never approved or authorized by the LLC, and by refusing to communicate a bona fide offer she did receive to the LLC. Kagan furthered this conspiracy by signing a fraudulent listing agreement with Tatiana and by participating in the decision to inflate the listing price and by knowingly failing to communicate a bona fide offer to the LLC.

3

**Interrogatory No. 4**

If you contend that Kagan defrauded Filippov, please identify all facts upon which you base that contention. Include in your response each act taken by Kagan in furtherance of the alleged fraud.

**Answer No. 4**

Kagan induced me to invest in the LLC by presenting a budget in October 2012 that Kagan represented was the maximum cost of construction and that he either knew was false at the time or, by subsequent conduct, became wrong when Kagan began fraudulently billing the LLC as set forth in Answer No. 3, above.

**Interrogatory No. 5**

Please identify each and every communication with Kristina Brusenkova regarding the Project, including the substance and dates of each such communication.

**Answer No. 5**

I first spoke with Ms. Brusenkova sometime in June or July 2015 after the original lawsuit was filed in state court. I do not recall the specific date. I understand that Ms. Brusenkova also spoke with my attorney following my conversation with her. The substance of what was communicated to me by Ms. Brusenkova is contained in her Affidavit, a copy of which I understand has been produced to Kagan's counsel. In or about July 2016, I was contacted by Ms. Brusenkova's counsel who asked if I would be willing to sign an affidavit in connection with a lawsuit that Kagan had filed against her. I agreed to do so. I understand that a copy of my affidavit has been produced to Kagan's counsel in that case.

**Interrogatory No. 6**

Please itemize all carrying costs you contributed to the Project, including the dates of each such contribution.

**Answer No. 6**

On or around May 7, 2015, I learned that Kagan had unilaterally decided to cease paying any further carrying costs for the Project. Since that time, I have paid $502,842.1 in carrying costs for the Project, as set forth below:

- Payments on Rockland Trust Commercial Construction Loan Nos. 320118900, 320118800, and 310764600 - $6,333.33 (5/18/15); $6,333.34 (5/18/15); $6,544.44 (6/18/15); $6,544.45 (6/18/15); $6,544.44 (6/18/15); $6,333.33 (11/5/15); $6,649.99 (11/5/15); $6,650.00 (11/5/15); $6,544.44 (11/18/15); $6,544.45 (11/18/15); $6,544.45 (11/24/15); $6,333.33 (12/17/15); $6,333.34 (12/17/15); and $6,333.33 (12/30/15) = Total of $90,566.66;

4

- Administrative fees - $38.09 (2/11/13); $212.45 (5/28/15); $5.95 (5/29/15) = Total of $256.49;

- Deposits to Rockland Trust Checking Account - $50,000 (7/16/15); $40,000 (7/30/15); $30,000 (8/26/15); $10,000 (8/26/15); $45,000 (9/15/15) = Total of $175,000;

- House-related items - $30.74 (9/4/15); $1.25 (9/4/15); $8.33 (9/11/15); $62.45 (9/13/15) = Total of $102.77;

- Bas, Doherty & Finks - $699.14 (11/4/15) = Total of $699.14;

- Sandberg & Creeden, P.C. - $1,000 (11/5/15) = Total of $1,000;

- Payments to Town of Brookline - $50.00 (11/5/15); $50.00 (11/5/15); $13,949.50 (11/5/15); $13,950.36 (11/5/15); $1,215.91 (11/19/15); $101.62 (11/19/15); $1,816.10 (11/19/15); $90.09 (11/19/15) = Total of $31,223.58;

- Insurance - $723.08 (11/9/15); $723.08 (11/9/15); $723.08 (12/17/15); $723.08 (12/17/15) = Total of $2,892.32;

- National Grid - $359.31 (12/17/15); $645.14 (12/17/15) = Total of $1,004.45;

- Mortgage to LLC on September 30, 2015 - $200,000 – Some of this was paid to the LLC; some of this was paid in cash directly to the U.S. Trustee.

**Interrogatory No. 7**

Please identify any and all communications with the Debtor regarding the note and mortgage which forms the basis for Claim No. 9. Include in your response the date of each such communication and the substance thereof.

**Answer No. 7**

In or around September 6, 2015, I had a conversation with Nickolay Lipetsker wherein we discussed the LLC's need for money. We agreed that I would loan another $200,000 to the LLC in exchange for a mortgage.

**Interrogatory No. 8**

Please identify each and every communication you had with Rockland Trust Company regarding the Project.

5

**Answer No. 8**

Filippov objects to this interrogatory because it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, particularly as it relates to communications between Filippov and Rockland Trust Company that are not related to any topic that is at issue in this case. Subject to and without waiving his foregoing objections, Filippov states the following: I had numerous communications with John McGregor at Rockland before construction on the Project began, mostly centered around the terms of the loans and the limits to my personal guarantees. Once the loans were issued, I spoke only sporadically to anybody at Rockland and it mostly had to do with the LLC's request to extend the loan because the Project had not yet been completed. I do not recall the specific dates of these communications. Further answering, and in accordance with Fed. R. Civ. P. 33, I refer to the emails between me and anybody at Rockland that have been produced during discovery.

**Interrogatory No. 9**

Please identify all actions you took to "monitor the withdrawal of funds," as alleged in paragraph 21 of the Adversary Complaint.

