UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ ) | | |
| *In re:* ) | | |
| ) | | |
| LYMAN-CUTLER, LLC, ) | Chapter 7 | |
| Debtor ) | Case No. 15-13881 FJB | |
| _____) | | |
| | | |
| _____ ) | | |
| ) | | |
| LYMAN-CUTLER, LLC, ALEX FILIPPOV, ) | | |
| and NICKOLAY LIPETSKER, ) | | |
| ) | | |
| Plaintiffs, ) | | |
| ) | Adv. Case No. 1:16-ap-01120 | |
| v. ) | | |
| ) | | |
| VADIM KAGAN, TATIANA KAGAN, ) | | |
| KAGAN DEVELOPMENT KDC, CORP. and ) | | |
| PROEXCAVATION CORP. ) | | |
| ) | | |
| Defendants. ) | | |
| _____) | | |

**PLAINTIFFS' OMNIBUS OPPOSITION TO DEFENDANT'S
MOTIONS TO DISMISS AMENDED ADVERSARY COMPLAINT**

Defendants Vadim Kagan ("Kagan"), Tatiana Kagan ("Tatiana"), Kagan Development KDC, Corp. ("KDC") and ProExcavation Corp. ("ProEx") have each separately moved to dismiss the First Amended Adversary Complaint against them (AP. Docs. 53, 55, 57, 59). Although each Defendant filed a separate motion to dismiss ("Motion"), inflicting on the Court a collective total of 83 pages of briefing in their memoranda in support, the Motions are quite repetitive. Each Motion makes the same argument (apparently verbatim with the names changed) with regard to standing and jurisdiction. Each Motion offers substantially the same challenges to the individual claims against them. Accordingly, the Plaintiffs respectfully submit this single, omnibus opposition to all four Motions.

1

The Defendants miss the mark with regard to standing because Lyman-Cutler, LLC (the "LLC" or "Company") is statutorily authorized to pursue its claims and has a pecuniary interest in the possible surplus.  This Court has already addressed and resolved the jurisdictional question.  The Amended Complaint details each Defendant's wrongdoing in a manner that more than satisfies the dictates of Fed R. Civ. P. 9(b) ("Rule 9(b)").  In any event, the claims against each Defendant encompass contractual and fiduciary duties with regard to which Rule 9(b) does not apply.  All four of the Defendants extensively argue disputed facts based upon partial evidence, which is wholly improper on a Rule 12(b)(6) motion.  The Motions should be denied on that ground alone.  In any event, the Defendants' contentions are meritless and the Court should deny all four Motions.

## FACTS

### I.   *The Company*

In 2012, Kagan and Nickolay Lipetsker ("Lipetsker") approached Alex Filippov ("Filippov") with a proposal to invest in a real estate development project they planned for a property in Brookline, Massachusetts.  *First Amended Adversary Complaint, 16-AP-01120-FJB (AP Doc. 52) ("Cmpt.")*, ¶ 11.  The project included purchasing a plot of land, subdividing the property in two, and constructing on each separate parcel a high-end single family home (the "Project").  *Id.*, ¶ 12.  On or about October 25, 2012, to induce Filippov and Lipetsker to invest in the project, Kagan presented to them a detailed budget and forecast of estimated returns on an investment in the Project (the "Kagan Presentation").  *Id.*, ¶ 14.  The Kagan Presentation represented that the homes would be built on a fixed cost for each home, with a $75,000 contingency for cost overruns.  *Id.*, ¶ 15.  A few weeks later, Kagan asked that the contingency

amount be increased to $100,000 for each home, but there was never any deviation from a fixed cost arrangement. *Id.*

Both Filippov and Lipetsker, as representatives of the LLC, reasonably relied on Kagan's Presentation when forming the LLC and deciding to invest in and undertake the Project. *Id.*, ¶ 17. Filippov agreed to invest $2 million. *Id.* Lipetsker and Kagan each agreed to invest $250,000. *Id.*; *Operating Agreement*, Schedule A, attached as <u>Exhibit 1</u> to KDC's supporting memorandum.

In November 2012, the three investors formed the LLC for the purpose of completing the Project. *Id.*, ¶ 16. In exchange for their respective investments, Filippov received an 80% interest in the LLC, and Kagan and Lipetsker each received 10%. *Operating Agreement*, Schedule A. As the majority owner, Filippov was named the LLC's Managing Member. *Cmpt.*, ¶ 18; *Operating Agreement*, p. 13 ("Alex Filippov, Managing Manager"). The Operating Agreement vested Filippov, as the Managing Member, with the overall "management and control of the operations of the [LLC]," which powers "shall include, but not be limited to," the authority to:

- engage, dismiss, and replace, personnel, including attorneys and brokers;

- execute all contracts; and

- "to take such other actions and incur such reasonable expenses on behalf of the Company as may be necessary or advisable in connection with the conduct of the affairs of the Company"

*Operating Agreement*, § 6.1(a) and (b)(1), (2), (3), and (5); *Cmpt.*, ¶ 18.

Kagan's fixed budget for the Project required $1.3 million for the construction of each home, $200,000 for carrying costs for each property and $100,000 for unexpected costs for each home. *Cmpt.* ¶¶ 19-20. Based on Kagan's figures, Kagan and Filippov agreed that the Company

would borrow a total of $4.8 million ($1.6 million for the construction and carrying costs of each property and $1.6 million to finance the balance of the land's purchase price). *Id.*, ¶ 21.

At no time since October 25, 2012 did Kagan ever provide to the Plaintiffs an updated budget or forecast for the costs of the Project. *Id.*, ¶ 22. At no time during construction of the homes did Kagan ever tell the Plaintiffs that there were any cost overruns on either of the houses. *Id.* To the contrary, as late as April 2015, a full six (6) months after construction was substantially completed, Kagan expressly told the Plaintiffs (through Filippov) that the construction and carrying costs for the two homes were within budget. *Id.* At no time did any of the Plaintiffs approve any change orders or cost overruns. *Id.*

Under the express terms of the Operating Agreement, Kagan was responsible for achieving substantial completion of the two new homes no later than March 30, 2014 in accordance with plans and drawings that had been approved by Filippov, so that the properties could be sold no later than November 2014 for a projected selling price of $4.9 million each. *Id.*, ¶¶ 25, 27. Although Kagan, through his construction company, KDC, failed to meet this mandated deadline, and failed to provide the Plaintiffs with any backup of the purported construction costs, Kagan continuously insisted throughout the construction process that the Project was within the forecasted budget. *Id.*, ¶¶ 22, 23, 25-27.

