# EXHIBIT 3

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS                                                    SUPERIOR COURT DEPT.
                                                                C.A. No.  1581CV03977

```
                                          )
LYMAN-CUTLER, LLC,                        )
                                          )
             Plaintiff,                   )
                                          )
    v.                                    )
                                          )
VADIM KAGAN, TATIANA KAGAN, and           )
CENTURY 21 COMMONWEALTH                    )
                                          )
             Defendants.                   )
                                          )
```

## AFFIDAVIT OF KRISTINA BRUSENKOVA

I, Kristina Brusenkova, under oath, state as follows:

1.      I am over the age of 18 and make the following statements based upon my own personal knowledge.

2.      I formerly served as the bookkeeper for Kagan Development KDC Corp. ("KDC"). I started out working for a company that provided accounting services to KDC, and then joined KDC as its bookkeeper at or about the beginning of 2014. I served as the bookkeeper for KDC until October 2014, when Mr. Kagan and his wife Tatiana abruptly fired me when I informed them that I was pregnant with Mr. Kagan's child. I later lost the baby due to the stress of the way they treated me.

3.      As KDC's bookkeeper, I kept track of the expenses and the invoices for each of Vadim Kagan's projects, including the Lyman-Cutler LLC project. The Lyman-Cutler project involved building two new houses on Lyman Road and Cutler Avenue. I also kept the books for ProExcavation and for all of Mr. Kagan's and his wife, Tatiana's, personal accounts.

4.      Vadim Kagan had two main companies when I worked for him -- KDC and ProExcavation. Neither company had many employees.  When I worked at KDC, other than Vadim Kagan, and myself, the only other employees were Yegeniy Augureev and Ryan O'Grady (until he was fired).  ProExcavation's only employee was Mr. Kagan.  The actual construction and excavation work on the projects was done by subcontractors hired by Mr. Kagan.

5.      All records were kept only on the copy page in the checkbooks. Upon completion of construction, cost estimates were calculated based on data that had been recorded in the checkbooks KDC would create invoices from the amounts in the checkbook, but if the amount seemed too low to Mr. Kagan, he would cut another check and add it to the invoice. When I first started to do the bookkeeping, I found a lot of missed amounts and we issued a lot of additional invoices to the investors (example, Hyde Ave).

6.      Mr. Kagan's standard practice for each project was to form a limited liability company to own the property.  He usually had investors who would invest the cash necessary to fund the project, along with bank loans.  Sometimes Mr. Kagan did a project on his own without outside investors.

7.      On projects where Mr. Kagan had outside investors, he regularly double-billed those projects by submitting invoices from ProExcavation for work that he also billed to the Project through KDC or for which he also directly submitted the subcontractor's bills for payment by the Project.

8.      For example, all of the landscaping work was done through and billed to the projects by ProExcavation. I have reviewed some Quickbooks reports for the Lyman-Cutler project and it appears to me that Mr. Kagan billed the project twice for excavation and landscaping work -- once through ProExcavation and once directly from KDC for the payments to the subcontractors who did

2

the work. The double billing increased in July 2014 when ProExcavation ran into financial trouble.

9.    On projects where Mr. Kagan had investors, he paid more to the survey company for the same work that he would pay less for on his projects.

10.    Mr. Kagan was close personal friends with some of his subcontractors and he would some times pay them more than the job was worth and have them kick back some of the payment to him in cash.

11.    I also know of at least one instance in which Mr. Kagan submitted a claim to an insurance company for damage to a property in double the amount necessary for the repairs, then kept the extra insurance money and then also included the damage to the property in the project expenses to decrease the profit on the project. He said "now we have enough funds to travel." He also confessed to me that he had caused the damage to the property intentionally -- he had someone stuff a rag in the sink and leave the water on and claim it was accident.

12.    Mr. Kagan bought materials using his American Express card but did not keep track of which project the materials were for. He would arbitrarily assign costs to projects. He also would regularly get credits to his account for returns that he would keep for himself and not credit back to his projects. He used to refer to these credits as his "commissions."

13.    Mr. Kagan also received refunds from NStar or National Grid on all of his projects, which he kept for himself and did not credit back to the project.

14.    When Mr. Kagan submitted bills to projects for ProExcavation, he would arbitrarily charge whatever fee he felt like he could get away with. There was no direct connection between the charge submitted to the project and the costs that KDC or ProExcavation had incurred for materials or for paying the subcontractors. It started when he was doing a project on Florence Street and encountered a rock. He doubled the excavation price and noticed the investor did not

have enough force to confront him. After that, he started to bill instead of regular price of $200,000.00 - 250,000.00 - more than $400,000.00 for every house.

15.     Mr. Kagan rarely had written invoices or estimates with his subcontractors. He would agree with them on a price and pay them in installments as he had money. When I became the bookkeeper I tried to insist on written proposals but I did not always succeed.

16.     Sometimes if Mr. Kagan did not have enough money to pay the subcontractors on one project, but he had money on another project, he would pay them ahead of time for work they had not yet done on the project where he had money in order to keep them happy. I have reviewed some Quickbooks reports from the Lyman-Cutler project and it appears to me that he paid the subcontractors before they did work on the Lyman-Cutler project.

17.     Mr. Kagan was responsible for paying the carrying costs on his deals, and would borrow more money from the bank than the construction required in order to pay the carrying costs. He did that on the Lyman-Cutler project. He would prepare one budget for the bank and another for his investors. At some point in each project, he would ask investors to contribute toward the carrying costs.

18.     When I was working for KDC, I used an email address, Kagandevelopment@gmail.com, which should have a lot of emails with attachments that will help document the costs on the project and should also include copies of Quickbooks files.


**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS _4_ DAY OF JULY, 2015.**


_____
Kristina Brusenkova