UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>LYMAN-CUTLER, LLC,<br><br>    Debtor. | Chapter 7<br>No. 15-13881-FJB |
| LYMAN-CUTLER, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>VADIM KAGAN, TATIANA KAGAN,<br>KAGAN DEVELOPMENT KDC, CORP.<br>and PROEXCAVATION CORP.<br><br>    Defendants. | Adv. Proc. No. 16-01120 |

**MOTION TO QUASH SUBPOENA DUCES TECUM
SERVED ON JASON GORDON, S. GORDON CORPORATION**

Now come Vadim Kagan ("Kagan"), Tatiana Kagan ("Tatiana"), ProExcavation Corp. ("ProExcavation") and Kagan Development KDC, Corp. ("KDC") (collectively, Kagan, Tatiana, ProExcavation and Kagan shall be referred to herein as the "Kagan Parties") and move, pursuant to Rule 26(c) of the Federal Rules of Civil Procedure, made applicable to these proceedings by Rule 7026 of the Federal Rules of Bankruptcy Procedure, to quash and/or limit the subpoena deuces tecum served on Jason Gordon, S. Gordon Corporation ("Gordon"). A copy of the subpoena is annexed hereto as Exhibit 1. Mr. Gordon is an accountant who provides corporate accounting services for KDC and ProExcavation, as well as individual accounting services for Kagan and Tatiana. As set forth below, the requests for documents is impermissibly broad and

{S1075134.2}

part of an improper fishing expedition upon which plaintiffs have embarked. The request for documents is not limited to information relating to the single project at issue in this dispute. Rather, it seeks to intrude on over twenty unrelated projects and the personal lives of Tatiana and Kagan. Additionally, Mr. Gordon reports that to respond to the overbroad subpoena served on him will take him dozens of (unpaid) hours which would greatly impact his ability to service his other clients. Gordon Aff., ¶6. Gordon is an accountant with a business that is dramatically seasonal in nature. He advises that this particular time of year is extremely busy and expects that it would be near impossible to comply with the subpoena without sacrificing his duty to his clients and family. Id.

In addition to the extensive time necessary for Mr. Gordon to respond, this subpoena will also mandate the expenditure of extensive resources in terms of time and personnel for the Kagan Parties if all of a sudden all twenty unrelated projects which were ongoing during the pertinent time are somehow dragged into this dispute. See Gordon Aff., ¶¶6-7; Gersh Aff. ¶2. Given the complete lack of any facts to support the allegations that have been asserted in this action, and that all of the pertinent information has already been provided in other forms, this subpoena is pure harassment and represents an impermissible fishing expedition. Additionally, the time ranges of documents requested are not narrowly tailored to the time frame of this project.

Finally, until this Court rules on the pending motions to dismiss, discovery should be stayed as depending on what the Court rules, the scope of discovery may be significantly narrowed. Moreover, as the motions to dismiss are still pending, the Kagan Parties have not yet responded to the complaint. When they do, they anticipate filing a counterclaim. Allowing discovery even before the issues in dispute are joined is inefficient and improper. The Kagan

Parties also provide herein an alternative less onerous suggestion if the Plaintiffs are somehow successful in persuading this Court that their need to investigate so far afield is appropriate.

In further support of this motion, the Kagan Parties state as follows:

