UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

_____
                                                )
In re:                                          )          Chapter 7
                                                )          No. 15-13881-FJB
LYMAN-CUTLER, LLC,                              )
                                                )
        Debtor.                                 )
_____)


_____
                                                )
LYMAN-CUTLER, LLC,                              )
ALEX FILIPPOV and                               )
NICKOLAY LIPETSKER,                             )
                                                )
        Plaintiffs,                             )
        Defendants in Counterclaim              )
                                                )          Adv. Proc. No. 16-01120
        v.                                      )
                                                )
VADIM KAGAN, TATIANA KAGAN,                     )
KAGAN DEVELOPMENT KDC, CORP.                    )
and PROEXCAVATION CORP.                         )
                                                )
        Defendants.                             )
        Plaintiffs in Counterclaims             )
_____)

**DEFENDANTS/PLAINTIFFS-IN-COUNTERCLAIMS' ANSWER TO PLAINTIFFS'
AMENDED ADVERSARY COMPLAINT, COUNTERCLAIMS
AND DEMAND FOR JURY TRIAL**

Defendants/Plaintiffs-in-Counterclaims Vadim Kagan ("Kagan"), Tatiana Kagan ("Mrs.

Kagan"), Kagan Development KDC, Corp. ("KDC") and ProExcavation ("ProExcavation")

submit the following Answer to Plaintiffs' Amended Adversary Complaint and Counterclaims.

Defendants demand a trial by jury.  Defendants respond to the numbered paragraphs of

Plaintiffs' Amended Adversary Complaint ("Amend. Adv. Compl.") as follows:

## INTRODUCTION

1. No response is required.  To the extent a response is required, Defendants deny Plaintiffs' allegations.

## PARTIES

2. Defendants deny that the Company was formed in November 2012.  The remaining allegations of paragraph 2 are admitted.  Answering further, the Company dissolved on November 30, 2015 pursuant to Section 2.3 of its operating agreement.

3. Defendants admit the first sentence of this paragraph of the Amend. Adv. Compl. Defendants admit that Filippov is the largest member.  Defendants deny that Filippov once served as the Company's Managing Member and that he continues to so serve as the Company ceased operations.  The final sentence of this paragraph of the Amend. Adv. Compl. states a legal conclusion to which no response is required.  To the extent a response is required, the allegations are denied.

4. Admitted, except that the Company ceased operations pursuant to the "Term" provision in its own operating agreement.

5. Admitted.

6. Admitted.

7. Admitted.

8. Admitted.

## JURISDICTION AND VENUE

9. This paragraph of the Amend. Adv. Compl. states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations.

10. This paragraph of the Amend. Adv. Compl. states a legal conclusion to which no response is required.  To the extent a response is required, Defendants deny the allegations.

### FACTUAL BACKGROUND

11. Kagan denies the allegations contained in paragraph 11.  Answering further, initially, Mr. Lipetsker approached Mr. Filippov.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 11, so those allegations are denied.

12. Kagan admits the allegations of paragraph 12, in general terms.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 12, so those allegations are denied.

13. Kagan admits that Mr. Lipetsker and Mr. Filippov, together with Kagan, were investors in the Project.  Kagan denies the remaining allegations contained in paragraph 13.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 13, so those allegations are denied.

14. Kagan denies the allegations contained in paragraph 14.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 14, so those allegations are denied.

15. Kagan denies that the presentation indicated that the homes would be constructed on a fixed cost basis.   Plaintiffs appear to refer to a document, the presentation, a document which speaks for itself and should be read as a whole.  Because Plaintiffs summarize the document and refer only to selected sections, Kagan denies Plaintiffs' allegations.  Answering further, there was no need to "deviate" from a fixed cost basis because the

Project was not undertaken on that basis.  Kagan denies all other allegations in this
paragraph of the Amend. Adv. Compl.  The remaining defendants are without
information sufficient to form a belief as to the truth or falsity of the allegations
contained in paragraph 15, so those allegations are denied.

16. Kagan denies that Messrs. Filippov, Kagan and Lipetsker formed the Company and that
the Company was formed in November 2012.  Answering further, the Company was
formed by Filippov though Kagan admits that he was a member and that it was formed to
carry out the Project.  The remaining defendants are without information sufficient to
form a belief as to the truth or falsity of the allegations contained in paragraph 16, so
those allegations are denied.

17. Kagan admits the final sentence of this paragraph of the Amend. Adv. Compl.
Answering further, Kagan states that he also invested $250,000.  Kagan denies all other
allegations in this paragraph of the Amend. Adv. Compl.  The remaining defendants are
without information sufficient to form a belief as to the truth or falsity of the allegations
contained in paragraph 17, so those allegations are denied.

18. Plaintiffs appear to refer to a document, the Lyman Cutler Operating Agreement, a
document which speaks for itself and should be read as a whole.  Because Plaintiffs
summarize the document and refer only to selected sections, Defendants deny Plaintiffs'
allegations.  Kagan denies that the parties intended for Mr. Filippov to serve as the
Company's managing member. The remaining defendants are without information
sufficient to form a belief as to the truth or falsity of the remaining allegations contained
in paragraph 18, so those allegations are denied.

19. Kagan denies the allegations contained in paragraph 19.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 19, so those allegations are denied.

20. Kagan denies the allegations contained in paragraph 20.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 20, so those allegations are denied.

21. Kagan admits that the Company borrowed $1.6 million for construction costs for each new home and states that the terms of the construction loan documents speak for themselves.  Kagan admits that the Company borrowed $1.6 million to finance the balance of the purchase price for the land and existing house for the Project and states that the terms of the purchase money loan speak for themselves.  Kagan admits that in the aggregate, the Company borrowed $4.8 Million.  Kagan denies the remaining allegations contained in this paragraph of the Amend. Adv. Compl.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 21, so those allegations are denied.

22. Kagan admits that he never provided Mr. Lipetsker or Mr. Filippov with an updated budget or forecast for the costs of the Project though he kept Lipetsker and Filippov generally apprised of the Project costs.  Answering further, Kagan never provided a fixed budget or forecast and no request for a budget or forecast was ever made.  Kagan admits the second sentence of this paragraph of the Amend. Adv. Compl. because there were no "overruns."  Kagan denies the remaining allegations of this paragraph of the Amend. Adv. Compl. The remaining defendants are without information sufficient to form a

belief as to the truth or falsity of the allegations contained in paragraph 22, so those
allegations are denied.

23. Kagan denies the first sentence of this paragraph of the Amend. Adv. Compl., but he
acknowledges that he had check writing authority for a period of time.  Kagan states that
information was available for Mr. Filppov to monitor the withdrawal of funds from the
account, but he lacks information sufficient to admit or deny the extent to which Mr.
Fillopov did so, so those allegations are denied.  Kagan denies the remaining allegations
of this paragraph of the Amend. Adv. Compl. The remaining defendants are without
information sufficient to form a belief as to the truth or falsity of the allegations
contained in paragraph 23, so those allegations are denied.

24. Kagan denies the first sentence of this paragraph of the Amend. Adv. Compl. Answering
further, the money was drawn down by the Company.  Kagan admits that monies were
paid to KDC, ProExcavation and subcontractors.  Kagan is without information sufficient
to form a belief as to the characterization of "lions share" as that term is ambiguous and
subject to many interpretations.  Kagan denies the remaining allegations contained in
paragraph 24.  The remaining defendants are without information sufficient to form a
belief as to the truth or falsity of the allegations contained in paragraph 24, so those
allegations are denied.

25. Plaintiffs utilize an undefined term, "LLC Agreement" and therefore the allegations are
vague and ambiguous.  On the assumption that Plaintiffs actually refer to the Lyman
Cutler Operating Agreement, Plaintiffs appear to refer to a document that speaks for itself
and should be read as a whole.  Because Plaintiffs summarize the document and refer
only to selected sections, Kagan denies that he was responsible for completing

construction of the two new homes no later than March 30, 2014.  Kagan admits that the

construction would be in accordance with plans and drawings approved by Mr. Filippov,

Mr. Lipetsker and Mr. Kagan.  Kagan denies Plaintiffs' remaining allegations.  The

remaining defendants are without information sufficient to form a belief as to the truth or

falsity of the allegations contained in paragraph 25, so those allegations are denied.

26. Kagan and KDC admit that final completion of the two new homes had not occurred by

March 30, 2014.  Answering further, Kagan states that the Lyman Cutler, LLC operating

agreement does not use the term "final completion" but rather speaks in terms of

"substantial completion."  Kagan and KDC deny the remaining allegations contained in

this paragraph of the Amend. Adv. Compl. The remaining defendants are without

information sufficient to form a belief as to the truth or falsity of the allegations

contained in paragraph 26, so those allegations are denied.

