# EXHIBIT 4

Review of
the Estimate by Mr. Doddridge
and Analysis by Mr. Goldman for

# 88 Cutler Lane and 55 Lyman Road
# Brookline, MA

August 29, 2018

# Table of Contents

STATEMENT OF ISSUES PRESENTED _____ 3

FACTS AND DATA CONSIDERED _____ 3

REVIEW OF ESTIMATE_____ 4
    Division 1 - General Requirements    4
    Division 2 – Existing Conditions    5
    Division 3 – Concrete    6
    Division 4 – Masonry    7
    Division 5 – Metals    8
    Division 31 – Earthwork    9
    Division 32 – Exterior Improvements    10
    Division 35 – Utilities    11

ITEMS NOT INCLUDED_____ 12

SUBSTANTIAL COMPLETION REVIEW _____ 13

MICHAEL GOLDMAN'S ANALYSIS _____ 14

CONCLUSION _____ 16

# Exhibits

EXHIBIT A –Financial Summary of Additional Costs as Listed in the 2014 RS Means Residential Cost Data, dated August 29, 2018

## STATEMENT OF ISSUES PRESENTED

As noted previously in our Review of the Cost to Build 88 Cutler Lane and 55 Lyman Road in Brookline, MA, on behalf of his clients, Vadim Kagan("Kagan), Kagan Development KDC, Corp. ("KDC"), ProExcavation Corp. ("ProExcavation) and Tatiana Kagan, John H. Perten, Esq. of Sheehan, Phinney, Bass & Green, P.A. of Boston, MA engaged the services of Von Salmi, President of Von Salmi and Associates, Inc. ("VSA"). We have been asked to review and provide brief feedback of D.A. Doddridge Assoc., Inc.'s Site-Work Estimate ("Estimate"), dated July 30, 2018, and Michael Goldman's Analysis, dated July 27, 2017.

## FACTS AND DATA CONSIDERED IN THE DODDRIDGE ESTIMATE

The initial review of the Estimate revealed a flawed basis. It appears that Mr. Doddridge did not reference the Building Permit Plans dated 5/23/2013, sheets A-1 through A6 and S1 through S8. Instead he based his work on Building Plans dated 03/18/2013 for sheets A-1 and A-2 and worse, sheets A-3 through A-6 dated 12/14/2012. "A" represents the Architectural Plans and "S" stands for the Structural Plans. As the plans used by Mr. Doddridge are not the Permit Plans, including the structural elements of the building, it is a flawed premise and the potential for significant errors pervades the entire Estimate. Our review is based on the permitted plans and the quantities of materials is derived solely from the Permit Plans ("Plans"). By law those are the plans that the building permit is predicated upon. Furthermore, through comparison of the as-built site plans, it appears certain that the Permit Plans were those used to build the home. It is therefore our professional opinion that it is improper to base an estimate on anything that predates the permit plans.

VSA is familiar with the estimating process using the RS Means Residential Cost Data. This data base is composed of reported costs from a sampling of contractors, which does not necessarily comport with the circumstances of any particular construction project. It does not cover all aspects or types of projects. At best, it provides a rough estimate of what some contractors may have charged for some aspects of a job. It is not relied upon in the high-end single family residential construction industry as a reliable indicator of costs. There are too many variables, as discussed below, to rely on the numbers generated as an accurate estimate of actual costs.

VSA has reviewed the RSMeans Residential Costs Data book ("Book") from 2014 which Mr. Doddridge utilized. To begin, our professional experience as Owners' Representatives allows us opportunities to review the work of other construction companies, and we are unaware of any high-end residential construction contractor who uses the Book to do its estimating in the Greater Boston metropolitan region for many of the reasons referenced above. As noted in the Book, "Costs of projects

of a significantly different size or type should be adjusted accordingly.[1]" As illustrated in the Book, high-end homes of the scale or size of the homes in the Lyman-Cutler project are not accounted for. For instance, the maximum square footage it calculates for a custom 2 story home is 4,400[2] (in contrast, each property of the Lyman-Cutler homes is 7,478 square feet), the finish materials utilized in the homes are not provided in the Book as an option for selection in many cases and some options which Mr. Doddridge selected are not available to build a house which complies with the MA State Building Code. Accordingly, the resultant estimate is significantly flawed and, as described in greater detail below, significantly understated.

