# EXHIBIT 6



**O'Connor
Carnathan
and Mack LLC**

Landmark One
1 Van De Graaff Drive
Suite 104
Burlington, MA 01803

Tel: 781.359.9000
Fax: 781.359.9001

www.ocmlaw.net

Sean T. Carnathan
Direct Line: 781.359.9002
scarnathan@ocmlaw.net

September 13, 2018

***By First Class Mail and E-mail***

John H. Perten, Esq.
Christopher M. Candon
Sheehan Phinney Bass + Green
255 State Street
Boston, MA 02109

      Re:    Lyman Cutler, LLC et al. v. Vadim Kagan, et al.
           <u>Chapter 7 No. 15-13881-FJB, A.P. No. 16-1120</u>

Dear John:

      Enclosed is the Rebuttal Report of David A. Doddridge.

      I received your letter concerning the expert rebuttal report deadline issue. Although there is no doubt we are late in producing this report, I doubt Judge Bailey will think highly of an objection based upon the timeliness of our production. He plainly grows weary of our discovery disputes.

      We encountered logistical and communication problems in August. I was traveling for depositions in Minnesota the last two weeks of the month and Mr. Doddridge's calendar was also packed. As a result, we experienced a miscommunication concerning the deadline for the production of our report. I note as well that you did not produce Mr. Von Salmi's specifications and bids until August 15, 2018 (which I believe we actually received August 16, 2018). Given that these were fundamental components of the report, I think we could contend in response to a timeliness objection to the Doddridge Rebuttal Report that Von Salmi's opening report was not timely produced.

      I suggest, however, that although in this case it seems like there is no issue too small to forego litigating, this is an issue we should set aside. There is no prejudice to your client based on the timing of the Doddridge Rebuttal Report production. I previously offered to defer Mr. Von Salmi's deposition into October, well after the September 15 deposition deadline. Please plan to have him appear **October 16, 2018 at 10:00 a.m.** We will send you a deposition notice of course. We will also produce Mr. Doddridge for his deposition in October 2018 if you would

John H. Perten, Esq.
Christopher M. Candon
September 13, 2018
Page 2

like to take his deposition.  There is no trial date set and dispositive motions are not due for over a month.

In short, if Mr. Von Salmi is permitted to testify over our likely Daubert challenge, we will offer Mr. Doddridge's testimony in rebuttal.  If you plan to object on timeliness grounds, we understand your position but do not believe it is a reasonable objection.

Very truly yours,

Sean T. Carnathan

cc:     Peter Tamposi, Esq.

4850-2004-2354, v. 1



D.A. DODDRIDGE
& ASSOCIATES, INC.

### SUPPLEMENTAL REPORT OF DAVID DODDRIDGE IN RESPONSE TO VON SALMI & ASSOCIATES REPORT DATED AUGUST 29, 2018 AND IN REBUTTAL TO REPORT DATED JULY 26, 2018 AS SUPPLEMENTED AUGUST 15, 2018

September 13, 2018

Page | 1

Mr. Sean Carnathan, Esq.
O'Connor, Carnathan and Mack, LLC
1 Van De Graaff Dr., Suite #104
Burlington, MA  01803

Re: LYMAN-CUTLER, LLC, ALEX FILIPPOV and NICKOLAY LIPETSKER, Plaintiffs, v. VADIM KAGAN, TATIANA KAGAN, KAGAN DEVELOPMENT KDC, CORP. and PROEXCAVATION CORP. Defendants. Adv. Case No. 16-01120-FJB, Chapter 7 Case No. 15-13881 FJB

Dear Attorney Carnathan,

At your request, and at the request of Attorney Peter Tamposi, I have reviewed the documents enumerated below with respect to the above-captioned civil litigation matter. The purpose of my review was to express my opinions on certain issues in the litigation. My opinions are expressed within this report.

My opinions are based upon my review of the documents enumerated below, the facts of the case, and my education, experience and training as it relates to this case. If further evidence becomes available in this case my opinions may change as a result of my review of such evidence. I reserve the right to supplement this report at any time in the future.

SCOPE OF ENGAGEMENT:

The scope of my engagement is as follows:

1. To respond to the "Review of the Estimate by Mr. Doddridge and Analysis by Mr. Goldman for 88 Cutler Lane and 55 Lyman Road, Brookline, MA" report issued by Von Salmi and Associates, Inc. ("Von Salmi") dated August 29, 2018 and



D.A. DODDRIDGE
& ASSOCIATES, INC.

rebut the report issued by Von Salmi July 26, 2018 as supplemented August 15, 2018.

2.  In order to respond to the above-cited reports, I rendered an opinion of the total cost of construction for 88 Cutler Lane and 55 Lyman Road, Brookline, MA based on recognized and reliable construction costs for the year 2014.

Page | 2

3.  To form such an opinion of construction costs, I established a fair and reasonable cost to construct 88 Cutler Lane and 55 Lyman Road, Brookline, MA "from permit to punch list" by performing a detailed construction cost estimate using historical construction cost guides, namely the R.S. Means Residential Cost Data-2014.

## DOCUMENTS REVIEWED, DATA & INFORMATION CONSIDERED:

1.  R.S. Means Residential Cost Data-2014

2.  Stamped "Permit Set" of drawings for each subject home received from Town of Brookline Building Department

3.  "Review of the Estimate by Mr. Doddridge and Analysis by Mr. Goldman for 88 Cutler Lane and 55 Lyman Road, Brookline, MA" by Von Salmi and Associates, Inc., dated August 29, 2018

4.  "Specifications" by Von Salmi and Associates, Inc. (undated), provided August 15, 2018.

5.  Bids received from Von Salmi vendors, provided August 15, 2018.

6.  Site plan by Peter Nolan and Associates, LLC for 55 Lyman Rd., Brookline, MA, "Final As-Built Plan" dated 9/18/14

7.  Site plan by Peter Nolan and Associates, LLC for 88 Cutler Ln., Brookline, MA, "Final As-Built Plan" dated 8/27/14

8.  Listing Sheet with Photos, by Charles Cherney, dated February 07, 2017

9.  Expert Disclosure of Vadim Kagan, Kagan Development KDC, Corp., Tatiana Kagan and ProExcavation Corp.



## D.A. DODDRIDGE
### & ASSOCIATES, INC.

### METHODS AND PRINCIPLES USED:

To establish my opinions with respect to the scope of this engagement, I relied upon several recognized and reliable methods and principles of construction estimating, including;

Page | 3

1. Using the blueprints submitted, I performed computerized quantity take-offs using a program called "Blue Beam" by Revu Software, which is a highly accurate method of measuring quantities of specific units of measure from electronic copies of blueprints.

2. To establish the per-unit cost of each construction cost line item, I identified the item(s) in the R.S. Means Residential Construction Cost Data, published for the year 2014.

3. After establishing quantity take-offs from the blueprints submitted, I then identified the appropriate category within the above-referenced R.S. Means publication for the purpose of establishing the associated per-unit cost of each unit measured (square feet, lineal feet, quantity of each, etc.) The significant majority of all costs used came from the R.S. Means Cost Guides.

4. Once I established the quantity of each unit and identified the appropriate cost-per-unit from the above-referenced construction cost guide, I then entered each in their respective cost categories in order to establish an accurate breakdown of the fair and reasonable costs to construct the above-referenced work.

### COST ESTIMATE BREAKDOWN & COMPARISON:

Table 1: D.A. Doddridge Estimate Summary-R.S. Means Cost Guide, 2014

| Description | Unit | Quantity | Price/Unit | Totals |
|---|---|---|---|---|
| | | | | |
| **General Requirements** | | | | |
| Equipment Mobilization | EA | 5 | $955.00 | $4,775 |
| Field Office | LS | 1 | $2,000.00 | $2,000 |
| Temporary Utilities | LS | 1 | $5,000.00 | $5,000 |
| Cleaning | LS | 1 | $8,000.00 | $8,000 |
| Temporary Toilets | LS | 1 | $1,500.00 | $3,000 |



D.A. DODDRIDGE
& ASSOCIATES, INC.

