UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| *In re:* ) | | |
| ) | | |
| LYMAN-CUTLER, LLC, ) | Chapter 7 | |
|       Debtor ) | Case No. 15-13881-FJB | |
| ) | | |

| | | |
|---|---|---|
| ) | | |
| LYMAN-CUTLER, LLC, ALEX FILIPPOV, ) | | |
| and NICKOLAY LIPETSKER, ) | | |
| ) | | |
|     Plaintiffs, ) | | |
| ) | Adv. Case No. 1:16-ap-01120 | |
| v. ) | | |
| ) | | |
| VADIM KAGAN, TATIANA KAGAN, ) | | |
| KAGAN DEVELOPMENT KDC, CORP. and ) | | |
| PROEXCAVATION CORP. ) | | |
| ) | | |
|     Defendants. ) | | |

**<u>PLAINTIFFS' MOTION IN LIMINE</u>**

Pursuant to this Court's October 10, 2018 order, as modified on November 6, 2018 (Docket No. 215), Plaintiffs Lyman-Cutler, LLC, Alex Filippov and Nickolay Lipetsker (the "Plaintiffs") respectfully move in limine for the following evidentiary rulings pretrial:

(1) The Court should rule that as a co-venturer in a closely-held company who owes fiduciary duties of care, loyalty and full disclosure to each of the Plaintiffs, Vadim Kagan ("Kagan") and the companies he controls bear the burden of persuasion at trial;

(2) The Court should rule that as a fiduciary, Kagan must prove <u>entire fairness</u> with regard to: (a) the proffered construction contract between Lyman-Cutler, LLC (the

1

"LLC") and Kagan Development KDC, Corp. ("KDC"), which Kagan executed for both parties; and (b) all charges KDC asserts against the LLC, including in particular the fees and overhead charges allegedly payable directly to KDC and the charges from ProExcavation Corp. ("ProEx") through KDC;

(3) The Court should exclude KDC's proffered binders of alleged documentary support for its proof of claim for lack of authentication, and on hearsay and best evidence grounds;

(4) The Court should exclude the June 24, 2013 construction contract between KDC and the LLC on best evidence grounds; and

(5) The Court should exclude any "expert" testimony by Von Salmi ("Salmi") for using a fundamentally flawed and unreliable methodology and by both Salmi and Paul H. McDonald ("McDonald") as irrelevant to any issue in this case.

## ARGUMENT

**I.    Kagan is a Fiduciary Who Bears the Burden of Persuasion at Trial and Must Prove Entire Fairness with Regard to his Self-Dealing (Alleged) Contracts.**

**A.    Kagan is a Fiduciary and Bears the Burden of Persuasion on KDC's Purported Contract and Construction Costs.**

As a co-venturer in a closely held, Massachusetts limited liability company, Kagan owed and continues to owe Plaintiffs a fiduciary duty. Allison v. Eriksson, 479 Mass. 626, 627 (2018). His duty encompasses duties of care, loyalty and full disclosure. Meehan v. Shaughnessy, 404 Mass. 419, 433 (1989) (fiduciary owes duty of "utmost good faith and loyalty"); id., at 436 (fiduciary has an "obligation to 'render on demand true and full information of all things affecting the [business]'"); Blake v. Friendly Ice Cream Corp., 2006 Mass. Super. LEXIS 496, at *13 (Aug. 24, 2006) ("The duty of care consists of an obligation to act on an informed basis.").

2

In matters where a fiduciary has engaged in self-dealing, the burden shifts from the plaintiff to the fiduciary defendant to prove the challenged conduct was "intrinsically fair" and did not harm the business. Meehan, 404 Mass. at 441. Failure of a fiduciary to disclose all material information is equivalent to fraudulent concealment under Massachusetts law. Demoulas v. Demoulas, 1995 Mass. Super. LEXIS 870, at *213-14 (Aug. 2, 1995).

      **B.**      **The Kagan Parties Must Prove Entire Fairness.**

KDC's proof of claim is based upon a purported June 24, 2013 contract that Kagan signed for both sides of the alleged deal (the "KDC Contract"). A true copy of the purported KDC Contract is attached to the Transmittal Affidavit of Sean Carnathan ("Carnathan Aff.") as Exhibit 9. Because Kagan stands on both sides of the transaction, under settled Massachusetts law, he bears the burden to prove the "entire fairness" of the transaction. This requirement applies to the totality of KDC's claims.

