UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| | ) | |
| *In re:* | ) | |
| | ) | |
| LYMAN-CUTLER, LLC, | ) | Chapter 7 |
| Debtor | ) | Case No. 15-13881 FJB |
| | ) | |

| | | |
|---|---|---|
| | ) | |
| LYMAN-CUTLER, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adv. Case No. 1:16-ap-01120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' MEMORANDUM IN SUPPORT OF THEIR
MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, Bankr. Rule 7056 and this Court's October 10, 2018

orders as modified on November 6, 2018 (Docket No. 215), Plaintiffs Lyman-Cutler, LLC (the

"LLC"), Alex Filippov ("Filippov"), and Nickolay Lipetsker ("Lipetsker") (collectively,

"Plaintiffs") respectfully submit this memorandum in support of their Motion for Summary

Judgment in their favor on certain Proofs of Claims in the Bankruptcy, and the corresponding

Claims of the Amended Adversary Complaint and Defendants' Amended Counterclaims in the

Adversary Proceeding as specified in the Motion.  The Court should grant the Plaintiffs summary

judgment because:

(1) Kagan Development KDC Corp.'s ("KDC") has no reasonable prospect of proving of proving the entire fairness of the contract upon which it bases its claims and the charges it asserts thereunder;

(2) Tatiana Kagan ("Tatiana"), KDC and ProExcavation ("ProEx") are not agents of any Member of the LLC under the Operating Agreement and, therefore, cannot be entitled to indemnification;

(3) There is absolutely no evidence the Plaintiffs "suborned perjury" or asserted false claims, and their conduct in asserting claims, interviewing witnesses and gathering evidence to support their claims is absolutely privileged;

(4) There is no evidence of any "freeze out," which is a species of breach of fiduciary duty and not a freestanding claim;

(5) The construction was governed by an express, written contract, which bars KDC's equitable claims, and equitable claims cannot be used to skirt the requirement that KDC and Kagan prove entire fairness (which they cannot prove); and

(6) Filippov was (and is) indisputably the Managing Member of the LLC with full authority to initiate litigation and file for bankruptcy on its behalf, and Kagan cannot contradict documents he signed to create a purported factual issue.

**<u>Statement of Undisputed Material Facts</u>**

Pursuant to D. Mass. Bankr. L.R. 7056-1, Plaintiffs have submitted and incorporate by reference a separate, concise statement of the material facts of record as to which there is no genuine issue to be tried ("SSUMF").  For the Court's convenience, Plaintiffs recount the essential narrative here.

Filippov is the owner and operator of Belmont Telecom.  SSUMF ¶ 1.  Lipetsker is a

dentist.  SSUMF ¶ 2.  Kagan has been in the construction business for many years and had built

30-40 homes prior to the Lyman-Cutler project.  SSUMF ¶ 3.

On or about November 14, 2012, Filippov, Lipetsker and Kagan executed the Operating

Agreement (the "Operating Agreement") of Lyman-Cutler, LLC.  SSUMF ¶ 4.  Filippov

invested $2 million in the LLC and received 80% of the membership interest.  Kagan and

Lipetsker each invested $250,000 and received 10% each of the membership interest.  SSUMF ¶

5.  Filippov was the managing member.  SSUMF ¶ 59.

Section 5.2 of the Operating Agreement provides: Kagan is responsible for building the

two homes "in accordance with the plans, including drawings supplied by Mr. Kagan and

approved by Managing Member, to be substantially complete no later than March 30, 2014 in

return for the compensation provided in section 8.1."  SSUMF ¶ 6.  Section 8.1 of the Operating

Agreement provides that Kagan's compensation for building the two homes is a 50% share in the

net profits, subject to certain adjustments.  SSUMF ¶ 7.  Section 8.1 of the Operating Agreement

further states that "[i]n the event the property is not sold within twenty-three (23) months from

the date of acquisition, then Mr. Kagan shall be responsible for all carrying costs until such time

as the property is sold."  SSUMF ¶ 8.

On December 31, 2012, the LLC purchased a property at 77 Lyman Road, Brookline,

Massachusetts for $4 million.  SSUMF ¶ 9.  The "Date of Acquisition" is defined in the

Operating Agreement as the "deed recording date for Lyman Road Brookline property into the

Company."  SSUMF ¶ 10.  The Lyman Road deed was recorded on December 31, 2012.

SSUMF ¶ 11.  In connection with the purchase of 77 Lyman Road, the LLC borrowed

$1,600,000 from Rockland Trust.  SSUMF ¶ 12.  On May 7, 2013, the LLC secured from

Rockland Trust two construction loans in the amount of $1.6 million each, for a total of $3.2

million.  SSUMF ¶ 13.

Kagan and his wife Tatiana are the officers and sole directors and shareholders of KDC.

SSUMF ¶ 14.  Kagan and his wife Tatiana are the sole shareholders of ProEx and Kagan is its

sole officer.  SSUMF ¶ 15 (Kagan is not sure if ProEx has a board of directors).  Daniel Gersh is

the "Chief Financial Officer" of KDC and has been primarily responsible for its books and

records since he started work for KDC in or about November 2014.  SSUMF ¶ 16.

**KDC did not keep track of the construction costs as the homes were constructed.**

SSUMF ¶ 17.  When Gersh arrived, KDC's books and records were a "mishmash" and a "mess."

