UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| *In re:*  )<br>)<br>LYMAN-CUTLER, LLC,  )<br>       Debtor  )<br>)  | Chapter 7<br>Case No. 15-13881 FJB |
| )<br>LYMAN-CUTLER, LLC, ALEX FILIPPOV,  )<br>and NICKOLAY LIPETSKER,  )<br>)<br>       Plaintiffs,  )<br>)<br>v.  )<br>)<br>VADIM KAGAN, TATIANA KAGAN,  )<br>KAGAN DEVELOPMENT KDC, CORP. and  )<br>PROEXCAVATION CORP.  )<br>)<br>       Defendants.  )<br>) | Adv. Case No. 1:16-ap-01120 |

**PLAINTIFFS' CONCISE STATEMENT OF UNDISPUTED MATERIAL FACTS IN SUPPORT OF THEIR MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, Bankr. Rule 7056, D. Mass. Bankr. L.R. 7056-1 and this Court's October 10, 2018 order as modified on November 6, 2018 (Docket No. 215), and in support of their accompanying Motion for Summary Judgment, Plaintiffs respectfully submit this separate concise statement of material facts as to which there is no genuine issue to be tried.

**Undisputed Material Facts**

1.    Alex Filippov ("Filippov") is the owner and operator of Belmont Telecom. Deposition of Alex Filippov, April 25, 2018 ("Filippov Depo. I"), at 10-12.; Transmittal Affidavit of Sean T. Carnathan ("Carnathan Aff"), Exhibit 23.

1

2. Nickolay Lipetsker ("Lipetsker") is a dentist. Deposition of Nickolay Lipetsker, April 26, 2018 ("Lipetsker Depo."), at 6. Carnathan Aff., Exhibit 24.

3. Vadim Kagan ("Kagan") has been in the construction business for many years and had built 30-40 homes prior to the Lyman-Cutler project. Deposition of Vadim Kagan, May 3, 2018 ("Kagan Depo. I"), at 14-17; Carnathan Aff., Exhibit 25.

4. On or about November 14, 2012, Filippov, Lipetsker and Kagan executed the Operating Agreement (the "Operating Agreement") of Lyman-Cutler, LLC (the "LLC"). Carnathan Aff., Exhibit 1.

5. Filippov invested $2 million in the LLC and received 80% of the membership interest. Kagan and Lipetsker each invested $250,000 and received 10% of the membership interest each. Carnathan Aff., Exhibit 1, Schedule A.

6. Section 5.2 of the Operating Agreement provides: Kagan is responsible for building the two homes "in accordance with the plans, including drawings supplied by Mr. Kagan and approved by Managing Member, to be substantially complete no later than March 30, 2014 in return for the compensation provided in section 8.1." Id. § 5.2.

7. Section 8.1 of the Operating Agreement provides that Kagan's compensation for building the two homes is a 50% share in the net profits, subject to certain adjustments. Id. § 8.1.

8. Section 8.1 of the Operating Agreement states that "[i]n the event the property is not sold within twenty-three (23) months from the date of acquisition, then Mr. Kagan shall be responsible for all carrying costs until such time as the property is sold." Id.

9. On December 31, 2012, the LLC purchased a property at 77 Lyman Road, Brookline, Massachusetts for $4 million. Carnathan Aff., Exhibit 2.

10. The "Date of Acquisition" is defined in the Operating Agreement as the "deed recording date for Lyman Road Brookline property into the Company." Carnathan Aff., Exhibit 1.

11. The Lyman Road deed was recorded on December 31, 2012. Carnathan Aff., Exhibit 2.

12. In connection with the purchase of 77 Lyman Road, the LLC borrowed $1,600,000 from Rockland Trust. Carnathan Aff., Exhibit 3.

13. On May 7, 2013, the LLC secured from Rockland Trust two construction loans in the amount of $1.6 million each, for a total of $3.2 million. Carnathan Aff., Exhibit 4.

14. Kagan and his wife Tatiana are the officers and sole directors and shareholders of Kagan Development KDC Corp. ("KDC"). Kagan Depo. I at 27-29, 35; Carnathan Aff., Exhibit 25.

