# EXHIBIT 1



EXHIBIT

Kagan   4
5-3-18  DA

# OPERATING AGREEMENT
## OF
## LYMAN-CUTLER, LLC

1.        THIS OPERATING AGREEMENT is entered into as of the  14   day of November, 2012 by and between Vadim Kagan, Nickolay Lipetsker and Alex Filippov.

WHEREAS, Mr. Kagan,  Mr. Lipetsker and Mr. Filippov wish to form a limited liability company known as LYMAN-CUTLER, LLC (the "Company") pursuant to the Massachusetts Limited Liability Company Act (as amended, the "Act") by filing a Certificate of Organization of the Company with the Massachusetts Secretary of State's Office and by entering into this Agreement;

NOW, THEREFORE, in consideration of the mutual agreements, promises and conditions contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Mr. Kagan,  Mr. Lipetsker and Mr. Filippov as acknowledge and agree as follows:

### ARTICLE I - DEFINITIONS

1.1  Definitions.         Capitalized terms used in this Agreement and not otherwise defined shall have the meanings assigned to them below:

(a) "Agreement" means this operating Agreement, as amended, modified, supplemented or restated from time to time.

(b) "Certificate of Formation" means the Certificate of Formation of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the Commonwealth Secretary of State's Office pursuant to the Act.

(c) "Member" means a member of the Company identified on Schedule A attached hereto, as the same may be amended from time to time.

(d) "Percentage Interest" shall refer to the percentage ownership interest of each Member in the Company.  The Percentage Interests of the Members are set forth on Schedule A attached hereto and incorporated herein for all purposes by this reference.

1

(e) "Date of Acquisition" shall refer to deed recording date for Lyman Road Brookline property into the Company.

### ARTICLE II - THE COMPANY

2.1 Formation.

    (a) The Members hereby agree to form the Company as a limited liability company under and pursuant to the provisions of the Act and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein. Upon the execution of this Agreement, Mr. Kagan, Mr. Lipetsker and Mr. Filippov shall be Members of the Company.

    (b) The name and mailing address of each Member and the amount contributed to the capital of the Company shall be listed on Schedule A.

2.2 Name; Principal Place of Business. The name of the Company shall be LYMAN-CUTLER, LLC. The principal office of the Company shall be located at 130 Trapelo Road, Belmont, Massachusetts, or at such other place as the Members may from time to time determine.

2.3 Term. The term of the Company shall commence on the date of the filing of the Certificate of Organization in the Commonwealth of Massachusetts Secretary of State's Office and shall continue until November 30, 2015 unless dissolved before such date in accordance with the provisions of this Agreement.

2.4 Registered Agent and Office. The company's registered agent and office in Massachusetts shall be as set forth in the Certificate of Organization of the Company filed with Commonwealth of Massachusetts Secretary of State's Office, as the same may from time to time be amended.

2.5 Fiscal Year. The Company's fiscal year (the "Fiscal Year") shall be the calendar year.

2.6 Taxation as Partnership. The Company shall be treated as a partnership for U.S. federal income tax purposes.

2

## ARTICLE III - PURPOSE AND POWERS OF THE COMPANY

<u>Nature of Business.</u>  The general character of the business of the LLC is to own (directly or through a nominee), invest in, develop, improve, operate, manage, lease and/or sell real estate in Commonwealth of Massachusetts.  To engage in any activities directly or indirectly related or incidental thereto including, but without limitation, everything necessary, suitable, convenient, or proper for the accomplishment of any of the foregoing activities, or the attainment of any one or more of the purposes, enumerated or incidental to the powers named, or which shall at any time appear conducive to or expedient for the production of benefit to the corporation, either as the holders of or interested in any property, or otherwise, with all the powers now or hereafter conferred by law, and for all lawful purposes.

3.1  <u>Powers of the Company.</u>  The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to or for the furtherance of the purpose set forth in Article 3., including, but not limited to the powers permitted under the Act.

## ARTICLE 1V - CAPITAL CONTRIBUTIONS AND ACCOUNTS

4.1  <u>Capital Contributions.</u>   Each Member has transferred and contributed to the capital of the Company the capital amounts (the "Capital Contributions") as set forth on Schedule A.  Furthermore, Purchase Money Loan and Construction Loan shall be taken from Rockland Trust Company to pay for construction and carrying costs until the issuance of Certificates of Occupancy (hereinafter "CO") but in no event for more then twenty three (23) months from the date of acquisition.

4.2  <u>Carrying Costs.</u>    Carrying costs shall be defined to include but not limited to mortgage payments, taxes and insurance for the subject property 77 Lyman Road, Brookline, Massachusetts.   In the event that a CO for each lot is not issued within twenty three (23) months from the date of acquisition, then Mr. Kagan will be responsible for all carrying costs until such time as CO's are issued.



3

4.3 <u>Capital Accounts: Assets.</u> An individual capital account (each a "Capital Account") shall be established and maintained for each Member in accordance with applicable regulations under the Internal Revenue Code of 1986 as from time to time amended (the "Code"). A Member shall not be entitled to interest on his or her Capital Contribution or Capital Account, or to withdraw any part of his or her Capital Contribution or Capital Account. No Member shall have any right in or to any asset or property of the Company, but shall only have a right to the distributions as and when provided for in Sections 8.2 and 9.2 hereof.

4.4 <u>Maintenance of Capital Accounts.</u> To the extent consistent with such regulations, there shall be credited to each Member's Capital Account the amount of any contribution of capital and carrying costs made by such Member to the Company, and such Member's share of the net profits of the Company and there shall be charged against each Member's Capital Account the amount of all distributions to such Member, and such member's share of the net losses of the Company.

### ARTICLE V - MEMBERS

5.1 <u>Powers of Members.</u> The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms of this Agreement.

5.2 <u>Duties of Members.</u> It shall be Mr. Kagan's duty and obligation to construct two (2) homes at the location currently known as 77 Lyman Road, in Brookline, Massachusetts in accordance with the plans, including drawings, supplied by Mr. Kagan and approved by Managing Member. The construction shall be substantially completed no later than March 30, 2014. It is specifically understood by all Members that Mr. Kagan's compensation for this duty is outlined in Section 8.1 below.

5.3 <u>Admission of Members.</u> No person shall be admitted as a Member of the Company after the date of formation of the Company without the written consent or approval of the Members owning at least eighty (80%) of the

4

Percentage Interests in the Company at the time of such admission, regardless of whether such person has previously acquired any rights in any existing Member's interest in the Company by assignment, sale or otherwise. A Member's execution of a counterpart of this Agreement, or such other instrument as the Members may require, shall evidence his or her admission.

5.4 <u>Transfer of Company Interest.</u>  No Member may transfer, sell, assign, pledge, mortgage, or dispose of or grant a security interest in his or her interest in the Company (each, a "Transfer") without the prior written consent of the Members owning at least eighty (80%) of the Percentage Interests in the Company at the time of such Transfer. Any purported Transfer in contravention of this Section 5.3 shall be null and void and the Member attempting such Transfer shall cease to be a Member of the Company shall be forfeited and reallocated to the remaining Members in accordance with their respective Percentage Interests.

5.5 <u>Rights of Assignee.</u> The purchaser or other transferee of a Member's interest in the Company shall have only the right to receive the distributions and allocations of profits or losses to which the Member would have been entitled under this Agreement with respect to the transferred interest and shall not have or enjoy any right to participate in the management of the Company or to receive any financial information or reports relating to the Company or any other rights of a Member unless and until the purchaser or transferee is admitted as a Member pursuant to Section 5.2.

5.6 <u>Partition.</u> Each Member waives any and all rights that he or she may have to maintain an action for partition of the Company's property.

### ARTICLE VI - MANAGEMENT

6.1 <u>Management, duties, and Restrictions.</u>

    (a) <u>General Management.</u> The management and control of the operations of the Company and the maintenance, development, sales and leasing of the property of the Company shall rest with the Managing Members.

VK
A.F.  N.L.

5

L-C BK 001081

(b) <u>Powers of Managing Member.</u> Subject to such limitations as may be imposed pursuant to the terms of this Agreement, the Act or by operation of law, the Members are and shall be authorized and empowered to carry out and implement the purposes of the Company. In that connection, the powers of the Managing Member shall include, but not be limited to, the following:

    (1) to engage, dismiss, and replace personnel, attorneys, accountants, brokers or such other persons as may be deemed necessary or advisable by Managing Member;

    (2) to authorize or approve all actions with respect to distributions by the Company, dispositions of the assets of the Company or its nominee, execution of leases, mortgage contracts, bonds, promissory notes, loan agreements and other instruments on behalf of the Company or its nominee, and to execute any agreements, instruments or documents relating to or affecting such matters;

    (3) to acquire, mortgage, improve and convey real property and interests therein, including, but not limited to, easements and rights-of-way, and to execute any agreements, instruments or documents relating to or affecting such matters;

    (4) to open, maintain, and close bank accounts and to draw checks and other orders for the payment of money; and

    (5) to take such other actions and to incur such reasonable expenses on behalf of the Company as may be necessary or advisable in connection with the conduct of the affairs of the Company.

    (6) The Managing Member hereby agrees to list the properties with Tatiana Kagan. In order to remove Tatiana Kagan as a listing broker by December 31, 2014 will require a written consent of the Members owning at least eighty one (81%) of the

6

Percentage Interests in the Company. After December 31, 2014 no such consent shall be required.

© Liability of Managing Member. In carrying out their duties, the Managing Member shall not be liable to the Company or to any other Members for any actions taken in good faith and reasonable believed to be in the best interest of the Company or which are taken upon the written advice of legal counsel for the Company.

(d) Reliance on Act of Managing Member. Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Managing Member. Any person other than a Member may and shall be entitled to rely on certificates, instructions, agreements or assignments signed or purporting to be signed by a Managing Member for or on behalf of the Company, and on the statements and agreements set forth therein, without inquiry as to the due authorization thereof or the authority of the person signing or purporting to sign such certificates, instructions, agreements or assignments.

(e) Delegation. The Managing Member may appoint Members only with such titles as they may elect, including the titles of President, Vice President, Treasurer and Secretary, to act on behalf of the Company with such power and authority as the Members may delegate in writing to any such person.

(f) Books and Records. The Company's books and records shall be maintained in accordance with good record keeping practices and federal and state income tax laws and regulations. All books and records of the Company shall be maintained at the principal office of the Company, and each of the Members shall have access thereto to review the same at any time upon reasonable notice and during normal business hours.

(g) Reimbursement of Managing Member. The Managing Member shall be reimbursed by the Company for all reasonable expenses (including attorney and accountant's fees) incurred or paid by them for or on behalf of the Company.

7

## ARTICLE VII - VOTING, MEMBER CONSENTS AND MEMBER GUARATEE, MEETINGS

7.1 <u>Voting.</u> Each Member shall be entitled to vote in proportion to his or her Percentage Interest in the Company from time to time. Such vote may be exercised by written or oral notification by a Member to the other Members.

7.2 <u>Member Consents.</u> The amendment of this Agreement shall require the vote and unanimous approval of all the Members. All other actions taken by the Company, including the admission of a new Member, shall require the vote and approval of Members owning eighty percent (80%) or more of the Percentage Interest at the time of such vote.

7.3 <u>Member Guarantee.</u> **Mr. Filippov** shall, if required by institutional lender, provide that lender with a limited personal guarantee not to exceed $200,000.00 for all loans obtained by the Company related to the property located at 77 Lyman Road, Brookline, Massachusetts. Coincident with any provision by Mr. Filippov of such a guarantee, Messrs Kagan and Lipetsker shall each provide Mr. Filippov with a limited personal guarantee not to exceed, in the case of Mr. Kagan, $100,000.00 and in the case of Mr. Lipetsker, $20,000.00

7.4 <u>Meetings of the Members.</u> The Members may, but shall not be required, to meet from time to time to consider the affairs of the Company and to take any action permitted to be taken by the Members by law or under this Agreement. Meetings of the Members may be called at any time by any Member. Notice of any meeting shall be given to all Members not less than two (2) days nor more than thirty (30) days prior to the date of such meeting. Each Member may authorize any person to act for it by proxy on all matters on which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or his or her attorney-in-fact. A quorum for each meeting shall be one more than one-half the number of all Members.

8

L-C BK 001084

## ARTICLE VIII - ALLOCATIONS AND DISTRIBUTIONS

8.1 <u>Allocations of Profits or Losses.</u> *The net profits,* net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows: Mr. Alex Filippov (40%) , Mr. Nickolay Lipetsker (10%) and Mr. Kagan (50%).  In the event that the demolition permit is not issued by June 30, 2013, then *the net profits,* net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows:  Mr. Alex Filippov (60%) , Mr. Nickolay Lipetsker (10%) and Mr. Kagan (30%).  The net losses from any sale of any property of the Company or upon liquidation of the Company shall be allocated among the Members according to the Percentage Interests of Each Member.  Net profits and net losses shall, for both accounting and tax purposes, be net profits and net losses as determined for reporting on the Company's federal income tax return. *In the event that the property is not sold within twenty three (23) months from the date of acquisition,  then Mr. Kagan shall be responsible for all carrying costs until such time as the property is sold.   If Mr. Kagan fails to pays to pay monthly carrying costs, then Mr. Filippov shall be responsible to contribute the necessary carrying costs and subsequently his capital contribution and percentage interest in the Company shall increase by the same amount and  percentage and at the same time will trigger reduction of Mr. Kagan's share of capital contribution by the same amount and subsequently his/her percentage interest in the Company.* For tax purposes, all items of depreciation, gain, loss, deduction or credit shall be determined in accordance with the Code and, except to the extent otherwise required by the Code, allocated to and among the Members in the same percentages in which the Members share in net profits and net losses.   Any change to this paragraph will require a written consent of the Members owning at least eighty one (81%) of the Percentage Interests in the Company.

VK
A.f  N. C.

9

L-C BK 001085

8.2 <u>Distribution to Members.</u> *The distribution to Members shall be in accordance with their respective Capital Contribution first, however, an additional five (5%) percent per annum payment based upon Members' respective Capital Contributions shall be paid out of Mr. Kagan's net profit share for each day that the property is not sold after twenty three (23) months of acquisition* For the purposes hereof, the term "Net Cash From Operations" shall mean the gross cash proceeds from Company operations less the portion thereof used to pay or establish reserves for Company expenses, debt payments, capital improvements, replacements, and guaranteed payments, all as determined by the Members. "Net Cash From Operations" shall not be reduced by depreciation , amortization, cost recovery deductions, or similar non-cash allowances, but shall be increased by any reductions of reserves previously established.

## ARTICLE IX - DISSOLUTION AND TERMINATION OF COMPANY

9.1 <u>Events of Dissolution.</u>  The Company shall be dissolved and its affairs shall be would up upon the occurrence of any of the following events:

(a) the death, insanity, dissolution, incompetency, bankruptcy, retirement, resignation or expulsion of a Member ("Retiring Member") unless there are at least two (2) remaining Members of the Company, and the remaining Members owning a "majority in interest" in the Company elect to continue the Company within ninety (90) days of the death, insanity, dissolution, bankruptcy, retirement, resignation or expulsion of the Retiring Member;

(b) Notwithstanding the above paragraph, in the event of the death, insanity, dissolution, incompetency, bankruptcy, retirement or resignation of Mr. Filippov, his interest in this Company and control of this Company will automatically pass to his spouse by operation of this Agreement;

(c) the conclusion of the term of the Company set forth in Section 2.3. hereof;



10

(d) the sale or disposition of all or substantially all of the assets of the Company;

(e) the written consent of the Members owning eighty (80%) or more of the Percentage Interests in the Company; or

(f) the entry of a decree of judicial dissolution in accordance with the provisions of the Act.

For the purpose of Section 9.1 (a) above, the term "majority in interest" means eighty (80%) or more of the remaining Members' collective interest in profits and their respective Capital Accounts. For the purpose of the foregoing sentence, profits shall be determined and allocated based upon any reasonable estimate of profits from the date of the dissolution event to the projected termination of the Company taking into account present and future allocations of profits under this Agreement, and the Capital Account balances shall be determined upon the date of the dissolution event.

9.2 Winding Up. Upon the dissolution of the Company, the remaining Member or, if more than one Member then remains, the Member selected by the remaining Members (in either case, the "Liquidating Member"), shall proceed with the winding up of the Company and apply and distribute the Company's assets as provided in this Section 9.2. The assets shall first be applied to the payment of the liabilities of the Company (other than any loans that may have been made by the Members to the Company) and to the expenses of liquidation. A reasonable time shall be allowed for the orderly liquidation of the Company and for the discharge of liabilities to creditors, so as to enable the Liquidating Member to minimize the normal losses attendant to a liquidation. The remaining assets shall next be applied to the repayment of any loans made by the Members to the Company. All assets then remaining shall be distributed to the Members in accordance with their respective Capital Accounts after giving effect to all contributions, distributions and allocations for all periods. Notwithstanding any of the foregoing, the Liquidating Member may retain a sum deemed necessary by him or her as a reserve for any

11

L-C BK 001087

contingent liabilities, expenses and obligations of the Company. Upon the final distribution of assets to the Members, each of the Members shall be furnished with a statement which sets forth the assets and liabilities of the Company as of the date of the complete liquidation.

## ARTICLE X - LIABILITY AND INDEMNIFICATION

10.1 <u>Liability.</u>  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

10.2 <u>Indemnification.</u>  The Company shall indemnify and hold harmless the Members and their respective employees and authorized agents from  and against any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member, employee or authorized agent in good faith on behalf of the Company and reasonable believed to be within the scope of authority conferred by this Agreement, except that no Member, employee or authorized agent shall be entitled to be indemnified or held harmless from or against any loss, damage or claim incurred by reason of such Member's, employee's or authorized agent's gross negligence or willful misconduct; provided, however, that any indemnity under this Section 10.2 shall be provided out of and to the extent of Company assets only, and no Member shall have any personal liability on account thereof.

## ARTICLE XI - MISCELLANEOUS

11.1 <u>Governing Law.</u>  The Company and this Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts.

12

L-C BK 001088

11.2 <u>Agreement Binding.</u>  This Agreement shall inure to the benefit of, and be

binding upon, the parties hereto and their respective next-of-kin, legatees,

administrators, executors, legal representatives, successors, and assigns.

11.3 <u>Notices.</u>  Notices to the Members or to the Company to be furnished

hereunder shall be deemed to have been given when mailed, by prepaid

registered or certified mail, or when deposited with an express courier service,

addressed to the address set forth on Schedule A or as set forth in any notice of

changes of address previously given in writing by the addressee to the addressor.

Executed as a Commonwealth of Massachusetts's instrument under seal on the

day and year first above written.

_____
Nickolay Lipetsker, Member

_____
Vadim Kagan, Member

_____
Alex Filippov, Managing Manager

13

## SCHEDULE A

### Capital Contributions and Percentage Interests

| Member | | Capital Contribution | Percentage Interest |
|---|---|---|---|
| **Name:** | Nickolay Lipetsker | **$250,000.00** | **10%** |
| **Address:** | 52 Stony Brae Road, Newton, MA, 02461 | | |
| **Name:** | Alex Filippov | **$2,000,000.00** | **80%** |
| **Address:** | **130 Trapelo Road, Belmont, Massachusetts** | | |
| **Name:** | **Vadim Kagan** | **$250,000.00** | **10%** |
| **Address:** | 99 Needham Street, Unit 1402, Newton, MA, 02461 | | |

14

# EXHIBIT 2



RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA

**EXHIBIT**
Kacay 23
5.3.18DA

MASSACHUSETTS STATE EXCISE TAX
Norfolk Registry of Deeds
Date: 12-31-2012 @ 09:28am
Ct1#: 192        Doc#: 162557
Fee: $18,240.00   Cons: $4,000,000.00

CERTIFY

*William P. O'Donnell*

WILLIAM P. O'DONNELL, REGISTER

Quitclaim Deed by Trustees

James A. Swartz and Joan E. Swartz Siff, as they are Trustees of the Freedom Trust under declaration of trust dated August 6, 1998 and recorded with the Norfolk County Registry of Deeds in Book 13087, Page 344 as amended in Book 16553, Page 87, and as affected by Resignation, Appointment and Acceptance dated February 16, 2010 and recorded in Book 27496, Page 330

*for consideration paid, and in full consideration of* Four Million ($4,000,000.00) Dollars

*grants to* LYMAN-Cutler, LLC a Massachusetts Limited Liability company with AN ADDRESS OF 130 Teapelo Road, Belmont, Massachusetts.
*with Quitclaim Covenants*

A certain parcel of land, known and numbered 77 Lyman Rd, Brookline, MA more completely described on Exhibit "A" annexed hereto.

**Witness our hands and seals this** 13 **day of December, 2012**

James A. Swartz, Trustee                    Joan E. Swartz Siff, Trustee

### COMMONWEALTH OF MASSACHUSETTS

Suffolk                          *ss.*                    December, 13 2012

On this 14 day of December, 2012, before me, the undersigned notary public, personally appeared James A. Swartz, Trustee of The Freedom Trust, proved to me through satisfactory evidence of identification, which were Personal Knowledge , to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose.

Notary Public
My Commission Expires:



LAUREN M. BOLOGNESE
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
July 4, 2019

**Property Address:**
**Address of Grantee:**
77 Lyman Rd. Brookline
77 Lyman Rd. Brookline

1424450-r1/18722-2

3

## COMMONWEALTH OF MASSACHUSETTS

Norfolk _____ ss.                                    December, 13 2012

On this 13th day of December, 2012, before me, the undersigned notary public, personally appeared Joan E. Swartz Siff, Trustee of The Freedom Trust, proved to me through satisfactory evidence of identification, which were MA Drivers Licence, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that she signed it voluntarily for its stated purpose.

FATIMA M. GONCALVES
Notary Public
COMMONWEALTH OF MASSACHUSETTS
My Commission Expires
April 14, 2017

_____
Notary Public
My Commission Expires: 4/14/2017

14244450v1/18722-2

Bk 30866   Pg 42   #162557

## Exhibit "A"

The land with the buildings and improvements thereon, presently known and numbered 77 Lyman Road in Brookline, Norfolk County Massachusetts, being shown as Lot 33 on a plan entitled, "77 Lyman Road Subdivision Plan of The land in Brookline, Massachusetts. Norfolk County, scale 1" = 30'," dated December 29, 2003 by J.F. Hennessy Co., Civil Engineers and Land Surveyors, which plan is recorded with the Norfolk County Registry of Deeds as Plan 42 of 2004 in Plan Book 518.

Said lot contains 67,741+/- square feet according to said plan

Being a portion of the same premises conveyed the Trustees of the Freedom Trust by virtue of a Deed recorded with the Norfolk County Registry of Deeds on August 6, 1998 in Book 13087, Page 355.

# EXHIBIT 3

ROCKLAND   Where Each Relationship Matters'

12/26/2012

Lyman-Cutler LLC
Alex Filippov
130 Trapelo Rd
Belmont, Ma 02478

Re: 77 Lyman Rd Brookline, Ma (the "Property")

Dear Alex,

We are pleased to inform you Rockland Trust Company (the "Bank") has approved your application for a $1,600,000.00 secured loan. The loan will be subject to the following terms and conditions:

**BORROWER.** The Borrower will be Lyman-Cutler, LLC.

**USE OF LOAN.** The proceeds of the loan will be used solely for the acquisition of the above mentioned property. In no event may loan proceeds be used for personal, family or household purposes.

**AMOUNT.** The amount of the loan will be $1,600,000.

**CLOSING DATE.** The closing of the loan must occur no later than January 30, 2013. If the loan does not close on or before such date, the Bank may withdraw this commitment without any further obligation on its part, or change the terms and conditions, including but not limited to, the interest rate of the loan.

**MATURITY DATE.** All amounts outstanding under the loan together with accrued and unpaid interest will be due and payable no later than 12 months from the date of the note.

**INTEREST RATE.** The principal amount of the loan outstanding from time to time will bear interest at a fixed rate equal to 4.75 percent (4.75%) per annum.

**INTEREST AFTER DEFAULT.** If an event of default (as will be defined in the loan documents) shall occur, the rate of interest will be increased to the contract rate of interest, computed pursuant to the loan documents plus 4.00%, whichever is higher. However, under no circumstances will the interest rate exceed the maximum interest rate limitations under applicable law.

**INTEREST CALCULATION METHOD.** Interest payable under the loan shall be computed on an actual/360 day method (also known as a 365(366)/360 basis); that is, by dividing the interest rate over a year of 360 days and multiplying the resulting daily rate by the actual number of calendar days elapsed during which the principal balance is outstanding.

**REPAYMENT.** The Borrower will make monthly payments of interest only, in arrears.

Payments will be applied first to outstanding expenses and fees owed to the Bank, then to accrued interest, then to principal.

**LATE CHARGE.** At the Bank's option, payments received more than fifteen (15) days following the date when due will be subject to a late fee of 5% of the amount of the payment.

**LOAN FEE.** A loan fee of 1% of the loan amount or $16,000.00 is due and payable at closing and shall be deemed fully earned at that time. The loan fee deposit shall be applied to the loan fee due at closing provided that the loan fee deposit will not be refunded to you if you elect not to close the loan for any reason whatsoever, or if the Bank declines

L-C BK 000298

to close the loan on account of its determination that representations or statements made in Borrower's application for the loan or in the Bank's due diligence process are false or misleading in any material respect.

_APPRAISAL AND APPRAISAL FEE._ An appraisal fee of $375.00 is due and payable at the time of closing. The appraisal fee will not be refunded to you in any circumstance, including, without limitation, the failure of either party to close this loan. The appraisal fee will be used by the Bank to obtain on the Borrower's behalf an appraisal of the Property. The appraisal must be received by the Bank not less than 10 days prior to the closing and must be satisfactory to the Bank in all respects. If the appraised value is insufficient (as set forth in the paragraph(s) below under the caption "Special Conditions"), or the appraisal is not satisfactory to the Bank for any other reason, then the Bank, in its sole discretion, may withdraw this commitment.

_PREPAYMENT._ The Borrower may prepay the loan in full at any time without premium or penalty.

To the extent any interest rate is governed by a swap or other interest rate hedge agreement, the foregoing is in addition to any payments due under the applicable swap or hedge agreements.

_COLLATERAL._ As collateral for the loan, the Borrower will grant the Bank a valid first mortgage on the land, improvements and fixtures located at the Property, together with an assignment of all leases and rents and an assignment of all licenses, permits and contracts affecting the Property.

