# EXHIBIT 16

BORIS MAIDEN SUPPLEMENTAL SUBPOENA RESPONSE                                    BM 001216



**LYMAN-CUTLER, LLC**

**MANAGER'S CERTIFICATE AND
MEMBER'S CONSENT**

I, Alex Filippov, Manager of **LYMAN-CUTLER, LLC,** a Massachusetts limited liability company, duly organized and existing by law, hereby certifies as follows:

1.      Attached hereto as Exhibit A is a true and accurate copy of the Certificate of Organization of the LLC (defined) (the "LLC").

2.      All of the Members of the LLC are myself, Vadim Kagan and Nickolay Lipetsker.

2.      The LLC remains in full force and effect, and there have been no amendments to the Certificate of Organization of the LLC filed with the Secretary of State for the Commonwealth of Massachusetts, a copy of which is attached hereto.

3.      I am the Manager of the LLC, and the person authorized on behalf of the LLC to execute, acknowledge, and deliver instruments affecting an interest in real property owned or held by the LLC.

4.      The Operating Agreement of the LLC has not been amended or altered as of the date hereof, and pursuant to the provisions thereof, I have full power and authority on behalf of the LLC, to enter into a **$1,600,000.00 Term Loan Arrangement** with Rockland Trust Company (the "Bank") for the acquisition of the property known as and numbered 77 Lyman Road, Brookline, Massachusetts (the "Property"), and to execute a Mortgage and Security Agreement, Collateral Assignment of Leases and Rents, Collateral, Hazardous Waste Indemnity Agreement and any and all other documents necessary with regard to said refinance, and to obtain such financing and to secure the position of the Bank as first mortgagee and to execute any and all additional documents usually and customarily executed in the Commonwealth of Massachusetts for the finance of real property.

5.      I have full power and authority on behalf of the LLC to execute such documents as the Bank deems necessary in order to effectuate the above-described Loan Arrangement.

Witness my hand and seal, this 28th day of December, 2012.

                                                        **LYMAN-CUTLER, LLC**

                                                        By: _____
                                                              Alex Filippov, Manager

ASSENTED TO BY ALL MEMBERS :

_____
Alex Filippov                                           _____
                                                        Nickolay Lipetsker

_____
Vadim Kagan

THE COMMONWEALTH OF MASSACHUSETTS

Norfolk,ss

On this 28th day of December, 2012, before me, the undersigned notary public, personally appeared
Alex Filippov, proved to me through satisfactory evidence of identification, which was a
Massachusetts Driver's License , to be the person whose name is signed on the preceding or attached
document, and acknowledged to me that he signed it voluntarily for its stated purpose, as Manager of
LYMAN-CUTLER, LLC.

Notary Public:
My commission expires: 6/2/17

BORIS B. MAIDEN
Notary Public
Commonwealth of Massachusetts
My Commission Expires
June 2, 2017

# EXHIBIT 17



06/02/15

Lyman-Cutler, LLC
Transaction List by Vendor
All Transactions

| Type | Entered/Last Modified | Date | Num | Memo | Account | Clr | Split | Amount |
|------|----------------------|------|-----|------|---------|-----|-------|--------|
| **55 lyman** | | | | | | | | |
| Deposit | 12/28/13 12:11:03 | 08/23/13 | | | Rockland Trust 1296 | X | -SPLIT- | 143,980.00 |
| Deposit | 12/28/13 12:11:11 | 09/05/13 | | | Rockland Trust 1296 | X | -SPLIT- | 47,875.00 |
| Deposit | 12/28/13 12:11:30 | 09/19/13 | | | Rockland Trust 1296 | X | -SPLIT- | 142,672.96 |
| Deposit | 12/28/13 12:11:31 | 09/20/13 | | | Rockland Trust 1296 | X | Construc Loan 8800 (88 … | 24,000.00 |
| Deposit | 12/28/13 12:11:35 | 10/03/13 | | | Rockland Trust 1296 | X | -SPLIT- | 63,875.00 |
| Deposit | 12/28/13 12:11:39 | 10/17/13 | | | Rockland Trust 1296 | X | -SPLIT- | 95,875.00 |
| Deposit | 07/21/14 14:56:24 | 10/24/13 | | | Rockland Trust 1296 | X | -SPLIT- | 47,980.00 |
| Deposit | 07/21/14 15:00:31 | 10/31/13 | | | Rockland Trust 1296 | X | -SPLIT- | 31,875.00 |
| Deposit | 05/04/15 20:37:47 | 11/07/13 | | | Rockland Trust 1296 | X | -SPLIT- | 15,875.00 |
| Deposit | 12/28/13 12:12:13 | 11/21/13 | | | Rockland Trust 1296 | X | -SPLIT- | 31,875.00 |
| Deposit | 12/28/13 12:12:29 | 12/05/13 | | | Rockland Trust 1296 | X | -SPLIT- | 41,155.04 |
| **88 Cutler Ln** | | | | | | | | |
| Deposit | 07/21/14 14:56:09 | 09/05/13 | | | Rockland Trust 1296 | X | -SPLIT- | 143,875.00 |
| Deposit | 07/21/14 14:56:13 | 09/19/13 | | | Rockland Trust 1296 | X | -SPLIT- | 110,672.96 |
| Deposit | 07/21/14 14:56:15 | 09/20/13 | | | Rockland Trust 1296 | X | Construc Loan 8800 (55 L… | 24,000.00 |
| Deposit | 07/21/14 14:56:18 | 10/03/13 | | | Rockland Trust 1296 | X | -SPLIT- | 63,875.00 |
| Deposit | 07/21/14 14:56:21 | 10/17/13 | | | Rockland Trust 1296 | X | -SPLIT- | 63,875.00 |
| Deposit | 05/04/15 20:39:13 | 11/07/13 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 31,875.00 |
| Deposit | 07/21/14 14:57:39 | 11/21/13 | | | Rockland Trust 1296 | X | -SPLIT- | 15,875.00 |
| **Affordable Lawn Sprinklers** | | | | | | | | |
| Check | 04/28/15 18:38:45 | 08/26/14 | 1108 | | Rockland Trust 1296 | X | Affordable Lawn Sprinklers | -8,400.00 |
| **AJM Group** | | | | | | | | |
| Check | 12/26/13 12:53:48 | 06/27/13 | 1053 | | Rockland Trust 1296 | X | -SPLIT- | -14,000.00 |
| Check | 12/26/13 12:54:32 | 09/18/13 | 1064 | Final Architech | Rockland Trust 1296 | X | -SPLIT- | -7,000.00 |
| **Alexander Filipov** | | | | | | | | |
| Deposit | 12/12/13 15:54:20 | 05/24/13 | | | Rockland Trust 1296 | X | N/P Alex Filipov - no funds | 1,000.00 |
| Check | 12/12/13 15:40:56 | 07/01/13 | 1105 | | Rockland Trust 1296 | X | N/P Alex Filipov - no funds | -1,000.00 |
| **Antonov Stone** | | | | | | | | |
| Check | 07/28/14 14:22:19 | 07/25/14 | 1089 | | Rockland Trust 1296 | X | Antonov Stone | -9,000.00 |
| Check | 07/28/14 14:22:40 | 07/25/14 | 1090 | | Rockland Trust 1296 | X | Antonov Stone | -15,000.00 |
| Check | 07/28/14 14:22:51 | 07/25/14 | 1091 | | Rockland Trust 1296 | X | Antonov Stone | -7,457.00 |
| Check | 07/28/14 14:23:22 | 07/25/14 | 1092 | | Rockland Trust 1296 | X | Antonov Stone | -9,000.00 |
| Check | 07/28/14 14:23:35 | 07/25/14 | 1093 | | Rockland Trust 1296 | X | Antonov Stone | -15,000.00 |
| Check | 07/28/14 14:23:46 | 07/25/14 | 1094 | | Rockland Trust 1296 | X | Antonov Stone | -7,457.00 |
| **Bill Getchell** | | | | | | | | |
| Check | 01/24/14 16:52:35 | 01/21/14 | 1029 | | Rockland Trust 1296 | X | Bill Getchell | -750.00 |
| **BROOKLINE/TAXES 0727238** | | | | | | | | |
| Check | 12/28/13 12:20:07 | 02/01/13 | | | Rockland Trust 1296 | X | -SPLIT- | -2,912.61 |
| Check | 12/28/13 12:20:28 | 02/01/13 | | | Rockland Trust 1296 | X | -SPLIT- | -9,363.14 |
| Check | 12/28/13 12:20:52 | 05/01/13 | | | Rockland Trust 1296 | X | -SPLIT- | -9,363.13 |
| Check | 12/28/13 12:21:07 | 05/01/13 | | | Rockland Trust 1296 | X | -SPLIT- | -2,912.61 |
| Check | 12/28/13 12:21:30 | 08/02/13 | | | Rockland Trust 1296 | X | -SPLIT- | -3,023.88 |
| Check | 12/28/13 12:21:46 | 08/02/13 | | | Rockland Trust 1296 | X | -SPLIT- | -9,720.80 |
| Check | 12/28/13 12:22:02 | 11/04/13 | | | Rockland Trust 1296 | X | -SPLIT- | -3,023.88 |
| Check | 12/28/13 12:22:20 | 11/04/13 | | | Rockland Trust 1296 | X | -SPLIT- | -9,720.80 |

06/02/15

**Lyman-Cutter, LLC**
**Transaction List by Vendor**
**All Transactions**

Page 2

| Type | Entered/Last Modified | Date | Num | Memo | Account | Clr | Split | Amount |
|---|---|---|---|---|---|---|---|---|
| **BST Plumbing** | | | | | | | | |
| Check | 02/14/14 11:37:07 | 02/04/14 | 1017 | | Rockland Trust 1296 | X | Plumbing | -20,000.00 |
| Check | 03/21/14 16:14:23 | 03/12/14 | 1040 | | Rockland Trust 1296 | X | Plumbing | -20,000.00 |
| Bill | 04/29/15 11:41:28 | 04/28/15 | | | Accounts Payable | | Plumbing | -19,670.00 |
| Bill | 04/29/15 11:41:40 | 04/28/15 | | | Accounts Payable | | Plumbing | -19,670.00 |
| **DaCosta** | | | | | | | | |
| Check | 12/26/13 12:37:39 | 09/23/13 | 1068 | 55 Lyman Rd | Rockland Trust 1296 | X | Framing | -10,000.00 |
| Check | 12/26/13 12:38:25 | 09/25/13 | 1069 | 88 Cutler | Rockland Trust 1296 | X | Framing | -10,000.00 |
| Check | 12/26/13 12:38:51 | 10/22/13 | 1081 | 88 Cutler - Fraim | Rockland Trust 1296 | X | Framing | -10,000.00 |
| Check | 12/26/13 12:39:23 | 10/22/13 | 1082 | 55 Lyman - Fraim | Rockland Trust 1296 | X | Framing | -10,000.00 |
| Check | 12/26/13 12:40:27 | 11/04/13 | 1093 | 55 Lyman - Fraim | Rockland Trust 1296 | X | Framing | -10,000.00 |
| Check | 12/26/13 12:40:49 | 11/04/13 | 1094 | 88 Cutler - Fraim | Rockland Trust 1296 | X | Framing | -10,000.00 |
| Check | 12/26/13 12:43:22 | 11/19/13 | 123 | 88 Cutler - Fraiming | Rockland Trust 1296 | X | Framing | -20,000.00 |
| Check | 12/26/13 12:43:46 | 11/19/13 | 123 | 88 Cutler - Fraiming | Rockland Trust 1296 | X | Framing | -20,000.00 |
| Check | 01/10/14 15:56:55 | 12/30/13 | 1006 | | Rockland Trust 1296 | X | -SPLIT- | -20,000.00 |
| Check | 01/24/14 16:55:09 | 01/22/14 | 1027 | | Rockland Trust 1296 | X | -SPLIT- | -40,000.00 |
| Check | 02/28/14 12:47:11 | 02/21/14 | 1023 | | Rockland Trust 1296 | X | -SPLIT- | -20,000.00 |
| Check | 03/21/14 16:14:21 | 03/10/14 | 1039 | | Rockland Trust 1296 | X | Framing | -30,000.00 |
| Check | 03/14/14 16:36:20 | 03/12/14 | 1038 | | Rockland Trust 1296 | X | Framing | -20,000.00 |
| Check | 05/06/14 12:43:18 | 04/18/14 | 1057 | | Rockland Trust 1296 | X | Framing | -30,000.00 |
| Check | 05/06/14 12:46:28 | 04/29/14 | 1061 | | Rockland Trust 1296 | X | Framing | -28,350.00 |
| Check | 05/15/14 12:05:05 | 05/07/14 | 1065 | | Rockland Trust 1296 | X | Framing | -4,350.00 |
| Check | 07/10/14 12:15:56 | 05/29/14 | 1069 | | Rockland Trust 1296 | X | Framing | -7,000.00 |
| Check | 08/25/14 10:23:49 | 07/29/14 | 1097 | | Rockland Trust 1296 | X | Framing | -10,000.00 |
| Check | 09/15/14 16:36:50 | 08/25/14 | 1115 | | Rockland Trust 1296 | X | Framing | -15,000.00 |
| **Decor Art** | | | | | | | | |
| Check | 04/28/15 21:27:53 | 11/04/13 | 1095 | 55 Lyman | Rockland Trust 1296 | X | Decor Art | -10,000.00 |
| Check | 04/28/15 21:29:40 | 11/04/13 | 1096 | 88 Cutler | Rockland Trust 1296 | X | Decor Art | -10,000.00 |
| Check | 04/28/15 21:30:48 | 01/21/14 | 1028 | 88 Cutler | Rockland Trust 1296 | X | Decor Art | -15,000.00 |
| Check | 05/06/14 12:42:31 | 04/18/14 | 1050 | | Rockland Trust 1296 | X | Decor Art | -5,000.00 |
| Check | 07/10/14 12:35:18 | 06/03/14 | 1079 | | Rockland Trust 1296 | X | Decor Art | -5,000.00 |
| Check | 07/10/14 13:11:46 | 07/02/14 | 1083 | | Rockland Trust 1296 | X | -SPLIT- | -16,000.00 |
| Check | 08/25/14 10:20:16 | 07/28/14 | 1100 | | Rockland Trust 1296 | X | Decor Art | -8,000.00 |
| Check | 08/25/14 10:20:32 | 07/28/14 | 1101 | | Rockland Trust 1296 | X | Decor Art | -8,000.00 |
| Check | 04/28/15 21:32:34 | 08/25/14 | 1114 | | Rockland Trust 1296 | X | -SPLIT- | -28,450.00 |
| Check | 04/16/15 22:15:42 | 01/23/15 | 1133 | | Rockland Trust 1296 | | Decor Art | -3,350.00 |
| Check | 04/16/15 22:30:38 | 02/18/15 | 1141 | | Rockland Trust 1296 | | Decor Art | -6,000.00 |
| Check | 04/16/15 22:39:22 | 03/19/15 | 1142 | | Rockland Trust 1296 | | Decor Art | -3,600.00 |
| Deposit | 04/28/15 21:34:44 | 04/17/15 | 1143 | Deposit | Decor Art | | Rockland Trust 1296 | 3,000.00 |
| Bill | 04/29/15 11:14:58 | 04/28/15 | | | Accounts Payable | | Decor Art | -5,250.00 |
| Bill | 04/29/15 11:15:09 | 04/28/15 | | | Accounts Payable | | Decor Art | -6,000.00 |
| **DPW-Water & Sewer Division** | | | | | | | | |
| Check | 02/28/14 12:49:36 | 02/21/14 | 1024 | | Rockland Trust 1296 | X | -SPLIT- | -1,087.53 |

06/02/15

**Lyman-Cutler, LLC**
**Transaction List by Vendor**
**All Transactions**

| Type | Entered/Last Modified | Date | Num | Memo | Account | Clr | Split | Amount |
|------|----------------------|------|-----|------|---------|-----|-------|--------|
| **Dream Flooring** | | | | | | | | |
| Check | 04/18/14 17:25:44 | 11/21/13 | 123 | 88 Cutler | Rockland Trust 1296 | X | Dream Flooring | -10,000.00 |
| Check | 04/18/14 17:30:31 | 11/21/13 | 123 | 88 Cutler | Rockland Trust 1296 | X | Dream Flooring | -10,000.00 |
| Check | 02/14/14 11:37:10 | 02/10/14 | 1019 | | Rockland Trust 1296 | X | -SPLIT- | -10,000.00 |
| Check | 02/28/14 12:46:33 | 02/19/14 | 1031 | | Rockland Trust 1296 | X | -SPLIT- | -10,000.00 |
| Check | 09/15/14 16:39:45 | 09/02/14 | 1119 | | Rockland Trust 1296 | X | -SPLIT- | -30,000.00 |
| Bill | 03/13/15 18:18:48 | 03/23/15 | | | Accounts Payable | | Dream Flooring | -12,210.00 |
| Bill Pmt -Check | 04/27/15 11:12:04 | 04/22/15 | 1144 | | Rockland Trust 1296 | | Accounts Payable | -12,210.00 |
| Bill | 05/13/15 18:19:05 | 04/28/15 | | | Accounts Payable | | Dream Flooring | -8,910.00 |
| Bill | 04/29/15 11:16:30 | 04/28/15 | | | Accounts Payable | | Dream Flooring | -6,550.00 |
| **EastCoast Pipelines** | | | | | | | | |
| Check | 04/16/15 22:02:04 | 10/16/14 | 1108 | | Rockland Trust 1296 | X | Plumbing | -500.00 |
| **Ernesto Espindola** | | | | | | | | |
| Check | 05/14/15 17:50:09 | 01/19/15 | 1139 | | Rockland Trust 1296 | | Landscaping | -2,080.00 |
| **European Closets** | | | | | | | | |
| Check | 07/28/14 14:24:23 | 07/25/14 | 1095 | | Rockland Trust 1296 | X | European Closets | -9,315.00 |
| Check | 09/15/14 16:36:51 | 08/25/14 | 1113 | | Rockland Trust 1296 | X | European Closets | -9,315.00 |
| **Foremost Insurance** | | | | | | | | |
| Bill | 05/14/15 18:00:18 | 04/03/15 | | | Accounts Payable | | Insurance Expense | -1,728.75 |
| Bill | 05/14/15 17:59:46 | 04/03/15 | | | Accounts Payable | | Interest Expenses | -1,728.75 |
| Bill | 05/14/15 17:59:20 | 05/03/15 | | | Accounts Payable | | Insurance Expense | 0.00 |
| Bill | 05/14/15 18:00:06 | 05/03/15 | | | Accounts Payable | | Insurance Expense | -1,728.75 |
| **Greator Boston Green** | | | | | | | | |
| Check | 05/14/15 17:49:47 | 10/23/13 | 1089 | 55 Lyman Dr - Hers Analysis | Rockland Trust 1296 | X | -SPLIT- | -600.00 |
| Check | 05/14/15 17:50:48 | 10/23/13 | 1090 | 88 Cutller Dr - Hers Analysis | Rockland Trust 1296 | X | Greator Boston Green | -600.00 |
| **HARLAND CLARKE/CHK ORDER** | | | | | | | | |
| Check | 12/09/13 13:18:21 | 12/03/13 | | Checks orders | Rockland Trust 1296 | X | -SPLIT- | -44.66 |
| **Instant Interiors** | | | | | | | | |
| Bill | 05/11/15 19:12:19 | 04/08/15 | | | Accounts Payable | | Instant Interiors | -1,482.18 |
| **INVOICE CLOUD/EPAYMENT 0734298** | | | | | | | | |
| Check | 12/09/13 17:58:39 | 02/01/13 | | | Rockland Trust 1296 | X | Bank Service Charges | -0.40 |
| Check | 12/09/13 17:58:48 | 02/01/13 | | | Rockland Trust 1296 | X | Bank Service Charges | -0.40 |
| Check | 12/09/13 17:58:57 | 05/01/13 | | | Rockland Trust 1296 | X | Bank Service Charges | -0.40 |
| Check | 12/09/13 17:59:07 | 05/01/13 | | | Rockland Trust 1296 | X | Bank Service Charges | -0.40 |
| Check | 12/09/13 17:59:16 | 08/02/13 | | | Rockland Trust 1296 | X | Bank Service Charges | -0.40 |
| Check | 12/09/13 17:59:27 | 08/02/13 | | | Rockland Trust 1296 | X | Bank Service Charges | -0.40 |
| Check | 12/09/13 17:59:37 | 11/04/13 | | | Rockland Trust 1296 | X | Bank Service Charges | -0.40 |
| Check | 12/09/13 17:59:45 | 11/04/13 | | | Rockland Trust 1296 | X | Bank Service Charges | -0.40 |
| Check | 04/16/15 21:56:15 | 11/05/14 | | | Rockland Trust 1296 | X | Office Expenses | -0.40 |
| Check | 04/16/15 21:56:28 | 11/05/14 | | | Rockland Trust 1296 | X | Office Expenses | -0.40 |
| Check | 04/16/15 22:14:32 | 01/29/15 | | | Rockland Trust 1296 | | Office Expenses | -0.40 |
| Check | 04/16/15 22:14:37 | 01/29/15 | | | Rockland Trust 1296 | | Office Expenses | -0.40 |
| **Jay M Bertson** | | | | | | | | |
| Check | 12/26/13 12:49:52 | 11/20/13 | 123 | 55 Lyman - Landscaping/Planting | Rockland Trust 1296 | X | Landscaping | -19,057.89 |
| Check | 12/26/13 12:50:23 | 11/20/13 | 123 | 88 Cutler - Landscaping/Planting | Rockland Trust 1296 | X | Landscaping | -24,036.31 |
| Check | 08/25/14 14:15:01 | 01/21/14 | 1012 | | Rockland Trust 1296 | X | Landscaping | -3,393.00 |
| Check | 01/24/14 16:55:39 | 01/21/14 | 1011 | 88 Cutler - Landscaping/Planting | Rockland Trust 1296 | X | Landscaping | -7,531.83 |
| Check | 09/15/14 16:38:43 | 08/29/14 | 1109 | | Rockland Trust 1296 | X | Landscaping | -13,597.98 |
| Check | 09/15/14 16:38:52 | 08/29/14 | 1118 | | Rockland Trust 1296 | X | -SPLIT- | -14,263.67 |

06/02/15

Lyman-Cutler, LLC
Transaction List by Vendor
All Transactions

| Type | Entered/Last Modified | Date | Num | Memo | Account | Clr | Split | Amount |
|---|---|---|---|---|---|---|---|---|
| **JW Campbell Construction** | | | | | | | | |
| Check | 02/14/14 11:37:09 | 02/10/14 | 1018 | Invoice #2416 | Rockland Trust 1296 | X | JW Campbell Construction | -150.00 |
| Check | 03/21/14 16:14:20 | 03/10/14 | 1037 | Invoice 2466 | Rockland Trust 1296 | X | JW Campbell Construction | -300.00 |
| Check | 03/21/14 16:14:18 | 03/17/14 | 1042 | | Rockland Trust 1296 | X | JW Campbell Construction | -3,702.50 |
| Check | 04/18/14 17:00:21 | 03/24/14 | 1043 | | Rockland Trust 1296 | X | -SPLIT- | -12,089.00 |
| Check | 04/18/14 17:03:24 | 03/31/14 | 1045 | | Rockland Trust 1296 | X | -SPLIT- | -9,851.50 |
| Check | 04/18/14 17:06:51 | 04/07/14 | 1048 | Invoice 2521, 2520 | Rockland Trust 1296 | X | JW Campbell Construction | -4,671.50 |
| Check | 04/18/14 17:14:41 | 04/14/14 | 1051 | invoice 2533-2534 | Rockland Trust 1296 | X | JW Campbell Construction | -10,338.50 |
| Check | 05/06/14 12:41:08 | 04/18/14 | 1054 | Invoice 2553, 2552 | Rockland Trust 1296 | X | JW Campbell Construction | -6,428.00 |
| Check | 05/06/14 12:44:56 | 04/25/14 | 1059 | invoice 2559, 2558 | Rockland Trust 1296 | X | JW Campbell Construction | -12,552.00 |
| Check | 05/06/14 12:47:54 | 05/02/14 | 1063 | inv 2576, 2578, 2575 | Rockland Trust 1296 | X | JW Campbell Construction | -9,020.50 |
| Check | 05/06/14 12:48:21 | 05/02/14 | 1064 | Invoice 2574 | Rockland Trust 1296 | X | JW Campbell Construction | -6,767.50 |
| Check | 05/15/14 12:05:05 | 05/12/14 | 1066 | | Rockland Trust 1296 | X | -SPLIT- | -7,791.00 |
| Check | 07/10/14 12:08:38 | 05/19/14 | 1068 | | Rockland Trust 1296 | X | JW Campbell Construction | -6,347.00 |
| Check | 07/10/14 12:13:56 | 05/27/14 | 1072 | | Rockland Trust 1296 | X | JW Campbell Construction | -8,287.00 |
| Check | 07/10/14 12:34:35 | 06/02/14 | 1075 | | Rockland Trust 1296 | X | -SPLIT- | -11,376.50 |
| Check | 07/10/14 12:54:57 | 06/09/14 | 1080 | | Rockland Trust 1296 | X | JW Campbell Construction | -10,516.00 |
| Check | 07/10/14 13:09:48 | 06/30/14 | 1081 | | Rockland Trust 1296 | X | JW Campbell Construction | -2,964.86 |
| Check | 07/10/14 13:12:33 | 07/07/14 | 1086 | | Rockland Trust 1296 | X | JW Campbell Construction | -4,450.00 |
| Check | 08/25/14 10:18:44 | 07/28/14 | 1096 | | Rockland Trust 1296 | X | -SPLIT- | -2,800.00 |
| Check | 08/25/14 10:28:20 | 08/04/14 | 1103 | | Rockland Trust 1296 | X | -SPLIT- | -2,810.00 |
| Check | 08/25/14 10:33:07 | 08/18/14 | 1111 | | Rockland Trust 1296 | X | -SPLIT- | -125.00 |
| Check | 09/15/14 16:36:52 | 08/25/14 | 1112 | | Rockland Trust 1296 | X | JW Campbell Construction | -450.00 |
| Bill | 04/27/15 11:08:29 | 04/21/15 | | | Accounts Payable | | JW Campbell Construction | -100.00 |
| Bill Pmt -Check | 04/27/15 11:12:27 | 04/23/15 | 1145 | | Rockland Trust 1296 | | Accounts Payable | -100.00 |
| **KDC** | | | | | | | | |
| Check | 12/26/13 13:43:32 | 09/11/13 | 1060 | AMEX 8/13/13 | Rockland Trust 1296 | X | -SPLIT- | -37,894.34 |
| Check | 12/26/13 13:45:12 | 09/12/13 | 1061 | 55/88 Lyman Cutler permits (14... | Rockland Trust 1296 | X | -SPLIT- | -29,000.00 |
| Check | 10/06/14 17:52:23 | 09/25/13 | 1072 | 55 Lyman - Water/Sewer | Rockland Trust 1296 | X | -SPLIT- | -30,000.00 |
| Check | 12/26/13 13:49:48 | 09/25/13 | 1073 | 55 Lyman | Rockland Trust 1296 | X | Excavation | -30,000.00 |
| Check | 12/26/13 13:50:00 | 09/25/13 | 1074 | 55 Lyman Foundation | Rockland Trust 1296 | X | ProExcavation | -30,000.00 |
| Check | 10/06/14 17:48:23 | 09/25/13 | 1075 | 55 Lyman Foundation | Rockland Trust 1296 | X | Excavation | -30,000.00 |
| Check | 04/29/15 09:04:40 | 10/01/13 | 1078 | Reimbursement | Rockland Trust 1296 | X | -SPLIT- | -28,697.00 |
| Check | 12/26/13 14:31:58 | 10/04/13 | 1079 | Partial Reimbursement - closin... | Rockland Trust 1296 | X | -SPLIT- | -200,000.00 |
| Check | 12/26/13 14:32:21 | 10/04/13 | 1080 | Reimbursement - closing date 9... | Rockland Trust 1296 | X | -SPLIT- | -12,344.73 |
| Check | 12/26/13 14:20:51 | 10/21/13 | 1083 | Reimbursement - closing date 1... | Rockland Trust 1296 | X | -SPLIT- | -80,000.00 |
| Check | 12/26/13 14:24:09 | 10/21/13 | 1084 | Anitial Reimbursement - closing... | Rockland Trust 1296 | X | -SPLIT- | -20,000.00 |
| Check | 04/29/15 09:03:51 | 11/15/13 | 1099 | Invoice 156 | Rockland Trust 1296 | X | -SPLIT- | -23,231.08 |
| Check | 12/26/13 14:27:08 | 12/02/13 | 1001 | Amex closing date 11/28/13 | Rockland Trust 1296 | X | -SPLIT- | -30,000.00 |
| Bill | 01/24/14 17:14:40 | 12/03/13 | 216 | | Accounts Payable | | Contractor Expenses | -3,000.00 |
| Bill | 01/24/14 17:14:40 | 12/28/13 | 214 | | Accounts Payable | | -SPLIT- | -531.72 |
| Check | 04/18/14 17:27:05 | 12/30/13 | 1003 | Amex closing date 11/28/13 | Rockland Trust 1296 | X | -SPLIT- | -73,838.55 |
| Check | 01/10/14 15:56:48 | 12/30/13 | 1005 | Amex closing date 11/28/13 | Rockland Trust 1296 | X | -SPLIT- | -10,137.61 |
| Bill | 04/29/15 09:07:02 | 01/16/14 | 239 | | Accounts Payable | | -SPLIT- | -19,000.00 |
| Bill | 01/24/14 17:18:40 | 01/22/14 | 229 | | Accounts Payable | | -SPLIT- | -15,985.51 |
| Bill Pmt -Check | 01/30/14 15:29:53 | 01/27/14 | 1013 | | Rockland Trust 1296 | X | Accounts Payable | -38,497.23 |
| Bill | 01/30/14 15:37:21 | 01/27/14 | 245 | | Accounts Payable | | -SPLIT- | -1,149.50 |
| Bill | 05/11/15 14:53:40 | 01/29/14 | | | Accounts Payable | | Home Depot | -183.18 |
| Bill Pmt -Check | 02/14/14 11:37:05 | 02/03/14 | 1016 | home depot charge | Rockland Trust 1296 | X | Accounts Payable | -1,149.50 |
| Check | 04/28/14 12:28:04 | 03/03/14 | 1034 | | Rockland Trust 1296 | X | -SPLIT- | -67,606.28 |

06/02/15

Lyman-Cutler, LLC
Transaction List by Vendor
All Transactions

| Type | Entered/Last Modified | Date | Num | Memo | Account | Clr | Split | Amount |
|---|---|---|---|---|---|---|---|---|
| Bill | 04/16/15 21:09:00 | 03/28/14 | 274 | Mar. AMEX Reimb. | Accounts Payable | | -SPLIT- | -219,443.91 |
| Bill Pmt-Check | 07/10/14 15:30:32 | 03/28/14 | 1050 | | Rockland Trust 1296 | X | Accounts Payable | -99,443.91 |
| Bill | 04/16/15 21:09:18 | 04/28/14 | 282 | Apr. AMEX Reimb. | Accounts Payable | | -SPLIT- | -97,984.74 |
| Bill | 07/10/14 13:19:48 | 05/02/14 | 310 | | Accounts Payable | | Contractor Expenses | -7,000.00 |
| Bill Pmt-Check | 07/10/14 15:31:12 | 05/02/14 | 1062 | | Rockland Trust 1296 | X | Accounts Payable | -67,000.00 |
| Bill | 04/16/15 21:10:28 | 05/29/14 | 316 | May AMEX Reimb. | Accounts Payable | | -SPLIT- | -108,257.47 |
| Bill Pmt-Check | 07/10/14 12:51:42 | 06/03/14 | 1077 | | Rockland Trust 1296 | X | Accounts Payable | -60,000.00 |
| Bill Pmt-Check | 07/10/14 12:53:11 | 06/03/14 | 1078 | | Rockland Trust 1296 | X | Accounts Payable | -48,257.47 |
| Bill | 05/11/15 12:59:14 | 06/06/14 | | KDC CK 1382 | Accounts Payable | | Snow Removal | -3,500.00 |
| Bill | 07/10/14 13:17:35 | 06/11/14 | 334 | | Accounts Payable | | JW Campbell Construction | -4,022.00 |
| Bill | 05/11/15 12:57:14 | 06/13/14 | | KDC CK 1391 | Accounts Payable | | -SPLIT- | -7,162.00 |
| Bill | 05/11/15 12:53:23 | 06/16/14 | | KDC CK 1451 | Accounts Payable | | Snow Removal | -2,000.00 |
| Bill | 05/11/15 12:55:39 | 06/20/14 | | KDC CK 1404 | Accounts Payable | | -SPLIT- | -8,242.50 |
| Bill | 07/10/14 13:21:39 | 06/27/14 | | | Accounts Payable | | -SPLIT- | -12,662.00 |
| Bill Pmt-Check | 07/10/14 15:32:58 | 06/27/14 | 341 | | Rockland Trust 1296 | X | Accounts Payable | -46,684.00 |
| Bill | 05/14/15 19:23:19 | 06/28/14 | 1084 | June Amex | Accounts Payable | | -SPLIT- | -94,637.44 |
| Check | 05/11/15 14:31:26 | 08/04/14 | 335 | | Rockland Trust 1296 | X | -SPLIT- | -13,242.50 |
| Bill Pmt-Check | 08/25/14 12:41:03 | 08/05/14 | 1105 | | Rockland Trust 1296 | X | Accounts Payable | -30,000.00 |
| Check | 04/15/15 13:33:57 | 08/05/14 | 1107 | AMEX 7/29/14 | Rockland Trust 1296 | X | -SPLIT- | -38,942.85 |
| Bill | 05/14/15 17:48:28 | 08/11/14 | 369 | | Accounts Payable | | -SPLIT- | -3,000.00 |
| Check | 05/13/15 18:07:26 | 08/27/14 | 1116 | | Rockland Trust 1296 | X | -SPLIT- | -29,315.00 |
| Bill | 05/13/15 18:15:45 | 08/29/14 | | Aug. AMEX Reimb. | Accounts Payable | | -SPLIT- | -29,808.28 |
| Check | 09/15/14 16:44:45 | 09/08/14 | 1122 | | Rockland Trust 1296 | X | -SPLIT- | -25,821.25 |
| Bill | 05/11/15 12:47:14 | 09/18/14 | | KDC CK 1511 | Accounts Payable | | JW Campbell Construction | -3,000.00 |
| Bill | 04/16/15 20:53:37 | 09/28/14 | | Sept. AMEX Reimb. | Accounts Payable | | -SPLIT- | -6,275.71 |
| Bill | 05/11/15 12:18:13 | 10/02/14 | | | Accounts Payable | | -SPLIT- | -500.00 |
| Bill | 05/11/15 15:54:40 | 10/02/14 | | KDC CK 1520 | Accounts Payable | | -SPLIT- | -200.00 |
| Bill | 05/11/15 12:37:20 | 10/06/14 | | KDC CK 1490 | Accounts Payable | | -SPLIT- | -800.00 |
| Bill Pmt-Check | 04/16/15 21:46:09 | 10/10/14 | 1127 | Apr. AMEX Reimb. | Rockland Trust 1296 | X | Accounts Payable | -97,984.74 |
| Check | 05/15/15 11:12:18 | 10/10/14 | 1128 | inv. 366 & 383 | Rockland Trust 1296 | X | -SPLIT- | -43,154.79 |
| Bill | 04/16/15 20:56:49 | 10/29/14 | | Oct. AMEX Reimb. | Accounts Payable | | -SPLIT- | -31,576.05 |
| Bill | 05/11/15 15:55:42 | 11/01/14 | | KDC CK 1510 | Accounts Payable | | -SPLIT- | -9,238.92 |
| Bill | 04/16/15 20:59:02 | 11/29/14 | | Nov. AMEX Reimb. | Accounts Payable | | -SPLIT- | -620.00 |
| Bill | 04/16/15 21:00:47 | 12/29/14 | | Dec. AMEX Reimb. | Accounts Payable | | -SPLIT- | -167.00 |
| Bill | 04/16/15 21:04:14 | 01/29/15 | | Jan. AMEX Reimb. | Accounts Payable | | -SPLIT- | -7,395.73 |
| Bill | 02/12/15 15:44:43 | 02/12/15 | | Reimbursement for charge to 5... | Accounts Payable | | Boston Glass | -877.00 |
| Bill | 04/16/15 21:05:31 | 02/26/15 | | | Accounts Payable | | National Lumber | -47.78 |
| Bill | 05/13/15 18:05:08 | 04/28/15 | | Feb. AMEX Reimb. | Accounts Payable | | Sergey Nikolaev | -9,660.00 |
| Bill | 05/13/15 18:04:46 | 04/28/15 | | | Accounts Payable | | Sergey Nikolaev | -9,660.00 |
| Bill | 05/04/15 20:45:58 | 04/28/15 | | Apr. AMEX Reimb. | Accounts Payable | | Instant Interiors | -5,928.72 |
| **MA SEC OF STATE** | | | | | | | | |
| Check | 12/26/13 15:07:45 | 12/18/13 | | MA SEC OF STATE/CONVEN ... | Rockland Trust 1296 | X | -SPLIT- | -20.00 |
| Check | 12/26/13 15:07:46 | 12/18/13 | | MA SEC OF STATE/CONVEN ... | Rockland Trust 1296 | X | -SPLIT- | -500.00 |
| **Metrostone** | | | | | | | | |
| Check | 07/10/14 12:10:21 | 05/27/14 | 1070 | | Rockland Trust 1296 | X | -SPLIT- | -2,589.31 |
| Check | 07/28/14 14:24:51 | 07/28/14 | 1098 | | Rockland Trust 1296 | X | -SPLIT- | -6,906.25 |

06/02/15

**Lyman-Cutter, LLC**
**Transaction List by Vendor**
**All Transactions**

| Type | Entered/Last Modified | Date | Num | Memo | Account | Clr | Split | Amount |
|---|---|---|---|---|---|---|---|---|
| **National Grid** | | | | | | | | |
| Check | 01/17/14 10:13:40 | 08/28/13 | 1054 | Gas service - 88 Cutler | Rockland Trust 1296 | X | National Grid | -2,800.00 |
| Check | 01/17/14 10:12:06 | 08/28/13 | 1055 | Gas service - 55 Lyman | Rockland Trust 1296 | X | National Grid | -1,600.00 |
| Check | 07/28/14 14:55:40 | 01/27/14 | | | Rockland Trust 1296 | X | -SPLIT- | -8.33 |
| Check | 07/28/14 14:55:49 | 03/03/14 | | | Rockland Trust 1296 | X | -SPLIT- | -10.00 |
| Check | 07/28/14 14:55:59 | 03/27/14 | | | Rockland Trust 1296 | X | -SPLIT- | -10.00 |
| Check | 07/28/14 14:56:09 | 04/25/14 | | | Rockland Trust 1296 | X | -SPLIT- | -10.00 |
| Check | 07/28/14 14:56:39 | 05/29/14 | | | Rockland Trust 1296 | X | -SPLIT- | -198.00 |
| Check | 07/28/14 14:56:32 | 06/29/14 | | | Rockland Trust 1296 | X | -SPLIT- | -198.00 |
| Check | 07/28/14 14:56:50 | 07/25/14 | | | Rockland Trust 1296 | X | -SPLIT- | -198.00 |
| Check | 09/15/14 16:37:01 | 08/27/14 | | | Rockland Trust 1296 | X | National Grid | -5.00 |
| Check | 09/15/14 16:37:09 | 08/27/14 | | | Rockland Trust 1296 | X | National Lumber | -198.00 |
| Check | 09/30/14 14:11:48 | 09/24/14 | | | Rockland Trust 1296 | X | National Grid | -10.67 |
| Check | 09/30/14 14:11:49 | 08/27/14 | | | Rockland Trust 1296 | X | National Grid | -198.00 |
| Check | 04/16/15 21:40:20 | 10/24/14 | | | Rockland Trust 1296 | X | National Grid | -9.67 |
| Check | 04/16/15 21:40:31 | 10/24/14 | | | Rockland Trust 1296 | X | National Grid | -198.00 |
| Check | 04/16/15 22:12:31 | 01/14/15 | | | Rockland Trust 1296 | X | National Grid | -20.67 |
| Check | 04/16/15 22:20:01 | 02/03/15 | | | Rockland Trust 1296 | | National Grid | -10.00 |
| Check | 04/16/15 22:20:32 | 02/05/15 | | | Rockland Trust 1296 | | National Grid | -1,331.25 |
| Check | 04/16/15 22:34:55 | 03/06/15 | | | Rockland Trust 1296 | | National Grid | -10.00 |
| Check | 04/16/15 22:35:18 | 03/06/15 | | | Rockland Trust 1296 | | National Grid | -188.00 |
| Check | 04/29/15 08:45:49 | 04/02/15 | | | Rockland Trust 1296 | | National Grid | -10.00 |
| Check | 04/29/15 08:45:59 | 04/02/15 | | | Rockland Trust 1296 | | National Grid | -188.00 |
| Bill | 04/24/15 13:33:18 | 04/17/15 | | | Accounts Payable | | National Grid | -188.00 |
| Bill | 04/24/15 13:40:00 | 04/17/15 | | | Accounts Payable | | National Grid | -10.00 |
| Bill Pmt -Check | 05/11/15 12:21:36 | 05/01/15 | EFT | | Rockland Trust 1296 | | Accounts Payable | -188.00 |
| Bill Pmt -Check | 05/11/15 12:22:11 | 05/01/15 | EFT | | Rockland Trust 1296 | | Accounts Payable | -10.00 |
| Bill | 05/13/15 16:25:03 | 05/10/15 | | Balance due for gas charges in... | Accounts Payable | | National Grid | -2,085.43 |
| Bill | 05/13/15 16:29:24 | 05/17/15 | EFT | | Accounts Payable | | National Grid | -188.00 |
| Bill | 05/13/15 16:29:37 | 05/17/15 | EFT | | Accounts Payable | | National Grid | -10.00 |
| **NSTAR/NSTAR** | | | | | | | | |
| Check | 01/17/14 10:09:23 | 03/14/13 | | | Rockland Trust 1296 | X | -SPLIT- | -826.46 |
| Check | 01/17/14 10:14:11 | 09/06/13 | | | Rockland Trust 1296 | X | NSTAR | -37.07 |
| Check | 01/17/14 10:09:52 | 09/06/13 | | | Rockland Trust 1296 | X | NSTAR | -43.43 |
| Check | 01/17/14 10:10:07 | 10/08/13 | | | Rockland Trust 1296 | X | NSTAR | -8.14 |
| Check | 01/17/14 10:14:50 | 10/08/13 | | | Rockland Trust 1296 | X | NSTAR | -10.96 |
| Check | 01/17/14 10:31:37 | 10/30/13 | 1058 | | Rockland Trust 1296 | X | NSTAR | -29.12 |
| Check | 01/17/14 10:10:56 | 10/30/13 | 1059 | | Rockland Trust 1296 | X | NSTAR | -8.14 |
| Check | 01/17/14 10:11:09 | 12/11/13 | 1076 | | Rockland Trust 1296 | X | NSTAR | -38.31 |
| Check | 01/17/14 10:31:48 | 12/11/13 | 1077 | | Rockland Trust 1296 | X | NSTAR | -69.06 |
| Check | 01/17/14 10:32:04 | 01/13/14 | 1087 | | Rockland Trust 1296 | X | NSTAR | -30.95 |
| Check | 01/17/14 10:11:22 | 01/13/14 | 1086 | | Rockland Trust 1296 | X | NSTAR | -34.39 |
| Check | 02/14/14 11:37:10 | 02/11/14 | | | Rockland Trust 1296 | X | NSTAR | -40.04 |
| Check | 02/14/14 11:37:11 | 02/11/14 | | | Rockland Trust 1296 | X | NSTAR | -48.62 |
| Check | 03/21/14 16:15:53 | 03/19/14 | | | Rockland Trust 1296 | X | NSTAR | -89.71 |
| Check | 03/21/14 16:15:53 | 03/19/14 | | | Rockland Trust 1296 | X | NSTAR | -68.09 |
| Check | 04/18/14 17:11:36 | 04/14/14 | | | Rockland Trust 1296 | X | NSTAR | -110.98 |
| Check | 04/18/14 17:11:50 | 04/14/14 | | | Rockland Trust 1296 | X | NSTAR | -52.02 |
| Check | 05/15/14 12:05:06 | 05/13/14 | | | Rockland Trust 1296 | X | NSTAR | -40.22 |
| Check | 05/15/14 12:05:06 | 05/13/14 | | | Rockland Trust 1296 | X | NSTAR | -91.68 |

06/02/15

Lyman-Cutter, LLC
Transaction List by Vendor
All Transactions

| Type | Entered/Last Modified | Date | Num | Memo | Account | Clr | Split | Amount |
|---|---|---|---|---|---|---|---|---|
| Check | 07/10/14 12:19:13 | 06/11/14 | | | Rockland Trust 1296 | X | NSTAR | -20.15 |
| Check | 07/10/14 12:19:21 | 06/11/14 | | | Rockland Trust 1296 | X | NSTAR | -28.95 |
| Check | 07/21/14 14:54:33 | 07/15/14 | | | Rockland Trust 1296 | X | NSTAR | -9.28 |
| Check | 07/21/14 14:54:34 | 07/15/14 | | | Rockland Trust 1296 | X | NSTAR | -14.22 |
| Check | 07/21/14 14:54:36 | 07/21/14 | | | Rockland Trust 1296 | X | NSTAR | -97.66 |
| Check | 08/25/14 10:29:54 | 08/13/14 | | | Rockland Trust 1296 | X | NSTAR | -6.43 |
| Check | 08/25/14 10:30:17 | 08/13/14 | | | Rockland Trust 1296 | X | NSTAR | -8.14 |
| Check | 08/25/14 10:30:45 | 08/13/14 | | | Rockland Trust 1296 | X | NSTAR | -351.97 |
| Check | 08/25/14 10:36:47 | 08/25/14 | | | Rockland Trust 1296 | X | -SPLIT- | -3.67 |
| Check | 08/25/14 10:36:30 | 08/25/14 | | | Rockland Trust 1296 | X | NSTAR | -708.87 |
| Check | 09/15/14 16:45:22 | 09/12/14 | | | Rockland Trust 1296 | X | NSTAR | -236.80 |
| Check | 09/15/14 16:45:33 | 09/12/14 | | | Rockland Trust 1296 | X | NSTAR | -295.19 |
| Check | 04/16/15 21:38:39 | 10/20/14 | EFT | | Rockland Trust 1296 | X | NSTAR | -109.33 |
| Check | 04/16/15 21:39:31 | 10/20/14 | EFT | | Rockland Trust 1296 | X | NSTAR | -280.58 |
| Check | 04/16/15 22:07:48 | 12/23/14 | EFT | | Rockland Trust 1296 | X | NSTAR | -310.17 |
| Check | 04/16/15 22:11:41 | 01/09/15 | EFT | | Rockland Trust 1296 | X | NSTAR | -212.07 |
| Check | 04/16/15 22:11:58 | 01/12/15 | | | Rockland Trust 1296 | | NSTAR | -165.24 |
| Check | 04/16/15 22:12:14 | 01/12/15 | | | Rockland Trust 1296 | | NSTAR | -173.40 |
| Check | 04/16/15 22:22:45 | 02/23/15 | | | Rockland Trust 1296 | | NSTAR | -231.58 |
| Check | 04/16/15 22:23:05 | 02/23/15 | | | Rockland Trust 1296 | | NSTAR | -249.79 |
| Check | 04/17/15 12:17:50 | 04/07/15 | | | Rockland Trust 1296 | | NSTAR | -192.84 |
| Check | 04/17/15 12:18:22 | 04/07/15 | | | Rockland Trust 1296 | | NSTAR | -158.55 |
| Bill | 05/11/15 19:20:54 | 05/11/15 | | | Accounts Payable | | NSTAR | -338.29 |
| Bill | 05/11/15 19:21:20 | 05/11/15 | | | Accounts Payable | | NSTAR | -321.04 |

ONLINE TRANSFER TO CL.XX8800

| Type | Entered/Last Modified | Date | Num | Memo | Account | Clr | Split | Amount |
|---|---|---|---|---|---|---|---|---|
| Check | 12/12/13 16:20:40 | 07/19/13 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -183.66 |
| Check | 12/12/13 16:20:52 | 08/19/13 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -196.33 |
| Check | 12/12/13 16:21:02 | 09/18/13 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -772.67 |
| Check | 12/12/13 16:21:11 | 10/18/13 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -1,711.74 |
| Check | 12/12/13 16:21:20 | 11/18/13 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -2,377.47 |
| Check | 12/26/13 15:07:44 | 12/18/13 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -2,555.05 |
| Check | 04/16/15 21:37:29 | 10/20/14 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -5,953.65 |
| Check | 04/16/15 21:57:45 | 11/18/14 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -6,658.35 |
| Check | 04/16/15 22:07:08 | 12/18/14 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -6,333.33 |
| Check | 04/16/15 22:13:24 | 01/20/15 | | | Rockland Trust 1296 | | Interest Expenses 8800 | -6,544.44 |
| Check | 04/16/15 22:21:00 | 02/18/15 | | | Rockland Trust 1296 | | Interest Expenses 8800 | -6,544.45 |
| Check | 04/16/15 22:35:52 | 03/18/15 | | | Rockland Trust 1296 | | Interest Expenses 8800 | -5,911.11 |
| Check | 04/29/15 08:49:17 | 04/20/15 | EFT | | Rockland Trust 1296 | | Interest Expenses 8800 | -6,544.44 |

ONLINE TRANSFER TO CL.XX8900

| Type | Entered/Last Modified | Date | Num | Memo | Account | Clr | Split | Amount |
|---|---|---|---|---|---|---|---|---|
| Check | 12/12/13 16:19:56 | 07/19/13 | | | Rockland Trust 1296 | X | Interest Expenses 8900 | -183.66 |
| Check | 12/12/13 16:19:48 | 08/19/13 | | | Rockland Trust 1296 | X | Interest Expenses 8900 | -196.33 |
| Check | 12/12/13 16:19:33 | 09/18/13 | | | Rockland Trust 1296 | X | Interest Expenses 8900 | -443.34 |
| Check | 12/12/13 16:19:25 | 10/18/13 | | | Rockland Trust 1296 | X | Interest Expenses 8900 | -1,399.29 |
| Check | 12/12/13 16:19:15 | 11/18/13 | | | Rockland Trust 1296 | X | Interest Expenses 8900 | -2,126.25 |
| Check | 12/26/13 15:07:43 | 12/18/13 | | | Rockland Trust 1296 | X | Interest Expenses 8900 | -2,237.24 |
| Check | 04/16/15 21:37:02 | 10/20/14 | | | Rockland Trust 1296 | X | Interest Expenses 8900 | -5,890.00 |
| Check | 04/16/15 21:58:00 | 11/19/14 | | | Rockland Trust 1296 | X | Interest Expenses 8900 | -6,677.44 |
| Check | 04/16/15 22:07:22 | 12/18/14 | | | Rockland Trust 1296 | X | Interest Expenses 8900 | -6,333.33 |
| Check | 04/16/15 22:13:52 | 01/20/15 | | | Rockland Trust 1296 | | Interest Expenses 8900 | -6,544.45 |

06/02/15

**Lyman-Cutler, LLC**
**Transaction List by Vendor**
**All Transactions**

| Type | Entered/Last Modified | Date | Num | Memo | Account | Clr | Split | Amount |
|---|---|---|---|---|---|---|---|---|
| Check | 04/16/15 22:20:49 | 02/18/15 | | | Rockland Trust 1296 | | Interest Expenses 8900 | -6,544.44 |
| Check | 04/16/15 22:36:07 | 03/18/15 | | | Rockland Trust 1296 | | Interest Expenses 8900 | -5,911.11 |
| **P.S. Tree Service** | | | | | | | | |
| **Paul Digiacomo** | | | | | | | | |
| Check | 08/25/14 14:14:22 | 08/27/13 | 1056 | Tree removal | Rockland Trust 1296 | x | -SPLIT- | -20,500.00 |
| Check | 12/26/13 12:56:09 | 10/22/13 | 1088 | Roof Copper | Rockland Trust 1296 | x | -SPLIT- | -3,400.00 |
| Check | 12/26/13 12:56:55 | 11/13/13 | 1098 | 88 Cutler - Roof Copper | Rockland Trust 1296 | x | Contractor Expenses | -2,000.00 |
| Check | 12/26/13 12:57:33 | 11/22/13 | 123 | Roof Copper | Rockland Trust 1296 | x | -SPLIT- | -3,400.00 |
| Check | 12/26/13 15:07:47 | 12/23/13 | 1002 | | Rockland Trust 1296 | x | Contractor Expenses | -4,000.00 |
| Check | 01/10/14 15:56:41 | 12/30/13 | 1004 | Cooper | Rockland Trust 1296 | x | Contractor Expenses | -4,000.00 |
| Check | 01/16/14 11:33:31 | 01/10/14 | 1009 | Cooper | Rockland Trust 1296 | x | Contractor Expenses | -4,000.00 |
| Check | 01/30/14 15:29:55 | 01/29/14 | 1015 | Cooper | Rockland Trust 1296 | x | Contractor Expenses | -3,100.00 |
| Check | 03/14/14 16:38:34 | 03/03/14 | 1020 | Cooper | Rockland Trust 1296 | x | -SPLIT- | -2,400.00 |
| Check | 04/18/14 17:01:54 | 03/28/14 | 1046 | | Rockland Trust 1296 | x | -SPLIT- | -4,360.00 |
| Check | 04/18/14 17:07:48 | 04/08/14 | 1049 | | Rockland Trust 1296 | x | -SPLIT- | -1,450.00 |
| Check | 04/18/14 17:10:36 | 04/11/14 | 1053 | invoice 2014-010018 | Rockland Trust 1296 | x | -SPLIT- | -7,500.00 |
| Check | 05/06/14 12:44:01 | 04/18/14 | 1060 | | Rockland Trust 1296 | x | Contractor Expenses | -7,500.00 |
| Check | 07/10/14 12:09:04 | 05/23/14 | 1074 | | Rockland Trust 1296 | x | Contractor Expenses | -7,500.00 |
| Check | 07/10/14 13:08:20 | 05/30/14 | 1076 | | Rockland Trust 1296 | x | Contractor Expenses | -6,000.00 |
| Check | 07/10/14 13:10:32 | 06/27/14 | | | Rockland Trust 1296 | x | Contractor Expenses | -3,000.00 |
| Check | 07/10/14 13:13:25 | 07/03/14 | 1087 | | Rockland Trust 1296 | x | -SPLIT- | -2,500.00 |
| Check | 08/25/14 10:23:13 | 07/29/14 | 1099 | | Rockland Trust 1296 | x | Contractor Expenses | -500.00 |
| Check | 08/25/14 10:29:21 | 08/07/14 | 1106 | | Rockland Trust 1296 | x | Contractor Expenses | -1,200.00 |
| Check | 04/16/15 22:38:27 | 02/27/15 | 000 | | Rockland Trust 1296 | x | Snow Removal | -2,000.00 |
| Check | 04/16/15 22:38:53 | 02/27/15 | 001 | | Rockland Trust 1296 | x | Snow Removal | -2,000.00 |
| **Pave Tech LLC** | | | | | | | | |
| Check | 08/25/14 10:26:43 | 07/31/14 | 1102 | | Rockland Trust 1296 | x | Pave Tech LLC | -15,037.00 |
| Check | 08/25/14 10:27:20 | 08/01/14 | 1104 | | Rockland Trust 1296 | x | Pave Tech LLC | -10,533.00 |
| Check | 09/15/14 16:37:40 | 08/27/14 | 1120 | | Rockland Trust 1296 | x | Pave Tech LLC | -7,662.00 |
| **Peter Nolan and Associates** | | | | | | | | |
| Check | 12/26/13 13:03:47 | 09/24/13 | 1065 | 55/88 Lyman-Cutler | Rockland Trust 1296 | x | -SPLIT- | -3,000.00 |
| Check | 04/16/14 21:51:36 | 10/16/14 | 1130 | | Rockland Trust 1296 | x | -SPLIT- | -2,000.00 |
| Bill | 05/13/15 17:59:10 | 10/25/14 | | Final Survey balance | Accounts Payable | | Servey | -1,300.00 |
| **ProExcavation** | | | | | | | | |
| Check | 12/26/13 12:58:43 | 08/28/13 | 1057 | Excavation/Foundation | Rockland Trust 1296 | x | -SPLIT- | -90,000.00 |
| Check | 12/26/13 12:59:50 | 09/18/13 | 1066 | 88 Water/Sewer | Rockland Trust 1296 | x | Excavation | -30,000.00 |
| Check | 10/06/14 17:45:00 | 10/21/13 | 1085 | payment | Rockland Trust 1296 | x | -SPLIT- | -40,000.00 |
| Check | 10/06/14 17:45:15 | 11/05/13 | 1097 | payment | Rockland Trust 1296 | x | -SPLIT- | -40,000.00 |
| Check | 12/26/13 13:00:32 | 11/29/13 | 123 | payment | Rockland Trust 1296 | x | -SPLIT- | -10,000.00 |
| Check | 12/26/13 13:00:44 | 11/29/13 | 123 | payment | Rockland Trust 1296 | x | -SPLIT- | -10,000.00 |
| Check | 10/06/14 17:46:43 | 01/27/14 | 1014 | payment | Rockland Trust 1296 | x | -SPLIT- | -30,000.00 |
| Check | 10/06/14 17:45:55 | 02/11/14 | 1025 | | Rockland Trust 1296 | x | -SPLIT- | -45,000.00 |
| Bill | 10/06/14 17:53:23 | 10/06/14 | | | Accounts Payable | | -SPLIT- | -117,500.00 |
| Bill | 10/06/14 17:55:19 | 10/06/14 | | | Accounts Payable | | -SPLIT- | -207,500.00 |
| Check | 04/16/14 21:44:50 | 10/10/14 | 1126 | | Rockland Trust 1296 | x | -SPLIT- | -40,000.00 |

06/02/15

Lyman-Cutler, LLC
Transaction List by Vendor
All Transactions

| Type | Entered/Last Modified | Date | Num | Memo | Account | Clr | Split | Amount |
|---|---|---|---|---|---|---|---|---|
| **RAV & Associating, Inc** | | | | | | | | |
| Check | 12/26/13 13:02:16 | 06/26/13 | 1052 | Invoice 280 | Rockland Trust 1296 | X | -SPLIT- | -15,990.00 |
| Check | 12/26/13 13:02:32 | 09/13/13 | 1062 | Invoice 279 | Rockland Trust 1296 | X | -SPLIT- | -200.00 |
| Check | 12/26/13 13:02:47 | 09/13/13 | 1063 | | Rockland Trust 1296 | X | -SPLIT- | -200.00 |
| Check | 04/16/15 21:27:49 | 09/23/14 | 1123 | | Rockland Trust 1296 | X | Engeenring | -200.00 |
| Check | 04/16/15 21:52:39 | 10/20/14 | 1132 | | Rockland Trust 1296 | X | Engeenring | -200.00 |
| **Rockland Trust Bank** | | | | | | | | |
| Check | 12/09/13 15:37:56 | 02/05/13 | 1001 | | Rockland Trust 1296 | X | -SPLIT- | -6,544.44 |
| Check | 12/09/13 15:38:15 | 02/28/13 | 1100 | | Rockland Trust 1296 | X | -SPLIT- | -6,544.44 |
| Check | 12/28/13 12:23:26 | 03/28/13 | 1101 | | Rockland Trust 1296 | X | -SPLIT- | -5,911.11 |
| Check | 12/09/13 15:39:13 | 04/29/13 | 1102 | | Rockland Trust 1296 | X | -SPLIT- | -6,544.45 |
| Check | 12/09/13 11:59:58 | 05/24/13 | | | Rockland Trust 1296 | X | Bank Service Charges | -35.00 |
| Check | 12/12/13 15:49:28 | 05/24/13 | 1103 | | Rockland Trust 1296 | X | -SPLIT- | -6,333.33 |
| Deposit | 12/09/13 17:26:12 | 05/28/13 | | | Rockland Trust 1296 | X | -SPLIT- | 35.00 |
| Deposit | 12/26/13 15:11:15 | 06/21/13 | | | Rockland Trust 1296 | X | Ask My Accountant | 27,075.00 |
| Deposit | 12/26/13 15:11:27 | 06/21/13 | | | Rockland Trust 1296 | X | Ask My Accountant | 26,522.00 |
| Check | 12/09/13 15:40:45 | 06/28/13 | 1104 | | Rockland Trust 1296 | X | -SPLIT- | -6,544.45 |
| Check | 05/31/15 13:47:40 | 07/23/13 | | | Rockland Trust 1296 | X | -SPLIT- | 3,500.00 |
| Check | 12/09/13 15:41:10 | 07/29/13 | | | Rockland Trust 1296 | X | -SPLIT- | -6,333.33 |
| Check | 12/09/13 15:41:29 | 08/28/13 | | | Rockland Trust 1296 | X | -SPLIT- | -6,544.44 |
| Check | 12/09/13 17:58:26 | 09/19/13 | | | Rockland Trust 1296 | X | -SPLIT- | -35.00 |
| Deposit | 05/11/15 13:41:34 | 09/19/13 | | | Rockland Trust 1296 | X | -SPLIT- | 15,000.00 |
| Deposit | 12/09/13 15:41:59 | 09/30/13 | | | Rockland Trust 1296 | X | -SPLIT- | -6,544.45 |
| Check | 12/09/13 15:42:20 | 10/28/13 | | | Rockland Trust 1296 | X | -SPLIT- | -6,333.33 |
| Deposit | 04/29/15 14:43:37 | 11/07/13 | | Deposit | Interest Expenses 8... | | -SPLIT- | 32,000.00 |
| Check | 05/11/15 13:39:53 | 11/29/13 | | | Rockland Trust 1296 | X | -SPLIT- | 3,000.00 |
| Check | 12/09/13 15:42:33 | 11/29/13 | | | Rockland Trust 1296 | X | -SPLIT- | -6,544.45 |
| Check | 12/28/13 12:12:33 | 12/26/13 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 63,875.00 |
| Check | 07/21/14 14:57:42 | 12/26/13 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 47,875.00 |
| Check | 01/10/14 14:56:24 | 12/30/13 | | | Rockland Trust 1296 | X | -SPLIT- | -6,333.33 |
| Deposit | 05/11/15 13:42:12 | 01/07/14 | | | Rockland Trust 1296 | X | -SPLIT- | 1,000.00 |
| Deposit | 05/11/15 13:42:27 | 01/15/14 | | Advance #11 | Rockland Trust 1296 | X | -SPLIT- | 15,000.00 |
| Deposit | 07/21/14 15:00:44 | 01/17/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 95,875.00 |
| Check | 07/21/14 14:57:44 | 01/18/14 | | | Rockland Trust 1296 | X | -SPLIT- | 73,077.04 |
| Deposit | 01/24/14 16:52:39 | 01/21/14 | | | Rockland Trust 1296 | X | Interest Expenses 8900 | -2,464.03 |
| Deposit | 01/24/14 16:52:42 | 01/21/14 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -2,943.20 |
| Check | 07/21/14 15:00:51 | 01/31/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 31,980.00 |
| Check | 07/21/14 14:57:45 | 01/31/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 15,980.00 |
| Check | 02/14/14 11:37:04 | 01/31/14 | | | Rockland Trust 1296 | X | -SPLIT- | -6,544.44 |
| Deposit | 07/21/14 14:57:48 | 02/13/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 47,875.00 |
| Deposit | 07/21/14 15:00:52 | 02/13/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 63,875.00 |
| Deposit | 02/28/14 12:45:14 | 02/18/14 | | | Rockland Trust 1296 | X | Interest Expenses 8900 | -2,873.54 |
| Check | 02/28/14 12:45:36 | 02/18/14 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -3,508.99 |
| Deposit | 07/21/14 15:00:57 | 02/27/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 79,960.00 |
| Check | 03/03/14 16:16:42 | 02/28/14 | | | Rockland Trust 1296 | X | -SPLIT- | -6,544.45 |
| Check | 07/21/14 15:01:00 | 03/13/14 | | | Rockland Trust 1296 | X | Interest Expenses 8900 | -3,111.77 |
| Check | 03/21/14 16:14:50 | 03/18/14 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -3,650.40 |
| Check | 04/18/14 17:02:41 | 03/28/14 | | | Rockland Trust 1296 | X | -SPLIT- | -5,911.11 |
| Deposit | 07/21/14 14:58:39 | 04/03/14 | 1047 | Deposit | Rockland Trust 1296 | X | -SPLIT- | 79,875.00 |

06/02/15

**Lyman-Cutter, LLC**
**Transaction List by Vendor**
**All Transactions**

| Type | Entered/Last Modified | Date | Num | Memo | Account | Clr | Split | Amount |
|---|---|---|---|---|---|---|---|---|
| Deposit | 07/21/14 15:01:00 | 04/03/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 31,875.00 |
| Deposit | 07/21/14 14:58:40 | 04/10/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 79,980.00 |
| Deposit | 07/21/14 15:01:50 | 04/10/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 47,980.00 |
| Check | 05/06/14 12:39:38 | 04/18/14 | | | Rockland Trust 1296 | X | -SPLIT- | -3,692.32 |
| Check | 04/18/14 17:17:53 | 04/18/14 | | | Rockland Trust 1296 | X | Interest Expenses 8900 | -4,414.65 |
| Check | 05/06/14 12:45:34 | 04/29/14 | | | Rockland Trust 1296 | X | -SPLIT- | -6,544.44 |
| Check | 05/06/14 12:46:48 | 05/01/14 | | | Rockland Trust 1296 | X | Bank Service Charges | -35.00 |
| Check | 05/06/14 12:46:57 | 05/01/14 | | | Rockland Trust 1296 | X | Bank Service Charges | 35.00 |
| Deposit | 05/11/15 13:43:27 | 05/01/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 20,000.00 |
| Deposit | 05/11/15 13:43:52 | 05/02/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 15,000.00 |
| Check | 07/21/14 15:01:51 | 05/06/14 | | | Rockland Trust 1296 | X | -SPLIT- | 111,750.00 |
| Check | 07/21/14 14:58:43 | 05/15/14 | | | Rockland Trust 1296 | X | -SPLIT- | 47,980.00 |
| Deposit | 07/21/14 15:01:18 | 05/15/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 15,980.00 |
| Check | 07/10/14 12:07:52 | 05/19/14 | | | Rockland Trust 1296 | X | Interest Expenses 8900 | -4,264.44 |
| Check | 07/10/14 12:08:06 | 05/19/14 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -4,598.31 |
| Check | 07/10/14 12:15:00 | 05/28/14 | | | Rockland Trust 1296 | X | -SPLIT- | -6,333.34 |
| Check | 07/21/14 14:58:45 | 05/30/14 | | | Rockland Trust 1296 | X | -SPLIT- | 31,875.00 |
| Check | 07/21/14 15:01:19 | 05/30/14 | | | Rockland Trust 1296 | X | -SPLIT- | 79,875.00 |
| Deposit | 05/11/15 13:44:04 | 06/18/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 100.00 |
| Check | 07/10/14 12:20:13 | 06/18/14 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -5,050.10 |
| Deposit | 07/10/14 12:20:33 | 06/19/14 | | Deposit | Rockland Trust 1296 | X | Interest Expenses 8900 | -4,811.22 |
| Check | 07/21/14 14:58:46 | 06/19/14 | | | Rockland Trust 1296 | X | -SPLIT- | 31,875.00 |
| Check | 07/21/14 15:01:22 | 06/30/14 | | | Rockland Trust 1296 | X | -SPLIT- | 31,980.00 |
| Check | 07/10/14 12:24:21 | 06/30/14 | | | Rockland Trust 1296 | X | -SPLIT- | -6,544.44 |
| Deposit | 05/11/15 13:37:50 | 07/03/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 15,000.00 |
| Check | 07/21/14 14:58:46 | 07/03/14 | | | Rockland Trust 1296 | X | -SPLIT- | 47,875.00 |
| Deposit | 07/21/14 15:01:23 | 07/03/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 63,875.00 |
| Check | 07/21/14 14:54:34 | 07/18/14 | | | Rockland Trust 1296 | X | Interest Expenses 8900 | -4,904.12 |
| Check | 07/21/14 14:54:35 | 07/18/14 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -5,252.75 |
| Check | 04/29/15 14:30:45 | 07/24/14 | | | Rockland Trust 1296 | X | -SPLIT- | 47,875.00 |
| Check | 04/29/15 14:31:52 | 07/24/14 | | | Rockland Trust 1296 | X | -SPLIT- | 31,875.00 |
| Check | 07/28/14 14:25:23 | 07/28/14 | EFT | | Rockland Trust 1296 | X | -SPLIT- | -6,333.34 |
| Check | 08/25/14 10:25:26 | 07/31/14 | | | Rockland Trust 1296 | X | -SPLIT- | 47,980.00 |
| Check | 08/25/14 10:25:46 | 07/31/14 | | | Rockland Trust 1296 | X | -SPLIT- | 31,980.00 |
| Check | 08/25/14 10:31:20 | 08/18/14 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -5,442.44 |
| Check | 08/25/14 10:31:32 | 08/18/14 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -5,744.65 |
| Check | 08/25/14 10:33:44 | 08/21/14 | | | Rockland Trust 1296 | X | -SPLIT- | 95,875.00 |
| Deposit | 08/25/14 11:20:26 | 08/21/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 79,875.00 |
| Check | 09/15/14 16:40:32 | 08/28/14 | | | Rockland Trust 1296 | X | -SPLIT- | -6,544.44 |
| Deposit | 09/15/14 16:41:13 | 09/04/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 31,875.00 |
| Check | 09/30/14 14:11:47 | 09/18/14 | | | Rockland Trust 1296 | X | Interest Expenses 8900 | -5,976.56 |
| Check | 09/30/14 14:11:48 | 09/18/14 | | | Rockland Trust 1296 | X | Interest Expenses 8800 | -6,120.43 |
| Deposit | 05/11/15 13:32:08 | 09/29/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 2,500.00 |
| Check | 04/16/15 21:25:20 | 09/30/14 | EFT | | Rockland Trust 1296 | X | -SPLIT- | -6,544.44 |
| Deposit | 04/29/15 14:28:41 | 10/09/14 | | Deposit | Rockland Trust 1296 | X | 55 Lyman Building & Impr… | 111,875.00 |
| Deposit | 04/16/15 21:31:30 | 10/09/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 103,750.00 |
| Check | 04/29/15 14:36:31 | 10/09/14 | | | Rockland Trust 1296 | X | 55 Lyman Building & Impr… | 95,797.00 |
| Check | 10/14/14 21:34:37 | 10/14/14 | error | | Rockland Trust 1296 | X | -SPLIT- | -103,750.00 |
| Check | 04/16/15 21:41:39 | 10/27/14 | | | Rockland Trust 1296 | X | Interest Expense 4600 | -6,333.34 |
| Deposit | 05/11/15 13:34:37 | 10/30/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 25,000.00 |

06/02/15

Lyman-Cutter, LLC
Transaction List by Vendor
All Transactions

| Type | Entered/Last Modified | Date | Num | Memo | Account | Clr | Split | Amount |
|------|----------------------|------|-----|------|---------|-----|-------|--------|
| Deposit | 05/11/15 13:34:45 | 11/18/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 5,000.00 |
| Deposit | 05/11/15 13:34:54 | 11/25/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 6,000.00 |
| Check | 04/16/15 21:58:43 | 11/28/14 | | | Rockland Trust 1296 | X | Interest Expense 4600 | -6,544.44 |
| Deposit | 04/16/15 13:34:59 | 12/17/14 | | Deposit | Rockland Trust 1296 | X | -SPLIT- | 20,000.00 |
| Check | 04/16/15 22:08:14 | 12/29/14 | | | Rockland Trust 1296 | X | Interest Expense 4600 | -6,333.34 |
| Deposit | 05/11/15 13:35:06 | 01/08/15 | | Deposit | Rockland Trust 1296 | | -SPLIT- | 2,000.00 |
| Deposit | 05/11/15 13:35:12 | 01/14/15 | | Deposit | Rockland Trust 1296 | | -SPLIT- | 15,000.00 |
| Deposit | 05/11/15 13:35:19 | 01/26/15 | | Deposit | Rockland Trust 1296 | | -SPLIT- | 20,000.00 |
| Check | 04/16/15 22:14:14 | 01/28/15 | | | Rockland Trust 1296 | | Interest Expense 4600 | -6,544.44 |
| Deposit | 05/11/15 13:35:29 | 01/29/15 | | Deposit | Rockland Trust 1296 | | -SPLIT- | 2,500.00 |
| Deposit | 05/11/15 13:35:34 | 02/10/15 | | Deposit | Rockland Trust 1296 | | -SPLIT- | 15,000.00 |
| Deposit | 05/11/15 13:35:42 | 02/18/15 | | Deposit | Rockland Trust 1296 | | -SPLIT- | 13,000.00 |
| Deposit | 05/11/15 13:35:51 | 02/25/15 | | Deposit | Rockland Trust 1296 | | -SPLIT- | 15.26 |
| Check | 04/16/15 22:23:26 | 02/26/15 | | | Rockland Trust 1296 | | Interest Expense 4600 | -6,544.44 |
| Deposit | 05/11/15 13:35:56 | 02/27/15 | | Deposit | Rockland Trust 1296 | | -SPLIT- | 5,000.00 |
| Deposit | 05/11/15 13:36:03 | 03/13/15 | | Deposit | Rockland Trust 1296 | | -SPLIT- | 15,000.00 |
| Deposit | 05/11/15 13:37:06 | 03/27/15 | | Deposit | Rockland Trust 1296 | | -SPLIT- | 8,000.00 |
| Check | 04/16/15 22:36:26 | 03/30/15 | | | Rockland Trust 1296 | | Interest Expense 4600 | -5,911.12 |
| Deposit | 04/29/15 08:48:31 | 04/17/15 | | Deposit | Rockland Trust 1296 | | -SPLIT- | 15,000.00 |
| Check | 04/29/15 08:49:56 | 04/20/15 | EFT | | Rockland Trust 1296 | | Interest Expenses 8900 | -6,544.45 |
| Deposit | 04/29/15 08:50:27 | 04/22/15 | | Deposit | Rockland Trust 1296 | | -SPLIT- | 12,000.00 |
| Deposit | 04/29/15 08:50:59 | 04/27/15 | | Deposit | Rockland Trust 1296 | | -SPLIT- | 20,000.00 |
| Check | 04/29/15 08:52:05 | 04/28/15 | EFT | | Rockland Trust 1296 | | Interest Expense 4600 | -6,544.44 |
| Bill | 05/13/15 16:09:40 | 05/10/15 | | | Accounts Payable | | Interest Expenses 8800 | -6,333.34 |
| Bill | 05/13/15 16:09:58 | 05/10/15 | | | Accounts Payable | | Interest Expenses 8900 | -6,333.33 |
| Bill | 05/13/15 16:11:38 | 05/10/15 | | | Accounts Payable | | Interest Expense 4600 | -6,544.44 |
| **Segal Insurance** | | | | | | | | |
| Check | 12/09/13 17:57:48 | 04/11/13 | 1051 | | Rockland Trust 1296 | X | -SPLIT- | -744.00 |
| Check | 02/14/14 11:37:08 | 02/05/14 | | | Rockland Trust 1296 | X | Insurance Expense | -2,250.00 |
| Check | 02/14/14 11:37:08 | 02/05/14 | | | Rockland Trust 1296 | X | Insurance Expense | -2,250.00 |
| Check | 03/14/14 16:38:00 | 03/03/14 | 1021 | | Rockland Trust 1296 | X | -SPLIT- | -1,488.00 |
| **Sergey Nikolaev** | | | | | | | | |
| Check | 04/28/15 18:07:22 | 02/26/14 | 1032 | | Rockland Trust 1296 | X | -SPLIT- | -10,000.00 |
| Check | 04/28/15 18:03:18 | 05/27/14 | 1073 | | Rockland Trust 1296 | X | Sergey Nikolaev | -10,000.00 |
| **Sounberg & Creeden** | | | | | | | | |
| Check | 01/10/14 16:02:18 | 01/07/14 | 1106 | Tax Preparation 2012 | Rockland Trust 1296 | X | -SPLIT- | -1,000.00 |
| Check | 04/16/15 22:00:33 | 11/04/14 | 1107 | Inv. 10/17/14 Tax Prep 2013 | Rockland Trust 1296 | X | Professional Services | -1,000.00 |
| **Town of Brookline** | | | | | | | | |
| Check | 05/14/15 17:41:28 | 04/01/13 | 1050 | | Rockland Trust 1296 | X | -SPLIT- | -450.00 |
| Check | 01/24/14 16:53:20 | 01/21/14 | | | Rockland Trust 1296 | X | -SPLIT- | -12,635.68 |
| Check | 01/24/14 16:55:44 | 01/22/14 | 1026 | | Rockland Trust 1296 | X | -SPLIT- | -160.00 |
| Check | 04/18/14 17:16:44 | 04/14/14 | | | Rockland Trust 1296 | X | Disposal | -210.35 |
| Check | 04/18/14 17:16:56 | 04/14/14 | | | Rockland Trust 1296 | X | -SPLIT- | -155.11 |
| Check | 04/18/14 17:18:14 | 04/14/14 | | | Rockland Trust 1296 | X | -SPLIT- | -12,635.69 |
| Check | 04/18/14 17:17:12 | 04/16/14 | | | Rockland Trust 1296 | X | Water | -80.00 |
| Check | 04/18/14 17:17:22 | 04/16/14 | | | Rockland Trust 1296 | X | Water | -80.00 |
| Check | 07/10/14 12:28:45 | 07/07/14 | | | Rockland Trust 1296 | X | -SPLIT- | -15,064.59 |
| Check | 07/10/14 12:31:16 | 07/08/14 | | | Rockland Trust 1296 | X | Disposal | -48.79 |
| Check | 07/10/14 12:31:27 | 07/08/14 | | | Rockland Trust 1296 | X | Disposal | -49.19 |
| Check | 07/21/14 14:54:35 | 07/18/14 | | | Rockland Trust 1296 | X | Water | -80.00 |

06/02/15

Lyman-Cutler, LLC
Transaction List by Vendor
All Transactions

| Type | Entered/Last Modified | Date | Num | Memo | Account | Clr | Split | Amount |
|---|---|---|---|---|---|---|---|---|
| Check | 07/21/14 14:54:36 | 07/18/14 | 1110 | | Rockland Trust 1296 | X | Water | -80.00 |
| Check | 08/25/14 10:34:33 | 08/22/14 | | | Rockland Trust 1296 | X | Police Details | -396.00 |
| Check | 04/16/15 21:33:41 | 10/07/14 | | | Rockland Trust 1296 | X | Business License and Pe... | -50.00 |
| Check | 04/16/15 21:33:35 | 10/07/14 | | | Rockland Trust 1296 | X | Business License and Pe... | -50.00 |
| Check | 04/16/15 21:39:07 | 10/20/14 | | | Rockland Trust 1296 | X | Water | -195.90 |
| Check | 04/16/15 21:39:54 | 10/20/14 | | | Rockland Trust 1296 | X | Water | -337.80 |
| Check | 04/16/15 21:57:08 | 11/05/14 | | | Rockland Trust 1296 | X | Taxes-Property | -7,192.41 |
| Check | 04/16/15 21:57:22 | 11/05/14 | | | Rockland Trust 1296 | X | Taxes - Property | -7,871.38 |
| Check | 04/16/15 22:06:31 | 12/09/14 | | | Rockland Trust 1296 | X | Taxes-Property | -20.00 |
| Check | 04/16/15 22:06:47 | 12/09/14 | | | Rockland Trust 1296 | X | Taxes-Property | -500.00 |
| Check | 04/16/15 22:14:53 | 01/29/15 | | | Rockland Trust 1296 | X | Taxes-Property | -6,420.32 |
| Check | 04/16/15 22:15:05 | 01/29/15 | | | Rockland Trust 1296 | X | Taxes-Property | -6,991.98 |
| Check | 04/16/15 22:24:50 | 01/29/15 | 1134 | | Rockland Trust 1296 | | Taxes-Property | -50.00 |
| Check | 04/16/15 22:25:14 | 01/29/15 | 1135 | | Rockland Trust 1296 | | Taxes-Property | -50.00 |
| Check | 04/16/15 22:26:02 | 01/29/15 | 1136 | | Rockland Trust 1296 | | Taxes-Property | -91.00 |
| Check | 04/16/15 22:32:14 | 01/29/15 | 1137 | | Rockland Trust 1296 | | Taxes-Property | -687.50 |
| Check | 04/16/15 22:27:16 | 01/29/15 | 1138 | | Rockland Trust 1296 | | Taxes - Property | -91.00 |
| Check | 04/16/15 22:30:18 | 01/29/15 | 1140 | | Rockland Trust 1296 | | Taxes - Property | -981.50 |
| Bill | 04/24/15 13:33:47 | 04/01/15 | | | Accounts Payable | | Disposal | -50.00 |
| Bill | 04/28/15 18:12:23 | 04/01/15 | | | Accounts Payable | | -SPLIT- | -6,992.37 |
| Bill | 04/28/15 18:11:55 | 04/01/15 | | | Accounts Payable | | -SPLIT- | -6,420.72 |
| Bill | 04/24/15 13:40:55 | 04/01/15 | | | Accounts Payable | | Disposal | -50.00 |
| Bill | 04/24/15 13:39:17 | 04/14/15 | | | Accounts Payable | | Water | -85.50 |
| Bill | 04/24/15 13:39:31 | 04/14/15 | | | Accounts Payable | | Water | -5.00 |
| Bill | 04/24/15 13:41:12 | 04/14/15 | | | Accounts Payable | | Water | -85.50 |
| Bill | 04/24/15 13:41:26 | 04/14/15 | | | Accounts Payable | | Water | -5.00 |
| Bill Pmt -Check | 05/04/15 20:44:03 | 04/29/15 | EFT | | Rockland Trust 1296 | | Accounts Payable | -6,992.37 |
| Bill Pmt -Check | 05/04/15 20:44:23 | 04/29/15 | EFT | | Rockland Trust 1296 | | Accounts Payable | -6,420.72 |
| Bill Pmt -Check | 05/11/15 12:24:36 | 05/01/15 | EFT | | Rockland Trust 1296 | | Accounts Payable | -50.00 |
| **Umanas Plastering** | | | | | | | | |
| Check | 03/14/14 16:36:21 | 03/10/14 | 1036 | | Rockland Trust 1296 | X | -SPLIT- | -10,000.00 |
| Check | 04/18/14 17:00:28 | 03/24/14 | 1044 | | Rockland Trust 1296 | X | Plastering | -10,000.00 |
| Check | 04/18/14 17:15:08 | 04/15/14 | 1052 | | Rockland Trust 1296 | X | Plastering | -15,000.00 |
| Check | 07/10/14 12:11:35 | 05/27/14 | 1071 | | Rockland Trust 1296 | X | Plastering | -4,000.00 |
| Check | 09/15/14 16:40:25 | 09/03/14 | 1121 | | Rockland Trust 1296 | X | -SPLIT- | -3,000.00 |
| Check | 04/16/15 21:50:41 | 10/13/14 | 1129 | | Rockland Trust 1296 | X | Plastering | -3,501.97 |
| **Unicorn Electric** | | | | | | | | |
| Check | 02/16/14 16:41:47 | 09/25/13 | 1070 | 55 Lyman | Rockland Trust 1296 | X | Electrical Services | -10,000.00 |
| Check | 02/16/14 16:41:22 | 09/26/13 | 1071 | 88 Cutler | Rockland Trust 1296 | X | -SPLIT- | -10,000.00 |
| Check | 01/16/14 11:33:34 | 01/15/14 | 1008 | 88 Cutler | Rockland Trust 1296 | X | Electrical Services | -10,000.00 |
| Check | 02/28/14 12:47:52 | 02/21/14 | 1030 | | Rockland Trust 1296 | X | -SPLIT- | -15,000.00 |
| Check | 08/12/14 12:34:25 | 03/13/14 | 1041 | | Rockland Trust 1296 | X | -SPLIT- | -10,000.00 |
| Check | 05/06/14 12:43:41 | 04/18/14 | 1058 | | Rockland Trust 1296 | X | Electrical Services | -10,000.00 |
| Bill | 04/29/15 11:17:49 | 04/28/15 | | | Accounts Payable | | Electrical Services | -30,000.00 |
| Bill | 04/29/15 11:18:02 | 04/28/15 | | | Accounts Payable | | Electrical Services | -35,000.00 |

06/02/15

Lyman-Cutler, LLC
Transaction List by Vendor
All Transactions

| Type | Entered/Last Modified | Date | Num | Memo | Account | Clr | Split | Amount |
|------|----------------------|------|-----|------|---------|-----|-------|--------|
| **V&D Heat** | | | | | | | | |
| Check | 12/26/13 13:07:20 | 10/28/13 | 1091 | 55 Lyman | Rockland Trust 1296 | X | Heating and Cooling | -10,000.00 |
| Check | 12/26/13 13:06:59 | 10/28/13 | 1092 | 88 Cutler | Rockland Trust 1296 | X | Heating and Cooling | -10,000.00 |
| Check | 01/10/14 16:02:17 | 01/07/14 | 1007 | 88 Cutler | Rockland Trust 1296 | X | Heating and Cooling | -25,000.00 |
| Check | 06/05/14 17:32:52 | 03/07/14 | 1035 | 88 Cutler | Rockland Trust 1296 | X | Heating and Cooling | -25,000.00 |
| Check | 05/06/14 12:42:48 | 04/18/14 | 1056 | | Rockland Trust 1296 | X | Heating and Cooling | -10,000.00 |
| Check | 07/21/14 14:52:02 | 07/10/14 | 1088 | | Rockland Trust 1296 | | -SPLIT- | -1,100.00 |
| Bill | 04/29/15 11:18:31 | 04/28/15 | | | Accounts Payable | | Heating and Cooling | -13,950.00 |
| Bill | 04/29/15 11:18:46 | 04/28/15 | | | Accounts Payable | | Heating and Cooling | -23,950.00 |

Page 13

# EXHIBIT 18

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS
                                                    SUPERIOR COURT DEPT.
                                                    C.A. No. 1581CV03977

LYMAN-CUTLER, LLC,                    )
                                      )
            Plaintiff,                )
                                      )
    v.                                )
                                      )
VADIM KAGAN, TATIANA KAGAN, and       )
CENTURY 21 COMMONWEALTH               )
                                      )
            Defendants.               )

> EXHIBIT
> Brusenkova 7
> 7-20-18 QA

## AFFIDAVIT OF KRISTINA BRUSENKOVA

I, Kristina Brusenkova, under oath, state as follows:

1.    I am over the age of 18 and make the following statements based upon my own personal knowledge.

2.    I formerly served as the bookkeeper for Kagan Development KDC Corp. ("KDC"). I started out working for a company that provided accounting services to KDC, and then joined KDC as its bookkeeper at or about the beginning of 2014. I served as the bookkeeper for KDC until October 2014, when Mr. Kagan and his wife Tatiana abruptly fired me when I informed them that I was pregnant with Mr. Kagan's child. I later lost the baby due to the stress of the way they treated me.

3.    As KDC's bookkeeper, I kept track of the expenses and the invoices for each of Vadim Kagan's projects, including the Lyman-Cutler LLC project. The Lyman-Cutler project involved building two new houses on Lyman Road and Cutler Avenue. I also kept the books for ProExcavation and for all of Mr. Kagan's and his wife, Tatiana's, personal accounts.

4.      Vadim Kagan had two main companies when I worked for him -- KDC and ProExcavation. Neither company had many employees.  When I worked at KDC, other than Vadim Kagan and myself, the only other employees were Yegeniy Augureev and Ryan O'Grady (until he was fired).  ProExcavation's only employee was Mr. Kagan.  The actual construction and excavation work on the projects was done by subcontractors hired by Mr. Kagan.

5.      All records were kept only on the copy page in the checkbooks. Upon completion of construction, cost estimates were calculated based on data that had been recorded in the checkbooks KDC would create invoices from the amounts in the checkbook, but if the amount seemed too low to Mr. Kagan, he would cut another check and add it to the invoice. When I first started to do the bookkeeping, I found a lot of missed amounts and we issued a lot of additional invoices to the investors (example, Hyde Ave).

6.      Mr. Kagan's standard practice for each project was to form a limited liability company to own the property. He usually had investors who would invest the cash necessary to fund the project, along with bank loans. Sometimes Mr. Kagan did a project on his own without outside investors.

7.      On projects where Mr. Kagan had outside investors, he regularly double-billed those projects by submitting invoices from ProExcavation for work that he also billed to the Project through KDC or for which he also directly submitted the subcontractor's bills for payment by the Project.

8.      For example, all of the landscaping work was done through and billed to the projects by ProExcavation. I have reviewed some Quickbooks reports for the Lyman-Cutler project and it appears to me that Mr. Kagan billed the project twice for excavation and landscaping work -- once through ProExcavation and once directly from KDC for the payments to the subcontractors who did

2

the work. The double billing increased in July 2014 when ProExcavation ran into financial trouble.

9.    On projects where Mr. Kagan had investors, he paid more to the survey company for the same work that he would pay less for on his projects.

10.    Mr. Kagan was close personal friends with some of his subcontractors and he would some times pay them more than the job was worth and have them kick back some of the payment to him in cash.

11.    I also know of at least one instance in which Mr. Kagan submitted a claim to an insurance company for damage to a property in double the amount necessary for the repairs, then kept the extra insurance money and then also included the damage to the property in the project expenses to decrease the profit on the project. He said "now we have enough funds to travel." He also confessed to me that he had caused the damage to the property intentionally -- he had someone stuff a rag in the sink and leave the water on and claim it was accident.

12.    Mr. Kagan bought materials using his American Express card but did not keep track of which project the materials were for. He would arbitrarily assign costs to projects. He also would regularly get credits to his account for returns that he would keep for himself and not credit back to his projects. He used to refer to these credits as his "commissions."

13.    Mr. Kagan also received refunds from NStar or National Grid on all of his projects, which he kept for himself and did not credit back to the project.

14.    When Mr. Kagan submitted bills to projects for ProExcavation, he would arbitrarily charge whatever fee he felt like he could get away with. There was no direct connection between the charge submitted to the project and the costs that KDC or ProExcavation had incurred for materials or for paying the subcontractors. It started when he was doing a project on Florence Street and encountered a rock. He doubled the excavation price and noticed the investor did not

have enough force to confront him. After that, he started to bill instead of regular price of

$200,000.00 - 250,000.00 - more than $400,000.00 for every house.

15.    Mr. Kagan rarely had written invoices or estimates with his subcontractors. He would agree with them on a price and pay them in installments as he had money. When I became the bookkeeper I tried to insist on written proposals but I did not always succeed.

16.    Sometimes if Mr. Kagan did not have enough money to pay the subcontractors on one project, but he had money on another project, he would pay them ahead of time for work they had not yet done on the project where he had money in order to keep them happy. I have reviewed some Quickbooks reports from the Lyman-Cutler project and it appears to me that he paid the subcontractors before they did work on the Lyman-Cutler project.

17.    Mr. Kagan was responsible for paying the carrying costs on his deals, and would borrow more money from the bank than the construction required in order to pay the carrying costs. He did that on the Lyman-Cutler project. He would prepare one budget for the bank and another for his investors. At some point in each project, he would ask investors to contribute toward the carrying costs.

18.    When I was working for KDC, I used an email address, Kagandevelopment@gmail.com, which should have a lot of emails with attachments that will help document the costs on the project and should also include copies of Quickbooks files.

**SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS /4 DAY OF JULY, 2015.**

_____
Kristina Brusenkova

# EXHIBIT 19

# OCM

## O'Connor
## Carnathan
## and Mack LLC

Landmark One
1 Van De Graaff Drive
Suite 104
Burlington, MA 01803

Tel: 781.359.9000
Fax: 781.359.9001

www.ocmlaw.net

Sean T. Carnathan
Direct Line: 781.359.9002
scarnathan@ocmlaw.net

May 11, 2018

***By First Class Mail and E-mail***

John H. Perten, Esq.
Sheehan Phinney Bass + Green
255 State Street
Boston, MA 02109

Re:   **Lyman Cutler, LLC et al. v. Vadim Kagan, et al.**
      **Chapter 7 No. 15-13881-FJB, A.P. No. 16-1120**

Dear John:

I write in follow up regarding the document issue I raised at the deposition of Joseph Cohen.

As you know, we challenge the authenticity of the purported June 2013 contract between Lyman Cutler LLC and Kagan Development KDC Corp., which Mr. Cohen drafted and Mr. Kagan signed for both parties (the "KDC Contract"). We, in fact, believe that Mr. Cohen and Mr. Kagan concocted this false document in June **2015** in order to inflate the charges inserted in the fraudulent June 22, 2015 mechanics lien that Mr. Cohen drafted.

We hereby demand production of the original, native format document of the KDC Contract with all metadata. I was amused that Mr. Cohen launched into an explanation of how his old computer was gone before I even asked about it at his deposition. Plainly, he had discussed the questions I asked Mr. Kagan with Mr. Kagan beforehand and was prepared to claim that computer was gone. If the Defendants are unable to produce the original native KDC Contract, it is our intention to seek an order compelling a forensic examination of Mr. Cohen's computer(s).

There are a number of other documents whose authenticity we challenge. I hereby demand that the Defendants produce for our inspection the originals of the following documents, with regard to which we will object to the admission of photocopies at trial unless the Defendants can demonstrate to us that there are legitimate originals:

John H. Perten, Esq.
May 11, 2018
Page 2

- The ProExcavation Proposals (Proof of Claim Binders, Lyman Tabs 39, 47 & 50, Cutler Tabs 36, 45 & 48)
- The Unicon Proposals (Proof of Claim Binders, Lyman Tab 37, Cutler Tab 33)
- V&D Proposals and invoices (Proof of Claim Binders, Lyman Tab 43, Cutler Tab 41)
- Dream Flooring invoices (Proof of Claim Binders, Lyman Tab 36, Cutler Tab 32)
- BST Plumbing invoices (Proof of Claim Binders, Lyman Tabs 53 & 60, Cutler Tabs 37 & 51)
- DaCosta invoices and Change Orders (Proof of Claim Binders, Lyman Tab 40, Cutler Tab 38)
- Décor Art Proposals and invoices (Proof of Claim Binders, Lyman Tab 35, Cutler Tab 31)
- Sergey Nikolaev invoices (Proof of Claim Binders, Lyman Tab 4, Cutler Tab 3)

To the extent any of these originals exist, please make them available at the deposition of Dan Gersh.

Very truly yours,

Sean T. Carnathan

4823-1932-2469, v. 1

# EXHIBIT 20

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:* ) | |
| ) | |
| LYMAN-CUTLER, LLC, ) | Chapter 7 |
| ) | |
| Debtor ) | Case No. 15-13881 FJB |
| ) | |

| | |
|---|---|
| LYMAN-CUTLER, LLC, ALEX FILIPPOV, ) | |
| and NICKOLAY LIPETSKER, ) | |
| ) | |
| Plaintiffs, ) | |
| v. ) | Adv. Case No. 1:16-ap-01120 |
| ) | |
| VADIM KAGAN, TATIANA KAGAN, ) | |
| KAGAN DEVELOPMENT KDC, CORP.and ) | |
| PROEXCAVATION CORP. ) | |
| ) | |
| Defendants. ) | |

## **Introduction:**

1.      My name is Michael Goldman.  I am a Certified Public Accountant, a Certified
Fraud Examiner, a Certified Valuation Analyst, and Certified in Financial Forensics.  I have a
Bachelor of Arts degree from Rice University in Houston, Texas with majors in Economics and
Managerial Studies.  I also have a Master of Management degree from the J.L. Kellogg Graduate
School of Management at Northwestern University in Evanston, Illinois with concentrations in
Accounting and Finance.

2.      I have been qualified as an expert witness in Federal court cases both in and out of
bankruptcy and in State courts in the states of Illinois, Indiana, and Wisconsin.  My
qualifications have been in the areas of Accounting, Internal Control, Insolvency, Fraud,
Forensic Accounting, Business Valuation, and Business Management.  The list of cases that I
have testified in is included in my Curriculum Vitae in Appendix 1.

3.     I have served as a court-appointed Examiner and have worked as a forensic accountant for bankruptcy trustees, banks, unsecured creditors, company owners, and the management teams of companies. I have performed forensic accounting in shareholder disputes, marital dissolution, commercial damages, bank fraud, embezzlement, skimming, and personal damage cases. A listing of the forensic accounting cases that I have worked in is in Appendix 1.

4.     I was a Senior Auditor at Touche Ross, now Deloitte, where a significant part of my responsibilities included the analysis, evaluation, or design of internal controls for companies ranging from start-ups to Sears Roebuck.

5.     I worked for 14 years as the Controller or Chief Financial Officer of Silvestri Corporation, Handy Andy Home Improvement Centers, Sportmart, and Office 1 Superstores where I was directly responsible for the design, establishment, maintenance, and execution of all company internal controls. Internal Controls that I was directly responsible for were audited by the accounting firms of Deloitte, KPMG, PWC, and Arthur Andersen and no exceptions or problems were noted.

6.     I have authored chapters about investigation of fraud in peer-reviewed books published by the Association of Certified Fraud Examiners, the American Bankruptcy Institute, and Aspen Law and Business. I authored a series of articles about accounting and internal control in The Corporate Counselor, a Law Journal Newsletter for in-house attorneys. I have had a chapter I wrote about insolvency and taxes published in a book by Westlaw. I have also had numerous other fraud, accounting, or finance related articles published in professional journals for business valuation professionals and matrimonial lawyers. A listing of my publications is in Appendix 1.

7.     I have experience managing, consulting to, valuing, or investigating over 200 businesses in numerous industries, of numerous entity types, and of various sizes. A representative client list is included in Appendix 1.

8.     As well as my hands-on experience with the financial management of growing mid-sized companies, I was on the faculty at the Lake Forest Graduate School of Management from 1998 to 2013 where I taught a course in Entrepreneurship that dealt with all aspects of starting and managing a new business. I also designed and taught courses in Financial Management and Control in the Lake Forest Corporate Education Division of the school.

9.     From 2008 through the end of 2014 I was a member of the Editorial Board of The Value Examiner, a Professional Journal for the consulting disciplines and published by the National Association of Valuation Analysts. In January 2012 I began a two-year term as Chairman of the Editorial Board. In November 2016 I rejoined the Editorial Board. The Value Examiner publishes articles on business valuation, forensic accounting, fraud risk management, business damages, and other topics for consultants.

10.     I have written articles that have been published in professional journals such as The Value Examiner, Illinois Family Law Report, American Journal of Family Law, the Journal of Corporate Renewal, and The Corporate Counselor. I have written chapters in the following

published professional books: Fraud Casebook - Lessons from the Bad Side of Business, Valuing Professional Practices and Licenses, American Bankruptcy Institute's Commercial Fraud Manual, and Strategic Alternatives for Distressed Businesses.

11.     I have reviewed the accounting of other construction and excavation companies similar in size and type to Kagan Development Corp. including home builders and sole-proprietor excavators.  I have helped similar companies establish and / or maintain their accounting systems, I have prepared tax returns for similar companies, and I have performed forensic investigations on similar companies.

12.     KCP Advisory Group ("KCP") has been retained by O'Connor, Carnathan and Mack, LLC and the Tamposi Law Group, P.C. as counsel for Alex Filippov, Nickolay Lipetsker and Lyman-Cutler, LLC to assist with the litigation matter captioned above.  I am a Senior Managing Director of KCP.  I performed all of the work for this matter.

## Background of the case:

13.     The debtor / plaintiffs were investors in a project to build two luxury homes. Defendant Kagan served as the general contractor for the project.

14.     Plaintiff Lyman-Cutler LLC ("LCLLC" or the "Company") is a Massachusetts Limited Liability Company formed in November 2012.  Under the express terms of the LLC Agreement, Mr. Kagan was responsible for completing construction of the two new homes no later than March 30, 2014.

15.     LCLLC borrowed approximately $3.2 million to finance construction and carrying costs.  Most of this money was paid to Kagan Development KDC, Corp ("KDC"), Pro Excavation (a company related to KDC), and to subcontractors hired by KDC to perform the construction of two properties in Brookline; one at 55 Lyman Avenue and the other at 88 Cutler Lane.  These two properties arose out of the division of a parcel that previously contained one house with the address of 77 Lyman Avenue.

16.     Mr. Kagan failed to complete the construction of the two new homes on or before March 30, 2014. On the contrary, construction was not complete until either August or October 2014:

a.     On August 15, 2014 Kristina Brusenkova, KDC's accountant and office manager, wrote an email to Mr. Filippov (KAGAN 01220) saying:

"88 Cutler is 100% complete. There is a staging in the house and it is open for showing. Will be on the market on Tuesday. Price is $5,500,000.00

55 Lyman Rd will be on 98% complete at the end of next week, including landscaping."

      b.     The two houses, at 55 Lyman Road and 88 Cutler Lane, both
received their Certificates of Occupancy from the Town of
Brookline on October 2, 2014

17.     On or about May 7, 2015 Mr. Kagan claimed for the first time that he had cost
overruns on the Project adding up to over $1 million.  According to the letter from Alexander H.
Pyle, attorney for Mr. Kagan and Kagan Development Corporation, these overruns consisted of
$758,025.56 in unreimbursed construction costs, approximately $50,000 in additional expected
vendor costs and $251,000 in carrying costs.

18.     On June 22, 2015, Kagan Development KDC Corp. filed a mechanics lien against
LCLLC's properties, asserting a lien in the amount of $2,095,985.23.  Documentation of this
claim was not provided until the litigation among the parties.

19.     The debtor / plaintiff alleges that the Kagan Defendants have acted together in a
self-dealing conspiracy to defraud the Plaintiffs by knowingly and intentionally inflating
purported construction charges and executing knowingly unauthorized and fraudulent contracts.

20.     Since commencing this action, Plaintiff has interviewed and/or deposed several
witnesses who are former investors in other various Kagan projects as the Plaintiffs are
experiencing and who have reported that they experienced the same type of conduct by Mr.
Kagan in connection with their projects. Specifically, Dmitry Zhukovskiy, Alexander
Fodymanow, Elena Lande, Mark Kayserman, and Vladislav Abramsky reported that Mr. Kagan
presented them with a budget at the outset of their projects, assured them that everything was
within budget until long after construction was complete and shortly before the homes sold, and
then announced extensive cost overruns and either filed a lien or threatened to file a lien unless
they agreed to the payment of these last minute purported cost overruns.

21.     I have been retained in this matter to assist with the review of documents provided
by Vadim Kagan and other evidence obtained in this matter and opine on the veracity of the
accounting information and documentary support provided by the Defendants with regard to the
mechanics lien.

22.     In conducting my analysis, I have reviewed various documents produced in this
matter including documents produced by Mr. Kagan to support his claims, QuickBooks files and
other documents from various Kagan projects other than the project in question, excerpts of
accounting records of KDC and Pro Excavation provided by Mr. Kagan and his outside CPA,
deposition transcripts, and other material provided by Plaintiff's attorneys.

23.     I reserve the right to modify or supplement this report as appropriate.

## Summary of Observations:

24.     Mr. Kagan produced a binder with 1,282 pages of documents to support his lien
claims on the two LCLLC properties.  The binder includes QuickBooks print-outs of activity by
vendor, invoices from vendors, portions of credit card statements, some copies of specific
checks, and heavily redacted segments of bank statements.  He subsequently provided

accounting files and records for KDC, Pro Excavation, and five of his other projects as part of the discovery process.

25.     Some of the documentation provided is for quotes and estimates as opposed to actual invoices.  Real invoice copies are needed to verify the accuracy of all charges recorded were not provided.

26.     Many of the purported invoices and payments were dated as late as May 2015, well after the August or October 2014 substantial completion of the two properties.  Some of the purported invoices were dated even later, into at least August 2015.

27.     It was noted from the partial records received that many documents, such as checks or invoices, were written out of sequence.  In properly managed businesses checks are almost always written in sequence, although sometimes there are reasons for an occasional breach in the use of check numbers, such as emergency payments.  I am not aware of any legitimate reason why invoice numbers would ever be used out of sequence.

28.     As will be discussed throughout this report, the documentation maintained and provided by Mr. Kagan is unreliable.  Documentation is very important in a construction project because it is the only contemporaneous record of what was happening at any given time during the course of the project. Documentation is the framework on which a claim is built; without it, there is no contemporaneous evidence to prove a claim.

29.     Project documents kept on a contemporaneous basis provide a permanent record which allows the detailed reconstruction, review, and analysis of events and actions of the project. The destruction of or failure to maintain project documents is destruction of evidence which severely handicaps the impacted party in presenting its case to the trier of fact. Such destruction or failure to maintain proper records violates industry practice and may violate the law, depending on the circumstances.  As detailed below, Mr. Kagan's record keeping was not complete or contemporaneous.

30.     Documentation for construction projects generally consists of the following items:

a.     Contracts between the Owner and Contractor

b.     Contracts between the Owner, Architect, Design Sub-Consultants, Contractor, and Subcontractors

c.     Contract drawings, including index and revisions

d.     Specifications, including general conditions, special conditions, technical specifications, and revisions

e.     Construction Schedules:

   i.     Baseline

   ii.     Updated

   iii.     As-Built

f.   Purchase orders

g.   Invoices for materials

h.   Bid analysis sheet

i.   Monthly payment requisitions with itemized breakdowns of amounts

j.   Monthly payments to contractor

k.   Payments to subcontractors and suppliers

l.   Change Orders - including all relevant back-up computations, and their status (i.e. requested, in process, or approved)

m.   Contractor payroll records and time cards

n.   Contractor cost reports

o.   Construction progress photos

p.   Itemized equipment hours charged to the project

q.   Procurement records for major items or long-lead items

**Most of these items were either totally missing from the documentation provided or, as discussed throughout this report, were not maintained in a proper manner.**

31.    During the pendency of the LCLLC project work, according to Defendants' answers to interrogatories as well as Kagan Development's web site, Ms. Brusenkova, and other sources such as real estate sites such as Zillow, Trulia, and Redfin, Mr. Kagan may have been working on the following projects, among others, whose timelines would have overlapped with the two LCLLC projects:

a.   10 Lyman Rd in Brookline.  7/9/12 - 5/1/15   According to Google Maps, this property is 0.1 miles from the LCLLC properties.

b.   50 Yarmouth Rd in Brookline.  1/23/13 – 10/29/14   According to Google Maps, this property is 0.6 miles from the LCLLC properties

c.   51 Parker Ter in Newton.  3/12/14 – 5/13/15   According to Google Maps, this property is 3.4 miles from the LCLLC properties

d.   131 Cynthia Rd in Newton.  12/26/12 – 5/13/15   According to Google Maps, this property is 3.5 miles from the LCLLC properties

e.   7 Fredette Rd in Newton.  12/31/13 – 3/31/15   According to Google Maps, this property is 3.8 miles from the LCLLC properties

f.   30 Hyde Ave in Newton.  5/10/12 – 4/18/14   According to Google Maps, this property is 4.0 miles from the LCLLC properties

g.   53 Wallace St, Newton.  9/16/13 – 2/24/15   According to Google Maps, this property is 4.4 miles from the LCLLC properties

h.   24 Druid Hill Road, Newton.  6/21/13-8/7/14   According to Google Maps, this property is 4.8 miles from the LCLLC properties   Note that there was also a Kagan property at 40 Druid Hill Road outside the time frame that this report covers.  24 Druid Hill Road is the property referred to in this report.

i.   6 Deborah Road, Newton.  6/1/12 – 8/22/13

j.   40 Druid Hill Rd, Newton (renovation) 10/1/15 – 9/1/16

k.   104 Dorcar Rd, Newton  10/19/12 -12/17/13

l.   73 Fuller Street, Newton  4/3/12 – 12/17/14

m.   143 Florence St, Newton  10/17/12 – 6/6/14

n.   80 Dorcar Rd, Newton  6/28/12 – 4/23/15

o.   1657 Centre St, Newton  8/14/14 – 2/3/16

p.   18 Valley Spring, Newton  5/13/14 – 6/2/16

q.   1580 Beacon St, Newton  8/26/14 – 10/7/16

r.   12 Valley Spring, Newton  6/22/15 – 4/28/17

s.   1664 Centre St, Newton  6/30/15 – 8/18/17

32.   As can be seen from the proximity of all of the projects, it is conceivable that materials could have been purchased for multiple sites and all delivered and charged to one site or multiple sites. Without working internal controls such as budgets and monitoring of actual costs to planned costs, there would be no way to detect if this were occurring.  Cost inconsistencies between the projects indicate that materials may have been paid for by one project but used at another.

33.   Mr. Kagan had check writing authority on the LCLLC bank account and drew funds from the account at his sole discretion.

34.   Expenses related for the LCLLC projects were sometimes paid from the LCLLC account and sometimes paid from a Kagan Development KDC Corp checking or credit card account.  This is not a proper practice and no explanation has been provided as to what would be paid out of one company or the other, and why.  The lack of controls and oversight opened the possibility for a commingling of entities and / or a commingling of projects.

## Summary of Opinions and Conclusions:

Based on the specific observations made below, my opinion and conclusion is that the claims made by the Defendant for the mechanics lien claim are not reliable or credible. Specifically:

35.    The summary sheets used in the mechanics lien claim made by the Defendant are problematic:

    a.    It appears that some of the Summary Sheets by Vendor are altered versions of the original accounting records and that they have incorrect, overstated amounts.

    b.    The totals accounted for on the Summary Sheets by Vendor often are not adequately supported.  There are many instances in which the detail presented does not add up to the amount being claimed on the summary sheet.

    c.    Based on the QuickBooks file that was provided, there are expenses in QuickBooks which were not documented at all in the mechanic's lien claim binder.

36.    The detail provided for support for some of the charges for some of the vendors has serious credibility problems.  In over twenty years of forensic investigation I have only seen this much inconsistency and incredibility in one other set of documentation, and that was in a case where it was determined that a significant fraud had been perpetrated.

37.    The accounting processes used by the Defendant had material control weaknesses and cannot be relied upon to provide accurate information.

38.    None of the KDC representatives were able to adequately defend their documentation in deposition. The company CFO admitted that much of the support for the accounting records did not exist and was created long after the fact.  As detailed in the "Specific Questions regarding the veracity of invoices and payments claimed" section below, these recreations of what people thought may or may not have happened are sloppy, inaccurate, and highly suspect.  They do not provide adequate evidence on which to base a claim of this size and nature.

39.    Based on the deposition testimony of Mr. Kagan and his current and former employees, on my review of the accounting records and documents purporting to support the mechanic's lien claim, and on my extensive experience reviewing the books, records, and claims of many companies over the years, **my conclusion is that the accounting processes employed by Mr. Kagan are severely deficient and that the attempts to recreate data that was never properly captured the first time are not at all convincing**.  The claim as it is presented now is not supported with reliable information and, based on how pervasive the problems are, may be knowingly fraudulent.

# Overview KDC's Accounting in the Context of Competency and Fraud:

40.     According to the U.S. Small Business Association, "The term "record keeping" refers to the orderly and disciplined practice of storing business records. Record keeping is one of your most important responsibilities as a small business owner. The success of your business depends on creating and maintaining an effective record system, whether your business is a sole proprietorship, partnership, or corporation."

41.     Record keeping is not solely about fulfilling regulations or legal requirements. Record keeping is also about understanding your business, now and in the future. Reasons why companies should keep good records include:

    a.     Detail Tracking: Owning a small business requires tracking a significant amount of information, such as customers, sales, and inventory. Without a proper record keeping system, owners lose sight of important business details that very often lead to problems and ultimate insolvency.

    b.     Planning:  Planning is one of the most important functions of management, and without reliable information good planning is almost impossible.  Without detailed plans and adequate information to monitor progress towards the planned goals, good project management becomes virtually impossible.

    c.     Legal compliance: Companies typically execute contracts and are required to hold various licenses and permits. Employers are required to maintain and report employee payroll for tax purposes.  Local, state, and federal governments require various business licenses and permits. Most commercial construction activities require a license or permit.  A company that hires employees needs a good enough record system to comply with numerous local, state, and federal payroll and personnel legal requirements.

    d.     Tax preparation (federal, state, and local)

42.     One of the most basic tenets of having a good accounting system is the use of pre-numbered or sequentially numbered documents.  In addition to the amount due, the invoice number is the second most important number on an invoice or payment record. Methodically assigning a unique number to each invoice provide a means to identify it. Using a numbering system facilitates the search for an invoice or payment.

43.     Consecutive or sequential invoice numbers help to ensure that each invoice is unique and each business transaction can be clearly and comprehensively organized and referenced – for accounting reasons as well as customer support and making sure that the invoice gets paid. While a receipt is generally used as proof of payment and therefore documents a

finalized sale, an invoice is a request for payment that includes more detailed payment or contact information in addition to pricing information for the goods or services rendered. Having a proper invoice numbering system helps to avoid both lost or duplicate payments that can amount to large losses for a company.

44.    An error-free invoice is an important requirement for businesses who want to avoid legal conflicts with customers or the IRS. Though invoices are not subject to strict regulation in the US, it is always better to have clear documentation and most reputable businesses do so.  Proper invoices usually contain:

    a.    The name and address of both the seller and the recipient

    b.    The date of the sale or service provided

    c.    A detailed description of the sale or service provided

    d.    The price of each sale or service provided

    e.    An itemization of all additional charges

    f.    The due date and terms

    g.    An invoice number and date

45.    Invoices from reputable contractors usually include additional information specific to their business that customers usually ask for such as their Tax ID number, their License number, the words "licensed and bonded", and warranty information.  Usually contractors have their invoices pre-printed or they use accounting software such as QuickBooks which have document templates and sequentially number each document.  With both pre-printed and computer-generated documents, each invoice will look essentially the same as every other invoice, and there should not be variance in document format or appearance and there should not be numbers used out of sequence.

46.    As will be discussed below, many of KDC's sub-contractors and vendors did not follow the basic protocols of invoicing as described above.  KDC also did not follow these protocols for most of the time period under review.  While it is not unusual to come across an occasional small business with poor documentation or sloppy controls, it has been my experience that every other time I have seen this pattern of pervasive conduct within a group of companies doing business together, it has ultimately been found that there was fraud involved.

47.    Kristina Brusenkova, KDC's accountant, testified that she had a master's degree in Accounting, business, economics, and auditing from a college in Russia.  Daniel Gersh, the KDC accountant after Ms. Brusenkova, testified that he had both an undergraduate and a master's degree in accounting from Bentley.  Both testified that they had prior accounting experience before joining KDC.  In Mr. Gersh's case, he is a Certified Public Accountant who had experience with KPMG, a "Big-4" accounting firm.  Each of these two accountants should have known the basics of accounting and internal control, yet the accounting files that they were

involved with that were produced showed **consistent lack of either competence or integrity**. Problems noted include:

a.   An insufficient audit trail including unsupported balances or transactions, or missing support or documents.  Audit trails provide a critical component in both control of the business and in both fraud prevention and detection by proving the legitimacy of transactions.  A clear audit trail consists of source documents that are easily retrievable and a clear record of how they were accounted for.  As will be discussed below, **the audit trails at KDC and Pro Excavation were insufficient**.  Had documents been handled and assembled in a way that leaves an easy to follow audit trail it is unlikely that there would be huge surprise cost overruns at the ends of the projects.

b.   **Transactions that were not recorded in a complete, timely, or proper manner**.  My review of the accounting files for six of the KDC projects showed many transactions that were recorded 6 or more months after they occurred.  Many transactions were recorded in lump-sum, which obscured their details.  Key and basic functionality of the QuickBooks software such as the invoicing and accounts payable modules were barely or improperly used.  Poor accounting practice is evident in that in 2015 the outside CPAs proposed **$3.2 million of adjusting entries** for that one year to correct the books of KDC and properly prepare the tax return.

c.   **Commingling of assets or transactions** across business entities occurred in numerous instances.  Commingling payment methods was also prevalent, with no apparent pattern as to when an invoice would be paid by LCLLC, by KDC via check, or by KDC via credit card.  Typically this degree of commingling or complexity in the handling of cash is either done to disguise or confuse the nature of individual transactions.  Sometimes it is indicative of a just-in-time crisis mentality at a company that is unable to properly anticipate and manage its affairs.

d.   It is very **poor payment practice** to pay anything (quotes, estimates, pro-forma invoices, etc.) other than real, valid invoices or statements.  Not only were these all of these non-invoices used as alleged support for payments claimed in the documentation of the mechanic's lien, but payments were even purportedly made or amounts added to the alleged claim simply on the basis of email notes asking for money.

e.   The documents presented as proof of costs in the mechanic's lien often **displayed inadequate authorization or support for the disbursements being made and the payment of invoices that looked spurious on their face.**

f.      Poor accounting practices often lead to inaccurate tax filings.  There are emails in the record between KDC and its CPA about "making up" journal entries to complete tax returns.  KDC's 2014 and 2015 tax returns were amended due to errors regarding the ownership of the project entities.

While none of these findings by themselves are proof of fraud, the pervasive presence of all of these findings together in the presence of accountants who should know better are strongly **indicative of either gross incompetence or fraud**.

48.      Mr. Kagan is a licensed contractor in the Commonwealth of Massachusetts.  As such he should be aware of the need to have contracts with his sub-contractors, to obtain estimates and proposals, to have individual budgets and schedules, to have material requirements and bills of materials, to adequately track payments and amounts due to sub-contractors, and to obtain lien waivers from all sub-contractors upon their work's completion.  None of these were consistently provided in the evidence produced to us.  In fact, not a single lien waiver was obtained. The fact that these project management and documentation tools did not exist is evident in the fact that huge cost overruns are suddenly discovered at the end of several of KDC's projects.  The refusal or inability to following basic construction management and accounting procedures is indicative of either gross incompetence or fraudulent activity.

49.      One of the final determinants of proper accounting is that it makes sense in relation to the business and economic environment that the firm is operating in.  In addition to the construction cost overruns being claimed in this case, according to several affiants and former investors with Mr. Kagan, KDC has a history of unexpected cost overruns that only appear months after construction was completed:

| Affiant | Project | Unexpected Overrun |
|---------|---------|--------------------|
| Dmitriy Zhukovskiy | Hyde Avenue | 510,000 |
| Alexander Fodymanow | Lyman Road | 418,495 |
| Elena Lande | Yarmouth Rd | 1,074,956 |
| Mark Kayserman | Deborah Rd | 111,000 |
| Vladislav Abramskiy | Cynthia Rd | 171,933 |

In my experience of 22 years working with small businesses and insolvent companies, a company the size of KDC could not stay solvent and operating with such poor cost control that it had unexpected overruns of this size and frequency.  Furthermore, the sub-contractors being used by KDC, who apparently cannot afford to buy either the pre-printed forms or the small business accounting package that would allow them to bill and collect their receivables in a timely manner, could not survive for many months while being owed the magnitude of money that KDC claims they had not previously billed but were in fact owed.

50.      Another test of whether the numbers for a particular project make sense is to compare the various KDC projects to each other.  Based on the QuickBooks files provided for each project, the 4 houses that KDC built with investors (10 Lyman, 55 Lyman, 88 Cutler, and 50 Yarmouth) were on average 27% larger (which would not impact many of these costs) but

cost on average 80% more to build than the three projects built without investors (Parker, Fredette, and 24 Druid Hill). Although I am not a construction expert and I have not done a feature by feature comparison of each house, some of the differences in cost, the usage of materials, and the expenditures on labor between the investor-houses and the KDC-only houses are absolutely striking:

| KDC Homes - Project Comparison based on Selected Costs recorded in QuickBooks files | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Built with Investors | | | | KDC Only | | |
| | 55 Lyman | 88 Cutler | 10 Lyman | Yarmouth | Parker | Fredette | Druid |
| Affordable Lawn Sprinklers | 8,400 | 8,400 | 8,620 | 8,600 | 2,176 | 1,775 | 3,400 |
| Architecture | 10,500 | 10,500 | 7,100 | 13,000 | 5,800 | 5,800 | |
| Dream Flooring | 56,120 | 41,550 | 45,067 | 45,067 | other less expensive co's used | | |
| Electrical Services | 65,000 | 65,000 | 65,000 | 75,000 | 30,000 | 20,000 | 25,000 |
| Engineering | 9,075 | 9,075 | 3,680 | 9,600 | 2,663 | 3,060 | |
| Excavation | 300,000 | 300,000 | 304,800 | 195,000 | 180,000 | 170,000 | 180,000 |
| Framing | 188,435 | 194,420 | 107,280 | 104,050 | 39,200 | | 37,800 |
| Heating and Cooling | 59,500 | 59,500 | 65,500 | 59,500 | 36,000 | 34,150 | 46,550 |
| Home Depot | 67,683 | 64,311 | 55,841 | 68,662 | 32,455 | 25,627 | 29,006 |
| Horner Millwork | 123,390 | 117,196 | 125,090 | 121,946 | 34,609 | 25,528 | 42,686 |
| Huntington TV | 7,597 | 6,600 | 741 | 10,024 | 6,752 | 5,417 | 4,000 |
| JW Campbell Construction | 90,069 | 81,851 | 82,538 | 44,029 | 31,074 | 32,255 | |
| Landscaping - Other | 45,285 | 49,201 | 111,404 | 110,740 | 18,032 | | 4,500 |
| Masonry | 90,000 | 90,000 | 166,906 | 145,000 | | 8,877 | |
| National Lumber | 269,918 | 249,995 | 66,148 | 178,153 | 68,047 | 43,707 | 72,232 |
| Paul DiGiacomo | 47,605 | 36,905 | 38,850 | 55,360 | 1,150 | | 1,800 |
| Plastering | 21,500 | 24,002 | 23,429 | 23,778 | 14,102 | 12,761 | 16,211 |
| Plumbing | 40,170 | 39,670 | 31,360 | 37,340 | 18,000 | 20,336 | |
| Protection | 5,937 | 5,925 | 5,980 | 5,822 | 1,402 | 1,495 | 1,603 |
| Sergey Nikolaev | 24,660 | 24,660 | 26,700 | 25,440 | 15,000 | 10,000 | 17,000 |
| square footage | 7,478 | 7,478 | 6,726 | 7,007 | 5,891 | 5,090 | 5,989 |
| total cost / sq ft | $  250 | $  236 | $  272 | $  262 | $  144 | $  130 | $  144 |

Note that the total cost shown above is the total of all costs, not just the selected costs actually shown.

## Specific Questions regarding the veracity of invoices and payments claimed

51.   As discussed in detail below, the claim documentation provided by the Defendant has so many inconsistencies, inaccuracies, mistakes, missing documents, unexplained changes to "historical" information, etc. that it I cannot conclude that it is credible.

52.   Construction subcontractors typically provide lien waivers to evidence that they have been paid and do not have a claim to the property. Lien waivers typically state the subcontractor's name, the address of the property worked on, a description of the work performed, and the exact amount of payment. They are legal documents and usually are signed

and notarized. **Mr. Kagan did not provide any lien waivers in the documentation
supporting his claim.**

53.   Ms. Brusenkova alleged in her affidavit that KDC overpaid some subcontractors
and then took kickbacks. While there was no direct proof of this in the evidence provided by Mr.
Kagan (nor would it be expected to be), this possibility should be kept in mind while reading the
deficiencies, irregularities, and unusual items found in the documentation supporting the
mechanic's lien.

54.   **Most businesses follow a standard set of accounting and operating
procedures**, both because they enhance control of the business and because they make running
the business simpler. For example;

    a.    Most companies sequentially number their important documents such as
checks and invoices and adhere to the integrity of the numerical sequence.
Document numbers are usually pre-printed, and if not they tend to be
computer generated from accounting software such as QuickBooks.

    b.    Most companies and even most individual sole proprietors use a standard
template for their forms because either they are computer-generated, they
are preprinted, or it is just plain easier to use a template in a word
processing or spreadsheet program than it is to create the form from
scratch each time it is needed.

    c.    Even in cases where business owners do not use computers or pre-printed
forms, people are habitual. For example, some people always put their
area code in parentheses, and some people never do, but hardly anybody
randomly switches back and forth from one convention to the other.
Likewise, most people consistently write dates in the same format. When
there are variances in common data fields such as these they are usually an
indication that multiple parties have prepared the documents.

    d.    In almost every case I have seen where the integrity of numerical
documents has been frequently violated, or common forms that are able to
be standardized or fit into a template appear instead to be created from
scratch each time, or people do not follow normal habitual patterns, these
anomalies have been reliable indications of the documents being
fraudulent. These anomalies have sometimes been found to be
explainable, but the more often they are found the greater the likelihood
that the documents are not authentic.

    e.    When business owners misspell their own name, there is a very high
probability that the invoice is not authentic.

    f.    Computers are consistent – when a name is entered into a field, that name
stays the same on document after document. When computer generated

documents have inconsistencies within the same field, that is often an indication that some of the documents are not authentic.

g.      While it is not uncommon for small businesses or individual sole proprietors to not have what would be considered proper form on business documents, it is very uncommon for them to be inconsistent (to use states in some addresses but not others, to vary the use of upper and lower cap cases, to use invoice numbers or not to use invoice numbers, etc.).  In every case where I have seen numerous inconsistencies among numerous vendors, accompanied by claims of cost overruns, it has been determined that fraud was being committed.

55.     The documentation shows that some expenses were paid by LCLLC, some were paid by KDC via check, some were paid somehow by Pro Excavation, and some were paid by KDC via credit card.  There was no discernable pattern as to how an invoice would be paid. There were no sufficient reconciliations provided to ensure that costs were not double paid.

56.     Evidence relating to vendors discussed below is included in appendices attached to this report.  It should also be kept in mind while reviewing these write-ups of invoices that were issued in February, April, and May of 2015 that both homes were completed by October 2014.

57.     As described below, the QuickBooks file that was produced by the Defendant differs from the QuickBooks reports used in the documentation submitted to support the mechanic's lien claim.  When reviewing the supporting evidence in the appendices to this report note the following:

a.      Reports from the documentation provided with the mechanic's lien claim have a KAGAN bates number on them.

b.      Reports generated from the QuickBooks file produced by the Defendant, which has significant differences than that that was used in the claim documentation, have a July 2018 date in the upper left corner and do not have a bates number.

58.     The documentation provided for **Construction Specialties** indicates that the **QuickBooks file that was produced to the Plaintiffs by Mr. Kagan is either not the same QuickBooks file that was used to produce the mechanic's lien claim, or a clone of the QuickBooks file was made and subsequently altered to prepare the mechanic's lien claim:**

a.      There are total charges for $17,965 to Construction Specialties on the March 2014 Amex card to LCLLC.  This is for 4 invoices issued in Feb and Mar 2014.

b.      In the LCLLC QuickBooks file that was produced by Mr. Kagan, this charge shows up correctly for $8,982.50 to each house, total $17,965.

c.   According to the claim documentation for the mechanic's lien that was submitted by Mr. Kagan, the QuickBooks report shows that each house was charged $14,130 for Construction Specialties on the March 2014 Amex reimbursement. **The Amex billing for March 2014 listed in the mechanics lien claim was overstated by a total of $10,295.**

d.   I ran an audit trail report for all transactions on the March 2014 Amex billing and they show the amount for Construction Specialties has always been $8,982.50 per house. The $14,130 charges never show up.   This means that either the Plaintiff was given a totally different file than the one that was used to prepare the mechanics lien claim, or more likely at some point Defendants took the original accounting file and cloned it and then modified it to inflate the amounts on the lien, but they produced the original unmodified version. **There is no other conceivable reason for this discrepancy.**

e.   The detail supporting invoices for Construction Specialties that were produced to back up the amounts on the QuickBooks reports total $36,530. One invoice for $9,250 has a printed note saying "revised" and a handwritten note saying "not paid?" and if this is subtracted the total of the invoices are $27,280. The total payments for Construction Specialties according to the QuickBooks file I have is $27,625. **Again, this shows the mechanics lien claim is overstated.**

59.   Based on the QuickBooks file produced by the Defendant, charges to each house for **Horner Millworks** for the May American Express bill were $26,938.92. I verified from the AMEX bill that this is the correct amount. However, the QuickBooks reports used in the mechanic's lien claim for Horner Millwork are for $35,060.84. **The QuickBooks reports used in the mechanic's lien claim for Horner Millworks were inexplicably changed and overstated by a total of $16,243.84 for the month of May 2014 alone.**

60.   When compared to invoices from other projects, **the invoices provided in the mechanic's lien claim for Huntington TV** appear to be fabricated:

a.   The invoices from the other projects use 6-digit invoice numbers and have compact spacing in the body of the invoice.

b.   The invoices purported to be for LCLLC have wasted spacing and unnecessary printing in the invoice body and only have 5-digit invoice numbers.

c.   There are two invoices, both dated 4/22/14, with invoice numbers 132 apart. Huntington is a family-owned retailer for digital theater & music systems, plus installation services. April 22 was a Tuesday, one of the slowest days of the week for retailers. It is unlikely that there would have

been 132 other sales in-between processing order for the two LCLLC homes.

    d.    One of the purported invoices from Huntington is actually titles "Statement". The "statement", which uses a 6-digit invoice number, is nonsensical: An invoice number is listed but shows an "amount" for $996.99 and a "balance" for $8,108.89. The past due amounts are $5,900.30 for 30 days and $2,208.39 for 60 days. These should correspond to invoices that were issued, because the purpose of a statement is to recap the invoices still due to be paid. There is not correspondence of the amounts on the statement to anything.

    e.    The purported invoice copies that were provided do not agree to the QuickBooks reports provided in the mechanic's lien claim.

    61.    **Décor Art** was a sub-contractor to both of the LCLLC projects as well as the Druid Hill, Yarmouth, and Lyman Road projects. The Décor Art production consists mostly of undated invoices and proposals, many of which look suspicious. A review of the invoices supplied by KDC from Décor Art (see Appendix) showed:

    a.    Some of the invoices used "MA" in the address. Most did not use the state as part of the address. Invoice preparers are usually consistent and if prepared by one person the state would either always be there or always not be there.

    b.    Décor Art's invoices used a colored bar in the middle of them that contained the invoice number. On non-LCLLC projects, the bar is solid. On most of the invoices for LCLLC the bar has a gradient to it that is not seen on the non-LCLLC invoices. This is not related to time, as when the invoices are sorted in invoice number order there are still differences in the gradient of the invoice number bar between LCLLC and non-LCLLC invoices.

    c.    Invoices #1015 to 88 Cutler Road and #1016 to 50 Yarmouth Rd have a different invoice body than all other invoices – there are no grid lines. **Differences such as this indicate a possibly fabricated invoice.**

    d.    **Invoice #1016 to 50 Yarmouth Road appears to be a fabrication.** It has different fonts than any other invoice. It also capitalizes the first letter in each word in the slogan "where quality comes first", while none of the other invoices do that. It also lists the phone numbers in opposite order than all other invoices do. It also spells the word "Painting" wrong in the masthead that is supposedly a constant portion of all Décor Art stationary.

    e.    Invoice # 1020 was used twice, once on an invoice to 88 Cutler for $10,000 and once on an invoice to 55 Lyman for $5,000. They were paid

two months apart. **Duplicate invoice numbers often indicate fabrication.**

f.   Invoices 1047 to 88 Cutler and 1048 to 55 Lyman both have the same gap in the grid work that contains the body of the invoice. No other Décor Art invoices have that gap.

g.   Some of the invoices use all lower-case letters, some use all upper-case letters, and some use proper sentence protocol in capitalization.

h.   Invoice #1076 was used twice on two separate invoices to 88 Cutler. On the invoice for $8,750, the invoice bar appears to have been cut and pasted on to the document. The other invoice for $4,250 has indications on it that the bottom portion of the document was obliterated from being copied.

i.   Jose Porto testified in deposition that he formed Décor Art in November 2012. He stated that his typical practice – which he used for this project – is to make verbal requests for payment 4 or 5 times throughout the project, which each request based upon 25% job completion (at start, ¼ way through, ½, ¾, and final payment). He stops doing work if he is not paid within a week of requesting payment. He does not prepare written invoices, unless he was asked to perform extra work. Even though he will not work if he is not paid, the records indicate significant amounts of money were owed to him.

j.   The claim files have unpaid bills for $15,450 allegedly dated 2/12/15, 4/28/15, and 5/28/15. One of these late invoices, #1057 for $8,750, does not appear in the QuickBooks file produced by the Defendants even though that file had entries in it that were made as late as 5/11/15.

k.   Invoice #1067 for $420 is listed as being for $1,420 in the QuickBooks report used in the mechanic's lien claim.

62.   **Paul DiGiacomo** is a subcontractor of KDC who was reported to have been paid about $100,000 for work on the LCLLC projects. According to the Wellesley Patch, he was arrested on March 12, 2012 for numerous warrants including larceny over $250 by false pretense – being an unlicensed home improvement contractor. The exhibits show invoices that were all issued within a few months of each other but are each substantially different from the others which strongly implies that they were fabricated:

a.   Invoice 20140028 dated 6/6/14 appears to be generated on a QuickBooks template but is missing the detail amounts that QuickBooks requires to prepare an invoice. Only the total amount is present. The area code of Mr. DiGiacomo's phone number is typed in parentheses.

b.   Invoice 20140066 dated 7/3/14 appears to be properly generated on a QuickBooks template. The amount of $1,500 has been entered in the

detail section of the invoice but is usually left-justified. This amount has
been manually typed because it is right-justified. The area code of Mr.
DiGiacomo's phone number is typed in parentheses.

c.    Invoice 20140069 has been typed free-form style instead of using the
template of the previous two invoices. DiGiacomo's name is on the right,
Kagan's name is on the left, and the phone number area code has no
parentheses. The "g" in "DiGiacomo" is not capitalized as it is in the
other three invoices.

d.    The invoice for the week of August 8th has no invoice number,
DiGiacomo's name is centered, Kagan's name is on the right, and the
word "Tasks" is not used as it is in all the other invoices.

e.    Invoice #9 dated 8/6/15 for $35,805 misspelled Mayfield, Lyman, and
Kagan's email address. Unlike any of the other invoices, this one was
produced by a web service www.aynax.com. This invoice was for
roofing, which had already passed inspection many months earlier.

f.    No detail was provided for the charges in the claim relating to Cutler.

g.    Other than a couple of emails, none of the other projects had invoices from
DiGiacomo in the files that were produced by the Defendant. There were
two instances where Mr. DiGiacomo simply emailed a request for money.

h.    Charges for snow cleaning in 2014 and early 2015 were added to the claim
after the QuickBooks file of 5/14/15 was produced by the Defendant.

63.    **JW Cambell Construction** issued numerous invoices to LCLLC. They appear to
be computer-generated from an accounting software package similar to QuickBooks. All of the
invoices that were paid directly by LCLLC show the "Work Performed at:" address as "88 Cutler
Rd., Brookline". For some reason three invoices relating to LCLLC were paid by KDC instead
of LCLLC. Those specific invoices are different from the invoices paid by LCLLC directly:

a.    One of these, invoice 2647 for Hutch and Pantry Bar and paid 6/11/14 for
$4,022 has a number of anomalies:

i.    The Location is "88 Cutler Ln., Brookline", not "Cutler Rd." as in
the other invoices

ii.    The estimate was for $4,800 but has $4,022 handwritten on it as
the amount paid, and that is the amount on the QuickBooks ledger.

iii.    The invoice was for $4,000 but has the "amount paid" handwritten
in on it as $4,800.

iv.    Invoice 2661 for $800 appears to be for the remainder of the Hutch
and Pantry Bar project and is marked as paid, but neither the

amount ($800) or the check number (1361) shows up on the QuickBooks ledger sheet for payments to this vendor.

b.    Another of these invoices paid by KDC instead of LCLLC, but charged to LCLLC in the ledger sheet, does not list the address of the property at all in the "Work Performed at" box

c.    According to the QuickBooks file JW Campbell billed or was paid over $171,919. Other than a few cancelled checks, there is no support for any of these charges in the documentation provided with the mechanics liens.

64.    According to its website, **Pave Tech** has been in business since 1989. A company this well-established would be expected to use sequential invoice numbers, to have invoice numbers that were 4-digits long or more, and to have more than one sale per month. The documentation provided by Mr. Kagan shows that:

a.    On 7/28/14 invoice #5 was issued for $15,037

b.    On 7/29/14 invoice # 5 was issued again, for $10,533

c.    On 8/24/14 invoice #6 was issued for $7,662

d.    On 9/29/14 invoice #6 was issued again for $7,022

e.    Invoices for other projects that were produced were:

        i.    On 11/11/14 Invoice #8 was issued to Yarmouth for $8,158

        ii.    On 12/5/14 an invoice with no invoice number was issued to Parker for $12,000

        iii.    On 12/17/14 an invoice with no invoice number was issued to Fredette for $6,436

        iv.    On 6/9/15 an invoice with no invoice number was issued to Parker for $7,500

f.    It is very unusual for companies to issue invoices with invoice numbers and then stop using invoice numbers.

g.    The invoices that do not have invoice numbers are printed slightly differently than those that do have invoice numbers: The former have the word "To" in the address and the latter do not. They also address to "Kagan Development Corp" while the numbered invoices all address to "Kagan Development".

h.    Check # 1120 for $7,662 was issued in August 2014 and cleared the bank that month. It is recorded in the QuickBooks file used for the mechanic's lien but not in the file produced by the Defendant. That means the check was entered after 5/11/15, 9 months after it was written. If it took 9

months to find this omission and enter it, that indicates that the **bank account had not been reconciled for 9 months.**

65.    **BST Plumbing** issued invoice #1165 on 2/14/15 and invoice #1166 on 3/1/15, indicating no other sales during the two weeks between them.  Except for the invoice numbers and dates, the two invoices are identical.  The invoices are for plumbing, which had already passed final inspection many months earlier.

f.    On 8/18/15 BST issued additional invoices #216 and 217 (out of sequence) for materials and rough plumbing.  BST responded to a subpoena for information and the response showed:

a.    BST invoice 1165 was dated 2/14/15 and invoice 1166 was dated 3/1/15.

b.    Invoices 1165 and 1166 are identical, even though they are for two different houses.

c.    Each of the invoices are marked in handwriting that $20,000 was paid and $19,670 is still outstanding.

d.    According to LLLLC's QuickBooks audit trail report, two invoices each for $11,360 from BST Plumbing were entered into the accounts payable system on 4/29/15 at 10:14 a.m.  27 minutes later, at 10:41 a.m. the amounts of both invoices was changed to $19,670.

e.    For 55 Lyman, invoice 1165 is dated 2/14/15 and the QuickBooks record shows the $20,000 payment as having been on check 1040 dated 3/12/14.  The check was written before the invoice date.

f.    For 88 Cutler, invoice 1166 is dated 3/1/15 and the QuickBooks record shows the $20,000 payment as having been on check 1017 dated 2/4/14.  The check was written before the invoice date.

g.    The remaining $19,670 allegedly open on both of the above invoices was entered into QuickBooks for each house separately as a new bill dated 4/28/15

h.    BST invoices 216 and 217 are for the two houses and are identical to each other.   They are dated 8/18/15, five months later than invoices 1165 and 1166 (invoices not being issued in numerical sequence).  Both invoices are for rough materials and both indicate that $3,500 was paid.

i.    The documentation for the rough materials comes from Ferguson Enterprises.  There is a set of quotes for each home.  Each set has two quotes and the two quotes in one set are identical to the two quotes in the other set except their time stamp and bid numbers are different.  The Ferguson quotes are dated 8/19/15, one day later than the invoices for these exact materials were prepared by BST.

j.     If the quotes are for actual materials purchased for these two houses, the materials were all purchased months after the work was done by BST and months after the houses were listed for sale.

k.     BST provided two handwritten notes in its deposition materials stating that $3,500 of the materials for each house was paid directly to Ferguson Plumbing Supply. According to KDC's QuickBooks production these payments were made on 10/29/14, 10 months before Ferguson quoted on them to BST and BST invoiced them to the projects.

l.     Mr. Kagan produced an AMEX receipt for a charge at Ferguson made on 10/9/14 for $7,000. There is no detail provided with this, nothing like the extensive quotations that Ferguson supplied to BST.

m.     The quotations prepared by Ferguson in August 2015 do not give credit for the $7,000 paid in October 2014, even though BST does on its invoices.

n.     The Town of Brookline issued the plumbing permit for 88 Cutler on August 29, 2013, with a start date for the work of September 17, 2013. The rough plumbing inspection was January 29, 2014 and the final inspection was September 26, 2014. On 55 Lyman Road, the Town of Brookline issued the plumbing permit to BST on September 25, 2013 with a work start date of October 1, 2013. The underground plumbing was inspected on November 18, 2013. The rough inspection of the plumbing was March 6, 2014. The final inspection was September 24, 2014. The Town of Brookline issued a gas line installation permit to BST Plumbing on March 20, 2014 with a start date of March 26, 2014. The rough inspection was March 26, 2014 and the final inspection was September 24, 2014. These dates are consistent with the initial payments to BST, but well before the invoices and amounts being claimed as they appear in the documentation.

o.     On the Lyman Road project, it appears that BST was paid $31,360 based on a blank, unsigned proposal (FIVEPROJ001126).

p.     On the 50 Yarmouth project, the copies of invoice #1158 were produced. One is for $33,670 and the other for $36,640.

q.     Two copies of Invoice #160 were produced. One of these was for $6,789 to the 51 Parker project and has markings indicating it was paid by both AMEX and by check. The other is for $4,558 to the 7 Fredette project and is marked paid by Amex.

66.     There are billings from **Ferguson** in the claim totaling $25,630 for which no activity exists in the QuickBooks file that was produced by the Defendant. The billings are for materials used by BST Plumbing. The invoices from Ferguson that are being claimed in the

mechanic's lien claim are for material sold to BST in August 2015, long after all plumbing work
was finished.

67.    **Sergey Nikolaev** issued an invoice for $24,660 for each LCLLC property for Tile
Work on 4/10/15, months after the final inspections had been done.  No invoice numbers were
used and invoices did not have any description to show what work was being paid for.  On
4/29/15 entries were made into LCLLC's QuickBooks file that $9,660 was payable for each
invoice.  On 5/13/15 the files were changed to show these amounts were due to KDC.
Handwritten numbers, particularly 4's and 9's, are different on these two invoices than they are
on an invoice from Mr. Nikolaev to 50 Yarmouth.

68.    **V&D Heating** provided two handwritten proposals that were identical except for
the header – property address and date.  Each proposal mentions that it will install two HVAC
systems.  It appears as if one proposal was copied to create the other.  The ledger sheets showing
payments are not consistent with the proposal.  The payment ledger sheets are also not consistent
with each other.  The Cutler sheet shows $24,500 and the Lyman sheet shows $14,500 billed in
April 2015, many months after final inspections and more than a year after the bulk of the work
that was paid for was done.  V&D responded to a data subpoena and the response showed that:

    a.    The check copies that V&D provided agree to the QuickBooks ledgers
produced by Mr. Kagan.

    b.    The two quotations provided by V&D were both dated 12/5/13 and call for
an initial payment of $25,000 each.  In fact, the initial payments on both
were $10,000 and occurred on 10/26/13, more than a month before the
proposals were written.

    c.    The copies of the proposals provided by V&D are identical to the copies
of proposals produced by Mr. Kagan, including where paper clips are
located and where text is cut off.  It appears that one of the two (V&D or
Mr. Kagan) copied the other's documentation for purposes of production.
Furthermore, the two proposals have different dates and proposal
numbers, but other than that they are identical in terms of the writing; it
appears that one was copied onto the other.

    d.    The proposals were each for $57,000.  The ledgers both show costs
incurred for V&D to be $60,050 with substantial amounts still due.

    e.    The documents produced by Mr. Kagan show invoices 607088 and
607086 issued from V&D on 11/25/14 for $2,500 each.  These invoices do
not separately appear on the QuickBooks ledger sheets and were not
produced by V&D in response to the subpoena.

    f.    According to the LCLLC QuickBooks file, invoices from V&D Heat for
$13,950 and $23,950 were entered on 4/29/15.  The Town of Brookline
issued the permit to install the heating system at 55 Lyman on February
12, 2014 and did the final inspection September 25, 2014.  On 88 Cutler,

the permit was issued December 30, 2013 and the final inspection was also done on September 25, 2014.

g.  According to KDC's QuickBooks general ledger KDC has owed V&D Heating $260,000 for at least three years with no payments being made.

69.  **Dream Flooring** invoices appear to be fabricated.

a.  Dream Flooring responded to subpoenas for information and provided two invoices related to 55 Lyman Rd in its deposition response. The invoices are not numbered. One invoice for $48,910 is dated 7/3/14 and states "Job is completed paid in full". The other invoice is dated 3/23/15 and is not totaled but shows a "remain balance" of $8,910 and additional work of $3,300. This invoice also says "Job is completed paid in full".

b.  The total charges on the two invoices above are $48,910 + $3,300 = 52,210

c.  The documentation produced by Mr. Kagan shows $52,210 of total charges for Dream Flooring. However, according to the QuickBooks file:

i.  Dream Floors was paid three times for a total of $20,000 all before 2/20/14, significantly before its invoice date, and $15,000 on 9/2/14. All of this money was paid from the Rockland Trust account.

ii.  The QuickBooks file shows a bill dated 3/23/15 for $14,710 and another dated 7/2/15 for $2,500.

d.  The invoice dated 3/23/15 produced by Mr. Kagan says at the bottom of it "Balance deu (sic) is $12,210.

e.  Dream Flooring provided one invoice related to 88 Cutler Lane in its deposition response. The invoice is not numbered and is dated 6/21/14 for $48,910. It states "Job is completed paid in full".

f.  The invoice copy produced by Mr. Kagan is also dated 6/21/14 and states "Job is completed amount due $48,910". **The invoice that Dream Flooring previously stated as paid in full is now being claimed as fully owed.**

g.  According to the QuickBooks ledger produced by Mr. Kagan, total charges from Dream Flooring were $48,910 and $20,000 of this was paid prior to 2/20/14, so an invoice prepared on 6/21/14 should not have stated that the whole amount of $48,910 was still due.

h.  According to the QuickBooks ledger $11,410 of the $48,910 was billed on 4/28/15 and $2,500 of the $48,910 is now owed to KDC for paying Dream Flooring on 7/2/15.

i.    On 5/13/15 an invoice for $6,550 and dated 4/28/15 was added to the QuickBooks file for Cutler. Sometime after that invoice was deleted from the QuickBooks file used to prepare the claim and in its place two other invoices were added: one dated 3/23/15 for $14,710 and one dated 7/2/15 for $2,500. The later invoice has an invoice number assigned to it, despite none of the other Dream Flooring invoices having invoice numbers.

j.    On 5/13/15 an invoice for $8,910 and dated 4/28/15 was added to the QuickBooks file for Lyman. Sometime after that invoice was deleted from the QuickBooks file used to prepare the claim and in its place two other invoices were added: one dated 4/28/15 for $11,410 and one dated 7/2/15 for $2,500. The later invoice has an invoice number assigned to it, despite none of the other Dream Flooring invoices having invoice numbers.

k.    One other invoice for Dream Flooring was found in the files for the other projects. The invoice states that the job total is $42,690 and $25,000 is still due. This would imply payments of $17,690 had already been made. According to the QuickBooks file for the Lyman project, only $10,000 had been paid to date. The file also indicates that the Lyman project paid $15,000 to Dream Flooring directly and all other payments to the vendor were supposedly paid through KDC.

70.    The invoice dates on the invoices from **Da Costa Construction** appear to have been prepared by multiple different people, as shown by the manner in which the dates were typed:

a.    Invoices were numbered and dated as follows:

| | | | |
|---|---|---|---|
| i. | #1402 dated | "October 10, 2013" | to Lyman Road |
| ii. | #1403 dated | "October 10, 2013" | to LLLLC |
| iii. | #1406 dated | "Abril 25 2014" | to LLLLC |
| iv. | #1407 dated | "08/29/2014" | to LLLLC |
| v. | #1409 dated | "April 15, 2013" | to Yarmouth |
| vi. | #1410 dated | "Abril 27, 2014" | to Lyman Rd |
| vii. | #1470 dated | "April 28, 2015" | to Lyman Rd |
| viii. | #1420 dated | "May, 5th 2014" | to Fredette |
| ix. | #1416 dated | "10/02/2014" | to Parker |
| x. | #2033 dated | "01 March 2015" | to LLLLC (change order) |

b.   Note that in addition to different date formats, invoices 1407, 1409, 1470, and 1420 appear to be out of sequence.

c.   Invoices 1402 and 1403 appear to have been edited on a copy machine.

d.   Invoice 1407 to LLLLC includes charges on it related to the other Lyman Rd project

e.   There are colored bars and grid lines on the invoices, and there is significant variance between these from invoice to invoice. This variance usually does not occur on preprinted forms or forms that were all printed on the same printer.

f.   According to the audit trail of the Lyman-Cutler, LLC QuickBooks file, two invoices without invoice numbers were entered into LLLLC's QuickBooks accounts payable system on 4/28/15: One for $20,350 and one for $28,350. Both were deleted one day later, on 4/29/15. The change order #2033 dated 3/1/15 for $18,500 does not appear in the accounting records.

g.   On September 2, 2015 Paulo Cordeiro sent an email to Mr. Kagan informing him that there had been a mistake on invoice #1405 and that when corrected he is owed a total of $23,000 from LLLLC. As can be seen from the list above, there never was an invoice #1405 produced by Mr. Kagan.

h.   Invoices #1403 and #1406 have payment amounts that are both factually incorrect and not properly subtracted to arrive at the balance due.

i.   Invoice #2033 is missing the word "Construction" from the usual "DeCosta Construction" in the invoice letterheads.

71.   The documentation for **Unicon Electric** shows:

a.   Two identical handwritten proposals for electric work (one appears to be a copy of the other), one on each property, for each property. The proposals are not dated and are for $65,000 each.

b.   A ledger sheet showing that Unicon was paid $30,000 for the Cutler property prior to 3/15/14

c.   A ledger sheet showing that Unicon was paid $35,000 for the Lyman property prior to 4/19/14

d.   The total paid while the houses were being built was $65,000

e.   On 4/18/15, a year after the final payments, another $65,000 is being shown as billed on the ledger sheets - $35,000 for Cutler and $30,000 for Lyman

f.   In reviewing the other Kagan projects for which documentation was provided, as well as the LCLLC project, in each instance the proposals from Unicom are the only documentation provided of the cost.  They may not be authentic and the costs on the investor-financed properties may be inflated.  4 of the proposals look to be exact copies of each other except for the amount.  3 other proposals differ slightly, but are also copies of each other except for the amounts.  The main difference between the two sets of proposals is that the 4 investor-owned properties are listed to get 400 amp service while the 3 KDC-owned properties are listed to get 200 amp service.   Estately.com listed two of the investor-owned homes as only having 200 amp service and did not provide amperage information on the two LCLLC homes.  My understanding from research is that the cost differential between a 200 amp installation and a 400 amp installation is between $500 - $4,000 and that the typical large house has 200 amp service.  A comparison of the homes built by KDC is as follows:

| Property | Ownership Structure | Sq Feet | Proposal AMPS | Estately.com AMPS | Unicom Cost |
|---|---|---|---|---|---|
| 88 Cutler | investors | 7,478 | 400 | n/a | 65,000 |
| 55 Lyman | investors | 7,478 | 400 | n/a | 65,000 |
| 10 Lyman | investors | 6,276 | 400 | 200 | 65,000 |
| 50 Yarmouth | investors | 7,007 | 400 | 200 | 75,000 |
| 26 Druid Hill | KDC | 5,968 | 200 | n/a | 35,000 |
| 51 Parker | KDC | 5,891 | 200 | 200 | 35,000 |
| 7 Fredette | KDC | 5,090 | 200 | 200 | 30,000 |

If actual invoices had been prepared or provided, as is typically done by reputable contractors and sub-contractors, those invoices would have listed the equipment installed and would have clearly stated whether 200 amp or 400 amp service was installed.  The detail invoices, if produced, would also easily explain the extreme cost differences between the investor projects and the Kagan-only projects.

a.   The Town of Brookline issued the permit for the electrical work on 88 Cutler on February 5, 2014.  The online information indicates that the Electrical was "signed off."  It appears that the electrical was inspected and signed off during the final inspection September 25, 2014.  On 55 Lyman Road, the Town of Brookline issued the electrical permit on March 3, 2014.  The rough inspection was March 13, 2014 and the final was September 23, 2014.  However, the accounts payables entries of $35,000

and $30,000 for Unicom in LCLLC's QuickBooks file were not made until 4/29/15.

72.   **Affordable Lawn Sprinklers** installed sprinklers in all the KDC projects I reviewed. The costs for KDC owned properties was less than half of the cost of investor properties. I noted the following:

a.   Invoice 9300 for $8,440 is addressed to 88 Cutler, but is provided as the support for the 55 Lyman charge

b.   The mechanic's lien has no documentation of the charge for 88 Cutler, but the QuickBooks file has an entry for $8,400 each for both houses.

c.   Affordable was paid the $8,400 for invoice #9300 twice – once with KDC check 1436 and once with LCLLC check 1108. Both checks reference payment for 88 Cutler. It is possible that both houses were installed under the same address and that either the overpayment was refunded and not credited to LCLLC, or that it was applied to some of the other KDC projects.

d.   Based on the documentation provided it appears that invoice #9300 for $8,400 was double paid and whether this was intentional or accidental, it should not be charged to LCLLC in the mechanic's lien claim.

73.   An invoice without an invoice number from **Eastcoast Pipelines** shows services performed for 4 of the properties that Mr. Kagan was working on, including the two LCLLC properties. The detail is blocked out and the entire invoice was paid by LCLLC. Two other invoices found in other project documentation are different enough from the invoice included in the mechanic's lien documentation that they all appear to be fabricated. The invoice for 10 Lyman Road printed on two pages in a way that no vendor would ever send to their customer, suggesting it was printed from a spreadsheet program in-house.

74.   The claim for **Pro Excavation** costs does not enumerate all of the costs being claimed. Additionally;

a.   The QuickBooks claim sheet for 55 Lyman has a bill dated 10/6/14 for $20,000. Since this is not in the QuickBooks file produced by the Defendant, it must have been entered after May 14, 2015.

b.   The QuickBooks claim sheet for 88 Cutler had a bill dated 10/6/14 for $75,000. Since this is not in the QuickBooks file produced by the Defendant, it must have been entered after May 14, 2015.

c.   The QuickBooks claim sheet for 88 Cutler has a bill dated 2/6/14 for $45,000 that is no longer there. It appears that the early 2014 invoice mentioned above was replaced. Since this is not in the QuickBooks file produced by the Defendant, this must have happened after May 14, 2015.

d.   A charge from Pro Ex to the Lyman house dated 10/6/14 for $90,000 was inexplicably changed to $120,000 in the claim, and another invoice for $4,600 dated 5/28/15 was also added to the claim.

e.   A charge from Pro Ex to the Cutler house dated 10/6/14 for $135,000 was inexplicably changed to $155,000 in the claim.

f.   None of the above invoices appear in Pro Excavation's 2014 or 2015 general ledger (i.e. they are not on Pro Excavation's books).

75.   Pro Excavation charged LCLLC $23,000 for snow removal, primarily from Paul Digiacomo.  According to documentation from other projects, Mr. Digiacomo billed other projects for snow removal, but those projects were not billed, making it appear that all of the cost for other projects was billed to LCLLC.

76.   As shown above (paragraph 50), the amounts spent on **National Lumber** far and away exceeded the amounts spent on any other of the projects.  KDC was making many deposits on AMEX with this vendor.  There is no reconciliation between the deposits paid and the product received at LCLLC.  It also appears as if there were double billings where KDC requested reimbursement from LCLLC and then billed LCLLC again for the AMEX charges.  Many of the American Express charges appear to be deposits and the deposits were charged to LCLLC as if they were purchases.  The detail with the claim indicates that some purchases that were paid with deposits were also billed to LCLLC, causing a double billing.

77.   An invoice from **Umanas Plastering** for $2,501.97 and dated 10/15/14 was added to the claim but was not in the QuickBooks file as of 5/14/15.  There was no supporting detail for this invoice.  There are two invoices in the file purportedly from Mr. Canas of Umanas Plastering.  Both invoices are factually incorrect regarding payment made and mathematically incorrect in terms of the amounts still due.  It is possible that the total cost of the jobs was changed on the invoice faces.  None of the other projects had any invoices on file from Mr. Umanas except for the Fredette project, in which he asked for money via email.

78.   Kristina Brusenkova stated in her affidavit (p 2) that **Pro Excavation** billed for excavation and landscaping work twice; once by having LCLLC pay the charges directly or to KDC, and then a second time in billings from Pro Excavation.  There was not enough detail provided to support the Pro Excavation billings that would allow anyone to dispute this statement.  The size of the charges compared to the charges for other similarly sized projects lends credence to Ms. Brusenkova's statement.

79.   The tax payments recorded in QuickBooks do not match up to the tax bills in the file.

80.   Many of the expenses being claimed are not supported, particularly the expenses billed by or paid to Pro Excavation.  Mr. Kagan testified in his deposition (p 19) that all of the documents that he has to support the claims made by KDC have been produced.

## Weak Internal Controls make accounting information from KDC and Pro Excavation unreliable

81.     Dan Gersh, the Chief Financial Officer at KDC, testified at his deposition that the books and records of KDC and Pro Excavation were disarrayed and unsupportable and needed extensive re-creation (i.e. after the fact documentation) to make them supportable. This supports the above observations that all point to the documentation that was provided not being contemporaneous or accurate, and that it cannot be relied upon. (pp 53 – 69, 74 - 75)

82.     Mr. Gersh also testified that:

a.      He joined KDC near the end of 2014 and he announced in an email that he was going to clean up and reorganize the accounting. In his deposition he described the accounting as an unorganized "mismash", always a mess. (pp 26 – 28)

b.      When Mr. Gersh arrived at KDC the books "lacked support and documentation" (pp 37 – 38) and that he went back to subcontractors to recreate documentation and support for accounting entries (pp 53 – 55). He later added that after May 7, 2015 he went back and did further significant reconstruction of the accounting records (pp 68, 74 – 75, 86, 88 - 91).

c.      Mr. Gersh stated that it is "not realistically possible" to track expenses to budget (a procedure that most companies of all sizes do routinely) (pp 35 – 36)

d.      Mr. Gersh stated that nobody can map the Pro Excavation charges in the proof of claim to the proposals (pp 125 – 128)

e.      Mr. Gersh emailed to his CPA (SGC-001513) "Centre Street – I don't see any AR from Centre ST for 2014. We can certainly play around with that property and throw in a healthy amount to AR if we need it. Total Proposal is $170k, and I can check with Vadim, but I think we can put $75-125k as earned in 2014 if needed."

83.     In an email to his CPA (SGC-001959-001996 p4) Mr. Kagan discusses a problem he is having getting a loan reviewed and states "…let me know if there is anything I/we should be concerned about right away, that requires us reshuffling or making any transactions before yearend? Maybe we need advance some services to KDC from certain properties?"

84.     There are numerous emails between Mr. Gersh and his outside CPAs about deciding what they wanted the numbers (financial results on the tax returns) to be, about where to shift income and expenses to, etc.

a.      Mr. Gersh in an email to his CPA said "This might be a repeat of last year where we simply make up some journal entries to get certain things closed

instead of wasting time trying to figure it out.  Sucks that it's like this
again" (Gersh dep p 110)

b.   An email from the CPA to Mr. Gersh (SGC-Druid-000017) asks "How
much do you actually want to show as excavation expense on the P&L"

c.   An email from the CPA to Mr. Gersh (SGC-000657) states that the CPA
"cannot figure out how the "Reimbursement" accounts tie out on KDC to
the properties QBs".

85.   Kristina Brusenkova, the accountant before Mr. Gersh, testified (p 63, 65) that
there were no contracts with subcontractors and the only information she had to tell her what to
pay was what Mr. Kagan told her.  Mr. Kagan throughout his deposition testimony was unable to
remember details about almost every invoice he was asked about.

86.   A significant amount of the claims being made either arose in Feb – May 2015 or
were not recorded in the accounting records until after mid-May 2015.  At this point both houses
had already been completed for at least 7 months.

a.   The concerns with the documentation noted above can easily support the
conclusion that much of the cost documentation has been fabricated and is
unsupportable

b.   If in fact all of the paperwork discussed above is valid, it raises serious
questions regarding the competency of any organization that allowed that
much in cost overruns to go unnoticed and unpaid for so long.  An
organization too incompetent to be able to notice a million dollar cost
overrun as it progresses is not competent to be able to report on it and file
claims after the fact.  Most businesses have a set of internal controls to
prevent these types of mistakes.  This section discusses and evaluates the
Defendant's accounting information and system of internal control in
more detail in order to provide an opinion on overall reliability of
information (and claims) generated by the Defendant.

87.   Elena Lande, and investor in the Yarmouth project, testified to a similar
experience with Mr. Kagan where he made large unexpected claims and then was unable to
satisfactorily answer any questions regarding them. (p 5)

88.   Having reviewed the documentation for the mechanics lien claim, the ledgers and
QuickBooks files of six KDC projects, the ledgers and reports provided by the Defendant, and
the material produced by the Defendant's CPA, I am of the opinion that accounting information
produced by the Defendant cannot be relied upon.

89.   **Internal Control**, as defined in accounting, is a process for assuring achievement
of

a.   an organization's objectives in operational effectiveness and efficiency

b.     reduction of the risk of asset loss

c.     financial reporting that is complete, accurate, and reliable

d.     compliance with laws, regulations, and policies

90.    There are two types of Internal Control:

    a.     <u>Preventive controls</u> are usually the most cost effective because they help prevent the loss of assets and are not very expensive to implement. Examples of preventive controls are:

        i.     employee training

        ii.     the use of pre-numbered documents

        iii.     timely accounting and reporting

        iv.     having adequate support for all payments and accounting entries

        v.     establishing and adequately communicating the prices and other terms of sale with both customers and suppliers

        vi.     comparison of vendor invoices to estimates, purchase orders, or budgets

        vii.     periodic review of unmatched, unpaid, or not-received invoices with budgets, plans, or other indications of activity such as customer billings

        viii.     Management approval, authorization, and verification of employee activity

        ix.     Accounting performed in adequate groupings (such as by project)

        x.     Establishment of separate and distinct entities for separate and distinct business practices, and not commingling assets, liabilities, or activities between them.

    b.     <u>Detective Controls</u> are used to identify when preventive controls were lacking or failed. Examples of detective controls are:

        i.     reconciling the company's books to its bank statements

        ii.     maintaining adequate files of important evidentiary documents such as invoices paid

        iii.     preparing and reviewing financial statements on a regular basis

        iv.     comparing financial results to plans or budgets

        v.     routine employee performance reviews

91.     <u>The Control Environment</u> and Management Tone set the character for the entire organization. Inappropriate management behavior sets a bad example for other employees to follow.  Management actions send a clear message to employees regarding the owner's commitment to integrity and ethical values.

92.     Control exists to keep performance within the ranges of what is expected, allowed, or accepted and to take corrective action when performance is outside of those ranges.

93.     Ultimate responsibility for the establishment and use of proper internal controls in small business falls upon the CEO or owner of the company.

94.     Management may be in a position to override or ignore basic control procedures, enabling a dishonest management or owner to intentionally misrepresent results to cover its tracks.

95.     **Without proper internal controls being established and used, the financial statements and other information provided by a company are generally unreliable.**  For example, invoice or check numbers being used out of sequence or not being used at all tends to be a very strong indicator that the accounting information is not reliable because there is no check on integrity or proper timing of wrongly numbered documents.

96.     Indications of inadequate internal exist throughout the data that was turned over in discovery, as detailed in the examples below:

97.     Pro Excavation LLC General Ledger 2013  (SGC-001297 – SGC-001335)

    a.     QuickBooks offers numerous ways to account for revenues and costs by project:  Class accounting, setting up the chart of accounts by project, or job accounting.   It does not appear as if any of these options were used. The company was aware of the ability to do this, because some (but not all) project materials purchased on AMEX were accounted for by project and some (but not most) of the labor was designated by project in the memo field.

    b.     There were Sales / Deposits from unidentified sources:

        vi.     1/2/13 "Service Income" $29,960

        vii.    10/3/13 Unidentified sale and deposit of $100,000

        viii.   10/18/13 Unidentified sale and deposit of $95,000

    c.     Check numbers used out of sequence

    d.     Although there was $1.9 million of sales recorded, only three invoices totaling $466,260 were issued.  All other customers apparently paid Pro Excavation without invoice, or the invoices were issued but not recorded in the accounting records.

e.    $416,260 of the invoices issued were to Classic Condominiums LLC, a related Kagan entity. The invoice, number 1001, was issued on 4/10/13. There is no other indication in any of the accounting records of work being done for Classic. Classic paid $80,000 in April/May and $45,000 in Nov/Dec, leaving a balance of $291,260 at year end.

f.    KDC loaned $338,000 to Pro Excavation during 2013 and was paid back $168,000. Given the sizes of the companies, these are significant amounts and could be indicative of commingling (see below for a discussion of why this is a problem).

g.    Payments on the TD Bank car note were paid irregularly.

h.    Vadim Kagan loaned $375,000 during 2014 and was paid back $220,000. Given the sizes of the companies, these are significant amounts and could be indicative of commingling.

98.    Pro Excavation LLC General Ledger 2014 (SGC-001336 – SGC-001370).

a.    QuickBooks offers numerous ways to account for revenues and costs by project: Class accounting, setting up the chart of accounts by project, or job accounting. It does not appear as if any of these options were used. The company was aware of the ability to do this, because some (but not all) project materials purchased on AMEX were accounted for by project and some (but not most) of the labor was designated by project in the memo field.

b.    Either some check numbers were used out of sequence (and some duplicated (1309)) or entries not made in a timely manner.

c.    Very few bills were being set up as accounts payable, most were paid and entered directly through cash.

d.    On 6/10/14 Classic Condominium paid the $291,260 it supposedly still owed from 4/10/13.

e.    On 12/31/14 invoices numbered 14 – 22 were issued to various Kagan projects for a total of $1,021,360 representing approximately 63% of the entire year's income. The remaining income consists of payments made to the company without it having issued any invoices. Invoice numbers 3 – 13 are unaccounted for.

f.    American Express charges for the year totaled $577,684. Some of these expenses were accounted for by project, indicating the ability to do so. Many of the charges were not accounted for by project and the accounting does not distinguish which project they belong to.

g.  On 12/31/14 there are entries totaling $290,792 that add to the amount that Pro Excavation owed to KDC, but there was no cash that changed hands between these two entities on that date.

   i.  $275,000 of these entries were to reduce the amount of sales recorded from Druid Hill Road

   ii.  On 8/11/14 $290,000 of sales from Druid Hill had been recorded and money from Druid Hill road had been deposited into Pro Excavation's bank account via check.

   iii.  According to Druid Hill's QuickBooks Audit Trail extract (KAGA 003013), the $290,000 consists of checks #1065, 1066, 1067, and 1069.  All were recorded as costs of Building and Outside Improvements.  Check 1068 for $25,000 was also written at the same time but payable to Classic Homes, a related entity.

   iv.  On 8/12/14 and 8/13/14 a total of $242,000 was transferred from Pro Excavation to KDC.

   v.  The net impact of this set of transactions was to transfer Druid Hill cash to KDC via Pro Excavation.  KDC appears to have ultimately recorded a profit of $321,323 on Druid Hill (SGC-000569).

| Druid Hill -> Pro Ex -> KDC | | | | | | |
|---|---|---|---|---|---|---|
| | Druid Hill Building Costs | Druid Hill Cash | Pro Ex Income | Pro Ex Cash | KDC Cash | KDC Note |
| August 2014 | 290,000 | (290,000) | 290,000 | 290,000 (242,000) | 242,000 | (242,000) |
| 12/31/2014 | | | (275,000) | | | 275,000 |
| Total Effect | 290,000 | (290,000) | 15,000 | 48,000 | 242,000 | 33,000 |

h.  KDC loaned $502,792 to Pro Excavation during 2014 and was paid back $419,216.  Given the sizes of the companies, these are significant amounts and could be indicative of commingling.

i.  Vadim Kagan loaned $441,000 during 2014 and was paid back $106,707.  Given the sizes of the companies, these are significant amounts and could be indicative of commingling.

j.  Prior to 12/31/14 Pro Excavation recorded $995,000 of Service Income but did not generate any invoices related to this income (payments were made by other entities without invoices).

99.  Pro Excavation LLC General Ledger 2015  (SGC-001371 – SGC-001383)

a.     There was very little bank activity recorded and the last cash entry made was on 6/30/15. There was a total of $535,393 left in three bank accounts and no accounting for what its final disposition was as the company closed.

b.     The company issued 7 invoices to customers in 2015. Invoice numbers were sporadic and out of sequence. For example, the first invoice of the year was on 1/1/15 given #24 for $100,000 to Lyman-Cutler. The second invoice was dated 3/15/15 given invoice number 40 for $19,000 also to Lyman Cutler. The next three invoices were given #31, #33, and #34 and the last two were given #41 and #42.

c.     A total of $859,136 in open invoices to customers remained on the books when the company stopped doing its accounting in June 2015.

    i.     Invoice #31, for $170,000 to 1657 Centre St, only had $30,000 recorded as being paid against it before the company stopped doing its accounting.

    ii.     Invoice #33 to 1580 Beacon Street for $65,000 has no payments recorded against it.

    iii.     Invoice #34 to 18 Valley Spring for $130,000 has no payments recorded against it.

d.     The $100,000 invoiced to Lyman Cutler on 1/2/15 was recorded as deferred revenue, not sales or income.

e.     $213,576 owed to KDC and $489,294 owed to Vadim Kagan are not resolved in the final general ledger for Pro Excavation.

100.     KDC Corp General Ledger 2013  (SGC-000010 – SGC-000084)

a.     Some checks were written out of numerical sequence

b.     Invoice numbers used were wildly out of sequence. On 1/1/13 invoices were issued with number 1071, 36 – 41, 136, 167, 202, 46, 75, and 123. A similarly disbursed set of numbers was used around the end of January. Invoice numbers continue to jump around during the year with no discernable pattern.

c.     KDC and its related entities only used the accounts payable functionality built into QuickBooks in a very minimal fashion with just a few bills from a few vendors.

101.     KDC Corp General Ledger 2014  (SGC-000085 – SGC-000187)

a.     Check numbers appear to be used sequentially this year.

    b.      Invoice numbers were barely used. The sporadic invoice numbers that were used are in no discernable pattern.

    c.      According to the general ledger account 1250 (SGC-000117), Lyman Cutler owed $108,600 as of 12/31/14 for "loans".

102.    KDC Corp General Ledger 2015 (SGC-000188 – SGC-000229)

    a.      In order to close the books in 2015 the outside CPA firm made $3,171,514 in adjusting entries (corrections) to the 2015 QuickBooks file (SGC-000674 – SGC-000679).

    b.      According to the general ledger account 1350 (SGC-000117 – SGC-000123), Lyman Cutler owes $33,614 to KDC as of 12/31/15. This is the net of an opening balance of $3,532 that Lyman Cutler owed KDC at 12/31/13, $1,053,276 in expenses that KDC incurred in behalf of Lyman Cutler, and $1,107,612 of payments from Lyman Cutler or accounts receivable billed to Lyman Cutler.

103.    Amounts that KDC and Pro Excavation claim they are owed by Lyman Cutler in their legal filings are not consistent with their accounting records:

    a.      Pro Excavation LLC General Ledger 2013 (SGC-001297 – SGC-001335) show no amounts due from Lyman Cutler as of 12/31/13.

    b.      Pro Excavation LLC General Ledger 2014 (SGC-001336 – SGC-001370) show no amounts due from Lyman Cutler as of 12/31/14.

    c.      Pro Excavation LLC General Ledger 2015 (SGC-001371 – SGC-001383) shows $114,137 of accounts receivable from LCLLC as of June 30, 2015.

104.    KDC Corp General Ledger 2013 (SGC-000010 – SGC-000084) show:

    a.      KDC set up separate reimbursement accounts receivable for each project to track expenses. The account that was set up for Lyman Cutler, account # 1350, shows that in 2013 (according to the accounting SGC-000031 - 33):

        i.      The year started with a balance owed to KDC from Lyman Cutler of $251,000

        ii.     $520,744 was spent in Lyman Cutler's behalf

        iii.    $517,211 was reimbursed by Lyman Cutler either in cash payments or invoices billed to Lyman Cutler

        iv.    On 12/31/13 the $251,000 opening balance that was originally accounted for a reimbursement due from Lyman Cutler was reclassified to be due from the 143 Florence project.

v.      The net of all the above left a total balance in the reimbursement account as $3,532 owed to KDC.

105.   KDC Corp General Ledger 2014  (SGC-000085 – SGC-000187) show that

a.      According to the general ledger account 1350 (SGC-000117 – SGC-000123), Lyman Cutler is owed $13,083 by KDC as of 12/31/14.  This is the net of an opening balance of $3,532 that Lyman Cutler owed KDC at 12/31/13, $1,053,276 in expenses that KDC incurred in behalf of Lyman Cutler, and $1,107,612 of payments from Lyman Cutler or accounts receivable billed to Lyman Cutler.

b.      The amount of accounts payable billed to Lyman Cutler and showing as unpaid in KDC's accounting records as of 12/31/14 (and finalized by the CPA firm in July 2015) is $164,674 (SGC-000510).

c.      According to the general ledger account 1250 (SGC-000117), Lyman Cutler owed $264,100 as of 12/31/15 for "loans"

106.   KDC Corp General Ledger as of 6/30/15 showed:

a.      According to the general ledger account 1250 Loan to Lyman Cutler, Lyman Cutler owed KDC $264,100 (SGC-000202 – SGC-000203)

b.      According to the general ledger account 1350 Reimb – Lyman Cutler Building, which includes invoices to KDC for Lyman Cutler, Lyman Cutler only owed KDC $12,378.76 (SGC-000203).

## **Other Observations on Pro Excavation:**

107.   Pro Excavation billed LCLLC or was paid by LCLLC at least $749,300 as documented in the mechanic's lien claim documentation binder.

108.   Pro Excavation's accounting does not support the level of activity that was billed for.  Pro Excavation's accounting attempted to break out costs by specific projects.  The costs that were recorded for LCLLC, per the QuickBooks general ledger reports were:

|  | 55 Lyman | | | 88 Cutler | | | Grand Total |
|---|---|---|---|---|---|---|---|
|  | 2013 | 2014 | Total | 2013 | 2014 | Total | |
| Materials Expense | 86,111 | 41,914 | 128,025 | 32,379 | 25,020 | 57,399 | |
| Other Costs | 10,800 | 2,069 | 12,869 | 6,148 | | 6,148 | |
| Total | 96,911 | 43,983 | 140,894 | 38,527 | 25,020 | 63,547 | 204,441 |

No other costs in the accounting records were identified as being for LCLLC.

109.    Kirill Kagan testified at deposition that he did not keep any records related to Pro-Excavation (p 17)

110.    In his second day of deposition Vadim Kagan answered most of the questions related to Pro Excavation by stating that he could not explain any of the billings to LCLLC; what they were for, how much of a mark-up was on them, what they were based on, what support there was for them, etc. were all inexplicable.

111.    Kristina Brusenkova testified (p 63, 65) that there were no contracts with subcontractors and the only information she had to tell her what to pay was what Mr. Kagan told her.

112.    Dan Gersh testified at his deposition that he cannot explain or support these billings.

113.    Apparently, nobody is able to explain or support the costs of work done for LCLLC and the Pro Excavation charges to LCLLC and there is no supporting detail that would even help them in trying to re-create the economic activity.

114.    There appears to have been significant commingling between KDC and Pro Excavation.  This means that there is very little actual distinction between two entities that profess to be separate:

> d.    The two companies shared a common management, administration, and facilities.
>
> e.    Cash flowed back and forth between Pro Excavation, KDC, and Mr. Kagan as if they were all just separate pockets in the same pair of pants. For example, the following direct transfers of cash to or from Pro-Excavation were made:

| | Kagan - In | Kagan - out | KDC - In | KDC - Out |
|---|---|---|---|---|
| 3/1/2013 | 20,000 | | | |
| 3/11/2013 | | 20,000 | | |
| 3/15/2013 | | | 3,000 | |
| 3/29/2013 | 20,000 | | | |
| 4/5/2013 | 10,000 | | | |
| 5/8/2013 | | | 20,000 | |
| 5/20/2013 | | | 10,000 | |
| 5/21/2013 | | | 20,000 | |
| 5/29/2013 | | | 55,000 | |
| 5/29/2013 | | | 45,000 | |
| 6/5/2013 | | | | 55,000 |
| 6/18/2013 | | | 10,000 | |
| 7/1/2013 | 65,000 | | | |
| 7/16/2013 | | | | 50,000 |
| 7/19/2013 | | | | |
| 7/22/2013 | 10,000 | | 25,000 | |
| 7/22/2013 | 20,000 | | | |
| 8/8/2013 | | | 20,000 | |
| 8/21/2013 | | | 20,000 | |
| 8/26/2013 | | | 20,000 | |
| 8/27/2013 | | | 25,000 | |
| 10/18/2013 | 30,000 | | | |
| 10/28/2013 | | | 15,000 | |
| 10/24/2013 | | | | 60,000 |
| 11/27/2013 | | | 20,000 | |
| 12/2/2013 | 200,000 | | | |
| 12/2/2013 | | 200,000 | | |
| 12/24/2013 | | | 30,000 | |
| | 375,000 | 220,000 | 308,000 | 165,000 |

f.      Other transfers of cash appear to have been facilitated through third party entities such as Druid Hill, where Pro Excavation received $290,000 from Druid Hill in August 2014 and then remitted $242,000 to KDC.

g.      Commingling blurs the distinctions between entities.   This matters in this case because of the way profits are to be split between the LLC members:

i.      The November 14, 2012 Operating Agreement of LCLLC states:

Paragraph 5.2 "It shall be Mr. Kagan's duty and obligation to construct two (2) homes at the location currently known as 77 Lyman Road, in Brookline, Massachusetts in accordance with the plans, including drawings, supplied by Mr. Kagan and approved by Managing Member.  The construction shall be substantially completed by no later than March 30, 2014.  It is specifically understood by all Members that Mr. Kagan's compensation for this duty is outlined in Section 8.1 below."

ii.    Paragraph 8.1, which allocates 50% of the net profits to Mr.
Kagan, subject to conditions regarding the issuance of the
demolition permit and the sale of the property within 23 months of
acquisition.

h.    If KDC and Pro Excavation are deemed to be distinguishable entities, and
there are no limits on Pro Excavation's and KDC's profit margins, than
Pro Excavation and KDC could become vehicles for siphoning off more
profits from the construction than the parties agreed in the LLC Operating
Agreement.

**Based on the deposition testimony of Mr. Kagan and his current and former
employees, on my review of the accounting records and documents purporting to support
the mechanic's lien claim, and on my extensive experience reviewing the books, records,
and claims of many companies over the past years, my conclusion is that the accounting
processes employed by Mr. Kagan are severely deficient and that the attempts to recreate
data that was never properly captured the first time were not at all convincing. The claim
as it is presented now is not supported with reliable information and, based on how
pervasive the problems are, may knowingly be fraudulent.**

Dated:  7/27/18

_____
Michael Goldman

4839-3115-2238, v. 1

# EXHIBIT 21



# Review of the Cost to Build
## 88 Cutler Lane and 55 Lyman Road
### Brookline, MA

July 26, 2018

Von Salmi and Associates, Inc.                    1
P.O. Box 425, Westminster, MA 01473   Tel: 617-823-9407   web: www.vonsalmi.com

# Table of Contents

**STATEMENT OF ISSUES PRESENTED** _____ **3**

**FACTS AND DATA CONSIDERED** _____ **3**
    **Project Overview**      3
    **Methodology**      4
    **Factors Impacting Cost Analysis**      7

**REVIEW OF COST SUMMARY** _____ **8**

**PROFESSIONAL OPINION** _____ **10**

# Exhibits

**EXHIBIT A** – PROJECT COST SUMMARY, dated May 1, 2018

**EXHIBIT B** – QUALIFICATIONS -  Curriculum Vitae and Casework

**EXHIBIT C** – LIST OF DOCUMENTS REVIEWED

**EXHIBIT D** – LETTER OF UNDERSTANDING, dated January 27, 2018

## STATEMENT OF ISSUES PRESENTED

On behalf of his clients, Vadim Kagan("Kagan), Kagan Development KDC, Corp. ("KDC"), ProExcavation Corp. ("ProExcavation) and Tatiana Kagan, John H. Perten, Esq. of Sheehan, Phinney, Bass & Green, P.A. of Boston, MA engaged the services of Von Salmi, President of Von Salmi and Associates, Inc. ("VSA") for the purpose of determining (1) the fair and reasonable value of demolition and construction costs to build the structures at 88 Cutler Lane and 55 Lyman Road in Brookline, MA;(2) the fair and reasonable value of the actual cost for labor and materials provided on the Project by ProExcavation Corp. ; and (3) the fair and reasonable cost for the materials provided by National Lumber and Home Depot.

## FACTS AND DATA CONSIDERED

In or about November, 2012, Kagan, Alex Filippov, and Nickolay Lipetsker created a limited liability company, Lyman-Cutler, LLC ("LC"), to purchase a property located at 77 Cutler Lane in Brookline, MA which was improved by a single-family residence. The plan called for the demolition of the existing residence and an in-ground pool located on the locus, the subdivision of the property into two buildable lots, and the construction of two single family residences, one on each of the two lots (the "Project").

VSA was provided with two contracts for the construction of the Project, one between Classic Homes Development & Construction, LLC ("Classic Homes") and LC, which was executed by Classic Homes on June 12, 2013 and executed by LC on June 18, 2013. The other executed on June 24, 2013 between KDC and LC. VSA understands that there is a disagreement between the parties as to which of these contracts is the operative agreement. VSA takes no position as to that issue. VSA notes, however, that neither of the contracts are written on a fixed cost basis. VSA has not been provided with any information that suggests that Classic Homes performed any aspect of the Project.

## Project Overview

KDC is a small closely held company with few employees, has been in business for several years, is based in Newton, MA, and specializes in high-end residential housing construction. Kagan is the principal of KDC and has worked in the construction industry for many years. He is also the principal of ProExcavation. VSA was notified of Kagan's relationship with ProExcavation on June 25, 2018. This relationship was unknown to VSA prior to the notification, and disclosure did not occur until after VSA's determination of cost on May 1, 2018. ProExcavation provided site work, concrete, masonry, & waterproofing (which some may also refer to as excavation, masonry, landscaping and hardscape) services to the Project. Moreover, VSA asserts that the discovery of the relationship between Kagan and ProExcavation in no way changed our findings and does not inform the conclusions set forth herein.

VSA reviewed the plans for the Project dated 5/23/2013, drawn by RAV & Assoc., Inc. from Needham, MA. VSA was not provided with Project specifications and was advised that there were no formal written specifications. KDC self-performed the specifications for the finish work.

According to the Plans, the residences to be constructed were to be 7,478 gross square feet (with garage). Each of the two residences were to be mirrored, though there were some minor differences in finishes and exterior landscaping. These minor differences did not materially impact the cost to construct. The one difference in finishes between the two properties that did have an impact was the stone versus brick on the front facades.

At the time of VSA's engagement, both homes had been sold and therefore VSA did not have access to the properties. VSA did an exterior visual inspection of the homes on April 23, 2018. VSA also was provided with photographs of the finished interior and material supplier invoices to determine the finishes utilized in both the exterior and interior of each residence.

## Methodology

To ascertain the fair and reasonable cost for construction of each home, VSA first reviewed and analyzed the RAV plans, Cutler Documents 1 of 2, Cutler Documents 2 of 2, Lyman Documents 1 of 2 and Lyman Documents 2 of 2 binders (the "Binders"), visited the site, and solicited Project bids from local subcontractors and vendors.

The RAV plans were basic and had minimal specifications. There were no details provided on finishes, finish schedules and execution details. They did provide a basic door and window schedule. They provide structural direction and the bare minimal required for a building permit. This is a very standard set of drawings for a developer's project. However, pricing from only the set of plans, without a tremendous amount of more information, would provide inaccurate figures as the impacts on the cost of the level of finishes and items provided have such a large variation and range in cost. Therefore, VSA first undertook to develop a set of construction specifications suitable for use, in conjunction with the Plans, when "bidding" the Project.

To develop clear Project specifications and create bid packages for the local vendors and subcontractors, VSA reviewed each of the documents contained in the Binders. VSA had been advised that these four Binders were submitted in support of the Proof of Claim submitted by KDC. So as to not be influenced by the prices set forth in the invoices and proposals that were contained in these Binders, VSA requested that all financial information, i.e. invoice amounts, receipts, be redacted before VSA's initial review. This redacted review allowed VSA to determine exactly what was purchased for the Project and what tradespeople had been engaged without any preconceived notions as to the costs that had been incurred. VSA then verified the information contained in the redacted documentation by its own visual inspection

of the Project's exterior, a review of photographs of both the interior and exterior of the completed residences, and an interview with Kagan. As noted previously, there were some minor differences in interior finishes between the two homes, as documented in the Binders and in the photographs. For example, the island in the kitchen at 88 Cutler had a dark mahogany stain and the island in the kitchen at 55 Lyman had a cherry stain. Another example is the bar at 88 Cutler had a dark stain and over the sink had glass doors flanked by paneled doors on either side. At the bar in 55 Lyman, the bar had a cherry finish with a shelf and panel doors over the sink and they were flanked by glass doors on either side. These differences in the interior finishes did not materially impact the cost of the Project. The exterior of 55 Lyman had a portion of the exterior as stone and 88 Cutler Lane had the same portion of the exterior as brick. This variance created a delta of approximately $8,000 on 55 Lyman Road. For consistency in our specifications, we referred to 55 Lyman finishes.

VSA did not identify any irregularities in the documentation contained in the Binders in terms of the items purchased and quantities referenced, all of which appeared typical for this type of construction and all of which were consistent with the homes to be constructed. VSA also relied on its own years of experience in the construction industry, including construction of similarly sized homes in the same geographic location to confirm that there were no irregularities in these documents in the Binders.

In addition, VSA visited the site in a drive by to better understand the site constraints such as the extreme topographic differences on the lot. There was a gradient difference of approximately 35 vertical feet from the front to the rear of the original property. The Project incorporated a substantial number of site walls to assist in mitigating these grade differences. This all adds to the cost of development of the site. VSA also reviewed the as-built plot plan to confirm its observations. VSA understands, based upon the interview with Kagan, that the contractor encountered ledge when excavating the site and that removal of the in-ground pool and disposal of the removed material were more time intensive and costly due to the amount of reinforcement in the concrete form for the pool.

The solutions and the level of development to resolve such things as the grade differential were well within the realm of standard methodologies employed by similar contractors in the area and consistent with what VSA would have expected on a project of this type.

Finally, it was our intention to price the construction costs for the homes using local vendor bids in order to establish a fair and reasonable cost.

Based upon all of the above noted procedures, documentation, information, and our intimate knowledge of construction in the Greater Boston metropolitan region, developed from our involvement on over a hundred construction projects, we began

to outline the scope of work, specifications, and bid packages for pricing the construction of the homes. Insofar as the two homes were being built simultaneously, in the pricing analysis we considered the economy of scale which inures to the benefit of a general contractor when building multiple equivalent homes at the same time.

To validate all of the bids after VSA's receipt, we used our years of experience in the construction industry, our involvement with hundreds of construction projects, including a home VSA built similar in size and value on Countryside Road in Newton at the same time that KDC was building 88 Cutler Lane and 55 Lyman Road, and the knowledge of factors impacting the cost analysis.

The Countryside Road project was 7,700 square feet and utilized materials and finishes comparable to those exhibited in the photographs and Binders provided to VSA from the Project. For example, Countryside had 8" 2-piece base boards, 6" built-up casings, 8' custom doors, built-up crown moldings, paneling, mantels with gas units, an extensive use of tile and stone, similar planked wood floors, recessed lighting, decorative fixtures, similar plumbing features, custom glass shower doors, copper flashings, use of columns, porches, patios, custom garage doors, and custom entry doors. Each of these elements was present in the Project. We built the home as construction managers. This project structure is quite similar to the relationship, as explained to us, that KDC had with its partners. That experience further informed our analysis.

Upon receipt and validation that all the bids and cost information from local vendors and subcontractors were accurate and valid, we compiled the costs to reflect our Project Cost Summary dated May 1, 2018, Exhibit A, (the "Project Cost Summary").

After VSA had completed its review and finalized its estimate and we submitted and finalized the Project Cost Summary, VSA was provided copies of all of the documentation in the Binders supporting the KDC Proof of Claim for a second time, but this time with financial information that had been redacted, revealed. This information enabled us to provide further validation of our cost analysis in comparison to actual costs.

Furthermore, VSA personally interviewed Kagan on June 15, 2018, to ascertain the methodologies employed in constructing the homes, to better understand the materials utilized, how sub-contractors were selected, and how final sub-contractor prices arrived for the home. The information provided, together with VSA's review of the documentation provided, reflected standard practices of the industry for homes of this level consistent with what VSA would have expected.

**Factors Impacting Cost Analysis**

As noted previously, there were other factors impacting our cost that were considered when preparing our analysis. One factor is the individual relationships a contractor may have with its sub-contractors.  Familiarity, volume of business, and prior experience between the general contractor and subcontractors or suppliers frequently results in increased savings. VSA discussed this during its interview of Kagan and learned, as anticipated, that he had pre-existing relationships with most of the major trades that worked on the Project.  As a result, he was able to negotiate lower prices or had existing lower prices, the benefit of which were passed through to LC. In performing our analysis, we took this into consideration also.

Furthermore, we understand the requirements for construction work being performed in the Greater Boston metropolitan region. Due to the high cost of land and labor in the local market, construction costs and quality expectations are of the highest levels.

Lot costs in the Newton/ Brookline area are in excess of $1,000,000[1]. Most of the available lots have older homes on them and due to their age and size they are 'knockdowns' or 'teardowns' in preparation for a new home to be built upon the lot. These costs are appreciably more than just 20 miles west where lots costs are between $235,000 to $595,000[2].

Noting these differences helps one to understand the basis for the construction costs of homes built in the Greater Boston metropolitan region versus other regions in the Commonwealth of Massachusetts.

Labor costs are appreciably higher due to housing costs. Tradespeople tend to live much farther outside of the city where housing stock is more affordable, but the commute is longer and transportation costs factor into wage costs. It is just more expensive to live and work in the Greater Boston metropolitan region thusly wages tend to be higher.[3]

Another factor contributing to labor costs is the shortage of skilled labor in the construction industry. There was a range of 43% to 77% of builders reporting labor shortages in 2017.[4]  However, this shortage has been in place since the recession of 2008.  This shortage makes it more difficult to negotiate lower sub-contractor costs. Therefore, the existence of prior relationships becomes even more important for the attainment of good sub-contractor bids and performance.

---

[1] www.zillow.com

[2] www.zillow.com

[3] https://www.cityrating.com/cost-of-living/massachusetts/

[4] http://nahbnow.com/2017/08/builders-report-labor-shortages-on-the-rise/

We also looked at cost deviations between when the Project was constructed and current prices. It should be noted that incremental increases in materials have been minor relative to the cost of the home since the time these two houses were built. For instance, if the construction materials totaled $100,000 in 2013, the cost adjusted with inflation included would be approximately $107,600 in 2018.[5] Industry labor costs have been extremely stable in the Greater Boston metropolitan region based on our direct experience and that the overwhelming majority of our subcontractors have not raised their labor rates since 2012.

## REVIEW OF COST SUMMARY

As in standard practice in the construction industry, we assembled our estimates using the Construction Standards Institute (CSI) format. This format divides construction work up into different divisions identified by the area of work. The CSI Master Format provides for over 40 plus divisions that the user can select from to format an estimate.

Most contractors will focus on 16 of those divisions beginning with 01 General Conditions up to 16 Electrical and various other divisions for professional services such as 90 Civil Engineering.

Our estimate incorporated 12 of the 16 divisions to identify costs for construction of the homes. The 12 divisions are:

01 General Conditions
This category includes conditions for administering and supervising the Project through construction. These costs include such items as an office/ storage trailer for site supervision and a central location for the site / building plans and documents. This category excludes overhead and profit.

Utility costs are in this category. Electricity, gas and water costs are found here.

Temporary facilities such as portable toilets and disposables are in this division. Cleaning for the site and building during construction and the cost for the building permit would also be found under this division.

02 Site work/ Demolition
This division includes all disposal for demolition material and construction waste generated. Also included are the site construction costs such as demolition of the existing building, pool and any site structures, ledge removal, landscaping both hard and soft, irrigation and security fencing.

[5] https://www.dcd.com/articles/construction-cost-trends-may-2018
Von Salmi and Associates, Inc.                                              8
P.O. Box 425, Westminster, MA 01473  Tel: 617-823-9407   web: www.vonsalmi.com

03 Concrete
Included in this division would be the cost for the concrete foundation and all concrete slabs for floors.

04 Masonry
Includes all masonry for the home such as the stone veneer work, site walls, walks and patios.

06 Carpentry
This division contains the cost to frame the house, cost of interior trim, cabinetry, building materials (except roofing).

07 Insulation/ Roofing
Cost to insulate the home with spray foam, blown in cellulose and fiberglass, waterproofing (any caulking by the masons). This division also includes all roofing and gutters/ downspout work materials and labor.

08 Doors and windows
This includes all exterior doors, windows, door hardware, mirrors and shower doors.

09 Finishes
This division includes all labor and material for board and plaster, stone surfaces (countertops, walls, floors), tile, wood flooring and paint/ staining.

10 Fireplaces
Includes all gas fireplaces labor and materials and accessories.

11 Specialties
In this division appliances, central vacuum, water filtration and any pumps such as sump pumps are included.

15 Mechanical
Plumbing and HVAC materials and labor are included in this division.

16 Electrical
This division includes all electrical with switching and recessed lighting, interior fixtures and exterior fixtures, backup generator installed and infrastructure wiring for sound, video and television.

The 12 divisions that we utilized are reflected on the Project Cost Summary. Initially, we created bid packages based on the CSI Divisions. The bid packages included the specifications as created by VSA and the RAV construction plans. Our bid package results are found in "VSA Cost" column. We reduced these costs to

reflect the variations to what is more standard in the industry for developer savings by and for KDC. This is provided in the column "Developer Costs (1 House)". Finally, when building two homes in close proximity and also similar in size, materials, finishes, and expectations of subcontractors, both houses when combined can be reduced in price further due to the economy of scale. This is provided in the "Economy of Scale (2nd house)" column in our Project Cost Summary. Reducing these costs further would result in producing a product that would not meet the real estate values of this area or would compromise the integrity of the building. It is a breaking point of where you would be able to produce a marketable product to recover costs.

The categories that may have the widest swing in costs revolve around the site work as there are usually many unknowns, such as sub-surface conditions, that tend to drive up these costs. Ledge and trucking costs for materials drive this category. There are no quarries in the immediate area so stone, sand, and gravel must be trucked in from the north and west of the city. Travel in city traffic slows down the number of trips and thusly drives up the cost, as trucking is a function of time.

In conclusion, it is our professional opinion that our Project Cost Summary, is an accurate reflection based upon our experience and the process that we undertook to summarize the anticipated cost to construct the homes built at 88 Cutler Lane and 55 Lyman Road in Brookline, MA.

## PROFESSIONAL OPINION

After VSA had completed its review and finalized the Project Cost Summary, VSA was provided with additional copies of all of the documentation in the Binders but this time with financial information that had been redacted, revealed. We reviewed the invoices and services provided based on cost to note if there were any major discrepancies between our independent determination of costs and the actual costs incurred. When reviewing for this purpose we determined that, as anticipated, ProExcavation and National Lumber/Home Depot had the largest impact on the total cost. The categories that ProExcavation and National Lumber/Home Depot represented in the "Our Cost" column of the Project Cost Summary also reflected the same impact on the total cost. We did not observe any costs that were inconsistent with the expected costs that we determined. In fact, most of the actual labor and material costs were lower than VSA expected. We believe that is due to the long-standing relationships that KDC enjoys with its subcontractors and vendors and the volume of work that it provides to many of them.

Based upon our experience and our ongoing involvement in residential construction in the Greater Boston metropolitan region, the costs of building homes of the level of 88 Cutler and 55 Lyman should range between $350 -650 per square foot including all fees, depending on final selections for finishes. Our Project Cost Summary

provides for three different costs based upon differing costs acquired with the sub-contractors available.

Under the first cost column, we estimated our costs to build the house at 88 Cutler Lane to be $3,689,730 or based upon 7748 sq. ft. $476 per square foot. The best-case scenario allowing for the most aggressive VSA costs come in at $400 per square foot.

We estimated one additional scenario combining all the attributes of value acquisition in sub-contractor costs based upon the previously stated circumstances and multiple homes being constructed at the same time and that cost was $2,771,667 or $357 per square foot. That final cost is lower than VSA expected and lower than the cost of construction for any Project of this size on which VSA has been involved on in the Greater Boston Metro area within the last 10 years.

Therefore, it is our professional opinion that the total combined cost of $5,869,828.74 to build 88 Cutler Lane and 55 Lyman is both fair and reasonable and, in fact, significantly lower than market price.

As noted above, in the instance of 88 Cutler Lane and 55 Lyman Road in Brookline, MA. ProExcavation provided a wide range of services not allocated to just the 02 (Site Work/Demolition) category.

The scope of work provided by Pro Excavation, based on the documentation reviewed and primarily information pertained in Cutler Documents 1 of 2, Cutler Documents 2 of 2, & Lyman Documents 1 of 2 and Lyman Documents 2 of 2, and our discussions with Kagan, would include all of our 02 Site work category, all of our 03 Concrete category, 04 Masonry category, and the 07 Waterproofing category.

Based upon our Project Cost Summary, it is our opinion that the fair and reasonable cost for these areas performed by ProExcavation for one home and site should be $556,700, if not performed by a developer. However, VSA estimated it to cost $531,700 if a developer was to build one house.   If you maximized the discount and the savings a developer would receive when building more than one house at a time, the cost for these same services would be $447,400.  For the Project therefore, we would expect the cost for the services provided by ProExcavation to be $447,400 per home.

Upon review of its actual invoices with pricing, we found the ProExcavation charges as per their invoices to be $448,300 per home, $900 higher (.2% difference) than our anticipated estimated cost.

Based on the foregoing is our opinion, to a reasonable degree of professional certainty, that the amount charged by ProExcavation for its services on the Project are fair and reasonable for the work performed.

We next looked at the cost of materials reflected in the National Lumber Company and Home Depot invoices.  The totals from National Lumber and Home Depot for the scope of items were $323,228.49.  The bid that VSA received for similar framing materials, exterior doors and windows, and door and window hardware from Concord Lumber Corp. totaled $314,228.49. This represents a difference of $9,000 (2% difference). Keep in mind that the National Lumber and Home Depot invoices were for the actual quantities of materials used to actually build the home and as is typical, the Concord Lumber estimate proves to be lower than the actual amount of materials used.

This discrepancy is easily understood given the fact that when estimating quantities, the estimator makes certain assumptions as the methodology that the framers may employ when assembling the home and those assumptions may not align with the realities of the work performed and its material requirements in the field. Accordingly, it is our professional opinion that the prices charged for materials purchased from National Lumber and Home Depot were fair and reasonable and consistent with what would be expected with respect to quality and quantity for the Project.

All opinions in this report are held to a reasonable degree of professional certainty.

Respectfully submitted,

Von Salmi, ASLA , Assoc. AIA
President
Von Salmi and Associates, Inc.

# Exhibit A
## PROJECT COST SUMMARY

### MAY 1, 2018

| CSI Divisions | VSA COST | DEVELOPER COSTS. (1 House) | ECONOMY OF SCALE (2nd House) |
|---|---|---|---|
| 01000 - General Site Conditions (Trailer) | $1,500.00 | $1,000.00 | - |
| 01500 - Electric & Gas Bills | $5,000.00 | $5,000.00 | $5,000.00 |
| 01500 - Temporary Failities and Controls | $1,680.00 | $1,680.00 | - |
| 01520 - Water | $1,500.00 | $1,500.00 | $1,500.00 |
| 01740 - Cleaning | $13,500.00 | $5,000.00 | $3,000.00 |
| | | | |
| 02120 - Off Site Transport/Disposal (Demolition) | $28,000.00 | $28,000.00 | - |
| 02120 - Off Site Transport/Disposal | $4,000.00 | $4,000.00 | $4,000.00 |
| 02250- Landscaping (Soft & Hard) | $75,000.00 | $55,000.00 | $45,000.00 |
| 02300 - Earthwork, Utilities & Engineering | $220,000.00 | $220,000.00 | $213,400.00 |
| 02300 - Earthwork (Ledge) | $30,000.00 | $30,000.00 | - |
| 02800 - Irrigation | $4,500.00 | $4,500.00 | $4,500.00 |
| 02820 - Fencing (temp/security) | $10,000.00 | $5,000.00 | $2,500.00 |
| | | | |
| 03050 - Concrete Foundation & Slabs | $134,000.00 | $134,000.00 | $127,300.00 |
| | | | |
| 04000 - Masonry | $43,200.00 | $43,200.00 | $43,200.00 |
| | | | |
| 06050 - Framing Labor | $283,050.00 | $283,050.00 | $268,897.50 |
| 06050 - Framing Material | $212,360.91 | $212,360.91 | $212,360.91 |
| 06410 - Finish Material & Install | $735,754.00 | $550,000.00 | $528,000.00 |
| | | | |
| 07050 - Insulation | $51,025.00 | $51,025.00 | $48,473.75 |
| 07100 - Waterproofing | $8,000.00 | $8,000.00 | $7,500.00 |
| 07300 - Roofing | $79,796.00 | $79,796.00 | $75,806.20 |
| | | | |
| 08360 - Overhead Doors | $6,000.00 | $6,000.00 | $6,000.00 |
| 08500 - Exterior Doors & Windows | $91,867.58 | $91,867.58 | $91,867.58 |
| 08700 - Door and Window Hardware | $10,000.00 | $10,000.00 | $10,000.00 |
| 08830 - Mirrors and Shower Doors | $22,000.00 | $12,000.00 | $12,000.00 |
| | | | |
| 09200 - Plaster and Gypsum Board | $86,000.00 | $86,000.00 | $86,000.00 |
| 09300 - Stone | $39,500.00 | $39,500.00 | $37,525.00 |
| 09300 - Tile (Install for wall and floor) | $42,372.50 | $42,372.50 | $40,253.88 |
| 09300 - Tile (Materials) | $14,901.00 | $11,150.00 | $11,150.00 |
| 09600 - Wood Flooring | $85,066.56 | $85,066.56 | $82,514.56 |
| 09900 - Painting | $105,687.89 | $75,000.00 | $72,750.00 |
| | | | |
| 10310 - Fireplace Specialties and Accessories | $10,000.00 | $10,000.00 | $10,000.00 |
| | | | |
| 11000 - Appliances | $26,584.69 | $26,584.69 | $26,584.69 |
| 11010 - Vacuum System (Finish) | $2,500.00 | $2,500.00 | $2,500.00 |

# PROJECT COST SUMMARY

## MAY 1, 2018

| | | | |
|---|---:|---:|---:|
| 11200 - Water Filtration System | $800.00 | $800.00 | $800.00 |
| 11210 - Pumps (Interior Sumpump System & Manifold) | $2,000.00 | $2,000.00 | $2,000.00 |
| | | | |
| 15000 - Mechanical System | $140,000.00 | $107,202.00 | $101,841.90 |
| 15050 - Plumbing | $85,481.73 | $85,481.73 | $83,772.10 |
| | | | |
| 16000 - Electrical | $278,000.00 | $205,000.00 | $194,750.00 |
| 16000 - Electrical (Backup Generator) | $20,000.00 | - | - |
| 16800 - Sound and Video | $4,794.22 | $4,794.22 | $4,794.22 |
| | | | |
| 90320 - Civil Engineer | $3,500.00 | $3,500.00 | $2,750.00 |
| | **$3,018,922.08** | **$2,628,931.19** | **$2,470,292.28** |
| | | | |
| 00360 - Permit & City Fees $20/$1000 | $60,378.44 | $52,578.62 | $49,405.85 |
| 01300 - Project Management | $145,000.00 | $135,000.00 | - |
| 01300 - Site Supervisor | $130,000.00 | - | - |
| | **$3,354,300.52** | **$2,816,509.81** | **$2,519,698.13** |
| | | | |
| OVERHEAD 10% | $335,430.05 | $281,650.98 | $251,969.81 |
| **TOTAL** | **$3,689,730.57** | **$3,098,160.80** | **$2,771,667.94** |

\* Finance Costs, Taxes, etc. (soft costs) are Not Included in Construction Costs

# Exhibit B
## CURRICULUM VITAE
## VON SALMI SENIOR, ASLA

## PROFESSIONAL EXPERIENCE

**2008 – Present**   **Von Salmi and Associates, Inc., Westminster, MA**
**President/ CEO**
Providing Services to clients including the legal profession, consisting of owner's representation, project management, construction consulting, construction forensic services and expert witness testimony. Performing construction forensic services and expert witness testimony services from 1996 to 2008 DBA Von Salmi Sr.

**2004 – 2008**   **The Classic Group, Lexington, MA**
**Senior Project Manager**
Responsible for overseeing the construction of high end homes from 5,000 sq. ft. to 35,000. Responsible for estimates, bidding, specifications, contracts, payments and client relationships.

**2000 – 2004**   **Thoughtforms Corporation, Acton, MA**
**Site Superintendent**
Responsible for the construction of multi-million-dollar homes and their site construction.

**1996 – 2000**   **Kepa Homes Corp., Southborough, MA**
**General Manager and Superintendent**
Responsible for the day to day operations of a custom home and spec. home building operation. Designed and constructed approx 60 homes in and around the Southborough area ranging from $350,000 - $950,000.

**1994 – 1996**   **Von Salmi Masonry, Westminster, MA**
**Owner**
Masonry and landscape business working in the Metro West area on high end residential homes and sites.

**1991 -1994**   **Cherry Valley Lumber Company, Cherry Valley, MA**
**VP of Sales and Operations**
Responsible the operations and sales for a multi location retail lumber company.

**1980 – 1991**   **Yankee Lumber and Specialty Products, Inc., Westminster, MA**
**Ceo/ President**
Owned and operated a retail lumber company, millwork and building company. Built custom homes and landscapes in Central Ma.

**1978 – 1980**   **Webber Lumber Company, Fitchburg, MA**
**Contractor Outside Salesman**
Selling lumber and associated products to residential contractors in Central MA and Southern, NH

**1976 – 1978**   **Halla Nursery, Chanhassen, MN**
**General Manager**
Responsible for the day to day operations of an 800-acre national award-winning nursery, landscape contracting and design company. Worked on corporate, industrial, public, institutional and private properties.

| | |
|---|---|
| **1975 – 1976** | **Buckeye State Landscapes, Toledo, OH** |
| | **General Manager and Landscape Designer** |
| | Responsible for a residential landscape company providing residential landscape design and contracting services. |
| **1974 – 1975** | **Dean Johnson, Landscape Architects, Barnstable, MA** |
| | **Landscape Designer** |
| | Worked on public, institutional and private projects providing landscape architectural services. |
| **1966 – 1974** | Worked various jobs as an apprentice plumber, roofer, painter, construction laborer, carpenter, carpentry foreman, heavy equipment operator, truck driver, mason, landscape laborer in the residential industry. |

## PROFESSIONAL CREDENTIALS

- **Massachusetts Licensed Construction Supervisor**
- **Massachusetts Licensed Home Improvement Contractor**
- **Massachusetts Licensed CDL Driver**
- **Massachusetts Licensed Environmental Protection Agency Renovate Repair and Paint Lead Safe Renovator**
- **Minnesota, Certified Nurseryman**

## EDUCATION

**1968 - 1974**   **Kansas State University in Manhattan, Kansas**
Professional Bachelors of Landscape Architecture, Minor in Architectural History

Certifications and Training Courses Completed
- Occupational Safety and Health Administration (OSHA) 10-hour Construction Safety & Health
- Massachusetts Environmental Protection Agency Renovate Repair and Paint Lead Safe Renovators Certification
- Certificates in Marvin Doors and Windows and Andersen Doors and Windows
- Certificate in EFIS Application and Coatings
- Certificate in Stress Skin Panel Construction and Timber Frames
- Certificate HVAC Design and Performance Standards
- Certificate in Fenestration Testing and Performance
- Certificate in Wood Flooring and Applications Over Radiant Heat
- Masonry Waterproofing and Flashing Systems, Horizontal Masonry Applications for Dry and Wet Set, & Vertical Masonry Flashings Details
- Contracting and Liability Insurance
- Roofing and Flashing Details for Natural and Manmade Roofing Products
- Landscape Lighting Systems, Low Voltage Lighting Systems, and Electrical Lighting and Mechanical Systems

## PROFESSIONAL MEMBERSHIPS

- American Institute of Architects (AIA)
- American Society of Landscape Architects (ASLA)
- Boston Society of Landscape Architects (BSLA)
- Eastern Massachusetts National Association of the Remodeling Industry (EMNARI), Board of Directors
- Builders and Remodelers Association of Greater Boston (BRAGB), Board of Directors
- Massachusetts Home Builders Association (MHBA)

- National Association of Home Builders (NAHB)
- International Code Council (ICC)
- International Furnishings and Design Association (IFDA)

## AREAS OF EXPERTISE

- Building codes for single and two-family structures
- Specification reviews, cost reviews, & compliance standards
- Residential site design for stairs, walls, driveways and walkways
- Building envelope design and waterproofing techniques
- Water penetration, foundation failures and repairs
- Siding failures
- Roofing failure to perform
- Window and door installations and fenestration details
- Masonry detailing and water control practices
- Radiant heat installations both interior and exterior
- Quality control on HVAC
- Plumbing and electrical installations
- Landscaping and site issues for residential sites, walks, drives and parking areas
- Construction safety and practices on site and any other issues related to building construction
- Providing Owner's representative services

## PAST CASE HISTORY (PARTIAL)

- Expert witness in residential cases reviewing contractor's failure to perform
- Expert witness reviewing costs of services provided and cost of construction
- Expert witness in wrongful discharge cases by owner
- Expert witness in residential cases reviewing defective workmanship for interior and exterior finishes
- Expert witness in residential cases reviewing professional failure to perform, provide proper standards of care and major defects in design, specification and installation
- Expert witness in residential cases reviewing major failure of defective water proofing and drainage systems, plumbing systems and heating systems
- Expert witness in residential projects reviewing plans and selections by landscape architects and failure to provide proper supervision resulting in catastrophic loss and damages in a multi-million-dollar landscape
- Expert witness in water intrusion and resultant damage cases
- Expert witness is foundation failure case
- Expert witness in flooring material and workmanship defects

# Exhibit B
## CASEWORK
## VON SALMI SENIOR, ASLA

Casework involving depositions, arbitration and court appearances by Von Salmi of Von Salmi and Associates, Inc., over the previous four years

1. Safety v. Endurance,  Choate and Hall LLP, Boston, MA, deposed & arbitration    2017
2. Milgram v. Seadar, Nystrom, Beckman and Paris LLP, Boston, MA, deposed & arbitration          2017
3. Noonan v. LaBarge, Philps, Silver, Talman, Aframe & Sinrich, P.C., Westborough, MA, deposed and arbitration 2015
4. Wahkloo v. Vintage, Lynch, Brewer and Hoffman, Boston, MA, arbitration 2016

# Exhibit C
## LIST OF DOCUMENTS REVIEWED

Plans captioned: 88 Cutler Lane, Brookline, Massachusetts, Prepared by RAV Associates, dated 05/23/2013, Sheets A-1-S-8.

Plans captioned: 55 Lyman Road, Brookline, Massachusetts, Prepared by RAV Associates, dated 05/23/2013, Sheets A-1-S-8.

Photographs of 55 Lyman and 88 Cutler, including maps.google.com illustrating the property prior to construction

Cutler Documents 1 of 2, Cutler Documents 2 of 2, & Lyman Documents 1 of 2 and Lyman Documents 2 of 2 Binders (provided in support of Proof of Claim), with numbers redacted

Site Plan for Development B on Subdivision, dated 1/28/2013.

KDC Proof of Claim

Cutler Documents 1 of 2, Cutler Documents 2 of 2, & Lyman Documents 1 of 2 and Lyman Documents 2 of 2 Binders (provided in support of Proof of Claim), a second set of Binders with the numbers not redacted.

Construction Budget submitted to Rockland Trust Company in the amount of $1.6M

Certificate of Occupancy, dated 10/02/2014

Appraisal(s) of Real Property, dated 05/26/2015, by Nicholas Morris on behalf of Commonwealth Appraisal Services for Rockland Trust Company

Final As-Built Plan for 55 Lyman Road, dated 9/18/2014

Final As-Built Plan for 88 Cutler Lane, dated 8/27/2014

Inspection report for 55 Lyman Road, completed in December of 2015, prepared by Paul Cornell

Building Inspection Report for 88 Cutler Lane, dated December 15, 2015, prepared by Alexander Zheleznyak

Amended Adversary Complaint, filed 05/3/2016

Contract to Build Two Houses, dated June 18, 2013 between Classic Homes
Development & Construction, LLC and Lyman-Cutler, LLC

Construction Management/General Contractor Agreement dated 7/24/2013 between
Lyman Cutler LLC and Kagan Development KDC, Corp.

Transcript of the Deposition of Vadim Kagan taken on May 3, 2018

Transcript of the Deposition of Vadim Kagan taken on May 23, 2018

Transcript of the Deposition of Kirill Kagan taken on May 18, 2018

Transcript of the Deposition of Erik Babayan, taken on 9/29/2015.

Transcript of the Deposition of Décor Art by Jose Pedro M. Porto, taken on September
28, 2015.

# Exhibit D



VON SALMI
—— and Associates, Inc. ——

Construction, Consulting and Design

Letter of Understanding

Jan. 27, 2018

Von Salmi, President
Von Salmi and Associates, Inc.
P.O. Box 425
41B Bacon Street
Westminster, MA 01473
Ph. 617-823-9407
Email; von@vonsalmi.com
www.vonsalmi.com

John Perten, Esq.
Sheehan, Phinney, Bass & Green
255 State Street, 5th Floor
Boston, MA 02019
P 617-897-5641
Email; jperten@sheehan.com

Dear John,

We are pleased to offer you this Letter of Understanding, our instrument of service, for our expert witness and construction forensic services for the Kagan case regarding the home pricing for 8 Cutler Lane in Brookline.

We will endeavor to provide a professional estimate of the cost to construct the home at 8 Cutler Lane, Brookline, with assistance in defining the scope of work and specifications from your client, Mr. Kagan. Our experience in building in the metro west area will accurately reflect the variance in local premiums generated in the Boston marketplace.

We would estimate a range of hours to perform this work 68-84 hours for associate time and 30 - 38 hours of principal time. This is ONLY an estimate of time required for your review as we will be billing for actual time.

This letter contains our rates for these services offered by Von Salmi and Associates, Inc.

1. **Trial and stand appearances, arbitration appearances, hearing appearances, depositions and any other legal proceedings** will be billed at the rate of **$395 / hr.** Travel time will be charged one way from our office in Westminster, MA.
2. **Discovery, report generation, research, estimate generation, interviews etc. and any other activities related to discovery** will be charged at the rate of **$195 / hr.**

P.O. Box 425, Westminster, MA 01473
Tel: 617-823-9407  Email: von@vonsalmi.com  Web: www.vonsalmi.com

3. Travel time will be charged at the rate of $135 per hour round trip from our office in Westminster, MA.
4. Associate services will be charged at the rate of $105 per hour.
5. We bill in half hour increments.
6. All expenses and additional costs will be billed at the rate of 110% of costs (10% over costs). This may include but shall not be limited to vehicle rentals, parking, tolls, postage, reproduction and any other expenses related to the performance of these services.
7. Bills are due within 10 days of date of invoice. Flights shall be at direct cost.
8. Any past due amounts will be assessed a 1 ½% per finance charge.
9. Any additional costs for additional professional services required will be borne by the Client at cost with 10% markup applied. The Client shall pay all invoices directly. VSA will approve invoices for the Client.
10. VSA carries a $1,000,000 Liability insurance policy with a $2,000,000 aggregate coverage. We also carry Workman's Compensation Insurance Coverage. Certificates are available upon request at no additional cost.
11. Documents produced by VSA shall remain the property of VSA until outstanding balances are paid in full.
12. We will require a retainer of $2000.

We will endeavor to assist you in any and all matters related to providing our expert witness and construction forensic services in providing our estimate.

If you find all is in order, please sign and date one copy of this Letter of Understanding and remit to our office at your earliest convenience.

We shall look forward to assisting you.

Sincerely,

Von Salmi, ASLA, AIA
President
Von Salmi and Associates, Inc.
WWW.vonsalmi.com

Accepted:

_____          3-6-18
John Peplen, Esq.                                    Date

# EXHIBIT 22

# *Handwriting Identification*

Court Qualified
Paul H. McDonald
1-978-779-0388

Board Certified
P.O. Box 60616
Worcester, MA 01606

July 25, 2018

TO:    John H. Perten, Esquire
       Sheehan Phinney Bass & Green
       255 State Street, 5th Floor
       Boston, MA. 02109

SUBJECT:    Kristina Brusenkova

REQUEST:    Determine the authenticity of a signature of Kristina Brusenkova appearing on a Nondisclosure Agreement document dated April 11, 2014.

EXAMINATION:    The following document was submitted for this examination as a questioned document. A copy of this document is annexed hereto as Exhibit A:

Q1    A two-page typed NONDISCLOSURE AGREEMENT document containing the signature of Kristina Brusenkova dated this 11th day of April, 2014, original.

The following documents were submitted for this examination as known signatures of Kristina Brusenkova. Copies of these documents are annexed hereto as Exhibit B:

K1    A one-page plan white paper containing two loan agreements and two signatures of Kristina Brusenkova dated 1/25/2014 and 2/19/2014 respectively, original.

K2    A signature of Kristina Brusenkova located on check # 121 dated 10/20/2014, electronic copy

1

K3    A signature of Kristina Brusenkova located on a document identified as page 19, machine copy.

K4    A signature of Kristina Brusenkova identified as employee, undated machine copy.

K5    A certified signature of Kristina Brusenkova, undated machine copy.

K6    An Acceptance of Commitment Terms document signed Kristina Brusenkova dated 01/13/2014, electronic copy. Document also identified as page 5 of 5.

K7    An Appraiser Independence Requirements (AIR) Appraisal Acknowledgement document signed Kristina Brusenkova dated 1/13/2014, electronic copy.

K8    A Loan Request Consumer Information Letter signed Kristina Brusenkova, electronic copy. Document also identified as page 1 of 1.

K9    A Notice to Home Loan Applicant document signed Kristina Brusenkova dated 1/13/2014, electronic copy.

K10    A signature document signed Kristina Brusenkova dated 1/13/2014, electronic copy. Document also identified as page 2 of 2.

K11    A four-page USA Property Management & Housing Rehab LLC Management Agreement document containing four signatures of Kristina Brusenkova dated 09/16/2013, electronic copy.

K11a Exhibits sections 1-5D

K11b Exhibits sections 5E-6

K11c Exhibits sections 7-10

K11d Exhibits signature page

K12    A two-page Offer to Purchase Real Estate document signed Kristina Brusenkova dated 9-23-2013, electronic copy.

K13    A single sheet of white lined paper of witnessed writings consisting of three signatures of Kristina Brusenkova, the word loan and two date notations, undated, original. The document exhibits the numbers 1-6, 1-3 refers to the

signatures of Kristina Brusenkova, number 4 the word loan and numbers 5-6 date notations.

K13a1   An original signature of Kristina Brusenkova, original.

K13b2   An original signature of Kristina Brusenkova, original

K13c3   An original signature of Kristina Brusenkova, original.

K13d4   The word loan, original.

K13e5   The written date, April 11, 2014, original.

K13f6   The written numerical date, 04/11/2014, original.

It should be noted that documents K2, K4-5 were submitted as redacted copies.

EXAMINATION PROCESS:

The examination process involving the signature of Kristina Brusenkova located on document Q1 with those known signatures of Kristina Brusenkova located on documents K1-13 (18) was conducted utilizing the naked eye as well as the following optic devices;

Leica Stereo Microscope M3Z System and Fiber Optic Light Source

Macroscope 18-36 ZM System kit

Hand Held Magnifiers

OBSERVATIONS:   The signature of Kristina Brusenkova appearing on document Q1 exhibited a very fluid and flourishing signature which was placed on document Q1 as an original. There were no indications of tremor, hesitation or pen lifts within the signature. Had those indications been present, they would have been indicative of one individual attempting to simulate the writing/signature of another. However, they were not present. The signature also consisted of three letter formations which extended below the base line as well as three upper extender formations above the base line. The beginning of the signature extended off to the extreme left and finished with a flourish to the extreme right of the beginning.

According to Robertson, Edna W. *Fundamentals of Document Examination,* Chicago: Nelson Hall Publishers, 1991, the definition of base Line is "Real or

3

imaginary line upon which writing is placed. Also, the line taken as a base for measurement or comparison of writing." Definition located on page 313.

Edna W. Robertson has been recognized as a well-known expert in the field of handwriting identification.

RESULTS:    The examination and comparison of the signature of Kristina Brusenkova appearing on document Q1 with the signatures of Kristina Brusenkova appearing on documents K1-13 revealed the following;

> The signature placed on document Q1 revealed a very fluid motion with no appearances of stop, starting or pen lifts. The signature exhibits flourishing letter formations both above and below the signature line as well as an angle to the upper right. The signature also exhibits a very flourishing start as well as a flourishing finish. Also present on the document were the numerical formations (4/11/2014).

> The signatures of Katrina Brusenkova appearing on documents K1-13 exhibited those same characteristics.

> A measurement of length of the signature of Katrina Brusenkova located on the signature line of Q1 measured 7.3 cm.

> The measurements of the length of signature located on documents K1-13 was as follows;

| K1 | 7.0cm | K8 | 4.9cm | | |
|------|--------|------|---------|------|--------|
| K2 | 8.4cm | K9 | 4.5cm | | |
| K3 | 6.2cm | K10 | 5.0cm | | |
| K4 | 6.7cm | K11A | 8.2cm | K11b | 8.9cm |
| K5 | 6.7cm | K11c | 10.1cm | K11d | 8.4cm |
| K6 | 5.9cm | K12 | 7.8cm | | |
| K7 | 5.5cm | K13a1 | 4.7cm | K13b2 | 5.2cm |
| | | K13c3 | 5.5cm | | |

The measurements consisting of the lowest point of signature to the highest point on document Q1 was 5.7cm

4

The measurements consisting of the lowest point of the signature of Kristina Brusenkova appearing on documents K1-13 and the highest point of the signature was as follows;

| | | | |
|------|--------|-------|--------|
| K1 | 4.5cm | K8 | 3.5cm |
| K2 | 5.2cm | K9 | 4.0cm |
| K3 | 3.4cm | K10 | 3.9cm |
| K4 | 5.3cm | K11a | 5.3cm |
| K5 | 5.8cm | K11b | 5.9cm |
| K6 | 4.9cm | K11c | 6.5cm |
| K7 | 4.6cm | K11d | 5.7cm |
| K12 | 5.7cm | K13a1 | 4.0cm |
| K13b2 | 4.0cm | K13c3 | 4.0cm |

Document Q1 is angled to the to the upper right as are documents K1-13. The measurement of the angle of writing, signature of Kristina Brusenkova are as follows in degrees;

| | | | |
|------|----|------|----|
| Q1 | 32 | K7 | 44 |
| K1 | 32 | K8 | 39 |
| K2 | 34 | K9 | 39 |
| K3 | 40 | K10 | 38 |
| K4 | 44 | K11a | 40 |
| K5 | 46 | K11b | 40 |
| K6 | 42 | K11c | 38 |
| K11d | 43 | K12 | 42 |

5

K13a1  27          K13b2  19

K13c3  20

A comparison of the above noted writings found on document Q1 with those found on documents K1-13 revealed there to be similarities between the writings. These similarities included fluid motion, flourishing letter formations, right angle appearance, letter height above and below base line as well as the numerical formations of the number 2, 1, 4 and 0. The date noted on document K13 line 6 (4/11/2014) exhibits similarities to the date of signature located on document Q1 (4/11/2014).

Edna W. Robertson also opined in *Fundamentals of Document Examination*, Chicago: Nelson-Hall Publishers, 1991 that "Once a handwriting has been executed, it cannot be identically reproduced in all its intricate features by the same or another person by freehand writing."

OPINION:            It is the highly probable opinion of this examiner, one which is based upon the evidence presented and held within a reasonable degree of professional certainty, that the author of the writings located on document Q1 is the same author of the writings located on documents K1-13.

This examiner reserves the right to alter this opinion based upon the ability to examine further writing of Kristina Brusenkova.

This opinion has been offered in accordance with the standards of the American Society for Testing Materials (ASTM).

QUALIFICATIONS:     A copy of the curriculum vitae of Paul H. McDonald is annexed hereto as Exhibit
A.


PRIOR TESTIMONY OVER THE PAST FOUR YEARS:
A copy of the prior testimony over the past four years of Paul H. McDonald is
annexed hereto as Exhibit B.

COMPENSATION:     For the professional services provided to date, Mr. McDonald has billed the
client $1,200.  For ongoing professional services, Mr. McDonald bills at the
following rates:


RATES

Examination/Comparison          $100.00/Hr

Travel/Incidental Expenses      Actual Expense

Court Appearance/Testimony      $100.00/Hr. Portal to Portal
Minimum 4 Hrs per Appearance

Deposition                      $300.00/Hr.  Portal to Portal

Conferences                     $100.00/Hr. Portal to Portal


Dated:  July 25, 2018

_____
Paul H. McDonald
Document Examiner


7

# NONDISCLOSURE AGREEMENT

### Kagan Development, KDC Corp Employees &
### Contractors Effective Date: April 11, 2012

In consideration of my employment or continued employment by Kagan Development, KDC Corp ("KDC") as an employee or consultant, and the compensation paid to me, I, Kristina Brusenkova, warrant and agree as follows:

1. I acknowledge that, as an employee or consultant of KDC, I have had and will have access to confidential information belonging to KDC or third parties to whom KDC has a duty of confidentiality and that any improper taking, disclosure or use of this confidential information would cause KDC substantial loss, damage and irreparable harm. I shall at all times continue to hold confidential all student data, all computer user information, all proprietary information, inventions and developments, and all other data or information (and any tangible evidence, record or representation thereof), whether prepared, conceived or developed by an employee or consultant of KDC (including myself) or received by KDC from a third party that is maintained in confidence by KDC (collectively, the "Confidential Information").

   During my employment or consultancy relationship with KDC, I shall continue to use and disclose Confidential Information only to the extent necessary to perform my duties as an employee or consultant of KDC and for the sole benefit of KDC, and, in any event, shall not disclose any Confidential Information to any person or entity outside KDC except as authorized pursuant to a written confidentiality agreement supplied by KDC or with the prior written direction and permission of an authorized officer of KDC. After the termination of my employment or consultancy relationship with KDC, I shall not disclose to any person or entity, or make use of, any Confidential Information without the prior written consent of an authorized officer of KDC. This provision shall not apply to any Confidential Information that KDC has voluntarily disclosed to the public or has otherwise legally entered the public domain.

   I understand that KDC has from time to time in its possession information that is claimed by others to be proprietary and that KDC has agreed to keep confidential. I agree that all this information shall be Confidential Information for purposes of this Agreement.

2. I agree that all originals and all copies of all files, memoranda, notes, programs, codes, and other materials and writings containing, representing, evidencing, recording, or constituting any Confidential Information, however and whenever produced (whether by myself or others), whether developed before or after the date of this Agreement, shall be the sole property of KDC and shall be returned to KDC upon the termination of my employment or consultancy relationship for any reason.

   I agree that all Confidential Information and all other discoveries, inventions, ideas, processes, products and materials, or parts thereof, conceived, developed, or otherwise made by me, alone or jointly with others and in any way relating to KDC's present or proposed activities or to tasks assigned to me during the course of my services to KDC, whether or not subject to copyright or patent protection and whether or not reduced to tangible form or reduced to practice, during the period of my employment or consultancy (collectively referred to herein as "Developments") shall be the sole property of KDC. I agree that all Developments shall constitute works made for hire under the copyright laws of the United States and hereby assign and, to the extent an assignment cannot be made at present, I hereby agree to assign to KDC all of my right, title and interest, including all intellectual property rights, in Developments. I agree to make and maintain adequate and current written records of all Confidential Information and Developments and shall disclose same promptly, fully and in writing to KDC and to execute all documents and perform all acts that KDC may request to secure its rights hereunder and to carry out the intent of this Agreement, during and after my employment or consultancy.

Q1

3. This Agreement constitutes the entire and only agreement between KDC and me respecting the subject matter hereof, and supersedes all prior agreements and understandings, oral or written, between us concerning this subject matter. No modification, amendment, waiver or termination of this Agreement shall be binding unless made in writing and signed by an authorized officer of KDC. Failure of KDC to insist upon strict compliance with any of the terms or conditions of this Agreement shall not be deemed a waiver of these terms or conditions. In the event of any inconsistency between this Agreement and any other contract between KDC and me, the provisions of this Agreement shall prevail.

4. I acknowledge that money damages alone will not adequately compensate KDC for breach of any of my covenants and agreements herein and, therefore, agree that in the event of the breach or threatened breach of any such covenant or agreement, in addition to all other remedies available to KDC, at law, in equity or otherwise, KDC shall be entitled to injunctive relief compelling specific performance of, or other compliance with, the terms of this Agreement.

5. This Agreement shall be binding upon me irrespective of the duration of my relationship with KDC, the reasons for the termination of my employment or consultancy relationship with KDC, or the amount of my compensation. My obligations under this Agreement shall survive the termination of my relationship with KDC irrespective of the reasons for the termination and shall not in any way be modified, altered or otherwise affected by the termination.

6. This Agreement shall inure to the benefit of KDC and its legal representatives, successors and assigns, and shall be binding upon me and my heirs, legal representatives, successors and assigns.

7. This Agreement shall be governed by, and construed and enforced in accordance with, the substantive laws of The Commonwealth of Massachusetts, without regard to its principles of conflicts of laws, and shall be deemed to be effective as of the first day of my employment or consultancy relationship with KDC.

8. This Agreement does not constitute a contract of employment and does not imply that employment or consultancy will continue for any length of time.

I ACKNOWLEDGE THAT, BEFORE PLACING MY SIGNATURE HEREUNDER, I HAVE READ ALL OF THE PROVISIONS OF THIS AGREEMENT, AND HAVE THIS DAY RECEIVED A COPY OF IT.

IN WITNESS WHEREOF, I have executed this Agreement as a sealed instrument on this 11th day of April, 2014.

Signature: Ksenia Brusenkova

4/11/2014

contr

I am, Viktor Sergeev /Vano D/
borow money to Kristina Brusenkova
in amount of $ 720.00, with interest
10% / $72.00/ for 1 year
Amount has to be return
by 01/25/15, amount of $ 792.00

01/25/14 Viktor Sergeev    Viktor Sergeev
1/25/2014 K. Brusenkova

02/19/14 ad amount $ 2,900.00
with interest, 10% /$290.00/ to the first
Loan, for one year. Total Loan will be
$ 3,620.00, return $ 3,960.00, by 01/25/15

2/19/2014.

02/19/14 Viktor Sergeev

K₁

**KRISTINA A BRUSENKOVA**
2 VILLAGE ROCK LN. APT 4
NATICK, MA 01760

60-728/2313

121

DATE 10/20/2014

PAY TO THE
ORDER OF _V & R Healiy_                    $ 3,620.00

_Three Thousand Six Hundred Twenty ___ dollars 00/100_

◆ **Santander**®

Santander Bank, N.A.

MEMO _____

⑆2313726911⑆      905 0121



Kristina Brusenkova





Employee

Employee    *Kristina Bonventre*    President

K4



IN WITNESS WHEREOF, the undersigned has executed this instrument as of the day and year first set forth above.

Name: Kristina A. Brusenkova

K5

Loan Number: 0010005817

## ACCEPTANCE OF COMMITMENT TERMS

I/We hereby understand and accept the terms of this Commitment. If this loan is cancelled for any reason after the acceptance of this Commitment, I/we agree to pay all reasonable costs incurred by Needham Bank and its Attorneys.

THE UNDERSIGNED HEREBY ACCEPT THE ABOVE TERMS OF THE COMMITMENT LETTER AND THE ATTACHED GENERAL CONDITIONS OF THIS COMMITMENT.

The undersigned specifically represents to Lender and to Lender's actual or potential agents, processors, attorneys, insurers, servicers, successors and assigns and agrees and acknowledges that the information provided to the Bank is accurate and complete as of the date set forth opposite my signature.

| | | |
|---|---|---|
| Borrower Kristina A Brusenkova | Date | Borrower                     Date |
| Borrower | Date | Borrower                     Date |
| Borrower | Date | Borrower                     Date |

COMMITMENT LETTER
CL2.NB  06/19/13                     Page 5 of 5                     DocMagic *eForms*
www.docmagic.com

K6

# APPRAISER INDEPENDENCE REQUIREMENTS (AIR)
## APPRAISAL ACKNOWLEDGMENT

Loan #: 0010005817

Date: 12/30/13

Lender: Needham Bank

Borrower: Kristina A Brusenkova

Property Address: 2 Village Rock Lane #4, Natick, Massachusetts 01760


You are entitled to receive a copy of any appraisal report that is obtained on your behalf, concerning your subject property, at least three business days prior to the closing of your loan. A copy of any and all such appraisal reports ("appraisal report") should have already been delivered to you, allowing you at least three business days to review it prior to the closing of your loan.

If you wish to proceed with the loan closing, your signature will acknowledge either:

(1)   Your receipt of the appraisal report three or more business days prior to your loan closing, or, alternatively,

(2)   That you previously had waived your right to review the appraisal report three or more business days prior to the closing of your loan.

| | |
|---|---|
| Borrower Kristina A Brusenkova                    Date | Borrower                    Date |
| Borrower                    Date | Borrower                    Date |
| Borrower                    Date | Borrower                    Date |

DocMagic eForms
www.docmagic.com

K9

12/30/2013

## Loan Request Consumer Information Letter

From:

KROLL FACTUAL DATA
5200 HAHNS PEAK DRIVE
LOVELAND, CO 80538
800-766-5600 FAX 800-456-7669

Date Ordered: 11/13/2013
Report ID: E1407BXCF0L7227
Source: Powersite

To:

Kristina A Brusenkova
23 Dominic Court
Dedham, MA 02026

RE:

NEEDHAM BANK
1063 GREAT PLAIN AVENUE
NEEDHAM, MA 02492

Dear Kristina A Brusenkova

KROLL FACTUAL DATA prepared a credit report to expedite your loan request with NEEDHAM BANK. A brief statement may be required by your lender to explain credit accounts which indicate a delinquent credit history, public record items and/or inquiries. Please write your explanation below. If additional space is required use the reverse side of this letter. Mail or deliver to NEEDHAM BANK promptly. If you are unsure of the explanation required, please contact your lender.

Inquiries:
An inquiry indicates that a credit grantor has obtained a copy of your credit report. Please indicate if you have applied for credit with the noted grantor, if you currently have an account, if credit was denied with the noted grantor, or if the inquiry was for employment purposes.

| | |
|---|---|
| 10/02/2013 | FACTL DTA |
| 09/29/2013 | SEARS/CBNA |
| 09/02/2013 | CBNA/BBY |
| 11/08/2013 | TD BANK N.A. |
| 10/02/2013 | KROLL FACTUAL DATA/060 |
| 11/13/2013 | 1407 NEEDHAM BANK |
| 10/02/2013 | 2204 NEEDHAM BANK |

Explanation:

*none of these*

_____

_____

_____

_____

Kristina A Brusenkova                                    Date

*** RETURN THIS LETTER TO YOUR LENDER ***
NEEDHAM BANK
1063 GREAT PLAIN AVENUE
NEEDHAM, MA 02492

K9

12/30/2013

## Notice to Home Loan Applicant

In connection with your application for a home loan, the lender must disclose to you the score that a consumer reporting agency distributed to users and the lender used in connection with your home loan, and the key factors affecting your credit scores.

The credit score is a computer generated summary calculated at the time of the request and based on information that a consumer reporting agency or lender has on file. The scores are based on data about your credit history and payment patterns. Credit scores are important because they are used to assist the lender in determining whether you will obtain a loan. They may also be used to determine what interest rate you may be offered on the mortgage. Credit scores can change over time, depending on your conduct, how your credit history and payment patterns change, and how credit scoring technologies change.

Because the score is based on information in your credit history, it is very important that you review the credit-related information that is being furnished to make sure it is accurate. Credit records may vary from one company to another.

If you have questions about your credit score or the credit information that is furnished to you, contact the consumer reporting agency at the address and telephone number provided with this notice, or contact the lender, if the lender developed or generated the credit score. The consumer reporting agency plays no part in the decision to take any action on the loan application and is unable to provide you with specific reasons for the decision on a loan application.

If you have questions concerning the terms of the loan, contact the lender.

| Experian Consumer Relations | TransUnion Consumer Relations | Equifax Consumer Relations | Kroll Factual Data |
|---|---|---|---|
| PO Box 2002 | PO Box 1000 | PO Box 740241 | 5200 Hahns Peak Drive |
| Allen, TX 75013 | Chester, PA 19022 | Atlanta, GA 30374 | Loveland, CO 80538 |
| (888) 397-3742 | (800) 916-8800 | (800) 685-1111 | (800) 929-2712 |
| www.experian.com | www.transunion.com/myoptions | www.equifax.com/fcra | www.krollfactualdata.com |

**Please acknowledge your receipt of this notice by signing below and returning to your lender.**

_____           1/9/1809

Kristina A Brusenkova                              Date

H3-23 14 0

K9

12/30/2013

Please acknowledge your receipt of this notice by signing below and returning to your lender.

_____        _____
Kristina A Brusenkova                                        Date

End of Report - Notice To Home Loan Applicant       0140A0264DA2.1.711   12/30/2013 10:28:25   1.7.14.0

K10

## USA PROPERTY MANAGEMENT & HOUSING REHAB LLC
### MANAGEMENT AGREEMENT  (pg. 1 of 3)

THIS AGREEMENT is made on September 16, 2013 between  Antares Realty LLC  23
Dominic Court Dedham MA 02026 herein called Owner and USA Property Management
& Housing Rehab LLC  (herein called Agent or DI & PM) under the following terms
and conditions:

**1. APPOINTMENT AND ACCEPTANCE:** The Owner hereby appoints the Agent as
exclusive agent for the management of the property described under Section 2 of this
Agreement, and the Agent accepts the appointment, subject to the terms and conditions
set forth in this agreement.

2. PREMISES: PROPERTY ADDRESS    To Be Determine

**3. CONSIDERATION:** This Agreement is being made in consideration of the mutual
promises of the parties hereto and the services to be rendered hereunder by the Agent and
the compensation herein agreed by the Owner to be paid to the Agent for such services.

**4. PROFESSIONAL MANAGEMENT STANDARDS:** The Agent agrees to furnish
the services of this organization, to exert its best efforts, and to exercise the highest
degree of professionalism and competence in managing the Premises, in order to provide
the Owner with the maximum economic return consistent with proper management.

**5. DUTIES WITH RESPECT TO LEASING AND TENANTS.**
A.The Agent hereby accepts the following responsibility, authority, and duties as
to renting and leasing the Premises. Use best efforts to keep the Premises rented by
procuring tenants for the Premises and negotiating and executing on behalf of the Owner
all leases for space in the Premises provided, however, that the Agent shall not execute
any lease in excess of twelve (12) months without securing the prior written consent of
the owner.

B. The Owner agrees that USA Property Management shall act as the Owner's exclusive
Agent in managing, operating, leasing, and renting of the Premises.

C To advertise the availability of rental or lease space by the full use of appropriate
media communications, such as newspapers, on Premise sign display, and solicitation
aids appropriate to market available rental space.

D. To conduct such inquiry of the references of prospective tenants as is necessary
and reasonable to protect the Owner against financial loss and for the protection of the
Premises; to obtain credit reports as to prospective tenants, only upon the written consent
of each prospective tenant.

E. To serve notices to vacate the Premises when the Agent deems such notice is necessary to bring any legal action or proceeding to recover possession of rented or leased Premises, to compromise and settle such lawsuits. with the approval of the Owner, to incur reasonable collection fees, costs and court costs as may be agreed from time to time with the Owner and to charge such expenses to the Owner as operating expenses of the Premises when approved, including reasonable attorney's fees.

F. To determine the necessity for security deposits. The Agent will collect and disburse security deposits in accordance with the terms of each lease as acquired.

G. To collect, when due, all rents, charges and other account receivables on the Owner's behalf in connection with the management and operation of the Premises.

H. To make or cause to be made and supervise repairs and alterations on the Premises; to make any extraordinary repairs, but only under an emergency, if in the opinion of the Agent such repairs are necessary to protect the property from damage, to avoid danger to life, to comply with federal, state, or local law, or to maintain services to the tenants as called for by their tenancy agreement. The Owner will be consulted and must approve any repairs emergency or otherwise that exceed three hundred dollars ($300). To hire, discharge and supervise all labor and employees required for the operation and maintenance of the Premises.

I. To disburse or to have disbursed regularly and punctually, the regularly recurring operating expenses of the Premises as authorized under this Agreement by the 10th of every month.

J. The Agent shall maintain and provide on a monthly basis to the owner accurate, complete and separate records in accordance with generally accepted accounting standards and procedures, showing income and expenditures relating to the operation of the Premises. The Owner shall have the right at any reasonable time to inspect all records kept by the Agent pertaining to the Premises.

K. To organize and maintain a system of controls designed to ensure the authenticity of bills, invoices, and statements charged and paid. The Agent shall further order goods and services from a list of suppliers and contractors, which shall be maintained in the files of the Agent.

**6. COMPENSATION FOR MANAGERIAL SERVICES:** In Consideration for the services to be rendered to the Owner by the Agent, DI& PM, under this Agreement, the Owner agrees to pay the Agent the SUM OF $300.00 WHEN THE PROPERTY IS RENTED BY THE AGENT THAT SUM WILL BE DEDUCTED FROM THE FIRST MONTH'S RENT. Additionally, the owner agrees to pay Agent 10 percent (10%) of the gross revenues from the Premises actually collected. payable to the Agent on a monthly basis. If the owner uses Agent, to manage five (5) or more units, the

management fee shall drop from ten percent (10%) to eight percent (8%) of collected gross revenues. A $300.00 deposit will be held in escrow for repairs. There will be a $125.00 administrative fee at time of agreement.

**7. TERMS OF AGREEMENT**: The initial term of this Agreement shall be one year and it shall automatically renew for successive one-year periods, unless written notice of expiration from either party is received giving ninety (90) days advance notice. Upon any termination, all records in possession of the Agent pertaining to the operation of the Premises, together with all supplies or all other items of property owned by the Owner and in the Agent's possession shall forthwith be delivered to the Owner. Either the owner or Agent can terminate this agreement at any time with ninety (90) days written notice.

**8. Owner's Responsibility**. The owner hereby agrees to give permission to USA PROPERTY MANAGEMENT & HOUSING REHAB to obtain a copy of property Deed to prove ownership.

b. In the event that any governmental agency, authority, or department should order the repair, alteration or removal of any structure or matter on the Property and if, after written or electronic notice of the same to the Owner by such body or by the Agent, the Owner authorizes the Agent or others in writing to make such repairs, alternations or removal within the period required.

**Note**. If rental properties are in need of any form of repairs in order to become rentable, Owner will be responsible for providing Agent with proper funds to make necessary renovations or Owner agrees to have house in proper condition before turning over possession to Agent.

**9. Insurance.** The Owner is responsible for the payment reinstatement and renewal of all insurance premiums on the subject property, unless specified.

**10. Arbitration Agreement**. The parties mutually agree that any controversy or claim arising out of or relating to this management agreement may be settled by Arbitration in accordance with the Commercial Arbitration Rules of the American Arbitration Association, as an alternative to the judicial system.

ADDITIONAL TERMS OR PROVISIONS:

At all times, this Agreement will ensure to the benefit and constitute a binding obligation on the parties and their respective successors and assigns.

This Agreement constitutes the entire agreement between Antares Realty LLC and USA Property Management, Agent, with respect to the management and operation of the Premises, and no changes will be valid unless made by supplemental written agreement, executed and approved by the parties. This Agreement shall be construed in accordance with the laws of the State of Michigan. IN WITNESS WHEREOF, the parties have affixed or caused their respective signatures on the day and date first written above.

Antares Realty LLC _____    Date _____09/16/2013_____

USA Property Management _____Date_____

Kild

## OFFER TO PURCHASE
### Real Estate

Purchase Offer:_____ANTARES REALTY LLC_____, referred to herein as

BUYER(S), offers to purchase the following described real estate located in the City____DETROIT_____, County of____Wayne_____, State of Michigan and more specifically described legal description as:


And more commonly known as:_____16566 FENMORE_____DETROIT MI 48235.

subject to any existing building and use restrictions, zoning ordinances, easement for utilities and right of the public in any portion of the property used as a public roadway, for the sum of : $_____N/A_____

from: __DEE FINANCIAL INVESTMENTS referred to herein as SELLER(S),

upon the terms and conditions Stated herein. SELLER shall signify acceptance by executing the attached form of acceptance for The Gross purchase Sum of: $_____27,000.00_____

### 2. Terms of Purchase:

New Mortgage: The full price upon execution and delivery of Warranty Deed, Contingent upon the Buyer ability to obtain a **Conventional Mortgage** amortized for 15 or 30 Years, In the amount of_____n/a_____ plus down payment

<sub>AMOUNT    OF    MORTGAGE</sub>

and prepaid items and adjustment at a minimum percent interest rate on or before the sale is to be closed, which the Buyer agrees to apply for with-in twenty one **(21) Days**. After final acceptance and accept promptly if tended. The Buyer agrees to Use his /her best efforts to obtain such commitment. If commitment is **Not Obtain With in (30) Days of** final acceptance of this offer, Seller has the option to terminate this Agreement By given written notice to the Buyer(s). If the Buyer(s) obtain a commitment prior to receipt of such written termination, then the agreement will not be terminated.

### 3. Other Provisions: Seller agrees to pay up to __n/a_____ **sellers concessions** towards the buyers closing cost and pre-paid items.

### 4. All improvements and Appurtenances: Are included in the purchase price,
including, now in or on the premises including all lighting fixtures, shades, blinds, curtain rods, Traverse rods , storm windows and storm doors, screen, awing, TV antenna, Rototenna, incinerator, purchase water softener, Landscaping, garage doors Openers, transmitters(s), and all tacked down carpeting, and following additional Items:_____whatever applies_____

### 5. Possession: to be given immediately after closing unless other wise noted with addendum.
### 6. Taxes: All taxes and assessments which have become a lien upon the land, whether recorded or not recorded at the date of this agreement will be paid by the seller. Current taxes, if any, will be prorated and adjusted as of the date of closing in accordance with due date's basis of the municipality or taxing unit in which the Property is located. The Title Company will retain from the amount due seller at Closing, a minimum of $_____ for water charges .When the Title Company receives final water bill or final reading, all water adjustments will be made from the date of possession and disbursed out to the appropriate authority. The remainder if any will be forwarded to the seller with in 30 days of disbursement.

### 7 .Deposit: ____1500.00____EARNEST MONEY DEPOSIT

1

K12

Sep 23 13 02:46p   USA Property Management   2488092225   p.3

**8. Acceptance:** By signing his signature, hereto, Seller accepts this offer and Acknowledges receipt of a copy thereof. Seller warrant that no further offers be Considered after acceptance of this offer, so long as the buyer is not in default.

**9. Purchaser(s)** _____ does   or   X  does not   (check one) choose to have to property inspected.

ADDITIONAL CONDITIONAL (if any) _____

PROPERTY SOLD AS IS AND ANY BACK TAXES WILL BE PAID

_____

_____

_____

_____

_____

_____

ACCEPTANCE OF OFFER
We hereby accept the offer set forth above

Dated:  9 - 23 - 2013

_____          _____
SELLER(S)                        SELLER(S)

X _____        _____
BUYER(S)                         BUYER(S)

2

K12

EXHIBIT K13 1
WIT:
DATE: 5/15/18
BAY STATE REPORTING



1 —

2

3

4   loan

5   April 11, 2014

6   04/11/2014

K13

# Handwriting Identification

Court Qualified
Paul H. McDonald
1-978-779-0388

Board Certified
P.O. Box 60616
Worcester, MA 01606

## PAUL H. MCDONALD
## HANDWRITING IDENTIFICATION

### CASE TYPES

Investigation of fraudulent checks, real estate deeds, medical records, disputed wills, threatening letters, anonymous notes, insurance claims and other questioned documents and writings.

### QUESTIONED DOCUMENT TRAINING

Training includes seminars, classroom instruction in handwriting, professional development in handwriting identification and document examination as well as admissibility of evidence and courtroom presentation. Professional training also included an apprenticeship program under the direction of John Swanson.

### ACCREDITATION AND MEMBERSHIP

World Association of Document Examiners, Member # 898, 1990-2000

Earned status of Certified Document Examiner by World Association of Document Examiners, August 10, 1999, Chicago, Il

Independent Association of Questioned Document Examiners, October 2001-October 2010

Earned status of Certified Document Examiner by IAQDE, September 2003, St. Louis, Mo and re certified 2008,

      Elected member Board of Directors IAQDE 2002-2007
      Elected office Vice President IAQDE 2007-2009
      Elected office of President IAQDE 2009-2010

American Society for Testing Materials      2004-present

EXH . A

**LECTURES, SEMINARS, PROFESSIONAL DEVELOPMENT**

World Association of Document Examiners Annual Accreditation Seminars, 1990-1999, Chicago, Il

Independent Association of Document Examiners Accreditation Seminars, 2001-04, 2006-07, 2009-2010

**EDUCATION**

Bachelor of Science in Management, Babson College, 1974

Masters of Arts in Criminal Justice, Clark University, 1987

**PROFESSIONAL EXPERIENCE**

Member Massachusetts State Police, 1972-1995, combination of road duties as well as 13 ½ years as a criminal investigator

Adjunct faculty member instructing in criminal justice programs from 1978 to present at the following institutions:

Quinsigamond Community College 1978-2001

Anna Maria College 1991-1993

Becker College 1998-2001

Curry College 1999-2011

Worcester State University 2012-present

Courses taught included all aspects of the criminal justice field including some course instruction in handwriting identification/document examination

## LECTURES

Conducted lectures on document examination and handwriting identification for various law enforcement organizations including the Massachusetts Department of Corrections, the Bristol County and Worcester County District Attorney's Office. Lectures also conducted for the Boston Chapter of Certified Fraud Examiners, MetLife Field Investigators, New England Claim Association, NESPIN and Sun Life Insurance Company.

## PROFESSIONAL EQUIPMENT

Examination equipment includes a LEICA Stereo Microscope M3Z System and Fiber Optic Light Source
Macroscope 18-36 ZM System Kit
Electronic Static Detection Apparatus Machine
Various hand held devices
Nikon N50 35mm Camera
Polaroid Microm SLR Microscope Camera

## REFERENCE LIBRARY

The Problem of Proof by Albert Osborn
Questioned Documents by Albert Osborn
Evidential Documents by James V. P. Conway
Fundamentals of Document Examination by Edna W. Robertson
Introduction to Handwriting Examination and Identification by Russell R. and Ralph B. Bradford
Suspect Documents by Wilson R. Harrison
Scientific Examinations of Questioned Documents by Ordway Hilton
Detecting Forgery by Joe Nickell

## CLIENT LIST

Banking Industry, Campus Police, Massachusetts Department of Corrections, Insurance industry, Legal Assistance Corporation of Central Massachusetts, Massachusetts Municipal Police Departments, Private Civil, Criminal Attorneys, Commercial Airline Industry, County and State Prosecuting Agencies, Committee

for Public Counsel, Financial Industry, Academic Institutions, Election
Commission, Other Assorted Private industries.

## COURT PROCEEDINGS/TESTIMONY PROVIDED

Testimony has been provided at the District Court Criminal as well as the
Superior Court Civil and Criminal levels throughout the Commonwealth of
Massachusetts as well as the Bankruptcy Court, Boston session. The courts where
testimony has been provided include Berkshire 6-man, Bristol Superior Civil and
Criminal, Middlesex Superior Civil, Suffolk Superior Criminal and Worcester
Superior Criminal and Civil as well as Probate. Also the Suffolk County Grand
Jury Session, Massachusetts Arbitration and American Arbitration Association
Boards and deposed in the State of Maine. Specifics provided upon request.

## *COURT PROCEEDINGS*

Worcester County Six Man Session, Judge T. Sullivan
February 27, 1995, Commonwealth V Tavares, Letter of opinion submitted
through Worcester County District Attorneys Office on behalf of the
Commonwealth

Worcester County Superior Court, Probate Session, Judge Ricki
August 7, 1995, McPherson v Malooly, Testimony presented

Worcester County Superior Court, Civil Session, Judge Francis Fecteau
May 9, 1996, Free Flow Packaging v John Lucas, Testimony presented

Worcester County Superior Court, Criminal Session
December 16, 1996, Commonwealth v Soto, Testimony presented

Uxbridge District Court, Civil Session
November 14, 1997, The Cadle Company v William Walenty, Justice S.
Teshoian, Testimony presented

Pittsfield District Court, Six Man Criminal Session
January 20, 1998, Commonwealth v A. Juvenile, Justice McElroy,
Testimony presented

Bristol County Superior Court, Taunton Civil Session
November 18, 1998, The Cadle Company v Correena Vargas, Justice John A.
Tierney, Testimony presented

Worcester Superior Court Civil Session
October 7, 1999, The Cadle Company v William Walenty, Justice Daniel
Twooney, Testimony presented

United States Bankruptcy Court, Boston, MA
January, 2003, In Re Bruce Diamond, US Trustee Judge Carol Kenner
Testimony presented

Ayer District Court, Criminal Session
October 30, 2003, Commonwealth v Georgette Clapp, Justice Peter Kilmartin
Testimony presented

Suffolk County Grand Jury, Attorneys General Session, June 28, 2004,
Commonwealth of Mass. Vs Dennis LeBlanc and Rosemary McLaughlin,
Testimony presented

Worcester County Probate Court, January 8, 2009, Evidentiary Hearing,
Commonwealth v Cynthia Dziurgot, Justice Ronald King, Testimony presented.

Middlesex Superior Court Civil Session, February 17, 2010, Civil Trial,
McGeoghean v McGeoghean, Testimony presented.

Suffolk Superior Court Criminal Session, April 27-28, 2010, Commonwealth v
David Flavell, Justice Charles Spurlock, Testimony provided.

Worcester Superior Court Criminal Session, December 10, 2010, Commonwealth
v Janleer Povez, Justice Janet Kenton-Walker, Testimony provided.

Bristol Superior Court Criminal Session, January 18, 2012, Commonwealth v
Timothy J. Cassidy, Justice Barbara Dortch-Okara, Testimony provided.

Middlesex Superior Court Civil Session, July 12, 2012, Monique Rosales v
Newton Wellesley Hospital, Testimony provided.

Middlesex Superior Court Civil Session, October 10, 2013, Roseman v Roseman,
Justice Kenneth Salinger, Testimony provided.

Worcester County Probate Court, March 27, 2014, Estate of Barry J. Coughlin
and Jamie Jones v Barry Coughlin, Justice Rikki, Testimony Presented.

Worcester Superior Court Criminal session, June 30, 2015, Commonwealth v Jan-
Leer Povez, Justice Janet Kinton-Walker, Testimony Presented.

Worcester Superior Court Criminal Session, February 2, 2016, Commonwealth v
Steven West, Justice Janet Kenton-Walker, Testimony Presented.

Commonwealth of Massachusetts Election Commission, June 7, 2016, Matter of
Stephen Borelli, Testimony Presented.

## *ARBITRATION HEARINGS*

Massachusetts Arbitration Board
January 29, 1997, Massachusetts Department of Corrections v Karen Poznick
Testimony presented

American Arbitration Association, Boston, MA
May 22, 2003, Massachusetts Department of Corrections v Krystal Ogletree,
Arbitrator, Kenneth Buckalow
Testimony presented

*DEPOSITIONS*

Civil Proceeding, Portland, ME
March 13, 1997, Reeves v Anderson, representing Attorney Kurt Olafsen, Olafsen
& Butterfield, 75 Pearl Street, Portland, ME



# Handwriting Identification

**Court Qualified**
Paul H. McDonald
1-978-779-0388

**Board Certified**
P.O. Box 60616
Worcester, MA 01606

July 25, 2018

John H. Perten, Esquire
Sheehan Phinney Bass & Green
255 State Street, 5th Floor
Boston, MA. 02109

RE:    Kristina Brusenkova

SERVICES RENDERED

Examination/Comparison

| | | |
|---|---|---|
| June 22, 2018 | 2.0 Hrs. @ $100.00/Hr | $200.00 |
| June 23, 2018 | 3.0 Hrs. @ $100.00/Hr | 300.00 |
| June 25, 2018 | 1.5 Hrs. @ $100.00/Hr. | 150.00 |
| June 26, 2018 | 3.5 Hrs. @ $100.00/Hr. | 350.00 |
| Jult 18, 2018 | 2.0 Hrs. @ $200.00/Hr. | 200.00 |
| TOTAL DUE | 12 Hrs. @ $100.00/Hr. | $1200.00 |

Paul H. McDonald
Document Examiner

# EXHIBIT 23

Exhibits: 1-30                    Volume 1, Pages 1-230
           UNITED STATES BANKRUPTCY COURT
               DISTRICT OF MASSACHUSETTS
                  (EASTERN DIVISION)
----------------------------
In Re:
                              Chapter 7
LYMAN-CUTLER, LLC,            Case No. 15-13881-FJB


           Debtor
----------------------------
LYMAN-CUTLER, LLC,

           Plaintiff
v.                           Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
           Defendants
----------------------------

        DEPOSITION OF LYMAN-CUTLER, LLC, By Its
          Representative ALEX FILIPPOV, and
           of ALEX FILIPPOV Individually
       Wednesday, April 25, 2018, 10:06 a.m.
        Sheehan Phinney Bass + Green, P.A.
           255 State Street, 5th Floor
              Boston, Massachusetts

     --------- Janis T. Young, RDR, CRR ---------
     jty@fabreporters.com   www.fabreporters.com
           Farmer Arsenault Brock LLC
              Boston, Massachusetts
                 617-728-4404

10

1      Q.   How did you come to meet Mr. Lipetsker in

2   1989?

3      A.   We turned out to be in the same pile of

4   immigrants in Italy.

5      Q.   Immigrants in --

6      A.   In Italy.  While in transit to the United

7   States, it was a spot where they would have

8   immigrants to wait for entry permission to the

9   United States.

10          And we lived in the same town near Rome,

11   and this is where we met first time.

12      Q.   Would you consider Mr. Lipetsker a friend

13   of yours?

14      A.   Yes.

15      Q.   Other than in the Lyman-Cutler project,

16   have you been in any business ventures with

17   Mr. Lipetsker?

18      A.   No, never.

19      Q.   Can you give me a brief breakdown of your

20   work history since you arrived in the United States?

21      A.   When I came to the United States, the first

22   job I got as soon as I arrived was Medical and

23   Scientific Enterprises.  It was a startup company

24   in, where was it, Sturbridge?  I don't remember.

11

1   Somewhere.

2           I was working there only for two month.

3   And then I moved to Signal Communications in Woburn

4   as an engineer, and had been working there from 1990

5   to 1996; Signal Communications Corporation.

6           And then I started my own business while

7   working at Signal Communications in 1994.

8           And in 1996 or '7, I don't remember, I

9   quit my job, because it didn't make any sense to

10  continue engineering job; and I've been running my

11  business ever since.

12      Q.   What is your business?

13      A.   Belmont Telecom, Inc.

14      Q.   What is the business of Belmont Telecom,

15  Inc.?

16      A.   It's different telecommunications services

17  that we provide to individual, corporate customers,

18  et cetera.

19      Q.   Where does that business operate from?

20      A.   Currently in Belmont, Massachusetts.  We

21  have office at 130 Trapelo Road in Belmont.

22      Q.   And how many people are currently employed

23  by Belmont Telecom, Inc.?

24      A.   Ten.

12

1      Q.   What is your position?

2      A.   I am the CEO of the company.

3      Q.   And as the owner and COO of Belmont

4   Telecom, generally what are your responsibilities?

5      A.   Everything a COO does.  I manage the

6   company.  I'm responsible, actually, for day-to-day

7   operation, and very busy guy; and am responsible for

8   development, technical development, application

9   development.

10           I'm working approximately 80 hours a

11   week for the company.

12      Q.   Should have been a lawyer.

13      A.   It's very difficult.  But, you know, I do a

14   lot of work for the company.  It turned out to be a

15   small business doesn't run on its own.

16      Q.   And what are the gross sales of Belmont per

17   year?

18      A.   Is that information going to be private?

19   Because we are a private company.

20           MR. CARNATHAN:  Well, does it really

21   have anything to do with anything, John?

22           MR. PERTEN:  I'm trying to get a sense

23   of his business savvy, certainly.

24      A.   It's running over a million dollars a year,

181

1    Lyman-Cutler, LLC?

2         A.  I've formed probably three or four LLCs for

3    my businesses.

4         Q.  So that's certainly a type of business

5    entity that you're familiar with?

6         A.  Yes.  I had an attorney helping me with

7    this, but....

8         Q.  Did you authorize Attorney Maiden to file

9    the organizational documents for Lyman-Cutler, LLC?

10        A.  Yes.

11        Q.  And did you review them before he filed

12   them?

13        A.  Yes.  It bears my signature.

14                (Marked, Exhibit 12, email string, top

15   email 2-20-13.)

16        Q.  Let me show you Exhibit 12.  Do you

17   recognize that as an email string involving you?

18        A.  Yes.  Me, Maiden, Lipetsker.

19        Q.  If we could start on the second page,

20   there's an email February 15, 2013, at 1:09 p.m.

21   Do you see that, towards the middle of the page?

22        A.  Yes.

23        Q.  This is Mr. Maiden letting you know that

24   "March is around the corner and I think it is time

# EXHIBIT 24

Exhibits: 38-39                    Volume 1, Pages 1-68
             UNITED STATES BANKRUPTCY COURT
                 DISTRICT OF MASSACHUSETTS
                      (EASTERN DIVISION)
---------------------------
In Re:

                              Chapter 7

LYMAN-CUTLER, LLC,            Case No. 15-13881-FJB


            Debtor
---------------------------
LYMAN-CUTLER, LLC,


            Plaintiff
v.                           Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
            Defendants
---------------------------


            DEPOSITION OF NICKOLAY LIPETSKER
         Thursday, April 26, 2018, 11:30 a.m.
         Sheehan Phinney Bass + Green, P.A.
            255 State Street, 5th Floor
               Boston, Massachusetts


      --------- David A. Arsenault, RPR ---------
      daa@fabreporters.com   www.fabreporters.com
            Farmer Arsenault Brock LLC
               Boston, Massachusetts
                   617-728-4404

6

1   educational background?

2       A.   No, not yet.   After immigrating to the

3   United States in 1990, I was accepted to dental

4   school at Boston University, which I graduated from

5   in 1994.

6       Q.   And after graduating from BU Dental School,

7   did you continue your formal education in any

8   manner?

9       A.   I complied with the requirement of the

10  Dental Society for continuous education, completing

11  40 hours a year.

12      Q.   Does that complete your formal education?

13      A.   Yes.

14      Q.   And in what year did you take your dental

15  boards in the United States?

16      A.   I think the first exam I passed that I can

17  recall 1992 -- no, around that time.   And the second

18  board I took in 1994.

19      Q.   After passing your dental boards, have you

20  been practicing as a dentist since that time?

21      A.   Yes.

22      Q.   And where do you maintain your dental

23  office?

24      A.   In Brookline on Beacon Street.

# EXHIBIT 25

Exhibits: 1-26                    Volume 1, Pages 1-239
            UNITED STATES BANKRUPTCY COURT
                DISTRICT OF MASSACHUSETTS
                  (EASTERN DIVISION)
----------------------------
In Re:

                                Chapter 7

LYMAN-CUTLER, LLC,              Case No. 15-13881-FJB


            Debtor
----------------------------
LYMAN-CUTLER, LLC,


            Plaintiff

v.                              Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
            Defendants
----------------------------
 30(b)(6) DEPOSITION of KAGAN DEVELOPMENT KDC CORP.
      30(b)(6) DEPOSITION of PROEXCAVATION
    By VADIM KAGAN and VADIM KAGAN Individually
        Thursday, May 3, 2018, 10:02 a.m.
          O'Connor Carnathan and Mack LLC
            1 Van de Graaff Drive, Suite 104
              Burlington, Massachusetts
    --------- David A. Arsenault, RPR ---------
    daa@fabreporters.com   www.fabreporters.com
          Farmer Arsenault Brock LLC
            Boston, Massachusetts
                617-728-4404

14

1   in jewelry design?

2       A.   Yes.

3       Q.   Where did you receive that?

4       A.   In Belarus.

5       Q.   When was that?

6       A.   1987.

7       Q.   Is that sort of -- is that a Belarus

8   equivalent to a high school graduation or college

9   graduation or something separate?

10      A.   More like college.

11      Q.   What's the name of the degree you received?

12      A.   Jewelry designer and firearms engraver.

13      Q.   That was the same training program?

14      A.   Yes.

15      Q.   Have you had any formal education since you

16  received that degree in 1987?

17      A.   No.

18      Q.   How long have you been in the construction

19  business, sir?

20      A.   Since 15 years old.

21      Q.   So you were in the construction business

22  when you were in Belarus?

23      A.   Yes.

24      Q.   Did you just continue in the construction

15

1   business once you came to this country?

2       A.   Yes.

3       Q.   So you have been in the construction

4   business in the United States for 23 years?

5       A.   Yes.

6       Q.   During the time that you have been in the

7   United States, have you always run your own company?

8       A.   Yes.

9       Q.   Do you hold any licenses in connection with

10  your construction business?

11      A.   Yes.

12      Q.   What licenses do you hold?

13      A.   Construction supervisor license.

14      Q.   How long have you had that?

15      A.   I don't remember.

16      Q.   What did you have to do to get your

17  construction supervisor license?

18      A.   Take the course.

19      Q.   Anything else?

20      A.   Pass the exam.

21      Q.   There's an exam?

22      A.   Yes.

23      Q.   Are there continuing education requirements

24  to maintain your construction supervisor license?

16

1    A.   Yes.

2    Q.   And have you taken the continuing education

3  courses to maintain your license?

4    A.   Yes.

5    Q.   What do you have to do by way of continuing

6  education to maintain your construction supervisor

7  license?

8    A.   Eight hours course before the license

9  expires.

10   Q.   How long before the license expires?

11   A.   Every two years.

12   Q.   Is there any kind of a code of ethics that

13  governs a construction supervisor?

14        MR. PERTEN:   Objection.

15   A.   Can you repeat the question?  Specify?

16   Q.   Are you aware of any code of ethics that

17  governs a construction supervisor?

18        MR. PERTEN:   Objection.

19   A.   Building a house?

20   Q.   I'm trying to understand if there's any

21  written code of ethics.  When you get your license,

22  do they expect you to live up to any code of ethics?

23   A.   I don't remember.

24   Q.   Would you agree with me, sir, that the

17

1   Lyman-Cutler project began in the fall of 2012,

2   around October 2012?

3       A.  I think it was 2013.

4       Q.  I'm not trying to be tricky at all but

5   trying to set date markers.

6       A.  I do not remember the date exactly.

7       Q.  If we think of it as starting on January 1,

8   2013, just to pick that date as a starting place,

9   how many prior homes had you built in the United

10  States before October 1, 2013?

11              MR. PERTEN:  October 1, 2013?

12              MR. CARNATHAN:  Right.

13      Q.  Before October 1, 2013, how many other

14  homes had you built?

15      A.  30, 40.

16      Q.  How many of those homes were in the

17  Brookline area?

18              MR. PERTEN:  Objection.

19      A.  One.

20      Q.  Where was that?

21      A.  Cleveland Road.

22      Q.  If we again think of that date of October

23  1, 2013, thinking of the homes you built before that

24  date, how many of them sold for more than $3

27

1      A.   I don't know.

2      Q.   You don't know?

3      A.   No.

4      Q.   Do you have any other ownership interest in

5  Classic Interiors?

6      A.   I don't think so.

7      Q.   Who are the shareholders of Kagan

8  Development Corp.?

9      A.   Vadim Kagan.

10     Q.   Anyone else?

11     A.   Tatiana Kagan.

12     Q.   What percentage of the ownership interest

13  do you personally have?

14     A.   I don't know.

15     Q.   Has your ownership interest changed

16  since 2013?

17     A.   I think so.

18     Q.   How has it changed?

19     A.   I don't know.  I know it has changed.

20     Q.   In what way has it changed?

21     A.   Some changes, percentagewise, shareholders.

22  I don't remember exactly.

23     Q.   Why did it change?

24     A.   I don't know.

28

1    Q.   Did you make the decision to change your

2    ownership interest in KDC?

3    A.   Yeah, I think so at some point.

4    Q.   Well, if you made the decision and you

5    don't know why, who would know why?

6    A.   If I made the decision a few years ago, I

7    don't remember why I made the decision.

8    Q.   Who are the shareholders of Proexcavation?

9    A.   Vadim Kagan and Tatiana Kagan.

10   Q.   How much of the ownership interest in

11   Proexcavation do you own?

12   A.   I don't remember.

13   Q.   Has your ownership interest in

14   Proexcavation changed since 2013?

15   A.   I don't remember.

16   Q.   At any time since 2013 have there been any

17   other shareholders in KDC other than you and your

18   wife Tatiana?

19   A.   No.

20   Q.   At any time since 2013 have there been any

21   other shareholders in Proexcavation other than you

22   and Tatiana?

23   A.   No.

24   Q.   Who are the corporate officers of KDC?

29

1     A.  Vadim Kagan.

2     Q.  Anyone else?

3     A.  Tatiana.

4     Q.  What position do you hold as a corporate

5   officer in KDC?

6     A.  Can you repeat the question?

7     Q.  Which officer for KDC are you?

8     A.  I don't know.  I'm the officer.

9     Q.  Are you the president?

10    A.  Yeah.

11    Q.  What about Tatiana, what title does she

12   hold?

13    A.  Just the officer of KDC.

14    Q.  Has that been true since 2013?

15    A.  I think so.

16    Q.  During that same time period since 2013

17   have there ever been any other officers of KDC?

18    A.  I think Joseph Cohen.

19    Q.  How long has Mr. Joseph Cohen been an

20   officer of KDC?

21    A.  A few years.

22    Q.  When did Mr. Cohen come to work for KDC?

23    A.  He's not working for KDC.  He's working for

24   himself.

35

1    Q.   Yes.

2    A.   Maybe ten years.

3    Q.   Are you related to Mr. Cohen by blood or

4    marriage?

5    A.   I can ask my father, but I don't think so.

6    Q.   We started down this trail when you

7    identified Mr. Cohen as an officer to KDC.  Do you

8    remember that, sir?

9    A.   Yes.

10   Q.   And so can you explain to me how he is a

11   subcontractor and also an officer of KDC?

12        MR. PERTEN:   Objection.

13   A.   I don't know.

14   Q.   Does KDC have a board of directors?

15   A.   Yes.

16   Q.   Who is on the board of directors?

17   A.   Right now, me and Tatiana.

18   Q.   Has that been true at all times since 2013?

19   A.   At some point Joseph was a director.

20   Q.   When did Joseph become a director?

21   A.   I don't remember.

22   Q.   Was it between 2013 and today?

23   A.   Probably.

24   Q.   How was Joseph elected as a director to

55

1      A.   No.

2      Q.   Does Mr. Gersh also keep the books for

3  Proexcavation?

4      A.   Yes.

5      Q.   Does Mr. Gersh keep the books for all of

6  your projects?

7      A.   Yes.

8      Q.   Is Mr. Gersh paid by KDC?

9      A.   Yes.

10      Q.   Does he draw a salary?

11      A.   Mm-hmm, yes.

12      Q.   Is he paid by Proexcavation?

13      A.   I don't remember.

14      Q.   Thinking again about the middle of 2013 but

15  now thinking about Proexcavation, who were the

16  officers of the company at that time?

17      A.   Vadim Kagan.

18      Q.   Anyone else?

19      A.   I don't remember.

20      Q.   What about Tatiana?

21      A.   I don't remember.

22      Q.   Do you have any records that will show us

23  who the officers of the company were at that time?

24      A.   Probably, yeah.

56

1        Q.   As you sit here today, who are the officers

2   of Proexcavation?

3        A.   Me, Vadim Kagan.

4        Q.   Just you?

5        A.   To the best of my knowledge, yes.

6        Q.   What about directors, did Proexcavation

7   have directors in the middle of 2013?

8        A.   I don't remember.

9        Q.   Who are the directors, as you sit here

10   today?

11        A.   For Proexcavation?

12        Q.   Correct.

13        A.   Maybe me.

14        Q.   You don't know?

15        A.   I don't remember.

16        Q.   Do you have any board meetings with

17   Proexcavation?

18        A.   Yes.

19        Q.   The last time you had a board meeting, who

20   showed up?

21        A.   I don't remember the last time we had a

22   meeting.

23        Q.   When was the last time Proexcavation had a

24   board meeting?

81

1      Q.   Did you discuss what the construction would

2   cost at the October 25, 2012 meeting at Boris

3   Maiden's office?

4      A.   We decide -- we talk about some kind of

5   hypothetic numbers what we have to spend for

6   construction and how much we are going to sell the

7   properties.

8      Q.   Did you provide the hypothetical number of

9   what the construction would cost?

10     A.   No, because we didn't know what we were

11  going to build yet.

12     Q.   Did you object and say Gee, that

13  construction budget is just hypothetical and we

14  don't know what we are going to build yet?

15     A.   We just had a general conversation at that

16  meeting.  We have to create the plan first and then

17  construction, the cost.

18     Q.   So at this point you didn't have any plans

19  for what you were going to build?

20     A.   No.

21     Q.   Who was at the meeting at Boris Maiden's

22  office?

23     A.   Lipetsker and Zhukovskiy.  I don't

24  remember.

86

1    Q.   You were potentially just going to finance

2  this on your own?

3    A.   I was potentially not going to do it if

4  Lipetsker doesn't want to do it.

5    Q.   What about the carry cost number,

6  Mr. Kagan, who came up with the carrying cost of

7  200,000?

8    A.   Probably the same person who did this

9  spreadsheet.

10    Q.   At any point did you say to Lipetsker and

11  Filippov and Zhukovskiy:  I know what the

12  construction costs will be; I've done this many

13  times, something to that effect?

14    A.   Based -- yes, how much is going to be

15  construction costs and carrying costs based on the

16  project if you have particular plans and particular

17  dates and particular times.

18    Q.   So at any point did you arrive at a firm

19  construction budget and a plan as to what you were

20  going to spend on construction?

21    A.   Yes.

22    Q.   When was that?

23    A.   Six months after that, somewhere in the

24  beginning of 2013, middle of 2013?

87

1      Q.   How much was that budget?

2      A.   1.6.  Not budget.  Construction costs.  I

3    don't call budget.

4      Q.   Who developed the $1.6 million number?

5      A.   Me.

6      Q.   Did anyone help you?

7      A.   No.

8      Q.   How did you arrive at the number 1.6

9    million?

10     A.   We finalize the plan with the architect.

11   We have a discussion with Filippov and Lipetsker,

12   what we are going to do, what is our target selling

13   price.  I end up with 1.6 construction cost to

14   construct the house.

15     Q.   I'll come back to that.  Let's stay with

16   the October 25 meeting for the moment.

17     A.   Okay.

18     Q.   As best you can recall, would you recount

19   to me everything you said during that October 25

20   meeting.

21     A.   Yeah.  Approximately.  It was a long time

22   ago.

23     Q.   I'm asking you to do your best.  What do

24   you recall that you said during that meeting?

88

1     A.  We have to finalize plans building the

2   house.  We have to finalize what we are going to do,

3   what house we are going to build, what is our

4   target, what is our size of the property.

5   Everything is variable.  It depends how much money

6   we will throw in landscaping, what kind of customers

7   do we want to bring in.  If we are going to finalize

8   this, we are going to go forward.

9     Q.  Have you now told me everything that you

10   can recall saying at that October 25, 2012 meeting?

11     A.  Yes.

12     Q.  As best you can recall, what did

13   Mr. Filippov say during that meeting?

14     A.  Let's finalize the numbers, let's finalize

15   our plans.  We will come back to the conversation

16   again.

17     Q.  Was Mr. Filippov willing to invest $2

18   million without having final numbers?

19     A.  No problem, yes.

20     Q.  So he was okay with that, I'll put in my $2

21   million and you tell me later what we are going to

22   do?

23     A.  Probably.  It is up to Mr. Filippov.

24     Q.  So it is your testimony that Mr. Filippov

89

1    put $2 million into this project before he knew what

2    the construction costs were going to be?

3              MR. PERTEN:  Objection.

4         A.   We didn't finalize construction cost at the

5    time.

6         Q.   If I understood you right, you told me

7    earlier that you didn't finalize the construction

8    costs until the middle of 2013, correct?

9         A.   Yes.

10        Q.   So Mr. Filippov put in his $2 million

11   before that, didn't he?

12        A.   Yes.

13        Q.   So is it your testimony that Mr. Filippov

14   agreed to put in his $2 million without knowing what

15   the construction costs will be?

16        A.   Mr. Filippov says, I know real estate.

17   Market in Brookline was strong.  Based on his

18   opinion even building cookie-cutter he can still

19   make the money, he will get his 20 percent or

20   something, his words.

21        Q.   Do you recognize the handwriting on the

22   page we have got it open to on Exhibit 6 that says

23   Estimated Project Financials and Risk Analysis at

24   the top?

95

1      A.   Yes.

2      Q.   And your budget in the middle of 2013 was

3   1.6 million, and you told me that was for a 7400-

4   square-foot, not cookie-cutter home.  Did I screw

5   that up?

6      A.   No.

7      Q.   So for a hundred thousand dollars you were

8   being to build a home that was 2400 square feet

9   bigger than the one you talked about at the October

10   25, 2012 meeting.  Is that what you are telling me?

11      A.   And we ended up with Filippov and Lipetsker

12   putting $250,000 into the project.  I said if -- we

13   have a conversation.  Filippov said, I spoke with

14   the bank and they are not going to give us more than

15   1.6 for construction.  I said, And we have a mutual

16   agreement with Kagan Development to add the money

17   during the process and going to be reimbursed at the

18   end of the project when the project is sold.  That's

19   our deal.

20      Q.   I'm not sure I got that.

21           MR. CARNATHAN:  Can you read that one

22   back.

23           (Answer read by the reporter.)

24      Q.   I'm not entirely sure I understand what you

96

1    just told me.  Are you saying that the deal was that

2    you would spend more on construction than 1.6?

3        A.  Yes.

4        Q.  And when did you reach that deal?

5        A.  When we finalized the plans.

6        Q.  In the middle of 2013?

7        A.  Yes.

8        Q.  So where were you when you made that

9    agreement?

10       A.  We met multiple times.

11       Q.  So you were at the site?

12       A.  Yes.

13       Q.  It is you and who else?

14       A.  Filippov and Lipetsker.

15       Q.  So the three of you were at the site?

16       A.  Yes.

17       Q.  If I understood you right, Alex told you he

18   could only borrow 1.6 million per house for

19   construction?

20       A.  Yes.

21       Q.  And then what did you say to him?

22       A.  I said, If you don't want to lose the deal,

23   if you want to invest only $2 million, I can add

24   more during the construction process.

97

1      Q.   Did you say how much more?

2      A.   About 2 or 300,000 per house.

3      Q.   So you were saying that the budget was

4  going to be more than 1.6 million.  Is that what

5  you're telling me?

6      A.   Yes.

7      Q.   Did you put that in writing anywhere?

8      A.   No.  We just have a friendly conversation.

9      Q.   So you met at the project site and Filippov

10 and Lipetsker told you to just add more money and

11 they would make it up to you later?

12     A.   Yeah, that was our agreement before we

13 started the project.

14     Q.   Do you have anything in writing to confirm

15 that?

16     A.   No.  We have agreement, the Kagan

17 Development agreement, the construction agreement

18 and what we use for future reference.  Mainly this

19 is based on this agreement, I can add more money, I

20 can pay carrying costs, and blah, blah, blah, and

21 money will be returned after project was sold.

22     Q.   So just in an effort to get this straight.

23 You are at the site.  As best you can recall, please

24 tell me everything that the three of you said to one

98

1  another during this.

2      A.   Before this we have multiple conversation

3  before.   This is not one-time conversation.

4      Q.   At what time did you agree that you would

5  put in more money and Filippov and Lipetsker would

6  pay you back later?

7      A.   Before we started the project.

8      Q.   So we are still in the beginning of 2013?

9      A.   Before we start.

10     Q.   Is this before you take out the bank loan?

11     A.   No, after.

12     Q.   After you have taken out the bank loan?

13     A.   I think.

14     Q.   You already closed on the bank loan?

15     A.   I don't know when we closed on the bank

16  loan.   I was not involved in the process at all.

17     Q.   At what point did you realize that 1.6

18  million was not going to be enough to build each

19  house?

20     A.   When we finished the architectural plans.

21     Q.   When was that?

22     A.   April or May 2013, something like that.   I

23  don't remember when we finished the plans.

24     Q.   When you finished the plans, how did you

99

1  know that 1.6 million wasn't going to be enough?

2      A.  Based on the size of the house and

3  finishes, what we are planning to do and how much we

4  have to spend for everything, it is going to be much

5  more than 1.6.

6      Q.  Did you do any math to figure out what it

7  was going to cost?

8      A.  Yes.

9      Q.  Do you have that written down anywhere?

10     A.  Whatever I created, the template,

11  spreadsheet, you add the number, you change the

12  number, and you get to this amount.

13     Q.  Do you have a template like this somewhere

14  that shows a number higher than 1.6 million?

15     A.  I give them the template.  We bring it last

16  time.  I don't know where is this template.

17     Q.  Mr. Kagan, we will agree that you are the

18  builder, right?

19     A.  Yes.

20     Q.  It was your responsibility to build each

21  home?

22     A.  Yes.

23     Q.  Did you have any responsibility to

24  calculate what the construction budget was going to

100

1  be before the project started?

2       A.   Yes.

3       Q.   Did you do that?

4       A.   I did -- we did this verbally with Filippov

5  and Lipetsker.  We started with 1.6.  We understand

6  that 1.6 is not going to be enough.  I promise

7  everybody I am going to cover, and I'm not going to

8  ask anybody else more money.  And we started the

9  deal.

10      Q.   What I'm asking is, did you tell them

11 exactly how much, did you figure out what it was

12 going to cost to build these houses back in April --

13      A.   1.6, 1.8 approximately.  I said, As soon as

14 we go, we'll see how much money we have and how much

15 money we have to put in and where we are.

16      Q.   And Filippov and Lipetsker were fine with

17 that.  Is that what you are telling me?

18      A.   Yes.

19      Q.   As best you can recall, what did Alex

20 Filippov say when you told him it was going to be

21 more than 1.6 and you would put in the money and get

22 paid back later?

23      A.   He said, based on his research and how this

24 market goes, we can sell the house for much more

141

was not going to be enough to build the house.  Did

I understand that correctly?

     A.  You did not understand correctly.  What I

said about 1.6, based on the picture which you

provide to me, this house 1.6, based on the simple

finishes, simple landscaping, simple exterior,

simple interior, everything simple, cookie-cutter.

This could easily be 1.8, 1.9, $2 million with

different finishes.

     Q.  So did there come a point when you decided

to put in more expensive finishes?

     A.  Yes.

     Q.  When was that?

     A.  Later.

     Q.  What finishes did you decide to upgrade

above the $1.6 million level?

     A.  All of them, all the finishes.

     Q.  When we talk about finishes, what are we

talking about, what are they?

     A.  Flooring, stairs, rails, finish carpentry,

all cabinetry, tile work, the amount of trees, size

of the paving, materials for retaining wall, decking

material, fireplace.

     Q.  Anything else?

142

1      A.   Lighting, doors, crown molding, baseboards.

2   We did a built-in library, which is not specified in

3   the plan.

4      Q.   So during the project you decided to

5   upgrade absolutely every material that was used in

6   the house.  Is that what you are telling me?

7      A.   I didn't decide myself.  We all decided to

8   do it.

9      Q.   Who decided to do it?

10      A.   Me, Lipetsker and Filippov.

11      Q.   Was this all in one go or did you do it as

12   you went?

13      A.   Through multiple conversation.  I spoke

14   with Lipetsker every day.  I spoke with Filippov

15   once a week, once in two weeks.  Lipetsker was there

16   every single day at the construction site talking to

17   my guys, smoking cigarettes with them, sometimes

18   bring the beer there, whatever.

19      Q.   So was there a moment where you sat down

20   and decided we are going to spend X more dollars on

21   the finishes and materials or was it as you did each

22   thing you decided?

23      A.   When we did each thing we talked about

24   those specifically and we go as we go.

143

1    Q.  Did you keep any kind of record of what

2  additional money you were spending on each thing?

3    A.  No.  Everybody verbally.  Everything

4  discussed with Lipetsker and Filippov.  If we want

5  to upgrade to copper, we talk about copper.  If we

6  upgrade the shingles, we talk about shingles,

7  siding, finish carpentry, kitchen cabinets,

8  everything.

9    Q.  And they agreed at each step that you would

10  upgrade the materials?

11    A.  Yes.

12    Q.  The flooring, for instance, you started

13  out, and looking at your $1.6 million budget you had

14  a $48,000 budget for hardwood, carpeting, labor and

15  material.  Do you see that?  It is two-thirds of the

16  way down the budget.

17    A.  Flooring, 48,000.

18    Q.  So you had some kind of a discussion with

19  Filippov and Lipetsker that said let's spend 48,000

20  on flooring?  Is that what happened?

21    A.  No, we did not spend 48,000 on flooring.

22  I believe it was much less than 48,000 on flooring.

23  We say are we going to keep this money for the

24  kitchen cabinets or something like that; some of the

148

1   windows and doors cost, how much it costs.

2       Q.   Did you make any specific calculations

3   about how much you were going to spend on windows?

4   Did you count the windows and say I'm going to spend

5   500 a window and do the math?

6       A.   I have no documents.  This is everything

7   that is in the plan.  This is the plan, initial

8   drawing not finalized.  It doesn't specify what kind

9   of windows we are doing.  This is initial plan.

10      Q.   Did you go out and get any bids from

11  subcontractors in order to arrive at the $1.6

12  million number?

13      A.   I don't have to get bids from other

14  subcontractor.

15      Q.   Why didn't you have to get bids from other

16  subcontractors?

17      A.   Because price is what my subcontractor gave

18  to me for the past 15 years.  These are the best

19  numbers on the market.

20      Q.   Which subcontractors have you been working

21  with over the last 15 years?

22      A.   Basically 70 percent of these people.

23      Q.   EST Plumbing?

24      A.   Yes.

152

1    deck in front of these $5 million houses and then

2    you decided to do stone?

3        A.   We originally want to do wood decking and

4    we decided to do stone.

5        Q.   And you met with Mr. Lipetsker and

6    Mr. Filippov and discussed going from wood to stone

7    and they said fine?

8        A.   Yes.

9        Q.   Was there anything on the list, Mr. Kagan,

10   where you decided to go with just what you had

11   budgeted originally?

12       A.   It was initial number we took.  We put the

13   number in and go forward.

14       Q.   So at absolutely every step you decided to

15   spend more money than the budget?

16       A.   Yeah, because we ended up building $5.5

17   million home.  We go to 5.5 slowly; from original

18   4.5, 4.7-something we go to 5.5.

19       Q.   And at each step in the process you talked

20   to Mr. Filippov and Mr. Lipetsker and they said go

21   ahead and spend more money?

22       A.   Absolutely.

23       Q.   Do you have anything in writing between you

24   and them that said go ahead, spend more money?

156

1        A.   I spend some time before I propose it to

2    someone.

3        Q.   So in each instance you went to

4    Mr. Filippov and Lipetsker and said I want to spend

5    a thousand dollars, 10,000, whatever the number is,

6    and you told them how much?

7        A.   Yes.

8        Q.   And in each instance they said fine?

9        A.   They said fine so long as we make our 20

10   percent, whatever, 15, 16, 17 percent.

11       Q.   How was it that they expected to still make

12   their 20 percent if the cost kept going up?

13            MR. PERTEN:   Objection.

14       A.   To what point is the cost going up?  I

15   don't understand the question.

16       Q.   You said in each instance you were telling

17   them you proposed to spend more on each element for

18   the home; is that right?

19       A.   Yes.

20       Q.   As the cost goes up for the home, doesn't

21   that diminish the profit?

22       A.   No.   The original plan to sell the house

23   was 4.7, 4.5, something like that.   We end up

24   selling for 5.5.   We end up putting the house on the

157

1  market for 5.5.

2      Q.  Each time you went to them and said I want

3  to spend more money on this element of the house and

4  you told them it was going to cost you X more

5  dollars, making up a number, $10,000 --

6      A.  I'm not making up the number.

7      Q.  I am for the hypothetical.  I am saying you

8  go to them and say I want to upgrade the retaining

9  wall and it will cost $10,000 more, making up the

10  number.

11      A.  I will tell them if you do the Versa-Lok,

12  it will be $25 a square foot.  If you do stone, it

13  will cost 50 bucks a foot.  But if you put the house

14  on the market on 5.5 you can not put Versa-Lok wall.

15      Q.  Did you also quote for them how much more

16  you were going to charge for the house based on that

17  particular upgrade?

18      A.  How much I charge more?  I didn't charge

19  anything.

20      Q.  If I'm following you right, the idea was

21  that you were going to spend more money on materials

22  and sell the house for more money.  Is that fair?

23      A.  Yes.

24      Q.  But you also did it on a piecemeal basis.

158

1    You never sat down and said our budget is 1.6, I

2    want to spend 1.9?

3        A.   Before we talk about the numbers, if we

4    were budgeting, hypothetically if you say $10,000

5    for retaining wall for Versa-Lok, if we are doing

6    the natural stone wall we are going to spend

7    $20,000, hypothetically, if you want hypothetical.

8    It is different materials, different labor.

9        Q.   In order to maintain the same projected

10   profit, did you then project a higher selling price

11   each time you increased the cost?

12       A.   Yes.

13       Q.   So when you said you were going to increase

14   the cost of the retaining wall by X, did you say

15   that would increase the selling price by Y?

16       A.   We didn't do every time.  For example, if

17   you're talking about landscaping, you have to

18   specify.  If you build a house for 5.5, you need to

19   end up with different amount of trees, different

20   materials for the patio and decking, different size

21   patio.  So we end up with different size of the

22   patio, different retaining wall, fireplace outside,

23   more trees.  That's how you end up for landscaping.

24       Q.   At what point during the project did the

159

1   target price become 5.5 million?

2       A.   I don't remember.  During the project.

3       Q.   So was it at the beginning of the project,

4   end of the project, somewhere along the line?

5       A.   In the beginning.  We talk about 4.5, 4.7,

6   we talk about 5, maybe 5 and a quarter.  After we

7   decided we do five and a half.

8       Q.   So before you started construction you

9   didn't have a target price for selling the house?

10      A.   4.9, I believe, approximately 4.9.

11      Q.   When you began construction back in the

12  middle of 2013 the target price was 4.9 million; is

13  that right?

14      A.   Yes.

15      Q.   When did you put the first house on the

16  market?

17      A.   I don't remember.

18      Q.   Was it August 2014?

19      A.   You have to look at the listing.

20      Q.   When you put it on the market, you put it

21  on for 5.5 million, right?

22      A.   Yes.

23      Q.   Was that your decision?

24      A.   Everybody's decision, especially Filippov's

174

1    jury trial.

2        Q.   So this is a document that was filed on

3    behalf of you, your companies and your wife, right?

4        A.   Yes.

5        Q.   Did you review it before it was filed?

6        A.   Yes.

7        Q.   Would you turn with me to Page 27.  I'm

8    looking at Paragraph 38.  In that you allege:  "KDC

9    achieved substantial completion of the two homes on

10   the property on or before March 30, 2014."

11              Have I read that correctly?

12       A.   Yes.

13       Q.   Is that an important fact?

14              MR. PERTEN:  Objection.

15       A.   Important fact for what?

16       Q.   Do you know why it is important?

17       A.   Why is it is important?

18       Q.   Were you obligated to complete the homes by

19   March 30, 2014 under the terms of the Lyman-Cutler

20   operating agreement?

21       A.   Yes, substantial completion.

22       Q.   What does substantial completion mean to

23   you, Mr. Kagan?

24       A.   If this is wintertime, substantial

195

1  plans and then approve them yourself?

2      A.  I don't know.

3      Q.  If we look at the signature page, second to

4  last page, Mr. Filippov is identified as the, quote,

5  "managing manager."  Do you see that?

6      A.  Yeah, managing manager.

7      Q.  Didn't you understand that Mr. Filippov was

8  the managing member?

9      A.  I don't know what is the managing manager.

10  I don't know what is this term.

11     Q.  Is it a typo by Mr. Maiden?

12     A.  Boris said sign it, I signed it.  I don't

13  know if there was a signature there or not.

14     Q.  At any time during the project did you

15  understand that Mr. Filippov was the managing

16  member?

17     A.  No, I'm always the managing member.

18     Q.  Did you attend the closing of the bank

19  loan, Mr. Kagan?

20     A.  No.

21         (Marked, Exhibit 20, Lyman-Cutler, LLC

22  manager's certificate and member's consent.)

23     Q.  Do you recognize Exhibit 20, Mr. Kagan?

24     A.  Yes.  It says manager's certificate and

196

1    member consent, yes.

2         Q.   Is that your signature down at the bottom,

3    assented to by all members, Vadim Kagan?

4         A.   Yes.  It says Vadim Kagan, yes.

5         Q.   This document at least purports to be dated

6    December 28, 2012, right, witness my hand and seal

7    above the signature block?

8         A.   Yes.

9         Q.   Under that it is signed by Alex Filippov,

10   manager, right?

11        A.   Yes.

12        Q.   In Paragraph 3 of this document it states:

13             "I am the manager of the LLC and the

14   person authorized on behalf of the LLC to execute,

15   acknowledge, and deliver instruments affecting an

16   interest in real property owned or held by the LLC?"

17             Have I read that correctly?

18        A.   Yes.  But they always said I'm the managing

19   member.

20        Q.   You signed this saying Alex was the

21   managing member, right?

22             MR. PERTEN:  Objection.

23        A.   When I signed it I put my signature and

24   Boris said you are good to go.

224

1      A.   Yes.

2      Q.   What changed between May 7th, 2015 when

3   Mr. Pyle wrote his letter saying it was $758,025.56

4   with approximately $50,000 of additional vendor

5   costs anticipated, and June 22, 2015 when you filed

6   a mechanic's lien against the properties for

7   $2,095,985.23?

8      A.   We finalized the accounting.

9      Q.   So in that time period you discovered -- to

10  be fair, the Pyle letter also refers to $251,000 in

11  carrying costs.  So doing the math quickly in my

12  head, the Pyle letter adds up to about a million and

13  50 thousand dollars in round numbers.

14           Are you telling me that between May

15  7th 2015 and June 22, 2015 you discovered roughly a

16  million and 50 thousand dollars in additional

17  charges that you didn't know about on May 7, 2015?

18      A.   I believe the first number was for

19  property.

20      Q.   That's not what the letter says.

21      A.   I don't know.

22      Q.   So sitting here right now, you can't tell

23  me where that other million-odd dollars came from in

24  that six-week period?

227

1    Q.  And you don't remember who calculated the

2    $2,095,985.23, you can't tell me who calculated that

3    either?

4    A.  Probably Mr. Gersh or somebody else in the

5    company.

6    Q.  But it wasn't you?

7    A.  It wasn't me.

8    Q.  If we look at the first page, it says:

9    "Notice is hereby given that by virtue of a written

10   contract dated June 24, 2013 between Lyman-Cutler,

11   LLC, owner, and Kagan Development KDC Corp., a

12   contractor, said contractor is to furnish or has

13   furnished labor and materials or rental equipment,

14   appliances or tools for the erection, alteration,

15   repair or removal of a building, structure, or other

16   improvement on a lot of land or other interest in

17   real property described as follows."

18        Have I read that part correctly?

19   A.  Yes.

20   Q.  So it is referring to a contract dated June

21   24, 2013 between Lyman-Cutler and KDC.

22        (Marked, Exhibit 25, Construction

23   management/general contractor agreement.)

24   Q.  Do you recognize Exhibit 25, Mr. Kagan?

233

1  construction phase fee.  Do you see that?

2      A.  Construction fee, yes.

3      Q.  So that states that the owner,

4  Lyman-Cutler, will pay KDC a fee of 15 percent; is

5  that right?

6      A.  Yes.

7      Q.  And so at the time you signed this contract

8  with yourself --

9              MR. PERTEN:  Objection.

10     Q.  -- the budget for the combined construction

11  was $3.2 million, right?

12     A.  Yes.

13     Q.  1.6 million for each house?

14     A.  Yes.

15     Q.  So 15 percent of that was $480,000; is that

16  right?

17     A.  Probably.

18     Q.  So you were signing a deal with your own

19  company to obligate your partnership to pay your

20  company no less than $480,000; is that right?

21     A.  Kagan Development is the subcontractor like

22  the rest of the companies.

23     Q.  How did you square that provision with

24  Exhibit 4, Paragraph 5.2 and 8.1, which together say

234

1  that your compensation for building the two houses

2  shall be 50 percent of the net profits?

3      A.  Simply.  I didn't charge in the 50 percent

4  for the company, I didn't charge for my personal

5  time what I'm spending for this.

6      Q.  So you were going to get 50 percent of the

7  profits for your personal time plus pay your own

8  company a half a million dollars for managing the

9  construction?

10             MR. PERTEN:  Objection.

11      A.  That was the deal, yes.

12      Q.  That's the deal.

13      A.  I don't know, yeah.

14      Q.  And you went to Lipetsker and Filippov and

15  they said great, no problem, that's fine, Vadim?

16      A.  They had no problem.

17             MR. PERTEN:  Objection.

18      Q.  When we look back at the budget that you

19  submitted to the bank, the $1.6 million budget,

20  there's no line item there for a general

21  contractor's fee, is there, sir?

22      A.  Yes.

23      Q.  That's right?

24      A.  Yes.

# EXHIBIT 26

Exhibits: 74-81                    Volume 2, Pages 240-305

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

---------------------------

In Re:

                           Chapter 7

LYMAN-CUTLER, LLC,                  Case No. 15-13881-FJB

        Debtor

---------------------------

LYMAN-CUTLER, LLC,

        Plaintiff

v.                                  Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,

        Defendants

---------------------------

CONTINUED 30(b)(6) DEPOSITION OF KAGAN DEVELOPMENT
KDC CORP., 30(b)(6) DEPOSITION OF PROEXCAVATION
By VADIM KAGAN, and VADIM KAGAN, Individually
Wednesday, May 23, 2018, 1:53 p.m.
O'Connor Carnathan and Mack LLC
1 Van de Graaff Drive, Suite 104
Burlington, Massachusetts

--------- Janis T. Young, RDR, CRR ---------
jty@fabreporters.com   www.fabreporters.com
Farmer Arsenault Brock LLC
Boston, Massachusetts
617-728-4404

261

1   through KDC 1283, which is the October 1, 2013

2   proposal, that adds up to $418,150, do you see that

3   last line item, the total?

4        A.   Yes.

5        Q.   Can you tell me how much, approximately,

6   Proexcavation expended on subcontractors and

7   materials in order to provide the work that's listed

8   on that piece of the proposal for which it purported

9   to charge $418,500?

10             MR. PERTEN:   Objection.

11        A.   Can you repeat the question?

12        Q.   Can you tell me approximately how much cost

13   Proexcavation incurred for materials and paying

14   subcontractors to provide the services listed on

15   this proposal for which it purports to charge

16   $418,150?

17             MR. PERTEN:   Objection.

18        A.   I can't say without looking at proper

19   documents.   I can't say; I can't answer this

20   question.

21        Q.   Can you tell me how much profit you built

22   into this proposal for Proexcavation?

23        A.   I don't remember.

24        Q.   Do you have a typical profit margin you

262

1    build into a Proexcavation proposal?

2        A.   No.

3        Q.   It's different every time?

4        A.   We do the job based on the market price,

5    per foot, per square foot, per yard, and per item;

6    and we're trying to keep all these prices below the

7    market price.

8        Q.   Is there any profit built into this

9    proposal for Proexcavation?

10       A.   Should be some.

11       Q.   Can you tell me within $50,000 how much

12   profit was built into this proposal for

13   Proexcavation?

14       A.   I don't know right now.

15       Q.   Do you have any kind of record anywhere

16   that would show you how much profit you built into

17   that Proexcavation proposal?

18       A.   I don't know.

19       Q.   Do you know of anyone who would know?

20       A.   I don't.

21            (Marked, Exhibit 75, Lyman-Cutler, LLC

22   transactions by account, KDC 01274 - 1278.)

23            (Marked, Exhibit 76, Lyman-Cutler, LLC

24   transactions by account, KDC 01299 - 1304.)

279

1          MR. PERTEN:  Objection.

2     A.  On 88 Cutler, based on Proexcavation

3  proposal for $418,150.  This is the proposal price.

4          Whatever it says on Page 1192, that's

5  the number.

6     Q.  When you created that proposal, did you

7  show it to anybody else?

8     A.  Don't remember.

9     Q.  Did you ever give it to Mr. Filippov?

10     A.  Don't remember.

11          Mr. Filippov has all the backup

12  documents on the proposal and invoices for Lyman-

13  Cutler.

14          (Marked, Exhibit 80, Lyman-Cutler, LLC

15  transactions by account, KDC 00477 - 487.)

16          (Marked, Exhibit 81, Lyman-Cutler, LLC

17  transactions by account, KDC 01078 - 1091.)

18          MR. PERTEN:  You just marked two?

19          MR. CARNATHAN:  Yes.  One should be for

20  55 Lyman, and one should be for 88 Cutler.  Exhibit

21  80 is a copy of the material contained in Tab 48 of

22  the Lyman binder; Exhibit 81 is a copy of what's

23  contained in Tab 46 of the Cutler binder.

24     Q.  So Mr. Kagan, if we could just look at

# EXHIBIT 27

Exhibits: 29-50                    Volume 1, Pages 1-178
            UNITED STATES BANKRUPTCY COURT
               DISTRICT OF MASSACHUSETTS
                  (EASTERN DIVISION)
----------------------------
In Re:

                                   Chapter 7

LYMAN-CUTLER, LLC,                 Case No. 15-13881-FJB


            Debtor
----------------------------
LYMAN-CUTLER, LLC,


            Plaintiff

v.                                 Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
            Defendants
----------------------------
30(b)(6) DEPOSITION of KAGAN DEVELOPMENT KDC CORP.
        30(b)(6) DEPOSITION of PROEXCAVATION
    By DANIEL GERSH and DANIEL GERSH Individually
        Thursday, May 17, 2018, 10:03 a.m.
            O'Connor Carnathan and Mack LLC
            1 Van de Graaff Drive, Suite 104
                Burlington, Massachusetts
    --------- David A. Arsenault, RPR ---------
    daa@fabreporters.com   www.fabreporters.com
            Farmer Arsenault Brock LLC
             Boston, Massachusetts
                  617-728-4404

18

1    the four.  I don't remember exactly the names of the

2    other ones.  It was interesting stuff, how to

3    interview, what tests -- the definitions of fraud

4    and a lot of the key features that go into it, how

5    to look for it, certain procedures, certain

6    programs, red flags, interview guidelines, a bunch

7    of things.

8        Q.   How did the -- am I right that you are

9    employed by KDC?

10       A.   Correct.

11       Q.   Are you a W-2 employee?

12       A.   Yes.

13       Q.   That's since sometime around the end

14   of 2014?

15       A.   Correct.

16       Q.   How did the opportunity to work at KDC come

17   to your attention?

18       A.   I don't remember specifically if it was

19   Vadim who reached out to me.  Probably it wasn't

20   because I didn't know him other than meeting him

21   randomly before that.

22            MR. PERTEN:  If you don't know, you

23   don't know.

24       A.   Someone reached out to me.  Whether it was

19

1   him or my wife's brother, somebody mentioned that I

2   was an accountant, had an accounting background and

3   he was looking for a bookkeeper.  I don't remember

4   the dates and who reached out to whom.

5       Q.  Did you have to interview for the position?

6       A.  Yes.  I guess not your standard corporate

7   interview, but it was a meeting, discussion and

8   interview process, sure.

9       Q.  Did you submit a resume?

10      A.  I can't remember.  I can't remember that

11  detail.

12      Q.  Who did you have the meeting with to talk

13  about working for KDC?

14      A.  I can't remember exactly, but I think just

15  Vadim.

16      Q.  Can you tell me what Vadim told you about

17  the position at KDC when you met with him to talk

18  about working there?

19      A.  I could not tell you the details.  Standard

20  bookkeeping, financial position for a small company,

21  probably doing some more day-to-day things, emails

22  and working with subs and stuff like that.

23      Q.  What enticed you to take the position?

24      A.  At first it was more of a kind of trial to

20

1   see how it is after just getting laid off again.  My

2   wife and I were thinking about moving as well.  It

3   was just one of those things where he needed help

4   and I was weighing options and possibilities.  It

5   was just kind of seeing how it was.  It was

6   different.  I had been in the corporate world for

7   eight years or whatever it was.  So day to day for a

8   small company with flexibility, tangible operations,

9   real estate, it was something different.  I liked it

10  and still like it.

11       Q.   How are you compensated by KDC?

12       A.   Salary.

13       Q.   Do you get an annual bonus or anything like

14  that?

15       A.   No.

16       Q.   Do you have any equity in any Mr. Kagan's

17  companies?

18       A.   I do not.

19       Q.   Do you hold a position in any of his

20  companies?

21       A.   I'm the CFO of KDC, Kagan Development.

22       Q.   Do you have any position with Proex?

23       A.   No, technically, I do not.  Just a salary

24  from KDC.

26

1      Q.   Were any Excel spreadsheets kept for the

2  projects when you arrived in 2014?

3      A.   I can't recall.  Probably.  That's how I

4  calculate items, how I keep track of things.  I'm

5  not sure if there were before me.

6      Q.   Any other type of ledger outside of the

7  QuickBooks maintained for any of the projects when

8  you arrived in 2014?

9      A.   What do you mean, ledger?

10     Q.   Some way of tracking the income and

11  expenses for each project besides QuickBooks.

12     A.   I know that Vadim wrote in pencil on the

13  inside of manila folders in years prior.  That was

14  the math and his documentation.  That's part of the

15  reason I was brought in to help organize.

16     Q.   What was contained within the manila

17  folders that Vadim wrote in pencil?

18     A.   His writing or what was in the folders?

19     Q.   What was in the folders?

20     A.   Any invoices or proposals that people sent,

21  subs.

22     Q.   How were those folders organized?

23     A.   However I could find them.  Sometimes

24  alphabetical, sometimes by year.  It was a mishmash

27

1   of prior organization, different bookkeepers,

2   Vadim's way of storing things.  It was always a

3   mess.

4        Q.   Were the folders organized by project?

5        A.   I don't believe so.  Prior to me they were

6   not.

7        Q.   And then in general terms, what sort of

8   things would Vadim write on the inside of the

9   folders in pencil?

10        A.   I don't know specifically because those are

11   from several years ago, but just the name or dates

12   of something or amounts of a proposal that he was

13   writing down.  I couldn't tell you specifically.

14   Chicken scratch.

15        Q.   When you arrived at KDC, were there any

16   bookkeeping systems or procedures in place that they

17   asked you to follow?

18        A.   No to the fullest.

19        Q.   So when you arrived, did they have any

20   system of tracking which invoices applied to which

21   project?

22             MR. PERTEN:  Objection.

23        A.   Just whatever was written on the invoices,

24   whether a subcontractor wrote an address or wrote

37

1     A.   I press the keys when entering in

2  spreadsheet numbers with Vadim.

3     Q.   So you sit with Mr. Kagan and he tells you

4  what to put in the budget.  Is that what you are

5  doing?

6              MR. PERTEN:  Objection.

7     A.   We discuss and put something together.

8     Q.   When was the last time you did that with

9  Mr. Kagan?

10    A.   Last summer, I want to say.

11    Q.   If we think in particular about that

12 process of creating some sort of a budget last

13 summer, was that for the bank or for some other

14 purpose?

15    A.   For the bank.

16    Q.   And as Mr. Kagan told you what numbers to

17 put into the budget, did he consult any records?

18             MR. PERTEN:  Objection.

19    A.   I can't recall.

20    Q.   If we think about the state of the

21 financial books when you arrived back in November

22 of 2014, what issues, if any, did you find with

23 them, what problems when you arrived?

24             MR. PERTEN:  Objection.

38

1      A.   Unclear; lack of support and documentation;

2  not everything was there, to my liking at least;

3  messiness.

4      Q.   And if we think about it as you sit here

5  today, what changes have you implemented in the way

6  the books are maintained for Mr. Kagan's companies

7  since you arrived?

8      A.   Definitely stressed getting proposals and

9  invoices in ahead of payment, ahead of agreement;

10  getting hard copies, electronic copies.  And I

11  personally have tried to make everything electronic,

12  safely stored and saved electronically so that it is

13  easier to keep track of, find, look up.  There was

14  minimal saved electronically when I joined.

15      Q.   So if we think specifically about the

16  Lyman-Cutler books when you arrived, what did they

17  consist of when you arrived?

18      A.   The Lyman-Cutler QuickBooks or Lyman-Cutler

19  project?

20      Q.   Was there more to it than the Lyman-Cutler

21  QuickBooks?

22      A.   You said books.  Do you mean the QuickBooks

23  themselves?

24      Q.   I'm thinking about the financial records

39

1    for the Lyman-Cutler.  What financial records were

2    there for that project when you arrived?

3        A.  The same as the others at the time; some

4    invoices and proposals and bills, some tracking of

5    payments made.  The QuickBooks at the time were --

6    when I came in, Kristina was behind on work.  I

7    don't know what specific time frame we were at in

8    the Lyman-Cutler QuickBooks.

9        Q.  I don't understand what you mean by that,

10   what time frame you were at the QuickBooks.

11       A.  The QuickBooks is pretty much a

12   documentation of your transactions.  If today is

13   May, we could have entered nothing in QuickBooks for

14   the last six months on a certain project.  But we

15   could put it all in once we look at the bank

16   accounts and put it in and reconcile.  I could not

17   tell you what date or completedness level

18   Lyman-Cutler was when I joined.

19       Q.  What's the first thing that you did in

20   connection with the Lyman-Cutler financial records?

21       A.  I couldn't tell you.  Just to catch it up

22   and enter it in.

23       Q.  Do you remember Mr. Kagan ever asking you

24   to do anything in particular with regard to the

54

1      Q.   How did you go about tracking down

2   documentation and invoices for the Lyman-Cutler

3   project?

4      A.   Requests, whether it be emails to whatever

5   vendors that actually used email then, or multiple

6   requests of subs, anybody else in person or over the

7   phone.

8      Q.   So you had to go out and ask for

9   documentation from the vendors and subs after you

10   arrived?

11              MR. PERTEN:  Objection.

12      A.   Yes.

13      Q.   Do you remember in particular any vendors

14   or subs that you had to ask for documentation of

15   their invoices after you arrived?

16      A.   I could not recall specifically which ones

17   when, no.

18      Q.   Was there any Lyman-Cutler file of invoices

19   or what not on the project when you arrived?

20      A.   Of what was already at the office?

21      Q.   Right.

22      A.   There probably was, but I believe

23   Kristina's organization then was by alphabetical

24   order of subcontractors or vendors.  There was a

55

1    Lyman-Cutler that maybe had some documents of

2    construction advances and stuff like that.  Any

3    subcontractors or vendors I believe her organization

4    was by alphabetical order.

5        Q.  So when you went to clean up the

6    documentation of the invoices from the vendors and

7    subcontractors, you just couldn't pull out a

8    Lyman-Cutler file and look through it?

9        A.  No, no way.

10              (Marked, Exhibit 30, Lyman-Cutler

11   transaction list by vendor spreadsheet.)

12       Q.  Mr. Gersh, I'm going to show you a document

13   the court reporter has marked for me as Exhibit 30.

14   Do you recognize that?

15       A.  It looks to be a transaction, a list of all

16   transactions from the Lyman-Cutler QuickBooks.

17       Q.  Is this a document that you printed out?

18       A.  I couldn't tell you.

19       Q.  You see the date in the upper left corner

20   06-02-15?

21       A.  Yes.

22       Q.  Can you tell me what that means?

23       A.  This means that this report has all the

24   transactions listed as of June 2, 2015.  I think

64

1      A.   I could not tell you with certainty whether

2  I was working on these books or any other books

3  during that time frame.

4      Q.   Is there anybody else who might have been

5  making entries in the Lyman-Cutler QuickBooks in

6  April and May of 2015?

7      A.   I don't believe so.

8      Q.   A moment ago you referred to your

9  bookkeeper.  What did you mean?

10      A.   We have a part-time bookkeeper Stephanie.

11      Q.   What is her last name?

12      A.   Santana-Perkins.

13      Q.   How long has Stephanie been working as

14  bookkeeper for Kagan?

15      A.   I think maybe a year, less than a year.

16      Q.   Is Stephanie a W-2 employee for KDC?

17      A.   She is.

18      Q.   Before Stephanie joined you as a

19  bookkeeper, did you have anybody else helping you

20  with bookkeeping?

21      A.   There was one but she left after a couple

22  of months.

23      Q.   What was her name?

24      A.   Merima, M e r i m a.  I only remember her

65

1   first name.

2       Q.   Before Merima, were you personally doing

3   the bookkeeping?

4       A.   Yes.

5            MR. CARNATHAN:  I want to pause to see

6   if I can get an audit report.  I'll be just a

7   moment.

8            (Recess - 11:51 to 11:59.)

9       Q.   Mr. Gersh, I think you told me earlier that

10  after you arrived in some instances you had to go

11  back to vendors and subcontractors to obtain

12  invoices to develop the figures for the Lyman-Cutler

13  project.  Is that fair?

14           MR. PERTEN:  Objection.

15      A.   Yes.

16      Q.   So when I look at this vendor transaction

17  report that we marked as Exhibit 30, am I able to at

18  least conclude that where we have dates in April or

19  May 2015, those are entries that you made after you

20  started at KDC?

21           MR. PERTEN:  Objection.

22      A.   I can't say that with entire certainty.  I

23  can't confirm that a hundred percent.  I think so.

24      Q.   You think so.  So when I look at BST -- I

66

1    may have asked you this -- on Page 2, is BST one of

2    the subcontractors with regard to which you had to

3    request invoicing?

4             MR. PERTEN:  Objection.

5        A.  I could not tell you off the top of my

6    head.  Sometimes they had it.  I don't remember

7    which ones we had to go back and request something

8    when I was there.

9        Q.  If we go through and use the transaction

10   list to refresh your memory, do you recall if

11   DaCosta was a vendor that you had to go back and

12   request an invoice from?

13       A.  This happened way too long ago, I wouldn't

14   be able to tell you which ones I had to go back to

15   and request with a hundred percent certainty.

16       Q.  I'm not sure the standard is a hundred

17   percent certainty.  We are not asking you to guess.

18   If you are reasonably certain, I think it is fair to

19   ask you to give me your best memory.  Mr. Perten can

20   object as he likes.  What's your best memory with

21   regard to DaCosta?

22             MR. PERTEN:  If you have a memory, tell

23   him.

24       A.  DaCosta is one of the subcontractors that

67

1    had a poor history of initial proposals.

2              MR. PERTEN:  Listen to his question.

3        Q.  So is it your best memory that DaCosta is

4    one of the subcontractors with regard to which you

5    had to request more information in connection to the

6    Lyman-Cutler project?

7              MR. PERTEN:  Objection.

8        A.  Without certainty, I would be guessing, but

9    possibly, yes.

10       Q.  What about Decor Art, is that one of the

11   vendors that you had to request more information

12   from with regard to the Lyman-Cutler project?

13       A.  Again, I'm not a hundred percent certain,

14   but he's one of the better ones.

15       Q.  What do you mean by better ones?

16       A.  He had a better history of support, invoice

17   support when I joined.

18       Q.  Who were the worst ones?

19       A.  DaCosta.  I don't know if I would classify

20   BST Plumbing as a worst one.  He would send multiple

21   projects at a time.  That might be it from this

22   list.

23       Q.  What about Dream Flooring?

24       A.  I don't think so.  Compared to all the

68

1  other ones, he is not someone I've dealt with much.

2  He's an expensive flooring subcontractor.  So we

3  have used a different flooring sub almost entirely

4  since I've been here.  From what I recall, he

5  submitted invoices or proposals, whatever you want

6  to call them, from what I can remember seeing when I

7  first started.

8      Q.  How about Sergey Nikolaev?

9      A.  I think he was a good one, itemized line by

10  line.  He was also an old vendor that we haven't

11  used since.

12      Q.  How about Unicon Electric?

13      A.  I think fine.

14      Q.  V&D Heating?

15      A.  The same.

16      Q.  I think you mentioned that in some

17  instances you actually emailed vendors and

18  subcontractors to get invoices and proposals after

19  you joined the company.  Do you remember telling me

20  that?

21      A.  If I did not have them.

22      Q.  I've not seen a single such email produced

23  in this case.  Do you have such emails in your

24  possession and control somewhere?

73

1    cost overruns on the Lyman-Cutler project?

2          MR. PERTEN:  Objection.

3      A.  I don't think I can say I spoke to anybody

4    about any cost overruns.  That's honestly not a term

5    I've ever said or heard during this time frame, or

6    discussed.

7      Q.  So other than printing out an aging AP

8    report from the Lyman-Cutler QuickBooks, did you

9    provide any other information with regard to the

10   unreimbursed construction costs referenced in the

11   letter we marked as Exhibit 5?

12     A.  Other than overseeing the QuickBooks up to

13   that date, no.

14     Q.  So if we look at the last page of Exhibit

15   5, is that the aging AP that you printed out?

16     A.  It is.

17     Q.  So when we look at that last page which is

18   Bates-stamped LCDK 000311, it has a little 0515 in

19   the upper left-hand corner.  Do you see that?

20     A.  Yes.

21     Q.  Does that mean you printed that out on

22   05/07/15?

23     A.  Yes.

24     Q.  As of 05/07/15, how much work had you done

74

1    on the Lyman-Cutler books?

2              MR. PERTEN:  Objection.

3        A.   Not that much.

4        Q.   Had you already gone back and requested

5    invoices from subcontractors and vendors?

6        A.   Not above standard day-to-day, no, I had

7    not.

8        Q.   How much work did you do on the

9    Lyman-Cutler books after May 7, 2015?

10       A.   Significant.

11       Q.   And during what time period did you do

12   significant work on the Lyman-Cutler books?

13       A.   Right around then to I don't know when.  I

14   don't know what steps.  It was all a blur.  There

15   were many, many hours, lots of years of my life

16   taken off for the next several months.

17       Q.   What work do you recall doing on the

18   Lyman-Cutler books after May 7, 2015?

19       A.   Going through every account, every payment,

20   every bank reconciliation, every folder, every email

21   I could find, anything and everything to clean

22   everything up and get it accurate.

23       Q.   So did you go back to the subs and vendors

24   to get documentation after this letter went out?

89

1   were the balances at times.

2       Q.   So you did some kind of final review of the

3   project?

4       A.   As much as we could at the time of this

5   becoming a case, yes.  Normally we would do final

6   accounting around the time of the closing -- the

7   sale of the property, the closings.

8       Q.   When did you do your final review of the

9   Lyman-Cutler project?

10      A.   An unofficial final review was during the

11  May and June timeline of those letters.

12      Q.   And who participated in the final review?

13      A.   The same group as mentioned previously.

14      Q.   So it was you?

15      A.   Doing the numbers.

16      Q.   Mr. Kagan?

17      A.   Mm-hmm.

18      Q.   Yes or no?

19      A.   Me, Mr. Kagan, Joseph.

20      Q.   Joseph Cohen?

21      A.   Joseph Cohen when it comes to asking what

22  the numbers and totals were.  Again, for me just me

23  and the vendors and Vadim.

24      Q.   Did Mr. Kagan identify to you any of the

90

1    subs or vendors to which you needed to go and get

2    more documentation?

3        A.   No.

4        Q.   Did Mr. Cohen identify to you any of the

5    subs or vendors to whom you had to go for more

6    documentation?

7        A.   No.

8        Q.   Do you recall any particular subs or

9    vendors who came to KDC looking for more money on

10   the Lyman-Cutler after you joined the company?

11       A.   Specifically, I do not.

12       Q.   Did Mr. Kagan take responsibility for

13   getting any of the additional documentation after

14   you identified the subs or vendors from whom you

15   needed it?

16       A.   I can't recall.  What do you mean?

17       Q.   I think you said you reached out to some

18   subcontractors and vendors looking for more

19   documentation, right?

20       A.   Yes.

21       Q.   Did Mr. Kagan do that with any of the

22   subcontractors or vendors?

23       A.   Sure.  He has far more day-to-day

24   interactions with them on the job site than I did in

91

1    the office, yeah.

2         Q.   Do you remember which subcontractors

3    Mr. Kagan reached out to for more documentation?

4         A.   No, I do not.  I was really the second

5    check of documentation requests.

6         Q.   So did he take primary responsibility for

7    getting further documentation from the

8    subcontractors?

9              MR. PERTEN:  Objection.

10        A.   I don't know that I could say that.  It was

11   still me looking for all the support I could find to

12   organize everything for the project.

13        Q.   So from a process standpoint, did you go to

14   Mr. Kagan and say I need more documentation from

15   subcontractor X and then he would go get more

16   documentation?  Is that how it worked?

17        A.   I don't know that he would get it.  They

18   may bring it to me, but he may be the communications

19   between them.

20        Q.   What about Mr. Cohen, did he go out and get

21   any of the documentation?

22        A.   No, I don't believe so.

23        Q.   Did you know Mr. Cohen used to go by

24   another name?

97

1    you think it might have been done?

2        A.   I'm sorry that I don't remember from that

3    long ago.  I think that's how that was done.

4        Q.   So there were no actual time records kept

5    as the project went on as to how many hours were

6    being spent on the Lyman-Cutler project by people at

7    KDC?

8        A.   We wouldn't have been able to get our work

9    done if we also kept track of our time.

10       Q.   If we compare this invoice in Exhibit 32 to

11   the invoice that was attached to Exhibit 28, you see

12   the construction costs changed?

13       A.   It increased, yes.

14       Q.   Are you able to explain to me how that

15   number changed between June 1, 2015 and March 17,

16   2016?

17       A.   Probably uncovering additional construction

18   costs that weren't found previously.  I don't

19   remember exactly if there was additional work done

20   on the property that was included in this number.

21       Q.   So you may have been still uncovering

22   additional construction costs as late as 2016 for

23   the Lyman-Cutler project?

24       A.   It's possible.  We spent the majority of

140

1    workpaper.  I don't know --

2       Q.  I've moved on from Exhibit 43.

3       A.  Okay.

4       Q.  I'm trying to determine if I can figure out

5    whether these subs are unpaid.  It looks like BST

6    has not been paid to the tune of 19670 on the 55

7    Lyman Road?

8       A.  Correct.

9       Q.  Are you saying there is something else I

10   should look at to see if that is right?

11      A.  If they have been paid or not from

12   Lyman-Cutler?

13      Q.  For this project, whether it be through KDC

14   or Lyman-Cutler, is there an outstanding balance due

15   to BST on the Lyman-Cutler project of 19670?

16      A.  Correct, yes.

17      Q.  So when I look at any of these things, if I

18   see an outstanding balance due, can I conclude that

19   that amount has not been paid to the sub?

20      A.  Correct.  Just trying to make sure I

21   understand the question.  I believe so.

22      Q.  In many instances we have certain payments

23   to the sub and then we have bills that are added.

24      A.  Sure.

# EXHIBIT 28

Exhibits: 27-28                    Volume 1, Pages 1-143
                UNITED STATES BANKRUPTCY COURT
                  DISTRICT OF MASSACHUSETTS
                      (EASTERN DIVISION)
----------------------------

In Re:
                                   Chapter 7

LYMAN-CUTLER, LLC,                 Case No. 15-13881-FJB

            Debtor
----------------------------

LYMAN-CUTLER, LLC,

            Plaintiff

v.                                 Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,

            Defendants
----------------------------


            DEPOSITION OF JAMES JOSEPH COHEN
            Tuesday, May 8, 2018, 10:20 a.m.
            O'Connor Carnathan and Mack LLC
             1 Van de Graaff Drive, Suite 104
              Burlington, Massachusetts


      --------- David A. Arsenault, RPR ---------
      daa@fabreporters.com   www.fabreporters.com
            Farmer Arsenault Brock LLC
             Boston, Massachusetts
                617-728-4404

88

1  describes Mr. Kagan's duty and obligation to

2  construct two homes, did you ever discuss that

3  provision with Mr. Kagan?

4       A.  Do I understand your question, for

5  clarification, that this is not involving counsel?

6       Q.  Yes, we are setting aside privileged

7  conversations involving counsel and trying to focus

8  on conversations that you had with Mr. Kagan outside

9  of the presence of counsel.

10      A.  Yes.  This was involved with my discussions

11  with Kagan about the mechanic's lien, this

12  particular paragraph.

13      Q.  To what extent was counsel involved in the

14  preparation of the mechanic's lien?

15      A.  Zero.

16      Q.  Would you please recount to me what your

17  discussion with Mr. Kagan was about his obligation

18  under 5.2 in connection with your preparation of the

19  mechanic's lien?

20      A.  I needed to understand from Kagan, Vadim,

21  what "substantially completed" meant.  I didn't know

22  if that was a term of art that was universal

23  throughout the construction industry, something that

24  he had specific understanding from people, or if

89

1    there was something that he could point to that

2    would demonstrate substantial completion.  The

3    response I got was:  I never thought about it.  The

4    houses are almost done.  So there wasn't -- the

5    problem for me is that it is an ambiguous term.

6    "Completion" I understand.  That's something that

7    you can use a metric to measure.  Substantial

8    completion, anything more than 50 percent

9    substantial?  Anything more than 75 percent?  To

10   this day I'm unable to get my arms around what that

11   actually means.

12       Q.   Why did you need to understand the meaning

13   of substantial completion to prepare a mechanic's

14   lien?

15       A.   In order to do a final invoice, we have to

16   be complete.  If we are complete, that informs when

17   you have the opportunity to file a mechanic's lien.

18   So we needed to determine when you were

19   substantially complete, when -- and whether there

20   were consequences for not being substantially

21   complete, because that impacts the obligations of

22   KDC under the construction management agreement and

23   Vadim's reciprocal obligations as well as our final

24   invoice.  So this term "substantial completion" is

90

1    actually a fairly important term, but as I sit

2    before you I don't understand.

3        Q.   What did Mr. Kagan explain to you it meant?

4        A.   He was ill-equipped to define it for me.

5    He basically used circular reasoning, substantial

6    complete means what it says, substantially complete.

7    I said, That's not good enough.  If you want to make

8    an argument for substantial completion, you have to

9    give me something to anchor it to.  He goes, Most of

10   it was done.  I understand from his perspective he

11   was getting frustrated with me.  He said that means

12   what it says.  It clearly is not complete but

13   clearly substantially complete.  Again, it is a

14   drafting error by Mr. Maiden, without a doubt.

15       Q.   So you believe that the use of the term

16   substantially complete in the LLC agreement was a

17   drafting error?

18       A.   Without an accompanying definition of it,

19   absolutely.  You don't have to be a lawyer to know

20   that.

21       Q.   So you are not aware of any commonly used

22   definition of substantial completion in the

23   construction industry?

24       A.   I am not a construction expert.  I have

91

1  inquired of people who I believe to be construction

2  experts who don't know Vadim who I would call out of

3  the blue, and there are as many opinions as there

4  are people.

5       Q.  Who else did you inquire of?

6       A.  I would have to go to records.  I pretty

7  much called a friend of mine who was an architect

8  from years ago in California.  He said it is

9  probably something unique to Massachusetts.  I asked

10  a real estate attorney in Newburyport.  I asked

11  another attorney who does construction work in

12  Newburyport.  They said that should be a defined

13  term.  If it is not, it means whatever you want it

14  to mean, which I also don't agree with.  It can't

15  just mean anything, but I don't know what it means

16  here.

17       Q.  Do you know what the AIA is?

18       A.  Yes, I do.

19       Q.  Do you ever check the AIA definition of

20  substantial completion?

21       A.  I believe that I did.  I think the

22  reference was that it should be something that is

23  locked down in each particular project.  In some

24  cases it should be when it is dried in.  In other

92

1  cases -- they don't have a specific, singular

2  definition of it, as far as I recall sitting here

3  before you today.

4      Q.  Would you agree with me that the AIA is an

5  authoritative source for definitions in the

6  construction industry?

7          MR. PERTEN:  Objection.

8      A.  No.

9      Q.  What's your basis for disagreeing with me?

10     A.  Because they are not a licensing body or

11  statutorily comprised body.  They are self-serving.

12     Q.  In what way are they self-serving?

13     A.  They exist for their membership and own

14  people.  They don't have any oversight over anybody

15  else other than their own people.  And it also

16  presupposes that if they wanted to use a particular

17  definition, it should say substantial completion per

18  a certain definition.  This is in lower case and it

19  just means what it means.  It is two words side by

20  side subject to whoever wants to interpret it within

21  some degree of general acknowledgment that it is

22  more than 50 percent and less than a hundred

23  percent.

24     Q.  Would you agree that Mr. Kagan is an expert

# EXHIBIT 29

Exhibits: 1-14                    Volume 1, Pages 1-170
          UNITED STATES BANKRUPTCY COURT
             DISTRICT OF MASSACHUSETTS
                 (EASTERN DIVISION)
----------------------------
In Re:

                              Chapter 7

LYMAN-CUTLER, LLC,            Case No. 15-13881-FJB


          Debtor
----------------------------
LYMAN-CUTLER, LLC,


          Plaintiff

v.                            Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
          Defendants
----------------------------


          DEPOSITION OF KRISTINA BRUSENKOVA
          Tuesday, March 20, 2018, 1:15 p.m.
          Sheehan Phinney Bass + Green, P.A.
           255 State Street, 5th Floor
              Boston, Massachusetts


     --------- David A. Arsenault, RPR ---------
     daa@fabreporters.com   www.fabreporters.com
          Farmer Arsenault Brock LLC
             Boston, Massachusetts
                 617-728-4404

125

1      A.   I don't understand your question.

2      Q.   Where did you get the information that

3  enabled you to say what you said in Paragraph 6 of

4  your affidavit?

5      A.   He usually create a company, a partnership.

6      Q.   And do you believe that's improper?

7      A.   I didn't say this.

8      Q.   I didn't say you did.  I just asked the

9  question.  Is that improper somehow?

10     A.   No.

11     Q.   Now, you say in Paragraph Number 7 that he

12  regularly double-billed projects.  Do you see that?

13     A.   Yes.

14     Q.   On the Lyman-Cutler project specifically

15  when did he double-bill?

16     A.   I can't recall.

17     Q.   Did he ever?

18     A.   Based on the information that I saw, the

19  information that Fillippov provided me, yes, for

20  landscaping.

21     Q.   So you believe he double-billed for

22  landscaping?

23     A.   I believe, yes.

24     Q.   Anything else?

126

1     A.  I can't recall right now.

2     Q.  Do you believe there was other things?

3     A.  I don't know.

4     Q.  Look at Paragraph Number 8.  This talks

5  about the landscaping work.  Do you see that?

6     A.  Yes.

7     Q.  You say:  "I've reviewed some QuickBooks

8  reports for the Lyman-Cutler project and it appears

9  to me that Mr. Kagan billed the project twice for

10  excavation and landscaping work."

11          Do you see that language?

12     A.  Yes.

13     Q.  What QuickBooks reports did you look at?

14     A.  The one that I was provided by Fillippov.

15     Q.  And prior to seeing what Mr. Fillippov

16  provided, were you aware of that problem?

17     A.  I cannot recall it.

18          (A recess was taken, 4:11 - 4:18.)

19     Q.  When Mr. Fillippov showed you QuickBooks

20  records at Starbucks, how long did you look at them?

21     A.  I can't recall.

22     Q.  Do you recall how long you were at

23  Starbucks with him?

24     A.  No.

133

1    7.  Look at Paragraph Number 10.  What

2    subcontractors did Mr. Kagan pay more than the job

3    was worth?

4         A.  I can't recall the names.

5         Q.  How did you make a determination that there

6    were payments in excess of what the job was worth?

7         A.  When the work was done, he usually came to

8    my desk and he asked me to pull all the numbers that

9    were paid to this particular person.  So when he saw

10   this number he said, you know, it is a little low.

11   Can we had an additional $2,000.

12        Q.  So try my question, though.  First of all,

13   did that happen in Lyman-Cutler?

14        A.  I can't recall.

15        Q.  Do you have any basis for knowing what the

16   proper charge from a subcontractor should be?

17        A.  No.

18        Q.  Now, with respect to the American Express

19   situation, looking at Paragraph Number 12 of your

20   affidavit, would you agree with me, Ms. Brusenkova,

21   that the American Express cards were used to

22   purchase items for projects?

23        A.  Yes.

24        Q.  Would you also agree with me that it was

134

1    proper for the items that were bought for a project

2    to be billed to that project?

3              MR. CARNATHAN:  Objection.

4        A.  Repeat the question.

5        Q.  Is there anything wrong with billing a

6    project for goods that were purchased for that

7    project?

8        A.  I don't understand the question.

9        Q.  Well, you say he bought materials using his

10   American Express card and didn't keep track, right?

11       A.  Yes.

12       Q.  If he was able to determine what products

13   were purchased for which project, was it proper to

14   charge those items to that project?

15             MR. CARNATHAN:  Objection.

16       A.  I don't understand your question, your

17   statement.

18       Q.  How do you know that Mr. Kagan improperly

19   assigned AmEx charges to the Lyman-Cutler project?

20       A.  I didn't say that he did it improper.  I

21   said that every time that he purchased for

22   Proexcavation on American Express card, he never

23   tracked the, keep a track of these expenses.  He

24   used one account for all expenses.  I think it was

137

1    magnitude?

2        A.   1,000, 1500, I don't know; not a huge

3    amount.

4        Q.   Do you know whether this happened on

5    Lyman-Cutler?

6        A.   I don't know.

7        Q.   Now let's look at your Paragraph Number 14.

8    You say:  "When Mr. Kagan submitted bills to

9    projects for Proexcavation, he would arbitrarily

10   charge whatever fee he felt like he could get away

11   with.  There was no direct connection between the

12   charge submitted to the project and the cost that

13   KDC or Proexcavation had incurred for the materials

14   or for paying the subcontractors."

15           Did I read that correctly?

16       A.   Yes.

17       Q.   How did you determine that there was no

18   direct connection between the charges submitted, as

19   you state in your affidavit?

20       A.   As he explained to me, every time when we

21   pay something for Proexcavation, we are supposed to

22   get reimbursed from the companies.  But he never did

23   this.  He just overcharge them.

24       Q.   How did you determine that there was an

138

1    overcharge?  As I understood your testimony this

2    morning or earlier today, you said you didn't know

3    exactly what Proexcavation did on this project; is

4    that correct?

5        A.   I said that the Proexcavation did site

6    preparation.

7        Q.   You gave me categories.

8        A.   Yes.

9        Q.   But you don't know specifically what they

10   did, correct?

11       A.   No.

12       Q.   So how do you know they overcharged?

13       A.   Every time when Proexcavation pays for

14   materials, he said that we are supposed to be

15   reimbursed for this money.  But we never did, we

16   never invoiced the company with the same amount of

17   money that he spent for Proexcavation.  Instead he

18   prepared the invoice with higher amount on it.

19       Q.   Let's continue on Paragraph 14.  You say

20   that he increased the excavation project cost when

21   he hit rock.  Do you see that language?

22       A.   Yes.

23       Q.   In your experience, Ms. Brusenkova, are

24   excavation costs more expensive when ledge is

# EXHIBIT 30

Exhibits: 1-4                    Volume 1, Pages 1-160

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

-----------------------------

In Re:

                                Chapter 7

LYMAN-CUTLER, LLC,              Case No. 15-13881-FJB


          Debtor

-----------------------------

LYMAN-CUTLER, LLC,


          Plaintiff

v.                              Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,

          Defendants

-----------------------------


          DEPOSITION OF VON ALAN SALMI
     Tuesday, October 16, 2018, 10:05 a.m.
        O'Connor Carnathan and Mack LLC
        1 Van de Graaff Drive, Suite 104
           Burlington, Massachusetts


     --------- Janis T. Young, RDR, CRR ---------
     jty@fabreporters.com    fab.fabreporters.com
          Farmer Arsenault Brock LLC
            Boston, Massachusetts
               617-728-4404

72

1    fair and reasonable cost.  Are those two different

2    things, in your expert opinion here?

3        A.  I'm thinking that they're one and the same.

4        Q.  When you began the engagement, did you ask

5    for any particular materials to be provided to you

6    in order to develop your opinion?

7        A.  Yes, we did.

8        Q.  What did you ask for?

9        A.  We wanted all of the construction

10   documents, particularly the plans and specifications

11   for the project.

12       Q.  Anything else?

13       A.  We understood that the specifications were

14   never generated from the beginning, as you would

15   normally have the set of specifications that would

16   delineate what the finish is, what selections had

17   been made.  Those were not available to us.

18           When we understood those were not

19   available, we wanted to understand what types of

20   finishes were used; because the plans were very

21   vague, the architectural plans.

22           So we asked if there were invoices

23   available that would give descriptions of the

24   materials.  We understood those invoices were

73

available.  We did not want to have the cost of

those invoices, so as not to contaminate or

prejudice our cost valuation.

             So we were provided with the redacted

invoice, that only had the description of those

materials and the various suppliers of those

materials.

             Those were requested so we could develop

a set of specifications so that we were able to take

and discern that fair and reasonable cost for the

project, and those elements discussed herein.

     Q.   So, in developing your specifications, did

you rely on the materials that were provided to you

by Mr. Perten?

     A.   Yes.

     Q.   And so, is there an assumption in your

report that the materials reflected on the documents

that Mr. Perten provided you were actually used on

the project?

             MR. PERTEN:  Objection.

     A.   We saw the invoices, and the invoices

reference this particular project, and they seemed

to reference also Mr. Kagan; so with that

information we made the assumption that these

74

1    materials were utilized on these projects.

2        Q.   What independent work, other than examining

3    the invoices, did you do to verify that the

4    materials reflected on those invoices were actually

5    used on this project?

6        A.   After we had taken and assemble the cost

7    and developed our estimate, which was generated

8    sometime in the beginning of May, I had a face-to-

9    face meeting, an interview, with Mr. Kagan.  That

10   was probably sometime in June or July, I think.

11           The purpose of that meeting was just to

12   ascertain the accuracy of the methodology, and the

13   types of materials that he utilized for these

14   particular projects.

15       Q.   Other than meeting with Mr. Kagan in June

16   or July, did you do any other independent work to

17   verify that the materials on the invoices that were

18   provided to you were actually used on the project?

19       A.   No.

20       Q.   Did you do anything to verify that the

21   quantity of materials reflected on those invoices

22   matched what was actually necessary to build the

23   homes?

24       A.   We did.

79

1      Q.   So you spoke to Mr. Kagan in June or July

2   of this year; is that right?

3      A.   Correct.

4      Q.   Other than that one conversation with

5   Mr. Kagan, did you ever talk to him in connection

6   with preparing this report?

7      A.   No.

8      Q.   To what extent did you rely on what

9   Mr. Kagan told you during your discussion with him

10   in preparing your report?

11      A.   Characterizations of the materials and

12   means and methods utilized in his construction.

13            I had to take them at face value, as he

14   was the contractor.  So it was more in terms of

15   characterization as to his means and methodologies

16   in construction and verifying the materials that we

17   utilized.

18            As a for-instance, in the countertops, I

19   could not identify the exact nature of the

20   countertops, but he utilized stone versus a solid-

21   surface material like Corian.

22      Q.   When you say you relied on him for the

23   means and methodologies, what do you mean by that?

24      A.   So, for instance, in his framing he

88

1      Q.   Do you recognize Exhibit 3, Mr. Salmi?

2      A.   Yes, I do.

3      Q.   What is it?

4      A.   This is the list of specifications we

5  generated for the project in order for us to be able

6  to generate bid forms to subcontractors.

7      Q.   Did you provide these specifications to

8  each of the subcontractors from whom you solicited

9  bids?

10     A.   Yes, we did.

11     Q.   Did any of those subcontractors receive any

12  additional specifications beyond what's represented

13  in Exhibit 3?

14     A.   No.

15     Q.   Somewhere in your report -- I won't

16  fumble -- there's a reference to bid packages that

17  were presented to these subcontractors; right?

18     A.   Yes.

19     Q.   What went into each bid package?

20     A.   Our standard methodology is to generate a

21  bid form.  In the bid form, we delineate what we

22  want the subcontractors to bid upon, and we give

23  them the specifications.

24            So, for instance, if there are multiple

92

1        A.   There may have been.  Very limited; just

2    for clarification, scope.

3                   (Marked, Exhibit 4, group of bids.)

4                   (Lunch recess)

5        Q.   Mr. Salmi, I've marked as Exhibit 4 a

6    collection of the bids that were produced to us by

7    your counsel, Bates-stamped VS-7 through VS-81.  Is

8    that a complete collection of the bids you received

9    in connection with forming your opinion in this

10   case?

11       A.   It looks like it, yes.

12       Q.   Did you just get one bid for each component

13   of your opinion?

14       A.   Yes, we did.

15       Q.   Why did you just get one?

16       A.   Because these were already prequalified

17   contractors that we had had previous experience

18   with.  They understood the requirements of this type

19   of work.

20              If we felt something was inordinately

21   awry in terms of their numbers, we would have sought

22   more bids.

23              We felt as though, again, they were all

24   qualified, because they had done this type of work

141

1    he can't answer the question; but....

2        A.   What are the specifications?  Because the

3    plans don't have a lot of specs in them.

4             So what are the specs that you would

5    take and provide for someone to get to that price?

6    Because there's not enough information in the plans

7    to take and come up with a price.

8             If you ask me to build that house based

9    upon those plans, I'd say I need more information,

10   as we did when we opined on the methodology for

11   establishing our cost.  We needed more information.

12   There was just not enough information to give any

13   type of a cost.

14       Q.   Fair enough.

15            If we return to Exhibit A to your report

16   that we marked as Exhibit 1, is the roughly $600,000

17   difference between Column 1 and Column 2 profit to

18   VSA?

19       A.   Well, you've got overhead, and then you've

20   got project, site supervisor; so right there is $460

21   that comes out of that.

22            So that's an overhead cost there,

23   although the overhead cost is reduced; and there's

24   profit, and it's everything else that goes into it.

# EXHIBIT 31

## GREATER BOSTON REAL ESTATE BOARD

# AGREEMENT FOR EXCLUSIVE AGENCY
## with Consent to Designated Agency

Date: _____



EXHIBIT
PERIGAD 800-631-6989
J Kagan 53
5·18·18 01

THIS AGREEMENT concerns the following property:
Street Address: 55 Lyman rd,, Brookline, MA  02467 _____
Description: Single family house _____
Tax Id._____ Book: _____ Page: _____ (If Registered) Cert. Num.:_____
County:_____ LISTING PRICE: $ 5,499,000.00

In consideration of the mutual covenants and agreements herein contained, the undersigned Seller hereby gives to the undersigned Broker the sole and exclusive agency to sell the said property for the price and on the terms and conditions herein set forth.

1. The Broker agrees to use reasonable efforts to procure a ready, willing, and able Buyer of the property in accordance with the price, terms, and conditions of this Agreement.

2. The Broker is granted the sole authority to: (Check if applicable)
   - ☒ Advertise the property;
   - ☒ Post "For Sale" signs on the property;
   - ☐ Offer compensation to buyer agents in the following amount: 2.5% _____ and/or
     **Note:** Regardless of how compensated, buyer agents represent the interest of buyers, not sellers.
   - ☐ Cooperate and compensate Subagents in the following amount: _____.
     **Note:** Subagents represent the interest of sellers, however, as agents of the seller, the seller may be held vicariously liable for the acts of the Subagents.
     Vicarious liability is the potential for a seller to be held liable for a misrepresentation or an act or omission of the subagent, and in checking the box above and initialing below, the seller authorizes the Broker to offer subagency to brokers and salespersons affiliated with other firms. Initials:_____ _____
   - ☐ Cooperate and compensate non-agent Facilitators in the following amount:1% _____

3. The Seller agrees:
   a. To refer all inquiries and offers made by or through any real estate agent for the purchase of said property to the Broker;
   b. To cooperate with the Broker in every reasonable way;
   c. To pay the Broker a fee for professional services of 5% _____ if:
      1. A Buyer is procured ready, willing, and able to buy said property, or any part thereof, in accordance with the price, terms and conditions of this Agreement, or such other price, terms and conditions as shall be acceptable to the Seller, whether or not the transaction proceeds; or
      2. The said property, or any part thereof, is sold through the efforts or with the assistance or participation (directly or indirectly) of the Broker or any other real estate agent; or
      3. The said property, or any part thereof, is sold within __90__ days after the term of this Agreement to anyone who was introduced to the said property through the efforts of the Broker or his agents prior to the expiration of said term. However, no fee will be payable under this clause if the said property is sold after said term with the participation of a licensed broker to whom the Seller is obligated to pay a fee under the terms of a subsequent written exclusive listing agreement.

It is specifically understood and agreed that no fee will be payable by the Seller under this Agreement in any case where no real estate agent has directly or indirectly furnished information about the property to the Buyer or otherwise assisted or participated in the sale in any way.

**Once an offer has been accepted in writing and a transaction is pending, the Broker shall have no obligation to market the property or present further offers to the Seller unless otherwise agreed in writing.**

© 2008 GREATER BOSTON REAL ESTATE BOARD All rights reserved.
This form may not be copied or reproduced in whole or in part in any manner whatsoever
without the prior express written consent of the Greater Boston Real Estate Board.
Form ID: RA250 PD: 05/08
Century 21 Commonwealth, 64 Needham Street Newton, MA 02461
Phone: (617)969-2121      Fax:               Tatiana Kagan                                    Untitled

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026   www.zipLogix.com

4. The Seller understands and agrees that the property will be marketed in compliance with all applicable fair housing laws.

5. The period of this Agreement shall be from _____ **April 26** _____ , **2015** _____ , to and including ___ **October 27** ___ , **2015** . Time is of the essence hereof.

6. In order to introduce other brokers to the property and solicit their assistance in procuring a buyer, the Broker may arrange to have this listing distributed through any multiple listing service ("MLS") to which the Broker has access. Any data regarding the property submitted by the Broker to an MLS shall be verified by the Seller. Such data, together with any other information provided to or obtained by the Broker with respect to the property, may be disclosed to prospective buyers and other brokers and may be included in all listings, comparable books and other materials distributed by the MLS either before or after the term of this listing or the sale of the property. The Seller expressly authorizes the Broker to advertise the property in the MLS and offer compensation to other firms as detailed in Paragraph 2.

7. _____ By intialing, the Broker is further authorized to place a lock box on the property in order to facilitate entry by cooperating brokers and others authorized to examine the property (check if applicable).

8. The Seller hereby acknowledges receipt of the Massachusetts Mandatory Consumer Licensee Disclosure Form. The Broker has explained the firm's policy regarding agency relationships. The Seller, in signing this Agreement **CONSENTS TO DESIGNATED AGENCY.** A designated agent is licensee, broker or salesperson, who has been appointed by a Broker to represent the seller or the buyer. The agent has explained and the Seller is advised that (a) the Designated Seller's Agent(s), identified below, will represent the Seller and will owe the Seller the duties of loyalty, full disclosure, confidentiality, to account for funds, reasonable care and obedience to lawful instruction; (b) all other licensees affiliated with the appointing Broker will not represent the Seller nor will they have the other duties specified herein to you as Seller and may be appointed to represent a potential purchaser of the Property; and (c) if the designated agents affiliated with the same Broker represent the Seller and purchaser in a transaction, the appointing Broker shall be a dual agent and neutral as to any conflicting interests of the seller and the purchaser, but will continue to owe the seller and the purchaser the duties of confidentiality of material information and to account for funds while the Designated Seller's Agent and the Designated Buyer's Agent will individually advocate for their respective client. In the event another agent affiliated with the Broker is a designated agent for the buyer, the Seller shall receive written notice. In the event Dual Agency occurs, the designated agent will seek consent from the buyer and the seller.

**ACKNOWLEDGMENT**

I acknowledge and agree that _____ **Tatiana Kagan 9055972** _____ *[insert name and license # of licensee(s)]* is authorized to represent me as a Designated Agent(s). I hereby consent to Designated Agency.

9. Offer Disclosure: Seller hereby authorizes the Broker named herein as follows:

_____ The Broker may not disclose the existence of any Offer(s) to Purchase received by the Seller nor the terms of any Offer received; price, contingencies, dates for performance, etc., to any potential buyer(s) or real estate licensee(s) and shall treat all such information as confidential.

_____ The Broker may disclose the existence of any Offer(s) to Purchase received by the Seller to any potential buyer(s) and/or real estate licensee(s), and whether any such Offer was procured by the listing Broker or that of another licensed broker but shall not disclose the terms of any Offer received; price, contingencies, dates for performance, etc, and shall treat such terms as confidential,

_____ The Broker may disclose the existence of any Offer(s) to Purchase received by the Seller to any potential buyer(s) and/or real estate licensee(s), whether such Offer was procured by the listing Broker or that of another licensed broker and may further disclose the terms of any Offer: price, contingencies, dates for performance, etc, to any potential buyer(s) or real estate licensee(s).

Additional terms and conditions:

_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____
_____

IN WITNESS WHEREOF, the Seller and the Broker have hereunto set their hands and seals as of the ___24th___ day
of _____April_____ , 2015 _____

Broker: _____    Seller: _____
　　C 21 Commonwealth

By: _____    Seller (or spouse): _____
　　Tatiana Kagan

Its: agent _____
　　Title (duly-authorized)

Under the Code of Ethics and Standards of Practice of the National Association of REALTORS®, any REALTOR®
entering into a listing contract must advise the SELLER of:

1.  The REALTOR®'s company policies regarding cooperation with, and the amount of any compensation that will be
    offered to, subagents, Buyer Agents and/or facilitators acting in a legally recognized non-agency capacity;

2.  The fact that Buyer Agents, even if compensated by the Listing Broker or by the SELLER, will represent the interests
    of BUYERS; and

3.  Any potential for the Listing Broker to act as a disclosed Dual Agent on behalf of the SELLER as well as the BUYER.

Produced with zipForm® by zipLogix 18070 Fifteen Mile Road, Fraser, Michigan 48026    www.zipLogix.com                    Untitled

KAGAN 01223

GREATER BOSTON REAL ESTATE BOARD

# AGREEMENT FOR EXCLUSIVE RIGHT TO SELL
## with Consent to Designated Agency

THIS AGREEMENT concerns the following property:

Date: August 12, 2014

Street Address: 88 Cutler Lane, Brookline, MA 02467

Description: A 6 bedroom single family house at the above address

Tax Id: _____ Book: _____ Page: _____ (If Registered) Cert. Num.: _____

County: Norfolk _____ LISTING PRICE: $ 5,499,000,00

In consideration of the mutual covenants and agreements herein contained, the undersigned Seller hereby gives to the undersigned Broker the sole and exclusive right to sell the said property for the price and on the terms and conditions herein set forth.

1. The Broker agrees to use reasonable efforts to procure a ready, willing, and able Buyer of the property in accordance with the price, terms, and conditions of this Agreement.

2. The Broker is granted the sole authority to: (Check if applicable)
   ☒ Advertise the property;
   ☒ Post "For Sale" signs on the property;
   ☒ Offer compensation to Buyer Agents in the following amount: 2.5% net sale price and/or
      Note: Regardless of how compensated, buyer agents represent the interest of buyers, not sellers.
   ☐ ~~Cooperate and compensate Subagents in the following amount:~~ _____
      ~~Note: Subagents represent the interest of sellers, however, as agents of the seller, the seller may be held vicariously liable for the acts of the Subagents.~~
      ~~Vicarious liability is the potential for a seller to be held liable for a misrepresentation or an act or omission of the subagent, and in checking the box above and initialing below, the seller authorizes the Broker to offer subagency to brokers and salespersons affiliated with other firms.~~ Initials: _____
   ☒ Cooperate and compensate non-agent Facilitators in the following amount: 1%

3. The Seller agrees:
   a. To refer all inquiries and offers for the purchase of said property to the Broker;
   b. To cooperate with the Broker in every reasonable way;
   c. To pay the Broker a fee for professional services of 5% of the net sale price if:
      1. A Buyer is procured ready, willing, and able to buy said property, or any part thereof, in accordance with the price, terms and conditions of this Agreement, or such other price, terms and conditions as shall be acceptable to the Seller, whether or not the transaction proceeds; or
      2. The said property, or any part thereof, is sold through the efforts of anyone including the Seller; or
      3. The said property, or any part thereof, is sold within 90 days after the term of this Agreement to anyone who was introduced to the said property through the efforts of the Broker or his agents prior to the expiration of said term. However, no fee will be payable under this clause if the said property is sold after said term with the participation of a licensed broker to whom the Seller is obligated to pay a fee under the terms of a subsequent written exclusive listing agreement.

Once an offer has been accepted in writing and a transaction is pending, the Broker shall have no obligation to market the property or present further offers to the Seller unless otherwise agreed in writing.

© 2008 GREATER BOSTON REAL ESTATE BOARD All rights reserved.
This form may not be copied or reproduced in whole or in part in any manner whatsoever
without the prior express written consent of the Greater Boston Real Estate Board.
Form ID: RA210 PD: 05/08

Form generated by: TrueForms™    www.TrueForms.com    800-499-9612



EXHIBIT
T Kagan 54
5.18.18 DA

4.  The Seller understands and agrees that the property will be marketed in compliance with all applicable fair housing laws.

5.  The period of this Agreement shall be from August 20, 2014, to and including March 1, 2016. Time is of the essence hereof.

6.  In order to introduce other brokers to the property and solicit their assistance in procuring a buyer, the Broker may arrange to have this listing distributed through any multiple listing service ("MLS") to which the Broker has access. Any data regarding the property submitted by the Broker to an MLS shall be verified by the Seller. Such data, together with any other information provided to or obtained by the Broker with respect to the property, may be disclosed to prospective buyers and other brokers and may be included in all listings, comparable books and other materials distributed by the MLS either before or after the term of this listing or the sale of the property. The Seller expressly authorizes the Broker to advertise the property in the MLS and offer compensation to other firms as detailed in Paragraph 2.

7.  _____ By initialing, the Broker is further authorized to place a lock box on the property in order to facilitate entry by cooperating brokers and others authorized to examine the property.

8.  The Seller hereby acknowledges receipt of the Massachusetts Mandatory Consumer Licensee Disclosure Form. The Broker has explained the firm's policy regarding agency relationships. The Seller, in signing this Agreement CONSENTS TO DESIGNATED AGENCY. A designated agent is a licensee, broker or salesperson, who has been appointed by a Broker to represent the seller or the buyer. The agent has explained and the Seller is advised that (a) the Designated Seller's Agent(s), identified below, will represent the Seller and will owe the Seller the duties of loyalty, full disclosure, confidentiality, to account for funds, reasonable care and obedience to lawful instruction; (b) all other licensees affiliated with the appointing Broker will not represent the Seller nor will they have the other duties specified herein to you as Seller and may be appointed to represent a potential purchaser of the Property; and (c) if the designated agents affiliated with the same Broker represent the Seller and purchaser in a transaction, the appointing Broker shall be a dual agent and neutral as to any conflicting interests of the seller and the purchaser, but will continue to owe the seller and the purchaser the duties of confidentiality of material information and to account for funds, while the Designated Seller's Agent and the Designated Buyer Agent will individually advocate for their respective client. In the event another agent affiliated with the Broker is a designated agent for the buyer, the Seller shall receive written notice.

**ACKNOWLEDGMENT**

I acknowledge and agree that Tatiana Kagan Lic#: 9055972 S [insert name and license # of licensee(s)] is authorized to represent me as a Designated Agent(s). I hereby consent to Designated Agency.

9.  Offer Disclosure: Seller hereby authorizes the Broker named herein as follow:

_____ The Broker may not disclose the existence of any Offer(s) to Purchase received by the Seller nor the terms of any Offer received; price, contingencies, dates for performance, etc., to any potential buyer(s) or real estate licensee(s) and shall treat all such information as confidential.

_____ The Broker may disclose the existence of any Offer(s) to Purchase received by the Seller to any potential buyer(s) and/or real estate licensee(s), and whether any such Offer was procured by the listing Broker or that of another licensed broker but shall not disclose the terms of any Offer received; price, contingencies, dates for performance, etc, and shall treat such terms as confidential,

_____ The Broker may disclose the existence of any Offer(s) to Purchase received by the Seller to any potential buyer(s) and/or real estate licensee(s), whether such Offer was procured by the listing Broker or that of another licensed broker and may further disclose the terms of any Offer: price, contingencies, dates for performance, etc, to any potential buyer(s) or real estate licensee(s).

Additional terms and conditions:

IN WITNESS WHEREOF, the Seller and the Broker have hereunto set their hands and seals as of the _12th_ _____ day of _August____, 20_14_.

Broker: _Century 21 Commonwealth_      Seller: X _____

By: _____      Seller (or spouse): X _____
   (Gregory Lively)

Its: _Sales Manager, Newton Office_
   Title (duly-authorized)

When entering into a listing agreement, REALTORS® must advise potential clients of:

1. The REALTOR®'s company policies regarding cooperation and the amount(s) of compensation that will be offered to cooperating agents;

2. The fact that buyer agents or brokers, even if compensated by the listing broker, will represent the interests of the buyer; and

3. Any potential for the listing brokers to act as disclosed dual agents.