UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

———————————————————

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

———————————————————

| | | |
|---|---|---|
| | ) | |
| LYMAN-CUTLER, LLC, | ) | |
| ALEX FILIPPOV and | ) | |
| NICKOLAY LIPETSKER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| Defendants in Counterclaim, | ) | |
| | ) | Adv. Proc. No. 16-01120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, TATIANA KAGAN, | ) | |
| KAGAN DEVELOPMENT KDC, CORP. | ) | |
| and PROEXCAVATION CORP. | ) | |
| | ) | |
| Defendants, | ) | |
| Plaintiffs in Counterclaim. | ) | |

———————————————————

MEMORANDUM OF TATIANA KAGAN IN SUPPORT OF
MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS OF
AMENDED COMPLAINT AND ON PROOF OF CLAIM NO. 5

INTRODUCTION

Defendant Tatiana Kagan ("Tatiana") is the wife of defendant Vadim Kagan ("Kagan").

She is not a member of Lyman-Cutler; not a manager of Lyman-Cutler, not a signatory to the

Lyman-Cutler Operating Agreement, and had no check writing authority on any of the Lyman-

Cutler accounts.  Tatiana is a real estate agent, and the members agreed that she would be given

the listing for the new homes being built by Lyman-Cutler.  Although on paper she is an officer

and director of defendants Kagan Development KDC, Corp. ("KDC") and ProExcavation Corp.

("ProExcavation"), she played no substantive role whatsoever in the construction of the homes at issue in this litigation and took no actions on behalf of KDC or ProExcavation.  She had nothing to do with any of the project billings or project expenditures.  No expert testimony supports any of her alleged transgressions, and plaintiffs have failed to come forward with any evidence that could subject her to liability.  Her continued presence in this lawsuit is the product of shotgun litigation against an innocent defendant.  Moreover, the inability of plaintiffs to come forward with "substantial evidence" to support their objection to Tatiana's proof of claim for indemnity mandates that her claim be allowed.

<u>The Allegations in the Amended Adversary Complaint</u>

Kagan, Alex Filippov ("Filippov"), and Nickolay Lipetsker ("Lipetsker") formed Lyman-Cutler, LLC ("Lyman-Cutler") to construct and sell two luxury homes.  Tatiana is first mentioned substantively in paragraph 28 of the Amended Adversary Complaint, where she is identified as a real estate agent affiliated with "Defendant Century 21"[1] and as an officer and director of KDC.  (Amd. Cmp., ¶28).  Plaintiffs allege that they planned to sell the new homes for $4.9 million each and that they agreed to list the homes for sale with Tatiana.   (Id., ¶¶27, 29). They further allege that, without consulting them, the "Kagans" set the selling price for the houses at $5.499 million, "nearly $600,000 higher than the budgeted selling price."  (Id., ¶30).

The plaintiffs allege, "upon information and belief," that in March, 2015, Tatiana received a "bona fide offer" to purchase one of the properties for $4.5 million and failed to present it to Filippov.  (Id., ¶¶31, 32).  Plaintiffs allege that Tatiana did "little or nothing to market" the properties.  (Id., ¶33).  In April, 2015, plaintiffs allege that Kagan [not Tatiana]

---

[1] Century 21 is not a defendant.  It was, however, a defendant in the state court incarnation of this complaint. The pronoun "Defendant" appears to be a vestige from the earlier state court pleading.

called Filippov and asked him to sign a new listing agreement for one of the properties, 55

Lyman Street.  Filippov claims that he refused to sign the new listing agreement and stated his

intention to list the properties with someone else.  (Id.)  Despite his refusal to sign the listing

agreement, "Kagan [not Tatiana] **unilaterally** executed a purported listing agreement with his

wife and Century 21…" (Emphasis added)(Id., ¶34).  Plaintiffs then plead that "upon information

and belief, based on the fact that the Kagans are married and business partners, Mrs. Kagan also

knew or should have known that her husband did not have authority to sign the listing agreement

and that Mr. Filippov had refused to sign it." ( Id. ¶35).

Compounding their narrative as it relates to Tatiana, plaintiffs point to a letter sent on

May 7, 2015 on behalf of Kagan [not Tatiana] wherein he allegedly made fabricated claims that

it was Filippov who set the selling price for the homes and refused to lower that price when

requested to do so by Kagan.  (Id., ¶36, Perten Aff., Exh. 5).  Plaintiffs claim that the "Kagans"

knew that sending the letter would "engender a dispute," and that they intentionally entered into

the unauthorized listing agreement with Century 21 in April "to give themselves unfair leverage"

in connection with the demand letter.  (Id., ¶38).  How the letter and the signing of a listing

agreement gave the Kagans "unfair leverage" in connection with KDC's claim for additional

construction costs remains a mystery as the complaint is silent on this point.

Lyman-Cutler filed suit against Kagan, Tatiana and Century 21 in the Middlesex Superior

Court.  Through discovery in that action, Plaintiffs claim to have learned, for the first time,

about a listing agreement with Century 21 which had been signed by Kagan [not Tatiana] on

August 12, 2014.  (Id., ¶¶39, 41).   Plaintiffs claim that the duration of this listing agreement,

eighteen months, was unreasonably long.  Plaintiffs allege that Tatiana knew or should have

known that her husband had no authority to sign that listing agreement.  (Id., ¶40).

3

The final conclusory allegation against Tatiana is that "[t]he Kagans have complete control over both KDC and ProExcavation and at all times controlled the funds of the Company [defined as Lyman-Cutler].  They allegedly abused their fiduciary position of power and trust to inflate charges and fraudulently milk the project for their own unjust enrichment."  (Id., ¶48).  As discussed in greater detail below, as Tatiana was not a member or manager of Lyman-Cutler and did not have signatory power on Lyman-Cutler's bank account, it is hard to understand how she "controlled" Lyman-Cutler's funds or how she owed Lyman-Cutler or its members a fiduciary duty.  Again, the complaint is silent on this issue.

