UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

_____

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| _____ | ) | |
| _____ | | |
| | ) | |
| LYMAN-CUTLER, LLC, | ) | |
| ALEX FILIPPOV and | ) | |
| NICKOLAY LIPETSKER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| Defendants in Counterclaim, | ) | |
| | ) | Adv. Proc. No. 16-01120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, TATIANA KAGAN, | ) | |
| KAGAN DEVELOPMENT KDC, CORP. | ) | |
| and PROEXCAVATION CORP. | ) | |
| | ) | |
| Defendants, | ) | |
| Plaintiffs in Counterclaim. | ) | |
| _____ | ) | |

MEMORANDUM OF VADIM KAGAN, KAGAN DEVELOPMENT KDC, CORP. AND
PROEXCAVATION CORP. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON
THE AMENDED COMPLAINT AND CLAIM NOS. 1, 4, 6 AND 7

Despite years of litigation and examination by purported experts, and hundreds of

thousands of dollars spent on litigation, plaintiffs have been unable to unearth a single fraudulent

project charge in support of their nefarious tale.  As such, the entire complaint, which is

predicated on the existence of fraud, fails.  Moreover, plaintiffs have failed to identify any

recoverable damages, an essential element of each claim, caused by the alleged acts or omissions

of defendants.  Additionally, the Operating Agreement which governs the parties' relationship

specifically precludes recovery of many of the damages plaintiffs now seek.  Finally, the lack of

expert support for the allegations of fraud and poor workmanship is fatal to the claims asserted.

FACTS[1]

Plaintiffs Alex Filippov ("Filippov") and Nickolay Lipetsker ("Lipetsker") claim that

Vadim Kagan ("Kagan") induced them to enter into a development project based upon his

assurance that he would complete construction of two homes at a fixed cost of $1.6 million each,

including carrying costs.  (Amd. Cmp., ¶¶14-17).  In furtherance of the project, the parties

formed Lyman-Cutler, LLC (the "Debtor") and executed an Operating Agreement that governed

their relationship.  (Id. at ¶¶16, 53; Operating Agreement ("OA"), Perten Aff., Exh. 1).  The

Operating Agreement expressly delegated the construction of the homes to Kagan.  (Id. at ¶25;

OA, §5.2).  It provided that for the first 23 months following acquisition of the underlying

properties, or until November 30, 2014, the Debtor would be responsible for paying carrying

costs, defined as mortgage payments, taxes and insurance.  (Id., §§4.1, 4.2).  It also contemplated

that the properties may not sell by November 30, 2014 and, if so, obligated Kagan to pay the

carrying costs.  (Id., §8.1).  If Kagan did not pay the carrying costs, the Operating Agreement

puts that responsibility on Filippov.  (Id.).  In that event, the Operating Agreement provides that

Kagan's capital account and percentage interest in the Debtor would decrease by the amount

Filippov advanced while Filippov's capital account and percentage would increase.  (Id.).

To finance the construction, Debtor took out two construction loans in the amount of $1.6

million each.  (Amd. Cmp. at ¶21; OA, §4.1).   Construction proceeded through Kagan's

construction company, Kagan Construction KDC, Corp. ("KDC").  To reduce costs and increase

---

[1] The facts are based upon the allegations of the complaint and deposition testimony which, for purposes of this motion only, must be accepted as true.  Power Control Devices, Inc. /V. Orchid Technologies Eng'r and Consulting, Inc., 980 F. Supp. 2d 435, 440 (D. Mass. 2013); Powers Law Office, P.C. v. Cable and Wireless USA, Inc., 326 F.Supp. 2d 190, 191-92 (D. Mass. 2004).  Copies of deposition excerpts and documents referenced in this memorandum are annexed to the Perten Affidavit filed simultaneously herewith.

efficiency, KDC subcontracted some of its work to another of Kagan's companies, ProExcavation Corp. ("ProExcavation"). The Debtor drew down the full amount of the construction loans. (Amd. Cmp., ¶24). Filippov had online access to the Debtor's bank accounts, received monthly bank statements and copies of all checks. His wife kept the Quickbooks account for the Debtor. (Filippov dep. at 69, 72; Perten Aff., Exh. 2). Filippov's wife communicated regularly with KDC's bookkeeper during construction. (Brusenkova dep. at 60, Perten Aff., Exh. 3; Filippov dep. at 71).

After completion of construction, Kagan advised Filippov that the Debtor had incurred significant costs beyond the amount of the construction loans, for which KDC was to be reimbursed upon the sale of the two homes. (Id.; Kagan dep. at 98, 218-21, Perten Aff., Exh. 4). Despite the expectations of the Debtor, the properties did not garner any offers after being on the market for several months. Kagan suggested that they reduce the selling price in effort to get them sold. He further advised Filippov that although the Debtor had been obligated to pay the carrying costs for the first 23 months, Kagan had been voluntarily fronting those costs and no longer wished to carry the burden of paying carrying costs alone. (May 7, 2015 letter; Perten Aff., Exh. 5).

Filippov claimed to be blindsided by the news that the construction costs exceeded his expectations. (Amd. Cmp., ¶¶22, 37). Without any evidence, he accused Kagan of falsifying KDC's financial records, over-charging, double billing, failing to credit refunds or returns, and charging the Debtor for materials purchased for other projects. (Id., ¶¶46-49, 54, 64). He filed suit against Kagan in the Middlesex Superior Court alleging fraud. Kagan, at that point, stopped paying the carrying costs, and Filippov, as required under the Operating Agreement, became obligated to pay the ongoing carrying costs. (OA, §8.1).

Meanwhile, KDC, who was owed significant monies for the construction, recorded a mechanics lien against the properties.  As required by statute, it filed suit to perfect its lien.  The two state court proceedings were consolidated, and then stayed upon filing of the bankruptcy.

