# EXHIBIT 1



# OPERATING AGREEMENT
## OF
## LYMAN-CUTLER, LLC

1.      THIS OPERATING AGREEMENT is entered into as of the 14 day of
November, 2012 by and between Vadim Kagan, Nickolay Lipetsker and Alex
Filippov.

WHEREAS, Mr. Kagan, Mr. Lipetsker and Mr. Filippov wish to form a limited liability
company known as LYMAN-CUTLER, LLC (the "Company") pursuant to the
Massachusetts Limited Liability Company Act (as amended, the "Act") by filing a
Certificate of Organization of the Company with the Massachusetts Secretary of State's
Office and by entering into this Agreement;

NOW, THEREFORE, in consideration of the mutual agreements, promises and
conditions contained herein and for other good and valuable consideration, the receipt and
sufficiency of which are hereby acknowledged, Mr. Kagan, Mr. Lipetsker and Mr.
Filippov as acknowledge and agree as follows:

### ARTICLE I – DEFINITIONS

1.1 Definitions.      Capitalized terms used in this Agreement and not otherwise
defined shall have the meanings assigned to them below:

(a) "Agreement" means this operating Agreement, as amended, modified,
supplemented or restated from time to time.

(b) "Certificate of Formation" means the Certificate of Formation of the
Company and any and all amendments thereto and restatements thereof
filed on behalf of the Company with the Commonwealth Secretary of
State's Office pursuant to the Act.

(c) "Member" means a member of the Company identified on Schedule A
attached hereto, as the same may be amended from time to time.

(d) "Percentage Interest" shall refer to the percentage ownership interest of
each Member in the Company. The Percentage Interests of the
Members are set forth on Schedule A attached hereto and incorporated
herein for all purposes by this reference.

1

(e) "Date of Acquisition" shall refer to deed recording date for Lyman Road Brookline property into the Company.

## ARTICLE II - THE COMPANY

2.1 Formation.

    (a) The Members hereby agree to form the Company as a limited liability company under and pursuant to the provisions of the Act and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein. Upon the execution of this Agreement, Mr. Kagan, Mr. Lipetsker and Mr. Filippov shall be Members of the Company.

    (b) The name and mailing address of each Member and the amount contributed to the capital of the Company shall be listed on Schedule A.

2.2 Name; Principal Place of Business. The name of the Company shall be LYMAN-CUTLER, LLC. The principal office of the Company shall be located at 130 Trapelo Road, Belmont, Massachusetts, or at such other place as the Members may from time to time determine.

2.3 Term. The term of the Company shall commence on the date of the filing of the Certificate of Organization in the Commonwealth of Massachusetts Secretary of State's Office and shall continue until November 30, 2015 unless dissolved before such date in accordance with the provisions of this Agreement.

2.4 Registered Agent and Office. The company's registered agent and office in Massachusetts shall be as set forth in the Certificate of Organization of the Company filed with Commonwealth of Massachusetts Secretary of State's Office, as the same may from time to time be amended.

2.5 Fiscal Year. The Company's fiscal year (the "Fiscal Year") shall be the calendar year.

2.6 Taxation as Partnership. The Company shall be treated as a partnership for U.S. federal income tax purposes.

2

## ARTICLE III - PURPOSE AND POWERS OF THE COMPANY

Nature of Business.  The general character of the business of the LLC is to own (directly or through a nominee), invest in, develop, improve, operate, manage, lease and/or sell real estate in Commonwealth of Massachusetts.  To engage in any activities directly or indirectly related or incidental thereto including, but without limitation, everything necessary, suitable, convenient, or proper for the accomplishment of any of the foregoing activities, or the attainment of any one or more of the purposes, enumerated or incidental to the powers named, or which shall at any time appear conducive to or expedient for the production of benefit to the corporation, either as the holders of or interested in any property, or otherwise, with all the powers now or hereafter conferred by law, and for all lawful purposes.

3.1  Powers of the Company.  The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to or for the furtherance of the purpose set forth in Article 3., including, but not limited to the powers permitted under the Act.

## ARTICLE 1V - CAPITAL CONTRIBUTIONS AND ACCOUNTS

4.1  Capital Contributions.  Each Member has transferred and contributed to the capital of the Company the capital amounts (the "Capital Contributions") as set forth on Schedule A.  Furthermore, Purchase Money Loan and Construction Loan shall be taken from Rockland Trust Company to pay for construction and carrying costs until the issuance of Certificates of Occupancy (hereinafter "CO") but in no event for more then twenty three (23) months from the date of acquisition.

4.2  Carrying Costs.  Carrying costs shall be defined to include but not limited to mortgage payments, taxes and insurance for the subject property 77 Lyman Road, Brookline, Massachusetts.  In the event that a CO for each lot is not issued within twenty three (23) months from the date of acquisition, then Mr. Kagan will be responsible for all carrying costs until such time as CO's are issued.

3

4.3 Capital Accounts; Assets. An individual capital account (each a "Capital Account") shall be established and maintained for each Member in accordance with applicable regulations under the Internal Revenue Code of 1986 as from time to time amended (the "Code"). A Member shall not be entitled to interest on his or her Capital Contribution or Capital Account, or to withdraw any part of his or her Capital Contribution or Capital Account. No Member shall have any right in or to any asset or property of the Company, but shall only have a right to the distributions as and when provided for in Sections 8.2 and 9.2 hereof.

4.4 Maintenance of Capital Accounts. To the extent consistent with such regulations, there shall be credited to each Member's Capital Account the amount of any contribution of capital and carrying costs made by such Member to the Company, and such Member's share of the net profits of the Company and there shall be charged against each Member's Capital Account the amount of all distributions to such Member, and such member's share of the net losses of the Company.

## ARTICLE V - MEMBERS

5.1 Powers of Members. The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms of this Agreement.

5.2 Duties of Members. It shall be Mr. Kagan's duty and obligation to construct two (2) homes at the location currently known as 77 Lyman Road, in Brookline, Massachusetts in accordance with the plans, including drawings, supplied by Mr. Kagan and approved by Managing Member. The construction shall be substantially completed no later than March 30, 2014. It is specifically understood by all Members that Mr. Kagan's compensation for this duty is outlined in Section 8.1 below.

5.3 Admission of Members. No person shall be admitted as a Member of the Company after the date of formation of the Company without the written consent or approval of the Members owning at least eighty (80%) of the

VK
I.K. N.L.

4

Percentage Interests in the Company at the time of such admission, regardless
of whether such person has previously acquired any rights in any existing
Member's interest in the Company by assignment, sale or otherwise. A
Member's execution of a counterpart of this Agreement, or such other
instrument as the Members may require, shall evidence his or her admission.

5.4 Transfer of Company Interest. No Member may transfer, sell, assign, pledge,
mortgage, or dispose of or grant a security interest in his or her interest in the
Company (each, a "Transfer") without the prior written consent of the
Members owning at least eighty (80%) of the Percentage Interests in the
Company at the time of such Transfer. Any purported Transfer in
contravention of this Section 5.3 shall be null and void and the Member
attempting such Transfer shall cease to be a Member of the Company shall be
forfeited and reallocated to the remaining Members in accordance with their
respective Percentage Interests.

5.5 Rights of Assignee. The purchaser or other transferee of a Member's interest
in the Company shall have only the right to receive the distributions and
allocations of profits or losses to which the Member would have been entitled
under this Agreement with respect to the transferred interest and shall not have
or enjoy any right to participate in the management of the Company or to
receive any financial information or reports relating to the Company or any
other rights of a Member unless and until the purchaser or transferee is
admitted as a Member pursuant to Section 5.2.

5.6 Partition. Each Member waives any and all rights that he or she may have to
maintain an action for partition of the Company's property.

### ARTICLE VI – MANAGEMENT

6.1 Management, duties, and Restrictions.

(a) General Management. The management and control of the operations
of the Company and the maintenance, development, sales and leasing
of the property of the Company shall rest with the Managing Members.

5

(b) Powers of Managing Member. Subject to such limitations as may be
imposed pursuant to the terms of this Agreement, the Act or by
operation of law, the Members are and shall be authorized and
empowered to carry out and implement the purposes of the Company.
In that connection, the powers of the Managing Member shall include,
but not be limited to, the following:

(1) to engage, dismiss, and replace personnel, attorneys,
accountants, brokers or such other persons as may be deemed
necessary or advisable by Managing Member;

(2) to authorize or approve all actions with respect to distributions
by the Company, dispositions of the assets of the Company or
its nominee, execution of leases, mortgage contracts, bonds,
promissory notes, loan agreements and other instruments on
behalf of the Company or its nominee, and to execute any
agreements, instruments or documents relating to or affecting
such matters;

(3) to acquire, mortgage, improve and convey real property and
interests therein, including, but not limited to, easements and
rights-of-way, and to execute any agreements, instruments or
documents relating to or affecting such matters;

(4) to open, maintain, and close bank accounts and to draw checks
and other orders for the payment of money; and

(5) to take such other actions and to incur such reasonable
expenses on behalf of the Company as may be necessary or
advisable in connection with the conduct of the affairs of the
Company.

(6) The Managing Member hereby agrees to list the properties with
Tatiana Kagan. In order to remove Tatiana Kagan as a listing
broker by December 31, 2014 will require a written consent of
the Members owning at least eighty one (81%) of the

VK
A.F.   N.C.

6

Percentage Interests in the Company. After December 31, 2014 no such consent shall be required.

(c) Liability of Managing Member. In carrying out their duties, the Managing Member shall not be liable to the Company or to any other Members for any actions taken in good faith and reasonable believed to be in the best interest of the Company or which are taken upon the written advice of legal counsel for the Company.

(d) Reliance on Act of Managing Member. Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Managing Member. Any person other than a Member may and shall be entitled to rely on certificates, instructions, agreements or assignments signed or purporting to be signed by a Managing Member for or on behalf of the Company, and on the statements and agreements set forth therein, without inquiry as to the due authorization thereof or the authority of the person signing or purporting to sign such certificates, instructions, agreements or assignments.

(e) Delegation. The Managing Member may appoint Members only with such titles as they may elect, including the titles of President, Vice President, Treasurer and Secretary, to act on behalf of the Company with such power and authority as the Members may delegate in writing to any such person.

(f) Books and Records. The Company's books and records shall be maintained in accordance with good record keeping practices and federal and state income tax laws and regulations. All books and records of the Company shall be maintained at the principal office of the Company, and each of the Members shall have access thereto to review the same at any time upon reasonable notice and during normal business hours.

(g) Reimbursement of Managing Member. The Managing Member shall be reimbursed by the Company for all reasonable expenses (including attorney and accountant's fees) incurred or paid by them for or on behalf of the Company.

7

## ARTICLE VII - VOTING, MEMBER CONSENTS AND MEMBER GUARATEE, MEETINGS

7.1 Voting. Each Member shall be entitled to vote in proportion to his or her Percentage Interest in the Company from time to time. Such vote may be exercised by written or oral notification by a Member to the other Members.

7.2 Member Consents. The amendment of this Agreement shall require the vote and unanimous approval of all the Members. All other actions taken by the Company, including the admission of a new Member, shall require the vote and approval of Members owning eighty percent (80%) or more of the Percentage Interest at the time of such vote.

7.3 Member Guarantee. Mr. Filippov shall, if required by institutional lender, provide that lender with a limited personal guarantee not to exceed $200,000.00 for all loans obtained by the Company related to the property located at 77 Lyman Road, Brookline, Massachusetts. Coincident with any provision by Mr. Filippov of such a guarantee, Messrs Kagan and Lipetsker shall each provide Mr. Filippov with a limited personal guarantee not to exceed, in the case of Mr. Kagan, $100,000.00 and in the case of Mr. Lipetsker, $20,000.00

7.4 Meetings of the Members. The Members may, but shall not be required, to meet from time to time to consider the affairs of the Company and to take any action permitted to be taken by the Members by law or under this Agreement. Meetings of the Members may be called at any time by any Member. Notice of any meeting shall be given to all Members not less than two (2) days nor more than thirty (30) days prior to the date of such meeting. Each Member may authorize any person to act for it by proxy on all matters on which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or his or her attorney-in-fact. A quorum for each meeting shall be one more than one-half the number of all Members.

8

## ARTICLE VIII – ALLOCATIONS AND DISTRIBUTIONS

8.1 Allocations of Profits or Losses. *The net profits,* net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows: Mr. Alex Filippov (40%) , Mr. Nickolay Lipetsker (10%) and Mr. Kagan (50%).   In the event that the demolition permit is not issued by June 30, 2013, then *the net profits,* net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows: Mr. Alex Filippov (60%) , Mr. Nickolay Lipetsker (10%) and Mr. Kagan (30%). The net losses from any sale of any property of the Company or upon liquidation of the Company shall be allocated among the Members according to the Percentage Interests of Each Member. Net profits and net losses shall, for both accounting and tax purposes, be net profits and net losses as determined for reporting on the Company's federal income tax return. *In the event that the property is not sold within twenty three (23) months from the date of acquisition, then Mr. Kagan shall be responsible for all carrying costs until such time as the property is sold. If Mr. Kagan fails to pays to pay monthly carrying costs, then Mr. Filippov shall be responsible to contribute the necessary carrying costs and subsequently his capital contribution and percentage interest in the Company shall increase by the same amount and percentage and at the same time will trigger reduction of Mr. Kagan's share of capital contribution by the same amount and subsequently his/her percentage interest in the Company.* For tax purposes, all items of depreciation, gain, loss, deduction or credit shall be determined in accordance with the Code and, except to the extent otherwise required by the Code, allocated to and among the Members in the same percentages in which the Members share in net profits and net losses.   Any change to this paragraph will require a written consent of the Members owning at least eighty one (81%) of the Percentage Interests in the Company.

9

8.2 *Distribution to Members.* *The distribution to Members shall be in accordance with their respective Capital Contribution first, however, an additional five (5%) percent per annum payment based upon Members' respective Capital Contributions shall be paid out of Mr. Kagan's net profit share for each day that the property is not sold after twenty three (23) months of acquisition* For the purposes hereof, the term "Net Cash From Operations" shall mean the gross cash proceeds from Company operations less the portion thereof used to pay or establish reserves for Company expenses, debt payments, capital improvements, replacements, and guaranteed payments, all as determined by the Members. "Net Cash From Operations" shall not be reduced by depreciation , amortization, cost recovery deductions, or similar non-cash allowances, but shall be increased by any reductions of reserves previously established.

## ARTICLE IX – DISSOLUTION AND TERMINATION OF COMPANY

9.1 Events of Dissolution. The Company shall be dissolved and its affairs shall be would up upon the occurrence of any of the following events:

    (a) the death, insanity, dissolution, incompetency, bankruptcy, retirement, resignation or expulsion of a Member ("Retiring Member") unless there are at least two (2) remaining Members of the Company, and the remaining Members owning a "majority in interest" in the Company elect to continue the Company within ninety (90) days of the death, insanity, dissolution, bankruptcy, retirement, resignation or expulsion of the Retiring Member;

    (b) Notwithstanding the above paragraph, in the event of the death, insanity, dissolution, incompetency, bankruptcy, retirement or resignation of Mr. Filippov, his interest in this Company and control of this Company will automatically pass to his spouse by operation of this Agreement;

    (c) the conclusion of the term of the Company set forth in Section 2.3, hereof;

VK
A.F.  N.L.

10

(d) the sale or disposition of all or substantially all of the assets of the Company;

(e) the written consent of the Members owning eighty (80%) or more of the Percentage Interests in the Company; or

(f) the entry of a decree of judicial dissolution in accordance with the provisions of the Act.

For the purpose of Section 9.1 (a) above, the term "majority in interest" means eighty (80%) or more of the remaining Members' collective interest in profits and their respective Capital Accounts. For the purpose of the foregoing sentence, profits shall be determined and allocated based upon any reasonable estimate of profits from the date of the dissolution event to the projected termination of the Company taking into account present and future allocations of profits under this Agreement, and the Capital Account balances shall be determined upon the date of the dissolution event.

9.2 <u>Winding Up.</u>  Upon the dissolution of the Company, the remaining Member or, if more than one Member then remains, the Member selected by the remaining Members (in either case, the "Liquidating Member"), shall proceed with the winding up of the Company and apply and distribute the Company's assets as provided in this Section 9.2. The assets shall first be applied to the payment of the liabilities of the Company (other than any loans that may have been made by the Members to the Company) and to the expenses of liquidation. A reasonable time shall be allowed for the orderly liquidation of the Company and for the discharge of liabilities to creditors, so as to enable the Liquidating Member to minimize the normal losses attendant to a liquidation. The remaining assets shall next be applied to the repayment of any loans made by the Members to the Company. All assets then remaining shall be distributed to the Members in accordance with their respective Capital Accounts after giving effect to all contributions, distributions and allocations for all periods. Notwithstanding any of the foregoing, the Liquidating Member may retain a sum deemed necessary by him or her as a reserve for any

11

contingent liabilities, expenses and obligations of the Company.  Upon the final distribution of assets to the Members, each of the Members shall be furnished with a statement which sets forth the assets and liabilities of the Company as of the date of the complete liquidation.

## ARTICLE X – LIABILITY AND INDEMNIFICATION

10.1 Liability.  Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

10.2 Indemnification.  The Company shall indemnify and hold harmless the Members and their respective employees and authorized agents from  and against any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member, employee or authorized agent in good faith on behalf of the Company and reasonable believed to be within the scope of authority conferred by this Agreement, except that no Member, employee or authorized agent shall be entitled to be indemnified or held harmless from or against any loss, damage or claim incurred by reason of such Member's, employee's or authorized agent's gross negligence or willful misconduct; provided, however, that any indemnity under this Section 10.2 shall be provided out of and to the extent of Company assets only, and no Member shall have any personal liability on account thereof.

## ARTICLE XI – MISCELLANEOUS

11.1 Governing Law.  The Company and this Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts.

12

11.2 <u>Agreement Binding.</u>  This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective next-of-kin, legatees, administrators, executors, legal representatives, successors, and assigns.

11.3 <u>Notices.</u>  Notices to the Members or to the Company to be furnished hereunder shall be deemed to have been given when mailed, by prepaid registered or certified mail, or when deposited with an express courier service,

addressed to the address set forth on Schedule A or as set forth in any notice of changes of address previously given in writing by the addressee to the addressor.

Executed as a Commonwealth of Massachusetts's instrument under seal on the day and year first above written.

_____
Nickolay Lipetsker, Member

_____
Vadim Kagan, Member

_____
Alex Filippov, Managing Manager

## SCHEDULE A

### Capital Contributions and Percentage Interests

| Member | | Capital Contribution | Percentage Interest |
|---|---|---|---|
| Name: | Nickolay Lipetsker | $250,000.00 | 10% |
| Address: | 52 Stony Brae Road, Newton, MA, 02461 | | |
| Name: | Alex Filippov | $2,000,000.00 | 80% |
| Address: | 130 Trapelo Road, Belmont, Massachusetts | | |
| Name: | Vadim Kagan | $250,000.00 | 10% |
| Address: | 59 Needham Street, Unit 1402, Newton, MA, 02461 | | |

14

# EXHIBIT 2

ORIGINAL

Exhibits: 1-30                    Volume 1, Pages 1-230
            UNITED STATES BANKRUPTCY COURT
               DISTRICT OF MASSACHUSETTS
                  (EASTERN DIVISION)
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
In Re:
                              Chapter 7
LYMAN-CUTLER, LLC,            Case No. 15-13881-FJB

            Debtor
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
LYMAN-CUTLER, LLC,

            Plaintiff
v.                            Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
            Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - - -

          DEPOSITION OF LYMAN-CUTLER, LLC, By Its
            Representative ALEX FILIPPOV, and
              of ALEX FILIPPOV Individually
        Wednesday, April 25, 2018, 10:06 a.m.
            Sheehan Phinney Bass + Green, P.A.
              255 State Street, 5th Floor
                Boston, Massachusetts

        - - - - - - - - - Janis T. Young, RDR, CRR - - - - - - - - -
        jty@fabreporters.com    www.fabreporters.com
              Farmer Arsenault Brock LLC
                Boston, Massachusetts
                   617-728-4404

38

1    was correct?
2    A. Yes. I Googled stuff, but I wasn't
3    concerned, again, that much. I discussed it with
4    Nick, not as a concern; it was just as a statement
5    that we exchanged.
6    And he agreed with me, Nick agreed with
7    me, as a matter of fact. He had the same idea, 30
8    percent; that's what contractor gets.
9    We were not in disagreement with Nick,
10    which it was a statement, a conversation. Yes, he
11    is going to get it; but he is going to get it well,
12    quickly, and inexpensively. That was the idea. And
13    we said fine.
14    Q. Have you now exhausted your memory as to
15    the conversation with Nick Lipetsker where you
16    discussed the profit margins that you've just told
17    us about?
18    A. The word "exhausted" is good, because we
19    definitely discussed other things, but I don't
20    remember.
21    Q. Was anybody else present during this
22    conversation with Mr. Lipetsker?
23    A. No. We had maybe one or two conversations
24    on the phone.

