# EXHIBIT 5





**SHEEHAN**
**PHINNEY**
**BASS +**
**GREEN**
PROFESSIONAL
ASSOCIATION

**ATTORNEYS AT LAW**

BOSTON
255 STATE STREET
BOSTON, MA
02109
T 617-897-5600
F 617-439-9363

MANCHESTER
1000 ELM STREET
MANCHESTER, NH
03101
T 603-668-0300
F 603-627-8121

CONCORD
TWO EAGLE SQUARE
CONCORD, NH
03301
T 603-223-2020
F 603-224-8899

HANOVER
17 ½ LEBANON STREET
HANOVER, NH
03755
T 603-643-9070
F 603-643-7670

www.sheehan.com

Alexander H. Pyle
617-897-5642
apyle@sheehan.com

May 7, 2015

## VIA OVERNIGHT DELIVERY

Mr. Alex Filippov
130 Trapelo Road
Belmont, MA 02478

Mr. Nickolay Lipetsker
52 Stony Brae Road
Newton, MA 02461

Mr. Vadim Kagan
239 Nahanton St.
Newton, MA 02459

Re:  **Lyman-Cutler, LLC**

Dear Messrs. Filippov, Lipetsker and Kagan:

I am writing on behalf of our clients, Vadim Kagan and Kagan Development Corporation, to open a discussion regarding several matters pertaining to Lyman Cutler, LLC (the "Company").

As you know, the three of you are the members of the Company, which is governed by an Operating Agreement dated as of November 14, 2012 (the "Operating Agreement"). In accordance with the terms of the Operating Agreement, Mr. Kagan and his company, Kagan Development Corporation ("KDC") have constructed two homes on the real property owned by the Company in Brookline, Massachusetts. The homes were completed in accordance with all the deadlines specified in the Operating Agreement and have been on the market for approximately ten months, but neither home has yet been sold. Under current market conditions, a reduction to the listing price is clearly necessary, but to date I understand that Mr. Filippov has refused to approve any price change.

The need for a price reduction is particularly important given the November 30, 2015 dissolution date of the Company, which is rapidly approaching. It is not in the interest of any of the members to have the homes sold as part of a liquidation, particularly when the liquidation would occur during the traditionally weak winter real estate market.

{S0830090.4}

L-C BK 000308

Mr. Alex Filippov
Mr. Nickolay Lipetsker
Mr. Vadim Kagan
May 7, 2015
Page 2

To date, Mr. Kagan and KDC have incurred substantial costs and expenses in complying with their obligations under the Operating Agreement. KDC's best accounting as to the unreimbursed construction costs as of May 7, 2015 total $758,025.56, exclusive of interest charges, with approximately $50,000 of additional vendor costs anticipated. These construction costs are detailed on the accompanying spreadsheet, and will be payable after repayment of the existing bank debt and before any proceeds are available for distribution to the Company's members. In addition, since November 2013, Mr. Kagan has made additional capital contributions totaling over $251,000 to cover carrying costs associated with the homes. While these additional capital contributions do not bear interest, they do have the effect of increasing Mr. Kagan's capital account and thereby increasing his share of the proceeds available for distribution when the Company is liquidated.[1]

Under the current circumstances, Mr. Kagan is not prepared to continue paying the carrying costs of the homes, which total approximately $28,000 per month. Section 8.1 of the Operating Agreement provides that if Mr. Kagan does not pay the carrying costs, then Mr. Filippov will be required to pay them. In such an event, Mr. Filippov's capital account would be increased by the amount of his contributions, which would increase his share of liquidation proceeds.[2] If, however, all members agree to a reduction in the listing price of each home from $5.5 million to $5.25 million (and to a reduction to $5.199 million if the houses do not sell within one month), Mr. Kagan would be willing to split equally with Mr. Filippov the carrying costs of the homes once Mr. Filippov has contributed carrying costs equal to those contributed by Mr. Kagan to date, until both homes are sold. Given the substantial costs already incurred by Mr. Kagan and KDC, we believe this approach is more than fair to the other members of the Company.

If you are amenable to the foregoing compromise, I would be happy to prepare an amendment to the Operating Agreement which reflects this approach, and also extends the term of the Company until November, 30 2016 and clarifies the economic rights and obligations of the members.

---

[1] Section 9.2 of the Operating Agreement provides that upon dissolution, Company's assets, after payment of liabilities to creditors and member loans, "shall be distributed to the Members in accordance with their respective Capital Accounts after giving effect to all contributions, distributions and allocations for all periods." Note that Capital Accounts, not Percentage Interests, determine how liquidation proceeds are allocated.

[2] Section 8.1 makes reference to a reduction of Mr. Kagan's share of capital contributions and percentage interest in the Company if Mr. Filippov pays the carrying costs. While the language is inartfully drafted, it simply states the same principle that applies to carrying costs paid by Mr. Kagan: The increase in Mr. Filippov's capital account has the effect of reducing the proportion of total capital contributed by Mr. Kagan and therefore, pursuant to Section 9.2, the proportion of liquidation proceeds he receives.

[5053-2/et al]

L-C BK 000309

Mr. Alex Filippov
Mr. Nickolay Lipetsker
Mr. Vadim Kagan
May 7, 2015
Page 3

It is the desire of Mr. Kagan and KDC to arrive at a mutually acceptable path forward that is fair to all of the members and recognizes the contributions that each of them has made to the Company. I would be pleased to work with you or your counsel towards this goal in a cooperative and constructive manner.

Because the active spring real estate market is currently underway, I would ask that you give this matter your prompt attention.

I look forward to hearing from you.

Sincerely,

Alexander H. Pyle

cc: Mr. J. Joseph Cohen

L-C BK 000310

05/07/15

**Lyman-Cutler, LLC**
**A/P Aging Summary**
**All Transactions**

| | Current | 1 - 30 | 31 - 60 | 61 - 90 | > 90 | TOTAL |
|---|---|---|---|---|---|---|
| BST Plumbing | 39,340.00 | 0.00 | 0.00 | 0.00 | 0.00 | 39,340.00 |
| Decor Art | 11,250.00 | 0.00 | 0.00 | 0.00 | 0.00 | 11,250.00 |
| Dream Flooring | 15,460.00 | 0.00 | 0.00 | 0.00 | 0.00 | 15,460.00 |
| KDC | 5,928.72 | 0.00 | 47.78 | 8,272.73 | 230,027.33 | 244,276.56 |
| National Grid | 0.00 | 198.00 | 0.00 | 0.00 | 0.00 | 198.00 |
| ProExcavation | 0.00 | 0.00 | 0.00 | 0.00 | 325,000.00 | 325,000.00 |
| Sergey Nikolaev | 19,320.00 | 0.00 | 0.00 | 0.00 | 0.00 | 19,320.00 |
| Town of Brookline | 0.00 | 281.00 | 0.00 | 0.00 | 0.00 | 281.00 |
| Unicon Electric | 65,000.00 | 0.00 | 0.00 | 0.00 | 0.00 | 65,000.00 |
| V&D Heat | 37,900.00 | 0.00 | 0.00 | 0.00 | 0.00 | 37,900.00 |
| TOTAL | 194,198.72 | 479.00 | 47.78 | 8,272.73 | 555,027.33 | 758,025.56 |

Current Carrying costs
(per month - approximate)      $30,000

Estimated additional vendor
costs:                         $50,000

L-C BK 000311

# EXHIBIT 6

## ORIGINAL

Exhibits: 38-39                     Volume 1, Pages 1-68

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

- - - - - - - - - - - - - - - - - - - - - - - - - - -

In Re:

LYMAN-CUTLER, LLC,                  Chapter 7
                                    Case No. 15-13881-FJB

        Debtor

- - - - - - - - - - - - - - - - - - - - - - - - - - -

LYMAN-CUTLER, LLC,

        Plaintiff

v.                                  Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,

        Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - -


DEPOSITION OF NICKOLAY LIPETSKER
Thursday, April 26, 2018, 11:30 a.m.
Sheehan Phinney Bass + Green, P.A.
255 State Street, 5th Floor
Boston, Massachusetts


- - - - - - - - - David A. Arsenault, RPR - - - - - - - - -
daa@fabreporters.com   www.fabreporters.com
Farmer Arsenault Brock LLC
Boston, Massachusetts
617-728-4404

26

1   the Lyman-Cutler project?
2       A. I only know about one service. If you can
3   call it a service, I call it work.
4       Q. What did he do?
5       A. As far as I know, Mr. Kagan asked
6   Mr. Zhukovskiy, based on the documents that
7   Mr. Kagan provided to Zhukovskiy and other
8   information that Kagan provided to Zhukovskiy, he
9   did some documents, some spreadsheet, what we call a
10  risk analysis. And this document was to reflect the
11  estimates as to what profit or what expenses -- what
12  the profit would be, what expenses would be incurred
13  depending on various circumstances. That's to the
14  to the best of my knowledge.
15      Q. What made you have that knowledge? Were
16  you present when Mr. Kagan made that request of
17  Mr. Zhukovskiy?
18      A. I don't remember exactly all the
19  conversations, but I remember exactly the time when
20  Mr. Zhukovskiy brought this spreadsheet or this
21  document for a presentation and he asked Mr. Kagan
22  is that what you wanted, and Mr. Kagan said yes,
23  that's what I wanted.
24      Q. Were you present at a meeting where that

27

1   presentation was discussed?
2       A. Yes.
3       Q. Where did that meeting occur?
4       A. It happened in a conference room in
5   Attorney Maiden's office.
6       Q. Who was present at that meeting?
7       A. I was, Kagan, Zhukovskiy, Filippov, Maiden.
8   That's it.
9       Q. What do you recall was said at that
10  meeting?
11      A. To a large extent that meeting was
12  definitive in deciding whether the project was going
13  to go forward. At that meeting Mr. Kagan said when
14  he presented this project that the important thing
15  for him was that building these two houses wall to
16  wall next to each other was less expensive than
17  building two single houses. And Mr. Kagan said that
18  he knew exactly what the cost of construction would
19  be. He said he knew exactly what the expenses would
20  be.
21      And the main question, the main question
22  of Mr. Filippov was to get the exact numbers, not
23  just the construction costs but all the expenses,
24  the bank payments, including insurance, including

28

1   taxes. He insisted on getting those numbers. And
2   Mr. Filippov said that until the time that he was
3   able to get all those numbers he wasn't going to
4   participate in this project.
5       Q. Do you recall anything else that was said
6   at that meeting?
7       A. I recall that the most important thing that
8   was said at the presentation in terms of risk
9   assessment was that the profit might vary depending
10  on the duration of the construction and the sale
11  price. But the constant thing there was the cost of
12  construction.
13      Q. Do you remember anything else that was said
14  at that meeting?
15      A. Not at this time.
16      Q. Have you now told us everything you can
17  remember about that presentation?
18      A. As far as I remember, people at my age....
19      There was one important question that
20  was raised when the numbers were discussed. It was
21  the question that Mr. Filippov focused on, and he
22  asked Mr. Kagan if bank interest was included in
23  that amount. And the answer was yes. He was
24  talking about the total cost of the project.

29

1       Q. When you say was interest included in that
2   amount, what amount are you referencing?
3       A. I will try to be as exact as possible.
4   Initially 1.3 million was the cost of construction
5   for each of the houses. 200,000 was preliminary
6   estimate for a mortgage, making it a total of 1.5
7   million. And again, I may not be exact about what
8   happened when. Dima, Mr. Kagan, asked for an
9   additional 100,000 per each house. This amount was
10  supposed to provide some financial security for the
11  whole project. And as far as I remember,
12  Mr. Filippov agreed.
13      Q. The discussion about an additional $100,000
14  did that occur after, at a subsequent meeting after
15  the project, after everybody had agreed on the
16  project?
17      A. If memory serves, it was not on the date of
18  the presentation. Again, as far as I recall, it was
19  at a later date but I may be mistaken.
20      Q. Do you remember anything else being
21  discussed at the meeting, the presentation meeting?
22      A. As I recall, certain terms and aspects were
23  discussed, how long the construction will take, what
24  the expected sales price would be, who was

Nickolay Lipetsker - Vol. 1 - 4/26/2018

12

---

**42**

1   increased by another million-plus for a total of 2.5
2   million, sorry, 2.1 million, so at that time when it
3   looked like those additional expenses were two times
4   more than the cost of the original construction of
5   those houses, I started having doubts that
6   everything was correct. In view of that, several
7   subject matter experts were invited to look at the
8   construction costs and they came to the conclusion
9   that the cost of work, cost of labor and materials
10  was exaggerated.
11       Q. Mr. Lipetsker, my question was: Do you
12  know of any double billings on the Lyman-Cutler
13  project?
14       MR. CARNATHAN: Objection.
15       A. Since I never received any invoices or any
16  bills, I never had them in my hands, I cannot answer
17  your question unequivocally. For me the main
18  document is the operating document. How things were
19  done and not done, I don't know. I'm not in the
20  position to review any documents like that. That's
21  why we have experts.
22       Q. If I can draw your attention to Exhibit
23  Number 5. I ask you to turn to Paragraph 47.
24  Please read that to yourself.

