# EXHIBIT 9

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:*<br><br>LYMAN-CUTLER, LLC,<br>      Debtor,<br><br><br>LYMAN-CUTLER, LLC,<br><br>      Plaintiff,<br><br>v.<br><br>VADIM KAGAN, TATIANA KAGAN,<br>KAGAN DEVELOPMENT KDC CORP.,<br>and PROEXCAVACTION CORP.,<br><br>      Defendants. | Chapter 7<br>No. 15-13881-FJB<br><br><br>A.P. No. 16-1120 |

### NICKOLAY LIPETSKER'S SUPPLEMENTAL ANSWERS TO
### KAGAN DEVELOPMENT KDC CORP.'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order, Nickolay Lipetsker ("Lipetsker") supplements his answers to Kagan Development KDC Corp.'s ("KDC") First Set of Interrogatories.

### SUPPLEMENTAL ANSWERS

**Interrogatory No. 5**

If you contend that any expenses charged by KDC for labor and/or material provided for the Project were excessive and somehow improper, please identify, in complete detail, each such expense and set forth all facts upon which you base that contention.

1

<u>**Answer No. 5**</u>

I believe that much of the amount claimed due by KDC in the proof of claim it filed in this bankruptcy is fraudulent and otherwise improper. I base this belief on a number of factors. Before the project began, Kagan presented to me and my co-investor, Alex Filippov, a detailed budget that Kagan claimed would represent the true costs of construction. Kagan's substantial experience building homes further led me to believe that Kagan's assertions were well founded. Throughout the course of the project, Kagan was continually asked whether the project remained on budget. He always said that it did. Then, when the homes were on the verge of selling and months after construction was complete, Kagan – for the very first time – claimed that there was suddenly a $758,026.56 shortfall in money the LLC owed to him, with another $50,000 of additional vendor costs anticipated, as well as additional "capital contributions" in the amount of $251,000. Just weeks later, after the LLC sued Kagan, Kagan's claimed entitlement rose dramatically to over $2 million, despite the fact that the homes had been substantially completed more than nine months before. I also learned around this time that Kagan had been making a practice with other projects on which he worked to claim an entitlement to a significant amount of alleged overruns on the verge of a home's sale in an effort to pressure his co-investors to pay him more money.

A review of the LLC and Kagan's financial records also support the conclusion that a number of payments made to KDC or payments made by KDC to others are fraudulent or otherwise improper, including the amount paid to ProExcavation Corp. which is grossly in excess of what a fair market charge would be for the type of site work that was involved in the Project. A detailed analysis of these charges is still being prepared by an expert(s), whose report will be produced in due course during this litigation and is incorporated herein by reference. Where Kagan controls both KDC and ProExcavation, and the ProExcavation charges are so grossly in excess of reasonable, the obvious conclusion is that Kagan is engaged in knowing and intentional fraud.

Even if for some reason this obvious conclusion were to prove incorrect, it is grossly negligent for Kagan and KDC to incur cost overruns of over $2 million on a Project where the budget was $3.2 million (including carrying costs and $200,000 for cost overruns already built into that figure) without prior consultation with and approval by me and Filippov. Because I never approved charges above the original budget, as required by the LLC Agreement, even if Kagan and the other co-conspirator Defendants have not engaged in fraud, those charges are improper, unauthorized, grossly negligent, and not properly payable by the LLC.

Discovery is ongoing and expert reports will be produced in due course, which are incorporated herein by reference.

<u>**Supplemental Answer No. 5**</u>

All of the alleged charges in excess of Kagan's original $1.6 million budget per home for construction costs, carrying costs and unanticipated cost overruns are excessive, unsupported and/or otherwise improper. These alleged charges in KDC's proof of claim are fraudulent or, at minimum, the product of gross breaches of Kagan's fiduciary duties and the terms of the LLC's Operating Agreement.

On October 25, 2012, at a meeting at the law office of Attorney Boris Maiden and before the project began, Kagan presented to me and Alex Filippov, a detailed budget that Kagan claimed represented an accurate statement of costs of construction, which Kagan represented would be $1.3 million, plus $200,000 for carrying costs. Before this meeting, Kagan circulated drafts of the presentation to Attorney Boris Maiden and Dimitriy Zhukovsky, whom Kagan had hired to put his budget figures into a spreadsheet for presentation to me and Filippov.

Kagan clearly and expressly represented to us that he had accurately priced the cost of construction for the Project, that we could rely on his knowledge, skill, and experience, and that the costs of construction would not exceed his budget. He later asked for an additional $100,000 in contingency funds in case of unexpected cost overruns, but he firmly and repeatedly told us that they could rely on his pricing for construction. Filippov and I justifiably and reasonably relied on Kagan's representations that the cost of construction for each home would be $1.3 million, with no more than $100,000 in potential overruns and that $200,000 per home would be sufficient to pay the carrying costs. Kagan represented that the total costs for both houses would therefore not exceed $3.2 million and that he would probably not need the extra $100,000 per home for any overruns. We reasonably relied on these representations in making our decision to invest in the Project.

Filippov, Kagan, and I executed the LLC's Operating Agreement (the "Operating Agreement"), which contained a specific, explicit provision that <u>Kagan</u> was responsible for building the two homes in the Project and that his compensation for doing so would consist of a 50% share of the net profits of the Project, subject to certain adjustments. The Operating Agreement further made specific provision for Kagan to be responsible for paying the carrying costs on the Project if the homes did not sell within 23 months as Kagan represented they would. We relied upon the terms of our express agreement with Kagan that he would be compensated for the construction only through his equity interest in the Project.

Kagan's representations concerning the costs of construction to us to induce us to invest in the Project were either knowingly false or, at minimum, made with reckless disregard for their truth. Kagan did not solicit bids from any subcontractors for the job. He had only minimal plans and no specifications sufficient to price accurately the costs of construction. He failed to exercise reasonable care (or indeed any care at all) to ensure that the representations he made to us were true. As a professional builder and as a joint venturer in a closely held company, Kagan had a duty of loyalty, care and full disclosure to make truthful and accurate representations to both me and Filippov. He breached those duties.

Other evidence adduced in discovery supports the conclusion that Kagan's representations were not merely reckless or grossly negligent but were intentionally false when made. Kagan's alleged cost overruns, described further below, are so far above the budget presented to us to induce us to invest that no honest contractor with Kagan's experience could have believed that he was accurately presenting the costs of construction. Kagan's alleged cost overruns are also far more than the reasonable cost of construction of the homes. Furthermore, Kagan previously and contemporaneously inflicted the same strategy of presenting a false budget to solicit investment and then submitting large cost overruns on several other investors, including Elena Lande, Vladislav Abramskiy, Dmitriy Zhukovskiy, Alexander Fodymanow, and Mark Kayserman. There exists a clear pattern of this fraudulent scheme being repeated by Kagan.

Furthermore, it is undisputed that Kagan failed to keep any proper or accurate records of his alleged costs and expenses during the construction on the Project. His former bookkeeper, Kristina Brusenkova, will testify that Kagan regularly made up charges after the fact to justify what he wanted to be paid for that project and made no effort to track payments he was making to subcontractors contemporaneously with when he was making the payments. His current bookkeeper, Daniel Gersh, has admitted that there were no organized Project cost files when Gersh was hired by KDC in or about November 2014, which was after the completion of construction. Gersh admits that he and Kagan solicited invoices from vendors and subcontractors to create purported financial records for the Project in 2015, long after construction was complete. Accordingly, there were no invoices or other documents to support his alleged cost overruns when he tried to pass them along to his investors. None of this proffered documentation is authentic, reliable or admissible in evidence. In the absence of proper recordkeeping, all of Kagan's purported charges are excessive, improper and not payable. Kagan had a duty to keep track of the costs of construction on the Project as they were incurred, and to timely inform me and Filippov of any cost overruns so that the joint venturers could make informed and timely decisions about what to do in light of any such cost overruns. Kagan completely failed to meet that duty.

