# EXHIBIT 18

Exhibits:  51-54                    Volume 1, Pages 1-65

## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS
#### (EASTERN DIVISION)

- - - - - - - - - - - - - - - - - - - - - - - - - - -

In Re:

                                   Chapter 7

LYMAN-CUTLER, LLC,                 Case No. 15-13881-FJB

            Debtor

- - - - - - - - - - - - - - - - - - - - - - - - -

LYMAN-CUTLER, LLC,


            Plaintiff

v.                                 Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
            Defendants

- - - - - - - - - - - - - - - - - - - - - - - - -


DEPOSITION OF TATIANA KAGAN
Friday, May 18, 2018, 11:47 a.m.
O'Connor Carnathan and Mack LLC
1 Van de Graaff Drive, Suite 104
Burlington, Massachusetts


- - - - - - - - - David A. Arsenault, RPR - - - - - - - - -
daa@fabreporters.com   www.fabreporters.com
Farmer Arsenault Brock LLC
Boston, Massachusetts
617-728-4404

Tatiana Kagan - Vol. 1 - 5/18/2018

14

1   as a realtor, have you had any other employment

2   other than being a realtor?

3       A.   A mom.

4       Q.   Have you done any work for Proexcavation

5   Corp.?

6       A.   No.

7       Q.   Have you done any work for Kagan

8   Development KDC?

9       A.   Define work.

10      Q.   I'm asking you, have you done anything for

11  Kagan Development KDC?

12      A.   It's too broad of a question.

13      Q.   What part don't you understand?

14      A.   "Work."

15      Q.   You are confused by the word "work"?

16      A.   Yes, I am.

17      Q.   If I were to ask you how you would define

18  work, how would you define it?

19      A.   It depends on the industry.

20      Q.   Do you have some understanding of what

21  Kagan Development KDC Corp. does?

22      A.   They build houses.

23      Q.   So have you done any work building

24  houses -- may I call it KDC?

Tatiana Kagan - Vol. 1 - 5/18/2018

15

1     A.   I don't use a hammer or excavating

2   equipment.  I don't do that.  I do pick out colors

3   and finishes for the houses.  So I don't know who I

4   work for when I do that.

5     Q.   Does KDC pay you when you pick out colors

6   and finishes?

7     A.   No.

8     Q.   Did you pick out colors and finishes for

9   the home at 55 Lyman Road?

10    A.   I did.

11    Q.   Did you pick out the colors and finishes

12  for the home at 88 Cutler Lane?

13    A.   Yes, I did.

14    Q.   Were you paid for your efforts in picking

15  out the colors and finishes for 88 Cutler Lane?

16    A.   I was not presented a specific check for

17  this particular work.

18    Q.   Were you paid for your work in picking out

19  colors and finishes for 55 Lyman Road?

20    A.   I was not presented with a specific check

21  that stated picking out colors and finishes for 55

22  Lyman.

23    Q.   How long did it take you to pick out the

24  colors and finishes for 55 Lyman?

Tatiana Kagan - Vol. 1 - 5/18/2018

19

1    do any other work for KDC?

2       A.  I don't know if it is for KDC.  I do open

3    houses and meet with clients and network with buyers

4    and sellers and other agents.

5       Q.  Anything else?

6       A.  No.

7       Q.  Do you have any input into the financial

8    records of KDC?

9       A.  No.

10      Q.  Do you have any input into the financial

11   records of Proexcavation?

12      A.  No.

13      Q.  Are you an officer of the company KDC?

14      A.  I believe so.

15      Q.  What position do you hold?

16      A.  Officer of the company.

17      Q.  What about with regard to Proex, are you an

18   officer of Proex?

19      A.  I'm not sure.

20      Q.  Are you a member of the board of directors

21   of KDC?

22      A.  I'm not sure.

23      Q.  Are you a member of the board of directors

24   of Proexcavation?

Tatiana Kagan - Vol. 1 - 5/18/2018

22

1    A.  No.

2    Q.  You never laid eyes on that document

3  before?

4    A.  No.  It says Operating Agreement.  I don't

5  have anything to do with operating agreements.  No,

6  I haven't seen it.

7    Q.  Do you have any understanding of what your

8  husband's authority was to retain you as the listing

9  agent for the Lyman-Cutler properties?

10    A.  It had always been our agreement and

11  understanding that every property that he builds I

12  sell.

13    Q.  And what's the basis for your understanding

14  that every property he builds you would sell?

15    A.  What's the basis?

16    Q.  How do you know that?

17    A.  How do I know that?  I'm the best at it.

18    Q.  Did your husband tell you that you would be

19  the listing agent for every property he built?

20    A.  That was an agreement between me and him.

21  That was the reason for obtaining the real estate

22  license.

23    Q.  Did anybody else ever tell you that you

24  would be the agent for every property he built?

Tatiana Kagan - Vol. 1 - 5/18/2018

38

1    Q.   Do you know why the Cutler property was put

2  on the market in August of 2014?

3    A.   Maybe it was ready to be sold at that time?

4    Q.   I'm asking you, ma'am.  I wasn't there.

5    A.   I'm assuming.

6    Q.   Well, you were the listing agent for

7  Cutler, right?

8    A.   Yes.

9    Q.   So after you became the listing agent for

10  Cutler, what did you do to try to sell it?

11    A.   I created a design box.  I picked out

12  colors for the walls, finishes, granite slabs, back

13  splashes, vanities.  The same thing I always do.

14    Q.   I'm talking about after the listing

15  agreement was signed and you became the listing

16  agent for the property, what did you do to sell the

17  property?

18    A.   Conducted open houses, public open houses,

19  broker open houses, my company advertised the

20  property.

21    Q.   How many open houses did you conduct?

22    A.   I do not recall.

23    Q.   How many broker open houses did you

24  conduct?

Tatiana Kagan - Vol. 1 - 5/18/2018

39

1    A.  I do not recall.

2    Q.  Where did you advertise the property?

3    A.  It was done by my company and they

4  submitted the list of places where it was advertised

5  in.  I do not recall exactly which ones.

6    Q.  Other than what's been produced already in

7  this lawsuit, are you aware of any other records

8  that would tell us how many open houses you

9  conducted?

10          MR. HARRIS:  Objection.

11          Go ahead.

12    A.  I do not recall.

13    Q.  Other than what's been produced in this

14  lawsuit, are you aware of what advertising was done

15  for the property?

16          MR. HARRIS:  Objection.

17          Go ahead.

18    A.  No.

19    Q.  Other than open houses and advertising,

20  what other efforts did you make to market or sell

21  the property?

22    A.  I reached out to every high-end agent in

23  the industry that potentially could bring clients.

24    Q.  What high-end agents in the industry did

Tatiana Kagan - Vol. 1 - 5/18/2018

40

1  you reach out to?

2      A.   Multiple.  I do not recall the names.

3      Q.   Do you recall any of the names?

4      A.   Deborah Gordon.

5      Q.   Anyone else?

6      A.   Jim Nemetz, N e m e t z.

7      Q.   What realty company is Jim with?

8      A.   Hammond.

9      Q.   Do you remember the names of any other

10  high-end agents to whom you reached out to with

11  regard to the Cutler property?

12      A.   There was more than a dozen.

13      Q.   Other than what you've already described,

14  what other efforts did you make to market the Cutler

15  property?

16      A.   I told everybody I knew who potentially

17  could buy or tell other people about the property.

18      Q.   When you held the open houses, did you have

19  one of those sheets that people sign in on when they

20  come in?

21      A.   I did but people, especially who attend

22  high-end properties, they refuse to sign.

23      Q.   Do you still have copies of those sheets

24  from the open houses?

FARMER ARSENAULT BROCK LLC

Tatiana Kagan - Vol. 1 - 5/18/2018

41

1    A.   I do not.

2    Q.   What became of them?

3    A.   They were not needed.

4    Q.   Why weren't they needed?

5    A.   If you follow up with all the people who

6    signed, which are very few, you don't need them

7    anymore because you already contacted all of the

8    potential people who came through the house.

9    Q.   During your time as the listing agent for

10   the Cutler property, did you have any individual

11   showings of the property?

12   A.   A lot.

13   Q.   How many do you recall?

14   A.   I do not.

15   Q.   More than ten?

16   A.   Possibly.

17   Q.   More than 20?

18   A.   I do not recall.

19   Q.   Did you receive any offers on the Cutler

20   property?

21   A.   I don't know which one.  We had one from

22   Chinese client, very low offer, 4.1 or so.

23   Q.   When was that?

24   A.   I do not recall.

Tatiana Kagan - Vol. 1 - 5/18/2018

43

1      A.   No.

2      Q.   Did Debbie Gordon ever present an offer to

3  you?

4      A.   She was supposed to, but it never

5  materialized.  She mentioned something that somebody

6  was interested, but she dismissed it right away

7  saying they don't even qualify to buy it.

8      Q.   Did she tell you the name of the person who

9  was interested in making an offer?

