UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>LYMAN-CUTLER, LLC,<br><br>Debtor. | Chapter 7<br>No. 15-13881-FJB |
| LYMAN-CUTLER, LLC,<br>ALEX FILIPPOV and<br>NICKOLAY LIPETSKER,<br><br>Plaintiffs,<br>Defendants in Counterclaim,<br><br>v.<br><br>VADIM KAGAN, TATIANA KAGAN,<br>KAGAN DEVELOPMENT KDC, CORP.<br>and PROEXCAVATION CORP.<br><br>Defendants,<br>Plaintiffs in Counterclaim. | Adv. Proc. No. 16-01120 |

**DEFENDANTS' MEMORANDUM OF LAW SUPPORTING THEIR
MOTION IN LIMINE TO PRECLUDE OPINIONS OF MICHAEL GOLDMAN**

Defendants Vadim Kagan ("Kagan"), Tatiana Kagan, Kagan Development KDC, Corp. ("KDC") and ProExcavation ("ProExcavation") submit this Memorandum of Law Supporting their Motion in Limine to Preclude Opinions of Michael Goldman. In support of their Motion, Defendants state as follows:

# I.
# Introduction

Plaintiffs have alleged that Defendants engaged in fraud, breached fiduciary duties and breached contracts through a scheme of fraudulent billing. They relied upon bold claims of fraud to expand the scope of discovery and scour the earth for evidence of fraud. When asked to identify and describe the fraud they alleged, Plaintiffs consistently deferred to their forthcoming expert report. Plaintiffs engaged Michael Goldman, who, among other things, is a "Certified Fraud Examiner," and he provided a written report. His report is remarkable for two reasons: (1) he was hired by Plaintiffs for the express purpose of opining as to the credibility and veracity of Defendants' documents; and (2) he goes out of his way *not* to opine that Defendants engaged in fraud, even though his clients, Plaintiffs, have perpetuated this litigation on that allegation. A copy of Mr. Goldman's report is attached hereto as Exhibit A. For the reasons stated below, his opinions are inadmissible because experts do not usurp the role of the fact finder to determine credibility and his opinion that "maybe" there was fraud is not helpful to the trier of fact. Defendants therefore ask that Mr. Goldman's opinions be excluded.

# II.
# Mr. Goldman's Opinions

**A. Mr. Goldman was hired specifically to determine the credibility of documents**

Mr. Goldman states that Plaintiffs hired him for the purpose of determining the credibility of documents. He writes, "I have been retained in this matter to assist with the review of documents provided by Vadim Kagan and other evidence obtained in this matter and *opine on the veracity* of the accounting information and documentary support provided by the Defendants with regard to the mechanic's lien." Exhibit A, ¶ 21 (emphasis added). The substance of Mr. Goldman's report bears out that he attempted to fulfill that charge. He summarizes his findings

2

as follows: "Based on the specific observations made below, my opinion and conclusion is that the claims made by the Defendant for the mechanic's lien claim are not ***reliable*** or ***credible***." Exhibit A, summary above ¶ 35 (emphasis added). He states, "The accounting processes used by the Defendant had material control weaknesses and cannot be ***relied upon*** to provide accurate information." Exhibit A, ¶ 37 (emphasis added).

He applies this finding, a lack of credibility, to the entire universe of information produced by Defendants. He writes, "Based on the deposition testimony of Mr. Kagan and his current and former employees, on my review of the accounting records and documents purporting to support the mechanic's lien claim, and on my extensive experience reviewing the books, records, and claims of many companies over the years, my conclusion is that the accounting processes employed by Mr. Kagan are severely deficient and that the attempts to recreate data that was never properly captured the first time are ***not at all convincing***. Exhibit A, ¶ 39 (emphasis added). He is critical of the manner in which Defendants keep their records, and offers opinions that the record-keeping is substandard. For example, Mr. Goldman is critical that some checks or invoices "were written out of sequence" which, according to Mr. Goldman, should not happen in a "properly managed" business. He is "not aware of any legitimate reason why invoice numbers would ever be used out of sequence." Exhibit A, ¶ 27. Mr. Goldman concludes there is a "consistent lack of either competence or integrity." Exhibit A, ¶ 47.

He similarly is critical of non-parties to this action, suppliers and subcontractors on the project, when he writes "The detail provided for support for some of the charges for some of the vendors has serious ***credibility*** problems." Exhibit A, ¶ 36 (emphasis added). Although Mr. Goldman concludes that scores of invoices reflecting the work of third parties have been fabricated, there is nothing in the report to suggest that Mr. Goldman actually spoke to any of

these subcontractors to confirm or disconfirm his suspicions. In other words, one would reasonably expect the suppliers and subcontractors to be in a position to disavow any fabricated invoice, but neither Mr. Goldman nor Plaintiffs present such evidence. Mr. Goldman somehow speculates that Eastcoast Pipelines would *never* send an invoice of that format to a customer, but there is no evidence he ever communicated with that company. Exhibit A, ¶ 73. Rather than actually generate evidence on this point, Plaintiffs appear content to rely on Mr. Goldman's gut feelings.

