UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>LYMAN-CUTLER, LLC,<br><br>       Debtor. | Chapter 7<br>No. 15-13881-FJB |
| LYMAN-CUTLER, LLC,<br>ALEX FILIPPOV and<br>NICKOLAY LIPETSKER,<br><br>       Plaintiffs,<br>       Defendants in Counterclaim,<br><br>       v.<br><br>VADIM KAGAN, TATIANA KAGAN,<br>KAGAN DEVELOPMENT KDC, CORP.<br>and PROEXCAVATION CORP.<br><br>       Defendants,<br>       Plaintiffs in Counterclaim. | Adv. Proc. No. 16-01120 |

CONCISE STATEMENT OF MATERIAL FACTS SUBMITTED BY VADIM KAGAN, KAGAN DEVELOPMENT KDC, CORP. AND PROEXCAVATION CORP. IN SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON THE AMENDED ADVERSARY COMPLAINT AND CLAIM NOS. 1, 4, 6 AND 7.

Pursuant to Rule 56(a), Bankruptcy Rule 7056, and D. Mass. Bankr. L.R. 7056-1, defendants Vadim Kagan, Kagan Development KDC, Corp. and ProExcavation Corp. submit this concise statement of material facts in support of their motion for summary judgment.

UNDISPUTED MATERIAL FACTS

1. Plaintiffs Alex Filippov ("Filippov") and Nickolay Lipetsker ("Lipetsker") claim that Vadim Kagan ("Kagan") induced them to enter into a development project based upon

his assurance that he would complete construction of two homes at a fixed cost of $1.6 million each, including carrying costs. (Amd. Cmp., ¶¶14-17).

2. In furtherance of the project, the parties formed Lyman-Cutler, LLC (the "Debtor") and executed an Operating Agreement that governed their relationship. (Id. at ¶¶16, 53; Operating Agreement ("OA"), Perten Aff., Exh. 1).

3. The Operating Agreement expressly delegated the construction of the homes to Kagan. (Id. at ¶25; OA, §5.2). It provided that for the first 23 months following acquisition of the underlying properties, or until November 30, 2014, the Debtor would be responsible for paying carrying costs, defined as mortgage payments, taxes and insurance. (Id., §§4.1, 4.2).

4. The Operating Agreement also contemplated that the properties may not sell by November 30, 2014 and, if so, obligated Kagan to pay the carrying costs. (Id., §8.1). If Kagan did not pay the carrying costs, the Operating Agreement puts that responsibility on Filippov. (Id.). In that event, the Operating Agreement provides that Kagan's capital account and percentage interest in the Debtor would decrease by the amount Filippov advanced while Filippov's capital account and percentage would increase. (Id.).

5. To finance the construction, Debtor took out two construction loans in the amount of $1.6 million each. (Amd. Cmp. at ¶21; OA, §4.1).

6. Construction proceeded through Kagan's construction company, Kagan Construction KDC, Corp. ("KDC"). To reduce costs and increase efficiency, KDC subcontracted some of its work to another of Kagan's companies, ProExcavation Corp. ("ProExcavation").

7. The Debtor drew down the full amount of the construction loans. (Amd. Cmp., ¶24).

2

8. Filippov had online access to the Debtor's bank accounts, received monthly bank statements and copies of all checks. His wife kept the Quickbooks account for the Debtor. (Filippov dep. at 69, 72; Perten Aff., Exh. 2).

9. Filippov's wife communicated regularly with KDC's bookkeeper during construction. (Brusenkova dep. at 60, Perten Aff., Exh. 3; Filippov dep. at 71).

10. After completion of construction, Kagan advised Filippov that the Debtor had incurred significant costs beyond the amount of the construction loans, for which KDC was to be reimbursed upon the sale of the two homes. (Id.; Kagan dep. at 98, 218-21, Perten Aff., Exh. 4).

11. Despite the expectations of the Debtor, the properties did not garner any offers after being on the market for several months. Kagan suggested that they reduce the selling price in effort to get them sold. He further advised Filippov that although the Debtor had been obligated to pay the carrying costs for the first 23 months, Kagan had been voluntarily fronting those costs and no longer wished to carry the burden of paying carrying costs alone. (May 7, 2015 letter; Perten Aff., Exh. 5).

12. Filippov claimed to be blindsided by the news that the construction costs exceeded his expectations. (Amd. Cmp., ¶¶22, 37).

