UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>LYMAN-CUTLER, LLC,<br><br>  Debtor. | Chapter 7<br>No. 15-13881-FJB |
| LYMAN-CUTLER, LLC,<br>ALEX FILIPPOV and<br>NICKOLAY LIPETSKER,<br><br>  Plaintiffs,<br>  Defendants in Counterclaim,<br><br>  v.<br><br>VADIM KAGAN, TATIANA KAGAN,<br>KAGAN DEVELOPMENT KDC, CORP.<br>and PROEXCAVATION CORP.<br><br>  Defendants,<br>  Plaintiffs in Counterclaim. | Adv. Proc. No. 16-01120 |

**DEFENDANTS' MEMORANDUM OF LAW SUPPORTING THEIR
MOTION IN LIMINE TO PRECLUDE EVIDENCE RELATING
TO APPRAISAL OPINION OF HUGH MORGAN FENNELL**

Defendants Vadim Kagan ("Kagan"), Tatiana Kagan, Kagan Development KDC, Corp. ("KDC") and ProExcavation ("ProExcavation") submit this Memorandum of Law Supporting their Motion in Limine to Preclude Evidence Relating to Appraisal Opinion of Hugh Morgan Fennell. In support of their Motion, Defendants state as follows:

# I.
# Introduction

Plaintiffs disclosed as one of their experts Hugh Morgan Fennell, a real estate appraiser. Mr. Fennell's written reports consist of appraisal reports, which are attached hereto as Exhibits A and B. One appraisal report, Exhibit A, expresses Mr. Fennell's opinion as to the market value of 55 Lyman Road as of March 11, 2016. Exhibit B constitutes Mr. Fennell's opinion as to the market value of 88 Cutler Lane as of January 29, 2016. Mr. Fennell opines that each home and parcel was worth $5.1 million on those dates. No valuation is provided as to value of the properties as of March 30, 2014, the date plaintiffs claim construction should have been complete or as of November 30, 2014, the date plaintiffs claim the sale should have been completed. Thus, we simply have a valuation at a date in time, which has no causal connection to the allegations in the complaint.

The appraisal reports are essentially the same form, template appraisal with some additional text authored by Mr. Fennell. The reports are nearly identical, except where there are objective differences between the two homes. For purposes of this Motion, the two appraisals can be considered collectively, as the problems plaguing one also infect the other.

Mr. Fennell does more, however, than state his opinion as to the market value of the properties on those specific dates – without providing any facts to support his conclusions, he opines as to *why* the homes were each sold by the trustee in 2016 for less than market value. The heart of Mr. Fennell's opinion is encapsulated in two bolded sentences, which are identical in the two reports:

> **Based on the appraisers [sic] findings in this report, the extended construction period, lack of effective marketing, and legal dispute between the builder and investors significantly impacted the eventual selling price of both new homes. This is**

**reflected in the difference between the appraised value of the subject property and the actual selling price.**

Exhibit A at Addendum pg. 1; Exhibit B at Addendum pg. 1 (bold in original).[1] As described below, the appraisals lack any detail or analysis to support a causal connection between these three factors that Mr. Fennell identifies as suppressing the homes' values and the sales of the two homes. Without a reliable methodology for making these connections, his opinions are inadmissible.

The reports contain no analysis by Mr. Fennell as to the "proper" construction time for these two homes nor does he opine as to the value of the homes had they been ready for sale between March, 2014 (when plaintiffs wrongfully claim they were supposed to be "completed") and November, 2014 (the outside date by which the properties, according to plaintiffs, were to be sold). He also provides no facts to support his conclusion that the properties were not completed on time, relying solely on what his "client" told him. Without this analysis and causal connection, his opinion about the effect of the "extended construction period" is unreliable and inadmissible.

Similarly, although concluding that the project lacked effective marketing, he never describes what an "effective marketing" campaign for these homes should have been. In other words, he does not compare the efforts taken to market the homes with what he apparently believes should have undertaken. The only "facts" offered in support of this conclusion, which facts were provided to him by the plaintiffs and not independently verified, were that "[t]he investors were not provided any information on the marketing process, how the homes were received in the market, or how involved the listing agent was during this process." Exhibit A at

---

[1] It is also noteworthy that in their interrogatory responses, plaintiffs blame the reduced selling price on "a false mechanics lien and self-dealing realtor listing agreements, and forced into bankruptcy which resulted in a distressed sale...". *See* Plaintiffs' Amended Answers to Interrogatories, attached hereto as Exhibit C. Plaintiffs themselves do not even claim that lack of marketing or extended construction had any impact on the sale price.

