# EXHIBIT C

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |
|---|---|
| *In re:* )<br>)<br>LYMAN-CUTLER, LLC, )<br>Debtor, )<br>)<br>──────────────────── )<br>)<br>LYMAN-CUTLER, LLC, )<br>)<br>Plaintiff, )<br>)<br>v. )<br>)<br>VADIM KAGAN, TATIANA KAGAN, )<br>KAGAN DEVELOPMENT KDC CORP., )<br>and PROEXCAVACTION CORP., )<br>)<br>Defendants. )<br>──────────────────── ) | Chapter 7<br>No. 15-13881-FJB<br><br><br>A.P. No. 16-1120 |

**LYMAN-CUTLER, LLC'S SUPPLEMENTAL ANSWERS TO
KAGAN DEVELOPMENT KDC CORP.'S FIRST SET OF INTERROGATORIES**

Pursuant to Federal Rules of Civil Procedure 26 and 33, made applicable to this proceeding

through Federal Rules of Bankruptcy Procedure 7026 and 7033, and this Court's Pre-Trial Order,

Lyman-Cutler, LLC (the "LLC") supplements its answers to Kagan Development KDC Corp.'s

("KDC") First Set of Interrogatories.

**SUPPLEMENTAL ANSWERS**

**Interrogatory No. 5**

If Debtor contends that any expenses charged by KDC for labor and/or material provided for the
Project was excessive or somehow improper, please identify, in complete detail, each such expense and
set forth all facts upon which you base that contention.

1

**Answer No. 5**

The LLC believes that much of the amount claimed due by KDC in the proof of claim it filed in this bankruptcy is fraudulent and otherwise improper. It bases this belief on a number of factors. Before the project began, Kagan presented to Filippov and his co-investor, Nickolay Lipetsker, a detailed budget that Kagan claimed would represent the true costs of construction. Kagan's substantial experience building homes further led the investors to believe that Kagan's assertions were well founded. Throughout the course of the project, the LLC continually asked Kagan whether the project remained on budget. He always said that it did. Then, when the homes were on the verge of selling and months after construction was complete, Kagan – for the very first time – claimed that there was suddenly a $758,026.56 shortfall in money the LLC owed to him, with another $50,000 of additional vendor costs anticipated, as well as additional "capital contributions" in the amount of $251,000. Just weeks later, after the LLC sued Kagan, Kagan's claimed entitlement rose dramatically to over $2 million, despite the fact that the homes had been substantially completed more than nine months before. The LLC also learned around this time that Kagan had been making a practice with other projects on which he worked to claim an entitlement to a significant amount of alleged overruns on the verge of a home's sale in an effort to pressure his co-investors to pay him more money.

A review of the LLC and Kagan's financial records also support the conclusion that a number of payments made to KDC or payments made by KDC to others are fraudulent or otherwise improper, including the amount paid to ProExcavation Corp. which is grossly in excess of what a fair market charge would be for the type of site work that was involved in the Project. A detailed analysis of these charges is still being prepared by an expert(s), whose report will be produced in due course during this litigation and is incorporated herein by reference. Where Kagan controls both KDC and ProExcavation, and the ProExcavation charges are so grossly in excess of reasonable, the obvious conclusion is that Kagan is engaged in knowing and intentional fraud.

Even if for some reason this obvious conclusion were to prove incorrect, it is grossly negligent for Kagan and KDC to incur cost overruns of over $2 million on a Project where the budget was $3.2 million (including carrying costs and $200,000 for cost overruns already built into that figure) without prior consultation, supported by documentary backup, and with written approval by Filippov and Lipetsker. Because the LLC never approved charges above the original budget, as required by the LLC Agreement, even if Kagan and the other co-conspirator Defendants have not engaged in fraud, those charges are improper, unauthorized, grossly negligent, and not properly payable by the LLC.

Discovery is ongoing and expert reports will be produced in due course, which are incorporated herein by reference.

