# EXHIBIT E

# CONSTRUCTION MANAGEMENT/
# GENERAL CONTRACTOR AGREEMENT



THIS AGREEMENT is made and entered into June 24, 2013, by and between Lyman Cutler LLC (hereinafter referred to as the "Owner" or "Company"), and Kagan Development KDC, Corp. (hereinafter referred to as the "Construction Manager/General Contractor" or "CM/GC"), for services in connection with the following described Project:

This Contract shall be performed in conjunction with the services of the Owners Project Manager, **Vadim Kagan (hereinafter the OPM).**

Therefore, in consideration of the mutual covenants and provisions contained herein, the parties agree as follows:

**1.0   THE CONSTRUCTION TEAM AND EXTENT OF AGREEMENT**

1.1   The CM/GC accepts the relationship of trust and confidence established with the Owner by this Agreement. He covenants with the Owner to furnish his best skill and judgment and to cooperate with the OPM in furthering the interests of the Owner. He agrees to furnish efficient business administration and superintendence and to use his best efforts to perform the Work in the best and soundest way and in the most expeditious and economical manner consistent with the interests of the Owner.

1.1.1   <u>The Construction Team</u>: The CM/GC, the Owner, and the OPM, collectively referred to as the "Construction Team" shall work from the beginning of design through construction completion. The CM/GC shall provide leadership to the Construction Team on all matters relating to construction.

1.1.2   <u>Extent of Agreement</u>: This Agreement and the General Conditions to the Agreement represent the entire agreement between the Owner and the CM/GC and supersedes all prior negotiations, representations or agreements. When plans and specifications are complete, they shall be identified as part of the Contract Documents. This Agreement shall not be superseded by any provisions of the documents for construction and may be amended only by written instrument executed by both the Owner and the CM/GC. Nothing contained herein shall be deemed to create any contractual relationship between the CM/GC and the OPM, or any of the contractors, subcontractors or material suppliers on the Project; nor shall anything contained herein be deemed to give any third party any claim or right of action against the Owner or the CM/GC which does not otherwise exist without regard to this Agreement.

1.1.3   <u>Contract Documents</u>: The provisions of the General Conditions and all of the "Contract Documents" for the Project as that term is defined therein are incorporated by this reference into this Construction Management/General Contractor Agreement, to the extent those documents and their provisions are not in conflict with specific provisions herein.

**2.0   CONSTRUCTION MANAGER/GENERAL CONTRACTOR SERVICES**

2.1   The CM/GC's basic services under this Agreement shall consist of the two phases described below;

2.2   <u>Design Phase</u>. As part of the Design Phase services, the CM/GC will:

VK/VK

2.2.1 **Consultation During Project Development** - Attend regularly scheduled meetings with the OPM during the development of conceptual and preliminary design to advise on site use and improvements, selection of materials, building systems and equipment. Provide recommendations on construction feasibility, availability of materials and labor, time requirements for installation and construction and factors related to cost including costs of alternative designs or materials, preliminary budgets and possible economies.

2.2.2 **Scheduling** - Develop a Project Time Schedule that coordinates and integrates the OPM's design efforts with construction schedules. Update the Project Time Schedule incorporating a detailed schedule for the construction operations of the Project, including realistic activity sequences and durations, allocation of labor and materials, processing of shop drawings and samples and delivery of products requiring long lead-time procurement. Include the Owner's occupancy requirements showing portions of the Project having occupancy priority.

2.2.3 **Project Construction Budget** - Review the Owner's established Project budget as soon as major program requirements have been identified and update the budget periodically for the Owner's approval. Prepare an estimate based on a quantity survey of drawings and specifications at the end of the Schematic Design Phase for approval by the Owner as the Project Construction Budget. Update and refine this estimate for Owner's approval as the development of the drawings and specifications proceeds. Advise the Owner and the OPM if it appears that the Project Construction Budget will not be met and, in that event, make recommendations for corrective action.

