# EXHIBIT F

ORIGINAL

Exhibits: 1-30                     Volume 1, Pages 1-230

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

---

In Re:

LYMAN-CUTLER, LLC,                 Chapter 7
                                   Case No. 15-13881-FJB

          Debtor

---

LYMAN-CUTLER, LLC,

          Plaintiff
v.                                 Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
          Defendants

---

DEPOSITION OF LYMAN-CUTLER, LLC, By Its
Representative ALEX FILIPPOV, and
of ALEX FILIPPOV Individually
Wednesday, April 25, 2018, 10:06 a.m.
Sheehan Phinney Bass + Green, P.A.
255 State Street, 5th Floor
Boston, Massachusetts

---------- Janis T. Young, RDR, CRR ----------
jty@fabreporters.com    www.fabreporters.com
Farmer Arsenault Brock LLC
Boston, Massachusetts
617-728-4404

**110**

buildings, wiring them for entertainment and everything else.

And she asked him on the phone, on the speakerphone, if he did work for Kagan. And he said yes, I did.

And she asked, do you know if he takes any kickbacks? Did you give him any kickbacks?

And he said no, I didn't; although, and I remember this conversation, he said he will not take the money, but he might ask for TV or something.

And the second thing he said about Kagan, that is interesting, for the same job you would pay me $3,500 Kagan paid me $8,000.

Q. Paid you --
A. $8,000.
Q. Who was this guy at Huntington TV?
A. I don't remember his name. I actually met him once at the house, because I asked him to bring me the drawings of the wiring. I can dig it out. I forgot his name. He's the owner.
Q. Did he provide you with any kind of an affidavit or anything to that effect?
A. No. I wasn't looking for an affidavit.

**111**

That was the conversation.

MR. CARNATHAN: Are we going to break for lunch? Seems like we've kind of drifted into other topics at this point.

MR. PERTEN: One last question, very quickly.

Q. Are you aware, sir, as you sit here today, of any materials that Mr. Kagan purchased for another project that were billed to this project?
A. Without looking at this, I'm not ready to give you details.
Q. So your answer is no; as you sit here today, you don't know?
A. Correct.

MR. PERTEN: So, why don't we take a break at this point.

(Lunch recess)

Q. Now, at some point, Mr. Filippov, there was a decision made to put Lyman-Cutler into bankruptcy; correct?
A. Yes.
Q. Who made that decision?
A. I did.
Q. Why?

**112**

A. A number of reasons.

The first one is that Mr. Perten, sitting in front of me, was insisting that the company is going to be dissolved by November, I believe, 2015; and then we would have to auction the properties, et cetera.

If it's dissolved, the loan would be called. And I was responsible for these loans, basically, and I didn't have any other better choice to sell.

And it was a lien that Mr. Kagan fraudulently put on the two properties that wouldn't allow us to sell this property until it's cleaned of the liens, so it was a way to remove the liens.

Q. Were those two reasons that you filed for bankruptcy?
A. Yes.
Q. Now, you said you were responsible for the loan. This morning you testified that you only had limited guarantee.
A. Yes, but still my guarantee.
Q. $200,000?
A. Yes.

And there is another thing. I never

**113**

cheated anybody. So when you say that you are not going to pay the loan, to me it's cheating. That's my kind of attitude to the whole thing.

So it's not just my responsibility, the $200,000. If I borrow money from somebody, I'm going to give it back.

Q. Was there a vote of the members of Lyman-Cutler prior to filing the petition for bankruptcy?
A. We discussed it with Nick Lipetsker on the phone, that was probably September 2015; and we agreed that that was the best solution.

And because we were more than 81 percent interest holder, that was in accordance with LLC operational agreement.

Q. Did you discuss it with Kagan before doing it?
A. We didn't. We didn't talk to Kagan. Kagan wouldn't even show up at the meeting.
Q. At the time you and Mr. Lipetsker made the decision to put the company in bankruptcy, was the LLC insolvent?

MR. CARNATHAN: Objection.

A. No. I was paying. I was paying the carrying costs because Kagan left.

**Page 122**

```
 1   company into bankruptcy?
 2       A. No.
 3       Q. When did you make the decision to put the
 4   company into bankruptcy?
 5       A. I believe that was done probably one week
 6   before. It was really urgent. A decision, it was
 7   probably one week before we put the company in
 8   bankruptcy. It was done very quickly.
 9       Q. When you say one week before, it was really
10   urgent, what made it urgent?
11       A. The dissolution. The company dissolution.
12       Q. The dissolution date in the operating
13   agreement?
14       A. Yes.
15           Let me remind you that you were writing
16   letters to us about this.
17       Q. How did the mechanic's lien impact the
18   ability to sell the property?
19       A. No reasonable buyer will buy a house that
20   has a lien on this.
21       Q. How do you know that?
22       A. It's common knowledge. Would you?
23       Q. Did you receive any offers on the property?
24       A. It was offered on the property, and those
```

**Page 123**

```
 1   offers were made without the buyer actually knowing
 2   that there is a lien. It was made to Michelle Lane,
 3   who was designated by the court and we agreed, to be
 4   the real estate broker; and the offer was $4.1
 5   million, and then $4.2 million.
 6           Both offers, as far as I know, were done
 7   in such a way so the buyer even didn't know about
 8   the lien.
 9       Q. Is it your experience, sir, that when
10   people make an offer on the property they don't
11   typically do a title exam or anything before the
12   offer?
13       A. It depends on the person who does it. We
14   don't know.
15           I'm not sure, but I think I asked
16   Michelle Lane about this; and she said that I will
17   have to disclose it to them, because I think the
18   offer was contingent on this.
19       Q. Did the listing disclose that there's a
20   lien on the property?
21       A. No, I don't think so.
22       MR. PERTEN: Off the record.
23       (Discussion off the record)
24       (Marked, Exhibit 5, amended adversary
```

