UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>LYMAN-CUTLER, LLC,<br><br>    Debtor. | Chapter 7<br>No. 15-13881-FJB |

| | |
|---|---|
| LYMAN-CUTLER, LLC,<br>ALEX FILIPPOV and<br>NICKOLAY LIPETSKER,<br><br>    Plaintiffs,<br>    Defendants in Counterclaim,<br><br>v.<br><br>VADIM KAGAN, TATIANA KAGAN,<br>KAGAN DEVELOPMENT KDC, CORP.<br>and PROEXCAVATION CORP.<br><br>    Defendants,<br>    Plaintiffs in Counterclaim. | Adv. Proc. No. 16-01120 |

### DEFENDANTS' MEMORANDUM OF LAW SUPPORTING THEIR MOTION IN LIMINE TO PRECLUDE EVIDENCE RELATING TO "OTHER PROJECTS"

Defendants Vadim Kagan ("Kagan"), Tatiana Kagan, Kagan Development KDC, Corp. ("KDC") and ProExcavation ("ProExcavation") submit this Memorandum of Law Supporting their Motion in Limine to Preclude Evidence Relating to "Other Projects." In support of their Motion, Defendants state as follows:

# I.
## Introduction

Plaintiffs proffered to this Court affidavits from investors in construction projects in which Kagan was an investor and/or managed the construction. The affidavits include vague and unspecific allegations of fraud, which Plaintiffs used to convince this Court to expand discovery into documents and testimony about those projects, referred to as the "Other Projects" throughout this litigation. Plaintiffs presumably wish to admit testimony and evidence about these "Other Projects" to try to show that is more likely that Kagan, KDC and/or ProExcavation submitted fraudulent invoices on the project that is the subject of this litigation, the Lyman-Cutler project.

There are several reasons why evidence concerning the "Other Projects" is inadmissible. First, it constitutes inadmissible character evidence, as Plaintiffs intend to use it solely to try to demonstrate some character trait of Kagan's and that he acted in conformance with that propensity on the Lyman-Cutler project. There are too many inherent differences between the "Other Projects" and the Lyman-Cutler project for a fact finder to draw any valuable conclusions.

Second, when the affiants were pressed for details at deposition, none of them could provide any specific information to support any conclusion that fraud was committed on their projects. In other words, there is no probative value to the evidence in the vignettes that are the "Other Projects" and without real proof of fraud on those projects, it is impossible for Plaintiffs to use them to demonstrate a fraud was committed in the Lyman-Cutler project.

Third, plaintiffs disclosed that there were approximately 25 other projects in which they were involved during the pendency of the Lyman-Cutler project. Cherry-picking a handful of

these other projects and ignoring the other twenty, highlights the unreliability of this non-representative selection.

Finally, because there is no probative value to the evidence regarding the "Other Projects", the evidence of those projects results in unfair prejudice, confusion and substantial prolongation of the trial of this case. Each vignette requires multiple witnesses and exhibits to conduct mini-trials of those "Other Projects" – all of which will take days of trial time. None of this has any bearing on issues disputed in this litigation and it should all be excluded.

## II.
## Character Evidence of this Type is Inadmissible

Federal R. Evid. 404 starts with the premise that character evidence is inadmissible, and this should frame the Court's analysis. Fed. R. Evid. 404 (b) (1) ("Prohibited Uses. Evidence of a crime, wrong or other act is not admissible to prove a person's character in order to show that on a particular occasion the person acted in accordance with the character."). Plaintiffs' real purpose in trying to admit evidence of "Other Projects" is to attempt to prove that Kagan acted in accordance with a purported character trait when working on the Lyman-Cutler project. This is precisely the type of evidence the Federal Rules of Evidence disallow.

