# EXHIBIT A

ORIGINAL

```
Exhibits: 1-21                    Volume 1, Pages 1-159
           UNITED STATES BANKRUPTCY COURT
             DISTRICT OF MASSACHUSETTS
                (EASTERN DIVISION)
-------------------------------
In Re:
                                  Chapter 7
LYMAN-CUTLER, LLC,                Case No. 15-13881-FJB

          Debtor
-------------------------------
LYMAN-CUTLER, LLC,

          Plaintiff
v.                                Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
          Defendants
-------------------------------


           DEPOSITION OF ELENA LANDE
       Friday, June 22, 2018, 9:57 a.m.
        Sheehan Phinney Bass + Green, P.A.
           255 State Street, 5th Floor
              Boston, Massachusetts


--------- David A. Arsenault, RPR ---------
    daa@fabreporters.com   www.fabreporters.com
           Farmer Arsenault Brock LLC
              Boston, Massachusetts
                  617-728-4404
```

Elena Lande - Vol. 1 - 6/22/2018

8

Page 26

1  Q. Why?
2  A. Personal decision.
3  Q. Who was sued on the Kagan side?
4  A. I don't have to answer this.
5  Q. I think you do. What were the parties?
6  Who did you sue?
7  A. Kagan and Kagan Excavation, Development,
8  whatever.
9  Q. So Mr. Kagan?
10 A. I think. I don't remember. It has been
11 five years now.
12 Q. Now, with respect to 50 Yarmouth Road,
13 Ms. Lande, how did that project first come to your
14 attention?
15 A. I was introduced to Kagan.
16 Q. Who introduced you to Kagan?
17 A. Boris Maiden.
18 Q. How did you know Boris Maiden?
19 A. As a lawyer that I worked with in the past.
20 Q. Mr. Maiden had represented you in the past?
21 A. In the past, yes.
22 Q. On what kinds of things did Mr. Maiden
23 represent you?
24 A. Real estate transactions.

Page 27

1  Q. In what real estate transactions did he
2  represent you?
3  A. The purchase of our house.
4  Q. Anything else?
5  A. I mean, that's attorney-client.
6  Q. The nature of what he represented you on
7  isn't. Just so we are clear, I'm not asking you to
8  tell me about conversations with him. I'm entitled
9  to know the scope of -- for what purpose he was
10 hired.
11 A. Real estate transactions. I don't remember
12 what else.
13 Q. Other than the purchase of your home in
14 Marblehead, can you tell me what other real estate
15 transactions he worked with you on?
16 A. Before we bought Yarmouth?
17 Q. At any point. Let's take it in two steps.
18 Up until the time you bought Yarmouth.
19 A. It is hard with the dates. I think -- New
20 York was after. He closed on the house in New
21 Hampshire.
22 Q. Anything else?
23 A. I don't remember.
24 Q. You told me a little bit ago that the only

Page 28

1  real estate transactions you had been involved with
2  other than Yarmouth was Randolph, Marblehead,
3  Maltenbury. Were there any other real estate
4  transactions that Mr. Maiden represented you in
5  other than those three that I've just referenced?
6  A. We bought other properties that I don't
7  currently own.
8  Q. Were any of those properties investment
9  properties?
10 A. Yes.
11 Q. What other investment properties did you
12 purchase and when?
13 A. Apartments.
14 Q. When did you first invest in apartments?
15 A. Maybe seven or eight years ago.
16 Q. So approximately 2010, 2011?
17 A. To the best of what I remember.
18 Q. What apartment buildings did you invest in
19 in 2010 to 2011?
20 A. Units in Swampscott.
21 Q. Are those units you held in your name or in
22 a company name?
23 A. I don't own them and the company doesn't
24 own them.

Page 29

1  Q. At some point did you have an investment in
2  a company that owned those?
3  A. Yes.
4  Q. And was that an existing building that you
5  purchased?
6  A. We bought apartments in the apartment
7  building.
8  Q. Was there any construction that needed to
9  be done on any of those apartments during your
10 ownership of it?
11 A. Other than painting, cosmetic work, no.
12 Q. Other than apartments in Swampscott, did
13 you own any other real estate at any point?
14 A. Yes. Boston and Brookline.
15 Q. What properties did you own in Boston and
16 Brookline?
17 A. Same scenario, apartments that required
18 cosmetic work.
19 Q. How many apartments did you have in Boston?
20 A. One in Boston and one in Brookline.
21 Q. What is the address of the one in Boston?
22 A. 124 Beacon Street.
23 Q. What about Brookline?
24 A. I don't remember that.

Elena Lande - Vol. 1 - 6/22/2018

9

### Page 30

1  Q. Those were apartment buildings?
2  A. Apartments in apartment buildings.
3  Q. Were these condominiums?
4  A. Yes.
5  Q. As to those projects in Boston and
6  Brookline, did you own them in your own name or did
7  you set up a company to own them?
8  A. I owned them for a short period of time.
9  Q. In your own name?
10 A. Yes.
11 Q. Was your husband also an owner of those
12 projects?
13 A. No.
14 Q. Did your husband have his own real estate
15 projects other than the ones you testified to
16 already?
17 A. No.
18 Q. And did Mr. Maiden represent you in the
19 closings on the Boston and Brookline projects?
20 A. Yes.
21 Q. What year was it that you purchased the
22 Boston property?
23 A. Three or four years ago.
24 Q. What about the Brookline property?

### Page 31

1  A. Two years.
2  Q. You said Mr. Maiden first brought the
3  Yarmouth Road project to your attention, correct?
4  A. Boris Maiden brought up Kagan with the
5  project.
6  Q. Was this a face-to-face conversation or a
7  phone call? How did it come about?
8  A. A face-to-face conversation.
9  Q. Where did that conversation occur?
10 A. Honestly, I don't even remember if it was
11 face-to-face. Maybe this was a phone conversation.
12 Q. Can you tell me everything that you recall
13 about that conversation as to what Mr. Maiden said
14 to you and you said to him?
15 A. I don't remember.
16 Q. So you don't remember anything about that
17 conversation?
18 A. I remember he mentioned Kagan. I met with
19 Kagan after that.
20 Q. How long after speaking to Boris Maiden did
21 you meet with Kagan?
22 A. I don't remember. I don't know, a week,
23 two weeks, I don't remember.
24 Q. Where did that meeting occur?

