# EXHIBIT B

Exhibits: 1-18                          Volume 1, Pages 1-123

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

---

In Re:

                                  Chapter 7

LYMAN-CUTLER, LLC,      Case No. 15-13881-FJB

       Debtor

---

LYMAN-CUTLER, LLC,

       Plaintiff

v.                               Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,

       Defendants

---

DEPOSITION OF VLADISLAV ABRAMSKIY
Monday, June 18, 2018, 9:59 a.m.
O'Connor Carnathan and Mack LLC
1 Van de Graaff Drive, Suite 104
Burlington, Massachusetts

--------- David A. Arsenault, RPR ---------
daa@fabreporters.com    www.fabreporters.com
Farmer Arsenault Brock LLC
Boston, Massachusetts
617-728-4404

Vladislav Abramskiy - Vol. 1 - 6/18/2018

16

**58**

1    A. He would say it all the time.
2    Q. Do you recall when he said that
3    specifically?
4    A. No, I don't.
5    Q. Do you recall how much, roughly, was the
6    monthly payment for both the construction loan and
7    the mortgage?
8    A. I don't remember. The construction loan
9    would fluctuate. It has been a long time. I don't
10   remember.
11   Q. If I suggested that the construction loan
12   was about $2,000 a month, would that sound right to
13   you?
14       MS. FULLER: Objection.
15   A. I don't remember, but if memory serves I
16   think I was putting in each month around 1.5
17   thousand and then it was even more with -- so it was
18   1.5 K monthly and because of the taxes that had to
19   be paid every three or four months, the amount was
20   even bigger.
21       (Marked, Exhibit 7, Email, top email
22   3/14/13, and construction loan document.)
23   Q. Can you tell me what Exhibit 7 is, please,
24   sir?

**59**

1    A. It's in relation to the amount that was
2    given to us as construction loan.
3    Q. And is this a document, sir, that you
4    received on or about March 14, 2013?
5    A. I don't remember, probably, yes.
6    Q. And the attachment, sir, has a signature
7    line for you. Did you ever see this document?
8    A. I don't remember.
9    Q. Now, sir, did you understand that the
10   Rockland Trust was only willing to lend $787,500?
11   A. Yes, we discussed it with Dima.
12   Q. What do you recall discussing relative to
13   the amount of the loan?
14   A. We discussed it with Dima. He said that we
15   had a shitty appraiser and the appraisal was lower
16   than expected but not to worry that at the end of
17   the project when the property was sold he would just
18   take or we would just repay him the about $60,000,
19   the difference between the anticipated 850,000 and
20   the amount of construction loan that was given.
21   Q. So is it fair to say, sir, that as of March
22   14, 2013 you knew that there was going to be a
23   shortfall of approximately $60,000 for this project?
24       MS. FULLER: Objection.

**60**

1    A. What I knew was that it was a different
2    appraisal from what was anticipated, and Dima said
3    that he would pay the difference, about $60,000 at
4    the end. We didn't argue with that.
5    Q. Just to make sure I understand it, you
6    understood that Kagan was going to contribute
7    another $60,000 to this project and then be
8    reimbursed at the closing; is that correct?
9    A. Yes.
10   Q. And the reason for that was that originally
11   you were hoping to get $850,000 with the bank but
12   because of the appraiser it only approved 787,500,
13   right?
14   A. It's not that we expected it, but that was
15   what Dima had told us.
16   Q. Sir, did you also understand that out of
17   the proceeds of the construction loan there was a
18   fee of 1 percent being charged?
19       MS. FULLER: Objection.
20   A. Dima never mentioned that.
21   Q. If you can turn to the second page of the
22   letter from Rockland Trust. The section is entitled
23   Loan Fee. Do you see that? Did you understand,
24   sir, that there was an additional $7,875 that was

**61**

1    due to the bank in connection with this loan?
2    A. I understood that, but because Dima was
3    providing everything it was my understanding that it
4    was included in the construction loan amount.
5    Q. That it was going to be deducted from the
6    construction loan, correct?
7    A. I don't know. I do not understand this
8    question. What he said, that amount, 850,000
9    included all the expenses, bank fees, carrying
10   costs, operational expenses, taxes.
11   Q. For what period of time did the
12   construction loan cover the carrying costs? How
13   long?
14   A. I asked him but he never gave me an answer
15   to this question. He would just say don't worry,
16   everything is under control.
17   Q. Okay. If I could ask you to turn to after
18   the fourth of fifth page, Construction Loan
19   Supplement in Exhibit 7. Do you have the section of
20   Exhibit 7 entitled Construction Loan Supplement in
21   front of you, sir?
22   A. Yes.
23   Q. Do you see the section that says, titled on
24   the top of the page Use of Loan Proceeds? Do you

