# EXHIBIT C

Exhibits: 103-111               Volume 1, Pages 1-89

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

----------------------------

In Re:

                                Chapter 7

LYMAN-CUTLER, LLC,              Case No. 15-13881-FJB


          Debtor

----------------------------

LYMAN-CUTLER, LLC,


          Plaintiff

v.                              Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,

          Defendants

----------------------------


          DEPOSITION OF MARK KAYSERMAN
        Friday, June 1, 2018, 2:00 p.m.
        O'Connor Carnathan and Mack LLC
        1 Van de Graaff Drive, Suite 104
            Burlington, Massachusetts


     --------- David A. Arsenault, RPR ---------
     daa@fabreporters.com   www.fabreporters.com
        Farmer Arsenault Brock LLC
            Boston, Massachusetts
                617-728-4404

Mark Kayserman - Vol. 1 - 6/1/2018

**6**

1    Q.  Are you represented by counsel here today
2  at your deposition?
3    A.  I am not.
4    Q.  Were you born in the United States?
5    A.  No.
6    Q.  When did you come to the United States?
7    A.  1981.
8    Q.  Can you describe for me your educational
9  background.
10    A.  Master's degree, electrical engineer.
11    Q.  When did you get that?
12    A.  '79.
13    Q.  From what institution?
14    A.  In former Soviet Union.
15    Q.  Did you get an undergraduate degree?
16    A.  Graduate.  It is an equivalent of graduate.
17    Q.  Are you married, sir?
18    A.  Yes.
19    Q.  What's your wife's name?
20    A.  Irina, I r i n a .
21    Q.  Are you employed, sir?
22    A.  Yes, I am.
23    Q.  Who is your current employer?
24    A.  Genesys Telecommunications.

**7**

1    Q.  How long have you been there?
2    A.  12 years.
3    Q.  What do you do for them?
4    A.  I'm a senior director of professional
5  services.
6    Q.  Can you summarize for me what that means?
7    A.  Our company manufactures software for call
8  center, contact center, customer service.  My team
9  installs and configures it to customer needs.
10    Q.  What did you do before working at Genesys?
11    A.  I worked at Verizon.
12    Q.  What did you do there?
13    A.  Same thing.
14    Q.  Is your wife employed?
15    A.  No.
16    Q.  So you worked at Genesys in 2012?
17    A.  That is correct.
18    Q.  Was your wife employed in 2012?
19    A.  Yes, she was.
20    Q.  Where did she work then?
21    A.  Self-employed, worked at a beauty salon as
22  nail technician, aesthetician, as they call them.
23    Q.  I'm going to ask you questions about a real
24  estate development project on Deborah Road.  Are you

**8**

1  familiar with that project?
2    A.  Yes.
3    Q.  Before we get to that, have you had any
4  other experience investing in real estate
5  development?
6    A.  Yes.
7    Q.  Can you explain that to me, please?
8    A.  I owned a property in Brighton,
9  Massachusetts acquired in 1985, disposed in 2004.  I
10  owned real estate that I resided in and sold for a
11  new one.  I also was engaged in a real estate
12  transaction with Vadim Kagan prior to Deborah Road.
13  It is a place in Newton Centre.  I don't remember
14  the number but it is Athelstine, A t h e l s t i n
15  e, Road.  Guessing, I can't remember.  It was two
16  condominiums where Vadim was primary investor and I
17  was coinvestor.  That was 2008, 2009, I can't
18  remember.
19    Q.  Any other real estate development
20  experience in your background?
21    A.  Just personal residential, additions to my
22  own home, renovations.
23    Q.  Any of the homes that you resided and
24  owned, were any of them new construction?

**9**

1    A.  No.
2    Q.  You said you've been involved in some
3  renovation or additions to homes in which you lived?
4    A.  Correct.
5    Q.  I assume you hired general contractors to
6  do that work?
7    A.  Yes and no.
8    Q.  What's the no?
9    A.  Sometimes I would be the general contractor
10  bringing people in and out based on their skills.  I
11  would bring in a plumber, electrician, sheetrock
12  people, a tile guy.  I have the experience of doing
13  that maybe above average.  I can't say I'm a builder
14  because I don't have a license, but I'm a handy guy.
15  I like to do this type of stuff.
16    Q.  And those projects that you did for
17  yourself, do those predate the Deborah Road project?
18    A.  Some predate; some after.
19    Q.  The property you described in Brighton,
20  what kind of property was it?
21    A.  It was a two-bedroom condominium.
22    Q.  Was that new construction?
23    A.  No.
24    Q.  Did you undertake any improvements,

Mark Kayserman - Vol. 1 - 6/1/2018

## 22

1    A.  I can't remember his name.
2    Q.  Was it John McGregor?
3    A.  Yes.
4    Q.  What do you recall of your discussions with
5  Mr. McGregor regarding the purchase loan?
6    A.  I don't recall any details.  There were no
7  issues.  Nothing stuck in my head.  It was a smooth
8  transaction.  It was based on Vadim's personal
9  relationship with John.
10    Q.  Did you endeavor to negotiate any of the
11  terms of the loan?
12    A.  Not really.
13    Q.  Is it fair to say that the proceeds of that
14  first loan were used to purchase the property?
15    A.  Yes.
16    Q.  Was any portion of that loan used to
17  finance the construction?
18    A.  No.
19    Q.  I think as we discussed, there was a second
20  loan to finance the construction?
21    A.  Correct.
22    Q.  Can you describe for me your involvement in
23  connection with obtaining the second loan?
24    A.  Same thing, through Rockland Bank.  We had

