# EXHIBIT D

ORIGINAL

Exhibits: 1-47        Volume 1, Pages 1-197

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

------------------------------

In Re:

LYMAN-CUTLER, LLC,        Chapter 7
       Case No. 15-13881-FJB

    Debtor

------------------------------

LYMAN-CUTLER, LLC,

    Plaintiff

v.        Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,

    Defendants

------------------------------

DEPOSITION OF DIMITRIY ZHUKOVSKIY
Tuesday, March 6, 2018, 10:01 a.m.
Sheehan Phinney Bass + Green, P.A.
255 State Street, 5th Floor
Boston, Massachusetts

--------- Janis T. Young, RDR, CRR ---------
jty@fabreporters.com    www.fabreporters.com
Farmer Arsenault Brock LLC
50 Congress Street, Boston, Massachusetts 02109
617-728-4404    Fax 617-728-4403

**54**

1  works at Aon Hewitt, by the name of Dmitriy
2  Zhukovskiy?
3      A. No.
4      Q. Did you graduate from St. Petersburg State
5  Polytechnic University?
6      A. No.
7      Q. Did you attend that school?
8      A. Yes.
9      Q. From 1992 to '93?
10     A. Yes.
11     Q. And then you went to Brandeis from '94 to
12 '97; correct?
13     A. Yes.
14     Q. And did you work for Towers Watson from May
15 1997 to February 1998?
16     A. No.
17     Q. When did you work there?
18     A. I never worked there.
19     Q. You never worked for Towers Watson?
20     A. I never worked for Towers Watson.
21     Q. And how about Aon Hewitt? Did you work
22 there from March 1998 to present?
23     A. Yes.
24     Q. If you could look, sir, at the description

**55**

1  on the first page and read that to yourself.
2          (Pause)
3      Q. Have you read --
4      A. I have finished reading.
5      Q. And that language that starts "I am a
6  consulting actuary" down to the last sentence, which
7  starts "In my spare time," have you read that?
8      A. Yes.
9      Q. And is that language that you wrote?
10     A. Yes.
11     Q. And does that accurately represent a
12 summary of your professional positions?
13     A. Please define "accurately."
14     Q. Well, is there anything in this language
15 which you feel is inaccurate?
16     A. Yes.
17     Q. What's inaccurate?
18     A. 16.
19     Q. That you're a consulting actuary with over
20 16 years of experience?
21     A. Yes.
22     Q. And you have a problem with the 16-years
23 part?
24     A. Yes.

**56**

1      Q. Is that because it's too little?
2      A. Yes.
3      Q. How many years should it be?
4      A. 20.
5      Q. Other than that, is there anything about
6  you in this language that you read which you believe
7  is inaccurate?
8      A. No.
9      Q. Now, do you know a gentleman by the name of
10 Nickolay Lipetsker?
11     A. Yes.
12     Q. Who is Mr. Lipetsker?
13     A. Could you please specify the question?
14     Q. How do you know him?
15     A. I'm not sure I understand the question.
16     Q. How did you meet him?
17     A. I believe that my mother asked him to
18 babysit me when I was about three months old.
19     Q. So is it fair to say that you first met him
20 when you were a child in Russia?
21     A. Yes.
22     Q. And is he related to your wife in some
23 manner?
24     A. No.

**57**

1      Q. Is he related to you?
2      A. I'm going to retract that.
3          Can you please define what it means to
4  be related to somebody?
5      Q. Is he a family member?
6      A. Can you please --
7      Q. Are you his nephew?
8      A. Again, I'm not familiar with the
9  classification for relatives.
10     Q. Well, other than him providing babysitting
11 services when you were young, what relationship if
12 any do you have with him?
13     A. He is husband to my mother's sister.
14     Q. What's your mother's sister's name?
15     A. Irene.
16     Q. Does she live in the United States?
17     A. Yes.
18     Q. Where does she reside?
19     A. 52 Stony Brae Road.
20     Q. Could you spell that for me?
21     A. B-r-a-e.
22     Q. Stony Brae. And that's in Newton?
23     A. Yes.
24     Q. What's Irene's last name?

