Case 16-01120    Doc 235    Filed 11/16/18    Entered 11/16/18 16:44:04    Desc Main
Document    Page 1 of 13

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| In re:<br><br>LYMAN-CUTLER, LLC,<br><br>    Debtor. | Chapter 7<br>No. 15-13881-FJB |
| LYMAN-CUTLER, LLC,<br>ALEX FILIPPOV and<br>NICKOLAY LIPETSKER,<br><br>    Plaintiffs,<br>    Defendants in Counterclaim,<br><br>    v.<br><br>VADIM KAGAN, TATIANA KAGAN,<br>KAGAN DEVELOPMENT KDC, CORP.<br>and PROEXCAVATION CORP.<br><br>    Defendants,<br>    Plaintiffs in Counterclaim. | Adv. Proc. No. 16-01120 |

CONCISE STATEMENT OF UNDISPUTED FACT FOR TATIANA KAGAN'S
MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS OF
AMENDED COMPLAINT AND ON PROOF OF CLAIM NO. 5

1. Defendant Tatiana Kagan ("Tatiana") is the wife of defendant Vadim Kagan ("Kagan").

2. She is not a member of Lyman-Cutler; not a manager of Lyman-Cutler, not a signatory to the Lyman-Cutler Operating Agreement, and had no check writing authority on any of the Lyman-Cutler accounts.

3. Tatiana is a real estate agent, and the members agreed that she would be given the listing for the new homes being built by Lyman-Cutler.

4. Although on paper she is an officer and director of defendants Kagan Development KDC, Corp. ("KDC") and ProExcavation Corp. ("ProExcavation"), she played no substantive role whatsoever in the construction of the homes at issue in this litigation and took no actions on behalf of KDC or ProExcavation.

5. She had nothing to do with any of the project billings or project expenditures.

6. Plaintiffs offer no expert testimony to support any allegations against Tatiana.

7. Kagan, Alex Filippov ("Filippov"), and Nickolay Lipetsker ("Lipetsker") formed Lyman-Cutler, LLC ("Lyman-Cutler") to construct and sell two luxury homes.

8. Tatiana is first mentioned substantively in paragraph 28 of the Amended Adversary Complaint, where she is identified as a real estate agent affiliated with "Defendant Century 21"[1] and as an officer and director of KDC. (Amd. Cmp., ¶28).

9. Plaintiffs allege that they planned to sell the new homes for $4.9 million each and that they agreed to list the homes for sale with Tatiana. (Id., ¶¶27, 29).

10. They further allege that, without consulting them, the "Kagans" set the selling price for the houses at $5.499 million, "nearly $600,000 higher than the budgeted selling price." (Id., ¶30).

11. The plaintiffs allege, "upon information and belief," that in March, 2015, Tatiana received a "bona fide offer" to purchase one of the properties for $4.5 million and failed to present it to Filippov. (Id., ¶¶31, 32).

12. Plaintiffs allege that Tatiana did "little or nothing to market" the properties. (Id., ¶33).

---

[1] Century 21 is not a defendant. It was, however, a defendant in the state court incarnation of this complaint. The pronoun "Defendant" appears to be a vestige from the earlier state court pleading.

13. In April, 2015, plaintiffs allege that Kagan [not Tatiana] called Filippov and asked him to sign a new listing agreement for one of the properties, 55 Lyman Street. Filippov claims that he refused to sign the new listing agreement and stated his intention to list the properties with someone else. (Id.)

14. Despite his refusal to sign the listing agreement, "Kagan [not Tatiana] **unilaterally** executed a purported listing agreement with his wife and Century 21…" (Emphasis added)(Id., ¶34).

15. Plaintiffs then plead that "upon information and belief, based on the fact that the Kagans are married and business partners, Mrs. Kagan also knew or should have known that her husband did not have authority to sign the listing agreement and that Mr. Filippov had refused to sign it." (Id. ¶35).

