UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re:<br><br>LYMAN-CUTLER, LLC,<br>    Debtor. | ) ) ) ) ) ) | Chapter 7<br>No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, et al.,<br>Plaintiffs/ Defendants in Counterclaim,<br><br>v.<br><br>VADIM KAGAN, et al.,<br>Defendants/Plaintiffs in Counterclaim. | ) ) ) ) ) ) ) ) ) ) ) | Adv. Proc. No. 16-01120 |

**OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

INTRODUCTION[1]

Plaintiffs' motion is mostly predicated on the fiction that defendants cannot prove that KDC's charges were "fair" and that defendants have the burden of proof on that issue. First, before the burden of proving fairness shifts to defendants, assuming it shifts at all, plaintiffs need to make an initial showing that the contract is not fair. They have failed to do this, relying solely on their own self-serving conclusions. Defendants' expert, who plaintiffs have ignored, opined that the charges are fair, highlighting the existence of material issues of fact on this question even had plaintiffs met their initial burden, which they have not.

As is their wont, plaintiffs ignore extensive deposition testimony and documents. Additionally, once again plaintiffs lump the defendants all together without any effort to

---

[1] Plaintiffs' supporting memorandum does not track its motion and identify the specific counts to which each argument is directed making it difficult to follow. Tracking from plaintiffs' motion, plaintiffs are not moving for summary judgment on Counts III, V, XV or XVI of defendants' counterclaim or Counts III, IV, V, VI, VII or VIII of plaintiffs' direct claims.

{S1277445.1}

distinguish each's alleged transgressions. Even if Kagan must prove the fairness of KDC's contract, this has nothing to do with Tatiana or ProExcavation as neither is attempting to enforce any agreement outside of their claims for indemnification. And, as set forth in defendants' pending motions for summary judgment, which are incorporated herein by reference, the lack of any recoverable damages claimed by plaintiffs mandates that their claims be dismissed.

## FACTS[2]

Filippov, Lipetsker and Kagan entered into an agreement to develop two luxury homes. Kagan was an experienced builder. (Kagan dep. at 15). Lipetsker had been involved in multiple real estate ventures. (Lipetsker dep. at 11-13). Filippov was a savvy businessman who had negotiated multiple contracts and acted as the general contractor on the construction of his own home. (Filippov dep. at 16, 39).

The Operating Agreement delegated construction to Kagan. (OA, §5.2). It did not restrict who he could hire as general contractor, subcontractors, or suppliers.[3] It did not mandate that the project be put out for bid. It did not require that the other members pre-approve construction contracts. It did not cap construction costs. The only reserved right relative to the construction was that the house plans be approved. (Id.). Filippov gave this approval. (Filippov dep. at 204).

For his efforts in finding the property and orchestrating the construction, the parties agreed that instead of allocating profit in accordance with their equity interests, Kagan would receive 50% of the profits. (OA, §5.2, 8.1). Filippov understood and agreed that this meant Kagan would earn "tons of money," (Filippov dep. at 31), though with hindsight plaintiffs now

---

[2] Unless otherwise noted, all deposition testimony and documents referenced are annexed to the Second Perten Affidavit filed herewith.
[3] Filippov understood that Kagan would be hiring subcontractors. (Filippov dep. at 173).

{S1277445.1}    2

apparently think this was not a good deal. (Id. at 31-32). The "fairness" of Kagan's compensation under the Operating Agreement, however, is not at issue in this litigation.

In an effort to save money, Kagan engaged his own company, Kagan Development KDC, Corp. ("KDC") to act as general contractor. (Kagan Aff., ¶ 2). Had he not engaged KDC, he would have had to engage someone else. Hiring KDC enabled the use of subcontractors with whom KDC had extensive experience and could demand more favorable pricing. (Id.; Kagan dep. at 148). By using KDC, the Debtor saved over $1 million from what would have been charged to build the two homes had it utilized an outside general contractor. (Salmi report, Carnathan Aff., Exh. 21). Filippov authorized Kagan to sign the KDC contract. (Kagan dep. at 236).

To further save money, KDC engaged ProExcavation as a subcontractor. ProExcavation did **much** more than just excavation: it did masonry, hardscaping, landscaping, snow removal, poured the basement slabs and foundations, put in storm drainage and utilities, graded, spread sod, paved the driveways and built retaining walls. (Carnathan Aff., Exh. 10). Had ProExcavation not been used, the Debtor would have had to pay other subcontractors to do this same work. Defendants' expert determined that ProExcavation's charges were fair and reasonable. (Salmi report, Carnathan Aff., Exh. 21).

