UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re:<br><br>LYMAN-CUTLER, LLC,<br>        Debtor. | )<br>)<br>)<br>)<br>)<br>) | Chapter 7<br>No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, et al.,<br>Plaintiffs/ Defendants in Counterclaim,<br><br>       v.<br><br>VADIM KAGAN, et al.,<br>Defendants/Plaintiffs in Counterclaim. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Adv. Proc. No. 16-01120 |

**DEFENDANTS' CONCISE STATEMENT OF DISPUTED MATERIAL FACTS IN OPPOSITION TO PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT**

Pursuant to Fed. R. Civ. P. 56, Fed. R. Bankr. P. 7056, MLBR 7056-1, and Mass. D. Ct. Local Rule 56-1, defendants Vadim Kagan, Tatiana Kagan, Kagan Development KDC, Corp. and ProExcavation Corp. submit this separate concise statement of material facts to which they contend there are genuine issues of material fact for purposes of their opposition to plaintiffs' motion for summary judgment. For the reasons set forth in their own motion for summary judgment, defendants do not believe there are any genuine issues of material fact that would preclude entry of summary judgment in their favor.

1. Filippov, Lipetsker and Kagan entered into an agreement to develop two high end luxury homes. Kagan was an experienced builder. (Kagan dep. at 15).

2. Lipetsker too had been involved in multiple real estate ventures. (Lipetsker dep. at 11-13).

{S1277447.1}

3. Filippov was a savvy and successful businessman who had negotiated multiple contracts and acted as the general contractor on the construction of his own home. (Filippov dep. at 16, 39).

4. The Operating Agreement delegated construction of the homes to Kagan. (OA, §5.2).

5. Filippov understood that Kagan would be hiring subcontractors. (Filippov dep. at 173).

6. The Operating Agreement does not restrict who he could hire as general contractor, subcontractors, or suppliers. It does not mandate that the project be put out for bid. It does not require that the Debtor or the other members pre-approve construction contracts. It does not cap construction costs.

7. The only reserved right in the Operating Agreement relative to the construction was that the house plans be approved. (OA, §5.2). Filippov gave this approval. (Filippov dep. at 204).

8. For his efforts in finding the property and orchestrating the construction, the parties agreed that instead of allocating profit in accordance with their equity interests, Kagan would receive 50% of the profits. (OA, §5.2, 8.1). Filippov understood and agreed that this meant "tons of money." (Filippov dep. at 31).

9. In an effort to save money, Kagan engaged his own company, Kagan Development KDC, Corp. ("KDC") to act as general contractor. (Kagan Aff., ¶ 2). Had he not engaged KDC, he would have had to engage someone else.

10. Hiring KDC enabled the use of subcontractors with whom KDC had extensive experience and could demand more favorable pricing. (Id.; Kagan dep. at 148).

11. By using KDC, the Debtor saved over $1 million dollars from what would have been charged to build the two homes had an outside general contractor been utilized. (Salmi report, Carnathan Aff., Exh. 21).

12. Filippov authorized Kagan to sign the KDC contract. (Kagan dep. at 236).

13. To further save money, KDC engaged ProExcavation as a subcontractor. ProExcavation did **much** more than just excavation: it did masonry, hardscaping, landscaping, snow removal, poured the basement slabs and foundations, put in storm drainage and utilities, graded, spread sod, paved the driveways and built retaining walls. (Carnathan Aff., Exh. 10).

14. Had ProExcavation not been used, the Debtor would have had to pay other subcontractors to do this same work.

15. Defendants' expert determined that ProExcavation's charges were fair and reasonable. (Salmi report, Carnathan Aff., Exh. 21).

16. Under the Operating Agreement:

    The Company's books and records shall be maintained in accordance with good record keeping practices and in accordance with federal and state income tax laws and regulations. All books and records of the Company shall be maintained at the principal office of the Company, …

    (OA, §6.1(f)).

17. The business address for the Debtor, both in the Operating Agreement and in the filings with the Secretary of State, is Filippov's residence. (Carnathan Aff., Exh. 1; Filippov dep., Exh. 11).

