EXHIBIT 1

Exhibits: 1-26                    Volume 1, Pages 1-239
UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)
- - - - - - - - - - - - - - - - - - - - - - - - - - -
In Re:

                                  Chapter 7
LYMAN-CUTLER, LLC,                Case No. 15-13881-FJB

        Debtor
- - - - - - - - - - - - - - - - - - - - - - - - - - -
LYMAN-CUTLER, LLC,

        Plaintiff
v.                               Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
        Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - -
30(b)(6) DEPOSITION of KAGAN DEVELOPMENT KDC CORP.
30(b)(6) DEPOSITION of PROEXCAVATION
By VADIM KAGAN and VADIM KAGAN Individually
Thursday, May 3, 2018, 10:02 a.m.
O'Connor Carnathan and Mack LLC
1 Van de Graaff Drive, Suite 104
Burlington, Massachusetts
- - - - - - - - - David A. Arsenault, RPR - - - - - - - - -
daa@fabreporters.com   www.fabreporters.com
Farmer Arsenault Brock LLC
Boston, Massachusetts
617-728-4404

Vadim Kagan - Vol. 1 - 5/3/2018

### 14

1    in jewelry design?
2        A. Yes.
3        Q. Where did you receive that?
4        A. In Belarus.
5        Q. When was that?
6        A. 1987.
7        Q. Is that sort of -- is that a Belarus
8    equivalent to a high school graduation or college
9    graduation or something separate?
10        A. More like college.
11        Q. What's the name of the degree you received?
12        A. Jewelry designer and firearms engraver.
13        Q. That was the same training program?
14        A. Yes.
15        Q. Have you had any formal education since you
16    received that degree in 1987?
17        A. No.
18        Q. How long have you been in the construction
19    business, sir?
20        A. Since 15 years old.
21        Q. So you were in the construction business
22    when you were in Belarus?
23        A. Yes.
24        Q. Did you just continue in the construction

### 15

1    business once you came to this country?
2        A. Yes.
3        Q. So you have been in the construction
4    business in the United States for 23 years?
5        A. Yes.
6        Q. During the time that you have been in the
7    United States, have you always run your own company?
8        A. Yes.
9        Q. Do you hold any licenses in connection with
10    your construction business?
11        A. Yes.
12        Q. What licenses do you hold?
13        A. Construction supervisor license.
14        Q. How long have you had that?
15        A. I don't remember.
16        Q. What did you have to do to get your
17    construction supervisor license?
18        A. Take the course.
19        Q. Anything else?
20        A. Pass the exam.
21        Q. There's an exam?
22        A. Yes.
23        Q. Are there continuing education requirements
24    to maintain your construction supervisor license?

### 16

1        A. Yes.
2        Q. And have you taken the continuing education
3    courses to maintain your license?
4        A. Yes.
5        Q. What do you have to do by way of continuing
6    education to maintain your construction supervisor
7    license?
8        A. Eight hours course before the license
9    expires.
10        Q. How long before the license expires?
11        A. Every two years.
12        Q. Is there any kind of a code of ethics that
13    governs a construction supervisor?
14        MR. PERTEN: Objection.
15        A. Can you repeat the question? Specify?
16        Q. Are you aware of any code of ethics that
17    governs a construction supervisor?
18        MR. PERTEN: Objection.
19        A. Building a house?
20        Q. I'm trying to understand if there's any
21    written code of ethics. When you get your license,
22    do they expect you to live up to any code of ethics?
23        A. I don't remember.
24        Q. Would you agree with me, sir, that the

### 17

1    Lyman-Cutler project began in the fall of 2012,
2    around October 2012?
3        A. I think it was 2013.
4        Q. I'm not trying to be tricky at all but
5    trying to set date markers.
6        A. I do not remember the date exactly.
7        Q. If we think of it as starting on January 1,
8    2013, just to pick that date as a starting place,
9    how many prior homes had you built in the United
10    States before October 1, 2013?
11        MR. PERTEN: October 1, 2013?
12        MR. CARNATHAN: Right.
13        Q. Before October 1, 2013, how many other
14    homes had you built?
15        A. 30, 40.
16        Q. How many of those homes were in the
17    Brookline area?
18        MR. PERTEN: Objection.
19        A. One.
20        Q. Where was that?
21        A. Cleveland Road.
22        Q. If we again think of that date of October
23    1, 2013, thinking of the homes you built before that
24    date, how many of them sold for more than $3

---

**42**

1    A. Make the phone calls; and if I asked him to
2  cut the check, he's going to cut the check.
3    Q. Cut checks from where?
4    A. From the company.
5    Q. From KDC?
6    A. Yeah.
7    Q. What about from Lyman-Cutler?
8    A. Also.
9    Q. Also?
10    A. Yes.
11    Q. And your other projects, would he cut
12  checks for other projects too?
13    A. If I had other projects, yes.
14    Q. Was Mr. O'Grady responsible for issuing
15  invoices for KDC?
16    A. No.
17    Q. During the time that Mr. O'Grady worked for
18  KDC, who if anyone was responsible for issuing
19  invoices for KDC?
20    A. Me.
21    Q. In general terms, what were your day-to-day
22  duties working for KDC in that same time frame?
23    A. Make sure everything running proper in the
24  business.

---

**43**

1    Q. Who was responsible for keeping the books
2  for KDC during the time that Mr. O'Grady worked for
3  KDC?
4    A. Me.
5    Q. You personally kept the books for KDC?
6    A. What do you call books?
7    Q. Making the financial entries.
8    A. What entries?
9    Q. Did you maintain QuickBooks for KDC back
10  in 2011 through the fall of 2013?
11    A. No.
12    Q. Did you have any way of tracking the income
13  and expenses of KDC during the period of 2011
14  through the fall of 2013?
15    A. Yes.
16    Q. How did you track the income and expenses
17  of KDC during the period of 2011 through the fall
18  of 2013?
19    A. Bank statements and the invoices and the
20  checkbook.
21    Q. Anything else?
22    A. No.
23    Q. During that same time period, how did you
24  differentiate among the expenses and income for each

---

**44**

1  project?
2    A. Because each project have a separate
3  account.
4    Q. A separate bank account?
5    A. Yes.
6    Q. So other than the bank statements,
7  checkbook and invoices, you had no other way of
8  tracking the expenses and income for KDC during that
9  period of time of 2011 through the fall of 2013?
10    A. Yes.
11    Q. Is that also true with regard to each of
12  the projects that you were operating?
13    A. Yes.
14    Q. At some point did that change?
15    A. Yes.
16    Q. When did it change?
17    A. My previous CP create the QuickBooks for
18  the company.
19    Q. That's Mr. Agranovich?
20    A. Yes.
21    Q. When you say the company, are we talking
22  about KDC?
23    A. Yeah.
24    Q. When did Mr. Agranovich create the

---

**45**

1  QuickBooks for KDC?
2    A. Somewhere in 2013, probably.
3    Q. Once Mr. Agranovich created the QuickBooks
4  for KDC, who was responsible for inputting expenses
5  and income into those books?
6    A. He usually send the different employees
7  from his firm to our office and they entered the
8  number.
9    Q. Who in particular did Mr. Agranovich send
10  to your office to enter the numbers for you?
11    A. The last person was Kristina Brusenkova.
12    Q. There were others before Kristina
13  Brusenkova?
14    A. Yes. Elena Kladov and -- I don't know much
15  about QuickBooks. They just entered the numbers.
16    Q. Can you spell Elena?
17    A. Elena.
18    Q. Would you spell that, please.
19    A. E l e n a.
20    Q. What is her last name?
21    A. Kladov.
22    Q. Can you spell Kladov, please?
23    A. K l a d o v.
24    Q. At some point you hired Ms. Brusenkova to

---

Vadim Kagan - Vol. 1 - 5/3/2018

**46**

1  keep your books; isn't that right?
2    A. Yes.
3    Q. When was that?
4    A. March 2014.
5    Q. When Mr. Agranovich set up the QuickBooks
6  for KDC, did you also set up QuickBooks for the
7  various construction projects that you were
8  operating?
9    A. Probably.
10    Q. You don't recall either way?
11    A. It happens at some point.
12    Q. Did you set up a set of QuickBooks for
13  Lyman-Cutler?
14    A. Yeah.
15    Q. And then what about 50 Yarmouth Road, did
16  you have an LLC to build 50 Yarmouth Road?
17    A. Yes.
18    Q. Did you set up QuickBooks for 50 Yarmouth
19  Road?
20    A. I think so. Maybe not. I don't remember
21  if it was set under QuickBooks. Maybe.
22    Q. When Kristina Brusenkova came to work for
23  you, did you have any other employees other than you
24  and her?

**47**

1    A. Yes.
2    Q. Who else worked for you -- thinking about
3  KDC, to be clear. Did you have -- I'll start that
4  one over. Thinking just about KDC, what employees
5  did you have other than yourself and Ms. Brusenkova?
6    A. At some point we have another employee.
7  His name is Evgueni Agoureev. I didn't remember
8  exactly when he was hired and when he was, he left
9  the company. I don't know.
10    Q. What did you hire him to do?
11    A. He was the manager of the company,
12  construction supervisor, kind of.
13    Q. Did he do any work on the Lyman-Cutler
14  project?
15    A. Yes.
16    Q. What did Mr. Agoureev do on the
17  Lyman-Cutler project?
18    A. Making sure our subcontractors on an every-
19  day basis doing what we told them to do.
20    Q. Was Mr. Agoureev responsible for keeping
21  any of the books for KDC?
22    A. No.
23    Q. Was Mr. Agoureev responsible for keeping
24  any of the books for Lyman-Cutler?

