EXHIBIT 3

ORIGINAL

Exhibits: 1-30                    Volume 1, Pages 1-230
         UNITED STATES BANKRUPTCY COURT
           DISTRICT OF MASSACHUSETTS
               (EASTERN DIVISION)
- - - - - - - - - - - - - - - - - - - - - - -
In Re:
                                  Chapter 7
LYMAN-CUTLER, LLC,                Case No. 15-13881-FJB

         Debtor
- - - - - - - - - - - - - - - - - - - - - - -
LYMAN-CUTLER, LLC,

         Plaintiff
v.                                Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
         Defendants
- - - - - - - - - - - - - - - - - - - - - - -

         DEPOSITION OF LYMAN-CUTLER, LLC, By Its
             Representative ALEX FILIPPOV, and
                of ALEX FILIPPOV Individually
          Wednesday, April 25, 2018, 10:06 a.m.
             Sheehan Phinney Bass + Green, P.A.
                  255 State Street, 5th Floor
                     Boston, Massachusetts

         - - - - - - - - - Janis T. Young, RDR, CRR - - - - - - - - -
           jty@fabreporters.com    www.fabreporters.com
                     Farmer Arsenault Brock LLC
                        Boston, Massachusetts
                           617-728-4404

**Page 14**

1  Q. Have you ever entered into any business
2  ventures with Mr. Maiden?
3  A. No, absolutely not.
4  Q. Did Boris Maiden represent you individually
5  at any point in connection with the formation of
6  Lyman-Cutler, LLC?
7  A. No.
8  Q. Did you have counsel representing you in
9  the formation of Lyman-Cutler, LLC?
10  A. It's a complex question. I will reply to
11  you.
12       Basically I was doing this myself as a
13  consultant; but I consulted with Mark Watson, and
14  Mark Watson is the closing attorney for Belmont
15  Savings Bank that I knew before in my dealing with
16  Belmont Savings Bank, and he provided me some legal
17  help reviewing the LLC agreement.
18       He wasn't on a retainer; he actually
19  didn't charge me, ever. He said, don't worry.
20  Q. Can we agree as we go forward that when I
21  say Lyman-Cutler you'll understand that I mean
22  Lyman-Cutler, LLC?
23  A. Yes, I do.
24  Q. So I don't need to say LLC each time; will

**Page 15**

1  you understand that?
2  A. Yes.
3  Q. In connection with the formation of Lyman-
4  Cutler, did you consult with any accountants?
5  A. I might have consulted with my tax
6  accountant. I don't remember, to tell you the
7  truth.
8  Q. Who is your tax accountant?
9  A. My tax accountant is Arthur Sandberg.
10  Q. Sandberg?
11  A. Yes; of Creeden's, I forget the name of the
12  company. He has been my tax accountant for the past
13  14 years, I'm guessing. I might have talked to him;
14  I don't remember.
15       Yes; I did talk to him, as a matter of
16  fact. Now I remember; it was an issue that I asked
17  him about capital gains and how that will be
18  treated, the profit, et cetera. Yes, I did ask him.
19  Q. Other than your running of Belmont Telecom,
20  have you been involved as an investor in any
21  business ventures other than Lyman-Cutler?
22  A. No.
23  Q. Have you ever been involved in any
24  construction projects?

**Page 16**

1  A. No, except building my own house.
2  Q. So you built your own house in Belmont?
3  A. I rebuilt my own house in Belmont;
4  basically razed it and built the house in Belmont.
5  Q. And did you actually do the construction,
6  or did you hire the people to --
7  A. I hired the contractor. And we were
8  monitoring this contractor, and were very much
9  involved with the full construction business.
10  Q. When was that?
11  A. That was in 2000.
12  Q. Who is the contractor?
13  A. Oh, I don't remember his last name. First
14  name Roman; I don't remember the last name.
15  Q. Do you remember the name of the company?
16  A. No. I can dig it out, but it was a long
17  time ago.
18  Q. Are you familiar with a gentleman by the
19  name of Dmitriy Zhukovskiy?
20  A. Yes.
21  Q. How do you know Mr. Zhukovskiy?
22  A. He's the nephew of Nick Lipetsker's wife.
23  I knew the whole family a long time ago, so I met
24  Mr. Zhukovskiy a couple times at social meetings.

**Page 17**

1  Q. Is Mr. Zhukovskiy a friend of yours as
2  well?
3  A. No. We just know each other. We met each
4  other, we got introduced; that's it. I know who he
5  is.
6  Q. So you met him through Mr. Lipetsker?
7  A. Yes.
8  Q. Because he's a relative of Mr. Lipetsker?
9  A. Well, if you consider a nephew of his wife
10  a relative, yes.
11  Q. Now, with respect to the Lyman-Cutler
12  project, how did that first come to your attention?
13  A. Nick Lipetsker -- actually, I do remember
14  it. It was a social meeting in my brothers's house,
15  as far as I remember.
16       And we just were chatting, and he said,
17  look, there is a business opportunity; would you be
18  interested to invest? And he started telling me
19  about Mr. Kagan and how great he was.
20  Q. What's the name of your brother?
21  A. Mikhail Filippov; M-i-k-h-a-i-l, Filippov.
22  The same last name.
23  Q. Where does he reside?
24  A. He resides 273 Prospect Street in

**30**

1  Mr. Maiden's office and the driving tour, did you
2  have discussions with anybody regarding the possible
3  Lyman-Cutler project?
4      A. I don't remember.
5      Q. In anticipation of the driving tour, did
6  you do anything to learn more about Kagan or any of
7  his projects?
8      A. Yes. We Googled the name, we Googled
9  properties, we Googled stuff about Kagan. We didn't
10 find anything that caused us concerns. Yes, we did;
11 we did prepare.
12     Q. Did you have conversation in that period
13 with Mr. Lipetsker for more detail as to what his
14 knowledge of Mr. Kagan was?
15     A. Mr. Lipetsker was all five-star for Kagan.
16 You know, he was saying how he's great, how
17 innovative he is, how efficiently and low-cost he
18 does the job, how you can trust the guy.
19         And I was really sold, not just by
20 Kagan, I was sold by Nick. Because he was the
21 person I have known for 20 years; I knew the guy,
22 actually.
23     Q. How long after the initial meeting at
24 Maiden's office was it that you did the drive-by

**31**

1  tours of the projects?
2      A. I don't remember. It was a week, ten days.
3      Q. Have you now exhausted your memory as to
4  conversations you had with Kagan during those drive-
5  around tours of properties?
6      A. Oh, during this time he was showing how
7  he's going to provide all the documentation for the
8  project, the invoices, checks written, how he'd
9  email it to us or send it. How would you say? He
10 was doing great salesmanship.
11     Q. Have you now exhausted your memory of that
12 interaction with Mr. Kagan?
13     A. I don't remember anything else.
14     Q. What happened next with respect to what
15 ultimately became the Lyman-Cutler project?
16     A. I was going through the numbers on Excel
17 spreadsheet, because that was very important to me.
18 And I remember having conversation with Nick about
19 the amount of money that Kagan was going to make.
20         And I remember this conversation,
21 because I said, he's going to make tons of money at
22 50 percent project.
23         I said, do you understand that's not
24 standard, that generally contractor fee is 30

**32**

1  percent? Contractor get 30 percent max, sometimes
2  20 percent, 50 percent. It's extremely high.
3  That's what I told Nick.
4          And Nick said, yes, that's true; but
5  we're going to get it done in quick time, the
6  project is going to be short term, we're going to
7  get all the 20 percent in a year in return.
8          And actually, Nick was going to get even
9  more, because I realized that he was treated as a
10 guy who found me. That's why the deal was that he
11 was putting, I believe, 10 percent -- no, not 10
12 percent -- he was putting, what? 5 percent, and was
13 getting much more in terms of profit/interest. I
14 don't remember the numbers now.
15         But that was fine with me. I understand
16 how the finder fees are working; and that was Nick's
17 compensation for this, basically. He found me; he
18 found the capital.
19         And I said, yes, Kagan is going to make
20 a fortune on this; but if you claim that he is
21 honest and will do this quickly and we'll get the
22 return on the investment, that's fine with me if he
23 gets paid 50 percent.
24     Q. When did you discussed with anybody that