**Answer No. 9**

During the course of the Project, I would sign in to the LLC's account online and review the checks that had been issued under Kagan's direction and tried to keep my own record of the payments that were reflected on the account. It was difficult to discern what these charges were for. I asked Kagan and his agents on numerous occasions to provide me with the invoices and other backup documentation supporting these payments, but my requests were always refused. In the beginning, he would provide only copies of checks, but never any backup. After a while, Kagan refused to provide even the checks.

**Interrogatory No. 10**

Please identify any and all communications you had with Attorney Boris Maiden regarding the Project, including without limitation communications regarding the drafting of the Operating Agreement.

**Answer No. 10**

Filippov objects to this interrogatory because it is overly broad, unduly burdensome, and not reasonably calculated to lead to the discovery of admissible evidence, particularly as it relates to communications between Filippov and Attorney Maiden that are not related to any topic that is at issue in this case. Subject to and without waiving his foregoing objections, Filippov states the following: I had numerous communications with Attorney Maiden before the construction on the Project began. One such communication I recall occurred after I reviewed a draft of the Operating Agreement which provided for very little control I would have over the LLC's affairs. On November 1, 2012, after I voiced these concerns to Kagan, Nickolay Lipetsker, and Attorney Maiden, I received an email from Attorney Maiden asking whether I wanted to be appointed as the LLC's Manager. Further discussions

6

between the members and Attorney Maiden confirmed that I would serve as the LLC's Manager. Attorney Maiden then prepared a revised draft or drafts of the Operating Agreement which confirmed that I would serve as the LLC's Manager. Further answering, and in accordance with Fed. R. Civ. P. 33, I refer to the emails between me and Attorney Maiden that have been produced during discovery.

**Interrogatory No. 11**

For each and every person who you expect to call as an expert witness at trial, please state: (a) the identify of each expert by giving his/her name, address, specialty, and professional education and experience; (b) the subject matter on which each expert is expected to testify; (c) the substance of the facts and opinions to which each such expert is expected to testify; and (d) a summary of the grounds for each such opinion.

**Answer No. 11**

Filippov objects to subparagraphs (b) through (d) of this interrogatory to the extent any expert witness identified is required to provide a written report under Fed. R. Civ. P. 26(b)(2)(B) as the requested information in those subparagraphs is duplicative of the information required to be identified in the written report. Filippov further objects because this interrogatory is premature as the Court has set an expert disclosure deadline of December 31, 2017. The identity of any expert Filippov intends to call as a witness at trial will be made in accordance with the Court's ordered deadline.

**Interrogatory No. 12**

Please identify all communications regarding the October 25, 2012 presentation referenced in paragraph 12 of the Adversary Complaint, including any follow-up communications. Include in your response, any communications you had with Dmitriy Zhukovskiy.

**Answer No. 12**

Filippov objects to this interrogatory because it seeks communications between Filippov and his counsel that are protected by the attorney-client privilege and/or the work-product doctrine. Filippov further objects because it seeks communications between Filippov or his counsel and any experts consulted or retained for purposes of this litigation. Any such communications are protected from disclosure by the work-product doctrine and Fed. R. Civ. P. 26(b)(4). Subject to and without waiving his foregoing objections, Filippov states the following: Kagan agreed, on behalf of whatever company he was intending to do the work, to construct the Project at a fixed cost of $1.3 million per home, plus another $200,000 in carrying costs. This was represented to me by Kagan personally during our meeting in October 2012 when Kagan made his financial presentation as part of his inducement for me to invest in the Project. To the best of my memory, he said that the $1.3 million would be the true costs for construction, that he was able to state this based on his significant experience in the industry, and that any deviations from this would be extremely minor. We ultimately agreed to add $100,000 to the construction budget for each house for any potential overruns, but was told by Kagan that this money would be expected to be returned to the investors. In accordance with Fed. R. Civ. P. 33, I also refer to the emails that were produced.

**Interrogatory No. 13**

If you contend that Kagan acted with "gross negligence" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 13**

Kagan's gross negligence consisted of the conduct generally described in the Adversary Proceeding Complaint and Answer No. 3, all of which is incorporated herein by reference as if fully set forth herein. In addition, to the extent that Kagan did not intentionally defraud Filippov, Lipetsker and the LLC, incurring purported cost overruns of some $2.1 million on a construction project budgeted to cost a total of $3.2 million (which already included carrying costs and $200,000 for unforeseen cost overruns) without prior consultation with and approval by Filippov and Lipetsker is grossly negligent. Kagan was further grossly negligent in failing to complete construction on time and thereby missing the selling season in 2014. He was also grossly negligent with regard to keeping proper books and records.

**Interrogatory No. 14**

If you contend that Kagan acted with "willful misconduct" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 14**

Kagan's willful misconduct consisted of the conduct generally described in the Adversary Proceeding Complaint and Answer No. 3, all of which is incorporated herein by reference as if fully set forth herein.

**Interrogatory No. 15**

If you contend that Kagan did not act in "good faith" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 15**

Kagan's bad faith consisted of the conduct generally described in the Adversary Proceeding Complaint and Answer No. 3, all of which is incorporated herein by reference as if fully set forth herein.

<u>Verification</u>

I, Alexander Filippov, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Alex Filippov

*As to objections:*


*/s/ Sean T. Carnathan*
Sean T. Carnathan, BBO No. 636889
*scarnathan@ocmlaw.net*
Joseph P. Calandrelli, BBO No. 666128
*jcalandrelli@ocmlaw.net*
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T: (781) 359-9000


Dated: October 2, 2017




<u>Certificate of Service</u>

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on October 2, 2017.


*/s/ Sean T. Carnathan*
Sean T. Carnathan

9