Meanwhile, throughout the life of the Project, Filippov had delegated to Kagan the check-writing authority on the LLC's bank account and he drew down funds from the account at will. *Id.*, ¶ 23. Although the LLC, through Filippov, attempted to monitor the withdrawal of these funds and tried to keep the books for the Project, Kagan failed and refused to provide any invoices, receipts, or other documentation for his withdrawals from the account. *Id.* During construction, Kagan drew down essentially all of the $3.2 million borrowed by the LLC, with the

lion's share of this being paid to KDC, one of his other companies, ProEx, and Kagan's long-time subcontractors. *Id.*, ¶ 24.

## II.    *The Unauthorized Listing Agreements*

Kagan's wife, Tatiana, is a real estate agent, as well as an officer, director, and owner of both KDC and ProEx. *Id.*, ¶¶ 1, 28. When the LLC was formed, Filippov and Lipetsker agreed to list the properties for sale with Tatiana but only **until December 31, 2014**, unless either Kagan or Lipetsker voted with Filippov to remove her prior to this date. *Id.*, ¶ 29; *Operating Agreement*, § 6.1(b)(6). Under the express terms of the Operating Agreement, Filippov, as the Manager, had exclusive authority to unilaterally remove Tatiana and retain a new listing agent any time after this date. *Cmpt.*, ¶ 29; *Operating Agreement*, § 6.1(b)(6).

Despite knowing that the LLC had agreed to list the Properties for sale for $4.9 million each, Tatiana and Kagan agreed, without consulting Filippov or Lipetsker, that Tatiana would set the selling price at $5.49 million, nearly $600,000 higher than had been authorized. *Cmpt.*, ¶ 30. In or about March 2015, Tatiana received an offer of $4.5 million for one of the properties. *Id.*, ¶ 29. Tatiana never informed Filippov of this offer and, working solely with her husband, countered at $5 million, causing the buyer to look elsewhere. *Id.*, ¶¶ 31-32, 36.

By April 2015, with neither home yet sold, and with little to no marketing being done, Kagan asked Filippov to sign a new listing agreement to permit Tatiana to continue to serve as the listing agent. *Id.*, ¶ 33. Exercising his right under Section 6.1(b)(6) of the Operating Agreement, Filippov refused and stated his intention to engage an alternative broker. *Id.* Without any authority, and with actual knowledge that Filippov had refused to authorize the new listing agreement, and that Filippov had the unfettered authority to refuse to consent to Tatiana's continued retention after December 31, 2014, Kagan fraudulently signed a listing agreement –

purportedly on the LLC's behalf – purporting to grant Tatiana an 18-month exclusive listing. *Id.*, ¶ 34. Tatiana knew that her husband lacked authority to sign this agreement, that Filippov, the only individual that did have authority, had refused to sign it, and that her authorization to market the properties had already expired. *Id.*, ¶ 35.

## III.    *The Fraudulent Cost Overruns*

On May 7, 2015, Kagan and KDC wrote to Filippov fabricating claims that it was Filippov, and not Kagan, who had set the original listing price too high and that he was wrongfully refusing to lower it. *Id.*, ¶ 36. Kagan and KDC also declared for the first time that there were significant cost overruns on the Project that exceeded **$1 million**. *Id.*, ¶ 37. This letter was sent (through counsel) knowing that Tatiana had procured an unauthorized listing agreement from the Company and knowing that the demands made therein would engender a dispute with the Plaintiffs. *Id.*, ¶ 38. Kagan stated the he would no longer pay the carrying costs, which was a violation of the Operating Agreement. *Id.* ¶ 37.

In June 2015, the LLC filed a lawsuit against the Defendants in state court. *Id.*, ¶ 39. Shortly thereafter, the Defendants produced for the very first time *another* listing agreement, purportedly signed by Kagan on August 12, 2014, granting an exclusive listing to Tatiana for a term of approximately 18 months – three times the length of an industry standard agreement. *Id.*, ¶¶ 39-42. The Kagans knew that this agreement was unauthorized and that Plaintiffs had never consented to keeping Tatiana on as the LLC's agent after December 31, 2014. *Id.*

Prior to answering the Complaint, on June 22, 2015, the Kagans caused their company, KDC, to file a mechanics lien against the LLC's properties, asserting in this lien that KDC was owed *$2,095,985.23*, nearly triple the amount that it had claimed as unreimbursed construction costs of $758,025.56 just six weeks earlier in May 2015. *Id.*, ¶ 43. The amounts claimed due,

which somehow tripled in a six-week period some eight months after construction was

completed, and which had never previously been reported to the LLC, are false and fraudulent,

and purportedly arise out of a written contract between the LLC and KDC, which Filippov, as the

Managing Member, never saw, approved, or signed. *Id.*, ¶¶ 43-44.

Kagan's fraudulent cost overruns are no mere accident. They are part of a scheme

designed to defraud the Plaintiffs. Indeed, the LLC and its members have interviewed several

witnesses who are former investors in Kagan's projects. *Cmpt.*, ¶ 45. As detailed in the

Affidavits that were filed in connection with the LLC's Opposition to the Defendants' original

motion to dismiss, all of them report that they have experienced the same type of fraudulent

conduct by Kagan that the Plaintiffs have experienced. *Id.* Specifically, multiple witnesses

report that Kagan presented them with a budget at the outset of the project, assured them that

everything was within budget during and after construction, and then, contrary to his prior

representations, announced extensive cost overruns shortly before the homes were sold and

threatened to file a lien unless his former investors agreed to the payment of these last minute

cost overruns. *Id.*

The Plaintiffs also interviewed Kagan's former bookkeeper. *Id.* ¶ 46. She has testified

under oath in an affidavit that Kagan uses ProEx as a vehicle to double-bill expenses to his

projects, mixes expenses for projects on his credit card, pockets for himself returns received on

unused materials, receives kickbacks from some of his subcontractors, and intentionally inflates

ProEx's excavation charges. *Id.*, ¶ 46. The Defendants use these extortionate tactics to

intentionally mislead investors and to wrongfully force them to pay falsified and fraudulent

charges. *Id.*, ¶¶ 44-46.

7

This is precisely the scheme the Defendants deployed here. *Id.* Kagan and Tatiana, who own and have complete control over both KDC and ProEx, abused their fiduciary position of power and trust to inflate charges and to fraudulently milk the Project for their own unjust enrichment. *Id.*, ¶ 48. For example, the supposed costs for the Project which support KDC's proof of claim, include approximately $900,000 for ProEx's alleged work – double any legitimate charges. *Id.*, ¶ 47. Despite multiple requests, neither ProEx nor any of the other Defendants have ever provided any meaningful support for these inflated charges, which are on their face at least double what any conceivably legitimate charge could be for its scope of work. *Id.* In sum, the cost overruns purportedly charged by the Defendants and included in KDC's proof of claim are false and fraudulent as they are rife with double billing, false and inflated charges, and ultimately forced the LLC to file for bankruptcy protection and sell its only two assets at a depreciated price. *Id.*, ¶¶ 49-50.