LEGAL STANDARDS

This is a fraud case which carries with it heightened pleadings standards. Fed. R. Civ. P. 9(b). As set forth in their currently pending motions to dismiss the complaint, the plaintiffs have not met that heightened pleading standard. Moreover, to the extent that some of the allegations in the complaint mirror the objections to the Kagan Parties' proofs of claim, the plaintiffs bear the burden of meeting "the initial **burden of producing substantial evidence**" to overcome the presumption of validity to which a properly executed proof of claim is otherwise entitled. Juniper Dev. Group v. Kahn (In re Hemingway Transp. Inc.), 993 F.2d 915, 925 (1st Cir. 1993) (Emphasis added). They have not done so. As discussed in more detail below, the documents requested in the Gordon subpoena is another patent fishing expedition embarked upon for the purposes of pure harassment and seeing if plaintiffs can discover any facts to support their unsubstantiated allegations of fraud. That is a gross abuse of the discovery process, and is universally prohibited. Universal Commun. Sys. v. Lycos, Inc., 478 F.3d 413, 426 (1st Cir. 2007) ("[P]laintiffs should not be permitted to conduct fishing expeditions in hopes of discovering claims that they do not know they have."), citing McCloskey v. Mueller, 446 F.3d 262, 271 (1st Cir. 2006) ("The purpose of pretrial discovery is not to allow a plaintiff to rummage about in search of a hitherto unexplicated cause of action.") (internal citations omitted); Wayne Inv., Inc. v. Gulf Oil Corp., 739 F.2d 11, 14 (1st Cir. 1984) (Rule 9(b) was not satisfied when support for allegation consisted of "speculations from industry analysts" and allowing the allegations of fraud to stand would be tantamount to "issu[ing] a license for a

'fishing expedition' in uncharted waters."); Doyle v. Hasbro, Inc., 103 F.3d 186, 194 (1st Cir. 1996) (one purpose of Rule 9(b) is to "prevent the filing of suits that simply hope to uncover relevant information during discovery"); Shaulis v. Nordstrom Inc., 120 F. Supp. 3d. 40, 45 (D. Mass. 2015) (one of the purposes of Rule 9(b) is "to preclude the use of a groundless fraud claim as a pretext to using discovery as a fishing expedition"), citing, In re Lupron Mktg. & Sales Practices Litig., 295 F. Supp. 2d 148, 170 (D. Mass. 2003) (quoting New England Data Services, Inc. v. Becher, 829 F.2d 286, 288 (1st Cir. 1987)); see also McGinty v. Beranger Volkswagen, Inc., 633 F.2d 226, 228-29 (1st Cir. 1980).

## FACTS

The amended complaint sets forth a tale based on unsupported suspicion and innuendo. The fiction developed by plaintiffs is as follows:

- In October, 2012, Kagan, individually, fraudulently induced Lipetsker and Filippov to invest in the project based on assurances that the cost of construction would not exceed $1.6 million, including carrying costs. Thereafter, Kagan, who was responsible for constructing the homes, spent down the entirety of the construction loans to complete the project. See Amended Complaint, Docket No. 52 ("Comp."), ¶¶11- 24.

- The homes were completed in October, 2014. (Id., ¶26). In May 2015, after completion of the homes, Kagan alleged for the first time that there were significant cost overruns. (Id., ¶¶36-38). Filippov and Lipetsker did not believe that the cost overruns were real, and immediately filed suit in state court alleging fraud. (Id., ¶26).

- The allegations of fraud are largely based on several hearsay statements by unnamed witnesses who plaintiffs claim to have interviewed who "are former investors in [other] Kagan projects." These witnesses allegedly claim that they experienced similar conduct in their own projects with Kagan. (Id., ¶45). Significantly, none of these witnesses are said to have any knowledge regarding the Lyman-Cutler project at issue in this lawsuit; none of them brought an action against Kagan based on the alleged conduct; and none of them is identified.

- Plaintiffs also claim to have interviewed KDC's former bookkeeper who allegedly reported that Kagan falsifies project books and records. (Id., ¶46). Again, and

{S1075134.2}  4

significantly, the former bookkeeper does not claim that this alleged conduct occurred on <u>this</u> particular project.[1]