27. Kagan admits that the parties hoped to sell the two new homes by November 2014, but

denies that this was a "plan".  Answering further, Kagan states that neither the sale date

nor the sale price was guaranteed.  Kagan denies the remaining allegations contained in

paragraph 27.  The remaining defendants are without information sufficient to form a

belief as to the truth or falsity of the allegations contained in paragraph 27, so those

allegations are denied.

28. Kagan and Mrs. Kagan admit that she is a real estate agent affiliated with Century 21, but

deny that Century 21 is a "defendant."  Kagan, Mrs. Kagan and KDC admit that Mrs.

Kagan is an officer and director of KDC.  ProExcavation is without information sufficient

to form a belief as to the truth or falsity of the allegations contained in paragraph 28.  The

remaining allegations contained in paragraph 28 are denied.

29. Kagan admits that he suggested that the Company list the new homes for sale with Mrs.

Kagan, though denies that this was a "request."  Plaintiffs appear to refer to a document,

the Lyman Cutler Operating Agreement, a document which speaks for itself and should

be read as a whole.  Because Plaintiffs summarize the document and refer only to

selected sections, Kagan denies Plaintiffs' allegations.  Kagan denies the remaining

allegations contained in paragraph 29.  The remaining defendants are without information

sufficient to form a belief as to the truth or falsity of the allegations contained in

paragraph 29, so those allegations are denied.

30. Kagan and Mrs. Kagan deny that they set the selling price for each home at $5,499,000

without consulting the plaintiffs.  Kagan denies that there was a "budgeted" selling price

for each home, and denies the remaining allegations contained in paragraph 30.  Mrs.

Kagan is without information sufficient to form a belief as to the remaining allegations

contained in paragraph 30.  The remaining defendants are without information sufficient

to form a belief as to the truth or falsity of the allegations contained in paragraph 30, so

those allegations are denied.

31. Kagan and Mrs. Kagan deny that a $4.5M bona fide offer to purchase the new home

located at 88 Cutler Road was made.  They therefore deny the allegations of this

paragraph of the Amend. Adv. Compl.  The remaining defendants are without

information sufficient to form a belief as to the truth or falsity of the allegations

contained in paragraph 31, so those allegations are denied.

32. Mrs. Kagan denies the allegations contained in paragraph 32.  The remaining defendants

are without information sufficient to form a belief as to the truth or falsity of the

allegations contained in paragraph 32, so those allegations are denied.

33. Kagan and Mrs. Kagan admit that in late April 2015, the homes were unsold.  Kagan and Mrs. Kagan admit that Kagan called Mr. Filippov and asked him to sign a new listing agreement for 55 Lyman Road.  Kagan and Mrs. Kagan deny the remaining allegations contained in this paragraph of the Amend. Adv. Compl. The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 33, so those allegations are denied.

34. Kagan and Mrs. Kagan admit that Kagan signed a listing agreement with Century 21.  Kagan and Mrs. Kagan deny the remaining allegations contained in paragraph 34.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 34, so those allegations are denied.

35. Kagan and Mrs. Kagan admit that they are married.  Kagan and Mrs. Kagan deny the remaining allegations contained in this paragraph of the Amend. Adv. Compl.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 35, so those allegations are denied.

36. Kagan admits that, through counsel, a letter was sent on or about May 7, 2015.  The letter speaks for itself and should be read as a whole.  Therefore, Defendants deny Plaintiffs' selective characterization of the letter.  Kagan and KDC deny the remaining allegations of this paragraph of the Amend. Adv. Compl.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 36, so those allegations are denied.

37. Plaintiffs appear to refer to another document, the May 7th letter, which speaks for itself and should be read as a whole.  Kagan therefore denies Plaintiffs' selective characterization of the letter and the allegations contained in paragraph 37. Kagan further

denies that Article 8.1 of the Lyman Cutler Operating Agreement imposes an obligation upon Kagan to pay for the carrying costs.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 37, so those allegations are denied.

38. Kagan and Mrs. Kagan deny the allegations contained in paragraph 38.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 38, so those allegations are denied.

39. Kagan and Mrs. Kagan admit that there is a listing agreement signed by Kagan on behalf of the Debtor, the terms of which speak for themselves.  Kagan and Mrs. Kagan deny the remaining allegations contained in paragraph 39.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 39, so those allegations are denied.

40. Kagan denies the allegations contained in paragraph 40.  Mrs. Kagan denies the allegations contained in the second sentence of paragraph 40 and is without information sufficient to form a belief as to the truth or falsity of the remaining allegation contained in paragraph 40, so those allegations are denied.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 40, so those allegations are denied.

41. Kagan and Mrs. Kagan deny that Messrs. Filppov or Lipetsker were unaware of the renewed listing agreement and lacked the opportunity to review its contents, until June, 11, 2015.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 41, so those allegations are denied.

42. Kagan and Mrs. Kagan deny the allegations contained in paragraph 42.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 42, so those allegations are denied.

43. Kagan and KDC admit that KDC filed a mechanic's lien against the properties owned by the Company in the amount of $2,095,985.23.  Kagan and KDC deny the remaining allegations in this paragraph of the Amend. Adv. Compl.  Plaintiffs appear to refer to the May 7, 2015 letter, which should be read as a whole and Defendants deny Plaintiffs' selective characterization of it.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 43, so those allegations are denied.

44. Kagan and KDC admit that the KDC mechanic's lien arises out of a contract between KDC and the Company.  Defendants lack information sufficient to admit or deny when Messrs. Fillipov or Lipetsker first learned of the contract between KDC and the Company, so those allegations are denied.  Answering further, Messrs. Fillipov and Lipetsker had actual knowledge that KDC was acting as the general contractor for the Project.  Kagan and KDC deny the remaining allegations of this paragraph of the Amend. Adv. Compl.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 44, so those allegations are denied.

45. Defendants lack information sufficient to admit or deny allegations concerning any interviews conducted by Plaintiffs, so those allegations are denied.  The remaining allegations of this paragraph of the Amend. Adv. Compl. are denied.

46. Defendants lack information sufficient to admit or deny allegations concerning any interviews conducted by Plaintiffs, so those allegations are denied.  The remaining allegations of this paragraph of the Amend. Adv. Compl. are denied.

47. Kagan, KDC and ProExcavation deny the allegations contained in paragraph 47.  Mrs. Kagan is without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 47, so those allegations are denied.

48. Defendants admit that the Kagan and Mrs. Kagan are owners and officers of KDC and ProExcavation.  The remaining allegations of this paragraph of the Amend. Adv. Compl. are denied.

49. Kagan and KDC deny that the mechanic's lien and costs asserted by KDC and ProExcavation were false and fraudulent.  KDC and ProExcavation deny the second sentence of this paragraph of the Amend. Adv. Compl.  Kagan, KDC and ProExcavation deny the third sentence of this paragraph of the Amend. Adv. Compl.  Answering further, Messrs. Filippov and Lipetsker's decision to have the Company file bankruptcy was imprudent and unjustified.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 49, though upon information and belief, paragraph 49 is denied.  Any allegations not expressly addressed are denied.

50. Kagan denies the allegations contained in paragraph 50.  The remaining defendants are without information sufficient to form a belief as to the truth or falsity of the allegations contained in paragraph 50, though upon information and belief, paragraph 50 is denied.

51. This allegation states a legal conclusion to which no response is required.  Further, the Defendants do not understand the allegation as written.  However, to the extent a

response is required, Defendants deny the allegations of this paragraph of the Amend.

Adv. Compl.

## COUNT I
### BREACH OF CONTRACT (PLAINTIFFS AGAINST VADIM KAGAN)

52. Defendants repeat and reallege their responses to the other paragraphs of the Amend.

Adv. Compl. as if set forth fully herein.

53. The term "LLC Agreement" is not defined and therefore this paragraph of the Amend.

Adv. Compl. is vague and ambiguous.  On the presumption that the term refers to the

Lyman Cutler, LLC operating agreement, the allegations are admitted insofar as "parties"

refers to the Company's members.

54. Denied.

55. Denied.

## COUNT II
### BREACH OF FIDUCIARY DUTY (PLAINTIFFS AGAINST VADIM KAGAN)

56. Defendants repeat and reallege their responses to the other paragraphs of the Amend.

Adv. Compl. as if set forth fully herein.

57. Admitted.

58. Denied.

59. Denied.

## COUNT III
### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY
### (PLAINTIFFS AGAINST TATIANA KAGAN, KDC AND PROEXCAVATION)

60. Defendants repeat and reallege their responses to the other paragraphs of the Amend.

Adv. Compl. as if set forth fully herein.