### REVIEW OF THE DODDRIDGE ESTIMATE

The Estimate is reviewed in accordance with the specification as stated in the Book and the quantities stated in the Estimate for comparison with the Building Permit Plans, the photographs, the As Built Plans, the specifications of what is on site, the building code, Occupational Safety and Health Administration ("OSHA") requirements, and the local municipality's requirements for this specific site. It is noteworthy to observe that this is merely a partial sampling of the inconsistencies with the Estimate versus a full assessment. Even this incomplete sampling reveals that had Mr. Doddridge utilized the proper basis for constructing his Estimate would have come out at least $120,757.50 per property higher, notwithstanding the inherent unreliability of an RS Means based estimate and the exorbitant number of items missing from his quote. The actual costs would be significantly higher than indicated in the Estimate if one could use RS Means to obtain accurate estimates for items in the Lyman-Cutler project that simply are not available options in the RS Means database. For this and the other reasons stated in this report, we do not believe that the Estimate is accurate nor do we believe that one can reasonably rely on RS Means for an accurate estimate of costs.

## Division 1 - General Requirements

**Equipment Mobilization –** This category considers all of the equipment and mobilizations and demobilizations of that equipment. The Estimate accounted for 3 mobilizations of a crawler-mounted piece of equipment. However, this predicate does not include the site trucks, loader, and compactors needed to complete the Lyman-Cutler project. Furthermore, under the header of "Mobilization" the Book states, "Use line item again for demobilization[3]." The Estimate did <u>not</u> use the line item again to calculate the amount attributable to demobilization of the equipment. During the course of constructing a home in an urban environment, equipment is typically moved multiple times due to the size of the site and scheduling of the

---

[1] RS Means Residential Cost Data, 2014, 33rd annual edition, page x
[2] RS Means Residential Cost Data, 2014, 33rd annual edition, page 64

[3] RS Means Residential Cost Data, 2014, 33rd annual edition, page 296

various portions of work. A contractor cannot afford to allow equipment to sit idle on a site as a lack of tachometer time equals no income from the equipment. Had the Estimate taken into account the site trucks, loaders and compactors and accounted for the demobilization costs, as noted by the Book, the Estimate attributable to Division 1 would have been increased. However, the RS Means does not have a unit price for the various types of equipment in the Boston metro area utilized in the Lyman-Cutler project.

For these reasons, the Estimate for Division 1 is inaccurate and significantly lower than it should have been.

### Division 2 – Existing Conditions

**Demolition of the Home –** This category in the Book considers the demolition of a single family, single story wood structure home at 3,200 square feet. However, the documentation confirms that the demolished structure was a house of 2 stories, of approximately 5,899 square feet above grade, with 5 bedrooms, 5.5 bathrooms above grade and 4 rooms and 3 bathrooms below grade, and had brick on the exterior.[4] The cost to cut and cap the original utilities on the original house are not included in the Estimate. Furthermore, the cost does not take into consideration the additional cost of disposal of the materials due to the MA Construction and Demolition Materials Waste Ban. All asphalt pavement, brick, concrete metal, wood, clean gypsum wallboard, and commercial organic material is prohibited from disposal in the Commonwealth of MA, which is regulated by the MA Department of Environmental Protection (MassDEP) through 310 Code of Massachusetts Regulations (CMR) 19.017. It should also be noted that nowhere in the Estimate are the requirements to install and maintain all mandated conservation and runoff measures as required by Brookline's Conservation Commission. These critical omissions significantly affect the final estimate making it artificially lower than it should have been. Had these factors been taken into account, the estimated value of Division 2 would have increased substantially.

---

[4] Data on house as provided by the Appraisal of Real Property, dated November 19, 2012.