Page | 4

| Existing Conditions | | | | |
|---|---|---|---|---|
| Demolition/Excavation/Off Site Disposal of Existing Single Family Home (within 20 Miles) | EA | 1 | $7,.725.00 | $7,725.00 |
| Demolition/Excavation/Off Site Disposal of Existing Pool and Patio (within 20 Miles) Treated as 4" Slab on Grade. | CY | 120 | $55.00 | $6,600 |
| Sedimentation and Erosion Control | LF | 600 | $1.49 | $894 |
| Tree & Stump Removal | EA | 1 | $4,175.00 | $4,175 |
| Strip & Stockpile Loam on site | CY | 500 | $1.12 | $560 |
| Concrete | | | | |
| Basement Foundation - Footing System | LF | 272 | $17.00 | $4,624 |
| Perimeter Drain System | LF | 272 | $4.97 | $1,352 |
| Full Basement Foundation - Wall System (10' H x 12" Thick) | L.F | 262 | $34.92 | $9,149 |
| Garage Winter Wall - Wall System (4' H x 12" Thick) | L.F | 105 | $12.16 | $1,277 |
| Concrete Stairs (Cast on Ground) | LF | 48 | $20.66 | $992 |
| 6" Floor Slab (Basement Slab) | S.F. | 3,248 | $3.70 | $12,026 |
| 6" Floor Slab (Slab on Grade - Garage) | S.F. | 718 | $3.70 | $2,658 |
| Control Joints, Saw Cut | L.F | 1,000 | $0.45 | $450 |
| Footings for interior columns (Under 1 CY) | EA | 16 | $235.67 | $3,771 |
| Front Porch - Footing System | LF | 80 | $11.31 | $905 |
| Masonry | | | | |
| Field Stone Veneer | SF | 540 | $22.50 | $12,150 |
| Metals | | | | |
| Steel Beam W8x31 (Beam Configuration 10%) | LF | 60 | $65.35 | $3,921 |
| Steel Columns 4" Dia. | EA | 31 | $52.59 | $1,630 |
| Woods, Plastics and Composites | | | | |
| Exterior Wall Framing (2" x 6", 16" o.c) | S.F. | 3,236 | $3.71 | $12,006 |
| Window Openings (6' Long) | EA | 55 | $41.80 | $2,299 |
| Door Openings (4' Long) | EA | 11 | $31.50 | $347 |
| Door Openings (12' Long) | EA | 6 | $110.00 | $660 |
| Level 1 - Partition Framing (2" x 4", 16" o.c) | S.F. | 3,350 | $1.95 | $6,533 |
| Level 2 - Partition Framing (2" x 4", 16" o.c) | S.F. | 4,440 | $1.95 | $8,658 |
| Partition Framing - Door Openings (3' Long) | EA | 40 | $18.18 | $727 |
| Level 1 - Floor Framing (2"x10", 16"o.c) | S.F. | 3,248 | $7.61 | $24,717 |
| Level 2 - Floor Framing (2"x10", 16"o.c) | S.F. | 3,199 | $7.61 | $24,344 |
| Hip Roof Framing | S.F. | 2,205 | $8.64 | $19,051 |



D.A. DODDRIDGE
& ASSOCIATES, INC.

Page | 5

| | | | | |
|---|---|---|---|---|
| Octagonal Mansard Roof | S.F | 140 | $13.31 | $1,863 |
| Gable Dormer, Shed Roof Framing | S.F. | 3,129 | $21.97 | $68,744 |
| Wood Staircase - Framing | L.S. | 3 | $3,516.50 | $10,550 |
| Wood Staircase - Millwork | L.S | 3 | $1,500.00 | $4,500 |
| Wood Staircase (Rotunda Stair) Framing | EA | 2 | $17,510.00 | $35,020 |
| Wood Staircase (Rotunda Stair) Millwork | L.S | 1 | $10,500.00 | $10,500 |
| Level 1 - Pressure Treated Exterior Stair (Assumed) | S.F | 140 | $5.80 | $812 |
| Front Porch Decking (Deck, Posts, Balusters, Soffits) | S.F. | 512 | $23.50 | $12,032 |
| Level 1 Raised Panel System / Wainscoting | S.F. | 664 | $25.00 | $16,600 |
| Closet Poles/Shelving (Utility) | L.S. | 1 | $10,000.00 | $10,000 |
| Millwork - Base Molding (Painted - Poplar) | L.F | 1,800 | $4.37 | $7,866 |
| Millwork - Crown Molding (Painted - Poplar) | L.F | 1,800 | $4.09 | $7,362 |
| Millwork - Window/Door Casings (Painted - Poplar) | L.F | 1,496 | $3.43 | $5,131 |
| **Thermal and Moisture Protection** | | | | |
| Exterior Wall Insulation (5" thick, R-21) | S.F. | 5,840 | $0.80 | $4,672 |
| Roofing System insulation (3" thick-CC; 7" thick-OC) | S.F. | 6,420 | $3.23 | $20,737 |
| Level 1 Flooring System insulation (6" thick, R-19) | S.F. | 3,248 | $1.00 | $3,248 |
| Level 1 Basement Perimeter/Foundation | S.F. | 450 | $3.23 | $1,454 |
| Vinyl siding | S.F. | 5,840 | $6.10 | $35,624 |
| Trim - Vinyl White | L.F | 2,900 | $1.95 | $5,655 |
| Built up Flat Roofing Systems | S.F. | 946 | $6.76 | $6,395 |
| Roofing Systems (Slate-like Shingles / Copper Downspouts) | S.F. | 5,474 | $7.91 | $43,299 |
| Roofing Systems (Misc. Sheetmetal Allowance) | L.S | 1 | $6,000.00 | $6,000 |
| Exterior Wall Insulation (5" thick, R-21) | S.F. | 5,840 | $0.80 | $4,672 |
| Roofing System insulation (3" thick-CC; 7" thick-OC) | S.F. | 6,420 | $3.23 | $20,737 |
| Level 1 Flooring System insulation (6" thick, R-19) | S.F. | 3,248 | $1.00 | $3,248 |
| Level 1 Basement Perimeter/Foundation | S.F. | 450 | $3.23 | $1,454 |
| Vinyl siding | S.F. | 5,840 | $6.10 | $35,624 |
| **Openings** | | | | |
| Double Hung Windows (2'x4') | EA | 38 | $674.25 | $25,622 |
| Double Hung Windows (3'x5') | EA | 11 | $752.17 | $8,274 |



D.A. DODDRIDGE
& ASSOCIATES, INC.

Page | 6

| | | | | |
|---|---|---|---|---|
| Bow/Bay Windows | EA | 5 | $3,945.42 | $19,727 |
| Exterior Entrance Doors (Colonial, 6 Panel, Wood) | EA | 4 | $1,171.35 | $4,685 |
| Exterior Sliding Doors (Wood Sliding Door, 8' Wide, Premium) | EA | 5 | $2,818.08 | $14,090 |
| Interior Door (Raised Panel, Solid, Oak Door) | EA | 40 | $847.07 | $33,883 |
| Interior Cased Openings | LF | 320 | $9.15 | $2,928 |
| Residential Garage Door | EA | 2 | $2,465.14 | $4,930 |
| Double Hung Windows (2'x4') | EA | 38 | $674.25 | $25,622 |
| Double Hung Windows (3'x5') | EA | 11 | $752.17 | $8,274 |
| Bow/Bay Windows | EA | 5 | $3,945.42 | $19,727 |
| **Finishes** | | | | |
| Plaster and Gypsum Board - Walls (Includes Paint) | S.F | 16,500 | $2.86 | $47,190 |
| Plaster and Gypsum Board - Ceilings (Includes Paint) | S.F | 7,734 | $2.30 | $17,788 |
| Kitchen Countertops (Granite) | L.F | 75 | $154.00 | $11,550 |
| Laundry Countertops (Granite) | L.F | 6 | $154.00 | $924.00 |
| Pantry Countertops (Granite) | L.F | 8 | $154.00 | $1,232 |
| Bathroom Vanity Countertops | E.A | 9 | $555.00 | $4,995 |
| Floor Tile 12X12 | S.F | 1,048 | $33.63 | $35,244 |
| Wall Tile 12X12 | S.F | 1,000 | $6.98 | $6,980 |
| Wood Flooring | S.F | 5,500 | $7.95 | $43,725 |
| Plaster and Gypsum Board - Walls (Includes Paint) | S.F | 16,500 | $2.86 | $47,190 |
| Plaster and Gypsum Board - Ceilings (Includes Paint) | S.F | 7,734 | $2.30 | $17,788 |
| Kitchen Countertops (Granite) | L.F | 75 | $154.00 | $11,550 |
| Laundry Countertops (Granite) | L.F | 6 | $154.00 | $924 |
| Pantry Countertops (Granite) | L.F | 8 | $154.00 | $1,232 |
| **Equipment** | | | | |
| Kitchen - Refrigerator | EA | 1 | $2,203.00 | $2,203 |
| Kitchen - Oven | EA | 1 | $2,393.00 | $2,393 |
| Kitchen - Dishwasher | EA | 1 | $1,688.00 | $1,688 |
| Kitchen - Range Top | EA | 1 | $2,095.00 | $2,095 |
| Kitchen - Range Hood | EA | 1 | $2,109.00 | $2,109 |
| Kitchen - Microwave | EA | 1 | $540.00 | $540 |
| Kitchen - Wine Refrigerator | EA | 1 | $1,495.00 | $1,495 |
| Kitchen - Wine Refrigerator | EA | 1 | $1,495.00 | $1,495 |
| Basement Sump Pump | LS | 1 | $315.00 | $315 |