For many years in Massachusetts, the law has been that a fiduciary who "stands on both sides of a transaction" faces "careful scrutiny" by the court and an "unflinching" demand for proof of "entire fairness." Coggins v. New Eng. Patriots Football Club, 397 Mass. 525, 530-31 (1986) (quoting with approval, Weinberger v. UOP, Inc., 457 A.2d 701, 711 (Del. 1983)); Buckman v. Elm Hill Realty Co., 312 Mass. 10, 15 (1942) ("transactions between boards having common members are regarded as jealously by the law as are personal dealings between a director and his corporation, and where the fairness of such transactions is challenged the burden is upon those who would maintain them to show their entire fairness"); Lazenby v. Henderson, 241 Mass. 177, 180 (1922) (fiduciary held liable for knowingly paying inadequate price for pianos he purchased from a company of which he was a director for a company which he owned and controlled); Johnson v. Witkowski, 30 Mass. App. Ct. 697, 710 (1991). Entire fairness

3

requires that the fiduciary prove not only fair price but also fair dealing. Coggins, 397 Mass. at 530-31.

> [Fair dealing] embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the directors, and how the approvals of the directors and the stockholders were obtained. The [fair price] aspect of fairness relates to the economic and financial considerations of the [transaction], including all relevant factors. . . .

Weinberger, 457 A.2d at 711; see also MAZ Partners LP v. Shear (In re PHC, Inc. S'holder Litig.), 894 F.3d 419, 431-32 (1st Cir. 2018) ("Coggins makes pellucid that fairness is an essential element in judicial examination of intra-corporate claims involving self-dealing").

Kagan's duty of loyalty to the LLC and his co-venturers was paramount; he was not entitled to use his position of trust to gain an advantage for himself. Durfee v. Durfee & Canning, Inc., 323 Mass. 187, 196 (1948) ("Their paramount duty is to the corporation, and their personal pecuniary interests are subordinate to that duty."); Demoulas, 1995 Mass. Super. LEXIS 870 at *225 (citing Durfee). A fiduciary forfeits compensation received in violation of his fiduciary duties. Meehan, 404 Mass. at 440. It does not matter that the fiduciary may divert the profits or compensation to a company he owns or controls; he remains liable as does his company. Durfee, 323 Mass. at 196 ("It is also settled that a director, who fraudulently or in violation of his fiduciary relationship diverts profits from the corporation, is personally liable though the profits are acquired by an agency controlled by the director or a third party"); Lazenby, 241 Mass. at 180 (fiduciary held liable for knowingly paying inadequate price for pianos he purchased from a company of which he was a director for a company which he owned and controlled). Accordingly, a contract entered into by a self-dealing fiduciary is voidable unless the fiduciary can prove it was on fair terms and "all the parties beneficially interested manifest assent with full understanding of their legal rights and all relevant facts that the

4

fiduciary knows or should know." Demoulas, 1995 Mass. Super. LEXIS 870 at *204 (emphasis added); Genesis Tech. & Fin., Inc. v. Cast Navigation, LLC, 74 Mass. App. Ct. 203, 211 n.15 (2009) ("[t]he fundamental fairness test places the burden on the fiduciary who acquires a corporate (or partnership) opportunity, or who engages in self-dealing, to prove that his or her actions were intrinsically fair, and did not result in harm to the corporation or partnership"). In sum, in order to rely upon the purported KDC Contract and recover the sums KDC claims thereunder, Kagan must prove that it was entirely fair to all parties.

The entire fairness doctrine applies with double force to the $916,800 in charges from ProEx, which is also Kagan's company, included as part of KDC's Proof of Claim. In addition, Kagan and Tatiana must also prove the entire fairness of the listing agreements Kagan executed with his wife, Tatiana. These are also self-dealing transactions.

**II.    The Court Should Exclude from Evidence the Proffered Binders Allegedly Supporting KDC's Proof of Claim.**

The Court should exclude from evidence the binders of photocopied documents KDC proffers in alleged support of its Proof of Claim because KDC cannot lay a foundation to authenticate the documents, they are inadmissible hearsay, and KDC has never produced the originals despite Plaintiffs' timely challenge to the authenticity of the proffered documents.