Id.  The Lyman-Cutler books were in the same state.  Id.   In fact, the Lyman Cutler Project

financial records at KDC were so bad that Gersh had to track down documentation and invoices

for the Lyman Cutler Project by going to the vendors and subcontractors and asking them

documentation and invoices.  SSUMF ¶ 19.  In some instances, Gersh approached the vendors;

in others, Kagan did.  Gersh cannot recall which were which.  SSUMF ¶ 20.[1]

On May 7, 2015, through counsel, Kagan asserted that he and KDC had incurred

"unreimbursed construction costs" totaling $758,025.56 "with approximately $50,000 of

additional vendor costs anticipated."  SSUMF ¶ 21.  In the May 7, 2015 letter, Kagan also

asserted that he was owed $251,000 for carrying costs and stated he would not pay the carrying

costs going forward.  SSUMF ¶ 22.  In the May 7, 2015 letter, Kagan advocated reducing the

listing price of the homes from $5.5 million to $5.25 million.  SSUMF ¶ 23.  **As of May 7, 2015,**

**Gersh had not done much work yet to clean up the Lyman-Cutler books.**  SSUMF ¶ 24.

---

[1]     It is fair to conclude this process took place in May and June 2015.  Gersh testified he
had not done much work on the Lyman Cutler books before the May 7, 2015 demand letter but
that he did "significant" work after that letter went out.  SSUMF ¶¶ 24 & 25.

KDC's Proof of Claim is based upon a mechanic's lien recorded in the Norfolk County

Registry of Deeds on June 22, 2015 (the "KDC Mechanic's Lien").  SSUMF ¶ 26.  The KDC

Mechanic's Lien asserted a claim in the amount of $2,095,985.23.  SSUMF ¶ 27.  Tallying up

the construction costs and carrying costs asserted in the May 7, 2015 letter, the total was

$1,059,025.56.  SSUMF ¶ 28.  On June 22, 2015, when Kagan caused KDC to file the

Mechanics Lien, he asserted that the total claim was $2,095,985.23.  Id.

Kagan explains the dramatic increase of over $1 million in KDC's claim between May 7,

2015 and June 22, 2015 as simply the result of having "finalized the accounting," and that the

May 2015 demand was "what we wanted to get from Lyman-Cutler right away to continue

operating on the project."  SSUMF ¶ 29.  KDC's original Proof of Claim, filed on December 18,

2015, was in the same amount as the KDC's Mechanic's Lien, $2,095,985.23.  SSUMF ¶ 30.

KDC's Amended Proof of Claim totals $2,396,914.66.  SSUMF ¶ 30.  KDC's Amended Proof of

Claim reflects an "updated" invoice dated March 17, 2016, reducing the amount of the

underlying claim by KDC against the LLC from $2,095,985.23 to $2,021,858.39.  SSUMF ¶ 32.

The overall reduction in the asserted claim by KDC of $74,126.84 consists of:

> (1) a reduction in the asserted total carrying costs of $95,225.59 ($760,771.08
>
> June 1, 2015 reduced to $665,545.49 March 17, 2016) and the accompanying
>
> "carrying costs advance fee" of $18,251.57 ($145,814.46 June 1, 2015 to
>
> $127,562.89 March 17, 2016); but
>
> (2) an increase in the asserted total construction costs of $34,217.67
>
> ($3,738,925.82 increased to $3,773,143.49 March 17, 2016) and the
>
> accompanying "General Contractor Construction Fee (@15%" of $5,132.65
>
> ($560,838.87 June 1, 2015 increased to $565,971.52 March 17, 2016).

SSUMF ¶ 33.

KDC's Amended Proof of claim includes $141,191.25 in "administrative expenses as provided for under the construction contract through May 1, 2016" on top of the amounts asserted in the KDC Mechanic's Lien.  SSUMF ¶ 34.  KDC's Amended Proof of Claim also asserts a claim for 12% interest, totaling $233,865.39 as of May 1, 2016.  SSUMF ¶ 35.

The KDC Mechanic's Lien purports to be based upon a contract between the LLC and KDC, dated June 24, 2013 (the "KDC Contract").  SSUMF ¶ 36.  Kagan signed the KDC Contract on behalf of both the LLC and KDC.  SSUMF ¶ 37.

The charges adding up to $2,095,985.23 as asserted in the KDC Mechanic's Lien are outlined in an invoice dated June 1, 2015.  SSUMF ¶ 38.  These charges include:

(1) a "General Contractor Construction Fee" of 15% of the total alleged costs of construction in the amount of $565,971.52, allegedly payable to KDC based upon Section 7.1.2 of the KDC Contract.  SSUMF ¶ 39.

(2) a "Design Fee" in the amount of $25,000, allegedly payable to KDC based upon Sections 2.2 and 7.1.1 of the KDC Contract.  SSUMF ¶ 40.

(3) a "Carrying Costs Advance Fee" allegedly payable to KDC in the amount of $127,562.89, based upon Section 7.1.3 of the KDC Contract.  SSUMF ¶ 41.

(4) a charge for "Office Overhead" allegedly payable to KDC in the amount of $59,250, based upon Section 7.3.2.1 of the KDC Contract.  SSUMF ¶ 42.

KDC did not charge for Kagan's time as part of the "Office Overhead" calculation. SSUMF ¶ 43.  KDC calculated the "Office Overhead" by estimating that KDC employees spent 790 hours on the Lyman Cutler Project and charging $75.00 an hour.  SSUMF ¶ 44.  KDC values

the time Kagan spent on the Project at $164,000 (820 hours x $200 per hour).  SSUMF ¶ 45.

KDC did not keep time records; the amount of time on the invoice is an estimate.  SSUMF ¶ 46.