15. Kagan and his wife Tatiana are the sole shareholders of ProEx and Kagan is its sole officer. Kagan Depo. I at 28, 56 (also testifying he is not sure if ProEx has a board of directors); Carnathan Aff., Exhibit 25.

16. Daniel Gersh is the "Chief Financial Officer" of KDC; he started work there in or about November 2014 and has been primarily responsible for its books and records since starting work there. Deposition of Daniel Gersh, May 17, 2018 ("Gersh Dep."), at 18-20, 38; Carnathan Aff., Exhibit 27.

17. KDC did not keep track of the construction costs as the homes were constructed. Gersh Dep. at 26-27 (Kagan kept folders -- "Sometimes alphabetical, sometimes by year. It was a mishmash of prior organization, different bookkeepers, Vadim's [Kagan] way of storing things. It was always a mess."), id., 37-38 (state of financial books upon his arrival in November 2014 –

"Unclear; lack of support and documentation; not everything was there, to my liking at least; messiness"); id., at 39 (When Gersh arrived in November 2014, the Lyman Cutler project books were "[t]he same as the others at the time; some invoices and proposals and bills, some tracking of payments made.") (emphasis added); id., at 55 ("Q. So when you went to clean up the documentation of the invoices from the vendors and subcontractors, you just couldn't pull out a Lyman-Cutler file and look through it?  A. No, no way."). Carnathan Aff., Exhibit 27.

18.     Kagan did not solicit bids from subcontractors, but instead used subcontractors with which he had worked in the past.  Kagan Dep. I at 148; Carnathan Aff., Exhibit 25.

19.     In fact, the project financial records at KDC were so bad that after its current CFO Daniel Gersh began work for KDC in November 2014, Gersh had to track down documentation and invoices for the Lyman Cutler Project by going to the vendors and subcontractors and asking them documentation and invoices.  Gersh Dep. at 54, 65; Carnathan Aff., Exhibit 27.

20.     In some instances, Gersh approached the vendors; in others, Kagan did.  Gersh cannot recall which were which.  Gersh Dep. at 90-91; Carnathan Aff., Exhibit 27.

21.     On May 7, 2015, through counsel, Kagan asserted that he and KDC had incurred "unreimbursed construction costs" totaled $758,025.56 "with approximately $50,000 of additional vendor costs anticipated."  Carnathan Aff., Exhibit 5.

22.     In the May 7, 2015 letter, Kagan also asserted that he was owed $251,000 for carrying costs and stated he would not pay the carrying costs going forward. Id. ("Mr. Kagan is not prepared to continue paying the carrying costs of the home, which total approximately $28,000 per month."  Id.; Carnathan Aff., Exhibit 5.

23.     In the May 7, 2015 letter, Kagan advocated reducing the listing price of the homes from $5.5 million to $5.25 million.  Id.; Carnathan Aff., Exhibit 5.

24. As of May 7, 2015, Gersh had not done much work yet to clean up the Lyman-Cutler books. Gersh Depo. at 73-74 (Q. As of 05/07/15, how much work had you done on the Lyman-Cutler books? MR. PERTEN: Objection. A. Not that much."); Carnathan Aff., Exhibit 27.

25. After the May 7, 2015 letter was sent out, Gersh did "significant" work on the Lyman Cutler books. Gersh Depo. at 74; Carnathan Aff., Exhibit 27.

26. KDC's Proof of Claim is based upon a mechanic's lien recorded in the Norfolk County Registry of Deeds on June 22, 2015 (the "KDC Mechanic's Lien"). KDC Amended Proof of Claim, Register No. 1-2.

27. The Mechanic's Lien asserted a claim in the amount of $2,095,985.23. Carnathan Aff., Exhibit 6.

28. Tallying up the construction costs and carrying costs asserted in the May 7, 2015 letter, the total was $1,059,025.56. On June 22, 2015, when Kagan caused KDC to file the Mechanics Lien, he asserted that the total claim was $2,095,985.23. Supra Facts 16, 17, 22.