_GUARANTEE(S)._ The loan and all other borrowings of Borrower from Bank shall be unconditionally guaranteed by Alexander Filippov. Such guaranty will be limited to $200,000.00 of principal plus collection costs including interest due. Should the house on the property be torn down prior to a construction loan being approved by the Bank, the guaranty becomes unlimited.

_CASUALTY AND OTHER INSURANCE._ The Borrower will maintain casualty insurance policies on the collateral for the loan covering such risks as are satisfactory to the Bank in an amount equal to the lesser of (i) the amount of the loan or (ii) full replacement cost of the collateral, as evidenced by an agreed amount endorsement to such policy. In addition the Borrower will maintain comprehensive general liability insurance as is reasonable based on the conduct of its business and otherwise reasonably satisfactory to the Bank, including but not limited to business interruption insurance or if applicable, loss of rents coverage for not less than twelve months, and will maintain all necessary worker's compensation insurance. The Borrower must provide the Bank at the closing with certificates satisfactory to the Bank evidencing such insurance coverage, naming the Bank and its successors and assigns as their interests may appear as mortgagee, loss payee and additional insured as appropriate and indicating that such coverage will not be changed or terminated without at least twenty days prior notice to the Bank.

_SPECIAL CONDITIONS._ The following conditions shall be satisfied on or prior to closing, otherwise, the Bank may, in its sole discretion, and without liability, withdraw this commitment:

1. The Bank to be satisfied with property zoned for two buildable lots and approved for subdividing or re-apportioning square footage between the two lots.
2. Construction plans and budget to be submitted to the Bank within 90 days of closing.

_TITLE AND TITLE INSURANCE._ Title to all collateral for the loan must be satisfactory to the Bank. The Borrower must provide the Bank with a lender's title insurance policy on the Property in the amount of the loan to insure the first priority mortgage lien of the Bank. The title insurance policy must be from a title insurance company satisfactory to the Bank and containing no exceptions other than those acceptable to the Bank's legal counsel. A title insurance commitment and copies of any documents evidencing title exceptions must be provided to the Bank or its counsel sufficiently in advance of closing to allow such review as the Bank or its counsel may consider necessary. The title insurance policy shall include such endorsements as the Bank or its counsel may consider necessary in the sole and reasonable discretion of the Bank, and in any event such as are normal and customary in transactions of this type.

_FLOOD INSURANCE._ If the Property is located in an area identified by FEMA (Federal Emergency Management Agency) as having special flood hazards, the Borrower must maintain and provide the Bank evidence that the property contents are covered by Flood Insurance in an amount equal to the lesser of the amount of the loan or the maximum

amount of coverage available under Title V of the Riegle Community Development and Regulatory Improvement Act of 1994. Evidence of required flood insurance must be provided to the Bank at least five (5) business days prior to loan closing and must be satisfactory in form and substance to the Bank.

In addition, if the Bank requires the escrow of taxes, insurance premiums or any other fees or charges for the loan, then the premiums and fees for flood insurance on the loan must also be escrowed.

*ANNUAL FINANCIAL STATEMENTS.* Borrower and each Guarantor which is an entity must submit to the Bank a copy of its signed federal tax return and all schedules for the preceding fiscal year within such one hundred twenty day period. Each guarantor who is an individual must furnish the Bank within ONE HUNDRED TWENTY (120) days after the end of each tax year, a personal financial statement on the Bank's form used for such purpose and such person's signed federal income tax return and all schedules. The Borrower will also provide such other information concerning the Borrower, or any guarantor, as the Bank may request from time to time.

*TAX IDENTIFICATION NUMBER.* Borrower shall provide its tax identification/social security number to the Bank on or before closing and certify to the Bank (on Form W-9, W-8 or such other form as Bank may require) under penalty of perjury that such number is correct.

*DEPOSIT ACCOUNTS.* The Borrower must maintain its principal deposit and operating accounts with the Bank.

*COMPLIANCE WITH LAWS AND REGULATIONS.* Prior to closing, the Borrower must provide the Bank with evidence satisfactory in form and substance to the Bank, in the form of affirmative title insurance, an opinion of counsel acceptable to the Bank, an opinion of a registered engineer or other evidence satisfactory to the Bank that the Property and the use thereof comply with all applicable zoning, building, subdivision, wetlands and other laws, ordinances, rules, regulations and other covenants and restrictions and there is no action or proceeding pending before any court, quasi-judicial body or administrative agency relating thereto, together with permanent and unconditional certificates of occupancy and other certificates, permits, licenses and other items relating to such compliance which are required by or are to be obtained from any board, agency or department, whether governmental or otherwise,

*ENVIRONMENTAL LAW COMPLIANCE.* Prior to closing, the Borrower must provide the Bank with such evidence as the Bank may require, satisfactory in form and substance to the Bank and its counsel, that the Property is in compliance with all applicable federal, state and local environmental laws, ordinances, rules and regulations, including, as applicable, those governing septic and waste water disposal. Such evidence will include a report addressed to the Bank from one or more licensed environmental professional(s) regarding (I) past or ongoing releases of hazardous materials at or affecting the Property in concentrations which are reportable under applicable law or are governed by applicable law; (II) the presence on the Property of hazardous materials in amounts or concentrations which are reportable under applicable law or which are regulated by law or required to be removed and (III) whether asbestos or asbestos-containing materials, polychlorinated biphenyl's (PCB's), radon gas, or urea formaldehyde foam insulation is present at the Property. The Bank may require more detailed evidence of environmental law compliance as may be indicated to the Bank upon review of any such reports.

*ENVIRONMENTAL INDEMNITY.* Final loan documents will include a provision by which the Borrower and each guarantor shall indemnify, defend and hold the Bank harmless against any and all loss, damage, liability, and expense, including attorneys' fees, as a result of the presence or threat of hazardous substances on, or emanating from, the Property, without regard to fault of the Borrower.

*DISCLOSURE.* You represent that you have fully disclosed to the Bank all facts material to the Property, the Borrower and Borrower's financial condition, business operations and the financial condition of any guarantor.

*SATISFACTION OF TERMS AND CONDITIONS.* The terms and conditions of this commitment must be satisfied on or before the closing, or, if an earlier date is specified, such earlier date.

*COSTS AND EXPENSES.* Whether or not the loan is closed, you will pay all costs and expenses incurred by the Bank in connection with the making of the loan and its administration and enforcement, including but not limited to,

L-C BK 000300

reasonable attorney's fees, U.C.C. search fees, U.C.C. filing fees, title insurance, appraisal fees, recording fees, documentary stamps, any taxes, and all other necessary costs. This provision shall survive any expiration or termination of this commitment.

**PARTICIPATIONS.** The Bank may grant participations in the loan to such institutional entities as Bank, may from time to time, select.

**ATTORNEY FOR THE BANK.** The following attorney will prepare all necessary and appropriate papers and instruments for the closing of the loan. This attorney will represent the Bank's interest only and will not be providing any services to the Borrower.

Boris Maiden
14 Webster St
Brookline, Ma

**ADDITIONAL REQUIREMENTS.** The Bank will require that you execute documents necessary to evidence the terms of this commitment and otherwise to comply with the Bank's requirements for documenting transactions of this nature. Documentation will include, but not be restricted to, various representations and warranties from you as to your current condition and the condition of the collateral, various affirmative and negative agreements on your part to be followed during the period the loan is outstanding, indemnifications (including environmental compliance), and various events, the occurrence of which may entitle the Bank to require that the loan be paid immediately. Among such events that will require immediate repayment will be the occurrence of any default on the part of you or any affiliated person or entity in any obligation to the Bank. The loan will be subject to such other terms and conditions as are required by the Bank or its attorney which will be set forth in the definitive loan documents and the definitive loan documents will control the terms and conditions of the loan.

Final loan documents will include provisions which will cause the loan to be immediately due and payable if liens or encumbrances are placed on any collateral for the loan or the Borrower transfers any of the collateral for the loan without the prior written consent of the Bank. If the Borrower is an entity, the transfer of ownership of any interest in the Borrower will constitute a prohibited transfer of the Collateral for purposes of the loan documents.

**NO MATERIAL ADVERSE CHANGE.** The occurrence of any material adverse change in the business or condition, financial or otherwise, which occurs prior to the closing date shall permit Bank to determine not to close the loan, all without liability to Bank.

**USA PATRIOT ACT.** To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.

What this means to you: At or before the loan closing, the Bank (or its agent) will ask the name, street address, date of birth, and other information that will allow us to identify each signer and guarantor. We will also ask to see a driver's license and/or other identifying documents for each signer and guarantor. All new accounts are verified through eFunds or Chex Systems, Inc.

**NOTICE OF RIGHT TO RECEIVE COPY OF APPRAISAL.** You have the right to a copy of the appraisal report used in connection with your application for credit. If you wish a copy, please send a written request to: Commercial Real Estate and Environmental Review Department, 120 Liberty Street, Brockton, MA 02301. We must hear from you no later than 90 days after we notify you about the action taken on your credit application or you withdraw your application. Upon receipt of your request, we will inform you about the amount of any required reimbursement. In your letter, please give us the following information: Loan or application number, if known, date of application, name(s) of loan applicant(s), property address, and your current mailing address.

**MISCELLANEOUS PROVISIONS.** This letter supersedes all prior oral or written agreements or discussions between Borrower and Bank concerning the loan. No officer of the Bank or other person is authorized to make any oral commitments in respect to a loan from the Bank. This letter represents the maximum scope of the commitment offered to you by the Bank. If at any time you seek any extension or modification of this commitment, you must

submit a written application. If your application for an extension or modification is accepted, you will receive a written commitment reflecting any extension or modifications agreed to signed by a duly authorized officer of the Bank. No other procedure for an extension or modification of this commitment is authorized by the Bank.

This letter may not be assigned by you and may not be relied upon by any third party. It may not be disclosed to any third party other than your counsel, your accountants, and persons employed by you.

Please acknowledge your acceptance of this commitment and its requirements by countersigning the enclosed copy of this letter where indicated below and returning it to the Bank together with any amounts due upon your acceptance of this commitment. The Bank reserves the right to withdraw this commitment, if the signed copy of this commitment together with any amounts due on your acceptance of this commitment is not received by the Bank on or before, January 30, 2013.

Yours truly,
ROCKLAND TRUST COMPANY

By:
John McGregor
First Vice President

[Customer's signature page to follow]

The undersigned hereby accept this commitment and agree to the terms and conditions thereof this _28_ day of
_December_, 2012.

BORROWER: Lyman- Cutler, LLC

By: _____

Alexander Filippov, Manager

GUARANTOR: Alexander Filippov

By: _____

Alexander Filippov, Individually

L-C BK 000303

# EXHIBIT 4

May 7, 2013

Alex Filippov
Lyman-Cutler LLC
130 Trapelo Road
Belmont, MA 02478

Re: Lot 36 Cutler Road,  Brookline, MA (formerly part of 77 Lyman Road) (the "Property")

Dear Alex:

We are pleased to inform you Rockland Trust Company (the "Bank") has approved your application for a $1,600,000 secured loan.  The loan will be subject to the following terms and conditions:

**_BORROWER_**.  The Borrower will be Lyman-Cutler LLC.

**_USE OF LOAN_**.  The proceeds of the loan will be used solely for the purposes set forth in the attached Construction Loan Supplement.  In no event may loan proceeds be used for personal, family or household purposes.

**_CONSTRUCTION LOANS_**.  The terms and conditions of the Construction Loan Supplement attached hereto are incorporated herein by reference.

**_AMOUNT_**.  The amount of the loan will be $1,600,000.

**_CLOSING DATE_**.  The closing of the loan must occur no later than June 30, 2013.  If the loan does not close on or before such date, the Bank may withdraw this commitment without any further obligation on its part, or change the terms and conditions, including but not limited to, the interest rate of the loan.

**_MATURITY DATE_**.  All amounts outstanding under the loan together with accrued and unpaid interest will be due and payable no later than twelve (12) months from the date of the note.

**_INTEREST RATE_**.  The principal amount of the loan outstanding from time to time will bear interest at a fixed rate equal to Four and Three Quarters percent (4.75%) per annum.

**_INTEREST AFTER DEFAULT_**.  If an event of default (as will be defined in the loan documents) shall occur, the rate of interest will be increased to a per annum rate equal to the aggregate of (a) the interest rate which would otherwise be applicable in the absence of default plus (b) six (6%) percent.  However, under no circumstances will the interest rate exceed the maximum interest rate limitations under applicable law.

**_INTEREST CALCULATION METHOD_** Interest payable under the loan shall be computed on an actual/360 day method (also known as a 365(366)/360 basis); that is, by dividing the interest rate over a year of 360 days and multiplying the resulting daily rate by the actual number of calendar days elapsed during which the principal balance is outstanding.

**_REPAYMENT._**  The Borrower will make monthly payments of interest only, in arrears.

Payments will be applied first to outstanding expenses and fees owed to the Bank, then to accrued interest, then to principal.

**_LATE CHARGE._**  At the Bank's option, payments received more than fifteen (15) days following the date when due will be subject to a late fee of 5% of the amount of the payment.

**LOAN FEE.**  A loan fee of 1.00% of the loan amount or $16,000.00 is due and payable at closing and shall be deemed fully earned at that time**.**

**APPRAISAL AND APPRAISAL FEE.** An appraisal fee of $375.00 is due and payable at closing.  The appraisal fee will not be refunded to you in any circumstance, including, without limitation, the failure of either party to close this loan.  The appraisal fee will be used by the Bank to obtain on the Borrower's behalf an appraisal of the Property.  The appraisal must be received by the Bank not less than 10 days prior to the closing and must be satisfactory to the Bank in all respects. If the appraised value is insufficient (as set forth in the paragraph(s) below under the caption "Special Conditions"), or the appraisal is not satisfactory to the Bank for any other reason, then the Bank, in its sole discretion, may withdraw this commitment.

**PREPAYMENT.**  The Borrower may prepay the loan in full at any time without premium or penalty.

**COLLATERAL.**  As collateral for the loan, the Borrower will grant the Bank a valid second mortgage, subject only to the Bank's first mortgage, on the land, improvements and fixtures located at the Property, together with an assignment of all leases and rents and an assignment of all licenses, permits and contracts affecting the Property.

**GUARANTEE(S).**  The loan and all other borrowings of Borrower from Bank shall be guaranteed by Alexander Filippov.  The guarantee of Alexander Filippov shall be limited in the aggregate to the amount of $600,000 loan principal plus all interest, costs and expenses, including legal expenses, incurred by the Bank in enforcing or collecting the loan and all other borrowings of Borrower from Bank.

**CASUALTY AND OTHER INSURANCE.**  The Borrower will maintain casualty insurance policies on the collateral for the loan covering such risks as are satisfactory to the Bank in an amount equal to the lesser of (i) the amount of the loan or (ii) full replacement cost of the collateral, as evidenced by an agreed amount endorsement to such policy. In addition the Borrower will maintain comprehensive general liability insurance as is reasonable based on the conduct of its business and otherwise reasonably satisfactory to the Bank, including but not limited to business interruption insurance or if applicable, loss of rents coverage for not less than twelve months, and will maintain all necessary worker's compensation insurance.  The Borrower must provide the Bank at the closing with certificates satisfactory to the Bank evidencing such insurance coverage, naming the Bank and its successors and assigns as their interests may appear as mortgagee, loss payee and additional insured as appropriate and indicating that such coverage will not be changed or terminated without at least twenty days prior notice to the Bank.

**SPECIAL CONDITIONS.**  The following conditions shall be satisfied on or prior to closing, otherwise, the Bank may, in its sole discretion, and without liability, withdraw this commitment:

- Bank receipt of confirmation the property located at 77 Lyman in Brookline is now divided into two approved lots.
- Bank to subordinate its existing mortgage on 77 Lyman to an "ANR" plan.
- Partial release payment will be 100% of net sale proceeds to be applied to existing Bank loan #310764600 as well as existing construction loan for Lot 36 Cutler Road and Lot 37 Lyman Road, Brookline, MA.

**TITLE AND TITLE INSURANCE.**  Title to all collateral for the loan must be satisfactory to the Bank.  The Borrower must provide the Bank with a lender's title insurance policy on the Property in the amount of the loan to insure the first priority mortgage lien of the Bank.  The title insurance policy must be from a title insurance company satisfactory to the Bank and containing no exceptions other than those acceptable to the Bank's legal counsel.  A title insurance commitment and copies of any documents evidencing title exceptions must be provided to the Bank or its counsel sufficiently in advance of closing to allow such review as the Bank or its counsel may consider necessary.  The title insurance policy shall include such endorsements as the Bank or its counsel may consider necessary in the sole and reasonable discretion of the Bank, and in any event such as are normal and customary in transactions of this type.

**SURVEY.**  Prior to the loan closing, Borrower will provide a survey satisfactory to Bank, certified by a registered surveyor acceptable to the Bank and dated as of a date reasonably proximate to the loan closing, showing the location

of the Property and all improvements thereon, with all improvements as lying wholly within the lot lines of the Property, showing the location of rights of way and easements, and such other matters as the Bank may require in its discretion. Any such survey or plot plan must in any event be sufficient to cause the title insurance company to remove the standard survey exception from the mortgagee title insurance policy.

**_FLOOD INSURANCE_**.   If the Property is located in an area identified by FEMA (Federal Emergency Management Agency) as having special flood hazards, the Borrower must maintain and provide the Bank evidence that the property is covered by Flood Insurance in an amount equal to the lesser of the amount of the loan or the maximum amount of coverage available under Title V of the Riegle Community Development and Regulatory Improvement Act of 1994. Evidence of required flood insurance must be provided to the Bank at least five (5) business days prior to loan closing and must be satisfactory in form and substance to the Bank.

In addition, if the Bank requires the escrow of taxes, insurance premiums or any other fees or charges for the loan, then the premiums and fees for flood insurance on the loan must also be escrowed.

**_ANNUAL FINANCIAL STATEMENTS_**.

The Borrower must furnish the Bank, within ONE HUNDRED TWENTY (120) days after the end of each fiscal year a copy of its signed federal tax return and all schedules for the preceding fiscal year prepared by a certified public accountant satisfactory to the Bank.

The guarantor must furnish the Bank within ONE HUNDRED TWENTY (120) days after the end of each tax year, a personal financial statement on the Bank's form used for such purpose and such person's signed federal income tax return and all schedules.

The Borrower will also provide such other information concerning the Borrower, or any guarantor, as the Bank may request from time to time.

**_TAX IDENTIFICATION NUMBER_**.   Borrower shall provide its tax identification/social security number to the Bank on or before closing and certify to the Bank (on Form W-9, W-8 or such other form as Bank may require) under penalty of perjury that such number is correct.

**_DEPOSIT ACCOUNTS._**   The Borrower must maintain its principal deposit and operating accounts with the Bank.

**_COMPLIANCE WITH LAWS AND REGULATIONS_**.   Prior to closing, the Borrower must provide the Bank with evidence satisfactory in form and substance to the Bank, in the form of affirmative title insurance, an opinion of counsel acceptable to the Bank, an opinion of a registered engineer or other evidence satisfactory to the Bank that the Property and the use thereof comply with all applicable zoning, building, subdivision, wetlands and other laws, ordinances, rules, regulations and other covenants and restrictions and there is no action or proceeding pending before any court, quasi-judicial body or administrative agency relating thereto, together with permanent and unconditional certificates of occupancy and other certificates, permits, licenses and other items relating to such compliance which are required by or are to be obtained from any board, agency or department, whether governmental or otherwise.

**_ENVIRONMENTAL LAW COMPLIANCE_**.   Prior to closing, the Borrower must provide the Bank with such evidence as the Bank may require, satisfactory in form and substance to the Bank and its counsel, that the Property is in compliance with all applicable federal, state and local environmental laws, ordinances, rules and regulations, including, as applicable, those governing septic and waste water disposal.  Such evidence will include a report addressed to the Bank from one or more licensed environmental professional(s) regarding (i) past or ongoing releases of hazardous materials at or affecting the Property in concentrations which are reportable under applicable law or are governed by applicable law; (ii) the presence on the Property of hazardous materials in amounts or concentrations which are reportable under applicable law or which are regulated by law or required to be removed and (iii) whether asbestos or asbestos-containing materials, polychlorinated biphenyl's (PCB's), radon gas, or urea formaldehyde foam insulation is present at the Property.  The Bank may require more detailed evidence of environmental law compliance as may be indicated to the Bank upon review of any such reports.

**_ENVIRONMENTAL INDEMNITY._**   Final loan documents will include a provision by which the Borrower and each guarantor shall indemnify, defend and hold the Bank harmless against any and all loss, damage, liability, and expense, including attorneys' fees, as a result of the presence or threat of hazardous substances on, or emanating from, the Property, without regard to fault of the Borrower.

**_DISCLOSURE_**.   You represent that you have fully disclosed to the Bank all facts material to the Property, the Borrower and Borrower's financial condition, business operations and the financial condition of any guarantor.

**_SATISFACTION OF TERMS AND CONDITIONS._**   The terms and conditions of this commitment must be satisfied on or before the closing, or, if an earlier date is specified, such earlier date.

**_COSTS AND EXPENSES._**   Whether or not the loan is closed, you will pay all costs and expenses incurred by the Bank in connection with the making of the loan and its administration and enforcement, including but not limited to, reasonable attorney's fees, U.C.C. search fees, U.C.C. filing fees, title insurance, appraisal fees,  surveys, recording fees, documentary stamps, any taxes, and all other necessary costs.   This provision shall survive any expiration or termination of this commitment.

**_PARTICIPATIONS_**.   The Bank may grant participations in the loan to such institutional entities as Bank, may from time to time, select.

**_ATTORNEY FOR THE BANK_**.   The following attorney will prepare all necessary and appropriate papers and instruments for the closing of the loan.  This attorney will represent the Bank's interest only and will not be providing any services to the Borrower.                                         Boris Maiden
                                                                 Brookline, MA

**_ADDITIONAL REQUIREMENTS_**.   The Bank will require that you execute documents necessary to evidence the terms of this commitment and otherwise to comply with the Bank's requirements for documenting transactions of this nature. Documentation will include, but not be restricted to, various representations and warranties from you as to your current condition and the condition of the collateral, various affirmative and negative agreements on your part to be followed during the period the loan is outstanding, indemnifications (including environmental compliance), and various events, the occurrence of which may entitle the Bank to require that the loan be paid immediately.  Among such events that will require immediate repayment will be the occurrence of any default on the part of you or any affiliated person or entity in any obligation to the Bank.  The loan will be subject to such other terms and conditions as are required by the Bank or its attorney which will be set forth in the definitive loan documents and the definitive loan documents will control the terms and conditions of the loan.

Final loan documents will include provisions which will cause the loan to be immediately due and payable if liens or encumbrances are placed on any collateral for the loan or the Borrower transfers any of the collateral for the loan without the prior written consent of the Bank.  If the Borrower is an entity, the transfer of ownership of any interest in the Borrower will constitute a prohibited transfer of the Collateral for purposes of the loan documents.

 **_CROSS COLLATERAL; CROSS DEFAULT._** The Collateral for this loan shall also serve as collateral for all other loans the Borrower has or may in the future have with the Bank other than consumer or personal loans.  A default under any such other loans shall also constitute a default under this loan.

**_NO MATERIAL ADVERSE CHANGE_**.   The occurrence of any material adverse change in the business or condition, financial or otherwise, which occurs prior to the closing date shall permit Bank to determine not to close the loan, all without liability to Bank.

**_USA PATRIOT ACT_**.   To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.

What this means to you: At or before the loan closing, the Bank (or its agent) will ask the name, street address, date of birth, and other information that will allow us to identify each signer and guarantor. We will also ask to see a driver's

license and/or other identifying documents for each signer and guarantor. All new accounts are verified through eFunds or Chex Systems, Inc.

**_NOTICE OF RIGHT TO RECEIVE COPY OF APPRAISAL_.** You have the right to a copy of the appraisal report used in connection with your application for credit. If you wish a copy, please send a written request to: Commercial Real Estate and Environmental Review Department, 120 Liberty Street, Brockton, MA 02301. We must hear from you no later than 90 days after we notify you about the action taken on your credit application or you withdraw your application. Upon receipt of your request, we will inform you about the amount of any required reimbursement.  In your letter, please give us the following information: Loan or application number, if known, date of application, name(s) of loan applicant(s), property address, and your current mailing address.

**_MISCELLANEOUS PROVISIONS_.**  This letter supersedes all prior oral or written agreements or discussions between Borrower and Bank concerning the loan.  No officer of the Bank or other person is authorized to make any oral commitments in respect to a loan from the Bank.  This letter represents the maximum scope of the commitment offered to you by the Bank.  If at any time you seek any extension or modification of this commitment, you must submit a written application.  If your application for an extension or modification is accepted, you will receive a written commitment reflecting any extension or modifications agreed to signed by a duly authorized officer of the Bank.  No other procedure for an extension or modification of this commitment is authorized by the Bank.

This letter may not be assigned by you and may not be relied upon by any third party.  It may not be disclosed to any third party other than your counsel, your accountants, and persons employed by you.

Please acknowledge your acceptance of this commitment and its requirements by countersigning the enclosed copy of this letter where indicated below and returning it to the Bank together with any amounts due upon your acceptance of this commitment. The Bank reserves the right to withdraw this commitment, if the signed copy of this commitment together with any amounts due on your acceptance of this commitment is not received by the Bank on or before, May 31, 2013.

Yours truly,
ROCKLAND TRUST COMPANY

By: _____
John McGregor, First Vice President


The undersigned hereby accept this commitment and agree to the terms and conditions thereof this _____ day of _____, 2013



**BORROWER: Lyman-Cutler, LLC**


By: _____
Alexander Filippov, Manager



**GUARANTOR:**


_____
Alexander Filippov, Individually

CONSTRUCTION LOAN SUPPLEMENT

This Construction Loan Supplement sets forth certain terms and conditions upon which the Loan proceeds will be disbursed by the Bank in connection with the hereinafter defined "Project", all of which will be more fully set forth and described in the definitive loan documents.

USE OF LOAN PROCEEDS:  The proceeds of the loan shall be used solely for costs incurred in connection with construction of the "Project".  "Project" shall mean: a single family home with approximately 6,730 s.f. gross living area.

**_PLANS AND SPECIFICATIONS._**  Prior to the loan closing, the Borrower must submit to the Bank for approval a complete and accurate set of Plans and Specifications, suitable for the purposes intended, prepared by a registered architect or engineer (which Plans and Specifications, along with all changes thereafter approved by Bank, are herein referred to as the "Plans and Specifications").