Count III alleges that Tatiana "knowingly and intentionally aided and abetted Kagan's breach of his fiduciary duty to the Plaintiffs." (Id., ¶61).  Count IV alleges that Tatiana is liable for fraud by conspiring to have her husband sign the listing agreements despite knowing that he did not have authority to do so.  Moreover, according to plaintiffs she is "individually responsible for the fraudulent acts of KDC and ProExcavation" solely "because she is an owner and director of both Companies." (Id., ¶65).  Count V alleges that Tatiana and all the other defendants "have conspired to defraud the Plaintiffs." (Id., ¶70).  Finally, Count VI alleges that Tatiana violated M.G.L. c. 93A "by asserting two knowingly unauthorized and fraudulent listing agreements…" (Id., ¶73).  The plaintiffs do not assert a negligence claim against Tatiana arising from her conduct as the listing agent for the properties.

<u>Pertinent Procedural Facts</u>

In June, 2015, at the request of Filippov, Century 21 voluntarily removed Tatiana as the listing agent and replaced her with Michelle Lane, another Century 21 agent.  After the filing of the bankruptcy petition, the Debtor moved to reject the Century 21 listing agreements, which motion was allowed.  (Docket No. 42).  Thereafter, the Trustee engaged Deborah Gordon of

4

Coldwell Banker to list the properties in Century 21's stead. (Docket No. 47). The bankruptcy

trustee listed the properties at $4.5 million and each sold for $4.4 million, without objection as to

the sale price.[2] (Docket Nos. 67, 75).

The Actual Facts Revealed Through Discovery

    a)  <u>Tatiana Played No Role in the Project Construction.</u>

There is no evidence that Tatiana had any role in the development of this project other

than acting as the listing agent trying to sell the properties. She played no role in the

construction of the homes other than assisting with paint color selections. (Tatiana dep. at 14-

15, Perten Aff., Exh. 19). She had no knowledge regarding KDC's activities on the project.

(<u>Id.</u>). She had no input into the financial records of either KDC or ProExcavation. (<u>Id.</u> at 19).

She also never even saw the Operating Agreement for Lyman-Cutler.  (<u>Id.</u> at 22).  No evidence

has been adduced to refute Tatiana's sworn deposition testimony in this regard.

    b)  <u>Filippov Was Aware That The Properties Were Listed For $5.5 Million And Never
Voiced Any Objection.</u>

Filippov testified at deposition in his individual capacity and as the Rule 30(b)(6)

designee of Lyman-Cutler. His testimony, as well as the deposition testimony of Lipetsker,

wholly belies the unsworn allegations in the Amended Adversary Complaint. Filippov testified

that he understood from the outset that Tatiana would be responsible for the sales and marketing

of the properties. (Fillipov dep. at 47, Perten Aff., Exh. 2). Filippov claims to have had only two

communications with Tatiana over the course of the entire Project. The first occurred in July,

2014, a year and a half after the creation of Lyman-Cutler, wherein she allegedly told them that

there was a lot of interest in the homes. The second communication occurred nine months later,

in April, 2015, when Filippov and Tatiana "exchanged a text message that has been produced in

---

[2] Plaintiffs filed a limited objection to ensure that Tatiana did not receive a commission for her efforts. Given the complete lack of support for the allegations against, as set forth therein, this insistence was nothing but spite.

discovery." (Filippov Resp. to Int. No. 1 propounded by Tatiana, Perten Aff., Exh. 10; Debtor

Resp. to Int. No. 1 propounded by Tatiana, Perten Aff., Exh. 11). That text message, which

related to Tatiana's and Kagan's request that Filippov sign a new listing agreement, was

discussed at length during Filippov's deposition and is referenced below. Lipetsker, for his part,

claims to have never spoken with Tatiana. (Lipetsker Int. Ans. No. 1 propounded by Tatiana,

Perten Aff., Exh. 12). Thus, both Filippov and Lipetsker concede that neither was relying on her

for any aspect of the project other than the marketing of the homes for sale. There are virtually

no written communications between any of the plaintiffs and Tatiana regarding any aspect of the

construction of the properties or the charges related thereto.

 At his deposition, Filippov recalled an additional communication with Tatiana. He

testified that he met Tatiana at a social engagement, a dinner, sometime after agreeing to work

together with Kagan and he was comfortable with her when he learned that she, like he, had

grown up in St. Petersburg, Russia. (Filippov dep. at 66). At his deposition, Lipetsker testified

that he rarely, if ever, spoke to Tatiana during construction. (Lipetsker dep. at 51, Perten Aff.,

Exh. 6).

 Contrary to the allegation in the complaint that the parties' plan was to sell the properties

for $4.9 million each, Filippov testified that the actual plan was to sell the properties for between

$5 million and $5.25 million. (Fillipov dep. at 46, 51). Filippov testified that when the first

home was listed [88 Cutler Lane], Kagan sent him a text message to let him know that the

property was listed. (Id. at 91). After receiving Kagan's text, Filippov testified that he went on-

line to review the listing and observed that the listing price was $5.5 million. (Id. at 92). Given

that their plan was to sell the homes for $5.25 million, listing at $5.5 million certainly should

raise no eyebrows [and apparently it did not], and clearly is not "nearly $600,000 higher than the

budgeted sale price" as alleged.  (Amd. Cmp., ¶30).  At $5.5 million, the listing price was less

than 5% above the hoped for selling price leaving room, as is typical, for negotiation.

Upon noting that the listing price was $5.5 million, Filippov asked Kagan [not Tatiana] if

he thought that that the listing price was reasonable.  According to Filippov, Kagan told him that

it was a reasonable listing price and Filippov voiced no further concern.  (Filippov dep. at 92).