Pursuant to the Operating Agreement, the Debtor was obligated to dissolve on November 30, 2015.  (OA, §2.3).  Upon dissolution, the Debtor's assets were to be liquidated. (Id., §9.2). Despite the fact that this was part of the deal he agreed to, Filippov did not want to liquidate.  He also did not want to pay carrying costs, despite his obligation to do so, and was clearly frustrated at his inability to address KDC's mechanics lien.  Unilaterally, though with the acquiescence of Lipetsker, Filippov determined that by filing a petition for bankruptcy under Chapter 11, he could avoid his obligations under the Operating Agreement by not having to dissolve the entity or continue paying carrying costs.  He also presumed that a bankruptcy would stave off a foreclosure by either the bank or KDC under its lien.  (Filippov dep. at 112-13, 122, 128-29). Without consulting Kagan, he caused the Debtor to file a Chapter 11 petition.  (Id. at 113).

Shortly after filing the petition, the Chapter 11 Trustee (who was appointed without objection), moved to convert the case to Chapter 7 as the only remaining business of the Debtor was to liquidate its two assets which could be done more efficiently and economically in a Chapter 7.  (Docket No. 44).  The Debtor did not object to the conversion.  The Chapter 7 Trustee moved for authority to engage a real estate broker to list and sell the properties.  (Docket No. 47).  The listing price for each home was to be $4.5 million.  The Trustee's motion was allowed, again without objection.  Some months later, the Trustee received offers to purchase the homes for $4.4 million each.  Again without objection[2], the Court approved the sale of the homes

---

[2] Debtor did file a limited objection to ensure that Tatiana Kagan, Kagan's wife, who was the real estate agent designated in the Operating Agreement, would not earn a commission.

at the offered price.  (Docket Nos. 67, 75).  After paying the secured lender, the Trustee is

holding approximately $3.5 million in escrow.

The only parties interested in the escrowed funds are plaintiffs and defendants.  KDC

filed two proofs of claim.  Claim No. 1 sought recovery for the amounts expended beyond the

payments made by the construction loans for completing the construction.  Debtor filed an

objection to Claim No. 1.  KDC's second proof of claim, Claim No. 4, was for indemnity under

Section 10.2 of the Operating Agreement.  No objection was ever filed against Claim No. 4.

Kagan and ProExcavation also filed claims for indemnity under Section 10.2.  (Claim Nos. 6 and

7).  As against these, Debtor filed a bare bones objection.  (Docket Nos. 141 and 142).

Over two months after the bar date, Filippov filed a late proof of claim seeking the

recovery of an alleged $200,000 loan to the Debtor, secured by a mortgage that he granted to

himself on the eve of the bankruptcy filing.  (Claim No. 9).  Filippov failed to respond to

defendants' objections to that claim and this Court initially stated that, as a result, the claim

would be rejected. The Court ultimately decided to give Filippov a second chance despite his

lateness.  (Docket No. 212).  Filippov explained at his deposition that the loan was an aggregate

of monies he deposited to the Debtor over time.  At his deposition, he was unable to identify the

specific entries in the Debtor's QuickBooks ledger which reflected the loan amounts.  In that

ledger, all of Filippov's deposits are labelled "Alex Filippov Investments."  Filippov initially

testified that these "investments" were capital contributions but then explained that labelling

them as "investments" was an error as some of them were loans, though he still could not

identify which deposits were capital contributions as opposed to loans.  (Filippov dep. 256-60).

Filippov's counsel also filed a proof of claim which this Court initially stated would be

rejected due to failure to file a timely response to defendants' objection. (Claim No. 2).  Here

too, the Court exercised its discretion, and gave plaintiffs a second chance.  (Docket No. 213).

Filippov admitted that counsel represented not just the Debtor but also himself, individually,

notwithstanding that counsel seeks to have his entire fee paid by the Debtor.  (Id. at 266-68).

Lipetsker, Filippov and Kagan each also filed a proof of interest. (Claim Nos. 10, 11, and

12, respectively).  Filippov claimed that his equity interest increased from the amount stated in

the Operating Agreement due to the fact that he paid carrying costs once Kagan ceased doing so.

According to Filippov, these payments resulted in an increase of his equity and a decrease to

Kagan's under Section 8.1 of the Operating Agreement.  (Id. at 269-70).

Despite having filed their proofs of claim, the Debtor, Filippov and Lipetsker filed an

adversary complaint seeking an affirmative recovery, essentially mirroring the basis for their

objections to defendants' proofs of claim.  In summary, they accused Kagan, KDC and

ProExcavation of massive fraud as to the actual costs of construction and of shoddy

workmanship.  Tatiana Kagan ("Tatiana"), whose only role was as a real estate agent, was named

simply because she was married to Kagan and was also an officer or director of his companies.[3]

(Amd. Cmp., ¶¶28, 35).  The defendants answered and counterclaimed.  (Docket No. 106).

Despite the defendants' repeatedly stated position that the plaintiffs' fraud allegations

amounted to nothing more than a fishing expedition, the parties commenced an extensive

discovery process.  Filippov, Lipetsker and the Debtor were provided and examined each and

every project invoice, proposal and QuickBooks entry for the Debtor, KDC and ProExcavation.

They deposed all the parties, subpoenaed credit card and phone records, and deposed KDC's

accountant.  They obtained leave to examine the financial doings of five other projects that were

occurring simultaneously, ostensibly to find evidence that Kagan was charging the Debtor

project for labor and materials used on those other projects.  They resisted, vehemently,

---

[3] Tatiana is simultaneously filing her own motion for summary judgment, and joins in the relief requested hereunder.

defendants' every effort to force them to identify, with particularity, the allegedly fraudulent

transactions, promising that this information would be revealed after completion of discovery

through expert reports.

Discovery is now complete and expert disclosures have been exchanged.  Despite their

broad and unencumbered examination, plaintiffs have failed to uncover any damages caused by

KDC's and ProExcavation's allegedly "cooked books."  In response to interrogatories seeking

itemization of damages, **plaintiffs have not identified any damages attributed to supposedly**

**fraudulent charges**.  As to other claimed damages, those damages are either barred by the

express terms of the Operating Agreement or fail because plaintiffs have not satisfied their

burden to establish a causal link between defendants and the alleged damages.  In summary, this

case has been nothing but a costly litigation strategy that has only accomplished a delay in the

disbursement of the sale proceeds and the needless running up of legal fees.