39

1    Q. What happened next with respect to the
2    Lyman-Cutler project?
3    A. Next, I believe we started working on the
4    operating agreement.
5    Q. When you say "we" started working, who is
6    "we"?
7    A. I started working with Maiden. First I
8    started working because in my business life, there
9    were a lot of agreements, international agreements,
10    domestic agreements. Sometimes I don't even consult
11    with attorney, because I worked on so many
12    agreements with people and entities.
13    Q. So you started working with Maiden?
14    A. I started discussing the agreement at some
15    point, that I didn't like the agreement and wanted
16    to change, with Maiden, in correspondence.
17    And then I decided to show this
18    agreement to Mark Watson, as I said; Mark Watson was
19    an attorney, closing attorney, who was working with
20    me on the mortgage closing for 130 Trapelo Road, my
21    business office.
22    And I asked him to help, and he reviewed
23    this and said, look, I cannot give you any advice as
24    to whether it is a good idea or bad idea to invest

40

1    this money; but there's a few things I don't like in
2    this agreement.
3    I don't remember what it was now; it was
4    a long time ago. But he gave me a few suggestions
5    what to change.
6    Q. Did you have conversations with Mr. Kagan
7    during the drafting of the operating agreement?
8    A. I don't remember this.
9    Q. Did you have conversations with
10    Mr. Lipetsker during the drafting period of the
11    operating agreement?
12    A. I don't think so. Mr. Lipetsker, he
13    understand basic things. He is not legal guy; he
14    cannot treat really well legal document as far as I
15    know. So discussing with him legal language just
16    doesn't make sense.
17    Q. Did you discuss anything with
18    Mr. Zhukovskiy during the period that the operating
19    agreement was being drafted?
20    A. I don't remember. We might have exchanged
21    few emails on numbers.
22    As a matter of fact, I do remember,
23    coming back to the conversation at the original
24    meeting, my concern was the carrying costs. And I

41

1    did ask, and I did ask Kagan about carrying costs
2    and how it's going to be done.
3    And he said carrying costs, that's what
4    Kagan said; carrying costs, this was the number,
5    $1.5 million per house, and that includes
6    everything, including carrying costs. And I take
7    care of this.
8    Q. Was that during the first meeting?
9    A. Yes, during the first meeting, yes; because
10    that was instant question that came to my mind.
11    Q. And between that first meeting and the
12    period in which you were drafting the operating
13    agreement, did you have any further discussions with
14    Mr. Kagan about any aspect of the project?
15    A. I don't remember.
16    Q. Did you have any conversations with anybody
17    about the project that you haven't already told us
18    about from the time of the first meeting up to and
19    including the day that you signed the operating
20    agreement?
21    A. I don't remember.
22    Q. You said that you left the first meeting
23    and you had a PDF of the Excel spreadsheet.
24    A. PDF, and then they emailed me the actual

---

46

1   attorney.
2           Maybe I sent it to Kagan; I don't
3   remember.
4       Q.  Was this an oral conversation, or an email
5   or a letter?  How did you communicate?
6       A.  We exchanged a few emails with Maiden.
7           Maybe I did send an email to Kagan.  To
8   tell the truth, I don't remember.
9       Q.  And what was the deal that you were
10  agreeing to, as you understood it?
11      A.  The deal was this.
12          Kagan -- the company, not Kagan -- the
13  company bought that property at 77 Lyman Road in
14  Brookline, razed the existing structure, divided the
15  lots into two buildable lots, and put two similar
16  houses.  Each would cost $5,000 when sold, the
17  luxury houses.
18      Q.  Each would cost --.
19      A.  I'm sorry; $5 million when sold.  And Kagan
20  would be responsible for construction.
21          And the cost would be $1.3 million for
22  each house, and $200,000 would be for the carrying
23  cost.  And we would take loans to buy the land, and
24  then construction loans to build the houses.  Each

---

47

1   of the loans would be $1.5 million.
2           That will cover the construction costs
3   and the carrying costs.
4       Q.  Have you now exhausted your memory as to
5   what the terms of the agreement you reached were
6   relative to the Lyman-Cutler project?
7       A.  It was the deal that I believe the sales
8   and marketing of the property will be done by his
9   wife, Tatiana.
10      Q.  Do you recall -- I'm sorry; go ahead.
11      A.  And that the construction will start in
12  March 2013, and it will take no more than one year
13  to build these houses.
14          So the agreement was that by March 2014
15  houses would be ready for sale.  That was the
16  agreement, yes.
17      Q.  Have you now exhausted your memory as to
18  your understanding of what the deal was that you had
19  agreed to which would be reflected in the operating
20  agreement?
21      A.  I think so, yes.
22      Q.  Now, you said that sales and marketing
23  would be handled by Mr. Kagan's wife, Tatiana.  Do
24  you recall that?

---

48

1       A.  Yes.
2       Q.  Do you recall a conversation leading up to
3   the execution of the operating agreement wherein you
4   discussed the sales and marketing by Tatiana with
5   anybody?
6       A.  We discussed it with Nick, and Nick said
7   that she is capable, she can sell.
8           And I said that I don't like the idea
9   that, if she's not going to sell the houses within a
10  certain period, that she is going to be selling them
11  indefinitely.  I didn't like this, and I insisted on
12  changing the agreement to make sure I can take
13  houses away and sell myself.
14      Q.  And this was a conversation that you had
15  with Nick Lipetsker?
16      A.  With Maiden.
17      Q.  With Maiden?
18      A.  Yes.  I don't remember if Kagan was there.
19  Or was it at the second meeting, or it wasn't?  I
20  think it was at the second meeting.
21      Q.  Did you discuss --
22      A.  It was in the second meeting, yes.
23      Q.  So this is the meeting that occurred after
24  you did the drive-by's of various projects?

---

49

1       A.  Yes.
2       Q.  Did you discuss Tatiana's role with anybody
3   other than Mr. Maiden and Mr. Lipetsker prior to the
4   execution of the operating agreement?
5       A.  I don't think so.
6       Q.  Now, you said that you had agreed that the
7   construction would start by March of 2013.  Do you
8   recall that testimony a moment ago?
9       A.  Yes.
10      Q.  Prior to the execution of the operating
11  agreement, with whom did you discuss that?
12      A.  Kagan.
13      Q.  Was that at the initial meeting, at the
14  second meeting?  When was that?
15      A.  I don't remember if it was the initial or
16  the second meeting.
17          But before we signed the agreement, that
18  was defined in the agreement, that we get the land,
19  the purchase, and the house at the end of 2012.  It
20  was urgent; I remember I provided $250,000 deposit.
21          And then the houses will be built, will
22  start.  The permits and everything will start in
23  March.
24      Q.  The demolition will start in March?

---

**50**

1  A. Yes.
2  Q. Incidentally, from the time of the two
3  meetings that you've testified about up to November
4  14, 2012, which is the date on the operating
5  agreement, did you have any other face-to-face
6  meetings, with Mr. Kagan?
7  A. I don't remember. I might. I really don't
8  remember.
9  Q. Did you have any other face-to-face
10  meetings with either Mr. Maiden or Mr. Lipetsker
11  prior to November 14, 2012?
12  A. Say that again? Oh, 11/12? November of
13  '12? I don't remember.
14  Q. I'll represent to you that the operating
15  agreement appears to be dated November 14, 2012.
16  A. Yes.
17  Q. Prior to the execution of the operating
18  agreement, did you have any other meetings with any
19  of the project participants that you haven't yet
20  told us about?
21  A. I don't remember.
22  Q. Now, you said that the agreement was that
23  the project would take no more than a year after
24  construction. Did you have discussions with anybody

**51**

1  at any point prior to the signing of the operating
2  agreement on the topic of the duration of the
3  project?
4  A. I think we discussed it with Kagan.
5  Generally Kagan was very confident,
6  period.
7  Q. When do you recall first discussing the
8  project duration with Kagan?
9  A. Oh, before I signed the agreement.
10  Q. Was this during one of the first two
11  meetings?
12  A. Yes.
13  Q. And do you recall specifically what was
14  discussed about the project duration?
15  A. I was interested when it will start, and
16  how long will it take. He said it will start in
17  March, and it will take one year.
18  Q. Was there any guarantee as to the profit
19  that you would make on this project?
20  A. There was no promise of the guarantee as
21  such; but he said this is the amount of money we
22  need. This property will be sold for five or five
23  and a quarter million dollars, he said; five or five
24  and a quarter million dollars.

**52**

1  And he said that he's very confident
2  that this is what it takes to build these houses in
3  terms of cost; and whatever is left will be part of
4  the investors' money back.
5  Q. I don't understand what you mean by that.
6  A. Whatever is left from the cost of the
7  loaned money, et cetera, that will go back to Lyman-
8  Cutler, LLC, actually. My assumption was that it
9  was too much money that is going to be left over.
10  Q. And what did you base that assumption on?
11  A. The way Kagan represented it. He was very
12  confident; it's too much money, basically. It was
13  not too much; it was plenty of money to build this.
14  Q. Have you now exhausted your memory as to
15  what Kagan told you about the amount of money needed
16  to do this project prior to the execution of the
17  operating agreement?
18  A. I guess so.
19  Q. You said that the sale price for the
20  property would be somewhere between $5 and $5.25
21  million. Who told you that?
22  A. Kagan.
23  Q. When was that?
24  A. At one of the meetings. I don't remember

**53**

1  which one, first or second, but it was one of the
2  meetings.
3  Q. Was there any discussion that you can
4  recall as to how those selling prices were reached?
5  A. He said that Brookline is very expensive.
6  Actually, on one of the tours he drove
7  me around this place, and then he brought me to a
8  property of Mr. Kraft next to it, very close. I'm
9  talking about that --
10  MR. CARNATHAN: The Patriots' owner?
11  A. The Patriots' owner. And he said, this is
12  where people want to be, they want to be next to
13  this guy; that's why these houses are going to be
14  sold for over $5 million.
15  Q. I thought everybody wanted to live next to
16  Mr. Carnathan.
17  MR. CARNATHAN: Well, they can't afford
18  it.
19  (Laughter)
20  A. But he drove around. I had never been in
21  this part before, of Brookline, but he drove us all
22  around the most expensive houses in Brookline to
23  show how close we are in this Lyman-Cutler project,
24  how it's going to be easy to sell, how desirable

54

1    this location.  He was really doing good
2    salesmanship.
3        Q.  Have you bought and sold houses before?
4        A.  I bought an apartment in 1997 in Brighton
5    and sold it in 2000, I believe.  It wasn't for
6    investment; it was different needs.
7        Q.  Do you have any experience or understanding
8    as to how one determines what to list a property at,
9    as opposed to what you expect you're actually going
10   to get?
11       A.  I don't know.  No.
12       Q.  Let me ask the question this way.
13           Is it your understanding that, if you
14   want to sell a property for $5.25 million, that the
15   listing price with the real estate broker would be
16   something higher than $5.25 million?
17           MR. CARNATHAN:  Objection.
18       A.  Not necessarily.
19       Q.  Did you ever have any discussions with
20   Mr. Kagan about the listing price for these
21   properties?
22       A.  No, not at this time.  Not at this time.
23       Q.  Have you now exhausted your memory as to
24   your understanding of the agreement that you were

55

1    entering into which resulted in the execution of the
2    operating agreement?
3        A.  Something might come back to my memory
4    later, but at this time I don't remember.
5        Q.  Now, once you had finalized and signed the
6    operating agreement in November of 2012, what
7    happened next with respect to the Lyman-Cutler
8    project, if you recall?
9        A.  Yes.  The LLC was formed.  The document for
10   LLC formation was done by Boris Maiden; he had made
11   these documents.  And I applied to, talked to,
12   Rockland Trust.
13           Actually, I didn't want to get mortgage
14   from Rockland Trust.  I wanted to get money from
15   Belmont Savings, where I had relations and I could
16   get better rate than Rockland Trust.
17           But finally, Belmont Savings wanted to
18   have my personal guarantee for the whole amount of
19   loan, and I didn't want this.  With Rockland Trust
20   we negotiated only for $600,000, originally, of my
21   personal guarantee.
22       Q.  So the next event, as I understand your
23   testimony, was negotiating or obtaining a mortgage
24   to actually purchase the property for Lyman-Cutler

56

1    entity?
2        A.  Yes.
3        Q.  Now, you said that Boris Maiden formed the
4    LLC?
5        A.  Yes.  He submitted documents.
6        Q.  And before you signed those documents, did
7    you review them at all?
8        A.  I don't remember.  I think I did.  Yes, I
9    did.
10       Q.  Did you have any discussions with Boris
11   Maiden regarding the formation of the LLC?
12       A.  Yes.  We had some email correspondence,
13   yes.
14       Q.  Other than email correspondence, did you
15   have any oral communications with Boris Maiden
16   regarding formation of the LLC?
17       A.  I don't remember.
18       Q.  Did you have any discussions with either
19   Mr. Kagan or Mr. Lipetsker regarding the formation
20   of the LLC?
21       A.  No, I don't remember.
22       Q.  At some point, did you come to learn that
23   the LLC had now been legally formed?
24       A.  Yes.

57

1        Q.  And you understand as we're going forward
2    that by the LLC I mean Lyman-Cutler, LLC?
3        A.  Yes.
4        Q.  At some point, you learned that it had been
5    actually legally formed?
6        A.  Yes.
7        Q.  Did you receive a copy of whatever papers
8    needed to be filed with the Secretary of State's
9    office to form the LLC?
10       A.  Yes.
11       Q.  Did you provide copies of that to either
12   Lipetsker or Kagan?
13       A.  I don't think I provided.  I assume Maiden
14   provided them.
15       Q.  Did Maiden tell you he was going to do
16   that, or was that an assumption?
17       A.  That was an assumption.  But that's a valid
18   assumption, because all of them --
19           No, that wasn't signed.  I don't
20   remember, no.
21       Q.  In terms of the mortgage, you told us a
22   little bit about the fact that you had a
23   relationship with Belmont Savings Bank.
24       A.  Yes.

Alex Filippov - Vol. 1 - 4/25/2018

18

---

66

1    This is the first time I met Tatiana. I
2    had never seen her before, so I was curious to see
3    who she is. Never heard of her before, basically:
4    And we had social conversation.
5        It turned out I believe that she was
6    from the same city we were, from St. Petersburg,
7    Leningrad back then; and that kind of made me feel
8    better. I like our own people.
9        Q. With respect to that conversation at the
10    dinner relative to the project, what if anything do
11    you recall?
12        A. I don't recall. My memory is not really
13    that great, to remember every conversation.
14        Q. And I don't mean to be flip here, but when
15    you say your memory is not that great, are you
16    taking medication or something that impacts your
17    ability to recall?
18        A. No.
19        Q. Or do you have any condition that impacts
20    your ability to recall, as far as you know?
21        A. I'm 61 years old. You know, when I was 40,
22    I still wouldn't be able to recall what happened six
23    years ago, what conversation I had with whom. There
24    are some people who are capable; I am not. I'm

---

67

1    jealous of those people, but I know very few who
2    can.
3        MR. CARNATHAN: Those people are kidding
4    themselves.
5        A. I know very few.
6        MR. CARNATHAN: My ex-wife has precise
7    recall of conversations from 32 years ago.
8        A. My brother has precise memory of numbers.
9    You can give him the number, and 40 years later he
10    will tell you the number. He still does; he's 67.
11        MR. CARNATHAN: Wow.
12        Q. Did you ever discuss the numbers on this
13    project with your brother?
14        A. No.
15        Q. Now, once the project started and the
16    demolition began, did you have occasion to go out to
17    the site?
18        A. Yes.
19        Q. How often during the life of this project
20    would you physically go out to see the project?
21        A. Ten times, maybe. I don't remember. But
22    we were coming and making pictures of the project
23    periodically; sometimes I'm alone, sometimes with my
24    wife. We were following; we were looking at the

---

68

1    progress, watching the progress.
2        Q. And did you observe construction trucks on
3    the project?
4        A. Yes.
5        Q. Were there names of the various contractors
6    on the sides of the trucks?
7        A. No, I didn't see this.
8        Q. Was there a fence around the site?
9        A. Yes.
10        Q. And did the site have signs on it that said
11    like Hardhat Area, something like that?
12        A. I think so, yes.
13        Q. Did Kagan's name appear anywhere? Was
14    there any sign of what's coming?
15        A. It was a sign, Kagan-something. Kagan
16    Development, I believe, or something.
17        Q. And did you take a photograph of the sign?
18        A. I don't remember. I might.
19        Q. Have you provided those photographs to your
20    counsel?
21        A. I don't know.
22        MR. PERTEN: I don't recall seeing them,
23    Mr. Carnathan; so if you could check, I think that
24    would be called for under the document request if

---

69

1    they exist.
2        MR. CARNATHAN: I agree; absolutely. I
3    don't recall seeing them either, but if we can put
4    our hands on them we will fork them over.
5        MR. PERTEN: Thank you.
6        Q. Did you take any videos? I understand on
7    phones now you can take videos as well as still
8    photos. Did you take any videos of the project of
9    construction?
10        A. I don't remember.
11        Q. In terms of the finances of the project and
12    the bills for the construction, did you have any
13    role in the paying of the bills?
14        A. Yes.
15        Q. What was your role?
16        A. We were paying some bills. First we were
17    paying for tax preparation. We were paying for I
18    believe financial software, QuickBooks.
19        I don't remember. Some of the checks
20    was written by -- Arina was doing the books,
21    basically.
22        Q. So Arina, your wife, was handling the books
23    for the LLC?
24        A. Yes.

---

FARMER ARSENAULT BROCK LLC

Alex Filippov - Vol. 1 - 4/25/2018

### 70

1    Q. When you took the loans out from Rockland
2  Trust Company, did they also require that you have a
3  bank account there?
4    A. Yes.
5    Q. So the LLC had a bank account, an operating
6  account?
7    A. Yes. They were required to establish a
8  bank account. I went to Rockland Trust for the LLC
9  to get signatures, to get checks ordered, to set up
10  the account. We set up the online access to the
11  account through Rockland Trust.
12    We obtained permission for Kagan to
13  write checks, as he requested. Yes, we were
14  visiting Rockland Trust bank quite often.
15    Q. Why were you visiting them quite often?
16    A. Because that's how they're organized.
17  Nothing you can do over the phone. Well, some of
18  the stuff you could, but --
19    Q. Are you referring that you visited them
20  quite often to set up the accounts and things of
21  that nature?
22    A. Right, yes.
23    Q. But once the accounts were set up, did you
24  still have to visit them quite often, or are you

### 71

1  just referring to this initially?
2    A. Initially. But also, I don't remember, we
3  were going there at least ten times or fifteen
4  times, to the office in Watertown.
5    Q. And who had check-signing authority for the
6  Lyman-Cutler account?
7    A. I did, I believe Arina did, and Kagan did.
8    Q. Now, you said that Arina --
9    A. I'm not sure about Arina, if she did or
10  not. I'm not sure; I don't remember.
11    Q. You said that Arina kept the books and
12  records of the LLC?
13    A. Yes. She was helping me.
14    Q. What were her duties and responsibilities
15  in that regard, as you understood them?
16    A. She was putting into QuickBooks, into
17  financial software, checks. She was watching the
18  balance of the bank account to make sure it's not
19  overdrafted.
20    And Kagan wasn't very accurate with
21  this. We had a few emails and messages that we had
22  to send him to warn him about low balance of the
23  account, because he wasn't watching the account
24  balance.