---

**43**

1       A. (Witness complies.) I have.
2       Q. What services did Proexcavation provide to
3   the Lyman-Cutler project?
4       A. Dima Kagan has several companies that
5   provide basically similar services. Therefore,
6   Mr. Kagan, which one of his companies provided
7   services and under what name, it is difficult for me
8   to say what exact services by Proexcavation or his
9   other company Home Improvement did.
10       Q. In Paragraph 47 you say that
11  Proexcavation's alleged charges on the project are
12  double what any conceivable legitimate charges for
13  the work it performed on the project. The question
14  is, how did you determine that Proex charges were
15  double any conceivable legitimate charges if you
16  don't know what Proexcavation did?
17       A. Proexcavation, basically the name tells us
18  what they did. They excavate the grounds, set the
19  foundation. When the experts, construction experts
20  who build expensive housing in this similar area
21  were asked how much it would cost to perform this
22  work, they came up with the amounts that were
23  practically two times less.
24       Q. Who did you ask?

---

**44**

1       A. It was Stumpo. It was several contractors
2   that Alex invited to the construction site. I
3   personally don't know them.
4       Q. Do you have any knowledge other than what
5   the experts told you as to the value of
6   Proexcavation's work?
7       A. No.
8       Q. Did you speak to these experts or was that
9   information that was given to you by Mr. Filippov?
10       A. This information came from Mr. Filippov.
11       Q. So you have no personal knowledge. It is
12  what you were told; is that correct?
13       A. That's correct.
14       Q. Now, are you aware of any expenses that
15  were charged to the Lyman-Cutler project that were
16  actually expenses that should have been charged to
17  another project?
18       A. As of today, I don't have that information.
19       Q. Has Mr. Kagan pocketed funds received for
20  the return of unused materials?
21       A. I haven't personally seen those numbers.
22  This is a serious charge that has to be investigated
23  by forensic accountants. I haven't seen those.
24       Q. Fair to say you don't know that occurred;

---

**45**

1   is that correct?
2       A. It is fair to say as of today.
3       Q. Has Mr. Kagan received any kickbacks
4   relative to work performed on the project, the
5   Lyman-Cutler project?
6       A. Personally I don't have this information.
7       Q. Did Mr. Kagan mix expenses for the project
8   on his American Express cards?
9       A. Mr. Kagan has never sent any statements of
10  his credit cards, of the charges on the credit
11  cards, or any invoices. I don't have any
12  information that can prove either way.
13       Q. Is it fair to say, Mr. Lipetsker, that as
14  you sit here today other than the fact that the
15  amount of money that Mr. Kagan is looking for is a
16  lot higher than you expected, you have no facts to
17  show that he did anything wrong?
18       MR. CARNATHAN: Objection.
19       THE INTERPRETER: Can you repeat the
20  question?
21       (Question read by the reporter.)
22       A. As I sit here today, what I understand
23  completely is that if our operating agreement
24  contained the numbers that we are talking about

---

46

1 today, none of us would have been involved with this
2 project.
3    Q. Have you finished your answer?
4    A. Every additional charge, even if it was
5 reasonable, should have been communicated to all the
6 participants in LLC as soon as possible.
7    Q. Has that completed the evidence that you
8 have, as you sit here today, of wrongdoing by
9 Mr. Kagan in connection with the charges for the
10 construction of the Lyman-Cutler project?
11    MR. CARNATHAN: Objection.
12    A. As of today, this is all I can say.
13    Q. Did you put any money into this project
14 other than the $250,000 capital contribution that
15 you made at the beginning?
16    A. No.
17    Q. Have you received any legal bills for legal
18 services that are being provided to you individually
19 in connection with this lawsuit?
20    A. What time period are we talking about?
21    Q. Since the lawsuit was filed?
22    A. Let me think how to formulate it correctly.
23 During the period that LLC existed, legal bills --
24 during the existence of the LLC, there was a lawyer

47

1 that was hired by the company. And the legal bills
2 were paid out of the company proceeds.
3    Q. Was that Mr. Tamposi?
4    A. I'm talking about Mr. Tamposi and Sean.
5    Q. While the homes were being built for
6 Lyman-Cutler, did you personally take any steps to
7 monitor the costs?
8    A. No.
9    Q. Did you ever have occasion to go to the
10 Lyman-Cutler site during the construction process?
11    A. Yes. Dima invited me to show me how
12 beautiful work he has done.
13    Q. How often did you go to the site while
14 construction was ongoing?
15    A. I don't remember. I really don't remember.
16    Q. Did you ever take any photographs of the
17 construction?
18    A. No, no.
19    Q. While the construction was ongoing, what
20 role, if any, did you have in connection with the
21 operation of the LLC?
22    A. I didn't have a specific role.
23    Q. Do you know when the homes were completed?
24    A. I can look it up exactly. If memory

48

1 serves, one was earlier, one was later. I don't
2 remember the exact dates. But the research is late
3 fall, early winter 2014.
4    Q. Who listed the properties for sale for
5 Lyman-Cutler?
6    A. Tatiana Kagan.
7    Q. What was the listing price that Tatiana
8 Kagan listed the properties at?
9    A. As far as I remember, Dima said that his
10 goal was to sell those houses for 5.5 million.
11    Q. When did he tell you that?
12    A. I don't remember exactly the date or
13 months, but I think it was towards the end of
14 completion of the project, construction project.
15    Q. So sometime in the fall of 2014?
16    A. Yeah, I think so, but I'm not sure.
17    Q. Did you have any understanding what the
18 target sales price was for the properties?
19    A. I personally thought 5 million for each
20 house. I thought they would go quickly, easily, and
21 everybody would benefit.
22    Q. So when Mr. Kagan told you the plan was to
23 sell for $5.5 million, did you object?
24    A. No, I didn't.

49

1    Q. At any point did you have any
2 communications regarding the removal of Tatiana
3 Kagan as the listing broker?
4    A. Yes.
5    Q. What communications did you have on that
6 topic?
7    A. I spoke to Alex Filippov. Alex was not
8 happy that it was taking so long to sell the houses.
9 He mentioned according to the agreement that existed
10 it was specified that if that property wasn't sold
11 within 23 months, he had the right to change the
12 listing broker.
13    Q. Prior to your conversation with
14 Mr. Filippov, did you have that same understanding?
15    A. The understanding about what?
16    Q. About Tatiana's listing of the properties.
17    A. With all due respect to Tatiana, and I know
18 well she's a good person, I didn't really care who
19 was the broker for these properties. But after
20 Mr. Filippov either met or talked to David Gordon,
21 who said that she could sell those houses quickly
22 and easily for the amount close to 5 million, so it
23 was no longer about the people, the personality, but
24 about the outcome.

50

1    Q.  Did Tatiana Kagan perpetrate any fraud on
2    you?
3        MR. CARNATHAN:  Objection.
4        A.  The fact is that our agreement is a legal
5    document.  And this agreement is the law for us.
6    The law states that Mr. Filippov as the manager of
7    the company had the right to replace the broker,
8    nobody should have been able to prevent him from
9    doing so.
10        Q.  Is it your understanding that Mrs. Kagan,
11    Tatiana Kagan, is a party to the contract that you
12    signed?
13        A.  Tatiana Kagan and Dima Kagan are one
14    family.  They are a good family.  I've known him for
15    a long time.  Tatiana knew perfectly well that the
16    only person who could sign the agreement was the
17    manager of the company, Alex Filippov.
18        Q.  How do you know that Tatiana knew that only
19    Alex Filippov could sign the agreement?
20        A.  Tatiana Kagan has been in this business for
21    a long time and she has been successful in this
22    business.  So she knows the business and she knows
23    perfectly well who has the authority to sign.
24        Q.  How do know that Tatiana knew who the

51

1    manager of the Lyman-Cutler, LLC was?
2        A.  Tatiana Kagan, if memory serves, is part
3    owner of the company called KDC or KDS -- the name
4    doesn't really matter -- and she's totally involved
5    in the whole process.
6        Q.  How often did you communicate with Tatiana
7    Kagan about the Lyman-Cutler project during
8    construction?
9        A.  Practically never.
10        Q.  Did you ever have discussions with her
11    about anything other than efforts to sell the
12    property?
13        A.  No.  We haven't seen each other for a long
14    time.
15        Q.  During the construction process, how often
16    did you speak with Vadim Kagan?
17        A.  Early on we spoke often.  As I have already
18    mentioned, not just about the project but we are
19    friends.  So we had social engagements.  So
20    unfortunately at some point, at some point towards
21    the end of construction Vadim Kagan started avoiding
22    phone calls raising questions.  Early on if we run
23    into each other or met I would ask how are we doing,
24    just in general.  He would say it was going great.

52

1    Towards the end he just avoided those conversations.
2        Q.  Did you ever review the construction plans
3    for the project?
4        A.  I didn't really review it.  I saw the plans
5    on paper, but I didn't really study it.
6        Q.  When did you see the plans on paper?
7        A.  I think it was, I think it was either
8    shortly after the commencement of the construction
9    or in the first few months.  But I don't understand
10    much about those plans.
11        Q.  Did you see the plans prior to the signing
12    of the operating agreement?
13        A.  I don't remember.
14        Q.  Were you involved at all in the
15    negotiations to obtain a construction loan for the
16    project?
17        A.  As far as I understand it, the construction
18    loan of 5.2 million was taken out by Mr. Filippov
19    with personal guarantees.
20        Q.  Were you involved at all in the
21    negotiations for the construction loans?
22        A.  What kind of negotiations?  What exactly
23    are you talking about?  Maybe I did participate.  I
24    just don't know exactly what you are asking.

53

1        Q.  Did you ever have meetings with Rockland
2    Trust Company?
3        A.  No.
4        Q.  Did you ever speak with John McGregor?
5        A.  No.
6        Q.  Did you ever have any conversation with
7    Mr. Kagan about building a more expensive home than
8    originally anticipated?
9        A.  No.  The square footage for the house was
10    determined early on.
11        Q.  Was there ever a discussion about changing
12    the finishes for the home?
13        A.  No, never.
14        Q.  I show you Exhibit 18.  Have you seen that
15    before?
16        A.  Yes.  Yes, I see my name on it.
17        Q.  And do you recall receiving this email on
18    or about May 5, 2013?
19        A.  I don't remember.  I don't remember the
20    date but I can see that it arrived on May 5th.
21        Q.  In this email Mr. Zhukovskiy makes
22    reference to an expansion of the project.  Do you
23    see that?
24        A.  When you say project expansion, what

---

**54**

1  exactly do you mean?
2      Q. I'm asking you. I don't know. Does that
3  refresh your recollection that there was an
4  expansion of the project?
5      A. I'm trying to understand what you're
6  asking. In terms of square footage expansion,
7  Mr. Kagan mentioned that he was building at the
8  maximum footage allowed by law so that it wasn't
9  possible to expand in terms of square footage.
10     Q. Did you ever have conversations with
11  Mr. Kagan about changing the type of wood that was
12  used on the exterior of the house?
13     A. In the initial conversations when the cost
14  of the project was discussed, Mr. Kagan said that he
15  wanted to have one house faced with brick with stone
16  decorations and the other one made of stone with
17  brick decorations so that they will look like small
18  castles.
19     Q. Did that change at some point?
20     A. Eventually it did. We noticed that there
21  was a little stone, a little brick, and more wood.
22     Q. Did you have conversations with Mr. Kagan
23  about the type of kitchen cabinets that were being
24  installed?