Throughout the course of the Project, Filippov on several occasions asked Kagan whether the Project remained on budget. Kagan always said that it was. Not until May 2015, approximately seven months after completion of construction did Kagan for the very first time assert that there were cost overruns when he had his lawyer, Alexander Pyle, sent a letter claiming $758,026.56 in construction cost overruns, with another $50,000 of additional vendor costs still "anticipated" despite the fact that construction was long since complete. In the Pyle letter, Kagan also claimed for the first time that he was entitled to recover additional "capital contributions" in the amount of $251,000. Shortly before sending this letter, Kagan wrongfully signed a listing agreement with his wife, Tatiana, because he knew that his demand letter would start a dispute. Kagan also at some point signed a listing agreement, purportedly on behalf of the LLC, with Tatiana for a term of 18 months, which is three times industry standard. Under the LLC's Operating Agreement, Kagan did not have authority to sign either listing agreement and he knew it or should have known it. He signed them for the wrongful purpose of generating leverage to force the LLC to pay his improper and excessive alleged cost overruns and to extend his wife's claim for a commission beyond what the Operating Agreement allowed in knowing violation of the Operating Agreement and his fiduciary duties.

Filippov and I rejected the cost overruns and challenged Kagan's actions in court. On June 22, 2015, Kagan breached his fiduciary duty again, violated Chapter 93A (through KDC), and fraudulently filed a mechanic's lien against the Project properties based upon a purported contract with KDC that he secretly signed himself for both KDC and purportedly for the LLC, but which he had never shown to me or Filippov and which contradicted the terms of the deal set forth in the LLC's Operating Agreement and the conditions of the loan from Rockland Trust Bank. The mechanic's lien falsely inflated KDC's purported cost over runs to over $2,095,985.23 – nearly double what he had claimed – despite the fact that the homes had been substantially completed more than nine months before. The additional charges in the mechanic's lien over and above those in the Pyle letter consist of an additional $1,086,958.67. Of this sum, $777,754.41 are charges derived from the false contract Kagan signed with himself. These charges are all knowingly false and fraudulent because Kagan knows that none of us ever agreed to the contract upon which he purported to base the mechanic's lien. Kagan has previously admitted that the mechanic's lien was overstated by $74,126.84, which again reflects a gross breach of his duties to me,

4

Filippov and the LLC. To this day, Kagan has never offered any satisfactory explanation as to how his alleged cost overruns surged by an additional $235,077.42 (to yield the full $1,086,958.67 asserted in the mechanic's lien above the sums in the Pyle letter). The mechanic's lien also purports to be based upon an invoice to the LLC, which was never sent prior to the filing of the mechanic's lien. This false invoice was first presented to me and Filippov by email on June 25, 2015. The invoice purports to be dated June 1, 2015 but this date is false. All of the charges asserted in the mechanic's lien are excessive, fraudulent, a breach of the Operating Agreement and Kagan's fiduciary duties, otherwise improper and not payable by the LLC. In addition, Kagan manufactured unnecessary work at the Properties shortly before filing the fraudulent mechanic's lien in order to be able to assert he had worked at the Properties within the time frame required by the statute.

Kagan's proffered documentation and financial records also support the conclusion that a number of the specific payments made to KDC or payments allegedly made by KDC to others on the Project are excessive or otherwise improper or fraudulent. This answer incorporates by reference the analysis and opinions stated in the expert reports of Michael Goldman and David Doddridge.

In particular, the financial records of ProExcavation Corp. ("ProEx") do not in any way support the charges asserted. The purported "Proposal" proffered as the only documentary support for the ProEx charges was never shown to me or Lipetsker until this litigation commenced. Although it purports to be dated in September and October 2013, it bears a phone number that ProEx did not use until some time in 2014. The Operating Agreement obligated Kagan to build the two houses for the Project and to accept as his compensation a 50% share in the net profits of the Project, subject to certain potential adjustments. Padding the ProEx bill with hundreds of thousands of dollars in profit for Kagan is a breach of the Operating Agreement and a breach of Kagan's duty of loyalty to his fellow members. ProEx has produced virtually no reliable documentation or other evidence to prove out of pocket expenses supporting the charges to the Project. The accounting records produced by ProEx and its accountant show that ProEx added $425,000 in purported receivables from the LLC to its books long after the Project was complete, which is nearly half of the amount claimed against the Project. As set forth in the Report of Michael Goldman, on projects Kagan builds without an investor, his costs of construction are much lower than on his projects with an investor. Kristina Brusenkova will also testify that Kagan makes up his ProEx charges without regard to the actual costs incurred. These facts all support the conclusion that the ProEx charges are false and fraudulently inflated double billing to the Project.

All of the charges based upon the purported contract between KDC and Lyman Cutler, allegedly signed by Kagan for both sides on July 24, 2013, are fraudulent double billing in breach of the Operating Agreement and Kagan's duty of loyalty to me and Filippov. The terms of the Operating Agreement provided that Kagan's only source of compensation above his direct construction costs would be in the form of a percentage of profits to which he was entitled from the LLC after the properties were sold. Asserting claims against Lyman Cutler for $1,086,958.67 based upon the alleged KDC contract violates the express terms of the Operating Agreement. Kagan did not have authority to sign this contract for Lyman Cutler and his contention that it is a valid contract is gross self-dealing. KDC is liable under Chapter 93A for the assertion of charges based upon this contract.

In addition, the evidence supports the conclusion that Kagan and Joseph Cohen forged the KDC contract in or about June 2015. Filippov and I never saw this alleged contract before this litigation. In

May 2018, after years of discovery requests, and only after Kagan's deposition commenced, did Kagan produce a printed version of what purported to be an email from Kagan to Filippov and a Rockland Trust representative that supposedly provided them with the alleged KDC contract back in 2013. Filippov's email records do not contain this particular email, nor was a copy of that email produced by Rockland Trust in response to the subpoena. As a result, the LLC's counsel immediately demanded production of the electronic, native file email. On or around May 23, 2018, Kagan produced a printed version of what purported to be an email forwarded from Joseph Cohen to himself on May 22, 2018, which itself purported to include a printed version of an email dated June 24, 2013 between Joseph Cohen and Kagan. Then, on June 6, 2018, Kagan's counsel forwarded what purported to be the electronic version of the email that had previously been produced in printed form. The metadata on what purported to be an unsigned contract suggested that the entire document was edited from start to finish in 2 minutes or less, which is nearly impossible to do (even if you start with a template), and was last printed on June 17, 2015, just days before KDC filed its mechanic's lien. If the email had been genuine, there is no conceivable way in which an email sent in June 2013 could have attached a Word document whose metadata reflects that it was printed two years later. Even if that were somehow possible, there is no reason why KDC would have needed to print the Word version of this document in June 2015 unless it had never been previously created. Kagan's book keeper, Daniel Gersh, testified that he had never seen the KDC contract. There are no entries in KDC's books and records based upon the alleged charges in the KDC contract. No charges based upon this purported contract were included in the May 2015 Pyle letter. The invoice purportedly based upon this contract was not sent to me until June 25, 2015 despite being dated June 1, 2015. Kagan and Cohen forged this contract in order to inflate the alleged charges from KDC, file the fraudulent mechanic's lien and wrongfully try to force me and Filippov to agree to pay the alleged cost overruns asserted in the Pyle letter to avoid financial catastrophe. Regardless of whether the fact finder concludes the KDC contract was forged in June 2015, however, all charges asserted based on it are improper, fraudulent, a breach of the LLC Agreement and Kagan's fiduciary duties and not properly payable.