10     A.   No.

11     Q.   As of August 2014, how many other

12 properties had you sold for more than $4 million?

13     A.   I sold 130 Warren Street for $9 million.  I

14 resold the same property for 9 million point two

15 several months later.  I sold another property for

16 about $4 million sometime around that time.

17     Q.   Any others?

18     A.   Yeah.  Many others.

19     Q.   What's your best estimate of how many other

20 properties you had sold for more than $4 million

21 before August of 2014?

22     A.   I can't give you the number.

23     Q.   More than five?

24     A.   I do not recall.  I don't calculate.

Tatiana Kagan - Vol. 1 - 5/18/2018

56

1   of minutes to look through my notes.

2              (A recess was taken.)

3      Q.   Mrs. Kagan, are you aware that a core

4   element of this dispute is a dispute over costs on

5   the property, the construction of the properties?

6              MR. HARRIS:   Objection.

7              Go ahead.

8      A.   No, I'm not.

9      Q.   You don't know anything about cost overruns

10  on the properties?

11     A.   No.

12     Q.   Did you ever talk to your husband about the

13  construction costs on the properties?

14     A.   No.

15     Q.   Do you know Joseph Cohen?

16     A.   Yes.

17     Q.   Have you ever spoken to Joseph Cohen about

18  the Lyman-Cutler project?

19     A.   I have.

20     Q.   On how many occasions?

21     A.   I do not recall.

22     Q.   If we think about your conversations with

23  Mr. Cohen about Lyman-Cutler as a general matter,

24  what do you recall speaking to Mr. Cohen about?

Tatiana Kagan - Vol. 1 - 5/18/2018

63

1                   CERTIFICATE OF COURT REPORTER

2

3

4

5

6           I, David A. Arsenault, Registered
Professional Reporter, do certify that the
7    deposition of TATIANA KAGAN, in the matter of
Lyman-Cutler vs. Kagan, et al., on May 18, 2018, was
8    stenographically recorded by me; that the witness
provided satisfactory evidence of identification, as
9    prescribed by Executive Order 455 (03-13) issued by
the Governor of the Commonwealth of Massachusetts,
10   before being sworn by me, a Notary Public in and for
the Commonwealth of Massachusetts; that the
11   transcript produced by me is a true and accurate
record of the proceedings to the best of my ability;
12   that I am neither counsel for, related to, nor
employed by any of the parties to the above action;
13   and further that I am not a relative or employee of
any attorney or counsel employed by the parties
14   thereto, nor financially or otherwise interested in
the outcome of the action.

15

16

17

18   Transcript review was requested of the reporter.

19

20

21

22

23   _____  ^ DEL DATE

24   David A. Arsenault, RPR

FARMER ARSENAULT BROCK LLC

# EXHIBIT 19

Exhibits: 1-8                    Volume 1, Pages 1-91
               UNITED STATES BANKRUPTCY COURT
                  DISTRICT OF MASSACHUSETTS
                     (EASTERN DIVISION)
- - - - - - - - - - - - - - - - - - - - - - - - - - -
In Re:

                              Chapter 7
LYMAN-CUTLER, LLC,            Case No. 15-13881-FJB


          Debtor
- - - - - - - - - - - - - - - - - - - - - - - - - - -
LYMAN-CUTLER, LLC,


          Plaintiff
v.                            Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
          Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - -


          DEPOSITION OF DEBORAH GORDON
       Tuesday, May 1, 2018, 10:05 a.m.
       Sheehan Phinney Bass + Green, P.A.
          255 State Street, 5th Floor
             Boston, Massachusetts


     - - - - - - - - - David A. Arsenault, RPR - - - - - - - - -
     daa@fabreporters.com   www.fabreporters.com
          Farmer Arsenault Brock LLC
             Boston, Massachusetts
                617-728-4404

Deborah Gordon - Vol. 1 - 5/1/2018

9

30

1   preoffer communication?
2         MR. CALANDRELLI:  Objection.
3         A.  You might ask if the buyer was expecting
4   multiple offers.  You might ask if the broker was
5   expecting any offers.  You might ask if the seller
6   was highly motivated.  I might ask a lot of feely
7   questions.
8         Q.  What's the purpose of these discussions?
9         A.  If I'm representing the buyer?
10        Q.  Yes.
11        A.  To get them the best value I can for the
12   house.
13        Q.  If you represent the seller and you take a
14   phone call from a buyer's agent, what's the purpose
15   from the buyer's side?
16        A.  The same purpose.  They are trying to get
17   the buyer the best buy they can get them.  I'm
18   trying to get the seller the most money anybody will
19   pay for their property.
20        Q.  The communications that happen before the
21   written offer is transmitted, do you consider those
22   communications to be binding offers between the
23   parties?
24        MR. CALANDRELLI:  Objection.

31

1         A.  No.
2         Q.  The written offer form that you have in
3   mind, can you describe for me some of the basic
4   elements that are contained in the offer?
5         A.  Seller's name, buyer's name, date of offer,
6   purchase price, deposit amount, amount at purchase
7   and sale agreement, deadline for the offer, date of
8   the purchase and sales agreement, date of the
9   closing, and other terms as needed.
10        Q.  Do buyers also disclose if there are any
11   contingencies to their offer?
12        A.  Yes.
13        Q.  What are some of common contingencies that
14   are disclosed?
15        A.  Mortgage contingency and inspection
16   contingency.
17        Q.  The mortgage contingency, is that the buyer
18   has to be able to secure adequate financing?
19        A.  Correct.
20        Q.  And inspection means the buyer reserves the
21   right to inspect the property and withdraw their
22   offer?
23        A.  Correct.
24        (Pause.)

32

1         Q.  Am I correct that the offer, the formal
2   offer we've been talking about is signed by the
3   buyers when it is transmitted?
4         A.  Yes.
5         Q.  If the sellers accept the offer, are the
6   buyers then bound by whatever they have proposed in
7   their written offer?
8         MR. CALANDRELLI:  Objection.
9         A.  It says at the bottom of our offers that it
10   is a legally binding document.
11        Q.  So is your answer yes?
12        MR. CALANDRELLI:  Objection.
13        A.  Yes.  I guess that would be once the seller
14   signed it.
15        Q.  Once the seller accepts.
16        A.  Right.
17        Q.  I want to ask you your practice about
18   representing sellers.  When you represent sellers
19   and a buyer's agent calls you to ask, for example,
20   if the seller is motivated, is that a communication
21   that you typically relay back to your sellers?
22        A.  All the inquiries?
23        Q.  Yes.
24        A.  Not necessarily.  It depends on the

33

1   circumstances.
2         Q.  How do you determine what --
3         A.  I have very good judgment.
4         Q.  What is the criteria?
5         A.  I don't think I have a criteria that I
6   could describe.
7         Q.  What would differentiate a preoffer
8   communication that you would not communicate to the
9   sellers from one that you would communicate to the
10   sellers?
11        MR. CALANDRELLI:  Objection.
12        A.  It's so dependent on what the circumstances
13   are.
14        Q.  But it is fair to say that in the exercise
15   of your judgment some of the preoffer communications
16   you choose not to communicate to sellers?
17        MR. CALANDRELLI:  Objection.
18        Q.  Is that fair to say?
19        A.  I don't know what you mean by preoffer
20   communication.  If a broker asks me a question, I
21   don't think that's necessarily a preoffer
22   communication.
23        Q.  I mean communications that go between you
24   and a buyer's agent before a formal offer is

FARMER ARSENAULT BROCK LLC

Deborah Gordon - Vol. 1 - 5/1/2018

### 34

1    communicated by the buyers.
2        A. I would say I communicate most things that
3    are relevant to a forthcoming offer. If it is
4    irrelevant, I would not communicate it.
5        Q. How do you determine what's relevant and
6    irrelevant?
7        A. It's my business.
8        Q. Can you give me an example of something
9    that's irrelevant?
10       A. Which direction does the house face? I
11   don't need to communicate that to a seller.
12       Q. If a seller's agent called you and
13   communicated that the buyers intended to make an
14   offer that was below list price, which I think was
15   one of the circumstances you identified --
16       A. The seller's agent calls me?
17       Q. You have a listing and the buyer's agent
18   calls you. Let's say your listing price is $5
19   million, to pick a number. The buyer's agent calls
20   you and says: I represent buyers who are interested
21   in the property. We are thinking about
22   communicating an offer that is below this price. Is
23   that a communication that you would normally then
24   share with your sellers?