Mr. Goldman refrains from alleging that any of the subcontractors and suppliers fabricated invoices. He carefully concludes that some invoices from third parties are "possibly fabricated", "appear to be a fabrication", or the circumstances "often indicate fabrication." Exhibit A, ¶ 61.c, d, and e. He concludes for another subcontractor that the invoices "*may not* be authentic and the costs on the investor-financed properties *may* be inflated." Exhibit A, ¶ 71.f (emphasis added). Mr. Goldman therefore took on the task normally filed by the trier of fact, to determine the reliability of documentary evidence.

In the end, he offers the opinion that the information presented is not credible and cannot be relied upon. He states, "As discussed in detail below, the claim documentation provided by the Defendant has so many inconsistencies, inaccuracies, mistakes, missing documents, unexplained changes to 'historical' information, etc. that I cannot conclude that it is *credible*." Exhibit A, ¶ 51 (emphasis added). He concludes, "I am of the opinion that accounting information produced by the Defendant cannot be *relied* upon." Exhibit A, ¶ 88 (emphasis added). As discussed below, experts are not permitted to opine as to credibility and veracity, as Mr. Goldman has done.

### B. Mr. Goldman deliberately avoids opining any fraud by Defendants

While Mr. Goldman offers his view that the documentation is not reliable, he very deliberately decided *not* to opine that Defendants engaged in fraud. Mr. Goldman, a "Certified Fraud Examiner", has enjoyed access to thousands of pages of information and had multiple opportunities in his report to demonstrate that Defendants committed fraud as his clients, Plaintiffs, have alleged since the outset of this litigation. But, in each and every instance, Mr. Goldman refused to put his name to an allegation of fraud; he consistently couched his words, which speaks volumes.

For example, Mr. Goldman writes, "The claim as it is presented now is not supported with reliable information and, based on how pervasive the problems are, *may be* knowingly fraudulent." Exhibit A, ¶ 39 (emphasis added). This is a far cry from Plaintiffs' allegations. At another point in his report, Mr. Goldman equivocates, stating that the records demonstrate either incompetence or fraud, but he does not conclude a fraud was perpetrated. "While none of these findings by themselves are proof of fraud, the pervasive presence of all of the findings together in the presence of accountants who should know better are strongly indicative of either gross incompetence *or* fraud." Exhibit A, ¶ 47(emphasis added). In the end, Mr. Goldman hedges his bets and leaves open the possibility that the inconsistencies he identified are entirely innocent. Mr. Goldman concedes that he has been unable to find any direct proof that KDC overpaid subcontractors and then took kickbacks. Exhibit A, ¶ 53. Rather, he suggests there is a "possibility" kickbacks were paid. *Id.* Mr. Goldman concludes his report with the following, similarly equivocal statement: "The claim as it is presented now is not supported with reliable information and, based on how pervasive the problems are, *may* knowingly *be* fraudulent." Exhibit A, last paragraph (emphasis added).

Nor does Mr. Goldman, a Certified Fraud Examiner, provide any opinion that materials were diverted to other projects. After listing other construction projects Kagan might have been working on at the same time as the Lyman-Cutler project, Mr. Goldman says "it is *conceivable* that materials *could have been* purchased for multiple sites and all delivered and charged to one site or multiple sites… Cost inconsistencies between the projects indicate that materials *may have* been paid for by one project by used at another." Exhibit A, ¶ 32 (emphasis added). Mr. Goldman again guesses that maybe commingling occurred, when he writes "The lack of controls and oversight opened the *possibility* for a commingling of entities and/or a commingling of projects." Exhibit A, ¶ 34 (emphasis added); *see also* Exhibit A, ¶ 97.h ("could be indicative of commingling").

Ironically, Mr. Goldman states that he has found fraud in other circumstances where the documentation was insufficient from his point of view, but he could not opine these Defendants committed fraud. He states, "In over twenty years of forensic investigation I have only seen this much inconsistency and incredibility in one other set of documentation, and that was in a case where it was determined that a significant fraud had been perpetrated." Exhibit A, ¶ 36; *see also* Exhibit A, ¶ 46. He appears to contend that because fraud occurred in that other, unnamed matter, it might have happened here as well. This is hardly a reliable methodology.