13. Without any evidence, he accused Kagan of falsifying KDC's financial records, over-charging, double billing, failing to credit refunds or returns, and charging the Debtor for materials purchased for other projects. (Id., ¶¶46-49, 54, 64). He filed suit against Kagan in the Middlesex Superior Court alleging fraud.

14. Kagan, at that point, stopped paying the carrying costs, and Filippov, as required under the Operating Agreement, became obligated to pay the ongoing carrying costs. (OA, §8.1).

15. KDC, who was owed significant monies for the construction, recorded a mechanics lien against the properties. As required by statute, it filed suit to perfect its lien. The two state court proceedings were consolidated, and then stayed upon filing of the bankruptcy.

16. Pursuant to the Operating Agreement, the Debtor was obligated to dissolve on November 30, 2015. (OA, §2.3). Upon dissolution, the Debtor's assets were to be liquidated. (Id., §9.2).

17. Despite the fact that this was part of the deal he agreed to, Filippov did not want to liquidate. He also did not want to pay carrying costs, despite his obligation to do so, and was clearly frustrated at his inability to address KDC's mechanics lien. Unilaterally, though with the acquiescence of Lipetsker, Filippov determined that by filing a petition for bankruptcy under Chapter 11, he could avoid his obligations under the Operating Agreement by not having to dissolve the entity or continue paying carrying costs. He also presumed that a bankruptcy would stave off a foreclosure by either the bank or KDC under its lien. (Filippov dep. at 112-13, 122, 128-29).

18. Without consulting Kagan, he caused the Debtor to file a Chapter 11 petition. (Id. at 113).

19. Shortly after filing the petition, the Chapter 11 Trustee (who was appointed without objection), moved to convert the case to Chapter 7 as the only remaining business of the Debtor was to liquidate its two assets which could be done more efficiently and economically in a Chapter 7. (Docket No. 44).

20. The Debtor did not object to the conversion. The Chapter 7 Trustee moved for authority to engage a real estate broker to list and sell the properties. (Docket No. 47).

21. The listing price for each home was to be $4.5 million. The Trustee's motion was allowed, again without objection. Some months later, the Trustee received offers to purchase the homes for $4.4 million each. Again without objection[1], the Court approved the sale of the homes at the offered price. (Docket Nos. 67, 75).

22. After paying the secured lender, the Trustee is holding approximately $3.5 million in escrow.

23. The only parties interested in the escrowed funds are plaintiffs and defendants. KDC filed two proofs of claim. Claim No. 1 sought recovery for the amounts expended beyond the payments made by the construction loans for completing the construction. Debtor filed an objection to Claim No. 1. KDC's second proof of claim, Claim No. 4, was for indemnity under Section 10.2 of the Operating Agreement. No objection was ever filed against Claim No. 4. Kagan and ProExcavation also filed claims for indemnity under Section 10.2. (Claim Nos. 6 and 7). As against these, Debtor filed a bare bones objection. (Docket Nos. 141 and142).

24. Over two months after the bar date, Filippov filed a late proof of claim seeking the recovery of an alleged $200,000 loan to the Debtor, secured by a mortgage that he granted to himself on the eve of the bankruptcy filing. (Claim No. 9).

25. Filippov failed to respond to defendants' objections to that claim and this Court initially stated that, as a result, the claim would be rejected. The Court ultimately decided to give Filippov a second chance despite his lateness. (Docket No. 212).

---

[1] Debtor did file a limited objection to ensure that Tatiana Kagan, Kagan's wife, who was the real estate agent designated in the Operating Agreement, would not earn a commission.

5

26. Filippov explained at his deposition that the loan was an aggregate of monies he deposited to the Debtor over time. At his deposition, he was unable to identify the specific entries in the Debtor's QuickBooks ledger which reflected the loan amounts. In that ledger, all of Filippov's deposits are labelled "Alex Filippov Investments." Filippov initially testified that these "investments" were capital contributions but then explained that labelling them as "investments" was an error as some of them were loans, though he still could not identify which deposits were capital contributions as opposed to loans. (Filippov dep. 256-60).

27. Filippov's counsel also filed a proof of claim which this Court initially stated would be rejected due to failure to file a timely response to defendants' objection. (Claim No. 2). Here too, the Court exercised its discretion, and gave plaintiffs a second chance. (Docket No. 213).

28. Filippov admitted that counsel represented not just the Debtor but also himself, individually, notwithstanding that counsel seeks to have his entire fee paid by the Debtor. (Id. at 266-68).