3

Addendum pg. 1; Exhibit B at Addendum pg. 1. Yet, despite having "no" information, somehow Mr. Fennell was able to conclude that there was a "lack of effective marketing." Moreover, nothing in his background suggests he is qualified to opine as to "marketing strategies". Again, his opinion is inadmissible.

The final factor he identifies as suppressing the value is the "legal dispute between the builder and investors" He offers no comparison between homes sold without "legal disputes" and homes sold with "legal disputes" to be able to quantify the impact "legal disputes" have on market value. Nor does he point to any evidence that the "legal disputes" actually impacted the prices the buyers offered to the trustee for these specific properties. All Mr. Fennell offers is a conclusory statement that, in his opinion, the homes were worth $5.1 million, but the trustee was able to sell them only for $4.4 million, and the litigation, which Plaintiffs themselves initiated, must explain the difference. Additionally, Mr. Fennell neglects to note that the listing price set by the bankruptcy trustee, with the approval of this Court and without any objection by Plaintiffs, was $4.5 million, and the sale price of $4.4 million was also approved by this Court, without objection by Plaintiffs. Thus, any suggestion that Defendants are somehow responsible for the $4.4 million sale price is wholly undermined by the orders of this Court to which Plaintiffs offered no objection.

## II.
## Standard for Admissibility

Federal R. Evid. 702 allows for the introduction of expert opinion testimony if it will assist the trier of fact to understand the evidence or to determine a fact in issue and if (1) the testimony is based upon sufficient facts or data, (2) the testimony is the product of reliable principles and methods, and (3) the witness has applied the principles and methods reliably to the facts of the case.

## III.
## The Appraisal Opinions

**A. Mr. Fennell Offers No Admissible Opinion Regarding the Impact of the Allegedly "Extended Construction."**

Nowhere in the appraisals does Mr. Fennell state how long the construction of the two homes should have taken. Based on the text authored by Mr. Fennell directly above his bolded opinion statement, he appears to have concluded, based exclusively on information "provided by the client" that construction should have been concluded by March 30, 2014 and the homes sold by November, 2014. Mr. Fennell does not cite to any sources (other than his client) to support these assertions, probably because the evidence flatly contradicts both points. Mr. Fennell writes, "As part of the development, the builder agreed to have the new homes completed by March 30, 2014 in an attempt to market the homes during the Spring." Exhibit A at Addendum, pg 1 Exhibit B at Addendum, pg 1. To the contrary, neither the Operating Agreement nor the construction contracts contain an express promise to complete construction by that date. *See* Lyman-Cutler, LLC Operating Agreement, attached hereto as Exhibit D and KDC Contract, attached hereto as Exhibit E. At best, the Operating Agreement speaks in terms of have the homes "substantially complete" by March 30, 2014, though it is silent as to why that date was chosen. Exhibit D at ¶5.2. Mr. Fennell compounds his error by writing, "As part of the LLC agreement the homes were to be sold by November, 2014." Exhibit A at Addendum, pg 1; Exhibit B at Addendum, pg 1. Again, the Operating Agreement contains no such obligation. Rather, the Operating Agreement addresses reallocating the members' interests and responsibility to pay carrying costs after that date, which is far different than a promise to sell the homes by that date. Exhibit D at ¶8.1.

5

Regardless of Mr. Fennell's errors, his opinions suffer from a more fundamental problem that renders them inadmissible – he never states what the market values of the homes would have been had construction completed earlier. In other words, he fails to provide any statement as to causation to link the "extended construction" period to a loss of market value. Mr. Fennell ***does not*** say that the homes would have each been worth $X million in March, 2014, but they only sold for $4.4 million in January and March 2016. Instead, Mr. Fennell picks points in time, January and March 2016, without any comparison to when he believes they should have been completed and placed on the market and the value he believes the properties should have had at that time. Without this analysis and without any opinion as to causation, Mr. Fennell's opinion as to the effect of the "extended construction" period is inadmissible. *Torres Otero v. Hosp. Gen. Menonita, Inc.*, 115 F. Supp. 2d 253, 261 (D.P.R. 2000) (excluding expert testimony when the expert failed to disclose his underlying reasoning or methodology depriving the court of a basis to determine reliability).