**Supplemental Answer No. 5**

All of the alleged charges in excess of Kagan's original $1.6 million budget per home for construction costs, carrying costs and unanticipated cost overruns are excessive, unsupported and/or otherwise improper. These alleged charges in KDC's proof of claim are fraudulent or, at minimum, the product of gross breaches of Kagan's fiduciary duties and the terms of the LLC's Operating Agreement.

On October 25, 2012, at a meeting at the law office of Attorney Boris Maiden and before the project began, Kagan presented to Filippov and Lipetsker, a detailed budget that Kagan claimed represented an accurate statement of costs of construction, which Kagan represented would be $1.3 million, plus $200,000 for carrying costs.  Before this meeting, Kagan circulated drafts of the presentation to Attorney Boris Maiden and Dimitriy Zhukovsky, whom Kagan had hired to put his budget figures into a spreadsheet for presentation to Filippov and Lipetsker.

Kagan clearly and expressly represented to Filippov and Lipetsker that he had accurately priced the cost of construction for the Project, that they could rely on his knowledge, skill, and experience, and that the costs of construction would not exceed his budget.  He later asked for an additional $100,000 in contingency funds in case of unexpected cost overruns, but he firmly and repeatedly told Filippov and Lipetsker that they could rely on his pricing for construction.  Filippov and Lipetsker justifiably and reasonably relied on Kagan's representations that the cost of construction for each home would be $1.3 million, with no more than $100,000 in potential overruns and that $200,000 per home would be sufficient to pay the carrying costs.  Kagan represented that the total costs for both houses would therefore not exceed $3.2 million and that they would probably not need the extra $100,000 per home for any overruns.  Filippov and Lipetsker reasonably relied on these representations in making their decision to invest in the Project.

Filippov, Lipetsker and Kagan executed the LLC's Operating Agreement (the "Operating Agreement"), which contained a specific, explicit provision that Kagan was responsible for building the two homes in the Project and that his compensation for doing so would consist of a 50% share of the net profits of the Project, subject to certain adjustments. The Operating Agreement further made specific provision for Kagan to be responsible for paying the carrying costs on the Project if the homes did not sell with 23 months as Kagan represented they would.  Filippov and Lipetsker relied upon the terms of their express agreement with Kagan that he would be compensated for the construction only through his equity interest in the Project.

Kagan's representations concerning the costs of construction to Filippov and Lipetsker to induce them to invest in the Project were either knowingly false or, at minimum, made with reckless disregard for their truth.  Kagan did not solicit bids from any subcontractors for the job.  He had only minimal plans and no specifications sufficient to price accurately the costs of construction.  He failed to exercise reasonable care (or indeed any care at all) to ensure that the representations he made to Filippov and Lipetsker were true.  As a professional builder and as a joint venturer in a closely held company, Kagan had a duty of loyalty, care and full disclosure to make truthful and accurate representations to Filippov and Lipetsker.  He breached those duties.

Other evidence adduced in discovery supports the conclusion that Kagan's representations were not merely reckless or grossly negligent but were intentionally false when made.  Kagan's alleged cost overruns, described further below, are so far above the budget presented to Filippov and Lipetsker to induce them to invest that no honest contractor with Kagan's experience could have believed that he was accurately presenting the costs of construction.  Kagan's alleged cost overruns are also far more than the reasonable cost of construction of the homes.  Furthermore, Kagan previously and contemporaneously inflicted the same strategy of presenting a false budget to solicit investment and then submitting large cost overruns on several other investors, including Elena Lande, Vladislav Abramskiy, Dmitriy

Zhukovskiy, Alexander Fodymanow, and Mark Kayserman. There exists a clear pattern of this fraudulent scheme being repeated by Kagan.