2.2.4 **Value Engineering** - Provide technical review and analysis of systems and materials being considered in the design to produce the greatest value for the least cost.

2.2.5 **Coordination of Contract Documents** - Review the drawings and specifications as they are being prepared, recommending alternative solutions whenever design details affect construction feasibility or schedules without, however, assuming any of the OPM's customary responsibilities for design.

2.2.6 **Construction Planning** - Recommend for purchase and expedite the procurement of long-lead items to ensure their delivery by the required dates.

2.2.7 **Division of Work** - Make recommendations to the Owner and the OPM regarding the division of the Work in the plans and specifications to facilitate the bidding and awarding of subcontractors and to allow for phased construction, taking into consideration such factors as time of performance, availability of labor, overlapping trade jurisdictions, provisions for temporary facilities and other matters.

2.2.8 **Construction Document Review** - Perform final review of plans and specifications with the OPM and Owner to eliminate areas of conflict or misinterpretation and to assure proper coordination, accuracy and completeness.

2.2.9 **Labor** - Analyze the types, quantity and availability of appropriate categories of labor required for various phases of the Project.

2.2.10 **Bidding** - Prepare pre-qualification criteria for bidders and develop subcontractor interest in the Project. As working drawings and specifications are completed, establish bidding schedules and conduct pre-bid conferences to familiarize bidders with bidding documents, management techniques and any special systems, materials or methods. Receive competitive bids on the Work from various subcontractors, pursuant to bidding procedures acceptable to the Owner. Analyze all bids, review them with the Owner and OPM, make recommendations for contract awards and award subcontractors.

2.2.11   Conferences - Conduct pre-construction conferences with successful subcontractors.

2.2.12   Equal Employment Opportunity - Determine applicable requirements for equal employment opportunity programs for inclusion in Project bidding documents.

2.3   Construction Phase. As part of the Construction Phase services, the CM/GC will:

2.3.1   Project Control - Supervise the Work of the subcontractors and coordinate the Work with the activities and responsibilities of the Owner and OPM in order to complete the Project in accordance with the Owner's objectives of cost, time and quality.

2.3.2   Staffing - Maintain a competent full-time staff at the Project site to coordinate, provide overall direction of the Work, and monitor progress of the subcontractors on the Project.

2.3.3   Organization - Establish on-site organization and lines of authority in order to carry out the overall plans of the Construction Team.

2.3.4   Coordination - Establish and implement procedures for coordination among the Owner, OPM, subcontractors and the CM/GC with respect to all aspects of the Project.

2.3.5   Scheduling - Schedule and conduct progress meetings at which subcontractors, the Owner, OPM and the CM/GC can discuss jointly such matters as procedures, progress, problems and scheduling. Provide a detailed schedule for the operations of the CM/GC and subcontractors on the Project, including realistic activity sequences and durations, allocation of labor and materials, processing of shop drawings and samples and delivery of products requiring long lead-time procurement. Include the Owner's occupancy requirements in all schedules showing portions of the Project having occupancy priority, if any.

2.3.6   Monitoring - Provide regular monitoring of the schedule as construction progresses. Identify potential variances between scheduled and probable completion dates. Review schedule for work not started or incomplete and recommend to the Owner and subcontractors adjustments in the schedule to meet the scheduled completion date. Provide summary reports of such monitoring activities and document all changes in the schedule.

2.3.7   Evaluation - Determine the adequacy of the subcontractors' personnel and equipment and the availability of materials and supplies to meet the schedule.

2.3.8   Cost Control - Develop and implement an effective system of Project cost control.

2.3.9   Change Orders - Develop and implement a system for the expeditious review and processing of Change Orders. Initiate necessary or desirable changes to the Owner and the OPM, review requests for changes, submit recommendations to the Owner and the OPM and assist in negotiating Change Orders, in accordance with section 17.00 of the General Conditions of the Agreement.