**Page 124**

```
 1   complaint.)
 2       Q. Sir, I've placed in front of you Exhibit 5,
 3   which is the amended adversary complaint that was
 4   filed in this action. Are you familiar with that
 5   document?
 6       A. I saw the document, yes.
 7       Q. Before it was filed, did you review it and
 8   make sure that the factual allegations were
 9   accurate?
10       A. Yes.
11       Q. And to the best of your knowledge, sir,
12   were the factual allegations in this document
13   accurate?
14       A. Yes.
15       Q. If I could ask you, sir, to turn to
16   Paragraph 46.
17       A. Okay.
18       Q. Just take a moment and read Paragraph 46 to
19   yourself, and let me know when you've done that.
20           (Pause)
21       A. Okay.
22       Q. The former bookkeeper that is referenced
23   there would be Kristina Brusenkova, correct?
24       A. That's correct.
```

**Page 125**

```
 1       Q. We covered some of this this morning.
 2           This alleges that Mr. Kagan "mixes
 3   expenses for projects on his American Express card."
 4   Do you see that?
 5       A. Yes.
 6       Q. As you sit here today, do you have any
 7   examples that you can give me of charges to the
 8   American Express card which were improper?
 9       A. Not yet.
10       Q. Did you obtain any formal estimates of
11   Proexcavation's work?
12       A. Estimates? I'm not sure I follow your
13   question.
14       Q. Take a look at Paragraph 47, which says,
15   "Proexcavation's alleged charges on the project are
16   double what any conceivable legitimate charges for
17   the work it performed on the project would be."
18           Do you see that language?
19       A. Yes. But I also see the language, "In
20   addition, plaintiff has interviewed KDC former
21   bookkeeper, who reports."
22       Q. Got it.
23           In Paragraph 47, what is the basis for
24   the allegation that Proex's charges are double?
```

### 126

1  A. That Proex's charges are double? Well, one
2  of the allegations, I explained that my conversation
3  with experienced contractors --
4  Q. That would be Ms. Stumpo, Mr. Palian --
5  A. Mr. Palian, Mr. Laffey.
6  Q. Anything else?
7  A. I think that's plenty.
8  Q. I'm sorry?
9  A. I think that's it. That's plenty.
10 Q. Just what you've explained this morning?
11 A. Yes.
12 Q. Now, if you'd take a moment and look at
13 Paragraph 49, please.
14 A. Yes.
15 Q. Tell me when you're done.
16     (Pause)
17 A. Yes.
18 Q. It says, the second sentence, that "KDC and
19 Proexcavation bills are rife with double-billing,
20 false and inflated charges." Do you see that
21 language?
22 A. Yes.
23 Q. Are you able to give me any specific
24 examples of double-billing, false and inflated

### 127

1  charges as it relates to the Proexcavation bills?
2  A. Well, inflated charges, I just pointed out.
3      There is one thing that Cindy Stumpo
4  mentioned that was very interesting. She said, in
5  my experience there are never two houses that have
6  the same cost for anything.
7      On Kagan's bill, the Proexcavation cost
8  is the same for both houses. It doesn't exist.
9  That means they're inflated and made-up charges.
10 Q. Anything else that you believe shows that
11 they're inflated and made-up charges?
12 A. Many round numbers. Look at his bills, and
13 look at some of the bills that his actual
14 contractors did. Contractor would put 125 and a
15 quarter hour at $100 rate, and they would multiply
16 one by each other. That's what they did, and they
17 would come up with the exact number.
18     All Kagan's numbers are round. Doesn't
19 exist in the real world.
20 Q. Is there anything else that led you to
21 believe that these are false and inflated charges?
22 A. We're still digging through this; and
23 between what Kristina Brusenkova said and what we
24 say are the costs of this, including the charge that

### 128

1  Mr. Kagan put on the bogus contract that he signed
2  with himself, it's like $800,000 all together.
3  That's bogus, and false.
4  Q. Is it?
5  A. Yes.
6  Q. And is it bogus to sign the mortgage note
7  by yourself to yourself?
8      MR. CARNATHAN: Object.
9  A. I didn't sign with myself. I signed it
10 with LLC, where there were three people.
11 Q. Now, sir --
12 A. With the agreement, I'm sorry, with the
13 agreement of another member.
14 Q. In Paragraph 49, you talk about the
15 properties being sold at below market value by the
16 Chapter 7 trustee. Do you see that?
17 A. Yes.
18 Q. In your experience, sir, does filing for
19 bankruptcy have any impact on the amount that you
20 can sell real estate for?
21 A. Generally, yes.
22 Q. What effect would you expect it to have?
23 A. It reduces the cost.
24 Q. When you made the decision to place the

### 129

1  company in bankruptcy, did you consider the fact
2  that the bankruptcy might have the effect of
3  reducing the price that you could sell the property
4  for?
5  A. I did.
6  Q. And how did you reconcile that with your
7  decision to put the company into bankruptcy?
8  A. There are certain things you have to make
9  decisions. I wasn't expecting that it was going to
10 have to be Chapter 7 bankruptcy. I was expecting
11 that I would be selling the houses; not the trustee,
12 whose only goal is just to get rid of it.
13     So it wasn't obvious to me when I was
14 putting in the bankruptcy that it's going to be sold
15 for less. All I was caring, that that would remove
16 the lien of the property, and we would be able to
17 sell it.
18 Q. Now, sir, take a look at Paragraph 50 of
19 your adversary complaint. Would you read that to
20 yourself, and let me know when you've done so?
21     (Pause)
22 A. Yes.
23 Q. You make the allegation that Mr. Kagan
24 planned all along to inflate construction costs.