As the proponent of the evidence, Plaintiffs bear the burden of establishing a different purpose, one other than trying to show that Kagan acted in conformity with the character trait. Plaintiffs cannot carry this burden. Federal R. Evid. 404 (b) (2) includes a list of permitted "other purposes" that includes "intent", "plan", and "absence of mistake". Fed. R. Evid. 404 (b) (2) ("This evidence may be admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."). In the earlier motion practice over whether Plaintiffs should be permitted to obtain discovery of the "Other Projects", Plaintiffs contended that the discovery was needed to prove Kagan's "plan."

3

Plaintiffs presumably hold the same position with respect to the admissibility of the information obtained in discovery. As the court stated in *Leon v. FedEx Ground Package Sys.*, 313 F.R.D. 615, 624 (D.N.M. 2016), "When bad-act evidence is both relevant and admissible for a proper purpose, the proponent must clearly articulate how that evidence fits into a chain of logical inferences, no link of which may be the inference that the defendant has the propensity to commit the bad act." (internal quotation omitted). Therefore, as Plaintiffs articulate their argument for admissibility, they must completely avoid any suggestion that Kagan possesses a propensity to act pursuant to a particular character trait.

### III.
### There "Other Projects" are Insufficiently Similar to the Lyman-Cutler Project

There is little case law in the First Circuit employing Rule 404 in civil cases. With respect to efforts to use prior bad act evidence to prove a "plan", cases from other jurisdictions require substantial similarity between the prior event and the event that is the subject of this trial. Discovery confirmed that there are material differences between the "Other Projects" and the Lyman-Cutler project. The projects were inherently different, the homes were different, the locations were different, and the finances on the projects differed substantially. More fundamentally, depositions revealed that the investors in the "Other Projects" cannot identify any fraud on their projects, which completely erodes any probative value they might have in this litigation. The dissimilarities and lack of probative value undercut Plaintiffs' attempt to invoke Fed. R. Evid. 404(b).

**A. Elena Lande**

Elena Lande was an investor in Yarmouth Road Development, LLC who received a $750,000 return on her $1.4 million investment. She and her husband were experienced real estate investors before they entered into the project with Kagan. Elena Lande Depo. Tr. at 27-31,

attached hereto as Exhibit A. She concedes that she was not guaranteed a return on her investment in the Yarmouth Road project and she appreciated that the construction costs could go higher than the $1.7 million initially estimated. *Id.* at 46, 69, 127. She did not believe the budget for that project included carrying costs such as interest, mortgage payments and taxes. *Id.* at 47. She could not identify any inaccurate figures on the financial information provided to her by Kagan Development in May, 2014. *Id.* at 68. She knew in May, 2014 that the construction costs were over the initial estimate, but she did not take any action. *Id.* at 68-69. Kagan agreed to pay any construction costs over the initial estimate in the first instance and to be repaid at closing. *Id.* at 76. In other words, Kagan ***did not*** require that his investors reach into their own pockets when construction costs exceeded the initial estimate and Kagan (or, Kagan Development) took on that additional risk.

Ms. Lande was not aware of any contractors submitting fraudulent bills, bills for work they did not actually perform. *Id.* at 84 ("Q. Are you aware of any contractors who submitted bills for work they had not performed? A. No."). Ms. Lande engaged in discussions with Kagan about the costs that exceeded the initial estimate and she received backup for those costs. *Id.* at 90-91. She could not identify any inaccuracies or errors with the QuickBooks file Kagan provided for the project nor could she identify anything inaccurate about the bills that were provided to her. *Id.* at 92, 98. She "guessed" that some costs were illegitimate, but she could not identify any, despite being asked several times at her deposition to do so. *Id.* at 102-03, 132, 135, 137. When questioned about the line in her affidavit in which she asserts that Kagan "fraudulently asserted false costs against the project," Ms. Lande conceded she merely "guesses" some costs were illegitimate:

> Q. I'm going to refer you to the bottom of the page where you talk about you got a return of capital and profit of $750,000?