### Page 32

1  A. In Boris Maiden's office.
2  Q. Was anybody present in that meeting other
3  than yourself and Mr. Kagan?
4  A. I don't remember if my husband was there.
5  Q. Was Mr. Maiden there?
6  A. Yes.
7  Q. Can you please tell me everything that you
8  remember about what happened at that meeting.
9  A. Kagan told us the way he does business. He
10 shared addresses of properties that he was either
11 currently building or already built. He had a
12 printout with the budget for one of his projects.
13 He agreed to send us more information. I think I
14 requested some documents. I don't remember right
15 now.
16 Q. When you said Kagan told you about the way
17 he does business, do you recall what he said?
18 A. Just discussing how he buys properties, how
19 he makes arrangements and builds it.
20 Q. Have you now exhausted your memory as to
21 what he said relative to the way he does business?
22 A. Yeah. I don't remember the details of it.
23 Q. You said he also mentioned addresses he
24 built. Do you recall what addresses he mentioned?

### Page 33

1  A. No, I do not. I know he owned at that time
2  Lyman, One Lyman I think was the address, the corner
3  building that he built.
4  Q. Was that 10 Lyman?
5  A. 10 Lyman, yes.
6  Q. Did he tell you anything about the 10 Lyman
7  project?
8  A. No, not that I remember right now.
9  Q. You said that he had a printout with a
10 budget from another project?
11 A. Yes.
12 Q. Do you recall what other project?
13 A. No.
14 Q. Do you recall anything about that project?
15 A. No.
16 Q. Did he provide you with any other documents
17 during that initial meeting?
18 A. Not that I remember.
19 Q. That budget from one of his other projects,
20 is that something he left with you or something he
21 showed you and took back?
22 A. I don't remember.
23 Q. Fair to say whatever it is, if he gave it
24 to you you no longer have it?

### Page 46

1  A. We did at that time.
2  Q. Do you recall what that was?
3  A. No, I do not.
4  Q. Were you guaranteed any rate of return in
5  connection with your budget?
6  A. No.
7  Q. Do you still have those calculations?
8  A. No, I do not.
9  Q. Did you do any other financial analysis
10 prior to making the decision to invest in the
11 Yarmouth Road project?
12 A. What houses were selling in the area, some
13 research.
14 Q. You said you also relied on your expertise
15 in construction. What construction expertise did
16 you rely on?
17 A. Knowledge of how much it costs to build per
18 square foot and reviewing line items and
19 guesstimating whether they made sense or not based
20 on the property.
21 Q. What price per square foot did you expect
22 this project to be?
23 A. I do not remember.
24 Q. How did you make the determination of what

### Page 47

1  the expected square foot cost would be?
2  A. What was the average at that time.
3  Q. And where did you get the data as to what
4  average there was?
5  A. I don't remember.
6  Q. This construction expertise that you had,
7  where did you obtain it?
8  A. Just our general interest in the market.
9  Q. Exhibit 3, the $1.7 million budget, did
10 that also include debt service?
11 A. Excuse me, what service?
12 Q. Debt service, interest payments to the
13 loan.
14 A. To pay the loan, no. There's nothing on
15 here.
16 Q. Did it include carrying costs?
17 A. No.
18 Q. How were carrying costs, as you understood
19 it, to be paid on this project?
20 A. I don't remember that.
21 Q. Did you pay the carrying costs on this
22 project?
23 A. You mean me personally?
24 Q. Yes.

### Page 48

1  A. No.
2  Q. Did your husband?
3  A. No.
4  Q. Where did the money come to pay the
5  carrying costs?
6  A. Kagan dealt with all financial obligations
7  and payments.
8  Q. Is it your understanding that Mr. Kagan
9  paid for the carrying costs?
10    MR. CARNATHAN: Objection.
11 A. Would you rephrase?
12 Q. Sure. If neither you nor your husband paid
13 for the carrying costs, did you have any
14 understanding as to how the carrying costs were
15 paid?
16 A. By Yarmouth LLC.
17 Q. Where did Yarmouth LLC get the money to pay
18 the carrying costs?
19 A. I do not know.
20 Q. Incidentally, Ms. Lande, in order to
21 prepare for today's deposition, did you do anything?
22 A. I send you the documentation.
23 Q. Did you speak to anybody about your
24 anticipated testimony?

### Page 49

1  A. My husband.
2  Q. Anybody else?
3  A. No.
4  Q. Did you review any documents?
5  A. I read the affidavit.
6  Q. That you signed?
7  A. That you have.
8  Q. The affidavit that you signed in this case?
9  A. Yes.
10 Q. Now, have you now exhausted your memory as
11 to all the conversations that you had with Mr. Kagan
12 prior to deciding to invest in this project?
13 A. Yes.
14 Q. Once you decided to invest in this project
15 and to go forward, what happened next?
16 A. We worked on operating agreement. We
17 applied for the loan.
18 Q. When you say -- I think you mentioned
19 earlier that Boris Maiden did the operating
20 agreement?
21 A. Yes.
22 Q. Who was he representing, to the best of
23 your knowledge?
24 A. Yarmouth LLC.

Elena Lande - Vol. 1 - 6/22/2018

18

**Page 66**

1  site?
2  A. Not that I remember.
3  Q. Did you receive accountings periodically
4  during the construction of this project?
5  A. Yes.
6  Q. And did you review them?
7  A. Yes.
8  Q. Let me show you a document that was one of
9  the documents that you produced to me.
10        (Marked, Exhibit 6, Expense accounts,
11  May 2014.)
12  Q. Ms. Lande, can you tell me what Exhibit 6
13  is?
14  A. Accounting numbers.
15  Q. Are these accounting numbers that you got
16  from Kagan in or about May 19, 2014?
17  A. As they say here.
18  Q. Do you have any reason to believe that is
19  incorrect?
20  A. No.
21  Q. Is this a document that you would have
22  reviewed in or about May 2014?
23  A. Yes.
24  Q. Now, if I could draw your attention to the

**Page 67**

1  second page, the bottom line says approximate amount
2  1,712,944.73. Do you see that?
3  A. Yes.
4  Q. So did you understand that as of May 19,
5  2014 the projection was that the cost was going to
6  be more than $1.7 million?
7  A. It says here 1,712,000, so that's more.
8  Q. Did you also understand that these numbers
9  were approximate?
10  A. No.
11  Q. For example, if we look at the first page,
12  there's a bunch of entries where it indicates
13  "depends on period of time." Do you see that?
14  A. Yes.
15  Q. So did you understand that those numbers
16  might go up?
17  A. Well, the interest, yes.
18  Q. And the other items there might go up,
19  correct?
20  A. Potentially, yes.
21  Q. Now, as of May 19, 2014, what was the
22  status of the project? How far along was it?
23  A. I don't remember.
24  Q. Was it near completion?