**Page 66**

1  A. Yes.
2  Q. And was Mr. Kagan going to front that cost
3  and get paid from the closing for the amount he
4  fronted?
5  A. Yes.
6  Q. So is it fair to say, sir, that when you
7  found out about the ledge you already knew, sir,
8  that there was going to be an additional $60,000
9  that he was going to front because the construction
10  loan was lower, and there was going to be some
11  additional cost with respect to the ledge, correct?
12  A. Yes.
13  Q. Now, would you agree with me that the house
14  was certainly completed by October of 2014?
15  A. I don't remember exactly, but I know that
16  there was at least a two-month delay as compared to
17  the terms of the agreement.
18  Q. Now, sir, I'm going to represent to you
19  that in the documents that you have provided to me
20  there's a gap from late March of 2013 until
21  October 2014. Do you have any documents in your
22  possession, sir, that is in that period of
23  April 2013 to September 2014?
24  A. I must not have them.

**Page 67**

1  Q. Do you recall that there were documents
2  during that period or was there just no written
3  communications during that period?
4  A. There must not have been any written
5  communication.
6       (Marked, Exhibit 8, Color printout of
7  text messages.)
8  Q. Can you tell me what Exhibit 8 is?
9  A. Vadim sent me a message, just me, that they
10  had gotten an offer for 1.8-plus million.
11  Q. And on this Exhibit 8 is it fair to say
12  that the responses that are in the color blue are
13  your responses and the gray is Vadim's?
14  A. Yes.
15  Q. And, sir, would you agree with me that as
16  of October 6, 2014 the property was completed and
17  had been listed with Tatiana?
18       MR. CALANDRELLI: Objection.
19  A. Yes, it must be true.
20  Q. How was it decided at what price to list
21  the property?
22  A. We primarily consulted with Tatiana, but
23  since it was finished and not selling, we started
24  getting worried. We started talking about maybe

**Page 68**

1  lowering the price, and all the partners were in on
2  that discussion.
3  Q. Were all the partners in on the discussion
4  on what to list the property for originally?
5  A. We listened to what Tatiana and Dima said
6  about it. They suggested that we would get at least
7  around $2 million and we just went with it because
8  they represented themselves as professionals in this
9  field.
10  Q. So looking at Exhibit 8, sir, on October 6,
11  2014 at 5:53 p.m. you got a text telling you that
12  there had been an offer, correct?
13  A. Yes.
14  Q. Can you translate the Russian for me on
15  this page?
16  A. I asked him if he had told Vitaly Gassel.
17  Q. And did he reply?
18  A. I called Vitaly. We had a conversation and
19  we wanted to agree to accept this offer. I called
20  Dima, called back Dima. So what he replied was that
21  they knew the person who gave this offer. He had
22  given offers previously on four of his properties
23  and that he always gives lowball offer. It turned
24  out that Vadim had already counteroffered this

**Page 69**

1  person without consulting with us. And we basically
2  lost this deal.
3  Q. When did you find out that Vadim had
4  counteroffered?
5  A. I called him right away. That's why there
6  is no further text conversation.
7  Q. So you called him on October 6, 2014; is
8  that correct?
9  A. After I had the conversation with Vitaly
10  and we decided that we were willing to accept this
11  offer, I called Vadim. He said, as I mentioned,
12  that he had had previously four offers from the same
13  person, that he always gives a low amount offer.
14  Vadim had already counteroffered him but did not get
15  the reply. So the following day I'm asking him if
16  he had any news.
17  Q. So this was a conversation that you had
18  with Vadim on October 6, 2014, correct?
19  A. Yes, correct.
20  Q. And when he told you that he had done that,
21  what did you say to him?
22  A. I told him that he needs to consult with
23  us. But Vadim says that he knows this person, this
24  person would never have bought the house. I asked