## 23

1  two loans both with Rockland.
2    Q.  Did you negotiate the terms of the second
3  loan?
4    A.  Not really.
5    Q.  Did you or your wife provide a guarantee to
6  the bank?
7    A.  Yes.
8    Q.  For how much?
9    A.  I don't remember.
10    Q.  I assume there was an application process?
11    A.  Yes.
12    Q.  Did you have to provide financial
13  information?
14    A.  Correct.
15    Q.  What was the amount that you and your wife
16  invested in the project?
17    A.  It was a down payment.  I don't remember if
18  we had to spend any more outside of the money from
19  the construction loan.
20    Q.  Explain that to me.
21    A.  We used the construction loan to fund the
22  building process and pay the mortgage.  I paid
23  interest on the mortgage.
24    Q.  You said you characterized part of your

## 24

1  investment as a down payment?
2    A.  The initial amount that we put down, which
3  was, according to this document, is roughly
4  $150,000.
5    Q.  Looking at Exhibit 104?
6    A.  Yes.
7    Q.  The last page is a schedule entitled
8  Capital Contributions?
9    A.  Yes.
10    Q.  And Percentage Interest?
11    A.  Correct.
12    Q.  The numbers next to you and your wife,
13  that's $74,000 each?
14    A.  Yes.
15    Q.  I total that at 148,000?
16    A.  Yes, right.
17    Q.  To your knowledge, were those funds used to
18  fund the purchase of the property?
19    A.  Yes.
20    Q.  And then there was a construction loan that
21  we have talked about that money from the bank was
22  used to finance the construction.
23    A.  Correct.
24    Q.  Did you invest any additional funds of your

## 25

1  own or your wife's as the project went on?
2    A.  I remember we had to add money because the
3  construction loan was given to us in chunks.  At one
4  point or another we were running out of funds before
5  the bank would approve the next infusion.  And so we
6  had to use our own money to keep the balance.  I
7  can't remember the amount.  But whenever we would
8  receive the money from the bank, we would write
9  checks out of the LLC to personal, to individuals to
10  cover for the borrowed money.  I don't remember if
11  we spent more than we had.
12    Q.  So in those instances where you had to
13  deposit your own funds into the bank account to pay
14  construction costs, when the bank disbursed funds
15  you paid yourself back?
16    A.  Yes.
17    Q.  So this $148,000 reflected on Exhibit 104,
18  is that the total of the cash that you and your wife
19  invested?
20    A.  I think so.  I may have missed something.
21    Q.  This Schedule A on Exhibit 104 also
22  reflects capital contributions from Kagan
23  Development KDC Corp.?
24    A.  Yes.

Mark Kayserman - Vol. 1 - 6/1/2018

**26**

1    Q. That's Mr. Kagan's company, correct?
2    A. Which one?
3    Q. Kagan Development KDC Corp.
4    A. It could be. He had so many companies; I
5    don't know which one it was. At that time it didn't
6    matter. Everything was rosy.
7    Q. Then it shows a $35,520 contribution by
8    Mr. Kagan, correct?
9    A. There could have been. There was a total
10   of $300,000 roughly. How it was broken down, that's
11   how it must be.
12   Q. As you sit here today, do you have any
13   doubt that the Kagan entity, Mr. Kagan and
14   Mrs. Kagan made the contributions reflected on this
15   sheet?
16   A. I believe it was 50/50. Whatever it adds
17   up to. How it was broken down in his company was
18   not my concern at the time.
19   Q. Was the intention to utilize proceeds from
20   the loans from the bank to pay any of the carrying
21   costs associated with the project?
22   A. Yes.
23   Q. What carrying costs were contemplated that
24   would be covered by the loan proceeds?

**27**

1    A. Mortgage, real estate tax, electricity,
2    utilities, water.
3    Q. Any others?
4    A. And construction costs.
5    Q. When you said mortgage as a carrying cost,
6    what did you mean by that?
7    A. Interest on the mortgage.
8    Q. So the intention was to use the loan
9    proceeds to cover the interest expense on the loan?
10   A. Mm-hmm.
11   Q. You have to say yes or no.
12   A. Yes.
13   Q. And was that how it actually happened, that
14   loan proceeds were used to pay the interest costs?
15   A. Yes.
16   Q. Did you participate to any degree in the
17   closing that resulted in the purchase of the
18   property?
19   A. Yes.
20   Q. Were you provided a settlement statement in
21   advance or in connection with that closing?
22   A. Yes.
23   Q. Did Attorney Maiden handle that closing?
24   A. You know what, I don't remember. Did he?

**28**

1    (Marked, Exhibit 105, Settlement summary
2    of 6 Deborah Road.)
3    Q. I'm going to show you what we marked as
4    Exhibit 105. Do you recognize this document?
5    A. Yes.
6    Q. Is that your signature?
7    A. Yes.
8    Q. It is entitled Settlement Summary, Deborah
9    Road, Newton, Mass. and the date at the top is June
10   1, 2012.
11   A. Okay.
12   Q. Is that consistent with your recollection
13   of around the time that the property was purchased?
14   A. It looks about right.
15   Q. Do the numbers on here as you review them
16   today, do they accurately reflect the settlement
17   that occurred with respect to the purchase of the
18   property?
19   A. Yes.
20   Q. You see the line there that says loan
21   amount, $420,000.
22   A. Okay.
23   Q. Is that the amount that Rockland Trust
24   provided in connection with the purchase?