Page 58:

1  A. Lipetsker.
2  Q. Is it fair to say that you have had a
3  relationship with Mr. Lipetsker since you were a
4  little boy, through to today?
5  A. Yes.
6  Q. Do you socialize with him?
7  A. Yes.
8  Q. Have you ever gone into any business
9  ventures with him?
10 A. Yes.
11 Q. Which business ventures have you gone into
12 with him?
13 A. Hyde Avenue LLC.
14 Q. Other than Hyde Avenue LLC, have you ever
15 done any business ventures with Mr. Lipetsker?
16 A. Yes.
17 Q. What other business ventures have you gone
18 into with Mr. Lipetsker?
19 A. 1880 Beacon Street LLC.
20 Q. Any others?
21 A. Yes.
22 Q. Which other ones?
23 A. 364 Amory LLC.
24 Q. Any others?

Page 59:

1  A. Yes.
2  Q. Which others?
3  A. 4 Wall LLC.
4  Q. Any others?
5  A. Yes.
6  Q. Which others?
7  A. 1834 Beacon Realty Trust.
8  Q. Anything else?
9  A. Yes.
10 Q. What?
11 A. 4 Vinald Road LLC.
12 Q. How do you spell that?
13 A. V-i-n-a-l-d.
14 Q. I'm sorry; 4 Vinald Street LLC?
15 A. I can't remember.
16 Q. Anything else?
17 A. Yes.
18 Q. In what other ones have you been an
19 investor with Mr. Lipetsker?
20 A. 25 Kensington LLC.
21 Q. 25 Kensington?
22 A. Yes.
23 Q. Anything else?
24 A. Yes.

Page 60:

1  Q. What other ones?
2  A. 1328 River LLC.
3  Q. All right. Any other ones?
4  A. Yes.
5  Q. What other ones?
6  A. 27 Ramsdell LLC.
7  Q. Any other ones?
8  A. Yes.
9  Q. What other ones do you recall?
10 A. 8 Hamilton LLC.
11 Q. Anything else?
12 A. I'm sure there's something else; I don't
13 remember.
14 Q. And each of those entities that you've just
15 identified, you were an investor in each of those?
16 A. Yes.
17 Q. As was Mr. Lipetsker?
18 A. Yes.
19 Q. With respect to Hyde Avenue LLC, who were
20 the other investors, if any?
21 A. Vadim Kagan and Tatiana Kagan.
22 Q. Anybody else?
23 A. No.
24 Q. How about 1880 Beacon Street?

Page 61:

1  A. Yes.
2  Q. Who else besides yourself and
3  Mr. Lipetsker?
4  A. A third party.
5  Q. Who?
6  A. MIR Realty.
7  Q. I'm sorry?
8  A. MIR.
9  Q. Realty?
10 A. Realty.
11 Q. Anybody else in that one?
12 A. No.
13 Q. How about 364 Amory LLC? Who besides you
14 and Mr. Lipetsker were investors in that project?
15 A. There are other investors.
16     Can you repeat the question?
17 Q. Sure. Other than you and Mr. Lipetsker,
18 who else was an investor in 364 Amory?
19 A. MIR Realty.
20 Q. Do you know the name of the principal of
21 MIR Realty; who owns it?
22 A. I don't.
23 Q. Who was the person that you dealt with at
24 MIR Realty relative to the investments?

Dimitriy Zhukofskiy - Vol. 1 - 3/6/2018

23

**Page 86**

1 happened with respect to what became Hyde Avenue
2 LLC?
3   A. I don't remember the details.
4   Q. Do you remember generally what happened?
5   A. Yes, generally, I do remember.
6   Q. What do you recall?
7   A. Mr. Kagan approached me and described the
8 investment opportunity.
9   Q. Where did he approach you?
10  A. I don't remember.
11  Q. Was it in an office?
12  A. No.
13  Q. Was it at a restaurant?
14  A. No.
15  Q. Was it in a conference room?
16  A. No.
17  Q. Was it at somebody's house?
18  A. I don't remember.
19  Q. Incidentally, to the best of your
20 knowledge, was this the first real-estate investment
21 that Mr. Lipetsker had ever done?
22  A. Can you rephrase this question?
23  Q. Sure. When Mr. Lipetsker told you that
24 there was an investment opportunity, did you have