16. Plaintiffs point to a letter sent on May 7, 2015 on behalf of Kagan [not Tatiana] wherein he allegedly made fabricated claims that it was Filippov who set the selling price for the homes and refused to lower that price when requested to do so by Kagan. (Id., ¶36, Perten Aff., Exh. 5).

17. Plaintiffs claim that the "Kagans" knew that sending the letter would "engender a dispute," and that they intentionally entered into the unauthorized listing agreement with Century 21 in April "to give themselves unfair leverage" in connection with the demand letter. (Id., ¶38).

18. Lyman-Cutler filed suit against Kagan, Tatiana and Century 21 in the Middlesex Superior Court.

19. Through discovery in that action, Plaintiffs claim to have learned, for the first time, about a listing agreement with Century 21 which had been signed by Kagan [not Tatiana] on August 12, 2014. (Id., ¶¶39, 41).

20. Plaintiffs claim that the duration of this listing agreement, eighteen months, was unreasonably long. Plaintiffs allege that Tatiana knew or should have known that her husband had no authority to sign that listing agreement. (Id., ¶40).

21. Plaintiffs allege against Tatiana is that "[t]he Kagans have complete control over both KDC and ProExcavation and at all times controlled the funds of the Company [defined as Lyman-Cutler]. They allegedly abused their fiduciary position of power and trust to inflate charges and fraudulently milk the project for their own unjust enrichment." (Id., ¶48).

22. Tatiana was not a member or manager of Lyman-Cutler and did not have signatory power on Lyman-Cutler's bank account.

23. In the Complaint, Count III alleges that Tatiana "knowingly and intentionally aided and abetted Kagan's breach of his fiduciary duty to the Plaintiffs." (Id., ¶61).

24. Count IV alleges that Tatiana is liable for fraud by conspiring to have her husband sign the listing agreements despite knowing that he did not have authority to do so.

25. Plaintiffs allege she is "individually responsible for the fraudulent acts of KDC and ProExcavation" solely "because she is an owner and director of both Companies." (Id., ¶65).

26. Count V alleges that Tatiana and all the other defendants "have conspired to defraud the Plaintiffs." (Id., ¶70).

27. Count VI alleges that Tatiana violated M.G.L. c. 93A "by asserting two knowingly unauthorized and fraudulent listing agreements…" (Id., ¶73).

28. The plaintiffs do not assert a negligence claim against Tatiana arising from her conduct as the listing agent for the properties.

29. In June, 2015, at the request of Filippov, Century 21 voluntarily removed Tatiana as the listing agent and replaced her with Michelle Lane, another Century 21 agent. After the filing of the bankruptcy petition, the Debtor moved to reject the Century 21 listing agreements, which motion was allowed. (Docket No. 42). Thereafter, the Trustee engaged Deborah Gordon of Coldwell Banker to list the properties in Century 21's stead. (Docket No. 47). The bankruptcy trustee listed the properties at $4.5 million and each sold for $4.4 million, without objection as to the sale price.[2] (Docket Nos. 67, 75).

30. Tatiana did not have any role in the development of this project other than acting as the listing agent trying to sell the properties. She played no role in the construction of the homes other than assisting with paint color selections. (Tatiana dep. at 14- 15, Perten Aff., Exh. 19).

31. She had no knowledge regarding KDC's activities on the project. (Id.).

32. She had no input into the financial records of either KDC or ProExcavation. (Id. at 19).

33. Tatiana also never even saw the Operating Agreement for Lyman-Cutler. (Id. at 22).

34. Filippov testified that he understood from the outset that Tatiana would be responsible for the sales and marketing of the properties. (Fillipov dep. at 47, Perten Aff., Exh. 2).

35. Filippov claims to have had only two communications with Tatiana over the course of the entire Project. The first occurred in July, 2014, a year and a half after the creation of

---

[2] Plaintiffs filed a limited objection to ensure that Tatiana did not receive a commission for her efforts. Given the complete lack of support for the allegations against, as set forth therein, this insistence was nothing but spite.