The Debtor's books were to be maintained "with good record keeping practices" at its principal office. (OA, §6.1(f)). Debtor's principal office was Filippov's residence. (OA, §2.2; Filippov dep., Exh. 11). Filippov opened the Debtor's bank accounts using his personal address. (Filippov dep. at 70-72). He received monthly bank statements and copies of checks. (Id. at 72). Filippov's wife kept the Debtor's financial books and records. (Id. at 71). She communicated regularly with KDC's bookkeeper, who sent her copies of checks, invoices and answered

questions. (Id. at 71-72; Brusenkova dep., Exh. 10). Kagan himself had no responsibility to maintain the Debtor's accounts. By this action Filippov seeks to avoid taking responsibility for his own failure to keep accurate books and records for the Debtor.

During construction, Kagan and Filippov tracked costs together. (Kagan dep. at 167-69). They spoke weekly and discussed every check. (Id. at 170-71). Filippov and Lipetsker visited the site and communicated with Kagan regularly. (Filippov dep. at 164, Lipetsker dep. at 47, Kagan dep. at 142). They took photos. (Filippov dep. at 67). Filippov observed KDC's name on the sign affixed to the site fence. (Filippov dep. at 68).[4] As plaintiffs claim that the cost of construction was a fixed price, Filippov did not care how much was actually spent. (Id. at 244).[5]

Prior to 2013, KDC's accounting system was not very formal, as is typical of a small construction company. Plaintiffs' claim that KDC did not track costs at all is untrue. To track costs, Kagan kept copies of invoices with notes, proposals, and dedicated project folders, monitored bank statements and checks, kept handwritten running tallies on job folders, and worked with their accountant. (Kagan dep. at 43; Gersh dep. at 26-30, 39, 49). Each project had a separate account. (Kagan dep. at 43-44; Gersh dep. at 24). In 2013, Kagan's accountant set up a QuickBooks program in KDC's office. Each month the accountant sent someone to KDC's office to make the appropriate entries. (Kagan dep. at 44-45). Kagan is not trained on QuickBooks and relied on the personnel sent over by the accountant. (Kagan Aff., ¶3).

In or about March 2014, KDC hired Kristina Brusenkova as a bookkeeper. (Kagan dep. at 45). Brusenkova had previously worked for KDC's accountant and was familiar with KDC's

---

[4] Filippov claims that the general contractor should have been Classic Homes & Development, LLC, though he admits that they did no work on the site, submitted no invoices, received no payment, and that the Classic Homes contract did not reflect their agreement. He admitted that the Classic Homes contract was merely an "internal" form signed for the purpose of applying for the construction loans. (Filippov dep. at 203-211, Filippov dep. Exh. 20).
[5] It appears that plaintiffs may be abandoning this position, or at least arguing inconsistently, as their motion, unlike their complaint, is predicated on there being a cost-plus contract.

{S1277445.1}                                4

systems.  (Brusenkova dep. at 41-42).  Brusenkova was responsible for keeping the books and records of both KDC and ProExcavation, and she relied on bank statements and checks to make her entries into QuickBooks.  (Id. at 50-51, 60, 70-71; Kagan dep. at 48).  Kagan relied upon Brusenkova to do her job competently.  (Id. at 49).  In October 2014, Brusenkova was fired after she embezzled money.  (Kagan dep. at 50).

After Brusenkova's firing, Dan Gersh was hired as KDC's chief financial officer.  Gersh holds an undergraduate and master's degree in accounting and trained as a fraud examiner.  (Gersh dep. at 12, 17).  He previously worked in the audit departments of several large companies.  (Id. at 13-14).  When he was hired, Kagan told him to familiarize himself generally with the companies' financial books and records.  (Id. at 22-23).  By the time of his hire, the Lyman-Cutler project was winding down and Gersh had little to do with its financial records.  (Id. at 24).  Recognizing that the transition to QuickBooks had not been smooth, on November 18, 2014, Gersh wrote to Filippov to introduce himself and stated, "My goal is to clean up, re-organize and square away any paperwork and bookkeeping inefficiencies here for Vadim and his partners.  I have a fair amount to catch up relating to the past few weeks, so please let me know if there are any issues or any questions…"  (Gersh dep. at 53, Gersh dep. Exh. 29).  Gersh does not recall any response to his e-mail.  (Id.).

When reviewing KDC's files, Gersh noted that the manner in which Brusenkova and the prior bookkeepers kept the financial records of KDC was not workable for him.  (Id. at 37-38).  Quickbooks is simply a database, only as accurate as the data input, from which one can run reports reflecting a snapshot in time.  As Gersh noted, each bookkeeper had her own way of tracking information and Quickbook entries.  (Id. at 26-27).  For example, instead of filing invoices and proposals by project, Brusenkova filed them alphabetically by subcontractor name,

meaning that there was no simple way to determine who worked on a particular project. (Id. at 54-55). Further, although Brusenkova entered payments into QuickBooks, she did not enter total contractual obligations into QuickBooks, meaning there was no way to use QuickBooks to easily track total liabilities or outstanding amounts. (Id. at 60-62, 88). There was also no consistency in how dates were entered into QuickBooks. Sometimes it was the date of an invoice, other times it was the date of a proposal, other times it was the date of the payment, or simply the date Brusenkova logged into the system. (Id. at 61-63). Part of Gersh's goal was to move away from paper and have everything stored electronically for easy access. (Id. at 38). Without accurate QuickBooks data, KDC would be forced to rely on its paper record keeping which needlessly complicated and slowed the process.