18. Filippov opened the Debtor's bank accounts under his personal address. (Filippov dep. at 70-72).

19. Filippov received monthly bank statements and copies of checks. (Id. at 72).

20. Filippov's wife kept the Debtor's financial books and records.  (Id. at 71).

21. Filippov's wife communicated regularly with KDC's bookkeeper, who sent her copies of checks, invoices and answered questions.  (Id. at 71-72; Brusenkova dep., Exh. 10).

22. Kagan himself had no responsibility to maintain the Debtor's accounts.

23. During construction, Kagan and Filippov tracked costs together.  (Kagan dep. at 167-69).

24. Kagan and Filippov spoke weekly and discussed every check.  (Id. at 170-71).

25. Filippov and Lipetsker visited the site and communicated with Kagan regularly.  (Filippov dep. at 164, Lipetsker dep. at 47, Kagan dep. at 142).

26. They took photos of the progress.  (Filippov dep. at 67).

27. Filippov observed KDC's name on the sign affixed to the site fence as the project contractor.  (Filippov dep. at 68).

28. As plaintiffs claim that the cost of construction was a fixed price, Filippov did not care how much was actually spent.  (Id. at 244).

29. Filippov claims that the general contractor should have been Classic Homes & Development, LLC, though he admits that they did no work on the site, submitted no invoices, received no payment, and that the Classic Homes contract did not reflect their agreement.  He admitted that the Classic Homes contract was merely an "internal" form signed for the purpose of applying for the construction loans.  (Filippov dep. at 203-211, Filippov Exh. 5).

30. Prior to 2013, KDC's accounting system was not very formal, as is typical of a small construction company.  To track costs, Kagan kept copies of invoices with notes, proposals, and dedicated project folders, monitored bank statements and checks, kept

{S1277447.1}                                       4

handwritten running tallies on job folders, and worked with their accountant. (Kagan dep. at 43; Gersh dep. at 26-30, 39, 49).

31. Each project had a separate account. (Kagan dep. at 43-44; Gersh dep. at 24).

32. In 2013, Kagan's accountant set up a QuickBooks program in KDC's office. Each month the accountant sent someone to KDC's office to make the appropriate entries. (Kagan dep. at 44-45; Kagan Aff., ¶3).

33. Kagan is not trained on Quickbooks and relied on the personnel sent over by the accountant. (Kagan Aff., ¶3).

34. In or about March 2014, KDC hired Kristina Brusenkova as a bookkeeper. (Kagan dep. at 45; Kagan Aff., ¶3).

35. Brusenkova had previously worked for KDC's accountant and was familiar with KDC's systems. (Brusenkova dep. at 41-42).

36. Brusenkova was responsible for keeping the books and records of both KDC and ProExcavation, and she relied on bank statements and checks to make her entries into Quickbooks. (Id. at 50-51, 60, 70-71; Kagan dep. at 48).

37. There are monthly and annual reconciliations of Quickbooks. If errors are noted, they are corrected. (Gersh dep. at 46)

38. Kagan relied upon Brusenkova to do her job competently. (Id. at 49). In October 2014, Brusenkova was fired after she embezzled money. (Kagan dep. at 50).

39. After Brusenkova's firing, Dan Gersh was hired as KDC's chief financial officer. In addition to an undergraduate and master's degree in accounting, he was trained as a fraud examiner. (Gersh dep. at 12, 17).

40. Gersh previously worked in the audit departments of several large companies. (Id. at 13-14).

41. When Gersh was hired, Kagan told him to familiarize himself generally with the companies' financial books and records. (Id. at 22-23).

42. By the time of Gersh's hire, the Lyman-Cutler project was winding down and Gersh had little to do with its financial records. (Id. at 24).