**48**

1    A. No.
2    Q. When Ms. Brusenkova was responsible for
3  keeping the books, was she responsible for the
4  Lyman-Cutler books?
5    MR. PERTEN: Objection.
6    A. She is just entering the number in the
7  books by the invoices or the checks we cut or
8  something like that.
9    Q. So she was just responsible for entering
10  the numbers in the QuickBooks?
11    A. Yes.
12    Q. Was that true for KDC?
13    A. Yes.
14    Q. Was that true for Lyman-Cutler?
15    A. Yes.
16    Q. Did you maintain a set of QuickBooks for
17  Proexcavation?
18    A. Yes.
19    Q. Was Ms. Brusenkova responsible for entering
20  the numbers in the Proexcavation QuickBooks?
21    A. Yes.
22    Q. How did Ms. Brusenkova know what numbers to
23  enter into which books?
24    MR. PERTEN: Objection.

**49**

1    A. I don't know.
2    Q. Did you tell her what numbers to enter into
3  which books?
4    A. No.
5    Q. Did you have any understanding at all as to
6  how she knew what numbers to enter into which books?
7    A. Can you repeat the question?
8    Q. Do you have any understanding at all as to
9  how Ms. Brusenkova entered which set of numbers into
10  which set of books?
11    A. No.
12    Q. Did you supervise Ms. Brusenkova at all in
13  keeping the books?
14    A. I supervised her to make sure she cut the
15  right check. For entering the invoices, I don't
16  know.
17    Q. Am I right that you had a romantic
18  relationship with Ms. Brusenkova?
19    A. Yes.
20    Q. During what time period were you engaged in
21  a romantic relationship with Ms. Brusenkova?
22    A. Somewhere in the beginning of the summer
23  of 2013.
24    Q. When did it end?

Vadim Kagan - Vol. 1 - 5/3/2018

14

---

**50**

1    A. When did it end?

2    Q. It's not going on today, is it?

3    A. I don't know. Probably not.

4    Q. You don't know whether you are in a

5    romantic relationship with Ms. Brusenkova?

6    A. I don't know what you call romantic

7    relationship. What do you call a romantic

8    relationship?

9    Q. When did you sleep with her last?

10    A. That's a good question. Probably the

11    summer of 2014.

12    Q. When did she leave KDC?

13    A. In October 2014.

14    Q. Did she quit or did you let her go?

15    A. I fired her.

16    Q. Why did you fire her?

17    A. Embezzlement.

18    Q. It had nothing to do with the discovery by

19    your wife of the romantic relationship?

20    A. No.

21    Q. What do you say Ms. Brusenkova embezzled

22    from you?

23    A. What is the question?

24    Q. What are you accusing Ms. Brusenkova of

---

**51**

1    embezzling from you?

2    A. Wrote checks, payroll record. I don't

3    know. Some kind of double billing. She

4    overcharged -- she overpaid to herself on her

5    salary, and cut a bunch of checks from Kagan

6    Development to her name and her companies.

7    Q. How much money are you accusing

8    Ms. Brusenkova of embezzling?

9    A. I don't remember now.

10    Q. Can you say within $10,000?

11    A. Maybe 80,000, 90,000.

12    Q. Is that part of the lawsuit that is

13    currently pending between you and Ms. Brusenkova?

14    A. Yes.

15    Q. Did you alter any of the checks that were

16    submitted to the court in that lawsuit, Mr. Kagan?

17    A. Can you repeat the question?

18    Q. Did you alter any of the checks that were

19    submitted to the court in the Brusenkova lawsuit,

20    sir?

21    A. What do you mean altered the check?

22    Q. Change the memo line on any of the checks

23    before they were submitted to the court.

24    A. No.

---

**52**

1    Q. Do you know if Mr. Cohen altered any of the

2    checks that were submitted to the court in the

3    Brusenkova matter?

4    A. I don't think so.

5    Q. Was Ms. Brusenkova responsible for keeping

6    the books for KDC up until the time you fired her in

7    October 2014?

8    A. Yes.

9    Q. Was she also responsible for keeping the

10    books for Lyman-Cutler up until the time you fired

11    her in October 2014?

12    A. Yes.

13    Q. After you fired Ms. Brusenkova, who became

14    responsible for keeping the books for KDC?

15    A. Dan Gersh.

16    Q. When did Mr. Gersh start for the company?

17    A. Sometime in the beginning of 2015.

18    Q. If I suggested to you he started in

19    November 2014, would that sound right?

20    A. I don't think so. I don't remember.

21    Q. Was Mr. Agoureev still working for the

22    company KDC when Mr. Gersh started?

23    A. No.

24    Q. Why did Mr. Agoureev leave?

---

**53**

1    A. I don't know.

2    Q. He quit?

3    A. Yeah.

4    Q. When did you last talk to Mr. Agoureev?

5    A. Yesterday.

6    Q. What did you talk about?

7    A. He's still doing my subcontracting project.

8    Q. What kind of subcontracting does

9    Mr. Agoureev do?

10    A. If I have to assemble something, install

11    something, he's doing it.

12    Q. Does he assemble or install certain types

13    of something?

14    A. Kitchen cabinets.

15    Q. Anything else?

16    A. Moldings, any wood-related item.

17    Q. Where were you when you talked to

18    Mr. Agoureev?

19    A. On the street.

20    Q. Did you talk about your deposition?

21    A. No.

22    Q. Did you talk about this lawsuit?

23    A. No.

24    Q. During the time period when Ms. Brusenkova

---

Vadim Kagan - Vol. 1 - 5/3/2018

25

---

94

1    A. No, we can't do that.

2    Q. At no time did you talk about borrowing the

3    carrying costs from the bank; is that right?

4    A. No, can't do that, no. We never do

5    that.

6    Q. You never do that?

7    A. No, can't do that. We can't.

8    Q. And so the final budget was 1.6 million?

9    A. Construction cost, yeah.

10   Q. So it's your testimony that at this first

11   meeting you were discussing a $1.5 million

12   construction budget. Did I get that right?

13   A. Yes.

14   Q. And that was for a 5,000-square-foot home,

15   cookie-cutter?

16   A. Yes.

17   Q. And so for another hundred thousand dollars

18   you were going to go to a 7400-square-foot home that

19   is not cookie-cutter; is that right?

20   A. Where did you get the other hundred

21   thousand?

22   Q. Because at the October 25 meeting you have

23   a $1.5 million budget. And you just told me that

24   was for a 5,000-square-foot, cookie-cutter home.

---

95

1    A. Yes.

2    Q. And your budget in the middle of 2013 was

3    1.6 million, and you told me that was for a 7400-

4    square-foot, not cookie-cutter home. Did I screw

5    that up?

6    A. No.

7    Q. So for a hundred thousand dollars you were

8    being to build a home that was 2400 square feet

9    bigger than the one you talked about at the October

10   25, 2012 meeting. Is that what you are telling me?

11   A. And we ended up with Filippov and Lipetsker

12   putting $250,000 into the project. I said if -- we

13   have a conversation. Filippov said, I spoke with

14   the bank and they are not going to give us more than

15   1.6 for construction. I said, And we have a mutual

16   agreement with Kagan Development to add the money

17   during the process and going to be reimbursed at the

18   end of the project when the project is sold. That's

19   our deal.

20   Q. I'm not sure I got that.

21   MR. CARNATHAN: Can you read that one

22   back.

23   (Answer read by the reporter.)

24   Q. I'm not entirely sure I understand what you

---

96

1    just told me. Are you saying that the deal was that

2    you would spend more on construction than 1.6?

3    A. Yes.

4    Q. And when did you reach that deal?

5    A. When we finalized the plans.

6    Q. In the middle of 2013?

7    A. Yes.

8    Q. So where were you when you made that

9    agreement?

10   A. We met multiple times.

11   Q. So you were at the site?

12   A. Yes.

13   Q. It is you and who else?

14   A. Filippov and Lipetsker.

15   Q. So the three of you were at the site?

16   A. Yes.

17   Q. If I understood you right, Alex told you he

18   could only borrow 1.6 million per house for

19   construction.

20   A. Yes.

21   Q. And then what did you say to him?

22   A. I said, If you don't want to lose the deal,

23   if you want to invest only $2 million, I can add

24   more during the construction process.

---

97

1    Q. Did you say how much more?

2    A. About 2 or 300,000 per house.

3    Q. So you were saying that the budget was

4    going to be more than 1.6 million. Is that what

5    you're telling me?

6    A. Yes.

7    Q. Did you put that in writing anywhere?

8    A. No. We just have a friendly conversation.

9    Q. So you met at the project site and Filippov

10   and Lipetsker told you to just add more money and

11   they would make it up to you later?

12   A. Yeah, that was our agreement before we

13   started the project.

14   Q. Do you have anything in writing to confirm

15   that?

16   A. No. We have agreement, the Kagan

17   Development agreement, the construction agreement

18   and what we use for future reference. Mainly this

19   is based on this agreement, I can add more money, I

20   can pay carrying costs, and blah, blah, blah, and

21   money will be returned after project was sold.