**33**

1  Kagan was going to get 50 percent, and that
2  Lipetsker was going to get --
3      A. It was on the phone conversation with --
4  I'm sorry.
5      Q. Let me finish the question.
6          Your testimony just now was that you
7  discussed with Mr. Lipetsker that 50 percent was
8  high. Was there some discussion prior to this
9  conversation with Mr. Lipetsker where you discussed
10 the relative profits that the investors were going
11 to make?
12     A. It was in Excel spreadsheet. I didn't
13 discuss it; it was part of the documentation that
14 they provided.
15     Q. So that was something that was in the
16 documentation that was provided in the initial
17 meeting?
18     A. Yes.
19     Q. As of this point, when you were having this
20 discussion with Mr. Lipetsker, nothing had been
21 agreed to yet; correct?
22     A. Nothing has been agreed, but the agreement
23 was there already. I read the operating agreement.
24         We didn't negotiate the whole thing yet;

**Page 38**

1  was correct?
2  A. Yes. I Googled stuff, but I wasn't
3  concerned, again, that much. I discussed it with
4  Nick, not as a concern; it was just as a statement
5  that we exchanged.
6      And he agreed with me, Nick agreed with
7  me, as a matter of fact. He had the same idea, 30
8  percent; that's what contractor gets.
9      We were not in disagreement with Nick,
10 which it was a statement, a conversation. Yes, he
11 is going to get it; but he is going to get it well,
12 quickly, and inexpensively. That was the idea. And
13 we said fine.
14 Q. Have you now exhausted your memory as to
15 the conversation with Nick Lipetsker where you
16 discussed the profit margins that you've just told
17 us about?
18 A. The word "exhausted" is good, because we
19 definitely discussed other things, but I don't
20 remember.
21 Q. Was anybody else present during this
22 conversation with Mr. Lipetsker?
23 A. No. We had maybe one or two conversations
24 on the phone.

**Page 39**

1  Q. What happened next with respect to the
2  Lyman-Cutler project?
3  A. Next, I believe we started working on the
4  operating agreement.
5  Q. When you say "we" started working, who is
6  "we"?
7  A. I started working with Maiden. First I
8  started working because in my business life, there
9  were a lot of agreements, international agreements,
10 domestic agreements. Sometimes I don't even consult
11 with attorney, because I worked on so many
12 agreements with people and entities.
13 Q. So you started working with Maiden?
14 A. I started discussing the agreement at some
15 point, that I didn't like the agreement and wanted
16 to change, with Maiden, in correspondence.
17     And then I decided to show this
18 agreement to Mark Watson, as I said; Mark Watson was
19 an attorney, closing attorney, who was working with
20 me on the mortgage closing for 130 Trapelo Road, my
21 business office.
22     And I asked him to help, and he reviewed
23 this and said, look, I cannot give you any advice as
24 to whether it is a good idea or bad idea to invest

**Page 40**

1  this money; but there's a few things I don't like in
2  this agreement.
3      I don't remember what it was now; it was
4  a long time ago. But he gave me a few suggestions
5  what to change.
6  Q. Did you have conversations with Mr. Kagan
7  during the drafting of the operating agreement?
8  A. I don't remember this.
9  Q. Did you have conversations with
10 Mr. Lipetsker during the drafting period of the
11 operating agreement?
12 A. I don't think so. Mr. Lipetsker, he
13 understand basic things. He is not legal guy; he
14 cannot treat really well legal document as far as I
15 know. So discussing with him legal language just
16 doesn't make sense.
17 Q. Did you discuss anything with
18 Mr. Zhukovskiy during the period that the operating
19 agreement was being drafted?
20 A. I don't remember. We might have exchanged
21 few emails on numbers.
22     As a matter of fact, I do remember,
23 coming back to the conversation at the original
24 meeting, my concern was the carrying costs. And I

**Page 41**

1  did ask, and I did ask Kagan about carrying costs
2  and how it's going to be done.
3      And he said carrying costs, that's what
4  Kagan said; carrying costs, this was the number,
5  $1.5 million per house, and that includes
6  everything, including carrying costs. And I take
7  care of this.
8  Q. Was that during the first meeting?
9  A. Yes, during the first meeting, yes; because
10 that was instant question that came to my mind.
11 Q. And between that first meeting and the
12 period in which you were drafting the operating
13 agreement, did you have any further discussions with
14 Mr. Kagan about any aspect of the project?
15 A. I don't remember.
16 Q. Did you have any conversations with anybody
17 about the project that you haven't already told us
18 about from the time of the first meeting up to and
19 including the day that you signed the operating
20 agreement?
21 A. I don't remember.
22 Q. You said that you left the first meeting
23 and you had a PDF of the Excel spreadsheet.
24 A. PDF, and then they emailed me the actual

## Page 58

Q. Who recommended that you look at Rockland Trust Company instead?

A. I believe Maiden and Kagan, both.

Q. And did you have any understanding whether Maiden or Kagan had a prior relationship with Rockland Trust?

A. Yes. I asked why. They said, we made many transactions with Rockland Trust, yes.

Q. Did they make an introduction to Rockland Trust Company for you?

A. I believe so, Maiden did.

Q. And you said the Rockland Trust Company only wanted a $600,000 guarantee, as opposed to an unlimited guarantee --

A. It was negotiated.

Q. You have to let me finish so she can take it down.

The Belmont Savings Bank wanted an unlimited guarantee, correct?

A. Yes.

Q. And you were able to negotiate a $600,000 guarantee with Rockland Trust Company, correct?

A. Correct.

Q. And did you do those negotiations with

## Page 59

Rockland Trust Company yourself?

A. Yes.

Q. Did anybody else participate in the negotiations with Rockland Trust Company relative to the loan and mortgage to purchase the property?

A. I don't think so. We had a meeting with McGregor, representative of the bank. He came to my office at 130 Trapelo Road.

I provided my personal information, investments, availability of cash, and we had a personal interview with McGregor.

Q. At that personal interview with McGregor, who was present other than yourself and Mr. McGregor?

A. Nobody. It was in my office; nobody else was present.

Q. And how did it come about? Did you call him and say we want to take out a loan, and then you arranged for him to come see you?

A. I don't remember. I believe it was introduction by Maiden, and then we started talking to McGregor.

Q. Did you have any understanding whether Rockland Trust Company had an attorney representing

## Page 60

its interest in connection with the mortgage and note to buy the property?

A. No.

Q. Did you understand whether Mr. Maiden was representing Rockland Trust Company in that transaction?

A. Yes, I did.

Q. What was your understanding?

A. That he is the closing attorney for this loan.

Q. Now, you told me earlier that it was your assumption that Mr. Maiden represented Mr. Kagan; correct?

A. Yes.

Q. Did you have any concerns about the fact that, in addition to representing Mr. Kagan, Mr. Maiden you understood also represented Rockland Trust Company?

MR. CARNATHAN: Objection.

A. No.

Q. Were you able to close a loan with Rockland Trust Company in order to purchase the property?

A. Yes.

Q. And what happened next with respect to the

## Page 61

Lyman-Cutler project?

A. After we got the money, we purchased the property.

Q. You purchased the property?

A. Yes. It was January 3rd or maybe 5th, I don't remember, of 2013.

Q. And did the LLC have an attorney representing it in the purchase of the property?

A. I believe it was Maiden. I'm not sure. I believe it was Maiden.

Q. What happened next after you purchased the property?

A. After we purchased the property it was a quiet time, because Kagan needed to work on demolition permit, and as far as I understand he couldn't get it. He was not experienced with Brookline.