## IV.   *Procedural History*

On October 7, 2015, the LLC filed for Chapter 11 bankruptcy protection. D. Mass. Bankr. Case No. 15-13881-FJB. On October 21, 2015, the Court directed that a Chapter 11 Trustee be appointed, and on October 29, 2015, David Madoff was appointed as the Trustee. (Docs. 23, 29). On December 7, 2015, the bankruptcy proceeding was converted to Chapter 7. (Doc. 57).

On July 5, 2016, the LLC commenced this Adversary Proceeding. (AP Doc. 1). On July 13, 2016, this Court overruled the LLC's objections to the proofs of claim by Kagan, Tatiana, KDC and ProEx on the grounds that the LLC lacked standing, but held that Filippov and Lipetsker had a pecuniary interest in the resolution of the proofs of claim and standing to object to them. (Docs. 131-134). On July 22, 2016, Filippov and Lipetsker moved to intervene in the

Adversary Proceeding. (AP Doc. 5). On August 26, 2016, the Defendants moved to dismiss the Adversary Proceeding. (AP Doc. 13). On September 16, 2016, the Parties filed their Joint Statement under Rule 26 in both the Adversary Proceeding and the underlying bankruptcy, in which all Parties consented to this Court's jurisdiction to enter a final order on all controversies between the Parties. (Doc. 195; AP Doc 23).

On April 7, 2017, the Trustee abandoned the Estate's claims, returning control of the LLC back to Filippov, the LLC's Managing Member. (Doc. 206). On April 12, 2017, the Court issued an order reflecting that Filippov and Lipetsker's motion to intervene would be granted and directing them to file an amended complaint. (AP Doc. 26). On April 19, 2017, this Court raised the question of subject matter jurisdiction over the Adversary Proceeding in light of the Trustee's abandonment of the Estate's claims and ordered the Plaintiffs to show cause why the Court should retain jurisdiction over the Adversary Proceeding. (AP Doc. 29).

On August 21, 2017 (after a brief stay for the Parties to pursue mediation), the Plaintiffs filed a Joint Statement Regarding the Court's Jurisdiction in response to the Order to Show Cause. (Doc. 231; AP Doc. 38). After further briefing (Docs. 44 and 46) and a hearing on October 31, 2017, this Court entered an order on November 1, 2017 in which it retained jurisdiction over and declined to abstain from adjudicating the Adversary Proceeding. (AP Doc. 48). The Court held that to the extent the Adversary Proceeding was a form of counterclaim and set off against the Defendants' proofs of claim it is a core proceeding and that the equitable subordination is core as well. *(Doc. A.P. 48).*[1]

---

[1] To the extent the Adversary Proceeding results in any affirmative recovery above the amount of the proofs of claim, the Court reserved its ruling until after the close of evidence. (AP Doc. 48).

On November 21, 2017, the Defendants filed their four Motions, each of which raises the jurisdictional issue again.

## ARGUMENT

**I.     The LLC Is Statutorily Authorized To Prosecute This Complaint For The Purpose of Winding Down Its Affairs.**

By statute, the Company has standing to pursue the claims in the Adversary Proceeding. *G.L. c. 156C, § 45(b)* ("Upon dissolution and notwithstanding the filing of a certificate of cancellation pursuant to section 14, a limited liability company may continue its existence but shall not carry on any business except as necessary to wind up its affairs or distribute its assets which may include, but shall not be limited to, <u>prosecuting and defending suits . . .</u>") (emphasis added); *see also Beliveau v. Ware*, 87 Mass. App. Ct. 615, 619 (2015) ("General Laws c. 156C, § 43, requires a formal 'winding up' of the affairs of a limited liability company"); *In re Kane*, 2011 Bankr. LEXIS 2007, *17 (Bankr. D. Mass. 2011) (LLC remained in existence following administrative dissolution to wind up affairs).  Filippov, the LLC's Managing Member and majority interest holder, has the authority under G.L. c. 156C, § 56 and the terms of the Operating Agreement to pursue the claims in the Adversary Proceeding action on the LLC's behalf.  He (and Lipetsker) also plainly have a pecuniary interest in prosecuting the Company's claims against the Defendants as, at minimum, offsets against the proofs of claim the Defendants have filed against the Company.  (Doc. 131-134; AP Doc. 48).  Even if the sole remaining function of the LLC is to distribute the remaining funds among the various interest holders, this is a statutorily recognized function of an LLC winding up its affairs and does not divest it of standing to assert these claims.[2]  *See G.L. c. 156C, §§ 45(b) and 46.*

---

[2]     The parties briefed this issue in connection with Filippov and Lipetsker's motion to intervene [Doc. Nos. 46 and 47, Adversary Proceeding], which the Court allowed.

This Court's prior ruling regarding standing to object to the proofs of claim is a different

issue.  The Court's July 2016 ruling that the Company did not have standing to object to the

proofs of claim filed by the Defendants appears to be premised on the LLC's lack of a pecuniary

interest in how the assets of the Estate are distributed.  *See, e.g.,* Doc. 131 (stating that Filippov

and Lipetsker have standing to object because they have a pecuniary interest in how the assets of

the Estate are distributed).[3]  This concept is separate from the Company's standing to prosecute

claims, which is authorized by statute in connection with its wind down.

The Company has suffered wrongs that the claims in the Adversary proceeding seek to

right.  As matters are currently framed, the Company retains a pecuniary interest in the outcome

because there is the potential for the result of the resolution of the Adversary Proceeding and

proofs of claim to leave a surplus.  *See In Re Mark Bell Furniture Warehouse, Inc.*, 992 F.2d 7,

10 (1st Cir. 1993); *Cf. In re De La Salle*, 2012 Bankr. LEXIS 6124, at *7 (Bankr. E.D. Cal. June

15, 2012) (debtor in chapter 7 case may have pecuniary interest to object to proof of claim if

there could be a surplus).  Because there is the potential for a surplus, the Company has a

pecuniary interest in the Adversary Proceeding and standing to prosecute its claims.

## II.    The Defendants Have Already Consented To, And This Court Has Already Held, That It Has Subject Matter Jurisdiction.

The Court has already squarely raised, considered and resolved the jurisdiction issue after

hearing on October 31, 2017.  (AP Doc.48).  The Defendants' argument is an unacknowledged

motion for reconsideration, presenting the same facts and arguments that this Court has already

---

[3]      The other "ruling" the Defendants rely on, Doc. 151, does not hold that the LLC lacked
standing.  The entirety of the Order states, "By agreement of the parties, the objection is
overruled with respect to the Debtor but not with respect to the other objecting parties.  The
Court will issue a pretrial and scheduling order."

rejected and should reject again. *In re Genesys Research Inst., Inc.*, 2016 Bankr. LEXIS 2376, at

* (Bankr. D. Mass. June 24, 2016) ("In bankruptcy cases, courts in this district routinely hold

that motions for reconsideration are not 'a means by which parties can rehash previously made

arguments' and that to succeed on motions to reconsider, the movant must 'show newly

discovered evidence or a manifest error of fact or law.'"). The Parties previously briefed this

issue (which filings are respectfully incorporated herein by reference), and the Court resolved it.