Based upon these generalized hearsay reports, plaintiffs conclude "[u]pon information and belief, based on the facts recited above," that the cost overruns claimed by KDC are false. Additionally, plaintiffs make the factual allegation that the billing of KDC and ProExcavation are "rife with double billing, false and inflated charges." (<u>Id.</u>, ¶49). However, when asked in interrogatories for specific examples of this improper billing, plaintiffs were unable to identify a single improper charge. Instead, they purported to incorporate by reference an expert report, that does not yet exist, which they claim will identify the improper charges. <u>See</u>, <u>e.g.</u>, Main Case, Docket No. 60, p. 41, Answer No. 2, p. 45, Answer No. 11, p. 49, Answer No. 2. While presumably an expert can provide an opinion, it does not take an expert to identify facts. There is also no privilege preventing the disclosure of facts provided to an expert, whether or not an expert ultimately relies upon them when [and if] forming an opinion. <u>See</u> <u>Planalto v. Ohio Cas. Ins. Co.</u>, 256 F.R.D. 16, 21 (D. Me. 2009) (facts supplied to an expert are not privileged); <u>see also</u> <u>Marine Petroleum Co. v. Champlin Petroleum Co.</u>, 206 U.S. App. D.C. 31, 641 F.2d 984, 990 (D.C. Cir. 1980) (parties are entitled to discover underlying information relied upon by experts per Fed. R. Civ. P. 26(b)(4)(A)). Either plaintiffs have facts, which should be immediately disclosed, or they have nothing. Trial by ambush, or even discovery by ambush, is not the proper standard. By their own inability to identify a single improper charge, the only permissible conclusion is that this lawsuit is predicated on nothing other than a suspicion arising from Plaintiffs' belief that the project could not possibly have cost what the Kagan Parties claim, the hearsay accusations of investors on other Kagan projects, and a generalized statement by a former bookkeeper none of which are tied, in any manner, to the instant project.

---

[1] In fact, the former bookkeeper worked for KDC for less than eight months, until Kagan fired her for embezzlement. There is ongoing litigation against her.

{S1075134.2}                5

## DISCOVERY PROVIDED TO DATE

### Proof of Claim Back-up

In support of its proof of claim, KDC provided four binders, containing more than three hundred pages of documents, indexed and organized by subcontractor name. These binders include copies of invoices, with back-up, to support KDC's claim for outstanding cost reimbursement. The back-up includes, as appropriate, a Quickbooks report for each vendor, the identity of any check utilized for payment (if paid by check), and/or the credit card receipts/statements (if paid by credit card) showing payment. Attached hereto as Exhibit 2 is a copy of the indices provided with the binders with exemplars of the type of back-up which corresponds to each subcontractor. Plaintiffs have articulated nothing that indicates that this back-up is insufficient.

### Bank Statements and Approved Disbursements from Rockland Trust Company

The project was funded through a construction loan from the Rockland Trust Company ("RTC") which closed In June, 2013. Before approving any disbursement, the bank sent an inspector out to confirm that the work for which payment was sought had, in fact, been completed. Through a Keeper of Records subpoena issued to RTC, plaintiffs have copies of all RTC records which include bank statements and cancelled checks.

### Monthly Bank Statements

The RTC loan disbursements were deposited into the Lyman-Cutler account from which project costs were paid. The address on the bank statements is Filippov's address. Monthly, he received copies of all statements and corresponding checks. These were produced a second time through the RTC production. The construction loan proceeds can be tracked through these documents.

Depositions

In the state court litigation, Plaintiffs took the deposition of several KDC subcontractors who attested to the work performed on the project and amounts billed.

Interrogatories and Document Requests

The parties have exchanged "paper discovery." As set forth in the motions to dismiss and as discussed above, despite all the documentation already provided, much of it over two years ago, Plaintiffs have been unable (or unwilling) to identify a single improper payment, claiming that this is the subject of an expert report which will, at some point, be produced (though the non-existent report is incorporated by reference). The incorporation by reference of a non-existent report is a creative sleight of hand. Double billing or improper charges are not dependent on expert opinion. They are facts. Either Plaintiffs have this information or they do not.