61. Denied.

62. Denied.

## COUNT IV
### FRAUD (PLAINTIFFS AGAINST ALL DEFENDANTS)

63. Defendants repeat and reallege their responses to the other paragraphs of the Amend.

Adv. Compl. as if set forth fully herein.

64. Denied.

65. Denied.

66. Denied.

67. Denied.

68. Denied.

## COUNT V
### CONSPRIACY (PLAINTIFFS AGAINST ALL DEFENDANTS)

69. Defendants repeat and reallege their responses to the other paragraphs of the Amend.

Adv. Compl. as if set forth fully herein.

70. Denied.

71. Denied.

## COUNT VI
### VIOLATION OF M.G.L. c. 93A
### (THE COMPANY AGAINST TATIANA KAGAN, KDC, AND PROEXCAVATION)

72. Defendants repeat and reallege their responses to the other paragraphs of the Amend.

Adv. Compl. as if set forth fully herein.

73. Denied.

74. Denied.

75. Denied.

76. Denied.

## COUNT VII
### BREACH OF CONTRACT (THE COMPANY AGAINST KDC)

77. Defendants repeat and reallege their responses to the other paragraphs of the Amend.

Adv. Compl. as if set forth fully herein.

78. Defendants admit that the Company entered into a contract with KDC. The contract is a

document which speaks for itself. The remaining allegations contained in paragraph 78

state a conclusion of law to which no response is required. To the extent further response

is required, the remaining allegations contained in paragraph 78 are denied.

79. Denied.

80. Denied.

## COUNT VIII
### EQUITABLE SUBORDINATION
### (FILIPPOV AND LIPETSKER AGAINST ALL DEFENDANTS)

81. Defendants repeat and reallege their responses to the other paragraphs of the Amend.

Adv. Compl. as if set forth fully herein.

82. Denied.

83. Denied.

84. Denied.


## **DEFENDANTS' AFFIRMATIVE DEFENSES**

### FIRST AFFIRMATIVE DEFENSE

Plaintiffs fail to state a claim on which relief can be granted.

### SECOND AFFIRMATIVE DEFENSE

Plaintiffs lack standing to assert some or all of the claims.

### THIRD AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by their own unclean hands.

## FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred or reduced by the doctrine of waiver.

## FIFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred or reduced by the doctrine of estoppel.

## SIXTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to mitigate their damages (if any) and in fact exacerbated them.

## SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are frivolous and not advanced in good faith.

## EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims were filed in violation of Rule 11 of the Massachusetts Rules of Civil

Procedure and M.G.L. c. 231, §6F and are now continued in violation of Fed. R. Civ. P. 11.

## NINTH AFFIRMATIVE DEFENSE

By knowingly asserting allegations that are false, plaintiffs attempt to perpetrate a fraud

on the Court.

## ELEVENTH AFFIRMATIVE DEFENSE

Plaintiffs conflate derivative and personal claims and have failed to meet the prerequisites

for filing derivative claims.

## TWELFTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred or reduced by the doctrines of setoff, recoupment

and/counterclaim.

## THIRTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred or reduced by their own fraudulent conduct.

## FOURTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the doctrine of laches.

## FIFTEENTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to comply with conditions precedent or conditions precedent have

not occurred.

## SIXTEENTH AFFIRMATIVE DEFENSE

Plaintiffs fail to plead fraud with requisite particularity.

## SEVENTEENTH AFFIRMATIVE DEFENSE

Plaintiffs did not rely on any actionable statements from Defendants and otherwise did

not reasonably rely.

## EIGHTEENTH AFFIRMATIVE DEFENSE

Plaintiffs' damages, if any, were caused by the actions or omissions of third parties over

whom Defendants do not exert control.

## NINETEENTH AFFIRMATIVE DEFENSE

Plaintiffs' claim of violation of M.G.L. c. 93A is improper because it is truly a claim for

breach of contract.

## TWENTIETH AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the economic loss doctrine.

## TWENTY-FIRST AFFIRMATIVE DEFENSE

Plaintiffs' claims are barred by the doctrine of mistake.

## TWENTY-SECOND AFFIRMATIVE DEFENSE

Plaintiff ratified any changes to the parties' contracts.

## TWENTY-THIRD AFFIRMATIVE DEFENSE

Defendants' actions were justified.

## TWENTY-FOURTH AFFIRMATIVE DEFENSE

Plaintiffs' breaches of contract excuse any nonperformance by Defendants.

## TWENTY-FIFTH AFFIRMATIVE DEFENSE

Plaintiffs failed to provide proper notice of any breach.

## TWENTY-SIXTH AFFIRMATIVE DEFENSE

Plaintiffs have been unjustly enriched.

## TWENTY-SEVENTH AFFIRMATIVE DEFENSE

Plaintiffs' lack privity to assert some or all of their claims.

## TWENTY-EIGHTH AFFIRMATIVE DEFENSE

Plaintiffs' claims appear to be based on alleged forward-looking statements that are not

actionable.

## TWENTY-NINTH AFFIRMATIVE DEFENSE

Plaintiffs have failed to fulfill conditions precedent to establish and maintain a claim

under G.L. c. 93A.

## THIRTIETH AFFIRMATIVE DEFENSE

Plaintiffs have not stated a viable claim under G.L. c. 93A to the extent their 93A claims

are based on singular transaction and/or based on intra-corporate disputes.

## THIRTY-FIRST AFFIRMATIVE DEFENSE

This Court lacks jurisdiction to decide claims not associated with the Debtor, including,

but not limited to, the claims between the members of the Debtor.

Defendants reserve the right to amend this list of affirmative defenses.

Defendants demand a trial by jury as to the claims asserted in Plaintiffs' Amend. Adv. Compl.

## DEFENDANTS' COUNTERCLAIMS

### I.
### The Parties

1. Defendant/Plaintiff-in-Counterclaim Vadim Kagan ("Mr. Kagan") is an individual residing at 239 Nahanton Street, Newton, Massachusetts.

2. Defendant/Plaintiff-in-Counterclaim Tatiana Kagan ("Mrs. Kagan") is an individual residing at 239 Nahanton Street, Newton, Massachusetts.

3. Defendant/Plaintiff-in-Counterclaim Kagan Development KDC, Corp. ("KDC") is a Massachusetts corporation with a principal place of business located at 239 Nahanton Street, Newton, Massachusetts.

4. Defendant/Plaintiff-in-Counterclaim ProExcavation Corp. ("ProEx") is a Massachusetts corporation with a principal place of business located at 239 Nahanton Street, Newton, Massachusetts.

5. Plaintiff/Defendant-in-Counterclaim Lyman Cutler, LLC (the "Company" or the "Debtor") was a Massachusetts limited liability company with a principal place of business in Belmont, Massachusetts.  The Company filed a petition for bankruptcy under Chapter 11 of the United States Bankruptcy Code on October 7, 2015.  That case was converted to one under Chapter 7 of the United States Bankruptcy Code on or about December 5, 2015.

6. Plaintiff/Defendant-in-Counterclaim Alex Filippov ("Filippov") is an individual residing in Belmont, Massachusetts.  He was a member of the Company.

7. Plaintiff/Defendant-in-Counterclaim Nickolay Lipetsker ("Lipetsker") is an individual residing in Newton, Massachusetts.  He was a member of the Company.

## II.
## Jurisdiction and Venue

8. This Court has previously indicated that jurisdiction over this matter is proper pursuant to 28 U.S.C. § 1334(b) and 28 U.S.C. § 157(a) and (b). The Plaintiffs in Counterclaim are compelled to proceed in accordance with the Court's prior assertion but respectfully do so without conceding that jurisdiction is proper.

9. Subject to the above, this matter is a core proceeding pursuant to 28 U.S.C. §§ 157(b)(2)(A) and (C) and (E).  Venue is properly in the Bankruptcy Court for the District of Massachusetts.  This Court has previously ruled that it properly exercises jurisdiction over the claims asserted by Plaintiffs.  Plaintiffs in Counterclaim are therefore compelled to assert these counterclaims in this forum but respectfully do so without conceding that jurisdiction is proper.

## III.
## Facts Common to All Counts

10. Mr. Kagan is a real estate developer who, over multiple years and through multiple entities, has developed and built many luxury homes in Massachusetts.

11. In or about late 2012, Mr. Kagan located a property for sale in Brookline, MA (the "Property") which, following the demolition of the existing house on the Property, was large enough to support the construction of two new luxury homes.  Mr. Kagan believed that the purchase and development of the Property into two improved house lots would be a good investment opportunity (the "Project").

12. Mr. Kagan approached Lipetsker, an individual who he had known for years and with
whom he had previously partnered on potential investments, and asked whether he would
be interested in participating in the Project.  Lipetsker responded in the affirmative, and
introduced Mr. Kagan to Filippov.  Lipetsker communicated that Filippov might also be
interested in investing in the Project.