*House that was demolished at 77 Lyman*

**Demolition of the Pool and Patio** – This category in the Book is the demolition of the slab on grade. However, slab on grade is not equivalent to what was demolished on the site as it does not include the demolishment of the concrete that had reinforcement or the vertical reinforcement of the pool walls. It also does not include the demolition of the tennis court or the original driveway, which was substantial in size. This too contributed to an inaccurate estimate. The additional cost for demolition and disposal is not accounted for in the Estimate.

For these reasons, the Estimate for Division 2 is inaccurate and significantly lower than it should have been.

## Division 3 – Concrete

**Basement Foundation – Footing System** – This category in the Book considers the footings of a 12" thick by 24" wide footing. However, the units are incorrect as the quantity is only for the main portion of the house and excludes the garage and porch footings (an additional 202 linear feet). Adding in the additional 202 linear feet would have increased the Estimate by $4,120.80, plus $865.36 for the 21% location factor for a total of $4,986.17.

**Full Basement Foundation** – On page 122 of the Book, the system described and which was ultimately utilized in the Estimate is of a 12" thick, poured concrete wall, up to 8' high in forms and an assumption of a 4' high wall.[5] The Estimate's unit calculation is incorrect as it does not account for the 5' frost wall of the garage

---

[5] RS Means Residential Cost Data, 2014, 33rd annual edition, page 122

(131.09 x 5=655.45) or the porch (70.85 x 5=354.25), which is a positive variant of approximately 1,010 square feet. Had the frost walls been included, the estimate would have been higher by more than $17,069 (plus $3,584.49 for the 21% location factor). Further, the Estimate does not include the additional cost of the twelve 45 degree corners, the 39 feet radius at the Living Room, the cost to pump the concrete as it cannot be chute poured, and waterproofing. The Estimate currently includes damp proofing, which is inaccurate. The Estimate should include waterproofing. Waterproofing is a more expensive system then damp proofing. These specialty items for the foundation work are not available to be estimated using the Book. These omissions caused a significant undervaluing of the Estimate.

**6" Floor Slab** – The Estimate omits the cost of control joints. In addition, we cannot tell if an appropriate vapor barrier and proper reinforcement was used in the calculations as it is not included in the specifications in the Book.

**Footings for Interior Columns & Exterior Columns** – Doddridge uses a quantity of 10 interior column footings and 10 exterior columns footings spread under 1 cubic yard ("CY"). The as permitted and as built Site Plans, however, document 31 interior columns and 11 exterior columns, a variant of 21 columns. Adding these missing 21 columns to the Estimate would result in an increase of $5,703.20, plus $1,197.67 for the 21% location factor. On a minor note, the Price/Unit for these two categories do not include O&P. However, for the Equipment Mobilization price/unit the O&P was included. This inconsistency is found throughout the Estimate. O&P should have been added on all items.

For these reasons, the Estimate for Division 3 is inaccurate and significantly lower than it should have been.

### Division 4 – Masonry

**Fireplace System** – The fireplace system is inaccurately identified. The quantity stated does not accurately reflect the number or type of chimneys built. According to the pictures, there are only two chimneys per house. The chimneys are thin brick veneer over a wood framed chase. In addition, the fireboxes were not masonry as the fireplaces were gas units with wood mantels. With that noted, the system description chosen on page 238 of the Book for the Estimate is for a 12' flue on a one story house. The chimneys are 2 ½ stories for an approximate height of 30'. Thus, the numbers utilized by in the Estimate do not reflect what was actually built. The Book does not have enough depth to properly estimate the fireplace system.



*The two chimneys located on 88 Cutler Lane*

For these reasons, the Estimate for Division 4 is inaccurate and significantly lower than it should have been.

## Division 5 – Metals

**Steel Beam W8x31 –** Mr. Doddridge estimated using the price for 60 linear feet ("LF") of a W8x31 steel column, not a steel beam as stated in the Estimate. In the Plans, sheet S-4, there is one W12 x 30 steel beam that is 19.5 LF. This is an inaccurate estimate.

**Steel Columns 4" Dia–** Mr. Doddridge estimated 10 steel columns at 4" with the unit cost not including the O&P. According to the S-1 of the Plans, there are 42 steel columns at 3.5". Thus, not only did Mr. Doddridge assume the wrong dimensions of the steel, he omitted 32 columns in their entirety. This omission and error has resulted in an undervaluing of at least $1,805.00, plus $379.05 for the 21% location factor.