Cape Cod, MA: 179 Brick Hill Rd, Orleans, MA 02653
Worcester, MA: 27 June St., Worcester, MA 01602

P: 800.717.7523 | E: info@DADoddridge.com | W: www.DADoddridge.com



**D.A. DODDRIDGE & ASSOCIATES, INC.**

| | | | | |
|---|---|---|---|---|
| Central Vacuum System | LS | 1 | $5,525.00 | $5,525 |
| Kitchen - Refrigerator | EA | 1 | $2,203.00 | $2,203 |
| Kitchen - Oven | EA | 1 | $2,393.00 | $2,393 |
| Kitchen - Dishwasher | EA | 1 | $1,688.00 | $1,688 |
| Kitchen - Range Top | EA | 1 | $2,095.00 | $2,095 |
| **Furnishings** | | | | |
| Kitchen Cabinets - Upper | L.F. | 45 | $179.80 | $8,091 |
| Kitchen Cabinets - Lower | L.F. | 45 | $269.70 | $12,137 |
| Library Casework | L.F. | 45 | $269.70 | $12,137 |
| Bathroom Vanities | L.F. | 32 | $269.70 | $8,630 |
| Pantry Casework | L.F. | 10 | $269.70 | $2,697 |
| Mud Room - Custom Millwork | L.F | 20 | $269.70 | $5,394 |
| Kitchen Cabinets - Upper | L.F. | 45 | $179.80 | $8,091 |
| Kitchen Cabinets - Lower | L.F. | 45 | $269.70 | $12,137 |
| Library Casework | L.F. | 45 | $269.70 | $12,137 |
| Bathroom Vanities | L.F. | 32 | $269.70 | $8,630 |
| Pantry Casework | L.F. | 10 | $269.70 | $2,697 |
| Mud Room - Custom Millwork | L.F | 20 | $269.70 | $5,394 |
| Kitchen Cabinets - Upper | L.F. | 45 | $179.80 | $8,091 |
| Kitchen Cabinets - Lower | L.F. | 45 | $269.70 | $12,137 |
| Library Casework | L.F. | 45 | $269.70 | $12,137 |
| **Plumbing** | | | | |
| Water Service (Piping, Meter, Backflow Preventers) | L.S. | 1 | $3,500.00 | $3,500 |
| Connections for Refrigerator and Dishwasher | E.A. | 3 | $250.00 | $750 |
| Kitchen - Sink (Double SS) | E.A. | 1 | $1,425.00 | $1,425 |
| Laundry Sink | E.A. | 2 | $310.00 | $620 |
| Washer Dryer Hook ups | L.S. | 1 | $2,500.00 | $2,500 |
| Butler's Pantry | E.A. | 1 | $2,350.00 | $2,350 |
| Powder Room 1 | E.A | 1 | $2,690.59 | $2,691 |
| Powder Room 2 | E.A | 1 | $2,690.59 | $2,691 |
| Master Bathroom | E.A | 1 | $9,800.00 | $9,800 |
| Bathroom 2 | E.A | 1 | $4,660.05 | $4,660 |
| Bathroom 3 | E.A | 1 | $4,660.05 | $4,660 |
| Bathroom 4 | E.A | 1 | $4,660.05 | $4,660 |
| Bathroom 5 | E.A | 1 | $4,660.05 | $4,660 |
| Hot Water Heater | E.A | 2 | $1,850.00 | $3,700 |
| Gas Distribution Piping | L.F. | 250 | $4.44 | $1,110 |
| Uponor Radiant Heating System | L.S. | 1 | $20,000.00 | $20,000 |

Page | 7

**Cape Cod, MA:** 179 Brick Hill Rd, Orleans, MA 02653
**Worcester, MA:** 27 June St., Worcester, MA 01602

P: 800.717.7523 | E: info@DADoddridge.com | W: www.DADoddridge.com



D.A. DODDRIDGE
& ASSOCIATES, INC.

Page | 8

| | | | | |
|---|---|---|---|---|
| Radon Chases | L.S. | 1 | $10,000.00 | $10,000 |
| Water Service (Piping, Meter, Backflow Preventers) | L.S. | 1 | $3,500.00 | $3,500 |
| Connections for Refrigerator and Dishwasher | E.A. | 3 | $250.00 | $750 |
| Kitchen - Sink (Double SS) | E.A. | 1 | $1,425.00 | $1,425 |
| Laundry Sink | E.A. | 2 | $310.00 | $620 |
| Washer Dryer Hook ups | L.S. | 1 | $2,500.00 | $2,500 |
| **Heating, Ventilation and Air Conditioning** | | | | |
| Gas Fired Forced Heating/Cooling System | EA | 4 | $10,841.72 | $43,367 |
| Fireplace System (prefabricated metal assembly) | EA | 3 | $7,028.30 | $21,085 |
| **Electrical** | | | | |
| Temporary Service | E.A. | 1 | $1,114.35 | $1,114 |
| Construction receptacles | E.A. | 8 | $216.00 | $1,728 |
| Temporary lighting strings | E.A. | 8 | $67.50 | $540 |
| 400 Amp Service | E.A. | 1 | $8,358.00 | $8,358 |
| 200 Amp Main distribution panels | E.A. | 2 | $1,200.00 | $2,400 |
| 100 Amp Sub Panels | E.A. | 2 | $655.00 | $1,310 |
| General purpose receptacles | E.A. | 100 | $44.00 | $4,400 |
| GFCI receptacles | E.A. | 40 | $90.00 | $3,600 |
| Weatherproof receptacles | E.A. | 10 | $200.00 | $2,000 |
| 20 amp appliance circuit | E.A. | 10 | $102.00 | $1,020 |
| 50 amp appliance circuit | E.A. | 2 | $275.00 | $550 |
| Decorative light fixture circuits | E.A. | 65 | $36.50 | $2,373 |
| Decorative light fixtures | E.A. | 65 | $234.00 | $15,210 |
| Recessed surface light circuits | E.A. | 150 | $57.50 | $8,625 |
| Recessed surface light fixtures | E.A. | 150 | $95.50 | $14,325 |
| closet light fixtures | E.A. | 11 | $95.50 | $1,051 |
| Utility LED strips | L.F. | 30 | $93.75 | $2,813 |
| LED under cabinet lighting | E.A. | 40 | $54.50 | $2,180 |
| Exhaust fan connections | E.A. | 9 | $70.50 | $635 |
| Dimmer switch locations | | 120 | $49.50 | $5,940 |
| Lighting control system | L.S. | 1 | $10,000.00 | $10,000 |
| HVAC Circuits | E.A. | 16 | $108.50 | $1,736 |
| Landscape Lighting | E.A. | 4 | $740.00 | $2,960 |
| Design Documents | L.S. | 1 | $8,000.00 | $8,000 |
| **Communications** | | | | |
| A/V | L.S. | 1 | $5,000.00 | $5,000 |
| **Fire Detection and Security** | | | | |

Cape Cod, MA: 179 Brick Hill Rd, Orleans, MA 02653
Worcester, MA: 27 June St., Worcester, MA 01602

P: 800.717.7523 | E: info@DADoddridge.com | W: www.DADoddridge.com


D.A. DODDRIDGE
& ASSOCIATES, INC.