**A.    KDC's CFO and Rule 30(b)(6) Designee Testified He Reconstructed KDC's Records After Construction and He Does Not Know Which Records He Reconstructed and Which Were in the Files.**

Daniel Gersh is the Chief Financial Officer for KDC and has been primarily responsible for keeping its books and records since November 2014. Deposition of Daniel Gersh, May 17, 2018 ("Gersh Dep."), at 18-20, 38, attached to the Carnathan Aff. as Exhibit 27. Both KDC and ProEx designated Gersh as a witness authorized to speak on their behalf. Gersh Dep., at 8.

5

Gersh testified that before he arrived, KDC's books were a "mess." Gersh Dep., at 26-27 (Kagan kept folders -- "Sometimes alphabetical, sometimes by year. It was a mishmash of prior organization, different bookkeepers, Vadim's [Kagan] way of storing things. It was always a mess."), 37-38 (state of financial books upon his arrival in November 2014 – "Unclear; lack of support and documentation; not everything was there, to my liking at least; messiness"). When Gersh arrived in November 2014, the Lyman Cutler project books were "[t]he same as the others at the time; some invoices and proposals and bills, some tracking of payments made." Id., at 39 (emphasis added).

According to Gersh, KDC's prior bookkeeper (Kristina Brusenkova) filed invoices alphabetically rather than by project. Id., at 54. As a result:

> Q. So when you went to clean up the documentation of the invoices from the vendors and subcontractors, you just couldn't pull out a Lyman-Cutler file and look through it?
>
> A. No, no way.

Id., at 55.[1] The project's financial records at KDC were so bad that at some point after Gersh arrived in November 2014, in order to square away the bookkeeping for the Lyman-Cutler project, Gersh had to track down documentation and invoices for the project by going to the vendors and subcontractors and asking them to provide documentation and invoices. Id., at 54, 65. Gersh, however, cannot recall which vendors and subcontractors he had to ask for documentation. Id., at 54, 66-68. In some instances, Gersh approached them for documentation;

---

[1] Brusenkova, the Court will recall, will testify that Kagan's books contained extensive fraud and double billing. Affidavit of Kristina Brusenkova, ¶¶ 5, 7-17, attached to the Carnathan Aff. as Exhibit 18; Brusenkova Deposition, Mar. 20, 2018, attached to the Carnathan Aff. as Exhibit 29, at 125-26 (believes Kagan double billed Lyman Cutler for the landscaping); id., at 133-34 (at the end of each project, Kagan would review books and if subcontractor charges "looked too low," he would add to them; id., at 137-38 (Kagan always charged more for ProEx work than it spent).

in others, Kagan did. Id., at 90-91. Again, Gersh could not recall which were which. Id. Gersh agreed that if the proof of claim shows a balance due, then the vendor is still unpaid. Id., at 140. Gersh also testified he had not done much work on the Lyman Cutler books before the May 7, 2015 demand letter but that he did "significant" work after that letter went out. Gersh Dep. at 73-74.

Accordingly, based upon the testimony of KDC's own CFO (and Rule 30(b)(6) designee for both KDC and ProEx), Kagan and KDC did not keep track of the costs of construction as the project went on. Instead, Gersh admits it is fair to conclude that entries made on the Quickbooks Vendor Report dated June 2, 2015 listed as "last modified" in April or May 2015 were entries he made after coming to work at KDC. Id., at 64; Lyman-Cutler, LLC Transaction List by Vendor, attached to the Carnathan Aff. as Exhibit 17. In light of Gersh's testimony that he had not done much work as of May 7, 2015 on the Lyman-Cutler books, the only reasonable conclusion is that he and Kagan solicited documentation from subcontractors and vendors after that date.

Based on KDC's own testimony, therefore, there is no way to tell which of the documents it proffers in support of its Proof of Claim were contemporaneous records and which were created after the fact. They cannot be authenticated and are, therefore, inadmissible. Fed. R. Evid. 901; In re Rojas, 859 F. Supp. 2d 203, 206 (D. Mass. 2012) ("The documents which the Government 'proffered' which ostensibly were on Burgos Rojas' person when he was arrested by the Deputy U.S. Marshals in Massachusetts have not been authenticated and consequently are inadmissible."); Neelon v. Blair Krueger & Desert Eagle Resources, Ltd., 2015 U.S. Dist. LEXIS 192503, at *9 (D. Mass. Sep. 8, 2015) (excluding documents that were not authenticated).

### B. The Documents in the KDC Proof of Claim Binders are Inadmissible Hearsay Because They were Not Contemporaneously Created By a Person with Knowledge.