KDC bases **$916,800** of its Proof of Claim on alleged charges to it from ProEx.  SSUMF

¶ 47.  Kagan admits that the ProEx proposal includes "market profit" but has testified he does not

know how much profit is included in the ProEx charges.  SSUMF ¶ 48.  Kagan did not show the

ProEx proposal to Filippov or Lipetsker in 2013.  SSUMF ¶ 50.  The $916,800 in charges by

ProEx includes $19,000 for four months of snow removal at the properties on top of $4,000 paid

to Paul DiGiacomo for snow removal at the two properties.  SSUMF ¶ 51.  $325,000 was added

to ProEx's accounts receivable for Lyman Cutler as of December 31, 2014.  SSUMF ¶ 52.  An

additional $100,000 was added to ProEx's accounts receivable for Lyman Cutler as of January 1,

2015.  SSUMF ¶ 53.

On June 25, 2015, Joseph Cohen wrote a letter to the Parties on behalf of KDC,

presenting the invoice dated June 1, 2015 and a "Proposal" to "work out" the KDC bill by an

immediate payment of $1,000,000, a payment of $500,000 upon sale of one of the Properties,

and the balance by November 30, 2015.  SSUMF ¶ 54.[2]  As of June 25, 2015, there was

**$6,172.89** in the LLC bank account at Rockland Trust.  SSUMF ¶ 55.

**Disputed Facts, Accepted as True for the
Purpose of this Motion for Summary Judgment**

This dispute involves many hotly contested facts and among them are a number of

assertions by Kagan including testimony and documents that Plaintiffs expect to prove at trial are

entirely false.  Even crediting Kagan's account for the purposes of this Motion <u>only</u>, however,

---

[2]     This letter is the first time the invoice purportedly dated June 1, 2015 was ever presented
to the Plaintiffs, but this is a disputed fact (although there are no documents to support Kagan's
dispute).

Plaintiffs respectfully submit that the Court should enter summary judgment in the Plaintiffs' favor as set forth herein. See Fed. R. Civ. P. 56(e)(2) (court may consider facts undisputed for purpose of the motion). Plaintiffs reserve the right to contest these facts at trial, if a trial is necessary. For the purposes of this Motion only, the Court should consider the following facts as undisputed:

Kagan did not provide construction plans or a budget to Filippov and Lipetsker before they invested in the Project. SSUMF ¶ 60. Filippov agreed to invest $2 million and Lipetsker agreed to invest $250,000 without any plans or construction budget. SSUMF ¶ 61. Filippov wanted to earn a 20% return on his money and was confident he would. SSUMF ¶ 62.

At the same time that Kagan presented plans and construction costs of $1.6 million per house, the Parties agreed that construction would cost more than that, and that Kagan would put in more money as the Project went along and get paid back at the end. SSUMF ¶ 63. As the Project progressed, the Parties decided to upgrade every finish and material used in the Project. SSUMF ¶ 64 ("Flooring, stairs, rails, finish carpentry, all cabinetry, tile work, the amount of trees, size of the paving, materials for retaining wall, decking, material, fireplace . . . . [l]ighting, doors, crown molding, baseboards . . . a built-in library"). "[A]t absolutely every step [Kagan] decided to spend more money than the budget." Id. Kagan told Filippov and Lipetsker about each upgrade and they agreed to each upgrade, but Kagan did not "keep any kind of record of what additional money [he was] spending on each thing." SSUMF ¶ 65.[3] As the investment in materials went up, so did the target selling price, rising from an original target of $4.5 million to $5.5 million. SSUMF ¶ 66.

---

[3]     Plaintiffs do not dispute and will not dispute at trial that Kagan did not keep any records of each cost increase. That part of Kagan's account is indisputably true as set forth herein.

The two homes Kagan built for the LLC were substantially completed by March 30, 2014.  SSUMF ¶ 67.

## ARGUMENT

There can be no disputing that Kagan is a fiduciary and that the KDC Mechanic's Lien, KDC Contract and underlying asserted charges against the LLC are all self-dealing transactions in which Kagan is acting on his own account.  Accordingly, and as a matter of law, he bears the burden of persuasion at each step to prove <u>entire fairness</u>.  This memorandum incorporates by reference the contemporaneously filed Motion in Limine, asking this Court to rule that the Kagan parties carry the burden to prove entire fairness.

As the Court knows, Plaintiffs have long contended that the cost overruns are the product of Kagan's fraud, which will be a disputed issue at trial, if a trial is necessary.  But this Court need not find that Kagan acted fraudulently in order to disallow the KDC Proof of Claim and find that Kagan breached his fiduciary duty to the Plaintiffs.  Rather, Kagan must prove the disputed charges are entirely fair; a finding by the Court that the asserted charges are <u>not</u> entirely fair does not require any finding of "corruption or dishonesty."  <u>Coggins v. New England Patriots Football Club</u>, 397 Mass. 525, 533 (1986); <u>Lazenby v. Henderson,</u> 241 Mass. 177, 180 (1922).

Accordingly, even crediting Kagan's preposterous account of what happened, the KDC Contract, KDC Mechanic's Lien, the KDC Proof of Claim and Kagan's attendant conduct are anything but entirely fair based upon undisputed facts.  To boil it down to two sentences:  KDC cannot possibly meet the entire fairness requirement, because entire fairness requires full disclosure and knowing agreement by the other parties to the venture.  Where KDC failed to bid the job, and failed keep record of the construction costs during the Project, and instead recreated

them after the fact, there is no way KDC can have made disclosures sufficient to make any

purported agreement by Filippov and Lipetsker entirely fair to them.  Because Kagan and KDC

have no prospect of proving entire fairness at trial, this Court should enter summary judgment on

the KDC Proof of Claim and the related claims and counterclaims that depend on Kagan carrying

this burden, which he cannot carry.

**I.     This Court Should Enter Summary Judgment Against KDC on its Proof of Claim
and the Corresponding Counts of the Amended Adversary Complaint and
Amended Counterclaim.**

KDC cannot prove entire fairness with regard to the over $2.3 million it claims pursuant

to the KDC Mechanic's Lien and KDC Contract, where:

(1) Kagan signed the contract for both sides of the deal;

(2) KDC did not bid the job and did not keep contemporaneous records of the

construction costs or the time charges it claims;

(3) KDC calculated the alleged construction costs and other charges <u>after</u> construction

was substantially complete, based on records it assembled <u>after</u> construction was substantially

complete;

(4) **$918,975.66** of KDC's claim consists of fees and "overhead" payments to KDC (*i.e.,*

Kagan) when the Operating Agreement obligated him to build the homes for a share of the profit;

(5) **$916,800** of KDC's claim are doubly self-dealing charges by ProEx, which includes a

profit margin Kagan claims not to know; and

(6) Kagan presented an initial statement of alleged debts in the amount of $1,059,025.56

on May 7, 2015, only to nearly double that figure in the KDC Mechanic's Lien he recorded on

June 22, 2015, when he asserted that the total claim was $2,095,985.23.