29. Kagan explains the dramatic increase of over $1 million in KDC's claim between May 7, 2015 and June 22, 2015 as simply the result of having "finalized the accounting," and that the May 2015 demand was "what we wanted to get from Lyman-Cutler right away to continue operating on the project." Kagan Depo. I, at 224-227 (also testifying he did not know for sure who did the accounting); Carnathan Aff., Exhibit 25; see also Gersh Depo. at 89 (did "final review" of Lyman Cutler Books in May/June 2015); Carnathan Aff., Exhibit 27.

30. KDC's original Proof of Claim, filed on December 18, 2015, was in the same amount as the Mechanic's Lien, $2,095,985.23. KDC Proof of Claim, Register No. 1-1.

5

31. KDC's Amended Proof of Claim totals $2,396,914.66. KDC Amended Proof of Claim, Register No. 1-2.

32. KDC's Amended Proof of Claim reflects an "updated" Invoice dated March 17, 2016, reducing the amount of the underlying claim by KDC against the LLC from $2,095,985.23 to $2,021,858.39. Carnathan Aff., Exhibit 7.

33. The overall reduction in the asserted claim by KDC of $74,126.84 consists of:

(1) a reduction in the asserted total carrying costs of $95,225.59 ($760,771.08 June 1, 2015 reduced to $665,545.49 March 17, 2016) and the accompanying "carrying costs advance fee" of $18,251.57 ($145,814.46 June 1, 2015 to $127,562.89 March 17, 2016); but

(2) an increase in the asserted total construction costs of $34,217.67 ($3,738,925.82 increased to $3,773,143.49 March 17, 2016) and the accompanying "General Contractor Construction Fee (@15%" of $5,132.65 ($560,838.87 June 1, 2015 increased to $565,971.52 March 17, 2016).

Compare Carnathan Aff. Exhibit 8 (June 1, 2015 invoice) with Carnathan Aff. Exhibit 7 (March 17, 2016 invoice).

34. KDC's Amended Proof of claim includes $141,191.25 in "administrative expenses as provided for under the construction contract through May 1, 2016" on top of the amounts asserted in the KDC Mechanic's Lien. KDC Amended Proof of Claim, Register No. 1-2.

35. KDC's Amended Proof of Claim also asserts a claim for 12% interest, totaling $233,865.39 as of May 1, 2016. Amended Proof of Claim, Register No. 1-2.

6

36. The KDC Mechanic's Lien purports to be based upon a contract between the LLC and KDC, dated June 24, 2013 (the "KDC Contract").  Carnathan Aff, Exhibit 6.

37. Kagan signed the KDC Contract on behalf of both the LLC and KDC.  Carnathan Aff., Exhibit 9; Kagan Depo. I at 227; Carnathan Aff., Exhibit 25.

38. The charges adding up to $2,095,985.23 as asserted in the KDC Mechanic's Lien are outlined in an invoice dated June 1, 2012.  Carnathan Aff., Exhibit 8.

39. KDC's claim includes a "General Contractor Construction Fee" of 15% of the total alleged costs of construction in the amount of $565,971.52, based upon Section 7.1.2 of the KDC Contract.  Carnathan Aff., Exhibits 7 & 9.

40. KDC's claim includes a "Design Fee" in the amount of $25,000, based upon Sections 2.2 and 7.1.1 of the KDC Contract.  Carnathan Aff., Exhibits 7 & 9.

41. KDC's claim includes a "Carrying Costs Advance Fee" in the amount of $127,562.89, based upon Section 7.1.3 of the KDC Contract.  Carnathan Aff., Exhibits 7 & 9.

42. KDC's claim includes a charge for "Office Overhead" in the amount of $59,250, based upon Section 7.3.2.1 of the KDC Contract.  Carnathan Aff., Exhibits 7 & 9.