**_OVERALL PROJECT BUDGET._**  Prior to the loan closing, Borrower must submit to the Bank for the Bank's approval a complete itemized budget for the Project (the "Budget").  The Budget must include not only the direct hard construction costs but also interest expense through completion of the Project and all related Project development costs including non-construction indirect soft costs, and also show sources of the funding for the costs.

**_LOAN DISBURSEMENT SCHEDULE._**  Prior to the loan closing, Borrower must submit to the Bank for the Bank's approval a complete itemized Loan Disbursement Schedule in a format that presents a progress time schedule for the related construction costs.  A sample form will be provided to the Borrower.  The Schedule must be consistent with the Budget.  Costs to be paid from Borrower's funds must be shown as well as the sources for such Borrower funds.

**_INSPECTIONS_**.  Borrower shall permit the Bank and its representatives at all reasonable times to enter the Property for the purpose of inspecting the progress of work on the Project.  The Bank may engage a construction inspector for such purpose, the cost of which will be the responsibility of Borrower.  A fee of $125.00 is charged per site inspection performed by the Bank.

**_AGREEMENTS WITH GENERAL CONTRACTOR AND ARCHITECT._**  Prior to the loan closing, Borrower must provide the Bank with copies of the agreement between Borrower and the General Contractor (the "Construction Contract") and any Agreement between Owner and Architect (if applicable).  The selection of the General Contractor and the Architect, and the forms of agreement, must be reasonably satisfactory to the Bank.  .

The definitive loan documents may require that such agreements be assigned as collateral to the Bank and that the General Contractor and Architect consent to such assignments.

**_CHANGES IN PLANS AND SPECIFICATIONS, BUDGET AND AGREEMENTS._** None of the Plans and Specifications, Budget nor the agreement with the General Contractor or Architect shall be modified or amended in any material respect, nor terminated, without Bank's written consent, which consent shall not be unreasonably withheld, provided that it shall not be deemed unreasonable for Bank to deny consent for changes which materially affect the scope or cost of the Project, impair the bank's security or adversely affect the prospects of completion of the Project on schedule and within budget.

**_PERMITS, LICENSES, APPROVALS AND AUTHORIZATION._**  Prior to the loan closing, Borrower must provide the Bank with copies of all permits, licenses, approvals and authorizations required by any governmental authorities for the construction, use and occupancy of the Project, together with evidence as required by Bank (including certifications, affidavits and letters of opinion) that all necessary permits, licenses, approvals  and authorizations have been obtained and that the Project, if constructed in

1

accordance with the Plans and Specifications, will comply with all requirements of all governmental authorities and will comply with all easements, rights, reservations and restrictions of record.

**_ADVANCE REQUESTS_**.  Each advance requested shall be for work performed in accordance with the Plans and Specifications and shall be consistent with the Budget, the Loan Disbursement Schedule, and the Agreement between Owner and Contractor.   Unless the Bank otherwise agrees in its sole discretion, all other funding sources for the Property shall have funded and be used for land or construction costs prior to any Loan advances.  All liens on the Property shall have been released, waived or subordinated to the Bank's satisfaction.  The Bank and Borrower will arrange prior to each advance for the title insurance policy to be updated to confirm that the Bank's mortgage remains as a valid first mortgage both to the extent of such advance and to the extent of all other amounts previously advanced.

In calculating the amounts to be disbursed under a requisition, the Bank will deduct from the requisition the amounts of retainage in accordance with the Construction Contract.

The Bank shall have a reasonable time after the receipt of each requisition to have its representatives make such investigation as the Bank deems necessary to determine whether the amount of the requisition is payable by it in accordance with the loan agreement which will be part of the definitive documents, and whether the loan is "in balance," (meaning that the undisbursed loan proceeds together with other funds of the Borrower pledged to or deposited with the Bank for the purpose are sufficient to complete the Project).

The requisition will be processed for approval only at such time as all reasonably required information and/or documentation has been received by the Bank.  The Bank shall not be required to make any advance hereunder until the requisition is approved by its representatives, including without limitation, its inspecting engineer (who may be an employee of, or a consultant to the Bank) and its title examiner.

**_OTHER INSURANCE_**.   In addition to insurance required by the commitment letter to which this supplement is attached, the Borrower shall carry and maintain (or cause the General Contractor to maintain): full Builder's All Risk Coverage, completed value non-reporting form, affording protection against such risks and with such insurance companies as the Bank may require, such Builder's Risk Insurance to be payable in case of loss to the Bank as mortgagee (as its interest may appear), and be maintained in such amounts as to equal the full replacement value of the Property.

**_MISCELLANEOUS._**  By reason of possessing and/or exercising its rights of approval, the Bank shall in no event be liable to the Borrower or any third party in regard to the Project in any manner.

This Supplement is hereby approved by The Bank and Borrower as a Supplement to the Commitment Letter dated May 7, 2013 and is hereby made a part hereof.  Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in said Commitment Letter.

BORROWER:  Lyman-Cutler,LLC


By_____
Alexander Filippov, Manager

ROCKLAND TRUST COMPANY


By_____
John McGregor, First Vice President

rev. 6/22/2012

3

May 7, 2013


Alex Filippov
Lyman-Cutler LLC
130 Trapelo Road
Belmont, MA 02478


Re: Lot 37 Lyman Road, Brookline, MA (formerly part of 77 Lyman Road) (the "Property")

Dear Alex:

We are pleased to inform you Rockland Trust Company (the "Bank") has approved your application for a $1,600,000 secured loan.  The loan will be subject to the following terms and conditions:

**_BORROWER_**.  The Borrower will be Lyman-Cutler LLC.

**_USE OF LOAN_**.  The proceeds of the loan will be used solely for the purposes set forth in the attached Construction Loan Supplement.  In no event may loan proceeds be used for personal, family or household purposes.

**_CONSTRUCTION LOANS_**.  The terms and conditions of the Construction Loan Supplement attached hereto are incorporated herein by reference.

**_AMOUNT_**.  The amount of the loan will be $1,600,000.

**_CLOSING DATE_**.  The closing of the loan must occur no later than June 30, 2013.  If the loan does not close on or before such date, the Bank may withdraw this commitment without any further obligation on its part, or change the terms and conditions, including but not limited to, the interest rate of the loan.

**_MATURITY DATE_**.  All amounts outstanding under the loan together with accrued and unpaid interest will be due and payable no later than twelve (12) months from the date of the note.

**_INTEREST RATE_**.  The principal amount of the loan outstanding from time to time will bear interest at a fixed rate equal to Four and Three Quarters percent (4.75%) per annum.

**_INTEREST AFTER DEFAULT_**.  If an event of default (as will be defined in the loan documents) shall occur, the rate of interest will be increased to a per annum rate equal to the aggregate of (a) the interest rate which would otherwise be applicable in the absence of default plus (b) six (6%) percent.  However, under no circumstances will the interest rate exceed the maximum interest rate limitations under applicable law.

**_INTEREST CALCULATION METHOD_** Interest payable under the loan shall be computed on an actual/360 day method (also known as a 365(366)/360 basis); that is, by dividing the interest rate over a year of 360 days and multiplying the resulting daily rate by the actual number of calendar days elapsed during which the principal balance is outstanding.

**_REPAYMENT._**  The Borrower will make monthly payments of interest only, in arrears.

Payments will be applied first to outstanding expenses and fees owed to the Bank, then to accrued interest, then to principal.

**_LATE CHARGE._**  At the Bank's option, payments received more than fifteen (15) days following the date when due will be subject to a late fee of 5% of the amount of the payment.

**LOAN FEE.** A loan fee of 1.00% of the loan amount or $16,000.00 is due and payable at closing and shall be deemed fully earned at that time.

**APPRAISAL AND APPRAISAL FEE.** An appraisal fee of $375.00 is due and payable at closing.  The appraisal fee will not be refunded to you in any circumstance, including, without limitation, the failure of either party to close this loan.  The appraisal fee will be used by the Bank to obtain on the Borrower's behalf an appraisal of the Property.  The appraisal must be received by the Bank not less than 10 days prior to the closing and must be satisfactory to the Bank in all respects. If the appraised value is insufficient (as set forth in the paragraph(s) below under the caption "Special Conditions"), or the appraisal is not satisfactory to the Bank for any other reason, then the Bank, in its sole discretion, may withdraw this commitment.

**PREPAYMENT.** The Borrower may prepay the loan in full at any time without premium or penalty.

**COLLATERAL.** As collateral for the loan, the Borrower will grant the Bank a valid second mortgage, subject only to the Bank's first mortgage, on the land, improvements and fixtures located at the Property, together with an assignment of all leases and rents and an assignment of all licenses, permits and contracts affecting the Property.

**GUARANTEE(S).** The loan and all other borrowings of Borrower from Bank shall be guaranteed by Alexander Filippov. The guarantee of Alexander Filippov shall be limited in the aggregate to the amount of $600,000 loan principal plus all interest, costs and expenses, including legal expenses, incurred by the Bank in enforcing or collecting the loan and all other borrowings of Borrower from Bank.

**CASUALTY AND OTHER INSURANCE.** The Borrower will maintain casualty insurance policies on the collateral for the loan covering such risks as are satisfactory to the Bank in an amount equal to the lesser of (i) the amount of the loan or (ii) full replacement cost of the collateral, as evidenced by an agreed amount endorsement to such policy. In addition the Borrower will maintain comprehensive general liability insurance as is reasonable based on the conduct of its business and otherwise reasonably satisfactory to the Bank, including but not limited to business interruption insurance or if applicable, loss of rents coverage for not less than twelve months, and will maintain all necessary worker's compensation insurance.  The Borrower must provide the Bank at the closing with certificates satisfactory to the Bank evidencing such insurance coverage, naming the Bank and its successors and assigns as their interests may appear as mortgagee, loss payee and additional insured as appropriate and indicating that such coverage will not be changed or terminated without at least twenty days prior notice to the Bank.

**SPECIAL CONDITIONS.** The following conditions shall be satisfied on or prior to closing, otherwise, the Bank may, in its sole discretion, and without liability, withdraw this commitment:

- Bank receipt of confirmation the property located at 77 Lyman in Brookline is now divided into two approved lots.
- Bank to subordinate its existing mortgage on 77 Lyman to an "ANR" plan.
- Partial release payment will be 100% of net sale proceeds to be applied to existing Bank loan #310764600 as well as existing construction loans for Lot 37 Lyman Road and Lot 36 Cutler Road, Brookline, MA.

**TITLE AND TITLE INSURANCE.** Title to all collateral for the loan must be satisfactory to the Bank.  The Borrower must provide the Bank with a lender's title insurance policy on the Property in the amount of the loan to insure the first priority mortgage lien of the Bank.  The title insurance policy must be from a title insurance company satisfactory to the Bank and containing no exceptions other than those acceptable to the Bank's legal counsel.  A title insurance commitment and copies of any documents evidencing title exceptions must be provided to the Bank or its counsel sufficiently in advance of closing to allow such review as the Bank or its counsel may consider necessary.  The title insurance policy shall include such endorsements as the Bank or its counsel may consider necessary in the sole and reasonable discretion of the Bank, and in any event such as are normal and customary in transactions of this type.

**SURVEY.** Prior to the loan closing, Borrower will provide a survey satisfactory to Bank, certified by a registered surveyor acceptable to the Bank and dated as of a date reasonably proximate to the loan closing, showing the location

of the Property and all improvements thereon, with all improvements as lying wholly within the lot lines of the Property, showing the location of rights of way and easements, and such other matters as the Bank may require in its discretion. Any such survey or plot plan must in any event be sufficient to cause the title insurance company to remove the standard survey exception from the mortgagee title insurance policy.

***FLOOD INSURANCE.***  If the Property is located in an area identified by FEMA (Federal Emergency Management Agency) as having special flood hazards, the Borrower must maintain and provide the Bank evidence that the property is covered by Flood Insurance in an amount equal to the lesser of the amount of the loan or the maximum amount of coverage available under Title V of the Riegle Community Development and Regulatory Improvement Act of 1994. Evidence of required flood insurance must be provided to the Bank at least five (5) business days prior to loan closing and must be satisfactory in form and substance to the Bank.

In addition, if the Bank requires the escrow of taxes, insurance premiums or any other fees or charges for the loan, then the premiums and fees for flood insurance on the loan must also be escrowed.

***ANNUAL FINANCIAL STATEMENTS.***

The Borrower must furnish the Bank, within ONE HUNDRED TWENTY (120) days after the end of each fiscal year a copy of its signed federal tax return and all schedules for the preceding fiscal year prepared by a certified public accountant satisfactory to the Bank.

The guarantor must furnish the Bank within ONE HUNDRED TWENTY (120) days after the end of each tax year, a personal financial statement on the Bank's form used for such purpose and such person's signed federal income tax return and all schedules.

The Borrower will also provide such other information concerning the Borrower, or any guarantor, as the Bank may request from time to time.

***TAX IDENTIFICATION NUMBER.***  Borrower shall provide its tax identification/social security number to the Bank on or before closing and certify to the Bank (on Form W-9, W-8 or such other form as Bank may require) under penalty of perjury that such number is correct.

***DEPOSIT ACCOUNTS.***  The Borrower must maintain its principal deposit and operating accounts with the Bank.

***COMPLIANCE WITH LAWS AND REGULATIONS.***  Prior to closing, the Borrower must provide the Bank with evidence satisfactory in form and substance to the Bank, in the form of affirmative title insurance, an opinion of counsel acceptable to the Bank, an opinion of a registered engineer or other evidence satisfactory to the Bank that the Property and the use thereof comply with all applicable zoning, building, subdivision, wetlands and other laws, ordinances, rules, regulations and other covenants and restrictions and there is no action or proceeding pending before any court, quasi-judicial body or administrative agency relating thereto, together with permanent and unconditional certificates of occupancy and other certificates, permits, licenses and other items relating to such compliance which are required by or are to be obtained from any board, agency or department, whether governmental or otherwise.

***ENVIRONMENTAL LAW COMPLIANCE.***  Prior to closing, the Borrower must provide the Bank with such evidence as the Bank may require, satisfactory in form and substance to the Bank and its counsel, that the Property is in compliance with all applicable federal, state and local environmental laws, ordinances, rules and regulations, including, as applicable, those governing septic and waste water disposal.  Such evidence will include a report addressed to the Bank from one or more licensed environmental professional(s) regarding (i) past or ongoing releases of hazardous materials at or affecting the Property in concentrations which are reportable under applicable law or are governed by applicable law; (ii) the presence on the Property of hazardous materials in amounts or concentrations which are reportable under applicable law or which are regulated by law or required to be removed and (iii) whether asbestos or asbestos-containing materials, polychlorinated biphenyl's (PCB's), radon gas, or urea formaldehyde foam insulation is present at the Property.  The Bank may require more detailed evidence of environmental law compliance as may be indicated to the Bank upon review of any such reports.

**ENVIRONMENTAL INDEMNITY.**  Final loan documents will include a provision by which the Borrower and each guarantor shall indemnify, defend and hold the Bank harmless against any and all loss, damage, liability, and expense, including attorneys' fees, as a result of the presence or threat of hazardous substances on, or emanating from, the Property, without regard to fault of the Borrower.

**DISCLOSURE.**  You represent that you have fully disclosed to the Bank all facts material to the Property, the Borrower and Borrower's financial condition, business operations and the financial condition of any guarantor.

**SATISFACTION OF TERMS AND CONDITIONS.**  The terms and conditions of this commitment must be satisfied on or before the closing, or, if an earlier date is specified, such earlier date.

**COSTS AND EXPENSES.**  Whether or not the loan is closed, you will pay all costs and expenses incurred by the Bank in connection with the making of the loan and its administration and enforcement, including but not limited to, reasonable attorney's fees, U.C.C. search fees, U.C.C. filing fees, title insurance, appraisal fees,  surveys, recording fees, documentary stamps, any taxes, and all other necessary costs.  This provision shall survive any expiration or termination of this commitment.

**PARTICIPATIONS.**  The Bank may grant participations in the loan to such institutional entities as Bank, may from time to time, select.

**ATTORNEY FOR THE BANK.**  The following attorney will prepare all necessary and appropriate papers and instruments for the closing of the loan.  This attorney will represent the Bank's interest only and will not be providing any services to the Borrower.                              Boris Maiden
Brookline, MA

**ADDITIONAL REQUIREMENTS.**  The Bank will require that you execute documents necessary to evidence the terms of this commitment and otherwise to comply with the Bank's requirements for documenting transactions of this nature. Documentation will include, but not be restricted to, various representations and warranties from you as to your current condition and the condition of the collateral, various affirmative and negative agreements on your part to be followed during the period the loan is outstanding, indemnifications (including environmental compliance), and various events, the occurrence of which may entitle the Bank to require that the loan be paid immediately.  Among such events that will require immediate repayment will be the occurrence of any default on the part of you or any affiliated person or entity in any obligation to the Bank.  The loan will be subject to such other terms and conditions as are required by the Bank or its attorney which will be set forth in the definitive loan documents and the definitive loan documents will control the terms and conditions of the loan.

Final loan documents will include provisions which will cause the loan to be immediately due and payable if liens or encumbrances are placed on any collateral for the loan or the Borrower transfers any of the collateral for the loan without the prior written consent of the Bank.  If the Borrower is an entity, the transfer of ownership of any interest in the Borrower will constitute a prohibited transfer of the Collateral for purposes of the loan documents.

 **CROSS COLLATERAL; CROSS DEFAULT.** The Collateral for this loan shall also serve as collateral for all other loans the Borrower has or may in the future have with the Bank other than consumer or personal loans.  A default under any such other loans shall also constitute a default under this loan.

**NO MATERIAL ADVERSE CHANGE.**  The occurrence of any material adverse change in the business or condition, financial or otherwise, which occurs prior to the closing date shall permit Bank to determine not to close the loan, all without liability to Bank.

**USA PATRIOT ACT.**  To help the government fight the funding of terrorism and money laundering activities, Federal law requires all financial institutions to obtain, verify and record information that identifies each person who opens an account.

What this means to you: At or before the loan closing, the Bank (or its agent) will ask the name, street address, date of birth, and other information that will allow us to identify each signer and guarantor. We will also ask to see a driver's

license and/or other identifying documents for each signer and guarantor. All new accounts are verified through eFunds or Chex Systems, Inc.

**_NOTICE OF RIGHT TO RECEIVE COPY OF APPRAISAL_**. You have the right to a copy of the appraisal report used in connection with your application for credit. If you wish a copy, please send a written request to: Commercial Real Estate and Environmental Review Department, 120 Liberty Street, Brockton, MA 02301. We must hear from you no later than 90 days after we notify you about the action taken on your credit application or you withdraw your application. Upon receipt of your request, we will inform you about the amount of any required reimbursement. In your letter, please give us the following information: Loan or application number, if known, date of application, name(s) of loan applicant(s), property address, and your current mailing address.

**_MISCELLANEOUS PROVISIONS_**.  This letter supersedes all prior oral or written agreements or discussions between Borrower and Bank concerning the loan.  No officer of the Bank or other person is authorized to make any oral commitments in respect to a loan from the Bank.  This letter represents the maximum scope of the commitment offered to you by the Bank.  If at any time you seek any extension or modification of this commitment, you must submit a written application.  If your application for an extension or modification is accepted, you will receive a written commitment reflecting any extension or modifications agreed to signed by a duly authorized officer of the Bank.  No other procedure for an extension or modification of this commitment is authorized by the Bank.

This letter may not be assigned by you and may not be relied upon by any third party.  It may not be disclosed to any third party other than your counsel, your accountants, and persons employed by you.

Please acknowledge your acceptance of this commitment and its requirements by countersigning the enclosed copy of this letter where indicated below and returning it to the Bank together with any amounts due upon your acceptance of this commitment.  The Bank reserves the right to withdraw this commitment, if the signed copy of this commitment together with any amounts due on your acceptance of this commitment is not received by the Bank on or before, May 31, 2013.

Yours truly,
ROCKLAND TRUST COMPANY

By: _____
John McGregor, First Vice President


The undersigned hereby accept this commitment and agree to the terms and conditions thereof this _____ day of _____, 2013



**BORROWER: Lyman-Cutler, LLC**


By: _____
Alexander Filippov, Manager



**GUARANTOR:**


_____
Alexander Filippov, Individually

CONSTRUCTION LOAN SUPPLEMENT

This Construction Loan Supplement sets forth certain terms and conditions upon which the Loan proceeds will be disbursed by the Bank in connection with the hereinafter defined "Project", all of which will be more fully set forth and described in the definitive loan documents.

USE OF LOAN PROCEEDS:  The proceeds of the loan shall be used solely for costs incurred in connection with construction of the "Project".  "Project" shall mean: a single family home with approximately 6,730 s.f. gross living area.

**_PLANS AND SPECIFICATIONS._**  Prior to the loan closing, the Borrower must submit to the Bank for approval a complete and accurate set of Plans and Specifications, suitable for the purposes intended, prepared by a registered architect or engineer (which Plans and Specifications, along with all changes thereafter approved by Bank, are herein referred to as the "Plans and Specifications").

**_OVERALL PROJECT BUDGET._**  Prior to the loan closing, Borrower must submit to the Bank for the Bank's approval a complete itemized budget for the Project (the "Budget").  The Budget must include not only the direct hard construction costs but also interest expense through completion of the Project and all related Project development costs including non-construction indirect soft costs, and also show sources of the funding for the costs.

**_LOAN DISBURSEMENT SCHEDULE._**  Prior to the loan closing, Borrower must submit to the Bank for the Bank's approval a complete itemized Loan Disbursement Schedule in a format that presents a progress time schedule for the related construction costs.  A sample form will be provided to the Borrower.  The Schedule must be consistent with the Budget.  Costs to be paid from Borrower's funds must be shown as well as the sources for such Borrower funds.

**_INSPECTIONS_**.  Borrower shall permit the Bank and its representatives at all reasonable times to enter the Property for the purpose of inspecting the progress of work on the Project.  The Bank may engage a construction inspector for such purpose, the cost of which will be the responsibility of Borrower.  A fee of $125.00 is charged per site inspection performed by the Bank.

**_AGREEMENTS WITH GENERAL CONTRACTOR AND ARCHITECT._**  Prior to the loan closing, Borrower must provide the Bank with copies of the agreement between Borrower and the General Contractor (the "Construction Contract") and any Agreement between Owner and Architect (if applicable).  The selection of the General Contractor and the Architect, and the forms of agreement, must be reasonably satisfactory to the Bank.  .

The definitive loan documents may require that such agreements be assigned as collateral to the Bank and that the General Contractor and Architect consent to such assignments.

**_CHANGES IN PLANS AND SPECIFICATIONS, BUDGET AND AGREEMENTS._** None of the Plans and Specifications, Budget nor the agreement with the General Contractor or Architect shall be modified or amended in any material respect, nor terminated, without Bank's written consent, which consent shall not be unreasonably withheld, provided that it shall not be deemed unreasonable for Bank to deny consent for changes which materially affect the scope or cost of the Project, impair the bank's security or adversely affect the prospects of completion of the Project on schedule and within budget.

**_PERMITS, LICENSES, APPROVALS AND AUTHORIZATION._**  Prior to the loan closing, Borrower must provide the Bank with copies of all permits, licenses, approvals and authorizations required by any governmental authorities for the construction, use and occupancy of the Project, together with evidence as required by Bank (including certifications, affidavits and letters of opinion) that all necessary permits, licenses, approvals  and authorizations have been obtained and that the Project, if constructed in

1

accordance with the Plans and Specifications, will comply with all requirements of all governmental authorities and will comply with all easements, rights, reservations and restrictions of record.

***ADVANCE REQUESTS***.  Each advance requested shall be for work performed in accordance with the Plans and Specifications and shall be consistent with the Budget, the Loan Disbursement Schedule, and the Agreement between Owner and Contractor.   Unless the Bank otherwise agrees in its sole discretion, all other funding sources for the Property shall have funded and be used for land or construction costs prior to any Loan advances.  All liens on the Property shall have been released, waived or subordinated to the Bank's satisfaction.  The Bank and Borrower will arrange prior to each advance for the title insurance policy to be updated to confirm that the Bank's mortgage remains as a valid first mortgage both to the extent of such advance and to the extent of all other amounts previously advanced.

In calculating the amounts to be disbursed under a requisition, the Bank will deduct from the requisition the amounts of retainage in accordance with the Construction Contract.

The Bank shall have a reasonable time after the receipt of each requisition to have its representatives make such investigation as the Bank deems necessary to determine whether the amount of the requisition is payable by it in accordance with the loan agreement which will be part of the definitive documents, and whether the loan is "in balance," (meaning that the undisbursed loan proceeds together with other funds of the Borrower pledged to or deposited with the Bank for the purpose are sufficient to complete the Project).

The requisition will be processed for approval only at such time as all reasonably required information and/or documentation has been received by the Bank.  The Bank shall not be required to make any advance hereunder until the requisition is approved by its representatives, including without limitation, its inspecting engineer (who may be an employee of, or a consultant to the Bank) and its title examiner.

***OTHER INSURANCE***.   In addition to insurance required by the commitment letter to which this supplement is attached, the Borrower shall carry and maintain (or cause the General Contractor to maintain): full Builder's All Risk Coverage, completed value non-reporting form, affording protection against such risks and with such insurance companies as the Bank may require, such Builder's Risk Insurance to be payable in case of loss to the Bank as mortgagee (as its interest may appear), and be maintained in such amounts as to equal the full replacement value of the Property.

***MISCELLANEOUS***.  By reason of possessing and/or exercising its rights of approval, the Bank shall in no event be liable to the Borrower or any third party in regard to the Project in any manner.


This Supplement is hereby approved by The Bank and Borrower as a Supplement to the Commitment Letter dated May 7, 2013 and is hereby made a part hereof.  Capitalized terms used herein and not otherwise defined herein shall have the meanings set forth in said Commitment Letter.