Filippov then asked Kagan why both properties were not listed simultaneously, and Kagan

advised that he did not want people to think the two adjacent homes were "cookie cutter" copies

of each other as that could adversely affect the selling price.  (Id.).  Filippov also noted a

discrepancy in the property description set forth in the listing, the square footage of the home

was understated, and had Tatiana fix that listing error.  (Id. at 91).  Lipetsker testified that he too

was aware that the properties were listed at $5.5 million and voiced no objection to that listing

price. (Lipetsker dep. at 48).

When 88 Cutler Lane did not sell as quickly as everyone had hoped, it was removed from

the listing service and the other property, 55 Lyman Road, was listed [in April 2015].  (Filippov

dep. at 92).  Filippov testified that he was also aware of this listing and knew that the listing price

for this property too was $5.5 million.  (Id. at 93).  He again voiced no objection to the $5.5

million listing price.  (Id.).  Filippov testified that he had no conversations whatsoever with

Tatiana about the fact that the properties were listed or about the price at which they were listed.

(Id. at 94).  Thus, the allegations in the adversary complaint are simply not borne out by

Filippov's and Lipetsker's sworn testimony.

c) Filippov Knew of, And Approved, The Execution of the Listing Agreement.

Regarding the allegedly fraudulent execution of the listing agreement for 55 Lyman Road

in April, 2015, once again Filippov's deposition testimony stands in sharp contrast to the

nefarious tale set forth in the complaint.  (Id. at 212-19).   Filippov recalled that both Tatiana and

Kagan reached out to him in April, 2015 about signing a new listing agreement, and he believes

that he may have spoken to both of them about that listing.  (Id. at 213). Tatiana texted him on

April 23, 2015 and asked him to call her about the listing.  Filippov admits he received her text.

(Id.).  He also admits that he received an additional text from Kagan that same day which stated,

"We have to put 55 Lyman on the market and take 88 Cutler off … We need you to sign C21s

agreement to put it on the market."  (Id. at 213, Exh. 23, Perten Exh. 13).  Filippov admits that

on April 24, 2015, Tatiana sent him an unsigned copy of the listing agreement for 55 Lyman

Road to review.  (Id. at 214, Exh. 25; Perten Aff., Exh. 22).  After reviewing the proposed listing

agreement, the only concern he raised related to Tatiana's commission rate.  He raised no other

objection and received a satisfactory response to his question regarding Tatiana's commission

rate.  (Id., Exh, 26, Perten Aff., Exh. 14).

Dan Gersh ("Gersh") is KDC's CFO. (Gersh dep. at 20, Perten Aff., Exh. 15).  On April

28, 2015, he confirmed back to Filippov by e-mail "Per our earlier conversations, **we signed the**

**agreement with C21 to put 55 Lyman on the market**, as agreed.  Please confirm receipt of this

e-mail." (Filippov dep. at 216, Exh. 27, Perten Aff, Exh. 16)([Emphasis added).  Filippov

immediately replied, "I confirm.  Thank you."  Upon receiving Filippov's confirmation, Gersh

responded: "Greatly appreciate the quick response. If you have any questions during the

selling/closing process, please feel free to reach out to me." (Id.)  Later that afternoon, Tatiana

too texted Filippov to confirm that she was authorized to list the properties.  Filippov texted back

"I sent confirming e-mail to Dan [Gersh]".  (Filippov dep. at 212-13; Exh. 22, Perten Aff., Exh.

17).

When shown these texts and e-mails at his deposition, Filippov claimed that he had not

focused on the word "signed" in Gersh's e-mail and simply intended to confirm that the

agreement had been "received". (Filippov dep. at 217).   That does not explain away the separate

confirmation he sent to Tatiana.  Despite the attempt to backtrack, he conceded that he knew that

"they put it on the market and listed it." (Id.).  Filippov also confirmed that despite Gersh's

telling him that the agreement was signed and the property listed, and the fact that Gersh

referenced the selling/closing process that would now proceed,  he never sent any e-mail, text

message or other communication stating that he did not authorize the signing of the agreement or

the listing of the property.  (Id. at 218).  He also conceded that had he told Gersh that he would

not authorize the signature of the listing agreement, Gersh's "Thank you" follow up would have

been quite odd.  (Id. at 219).  The follow-up confirmation from Filippov to Tatiana makes no

sense if, in fact, Filippov had refused to allow the listing to proceed.

d) There Was No Bona Fide Offer.

Although Tatiana's alleged failure to transmit a bona fide offer to purchase figures

prominently in the unsworn allegations against her, discovery has revealed that there was no

bona fide offer.  This allegation too, like so much of the complaint, is patent fiction.  In response

to interrogatories, plaintiffs revealed that the source for their information about the "offer" was

another broker, Deborah Gordon, and that there was no written offer.  (Filippov's Resp. to

Tatiana's Int. No. 3, Perten Aff., Exh. 10).  Ms. Gordon was the agent who ultimately received

the listing for the properties after this Court approved the rejection of the executory Century 21

listing agreements.  It is noteworthy that when the Trustee subsequently moved for authority to

engage Ms. Gordon as the listing agent once the Century 21 contracts were rejected, Debtor

failed to disclose its prior relationship with Ms. Gordon nor that she likely would be a central

witness if there truly was any merit to the allegations regarding the alleged offer.  Similarly, as part of the application to employ her, Ms. Gordon denied any "connection" to Debtor, parties in interest, or creditors.  See Docket No. 47.  Undoubtedly, Filippov kept their relationship secret from the Trustee and this Court so as to reward Ms. Gordon for her potential testimony against Kagan.  While she was rewarded by getting the listing for the properties and earning a commission, based on her deposition testimony, Filippov's hope that she would be a favorable witness for him did not pan out.