I.     <u>PLAINTIFFS HAVE FAILED TO COME FORWARD WITH ANY
AFFIRMATIVE EVIDENCE OF DAMAGES.</u>

The plaintiffs were supplied with binders of invoices, checks and credit card statements

supporting KDC's claim.  Notwithstanding the ample support for KDC's charges, the plaintiffs

created an entirely false narrative of widespread fraud and malfeasance.  Despite having been

granted the opportunity for extensive discovery, the plaintiffs have uncovered no evidence that

KDC or ProExcavation intentionally falsified their books and records.  However, as there is no

evidence of any compensable damages, this Court does not even have to reach this issue.

<u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 322 (1986)(summary judgment appropriate where non-

moving party cannot come forth with affirmative evidence to support its claim).

a)   Damages Relating to the Allegations of Fraudulent Charges by KDC and
      ProExcavation.

Despite years of assertions that Kagan orchestrated a conspiracy to "cook" KDC's and

ProExcavation's books, plaintiffs have failed to identify a single dollar spent in reliance on this

alleged fraud.  According to plaintiffs, the cost of construction for each home, with carrying

costs, was fixed at $1.6 million ($1.3 million construction, $200,000 carrying costs, $100,000

contingency).  (Amd. Cmp., ¶15; Filippov dep. at 41, 74-75,155-56, 204-05; Lipetsker dep. at

29, Perten Aff., Exh. 6).  Assuming this to be true for purposes of this motion, as a fixed price

contract, the actual cost of construction is irrelevant.  With a fixed price contract, whether the

homes actually cost $10 million or $10, the price was $1.6 million.  Filippov clearly understood

this.  When asked if he was concerned that Kagan may have been making deposits to and

withdrawing monies out of the Debtor's account he stated:

> No, but it wasn't my concern.  **It was a fixed-price project**.  I didn't really care much.
> All I cared, that we didn't blow the bank account, and we wouldn't need to deal with
> Rockland Trust.  But how he [Kagan] deposit, take money back, its his business.

(Filippov dep. at 74)(Emphasis added).  Thus, while plaintiffs can object to KDC's proof of

claim seeking additional monies if they have "substantial evidence" that the supporting records

are false, as it relates to their claim for an affirmative recovery, whether KDC's actual costs were

"inflated" or not is irrelevant as plaintiffs allege a fixed price contract.  The only basis for an

affirmative recovery would be if the plaintiffs actually paid more than the contracted price in

reliance on allegedly false and inflated invoices.   They have not.

Plaintiffs have failed to identify any damages relating to the allegation that KDC

fraudulently claimed monies beyond the fixed price amount.  In interrogatories, defendants asked

each plaintiff to itemize damages.  None of them itemized a single penny overpaid in reliance on

the allegedly falsified records.[4]  A careful review of their forensic accountant's 41-page report, despite raising all sorts of supposedly questionable entries in KDC's and ProExcavation's accounts, failed to reveal a single dollar paid beyond the supposed fixed price.  As such, whether KDC's/ProExcavation's records are accurate or not is a red herring.

     b)  <u>Plaintiffs Have No Valid Claim For Damages Relating To The Allegedly Depressed Sale Price Of The Properties In 2016.</u>

Plaintiffs claim entitlement to the delta between the property sale price obtained by the bankruptcy Trustee in 2016 and the fair market value of those properties at that time.  The Debtor's supplemental response to KDC's damage interrogatory, incorporated into the other plaintiffs' responses, was:

> [b]ecause of Kagan's [not ProExcavation's or KDC's] wrongful conduct… the LLC was subjected to a false mechanics' lien and self-dealing realtor listing agreements, and forced into bankruptcy which resulted in a distressed sale of the LLC's two primary assets … The LLC's damages include the difference between the selling price of the properties - $4,400,000 per house – and the fair market value each house would have sold for but for Kagan's [not ProExcavation or KDC] conduct - $5,100,000 per house.  The damages for the diminished selling price of the homes equal $1.4M, plus interest.  The LLC will rely on expert testimony by Morgan Fennell as set forth in his two expert reports one for 55 Lyman Road and one for 88 Cutler Lane, produced on July 30, 2018.

(Debtor's Supp. Resp. to KDC Int. No. 9, Perten Aff., Exh. 7).  This damage claim fails because there is no admissible evidence establishing either a diminished price or that the allegedly low sale price was causally connected to defendants' alleged acts or omissions.  Moreover, the sale price in 2016, has nothing to do with defendants' alleged conduct which ceased no later than June, 2015 when Filippov took over the project.

---

[4] Fillipov Supp. Resp. to KDC Int. No. 9, Kagan No. 2, ProExcavation No. 8, Perten Aff., Exh. 7; Debtor Supp. Resp. to KDC Int. No. 9, Kagan No. 2, ProExcavation Int. No. 8, Perten Aff., Exh. 8; Lipetsker Sup Response to KDC Int. No. 10, Kagan Int. No. 2 , ProExcavation Int. No. 8, Perten Aff., Exh. 9.

Plaintiffs' expert, Hugh Fennell, appraised the properties as of March 11, 2016 (for 55 Lyman Road) and as of January 29, 2016 (for 88 Cutler Lane).[5] These dates correspond to the dates that the bankruptcy Trustee sold the properties. Mr. Fennell opined that as of the 2016 dates the fair market value of each property was $5.1 million. What is missing, however, is any discussion of the causal link between the allegedly "false mechanics' lien," "self-dealing realtor listing agreements" and "forced bankruptcy" which plaintiffs claim to be the cause of the supposedly low sale price.

Significantly, Mr. Fennell offers no opinion of value as of November, 2014, the date by which plaintiffs claim the properties should have sold according to their agreement, (Amd. Cmp., ¶¶25-27), or even 2015 when plaintiffs took over the project. Additionally, no information is offered to compare the value of the properties in 2014 or 2015 with the value in 2016 to determine if there even was a loss. The mere fact that in 2016 the properties were valued higher than their sale price in 2016, by itself, establishes nothing. Conspicuously absent from Mr. Fennell's report is any analysis to support an opinion that but for defendants' conduct, more likely than not and to a reasonable degree of professional certainty, there would have been a buyer, ready, willing and able to purchase the properties for at least $5.1 million each in 2014 or 2015. A valuation in 2016, with nothing tying it to the allegations in the complaint, is worthless.