### 72

1    And we were trying to monitor the
2  balance on the account and all checks; and if we got
3  a copy of the invoice, which almost never happened,
4  it would be entered into the books on our side. We
5  were trying to keep track of the expenses.
6    Q. And the bank statements and copies of
7  checks, those went to your address?
8    A. Yes. They were available online, but --
9    Q. The hard copies came to you?
10    A. Yes.
11    Q. Now, you mentioned that there were times
12  when the balance got low. Do you recall that?
13    A. Yes.
14    Q. When the balance got low, did you have
15  communications with Mr. Kagan to let him know that
16  the balance was low?
17    A. Yes.
18    Q. And was he able to deposit funds to bring
19  the balance back up?
20    A. I think so.
21    Q. And what were the sources of revenue for
22  deposit into the bank account?
23    MR. CARNATHAN: Objection.
24    A. Sources? I had to deposit my personal

### 73

1  money. I had to deposit money there once or twice.
2  That was my personal money, obviously.
3    Q. And do you recall when that was?
4    A. We can look it up. I don't recall. But
5  that was at the beginning of construction, I
6  believe.
7    Q. And do you have any understanding whether
8  Mr. Kagan deposited any of his personal money to
9  bring the balance back up?
10    A. I don't know if that was his personal
11  money, his business money, but he deposited some
12  money.
13    Q. Now, other than whatever disbursements
14  Rockland Trust Company made under the construction
15  loan, did Lyman-Cutler have any other sources of
16  operating capital?
17    A. No, I don't think so.
18    Q. So if money was deposited into the account
19  which was not a construction-loan disbursement,
20  would you agree that it came from some other source
21  other than the bank?
22    MR. CARNATHAN: Objection.
23    A. Yes, obviously. But this money could come
24  and go. The fact that they came, it doesn't matter

Alex Filippov - Vol. 1 - 4/25/2018

20

---

74

1    that they were not taken later back.
2         That's what we did with our deposit.  We
3    put the money to make sure that the bank account,
4    you know, we're in good condition with the bank, and
5    when there is money in the bank account we would
6    take it back to make sure that our capital account
7    would stay the same.
8         And my understanding is that Kagan was
9    doing the same.
10   Q.  What is the basis of that understanding?
11   A.  The basis of this understanding was common
12   sense.
13   Q.  So that was an assumption?
14   A.  Yes.
15   Q.  And did you have any communications with
16   anybody to confirm the assumption that moneys that
17   Kagan was putting in he was taking back later?
18   A.  No, but it wasn't my concern.  It was a
19   fixed-price project.  I didn't really care much.
20   All I cared, that we didn't blow the bank account,
21   and we wouldn't need to deal with Rockland Trust.
22        But how he deposit, take money back,
23   it's his business.
24   Q.  You said this was a fixed-price project.

---

75

1    What is the basis for that statement?
2    A.  The basis was his presentation of the
3    original company, when he said this is what it's
4    going to cost, this is what it's going to cost.
5    Q.  Anything else, or that is the basis?
6    A.  This is the basis.  He presented this to
7    us; he said this is what it's going to cost.
8    Q.  Do you know Kristina Brusenkova?
9    A.  Yes.
10   Q.  How did you first meet Ms. Brusenkova?
11   A.  Meet?  I believe I located her to ask her a
12   few questions.  It was in 2015, after Mr. Kagan sent
13   us nasty letter.
14   Q.  How did you go about locating her?
15   A.  Google.  Web searching.  We can find
16   anybody today online, pretty much.
17        You know, I'll tell you, my mother, who
18   is 92, she was reading an article in the newspaper
19   written by this person that she knew before World
20   War II; she was living in New York.
21        She asked me, can you find this person?
22   Took me 15 minutes.
23   Q.  Did you understand Ms. Brusenkova to have
24   any role on the Lyman-Cutler project?

---

76

1    A.  Yes.  We were in correspondence with her
2    when she was a bookkeeper, email correspondence.  We
3    knew she was a bookkeeper; that's why I was
4    interested to talk to her.
5    Q.  And did you in fact talk with her?
6    A.  Yes.
7    Q.  Was this a phone conversation or a face-to-
8    face meeting?
9    A.  Originally I believe it was phone
10   conversation, and then we would have a face-to-face
11   meeting.
12   Q.  And the phone conversations, what do you
13   recall about that conversation?
14   A.  I called and said that we would like to ask
15   if she's still employed with Mr. Kagan, and that we
16   would like to meet to ask a few questions if she
17   doesn't mind.
18        She said no, I don't mind, so we met.
19        As a matter of fact, she's not the only
20   accountant I was looking for.  The other accountant,
21   O'Brady, I couldn't find.
22   Q.  Who?
23   A.  O'Brady.  Before Kristina Brusenkova, there
24   was another accountant in the company, at the

---

77

1    beginning of the whole project.
2         His name was, I believe, O'Grady; I'm
3    sorry.
4    Q.  When you say accountant, are you using that
5    word interchangeably with bookkeeper?
6    A.  Yes.
7    Q.  Or was it actually accountants?
8    A.  No, bookkeeper, I'm guessing, I'm talking
9    about.
10   Q.  Incidentally, when you use that term
11   bookkeeper, what did you understand Ms. Brusenkova's
12   duties and responsibilities were at Kagan's
13   business?
14   A.  My understanding, that she kept books, she
15   made some payments on behalf of Kagan or KDC or
16   whatever entity he was using, and she was in
17   correspondence with us about certain payments,
18   questions that we asked.
19        My understanding was that she knew
20   pretty well the whole money disbursement, the
21   expenses, the project, et cetera.
22   Q.  And what was the basis of your
23   understanding?
24   A.  My basis was the communication with her

---

FARMER ARSENAULT BROCK LLC

78

1   over email, that she was pretty much knowledgeable
2   about what's happening with the Rockland Trust
3   account.
4       Q.  Have you now exhausted your memory as to
5   the initial phone conversation with Ms. Brusenkova?
6       A.  Yes.
7       Q.  And you said you then met with her?
8       A.  Yes.
9       Q.  Where did that meeting occur?
10      A.  That happened in Starbucks in Belmont.
11      Q.  Do you recall when that was?
12      A.  May -- no; June 2015.
13      Q.  And who was present besides yourself and
14  Ms. Brusenkova?
15      A.  Nick Lipetsker.
16      Q.  How long did you meet with her?
17      A.  Maybe an hour, maybe more.
18      Q.  Did you bring any documents with you to
19  that meeting relative to Lyman-Cutler?
20      A.  I don't remember.  I don't think so.
21      Q.  Did she bring any documents with her at
22  that meeting relative to Lyman-Cutler?
23      A.  No, I don't think so.
24      Q.  And what do you recall about your

79

1   conversations at Starbucks in June of 2015 with
2   Ms. Brusenkova?
3       A.  She actually said about certain practices
4   that Kagan was applying bills from another project
5   to this project and vice versa, getting refunds that
6   were not attributed to the project, that he wouldn't
7   put back to this project; he would just pocket it.
8           She provided kind of the picture of the
9   operation, unorganized and dishonest.  That was the
10  picture we got.
11      Q.  When you said that he applied bills to
12  different projects, did she give you any specifics
13  of that; examples?
14      A.  She might.  I don't remember now.  She
15  might have said something specific.
16          She also mentioned some issue with some
17  of his subcontractors, Russian subcontractors, that
18  he had close relations with; kickbacks, et cetera.
19      Q.  Anything else that you can recall about
20  that conversation with Ms. Brusenkova?
21      A.  Yes.  We asked if she would write an
22  affidavit and asked her to talk to our attorney, and
23  she agreed.
24      Q.  Forgive me; I think I may have asked this

80

1   already.  Did she tell you that the applying of
2   bills to different projects occurred on the Lyman-
3   Cutler project?
4       A.  Yes.
5       Q.  And did she give you specifics?
6       A.  I think she did.  I don't remember.
7   I think she did.
8       Q.  Did you take notes of any kind at this
9   meeting?
10      A.  That's a good question.  I might have had a
11  notepad with me; not a computer, a notepad.  But I
12  don't remember what happened to this.
13      Q.  Would you make a search for those notes and
14  give them to your counsel if you have them, please?
15      A.  I will.  I'm not sure if it's there.
16          Because I just took it from my memory
17  and conveyed that information to my attorney,
18  generally, the conversation.
19      Q.  With respect to refunds that he took and
20  didn't attribute to the specific project, did she
21  give you any examples of that happening in the
22  Lyman-Cutler project?
23      A.  Not specifics.
24      Q.  You said he was disorganized, actually, you

81

1   said unorganized; unorganized, and dishonest.  What
2   else did she tell you, if anything, that led you to
3   the conclusion that he was dishonest and
4   unorganized?
5       A.  She said that everything was approximately;
6   All bills never calculated properly.
7           If they were not structured like
8   invoicing, it was just a number; "Bill them this,
9   put this charge in the account."
10      Q.  And did she give you specifics, or was this
11  a general observation?
12      A.  General observation.  She didn't have
13  documents, so....
14      Q.  With respect to the kickbacks from Russian
15  subcontractors, did she give you specifics of any of
16  those occurrences?
17      A.  No.
18      Q.  Did she say anything else during this one-
19  hour meeting you had at Starbucks?
20      A.  I don't remember.  It was a long time ago.
21          But it was enough for us to confirm the
22  picture we had already formed about Kagan.
23      Q.  This meeting was in June of 2015, you told
24  me, to the best of your recollection?

Alex Filippov - Vol. 1 - 4/25/2018

24

### 90

1  was it, and getting his help, maybe paying him for
2  helping?  I don't remember.
3        To tell you the truth, these details are
4  not in my memory.  She just, I had a picture of my
5  fight with Kagan, and I also Googled and read some.
6        So I don't know what she told me, what I
7  read in the Middlesex court record that I Googled,
8  et cetera.  So it's hard for me to tell now.  The
9  memory doesn't hold.
10       Q.  Have you now exhausted your memory of that
11  conversation with her, to the best of your ability?
12       A.  Yes.
13       Q.  Did you have any further communications
14  with Kristina Brusenkova?
15       A.  I don't remember.
16       Q.  Did you ever provide her with any financial
17  support of any kind?
18       A.  No.
19       Q.  You said you wanted to be helpful.  Were
20  you able to be helpful to her?
21       A.  Yes; with affidavit, yes.
22       Q.  Did you provide her any other kind of help
23  other than the affidavit?
24       A.  No.

### 91

1        Q.  Now, at some point in the Lyman-Cutler
2  project, did you become aware that the properties
3  were on the market for sale?
4        A.  Yes.
5        Q.  How did that come to your attention?
6        A.  I believe Kagan sent text -- he was usually
7  doing texts -- that it was listed, and I went to see
8  the listing, and I found the error in the listing.
9        It was the sloppiness of Tatiana, by the
10  way.  It was that the square footage of 55 Lyman, I
11  believe, that was first listed, wasn't accurate.  It
12  was listed as 6,500 instead of 7,500.
13       And I sent either an email or text to
14  Kagan telling him that that needs to be corrected,
15  and that was corrected a week or two weeks later, I
16  believe.
17       Q.  And so you looked at the listing to find
18  this out?
19       A.  Yes.
20       Q.  Where was it listed?
21       A.  Where it was listed?  Oh, I found it on
22  Google, on Zillow, the realtor; whatever websites.
23  MLS.
24       Q.  And how much was it listed for?

### 92

1        A.  It was listed for five and a half million
2  dollars, yes.
3        Q.  When you learned that it was listed for
4  five and a half million dollars, did you object to
5  that listing at that price at that time?
6        A.  I did.  I asked Kagan, is it reasonable?
7        He said yes, sure, it's reasonable.
8        Q.  And at some point, did you learn that 88
9  Cutler was also listed?
10       A.  I asked Kagan why he didn't list both
11  properties at the same time.
12       He said that is strategy.  We don't want
13  to show both properties at the same time so people
14  don't see cookie-cutter.  Because that was cookie-
15  cutter; that was the idea of low-cost construction.
16       So I don't remember when both of them
17  were listed.  I don't think they were ever listed at
18  the same time.
19       These properties were listed separately.
20  First they put one on the market, then removed it;
21  then they put another one on the market and removed
22  it.
23       Q.  And when did you become aware of the fact
24  that they had put one on the market, and then

### 93

1  removed it and put the other one on?
2        A.  I don't remember.
3        Q.  Did you have any understanding as to what
4  the listing price was for Cutler Lane; 88 Cutler?
5        A.  Well, my understanding was that they were
6  putting Lyman at five and a half; they were putting
7  Cutler at the same price.
8        Q.  And did you voice any objection to having
9  the listing at 5.5 for the Cutler property as well?
10       A.  I believe I told Kagan that, will it sell?
11  I asked him.
12       He said, sure; it's a correct price; it
13  will sell.
14       Q.  And you said you went online to Google or
15  Zillow or whatever it was to look at the listing for
16  55 Lyman.  Did you also go online to look at the
17  listing for Cutler?
18       A.  Yes.
19       Q.  You said that the Lyman listing initially
20  had the wrong square footage.  Did you notice any
21  errors or mistakes with respect to the Cutler
22  listing?
23       A.  I don't remember.  I don't think so.
24       Q.  When did you first become aware that the 88

FARMER ARSENAULT BROCK LLC

Alex Filippov - Vol. 1 - 4/25/2018

94

1     Cutler property was listed?
2        A. I think October or November 2014. I can't
3     tell for sure.
4        Q. And was that before or after you became
5     aware that Lyman was listed?
6        A. After.
7        Q. So Lyman was listed earlier?
8        A. I think so.
9        Q. Did you have any conversations with Tatiana
10    about the listing of Cutler in October-November of
11    2014?
12       A. No. The only time I talked to Tatiana
13    about this, the only other time I met outside of the
14    Barcelona restaurant meeting, I believe it was July
15    2014 when I asked Kagan to meet me at the property.
16       Yes, I think so, yes; asked Kagan to
17    meet me at the property. I came there, and Tatiana
18    came there also. She came separately in her white
19    Mercedes, I remember.
20       And they was finishing 10 Lyman at this
21    time.
22       Q. That's a different project?
23       A. That's a different project, 10 Lyman.
24       And it just happened that we all were

95

1     standing there, and she was -- I don't remember if
2     55 Lyman was already listed or not; but I asked her
3     how it's going, the sales, because houses were
4     built. They were not finished yet, but built.
5       And she said yes, I have a lot of
6     interest. There is tons of interest; the houses
7     will be sold.
8       Q. And is that the best recollection of the
9     conversation you had with Tatiana?
10      A. Yes.
11      Q. And can you date that for me? Can you give
12    me a timeline of when this conversation occurred?
13      A. July 2014. I don't remember the date. I
14    can dig it out, because my son was visiting me from
15    Belgium, and he was there; and that was July 2014.
16    That's probably the only reason I remember this.
17      Q. At any point, did you make a determination
18    that the properties were listed at a price that was
19    too high?
20      A. Yes. At a certain point I realized it's
21    probably too high of a listing, but that happened
22    when I started talking to other brokers.
23      Q. Who did you speak with?
24      A. I talked to Deborah Gordon; and I talked

96

1     to, her last name was Krongel --
2       Q. Kathy Krongel?
3       A. Kathy, yes, from Hammond.
4       Q. When did you speak with Deborah Gordon?
5       A. I spoke with them in May.
6       Q. 2015?
7       A. Yes.
8       Q. And what about Ms. Krongel?
9       A. At the same time. I talked to both of them
10    at the same time. Because at this time I understood
11    that Tatiana is not selling houses, she's not
12    capable; and that's my time to take the properties
13    and move it to capable hands.
14      Q. Had you previously ever spoken to either
15    Ms. Gordon or Ms. Krongel?
16      A. No, never.
17      Q. How did you find them?
18      A. I asked around about Ms. Gordon, both of
19    them.
20      Deborah Gordon is probably the most
21    prolific seller in high-value houses in Brookline.
22    She has been doing this for 40 years. She sold most
23    expensive houses there. If anybody had the
24    experience, it would be her.

97

1       But my idea was to have two different
2     brokers instead of one for two different houses. So
3     I knew that one is going to be Deborah Gordon, and I
4     wanted a second one.
5       And when I looked around, I found the
6     person who specialized in high-luxury houses in
7     Brookline; Hammond, Krongel, yes.
8       Q. And did Ms. Gordon indicate that she thinks
9     the property should be listed at a different price?
10      A. Yes.
11      Q. What did she tell you?
12      A. I believe she said $5 million, and
13    Ms. Krongel said five and a quarter million dollars.
14      Q. 5.25?
15      A. Yes.
16      Q. While we're on the subject of Ms. Gordon,
17    you've made an allegation that there was an offer
18    that she presented. Did you have a discussion with
19    Ms. Gordon about an offer that she had received on
20    either of the properties?
21      A. Yes. I was in her office. That was in May
22    2015. I don't remember the date.
23      And when I explained to her the
24    situation that I'm looking for the broker, she said,

Alex Filippov - Vol. 1 - 4/25/2018

26

---

98

1    oh, I had an offer for this.  We made an offer for
2    this house to Tatiana.
3            And I said, what was the offer?  And she
4    said, four and a half million dollars.
5            And I said, when was it?  And she said,
6    probably four or five month ago, I guess; I'm not
7    sure about that, I think four or five month ago, she
8    said.  And I never heard of this.  It never was
9    communicated to me.
10           And then I asked Deborah Gordon in email
11   to confirm this, and she did.
12       Q.  And the conversation with Ms. Gordon about
13   the offer that you've just told us about, have you
14   exhausted your memory of your communication with her
15   on that topic?
16       A.  I think so.
17       Q.  So you had a conversation when you were
18   looking to change the listing price where that came
19   up, and that was followed up with an email; correct?
20       A.  Right, yes.
21       Q.  Other than those two communications, did
22   you have any further communications with Ms. Gordon
23   on that topic?
24       A.  On the topic of --

---

99

1        Q.  The offer.
2        A.  I don't think so.  Maybe I asked who it
3    was, maybe I didn't ask it.  It wasn't important,
4    basically, to me.
5            What was important to me, that there was
6    an offer that none of us were aware.
7        Q.  Now, we'll look at this after the break,
8    perhaps, in more detail, but you've alleged in this
9    lawsuit that there has been double-billing; correct?
10       A.  Yes.
11       Q.  Can you give me any specific examples of
12   double-billing that you're aware of on this project?
13       A.  We're still digging into the books that
14   Kagan conveniently didn't provide yet, because what
15   he provided is nonsense.  It's not books of a
16   contractor.  There is no details, there is no
17   invoicing, there is nothing but numbers that he
18   provided.
19           Billed by KDC, billed by Proexcavation;
20   looks like for the same job made.  Proexcavation
21   billed KDC, then KDC billed Lyman-Cutler.
22       Q.  My question, sir, though, was, can you give
23   me specific examples of double-billing that occurred
24   on this project?  Are you able to do that as you sit

---

100

1    here today?
2        A.  No, I'm not able to give you specifics.
3        Q.  You've also alleged that certain bills were
4    inflated, were too high.  Can you give me specific
5    examples of bills that you believe were inflated?
6        A.  Yes.  The whole Proexcavation bill is
7    $480,000.
8            I talked to three different contractors
9    building similar houses.  All of them said the cost
10   is approximately $70,000.
11       Q.  What three different contractors did you
12   speak with?
13       A.  I talked to the contractor who owns the
14   company Built-Well, Paul Laffey.
15       Q.  Built-Well, Paul Laffey?
16       A.  Yes, Laffey; L-a-f -- double F or single
17   F -- e-y.
18           I talked to Cindy Stumpo.
19       Q.  I'm sorry?
20       A.  Cindy Stumpo.
21       Q.  How do you spell that?
22       A.  Ask Kagan; Kagan would know.
23       Q.  Cindy Stumpo?
24       A.  Stumpo, S-t-u-m-p-o.  She's the largest

---

101

1    developer in Brookline, basically, of luxury homes.
2        Q.  Who else?  Who was the third?
3        A.  The third was Mr. Palian.
4        Q.  P-a-l --
5        A.  P-a-l-i-a-n.
6        Q.  Is he with a company?
7        A.  He has his own company in Weston; also
8    luxury homes.
9        Q.  And when did you speak with Mr. Laffey of
10   Built-Well?
11       A.  Mr. Laffey I believe was June or July of
12   2015, when the lien happened; yes.  I recall
13   inflated stuff started coming at us.
14       Q.  And what do you recall that you said to
15   Mr. Laffey and he said to you?
16       A.  I brought him to the house.  I showed him
17   the house, I showed him the work, and I asked what
18   do you think the cost of this project?  And he
19   basically said $1.3 million, approximately.
20           And I said what about excavation cost,
21   $480,000?  And he said, I don't know where these
22   numbers are coming from.  It should be around
23   $70,000, $80,000.
24       Q.  Did Mr. Laffey give you any kind of formal

---

FARMER ARSENAULT BROCK LLC

Alex Filippov - Vol. 1 - 4/25/2018

102

1    written appraisal?
2        A.  No, he didn't.
3        Q.  What exactly did you tell Mr. Laffey that
4    Proexcavation did on this project?
5        A.  I didn't tell what Proexcavation did.
6    Proexcavation is a big excavation company that does
7    site preparation.
8        Q.  Let me stop you there for a moment.  So
9    it's your understanding that Proexcavation did the
10   site preparation?
11       A.  Yes.
12       Q.  Did it do anything else?
13       A.  Site preparation; maybe foundation, with
14   the help of contractors again.
15       Q.  Anything else?
16       A.  That's basically it.  Maybe landscaping,
17   yes.
18       Q.  And when you say site preparation, what do
19   you mean by that?
20       A.  Preparation of the ground, preparation for
21   the foundation, preparation for making the surface
22   suitable, road, entrance, driveway, et cetera.
23       Q.  Did Mr. Laffey review the actual building
24   plans?