---

**55**

1      A. No, he didn't have those conversations with
2  me. He has his own vendors with good prices.
3      Q. Did you have conversations with him about
4  the type of stone countertops to be used in the
5  houses?
6      A. No.
7      Q. Now, Mr. Lipetsker, you are aware that
8  Lyman-Cutler filed for bankruptcy, correct?
9      A. Yes.
10     Q. Were you part of the decision-making
11  process to put it into bankruptcy?
12     A. Yes.
13     Q. Why did you put Lyman-Cutler in bankruptcy?
14     A. We had absolutely no money left in the
15  Lyman-Cutler accounts, bank accounts. We had to pay
16  bank interest monthly. And we had to pay taxes to
17  the city each quarter. It was necessary to maintain
18  the properties, both houses, and the grounds. We
19  had to keep heating, air-conditioning at a certain
20  level. It is very expensive. In addition to
21  everything, there were liens placed on both houses
22  which prevented them from being sold.
23         In addition at any moment the bank could
24  request that the whole mortgage was repaid and it

---

**56**

1  could be a total catastrophe.
2      Q. Anything else?
3      A. No. What I just said.
4      Q. Was the mortgage to the bank in default at
5  the time you put the company in bankruptcy?
6         MR. CARNATHAN: Objection.
7      A. I can't tell you. I don't remember.
8      Q. Who was paying the mortgage?
9      A. At that time, Filippov was paying the
10  mortgage.
11     Q. Who was paying the mortgage during
12  construction of the Lyman-Cutler project?
13     A. I don't know who specifically paid the
14  mortgage, but the money came out of LLC funds.
15     Q. How do you know that?
16     A. That was our agreement.
17     Q. So you base that on what the agreement
18  says?
19     A. Yes.
20         (A recess was taken.)
21     (Marked, Exhibit 39, Affidavit of
22  Nickolay Lipetsker.)
23     Q. Mr. Lipetsker, I've placed in front of you
24  what we have marked as Exhibit 39. Is that an

---

**57**

1  affidavit that bears your signature?
2      A. Yes.
3      Q. Was this affidavit translated into Russian
4  for you before you signed it?
5      A. Yes.
6      Q. Who translated it for you?
7      A. I don't know but it was definitely
8  translated.
9      Q. Now, I want to draw your attention, sir, to
10  Paragraph Number 5. Let me represent to you that
11  this affidavit did not have any exhibits attached to
12  it. So I'm just trying to find out what was
13  supposed to be attached. Do you know what Exhibit 1
14  was supposed to be?
15         MR. CARNATHAN: It actually recites that
16  it was attached to the complaint.
17         MR. PERTEN: You are absolutely right.
18  I'll withdraw the question. I apologize.
19     Q. Let me draw your attention instead to
20  Paragraph Number 10. In Paragraph 10 you are
21  reciting a conversation with Mr. Filippov; is that
22  correct? It says: "Mr. Filippov told me during
23  this conversation that Mr. Kagan had asked
24  Mr. Filippov to sign a new listing agreement with

**66**

```
 1                  CERTIFICATE OF COURT REPORTER
 2
 3
 4
 5
 6         I, David A. Arsenault, Registered
     Professional Reporter, do certify that the
 7   deposition of NICKOLAY LIPETSKER, in the matter of
     Lyman-Cutler v Kagan, et al., on April 26, 2018, was
 8   stenographically recorded by me; that the witness
     provided satisfactory evidence of identification, as
 9   prescribed by Executive Order 455 (03-13) issued by
     the Governor of the Commonwealth of Massachusetts,
10   before being sworn by me, a Notary Public in and for
     the Commonwealth of Massachusetts; that the
11   transcript produced by me is a true and accurate
     record of the proceedings to the best of my ability;
12   that I am neither counsel for, related to, nor
     employed by any of the parties to the above action;
13   and further that I am not a relative or employee of
     any attorney or counsel employed by the parties
14   thereto, nor financially or otherwise interested in
     the outcome of the action.
15
16
17
18   Transcript review was requested of the reporter.
19
20
21
22
23                                            5.7.18
24   David A. Arsenault, RPR
```

**67**

```
     WITNESS:  NICKOLAY LIPETSKER
     CASE:  Lyman-Cutler v Kagan, et al.
                    SIGNATURE PAGE/ERRATA SHEET
     PAGE   LINE   CHANGE OR CORRECTION AND REASON
```

| | | |
|---|---|---|
| | | |

```
     I have read the transcript of my deposition taken April 26,
     2018.  Except for any corrections or changes noted above I
     hereby subscribe to the transcript as an accurate record of the
     statements made by me.
     Signed under the pains and penalties of perjury.
                                    DATE
     Deponent, NICKOLAY LIPETSKER
     NOTARY (if requested)
     On this _____ day of _____, 20___, before me, the
     undersigned notary public, personally appeared NICKOLAY
     LIPETSKER, who presented satisfactory evidence of
     identification, to wit, _____, and
     signed this document in my presence.


     Notary Public in and for_____
     My commission expires _____
```

**68**

Transcript Produced and Delivered
to counsel/witness on 5.7.18

NICKOLAY LIPETSKER
SIGNATURE PAGE/ERRATA SHEET INFORMATION
For deposition taken on: April 26, 2018
Lyman-Cutler v Kagan, et al.

SIGNATURE INFORMATION FOR COUNSEL
The original signature page/errata sheet has been
sent to Attorney Carnathan to obtain signature from
the deponent.  When complete, please send original
to Attorney Perten.

WITNESS INSTRUCTIONS
After reading the transcript of your deposition,
please note any change or correction and the reason
on the errata/signature page.  DO NOT make any
notations on the transcript itself.

If necessary, duplicate errata/signature page.

PLEASE SIGN AND DATE the errata/signature page
(before a notary if requested) and return it to your
counsel.

# EXHIBIT 7

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:* ) | |
| ) | |
| LYMAN-CUTLER, LLC, ) | |
| Debtor, ) | Chapter 7 |
| ) | No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | A.P. No. 16-1120 |
| v. ) | |
| ) | |
| VADIM KAGAN, TATIANA KAGAN, ) | |
| KAGAN DEVELOPMENT KDC CORP., ) | |
| and PROEXCAVACTION CORP., ) | |
| ) | |
| Defendants. ) | |
| ) | |

**ALEX FILIPPOV'S SUPPLEMENTAL ANSWERS TO
KAGAN DEVELOPMENT KDC CORP.'S FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order, Alex

Filippov ("Filippov") supplements his answers to Kagan Development KDC Corp.'s ("KDC") First Set

of Interrogatories.

**SUPPLEMENTAL ANSWERS**

**Interrogatory No. 5**

If you contend that any expenses charged by KDC for labor and/or material provided for the
Project were excessive and somehow improper, please identify, in complete detail, each such expense
and set forth all facts upon which you base that contention.

1

### Answer No. 5

I believe that much of the amount claimed due by KDC in the proof of claim it filed in this bankruptcy is fraudulent and otherwise improper. I base this belief on a number of factors. Before the project began, Kagan presented to me and our co-investor, Nickolay Lipetsker, a detailed budget that Kagan claimed would represent the true costs of construction. Kagan's substantial experience building homes further led me to believe that Kagan's assertions were well founded. Throughout the course of the project, I continually asked Kagan whether the project remained on budget. He always said that it did. Then, when the homes were on the verge of selling and months after construction was complete, Kagan – for the very first time – claimed that there was suddenly a $758,026.56 shortfall in money the LLC owed to him, with another $50,000 of additional vendor costs anticipated, as well as additional "capital contributions" in the amount of $251,000. Just weeks later, after the LLC sued Kagan, Kagan's claimed entitlement rose dramatically to over $2 million, despite the fact that the homes had been substantially completed more than nine months before. I also learned around this time that Kagan had been making a practice with other projects on which he worked to claim an entitlement to a significant amount of alleged overruns on the verge of a home's sale in an effort to pressure his co-investors to pay him more money.

A review of the LLC and Kagan's financial records also support the conclusion that a number of payments made to KDC or payments made by KDC to others are fraudulent or otherwise improper, including the amount paid to ProExcavation Corp. which is grossly in excess of what a fair market charge would be for the type of site work that was involved in the Project. A detailed analysis of these charges is still being prepared by an expert(s), whose report will be produced in due course during this litigation and is incorporated herein by reference. Where Kagan controls both KDC and ProExcavation, and the ProExcavation charges are so grossly in excess of reasonable, the obvious conclusion is that Kagan is engaged in knowing and intentional fraud.

Even if for some reason this obvious conclusion were to prove incorrect, it is grossly negligent for Kagan and KDC to incur cost overruns of over $2 million on a Project where the budget was $3.2 million (including carrying costs and $200,000 for cost overruns already built into that figure) without prior consultation with and approval by me and Lipetsker. Because I never approved charges above the original budget, as required by the LLC Agreement, even if Kagan and the other co-conspirator Defendants have not engaged in fraud, those charges are improper, unauthorized, grossly negligent, and not properly payable by the LLC.

Discovery is ongoing and expert reports will be produced in due course, which are incorporated herein by reference.

### Supplemental Answer No. 5

All of the alleged charges in excess of Kagan's original $1.6 million budget per home for construction costs, carrying costs and unanticipated cost overruns are excessive, unsupported and/or otherwise improper. These alleged charges in KDC's proof of claim are fraudulent or, at minimum, the product of gross breaches of Kagan's fiduciary duties and the terms of the LLC's Operating Agreement.

On October 25, 2012, at a meeting at the law office of Attorney Boris Maiden and before the project began, Kagan presented to me and Nickolay Lipetsker, a detailed budget that Kagan claimed represented an accurate statement of costs of construction, which Kagan represented would be $1.3 million, plus $200,000 for carrying costs. Before this meeting, Kagan circulated drafts of the presentation to Attorney Boris Maiden and Dimitriy Zhukovsky, whom Kagan had hired to put his budget figures into a spreadsheet for presentation to me and Lipetsker.

Kagan clearly and expressly represented to us that he had accurately priced the cost of construction for the Project, that we could rely on his knowledge, skill, and experience, and that the costs of construction would not exceed his budget. He later asked for an additional $100,000 in contingency funds in case of unexpected cost overruns, but he firmly and repeatedly told us that they could rely on his pricing for construction. Lipetsker and I justifiably and reasonably relied on Kagan's representations that the cost of construction for each home would be $1.3 million, with no more than $100,000 in potential overruns and that $200,000 per home would be sufficient to pay the carrying costs. Kagan represented that the total costs for both houses would therefore not exceed $3.2 million and that he would probably not need the extra $100,000 per home for any overruns. We reasonably relied on these representations in making our decision to invest in the Project.

Lipetsker, Kagan, and I executed the LLC's Operating Agreement (the "Operating Agreement"), which contained a specific, explicit provision that <u>Kagan</u> was responsible for building the two homes in the Project and that his compensation for doing so would consist of a 50% share of the net profits of the Project, subject to certain adjustments. The Operating Agreement further made specific provision for Kagan to be responsible for paying the carrying costs on the Project if the homes did not sell within 23 months as Kagan represented they would. We relied upon the terms of our express agreement with Kagan that he would be compensated for the construction only through his equity interest in the Project.

Kagan's representations concerning the costs of construction to us to induce us to invest in the Project were either knowingly false or, at minimum, made with reckless disregard for their truth. Kagan did not solicit bids from any subcontractors for the job. He had only minimal plans and no specifications sufficient to price accurately the costs of construction. He failed to exercise reasonable care (or indeed any care at all) to ensure that the representations he made to us were true. As a professional builder and as a joint venturer in a closely held company, Kagan had a duty of loyalty, care and full disclosure to make truthful and accurate representations to both me and Lipetsker. He breached those duties.

Other evidence adduced in discovery supports the conclusion that Kagan's representations were not merely reckless or grossly negligent but were intentionally false when made. Kagan's alleged cost overruns, described further below, are so far above the budget presented to us to induce us to invest that no honest contractor with Kagan's experience could have believed that he was accurately presenting the costs of construction. Kagan's alleged cost overruns are also far more than the reasonable cost of construction of the homes. Furthermore, Kagan previously and contemporaneously inflicted the same strategy of presenting a false budget to solicit investment and then submitting large cost overruns on several other investors, including Elena Lande, Vladislav Abramskiy, Dmitriy Zhukovskiy, Alexander Fodymanow, and Mark Kayserman. There exists a clear pattern of this fraudulent scheme being repeated by Kagan.

Furthermore, it is undisputed that Kagan failed to keep any proper or accurate records of his alleged costs and expenses during the construction on the Project. His former bookkeeper, Kristina Brusenkova, will testify that Kagan regularly made up charges after the fact to justify what he wanted to be paid for that project and made no effort to track payments he was making to subcontractors contemporaneously with when he was making the payments. His current bookkeeper, Daniel Gersh, has admitted that there were no organized Project cost files when Gersh was hired by KDC in or about November 2014, which was after the completion of construction. Gersh admits that he and Kagan solicited invoices from vendors and subcontractors to create purported financial records for the Project in 2015, long after construction was complete. Accordingly, there were no invoices or other documents to support his alleged cost overruns when he tried to pass them along to his investors. None of this proffered documentation is authentic, reliable or admissible in evidence. In the absence of proper recordkeeping, all of Kagan's purported charges are excessive, improper and not payable. Kagan had a duty to keep track of the costs of construction on the Project as they were incurred, and to timely inform me and Lipetsker of any cost overruns so that the joint venturers could make informed and timely decisions about what to do in light of any such cost overruns. Kagan completely failed to meet that duty.