In addition, there are also a number of specific subcontractors whose purported charges appear to be fraudulent:

Unicom Electric has been paid $65,000 during the course of the project for the electrical work completed on both houses. This number corresponds precisely to the amount KDC asserts that it is owed for Unicom's remaining balance on the Project based upon undated, duplicate invoices that appear to be photocopies of the same invoice with only the address changed. The remaining $65,000 KDC claims it is owed for Unicom-related work was not even listed on the accounts payable ledger until April 2015, more than a year after the electrical work was complete and approved by the local building inspector. Unicom never filed a mechanic's lien of its own against the Project and has allegedly gone unpaid for over 4 years. No original invoices have ever been produced. Unicom also used a duplicate copy of this invoice on the 10 Lyman Road project with only the number of the address changed. Unicom also appears to have two sets of proposals that he uses on different Kagan projects – one for a house receiving 200 amp service and one for a house receiving 400 amp service. The proposals among these two different style houses appear to be duplicates of each other.

BST Plumbing's materials invoices for the two properties, dated August 18, 2015 (two months after KDC filed its mechanics lien) are identical – even going so far as having the same invoice number and job address of 55 Lyman. They are dated months after work was completed, and provide as backup

6

identical quotes from Ferguson Enterprises that post-date the date of BST's invoices. These payments appear to be duplicative of material invoices submitted directly by (and paid to) the plumbing supply company by way of Kagan's American Express card in October 2014, credits that are not accounted for in Ferguson's August 19, 2015 bid. BST's labor invoices, dated March 14, 2015 and March 1, 2015, are identical, are dated many months after the local inspector had approved BST's work, were sent to Kagan nearly a year after BST received payment from Kagan, and contain handwritten remarks indicating that a total of $39,670 remains unpaid. The LLC's QuickBooks audit trail report indicates that two invoices from BST in the amount of $11,360 each were entered into the system on April 29, 2015 and were changed 27 minutes later to $19,670 each. BST also was purportedly paid only half of what its purported proposals required it to be paid, and allowed tens of thousands of dollars allegedly owing to it sit on the books unpaid for years.

V&D Heating and Cooling likewise provided two handwritten "proposals" that were identical even so far as including marks where the paper clips were located except for the header – property address and date. Each proposal describes the work as the same, and it appears as if one proposal was copied to create the other. These proposals are dated December 5 and 6, 2013, and call for an initial payment of $25,000 each. In fact, V&D had received only $10,000 as an initial payment for each house, and had received these payments over a month before issuing its proposals. V&D allowed $19,000 to remain unpaid for over four months, then supposedly performed an extra $5,000 worth of work (which were not included in the QuickBooks ledger), bringing the total outstanding amount allegedly owed to $24,000, and has permitted that amount to allegedly remain unpaid to this day.

Décor Art's invoices appear on their face to have been fabricated by KDC given that they are facially inconsistent with each other in numerous ways, including how the company's address is identified, the use of a color graphic in the header of the invoice, and the use of different style invoices with different color gradients for different projects. Décor Art's invoices include duplicate invoice numbers paid months apart, and in at least one, the painter's purported letterhead did not spell the word "painter" correctly. The February 12, 2015 invoice for $8,750 was included in Kagan's documentation but was not included in the QuickBooks file, even though invoices which are dated later than that one are included in the file. A separate Décor Art invoice dated April 23, 2015 purported to charge KDC $420 for house cleaning services, but was entered into the QuickBooks records for purposes of the mechanics lien with an additional $1,000 charge. Décor Art also purportedly had a balance outstanding to him and continued to work, even though he testified that he would not work if he was not timely paid.

Paul DiGiacomo, a convicted criminal, also prepared invoices that were close in time with each other but contain invoice numbers that are significantly far apart. They also appear to have been produced using different formats and templates, are facially inconsistent with each other, and, with respect to at least the invoice No. 9 dated August 6, 2015, include charges for work that had passed inspection months earlier, are precisely identical to each other with the exception of the street name, and appear to include charges for that had been invoiced previously. Based on the documents produced with respect to the other construction projects, Mr. DiGiacomo never submitted invoices on other projects. Moreover, purported snow charges for 2014 and 2015 were not entered into the QuickBooks records until May 24, 2015.

Pave Tech, a company that supposedly has been in business for nearly 20 years, issued invoices that contain a low invoice number suggesting that these were some of the first invoices ever issued by

the company. Moreover, some of these invoices were duplicate in number but contained different amounts to be billed. One payment supposedly made to PaveTech in August 2014 was not even entered into the QuickBooks ledger until May 11, 2015.

Sergey Nikolaev similarly issued invoices for tile work on April 10, 2015, months after having been paid a substantial portion of this and after the final inspection had been completed. These invoices do not credit any of the prior payment received and lack any description of the work supposedly performed. The balance was then paid by KDC, which in turn seeks payment from the LLC.

Dream Flooring's invoices contradict each other both in terms of price and amount received. One invoice produced by Dream Flooring for $48,910 with respect to the Lyman Road house is dated July 3, 2014 and states that the job was complete and paid in full. A second invoice for Lyman Road, dated March 23, 2015, states that there is a remaining balance of $8,910 with additional work outstanding for $3,300, but also indicates that the job was completed and paid in full. However, according to Kagan's records, Dream Flooring was paid on March 20, 2014, significantly before the date of Dream Flooring's invoices, and Kagan's records of the March 2015 invoice suggest that there is still a balance owed of over $12,000. Dream Flooring's invoice for Cutler Lane that it produced in response to the subpoena also indicates that it was "paid in full," yet the invoice produced by Kagan indicates that the amount "due" is $48,910 even though Kagan's own records show that a portion of this invoice had been paid months earlier. An additional $2,500 was supposedly invoiced by Dream Flooring for each home in April 2015, long after work was complete. Kagan's QuickBooks records reflect that invoices entered into the system in April 2015 were subsequently modified and assigned an invoice number, even though Dream Flooring's invoices were unnumbered.

DaCosta Construction also used non-sequential invoices that have different formats, appear to have been fabricated, and which include work supposedly performed on other projects. On April 28, 2015, two invoices without invoice numbers were listed as accounts payable in Kagan's bookkeeping system. Both of these were deleted one day later. A large change order in the amount of $18,500 appears nowhere in the QuickBooks records. Moreover, KDC appears to be claiming $23,000 allegedly owing to DaCosta that was evidenced only by an email that purports to modify a pre-existing invoice that was never issued. At least one of DaCosta's invoices also purports to credit a payment received by it that is not identified in the QuickBooks files.

Horner Millworks was supposedly paid by credit card. One version of the QuickBooks files produced by Kagan matches what was reflected as paid through the American Express statements, $228,866.35. However, a different version of the QuickBooks files that was used for purposes of the mechanics lien claims an additional $35,060.84 that does not appear to ever have been paid to or charged by Horner Millworks.

Affordable Lawn Sprinklers worked on every Kagan project. It charges double the price when it works on a project with which Kagan is working with outside investors. Its only invoice, Invoice No. 9300, was included in the support for Lyman Road but identified a property address of 88 Cutler. The mechanic's lien filed by Kagan includes an $8,400 charge for Cutler which is missing documentation but which is included as an identical charge for both properties in Kagan's QuickBooks records. It was paid twice – once by KDC and once by the LLC directly.

8

Eastcoast Pipelines submitted one invoice in the amount of $1,000 that covered Kagan's work on 4 separate houses, including 55 Lyman and 88 Cutler. The entire charge was paid directly by the LLC.

There are other highly suspect charges and additional detail with respect to the above that are identified in the report by Michael Goldman, which is incorporated herein by reference.

Finally, the carrying costs Kagan purports to have incurred after 23 months after the Date of Acquisition as set forth in the Lyman Cutler Operating Agreement are excessive, improper and not properly payable to Kagan. First, Kagan undertook to pay those costs if the properties were not sold by that time. Second, if Kagan had completed the construction on time as required by the Operating Agreement, the properties would have been sold by then and these carrying costs would not have been incurred.

### Interrogatory No. 10

Please itemize all damages which you seek to recover from KDC, including in your response any pertinent calculations and the factual basis for those damages.