### 35

1        A. Yes, of course.
2        Q. Have you fielded calls like that where you
3    represent sellers and you've asked that the buyer's
4    agent transmit their offer in writing?
5        A. Sometimes.
6        Q. Have you been on the buyer's side of that
7    conversation where you call up the seller's agent
8    and the seller's agent requests that you transmit
9    the buyer's offer in writing?
10       A. Yes.
11       Q. When you are on the seller's side of that
12   conversation and you ask the buyers to transmit
13   their offer in writing, why do you communicate that
14   message?
15       A. Why?
16       Q. Why ask for the offer in writing?
17       A. I wouldn't ask for the offer in writing
18   unless the seller gave me a message that they should
19   but the offer in writing.
20       Q. So piecing it together: You have a
21   discussion with the buyer agent about price. You
22   talk to your sellers. The sellers say have them
23   submit the offer. You then tell the buyer's agent
24   to submit the offer in writing. Is that what you

### 36

1    are generally describing?
2        MR. CALANDRELLI: Objection.
3        A. Yes.
4        Q. I want to ask you some questions about the
5    Lyman-Cutler properties, those two properties. Did
6    you have any involvement in any negotiations for
7    someone to purchase either one of those properties?
8        A. I think I was barely involved in both,
9    because I think Jayne took the front seat in the
10   negotiations, my partner in the listing. But she
11   would have shared.
12       Q. Did you represent any buyers that expressed
13   interest in either of those two properties?
14       A. I was reminded that Alana Franklin, who was
15   a buyer of mine, had an interest in the property.
16       Q. Can you spell the first name?
17       A. A l a n a.
18       Q. Franklin?
19       A. Yes.
20       Q. She was a buyer client of yours?
21       A. Yes, who looked at the properties.
22       Q. Who was the listing agent for the
23   properties at that time?
24       A. I'm not sure, but I think it was Tatiana.

### 37

1        Q. How did you -- strike that. Did you have
2    any communications with Tatiana or anyone at her
3    firm on behalf of Ms. Franklin with respect to those
4    properties?
5        A. I can't really remember.
6        Q. Did you arrange for a showing?
7        A. Yes.
8        Q. Did you attend the showing with your
9    client?
10       A. I can't remember that. She may have gone
11   into an open house or gone in without me. I can't
12   remember showing her the property specifically.
13       Q. Did she explore both properties or just
14   one, do you recall?
15       A. She would have explored both.
16       Q. But you cannot recall if you had any
17   discussions or communications with Tatiana or anyone
18   at her firm on behalf of Ms. Franklin?
19       A. No.
20       Q. Do you recall having any telephone
21   conversations with Tatiana or anyone at her firm
22   about those properties on behalf of Ms. Franklin?
23       A. I know that I talked to Tatiana about the
24   properties, but I don't remember the specific

Deborah Gordon - Vol. 1 - 5/1/2018

11

---

**38**

1 conversations.
2 Q. Do you think you had any communication with
3 anybody else at Tatiana's firm about those
4 properties in connection with Ms. Franklin?
5 A. No, I don't remember.
6 Q. Is it your recollection that you had more
7 than one conversation with Tatiana about the
8 properties?
9 A. About her listings, yes.
10 Q. Can you tell me how many you had, how many
11 conversations?
12 A. No.
13 Q. Can you recall with any specificity the
14 topics you discussed with Tatiana?
15 A. I'm pretty sure we had a discussion that it
16 was going to be my turn to have the listing, that I
17 felt very badly about having the listing. I don't
18 remember anything specific about that.
19 Q. Did you ever transmit a written offer to
20 Ms. Franklin?
21 A. I don't think so.
22 Q. If you did, would you have records of that?
23 A. No.
24 Q. Were you successful in helping Ms. Franklin

---

**39**

1 purchase another home?
2 A. Yes.
3 Q. Where did she purchase?
4 A. She purchased a home on Fernwood Road.
5 Q. Do you remember what price she paid for the
6 home?
7 A. No.
8 Q. Did you communicate anything about the
9 price that Ms. Franklin was considering to offer for
10 the Lyman-Cutler properties to Tatiana?
11 MR. CALANDRELLI: Objection.
12 A. I don't recall.
13 Q. How did you know the Lyman-Cutler
14 properties were for sale?
15 A. Probably from MLS.
16 Q. Do you have any information -- strike that.
17 Can we agree that at the time Tatiana was working at
18 a Century 21 office?
19 A. Yes.
20 Q. Do you have any information about the
21 efforts Tatiana or Century 21 employed to market the
22 Lyman-Cutler properties?
23 A. No.
24 Q. They were in the multiple listing service?

---

**40**

1 A. Correct.
2 Q. You think that's how you found out about
3 them?
4 A. Yes.
5 Q. Do you have any information to suggest that
6 either Tatiana or Century 21 failed to diligently
7 market those two properties?
8 MR. CALANDRELLI: Objection.
9 A. No.
10 Q. It sounded like you cannot recall whether
11 you actually ever -- strike that. Do you recall
12 what the asking prices were, what the list prices
13 were for the two homes when Ms. Franklin was
14 exploring them?
15 A. I don't know exactly, but my best
16 recollection is that they were over 5 million.
17 Q. Have you ever represented any other buyers
18 that explored or investigated the Lyman-Cutler
19 properties?
20 A. I don't recall.
21 Q. Did you initiate the first communication
22 with Tatiana on behalf of -- when you were
23 representing Ms. Franklin, were you the one who
24 initiated the first --

---

**41**

1 A. I don't remember.
2 Q. Did you ever transmit a written offer on
3 behalf of any buyer for either of the Lyman-Cutler
4 properties?
5 A. I don't remember.
6 Q. I think you said Ms. Franklin viewed one or
7 both of the Lyman-Cutler properties. After her
8 view, did she express any displeasure with respect
9 to the quality of the construction?
10 A. I really don't remember. One of my
11 associates, Ronni Casty, was alive at the time, and
12 she worked with Alana also. I don't remember which
13 one of us did what for that.
14 Q. Am I correct that at a certain point in
15 time you became the listing agent for one of the
16 properties?
17 A. Correct.
18 Q. Which one?
19 A. 55 Lyman.
20 Q. How did that come about?
21 A. We were called by David Madoff.
22 Q. Tell me about that discussion.
23 A. I think we actually listed both properties
24 per David Madoff. And then I remember that there

---

FARMER ARSENAULT BROCK LLC

**86**

1    A. Apparently.

2    Q. And do you have any reason to believe,

3  sitting here today, that the information that you

4  provided to Mr. Filippov on June 2nd, 2015 was

5  incorrect or inaccurate in any way?

6    A. No.

7    Q. If you informed Mr. Filippov that

8  Ms. Franklin was willing to pay 4 and a half million

9  for the 88 Cutler house, do you have any reason

10  sitting here today to think that was untrue?

11    A. That it was untrue?

12    Q. Yes.

13    A. That she said it?

14    Q. Yes.

15    A. I believe that she said it.

16    Q. And had you informed --

17    A. That means she would have put it in writing

18  and closed? I'm not saying that.

19    Q. You do remember, if I heard your testimony

20  correctly, you do remember getting some sort of

21  counteroffer back, correct?

22    A. If I said it at the time, then it is likely

23  it happened. I'm very straightforward when it comes

24  to that.

**87**

1    Q. And you don't remember what that number

2  was?

3    A. Apparently it was $5 million.

4    Q. But sitting here today, you don't remember

5  that?

6    A. No.

7    Q. Throughout your 30-plus-year career have

8  you ever been involved in a real estate transaction

9  involving a home that had a mechanic's lien placed

10  on it?

11    A. I can't recall.

12    Q. Do you know what a mechanic's lien is?

13    A. Yes.

14    Q. As a real estate professional with over 30

15  years of experience in the real estate industry, do

16  you have any knowledge as to what effect, if any, a

17  mechanic's lien can have on the ability to sell a

18  house?

19    A. I suspect that it would not be able to be

20  sold with a mechanic's lien before it was resolved.

21    Q. Why do you say that?

22    A. Because we can't even close a house with an

23  open building permit.

24    Q. During your career have you ever received

**88**

1  any training from any of your different employers,

2  or organizations with whom you have been an

3  independent contractor for, I should say, have you

4  ever received any training with regard to the sale

5  of a house concerning, that has a mechanic's lien on

6  it?

7    A. No.

8    MR. CALANDRELLI: I don't have any

9  further questions at this time.

10    MR. HARRIS: Just one more for me.

11    EXAMINATION

12  BY MR. HARRIS:

13    Q. In connection with communicating with

14  Ms. Kagan about the Franklin $4.5 million offer, did

15  you communicate whether Ms. Franklin had any

16  contingencies attached to that offer?

17    A. I don't remember.

18    Q. Was Ms. Franklin seeking financing to allow

19  her to purchase the home at that time?

20    A. Not that I recall.

21    Q. That's it for me. Thank you very much.

22    (12:16 p.m.)

23

24

**89**

1    CERTIFICATE OF COURT REPORTER

2

3

4

5

6    I, David A. Arsenault, Registered

Professional Reporter, do certify that the

7  deposition of DEBORAH GORDON, in the matter of

Lyman-Cutler vs. Kagan, et al., on May 1, 2018, was

8  stenographically recorded by me; that the witness

provided satisfactory evidence of identification, as

9  prescribed by Executive Order 455 (03-13) issued by

the Governor of the Commonwealth of Massachusetts,

10  before being sworn by me, a Notary Public in and for

the Commonwealth of Massachusetts; that the

11  transcript produced by me is a true and accurate

record of the proceedings to the best of my ability;

12  that I am neither counsel for, related to, nor

employed by any of the parties to the above action;

13  and further that I am not a relative or employee of

any attorney or counsel employed by the parties

14  thereto, nor financially or otherwise interested in

the outcome of the action.