### III.
### Standard for Admissibility

Federal R. Evid. 702 allows for the introduction of expert opinion testimony if it will assist the trier of fact to understand the evidence or to determine a fact in issue and if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

## IV.
### Mr. Goldman's Expert Opinion as to Reliability and Credibility is Inadmissible

Courts routinely hold that experts cannot usurp the role of the fact-finder and opine as to credibility because such opinions do not "assist the trier of fact." *Adams v. New Eng. Scaffolding, Inc.*, Civil Action No. 13-12629-FDS, 2015 U.S. Dist. LEXIS 170688, at *27 (D. Mass. Dec. 22, 2015); *see also United States v. Duncan*, 42 F.3d 97, 101 (2d Cir. 1994) ("When an expert undertakes to tell the jury what result to reach, this does not *aid* the jury in making a decision, but rather attempts to substitute the expert's judgment for the jury's."). In *Zaccaro v. Shah*, 746 F. Supp. 2d 508, 517 (S.D.N.Y. 2010), the court excluded an expert's opinions where the expert usurped the role of the court and jury with conclusions that a party was fraudulently induced into entering a transaction and a party breached the partnership agreement. *Id.* (citing *Nimely v. City of N.Y.*, 414 F.3d 381 (2d Cir. 2005)). In *Hinton v. Outboard Marine Corp.*, No. 1:09-cv-00554-JAW, 2012 U.S. Dist. LEXIS 8505, at *3-4 (D. Me. Jan. 25, 2012), the court excluded an opinion by an expert as to whose testimony the jury should and should not accept. *See also United States v. Deleon*, No. 07-10277-NMG, 2016 U.S. Dist. LEXIS 89537, at *44 (D. Mass. May 9, 2016); *United States v. Scop*, 846 F.2d 135, 142 (2nd Cir. 1988) (expert witnesses may not opine as to credibility of another witness's testimony - this is a determination left solely to the jury); *United States v. Ward*, 169 F.2d 460, 462 (3rd Cir. 1948) ("'expert' may not go so far as to usurp the exclusive function of the jury to weigh the evidence and determine credibility"). This is precisely what Mr. Goldman presents in his report, his opinion as to which testimony the fact finder should credit, and it is therefore inadmissible.

Unquestionably, it is the fact-finder's job to determine credibility, not Mr. Goldman's. *Aponte-Rivera v. DHL Sols. (USA), Inc.*, 650 F.3d 803, 809 (1st Cir. 2011); *MacQuarrie v. Howard Johnson Co.*, 877 F.2d 126, 128 (1st Cir. 1989); *see also United States v. Lumpkin*, 192

F.3d 280, 289 (2d Cir. 1999) ("Fundamental to the role of juror as trier of fact is the task of assessing witness credibility."). Mr. Goldman's conclusions that documents are not reliable or that Defendants are not credible constitute an impermissible effort to have an expert provide a lawyer's summation from the witness stand. *See Primavera Familienstifung v. Askin*, 130 F. Supp. 2d 240, 529 (S.D.N.Y. 2001) (granting motion to exclude expert testimony where witness "does not serve as an expert but, rather, seeks to supplant the role of counsel in making argument at trial, and the role of the jury in interpreting the evidence"). As he was hired for the purpose of determining credibility, a function he cannot properly serve, his opinions should be excluded.

In *Lippe v. Bairnco Corp.*, 288 B.R. 678, 687 (S.D.N.Y. 2003), the court excluded an expert who planned to "opine" as to the defendants' purported fraudulent intent. The court referred to such a plan as "ill-conceived from the outset". The court wrote, "Expert testimony is not relevant if the expert is offering a personal evaluation of the testimony and credibility of others or the motivations of the parties." *Id.* (citing *United States v. Scop*, 846 F.2d 135, 142 (2d Cir. 1988), *rev'd in part on other grounds*, 856 F.2d 5 (2d Cir. 1988)). In *GST Telecomms., Inc. v. Irwin*, 192 F.R.D. 109, 110 - 11 (S.D.N.Y. 2000), the court excluded an expert's personal assessment of credibility. Id. ("It would be inappropriate to consider the experts' personal assessments of the credibility of the situations involved, the sufficiency of the measures utilized in considering the business plans being pursued, . . . and the impact of self-interested conduct and the significance thereof."); *see also Taylor v. Evans*, No. 94 Civ. 8425 (CSH), 1997 U.S. Dist. LEXIS 3907, 1997 WL 154010, at *2 (S.D.N.Y. Apr. 1, 1997) ("Musings as to defendants' motivations would not be admissible if given by any witness -- lay or expert."). The task Mr. Goldman was asked and attempted to complete is inappropriate and has no place in the trial of

8

this matter either to support Plaintiffs' affirmative claims or as a defense to KDC's proof of claim.