29. Lipetsker, Filippov and Kagan each also filed a proof of interest. (Claim Nos. 10, 11, and 12, respectively). Filippov claimed that his equity interest increased from the amount stated in the Operating Agreement due to the fact that he paid carrying costs once Kagan ceased doing so. According to Filippov, these payments resulted in an increase of his equity and a decrease to Kagan's under Section 8.1 of the Operating Agreement. (Id. at 269-70).

30. Filippov and Lipetsker filed an adversary complaint seeking an affirmative recovery, essentially mirroring the basis for their objections to defendants' proofs of claim. In

6

summary, they accused Kagan, KDC and ProExcavation of massive fraud as to the actual costs of construction and of shoddy workmanship. Tatiana Kagan ("Tatiana"), whose only role was as a real estate agent, was named simply because she was married to Kagan and was also an officer or director of his companies.[2] (Amd. Cmp., ¶¶28, 35).

31. The defendants answered and counterclaimed. (Docket No. 106).

32. Filippov, Lipetsker and the Debtor were provided and examined each and every project invoice, proposal and QuickBooks entry for the Debtor, KDC and ProExcavation. They deposed all the parties, subpoenaed credit card and phone records, and deposed KDC's accountant. They obtained leave to examine the financial doings of five other projects that were occurring simultaneously, ostensibly to find evidence that Kagan was charging the Debtor project for labor and materials used on those other projects.

33. Plaintiffs have failed to uncover any damages caused by KDC's and ProExcavation's allegedly "cooked books."

34. In response to interrogatories seeking itemization of damages, **plaintiffs have not identified any damages attributed to supposedly fraudulent charges**.

35. Despite years of assertions that Kagan orchestrated a conspiracy to "cook" KDC's and ProExcavation's books, plaintiffs have failed to identify a single dollar spent in reliance on this alleged fraud. According to plaintiffs, the cost of construction for each home, with carrying costs, was fixed at $1.6 million ($1.3 million construction, $200,000 carrying costs, $100,000 contingency). (Amd. Cmp., ¶15; Filippov dep. at 41, 74-75,155-56, 204-05; Lipetsker dep. at 29, Perten Aff., Exh. 6).

36. When asked if he was concerned that Kagan may have been making deposits to and withdrawing monies out of the Debtor's account Filippov stated:

---

[2] Tatiana is simultaneously filing her own motion for summary judgment, and joins in the relief requested hereunder.

> No, but it wasn't my concern. **It was a fixed-price project**. I didn't really care much. All I cared, that we didn't blow the bank account, and we wouldn't need to deal with Rockland Trust. But how he [Kagan] deposit, take money back, its his business.

(Filippov dep. at 74)(Emphasis added).

37. Plaintiffs have failed to identify <u>any</u> damages relating to the allegation that KDC fraudulently claimed monies beyond the fixed price amount. In interrogatories, defendants asked each plaintiff to itemize damages. None of them itemized a single penny overpaid in reliance on the allegedly falsified records. Fillipov Supp. Resp. to KDC Int. No. 9, Kagan No. 2, ProExcavation No. 8, Perten Aff., Exh. 7; Debtor Supp. Resp. to KDC Int. No. 9, Kagan No. 2, ProExcavation Int. No. 8, Perten Aff., Exh. 8; Lipetsker Sup Response to KDC Int. No. 10, Kagan Int. No. 2, ProExcavation Int. No. 8, Perten Aff., Exh. 9.

38. Plaintiffs claim entitlement to the delta between the property sale price obtained by the bankruptcy Trustee in 2016 and the fair market value of those properties at that time. The Debtor's supplemental response to KDC's damage interrogatory, incorporated into the other plaintiffs' responses, was:

> [b]ecause of Kagan's [not ProExcavation's or KDC's] wrongful conduct… the LLC was subjected to a false mechanics' lien and self-dealing realtor listing agreements, and forced into bankruptcy which resulted in a distressed sale of the LLC's two primary assets … The LLC's damages include the difference between the selling price of the properties - $4,400,000 per house – and the fair market value each house would have sold for but for Kagan's [not ProExcavation or KDC] conduct - $5,100,000 per house. The damages for the diminished selling price of the homes equal $1.4M, plus interest. The LLC will rely on expert testimony by Morgan Fennell as set forth in his two expert reports one for 55 Lyman Road and one for 88 Cutler Lane, produced on July 30, 2018.

(Debtor's Supp. Resp. to KDC Int. No. 9, Perten Aff., Exh. 7).

39. Plaintiffs' expert, Hugh Fennell, appraised the properties as of March 11, 2016 (for 55 Lyman Road) and as of January 29, 2016 (for 88 Cutler Lane). Fennell Apraisals attached to motions in limine.