### B. Mr. Fennell Offers No Admissible Opinion Regarding the Impact of Allegedly "Ineffective Marketing"

Mr. Fennell also opines that the manner in which the homes were marketed led to actual sale prices that were less than the homes' market values. This opinion suffers the same fate as Mr. Fennell's opinion regarding the length of construction. First, Mr. Fennell's written appraisals provide no description of the basis of his opinion that the homes were "ineffectively marketed." To the contrary, he expressly notes that he has been provided with no information regarding the prior marketing efforts. He does not list or describe in any way the steps taken to market the homes, nor does he compare the manner in which the homes were marketed against what he believes should have been the marketing campaign. Mr. Fennell's credentials suggest that he is utterly unqualified to opine as to proper marketing efforts, as his curriculum vitae is

devoid of any experience selling real estate. *See* Exhibit A, Fennell Curriculum Vitae; Exhibit B, Fennell Curriculum Vitae. Plaintiffs have no other expert to opine as to "proper" marketing efforts and without such an opinion, Mr. Fennell's conclusion that the homes sold for less because of the marketing campaign is irrelevant and inadmissible. *Carlucci v. CNH Am. LLC*, No. 10-12205-DPW, 2012 U.S. Dist. LEXIS 131405, at *11 (D. Mass. Sep. 14, 2012) ("[W]here an expert lacks relevant experience, training, and education to testify about design defects, his testimony is inadmissible.").

Mr. Fennell's opinion as to "improper marketing" suffers from the same fundamental problem as his opinion about the length of construction – he does not opine as to the market value of the homes from March, 2014 to November, 2014, when he apparently believes the homes should have been sold if marketed appropriately. He does not opine, for example, that had the homes been properly marketed in April 2014, they would have sold for $X million. Without this data point, he cannot make the required causal link between what he refers to as "ineffective marketing" and the allegedly depressed sale prices garnered by the homes when the trustee sold them in 2016. *Nna v. Am. Standard, Inc.*, 630 F. Supp. 2d 115, 137 (D. Mass. 2009) (Excluding an expert's opinion where there was no indication the expert did the analysis required to render the conclusion.). *Barletta Heavy Div., Inc. v. Travelers Ins. Co.*, No. 12-11193-DPW, 2013 U.S. Dist. LEXIS 153555, at *23 (D. Mass. Oct. 25, 2013) ("However, meaningful information regarding the intricacies and common practices of the insurance industry is precisely what the Turteltaub Report lacks, offering instead barebones conclusions regarding ultimate facts for the jury to decide. Opinions which are connected to factual data only by the '*ipse dixit*' of an expert are inadmissible."). Mr. Fennell's opinions, to the extent they are based on the quality of the marketing efforts are therefore inadmissible.

### C. Mr. Fennell Offers No Admissible Opinion Regarding the Impact the Parties' Dispute Had on the Market Value

The final factor Mr. Fennell identifies as depressing the homes' values is the fact that litigation between these parties was pending at the time they were offered for sale. Again, he cites to no evidence or information to support this conclusion. For example, Mr. Fennell does not state that he interviewed the buyers who confirmed the properties were less desirable to them because of the pending litigation. Mr. Fennell does not even indicate that the pending lawsuit was known among potential buyers. Nor does he cite to any recognized treatise or statistics to indicate that pending litigation has a quantifiable impact on property values. He does not even state whether the homes to which Mr. Fennell compared values had any litigation pending at the time of their sales.

In addition to failing to connect logical dots from Mr. Fennell's hypothesis to his conclusion, his opinion suffers from a fundamental defect in that the nature of the legal dispute between these parties has nothing to do with marketable title or the ability to sell the homes. There is a logical disconnect between the litigation between Plaintiffs and Defendants and these properties. At their essence, this litigation is a dispute between partners in a real estate development over the expenses and allocations of profit. This is not litigation in which title to the properties was at stake. If this were litigation about an encroachment or easement, one might logically conclude that the pendency of the case would scare off some potential buyers. But, this case involves ultimately the allocation of profits from the sale of the homes, which had no impact whatsoever on a buyers' ability to purchase the home.[2]

---

[2] As to the mechanics lien, this would not have chilled any offer as it would not have been revealed until a title search was obtained, which always occurs after an offer has been accepted. More importantly, a lien could always have been bonded off which would have removed any impediment to the sale. M.G.L. c. 254, §14.