Furthermore, it is undisputed that Kagan failed to keep any proper or accurate records of his alleged costs and expenses during the construction on the Project. His former bookkeeper, Kristina Brusenkova, will testify that Kagan regularly made up charges after the fact to justify what he wanted to be paid for that project and made no effort to track payments he was making to subcontractors contemporaneously with when he was making the payments. His current bookkeeper, Daniel Gersh, has admitted that there were no organized Project cost files when Gersh was hired by KDC in or about November 2014, which was after the completion of construction. Gersh admits that he and Kagan solicited invoices from vendors and subcontractors to create purported financial records for the Project in 2015, long after construction was complete. Accordingly, there were no invoices or other documents to support his alleged cost overruns when he tried to pass them along to his investors. None of this proffered documentation is authentic, reliable or admissible in evidence. In the absence of proper recordkeeping, all of Kagan's purported charges are excessive, improper and not payable. Kagan had a duty to keep track of the costs of construction on the Project as they were incurred, and to timely inform Filippov and Lipetsker of any cost overruns so that the joint venturers could make informed and timely decisions about what to do in light of any such cost overruns. Kagan completely failed to meet that duty.

Throughout the course of the Project, Filippov on several occasions asked Kagan whether the Project remained on budget. Kagan always said that it was. Not until May 2015, approximately seven months after completion of construction did Kagan for the very first time assert that there were cost overruns when he had his lawyer, Alexander Pyle, send Filippov a letter claiming $758,026.56 in construction cost overruns, with another $50,000 of additional vendor costs still "anticipated" despite the fact that construction was long since complete. In the Pyle letter, Kagan also claimed for the first time that he was entitled to recover additional "capital contributions" in the amount of $251,000. Shortly before sending this letter, Kagan wrongfully signed a listing agreement with his wife, Tatiana, because he knew that his demand letter would start a dispute. Kagan also at some point signed a listing agreement, purportedly on behalf of Lyman Cutler, with Tatiana for a term of 18 months, which is three times industry standard. Under the Lyman Cutler Operating Agreement, Kagan did not have authority to sign either listing agreement and he knew it or should have known it. He signed them for the wrongful purpose of generating leverage to force the Company to pay his improper and excessive alleged cost overruns and to extend his wife's claim for a commission beyond what the Operating Agreement allowed in knowing violation of the Operating Agreement and his fiduciary duties.

Filippov and Lipetsker rejected the cost overruns and challenged Kagan's actions in court. On June 22, 2015, Kagan breached his fiduciary duty again, violated Chapter 93A (through KDC), and fraudulently filed a mechanic's lien against the Project properties based upon a purported contract with KDC that he secretly signed himself for both KDC and purportedly for Lyman Cutler, but which he had never shown to Filippov or Lipetsker and which contradicted the terms of the deal set forth in the LLC's Operating Agreement and the conditions of the loan from Rockland Trust Bank. The mechanic's lien falsely inflated KDC's purported cost over runs to over $2,095,985.23 nearly double what he had claimed despite the fact that the homes had been substantially completed more than nine months before. The additional charges in the mechanic's lien over and above those in the Pyle letter consist of an additional $1,086,958.67. Of this sum, $777,754.41 are charges derived from the false contract Kagan signed with himself. These charges are all knowingly false and fraudulent because Kagan knows that

none of the Plaintiffs ever agreed to the contract upon which he purported to base the mechanic's lien. Kagan has previously admitted that the mechanic's lien was overstated by $74,126.84, which again reflects a gross breach of his duties to Filippov, Lipetsker and Lyman-Cutler. To this day, Kagan has never offered any satisfactory explanation as to how his alleged cost overruns surged by an additional $235,077.42 (to yield the full $1,086,958.67 asserted in the mechanic's lien above the sums in the Pyle letter). The mechanic's lien also purports to be based upon an invoice to Lyman Cutler, which was never sent prior to the filing of the mechanic's lien. This false invoice was first presented to Filippov and Lipetsker by email on June 25, 2015. The invoice purports to be dated June 1, 2015 but this date is false. All of the charges asserted in the mechanic's lien are excessive, fraudulent, a breach of the Operating Agreement and Kagan's fiduciary duties, otherwise improper and not payable by Lyman-Cutler. In addition, Kagan manufactured unnecessary work at the Properties shortly before filing the fraudulent mechanic's lien in order to be able to assert he had worked at the Properties within the time frame required by the statute.