2.3.10   Permits - Secure or assist the Owner in securing all necessary permits, licenses and inspections for the proper completion and execution of the Work, in accordance with section 12.00 of the General Conditions of the Agreement.

2.3.11   Carrying Costs – Advance such funds as required to provide all needed services for the establishment and maintenance of the Work, whether or not such accounts as established are in the name of the Owner or the CM/GC.

2.3.12   Owner's Consultants - If required, assist the Owner in selecting, retaining and coordinating professional services of a surveyor, testing laboratories and any special consultants.

NK/VK

2.3.13   *Superintendent* - Keep on the Project, during the work, a competent superintendent and any necessary assistants, all satisfactory to the OPM and the Owner, in accordance with section 16.00 of the General Conditions of the Agreement. The superintendent shall not be changed except with the consent of the OPM and the Owner, unless the superintendent proves to be unsatisfactory to the CM/GC and ceases to be in his employ. The superintendent shall represent the CM/GC in his absence and all directions given to him shall be as binding as if given to the CM/GC. The OPM and the Owner shall not be responsible for the acts or omissions of the superintendent or his assistants.

2.3.13.1   The superintendent shall provide full-time, qualified and efficient supervision of the Work, using his best skill and attention. Carefully study and compare all drawings, specifications and other instructions and immediately report to the OPM any error, inconsistency or omission which may be discovered. Inspect the Work of the subcontractors at all stages and at final completion and guard the Owner against defects and deficiencies in such Work. The CM/GC shall be responsible to the Owner for the acts and omissions of all his employees and of all subcontractors, their agents and employees and all other persons performing any of the Work, for which the CM/GC has supervisory or inspection responsibility hereunder.

2.3.13.2   The superintendent shall see that the Work is carried out in accordance with the Contract Documents and in a thorough and first class manner in every respect. The CM/GC's superintendent shall establish all lines, levels and marks necessary to facilitate the operations of all concerned in subcontract work. He shall lay out the Work in a manner satisfactory to the OPM, making permanent records of all lines and levels required for excavation, grading and foundations and for all other portions of the Work. He shall, together with the OPM, authorize the commencement and certify the proper completion of the various stages of construction. The CM/GC shall be responsible for construction means, methods, techniques, sequences and procedures and for carrying out the Work in accordance with the Contract Documents.

2.3.14   *Safety Measures* - Establish procedures and measures for the safety of persons and property at and around the site of the Work. Assure compliance with all federal, state and local statutes, rules, regulations and orders applicable to the conduct of the Work.

2.3.15   *Contract Interpretations* - Refer all questions relative to interpretation of design intent to the OPM in writing.

2.3.16   *Shop Drawings and Samples* - In collaboration with the OPM, establish and implement procedures for expediting the processing and approval of shop drawings and samples, in accordance with section 8.00 of the General Conditions of the Agreement.

2.3.17   *Reports and Project Site Documents* - Record the progress in written progress reports and summaries of meetings to the Owner and the OPM, including information on the subcontractors' work and the percentage of completion at the request of the OPM.

2.3.18   *Record Sets* - Maintain at the Project site, on a current basis, records of all necessary contracts, shop drawings, samples, purchases, materials, equipment, maintenance and operating manuals and instructions and any other documents and revisions thereto which arise out of the Agreement or the Work, in accordance with section 7.00 of the General Conditions of the Agreement. Obtain data from subcontractors and maintain a current set of record drawings, specifications, operating manuals, warranties and guarantees. At the completion of the Project submit all such documents to the OPM for delivery to the Owner.

2.3.19   *Completion* - Determine completion of the Work or designated portions thereof and prepare for the OPM a list of incomplete or unsatisfactory items together with a schedule for their completion, in accordance with section 50.00 of the General Conditions of the Agreement.

2.3.20   *Start-Up* - With the Owner's maintenance personnel and the OPM, direct the checkout of utilities, operating systems and equipment for readiness and assist in their initial start-up and testing by the subcontractors.