5

> A. Yes.
> Q. Then you say: "But we believe Mr. Kagan fraudulently asserted false costs against the project." How did you make the determination that he fraudulently asserted false costs?
> A. That was my guess. I didn't have any proof of that.
> Q. So that was just a guess.
> A. Yes.
> Q. Is it fair to say that you never identified any specific false cost other than your guess?
> A. No.
> Q. No, it is not fair to say or yes, it is fair to say?
> A. We haven't confirmed any of those findings.

*Id.* at 139-40. When pressed, Ms. Lande was similarly incapable of identifying any construction line item on the balance sheet that she previously characterized as "all wrong." *Id.* at 124.

In the end, Ms. Lande approved the listing price for the home, and it garnered an offer that was higher than the price Mr. and Ms. Lande anticipated before they decided to invest. *Id.* at 88-89. Mr. and Ms. Lande received a return of their investment ($1.4 million) plus $750,000 in positive return, which is a return of a little more than 50%. *Id.* at 103. Mr. and Ms. Lande of course did not pursue a claim against Kagan (or KDC), probably because they do not actually believe there was any fraud. Without any credible contention of fraud on that project, it has no probative value to this case whatsoever.

**B. Vladislav Abramskiy**

Vladislav Abramskiy was an investor in the Newton-Cynthia Road project. When the bank's appraisal of the anticipated home came in lower than expected, Kagan put up his own money to make up the shortfall, which was to be repaid at closing. Vladislav Abramskiy Depo. Tr. at 60, attached hereto as Exhibit B. Again, Kagan did not require his investor to invest more money than what he, Abramskiy, initially decided to invest. When they encountered ledge during the construction, Kagan did not require Mr. Abramskiy to invest more of his funds to cover the extra costs. *Id.* at 66, 78. The only construction charge Abramskiy questions is the

cost to remove the ledge, but he concedes that he does not know all of the work required to remove it and does not know the overall construction costs. *Id.* at 105-06, 108. In fact, Abramskiy is uncertain as to how much Kagan (or KDC) was paid on the project. *Id.* at 103-05. He is critical of invoices being presented late in the project, but he never paid them. *Id.* at 119. In the end, Abramskiy received the return of his entire investment ($120,000) plus an additional $17,000, 14% return on his investment. *Id.* at 87. He consulted with legal counsel, the same counsel representing Plaintiffs in this matter, but decided not to file suit against Kagan or his companies. *Id.* at 112. There is no probative value to this vignette, which was profitable for the investors and it should be inadmissible in this litigation.

**C. Mark Kayserman**

Mark Kayserman had prior real estate investment experience, including an earlier project with Kagan. Mark Kayserman Depo. Tr. at 8, attached hereto as Exhibit C. For the most recent project, known as Deborah Road, Mr. and Mrs. Kayserman invested a total of $148,000. *Id.* at 24. Mr. Kayserman does not recall if he saw an initial construction cost estimate prior to investing. *Id.* at 29. He is clear, however, that Kagan did not guarantee a fixed price for the construction; he understood when he invested there was a possibility that he might have to invest additional funds. *Id.* at 34-35. He knew at the outset that actual construction costs might be higher than initially estimated. *Id.* at 73. He also appreciated the risk that it might take longer to sell the home, in which case the carrying costs would be higher. *Id.* at 35. Mr. Kayserman concedes that he did not get a guarantee that the home would sell for a particular price and he appreciated the risk that it might sell for less than the targeted price. *Id.* at 43. Mr. Kayserman exerted some control over the distribution of the funds from the bank and on the occasions when he paid construction expenses from his own funds, he reimbursed himself from the construction

Case 16-01120   Doc 234   Filed 11/16/18   Entered 11/16/18 16:40:24   Desc Main
Document      Page 8 of 14

loan proceeds. *Id.* at 25. He testified that he assumed Kagan did the same and he had no objection to Kagan's doing so. *Id.* at 57.