**Page 68**

1  A. No.
2  Q. Are there any entries on this report that
3  you believe are improper?
4  A. I don't remember now. At that point in
5  time we were comparing to some of the other
6  materials that we had.
7  Q. What other materials did you have?
8  A. I think we had this budget and some
9  accounting from the bank.
10  Q. Did you have some invoices from some of
11  these vendors?
12  A. I had some copies sent to me by Kagan at
13  some point, but I don't remember which ones.
14  Q. So as you sit here today, are you able to
15  identify any of the costs in this May 2014
16  spreadsheet which are somehow wrong?
17        MR. CARNATHAN: Objection.
18  A. What do you mean by wrong?
19  Q. Inaccurate.
20  A. I'm not able to identify them now. I do
21  not remember. And I don't have any information. It
22  has been five years.
23  Q. Fair enough. In May 2014 when you learned
24  that the project was already projected to go over

**Page 69**

1  $1.7 million, did you tell Mr. Kagan to stop?
2  A. No.
3  Q. Did you have any discussion with him about
4  who was going to pay the overage?
5  A. At that point in time when we realized that
6  the project was going over $15,000, I raised the
7  question of making sure it will not go way more than
8  that. In any construction project we were aware
9  that minor things -- at that point the major
10  construction was done. So we were not expecting the
11  number to go much higher than that.
12  Q. So you understood that the costs could be
13  slightly more than 1.7?
14  A. Yes.
15  Q. Did you have a discussion with Mr. Kagan in
16  May of 2014 as to how much more he expected it to
17  be?
18  A. Yes.
19  Q. And do you recall a specific conversation
20  in May of 2014 on that topic?
21  A. We talked in front of that Yarmouth Road
22  building. He said no more than extra 20 to $25,000.
23  Q. Was that representation put down in writing
24  anywhere?

FARMER ARSENAULT BROCK LLC

**Page 74**

1  unacceptable?
2  A. I do not remember.
3  Q. Did you have further questions or were
4  these issues laid to rest?
5      MR. CARNATHAN: Objection.
6  A. I don't understand the question.
7  Q. You raised a bunch of questions in the July
8  24, 2014 email, correct?
9  A. Yes.
10 Q. Which is Exhibit 7?
11 A. Yes.
12 Q. You got answers in Exhibit 8, correct?
13 A. Yes.
14 Q. Once you received those answers, had the
15 questions that you raised in Exhibit 7 been
16 addressed?
17 A. They were answered, yes.
18 Q. Did you have further questions on those
19 topics?
20 A. I don't remember.
21 Q. At that point as of August 2014, did you
22 tell Mr. Kagan to stop?
23 A. No.
24 Q. Looking at Exhibit Number 7, the July 24,

**Page 75**

1  2014, let me draw your attention to Item 4. You
2  make the statement that the total number went up
3  $60,000. Do you see that in the last sentence?
4  A. Yes.
5  Q. Was it your understanding that as of July
6  24, 2014 that the construction costs according to
7  Kagan had gone up $60,000 over what you thought it
8  would cost originally?
9  A. I need a second.
10 Q. Sure.
11 A. I wouldn't say so because it says here
12 Expenses. I don't remember calling the complete
13 budget or whether it was addressing the expenses
14 going up by 60 K at that point.
15 Q. As of July 2014, how much had been spent of
16 the $1.7 million construction budget?
17 A. I don't remember.
18 Q. As of July of 2014, what was the status of
19 the construction? What percent was completed?
20 A. I'm not able to answer that question.
21 Q. Was the house completed then?
22 A. No.
23 Q. So you understood in July of 2014 that
24 construction was ongoing, correct?

**Page 76**

1  A. Yes.
2  Q. And you understood that additional
3  construction costs were going to be incurred going
4  forward, correct?
5  A. Additional?
6  Q. Yes.
7  A. Yes.
8  Q. Now, at some point, Ms. Lande, did
9  Mr. Kagan agree to front any costs over $1.7
10 million?
11 A. Would you rephrase the question?
12 Q. At some point did you have a discussion
13 with Mr. Kagan wherein he agreed to front any
14 expenses that went above 1.7?
15 A. Yes.
16 Q. And did you understand that he expected to
17 be reimbursed at the closing for those monies that
18 he had fronted over and above $1.7 million?
19 A. This is a document that he signed but not
20 the document we provided him for signature.
21 Q. What was your understanding of the
22 agreement that you struck with Mr. Kagan?
23 A. That he was responsible for covering. I
24 think I sent you the copy and you have an exact

**Page 77**

1  wording. I don't want to say. I'm pretty sure I
2  sent it to you. I think the idea was that he's not
3  going to go over a certain number.
4      (Marked, Exhibit 9, Email, 9/17/14.)
5  Q. Showing you what we marked as Exhibit 9,
6  Ms. Lande. Can you tell me what that document is?
7  A. This is the document that Kagan produced
8  and sent us in September.
9  Q. A couple of questions for you. This was a
10 document that I received in the litigation from the
11 other side. Is this a document that you provided to
12 Mr. Carnathan's office?
13 A. I don't remember. I don't believe so.
14 Q. Did you provide any documents to
15 Mr. Filippov?
16 A. Directly? I don't think so.
17 Q. Did you provide any documents to
18 Mr. Filippov indirectly?
19 A. To the attorney office, I did.
20 Q. Do you know Mr. Filippov?
21 A. No. I talked to him.
22 Q. When was the first time you spoke to
23 Mr. Filippov?
24 A. I think last year.

Elena Lande - Vol. 1 - 6/22/2018

22

### Page 82

1  A. No.
2  Q. So you have no idea whether he paid
3  anything over the $1.7 million that was provided by
4  the construction loan?
5  A. He still uses the construction loan to
6  cover the invoices.
7  Q. Is it your position there were no invoices
8  beyond $1.7 million?
9  A. Yes.
10  Q. How do you know that?
11  A. At that point in time when we discussed it,
12  he was drafting off the loan. To my best
13  understanding, he was still using the loan to cover
14  costs.
15  Q. At this point in time. But at some point
16  did you learn that the $1.7 million had been fully
17  expended and there were still expenses being
18  accrued?
19  A. Yes.
20  Q. How were those expenses being paid?
21  A. They were not paid.
22  Q. Did construction stop once the $1.7 million
23  was fully disbursed?
24  A. No.