**Page 78**

1  in the negotiation of the purchase and sale
2  agreement in connection with the accepted offer,
3  which is Exhibit 11?
4      A. Yes.
5      Q. And did you understand, sir, that in
6  connection with the sale of the property that Kagan
7  Development would be giving a builder's warranty to
8  the new owners?
9      A. Yes.
10     Q. Did you also understand that once the
11 property sold there would be a reconciliation of all
12 monies as between the partners?
13     A. Yes.
14     Q. It was after the closing that Mr. Kagan
15 would receive the $60,000 plus whatever the ledge
16 costs were, correct?
17     A. Yes.
18         (Marked, Exhibit 12, Email, top email
19 4/29/15, and documents re accounting.)
20     Q. Is Exhibit 12, sir, an accounting that you
21 received on or about April 27, 2015?
22     A. Not so much an accounting as some kind of
23 invoices that came out of nowhere.
24     Q. Did you review these invoices when you

**Page 79**

1  received them?
2      A. I did. I looked at them.
3      Q. And were any of these invoices, did you
4  determine that any of these invoices were
5  inaccurate?
6      A. I never verified it because at that time I
7  had not understood what was going on. It didn't
8  make any sense.
9      Q. I ask you to look at the second page of
10 this exhibit, the email of Monday, April 27. At any
11 point, sir, did you respond to this email with
12 questions about the attachments?
13     A. Yes, we wanted to meet with Dima but he
14 disappeared. He actually disappeared for about a
15 month and a half after the offer. And only came
16 back to life, surfaced about a week before the
17 closing.
18     Q. Did Mr. Kagan suggest that you speak with
19 Dan in his office to have any questions about the
20 accounting addressed?
21     A. He would always try to refer us to Dan or
22 to Mr. Cohen in his office. We didn't know either
23 of them. We had always previously dealt with
24 Mr. Kagan and also had signed an agreement with

**Page 80**

1  Mr. Kagan.
2      Q. Did Ilya have an agreement with Mr. Kagan?
3      A. We would always meet together, all of us.
4      Q. Did Vitaly Gassel have an agreement with
5  Mr. Kagan?
6      A. Vadim Kagan knew that we all meet together
7  and were all interested partners.
8      Q. When Mr. Kagan suggested that you address
9  your questions to Dan, did you refuse to do that?
10     A. We didn't want to deal with Dan. We didn't
11 know him. We wanted to deal with Mr. Kagan and he
12 knew that Vitaly Gassel and Ilya were part of this
13 project from the very beginning and we had all dealt
14 with Mr. Kagan, so why would we be dealing with Dan
15 now.
16     Q. So is it your answer that you refused to
17 deal with Dan?
18         MR. CALANDRELLI: Objection.
19         MS. FULLER: Objection.
20     A. Not that we refused. We just wanted to
21 talk to Dima.
22     Q. Now, sir, above the April 27, 2015 email,
23 it looks like there's a response from Ilya
24 Prudovsky. Do you see that at 9:37 p.m. at the top?

**Page 81**

1  Can you translate that for me?
2          THE WITNESS: The interpreter can.
3      Q. Can you do that?
4      A. "Hi, Dima, congrats. Tatiana did well.
5  Look, we don't understand where this 171,000 came
6  from. Let's talk about it. Can we meet Wednesday?"
7      Q. And "Spasibo"?
8      A. That's thank you.
9          (Marked, Exhibit 13, Purchase and sale
10 agreement.)
11     Q. Sir, is Exhibit 13 a purchase and sale
12 agreement that you signed on behalf of the LLC for
13 the sale of the Newton-Cynthia Road property?
14     A. I signed it on my own.
15     Q. You understood you were signing on behalf
16 of the LLC, right?
17     A. Yes.
18     Q. And is it fair to say, sir, that this
19 agreement was negotiated on your behalf by Attorney
20 Joseph Brooks?
21     A. Yes.
22     Q. Now, sir, you signed this of your own free
23 will, correct?
24     A. Yes.