**29**

1    A. The mortgage, yes.
2    Q. The second line from the top, there's a
3    deposit. Do you see that?
4    A. Yes.
5    Q. Do you know who contributed the deposit?
6    A. No. It could have been Vadim.
7    Q. At the time you signed the operating
8    agreement, what was your understanding of the cost
9    expected to construct the new home?
10   A. Roughly 800,000, $850,000.
11   Q. What's the basis of that understanding?
12   A. Vadim's work and experience doing that.
13   Q. When you say experience, your experience?
14   A. No, Vadim's experience.
15   Q. Vadim's. Can you tell me anything that you
16   recall with any specificity with respect to any
17   discussions that you had with Vadim on the
18   construction costs?
19   A. He explained that based on his experience
20   that's what it typically takes to build a house of
21   this magnitude.
22   Q. Did he show you a budget?
23   A. I don't remember.
24   Q. Did you do any investigation or due

Mark Kayserman - Vol. 1 - 6/1/2018

---

**34**

1  me because of our prior personal relationship.
2  There was no need for anything else.
3      Q.  Did the general contractor in this instance
4  charge a fee for its services?
5      A.  Not that I know of.  It is not directly
6  reflected on the paperwork.  It could have been
7  buried somewhere else but I don't know.
8      Q.  Did you ever see a written contract between
9  the LLC and the general contractor for your project?
10     A.  No.
11     Q.  I asked you what you understood the
12  construction cost was going to be; you gave me a
13  range of 800 to $850,000.  Is that the discussion
14  that you had with Vadim, that he gave you a range?
15     A.  I don't remember exactly.  I remember
16  ballpark, it was around $800,000.
17     Q.  Did Vadim guarantee to you that the
18  construction costs would be fixed at a certain
19  price?
20     A.  No.
21     Q.  When you decided to invest, did you have
22  any expectation that you would have to pay from your
23  personal funds for any of the carrying costs?
24     A.  We were hoping to avoid that.

---

**35**

1      Q.  But you thought it might be a possibility?
2      A.  Could have been.
3      Q.  When I asked you before about what you did
4  to estimate or account for carrying costs at the
5  outset of the project, did you factor in a certain
6  period of time, a number of months?
7      A.  One year.
8      Q.  What if it took longer to sell the
9  property?
10     A.  It would be upsetting.
11     Q.  Did you appreciate that you had some
12  financial risk in that event?
13     A.  I appreciate it.  What are you going to do?
14     Q.  You decided to go ahead anyway?
15     A.  That's correct.
16     Q.  This 800 to $850,000 construction budget,
17  did you ever see a document that broke that down
18  into different components?
19     A.  I don't recall.
20     Q.  Do you recall asking for one?
21     A.  There may have been a discussion about
22  that.  It wasn't that important to me.  Because A,
23  our personal relationship, and B, his experience.
24         (Marked, Exhibit 106, Settlement

---

**36**

1  summary, 8/27/12.)
2      Q.  I'm going to show you what we marked as
3  Exhibit 106.  Do you recognize this document?
4      A.  I see my signature but I don't know what
5  this is.  Construction loan.
6      Q.  Do you have a recollection of participating
7  in the closing in connection with the construction
8  loan?
9      A.  Yes.
10     Q.  Do you recognize your signature?
11     A.  Yes.
12     Q.  And this settlement summary, there's a
13  date, August 27, 2012.  Do you see that at the top?
14     A.  That sounds about right.
15     Q.  Is that consistent with your recollection?
16     A.  Close, yes.
17     Q.  There's a loan amount here of $840,000.  Is
18  that consistent with your recollection as to the
19  amount of the construction loan?
20     A.  I thought it was 850.  Close enough.
21     Q.  Were there any changes to the scope of the
22  project after construction got underway?
23     A.  No.
24     Q.  Did the plans change in any way?

---

**37**

1      A.  No.
2      Q.  Did you have any discussions with Vadim
3  that the budget had changed in any way?
4      A.  No.  Everything was on plan, on budget.  I
5  would stop by once in a while just to take a look at
6  it, the house beautiful, good-quality work.  I had
7  no reason to believe anything can go wrong.
8      Q.  Were there any unexpected conditions in
9  demolishing the house?
10     A.  No.
11     Q.  Any weather delays?
12     A.  No.
13     Q.  Any ledge on the site?
14     A.  Not that I recall.  There may have been
15  some delays in getting inspectors in.  I don't know.
16  Nothing that I can recall that put a wrench into the
17  whole project.  Vadim knew what he was doing.  He's
18  a brilliant builder.
19     Q.  Did Rockland Trust Bank send you periodic
20  statements in connection with the account?
21     A.  Yes.
22     Q.  And they were addressed to you?
23     A.  I don't remember.
24     Q.  Why don't you hold on.  I'll show you some

---

FARMER ARSENAULT BROCK LLC

Mark Kayserman - Vol. 1 - 6/1/2018

12

---

**42**

1    A. 1.8.
2    Q. What was the basis for that?
3    A. Like I said, I have a lot of friends in the
4    real estate business. It was just a hunch.
5    Q. Did you have any discussions with Vadim
6    about that sale price?
7    A. Vadim mentioned that price as well, 1.8,
8    1.85.
9    Q. But you came up with 1.8 on your own?
10   A. I don't remember.
11   Q. What about Mrs. Kagan, did you have any
12   discussions with her about the sale price?
13   A. We rarely had conversation with Tatiana on
14   this project.
15   Q. Was she involved at all in listing the home
16   for sale?
17   A. Yes.
18   Q. Did you interact with her at all in
19   connection with that?
20   A. No.
21   Q. Did you ever see the listing agreement?
22   A. I don't recall.
23   Q. Did you testify that you spoke to other
24   builders or people in the real estate business as to

---

**43**

1    their views as to an appropriate sales price?
2    A. No. It was prior to that, what a typical
3    4,000-square-feet home would cost in a certain area
4    with new construction.
5    Q. Did you search to see what was available
6    for sale?
7    A. No.
8    Q. Did you perform any comp analysis on your
9    own?
10   A. No.
11   Q. Did anyone guarantee for you at the outset
12   that the home would sell for 1.8?
13   A. No.
14   Q. Did you appreciate there was some risk that
15   it might sell for less than that?
16   A. Yes.
17   Q. At the time that you decided to invest,
18   what did you expect your return to be on your
19   investment?
20   A. About $250,000.
21   Q. Is that for you and your wife?
22   A. Combined, yes.
23   Q. Combined. Is that after getting back the
24   148,000?