**Page 87**

1 any understanding whether Mr. Lipetsker had ever
2 been involved in real-estate investments at that
3 time?
4   A. I don't remember.
5   Q. So did you have a meeting with Mr. Kagan?
6   A. I don't remember.
7   Q. Sir, look at Exhibit No. 3. In Paragraph
8 No. 2, it references a meeting. Does that refresh
9 your memory that you had a meeting with Mr. Kagan?
10  A. Yes.
11  Q. Where was the meeting?
12  A. I don't remember where.
13  Q. How long did the meeting take?
14  A. I don't remember.
15  Q. What was said at the meeting?
16  A. "Mr. Kagan informed us that he wanted to
17 buy an old house in Newton, remodel it, build an
18 addition, and sell the house for the profit. During
19 our discussion, Mr. Kagan presented to me the
20 project that could be completed for $2.8 million,
21 where $1.6 million would go towards purchasing the
22 old house, $1.2 million would cover the entire cost
23 of construction, including interest on mortgage and
24 construction loan, real-estate taxes and insurance."

**Page 88**

1   Q. Sir, you just read Paragraph 3 of your
2 affidavit; correct?
3   A. Yes.
4   Q. Other than what you wrote in Paragraph 3,
5 do you recall anything else that was said at the
6 meeting?
7   A. Yes.
8   Q. What else do you recall?
9   A. "Kagan represented that based on his
10 experience and that of his wife, Tatiana, whom I
11 understood to be a real estate broker, the property
12 could be sold for a minimum of $3.7 million. Kagan
13 assured me of his ability to complete the
14 construction in twelve months with a reasonable
15 construction cost margin of error of 5 percent."
16  Q. And did you just read, sir, Paragraph 4 of
17 your affidavit?
18  A. Yes.
19  Q. Other than what you wrote in Paragraph 4,
20 do you have any other independent memories of the
21 meeting?
22  A. Yes.
23  Q. Would that be what you have written down in
24 Paragraph No. 5?

**Page 89**

1   A. Yes.
2   Q. Other than Paragraphs 3, 4 and 5, do you
3 remember anything else about the meeting?
4   A. No.
5   Q. Incidentally, were there multiple drafts of
6 the affidavit?
7   A. Yes.
8   Q. And what happened to the earlier drafts?
9 Do you still have them?
10  A. They are included.
11  Q. Sir, I see two signed copies of this
12 affidavit, and an unsigned copy.
13  A. Yes.
14  Q. Were there any other drafts of it?
15  A. There might be.
16  Q. Did you make diligent search, sir, when you
17 were looking for documents to see if you had other
18 drafts of this affidavit?
19  A. Yes.
20  Q. And were you able to find any?
21  A. I might have.
22  Q. You might have, but you don't know?
23  A. Correct.
24  Q. How is it that you don't know if you had

FARMER ARSENAULT BROCK LLC

**Page 94**

1   A. Apparently I did not.
2   Q. So that's a mistake?
3   A. It was intended to be attached.
4   Q. And you've been unable to locate that
5   document; is that correct?
6   A. I have been unable to locate this document
7   at this point, yes.
8   Q. Now, when Mr. Lipetsker told you there was
9   an opportunity to invest in what became Hyde Avenue
10  LLC, other than what's stated in Paragraphs 3, 4, 5
11  of your November 11, 2015 affidavit, do you remember
12  anything else about your initial conversations with
13  Mr. Kagan?
14  A. I do not remember anything else.
15  Q. How much did you invest?
16  A. I do not remember that, but.... (Pause)
17      31 percent of the required investment.
18  Q. How much was that?
19  A. I don't remember.
20  Q. Did Mr. Kagan tell you what your expected
21  profit would be on your investment?
22  A. Yes.
23  Q. What did he tell you?
24  A. He told me that the expected profit would

**Page 95**

1   be the difference between the sell price of the
2   house for $3.7 million, that amount invested
3   originally, and the cost of construction of $1.2
4   million.
5   Q. So, how much did you expect to make on this
6   project? What percent?
7   A. I would expect to make $225,000.
8   Q. And how did you calculate that?
9   A. I've taken a number 3.7 million, subtracted
10  1.6 million for the purchase of the lot, subtracted
11  1.2 million for the cost of construction; and then
12  multiplied that by 25 percent, which was my profit
13  share.
14  Q. How much did you actually make?
15  A. $44,167.
16  Q. And how did you calculate that?
17  A. I am looking at the balance sheet which is
18  marked as Exhibit 5, which shows the net income of
19  $176,670.53; and I'm applying a 25 percent investor
20  share.
21  Q. And where, sir, does it say that your
22  investor share is 25 percent? Is that in your
23  affidavit somewhere?
24  A. It is not.