5

Lyman-Cutler, wherein she allegedly told them that there was a lot of interest in the homes.

36. The second communication occurred nine months later, in April, 2015, when Filippov and Tatiana "exchanged a text message that has been produced in discovery." (Filippov Resp. to Int. No. 1 propounded by Tatiana, Perten Aff., Exh. 10; Debtor Resp. to Int. No. 1 propounded by Tatiana, Perten Aff., Exh. 11).

37. Lipetsker, for his part, claims to have never spoken with Tatiana. (Lipetsker Int. Ans. No. 1 propounded by Tatiana, Perten Aff., Exh. 12).

38. At his deposition, Filippov recalled an additional communication with Tatiana. He testified that he met Tatiana at a social engagement, a dinner, sometime after agreeing to work together with Kagan and he was comfortable with her when he learned that she, like he, had grown up in St. Petersburg, Russia. (Filippov dep. at 66).

39. At his deposition, Lipetsker testified that he rarely, if ever, spoke to Tatiana during construction. (Lipetsker dep. at 51, Perten Aff., Exh. 6).

40. Filippov testified that the actual plan was to sell the properties for between $5 million and $5.25 million. (Fillipov dep. at 46, 51).

41. Filippov testified that when the first home was listed [88 Cutler Lane], Kagan sent him a text message to let him know that the property was listed. (Id. at 91). After receiving Kagan's text, Filippov testified that he went on-line to review the listing and observed that the listing price was $5.5 million. (Id. at 92).

42. Upon noting that the listing price was $5.5 million, Filippov asked Kagan [not Tatiana] if he thought that that the listing price was reasonable. According to Filippov, Kagan told him that it was a reasonable listing price and Filippov voiced no further concern.

6

(Filippov dep. at 92). Filippov then asked Kagan why both properties were not listed simultaneously, and Kagan advised that he did not want people to think the two adjacent homes were "cookie cutter" copies of each other as that could adversely affect the selling price. (Id.). Filippov also noted a discrepancy in the property description set forth in the listing, the square footage of the home was understated, and had Tatiana fix that listing error. (Id. at 91).

43. Lipetsker testified that he too was aware that the properties were listed at $5.5 million and voiced no objection to that listing price. (Lipetsker dep. at 48).

44. When 88 Cutler Lane did not sell as quickly as everyone had hoped, it was removed from the listing service and the other property, 55 Lyman Road, was listed [in April 2015]. (Filippov dep. at 92).

45. Filippov testified that he was also aware of this listing and knew that the listing price for this property too was $5.5 million. (Id. at 93).

46. He voiced no objection to the $5.5 million listing price. (Id.).

47. Filippov testified that he had no conversations whatsoever with Tatiana about the fact that the properties were listed or about the price at which they were listed. (Id. at 94).

48. Filippov recalled that both Tatiana and Kagan reached out to him in April, 2015 about signing a new listing agreement, and he believes that he may have spoken to both of them about that listing. (Id. at 213).

49. Tatiana texted him on April 23, 2015 and asked him to call her about the listing. Filippov admits he received her text. (Id.).

50. He also admits that he received an additional text from Kagan that same day which stated, "We have to put 55 Lyman on the market and take 88 Cutler off … We need you to sign C21s agreement to put it on the market." (Id. at 213, Exh. 23, Perten Exh. 13).

51. Filippov admits that on April 24, 2015, Tatiana sent him an unsigned copy of the listing agreement for 55 Lyman Road to review. (Id. at 214, Exh. 25; Perten Aff., Exh. 22).

52. After reviewing the proposed listing agreement, the only concern he raised related to Tatiana's commission rate. He raised no other objection and received a satisfactory response to his question regarding Tatiana's commission rate. (Id., Exh, 26, Perten Aff., Exh. 14).