With respect to individual projects, Gersh testified that the final accountings are typically made just before the sale of the property. (Id. at 89). Some of KDC's subcontractors were "old school" and did not submit formal invoices unless requested or until they wanted payment. (Id. at 32-33). Gersh testified that the QuickBooks general ledger would be updated after bank and credit card statements were received. (Id. at 102-04). There are monthly and annual reconciliations of QuickBooks. If errors are noted, they are corrected. (Id. at 46). Entries in QuickBooks routinely lag behind actual transaction dates. (Id. at 43-45).

In or about May 2015, Gersh was asked to run a QuickBooks aging report for accounts payable on the Lyman-Cutler project. (Id. at 69-70). At that point, he had not "audited" the Lyman-Cutler account nor had any final accounting been performed. The report simply listed open invoices received as of that date, based on the unverified information entered by prior

bookkeepers. (Id. at 73-74, 79-80).[6] This preliminary number was utilized in Kagan's May 7, 2015 letter to Filippov and Lipetsker and represented the amount of money QuickBooks indicated as being owed to subcontractors who had submitted invoices as of that date. (Id. at 83-84). It was not a final number. (Id. at 84, 135-36). The QuickBooks reports themselves do not necessarily correlate to the amount of defendants' claim. (Id. at 105-06).

When Filippov and Lipetsker questioned the number presented, Gersh went back to verify the QuickBooks entries. (Id. at 74). He went back through the folders of invoices, proposals and contracts. He reviewed every check, credit card charge and entry in the bank statements. (Id.). There were relatively few instances where Gersh could not find back-up for Brusenkova's QuickBooks entries. For those limited items, Gersh or Kagan contacted subcontractors to get replacement copies of what they had previously submitted or other back-up. (Id. at 74-75). When Gersh identified input errors, he fixed them. In this litigation, Plaintiffs received copies of KDC's QuickBooks reports for Lyman-Cutler before any changes were made and were also provided audit trail reports to enable plaintiffs to track changes. (Gersh dep. at 62). With KDC's proof of claim, plaintiffs received copies of the hard data which was entered into QuickBooks: invoices, receipts, checks, bank statements and credit charges.[7]

## ARGUMENT

1. <u>PLAINTIFFS MISSTATE THE LAW ON THEIR BURDEN OF PROOF.</u>

KDC filed a proof of claim to recover amounts due for the construction project. In an abundance of caution lest it be deemed a compulsory counterclaim, it restated its claim as a

---

[6] Plaintiffs rely on Quickbook entries instead of the raw data. The manner in which items are entered into QuickBooks often reflect tax planning, and then there are year-end reconciliations. (Gordon dep. at 72-73). Additionally, once there is a closing, numbers get moved to other reports (Id. at 79). The accountant also makes entries into QuickBooks as part of their review of the accounts. Id. at 47). QuickBooks are not updated contemporaneously with each payment. (Gersh dep. at 39, 43)

[7] Defendants incorporate herein their motion in limine seeking to strike Mr. Goldman's report which failed to identify any fraud found in the back-up provided.

{S1277445.1}                                              7

counterclaim in the adversary proceeding. In their desperation to overcome the fact that they are precluded by order of this Court from using their expert report to affirmatively challenge the fair and reasonable value of KDC's and ProExcavation's work, plaintiffs now argue that KDC and ProExcavation bear the burden of proof on the issue of fairness in the first instance, and then argue that defendants cannot meet that burden. In so doing, plaintiffs wholly ignore Bankruptcy Rule 3001(f). That Rule states: "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and the amount of the claim." Fed. R. Bankr. P. 3001(f). If a party-in-interest objects to a proof of claim, that party bears "the initial burden of producing **substantial evidence**" to overcome the presumption of validity to which a properly executed proof of claim is otherwise entitled. Juniper Dev. Group v. Kahn (In re Hemingway Transp. Inc.), 993 F.2d 915, 925 (1st Cir. 1993)(Emphasis added). Only if the objector meets its burden of providing **substantial** evidence, does the burden shift back to the claim-filing creditor. Id. When the claim involves a fiduciary, the rule does not change.