43. Recognizing that the transition to Quickbooks had not been smooth, on November 18, 2014, Gersh wrote to Filippov to introduce himself and stated, "My goal is to clean up, re-organize and square away any paperwork and bookkeeping inefficiencies here for Vadim and his partners. I have a fair amount to catch up relating to the past few weeks, so please let me know if there are any issues or any questions…" (Gersh dep. at 53, Gersh dep. Exh. 29). Gersh does not recall any response to his e-mail. (Id.)

44. When reviewing KDC's files, Gersh noted that the manner in which Brusenkova and the multitude of other bookkeepers kept the financial records of KDC was not workable for him. (Id. at 37-38).

45. As Gersh noted, each bookkeeper had her own way of tracking information. (Id. at 26-27, 43-45). For example, instead of filing invoices and proposals by project, Brusenkova filed them alphabetically by subcontractor name, meaning that there was no simple way to determine who worked on a particular project. (Id. at 54-55).

46. Although Brusenkova entered payments into Quickbooks, she did not enter total contractual obligation into Quickbooks, meaning there was no way to use Quickbooks to easily track total liabilities or outstanding amounts. (Id. at 60-61, 88).

47. There was also no consistency in how dates were entered into Quickbooks. Sometimes it was the date of an invoice, other times it was the date of a proposal, other times it was the date of the payment, or simply the date Brusenkova logged into the system. (Id. at 61-63).

48. Part of Gersh's goal was to move away from paper and have everything stored electronically for easy access. (Id. at 38). Without accurate Quickbooks data, KDC would be forced to rely on its paper record keeping which needlessly complicated and slowed the process.

49. With respect to individual projects, final accountings are typically made just before the sale of the property, as bills continue to come in after construction is completed. (Id. at 89).

50. Some of KDC's subcontractors were "old school" and did not submit formal invoices unless requested or until they wanted payment. (Id. at 32-33).

51. There are monthly and annual reconciliations of QuickBooks. If errors are noted, they are corrected. (Id. at 46).

52. The Quickbooks reports themselves do not necessarily correlate to the amount of defendants' claim. (Gersh dep. at 105-06).

53. QuickBooks is just database, only as accurate as the data entered, from which one can run reports reflecting snapshots in time.

54. In or about May 2015, Gersh was asked to run a Quickbooks aging report for accounts payable on the Lyman-Cutler project. (Id. at 69-70).

55. At that point, he had not "audited" the Lyman-Cutler account nor had any final accounting been performed. The report simply listed open invoices received as of that

date, based on the unverified information entered by Brusenkova and other bookkeepers. (Id. at 73-74, 79-80).

56. This preliminary number was utilized in Kagan's May 7, 2015 letter to Filippov and Lipetsker and represented the amount of money Quickbooks indicated as being owed to subcontractors who had submitted invoices as of that date. (Id. at 83-84). It was not a final number. (Id. at 84, 135-36).

57. The manner in which items are entered into Quickbooks often reflect tax planning, and then there are year-end reconciliations. (Gordon dep. at 72-73). Additionally, once there is a closing, numbers get moved to other reports (Id. at 79).

58. The entries into Quickbooks are not done contemporaneously with each transaction. (Gersh dep. at 39, 43).

59. KDC's accountant also makes entries into Quickbooks as part of their review of the accounts. Gordon dep. at 47).

60. When Filippov and Lipetsker questioned the number presented, Gersh went back to verify the Quickbooks entries. (Id. at 74).

61. He went back through the folders of invoices, proposals and contracts. He reviewed every check, credit card charge and entry in the bank statements. (Id.).

62. On those relatively few instances where he could not find back-up for bookkeeping entries, Gersh or Kagan contacted subcontractors to get replacement copies of what they had previously submitted or other back-up. (Id. at 74-75).

63. When Gersh identified input errors, he fixed them.

64. In this litigation, Plaintiffs received copies of KDC's Quickbooks reports for Lyman-Cutler before any changes were made and were also provided audit trail reports to enable

plaintiffs to track changes. (Gersh dep. at 62). With KDC's proof of claim, plaintiffs received copies of the hard data which was entered into Quickbooks: invoices, receipts, checks, bank statements and credit charges.