22   Q. So just in an effort to get this straight.

23   You are at the site. As best you can recall, please

24   tell me everything that the three of you said to one

---

Vadim Kagan - Vol. 1 - 5/3/2018

---

102

1  Q. So is it your testimony, sir, that by
2  April 2013 you knew that the $1.6 million budget was
3  not going to be enough to build the houses?
4  A. We thought maybe it was going to be enough,
5  maybe we need more. If we need to have more, we
6  will put more money in and we will cover some
7  expenses. Maybe the subs will give us more
8  discount.
9  Q. Who did the plans for you for the houses?
10  A. Architect.
11  Q. Who was the architect?
12  A. RAV.
13  Q. RAV?
14  A. Yes.
15  Q. So when they do the plans, what exactly do
16  they give you?
17  A. Plans, framing plan and architectural plan.
18  Q. What about specifications?
19  A. No specifications.
20  Q. No specifications?
21  A. No.
22  Q. So when you go to buy the lumber, how do
23  you know how much lumber to buy?
24  A. Because they have a framing plan. You send

---

103

1  the plan to the lumber company, and the lumber
2  company charges you per item.
3  Q. So does it tell you on the framing plan how
4  many board feet you need for different things?
5  A. Yeah, they usually send us the invoices,
6  yes.
7  Q. I mean right on the plans, do the plans
8  tell you you have to buy 10,000 square feet?
9  A. No. It says how many 2-by-4s, how many
10  rafter, how many joists. And from what I understand
11  they have estimators at the lumber company that can
12  put exact numbers for each item.
13  Q. So you take these plans, you send them to
14  the lumber company, and the lumber company figures
15  out how much of each thing you need?
16  A. Yes.
17  Q. So if I remember right, you bought
18  construction materials from Home Depot; is that
19  right?
20  A. Yes.
21  Q. You bought them from National Lumber,
22  right?
23  A. Yes.
24  Q. Did you buy it from Huntington?

---

104

1  A. No, Huntington TV.
2  Q. There was a third one.
3  A. Merrimac.
4  Q. Horner Millwork?
5  A. Yes.
6  Q. Did you give the plans to Home Depot?
7  A. We didn't buy the lumber at Home Depot.
8  Q. What did you buy at Home Depot?
9  A. Handles, doors, sometimes siding, different
10  things.
11  Q. How did you know how much siding to buy?
12  A. National Lumber usually do the calculation.
13  Q. So you bought the siding at National
14  Lumber?
15  A. Yes.
16  Q. And you gave National Lumber a copy of the
17  plans?
18  A. They have the plans before we started the
19  project, full set of plans.
20  Q. You have to give them the plans, right?
21  A. Yes.
22  Q. Did you give the plans to Horner Millwork?
23  A. Horner Millwork not dealing with the
24  construction materials. Horner Millwork is the

---

105

1  finish carpentry. You can do the moldings, only the
2  finish materials. We usually have a meeting with
3  the Horner salesperson representative and my finish
4  carpenter. We do the take-off, write everything we
5  need. They do the estimate. If I approve the
6  estimate, we buy the materials from them.
7  Q. How do you know how much crown molding, for
8  example, to buy from Horner Millwork?
9  A. Because we usually have a take-off from
10  finish carpenter and from the Horner people. They
11  usually calculate and measure every room. Every
12  vendor.
13  Q. They don't use the plans. They come and
14  actually measure the house?
15  A. Absolutely.
16  Q. Who was your finish carpenter?
17  A. Joe Campbell, Campbell Construction.
18  Q. So Joe Campbell calculated how much, for
19  example, crown millwork to buy?
20  A. He is figuring out his part, how much he
21  has to charge me per foot of installation for each
22  item. Horner will figure out how much materials
23  they have to bring for each room based on our
24  specification and based on our request.

Vadim Kagan - Vol. 1 - 5/3/2018

28

106

1     Q.  What do you mean by your specification?
2     A.  Verbal specification.  We talk about the
3  crown molding.  Since we are doing this with this
4  company, we work with them on an everyday basis.
5  They know exactly what we are going to use on this
6  house because we specify with them.  Spare parts,
7  doors, numbers, sizes, prices per foot.
8     Q.  So let's just say hypothetically that we
9  would like to figure out whether the amount of
10  framing material that was bought maps correctly to
11  the size of the house that was built.  Is there any
12  way for us to tell that from what you have provided
13  us?
14        MR. PERTEN:  Objection.
15     A.  We send you the invoices from lumber
16  company how much they charge us to do the house for
17  all the materials.
18     Q.  Is there any way for me to check if the
19  correct number of, say, 2 by 4s that was bought to
20  frame the house -- I don't know if 2 by 4s were
21  used -- but if I want to know if you bought the
22  right number, what can I look at in the materials
23  you provided to see if you bought the right number
24  of 2 by 4s?

107

1        MR. PERTEN:  Objection.
2     A.  The National Lumber record and the
3  construction plan, you can mesh this together.
4     Q.  I'll come back to that.
5        (Marked, Exhibit 7, Email string and
6  documents.)
7     Q.  Looking at Exhibit 7, Mr. Kagan, please
8  ignore the top part where it was forwarded to your
9  attorney.  I'm looking at the forwarded
10  conversation, Subject:  Presentation draft for
11  Thursday.  Are you with me?
12     A.  Yes.
13     Q.  It shows an email from Dmitriy Zhukovskiy
14  on Tuesday, October 23, 2012 to Nickolai Lipetsker,
15  Vadim Kagan and Boris Maiden.  Do you see that?
16     A.  Yes.
17     Q.  Do you remember this email from October 23,
18  2012?
19     A.  After the discovery, due to discovery, yes.
20  Now I remember.
21     Q.  Can you translate the Russian for me?
22     A.  "I will print this tomorrow and send, bring
23  this tomorrow and send, like bring in person, with
24  Anna and Nick."

108

1     Q.  Who is Anna?
2     A.  Anna, what I believe, is Dmitriy
3  Zhukovskiy's wife.
4     Q.  And in the paragraph above that where it
5  refers to Borya, is that Mr. Maiden?
6     A.  Yes.
7     Q.  If you look at the attachment to this
8  document, sir, you will see that it includes the
9  estimated project financials and risk analysis,
10  correct?
11     A.  That's what it says there.
12     Q.  You will agree with me that Mr. Filippov is
13  not part of this email chain, right?
14     A.  Probably not.  I don't see him here.
15     Q.  Definitely not.  Take your time.  He's not
16  on here, right?
17     A.  He's not on.
18     Q.  In fact, it is among you, Mr. Lipetsker and
19  Mr. Maiden and Mr. Zhukovskiy, correct?
20     A.  Yes.
21     Q.  This is two days before the October 25,
22  2012 meeting, right?
23     A.  Yes.
24     Q.  And in fact it is titled Subject:

109

1  Presentation draft for Thursday, right?
2     A.  Yes.
3     Q.  If you turn the page, the second page, this
4  is I believe Mr. Zhukovskiy emailing Mr. Perten
5  saying:  "This is the email with exhibits provided
6  to Kagan asking him to confirm that this is what he
7  wanted."
8        Have I read that correctly?
9     A.  Where is this?
10     Q.  Looking at the top of the second page.
11     A.  Lyman-Cutler versus Kagan.  What is that?
12     Q.  I believe this is a statement by
13  Mr. Zhukovskiy to Mr. Perten when he forwarded him
14  the document.  Have I read it correctly?
15     A.  "This is email with the exhibits provided
16  to Kagan asking to confirm if this is what he
17  wanted."  Whatever it says there.
18     Q.  Does looking at this email have any impact
19  on your testimony about who provided the numbers in
20  this presentation?
21     A.  Zhukovskiy.
22     Q.  So you still deny that you provided the
23  numbers?
24     A.  Yeah, I didn't provide the numbers.  It's

Vadim Kagan - Vol. 1 - 5/3/2018

142

1    A. Lighting, doors, crown molding, baseboards.
2  We did a built-in library, which is not specified in
3  the plan.
4    Q. So during the project you decided to
5  upgrade absolutely every material that was used in
6  the house. Is that what you are telling me?
7    A. I didn't decide myself. We all decided to
8  do it.
9    Q. Who decided to do it?
10   A. Me, Lipetsker and Filippov.
11   Q. Was this all in one go or did you do it as
12  you went?
13   A. Through multiple conversation. I spoke
14  with Lipetsker every day. I spoke with Filippov
15  once a week, once in two weeks. Lipetsker was there
16  every single day at the construction site talking to
17  my guys, smoking cigarettes with them, sometimes
18  bring the beer there, whatever.
19   Q. So was there a moment where you sat down
20  and decided we are going to spend X more dollars on
21  the finishes and materials or was it as you did each
22  thing you decided?
23   A. When we did each thing we talked about
24  those specifically and we go as we go.