Brookline turned out to be completely different town from Newton, where he had experience. And that's the first time I started thinking that he told me he knows everything, but he doesn't know Brookline.

He said, that's okay, I know how it works; I'll figure this out. It's going to be done.

**66**

1     This is the first time I met Tatiana. I
2  had never seen her before, so I was curious to see
3  who she is. Never heard of her before, basically;
4  And we had social conversation.
5     It turned out I believe that she was
6  from the same city we were, from St. Petersburg,
7  Leningrad back then; and that kind of made me feel
8  better. I like our own people.
9     Q. With respect to that conversation at the
10 dinner relative to the project, what if anything do
11 you recall?
12    A. I don't recall. My memory is not really
13 that great, to remember every conversation.
14    Q. And I don't mean to be flip here, but when
15 you say your memory is not that great, are you
16 taking medication or something that impacts your
17 ability to recall?
18    A. No.
19    Q. Or do you have any condition that impacts
20 your ability to recall, as far as you know?
21    A. I'm 61 years old. You know, when I was 40,
22 I still wouldn't be able to recall what happened six
23 years ago, what conversation I had with whom. There
24 are some people who are capable; I am not. I'm

**67**

1  jealous of those people, but I know very few who
2  can.
3     MR. CARNATHAN: Those people are kidding
4  themselves.
5     A. I know very few.
6     MR. CARNATHAN: My ex-wife has precise
7  recall of conversations from 32 years ago.
8     A. My brother has precise memory of numbers.
9  You can give him the number, and 40 years later he
10 will tell you the number. He still does; he's 67.
11    MR. CARNATHAN: Wow.
12    Q. Did you ever discuss the numbers on this
13 project with your brother?
14    A. No.
15    Q. Now, once the project started and the
16 demolition began, did you have occasion to go out to
17 the site?
18    A. Yes.
19    Q. How often during the life of this project
20 would you physically go out to see the project?
21    A. Ten times, maybe. I don't remember. But
22 we were coming and making pictures of the project
23 periodically; sometimes I'm alone, sometimes with my
24 wife. We were following; we were looking at the

**68**

1  progress, watching the progress.
2     Q. And did you observe construction trucks on
3  the project?
4     A. Yes.
5     Q. Were there names of the various contractors
6  on the sides of the trucks?
7     A. No, I didn't see this.
8     Q. Was there a fence around the site?
9     A. Yes.
10    Q. And did the site have signs on it that said
11 like Hardhat Area, something like that?
12    A. I think so, yes.
13    Q. Did Kagan's name appear anywhere? Was
14 there any sign of what's coming?
15    A. It was a sign, Kagan-something. Kagan
16 Development, I believe, or something.
17    Q. And did you take a photograph of the sign?
18    A. I don't remember. I might.
19    Q. Have you provided those photographs to your
20 counsel?
21    A. I don't know.
22    MR. PERTEN: I don't recall seeing them,
23 Mr. Carnathan; so if you could check, I think that
24 would be called for under the document request if

**69**

1  they exist.
2     MR. CARNATHAN: I agree; absolutely. I
3  don't recall seeing them either, but if we can put
4  our hands on them we will fork them over.
5     MR. PERTEN: Thank you.
6     Q. Did you take any videos? I understand on
7  phones now you can take videos as well as still
8  photos. Did you take any videos of the project of
9  construction?
10    A. I don't remember.
11    Q. In terms of the finances of the project and
12 the bills for the construction, did you have any
13 role in the paying of the bills?
14    A. Yes.
15    Q. What was your role?
16    A. We were paying some bills. First we were
17 paying for tax preparation. We were paying for I
18 believe financial software, QuickBooks.
19    I don't remember. Some of the checks
20 was written by -- Arina was doing the books,
21 basically.
22    Q. So Arina, your wife, was handling the books
23 for the LLC?
24    A. Yes.

### 70

Q. When you took the loans out from Rockland Trust Company, did they also require that you have a bank account there?

A. Yes.

Q. So the LLC had a bank account, an operating account?

A. Yes. They were required to establish a bank account. I went to Rockland Trust for the LLC to get signatures, to get checks ordered, to set up the account. We set up the online access to the account through Rockland Trust.

We obtained permission for Kagan to write checks, as he requested. Yes, we were visiting Rockland Trust bank quite often.

Q. Why were you visiting them quite often?

A. Because that's how they're organized. Nothing you can do over the phone. Well, some of the stuff you could, but --

Q. Are you referring that you visited them quite often to set up the accounts and things of that nature?

A. Right, yes.

Q. But once the accounts were set up, did you still have to visit them quite often, or are you

### 71

just referring to this initially?

A. Initially. But also, I don't remember, we were going there at least ten times or fifteen times, to the office in Watertown.

Q. And who had check-signing authority for the Lyman-Cutler account?

A. I did, I believe Arina did, and Kagan did.

Q. Now, you said that Arina --

A. I'm not sure about Arina, if she did or not. I'm not sure; I don't remember.

Q. You said that Arina kept the books and records of the LLC?

A. Yes. She was helping me.

Q. What were her duties and responsibilities in that regard, as you understood them?

A. She was putting into QuickBooks, into financial software, checks. She was watching the balance of the bank account to make sure it's not overdrafted.

And Kagan wasn't very accurate with this. We had a few emails and messages that we had to send him to warn him about low balance of the account, because he wasn't watching the account balance.

### 72

And we were trying to monitor the balance on the account and all checks; and if we got a copy of the invoice, which almost never happened, it would be entered into the books on our side. We were trying to keep track of the expenses.

Q. And the bank statements and copies of checks, those went to your address?

A. Yes. They were available online, but --

Q. The hard copies came to you?

A. Yes.

Q. Now, you mentioned that there were times when the balance got low. Do you recall that?

A. Yes.

Q. When the balance got low, did you have communications with Mr. Kagan to let him know that the balance was low?

A. Yes.

Q. And was he able to deposit funds to bring the balance back up?

A. I think so.

Q. And what were the sources of revenue for deposit into the bank account?

MR. CARNATHAN: Objection.

A. Sources? I had to deposit my personal

### 73

money. I had to deposit money there once or twice. That was my personal money, obviously.

Q. And do you recall when that was?

A. We can look it up. I don't recall. But that was at the beginning of construction, I believe.

Q. And do you have any understanding whether Mr. Kagan deposited any of his personal money to bring the balance back up?

A. I don't know if that was his personal money, his business money, but he deposited some money.

Q. Now, other than whatever disbursements Rockland Trust Company made under the construction loan, did Lyman-Cutler have any other sources of operating capital?

A. No, I don't think so.

Q. So if money was deposited into the account which was not a construction-loan disbursement, would you agree that it came from some other source other than the bank?

MR. CARNATHAN: Objection.