(AP Doc. 48). Defendants offer no reason to reconsider the Court's ruling.

It bears repeating, nevertheless, that the Defendants long since consented to this Court's

exercise of jurisdiction "to enter a final order on all controversies between the parties." (Doc.

195, AP Doc. 23). *See Wellness Int'l Network, Ltd. v. Sharif*, 135 S. Ct. 1932, 1942-1945 (2015)

("[o]ur precedents make clear that litigants may validly consent to adjudication by bankruptcy

courts").[4]

## III.    The Plaintiffs Have Sufficiently Pleaded A Claim of Fraud Against Each of the Defendants.

In over 80 pages of briefing, the Defendants collectively allocate only 23 paragraphs over

17 pages to their argument that the Plaintiffs have failed to provide enough detail at the pleading

stage for them to be able to determine the factual basis of the Plaintiffs' claim for fraud. Twelve

(12) of those paragraphs are dedicated to reciting Fed. R. Civ. P. 9(b) pleading standard

applicable to fraud claims and the Defendants' plea that the Court deny the Plaintiffs discovery

---

[4]    In a footnote, the Defendants attempt to claim that their consent was ineffective and should be ignored. The primary case they cite as support pre-dates the Supreme Court's unambiguous decision in *Wellness Int'l Network* by more than a decade and does not even concern bankruptcy jurisdiction. The Supreme Court has made it perfectly clear that this Court's statutory grant of jurisdiction encompasses a final judgment on a counterclaim filed by the debtor against persons or entities filing proof of claims. *See Stern v. Marshall*, 564 U.S. 462 (2011).

to prove their allegations. Their arguments concerning the facts ignore the standard of review and incorporate references to the incomplete discovery done to date. Applying the review required by Rule 9(b) and Rule 12(b)(6) to the Amended Complaint demonstrates that it satisfies the pleading requirements to state viable claims for fraud and the Defendants' motions should be denied.

### A. The Amended Complaint States a Claim for Fraud Against KDC.

The purpose of Fed. R. Civ. P. 9(b) is simply to give defendants fair notice of the claims against them and to ensure "the defendant is sufficiently informed of the misconduct of which he is charged." *Kaufman v. Magid*, 539 F. Supp. 1088, 1093 (D. Mass. 1982). Rule 9(b) requires only that the Complaint specifically allege the time, place and content of any misrepresentation. As against KDC, the Complaint specifically alleges that KDC:

- Doubled billed the Company and submitted false and inflated charges. *Cmplt* ¶¶ 49, 66.

- Filed a fraudulent mechanic's lien against the Properties, forcing the Company into bankruptcy and resulting in the sale of the Properties below market value. *Id.*

- Signed a false and fraudulent construction contract (through Kagan signing for both sides of the deal), which contract contradicts the terms of the LLC agreement, and which KDC used to submit false claims for contractor fees and overhead of $625,221.52. *Id.* ¶ 66.

- Falsified its books and records to cover its fraud. *Id.*

The Complaint thereby states the time, place and content of the fraud and, therefore, fully satisfies Rule 9(b). KDC's *sole* substantive argument is that the Plaintiffs' <u>interrogatory responses</u> purportedly do not "identify a specific improper expense." *See KDC's Memorandum,*

at p. 15.  As an initial matter, this contention ignores the standard of review.  Fed. R. Civ. P.

12(b)(6); *Bielski v. Cabletron Sys. (in Re Cabletron Sys.)*, 311 F.3d 11, 33 (1st Cir. 2002) ("this

court has said repeatedly that the rigorous standards for pleading securities fraud do not require a

plaintiff to plead evidence.  Defendants' argument that even more detail be required, before there

is any discovery, here amounts to requiring plaintiffs to plead evidence").  If the Defendants

want to bring a motion for summary judgment, they should wait until discovery is complete.  *See*

Fed. R. Civ. P. 56(d).[5]

More importantly, this assertion is untrue even on the face of the Complaint.  *See Cmpt.*,

¶¶ 49, 64 and 66.  The Complaint identifies as false and fraudulent KDC's billing to the

Company, the mechanic's lien it filed (and asserts as a proof of claim before this Court), and

specifically the $625,221.52 it asserts based on the fraudulent construction contract.  *Id.*  The

Complaint specifically identifies the ProEx bills, which are asserted through KDC against the

Company, as double bills.  *Id.* ¶¶ 46, 47, 67.  KDC's challenge to the fraud allegations against it

is empty and its motion should be denied.

### B.  The Complaint Adequately Alleges Fraud Against ProEx.

The Complaint also states a claim for fraud against ProEx.  It is important to bear in mind

that the Kagans own and control both KDC and ProEx.  *Compl.* ¶ 48.  They have an obvious

opportunity to use their companies for fraudulent billing.  *Id.*  Their former bookkeeper has

testified that they do exactly that.  *Compl.* ¶ 46.  The Complaint squarely alleges that the Kagans

---

[5]       As of this writing, there remain serious discovery disputes between the Parties and much
discovery to be done.  Plaintiffs have significant evidence of fraud in hand, including testimony
from KDC's former bookkeeper, but require full discovery to state the sort of specific
conclusions that the Defendants demand while simultaneously refusing to comply with their
discovery obligations.

used ProEx as a vehicle for fraudulent, double billing, and that its total charges are double any

legitimate charge. *Compl.* ¶¶ 46-49, 67.

In response to these highly specific allegations, ProEx purports to demand even greater

specificity and again improperly goes outside the pleadings to cite allegedly inadequate

interrogatory responses. ProEx Memorandum [Doc. 58] at 16. ProEx's challenge is particularly

egregious, where it has never itself produced a single page of documents in response to the

Plaintiffs' document requests. Indeed, the only documentation of its charges that has been

provided to Plaintiffs despite over 2 years of litigation is Bate stamped as part of the Kagan

production and consists of Quickbooks vendor reports for each Property showing the total

charges and a "proposal" for each Property that does not match the total charges. The sum total

of these documents is attached hereto as <u>Exhibit 1</u>.