## ARGUMENT

I. THE GORDON SUPOENA AND ITS OVERBREADTH.

The Gordon subpoena seeks thirteen discrete categories of documents. The subpoena seeks not just financial accounting documents for KDC and Kagan, but any financial documents relating to "agents, servants, employees, attorneys, officers, directors, members, affiliates, parent companies or subsidiaries," and "any attorney retained by or otherwise working on its behalf." This broad definition potentially reaches dozens of potentially responsive entities. The subpoena is also not limited to financial records relating to the single Project at issue, making it even more overbroad. Given the complete lack of any evidence to support the allegations asserted against the Kagan Parties, this subpoena represents a significant and costly fishing expedition that is not

proportional to the dispute at hand. As set forth in the Gordon Affidavit, the time and cost required of him, a non-party, to respond will be extensive.

Of the thirteen categories of documents requested, only two (Request Nos. 1 and 2) purport to be limited to the single project at issue. All of the rest impermissibly seek to intrude into private financial dealings of the Kagan Parties and their employees. While these far ranging requests are discussed in greater detail below, the overreaching is so extreme that some advance context should be helpful for this Court.

As is typical in the construction industry, KDC and ProExcavation work on multiple projects simultaneously. During the two plus years of the Lyman-Cutler project, KDC and ProExcavation simultaneously worked on at least twenty other discrete projects. As part of its cost tracking program, Kagan opens a dedicated AMEX credit card account for each project. If payment was made by check, the pertinent checks have been identified and/or provided. Gersh Aff., ¶2. Notwithstanding that Plaintiffs have been unwilling or unable to identify a single improper charge, they now seek to discover financial information relating to every other project on which KDC or ProExcavation worked.

Request Nos. 3 and 4 ask for documents relating to any "Other Construction Project," defined in the subpoena as "any home construction project on which KDC or ProExcavation worked between December 1, 2012 and June 2015, regardless of when the project was commenced or completed." The remaining requests are not limited to any specific projects and therefore are even broader.

Further compounding the breadth of these requests, they are not properly limited in time. Construction of the Lyman-Cutler homes did not commence until after June 2013 and, according to plaintiffs, were completed by October, 2014. (Comp., ¶26). The requests, however, span a

period that is six months before commencement of construction (December 1, 2012) and eight months after completion (June 30, 2015) of the instant project. Thus, not only is the intrusion into the private financial dealings of the Kagan Parties overbroad in scope, it is also overbroad in time.

## REQUESTS

**Request No. 1 – All documents concerning the Project, including but not limited to all financial records for KDC and ProExcavation.**

The Kagan Parties have no objection to the production of documents concerning the Project. They do object to "all financial records" as this is not a defined term and overly inclusive. To the extent this request is properly limited to this single project and defined, the Kagan Parties do not object to this request.

**Request No. 2 – All communications with Kagan, KDC, or ProExcavation regarding the Project.**

The Kagan Parties do not object to this request other than to note that it will require extensive time and expense for Gordon, a non-party witness, to cull through every e-mail over three-year period to isolate those communications that relate to this single Project. Other than transmittal cover notes, the Kagan Parties are unaware of any substantive written communications that Gordon may have. Given the limited use that these communications may have, requiring Gordon to undertake this enormous expense and time, is disproportionate to any potential legitimate discovery. The Kagan Parties have already produced thousands of documents and made available for inspection and copying additional non-privileged documents relating to this project. Before further imposing on the time of a non-party, there should be, at a minimum some threshold showing of why this duplicative discovery is necessary.

**Request No. 3 – All documents concern any Other Construction Project, including but not limited to all financial records prepared for KDC or ProExcavation with respect to each Other Construction Project.**

As discussed above, this request functionally seeks to intrude into the finances of twenty other projects, with a time period that is overly expansive. Moreover, since the definition of "Other Construction Project" includes projects "regardless of when the project was commenced or completed," its reach is actually even broader. The shear breadth of this request, especially when viewed against the lack of any legitimate need for this discovery given that all pertinent information has already been provided, speaks volumes. There has been no showing of any need for this unprecedented intrusion into projects unrelated to the Lyman-Cutler project. Given the extensive documentation provided or made available, it is beyond any proportionality to allow this far ranging intrusion. This is a patent fishing expedition and should not be permitted.