13. Mr. Kagan, Lipetsker and Filippov met to discuss the Project.  They had multiple
conversations regarding the Project.  Mr. Kagan, Lipetsker and Filippov each performed
his own analysis and due diligence and each made an independent decision as to whether
he wished to participate in the Project.  Each decided that he wanted to be part of the
Project.  No return on investment was guaranteed.

14. As part of their due diligence, in or about October 2012, Filippov and Lipetsker consulted
with Lipetsker's nephew, Dimitriy Zhukovskiy, who prepared documents analyzing, inter
alia, potential profits from the Project for the benefit of Filippov and Lipetsker.  Mr.
Kagan did not engage Mr. Zhukovskiy nor prepare that analysis.

15. On or about November 14, 2012, the parties, Lipetsker, Filippov and Mr. Kagan, entered
into an agreement titled "Operating Agreement of the Lyman-Cutler, LLC" (the
"Operating Agreement").  A true and accurate copy of the Operating Agreement is
annexed hereto as Exhibit A.  Although titled an "operating agreement," the Company
had not yet been formed.

16. The Operating Agreement was drafted by Attorney Boris Maiden ("Attorney Maiden") at
the direction of, and with the approval of Filippov.  Mr. Kagan, Mr. Lipetsker, and Mr.
Filippov had worked with Attorney Maiden on several prior projects. Attorney Maiden
had developed form documents which he stated he would use in setting up the Company

and the related contracts.  Neither Attorney Maiden nor Filippov disclosed that Filippov

had a pre-existing relationship with Attorney Maiden nor did he obtain a conflict waiver

to represent all three of the parties.  Filippov communicated directly with Attorney

Maiden and negotiated changes to the form documents which were not disclosed to, nor

discussed with, Mr. Kagan.

17. Filippov agreed to invest $2 million into the Project.  Lipetsker and Mr. Kagan each

agreed to invest $250,000.  Thus, the Company was to be capitalized by investments

totaling $2.5 million.  Filippov was to be an 80% member of the Company once formed,

and Lipetsker and Mr. Kagan would each be 10% members.  The parties treated their

ownership interests differently from their shares of profits and losses.

18. Although Filippov initially invested the largest sum of money into the Project, he made it

clear from the inception that he did not want to be involved in the day-to-day

management of the Company.  Lipetsker too had no interest in managing the Project.

Instead, as Mr. Kagan possessed the necessary background, expertise, and resources (i.e.

Kagan owned a development company, KDC), the parties agreed that Mr. Kagan would

manage the Project and the Company.

19. Mr. Kagan agreed that he would not charge the Company for his personal time in

managing the Project.  Rather, he would be compensated through other benefits,

including receiving a larger share of the profits than his membership interest would

otherwise have required based on his capital contribution.  Further, following the sales of

the homes on the Property, Mr. Kagan would have some collateral benefit from the

commission earned by his wife, Mrs. Kagan, a real estate agent affiliated with Century 21

Commonwealth, with whom the parties agreed the Property would be listed for sale.

20. Mr. Kagan, Filippov and Lipetsker agreed, and common sense dictated, that the Project would require a developer and general contractor and that Mr. Kagan's contracting business, KDC, would serve that role. They also agreed that Mr. Kagan's excavation subcontractor business, ProExcavation, would also work on the Project.

21. The Operating Agreement is silent as to the amount of consideration that would be paid to a developer or general contractor, KDC in this instance, for its work on the Project.

22. The purchase price of the Property was $4 million. As the Company coffers had only the $2.5 million initial capitalization, this left a shortfall for the purchase price and no money for construction and carrying costs.

23. In the Operating Agreement, the parties addressed how to make up the shortfall for the purchase of the Property, construction and carrying costs. In pertinent part, the Operating Agreement provides that a "Purchase Money Loan and Construction Loan shall be taken from Rockland Trust Company to pay for construction and carrying costs until issuance of a Certificate of Occupancy (hereinafter "CO") but in no event for more than twenty three (23) months from the date of acquisition." (Operating Agreement, ¶4.1).

24. Mr. Kagan had a long term relationship with Rockland Trust Company and introduced the Project and Filippov to the bank. As the majority investor and one who would be providing the bank with a personal guaranty, Filippov negotiated the loans with the Rockland Trust Company on behalf of the Company.

25. Under the Operating Agreement, the Company was obligated to pay the carrying costs on the Property for the first twenty-three months following its acquisition. To incentivize Mr. Kagan to obtain certificates of occupancy ("COs") at the earliest possible occasion, the Operating Agreement provided that if a CO had not been obtained on or before

twenty-three months from acquisition of the Property, Mr. Kagan would thereupon be responsible for the carrying costs until such time as the CO issued. (Operating Agreement, ¶4.2).

26. Each of Lipetsker, Filippov and Mr. Kagan executed the Operating Agreement.

27. The Operating Agreement allowed for one or more "Managing Members" and set forth the powers of a "Managing Member." It did not, however, set forth a process by which a "Managing Member" would be selected or removed. Though the parties had agreed that Mr. Kagan would be the manager of the Company, Filippov signed the Operating Agreement as "Managing Manager." "Managing Manager" is not a title or position defined or even discussed in the Operating Agreement.

28. Upon information and belief, on December 26, 2012, Attorney Boris Maiden, with the agreement of Filippov, caused to be filed a Certificate of Organization with the Secretary of State for the Commonwealth of Massachusetts, thereby creating the Company. In the Certificate of Organization, Filippov designated himself as the manager of the Company, despite the fact that the Operating Agreement did not provide that he was to be a manager and despite the fact that the parties had, in fact, agreed that Mr. Kagan would be managing the Project and the Company. The Certificate of Organization also failed to list that the Operating Agreement provided that the Company was to terminate by November 30, 2015

29. Filippov neither discussed the contents of the Certificate of Organization with Mr. Kagan nor provided him with a copy of the Certificate of Organization either before or after it was filed. Filippov simply reported that the Company now legally existed.

30. After filing the Certificate of Organization, and at no time since then, has there been a meeting of the members to elect a "Managing Member," though Mr. Kagan kept Filippov and Lipetsker generally apprised as to the Project status and each of them had access to the Company bank records and could request access to other Company records at any time.  In fact, the members had no formal meetings until Mr. Kagan called a special meeting in Spring 2015.

31. On December 30, 2012, the Company purchased the Property for $4 million.  As agreed, Filippov arranged with the Rockland Trust Company for the Company to take out a loan to finance the remainder of the Property purchase price.  On behalf of the Company, Filippov also arranged to take out two construction loans, one for each home to be built on the Property.

32. Contrary to the express terms of the Operating Agreement, the construction loans which Filippov negotiated for the Company did not cover carrying costs.  Insofar as the Company accounts had been emptied for the down payment on the Property, this left the Company with a significant monthly shortfall.

33. As agreed between the parties, Mr. Kagan proceeded to develop the Property.  On behalf of the Company, on June 24, 2013, Mr. Kagan entered into a contract for the construction and construction management of the Project with KDC.  As agreed and as expressly provided for in the Operating Agreement, the Company also listed the Property with his wife, Mrs. Kagan, through Century 21 Commonwealth.  Filippov and Lipetsker both knew that KDC acted as general contractor for the Project.

34. Both Filippov and Lipetsker visited the site on multiple occasions to view the progress, and the parties communicated frequently.

35. Filippov opened the Company operating/checking account and listed his personal
residence as the address to which monthly statements were sent.  Filippov and Lipetsker
assented to Mr. Kagan's having check writing ability on the Company bank account so
that he could proceed with the construction.  Filippov too had check writing authority on
the account.

36. In the ordinary course, KDC incurred costs for construction and prepared the necessary
paperwork for a draw down against the construction loan.  After conducting its own
inspection of the Project progress, Rockland Trust Company disbursed monies into the
Company account to enable the Company to pay subcontractors and suppliers.  The
Company bank statements went directly to Filippov so, monthly, he received copies of all
inspection records, cleared checks and bank transactions. The construction loans,
however, did not cover the carrying costs of the loan nor did they cover the entire cost for
the construction of the homes on the Property.  Mr. Kagan used the construction loans to
pay KDC and its subcontractors for their performance under the construction contract.
This included the payments to subcontractors and suppliers while KDC and some
subcontractors remained unpaid for the services it provided.