*Sheet S-1 of the Permit Plan Set for 88 Cutler Lane Illustrating the Steel Columns*

For these reasons, the Estimate for Division 5 is inaccurate and significantly lower than it should have been.

## Division 31 – Earthwork

**Excavation for New Foundation –** The system description in the Book defines an 8' deep foundation excavation with a 1'0" clearance beyond the footing projection. As noted previously, the basement is 10' according to the Plans. Based on the MA Building Code, the foundation must extend above grade by 8". Therefore, the excavation would be 108"-8" (100") + 12" for the footing + 12" to level for the irregularities of the ledge, which equals a 10'-4" deep excavation. Furthermore, forms cannot be installed with a 1'0" clearance and there is a high risk that the hole will collapse if installed as described in the Book. OSHA has regulations and specific protocol to protect the safety of the crews. A 1'0" clearance beyond the footing projection is insufficient to meet these requirements notwithstanding the ability of workers to work within 1' of the foundation to install and remove forms. It is noteworthy that Doddridge ignored the applicable Codes and regulations when preparing his estimate. Importantly, it must be observed that ledge was encountered during this Lyman-Cutler project. That resultant cost must be included in the excavation costs. However, and significantly, they were omitted from the Estimate. Although the ledge was an unknown at the time of the commencement of the project those costs must be included in the costs at this time. These omissions undervalued the cost.

**Driveway Excavation and Crushed Stone –** It is unclear what specification the price/unit in the Estimate references as there is no price/unit of $1.40 square feet on page 630 for a driveway. Thus, this appears to be an error. However, in the Commonwealth of MA the recommendation for residential driveways needs to include the base preparation of an 8" compacted base with a 2" binder and 1 ½" finish. The reason for this specification is that in the Greater Boston metropolitan region the conditions of the soil and the weather that includes regional freeze thaw cycles on a Zone 5-6 area are not conducive to the specifications noted in the Book. The Book does not provide unit price for these specifications required to properly build in the Greater Boston metropolitan region. This too results in an undervaluing in the Estimate. Had those items been included the estimate would have increased.

**Catch Basin –** The pricing provided in the Estimate excludes sediment control measures, infiltrator run-off capturing systems, and erosion control, which are significant costs and are required by the municipality of Brookline. These requirements are not available using the Book to estimate. Had those items been included, the estimate would have increased.

For these reasons, the Estimate for Division 31 is inaccurate and significantly lower than it should have been.

## Division 32 – Exterior Improvements

**Sodding Systems –** The Estimate provides for 1,400 square feet ("SF") of sodding at $4.65 (including prep). Nowhere on page 639 is there a reference to a sodding cost of $4.65 per SF. In addition, the square footage for the calculation he provides in inaccurate. In our calculations there is approximately 18,146 SF of sod for each property as the actual lot area is 33,908 SF. Thus, the Estimate has shorted the area by 16,746 SF. By using the Book the cost per thousand square feet ("MSF") is $395 and the cost per SF of preparation for topsoil placement and grading equals $0.52 per SF (see page 639 of the Book). This equals a total cost for the sodding system at $16,603.59. The sodding system is undervalued by at least $10,093.59, plus $2,119.65 for the 21% location factor.

**Stone Walls per Site Plans –** The calculations are off on the Estimate as there are approximately 1,000 SF of walls when you reference the as-built engineering plans on 55 Lyman and 1,568 SF of walls on 88 Cutler (taken from the as-built site plans and elevations) (the Doddridge Estimate asserts that these plans were indeed reviewed). The Estimate calls for only 300 SF. Had the missing 700 SF been added for 55 Lyman, the Estimate would have increased by $43,400. Had the missing 1,268 SF been added for 55 Lyman, the Estimate would have increased by $ 78,616. An average total increase per property of $61,008, plus $12,811.68 for the 21% location factor.