Page | 9

| Security System | L.S. | 1 | $5,000.00 | $5,000 |
|---|---|---|---|---|
| Fire Alarm System | L.S. | 1 | $7,500.00 | $7,500 |
| **Earthwork** | | | | |
| Erosion and Sedimentation Controls | L.F. | 2,100 | $1.49 | $3,129 |
| Excavation for New Foundation (Excavator) | C.Y. | 1,850 | $1.73 | $3,195 |
| Hauling (Off-site disposal of excess fill) | C.Y. | 1,350 | $8.55 | $11,548 |
| Back Fill (Compaction 2' lifts) | C.Y. | 850 | $9.09 | $7,727 |
| Rough Grade (Dozer) | C.Y. | 850 | $1.58 | $1,342 |
| Rock Ledge Removal | LS | 1 | $24,793.39 | $24,793 |
| Grading Cut/Fill (Assume 2' avg) | C.Y. | 2,500 | $1.58 | $3,946 |
| Driveway Excavation and Crushed Stone | C.Y. | 80 | $37.19 | $2,975 |
| Surveying | L.S. | 1 | $6,611.57 | $6,612 |
| **Exterior Improvements** | | | | |
| Final topsoil placement and grading | S.F. | 18,146 | $0.55 | $10,048 |
| Sodding Systems | M.S.F. | 18 | $326.45 | $5,924 |
| Landscaping - Fencing | L.F. | 500 | $27.27 | $13,636 |
| Landscaping - Shrubs | E.A. | 60 | $61.98 | $3,719 |
| Landscaping - Trees | E.A. | 40 | $173.55 | $6,942 |
| Landscaping - Mulching (w/Equipment) | S.Y. | 300 | $5.79 | $1,736 |
| Landscaping - Planting Beds (w/skid steer) | C.Y. | 220 | $4.72 | $1,038 |
| Sprinkler Irrigation Systems (w/Controller) | S.F. | 2,400 | $1.73 | $4,145 |
| Pinned CMU Retaining Walls per Site Plans | S.F. | 1,568 | $15.83 | $24,816 |
| CMU Retaining wall stone base and fill | CY | 129 | $37.19 | $4,798 |
| Construct Natural Retaining Walls (Allowance from VSA Spec) | L.S. | 1 | $16,528.93 | $16,529 |
| Patios, Walkways, & Steps (Flagging Bluestone) | S.F. | 1,800 | $14.45 | $26,003 |
| Paving Systems | S.F. | 2,500 | $2.78 | $6,942 |
| Concrete Sidewalks | C.Y. | 8 | $171.90 | $1,375 |
| **Utilities** | | | | |
| Water Service (40' to Existing Utility + 5' Building Connection) | L.F. | 120 | $24.79 | $2,975 |
| Trenching/Backfill for Water Service | C.Y. | 106 | $9.75 | $1,034 |
| Sewer Line | L.F. | 120 | $5.33 | $640 |
| Trenching/Backfill for Sewer Line | C.Y. | 106 | $9.75 | $1,034 |
| Storm Drain Lines | L.F. | 120 | $14.71 | $1,765 |
| Catch Basins | EA | 6 | $516.53 | $3,099 |
| Storm Drainage Structures | EA | 4 | $1,012.40 | $4,050 |
| Trenching/Backfill for Storm Drainage Structures | C.Y. | 300 | $9.75 | $2,926 |



**D.A. DODDRIDGE & ASSOCIATES, INC.**

| | | | | | |
|---|---|---|---|---|---|
| Underground Electrical Service | L.F. | 125 | $34.00 | $4,250 | |
| Trenching/Backfill for Electrical Service | C.Y. | 110 | $9.75 | $1,073 | |
| Natural Gas Service | EA | 105 | $20.50 | $2,153 | |
| Trenching/Backfill for Natural Gas Service | C.Y. | 98 | $9.75 | $956 | |
| Milling Street Utility Connections | L.S. | 1 | $5,000.00 | $5,000 | Page \| 10 |
| Paving Street Utility Connections | S.F. | 600 | $2.90 | $1,740 | |
| Police Detail for Street Utility Work | L.S. | 1 | $2,000.00 | $2,000 | |
| | | | | $1,365,089 | Subtotal Construction Costs |
| | | | | $286,669 | 21% Location Factor (Boston) |
| | | | | $1,651,757 | Subtotal |
| | | | | $33,035 | Permit Fee ($20 per / $1000 Cost) |
| | | | | $34,067 | 6.25% MA Sales Tax (Material Only) |
| Kagan's Estimated Direct Cost of Construction, per Home | | | | $1,718,860 | Subtotal Each Home |
| | | | | | |
| | | | | | |

## COMMENTARY RE: VON SALMI ESTIMATE:

As discussed in select examples below, Mr. Von Salmi has overinflated his estimate and arrived a cost-per-home of $2,937,914 which translates into a per square foot cost of approximately $433.00. Mr. Von Salmi prepared his own "bid package" and received vague and ambiguous quotes from select vendors, which has allowed Mr. Von Salmi to skew his numbers to an unrealistically high amount. Mr. Von Salmi's methodology is questionable and lends itself to unrealistic construction costs and an inflated estimate.

Cape Cod, MA: 179 Brick Hill Rd, Orleans, MA 02653
Worcester, MA: 27 June St., Worcester, MA 01602

P: 800.717.7523 | E: info@DADoddridge.com | W: www.DADoddridge.com



**D.A. DODDRIDGE & ASSOCIATES, INC.**

<u>VON SALMI METHODOLOGY:</u>

To estimate the cost to construct each home, Mr. Von Salmi prepared a "bid package" and submitted that information to select subcontractors and material suppliers, along with the "permit set" of blueprints. While this methodology may be considered appropriate when bidding a construction project, it is inappropriate when offering an opinion in a civil litigation matter. This is particularly true where Mr. Von Salmi states in his report Methodology (p. 4) that the plans and specifications were inadequate to determine pricing, which forced Mr. Von Salmi to develop his own specifications.

Mr. Kagan's original estimate per home was $1,300,000, which is unrealistically low. On top of that $1,300,000 figure, Mr. Kagan then added $200,000 in carrying costs and a $100,000 contingency for unforeseen costs and/or cost overruns. These figures represent unrealistic and suspiciously low numbers. To the contrary, Mr. Von Salmi has estimated the overall construction cost of each home at $2,937,914 which is unrealistically high and overestimated. I have arrived at an overall direct construction cost to Mr. Kagan of $1,718,860 per home, without contingencies or carrying costs.

Mr. Kagan's original $1,300,000 figure was based upon a preliminary set of building plans. As I understand it, the plans Mr. Kagan started with in forming his original $1,300,000 estimate were close in size and scope to the final construction. In the past I have been asked to perform preliminary budget estimates based on preliminary plans for multi-million dollar homes. A typical and expected method to construct a preliminary budget is to break down each major category of construction and assign a realistic cost to each based on previous experience building similar homes combined with available construction cost data resources. Once a "baseline" construction cost has been established, a baseline per square foot cost can then be used to adjust the size and scope of the construction project accordingly. The final estimate is typically expected to be within approximately 5% to 7% of the original figure. An experienced builder has the ability to perform a preliminary budget based on preliminary plans with a degree of accuracy

Page | 11



D.A. DODDRIDGE
& ASSOCIATES, INC.

that would allow the property owners to move forward in making their final decisions on how to proceed.

Some of the bids Mr. Von Salmi used to calculate his total cost of construction are highly suspect and seemingly intentionally skewed to favor Mr. Von Salmi's client. When using Mr. Von Salmi's methodology to prove what construction costs should have been 4 to 5 years ago, it is important to utilize historic construction cost data from a recognized and reliable source rather than obtaining bids based upon current pricing. Mr. Von Salmi's cost estimate is based upon bids he received in 2018, which one would expect to be higher than bids that would have been received in 2013 or 2014.