In addition, the documents in the Proof of Claim binders are inadmissible hearsay. KDC offers these documents for the truth of the matter asserted in them, and in a typical case they might be admissible as business records with a proper foundation. But here, where Kagan and Gersh solicited "invoices" from subcontractors and vendors long after construction was complete, and cannot even tell us which ones were contemporaneous and which are not, they cannot lay a proper foundation and cannot be permitted to offer these records at trial. Fed. R. Evid. 801; Fed. R. Evid. 803(6)(A) (to be admissible, record must be "made at or near the time by — or from information transmitted by — someone with knowledge"); Akbarian v. Public Serv. Mut. Ins. Co., 2004 Mass. App. Div. 87, 90 (June 3, 2004) (invoices properly excluded as hearsay); Copenbarger v. Morris Cerullo World Evangelism, Inc., 2018 Cal. App. LEXIS 1023, at *20-21 (Cal. Ct. App. Oct. 19, 2018) (invoices are hearsay and inadmissible absent foundational showing of exception to the rule); Keystone Dedicated Logistics, Inc. v. JGB Enters., 77 A.3d 1, 14 (Pa. Super. Ct. 2013) (invoices offered to prove freight charges were hearsay and not trustworthy).

### C. KDC's Documents are Inadmissible Under the Best Evidence Rule.

In light of the serious questions concerning the authenticity of the documents KDC proffers in support of its proof of claim, Plaintiffs timely demanded that it produce originals for inspection. Letter from Sean T. Carnathan to John Perten, May 11, 2018, attached to the Carnathan Aff. as Exhibit 19; see also Expert Report of Michael Goldman, attached to the Carnathan Aff. as Exhibit 20 (outlining specific reasons why records do not appear authentic).

KDC did not produce any originals.

The best evidence rule requires that "[a]n original writing, recording or photograph is required in order to prove its content" unless an exception applies. Fed. R. Evid. R. 1002. Duplicates are not admissible if there is a genuine question about the original's authenticity. Fed. R. Evid. R. 1003. Thus, the best evidence rule "generally requires the use of the original as proof of its contents" unless there is no dispute about the original's authenticity or the proponent of the document properly shows that the original is lost or unavailable. John Beaudette, Inc. v. Sentry Ins., 94 F. Supp. 2d 77, 137-138 (D. Mass. 1999). KDC cannot offer photocopies of these records at trial where the authenticity of these documents is highly suspect.

    **D**.    **The Court Should Exclude the KDC Contract from Evidence.**

KDC's Proof of Claim is premised on its June 22, 2015 Mechanic's Lien, which is in turn based on the proffered KDC Contract, allegedly dated June 24, 2013, which Kagan executed for both sides of the deal. In light of the serious questions about the KDC Contract's authenticity, the Plaintiffs also demanded production of the original KDC Contract. May 11, 2018 Letter, attached to the Carnathan Aff. as Exhibit 19. KDC did not produce it. A photocopy of this purported contract should not be admissible at trial. Fed. R. Evid. R. 1002, 1003.

**III.**    **The Court Should Exclude Expert Testimony by Von Salmi and Paul McDonald.**

    **A.**    **The Court Should Exclude Testimony by Von Salmi Because His Methodology is Unsound and Unreliable.**

Under Federal Rule of Evidence 702, courts must act as "gatekeepers" for the introduction of expert testimony "ensuring that an expert's proffered testimony 'both rests on a reliable foundation and is relevant to the task at hand.'" Abbott Biotechnology Ltd. v. Centocor Ortho Biotech, Inc., 2014 U.S. Dist. LEXIS 175470, *15 (D. Mass. 2014). Among the most important factors to consider when analyzing whether an expert's opinion is admissible is whether the proponent of the evidence can show that the expert's conclusion has been arrived at

9

in a "sound and methodologically reliable fashion." Milward v. Acuity Specialty Prods. Group, 639 F.3d 11, 15 (1st Cir. 2011); Riani v. Louisville Ladder, Inc., 2010 U.S. Dist. LEXIS 70728, *13 (D. Mass. 2010) ("Of course, the focus of the Court's inquiry should be on the principles and methodology employed by the expert, not the ultimate conclusions"). Opinions that are supported by unreliable methodologies, including factual assumptions that are not based on admitted evidence, should be excluded. See Riani, 2010 U.S. Dist. LEXIS at *17 ("An expert cannot render an opinion that is based on an incorrect factual premise or an assumption as to which there is no evidence"); Abbott Biotechnology Ltd., 2014 U.S. Dist. LEXIS at *16 ("A court may choose to exclude an expert's opinion when it is based on conjecture or speculation from an insufficient evidentiary foundation . . . or when it is connected to existing data only by the *ipse dixit* of the expert"); Lavina v. Satin, 33 Mass. L. Rep. 434 (Mass. Super. 2016) (where an opinion "rests upon an assumed fact that is not established in the evidence, the opinion is unreliable and cannot stand").