SSUMF ¶ 28.

Accordingly, this Court should enter summary judgment disallowing KDC's Proof of

Claim and also enter summary judgment in favor of Plaintiffs on the corresponding counts of the

Amended Adversary Complaint (Counts I and II) and against KDC and Kagan on the

corresponding counts of the Amended Counterclaim (Counts IX, X, XII).

> ### A.    On the Undisputed Facts, and Crediting Kagan's Implausible Account, Kagan Cannot Prove Entire Fairness with Regard to the KDC Proof of Claim.

KDC's Proof of Claim is based upon the KDC Mechanic's Lien, which is in turn based

upon the KDC Contract.  Because Kagan cannot prove entire fairness with regard to the KDC

Mechanic's Lien, the KDC Contract or the charges asserted through the KDC Contract, this

Court should enter summary judgment disallowing the KDC Proof of Claim.  See In re Paxson

Elec. Co., 248 B.R. 451, 463 (M.D. Fla. Bankr. 2000) (finding abandonment of equitable claims

where proof of claim "makes no reference to amounts owed based on equitable principles"); In

re Grove Instruments, Inc., 573 B.R. 307, 310 (D. Mass. Bankr. 2017) (noting that certain claim

was not "explicitly referenced in . . . proof of claim"); Applied Sci. Int'l, LLC v. Torres, 2010

Bankr. LEXIS 2533, at *8-10 (M.D.N.C. Bankr. July 30, 2010) (proof of claim failed to include

claims for fraud, negligent misrepresentation, or punitive damages).

> ### 1.   Kagan Cannot Prove Entire Fairness with Regard to the KDC Mechanic's Lien.

A mechanic's lien is a remedy available only to those contractors that have a written

contract with the property owner.  See G.L. c. 254, § 2.  The statute defines a "written contract"

as "any written contract enforceable under the laws of the Commonwealth."  Id., § 2A.  Being a

creation of statute, the lien requirements must be strictly complied with for a contractor to avail

himself of these protections.  Ng Bros. Constr., Inc. v. Cranney, 436 Mass. 638, 642 (2002); E.

Coast Steel Erectors, Inc. v. Ciolfi, 417 Mass. 602, 605 (1994).  Consequently, if a contractor has

not entered into an enforceable written contract with the owner, the lien will be invalid.  See,

e.g., Atlas Contr., Inc. v. Saleh, 2018 Mass. Super. LEXIS 99 (Mass. Super. June 2018)

(discharging a lien because contractor's lien was not based upon an enforceable written contract).

The Notice of Contract filed by KDC identifies the written contract supporting the lien as

the KDC Contract.  KDC must therefore prove that this contract is enforceable to be entitled to

the lien.  See Atlas Contr., Inc., 2018 Mass. Super. LEXIS 99 at *8-9 ("The mechanic's lien

statute and the case law interpreting it demonstrate that [the contractor's lien] must be supported

by the actual written contract identified in the Notice [of Contract]").  Any other type of oral or

written agreement purportedly relied upon by KDC cannot suffice.  Id. (discharging lien because

the only enforceable written contract was a modified version of the contract identified in the

Notice of Contract and was not itself identified in the Notice).

The KDC Contract is a self-dealing contract, which Kagan executed for the LLC with his

own company, KDC.  Durfee v. Durfee & Canning, Inc., 323 Mass. 187, 196 (1948)("It is also

settled that a director, who fraudulently or in violation of his fiduciary relationship diverts profits

from the corporation, is personally liable though the profits are acquired by an agency controlled

by the director or a third party"); Lazenby, 241 Mass. at 180 (fiduciary held liable for knowingly

paying inadequate price for pianos he purchased from a company of which he was a director for

a company which he owned and controlled).  In order to enforce it, he must prove it is entirely

fair with regard to both the charges asserted under it and with regard to the process by which it

came to be executed.  Coggins, 397 Mass. at 530-31 (quoting with approval, Weinberger v.

UOP, Inc., 457 A.2d 701, 711 (Del. 1983)); see MAZ Partners LP v. Shear (In re PHC, Inc.

S'holder Litig.), 894 F.3d 419, 431-32 (1st Cir. 2018) (quoting Coggins and stating that

"Coggins makes pellucid that fairness is an essential element in judicial examination of intra-

corporate claims involving self-dealing") see also Plaintiffs' Motion in Limine, November 16, 2018, § I (gathering authorities).  Kagan can do neither.

First, Kagan cannot prove that the "price" of the self-dealing KDC Contract is entirely fair.  KDC asserts fees and overhead charges by KDC itself (*i.e.,* Kagan) totaling **$918,975.66** based upon the KDC Contract ($565,971.52 general contractor fee, $25,000 design fee, $127,562.89 carrying costs advance fee, $59,250 in office overhead and $141,191.25 in administrative expenses).  SSUMF ¶¶ 34, 39-42.  The LLC's Operating Agreement expressly obligates Kagan to build the two homes in return for compensation in the form of 50% of the net profits (subject to certain adjustments), and to pay the carrying costs if the homes did not sell within 23 months of the acquisition date, which they did not.  SSUMF ¶¶ 7-8.  When confronted with the Operating Agreement, Kagan explained that he did not charge for his personal time.  SSUMF ¶ 43.  Kagan's own invoice values this time (without any time records) at $164,000.  SSUMF ¶ 45.  This would mean that Kagan's contribution to the joint venture is $164,000 worth of his time (by his own calculation) in return for 50% of net profits – on top of **$918,975.66** in KDC fees, which are directly at odds with the Operating Agreement.  This is anything but fair.