43. KDC did not charge for Kagan's time as part of the Office Overhead calculation. Carnathan Aff., Exhibit 9, § 7.3.2.1

44. KDC calculated the "Office Overhead" by estimating KDC employees spent 790 hours on the Lyman Cutler Project and charging $75.00 an hour  Carnathan Aff., Exhibit 7.

45. KDC values the time Kagan spent on the Project at $164,000 (820 hours x $200 per hour).  Carnathan Aff., Exhibit 7.

46. KDC did not keep time records; the amount of time on the invoice is an estimate. Gersh Depo. at 95; Carnathan Aff., Exhibit 27.

7

47. KDC bases **$916,800** of its Proof of Claim on alleged charges to it from ProEx, which KDC retained to the site work. Gersh Ex. 40 ($204,600); Kagan Ex. 75 ($150,000), Kagan Ex. 76 ($94,300), Kagan Ex. 77 ($194,600), Kagan Ex. 78 ($160,000), Kagan Ex. 79 ($94,300) = $897,800 plus Snow Removal Exhibits $9,500x2 on top of $2000 x 2 to the guy who did the work). Carnathan Aff., Exhibit 10.

48. Kagan admits that the ProEx proposal includes "market profit" but has testified he does not know how much profit is included in the ProEx charges. Deposition of Vadim Kagan, May 23, 2018 ("Kagan Depo. II"), at 259; Carnathan Aff., Exhibit 26.

49. Kagan has no standard profit margin that he includes in ProEx proposals. Id.

50. Kagan did not show the ProEx proposal to Filippov or Lipetsker in 2013. Kagan Depo II at 279 (does not remember); Carnathan Aff., Exhibit 26.

51. The $916,800 in charges by ProEx includes $19,000 for four months of snow removal at the properties on top of $4,000 paid to Paul DiGiacomo for snow removal at the two properties. Carnathan Aff.; Exhibit 11.

52. $325,000 was added to ProEx's accounts receivable for Lyman Cutler as of December 31, 2014. Carnathan Aff., Exhibit 12.

53. An additional $100,000 was added to ProEx's accounts receivable for Lyman Cutler as of January 1, 2015. Carnathan Aff., Exhibit 13.

54. On June 25, 2015, Joseph Cohen wrote a letter to the Parties on behalf of KDC, presenting the invoice dated June 1, 2015 and a "Proposal" to "work out" the KDC bill by an

8

immediate payment of $1,000,000, a payment of $500,000 upon sale of one of the Properties, and the balance by November 30, 2015.  Carnathan Aff., Exhibit 14.[1]

55.     As of June 25, 2015, there was **$6,172.89** in the LLC Bank Account at Rockland Trust.  Carnathan Aff., Exhibit 15.

56.     In her Proof of Claim, Tatiana asserts a claim for indemnification, asserting should she be "determined to be an authorized agent of any member of the Debtor Lyman-Cutler LLC (the 'Debtor), [then she has] indemnification rights under the organizational and operating documents and agreements of the Debtor."  Claims Register, No. 5-1.  Tatiana is a real estate broker and Kagan signed Listing Agreements with her for the two LLC properties.  Carnathan Aff., Exhibit 31.

57.     In its Proof of Claim, ProEx asserts a claim for indemnification, asserting should it be "determined to be an authorized agent of any member of the Debtor Lyman-Cutler LLC (the 'Debtor), [then it has] indemnification rights under the organizational and operating documents and agreements of the Debtor."

58.     In its second Proof of Claim, KDC asserts a claim for indemnification, asserting that should it be "determined to be an authorized agent of any member of the Debtor Lyman-Cutler LLC (the 'Debtor), [then it has] indemnification rights under the organizational and operating documents and agreements of the Debtor."  Claims Register, No. 4.

59.     Filippov is and always has been the managing member of the LLC.  Operating Agreement; Manager's Certificate and Member Consent; Filippov Depo. at 181; Kagan Depo at 195-196. Carnathan Aff., Exhibits 1, 16, 23 & 25.

---

[1] This letter is the first time the invoice purportedly dated June 1, 2015 was ever presented to the Plaintiffs, but this is a disputed fact (although there are no documents to support Kagan's dispute).