BORROWER:  Lyman-Cutler,LLC


By_____
Alexander Filippov, Manager


ROCKLAND TRUST COMPANY


By_____
John McGregor, First Vice President

rev. 6/22/2012

rev. 6/22/2012

# EXHIBIT 5

EXHIBIT

Kagan 5
5·3·18 DA

SHEEHAN
PHINNEY
BASS +
GREEN

PROFESSIONAL
ASSOCIATION



ATTORNEYS AT LAW

Alexander H. Pyle
617-897-5642
apyle@sheehan.com

May 7, 2015

BOSTON
255 STATE STREET
Boston, MA
02109
T 617-897-5600
F 617-430-9363

MANCHESTER
1000 ELM STREET
MANCHESTER, NH
03101
T 603-668-0700
F 603-627-8121

CONCORD
TWO EAGLE SQUARE
CONCORD, NH
03301
T 603-223-2020
F 603-224-8899

HANOVER
17 ½ LEBANON STREET
HANOVER, NH
03755
T 603-643-9070
F 603-643-7670

WWW.SHEEHAN.COM

**VIA OVERNIGHT DELIVERY**

Mr. Alex Filippov
130 Trapelo Road
Belmont, MA 02478

Mr. Nickolay Lipetsker
52 Stony Brae Road
Newton, MA 02461

Mr. Vadim Kagan
239 Nahanton St.
Newton, MA 02459

Re:     **Lyman-Cutler, LLC**

Dear Messrs. Filippov, Lipetsker and Kagan:

I am writing on behalf of our clients, Vadim Kagan and Kagan Development Corporation, to open a discussion regarding several matters pertaining to Lyman Cutler, LLC (the "Company").

As you know, the three of you are the members of the Company, which is governed by an Operating Agreement dated as of November 14, 2012 (the "Operating Agreement"). In accordance with the terms of the Operating Agreement, Mr. Kagan and his company, Kagan Development Corporation ("KDC") have constructed two homes on the real property owned by the Company in Brookline, Massachusetts. The homes were completed in accordance with all the deadlines specified in the Operating Agreement and have been on the market for approximately ten months, but neither home has yet been sold. Under current market conditions, a reduction to the listing price is clearly necessary, but to date I understand that Mr. Filippov has refused to approve any price change.

The need for a price reduction is particularly important given the November 30, 2015 dissolution date of the Company, which is rapidly approaching. It is not in the interest of any of the members to have the homes sold as part of a liquidation, particularly when the liquidation would occur during the traditionally weak winter real estate market.

{S0854980.4}

L-C BK 000308

Mr. Alex Filippov
Mr. Nickolay Lipetsker
Mr. Vadim Kagan
May 7, 2015
Page 2

To date, Mr. Kagan and KDC have incurred substantial costs and expenses in complying with their obligations under the Operating Agreement. KDC's best accounting as to the unreimbursed construction costs as of May 7, 2015 total $758,025.56, exclusive of interest charges, with approximately $50,000 of additional vendor costs anticipated. These construction costs are detailed on the accompanying spreadsheet, and will be payable after repayment of the existing bank debt and before any proceeds are available for distribution to the Company's members. In addition, since November 2013, Mr. Kagan has made additional capital contributions totaling over $251,000 to cover carrying costs associated with the homes. While these additional capital contributions do not bear interest, they do have the effect of increasing Mr. Kagan's capital account and thereby increasing his share of the proceeds available for distribution when the Company is liquidated.[1]

Under the current circumstances, Mr. Kagan is not prepared to continue paying the carrying costs of the homes, which total approximately $28,000 per month. Section 8.1 of the Operating Agreement provides that if Mr. Kagan does not pay the carrying costs, then Mr. Filippov will be required to pay them. In such an event, Mr. Filippov's capital account would be increased by the amount of his contributions, which would increase his share of liquidation proceeds.[2] If, however, all members agree to a reduction in the listing price of each home from $5.5 million to $5.25 million (and to a reduction to $5.199 million if the houses do not sell within one month), Mr. Kagan would be willing to split equally with Mr. Filippov the carrying costs of the homes once Mr. Filippov has contributed carrying costs equal to those contributed by Mr. Kagan to date, until both homes are sold. Given the substantial costs already incurred by Mr. Kagan and KDC, we believe this approach is more than fair to the other members of the Company.

If you are amenable to the foregoing compromise, I would be happy to prepare an amendment to the Operating Agreement which reflects this approach, and also extends the term of the Company until November, 30 2016 and clarifies the economic rights and obligations of the members.

---

[1] Section 9.2 of the Operating Agreement provides that the upon dissolution, Company's assets, after payment of liabilities to creditors and member loans, "shall be distributed to the Members in accordance with their respective Capital Accounts after giving effect to all contributions, distributions and allocations for all periods." Note that Capital Accounts, not Percentage Interests, determine how liquidation proceeds are allocated.

[2] Section 8.1 makes reference to a reduction of Mr. Kagan's share of capital contributions and percentage interest in the Company if Mr. Filippov pays the carrying costs. While the language is inartfully drafted, it simply states the same principle that applies to carrying costs paid by Mr. Kagan: The increase in Mr. Filippov's capital account has the effect of reducing the proportion of total capital contributed by Mr. Kagan and therefore, pursuant to Section 9.2, the proportion of liquidation proceeds he receives.

{SB65-0301 4}

L-C BK 000309

Mr. Alex Filippov
Mr. Nickolay Lipetsker
Mr. Vadim Kagan
May 7, 2015
Page 3

It is the desire of Mr. Kagan and KDC to arrive at a mutually acceptable path forward that is fair to all of the members and recognizes the contributions that each of them has made to the Company. I would be pleased to work with you or your counsel towards this goal in a cooperative and constructive manner.

Because the active spring real estate market is currently underway, I would ask that you give this matter your prompt attention.

I look forward to hearing from you.

Sincerely,

Alexander H. Pyle

cc: Mr. J. Joseph Cohen

{S0554989 4}

L-C BK 000310

05/07/15

**Lyman-Cutler, LLC**
**A/P Aging Summary**
**All Transactions**

|  | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| BST Plumbing | 39,340.00 | 0.00 | 0.00 | 0.00 | 0.00 | 39,340.00 |
| Decor Art | 11,250.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,250.00 |
| Dream Flooring | 15,460.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,460.00 |
| KDC | 5,928.72 | 0.00 | 47.76 | 8,272.73 | 230,027.33 | 244,276.56 |
| National Grid | 0.00 | 198.00 | 0.00 | 0.00 | 0.00 | 198.00 |
| ProExcavation | 0.00 | 0.00 | 0.00 | 0.00 | 325,000.00 | 325,000.00 |
| Sergey Nikolaev | 19,320.00 | 0.00 | 0.00 | 0.00 | 0.00 | 19,320.00 |
| Town of Brookline | 0.00 | 281.00 | 0.00 | 0.00 | 0.00 | 281.00 |
| Unicon Electric | 65,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 65,000.00 |
| V&D Heat | 37,900.00 | 0.00 | 0.00 | 0.00 | 0.00 | 37,900.00 |
| TOTAL | 194,198.72 | 479.00 | 47.78 | 8,272.73 | 555,027.33 | 758,025.56 |

Current Carrying costs
(per month - approximate)    $30,000

Estimated additional vendor
costs:    $50,000

Page 1 of 1

L-C BK 000311

# EXHIBIT 6

## Notice of Contract



**STATE OF MASSACHUSETTS** )

)

**COUNTY OF NORFOLK** )

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA

CERTIFY

*William P O'Donnell*
WILLIAM L O'DONNELL, REGISTER

*NOTICE IS HEREBY GIVEN,* that by virtue of a written contract dated June 24, 2013, between Lyman Cutler LLC, owner, and Kagan Development KDC Corp Inc., contractor, said contractor is to furnish or has furnished labor and material or rental equipment, appliances or tools for the erection, alteration, repair or removal of a building, structure, or other improvement on a lot of land or other interest in real property described as follows:

The contiguous properties being located at                    88 Cutler Ln, in the City of Brookline, Massachusetts 02467, and together with any improvements and other buildings, if any, is hereinafter referred to as the "Premises," with said real estate having the permanent index identification number of 437-27-01 And 437- 27-02 and the legal property description as follows:

The Land with the buildings and improvements thereon, presently known and numbered 88 Cutler Lane and 55 Lyman Road in Brookline, Norfolk County Massachusetts, being shown as Lot 33-A and lot 33-b respectively on a plan entitled "77 Lyman Road Brookline, MA which plan is filed with Norfolk Registry of Deeds herewith.

Kagan Development KDC Corp Inc:
239 Nahanton Street
Newton Massachusetts 02459

(Signature)
James Cohen
Secretary

6/22/2015
(Date)

# NOTARY ACKNOWLEDGMENT

**STATE OF MASSACHUSETTS** )
*Norfolk* ) ss.
**COUNTY OF MIDDLESEX** )

The Affiant, Kagan Development KDC Corp Inc., being duly sworn, on oath deposes and says that he is the Contracted Party and that he has read the foregoing Notice of Contract and knows the contents thereof, and that all statements therein contained are true and correct to the best of his belief and knowledge.

Subscribed and sworn to before me on _June 22, 2015_.   By mDL

Kagan Development KDC Corp Inc.
239 Nahanton
Newton Massachusetts 02459

_____
(Signature)
James Cohen
Secretary

_____ 6/22/2015 _____
(Date)

_____
(Notary Signature)

_____
(Notary Printed Name)

**MY COMMISSION EXPIRES 7/14/2017**

My commission expires on: _____



# MECHANICS LIEN
## Notice of Claim

**STATE OF MASSACHUSETTS** )

)

**COUNTY OF NORFOLK** )

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA

CERTIFY

*William P. O'Donnell*
WILLIAM P. O'DONNELL, REGISTER

### Notice of Claim

**Notice is hereby given** that by virtue of a written contract dated June 24, 2013, between Lyman Cutler LLC, owner, and Kagan Development KDC Corp Inc., General Contractor, said General Contractor has furnished professional services relating to the actual erection, alteration, repair or removal of a building, structure or other improvement on a lot of land or other interest in real property described as follows:

The contiguous properties being located at                         : 88' Cutler Ln. in the City of Brookline, Massachusetts 02467, and together with any improvements and other buildings, if any, is hereinafter referred to as the "Premises," with said real estate having the permanent index identification number of 457-27-01 And 437- 27-00 and the legal property description as follows:

The Land with the buildings and improvements thereon, presently known and numbered 88 Cutler Lane and 55 Lyman Road in Brookline, Norfolk County Massachusetts, being shown as Lot 33-A and lot 33-b respectively on a plan entitled "77 Lyman Road Brookline, MA which plan is filed with Norfolk Registry of Deeds herewith.

On 06/24/2013, the Lien Claimant entered into a written contract with the aforementioned Owner to construct two residences on said Premises for the original total sum based upon approved design for which $5,290,600.23, which became due and payable upon completion of the build and/or project services.

The Lien Claimant satisfactorily completed and fulfilled its obligation to construct two residences on the aforementioned Premises on 06/11/2015, and the Owner having inspected and approved of the work completed. To date the Lien Claimant has received payments toward the project build in the amount of $3,194,615.00, thus leaving a balance due of $2,095,985.23.

Lien Claimant, in good faith, provided the agreed upon labor and materials needed to construct two residences at the request of the Owner of the Premises. A final invoice was provided to the Owner itemizing cost of materials and labor with a request for final payment.

The Lien Claimant hereby states and affirms that there is a total outstanding balance of $2,095,985.23 (two million and ninety five thousand and nine hundred and eighty five dollars and twenty three cents) in which the aforementioned party has repudiated their obligation and has, after repeated collection attempts, refuses to submit payment. It is due to the Owner's breach of contract that the Claimant is entitled to have imposed a lien on

the aforementioned and herein described property, along with any and all improvements located on the premises for the total outstanding sum owed, in addition to any interest and collection costs allowable by law pursuant to the State of Massachusetts Statutes.

Kagan Development KDC Corp Inc.
239 Nahunton Street
Newton Massachusetts 02459

(Signature)
James Cohen
Secretary

6/23/2015
(Date)

L-C BK 000399

# NOTARY ACKNOWLEDGMENT

**STATE OF MASSACHUSETTS**     )
             )   ss.
**COUNTY OF NORFOLK**      )

The Affiant, Kagan Development KDC Corp Inc., being duly sworn, on oath deposes and says that he is the Lien Claimant and that he has read the foregoing claim for the lien and knows the contents thereof, and that all statements therein contained are true and correct to the best of his/her belief and knowledge.

Subscribed and sworn to before me on _June 22, 2015_   _By MDC_

Kagan Development KDC Corp Inc.
239 Nahanton
Newton Massachusetts 02459


_____
(Signature)
James Cohen
Secretary

_____
(Date)

_____
(Notary Signature)

Janice R. Connolly
(Notary Printed Name)

**MY COMMISSION EXPIRES 7/14/2017**

My commission expires on: _____

L-C BK 000400

## Notice of Contract

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA

CERTIFY

WILLIAM P. O'DONNELL, REGISTER

**STATE OF MASSACHUSETTS** )
)
**COUNTY OF NORFOLK** )

*NOTICE IS HEREBY GIVEN,* that by virtue of a written contract dated June 24, 2013, between Lyman Cutler LLC, owner, and Kagan Development KDC Corp Inc., contractor, said contractor is to furnish or has furnished labor and material or rental equipment, appliances or tools for the erection, alteration, repair or removal of a building, structure, or other improvement on a lot of land or other interest in real property described as follows:

The **contiguous** properties being located at 55 Lyman Rd :                 , in the City of Brookline, Massachusetts 02467, and together with any improvements and other buildings, if any, is hereinafter referred to as the "Premises," with said real estate having the permanent index identification number of 437-27-01 And 437-27-02 and the legal property description as follows:

The Land with the buildings and improvements thereon, presently known and numbered 88 Cutler Lane and 55 Lyman Road in Brookline, Norfolk County Massachusetts, being shown as Lot 33-A and lot 33-b respectively on a plan entitled "77 Lyman Road Brookline, MA which plan is filed with Norfolk Registry of Deeds herewith.

Kagan Development KDC Corp Inc.
239 Nahanton Street
Newton Massachusetts 02459

(Signature)
James Cohen
Secretary

6/15/2015
(Date)

L-C BK 000401

# NOTARY ACKNOWLEDGMENT

STATE OF MASSACHUSETTS          )

                                )    ss.
COUNTY OF ~~MIDDLESEX~~ Norfolk )

The Affiant, Kagan Development KDC Corp Inc., being duly sworn, on oath deposes and says that he is the Contracted Party and that he has read the foregoing Notice of Contract and knows the contents thereof, and that all statements therein contained are true and correct to the best of his belief and knowledge.

Subscribed and sworn to before me on ___June 22, 2015___   By me

                              Kagan Development KDC Corp Inc.
                              239 Nahanton
                              Newton Massachusetts 02459


                              _____
                              (Signature)
                              James Cohen
                              Secretary

                              ___6 / 5 / 2015_____
                              (Date)


_____
(Notary Signature)

_____
(Notary Printed Name)
                         MY COMMISSION EXPIRES 7/14/2017

My commission expires on: _____

# MECHANICS LIEN
## Notice of Claim

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA

CERTIFY

WILLIAM P. O'DONNELL, REGISTER

STATE OF MASSACHUSETTS          )

                                )

COUNTY OF NORFOLK               )

### Notice of Claim

**Notice is hereby given** that by virtue of a written contract dated June 24, 2013, between Lyman Cutler LLC, owner, and Kagan Development KDC Corp Inc., General Contractor, said General Contractor has furnished professional services relating to the actual erection, alteration, repair or removal of a building, structure or other improvement on a lot of land or other interest in real property described as follows:

The contiguous properties being located at 55 Lyman Rd                , in the City of Brookline, Massachusetts 02467, and together with any improvements and other buildings, if any, is hereinafter referred to as the "Premises," with said real estate having the permanent index Identification number of 437-27-01 And 437- 27-02 and the legal property description as follows:

The land with the buildings and improvements thereon, presently known and numbered 88 Cutler Lane  and 55 Lyman Road in Brookline, Norfolk County Massachusetts, being shown as Lot 33-A and lot 33-b respectively on a plan entitled "77 Lyman Road Brookline, MA which plan is filed with Norfolk Registry of Deeds herewith.

On 06/24/2013, the Lien Claimant entered into a written contract with the aforementioned Owner to construct two residences on said Premises for the original total sum based upon approved design for which $5,290,600.23, which became due and payable upon completion of the build and/or project services.

The Lien Claimant satisfactorily completed and fulfilled its obligation to construct two residences on the aforementioned Premises on 06/11/2015, and the Owner having inspected and approved of the work completed. To date the Lien Claimant has received payments toward the project build in the amount of $3,194,615.00, thus leaving a balance due of $2,095,985.23.

Lien Claimant, in good faith, provided the agreed upon labor and materials needed to construct two residences at the request of the Owner of the Premises. A final invoice was provided to the Owner itemizing cost of materials and labor with a request for final payment.

The Lien Claimant hereby states and affirms that there is a total outstanding balance of $2,095,985.23 (two million and ninety five thousand and nine hundred and eighty five dollars and twenty three cents) in which the aforementioned party has repudiated their obligation and has , after repeated collection attempts, refuses to submit payment. It is due to the Owner's breach of contract that the Claimant is entitled to have imposed a lien on

3

the aforementioned and herein described property, along with any and all improvements located on the premises for the total outstanding sum owed, in addition to any interest and collection costs allowable by law pursuant to the State of Massachusetts Statutes.

Kagan Development KDC Corp Inc.
239 Nahanton Street
Newton Massachusetts 02459


_____
(Signature)
James Cohen
Secretary

_____ 6/22/ 2015 _____
(Date)

L-C BK 000404

# NOTARY ACKNOWLEDGMENT

**STATE OF MASSACHUSETTS**                    )
                                              )  ss.
**COUNTY OF NORFOLK**                         )

The Affiant, Kagan Development KDC Corp Inc., being duly sworn, on oath deposes and says that he is the Lien Claimant and that he has read the foregoing claim for the lien and knows the contents thereof, and that all statements therein contained are true and correct to the best of his/her belief and knowledge.

Subscribed and sworn to before me on _June 20, 2015_       By MDC

                                              **Kagan Development KDC Corp Inc.**
                                              **239 Nahanton**
                                              **Newton Massachusetts 02459**


                                              _____
                                              (Signature)
                                              James Cohen
                                              Secretary

                                              _____
                                              (Date)

_____
(Notary Signature)

_____
(Notary Printed Name)
Janice R. Connolly

                        MY COMMISSION EXPIRES 7/14/2017

My commission expires on: _____

# EXHIBIT 7

# Kagan Development KDC Corp

*A Premier Luxury Home Developer*

# INVOICE

239 Nahanton St.
Newton MA, 02459
617-610-1276

**DATE:** March 17, 2016
**INVOICE #** UPDATED

**FOR:** Construction and Mgmt Services
Prjct. LCR-10MM

**BILL TO:**
Lyman-Cutler LLC
c/o Vadim Kagan
239 Nahanton St.
Newton MA. 02459

| DESCRIPTION (55 Lyman & 88 Cutler Lane) | HOURS | RATE | | AMOUNT |
|---|---|---|---|---|
| Design Fee | 1.00 | $25,000.00 | $ | 25,000.00 |
| | | | $ | - |
| Total Construction cost | 1.00 | $3,773,143.49 | $ | 3,773,143.49 |
| General Contractor Construction Fee (@15%) | 1.00 | $565,971.52 | $ | 565,971.52 |
| | | | $ | - |
| KDC office overhead (net of Vadim Kagan 820 @ 200/hr $164,000.) | 790.00 | $75.00 | $ | 59,250.00 |
| | | | $ | - |
| Total Construction Payments through June 10, 2015 | -1.00 | $3,194,615.00 | $ | (3,194,615.00) |
| (Received from Rockland Trust Construction Advances less fees to bank) | | | $ | - |
| | | | $ | - |
| Total Carrying Costs from July 1, 2013 through June 10, 2015 | 1.00 | $665,545.49 | $ | 665,545.49 |
| Carrying Costs advance fee @ 1.459% of total accrued monthly Carry Advance | 23.00 | $5,546.21 | $ | 127,562.89 |
| (17.5% divided by 12 months = 1.45833%) | | | $ | - |
| | | | $ | - |
| | | SUBTOTAL | $ | 2,021,858.39 |
| | | TAX RATE | | |
| | | SALES TAX | | - |
| | | OTHER | | |
| | | TOTAL | $ | 2,021,858.39 |

Make all checks payable to KDC+A7 Corp Inc.

Total due in 10 days. Overdue accounts subject to a service charge of 1% per month.

**THANK YOU FOR YOUR BUSINESS!**

# EXHIBIT 8



A Premier Luxury Home Developer

# INVOICE

239 Nahanton St
Newton MA, 02459
617-610-1276

DATE: June 1, 2015
INVOICE # LC-15018

FOR: Construction and Mgmt
Services
Prjct. LCR-10MM

BILL TO:
Lyman-Cutler LLC
c/o Vadim Kagan
239 Nahanton St.
Newton MA, 02459

| DESCRIPTION (55 Lyman & 88 Cutler Lane) | HOURS | RATE | AMOUNT |
|---|---|---|---|
| Design Fee | 1.00 | $25,000.00 | $ 25,000.00 |
| | | | $ - |
| Total Construction cost | 1.00 | $3,738,925.82 | $ 3,738,925.82 |
| General Contractor Construction Fee (@15%) | 1.00 | $560,838.87 | $ 560,838.87 |
| | | | $ - |
| KDC office overhead (net of Vadim Kagan 820 @ 200/hr $164,000.) | 790.00 | $75.00 | $ 59,250.00 |
| | | | $ - |
| Total Construction Payments through June 10, 2015 | -1.00 | $3,194,615.00 | $ (3,194,615.00) |
| (Received from Rockland Trust Construction Advances less fees to bank) | | | $ - |
| | | | $ - |
| Total Carrying Costs from July 1, 2013 through June 10, 2015 | 1.00 | $700,771.08 | $ 700,771.08 |
| Carrying Costs advance fee @ 1.459% of total accrued monthly Carry Advance | 23.00 | $6,339.76 | $ 145,814.48 |
| (17.5% divided by 12 months = 1.45833%) | | | $ - |
| | | | $ - |
| | | SUBTOTAL | $ 2,095,985.23 |
| | | TAX RATE | |
| | | SALES TAX | - |
| | | OTHER | |
| | | TOTAL | $ 2,095,985.23 |

Make all checks payable to KDC Corp Inc.

Total due in 10 days. Overdue accounts subject to a service charge of 1% per month.

**THANK YOU FOR YOUR BUSINESS!**

L-C BK 002526

# EXHIBIT 9

## CONSTRUCTION MANAGEMENT/
## GENERAL CONTRACTOR AGREEMENT



THIS AGREEMENT is made and entered into June 24, 2013, by and between Lyman Cutler LLC (hereinafter referred to as the "Owner" or "Company"), and Kagan Development KDC, Corp. (hereinafter referred to as the "Construction Manager/General Contractor" or "CM/GC"), for services in connection with the following described Project:

_____

_____

This Contract shall be performed in conjunction with the services of the Owners Project **Manager, Vadim Kagan (hereinafter the OPM).**

Therefore, in consideration of the mutual covenants and provisions contained herein, the parties agree as follows:

**1.0    THE CONSTRUCTION TEAM AND EXTENT OF AGREEMENT**

1.1     The CM/GC accepts the relationship of trust and confidence established with the Owner by this Agreement. He covenants with the Owner to furnish his best skill and judgment and to cooperate with the OPM in furthering the interests of the Owner. He agrees to furnish efficient business administration and superintendence and to use his best efforts to perform the Work in the best and soundest way and in the most expeditious and economical manner consistent with the interests of the Owner.

1.1.1    <u>The Construction Team</u>: The CM/GC, the Owner, and the OPM, collectively referred to as the "Construction Team" shall work from the beginning of design through construction completion. The CM/GC shall provide leadership to the Construction Team on all matters relating to construction.

1.1.2    <u>Extent of Agreement</u>: This Agreement and the General Conditions to the Agreement represent the entire agreement between the Owner and the CM/GC and supersedes all prior negotiations, representations or agreements. When plans and specifications are complete, they shall be identified as part of the Contract Documents. This Agreement shall not be superseded by any provisions of the documents for construction and may be amended only by written instrument executed by both the Owner and the CM/GC. Nothing contained herein shall be deemed to create any contractual relationship between the CM/GC and the OPM, or any of the contractors, subcontractors or material suppliers on the Project; nor shall anything contained herein be deemed to give any third party any claim or right of action against the Owner or the CM/GC which does not otherwise exist without regard to this Agreement.

1.1.3    <u>Contract Documents</u>: The provisions of the General Conditions and all of the "Contract Documents" for the Project as that term is defined therein are incorporated by this reference into this Construction Management/General Contractor Agreement, to the extent those documents and their provisions are not in conflict with specific provisions herein.

**2.0    CONSTRUCTION MANAGER/GENERAL CONTRACTOR SERVICES**

2.1     The CM/GC's basic services under this Agreement shall consist of the two phases described below:

2.2     <u>Design Phase</u>. As part of the Design Phase services, the CM/GC will:

VK / VK

KAGAN 01259

2.2.1     Consultation During Project Development - Attend regularly scheduled meetings with the OPM during the development of conceptual and preliminary design to advise on site use and improvements, selection of materials, building systems and equipment. Provide recommendations on construction feasibility, availability of materials and labor, time requirements for installation and construction and factors related to cost including costs of alternative designs or materials, preliminary budgets and possible economies.

2.2.2     Scheduling - Develop a Project Time Schedule that coordinates and integrates the OPM's design efforts with construction schedules. Update the Project Time Schedule incorporating a detailed schedule for the construction operations of the Project, including realistic activity sequences and durations, allocation of labor and materials, processing of shop drawings and samples and delivery of products requiring long lead-time procurement. Include the Owner's occupancy requirements showing portions of the Project having occupancy priority.

2.2.3     Project Construction Budget - Review the Owner's established Project budget as soon as major program requirements have been identified and update the budget periodically for the Owner's approval. Prepare an estimate based on a quantity survey of drawings and specifications at the end of the Schematic Design Phase for approval by the Owner as the Project Construction Budget. Update and refine this estimate for Owner's approval as the development of the drawings and specifications proceeds. Advise the Owner and the OPM if it appears that the Project Construction Budget will not be met and, in that event, make recommendations for corrective action.

2.2.4     Value Engineering - Provide technical review and analysis of systems and materials being considered in the design to produce the greatest value for the least cost.

2.2.5     Coordination of Contract Documents - Review the drawings and specifications as they are being prepared, recommending alternative solutions whenever design details affect construction feasibility or schedules without, however, assuming any of the OPM's customary responsibilities for design.

2.2.6     Construction Planning - Recommend for purchase and expedite the procurement of long-lead items to ensure their delivery by the required dates.