Tatiana testified at her deposition that she received a single phone call from Ms. Gordon. Ms. Gordon told her that she had a client that <u>might</u> be interested in making an offer, but it never materialized.  Ultimately, Ms. Gordon told Tatiana that her client elected not to make an offer because the client was not qualified to purchase a home at that price.  (Tatiana dep. at 43, Perten Aff, Exh. 18).  At her deposition, Ms. Gordon did not dispute Tatiana's testimony.  Ms. Gordon too had no memory whatsoever of having her client, a Ms. Franklin, ever actually make an offer for the Lyman-Cutler properties, and no memory of ever speaking with Tatiana about such an offer.  (Gordon dep. at 36-38, 41, Perten Aff., Exh. 19).  She testified that it is not uncommon for a buyer's broker to call and feel out the listing broker as to whether there are other offers or what kind of money the sellers might be looking for, though she had no recollection of doing so on this occasion.  She agreed, however, that until a **written** offer is obtained, there is no binding offer for the listing agent to convey to the seller.  (<u>Id.</u> at 31).  There is no dispute over the fact that there never was a written offer.

<u>ARGUMENT</u>

I.       <u>THERE ARE NO DAMAGES ATTRIBUTABLE TO TATIANA AS THERE IS NO EXPERT
OPINION CAUSALLY CONNECTING HER TO THE LOSSES ALLEGEDLY SUSTAINED.</u>

There is no causal connection between the acts attributed to Tatiana and the damages

which plaintiffs seek to collect.  In interrogatories, Tatiana asked for details as to the damages

which plaintiffs sought to collect from her.  Each of the defendants answered identically:

> [Filippov, Lipetsker, LLC] objects to this interrogatory as premature.  Discovery is
> ongoing and damages are subject to expert analysis and report which will be produced in
> due course.  In general terms, Tatiana is liable for damages for failing to convey the offer
> for 88 Cutler, failing to competently market the Properties, supporting the enforcement of
> listing agreements she knew to be fraudulent, and for participating in the Defendants'
> scheme to overbill the Project.

(Filippov, Lipetsker and Lyman-Cutler Resp. to Tatiana Interrogatory No. 4, Perten Aff., Exh.

20).

After expert disclosures, plaintiffs supplemented their interrogatory responses.  (Perten

Aff., Exh. 20).  Again, each plaintiff provided identical answers to Interrogatory No. 4 which

effectively said nothing:

> Tatiana is equally culpable along with the other Defendants for the wrongful conduct
> described in the LLC's supplemental response to the interrogatories propounded to it by
> KDC, which are incorporated by reference.  The LLC asserts that Tatiana is jointly and
> severally liable for all damages described in those supplemental responses.

As noted in the motion for summary judgment filed by Kagan, KDC and ProExcavation

which discusses the LLC's interrogatory responses to KDC in detail, and which arguments are

incorporated herein by reference, no compensable damages have been claimed against KDC.

Therefore, these same damage claims fail against Tatiana for the same reasons.  More

importantly, plaintiffs have failed to come forward with <u>any</u> evidence that Tatiana is somehow

tied to the alleged fraudulent conduct which led to the damages claimed.  Her sole role was as a

real estate agent.  Accordingly, in this motion, Tatiana will not address the allegations of fraud

11

with respect to the project itself. Unless and until plaintiffs come forward with any evidence that

she actually participated in the alleged fraud, there is nothing to discuss and any element of

damages relating to the construction process cannot be ascribed to her. Tatiana will, however,

address the generalized categories of damages listed in the interrogatory response relating to her

role as real estate agent, notwithstanding that plaintiffs do not appear to be claiming that any

damages actually flowed from her efforts as a real estate broker.[3]

1.  <u>DAMAGES RELATING TO TATIANA'S PERFORMANCE AS A REAL ESTATE
    BROKER.</u>

a)  <u>Damages Relating to the Failure to Convey the Oral Offer</u>

As set forth above, there was no binding offer to convey. At best, there was a phone call

about a potential offer which never came to fruition. Deborah Gordon, the agent who

supposedly transmitted the oral offer, testified that she has no recollection of ever forwarding an

offer to Tatiana and discovery has unearthed no documents to demonstrate an offer was

conveyed. Plaintiffs elected not to depose the supposed offeror, Ms. Franklin. Insofar as there

was no "bona fide" offer, there can be no damages resulting from the failure to have conveyed

that "offer" to Filippov. Moreover, with no written offer there is no evidence that the supposed

offeror was ready, willing and able to purchase the property for $4.5 million or that the offer, if

there was one, was enforceable. M.G.L. c. 259, §1 (statute of frauds relating to contracts for the

sale of an interest in real property). Ms. Gordon testified that the supposed offeror was not

qualified to purchase the property. Without any evidence that there was an offeror ready, willing

and able to purchase the property for 4.5 million, there can be no recovery for the failure to

transmit the alleged oral offer. In fact, in their responses to interrogatories, plaintiffs have not

even claimed any damages relating to Tatiana's alleged failure to convey the "oral" offer. <u>See</u>

---

[3] Tatiana incorporates by reference the arguments as to damages set forth in the pending motion for summary
judgment filed by her co-defendants.

Plaintiffs Supp. Int. Response to the other defendants, Perten Aff. Exhs. 10, 11 and 12, which

plaintiffs incorporated into the supplemental interrogatory responses to Tatiana, Perten Aff., Exh.

20.

      If plaintiffs plan to argue that Tatiana had a duty to disclose the preliminary inquiry and

breached that duty by not advising Filippov about the potential offer, plaintiff would need expert

testimony to establish not only that there was duty to disclose this informal conversation but also

that the failure to disclose an "oral" inquiry is a violation of the duty. Plaintiffs have not

disclosed any such expert.  Accordingly, the fiction regarding the "oral offer" provides no legal

basis for a claim.

    b)  <u>Failure to Competently Market the Properties</u>

      Plaintiffs claim that Tatiana failed to competently market the properties.  Tatiana testified

at her deposition that she held multiple public open houses, multiple broker's only open houses,

advertised, reached out to brokers who typically represent high end purchasers, contacted anyone

she knew who might have a potential buyer, and made multiple individual showings to potential

purchasers.  (Tatiana dep. at 38-41).  Century 21 provided a summary of all the efforts it made.