Without objection, the Trustee listed the properties for sale at $4.5 million in November 2015, thereby virtually assuring that there would not be an offer for $5.1 million. (Docket No. 47). Mr. Fennell offers no opinion as to the value of the property at the time of that listing, nor does he opine that any conduct by the defendants somehow caused the Trustee to list at that amount. And, having failed to object to the Trustee's listing price, plaintiffs are estopped from

---

[5] Simultaneously herewith, defendants have moved in limine to preclude any testimony by Mr. Fennell. That motion is incorporated herein by reference. Copies of his reports are annexed to that motion.

now complaining.  See In re HHG Corp., No. 01-B-11982 (ASH), 2006 Bankr. LEXIS 768, at

*11-12 (Bankr. S.D.N.Y. May 2, 2006); In re DeArakie, 199 B.R. 821, 827 (Bankr. S.D.N.Y.

1996) (debtor equitably estopped from enforcing exemption where he "stated that he was not

opposed to the sale, and failed to object to the distribution of the proceeds made by the trustee.");

Canino v. Bleau (In re Canino), 185 B.R. 584, 595 (9th Cir. B.A.P. 1995) (debtor's failure to

object to trustee's distribution of proceeds resulting from the sale of exempt property equitably

estopped her from complaining, two years after the fact, that she should have received a greater

share); Folger Adam Sec., Inc. v. DeMatteis, C.A. NO. 96-4072, C.A. NO. 96-4073, 1998 U.S.

Dist. LEXIS 18806, at *9 (E.D. Pa. Nov. 24, 1998) ("where a creditor has received notice of a

Section 363 sale and has failed to object, it has impliedly consented to the sale.") (citing In re

Elliot, 94 B.R. 343, 345 (E.D. Pa. 1988)).  Plaintiffs also did not object to the Trustee's motion

for authority to sell for $4.4 million. (Docket Nos. 67, 75).  Having failed to timely object, it is

now too late to cry foul.

     Even if Mr. Fennell's valuation as of 2016 had any relevance to this dispute, there can

still be no recovery.  According to the Debtor's self-serving interrogatory response, three alleged

transgressions chargeable to defendants lead to the diminished sale price: the mechanics lien, the

"self-serving" listing agreements, and the "forced" bankruptcy.  This causal link between those

items and the sale price, however, is not established by Mr. Fennell's reports.

    1.  The "Forced" Bankruptcy.

     Mr. Fennell offers no analysis of the allegedly "forced bankruptcy" or its impact on the

sale price.[6]  The filing of the Chapter 11 petition was a unilateral and misguided decision by

Filippov.  According to the bankruptcy schedules, the Debtor was not insolvent at the time of the

---

[6] In his reports, Mr. Fennell refers generally to a "legal dispute," with no analysis as to how it may have affected the
sale price.  (Fennell Reports, Addendum, p. 1 of 5).

petition.  It had assets valued at approximately $9.7 million against liabilities of approximately

$7.4 million.  (Docket No. 1).  At his deposition, Filippov admitted that he did not discuss filing

the petition with Kagan, despite the fact that Kagan was a member of the Debtor and a vote was

required.  (Filippov dep. at 113).  Thus, nothing was "forced" onto Filippov by Kagan.  Filippov

explained that he put the Debtor into bankruptcy because he did not want to dissolve it on

November 30, 2015, as required by the Operating Agreement, as that would have triggered a

liquidation of the properties.  (Id. at 112, 122; OA, §§2.3, 9.1 and 9.2).  However, liquidation

was the only logical outcome in the bankruptcy, so Filippov's logic was flawed.  Filippov was

also concerned that the loans might be called, apparently not recognizing that filing a bankruptcy

petition does not "undo" a default and, because the bank held a mortgage, obtaining leave to

foreclose would likely prove relatively routine.  (Fillipov dep. at 112).  Filippov also unilaterally

determined that no "reasonable buyer" would buy the property if there was a lien, (Id. at 122),

though no expert backs up his assertion.

At his deposition, Filippov candidly admitted that although he understood that

bankruptcy could adversely affect the sale price, he believed that he could avoid this problem by

filing Chapter 11.  As he explained:

> I wasn't expecting that it was going to have to be Chapter 7 bankruptcy.  I was expecting
> that I was going to be selling the houses [as a debtor-in-possession]; not the trustee whose
> only goal is just to get rid of it.  So, it wasn't obvious to me when I was putting in the
> bankruptcy that its going to be sold for less.  All I was caring was that that would remove
> the lien of the property, and we would be able to sell it.

(Fillipov dep. at 128-29).  See Lipetsker dep. at 55-56.

There was no guarantee that the Chapter 11 would not be converted into a Chapter 7.  In

fact, the conversion of the case was an obvious outcome given that Debtor had no business

operations, only assets to be liquidated. Because the plaintiffs did not object to either the

Trustee's motion to convert or to the motion to sell at the $4.4 million price, they cannot now

complain that the sale price obtained was $700,000 less than market price.[7]  Whether the

properties were liquidated under the terms of the Operating Agreement or under the Bankruptcy

Code, the end result would be the same.  Filippov elected the forum and cannot now complain

that the events he put into motion did not turn out as he had envisioned.  Indeed, this is a theme

for Filippov: make a decision and then, if dissatisfied with the results, blame defendants.  With

respect to the liquidation of the properties following the bankruptcy filing, the defendants are not

responsible and the resulting sale should have been anticipated.  The objection to the sale price is

irrelevant to this action and, in any event, has been waived.

Filippov's strategy to avoid his obligations under the Operating Agreement was based

upon his fundamental misunderstanding of the purposes of bankruptcy.  Far from being "forced"

into bankruptcy, Filippov unilaterally made the decision.  There is no evidence that defendants

"forced" this decision onto Filippov or that had he honored his obligation to liquidate under the

Section 9.2 of the Operating Agreement the result would have been any different.