103

1        A.  Yes.  I showed them to him.
2        Q.  You have the building plans?
3        A.  Yes.
4        Q.  Were they 8 1/2 by 11 or full three-foot
5    sheets, or whatever size the big sheets are?
6        A.  I don't remember which one.  I had big
7    sheets by then, I think, yes.
8        Q.  Did you give them to him to study, or he
9    just looked at them while you were talking to him?
10       A.  I believe I gave it to him.
11       Q.  And how long did he take before he got back
12   to you?
13       A.  A couple weeks.
14       Q.  What about your communications with Cindy
15   Stumpo?
16       A.  Cindy Stumpo, she also came to the
17   property.
18           MR. CARNATHAN:  Let me think about that
19   one for a moment.
20           The thing is whether Stumpo was
21   considered a consulting expert at some point, in
22   which case we probably shouldn't be disclosing
23   communications with her.
24       Q.  You discussed with Cindy Stumpo, you said,

104

1    sometime in roughly May of 2015; is that correct?
2        A.  June.
3        Q.  June of 2015?
4        A.  Yes.
5            MR. CARNATHAN:  I guess we never really
6    retained Stumpo, so probably he can testify.
7        Q.  Go ahead.  What were your communications
8    with Ms. Stumpo?
9        A.  She said she knew the owner of this
10   property; Mr. Schwartz, I believe.
11           She said that she was the person who
12   built the house next to this property.  She said she
13   knows exactly the land, and there is no ledge over
14   there or anything else that makes site preparation
15   work any difficult.
16           And she said that the cost of the site
17   preparation is around $70,000.
18       Q.  And did you provide her with a copy of the
19   plans as well?
20       A.  No.
21       Q.  Did she provide a written report to you?
22       A.  No.
23       Q.  How long did you speak with her?
24       A.  How long?  Oh, I spent probably a good two,

105

1    three hours in her office, and then we went.
2    I showed her the houses.
3        Q.  Did she bill you for her time?
4        A.  No, she didn't.
5        Q.  Did you have any further communications
6    with Ms. Stumpo?
7        A.  I believe I asked her a few more questions
8    over the phone.  I don't remember it, but certainly
9    we discussed about the construction cost.
10           Oh, she said that the framing job was
11   double-billing; absolutely, she said.  He billed
12   like, I don't remember, $160,000, and it was
13   supposed to be half of this.
14           She gave some ballpark.  She has been
15   very experienced builder for many, many years.
16       Q.  Anything else she said?
17       A.  She wasn't impressed with the quality of
18   the construction.  She said it's not bad, it's not
19   good; it's kind of mediocre.
20           Also, I asked about Home Depot bills.
21   She said builders who build houses like this do not
22   buy anything at Home Depot.  That's what she said;
23   that's what I remember.
24       Q.  Anything else?

Alex Filippov - Vol. 1 - 4/25/2018

28

---

106

1   A. No, I don't remember.
2   Q. Then you also had a conversation with
3   Mr. Palian?
4   A. Yes.
5   MR. CARNATHAN: And I'll stop you there.
6   With regard to Palian, we have retained
7   him; and so I'm going to instruct Mr. Filippov not
8   to disclose communications with Mr. Palian.
9   Q. When did you retain Mr. Palian as an
10  expert?
11  A. I don't remember.  September?
12  Q. At the time you had your initial
13  conversation with Mr. Palian, had you retained him
14  as an expert?
15  A. Say that again?
16  Q. At the time you had your initial
17  conversation with Mr. Palian, had you asked him to
18  testify on your behalf as an expert?
19  A. I don't remember.
20  Q. Why did you speak with Mr. Palian?
21  MR. CARNATHAN: We're just not going to
22  testify about Mr. Palian.  If we need to go do
23  motions or something, that's fine.
24  MR. PERTEN: I'm certainly entitled to

---

107

1   probe on what I'm probing on, John.
2   MR. CARNATHAN: No, you're not.  He's
3   currently a consulting expert; he may become a
4   testifying expert.
5   The rule is pretty clear about what we
6   have to give you, and when; and we'll do that.  But
7   my witness here today is not going to testify about
8   his conversations with David Palian.
9   So you can move on; and if you want to
10  suspend and go talk to the judge that's fine, we can
11  do that.  But we're not going to talk about
12  conversations with David Palian here today.
13  Q. To the best of your knowledge, sir, when
14  was your initial conversation with Mr. Palian?
15  A. I don't remember.
16  Q. Was it at or about the same time you spoke
17  to Stumpo?
18  A. No; later.
19  Q. How much later?
20  A. A month or two month later; I don't
21  remember.
22  Q. At the time you spoke with Mr. Palian, had
23  you already initiated any litigation against
24  Mr. Kagan?

---

108

1   A. Yes.
2   Q. In the state court?
3   A. Yes.
4   Q. And were you speaking with Mr. Palian to
5   assist you in your state-court litigation?
6   A. I think so.  I don't remember.
7   MR. CARNATHAN: I don't know why we're
8   thumping this drum, John, but we're not going to
9   answer any more questions about Mr. Palian.
10  That's how it's going to be.  So if you
11  want to take it to the judge, let's do it; but we're
12  done.  Done, done, done.
13  MR. PERTEN: We're thumping because, if
14  I'm going to take it to the judge, I certainly need
15  to make a record of the things that you're refusing
16  to let him testify to; because otherwise the judge
17  has no basis to make a decision one way or the
18  other.  So I think I'm entitled to --
19  MR. CARNATHAN: David Palian is
20  currently our construction expert.  We're not going
21  to testify about him.  If he does a report, which I
22  expect he will, we'll give it to you when we're
23  supposed to give you a report under the rules, and
24  then you'll get all the stuff the rule requires that

---

109

1   we tell you.
2   But other than that, we're done talking
3   about David Palian.
4   MR. PERTEN: Just so that we're clear,
5   you're instructing your client not to answer?
6   MR. CARNATHAN: That's correct.
7   Q. Now, you told us a little while ago about
8   allegations of kickbacks which Ms. Brusenkova
9   discussed with you; correct?  Do you recall that
10  testimony?
11  A. Yes.
12  Q. Are you aware of any specific examples of
13  kickbacks that occurred in the Lyman-Cutler project?
14  A. It's pretty difficult to prove.  But,
15  first, Kristina Brusenkova mentioned this; and
16  second, one of the contractors who worked for Kagan
17  said that.
18  Q. What contractor?
19  A. There is a contractor who was working with
20  this house, Huntington TV.
21  Q. And did you have a conversation with
22  somebody from Huntington TV?
23  A. I was in the office of Cindy Stumpo
24  conversing with her.  He is doing work on upscale

---

Alex Filippov - Vol. 1 - 4/25/2018

---

110

1  buildings, wiring them for entertainment and
2  everything else.
3          And she asked him on the phone, on the
4  speakerphone, if he did work for Kagan.  And he said
5  yes, I did.
6          And she asked, do you know if he takes
7  any kickbacks?  Did you give him any kickbacks?
8          And he said no, I didn't; although, and
9  I remember this conversation, he said he will not
10 take the money, but he might ask for TV or
11 something.
12         And the second thing he said about
13 Kagan, that is interesting, for the same job you
14 would pay me $3,500 Kagan paid me $8,000.
15 Q.  Paid you --
16 A.  $8,000.
17 Q.  Who was this guy at Huntington TV?
18 A.  I don't remember his name.  I actually met
19 him once at the house, because I asked him to bring
20 me the drawings of the wiring.  I can dig it out.
21 I forgot his name.  He's the owner.
22 Q.  Did he provide you with any kind of an
23 affidavit or anything to that effect?
24 A.  No.  I wasn't looking for an affidavit.

---

111

1  That was the conversation.
2          MR. CARNATHAN:  Are we going to break
3  for lunch?  Seems like we've kind of drifted into
4  other topics at this point.
5          MR. PERTEN:  One last question, very
6  quickly.
7  Q.  Are you aware, sir, as you sit here today,
8  of any materials that Mr. Kagan purchased for
9  another project that were billed to this project?
10 A.  Without looking at this, I'm not ready to
11 give you details.
12 Q.  So your answer is no; as you sit here
13 today, you don't know?
14 A.  Correct.
15         MR. PERTEN:  So, why don't we take a
16 break at this point.
17         (Lunch recess)
18 Q.  Now, at some point, Mr. Filippov, there was
19 a decision made to put Lyman-Cutler into bankruptcy;
20 correct?
21 A.  Yes.
22 Q.  Who made that decision?
23 A.  I did.
24 Q.  Why?

---

112

1  A.  A number of reasons.
2          The first one is that Mr. Perten,
3  sitting in front of me, was insisting that the
4  company is going to be dissolved by November, I
5  believe, 2015; and then we would have to auction the
6  properties, et cetera.
7          If it's dissolved, the loan would be
8  called.  And I was responsible for these loans,
9  basically, and I didn't have any other better choice
10 to sell.
11         And it was a lien that Mr. Kagan
12 fraudulently put on the two properties that wouldn't
13 allow us to sell this property until it's cleaned of
14 the liens, so it was a way to remove the liens.
15 Q.  Were those two reasons that you filed for
16 bankruptcy?
17 A.  Yes.
18 Q.  Now, you said you were responsible for the
19 loan.  This morning you testified that you only had
20 limited guarantee.
21 A.  Yes, but still my guarantee.
22 Q.  $200,000?
23 A.  Yes.
24         And there is another thing.  I never

---

113

1  cheated anybody.  So when you say that you are not
2  going to pay the loan, to me it's cheating.  That's
3  my kind of attitude to the whole thing.
4          So it's not just my responsibility, the
5  $200,000.  If I borrow money from somebody, I'm
6  going to give it back.
7  Q.  Was there a vote of the members of Lyman-
8  Cutler prior to filing the petition for bankruptcy?
9  A.  We discussed it with Nick Lipetsker on the
10 phone, that was probably September 2015; and we
11 agreed that was the best solution.
12         And because we were more than 81 percent
13 interest holder, that was in accordance with LLC
14 operational agreement.
15 Q.  Did you discuss it with Kagan before doing
16 it?
17 A.  We didn't.  We didn't talk to Kagan.  Kagan
18 wouldn't even show up at the meeting.
19 Q.  At the time you and Mr. Lipetsker made the
20 decision to put the company in bankruptcy, was the
21 LLC insolvent?
22         MR. CARNATHAN:  Objection.
23 A.  No.  I was paying.  I was paying the
24 carrying costs because Kagan leaved.

Alex Filippov - Vol. 1 - 4/25/2018

32

122

1    company into bankruptcy?
2    A. No.
3    Q. When did you make the decision to put the
4    company into bankruptcy?
5    A. I believe that was done probably one week
6    before. It was really urgent. A decision, it was
7    probably one week before we put the company in
8    bankruptcy. It was done very quickly.
9    Q. When you say one week before, it was really
10   urgent, what made it urgent?
11   A. The dissolution. The company dissolution.
12   Q. The dissolution date in the operating
13   agreement?
14   A. Yes.
15       Let me remind you that you were writing
16   letters to us about this.
17   Q. How did the mechanic's lien impact the
18   ability to sell the property?
19   A. No reasonable buyer will buy a house that
20   has a lien on this.
21   Q. How do you know that?
22   A. It's common knowledge. Would you?
23   Q. Did you receive any offers on the property?
24   A. It was offered on the property, and those

123

1    offers were made without the buyer actually knowing
2    that there is a lien. It was made to Michelle Lane,
3    who was designated by the court and we agreed, to be
4    the real estate broker; and the offer was $4.1
5    million, and then $4.2 million.
6        Both offers, as far as I know, were done
7    in such a way so the buyer even didn't know about
8    the lien.
9    Q. Is it your experience, sir, that when
10   people make an offer on the property they don't
11   typically do a title exam or anything before the
12   offer?
13   A. It depends on the person who does it. We
14   don't know.
15       I'm not sure, but I think I asked
16   Michelle Lane about this; and she said that I will
17   have to disclose it to them, because I think the
18   offer was contingent on this.
19   Q. Did the listing disclose that there's a
20   lien on the property?
21   A. No, I don't think so.
22   MR. PERTEN: Off the record.
23   (Discussion off the record)
24   (Marked, Exhibit 5, amended adversary

124

1    complaint.)
2    Q. Sir, I've placed in front of you Exhibit 5,
3    which is the amended adversary complaint that was
4    filed in this action. Are you familiar with that
5    document?
6    A. I saw the document, yes.
7    Q. Before it was filed, did you review it and
8    make sure that the factual allegations were
9    accurate?
10   A. Yes.
11   Q. And to the best of your knowledge, sir,
12   were the factual allegations in this document
13   accurate?
14   A. Yes.
15   Q. If I could ask you, sir, to turn to
16   Paragraph 46.
17   A. Okay.
18   Q. Just take a moment and read Paragraph 46 to
19   yourself, and let me know when you've done that.
20   (Pause)
21   A. Okay.
22   Q. The former bookkeeper that is referenced
23   there would be Kristina Brusenkova, correct?
24   A. That's correct.

125

1    Q. We covered some of this this morning.
2        This alleges that Mr. Kagan "mixes
3    expenses for projects on his American Express card."
4    Do you see that?
5    A. Yes.
6    Q. As you sit here today, do you have any
7    examples that you can give me of charges to the
8    American Express card which were improper?
9    A. Not yet.
10   Q. Did you obtain any formal estimates of
11   Proexcavation's work?
12   A. Estimates? I'm not sure I follow your
13   question.
14   Q. Take a look at Paragraph 47, which says,
15   "Proexcavation's alleged charges on the project are
16   double what any conceivable legitimate charges for
17   the work it performed on the project would be."
18       Do you see that language?
19   A. Yes. But I also see the language, "In
20   addition, plaintiff has interviewed KDC former
21   bookkeeper, who reports."
22   Q. Got it.
23       In Paragraph 47, what is the basis for
24   the allegation that Proex's charges are double?

Alex Filippov - Vol. 1 - 4/25/2018

126

1     A.  That Proex's charges are double?  Well, one
2  of the allegations, I explained that my conversation
3  with experienced contractors --
4     Q.  That would be Ms. Stumpo, Mr. Palian --
5     A.  Mr. Palian, Mr. Laffey.
6     Q.  Anything else?
7     A.  I think that's plenty.
8     Q.  I'm sorry?
9     A.  I think that's it.  That's plenty.
10     Q.  Just what you've explained this morning?
11     A.  Yes.
12     Q.  Now, if you'd take a moment and look at
13  Paragraph 49, please.
14     A.  Yes.
15     Q.  Tell me when you're done.
16        (Pause)
17     A.  Yes.
18     Q.  It says, the second sentence, that "KDC and
19  Proexcavation bills are rife with double-billing,
20  false and inflated charges."  Do you see that
21  language?
22     A.  Yes.
23     Q.  Are you able to give me any specific
24  examples of double-billing, false and inflated

127

1  charges as it relates to the Proexcavation bills?
2     A.  Well, inflated charges, I just pointed out.
3  There is one thing that Cindy Stumpo
4  mentioned that was very interesting.  She said, in
5  my experience there are never two houses that have
6  the same cost for anything.
7  On Kagan's bill, the Proexcavation cost
8  is the same for both houses.  It doesn't exist.
9  That means they're inflated and made-up charges.
10     Q.  Anything else that you believe shows that
11  they're inflated and made-up charges?
12     A.  Many round numbers.  Look at his bills, and
13  look at some of the bills that his actual
14  contractors did.  Contractor would put 125 and a
15  quarter hour at $100 rate, and they would multiply
16  one by each other.  That's what they did, and they
17  would come up with the exact number.
18  All Kagan's numbers are round.  Doesn't
19  exist in the real world.
20     Q.  Is there anything else that led you to
21  believe that these are false and inflated charges?
22     A.  We're still digging through this; and
23  between what Kristina Brusenkova said and what we
24  say are the costs of this, including the charge that

128

1  Mr. Kagan put on the bogus contract that he signed
2  with himself, it's like $800,000 all together.
3  That's bogus, and false.
4     Q.  Is it?
5     A.  Yes.
6     Q.  And is it bogus to sign the mortgage note
7  by yourself to yourself?
8        MR. CARNATHAN:  Object.
9     A.  I didn't sign with myself.  I signed it
10  with LLC, where there were three people.
11     Q.  Now, sir --
12     A.  With the agreement, I'm sorry, with the
13  agreement of another member.
14     Q.  In Paragraph 49, you talk about the
15  properties being sold at below market value by the
16  Chapter 7 trustee.  Do you see that?
17     A.  Yes.
18     Q.  In your experience, sir, does filing for
19  bankruptcy have any impact on the amount that you
20  can sell real estate for?
21     A.  Generally, yes.
22     Q.  What effect would you expect it to have?
23     A.  It reduces the cost.
24     Q.  When you made the decision to place the

129

1  company in bankruptcy, did you consider the fact
2  that the bankruptcy might have the effect of
3  reducing the price that you could sell the property
4  for?
5     A.  I did.
6     Q.  And how did you reconcile that with your
7  decision to put the company into bankruptcy?
8     A.  There are certain things you have to make
9  decisions.  I wasn't expecting that it was going to
10  have to be Chapter 7 bankruptcy.  I was expecting
11  that I would be selling the houses; not the trustee,
12  whose only goal is just to get rid of it.
13  So it wasn't obvious to me when I was
14  putting in the bankruptcy that it's going to be sold
15  for less.  All I was caring, that that would remove
16  the lien of the property, and we would be able to
17  sell it.
18     Q.  Now, sir, take a look at Paragraph 50 of
19  your adversary complaint.  Would you read that to
20  yourself, and let me know when you've done so?
21        (Pause)
22     A.  Yes.
23     Q.  You make the allegation that Mr. Kagan
24  planned all along to inflate construction costs.