Throughout the course of the Project, I on several occasions asked Kagan whether the Project remained on budget. Kagan always said that it was. Not until May 2015, approximately seven months after completion of construction did Kagan for the very first time assert that there were cost overruns when he had his lawyer, Alexander Pyle, send me a letter claiming $758,026.56 in construction cost overruns, with another $50,000 of additional vendor costs still "anticipated" despite the fact that construction was long since complete. In the Pyle letter, Kagan also claimed for the first time that he was entitled to recover additional "capital contributions" in the amount of $251,000. Shortly before sending this letter, Kagan wrongfully signed a listing agreement with his wife, Tatiana, because he knew that his demand letter would start a dispute. Kagan also at some point signed a listing agreement, purportedly on behalf of the LLC, with Tatiana for a term of 18 months, which is three times industry standard. Under the LLC's Operating Agreement, Kagan did not have authority to sign either listing agreement and he knew it or should have known it. He signed them for the wrongful purpose of generating leverage to force the LLC to pay his improper and excessive alleged cost overruns and to extend his wife's claim for a commission beyond what the Operating Agreement allowed in knowing violation of the Operating Agreement and his fiduciary duties.

Lipetsker and I rejected the cost overruns and challenged Kagan's actions in court. On June 22, 2015, Kagan breached his fiduciary duty again, violated Chapter 93A (through KDC), and fraudulently filed a mechanic's lien against the Project properties based upon a purported contract with KDC that he secretly signed himself for both KDC and purportedly for the LLC, but which he had never shown to me or Lipetsker and which contradicted the terms of the deal set forth in the LLC's Operating Agreement and the conditions of the loan from Rockland Trust Bank. The mechanic's lien falsely inflated KDC's purported cost over runs to over $2,095,985.23 – nearly double what he had claimed – despite the fact that the homes had been substantially completed more than nine months before. The additional charges in the mechanic's lien over and above those in the Pyle letter consist of an additional $1,086,958.67. Of this sum, $777,754.41 are charges derived from the false contract Kagan signed with himself. These charges are all knowingly false and fraudulent because Kagan knows that none of us ever agreed to the contract upon which he purported to base the mechanic's lien. Kagan has previously admitted that the mechanic's lien was overstated by $74,126.84, which again reflects a gross breach of his duties to me,

4

Lipetsker and the LLC. To this day, Kagan has never offered any satisfactory explanation as to how his alleged cost overruns surged by an additional $235,077.42 (to yield the full $1,086,958.67 asserted in the mechanic's lien above the sums in the Pyle letter). The mechanic's lien also purports to be based upon an invoice to the LLC, which was never sent prior to the filing of the mechanic's lien. This false invoice was first presented to me and Lipetsker by email on June 25, 2015. The invoice purports to be dated June 1, 2015 but this date is false. All of the charges asserted in the mechanic's lien are excessive, fraudulent, a breach of the Operating Agreement and Kagan's fiduciary duties, otherwise improper and not payable by the LLC. In addition, Kagan manufactured unnecessary work at the Properties shortly before filing the fraudulent mechanic's lien in order to be able to assert he had worked at the Properties within the time frame required by the statute.

Kagan's proffered documentation and financial records also support the conclusion that a number of the specific payments made to KDC or payments allegedly made by KDC to others on the Project are excessive or otherwise improper or fraudulent. This answer incorporates by reference the analysis and opinions stated in the expert reports of Michael Goldman and David Doddridge.

In particular, the financial records of ProExcavation Corp. ("ProEx") do not in any way support the charges asserted. The purported "Proposal" proffered as the only documentary support for the ProEx charges was never shown to me or Lipetsker until this litigation commenced. Although it purports to be dated in September and October 2013, it bears a phone number that ProEx did not use until some time in 2014. The Operating Agreement obligated Kagan to build the two houses for the Project and to accept as his compensation a 50% share in the net profits of the Project, subject to certain potential adjustments. Padding the ProEx bill with hundreds of thousands of dollars in profit for Kagan is a breach of the Operating Agreement and a breach of Kagan's duty of loyalty to his fellow members. ProEx has produced virtually no reliable documentation or other evidence to prove out of pocket expenses supporting the charges to the Project. The accounting records produced by ProEx and its accountant show that ProEx added $425,000 in purported receivables from the LLC to its books long after the Project was complete, which is nearly half of the amount claimed against the Project. As set forth in the Report of Michael Goldman, on projects Kagan builds without an investor, his costs of construction are much lower than on his projects with an investor. Kristina Brusenkova will also testify that Kagan makes up his ProEx charges without regard to the actual costs incurred. These facts all support the conclusion that the ProEx charges are false and fraudulently inflated double billing to the Project.

All of the charges based upon the purported contract between KDC and Lyman Cutler, allegedly signed by Kagan for both sides on July 24, 2013, are fraudulent double billing in breach of the Operating Agreement and Kagan's duty of loyalty to me and Lipetsker. The terms of the Operating Agreement provided that Kagan's only source of compensation above his direct construction costs would be in the form of a percentage of profits to which he was entitled from the LLC after the properties were sold. Asserting claims against Lyman Cutler for $1,086,958.67 based upon the alleged KDC contract violates the express terms of the Operating Agreement. Kagan did not have authority to sign this contract for Lyman Cutler and his contention that it is a valid contract is gross self-dealing. KDC is liable under Chapter 93A for the assertion of charges based upon this contract.

In addition, the evidence supports the conclusion that Kagan and Joseph Cohen forged the KDC contract in or about June 2015. Lipetsker and I never saw this alleged contract before this litigation. In

May 2018, after years of discovery requests, and only after Kagan's deposition commenced, did Kagan produce a printed version of what purported to be an email from Kagan to me and a Rockland Trust representative that supposedly provided them with the alleged KDC contract back in 2013. My email records do not contain this particular email, nor was a copy of that email produced by Rockland Trust in response to the subpoena. As a result, the LLC's counsel immediately demanded production of the electronic, native file email. On or around May 23, 2018, Kagan produced a printed version of what purported to be an email forwarded from Joseph Cohen to himself on May 22, 2018, which itself purported to include a printed version of an email dated June 24, 2013 between Joseph Cohen and Kagan. Then, on June 6, 2018, Kagan's counsel forwarded what purported to be the electronic version of the email that had previously been produced in printed form. The metadata on what purported to be an unsigned contract suggested that the entire document was edited from start to finish in 2 minutes or less, which is nearly impossible to do (even if you start with a template), and was last printed on June 17, 2015, just days before KDC filed its mechanic's lien. If the email had been genuine, there is no conceivable way in which an email sent in June 2013 could have attached a Word document whose metadata reflects that it was printed two years later. Even if that were somehow possible, there is no reason why KDC would have needed to print the Word version of this document in June 2015 unless it had never been previously created. Kagan's book keeper, Daniel Gersh, testified that he had never seen the KDC contract. There are no entries in KDC's books and records based upon the alleged charges in the KDC contract. No charges based upon this purported contract were included in the May 2015 Pyle letter. The invoice purportedly based upon this contract was not sent to me until June 25, 2015 despite being dated June 1, 2015. Kagan and Cohen forged this contract in order to inflate the alleged charges from KDC, file the fraudulent mechanic's lien and wrongfully try to force me and Lipetsker to agree to pay the alleged cost overruns asserted in the Pyle letter to avoid financial catastrophe. Regardless of whether the fact finder concludes the KDC contract was forged in June 2015, however, all charges asserted based on it are improper, fraudulent, a breach of the LLC Agreement and Kagan's fiduciary duties and not properly payable.

In addition, there are also a number of specific subcontractors whose purported charges appear to be fraudulent:

Unicom Electric has been paid $65,000 during the course of the project for the electrical work completed on both houses. This number corresponds precisely to the amount KDC asserts that it is owed for Unicom's remaining balance on the Project based upon undated, duplicate invoices that appear to be photocopies of the same invoice with only the address changed. The remaining $65,000 KDC claims it is owed for Unicom-related work was not even listed on the accounts payable ledger until April 2015, more than a year after the electrical work was complete and approved by the local building inspector. Unicom never filed a mechanic's lien of its own against the Project and has allegedly gone unpaid for over 4 years. No original invoices have ever been produced. Unicom also used a duplicate copy of this invoice on the 10 Lyman Road project with only the number of the address changed. Unicom also appears to have two sets of proposals that he uses on different Kagan projects – one for a house receiving 200 amp service and one for a house receiving 400 amp service. The proposals among these two different style houses appear to be duplicates of each other.

BST Plumbing's materials invoices for the two properties, dated August 18, 2015 (two months after KDC filed its mechanics lien) are identical – even going so far as having the same invoice number and job address of 55 Lyman. They are dated months after work was completed, and provide as backup

6

identical quotes from Ferguson Enterprises that post-date the date of BST's invoices. These payments appear to be duplicative of material invoices submitted directly by (and paid to) the plumbing supply company by way of Kagan's American Express card in October 2014, credits that are not accounted for in Ferguson's August 19, 2015 bid. BST's labor invoices, dated March 14, 2015 and March 1, 2015, are identical, are dated many months after the local inspector had approved BST's work, were sent to Kagan nearly a year after BST received payment from Kagan, and contain handwritten remarks indicating that a total of $39,670 remains unpaid. The LLC's QuickBooks audit trail report indicates that two invoices from BST in the amount of $11,360 each were entered into the system on April 29, 2015 and were changed 27 minutes later to $19,670 each. BST also was purportedly paid only half of what its purported proposals required it to be paid, and allowed tens of thousands of dollars allegedly owing to it sit on the books unpaid for years.

V&D Heating and Cooling likewise provided two handwritten "proposals" that were identical even so far as including marks where the paper clips were located except for the header – property address and date. Each proposal describes the work as the same, and it appears as if one proposal was copied to create the other. These proposals are dated December 5 and 6, 2013, and call for an initial payment of $25,000 each. In fact, V&D had received only $10,000 as an initial payment for each house, and had received these payments over a month before issuing its proposals. V&D allowed $19,000 to remain unpaid for over four months, then supposedly performed an extra $5,000 worth of work (which were not included in the QuickBooks ledger), bringing the total outstanding amount allegedly owed to $24,000, and has permitted that amount to allegedly remain unpaid to this day.

Décor Art's invoices appear on their face to have been fabricated by KDC given that they are facially inconsistent with each other in numerous ways, including how the company's address is identified, the use of a color graphic in the header of the invoice, and the use of different style invoices with different color gradients for different projects. Décor Art's invoices include duplicate invoice numbers paid months apart, and in at least one, the painter's purported letterhead did not spell the word "painter" correctly. The February 12, 2015 invoice for $8,750 was included in Kagan's documentation but was not included in the QuickBooks file, even though invoices which are dated later than that one are included in the file. A separate Décor Art invoice dated April 23, 2015 purported to charge KDC $420 for house cleaning services, but was entered into the QuickBooks records for purposes of the mechanics lien with an additional $1,000 charge. Décor Art also purportedly had a balance outstanding to him and continued to work, even though he testified that he would not work if he was not timely paid.

Paul DiGiacomo, a convicted criminal, also prepared invoices that were close in time with each other but contain invoice numbers that are significantly far apart. They also appear to have been produced using different formats and templates, are facially inconsistent with each other, and, with respect to at least the invoice No. 9 dated August 6, 2015, include charges for work that had passed inspection months earlier, are precisely identical to each other with the exception of the street name, and appear to include charges for that had been invoiced previously. Based on the documents produced with respect to the other construction projects, Mr. DiGiacomo never submitted invoices on other projects. Moreover, purported snow charges for 2014 and 2015 were not entered into the QuickBooks records until May 24, 2015.

Pave Tech, a company that supposedly has been in business for nearly 20 years, issued invoices that contain a low invoice number suggesting that these were some of the first invoices ever issued by

7

the company. Moreover, some of these invoices were duplicate in number but contained different amounts to be billed. One payment supposedly made to PaveTech in August 2014 was not even entered into the QuickBooks ledger until May 11, 2015.

Sergey Nikolaev similarly issued invoices for tile work on April 10, 2015, months after having been paid a substantial portion of this and after the final inspection had been completed. These invoices do not credit any of the prior payment received and lack any description of the work supposedly performed. The balance was then paid by KDC, which in turn seeks payment from the LLC.

Dream Flooring's invoices contradict each other both in terms of price and amount received. One invoice produced by Dream Flooring for $48,910 with respect to the Lyman Road house is dated July 3, 2014 and states that the job was complete and paid in full. A second invoice for Lyman Road, dated March 23, 2015, states that there is a remaining balance of $8,910 with additional work outstanding for $3,300, but also indicates that the job was completed and paid in full. However, according to Kagan's records, Dream Flooring was paid on March 20, 2014, significantly before the date of Dream Flooring's invoices, and Kagan's records of the March 2015 invoice suggest that there is still a balance owed of over $12,000. Dream Flooring's invoice for Cutler Lane that it produced in response to the subpoena also indicates that it was "paid in full," yet the invoice produced by Kagan indicates that the amount "due" is $48,910 even though Kagan's own records show that a portion of this invoice had been paid months earlier. An additional $2,500 was supposedly invoiced by Dream Flooring for each home in April 2015, long after work was complete. Kagan's QuickBooks records reflect that invoices entered into the system in April 2015 were subsequently modified and assigned an invoice number, even though Dream Flooring's invoices were unnumbered.