### Answer No. 10

Lipetsker objects to this interrogatory as premature. Discovery and expert analysis is ongoing. In general terms, Lipetsker asserts that the purported charges above the original budget are fabricated and fraudulent, are grossly negligent, and not authorized and not properly payable even if not intentionally false and fraudulent. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

### Supplemental Answer No. 10

In addition to the damages sought by the LLC as described in its Supplemental Answer to Interrogatory No. 9, the damages sought by my co-investor Alex Filippov, and the disallowance of the Defendants' proofs of claim, I seek allowance of my proof claim as well as a 5% return on my capital contribution as provided under Section 8.2 of the LLC's Operating Agreement. Applying 5% to the $250,000 invested by me for this Project results in $15,625 in damages I am seeking.

I also assert that this rate of return should be applied to all of the funds held in escrow by the Trustee as a result of the bankruptcy, which was forced upon the LLC by the Defendants' wrongdoing. Applying 5% to the $3,528,723.43 being held in escrow by the Trustee as of September 25, 2018, which funds are earning no interest whatsoever, then between January 2016 and the present date, those funds would have earned approximately $265,000 in interest, which sum continues to grow. I seek my pro rata share of those damages along with Mr. Filippov.

My direct independent claim for damages in addition to the damages outlined in the Supplemental Answers to Interrogatories by the LLC and Mr. Filippov equals $15,625, plus interest, costs, and treble damages under Chapter 93A.

Verification

    I, Nickolay Lipetsker, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

*N. Lipetsker*

_____

Nickolay Lipetsker

*As to objections:*

/s/ Sean T. Carnathan
_____
Sean T. Carnathan, BBO No. 636889
scarnathan@ocmlaw.net
Joseph P. Calandrelli, BBO No. 666128
jcalandrelli@ocmlaw.net
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T: (781) 359-9000

Dated: September 27, 2018

Certificate of Service

    I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on September 27, 2018.

/s/ Sean T. Carnathan
_____
Sean T. Carnathan

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:* )<br><br>LYMAN-CUTLER, LLC, )<br>    Debtor, )<br><br>_____ )<br><br>LYMAN-CUTLER, LLC, )<br><br>    Plaintiff, )<br><br>v. )<br><br>VADIM KAGAN, TATIANA KAGAN, )<br>KAGAN DEVELOPMENT KDC CORP., )<br>and PROEXCAVACTION CORP., )<br><br>    Defendants. )<br>_____ ) | Chapter 7<br>No. 15-13881-FJB<br><br><br>A.P. No. 16-1120 |

### NICKOLAY LIPETSKER'S SUPPLEMENTAL ANSWERS TO
### VADIM KAGAN'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Nickolay Lipetsker ("Lipetsker") supplements his answers to Vadim Kagan's ("Kagan") First Set of

Interrogatories.

### SUPPLEMENTAL ANSWERS

**Interrogatory No. 2**

Please itemize all damages which you seek to recover from Kagan, including in your response
any pertinent calculations and the factual basis for those damages.

**Answer No. 2**

Lipetsker objects to this interrogatory as premature.  Discovery and expert analysis is ongoing.
In general terms, Lipetsker states the following:  The purported charges above the original budget are

1

fabricated and fraudulent. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

<u>Supplemental Answer No. 2</u>

Kagan is equally culpable along with the other Defendants for the wrongful conduct described in my supplemental response to the interrogatories propounded to me by KDC, which are incorporated by reference. I assert that Kagan is jointly and severally liable for all damages described in those supplemental responses.

Verification

I, Nickolay Lipetsker, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

*N. Lipetsker*

_____
Nickolay Lipetsker

*As to objections:*

*/s/ Sean T. Carnathan*
Sean T. Carnathan, BBO No. 636889
scarnathan@ocmlaw.net
Joseph P. Calandrelli, BBO No. 666128
jcalandrelli@ocmlaw.net
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T:  (781) 359-9000

Dated:  September 27, 2018

Certificate of Service

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on September 27, 2018.

*/s/ Sean T. Carnathan*
Sean T. Carnathan

3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:* )<br><br>LYMAN-CUTLER, LLC, )<br>       Debtor, )<br><br>_____ )<br><br>LYMAN-CUTLER, LLC, )<br><br>      Plaintiff, )<br><br>v. )<br><br>VADIM KAGAN, TATIANA KAGAN, )<br>KAGAN DEVELOPMENT KDC CORP., )<br>and PROEXCAVACTION CORP., )<br><br>      Defendants. )<br>_____ ) | Chapter 7<br>No. 15-13881-FJB<br><br><br>A.P. No. 16-1120 |

### NICKOLAY LIPETSKER'S SUPPLEMENTAL ANSWERS TO
### PROEXCAVATION CORP.'S FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Nickolay Lipetsker ("Lipetsker") supplements his answers to ProExcavation Corp.'s ("ProExcavation")

First Set of Interrogatories.

### SUPPLEMENTAL ANSWERS

**Interrogatory No. 4**

If you contend that the monies charged by ProExcavation for labor and material provided for the
Project were excessive or somehow improper, please set forth, in complete detail, all facts upon which
you base that contention.

1

<u>Answer No. 4</u>

I am unaware of what ProExcavation may or may not have "charged" KDC because
ProExcavation has never provided an invoice, bill, or other form of request for payment reflecting what
it charged for the labor or materials purportedly provided for the Project. Nonetheless, I am aware that
the LLC paid ProExcavation at least $455,000, and that ProExcavation claims an entitlement to nearly
$455,000 more. This total figure is grossly in excess of what a fair market charge would be for the type
of site work that was involved in the Project. Discovery is ongoing and a detailed analysis of these
charges is still being prepared by an expert(s), subject to completion of fact discovery. An expert report
will be produced in due course during this litigation, which report is incorporated by reference herein.

<u>Supplemental Answer No. 4</u>

Vadim Kagan is ProExcavation's sole employee. Kagan, on behalf of ProExcavation, never bid
the job, never tracked its costs, and has never submitted contemporaneous or accurate time records,
invoices, or any other documentation that would accurately reflect what ProExcavation purportedly did
on the project and at what cost. One of ProExcavation's purported subcontractors, Kagan's brother
Kirill, has no business records from his work at the properties, and could not specifically identify what
he did on the project, who assisted him, how long he worked, how much he was paid, or what he or
those other individuals specifically did in terms of work.

Indeed, the financial records of ProExcavation do not in any way support the charges asserted.
The purported "Proposal" proffered as the only documentary support for the ProExcavation charges was
never shown to me or Filippov until this litigation commenced. Although it purports to be dated in
September and October 2013, it bears a phone number that ProExcavation did not use until some time in
2014. The Operating Agreement obligated Kagan to build the two houses for the Project and to accept
as his compensation a 50% share in the net profits of the Project, subject to certain potential
adjustments. Padding the ProExcavation bill with hundreds of thousands of dollars in profit for Kagan
is a breach of the Operating Agreement and a breach of Kagan's duty of loyalty to me and Filippov.
ProExcavation has produced virtually no reliable documentation or other evidence to prove out of
pocket expenses supporting the charges to the Project and does not even know how much of its
purported charges constitute direct costs as opposed to profit. The accounting records produced by
ProExcavation and its accountant show that ProExcavation added $425,000 in purported receivables
from the LLC to its books long after the Project was complete, which is nearly half of the amount
claimed against the Project. As set forth in the Report of Michael Goldman, on projects Kagan builds
without an investor, his costs of construction are much lower than on his projects with an investor.
Kristina Brusenkova will also testify that Kagan makes up his ProExcavation charges without regard to
the actual costs incurred. These facts all support the conclusion that the ProExcavation charges are false
and fraudulently inflated double billing to the Project.

<u>Interrogatory No. 5</u>

Please set forth what you believe is the fair and reasonable value for the labor and material
provided by ProExcavation for the Project, and the complete factual basis for that belief.