15

16

17

18

19    Transcript review was requested of the reporter.

20

21

22

23                                                5.10.18

24  David A. Arsenault, RPR

# EXHIBIT 20

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

*In re:*                                             )
                                                     )
LYMAN-CUTLER, LLC,                                   )
      Debtor,                                       )
                                                     )        Chapter 7
                                                     )        No. 15-13881-FJB
LYMAN-CUTLER, LLC,                                   )
                                                     )
      Plaintiff,                                    )
                                                     )        A.P. No. 16-1120
v.                                                   )
                                                     )
VADIM KAGAN, TATIANA KAGAN,                          )
KAGAN DEVELOPMENT KDC CORP.,                         )
and PROEXCAVACTION CORP.,                            )
                                                     )
      Defendants.                                   )
                                                     )

**LYMAN-CUTLER, LLC'S SUPPLEMENTAL ANSWERS
TO TATIANA KAGAN'S FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Lyman-Cutler, LLC (the "LLC") supplements its answers to Tatiana Kagan's ("Tatiana") First Set of

Interrogatories.

**SUPPLEMENTAL ANSWERS**

**Interrogatory No. 4**

     Please itemize all damages which you seek to recover from Tatiana, including in your response
any pertinent calculations and the factual basis for those damages.

**Answer No. 4**

     The LLC objects to this interrogatory as premature. Discovery is ongoing and damages are
subject to expert analysis and report, which will be produced in due course. In general terms, Tatiana is

1

liable for damages for failing to convey the offer for 88 Cutler, failing competently to market the Properties, supporting the enforcement of listing agreements she knew to be fraudulent, and for participating in the Defendants' fraudulent scheme to overbill the Project.

## Supplemental Answer No. 4

Tatiana is equally culpable along with the other Defendants for the wrongful conduct described in the LLC's supplemental response to the interrogatories propounded to it by KDC, which are incorporated by reference.  The LLC asserts that Tatiana is jointly and severally liable for all damages described in those supplemental responses.

<u>Verification</u>

I, Alex Filippov, state under the pains and penalties of perjury that I am the Managing Member of the LLC; that I am authorized to answer these interrogatories on the LLC's behalf; and that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

Alex Filippov

*As to objections:*

*/s/ Peter N. Tamposi*
Peter N. Tamposi (BBO No. 639497)
The Tamposi Law Group, P.C.
159 Main Street
Nashua, NH 03060
T: (603) 204-5513

Dated: September 27, 2018

<u>Certificate of Service</u>

I, Peter Tamposi, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on September 27, 2018.

*/s/ Peter N. Tamposi*
Peter N. Tamposi

4844-7392-9074, v. 1

3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:* | ) |
| | ) |
| LYMAN-CUTLER, LLC, | ) |
| Debtor, | ) |
| | ) |
| | ) Chapter 7 |
| LYMAN-CUTLER, LLC, | ) No. 15-13881-FJB |
| | ) |
| Plaintiff, | ) |
| | ) A.P. No. 16-1120 |
| v. | ) |
| | ) |
| VADIM KAGAN, TATIANA KAGAN, | ) |
| KAGAN DEVELOPMENT KDC CORP., | ) |
| and PROEXCAVACTION CORP., | ) |
| | ) |
| Defendants. | ) |
| | ) |

**ALEX FILIPPOV'S SUPPLEMENTAL ANSWERS TO
TATIANA KAGAN'S FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order, Alex

Filippov ("Filippov") supplements his answers to Tatiana Kagan's ("Tatiana") First Set of

Interrogatories.

**SUPPLEMENTAL ANSWERS**

**Interrogatory No. 4**

Please itemize all damages which you seek to recover from Tatiana, including in your response
any pertinent calculations and the factual basis for those damages.

**Answer No. 4**

Filippov objects to this interrogatory as premature. Discovery is ongoing and damages are
subject to expert analysis and report, which will be produced in due course. In general terms, Tatiana is

1

liable for damages for failing to convey the offer for 88 Cutler, failing competently to market the Properties, supporting the enforcement of listing agreements she knew to be fraudulent, and for participating in the Defendants' fraudulent scheme to overbill the Project.

## Supplemental Answer No. 4

Tatiana is equally culpable along with the other Defendants for the wrongful conduct described in my supplemental response to the interrogatories propounded to me by KDC, which are incorporated by reference. I assert that Tatiana is jointly and severally liable for all damages described in those supplemental responses.

<u>Verification</u>

I, Alex Filippov, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Alex Filippov

*As to objections:*

*/s/ Sean T. Carnathan*
Sean T. Carnathan, BBO No. 636889
*scarnathan@ocmlaw.net*
Joseph P. Calandrelli, BBO No. 666128
*jcalandrelli@ocmlaw.net*
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T:  (781) 359-9000

Dated:  September *27* , 2018

<u>Certificate of Service</u>

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on September *27* , 2018.

*/s/ Sean T. Carnathan*
Sean T. Carnathan

3

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| *In re:* | ) | |
| | ) | |
| LYMAN-CUTLER, LLC, | ) | |
| Debtor, | ) | |
| | ) | Chapter 7 |
| | ) | No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | A.P. No. 16-1120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, TATIANA KAGAN, | ) | |
| KAGAN DEVELOPMENT KDC CORP., | ) | |
| and PROEXCAVACTION CORP., | ) | |
| | ) | |
| Defendants. | ) | |
| | ) | |

**NICKOLAY LIPETSKER'S SUPPLEMENTAL ANSWERS TO
TATIANA KAGAN'S FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Nickolay Lipetsker ("Lipetsker") supplements his answers to Tatiana Kagan's ("Tatiana") First Set of

Interrogatories.

**SUPPLEMENTAL ANSWERS**

**Interrogatory No. 4**

Please itemize all damages which you seek to recover from Tatiana, including in your response
any pertinent calculations and the factual basis for those damages.

**Answer No. 4**

Lipetsker objects to this interrogatory as premature.  Discovery is ongoing and damages are
subject to expert analysis and report, which will be produced in due course.  In general terms, Tatiana is

1

liable for damages for failing to convey the offer for 88 Cutler, failing competently to market the Properties, supporting the enforcement of listing agreements she knew to be fraudulent, and for participating in the Defendants' fraudulent scheme to overbill the Project.

**Supplemental Answer No. 4**

Tatiana is equally culpable along with the other Defendants for the wrongful conduct described in my supplemental response to the interrogatories propounded to me by KDC, which are incorporated by reference. I assert that Tatiana is jointly and severally liable for all damages described in those supplemental responses.

<u>Verification</u>

I, Nickolay Lipetsker, state under the pains and penalties of perjury that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

*N. Lipetsker*

_____

Nickolay Lipetsker

*As to objections:*

*/s/ Sean T. Carnathan*
_____
Sean T. Carnathan, BBO No. 636889
*scarnathan@ocmlaw.net*
Joseph P. Calandrelli, BBO No. 666128
*jcalandrelli@ocmlaw.net*
**O'Connor, Carnathan and Mack LLC**
Landmark One, Suite 104
1 Van de Graaff Dr.
Burlington, Massachusetts 01803
T: (781) 359-9000

Dated: September 27, 2018

<u>Certificate of Service</u>

I, Sean T. Carnathan, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on September 27, 2018.

*/s/ Sean T. Carnathan*
_____
Sean T. Carnathan

3

# EXHIBIT 21

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.                                 SUPERIOR COURT
                                              DEPARTMENT OF THE TRIAL COURT
                                              CIVIL ACTION NO. 1581CV03977

LYMAN-CUTLER, LLC,                            )
        *Plaintiff*                           )
                                              )
                                              )
v.                                            )
                                              )
VADIM KAGAN, TATIANA KAGAN,                   )
CENTURY 21 COMMONWEALTH                       )
        *Defendants*                          )

### AFFIDAVIT OF GREG KIELY

1.      My name is Greg Kiely.   I make this Affidavit based upon my personal

knowledge and in support of Defendant Commonwealth Realty Group LLC d/b/a CENTURY 21

Commonwealth's ("Commonwealth") Opposition to Plaintiff's Motion for Preliminary

Injunction.

2.      I am currently the Manager of the Newton Office of Commonwealth, a position

that I have occupied for four years.

3.      Commonwealth has twenty offices in the Greater Boston area and in Eastern

Massachusetts.  Commonwealth is the #1 CENTURY 21 company in New England and in 2014

was ranked as the #4 real estate company in Massachusetts in dollar volume of property sold.

4.      During all relevant times Defendant Tatiana Kagan ("Ms. Kagan") is and was a

real estate agent affiliated with Commonwealth's Newton Office as an independent contractor.