V.
**Mr. Goldman's Opinion that "There Might Be Fraud" is Inadmissible**

Mr. Goldman's deliberately reluctance to opine that Defendants committed fraud speaks volumes as to the merits of Plaintiffs' claims. Beyond that, however, his stopping short renders his opinion inadmissible because it is not helpful to the trier of fact. Mr. Goldman opines that it is ***conceivable*** there was fraud and it is ***possible*** there was fraud, but he does not put his name to the assertion that Defendants acted fraudulently. At other times, he opines that Defendants were either incompetent ***or*** committed fraud. Of course, one of these options, one Mr. Goldman did not eliminate, is perfectly innocent. Guesses as to whether a fraud was perpetrated is not helpful to the finder of fact, who can make an independent determination based on the facts presented. Mr. Goldman's opinion is therefore not helpful and is not admissible per Fed. R. Evid. 702. *In re Bard IVC Filters Prods. Liab. Litig.*, No. MDL 15-02641-PHX DGC, 2017 U.S. Dist. LEXIS 210162 (D. Ariz. Dec. 21, 2017) (experts are not allowed to speculate); *Holley v. ACTS, Inc.*, 581 S.E.2d 750, 753 (N.C. 2003) (expert's guess or speculation is inadmissible).

Mr. Goldman also fails to put a dollar amount to his opinion, despite the fact that Plaintiffs represented in their interrogatory responses that itemization of their damages would be part of their expert reports. Not surprisingly, in specifying their damages in response to damage interrogatories, Plaintiffs have failed to identify a single penny that was spent improperly as a result of the allegedly fraudulent invoices and charges. In other words, as Plaintiffs themselves apparently recognized, Mr. Goldman is critical of record-keeping practices of KDC, ProExcavation and third parties, but he explicitly refrained from identifying any invoices for services or materials not actually provided to the Lyman-Cutler project. He similarly abstained

from concluding that materials were charged to the Lyman-Cutler accounts but delivered to one of Kagan's other projects. Even if one were to find Mr. Goldman's opinions as to record-keeping to be worthwhile, he never identifies any transactions that cost Lyman-Cutler more money than they should and he never quantifies an amount to discount KDC's proof of claim. Without such quantification, Mr. Goldman's opinion reduces to a "so what?" This is not helpful to the trier of fact and is therefore inadmissible.

## VI.
## Mr. Goldman's Opinions Should be Excluded

Plaintiffs have been telling this Court for years that it would deliver on its allegation that Defendants engaged in fraud. When pressed at deposition, Messrs. Filippov and Lipetsker said their expert would identify the fraudulent conduct. In the end, all Plaintiffs could muster is Mr. Goldman's report, which is nothing more than an attempt to "opine" as to something the trier of fact will decide. In the end, Mr. Goldman chose his words carefully and states that "maybe" a fraud occurred. Or, it could be innocent incompetence – he's not sure. This is not a helpful opinion for the trier of fact and therefore it is inadmissible. Moreover, it reveals that Plaintiffs have unnecessarily prolonged this litigation.

WHEREFORE, Defendants respectfully request that this honorable Court:

A. Issue an order prohibiting the introduction of evidence and argument concerning the opinions of Michael Goldman; and

B. Grant such additional and further relief as the Court deems necessary.

Dated:  November 16, 2018

Respectfully submitted,

VADIM KAGAN,
TATIANA KAGAN,
KAGAN DEVELOPMENT KDC, CORP. and
PROEXCAVATION CORP.,

By their Attorneys,

/s/ John H. Perten
Christopher M. Candon, BBO# 650855
John H. Perten, BBO# 548728
James P. Harris, BBO# 678283
SHEEHAN PHINNEY BASS & GREEN, PA
255 State Street, 5th Floor
Boston, MA  02109
Tel:  617-897-5600
Fax: 617-439-9363
E-mail: ccandon@sheehan.com
         jperten@sheehan.com
         jharris@sheehan.com

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of November, 2018, a copy of the foregoing was served upon the parties listed below via ECF and/or first class mail, postage prepaid.

Eric K. Bradford
Office of the US Trustee
J.W. McCormack Post Office & Courthouse
5 Post Office Sq., 10th Fl, Suite 1000
Boston, MA 02109

Sean T. Carnathan
O'Connor, Carnathan and Mack, LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

David B. Madoff
Madoff & Khoury LLP
124 Washington Street - Suite 202
Foxborough, MA 02035

Steffani Pelton Nicholson
Madoff & Khoury LLP
124 Washington Street
Foxborough, MA 02035

Sarah A Smegal
Hackett Feinberg P.C.
155 Federal Street
9th Floor
Boston, MA 02110

Joseph P. Calandrelli
O'Connor Carnathan and Mack LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

Stephen G. DeLisle
Rubin and Rudman LLP
50 Rowes Wharf
3rd Floor
Boston, MA 02110

Amy M. McCallen
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110

David C. Phalen
Hackett Feinberg P.C.
155 Federal Street, 9th Floor
Boston, MA 02110

Peter N. Tamposi
The Tamposi Law Group
159 Main Street
Nashua, NH 03060

/s/ John H. Perten
John H. Perten