40. Fennell provided no discussion of the causal link between the allegedly "false mechanics' lien," "self-dealing realtor listing agreements" and "forced bankruptcy" which plaintiffs claim to be the cause of the supposedly low sale price. Id.

41. Mr. Fennell offers no opinion of value as of November, 2014, the date by which plaintiffs claim the properties should have sold according to their agreement, (Amd. Cmp., ¶¶25-27), or even 2015 when plaintiffs took over the project.

42. Additionally, no information is offered to compare the value of the properties in 2014 or 2015 with the value in 2016 to determine if there even was a loss. Id.

43. Without objection, the Trustee listed the properties for sale at $4.5 million in November 2015, thereby virtually assuring that there would not be an offer for $5.1 million. (Docket No. 47).

44. According to the Debtor's self-serving interrogatory response, three alleged transgressions chargeable to defendants lead to the diminished sale price: the mechanics lien, the "self-serving" listing agreements, and the "forced" bankruptcy. This causal link between those items and the sale price, however, is not established by Mr. Fennell's reports.

45. Mr. Fennell offers no analysis of the allegedly "forced bankruptcy" or its impact on the sale price. Fennell Reports, Addendum.

9

46. According to the bankruptcy schedules, the Debtor was not insolvent at the time of the petition. It had assets valued at approximately $9.7 million against liabilities of approximately $7.4 million. (Docket No. 1).

47. At his deposition, Filippov admitted that he did not discuss filing the petition with Kagan, despite the fact that Kagan was a member of the Debtor and a vote was required. (Filippov dep. at 113).

48. Filippov explained that he put the Debtor into bankruptcy because he did not want to dissolve it on November 30, 2015, as required by the Operating Agreement, as that would have triggered a liquidation of the properties. (Id. at 112, 122; OA, §§2.3, 9.1 and 9.2).

49. Filippov was also concerned that the loans might be called, apparently not recognizing that filing a bankruptcy petition does not "undo" a default and, because the bank held a mortgage, obtaining leave to foreclose would likely prove relatively routine. (Fillipov dep. at 112).

50. Filippov also unilaterally determined that no "reasonable buyer" would buy the property if there was a lien, (Id. at 122), though no expert backs up his assertion.

51. At his deposition, Filippov candidly admitted that although he understood that bankruptcy could adversely affect the sale price, he believed that he could avoid this problem by filing Chapter 11. As he explained:

I wasn't expecting that it was going to have to be Chapter 7 bankruptcy. I was expecting that I was going to be selling the houses [as a debtor-in-possession]; not the trustee whose only goal is just to get rid of it. So, it wasn't obvious to me when I was putting in the bankruptcy that its going to be sold for less. All I was caring was that that would remove the lien of the property, and we would be able to sell it.

(Fillipov dep. at 128-29). See Lipetsker dep. at 55-56.

52. There is no expert opinion that there was anything improper about the listing agreements and virtually no discussion about how they were "self-dealing" or how this alleged "self-dealing" somehow deflated the sale price.

53. Tatiana is specifically identified in the Operating Agreement as the listing agent so far from being "self-dealing" her getting the listing was exactly what the parties had agreed to do.  (OA, §6.1(b)(6)).

54. As noted in Tatiana's parallel motion for summary judgment, Filippov was well aware of the listing agreements and voiced no objections thereto.  Tatiana Stmt. Of Facts.

55. There is also no expert evidence that the listing agreements were inconsistent with industry standards or that the marketing effort put in by Tatiana somehow contributed to the inability to sell the properties.

56. While Mr. Fennell concludes, with no analysis and in less than a sentence, that a lack of effective marketing contributed to the low sale price, in his recitation of the facts relied upon, the only facts bearing on the marketing effort were that "[t]he investors were not provided any information on the marketing process, how the homes were received in the market, or how involved the listing broker was during this process."  (Fennell Reports, Addendum p. 1/5).

57.  The mechanics lien was filed by KDC.

58. In his report, Mr. Fennell, who, according to his CV is not a real estate agent and therefore not qualified to opine on this topic in any event, does not explain why, even prior to the mechanics lien, the property did not sell.  Fennell Appraisals.

59. Filippov testified that he was not guaranteed any fixed rate of return on his investment. (Filippov dep. at 51).

11

60. Filippov has already submitted a proof of interest arguing that his payment of carrying costs were additional capital contributions which had the effect of increasing his capital contribution and membership interest per Section 8.1.  (Claim No. 11).