8

To the extent Mr. Fennell opines that Defendants should bear the financial loss suffered as a result of the parties' legal dispute, Mr. Fennell operates from a faulty factual assumption. He overlooks the fact that Plaintiffs (not Defendants) initiated the legal proceedings by filing suit in State Court. He also overlooks the fact that Plaintiffs, without consulting or involving Kagan in the decision, decided to place the Debtor into bankruptcy. *See* Alexander Filippov Dep. Tr. at 112-13, 122, 128-29, attached hereto as Exhibit F. This decision was improvident to say the least, but if it is true that the litigation and subsequent bankruptcy petition suppressed the market value of the homes, Mr. Fennell cannot logically opine that Defendants are the cause of that shortfall.

### D. Mr. Fennell Lumped Together His Three Purported Causes

Mr. Fennell identifies there unrelated factors as explaining why the homes sold for $4.4 million when they were worth $5.1 million, the "extended construction", "ineffective marketing" and the parties' legal disputes. He does not individually quantify the effect of each factor. In other words, he does not say that the extended construction schedule accounts for a loss of $X, the ineffective marketing accounts for a loss of $Y, and the legal dispute accounts for a loss of $Z. For the reasons stated above, none of Mr. Fennell's opinions as to the three factors is admissible, and because he lumped them all together, even if only one of them is excluded, the entire opinion falls apart. If the Court excludes Mr. Fennell's opinion that "ineffective marketing" caused a lower sale price, for example, it will be impossible to determine from the disclosed opinion what portion of the allegedly $700,000 shortfall was attributable to the marketing. Mr. Fennell's report simply fails to disclose sufficient detail or explanation of the bases for his opinion to allow for the allocation of loss to one factor over another. Without this detail the admissibility of Mr. Fennell's causation opinion is an "all-or-nothing proposition."

9

## III.
## Plaintiffs are Estopped From Complaining About the Homes' Sale Prices

Even if Mr. Fennell's opinions were otherwise valid and admissible, Plaintiffs cannot lawfully complain about the sales prices obtained by the trustee because they were actively involved in this litigation, had notice of the impending sales and the listing price, and did not object. Under similar circumstances, courts have held that parties are estopped from making claims based on the transactions to which they did not object. Because Plaintiffs cannot maintain a claim against Defendants arising from or based on the sales prices to which they did not object, Mr. Fennell's opinion is irrelevant to any viable issues in this litigation.

Estoppel requires "(1) a representation or conduct amounting to a representation intended to induce a course of conduct on the part of the person to whom the representation is made; (2) an act or omission resulting from the representation, whether actual or by conduct, by the person to whom the representation is made; (3) and detriment to such person as a consequence of the act or omission." *Canzano v. Ragosa (In re Colarusso)*, 280 B.R. 548, 559 (Bankr. D. Mass. 2002), aff'd *Ragosa v. Canzano (In re Colarusso)*, 295 B.R. 166 (B.A.P. 1st Cir. 2003) (citing *Edwards v. Sullivan and Cogliano Companies, Inc.*, 2002 Mass. App. Div. 43, 2002 Mass. App. Div. LEXIS 19, 2002 WL 441968 (Mass. App. Div. 2002), and *Boylston Develop. Group v. 22 Boylston St. Corp.*, 412 Mass. 531, 542, 591 N.E.2d 157 (1992)). Here, Plaintiffs, active litigants by the time the trustee proposed to sell the homes, represented through their inaction that they consented to both the $4.5 million listing price and the $4.4 million sale. The Trustee and Defendants moved forward with the sale based on part on Plaintiffs' acquiescence. The elements of estoppel are therefore present on these facts.