Kagan's proffered documentation and financial records also support the conclusion that a number of the specific payments made to KDC or payments allegedly made by KDC to others on the Project are excessive or otherwise improper or fraudulent. This answer incorporates by reference the analysis and opinions stated in the expert reports of Michael Goldman and David Doddridge.

In particular, the financial records of ProExcavation Corp. ("ProEx") do not in any way support the charges asserted. The purported "Proposal" proffered as the only documentary support for the ProEx charges was never shown to Filippov or Lipetsker until this litigation commenced. Although it purports to be dated in September and October 2013, it bears a phone number that ProEx did not use until some time in 2014. The Operating Agreement obligated Kagan to build the two houses for the Project and to accept as his compensation a 50% share in the net profits of the Project, subject to certain potential adjustments. Padding the ProEx bill with hundreds of thousands of dollars in profit for Kagan is a breach of the Operating Agreement and a breach of Kagan's duty of loyalty to Filippov and Lipetsker. ProEx has produced virtually no reliable documentation or other evidence to prove out of pocket expenses supporting the charges to the Project. The accounting records produced by ProEx and its accountant show that ProEx added $425,000 in purported receivables from Lyman Cutler to its books long after the Project was complete, which is nearly half of the amount claimed against the Project. As set forth in the Report of Michael Goldman, on projects Kagan builds without an investor, his costs of construction are much lower than on his projects with an investor. Kristina Brusenkova will also testify that Kagan makes up his ProEx charges without regard to the actual costs incurred. These facts all support the conclusion that the ProEx charges are false and fraudulently inflated double billing to the Project.

All of the charges based upon the purported contract between KDC and Lyman Cutler, allegedly signed by Kagan for both sides on July 24, 2013, are fraudulent double billing in breach of the Operating Agreement and Kagan's duty of loyalty to Filippov and Lipetsker. The terms of the Operating Agreement provided that Kagan's only source of compensation above his direct construction costs would be in the form of a percentage of profits to which he was entitled from the LLC after the properties were sold. Asserting claims against Lyman Cutler for $1,086,958.67 based upon the alleged KDC contract violates the express terms of the Operating Agreement. Kagan did not have authority to sign this contract for Lyman Cutler and his contention that it is a valid contract is gross self-dealing. KDC is liable under Chapter 93A for the assertion of charges based upon this contract.

In addition, the evidence supports the conclusion that Kagan and Joseph Cohen forged the KDC contract in or about June 2015. Filippov and Lipetsker never saw this alleged contract before this litigation. In May 2018, after years of discovery requests, and only after Kagan's deposition commenced, did Kagan produce a printed version of what purported to be an email from Kagan to Filippov and a Rockland Trust representative that supposedly provided them with the alleged KDC contract back in 2013. Filippov's email records do not contain this particular email, nor was a copy of that email produced by Rockland Trust in response to the subpoena. As a result, the LLC's counsel immediately demanded production of the electronic, native file email. On or around May 23, 2018, Kagan produced a printed version of what purported to be an email forwarded from Joseph Cohen to himself on May 22, 2018, which itself purported to include a printed version of an email dated June 24, 2013 between Joseph Cohen and Kagan. Then, on June 6, 2018, Kagan's counsel forwarded what purported to be the electronic version of the email that had previously been produced in printed form. The metadata on what purported to be an unsigned contract suggested that the entire document was edited from start to finish in 2 minutes or less, which is nearly impossible to do (even if you start with a template), and was last printed on June 17, 2015, just days before KDC filed its mechanic's lien. If the email had been genuine, there is no conceivable way in which an email sent in June 2013 could have attached a Word document whose metadata reflects that it was printed two years later. Even if that were somehow possible, there is no reason why KDC would have needed to print the Word version of this document in June 2015 unless it had never been previously created. Kagan's book keeper, Daniel Gersh, testified that he had never seen the KDC contract. There are no entries in KDC's books and records based upon the alleged charges in the KDC contract. No charges based upon this purported contract were included in the May 2015 Pyle letter. The invoice purportedly based upon this contract was not sent to Filippov until June 25, 2015 despite being dated June 1, 2015. Kagan and Cohen forged this contract in order to inflate the alleged charges from KDC, file the fraudulent mechanic's lien and wrongfully try to force Filippov and Lipetsker to agree to pay the alleged cost overruns asserted in the Pyle letter to avoid financial catastrophe. Regardless of whether the fact finder concludes the KDC contract was forged in June 2015, however, all charges asserted based on it are improper, fraudulent a breach of the LLC Agreement and Kagan's fiduciary duties and not properly payable.