2.3.21   *Completion* - Determine final completion and provide written notice to the Owner

VK/VK

KAGAN 01262

and OPM that the Work is ready for final inspection. Secure and transmit to the OPM required guarantees, tax affidavits, certificates, releases, bonds and waivers. Turn over to the Owner all keys and maintenance stocks.

2.3.22   Warranty - During the one-year warranty period at no additional cost to the Owner, perform four quarterly warranty inspections and ensure that Work which proves defective or deficient during such time is corrected either by the subcontractors or such other means as shall be required. Administer the one-year warranty period by the Owner's Warranty Work Request process and attend four quarterly warranty work request meetings, in accordance with section 53.00 of the General Conditions of the Agreement.

2.4   Additional Services - Additional services shall be performed only upon the express, prior written authorization of the Owner and paid for as provided herein. Additional services shall include the following:

2.4.1   Analysis of Existing Improvements - Services related to investigation, appraisals or valuations of existing conditions, facilities or equipment; or verifying the accuracy of existing drawings or other Owner-furnished information.

2.4.2   Owner-Furnished Equipment - Services related to Owner furnished equipment, furniture and furnishings which are not a part of the Work.

2.4.3   Expert Witness - Preparing to serve or serving as an expert witness in connection with any public hearing or legal proceeding.

2.4.4   After Completion - Inspections of and services related to the Project after completion of the services under this Agreement.

2.4.5   Other - Providing any other service not otherwise included in this Agreement.

3.0   THE OWNER'S RESPONSIBILITIES

3.1   Information - The Owner shall provide full information regarding its requirements for the Project.

3.2   Owner's Representative - The Owner shall designate a representative who shall be acquainted with the scope of the Work; has authority to approve budgets and adjustments thereto, as contemplated by Paragraph 2.2.3 within the Project Cost Estimate, and otherwise furnish information.

3.3   OPM - The Owner shall retain an OPM to provide design services and to prepare construction documents for the Project. The OPM's services, duties and responsibilities are described in the Agreement between the Owner and the OPM, a copy of which will be furnished to the CM/GC.

3.4   Professional Services - The Owner shall furnish such legal services as may be necessary for the Project, and such auditing services as it may require.

3.5   Documentation - The CM/GC will be furnished, without charge, all copies of drawings and specifications reasonably necessary for the execution of the Work.

3.6   Defects - If the Owner becomes aware of any fault or defect in the Project or nonconformance with the Contract Documents, it shall give prompt written notice thereof to the CM/GC. This provision shall not, however, charge the Owner with any obligation to make inspections and shall in no manner be construed to discharge or modify the CM/GC's obligations to supervise, inspect and to otherwise complete the Project in accordance with the Contract Documents.

3.7   Surveys and Special Testing - So far as the Project contemplated by this Agreement may require, the CM/GC shall be entitled to information giving a complete and accurate survey of the building site and the existing grades and lines of streets, pavements and adjoining properties; information as to the rights, restrictions, easements, surface water courses, boundaries and contours of the building site; and full

VK/VK

KAGAN 01263

information as to existing sanitary sewer, storm sewer, water, gas and electrical services. The Owner, at its expense, shall furnish all such data, upon request. The Owner likewise shall pay for all borings or test pits and for any mechanical, chemical or other tests as well as professional verifications and inspections incident to proper appraisal of the site for the contemplated structure. A copy of all reports of such tests and borings shall be filed with the Owner and shall be available to the CM/GC, upon request.

3.8    Owner's Expenses - The services, information, surveys and reports required by Paragraphs 3.3 through 3.5 and 3.7, shall be furnished at the Owner's expense.

**4.0    SUBCONTRACTS**

4.1    Bidding - All Work, performed at the direction of the OPM shall be exempt from bidding. Notwithstanding, CM/GC shall use its expertise in providing appropriate services at industry standard pricing for the market and timing required by the OPM.