Mr. Kayserman does not contend that any charges on the project were fraudulent; his only objection is that some expenses surfaced at the end of the project and he did not get the backup information he wanted for those costs. *Id.* at 57-58. He conceded that he has no specific charges he claims are improper cost overruns. *Id.* at 54-56. He is aware of no evidence that Kagan used the American Express credit card for the Deborah Road project to pay expenses for another project. *Id.* at 62-63, 75.

When examined about the affidavit he provided in this litigation, he admitted that aspects of the affidavit are false. For example, the affidavit drafted by Plaintiffs' counsel says Mr. Kayserman was presented with a construction budget, but Mr. Kayserman now concedes that statement is false. *Id.* at 72-73. His affidavit avers that Kagan "promised" construction costs would not exceed budget, but he testified that statement in his affidavit is false. *Id.* at 73. Rather than "promise", the term Mr. Kayserman used in the affidavit, Mr. Kayserman retracted his affidavit statement to merely that Kagan "said" the costs would be $850,000 and that Mr. Kayserman knew the costs could exceed that amount. *Id.*

In the end, Mr. and Mrs. Kayserman received the return of their entire investment of $148,000 plus an additional $37,000, a 25% return. *Id.* at 45.[1] The tax returns for the Deborah Road LLC reflect that all of the profit on the sale of the home was allocated to Mr. and Mrs. Kayserman with none allocated to Kagan, Tatiana Kagan or Kagan Development. *Id.* at 66-67.[2]

---

[1] Mr. Kayserman explained at his deposition that he was disappointed because he believed Tatiana Kagan (through Kagan) agreed to split the real estate commission earned on the sale of the completed home and did not honor that promise. *Id.* at 47-48. He never pursued this claim and accepted the return on his overall investment. Even if true, this remaining "claim" by Mr. Kayserman is distinctly dissimilar from the claims asserted by Plaintiffs in this action.

[2] Plaintiffs submitted an affidavit from a fourth investor in an "Other Project", Mr. Fodymanov. He was not in the United States and could not be deposed. Without his presence during trial, his affidavit constitutes inadmissible hearsay.

### D. Dmitriy Zhukovskiy

Mr. Zhukovskiy is the nephew of Plaintiff Nickolay Lipetsker. Dmitriy Zhukovskiy Depo Tr. at 56-57, attached hereto as Exhibit D. He has invested in multiple projects. Together with Mr. Lipetsker, Kagan and Ms. Kagan, Mr. Zhukovskiy invested into and became the managing member of the Hyde Avenue, LLC. *Id.* at 60. Unlike the Lyman-Cutler project and the other projects which are the subject of this motion, Hyde Avenue was not new construction. It was a renovation to an existing residence. *Id.* at 87, 104. Mr. Zhukovskiy was unable to locate the operating agreement for this project and could not recall the amount of his investment. *Id.* at 94. He does recall that he received 25% of the eventual profit, which totaled $44,167. *Id.* at 95. He recalls that the property sold at the price that Kagan represented it would sell at the outset of the relationship. *Id.* at 103. He admits that he never sent a demand letter to Kagan, never refused to go forward with the sale, took his share of the profit, and never threatened to file suit. *Id.* at 105-09. He has no reason to believe that Kagan did not have the back-up for all the expenses he incurred on the project. *Id.* at 112.

### E. The "Other Projects" Do Not Prove Anything At Issue in This Litigation

The "Other Projects" are too dissimilar to this one to warrant admitting evidence about them. They involve projects with investors of varying degrees of real estate investment experience who had vastly different experiences with Kagan and his companies. Some recalled seeing construction cost estimates while others did not; some paid expenses for the construction and reimbursed themselves from the loan proceeds while other did not; some received access to invoices and backup information and some allegedly did not. One complains that he was not paid half the real estate commission, but this is not similar to Plaintiffs' claims in this case. One of the projects was a remodeling project.