### Page 83

1  Q. Did you request that the construction stop
2  once you knew that the $1.7 million had been fully
3  disbursed?
4  A. No.
5  Q. How did you expect that the contractors
6  that were working after the $1.7 million had been
7  fully disbursed, how did you expect they were going
8  to be paid?
9  A. I wasn't aware they were disbursed until
10  December of 2014.
11  Q. At some point you learned that all the
12  monies in the construction loan had been disbursed,
13  correct?
14  A. Yes.
15  Q. At some point you learned that there were
16  contractors that hadn't been paid, correct?
17  A. Yes.
18  Q. And you understood that those contractors
19  had done work on the project, correct?
20  A. I was questioning that.
21  Q. You didn't know one way or the other,
22  correct?
23  A. Yes.
24  Q. Is it your position, Ms. Lande, that

### Page 84

1  contractors who worked on the project are not
2  entitled to be paid for their services?
3  A. If somebody performed the work that they
4  are entitled to be paid according to the agreement
5  of what they were supposed to be paid for work being
6  done.
7  Q. So if a contractor does work on the project
8  which was work that was required, they are entitled
9  to be paid?
10  A. Yes, for the amount of work to be
11  performed.
12  Q. Did any contractor bill you for work they
13  hadn't performed?
14  A. No one billed me directly.
15  Q. Are you aware of any contractors who
16  submitted bills for work they had not performed?
17  A. No.
18  (Marked, Exhibit 10, Certification of
19  funding.)
20  Q. After you received the Exhibit 9, the
21  signed document from Mr. Kagan, did you prepare your
22  own version of that?
23  A. To the best of what I remember, we prepared
24  ahead of that.

### Page 85

1  Q. Let me show you what we have marked as
2  Exhibit 10. Is that a document that you prepared?
3  A. Yes.
4  Q. Is that the document that you prepared in
5  dealing with funding beyond $1.75 million?
6  A. Yes.
7  Q. I see this is dated September 23, roughly a
8  week after the one that was Exhibit 9, correct?
9  A. Yes.
10  Q. Does that refresh your recollection that
11  approximately a week later you provided a different
12  version of that document?
13  A. Yes.
14  Q. Mr. Kagan did not sign this document,
15  correct?
16  A. No.
17  Q. At any point did you email Mr. Kagan or
18  write him or anything telling him that the document
19  that he signed was unacceptable?
20  A. I don't remember.
21  Q. At any point did you email him anything
22  further about this document that you prepared that
23  we marked as Exhibit 10 about the fact that he
24  hadn't signed it?

Elena Lande - Vol. 1 - 6/22/2018

23

**Page 86**

1  A. I called him a number of times after that.
2  Q. Did he say he wouldn't sign?
3  A. He wouldn't pick up the phone.
4  Q. Did you have any further discussion after
5  September 23, 2014 as to how expenses beyond $1.75
6  million would be handled?
7  A. I don't recall any specific discussions.
8  Q. As of September 23, 2014, were you aware
9  that there was a projection that the costs for
10  construction would exceed $1.7 million?
11  A. Would you repeat that?
12  Q. Sure. On Exhibit 10 and Exhibit 9 there's
13  a reference of costs going beyond 1.750, correct?
14  A. Yes.
15  Q. Is it fair to say that as of September
16  of 2014 you understood that it was projected that
17  the costs of this project would exceed the initial
18  $1.7 million budget?
19  A. Yes.
20  Q. Did Mr. Boris Maiden have any involvement
21  with Yarmouth Road after you purchased the property
22  and before it was sold?
23  A. What do you mean involvement?
24  Q. Did he represent the LLC for any purpose

**Page 87**

1  other than the initial purchase of the property and
2  then the sale of the property once the house was
3  completed?
4  A. No.
5  (Marked, Exhibit 11, Email, 9/23/14.)
6  Q. Showing you Exhibit 11, which is another
7  document that you produced. Is that the cover email
8  for the document which we have marked as Exhibit 10?
9  A. Yes.
10  Q. Why did you copy Boris Maiden?
11  A. He was a lawyer representing Yarmouth.
12  Since Yarmouth was having issues, I copied him so
13  that he was aware.
14  Q. Did you have any discussions with Boris
15  Maiden about the document that you forwarded with
16  Exhibit 11?
17  A. I don't remember what the document was.
18  Q. It was Exhibit 10, correct? Exhibit 10 was
19  the enclosure for Exhibit 11; is that right?
20  A. This was prepared by my husband and I.
21  Q. Exhibit 11 says in part: "Attached is a
22  document we discussed in detail last Friday. Please
23  sign in by end of the week so that we can move
24  forward."

**Page 88**

1  Did I read that correctly?
2  A. Yes.
3  Q. At any point did you tell Mr. Kagan that
4  you were unwilling to move forward since he hadn't
5  signed that document?
6  A. I don't recall that.
7  Q. Do you recall the listing price for the
8  house at 50 Yarmouth?
9  A. No.
10  Q. Did you have any role in deciding what to
11  list it at?
12  A. No.
13  Q. As managing partner, were you part of the
14  discussion about how much the house should be sold
15  for?
16  A. I was aware of it.
17  Q. And you approved of whatever it was listed
18  at?
19  A. Yes.
20  Q. What did you expect this property would
21  sell for when you first went into the deal?
22  A. I think there was a discussion of five six,
23  five seven, to be on the safe side.
24  Q. You were expecting five six, five seven

**Page 89**

1  somewhere in that ballpark?
2  A. We knew that was a safe bet.
3  Q. At some point did you receive an offer to
4  purchase the property?
5  A. Yes.
6  Q. Do you recall the purchase price?
7  A. I think it was close to 6 million.
8  (Marked, Exhibit 12, Contract to
9  purchase real estate.)
10  Q. Exhibit 12, is that the offer to purchase?
11  A. It looks like it to me.
12  Q. Would you agree with me that the sale price
13  was $5,988,000?
14  A. Yes.
15  Q. Which was a higher price than you expected?
16  A. Yes.
17  Q. So it was 2 to $300,000 more than you had
18  hoped to get, correct?
19  A. Incorrect. We were not hoping for more
20  than was safe.
21  Q. This was an offer that was acceptable to
22  you, correct?
23  A. Yes.
24  Q. You ultimately agreed to sell it for that

FARMER ARSENAULT BROCK LLC

**Page 90**

1  price, correct?
2  A. Yes.
3  Q. This was an all-cash deal?
4  A. Yes.
5  Q. Now, after you decided to sell the
6  property, did you then enter into a period of
7  negotiations with Mr. Kagan or any of his
8  representatives as to the final construction costs?
9  A. Yes.
10 Q. Fair to say that you and the Kagans did not
11 have agreement as to what the costs should have
12 been?
13 A. Yes.
14 Q. And it was back and forth?
15 A. Yes.
16 Q. In connection with those discussions about
17 final construction costs, were you provided with
18 additional information and backup as to the amounts
19 that were claimed?
20      MR. CARNATHAN: Objection.
21 A. Would you repeat the question?
22 Q. Sure. In connection with your discussions
23 with the Kagan people as to the final construction
24 costs, were you provided with information as to the

**Page 91**

1  numbers they were claiming?
2  A. I don't understand the question.
3  Q. Did they give you any backup?
4  A. Yes.
5  Q. Would you agree with me that these
6  discussions relative to the final construction costs
7  occurred over a period of several weeks?
8  A. Yes.
9  Q. And there was lots of back and forth.
10 Would you agree with that?
11 A. Yes.
12      (Marked, Exhibit 13, Email 12/15/14.)
13 Q. Do you recognize Exhibit 13?
14 A. Yes.
15 Q. What do you recognize this to be?
16 A. Exchange of emails.
17 Q. Between yourself and the Kagan folks?
18 A. Yes.
19 Q. Fair to say that these were communications
20 between you and Dan at Kagan?
21 A. Yes.
22 Q. Dan provided you eventually with a
23 QuickBooks for the Yarmouth Road, correct?
24 A. Yes, as far as I remember.