Vladislav Abramskiy - Vol. 1 - 6/18/2018

23

**Page 86**

1   Q. I've placed in front of you Exhibit 14.
2   Does that bear your signature on the last page?
3   A. Yes.
4   Q. Does that memorialize the agreement that
5   you reached with Kagan?
6   A. We had no choice because they had send us a
7   threatening letter which states if we didn't agree
8   instead of 200,000 we would be paying 450,000. We
9   had to sign this in order to not lose the deal.
10  Q. Sir, you will agree that you signed this
11  agreement, correct?
12  A. Yes.
13  Q. And in fact will you agree with me as well
14  that everybody, both sides did what they were
15  supposed to do under this agreement?
16      MS. FULLER: Objection.
17  A. I signed it, but as far as the our
18  relations are concerned on the part of Kagan, he did
19  not fulfill anything that he had told us. I was put
20  in such a position that I had to sign it just to get
21  out of this.
22  Q. And, sir, if I could draw your attention to
23  the third page, there's the paragraph sort of in the
24  middle of the page that says: "Mr. Kagan has agreed

**Page 87**

1   to contribute enough funds." Do you see that
2   paragraph?
3   A. Yes.
4   Q. And will you agree with me that you
5   received $132,373.17 at the closing and Kagan cut
6   you a separate check for $17,321.83?
7       MS. FULLER: Objection.
8   A. So this in totality was the amount of my
9   contribution to this project.
10  Q. You will agree with me, sir, that you
11  received those two sums at the closing, correct?
12  A. I only received the first one at the
13  closing and the second check came two weeks after.
14  Q. But you did receive it, did you not?
15  A. Yes.
16  Q. And this also called for you to transfer
17  your interest in Newton-Cynthia Road to Vadim Kagan
18  by July 1, 2015, correct?
19      MS. FULLER: Objection.
20  A. Yes.
21  Q. In fact, you did transfer your interest to
22  Vadim Kagan by July 1, 2015 in the Newton-Cynthia
23  Road, LLC, correct?
24  A. Yes.

**Page 88**

1   Q. So you agree with me, sir, that as of July
2   1, 2015 you were done, you no longer had an interest
3   in the Newton-Cynthia Road, LLC, correct?
4   A. Yes.
5   Q. Now, after July 1, 2014 did you empty the
6   bank account that Newton-Cynthia Road, LLC
7   maintained?
8       MR. CALANDRELLI: Objection.
9       MS. FULLER: Objection.
10      THE INTERPRETER: You said 2014.
11      MR. PERTEN: 2015.
12  A. The agreement was that there was a person
13  who had done our taxes for four years. So we left
14  3,000 on the account because we needed to pay our
15  accountant.
16  Q. The account was an account in the name of
17  Newton-Cynthia Road, LLC, correct?
18  A. The account was in the name of
19  Newton-Cynthia Road, LLC Kagan Abramskiy Gassel.
20  Q. And you withdrew funds from that account
21  after July 1, 2015; is that correct?
22  A. I didn't empty the account or take money
23  out of the account. Vitaly transferred electronic
24  payment to the accountant, and I went to the bank to

**Page 89**

1   close the account because we didn't want our names
2   associated with it.
3   Q. At the time that Vitaly transferred the
4   funds, were you aware that he was going to do that?
5   A. Yes.
6   Q. And did you tell Mr. Kagan before you did
7   that that he was going to withdraw the funds from
8   the account?
9   A. We didn't have any communication with
10  Mr. Kagan at this point. That was the agreement
11  made prior to that.
12  Q. And Vitaly was not a member of the LLC, was
13  he?
14  A. No.
15  Q. Was his name on the account or was his
16  wife's name on the account?
17  A. I don't remember, but for the three years
18  Vitaly was the one who made all the payments and
19  transfers of the account. For some reason the
20  Kagans didn't have any questions then.
21  Q. Now, sir, after the LLC account was
22  emptied, did you have occasion, sir, to be contacted
23  by Alex Filippov?
24  A. Yes, I think I told you about it.

**102**

1  A. I asked contractors in Newton who do this
2  type of work. They said for an old house, this cost
3  could be 10 or 15,000. But I don't have any
4  documentary evidence.
5  Q. Who did you ask?
6  A. I don't remember.
7  Q. When did you ask?
8  A. Maybe six months after the house was sold.
9  Q. How much ledge was removed?
10 A. Kagan never told me. He tried to avoid all
11 clarifications and conversations on this subject.
12 Q. As the managing member of this LLC, did you
13 believe you had the right to go onsite during this
14 construction process at any point?
15 A. I think so. But from my conversations with
16 Kagan, I realized that if I were in his opinion to
17 interfere, start interfering into what he thought
18 was not my business, we would have disagreements and
19 fights and I wanted to avoid that.
20 Q. So that was a choice that you made to keep
21 the peace; is that correct?
22      MS. FULLER: Objection.
23 A. Yes.
24 Q. But if you had chosen, you certainly could