---

**44**

1    A. Yes.
2    Q. So you were going to get your 148,000 back
3    and your wife and you would also be paid 250,000;
4    that was your expectation?
5    A. Right.
6    Q. And that was based on the project taking
7    one year?
8    A. Yes.
9    Q. And that was based on an expected $1.8
10   million sales price?
11   A. Correct.
12   Q. How long was the home on the market before
13   it sold?
14   A. Fairly short. I can't recall. A couple of
15   weeks, a week.
16   Q. It wasn't a lengthy marketing process?
17   A. No.
18   Q. Do you have any understanding as to what
19   Mrs. Kagan did to market the property?
20   A. No idea.
21   Q. What did it ultimately sell for?
22   A. Close to 2. 1.95.
23   Q. What return did you actually receive?
24   A. I don't remember. I remember what I

---

**45**

1    declared on my income tax.
2    Q. What did you declare?
3    A. 37,000.
4    Q. Was that after your return of your $148,000
5    contribution?
6    A. Yes.
7    Q. Do you have any understanding as to why
8    your actual return was less than your expected
9    return?
10   A. Two factors. One is it was an agreement
11   between Vadim and I that we would split the
12   commission, real estate sale commission on the
13   property 50/50, which was $50,000, roughly.
14   Q. Was your 50 percent of it $50,000 or the
15   total commission was 50,000?
16   A. It was 50 percent of Tatiana's commission.
17   There could have been other broker's involved.
18   Q. Let me follow up. You expected your
19   financial responsibility for the commission to be
20   $50,000?
21   A. 50 percent of Tatiana's commission.
22   Q. 50 percent.
23   A. If you take 6 percent of $2 million, that's
24   120, divide by two, best case scenario, 60,000. If

---

FARMER ARSENAULT BROCK LLC

Mark Kayserman - Vol. 1 - 6/1/2018

46

1  it is 5 percent is 50,000. That's roughly. If
2  another broker is involved, it would be half of
3  that. That was one.
4        The other one is I received the surprise
5  bill a couple days prior to closing which was in
6  excess of a hundred thousand dollars. There was no
7  explanation -- there was an explanation for the work
8  done prior. And that was a surprise.
9     Q. So let me ask you about the real estate
10 commission part of it. So it was your expectation
11 that you and your wife would be responsible for only
12 50 percent of the real estate commission to be paid
13 to Tatiana Kagan?
14       MR. CARNATHAN: Objection.
15    A. No.
16    Q. Explain.
17    A. My expectation was for Vadim and Tatiana to
18 split the commission with my wife and I 50/50.
19    Q. Sorry. So if Tatiana's commission was
20 $50,000, you expected you and your wife would
21 receive $25,000?
22    A. Correct.
23    Q. If I understand your testimony, that did
24 not occur?

47

1     A. That did not.
2     Q. And based on your math that you did a few
3  minutes ago, that resulted in a 25 to $30,000
4  reduction to you and your wife versus what you
5  expected.
6     A. It could have been $50,000.
7     Q. Depending on if there was a cooperating
8  broker?
9     A. Right. My understanding was there was not.
10 It was sold directly by Vadim, not by Tatiana.
11 Vadim sold it to someone he knew. I know those
12 people as well.
13    Q. So what was the net downside to you as a
14 result of that?
15    A. Plus this, I want to say over a hundred
16 thousand dollars.
17    Q. Just the real estate commission issue?
18    A. No. Real estate commission is 50. My
19 expectation was 50.
20    Q. The agreement to split the real estate
21 commission, was that written down anywhere?
22    A. No.
23    Q. Did you have any discussions with Vadim
24 about his not paying to you and your wife the

48

1  portion of the commission?
2     A. Yes.
3     Q. Tell me what you recall about that
4  discussion.
5     A. He said: Why would I do that?
6     Q. What did you say to him?
7     A. That was our agreement. He said, Well, my
8  wife had expenses associated with selling the
9  property. Why would I share what she worked for
10 with you? Then he offered $10,000 for this problem
11 to go away.
12    Q. Did you accept that?
13    A. He didn't give it to me.
14    Q. Did you indicate that you would accept
15 10,000?
16    A. What choice did I have? Yes, I indicated
17 that I would accept that reluctantly.
18    Q. Your testimony is that you did not receive
19 the $10,000?
20    A. No, I did not.
21    Q. The agreement or the discussion about
22 compromising for $10,000, was that reduced to
23 writing anywhere?
24    A. No. But I recall the conversation and I

49

1  recall where the conversation took place.
2     Q. Give me those details.
3     A. It took place in Vadim's home office on the
4  ground floor.
5     Q. Who was present?
6     A. Just the two of us. There may have been
7  somebody in the office next door.
8     Q. So I would like to ask you some questions
9  about the bill that you testified about.
10    A. Sure.
11    Q. Was that bill from a company, an entity?
12    A. Yes.
13    Q. Who was it from?
14    A. His excavation company.
15    Q. Was it Proexcavation?
16    A. I can't remember. I don't remember.
17 Something like that. That's the bill I couldn't
18 find.
19    Q. That's a bill that you recall --
20    A. I think it was KDC. What does that stand
21 for.
22    Q. Kagan Development Company?
23    A. It must have been. I can't remember which
24 it was.