**Page 96**

1   Q. Is there any document that you're aware of
2   that says that you were supposed to get 25 percent?
3   A. Yes.
4   Q. What document?
5   A. Tax returns which were filed by the
6   corporation, where I am listed as a 25 percent share
7   investor.
8   Q. Were you a 25 percent share investor?
9   A. I was a 25 percent profit-share investor.
10  Q. The second Paragraph 4 of your affidavit
11  says you contributed 31 percent.
12  A. Correct.
13  Q. So are you a 25 percent, or a 31 percent,
14  investor?
15      MR. CARNATHAN: Objection.
16  A. I am a 25 percent profit-share investor.
17  Q. Now, sir, what was your role in Hyde Avenue
18  LLC?
19  A. I agreed to 31 percent of the required
20  initial investment and personally guaranteed
21  mortgage and construction loan.
22  Q. Were you the managing member?
23  A. Yes.
24  Q. And as managing member, did you have any

**Page 97**

1   duties and responsibilities with respect to this
2   project?
3   A. Yes.
4   Q. What were they?
5   A. They were outlined in the agreement which I
6   cannot locate now.
7   Q. So do you have no recollection about what
8   your duties and responsibilities were as the
9   managing member?
10  A. No.
11  Q. No, you don't have any idea?
12  A. No, I don't have any recollection of my
13  duties and responsibilities as a managing member.
14  Q. Other than putting money into the project,
15  did you do anything else with respect to the
16  project?
17  A. Yes.
18  Q. What else did you do with respect to the
19  project?
20  A. I looked at the bank statements and AMEX
21  statements provided by Mr. Kagan, and I entered the
22  information of the bank statements and the AMEX
23  statements into the spreadsheet.
24      The spreadsheet is attached as part of

Dimitriy Zhukofskiy - Vol. 1 - 3/6/2018

27

**Page 102**

1  A. No.
2  Q. Other than for his legal fees, did
3  Mr. Boris Maiden receive any moneys relative to Hyde
4  Avenue LLC?
5  A. I don't know.
6      Boris Maiden did not receive any money.
7  The only money that Boris made and received as part
8  of these proceeds were the money that would have
9  come to him as part of purchase and sales. And this
10 money is residing in an IOLTA account and
11 distributed to the various parties, whether it be
12 sellers or buyers or brokers.
13 Q. And the money that you contributed, was
14 that your money or did you get it from somebody
15 else?
16 A. It was my money.
17 Q. 100 percent?
18 A. Yes.
19 Q. Did you share your profit with anybody?
20 A. No.
21 Q. How much was the property sold for?
22 A. I believe that the property was sold for
23 $3.8 million.
24 Q. And was that consistent with what Mr. Kagan

**Page 103**

1  told you up front?
2  A. Yes.
3  Q. Other than what you've set forth in
4  Paragraphs 3, 4 and 5 of this affidavit, do you have
5  any other recollection of anything that was
6  discussed at the initial meeting with Mr. Kagan?
7  A. Can you please repeat the question?
8  Q. Sure. Other than what is stated in
9  Paragraphs 3, 4, 5 of your November 11, 2015
10 affidavit, do you have any memory of anything else
11 that was discussed at the initial meeting about this
12 project?
13 A. No.
14 Q. So the sum total of everything you remember
15 about the meeting --
16 A. Yes.
17 Q. -- is in Paragraphs 3, 4 and 5?
18 A. Yes.
19 Q. By the way, was this a new construction, or
20 was this a renovation of an existing house?
21 A. I don't know how to classify that.
22 Q. Well, was it a brand-new house, or did they
23 renovate an existing house?
24 A. Again, define the term renovate; the