53. Dan Gersh ("Gersh") is KDC's CFO. (Gersh dep. at 20, Perten Aff., Exh. 15).

54. On April 28, 2015, he confirmed back to Filippov by e-mail "Per our earlier conversations, **we signed the agreement with C21 to put 55 Lyman on the market**, as agreed. Please confirm receipt of this e-mail." (Filippov dep. at 216, Exh. 27, Perten Aff, Exh. 16)([Emphasis added).

55. Filippov immediately replied, "I confirm. Thank you."

56. Upon receiving Filippov's confirmation, Gersh responded: "Greatly appreciate the quick response. If you have any questions during the selling/closing process, please feel free to reach out to me." (Id.)

57. Later that afternoon, Tatiana too texted Filippov to confirm that she was authorized to list the properties. Filippov texted back "I sent confirming e-mail to Dan [Gersh]". (Filippov dep. at 212-13; Exh. 22, Perten Aff., Exh. 17).

58. When shown these texts and e-mails at his deposition, Filippov claimed that he had not focused on the word "signed" in Gersh's e-mail and simply intended to confirm that the agreement had been "received". (Filippov dep. at 217).

59. He testified that he knew that "they put it on the market and listed it." (Id.).

60. Filippov also confirmed that despite Gersh's telling him that the agreement was signed and the property listed, and the fact that Gersh referenced the selling/closing process that would now proceed, he never sent any e-mail, text message or other communication stating that he did not authorize the signing of the agreement or the listing of the property. (Id. at 218).

61. He also conceded that had he told Gersh that he would not authorize the signature of the listing agreement, Gersh's "Thank you" follow up would have been quite odd. (Id. at 219).

62. In response to interrogatories, plaintiffs revealed that the source for their information about the "offer" was another broker, Deborah Gordon, and that there was no written offer. (Filippov's Resp. to Tatiana's Int. No. 3, Perten Aff., Exh. 10).

63. Ms. Gordon was the agent who ultimately received the listing for the properties after this Court approved the rejection of the executory Century 21 listing agreements.

64. When the Trustee subsequently moved for authority to engage Ms. Gordon as the listing agent once the Century 21 contracts were rejected, Debtor failed to disclose its prior relationship with Ms. Gordon nor that she likely would be a central witness if there truly was any merit to the allegations regarding the alleged offer. Similarly, as part of the application to employ her, Ms. Gordon denied any "connection" to Debtor, parties in interest, or creditors. See Docket No. 47.

9

65. Tatiana testified at her deposition that she received a single phone call from Ms. Gordon. Ms. Gordon told her that she had a client that <u>might</u> be interested in making an offer, but it never materialized. Ultimately, Ms. Gordon told Tatiana that her client elected not to make an offer because the client was not qualified to purchase a home at that price. (Tatiana dep. at 43, Perten Aff, Exh. 18).

66. Ms. Gordon too had no memory whatsoever of having her client, a Ms. Franklin, ever actually make an offer for the Lyman-Cutler properties, and no memory of ever speaking with Tatiana about such an offer. (Gordon dep. at 36-38, 41, Perten Aff., Exh. 19). She testified that it is not uncommon for a buyer's broker to call and feel out the listing broker as to whether there are other offers or what kind of money the sellers might be looking for, though she had no recollection of doing so on this occasion. She agreed, however, that until a **written** offer is obtained, there is no binding offer for the listing agent to convey to the seller. (<u>Id.</u> at 31).

67. In interrogatories, Tatiana asked for details as to the damages which plaintiffs sought to collect from her. Each of the defendants answered identically:

> [Filippov, Lipetsker, LLC] objects to this interrogatory as premature. Discovery is ongoing and damages are subject to expert analysis and report which will be produced in due course. In general terms, Tatiana is liable for damages for failing to convey the offer for 88 Cutler, failing to competently market the Properties, supporting the enforcement of listing agreements she knew to be fraudulent, and for participating in the Defendants' scheme to overbill the Project.

(Filippov, Lipetsker and Lyman-Cutler Resp. to Tatiana Interrogatory No. 4, Perten Aff., Exh. 20).