> … requiring a claimant who is a fiduciary to a corporation, to prove the good faith and inherent fairness of his transactions with the corporation, does not apply until the objecting party overcomes the prima facie effect of the claim. Absent such a requirement, an intolerable burden would be placed on corporate fiduciaries, requiring them to prove the good faith and fairness of each of their dealings with the corporation.

In re Americana Apparel, Inc., 55 B.R. 160, 162 (E.D. Pa. 1985), *citing*, In re Mobil Steel Co., 563 F.2d 692, 701 (5th Cir. 1977). See Matter of Multiponics, 622 F.2d 709, 714 (5th Cir. 1980)("This proof allocation provides a proper balance of burdens, assuring that the trustee does not underprove his objections while, at the same time, assuring that the fiduciary need not overprove his good faith and fairness at the mere cry of inequity by the trustee."); In the Matter of Lemco Gypsum, Inc., 108 B.R. 831, 834 (S.D. Ga. 1988)("Where the claimant is an insider or fiduciary, the [objecting party] bear the burden of presenting material evidence of unfair

conduct"), *citing*, In re N&D Properties, Inc., 799 F.2d 726, 731 (11th Cir. 1986); In re Missionary Baptist Foundation of America, Inc., 48 B.R. 885, 887 (N.D. Tex. 1985)("While a claim arising out of dealings between the debtor and its fiduciary must be rigorously scrutinized by the courts, the claim still enjoys *prima facie* validity."). As set forth in defendants' pending summary judgment motions, plaintiffs have failed to come forward with "substantial evidence."

As to the claims in the complaint, the burden allocation is the same. As plaintiffs, they bear the burden of proving each and every element necessary to support their claims. If, and only if, plaintiffs meet their threshold burden do defendants have any burden to rebut that evidence. If, as argued in defendants' pending summary judgment motions, plaintiffs cannot even make their prima facie case, defendants are entitled to a judgment without even offering a shred of rebuttal evidence.

The fairness cases cited by plaintiffs all involve breaches of fiduciary duty by a majority shareholder or director and refer to the "ultimate" burden, <u>not</u> the preliminary burden.[8] None of the cases cited deal with members of an LLC or situations where it is the majority members challenging the acts of a minority. See Liston v. Gottsegen, 348 F.3d 294,305 (1st Cir. 2003)(in small LLCs, less likely that there are "disinterested shareholders" so members' actual knowledge precludes claim against acting member). Assuming, *arguendo*, that the rules developed in large corporate settings also apply to a small limited liability company, there are a plethora of disputed facts regarding the fairness of the transaction and questions as to who bears the burden.

Coggins v. New England Patriots Football Club, 397 Mass. 525 (1986), heavily relied upon by plaintiffs, was a minority freeze-out case. The issue on appeal was the standard to be applied to determine whether the merger orchestrated by the majority shareholder and director,

---

[8] Based upon plaintiffs' motion, the fairness argument applies only to Counts IX, X and XII of defendants' counterclaim and Count I of the Amended Adversary Complaint.

{S1277445.1}                                  9

which eliminated the minority interests, was fair.  In that context, the SJC said that the majority shareholder, as a fiduciary, <u>ultimately</u> bore the burden of proving that the transaction was fair.  It did not say, however, that the plaintiff could simply make unsupported allegations and then leave it to the defendants to disprove them.

To determine what was fair, the <u>Coggins</u> court cited with approval the approach set forth in <u>Weinberger v. UOP, Inc.</u>, 457 A.2d 707, 711 (Del. 1983).  <u>Weinberger</u>, like <u>Coggins</u>, was a minority freeze-out case.  <u>Weinberger</u> sets forth the rule adopted by <u>Coggins</u>[9]:

> The Chancellor also held that even though the **ultimate** burden of proof is on the majority shareholder to show by a preponderance of the evidence that the transaction is fair, **it is first the burden of the plaintiff attacking the merger to demonstrate some basis for invoking the fairness obligation.** We agree with that principle.  **However, where the corporate action has been approved by an informed vote of a majority of the minority shareholders, we conclude that the burden entirely shifts to the plaintiff to show that the transaction was unfair to the minority.**

<u>Weinberger</u> at 702. (Emphasis added).  Thus, even in a non-bankruptcy setting, the burden of proof still falls, in the first instance, on the plaintiffs.  At its essence, plaintiffs' complaint is that they think the amounts charged were too high.  That is not enough.  They must still make some threshold showing, based on admissible evidence, that the amounts charged are not fair or reasonable.  Otherwise, a plaintiff could file a frivolous lawsuit, as did the plaintiffs here, and then simply sit back while they wait to see if the defendants can disprove their allegations.[10]

Here, the Operating Agreement authorized the KDC contract.  Filippov and Lipetsker approved the signing of that contract, authorized every change and discussed every additional cost.  As such, this matter also falls squarely within the <u>Weinberger</u> exception insofar as the majority fully approved the transaction and therefore "the burden shifts entirely to the plaintiff to

---

[9] The <u>Coggins</u> court went even further.  It not only adopted the <u>Weinberger</u> "fairness" test set forth above, but also stated that the "business-purpose" test would be an additional useful means "for examining a transaction in which a controlling shareholder eliminates the minority interest in a corporation."  <u>Collins</u> at 532.