65. $760,000 of KDC's claim is to reimburse carrying costs that it fronted when Filippov failed to honor his obligations to pay those under the Operating Agreement.

66. KDC's expert has opined that the costs claimed are fair and reasonable. See Salmi Report at 11, Carnathan Aff., Exh. 21 ("it is our professional opinion that the total combined cost of $5,869,828.74 to build 88 Cutler Lane and 55 Lyman Road is both fair and reasonable and, in fact, significantly lower than market price…. Based on the foregoing, to a reasonable degree of professional certainty, the amount charged by ProExcavation for its services on the Project are fair and reasonable for the work performed.").

67. As to the prices charged by KDC, these were market prices based on Kagan's knowledge of the industry. (Kagan dep. at 250-51, 262).

68. As to material costs, the supply houses did take-offs from the plans to determine needed quantities and provide estimates. (Id. at 102-06).

69. Changes and increased costs to the project were discussed "constantly" and plaintiffs approved every additional expenditure. (Id. at 145, 152, 156).

70. Filippov has no memory ever requiring Kagan to obtain bids. (Filippov dep. at 173-74). Neither the KDC contract nor the Classic Homes contract require competitive bids.

71. KDC has its original construction agreement and plaintiffs never contested Kagan's signature on the agreement nor demanded its production. They demanded that the native electronic version of the contract, with all metadata, be produced so they could test their

theory that the contract was created after the litigation commenced and back dated. KDC promptly produced the original native file with metadata. (Affidavit of James P. Harris, ¶¶ 5-10; Opposition to Motion in Limine, pp. 5-6, both filed contemporaneously herewith).

72. Filippov and Lipetsker agreed that Kagan would be reimbursed for monies he advanced to pay additional carrying costs and construction costs. (Kagan dep. at 96-97).

73. Filippov and/or Lipetsker (without counsel) communicated with investors on other projects about his dissatisfaction on the Lyman-Cutler project. (Abramskiy dep. at 89-91; Kayserman dep. at 68-69; Lande dep. at 77-80).

74. The Operating Agreement is silent on how a managing member is to be selected. In the body of the agreement, it does not designate anyone as the managing member. The term "Managing Manager" under Filippov's signature line is not a defined term.

75. Kagan was told by Filippov and Lipetsker that he was the manager. (Kagan dep. at 194-96, 200-202; Filippov dep. at 163).

76. The body of the Operating Agreement refers to "Managing Members," in the plural. See OA, §6.1(a) ("The management and control of the operations of the Company and the maintenance, development, sales and leasing of the property of the Company shall rest with the Managing Member<u>s</u>.")(Emphasis added).

77. The Certificate of Organization was not prepared by or signed by Kagan.

78. As to the manager's consent signed as part of the loan documentation, Kagan did not read it and signed it because his attorney told him to. (Kagan dep. at 194-96).

79. Prior to litigation, plaintiffs threatened that if Kagan did not capitulate to their demands, they would vote to strip him of his interests in the profit. See May 13, 2015 letter ("I

assure you that Mr. Lipetsker is in full agreement with Mr. Filippov's position and plan and that together they have 81% of the vote required under paragraph 8.2 to make changes in the allocations of the profits and losses from the Project if Mr. Kagan impedes its successful completion." (Perten 2d Aff., Exh. 13).

80. After plaintiffs filed suit, the parties participated in a special meeting of the members. As set forth in the meeting minutes, Filippov and Lipetsker refused to discuss matters and voted against Kagan on nearly every substantive issue. (Perten 2d Aff., Exh. 15).

VADIM KAGAN, TATIANA KAGAN, KAGAN DEVELOPMENT KDC, CORP. and PROEXCAVATION CORP.

By their attorneys,

/s/ John H. Perten, Esq.
John H. Perten (BBO# 548728)
James P. Harris (BBO# 678283)
SHEEHAN PHINNEY BASS & GREEN, P.A.
255 State Street, Fifth Floor
Boston, MA 02109
(617) 897-5600
jperten@sheehan.com

Dated: December 7, 2018

{S1277447.1}                                        11