143

1    Q. Did you keep any kind of record of what
2  additional money you were spending on each thing?
3    A. No. Everybody verbally. Everything
4  discussed with Lipetsker and Filippov. If we want
5  to upgrade to copper, we talk about copper. If we
6  upgrade the shingles, we talk about shingles,
7  siding, finish carpentry, kitchen cabinets,
8  everything.
9    Q. And they agreed at each step that you would
10  upgrade the materials?
11   A. Yes.
12   Q. The flooring, for instance, you started
13  out, and looking at your $1.6 million budget you had
14  a $48,000 budget for hardwood, carpeting, labor and
15  material. Do you see that? It is two-thirds of the
16  way down the budget.
17   A. Flooring, 48,000.
18   Q. So you had some kind of a discussion with
19  Filippov and Lipetsker that said let's spend 48,000
20  on flooring? Is that what happened?
21   A. No, we did not spend 48,000 on flooring.
22  I believe it was much less than 48,000 on flooring.
23  We say are we going to keep this money for the
24  kitchen cabinets or something like that; some of the

144

1  number is bigger, some are smaller; you deduct from
2  one thing and add it to another thing. This is how
3  you build a house. You see where you can save the
4  money and see where you add the money.
5    Q. In what way did you upgrade the flooring?
6  What were you going to use and what did you use?
7    A. Our first idea, two and a quarter hardwood
8  floor. We ended up doing three and a quarter,
9  because more high-end product, the stain, more coat
10  of the poly there. Some rooms want herringbone.
11  That brings the cost up.
12   Q. Did you do any math to figure out how much
13  you were increasing the cost of the project by when
14  you decided to upgrade the flooring?
15   A. Yes.
16   Q. Was that written down somewhere?
17   A. No.
18   Q. What happened?
19   A. Based on the conversation with Lipetsker
20  and Filippov, we agreed on the number.
21   Q. Did you write anything down like we were
22  going to spend 48,000 and now we are going to spend
23  60,000 or anything like that?
24   A. Probably write it down somewhere. Maybe I

145

1  did. It looks like I did. I don't know.
2    Q. If I tell you I've never seen a document
3  like that, do you have a document like that that you
4  haven't given us?
5    A. If you don't have it, it doesn't exist. We
6  don't have it.
7    Q. I think you mentioned upgrading the rails
8  on the staircases. Did I get that right?
9    A. Yes.
10   Q. In what way did you upgrade the rail on the
11  staircases?
12   A. Using different materials, sizes, poles.
13   Q. Was there ever a point, Mr. Kagan, where
14  you said okay, we started out with $1.6 million
15  budget and now our budget is going to be 1.8, 1.9
16  million, some higher number?
17   A. No. We did this as we go. Our budget
18  raising every month.
19   Q. Did you believe you had any duty to your
20  partners as the builder to keep track of what the
21  price would be for the construction?
22       MR. PERTEN: Objection.
23   A. We talked about 1.6 to 1.650, to 1.7 to
24  1.720, 1.8; we had this conversation constantly.

Vadim Kagan - Vol. 1 - 5/3/2018

38

146

1    Q. When did you decide to upgrade the tile
2    work?
3    A. When we start doing the tile, before we
4    picked the tile material.
5    Q. What were you going to use and what did you
6    end up using?
7    A. We initially planned to spend average,
8    around 4 bucks a foot for tile. We ended up going
9    to much more. I don't remember. I have to look at
10   the numbers.
11   Q. I'm looking at your original budget. Where
12   do I find the tile? Was it interior stone and tile?
13   A. Yes.
14   Q. So you originally budgeted $36,000; is that
15   right, just the tile?
16   A. This is the full spreadsheet. This is not
17   the each itemized item.
18   Q. I don't understand what you mean. Is there
19   another spreadsheet that shows each itemized item?
20   A. No. This is usually spreadsheet what we
21   prepare for the bank. And the bank -- if you look
22   at another exhibit that you showed me before -- this
23   prepared for bank. Since we work with Rockland
24   Trust and other banks, this is how they disburse us

147

1    the money.
2    Q. You prepared this for the bank?
3    A. I prepared it for the bank, yes.
4    Q. Did you try to put in numbers that you were
5    actually planning to spend on each item?
6    A. We had to stay at 1.6. Some items can be
7    lower; some items can be bigger.
8    Q. When you first made this spreadsheet, you
9    actually were planning to build the house for 1.6
10   million. Did I get that right?
11   A. Yes.
12   Q. So how did you tally up your 1.6 million?
13   A. Based on this number, based on number of
14   square feet to build the house. This is how you can
15   say how much the number is to build the house.
16   Q. Did you work from the plans that you
17   obtained from RAV?
18   A. Yes, I worked from the plans.
19   Q. When you looked at the plans, did you say
20   I'm going to spend X on framing because I know how
21   much lumber goes into a 7400-square-foot house?
22   A. If you look at this plan, you can see how
23   much money you have to spend based on your previous
24   experience, based on how much lumber costs, how much

148

1    windows and doors cost, how much it costs.
2    Q. Did you make any specific calculations
3    about how much you were going to spend on windows?
4    Did you count the windows and say I'm going to spend
5    500 a window and do the math?
6    A. I have no documents. This is everything
7    that is in the plan. This is the plan, initial
8    drawing not finalized. It doesn't specify what kind
9    of windows we are doing. This is initial plan.
10   Q. Did you go out and get any bids from
11   subcontractors in order to arrive at the $1.6
12   million number?
13   A. I don't have to get bids from other
14   subcontractor.
15   Q. Why didn't you have to get bids from other
16   subcontractors?
17   A. Because price is what my subcontractor gave
18   to me for the past 15 years. These are the best
19   numbers on the market.
20   Q. Which subcontractors have you been working
21   with over the last 15 years?
22   A. Basically 70 percent of these people.
23   Q. EST Plumbing?
24   A. Yes.

149

1    Q. V&D heating and cooling?
2    A. Yes.
3    Q. DeCosta?
4    A. DeCosta probably six years or so.
5    Q. Dream Flooring?
6    A. Dream Flooring only did for us -- they
7    usually do our high-end project for a different job.
8    Q. Was this a high-end project?
9    A. A high-end project.
10   Q. So Dream Flooring worked on this project?
11   A. Yes.
12   Q. How did you upgrade the retaining wall?
13   A. You can use Versa-Lok, natural stone; you
14   can use concrete wall, you can do dry wall.
15   Q. What were you originally planning to do for
16   the retaining wall and what did you end up doing?
17   A. We originally planning to do Versa-Lok. We
18   ended up with high-end fieldstone wall.
19   Q. In what way does upgrading the retaining
20   wall increase the likelihood of profit on the
21   project?
22   A. Different price for different people who
23   want to see different finish.
24   Q. In what way did you upgrade the crown

Vadim Kagan - Vol. 1 - 5/3/2018

150

1  molding on the project?
2  A. From the simple crown molding, simple
3  colonial molding you can do three-piece molding. I
4  believe this is two- or three-piece crown molding on
5  this project.
6  Q. What about the bathroom cabinets and
7  fixtures, did you upgrade those or did you go with
8  what you originally planned?
9  A. Are you talking about bathroom cabinets and
10  vanities?
11  Q. We have the bathroom cabinets and vanities.
12  The line item says $16,000. Did you upgrade those?
13  A. I don't remember.
14  Q. What about the bathroom fixtures and
15  enclosures, did you upgrade those?
16  A. I don't remember.
17  Q. I think you mentioned the kitchen cabinets.
18  Did you upgrade those?
19  A. A little, I think.
20  Q. In what way did you upgrade the kitchen
21  cabinets?
22  A. Put the cabinets, different brand.
23  Q. What did you originally plan to do and what
24  did you end up doing?

151

1  A. Initially planning to go with one brand and
2  you end up with a different brand, different style.
3  Q. Can you be more specific?
4  A. From three types of cabinets. One type of
5  cabinet is frameless cabinet. Second type of
6  cabinet is frame cabinets. And another type is high
7  end, inset cabinet. We ended up with the inset with
8  the high-end cabinet called Greenfield beaded inset
9  cabinetry.
10  Q. How about the decking, how did you upgrade
11  the decking?
12  A. Do we have decking here?
13  Q. I think when you were listing off things
14  that you upgraded, decking was on the list. Was
15  there decking?
16  A. Yes, there was decking.
17  Q. Did you upgrade the decking?
18  A. I'll let you know in a second. Let me see.
19  I believe the original decking should be wooden
20  decking. We end up doing the concrete bluestone
21  decking in the front of the house. The whole entire
22  front area. It is supposed to be wood. We ended up
23  doing the stone.
24  Q. So you were going to originally put a wood

152

1  deck in front of these $5 million houses and then
2  you decided to do stone?
3  A. We originally want to do wood decking and
4  we decided to do stone.
5  Q. And you met with Mr. Lipetsker and
6  Mr. Filippov and discussed going from wood to stone
7  and they said fine?
8  A. Yes.
9  Q. Was there anything on the list, Mr. Kagan,
10  where you decided to go with just what you had
11  budgeted originally?
12  A. It was initial number we took. We put the
13  number in and go forward.
14  Q. So at absolutely every step you decided to
15  spend more money than the budget?
16  A. Yeah, because we ended up building $5.5
17  million home. We go to 5.5 slowly; from original
18  4.5, 4.7-something we go to 5.5.
19  Q. And at each step in the process you talked
20  to Mr. Filippov and Mr. Lipetsker and they said go
21  ahead and spend more money?
22  A. Absolutely.
23  Q. Do you have anything in writing between you
24  and them that said go ahead, spend more money?