A. Yes, obviously. But this money could come and go. The fact that they came, it doesn't matter

142

1 A. That there was an issue with the spouts,
2 the way they were formed; there was an issue with
3 the kind of material that used. He used raw pine on
4 the exterior. She said that will erode instantly.
5 She mentioned a few things.
6 Q. Anything else you can recall?
7 A. It's hard for me now to recall this. But
8 there are definitely things she pointed to me.
9 Q. So other than what Ms. Stumpo told you and
10 the doors, fan covers and painting, as you sit here
11 today you can't identify anything else that wasn't
12 done in a good and workmanlike manner?
13 A. Probably, but that's plenty for me. It's a
14 luxury home.
15 Q. Were there any warranty claims against the
16 builder for this property?
17 A. I'm not aware of this.
18 Q. Was there a new-home warranty on these
19 properties?
20 A. I'm not aware of this. I wasn't involved
21 at this point.
22 Q. Mr. Filippov, I'm going to put in front of
23 you a document that we marked at Mr. Zhukovskiy's
24 deposition --

143

1 A. Oh, I apologize. I just remembered talking
2 about another affidavit; Mr. Zhukovskiy.
3 Q. Got it.
4 I'm going to place in front of you what
5 was marked at Mr. Zhukovskiy's deposition as Exhibit
6 7. Do you recognize this document?
7 A. Yes, sure.
8 Q. Was this the document that was handed out
9 at your initial meeting with Mr. Kagan in October of
10 2012?
11 A. It looks like, yes.
12 Q. Take your time and look through the whole
13 thing.
14 (Pause)
15 A. Yes, it is.
16 Q. Now, did you understand that you were
17 provided with three potential scenarios of project
18 financials and risk analysis?
19 A. Yes.
20 Q. And that's the first three pages after the
21 email cover sheet?
22 A. Not actually the first three pages. The
23 scenarios are starting at the next page.
24 Q. Well, the first page is entitled Estimated

144

1 Project Financials and Risk Analysis. Do you see
2 that?
3 A. Yes, but it doesn't provide the analysis
4 for risk.
5 The first page, the second page and the
6 third are the same.
7 Q. Got it.
8 The first, second, and third are the
9 same, but they are different investment allocations;
10 correct?
11 A. Let me see. Investor 1, Investor 2; yes.
12 Q. And these three pages were documents that
13 were handed out at the meeting on October 25, 2012;
14 correct?
15 A. I believe so. I think so, yes.
16 Q. Now, is it fair to say, sir, that as of
17 October 25, 2012, that first meeting that you had
18 where this was handed out, no decision had yet been
19 made as to the investment allocation? There were
20 three scenarios that were being presented; correct?
21 A. Investment allocations?
22 Yes. I didn't agree to the deal, so
23 nothing was -- yes.
24 Q. And you also understood, did you not, sir,

145

1 that this was an estimated project financials?
2 A. Yes.
3 Q. At this point, sir, there were no
4 construction plans, were there?
5 A. At this point, I don't remember. At a
6 certain point, at one of the meetings, either the
7 first or second, Kagan did show the plans. I don't
8 remember which.
9 Q. And at this point, sir, how the profit was
10 going to be shared, certainly there was no agreement
11 on that yet at this first meeting; correct?
12 A. I don't remember.
13 Q. Well, the first page has profit being
14 shared 43.75/45/11.25; correct?
15 A. Yes.
16 Q. And the next one shows property sharing as
17 43.75 and 56.25?
18 A. Right, but we didn't consider this. That's
19 only one investor. That wasn't considered.
20 Q. And the third estimated project panel shows
21 a profit-sharing of 50/50, correct?
22 A. Yes.
23 Q. And none of those scenarios is ultimately
24 what happened?

### 162

1  Q. Can you tell me what this handwriting
2  reflects? There's handwriting on Page 3 of this
3  document. What do those notations mean?
4  A. Those notations were for myself. I was
5  just doing the calculations. First, I can't even
6  read because it is a copy. Not everything is
7  readable here.
8      Then it was a question. You see, for
9  example, at the bottom it says Maiden, and "Maiden"
10 is misspelled because I didn't know how to spell his
11 name properly in English. 53, 537...
12     I don't think I was understanding who is
13 doing what.
14 Q. So what is that 53 --
15 A. I don't remember.
16 Q. When did you put these numbers on --
17 A. 50 percent -- hold on; let me see.
18     50 percent, no risk. Yes, I think I
19 remember. I don't know why the word "Maiden" is
20 here; but $537,000 is the calculated profit of
21 Kagan, actually, and that is at 50 percent.
22     And I said 50 percent no risk here.
23 That's what I put. That's the calculated profit of
24 Kagan, because it was written here as managing

### 163

1  partner.
2  Q. And at the time this was written he was
3  going to be the managing partner, correct?
4  A. Yes.
5  Q. And at any point did you have a
6  conversation with Mr. Kagan where you said, "I'm
7  going to be the managing partner, not you"; at any
8  point between the October 25, 2012 meeting and the
9  date that you signed the operating agreement?
10 A. Mr. Kagan never participated in discussion
11 of the operating agreement with me.
12 Q. So that would be a no?
13 A. I communicated this to Maiden, yes. There
14 are emails on this topic.
15 Q. But you didn't communicate this to Kagan?
16 A. Kagan got a copy of this, I believe. He
17 was part of the email chain that went back and
18 forth. He is aware of this.
19 Q. As the managing partner, what did you
20 understand your duties and responsibilities to be?
21 A. My duties and responsibilities, as a matter
22 of fact, as was provided in these emails that I keep
23 referring, when it was changed to me, was that I was
24 responsible for defining the sales price. They

### 164

1  cannot change it without my permission. I was
2  responsible for loans. I was responsible basically
3  for supervision of the whole project.
4  Q. And during the life of the project, what
5  did you do in furtherance of your duties as managing
6  partner?
7  A. I was taking care of construction loans,
8  extending them a number of times; negotiating that
9  extension.
10     I was doing books to the extent I could
11 do this, because Kagan wasn't providing any invoices
12 or documentations; just payment checks, et cetera.
13 Very few invoices, very few details.
14     I was visiting sites periodically. I
15 was talking to Kagan periodically about the
16 progress. I was inquiring him about the cost and
17 how we're doing with the cost; and every time I
18 talked to him he would assure me that we're under
19 budget.
20 Q. I don't think you answered this question.
21     When did you put this writing on Exhibit
22 No. 7?
23 A. That was before we finalized the operating
24 agreement.

### 165

1  Q. Now, the first page of Exhibit 7 says
2  Project, and then there's a quotation mark and it
3  says "Lyman (1)." Do you see that?
4  A. Yes.
5  Q. Does that indicate to that you this was the
6  first revision of the documents that were provided
7  to you at the October initial meeting?
8  A. No, it doesn't. It indicates to me that at
9  this time it wasn't the name of the project. It
10 wasn't signed; it wasn't an LLC or anything.
11     (Marked, Exhibit 8, email string, top
12 email 10-26-12.)
13 Q. Can you identify what Exhibit No. 8 is?
14 A. It's an email that I exchanged with Kagan.
15 Let me read it.
16     That's where I requested him to show me
17 his achievement.
18 Q. Now, would you agree that this was an email
19 sent on October 26 after the initial meeting, the
20 first meeting?
21 A. Yes.
22 Q. In the first email that you sent at 11:50
23 a.m. on October 26, amongst other things you say,
24 "It sounds like the risk is a bit higher than I

**170**

1  Q. What is that?
2  A. Operating agreement of Lyman-Cutler, LLC.
3  Q. Is that a document that bears your
4  signature on the second-to-the-last page?
5  A. Yes.
6  Q. And you initialed every page?
7  A. Yes, as well as Kagan and Lipetsker.
8  Q. Now, if I could ask you to turn to Page 2
9  of this agreement, Paragraph 2.3 indicates that the
10 term of the company will be until November 30, 2015;
11 do you see that?
12 A. Yes.
13 Q. Why was that agreed upon?
14 A. I overlooked this, and Maiden somehow put
15 it there. I don't know why he put it there.
16     Again, in this particular case, it was
17 so clear that the project will be done in one year,
18 basically, maybe one and a half years, so nobody was
19 concerned about three-year term.
20     Nobody was thinking that it might be
21 there, because Kagan told us it's a done deal.
22 Q. Did you read this document before you
23 signed it?
24 A. Yes, obviously. We negotiated this