Plaintiffs have established that Kagan is the only employee of ProEx, and that his former

bookkeeper will testify that he routinely made up charges to his investors through ProEx and

used it for double billing. True copies of ProEx's Interrogatory Responses and the Affidavit of

Kristina Brusenkova are attached hereto as <u>Exhibits 2 and 3.</u> Given that Kagan is ProEx's only

employee and it has to date not produced a single page of documentation for its charges, one can

fairly infer that ProEx does not have any such documentation. It is unquestionably true that

ProEx is unfairly demanding that the Plaintiffs make highly specific allegations about facts that

are entirely in ProEx's possession and control (and which it refuses to produce). Rule 9(b)

requires no such allegations. *See Sternklar v. Heritage Auction Galleries, Inc. (In re Paul)*, 399

B.R. 81, 111-12 (Bankr. D. Mass. 2008), *aff'd in part and remanded sub nom In re Rarities Grp.,*

*Inc.*, 434 B.R. 1 (D. Mass. 2010) (particularity requirement relaxed where particulars in hands of defendant).[6]

### C. The Complaint Adequately Pleads Fraud against Kagan.

Kagan's arguments on the fraud claim are even more perplexing.  On one hand, Kagan claims that there are insufficient allegations of fraud against him.  On the other, he admits – repeatedly – that the Complaint contains a "laundry list" of actionable fraud allegations.  Kagan Memo at 11 (Doc. 60).

At the outset, the Complaint specifically alleges that on October 25, 2012, Kagan gave a detailed presentation to Filippov and Lipetsker to induce them to invest, which they relied upon to make their investments, and which was knowingly false.  *Compl.* ¶¶ 14-17, 45-50, 64.  As a result of Kagan's fraudulent inducement of their investment, and his subsequent fraud which includes encumbering the Properties with a fraudulent mechanic's lien for $2,095.958.23, the Company, Filippov and Lipetsker have suffered significant damages in connection with the bankruptcy proceeding and the distressed sale of the Properties below market value.  *Compl.* ¶¶ 43, 49.

The Complaint also alleges significant other fraudulent acts.  Kagan – as the co-owner, president, and director of both KDC and ProEx – is personally liable for the companies'

---

[6]    There is tremendous irony in ProEx's often repeated argument that the Plaintiffs do not know what work ProEx did to justify its over $900,000 in billing.  This is because at this point in discovery – after years of requests from the Plaintiffs – ProEx has not documented that it did anything at all.  We know that it has one employee – Kagan – and that any work billed by ProEx must have been done by subcontractors.  Yet ProEx has not produced a single page of documentation of the work it purports to have charged for.  Properly understood, as of this moment, the entirety of ProEx's charges are undocumented double billing.  Plaintiffs accept that ProEx can likely prove some of its charges are valid but to date it has yet to do so.  The burden is on ProEx to document its work, not on the Plaintiffs to speculate about exactly which elements of its double billing are fictitious.

fraudulent billing practices (as is Tatiana).  *See LaClair v. Silberline Mfg. Co.*, 379 Mass. 21, 29

(1979) ("a corporate officer is liable for torts in which he personally participated whether or not

he was acting within the scope of his authority").  The Complaint specifically alleges that Kagan

used KDC and ProEx to double bill the Company.  *Compl.* ¶¶ 45-49, 64.  He caused KDC to file

a fraudulent mechanic's lien.  *Compl.* ¶ 43, 64.  He signed a false construction contract with

KDC based upon which he asserts $625,221.52 in the fraudulent mechanic's lien and in the proof

of claim he caused KDC to file with this Court.  *Compl. ¶¶ 44, 64.*  He signed false and

unauthorized listing agreements with his own wife, knowing he had no authority to do so,

specifically to generate leverage and claims against the Company and Filippov and Lipetsker.

*Compl. ¶¶ 27-38.*[7]

Conspicuously missing from Kagan's motion is any argument for why Plaintiffs'

allegations about Kagan entering into the fraudulent listing agreement with Tatiana do not

sufficiently plead a claim for fraud.  Those claims, which are well pleaded in the Complaint, are

also sufficient to state a claim for fraud against Kagan.

### D.  *The Complaint Adequately Alleges Fraud against Tatiana.*

Much of Tatiana's argument concerns her position that she cannot be held liable for the

fraudulent presentation made by her husband.  Since Plaintiffs have not alleged otherwise, a

large portion of Tatiana's briefing is simply irrelevant.  Tatiana is, however, liable for her

individual participation in the fraudulent acts by KDC and ProEx, of which she is an owner and

director.  *Compl.* ¶ 65; *LaClair* 379 Mass. at 29.

---

[7]     Again ignoring the standard of review, Kagan attaches a construction contract to contend
that Filippov and Lipetsker did not rely on his false presentation in October 2012.  This contract
does not contradict Filippov and Lipetsker and more important, is not the false contract upon
which Kagan predicates KDC's false claim for over $625,000.

Tatiana is also liable for her conduct in knowingly accepting and enforcing listing agreements for the Properties that she knew her husband had no authority to execute. *Compl.* ¶¶ 28, 33-35, 40-42, 65. Tatiana's only real challenge to this allegation is that Plaintiffs' allegation that she "knew or should have known that [Kagan] did not have authority to sign the listing agreement and that Mr. Filippov refused to sign it" is, in Tatiana's view, "simply insufficient to comply with the requirements of Rule 9(b)." Decades of federal court jurisprudence prove Tatiana's position is wrong. Under Rule 9(b), "the other elements of fraud, such as intent and knowledge, may be averred in general terms." *Rodi v. S. New Eng. Sch. of Law*, 389 F.3d 5, 15 (1sti Cir. 2004); *see Fed. R. Civ. P. 9(b)* ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally").[8]

The fact that Tatiana can also be held liable for KDC and ProEx's fraudulent conduct as an owner and officer, *see LaClair, supra*, is – contrary to what Tatiana claims – not the "sole" basis of the fraud claims against her. They are an *additional* basis – one which is well grounded in fact for the reasons set forth above. The claims against Tatiana are well pleaded and comply with Fed. R. Civ. P. 9(b).[9]

---

[8]     Tatiana's insistence that she never signed the listing agreement is a red herring as she clearly accepted the benefits of the agreement. There is no dispute that Tatiana held herself out to the world as the listing agent for the two homes, received and communicated a counteroffer to a prospective buyer, and otherwise purported to act on the Plaintiffs' behalf. If Tatiana's position is going to be that she was never retained by the LLC following December 31, 2014, then she has participated in perhaps an even more egregious fraud by continuing to act on its behalf knowing she had absolutely no right to do so.

[9]     Tatiana also improperly relies on a variety of materials outside the Complaint. As is true with regard to all the Defendants, arguing disputed facts based on partial evidence is improper on a motion to dismiss and the Court should summarily reject all four motions as failing to argue in light of the proper standard of review.

## IV.    The Complaint Adequately Alleges Reliance.

All four Defendants also challenge the reliance element of the fraud claims.  Whether

Plaintiffs reasonably relied on the Defendants' fraud is a factual matter to be resolved at trial.