**Request No. 4 – All communications with Kagan, KDC, or ProExcavation concerning Other Construction Projects.**

As noted above with respect to Request No. 3, this request too seeks unprecedented intrusion into at least twenty other projects, with virtually no showing other than unsupported allegations, that there is any reason to venture so far afield.

**Request No. 5 – All income tax returns, related work papers and supporting documents prepared for KDC for the 2012, 2013, 2014, and 2015 calendar years.**

**Request No. 6 – All income tax returns, related work papers and supporting documents prepared for ProExcavation for the 2012, 2013, 2014 and 2015 calendar years.**

Tax returns bear protected status. A party requesting federal tax returns must demonstrate a heightened standard to compel a taxpayer to disclose the returns. See Town Taxi, Inc. v. Police Commissioner of Boston, 377 Mass. 576, 586-88, 387 N.E.2d 129 (1979). Specifically, a requesting party must show both: (1) the tax returns are specifically relevant to the issues in the case; and (2) the requesting party cannot obtain the relevant information from any

{S1075134.2}                                10

other source.  See SEC v. Cymaticolor Corp., 106 F.R.D. 545, 547 (S.D.N.Y. 1985).  Here, Plaintiffs cannot establish either of these elements.

In addition, state tax returns are privileged as a matter of law.  See Finance Commission of Boston v. Commissioner of Revenue, 383 Mass. 63, 71, (1981) (state tax returns in Massachusetts are privileged as a matter of statute under G.L. c. 62C, § 21).  Also, "[t]he privilege cannot be circumvented by simply demanding the information from the taxpayer." Cadrin v. Trans Spec Truck Serv., Inc., 2003 Mass. Super. LEXIS 413 *, 17 Mass. L. Rep. 121 (Mass. Super. Ct. Nov. 26, 2003), citing, Jason Millar Co. v. Commonwealth, 251 Mass. 457, 464 (1925).  Nothing in KDC's or ProExcavation's tax returns would have any bearing on whether the costs charged in this construction project were properly allocated.  Tax returns will not itemize individual expenses.  At best, they will show gross profits and losses, spanning multiple projects on which ProExcavation and KDC worked during the taxable year.  The request to see KDC's tax returns is simply an attempt by Plaintiffs to pry into KDC's financial status and its profits and losses.  There is absolutely no reason to permit this gross intrusion into the confidential and private tax status of KDC and ProExcavation, especially when there had been no showing that ProExcavation's or KDC's tax reporting has any bearing on the disputes in issue.  Furthermore, the information on these tax returns is not limited to issues relating solely to this Project.  As such, the request is overly broad.

The Lyman-Cutler project did not even commence until sometime in 2013.  Thus, requesting tax returns going back to 2012 is further overreaching.  Plaintiffs themselves plead that the project was completed in 2014.  Thus, there can be no reason to disclose tax returns from 2015 either.  This is a patent fishing expedition used to manufacture information for use as leverage in this proceeding.

{S1075134.2}    11

**Request No. 7 – All financial statements for KDC or ProExcavation for all financial periods including any part of the time period between December 1, 2012 and June 30, 2015.**

The issue in this dispute is whether the amounts charged to this single project are proper or not. Neither KDC's or ProExcavation's financial statements would provide anything of use on this issue. Even if they showed outstanding accounts receivable or accounts payable, it would be an aggregate figure, not tied specifically to this Project. Additionally, as noted, the time frame is larger than proper.