37. In anticipation of the timely completion of the Project and sale of the homes, and given
that the Company had no money other than the loan proceeds which could only be used
to pay subcontractors and suppliers, Mr. Kagan caused KDC to front all the carrying
costs and all construction costs on behalf of the Company once the construction loans
were exhausted.  The Company, Lipetsker and Filippov were each aware that KDC was
fronting the carrying costs and some construction costs for the Property.  As it was not

coming out of their pockets, neither the Company nor Messrs. Filippov and Lipetsker complained about this arrangement during construction.

38. KDC achieved substantial completion of the two homes on the Property on or before March 30, 2014.  The Certificates of Occupancy for the two new homes on the Property issued on October 2, 2014.

39. The Company, at the insistence of Filippov, set the initial asking price for the sale of the two new homes at $5.499 million and listed them at that price with Mrs. Kagan of Century 21 Commonwealth ("Century 21").  Despite substantial efforts to market the properties by Century 21 and despite being listed since August 2014, no bona fide, written offer to purchase was received prior to the filing of the Bankruptcy Petition.

40. The purchase money loan and the construction loans, though extended previously, were scheduled to mature in June, 2015.  Absent a sale of the Property, the Company did not have the money to pay back the loans.  Additionally, although Mr. Kagan had been causing KDC to front all the carrying costs for the project, without seeking additional capitalization from Lipetsker and Filippov, he was unwilling to allow KDC to continue incurring these costs indefinitely.  Filippov was obligated to pay the shortfall but did not do so.

41. On or about May 7, 2015, Mr. Kagan, through counsel, sent a letter to Lipetsker and Filippov seeking their agreement to lower the asking price for the homes on the Property. Mr. Kagan pointed out that as this was prime selling season, it made sense to reduce the price as soon as possible.  This was especially so given that the outstanding loans would mature in a matter of weeks and the proceeds from the home sales would be needed to pay off the loans.

42. The Operating Agreement set November 30, 2015 as the date on which the Company would dissolve. In the May 7, 2015 letter, Mr. Kagan recommended that the Operating Agreement be amended to reflect a later dissolution date. Otherwise, if the sales of the homes on the Property did not occur prior to the dissolution date provided for in the Lyman Cutler Operating Agreement, a prospect that was extremely likely given that there had been no offers and the prime selling season was almost over, the Company would dissolve and its assets would have to be liquidated. Selling the homes at a liquidation sale would benefit none of the Company members.

43. Mr. Kagan also informed Filippov and Lipetsker that he was no longer willing to front the carrying costs through KDC and other arrangements would need to be made. Mr. Kagan invited a dialogue to discuss these and any other issues.

44. Instead of agreeing to lower the price or amend the Operating Agreement or engaging in other dialogue, by letter dated May 13, 2015, the Company, through Filippov, responded by accusing Mr. Kagan of mishandling Company funds and of extending the listing agreements for the Property without Company authorization. Filippov knew that these allegations were false but hoped to strong-arm Mr. Kagan into continuing to be responsible for carrying costs and, as it appeared clear that the homes would not sell for as much as Filippov would have liked, Filippov wanted to force Mr. Kagan to take a lesser share of the profits upon the sale of the homes. Filippov also asserted, for the first time, that he was claiming the role of the managing member of the Company and would be taking control of the Project. He demanded the immediate turn-over of all the Company books and records and claimed that only he had the authority to execute listing agreements on behalf of the Company.

45. In the May 13, 2015 letter, Filippov also asserted that Mr. Kagan was personally
responsible to pay the ongoing carrying costs for the Property, despite the fact that the
COs had issued back in October 2014 and that, through KDC, Mr. Kagan had been
advancing the carrying costs on behalf of the Company since the Property was purchased.
In contrast, neither Filippov nor Lipetsker had paid any additional monies toward the
Project other than their initial capital contributions.

46. Filippov refused to reduce the asking price for the new homes thereby virtually ensuring
that they would not sell, that the Company would miss the prime selling season, and that
Mr. Kagan and KDC would be left carrying the large debt they incurred on behalf of the
Project. Filippov also expressed his intention to cause harm to Mr. Kagan.

47. In the May 13, 2015 letter, Filippov threatened that if Mr. Kagan did not comply with his
demands, Filippov, who together with Lipetsker controlled 90% of the membership
interests in the Company at that time, would vote to reallocate and reduce Mr. Kagan's
share of the profits.

48. Though denying the charges leveled against him, Mr. Kagan immediately provided
Filippov with copies of the Company's books and records, and again offered to meet with
him to discuss any concerns or questions he might have. Filippov refused to meet and
refused to identify anything on the books and records which he believed may be
improper. He also refused to back down from his false accusations and refused Mr.
Kagan's offer to participate in mediation.

49. Thereafter, Filippov, with the acquiescence of Lipetsker, unilaterally removed Mr.
Kagan's access to the Company bank accounts and exercised complete control over the
Project, to the exclusion of Mr. Kagan. Despite repeated requests, Filippov persisted in

his refusal to assent to a reduction in the asking price thereby virtually ensuring that the homes on the Property would not sell.

50. On or about May 14, 2015, Filippov contacted Century 21 to ask what it had been doing to market the Property. Century 21 provided Filippov with a summary of its marketing efforts. Filippov voiced no objection to Century 21's efforts at that time.

51. On or about May 26, 2015, Filippov, through counsel, wrote to Century 21 and falsely accused Mr. Kagan and Mrs. Kagan of orchestrating the execution of a listing agreement on behalf of the Company despite the fact that he, allegedly, had refused to consent to such agreement. Filippov alleged that Mr. Kagan had no authority to execute the listing agreement and that Mrs. Kagan was aware that Mr. Kagan lacked this authority. These allegations were patently false and Filippov knew this.

52. In fact, prior to executing the listing agreement in April 2015, both Mr. Kagan and Mrs. Kagan, individually, spoke to Filippov to confirm that he was in favor of the executing the listing agreement and that Kagan was authorized to execute the agreement. Filippov confirmed that Mr. Kagan should sign the listing agreement, and Mr. Kagan did so.

53. On behalf of the Company, Filippov, through counsel, demanded that the listing agreements be set aside and threatened to sue Century 21 if it refused to accede to his demands.

54. By removing or voiding the listing with Century 21, Filippov intended to punish Mr. Kagan by ensuring that Mr. and Mrs. Kagan did not benefit from the commission that would be earned upon the sale and which was part of the compensation that Mr. Kagan relied upon when agreeing to go forward with the Project. He also hoped to force Mr. Kagan to accept a lower distribution of potential profit as a cost of buying "peace."

55. On or about June 1, 2015, KDC forwarded its invoice to the Company for the unpaid construction and construction related costs plus the carrying costs for the Property which it had been fronting since the Company purchased the Property.  The Company, under the control of Filippov, refused to pay any part of the invoice.

56. On or about June 22, 2015, KDC caused a mechanics lien to be recorded against the Company's property so as to secure the unpaid balance due to it for constructing the homes.

57. Earlier, on or about October 24, 2014, Mr. Kagan terminated the employment of his bookkeeper, Kristina Brusenkova ("Brusenkova"), after discovering that she had been embezzling money from his companies.  Brusenkova also assaulted and threatened bodily harm against Mr. Kagan and Mrs. Kagan.  Filippov learned of the dispute with Brusenkova and contacted her in an effort to solicit false testimony against Mr. Kagan in exchange for financial remuneration.  Brusenkova, with the active encouragement of Filippov, agreed to perjure herself and assist Filippov in damaging the reputation of Mr. Kagan and his efforts to force Mr. Kagan to take less of the Company profits upon the sale of the Property.

58. Filippov conspired with Brusenkova to file an MCAD (Massachusetts Commission Against Discrimination) complaint.  (MCAD Docket No: 15BEM02482, EEOC/HUD Number: 16C-2015-02225) against KDC and Mr. and Mrs. Kagan on August 20, 2015, alleging violations of Mass. G.L. c. 151B, §4.  Ultimately, this complaint was dismissed by the MCAD.  Brusenkova attempted to resurrect the complaint at the federal level but was unsuccessful.

59. Filippov also contacted investors on other projects in which Mr. Kagan had an interest, and advised them that he (Filippov) had evidence that Mr. Kagan was dishonest and likely had been dishonest on their projects too.  Filippov actively fomented calumnies and convinced some former investors to join him in a smear campaign against Mr. Kagan.

60. On June 5, 2015, Filippov caused the Company to file suit in the Middlesex Superior Court.  (Lyman Cutler, LLC v. Kagan, et al., Civil Action No. 1581CV03977 ("the State Court Action").  He also moved for an injunction to have Century 21 removed as the listing broker for the Property.  That motion was denied.

61. On June 11, 2015, almost a month after the initial request, the Company, through Filippov, finally assented to a reduction in the asking price for the new homes on the Property, but coupled it with a demand that Mrs. Kagan be removed as the listing agent. Over the objection of Mr. Kagan, Century 21 acceded to the Company's request to remove Mrs. Kagan as the listing agent and replaced her with another Century 21 agent.