**Patios, Walkways, & Steps–** Precast architectural pavers (in a running bond), as utilized in the Lyman-Cutler homes, are not a specification offered in the Book nor is a comparable product offered. Furthermore, the descriptions of what is available to choose from in the Book, does not include the cost for the bed preparation. Thus, the total, incorporated into the Estimate, is inaccurate.



*Rear Photograph of 88 Cutler Lane – Showing Precast Pavers*

For these reasons, the Estimate for Division 32 is inaccurate and significantly lower than it should have been.

### Division 35 - Utilities

There were five trenches for gas, electric, communication, water, and sewer completed per house. Mr. Doddridge only carries an estimate for the new water service, referencing to a page that is blank in the Book, page 652. Thus, we have no idea where he obtained the number he utilized. Furthermore, in Division 33 he includes a septic system and the underground electrical service installation. The Town of Brookline is not on septic, they are on town sewer. Finally, the electrical service is not installed by the excavator. The electrical work, to meet MA Electrical Code, has to be completed by a licensed electrician and would be inappropriate to carry in the excavator's costs for the utilities. The industry standard is for the electricians to install the conduit with sensing tape as the installation is inspected by the electrical inspector. This patent error further demonstrates the inherent inaccuracy of the Estimate and Mr. Doddridge's apparent lack of familiarity with the subject projects and applicable laws, regulations and standards.

For these reasons, the Estimate for Division 35 is inaccurate and significantly lower than it should have been.

## ITEMS NOT INCLUDED

As we already discussed in our Expert Report the impact of the labor costs in the Greater Boston metropolitan region, we will not opine again herein on how expensive it is to live and work in the region. Nevertheless, as stated in the Book, "If wage rates in your area vary from those in this book, or if rate increases are expected within a given year, labor costs should be adjusted accordingly."[6] Labor adjustments are a different variable than the Location Factor used in the Estimate and therefore were not included in that Estimate. Accounting for labor costs would have resulted in an increase to the Estimate.

Another factor noted in the Book, but omitted in the Estimate, is the season of year and weather conditions. A substantial portion of the construction was during the winter of 2013 and 2014. During the winter of 2013-2014 records were broken in both snowfall, precipitation, and temperature. On January 2nd/3rd of 2014, for example, Boston recorded its largest winter storm of the season with 15.1". The total snowfall for the season in Boston was 56.4", 22" above the average.[7]

Traditionally the excavator on site will be tasked with the snow removal on the site. There is no calculation for this cost shown anywhere.

The Book also states other factors that are not included in their pricing as noted on page x of the *How to Use the Book: The Details*. Factors given and identified in our Review of the Estimate and in the Book are building code requirements, safety requirements, and environmental considerations. These factors are not accounted for in the Estimate.

Beyond what has been noted as not included, there are additional items which are the responsibility of the excavator that were not included in the categories or scope of the Doddridge Estimate. By way of example: the cost to meet the MA Building Code for a well-drained gravel backfill (compacted in 6" lifts to within minus 1' of the finished grade around each house), the cost to provide and install an interior 4" perforated SDR drainage and Radon manifold at 8' on center ("OC") terminating in future sump location with 6" PVC solid riser for Radon remediation system, the cost to provide the cut, patch, and fill of the street for the utilities, the expense for providing police detail as required by the Town of Brookline, and the expense for repairing and reinstalling any new sidewalks disturbed as per the Town of Brookline's requirements. These omissions would have increased the Estimate and underscore our opinion that the Estimate is unreliable, inaccurate and significantly lower than it should have been.

---

[6] RS Means Residential Cost Data, 2014, 33rd annual edition, page ix
[7] https://www.weatherworksinc.com/winter-statistics-2013-2014

## SUBSTANTIAL COMPLETION REVIEW

Finally, the Estimate concludes that the definition of "substantial completion" as defined by the Means Illustrated Construction Dictionary is the standard definition utilized in the residential construction industry:

> *"The condition of the work when the project is substantially complete, and ready for owner acceptance and occupancy. Any items remaining to be completed should, at this point, be duly noted or stipulated in writing".*

We disagree with that conclusion. Most residential, and especially high end residential contractors, **do not use** the Means Illustrated Construction Dictionary to define substantial completion. In fact, there is no one standard definition in our industry. Often, the definition is tailored for each project depending on the parties' negotiations. We note that in the Classic Homes Development & Construction, LLC contract, "substantial completion" is not defined at all. In contrast, the KDC construction contract has a stated definition of substantial completion. As previously noted, we take no position on which of these two contracts is the operative one other than to say that nowhere in either of these two contracts did the parties agree to utilize the RS Means definition of substantial completion.