Page | 12

Obtaining "after the fact" bids to calculate the cost of construction provided Mr. Von Salmi with the opportunity to intentionally skew his numbers to favor his client. For example, there are several categories where Mr. Von Salmi's cost estimate is suspect, including;

1. Framing Labor:
   Mr. Von Salmi carried $267,000 ($283,000 less $16,000 allowance for the Lull) for framing labor. This would equate to a well-paid crew of 6 men (2 lead carpenters, 4 laborers) at a total cost of $2,600 per day approximately 102 to 103 days just to frame the building. This translates into approximately 20 weeks, or 5 months, for a crew of 6 men just to frame one of the subject homes. Mr. Von Salmi's estimated cost for framing labor represents an extraordinary amount of time to perform this task.

2. Site Work
   Following the receipt of the Von Salmi report dated August 29, 2018, which included photographic evidence of the existing 77 Lyman Rd Structure, I have revised my estimate to reflect the single structure demolition.
   However, the estimate in my initial report accounted for a total of $33,150.00 for the complete cost of demolition for the site. Comparatively, the Von Salmi estimate (Exhibit A date 5/1/18) is accounting for a cost of $28,000 for demolition and additional $4,000



for off-site transport/disposal for a total of $32,000.00 for the demolition, removal and off-site disposal of the existing home and pool structures.

Here the difference of estimated costs is within 3.5%, with the Doddridge Estimate accounting for a greater cost for the Demolition.

Page | 13

3. Specific Bids Received by Von Salmi:

Many of the proposals solicited by Mr. Von Salmi lacked detail. Many proposals did not include breakdowns of materials or man hours and in most cases assumed an incomplete design. Subcontractors and vendors, such as Glen E. Hines ("GEH"), Kenneth Castellucci & Associates ("KCA"), Keyes North Atlantic ("Keyes"), and Herrick & White ("H&W") did not provide detailed estimates but instead submitted budgets that carried allowances, accounted for exclusions, and were not based on the Owner's final selections. C&R Flooring's ("C&R") estimate does not specify quantities or costs based on those quantities. C&R's estimate does not reference the use of drawings or provide a detailed breakdown of where these costs would be expended throughout the home. None of the proposals provided were based on a full set of drawings and many were marked "for budget purposes only". The proposal from Bennett Masonry was not only vague in content but was not on a letterhead nor did it provide the name of a company contact, a phone number or a business address.

There were also a few instances where multiple subcontractors and/or vendors were carrying the same costs. The Larkin Painting Company ("Larkin") carried costs for painting the wainscoting while H&W carried costs to stain it. Further inconsistencies appear in the Installations Plus Inc. ("IPI") and KCA budgets as they both carry costs for the thresholds in the bathrooms. In addition, some of the proposals assume design costs, such as Keyes, and some do not. IPI carries costs for six (6) full bathrooms and one (1) powder room which is inconsistent with the drawings and results in IPI carrying additional costs for installing a shower. These inconsistencies show that the proposals were put together without sufficient detail and are examples of how using proposals to

Cape Cod, MA: 179 Brick Hill Rd, Orleans, MA 02653
Worcester, MA: 27 June St., Worcester, MA 01602

P: 800.717.7523 | E: info@DADoddridge.com | W: www.DADoddridge.com



estimate the costs of projects is inaccurate and allows for inconsistencies. Further examples of such inconsistencies are as follows:

a) Glenn E. Hines ("GEH") carries a lump sum amount of $220,000 for all earthwork, utilities and engineering. This amount cannot be substantiated without further breakdown of the components accounted for in the estimate.

b) Bennett Masonry – This estimate is not submitted on letterhead nor is there contact information or an address provided for this contractor. The information provided is uncertain and speaks more in generalities than specifics.

c) Herrick & White – Herrick & White are providing a budget and scope of work, not a final, detailed estimate to put construction in place. The budget provides for exclusions and does not account for all finished construction work.

d) Kenneth Castellucci & Associates ("KCA") is providing a budget for the work, not a detailed, itemized estimate. KCA's budget is based on two preliminary drawings dated May 23, 2013 and not the full set. KCA's budget assumes allowances for certain items and does not account for the Owner's final selections.

e) Installations Plus Inc. ("IPI") – IPI's estimate is not based on the full set of drawings and specifically states that it is for budgetary purposes only and that costs may vary. IPI's estimate also assumes final selections have not been made by Owner. IPI accounts for 6 full bathrooms and one powder room. IPI is carrying unwarranted additional costs for materials associated with building another shower.

f) C&R Flooring ("C&R") – C&R's estimate does not specify the basis for the quantities or costs included in the estimate. The estimate does not reference any drawings or provide a detailed breakdown of where these costs would be expended throughout the home.

g) The Larkin Painting Company ("Larkin") – Larkin does not breakdown the materials necessary or the manpower hours required to complete this job. There are many exclusions contained in this proposal as well. This proposal carries costs for painting



the wainscoting, but Herrick & White is carrying costs to stain it. Again, this proposal was put together without sufficient detail. This is another example of how using proposals to estimate the costs of projects is inaccurate and inconsistent.

h)  KCA and IPI both carrying costs for the thresholds in the bathrooms. It is not clear which contract will be providing what.

i)  Keyes North Atlantic ("Keyes") also put together a budget instead of a detailed estimate. This budget carries allowances and assumes an incomplete design. Keyes is also carrying design costs for the lighting plan.

As discussed above, many of the bids Mr. Von Salmi used to calculate construction costs do not specify the actual work that is being proposed. As a result, Mr. Von Salmi's calculations are not broken down to an expected level of specificity. To the contrary, using the R.S. Means cost guide, the estimator is allowed the opportunity to pinpoint a specific item of work, identify the cost-per-unit of measure and apply the calculated quantity of units to that specific item, regardless of the quantity or size of the construction project being considered. Calculating cost estimates utilizing the methodology I used provided me with the opportunity to break down the construction costs item-by-item for nearly all required categories of construction. This methodology provides for a far more realistic and accurate construction cost estimate than the methodology Mr. Von Salmi used.

REBUTTAL TO VON SALMI REPORT:

Mr. Von Salmi's per-home construction cost estimate is overstated by $1,216,054 per home as the direct result of Mr. Von Salmi's receipt of overly vague bids from vendors and "double dipping" by adding an additional cost to a cost item that would already have included that cost.

1.  Page 3, paragraph 2:

Page | 15



D.A. DODDRIDGE
& ASSOCIATES, INC.

My latest estimate is predicated upon the stamped "Permit Set" of drawings received
from the Town of Brookline Building Department. As I understand it, these drawings
represent the final set of applicable drawings.

Page | 16

2.   Page 3, paragraph 3:

The R.S. Means Construction Cost Guides are used by contractors, architects, developers
and government agencies on a regular basis due to the accuracy, reliability and
expediency of generating construction cost estimates. I have personally built numerous
multi-million dollar homes and often times have utilized the R.S. Means Construction
cost guides as the basis for my estimates. While each of my construction projects were
under construction, I would track the actual cost of labor, materials and equipment as part
of my job-cost accounting. My estimates were always very much on point with the actual
costs incurred on each project.

In fact, an expected standard in the industry calls for the builder to submit monthly
payment applications to the owner/developer of the property to illustrate the continuation
of work performed and completed. A.I.A. Documents G-702 "Application for Payment"
and G-703 "Continuation Sheet" are the typical forms used to submit such payment
application.

Mr. Kagan failed to submit monthly payment applications to Lyman-Cutler or otherwise
track his costs for the construction projects. Any competent builder will track the actual
costs of construction and compare those actual costs to the estimated costs during the life
of the construction project. In an agreement such as that between Lyman-Cutler and Mr.
Kagan, it is my opinion that Mr. Kagan had the duty to track costs and submit monthly
payment applications to Lyman-Cutler.