First, Salmi's methodology of soliciting bids from local contractors to establish what the "fair and reasonable value" of the construction costs would have been is fatally flawed because the bids solicited were not based upon actual project documents. When Salmi was retained to serve as an expert witness, he "wanted all of the construction documents, particularly the plans and specifications for the project" so that he could have his chosen subcontractors provide accurate bids. Von Salmi Deposition, at 72, 141, attached to the Carnathan Aff. as Exhibit 30. The difficulty Salmi confronted was that Kagan never prepared specifications and the architectural plans were too vague and incomplete to allow Salmi to accurately quote the project. Id., at 141 ("If you ask me to build that house based upon those plans, I'd say I need more information, as we did when we opined on the methodology for establishing our cost. We

10

needed more information. There was just not enough information to give any type of a cost."); Salmi Report at 4 ("pricing from only the set of plans, without a tremendous amount of more information, would provide inaccurate figures as the impacts on the cost of the level of finishes and items provided such a large variation and range in cost") (emphasis added); id. at 10 ("The categories that may have the widest swing in costs revolve around site work") (emphasis added).[2]

Because Kagan did not have adequate plans and specifications to bid the job, Salmi then created his own set of specifications, years after construction was complete, based upon what was contained in some of the subcontractor's invoices (some of which themselves were created after the fact and the largest of which was from ProEx), what he was told by Kagan, and by reviewing some photographs. Id., at 72-74, 79, 88; Salmi Report at 4, attached to the Carnathan Aff. as Exhibit 21. He then provided his own manufactured specifications through a non-competitive (one subcontractor per trade) bidding process and combined the "bids" he received to formulate his conclusions. Salmi Deposition, at 88, 92.

Attempting to fabricate one's own set of project specifications when none existed in the first place is an inherently unreliable process. It necessarily encompasses many unknowns of the project, which Salmi concedes he filled in by obtaining unsworn statements from Kagan during an informal interview. Salmi compounded these errors by relying on a non-competitive process that did not account for prices that would have prevailed at the time of the construction four years earlier. Contrast Smithkline Beecham Corp. v. Eastern Applicators, Inc., 2001 U.S. Dist. LEXIS 19728, at *8-9 (E.D. Pa. Nov. 29, 2001) (denying motion to exclude construction expert who personally viewed the construction, analyzed the project's original plans and specifications,

---

[2]    ProEx did the site work.

11

and utilized prices for the same time period that the construction was underway). Simply tallying up a single "bid" for each component of the hypothetical project Salmi created offers no reliable information about what Kagan did or the costs he incurred. Salmi's conclusions are unreliable and are "akin to inserting a square peg into a round hole." United States v. Mehanna, 735 F.3d 32, 66 (1st Cir. 2013). The Court should exclude his testimony.

### B. Salmi's Opinion Concerning the Hypothetical Fair and Reasonable Cost of Construction is Irrelevant.

Even if Salmi had used a proper methodology, which he did not, he should be precluded from testifying because his opinion concerning the "fair and reasonable" cost of the construction is entirely irrelevant. Bogosian v. Mercedes-Benz of N. Am., Inc., 104 F.3d 472, 476 (1st Cir. 1997) ("To be admissible, expert testimony must be 'helpful to the trier of fact' which requires that the opinions be 'relevant to the facts of the case.'"). Salmi's opinion is formed in an alternate, hypothetical universe where a third-party is retained to build the homes in 2018 based upon specifications Salmi created himself. The joint venture between the parties bears no resemblance to that scenario.

Rather, Kagan was a joint venturer in a limited liability company, who undertook to build the two homes in 2014 in return for a 50% share of the venture's net profits. He was a fiduciary, who owed a duty of care and utmost loyalty to deliver the best pricing possible – or, if he was going to line his own pockets, to do so in a manner that complied with the entire fairness standard. The issue presented here is, therefore, not what some arms-length third-party might have charged to build to Salmi's speculative specifications (in 2018 no less), but what Kagan's actual costs were and whether Kagan complied with his fiduciary duties in determining and managing the costs of construction, keeping his partners informed, and getting their fully

12

informed consent to any increased construction costs. Salmi's report does not illuminate this inquiry in any way.