Second, and to make matters worse, the largest single subcontractor component of the construction costs is from Kagan's other company, ProEx, totaling **$916,800.**  Kagan cannot (or will not) disclose how much of this is profit, but his ledger entries strongly suggest at least the $425,000 entered into the ProEx ledger on December 31, 2014 ($325,000) and January 1, 2015 ($100,000), and likely more, are his profit.  Certainly, charging $19,000 for four months of snow removal at two adjacent properties includes a hefty profit margin.  Taken together with the KDC fees and overhead charges, KDC's Amended Proof of Claim demands $2,396,914.66, but $233,865.39 is statutory interest as of the date of filing, leaving an underlying claim of

13

$2,163,049.27.  KDC Amended Proof of Claim, Register No. 1-2.  In comparison, the fees and

charges by KDC and ProEx total **$1,835,775.66**.  **All this on a joint venture where Kagan**

**agreed to build the two homes in return for a 50% share in the net profits.**  The Operating

Agreement already established Kagan's obligation to build the two homes.  The KDC Contract

conferred no additional benefit on the LLC, and only served to line Kagan' pockets.

KDC also cannot meet its burden to prove the **process** was entirely fair**.**  First, Kagan

claims that he gave a copy of the KDC Contract to Filippov and Lipetsker and that Filippov told

him to go ahead and sign it.  Even if this testimony were true, that does not satisfy Kagan's

burden to make full disclosure of all of the material terms of the KDC Contract and its impact on

the LLC.  A self-dealing fiduciary contract is voidable unless the fiduciary can prove it was on

fair terms and "all the parties beneficially interested manifest assent with full understanding of

their legal rights and all relevant facts that the fiduciary knows or should know."  Demoulas v.

Demoulas, 1995 Mass. Super. LEXIS 870, at *204 (Aug. 2, 1995) (emphasis added); see Puritan

Medical Ctr., Inc. v. Cashman, 413 Mass. 167, 172 (1992) ("there may be no ratification of self-

dealing without full disclosure" -- "No half-hearted disclosure or partial discovery is sufficient . .

. .  The trustee's duty of disclosure is not discharged by leaving the cestui to draw doubtful

inferences, conclusions and suspicions . . . ."); see also Kidder v. Greenman, 283 Mass. 601,

615-616 (1933) (plaintiff who was provided with copy of the lease did not ratify it even though it

was in her possession because she had no reason to examine it).

Second, neither was the process by which the alleged construction costs were incurred

entirely fair.  Kagan testified (again, falsely) that he told Filippov and Lipetsker about the cost

overruns as they were incurred, and that they agreed to them.  BUT where it is undisputed that

KDC did not bid the job and did not keep track of the construction costs as they were incurred

and was forced to try and reconstruct the alleged costs after construction was complete, there is no way Kagan could have made the sort of full and fair disclosure to Filippov and Lipetsker required by the stringent scrutiny of the entire fairness rule.[4]   The ProEx charges -- $916,800 – are particularly unfair, where: (1) Kagan hired his another of his own companies; (2) cannot (or will not) say how much the ProEx profit margin is; and (3) cannot even recall showing the ProEx Proposal to Filippov and Lipetsker.  Kagan cannot possibly have made the disclosures and obtained the fully informed consent necessary to enforce ProEx's charges against the LLC.

In addition, Kagan and KDC cannot meet the burden of proving entire fairness with regard to the manner in which they billed the LLC.  It is undisputed that the first demand for any payment for the LLC above the construction loan from Rockland Bank was the letter from Kagan's lawyer, Alexander Pyle, on May 7, 2015, over a year after Kagan claims construction was substantially complete, and at which time the demand was for $1,059,025.56.  This alone is not entirely fair – presenting a surprise bill for over $1 million long after construction is complete.  This is particularly unfair where KDC's CFO claims he had not done much work to confirm the costs when this demand was sent.  To again make matters worse, when the Plaintiffs rejected the demand, Kagan literally "doubled down," and doubled the amount demanded when he recorded the KDC Mechanic's Lien, demanding $2,095,985.23.  Three days after recording the Mechanic's Lien he sent Plaintiffs an invoice summarizing the components of that figure, disclosing that it included massive fees and overhead charges from KDC totaling **$777,784.41**.  In that letter, he demanded an immediate payment of $1 million when he knew that the Company bank account held just over $1,000.  This assault on the LLC and Kagan's co-venturers cannot

---

[4]     Kagan's plans and total absence of specifications were so inadequate that his own construction expert, Von Salmi, had to make up his own specifications.  See Plaintiff's Motion in Limine at 10.

meet an entire fairness standard.  In KDC's Amended Proof of Claim, Kagan also lards on

another $141,191.25 in "administrative" charges.  In March 2016, KDC was still adding to the

alleged costs of construction.  None of this is the least bit fair, let alone entirely fair.

    **2.  KDC Has No Reasonable Expectation of Proving its Claim Because the KDC Contract is Inadmissible.**

KDC also has no reasonable expectation of proving that the KDC Contract is enforceable

because it has no admissible copy of the KDC Contract to offer at trial.  See Yerardi v. Pacific

Indem. Co., 436 F. Supp. 2d 223, 244 (D. Mass. 2006) (summary judgment is appropriate where

plaintiff has "no reasonable expectation of proving an essential element of his case").  As set

forth in the Motion in Limine simultaneously filed by the Plaintiffs and incorporated herein by

reference, the KDC Contract is inadmissible on the basis of the best evidence rule.  This is a

death knell for KDC's claims, particularly in light of the entire fairness standard.