9

**Disputed Facts, Accepted for the Purpose
of this Motion for Summary Judgment**

This dispute involves many hotly contested facts and among them are a number of assertions by Kagan including testimony and documents that Plaintiffs expect to prove at trial are entirely false. Even crediting Kagan's account for the purposes of this Motion only, however, Plaintiffs respectfully submit that the Court should enter summary judgment in the Plaintiffs' favor as set forth herein. See Fed. R. Civ. P. 56(e)(2) (court may consider facts undisputed for purpose of the motion). Plaintiffs reserve the right to contest these facts at trial, if a trial is necessary. For the purposes of this Motion only, the Court should also consider the following facts as undisputed:

60. Kagan did not provide a construction plans or a budget to Filippov and Lipetsker before they invested in the Project. Kagan Depo. I at 81 (talked about hypothetical numbers and had no construction plans), 86-87 (6 months later, in mid 2013, came up with plans and construction costs of $1.6 million). Carnathan Aff., Exhibit 25.

61. Filippov agreed to invest $2 million and Lipetsker agreed to invest $250,000 without any plans or construction budget. Kagan Depo. I at 88-89; Carnathan Aff., Exhibit 25.

62. Filippov wanted to earn a 20% return on his money and was confident he would. Kagan Depo. I at 89; Carnathan Aff., Exhibit 25.

63. At the same time that Kagan presented plans and construction costs of $1.6 million per house, the Parties agreed that construction would cost more than that, and that Kagan would put in more money as the Project went along and get paid back at the end. Kagan Depo. I at 95-100; Carnathan Aff., Exhibit 25.

64. As the Project progressed, the Parties decided to upgrade every finish and material used in the Project. Kagan Depo. I at 141-42 ("Flooring, stairs, rails, finish carpentry,

10

all cabinetry, tile work, the amount of trees, size of the paving, materials for retaining wall, decking, material, fireplace . . . . [l]ighting, doors, crown molding, baseboards . . . a built-in library"); id. at 152 ("at absolutely every step [Kagan] decided to spend more money than the budget"). Carnathan Aff., Exhibit 25.

65. Kagan told Filippov and Lipetsker about each upgrade and they agreed to each upgrade, but Kagan did not "keep any kind of record of what additional money [he was] spending on each thing." Kagan Depo. I at 142-43, 152[2]; Carnathan Aff., Exhibit 25.

66. As the investment in materials went up, so did the target selling price, rising from an original target of $4.5 million to $5.5 million. Kagan Depo. I at 156-59; Carnathan Aff., Exhibit 25.

67. The two homes Kagan built for the LLC were substantially completed by March 30, 2014. Kagan Depo. I at 174 (testimony concerning allegation in paragraph 38 of Counterclaim asserting substantial completion by March 30, 2014); Deposition of Joseph Cohen, 128-29 (same); Carnathan Aff., Exhibits 25 & 28.

---

[2] Plaintiffs do not dispute and will not dispute at trial that Kagan did not keep any records of each cost increase. That part of Kagan's account is indisputably true as set forth herein.

| | |
|---|---|
| LYMAN-CUTLER, LLC,<br>By its attorney, | ALEX FILIPPOV and<br>NICKOLAY LIPETSKER,<br>By their attorneys, |
| */s/ Peter Tamposi*<br>Peter N. Tamposi, BBO No. 639497<br>The Tamposi Law Group, P.C.<br>159 Main Street<br>Nashua, NH 03060<br>T: (603) 204-5513 | */s/ Sean T. Carnathan*<br>Sean T. Carnathan, BBO No. 636889<br>scarnathan@ocmlaw.net<br>Joseph P. Calandrelli, BBO No. 666128<br>jcalandrelli@ocmlaw.net<br>O'Connor, Carnathan and Mack, LLC<br>1 Van de Graaff Dr. Suite 104<br>Burlington, MA 01803<br>T:  781-359-9000 |

Dated:  November 16, 2018

Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on November 16, 2018.

*/s/ Sean T. Carnathan*