2.2.7     Division of Work - Make recommendations to the Owner and the OPM regarding the division of the Work in the plans and specifications to facilitate the bidding and awarding of subcontractors and to allow for phased construction, taking into consideration such factors as time of performance, availability of labor, overlapping trade jurisdictions, provisions for temporary facilities and other matters.

2.2.8     Construction Document Review - Perform final review of plans and specifications with the OPM and Owner to eliminate areas of conflict or misinterpretation and to assure proper coordination, accuracy and completeness.

2.2.9     Labor - Analyze the types, quantity and availability of appropriate categories of labor required for various phases of the Project.

2.2.10     Bidding - Prepare pre-qualification criteria for bidders and develop subcontractor interest in the Project. As working drawings and specifications are completed, establish bidding schedules and conduct pre-bid conferences to familiarize bidders with bidding documents, management techniques and any special systems, materials or methods. Receive competitive bids on the Work from various subcontractors, pursuant to bidding procedures acceptable to the Owner. Analyze all bids, review them with the Owner and OPM, make recommendations for contract awards and award subcontractors.

$\cup k / \cup k$

KAGAN 01260

2.2.11   Conferences   -   Conduct   pre-construction   conferences   with   successful subcontractors.

2.2.12   Equal Employment Opportunity - Determine applicable requirements for equal employment opportunity programs for inclusion in Project bidding documents.

2.3   Construction Phase. As part of the Construction Phase services, the CM/GC will:

2.3.1   Project Control - Supervise the Work of the subcontractors and coordinate the Work with the activities and responsibilities of the Owner and OPM in order to complete the Project in accordance with the Owner's objectives of cost, time and quality.

2.3.2   Staffing - Maintain a competent full-time staff at the Project site to coordinate, provide overall direction of the Work, and monitor progress of the subcontractors on the Project.

2.3.3   Organization - Establish on-site organization and lines of authority in order to carry out the overall plans of the Construction Team.

2.3.4   Coordination - Establish and implement procedures for coordination among the Owner, OPM, subcontractors and the CM/GC with respect to all aspects of the Project.

2.3.5   Scheduling - Schedule and conduct progress meetings at which subcontractors, the Owner, OPM and the CM/GC can discuss jointly such matters as procedures, progress, problems and scheduling. Provide a detailed schedule for the operations of the CM/GC and subcontractors on the Project, including realistic activity sequences and durations, allocation of labor and materials, processing of shop drawings and samples and delivery of products requiring long lead-time procurement. Include the Owner's occupancy requirements in all schedules showing portions of the Project having occupancy priority, if any.

2.3.6   Monitoring - Provide regular monitoring of the schedule as construction progresses. Identify potential variances between scheduled and probable completion dates. Review schedule for work not started or incomplete and recommend to the Owner and subcontractors adjustments in the schedule to meet the scheduled completion date. Provide summary reports of such monitoring activities and document all changes in the schedule.

2.3.7   Evaluation - Determine the adequacy of the subcontractors' personnel and equipment and the availability of materials and supplies to meet the schedule.

2.3.8   Cost Control - Develop and implement an effective system of Project cost control.

2.3.9   Change Orders - Develop and implement a system for the expeditious review and processing of Change Orders. Initiate necessary or desirable changes to the Owner and the OPM, review requests for changes, submit recommendations to the Owner and the OPM and assist in negotiating Change Orders, in accordance with section 17.00 of the General Conditions of the Agreement.

2.3.10   Permits - Secure or assist the Owner in securing all necessary permits, licenses and inspections for the proper completion and execution of the Work, in accordance with section 12.00 of the General Conditions of the Agreement.

2.3.11   Carrying Costs -- Advance such funds as required to provide all needed services for the establishment and maintenance of the Work, whether or not such accounts as established are in the name of the Owner or the CM/GC.

2.3.12   Owner's Consultants - If required, assist the Owner in selecting, retaining and coordinating professional services of a surveyor, testing laboratories and any special consultants.

NK / VK

KAGAN 01261

2.3.13    Superintendent - Keep on the Project, during the work, a competent superintendent and any necessary assistants, all satisfactory to the OPM and the Owner, in accordance with section 16.00 of the General Conditions of the Agreement. The superintendent shall not be changed except with the consent of the OPM and the Owner, unless the superintendent proves to be unsatisfactory to the CM/GC and ceases to be in his employ. The superintendent shall represent the CM/GC in his absence and all directions given to him shall be as binding as if given to the CM/GC. The OPM and the Owner shall not be responsible for the acts or omissions of the superintendent or his assistants.

2.3.13.1    The superintendent shall provide full-time, qualified and efficient supervision of the Work, using his best skill and attention. Carefully study and compare all drawings, specifications and other instructions and immediately report to the OPM any error, inconsistency or omission which may be discovered. Inspect the Work of the subcontractors at all stages and at final completion and guard the Owner against defects and deficiencies in such Work. The CM/GC shall be responsible to the Owner for the acts and omissions of all his employees and of all subcontractors, their agents and employees and all other persons performing any of the Work, for which the CM/GC has supervisory or inspection responsibility hereunder.

2.3.13.2    The superintendent shall see that the Work is carried out in accordance with the Contract Documents and in a thorough and first class manner in every respect. The CM/GC's superintendent shall establish all lines, levels and marks necessary to facilitate the operations of all concerned in subcontract work. He shall lay out the Work in a manner satisfactory to the OPM, making permanent records of all lines and levels required for excavation, grading and foundations and for all other portions of the Work. He shall, together with the OPM, authorize the commencement and certify the proper completion of the various stages of construction. The CM/GC shall be responsible for construction means, methods, techniques, sequences and procedures and for carrying out the Work in accordance with the Contract Documents.

2.3.14    Safety Measures - Establish procedures and measures for the safety of persons and property at and around the site of the Work. Assure compliance with all federal, state and local statutes, rules, regulations and orders applicable to the conduct of the Work.

2.3.15    Contract Interpretations - Refer all questions relative to interpretation of design intent to the OPM in writing.

2.3.16    Shop Drawings and Samples - In collaboration with the OPM, establish and implement procedures for expediting the processing and approval of shop drawings and samples, in accordance with section 8.00 of the General Conditions of the Agreement.

2.3.17    Reports and Project Site Documents - Record the progress in written progress reports and summaries of meetings to the Owner and the OPM, including information on the subcontractors' work and the percentage of completion at the request of the OPM.

2.3.18    Record Sets - Maintain at the Project site, on a current basis, records of all necessary contracts, shop drawings, samples, purchases, materials, equipment, maintenance and operating manuals and instructions and any other documents and revisions thereto which arise out of the Agreement or the Work, in accordance with section 7.00 of the General Conditions of the Agreement. Obtain data from subcontractors and maintain a current set of record drawings, specifications, operating manuals, warranties and guarantees. At the completion of the Project submit all such documents to the OPM for delivery to the Owner.

2.3.19    Completion - Determine completion of the Work or designated portions thereof and prepare for the OPM a list of incomplete or unsatisfactory items together with a schedule for their completion, in accordance with section 50.00 of the General Conditions of the Agreement.

2.3.20    Start-Up - With the Owner's maintenance personnel and the OPM, direct the checkout of utilities, operating systems and equipment for readiness and assist in their initial start-up and testing by the subcontractors.

2.3.21    Completion - Determine final completion and provide written notice to the Owner

VK/VC

KAGAN 01262

and OPM that the Work is ready for final inspection. Secure and transmit to the OPM required guarantees, tax affidavits, certificates, releases, bonds and waivers. Turn over to the Owner all keys and maintenance stocks.

2.3.22    Warranty - During the one-year warranty period at no additional cost to the Owner, perform four quarterly warranty inspections and ensure that Work which proves defective or deficient during such time is corrected either by the subcontractors or such other means as shall be required. Administer the one-year warranty period by the Owner's Warranty Work Request process and attend four quarterly warranty work request meetings, in accordance with section 53.00 of the General Conditions of the Agreement.

2.4  Additional Services - Additional services shall be performed only upon the express, prior written authorization of the Owner and paid for as provided herein. Additional services shall include the following:

2.4.1    Analysis of Existing Improvements - Services related to investigation, appraisals or valuations of existing conditions, facilities or equipment; or verifying the accuracy of existing drawings or other Owner-furnished information.

2.4.2    Owner-Furnished Equipment - Services related to Owner furnished equipment, furniture and furnishings which are not a part of the Work.

2.4.3    Expert Witness - Preparing to serve or serving as an expert witness in connection with any public hearing or legal proceeding.

2.4.4    After Completion - Inspections of and services related to the Project after completion of the services under this Agreement.

2.4.5    Other - Providing any other service not otherwise included in this Agreement.

## 3.0    THE OWNER'S RESPONSIBILITIES

3.1    Information - The Owner shall provide full information regarding its requirements for the Project.

3.2    Owner's Representative - The Owner shall designate a representative who shall be acquainted with the scope of the Work; has authority to approve budgets and adjustments thereto, as contemplated by Paragraph 2.2.3 within the Project Cost Estimate, and otherwise furnish information.

3.3    OPM - The Owner shall retain an OPM to provide design services and to prepare construction documents for the Project. The OPM's services, duties and responsibilities are described in the Agreement between the Owner and the OPM, a copy of which will be furnished to the CM/GC.

3.4    Professional Services - The Owner shall furnish such legal services as may be necessary for the Project, and such auditing services as it may require.

3.5    Documentation - The CM/GC will be furnished, without charge, all copies of drawings and specifications reasonably necessary for the execution of the Work.

3.6    Defects - If the Owner becomes aware of any fault or defect in the Project or nonconformance with the Contract Documents, it shall give prompt written notice thereof to the CM/GC. This provision shall not, however, charge the Owner with any obligation to make inspections and shall in no manner be construed to discharge or modify the CM/GC's obligations to supervise, inspect and to otherwise complete the Project in accordance with the Contract Documents.

3.7    Surveys and Special Testing - So far as the Project contemplated by this Agreement may require, the CM/GC shall be entitled to information giving a complete and accurate survey of the building site and the existing grades and lines of streets, pavements and adjoining properties; information as to the rights, restrictions, easements, surface water courses, boundaries and contours of the building site; and full

$\cup k / \nu k$

information as to existing sanitary sewer, storm sewer, water, gas and electrical services. The Owner, at its expense, shall furnish all such data, upon request. The Owner likewise shall pay for all borings or test pits and for any mechanical, chemical or other tests as well as professional verifications and inspections incident to proper appraisal of the site for the contemplated structure. A copy of all reports of such tests and borings shall be filed with the Owner and shall be available to the CM/GC, upon request.

3.8     Owner's Expenses  - The services, information, surveys and reports required by Paragraphs 3.3 through 3.6 and 3.7, shall be furnished at the Owner's expense.

## 4.0   SUBCONTRACTS

4.1     Bidding - All Work, performed at the direction of the OPM shall be exempt from bidding. Notwithstanding, CM/GC shall use its expertise in providing appropriate services at industry standard pricing for the market and timing required by the OPM.

4.2     Award  - The CM/GC when needed, shall request and receive proposals from subcontractors and subcontracts will be awarded by the CM/GC after the proposals are reviewed by the CM/GC with the OPM.

4.3     Substitution - If the OPM refuses to accept a subcontractor recommended by the CM/GC, the CM/GC shall recommend an acceptable substitute. The Guaranteed Maximum Price, if applicable, shall be increased or decreased by the difference in cost occasioned by such substitution and an appropriate Change Order shall be issued.

4.4     Forms - The form of the subcontract, including the General and Supplementary Conditions applicable thereto, shall be satisfactory to the, OPM and the CM/GC.

## 5.0   CONTRACT TIME SCHEDULE

5.1     Schedule - The services and work to be performed under this Contract shall be in general accordance with the Contract Time Schedule attached hereto as Exhibit 1.

5.2     Time of Completion – This date shall be established at the time a Guaranteed Maximum Price is established or prior to the award of any subcontracts if a GMP is not established.

5.3     Revision - At the time a Guaranteed Maximum Price is fixed, as provided for in Paragraph 6, a new Contract Time Schedule shall also be established.

5.4     Delays and Extension of Time - If the CM/GC is delayed at any time in the progress of the Work by any act or neglect of the Owner or the OPM or by any employee of either; or by any separate contractor employed by the Owner; or by changes ordered in the Work; or by labor disputes, fire unusual delay in transportation, unavoidable casualties or any causes beyond the CM/GC's control; or by delay authorized by the Owner; the Contract Time Schedule shall be extended.

VK/VK

KAGAN 01264

5.5    Liquidated Damages - The CM/GC understands and agrees that the completion of the entire Project within the time specified is an essential feature of this Agreement and that the Owner will sustain substantial damages, the amount of which is not possible to accurately determine at the time of contracting and which may be difficult to prove, if the Work is not so completed. The CM/GC, therefore, agrees to proceed with due diligence, taking all precautions and making all necessary arrangements to insure the completion of the Work within the prescribed time. The CM/GC further agrees that his failure to fully and finally complete the Work due to negligence, neglect, or mismanagement, within the time allowed shall be considered a material breach of this Agreement and shall entitle the Owner to collect liquidated damages for the delay in completion in  accordance with the General Conditions in the sum of five hundred dollars ($500.00) per calendar day.

## 6.0    GUARANTEED MAXIMUM PRICE

6.1    Establishment - When the design, plans and specifications are sufficiently complete to make the final cost estimates and prior to awarding any subcontracts, the CM/GC will, if desired by the Owner, and requested in writing, fix a Guaranteed Maximum Price (GMP), guaranteeing the maximum cost to the Owner for the Cost of the Work and the CM/GC's Fees. Such GMP will be guaranteed by the CM/GC, subject only to  modification for Changes in the Work as provided in the General Conditions of the Agreement 17.00 Changes in the Work and for additional costs arising from delays caused by the Owner or the OPM.

6.2    Subcontracts - When the CM/GC provides  a GMP, the subcontracts will contain the necessary provisions to allow the CM/GC to control the performance of the Work.

## 7.0    CONSTRUCTION MANAGER/GENERAL CONTRACTOR'S FEE

7.1    Determination - In consideration of the performance of this Agreement, the Owner agrees to pay the CM/GC in current funds as compensation for his services a CM/GC's Fee as set forth in Paragraph 7.1.1 and 7.1.2.

7.1.1    Design Phase Fee - For the performance of the Design Phase services, as defined in Paragraph 2.2, a fee of $25,000.00.

7.1.2    Construction Phase Fee - For work or services performed  during the Construction Phase, as defined in Paragraph 2.3, a fee of 15% fifteen percent, which shall be paid  proportionately to the ratio the monthly payment for the Cost of the Work bears to the total Cost of the Work.  Any balance of this fee shall be paid the time of final payment.

7.1.3    Operational Advances – For any capital outlay advanced by the CM/GC done in order to facilitate the advancement of this agreement or the project as defined in the Scope of Work, attached hereto, or as directed by the Owner, whether or not this advance occurs during or post the construction phase, but in all events prior to the sale or disposal of the property, the CM/GC shall be reimbursed the full amount of the Operational Advance plus a fee of 17.5% (seventeen and one half percent).  Any balance remaining unpaid beyond 30 days after being advanced shall accrue additional interest at 12% (twelve percent) per annum compounded monthly.

7.1.4    Post Construction Services – For the support work performed by KDC in maintaining, and keeping the project properties in Marketable Condition, services to be billed at actual cost plus a fee of 17.5% seventeen and one half percent.

7.2    Adjustments - Adjustments in Fee shall be made as follows:

7.2.1    Change in Scope - The CM/GC fee shall be adjusted only for owner approved changes which involve a substantial change in the scope of Work.  The CM/GC fee shall be adjusted percent (5 % ) of the Cost of the Work for substantial changes in the scope of the Work. A "substantial



KAGAN 01265

change in the scope of the Work" for purposes of this Article is defined as follows:

    7.2.1.1      Changes which vary the scope of Work in excess of 10% of the original scope of Work, based either on square footage of floor area or estimated construction cost.

    7.2.1.2      Change orders involving the procurement of additional subcontractors, not previously contemplated by the Contract Documents.

    7.2.1.3      Changes which involve the revision or modification of major systems not contemplated in the original scope of Work.

    7.2.2      Delays - For delays in the Work, other than for weather, in excess of seven (7) calendar days and which are not the responsibility of the CM/GC, there will be an equitable adjustment in the Fee to compensate the CM/GC for verified and documented increased expenses.

    7.2.3      Additional Services - Additional services, as described in Paragraph 2.4 shall be computed as follows:

        **Labor:**    Direct Personnel Expense (base wage) times 1.5

        **Expenses:**    Actual cost.

    7.3      Items Included in Fee - Included in the CM/GC's Fee for the Construction Phase are the following:

    7.3.1      Profit - Before tax profit.

    7.3.2      Overhead - Off-site costs for general management of the Project including:

    7.3.2.1      Salaries or other compensation of the CM/GC's employees at the principal office and branch offices including:

        Vadim Kagan - at no cost.

        General Office staff - at $75.00 per hour

to provide support in scheduling the Work, cost estimating, cost accounting, processing payment requests, processing Change Orders, processing shop drawings/samples, etc.

    7.3.2.2      General operating expenses of the CM/GC's principal office.

    7.3.2.3      Any part of the CM/GC's capital expenses, including interest @ 16% on the CM/GC's capital employed for the Work.

    7.3.2.4      Costs due to the negligence of the CM/GC, any subcontractor, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including but not limited to, the correction of defective or nonconforming Work, disposal of materials and equipment wrongly supplied, or making good any damage to property.

    7.3.2.5      Overhead or general expenses of any kind, except as may be expressly included in Paragraph 8.

    7.3.2.6      Costs in excess of the GMP, if any, as set forth in Paragraph 6 and adjusted pursuant to the General Conditions of the Agreement, 17.00 Changes in the Work.

**8.0    COST OF THE WORK**

VK / NK

8.1     Definition – The term Cost of the Work shall mean costs necessarily incurred in the proper performance of the Work during either the Design or Construction Phase, and paid by the CM/GC. Such costs shall be at the lowest responsible competitive rates not higher than the standard paid in the locality of the Work except with prior consent of the Owner, and shall include the items set forth below in this Paragraph. The Owner agrees to pay the CM/GC for the Cost of the Work as defined in this Paragraph 8. Such payment shall be in addition to the CM/GC's Fee stipulated in Paragraph 7.

8.2     Cost Items Included – On-site costs of the Work including General Conditions and the aggregate cost of subcontracts.

8.2.1 General Condition Costs – Those costs for work outlined in the General Conditions of the Contract that are the responsibility of the CM/GC unless specific items of Work are included in the subcontract work.

8.2.1.1     Wages paid for labor in the direct employ of the CM/GC in the performance of the Work under applicable collective bargaining agreements, or under a salary or wage schedule agreed upon by the Owner and CM/GC and including such welfare or other benefits, if any, as may be payable with respect thereto.
8.2.1.2     Cost of ordinary employee benefits and taxes, such as pension contributions, hospitalization, vacations, medical insurance, assessments or taxes for such items as unemployment compensation and Social Security, insofar as such cost is based on wages, salaries or other remuneration paid to employees of the CM/GC and included in the Cost of the Work.

8.2.1.3     The proportion of reasonable transportation, traveling and hotel expenses of the CM/GC or of his officers or employees incurred in discharge of duties connected with the Work, when the necessity for such expenditures is approved in advance by the Owner.

8.2.1.4     Cost of all materials, supplies and equipment incorporated in the Work, including costs of transportation thereof.

8.2.1.5     Cost, including transportation and maintenance, of all materials, supplies, equipment and hand tools not owned by the workmen employed by the CM/GC, which are employed or consumed in the performance of the Work and cost less salvage value on such items used but not consumed which remain the property of the CM/GC.

8.2.1.6     Rental charges of all necessary machinery and equipment, exclusive of hand tools, used at the site of the Work, whether rented from the CM/GC or other, including installation, repairs and replacements, dismantling, removal, costs of lubrication, transportation and delivery costs thereof, at rental charges consistent with those prevailing in the area. All equipment which the CM/GC intends to rent to the Owner and the rates therefor must be approved by the Owner in writing prior to use.

8.2.1.7     Cost of the premiums for all bonds and insurance which are required by the Contract Documents.

8.2.1.8     Unavoidable sales taxes, if approved in writing in advance by the Owner.

8.2.1.9     Permit fees, licenses, tests and royalties.

8.2.1.10     Minor expenses such as telegrams, long distance telephone calls, telephone service at the site, expressage and similar petty cash items in connection with the Work.

8.2.1.11     Cost of removal of all debris, snow removal, interim and final cleaning.

8.2.1.12     Costs incurred due to an emergency affecting the safety of persons or property, to the extent not compensated by insurance or otherwise, and not attributable to the fault of the



CM/GC or his subcontractor.

8.2.1.13    Cost of site security during construction, if requested by the Owner, and the cost of site safety measures, such as fences, signs, and barricades.

8.2.1.14    Cost of computer services as required at the field office.

8.2.1.15    Cost of construction support activities such as Work items included in the General Conditions of the Contract and in the specifications unless they are provided by subcontractors.

8.2.1.16    The cost of adequate, weatherproofed, heated and well lighted office space with telephone service at the site of the Work for the use of the CM/GC and the OPM and Owner representatives.

8.2.1.17    The cost of providing and maintaining neat, sanitary and adequate temporary toilet facilities for all personnel at the construction site.

8.2.1.18    The cost of providing suitable temporary facilities and quarters for workmen and of maintaining on premises water tight storage sheds and tool houses for storage of building materials and tools.

8.2.1.19    The cost of providing temporary facilities required to supply all the power, light, water and heat needed for the proper execution and completion of the Work. Unless provided by subcontractors, the cost of all power, light, water and heat for the duration of the Work.

8.2.1.20    The cost of providing temporary weather protection and temporary heating as required for the expeditious prosecution of the Work.

8.2.1.21    Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

8.2.1.22    All costs directly incurred in the performance of the Work and not included in the CM/GC Fee as defined in Paragraph 7.

8.2.2    Subcontracts - The cost of Work performed by subcontractors.

8.2.3    Estimates - The CM/GC shall when requested, furnish detailed and itemized estimate of General Condition costs.

## 9.0    DISCOUNTS

9.1    All discounts for prompt payment shall accrue to the Owner to the extent the Costs of the Work are paid directly by the Owner or from a fund made available by the Owner to the CM/GC for such payments. To the extent the Costs of the Work are paid with funds of the CM/GC, all cash discounts shall accrue to the CM/GC, provided, however, that all costs claimed pursuant to Paragraph 8, billed to the Owner, reflect such discounts. All trade discounts, rebates and refunds, and all returns from sale of surplus materials and equipment, shall accrue to the Owner, and the CM/GC shall make provisions so that they can be secured.

## 10.0    MISCELLANEOUS PROVISIONS

10.1    Assignment - Neither party to this Agreement shall assign its interests herein in whole or in part without the written consent of the other; nor shall the CM/GC assign any moneys due or to become due to him hereunder, without the previous written consent of the Owner.

10.2    Limitation of Actions - Any actions against the CM/GC, his employees or agents brought



KAGAN 01268

to recover damages for injury to person or defects in or damage to property, including the Work itself, caused by the administration, superintendence or efforts of the CM/GC or those under his control relating to this   Project shall be brought within six (6) years after such claim for relief arises and is discovered by the Owner.

10.3    Binding Effect - This Agreement shall be binding upon the heirs, personal representatives,  successors and assigns of the respective parties.

10.4    Controlling Law - This Agreement is being executed and is to be performed in the State of  Massachusetts, and shall be enforced and construed according to the laws of the State of Massachusetts.

10.5    Waiver - Any failure of the Owner or the CM/GC to require strict performance or any waiver  of any provision herein shall not be construed as a consent or waiver to any other breach of the same or any  other provision.

10.6    Severability - If in any instance any provision hereof shall be determined to be invalid or  unenforceable under any applicable law, such provision shall not apply in such instances, but the remaining  provisions shall be given effect in accordance with their terms.

10.7    Notices - Any notices required or permitted under this Agreement shall be deemed given when personally  delivered or when deposited in the United States Certified Mail, postage prepaid.

Owner:

        **Attention:**
        **Vadim Kagan**
        **99 Needham St,**
        **Newton, MA**
        **02461**

CM/GC:

        **c/o Vadim Kagan**
        **99 Needham St,**
        **Newton, MA**
        **02461**

This Agreement is effective the day and year first written above upon the signatures of the undersigned  parties.

CM/GC: Kagan Development, KDC Corp

By:_____    Date: _7. 24. 13_

    Title: President –Vadim Kagan

Owner:
Lyman Cutler Road LLC

By:_____    Date: _7. 24. 13_

    Title: Manager – Vadim Kagan

KAGAN 01269

# Exhibit I

Services and Work to be preformed

**Scope of Work:**

The CM/GC shall build two residences on the subdivided lots formerly known as 77 Lyman Road.  These residences shall be of commensurate quality of materials, style, and workmanship for the area and inn particular shall be of a size and structure for a target sale price of approximately $5,000,000.00 each. Best efforts shall be to maximize the value of the build to emphasize the marketability of the properties. These efforts shall include consultation with Vadim Kagan, and Century 21 as well as other professionals for input as to design and implementation.

Final design approval shall vest with the Owner.

**Completion time:**

The residences shall be substantially completed by March 30th of 2014.  Substantial completion shall be defined as in excess of 95%, and shall further be showable to prospective purchasers in a marketable condition by this date.  In the event that the residences are not marketable by this date, The GC shall credit the owner according to section 5.5 – Liquidated Damages.

**Budget:**

The Construction Manager/General Contractor shall charge the Owner in accordance with the provisions of this Construction Management agreement.