(Keily Affidavit; Perten Aff., Exh. 21).  No analysis, expert or otherwise, has been provided to

suggest that this effort was substandard.  It is hard to imagine what possible motivation Tatiana

would have to not aggressively market the properties insofar as unless the properties sold, she

would not earn a commission.  Regardless, if plaintiffs seek to establish that her marketing effort

fell below the standard of a reasonably competent real estate agent, they would need an expert to

opine as to how the properties should have been marketed, how Tatiana's efforts fell below the

acceptable standard of care, and then to draw the causal connection between her substandard

efforts and the potential loss, whatever it might be. There is no such expert report.[4]  Therefore,

this argument too provides no legal basis for a claim.

   c)  <u>Supporting the "Fraudulent" Listing Agreements.</u>

      a.  <u>Filippov Knew that the Properties Were Listed and Voiced No Objection.</u>

As set forth above, there were no "fraudulent" listing agreements.  Even if Filippov never

actually saw the written listing agreements, he knew both properties had been listed and

reviewed the listings on-line.  He noted the listing price and even corrected an error in the

property description set forth in the listing.  That notwithstanding, he voiced no objection to the

listing.  Thus, he ratified them in any event.  <u>See</u> <u>Weinberg v. Grand Circle Travel, LLC</u>, 891 F.

Supp. 2d 228, 243 (D. Mass. 2012)(ratification occurs when conduct justifies a reasonable

assumption that the other consents); <u>Lowell Hsg. Auth. v. PSC Intern, Inc.</u>, 759 F. Supp. 2d 104,

109 (D. Mass. 2010)(ratification occurs if principal acquiesces in agents action or fails to

promptly disavow it).   It is also noteworthy, that Tatiana herself did not sign the listing

agreements on behalf of Century 21, yet Century 21 is not named as a defendant in this claim.

      b.  <u>Filippov Knew that the Properties Were Listed for $5.5 million and Voiced No
Objection.</u>

Plaintiffs allege in their pleadings that Filippov never authorized listing the properties at a

price greater than $4.9 million.  Yet, Filippov and Lipetsker both testified at their deposition that

the parties' plan was to sell the properties for between $5-$5.25 million, not $4.9 million as

alleged in the complaint, and that both were aware that the properties had been listed at $5.5

---

[4] Plaintiffs did produce a report by an appraiser, Hugh Fennell, who assessed the value of the properties as of 2016
when they were sold by the Bankruptcy Trustee.  Although he stated that there had been a "lack of effective
marketing," he failed to provide any facts whatsoever to support this conclusion.  In fact, he expressly noted that he
had been provided <u>no</u> information regarding the marketing of the properties.  (Fennell Reports, Addendum, p. 1 of
5).  As such, his gratuitous statement must be disregarded.  A motion in limine to strike Mr. Fennell's testimony is
pending.  His appraisals are annexed to the motion in limine.

million (which given the plan sell for $5.25 million is entirely reasonable, and there is no expert

who opines otherwise).  Most importantly, despite knowing as far back as August, 2014 that the

properties were listed at $5.5 million, Filippov never objected to the $5.5 million listing price.

Thus, any claim of fraud as it relates to listing the properties at $5.5 million instead of $4.9

million is simply unsupported.  Even had Filippov desired to list at $4.9 million, he ratified the

"unauthorized" listing at $5.5 million by his conscious inaction once he learned that the

properties had been listed at $5.5 million. See Weinberg and Lowell Housing, *supra.* There is

also no expert opinion that had the properties been listed at $4.9 million, they more likely than

not would have sold for that price or that listing at $5.5 million somehow chilled a $4.9 million

offer.[5]

      c.   There Is No Evidence That a Listing Agreement of Eighteen Months Duration is
            Improper.

Filippov also claims that the listing agreement for 88 Cutler Lane executed in August

2014, which was for an 18 month period, is for a longer period than is typical in the market and

longer than permitted by the Lyman-Cutler Operating Agreement.  These arguments too do not

make out a claim.

As to the duration of the listing, there is no expert report opining that it is atypical to have

a listing on a high end property, for which there is a limited universe of potential purchasers, for

an 18 month period.  There is also no expert testimony that the duration of the listing agreement

somehow contributed to the inability to sell the properties, especially given the lack of any

proper expert report that Tatiana's efforts to sell were somehow substandard.  Thus, the causal

connection between the duration of the listing agreement and the damages allegedly sustained is

simply missing.

---

[5] If Filippov insisted on listing at $4.9 million, with the expectation that the properties should sell at $5.25 million,
arguably he would have been violating his fiduciary duty to the other members of the LLC.

Contrary to plaintiffs' allegations, the Lyman-Cutler Operating Agreement does not prohibit listing with Tatiana beyond December 31, 2014. Not only does the Operating Agreement not say that, Tatiana is not a party to the Operating Agreement and testified that she had never seen the Operating Agreement. (Tatiana dep. at 22). Thus, whatever the Operating Agreement may say is not binding on her and she cannot be charged with violating it. What the Operating Agreement does provide is that if the members wish to remove the listing from Tatiana prior to December 31, 2014, they can do so only by a vote of 81% of the members. (Operating Agreement, §6.1(b)(6), Perten Aff., Exh. 1). It does not set any outside limit on the duration of any agreement with Tatiana.

> **d.** <u>The April, 2015 Listing Agreement Was Executed With Filippov's Knowledge and Approval.</u>

As to the listing agreement which plaintiffs claim was fraudulently executed in April, 2015, Filippov conceded at his deposition that he <u>did</u> know about it and, in fact, confirmed by e-mail that its execution was authorized. He admitted that he was forwarded a copy of the listing agreement prior to its execution and never sent any written communication objecting to it after he was expressly told it had been signed and the properties listed. He confirmed his assent to both Tatiana and Dan Gersh. Plaintiffs' claim of "fraud" is simply not borne out by the undisputed facts.