2.   The Listing Agreements

As to the "self-dealing" listing agreements, there is no expert opinion that there was

anything improper about the listing agreements and virtually no discussion about how they were

"self-dealing" or how this alleged "self-dealing" somehow deflated the sale price.  Tatiana is

specifically identified in the Operating Agreement as the listing agent so far from being "self-

dealing" her getting the listing was exactly what the parties had agreed to do.  (OA, §6.1(b)(6)).

As noted in Tatiana's parallel motion for summary judgment, Filippov was well aware of the

listing agreements and voiced no objections thereto.  There is also no expert evidence that the

---

[7] Debtor did file a limited objection to the Trustee's motion to sell in order to prevent the payment of a commission to Tatiana.  It did not, however, object to the proposed sale price.  (Docket No. 82).

listing agreements were inconsistent with industry standards or that the marketing effort put in by Tatiana somehow contributed to the inability to sell the properties.  While Mr. Fennell concludes, with no analysis and in less than a sentence, that a lack of effective marketing contributed to the low sale price, in his recitation of the facts relied upon, the only facts bearing on the marketing effort were that "[t]he investors were not provided any information on the marketing process, how the homes were received in the market, or how involved the listing broker was during this process."  (Fennell Reports, Addendum p. 1/5).  Despite having **no** information about the marketing, somehow Mr. Fennell was able to conclude that the marketing effort was lacking – highlighting the gratuitous and inadmissible nature of his observation.  He provides no information on what a proper marketing effort should have looked like.  He also fails to opine that had a proper marketing effort been undertaken, more likely than not, there would have been a buyer ready, willing and able to purchase both homes for $5.1 million.  As such, the causal connection for plaintiffs' claim that the allegedly diminished value of the sale was somehow attributable to a "self-dealing" listing agreement is missing.

3. The mechanics lien.

The mechanics lien was filed by KDC.[8]  In his report, Mr. Fennell, who, according to his CV is not a real estate agent and therefore not qualified to opine on this topic in any event, does not explain why, even prior to the mechanics lien, the property did not sell.  He failed to do a market analysis to enable him to opine that the property, more likely than not, would have sold for $5.1 million but for the mechanics lien.  There is no analysis explaining how the recording of the mechanics lien chilled the submission of any offer.  More fundamentally, Mr. Fennell does not opine that without the lien, more likely than not, there would have been a buyer ready,

---

[8] No explanation is provided as to why the other defendants are somehow responsible for KDC's lien.  Plaintiffs also do not explain why they did not simply bond off the lien or move for its immediate dissolution.  M.G. L., c. 254, 15A.

willing and able to buy at the $5.1million price in November 2014 which was the sale date allegedly contemplated in the Operating Agreement.

As Mr. Fennell relies upon these three factors as a group and does not state that any one of them acting alone would have had any impact, the failure of any one of them causes the whole causal connection to fail, assuming *arguendo* that his causal links are even admissible.

c) Fees And Costs Relating To The Bankruptcy Are Not Recoverable As An Element Of Damages In The Adversary Proceeding.

Plaintiffs also claim entitlement to "increased costs as a result of the bankruptcy proceeding, including substantial attorneys' fees. These damages include lost earnings on funds held in escrow during the pendency of the bankruptcy." The Debtor further seeks "$17,986.83 in fees paid to Rabobank, N.A as a result of the bankruptcy and the bond fees of $3,910.89 all incurred as a result of the bankruptcy, as well as any fees paid to the Trustee." (Perten Aff., Exh. 8). These claims are without merit as any costs associated with the bankruptcy are directly due to plaintiffs' decision to file for bankruptcy protection and bring needless litigation.

Without any consultation with, or prior knowledge by, Kagan, Filippov caused the Debtor to file for Chapter 11 protection despite the fact that substantial equity existed in the properties. Because the Debtor had no operations and no employees and only existed for the sole purpose of selling the Properties, the Chapter 11 Trustee quickly moved to convert the case to a Chapter 7 case. The Debtor did not oppose the conversion. There is no theory that entitles the Debtor to recover costs and attorneys' fees incurred due to Filippov's decision to file a bankruptcy petition. To the extent that Filippov and/or Lipetsker could even assert such a claim (they can't), they did not file a proof of claim for such costs.

Incident to the administration of a Chapter 7 case, the Trustee is obligated to maintain funds in accordance with the U.S. Trustee rules and guidelines. Ignoring the fact that Filippov

15

caused the bankruptcy filing, the plaintiffs now claim they have been damaged by his decision

and seek to hold the defendants responsible.  As to lost earnings on the monies held in escrow by

the Trustee, there is no expert report opining as to how those monies could have been invested

and the likely return thereon had they been invested differently.  More importantly, Filippov

testified that he was not guaranteed any fixed rate of return on his investment.  (Filippov dep. at

51).  With respect to the costs incurred by the Debtor's estate for bank charges, bond fees, and

compensation to the Trustee, these too are not recoverable.  These are the costs of administration

of a bankruptcy estate, which are necessary not because of anything the defendants did but

because of the forum in which plaintiffs chose to pursue their frivolous dispute.  Had the

plaintiffs not filed bankruptcy and allowed the properties to be liquidated under the terms of the

Operating Agreement, these costs would not have been incurred.  Having made the election to

invoke this Court's jurisdiction, they are bound by the financial consequences thereof.

   d)   Plaintiffs Are Not Entitled To A 5% Return On The Monies Recovered By The
        Trustee.

   Perhaps recognizing that they had no expert willing to opine that there was fraud and/or

who could itemize the damages resulting therefrom, Filippov and Lipetsker supplemented their

interrogatory responses in a futile effort to find something, anything, compensable.  Filippov

now claims entitlement to "damages for carrying costs I was forced to pay out of pocket as a

result of Defendants' wrongdoing," and both Filippov and Lipetsker seek a "5% return on my

capital contribution as provided under Section 8.2 of the LLC's Operating Agreement." (Perten

Aff., Exh. 7 and 9).  They also seek a 5% return on the monies held in escrow by the bankruptcy

trustee.  None of these new categories, however, is recoverable under Section 8.2.