Alex Filippov - Vol. 1 - 4/25/2018

40

---

154

1    We know the price of the houses,
2  approximately; they're not going to be sold for less
3  than $4 million or $5 million. And actually Kagan
4  said back then, I repeat again, probably five and a
5  quarter million dollars; that's the sale price of
6  these properties.
7    That was the salesmanship; he was
8  telling us what to expect.
9    Q. Look at the next page, the initial loan
10 interest schedule.
11   Would you agree with me that this
12 scenario anticipates a loan of $750,000? Top line,
13 Lot Purchase.
14   A. Lot purchase, $750,000; yes.
15   Q. In fact, did you take a loan out for
16 $750,000 for the lot purchase?
17   A. No, no. We took $1.8 million, I believe.
18   Q. So that number which was used here was not
19 the actual number, correct?
20   A. I think so.
21   Q. So would you agree with me again that it
22 was an estimate at that time, and ultimately a
23 different number was used?
24   A. For the purchase, yes; I think so.

---

155

1    Yes. For the lot purchase it looks
2  like, yes.
3    Q. Now, beneath the lot there's something
4  titled Construction Loan Distribution Schedule,
5  correct? Do you see that?
6    A. This one? Yes, okay.
7    Q. And below that topic heading there is a
8  distribution schedule. Do you see that?
9    A. Yes.
10   Q. What did you understand that to be showing?
11   A. The distribution of the construction loan
12 for a single home based on the phases finished; so
13 when he gets plans and permits he gets the first
14 $45,000, then for foundation $135,000, et cetera,
15 all the way to $1.5 million.
16   And this number of $1.5 million was
17 inflated to include the carrying costs;
18 deliberately.
19   Q. And where are the carrying costs listed?
20   A. The carrying costs on this particular one
21 is not listed because it's built in. It's $200,000.
22   If you go back, you will see that the
23 cost of construction, one point three, and two
24 hundred and point two million dollars is built into

---

156

1  this number.
2    Q. Who told you that --
3    A. Kagan did.
4    Q. Let me finish the question.
5    Who told you that this $1.5 million
6  construction loan distribution schedule was inflated
7  to include carrying costs?
8    A. Kagan did.
9    Q. When did he tell you that?
10   A. At the meeting. I asked him. He said
11 that's a common practice; that's what we do.
12   Q. Did you have any further conversation about
13 that at that meeting?
14   A. I don't think so.
15   Q. Ultimately, sir, the construction loan that
16 you ultimately took out was not $1.5 million;
17 correct? It was higher than that, correct?
18   A. On the second meeting, he asked just in
19 case another $100,000 for each home. And we'll kind
20 of talk to each other; and he said, well, whatever
21 money is going to be left over, we're going to
22 return back to capital, just in case not to get dry.
23   Q. If I could ask you to turn to the last page
24 of this exhibit. At the top it says Estimated

---

157

1  Settlement Statement, Lot Purchased. Do you see
2  that?
3    A. Yes.
4    Q. Would you agree with me that that was
5  simply an estimate of what the settlement for the
6  lot purchase would be, since the lot hadn't yet been
7  bought?
8    A. Yes.
9    Q. And similarly, in the middle it says
10 Estimated Settlement Statement For the Construction
11 Loan. Would you agree with me that too was just an
12 estimate?
13   A. Yes.
14   Q. And at the bottom, Estimated Settlement
15 Statement, Construction Loan, would you agree that
16 that too was an estimate?
17   A. Yes.
18   Q. What I'd like to do, just so that we don't
19 get mixed up, let's re-mark what was Zhukovskiy
20 No. 7 as the next exhibit to this deposition.
21   (Marked, Exhibit 6, email string, top
22 email 9-29-15, with attached estimated project
23 financials and risk analysis.)
24   MR. CARNATHAN: Can we take two?

---

FARMER ARSENAULT BROCK LLC

Alex Filippov - Vol. 1 - 4/25/2018

52

### 202

1  complexity.
2  Q. And that's why Mr. Zhukovskiy did it?
3  A. Yes.
4  Q. Got it.
5  A. He requested Mr. Zhukovskiy to help. And
6  my understanding was from Zhukovskiy that he
7  promised him to pay when the house is going to be
8  sold.
9  MR. PERTEN: We'll take a short break.
10  (Recess)
11  (Marked, Exhibit 20, contract to build
12  two houses, 55 Lyman and 88 Cutler.)
13  Q. You have Exhibit No. 20 in front of you.
14  Can you identify that document?
15  A. That was a document that was part of the
16  Rockland Trust construction loan, and that's the
17  agreement to build houses with Classic Homes
18  Development and Construction, LLC.
19  Q. Did Classic Homes Development and
20  Construction do any of the construction?
21  A. I don't know.
22  Q. Did you ever see any bills from Classic
23  Homes Development and Construction?
24  A. I didn't.

### 203

1  Q. Did you ever see any checks made out to
2  Classic Homes Development and Construction?
3  A. I didn't.
4  Q. Did you ever ask Kagan who Kagan
5  Development KDC was, and what their role was?
6  A. I don't remember.
7  Q. Do you understand that KDC acted as a
8  general contractor on this project?
9  A. No.
10  Q. What role did KDC play on this project?
11  A. I do not know. My understanding was that
12  Kagan is responsible for building this.
13  I don't know why he had to use
14  Proexcavation; I don't know why he had to use KDC.
15  I just don't know this. It doesn't make any sense
16  to me.
17  Q. Did you ask him?
18  A. No, I didn't.
19  Q. Now, this document, Exhibit 20, you said
20  was part of the Rockland Trust Company loan package?
21  A. Yes.
22  Q. Before you signed it, did you read it?
23  A. I don't remember now, but I'm thinking yes.
24  Q. Let's look at this document.

### 204

1  Q. By the way, how much did you pay Classic
2  Homes for its services?
3  A. I don't know. I didn't pay anything
4  personally. Or LLC didn't pay, as far as I know.
5  Q. Paragraph II, Contract Documents, it
6  references architectural plans and drawings, and
7  then there are a couple of blanks.
8  A. Yes.
9  Q. What architectural plans and drawings was
10  Classic Homes supposed to build to?
11  A. I do not know.
12  Q. Were there architectural plans and drawings
13  that you approved as of June 18, 2013?
14  A. I think so, yes. They were approved as
15  part of the loan.
16  Q. By you?
17  A. Yes, I reviewed them. I saw them.
18  It didn't have my written permission,
19  because it wasn't required.
20  Q. Why didn't you fill in dates and
21  descriptions when you signed this agreement?
22  A. I don't know.
23  Q. Now, you told me earlier this morning that
24  the construction was fixed-price at $1.3 million; do

### 205

1  you recall that?
2  A. Yes.
3  Q. What is the price that is being agreed to
4  be paid to Classic Homes?
5  A. I don't think it was defined here.
6  Q. Was it defined in some other agreement with
7  Classic Homes?
8  A. I don't think so.
9  Q. Why didn't you insist that the price for
10  the work to be performed by Classic Homes was $1.3
11  million?
12  A. Because, again, the agreement was with
13  Kagan; and Kagan said this is what the cost is going
14  to be.
15  Q. If the agreement was with Kagan, sir, why
16  did you sign this agreement with Classic Homes?
17  A. He said, I need this for my internal
18  issues, whatever the reason. That's his internal
19  issues.
20  Q. I thought this was part of the Rockland
21  Trust Company loans.
22  A. That's true, because Rockland Trust has to
23  have an official contract on the job.
24  Q. And prior to the closing on the

FARMER ARSENAULT BROCK LLC

Alex Filippov - Vol. 1 - 4/25/2018

54

---

**210**

1    all fixtures, you know.

2            Maybe there are a few things to be left

3    to clean up the house, to bring cleaners.  I don't

4    know.

5        Q.  Did you ever send any kind of a notice of

6    default to Classic Homes for not completing the

7    project timely?

8        A.  No.

9        Q.  Did you ever send a notice of default to

10    KDC for not completing the project timely?

11        A.  No.

12        Q.  Did you ever send a notice of default to

13    anyone for not completing the project timely?

14        A.  No.  But I sent the email to Kagan, text to

15    Kagan, asking him why so slow, asking him to provide

16    me a weekly update on the status, that he had failed

17    to do.

18        Q.  If we could, sir, go back to the operating

19    agreement, Exhibit No. 10.  Can you show me, sir,

20    where in that agreement it says that the

21    construction costs will be $1.3 million?

22        A.  It doesn't say $1.3 million.  Hold on a

23    moment; I'll find it.

24            "Duty of members," Article 5, Members.

---

**211**

1    "It shall be Mr. Kagan's duty and obligation to

2    construct two homes at the location currently known

3    as 77 Lyman Road in Brookline, Massachusetts, in

4    accordance with the plans, including drawings

5    supplied by Mr. Kagan and approved by managing

6    member."

7        Q.  And how do you conclude from that that he's

8    supposed to do it at 1.3?

9        A.  In accordance with plans.  He provided

10    plans, including that Excel spreadsheet.  That's his

11    plans, how he's planning to build it.

12        Q.  So again, your interpretation is that the

13    word "plans" is not the construction plans; it's the

14    construction plans plus the financial projections,

15    in that first meeting?

16            MR. CARNATHAN:  Objection.

17        A.  Yes.

18        Q.  Interesting.

19        A.  That's how he was planning to build it.  He

20    showed it to me with numbers.

21            (Marked, Exhibit 21, email, 9-4-14.)

22        Q.  Can you identify Exhibit 21?

23        A.  Yes.

24        Q.  What is that?

---

**212**

1        A.  I just got this, actually.  That was an

2    email I sent to Kagan about inaccurate listing on

3    Zillow.

4        Q.  So this is what you testified about earlier

5    this morning?

6        A.  Yes.

7        Q.  Would you agree with me that on or about

8    September 4, 2014 you looked at the listing for 88

9    Cutler?

10        A.  Yes.  I believe they just listed it for 88

11    Cutler.

12            And for Lyman, both of them were small,

13    actually, and somehow they were different.

14            (Marked, Exhibit 22, text message

15    string, top message 4-23, 2:05 p.m.)

16        Q.  I've placed in front of you Exhibit No. 22.

17    Do you recall receiving this fax --

18        A.  Text.

19        Q.  -- I'm sorry, text; on April 23, 2015?

20        A.  Yes.

21        Q.  Was this the beginning of the conversation

22    about signing the new listing agreement that you

23    spoke about earlier?

24        A.  For 55 Lyman, yes.

---

**213**

1        Q.  So this is Tatiana reaching out to you,

2    asking you to give her a call; right?

3        A.  Yes.

4        Q.  Did you call her at this point?

5        A.  I don't remember.  Either I called or she

6    called; I don't remember.  But we talked, yes.

7        Q.  And did you also receive a communication

8    about extending the listing agreement from Vadim

9    Kagan?

10        A.  I think we had talked also to him.  I don't

11    remember if it was written communication or verbal.

12    I don't remember.

13            I was busy; I was on a business trip.

14            (Marked, Exhibit 23, text message,

15    4-23-15.)

16        Q.  Is Exhibit 23 a text message that you

17    received from Vadim regarding getting a listing

18    agreement for 55 Lyman?

19        A.  Yes.

20        Q.  And did you receive that?

21        A.  Yes.

22        Q.  And you received that on April 23, 2015?

23        A.  Yes.  That's the same date as here, Exhibit

24    22; and this is the first time I heard about any

---

Alex Filippov - Vol. 1 - 4/25/2018

214

1  listing agreement.
2      (Marked, Exhibit 24, text message,
3  4-24-15.)
4      A. And I couldn't understand why.
5      Q. Is this your response to Vadim asking him
6  to call you?
7      A. Yes.
8      Q. And did he in fact call you?
9      A. I think he did. When he needed this, he
10  was calling.
11      Q. And you told us, I think, that in fact they
12  sent you the listing agreement for you to look at;
13  correct?
14      A. Emailed it to me, yes.
15      (Marked, Exhibit 25, email string, top
16  email 4-25-15, with attached listing agreement.)
17      Q. Is this the email that you received,
18  together with the unsigned listing agreement?
19      A. I guess so, yes.
20      Q. So you received that on 4-25 at roughly
21  9:53 a.m.; correct?
22      A. That's what the timestamp says, yes.
23  Otherwise I don't remember.
24      Q. And do you recall that, after reviewing the

215

1  listing agreement which is part of Exhibit No. 25,
2  you had a question about the rate of the commission
3  and whether 5 percent was good or bad?
4      A. Yes. I don't --
5      Yes, I had some question, yes.
6      Q. And did you ultimately agree that 5 percent
7  was acceptable?
8      A. No; I said I understood what it is.
9  I believe that's what I said.
10      Q. So let's look at this document now.
11      (Marked, Exhibit 26, text message,
12  4-25-15.)
13      Q. Is that a text message that you sent on
14  April 25 --
15      A. Yes, that's what I said. It was clear.
16      Q. So you reviewed the agreement.
17      The questions that you had regarding the
18  commission and 5 percent, you understood?
19      A. They answered about the 5 percent question
20  that I had; and I said never mind, it's clear, about
21  5 percent.
22      Q. And did you in fact understand at that time
23  that the agreement was signed and the property was
24  put on the market in accordance with the exclusive

216

1  agreement that they had sent you a copy of?
2      A. Actually, no; I'm not sure if I understood
3  this.
4      They sent me the agreement. As far as I
5  remember, they sent me the agreement; because I
6  didn't sign it. I assume it's not signed.
7      Q. Let's look at this document.
8      (Marked, Exhibit 27, email string, top
9  email 4-28-15.)
10      Q. Is this an email string that you recall
11  receiving?
12      A. Yes.
13      Q. Would you agree with me that the top email,
14  April 28, 2015, at 10:02, from Dan at Kagan says,
15  "Per our conversations, we signed the agreement with
16  Chapter C-21 to put 55 Lyman on the market as
17  agreed. Please confirm receipt of this email."
18      A. Yes. And I confirmed the receipt.
19      Q. So would you agree with me that you were
20  aware that they had signed the agreement and put it
21  on?
22      A. I didn't pay attention to the word
23  "signed," et cetera. I just confirmed, I agreed I
24  got the email. I didn't sign it.

217

1      Q. But would you agree with me that they
2  signed it; that's what it says? Would you agree
3  with that?
4      A. That's what they said, yes.
5      Q. And you got that email, didn't you?
6      A. Yes, I did.
7      Q. Also looking back at Exhibit 22, you told
8  Tatiana when she inquired about the agreement that
9  you sent a confirming email to Dan; correct?
10      A. Yes. That I received the email, yes.
11      Q. And the confirming email, sir, referenced
12  in Exhibit No. 22 would be the middle email on
13  Exhibit No. 27 to Dan; correct? "I confirm"?
14      A. I confirm that I received the agreement,
15  yes.
16      Q. So you knew this property was on the market
17  and listed; correct?
18      A. Yes. They put it on the market and listed
19  it, yes.
20      Q. And after you confirmed back to Tatiana
21  that you had confirmed to Dan, she in fact contacted
22  you to say Thank you; correct?
23      A. I don't remember.
24      Q. Let's look at that.

FARMER ARSENAULT BROCK LLC

Alex Filippov - Vol. 1 - 4/25/2018

56

---

**218**

1        (Marked, Exhibit 28, text message,
2  4-28-15.)
3    A. Yes, okay.
4    Q. Is that your response to Tatiana or Tanya
5  Kagan?
6    A. Yes.
7    Q. Did you ever send an email or a text saying
8  words to the effect "Do not sign, you're not
9  authorized to sign," or anything like that?
10    A. No.
11    Q. And after you learned that this property
12  was listed, because Dan told you, did you ask to see
13  a copy of the signed agreement?
14    A. No.
15    Q. Looking back at Exhibit No. 27, Dan says to
16  you, "Greatly appreciate the quick response. If you
17  have any questions during the selling/closing
18  process, please feel free to reach out to me. I
19  will, however, be out of the office this Thursday
20  and Tuesday, just FYI. Thank you again," from Dan.
21    Do you recall receiving that?
22    A. That one I don't remember, but if it's
23  there it's there; yes.
24    Q. And did you ever call him with any

---

**219**

1  questions?
2    A. No. I don't think I ever talked to him,
3  except for emails that we exchanged.
4    He materialized too late on the horizon.
5  This is probably the first time I heard from him, in
6  April 2015.
7    Q. Now, did it strike you at all odd that, if
8  you told him that you would not sign this agreement,
9  that they would send you an email that says Thank
10  you?
11    A. Yes. Well, it is odd.
12    I'll tell you, I felt very conflicted
13  about this. I didn't want to sign them. They were
14  pushing. I didn't want to sign this myself, and
15  that's the reason why you don't see this. I know
16  how to electronically sign documents; I do this all
17  the time, every day. Do you understand? I didn't
18  sign this document.
19    They were doing something, and I
20  discussed it at this time. I called Nick and said,
21  I don't like this; we need to deal with this; we
22  don't want another six months of no selling. The
23  season is coming and they're not selling; they're
24  not doing anything.

---

**220**

1    Q. And on April 28, when this exchange was
2  happening relative to the listing agreement, how
3  long was it before you identified a different broker
4  that you wanted to use?
5    A. I believe ten days.
6    Q. And did you send any communication within
7  ten days saying I want a different broker?
8    A. No, I didn't.
9    Q. Why not?
10    A. Why do I have to? I was under the
11  impression that I can change my broker any time
12  based on --
13    I signed the agreement with Kagan LLC.
14  That was the governing document of the whole thing,
15  not the agreement with Century 21. Actually, this
16  is the first time I heard about Century 21
17  altogether.
18    My idea is that I will take it from
19  Tatiana Kagan. And by the way, when I talked to
20  Deborah Gordon, she said they would be stupid not to
21  give back this listing, because that's what people
22  do in real estate.
23    She told me. She was absolutely
24  positive she will get the listing, when I talked to

---

**221**

1  her.
2    (Marked, Exhibit 29, email, 5-18-15.)
3    Q. Is that an email that you sent on May 18,
4  2015?
5    A. Yes.
6    Q. What is the issue with Tatiana that you are
7  referencing?
8    A. This is the issue with that listing
9  agreement, that we are taking away both properties
10  to put it with Coldwell Banker, Deborah Gordon and
11  Kathy Krongel. That was the issue.
12    Q. And as of May 18, was that your
13  understanding; that the listing had been removed
14  from Century 21 and given to Deborah Gordon?
15    A. I thought so. That's the reason for this
16  email.
17    Q. Had you had conversations with
18  Mr. Lipetsker between April 28 and May 18 of 2015
19  regarding the listing agreement?
20    A. We had talked about this, yes.
21    Q. Did you share the emails and exchanges you
22  had had with him that we marked as Exhibit 22
23  through 27?
24    A. No, I didn't. We had a conversation.