DaCosta Construction also used non-sequential invoices that have different formats, appear to have been fabricated, and which include work supposedly performed on other projects. On April 28, 2015, two invoices without invoice numbers were listed as accounts payable in Kagan's bookkeeping system. Both of these were deleted one day later. A large change order in the amount of $18,500 appears nowhere in the QuickBooks records. Moreover, KDC appears to be claiming $23,000 allegedly owing to DaCosta that was evidenced only by an email that purports to modify a pre-existing invoice that was never issued. At least one of DaCosta's invoices also purports to credit a payment received by it that is not identified in the QuickBooks files.

Horner Millworks was supposedly paid by credit card. One version of the QuickBooks files produced by Kagan matches what was reflected as paid through the American Express statements, $228,866.35. However, a different version of the QuickBooks files that was used for purposes of the mechanics lien claims an additional $35,060.84 that does not appear to ever have been paid to or charged by Horner Millworks.

Affordable Lawn Sprinklers worked on every Kagan project. It charges double the price when it works on a project with which Kagan is working with outside investors. Its only invoice, Invoice No. 9300, was included in the support for Lyman Road but identified a property address of 88 Cutler. The mechanic's lien filed by Kagan includes an $8,400 charge for Cutler which is missing documentation but which is included as an identical charge for both properties in Kagan's QuickBooks records. It was paid twice – once by KDC and once by the LLC directly.

Eastcoast Pipelines submitted one invoice in the amount of $1,000 that covered Kagan's work on 4 separate houses, including 55 Lyman and 88 Cutler. The entire charge was paid directly by the LLC.

There are other highly suspect charges and additional detail with respect to the above that are identified in the report by Michael Goldman, which is incorporated herein by reference.

Finally, the carrying costs Kagan purports to have incurred after 23 months after the Date of Acquisition as set forth in the Lyman Cutler Operating Agreement are excessive, improper and not properly payable to Kagan. First, Kagan undertook to pay those costs if the properties were not sold by that time. Second, if Kagan had completed the construction on time as required by the Operating Agreement, the properties would have been sold by then and these carrying costs would not have been incurred.

### Interrogatory No. 9

Please itemize all damages which you seek to recover from KDC, including in your response any pertinent calculations and the factual basis for those damages.

### Answer No. 9

Filippov objects to this interrogatory as premature. Discovery and expert analysis is ongoing. In general terms, Filippov asserts that the purported charges above the original budget are fabricated and fraudulent, are grossly negligent, and not authorized and not properly payable even if not intentionally false and fraudulent. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

### Supplemental Answer No. 9

In addition to the damages sought by the LLC as described in its Supplemental Answer to Interrogatory No. 9 and the disallowance of the Defendants' proofs of claim, I seek allowance of my proof claim as well as damages for carrying costs I was forced to pay out of pocket as a result of the Defendants' wrongdoing and a 5% return on my capital contribution as provided under Section 8.2 of the LLC's Operating Agreement.

Applying 5% to my investment this Project between November 2014 and February 2016 results in $160,000 in damages I am seeking.

As a result of Defendants' wrongdoing, $3,528,723.43 is being held in escrow by the Trustee in escrow, which is capital earning no return. Applying 5% rate of return provided in the Operating Agreement to the funds in escrow as a result of the bankruptcy which in turn was caused by the Defendants' wrongdoing yields approximately $265,000 in interest, which sum continues to grow.

In addition, I seek damages in the amount of $493,759.12, consisting of interest, insurance and taxes, I was forced to pay out of pocket as a result of Defendants' wrongdoing.

My total single damages as of September 26, 2018 are, therefore, $918,759.12.  I also seek recovery of interest, attorneys' fees, costs and treble damages under Chapter 93A.

Verification

I, Alex Filippov, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Alex Filippov

*As to objections:*

/s/ Sean T. Carnathan
Sean T. Carnathan, BBO No. 636889
scarnathan@ocmlaw.net
Joseph P. Calandrelli, BBO No. 666128
jcalandrelli@ocmlaw.net
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T:  (781) 359-9000

Dated:  September *21* , 2018

<u>Certificate of Service</u>

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on September _27_, 2018.

*/s/ Sean T. Carnathan*
Sean T. Carnathan

4828-2852-6706, v. 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:* )<br>)<br>LYMAN-CUTLER, LLC, )<br>Debtor, )<br>)<br>———————————————)<br>)<br>LYMAN-CUTLER, LLC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>VADIM KAGAN, TATIANA KAGAN, )<br>KAGAN DEVELOPMENT KDC CORP., )<br>and PROEXCAVACTION CORP., )<br>)<br>Defendants. )<br>) | Chapter 7<br>No. 15-13881-FJB<br><br>A.P. No. 16-1120 |

### ALEX FILIPPOV'S SUPPLEMENTAL ANSWERS TO
### VADIM KAGAN'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order, Alex

Filippov ("Filippov") supplements his answers to Vadim Kagan's ("Kagan") First Set of Interrogatories.

### SUPPLEMENTAL ANSWERS

**Interrogatory No. 2**

Please itemize all damages which you seek to recover from Kagan, including in your response
any pertinent calculations and the factual basis for those damages.

**Answer No. 2**

Filippov objects to this interrogatory as premature.  Discovery and expert analysis is ongoing.  In
general terms, Filippov states the following:  The purported charges above the original budget are
fabricated and fraudulent, or at best the product of gross negligence.  Damages include the amounts paid
above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale

1

of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

### Supplemental Answer No. 2

Kagan is equally culpable along with the other Defendants for the wrongful conduct described in my supplemental response to the interrogatories propounded to me by KDC, which are incorporated by reference. I assert that Kagan is jointly and severally liable for all damages described in those supplemental responses.

<u>Verification</u>

I, Alexander Filippov, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____

Alex Filippov

*As to objections:*

/s/ Sean T. Carnathan
Sean T. Carnathan, BBO No. 636889
scarnathan@ocmlaw.net
Joseph P. Calandrelli, BBO No. 666128
jcalandrelli@ocmlaw.net
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T:  (781) 359-9000

Dated:  September 27, 2018

<u>Certificate of Service</u>

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on September 27, 2018.

/s/ Sean T. Carnathan
Sean T. Carnathan

3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| *In re:*  )<br><br>LYMAN-CUTLER, LLC,  )<br>Debtor,  )<br><br>_____  )<br>LYMAN-CUTLER, LLC,  )<br><br>Plaintiff,  )<br><br>v.  )<br><br>VADIM KAGAN, TATIANA KAGAN,  )<br>KAGAN DEVELOPMENT KDC CORP.,  )<br>and PROEXCAVACTION CORP.,  )<br><br>Defendants.  )<br>_____  ) | Chapter 7<br>No. 15-13881-FJB<br><br>A.P. No. 16-1120 |

**ALEX FILIPPOV'S SUPPLEMENTAL ANSWERS TO
PROEXCAVATION CORP.'S FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order, Alex

Filippov ("Filippov") supplements his answers to ProExcavation Corp.'s ("ProExcavation") First Set of

Interrogatories.

**SUPPLEMENTAL ANSWERS**

**Interrogatory No. 4**

If you contend that the monies charged by ProExcavation for labor and material provided for the
Project were excessive or somehow improper, please set forth, in complete detail, all facts upon which
you base that contention.

1

<u>Answer No. 4</u>

I am unaware of what ProExcavation may or may not have "charged" KDC because ProExcavation has never provided an invoice, bill, or other form of request for payment reflecting what it charged for the labor or materials purportedly provided for the Project. Nonetheless, I am aware that the LLC paid ProExcavation at least $455,000, and that ProExcavation claims an entitlement to nearly $455,000 more. This total figure is grossly in excess of what a fair market charge would be for the type of site work that was involved in the Project. Discovery is ongoing and a detailed analysis of these charges is still being prepared by an expert(s), subject to completion of fact discovery. An expert report will be produced in due course during this litigation, which report is incorporated by reference herein.

<u>Supplemental Answer No. 4</u>

Vadim Kagan is ProExcavation's sole employee. Kagan, on behalf of ProExcavation, never bid the job, never tracked its costs, and has never submitted contemporaneous or accurate time records, invoices, or any other documentation that would accurately reflect what ProExcavation purportedly did on the project and at what cost. One of ProExcavation's purported subcontractors, Kagan's brother Kirill, has no business records from his work at the properties, and could not specifically identify what he did on the project, who assisted him, how long he worked, how much he was paid, or what he or those other individuals specifically did in terms of work.

Indeed, the financial records of ProExcavation do not in any way support the charges asserted. The purported "Proposal" proffered as the only documentary support for the ProExcavation charges was never shown to me or Lipetsker until this litigation commenced. Although it purports to be dated in September and October 2013, it bears a phone number that ProExcavation did not use until some time in 2014. The Operating Agreement obligated Kagan to build the two houses for the Project and to accept as his compensation a 50% share in the net profits of the Project, subject to certain potential adjustments. Padding the ProExcavation bill with hundreds of thousands of dollars in profit for Kagan is a breach of the Operating Agreement and a breach of Kagan's duty of loyalty to me and Lipetsker. ProExcavation has produced virtually no reliable documentation or other evidence to prove out of pocket expenses supporting the charges to the Project and does not even know how much of its purported charges constitute direct costs as opposed to profit. The accounting records produced by ProExcavation and its accountant show that ProExcavation added $425,000 in purported receivables from the LLC to its books long after the Project was complete, which is nearly half of the amount claimed against the Project. As set forth in the Report of Michael Goldman, on projects Kagan builds without an investor, his costs of construction are much lower than on his projects with an investor. Kristina Brusenkova will also testify that Kagan makes up his ProExcavation charges without regard to the actual costs incurred. These facts all support the conclusion that the ProExcavation charges are false and fraudulently inflated double billing to the Project.

<u>Interrogatory No. 5</u>

Please set forth what you believe is the fair and reasonable value for the labor and material provided by ProExcavation for the Project, and the complete factual basis for that belief.

<u>Answer No. 5</u>

Filippov objects to this interrogatory.  Filippov's subjective belief regarding the "fair and reasonable value" for labor or material provided by ProExcavation for the Project is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence as ProExcavation's alleged entitlement to any money from the LLC is not dependent on what is "fair and reasonable."  Subject to and without waiving his foregoing objections, Filippov states the following:  I believe that the amounts originally budgeted by Kagan for the foundation work - $135,000 for each home – represents what I consider to be fair and reasonable for the foundation services purportedly rendered by ProExcavation. An expert report will be produced in due course in this litigation and is incorporated herein by reference.

<u>Supplemental Answer No. 5</u>

I continue to believe that the $135,000 figure for each home that Kagan represented in his budget for foundation work is the "fair and reasonable value" of what the foundation work should have cost. Based on his experience and ownership of ProExcavation, Kagan should have known what the excavation costs should have been for a project of this scope.

<u>Interrogatory No. 7</u>

If you contend that any expenses charged by ProExcavation are "double charges" as alleged in paragraph 44 of the Adversary Proceeding Complaint, please identify each such charge and the factual basis for that contention.

<u>Answer No. 7</u>

Kagan agreed, on behalf of whatever company he was intending to the work, to construct the Project at a fixed cost of $1.3 million per home, plus soft carrying costs.  This included a budget of $135,000 to perform the foundation work on each home.  Based on my understanding at the time, and I do still continue to believe, that this represented the fair value and true arms' length cost for the type of work that I believe ProExcavation to have performed on the Project.  Though I am unaware of what ProExcavation may or may not have "charged" KDC because ProExcavation has never provided an invoice, bill, or other form of request for payment reflecting what it charged for the labor or materials purportedly provided for the Project, I am aware that the LLC paid ProExcavation at least $455,000 for the work it purportedly provided, and that ProExcavation is claiming an entitlement to nearly $455,000 more.  It is my belief that all of the payments received and charged by ProExcavation above the amount originally budgeted by Kagan were the result of fraud and were fabricated by Kagan, KDC and ProExcavation.  I am not aware of any site condition existing at the Project that should have increased this budgeted cost, nor am I aware of any contemporaneous time record or payment request that would have accurately captured or supported ProExavation's charges beyond this figure.  The fact that Kagan also controlled the payment of the cost from KDC to his other company, ProExcavation, and made several large, unsupported payments, further causes me to believe that these payments were fraudulent. Discovery is ongoing and an expert report on this topic is also expected in the due course of this litigation and incorporated herein by reference.

3

## Supplemental Answer No. 7

Kagan agreed, on behalf of whatever company he was intending to the work, to construct the Project at a fixed cost of $1.3 million per home, plus soft carrying costs. This included a budget of $135,000 to perform the foundation work on each home. ProExcavation was obligated to perform on the Project for the sum approved in the budget. The proffered "Proposal" was never presented to or approved by me or any of the other Plaintiffs during the Project and it represents a multiple of the price quoted to us by ProExcavation's principal, Vadim Kagan, at the outset of the Project, upon which we relied.