2

### Answer No. 5

Lipetsker objects to this interrogatory.  Lipetsker's subjective belief regarding the "fair and reasonable value" for labor or material provided by ProExcavation for the Project is irrelevant and not reasonably calculated to lead to the discovery of admissible evidence as ProExcavation's alleged entitlement to any money from the LLC is not dependent on what is "fair and reasonable."  Subject to and without waiving his foregoing objections, Lipetsker states the following:  I believe that the amounts originally budgeted by Kagan for the foundation work - $135,000 for each home – represents what I consider to be fair and reasonable for the foundation services purportedly rendered by ProExcavation. An expert report will be produced in due course in this litigation and is incorporated herein by reference.

### Supplemental Answer No. 5

I continue to believe that the $135,000 figure for each home that Kagan represented in his budget for foundation work is the "fair and reasonable value" of what the foundation work should have cost. Based on his experience and ownership of ProExcavation, Kagan should have known what the excavation costs should have been for a project of this scope.

### Interrogatory No. 7

If you contend that any expenses charged by ProExcavation are "double charges" as alleged in paragraph 44 of the Adversary Proceeding Complaint, please identify each such charge and the factual basis for that contention.

### Answer No. 7

Kagan agreed, on behalf of whatever company he was intending to the work, to construct the Project at a fixed cost of $1.3 million per home, plus soft carrying costs.  This included a budget of $135,000 to perform the foundation work on each home.  Based on my understanding at the time, and I do still continue to believe, that this represented the fair value and true arms' length cost for the type of work that I believe ProExcavation to have performed on the Project.  Though I am unaware of what ProExcavation may or may not have "charged" KDC because ProExcavation has never provided an invoice, bill, or other form of payment reflecting what it charged for the labor or materials purportedly provided for the Project, I am aware that Lyman Cutler, LLC paid ProExcavation at least $455,000 for the work it purportedly provided, and that ProExcavation is claiming an entitlement to nearly $455,000 more.  It is my belief that all of the payments received and charged by ProExcavation above the amount originally budgeted by Kagan were the result of fraud.  I am not aware of any site condition existing at the Project that should have increased this budgeted cost, nor am I aware of any contemporaneous time record or payment request that would have accurately captured or supported ProExavation's charges beyond this figure.  The fact that Kagan also controlled the payment of the cost from KDC to his other company, ProExcavation, and made several large, unsupported payments, further causes me to suspect that these payments were fraudulent.  Discovery is ongoing and an expert report on this topic is also expected in the due course of this litigation and incorporated herein by reference.

3

### Supplemental Answer No. 7

Kagan agreed, on behalf of whatever company he was intending to the work, to construct the Project at a fixed cost of $1.3 million per home, plus soft carrying costs. This included a budget of $135,000 to perform the foundation work on each home. ProExcavation was obligated to perform on the Project for the sum approved in the budget. The proffered "Proposal" was never presented to or approved by me or any of the other Plaintiffs during the Project and it represents a multiple of the price quoted to us by ProExcavation's principal, Vadim Kagan, at the outset of the Project, upon which we relied.

As I understand ProExcavation's proof of claim, it seeks in this dispute $455,000 over and above what Kagan personally caused it to be paid during the Project. As set forth above and in my supplemental response to the interrogatories propounded to me by KDC, which are incorporated herein by reference, these sums have no support and are double billing.

### Interrogatory No. 8

Please itemize all damages which you seek to recover from ProExcavation, including in your response any pertinent calculations and the factual basis for those damages.

### Answer No. 8

Lipetsker objects to this interrogatory as premature. Discovery and expert analysis is ongoing. In general terms, Lipetsker asserts that the purported charges above the original budget are fabricated and fraudulent and not authorized or properly payable even if not intentionally false and fraudulent. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

### Supplemental Answer No. 8

ProExcavation is equally culpable along with the other Defendants for the wrongful conduct described in my supplemental response to the interrogatories propounded to me by KDC, which are incorporated by reference. I assert that ProExcavation is jointly and severally liable for all damages described in those supplemental responses.

4

Verification

I, Nickolay Lipetsker, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

*N. Lipetsker*

———————————————————
Nickolay Lipetsker

*As to objections:*

*/s/ Sean T. Carnathan*
Sean T. Carnathan, BBO No. 636889
scarnathan@ocmlaw.net
Joseph P. Calandrelli, BBO No. 666128
jcalandrelli@ocmlaw.net
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T:  (781) 359-9000

Dated:  September 27, 2018

Certificate of Service

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on September 27, 2018.

*/s/ Sean T. Carnathan*
Sean T. Carnathan

5

# EXHIBIT 10

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| *In re:* | ) | |
| | ) | |
| LYMAN-CUTLER, LLC, | ) | |
| Debtor, | ) | |
| | ) | Chapter 7 |
| | ) | No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | A.P. No. 16-1120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, TATIANA KAGAN, | ) | |
| KAGAN DEVELOPMENT KDC CORP., | ) | |
| and PROEXCAVACTION CORP., | ) | |
| | ) | |
| Defendants. | ) | |

**ALEX FILIPPOV'S ANSWERS TO TATIANA KAGAN'S**
**FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order, Alex

Filippov ("Filippov") responds to Tatiana Kagan's ("Tatiana") First Set of Interrogatories. Filippov's

responses are based upon information currently known. Discovery is ongoing. He reserves the right to

amend, modify, or supplement each of the responses set forth below.

**GENERAL OBJECTIONS**

Filippov objects to the extent Tatiana's First Set of Interrogatories purport to require Filippov to

respond on his own behalf as well as "alleged managing member" of Lyman-Cutler, LLC (the "LLC").

Tatiana, and each of the other parties named above, has served separate discovery requests on the LLC.

Purporting to require Filippov to respond to these interrogatories on behalf of the LLC as well as on his

1

own individual behalf is unduly burdensome, needlessly duplicative, and in violation of the Court's Pre-

Trial Order.  Filippov will respond to these interrogatories on his own behalf only.

Filippov further objects to the extent the "Instructions" section of Tatiana's First Set of

Interrogatories purport to impose on Filippov any obligation that exceeds those required by the Rules of

Civil Procedure.  Filippov will respond in accordance with any obligations imposed by the Rules.

## ANSWERS

### Interrogatory No. 1

Please set forth, with complete detail, each and every communication between Filippov and
Tatiana regarding the Project.

### Answer No. 1

I met Tatiana in or around July 2014 while I was meeting with Vadim Kagan ("Kagan") at the
Project site.  Tatiana assured me then that there was already a lot of interest in the Properties, even
though they had not yet been completed.  Then, in or around April 2015, I had a telephone conversation
with Tatiana wherein she asked that I sign an additional listing agreement for 55 Lyman Road, which I
refused to do.  We then exchanged a text message that has been produced in discovery.

### Interrogatory No. 2

Please set forth all actions that Filippov, either individually or as the alleged managing member
of the Debtor, took to market and sell the Properties.

### Answer No. 2

Filippov objects to this interrogatory because it is overly broad, irrelevant, and not reasonably
calculated to lead to the discovery of admissible evidence.  The responsibility to "market and sell" the
Properties did not belong to Filippov or any other member of the LLC.  That was Tatiana's
responsibility during the time she was authorized to serve as the LLC's real estate agent.  Subject to and
without waiving his foregoing objections, Filippov states as follows:  After I learned that Tatiana was
continuing without permission to hold herself out as the LLC's real estate agent, I contacted Deborah
Gordon, a real estate agent with Coldwell Banker Residential Brokerage, and Kathy Kronger from
Hammond Residential to inquire whether they would be interested in taking over the marketing from
Tatiana.  During my discussion with Ms. Gordon, she mentioned that she had previously made an offer
on behalf of one of her clients for 88 Cutler Lane.  I was surprised to hear this news as I had not
previously been made aware of any offers.  I then gathered additional information from Ms. Gordon
about this offer.  Around the same time, I had signed an agreement with Ms. Kronger to replace Century
21, but Century 21 refused to allow the LLC out of the fraudulent contract Kagan had signed.  To be
able to sell the Properties and cut our losses, sometime after the state lawsuit was filed, I authorized the

LLC to retain Michelle Lane at Century 21 Commonwealth to market and sell the Properties on the LLC's behalf.