5.     In the course of my career, through both my current affiliation with Commonwealth and at my prior place of employment, I have had occasion to become acquainted with Vadim Kagan ("Mr. Kagan"), who is the husband of Ms. Kagan. It is my understanding that Mr. Kagan is a builder who specializes in developing high-end luxury residences in Brookline and Newton Massachusetts.

6.     I have personal knowledge that over the past 3.5 years, Mr. Kagan executed several Agreements giving Commonwealth the sole and exclusive right to sell certain properties that he had developed and/or was developing as part of his business. In total, 14 such properties have been sold by Commonwealth. In each case, Ms. Kagan was the Designated Agent for the sale.

7.     With respect to the present dispute, on or about August 12, 2014, I met with Mr. Kagan for the purpose of executing an Agreement (the "Cutler Lane Listing Agreement") giving Commonwealth sole and exclusive right to sell the property located at 88 Cutler Lane, Brookline, Massachusetts 02467. A true and accurate copy of the Cutler Lane Listing Agreement is attached hereto as Exhibit A.

8.     At the time I executed this Agreement on behalf of Commonwealth, I understood that Mr. Kagan was building this property as part of another high-end residential real estate project.

9.     As set forth in Exhibit A, the term of the Cutler Lane Listing Agreement is from August 20, 2014 to and including March 1, 2016. As with his prior Agreements, while the Cutler Lane Listing Agreement authorizes Ms. Kagan to act as the Designated Agent for this property, the Cutler Lane Listing Agreement is between CENTURY 21 Commonwealth (as the "Broker") and Mr. Kagan (as the "Seller").

-2-

10.    Over the ensuing months, Commonwealth undertook substantial efforts to advertise market and sell this property.    These efforts continue to the present day.

11.    On or about April 24, 2015, Ms. Kagan executed an Agreement with Mr. Kagan giving Commonwealth the sole and exclusive right to sell the property located at 55 Lyman Road, Brookline, Massachusetts 02467 (the "Lyman Road Listing Agreement").    A true and accurate copy of the Lyman Road Listing Agreement is attached hereto as Exhibit B.

12.    As set forth in Exhibit B, the term of the Lyman Road Listing Agreement is from April 26, 2015 until October 27, 2015.    Again, the Lyman Road Listing Agreement authorizes Ms. Kagan to act as the Designated Agent for this property but the Agreement is between CENTURY 21 Commonwealth (as the "Broker") and Mr. Kagan (as the "Seller").

13.    On or about May 13, 2015, Ms. Kagan notified me that Mr. Kagan's partner, Alex Filippov ("Mr. Filippov") had made inquiry as to what efforts Commonwealth had made to sell the properties that were the subject of the Cutler Road Listing Agreement and the Lyman Road Listing Agreement.

14.    Thereafter I prepared a letter summarizing the substantial efforts undertaken by Commonwealth to advertise and market these properties.    A true and accurate copy of this Letter is attached hereto as Exhibit C.    In addition, the properties have had an enhanced listing presence on    Zillow.com,    Trulia.com,    Homes.com,    Commonmoves.com,    Century21.com    and c21gobal.com.

15.    In response, I received a letter from Sean Carnathan ("Mr. Carnathan"), who I understand represents Mr. Filippov.    This letter is dated May 26, 2015, and is attached to this Affidavit as Exhibit D.    The letter erroneously states that Ms. Kagan "previously held the listings" for the properties located at 55 Lyman Road and 88 Cutler Lane but that the "agreement

1633613_1

was valid through the end of 2014." In fact, and as unambiguously demonstrated by Exhibit A and Exhibit B, the Cutler Road Listing Agreement expires on March 1, 2016 and the Lyman Road Listing Agreement expires on October 27, 2015. The May 26, 2015 letter goes on to assert that the Agreement signed by Mr. Kagan in late April 2015 was "signed without authority from the Company."

16.     At no point prior to May 26, 2015 did Mr. Filippov or Nickolay Lipetsker ("Mr. Lipetsker"), notify me or to my knowledge anyone else associated with Commonwealth that they were claiming that Mr. Kagan did not have the authority to execute either the Culter Road Listing Agreement or the Lyman Road Listing Agreement. Indeed, based upon my past course of dealing with Mr. Kagan and the lack of any notice from any individual associated with Lyman-Cutler, LLC, I reasonably understood that he was authorized to execute both Agreements.

17.     In a subsequent conversation with Mr. Filippov's counsel, I was told that it was Mr. Filippov's opinion that Commonwealth was "not doing anything" to sell these properties. In point of fact, Commonwealth has engaged in more vigorous efforts to market these properties than any other property that has been listed with Commonwealth during the time that I have been associated with the company.

18.     On or about June 1, 2015, I received a letter from counsel representing Mr. Kagan. A true and accurate copy of this letter is attached hereto as Exhibit E. That letter noted that "Mr. Kagan does not agree with Mr. Carnathan's allegation and believes that the agreements are binding obligations of the Company."

19.     Commonwealth entered into both the Cutler Road Listing Agreement and the Lyman Road Listing Agreement in good faith. Commonwealth has and continues to fully

perform all of its obligations under both contracts.    Mr. Kagan indicated that he believes that

the agreements constitute binding contracts, which would bind both the broker and the seller.

Therefore, Commonwealth's position is that it must continue to honor its obligations under both

Agreements and actively advertise and market these properties unless a Court determines that

Mr. Kagan had no actual or apparent authority to execute these Agreements.

Subscribed under the pains and penalties of perjury this 10 th day of June 2015 at Newton,

Massachusetts.

Greg Kiely

CERTIFICATE OF SERVICE

I, Amy McCallen certify that on this 10th of June, 2015, I have served a copy of the foregoing document upon the following counsel by email and on June 11, 2015, I served a copy of this document by first class mail:

| | |
|---|---|
| Sean T. Carnathan, Esq.<br>O'Connor Carnathan and Mack LLC<br>1 Van De Graaff Drive, Suite 104<br>Burlington, MA 01803<br>scarnathan@ocmlaw.net | John H. Perten, Esq.<br>Sheehan Phinney Bass & Green, P.A.<br>225 State Street, Fifth Floor<br>Boston, MA 02109<br>jperten@sheehan.com |

Amy M. McCallen

1633613_1

# EXHIBIT *A*

GREATER BOSTON REAL ESTATE BOARD

# AGREEMENT FOR EXCLUSIVE RIGHT TO SELL
## with Consent to Designated Agency

Date: August 12, 2014

THIS AGREEMENT concerns the following property:

Street Address: 88 Cutler Lane, Brookline, MA 02467

Description: A 6 bedroom single family house at the above address

Tax Id: _____ Book: _____ Page: _____ (if Registered) Cert. Num.: _____

County: Norfolk _____ LISTING PRICE: $ 5,499,000.00

In consideration of the mutual covenants and agreements herein contained, the undersigned Seller hereby gives to the undersigned Broker the sole and exclusive right to sell the said property for the price and on the terms and conditions herein set forth.

1. The Broker agrees to use reasonable efforts to procure a ready, willing, and able Buyer of the property in accordance with the price, terms, and conditions of this Agreement.

2. The Broker is granted the sole authority to: (Check if applicable)
   - ☒ Advertise the property;
   - ☒ Post "For Sale" signs on the property;
   - ☒ Offer compensation to Buyer Agents in the following amount: 2.5% net sale price and/or
     Note: Regardless of how compensated, buyer agents represent the interest of buyers, not sellers.
   - ☐ ~~Cooperate and compensate Subagents in the following amount:~~ _____
     ~~Note: Subagents represent the interest of sellers, however, as agents of the seller, the seller may be held vicariously liable for the acts of the Subagents.~~
     ~~Vicarious liability is the potential for a seller to be held liable for a misrepresentation or an act or omission of the subagent, and in checking the box above and initialing below, the seller authorizes the Broker to offer subagency to brokers and salespersons affiliated with other firms.~~ ~~Initials:~~ _____
   - ☒ Cooperate and compensate non-agent Facilitators in the following amount: 1%

3. The Seller agrees:
   a. To refer all inquiries and offers for the purchase of said property to the Broker;
   b. To cooperate with the Broker in every reasonable way;
   c. To pay the Broker a fee for professional services of 5% of the net sale price _____ if:
      1. A Buyer is procured ready, willing, and able to buy said property, or any part thereof, in accordance with the price, terms and conditions of this Agreement, or such other price, terms and conditions as shall be acceptable to the Seller, whether or not the transaction proceeds; or
      2. The said property, or any part thereof, is sold through the efforts of anyone including the Seller; or
      3. The said property, or any part thereof, is sold within 90 days after the term of this Agreement to anyone who was introduced to the said property through the efforts of the Broker or his agents prior to the expiration of said term. However, no fee will be payable under this clause if the said property is sold after said term with the participation of a licensed broker to whom the Seller is obligated to pay a fee under the terms of a subsequent written exclusive listing agreement.