61. At his deposition, Filippov admitted that the increase he claimed in his equity interest was based on his payment of carrying costs and application of Sections 8.1 and 8.2 of the Operating Agreement.  (Filippov dep. at 268-70).

62. The distribution of profit under the Operating Agreement does not track the parties' equity interests.  Although Kagan initially had a 10% equity interest, Section 8.1 of the Operating Agreement provides that upon liquidation, the proceeds of any sale shall be allocated 50% to Kagan.  Operating Agreement, §8.1

63. Section 8.1 goes on to say:

**In the event that the property is not sold within twenty three (23) months from the date of acquisition, then Mr. Kagan shall be responsible for all carrying costs until such time as the property is sold.  If Mr. Kagan fails to pay the monthly carrying costs, then Mr. Filippov shall be responsible to contribute the necessary carry costs and subsequently his capital contribution and percentage interest in the Company shall increase by the same amount and percentage and at the same time will trigger reduction of Mr. Kagan's share of capital contribution by the same amount and subsequently his/her percentage interest in the Company.**

(OA, ¶8.1 at p. 9, emphasis in the original).

64. Section 8.2 of the Operating Agreement is entitled "Distribution to Members." It provides:

> **The distribution to Members shall be in accordance with their respective Capital Contribution first, however, an additional five (5%)  percent per annum based upon the Members' respective Capital Contributions shall be paid out of Mr. Kagan's net profit share for each day that the property is not sold after twenty three (23) months of acquisition.**

(OA, §8.2, emphasis in original).

65. Ms. Brusenkova submitted an affidavit in support of plaintiffs' claims of malfeasance. She also figures prominently in plaintiffs' complaint. (Amd. Cmp., ¶46; Brusenkova dep. at 102).

66. At her deposition, Ms. Brusenkova was unable to identify any specific instances of financial malfeasance relating to the Debtor's project. She admitted she had no detail as to any improper financial dealings on the project. (Brusenkova dep. at 95).

67. Her only understanding that Kagan was trying to "steal" money on this project was based on statements that Filippov made to her and not on any personal knowledge. (Id. at 102).

68. She testified that despite plaintiffs' allegation that ProExcavation grossly overcharged (Amd. Cmp., ¶47), she had no idea exactly what services ProExcavation provided, what it charged on this project, or what its work was worth. (Brusenkova dep. at 117-18).

69. As to Debtor's project, she could not recall any instances of overcharging (Id. at 119), any improper uses of the company credit card (Id. at 123), or any instances of double-billing. (Id. at 125, 132).

70. She could not identify any subcontractors or suppliers who were overpaid. (Id. at 133). She could not identify any improper charges to the company credit card. (Id. at 135). Finally, with respect to the allegation that Kagan failed to properly credit the project for refunds or goods returned, Ms. Brusenkova could not say that this ever happened on this project. (Id. at 137).

71. At his deposition, Filippov too testified that he had no details to support his spurious allegations. He could not provide any specific instances of double billing. (Filippov dep. at 99-100).

13

72. Other than hearsay statement from other contractors, none of which have been identified as an expert on this case, he had nothing to support the allegation that ProExcavation overcharged. (Id. at 100-109, 126-27).

73. He testified that he could not identify any items that were purchased for another project but charged to this project. (Id. at 111).

74. He could not identify any improper AMEX charges. (Id. at 125). He could not even identify which invoices he questioned. (Id. at 246).

75. Lipetsker too admitted that he had no facts to support the allegations that had been made. (Lipetsker dep. at 42-46).

76. The long anticipated forensic accounting report of Michael Goldman arrived on July 30, 2018.[3] Nowhere in his 41-page report is there any opinion that, more likely than not, there was fraud committed on this project. Nowhere is there any itemization of damages incurred by plaintiffs due to the alleged fabricated or improper billings. Goldman Report, annexed to motion in limine.

77. Goldman waswas retained only to "opine on the veracity of the accounting information and documentary support provided by the Defendants with regard to the mechanics lien," i.e. KDC's proof of claim. (Goldman Report, ¶21). Consistent with his limited scope, Mr. Goldman's opinion was not that he found fraud which may entitle plaintiffs to damages, but only that "the documentation maintained and provided by Mr. Kagan is unreliable" and that "attempts to recreate data that was never properly captured the first time are not at all convincing." (Id., ¶¶28, 39).

---

[3] Defendants have filed a motion in limine to strike the expert opinions offered by Mr. Goldman, which is incorporated herein by reference. A copy of his report is annexed to that motion.