In other similar cases, courts have held that when a party fails to object to a sale, it cannot later complain about it. *See In re HHG Corp.*, No. 01-B-11982 (ASH), 2006 Bankr. LEXIS 768,

10

at *11-12 (Bankr. S.D.N.Y. May 2, 2006); *In re DeArakie*, 199 B.R. 821, 827 (Bankr. S.D.N.Y. 1996) (holding that a debtor was equitably estopped from enforcing exemption where he "stated that he was not opposed to the sale, and failed to object to the distribution of the proceeds made by the trustee."); *Canino v. Bleau (In re Canino)*, 185 B.R. 584, 595 (9th Cir. B.A.P. 1995) (holding that a debtor's failure to object to trustee's distribution of proceeds resulting from the sale of exempt property equitably estopped her from complaining, two years after the fact, that she should have received a greater share); *Folger Adam Sec., Inc. v. DeMatteis*, C.A. NO. 96-4072, C.A. NO. 96-4073, 1998 U.S. Dist. LEXIS 18806, at *9 (E.D. Pa. Nov. 24, 1998) (holding that "where a creditor has received notice of a Section 363 sale and has failed to object, it has impliedly consented to the sale.") (citing *In re Elliot*, 94 B.R. 343, 345 (E.D. Pa. 1988)). Here, Mr. Fennell's opinion is irrelevant and inadmissible because Plaintiffs cannot maintain any claim flowing from the prices garnered on the sales of the homes.

## IV.
## Mr. Fennell's Opinions Should be Excluded

Mr. Fennell's opinions as to why the homes sold for less than the market value he assigned to each is inadmissible because he fails to explain the causal connection between the forces he identifies and the sales of the homes. In some instances, the factual assumptions on which the forces are based are so fundamentally flawed that Mr. Fennell's opinion is inherently unreliable. With respect to whether the homes were "effectively marketed" for sale, Mr. Fennell not only fails to explain his rationale, but he is also unqualified to offer such an opinion. Beyond those failures, Plaintiffs are estopped from asserting any claims based on the prices for which the homes were sold because they failed to object at the time the trustee sold them. For these reasons, Mr. Fennell's opinions are inadmissible and Plaintiffs should be precluded from arguing that the "extended construction" period, "ineffective marketing" or initiation of the litigation

caused the homes to sell for less than market value because they lack admissible expert testimony to support such claims.

WHEREFORE, Defendants respectfully request that this honorable Court:

A. Issue an order prohibiting the introduction of evidence and argument concerning the appraisal opinion of Hugh Morgan Fennell;

B. Issue an order precluding Plaintiffs from arguing that the "extended construction" period, "ineffective marketing" or initiation of the litigation caused the homes to sell for less than market value; and

C. Grant such additional and further relief as the Court deems necessary.

Dated:  November 16, 2018

Respectfully submitted,

VADIM KAGAN,
TATIANA KAGAN,
KAGAN DEVELOPMENT KDC, CORP. and
PROEXCAVATION CORP.,

By their Attorneys,

/s/ John H. Perten
Christopher M. Candon, BBO# 650855
John H. Perten, BBO# 548728
James P. Harris, BBO# 678283
SHEEHAN PHINNEY BASS & GREEN, PA
255 State Street, 5th Floor
Boston, MA  02109
Tel:  617-897-5600
Fax: 617-439-9363
E-mail: ccandon@sheehan.com
        jperten@sheehan.com
        jharris@sheehan.com

## CERTIFICATE OF SERVICE

I hereby certify that on this 16th day of November, 2018, a copy of the foregoing was served upon the parties listed below via ECF and/or first class mail, postage prepaid.

Eric K. Bradford
Office of the US Trustee
J.W. McCormack Post Office & Courthouse
5 Post Office Sq., 10th Fl, Suite 1000
Boston, MA 02109

Sean T. Carnathan
O'Connor, Carnathan and Mack, LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

David B. Madoff
Madoff & Khoury LLP
124 Washington Street - Suite 202
Foxborough, MA 02035

Steffani Pelton Nicholson
Madoff & Khoury LLP
124 Washington Street
Foxborough, MA 02035

Sarah A Smegal
Hackett Feinberg P.C.
155 Federal Street
9th Floor
Boston, MA 02110

Joseph P. Calandrelli
O'Connor Carnathan and Mack LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

Stephen G. DeLisle
Rubin and Rudman LLP
50 Rowes Wharf
3rd Floor
Boston, MA 02110

Amy M. McCallen
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110

David C. Phalen
Hackett Feinberg P.C.
155 Federal Street, 9th Floor
Boston, MA 02110

Peter N. Tamposi
The Tamposi Law Group
159 Main Street
Nashua, NH 03060

/s/ John H. Perten
John H. Perten