In addition, there are also a number of specific subcontractors whose purported charges appear to be fraudulent:

Unicom Electric has been paid $65,000 during the course of the project for the electrical work completed on both houses. This number corresponds precisely to the amount KDC asserts that it is owed for Unicom's remaining balance on the Project based upon undated, duplicate invoices that appear to be photocopies of the same invoice with only the address changed. The remaining $65,000 KDC claims it is owed for Unicom-related work was not even listed on the accounts payable ledger until April 2015, more than a year after the electrical work was complete and approved by the local building inspector. Unicom never filed a mechanic's lien of its own against the Project and has allegedly gone unpaid for over 4 years. No original invoices have ever been produced. Unicom also used a duplicate copy of this invoice on the 10 Lyman Road project with only the number of the address changed. Unicom also appears to have two sets of proposals that he uses on different Kagan projects – one for a house receiving 200 amp service and one for a house receiving 400 amp service. The proposals among these two different style houses appear to be duplicates of each other.

BST Plumbing's materials invoices for the two properties, dated August 18, 2015 (two months after KDC filed its mechanics lien) are identical -- even going so far as having the same invoice number and job address of 55 Lyman. They are dated months after work was completed, and provide as backup identical quotes from Ferguson Enterprises that post-date the date of BST's invoices. These payments appear to be duplicative of material invoices submitted directly by (and paid to) the plumbing supply company by way of Kagan's American Express card in October 2014, credits that are not accounted for in Ferguson's August 19, 2015 bid. BST's labor invoices, dated March 14, 2015 and March 1, 2015, are identical, are dated many months after the local inspector had approved BST's work, were sent to Kagan nearly a year after BST received payment from Kagan, and contain handwritten remarks indicating that a total of $39,670 remains unpaid. The LLC's QuickBooks audit trail report indicates that two invoices from BST in the amount of $11,360 each were entered into the system on April 29, 2015 and were changed 27 minutes later to $19,670 each. BST also was purportedly paid only half of what its purported proposals required it to be paid, and allowed tens of thousands of dollars allegedly owing to it sit on the books unpaid for years.

V&D Heating and Cooling likewise provided two handwritten "proposals" that were identical even so far as including marks where the paper clips were located except for the header -- property address and date. Each proposal describes the work as the same, and it appears as if one proposal was copied to create the other. These proposals are dated December 5 and 6, 2013, and call for an initial payment of $25,000 each. In fact, V&D had received only $10,000 as an initial payment for each house, and had received these payments over a month before issuing its proposals. V&D allowed $19,000 to remain unpaid for over four months, then supposedly performed an extra $5,000 worth of work (which were not included in the QuickBooks ledger), bringing the total outstanding amount allegedly owed to $24,000, and has permitted that amount to allegedly remain unpaid to this day.