4.2    Award - The CM/GC when needed, shall request and receive proposals from subcontractors and subcontracts will be awarded by the CM/GC after the proposals are reviewed by the CM/GC with the OPM.

4.3    Substitution - If the OPM refuses to accept a subcontractor recommended by the CM/GC, the CM/GC shall recommend an acceptable substitute. The Guaranteed Maximum Price, if applicable, shall be increased or decreased by the difference in cost occasioned by such substitution and an appropriate Change Order shall be issued.

4.4    Forms - The form of the subcontract, including the General and Supplementary Conditions applicable thereto, shall be satisfactory to the, OPM and the CM/GC.

**5.0    CONTRACT TIME SCHEDULE**

5.1    Schedule - The services and work to be performed under this Contract shall be in general accordance with the Contract Time Schedule attached hereto as Exhibit 1.

5.2    Time of Completion - This date shall be established at the time a Guaranteed Maximum Price is established or prior to the award of any subcontracts if a GMP is not established.

5.3    Revision - At the time a Guaranteed Maximum Price is fixed, as provided for in Paragraph 6, a new Contract Time Schedule shall also be established.

5.4    Delays and Extension of Time - If the CM/GC is delayed at any time in the progress of the Work by any act or neglect of the Owner or the OPM or by any employee of either; or by any separate contractor employed by the Owner; or by changes ordered in the Work; or by labor disputes, fire unusual delay in transportation, unavoidable casualties or any causes beyond the CM/GC's control; or by delay authorized by the Owner; the Contract Time Schedule shall be extended.

KAGAN 01264

5.5 Liquidated Damages - The CM/GC understands and agrees that the completion of the entire Project within the time specified is an essential feature of this Agreement and that the Owner will sustain substantial damages, the amount of which is not possible to accurately determine at the time of contracting and which may be difficult to prove, if the Work is not so completed. The CM/GC, therefore, agrees to proceed with due diligence, taking all precautions and making all necessary arrangements to insure the completion of the Work within the prescribed time. The CM/GC further agrees that his failure to fully and finally complete the Work due to negligence, neglect, or mismanagement, within the time allowed shall be considered a material breach of this Agreement and shall entitle the Owner to collect liquidated damages for the delay in completion in accordance with the General Conditions in the sum of five hundred dollars ($500.00) per calendar day.

**6.0 GUARANTEED MAXIMUM PRICE**

6.1 Establishment - When the design, plans and specifications are sufficiently complete to make the final cost estimates and prior to awarding any subcontracts, the CM/GC will, if desired by the Owner, and requested in writing, fix a Guaranteed Maximum Price (GMP), guaranteeing the maximum cost to the Owner for the Cost of the Work and the CM/GC's Fees. Such GMP will be guaranteed by the CM/GC, subject only to modification for Changes in the Work as provided in the General Conditions of the Agreement 17.00 Changes in the Work and for additional costs arising from delays caused by the Owner or the OPM.

6.2 Subcontracts - When the CM/GC provides a GMP, the subcontracts will contain the necessary provisions to allow the CM/GC to control the performance of the Work.

**7.0 CONSTRUCTION MANAGER/GENERAL CONTRACTOR'S FEE**

7.1 Determination - In consideration of the performance of this Agreement, the Owner agrees to pay the CM/GC in current funds as compensation for his services a CM/GC's Fee as set forth in Paragraph 7.1.1 and 7.1.2.

7.1.1 Design Phase Fee - For the performance of the Design Phase services, as defined in Paragraph 2.2, a fee of $25,000.00.

7.1.2 Construction Phase Fee - For work or services performed during the Construction Phase, as defined in Paragraph 2.3, a fee of 15% fifteen percent, which shall be paid proportionately to the ratio the monthly payment for the Cost of the Work bears to the total Cost of the Work. Any balance of this fee shall be paid the time of final payment.