While there are many differences between the "Other Projects" and the Lyman-Cutler project, there is one unifying fact among the "Other Projects" – each of the investors made money on their investments with Kagan. This fact, confirmed by the investors at their depositions, dramatically erodes the probative value of admitting the "Other Project" evidence in this trial. As these other investors concede, they were fully aware of the risks of real estate investments. None of them filed a claim against Kagan or his companies, even though several were in contact with legal counsel, including Plaintiffs' counsel. One has to question the value of calling witnesses and introducing documents for projects on which the investors made money on their investment. In other words, why should Plaintiffs be permitted to introduce evidence of other projects in which the investors made money to attempt to prove Plaintiffs lost money on the Lyman-Cutler project? This logical disconnect renders inadmissible the evidence of the "Other Projects".

Research could not locate cases involving other construction projects in which character evidence was used in the manner Plaintiffs propose, but analogies can be drawn to other factual circumstances and lead to the inevitable conclusion that the "Other Projects" evidence is inadmissible. *Medcom Holding Co. v. Baxter Travenol Labs.*, No. 87 C 9853, 1993 U.S. Dist. LEXIS 10191, at *9 (N.D. Ill. July 21, 1993) involved claims that a company made false representations in connection with the sale of one of its subsidiaries. The buyer sought to introduce evidence of misrepresentations allegedly made by the seller as to matters unrelated to the sale of the subsidiary. The court disallowed introduction of the evidence of misrepresentations made in other contexts: "But where the subject matter of the collateral misrepresentations differs from the subject matter of the misrepresentations sought to be proved, the overwhelming thrust of collateral misrepresentation evidence is to have the jury believe that

because the defendant lied about collateral matters, it also made the misrepresentation in issue."
In *Hayne v. Rutgers, State Univ.*, Civil Action No. 83-4913 (JCL), 1989 U.S. Dist. LEXIS 9984, at *43 (D.N.J. Aug. 10, 1989), a claim of discrimination brought by a college professor who was denied tenure, the court disallowed discovery regarding alleged discrimination suffered by professors in other departments because those departments were not substantially similar to the one in which the plaintiff worked. Applying the logic of these cases, evidence of alleged wrongdoing on projects other than Lyman Cutler should be excluded.

### IV.
### The "Other Project" Evidence is Inadmissible Per Fed. R. Evid. 403 and 405(b)

The "Other Project" evidence has no probative value in proving the claims asserted by Plaintiffs in this action. That aside, allowing even some evidence regarding the "Other Projects" will greatly extend the amount of time required to try this case. Each "Other Project" will require a separate mini-trial, the resolution of which will have no utility to deciding the issues affecting the Lyman-Cutler project. For example, hours will be spent determining the amount of ledge and cost to remove it from Mr. Kayserman's project. That time will not be useful in determining any issues material to litigating the disagreements between the investors in the Lyman-Cutler project.

If the "Other Projects" evidence is admitted, Plaintiffs will presumably call the investors for those projects, and perhaps others involved in them as well. Each of these witnesses will be asked about documents pertaining to the "Other Projects", which causes the parties' exhibit lists to balloon. Defendants, of course, will cross-examine the investors (and Plaintiffs' other witnesses) about the "Other Projects", which again takes valuable time and requires the use of additional exhibits. To rebut Plaintiffs' presentation, Defendants will invariably call witnesses of their own to testify regarding the details of the "Other Projects". This will require additional

exhibits to be followed by cross-examination by Plaintiffs. Days of trial time will be spent on the details of the "Other Projects" when none of it has anything to do with the Lyman Cutler dispute. Defendants may also call investors in the many successful projects completed by Kagan and/or KDC to rebut the inference Plaintiffs attempt to create about Kagan's character.