**Page 92**

1  Q. Did you observe anything in the QuickBooks
2  that was wrong?
3  A. I don't remember right now. I believe so.
4  Q. Do you recall specifically what was wrong
5  with it?
6  A. No.
7  Q. If I could draw your attention to what's
8  the second page of this document, there's an email,
9  the second email on the page, December 15 at 12:02
10 p.m. Do you see that?
11 A. Yes.
12 Q. It is from Dan saying: "Please see
13 attached with my set of notes in Column J."
14      Do you see that?
15 A. Yes.
16 Q. Let me show you another document provided
17 to us.
18      (Marked, Exhibit 14, Yarmouth Road
19 balance sheet all transactions, 12/15/14.)
20 Q. Is Exhibit 14, which appears to have the
21 date of December 15, 2014 on it, the attached
22 document that is referenced in the December 15, 2014
23 email that's part of Exhibit 13?
24 A. I don't know. I believe so.

**Page 93**

1  Q. Is there anything on Exhibit 14 that you
2  believe was inaccurate?
3  A. I don't remember.
4  Q. So as you sit here today, you have no idea?
5  A. I know there were wrong items because this
6  is what the negotiations were. There were still a
7  lot of unpaid bills. I don't remember exactly which
8  ones were alarming at that time.
9  Q. As of December 2014, was the property
10 complete?
11 A. I don't remember the exact date.
12 Q. When was the property substantially
13 complete?
14      MR. CARNATHAN: Objection.
15 A. Sometime in December.
16 Q. How do you define that term, "substantial
17 completion"?
18 A. CO is obtained. All communications and
19 major work was done, and there was some cosmetic
20 leftovers to be completed within a short period of
21 time.
22 Q. And is that your definition of what
23 substantial completion means, that the CO issues?
24 A. CO means they can occupy the building.

Elena Lande - Vol. 1 - 6/22/2018

26

**98**

1  Q. Those are the attachments to this email?
2  A. I believe so.
3  Q. Is it fair to say that when you received
4  the balance sheet and the list of unpaid bills you
5  reviewed them?
6  A. Yes.
7  Q. Can you identify anything on the balance
8  sheet that's inaccurate?
9  A. No, I'm not in a position to right now.
10  Q. At any point did you make a
11  determination -- looking at the balance sheet where
12  it says Outside Services and there's a bunch of
13  contractors listed, at any point did you determine
14  that any of those numbers were inaccurate?
15  A. As far as I remember, I questioned some
16  numbers but I don't recall which ones.
17  Q. At any point did you make a determination
18  that any of those numbers were not accurate?
19  A. Yes.
20  Q. Which ones?
21  A. I don't remember.
22  Q. Do you have any documents that would
23  refresh your recollection as to which of these were
24  inaccurate?

**99**

1  A. Comparing all of this and trying to figure
2  it out, I don't remember now. It has been years.
3  At the time when this was going on, we were about to
4  close. If you look at the dates, it was the week
5  before the holidays and the emails were going on
6  within minutes. I don't remember the scope right
7  this second.
8  Q. Do you recall an order of magnitude as to
9  how much money you were questioning?
10  A. On the balance sheet?
11  Q. Yes.
12  A. Looking at the math now, it is probably
13  about 2 to $300,000.
14  Q. But you don't have any idea how that breaks
15  out?
16  A. I don't remember.
17  Q. Did you ever send any emails or make any
18  notations as to which specific entries you felt were
19  somehow wrong or improper?
20  A. I don't recall. We also met in person with
21  Dan and Kagan around those dates.
22  Q. You met with Dan and Kagan around those
23  dates to review this?
24  A. Yes.

**100**

1  Q. And were they able to answer questions for
2  you?
3  A. No.
4  Q. Were they able --
5  A. They were not satisfying answers.
6  Q. You were also provided an unpaid bills
7  detail, would you agree, attached to this Exhibit
8  15?
9  A. I guess it was attached.
10  Q. Do you recall reviewing that document?
11  A. Is it the last page you are referring to?
12  Q. Second to last page, two pages.
13  A. Okay.
14  Q. Do you recall receiving this unpaid bills
15  detail?
16  A. I mean, I don't remember now. I believe I
17  did if I forwarded it to you.
18  Q. At any point did you determine that any of
19  the contractors listed on this unpaid bills detail
20  had billed for work they had not completed?
21  A. I questioned some of who they were and what
22  they did.
23  Q. Did you make any determination whether any
24  of these entities were billing for work that they

**101**

1  had not done?
2  A. I don't remember.
3  Q. Did you make any determination whether any
4  of these contractors were billing more than they
5  should have?
6  A. I don't remember.
7      MR. PERTEN: Off the record.
8      (Discussion off the record.)
9      (Marked, Exhibit 16, Email, 12/22/14.)
10  Q. Do you recognize Exhibit 16?
11  A. Yes.
12  Q. Would you agree with me that at least the
13  face sheet, the email is an email that you received
14  on December 22?
15  A. Yes.
16  Q. And you were provided with balance sheets
17  and QuickBook reports, correct?
18  A. Yes.
19  Q. And a disbursement schedule, a draft
20  disbursement schedule?
21  A. Yes.
22  Q. With respect to the attachments, the draft
23  HUD statement, the balance sheet, and the
24  disbursement schedule, were there any numbers on

**102**

1  those documents which you thought were wrong?
2      A. I don't remember.
3      Q. Did you ever make a determination that
4  anything was wrong?
5      A. I don't remember details of those
6  conversations.
7      Q. Well, did this project cost more than you
8  anticipated?
9      A. Yes.
10     Q. To the extent that it cost more, did you
11 ever make any determination that these additional
12 costs were not legitimate costs?
13     A. Would you rephrase?
14     Q. Sure. Were there any costs that were
15 charged -- I understand you don't agree with the
16 final balance, but were there any costs that were
17 charged to get to that final balance that you
18 believe were somehow improper or false numbers?
19     A. That was my guess.
20     Q. That was your guess?
21     A. Yes.
22     Q. And were you ever able to confirm your
23 guess?
24     A. No.