**103**

1  have gone onsite, correct?
2       MS. FULLER: Objection.
3  A. Yes.
4  Q. Sir, do you believe that Kagan is entitled
5  to be paid for the costs of construction of this
6  house?
7       MR. CALANDRELLI: Objection.
8       MS. FULLER: Objection.
9  A. Construction of what?
10 Q. The project.
11 A. He did get this.
12 Q. How do you know that?
13 A. That's what he said.
14 Q. How much did Mr. Kagan get for this
15 project?
16 A. He took the whole of construction cost,
17 everything.
18 Q. Do you know how much he was paid?
19 A. No. He never mentioned that. He never
20 said that he needed the money right away.
21 Q. But you understood, sir, that at the
22 closing everything would be tallied up; is that
23 correct?
24 A. Yes.

**104**

1  Q. Now, sir, if you could draw your attention
2  to Paragraph 10 of your affidavit, the second
3  sentence of Paragraph 10 says: "Kagan, on the other
4  hand, was paid handsomely through the construction
5  costs."
6       Do you see that language?
7  A. Yes.
8  Q. What did you mean when you said he was paid
9  handsomely?
10 A. All the extra charges that he presented
11 were for the work of his company, Proexcavation.
12 Q. And is Proexcavation, sir, entitled to be
13 paid for the services that it performed on the
14 project?
15      MR. CALANDRELLI: Objection.
16      MS. FULLER: Objection.
17 A. Yes. But that's not what he said from the
18 beginning.
19 Q. Do you believe that Proexcavation should
20 have done the work for free?
21      MR. CALANDRELLI: Objection.
22      MS. FULLER: Objection.
23 A. Of course not. He said that it was his
24 company, and so he is providing this work at cost

**105**

1  for his clients, but it ended up being much more
2  than what he said.
3  Q. How much did he say Proex was going to
4  charge for its work?
5  A. When we were discussing it, he said 70,000
6  or around 70,000. But he said that he charges much
7  less, he charges his clients much less. I wasn't
8  present at that conversation, but he told Vitaly
9  that it would be in the vicinity of 30 or 40,000.
10 Q. Are you referring to the cost of removal of
11 the ledge?
12 A. Yes.
13 Q. What other work, if any, did Proexcavation
14 do on this project?
15 A. I don't know.
16 Q. How much did Proexcavation charge to work
17 on this project?
18 A. I don't remember.
19 Q. Did Kagan Development do the construction?
20 A. Yes.
21 Q. How much did Kagan Development get paid for
22 the work that it did on the project?
23 A. I don't remember.
24 Q. If you don't know how much Proexcavation

**106**

1  was paid and don't know how much Kagan Development
2  was paid, how do you know that Kagan was paid
3  handsomely?
4      MR. CALANDRELLI: Objection.
5      MS. FULLER: Objection.
6    A. Because we agreed with Kagan on a flat fee
7  for the construction. And the fact that all the
8  expenses were not exceeding 850,000.
9    Q. That was the $850,000 figure?
10   A. Yes.
11   Q. Plus the $60,000 that you knew about from
12  up front, correct?
13     MR. CALANDRELLI: Objection.
14     MS. FULLER: Objection.
15   A. No, it is 800,000 minus 60,000... because
16  we only received a loan for 780,000 -- 787,000.
17   Q. So what was the total cost of the
18  construction?
19   A. As Kagan demonstrated, it was over a
20  million dollars.
21   Q. How did he demonstrate that to you?
22   A. Through all those emails that he sent.
23   Q. Do you know how much was actually the
24  construction costs? Do you know? Do you have any

**107**

1  personal knowledge?
2    A. No.
3    Q. Now, sir, at some point after you signed
4  this affidavit did Mr. Filippov discuss with you
5  whether or not there should be criminal charges
6  brought against Kagan?
7    A. Yes.
8    Q. How did that come about?
9    A. I don't remember now.
10   Q. Did you have a meeting with Mr. Filippov to
11  discuss potential criminal actions?
12   A. No.
13   Q. Did you meet with Mr. Filippov's attorneys
14  to discuss potential criminal actions?
15   A. No.
16   Q. How did you find out that criminal charges
17  were being contemplated?
18   A. I was talking to Filippov over the phone,
19  and he mentioned that they were going to meet with
20  the district attorney and if I wanted to join.
21   Q. And what did you say?
22   A. I said I could join them.
23   Q. And what is it that you believe that
24  Mr. Kagan did that was criminal?