Mark Kayserman - Vol. 1 - 6/1/2018

**54**

1   with the 6 Deborah Road project?
2       A. That's what he told me.
3       Q. Have you ever seen any documents to confirm
4   that?
5       A. No.
6       Q. So do you have any understanding as to what
7   goes into this American Express charge?
8       A. No idea.
9       Q. Did he tell you what was in there?
10      A. No.
11      Q. Did you ask him?
12      A. Yes.
13      Q. When you asked him, what did he say?
14      A. He will give it to me tomorrow.
15      Q. The next payment for just over $3,000, do
16  you have any understanding as to what that is for?
17      A. No.
18      Q. The next one for $10,000 for Decor Art?
19      A. I don't know.
20      Q. The next one is $500 for GSC Systems?
21      A. Don't know.
22      Q. Another one for $5,500 for Decor?
23      A. Don't know.
24      Q. Was the home staged for selling?

**55**

1       A. According to this, yes. But Vadim sold it
2   to his friends.
3       Q. Did you make any personal observations --
4       A. No.
5       Q. -- as to whether it was staged?
6       A. I have no idea.
7       Q. As to whether it was staged or not.
8       A. I don't know.
9       Q. There's another entry for more than $5,000
10  for American Express. Do you have any understanding
11  as to that?
12      A. I don't know.
13      Q. $150 for AJM Group. Do you know what that
14  is?
15      A. No.
16      Q. Then another $12,000 and change to American
17  Express; do you know what that is?
18      A. No.
19      Q. $4,000 and change to J Berkson?
20      A. I don't know.
21      Q. A couple more American Express charges. Do
22  you know what those are?
23      A. I don't know.
24      Q. There's a payment to Construction

**56**

1   Specialties. Do you know anything about that?
2       A. I don't know.
3       Q. Then Affordable Lawn Sprinklers, do you
4   know what that is?
5       A. I know who the guy is. He's my relative.
6   I don't know if there was a payment made to him or
7   not.
8       Q. How is he related to you?
9       A. He's my sister-in-law's brother.
10      Q. Did you ask him about this?
11      A. No.
12      Q. Was there an irrigation system at the home?
13      A. I don't know.
14      Q. Then another payment to Vanity World?
15      A. I don't know.
16      Q. There are several payments down below that
17  where it says No Funds. What do you understand that
18  to be?
19      A. I don't know. I can make a guess, but I
20  don't know.
21      Q. What's your guess?
22      A. That there was no funds available in the
23  account and Vadim used his own money to pay for
24  something. But I have no idea. That's just an

**57**

1   educated guess.
2       Q. Well, you have had access to the bank
3   account statements, correct?
4       A. Correct.
5       Q. Did you go back to see if Vadim deposited
6   any funds along the way?
7       A. I don't recall.
8       Q. If he did, as you did, you would have
9   expected him to be reimbursed from the loan?
10      A. That sounds logical.
11      Q. There's a $50 payment to the City of
12  Newton. Do you know what that relates to?
13      A. I don't know.
14      Q. There's a $1,767 payment to the City of
15  Newton. Do you know what that is?
16      A. I don't know.
17      Q. As you sit here today, do you have any
18  information to suggest that any of the charges
19  associated with the project were fraudulent?
20      A. I don't have anything to suggest that. The
21  only thing I have problem is that this was presented
22  to me two days before closing.
23      Q. So it is the timing?
24      A. The timing and any backup information to

Mark Kayserman - Vol. 1 - 6/1/2018

---

**58**

1  that.
2      Q.  Let me ask you about the bottom part of
3  this page where it says:  To Vadim Kagan.  Do you
4  have any understanding as to what this section
5  relates to?
6      A.  I don't.
7      Q.  Can you go to the first page of the packet
8  and tell me what the first document is in the
9  packet?
10     A.  It is the HUD settlement statement.
11     Q.  For the sale of the completed home?
12     A.  Correct.  It could have been final version
13  or maybe preliminary version.  I don't recall.
14     Q.  After the 6 Deborah Reimbursements what
15  follows in this packet is a deposit ticket and a
16  check, it appears.
17     A.  I don't remember what this is.
18     Q.  The first one appears to be a deposit
19  ticket for Kagan Development KDC Corp.  Below that
20  is a check for $111,000.  Do you agree with that?
21     A.  That's the check that I imagine Vadim wrote
22  to himself.
23     Q.  Did you -- when Vadim presented you with
24  the $111,000 bill, did you agree that those funds

---

**59**

1  should be paid?
2      A.  I don't remember whether we agreed, but it
3  had to be paid otherwise we are not closing.
4      Q.  Go to the next page in the packet.  This
5  looks like, the middle part is a check to Vadim
6  Kagan for $148,050.  What does this represent?
7      A.  I don't remember.  It could be closing
8  receipts.  I don't remember.
9      Q.  The memo on this line says "initial
10  investment reimbursement."  Does that help?
11     A.  Okay, that makes sense.
12     Q.  Having seen that now, what is the purpose
13  of these funds?
14     A.  I believe this is the reimbursement for the
15  down payment was made by Vadim and Tatiana's initial
16  purchase of the property.  That makes sense.
17     Q.  You and your wife similarly got $148,000?
18     A.  I imagine, yes.
19     Q.  What is the next page?
20     A.  The next page is a printout of bank history
21  at Rockland Bank at some point in time.
22     Q.  It looks like the most recent date is
23  September 6, 2013.  Would you agree with that?
24     A.  Yes.