**Page 104**

1  percentage.
2  Q. Fix it; add to it.
3  A. Define the percentage.
4  Q. No, I can't define the percentage.
5  A. Then I cannot answer this question.
6  Q. So was this house knocked down and a new
7  one built?
8  A. Part of the house was knocked down.
9  Q. And part of it remained?
10 A. And part of it remained.
11 Q. Were you given any documents during this
12 first meeting?
13 A. No.
14 Q. Now, as an actuary, sir, did you do any due
15 diligence regarding the financial projections for
16 this meeting?
17     MR. CARNATHAN: Objection.
18 A. I am not required to do any due diligence
19 for the financial projections.
20 Q. I didn't ask you if you were required to; I
21 asked you if you did.
22 A. Define due diligence.
23 Q. Well, what did you do when Mr. Kagan told
24 you what he thought the project would cost? Did you

**Page 105**

1  do any investigation whatsoever of the information
2  you were being provided with?
3  A. No.
4  Q. And you don't recall getting any documents
5  at that meeting, correct?
6  A. No.
7  Q. How long was the first meeting?
8  A. Don't remember.
9  Q. Was it a short meeting, a long meeting?
10 A. Define short or long.
11 Q. Was it more than an hour?
12 A. No.
13 Q. Was it more than half an hour?
14 A. I don't remember.
15 Q. Somewhere between half an hour and an hour?
16 A. I don't remember.
17 Q. Who else was at this meeting besides you?
18 A. Nickolay Lipetsker.
19 Q. Anybody else?
20 A. No.
21 Q. Were you provided with copies of invoices
22 during the construction of the Hyde Avenue project?
23 A. Some.
24 Q. At any point, sir, did you send a demand

**Page 106**

1  letter to Kagan objecting to the costs of this
2  project?
3      A. No.
4      Q. At any point, sir, when the property was
5  being sold, did you refuse to go forward with the
6  sale of the property because you didn't like the
7  numbers?
8      A. No.
9      Q. You got a distribution from profit,
10 correct?
11     A. Correct.
12     Q. And Mr. Lipetsker got a distribution from
13 profit, correct?
14     A. Correct.
15     Q. And his distribution was the same as yours,
16 correct?
17     A. I don't remember.
18     Q. And Mr. Kagan got a distribution from
19 profit, correct?
20     A. I don't remember that.
21     Q. Well, at any point, sir, did you refuse to
22 pay any moneys to Mr. Kagan for his portion?
23     A. No.
24     Q. When you got the proceeds, did you write

**Page 107**

1  any document saying I'm accepting this under
2  protest, or words to that effect?
3      A. No.
4      Q. Did you express any displeasure to
5  Mr. Kagan regarding the distribution that you
6  received?
7      A. Can you please rephrase the question?
8      Q. Did you tell him that this was the wrong
9  number?
10     A. No.
11     Q. Now, as managing member of this LLC, did
12 you understand that you had the ultimate authority
13 to decide whether this project went forward or not?
14     A. Yes.
15     Q. And you authorized the project to go
16 forward; correct?
17     A. No.
18     Q. You didn't authorize the project to go
19 forward?
20     A. I never objected to the project going
21 forward.
22     Q. Well, would you describe your role as
23 passive, or --
24     A. Yes.

**Page 108**

1      Q. So you were not actively involved in the
2  day-to-day?
3      A. Define actively involved in day-to-day.
4      Q. Well, what did you do?
5      A. I collected the information from the bank
6  statements and AMEX statements and recorded them in
7  the spreadsheet, which was provided to you.
8         I met with the accountant and ensured
9  that the balance sheets which were prepared by him
10 are matching my records.
11        I signed the tax returns, and I
12 distributed the K-1 forms to the investors.
13     Q. And did you have the opportunity to ask
14 questions during the course of the project if there
15 was an expense that you didn't understand?
16     A. Yes.
17     Q. And did you get answers?
18     A. No.
19     Q. You never got answers?
20     A. Sometimes I got answers.
21     Q. And when you didn't get answers, did you
22 write letters or send emails saying I've been asking
23 for this information and you're refusing to respond,
24 or words to that effect?