68. After expert disclosures, plaintiffs supplemented their interrogatory responses. (Perten Aff., Exh. 20). Again, each plaintiff provided identical answers to Interrogatory No. 4 which effectively said nothing:

> Tatiana is equally culpable along with the other Defendants for the wrongful conduct described in the LLC's supplemental response to the interrogatories propounded to it by KDC, which are incorporated by reference. The LLC asserts that Tatiana is jointly and severally liable for all damages described in those supplemental responses.

69. Plaintiffs claim that Tatiana failed to competently market the properties. Tatiana testified at her deposition that she held multiple public open houses, multiple broker's only open houses, advertised, reached out to brokers who typically represent high end purchasers, contacted anyone she knew who might have a potential buyer, and made multiple individual showings to potential purchasers. (Tatiana dep. at 38-41).

70. Century 21 provided a summary of all the efforts it made. (Keily Affidavit; Perten Aff., Exh. 21).

71. Tatiana is not a party to the Operating Agreement and testified that she had never seen the Operating Agreement. (Tatiana dep. at 22).

72. The Operating Agreement provides that if the members wish to remove the listing from Tatiana prior to December 31, 2014, they can do so only by a vote of 81% of the members. (Operating Agreement, §6.1(b)(6), Perten Aff., Exh. 1). It does not set any outside limit on the duration of any agreement with Tatiana.

73. When the Trustee moved to sell the properties, Plaintiffs did not object to the sale price. Plaintiffs' only objection was that they wanted to ensure that Tatiana did not get a commission for the sale. (Docket No. 82).

74. Tatiana filed a proof of claim (Claim No. 5) seeking indemnity under Section 10.2 of the Operating Agreement.  Section 10.2 provides:

> The Company shall indemnify and hold harmless the Members and their respective employees and authorized agents from and against any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member, employee or authorized agent in good faith on behalf of the Company and reasonable believed to be within the scope of authority conferred by this Agreement, except that no Member, employ or authorized agent shall be entitled to be indemnified or held harmless from or against any loss, damage or claim incurred by reason of such Member's, employee's or authorized agent's gross negligence or willful misconduct.

75. The Operating Agreement itself which specifically identifies Tatiana as the listing agent. (Oper. Agr., §6.1(b)(6)).

        Respectfully submitted,

        TATIANA KAGAN,

        By her attorneys,

        /s/ John H. Perten, Esq.
        John H. Perten (BBO# 548728)
        SHEEHAN PHINNEY BASS & GREEN, P.A.
        255 State Street, Fifth Floor
        Boston, MA 02109
        (617) 897-5600
        jperten@sheehan.com

Dated:  November 16, 2018

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 16th day of November, 2018, a copy of the foregoing was served upon the parties listed below via ECF and/or first class mail, postage prepaid.

Eric K. Bradford
Office of the US Trustee
J.W. McCormack Post Office & Courthouse
5 Post Office Sq., 10th Fl, Suite 1000
Boston, MA 02109

Sean T. Carnathan
O'Connor, Carnathan and Mack, LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

David B. Madoff
Madoff & Khoury LLP
124 Washington Street - Suite 202
Foxborough, MA 02035

Steffani Pelton Nicholson
Madoff & Khoury LLP
124 Washington Street
Foxborough, MA 02035

Sarah A Smegal
Hackett Feinberg P.C.
155 Federal Street
9th Floor
Boston, MA 02110

Joseph P. Calandrelli
O'Connor Carnathan and Mack LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

Stephen G. DeLisle
Rubin and Rudman LLP
50 Rowes Wharf
3rd Floor
Boston, MA 02110

Amy M. McCallen
Rubin and Rudman LLP
50 Rowes Wharf
Boston, MA 02110

David C. Phalen
Hackett Feinberg P.C.
155 Federal Street, 9th Floor
Boston, MA 02110

Peter N. Tamposi
The Tamposi Law Group
159 Main Street
Nashua, NH 03060

/s/ John H. Perten
John H. Perten