[10] Especially in a closely held entity where things tend to be less formal, the Court is not obligated to "flyspeck" every single expenditure.  <u>Diamond v. Pappathanasi</u>, 78 Mass. App. Ct. 77, 95-96 (2010).

{S1277445.1}                    10

show that the transaction was unfair…" Id.  At a minimum, questions of fact regarding the sufficiency of the disclosure of the contract preclude summary judgment for plaintiffs.

2. <u>PLAINTIFFS HAVE UTTERLY FAILED TO MEET THEIR INITIAL BURDEN OF PROVING THE TRANSACTION WAS UNFAIR.  ALTERNATIVELY, THERE ARE MULTIPLE DISPUTED FACTS PRECLUDING SUMMARY JUDGMENT ON THIS ISSUE.</u>

Plaintiffs have come up with no evidence to support their claim of unfairness.  They claim that KDC's fees are outrageous but have nothing other than their own self-serving sense of outrage supporting their claim.  They ignore that $760,000 of KDC's claim is to reimburse carrying costs that it fronted when Filippov failed to honor his obligations to pay those under the Operating Agreement.  They ignore that QuickBooks is just a database containing a compilation of snapshots in time that are not necessarily contemporaneous with actual transactions and only as accurate as the raw data input, which they also ignore.  By order of this Court, plaintiffs can offer no affirmative expert testimony that the amounts charged by KDC for the construction are unfair.  And, even if they could, because defendants' expert has opined that the charges by KDC are fair and reasonable, at worst there is a battle of the experts that precludes the grant of summary judgment.  See Salmi Report at 11, Carnathan Aff., Exh. 21 ("it is our professional opinion that the total combined cost of $5,869,828.74 to build 88 Cutler Lane and 55 Lyman Road is both fair and reasonable and, in fact, significantly lower than market price…. Based on the foregoing, to a reasonable degree of professional certainty, the amount charged by ProExcavation for its services on the Project are fair and reasonable for the work performed.").

Not only did Kagan fully disclose the terms of the transaction, as noted above, he and Filippov tracked all costs together.  As to the prices charged, Kagan testified that these were market prices based on his knowledge of the industry.  (Kagan dep. at 250-51, 262).  As to material costs, Kagan explained that the supply houses did take-offs from the plans to determine

{S1277445.1}                                                11

needed quantities and provided estimates. (Id. at 102-06). Changes and increased costs to the project were discussed "constantly" and plaintiffs approved every additional expenditure. (Id. at 145, 152, 156). Kagan's testimony, coupled with that of his expert, raise genuine issues of material fact as to the fairness of the transaction. See Danois v. i3 Archive, Inc., No. 11-3856, 2013 U.S. Dist. LEXIS 98105, at *27 (E.D. Pa. July 12, 2013) ("The determination of entire fairness is highly fact-specific . . . such that we will not grant summary judgment for i3's breach of fiduciary duty claims with regard to those transactions."); Holten v. Standard Parking Corp., 98 F. Supp. 3d 444, 455 (D. Conn. 2015) ("In general, the entire fairness standard is a fact-intensive inquiry that may be difficult to resolve at the summary judgment phase of litigation."); Godina v. Resinall Int'l, Inc., 677 F. Supp. 2d 560, 572 (D. Conn. 2009) ("fairness must be decided based upon a careful analysis of the factual circumstances … it is clear that the issue of entire fairness is best left to the trier of fact…").

Plaintiffs' argument about the fairness of the "process" and the manner in which the project was billed is not only irrelevant but rife with fact questions. (Memo at 14-15). Kagan testified that he discussed the contract with Filippov, and that Filippov approved it. Costs and changes were discussed constantly. As to plaintiffs' assertion that the process could not possibly be fair because KDC did not bid the job to multiple contractors, (Memo at 14), there is no law that says that competitive bids are required. Neither the KDC contract nor the Classic Homes contract required competitive bids, and Filippov has no memory ever requiring Kagan to obtain bids. (Filippov dep. at 173-74). More importantly, there is no evidence that had this project gone out for competitive bids the price would have been any lower. Other than their unsupported challenge to ProExcavation's charges, plaintiffs have failed to identify a single subcontractor who allegedly overcharged for its work.