153

1  A. I don't have anything in writing between
2  these two people, from what I understand.
3  Q. Did you upgrade the sprinklers?
4  A. I don't remember.
5  Q. What about the fireplaces, you said you
6  upgraded the fireplaces?
7  A. Yes.
8  Q. In what way did you upgrade the fireplaces?
9  A. First of all, we add extra fireplace
10  outside. The stone on the chimneys. A fireplace in
11  the master bedroom.
12  Q. You added fireplace that wasn't on the
13  plans?
14  A. Yes.
15  Q. Where was that?
16  A. Outside on the patio.
17  Q. And you upgraded the stone in the
18  fireplace. Did I understand that right?
19  A. Yes.
20  Q. What was the original plan for the stone?
21  A. Original plan was the shingles in the
22  fireplace. We ended up doing New England fieldstone
23  because it looks much better in expensive home.
24  Q. Am I right that the original plan was that

Vadim Kagan - Vol. 1 - 5/3/2018

40

---

154

1  one home was going to have a brick exterior and one
2  was going to have a stone exterior?
3      A. Yes.
4      Q. And you ended up doing shingles; is that
5  correct?
6      A. No, not correct. It was small part in the
7  front has to be brick. Another house small part has
8  a little bit stone. The whole house has shingles
9  from day one -- not shingles but clapboard.
10     Q. Did you upgrade the exterior in some
11 fashion for each home?
12     A. Yes.
13     Q. Thinking first about Lyman Road, in what
14 way did you upgrade the exterior?
15     A. From clapboard to stone and shingles.
16     Q. You are saying the original plan was all
17 clapboard and you added some stone?
18     A. Yes.
19     Q. What about with Cutler Lane?
20     A. The same thing, different color. Instead
21 of stone do the brick.
22     Q. So the original plan would be all clapboard
23 and instead you went with some brick?
24     A. Some parts of the brick.

---

155

1      Q. And again, you met with Filippov and
2  Lipetsker and said this is how we are going to do it
3  and they said fine?
4      A. Yes.
5      Q. When you met with them for approval for
6  each item, did you tell them how much more each item
7  would be?
8      A. Yes.
9      Q. When you told them how much it was going to
10 cost to upgrade the fireplace, how much did you tell
11 them it was going to cost them?
12     A. I don't remember. We have to put the
13 number together. I have to find out what model we
14 are putting, put the numbers together for the
15 stonework.
16     Q. With regard to any of the upgrades you are
17 testifying to, are you able to tell me how much more
18 you spent than planned, any of them at all?
19     A. We have to put the number on paper
20 together, do the math. You have to spend some time
21 for it.
22     Q. Well, did you spend some time on it at the
23 time? Did you figure out how much more you were
24 proposing to spend?

---

156

1      A. I spend some time before I propose it to
2  someone.
3      Q. So in each instance you went to
4  Mr. Filippov and Lipetsker and said I want to spend
5  a thousand dollars, 10,000, whatever the number is,
6  and you told them how much?
7      A. Yes.
8      Q. And in each instance they said fine?
9      A. They said fine so long as we make our 20
10 percent, whatever, 15, 16, 17 percent.
11     Q. How was it that they expected to still make
12 their 20 percent if the cost kept going up?
13         MR. PERTEN: Objection.
14     A. To what point is the cost going up? I
15 don't understand the question.
16     Q. You said in each instance you were telling
17 them you proposed to spend more on each element for
18 the home; is that right?
19     A. Yes.
20     Q. As the cost goes up for the home, doesn't
21 that diminish the profit?
22     A. No. The original plan to sell the house
23 was 4.7, 4.5, something like that. We end up
24 selling for 5.5. We end up putting the house on the

---

157

1  market for 5.5.
2      Q. Each time you went to them and said I want
3  to spend more money on this element of the house and
4  you told them it was going to cost you X more
5  dollars, making up a number, $10,000 --
6      A. I'm not making up the number.
7      Q. I am for the hypothetical. I am saying you
8  go to them and say I want to upgrade the retaining
9  wall and it will cost $10,000 more, making up the
10 number.
11     A. I will tell them if you do the Versa-Lok,
12 it will be $25 a square foot. If you do stone, it
13 will cost 50 bucks a foot. But if you put the house
14 on the market on 5.5 you can not put Versa-Lok wall.
15     Q. Did you also quote for them how much more
16 you were going to charge for the house based on that
17 particular upgrade?
18     A. How much I charge more? I didn't charge
19 anything.
20     Q. If I'm following you right, the idea was
21 that you were going to spend more money on materials
22 and sell the house for more money. Is that fair?
23     A. Yes.
24     Q. But you also did it on a piecemeal basis.

---

Vadim Kagan - Vol. 1 - 5/3/2018

166

1    A. You can't say it is completed. It is part
2 of the landscaping. Landscaping is much more money.
3 Landscaping 2 percent, decks 1 percent. Each means
4 something was done at the time, which is the bank
5 can see as the landscaping or part of the
6 landscaping, and this is why advanced for us is
7 $16,000, by completion of something.
8    Q. Let me try it this way. If I look at
9 January 13, 2014 and it asks for money for roof
10 shingles, does that mean that the bank came out to
11 see if there were roof shingles on the property?
12    A. Yes.
13    Q. So we can at least conclude that by
14 January 2014 there were some roof shingles installed
15 on the house, right?
16    A. Yes.
17    Q. So just to try to tie this one up, are you
18 able to tell me when during the project you first
19 decided to diverge from the $1.6 million budget?
20    A. I didn't. We all decide. I didn't decide
21 things for myself.
22    Q. Are you able to tell me when you first
23 discussed with Mr. Lipetsker and Mr. Filippov that
24 you would diverge from the $1.6 million budget?

167

1    A. After we start construction, like two
2 months after that, something like that.
3    Q. As the construction went on, did you keep
4 track of how much overbudget you were?
5    MR. PERTEN: Objection.
6    A. Based on our conversation with Filippov and
7 Lipetsker all the time. We increase a certain
8 amount of price per item; this is our price going
9 up.
10    Q. But did you keep anywhere, anywhere at all,
11 some kind of a running list of how much more you had
12 spent than you had originally budgeted?
13    A. If I did at that time, I usually mark
14 somewhere, when we talking to Filippov, he getting the
15 piece of paper, he putting the numbers together, and
16 that's it. I said okay, good, we go.
17    Q. As the project went on, did you have any
18 idea at all how much you had spent on construction
19 costs?
20    A. I had idea we are going to spend more. We
21 are going to spend another few hundred thousand
22 more. After we spend the money, we will figure out
23 how much to price the house to make 20 percent.
24    Q. Was there anywhere where you kept some kind

168

1 of a ledger where you could keep track of how much
2 more you were spending than you had budgeted?
3    A. Filippov keeping a lot of records. He is
4 our money guy.
5    Q. He was tracking the checks that you were
6 writing out of Rockland Bank account, right?
7    A. He's not only tracking the checks. He is
8 tracking a lot of stuff. He put the numbers
9 together, the spreadsheet. I don't know what he
10 did. He's our money guy. He has to provide us the
11 financial, enough money to build the house.
12    Q. You are saying it was Mr. Filippov's job to
13 keep track of how much you were spending on
14 construction?
15    A. How much we are spending. Not me. I'm not
16 spending anything myself. We are spending, three of
17 us together, me, Lipetsker and Filippov.
18    Q. You guys were in a joint venture together,
19 right?
20    A. Yes.
21    Q. Did you owe Mr. Filippov and Mr. Lipetsker
22 a fiduciary duty?
23    MR. PERTEN: Objection.
24    A. What's the fiduciary duty?

169

1    Q. Did you have some kind of duty to manage
2 the cost on the project?
3    MR. PERTEN: Objection.
4    A. Yes.
5    Q. Did you have some kind of duty to try to
6 get the best price from your subcontractors?
7    A. Yes.
8    Q. Did you have a duty to buy the right amount
9 of materials?
10    A. Absolutely.
11    Q. Did you have a duty to keep track of how
12 much you were spending as you did the project?
13    A. Yes.
14    Q. And did you do that?
15    A. We did this together with Lipetsker and
16 Filippov. We all did, three of us.
17    Q. For some period of time you would take
18 photographs of checks and send them to Mr. Filippov
19 and Lipetsker, right?
20    A. Yes.
21    Q. Eventually you stopped doing that around
22 February of 2014 or thereabouts? Is that right?
23    A. Because we all have same access to bank
24 account and know what we are doing, we don't need

Vadim Kagan - Vol. 1 - 5/3/2018

44

---

170

1  this no more. If they have a question of how much
2  they can spend, they can ask me and I can tell them.
3  They have a bank statement and the bank statement
4  of what Filippov is receiving every month, I believe
5  a copy of every check that we spend.
6      Q. Did you have an understanding of how you
7  thought Filippov could keep track of what you were
8  spending compared to what you had budgeted?
9      A. Based on our conversation with Filippov and
10  copy of check which he got and our every week
11  conversation, he understand exactly where we are.
12      Q. Before you finished construction, was there
13  ever a moment when you knew how much the
14  construction was going to cost in full?
15      A. We all knew, approximately a few hundred
16  thousand over budget. We are finalizing the number.
17  We don't know how much more we have to spend to
18  finish.
19      Q. As you sit here right now, do you know how
20  much you spent on the construction?
21      A. 1.8, 1.850, 1.860, 1.8-and-a-half or
22  something.
23      Q. You say that Mr. Filippov and Lipetsker
24  approved those expenditures in realtime as they

---

171

1  happened; is that right?
2      A. Yes.
3          (Marked, Exhibit 13, Email string, top
4  email 7/24/14.)
5      Q. Do you recognize Exhibit 13, Mr. Kagan?
6      A. Let me read it.
7          MR. PERTEN: This appears to be two
8  different documents stapled together.
9          MR. CARNATHAN: They are consecutive
10  Bates numbers and consecutive times.
11          MR. PERTEN: I believe it is your
12  document.
13      Q. Starting with the first page, Mr. Kagan, do
14  you recognize that email exchange?
15      A. I see it right now. I don't remember if I
16  get it at the time. I see this email from 2014,
17  yes, right here.
18      Q. Do you remember Mr. Filippov asking you for
19  weekly progress updates?
20      A. We talked about weekly updates all the
21  time. We spoke always about update.
22      Q. Did you give him any weekly updates?
23      A. I give them verbally, did updates every
24  week.