**171**

1  document. I read it, yes.
2  Q. Now, on the next page, sir, Section 4.1
3  talks about capital contributions; do you see that?
4  A. Yes.
5  Q. And it says, "Furthermore, purchase money
6  loan and construction loan shall be taken from
7  Rockland Trust Company to pay for construction and
8  carrying costs until the issuance of a certificate
9  of occupancy, but in no event for more than 23
10 months from the date of acquisition."
11     Do you see that language?
12 A. Yes.
13 Q. Did you understand, sir, that the
14 obligation to pay the carrying costs initially was
15 with the LLC?
16 A. Yes. From the loan, yes.
17 Q. When you negotiated the construction loan
18 with Rockland Trust Company, did you make sure that
19 you could use that money to pay carrying costs?
20 A. I didn't. When mortgage company gives you
21 the list of documents, it's a thousand pages thick,
22 and there are too many things to look at; and I
23 didn't pay even attention to what's written there.
24 Q. Was there an actual closing on the

**172**

1  construction loan?
2  A. Yes, I think so.
3  Q. A physical closing; or did you get a stack
4  of documents to sign?
5  A. I think I got a stack of documents to sign.
6  Q. Mr. Maiden was at that closing, correct?
7  A. Yes, yes.
8  Q. Did Mr. Maiden go through the entire stack
9  of documents and review them with you and tell you
10 what you were signing?
11 A. I think so. I don't remember. I was at so
12 many closings in my life that I don't remember what
13 that closing was --
14 Q. Well, you just said that there was a stack
15 of documents, and you just signed them without
16 reading them; is that correct?
17 A. Well, he probably explained to me....
18     I don't remember the details of this
19 particular date, yes.
20 Q. And do you know as you sit here today
21 whether the construction loan that you signed
22 permitted the proceeds to be used for carrying
23 costs?
24 A. I read that it doesn't; but at that point

**173**

1  again Kagan said that it's a common practice. So
2  there are certain things that you sign. Even if
3  it's a common practice, you know that it's how the
4  business is done.
5      And it was okay with me, actually. Even
6  though I would be told you cannot do this, I
7  probably would say, look, there is no way to obey
8  every law.
9  Q. If I could ask you to turn to Page 4 and
10 look at Section 5.2.
11     That says, "It shall be Mr. Kagan's duty
12 and obligation to construct two homes at the
13 location currently known as 77 Lyman Road in
14 Brookline, Massachusetts, in accordance with the
15 plans, including drawings supplied by Mr. Kagan and
16 approved by the managing member."
17     Do you see that language?
18 A. Yes.
19 Q. Did you understand, sir, that part of
20 Mr. Kagan's obligation then would be to arrange for
21 subcontractors?
22 A. Yes.
23 Q. And to handle all the business of the
24 actual building of the property?

**174**

1  A. Yes; get bids, for example.
2  Q. Did you discuss with him getting bids?
3  A. He has fiduciary obligations here. That
4  means getting bids.
5  Q. Let's try my question. Did you discuss
6  with him specifically --
7  A. I don't remember.
8  Q. Did you discuss with him specifically that
9  you wanted him to get bids?
10 A. I don't remember.
11 Q. As of November 14, had the construction
12 plans yet been finalized?
13 A. I don't think so, but I don't remember.
14 Q. Did Mr. Kagan have the authority to enter
15 into contracts for the construction?
16 A. When you say with the construction, what do
17 you mean?
18 Q. It says it will be his duty and obligation
19 to construct the two homes, correct?
20 A. Yes.
21 Q. Did you have any understanding of whether
22 in fulfilling his duty and obligation to construct
23 he had the right to enter into contracts?
24 A. No. I thought that he is a contractor.

**175**

1  He's the guy who was going to be building it. That
2  was my understanding.
3  Q. Sir, with respect to Tatiana Kagan and her
4  listing, you told us something along the lines that
5  you didn't want her to be able to list it for beyond
6  a year or something like that. Do you recall that
7  testimony?
8  A. Yes. And there is language here.
9  Q. Let me draw your attention on Page 6 to
10 Section 6.1(b)(6). It's at the very bottom of that
11 page.
12     Is there language in that Section 6
13 which says that she can list the properties only
14 through a certain date?
15 A. The language....
16     Something is missing in this document.
17 Q. What's missing?
18 A. Because there is a line here, oh.
19     Yes, there is a line "of their"; okay.
20 The line is here. "After December 31, 2014, no such
21 consent shall be required" for managing member to
22 remove Tatiana.
23     And that was my understanding, where I
24 have full power to get rid of her to if I need to.

**176**

1  Q. If you need to?
2  A. Yes.
3  Q. So is it your understanding that she could
4  not work beyond December 31, 2014, unless you made
5  an election not to use her?
6  A. That's correct, yes.
7  Q. So you had the right to remove her, but it
8  didn't self-perform; you had to affirmatively say
9  you don't want her after December 31, correct?
10 A. Yes. And by signing the agreement between
11 her and Vadim, she took away my right to do this.
12 Q. Did you provide Tatiana with a copy of the
13 operating agreement?
14 A. I didn't.
15 Q. Do you know whether she ever had a copy of
16 the operating agreement?
17 A. I don't.
18     But knowing that she's a member of KDC
19 and Proexcavation and the wife of Kagan, we assume
20 that she probably knows, if she's interested. I
21 didn't need to provide it to her specifically.
22 Q. On Page 7, Subparagraph F, Books and
23 Records, it says, "All books and records of the
24 company shall be maintained at the principal office

**177**

1  of the company."
2     What books and records did you maintain?
3  A. We maintained QuickBooks file; the printout
4  from this pile that was presented as one of the
5  exhibits here, as a matter of fact.
6     And we kept all the expenses that we
7  were aware of, that Kagan was providing to us during
8  the whole construction process.
9  Q. Was the operating agreement ever amended?
10 A. Amended? After it was signed?
11 Q. Yes, sir.
12 A. I don't think so. I don't remember.
13 I don't think so.
14 Q. When did you first learn that the operating
15 agreement required the company to terminate by
16 November 30, 2015?
17 A. When you sent the letter about this.
18 Q. And as I understood your testimony, one of
19 the reasons for filing the petition was so that you
20 wouldn't have to dissolve on 11-30-2015; is that
21 correct?
22 A. That's correct. That's one of the reasons.
23 Q. And the other was the lien?
24 A. The lien, yes.

### 178

1  Q. Now, sir, let me ask you to turn your
2  attention to Page 12.
3  Specifically in Section 10.2, which is
4  entitled Indemnification, you assert that there's no
5  indemnity obligation for Kagan, because he acted
6  with gross negligence or willful misconduct.
7  A. Yes.
8  Q. What did he do that you think is grossly
9  negligent?
10  MR. CARNATHAN: Objection.
11  A. First, he didn't finish the project on
12  time.
13  Second, he signed the bogus agreement
14  with his wife to market the property for 18 months,
15  taking away my rights of this agreement by doing
16  this.
17  He signed the contract with himself,
18  with Kagan Development Corporation, coming up with
19  charges that were not ever discussed and were not
20  charged as part of this operational agreement.
21  The agreement that we signed on the
22  mortgage document was luxury homes, not with KDC;
23  and the agreement was completely different.
24  And the agreement he signed with

### 179

1  himself, signed "VK, VK," was signed one week,
2  supposedly one week, after. Hopefully the expert
3  can identify that it was actually signed in July
4  2015, not in 2014.
5  He signed the completely bogus agreement
6  with himself with charges, design fees, construction
7  fees, all made-up fees, that he is not entitled.
8  Q. How do you know they're all made up?
9  A. Because he is not entitled to them.
10  Q. Anything else that you believe was --
11  A. He never asked me about this, he never
12  asked Nick about this; he just signed it with
13  himself.
14  Q. Anything else that you believe was either
15  grossly negligent, or evidence of willful
16  misconduct?
17  A. Obviously, his liens that he put on the
18  company, the result is an act of willful misconduct,
19  with $2 million that he came up with in charges. I
20  don't know how to characterize it any other way.
21  Q. Anything else?
22  A. Possibly there is something else. It's
23  hard for me to tell you. I think it's plenty.
24  Q. Have you exhausted your memory on that