*See Grispino v. New Eng. Mut. Life Ins. Co.*, 2003 U.S. Dist. LEXIS 25664, (D. Mass. 2003)

(holding that reasonable reliance on oral statements that are later contradicted by written

statements "necessarily involves factual determination" that are "not amenable to disposition on

a motion to dismiss"); *see also Fin. Res. Network, Inc. v. Brown & Brown, Inc.*, 754 F. Supp. 2d

128, 152 (D. Mass. 2010) (holding that question of a plaintiff's reasonable reliance on

representation presents factual question for jury).

Kagan argues that Filippov and Lipetsker could not have relied on his fraudulent October

2012 presentation and, again ignoring the standard of review, Kagan attaches a construction

contract to his motion.  Kagan Memo (Doc. 60) at 1.  This contract does not contradict Filippov

and Lipetsker and more important, is not the false contract upon which Kagan predicates KDC's

false claim for over $625,000.  That contract, signed by Kagan for both the Company and KDC

is attached hereto as Exhibit 4.  In any event, his argument fails because he is improperly arguing

facts outside the allegations of the Complaint.

ProEx, KDC and Kagan contend that the Plaintiffs have failed to plead reliance on their

fraudulent charges.  But that is not true and once again, they improperly go outside the four

corners of the Complaint to try and shore up their argument.  The Complaint squarely alleges

that Kagan had control of the checkbook, drew down "essentially all of the $3.2 million

borrowed by the Company" and that the "lion's share of this sum was paid to KDC,

ProExcavation and to subcontractors hired by KDC."  *Compl.* ¶¶ 23-24.  The Complaint further

squarely alleges that the Kagans used KDC's and ProEx's charges to "fraudulently milk the

Project for [the Kagans'] unjust enrichment." *Compl.* ¶ 48.  There is no question that ProEx has been paid hundreds of thousands of dollars and that hundreds of thousands more are included in the KDC proof of claim (originally $2,095,985.23, later amended to $2,396,914.66) and the fraudulent mechanic's lien ($2,095.958.23), which forced the Company into bankruptcy in the first place and forced the sale of the Properties below market value.  *See Compl.* ¶¶ 46-49.

The reliance here is inflicted by Kagan, upon whom the Company, Filippov and Lipetsker relied in entering into the Project and upon whom they are, as a matter of law, entitled to rely upon because he is a fiduciary to all three Plaintiffs.  *See Demoulas v. Demoulas Super Markets*, 424 Mass. 501, 519-20 (1997) (fiduciary duty includes full disclosure and a fiduciary's failure to make full disclosure is fraud); *see also Amusement Indus. v. Buchanan, Ingersoll & Rooney, P.C.*, 2013 U.S. Dist. LEXIS 8569, at *38 (S.D.N.Y. Jan. 22, 2013)  ("Due to this fiduciary relationship, [plaintiff] could justifiably rely — without further investigation — on the truth of [defendant]'s statements and could properly assume that Friedman would disclose all material information"); *Frame v. Maynard*, 83 A.D.3d 599, (N.Y. Sup. Ct. App. Div. Apr. 28, 2011) (cross claimants "as beneficiaries of this fiduciary relationship, were entitled to rely on [the fiduciary]'s 'representations and his complete, undivided loyalty'").  Up to the point where the Company ran out of money, Kagan caused it to pay his own Company's invoices.  When the money ran out, he piled on with false claims that he asserts to this day to this Court.  He cannot be heard to say that he cannot be called account for this fraud because his victims did not "rely" on it.

As explained by Judge Posner of the 7th Circuit, actual fraud is

> **any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another**. . . No learned inquiry into the history of fraud is necessary to establish that it is not limited to misrepresentations and misleading omissions.  Fraud is a

> generic term, which embraces all the multifarious means which human
> ingenuity can devise and which are resorted to by one individual to gain
> an advantage over another by false suggestions or by the suppression of
> truth.  No definite and invariable rule can be laid down as a general
> proposition defining fraud, and it includes all surprise, trick, cunning,
> dissembling, and any unfair way by which another is cheated.

*McClellan v. Cantrell*, 217 F.3d 890, 893 (7th Cir. 2000) (emphasis added); *see also In re: Lawson*, 791 F.3d 214, 220 (1st Cir. 2015) (actual fraud "is not limited to fraud effected by misrepresentation").  *See e.g., In re: Lawson*, 791 F.3d at 225 (actual fraud includes fraudulent conveyances); *Beal Bank, SSB v. Pittorino*, 177 F.3d 65, 69 (1st Cir. 1999) (same); *Bailey v. Community Bank of Homewood-Flossmoor*, 145 B.R. 919, 927 (Bankr. N.D. Ill. 1992) (denying debtor discharge based on actual fraud for his participation in fabricating fraudulent mechanics' lien); *In re Maher*, 144 F. 503 (D. Mass. 1906) ("In a fraudulent transfer the fraud is actual, the bankrupt has secured an advantage for himself out of what in law should belong to his creditors, and not to him").  Asserting a false mechanic's lien is not only fraudulent, but it also can carry with it criminal penalties.  *See e.g., Cordeck Sales, Inc. v. Construction Sys., Inc.*, 382 Ill. App. 3d 334, 399 (Ill. App. Ct. 2008) ("[w]hen there is evidence that a lien claimant knowingly recorded a claim that contained a substantial overcharge, the claim will be defeated on the basis of constructive fraud the effect of his actions is to give an appearance of a greater encumbrance on the property than that to which he is entitled"); *Marsh v. Mick*, 159 Ill. App. 399 (Ill. App. Ct. 1911) ("in asserting that claim in his petition for a [mechanic's] lien, we think that O'Meara was guilty of fraud"); *United States v. Joiner*, 418 F.3d 863, 867 (8th Cir. 2005) (attempting to create fraudulent real estate lien is criminal); *Vasquez v. The State of Texas*, 2008 Tex. App. LEXIS 3948 (Ct. App. Tex. 2008) (affirming 7-year criminal sentence for filing a fraudulent mechanics' lien).

## V.      The Complaint Plainly Alleges Damages.

The four Defendants also claim that the Complaint does not allege damages.  It plainly

does.  It alleges that the billing by KDC and ProEx is false and inflated, that the fraudulent

mechanic's lien (based upon these false charges) forced the Company into bankruptcy, and that

the distressed sale of the Properties resulted in them being sold below market value.  *Compl.* 49-

50; *see Wilson Farm Cmty. Trust v. Marchegay*, 2014 Mass. Super. LEXIS 115 (Mass. Super.

Aug. 25, 2014) (rejecting defendant's motion for j.n.o.v. on fraud claim based on purported lack

of detrimental reliance when fraudulent request for money was not paid, holding that "[t]his

argument ignores the efforts the plaintiff was forced to undertake as a result of [the defendant's]

fraudulent act, including the request for a temporary restraining order that set this case in

motion."); *see also Restatement (Second) of Torts, § 871* ("One who intentionally deprives

another of his legally protected property interest or causes injury to the interest is subject to

liability to the other").