**Request No. 8 – All loan applications or documents that you assisted with or are in your possession relating to KDC or ProExcavation for all financial periods including any part of the time period between December 1, 2012 and June 30, 2015.**

KDC is seeking to recover for monies expended on the project. ProExcavation seeks only indemnification under the Operating Agreement for Lyman-Cutler. Neither entity has taken out any loans relating to this Project (or any other project), and even if they had, this information has nothing to do with the issues in dispute relative to the Lyman-Cutler project. Worse still, this request is not limited to loan applications. It also seeks "documents," unlimited in scope, that Gordon assisted in or has in his possession. This catch-all word makes this request impermissibly vague and overly broad.

**Request No. 9 – Your complete files concerning KDC for all financial periods including any part of the time between December 1, 2012 and June 30, 2015, including but not limited to all electronic versions of any QuickBooks files, Excel spreadsheets, or any other file used in the accounting or tax preparation for KDC.**

As with the other requests, Plaintiffs' demand to review all "files," including QuickBooks files, overreaches because the vast majority of documents and information within the QuickBooks is wholly irrelevant to the project at issue in this case and the raw data which would have been entered into the QuickBooks program has already been provided. It is clear that the Plaintiffs are attempting to mine confidential financial data in QuickBooks and other files in an

effort to harass KDC and its customers. Further, there is absolutely no need for this sweeping access because Defendants have already provided relevant QuickBooks reports. See M3Girl Designs, LLC v. Blue Brownies, LLC, No. 3:09-cv-2390-F, 2011 U.S. Dist. LEXIS 159909, at *13-15 (N.D. Tex. Aug. 31, 2011) (holding that there was no need to produce "native" QuickBook files when documents were produced in other formats).

**Request No. 10 - Your complete files concerning ProExcavation for all financial periods including any part of the time between December 1, 2012 and June 30, 2015, including but not limited to all electronic versions of any QuickBooks files, Excel spreadsheets, or any other file used in the accounting or tax preparation for ProExcavation.**

Not knowing what the "complete file" is, and not restricting the request to a file relating to this single project, makes these requests vague and overbroad. It seeks everything, with no real parameters, and is a completely unjustifiable request.

**Request No. 11 – All bank statements for KDC or ProExcavation, or any reconciliation thereof, prepared by you or in your possession for the period between December 1, 2012 and June 30, 2015.**

KDC and ProExcavation's bank statements will show nothing about what charges were incurred for the single project at issue. At best, it will show account balances and debits, without any detail as to their sources. The request is also overly broad in terms of time.

**Request No. 12 – All payroll tax returns, W-2 forms, and 1099 forms concerning KDC or ProExcavation for the period between December 1, 2012 and June 30, 2015.**

Payroll information is confidential to the employees and the company. ProExcavation has a single employee, Vadim Kagan, and he has been identified as such in response to interrogatories. The amount of compensation he receives is irrelevant to the dispute and between himself and his employers and certainly is not information to which plaintiffs are entitled. Its payroll information too is private and confidential. This is a patent fishing expedition.

**Request No. 13** – **To the extent not produced in response to any of the foregoing requests, all documents concerning any financial record prepared for KDC or ProExcavation between December 1, 2012 and June 30, 2015.**

This is a catch-all request. It is not narrowly tailored to anything. It is also not properly limited in time.

II. DISCOVERY SHOULD BE STAYED PENDING
 A DECISION ON THE PENDING MOTIONS TO DISMISS.

Currently pending are motions to dismiss the complaint. Those motions are scheduled for hearing on January 9, 2018. Depending on the Court's decision, the result may vitiate entirely or markedly limit the scope of the issues in dispute. This, in turn, would likely impact the scope of permissible discovery. While the Kagan Parties concede that the pendency of the motions to dismiss does not automatically stay discovery, normal convention and economy dictates that it is appropriate to postpone discovery until the parties know exactly what the issues remain. As a matter of judicial and litigant economy, the Kagan Parties ask that all discovery be halted until the Court issues its decision.