62. On July 2, 2015, KDC filed suit in the Norfolk Superior Court to enforce its mechanic's lien (Kagan Development KDC, Corp. v. Lyman-Cutler, LLC, Civil Action No. 1582CV00844).  That action was ultimately consolidated into the Middlesex Superior Court action.

63. Mr. Kagan also requested that Filippov file the necessary papers with the Secretary of State to dissolve the Company as provided for in the Operating Agreement.  Filippov refused or ignored the request to dissolve the Company.

64. Mr. Kagan also served deposition notices in the state court proceedings.

65. Just prior to the deadline for responding to the motion to compel the dissolution of the Company and on the eve of scheduled depositions of witnesses who would likely provide

unfavorable testimony to them, Filippov and Lipetsker caused the Company to file its

petition for bankruptcy, notwithstanding that there was no membership vote to do so.

66. Filippov and Lipetsker cut out Mr. Kagan from participating in any management

decisions and refused to acknowledge any debt owed to Mr. Kagan or KDC for the

development and construction of the Property.

## Count I: Breach of Fiduciary Duty
### (Vadim Kagan v. Filippov and Lipetsker)

67. Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the other

paragraphs of this Counterclaim as if set forth fully herein.

68. Filippov and Lipetsker, as members of Lyman Cutler, LLC, owed fiduciary duties to Mr.

Kagan.

69. The duties owed by Filippov and Lipetsker to Mr. Kagan included the duty of utmost

good faith and fair dealing.

70. Filippov and Lipetsker breached the fiduciary duties owed to Mr. Kagan by, among other

things:

    a.   failing to pay the Project's carrying costs when it was in the best interest of the

        Company and its members to do so;

    b.   falsely accusing Mr. Kagan and Mrs. Kagan of fraud in connection with the

        listing agreements;

    c.   causing the Company for file a petition for bankruptcy, without any vote of the

        members, solely to harm Mr. Kagan;

    d.   claiming to be the Managing Member without actual authority to do so;

    e.   causing the Company to file litigation against Plaintiffs-in-Counterclaim without

        holding a meeting;

    f.   refusing to lower the sale price of the homes due to a desire to harm Kagan;

    g.   directing the Company not to pay obligations due to KDC;

    h.   failing to amend the operating agreement and the state organizational certificate to reflect the ongoing operation of the LLC;

    i.   leveraging the imminent loan maturity date to harm Mr. Kagan; and

    j.   conspiring with a disgruntled former KDC employee Brusenkova to offer false evidence against Plaintiffs-in-Counterclaim.

71. Filippov's and Lipetsker's actions were intentional and/or the product of gross negligence and/or willful misconduct.

72. Filippov's and Lipetsker's breaches of fiduciary duties caused Mr. Kagan to suffer damages, including emotional distress, in an amount to be proven at trial.

**Count II: Freeze Out**
**(Vadim Kagan v. Filippov and Lipetsker)**

73. Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the other paragraphs of this Counterclaim as if set forth fully herein.

74. Filippov is the owner of the majority of interests in Lyman Cutler, LLC.

75. Filippov, alone and in concert with Lipetsker, another member of the Company, have acted to deprive Mr. Kagan, a minority owner, of the benefits of Mr. Kagan's reasonable expectations of ownership and participation in the Company by, among other things:

    a.   stripping Mr. Kagan of authority to manage the affairs of the Company;

    b.   stripping Mr. Kagan of the authority to manage the Project;

    c.   causing the Company to file a petition for bankruptcy unnecessarily;

    d.   refusing to implement the dissolution processes of the Lyman Cutler, LLC operating agreement;

    e.   depriving Mr. Kagan of the financial benefits of ownership;

    f.   depriving Mr. Kagan of the rights of participation in the Company's affairs; and

    g.   conspiring with a disgruntled former KDC employee Brusenkova to offer false evidence against Plaintiffs.

76. Filippov, alone and in concert with Lipetsker, took these actions without a legitimate business purpose, without a good faith belief that they were in the best interest of the Company, and without examining courses of action that would have been less harmful to Mr. Kagan's interests.

77. Filippov's and Lipetsker's actions were intentional and/or the product of gross negligence and/or willful misconduct.

78. Filippov's and Lipetsker's actions caused Mr. Kagan to suffer damages, including emotional distress, in an amount to be proven at trial.

### Count III: Breach of Contract
### (Vadim Kagan v. Filippov and Lipetsker)

79. Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the other paragraphs of this Counterclaim as if set forth fully herein.

80. The Lyman Cutler, LLC operating agreement signed by Mr. Kagan, Filippov, and Lipetsker is a valid and binding contract.

81. The Lyman Cutler, LLC operating agreement contains several material promises made by Filippov and Lipetsker, including, their promises to, among other things:

    a.   Pay the Project's carrying costs if Mr. Kagan did not pay them (paragraph 8.1);

    b.   Pay distributions based on the net profit of the Project;

    c.   Take out loans for the Company to cover the anticipated carrying costs for the Company; and

    d.   Pay the indemnification due to Mr. Kagan, KDC, Mrs. Kagan, and ProEx.

82. Filippov and Lipetsker breached these promises.

83. Filippov's and Lipetsker's actions were intentional and/or the product of gross negligence

and/or willful misconduct.

84. Filippov's and Lipetsker's breaches caused Mr. Kagan to suffer damages in an amount to

be proven at trial.

### Count IV: Breach of the Implied Covenant of Good Faith and Fair Dealing
### (Vadim Kagan v. Filippov and Lipetsker)

85. Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the other

paragraphs of this Counterclaim as if set forth fully herein.

86. Implied in the Lyman Cutler, LLC operating agreement is a covenant that the members

act in good faith and deal fairly with each other.

87. Filippov and Lipetsker breached the implied covenant of good faith and fair dealing by,

among other things, exercising the discretion afforded to them under the Operating

Agreement in an unreasonable manner and in bad faith so as to deprive Mr. Kagan of the

reasonable benefits of the contract.

88. Filippov and Lipetsker did so by, among other things, being secretive and duplicitous in

the ongoing business of the Debtor, suborning perjured testimony, and by failing to

conform to the promises made in the Operating agreement solely for the purpose of

causing harm to the Plaintiffs in Counterclaim.

89. Filippov's and Lipetsker's actions were intentional and/or the product of gross negligence

and/or willful misconduct.

90. Filppov's and Lipetsker's breaches have caused Mr. Kagan damages in an amount to be

proven at trial.

### Count V: Indemnification
**(Vadim Kagan v. Lyman Cutler, LLC)**

91. Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the other

    paragraphs of this Counterclaim as if set forth fully herein.

92. Paragraph 10.2 of the Lyman Cutler, LLC operating agreement includes Lyman Cutler,

    LLC's promise to indemnify and hold harmless the members and their respective

    employees and authorized agents from and against any loss, damage or claim incurred by

    reason of any act or omission performed or omitted by such member, employee or

    authorized agent in good faith on behalf of the company and reasonably believed to be

    within the scope of authority conferred by the Operating Agreement.[1]

93. Mr. Kagan was a member of Lyman Cutler, LLC.

94. The claims asserted by Lyman Cutler, LLC, Filippov and Lipetsker in the Amended

    Adversary Complaint constitute claims that are covered by the contractual and legal

    indemnification obligations owed to Mr. Kagan by Lyman Cutler, LLC.

95. Lyman Cutler, LLC has failed and refused to honor its promise to indemnify Mr. Kagan.

96. Lyman Cutler, LLC therefore has caused Mr. Kagan to suffer damages in an amount to

    be proven at trial.

### Count VI: Indemnification
**(Tatiana Kagan v. Lyman Cutler, LLC)**

97. Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the other

    paragraphs of this Counterclaim as if set forth fully herein.

98. Paragraph 10.2 of the Lyman Cutler, LLC operating agreement includes Lyman Cutler,

    LLC's promise to indemnify and hold harmless the members and their respective

---

[1] This count has also been asserted by Mr. Kagan as a proof of claim and is replicated here solely to prevent any argument that he has waived this claim by failing to assert it in this pleading.

employees and authorized agents from and against any loss, damage or claim incurred by reason of any act or omission performed or omitted by such member, employee or authorized agent in good faith on behalf of the company and reasonably believed to be within the scope of authority conferred by the Operating Agreement.[2]

99. Mrs. Kagan was an agent of Lyman Cutler, LLC and Mr. Kagan, as that term is used in the indemnification provision of the operating agreement, by virtue of her work as the real estate agent retained to market the Project.