Regardless of how substantial completion is defined, to reach this condition of the work one does not need to receive a Certificate of Occupancy and the Estimate's reliance on the date of the Certificate of Occupancy as indicative of the date of substantial completion is flawed and improper. Regardless of the date of "substantial completion", many developers do not request a Certificate of Occupancy from the Town's Building Department until right before the transfer of the property to the new owner. The reason many developers wait to receive the Certificate of Occupancy is because once the Permit is closed, the new home's value is filed with the Town's Assessor's Department and the taxes are modified. This action increases the costs to carry the house and may hurt the marketability of the property. In addition, if the new home owner would like additions completed to the property prior to their purchase or as a condition of the purchase, prior to issuance of the Certificate of Occupancy, a building permit is still open and can be modified without the additional cost and time associated with applying for a new permit. This is especially important with houses like 55 Cutler and 88 Lyman, which are under the Conservation Commission's Authority. We understand, based on our interview of Mr. Kagan, that he delayed requesting a Certificate of Occupancy for just these reasons.

We also believe that the Estimate's reliance on the dates of financial draws from the construction loan as indicative of the state of completion of the Lyman-Cutler project is improper. Basing the state of completion on the financial draws is inappropriate as invoices typically need to be received prior to the request for a draw. Invoices from subcontractors are frequently issued months after the work is completed, depending on a subcontractor's workload and urgency to be paid. Also,

many of the residential subcontractors in the Greater Boston metropolitan area tend to be disorganized and less sophisticated in their record keeping. They are considered to be more craftsmen then businessmen. Additionally, every time a financial draw is requested, the lending bank sends an inspector to the job site to confirm the completion of the work indicated in the draw request. The bank charges a fee for each inspection. To reduce the cost of fees, many contractors will wait until they either have a large enough number or have a need for more money before they decide to submit a draw request. We understand from our interview with Mr. Kagan that he frequently would delay requesting money from the bank in order to reduce the inspection costs which the project owner would have to bear. In sum, the RS Means "substantial completion" definition is not widely utilized in the residential construction industry, and reliance on the date of issuance of a Certificate of Occupancy or the dates of a construction loan draw are not reliable indicators as to the actual state of completion of a project.

In order to determine the applicable definition of "Substantial Completion" in regard to the Lyman-Cutler project, it would be necessary to ascertain what utility the Parties needed at the Substantial Completion date. It appears that the owner and the developer shared the desire to market the property at a date certain. But that the final occupancy was not part of that requirement inasmuch as neither intended to occupy either of the project homes. If the properties were marketable by the specified date, as our records seem to indicate, then the Substantial Completion term would be satisfied by that self-same date.

## MICHAEL GOLDMAN'S ANALYSIS

In reviewing Michael Goldman's analysis, we would like to make a few comments:

We note that Mr. Goldman too relied, in part, on the date of the Certificates of Occupancy, as indicating the date of substantial completion. (¶16(b)) For the reasons stated above, this is improper. It does not appear that Mr. Goldman has any construction expertise himself.

It is without basis for Mr. Goldman to opine that "a failure to maintain proper records violates industry practice." (¶30). While we agree that it would be preferable to have all of the documents noted under Paragraph 30 of his analysis included, we are not aware of any regulation that paper work has to be processed in any particular format. There may be accounting formats for which income reporting must comply for tax purposes but for individual company record keeping we are not aware of any such current regulations.

In our work we have extensive access to many residential builders in the Greater Boston area. We regularly review project documents and copies of the invoices received and accepted by those companies. We have found many subcontractors and contractors are first craftsmen who developed their skillset through the trades.