It appears as though Mr. Von Salmi is only "familiar"[1] with the R.S. Means Construction
cost methodology and therefore, since Mr. Von Salmi is not thoroughly knowledgeable

---

[1] Von Salmi report, pg. 3, 3rd paragraph

Cape Cod, MA: 179 Brick Hill Rd, Orleans, MA 02653
Worcester, MA: 27 June St., Worcester, MA 01602

P: 800.717.7523 | E: info@DADoddridge.com | W: www.DADoddridge.com



with this method of construction cost estimating, it is fair to say that he is in no position
to offer an opinion as to the accuracy of such construction cost estimating methodology.

3.  Page 3, paragraph 4 and Page 4, paragraph 1:

Mr. Von Salmi's lack of awareness of other high-end residential contractors estimating
methodology, and their use or nonuse of the R.S. Means Construction Cost Guides, does
not prove that this statement is correct. The R.S. Means Company has been publishing
construction cost data for over 50 years and is relied upon by numerous industry
professionals, including myself for over 30 years as a high-end residential contractor to
provide accurate construction cost estimates in numerous disciplines throughout the
construction industry.  To the contrary, his lack of awareness of the Cost Guides calls
into question his expertise.

Mr. Von Salmi suggests that "high-end homes of the scale or size of the homes in the
Lyman-Cutler project are not accounted for" is absolutely incorrect. When using the per-
unit cost section of the cost guides the scale of the project is completely insignificant.

What Mr. Von Salmi is referring to is the per square foot section of the cost guide, which
accounts for homes up to a certain size. I did not utilize the data found in this section of
the book but rather, I used the per-unit section of the book where quantities are of little, if
any, significance.

I am not sure what Mr. Von Salmi is referencing when he states that "the finish materials
utilized in the homes are not provided in the Book as an option for selection". In fact, one
who is experienced in the use of the R.S. Means Construction Cost Guides can estimate a
home with any number of options, as I have accurately done in forming my opinions in
this particular matter.

All line item estimates I have provided for in my estimate for this particular construction
project are well within the regulations required under the CMR 780-Massachusetts State
Building Code. Having been qualified in Federal Court as an expert in residential

Page | 17



building codes, I am confident that I have provided a construction cost estimate based upon applicable building codes.

4.  Page 4, paragraph 2:

    A construction cost estimate is simply a "reaction" to a set of blueprints generated by a registered design professional. Provided that the design professional has designed the subject construction project in accordance with applicable building codes, then the materials included in the cost estimate would naturally be code compliant as well. Code compliance does not start with the estimate, it starts with the design and planning of the construction project. My estimate was based upon the stamped "Permit Set" of drawings received from the Town of Brookline Building Department, which I understand to be the final set of applicable drawings and therefore represent compliance with applicable building codes.

    Mr. Von Salmi's suggestion that OSHA regulations would be violated based upon my construction estimate clearly suggests that Mr. Von Salmi's is reaching for anything he can possibly grasp, regardless of its relationship to this matter. In my 35 years of constructing high-end and light commercial construction projects, not once have I had an OSHA violation or even an accident that would have been required to be reported under CFR Part 1904. There exists little, if any, relationship between a construction cost estimate and OSHA regulations on a construction project such as that being discussed here. I have been qualified numerous times in various courts throughout the Northeast as an expert in construction site safety.

5.  Page 4, paragraph 3:

    Proper construction scheduling and coordination minimizes the number of times equipment must be mobilized and/or demobilized. I based my estimate on my decades of high-end residential construction experience, which did not include constant and unnecessary relocation of heavy equipment.

6.  Page 5, paragraph 3:

Page | 18

Cape Cod, MA: 179 Brick Hill Rd, Orleans, MA 02653
Worcester, MA: 27 June St., Worcester, MA 01602

P: 800.717.7523 | E: info@DADoddridge.com | W: www.DADoddridge.com



Following the receipt of the Von Salmi report dated August 29, 2018 which included photographic evidence of the existing 77 Lyman Rd Structure, I have revised my estimate to reflect the single structure demolition. However, the estimate in my initial report accounted for $16,575 allocated equally to the overall cost of demolition for each home, for a total of $33,150.00 for the complete cost of demolition for the site. Comparatively, the Von Salmi estimate (Exhibit A date 5/1/18) is accounting for a cost of $28,000 for Demolition and an additional $4,000 for Off-Site Transport/Disposal for a total of $32,000.00 for the Demolition, removal and Off-Site Disposal of the existing home and pool structures. Here the difference of estimated costs is within 3.5% of my estimate which accounts for a greater cost of demolition.

Page | 19

7. Page 7, paragraph 2
   The revised estimate includes the cost of the control joints

8. Page 7, paragraph 3
   Following the receipt of the structural drawings, the revised estimate includes the cost of the interior and exterior columns and exterior footings as outlined in the drawings.

9. Page 7, paragraph 5
   The revised estimate reflects the fireplace assembly as identified in the architectural drawings

10. Page 8, paragraph 2
    Following the receipt of the structural drawings, the revised estimate includes the cost of the structural steel as outlined in the drawings. The cost of the item was reduced from my original estimate. The additional steel columns identified in the structural drawings have been accounted for in the revised estimate.

11. Page 12, paragraph 1
    My extensive experience using the R.S. Means guides to calculate overall construction costs, including labor, has consistently shown that using the rates shown in the cost

Cape Cod, MA: 179 Brick Hill Rd, Orleans, MA 02653
Worcester, MA: 27 June St., Worcester, MA 01602

P: 800.717.7523 | E: info@DADoddridge.com | W: www.DADoddridge.com



D.A. DODDRIDGE
& ASSOCIATES, INC.

guides, and multiplying by the appropriate location factor, is an accurate method to calculate labor costs.

12. Page 12, paragraph 2

Page | 20

I have constructed high-end homes in New England for over 30 years and in my experience, the amount of snowfall during any specific year has had little if any impact on the overall cost of a construction project.

13. Page 12, paragraph 3

I have included an amount for snow removal in my most recent cost estimate.

14. Page 12, paragraph 4

As previously stated, building code compliance is reflected in the set of plans drawn and constructed from and not from the estimate. To suggest otherwise is further proof of Mr. Von Salmi's attempt to reach for anything he can possibly grasp. Mr. Von Salmi's reference to building code lies, in part, in his assumption that my original estimate did not account for the foundation to project 8" above grade. From an estimating standpoint this is a trivial point and I can assure the reader of this report that if I were to construct the subject home using the estimate I have calculated that the construction would meet all building code requirements.

Once again, to relate OSHA compliance to a construction estimate on a residential construction project is trivial and does not warrant further explanation as I have already discussed this subject earlier in this report.

All environmental considerations have been accounted for in my current estimate.

15. Page 13, paragraphs 1, 2 and 3

a) The definition of Substantial Completion as per the R.S. Means Illustrated Construction Dictionary is as follows:

*"The condition of the work when the project is substantially complete, and ready for owner acceptance and **occupancy**. Any items remaining to be completed should, at this point, be duly noted or stipulated in writing"*

Cape Cod, MA: 179 Brick Hill Rd, Orleans, MA 02653
Worcester, MA: 27 June St., Worcester, MA 01602

P: 800.717.7523 | E: info@DADoddridge.com | W: www.DADoddridge.com



D.A. DODDRIDGE
& ASSOCIATES, INC.

b) The definition of Substantial Completion used in A.I.A. Document G704-2000,

Certificate of Substantial Completion, is as follows:

*"The work performed under this Contract has been reviewed and found, to the Architect's best knowledge, information and belief, to be substantially complete. Substantial Completion is the stage in the progress of the Work when the Work or designated portion is sufficiently complete in accordance with the Contract Documents so that the Owner **can occupy** or utilize the Work for its intended use. The date of Substantial Completion of the Project or portion designated above is the date of issuance established by this Certificate, which is also the date of commencement of applicable warranties required by the Contract Documents, except as stated below:"*

Page | 21

c) As per Ma. G.L. c. 254, Section 2A, (mechanics lien law) the definition of Substantial Completion is as follows:

*"Substantial completion", that work under the written contract is sufficiently complete so that it can be **occupied** or utilized for its intended use.*

A.I.A. contracts and documents are the most widely used and recognized in the construction industry. The above definitions of Substantial Completion are remarkably close to one another and it is my opinion that each definition is fundamentally the same. Mr. Von Salmi is of the opinion that the R.S. Means Illustrated Construction Dictionary is not used in the high-end residential construction industry however, I highly doubt that Mr. Von Salmi would be of the opinion that A.I.A. documents are not used in the high-end residential construction industry. In fact, most architecturally designed high-end homes are accompanied by A.I.A. construction documents and contracts.
Mr. Von Salmi argues that there is "no one standard definition in our industry" relative to the definition of Substantial Completion. The fact that two widely recognized publications have nearly identical definitions of Substantial Completion should illustrate that Mr. Von Salmi is once again skewing his opinion to favor his client.