Accordingly, because Salmi's conclusions are both inherently unreliable and irrelevant, he should be precluded from offering any testimony at trial.

### C. The Court Should Exclude Testimony by Paul H. McDonald Because it is Extrinsic Evidence Offered Solely to Impeach a Third-Party Witness on a Collateral Matter.

The Defendants should also be precluded from introducing evidence from their proffered handwriting expert because any such evidence is being used solely in an attempt to impeach the credibility of a third-party witness on a collateral matter. A true copy of his report is attached to the Carnathan Aff. as Exhibit 22.

It is well established that a party may not present extrinsic evidence to impeach a witness on a collateral matter. United States v. Beauchamp, 986 F.2d 1, 3-4 (1st Cir. 1993); United States v. Munoz-Franco, 356 F. Supp. 2d 20, 63 (D.P.R. 2005). This common law rule is rooted in the notion that courts have discretion to exclude evidence whose probative value will be substantially outweighed by considerations of other factors such as undue delay or waste of time. United States v. DeCologero, 530 F.3d 36, 60 (1st Cir. 2008). A matter is considered "collateral" if the matter itself is not relevant in the litigation to establish a fact of consequence other than the mere contradiction of the witness' in-court testimony. Beauchamp, 986 F.2d at 3-4; United States v. Mulinelli-Navas, 111 F.3d 983, 988-989 (1st Cir. 1997).

The handwriting expert's report has nothing to do with the issues that will be resolved at trial. It does not even have anything to do with the actual parties to this case. Instead, it is being offered to show that a third-party witness who is expected to testify at trial concerning KDC's business practices should not be believed.

Specifically, KDC's former bookkeeper, Ms. Brusenkova, is expected to provide damning evidence concerning Kagan's practice of manipulating KDC's books and records, providing kickbacks to his subcontractors, and the fact that certain documentary evidence offered by KDC such as the proposals submitted by ProEx cannot be genuine since they contain a reference to a telephone number that was not assigned to KDC until sometime the following year. In retaliation for this testimony, Kagan has sued Ms. Brusenkova in a separate case claiming that the information she provided to the Plaintiffs in this case violated the terms of a Non Disclosure Agreement. Ms. Brusenkova testified in that case that she never signed the Non Disclosure Agreement. The report offered in this case opines that Ms. Brusenkova did in fact sign the Non Disclosure Agreement.

Whether or not Ms. Brusenkova was subject to that agreement has no bearing on any issue in this case or the subjects of her anticipated testimony. DeCologero, 530 F.3d at 60 (affirming exclusion of collateral impeachment evidence "given the court's interest in avoiding a mini-trial on [the witness'] conduct, which could distract the jury in an already complex case"); Mulinelli-Navas, 111 F.3d at 988-989 ("When a witness testifies to a collateral matter, the examiner must take the answer, *i.e.,* the examiner may not disprove it by extrinsic evidence"). It is merely a collateral issue that the Defendants will waste significant time on and will distract from the issues in this case that need to be resolved.

## CONCLUSION

For the foregoing reasons, the Court should allow Plaintiffs' Motion in Limine and grant the requested evidentiary and pre-trial rulings.

| | |
|---|---|
| LYMAN-CUTLER, LLC,<br>By its attorney, | ALEX FILIPPOV and<br>NICKOLAY LIPETSKER,<br>By their attorneys, |
| */s/ Peter Tamposi*<br>Peter N. Tamposi, BBO No. 639497<br>The Tamposi Law Group, P.C.<br>159 Main Street<br>Nashua, NH 03060<br>T: (603) 204-5513 | */s/ Sean T. Carnathan*<br>Sean T. Carnathan, BBO No. 636889<br>*scarnathan@ocmlaw.net*<br>Joseph P. Calandrelli, BBO No. 666128<br>*jcalandrelli@ocmlaw.net*<br>O'Connor, Carnathan and Mack, LLC<br>1 Van de Graaff Dr. Suite 104<br>Burlington, MA 01803<br>T:  781-359-9000 |

Dated:  November 16, 2018

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on November 16, 2018.

*/s/ Sean T. Carnathan*