**II.  The Court Should Enter Summary Judgment in Favor of the Plaintiffs on the Claims and Counterclaims Dependent on Kagan, KDC and ProEx Proving Entire Fairness.**

As a co-venturer in a closely held, Massachusetts limited liability company, Kagan owed

the Plaintiffs a fiduciary duty of care, utmost loyalty and full disclosure.  Allison v. Eriksson,

479 Mass. 626, 627 (2018); Meehan v. Shaughnessy, 404 Mass. 419, 436 (1989); Blake v.

Friendly Ice Cream Corp., 2006 Mass. Super. LEXIS 496, at *13 (Aug. 24, 2006).  On the

undisputed facts, and even crediting Kagan's account of what happened, Kagan breached his

fiduciary duties.  He signed an agreement with his own company and then had that company hire

another of his companies.  He failed to exercise due care in managing the Project, bidding the job

and keeping track of the costs of construction.  He cannot have made the disclosures his duties

required because he failed to exercise due care to keep himself informed.  He was not loyal to the

Company, but rather sought his own gain at its expense.  On the undisputed facts, he is liable for breach of his fiduciary duties of loyalty, care and disclosure.

III.    **The Court Should Enter Summary Judgment for the Counterclaim Defendants on the Counts XI, XIII and XIV-- Quantum Meruit, Promissory Estoppel and Unjust Enrichment -- Because the Construction was Governed By a Written Contract and Any Arrangements with KDC and ProEx Were Subject to Entire Fairness.**

A.    **The Equitable Claims Fail Because a Written Contract Governed.**

It is black-letter law in Massachusetts that equitable, quasi-contractual claims such as unjust enrichment, quantum meruit, and promissory estoppel do not lie where there is a contract that governs the subject matter of the parties' dispute.  See CareOne Mgmt., LLC v. NaviSite, Inc., 2017 Mass. Super. LEXIS 58, at *25 (Mass. Super. Ct. Apr. 24, 2017) ("[o]rdinarily, a claim of unjust enrichment will not lie where there is a valid contract that defines the obligations of the parties . . . That is because a valid contract defines the obligations of the parties as to matters within its scope, displacing to extent any inquiry into unjust enrichment") (citing Metropolitan Life Ins. Co. v. Cotter, 464 Mass. 623, 641 (2013)); Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 931 (1st Cir. 2014) ("[u]nder Massachusetts law, the existence of a contractual relationship between the parties typically precludes an unjust enrichment claim arising out of that contract"); 92 Mass. App. Ct. 53, 60-61 (2017) ("[a] plaintiff is not entitled to recovery on a theory of unjust enrichment where a valid contract defines the obligations of the parties . . . Where an enforceable contract exists . . . a claim for promissory estoppel will not lie"); Boston Med. Ctr. Corp. v. Sec'y of the Exec. Office of HHS, 463 Mass. 447, 467 (2012) ("[a] plaintiff is not entitled to recovery on a theory of quantum meruit where there is a valid contract that defines the obligations of the parties"); Robinson v. Spencer Stuart, Inc., 2015 U.S. Dist. LEXIS 183961, at *12-13 (D. Mass. Feb. 24, 2015) ("[p]romissory estoppel and unjust enrichment are equitable remedies available in the absence of a contract only").

17

Here, KDC asserts counterclaims against the LLC for, among other things unjust enrichment, promissory estoppel, and quantum meruit.  Kagan also asserts a counterclaim against the LLC for promissory estoppel.  Each of these claims fails due to the existence of a contract – the LLC's Operating Agreement – that governs the construction project at issue in this litigation.

Kagan, Lipetsker and Filippov entered into the Operating Agreement in November 2012.  The Counterclaims expressly rely upon it and it is the only document attached to the Amended Counterclaim.  As the Amended Counterclaim recognizes, the Operating Agreement memorialized the joint venture between Kagan, Lipetsker, and Filippov in which they agreed to develop the 77 Lyman Road property.  The Operating Agreement made clear that Kagan had a duty and obligation to construct two homes on the Property, in accordance with plans to be supplied by Kagan, and that construction was to be substantially completed by no later than March 30, 2014.  The Operating Agreement specifically sets forth the compensation that Kagan would receive in connection with this development project, and Section 5.2 states, "It is specifically understood by all members that Mr. Kagan's compensation for this duty [of construction] is outlined in Section 8.1 below."  Section 8.1 provides that Kagan is to receive 50% of net profits, despite only contributing 10% of the capital contribution to Lyman Cutler.  It also states that if the Property is not sold within 23 months from the date of acquisition, Kagan shall be responsible for all carrying costs until the Property is sold.  The Operating Agreement also provides a mechanism for funding the construction, in the form of an agreement that a Purchase Money Loan and Construction Loan would be taken out from Rockland Trust Company "to pay for construction and carrying costs."

The Amended Counterclaim recognizes that the Operating Agreement sets forth Kagan's compensation in connection with the project, where it alleges that Kagan would be compensated through benefits including "receiving a larger share of the profits than his membership interest would otherwise have required based on his capital contribution" and, following a sale of the property, receiving a collateral benefit from the commission earned by his wife, a real estate agent with whom the parties agreed the Property would be listed for sale.  The Operating Agreement contains no agreement that Kagan's contracting business, KDC, which was owned solely by him and his wife, would receive additional compensation over and above the benefits set forth in the Operating Agreement.

Kagan's breach of contract claim is expressly based on the Operating Agreement.  There is no dispute that the Operating Agreement is an enforceable contract.  Kagan's promissory estoppel claim is based on the same alleged promises as those contained in the Operating Agreement – that Kagan would be compensated for constructing the two homes on the Property. This equitable claim is unquestionably barred by the existence of the Operating Agreement and should be dismissed.