CM/GC: Kagan Development, KDC Corp

By: _____    Date  7.24.13
        President: Vadim Kagan

Owner:
Lyman Cutler Road LLC

By: _____    Dare  7.24.13
        Manager: Vadim Kagan:

# EXHIBIT 10

09/23/15

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Num | Adj | Name | Memo | Split | Debit | Credit | Original Amount | Balance |
|------|------|-----|-----|------|------|-------|-------|--------|-----------------|---------|
| **55 Lyman Building & Improvement** | | | | | | | | | | |
| **Outside Service** | | | | | | | | | | |
| **Landscaping** | | | | | | | | | | |
| **ProExcavation** | | | | | | | | | | |
| Check | 09/25/13 | 1072 | | ProExcavation | 55 Lyman - ... | Rockland Tru... | 15,000.00 | | 15,000.00 | 15,000.00 |
| Check | 09/25/13 | 1075 | | ProExcavation | 55 Lyman F... | Rockland Tru... | 30,000.00 | | 30,000.00 | 45,000.00 |
| Check | 01/27/14 | 1014 | | ProExcavation | payment | Rockland Tru... | 15,000.00 | | 15,000.00 | 60,000.00 |
| Bill | 10/06/14 | | | ProExcavation | | Accounts Pay... | 120,000.00 | | 120,000.00 | 180,000.00 |
| Check | 10/10/14 | 1126 | | ProExcavation | | Rockland Tru... | 20,000.00 | | 20,000.00 | 200,000.00 |
| Bill | 05/28/15 | | | ProExcavation | Landscaping... | Accounts Pay... | 4,600.00 | | 4,600.00 | 204,600.00 |
| **Total ProExcavation** | | | | | | | 204,600.00 | 0.00 | | 204,600.00 |
| **Total Landscaping** | | | | | | | 204,600.00 | 0.00 | | 204,600.00 |
| **Total Outside Service** | | | | | | | 204,600.00 | 0.00 | | 204,600.00 |
| **Total 55 Lyman Building & Improvement** | | | | | | | 204,600.00 | 0.00 | | 204,600.00 |
| **TOTAL** | | | | | | | 204,600.00 | 0.00 | | 204,600.00 |

KDC 01279

Prof Excavation

73° Suburban cover                    INVOICE NO.   77 Lyman  1
N---- M-007 20                               DATE   September 1, 2013
61° 614 1° 6                        CUSTOMER ID   77 Lyman Road - Chestnut Hill
                                    EXPIRATION DATE

16 1

| | | JOB | PAYMENT TERMS | | DUE DATE |
|---|---|---|---|---|---|
| | | 77 Lyman Road | | | |

| # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|
| 1 | 1 | Cut and cap the water and sewer services at lot line | $    3,900.00 | $    3,900.00 |
| 2 | 1 | Demolition of the existing property, including all dumpsters for disposal of the debris off-site. Bricks will be hauled off site and disposed of. Foundation system will be removed off site for legal disposal foundation system will be broken up and removed off site for legal disposal | 27,000.00 | 27,000.00 |
| 3 | 1 | Remove and trucking out an existing natural stone retaining wall from front of the property | 3,600.00 | 3,600.00 |
| 4 | 1 | Remove and trucking an existing asphalt drive from right side of the house | 2,300.00 | 2,300.00 |
| 5 | 1 | Gunite pool demolition and removal. Existing pool materials require separation of concrete and re-bars for off site legal disposal. | 4,900.00 | 4,900.00 |
| 6 | 1 | Demolition and removal of tennis court | 2,000.00 | 2,000.00 |

|  |  |  | SUBTOTAL | $    43,700.00 |
|---|---|---|---|---|
|  |  |  | SALES TAX | |
|  |  |  | TOTAL | $    43,700.00 |

THANK YOU FOR YOUR BUSINESS!

KDC 01280

Prof Excavation

VP Salemton Street          INVOICE NO.    55 Lyman - 1
S    St, MA 01-19           DATE    October 1, 2013
cl  cdo pct               CUSTOMER ID    55 Lyman Road - Chestnut Hill
                           EXPIRATION DATE

FO

| | | JOB | PAYMENT TERMS | DUE DATE | |
|---|---|---|---|---|---|
| | | 55 Lyman Road | | | |
| **#** | **QTY** | **DESCRIPTION** | | **UNIT PRICE** | **LINE TOTAL** |
| 1 | 1 | Install hay bales and silt fence per the drawings | | 5,200.00 | 5,200.00 |
| 2 | 1 | Clear and expose ledge in two areas | | 4,800.00 | 4,800.00 |
| 3 | 1 | Ledge Removal (Hydraulic Breaker) included: one excavator, one Hydraulic Breaker, one mini excavator, and two dump trucks | | 23,700.00 | 23,700.00 |
| 4 | 1 | Excavation and earthwork for the proposed foundation system, requires:<br>- 2 excavators, 1 mini excavator, 2 bobcats<br>- Includes stump removal, lot clearing and disposal | | 19,000.00 | 19,000.00 |
| 5 | 1 | Laser grade and lay out | | 2,150.00 | 2,150.00 |
| 6 | 1 | Form and Pour proposed 24x12 footing (including all labor and equipment)<br>Form and Pour proposed footing for Lally Column (including all labor and equipment) | | 6,000.00 | 6,000.00 |
| 7 | 1 | Form and Pour proposed 9 foot foundation walls | | 26,000.00 | 26,000.00 |
| 8 | 4 | Concrete Pumps (for entire project); $850 each | | 850.00 | 3,400.00 |
| 9 | 1 | Concrete material and steel material for the proposed foundation as shown on the plans included:<br>- All concrete 3500 psi with 3/4" stone<br>- Structural steel: Footings, install 3 # 4 rebar placed vertically 48" on center. Walls: install #4 rebar placed horizontally 18" on center tired to #4 rebar placed vertically 48" on center | | 24,600.00 | 24,600.00 |
| 10 | 1 | Foundation Back Fill: Trucking in fill material, on site | | 32,000.00 | 32,000.00 |

| 11 | 1 | Interior perimeter trench drain installation and connection into a sump basin in the basement. (Plumber to supply Pump and Complete haul pipe discharge line | 4,400.00 | 4,400.00 |
| 12 | 1 | Interior perimeter of foundation wall (Mira drain installation) | 3,700.00 | 3,700.00 |
| 13 | 1 | Pour and finish the basement slabs:<br>- Grade and Compact crushed stone<br>- Set elevations with laser level to allow for 4 inches of concrete<br>- Install 6 mil poly as the vapor barrier<br>- Supply and pump into place of 3500 PSI concrete with hot water and 2% accelerator<br>- Trowel finish concrete surface smooth<br>- Diamond cut expansion control joints where needed to help control cracking<br>- Materials are included | 12,000.00 | 12,000.00 |
| 14 | 1 | Garage slab:<br>- Grade and Compact crushed stone<br>- Set elevations with laser level to allow for 4 inches of concrete<br>- Install 6 mil poly as the vapor barrier<br>- Install wire mash<br>- Supply and pump into place of 3500 PSI concrete with hot water and 2% accelerator<br>- Trowel finish concrete surface smooth<br>- Diamond cut expansion control joints where needed to help control cracking<br>- Materials are included | 5,800.00 | 5,800.00 |
| 15 | 1 | Foundation Insulation and Waterproofing (all materials are included):<br>- 1/2 pink Rigid insulation 2x8 sheets<br>- Spray on Waterproofing | 6,800.00 | 6,800.00 |
| 16 | 1 | Storm Drainage as shown on the plan including two trench drain, two drain manholes, four storm tech units, pipe material. Ledge removal, disposal, and all materials are included | 32,000.00 | 32,000.00 |
| 17 | 1 | New Water and Sewer Services as shown on the plan:<br>- Police details for the street work are included<br>- Fill material for the street trenches is included<br>- Asphalt patch for the street are included<br>- Ledge removal and disposal are included | 24,000.00 | 24,000.00 |
| 18 | 1 | Rough Grading entire property:<br>- Trucking in Fill material<br>- Ledge removal and disposal are included | 12,000.00 | 12,000.00 |
| 19 | 1 | Construct natural stone retaining walls as shown on the plan (for the back right side of the patio, behind garage):<br>- Excavation for the wall footing<br>- Footing installation (concrete and steel materials are included)<br>- Construct New England natural stone wall<br>- Drainage pipes and crushed stone and concrete material is included | 17,000.00 | 17,000.00 |

KDC 01282

| | | | | |
|---|---|---|---|---|
| 20 | 1 | Construct versa lock retaining walls as shown on the plan (at the property line, right side of the house):<br>- Excavation for the wall footing<br>- Footing installation (compact crushed stone)<br>Construct versa lock wall (all versa lock material included)<br>Drainage pipes, geo grid mesh and crushed stone material are included | 26,000.00 | 26,000.00 |
| 22 | 1 | Footings and slab for front steps and landings:<br>- Excavation, concrete materials, and steel materials are included | 6,000.00 | 6,000.00 |
| 23 | 1 | Outside Front Steps, Front Porch, Landing and Walkway:<br>- Excavation, footing, concrete materials, and steel materials are included<br>- Blue Stone and natural stone is included | 22,500.00 | 22,500.00 |
| 24 | 1 | Back Patios:<br>- Excavation, preparation<br>- Blue Stone material, crushed stone, stone dust, and sand are included | 17,000.00 | 17,000.00 |
| 25 | 1 | Footings for back steps:(3)<br>- Excavation, footing, concrete materials, and steel materials are included | 2,400.00 | 2,400.00 |
| 26 | 1 | Outside Back Steps: (3)<br>- Blue Stone and natural stone materials are included | 8,300.00 | 8,300.00 |
| 27 | 1 | Trees and shrubs planting | 21,000.00 | 21,000.00 |
| 28 | 1 | Final Grading | 7,200.00 | 7,200.00 |
| 29 | 1 | Sod Installation | 7,800.00 | 7,800.00 |
| 30 | 1 | Exterior (walls and foundation and chimneys). Stone and stone veneer Installation:<br>- Waterproof Exterior Walls of the House<br>- Metal mesh installation and cement top layering<br>- Stone Veneer installation and pointing<br>- All materials (including stone Veneer) are included | 29,000.00 | 29,000.00 |
| 31 | 1 | Preparation for asphalt driveway | 6,400.00 | 6,400.00 |

| | |
|---|---|
| SUBTOTAL $ | 418,150.00 |
| SALES TAX | |
| TOTAL $ | 418,150.00 |

THANK YOU FOR YOUR BUSINESS!

Peal Excavation

570 Seabourne street          INVOICE NO    Lyman-Cutler  2015-2
Seaton NJ, 07450              DATE          May 25, 2015
61  6101 1 6                  CUSTOMER ID   55 Lyman Road & 88 Cutler Lane

TO

| JOB | PAYMENT TERMS | DUE DATE |
|-----|---------------|----------|
| 55/88 Lyman-Cutler | | |

| # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|-----|-------------|------------|------------|
| 1 | 1 | After-winter landscaping damage repair and maintenance, includes: - Trees and shrubs replacement - Sod Repair | 9,200.00 | 9,200.00 |

|  |  | SUBTOTAL | $ | 9,200.00 |
|  |  | SALES TAX | | |
|  |  | TOTAL | $ | 9,200.00 |

THANK YOU FOR YOUR BUSINESS!

09/23/15

Lyman-Cutler, LLC
Transactions by Account
All Transactions

| Type | Date | Num | Adj | Name | Memo | Split | Debit | Credit | Original Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|---|
| **55 Lyman Building & Improvement** | | | | | | | | | | |
| **Outside Service** | | | | | | | | | | |
| **Excavation** | | | | | | | | | | |
| Check | 08/28/13 | 1057 | | ProExcavation | Excavation/... | Rockland Tru... | 45,000.00 | | 45,000.00 | 45,000.00 |
| Check | 09/25/13 | 1073 | | ProExcavation | 55 Lyman | Rockland Tru... | 30,000.00 | | 30,000.00 | 75,000.00 |
| Check | 09/25/13 | 1074 | | ProExcavation | 55 Lyman F... | Rockland Tru... | 30,000.00 | | 30,000.00 | 105,000.00 |
| Check | 09/25/13 | 1072 | | ProExcavation | 55 Lyman -... | Rockland Tru... | 15,000.00 | | 15,000.00 | 120,000.00 |
| Check | 11/29/13 | 123 | | ProExcavation | payment | Rockland Tru... | 5,000.00 | | 5,000.00 | 125,000.00 |
| Check | 11/29/13 | 123 | | ProExcavation | payment | Rockland Tru... | 5,000.00 | | 5,000.00 | 130,000.00 |
| Bill | 10/06/14 | | | ProExcavation | | Accounts Pay... | 20,000.00 | | 20,000.00 | 150,000.00 |
| **Total Excavation** | | | | | | | 150,000.00 | 0.00 | | 150,000.00 |
| **Total Outside Service** | | | | | | | 150,000.00 | 0.00 | | 150,000.00 |
| **Total 55 Lyman Building & Improvement** | | | | | | | 150,000.00 | 0.00 | | 150,000.00 |
| **TOTAL** | | | | | | | 150,000.00 | 0.00 | | 150,000.00 |



EXHIBIT
V. KAGAN 75

# Proposal

ProExcavation

239 Nahanton Street
Newton, MA 02459
617-610-1276

To

| | |
|---|---|
| INVOICE NO. | 77 Lyman - 1 |
| DATE | September 1, 2013 |
| CUSTOMER ID | 77 Lyman Road - Chestnut Hill |
| EXPIRATION DATE | |

| JOB | PAYMENT TERMS | DUE DATE |
|---|---|---|
| 77 Lyman Road | | |

| # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|
| 1 | 1 | Cut and cap the water and sewer services at lot line | $ 3,900.00 | $ 3,900.00 |
| 2 | 1 | Demolition of the existing property, including all dumpsters for disposal of the debris off-site: Bricks will be hauled off site and disposed of. Foundation system will be removed off site for legal disposal foundation system will be broken up and removed off site for legal disposal | 27,000.00 | 27,000.00 |
| 3 | 1 | Remove and trucking out an existing natural stone retaining wall from front of the property | 3,600.00 | 3,600.00 |
| 4 | 1 | Remove and trucking an existing asphalt drive from right side of the house | 2,300.00 | 2,300.00 |
| 5 | 1 | Gunite pool demolition and removal. Existing pool materials require separation of concrete and re-bars for off site legal disposal. | 4,900.00 | 4,900.00 |
| 6 | 1 | Demolition and removal of tennis court | 2,000.00 | 2,000.00 |

| | | |
|---|---|---|
| SUBTOTAL | $ | 43,700.00 |
| SALES TAX | | |
| TOTAL | $ | 43,700.00 |

THANK YOU FOR YOUR BUSINESS!

# Proposal

ProExcavation

239 Nahanton Street
Newton, MA 02459
617 610 1276

INVOICE NO.    55 Lyman - 1
DATE    October 1, 2013
CUSTOMER ID    55 Lyman Road - Chestnut Hill
EXPIRATION DATE

TO

| JOB | PAYMENT TERMS | DUE DATE |
|-----|---------------|----------|
| 55 Lyman Road | | |

| # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|-----|-------------|------------|------------|
| 1 | 1 | Install hay bales and silt fence per the drawings | 5,200.00 | 5,200.00 |
| 2 | 1 | Clear and expose ledge in two areas | 4,800.00 | 4,800.00 |
| 3 | 1 | Ledge Removal (Hydraulic Breaker) included: one excavator, one Hydraulic Breaker, one mini excavator, and two dump trucks | 23,700.00 | 23,700.00 |
| 4 | 1 | Excavation and earthwork for the proposed foundation system, requires: - 2 excavators, 1 mini excavator, 2 bobcats - Includes stump removal, lot clearing and disposal | 19,000.00 | 19,000.00 |
| 5 | 1 | Laser grade and lay out | 2,150.00 | 2,150.00 |
| 6 | 1 | Form and Pour proposed 24x12 footing (including all labor and equipment) Form and Pour proposed footing for Lally Column (including all labor and equipment) | 6,000.00 | 6,000.00 |
| 7 | 1 | Form and Pour proposed 9 foot foundation walls | 26,000.00 | 26,000.00 |
| 8 | 4 | Concrete Pumps (for entire project); $850 each | 850.00 | 3,400.00 |
| 9 | 1 | Concrete material and steel material for the proposed foundation as shown on the plans included: - All concrete 3500 psi with 3/4" stone - Structural steel: Footings, install 3 # 4 rebar placed vertically 48" on center. Walls: install #4 rebar placed horizontally 18" on center tied to #4 rebar placed vertically 48" on center | 24,600.00 | 24,600.00 |
| 10 | 1 | Foundation Back Fill: Trucking in fill material, on-site | 32,000.00 | 32,000.00 |

| 11 | 1 | Interior perimeter trench drain installation and connection into a sump basin in the basement. (Plumber to supply Pump and Complete hard pipe discharge line | 4,400.00 | 4,400.00 |
| 12 | 1 | Interior perimeter of foundation wall (Alira drain installation) | 3,700.00 | 3,700.00 |
| 13 | 1 | Pour and finish the basement slabs:<br>- Grade and Compact crushed stone<br>- Set elevations with laser level to allow for 4 inches of concrete<br>- Install 6 mil poly as the vapor barrier<br>- Supply and pump into place of 3500 PSI concrete with hot water and 2% accelerator<br>- Trowel finish concrete surface smooth<br>- Diamond cut expansion control joints where needed to help control cracking<br>- Materials are included | 12,000.00 | 12,000.00 |
| 14 | 1 | Garage slab:<br>- Grade and Compact crushed stone<br>- Set elevations with laser level to allow for 4 inches of concrete<br>- Install 6 mil poly as the vapor barrier<br>- Install wire mash<br>- Supply and pump into place of 3500 PSI concrete with hot water and 2% accelerator<br>- Trowel finish concrete surface smooth<br>- Diamond cut expansion control joints where needed to help control cracking<br>- Materials are included | 5,800.00 | 5,800.00 |
| 15 | 1 | Foundation Insulation and Waterproofing (all materials are included):<br>- 1/2 pink Rigid insulation 2x8 sheets<br>- Spray on Waterproofing | 6,800.00 | 6,800.00 |
| 16 | 1 | Storm Drainage as shown on the plan including two trench drain, two drain manholes, four storm tech units, pipe material.<br>Ledge removal, disposal, and all materials are included | 32,000.00 | 32,000.00 |
| 17 | 1 | New Water and Sewer Services as shown on the plan:<br>- Police details for the street work are included<br>- Fill material for the street trenches is included<br>- Asphalt patch for the street are included<br>- Ledge removal and disposal are included | 24,000.00 | 24,000.00 |
| 18 | 1 | Rough Grading entire property:<br>- Trucking in Fill material<br>- Ledge removal and disposal are included | 12,000.00 | 12,000.00 |
| 19 | 1 | Construct natural stone retaining walls as shown on the plan (for the back right side of the patio, behind garage):<br>- Excavation for the wall footing<br>- Footing installation (concrete and steel materials are included)<br>- Construct New England natural stone wall<br>- Drainage pipes and crushed stone and concrete material is included | 17,000.00 | 17,000.00 |

| | | | | |
|---|---|---|---|---|
| 20 | 1 | Construct versa lock retaining walls as shown on the plan (at the property line, right side of the house):<br>- Excavation for the wall footing<br>- Footing installation (compact crushed stone)<br>- Construct versa lock wall (all versa lock material included)<br>- Drainage pipes, geo-grid mesh and crushed stone material are included | 26,000.00 | 26,000.00 |
| 22 | 1 | Footings and slab for front steps and landings:<br>- Excavation, concrete materials, and steel materials are included | 6,000.00 | 6,000.00 |
| 23 | 1 | Outside Front Steps, Front Porch, Landing and Walkway:<br>- Excavation, footing, concrete materials, and steel materials are included<br>- Blue Stone and natural stone is included | 22,500.00 | 22,500.00 |
| 24 | 1 | Back Patios:<br>- Excavation, preparation<br>- Blue Stone material, crushed stone, stone dust, and sand are included | 17,000.00 | 17,000.00 |
| 25 | 1 | Footings for back steps:(3)<br>- Excavation, footing, concrete materials, and steel materials are included | 2,400.00 | 2,400.00 |
| 26 | 1 | Outside Back Steps: (3)<br>- Blue Stone and natural stone materials are included | 8,300.00 | 8,300.00 |
| 27 | 1 | Trees and shrubs planting | 21,000.00 | 21,000.00 |
| 28 | 1 | Final Grading | 7,200.00 | 7,200.00 |
| 29 | 1 | Sod Installation | 7,800.00 | 7,800.00 |
| 30 | 1 | Exterior (walls and foundation and chimneys). Stone and stone veneer Installation:<br>- Waterproof Exterior Walls of the House<br>- Metal mesh installation and cement top layering<br>- Stone Veneer installation and pointing<br>- All materials (including stone Veneer) are included | 29,000.00 | 29,000.00 |
| 31 | 1 | Preparation for asphalt driveway | 6,400.00 | 6,400.00 |

|  |  |
|---|---|
| SUBTOTAL $ | 418,150.00 |
| SALES TAX | |
| TOTAL $ | 418,150.00 |

THANK YOU FOR YOUR BUSINESS!

09/23/15

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Num | Adj | Name | Memo | Split | Debit | Credit | Original Amount | Balance |
|------|------|-----|-----|------|------|-------|-------|--------|-----------------|---------|
| **55 Lyman Building & Improvement** | | | | | | | | | | |
| **Outside Service** | | | | | | | | | | |
| **Masonry** | | | | | | | | | | |
| Check | 10/21/13 | 1085 | | ProExcavation | payment | Rockland Tru... | 20,000.00 | | 20,000.00 | 20,000.00 |
| Check | 11/05/13 | 1097 | | ProExcavation | payment | Rockland Tru... | 20,000.00 | | 20,000.00 | 40,000.00 |
| Check | 02/19/14 | 1025 | | ProExcavation | payment | Rockland Tru... | 22,500.00 | | 22,500.00 | 62,500.00 |
| Bill | 10/06/14 | | | ProExcavation | | Accounts Pay... | 27,500.00 | | 27,500.00 | 90,000.00 |
| Bill | 05/28/15 | | | ProExcavation | Masonry Re... | Accounts Pay... | 4,300.00 | | 4,300.00 | 94,300.00 |
| **Total Masonry** | | | | | | | 94,300.00 | 0.00 | | 94,300.00 |
| **Total Outside Service** | | | | | | | 94,300.00 | 0.00 | | 94,300.00 |
| **Total 55 Lyman Building & Improvement** | | | | | | | 94,300.00 | 0.00 | | 94,300.00 |
| **TOTAL** | | | | | | | 94,300.00 | 0.00 | | 94,300.00 |

EXHIBIT
V KAHAN
76
JM4    5:33A

Page 1

KDC 01299

# Proposal

ProExcavation

239 Nahanton Street
Newton, MA 02459
617-610-1276

TO

| | | |
|---|---|---|
| INVOICE NO. | 77 Lyman - 1 |
| DATE | September 1, 2013 |
| CUSTOMER ID | 77 Lyman Road - Chestnut Hill |
| EXPIRATION DATE | |

| JOB | PAYMENT TERMS | DUE DATE |
|---|---|---|
| 77 Lyman Road | | |

| # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|
| 1 | 1 | Cut and cap the water and sewer services at lot line | $ 3,900.00 | $ 3,900.00 |
| 2 | 1 | Demolition of the existing property, including all dumpsters for disposal of the debris off-site. Bricks will be hauled off site and disposed of. Foundation system will be removed off site for legal disposal foundation system will be broken up and removed off site for legal disposal | 27,000.00 | 27,000.00 |
| 3 | 1 | Remove and trucking out an existing natural stone retaining wall from front of the property | 3,600.00 | 3,600.00 |
| 4 | 1 | Remove and trucking an existing asphalt drive from right side of the house | 2,300.00 | 2,300.00 |
| 5 | 1 | Gunite pool demolition and removal. Existing pool materials require separation of concrete and re-bars for off site legal disposal. | 4,900.00 | 4,900.00 |
| 6 | 1 | Demolition and removal of tennis court | 2,000.00 | 2,000.00 |

| | |
|---|---|
| SUBTOTAL | $ 43,700.00 |
| SALES TAX | |
| TOTAL | $ 43,700.00 |

THANK YOU FOR YOUR BUSINESS!