Moreover, after his alleged refusal to agree to the new listing agreement, Filippov observed that the property had been listed, ostensibly in contravention of his express instructions. He reviewed the listing on-line and received confirmatory e-mails and texts confirming that the property had been listed and the listing agreement signed, yet voiced no objection whatsoever. Filippov's failure to object after having actual notice that the property had been listed confirms that the contrary allegations in the complaint are pure fiction. Finally, there is no expert opinion

16

drawing a causal connection between the damages allegedly sustained and the execution of that

listing agreement.

     e.  <u>Plaintiffs Have Waived any Objection to the Sale Price of the Properties.</u>

When the Trustee moved to sell the properties, Plaintiffs did not object to the sale price.

Plaintiffs' only objection was that they wanted to ensure that Tatiana did not get a commission

for the sale. (Docket No. 82).  Having assented to the sale at the price offered and having

unilaterally decided to put the company into bankruptcy notwithstanding that it was not

insolvent, it is too late for plaintiffs to now complain that they lost money on the sale. <u>See</u> <u>In re</u>

<u>HHG Corp.</u>, No. 01-B-11982 (ASH), 2006 Bankr. LEXIS 768, at *11-12 (Bankr. S.D.N.Y. May

2, 2006); <u>In re DeArakie</u>, 199 B.R. 821, 827 (Bankr. S.D.N.Y. 1996) (debtor equitably estopped

from enforcing exemption where he "stated that he was not opposed to the sale, and failed to

object to the distribution of the proceeds made by the trustee."); <u>Canino v. Bleau (In re Canino)</u>,

185 B.R. 584, 595 (9th Cir. B.A.P. 1995) (debtor's failure to object to trustee's distribution of

proceeds resulting from the sale of exempt property equitably estopped her from complaining,

two years after the fact, that she should have received a greater share); <u>Folger Adam Sec., Inc. v.</u>

<u>DeMatteis</u>, C.A. NO. 96-4072, C.A. NO. 96-4073, 1998 U.S. Dist. LEXIS 18806, at *9 (E.D. Pa.

Nov. 24, 1998) ("where a creditor has received notice of a Section 363 sale and has failed to

object, it has impliedly consented to the sale.") (*citing* <u>In re Elliot</u>, 94 B.R. 343, 345 (E.D. Pa.

1988)).

     f.  <u>Plaintiff's Expert Real Estate Appraisal Should Be Disregarded.</u>

Plaintiffs have provided an appraisal of the properties as of January 29, 2016 and March

11, 2016, respectively by their expert, Hugh Fennell.[6]   The appraiser concluded that the value of

---

[6] The motion in limine to strike the report of Mr. Fennell and associated testimony is pending and incorporated
herein by reference.

each property as of the 2016 date was $5.1 million. There is no explanation how that 2016

valuation has any relevance to the claims against Tatiana, especially as she was removed as the

listing agent nine months earlier, in June, 2015.  The appraiser does not opine as to the value of

the properties prior to June, 2015, what Tatiana could/should have done differently while she

was the listing agent, whether the listing price was too high, or that Tatiana, somehow, was the

cause for the delayed sale of the properties or price received in 2016 after plaintiffs unilaterally

decided to place Lyman-Cutler into bankruptcy.  Although the report touches on real estate

issues, it does not tie Tatiana into any malfeasance.  As there is no expert report discussing any

of the transgressions that plaintiffs ascribe to Tatiana and how they tie to the sale price of the

properties, the appraisal should be disregarded.

    2.  <u>CLAIMS RELATING TO THE ALLEGED FRAUDULENT PROJECT BILLINGS</u>

       a.  <u>Damages Due to Overbilling on the Project</u>.

Separate from damages flowing from her alleged acts or omissions as a real estate agent,

plaintiffs claim that Tatiana should be liable for damages caused by the "fraudulent scheme [by

KDC] to overbill the Project."   As noted in the parallel motion filed by Tatiana's co-defendants,

plaintiffs have failed to identify any such fraud or damages which flow from the allegedly

improper records.  Even had they found something, there is virtually no evidence that ties

Tatiana to any aspect of this "scheme." There is no evidence that refutes Tatiana's sworn

testimony that she had nothing to do with the project funding, project billing, and knows nothing

about cost overruns.  None of the Plaintiffs ever dealt with Tatiana outside of her role as listing

agent, and there were no communications with her on billing or construction issues.  She was not

responsible for preparing the project billings and is not a signatory to the Lyman-Cutler bank

account.  She had no role in their work on the project, other than helping choose paint colors, nor

on the billing for that work.  As noted in the parallel summary judgment motion filed by

Tatiana's co-defendants, plaintiffs have also not alleged any damages flowing from the alleged

fraudulent overcharging.  This Court need not waste any further time analyzing whether Tatiana

participated in the alleged fraud dealing with KDC's books and records.  Even if there was fraud

by the other defendants, a proposition which is vehemently denied, there is nothing tying Tatiana

to those alleged transgressions.  If the Court wishes a more detailed discussion on those

allegation, Tatiana incorporates by reference the analysis provided in her co-defendants' parallel

motion for summary judgment.

The only connection that Tatiana has to the project, outside of her efforts as a real estate

broker, is that she is married to Kagan and, on paper, an officer/director of KDC and

ProExcavation.  Those facts alone are not sufficient to expose her to personal liability for the

alleged corporate transgressions.  See M.G.L. c. 156D, §6.22(b) (shareholders not liable for

corporate obligations absent some personal transgressions).  Plaintiffs have failed to identify any

specific transgressions by Tatiana nor any causal connection to the losses allegedly sustained as a

result thereof.   The failure to identify any conduct attributable to Tatiana relating to the project

construction and its billing, is fatal to the claims against her.