   First, Filippov has already submitted a proof of interest arguing that his payment of

carrying costs were additional capital contributions which had the effect of increasing his capital

contribution and membership interest per Section 8.1.  (Claim No. 11).  At his deposition,

Filippov admitted that the increase he claimed in his equity interest was based on his payment of

carrying costs and application of Sections 8.1 and 8.2 of the Operating Agreement.  (Filippov

dep. at 268-70).  He also filed a proof of claim claiming that these same "investments" were

loans.  He cannot have it both ways.  By claiming that his payment of carrying costs are capital

contributions which increased his equity, he cannot simultaneously characterize these same sums

as damages.

The distribution of profit under the Operating Agreement does not track the parties'

equity interests.  Although Kagan initially had a 10% equity interest, Section 8.1 of the

Operating Agreement provides that upon liquidation, the proceeds of any sale shall be allocated

50% to Kagan.  Therefore, even if all of the defendants' claims were disallowed, 50% of the sale

proceeds would still go to Kagan.  Section 8.1 goes on to say:

> **In the event that the property is not sold within twenty three (23) months from the
> date of acquisition, then Mr. Kagan shall be responsible for all carrying costs until
> such time as the property is sold.  If Mr. Kagan fails to pay the monthly carrying
> costs, then Mr. Filippov shall be responsible to contribute the necessary carry costs
> and subsequently his capital contribution and percentage interest in the Company
> shall increase by the same amount and percentage and at the same time will trigger
> reduction of Mr. Kagan's share of capital contribution by the same amount and
> subsequently his/her percentage interest in the Company.**

(OA, ¶8.1 at p. 9, emphasis in the original).  Thus, not only did the parties anticipate that

Filippov may be required to pay carrying costs, it also provided the remedy which has nothing to

do with the allocation of the sale proceeds.  This is essentially a liquidated damages clause.

While Kagan's initial $250,000 capital contribution may have been at risk if the properties did

not sell timely, his ability to share in the sale proceeds was not.  Having agreed to this remedy

and invoked it when filing his proof of interest, Filippov is bound by those terms.

Filippov's and Lipetsker's reliance on Section 8.2 of the Operating Agreement to claim

entitlement to a 5% return on their capital contributions and monies held in escrow by the

Trustee is based on a wholesale misreading of that section.  At his deposition, Filippov testified,

there was never any guaranteed rate of return.  (Filippov dep. at 51).  The Operating Agreement

does not state otherwise.

Section 8.2 of the Operating Agreement is entitled "Distribution to Members." It

provides:

> **The distribution to Members shall be in accordance with their respective
> Capital Contribution first, however, an additional five (5%)  percent per
> annum based upon the Members' respective Capital Contributions shall be
> paid out of Mr. Kagan's net profit share for each day that the property is not
> sold after twenty three (23) months of acquisition.**

(OA, §8.2, emphasis in original).  This clause deals solely with how profit, if any, is to be

distributed in the event the property is not sold within 23 months.  It neither guarantees a specific

return nor establishes a fixed rate of return on any capital contribution.  It also does not trump

Section 8.1.  Accordingly, Section 8.2 provides no basis for any affirmative recovery.

II.   <u>PLAINTIFFS HAVE FAILED TO IDENTIFY ANY SPECIFIC INSTANCES OF
      ACTIONABLE FRAUD.  THEIR EXPERT WAS UNABLE TO CONCLUDE
      THAT THE DISCREPANCIES HE NOTED, MORE LIKELY THAN NOT, WERE
      THE PRODUCT OF FRAUD.</u>

There is no allegation that the <u>Debtor's</u> books were falsified. Rather, plaintiffs focus on

KDC's and ProExcavation's books.  None of the plaintiffs have any interest in these entities, and

the manner in which they kept their financial records, even if sloppy, does not give plaintiffs an

affirmative cause of action.  At best, it may provide grounds to object to KDC's proof of claim.

Plaintiffs never saw defendants' records until this litigation, and certainly were not relying upon

them for anything.  If plaintiffs somehow overcome their hurdle of establishing that they suffered

some cognizable damage due to the manner in which KDC and ProExcavation kept their books and records, there is still a complete lack of evidence that these records were, in fact, fraudulent.

Plaintiffs repeatedly claimed to have incontrovertible evidence of fraudulent billing by KDC and its subcontractors. They have accused KDC of double billing, charging for materials used in other projects, overcharging, paying kickbacks and forging invoices. To support their claim, they relied upon statements made by KDC's former bookkeeper, Kristina Brusenkova, and analysis by their forensic accountant, Michael Goldman. Despite their insistence that these sources provided incontrovertible evidence of fraud, discovery has revealed just the opposite.

Early on, Ms. Brusenkova submitted an affidavit in support of plaintiffs' claims of malfeasance. She also figures prominently in plaintiffs' complaint. (Amd. Cmp., ¶46; Brusenkova dep. at 102). At her deposition, Ms. Brusenkova was unable to identify any specific instances of financial malfeasance relating to the Debtor's project. She admitted she had no detail as to any improper financial dealings on the project. (Brusenkova dep. at 95). Her only understanding that Kagan was trying to "steal" money on this project was based on statements that Filippov made to her and not on any personal knowledge. (Id. at 102). She testified that despite plaintiffs' allegation that ProExcavation grossly overcharged (Amd. Cmp., ¶47), she had no idea exactly what services ProExcavation provided, what it charged on this project, or what its work was worth. (Brusenkova dep. at 117-18).[9] As to Debtor's project, she could not recall any instances of overcharging (Id. at 119), any improper uses of the company credit card (Id. at 123), or any instances of double-billing. (Id. at 125, 132). She could not identify any subcontractors or suppliers who were overpaid. (Id. at 133). She could not identify any improper charges to the company credit card. (Id. at 135). Finally, with respect to the allegation

---

[9] There is no evidence that ProExcavation overcharged for its services. By order of this Court, plaintiffs are precluded from offering any evidence on this issue by its construction expert, Mr. Doddridge, as part of their case-in-chief. (Docket No. 244).

that Kagan failed to properly credit the project for refunds or goods returned, Ms. Brusenkova

could not say that this ever happened on this project.  (Id. at 137).  In sum, despite plaintiffs'

repeated contrary assurance, Ms. Brusenkova had no damning evidence – because there is none!