---

Alex Filippov - Vol. 1 - 4/25/2018

58

226

1          (Pause)
2     A. It looked different, but it's part of this.
3          This part is different.  This part was
4  just pasted.
5     Q. So the re-creation from Exhibit 30 was
6  taken from one of the attachments to Exhibit No. 16?
7     A. Yes.  This part is just pasted this way.
8     Q. Does that refresh your recollection, sir,
9  that Exhibit No. 7 is not the complete set of
10  documents that was handed out at the October 25,
11  2012 meeting?
12     A. I'm not sure about this.  I think that the
13  whole thing was printed out.  I don't remember this.
14  It's hard for me to tell now.
15          No, it must be the whole thing.  That
16  part was there.
17     Q. Sir, only because we won't know what you're
18  talking about, when you say it's part of the whole
19  thing, could you refer to it by the exhibit?
20     A. This part of this spreadsheet wasn't there.
21  I don't know where it is; but it was there, from the
22  beginning.
23     Q. What you're saying is that, looking at
24  Exhibit No. 16, the project scenario and assumptions

227

1  was part from the beginning?
2     A. Yes.
3     Q. And is the spreadsheet that's Exhibit No.
4  30 something that you were provided on October 25,
5  2012?
6     A. Yes.  These are the same numbers.
7     Q. But the eighty-forty --
8     A. Maybe it was another version of the
9  document they sent me.  It's hard for me to tell
10  right now.
11     Q. Did you get multiple versions of the
12  financial analysis?
13     A. Hold it.
14          It's not exactly from here.  It was
15  somewhere.  The part of this document, I don't know
16  where it is.
17     Q. So you don't know where you got the re-
18  creation that's part of Exhibit 30?
19     A. Yes.  I would have to look for this.
20          MR. PERTEN:  Let me go off the record
21  for a second.
22          (Discussion off the record)
23          (Adjourned, 4:52 p.m.)
24

228

1          CERTIFICATE OF COURT REPORTER
2          I, Janis T. Young, Registered Professional
3  Reporter and Certified Realtime Reporter, do certify
4  that the deposition of ALEX FILIPPOV, in the matter
5  of In Re:  Lyman-Cutler, LLC, on April 25, 2018, was
6  stenographically recorded by me; that the witness
7  provided satisfactory evidence of identification, as
8  prescribed by Executive Order 455 (03-13) issued by
9  the Governor of the Commonwealth of Massachusetts,
10  before being sworn by me, a Notary Public in and for
11  the Commonwealth of Massachusetts; that the
12  transcript produced by me is a true and accurate
13  record of the proceedings to the best of my ability;
14  that I am neither counsel for, related to, nor
15  employed by any of the parties to the above action;
16  and further that I am not a relative or employee of
17  any attorney or counsel employed by the parties
18  thereto, nor financially or otherwise interested in
19  the outcome of the action.
20
21  Transcript review was requested by the reporter.
22
23                                    5/1/18
24  Janis T. Young, RDR/CRR

229

WITNESS:  ALEX FILIPPOV
CASE:  In Re:  Lyman-Cutler, LLC
          SIGNATURE PAGE/ERRATA SHEET
PAGE   LINE   CHANGE OR CORRECTION AND REASON

I have read the transcript of my deposition taken April 25,
2018.  Except for any corrections or changes noted above, I
hereby subscribe to the transcript as an accurate record of the
statements made by me.
Signed under the pains and penalties of perjury.

_____DATE_____
Deponent, ALEX FILIPPOV

ORIGINAL

Exhibits: 31-37                    Volume 2, Pages 231-274
          UNITED STATES BANKRUPTCY COURT
             DISTRICT OF MASSACHUSETTS
                (EASTERN DIVISION)
- - - - - - - - - - - - - - - - - - - - - - - - - - -
In Re:
                            Chapter 7

LYMAN-CUTLER, LLC,          Case No. 15-13881-FJB


           Debtor
- - - - - - - - - - - - - - - - - - - - - - - - - - -
LYMAN-CUTLER, LLC,


           Plaintiff
v.                          Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
           Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - -
CONTINUED 30(b)(6) DEPOSITION OF LYMAN-CUTLER, LLC
   and DEPOSITION OF ALEX FILIPPOV, Individually
      Thursday, April 26, 2018, 10:12 a.m.
       Sheehan Phinney Bass + Green, P.A.
        255 State Street, 5th Floor
          Boston, Massachusetts


    - - - - - - - - - David A. Arsenault, RPR - - - - - - - - -
    daa@fabreporters.com   www.fabreporters.com
         Farmer Arsenault Brock LLC
          Boston, Massachusetts
             617-728-4404

Alex Filippov - Vol. 2 - 4/26/2018

5

---

244

1  checks to Proexcavation in the amount of $45,000,
2  even number. We don't know what it was for.
3      Q. Did you send an email upon receiving that
4  saying, hey, what is that $45,000?
5      A. I don't think we did. Again, let me repeat
6  what I said yesterday. The project was a fixed
7  amount. That was Kagan's matter, basically, how he
8  handles the money. He can move it to Proexcavation,
9  to KDC, that's his personal issue. All we were
10  caring about is that to make sure that our loan is
11  paid, the project is going on. Dealing with funds
12  was the last thing. That wasn't on my mind. He was
13  a trusted partner who had fiduciary obligation to
14  the company. That wasn't important. That was
15  mostly bookkeeping issue. Nothing else.
16      (Marked, Exhibit 33, Email, 3-20-14, and
17  invoices.)
18      Q. Mr. Filippov, can you identify Exhibit
19  Number 33?
20      A. Yes. That's the email from Kristina to
21  Arina. She was in correspondence with her. Arina
22  was doing bookkeeping, so was Kristina doing
23  bookkeeping. She informs her about two checks
24  withdrawn from Rockland Trust Bank.

---

245

1      Q. Attached to this email and referenced in
2  the cover email are three invoices from JW Campbell
3  Construction. Do you see that?
4      A. Yes, okay.
5      Q. When you received those invoices, did you
6  believe they provided insufficient information for
7  you to understand what was being billed for?
8      A. The invoices from JW Campbell never was in
9  question. In question was invoices by Proexcavation
10  by KDC. If you look at the invoice of JW Campbell
11  Construction in the amount of $12,089 it is very
12  different from $45,000 for Proexcavation. Because
13  that's how these people did the details of the work
14  they did, to the contrary of Proexcavation who never
15  put any details.
16      Q. Sir, other than the invoices for
17  Proexcavation and KDC, are you questioning the
18  invoices from any other vendors?
19      A. We might question invoices from some other
20  vendors, but JW Campbell is not one we might
21  question.
22      Q. When you say you might question, as you sit
23  here today are there any other payments that you are
24  challenging in this lawsuit?

---

246

1      A. I don't remember right now. I cannot tell
2  you this. There are a few vendors of Kagan whose
3  invoices are very questionable.
4      Q. And as you sit here, you can't remember the
5  name of a single vendor, a single vendor whose
6  invoices you believe are questionable?
7      A. V&D.
8      Q. What's questionable about the V&D invoices?
9      A. They are very high. They are round
10  numbers. They are equal for each house, exact
11  amounts. We looked into his invoices. His invoices
12  are not detailed. We know that Kagan and V&D had
13  very close personal relations with this person.
14      Q. How did you make the determination that
15  V&D's invoices were very high?
16      A. We look at comparing similar jobs.
17      Q. What other jobs did you compare it to?
18      A. Well, we talked to contractors, as I said
19  yesterday.
20      Q. Was that Cindy Stumpo?
21      A. We talked to Cindy Stumpo. We talked to
22  Paul Laffey, et cetera.
23      Q. What did V&D do on this job?
24      A. V&D, as far as I remember they were doing

---

247

1  the plumbing, I think plumbing.
2      Q. What specifically did Ms. Stumpo tell you
3  about V&D?
4      A. I don't remember now.
5      Q. Do you have any documents that she provided
6  to you which comments upon the bills of V&D?
7      A. No. She didn't provide any comments. But
8  if you look at V&D bills, invoices, these are
9  handwritten papers produced, it looks like produced
10  way after the job was done.
11      Q. And how did you make that determination
12  that they were produced way after the job was done?
13      A. Because we didn't see this until I believe
14  we started the litigation.
15      Q. Any other reason why you think that?
16      A. No.
17      Q. Okay.
18      A. That's a good reason to believe so.
19      Q. Now, you told us these two houses were
20  identical, correct?
21      A. Yes.
22      Q. Why do you believe that if V&D did the
23  plumbing that the costs for the plumbing work on the
24  two houses shouldn't be the same?

---

Alex Filippov - Vol. 2 - 4/26/2018

8

**256**

1  with me?  No.

2      Q.  No, to list the properties with anyone.

3      A.  I didn't see any; never informed of any and

4  never seen any.  I don't believe I ever heard of any

5  buyer who made an offer, from Tatiana.

6          (Marked, Exhibit 36, Excel spreadsheet

7  Account QuickReport.)

8          MR. CARNATHAN:  Is this a printout of

9  the Excel spreadsheet?

10         MR. PERTEN:  Yes.

11     Q.  I've placed in front of you Exhibit 36.

12  I'll represent to you that this is a printout of a

13  spreadsheet that was provided to me by your counsel.

14  Can you identify what this is?

15     A.  This looks like the register from the bank

16  account of Rockland Trust.  It looks like our books

17  that we kept, yes.

18     Q.  So is this a report that was kept by Arina?

19     A.  Yes.

20     Q.  How did she go about preparing this?

21     A.  There is a button in the QuickBooks

22  software.  If you click on this, it will generate

23  this report.

24     Q.  If I can ask you to turn to the last page.

**257**

1  There are a bunch of entries.  For example, the very

2  last entry, November 9, 2015, it was a deposit and

3  then it says:  "Alex Filippov Investments."

4      Do you see that?

5      A.  Yes.

6      Q.  What does that indicate?

7      A.  That means a deposit, deposit made in the

8  bank account by me.  It maybe shouldn't be labeled

9  investment.  It could be labeled capital

10  contribution.  It's hard to tell.  But that was a

11  deposit of money that I personally put in the

12  account to keep the account afloat to be able to pay

13  off the loan to Rockland Trust to keep up the

14  company.  That's all my obligations to the company

15  and my personal money.  That's what it is.

16     Q.  Now, when this venture first started you

17  made a capital investment of $2 million, correct?

18     A.  Correct.

19     Q.  At any point did you make any additional

20  capital investments in the project?

21     A.  It was we had to deposit a few times some

22  amount of money that we latter took back because we

23  realized we didn't want to add to the $2 million.

24  Until we start fighting with Kagan in May, whatever

**258**

1  the letter he sent to us, I don't believe I was

2  adding to this.  It was $2 million.

3      Q.  And after May did you make any capital

4  contributions to the company?

5      A.  Yes.  Those are capital contributions.

6  They are called investments but basically it is a

7  capital contribution.

8      Q.  And how did you make the determination as

9  to what was a capital contribution as opposed to

10  some other type of deposit?

11     A.  All deposits I did was capital

12  contribution.

13     Q.  So when you deposited money to prepare the

14  mortgage note for your $200,000 mortgage, was that a

15  capital contribution?

16     A.  It was a capital contribution.  200,000 of

17  the money that I deposited, we characterized as a

18  part of the mortgage.  It shouldn't be capital

19  contribution.  $200,000 is mortgage, but everything

20  else is capital contribution.

21     Q.  So that I am clear, on this QuickBook

22  report here, Exhibit Number 36, every deposit that

23  is listed as Alex Filippov investments, it's your

24  position that is a capital contribution?

**259**

1      A.  Yes, except $200,000 of the mortgage that I

2  put there.  Mortgage is the mortgage, and everything

3  else is capital contribution, yes.

4      Q.  I'm not sure I understood.  Let me see

5  if I can clarify this.  Let me ask the question and

6  maybe we can get educate me.  I see a deposit on May

7  29, 2015.  Do you see that, the top of the page,

8  last page?

9      A.  Yes.

10     Q.  It says deposit Alex Filippov investment?

11     A.  Yes.

12     Q.  And I believe that is the first place that

13  I see something labeled Alex Filippov investment.

14     A.  Yes.

15     Q.  And that was a deposit of $5.95, correct?

16     A.  Apparently, yes.

17     Q.  Your position is that that is a capital

18  investment?

19     A.  As soon as I put my own money on the

20  company account and it is not anything else, it is

21  capital investment.  What else can it be?

22     Q.  Who made the determination as to what was a

23  capital investment versus a loan versus anything

24  else?

Alex Filippov - Vol. 2 - 4/26/2018

9

260

1    A. Which particular of the sum?  At this point
2    nobody.  She was just entering.  She apparently made
3    an error labeling it investment.  Because she
4    considered that to be investment, capital
5    contribution; to her it was the same.
6    Q. So that was a mistake?
7    A. Labeling it investment, probably.  It
8    should be capital contribution.  I personally don't
9    see much difference.
10    Q. Let's read on.  On June 18 there was a
11    payment of loan interest, two payments.  Do you see
12    that?
13    A. Yes.
14    Q. Also on June 18 it looks like there was a
15    deposit to pay the loan interest?
16    A. Exactly, yes.
17    Q. Is it your position that the monies that
18    you deposited to Lyman-Cutler in order to pay the
19    loan interest is a capital investment?
20    A. Yes.
21    Q. It is an additional capital contribution?
22    A. Outside of $200,000 mortgage that I paid,
23    if this money was paid from the mortgage, that was
24    paid from the mortgage.  But at the end there is

261

1    only sum of two, capital contribution and the
2    mortgage.
3    Q. Now, would you agree with me that the
4    mortgage is part of the carrying costs for this
5    project?
6    MR. CARNATHAN:  Objection.
7    A. It may be a carrying cost, but carrying
8    costs paid by me is my capital contribution.
9    Q. Do you understand that the operating
10    agreement talked about carrying costs?
11    A. Yes.
12    Q. What is your understanding of what a
13    carrying cost is?
14    A. A carrying cost is any cost connected to
15    servicing the loan, servicing taxes, servicing
16    permits.  I'm guessing, I'm not sure about permits.
17    Generally everything else that's required for the
18    project to be finished outside of construction
19    costs.
20    Q. Whose responsibility for the first 23
21    months of this project was it to pay carrying costs?
22    A. Kagan's.
23    Q. Kagan's responsibility for the first 23
24    months?

262

1    A. Yes.
2    Q. And is there something in the operating
3    agreement that you rely upon for that statement?
4    Let me give you Exhibit 10, which is the operating
5    agreement.
6    A. You will have to give me some time to go
7    through.
8    Q. Maybe I can help you out a little bit.
9    A. Maybe.
10    Q. Take a look if you will at Section 4.2.
11    A. Carrying costs.
12    Q. That defines carrying costs, correct?
13    A. Yes.
14    Q. And then take a look at --
15    A. 8.1.
16    Q. -- 4.1.
17    A. Yes.
18    Q. It says:  "Purchase money loan and
19    construction loan shall be taken from Rockland Trust
20    company to pay construction and carrying costs until
21    the issuance of certificates of occupancy but in no
22    event more than 23 months from the date of
23    acquisition"?
24    A. Yes.

263

1    Q. It your understanding that the first 23
2    months from the date of acquisition of the carrying
3    costs were going to be paid by the LLC out of the
4    construction loans and purchase money loan?
5    A. Yes.
6    Q. So would you agree with me that was an LLC
7    obligation for the first 23 months?
8    A. If I can get you to Paragraph 8.1.  That's
9    talking about after the 23rd month.  So within the
10    first 23 months, we took the loan.  The amount of
11    loan should cover the carrying costs.  That was the
12    idea.
13    Q. Did Mr. Kagan have any responsibility for
14    paying carrying costs for the first 23 months after
15    acquisition?
16    A. After acquisition for the first?
17    Q. 23 months from the date of acquisition?
18    A. I would need to review this document.  It
19    was supposed to be paid as Kagan himself said, it's
20    supposed to be paid from the loan.  And that was his
21    responsibility to make sure that there is enough
22    money going on construction so that there is money
23    left for the carrying costs.
24    Q. Let's try my question.  Was it Mr. Kagan's

Alex Filippov - Vol. 2 - 4/26/2018

264

1  responsibility to use his own money to pay carrying
2  costs for the first 23 months from acquisition, as
3  you understood the deal?
4          MR. CARNATHAN: Objection.
5      A. As I understand, yes. That was his
6  responsibility of the whole construction thing.
7      Q. Is there any language in the operating
8  agreement that you are relying upon for your
9  conclusion?
10     A. It's hard for me to say. I would need to
11 review this again. But the fact that he -- the
12 whole operation agreement is talking about him being
13 responsible for construction in accordance with the
14 plans he submitted, yes. He is responsible for the
15 carrying costs in the first 23 months to the degree
16 that it is his responsibility to manage the amount
17 of money of the loan to make sure that there is a
18 carrying cost.
19     Q. And where in the operating agreement does
20 it say that?
21     A. It doesn't say that. It's implied. That
22 was our understanding.
23     Q. Now, you asked me, trying to get me to look
24 at Section 8.1?

265

1      A. Yes.
2      Q. There's something in 8.1 that you believe
3  supports the contention that Mr. Kagan was
4  personally responsible for carrying costs for the
5  first 23 months after acquisition?
6      A. No, I took it back. I said that's talking
7  about after the 23rd month.
8      Q. Looking at Section 8.1, in the middle, the
9  bolded language, it says: "In the event that the
10 property is not sold within 23 months from the date
11 of acquisition, then Mr. Kagan shall be responsible
12 for all carrying costs until such time as the
13 property is sold"?
14     A. Yes.
15     Q. Then it says: "If Mr. Kagan fails to pay
16 monthly carrying costs, then Mr. Filippov shall be
17 responsible to pay the necessary carrying costs."
18         Do you see that?
19     A. Yes. "And subsequently his capital
20 contribution and percentage interest in the company
21 shall increase by the same amount and percentage and
22 at the same time will trigger reduction of
23 Mr. Kagan's share of capital contribution by the
24 same amount."

266

1      Q. Let me ask you the question now. Is it
2  your contention, sir, that -- going back to Exhibit
3  36 -- that all the items that are Alex Filippov
4  investments are capital contributions?
5          MR. CARNATHAN: Objection.
6      A. Let me repeat one more time what I said.
7  If you sum up all money I deposited after May 18 or
8  whatever date when we started depositing money,
9  $200,000 of this amount deposited is part of my
10 mortgage and everything else is capital
11 contribution, yes.
12     Q. Still looking at Exhibit 36, I see a
13 payment on 7/28/2015 to Mr. Carnathan's firm. Do
14 you see that?
15     A. Yes.
16     Q. Who did O'Connor Carnathan & Mack
17 represent?
18     A. Lyman-Cutler, LLC.
19     Q. At some point did O'Connor Carnathan & Mack
20 represent you personally?
21     A. I think so, yes.
22     Q. When did that occur?
23     A. I don't know. I don't remember.
24     Q. Were they representing you personally

267

1  simultaneously with representing the LLC?
2      A. I need to look it up. I don't remember.
3      Q. Have you received invoices from O'Connor
4  Carnathan & Mack for services rendered to you
5  personally?
6      A. I need to review this. I don't remember.
7      Q. Do you get legal bills from Mr. Carnathan's
8  firm, some for the company, some for you
9  individually?
10     A. I don't think so.
11     Q. What was O'Connor Carnathan & Mack engaged
12 to do back in July 2015?
13     A. Back in July of 2015 we requested to help
14 us legally, A, to get the listing back from Century
15 21 and to respond to Kagan's demand that we
16 considered to be fraudulent.
17     Q. And at some point did the scope of what you
18 engaged that law firm to do change?
19     A. I don't think so.
20     Q. Have you reimbursed the LLC for any legal
21 services that were done for yourself or
22 Mr. Lipetsker personally?
23     A. I don't know the answer to this question.
24 Because I personally, I deal only with LLC. I don't

Alex Filippov - Vol. 2 - 4/26/2018

11

268

1  know what's my personal here.
2      Q. You understand that there were claims
3  asserted against you personally both in the state
4  court and bankruptcy court, correct?
5      A. Yes.
6      Q. Who is representing you?
7      A. OCM.
8      Q. Are there separate invoices for the
9  representation of you personally versus corporately?
10     A. I don't think so. But my understanding the
11 indemnification agreement talking about the
12 indemnification. As part of this my legal fees and
13 everything else is part of the LLC. That's my
14 understanding.
15         (Marked, Exhibit 37, Proof of interest.)
16     Q. Mr. Filippov, I'm handing you what is
17 Number 37, a document which was filed in the
18 bankruptcy called proof of interest on your behalf.
19 If I could draw your attention on the second page,
20 it indicates that you are claiming an 87.11 percent
21 ownership interest in Lyman-Cutler. It is Item
22 Number 7. How was that calculated?
23     A. I don't remember exact formula now, but I
24 can tell you based on what my interest went up from

269

1  80 percent to 87.1. It is based on the operating
2  agreement, Paragraph 8.1 -- actually, it is not even
3  correctly calculated. It should be more -- it took
4  me a while to figure this out -- because of two
5  provisions of operating agreement.
6      Provision 8.1 is talking about: "If
7  Mr. Kagan fails to pay monthly carrying costs, then
8  Mr. Filippov shall be responsible to contribute to
9  the necessary carrying costs and subsequently his
10 capital contribution and percentage interest in the
11 company shall increase by the same amount and
12 percentage and at the same time will trigger
13 reduction of Mr. Kagan's share of capital
14 contribution by the same amount and subsequently
15 his/her percentage interest in the company."
16     That was part of this. The second part,
17 the 5 percent interest he owes me on the money for
18 investment after month 23. Distribution to Members,
19 8.2: "The distribution to members shall be in
20 accordance with their respective capital
21 contribution first. However, an additional 5
22 percent interest per annum payment based upon
23 members' respective capital contribution shall be
24 paid out of Mr. Kagan's net profit share for each

270

1  day that the property is not sold after 23 months of
2  acquisition."
3      Q. Was there any distribution of net profit in
4  this case?
5      A. No, there wasn't.
6      Q. Was there any profit?
7      A. I would hope there was. Because all
8  Kagan's claims are fraud. So if you remove all his
9  claims, there was a profit over $1 million even when
10 it sold in a fire sale.
11     Q. How much money did Kagan get for this
12 project?
13         MR. CARNATHAN: Objection.
14     A. I don't know how much money he got. He was
15 supposed to get 50 percent of the profit when he
16 does it properly. Getting back that 50 percent is
17 his sole compensation. Nothing else, net his sweat
18 equity for doing the job right and timely.
19         MR. PERTEN: Let's take a break. I may
20 be done.
21         (A recess was taken.)
22         MR. PERTEN: I'm finished. The only
23 other thing to note is that there are some
24 additional documents, photographs.