As I understand ProExcavation's proof of claim, it seeks in this dispute $455,000 over and above what Kagan personally caused it to be paid during the Project. As set forth above and in my supplemental response to the interrogatories propounded to me by KDC, which are incorporated herein by reference, these sums have no support and are double billing.

## Interrogatory No. 8

Please itemize all damages which you seek to recover from ProExcavation, including in your response any pertinent calculations and the factual basis for those damages.

## Answer No. 8

Filippov objects to this interrogatory as premature. Discovery and expert analysis is ongoing. In general terms, Filippov asserts that the purported charges above the original budget are fabricated and fraudulent and not authorized or properly payable even if not intentionally false and fraudulent. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

## Supplemental Answer No. 8

ProExcavation is equally culpable along with the other Defendants for the wrongful conduct described in my supplemental response to the interrogatories propounded to me by KDC, which are incorporated by reference. I assert that ProExcavation is jointly and severally liable for all damages described in those supplemental responses.

4

<u>Verification</u>

I, Alex Filippov, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Alex Filippov

*As to objections:*

/s/ Sean T. Carnathan
Sean T. Carnathan, BBO No. 636889
scarnathan@ocmlaw.net
Joseph P. Calandrelli, BBO No. 666128
jcalandrelli@ocmlaw.net
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T:  (781) 359-9000

Dated:  September 27, 2018

<u>Certificate of Service</u>

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on September 27, 2018.

/s/ Sean T. Carnathan
Sean T. Carnathan

4816-4265-3042, v.  1

5

# EXHIBIT 8

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:*<br><br>LYMAN-CUTLER, LLC,<br>Debtor,<br><br>LYMAN-CUTLER, LLC,<br><br>Plaintiff,<br><br>v.<br><br>VADIM KAGAN, TATIANA KAGAN,<br>KAGAN DEVELOPMENT KDC CORP.,<br>and PROEXCAVACTION CORP.,<br><br>Defendants. | Chapter 7<br>No. 15-13881-FJB<br><br>A.P. No. 16-1120 |

**LYMAN-CUTLER, LLC'S SUPPLEMENTAL ANSWERS TO
KAGAN DEVELOPMENT KDC CORP.'S FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Lyman-Cutler, LLC (the "LLC") supplements its answers to Kagan Development KDC Corp.'s

("KDC") First Set of Interrogatories.

**SUPPLEMENTAL ANSWERS**

**Interrogatory No. 5**

If Debtor contends that any expenses charged by KDC for labor and/or material provided for the
Project was excessive or somehow improper, please identify, in complete detail, each such expense and
set forth all facts upon which you base that contention.

1

**Answer No. 5**

The LLC believes that much of the amount claimed due by KDC in the proof of claim it filed in this bankruptcy is fraudulent and otherwise improper. It bases this belief on a number of factors. Before the project began, Kagan presented to Filippov and his co-investor, Nickolay Lipetsker, a detailed budget that Kagan claimed would represent the true costs of construction. Kagan's substantial experience building homes further led the investors to believe that Kagan's assertions were well founded. Throughout the course of the project, the LLC continually asked Kagan whether the project remained on budget. He always said that it did. Then, when the homes were on the verge of selling and months after construction was complete, Kagan – for the very first time – claimed that there was suddenly a $758,026.56 shortfall in money the LLC owed to him, with another $50,000 of additional vendor costs anticipated, as well as additional "capital contributions" in the amount of $251,000. Just weeks later, after the LLC sued Kagan, Kagan's claimed entitlement rose dramatically to over $2 million, despite the fact that the homes had been substantially completed more than nine months before. The LLC also learned around this time that Kagan had been making a practice with other projects on which he worked to claim an entitlement to a significant amount of alleged overruns on the verge of a home's sale in an effort to pressure his co-investors to pay him more money.

A review of the LLC and Kagan's financial records also support the conclusion that a number of payments made to KDC or payments made by KDC to others are fraudulent or otherwise improper, including the amount paid to ProExcavation Corp. which is grossly in excess of what a fair market charge would be for the type of site work that was involved in the Project. A detailed analysis of these charges is still being prepared by an expert(s), whose report will be produced in due course during this litigation and is incorporated herein by reference. Where Kagan controls both KDC and ProExcavation, and the ProExcavation charges are so grossly in excess of reasonable, the obvious conclusion is that Kagan is engaged in knowing and intentional fraud.

Even if for some reason this obvious conclusion were to prove incorrect, it is grossly negligent for Kagan and KDC to incur cost overruns of over $2 million on a Project where the budget was $3.2 million (including carrying costs and $200,000 for cost overruns already built into that figure) without prior consultation, supported by documentary backup, and with written approval by Filipov and Lipetsker. Because the LLC never approved charges above the original budget, as required by the LLC Agreement, even if Kagan and the other co-conspirator Defendants have not engaged in fraud, those charges are improper, unauthorized, grossly negligent, and not properly payable by the LLC.

Discovery is ongoing and expert reports will be produced in due course, which are incorporated herein by reference.

**Supplemental Answer No. 5**

All of the alleged charges in excess of Kagan's original $1.6 million budget per home for construction costs, carrying costs and unanticipated cost overruns are excessive, unsupported and/or otherwise improper. These alleged charges in KDC's proof of claim are fraudulent or, at minimum, the product of gross breaches of Kagan's fiduciary duties and the terms of the LLC's Operating Agreement.

On October 25, 2012, at a meeting at the law office of Attorney Boris Maiden and before the project began, Kagan presented to Filippov and Lipetsker, a detailed budget that Kagan claimed represented an accurate statement of costs of construction, which Kagan represented would be $1.3 million, plus $200,000 for carrying costs. Before this meeting, Kagan circulated drafts of the presentation to Attorney Boris Maiden and Dimitriy Zhukovsky, whom Kagan had hired to put his budget figures into a spreadsheet for presentation to Filippov and Lipetsker.

Kagan clearly and expressly represented to Filippov and Lipetsker that he had accurately priced the cost of construction for the Project, that they could rely on his knowledge, skill, and experience, and that the costs of construction would not exceed his budget. He later asked for an additional $100,000 in contingency funds in case of unexpected cost overruns, but he firmly and repeatedly told Filippov and Lipetsker that they could rely on his pricing for construction. Filippov and Lipetsker justifiably and reasonably relied on Kagan's representations that the cost of construction for each home would be $1.3 million, with no more than $100,000 in potential overruns and that $200,000 per home would be sufficient to pay the carrying costs. Kagan represented that the total costs for both houses would therefore not exceed $3.2 million and that they would probably not need the extra $100,000 per home for any overruns. Filippov and Lipetsker reasonably relied on these representations in making their decision to invest in the Project.

Filippov, Lipetsker and Kagan executed the LLC's Operating Agreement (the "Operating Agreement"), which contained a specific, explicit provision that Kagan was responsible for building the two homes in the Project and that his compensation for doing so would consist of a 50% share of the net profits of the Project, subject to certain adjustments. The Operating Agreement further made specific provision for Kagan to be responsible for paying the carrying costs on the Project if the homes did not sell with 23 months as Kagan represented they would. Filippov and Lipetsker relied upon the terms of their express agreement with Kagan that he would be compensated for the construction only through his equity interest in the Project.

Kagan's representations concerning the costs of construction to Filippov and Lipetsker to induce them to invest in the Project were either knowingly false or, at minimum, made with reckless disregard for their truth. Kagan did not solicit bids from any subcontractors for the job. He had only minimal plans and no specifications sufficient to price accurately the costs of construction. He failed to exercise reasonable care (or indeed any care at all) to ensure that the representations he made to Filippov and Lipetsker were true. As a professional builder and as a joint venturer in a closely held company, Kagan had a duty of loyalty, care and full disclosure to make truthful and accurate representations to Filippov and Lipetsker. He breached those duties.

Other evidence adduced in discovery supports the conclusion that Kagan's representations were not merely reckless or grossly negligent but were intentionally false when made. Kagan's alleged cost overruns, described further below, are so far above the budget presented to Filippov and Lipetsker to induce them to invest that no honest contractor with Kagan's experience could have believed that he was accurately presenting the costs of construction. Kagan's alleged cost overruns are also far more than the reasonable cost of construction of the homes. Furthermore, Kagan previously and contemporaneously inflicted the same strategy of presenting a false budget to solicit investment and then submitting large cost overruns on several other investors, including Elena Lande, Vladislav Abramskiy, Dmitriy

3

Zhukovskiy, Alexander Fodymanow, and Mark Kayserman. There exists a clear pattern of this fraudulent scheme being repeated by Kagan.

Furthermore, it is undisputed that Kagan failed to keep any proper or accurate records of his alleged costs and expenses during the construction on the Project. His former bookkeeper, Kristina Brusenkova, will testify that Kagan regularly made up charges after the fact to justify what he wanted to be paid for that project and made no effort to track payments he was making to subcontractors contemporaneously with when he was making the payments. His current bookkeeper, Daniel Gersh, has admitted that there were no organized Project cost files when Gersh was hired by KDC in or about November 2014, which was after the completion of construction. Gersh admits that he and Kagan solicited invoices from vendors and subcontractors to create purported financial records for the Project in 2015, long after construction was complete. Accordingly, there were no invoices or other documents to support his alleged cost overruns when he tried to pass them along to his investors. None of this proffered documentation is authentic, reliable or admissible in evidence. In the absence of proper recordkeeping, all of Kagan's purported charges are excessive, improper and not payable. Kagan had a duty to keep track of the costs of construction on the Project as they were incurred, and to timely inform Filippov and Lipetsker of any cost overruns so that the joint venturers could make informed and timely decisions about what to do in light of any such cost overruns. Kagan completely failed to meet that duty.

Throughout the course of the Project, Filippov on several occasions asked Kagan whether the Project remained on budget. Kagan always said that it was. Not until May 2015, approximately seven months after completion of construction did Kagan for the very first time assert that there were cost overruns when he had his lawyer, Alexander Pyle, send Filippov a letter claiming $758,026.56 in construction cost overruns, with another $50,000 of additional vendor costs still "anticipated" despite the fact that construction was long since complete. In the Pyle letter, Kagan also claimed for the first time that he was entitled to recover additional "capital contributions" in the amount of $251,000. Shortly before sending this letter, Kagan wrongfully signed a listing agreement with his wife, Tatiana, because he knew that his demand letter would start a dispute. Kagan also at some point signed a listing agreement, purportedly on behalf of Lyman Cutler, with Tatiana for a term of 18 months, which is three times industry standard. Under the Lyman Cutler Operating Agreement, Kagan did not have authority to sign either listing agreement and he knew it or should have known it. He signed them for the wrongful purpose of generating leverage to force the Company to pay his improper and excessive alleged cost overruns and to extend his wife's claim for a commission beyond what the Operating Agreement allowed in knowing violation of the Operating Agreement and his fiduciary duties.

Filippov and Lipetsker rejected the cost overruns and challenged Kagan's actions in court. On June 22, 2015, Kagan breached his fiduciary duty again, violated Chapter 93A (through KDC), and fraudulently filed a mechanic's lien against the Project properties based upon a purported contract with KDC that he secretly signed himself for both KDC and purportedly for Lyman Cutler, but which he had never shown to Filippov or Lipetsker and which contradicted the terms of the deal set forth in the LLC's Operating Agreement and the conditions of the loan from Rockland Trust Bank. The mechanic's lien falsely inflated KDC's purported cost over runs to over $2,095,985.23 nearly double what he had claimed despite the fact that the homes had been substantially completed more than nine months before. The additional charges in the mechanic's lien over and above those in the Pyle letter consist of an additional $1,086,958.67. Of this sum, $777,754.41 are charges derived from the false contract Kagan signed with himself. These charges are all knowingly false and fraudulent because Kagan knows that

none of the Plaintiffs ever agreed to the contract upon which he purported to base the mechanic's lien. Kagan has previously admitted that the mechanic's lien was overstated by $74,126.84, which again reflects a gross breach of his duties to Filippov, Lipetsker and Lyman-Cutler. To this day, Kagan has never offered any satisfactory explanation as to how his alleged cost overruns surged by an additional $235,077.42 (to yield the full $1,086,958.67 asserted in the mechanic's lien above the sums in the Pyle letter). The mechanic's lien also purports to be based upon an invoice to Lyman Cutler, which was never sent prior to the filing of the mechanic's lien. This false invoice was first presented to Filippov and Lipetsker by email on June 25, 2015. The invoice purports to be dated June 1, 2015 but this date is false. All of the charges asserted in the mechanic's lien are excessive, fraudulent, a breach of the Operating Agreement and Kagan's fiduciary duties, otherwise improper and not payable by Lyman-Cutler. In addition, Kagan manufactured unnecessary work at the Properties shortly before filing the fraudulent mechanic's lien in order to be able to assert he had worked at the Properties within the time frame required by the statute.