### Interrogatory No. 3

Please identify, in complete detail, any and all offers received for the Properties.

### Answer No. 3

Filippov objects to this interrogatory because it seeks information from third parties; namely, Tatiana and Vadim Kagan ("Kagan"). Subject to and without waiving his foregoing objections, Filippov states as follows: According to Deborah Gordon, she had made a verbal offer on behalf of a buyer named Franklin for 88 Cutler Lane in the amount of $4.5 million, that Tatiana had communicated a counter offer of $5 million, and that the buyer proceeded to purchase another property. Tatiana never communicated with me about this offer. On or around July 21, 2015, the LLC received an offer for $4.1 million. On or around October 8, 2015, the LLC received an offer of $4.2 million. Each of these offers were rejected. The only other two offers I am aware of are the offers that ultimately turned into the sale of both Properties out of the estate for $4.4 million each.

### Interrogatory No. 4

Please itemize all damages which you seek to recover from Tatiana, including in your response any pertinent calculations and the factual basis for those damages.

### Answer No. 4

Filippov objects to this interrogatory as premature. Discovery is ongoing and damages are subject to expert analysis and report, which will be produced in due course. In general terms, Tatiana is liable for damages for failing to convey the offer for 88 Cutler, failing competently to market the Properties, supporting the enforcement of listing agreements she knew to be fraudulent, and for participating in the Defendants' fraudulent scheme to overbill the Project.

### Interrogatory No. 5

If you contend that Tatiana conspired with Kagan, KDC, and ProExcavation, or any one of them, to defraud the Debtor, please identify all facts upon which you base that contention.

### Answer No. 5

Tatiana conspired with Kagan when they reached an agreement for Tatiana to continue to serve as the LLC's agent far beyond the time permitted and authorized by the Operating Agreement, by agreeing to list the Properties for sale at a price that was never approved or authorized by the LLC, and by failing to communicate a bona fide offer she did receive to Filippov, the LLC's Managing Member. Tatiana furthered this conspiracy by signing a fraudulent listing agreement with Kagan and by participating in the decision to inflate the listing price and by knowingly failing to communicate a bona fide offer to the LLC. Tatiana, as a partner with Kagan and an officer of KDC, reached an agreement

with KDC whereby KDC would hire subcontractors, vendors, and suppliers to perform certain work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC to use these purported expenses to demand additional money from the LLC and, indirectly, from me. Tatiana furthered this conspiracy by permitting the subcontractors, vendors, and suppliers to perform the work, causing KDC to pay them charges which Tatiana and KDC knew to be falsely inflated, causing KDC to demand that sum be repaid to it by the LLC, and subsequently causing KDC to file a mechanics' lien and a proof of claim seeking to recover that amount from the LLC. Tatiana and KDC also conspired to have KDC purportedly enter into a written contract with the LLC which was never authorized and which KDC now bases its claim for payment. Tatiana furthered this conspiracy by causing both KDC and the LLC to sign this fraudulent document and by causing KDC to seek to enforce the terms of that contract on the LLC when it knows that the LLC never agreed to the terms set forth therein.

Tatiana participated in the scheme with ProExcavation to overbill the Project through KDC, with regard to which Tatiana is an officer.

**Interrogatory No. 6**

If you contend that Tatiana conspired with Kagan, KDC and ProExcavation, or any of them, to defraud the Debtor, please identify all facts upon which you base that contention. Include in your response each act taken by Tatiana in furtherance of the alleged conspiracy.

**Answer No. 6**

Filippov objects to this interrogatory because it is duplicative of Interrogatory No. 5. Subject to and without waiving his foregoing objections, Filippov states: See Answer No. 5, which is incorporated by reference as if fully set forth herein.

**Interrogatory No. 7**

For each and every person who you expect to call as an expert witness at trial, please state: (a) the identify of each expert by giving his/her name, address, specialty, and professional education and experience; (b) the subject matter on which each expert is expected to testify; (c) the substance of the facts and opinions to which each such expert is expected to testify; and (d) a summary of the grounds for each such opinion.

**Answer No. 7**

Filippov objects to subparagraphs (b) through (d) of this interrogatory to the extent any expert witness identified is required to provide a written report under Fed. R. Civ. P. 26(b)(2)(B) as the requested information in those subparagraphs is duplicative of the information required to be identified in the written report. Filippov further objects because this interrogatory is premature as the Court has set an expert disclosure deadline of December 31, 2017. The identity of any expert Filippov intends to call as a witness at trial will be made in accordance with the Court's ordered deadline.

4

**Interrogatory No. 8**

If you contend that Tatiana acted with "gross negligence" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 8**

Filippov objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the gross negligence detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified. To the extent relevant, Tatiana was grossly negligent with regard to her marketing of the properties and grossly negligent as an officer of KDC in allowing gross cost overruns (to the extent those cost overruns are not willfully fraudulent).

**Interrogatory No. 9**

If you contend that Tatiana acted with "willful misconduct" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 9**

Filippov objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the willful misconduct detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified.

**Interrogatory No. 10**

If you contend that Tatiana did not act in "good faith" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 10**

Filippov objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the

foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the bad faith detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified.

<u>Verification</u>

I, Alex Filippov, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Alex Filippov

*As to objections:*

*/s/ Sean T. Carnathan*
Sean T. Carnathan, BBO No. 636889
*scarnathan@ocmlaw.net*
Joseph P. Calandrelli, BBO No. 666128
*jcalandrelli@ocmlaw.net*
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T:  (781) 359-9000

Dated:  October 2, 2017

<u>Certificate of Service</u>

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on October 2, 2017.

*/s/ Sean T. Carnathan*
Sean T. Carnathan

7

# EXHIBIT 11

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| *In re:* | ) | |
| | ) | |
| LYMAN-CUTLER, LLC, | ) | |
| Debtor, | ) | |
| | ) | Chapter 7 |
| | ) | No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | A.P. No. 16-1120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, TATIANA KAGAN, | ) | |
| KAGAN DEVELOPMENT KDC CORP., | ) | |
| and PROEXCAVACTION CORP., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**LYMAN-CUTLER, LLC'S ANSWERS TO TATIANA KAGAN'S
FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Lyman-Cutler, LLC (the "LLC") responds to Tatiana Kagan's ("Tatiana") First Set of Interrogatories.

The LLC's responses are based upon information currently known.  It reserves the right to amend,

modify, or supplement each of the responses set forth below.

**GENERAL OBJECTION**

The LLC objects to the extent the "Instructions" section of Tatiana's First Set of Interrogatories

purport to impose on the LLC any obligation that exceeds those required by the Rules of Civil

Procedure.  The LLC will respond in accordance with any obligations imposed by the Rules.

1

## ANSWERS

### Interrogatory No. 1

Please set forth, with complete detail, each and every communication between Debtor and Tatiana regarding the Project.

### Answer No. 1

The LLC objects to this interrogatory. The word "Debtor" is defined to include its members, including Alex Filippov ("Filippov"), Nickolay Lipetsker ("Lipetsker"), and Vadim Kagan ("Kagan"). There were likely numerous communications between Kagan and Tatiana regarding the Project. This information is uniquely in the possession of the Defendants. Subject to and without waiving its foregoing objections, the LLC states: Filippov met Tatiana in or around July 2014 while he was meeting with Kagan at the Project site. Tatiana assured the LLC then that there was already a lot of interest in the Properties, even though they had not yet been completed. Then, in or around April 2015, Filippov had a telephone conversation with Tatiana wherein she asked that he sign an additional listing agreement for 55 Lyman Road, which he refused to do. They then exchanged a text message that has been produced in discovery.

### Interrogatory No. 2

Please set forth all actions that the Debtor took to market and sell the Properties.