**Once an offer has been accepted in writing and a transaction is pending, the Broker shall have no obligation to market the property or present further offers to the Seller unless otherwise agreed in writing.**

© 2008 GREATER BOSTON REAL ESTATE BOARD All rights reserved.
This form may not be copied or reproduced in whole or in part in any manner whatsoever without the prior express written consent of the Greater Boston Real Estate Board.
Form ID: RA210 PD: 05/08



Form generated by: TrueForms™   www.TrueForms.com   800-499-9612

4. The Seller understands and agrees that the property will be marketed in compliance with all applicable fair housing laws.

5. The period of this Agreement shall be from _August 20, 2014_, to and including _March 1, 2016_. Time is of the essence hereof.

6. In order to introduce other brokers to the property and solicit their assistance in procuring a buyer, the Broker may arrange to have this listing distributed through any multiple listing service ("MLS") to which the Broker has access. Any data regarding the property submitted by the Broker to an MLS shall be verified by the Seller. Such data, together with any other information provided to or obtained by the Broker with respect to the property, may be disclosed to prospective buyers and other brokers and may be included in all listings, comparable books and other materials distributed by the MLS either before or after the term of this listing or the sale of the property. The Seller expressly authorizes the Broker to advertise the property in the MLS and offer compensation to other firms as detailed in Paragraph 2.

7. _____ By initialing, the Broker is further authorized to place a lock box on the property in order to facilitate entry by cooperating brokers and others authorized to examine the property.

8. The Seller hereby acknowledges receipt of the Massachusetts Mandatory Consumer Licensee Disclosure Form. The Broker has explained the firm's policy regarding agency relationships. The Seller, in signing this Agreement **CONSENTS TO DESIGNATED AGENCY.** A designated agent is a licensee, broker or salesperson, who has been appointed by a Broker to represent the seller or the buyer. The agent has explained and the Seller is advised that (a) the Designated Seller's Agent(s), identified below, will represent the Seller and will owe the Seller the duties of loyalty, full disclosure, confidentiality, to account for funds, reasonable care and obedience to lawful instruction; (b) all other licensees affiliated with the appointing Broker will not represent the Seller nor will they have the other duties specified herein to you as Seller and may be appointed to represent a potential purchaser of the Property; and (c) if the designated agents affiliated with the same Broker represent the Seller and purchaser in a transaction, the appointing Broker shall be a dual agent and neutral as to any conflicting interests of the seller and the purchaser, but will continue to owe the seller and the purchaser the duties of confidentiality of material information and to account for funds, while the Designated Seller's Agent and the Designated Buyer' Agent will individually advocate for their respective client. In the event another agent affiliated with the Broker is a designated agent for the buyer, the Seller shall receive written notice.

**ACKNOWLEDGMENT**

I acknowledge and agree that _Tatiana Kagan_   Lic #: _9055972 S_ *[insert name and license # of licensee(s)]* is authorized to represent me as a Designated Agent(s). I hereby consent to Designated Agency.

9. Offer Disclosure: Seller hereby authorizes the Broker named herein as follow:

_____ The Broker may not disclose the existence of any Offer(s) to Purchase received by the Seller nor the terms of any Offer received; price, contingencies, dates for performance, etc., to any potential buyer(s) or real estate licensee(s) and shall treat all such information as confidential.

____VK_____ The Broker may disclose the existence of any Offer(s) to Purchase received by the Seller to any potential buyer(s) and/or real estate licensee(s), and whether any such Offer was procured by the listing Broker or that of another licensed broker but shall not disclose the terms of any Offer received; price, contingencies, dates for performance, etc, and shall treat such terms as confidential.

_____ The Broker may disclose the existence of any Offer(s) to Purchase received by the Seller to any potential buyer(s) and/or real estate licensee(s), whether such Offer was procured by the listing Broker or that of another licensed broker and may further disclose the terms of any Offer: price, contingencies, dates for performance, etc, to any potential buyer(s) or real estate licensee(s).

Additional terms and conditions:

IN WITNESS WHEREOF, the Seller and the Broker have hereunto set their hands and seals as of the ___12th___ day
of ___August___, 20_14_.

Broker: _Century 21 Commonwealth_          Seller: _____

By: _____          Seller (or spouse): _X_____
       _Gregory Kiely_

Its: _Sales Manager, Newton Office_
       Title (duly-authorized)

When entering into a listing agreement, REALTORS® must advise potential clients of:

1.   The REALTOR®'s company policies regarding cooperation and the amount(s) of compensation that will be offered to cooperating agents;

2.   The fact that buyer agents or brokers, even if compensated by the listing broker, will represent the interests of the buyer; and

3.   Any potential for the listing brokers to act as disclosed dual agents.

EXHIBIT B

# GREATER BOSTON REAL ESTATE BOARD

## AGREEMENT FOR EXCLUSIVE AGENCY
## with Consent to Designated Agency

Date: __April 24, 2015__

THIS AGREEMENT concerns the following property:

Street Address: **55 Lyman rd,, Brookline, MA   02467**

Description: **Single family house**

Tax Id._____ Book:_____ Page:_____ (if Registered) Cert. Num.:_____

County:_____ LISTING PRICE: $ **5,499,000.00**

In consideration of the mutual covenants and agreements herein contained, the undersigned Seller hereby gives to the undersigned Broker the sole and exclusive agency to sell the said property for the price and on the terms and conditions herein set forth.

1. The Broker agrees to use reasonable efforts to procure a ready, willing, and able Buyer of the property in accordance with the price, terms, and conditions of this Agreement.

2. The Broker is granted the sole authority to: (Check if applicable)
   - ☒ Advertise the property;
   - ☒ Post "For Sale" signs on the property;
   - ☐ Offer compensation to buyer agents in the following amount: **2.5%**_____ and/or
     **Note:** Regardless of how compensated, buyer agents represent the interest of buyers, not sellers.
   - ☐ Cooperate and compensate Subagents in the following amount: _____ May 19, 2015
     **Note:** Subagents represent the interest of sellers, however, as agents of the seller, the seller may be held vicariously liable for the acts of the Subagents.
     Vicarious liability is the potential for a seller to be held liable for a misrepresentation or an act or omission of the subagent, and in checking the box above and initialing below, the seller authorizes the Broker to offer subagency to brokers and salespersons affiliated with other firms. Initials:_____ _____
   - ☐ Cooperate and compensate non-agent Facilitators in the following amount:**1%**

3. The Seller agrees:
   a. To refer all inquiries and offers made by or through any real estate agent for the purchase of said property to the Broker;
   b. To cooperate with the Broker in every reasonable way;
   c. To pay the Broker a fee for professional services of **5%**_____ if:
      1. A Buyer is procured ready, willing, and able to buy said property, or any part thereof, in accordance with the price, terms and conditions of this Agreement, or such other price, terms and conditions as shall be acceptable to the Seller, whether or not the transaction proceeds; or
      2. The said property, or any part thereof, is sold through the efforts or with the assistance or participation (directly or indirectly) of the Broker or any other real estate agent; or
      3. The said property, or any part thereof, is sold within __90__ days after the term of this Agreement to anyone who was introduced to the said property through the efforts of the Broker or his agents prior to the expiration of said term. However, no fee will be payable under this clause if the said property is sold after said term with the participation of a licensed broker to whom the Seller is obligated to pay a fee under the terms of a subsequent written exclusive listing agreement.

It is specifically understood and agreed that no fee will be payable by the Seller under this Agreement in any case where no real estate agent has directly or indirectly furnished information about the property to the Buyer or otherwise assisted or participated in the sale in any way.

**Once an offer has been accepted in writing and a transaction is pending, the Broker shall have no obligation to market the property or present further offers to the Seller unless otherwise agreed in writing.**

© 2008 GREATER BOSTON REAL ESTATE BOARD All rights reserved.
This form may not be copied or reproduced in whole or in part in any manner whatsoever without the prior express written consent of the Greater Boston Real Estate Board.
Form ID: RA250  PD: 05/08
Century 21 Commonwealth, 64 Needham Street Newton, MA 02461
Phone: (617)969-2121        Fax:                      Tatiana Kagan                                                      Untitled



EQUAL HOUSING OPPORTUNITY

4. The Seller understands and agrees that the property will be marketed in compliance with all applicable fair housing laws.

5. The period of this Agreement shall be from _____ **April 26** _____ , **2015** , to and including __**October 27**__ , **2015** . Time is of the essence hereof.

6. In order to introduce other brokers to the property and solicit their assistance in procuring a buyer, the Broker may arrange to have this listing distributed through any multiple listing service ("MLS") to which the Broker has access. Any data regarding the property submitted by the Broker to an MLS shall be verified by the Seller. Such data, together with any other information provided to or obtained by the Broker with respect to the property, may be disclosed to prospective buyers and other brokers and may be included in all listings, comparable books and other materials distributed by the MLS either before or after the term of this listing or the sale of the property. The Seller expressly authorizes the Broker to advertise the property in the MLS and offer compensation to other firms as detailed in Paragraph 2.

7. _____ By initaling, the Broker is further authorized to place a lock box on the property in order to facilitate entry by cooperating brokers and others authorized to examine the property (check if applicable).