78. Mr. Goldman scrupulous he opined simply that "my opinion and conclusion is that the claims made by the Defendant for the mechanics lien are not reliable or credible. (Id. at Summary of Opinions and Conclusions).

79. With respect to the allegations that materials from other projects were improperly charged to this project, Mr. Goldman offered that although it was "conceivable," "there would be no way to detect if this was occurring." (Id. ¶32).

80. As to improper charges to credit cards, all he could say is that "the lack of controls and oversight opened the *possibility* for a commingling of entities and/or a commingling of projects", though he did not opine that this, in fact, occurred. (Id., ¶34, emphasis added).

81. He noted that his perceived discrepancies in the records showed a "lack of competence **or** integrity," though he could not determine which was more likely. (Id., ¶47)(Emphasis added).

82. Mr. Goldman's ultimate conclusion is simply that he did not believe the records that were produced to support KDC's claim. See Id., ¶51 ("The claim documentation provided by the Defendant has so many inconsistencies, inaccuracies, mistakes, missing documents, unexplained changes to "historical" information, etc. that I cannot conclude that it is credible.").

83. The only reliance plead by plaintiffs is on the pre-project representation by Kagan as to the construction costs. (Amd. Cmp., ¶17). Plaintiffs do not claim reliance on KDC's books and records.

84. In Count VII, Debtor alleges that it "entered into a contract with Defendant KDC that required, among other things, that KDC perform its work in a good and workmanlike manner." (Amd. Comp., ¶78).

85. No construction expert reviewed the construction and opined that it was not performed in a good and workmanlike manner, this claim fails. The only expert comment bearing on the quality of construction was an observation by plaintiffs' real estate appraiser, who opined, "Overall, the subject property was in good condition and was of good construction quality at the time of the sale." (Fennell Report, Addendum, p. 3 of 5).

86. KDC's Claim No.4 sought indemnity under Section 10.2 of the Operating Agreement. The deadline for objection to proofs of claim was May 3, 2016. (Docket No. 71). Plaintiffs never objected to Claim No. 4.

87. Kagan and ProExcavation also seek indemnity under Section 10.2 of the Operating Agreement. (Claim Nos. 6 and 7). Section 10.2 provides:

The Company shall indemnify and hold harmless the Members and their respective employees and authorized agents from and against any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member, employee or authorized agent in good faith on behalf of the Company and reasonable believed to be within the scope of authority conferred by this Agreement, except that no Member, employ or authorized agent shall be entitled to be indemnified or held harmless from or against any loss, damage or claim incurred by reason of such Member's, employee's or authorized agent's gross negligence or willful misconduct.

88. Under the Operating Agreement, the members delegated Kagan full responsibility to build the houses. (OA, §5.2).

Dated: November 16, 2018

Respectfully submitted,

VADIM KAGAN,
KAGAN DEVELOPMENT KDC, CORP. and
PROEXCAVATION CORP.,

By their Attorneys,

/s/ John H. Perten
John H. Perten, BBO# 548728
James P. Harris, BBO# 678283
SHEEHAN PHINNEY BASS & GREEN, PA
255 State Street, 5th Floor
Boston, MA  02109
Tel:  617-897-5600
Fax: 617-439-9363
E-mail: jperten@sheehan.com

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of November, 2018, a copy of the foregoing was served upon the parties listed below via ECF and/or first class mail, postage prepaid.

Eric K. Bradford
Office of the US Trustee
J.W. McCormack Post Office & Courthouse
5 Post Office Sq., 10th Fl, Suite 1000
Boston, MA 02109

Sean T. Carnathan
O'Connor, Carnathan and Mack, LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

David B. Madoff
Madoff & Khoury LLP
124 Washington Street - Suite 202
Foxborough, MA 02035

Steffani Pelton Nicholson
Madoff & Khoury LLP
124 Washington Street
Foxborough, MA 02035

Sarah A Smegal
Hackett Feinberg P.C.
155 Federal Street
9th Floor
Boston, MA 02110

Joseph P. Calandrelli
O'Connor Carnathan and Mack LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

Stephen G. DeLisle
Rubin and Rudman LLP
50 Rowes Wharf
3rd Floor
Boston, MA 02110

Amy M. McCallen
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110

David C. Phalen
Hackett Feinberg P.C.
155 Federal Street, 9th Floor
Boston, MA 02110

Peter N. Tamposi
The Tamposi Law Group
159 Main Street
Nashua, NH 03060

/s/ John H. Perten
John H. Perten