Décor Art's invoices appear on their face to have been fabricated by KDC given that they are facially inconsistent with each other in numerous ways, including how the company's address is identified, the use of a color graphic in the header of the invoice, and the use of different style invoices with different color gradients for different projects. Décor Art's invoices include duplicate invoice numbers paid months apart, and in at least one, the painter's purported letterhead did not spell the word "painter" correctly. The February 12, 2015 invoice for $8,750 was included in Kagan's documentation but was not included in the QuickBooks file, even though invoices which are dated later than that one are included in the file. A separate Décor Art invoice dated April 23, 2015 purported to charge KDC $420 for house cleaning services, but was entered into the QuickBooks records for purposes of the mechanics lien with an additional $1,000 charge. Décor Art also purportedly had a balance outstanding to him and continued to work, even though he testified that he would not work if he was not timely paid.

Paul DiGiacomo, a convicted criminal, also prepared invoices that were close in time with each other but contain invoice numbers that are significantly far apart. They also appear to have been produced using different formats and templates, are facially inconsistent with each other, and, with respect to at least the invoice No. 9 dated August 6, 2015, include charges for work that had passed inspection months earlier, are precisely identical to each other with the exception of the street name, and appear to include charges for that had been invoiced previously. Based on the documents produced with respect to the other construction projects, Mr. DiGiacomo never submitted invoices on other projects. Moreover, purported snow charges for 2014 and 2015 were not entered into the QuickBooks records until May 24, 2015.

7

Pave Tech, a company that supposedly has been in business for nearly 20 years, issued invoices that contain a low invoice number suggesting that these were some of the first invoices ever issued by the company. Moreover, some of these invoices were duplicate in number but contained different amounts to be billed. One payment supposedly made to PaveTech in August 2014 was not even entered into the QuickBooks ledger until May 11, 2015.

Sergey Nikolaev similarly issued invoices for tile work on April 10, 2015, months after having been paid a substantial portion of this and after the final inspection had been completed. These invoices do not credit any of the prior payment received and lack any description of the work supposedly performed. The balance was then paid by KDC, which in turn seeks payment from the LLC.

Dream Flooring's invoices contradict each other both in terms of price and amount received. One invoice produced by Dream Flooring for $48,910 with respect to the Lyman Road house is dated July 3, 2014 and states that the job was complete and paid in full. A second invoice for Lyman Road, dated March 23, 2015, states that there is a remaining balance of $8,910 with additional work outstanding for $3,300, but also indicates that the job was completed and paid in full. However, according to Kagan's records, Dream Flooring was paid on March 20, 2014, significantly before the date of Dream Flooring's invoices, and Kagan's records of the March 2015 invoice suggest that there is still a balance owed of over $12,000. Dream Flooring's invoice for Cutler Lane that it produced in response to the subpoena also indicates that it was "paid in full," yet the invoice produced by Kagan indicates that the amount "due" is $48,910 even though Kagan's own records show that a portion of this invoice had been paid months earlier. An additional $2,500 was supposedly invoiced by Dream Flooring for each home in April 2015, long after work was complete. Kagan's QuickBooks records reflect that invoices entered into the system in April 2015 were subsequently modified and assigned an invoice number, even though Dream Flooring's invoices were unnumbered.

DaCosta Construction also used non-sequential invoices that have different formats, appear to have been fabricated, and which include work supposedly performed on other projects. On April 28, 2015, two invoices without invoice numbers were listed as accounts payable in Kagan's bookkeeping system. Both of these were deleted one day later. A large change order in the amount of $18,500 appears nowhere in the QuickBooks records. Moreover, KDC appears to be claiming $23,000 allegedly owing to DaCosta that was evidenced only by an email that purports to modify a pre-existing invoice that was never issued. At least one of DaCosta's invoices also purports to credit a payment received by it that is not identified in the QuickBooks files.

Horner Millworks was supposedly paid by credit card. One version of the QuickBooks files produced by Kagan matches what was reflected as paid through the American Express statements, $228,866.35. However, a different version of the QuickBooks files that was used for purposes of the mechanics lien claims an additional $35,060.84 that does not appear to ever have been paid to or charged by Horner Millworks.