7.1.3 Operational Advances – For any capital outlay advanced by the CM/GC done in order to facilitate the advancement of this agreement or the project as defined in the Scope of Work, attached hereto, or as directed by the Owner, whether or not this advance occurs during or post the construction phase, but in all events prior to the sale or disposal of the property, the CM/GC shall be reimbursed the full amount of the Operational Advance plus a fee of 17.5% (seventeen and one half percent). Any balance remaining unpaid beyond 30 days after being advanced shall accrue additional interest at 12% (twelve percent) per annum compounded monthly.

7.1.4 Post Construction Services – For the support work performed by KDC in maintaining, and keeping the project properties in Marketable Condition, services to be billed at actual cost plus a fee of 17.5% seventeen and one half percent.

7.2 Adjustments - Adjustments in Fee shall be made as follows:

7.2.1 Change in Scope - The CM/GC fee shall be adjusted only for owner approved changes which involve a substantial change in the scope of Work. The CM/GC fee shall be adjusted percent (5%) of the Cost of the Work for substantial changes in the scope of the Work. A "substantial

Vκ/Vκ

change in the scope of the Work" for purposes of this Article is defined as follows:

    7.2.1.1    Changes which vary the scope of Work in excess of 10% of the original scope of Work, based either on square footage of floor area or estimated construction cost.

    7.2.1.2    Change orders involving the procurement of additional subcontractors, not previously contemplated by the Contract Documents.

    7.2.1.3    Changes which involve the revision or modification of major systems not contemplated in the original scope of Work.

    7.2.2    <u>Delays</u> - For delays in the Work, other than for weather, in excess of seven (7) calendar days and which are not the responsibility of the CM/GC, there will be an equitable adjustment in the Fee to compensate the CM/GC for verified and documented increased expenses.

    7.2.3    <u>Additional Services</u> - Additional services, as described in Paragraph 2.4 shall be computed as follows:

    **Labor:**    Direct Personnel Expense (base wage) times 1.5

    **Expenses:**    Actual cost.

7.3    <u>Items Included In Fee</u> - Included in the CM/GC's Fee for the Construction Phase are the following:

    7.3.1    <u>Profit</u> - Before tax profit.

    7.3.2    <u>Overhead</u> - Off-site costs for general management of the Project including:

    7.3.2.1    Salaries or other compensation of the CM/GC's employees at the principal office and branch offices including:

    Vadim Kagan - at no cost.

    General Office staff - at $75.00 per hour

to provide support in scheduling the Work, cost estimating, cost accounting, processing payment requests, processing Change Orders, processing shop drawings/samples, etc.

    7.3.2.2    General operating expenses of the CM/GC's principal office.

    7.3.2.3    Any part of the CM/GC's capital expenses, including interest @ 16% on the CM/GC's capital employed for the Work.

    7.3.2.4    Costs due to the negligence of the CM/GC, any subcontractor, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including but not limited to, the correction of defective or nonconforming Work, disposal of materials and equipment wrongly supplied, or making good any damage to property.

    7.3.2.5    Overhead or general expenses of any kind, except as may be expressly included in Paragraph 8.

    7.3.2.6    Costs in excess of the GMP, if any, as set forth in Paragraph 6 and adjusted pursuant to the General Conditions of the Agreement, 17.00 <u>Changes in the Work</u>.

**8.0    COST OF THE WORK**

*VK/NK* (initials)

8.1 Definition - The term Cost of the Work shall mean costs necessarily incurred in the proper performance of the Work during either the Design or Construction Phase, and paid by the CM/GC. Such costs shall be at the lowest responsible competitive rates not higher than the standard paid in the locality of the Work except with prior consent of the Owner, and shall include the items set forth below in this Paragraph. The Owner agrees to pay the CM/GC for the Cost of the Work as defined in this Paragraph 8. Such payment shall be in addition to the CM/GC's Fee stipulated in Paragraph 7.