Courts facing similar circumstances have excluded evidence based on Fed. R. Evid. 403 where distracting mini-trials are required. *See United States v. Waloke*, 962 F2d 824 (8th Cir. 1992) (District Court properly excluded evidence of assault victim's specific violent acts where it properly concluded that evidence would have been unfairly prejudicial and would have led to "collateral minitrials" in which both prosecution and defense would have characterized each incident differently) and *Lund v. Henderson*, 807 F.3d 6, 11 (1st Cir. 2015) (affirming exclusion of evidence where its admission would have turned the trial into a series of mini-trials about other misconduct complaints against the defendant police officer). Rule 403 is intended for this very situation – where the proffered evidence has little (or no) probative value and opening that door will require a significant detour from the issues of this dispute.

Plaintiffs might also argue that they should be permitted to introduce specific instances of prior misconduct because Kagan's character trait is an "essential element of a charge, claim, or defense." Fed. R. Evid. 405 (b). At least one court has ruled that character evidence is not an essential element in a fraud claim. *State Farm Mut. Auto. Ins. Co. v. Accident Victims Home Health Care Servs.*, 467 F. App'x 368 (6th Cir. 2012). Therefore, Plaintiffs cannot carry their burden of demonstrating the admissibility of the "Other Projects" evidence they intend to offer.

## V.
### The "Other Projects" Evidence Should be Excluded

For the reasons stated above, the "Other Projects" evidence constitutes improper character evidence. Plaintiffs fail to demonstrate a legitimate other purpose for the evidence and

seek merely to besmirch Kagan's character in the hopes the finder of fact will conclude he acted improperly because of some perceived character flaw. The Rules prohibit this use. Just as courts have done in other similar circumstances, this Court should not permit Plaintiffs from introducing evidence or argument relating to the "Other Projects." Given the evidence's lack of probative value, introducing even some of it will necessarily require days of extra, unnecessary testimony that prolongs trial and distracts from the real issues in dispute among these parties.

WHEREFORE, Defendants respectfully request that this honorable Court:

A. Issue an order prohibiting the introduction of evidence and argument concerning the "Other Projects", projects other than the Lyman-Cutler project at issue in this litigation; and

B. Grant such additional and further relief as the Court deems necessary.

Dated:  November 16, 2018

Respectfully submitted,

VADIM KAGAN,
TATIANA KAGAN,
KAGAN DEVELOPMENT KDC, CORP. and
PROEXCAVATION CORP.,

By their Attorneys,

/s/ John H. Perten
Christopher M. Candon, BBO# 650855
John H. Perten, BBO# 548728
James P. Harris, BBO# 678283
SHEEHAN PHINNEY BASS & GREEN, PA
255 State Street, 5th Floor
Boston, MA  02109
Tel:  617-897-5600
Fax: 617-439-9363
E-mail: ccandon@sheehan.com
          jperten@sheehan.com
          jharris@sheehan.com

13

**CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of November, 2018, a copy of the foregoing was served upon the parties listed below via ECF and/or first class mail, postage prepaid.

Eric K. Bradford
Office of the US Trustee
J.W. McCormack Post Office & Courthouse
5 Post Office Sq., 10th Fl, Suite 1000
Boston, MA 02109

Sean T. Carnathan
O'Connor, Carnathan and Mack, LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

David B. Madoff
Madoff & Khoury LLP
124 Washington Street - Suite 202
Foxborough, MA 02035

Steffani Pelton Nicholson
Madoff & Khoury LLP
124 Washington Street
Foxborough, MA 02035

Sarah A Smegal
Hackett Feinberg P.C.
155 Federal Street
9th Floor
Boston, MA 02110

Joseph P. Calandrelli
O'Connor Carnathan and Mack LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

Stephen G. DeLisle
Rubin and Rudman LLP
50 Rowes Wharf
3rd Floor
Boston, MA 02110

Amy M. McCallen
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110

David C. Phalen
Hackett Feinberg P.C.
155 Federal Street, 9th Floor
Boston, MA 02110

Peter N. Tamposi
The Tamposi Law Group
159 Main Street
Nashua, NH 03060

/s/ John H. Perten
John H. Perten