**103**

1      Q. Is it fair to say that your primary
2  disagreement was that it was more expensive than you
3  had expected?
4      A. Yes.
5      Q. At some point did you reach an agreement
6  with the Kagan parties as to the final disbursement?
7      A. Yes.
8      Q. Is it fair to say that you agreed that you
9  would accept $750,000 over and above your $1.4
10 million investment?
11     A. Yes.
12     Q. You agree that you got your $1.4 million
13 back, correct?
14     A. Yes.
15     Q. And you got $750,000 on top of that,
16 correct?
17     A. As a return on investment, yes.
18     Q. So your return on investment was a little
19 more than 50 percent?
20     A. Yes.
21     Q. That, if you will, was a resolution of the
22 disagreements that you were having with the Kagans
23 as to the proper numbers, correct?
24     MR. CARNATHAN: Objection.

**104**

1      A. Would you repeat? I didn't follow.
2      Q. That was an agreement that you reached with
3  the Kagan people as to how the money was going to be
4  disbursed, that you would accept $750,000, correct?
5      A. Yes.
6      Q. You in fact did get that $750,000, correct?
7      A. Yes.
8      Q. And once the property was sold and you got
9  the $750,000, was there any remaining business of
10 the Yarmouth Road, LLC? Was there anything else
11 that had to be done?
12     A. I think Kagan as a contractor or the LLC
13 said at the purchase and sales point we were
14 supposed to fix minor things at the property. The
15 account was still open. The LLC was still
16 registered on the books functioning.
17     Q. Was it doing anything or just legally still
18 there?
19     A. Legally still there and the account was
20 still there.
21         (Marked, Exhibit 17, Emails, top email
22 12/24/14.)
23     Q. Can you identify Exhibit 17 for me, please.
24     A. Yes.

**105**

1      Q. Is that an email, the top one an email that
2  you sent to Joseph Cohen on December 24, 2014 at
3  6:52 p.m.?
4      A. Yes.
5      Q. And you say: "We agree to the terms that
6  we take $750,000 in profit and Vadim assumes all
7  responsibility for all warranties and claims on the
8  property." Correct?
9      A. Yes.
10     Q. That was the deal you struck?
11     A. Yes.
12     Q. After you got your $750,000 you understood
13 that you were done with the project, correct?
14     A. Would you define "done with the project"?
15     Q. What other duties and responsibilities did
16 you have after the property closed, it was sold, you
17 got your $750,000? Was the only thing left to do
18 was to close the bank account?
19     A. I believe so.
20     Q. Was there any money left in the bank
21 account?
22     A. Yes.
23     Q. Where did that money go?
24     A. I withdrew that later.

Elena Lande - Vol. 1 - 6/22/2018

32

### Page 122

1    A. I don't remember.
2    Q. Did you ever know?
3    A. I probably knew at the time.
4    Q. When were the demolition permits issued?
5    A. I don't remember.
6    Q. As managing member, did you make any effort
7    to ascertain why the building permits didn't issue
8    until July 2013?
9    A. I was asking Kagan and he was providing
10   answers, but I didn't qualify those.
11   Q. Now, you say in Paragraph 11 that there was
12   an annual report filed that an attorney made who
13   made this filing, correct?
14   A. Which paragraph?
15   Q. Paragraph 11. There was an annual report
16   filed on February 25, correct?
17   A. Yes.
18   Q. You believe Attorney Maiden made this
19   filing. "I did not," it says, correct?
20   A. Yes.
21   Q. Did you object to Attorney Maiden making
22   that filing?
23   A. No.
24   Q. Was there anything in that filing which you

### Page 123

1    felt was somehow improper?
2    A. I don't know.
3    Q. Paragraph 12 references a new draft of the
4    LLC agreement that was forwarded, correct?
5    A. Yes.
6    Q. And you never signed that document,
7    correct?
8    A. No.
9    Q. And it's your position that that's not an
10   operative document, it was never signed, correct?
11   A. It was never signed, that's correct.
12   Q. And it's your position that the operating
13   agreement which we have marked as Exhibit 5, I
14   believe -- is it Exhibit 5 that's the operating
15   agreement?
16   A. Yes.
17   Q. It's your position that Exhibit 5 is the
18   operative agreement, correct?
19   A. Yes.
20   Q. Has anybody, to the best of your knowledge,
21   has Kagan ever taken the position that the one you
22   didn't sign is the operative agreement?
23   A. The only change in the operative agreement
24   is that he changed his name to his company's name.

### Page 124

1    Q. But that agreement was not signed by him
2    nor signed by you.
3    A. No.
4    Q. Paragraph 13, it says that: "Mr. Kagan's
5    bookkeeper, Kristina, sent us the balance sheet on
6    May 19 which showed the project was within the
7    budget"?
8    A. Yes.
9    Q. Then you say: "The construction line items
10   looked all wrong to me and I asked for backup for
11   them."
12        Do you see that?
13   A. Yes.
14   Q. We looked at the May 19 budget. We marked
15   it as an exhibit. Do you know, as you sit here,
16   what looked all wrong to you? What exhibit number
17   is that?
18   A. 6, I believe.
19   Q. Are you able to identify what looked all
20   wrong to you?
21   A. No, I don't remember at this point.
22   Q. You go on to say: "As I demanded more
23   information, the numbers did not get clearer and I
24   did not get any backup."

### Page 125

1         Is that a true statement?
2    A. Sorry?
3    Q. Reading in Paragraph 13, the last two
4    sentences: "As I demanded more information, the
5    numbers did not get any clearer, and I did not get
6    any backup."
7         Is that a true statement?
8    A. I recall asking Kristina for backup and she
9    never responded to my emails.
10   Q. Would you agree with me that you did get
11   some backup?
12   A. Some backup.
13   Q. So the statement that you didn't get any
14   backup is inaccurate. You got some backup, didn't
15   you?
16   A. I don't remember if I got backup to this.
17   Q. Certainly at some point, you will agree
18   with me, that you got some backup?
19   A. Some backup but I don't remember if it was
20   backup to this.
21   Q. Would you agree with me, Ms. Lande, that as
22   of June 3, 2014 the project was not complete,
23   correct?
24   A. No.