**108**

1    A. The way he falsified all the charges, I
2  have no doubts that it was fraud from the very
3  beginning and that it had been planned.
4    Q. What charges did he falsify?
5    A. The charges that he presented right before
6  the closing to LLC.
7    Q. Specifically, sir, of those charges that he
8  presented before the closing, what charges are
9  false?
10     MS. FULLER: Objection.
11   A. I think anything above a hundred thousand.
12  If the charge was 60 or 40,000 for the ledge, we
13  didn't have any objections and we discussed it in
14  emails and everything. I think he just took
15  advantage of us and used us as somebody in whose
16  name the mortgage can be taken out.
17   Q. Other than your concerns about the price of
18  the ledge which you've just mentioned again, what
19  other charges, if any, do you believe were false?
20   A. I don't know.
21   Q. Now, you said you thought there was fraud
22  from the very beginning. What do you believe was
23  fraudulent from the very beginning?
24   A. Because when we went through it, thinking

**109**

1  back I realized that it was very well planned.
2    Q. What was very well planned?
3    A. Well planned how to lead us through all the
4  way to the closing and then present all those
5  charges.
6    Q. What facts do you have other than your
7  belief that supports that conclusion?
8      MS. FULLER: Objection.
9      MR. CALANDRELLI: Objection.
10   A. When we received this email from Joe Cohen
11  regarding the fact that LLC owed Mr. Kagan $144,000,
12  we called for a meeting. He said it was a mistake.
13   Q. Anything else?
14   A. I don't remember now.
15     (Marked, Exhibit 17, Email, top email
16  6/7/18.)
17     MR. CALANDRELLI: I want to note for the
18  record that we are beyond the four-hour mark at this
19  point.
20     MR. PERTEN: We also took breaks and had
21  a lunch and we have an interpreter.
22     MR. CALANDRELLI: I made a note. You
23  can continue.
24   Q. Can you identify Exhibit Number 17, sir?

**110**

1   A. Yes.
2   Q. Is this an email that you received on or
3   about March 3rd of 2016?
4   A. Yes.
5   Q. The email is addressed to you as well as
6   Elena Lande. Do you see that?
7   A. Yes.
8   Q. Did you have any conversations with Elena
9   Lande about potential criminal actions against
10  Mr. Kagan?
11  A. You already asked me about her. I never
12  met or talked with her.
13  Q. Is this document marked as Exhibit 17 the
14  last communication that you had with anybody
15  regarding potential criminal action against
16  Mr. Kagan?
17  A. Yes.
18  Q. Did you ever speak with the district
19  attorney's office?
20  A. No.
21  Q. Did you ever provide any documents to be
22  given to the district attorney's office?
23  A. No.
24  Q. Did you ever speak with anybody from the

**111**

1   Attorney General's office regarding Mr. Kagan?
2   A. No.
3   Q. At any point, sir, did you ask
4   Mr. Calandrelli to represent you individually?
5   A. Yes.
6       MS. FULLER: Yes or no. Not anything
7   more than that.
8   Q. When was that?
9       MS. FULLER: You can answer that.
10  A. We only had one meeting.
11  Q. When was that?
12  A. It was three or four months after the
13  closing, two or three. I don't remember.
14  Q. What was the scope of the representation
15  that you were soliciting from Attorney Calandrelli's
16  office?
17      MS. FULLER: Do you understand the
18  question?
19      THE WITNESS: I don't.
20  Q. What did you want them to do for you?
21      MR. CALANDRELLI: Objection. Be careful
22  not to disclose any private communications that you
23  had with my office on this subject.
24  A. Can you repeat the question?