---

**60**

1      Q.  The handwriting that appears on this, is it
2  your handwriting?
3      A.  Yes, it is.  I think I was just trying to
4  understand what that was for.
5      Q.  Would you mind deciphering for me the
6  handwriting on the page so that we know what it
7  says?
8      A.  I think one of them says $3500, says
9  asphalt.  The check for credit for $5,000 was
10  personal.  That must have been from personal
11  account.
12     Q.  From your personal account?
13     A.  I don't remember mine, or his, I don't
14  know.
15     Q.  About a third of the way down from the top
16  of the page there's a check for $11,036.  That one
17  is circled.  Do you have any recollection?
18     A.  No, I don't remember why.
19     Q.  Does this printout reflect all of the
20  activity in and out of the Rockland Trust account?
21     A.  I would believe so.  From July 5 of 2012
22  through September 6, 2013.
23     Q.  As we flip through, there's some
24  handwriting on the back.  Can you tell me what that

---

**61**

1  is?
2      A.  No.  I don't recall what it is.
3      Q.  How about the next page?
4      A.  The next page I think is just one of the
5  representative invoices I got from Vadim with
6  explanation as to why he paid $31,000 for some
7  activity.  I had a similar page for 111,000
8  handwritten, but I couldn't find it.
9      Q.  You said this was a representative sample.
10  Did you receive others?
11     A.  Not many.
12     Q.  More than just one?
13     A.  Two or three, yes.  Smaller amounts,
14  usually.  I've got to tell you when project was
15  going well, when there was no concern about the
16  budget, I really didn't pay any attention to this.
17  It is the normal process of building a house.  You
18  have to spend money in order to make money.  So I
19  had no concerns so long as it was going according to
20  budget based on Vadim's words, and I had no reason
21  not to trust him.  The trust was gone when surprises
22  started to happen.
23     Q.  If you flip through a few pages, you find a
24  check that's numbered 1005.  The page that follows

---

### 62

1   that, what is this document?
2       A. This must be a page from a credit card.
3       Q. Does this relate to the American Express
4   account for your project?
5       A. I can't say. I don't know what he had. I
6   never had access to that American Express.
7       Q. How did you get this document?
8       A. It must have been attached to this
9   explanation. I don't know. Vadim told me that he
10  had American Express card for every project he was
11  working on. He also told me that he was sometimes
12  using American Express card from one account to pay
13  for the expenses on another account. I thought you
14  would be interested in that.
15      Q. Did he do that with respect to your
16  project?
17      A. I have no idea. But that kind of throws a
18  flag: Does he do it with our project or not.
19      Q. As you sit here today, do you have any
20  evidence --
21      A. No.
22      Q. -- that he used the American Express card
23  from your project to pay expenses for something
24  else?

### 63

1       A. No. Since I never seen the -- it could be
2   things purchased on my American Express card since I
3   didn't see the bills.
4       Q. As you sit here today, can you identify any
5   fraudulent charges in connection with your project?
6       A. No. Suspicious, yes; fraudulent, no.
7       Q. I'm assuming that tax returns were prepared
8   for the LLC?
9       A. Yes.
10      Q. An accountant prepared them?
11      A. Yes.
12      Q. Was it your accountant?
13      A. It was an accountant that Vadim introduced
14  me to, but that accountant did my personal income
15  tax as well.
16      (Marked, Exhibit 110, 2013 tax return,
17  Deborah Road, LLC.)
18      Q. Will you agree with me that this is a copy
19  of the 2013 tax return for the Deborah Road, LLC?
20      A. It looks about right.
21      Q. The accountant identified on the front
22  page, is the accountant you just testified to?
23      A. I don't remember the accountant name. I
24  just know the firm is correct.

### 64

1       Q. Agranovich is correct?
2       A. Yes.
3       Q. Did you have any involvement in providing
4   information in connection with the preparation of
5   this tax return?
6       A. I think so.
7       Q. What was your involvement?
8       A. I met with them. There was some questions,
9   some documents. I don't remember exactly.
10      Q. Do you recall being designated as the tax
11  matters partner for the limited liability company in
12  connection with this tax return?
13      A. I don't remember if I was designated to be
14  one. I took active part in providing information
15  necessary to file the returns according to the laws.
16      Q. If you can find, these are not numbered,
17  but there's a little Page 4 at the top of the
18  return, Schedule K. The page I'm showing you now
19  says Page 4 of Schedule K. I want to ask you about
20  the line 9 A. Do you see the amount there, $37,428?
21      A. Yes.
22      Q. What does that figure represent?
23      A. Remarkably similar to the amount of money I
24  thought I made on this project.

### 65

1       Q. Does this $37,000 represent the profit for
2   the company, the LLC?
3       A. No. For myself and my wife.
4       Q. So you understand that to be your
5   individual gain on this project?
6       A. Correct.
7       Q. But is this a tax return for you or for the
8   company?
9       A. It says the company.
10      Q. But it is your understanding, your
11  testimony that this $37,000 profit is your personal
12  profit?
13      A. That's not what I'm saying. The number
14  looks remarkably similar to my profit. What this
15  number is I have no idea.
16      Q. You can't testify with any certainty
17  whether this number represents the profit of the
18  company?
19      A. I don't know.
20      Q. You know that this number or a number very
21  close to it was the amount you collected?
22      A. I claimed as income on my personal income
23  tax, correct. When you have a business you are
24  hiring an accountant.