**Page 109**

1      A. You're putting words into my mouth.
2      Q. I am, absolutely.
3         Did you write any emails to anybody on
4  the Kagan side saying You're not giving me the
5  information I wanted, or words to that effect?
6      A. I have written emails to somebody on
7  Kagan's side asking for the invoices, but not in the
8  words that you have just pronounced.
9      Q. Did you ever write an email saying that if
10 you didn't get the information that you requested
11 you were going to halt the project?
12     A. No.
13     Q. Did you ever send emails to the effect that
14 if you didn't get the information that you requested
15 you would not allow the sale to go through?
16     A. No.
17     Q. Did you ever file suit against Kagan?
18     A. No.
19     Q. Did you ever threaten him?
20     A. No.
21     Q. Now, you said that you were able to monitor
22 the disbursements from the construction loan;
23 correct?
24     A. Yes.

Dimitriy Zhukofskiy - Vol. 1 - 3/6/2018

29

**Page 110**

1  Q. And you also saw every check on the company
2  account, correct?
3  A. Yes.
4  Q. And at any point, did you question why
5  those checks were being cut?
6  A. Yes.
7  Q. And did you get the answers?
8  A. No.
9  Q. And when you didn't get the answers, did
10 you write any kind of document saying I'm still
11 waiting for this information, where is it, or words
12 to that effect?
13 A. I would send a follow-up email.
14 Q. And if you got no satisfactory response to
15 the follow-up email, what would you do?
16 A. Nothing.
17 Q. You let it go?
18 A. Yes.
19 Q. Why?
20 A. I'm not understanding the question.
21 Q. Well, if you were asking for information
22 and you weren't getting it, why didn't you follow
23 up?
24 A. I did.

**Page 111**

1  Q. But eventually you just agreed to let it
2  go, correct?
3  A. Yes.
4  Q. Why?
5  A. I don't understand the question.
6  Q. Well, if you're asking for information --
7  A. Yes.
8  Q. -- and you're not getting satisfactory
9  responses --
10 A. Yes.
11 Q. -- why did you drop it? Why didn't you
12 follow up in some fashion?
13 A. You're asking me to speculate as to why I
14 would do certain things.
15 Q. I'm not asking you to speculate, sir; I'm
16 asking you to tell me why you didn't do certain
17 things.
18 A. I didn't believe it was worth pursuing.
19 Q. That what wasn't worth pursuing?
20 A. Continuing to get this information.
21 Q. Why?
22 A. Because Mr. Kagan informed me that he had
23 all of the invoices.
24 Q. And at any point, did you come to learn

**Page 112**

1  that that was false?
2  A. No.
3  Q. So Mr. Kagan told you he had all the
4  invoices, and you have no reason to think he didn't
5  have all the invoices; is that your testimony?
6  A. Yes.
7  Q. Did you ever discuss with Mr. Lipetsker his
8  experiences on the Hyde Avenue LLC project?
9  A. Yes.
10 Q. When do you recall discussing with him
11 about Hyde Avenue LLC?
12 A. I don't remember particular times.
13 Q. What do you recall discussing with him
14 about Hyde Avenue LLC?
15 A. Our experiences.
16 Q. And what did he say to you, and what did
17 you say to him?
18 A. He agreed with me.
19 Q. What did he say to you?
20 A. That he agrees with me.
21 Q. When did he tell you that?
22 A. When we discussed this.
23 Q. And you don't recall when that was?
24 A. No.

**Page 113**

1  Q. Is there any document that you're aware of
2  where Mr. Lipetsker says he agrees with you?
3  A. No.
4  Q. Was this a casual conversation?
5  A. Yes.
6  Q. Was it more than one conversation?
7  A. Yes.
8  Q. And you don't recall when these
9  conversations occurred?
10 A. No.
11 Q. Did they occur during the pendency of the
12 Hyde Avenue project?
13 A. No.
14 Q. It was after the Hyde Avenue project?
15 A. Yes.
16 Q. What was his return?
17 A. His return was determined in accordance
18 with his contribution in terms of the agreement.
19 Q. So you don't know without looking at the
20 agreement, which you can't find; is that correct?
21 A. I do not know without looking at the tax
22 returns and investigating the filed tax returns and
23 K-1 forms.
24 Q. Do you believe that you have provided, in