{S1277445.1}　12

As to the "process" regarding how the costs were "incurred," nothing has been put forward to demonstrate the manner in which costs were incurred was improper. Simply saying something is so does not conclusively prove it. Finally, the argument that KDC did not track expenses is just plain false as set forth above. The pre-QuickBooks manner of tracking may have been "old school" but there was tracking and Gersh subsequently went back to ensure it was accurate. He made only a few changes. The disclosure of all changes and the voluntary reduction of its proof of claim when an additional discrepancy was identified speaks volumes regarding KDC's integrity. As to unfairness in the manner in which the project was billed, there is no law supporting the argument that the manner of tracking those bills is somehow unfair.

Plaintiffs also assert that KDC's claim is directly contrary to the terms of the Operating Agreement which capped Kagan's compensation. (Memo at 13). KDC is not a party to the Operating Agreement. Plaintiffs have not pleaded any kind of an alter ego theory. In fact, they expressly disavowed the alter-ego theory in prior filings. See A. P. Docket No. 22 at p. 18 (alter ego theory "is not and has never been the LLC's theory. Rather, the Debtor is asserting this claim against these defendants for their own, independently unlawful conduct…" ). Moreover, nothing in the Operating Agreement capped construction costs and, as agreed, Kagan did not charge for his time. (Carnathan Aff., Exh. 7 and 8).

Plaintiffs make the outrageous statement that simply because Kagan did not show ProExcavation's proposal to Filippov and Lipetsker[11] and cannot recall the profit margin built into ProExcavation's price, ProExcavation's claim must somehow be inflated. The fact that in **2018** Kagan could not now recall what profit margin he figured into a **2013** estimate is

---

[11] Kagan's actual testimony was that he did not remember if he showed Filippov the proposal. (Kagan dep. at 279). Not remembering and affirmatively testifying that it did not happen are very different things.

{S1277445.1}                                    13

meaningless. What is missing from the equation is any affirmative evidence that the amount charged by ProExcavation, with profit, was unfair.

3. <u>KDC'S CONTRACT IS ADMISSIBLE.</u>

Plaintiffs claim that the KDC contract is inadmissible due to the best evidence rule. Defendants incorporate herein by reference their response to plaintiffs' motion in limine on this issue. KDC has the original agreement and plaintiffs never contested Kagan's signature on the agreement nor demanded its production. They demanded that the native electronic version of the contract, with all metadata, be produced so they could test their groundless theory that the contract was created after the litigation commenced and back dated. KDC promptly produced the original native file with metadata. Not surprisingly, plaintiffs have not disclosed any expert to testify that the metadata confirmed their suspicion.

4. <u>PLAINTIFFS ARE NOT ENTITLED TO SUMMARY JUDGMENT ON COUNTS I AND II OF THEIR AFFIRMATIVE CLAIMS.</u>

For the reasons set forth in defendants' motions for summary judgment, plaintiffs are not entitled to summary judgment on Counts I and II of their affirmative claims. To the contrary, those claims should be dismissed. In summary fashion, in four sentences, plaintiffs claim they are entitled to summary judgment because Kagan hired his own company and allegedly failed to exercise due care in managing the project. In addition to the multitude of facts precluding summary judgment, there is no expert opinion that Kagan failed to manage with due care.

5. <u>DEFENDANTS' EQUITABLE CLAIMS ARE ENTIRELY PROPER.</u>

Plaintiffs are talking out of both sides of their mouths. Counts XI, XIII and XIV are equitable claims brought by KDC. As KDC is not a party to the Operating Agreement, the existence of the Operating Agreement has nothing to do with KDC's right to seek payment. Plaintiffs deny that the KDC contract is valid and enforceable, yet simultaneously claim that its

claims for quantum meruit, promissory estoppel and unjust enrichment fail because there is a valid written contract. Plaintiffs need to "pick their poison." KDC is simply arguing in the alternative. If the contract is unenforceable, falling back on equitable claims is entirely appropriate. KDC conferred a benefit on Debtor and is entitled to be compensated. Plaintiffs do not get a windfall in the unlikely event that they are successful in knocking out KDC's contract. And, as to Kagan's individual equitable claims, those relate largely to statements made outside of the contract, i.e. the assurance will be reimbursed for paying additional carrying and construction costs those at the closing. (Kagan dep. at 96-97).

Plaintiffs claim that if the KDC contract was "unfair," Kagan forfeits any right to compensation, and cites Meehan v. Shaughnessy, 404 Mass. 419 (1989) for that proposition. In fact, Meehan expressly rejected this argument. The Meehan Court stated that a fiduciary might be required to forfeit compensation, "but only that portion of his compensation, if any, that was in excess of the worth of his services…" 404 Mass. at 440. If plaintiffs were to succeed on their fairness claim, that would not void the contract. M.G.L. c. 156C, §7. Again, plaintiffs have failed to establish the fair and reasonable value of KDC's services and therefore have no ability to claim that any monies should be forfeited. They have also failed to demonstrate that Kagan received any compensation for the construction, as his time was intentionally omitted from KDC's bill as required under the Operating Agreement.