---

172

1      Q. Every week right through the project?
2      A. Almost every week.
3      Q. If you were giving him weekly updates all
4  the way through the project, why is he sending you
5  an email asking you for weekly updates?
6          MR. PERTEN: Objection.
7      A. Maybe he is a person who likes to write
8  emails. I'm a person who talks on the phone. I am
9  at the construction site.
10      Q. If you turn the page to the second page of
11  Exhibit 13, looking now at the email at the top,
12  which appears to be an email from you to Alex on
13  July 25, 2014 at 7:02 p.m., do you recall sending
14  that email to Alex?
15      A. Maybe. It is 2014. Come on?
16      Q. As you read it right now, do you recognize
17  this as an email you sent?
18      A. Let me read it.
19      Q. Would you agree with me that's an email you
20  sent to Mr. Filippov on July 25, 2014?
21      A. I see I probably sent it. I don't
22  remember. I probably did.
23      Q. Do you have any reason to deny sending it?
24      A. No.

---

173

1      Q. So as of July 2014 you say that: The sod
2  installation is scheduled for next Friday and final
3  cleaning next Friday on 88 Cutler. That means the
4  project will be 98 percent done.
5          Did I read that correctly?
6      A. Yes.
7      Q. On 55 Lyman you say: Right now we are
8  doing the hardwood floor and when you finish that
9  you will be completed with 90 percent of this house.
10          Did I read that correctly?
11      A. Yes.
12      Q. When do you recall finishing the houses?
13          MR. PERTEN: Objection.
14      A. I don't remember.
15          (Marked, Exhibit 14, Defendants/
16  plaintiffs-in-counterclaim's answer to plaintiffs'
17  amended adversary complaint, counterclaims and
18  demand for jury trial.)
19      Q. Do you recognize Exhibit 14, Mr. Kagan?
20      A. Yes.
21      Q. What is it?
22      A. It says defendants/plaintiffs-in-
23  counterclaim's answer to plaintiffs' amended
24  adversary complaint, counterclaims and demand for

---

Vadim Kagan - Vol. 1 - 5/3/2018

50

---

194

1   obligation to construct two homes at the location
2   currently known as 77 Lyman Road in Brookline,
3   Massachusetts in accordance with the plans,
4   including drawings, supplied by Mr. Kagan and
5   approved by the managing member."
6           Have I read that correctly?
7       A.  Yes.
8       Q.  So you understood that it was your job to
9   construct the two homes, right?
10      A.  Yes.
11      Q.  And you were to do that in accordance with
12  plans that you were to supply and have them approved
13  by the managing member, correct?
14      A.  No.  It was plans was created actually six
15  months after this was signed.  I had no plans at
16  that time.
17      Q.  When you did achieve plans, you needed to
18  have them approved by the managing member.  Isn't
19  that what this says?
20      A.  Yes.  But I always understand I'm the
21  managing member.
22      Q.  You say you are the managing member?
23      A.  Yes.
24      Q.  Why would it say that you would supply the

---

195

1   plans and then approve them yourself?
2       A.  I don't know.
3       Q.  If we look at the signature page, second to
4   last page, Mr. Filippov is identified as the, quote,
5   "managing manager."  Do you see that?
6       A.  Yeah, managing manager.
7       Q.  Didn't you understand that Mr. Filippov was
8   the managing member?
9       A.  I don't know what is the managing manager.
10  I don't know what is this term.
11      Q.  Is it a typo by Mr. Maiden?
12      A.  Boris said sign it, I signed it.  I don't
13  know if there was a signature there or not.
14      Q.  At any time during the project did you
15  understand that Mr. Filippov was the managing
16  member?
17      A.  No, I'm always the managing member.
18      Q.  Did you attend the closing of the bank
19  loan, Mr. Kagan?
20      A.  No.
21          (Marked, Exhibit 20, Lyman-Cutler, LLC
22  manager's certificate and member's consent.)
23      Q.  Do you recognize Exhibit 20, Mr. Kagan?
24      A.  Yes.  It says manager's certificate and

---

196

1   member consent, yes.
2       Q.  Is that your signature down at the bottom,
3   assented to by all members, Vadim Kagan?
4       A.  Yes.  It says Vadim Kagan, yes.
5       Q.  This document at least purports to be dated
6   December 28, 2012, right, witness my hand and seal
7   above the signature block?
8       A.  Yes.
9       Q.  Under that it is signed by Alex Filippov,
10  manager, right?
11      A.  Yes.
12      Q.  In Paragraph 3 of this document it states:
13          "I am the manager of the LLC and the
14  person authorized on behalf of the LLC to execute,
15  acknowledge, and deliver instruments affecting an
16  interest in real property owned or held by the LLC?"
17          Have I read that correctly?
18      A.  Yes.  But they always said I'm the managing
19  member.
20      Q.  You signed this saying Alex was the
21  managing member, right?
22          MR. PERTEN:  Objection.
23      A.  When I signed it I put my signature and
24  Boris said you are good to go.

---

197

1       Q.  So did you read that before you signed it?
2       A.  No.
3           (Marked, Exhibit 21, Letter, 5/11/15,
4   Cohen to Filippov.)
5       Q.  Have you seen this letter before,
6   Mr. Kagan?
7       A.  I think so.
8       Q.  This is a letter from Joseph Cohen to Alex
9   Filippov, right?
10      A.  Yes.
11      Q.  Dated May 11, 2015?
12      A.  Yes.
13      Q.  Mr. Cohen identifies himself as the
14  strategic business manager for Kagan Development
15  Corporation.  Do you see that?
16      A.  Yes.
17      Q.  In May 2015 was Mr. Cohen the strategic
18  business manager for Kagan Development?
19      A.  Yes.
20      Q.  In the very first paragraph he says:
21          "Dear Mr. Filippov, as you are
22  undoubtedly aware, the sale of either property owned
23  by Lyman-Cutler, LLC has not borne fruit.  While you
24  are the managing partner in the LLC and as such the

---

FARMER ARSENAULT BROCK LLC

Vadim Kagan - Vol. 1 - 5/3/2018

### 198

1  party authorized to conduct the sale of real
2  property, as a practical matter Vadim Kagan is the
3  operating partner in the venture."
4      Have I read that correctly?
5  A. What are you reading?
6  Q. The first paragraph, sir.
7  A. It says managing partner. With other paper
8  it says managing manager. What is the difference
9  between managing partner and managing manager?
10  Q. Semantics, right? We all understood that
11  Alex was the manager.
12      MR. PERTEN: Objection.
13  A. I never understand he was the manager.
14  Maybe you understand it. Reading this I don't
15  understand it. He's the managing partner. If I'm
16  the manager, he's my managing partner. I don't
17  know. This is how I'm reading this.
18  Q. What distinction are you making between
19  managing partner and manager?
20  A. If I'm the manager, he's my managing
21  partner, is what I understand.
22  Q. Mr. Cohen apparently believed that he was
23  the party authorized to conduct the sale of the
24  property. Do you see that?

### 199

1      MR. PERTEN: Objection.
2  A. Where do you get this?
3  Q. Mr. Cohen says: "You are the managing
4  partner in the LLC and as such the party to conduct
5  the sale of the real property. As a practical
6  matter, Vadim Kagan is the operating partner."
7  I read that correctly, right?
8  A. I don't know. I don't know what does it
9  mean in legal language.
10  Q. Two paragraphs down Mr. Cohen says:
11      "Reciprocally, as you are the managing
12  partner authorized on behalf of the LLC to engage
13  professionals to assist with accounting and legal
14  issues," et cetera.
15      Mr. Cohen is again recognizing Mr.
16  Filippov as the managing partner authorized to
17  engage professionals for the LLC, right?
18  A. How did you get this? I get it
19  differently.
20      MR. PERTEN: Objection.
21  Q. How are you interpreting that?
22  A. I'm interpreting I'm the manager, I'm
23  managing the company. He's my managing partner.
24  This is what I'm understanding.