### 180

1  topic?
2  A. Yes.
3  (Marked, Exhibit 11, Lyman-Cutler
4  certificate of organization.)
5  Q. Is that a document that you signed?
6  A. Yes.
7  Q. And did you review this document before you
8  signed this?
9  A. I think so, yes.
10  Q. Take a look at Paragraph No. 5. Is that a
11  true statement?
12  A. It's probably omission on my part, yes.
13  Q. So you would agree with me that that is not
14  a true statement?
15  A. I don't know. That's what I would assume.
16  I didn't see in the operating agreement the date
17  November 15. I just missed it.
18  All LLCs usually do not have the date,
19  as a rule. I have formed LLCs in the past myself; I
20  know you don't put dissolution of LLC until you need
21  it.
22  So I just didn't see this in operating
23  agreement, and that's the only reason I did that.
24  Q. And how many LLCs have you formed prior to

### 181

1  Lyman-Cutler, LLC?
2  A. I've formed probably three or four LLCs for
3  my businesses.
4  Q. So that's certainly a type of business
5  entity that you're familiar with?
6  A. Yes. I had an attorney helping me with
7  this, but....
8  Q. Did you authorize Attorney Maiden to file
9  the organizational documents for Lyman-Cutler, LLC?
10  A. Yes.
11  Q. And did you review them before he filed
12  them?
13  A. Yes. It bears my signature.
14  (Marked, Exhibit 12, email string, top
15  email 2-20-13.)
16  Q. Let me show you Exhibit 12. Do you
17  recognize that as an email string involving you?
18  A. Yes. Me, Maiden, Lipetsker.
19  Q. If we could start on the second page,
20  there's an email February 15, 2013, at 1:09 p.m.
21  Do you see that, towards the middle of the page?
22  A. Yes.
23  Q. This is Mr. Maiden letting you know that
24  "March is around the corner and I think it is time

### 202

1 complexity.
2 Q. And that's why Mr. Zhukovskiy did it?
3 A. Yes.
4 Q. Got it.
5 A. He requested Mr. Zhukovskiy to help. And
6 my understanding was from Zhukovskiy that he
7 promised him to pay when the house is going to be
8 sold.
9     MR. PERTEN: We'll take a short break.
10     (Recess)
11     (Marked, Exhibit 20, contract to build
12 two houses, 55 Lyman and 88 Cutler.)
13 Q. You have Exhibit No. 20 in front of you.
14 Can you identify that document?
15 A. That was a document that was part of the
16 Rockland Trust construction loan, and that's the
17 agreement to build houses with Classic Homes
18 Development and Construction, LLC.
19 Q. Did Classic Homes Development and
20 Construction do any of the construction?
21 A. I don't know.
22 Q. Did you ever see any bills from Classic
23 Homes Development and Construction?
24 A. I didn't.

### 203

1 Q. Did you ever see any checks made out to
2 Classic Homes Development and Construction?
3 A. I didn't.
4 Q. Did you ever ask Kagan who Kagan
5 Development KDC was, and what their role was?
6 A. I don't remember.
7 Q. Do you understand that KDC acted as a
8 general contractor on this project?
9 A. No.
10 Q. What role did KDC play on this project?
11 A. I do not know. My understanding was that
12 Kagan is responsible for building this.
13     I don't know why he had to use
14 Proexcavation; I don't know why he had to use KDC.
15 I just don't know this. It doesn't make any sense
16 to me.
17 Q. Did you ask him?
18 A. No, I didn't.
19 Q. Now, this document, Exhibit 20, you said
20 was part of the Rockland Trust Company loan package?
21 A. Yes.
22 Q. Before you signed it, did you read it?
23 A. I don't remember now, but I'm thinking yes.
24 Q. Let's look at this document.

### 204

1     By the way, how much did you pay Classic
2 Homes for its services?
3 A. I don't know. I didn't pay anything
4 personally. Or LLC didn't pay, as far as I know.
5 Q. Paragraph II, Contract Documents, it
6 references architectural plans and drawings, and
7 then there are a couple of blanks.
8 A. Yes.
9 Q. What architectural plans and drawings was
10 Classic Homes supposed to build to?
11 A. I do not know.
12 Q. Were there architectural plans and drawings
13 that you approved as of June 18, 2013?
14 A. I think so, yes. They were approved as
15 part of the loan.
16 Q. By you?
17 A. Yes, I reviewed them. I saw them.
18     It didn't have my written permission,
19 because it wasn't required.
20 Q. Why didn't you fill in dates and
21 descriptions when you signed this agreement?
22 A. I don't know.
23 Q. Now, you told me earlier this morning that
24 the construction was fixed-price at $1.3 million; do

### 205

1 you recall that?
2 A. Yes.
3 Q. What is the price that is being agreed to
4 be paid to Classic Homes?
5 A. I don't think it was defined here.
6 Q. Was it defined in some other agreement with
7 Classic Homes?
8 A. I don't think so.
9 Q. Why didn't you insist that the price for
10 the work to be performed by Classic Homes was $1.3
11 million?
12 A. Because, again, the agreement was with
13 Kagan; and Kagan said this is what the cost is going
14 to be.
15 Q. If the agreement was with Kagan, sir, why
16 did you sign this agreement with Classic Homes?
17 A. He said, I need this for my internal
18 issues, whatever the reason. That's his internal
19 issues.
20 Q. I thought this was part of the Rockland
21 Trust Company loans.
22 A. That's true, because Rockland Trust has to
23 have an official contract on the job.
24 Q. And prior to the closing on the

### 206

1  construction loans, had you seen this document?
2  A. I don't remember.
3  Q. Did you ever discuss this document with
4  Mr. Kagan prior to June 28, 2013?
5  A. I don't remember.
6  Q. And you agree that you read this and signed
7  this, correct?
8  A. Yes. During the signing, yes.
9  Q. And would you agree with me that this
10 contract obligates the LLC to pay Classic Homes the
11 cost of the project without any cap?
12 A. The builder agrees to construct the house
13 according to the plans. As consideration for the
14 builder constructing the house, the owner agrees to
15 pay the builder, constructor, and trades full
16 cost --
17     (Reporter request to repeat.)
18 Q. "To pay the builders, contractors, and
19 trades full costs and expenses on a weekly basis."
20 A. Right.
21 Q. And is there language there that you're
22 relying upon to say that that means that the builder
23 can only charge $1.3 million?
24 A. In this particular case, no.

### 207

1  Q. It also says that payment will be done on a
2  weekly basis. Did the LLC pay Classic Homes on a
3  weekly basis?
4  A. Except that work according to plans, when I
5  read it, that's plans that he provided; and plans
6  are including the Excel file Kagan gave us.
7  Q. So it's your position, sir, that when it
8  says, "The builder agrees to construct in according
9  to the plans" that the word "plans" means the Excel
10 spreadsheets?
11 A. Including, yes.
12 Q. What do you rely upon for that
13 interpretation?
14 A. Because he made the presentation; he gave
15 us the plans and said that's what it's going to
16 cost.
17 Q. But, sir, this is not a contract with
18 Kagan, it's a contract with Classic Homes, is it
19 not?
20 A. Yes, and I said I assumed that was the deal
21 with Kagan. That's his company.
22 Q. Did you ever take any steps to confirm your
23 assumption?
24 A. No.