From a conceptual standpoint, by fraudulently overbilling, signing false contracts,

accepting the benefits of a knowingly falsified contract, and recording the fraudulent mechanic's

lien (not to mention fraudulent proofs of claim in the bankruptcy proceeding), the Defendants

fraudulently conveyed the properties' value to themselves at the expense of the Plaintiffs.  *See*

*Bailey v. Community Bank of Homewood-Flossmoor*, 145 B.R. 919, 927 (Bankr. N.D. Ill. 1992)

("In effect, the perfection of the mechanic's lien caused a transfer of all of the Debtor's assets

without reservation for necessities").  Defendants' challenge to the damages component of the

claim again improperly relies upon arguing facts outside the Complaint and should be rejected.

*See, e.g.*, Kagan Memo (Doc. 60) at 15.

**VI.    The Complaint Alleges Claims for Breach of Contract, Tort and Equitable Surbordination.**

Apart from the allegations of fraud reviewed under Rule 9(b), the Court reviews the claims against the Defendants under Fed. R. Civ. P. 8, which requires simply a "short plain statement of the claim showing the pleader is entitled to relief. *Artuso v. Vertex Pharmaceuticals, Inc.*, 637 F.3d 1, 5 (1st Cir. 2011). There is no doubt that the Complaint alleges proper claims for breach of contract and various torts against each of the Defendants.

**A.    *The Conspiracy Claim Is Supported By The Numerous Allegations Set Forth Throughout The Entire Amended Complaint.***

Under Massachusetts law, a conspiracy claim requires evidence of "an agreement between two or more people to do a wrongful act and proof of some tortious act in furtherance of the agreement." *Metropolitan Prop. & Cas. Ins. v. Boston Reg. Phys. Therapy*, 550 F. Supp. 2d 199, 202 (D. Mass. 2008). The Amended Complaint alleges a detailed conspiracy among all of the Defendants to execute false contracts and submit false bills to the Company. The Defendants' challenge to the conspiracy claim requires that they focus solely on a single paragraph – paragraph 70 – as if it were alleged in a vacuum. Reading the Complaint as a whole outlines a concerted strategy among the four defendants to hoodwink Filippov and Lipetsker into investing in the Project, assuring them that the Project was on budget until well after construction was complete, then pile on with false claims for inflated, double billing charges, and inflict extortionate tactics upon them to try and force them to agree to these false charges – specifically by executing false contracts with KDC and Tatiana and hitting the Properties with a huge, fraudulent mechanic's lien. *Compl.,* generally. They have a history of doing this to their investors that shows this was a coordinated plan from the beginning. *Compl.* ¶ 45. Contrary to the Defendants' contentions, the conspiracy claim is compelling and well pleaded.

**VI.    The Complaint Alleges Viable Claims Under Chapter 93A against KDC, ProExcavation and Tatiana.**

The Complaint plainly alleges viable claims under Chapter 93A against three non joint venturer Defendants – KDC, ProEx and Tatiana.  They challenge the Chapter 93A claims against them, arguing that the fraud is not pleaded with sufficient specificity, the fraudulent billing is a "garden variety breach of contract," and there is no allegation of extortionate conduct.  None of that is remotely true.   The Amended Complaint details an intentional, knowing scheme designed to unlawfully line the Kagans' pockets at the expense of the Plaintiffs and explicitly alleged extortionate tactics to force the Plaintiffs to accept their fraudulent charges, including executing false contracts and filing a false mechanic's lien.  *See Compl.* ¶ 38 (Tatiana and Kagan knowingly signed false listing agreement to give themselves leverage just before sending the false demand for overages), ¶ 44 (Kagan signed false construction contract with himself), ¶ 45 (multiple other investors report same tactics), 46 (former bookkeeper reports double billing, inflation of charges and kickbacks), 48 (Tatiana and Kagan inflated charges to milk Project), 49 (false mechanic's lien forced Company into bankruptcy), 50 (Kagan planned this all along), 65-67 (individual participation in fraudulent acts).  The Defendants' challenge to the Chapter 93A claim is meritless.

**VII.    The Plaintiffs Have Sufficiently Pleaded A Claim for Breach of Fiduciary Duty by Kagan and Aiding and Abetting that Breach by the Other Defendants.**

The Court should reject the Defendants' challenge to the fiduciary duty claims.   Kagan purports to challenge the breach of fiduciary duty claim against him on the ground that fraud is not pleaded with sufficient specificity against him.  In the first place, this is not true.  The Complaint makes detailed allegations of fraud by Kagan.  In the second place, the Complaint alleges self-dealing and, at best, grossly negligent conduct by Kagan that constitute a breach of

his fiduciary duties of care, loyalty and full disclosure, even if one makes the (unlikely) assumption that he is not engaged in knowing fraud. *See Demoulas v. Demoulas Super Mkts.*, 424 Mass. 501, 529 (1997) ("corporate directors and officers are bound by their duty of loyalty to subordinate their self-interest to the well being of the corporation"); *NRT New England, Inc. v. Moncure*, 78 Mass. App. Ct. 397, 402 (2012) (self-dealing is a breach of fiduciary duty). Kagan controlled the construction and the checkbook and ran up an alleged overage of $2.1 million above a budget of $3.2 million – a massive overrun – without ever consulting his co-venturers. He failed to complete construction on time. He signed self-dealing contracts with his construction company and his wife. *Compl*. ¶¶ 15-44. Rule 9(b) does not apply to non-fraud-based allegations underpinning a claim for breach of fiduciary duty. *N. Am. Catholic Educ. Programming Found., Inc. v. Cardinale*, 567 F.3d 8, 16 (1st Cir. 2009); *In re Stratus Computer*, 1991 U.S. Dist. LEXIS 21587, at *20-21 (D. Mass. Dec. 10, 1991). Even if the Court ultimately concludes after trial that Kagan did not commit knowing and intentional fraud (an outcome the Plaintiffs respectfully submit is unlikely in the extreme), he still breached his fiduciary duty through his self-dealing and gross negligence in managing the construction. The Complaint contains those allegations and the Court should reject Kagan's challenge to the breach of fiduciary duty claim.

The other Defendants argue that they did not actively participate or substantially assist him in his breaches, but the Complaint alleges otherwise in careful detail. Kagan's breach of fiduciary duty and fraudulent scheme could not have been completed without the active participation of each of the Defendants. *MAZ Partners LP v. Shear*, 2016 U.S. Dist. LEXIS 118191, at *32-33 (D. Mass. Sept. 1, 2016) ("defendant must actively participate or substantially

assist in or encourage the breach to the degree that he or she could not reasonably be held to have

acted in good faith").