III. SUGGESTION FOR ALTERNATIVE,
 LESS COSTLY, MEANS TO NARROW DISCOVERY.

This dispute, in essence, calls into question whether KDC (and others) fraudulently overcharged for building the two subject properties. As the houses are now built, an expert may determine the expected actual construction costs for these homes. Such an expert – mutually acceptable to the parties and supervised by this Court – may be employed to render a construction cost estimate based upon the plans, permits, and as-built homes. He/she should be able to determine whether the construction costs claimed by KDC fall within the expected range of cost, or grossly exceed the expected range. Should the estimate show a cost deviation beyond the industry standard, it should be apparent from where the deviation derived and would enable

the parties where to focus their discovery on that area. If the deviation was within the industry standard, or lower, it would also show the court that any error in a particular invoice, to the extent one exists, is immaterial. Finally, if the expert determines that the costs charges were appropriate, the focus of the discovery could shift from whether the costs were proper, to the remaining issue of whether Kagan fraudulently induced Plaintiffs into joining with him in this venture and whether Debtor should be responsible for any overage. The cost for this expert opinion is expected to be under $8,000.00 and should take under two weeks. This alternative would likely cost less than $1/10^{th}$ the cost of the "scorched earth" discovery on which plaintiffs have embarked, and likewise less expensive than the necessary follow on forensic examination of any such discovery as requested.

Once the expert report has been produced, the Parties would be free to request more focused discovery, guided by the findings of that report. Defendants believe that the court should consider the appointment of a Special Master to determine the future discovery efforts. This would preserve judicial resources and expedite resolution of discovery disputes.

## CONCLUSION

Especially in a fraud case, this Court must guard against patent fishing. That is exactly what is occurring here. Plaintiffs already have extensive back-up, yet still cannot identify a single improper expense, preferring to fish further in the hope that something will reveal itself. That is an abuse of the discovery process. Based upon the foregoing, the Kagan Parties request that the Gordon subpoena be quashed.

Dated:   December 21, 2017

Respectfully submitted,

VADIM KAGAN,
TATIANA KAGAN,
KAGAN DEVELOPMENT KDC, CORP. and
PROEXCAVATION CORP.,

By their Attorneys,

/s/ John H. Perten
Christopher M. Candon, BBO# 650855
John H. Perten, BBO# 548728
SHEEHAN PHINNEY BASS & GREEN, PA
255 State Street, 5th Floor
Boston, MA  02109
Tel:  617-897-5600
Fax: 617-439-9363
E-mail: jperten@sheehan.com

{S1075134.2}                           16

# **CERTIFICATE OF SERVICE**

I hereby certify that on this 21st day of December, 2017, a copy of the foregoing was served upon the parties listed below via ECF and/or first class mail, postage prepaid.

Eric K. Bradford
Office of the US Trustee
J.W. McCormack Post Office & Courthouse
5 Post Office Sq., 10th Fl, Suite 1000
Boston, MA 02109

Sean T. Carnathan
O'Connor, Carnathan and Mack, LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

David B. Madoff
Madoff & Khoury LLP
124 Washington Street - Suite 202
Foxborough, MA 02035

Steffani Pelton Nicholson
Madoff & Khoury LLP
124 Washington Street
Foxborough, MA 02035

Sarah A Smegal
Hackett Feinberg P.C.
155 Federal Street
9th Floor
Boston, MA 02110

Joseph P. Calandrelli
O'Connor Carnathan and Mack LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

Stephen G. DeLisle
Rubin and Rudman LLP
50 Rowes Wharf
3rd Floor
Boston, MA 02110

Amy M. McCallen
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110

David C. Phalen
Hackett Feinberg P.C.
155 Federal Street, 9th Floor
Boston, MA 02110

Peter N. Tamposi
The Tamposi Law Group
159 Main Street
Nashua, NH 03060

/s/ John H. Perten
John H. Perten

{S1075134.2}                                17