100.    The claims asserted by Lyman Cutler, LLC, Filippov and Lipetsker in the Amended Adversary Complaint constitute claims that are covered by the contractual and legal indemnification obligations owed to Mrs. Kagan by Lyman Cutler, LLC.

101.    Lyman Cutler, LLC has failed and refused to honor its promise to indemnify Mrs. Kagan.

102.    Lyman Cutler, LLC therefore has caused Mrs. Kagan to suffer damages in an amount to be proven at trial.

**Count VII: Indemnification**
**(ProExcavation v. Lyman Cutler, LLC)**

103.    Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the other paragraphs of this Counterclaim as if set forth fully herein.

104.    Paragraph 10.2 of the Lyman Cutler, LLC operating agreement includes Lyman Cutler, LLC's promise to indemnify and hold harmless the members and their respective employees and authorized agents from and against any loss, damage or claim incurred by reason of any act or omission performed or omitted by such member, employee or

---

[2] This count has also been asserted by Tatiana Kagan as a proof of claim and is replicated here solely to prevent any argument that she has waived this claim by failing to assert it in this pleading.

authorized agent in good faith on behalf of the company and reasonably believed to be

within the scope of authority conferred by the Operating Agreement.[3]

105.    ProEx was an agent of Lyman Cutler, LLC and/or Mr. Kagan, as that term is used

in the indemnification provision of the operating agreement, by virtue of its work as a

subcontractor on the Project.

106.    The claims asserted by Lyman Cutler, LLC, Filippov and Lipetsker in the

Amended Adversary Complaint constitute claims that are covered by the contractual and

legal indemnification obligations owed to ProEx by Lyman Cutler, LLC.

107.    Lyman Cutler, LLC has failed and refused to honor its promise to indemnify

ProEx.

108.    Lyman Cutler, LLC therefore has caused ProEx to suffer damages in an amount to

be proven at trial.

**Count VIII: Indemnification**
**(KDC v. Lyman Cutler, LLC)**

109.    Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the

other paragraphs of this Counterclaim as if set forth fully herein.

110.    Paragraph 10.2 of the Lyman Cutler, LLC operating agreement includes Lyman

Cutler, LLC's promise to indemnify and hold harmless the members and their respective

employees and authorized agents from and against any loss, damage or claim incurred by

reason of any act or omission performed or omitted by such member, employee or

---

[3] This count has also been asserted by ProExcavation as a proof of claim and is replicated here solely to prevent any argument that it has waived this claim by failing to assert it in this pleading.

authorized agent in good faith on behalf of the company and reasonably believed to be within the scope of authority conferred by the Operating Agreement.[4]

111.     KDC was an agent of Lyman Cutler, LLC and/or Mr. Kagan, as that term is used in the indemnification provision of the operating agreement, by virtue of its work as developer and general contractor the Project.

112.     The claims asserted by Lyman Cutler, LLC, Filippov and Lipetsker in the Amended Adversary Complaint constitute claims that are covered by the contractual and legal indemnification obligations owed to KDC by Lyman Cutler, LLC.

113.     Lyman Cutler, LLC has failed and refused to honor its promise to indemnify KDC.

114.     Lyman Cutler, LLC therefore has caused KDC to suffer damages in an amount to be proven at trial.

**Count IX: Breach of Contract**
**(KDC v. Lyman Cutler, LLC)**

115.     Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the other paragraphs of this Counterclaim as if set forth fully herein.

116.     Lyman Cutler, LLC and KDC entered a valid and binding contract, the June 24, 2013 construction contract.[5]

117.     In that contract, Lyman Cutler, LLC promised to pay KDC to serve as developer and general contractor on the Project.

118.     Lyman Cutler, LLC's promises were material to the parties' contract.

---

[4] This count has also been asserted by KDC as a proof of claim and is replicated here solely to prevent any argument that it has waived this claim by failing to assert it in this pleading.
[5] This count has also been asserted by KDC as a proof of claim and is replicated here solely to prevent any argument that it has waived this claim by failing to assert it in this pleading.

119.      Lyman Cutler, LLC has failed and refused to pay KDC in accordance with the

parties' agreement and therefore has beached the contract.

120.      Lyman Cutler, LLC's breaches have caused KDC to suffer damages in an amount

to be proven at trial.

### Count X: Breach of the Implied Covenant of Good Faith and Fair Dealing
### (KDC v. Lyman Cutler, LLC)

121.      Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the

other paragraphs of this Counterclaim as if set forth fully herein.

122.      Implied in the contract between Lyman Cutler, LLC and KDC, the June 24, 2013

construction contract, is a covenant that the members act in good faith and deal fairly

with each other.[6]

123.      Lyman Cutler, LLC breached the implied covenant of good faith and fair dealing

by, among other things, exercising its discretion in a manner that deprived KDC of the

benefits of the parties' contract as set forth above.

124.      Lyman Cutler, LLC's breaches have caused KDC damages in an amount to be

proven at trial.

### Count XI: Unjust Enrichment
### (KDC v. Lyman Cutler, LLC)

125.      Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the

other paragraphs of this Counterclaim as if set forth fully herein.

126.      Lyman Cutler, LLC knowingly accepted the services provided by KDC as

developer and general contractor on the Project.[7]

---

[6] This count has also been asserted by KDC as a proof of claim and is replicated here solely to prevent any argument that it has waived this claim by failing to assert it in this pleading.
[7] This count has also been asserted by KDC as a proof of claim and is replicated here solely to prevent any argument that it has waived this claim by failing to assert it in this pleading.

127.      Lyman Cutler, LLC unjustly reaped the benefits of the services KDC provided by, among other things, selling the two homes that were the Project.

128.      Lyman Cutler, LLC has failed and refused to pay KDC compensation for the services KDC provided on the Project.

129.      Lyman Cutler, LLC reasonably should have expected to compensate KDC for the development services provided on the Project.

130.      KDC reasonably expected to receive compensation for its development services on the Project.

131.      It would be inequitable to allow Lyman Cutler, LLC to keep the benefits of the services KDC provided without paying KDC for them.

132.      KDC therefore requests that this honorable Court order that Lyman Cutler, LLC compensate KDC for the services it provided on the Project, an amount that will be proven at trial.

### Count XII: Mechanic's Lien Pursuant to M.G.L. c. 254
### (KDC v. Lyman Cutler, LLC)

133.      Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the other paragraphs of this Counterclaim as if set forth fully herein.

134.      KDC furnished labor and labor and materials to the Project pursuant to a contract with the owner, Lyman Cutler, LLC. [8]

135.      KDC recorded notices of contract with the Norfolk County Registry of Deeds on June 22, 2015(Book 33233, Page 241).

136.      KDC provided notices to Lyman Cutler, LLC.

---

[8] This count has also been asserted by KDC as a proof of claim and is replicated here solely to prevent any argument that it has waived this claim by failing to assert it in this pleading and to maintain priority.

137.     KDC recorded its Notice of Claim on June 22, 2015 pursuant to M.G.L. c. 254 § 8

on June 22, 2015(Book 33233, Page 243) in the Norfolk County Registry of Deeds.

138.     KDC therefore enjoys a lien for the labor and materials it provided to the Project.

### Count XIII: Promissory Estoppel
### (KDC v. Lyman Cutler, LLC)

139.     Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the

other paragraphs of this Counterclaim as if set forth fully herein.

140.     Lyman Cutler, LLC represented to KDC that the Company would make payments

to KDC.[9]

141.     In making those representations, the Company intended to induce KDC to

develop the Project and to defer receiving payments until a future time.

142.     KDC reasonably relied upon Lyman Cutler, LLC's representations by, among

other things, continuing to incur expenses developing the Project.

143.     Lyman Cutler, LLC should reasonably have expected KDC to rely on Lyman

Cutler, LLC's representations, and should therefore be estopped from denying the

existence and enforceability of such representations.

144.     KDC's reliance upon Lyman Cutler, LLC's representations caused detriment to

KDC including, but not limited to, incurring expenses on the Project for which it was not

compensated and for foregoing seeking collection on past monies owed.

145.     KDC has therefore suffered damages in an amount to be proven at trial.

### Count XIV: Quantum Meruit
### (KDC v. Lyman Cutler, LLC)

---

[9] This count has also been asserted by KDC as a proof of claim and is replicated here solely to prevent any argument that it has waived this claim by failing to assert it in this pleading.

146.    Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the other paragraphs of this Counterclaim as if set forth fully herein.

147.    KDC substantially performed on the parties' contracts and endeavored in good faith to fully perform.[10]

148.    KDC conferred a measurable benefit upon Lyman Cutler, LLC, principally in the form of two houses that were sold.

149.    A reasonable person in position of Lyman Cutler, LLC would have expected to compensate KDC upon accepting the development services provided.