Smaller companies establish their own bookkeeping system in manners that works for them, which tends to lend itself to the myriad of discrepancies described by Mr. Goldman. Assuming Mr. Goldman's observations are accurate, it is not uncommon to find many companies with records in the state as Michael Goldman described. Contractors frequently do not have written subcontracts. Proposals or quotes are often not in writing or are handwritten, and/or copied for use on other related or identical projects. Invoices frequently follow payment, especially where the subcontractors and contractor have a long working relationship. Invoices are sometimes out of sequence. Payments are often made months after a project is complete. Finish specifications are often lacking and it is extremely common for change order work to be completed without a written change order. These issues are often compounded by turnover in the industry as different persons have different skill sets and ways of tracking costs. Many smaller contractors do not run cost reports and do not have sophisticated financial recording systems in place. While greater and more complete documentation may be optimal for forensic sake, especially with small contractors, it is often lacking due to time, manpower, skill and the requisite cost. The lack of lien waivers is another good example. Approximately half of the construction companies we work with as Client Representatives were not completing lien forms prior to our involvement. Unless it is a contractual obligation to obtain lien waivers, many contractors do not insist on lien waivers and we are unaware of any law which requires a contractor to obtain lien waivers. In our findings, it is more likely that these shortcomings are a product of them never being taught the rigorous process preferred by Mr. Goldman or simply not having enough time and manpower to have the paperwork keep pace with the logistical demands of a project. It is not a requirement of a licensed contractor in the Commonwealth of Massachusetts to study and understand the financial and accounting process to the level as outlined by Mr. Goldman. We have observed that many contractors who have computer aided financial programs in place, such as QuickBooks, often do not use them accurately and do not understand all of the various reports and tools available in QuickBooks. When evaluating construction costs, being cognizant of the typical small contractor issues, we rely more on the actual invoices, receipts and payment records than on programs such as QuickBooks because those are the direct evidence of costs while Quickbooks is only as good as the data entered and sophistication of the persons entering the data. Based upon our own estimates set forth in our initial expert report, the total costs claimed by KDC for constructing the two homes for Lyman-Cutler are fair and reasonable and, if anything, lower than we would have expected at market rates.

## CONCLUSION

Based upon our review of the Estimate, there are just too many inconsistencies, inaccuracies, and missing components with what is actually in the Plans, Specifications of what was built, the State and Local authorities' requirements, the building code requirements, the site limitations, and health and safety issues for his Estimate to be considered as an accurate estimate. Nor does it accurately reflect the cost to perform the scope of work reserved to ProExcavation.

Our analysis indicates that the Estimate significantly undervalued the scope of work. However, the costs for accurate equipment mobilization, the correct sized house for the demolition, the cost to cut and cap the utilities, the disposal of hazardous materials, the mandated conservation and runoff measures, the demolition of the tennis court, the waterproofing (versus damp proofing), control joints in the slab, the correct fireplace system, the correct sized steel beams, the ledge, the excavation of the driveway and the crushed stone, the catch basin specifications, the patios, walkways, & steps material, the correct amount of sod installed, five trenches for the utilities, the labor costs in Boston, the impact of the weather conditions, the site snow removal, the SDR drainage and radon manifold, the cut patch, and fill of the street for the utilities, the police detail, and the repairing an reinstalling of any new sidewalks are all **not included** in the Estimate and fall under ProExcavation's scope and responsibility for the Lyman-Cutler project. Using the price for the items that are available to be estimated using the Book, the revised total would be $120,757.50 per property more than indicated in the Estimate and, when thereafter including the items not available using other pricing means, the cost would well exceed the price paid by KDC. Our financial summary, as to those items listed in the 2014 RS Means Residential Cost Data, is attached hereto as Exhibit A.

While we agree that better and more detailed paperwork is preferable, we disagree with Mr. Goldman's apparent view that all reputable contractors have the same quality of paper back up, supported by a sophisticated accounting system in place with detailed knowledge of accounting processes and programs such as QuickBooks. Our experience is that even reputable contractors frequently have incomplete records and lack understanding of sophisticated accounting software. However, as detailed in our Expert Report, given that the costs charged by KDC and ProExcavation were fair and reasonable. In our opinion, any discrepancies are more likely a function of poor record keeping than the product of fraud.