16. Page 13, paragraph 4



As required by applicable building codes, the Owner of a property is not allowed to **occupy** a building until such time as a Certificate of Occupancy is issued. After considering the above widely recognized definitions of Substantial Completion, and after considering the date upon which the Certificates of Occupancy were issued on the subject construction projects, combined with work that was still being performed during or around April and May of 2014, it is clear that the work, by definition and otherwise, was not substantially complete as of March 31, 2014.

Page | 22

Mr. Von Salmi is suggesting that the issuance of a Certificate of Occupancy is not necessarily an indication of Substantial Completion. Mr. Von Salmi is also suggesting that the request for a Certificate of Occupancy was intentionally delayed in order to avoid an increase in property taxes and the resulting carrying costs. While this may make sense and I am familiar with this concept, this does not provide any evidence whatsoever that substantial completion had been achieved as of March 31, 2014.

Mr. Von Salmi further suggests that the buyer of a new construction project may wish to make changes to the property that would require an additional permit and if so, those modifications would be more easily executed under an existing building permit rather than having to apply for a new permit after the original permit had been "closed out" due to the issuance of a Certificate of Occupancy. While I understand this concept, in over 30 years as a high-end residential contractor I have never witnessed the buyer of a property make such a request, particularly when a home is sold in a 100% completed state, and I find this possibility highly unlikely. Once again, I believe Mr. Von Salmi is attempting to come up with as many opinions as possible to favor his client, regardless of the merit of those opinions.

17. Page 13, paragraph 5 and Page 14, paragraph 1

Mr. Von Salmi is suggesting that a Construction Advance Request is not an accurate indication of the completion of the work related to that request, and that a builder will intentionally delay a Construction Advance Request due to the cost of the inspections

Cape Cod, MA: 179 Brick Hill Rd, Orleans, MA 02653
Worcester, MA: 27 June St., Worcester, MA 01602

P: 800.717.7523 | E: info@DADoddridge.com | W: www.DADoddridge.com



required in order for the bank to release the related funds. This is a weak argument. The cost of each inspection for a construction advance is minimal, at approximately $250 per inspection. Most banks will perform 6 or 7 construction advance inspections for free and then charge approximately $250 per inspection moving forward. The total cost of bank inspection fees is minimal as compared to the overall cost of construction.

Page | 23

I have had numerous construction advance inspections performed on my own construction projects and it is typical and expected that a) the builder will call for that construction advance inspection as soon as possible after the work is completed to maintain proper cash flow and b) the work that each inspection represents is complete otherwise the bank will refuse to release funds and then charge for a subsequent inspection. When a payment is issued for a construction advance, the work that each payment represents must be complete and therefore this is a clear representation of the date that work was completed.

Mr. Von Salmi also suggests that invoices from subcontractors are issued "months after the work is completed". Nothing could be further from the truth. Subcontractors typically insist on being paid within a very short period of time after their work is completed. In fact, most subcontractors refuse to wait 30 days to be paid, and also require periodic payments during their work at specific milestones, particularly if that subcontractor is providing materials or equipment necessary for the completion of their work. For Mr. Von Salmi to suggest that subcontractors typically wait months to be paid for their work on a construction project, while at the same time suggesting that typical subcontractors "tend to be disorganized and less sophisticated" goes against logical thinking. If a subcontractor is disorganized and less sophisticated, then there is a much greater likelihood of the subcontractor requiring immediate payment upon completion of their work because cash flow and cash reserves is most likely an issue. If in fact a subcontractor were highly organized and sophisticated, and therefore had ample funds in their business operating account, then perhaps one could understand Mr. Von Salmi's



D.A. DODDRIDGE
& ASSOCIATES, INC.

logic however, that is clearly not the case. Even if a subcontractor was organized and
sophisticated, that subcontractor would be mindful of their own cash flow and insist on
being paid periodically during the construction project and promptly upon completion.
Mr. Von Salmi goes against his own argument here and suggests he lacks the hands-on
business experience related to the opinion he is providing.

Page | 24

Upon Mr. Von Salmi's own admission, he relied upon his interview with Mr. Kagan in
the formation of his opinion, and given that Mr. Kagan is a party to this civil litigation
one can easily see how Mr. Von Salmi's opinion has been skewed once again in favor of
his client.

18. Page 16, paragraph 2

All items Mr. Von Salmi indicates as being missing from my original estimate are
addressed within the estimate associated with this report.

19. Exhibit "A"

All costs indicated by Mr. Von Salmi as "Accurate Cost Not Available Using RS Means
Cost Data" have been addressed in the estimated associated with this report.

CONCLUSION & OPINION:

It is clear that Mr. Von Salmi skewed many of his numbers in order to favor his client,
Mr. Kagan. Mr. Von Salmi intentionally and suspiciously overestimated certain specific
categories of work as stated above.

Mr. Von Salmi's construction estimating methodology lends itself to inaccuracies and the
opportunity to overinflate select cost categories. The vagueness found in the backup
documentation Mr. Von Salmi is an indication of the inaccuracy of select vendor bids. For
example, Mr. Von Salmi's backup documentation for the kitchen included Castelucci
countertops for use as a "budget" number, which would provide an extraordinarily high figure
for this item. If Castelucci countertops were not used in the construction of the subject homes,



## D.A. DODDRIDGE & ASSOCIATES, INC.

then it would be clear that Mr. Von Salmi included this item for the purpose of overinflating his estimated construction costs.

Mr. Von Salmi claims that the R.S. Means Construction Cost Guides I used to calculate my estimate is an inaccurate and unreliable construction cost resource however, in many other categories of construction costs, my estimates are very much in line with Mr. Von Salmi's (see commentary, above). This proves that the R.S. Means Construction Cost Guides are in fact a reliable construction cost resource for high-end homes in the Boston area.

The above-cited R.S. Means publications are a widely recognized source of accurate construction cost data. Established in 1942, the R.S. Means Construction Cost Guides are an invaluable resource to the construction industry for the purpose of accurately estimating construction costs related to any number of different types of construction projects, including the costs of the buildings which are the subject of this civil litigation matter. Aside from being widely used and relied upon by contractors, engineers and architects, the R.S. Means Construction Cost Guides are also used by government entities and recognized by numerous courts as a reliable construction cost resource. The R.S. Means Cost Guides are widely used in the construction industry and I have personally used these guides for approximately 20 to 25 years.

In my many years of residential and light commercial construction experience, and in my duties as a principal owner of a construction company, I have relied upon the R.S. Means Construction Cost Guides to accurately estimate construction projects. In fact, my father first introduced me to these guides and instructed me as to the proper usage of them. As with most construction techniques, there is naturally a "learning curve" at the beginning however at this point I consider myself proficient in the use of these guides and I am confident that I have accurately extracted relevant per-unit pricing from each cost guide and applied that per-unit pricing to each work item, thus establishing reliable and accurate costs to each.

Contained in each per-unit cost within the above-cited R.S. Means publication is the overhead and profit for the *installing contractor* and therefore, once the installing contractor's

Cape Cod, MA: 179 Brick Hill Rd, Orleans, MA 02653
Worcester, MA: 27 June St., Worcester, MA 01602

P: 800.717.7523 | E: info@DADoddridge.com | W: www.DADoddridge.com



construction costs are established, it is important to note that the overhead and profit for the
*General Contractor* must then be added to the overall established costs. In other words, the R.S.
Means publications are used to establish what the "direct costs" are for labor, materials,
equipment, permits, professional services, etc. and those are the costs that the General Contractor   Page | 26
would expect to pay before adding in their own required overhead and profit necessary for the
General Contractor to earn its money on the project. Overhead and profit for the General
Contractor was excluded. As per the agreement between Lyman-Cutler and Mr. Kagan, Mr.
Kagan's overhead and profit was to have come in the form of equity in the subject properties.