Similarly, KDC's equitable claims for promissory estoppel, unjust enrichment, and quantum meruit are based on allegations that Kagan, through KDC, provided construction services to Lyman Cutler and was not compensated.   These claims are all barred because the Operating Agreement defines the obligations of the parties with respect to the Project.

**B.**     **The Requirement of Entire Fairness Blocks any Equitable Claims.**

A fiduciary who enters into a self-dealing contract and fails to prove entire fairness forfeits any compensation to himself or his companies.  Meehan, 404 Mass. at 440.  It does not matter that the fiduciary may divert the profits or compensation to a company he owns or

19

controls; he remains liable as does his company.  Durfee, 323 Mass. at 196.  Kagan and KDC

cannot plead equitable claims in the alternative to avoid the application of the entire fairness

doctrine.  Where he cannot prove entire fairness, neither KDC nor Kagan can recover for breach

of the unfair contract or for any "equitable" variation thereof.

**IV.  The Court Should Enter Summary Judgment on the Proofs of Claim by Tatiana, ProEx and KDC and the Corresponding Counterclaims Seeking Indemnification Because They Are Not LLC Agents Under the Operating Agreement.**

In addition, the Court should enter summary judgment disallowing the proofs of claim by

Tatiana, ProEx and KDC (Claims Register 4-1, 5-1, 7-1), and the corresponding Counterclaims

(Counts VI, VII and VIII) seeking indemnification for legal fees incurred in this proceeding

because they are not agents of the LLC or its members under the Operating Agreement.[5]

> The Operating Agreement provides for the LLC to "indemnify and hold harmless
> the Members and their respective employees and authorized agents from and
> against any loss, damage or claim incurred by reason of any act or omission
> performed or omitted by such Member, employee or agent in good faith and on
> behalf of the Company and reasonably believed to be within the scope of
> authority conferred by this Agreement, except that no Member, employee or
> authorized agent shall be entitled to be indemnified or held harmless from or
> against any loss, damage or claim incurred by reason of such Member's,
> employee's or authorized agent's gross negligence or willful misconduct;
> provided, however that any indemnity under this Section 10.2 shall be provided
> out of and to the extent of Company assets only, and no Member shall have any
> personal liability on account thereof.

Carnathan Aff. Exhibit 1 § 10.2 (emphasis added).

Setting aside the many disputed issues of good faith, authority, gross negligence and

willful misconduct, the Kagan Parties are not entitled to indemnification because Tatiana, KDC

and ProEx are not "agents" of any member of the LLC.  Certainly they are not agents of Filippov

and Lipetsker, but neither are they "agents" of Kagan.

---

[5]      Even if they were, they would not be entitled to indemnification for their gross
negligence and willful misconduct.

"Agency is the fiduciary relationship that arises when one person (a 'principal') manifests assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject to the principal's control, and the agent manifests assent or otherwise consents so to act." Restatement (Third) of Agency § 1.01.  An agent owes its principal a fiduciary duty, "a duty to his principal to act solely for the benefit of the principal in all matters connected with his agency." Mackey v. Rootes Motors, Inc., 348 Mass. 464, 467-68 (1965); see also Hollingsworth v. Perry, 570 U.S. 693, 713-14 (2013) (if there is an agent relationship, the principal controls the agent, the agent owes the principal a fiduciary duty); CNE Direct, Inc. v. Blackberry Corp., 821 F.3d 146, 150 (1st Cir. 2016) (one of the "essential ingredients" of a principal-agent relationship under Massachusetts law is "a fiduciary relationship toward the principal regarding matters within the scope of the agency"); Carreras v. PMG Collins, LLC, 660 F.3d 549, 556 (1st Cir. 2011) ("[a]n agency relationship would exist only if [the principal] had manifested its assent to have [the agent] act on its behalf and subject to its control").

Kagan contends that the LLC hired KDC, not that he hired it himself.  Although he doubtlessly controlled its work as its owner, it did not owe him a fiduciary duty as a result of the alleged KDC Contract.  It was not his "agent" within the meaning of the Operating Agreement. The same reasoning applies to Tatiana.  ProEx is an additional step removed and was hired by KDC, not the LLC.  The indemnification provision applies to Members and their agents, not to vendors (allegedly) hired by the LLC.

## V.   The Court Should Enter Summary Judgment on the Counterclaims Based upon Asserting Claims Against the Defendants and Interviewing Witnesses to Kagan's Misconduct.

The Court should enter summary judgment on Counts I, II, IV, XVII, XVIII of the Counterclaim to the extent they are predicated on the assertion that the Plaintiffs wrongfully

asserted claims against the Defendants, have "suborned perjury" by witnesses in this dispute or tortiously interfered with advantageous business relations by interviewing witnesses. There is no evidence of any such thing. <u>See</u> Amended Counterclaim ¶ 70(b), (j); ¶ 75(g); ¶ 88, ¶ 169, 177 (making such allegations).

As a matter of law, Plaintiffs are entitled as a matter of absolute litigation privilege to make claims, interview witnesses, investigate the veracity of Kagan's assertions, and present evidence in support of their case. <u>Fraser v. Prudential Ins. Agency, LLC</u>, 2015 U.S. Dist. LEXIS 180905, at *5-6 (D. Mass. Nov. 5, 2015) ("the statements contained in the pleadings filed by the defendant with the court are protected by the absolute litigation privilege"); <u>Bose Corp. v. Ejaz</u>, 2011 U.S. Dist. LEXIS 128848, at *8-9 (D. Mass. Nov. 7, 2011) (one consequence of the litigation privilege "is that the filing of a complaint is privileged under state law and thus that act, alone, is insufficient to form the basis of a counterclaim for tortious interference"); <u>Bartle v. Berry</u>, 80 Mass. App. Ct. 372, 378 & 383 (2011) ("[a]n attorney's statements are privileged where such statements are made by an attorney engaged in his function as an attorney whether in the institution or conduct of litigation or in conferences and other communications preliminary to litigation . . . The privilege applies . . . to civil liability generally" and "is based upon a public policy of securing to attorneys as officers of the court the utmost freedom in their efforts to secure justice for their clients . . . the litigation privilege . . . serves as a defense to claims of interference with advantageous business relations brought by nonclients, based on statements made preliminary to litigation"); <u>see also</u> <u>Harihar v. United States Bank Nat'l Ass'n</u>, 2017 U.S. Dist. LEXIS 50596, at *32-33 (D. Mass. Mar. 31, 2017) ("[u]nder Massachusetts law, statements by a party, counsel or witness in the institution of, or during the course of, a judicial proceeding are absolutely privileged provided such statements relate to that proceeding"); <u>Leavitt v.</u>