KDC 01300

# Proposal

ProExcavation

239 Nahanton Street
Newton, MA 02459
617 610 1276

INVOICE NO.   55 Lyman - 1
DATE    October 1, 2013
CUSTOMER ID    55 Lyman Road - Chestnut Hill
**EXPIRATION DATE**

TO

| | | JOB | PAYMENT TERMS | | DUE DATE |
|---|---|---|---|---|---|
| | | 55 Lyman Road | | | |

| # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|
| 1 | 1 | Install hay bales and silt fence per the drawings | 5,200.00 | 5,200.00 |
| 2 | 1 | Clear and expose ledge in two areas | 4,800.00 | 4,800.00 |
| 3 | 1 | Ledge Removal (Hydraulic Breaker) included: one excavator, one Hydraulic Breaker, one mini excavator, and two dump trucks | 23,700.00 | 23,700.00 |
| 4 | 1 | Excavation and earthwork for the proposed foundation system, requires: - 2 excavators, 1 mini excavator, 2 bobcats - Includes stump removal, lot clearing and disposal | 19,000.00 | 19,000.00 |
| 5 | 1 | Laser grade and lay out | 2,150.00 | 2,150.00 |
| 6 | 1 | Form and Pour proposed 24x12 footing (including all labor and equipment) Form and Pour proposed footing for Lally Column (including all labor and equipment) | 6,000.00 | 6,000.00 |
| 7 | 1 | Form and Pour proposed 9 foot foundation walls | 26,000.00 | 26,000.00 |
| 8 | 4 | Concrete Pumps (for entire project); $850 each | 850.00 | 3,400.00 |
| 9 | 1 | Concrete material and steel material for the proposed foundation as shown on the plans included: - All concrete 3500 psi with 3/4" stone - Structural steel: Footings, install 3 # 4 rebar placed vertically 48" on center. Walls: install #4 rebar placed horizontally 18" on center tied to #4 rebar placed vertically 48" on center | 24,600.00 | 24,600.00 |
| 10 | 1 | Foundation Back Fill: Trucking in fill material, on-site | 32,000.00 | 32,000.00 |

KDC 01301

| 11 | 1 | Interior perimeter trench drain installation and connection into a sump basin in the basement. (Plumber to supply Pump and Complete hard pipe discharge line | 4,400.00 | 4,400.00 |
| 12 | 1 | Interior perimeter of foundation wall (Mira drain installation) | 3,700.00 | 3,700.00 |
| 13 | 1 | Pour and finish the basement slab:<br>- Grade and Compact crushed stone<br>- Set elevations with laser level to allow for 4 inches of concrete<br>- Install 6 mil poly as the vapor barrier<br>- Supply and pump into place of 3500 PSI concrete with hot water and 2% accelerator<br>- Trowel finish concrete surface smooth<br>- Diamond cut expansion control joints where needed to help control cracking<br>- Materials are included | 12,000.00 | 12,000.00 |
| 14 | 1 | Garage slab:<br>- Grade and Compact crushed stone<br>- Set elevations with laser level to allow for 4 inches of concrete<br>- Install 6 mil poly as the vapor barrier<br>- Install wire mesh<br>- Supply and pump into place of 3500 PSI concrete with hot water and 2% accelerator<br>- Trowel finish concrete surface smooth<br>- Diamond cut expansion control joints where needed to help control cracking<br>- Materials are included | 5,800.00 | 5,800.00 |
| 15 | 1 | Foundation Insulation and Waterproofing (all materials are inlcuded):<br>- 1/2 pink Rigid insulation 2x8 sheets<br>- Spray on Waterproofing | 6,800.00 | 6,800.00 |
| 16 | 1 | Storm Drainage as shown on the plan including two trench drain, two drain manholes, four storm tech units, pipe material.<br>Ledge removal, disposal, and all materials are included | 32,000.00 | 32,000.00 |
| 17 | 1 | New Water and Sewer Services as shown on the plan:<br>- Police details for the street work are included<br>- Fill material for the street trenches is included<br>- Asphalt patch for the street are included<br>- Ledge removal and disposal are included | 24,000.00 | 24,000.00 |
| 18 | 1 | Rough Grading entire property:<br>- Trucking in Fill material<br>- Ledge removal and disposal are included | 12,000.00 | 12,000.00 |
| 19 | 1 | Construct natural stone retaining walls as shown on the plan (for the back right side of the patio, behind garage):<br>- Excavation for the wall footing<br>- Footing installation (concrete and steel materials are included)<br>- Construct New England natural stone wall<br>- Drainage pipes and crushed stone and concrete material is included | 17,000.00 | 17,000.00 |

| | | | | |
|---|---|---|---|---|
| 20 | 1 | Construct versa lock retaining walls as shown on the plan (at the property line, right side of the house):<br>- Excavation for the wall footing<br>- Footing installation (compact crushed stone)<br>- Construct versa lock wall (all versa lock material included)<br>- Drainage pipes, geo-grid mesh and crushed stone material are included | 26,000.00 | 26,000.00 |
| 22 | 1 | Footings and slab for front steps and landings:<br>- Excavation, concrete materials, and steel materials are included | 6,000.00 | 6,000.00 |
| 23 | 1 | Outside Front Steps, Front Porch, Landing and Walkway:<br>- Excavation, footing, concrete and steel materials are included<br>- Blue Stone and natural stone is included | 22,500.00 | 22,500.00 |
| 24 | 1 | Back Patios:<br>- Excavation, preparation<br>- Blue Stone material, crushed stone, stone dust, and sand are included | 17,000.00 | 17,000.00 |
| 25 | 1 | Footings for back steps:(3)<br>- Excavation, footing, concrete materials, and steel materials are included | 2,400.00 | 2,400.00 |
| 26 | 1 | Outside Back Steps: (3)<br>- Blue Stone and natural stone materials are included | 8,300.00 | 8,300.00 |
| 27 | 1 | Trees and shrubs planting | 21,000.00 | 21,000.00 |
| 28 | 1 | Final Grading | 7,200.00 | 7,200.00 |
| 29 | 1 | Sod Installation | 7,800.00 | 7,800.00 |
| 30 | 1 | Exterior (walls and foundation and chimneys). Stone and stone veneer Installation:<br>- Waterproof Exterior Walls of the House<br>- Metal mesh installation and cement top layering<br>- Stone Veneer installation and pointing<br>- All materials (including stone Veneer) are included | 29,000.00 | 29,000.00 |
| 31 | 1 | Preparation for asphalt driveway | 6,400.00 | 6,400.00 |
| | | | SUBTOTAL $ | 418,150.00 |
| | | | SALES TAX | |
| | | | TOTAL $ | 418,150.00 |

THANK YOU FOR YOUR BUSINESS!

# Proposal

**ProExcavation**

239 Nahanton Street
Newton, MA 02459
617 616 1276

| | |
|---|---|
| INVOICE. NO. | Lyman-Cutler - 2015-1 |
| DATE | May 25, 2015 |
| CUSTOMER ID | 55 Lyman Road & 88 Cutler Lane |

TO

| JOB | PAYMENT TERMS | DUE DATE |
|---|---|---|
| 55/88 Lyman-Cutler | | |

| # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|
| 1 | 1 | After-winter damage repair and maintanence, includes:<br>- Blue stone leveling<br>- Blue stone step repair<br>- Landing pointing<br>- Applying and leveling new sand<br>- Retaining walls repair and pointing | 8,600.00 | 8,600.00 |

|  |  |  |
|---|---|---|
| SUBTOTAL | $ | 8,600.00 |
| SALES TAX | | |
| TOTAL | $ | 8,600.00 |

THANK YOU FOR YOUR BUSINESS!

KDC 01304

09/23/15

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Num | Adj | Name | Memo | Split | Debit | Credit | Original Amount | Balance |
|------|------|-----|-----|------|------|-------|-------|--------|-----------------|---------|
| **88 Cutler Building & Improvemen** | | | | | | | | | | |
| **Outside Service** | | | | | | | | | | |
| **Landscaping** | | | | | | | | | | |
| **ProExcavation** | | | | | | | | | | |
| Check | 01/27/14 | 1014 | | ProExcavation | payment | Rockland Tru... | 15,000.00 | | 15,000.00 | 15,000.00 |
| Bill | 02/06/14 | | | ProExcavation | | Accounts Pay... | 155,000.00 | | 155,000.00 | 170,000.00 |
| Check | 10/10/14 | 1126 | | ProExcavation | | Rockland Tru... | 20,000.00 | | 20,000.00 | 100,000.00 |
| Bill | 05/28/15 | | | ProExcavation | Landscaping... | Accounts Pay... | 4,600.00 | | 4,600.00 | 194,600.00 |
| **Total ProExcavation** | | | | | | | 194,600.00 | 0.00 | | 194,600.00 |
| **Total Landscaping** | | | | | | | 194,600.00 | 0.00 | | 194,600.00 |
| **Total Outside Service** | | | | | | | 194,600.00 | 0.00 | | 194,600.00 |
| **Total 88 Cutler Building & Improvemen** | | | | | | | 194,600.00 | 0.00 | | 194,600.00 |
| **TOTAL** | | | | | | | 194,600.00 | 0.00 | | 194,600.00 |

EXHIBIT
V. KAGANS
JH  5-23-16
Bibbler's

Page 1

KAG 02067

# Proposal

ProExcavation

239 Nahanton Street
Newton, MA 02459
617 610 1276

INVOICE NO.    77 Lyman - 1
DATE    September 1, 2013
CUSTOMER ID    77 Lyman Road - Chestnut Hill
EXPIRATION DATE

TO:

| JOB | PAYMENT TERMS | DUE DATE |
|-----|---------------|----------|
| 77 Lyman Road | | |

| # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|-----|-------------|------------|------------|
| 1 | 1 | Cut and cap the water and sewer services at lot line | $ 3,900.00 | $ 3,900.00 |
| 2 | 1 | Demolition of the existing property, including all dumpsters for disposal of the debris off-site: Bricks will be hauled off site and disposed of. Foundation system will be removed off site for legal disposal foundation system will be broken up and removed off site for legal disposal | 27,000.00 | 27,000.00 |
| 3 | 1 | Remove and trucking out an existing natural stone retaining wall from front of the property | 3,600.00 | 3,600.00 |
| 4 | 1 | Remove and trucking an existing asphalt drive from right side of the house | 2,300.00 | 2,300.00 |
| 5 | 1 | Gunite pool demolition and removal. Existing pool materials require separation of concrete and re-bars for off site legal disposal. | 4,900.00 | 4,900.00 |
| 6 | 1 | Demolition and removal of tennis court | 2,000.00 | 2,000.00 |

|  |  |  | SUBTOTAL $ | 43,700.00 |
|--|--|--|------------|-----------|
|  |  |  | SALES TAX | |
|  |  |  | TOTAL $ | 43,700.00 |

**THANK YOU FOR YOUR BUSINESS!**

KAG 02068

# Proposal

**ProExcavation**

239 Nahanton Street
Newton, MA 02459
617 610 1276

INVOICE NO.   88 Cutler - 1
DATE   October 1, 2013
CUSTOMER ID   88 Cutler Lane - Chestnut Hill
EXPIRATION DATE

TO

| JOB | PAYMENT TERMS | DUE DATE |
|-----|---------------|----------|
| 88 Cutler Lane | | |

| # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|-----|-------------|------------|------------|
| 1 | 1 | Install hay bales and silt fence per the drawings | 5,200.00 | 5,200.00 |
| 2 | 1 | Clear and expose ledge | 4,800.00 | 4,800.00 |
| 3 | 1 | Ledge Removal (Hydraulic Breaker) included: one excavator, one Hydraulic Breaker, one mini excavator, and two dump trucks | 18,700.00 | 18,700.00 |
| 4 | 1 | Excavation and earthwork for the proposed foundation system, requires:<br>- 2 excavators, 1 mini excavator, 2 bobcats<br>- Includes stump removal, lot clearing and disposal | 9,000.00 | 9,000.00 |
| 5 | 1 | Laser grade and lay out | 2,150.00 | 2,150.00 |
| 6 | 1 | Form and Pour proposed 24x12 footing (including all labor and equipment)<br>Form and Pour proposed footing for Lally Column (including all labor and equipment) | 6,000.00 | 6,000.00 |
| 7 | 1 | Form and Pour proposed 9 foot foundation walls | 26,000.00 | 26,000.00 |
| 8 | 4 | Concrete Pumps (for entire project); $850 each | 850.00 | 3,400.00 |
| 9 | 1 | Concrete material and steel material for the proposed foundation as shown on the plans included:<br>- All concrete 3500 psi with 3/4" stone<br>- Structural steel: Footings, install 3 # 4 rebar placed vertically 48" on center. Walls: install #4 rebar placed horizontally 18" on center tied to #4 rebar placed vertically 48" on center | 24,600.00 | 24,600.00 |
| 10 | 1 | Foundation Back Fill: Trucking in fill material, on-site | 24,000.00 | 24,000.00 |
| 11 | 1 | Interior perimeter trench drain installation and connection into a sump basin in the basement. (Plumber to supply Pump and Complete hard pipe discharge line | 4,400.00 | 4,400.00 |

| 12 | 1 | Interior perimeter of foundation wall (Mira drain installation) | 3,700.00 | 3,700.00 |
| 13 | 1 | Pour and finish the basement slabs:<br>- Grade and Compact crushed stone<br>- Set elevations with laser level to allow for 4 inches of concrete<br>- Install 6 mil poly as the vapor barrier<br>- Supply and pump into place of 3500 PSI concrete with hot water and 2% accelerator<br>- Trowel finish concrete surface smooth<br>- Diamond cut expansion control joints where needed to help control cracking<br>- Materials are included | 12,000.00 | 12,000.00 |
| 14 | 1 | Garage slab:<br>- Grade and Compact crushed stone<br>- Set elevations with laser level to allow for 4 inches of concrete<br>- Install 6 mil poly as the vapor barrier<br>- Install wire mesh<br>- Supply and pump into place of 3500 PSI concrete with hot water and 2% accelerator<br>- Trowel finish concrete surface smooth<br>- Diamond cut expansion control joints where needed to help control cracking<br>- Materials are included | 5,800.00 | 5,800.00 |
| 15 | 1 | Foundation Insulation and Waterproofing (all materials are inlcuded):<br>- 1/2 pink Rigid insulation 2x8 sheets<br>- Spray on Waterproofing | 6,800.00 | 6,800.00 |
| 16 | 1 | Storm Drainage as shown on the plan including two trench drain, two drain manholes, four storm tech units, pipe material.<br>Ledge removal, disposal, and all materials are included | 32,000.00 | 32,000.00 |
| 17 | 1 | New Water and Sewer Services as shown on the plan:<br>- Police details for the street work are included<br>- Fill material for the street trenches is included<br>- Asphalt patch for the street are included<br>- Ledge removal and disposal are included | 24,000.00 | 24,000.00 |
| 18 | 1 | Rough Grading entire property:<br>- Trucking in Fill material<br>- Ledge removal and disposal are included | 12,000.00 | 12,000.00 |
| 19 | 1 | Construct natural stone retaining walls as shown on the plan (at the property line, at the back line of the house):<br>- Excavation for the wall footing<br>- Footing installation (compact crushed stone)<br>- Construct New England natural stone wall<br>- Drainage pipes and crushed stone and concrete material is included | 34,000.00 | 34,000.00 |

| | | | | |
|---|---|---|---|---|
| 20 | 1 | Construct versa lock retaining walls as shown on the plan (at the property line, left side of the house):<br>- Excavation for the wall footing<br>- Footing installation (compact crushed stone)<br>- Construct versa lock wall (all versa lock material included)<br>- Drainage pipes, geo-grid mesh and crushed stone material are included | 15,000.00 | 15,000.00 |
| 21 | 1 | Construct retaining walls as shown on the plan (left and back of the patio):<br>- Excavation for the stone wall footing<br>- Footing installation (compact crushed stone)<br>- Construct New England natural stone wall (stone and material included)<br>- Drainage pipes and crushed stone material are included | 17,000.00 | 17,000.00 |
| 22 | 1 | Footings and slab for front steps and landings:<br>- Excavation, concrete materials, and steel materials are included | 6,000.00 | 6,000.00 |
| 23 | 1 | Outside Front Steps, Front Porch, Landing and Walkway:<br>- Excavation, footing, concrete materials, and steel materials are included<br>- Blue Stone and brick materials included | 22,500.00 | 22,500.00 |
| 24 | 1 | Back Patios:<br>- Excavation, preparation<br>- Blue Stone material, crushed stone, stone dust, and sand are included | 17,000.00 | 17,000.00 |
| 25 | 1 | Footings for back steps:(3)<br>- Excavation, footing, concrete materials, and steel materials are included | 2,400.00 | 2,400.00 |
| 26 | 1 | Outside Back Steps: (3)<br>- Blue Stone and brick materials are included | 8,300.00 | 8,300.00 |
| 27 | 1 | Trees and shrubs planting | 21,000.00 | 21,000.00 |
| 28 | 1 | Final Grading | 7,200.00 | 7,200.00 |
| 29 | 1 | Sod Installation | 7,800.00 | 7,800.00 |
| 30 | 1 | Exterior (walls and foundation and chimneys). Stone and stone veneer Installation:<br>- Waterproof Exterior Walls of the House<br>- Wire mesh and cement coat<br>- Brick and brick veneer installation and pointing<br>- All materials (including brick and brick veneer) are included | 29,000.00 | 29,000.00 |
| 31 | 1 | Preparation for asphalt driveway | 6,400.00 | 6,400.00 |

SUBTOTAL $ 418,150.00
SALES TAX
TOTAL $ 418,150.00

THANK YOU FOR YOUR BUSINESS!

# Proposal

**ProExcavation**

239 Nahanton Street
Newton, MA 02459
617 610 1276

INVOICE NO.   Lyman-Cutler - 2015-2
DATE   May 25, 2015
CUSTOMER ID   55 Lyman Road & 88 Cutler Lane

TO

| JOB | PAYMENT TERMS | DUE DATE |
|---|---|---|
| 55/88 Lyman-Cutler | | |

| # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|
| 1 | 1 | After-winter landscaping damage repair and maintanence, includes: <br> - Trees and shrubs replacement <br> - Sod Repair | 9,200.00 | 9,200.00 |

|  |  |
|---|---|
| SUBTOTAL $ | 9,200.00 |
| SALES TAX | |
| TOTAL $ | 9,200.00 |

**THANK YOU FOR YOUR BUSINESS!**

KAG 02072

09/23/15

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Num | Adj | Name | Memo | Split | Debit | Credit | Original Amount | Balance |
|------|------|-----|-----|------|------|-------|-------|--------|-----------------|---------|
| **BB Cutler Building & Improvemen** | | | | | | | | | | |
| **Outside Service** | | | | | | | | | | |
| **Excavation** | | | | | | | | | | |
| Check | 08/28/13 | 1057 | | ProExcavation | Excavation/... | Rockland Tru... | 45,000.00 | | 45,000.00 | 45,000.00 |
| Check | 09/18/13 | 1066 | | ProExcavation | BB Water/Se... | Rockland Tru... | 30,000.00 | | 30,000.00 | 75,000.00 |
| Check | 11/29/13 | 123 | | ProExcavation | payment | Rockland Tru... | 5,000.00 | | 5,000.00 | 80,000.00 |
| Check | 11/29/13 | 123 | | ProExcavation | payment | Rockland Tru... | 5,000.00 | | 5,000.00 | 85,000.00 |
| Bill | 02/06/14 | | | ProExcavation | | Accounts Pay... | 75,000.00 | | 75,000.00 | 160,000.00 |
| **Total Excavation** | | | | | | | 160,000.00 | 0.00 | | 160,000.00 |
| **Total Outside Service** | | | | | | | 160,000.00 | 0.00 | | 160,000.00 |
| **Total BB Cutler Building & Improvemen** | | | | | | | 160,000.00 | 0.00 | | 160,000.00 |
| **TOTAL** | | | | | | | 160,000.00 | 0.00 | | 160,000.00 |

EXHIBIT
V. KAGAN
76
JH 5-23-18

Page 1

KAG 02056

# Proposal

ProExcavation

239 Nahanton Street
Newton, MA 02459
617-610-1276

INVOICE NO.   77 Lyman - 1
DATE   September 1, 2013
CUSTOMER ID   77 Lyman Road - Chestnut Hill
**EXPIRATION DATE**

TO

| JOB | PAYMENT TERMS | DUE DATE |
|-----|---------------|----------|
| 77 Lyman Road | | |

| # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|-----|-------------|------------|------------|
| 1 | 1 | Cut and cap the water and sewer services at lot line | $  3,900.00 | $  3,900.00 |
| 2 | 1 | Demolition of the existing property, including all dumpsters for disposal of the debris off-site. Bricks will be hauled off site and disposed of. Foundation system will be removed off site for legal disposal foundation system will be broken up and removed off site for legal disposal | 27,000.00 | 27,000.00 |
| 3 | 1 | Remove and trucking out an existing natural stone retaining wall from front of the property | 3,600.00 | 3,600.00 |
| 4 | 1 | Remove and trucking an existing asphalt drive from right side of the house | 2,300.00 | 2,300.00 |
| 5 | 1 | Gunite pool demolition and removal. Existing pool materials require separation of concrete and re-bars for off site legal disposal. | 4,900.00 | 4,900.00 |
| 6 | 1 | Demolition and removal of tennis court | 2,000.00 | 2,000.00 |

SUBTOTAL  $   43,700.00
SALES TAX
TOTAL  $   43,700.00

**THANK YOU FOR YOUR BUSINESS!**

KAG 02057

# Proposal

ProExcavation

239 Nahanton Street
Newton, MA 02459
617 610 1276

INVOICE NO.   88 Cutler - 1
DATE   October 1, 2013
CUSTOMER ID   88 Cutler Lane - Chestnut Hill
EXPIRATION DATE

TO

| JOB | PAYMENT TERMS | DUE DATE |
|-----|---------------|----------|
| 88 Cutler Lane | | |

| # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|-----|-------------|------------|------------|
| 1 | 1 | Install hay bales and silt fence per the drawings | 5,200.00 | 5,200.00 |
| 2 | 1 | Clear and expose ledge | 4,800.00 | 4,800.00 |
| 3 | 1 | Ledge Removal (Hydraulic Breaker) included: one excavator, one Hydraulic Breaker, one mini excavator, and two dump trucks | 18,700.00 | 18,700.00 |
| 4 | 1 | Excavation and earthwork for the proposed foundation system, requires: - 2 excavators, 1 mini excavator, 2 bobcats - Includes stump removal, lot clearing and disposal | 9,000.00 | 9,000.00 |
| 5 | 1 | Laser grade and lay out | 2,150.00 | 2,150.00 |
| 6 | 1 | Form and Pour proposed 24x12 footing (including all labor and equipment) Form and Pour proposed footing for Lally Column (including all labor and equipment) | 6,000.00 | 6,000.00 |
| 7 | 1 | Form and Pour proposed 9 foot foundation walls | 26,000.00 | 26,000.00 |
| 8 | 4 | Concrete Pumps (for entire project); $850 each | 850.00 | 3,400.00 |
| 9 | 1 | Concrete material and steel material for the proposed foundation as shown on the plans included: - All concrete 3500 psi with 3/4" stone - Structural steel: Footings, install 3 # 4 rebar placed vertically 48" on center. Walls: install #4 rebar placed horizontally 18" on center tied to #4 rebar placed vertically 48" on center | 24,600.00 | 24,600.00 |
| 10 | 1 | Foundation Back Fill: Trucking in fill material, on-site | 24,000.00 | 24,000.00 |
| 11 | 1 | Interior perimeter trench drain installation and connection into a sump basin in the basement. (Plumber to supply Pump and Complete hard pipe discharge line | 4,400.00 | 4,400.00 |

KAG 02058

| | | | | |
|---|---|---|---|---|
| 12 | 1 | Interior perimeter of foundation wall (Mira drain installation) | 3,700.00 | 3,700.00 |
| 13 | 1 | Pour and finish the basement slabs:<br>- Grade and Compact crushed stone<br>- Set elevations with laser level to allow for 4 inches of concrete<br>- Install 6 mil poly as the vapor barrier<br>- Supply and pump into place of 3500 PSI concrete with hot water and 2% accelerator<br>- Trowel finish concrete surface smooth<br>- Diamond cut expansion control joints where needed to help control cracking<br>- Materials are included | 12,000.00 | 12,000.00 |
| 14 | 1 | Garage slab:<br>- Grade and Compact crushed stone<br>- Set elevations with laser level to allow for 4 inches of concrete<br>- Install 6 mil poly as the vapor barrier<br>- Install wire mash<br>- Supply and pump into place of 3500 PSI concrete with hot water and 2% accelerator<br>- Trowel finish concrete surface smooth<br>- Dinmond cut expansion control joints where needed to help control cracking<br>- Materials are included | 5,800.00 | 5,800.00 |
| 15 | 1 | Foundation Insulation and Waterproofing (all materials are inlcuded):<br>- 1/2 pink Rigid insulation 2x8 sheets<br>- Spray on Waterproofing | 6,800.00 | 6,800.00 |
| 16 | 1 | Storm Drainage as shown on the plan including two trench drain, two drain manholes, four storm tech units, pipe material.<br>Ledge removal, disposal, and all materials are included | 32,000.00 | 32,000.00 |
| 17 | 1 | New Water and Sewer Services as shown on the plan:<br>- Police details for the street work are included<br>- Fill material for the street trenches is included<br>- Asphalt patch for the street are included<br>- Ledge removal and disposal are included | 24,000.00 | 24,000.00 |
| 18 | 1 | Rough Grading entire property:<br>- Trucking in Fill material<br>- Ledge removal and disposal are included | 12,000.00 | 12,000.00 |
| 19 | 1 | Construct natural stone retaining walls as shown on the plan (at the property line, at the back line of the house):<br>- Excavation for the wall footing<br>- Footing installation (compact crushed stone)<br>- Construct New England natural stone wall<br>- Drainage pipes and crushed stone and concrete material is included | 34,000.00 | 34,000.00 |

| | | | | |
|---|---|---|---|---|
| 20 | 1 | Construct versa lock retaining walls as shown on the plan (at the property line, left side of the house):<br>- Excavation for the wall footing<br>- Footing installation (compact crushed stone)<br>- Construct versa lock wall (all versa lock material included)<br>- Drainage pipes, geo-grid mesh and crushed stone material are included | 15,000.00 | 15,000.00 |
| 21 | 1 | Construct retaining walls as shown on the plan (left and back of the patio):<br>- Excavation for the stone wall footing<br>- Footing installation (compact crushed stone)<br>- Construct New England natural stone wall (stone and material included)<br>- Drainage pipes and crushed stone material are included | 17,000.00 | 17,000.00 |
| 22 | 1 | Footings and slab for front steps and landings:<br>- Excavation, concrete materials, and steel materials are included | 6,000.00 | 6,000.00 |
| 23 | 1 | Outside Front Steps, Front Porch, Landing and Walkway:<br>- Excavation, footing, concrete materials, and steel materials are included<br>- Blue Stone and brick materials included | 22,500.00 | 22,500.00 |
| 24 | 1 | Back Patios:<br>- Excavation, preparation<br>- Blue Stone material, crushed stone, stone dust, and sand are included | 17,000.00 | 17,000.00 |
| 25 | 1 | Footings for back steps:(3)<br>- Excavation, footing, concrete materials, and steel materials are included | 2,400.00 | 2,400.00 |
| 26 | 1 | Outside Back Steps: (3)<br>- Blue Stone and brick materials are included | 8,300.00 | 8,300.00 |
| 27 | 1 | Trees and shrubs planting | 21,000.00 | 21,000.00 |
| 28 | 1 | Final Grading | 7,200.00 | 7,200.00 |
| 29 | 1 | Sod Installation | 7,800.00 | 7,800.00 |
| 30 | 1 | Exterior (walls and foundation and chimneys). Stone and stone veneer Installation:<br>- Waterproof Exterior Walls of the House<br>- Wire mesh and cement coat<br>- Brick and brick veneer installation and pointing<br>- All materials (including brick and brick veneer) are included | 29,000.00 | 29,000.00 |
| 31 | 1 | Preparation for asphalt driveway | 6,400.00 | 6,400.00 |

|  |  |
|---|---|
| SUBTOTAL $ | 418,150.00 |
| SALES TAX | |
| TOTAL $ | 418,150.00 |

THANK YOU FOR YOUR BUSINESS!