II.    PLAINTIFFS HAVE FAILED TO PLEAD DETRIMENTAL RELIANCE

Count IV sought to hold Tatiana liable for fraud.  "[T]o recover in an action for deceit,

'the Plaintiff must prove "that the defendant made a false representation of a material fact with

knowledge of its falsity for the purpose of inducing the Plaintiff to act thereon, and that the

Plaintiff relied upon the representation as true and acted upon it to [its] damage.'"  Totalizing

Sys. v. PepsiCo, Inc., 29 Mass. App. Ct. 424 , 431 (1990), citing, Danca v. Taunton Sav. Bank,

385 Mass. 1 (1982) (citations omitted).  See also Restatement (Second) of Torts § 525 (1977)

("One who fraudulently makes a misrepresentation of fact, opinion, intention or law for the

purpose of inducing another to act or to refrain from action in reliance upon it, is subject to

liability to the other in deceit for pecuniary loss caused to him by his justifiable reliance upon the

misrepresentation").

Plaintiffs have failed to plead any reliance on the allegedly fraudulent acts by Tatiana.

Reliance is an essential element of the tort of fraud. The only paragraph in the entire complaint

that even mentions reliance is paragraph 17, and that pleads reliance on Kagan's, not Tatiana's,

representations during the parties' initial meeting in October, 2012.  Tatiana was not even at that

meeting and there is no evidence that she had anything to do with the presentation at that

meeting.   Standing alone, Debtor's failure to plead any reliance on Tatiana's acts is fatal to all

the claims against her based on the alleged fraud.  See Sebago, Inc. v. Beazer E., Inc., 18 F.

Supp. 2d 70, 95 (D. Mass. 1998) (Plaintiff must "plead reliance with particularity."); Lambert v.

Leary, No. 05-3422, 2006 Mass. Super. LEXIS 63, at *12 (Feb. 14, 2006) (Plaintiff's fraud claim

failed because, inter alia, he failed to plead reliance); see also Collins v. Huculak, 57 Mass. App.

Ct. 387, 389 (2003) (fraud claim failed because could not establish justifiable reliance).  See

Masingill v. EMC Corp., 449 Mass. 532, 541 (2007) (Plaintiff could not establish the necessary

element of reasonable reliance upon alleged oral misrepresentations that contradicted the terms

of the written contract); see also Sebago, Inc., 18 F. Supp. 2d at 95; Collins, 57 Mass. App. Ct. at

389.  Accordingly, the fraud and fraud based claims should be dismissed.

## III. DEBTOR HAS FAILED TO PROPERLY PLEAD A CLAIM FOR CIVIL CONSPIRACY.

Count V alleges, in conclusory fashion, that "Through the conduct described herein, the

Defendants have conspired to defraud the Plaintiffs."  (Amd. Cmp., ¶70).  The form of civil

conspiracy which appears applicable to this case "is more akin to a theory of common law joint

liability in tort." Aetna Cas. Sur. Co., 43 F.3d at 1564.  It requires "a common design or an

agreement, although not necessarily express, between two or more persons to do a wrongful act

and, second, proof of some tortious act in furtherance of the agreement." Id. Other than the

unsupported allegations in the complaint, the totality of the "facts" supporting the conspiracy

claim amount to a generic, conclusory-based statement that Defendants "conspired" to "defraud"

the Plaintiffs. See Amd. Cmp., ¶70.

Plaintiffs' responses to interrogatories shed no light on this count. In response to the

question as to what predicate acts Tatiana took in furtherance of the conspiracy, Plaintiffs fall

back on their broad conclusory allegations instead of coming forward with specific facts. See

Plaintiffs' Resp. to Tatiana Int. No. 5, Perten Aff., Exhs. 10, 11 and 12. They list the following

conclusions, each of which is completely undermined by Filippov's deposition testimony:

a) "Tatiana conspired with Kagan when they reached an agreement for Tatiana to

   continue to serve as the LLC's agent far beyond the time permitted and authorized in

   the Operating Agreement." As set forth above, Tatiana never saw the Operating

   Agreement, is not a signatory to the Operating Agreement, and it does not cap the

   duration of any listing agreement. Finally, there is no expert opinion that the duration

   of the listing agreement was improperly long or that the length of the agreement

   contributed to the delay in selling the properties.

b) "by agreeing to list the Properties for sale at a price that was never approved or

   authorized by the LLC". Filippov's testimony was unequivocal that he knew that the

   properties were listed at $5.5 million and voiced no objection. This allegation is

   simply not supported. There is no expert testimony that listing at $5.5 million

   contributed to the inability to sell the properties as quickly as hoped.

21

c) "by failing to communicate a bona fide offer she did receive to Filippov, the LLC's

   Managing Member."  As noted, there was no "bona fide offer" and, in fact, the agent

   who supposedly solicited that offer has no memory of ever receiving an offer for the

   property.  Moreover, there is no expert testimony establishing any duty to convey an

   "oral" offer, assuming one was even made.  And, no damages are claimed relating to

   this alleged transgression.

d) "Tatiana furthered this conspiracy by signing a fraudulent listing agreement with

   Kagan".  Tatiana did not sign any of the listing agreements.  More importantly, as

   discussed above, the listing agreement was forwarded to Filippov, and he confirmed,

   in writing, to both Tatiana and Dan Gersh that he the execution of that agreement.

e) "by participating in the decision to inflate the listing price".  While there may be a

   dispute as to how the parties arrived at the initial listing price, there is no dispute that

   Filippov knew that the properties were listed at $5.5 million and voiced no objection.