At his deposition, Filippov too testified that he had no details to support his spurious

allegations.  He could not provide any specific instances of double billing.  (Filippov dep. at 99-

100).  Other than hearsay statement from other contractors, none of which have been identified

as an expert on this case, he had nothing to support the allegation that ProExcavation

overcharged.  (Id. at 100-109, 126-27).[10]  He testified that he could not identify any items that

were purchased for another project but charged to this project.  (Id. at 111).  He could not

identify any improper AMEX charges.  (Id. at 125).  He could not even identify which invoices

he questioned.  (Id. at 246).  Lipetsker too admitted that he had no facts to support the allegations

that had been made.  (Lipetsker dep. at 42-46).

The long anticipated forensic accounting report of Michael Goldman arrived on July 30,

2018.[11]  Nowhere in his 41-page report is there any opinion that, more likely than not, there was

fraud committed on this project.  Nowhere is there any itemization of damages incurred by

plaintiffs due to the alleged fabricated or improper billings.  In short, the forensic accounting

review yielded nothing of any relevance to the affirmative claims of damage caused by fraud.

Amazingly, Mr. Goldman was not engaged to determine whether there was any fraud to

support plaintiffs' claim for an affirmative recovery.  Rather, in his own words, he was retained

only to "opine on the veracity of the accounting information and documentary support provided

---

[10] Interestingly, plaintiffs refused to allow defendants to inquire into the basis for the "opinion" as to
ProExcavation's work offered by one of the persons identified by Filippov, David Palian, ostensibly because he had
been engaged as an expert.  (Filippov dep. at 106-09).  Mr. Palian was not listed as an expert in plaintiffs' expert
disclosures and did not provide a report.  Presumably, had he really been able to opine that ProExcavation's charges
were excessive; a report would have been forthcoming.
[11] Defendants have filed a motion in limine to strike the expert opinions offered by Mr. Goldman, which is
incorporated herein by reference.  A copy of his report is annexed to that motion.

by the Defendants with regard to the mechanics lien," i.e. KDC's proof of claim.  (Goldman Report, ¶21).   Consistent with his limited scope, Mr. Goldman's opinion was <u>not</u> that he found fraud which may entitle plaintiffs to damages, but only that "the documentation maintained and provided by Mr. Kagan is unreliable" and that "attempts to recreate data that was never properly captured the first time are not at all convincing."  (<u>Id.</u>, ¶¶28, 39).  Mr. Goldman scrupulously avoided opining as to whether fraud occurred and identified no entries for which plaintiffs suffered a loss.  Instead, he opined simply that "my opinion and conclusion is that the claims made by the Defendant for the mechanics lien are not reliable or credible.  (<u>Id.</u> at Summary of Opinions and Conclusions).[12]   That is not enough to support a claim for affirmative recovery.

With respect to the allegations that materials from other projects were improperly charged to this project, Mr. Goldman offered that although it was "conceivable," "there would be no way to detect if this was occurring."  (<u>Id.</u> ¶32).  As to improper charges to credit cards, all he could say is that "the lack of controls and oversight opened the *possibility* for a commingling of entities and/or a commingling of projects", though he did not opine that this, in fact, occurred.  (<u>Id.</u>, ¶34, emphasis added).  He noted that his perceived discrepancies in the records showed a "lack of competence **or** integrity," though he could not determine which was more likely.  (<u>Id.</u>, ¶47)(Emphasis added).  This is a far cry from an opinion that fraud, more likely than not, occurred and that plaintiffs suffered compensable damages as a result.

Mr. Goldman's ultimate conclusion is simply that he did not believe the records that were produced to support KDC's claim.   <u>See Id.</u>, ¶51 ("The claim documentation provided by the Defendant has so many inconsistencies, inaccuracies, mistakes, missing documents, unexplained changes to "historical" information, etc. that I cannot conclude that it is credible.").  Given the

---

[12] As noted in the motion in limine, issues of credibility are for the jury to determine, and not a proper subject for expert testimony.

complete absence of any testimony establishing that a fraud, more likely than not, occurred in

KDC's books and records, all the claims predicated upon a theory of fraudulent books and

records must be dismissed.

III.     PLAINTIFFS HAVE FAILED TO PLEAD ANY RELIANCE ON THE
         ALLEGEDLY FALSIFIED RECORDS.

        Even had plaintiffs been able to identify any fraudulent invoices or charges, at worst, it

would have been non-actionable "attempted" fraud, as plaintiffs never fronted any additional

monies beyond the agreed upon fixed price and did not change position in reliance upon the

KDC's books and records.  The only reliance plead by plaintiffs is on the pre-project

representation by Kagan as to the construction costs.  (Amd. Cmp., ¶17).  Plaintiffs do not claim

reliance on KDC's books and records.  The absence of "reliance" is fatal to all the claims relating

to the allegedly fraudulent bookkeeping.  See Sebago, Inc. v. Beazer E., Inc., 18 F. Supp. 2d 70,

95 (D. Mass. 1998) (Plaintiff must "plead reliance with particularity."); Lambert v. Leary, No.

05-3422, 2006 Mass. Super. LEXIS 63, at *12 (Feb. 14, 2006) (Plaintiff's fraud claim failed

because, inter alia, he failed to plead reliance); see also Collins v. Huculak, 57 Mass. App. Ct.

387, 389 (2003) (fraud claim failed because could not establish justifiable reliance).

IV.     THERE IS NO EVIDENCE THAT KDC FAILED TO CONSTRUCT IN A GOOD
        AND WORKMANLIKE MANNER, AND NO DAMAGES ARE CLAIMED
        THEREFROM.  THEREFORE SUMMARY JUDGMENT IS WARRANTED ON
        COUNT VII.

        In Count VII, Debtor alleges that it "entered into a contract with Defendant KDC that

required, among other things, that KDC perform its work in a good and workmanlike manner."

(Amd. Comp., ¶78).  As no construction expert reviewed the construction and opined that it was

not performed in a good and workmanlike manner, this claim fails. The only expert comment

bearing on the quality of construction was an observation by plaintiffs' real estate appraiser, who

opined, "Overall, the subject property was in good condition and was of good construction quality at the time of the sale." (Fennell Report, Addendum, p. 3 of 5). Not surprisingly, in their supplemental interrogatory responses, plaintiffs failed to identify any damages related to poor quality workmanship. The failure to identify any damages attributable to allegedly substandard work mandates that Count VII be dismissed.