271

1          MR. CARNATHAN: Photographs. We were
2  going to look for what some other folks may have
3  turned over?
4          MR. PERTEN: Yeah. We can look at the
5  transcript. I can't imagine that will change
6  anything, but I'll reserve rights with respect to
7  that stuff.
8          MR. CARNATHAN: Understood.
9          (11:25 p.m.)

Alex Filippov - Vol. 2 - 4/26/2018

12

**272**

1  CERTIFICATE OF COURT REPORTER
2
3
4
5
6       I, David A. Arsenault, Registered
Professional Reporter, do certify that the
7   deposition of ALEX FILIPPOV, in the matter of
Lyman-Cutler v Kagan, et al., on April 26, 2018, was
8   stenographically recorded by me; that the witness
provided satisfactory evidence of identification, as
9   prescribed by Executive Order 455 (03-13) issued by
the Governor of the Commonwealth of Massachusetts,
10  before being sworn by me, a Notary Public in and for
the Commonwealth of Massachusetts; that the
11  transcript produced by me is a true and accurate
record of the proceedings to the best of my ability;
12  that I am neither counsel for, related to, nor
employed by any of the parties to the above action;
13  and further that I am not a relative or employee of
any attorney or counsel employed by the parties
14  thereto, nor financially or otherwise interested in
the outcome of the action.
15
16
17
18
19  Transcript review was requested of the reporter.
20
21
22
23                                    5.7.18
24  David A. Arsenault, RPR

**273**

WITNESS:  ALEX FILIPPOV
CASE:  Lyman-Cutler v Kagan, et al.
              SIGNATURE PAGE/ERRATA SHEET
PAGE   LINE   CHANGE OR CORRECTION AND REASON

I have read the transcript of my deposition taken April 26,
2018.  Except for any corrections or changes noted above I
hereby subscribe to the transcript as an accurate record of the
statements made by me.
Signed under the pains and penalties of perjury.

_____DATE_____
Deponent, ALEX FILIPPOV
NOTARY (if requested)
On this _____ day of _____, 20___, before me, the
undersigned notary public, personally appeared ALEX FILIPPOV,
who presented satisfactory evidence of identification, to wit,
_____, and signed this document in my
presence.

Notary Public in and for_____
My commission expires _____

**274**

Transcript Produced and Delivered
to counsel/witness on 5.7.18

ALEX FILIPPOV
SIGNATURE PAGE/ERRATA SHEET INFORMATION
For deposition taken on: April 26, 2018
Lyman-Cutler v Kagan, et al.

SIGNATURE INFORMATION FOR COUNSEL
The original signature page/errata sheet has been
sent to Attorney Carnathan to obtain signature from
the deponent.  When complete, please send original
to Attorney Perten.

WITNESS INSTRUCTIONS
After reading the transcript of your deposition,
please note any change or correction and the reason
on the errata/signature page.  DO NOT make any
notations on the transcript itself.

If necessary, duplicate errata/signature page.

PLEASE SIGN AND DATE the errata/signature page
(before a notary if requested) and return it to your
counsel.

FARMER ARSENAULT BROCK LLC

# EXHIBIT 3

Exhibits: 1-14                    Volume 1, Pages 1-170
             UNITED STATES BANKRUPTCY COURT
                DISTRICT OF MASSACHUSETTS
                   (EASTERN DIVISION)
- - - - - - - - - - - - - - - - - - - - - - - - - - -
In Re:

                                  Chapter 7
LYMAN-CUTLER, LLC,                Case No. 15-13881-FJB


          Debtor
- - - - - - - - - - - - - - - - - - - - - - - - - - -
LYMAN-CUTLER, LLC,


          Plaintiff
v.                                Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
          Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - -


          DEPOSITION OF KRISTINA BRUSENKOVA
          Tuesday, March 20, 2018, 1:15 p.m.
          Sheehan Phinney Bass + Green, P.A.
           255 State Street, 5th Floor
             Boston, Massachusetts


     - - - - - - - - - David A. Arsenault, RPR - - - - - - - - -
     daa@fabreporters.com   www.fabreporters.com
          Farmer Arsenault Brock LLC
             Boston, Massachusetts
                  617-728-4404

Kristina Brusenkova - Vol. 1 - 3/20/2018

60

1      Q.   When you got to KDC, did you review any

2    documents relating to Lyman-Cutler, LLC?

3      A.   I can't recall.

4      Q.   Did you have any role with respect to

5    Lyman-Cutler, LLC?

6      A.   Clarify your question.

7      Q.   Did you do anything while you were at KDC

8    relating to Lyman-Cutler?

9      A.   Yes.

10     Q.   What did you do?

11     A.   Bookkeeping.

12     Q.   What did that entail?

13     A.   Entering transactions, cut checks,

14   coordinate with Fillippov's wife.

15     Q.   Anything else?  Did you do anything else

16   with respect to the Lyman-Cutler project?

17     A.   Paying bills.

18     Q.   Anything else?

19     A.   Reconciliation.

20     Q.   Anything else?

21     A.   I can't recall.

22     Q.   When you say you coordinated with

23   Fillippov's wife, what did you mean by that?

24     A.   Sometimes she sent us emails with some kind

Kristina Brusenkova - Vol. 1 - 3/20/2018

95

1    landscaping was done by Proexcavation.  At the end

2    of the construction he usually billed the entity for

3    this.

4        Q.  Do you know if that happened in this case?

5        A.  I saw this number.  I didn't see the

6    invoice from Proexcavation.

7        Q.  Okay.  So you base that conclusion on the

8    fact that you hadn't seen an invoice?

9            MR. CARNATHAN:  Objection.

10       A.  Repeat the question.

11       Q.  You base that conclusion on the fact that

12   you have not seen an invoice?

13           MR. CARNATHAN:  Objection.

14       A.  No.  This is what Fillippov told me.

15       Q.  This is not something that you knew.  This

16   is something that Fillippov told you?

17       A.  No.  I saw the number on the paper, the

18   paper that was provided by Fillippov.  He also said

19   that there is an invoice that Kagan billed him for

20   landscaping.  I then asked him a question:  Why did

21   he bill you for landscaping if you already reimburse

22   him for the check that was issued from KDC?

23       Q.  Did Mr. Fillippov show you the invoice from

24   landscaping?

Kristina Brusenkova - Vol. 1 - 3/20/2018

102

1    affidavit.)

2        Q.   Can you identify what we marked as Exhibit

3    Number 7?

4        A.   Yes.

5        Q.   What is this?

6        A.   My affidavit.

7        Q.   Does that bear your signature on the fourth

8    page?

9        A.   Yes.

10       Q.   Why did you prepare this affidavit?

11       A.   To help Fillippov and Lipetsker in this

12   case.

13       Q.   And why did you want to help Fillippov and

14   Lipetsker in this case?

15       A.   Because I didn't like when somebody is

16   telling not truth or trying to steal money.

17       Q.   Who tried to steal money?

18       A.   That's what I heard.

19       Q.   From whom?

20       A.   From investors.

21       Q.   What investors?

22       A.   Fillippov and Lipetsker.

23       Q.   Anybody else?

24       A.   I cannot recall.

Kristina Brusenkova - Vol. 1 - 3/20/2018

117

1    was W-2.  I've never been paid twice.

2        Q.  Okay.  Let's look at Paragraph 4 of your

3    affidavit.  What subcontractors did construction and

4    excavation work on projects hired by Mr. Kagan?

5        A.  What is your question?

6        Q.  You say:  "The actual construction and

7    excavation work on the projects was done by

8    subcontractors hired by Mr. Kagan."  Do you see that

9    language, the last sentence of Paragraph 4 of your

10   affidavit?

11       A.  Yes.

12       Q.  Is that an accurate statement?

13       A.  Yes.

14       Q.  Does Proex do any work?

15       A.  I don't understand the question.

16       Q.  Does Proexcavation own some construction

17   equipment?

18       A.  Yes.

19       Q.  And does it do demolition work?

20       A.  I'm not aware of this.

21       Q.  Well, do you know if Proexcavation did work

22   on the Lyman-Cutler project?

23       A.  Proexcavation?  I believe so.

24       Q.  What work did Proexcavation do on the

FARMER ARSENAULT BROCK LLC

Kristina Brusenkova - Vol. 1 - 3/20/2018

118

1    Lyman-Cutler project?

2        A.  Site preparation.  Maybe landscaping and

3    masonry, but I left the company.

4        Q.  So when we look at Paragraph 4 of your

5    affidavit, you say:  "The actual construction and

6    excavation work on the projects was done by

7    subcontractors hired by Mr. Kagan."  Do I understand

8    your testimony that Proexcavation did excavation

9    work on the Lyman-Cutler project?

10            MR. COHEN:  Objection.

11       A.  Repeat the question.

12       Q.  Did Proexcavation do excavation work on the

13   Lyman-Cutler project?

14       A.  Yes.

15       Q.  Now, let's look at Paragraph 5.  You say

16   when you got to the Kagan Development all records

17   were kept on the copy page in the checkbooks,

18   correct?

19       A.  Yes.

20       Q.  And cost estimates were calculated based on

21   data that had been recorded in the checkbooks,

22   correct?

23       A.  Repeat the question?

24       Q.  You said in your affidavit that cost

Kristina Brusenkova - Vol. 1 - 3/20/2018

119

1  estimates were calculated based on data that had

2  been recorded in the checkbooks, correct?  That's

3  what you said?

4       A.  Yes.

5       Q.  Why is that improper?

6            MR. COHEN:  Objection.

7       A.  When you hire a person, you're supposed to

8  get an estimate first in order to see the total

9  amount that should be done, should be paid for

10  particular work.  When you pay on a regular basis

11  and you don't have estimate, you don't know the

12  total amount that's supposed to be paid.  If the

13  total amount after the work is done is very low, he

14  just say:  Okay, I'm going to pay you more for this

15  work.  And this is not right.

16       Q.  What work did Mr. Kagan overcharge for the

17  Lyman-Cutler project?

18       A.  I cannot recall.

19       Q.  Do you know?

20       A.  I can't recall.

21       Q.  Do you know if it ever happened that he

22  overcharged on the Lyman-Cutler project?

23       A.  Paragraph 9.

24       Q.  Let's look at Paragraph 9.  You said on

Kristina Brusenkova - Vol. 1 - 3/20/2018

123

1    to Lyman-Cutler.

2         Q.   And at the time you left in October

3    of 2014, had the final reconciliation of the books

4    and records for Lyman-Cutler been done yet?

5         A.   I don't know this.

6         Q.   How do you know that credits weren't given

7    for returns after you left?

8         A.   Because all of the credits went straight to

9    KDC income account.

10        Q.   How do you know that there were no credits

11   made to the final accounting for the Lyman-Cutler

12   project?

13        A.   I don't know for this company, but I know

14   for other companies.

15        Q.   Which other companies?

16        A.   The ones that were closed when I used to

17   work for him.   I can't recall the names.

18        Q.   You can't recall the names.   Okay.

19             Still looking at Paragraph Number 5, you

20   say:   "When I first started to do the bookkeeping, I

21   found a lot of missed amounts and we issued a lot of

22   additional invoices to the investors (Example, Hyde

23   Avenue)."

24             What do you mean when you say you found

Kristina Brusenkova - Vol. 1 - 3/20/2018

125

1    A.  I don't understand your question.

2    Q.  Where did you get the information that

3 enabled you to say what you said in Paragraph 6 of

4 your affidavit?

5    A.  He usually create a company, a partnership.

6    Q.  And do you believe that's improper?

7    A.  I didn't say this.

8    Q.  I didn't say you did.  I just asked the

9 question.  Is that improper somehow?

10    A.  No.

11    Q.  Now, you say in Paragraph Number 7 that he

12 regularly double-billed projects.  Do you see that?

13    A.  Yes.

14    Q.  On the Lyman-Cutler project specifically

15 when did he double-bill?

16    A.  I can't recall.

17    Q.  Did he ever?

18    A.  Based on the information that I saw, the

19 information that Fillippov provided me, yes, for

20 landscaping.

21    Q.  So you believe he double-billed for

22 landscaping?

23    A.  I believe, yes.

24    Q.  Anything else?

Kristina Brusenkova - Vol. 1 - 3/20/2018

132

1    Q.   Do you know that?

2    A.   Based on this, yes.  I don't know

3    personally.

4    Q.   That's what I wanted to know.  Anything

5    else you want to point out?

6              (Pause.)

7    A.   The last question?

8    Q.   I'm asking you for any double payments that

9    you can identify.  If you can't, you can't?

10   A.   I can't because this is not my records.

11   Q.   Let me ask you another question.  Strike

12   that.  Kagan Development would sometimes pay its

13   subcontractors out of a Kagan Development account,

14   correct?

15   A.   Yes.

16   Q.   And when it paid subcontractors out of a

17   Kagan Development account, it would then reimburse

18   itself for monies it laid out, right?

19   A.   Yes.

20   Q.   So if Kagan Development paid a foundation

21   subcontractor, it would then reimburse itself for

22   the foundation costs, wouldn't it?

23   A.   Yes.

24   Q.   So let's go back to your affidavit, Exhibit

Kristina Brusenkova - Vol. 1 - 3/20/2018

133

1    7.   Look at Paragraph Number 10.   What

2   subcontractors did Mr. Kagan pay more than the job

3   was worth?

4        A.   I can't recall the names.

5        Q.   How did you make a determination that there

6   were payments in excess of what the job was worth?

7        A.   When the work was done, he usually came to

8   my desk and he asked me to pull all the numbers that

9   were paid to this particular person.   So when he saw

10  this number he said, you know, it is a little low.

11  Can we had an additional $2,000.

12       Q.   So try my question, though.   First of all,

13  did that happen in Lyman-Cutler?

14       A.   I can't recall.

15       Q.   Do you have any basis for knowing what the

16  proper charge from a subcontractor should be?

17       A.   No.

18       Q.   Now, with respect to the American Express

19  situation, looking at Paragraph Number 12 of your

20  affidavit, would you agree with me, Ms. Brusenkova,

21  that the American Express cards were used to

22  purchase items for projects?

23       A.   Yes.

24       Q.   Would you also agree with me that it was

FARMER ARSENAULT BROCK LLC

Kristina Brusenkova - Vol. 1 - 3/20/2018

135

1   materials at that time.  I think sometime in the

2   middle of 2014 he said we have to start to do this.

3   I started creating different accounts and

4   subaccounts and classes for them.  But we were not

5   able to split the expenses that were made before the

6   conversation.

7        Q.   Do you know if any of the expenses from

8   before were improperly charged to the Lyman-Cutler

9   account?

10       A.   I can't recall it.

11       Q.   You can't recall or you don't know?

12       A.   I can't recall it.

13       Q.   Do you know if it ever happened?

14       A.   I just know it happened usually when he

15   billed from Proexcavation it is the amount -- he

16   just create the amount and put it on the invoice,

17   and ask me to prepare this invoice.

18       Q.   How do you know -- strike that.  The

19   amounts that he charged, how do you know whether

20   those amounts were high or low or right?

21       A.   What company?

22       Q.   Any of the companies.  Let me try it this

23   way and rephrase it.  Unless you know exactly what a

24   vendor did, what a subcontractor did, how do you

Kristina Brusenkova - Vol. 1 - 3/20/2018

137

1    magnitude?

2        A.   1,000, 1500, I don't know; not a huge

3    amount.

4        Q.   Do you know whether this happened on

5    Lyman-Cutler?

6        A.   I don't know.

7        Q.   Now let's look at your Paragraph Number 14.

8    You say: "When Mr. Kagan submitted bills to

9    projects for Proexcavation, he would arbitrarily

10   charge whatever fee he felt like he could get away

11   with.  There was no direct connection between the

12   charge submitted to the project and the cost that

13   KDC or Proexcavation had incurred for the materials

14   or for paying the subcontractors."

15            Did I read that correctly?

16       A.   Yes.

17       Q.   How did you determine that there was no

18   direct connection between the charges submitted, as

19   you state in your affidavit?

20       A.   As he explained to me, every time when we

21   pay something for Proexcavation, we are supposed to

22   get reimbursed from the companies.  But he never did

23   this.  He just overcharge them.