Kagan's proffered documentation and financial records also support the conclusion that a number of the specific payments made to KDC or payments allegedly made by KDC to others on the Project are excessive or otherwise improper or fraudulent. This answer incorporates by reference the analysis and opinions stated in the expert reports of Michael Goldman and David Doddridge.

In particular, the financial records of ProExcavation Corp. ("ProEx") do not in any way support the charges asserted. The purported "Proposal" proffered as the only documentary support for the ProEx charges was never shown to Filippov or Lipetsker until this litigation commenced. Although it purports to be dated in September and October 2013, it bears a phone number that ProEx did not use until some time in 2014. The Operating Agreement obligated Kagan to build the two houses for the Project and to accept as his compensation a 50% share in the net profits of the Project, subject to certain potential adjustments. Padding the ProEx bill with hundreds of thousands of dollars in profit for Kagan is a breach of the Operating Agreement and a breach of Kagan's duty of loyalty to Filippov and Lipetsker. ProEx has produced virtually no reliable documentation or other evidence to prove out of pocket expenses supporting the charges to the Project. The accounting records produced by ProEx and its accountant show that ProEx added $425,000 in purported receivables from Lyman Cutler to its books long after the Project was complete, which is nearly half of the amount claimed against the Project. As set forth in the Report of Michael Goldman, on projects Kagan builds without an investor, his costs of construction are much lower than on his projects with an investor. Kristina Brusenkova will also testify that Kagan makes up his ProEx charges without regard to the actual costs incurred. These facts all support the conclusion that the ProEx charges are false and fraudulently inflated double billing to the Project.

All of the charges based upon the purported contract between KDC and Lyman Cutler, allegedly signed by Kagan for both sides on July 24, 2013, are fraudulent double billing in breach of the Operating Agreement and Kagan's duty of loyalty to Filippov and Lipetsker. The terms of the Operating Agreement provided that Kagan's only source of compensation above his direct construction costs would be in the form of a percentage of profits to which he was entitled from the LLC after the properties were sold. Asserting claims against Lyman Cutler for $1,086,958.67 based upon the alleged KDC contract violates the express terms of the Operating Agreement. Kagan did not have authority to sign this contract for Lyman Cutler and his contention that it is a valid contract is gross self-dealing. KDC is liable under Chapter 93A for the assertion of charges based upon this contract.

In addition, the evidence supports the conclusion that Kagan and Joseph Cohen forged the KDC contract in or about June 2015. Filippov and Lipetsker never saw this alleged contract before this litigation. In May 2018, after years of discovery requests, and only after Kagan's deposition commenced, did Kagan produce a printed version of what purported to be an email from Kagan to Filippov and a Rockland Trust representative that supposedly provided them with the alleged KDC contract back in 2013. Filippov's email records do not contain this particular email, nor was a copy of that email produced by Rockland Trust in response to the subpoena. As a result, the LLC's counsel immediately demanded production of the electronic, native file email. On or around May 23, 2018, Kagan produced a printed version of what purported to be an email forwarded from Joseph Cohen to himself on May 22, 2018, which itself purported to include a printed version of an email dated June 24, 2013 between Joseph Cohen and Kagan. Then, on June 6, 2018, Kagan's counsel forwarded what purported to be the electronic version of the email that had previously been produced in printed form. The metadata on what purported to be an unsigned contract suggested that the entire document was edited from start to finish in 2 minutes or less, which is nearly impossible to do (even if you start with a template), and was last printed on June 17, 2015, just days before KDC filed its mechanic's lien. If the email had been genuine, there is no conceivable way in which an email sent in June 2013 could have attached a Word document whose metadata reflects that it was printed two years later. Even if that were somehow possible, there is no reason why KDC would have needed to print the Word version of this document in June 2015 unless it had never been previously created. Kagan's book keeper, Daniel Gersh, testified that he had never seen the KDC contract. There are no entries in KDC's books and records based upon the alleged charges in the KDC contract. No charges based upon this purported contract were included in the May 2015 Pyle letter. The invoice purportedly based upon this contract was not sent to Filippov until June 25, 2015 despite being dated June 1, 2015. Kagan and Cohen forged this contract in order to inflate the alleged charges from KDC, file the fraudulent mechanic's lien and wrongfully try to force Filippov and Lipetsker to agree to pay the alleged cost overruns asserted in the Pyle letter to avoid financial catastrophe. Regardless of whether the fact finder concludes the KDC contract was forged in June 2015, however, all charges asserted based on it are improper, fraudulent a breach of the LLC Agreement and Kagan's fiduciary duties and not properly payable.

In addition, there are also a number of specific subcontractors whose purported charges appear to be fraudulent:

Unicom Electric has been paid $65,000 during the course of the project for the electrical work completed on both houses. This number corresponds precisely to the amount KDC asserts that it is owed for Unicom's remaining balance on the Project based upon undated, duplicate invoices that appear to be photocopies of the same invoice with only the address changed. The remaining $65,000 KDC claims it is owed for Unicom-related work was not even listed on the accounts payable ledger until April 2015, more than a year after the electrical work was complete and approved by the local building inspector. Unicom never filed a mechanic's lien of its own against the Project and has allegedly gone unpaid for over 4 years. No original invoices have ever been produced. Unicom also used a duplicate copy of this invoice on the 10 Lyman Road project with only the number of the address changed. Unicom also appears to have two sets of proposals that he uses on different Kagan projects – one for a house receiving 200 amp service and one for a house receiving 400 amp service. The proposals among these two different style houses appear to be duplicates of each other.

BST Plumbing's materials invoices for the two properties, dated August 18, 2015 (two months after KDC filed its mechanics lien) are identical – even going so far as having the same invoice number and job address of 55 Lyman. They are dated months after work was completed, and provide as backup identical quotes from Ferguson Enterprises that post-date the date of BST's invoices. These payments appear to be duplicative of material invoices submitted directly by (and paid to) the plumbing supply company by way of Kagan's American Express card in October 2014, credits that are not accounted for in Ferguson's August 19, 2015 bid. BST's labor invoices, dated March 14, 2015 and March 1, 2015, are identical, are dated many months after the local inspector had approved BST's work, were sent to Kagan nearly a year after BST received payment from Kagan, and contain handwritten remarks indicating that a total of $39,670 remains unpaid. The LLC's QuickBooks audit trail report indicates that two invoices from BST in the amount of $11,360 each were entered into the system on April 29, 2015 and were changed 27 minutes later to $19,670 each. BST also was purportedly paid only half of what its purported proposals required it to be paid, and allowed tens of thousands of dollars allegedly owing to it sit on the books unpaid for years.

V&D Heating and Cooling likewise provided two handwritten "proposals" that were identical even so far as including marks where the paper clips were located except for the header – property address and date. Each proposal describes the work as the same, and it appears as if one proposal was copied to create the other. These proposals are dated December 5 and 6, 2013, and call for an initial payment of $25,000 each. In fact, V&D had received only $10,000 as an initial payment for each house, and had received these payments over a month before issuing its proposals. V&D allowed $19,000 to remain unpaid for over four months, then supposedly performed an extra $5,000 worth of work (which were not included in the QuickBooks ledger), bringing the total outstanding amount allegedly owed to $24,000, and has permitted that amount to allegedly remain unpaid to this day.

Décor Art's invoices appear on their face to have been fabricated by KDC given that they are facially inconsistent with each other in numerous ways, including how the company's address is identified, the use of a color graphic in the header of the invoice, and the use of different style invoices with different color gradients for different projects. Décor Art's invoices include duplicate invoice numbers paid months apart, and in at least one, the painter's purported letterhead did not spell the word "painter" correctly. The February 12, 2015 invoice for $8,750 was included in Kagan's documentation but was not included in the QuickBooks file, even though invoices which are dated later than that one are included in the file. A separate Décor Art invoice dated April 23, 2015 purported to charge KDC $420 for house cleaning services, but was entered into the QuickBooks records for purposes of the mechanics lien with an additional $1,000 charge. Décor Art also purportedly had a balance outstanding to him and continued to work, even though he testified that he would not work if he was not timely paid.

Paul DiGiacomo, a convicted criminal, also prepared invoices that were close in time with each other but contain invoice numbers that are significantly far apart. They also appear to have been produced using different formats and templates, are facially inconsistent with each other, and, with respect to at least the invoice No. 9 dated August 6, 2015, include charges for work that had passed inspection months earlier, are precisely identical to each other with the exception of the street name, and appear to include charges for that had been invoiced previously. Based on the documents produced with respect to the other construction projects, Mr. DiGiacomo never submitted invoices on other projects. Moreover, purported snow charges for 2014 and 2015 were not entered into the QuickBooks records until May 24, 2015.

7

Pave Tech, a company that supposedly has been in business for nearly 20 years, issued invoices that contain a low invoice number suggesting that these were some of the first invoices ever issued by the company. Moreover, some of these invoices were duplicate in number but contained different amounts to be billed. One payment supposedly made to PaveTech in August 2014 was not even entered into the QuickBooks ledger until May 11, 2015.

Sergey Nikolaev similarly issued invoices for tile work on April 10, 2015, months after having been paid a substantial portion of this and after the final inspection had been completed. These invoices do not credit any of the prior payment received and lack any description of the work supposedly performed. The balance was then paid by KDC, which in turn seeks payment from the LLC.

Dream Flooring's invoices contradict each other both in terms of price and amount received. One invoice produced by Dream Flooring for $48,910 with respect to the Lyman Road house is dated July 3, 2014 and states that the job was complete and paid in full. A second invoice for Lyman Road, dated March 23, 2015, states that there is a remaining balance of $8,910 with additional work outstanding for $3,300, but also indicates that the job was completed and paid in full. However, according to Kagan's records, Dream Flooring was paid on March 20, 2014, significantly before the date of Dream Flooring's invoices, and Kagan's records of the March 2015 invoice suggest that there is still a balance owed of over $12,000. Dream Flooring's invoice for Cutler Lane that it produced in response to the subpoena also indicates that it was "paid in full," yet the invoice produced by Kagan indicates that the amount "due" is $48,910 even though Kagan's own records show that a portion of this invoice had been paid months earlier. An additional $2,500 was supposedly invoiced by Dream Flooring for each home in April 2015, long after work was complete. Kagan's QuickBooks records reflect that invoices entered into the system in April 2015 were subsequently modified and assigned an invoice number, even though Dream Flooring's invoices were unnumbered.

DaCosta Construction also used non-sequential invoices that have different formats, appear to have been fabricated, and which include work supposedly performed on other projects. On April 28, 2015, two invoices without invoice numbers were listed as accounts payable in Kagan's bookkeeping system. Both of these were deleted one day later. A large change order in the amount of $18,500 appears nowhere in the QuickBooks records. Moreover, KDC appears to be claiming $23,000 allegedly owing to DaCosta that was evidenced only by an email that purports to modify a pre-existing invoice that was never issued. At least one of DaCosta's invoices also purports to credit a payment received by it that is not identified in the QuickBooks files.

Horner Millworks was supposedly paid by credit card. One version of the QuickBooks files produced by Kagan matches what was reflected as paid through the American Express statements, $228,866.35. However, a different version of the QuickBooks files that was used for purposes of the mechanics lien claims an additional $35,060.84 that does not appear to ever have been paid to or charged by Horner Millworks.

Affordable Lawn Sprinklers worked on every Kagan project. It charges double the price when it works on a project with which Kagan is working with outside investors. Its only invoice, Invoice No. 9300, was included in the support for Lyman Road but identified a property address of 88 Cutler. The mechanic's lien filed by Kagan includes an $8,400 charge for Cutler which is missing documentation

but which is included as an identical charge for both properties in Kagan's QuickBooks records. It was paid twice – once by KDC and once by the LLC directly.

Eastcoast Pipelines submitted one invoice in the amount of $1,000 that covered Kagan's work on 4 separate houses, including 55 Lyman and 88 Cutler. The entire charge was paid directly by the LLC.

There are other highly suspect charges and additional detail with respect to the above that are identified in the report by Michael Goldman, which is incorporated herein by reference.

Finally, the carrying costs Kagan purports to have incurred after 23 months after the Date of Acquisition as set forth in the Lyman Cutler Operating Agreement are excessive, improper and not properly payable to Kagan. First, Kagan undertook to pay those costs if the properties were not sold by that time. Second, if Kagan had completed the construction on time as required by the Operating Agreement, the properties would have been sold by then and these carrying costs would not have been incurred.

<u>Interrogatory No. 9</u>

Please itemize all damages which Debtor seeks to recover from KDC, including in your response any pertinent calculations and the factual basis for those damages.