### Answer No. 2

The LLC objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. The responsibility to "market and sell" the Properties did not belong to the LLC or any of its members. That was Tatiana's responsibility during the time she was authorized to serve as the LLC's real estate agent. Subject to and without waiving its foregoing objections, the LLC states as follows: After Filippov learned that Tatiana was continuing without permission to hold herself out as the LLC's real estate agent, the LLC contacted Deborah Gordon, a real estate agent with Coldwell Banker Residential Brokerage, and Kathy Kronger from Hammond Residential to inquire whether they would be interested in taking over the marketing from Tatiana. During Filippov's discussion with Ms. Gordon, she mentioned that she had previously made an offer on behalf of one of her clients for 88 Cutler Lane. He was surprised to hear this news as he had not previously been made aware of any offers. The LLC then gathered additional information from Ms. Gordon about this offer. Around the same time, the LLC had signed an agreement with Ms. Kronger to replace Century 21, but Century 21 refused to allow the LLC out of the fraudulent contract Kagan had signed. To be able to sell the Properties and cut its losses, sometime after the state lawsuit was filed, the LLC retained Michelle Lane at Century 21 Commonwealth to market and sell the Properties on the LLC's behalf.

### Interrogatory No. 3

Please identify, in complete detail, any and all offers received for the Properties.

2

**Answer No. 3**

The LLC objects to this interrogatory because it seeks information from third parties; namely, Tatiana and Vadim Kagan ("Kagan"). Subject to and without waiving its foregoing objections, the LLC states as follows: According to Deborah Gordon, she had made a verbal offer on behalf of a buyer named Franklin for 88 Cutler Lane in the amount of $4.5 million, that Tatiana had communicated a counter offer of $5 million, and that the buyer proceeded to purchase another property. Tatiana never communicated with the LLC about this offer. On or around July 21, 2015, the LLC received an offer for $4.1 million. On or around October 8, 2015, the LLC received an offer of $4.2 million. Each of these offers were rejected. The only other two offers the LLC is aware of are the offers that ultimately turned into the sale of both Properties out of the estate for $4.4 million each.

**Interrogatory No. 4**

Please itemize all damages which you seek to recover from Tatiana, including in your response any pertinent calculations and the factual basis for those damages.

**Answer No. 4**

The LLC objects to this interrogatory as premature. Discovery is ongoing and damages are subject to expert analysis and report, which will be produced in due course. In general terms, Tatiana is liable for damages for failing to convey the offer for 88 Cutler, failing competently to market the Properties, supporting the enforcement of listing agreements she knew to be fraudulent, and for participating in the Defendants' fraudulent scheme to overbill the Project.

**Interrogatory No. 5**

If you contend that Tatiana conspired with Kagan, KDC, and ProExcavation, or any one of them, to defraud the Debtor, please identify all facts upon which you base that contention.

**Answer No. 5**

Tatiana conspired with Kagan when they reached an agreement for Tatiana to continue to serve as the LLC's agent far beyond the time permitted and authorized by the Operating Agreement, by agreeing to list the Properties for sale at a price that was never approved or authorized by the LLC, and by failing to communicate a bona fide offer she did receive to Filippov, the LLC's Managing Member. Tatiana furthered this conspiracy by signing a fraudulent listing agreement with Kagan and by participating in the decision to inflate the listing price and by knowingly failing to communicate a bona fide offer to the LLC. Tatiana, as a partner with Kagan and an officer of KDC, reached an agreement with KDC whereby KDC would hire subcontractors, vendors, and suppliers to perform certain work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC to use these purported expenses to demand additional money from the LLC. Tatiana furthered this conspiracy by permitting the subcontractors, vendors, and suppliers to perform the work, causing KDC to pay them charges which Tatiana and KDC knew to be falsely inflated, causing KDC to demand that sum be repaid to it by the LLC, and

3

subsequently causing KDC to file a mechanics' lien and a proof of claim seeking to recover that amount from the LLC. Tatiana and KDC also conspired to have KDC purportedly enter into a written contract with the LLC which was never authorized and which KDC now bases its claim for payment. Tatiana furthered this conspiracy by causing both KDC and the LLC to sign this fraudulent document and by causing KDC to seek to enforce the terms of that contract on the LLC when it knows that the LLC never agreed to the terms set forth therein.

Tatiana participated in the scheme with ProExcavation to overbill the Project through KDC, with regard to which Tatiana is an officer.

## Interrogatory No. 6

For each and every person who you expect to call as an expert witness at trial, please state: (a) the identify of each expert by giving his/her name, address, specialty, and professional education and experience; (b) the subject matter on which each expert is expected to testify; (c) the substance of the facts and opinions to which each such expert is expected to testify; and (d) a summary of the grounds for each such opinion.

## Answer No. 6

The LLC objects to subparagraphs (b) through (d) of this interrogatory to the extent any expert witness identified is required to provide a written report under Fed. R. Civ. P. 26(b)(2)(B) as the requested information in those subparagraphs is duplicative of the information required to be identified in the written report. The LLC further objects because this interrogatory is premature as the Court has set an expert disclosure deadline of December 31, 2017. The identity of any expert the LLC intends to call as a witness at trial will be made in accordance with the Court's ordered deadline.

## Interrogatory No. 7

If you contend that Tatiana acted with "gross negligence" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

## Answer No. 7

The LLC objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the gross negligence detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified. To the extent relevant, Tatiana was grossly negligent with regard to her marketing of the properties and grossly negligent as an officer of KDC in allowing gross cost overruns (to the extent those cost overruns are not willfully fraudulent)

**Interrogatory No. 8**

If you contend that Tatiana acted with "willful misconduct" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 8**

The LLC objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the willful misconduct detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified.

**Interrogatory No. 9**

If you contend that Tatiana did not act in "good faith" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 9**

The LLC objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the bad faith detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified.

<u>Verification</u>

I, Alex Filippov, state under the pains and penalties of perjury that I am the Managing Member of the LLC; that I am authorized to answer these interrogatories on the LLC's behalf; and that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Alex Filippov

*As to objections:*

*/s/ Peter N. Tamposi*
Peter N. Tamposi (BBO No. 639497)
The Tamposi Law Group, P.C.
159 Main Street
Nashua, NH 03060
T:  (603) 204-5513

Dated:  October 2, 2017

<u>Certificate of Service</u>

I, Peter Tamposi, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on October 2, 2017.

*/s/ Peter N. Tamposi*
Peter N. Tamposi

6

# EXHIBIT 12

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:* ) | |
| ) | |
| LYMAN-CUTLER, LLC, ) | |
| Debtor, ) | |
| ) | Chapter 7 |
| | No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, ) | |
| ) | |
| Plaintiff, ) | |
| ) | A.P. No. 16-1120 |
| v. ) | |
| ) | |
| VADIM KAGAN, TATIANA KAGAN, ) | |
| KAGAN DEVELOPMENT KDC CORP., ) | |
| and PROEXCAVACTION CORP., ) | |
| ) | |
| Defendants. ) | |

## NICKOLAY LIPETSKER'S ANSWERS TO TATIANA KAGAN'S
## FIRST SET OF INTERROGATORIES

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Nickolay Lipetsker ("Lipetsker") responds to Tatiana Kagan's ("Tatiana") First Set of Interrogatories.

Lipetsker's responses are based upon information currently known.  Discovery is ongoing.  He reserves

the right to amend, modify, or supplement each of the responses set forth below.

## GENERAL OBJECTION

Lipetsker objects to the extent the "Instructions" section of Tatiana's First Set of Interrogatories

purport to impose on Lipetsker any obligation that exceeds those required by the Rules of Civil

Procedure.  Lipetsker will respond in accordance with any obligations imposed by the Rules.

1

## ANSWERS

### Interrogatory No. 1

Please set forth, with complete detail, each and every communication between Lipetsker and Tatiana regarding the Project.