8. The Seller hereby acknowledges receipt of the Massachusetts Mandatory Consumer Licensee Disclosure Form. The Broker has explained the firm's policy regarding agency relationships. The Seller, in signing this Agreement **CONSENTS TO DESIGNATED AGENCY.** A designated agent is licensee, broker or salesperson, who has been appointed by a Broker to represent the seller or the buyer. The agent has explained and the Seller is advised that (a) the Designated Seller's Agent(s), identified below, will represent the Seller and will owe the Seller the duties of loyalty, full disclosure, confidentiality, to account for funds, reasonable care and obedience to lawful instruction; (b) all other licensees affiliated with the appointing Broker will not represent the Seller nor will they have the other duties specified herein to you as Seller and may be appointed to represent a potential purchaser of the Property; and (c) if the designated agents affiliated with the same Broker represent the Seller and purchaser in a transaction, the appointing Broker shall be a dual agent and neutral as to any conflicting interests of the seller and the purchaser, but will continue to owe the seller and the purchaser the duties of confidentiality of material information and to account for funds while the Designated Seller's Agent and the Designated Buyer's Agent will individually advocate for their respective client. In the event another agent affiliated with the Broker is a designated agent for the buyer, the Seller shall receive written notice. In the event Dual Agency occurs, the designated agent will seek consent from the buyer and the seller.

**ACKNOWLEDGMENT**

I acknowledge and agree that _____ **Tatiana Kagan 9055972** _____ *[insert name and license # of licensee(s)]* is authorized to represent me as a Designated Agent(s). I hereby consent to Designated Agency.

9. Offer Disclosure: Seller hereby authorizes the Broker named herein as follows:

_____ The Broker may not disclose the existence of any Offer(s) to Purchase received by the Seller nor the terms of any Offer received; price, contingencies, dates for performance, etc., to any potential buyer(s) or real estate licensee(s) and shall treat all such information as confidential.

____VK_____ The Broker may disclose the existence of any Offer(s) to Purchase received by the Seller to any potential buyer(s) and/or real estate licensee(s), and whether any such Offer was procured by the listing Broker or that of another licensed broker but shall not disclose the terms of any Offer received; price, contingencies, dates for performance, etc, and shall treat such terms as confidential,

_____ The Broker may disclose the existence of any Offer(s) to Purchase received by the Seller to any potential buyer(s) and/or real estate licensee(s), whether such Offer was procured by the listing Broker or that of another licensed broker and may further disclose the terms of any Offer: price, contingencies, dates for performance, etc, to any potential buyer(s) or real estate licensee(s).

Additional terms and conditions:

_____

IN WITNESS WHEREOF, the Seller and the Broker have hereunto set their hands and seals as of the ____**24th**____ day of _____**April**_____, **2015**____

Broker: _____     Seller: _____
        C 21 Commonwealth

By: _____     Seller (or spouse): _____
    Tatiana Kagan

Its: **agent**_____
      Title (duly-authorized)

Under the Code of Ethics and Standards of Practice of the National Association of REALTORS®, any REALTOR® entering into a listing contract must advise the SELLER of:

1. The REALTOR®'s company policies regarding cooperation with, and the amount of any compensation that will be offered to, subagents, Buyer Agents and/or facilitators acting in a legally recognized non-agency capacity;

2. The fact that Buyer Agents, even if compensated by the Listing Broker or by the SELLER, will represent the interests of BUYERS; and

3. Any potential for the Listing Broker to act as a disclosed Dual Agent on behalf of the SELLER as well as the BUYER.

EXHIBIT C

May 14, 2015

To whom it may concern,

CENTURY 21 Commonwealth has been working diligently advertising various properties for Tatiana Kagan. Here is a timeline of work completed for 88 Cutler Lane, Brookline and 55 Lyman Road, Brookline:

### 88 Cutler Lane, Brookline

- Listed on MLS 8/20/2014
- MLS listing feeds to CENTURY 21 Commonwealth site, Zillow, Realtor.com,
- Featured in Wellesley Weston Magazine Winter 2014/2015
- Featured in At Home with CENTURY 21 magazine Jan/Feb 2015
- Featured in Boston Magazine March 2015
- Submitted to SkyAds in April 2015 for June publication

### 55 Lyman Road, Brookline

- Listed on MLS 4/30/2015
- MLS listing feeds to CENTRUY 21 Commonwealth site, Zillow, Realtor.com,
- Submitted to SkyAds in April 2015 for June publication

We are committed to assisting our agents in advertising and marketing their listings.

Sincerely,

Greg Kiely
Sales Manager Newton

# EXHIBIT D



**O'Connor
Carnathan
and Mack** LLC

Landmark One
1 Van De Graaff Drive
Suite 104
Burlington, MA 01803

Tel: 781.359.9000
Fax: 781.359.9001

www.ocmlaw.net

Sean T. Carnathan
Direct Line: 781.359.9002
scarnathan@ocmlaw.net

May 26, 2015

*Via Hand Delivery*

Greg Kiely
Century 21
60-64 Needham Street
Newton, MA 02461

Re:   **Lyman-Cutler, LLC**

Dear Mr. Kiely:

This Firm represents Alex Filippov in his capacity as Managing Member of the Lyman Cutler, LLC ("Company").

We have been informed that an agent with your office, Tatiana Kagan, purports to hold an exclusive agency agreement with regard to two properties owned by the Company — 55 Lyman Road, Brookline, Massachusetts 02467 and 88 Cutler Lane, Chestnut Hill, Massachusetts, 02467. Ms. Kagan previously held the listings for these properties, which agreement was valid through the end of 2014.

More recently, however, the Company refused to agree to continue the listing with Ms. Kagan and it appears that she and her husband, Vadim Kagan, purported to enter into a new agreement in late April 2015, which agreement was signed without authority from the Company as Ms. Kagan well knew and knows given that it was signed by her husband.

We have reason to believe you may be unaware of Ms. Kagan's actions. Currently, she is blocking the Company from retaining the brokers with whom it plans to list the properties. It is urgent that I discuss the situation with you immediately in order to avoid litigation.

Very truly yours,

Sean T. Carnathan

cc:   Mr. Alex Filippov
        Mr. Nickolay Lipetsker

EXHIBIT E

SHEEHAN
PHINNEY
BASS +
GREEN

PROFESSIONAL
ASSOCIATION



ATTORNEYS AT LAW

BOSTON
255 STATE STREET
BOSTON, MA
02109
T 617 897-5600
F 617 439-9363

MANCHESTER
1000 ELM STREET
MANCHESTER, NH
03101
T 603 668-0300
F 603 627-8121

CONCORD
TWO EAGLE SQUARE
CONCORD, NH
03301
T 603 223-2020
F 603 224-8899

HANOVER
17 ½ LEBANON STREET
HANOVER, NH
03755
T 603 643-9070
F 603 643-3679

WWW.SHEEHAN.COM

Alexander H. Pyle
617-897-5642
apyle@sheehan.com

June 1, 2015

**VIA ELECTONIC MAIL AND U.S. MAIL**

Mr. Greg Kiely, Realtor
Manager – Newton Office
Century 21 Commonwealth
64 Needham Street
Newton, MA  02461

> Re:   **Lyman-Cutler, LLC**

Dear Mr. Kiely:

This firm represents Vadim Kagan.  As you know, Mr. Kagan is a member of the Lyman-Cutler, LLC (the "Company") and signed certain listing agreements with Century 21 for the sale of Company properties located at 55 Lyman Road, Brookline, MA and 88 Cutler Lane, Brookline, MA.

We have been copied on various e-mails between yourself and Attorney Sean Carnathan in which Mr. Carnathan demands that you void the listing agreements because of his unilateral determination that Mr. Kagan was not authorized to sign them on behalf of the Company.  Mr. Kagan does <u>not</u> agree with Mr. Carnathan's allegation and believes the agreements are binding obligations of the Company.  Mr. Kagan has a long history with Century 21, and he is sorry that you are being dragged into a Company dispute.

We trust that Mr. Carnathan and his client will recognize that allowing Century 21 to do what it does best, sell properties, will benefit all parties involved.  By copy of this letter, we are also asking Mr. Carnathan to stop the unnecessary threats and incurring of legal fees by all parties.

Thank you.