Affordable Lawn Sprinklers worked on every Kagan project. It charges double the price when it works on a project with which Kagan is working with outside investors. Its only invoice, Invoice No. 9300, was included in the support for Lyman Road but identified a property address of 88 Cutler. The mechanic's lien filed by Kagan includes an $8,400 charge for Cutler which is missing documentation

but which is included as an identical charge for both properties in Kagan's QuickBooks records. It was paid twice – once by KDC and once by the LLC directly.

Eastcoast Pipelines submitted one invoice in the amount of $1,000 that covered Kagan's work on 4 separate houses, including 55 Lyman and 88 Cutler. The entire charge was paid directly by the LLC.

There are other highly suspect charges and additional detail with respect to the above that are identified in the report by Michael Goldman, which is incorporated herein by reference.

Finally, the carrying costs Kagan purports to have incurred after 23 months after the Date of Acquisition as set forth in the Lyman Cutler Operating Agreement are excessive, improper and not properly payable to Kagan. First, Kagan undertook to pay those costs if the properties were not sold by that time. Second, if Kagan had completed the construction on time as required by the Operating Agreement, the properties would have been sold by then and these carrying costs would not have been incurred.

## Interrogatory No. 9

Please itemize all damages which Debtor seeks to recover from KDC, including in your response any pertinent calculations and the factual basis for those damages.

## Answer No. 9

The LLC objects to this interrogatory as premature. Discovery and expert analysis is ongoing. In general terms, the LLC asserts that the purported charges above the original budget are fabricated and fraudulent, are grossly negligent, and not authorized and not properly payable even if not intentionally false and fraudulent. Damages include the amounts paid above the budgeted amounts and also the losses incurred as a result of being forced into a distressed sale of the LLC's properties, encumbered by a false and fraudulent mechanic's lien and resulting bankruptcy. The precise amount of the damages will depend upon the determinations of the experts, which will be produced in due course in this litigation and are incorporated herein by reference.

## Supplemental Answer No. 9

Because of Kagan's wrongful conduct described above, the LLC was subjected to a false mechanic's lien and self-dealing realtor listing agreements, and forced into bankruptcy which resulted in a distressed sale of the LLC's two primary assets, the properties located at 55 Lyman Road and 88 Cutler Lane. The LLC's damages include the difference between the selling price of the properties - $4,400,000 per house – and the fair market value each house would have sold for but for Kagan's conduct - $5,100,000 per house. The damages for the diminished selling price of the homes equal $1.4 million, plus interest. The LLC will rely on expert testimony by Morgan Fennell as set forth in his two expert reports one for 55 Lyman Road and one for 88 Cutler Lane, produced on July 30, 2018.

The Debtor also seeks as damages the increased costs incurred as a result of the bankruptcy proceeding, including substantial attorneys' fees. These damages include the lost earnings on funds held in escrow during the pendency of the bankruptcy filing. Plaintiffs further claim as damages the

$17,986.83 in fees paid to Rabobank, N.A. as a result of the bankruptcy and the bond fees of $3,910.89 also incurred as a result of the bankruptcy, as well as any fees paid to the Trustee.

The Debtor also seeks recovery of attorneys' fees and costs in connection with the bankruptcy and an award of attorneys' fees pursuant to Chapter 93A.

These damages are in addition to seeking the disallowance of the Defendants' proofs of claim.

### Verification

I, Alex Filippov, state under the pains and penalties of perjury that I am the Managing Member of the LLC; that I am authorized to answer these interrogatories on the LLC's behalf; and that the foregoing answers are true and accurate to the best of my knowledge, information, and belief.

_____
Alex Filippov

*As to objections:*


/s/ Peter N. Tamposi
Peter N. Tamposi (BBO No. 639497)
The Tamposi Law Group, P.C.
159 Main Street
Nashua, NH 03060
T:  (603) 204-5513

Dated:  September 27, 2018


### Certificate of Service

I, Peter Tamposi, certify that a copy of the foregoing document was served by electronic and first-class mail, postage prepaid, to Defendants' counsel on September 27, 2018.

/s/ Peter N. Tamposi
Peter N. Tamposi

4833-0183-9476, v. 1