8.2 Cost Items Included - On-site costs of the Work including General Conditions and the aggregate cost of subcontracts.

8.2.1 General Condition Costs - Those costs for work outlined in the General Conditions of the Contract that are the responsibility of the CM/GC unless specific items of Work are included in the subcontract work.

8.2.1.1 Wages paid for labor in the direct employ of the CM/GC in the performance of the Work under applicable collective bargaining agreements, or under a salary or wage schedule agreed upon by the Owner and CM/GC and including such welfare or other benefits, if any, as may be payable with respect thereto.

8.2.1.2 Cost of ordinary employee benefits and taxes, such as pension contributions, hospitalization, vacations, medical insurance, assessments or taxes for such items as unemployment compensation and Social Security, insofar as such cost is based on wages, salaries or other remuneration paid to employees of the CM/GC and included in the Cost of the Work.

8.2.1.3 The proportion of reasonable transportation, traveling and hotel expenses of the CM/GC or of his officers or employees incurred in discharge of duties connected with the Work, when the necessity for such expenditures is approved in advance by the Owner.

8.2.1.4 Cost of all materials, supplies and equipment incorporated in the Work, including costs of transportation thereof.

8.2.1.5 Cost, including transportation and maintenance, of all materials, supplies, equipment and hand tools not owned by the workmen employed by the CM/GC, which are employed or consumed in the performance of the Work and cost less salvage value on such items used but not consumed which remain the property of the CM/GC.

8.2.1.6 Rental charges of all necessary machinery and equipment, exclusive of hand tools, used at the site of the Work, whether rented from the CM/GC or other, including installation, repairs and replacements, dismantling, removal, costs of lubrication, transportation and delivery costs thereof, at rental charges consistent with those prevailing in the area. All equipment which the CM/GC intends to rent to the Owner and the rates therefor must be approved by the Owner in writing prior to use.

8.2.1.7 Cost of the premiums for all bonds and insurance which are required by the Contract Documents.

8.2.1.8 Unavoidable sales taxes, if approved in writing in advance by the Owner.

8.2.1.9 Permit fees, licenses, tests and royalties.

8.2.1.10 Minor expenses such as telegrams, long distance telephone calls, telephone service at the site, expressage and similar petty cash items in connection with the Work.

8.2.1.11 Cost of removal of all debris, snow removal, interim and final cleaning.

8.2.1.12 Costs incurred due to an emergency affecting the safety of persons or property, to the extent not compensated by insurance or otherwise, and not attributable to the fault of the

VK/VK

KAGAN 01267

CM/GC or his subcontractor.

8.2.1.13   Cost of site security during construction, if requested by the Owner, and the cost of site safety measures, such as fences, signs, and barricades.

8.2.1.14   Cost of computer services as required at the field office.

8.2.1.15   Cost of construction support activities such as Work items included in the General Conditions of the Contract and in the specifications unless they are provided by subcontractors.

8.2.1.16   The cost of adequate, weatherproofed, heated and well lighted office space with telephone service at the site of the Work for the use of the CM/GC and the OPM and Owner representatives.

8.2.1.17   The cost of providing and maintaining neat, sanitary and adequate temporary toilet facilities for all personnel at the construction site.

8.2.1.18   The cost of providing suitable temporary facilities and quarters for workmen and of maintaining on premises water tight storage sheds and tool houses for storage of building materials and tools.

8.2.1.19   The cost of providing temporary facilities required to supply all the power, light, water and heat needed for the proper execution and completion of the Work. Unless provided by subcontractors, the cost of all power, light, water and heat for the duration of the Work.

8.2.1.20   The cost of providing temporary weather protection and temporary heating as required for the expeditious prosecution of the Work.

8.2.1.21   Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

8.2.1.22   All costs directly incurred in the performance of the Work and not included in the CM/GC Fee as defined in Paragraph 7.