**126**

1  Q. So you would expect that if the project was
2  not complete that there would be additional costs
3  incurred as the construction continued, correct?
4  A. Yes.
5  Q. So it certainly was no surprise that the
6  expenses kept going up after June 3, 2014. Do you
7  agree with that?
8      MR. CARNATHAN: Objection.
9  A. Yes.
10 Q. Paragraph 14, you say: "In September 2014,
11 as the numbers kept growing, I expressed concerns
12 about cost overruns and we discussed how such
13 overruns would be paid. He signed an undertaking to
14 pay them and be reimbursed at the closing."
15     Do you see that language?
16 A. Yes.
17 Q. Is the undertaking that he signed the
18 document that we marked as Exhibit 9?
19 A. Could you repeat the question?
20 Q. Is the document that you are referencing in
21 Paragraph 14 the attachment to Exhibit 9?
22 A. Yes.
23 Q. Paragraph 14, the sentence that says: "As
24 the unsigned undertaking shows, however, we were not

**127**

1  expecting the cost overruns to exceed a hundred
2  thousand dollars."
3      Do you see that language?
4  A. Yes.
5  Q. Is it fair to say that as of September 14,
6  2014 you understood that there could be at least a
7  hundred thousand dollars of overruns?
8      MR. CARNATHAN: Objection.
9  A. Would you rephrase?
10 Q. Sure. You say, "We were not expecting the
11 cost overruns to exceed a hundred thousand dollars."
12     Do you see that language in Paragraph
13 14?
14 A. Yes.
15 Q. My question is, so you understood as of
16 September 2014 that there might be overruns up to a
17 hundred thousand dollars, correct?
18 A. I would disagree. This refers to Exhibit
19 10. So we did expect him to spend more than that
20 but it was not an expectation for him to do so.
21 Q. But you understood there was a possibility
22 that it might be as much as --
23 A. There's always a possibility.
24 Q. There's always a possibility, correct.

**128**

1  How much in carrying costs were incurred
2  after May 30, 2014?
3  A. I don't remember.
4  Q. If I could ask you to look at Paragraph 17.
5  It says: "After we had the property under
6  agreement, suddenly Mr. Kagan's claims of cost
7  overruns exploded. On or about December 15
8  Mr. Kagan presented a new balance sheet that claimed
9  that the costs had skyrocketed since June 2014.
10 This short chart summarizes the claimed increases."
11     Do you see that?
12 A. Yes.
13 Q. I believe you told us that in June 2014 the
14 property was not yet complete, correct?
15 A. Right.
16 Q. As I understand your testimony,
17 construction was not complete until December 2014,
18 correct?
19 A. Yes.
20 Q. So certainly you would expect there would
21 be significant costs between June and six months
22 later, December, correct?
23 A. Yes.
24 Q. So it certainly came to you as no surprise

**129**

1  that the numbers went up significantly between June
2  and December 2014, correct?
3      MR. CARNATHAN: Objection.
4  A. Would you repeat the question?
5  Q. It was no surprise to you that the claimed
6  expenses went up in the six months between June 2014
7  and December 2014.
8  A. I agree there would be expenses associated
9  with continued building of the project.
10 Q. Did you make any determination? For
11 example, you have in your chart contractor expenses
12 went up from 25,660 to 123,111.23, which was a
13 claimed increase of 97.451.23. Do you see that?
14 A. Yes.
15 Q. How did you determine that the claimed
16 increase of 97,451.23 was somehow improper?
17 A. As far as I remember and to the best of my
18 remembrance and knowledge, if you build for a year
19 and $25,000 and you do significant amount of work
20 until June and then for four months all of a sudden
21 the number goes five times bigger, then that doesn't
22 translate into the amount of work being done at that
23 point.
24 Q. You will agree with me that is a six-month

Elena Lande - Vol. 1 - 6/22/2018

34

**Page 130**

1 figure, not a four-month figure?
2 A. Yes.
3 Q. What exactly was done as of June 2014?
4 A. I don't remember.
5 Q. Was the house more than 25 percent complete
6 at that point?
7 A. On June 2014?
8 Q. Yes.
9 A. Yes.
10 Q. What percent was completed?
11     MR. CARNATHAN: Objection.
12 A. I don't remember. I don't think I'm in a
13 position to answer that question.
14 Q. Were you ever in a position to answer that?
15 A. No.
16 Q. What was that?
17 A. I can't give an exact percentage to the
18 completion rate.
19 Q. How did you determine that this was a
20 skyrocketing cost?
21 A. To my best knowledge of the construction
22 process and financial documents provided by Kagan.
23 Q. Did you do any formal analysis?
24 A. I didn't do any formal analysis.

**Page 131**

1 Q. You are not a contractor, are you?
2 A. No.
3 Q. Had you ever been involved in a
4 construction contract prior to Yarmouth Road?
5 A. No.
6 Q. So how did you make the determination that
7 the claimed increase over six months of construction
8 was somehow improper?
9 A. To the best of my knowledge and
10 understanding of the construction business.
11 Q. What is your knowledge and understanding,
12 what is the basis of your knowledge and
13 understanding of the construction business if this
14 was the first construction project that you have
15 been involved with?
16 A. General common sense.
17 Q. When You say contractor expenses, which
18 contractor are you referencing?
19 A. I think it was a line item. I don't
20 remember now.
21 Q. Is this a chart that you made or is this a
22 chart that Mr. Carnathan made when he drafted this
23 affidavit for your signature?
24     MR. CARNATHAN: Objection.

**Page 132**

1 A. I don't remember.
2 Q. The chart then turns to materials
3 indicating that in that six-month period of time
4 there were $308,000 of additional materials. How
5 did you determine that in that six-month -- strike
6 that. Did you determine in the six-month period
7 there had not been an additional $308,000 of
8 materials of purchased?
9 A. I don't remember now. At the time I had
10 more information.
11 Q. Do you have any understanding as you sit
12 here today whether or not there were $308,000 more
13 materials utilized between June and December 2014?
14 A. Would you repeat the question?
15 Q. Yes. As you sit here today, do you have
16 any understanding whether or not there were
17 additional $308,000 worth of materials used in the
18 six months between June and December 2014?
19 A. I don't remember.
20 Q. Well, given your knowledge of the
21 construction industry, how would you determine
22 whether or not there were actually $308,000 of
23 additional materials utilized between June and
24 December 2014?

**Page 133**

1 A. I don't believe that was my judgment. My
2 judgment was based on his projection costs and the
3 plan that he originally submitted. As we were
4 moving throughout the project, all of a sudden at
5 the end of the project all his numbers were
6 inflated.
7 Q. How much was projected for materials in
8 this project?
9 A. I don't remember. You can do the math.
10 Q. Is there any line item that you rely on as
11 to the total cost for materials in the budget,
12 Exhibit 3?
13 A. There are multiple material line items that
14 are marked labor and material.
15 Q. How much is labor and how much is material
16 on those line items?
17 A. There's no split mentioned here.
18 Q. Did you ever get a breakdown in any budget
19 as to how much materials would be versus how much
20 labor would be?
21 A. No.
22 Q. So how did you determine that a $308,000
23 increase was somehow improper?
24 A. I'm not in a position to answer the

FARMER ARSENAULT BROCK LLC

Elena Lande - Vol. 1 - 6/22/2018

35

**134**

1  question.
2  Q. Why not?
3  A. I don't remember.
4  Q. Did you ever know?
5  A. I don't have any documents or calculations
6  that I had at the time in front of me.
7  Q. What documents or calculation did you have
8  at that time?
9  A. I still had my communication with Kagan at
10 the time I wrote the affidavit. I don't have that
11 anymore.
12 Q. Did you provide these numbers to
13 Mr. Carnathan's office or did he provide them to you
14 and ask you to confirm?
15 A. The only documentation I provided to Sean's
16 office you have a copy of that.
17 Q. I understand that. Did he do the analysis
18 of the documents and prepare the affidavit or did
19 you do the analysis and provide him with this chart?
20      MR. CARNATHAN: Objection.
21 A. Will you repeat that?
22 Q. Who prepared this chart which is part of
23 Exhibit 17? Did you prepare it or did
24 Mr. Carnathan's office prepare it?