**112**

1   Q. I want to know the nature of the legal
2   services that you were seeking from
3   Mr. Calandrelli's office.
4   A. We were planning to file a suit against
5   Kagan and that's why.
6   Q. Was this before or after you signed your
7   affidavit?
8   A. Before.
9   Q. You said we. Who is we?
10  A. Myself and Gassel.
11      MR. PERTEN: Let's take two minutes. I
12  think I'm done. Let me look at my notes.
13      (A recess was taken.)
14      MR. PERTEN: I'm all set.
15      (Marked, Exhibit 18, Letter 6/15/15.)
16      EXAMINATION
17  BY MR. CALANDRELLI:
18  Q. Mr. Abramskiy, if you can just review
19  Exhibit 18 for me please and let me know when you're
20  finished.
21  A. (Witness complies.) I have.
22  Q. Previously -- sorry, if you can look at
23  Exhibit 14, please. I believe you said you signed
24  this Exhibit 14 after you received a threatening

**113**

1   letter by Mr. Kagan; is that right?
2   A. Yes.
3   Q. Is the letter that's marked as Exhibit 18
4   the letter that you referenced as a threatening
5   letter?
6   A. Yes.
7   Q. Now, if you look at the first page of
8   Exhibit 18, in the fourth paragraph it begins: "The
9   total due under this invoice is therefore
10  $1,195,672.77." Do you see that?
11  A. Yes.
12  Q. What did you understand that number to be
13  in this letter?
14  A. That was all the additions that they came
15  up with, that was the cost of the construction of
16  the house.
17  Q. If you look to the invoice that's attached
18  to the back of this document, please, do you see the
19  total amount on this invoice is $408,172.77?
20  A. Yes.
21  Q. Did you understand this was the amount that
22  Mr. Kagan's company was demanding to be paid on this
23  project?
24  A. Yes.

### Page 118

1  THE INTERPRETER: I want to clarify for
2  the deponent, you are asking him to review the whole
3  affidavit?
4  MR. CALANDRELLI: Yes.
5  Q. My question is, is there anything else you
6  wanted to clarify in the affidavit?
7  A. Can you repeat the question?
8  Q. You made a clarification for me with
9  respect to the first sentence of Paragraph 6. With
10  the exception of that, is everything else contained
11  in that affidavit still true and accurate?
12  A. Yes.
13  MR. CALANDRELLI: I have no further
14  questions.
15  MR. PERTEN: Do you have any questions?
16  MS. FULLER: No.
17  MR. PERTEN: I have a couple of
18  follow-up.
19  MS. FULLER: I'm going to object. It is
20  well past the four-hour window. We have tried to be
21  very accommodating. If we go more than a couple of
22  minutes, I would like to stop.
23  EXAMINATION
24  BY MR. PERTEN:

### Page 119

1  Q. Mr. Abramskiy, you looked at the letter
2  from Mr. Cohen which Mr. Calandrelli marked as
3  Exhibit 18 and the invoice attached. Do you recall
4  that?
5  A. Yes.
6  Q. You never paid that invoice; is that
7  correct?
8  MS. FULLER: Objection.
9  A. No.
10  Q. In fact, Mr. Kagan ended up paying you an
11  additional $17,000 and change, correct?
12  MR. CALANDRELLI: Objection.
13  MS. FULLER: Objection.
14  A. They put us in such position that we would
15  lose if we didn't accept the conditions so we had to
16  do it.
17  Q. Did you have counsel at the time you
18  received this?
19  MS. FULLER: Do you understand the
20  question?
21  A. You are asking about the attorney that
22  represented the LLC?
23  Q. I'm asking in June of 2015 did you have a
24  lawyer representing you?

### Page 120

1  A. No.
2  MR. PERTEN: Nothing further. You can
3  object, but I'm going to suspend pending you getting
4  back to me as to whether there are any additional
5  documents.
6  MS. FULLER: I'm objecting to that on
7  the grounds those documents could have been obtained
8  before this deposition from the Lyman-Cutler party.
9  There was no reason why it was not obtained prior to
10  this deposition. We are objecting to the suspension
11  of this deposition. We are also objecting to the
12  length beyond the four hours of today's deposition.
13  We do object to bringing him back.
14  MR. PERTEN: Thank you.
15  We are suspending.
16  (3:14 p.m.)

### Page 121

CERTIFICATE OF COURT REPORTER

I, David A. Arsenault, Registered Professional Reporter, do certify that the deposition of VLADISLAV ABRAMSKIY, in the matter of Lyman-Cutler vs Kagan, et al., on June 18, 2018, was stenographically recorded by me; that the witness provided satisfactory evidence of identification, as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts, before being sworn by me, a Notary Public in and for the Commonwealth of Massachusetts; that the transcript produced by me is a true and accurate record of the proceedings to the best of my ability; that I am neither counsel for, related to, nor employed by any of the parties to the above action; and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

Transcript review was requested of the reporter.

_____  6.27.18
David A. Arsenault, RPR