Mark Kayserman - Vol. 1 - 6/1/2018

18

---

**66**

1     Q. I want you to find the 2013 Schedule K-1
2 for you.
3     A. Yes.
4     Q. Would you agree, sir, this is the Schedule
5 K-1 that represents your -- strike that. This
6 Schedule K-1 reflects your personal share of income
7 deductions and credits from the company?
8     A. It looks about right.
9     Q. And it reflects, if you look at the letter
10 J, you were allocated 50 percent of the profit, you
11 personally?
12     A. Yes.
13     Q. And then 9, you have $18,714 attributed to
14 you?
15     A. Yes.
16     Q. I think that's half of the number we just
17 looked at?
18     A. Yes.
19     Q. The next two pages after that is the K-1
20 for your wife?
21     A. That's correct.
22     Q. She got the same amount?
23     A. That's correct.
24     Q. She also got 50 percent of the company's

---

**67**

1 profits?
2     A. Correct.
3     Q. If you go two more pages, you see the K-1
4 for Kagan Development and KDC Corp.?
5     A. Yes.
6     Q. Was any profit attributed to Kagan
7 Development Corp.?
8     A. Not according to this.
9     Q. Two more pages in, the K-1 for Vadim. Did
10 he get any profits according to this K-1?
11     A. Not according to this.
12     Q. Two more pages is the K-1 for Tatiana. She
13 comes after Vadim. Does this K-1 reflect any
14 profits to her?
15     A. Not according to this.
16     Q. If we look at the K-1s, does it appear to
17 you that you and your wife received all the profits
18 earned by the company?
19       MR. CARNATHAN: Objection.
20     A. I don't know. I can't say. In fact, I
21 would say probably not.
22     Q. Why is that?
23     A. They must have received their money through
24 a different mechanism. I just don't remember how.

---

**68**

1     Q. Have you had any recent communications with
2 Mr. Alex Filippov?
3     A. A phone conversation probably a few years
4 ago.
5     Q. Did that have anything to do with the
6 project that Mr. Filippov was involved in with
7 Vadim?
8     A. He didn't get into details with his
9 project. He asked me about my experience working
10 with Vadim.
11     Q. What did you tell him?
12     A. I told him my experience working with Vadim
13 that everything was fine expect until the end of the
14 project. I received a surprise invoice.
15     Q. What did he say to you in this call?
16     A. He said that he also had the same
17 experience.
18     Q. Anything else about that conversation?
19     A. No.
20     Q. Do you know a woman by the name of Kristina
21 Brusenkova?
22     A. No.
23     Q. How about Nick Lipetsker?
24     A. Yes.

---

**69**

1     Q. Have you had any discussions with him?
2     A. Same conversation. Nick is the one who
3 introduced me to Alex Filippov. I was introduced to
4 Nick by another common mutual acquaintance who had
5 very similar experience. And so when he introduced
6 me and Nick, he said Nick, this is Mark, he worked
7 with Vadim and he had exactly the same experience as
8 you and I. Why don't you tell him what happened.
9     Q. Who was the acquaintance that connected you
10 with Nick?
11     A. Michael Gankin.
12     Q. Did he work on a project with Vadim?
13     A. I believe they did a different project.
14     Q. Have you any recent discussions with Vadim?
15     A. I haven't talked to Vadim in probably five
16 years.
17     Q. And how about Tatiana?
18     A. Same.
19       (Marked, Exhibit 111, Affidavit of Mark
20 Kayserman.)
21     Q. I'm going to show you Exhibit 111. Can you
22 confirm that Exhibit 111 is a copy of the affidavit
23 that you provided?
24     A. Yes, I did.

---

Mark Kayserman - Vol. 1 - 6/1/2018

## 70

1     Q.  You see your signature on the end, I
2 believe?
3     A.  Yes.
4     Q.  Is that your signature?
5     A.  Yes.
6     Q.  Can you tell me the circumstance under
7 which you came to provide this affidavit?
8     A.  After the conversation with Mr. Filippov,
9 his attorney -- Mr. Filippov asked me if I would be
10 open to put it into writing and share my experience
11 working with Vadim.  I said I would.
12     Q.  Were you subsequently contacted by one of
13 Mr. Filippov's attorneys?
14     A.  I believe so.
15     Q.  Do you recall who contacted you?
16     A.  I can't remember the name.
17     Q.  Joseph?
18     A.  Probably.
19     Q.  Whoever it was, did you meet with an
20 attorney?
21     A.  I did not.
22     Q.  Did you communicate with this attorney over
23 the phone?
24     A.  Over the phone.

## 71

1     Q.  Did you have more than one telephone
2 conversation with this lawyer?
3     A.  We had one conversation at which I agreed
4 to write a document.  We had a couple of follow-ups
5 to make sure I do it.
6     Q.  Who actually drafted the document that is
7 Exhibit 111?
8     A.  I don't remember.
9     Q.  So as you sit here today, you can't say if
10 you were the one that typed this up?
11     A.  I may have asked for a sample of an
12 affidavit or -- I can't remember.
13     Q.  You can't remember whether you typed it up
14 or the lawyer typed it up and sent it to you?
15     A.  I know that I typed it up using Word.
16     Q.  We refer to the top part of this affidavit
17 as the caption, the part that identifies the case.
18 Are you saying that you created a Word document that
19 had the substance of the affidavit?
20     A.  I believe so.
21     Q.  Did you email that to the lawyer?
22     A.  Yes.
23     Q.  When it came back to you, did it look more
24 like this final affidavit?