6. <u>THE INDEMNITY CLAIMS ARE VALID.</u>

As set forth in their motions for summary judgment, defendants are entitled to summary judgment on their indemnity claims, especially given their failure to object to KDC's proof of claim for indemnity. Plaintiffs have the burden of coming forward with "substantial evidence"

{S1277445.1}  15

to support their objections to these proofs of claim. Fed. R. Bankr. P. 3001(f). In an abundance of caution, defendants restated the indemnity claims as counterclaims to the adversary complaint.

Plaintiffs argue that Tatiana, ProExcavation and KDC are not covered by the indemnity clause because they are not "agents" of any member. This determination of agency is laden with fact questions. See Smith v. Jenkins, 626 F. Supp. 2d 155, 166 (D. Mass. 2009) (whether agency relationship existed was "an issue for the finder of fact"); White's Farm Dairy, Inc. v. De Laval Separator Co., 433 F.2d 63, 66 (1st Cir. 1970) ("In Massachusetts the proof of agency is held to be ordinarily a question of fact for the jury."); Trans Nat'l Commc'ns, Inc. v. Overlooked Opinions, Inc., 877 F. Supp. 35, 44 (D. Mass. 1994) ("The existence and extent of an agency relationship is ordinarily a question of fact to be decided by a jury."). This is especially so where there are only three members. Once again, plaintiffs are talking out of both sides of their mouth. Their claims are predicated on their insistence that each of the defendants acted as an agent of Kagan and should be tarred with the transgressions they attribute to him. Accepting plaintiffs' position for the purpose of this motion, defendants fall squarely within the ambit of the indemnity language in the Operating Agreement.

As to Tatiana, the Operating Agreement, signed by all the members, states that "[t]he **Managing Member** hereby agrees to list the properties with Tatiana Kagan." (OA §6.1(b)(6) (Emphasis added). Although she clearly acted as an agent of the Debtor too, by the express verbiage of the Operating Agreement, she also acted as agent of the Managing Member. Again, plaintiffs need to decide what theory of the case they are pursuing.

As to KDC and ProExcavation, each conferred a benefit on the members individually as evidenced by plaintiffs request to intervene because they claim an interest in the underlying transaction. And, because the Operating Agreement delegated the authority to contract for

construction to Kagan, and he (with Filippov's express or implied approval) made the decision to engage KDC and ProExcavation, there is a fact question as to whether they also acted as his agent. The presence of these fact questions preclude summary judgment for plaintiffs.

7. <u>THE LITIGATION PRIVILEGE PROVIDES NO SAFE HAVEN FOR THE TORITIOUS CONDUCT OF LIPETSKER AND FILIPPOV.</u>

Plaintiffs seek summary judgment on Counts I, II, IV, XVII and XVIII but only "to the extent" that defendants' claims are predicated on assertion of false claims and suborning of perjury, claiming that such conduct is protected by the litigation privilege. Given that those counts are predicated on much more than the few items that plaintiffs claim are protected, regardless of whether that evidence is precluded, the claims still stand. Plaintiffs provide no argument whatsoever as to how, even if those limited allegations fail, the remaining allegations are insufficient to fail to support the claims plead.

Each of the cases cited by plaintiffs dealing with the litigation privilege address whether an attorney can be held liable for statements made in the course of, or in anticipation of, litigation. Defendants are not relying on communications by <u>counsel</u> for their claims. Rather, the conduct complained about is that Filippov and Lipetsker went out into the community and started bad mouthing Kagan and his companies so as to damage his business. See Counterclaim, ¶59. Deposition testimony has confirmed that Filippov and/or Lipetsker (without counsel) communicated with investors on other projects about their dissatisfaction on the Lyman-Cutler project. (Abramskiy dep. at 89-91; Kayserman dep. at 68-69; Lande dep. at 77-80). Defendants also allege that Filippov actively encouraged Brusenkova to lie and bring a false MCAD claim against Kagan.[12] While counsel may enjoy an absolute litigation privilege to defame Kagan, Filippov and Lipetsker certainly do not. See <u>Bose Corp. v. Ejaz</u>, 2011 WL 5402634 (D. Mass.

---

[12] The MCAD claim was dismissed on motion by defendants.

{S1277445.1}                    17

Nov. 7, 2011)(Notwithstanding the litigation privilege, "[a] party can, however, be held liable for tortious interference on the basis of filing the lawsuit if it is alleged that the suit was filed for the ulterior purpose of interfering with prospective business relationships.")