### 200

1  Q. Did you review this letter before Mr. Cohen
2  sent it out?
3  A. Yeah.
4  Q. You authorized him to send it out?
5  A. Yes. Managing partner. He is my partner.
6  I'm the manager. I'm the partner. That's how I
7  read this.
8  Q. We can return to Exhibit 4. I'm looking at
9  Subparagraph 6.1 B 6, the very bottom of Page 6. It
10  says:
11      "The managing member hereby agrees to
12  list the properties with Tatiana Kagan. In order to
13  remove Tatiana Kagan as a listing broker by December
14  31, 2014 will require a written consent of the
15  members owning at least 81 percent of the percentage
16  interest in the company. After December 31, 2014 no
17  such consent shall be required."
18      Have I read that correctly?
19  A. Probably you know how to read this.
20  Q. Would you agree with me that the managing
21  member there refers to Mr. Filippov?
22      MR. PERTEN: Objection.
23  A. Managing member agrees. He's the managing
24  manager. I don't know what this is, managing

### 201

1  member. I don't know where you get this idea. I
2  don't understand.
3  Q. Who do you contend is the managing member
4  referred to in that paragraph?
5  A. Me, Vadim Kagan. I always understand I'm
6  the manager of the company.
7  Q. Is there anything in this document that you
8  can point me to that says you are the managing
9  member?
10  A. Alex Filippov the managing member?
11  Everybody is saying I am the manager. The managing
12  member hereby agree. Maybe all the managing members
13  agree. I don't know.
14  Q. What's the basis for your belief that you
15  are the managing member?
16  A. Everybody says from day one I'm the
17  managing member, I'm the manager of the company.
18  Boris, Filippov, Lipetsker, do this, do that, cut
19  the checks. They are all saying this. When I have
20  to sign the leasing agreement, Filippov say go sign
21  the leasing agreement, no problem, review it and
22  sign it. I sign the agreement. He said I am the
23  manager. He review. I send him the email. He said
24  confirm, we are good to go, but at least I can

Vadim Kagan - Vol. 1 - 5/3/2018

52

### 202

1  consult with my, as you are saying, managing
2  partner. So he's my partner. Right?
3       MR. CARNATHAN: Mark this one as Exhibit
4  22.
5       (Marked, Exhibit 22, Text message,
6  4/23/15.)
7       Q. Do you recognize Exhibit 22, Mr. Kagan?
8       A. This is some kind of printout? What is
9  that? Text, email? What is that?
10      Q. I believe it is a printout of a text
11 message that you sent to Alex Filippov on April 23,
12 2015 at 4:45:53 in the afternoon.
13      A. First of all, I don't get from anywhere
14 that I sent this to Filippov. This is a printout on
15 a piece of paper. I can read it.
16      Q. Is that your phone number, 617-828-2903?
17      A. Yes.
18      Q. Is that Alex's phone number, 617-306-4965?
19      A. I don't know. I have to check to see his
20 phone number.
21      Q. Do you admit sending this text message to
22 Alex on April 23rd?
23      A. I didn't remember. I see this exhibit in
24 front of me. You want me to read it?

### 203

1       Q. Yes.
2       A. "We have to put 55 Lyman on the market and
3  take 88 Cutler off. 55 is staged, freshly painted,
4  floors refinished. We need to sign C21's agreement
5  to put it on the market."
6       Q. So did you send that text to Mr. Filippov
7  on April 23rd?
8       A. I don't know. Probably. If he says so,
9  yes.
10      Q. My question is, if you were the managing
11 member and Alex was not the managing member, why on
12 April 23rd, 2015 did you need Alex to sign the
13 Century 21 agreement?
14      A. Because I also respect his opinion, what
15 are we doing here, keep him informed. This is why I
16 spoke with him on the phone multiple times. Maybe I
17 sent him a text message. I don't know.
18      Q. You are saying you didn't really need him
19 to sign it. You were just being courteous to your
20 partner?
21      A. Did I say he has to sign it? "We have to
22 put 55 Lyman on the market and take 88 Cutler off.
23 55 is staged, freshly painted, floors refinished.
24 We need you to sign C21 agreement to put it on the

### 204

1  market." Maybe we talk about it and he says he will
2  sign it. I don't know.
3       Q. My point in asking you about this is you
4  say you need him to sign it.
5       A. I don't know why the text message. I talk
6  to him on the phone. Maybe he asked me to send him
7  a text message to confirm to sign something. I
8  don't know.
9       Q. So you remember the text message where
10 confirmed receiving your email. You remember that
11 part?
12      A. Now I remember.
13      Q. But you don't remember asking him to sign
14 it.
15      A. When you start reading what's April in
16 April 24, 2015, now 2018, maybe I remember something
17 more than before you showed me some piece of paper.
18      Q. If you would return to me to Exhibit 4, the
19 operating agreement. I'm again at Paragraph 5.2 on
20 Page 4. We talked about substantial completion
21 earlier today.
22      The last sentence of Paragraph 5.2 says:
23 "It is specifically understood by all members that
24 Mr. Kagan's compensation for this duty is outlined

### 205

1  in Section 8.1 below."
2       Have I read that correctly?
3       A. Yes, you read this correctly.
4       Q. The duty we are referring to is the duty to
5  build the two homes, right?
6       A. I have to read this.
7       Q. I'm just trying to nail down the duty. The
8  duty is in 5.2, sir.
9       A. You are referring to 8.1.
10      Q. That's the compensation. We are going to
11 turn to that next. I don't want to derail you. If
12 you want to read this, by all means, but we will
13 need three days, not two.
14      A. You said 5.2?
15      Q. I want you to confirm for me that the duty
16 we are talking about in Paragraph 5.2 is described
17 two sentences earlier where it says your duty to
18 construct the two homes.
19      A. My duty is to construct two homes, yeah.
20      Q. That duty is what you are going to get
21 compensated for as outlined in 8.1, right?
22      MR. PERTEN: Objection.
23      A. I don't know. I have to read 8.1.
24      Q. Please do. Let's turn to 8.1 now.

Vadim Kagan - Vol. 1 - 5/3/2018

56

### 218

1  obligations under the operating agreement. KDC's
2  best accounting as to the unreimbursed construction
3  costs as of May 7, 2015 total $758,025.56 exclusive
4  of interest charges, with approximately 50,000 of
5  additional vendor costs anticipated."
6       Have I read that correctly?
7       A. Yes.
8       Q. So who calculated the $758,025.56?
9       A. I don't remember who did this.
10      Q. It was not you?
11      A. No.
12      Q. Who else did you have available to make the
13  calculation at that time?
14      A. The date of this? 2015. Maybe Dan. Maybe
15  he took the number from the QuickBooks. Maybe.
16  What I believe, what I believe it is initial number.
17  This is the initial number what has to be reimbursed
18  right away. I don't want to pay the carrying costs
19  no more. The company owes me $750,000. I want to
20  be reimbursed at least this number so I can continue
21  doing what I'm doing. The guys said they were going
22  to reimburse me the money and they didn't.
23      Q. I think earlier you told me that you had
24  substantially completed construction by the end of

### 219

1  March 2014, right?
2       A. Substantially completed. I think we have a
3  different interpretation of what is substantial
4  completion, a difference in the percentage of this.
5       Q. I don't understand what you mean.
6       A. Substantially completed, yes.
7       Q. You got the certificates of occupancy for
8  the properties on October 2, 2014, right?
9       MR. PERTEN: Objection.
10      A. We usually do the certificate of occupancy
11  whenever we can get. We don't need the certificate
12  of occupancy. Sometimes we get a certificate of
13  occupancy two days before the closing. Nobody
14  rushing to get certificates of occupancy.
15      Q. You will agree with me, sir, that the
16  construction was done by October 2014; isn't that
17  right?
18      A. Probably.
19      Q. So why is it that you are just sending this
20  bill for unreimbursed construction costs or this
21  claim for unreimbursed construction costs in
22  May 2015?
23      A. I didn't finalize the number yet. The guys
24  said we are going to get the money, we are going to

### 220

1  get the money, we will give you the money but nobody
2  is giving me the money. This is why I go Alex Pyle
3  and say we have to ask for the money.
4       Q. If you had met on many occasions with
5  Mr. Lipetsker and Mr. Filippov during which they
6  agreed to all the expense overruns, why did you hire
7  an attorney to tell them how much they owed?
8       A. Because I don't know how to write a letter.
9       Q. Is this May 7th letter, sir, the very first
10  time that you told them the cost overruns were
11  $758,025.56?
12      A. No.
13      Q. When did you first tell them the cost
14  overruns were that figure?
15      A. According to our project, every month we
16  exceeding our initial monthly expense in
17  construction, and at some point we get to a
18  different number. I don't remember the month
19  exactly.
20      Q. Can you give me any estimate of when you
21  exactly you told them the cost overruns were going
22  to be this big?
23      A. I don't remember if you talk about a
24  specific number. First of all we are 200 over

### 221

1  budget, then 400 over budget, then 500 over budget;
2  I don't remember exactly.
3       Q. And you are not sure who did the
4  calculation. It could have been Mr. Gersh; it could
5  have been Mr. Cohen?
6       A. Maybe we get something from QuickBook
7  computer. This is not the final number. This is
8  like the initial number which we need to be paid
9  right away. This was not the final number.
10      Q. Mr. Pyle's letter says: With approximately
11  $50,000 of additional vendor costs anticipated.
12  Have I read that correctly?
13      A. Yeah, but I don't know. Definitely 650,000
14  was not the full amount.
15      Q. As of May 7, 2015 you represented that you
16  thought it might be another 50,000 outstanding,
17  right?
18      A. I don't know. I'm not the bookkeeper. We
19  get this number from QuickBooks or whatever. I know
20  this was not the final number, but this was the
21  number that we need exactly at least to cover to
22  Kagan Development to continue doing the business.
23      Q. Did you review this letter before Mr. Pyle
24  sent it out?