### 208

1  Q. Did you even get a copy of this contract
2  from the bank before we received subpoenaed bank
3  documents in this case?
4  A. Yes. I had it in my closing documents,
5  yes, because I got the pile of closing documents
6  that I sent.
7  Q. Now, on the top of the second page, it
8  says, "Assuming all conditions are satisfied and
9  weather permits, the work to be performed under the
10 contract shall be substantially completed in a 44-
11 week time frame."
12    Is that, sir, consistent with what your
13 understanding of the time frame you agreed upon was?
14 A. I didn't pay attention to the number 44
15 weeks. What's 44 weeks? 44 weeks, how many months
16 is it? Three and a half month.
17    MR. CARNATHAN: 44 weeks is about ten
18 months. 52 weeks in a year.
19    THE WITNESS: It's nine month, yes.
20 Q. I thought you told us that the time was a
21 year.
22 A. What we expected? Yes.
23 Q. So would you agree that this agreement with
24 Classic Homes is not consistent with what your

### 209

1  understanding was in terms of the time frame that
2  you had agreed upon?
3  A. It was even better than one year.
4  Q. It says, "The work shall commence within
5  ten days after the permits necessary to start the
6  work had been issued."
7  A. Yes.
8  Q. When were the permits issued?
9  A. Permits issued, I believe was in May.
10 Q. So 44 weeks from May?
11 A. To March, yes, when it's supposed to be
12 done; but it wasn't.
13 Q. When were the properties actually
14 substantially completed, as far as you know?
15 A. One was more or less completed in August,
16 55 Lyman; and another one in October.
17 Q. And what do you base that conclusion on?
18 A. Based on what I saw there, based on what
19 Kagan said.
20 Q. And this contract talks about substantial
21 completion. What is substantial completion, as you
22 understand it?
23 A. Substantial completion is when there is a
24 house, there are floors, there is paint, there are

**Page 210**

1 all fixtures, you know.
2          Maybe there are a few things to be left
3 to clean up the house, to bring cleaners. I don't
4 know.
5      Q. Did you ever send any kind of a notice of
6 default to Classic Homes for not completing the
7 project timely?
8      A. No.
9      Q. Did you ever send a notice of default to
10 KDC for not completing the project timely?
11      A. No.
12      Q. Did you ever send a notice of default to
13 anyone for not completing the project timely?
14      A. No. But I sent the email to Kagan, text to
15 Kagan, asking him why so slow, asking him to provide
16 me a weekly update on the status, that he had failed
17 to do.
18      Q. If we could, sir, go back to the operating
19 agreement, Exhibit No. 10. Can you show me, sir,
20 where in that agreement it says that the
21 construction costs will be $1.3 million?
22      A. It doesn't say $1.3 million. Hold on a
23 moment; I'll find it.
24          "Duty of members," Article 5, Members.

**Page 211**

1 "It shall be Mr. Kagan's duty and obligation to
2 construct two homes at the location currently known
3 as 77 Lyman Road in Brookline, Massachusetts, in
4 accordance with the plans, including drawings
5 supplied by Mr. Kagan and approved by managing
6 member."
7      Q. And how do you conclude from that that he's
8 supposed to do it at 1.3?
9      A. In accordance with plans. He provided
10 plans, including that Excel spreadsheet. That's his
11 plans, how he's planning to build it.
12      Q. So again, your interpretation is that the
13 word "plans" is not the construction plans; it's the
14 construction plans plus the financial projections,
15 in that first meeting?
16          MR. CARNATHAN: Objection.
17      A. Yes.
18      Q. Interesting.
19      A. That's how he was planning to build it. He
20 showed it to me with numbers.
21          (Marked, Exhibit 21, email, 9-4-14.)
22      Q. Can you identify Exhibit 21?
23      A. Yes.
24      Q. What is that?

**Page 212**

1      A. I just got this, actually. That was an
2 email I sent to Kagan about inaccurate listing on
3 Zillow.
4      Q. So this is what you testified about earlier
5 this morning?
6      A. Yes.
7      Q. Would you agree with me that on or about
8 September 4, 2014 you looked at the listing for 88
9 Cutler?
10      A. Yes. I believe they just listed it for 88
11 Cutler.
12          And for Lyman, both of them were small,
13 actually, and somehow they were different.
14          (Marked, Exhibit 22, text message
15 string, top message 4-23, 2:05 p.m.)
16      Q. I've placed in front of you Exhibit No. 22.
17 Do you recall receiving this fax --
18      A. Text.
19      Q. -- I'm sorry, text; on April 23, 2015?
20      A. Yes.
21      Q. Was this the beginning of the conversation
22 about signing the new listing agreement that you
23 spoke about earlier?
24      A. For 55 Lyman, yes.

**Page 213**

1      Q. So this is Tatiana reaching out to you,
2 asking you to give her a call; right?
3      A. Yes.
4      Q. Did you call her at this point?
5      A. I don't remember. Either I called or she
6 called; I don't remember. But we talked, yes.
7      Q. And did you also receive a communication
8 about extending the listing agreement from Vadim
9 Kagan?
10      A. I think we had talked also to him. I don't
11 remember if it was written communication or verbal.
12 I don't remember.
13          I was busy; I was on a business trip.
14          (Marked, Exhibit 23, text message,
15 4-23-15.)
16      Q. Is Exhibit 23 a text message that you
17 received from Vadim regarding getting a listing
18 agreement for 55 Lyman?
19      A. Yes.
20      Q. And did you receive that?
21      A. Yes.
22      Q. And you received that on April 23, 2015?
23      A. Yes. That's the same date as here, Exhibit
24 22; and this is the first time I heard about any

226

1   (Pause)
2   A. It looked different, but it's part of this.
3   This part is different. This part was
4   just pasted.
5   Q. So the re-creation from Exhibit 30 was
6   taken from one of the attachments to Exhibit No. 16?
7   A. Yes. This part is just pasted this way.
8   Q. Does that refresh your recollection, sir,
9   that Exhibit No. 7 is not the complete set of
10  documents that was handed out at the October 25,
11  2012 meeting?
12  A. I'm not sure about this. I think that the
13  whole thing was printed out. I don't remember this.
14  It's hard for me to tell now.
15      No, it must be the whole thing. That
16  part was there.
17  Q. Sir, only because we won't know what you're
18  talking about, when you say it's part of the whole
19  thing, could you refer to it by the exhibit?
20  A. This part of this spreadsheet wasn't there.
21  I don't know where it is; but it was there, from the
22  beginning.
23  Q. What you're saying is that, looking at
24  Exhibit No. 16, the project scenario and assumptions

227

1   was part from the beginning?
2   A. Yes.
3   Q. And is the spreadsheet that's Exhibit No.
4   30 something that you were provided on October 25,
5   2012?
6   A. Yes. These are the same numbers.
7   Q. But the eighty-forty --
8   A. Maybe it was another version of the
9   document they sent me. It's hard for me to tell
10  right now.
11  Q. Did you get multiple versions of the
12  financial analysis?
13  A. Hold it.
14      It's not exactly from here. It was
15  somewhere. The part of this document, I don't know
16  where it is.
17  Q. So you don't know where you got the re-
18  creation that's part of Exhibit 30?
19  A. Yes. I would have to look for this.
20      MR. PERTEN: Let me go off the record
21  for a second.
22      (Discussion off the record)
23      (Adjourned, 4:52 p.m.)
24

228

1   CERTIFICATE OF COURT REPORTER
2   I, Janis T. Young, Registered Professional
3   Reporter and Certified Realtime Reporter, do certify
4   that the deposition of ALEX FILIPPOV, in the matter
5   of In Re: Lyman-Cutler, LLC, on April 25, 2018, was
6   stenographically recorded by me; that the witness
7   provided satisfactory evidence of identification, as
8   prescribed by Executive Order 455 (03-13) issued by
9   the Governor of the Commonwealth of Massachusetts,
10  before being sworn by me, a Notary Public in and for
11  the Commonwealth of Massachusetts; that the
12  transcript produced by me is a true and accurate
13  record of the proceedings to the best of my ability;
14  that I am neither counsel for, related to, nor
15  employed by any of the parties to the above action;
16  and further that I am not a relative or employee of
17  any attorney or counsel employed by the parties
18  thereto, nor financially or otherwise interested in
19  the outcome of the action.
20
21  Transcript review was requested of the reporter.
22  _____
23                            5/4/18
24  Janis T. Young, RDR/CRR

229

WITNESS: ALEX FILIPPOV
CASE: In Re: Lyman-Cutler, LLC
SIGNATURE PAGE/ERRATA SHEET
PAGE   LINE   CHANGE OR CORRECTION AND REASON

I have read the transcript of my deposition taken April 25, 2018. Except for any corrections or changes noted above, I hereby subscribe to the transcript as an accurate record of the statements made by me.
Signed under the pains and penalties of perjury.