**VIII.**  **Kagan Breached The Express Terms of the Operating Agreement.**

The Court should also reject Kagan's challenge to the breach of contract claim.  *See*

*Compl.* 54 (outlining 7 breaches of the LLC Agreement by Kagan).  Kagan does not even

address the allegation that he breached his contractual obligation to pay the monthly carrying

costs when the Properties did not sell within 23 months.  *See Cmpt.*, ¶ 54(g).  Section 8.1 of the

Operating Agreement unambiguously provides, "***In the event that the property is not sold within***

***twenty-three (23) months from the date of acquisition, then Mr. Kagan shall be responsible for***

***all carrying costs until such time as the property is sold.***"  *Operating Agreement*, § 8.1

(emphasis in original).  Kagan's brief does not mention this allegation at all.

He primarily claims that he cannot be liable for failing to complete construction on time

because the Operating Agreement specified a date for "substantial completion."  Kagan Memo

(Doc. 60) at 17.  This argument is baseless.  All construction contracts are measured by their date

of substantial completion.  *See e.g., G.L. c. 254, § 2A* (defining "substantial completion" as the

date by which the property can be occupied and measuring the time for filing of mechanics' liens

by the project's substantial completion date); *G.L. c. 260, § 2B* (statute of repose for construction

claims triggered by substantial completion date); *MCLE Damages, Interest & Attorneys Fees in*

*Mass. Litigation*, § 5.1 ("The duration of the project is usually measured from the date of the

contract (or the date designated in the notice to proceed) to the date of substantial completion,

not final completion").  The Operating Agreement clearly sets forth an obligation to achieve

substantial completion by March 30, 2014.  *See Operating Agreement*, § 5.2 ("The construction

shall be substantially completed no later than March 30, 2014"). In any event, the homes were

not "substantially" completed until October 2014, more than six months after the deadline.

Kagan also argues that he did not breach the Operating Agreement by signing

unauthorized contracts or running up (fraudulent) unquestionably unauthorized purported cost

overruns. The Operating Agreement grants to Filippov, as the Managing Member, the exclusive

power to "execute any agreements, instruments or documents" necessary to improve the property

owned by the LLC. *Id.*, § 6.1(b)(3). It also vests him with the authority to "engage, dismiss, and

replace personnel, attorneys, accountants, ***brokers*** or such other persons as may be deemed

necessary" for the LLC's benefit. *Id.*, § 6.1(b)(1). It is Filippov, and not Kagan, who has the

right to "draw checks and other orders for the payment of money," "incur reasonable expenses

on behalf of the Company," and to approve all of the LLC's distributions. *Id.*, §§ 6.1(b)(2), (4),

and (5). Kagan was expressly responsible for overseeing the construction, and he was to do so

only in accordance with the construction documents "supplied by Mr. Kagan and approved by

the Managing Member [Filippov]." *Id.*, § 5.2. These construction documents, Plaintiffs allege,

required a maximum price of $1.6 million for each home. Section 5.2 also expressly provides

that Kagan's compensation for constructing the homes was his interest in the profits from the

LLC as set forth in Section 8.1 Kagan's extortionate campaign was designed to extract

compensation from the LLC to which he was not entitled in violation of the Operating

Agreement. There can be no question that Plaintiffs have sufficiently stated a claim for breach

of contract against Kagan.

KDC's contention is even more audacious where it argues that it cannot be held liable for

breach of contract because Plaintiffs have alleged that the KDC contract is a product of Kagan

and KDC's fraud. The fact that Kagan and KDC have long been trying to fraudulently extort

$625,221.52 from the Plaintiffs based upon a fraudulent contract does not relieve KDC of the

obligation to have built the homes in a good and workmanlike manner.[10]

### IX.   As Claimants and Interest Holders, Filippov and Lipetsker Each Have Standing to Assert A Claim for Equitable Subordination.

Contrary to Defendants' statements, "the power of equitable subordination, codified at 11

U.S.C. § 510(c), allows a bankruptcy court to relegate even a secured claim to a lower tier, even

to the lowest – the equity tier." *In re Lifschultz Fast Freight*, 132 F.3d 339, 342 (7th Cir. 1997).

However, even assuming, *arguendo*, that the Court could not equitably subordinate an allowed

claim to an allowed interest (which the Plaintiffs dispute), the statute expressly permits a Court

to equitably subordinate an allowed claim to another allowed claim and an allowed interest to

another allowed interest. *See 11 U.S.C. § 510(c)* ("after notice and a hearing, the court may – (1)

under principles of equitable subordination, subordinate for purposes of distribution all or part of

an allowed claim to all or part of another allowed claim or all or part of an allowed interest to all

or part of another allowed interest"). Filippov has filed both a proof of claim and a proof of

interest. Lipetsker has filed a proof of interest. Each of the Defendants have filed a proof of

claim, and Kagan has filed a proof of interest. Both Filippov and Lipetsker therefore have

standing to assert a claim for equitable subordination. Whether there ultimately is enough assets

remaining in the LLC to satisfy each of these claims and interests regardless of order is yet to be

conclusively determined.[11] As this Court already held in its jurisdictional ruling, the resolution

---

[10]   In keeping with the Defendants' approach to this Rule 12(b)(6) motion, KDC also argues facts outside the Complaint. The Plaintiffs repaired the poor workmanship before the homes were sold and KDC's argument is not only procedurally improper but factually misleading.

[11]   Each of the Defendants, for example, have filed a proof of claim for indemnification in an undetermined amount for the attorneys' fees incurred in this matter. Though Plaintiffs deny that Defendants are entitled to any indemnification, the monetary amount of the claim continues to increase as this case proceeds.

of the equitable subordination claims "arises in the bankruptcy case and is itself a core

proceeding, necessary to a determination of the priority of claims and interests."  (AP Doc. 48).

### CONCLUSION

For the foregoing reasons, the Court should deny the Defendants' four renewed Motions

to Dismiss in their entirety.


LYMAN-CUTLER, LLC,                          ALEX FILIPPOV and
By its attorney,                           NICKOLAY LIPETSKER,
                                           By their attorneys,



/s/ Peter Tamposi                          /s/ Sean T. Carnathan
Peter N. Tamposi, BBO No. 639497           Sean T. Carnathan, BBO No. 636889
The Tamposi Law Group, P.C.                scarnathan@ocmlaw.net
159 Main Street                            Joseph P. Calandrelli, BBO No. 666128
Nashua, NH 03060                           jcalandrelli@ocmlaw.net
T: (603) 204-5513                          O'Connor, Carnathan and Mack, LLC
                                           1 Van de Graaff Dr. Suite 104
                                           Burlington, MA 01803
                                           T:  781-359-9000

Dated:  December 20, 2017



Certificate of Service


I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing and
paper copies will be sent to those indicated as non-registered participants on December 20, 2017.


                              /s/ Sean T. Carnathan