150.    KDC provided the development services with the reasonable expectation of receiving compensation.

151.    KDC is entitled to an award for the fair value of the materials and services it provided and the value of what Lyman Cutler, LLC received.

## Count XV: Interference with Contract
### (Vadim Kagan v. Lyman Cutler, LLC)

152.    Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the other paragraphs of this Counterclaim as if set forth fully herein.

153.    Mr. Kagan was a party to the Lyman Cutler, LLC operating agreement, a valid and binding contract.

154.    Lyman Cutler, LLC knew of the operating agreement.

155.    Lyman Cutler, LLC intentionally and without privilege interfered with the operating agreement through improper motive or means and caused Filippov and/or Lipetsker to breach the operating agreement.

156.    Lyman Cutler, LLC did so by, among other things:

---

[10] This count has also been asserted by KDC as a proof of claim and is replicated here solely to prevent any argument that it has waived this claim by failing to assert it in this pleading.

a.  Acquiescing in and encouraging Filippov's assertion that he is the managing member of the Company despite the fact that the Operating Agreement does not designate him as managing member;

b.  Acquiescing in and allowing Filippov, ostensibly as managing member, to arrange for loans by the Company which did not comply with the Company's obligation under the Operating Agreement to borrow monies to cover carrying costs for the Property;

c.  Acquiescing in and allowing Filippov, ostensibly as managing member, to authorize the filing of the instant litigation despite the fact that he is not authorized to do so under the Operating Agreement;

d.  Acquiescing in and allowing Filippov to freeze out Kagan from his rights and privileges as a member of the Company;

e.   Refusing to timely lower the price for the Properties; and

f.  Filing bankruptcy unnecessarily to diminish Mr. Kagan's rights to the net profits under the Operating Agreement.

157.    The Company had improper means and motive.

158.    As a result of the Company's unlawful interference with the operating agreement, Mr. Kagan suffered damages in an amount to be proven at trial.

**Count XVI: Promissory Estoppel**
**(Vadim Kagan v. Lyman Cutler, LLC and Filippov and Lipetsker)**

159.    Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the other paragraphs of this Counterclaim as if set forth fully herein.

160.     Lyman Cutler, LLC and Filippov and Lipetsker represented to Mr. Kagan that he would be compensated for arranging for the construction of the two homes that are the Project.

161.     In making those representations, the Company, Filippov and Lipetsker intended to induce Mr. Kagan to arrange for the development of the Project and take on the risks associated with the Project.

162.     Mr. Kagan reasonably relied upon the representations by, among other things, undertaking to arrange for the completion of the Project and incurring expenses developing the Project.

163.     Lyman Cutler, LLC and Filippov and Lipetsker should reasonably have expected Mr. Kagan to rely on the representations, and should therefore be estopped from denying the existence and enforceability of such representations.

164.     Mr. Kagan's reliance upon the representations caused detriment to Mr. Kagan including, but not limited to, taking on risk associated with the Project, incurring expenses on the Project for which he was not compensated and for foregoing seeking collection on past monies owed.

165.     Filippov's and Lipetsker's actions were the product of gross negligence and/or willful misconduct.

166.     Mr. Kagan has therefore suffered damages in an amount to be proven at trial.

**Count XVII: Conspiracy**
**(Vadim Kagan v. Lyman Cutler, LLC and Filippov and Lipetsker)**

167.     Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the other paragraphs of this Counterclaim as if set forth fully herein.

168.     Plaintiffs knew of each other's breaches of duties owed to Mr. Kagan.

{S1087479.9}                                          46

169.      Plaintiffs provided substantial assistance and encouragement to one another in connection with those breaches.  They also encouraged and joined with Brusenkova in her quest to harm the reputation of Mr. Kagan and desire to extort monies from Mr. Kagan for her silence.

170.      Plaintiffs knew that their assistance and encouragement contributed to a common tortious plan.

171.      Plaintiffs took affirmative steps to encourage the achievement of harming Mr. Kagan.

172.      Plaintiffs acted in unison to exert a peculiar power they would not have if they acted independently.

173.      Plaintiffs are therefore jointly and severally liable to Mr. Kagan.

### Count XVIII: Tortious Interference with Advantageous Business Relations
**(Vadim Kagan v. Filippov and Lipetsker)**

174.      Defendants/Plaintiffs-in-Counterclaim repeat and reallege the allegations of the other paragraphs of this Counterclaim as if set forth fully herein.

175.      Mr. Kagan enjoyed advantageous business relationships with investors on other development projects.

176.      Filippov and Lipetsker knew of these advantageous business relations.

177.      Filippov and Lipetsker, without privilege, interfered with Mr. Kagan's relationships with these other investors by, among other things, spreading false allegations concerning Mr. Kagan, his businesses and his business practices.

178.      Filippov's and Lipetsker's actions damaged Kagan's relationships with these investors which resulted in the investors declining to participate in projects with Mr. Kagan.

179.      Filippov and Lipetkser acted with actual malice toward Kagan.

180.      Filippov and Lipetsker acted with improper motive and means.

181.      Filippov's and Lipetsker's actions were the product of gross negligence and/or willful misconduct.

182.      Mr. Kagan has therefore suffered damages, including emotional distress, in an amount to be proven at trial.


WHEREFORE, Defendants/Plaintiffs-in-Counterclaim request that this Court:

A.  Award Mr. Kagan damages for Filippov's and Lipetsker's breaches of fiduciary duty;

B.  Award Mr. Kagan damages for Filippov's and Lipetsker's freezing Mr. Kagan out of the Company;

C.  Award Mr. Kagan damages for Filippov's and Lipetsker's breaches of contract;

D.  Award Mr. Kagan damages for Filippov's and Lipetsker's breaches of the implied covenant of good faith and fair dealing;

E.  Award Vadim Kagan damages for Lyman Cutler, LLC's refusal to indemnify him;

F.  Award Tatiana Kagan damages for Lyman Cutler, LLC's refusal to indemnify her;

G.  Award ProExcavation damages for Lyman Cutler, LLC's refusal to indemnify it;

H.  Award KDC damages for Lyman Cutler, LLC's refusal to indemnify it;

I.  Award KDC damages for Lyman Cutler, LLC's breaches of contract;

J.  Award KDC damages for Lyman Cutler, LLC's breaches of the implied covenant of good faith and fair dealing;

K.  Award KDC damages for Lyman Cutler, LLC's having been enriched unjustly;

L.  Confirm KDC's mechanic's lien on the properties and allow KDC to levy on the proceeds of the sale of the homes in the Project to recoup the amount secured by the lien;

M.  Award KDC damages against Lyman Cutler, LLC under the doctrine of promissory estoppel;

N.  Award KDC damages against Lyman Cutler, LLC under the doctrine of quantum meruit;

O.  Award Vadim Kagan damages for Lyman Cutler, LLC's interfering with contract;

P.  Award Vadim Kagan damages against Lyman Cutler, LLC; Filippov and Lipetsker under the doctrine of promissory estoppel;

Q.  Determine that Plaintiffs are jointly and severally liable for the harms suffered by Mr. Kagan;

R.  Award Vadim Kagan damages against Filippov and Lipetsker for damages suffered by their interference with Mr. Kagan's advantageous business relations; and

S.  Grant such additional and further relief as the Court deems necessary.


Plaintiffs-in-Counterclaim demand a trial by jury on their counterclaims.

Dated:   January 30, 2018                    Respectfully submitted,

                                             VADIM KAGAN,
                                             TATIANA KAGAN,
                                             KAGAN DEVELOPMENT KDC, CORP. and
                                             PROEXCAVATION CORP.,


                                             By their Attorneys,

                                             /s/ John H. Perten
                                             Christopher M. Candon, BBO# 650855
                                             John H. Perten, BBO# 548728
                                             SHEEHAN PHINNEY BASS & GREEN, PA
                                             255 State Street, 5th Floor
                                             Boston, MA  02109
                                             Tel:  617-897-5600
                                             Fax: 617-439-9363
                                             E-mail: jperten@sheehan.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 30th day of January, 2018, a copy of the foregoing was

served upon the parties listed below via ECF and/or first class mail, postage prepaid.

Eric K. Bradford
Office of the US Trustee
J.W. McCormack Post Office & Courthouse
5 Post Office Sq., 10th Fl, Suite 1000
Boston, MA 02109

Joseph P. Calandrelli
O'Connor Carnathan and Mack LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

Sean T. Carnathan
O'Connor, Carnathan and Mack, LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

David B. Madoff
Madoff & Khoury LLP
124 Washington Street - Suite 202
Foxborough, MA 02035

Peter N. Tamposi
The Tamposi Law Group
159 Main Street
Nashua, NH 03060

/s/ John H. Perten
John H. Perten