All opinions in this report are held to a reasonable degree of professional certainty and we reserve the right to alter or amend these opinions if provided with additional information that would cause us to alter these opinions.

Respectfully submitted,

Von Salmi, ASLA, Assoc. AIA
President
Von Salmi and Associates, Inc.

# EXHIBIT A
## Financial Summary of Additional Costs
## as Listed in the
## 2014 RS Means Residential Cost Data

| Division | Description | Additional Cost Using Book |
|---|---|---|
| 1 | Equipment Mobilization | Accurate Cost Not Available Using RS Means Cost Data |
| 2 | House Demolition | Accurate Cost Not Available Using RS Means Cost Data |
|  | Cost to Cut and Cap Utilities | Accurate Cost Not Available Using RS Means Cost Data |
|  | Disposal of Materials | Accurate Cost Not Available Using RS Means Cost Data |
|  | Maintain Mandated Conservation and Runoff Measures | Accurate Cost Not Available Using RS Means Cost Data |
|  | Demolition of the Pool and Patio | Accurate Cost Not Available Using RS Means Cost Data |
| 3 | Basement Foundation - Footing System | $4,120.80 |
|  | Full Basement Foundation | $17,069.00 |
|  | Waterproofing instead of Damp Proofing | Accurate Cost Not Available Using RS Means Cost Data |
|  | Control Joint in Slab | Accurate Cost Not Available Using RS Means Cost Data |
|  | Footings for Interior Columns & Exterior Columns | $5,703.20 |
| 4 | Fireplace System | Accurate Cost Not Available Using RS Means Cost Data |
| 5 | Steel Beam | Accurate Cost Not Available Using RS Means Cost Data |
|  | Steel Columns | $1,805.00 |
| 31 | Excavation for New Foundation | Accurate Cost Not Available Using RS Means Cost Data |
|  | Ledge | Accurate Cost Not Available Using RS Means Cost Data |
|  | Driveway Excavation and Crushed Stone | Accurate Cost Not Available Using RS Means Cost Data |
|  | Catch Basin | Accurate Cost Not Available Using RS Means Cost Data |
| 32 | Sodding Systems | $10,093.59 |
|  | Stone Walls per Site Plans | $61,008.00 |
|  | Patios, Walkways, & Steps | Accurate Cost Not Available Using RS Means Cost Data |
| 35 | 5 Trenches & Hook-up Support For | Accurate Cost Not Available Using RS Means Cost Data |
| ITEMS NOT INCLUDED IN REPORT | Labor Costs in Boston | Accurate Cost Not Available Using RS Means Cost Data |
|  | Season of Year and Weather Condition | Accurate Cost Not Available Using RS Means Cost Data |
|  | Snow Removal on Site | Accurate Cost Not Available Using RS Means Cost Data |
|  | Gravel Backfill | Accurate Cost Not Available Using RS Means Cost Data |
|  | SDR Drainage and Radon Manifold | Accurate Cost Not Available Using RS Means Cost Data |
|  | Cut, Patch, and Fill of the Street for the Utilities | Accurate Cost Not Available Using RS Means Cost Data |
|  | Police Detail | Accurate Cost Not Available Using RS Means Cost Data |
|  | Repairing and Reinstalling any New Sidewalks | Accurate Cost Not Available Using RS Means Cost Data |
|  | *Subtotal from Values Available in Book* | $99,799.59 |
|  | *21% Location Factor (Boston)* | $20,957.91 |
|  | *Total Additional Cost of Items Available Per Property* | $120,757.50 |
|  | *Reports Subtotal Each Property from Site-Work Estimate* | $260,611.09 |
|  | *Total from Values Only Available in Book* | $381,368.59 |
|  | Revised total from values only available in the book for the Lyman-Cutler Project * | **$762,737.19** |

Von Salmi and Associates, Inc.
P.O. Box 425, Westminster, MA 01473   Tel: 617-823-9407   web: www.vonsalmi.com

8/29/18