In my opinion, the construction costs stated in Table 1, above, are objective, accurate, fair
and reasonable and are based upon non-biased third-party resources and opinions.

The date of Substantial Completion has also been contended by Mr. Von Salmi. Mr. Von
Salmi claims that there is no "standard definition" for a date of Substantial Completion. This is
not an accurate statement. I referred to two widely recognized and reliable resources, namely the
R.S. Means Illustrated Construction Dictionary and the A.I.A. (American Institute of Architects)
Document G704-2000, Certificate of Substantial Completion. Mr. Von Salmi claims that the
definition of substantial completion is not used or recognized by high-end residential contractors.
While the R.S. Means definition of Substantial Completion may not be as widely recognized by
some contractors, the A.I.A. definition of Substantial Completion most certainly would be. It is a
well-known fact that A.I.A. contracts and documents are the most widely used construction
documents in the construction industry. Mr. Von Salmi is a member of the A.I.A., and I am
certain he would agree with this statement. The definition of Substantial Completion is
fundamentally the same between the R.S. Means definition and the A.I.A. definition.

The reasons I cite as evidence of the fact that Substantial Completion was not completed
as of March 31, 2014 are also contended by Mr. Von Salmi. Mr. Von Salmi claims that the
issuance of a Certificate of Occupancy and the dates of inspections for Construction Advance
Requests are not a reliable indication of Substantial Completion or when certain work was being
performed or had not yet been completed.

Cape Cod, MA: 179 Brick Hill Rd, Orleans, MA 02653
Worcester, MA: 27 June St., Worcester, MA 01602

P: 800.717.7523 | E: info@DADoddridge.com | W: www.DADoddridge.com



**D.A. DODDRIDGE**
**& ASSOCIATES, INC.**

While I do understand Mr. Von Salmi's point that a contractor will delay his request for a final inspection and Certificate of Occupancy so as to avoid a reassessment of property value and the resulting increase of property taxes, I disagree with Mr. Von Salmi's suggestion that a contractor will delay the issuance of a Certificate of Occupancy for the purpose of a potential buyer requesting that further permit-required work be performed. I have constructed numerous high-end homes over 30-plus years in the construction industry and I have never had such a request. The homes which are the subject of this litigation are high-end, well-appointed homes that were completed and staged, and I can't imagine that a potential buyer of either home would require any further work be done, let alone further work that would require a permit.

Page | 27

Aside from the issuance of a Certificate of Occupancy, Mr. Von Salmi also claims that the dates of Construction Advance Request inspections are not an indication of the stage of a construction project. Mr. Von Salmi claims that contractors will intentionally delay construction inspections to avoid the fees associated with those inspections. Most lending institutions will include the first 6 or 7 inspections without charge and then charge approximately $250 per inspection moving forward. The total cost of these inspections is negligible when compared to the overall cost of the subject homes and when considering the importance of cash flow on such construction projects.

When a bank performs an inspection and releases the funds associated with that inspection, the work must be 100% complete. Therefore, the release of funds by the lending institution is a strong indication of the date of that work being completed. Mr. Von Salmi's claim that cash flow is unimportant to subcontractors due to their "lack of organization" makes little if any sense. My experience has always been that subcontractors require payment incrementally during construction and immediately upon completion of their work. In fact, most subcontractors refuse to even wait 30 days for payment. Cash flow is therefore critical to the success of a construction project and to the maintenance of a good working relationship with subcontractors.

On April 2, 2014 the Construction Advance Request Form for 88 Cutler Ln. indicates that the "interior finish (woodwork)" was completed however there are numerous other construction



advances that occurred after that date, including the next Construction Advance Form dated May
30, 2014 which indicates that the finish heat, bath and kitchen floors and kitchen cabinets were
installed. There still remained a considerable amount of work beyond that date which was
approved for construction advance requests after the above dates and in my opinion Substantial
Completion would have still been months away, around the date that the Certificate of
Occupancy was issued.

Page | 28

     In my opinion, as of March 31, 2014 the level of completeness of the subject homes did
not meet the definition of Substantial Completion as the work that had yet to be completed to
allow either home to be occupied, as stated in the definition of Substantial Completion above,
was not done.

     I have thoroughly reviewed Mr. Von Salmi's report dated August 29, 2018 and addressed
each and every item Mr. Von Salmi claimed was missing from my original estimate. I have since
performed a complete construction cost estimate to build each of the subject homes from permit
to punch list and I have included each construction cost item Mr. Von Salmi claimed was
missing from my original estimate.

     Mr. Von Salmi has estimated the per-home cost of construction at $2,934,914 ($433 per
sq. ft). I have estimated the per-home cost to be $1,718,860 ($254 per sq. ft.) using the R.S.
Means Construction Cost Guide as the basis for my estimate. The difference between my
estimate and Mr. Von Salmi's estimate is $1,216,054 per home for a grand total difference of
$2,432,108 for the construction of both homes.

     My estimate does not include overhead and profit for Mr. Kagan on a) his work as the
general contractor, b) his work under his company ProExcavation and c) compensation for his
work as the project manager. According to the agreement between Mr. Kagan and Lyman-Cutler,
LLC, Mr. Kagan was to have performed the above work at his direct cost in exchange for Mr.
Kagan's equity in the construction project, and Mr. Kagan was to have overseen and managed
the construction of each home at no cost in place of a general contractor and project manager. It

Cape Cod, MA: 179 Brick Hill Rd, Orleans, MA 02653
Worcester, MA: 27 June St., Worcester, MA 01602

P: 800.717.7523 | E: info@DADoddridge.com | W: www.DADoddridge.com



would therefore have been improper for me to include the above items a through c in my
estimate when my task was to estimate Mr. Kagan's direct costs to build each home.

Mr. Kagan's compensation would have been received when each subject home was sold.
According to Mr. Kagan, his company was a "one man operation" (Kagan depo., pgs. 57-61) and
he had no other employees. This allowed Mr. Kagan to easily operate without receiving
compensation for overhead and profit, and without receiving compensation for his role as the
general contractor and project manager.

My estimate is based upon work being performed in a good and workmanlike manor by
professional, skilled, licensed (where applicable) tradespeople. It is my understanding, based
upon testimony by Mr. Kagan's brother Kirill, that many of the workers Mr. Kagan used were
"fly by night" tradespeople and day-workers whose names were not kept on record. It is also my
understanding that pine trim was used around select areas of the exterior of the homes rather than
vinyl composite trim as expected. My estimate is based upon quality workmanship and materials.

To calculate my estimate, I utilized non-biased published, recognized and reliable
construction cost resources. I then quantified each cost item with the appropriate unit of measure
and applied the per-unit cost to each item. The methodology I used to calculate my estimate is far
more accurate than the methodology Mr. Von Salmi utilized. As discussed in detail above, Mr.
Von Salmi's estimate is skewed in favor of his client and is based upon vague backup
documentation in the bids he received from select vendors combined with cost estimates using
numbers that align with Mr. Kagan's company, ProExcavation.

Please understand that my opinions are based upon my review of the documents
enumerated above, the facts of the case, and my education, experience and training as it relates to
this case. If further evidence becomes available in this case, my opinions may change as the
result of my review of such evidence. I reserve the right to supplement this report at any time in
the future.

Thank you for the opportunity to be of service, if you have any questions or comments
with respect to the facts stated within this report, please do not hesitate to contact me.

Cape Cod, MA: 179 Brick Hill Rd, Orleans, MA 02653
Worcester, MA: 27 June St., Worcester, MA 01602

P: 800.717.7523 | E: info@DADoddridge.com | W: www.DADoddridge.com



Respectfully,

David A. Doddridge, Pres.
D.A. Doddridge & Associates, Inc.

Cape Cod, MA: 179 Brick Hill Rd, Orleans, MA 02653
Worcester, MA: 27 June St., Worcester, MA 01602

P: 800.717.7523 | E: info@DADoddridge.com | W: www.DADoddridge.com