Bickerton, 855 F. Supp. 455, 457 (D. Mass. 1994) (privilege attached to witness interviews

"regardless of the underlying intent behind" the interviews); Kersey v. Becton Dickinson & Co.,

2010 U.S. Dist. LEXIS 44257, at *13 (D.N.J. May 5, 2010) ("[t]he litigation privilege extends to

preliminary conversations and interviews between a prospective witness and an attorney if they

are in some way related to or connected with a pending or contemplated action"); Taylor v.

Swartwout, 429 F. Supp. 2d 209, 214-15 (D. Mass. 2009) (attorney's absolute litigation privilege

applies to alleged actions by private investigators).

**VI.     The Court Should Enter Summary Judgment on Claims Dependent on Kagan's
        Contention that Filippov Was Not the Managing Member or Otherwise Lacked
        Authority to Operate the Company.**

Kagan asserts a number of curious claims predicated on the assertion that Filippov was

not the managing member or otherwise did not have authority to cause the LLC to act "without a

meeting."  Filippov is and has always been the managing member.  There can be no dispute that

Filippov and Lipetsker together own 90% of the membership interest and have the right to

control the Company.  See Carnathan Aff. Exhibit 1, Art. VII (actions of the Company, other

than amendment of the Operating Agreement require 80% of the members to vote and approve;

Members "may, but shall not be required, to meet from time to time to consider the affairs of the

Company and take any action permitted to be taken under this agreement") (emphasis added).

To the extent it matters, Kagan's challenge to Filippov's status as managing member

cannot survive summary judgment because his testimony is contradicted by documents he signed

himself.  Ng Bros. Constr., 436 Mass. at 648 (plaintiff's conclusory assertions that purportedly

contradict project documents are not sufficient to withstand summary judgment); Mercado-

Garcia v. Ponce Fed. Bank, 979 F.2d 890, 893 (1st Cir. 1992) ("Conclusory assertions or mere

allegations, in lieu of documented facts, cannot withstand a summary judgment"); Hingham

Land, LLC v. Town of Rockland, 13 LCR 620, 622 (Mass. Land Ct. 2005) ("And just as a party

cannot defeat summary judgment by submitting affidavits to contradict its earlier deposition

testimony, a party cannot rewrite history by submitting later affidavits or testimony to contradict

its contemporaneous documents"). The Operating Agreement, which Kagan signed, terms

Filippov the "Managing Manager". See Carnathan Aff. Exhibit 1 at page 13. Filippov is

identified as the Managing Member in the LLC organizational documents Attorney Boris

Maiden filed with the Secretary of the Commonwealth. SSUMF ¶ 59 and accompanying

citations. On December 28, 2012, all three members of the LLC, including Kagan, signed a

notarized Manager's Certificate and Members' Consent in connection with getting a loan from

Rockland Bank which identifies Filippov as the Manager of the LLC. Id.

Because there is no genuine dispute that Filippov and Lipetsker have authority to control

the Company and to file for bankruptcy protection and institute litigation against Kagan and the

other Defendants, and because there is no evidence to support the allegation that the litigation or

bankruptcy was solely to harm Kagan, the Court should enter summary judgment on the Counts

of the Amended Counterclaim to the extent dependent on those allegations: Counts I, II, and IV.

**VII.    The Court should Enter Summary Judgment on Count II of the Amended
Counterclaim Because there is no Freestanding Claim for "Freeze Out" and there is
No Evidence of Any Freeze Out.**

As a procedural matter, a freeze out is a type of breach of fiduciary duty; it is not a

freestanding claim. See, e.g., Pointer v. Castellani, 455 Mass. 537, 550-51 (2009). Count II of

the Amended Counterclaim should, therefore, be dismissed as duplicative of Count I.

On the merits, there is no evidence of any "freeze out." Out of the blue on May 7, 2015,

Kagan demanded over $1 million from the Company. He doubled that figure in June 2015 and

recorded a Mechanic's Lien against the Company's properties.  The Parties ended up in litigation.  That is not a "freeze out."

## CONCLUSION

For the foregoing reasons, the Court should grant Plaintiffs summary judgment in accordance with their Motion.

LYMAN-CUTLER, LLC,                    ALEX FILIPPOV and
By its attorney,                      NICKOLAY LIPETSKER,
                                      By their attorneys,


/s/ Peter Tamposi                     /s/ Sean T. Carnathan
Peter N. Tamposi, BBO No. 639497      Sean T. Carnathan, BBO No. 636889
The Tamposi Law Group, P.C.           scarnathan@ocmlaw.net
159 Main Street                       Joseph P. Calandrelli, BBO No. 666128
Nashua, NH 03060                      jcalandrelli@ocmlaw.net
T: (603) 204-5513                     O'Connor, Carnathan and Mack, LLC
                                      1 Van de Graaff Dr. Suite 104
                                      Burlington, MA 01803
                                      T:  781-359-9000

Dated:  November 16, 2018



Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on November 16, 2018.


/s/ Sean T. Carnathan