KAG 02060

09/23/15

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Num | Adj | Name | Memo | Split | Debit | Credit | Original Amount | Balance |
|------|------|-----|-----|------|------|-------|-------|--------|-----------------|---------|
| **88 Cutler Building & Improvemen** | | | | | | | | | | |
| **Outside Service** | | | | | | | | | | |
| **Masonry** | | | | | | | | | | |
| Check | 10/21/13 | 1085 | | ProExcavation | payment | Rockland Tru... | 20,000.00 | | 20,000.00 | 20,000.00 |
| Check | 11/05/13 | 1097 | | ProExcavation | payment | Rockland Tru... | 20,000.00 | | 20,000.00 | 40,000.00 |
| Bill | 02/06/14 | | | ProExcavation | | Accounts Pay... | 27,500.00 | | 27,500.00 | 67,500.00 |
| Check | 02/19/14 | 1025 | | ProExcavation | payment | Rockland Tru... | 22,500.00 | | 22,500.00 | 90,000.00 |
| Bill | 05/28/15 | | | ProExcavation | Masonry Re... | Accounts Pay... | 4,300.00 | | 4,300.00 | 94,300.00 |
| **Total Masonry** | | | | | | | 94,300.00 | 0.00 | | 94,300.00 |
| **Total Outside Service** | | | | | | | 94,300.00 | 0.00 | | 94,300.00 |
| **Total 88 Cutler Building & Improvemen** | | | | | | | 94,300.00 | 0.00 | | 94,300.00 |
| **TOTAL** | | | | | | | 94,300.00 | 0.00 | | 94,300.00 |

EXHIBIT
V. RALPH
79
5-23-16
JH
tabbies

Page 1

KDC 01188

# Proposal

ProExcavation

239 Nahanton Street
Newton, MA 02459
617-610-1276

INVOICE NO.    77 Lyman - 1
DATE    September 1, 2013
CUSTOMER ID    77 Lyman Road - Chestnut Hill

**EXPIRATION DATE**

TO

| | JOB | PAYMENT TERMS | DUE DATE |
|---|---|---|---|
| | 77 Lyman Road | | |

| # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|
| 1 | 1 | Cut and cap the water and sewer services at lot line | $  3,900.00 | $    3,900.00 |
| 2 | 1 | Demolition of the existing property, including all dumpsters for disposal of the debris off-site. Bricks will be hauled off site and disposed of. Foundation system will be removed off site for legal disposal foundation system will be broken up and removed off site for legal disposal | 27,000.00 | 27,000.00 |
| 3 | 1 | Remove and trucking out an existing natural stone retaining wall from front of the property | 3,600.00 | 3,600.00 |
| 4 | 1 | Remove and trucking an existing asphalt drive from right side of the house | 2,300.00 | 2,300.00 |
| 5 | 1 | Gunite pool demolition and removal. Existing pool materials require separation of concrete and re-bars for off site legal disposal. | 4,900.00 | 4,900.00 |
| 6 | 1 | Demolition and removal of tennis court | 2,000.00 | 2,000.00 |

|  |  |
|---|---|
| SUBTOTAL | $   43,700.00 |
| SALES TAX | |
| **TOTAL** | **$   43,700.00** |

### THANK YOU FOR YOUR BUSINESS!

KDC 01189

# Proposal

ProExcavation

239 Nahanton Street
Newton, MA 02459
617-610-1276

INVOICE NO.    88 Cutler - 1
DATE    October 1, 2013
CUSTOMER ID    88 Cutler Lane - Chestnut Hill
**EXPIRATION DATE**

TO

| JOB | PAYMENT TERMS | DUE DATE |
|---|---|---|
| 88 Cutler Lane | | |

| # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|
| 1 | 1 | Install hay bales and silt fence per the drawings | 5,200.00 | 5,200.00 |
| 2 | 1 | Clear and expose ledge | 4,800.00 | 4,800.00 |
| 3 | 1 | Ledge Removal (Hydraulic Breaker) included: one excavator, one Hydraulic Breaker, one mini excavator, and two dump trucks | 18,700.00 | 18,700.00 |
| 4 | 1 | Excavation and earthwork for the proposed foundation system, requires: - 2 excavators, 1 mini excavator, 2 bobcats - Includes stump removal, lot clearing and disposal | 9,000.00 | 9,000.00 |
| 5 | 1 | Laser grade and lay out | 2,150.00 | 2,150.00 |
| 6 | 1 | Form and Pour proposed 24x12 footing (including all labor and equipment) Form and Pour proposed footing for Lally Column (including all labor and equipment) | 6,000.00 | 6,000.00 |
| 7 | 1 | Form and Pour proposed 9 foot foundation walls | 26,000.00 | 26,000.00 |
| 8 | 4 | Concrete Pumps (for entire project); $850 each | 850.00 | 3,400.00 |
| 9 | 1 | Concrete material and steel material for the proposed foundation as shown on the plans included: - All concrete 3500 psi with 3/4" stone - Structural steel: Footings, install 3 # 4 rebar placed vertically 48" on center. Walls: install #4 rebar placed horizontally 18" on center tied to #4 rebar placed vertically 48" on center | 24,600.00 | 24,600.00 |
| 10 | 1 | Foundation Back Fill: Trucking in fill material, on-site | 24,000.00 | 24,000.00 |
| 11 | 1 | Interior perimeter trench drain installation and connection into a sump basin in the basement. (Plumber to supply Pump and Complete hard pipe discharge line | 4,400.00 | 4,400.00 |

| | | | | |
|---|---|---|---|---|
| 12 | 1 | Interior perimeter of foundation wall (Mira drain installation) | 3,700.00 | 3,700.00 |
| 13 | 1 | Pour and finish the basement slabs:<br>- Grade and Compact crushed stone<br>- Set elevations with laser level to allow for 4 inches of concrete<br>- Install 6 mil poly as the vapor barrier<br>- Supply and pump into place of 3500 PSI concrete with hot water and 2% accelerator<br>- Trowel finish concrete surface smooth<br>- Diamond cut expansion control joints where needed to help control cracking<br>- Materials are included | 12,000.00 | 12,000.00 |
| 14 | 1 | Garage slab:<br>- Grade and Compact crushed stone<br>- Set elevations with laser level to allow for 4 inches of concrete<br>- Install 6 mil poly as the vapor barrier<br>- Install wire mash<br>- Supply and pump into place of 3500 PSI concrete with hot water and 2% accelerator<br>- Trowel finish concrete surface smooth<br>- Diamond cut expansion control joints where needed to help control cracking<br>- Materials are included | 5,800.00 | 5,800.00 |
| 15 | 1 | Foundation Insulation and Waterproofing (all materials are inlcuded):<br>- 1/2 pink Rigid insulation 2x8 sheets<br>- Spray on Waterproofing | 6,800.00 | 6,800.00 |
| 16 | 1 | Storm Drainage as shown on the plan including two trench drain, two drain manholes, four storm tech units, pipe material.<br>Ledge removal, disposal, and all materials are included | 32,000.00 | 32,000.00 |
| 17 | 1 | New Water and Sewer Services as shown on the plan:<br>- Police details for the street work are included<br>- Fill material for the street trenches is included<br>- Asphalt patch for the street are included<br>- Ledge removal and disposal are included | 24,000.00 | 24,000.00 |
| 18 | 1 | Rough Grading entire property:<br>- Trucking in Fill material<br>- Ledge removal and disposal are included | 12,000.00 | 12,000.00 |
| 19 | 1 | Construct natural stone retaining walls as shown on the plan (at the property line, at the back line of the house):<br>- Excavation for the wall footing<br>- Footing installation (compact crushed stone)<br>- Construct New England natural stone wall<br>- Drainage pipes and crushed stone and concrete material is included | 34,000.00 | 34,000.00 |

| | | | | |
|---|---|---|---|---|
| 20 | 1 | Construct versa lock retaining walls as shown on the plan (at the property line, left side of the house):<br>- Excavation for the wall footing<br>- Footing installation (compact crushed stone)<br>- Construct versa lock wall (all versa lock material included)<br>- Drainage pipes, geo-grid mesh and crushed stone material are included | 15,000.00 | 15,000.00 |
| 21 | 1 | Construct retaining walls as shown on the plan (left and back of the patio):<br>- Excavation for the stone wall footing<br>- Footing installation (compact crushed stone)<br>- Construct New England natural stone wall (stone and material included)<br>- Drainage pipes and crushed stone material are included | 17,000.00 | 17,000.00 |
| 22 | 1 | Footings and slab for front steps and landings:<br>- Excavation, concrete materials, and steel materials are included | 6,000.00 | 6,000.00 |
| 23 | 1 | Outside Front Steps, Front Porch, Landing and Walkway:<br>- Excavation, footing, concrete materials, and steel materials are included<br>- Blue Stone and brick materials included | 22,500.00 | 22,500.00 |
| 24 | 1 | Back Patios:<br>- Excavation, preparation<br>- Blue Stone material, crushed stone, stone dust, and sand are included | 17,000.00 | 17,000.00 |
| 25 | 1 | Footings for back steps:(3)<br>- Excavation, footing, concrete materials, and steel materials are included | 2,400.00 | 2,400.00 |
| 26 | 1 | Outside Back Steps: (3)<br>- Blue Stone and brick materials are included | 8,300.00 | 8,300.00 |
| 27 | 1 | Trees and shrubs planting | 21,000.00 | 21,000.00 |
| 28 | 1 | Final Grading | 7,200.00 | 7,200.00 |
| 29 | 1 | Sod Installation | 7,800.00 | 7,800.00 |
| 30 | 1 | Exterior (walls and foundation and chimneys). Stone and stone veneer Installation:<br>- Waterproof Exterior Walls of the House<br>- Wire mesh and cement coat<br>- Brick and brick veneer installation and pointing<br>- All materials (including brick and brick veneer) are included | 29,000.00 | 29,000.00 |
| 31 | 1 | Preparation for asphalt driveway | 6,400.00 | 6,400.00 |

|  | |
|---|---|
| SUBTOTAL $ | 418,150.00 |
| SALES TAX | |
| TOTAL $ | 418,150.00 |

THANK YOU FOR YOUR BUSINESS!

# Proposal

**ProExcavation**

259 Nahanton Street
Newton, MA 02459
617 610-1276

INVOICE NO.    Lyman-Cutler - 2015-1
DATE    May 25, 2015
CUSTOMER ID    55 Lyman Road & 88 Cutler Lane

TO

| JOB | PAYMENT TERMS | DUE DATE |
|---|---|---|
| 55/88 Lyman-Cutler | | |

| # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|
| 1 | 1 | After-winter damage repair and maintenance, includes:<br>- Blue stone leveling<br>- Blue stone step repair<br>- Landing pointing<br>- Applying and leveling new sand<br>- Retaining walls repair and pointing | 8,600.00 | 8,600.00 |

| | | |
|---|---|---|
| SUBTOTAL | $ | 8,600.00 |
| SALES TAX | | |
| TOTAL | $ | 8,600.00 |

**THANK YOU FOR YOUR BUSINESS!**

# EXHIBIT 11

KDC 00520

07/27/15

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Num | Name | Memo | Clr | Split | Original Amount | Paid Amount | Balance |
|------|------|-----|------|------|-----|-------|-----------------|-------------|---------|
| **55 Lyman Building & Improvement** | | | | | | | | | |
| **Outside Service** | | | | | | | | | |
| **Snow Removal** | | | | | | | | | |
| Check | 02/27/15 | 000 | Paul Digiacomo | | | Rockland Tru... | 2,000.00 | 2,000.00 | 2,000.00 |
| Bill | 03/15/15 | | ProExcavation | Plow and B... | | Accounts Pa... | 9,500.00 | 9,500.00 | 11,500.00 |
| **Total Snow Removal** | | | | | | | | 11,500.00 | 11,500.00 |
| **Total Outside Service** | | | | | | | | 11,500.00 | 11,500.00 |
| **Total 55 Lyman Building & Improvement** | | | | | | | | 11,500.00 | 11,500.00 |
| **TOTAL** | | | | | | | | 11,500.00 | 11,500.00 |

2/25/2015

Gmail - 55 Lyman

# Gmail

Kagan Development <kagandevelopment@gmail.com>

## 55 Lyman
1 message

Paul DiGiacomo <digiacomoroofing@gmail.com>
To: Kagan Development <kagandevelopment@gmail.com>

Wed, Feb 25, 2015 at 7:49 AM

Paul DiGiacomo
65 Curve Street
Millis, Ma 02054

Clean off roof $2050.00

PAID
Date: 4/27/15
Amount:$ 2,050
Check #: *Trans Payment Cutler*

KDC 00521

# Proposal

ProExcavation

239 Nahanton Street
Newton, MA 02459
617 610-1276

INVOICE NO.   55 Lyman - Snow
DATE   March 25, 2015
CUSTOMER ID   55 Lyman Road

TO

| | | JOB | PAYMENT TERMS | DUE DATE |
|---|---|---|---|---|
| | | 55 Lyman Road | | |

| # | QTY | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|
| 1 | 1 | Four months snow removal, use of:<br>- Bobcat<br>- Frontloader (backhoe) | 9,500.00 | 9,500.00 |

|  |  |  |
|---|---|---|
| SUBTOTAL | $ | 9,500.00 |
| SALES TAX | | |
| TOTAL | $ | 9,500.00 |

THANK YOU FOR YOUR BUSINESS!

KDC 00522

KDC 01123

07/27/15

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Num | Name | Memo | Clr | Split | Original Amount | Paid Amount | Balance |
|------|------|-----|------|------|-----|-------|-----------------|-------------|---------|
| **88 Cutler Building & Improvemen** | | | | | | | | | |
| **Outside Service** | | | | | | | | | |
| **Snow Removal** | | | | | | | | | |
| Check | 02/27/15 | 001 | Paul Digiacomo | | | Rockland Tru... | 2,000.00 | 2,000.00 | 2,000.00 |
| Bill | 03/15/15 | | ProExcavation | Plow and B... | | Accounts Pa... | 9,500.00 | 9,500.00 | 11,500.00 |
| **Total Snow Removal** | | | | | | | | 11,500.00 | 11,500.00 |
| **Total Outside Service** | | | | | | | | 11,500.00 | 11,500.00 |
| **Total 88 Cutler Building & Improvemen** | | | | | | | | 11,500.00 | 11,500.00 |
| **TOTAL** | | | | | | | | 11,500.00 | 11,500.00 |

2/25/2015



Kagan Development <kagandevelopment@gmail.com>

**Cutler Street**
1 message

**Paul DiGiacomo** <digiacomoroofing@gmail.com>
To: Kagan Development <kagandevelopment@gmail.com>

Wed, Feb 25, 2015 at 7:53 AM

Paul DiGiacomo
65 Curve Street
Millis, MA 02054
(781)269-5898

Clean off roof $2050.00

PAID
Date:
Amount:$
Check #.

KDC 01124

# Proposal

ProExcavation

259 Nahanton Street
Newton, MA 02459
617-610-1276

| | INVOICE NO. | 88 Cutler - Snow |
| | DATE | March 25, 2015 |
| | CUSTOMER ID | 88 Cutler Lane |

TO

| | JOB | | PAYMENT TERMS | DUE DATE |
|---|---|---|---|---|
| | 88 Cutler Lane | | | |

| # | QTY | | DESCRIPTION | UNIT PRICE | LINE TOTAL |
|---|---|---|---|---|---|
| | | | Four months snow removal, use of: | | |
| 1 | 1 | | - Bobcat | 9,500.00 | 9,500.00 |
| | | | - Frontloader (backhoe) | | |

|  |  |  |
|---|---|---|
| SUBTOTAL | $ | 9,500.00 |
| SALES TAX | | |
| TOTAL | $ | 9,500.00 |

THANK YOU FOR YOUR BUSINESS!

KDC 01125

# EXHIBIT 12

PBC



07/01/15

**Pro Excavation LLC**
**A/R Aging Summary**
**As of December 31, 2014**

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| 10 Lyman Road LLC | 185000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 185000.00 |
| Dorcar Road, LLC | 60,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 60,000.00 |
| Fredette Road, LLC | 155000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 155000.00 |
| Lyman-Cutler Road | 325000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 325000.00 |
| Newton-Cynthia Road, ... | 41,360.00 | 0.00 | 0.00 | 0.00 | 0.00 | 41,360.00 |
| Parker Terrace, LLC | 60,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 60,000.00 |
| Wallace Street, LLC | 85,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 85,000.00 |
| TOTAL | 911360.00 | 0.00 | 0.00 | 0.00 | 0.00 | 911360.00 | TB |

**Confirmed corresponding AP balances tie out with client - ref PL-05**

SGC-001530

# EXHIBIT 13

09/15/16

**Pro Excavation LLC**
**A/R Aging Summary**
**As of December 31, 2015**

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| 12 Valley Spring | 41,176.72 | 0.00 | 0.00 | 0.00 | 0.00 | 41,176.72 B-15 |
| 18 Valley Spring | 0.00 | 0.00 | 0.00 | 0.00 | 52,450.00 | 52,450.00 B-20 |
| Lyman-Cutler Road | 0.00 | 0.00 | 0.00 | 0.00 | 439,136.69 | 439,136.69 B-25 |
| TOTAL | 41,176.72 | 0.00 | 0.00 | 0.00 | 491,586.69 | 532,763.41 |

TB

Lyman Cutler balance is increased by $100,000 to what it s/b becuase
want partners to see real numbers. However, there is at least $100,000
that will never be paid (maybe more). There is $100,000 sitting in
deferred revenue wp AL-20...which is really a reserve and should be

AL-20



SGC-001640

09/15/16

## Pro Excavation LLC
## Transaction Journal
## All Transactions

| Type | Date | Name | Memo | Item | Account | Sales Price | Debit |
|---|---|---|---|---|---|---|---|
| Invoice | 01/01/2015 | Lyman-Cutler Road | Missing $100K to PreEx from LC that wasn't billed in 2014 but should have been | Reserve | 1100 · Accounts Receivable | 100,000.00 | 100,000.00 |
| | | Lyman-Cutler Road | Sales Tax | no tax (Sales Tax) | 2355 · Deferred Revenue | 0.0% | 0.00 |
| | | Lyman-Cutler Road | Wanted to carry the full amount of what should be due from Lyman Cutler b/c there are partners. However, this is setup as reserve b/c there are no funds to pay this and it will never be paid. | | | | 100,000.00 |
| **TOTAL** | | | | | | | **100,000.00** |



PENGAD 800-631-6989
EXHIBIT
73
Gordon
5-22-18 DA

SGC-001652

# EXHIBIT 14

**Subject:** collection letter
**From:** Joseph Cohen <polysavant@hotmail.com>
**Date:** 6/25/2015 4:23 PM
**To:** Vadim Kagan <kagandevelopment@gmail.com>, Alex Filippov <alex@ldpost.com>
**CC:** apyle@sheehan.com, John Perten <jperten@sheehan.com>

Dear Lyman Cutler LLc,
    I have attached a letter regarding managing payment on our outstanding bill.   Kindly
review and contact me with your response.

Respectfully, J. Joseph Cohen

— Attachments:

LCLLC collection letter.pdf                                                    168 KB

6/24/2015

Kagan Development KDC Corp Inc.
4 79th St.
Newburyport, MA 01950

Mr. Vadim Kagan
239 Nahanton St.
Newton, MA 02459
kagan@kagandevelopment.com

Via Certified Mail and E-Mail
Mr. Alex Filippov
130 Trapelo Road
Belmont, MA 02478
alex@ldpost.com

Via Certified Mail and E-Mail
Mr. Nickolay Lipetsker
52 Stony Brae Road
Newton, MA 02461

Lyman Cutler, LLC
130 Trapelo Road
Belmont, MA 02478
[alex@ldpost.com]

    In Re:  Kagan Development, KDC Corp
           Construction Management/General Contractor Agreement dated June 24, 2013

Gentlemen,

    It has come to our attention that significant internal management issues have developed at Lyman-Cutler, LLC ("Lyman-Cutler"). We hope that this will not create problems for our relationship. As evidenced from the enclosed invoice which had previously been forwarded, Kagan Development, KDC, Corp (KDC) is the holder of a substantial outstanding accounts receivable from Lyman-Cutler for work it performed for Lyman-Cutler under a Construction Management/General Contractor Agreement dated June 24, 2013 (the "Contract"). We hope that your internal issues will not impact our relationship. This receivable is now overdue.

    As of this writing, KDC has substantially completed all of its obligations under the Contract save for ongoing maintenance and warranty matters, if any. Pursuant to Section 2.3.20 of the Contract, a final inspection of the underlying property was satisfactorily conducted and KDC has turned over the property keys to Lyman-Cutler.

    Notwithstanding the outstanding receivable, as provided in Section 7.1.3 of the Contract, KDC remains willing to provide ongoing maintenance and additional services "in keeping the properties in Marketable Condition." Please indicate, by return correspondence, if Lyman-Cutler desires KDC to continue maintaining the property. If so, KDC will require advance payment for such services so that Lyman-Cutler does not fall further into arrears. Unless such arrangements are made, KDC will no longer maintain the property.

    As noted, there remains over two million dollars outstanding to KDC on the Lyman-Cutler account. The lawsuit filed by Lyman-Cutler against its own member, who also has a close relationship with KDC, strongly suggests that Lyman-Cutler does not intend to pay the outstanding invoice to KDC. In lieu of resorting to legal

recourse, KDC is willing to discuss formalization of a satisfactory payment plan to retire the overdue invoices. A proposal for such a plan is enclosed. If Lyman-Cutler wishes to enter into a modification of the Contract as described in the proposal, KDC will prepare an amendment to the Contract for endorsement by the parties. If not accepted by the close of business on June 30, 2015, this proposal shall lapse and be null and void.

KDC also requests advice as to who its point of contact should be from this point forward.

This letter is written with a complete reservation of all claims, rights and defenses. I look forward to working with you through these issues. If you have any questions regarding this matter, please contact me at the address above.

Respectfully, J. Joseph Cohen

Strategic Business Manger
Kagan Development KDC Corp
347-902-3512
[j.cohen@kagandevelopment.com]

Enclosure:

1. Proposal
2. Outstanding Invoice

## Balance Work-Out Proposal

Subject to execution of a mutually acceptable agreement,

Lyman-Cutler, LLC agrees to the following payment plan to resolve its outstanding bill of $2,095,985.23 with KDC.

Lyman-Cutler LLC will pay KDC the sum of $1,000,000.00 (One Million Dollars) within 10 days of its receipt of this proposal.

Upon the sale of either of 88 Cutler Road, or 55 Lyman Road, Lyman-Cutler, LLC will pay KDC an additional $500,000.00 (Five Hundred Thousand Dollars).

Upon the sale of the remaining property, but in no event later than November 30, 2015, Lyman-Cutler LLC will pay KDC the entire remaining balance plus any accrued interest.

In the event Lyman-Cutler fails to comply with its obligations hereunder, it shall be responsible for all of KDC's attorneys' fees and costs, plus interest at the rate of 18% per annum, incurred in connection with any action to enforce the provisions of this agreement.

If you are agreeable to abide by this arrangement, sign below and send this back to us accompanied by a check for $1,000,000.00 made out to Kagan Development KDC, Corp. We will then forward an amendment to the Construction Management/General Contractor Agreement dated June 24, 2013 for your signature.


X _____
Alex Fillipov


Date_____


X _____
Nickolay Lipetsker


Date_____


X _____
Vadim Kagan


Date_____


**THIS PROPOSAL SHALL LAPSE AND BE NULL AND VOID IF NOT ACCEPTED BY ALL PARTIES ON OR BEFORE THE CLOSE OF BUSINESS ON JUNE 30, 2015.**

L-C BK 002525



*A Premier Luxury Home Developer*

# INVOICE

230 Nahanton St.
Newton MA, 02459
617-610-1276

DATE: June 1, 2015
INVOICE # LC-15016

BILL TO:
Lyman-Cutler LLC
c/o Vadim Kagan
230 Nahanton St.
Newton MA, 02459

FOR: Construction and Mgmt
Services
Prjct. LCR-15MM

| DESCRIPTION (55 Lyman & 88 Cutler Lane) | HOURS | RATE | AMOUNT |
|---|---|---|---|
| Design Fee | 1.00 | $25,000.00 | $ 25,000.00 |
| | | | $ - |
| Total Construction cost | 1.00 | $3,738,925.82 | $ 3,738,925.82 |
| General Contractor Construction Fee (@15%) | 1.00 | $560,838.87 | $ 560,838.87 |
| | | | $ - |
| KDC office overhead (net of Vadim Kagan 820 @ 200/hr $164,000.) | 700.00 | $75.00 | $ 52,250.00 |
| | | | $ - |
| Total Construction Payments through June 10, 2015 | -1.00 | $3,194,815.00 | $ (3,194,815.00) |
| (Received from Rockland Trust Construction Advances less fees to bank) | | | $ - |
| | | | $ - |
| Total Carrying Costs from July 1, 2013 through June 10, 2015 | 1.00 | $760,771.06 | $ 760,771.06 |
| Carrying Costs advance fee @ 1.459% of total accrued monthy Carry Advance | 23.00 | $6,339.76 | $ 145,814.46 |
| (17.5% divided by 12 months = 1.45833%) | | | $ - |
| | | | $ - |
| | | SUBTOTAL | $ 2,095,885.23 |
| | | TAX RATE | |
| | | SALES TAX | $ - |
| | | OTHER | |
| | | TOTAL | $ 2,095,885.23 |

Make all checks payable to KDC Corp Inc.

Total due in 10 days. Overdue accounts subject to a service charge of 1% per month.

**THANK YOU FOR YOUR BUSINESS!**

L-C BK 002526

# EXHIBIT 15



Account Statement

LYMAN-CUTLER LLC
130 TRAPELO RD
BELMONT MA 02478-1873

STATEMENT DATE:  6/30/15
PAGE NUMBER           1

ACCOUNT           █████1296
                              1

Join us for a summer of saving and reading beginning
June 22, 2015 through August 31, 2015. Reading Makes
Cents is Rockland Trust's summer reading program for
students entering grades 1 through 8. Students can earn
$2.50 for each book read up to 10 books.
Visit RocklandTrust.com for more information.

| Account Name | Account Number | Balance |
|---|---|---|
| FREE BUSINESS CHECKING | █████1296 | 6,172.89 |

FREE BUSINESS CHECKING        LYMAN-CUTLER LLC                    Acct  █████1296

|  | | |
|---|---|---|
| Beginning Balance | 6/01/15 | 7,328.89 |
| Deposits / Misc Credits | 0 | .00 |
| Withdrawals / Misc Debits | 3 | 1,156.00 |
| ** Ending Balance | 6/30/15 | 6,172.89  ** |
| Service Charge | | .00 |
| Enclosures | | 1 |

Miscellaneous Debits

| Date | Withdrawals | Activity Description |
|---|---|---|
| 6/09 | 10.00 | NATIONAL GRID NE/UTILITYPAY |
| 6/09 | 346.00 | NATIONAL GRID NE/UTILITYPAY |
| 6/25 | 800.00 | DEBIT MEMO |

Daily Balance Summary

| Date | Balance | Date | Balance | Date | Balance |
|---|---|---|---|---|---|
| 6/09 | 6,972.89 | 6/25 | 6,172.89 | | |