   Moreover, there is no evidence that the listing price was "inflated."  Filippov testified

   that the anticipated sale price was $5.25 million.  With this as the projected sale price,

   listing the properties at $5.5 million certainly does not qualify as inflated.  And, there

   is no expert to opine that this price was too high.

f)  The fact that Tatiana is married to Kagan, and that she is an officer/director of KDC

   and ProEx, without anything more, is simply not enough to infer some sort of

   nefarious agreement, especially given her unrefuted testimony that she had nothing to

   do with the project construction.  See M.G.L. c. 156D, §6.22(b) (shareholders not

   liable for corporate obligations absent some personal transgressions).

Count V should be dismissed.

IV. AS TO TATIANA, NO UNFAIR AND DECEPTIVE PRACTICE IS PLEAD. THEREFORE, COUNT VI FAILS.

In Count VI, the Debtor claims that the defendants violated Chapter 93A. This violation is predicated exclusively on Tatiana "asserting two knowingly unauthorized and fraudulent listing agreements." Given that Filippov not only knew about the listing agreements, but approved them, this claim fails. Additionally, although Tatiana was the agent, each of the agreements was with Century 21, not with Tatiana, individually.

V. COUNTS III ALLEGING "AIDING AND ABETTING" BREACH OF FIDUCIARY DUTY FAILS AS A MATTER OF LAW.

Count III must also be dismissed because Plaintiffs fail to allege the necessary elements to support a claim for aiding and abetting breach of fiduciary duty. "[T]he tort of aiding and abetting a fiduciary breach are: (1) there must be a breach of fiduciary duty, (2) the defendant must know of the breach, and (3) the defendant must actively participate or substantially assist in or encourage the breach to the degree that he or she could not reasonably be held to have acted in good faith." Arcidi v. Nat'l Ass'n of Gov't Employees, Inc., 447 Mass. 616, 623-24 (2006). In R. Wojtkun, 534, B.R. 435, 459 (D. MA 2015). Even assuming, *arguendo,* that Kagan breached his fiduciary duty, no facts are alleged to establish that Tatiana knew of Kagan's breach – much less that she actively participated or substantially assisted in or encouraged the breach to the degree that she could not reasonably be held to have acted in good faith. Accordingly, Count III fails.

VI. TATIANA IS ENTITLED TO JUDGMENT ON HER PROOF OF CLAIM NO. 5.[7]

Tatiana filed a proof of claim (Claim No. 5) seeking indemnity under Section 10.2 of the Operating Agreement. Section 10.2 provides:

---

[7] Claim No. 5 corresponds to Count VI in Tatiana's counterclaim.

> The Company shall indemnify and hold harmless the Members and their respective employees and authorized agents from and against any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member, employee or authorized agent in good faith on behalf of the Company and reasonable believed to be within the scope of authority conferred by this Agreement, except that no Member, employ or authorized agent shall be entitled to be indemnified or held harmless from or against any loss, damage or claim incurred by reason of such Member's, employee's or authorized agent's gross negligence or willful misconduct.

Plaintiffs bear the burden of proof to come forward with "substantial evidence" to support their objections.  Arcari v. Marder, 225 B.R. 253, 255 (Bankr. D. Mass. 1998); In Re Colonial Bakery, Inc., `08 B.R. 13, 15 (Bankr. D.R.I. 1989).

Plaintiffs filed a bare bones objection.  First they claim that Tatiana was not an authorized agent.  This is in direct contravention of the Operating Agreement itself which specifically identifies Tatiana as the listing agent.  (Oper. Agr., §6.1(b)(6)).  Next, plaintiffs fall back on their unsupported mantra that she acted with gross negligence and/or willful misconduct.  There is no expert report establishing gross negligence (in fact the adversary complaint does not even allege negligence), and there are no facts that support a finding of willful misconduct or gross negligence by Tatiana.  Although plaintiffs try to tar Tatiana with the alleged transgressions they attribute to Kagan, KDC and ProExcavation, as discussed above, she has no connection to that alleged malfeasance and plaintiffs are unable to come forward with substantial evidence to support their objection.  Therefore, plaintiffs' objection to Claim No. 5 should be overruled and the claim allowed.

## CONCLUSION

Based upon the foregoing, Tatiana respectfully requests that counts against her in Plaintiffs' Amended Complaint be dismissed and that plaintiffs' objections to Claim No. 5 (which corresponds to Count VI of Tatiana's counterclaim) be overruled and the claim allowed.

TATIANA KAGAN,

By her attorneys,

/s/ John H. Perten, Esq.
John H. Perten (BBO# 548728)
SHEEHAN PHINNEY BASS & GREEN, P.A.
255 State Street, Fifth Floor
Boston, MA 02109
(617) 897-5600
jperten@sheehan.com

Dated:  November 16, 2018

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of November, 2018, a copy of the foregoing was

served upon the parties listed below via ECF and/or first class mail, postage prepaid.

Eric K. Bradford
Office of the US Trustee
J.W. McCormack Post Office & Courthouse
5 Post Office Sq., 10th Fl, Suite 1000
Boston, MA 02109

Joseph P. Calandrelli
O'Connor Carnathan and Mack LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

Sean T. Carnathan
O'Connor, Carnathan and Mack, LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

Stephen G. DeLisle
Rubin and Rudman LLP
50 Rowes Wharf
3rd Floor
Boston, MA 02110

David B. Madoff
Madoff & Khoury LLP
124 Washington Street - Suite 202
Foxborough, MA 02035

Amy M. McCallen
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110

Steffani Pelton Nicholson
Madoff & Khoury LLP
124 Washington Street
Foxborough, MA 02035

David C. Phalen
Hackett Feinberg P.C.
155 Federal Street, 9th Floor
Boston, MA 02110

Sarah A Smegal
Hackett Feinberg P.C.
155 Federal Street
9th Floor
Boston, MA 02110

Peter N. Tamposi
The Tamposi Law Group
159 Main Street
Nashua, NH 03060

/s/ John H. Perten
John H. Perten