V.       PLAINTIFFS HAVE FAILED TO OBJECT TO KDC'S PROOF OF CLAIM NO. 4.

KDC's Claim No.4 sought indemnity under Section 10.2 of the Operating Agreement. The deadline for objection to proofs of claim was May 3, 2016. (Docket No. 71). Plaintiffs never objected to Claim No. 4. Therefore, Claim No. 4 should be allowed.

VI.      HAVING FAILED TO COME FORWARD WITH "SUBSTANTIAL EVIDENCE" TO SUPPORT THEIR FRAUD CLAIMS, DEFENDANTS ARE ENTITLED TO SUMMARY JUDGMENT ON PROOF OF CLAIM NOS. 1, 6 AND 7.

Kagan and ProExcavation also seek indemnity under Section 10.2 of the Operating Agreement. (Claim Nos. 6 and 7). Section 10.2 provides:

> The Company shall indemnify and hold harmless the Members and their respective employees and authorized agents from and against any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member, employee or authorized agent in good faith on behalf of the Company and reasonable believed to be within the scope of authority conferred by this Agreement, except that no Member, employ or authorized agent shall be entitled to be indemnified or held harmless from or against any loss, damage or claim incurred by reason of such Member's, employee's or authorized agent's gross negligence or willful misconduct.

Plaintiffs bear the burden of proof to come forward with "substantial evidence" to support their objections. Arcari v. Marder, 225 B.R. 253, 255 (Bankr. D. Mass. 1998); In Re Colonial Bakery, Inc., `08 B.R. 13, 15 (Bankr. D.R.I. 1989).

Plaintiffs' objection to Kagan's indemnity claim is baseless. First, plaintiffs claim that Filippov, as managing member, never authorized the Debtor to enter into an agreement with Kagan. (Docket No. 140). This makes no sense as his indemnity claim is based upon his status

as a member which needs no authorization.  Next, seeking to take advantage of the exclusion

from indemnity, plaintiffs assert that in his dealings with the Debtor, Kagan acted with gross

negligence and/or willful misconduct.  This can only relate to conduct that occurred after the

formation of the Debtor, meaning that the allegations of fraudulent inducement which predate the

formation of the Debtor play no role in the analysis of Kagan's entitlement to indemnity.  As to

Kagan's conduct during the construction, as demonstrated *supra*, there is no evidence, and

certainly no "substantial evidence", that Kagan committed the fraud.  There also is no expert

opinion that his conduct constituted gross negligence and no facts supporting a finding of willful

misconduct.  As such, Kagan's indemnity claim should be allowed.

As to ProExcavation, plaintiffs' claim that they never authorized a contract with it is

meritless.  Under the Operating Agreement, the members delegated Kagan full responsibility to

build the houses.  (OA, §5.2).  Implicit in this grant of authority was his right to engage

contractors and subcontractors to do the actual construction.  Implied authority "evolves by

implication from the conduct of the parties."  Theos & Sons, Inc. v. Mack Truck, Inc., 431 Mass.

736, 743 n.13 (2000).  An agent has implied authority to do that which is reasonably necessary to

complete the transaction.  McDonald v. Gough, 326 Mass. 93, 97 (1950).  Thus, ProExcavation

as an agent of the Kagan, is entitled to take full advantage of the indemnity in the Operating

Agreement.  As to the allegations of gross negligence and willful misconduct by ProExcavation,

there is virtually no evidence, substantial or otherwise, of malfeasance by ProExcavation.  As

such, Claim No. 7 must be allowed.

Finally, KDC's claim to recover for additional costs for construction (Claim No. 1) must

also be allowed as there is no evidence that any of its charges are improper.  KDC had nothing to

do with the pre-project representations as to the estimated construction costs that have been

alleged so those "facts" are irrelevant to its claim. Given that plaintiffs have failed to come forward with "substantial evidence" to support these same allegations in the context of their objection to the proof of claim.

<u>CONCLUSION</u>

Based upon the foregoing, all claims asserted in the adversary proceeding should be dismissed, and Claim Nos. 1, 4, 6 and 7 (which correspond to Counts V through IX of defendants' counterclaims) should be allowed.

Dated:   November 16, 2018               Respectfully submitted,

VADIM KAGAN,
KAGAN DEVELOPMENT KDC, CORP. and
PROEXCAVATION CORP.,

By their Attorneys,

/s/ John H. Perten
John H. Perten, BBO# 548728
James P. Harris, BBO# 678283
SHEEHAN PHINNEY BASS & GREEN, PA
255 State Street, 5th Floor
Boston, MA  02109
Tel:  617-897-5600
Fax: 617-439-9363
E-mail: jperten@sheehan.com

## <u>CERTIFICATE OF SERVICE</u>

I hereby certify that on this 16th day of November, 2018, a copy of the foregoing was

served upon the parties listed below via ECF and/or first class mail, postage prepaid.

Eric K. Bradford
Office of the US Trustee
J.W. McCormack Post Office & Courthouse
5 Post Office Sq., 10th Fl, Suite 1000
Boston, MA 02109

Joseph P. Calandrelli
O'Connor Carnathan and Mack LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

Sean T. Carnathan
O'Connor, Carnathan and Mack, LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

Stephen G. DeLisle
Rubin and Rudman LLP
50 Rowes Wharf
3rd Floor
Boston, MA 02110

David B. Madoff
Madoff & Khoury LLP
124 Washington Street - Suite 202
Foxborough, MA 02035

Amy M. McCallen
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110

Steffani Pelton Nicholson
Madoff & Khoury LLP
124 Washington Street
Foxborough, MA 02035

David C. Phalen
Hackett Feinberg P.C.
155 Federal Street, 9th Floor
Boston, MA 02110

Sarah A Smegal
Hackett Feinberg P.C.
155 Federal Street
9th Floor
Boston, MA 02110

Peter N. Tamposi
The Tamposi Law Group
159 Main Street
Nashua, NH 03060

/s/ John H. Perten
John H. Perten