24       Q.   How did you determine that there was an

FARMER ARSENAULT BROCK LLC

168

1               CERTIFICATE OF COURT REPORTER
2
3
4
5
6          I, David A. Arsenault, Registered
Professional Reporter, do certify that the
7   deposition of KRISTINA BRUSENKOVA, in the matter of
Lyman-Cutler vs. Kagan, et al., on March 20, 2018,
8   was stenographically recorded by me; that the
witness provided satisfactory evidence of
9   identification, as prescribed by Executive Order 455
(03-13) issued by the Governor of the Commonwealth
10   of Massachusetts, before being sworn by me, a Notary
Public in and for the Commonwealth of Massachusetts;
11   that the transcript produced by me is a true and
accurate record of the proceedings to the best of my
12   ability; that I am neither counsel for, related to,
nor employed by any of the parties to the above
13   action; and further that I am not a relative or
employee of any attorney or counsel employed by the
14   parties thereto, nor financially or otherwise
interested in the outcome of the action.
15
16
17
18   Transcript review was requested of the reporter.
19
20
21
22
23   _____   3.29.18
24   David A. Arsenault, RPR

FARMER ARSENAULT BROCK LLC

# EXHIBIT 4

Exhibits: 1-26                    Volume 1, Pages 1-239
             UNITED STATES BANKRUPTCY COURT
                  DISTRICT OF MASSACHUSETTS
                    (EASTERN DIVISION)

-----------------------------

In Re:
                                   Chapter 7
LYMAN-CUTLER, LLC,                 Case No. 15-13881-FJB

             Debtor
-----------------------------

LYMAN-CUTLER, LLC,

             Plaintiff
v.                                 Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
             Defendants
-----------------------------

    30(b)(6) DEPOSITION of KAGAN DEVELOPMENT KDC CORP.
        30(b)(6) DEPOSITION of PROEXCAVATION
      By VADIM KAGAN and VADIM KAGAN Individually
          Thursday, May 3, 2018, 10:02 a.m.
            O'Connor Carnathan and Mack LLC
             1 Van de Graaff Drive, Suite 104
                Burlington, Massachusetts
      --------- David A. Arsenault, RPR ---------
      daa@fabreporters.com   www.fabreporters.com
              Farmer Arsenault Brock LLC
                Boston, Massachusetts
                    617-728-4404

46

1　keep your books; isn't that right?
2　　A. Yes.
3　　Q. When was that?
4　　A. March 2014.
5　　Q. When Mr. Agranovich set up the QuickBooks
6　for KDC, did you also set up QuickBooks for the
7　various construction projects that you were
8　operating?
9　　A. Probably.
10　　Q. You don't recall either way?
11　　A. It happens at some point.
12　　Q. Did you set up a set of QuickBooks for
13　Lyman-Cutler?
14　　A. Yeah.
15　　Q. And then what about 50 Yarmouth Road, did
16　you have an LLC to build 50 Yarmouth Road?
17　　A. Yes.
18　　Q. Did you set up QuickBooks for 50 Yarmouth
19　Road?
20　　A. I think so. Maybe not. I don't remember
21　if it was set under QuickBooks. Maybe.
22　　Q. When Kristina Brusenkova came to work for
23　you, did you have any other employees other than you
24　and her?

47

1　　A. Yes.
2　　Q. Who else worked for you -- thinking about
3　KDC, to be clear. Did you have -- I'll start that
4　one over. Thinking just about KDC, what employees
5　did you have other than yourself and Ms. Brusenkova?
6　　A. At some point we have another employee.
7　His name is Evgueni Agoureev. I didn't remember
8　exactly when he was hired and when he was, he left
9　the company. I don't know.
10　　Q. What did you hire him to do?
11　　A. He was the manager of the company,
12　construction supervisor, kind of.
13　　Q. Did he do any work on the Lyman-Cutler
14　project?
15　　A. Yes.
16　　Q. What did Mr. Agoureev do on the
17　Lyman-Cutler project?
18　　A. Making sure our subcontractors on an every-
19　day basis doing what we told them to do.
20　　Q. Was Mr. Agoureev responsible for keeping
21　any of the books for KDC?
22　　A. No.
23　　Q. Was Mr. Agoureev responsible for keeping
24　any of the books for Lyman-Cutler?

48

1　　A. No.
2　　Q. When Ms. Brusenkova was responsible for
3　keeping the books, was she responsible for the
4　Lyman-Cutler books?
5　　　MR. PERTEN: Objection.
6　　A. She is just entering the number in the
7　books by the invoices or the checks we cut or
8　something like that.
9　　Q. So she was just responsible for entering
10　the numbers in the QuickBooks?
11　　A. Yes.
12　　Q. Was that true for KDC?
13　　A. Yes.
14　　Q. Was that true for Lyman-Cutler?
15　　A. Yes.
16　　Q. Did you maintain a set of QuickBooks for
17　Proexcavation?
18　　A. Yes.
19　　Q. Was Ms. Brusenkova responsible for entering
20　the numbers in the Proexcavation QuickBooks?
21　　A. Yes.
22　　Q. How did Ms. Brusenkova know what numbers to
23　enter into which books?
24　　　MR. PERTEN: Objection.

49

1　　A. I don't know.
2　　Q. Did you tell her what numbers to enter into
3　which books?
4　　A. No.
5　　Q. Did you have any understanding at all as to
6　how she knew what numbers to enter into which books?
7　　A. Can you repeat the question?
8　　Q. Do you have any understanding at all as to
9　how Ms. Brusenkova entered which set of numbers into
10　which set of books?
11　　A. No.
12　　Q. Did you supervise Ms. Brusenkova at all in
13　keeping the books?
14　　A. I supervised her to make sure she cut the
15　right check. For entering the invoices, I don't
16　know.
17　　Q. Am I right that you had a romantic
18　relationship with Ms. Brusenkova?
19　　A. Yes.
20　　Q. During what time period were you engaged in
21　a romantic relationship with Ms. Brusenkova?
22　　A. Somewhere in the beginning of the summer
23　of 2013.
24　　Q. When did it end?

Vadim Kagan - Vol. 1 - 5/3/2018

14

### Page 50

1    A. When did it end?
2    Q. It's not going on today, is it?
3    A. I don't know. Probably not.
4    Q. You don't know whether you are in a
5 romantic relationship with Ms. Brusenkova?
6    A. I don't know what you call romantic
7 relationship. What do you call a romantic
8 relationship?
9    Q. When did you sleep with her last?
10    A. That's a good question. Probably the
11 summer of 2014.
12    Q. When did she leave KDC?
13    A. In October 2014.
14    Q. Did she quit or did you let her go?
15    A. I fired her.
16    Q. Why did you fire her?
17    A. Embezzlement.
18    Q. It had nothing to do with the discovery by
19 your wife of the romantic relationship?
20    A. No.
21    Q. What do you say Ms. Brusenkova embezzled
22 from you?
23    A. What is the question?
24    Q. What are you accusing Ms. Brusenkova of

### Page 51

1 embezzling from you?
2    A. Wrote checks, payroll record. I don't
3 know. Some kind of double billing. She
4 overcharged -- she overpaid to herself on her
5 salary, and cut a bunch of checks from Kagan
6 Development to her name and her companies.
7    Q. How much money are you accusing
8 Ms. Brusenkova of embezzling?
9    A. I don't remember now.
10    Q. Can you say within $10,000?
11    A. Maybe 80,000, 90,000.
12    Q. Is that part of the lawsuit that is
13 currently pending between you and Ms. Brusenkova?
14    A. Yes.
15    Q. Did you alter any of the checks that were
16 submitted to the court in that lawsuit, Mr. Kagan?
17    A. Can you repeat the question?
18    Q. Did you alter any of the checks that were
19 submitted to the court in the Brusenkova lawsuit,
20 sir?
21    A. What do you mean altered the check?
22    Q. Change the memo line on any of the checks
23 before they were submitted to the court.
24    A. No.

### Page 52

1    Q. Do you know if Mr. Cohen altered any of the
2 checks that were submitted to the court in the
3 Brusenkova matter?
4    A. I don't think so.
5    Q. Was Ms. Brusenkova responsible for keeping
6 the books for KDC up until the time you fired her in
7 October 2014?
8    A. Yes.
9    Q. Was she also responsible for keeping the
10 books for Lyman-Cutler up until the time you fired
11 her in October 2014?
12    A. Yes.
13    Q. After you fired Ms. Brusenkova, who became
14 responsible for keeping the books for KDC?
15    A. Dan Gersh.
16    Q. When did Mr. Gersh start for the company?
17    A. Sometime in the beginning of 2015.
18    Q. If I suggested to you he started in
19 November 2014, would that sound right?
20    A. I don't think so. I don't remember.
21    Q. Was Mr. Agoureev still working for the
22 company KDC when Mr. Gersh started?
23    A. No.
24    Q. Why did Mr. Agoureev leave?

### Page 53

1    A. I don't know.
2    Q. He quit?
3    A. Yeah.
4    Q. When did you last talk to Mr. Agoureev?
5    A. Yesterday.
6    Q. What did you talk about?
7    A. He's still doing my subcontracting project.
8    Q. What kind of subcontracting does
9 Mr. Agoureev do?
10    A. If I have to assemble something, install
11 something, he's doing it.
12    Q. Does he assemble or install certain types
13 of something?
14    A. Kitchen cabinets.
15    Q. Anything else?
16    A. Moldings, any wood-related item.
17    Q. Where were you when you talked to
18 Mr. Agoureev?
19    A. On the street.
20    Q. Did you talk about your deposition?
21    A. No.
22    Q. Did you talk about this lawsuit?
23    A. No.
24    Q. During the time period when Ms. Brusenkova

FARMER ARSENAULT BROCK LLC

Vadim Kagan - Vol. 1 - 5/3/2018

26

98

1    another during this.
2        A.  Before this we have multiple conversation
3    before.  This is not one-time conversation.
4        Q.  At what time did you agree that you would
5    put in more money and Filippov and Lipetsker would
6    pay you back later?
7        A.  Before we started the project.
8        Q.  So we are still in the beginning of 2013?
9        A.  Before we start.
10       Q.  Is this before you take out the bank loan?
11       A.  No, after.
12       Q.  After you have taken out the bank loan?
13       A.  I think.
14       Q.  You already closed on the bank loan?
15       A.  I don't know when we closed on the bank
16   loan.  I was not involved in the process at all.
17       Q.  At what point did you realize that 1.6
18   million was not going to be enough to build each
19   house?
20       A.  When we finished the architectural plans.
21       Q.  When was that?
22       A.  April or May 2013, something like that.  I
23   don't remember when we finished the plans.
24       Q.  When you finished the plans, how did you

99

1    know that 1.6 million wasn't going to be enough?
2        A.  Based on the size of the house and
3    finishes, what we are planning to do and how much we
4    have to spend for everything, it is going to be much
5    more than 1.6.
6        Q.  Did you do any math to figure out what it
7    was going to cost?
8        A.  Yes.
9        Q.  Do you have that written down anywhere?
10       A.  Whatever I created, the template,
11   spreadsheet, you add the number, you change the
12   number, and you get to this amount.
13       Q.  Do you have a template like this somewhere
14   that shows a number higher than 1.6 million?
15       A.  I give them the template.  We bring it last
16   time.  I don't know where is this template.
17       Q.  Mr. Kagan, we will agree that you are the
18   builder, right?
19       A.  Yes.
20       Q.  It was your responsibility to build each
21   home?
22       A.  Yes.
23       Q.  Did you have any responsibility to
24   calculate what the construction budget was going to

100

1    be before the project started?
2        A.  Yes.
3        Q.  Did you do that?
4        A.  I did -- we did this verbally with Filippov
5    and Lipetsker.  We started with 1.6.  We understand
6    that 1.6 is not going to be enough.  I promise
7    everybody I am going to cover, and I'm not going to
8    ask anybody else more money.  And we started the
9    deal.
10       Q.  What I'm asking is, did you tell them
11   exactly how much, did you figure out what it was
12   going to cost to build these houses back in April --
13       A.  1.6, 1.8 approximately.  I said, As soon as
14   we go, we'll see how much money we have and how much
15   money we have to put in and where we are.
16       Q.  And Filippov and Lipetsker were fine with
17   that.  Is that what you are telling me?
18       A.  Yes.
19       Q.  As best you can recall, what did Alex
20   Filippov say when you told him it was going to be
21   more than 1.6 and you would put in the money and get
22   paid back later?
23       A.  He said, based on his research and how this
24   market goes, we can sell the house for much more

101

1    than we proposed or we expect.
2        Q.  Did Mr. Filippov say anything else?
3        A.  He said, Let's move on and we'll see where
4    we are.  We will do the updates and we'll see what
5    we are doing.  We start the project.
6        Q.  How about Mr. Lipetsker, what did he say
7    when you told him the number was going to be some
8    number bigger than the budget?
9        A.  Mr. Lipetsker saying you always make the
10   money.  You always make 10, 15, 20 percent, it
11   depends on the project.  He said we cannot lose.
12   Based on the numbers and the conversation what we
13   did, if something happened, the worse was going to
14   happen, we can take our money and leave because we
15   are not going to lose anything.  I'm going to waste
16   my two years building this house.  That was the
17   basic conversation, one of the conversation.
18       Q.  What other conversations do you recall
19   having with Mr. Lipetsker and Mr. Filippov about the
20   construction budget?
21       A.  We always have a conversation about
22   construction budget, how much this, how much that,
23   what are we going to do, how expensive the kitchen
24   has to be, how expensive the finishes has to be.

Vadim Kagan - Vol. 1 - 5/3/2018

56

218

1    obligations under the operating agreement. KDC's
2    best accounting as to the unreimbursed construction
3    costs as of May 7, 2015 total $758,025.56 exclusive
4    of interest charges, with approximately 50,000 of
5    additional vendor costs anticipated."
6         Have I read that correctly?
7    A. Yes.
8    Q. So who calculated the $758,025.56?
9    A. I don't remember who did this.
10   Q. It was not you?
11   A. No.
12   Q. Who else did you have available to make the
13   calculation at that time?
14   A. The date of this? 2015. Maybe Dan. Maybe
15   he took the number from the QuickBooks. Maybe.
16   What I believe, what I believe it is initial number.
17   This is the initial number what has to be reimbursed
18   right away. I don't want to pay the carrying costs
19   no more. The company owes me $750,000. I want to
20   be reimbursed at least this number so I can continue
21   doing what I'm doing. The guys said they were going
22   to reimburse me the money and they didn't.
23   Q. I think earlier you told me that you had
24   substantially completed construction by the end of

220

1    get the money, we will give you the money but nobody
2    is giving me the money. This is why I go Alex Pyle
3    and say we have to ask for the money.
4    Q. If you had met on many occasions with
5    Mr. Lipetsker and Mr. Filippov during which they
6    agreed to all the expense overruns, why did you hire
7    an attorney to tell them how much they owed?
8    A. Because I don't know how to write a letter.
9    Q. Is this May 7th letter, sir, the very first
10   time that you told them the cost overruns were
11   $758,025.56?
12   A. No.
13   Q. When did you first tell them the cost
14   overruns were that figure?
15   A. According to our project, every month we
16   exceeding our initial monthly expense in
17   construction, and at some point we get to a
18   different number. I don't remember the month
19   exactly.
20   Q. Can you give me any estimate of when you
21   exactly you told them the cost overruns were going
22   to be this big?
23   A. I don't remember if you talk about a
24   specific number. First of all we are 200 over

219

1    March 2014, right?
2    A. Substantially completed. I think we have a
3    different interpretation of what is substantial
4    completion, a difference in the percentage of this.
5    Q. I don't understand what you mean.
6    A. Substantially completed, yes.
7    Q. You got the certificates of occupancy for
8    the properties on October 2, 2014, right?
9         MR. PERTEN: Objection.
10   A. We usually do the certificate of occupancy
11   whenever we can get. We don't need the certificate
12   of occupancy. Sometimes we get a certificate of
13   occupancy two days before the closing. Nobody
14   rushing to get certificates of occupancy.
15   Q. You will agree with me, sir, that the
16   construction was done by October 2014; isn't that
17   right?
18   A. Probably.
19   Q. So why is it that you are just sending this
20   bill for unreimbursed construction costs or this
21   claim for unreimbursed construction costs in
22   May 2015?
23   A. I didn't finalize the number yet. The guys
24   said we are going to get the money, we are going to

221

1    budget, then 400 over budget, then 500 over budget;
2    I don't remember exactly.
3    Q. And you are not sure who did the
4    calculation. It could have been Mr. Gersh; it could
5    have been Mr. Cohen?
6    A. Maybe we get something from QuickBook
7    computer. This is not the final number. This is
8    like the initial number which we need to be paid
9    right away. This was not the final number.
10   Q. Mr. Pyle's letter says: With approximately
11   $50,000 of additional vendor costs anticipated.
12   Have I read that correctly?
13   A. Yeah, but I don't know. Definitely 650,000
14   was not the full amount.
15   Q. As of May 7, 2015 you represented that you
16   thought it might be another 50,000 outstanding,
17   right?
18   A. I don't know. I'm not the bookkeeper. We
19   get this number from QuickBooks or whatever. I know
20   this was not the final number, but this was the
21   number that we need exactly at least to cover to
22   Kagan Development to continue doing the business.
23   Q. Did you review this letter before Mr. Pyle
24   sent it out?

Vadim Kagan - Vol. 1 - 5/3/2018

234

1    that your compensation for building the two houses
2    shall be 50 percent of the net profits?
3        A.  Simply.  I didn't charge in the 50 percent
4    for the company, I didn't charge for my personal
5    time what I'm spending for this.
6        Q.  So you were going to get 50 percent of the
7    profits for your personal time plus pay your own
8    company a half a million dollars for managing the
9    construction?
10       MR. PERTEN:  Objection.
11       A.  That was the deal, yes.
12       Q.  That's the deal.
13       A.  I don't know, yeah.
14       Q.  And you went to Lipetsker and Filippov and
15   they said great, no problem, that's fine, Vadim?
16       A.  They had no problem.
17       MR. PERTEN:  Objection.
18       Q.  When we look back at the budget that you
19   submitted to the bank, the $1.6 million budget,
20   there's no line item there for a general
21   contractor's fee, is there, sir?
22       A.  Yes.
23       Q.  That's right?
24       A.  Yes.

235

1        Q.  So in effect, the cost of construction was
2    going to go immediately from 1.6 million to no less
3    than 2.1 million, right, with your fee?
4        MR. PERTEN:  Objection.
5        A.  This is our deal.  Then I get this in the
6    end.
7        Q.  Why don't we briefly look at the profit
8    scenarios.  I'm back to Exhibit 6.  Recognizing that
9    you say that these were approximate and that the
10   construction costs could vary, the very best case on
11   these profit scenarios is about 1.4-odd million
12   dollars if the property sold for 5.3 million in 20
13   months.  Do you see that?
14       A.  Yeah.  But it is template.  I don't know
15   what it is.
16       Q.  How was anybody else going to make a profit
17   on this project if you increased the cost of every
18   material in the house and agreed to pay yourself
19   half a million dollars as a general contractor fee?
20       A.  We pulled the number together.  Nobody had
21   a problem with it.
22       Q.  Everybody just thought they were going to
23   make money even paying you a half a million dollars
24   for your general contractor fee and increasing the

236

1    cost of all the materials?
2        A.  Yes.  Put the numbers together; the numbers
3    worked.
4        Q.  When did you have that conversation with
5    Mr. Lipetsker and Mr. Filippov?
6        A.  Before we start building the house.
7    Because I said if we are not going to sign the
8    agreement, I'm not going to build the house.  We
9    have to sign this agreement.  The company has to
10   lend the money to the project and this has to be
11   official somehow.
12       Q.  This contract that you signed with yourself
13   was after you got the construction loan, right?
14       MR. PERTEN:  Objection.
15       A.  I did not sign this for myself.
16       Q.  You are the only guy that signed this.  You
17   signed for KDC.
18       A.  Mr. Filippov said just go sign it, you are
19   the manager.
20       Q.  Mr. Filippov said go sign it, you are the
21   manager?
22       A.  Yeah, absolutely.
23       MR. CARNATHAN:  Why don't we pause
24   there.      (4:35 p.m.)

237

1        CERTIFICATE OF COURT REPORTER
2
3
4
5
6        I, David A. Arsenault, Registered
     Professional Reporter, do certify that the
7    deposition of VADIM KAGAN, in the matter of
     Lyman-Cutler vs. Kagan, et al., on May 3, 2018, was
8    stenographically recorded by me; that the witness
     provided satisfactory evidence of identification, as
9    prescribed by Executive Order 455 (03-13) issued by
     the Governor of the Commonwealth of Massachusetts,
10   before being sworn by me, a Notary Public in and for
     the Commonwealth of Massachusetts; that the
11   transcript produced by me is a true and accurate
     record of the proceedings to the best of my ability;
12   that I am neither counsel for, related to, nor
     employed by any of the parties to the above action;
13   and further that I am not a relative or employee of
     any attorney or counsel employed by the parties
14   thereto, nor financially or otherwise interested in
     the outcome of the action.
15
16
17
18   Transcript review was requested of the reporter.
19
20
21
22
23   _____  5.15.18
24   David A. Arsenault, RPR

FARMER ARSENAULT BROCK LLC