<u>Answer No. 9</u>

The LLC objects to this interrogatory as premature. Discovery and expert analysis is ongoing. In general terms, the LLC asserts that the purported charges above the original budget are fabricated and fraudulent, are grossly negligent, and not authorized and not properly payable even if not intentionally false and fraudulent. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

<u>Supplemental Answer No. 9</u>

Because of Kagan's wrongful conduct described above, the LLC was subjected to a false mechanic's lien and self-dealing realtor listing agreements, and forced into bankruptcy which resulted in a distressed sale of the LLC's two primary assets, the properties located at 55 Lyman Road and 88 Cutler Lane. The LLC's damages include the difference between the selling price of the properties - $4,400,000 per house – and the fair market value each house would have sold for but for Kagan's conduct - $5,100,000 per house. The damages for the diminished selling price of the homes equal $1.4 million, plus interest. The LLC will rely on expert testimony by Morgan Fennell as set forth in his two expert reports one for 55 Lyman Road and one for 88 Cutler Lane, produced on July 30, 2018.

The Debtor also seeks as damages the increased costs incurred as a result of the bankruptcy proceeding, including substantial attorneys' fees. These damages include the lost earnings on funds held in escrow during the pendency of the bankruptcy filing. Plaintiffs further claim as damages the

$17,986.83 in fees paid to Rabobank, N.A. as a result of the bankruptcy and the bond fees of $3,910.89 also incurred as a result of the bankruptcy, as well as any fees paid to the Trustee.

The Debtor also seeks recovery of attorneys' fees and costs in connection with the bankruptcy and an award of attorneys' fees pursuant to Chapter 93A.

These damages are in addition to seeking the disallowance of the Defendants' proofs of claim.

<u>Verification</u>

I, Alex Filippov, state under the pains and penalties of perjury that I am the Managing Member of the LLC; that I am authorized to answer these interrogatories on the LLC's behalf; and that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Alex Filippov

*As to objections:*

*/s/ Peter N. Tamposi*
Peter N. Tamposi (BBO No. 639497)
The Tamposi Law Group, P.C.
159 Main Street
Nashua, NH 03060
T:  (603) 204-5513

Dated:  September 27, 2018

<u>Certificate of Service</u>

I, Peter Tamposi, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on September 27, 2018.

*/s/ Peter N. Tamposi*
Peter N. Tamposi

4833-0183-9476, v.  1

10

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:*<br><br>LYMAN-CUTLER, LLC,<br>    Debtor,<br><br>LYMAN-CUTLER, LLC,<br><br>    Plaintiff,<br><br>v.<br><br>VADIM KAGAN, TATIANA KAGAN,<br>KAGAN DEVELOPMENT KDC CORP.,<br>and PROEXCAVACTION CORP.,<br><br>    Defendants. | ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) ) )<br><br>Chapter 7<br>No. 15-13881-FJB<br><br>A.P. No. 16-1120 |

## LYMAN-CUTLER, LLC'S SUPPLEMENTAL ANSWERS
## TO VADIM KAGAN'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order, Lyman-Cutler, LLC (the "LLC") supplements its answers to Vadim Kagan's ("Kagan") First Set of Interrogatories.

### SUPPLEMENTAL ANSWER

**Interrogatory No. 2**

Please itemize all damages which the Debtor seeks to recover from Kagan, including in your response any pertinent calculations and the factual basis for those damages.

**Answer No. 2**

The LLC objects to this interrogatory as premature. Discovery and expert analysis is ongoing. In general terms, the LLC states the following: The purported charges above the original budget are

1

fabricated and fraudulent, or at best the product of gross negligence. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

## Supplemental Answer No. 2

Kagan is equally culpable along with the other Defendants for the wrongful conduct described in the LLC's supplemental response to the interrogatories propounded to it by KDC, which are incorporated by reference. The LLC asserts that Kagan is jointly and severally liable for all damages described in those supplemental responses.

<u>Verification</u>

I, Alex Filippov, state under the pains and penalties of perjury that I am the Managing Member of the LLC; that I am authorized to answer these interrogatories on the LLC's behalf; and that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____

Alex Filippov

*As to objections:*


*/s/ Peter N. Tamposi*
Peter N. Tamposi (BBO No. 639497)
The Tamposi Law Group, P.C.
159 Main Street
Nashua, NH 03060
T:  (603) 204-5513


Dated:  September 27, 2018



<u>Certificate of Service</u>

I, Peter Tamposi, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on September 27, 2018.


*/s/ Peter N. Tamposi*
Peter N. Tamposi


4815-1143-9730, v.  1

3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:*<br><br>LYMAN-CUTLER, LLC,<br>        Debtor,<br><br>_____<br><br>LYMAN-CUTLER, LLC,<br><br>        Plaintiff,<br><br>v.<br><br>VADIM KAGAN, TATIANA KAGAN,<br>KAGAN DEVELOPMENT KDC CORP.,<br>and PROEXCAVACTION CORP.,<br><br>        Defendants. | Chapter 7<br>No. 15-13881-FJB<br><br><br>A.P. No. 16-1120 |

## LYMAN-CUTLER, LLC'S SUPPLEMENTAL ANSWERS
## TO PROEXCAVATION CORP.'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Lyman-Cutler, LLC (the "LLC") supplements its answers to ProExcavation Corp.'s ("ProExcavation")

First Set of Interrogatories.

### SUPPLEMENTAL ANSWERS

**Interrogatory No. 4**

    If you contend that the monies charged by ProExcavation for labor and material provided for the
Project were excessive or somehow improper, please set forth, in complete detail, all facts upon which
you base that contention.

1

### Answer No. 4

The LLC is unaware of what ProExcavation may or may not have "charged" KDC because ProExcavation has never provided an invoice, bill, or other form of request for payment reflecting what it charged for the labor or materials purportedly provided for the Project. Nonetheless, the LLC is aware that the LLC paid ProExcavation at least $455,000, and that ProExcavation claims an entitlement to nearly $455,000 more. This total figure is grossly in excess of what a fair market charge would be for the type of site work that was involved in the Project. Discovery is ongoing and a detailed analysis of these charges is still being prepared by an expert(s), subject to completion of fact discovery. An expert report will be produced in due course during this litigation, which report is incorporated by reference herein.

### Supplemental Answer No. 4

Vadim Kagan is ProExcavation's sole employee. Kagan, on behalf of ProExcavation, never bid the job, never tracked its costs, and has never submitted contemporaneous or accurate time records, invoices, or any other documentation that would accurately reflect what ProExcavation purportedly did on the project and at what cost. One of ProExcavation's purported subcontractors, Kagan's brother Kirill, has no business records from his work at the properties, and could not specifically identify what he did on the project, who assisted him, how long he worked, how much he was paid, or what he or those other individuals specifically did in terms of work.

Indeed, the financial records of ProExcavation do not in any way support the charges asserted. The purported "Proposal" proffered as the only documentary support for the ProExcavation charges was never shown to Filippov or Lipetsker until this litigation commenced. Although it purports to be dated in September and October 2013, it bears a phone number that ProExcavation did not use until some time in 2014. The Operating Agreement obligated Kagan to build the two houses for the Project and to accept as his compensation a 50% share in the net profits of the Project, subject to certain potential adjustments. Padding the ProExcavation bill with hundreds of thousands of dollars in profit for Kagan is a breach of the Operating Agreement and a breach of Kagan's duty of loyalty to Filippov and Lipetsker. ProExcavation has produced virtually no reliable documentation or other evidence to prove out of pocket expenses supporting the charges to the Project and does not even know how much of its purported charges constitute direct costs as opposed to profit. The accounting records produced by ProExcavation and its accountant show that ProExcavation added $425,000 in purported receivables from the LLC to its books long after the Project was complete, which is nearly half of the amount claimed against the Project. As set forth in the Report of Michael Goldman, on projects Kagan builds without an investor, his costs of construction are much lower than on his projects with an investor. Kristina Brusenkova will also testify that Kagan makes up his ProExcavation charges without regard to the actual costs incurred. These facts all support the conclusion that the ProExcavation charges are false and fraudulently inflated double billing to the Project.

### Interrogatory No. 5

Please set forth what you believe is the fair and reasonable value for the labor and material provided by ProExcavation for the Project, and the complete factual basis for that belief.

2

<u>Answer No. 5</u>

The LLC objects to this interrogatory. The LLC's subjective belief regarding the "fair and reasonable value" for labor or material provided by ProExcavation for the Project is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence as ProExcavation's alleged entitlement to any money from the LLC is not dependent on what is "fair and reasonable." Subject to and without waiving the foregoing objections, the LLC states the following: It believes that the amounts originally budgeted by Kagan for the foundation work - $135,000 for each home – represents what it considers to be fair and reasonable for the foundation services purportedly rendered by ProExcavation. An expert report will be produced in due course in this litigation and is incorporated herein by reference.

<u>Supplemental Answer No. 5</u>

The LLC continues to believe that the $135,000 figure for each home that Kagan represented in his budget for foundation work is the "fair and reasonable value" of what the foundation work should have cost. Based on his experience and ownership of ProExcavation, Kagan should have known what the excavation costs should have been for a project of this scope.

<u>Interrogatory No. 7</u>

If you contend that any expenses charged by ProExcavation are "double charges" as alleged in paragraph 44 of the Adversary Proceeding Complaint, please identify each such charge and the factual basis for that contention.

<u>Answer No. 7</u>

Kagan agreed, on behalf of whatever company he was intending to the work, to construct the Project at a fixed cost of $1.3 million per home, plus soft carrying costs. This included a budget of $135,000 to perform the foundation work on each home. Based on the LLC's understanding at the time, and it does still continue to believe, that this represented the fair value and true arms' length cost for the type of work that the LLC believes ProExcavation to have performed on the Project. Though the LLC is unaware of what ProExcavation may or may not have "charged" KDC because ProExcavation has never provided an invoice, bill, or other form of request for payment reflecting what it charged for the labor or materials purportedly provided for the Project, the LLC is aware that the LLC paid ProExcavation at least $455,000 for the work it purportedly provided, and that ProExcavation is claiming an entitlement to nearly $455,000 more. It is the LLC's belief that all of the payments received and charged by ProExcavation above the amount originally budgeted by Kagan were the result of fraud and were fabricated by Kagan, KDC and ProExcavation. The LLC is not aware of any site condition existing at the Project that should have increased this budgeted cost, nor is it aware of any contemporaneous time record or payment request that would have accurately captured or supported ProExavation's charges beyond this figure. The fact that Kagan also controlled the payment of the cost from KDC to his other company, ProExcavation, and made several large, unsupported payments, further causes the LLC to believe that these payments were fraudulent. Discovery is ongoing and an expert report on this topic is also expected in the due course of this litigation and incorporated herein by reference.

<u>**Supplemental Answer No. 7**</u>

Kagan agreed, on behalf of whatever company he was intending to the work, to construct the Project at a fixed cost of $1.3 million per home, plus soft carrying costs. This included a budget of $135,000 to perform the foundation work on each home. ProExcavation was obligated to perform on the Project for the sum approved in the budget. The proffered "Proposal" was never presented to or approved by the Plaintiffs during the Project and it represents a multiple of the price quoted to the Plaintiffs by ProExcavation's principal, Vadim Kagan, at the outset of the Project, upon which the Plaintiffs relied.

As the LLC understands ProExcavation's proof of claim, it seeks in this dispute $455,000 over and above what Kagan personally caused it to be paid during the Project. As set forth above and in the LLC's supplemental response to the interrogatories propounded to it by KDC, which are incorporated herein by reference, these sums have no support and are double billing.

<u>**Interrogatory No. 8**</u>

Please itemize all damages which you seek to recover from ProExcavation, including in your response any pertinent calculations and the factual basis for those damages.

<u>**Answer No. 8**</u>

The LLC objects to this interrogatory as premature. Discovery and expert analysis is ongoing. In general terms, the LLC asserts that the purported charges above the original budget are fabricated and fraudulent and not authorized or properly payable even if not intentionally false and fraudulent. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

<u>**Supplemental Answer No. 8**</u>

ProExcavation is equally culpable along with the other Defendants for the wrongful conduct described in the LLC's supplemental response to the interrogatories propounded to it by KDC, which are incorporated by reference. The LLC asserts that ProExcavation is jointly and severally liable for all damages described in those supplemental responses.

<u>Verification</u>

I, Alex Filippov, state under the pains and penalties of perjury that I am the Managing Member of the LLC; that I am authorized to answer these interrogatories on the LLC's behalf; and that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____

Alex Filippov

*As to objections:*

*/s/ Peter N. Tamposi*
Peter N. Tamposi (BBO No. 639497)
The Tamposi Law Group, P.C.
159 Main Street
Nashua, NH 03060
T:  (603) 204-5513

Dated:  September 27, 2018

<u>Certificate of Service</u>

I, Peter Tamposi, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on September 27, 2018.

*/s/ Peter N. Tamposi*
Peter N. Tamposi

5