### Answer No. 1

I do not recall having any communications with Tatiana regarding the Project.

### Interrogatory No. 2

Please set forth all actions that Lipetsker took to market and sell the Properties.

### Answer No. 2

Lipetsker objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. The responsibility to "market and sell" the Properties did not belong to Lipetsker or any other member of Lyman Cutler, LLC (the "LLC"). That was Tatiana's responsibility during the time she was authorized to serve as the LLC's real estate agent. Subject to and without waiving his foregoing objections, Lipetsker states as follows: I understand that after Filippov and I learned that Tatiana was continuing without permission to hold herself out as the LLC's real estate agent, Filippov contacted Deborah Gordon, a real estate agent with Coldwell Banker Residential Brokerage, and Kathy Kronger from Hammond Residential to inquire whether they would be interested in taking over the marketing from Tatiana. I understand that during Filippov's discussion with Ms. Gordon, she mentioned that she had previously made an offer on behalf of one of her clients for 88 Cutler Lane. I had not previously been made aware of any offers. Around the same time, the LLC signed an agreement with Ms. Kronger to replace Century 21, but Century 21 refused to allow the LLC out of the fraudulent contract Kagan had signed. To be able to sell the Properties and cut our losses, sometime after the state lawsuit was filed, the LLC retained Michelle Lane at Century 21 Commonwealth to market and sell the Properties on the LLC's behalf.

### Interrogatory No. 3

Please identify, in complete detail, any and all offers received for the Properties.

### Answer No. 3

Lipetsker objects to this interrogatory because it seeks information from third parties; namely, Tatiana and Vadim Kagan ("Kagan"). Subject to and without waiving his foregoing objections, Lipetsker states as follows: According to Deborah Gordon, she had made a verbal offer on behalf of a buyer named Franklin for 88 Cutler Lane in the amount of $4.5 million, that Tatiana had communicated a counter offer of $5 million, and that the buyer proceeded to purchase another property. Tatiana never communicated with Filippov or me about this offer. On or around July 21, 2015, the LLC received an offer for $4.1 million. On or around October 8, 2015, the LLC received an offer of $4.2 million. Each

of these offers were rejected.  The only other two offers I am aware of are the offers that ultimately turned into the sale of both Properties out of the estate for $4.4 million each.

**Interrogatory No. 4**

Please itemize all damages which you seek to recover from Tatiana, including in your response any pertinent calculations and the factual basis for those damages.

**Answer No. 4**

Lipetsker objects to this interrogatory as premature.  Discovery is ongoing and damages are subject to expert analysis and report, which will be produced in due course.  In general terms, Tatiana is liable for damages for failing to convey the offer for 88 Cutler, failing competently to market the Properties, supporting the enforcement of listing agreements she knew to be fraudulent, and for participating in the Defendants' fraudulent scheme to overbill the Project.

**Interrogatory No. 5**

If you contend that Tatiana conspired with Kagan, KDC, and ProExcavation, or any one of them, to defraud the Debtor, please identify all facts upon which you base that contention.

**Answer No. 5**

Tatiana conspired with Kagan when they reached an agreement for Tatiana to continue to serve as the LLC's agent far beyond the time permitted and authorized by the Operating Agreement, by agreeing to list the Properties for sale at a price that was never approved or authorized by the LLC, and by failing to communicate a bona fide offer she did receive to Filippov, the LLC's Managing Member. Tatiana furthered this conspiracy by signing a fraudulent listing agreement with Kagan and by participating in the decision to inflate the listing price and by knowingly failing to communicate a bona fide offer to the LLC.  Tatiana, as a partner with Kagan and an officer of KDC, reached an agreement with KDC whereby KDC would hire subcontractors, vendors, and suppliers to perform certain work on the Project and knowingly and intentionally submit fabricated, falsely inflated requests for payment from KDC for the purpose of then permitting KDC to use these purported expenses to demand additional money from the LLC and, indirectly, from me.  Tatiana furthered this conspiracy by permitting the subcontractors, vendors, and suppliers to perform the work, causing KDC to pay them charges which Tatiana and KDC knew to be falsely inflated, causing KDC to demand that sum be repaid to it by the LLC, and subsequently causing KDC to file a mechanics' lien and a proof of claim seeking to recover that amount from the LLC.  Tatiana and KDC also conspired to have KDC purportedly enter into a written contract with the LLC which was never authorized and which KDC now bases its claim for payment.  Tatiana furthered this conspiracy by causing both KDC and the LLC to sign this fraudulent document and by causing KDC to seek to enforce the terms of that contract on the LLC when it knows that the LLC never agreed to the terms set forth therein.

Tatiana participated in the scheme with ProExcavation to overbill the Project through KDC, with regard to which Tatiana is an officer.

**Interrogatory No. 6**

If you contend that Tatiana conspired with Kagan, KDC and ProExcavation, or any of them, to defraud the Debtor, please identify all facts upon which you base that contention. Include in your response each act taken by Tatiana in furtherance of the alleged conspiracy.

**Answer No. 6**

Lipetsker objects to this interrogatory because it is duplicative of Interrogatory No. 5. Subject to and without waiving his foregoing objections, Lipetsker states:  See Answer No. 5, which is incorporated by reference as if fully set forth herein.

**Interrogatory No. 7**

For each and every person who you expect to call as an expert witness at trial, please state: (a) the identify of each expert by giving his/her name, address, specialty, and professional education and experience; (b) the subject matter on which each expert is expected to testify; (c) the substance of the facts and opinions to which each such expert is expected to testify; and (d) a summary of the grounds for each such opinion.

**Answer No. 7**

Lipetsker objects to subparagraphs (b) through (d) of this interrogatory to the extent any expert witness identified is required to provide a written report under Fed. R. Civ. P. 26(b)(2)(B) as the requested information in those subparagraphs is duplicative of the information required to be identified in the written report. Lipetsker further objects because this interrogatory is premature as the Court has set an expert disclosure deadline of December 31, 2017. The identity of any expert Lipetsker intends to call as a witness at trial will be made in accordance with the Court's ordered deadline.

**Interrogatory No. 8**

If you contend that Tatiana acted with "gross negligence" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

**Answer No. 8**

Lipetsker objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the gross negligence detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified. To the extent relevant, Tatiana was grossly negligent with regard to her marketing of the properties and grossly negligent as an officer of KDC in allowing gross cost overruns (to the extent those cost overruns are not willfully fraudulent).

## Interrogatory No. 9

If you contend that Tatiana acted with "willful misconduct" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

## Answer No. 9

Lipetsker objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the willful misconduct detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified.

## Interrogatory No. 10

If you contend that Tatiana did not act in "good faith" as that term is utilized in Section 10.2 of the Operating Agreement, please set forth all facts upon which you rely for that contention.

## Answer No. 10

Lipetsker objects to this interrogatory because it is overly broad, irrelevant, and not reasonably calculated to lead to the discovery of admissible evidence. Section 10.2 of the LLC's Operating Agreement provides for certain indemnification obligations to the LLC's members. Tatiana is not a member of the LLC and only had limited authorization to take certain action on the LLC's behalf, and therefore is not entitled to any indemnification from the LLC. Subject to and without waiving any of the foregoing objections, even if Tatiana was somehow entitled to assert a claim for indemnification against the LLC, the bad faith detailed in the Adversary Proceeding Complaint and in Answer No. 5, above, would preclude Tatiana from being indemnified.

### Verification

I, Nickolay Lipetsker, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Nickolay Lipetsker

*As to objections:*


*/s/ Sean T. Carnathan*
_____
Sean T. Carnathan, BBO No. 636889
*scarnathan@ocmlaw.net*
Joseph P. Calandrelli, BBO No. 666128
*jcalandrelli@ocmlaw.net*
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T:  (781) 359-9000


Dated:  October 18, 2017


### Certificate of Service

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on October ___, 2017.


*/s/ Sean T. Carnathan*
_____
Sean T. Carnathan