Sincerely,

Alexander H. Pyle

cc:   Mr. Vadim Kagan
       John H. Perten, Esq.
       Sean Carnathan, Esq. (via e-mail and regular mail)

{S0573776.1}

# EXHIBIT 22

**Subject:** Fwd: agreement for exclusive right to sell
**From:** Vadim Kagan <kagandevelopment@gmail.com>
**Date:** 4/25/2015 9:53 AM
**To:** Filipov Alex <alex@ldpost.com>, Filipov Alex <lymancutlerllc@gmail.com>



Vadim Kagan
Kagan Development Corp.
239 Nahanton St,
Newton, MA 02459
Main: 1(617) 610-1276
Cell:   1(617) 828-2903
Fax:   1(617) 663-6500
Email: kagandevelopment@gmail.com
Web: www.kagandevelopment.com

Begin forwarded message:

**From:** do-not-reply-zipformplus@mail.ziplogix.com
**Date:** April 24, 2015 at 6:57:13 PM EDT
**To:** kagandevelopment@gmail.com, alex@ldpost.com
**Subject:** agreement for exclusive right to sell
**Reply-To:** tatiana_kagan@yahoo.com

—photo.jpg



Sent From Tatiana Kagan
Untitled

—zipFormPlus.jpg

zipForm Plus

Tatiana Kagan has sent you a document(s) from zipForm® Plus

—propPhoto.jpg



18070 15 Mile Road, Fraser, MI 48026
Copyright 2015, zipLogix. All Rights Reserved

—zipFormPlus.jpg

zipForm Plus

photo.jpg



propPhoto.jpg



Attachments:

| | |
|---|---|
| photo.jpg | 1.6 KB |
| zipFormPlus.jpg | 4.4 KB |
| propPhoto.jpg | 699 bytes |
| Agr_for_Excl_Agency_with_Consent_to_Design_Agency_-_508_ts39157.pdf | 45.9 KB |
| zipFormPlus.jpg | 4.4 KB |
| photo.jpg | 1.6 KB |
| propPhoto.jpg | 699 bytes |

# GREATER BOSTON REAL ESTATE BOARD

## AGREEMENT FOR EXCLUSIVE AGENCY
## with Consent to Designated Agency

Date: _____

THIS AGREEMENT concerns the following property:

Street Address: 55 Lyman rd., Brookline, MA  02467

Description: Single family house

Tax Id. _____ Book: _____ Page: _____ (if Registered) Cert. Num.: _____

County: _____ LISTING PRICE: $ 5,499,000.00

In consideration of the mutual covenants and agreements herein contained, the undersigned Seller hereby gives to the undersigned Broker the sole and exclusive agency to sell the said property for the price and on the terms and conditions herein set forth.

1. The Broker agrees to use reasonable efforts to procure a ready, willing, and able Buyer of the property in accordance with the price, terms, and conditions of this Agreement.

2. The Broker is granted the sole authority to: (Check if applicable)
   - ☒ Advertise the property;
   - ☒ Post "For Sale" signs on the property;
   - ☐ Offer compensation to buyer agents in the following amount: 2.5% _____ and/or
     Note: Regardless of how compensated, buyer agents represent the interest of buyers, not sellers.
   - ☐ Cooperate and compensate Subagents in the following amount: _____ ;
     Note: Subagents represent the interest of sellers, however, as agents of the seller, the seller may be held vicariously liable for the acts of the Subagents.
     Vicarious liability is the potential for a seller to be held liable for a misrepresentation or an act or omission of the subagent, and in checking the box above and initialing below, the seller authorizes the Broker to offer subagency to brokers and salespersons affiliated with other firms. Initials: _____
   - ☐ Cooperate and compensate non-agent Facilitators in the following amount: 1%

3. The Seller agrees:
   a. To refer all inquiries and offers made by or through any real estate agent for the purchase of said property to the Broker;
   b. To cooperate with the Broker in every reasonable way;
   c. To pay the Broker a fee for professional services of 5% _____ if:
      1. A Buyer is procured ready, willing, and able to buy said property, or any part thereof, in accordance with the price, terms and conditions of this Agreement, or such other price, terms and conditions as shall be acceptable to the Seller, whether or not the transaction proceeds; or
      2. The said property, or any part thereof, is sold through the efforts or with the assistance or participation (directly or indirectly) of the Broker or any other real estate agent; or
      3. The said property, or any part thereof, is sold within __90__ days after the term of this Agreement to anyone who was introduced to the said property through the efforts of the Broker or his agents prior to the expiration of said term. However, no fee will be payable under this clause if the said property is sold after said term with the participation of a licensed broker to whom the Seller is obligated to pay a fee under the terms of a subsequent written exclusive listing agreement.

It is specifically understood and agreed that no fee will be payable by the Seller under this Agreement in any case where no real estate agent has directly or indirectly furnished information about the property to the Buyer or otherwise assisted or participated in the sale in any way.

Once an offer has been accepted in writing and a transaction is pending, the Broker shall have no obligation to market the property or present further offers to the Seller unless otherwise agreed in writing.

© 2008 GREATER BOSTON REAL ESTATE BOARD All rights reserved.
This form may not be copied or reproduced in whole or in part in any manner whatsoever
without the prior express written consent of the Greater Boston Real Estate Board.
Form ID: RA250  PD: 05/08.



4. The Seller understands and agrees that the property will be marketed in compliance with all applicable fair housing laws.

5. The period of this Agreement shall be from _____ April 26 _____, 2015 ____, to and including ____ October 27 ____, 2015 __. Time is of the essence hereof.

6. In order to introduce other brokers to the property and solicit their assistance in procuring a buyer, the Broker may arrange to have this listing distributed through any multiple listing service ("MLS") to which the Broker has access. Any data regarding the property submitted by the Broker to an MLS shall be verified by the Seller. Such data, together with any other information provided to or obtained by the Broker with respect to the property, may be disclosed to prospective buyers and other brokers and may be included in all listings, comparable books and other materials distributed by the MLS either before or after the term of this listing or the sale of the property. The Seller expressly authorizes the Broker to advertise the property in the MLS and offer compensation to other firms as detailed in Paragraph 2.

7. _____ By initialing, the Broker is further authorized to place a lock box on the property in order to facilitate entry by cooperating brokers and others authorized to examine the property (check if applicable).

8. The Seller hereby acknowledges receipt of the Massachusetts Mandatory Consumer Licensee Disclosure Form. The Broker has explained the firm's policy regarding agency relationships. The Seller, in signing this Agreement CONSENTS TO DESIGNATED AGENCY. A designated agent is licensee, broker or salesperson, who has been appointed by a Broker to represent the seller or the buyer. The agent has explained and the Seller is advised that (a) the Designated Seller's Agent(s), identified below, will represent the Seller and will owe the Seller the duties of loyalty, full disclosure, confidentiality, to account for funds, reasonable care and obedience to lawful instruction; (b) all other licensees affiliated with the appointing Broker will not represent the Seller nor will they have the other duties specified herein to you as Seller and may be appointed to represent a potential purchaser of the Property; and (c) if the designated agents affiliated with the same Broker represent the Seller and purchaser in a transaction, the appointing Broker shall be a dual agent and neutral as to any conflicting interests of the seller and the purchaser, but will continue to owe the seller and the purchaser the duties of confidentiality of material information and to account for funds while the Designated Seller's Agent and the Designated Buyer's Agent will individually advocate for their respective client. In the event another agent affiliated with the Broker is a designated agent for the buyer, the Seller shall receive written notice. In the event Dual Agency occurs, the designated agent will seek consent from the buyer and the seller.

### ACKNOWLEDGMENT

I acknowledge and agree that _____ Tatiana Kagan 9055972 _____ [insert name and license # of licensee(s)] is authorized to represent me as a Designated Agent(s). I hereby consent to Designated Agency.

9. Offer Disclosure: Seller hereby authorizes the Broker named herein as follows:

_____ The Broker may not disclose the existence of any Offer(s) to Purchase received by the Seller nor the terms of any Offer received; price, contingencies, dates for performance, etc., to any potential buyer(s) or real estate licensee(s) and shall treat all such information as confidential.

_____ The Broker may disclose the existence of any Offer(s) to Purchase received by the Seller to any potential buyer(s) and/or real estate licensee(s), and whether any such Offer was procured by the listing Broker or that of another licensed broker but shall not disclose the terms of any Offer received; price, contingencies, dates for performance, etc. and shall treat such terms as confidential.

_____ The Broker may disclose the existence of any Offer(s) to Purchase received by the Seller to any potential buyer(s) and/or real estate licensee(s), whether such Offer was procured by the listing Broker or that of another licensed broker and may further disclose the terms of any Offer: price, contingencies, dates for performance, etc, to any potential buyer(s) or real estate licensee(s).

Additional terms and conditions:

IN WITNESS WHEREOF, the Seller and the Broker have hereunto set their hands and seals as of the ____24th____ day of _____April_____, 2015____

Broker: _____          Seller: _____
    C 21 Commonwealth

By: _____          Seller (or spouse): _____
    Tatiana Kagan

Its: agent
    Title (duly-authorized)

Under the Code of Ethics and Standards of Practice of the National Association of REALTORS®, any REALTOR® entering into a listing contract must advise the SELLER of:

1. The REALTOR®'s company policies regarding cooperation with, and the amount of any compensation that will be offered to, subagents, Buyer Agents and/or facilitators acting in a legally recognized non-agency capacity;

2. The fact that Buyer Agents, even if compensated by the Listing Broker or by the SELLER, will represent the interests of BUYERS; and

3. Any potential for the Listing Broker to act as a disclosed Dual Agent on behalf of the SELLER as well as the BUYER.