8.2.2   Subcontracts - The cost of Work performed by subcontractors.

8.2.3   Estimates - The CM/GC shall when requested, furnish detailed and itemized estimate of General Condition costs.

**9.0   DISCOUNTS**

9.1   All discounts for prompt payment shall accrue to the Owner to the extent the Costs of the Work are paid directly by the Owner or from a fund made available by the Owner to the CM/GC for such payments. To the extent the Costs of the Work are paid with funds of the CM/GC, all cash discounts shall accrue to the CM/GC, provided, however, that all costs claimed pursuant to Paragraph 8, billed to the Owner, reflect such discounts. All trade discounts, rebates and refunds, and all returns from sale of surplus materials and equipment, shall accrue to the Owner, and the CM/GC shall make provisions so that they can be secured.

**10.0   MISCELLANEOUS PROVISIONS**

10.1   Assignment - Neither party to this Agreement shall assign its interests herein in whole or in part without the written consent of the other; nor shall the CM/GC assign any moneys due or to become due to him hereunder, without the previous written consent of the Owner.

10.2   Limitation of Actions - Any actions against the CM/GC, his employees or agents brought

KAGAN 01268

to recover damages for injury to person or defects in or damage to property, including the Work itself, caused by the administration, superintendence or efforts of the CM/GC or those under his control relating to this Project shall be brought within six (6) years after such claim for relief arises and is discovered by the Owner.

    10.3    Binding Effect - This Agreement shall be binding upon the heirs, personal representatives, successors and assigns of the respective parties.

    10.4    Controlling Law - This Agreement is being executed and is to be performed in the State of Massachusetts, and shall be enforced and construed according to the laws of the State of Massachusetts.

    10.5    Waiver - Any failure of the Owner or the CM/GC to require strict performance or any waiver of any provision herein shall not be construed as a consent or waiver to any other breach of the same or any other provision.

    10.6    Severability - If in any instance any provision hereof shall be determined to be invalid or unenforceable under any applicable law, such provision shall not apply in such instances, but the remaining provisions shall be given effect in accordance with their terms.

    10.7    Notices - Any notices required or permitted under this Agreement shall be deemed given when personally delivered or when deposited in the United States Certified Mail, postage prepaid.

Owner:

    Attention:
    Vadim Kagan
    99 Needham St,
    Newton, MA
    02461

CM/GC:

    c/o Vadim Kagan
    99 Needham St,
    Newton, MA
    02461

This Agreement is effective the day and year first written above upon the signatures of the undersigned parties.

CM/GC: Kagan Development, KDC Corp
By: _____ Date: 7.24.13
Title: President – Vadim Kagan

Owner:
Lyman Cutler Road LLC
By: _____ Date: 7.24.13
Title: Manager - Vadim Kagan

KAGAN 01269

# Exhibit I

Services and Work to be preformed

**Scope of Work:**

The CM/GC shall build two residences on the subdivided lots formerly known as 77 Lyman Road. These residences shall be of commensurate quality of materials, style, and workmanship for the area and inn particular shall be of a size and structure for a target sale price of approximately $5,000,000.00 each. Best efforts shall be to maximize the value of the build to emphasize the marketability of the properties. These efforts shall include consultation with Vadim Kagan, and Century 21 as well as other professionals for input as to design and implementation.

Final design approval shall vest with the Owner.

**Completion time:**

The residences shall be substantially completed by March 30th of 2014. Substantial completion shall be defined as in excess of 95%, and shall further be showable to prospective purchasers in a marketable condition by this date. In the event that the residences are not marketable by this date, The GC shall credit the owner according to section 6.5 – Liquidated Damages.

**Budget:**

The Construction Manager/General Contractor shall charge the Owner in accordance with the provisions of this Construction Management agreement.

CM/GC: Kagan Development, KDC Corp

By: _____  Date 7.24.13
President: Vadim Kagan

Owner: VK
Lyman Cutler Road LLC

By: _____  Date 7.24.13
Manager: Vadim Kagan:

KAGAN 01270