**135**

1  A. Physically prepare or supply the
2  information?
3  Q. Who came up with the math that's reflected
4  there, you or him?
5      MR. CARNATHAN: Objection.
6  A. I don't remember.
7  Q. You indicated that operating expenses went
8  up by $21,000 over a six-month period. How did you
9  determine that $21,000 reflected a skyrocketing
10 operating expense?
11     MR. CARNATHAN: Objection.
12 A. I don't think skyrocketing is every line
13 item. It was to the overall number.
14 Q. Which costs in your chart had skyrocketed
15 since June 2014?
16 A. I don't think I meant any particular one.
17 I meant as a total, and that was a breakdown of the
18 total.
19 Q. So you can't identify any particular costs
20 that you claim skyrocketed, as you sit here today?
21 A. I'm not in a position to identify right
22 now.
23 Q. Did you ever know?
24 A. Maybe.

**136**

1  Q. What did you mean by the word
2  "skyrocketed"?
3  A. Increased significantly.
4  Q. What is your litmus test for what is
5  significant?
6  A. More than 20 percent.
7  Q. Did you do an analysis to see what was more
8  than 20 percent?
9  A. What do you mean, more than 20 percent of
10 the project?
11 Q. Did you do an analysis on each of those
12 line items when you claim that these were
13 skyrocketing to determine what was 20 percent more
14 and what wasn't?
15 A. I don't remember.
16 Q. You talk about outside services went up
17 $647,000. Do you see that?
18 A. Yes.
19 Q. How did you determine that that number
20 skyrocketed?
21 A. You are asking the same question?
22 Q. I am but as to a different category.
23 A. I answered.
24 Q. So you don't know?

**137**

1  A. I'm not in a position to answer that
2  question.
3  Q. Do you have any documents which you haven't
4  produced that would enable you to make that
5  determination?
6  A. I don't think so.
7  Q. So it's fair to say that as you sit here
8  today you have no idea how you came up with these
9  numbers.
10     MR. CARNATHAN: Objection.
11 A. Would you rephrase?
12 Q. As you sit here today, you cannot explain
13 to me how you made the determination that these
14 numbers somehow were improper.
15     MR. CARNATHAN: Objection.
16 A. Do you mean when I made it as part of the
17 affidavit?
18 Q. I'm asking, as you sit here today, you are
19 unable to explain to me how you came up with these
20 numbers and did the analysis; is that correct?
21     MR. CARNATHAN: Objection.
22 A. I don't remember.
23 Q. And is it fair to say, Ms. Lande, that in
24 the contractor expenses, as you sit here today, you

Elena Lande - Vol. 1 - 6/22/2018

36

**138**

1  have no idea which contractors you are referencing?
2      MR. CARNATHAN: Objection. Would you
3  repeat?
4      Q. Which contractor expenses are included in
5  the category that is titled Contractor Expenses?
6      A. I don't have any supporting documentation
7  on this right now. I am not in a position to
8  answer.
9      Q. What materials were included in the
10  category marked Materials?
11      A. The same. I don't have any supporting
12  documentation anymore. I got rid of the files. I
13  don't remember. At the time I had files that I used
14  to do those numbers.
15      Q. Did you understand, Ms. Lande, that this
16  affidavit was going to be used in a lawsuit?
17      A. Yes.
18      Q. In fact, it has a lawsuit caption on the
19  first page, the name of the lawsuit?
20      A. Yes.
21      Q. Is it your testimony that in fact -- strike
22  that. As of the date you signed this, had you
23  already filed suit against Mr. Kagan,
24  September 2015?

**139**

1      A. Yes.
2      Q. Had you dismissed that case yet, as of
3  then?
4      A. Yes.
5      Q. Again, you don't recall when you destroyed
6  the documentation that you might have been looking
7  at to come up with these numbers?
8      A. No.
9      Q. Let me draw your attention to Paragraph 19
10  of your affidavit. Take a moment to read Paragraph
11  19 to yourself.
12      A. (Witness complies.)
13      Q. I'm going to refer you to the bottom of the
14  page where you talk about you got a return of
15  capital and a profit of $750,000?
16      A. Yes.
17      Q. Then you say: "But we believe Mr. Kagan
18  fraudulently asserted false costs against the
19  project."
20      How did you make the determination that
21  he fraudulently asserted false costs?
22      A. That was my guess. I didn't have any proof
23  of that.
24      Q. So that was just a guess.

**140**

1      A. Yes.
2      Q. Is it fair to say that you never identified
3  any specific false cost other than your guess?
4      A. No.
5      Q. No, it is not fair to say or yes, it is
6  fair to say?
7      A. We haven't confirmed any of those findings.
8      Q. And that's true -- this project has been
9  over about three years. Fair to say that as you sit
10  here today you don't know whether there were any
11  fraudulently asserted false costs; is that correct?
12      A. I don't have any confirmation of that.
13      Q. Paragraph 20, would you take a moment and
14  look at Paragraph 20.
15      A. (Witness complies.) Okay.
16      Q. Your first sentence you say that Kagan
17  started harassing you a week before the closing,
18  correct?
19      A. Yes.
20      Q. What did he do to harass you the week
21  before the closing?
22      A. That we won't close, he will put liens on
23  it. The buyer is going to walk away the moment they
24  find out we were arguing and we can't close, and it

**141**

1  won't sell because it was off season.
2      Q. Did he say that or did Mr. Cohen say that?
3      A. Kagan said that.
4      Q. Did you consult with an attorney?
5      A. Not at that time.
6      Q. Did you consult with Mr. Maiden, who is the
7  LLC's attorney?
8      A. Consult on what?
9      Q. On whether or not this was a proper conduct
10  by Mr. Kagan.
11      A. No.
12      Q. You didn't have to agree to take that 750,
13  did you?
14      MR. CARNATHAN: Objection.
15      A. What?
16      Q. You didn't have to agree to take that
17  $750,000, did you?
18      MR. CARNATHAN: Objection.
19      A. Would you rephrase?
20      Q. You were free to say no to the deal that
21  was offered you; isn't that correct?
22      A. I had an option of saying no.
23      Q. Take a look at Paragraph 24.
24      A. Yes.