## 72

1     A.  I can't remember, probably did.
2     Q.  Did the lawyer make any changes to the
3 document that you sent?
4     A.  There were a couple of things that I
5 corrected afterwards.
6     Q.  Such as?
7     A.  I don't remember.
8     Q.  For this, did you have any other
9 communication with Mr. Filippov's lawyers?
10     A.  No.
11     Q.  Do you still have the Word version of the
12 document that you sent?
13     A.  I doubt it.
14     Q.  How about the -- I assume you transmitted
15 that by email to his lawyers?
16     A.  Yes.
17     Q.  Do you have that email?
18     A.  It probably is buried somewhere in my
19 emails.  I don't know.
20     Q.  I'm going to ask you questions about
21 Exhibit 111 for a minute.
22     A.  Sure.
23     Q.  Paragraph 3 says:  "Before I decided to
24 invest, Kagan presented me with a budget that

## 73

1 forecast construction costs at $850,000."
2     So did he present you with a document
3 that showed the $850,000 amount?
4     A.  No.
5     Q.  The next sentence says:  "Kagan promised
6 that construction costs would not exceed this budget
7 and will most likely be less."
8     A.  "Promise" is a strong word.  I would use
9 the word "said."  It didn't seem too different to me
10 at the time.
11     Q.  In retrospect as you sit here today, your
12 testimony is he didn't promise you that the
13 construction costs would be $850,000.
14     A.  When you negotiate a handshake agreement,
15 "said" or "promise" is the same.
16     Q.  When you had that discussion with him, did
17 you have some appreciation of the fact that
18 construction costs might be more than 850,000?
19     A.  Yes.
20     Q.  On the second page of your affidavit,
21 Paragraph 5, you say:  "Although I attempted to
22 manage some of the LLC's paperwork, it was Kagan who
23 was responsible for paying all of the LLC's
24 expenses."

Mark Kayserman - Vol. 1 - 6/1/2018

20

---

**74**

1        Is that an accurate statement?
2    A. Yes, with the exception of bank payments.
3    Q. Paragraph 6, the third sentence starts. "I
4 discovered that Kagan had written numerous checks to
5 his own construction companies as well as a variety
6 of contractors with virtually no written backup
7 supporting the expenses."
8        Do you see that?
9    A. Yes.
10    Q. Did you in fact expect that checks would be
11 written to cover subcontractor expenses?
12    A. Yes.
13    Q. So was there anything unusual --
14    A. Yes.
15    Q. -- about the payment of checks to a variety
16 of contractors?
17    A. Backup information.
18    Q. If the writing is on the check -- strike
19 that. You expected there to be checks to
20 subcontractors?
21    A. Yes.
22    Q. And you expected there to be checks to
23 Kagan's companies for materials?
24    A. Yes.

---

**75**

1    Q. I want to ask you about Paragraph 7.
2    A. Sure.
3    Q. The first sentence has to do with the
4 American Express card and the shifting of costs
5 around, is what you wrote. I want to ask you about
6 the second sentence where you say: "I witnessed
7 this myself when during the course of our project
8 our lender was unwilling to extend additional
9 payments to the LLC until it received additional
10 collateral for its loan."
11        Explain to me that sentence.
12    A. When I read it before, it had a different
13 meaning to me.
14    Q. What did you intend?
15    A. It's possible -- I can't remember what I
16 thought at the time. I say today that I'm aware
17 that Vadim was using American Express cards from one
18 account to cover for the other.
19    Q. How do you know that?
20    A. He told me.
21    Q. Do you have any sense that he did that for
22 your project?
23    A. Do I have a sense? No. Suspicion, yes.
24    Q. Do you have any facts to support that?

---

**76**

1    A. No.
2    Q. Do you know whether the bank performed
3 inspections from time to time as the construction
4 was going along?
5    A. I don't know if they did.
6    Q. Do you have any understanding of the
7 process followed when Vadim was looking to draw down
8 on construction funds?
9    A. Yes.
10    Q. What was that?
11    A. There were forms filled out on different
12 milestones of the project that were sent to the bank
13 reporting the status. Sometimes Vadim would fill
14 out those forms and send them to the bank, and the
15 bank would disburse the next amount of money.
16    Q. Were there any problems in connection with
17 that process?
18    A. No. There were no problems with the entire
19 project until two days before the closing.
20    Q. You mentioned a few folks that were
21 investors on other of Vadim's projects. Other than
22 the ones that you have told us about, have you had
23 any discussions with any of the other investors in
24 Vadim's projects?

---

**77**

1    A. I have not.
2    Q. Those are all the questions that I have.
3        EXAMINATION
4 BY MR. CARNATHAN:
5    Q. Can we start with the affidavit that we
6 marked as Exhibit 111. When Mr. Harris was asking
7 you about Paragraph 6, I think he established that
8 you expected checks to be written to Mr. Kagan's
9 company to reimburse it for materials, and you
10 expected checks to be written to subcontractors,
11 right?
12    A. In general, yes. Not in relation to this
13 particular invoice but pretty much to all of it,
14 yes.
15    Q. I think where we lost the thread from my
16 perspective was on the backup. Did you get any
17 backup?
18    A. I have never gotten any backup.
19    Q. Did you ever get any receipts from any
20 subcontractors?
21    A. Maybe one or two. I can't even recall if I
22 got that many.
23    Q. Did you ever see any invoices from
24 subcontractors?

---

FARMER ARSENAULT BROCK LLC