8. <u>THE ISSUE OF FILIPPOV'S STATUS AS "MANAGING MEMBER" IS RIFE WITH FACT QUESTIONS AND, IN ANY EVENT, COUNTS I, III AND IV ARE PREDICATED ON MUCH MORE THAN THIS MINOR ISSUE.</u>

Plaintiffs seek summary judgment "to the extent" that claims are predicated on whether Filippov was the managing member. This Court does not have to reach the issue because, just like the litigation privilege, none of Counts I, III and IV are predicated exclusively on that issue. Plaintiffs claim that "Kagan asserts a number of curious claims predicated on the assertion that Filippov was not the managing member or otherwise did not have the authority…" (Memo at 23). Kagan shares plaintiffs' curiosity as only Count I, breach of fiduciary duty, even mentions Filippov's supposed status and authority, though his breach goes far beyond questions of status and authority. <u>See</u> Counterclaim, ¶70(a-j). Neither Counts III nor IV discuss that allegation specifically. Count III alleges that plaintiffs breached the Operating Agreement by not honoring its terms, which is not dependent on Filippov's status. <u>See</u> <u>Id.</u> at ¶81. Count IV is for breach of the covenant of good faith and fair dealing. It too is not dependent on Filippov's claimed status as managing member.

Even if his status was essential, there are a multitude of disputed facts precluding a grant of summary judgment. The Operating Agreement is silent on how a managing member is to be selected. It does not designate anyone as the managing member. The term "Managing Manager" under Filippov's signature line is not a defined term. In fact, the Operating Agreement refers to "Managing Members," in the plural, so it is entirely possible that both Kagan and Filippov were managing members. <u>See</u> OA, §6.1(a) ("The management and control

of the operations of the Company … shall rest with the Managing Member<u>s</u>.")(Emphasis added). Kagan was told by Filippov and Lipetsker that he was the manager. (Kagan dep. at 194-96, 200-202; Filippov dep. at 163). Plaintiffs have cited no inconsistent testimony by Kagan. The Certificate of Organization was not prepared by or signed by Kagan; Filippov's deposition testimony is not binding on Kagan; and Kagan testified that he signed the manager's consent without reading it because his attorney told him to. (Kagan dep. at 194-96). Filippov's alternative interpretations simply highlight the existence of fact questions on this issue. Regardless, this Court need not even reach this issue because the claims stand whether Filippov was managing member or not.

9. <u>THE EVIDENCE SUPPORTS A CLAIM OF MINORITY FREEZE OUT.</u>

As conceded by plaintiffs, "[t]here can be no dispute that Filippov and Lipetsker together own 90% of the membership interest and have the right to control the Company." (Memo at 23). Plaintiffs' sole argument as to why they believe there is "no evidence of any 'freeze out'" is because "[o]ut of the blue on May 7, 2015, Kagan demanded over $1 million from the company" … then doubled that number and recorded a mechanics lien. (Memo at 24-25). Defendants simply do not understand how these facts, even if true, preclude a finding of freeze out.

Paragraph 75 of the counterclaim sets forth a number of actions taken by the majority members against Kagan. Plaintiffs do not dispute any of these facts for purposes of their argument. In fact, prior to litigation, plaintiffs threatened that if Kagan did not capitulate to their demands, they would vote to strip him of his interests in the profit. <u>See</u> May 13, 2015 letter ("I assure you that Mr. Lipetsker is in full agreement with Mr. Filippov's position and plan and that together they have 81% of the vote required under paragraph 8.2 to make changes in the allocations of the profits and losses from the Project if Mr. Kagan impedes its successful

completion." (Perten 2d Aff., Exh. 13). After plaintiffs filed suit, the parties held a special meeting of the members. At that meeting, Filippov and Lipetsker refused to discuss matters and voted against Kagan on nearly every substantive issue. (Perten 2d Aff., Exh. 15).

Freeze out is typically plead as a standalone count. In fact, that is exactly what happened in Pointer v. Castellani, 455 Mass. 537 (2009), the single case cited by plaintiffs to support their claim that a freeze out claim has no independent legal significance. Whether standing alone or as part of the breach of fiduciary duty count, summary judgment is not warranted on the freeze out claim.

## CONCLUSION

There are a multitude of genuine issues of material fact precluding summary judgment in favor of plaintiffs. In contrast, defendants' pending motions for summary judgment should be allowed and all affirmative claims against them and objections to their proofs of claims should be dismissed.

> VADIM KAGAN, TATIANA KAGAN, KAGAN
> DEVELOPMENT KDC, CORP. and
> PROEXCAVATION CORP.
> By their attorneys,
>
> /s/ John H. Perten, Esq.
> John H. Perten (BBO# 548728)
> James P. Harris (BBO# 678283)
> SHEEHAN PHINNEY BASS & GREEN, P.A.
> 255 State Street, Fifth Floor
> Boston, MA 02109
> (617) 897-5600
> jperten@sheehan.com

Dated: December 7, 2018

{S1277445.1}                                    20