234

1  that your compensation for building the two houses
2  shall be 50 percent of the net profits?
3      A.  Simply.  I didn't charge in the 50 percent
4  for the company, I didn't charge for my personal
5  time what I'm spending for this.
6      Q.  So you were going to get 50 percent of the
7  profits for your personal time plus pay your own
8  company a half a million dollars for managing the
9  construction?
10      MR. PERTEN:  Objection.
11      A.  That was the deal, yes.
12      Q.  That's the deal.
13      A.  I don't know, yeah.
14      Q.  And you went to Lipetsker and Filippov and
15  they said great, no problem, that's fine, Vadim?
16      A.  They had no problem.
17      MR. PERTEN:  Objection.
18      Q.  When we look back at the budget that you
19  submitted to the bank, the $1.6 million budget,
20  there's no line item there for a general
21  contractor's fee, is there, sir?
22      A.  Yes.
23      Q.  That's right?
24      A.  Yes.

235

1      Q.  So in effect, the cost of construction was
2  going to go immediately from 1.6 million to no less
3  than 2.1 million, right, with your fee?
4      MR. PERTEN:  Objection.
5      A.  This is our deal.  Then I get this in the
6  end.
7      Q.  Why don't we briefly look at the profit
8  scenarios.  I'm back to Exhibit 6.  Recognizing that
9  you say that these were approximate and that the
10  construction costs could vary, the very best case on
11  these profit scenarios is about 1.4-odd million
12  dollars if the property sold for 5.3 million in 20
13  months.  Do you see that?
14      A.  Yeah.  But it is template.  I don't know
15  what it is.
16      Q.  How was anybody else going to make a profit
17  on this project if you increased the cost of every
18  material in the house and agreed to pay yourself
19  half a million dollars as a general contractor fee?
20      A.  We pulled the number together.  Nobody had
21  a problem with it.
22      Q.  Everybody just thought they were going to
23  make money even paying you a half a million dollars
24  for your general contractor fee and increasing the

236

1  cost of all the materials?
2      A.  Yes.  Put the numbers together; the numbers
3  worked.
4      Q.  When did you have that conversation with
5  Mr. Lipetsker and Mr. Filippov?
6      A.  Before we start building the house.
7  Because I said if we are not going to sign the
8  agreement, I'm not going to build the house.  We
9  have to sign this agreement.  The company has to
10  lend the money to the project and this has to be
11  official somehow.
12      Q.  This contract that you signed with yourself
13  was after you got the construction loan, right?
14      MR. PERTEN:  Objection.
15      A.  I did not sign this for myself.
16      Q.  You are the only guy that signed this.  You
17  signed for KDC.
18      A.  Mr. Filippov said just go sign it, you are
19  the manager.
20      Q.  Mr. Filippov said go sign it, you are the
21  manager?
22      A.  Yeah, absolutely.
23      MR. CARNATHAN:  Why don't we pause
24  there.      (4:35 p.m.)

237

1      CERTIFICATE OF COURT REPORTER
2
3
4
5
6      I, David A. Arsenault, Registered
   Professional Reporter, do certify that the
7  deposition of VADIM KAGAN, in the matter of
   Lyman-Cutler vs. Kagan, et al., on May 3, 2018, was
8  stenographically recorded by me; that the witness
   provided satisfactory evidence of identification, as
9  prescribed by Executive Order 455 (03-13) issued by
   the Governor of the Commonwealth of Massachusetts,
10  before being sworn by me, a Notary Public in and for
   the Commonwealth of Massachusetts; that the
11  transcript produced by me is a true and accurate
   record of the proceedings to the best of my ability;
12  that I am neither counsel for, related to, nor
   employed by any of the parties to the above action;
13  and further that I am not a relative or employee of
   any attorney or counsel employed by the parties
14  thereto, nor financially or otherwise interested in
   the outcome of the action.
15
16
17
18  Transcript review was requested of the reporter.
19
20
21
22
23  _____  5.15.18
24  David A. Arsenault, RPR

FARMER ARSENAULT BROCK LLC

Exhibits: 74-81                    Volume 2, Pages 240-305
                    UNITED STATES BANKRUPTCY COURT
                      DISTRICT OF MASSACHUSETTS
                          (EASTERN DIVISION)
- - - - - - - - - - - - - - - - - - - - - - - - - - -
In Re:
                                    Chapter 7
LYMAN-CUTLER, LLC,                  Case No. 15-13881-FJB

            Debtor
- - - - - - - - - - - - - - - - - - - - - - - - - - -
LYMAN-CUTLER, LLC,

            Plaintiff
v.                                  Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
            Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - -


CONTINUED 30(b)(6) DEPOSITION OF KAGAN DEVELOPMENT
  KDC CORP., 30(b)(6) DEPOSITION OF PROEXCAVATION
   By VADIM KAGAN, and VADIM KAGAN, Individually
          Wednesday, May 23, 2018, 1:53 p.m.
           O'Connor Carnathan and Mack LLC
           1 Van de Graaff Drive, Suite 104
              Burlington, Massachusetts


      - - - - - - - - - Janis T. Young, RDR, CRR - - - - - - - - -
      jty@fabreporters.com   www.fabreporters.com
            Farmer Arsenault Brock LLC
               Boston, Massachusetts
                  617-728-4404

Vadim Kagan - Vol. 2 - 5/23/2018

250

1      Q.   Did anybody help you?

2      A.   I don't remember.

3      Q.   What kind of software did you use to create

4   that proposal?

5      A.   I used to have Excel spreadsheet on my

6   computer, and you just fill in the number and change

7   the order.

8      Q.   Do you still have that computer?

9      A.   I don't know.

10      Q.   Do you still have that document in

11   electronic format on your computer somewhere?

12      A.   I don't know.

13      Q.   When we look at the different line items,

14   the different prices, are you the fellow who came up

15   with those prices?

16      A.   Yes.

17      Q.   So how did you arrive at those numbers?

18      A.   Based on the scope of work.

19      Q.   So, for instance, when we did the cut and

20   cap the water and sewer service line, $3,900, what

21   was your basis for charging $3,900 to cut and cap

22   the water and sewer service line?

23      A.   This is the market price, which is

24   including scope of work to do this particular job.

FARMER ARSENAULT BROCK LLC

Vadim Kagan - Vol. 2 - 5/23/2018

251

1      Q.   How did you know that was the market price?

2      A.   Because I do multiple bids from different

3   contractors and different companies, and the usual

4   market price is $4,500 and up, and for our

5   companies, I usually do $3,900, which is including

6   police details, backfill, and whatever is necessary

7   that needs to be done to do this job.

8      Q.   Did you have police details at 77 Lyman

9   Road when you were cutting and capping the water and

10   sewer line?

11      A.   Absolutely, yes.

12      Q.   How much did you pay the police?

13      A.   I don't remember.

14      Q.   Who actually did the work to cut and cap

15   the sewer line at 77 Lyman Road?

16      A.   I don't remember.

17      Q.   Is there any record in the document

18   somewhere where we can look to figure out who

19   actually did the work?

20      A.   I don't know.   Probably.

21      Q.   You'll agree with me that at the time in

22   September 2013 you were the only employee of

23   Proexcavation?

24      A.   Maybe.

FARMER ARSENAULT BROCK LLC

Vadim Kagan - Vol. 2 - 5/23/2018

262

1   build into a Proexcavation proposal?

2       A.   No.

3       Q.   It's different every time?

4       A.   We do the job based on the market price,

5   per foot, per square foot, per yard, and per item;

6   and we're trying to keep all these prices below the

7   market price.

8       Q.   Is there any profit built into this

9   proposal for Proexcavation?

10      A.   Should be some.

11      Q.   Can you tell me within $50,000 how much

12  profit was built into this proposal for

13  Proexcavation?

14      A.   I don't know right now.

15      Q.   Do you have any kind of record anywhere

16  that would show you how much profit you built into

17  that Proexcavation proposal?

18      A.   I don't know.

19      Q.   Do you know of anyone who would know?

20      A.   I don't.

21              (Marked, Exhibit 75, Lyman-Cutler, LLC

22  transactions by account, KDC 01274 - 1278.)

23              (Marked, Exhibit 76, Lyman-Cutler, LLC

24  transactions by account, KDC 01299 - 1304.)

Vadim Kagan - Vol. 2 - 5/23/2018

303

1              CERTIFICATE OF COURT REPORTER

2              I, Janis T. Young, Registered Professional

3      Reporter and Certified Realtime Reporter, do certify

4      that the deposition of VADIM KAGAN, in the matter of

5      Lyman-Cutler v. Kagan, et al., on May 23, 2018, was

6      stenographically recorded by me; that the witness

7      provided satisfactory evidence of identification, as

8      prescribed by Executive Order 455 (03-13) issued by

9      the Governor of the Commonwealth of Massachusetts,

10     before being sworn by me, a Notary Public in and for

11     the Commonwealth of Massachusetts; that the

12     transcript produced by me is a true and accurate

13     record of the proceedings to the best of my ability;

14     that I am neither counsel for, related to, nor

15     employed by any of the parties to the above action;

16     and further that I am not a relative or employee of

17     any attorney or counsel employed by the parties

18     thereto, nor financially or otherwise interested in

19     the outcome of the action.

20

21     Transcript review was requested of the reporter.

22

23     _____  6/1/18

24     Janis T. Young, RDR/CRR