_____ DATE _____
Deponent, ALEX FILIPPOV

ORIGINAL

Exhibits: 31-37    Volume 2, Pages 231-274

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

----------------------------------

In Re:

LYMAN-CUTLER, LLC,    Chapter 7
                     Case No. 15-13881-FJB

          Debtor

----------------------------------

LYMAN-CUTLER, LLC,

          Plaintiff

v.                            Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,

          Defendants

----------------------------------

CONTINUED 30(b)(6) DEPOSITION OF LYMAN-CUTLER, LLC
   and DEPOSITION OF ALEX FILIPPOV, Individually
      Thursday, April 26, 2018, 10:12 a.m.
        Sheehan Phinney Bass + Green, P.A.
           255 State Street, 5th Floor
              Boston, Massachusetts


--------- David A. Arsenault, RPR ---------
 daa@fabreporters.com   www.fabreporters.com
         Farmer Arsenault Brock LLC
             Boston, Massachusetts
                617-728-4404

Alex Filippov - Vol. 2 - 4/26/2018

5

**244**

1  checks to Proexcavation in the amount of $45,000,
2  even number. We don't know what it was for.
3      Q. Did you send an email upon receiving that
4  saying, hey, what is that $45,000?
5      A. I don't think we did. Again, let me repeat
6  what I said yesterday. The project was a fixed
7  amount. That was Kagan's matter, basically, how he
8  handles the money. He can move it to Proexcavation,
9  to KDC, that's his personal issue. All we were
10 caring about is that to make sure that our loan is
11 paid, the project is going on. Dealing with funds
12 was the last thing. That wasn't on my mind. He was
13 a trusted partner who had fiduciary obligation to
14 the company. That wasn't important. That was
15 mostly bookkeeping issue. Nothing else.
16          (Marked, Exhibit 33, Email, 3-20-14, and
17 invoices.)
18     Q. Mr. Filippov, can you identify Exhibit
19 Number 33?
20     A. Yes. That's the email from Kristina to
21 Arina. She was in correspondence with her. Arina
22 was doing bookkeeping, so was Kristina doing
23 bookkeeping. She informs her about two checks
24 withdrawn from Rockland Trust Bank.

**245**

1      Q. Attached to this email and referenced in
2  the cover email are three invoices from JW Campbell
3  Construction. Do you see that?
4      A. Yes, okay.
5      Q. When you received those invoices, did you
6  believe they provided insufficient information for
7  you to understand what was being billed for?
8      A. The invoices from JW Campbell never was in
9  question. In question was invoices by Proexcavation
10 by KDC. If you look at the invoice of JW Campbell
11 Construction in the amount of $12,089 it is very
12 different from $45,000 for Proexcavation. Because
13 that's how these people did the details of the work
14 they did, to the contrary of Proexcavation who never
15 put any details.
16     Q. Sir, other than the invoices for
17 Proexcavation and KDC, are you questioning the
18 invoices from any other vendors?
19     A. We might question invoices from some other
20 vendors, but JW Campbell is not one we might
21 question.
22     Q. When you say you might question, as you sit
23 here today are there any other payments that you are
24 challenging in this lawsuit?

**246**

1      A. I don't remember right now. I cannot tell
2  you this. There are a few vendors of Kagan whose
3  invoices are very questionable.
4      Q. And as you sit here, you can't remember the
5  name of a single vendor, a single vendor whose
6  invoices you believe are questionable?
7      A. V&D.
8      Q. What's questionable about the V&D invoices?
9      A. They are very high. They are round
10 numbers. They are equal for each house, exact
11 amounts. We looked into his invoices. His invoices
12 are not detailed. We know that Kagan and V&D had
13 very close personal relations with this person.
14     Q. How did you make the determination that
15 V&D's invoices were very high?
16     A. We look at comparing similar jobs.
17     Q. What other jobs did you compare it to?
18     A. Well, we talked to contractors, as I said
19 yesterday.
20     Q. Was that Cindy Stumpo?
21     A. We talked to Cindy Stumpo. We talked to
22 Paul Laffey, et cetera.
23     Q. What did V&D do on this job?
24     A. V&D, as far as I remember they were doing

**247**

1  the plumbing, I think plumbing.
2      Q. What specifically did Ms. Stumpo tell you
3  about V&D?
4      A. I don't remember now.
5      Q. Do you have any documents that she provided
6  to you which comments upon the bills of V&D?
7      A. No. She didn't provide any comments. But
8  if you look at V&D bills, invoices, these are
9  handwritten papers produced, it looks like produced
10 way after the job was done.
11     Q. And how did you make that determination
12 that they were produced way after the job was done?
13     A. Because we didn't see this until I believe
14 we started the litigation.
15     Q. Any other reason why you think that?
16     A. No.
17     Q. Okay.
18     A. That's a good reason to believe so.
19     Q. Now, you told us these two houses were
20 identical, correct?
21     A. Yes.
22     Q. Why do you believe that if V&D did the
23 plumbing that the costs for the plumbing work on the
24 two houses shouldn't be the same?

**272**

**CERTIFICATE OF COURT REPORTER**

I, David A. Arsenault, Registered Professional Reporter, do certify that the deposition of ALEX FILIPPOV, in the matter of Lyman-Cutler v Kagan, et al., on April 26, 2018, was stenographically recorded by me; that the witness provided satisfactory evidence of identification, as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts, before being sworn by me, a Notary Public in and for the Commonwealth of Massachusetts; that the transcript produced by me is a true and accurate record of the proceedings to the best of my ability; that I am neither counsel for, related to, nor employed by any of the parties to the above action; and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

Transcript review was requested of the reporter.

*[signature]* 5.7.18
David A. Arsenault, RPR

**274**

Transcript Produced and Delivered to counsel/witness on 5.7.18

ALEX FILIPPOV
SIGNATURE PAGE/ERRATA SHEET INFORMATION
For deposition taken on: April 26, 2018
Lyman-Cutler v Kagan, et al.

SIGNATURE INFORMATION FOR COUNSEL
The original signature page/errata sheet has been sent to Attorney Carnathan to obtain signature from the deponent. When complete, please send original to Attorney Perten.

WITNESS INSTRUCTIONS
After reading the transcript of your deposition, please note any change or correction and the reason on the errata/signature page. DO NOT make any notations on the transcript itself.

If necessary, duplicate errata/signature page.

PLEASE SIGN AND DATE the errata/signature page (before a notary if requested) and return it to your counsel.

**273**

WITNESS: ALEX FILIPPOV
CASE: Lyman-Cutler v Kagan, et al.
SIGNATURE PAGE/ERRATA SHEET
PAGE   LINE   CHANGE OR CORRECTION AND REASON

I have read the transcript of my deposition taken April 26, 2018. Except for any corrections or changes noted above I hereby subscribe to the transcript as an accurate record of the statements made by me.
Signed under the pains and penalties of perjury.

_____ DATE _____
Deponent, ALEX FILIPPOV
NOTARY (if requested)
On this ____ day of _____, 20___, before me, the undersigned notary public, personally appeared ALEX FILIPPOV, who presented satisfactory evidence of identification, to wit, _____, and signed this document in my presence.

Notary Public in and for_____
My commission expires _____