# EXHIBIT 6

Exhibits: 29-50                    Volume 1, Pages 1-178

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

(EASTERN DIVISION)

----------------------------

In Re:

                                    Chapter 7

LYMAN-CUTLER, LLC,                  Case No. 15-13881-FJB

         Debtor

----------------------------

LYMAN-CUTLER, LLC,

         Plaintiff

v.                                  Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,

KAGAN DEVELOPMENT KDC CORP.

and PROEXCAVATION CORP.,

         Defendants

----------------------------

30(b)(6) DEPOSITION of KAGAN DEVELOPMENT KDC CORP.

30(b)(6) DEPOSITION of PROEXCAVATION

By DANIEL GERSH and DANIEL GERSH Individually

Thursday, May 17, 2018, 10:03 a.m.

O'Connor Carnathan and Mack LLC

1 Van de Graaff Drive, Suite 104

Burlington, Massachusetts

--------- David A. Arsenault, RPR ---------

daa@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

Boston, Massachusetts

617-728-4404

Daniel Gersh - Vol. 1 - 5/17/2018

12

1     Q.  Could you describe your education to me

2  starting with high school, please.

3     A.  Sure.  I grew up in Newton, Massachusetts.

4  I went to Newton North High School.  I graduated

5  there in 2004 and went to undergrad at Bentley

6  University.  I majored in accounting.  I graduated

7  in 2008.  I also received my master's in accounting

8  in 2009 from Bentley.

9     Q.  What was your first job after Bentley?

10    A.  KPMG, external accounting.  I started

11  internship during college and was full-time

12  immediately after, the fall right after.

13    Q.  How long did you work for KPMG?

14    A.  One and a half years.

15    Q.  Where did you go after that?

16    A.  After that I went to Iron Mountain into

17  internal auditing.

18    Q.  Why did you leave KPMG?

19    A.  That was the recession that first year.  I

20  think they laid off about 10 percent of the first

21  year's class.

22    Q.  How long were you at Iron Mountain?

23    A.  Between three and four years, I would say.

24    Q.  What did you do next after Iron Mountain?

Daniel Gersh - Vol. 1 - 5/17/2018

13

1     A.   After Iron Mountain was Blue Cross/Blue

2  Shield internal auditing as well.

3     Q.   What were your general responsibilities

4  doing internal auditing for Iron Mountain?

5     A.   Iron Mountain was operational internal

6  auditing for the most part.  They are a company that

7  has huge warehouses and items and documents and

8  transportation and trucks and all of that.  So

9  roughly once every three or four weeks I would

10  travel to a new city with co-workers and do audits

11  of mostly operational, some financial aspects as

12  well, and then report on it.

13     Q.   What does an operational audit entail?

14     A.   These were audits that took about a week's

15  time.  They were surprise audits that we announced

16  Sunday when we arrived in a new city.  They were in

17  North America for the most part.  They covered 13

18  different categories, but mostly records management,

19  do they follow the procedures that they are supposed

20  to.  Then there's safety, security, transportation,

21  pretty much checklists, if you want to simplify it,

22  are people doing what they should be doing, are

23  there correct safeguards and security measures in

24  place by market, so that a general manager or a

Daniel Gersh - Vol. 1 - 5/17/2018

14

1    president of a market could be held responsible and

2    accountable and measure that city to city.

3        Q.    Why did you leave Iron Mountain?

4        A.    A boys club issue there.   My boss retired.

5    She was the best boss ever.   Once she left, everyone

6    realized she did everything.   So the department

7    started to fall apart and I found out that there was

8    some drama and I was able to negotiate a little

9    layoff package before the whole department got axed

10   a year later.

11       Q.    How long were you at Blue Cross/Blue

12   Shield?

13       A.    One year only.

14       Q.    What was your general job responsibility

15   there?

16       A.    Blue Cross/Blue Shield was back on the

17   financial side of the internal auditing.   As much as

18   you can imagine the fun of an insurance financial

19   auditor position to be; just a lot of reports and

20   procedural auditing.

21       Q.    What does procedural auditing entail?

22       A.    A decent amount of preventive and detective

23   audit standards that the company had set out and to

24   see if departments were following through, and a lot

Daniel Gersh - Vol. 1 - 5/17/2018

17

1    Q.  Are you a CPA?

2    A.  I'm not.

3    Q.  Do you hold any professional licenses?

4    A.  I was a certified fraud examiner for

5  several years.

6    Q.  What did you do to earn a certified fraud

7  examiner license?

8    A.  It was a four-part license exam that the

9  program that I signed up for was onsite, one-week

10  intensive learning class with study materials prior

11  to that as well, and then testing immediately after.

12    Q.  And who or what organization provided the

13  training and the testing?

14    A.  Probably the ACFE, the Association of

15  Certified Fraud Examiners, I would guess.

16    Q.  Do you still hold that license today?

17    A.  No.  I let the continuing education credits

18  expire probably in my second year here.

19    Q.  Why did you let it expire?

20    A.  Too busy.

21    Q.  In general terms, what were the areas of

22  training in the certified fraud examiner training?

23    A.  I don't remember the four categories

24  specifically.  Internal audit -- auditing was one of

FARMER ARSENAULT BROCK LLC

Daniel Gersh - Vol. 1 - 5/17/2018

22

1   in and doing stuff probably in November.

2       Q.  Did you do anything to produce documents in

3   this case?

4       A.  Yes.

5       Q.  What did you do in terms of producing

6   documents in this case?

7       A.  Spent many, many hours digging up old

8   files, hard copy and in electronic that we had;

9   sorting items, making copies, scanning items,

10  printing, requesting documents over many months

11  trying to get as much support for this.

12      Q.  Did you search your emails?

13      A.  Yes, well, the company's emails.

14      Q.  So when you first arrived at KDC back in

15  late 2014, during that initial trial period what

16  were you asked to do?

17      A.  Catch up, learn and catch up since there

18  was a gap between myself and Kristina, plus being a

19  new person.  It wasn't the most complicated job in

20  the world but learning the ropes of construction and

21  real estate and paying subcontractors and all of

22  that stuff, there was definitely a learning curve at

23  the beginning in terms of how things operate and the

24  speed and timelines.  But mostly just day-to-day

Daniel Gersh - Vol. 1 - 5/17/2018

23

1    financials and operations in the office.

2        Q.    If we think specifically about your role as

3    a bookkeeper when you arrived back -- I'll suggest

4    it was November 2014.  Does that sound right?

5        A.    Sure.

6        Q.    Which companies were you asked to take

7    control of the books for?

8            MR. PERTEN:  Objection.

9        A.    I worked on all properties and companies, I

10   think.

11       Q.    So did you assume responsibility for the

12   books of KDC at the time that you arrived in

13   November 2014?

14           MR. PERTEN:  Objection.

15       A.    Could you clarify what assume control

16   means.

17       Q.    Sure.  Let me ask you in a different way.

18   What, if anything, did you do with the books of KDC

19   when you arrived in November 2014?

20       A.    Reviewed, entered in the day-to-day

21   financials of money in/money out entries, vendor

22   bills, all of those items.

23       Q.    What about with regard to Proex, did you

24   have any involvement with the Proex books when you

Daniel Gersh - Vol. 1 - 5/17/2018

24

1  arrived in November 2014?

2      A.  Yes.

3      Q.  What involvement did you have with the

4  Proex books in your arrival?

5      A.  To speak specifically which companies I was

6  working on right at my arrival, I can't remember if

7  it was all of these or some of these.  For the most

8  part they all worked hand in hand because there were

9  only a few of us working there, a couple.  Again,

10  daily transactions, monthly reconciliations,

11  standard basic DIY bookkeeping.

12      Q.  What about with regard to the different

13  projects that Mr. Kagan was working on, did they

14  have separate books?

15      A.  They did.  Each property has its own stand-

16  alone QuickBooks.

17      Q.  So when you arrived in November 2014, did

18  you become involved with the Lyman-Cutler books?

19      A.  Yes.  I don't remember the specific date

20  when.  I want to say that was a lesser active

21  project at the time, so probably less involvement

22  when I first started.

23      Q.  Was construction complete on the

24  Lyman-Cutler project when you arrived in

Daniel Gersh - Vol. 1 - 5/17/2018

26

1   Q.   Were any Excel spreadsheets kept for the

2   projects when you arrived in 2014?

3   A.   I can't recall.  Probably.  That's how I

4   calculate items, how I keep track of things.  I'm

5   not sure if there were before me.

6   Q.   Any other type of ledger outside of the

7   QuickBooks maintained for any of the projects when

8   you arrived in 2014?

9   A.   What do you mean, ledger?

10   Q.   Some way of tracking the income and

11   expenses for each project besides QuickBooks.

12   A.   I know that Vadim wrote in pencil on the

13   inside of manila folders in years prior.  That was

14   the math and his documentation.  That's part of the

15   reason I was brought in to help organize.

16   Q.   What was contained within the manila

17   folders that Vadim wrote in pencil?

18   A.   His writing or what was in the folders?

19   Q.   What was in the folders?

20   A.   Any invoices or proposals that people sent,

21   subs.

22   Q.   How were those folders organized?

23   A.   However I could find them.  Sometimes

24   alphabetical, sometimes by year.  It was a mishmash

Daniel Gersh - Vol. 1 - 5/17/2018

27

1   of prior organization, different bookkeepers,

2   Vadim's way of storing things.  It was always a

3   mess.

4        Q.  Were the folders organized by project?

5        A.  I don't believe so.  Prior to me they were

6   not.

7        Q.  And then in general terms, what sort of

8   things would Vadim write on the inside of the

9   folders in pencil?

10       A.  I don't know specifically because those are

11  from several years ago, but just the name or dates

12  of something or amounts of a proposal that he was

13  writing down.  I couldn't tell you specifically.

14  Chicken scratch.

15       Q.  When you arrived at KDC, were there any

16  bookkeeping systems or procedures in place that they

17  asked you to follow?

18       A.  No to the fullest.

19       Q.  So when you arrived, did they have any

20  system of tracking which invoices applied to which

21  project?

22            MR. PERTEN:  Objection.

23       A.  Just whatever was written on the invoices,

24  whether a subcontractor wrote an address or wrote

Daniel Gersh - Vol. 1 - 5/17/2018

28

1    the wrong address or provided detail or not.

2    Literally you never knew with the subcontractors

3    back then.

4        Q.   So was there anyone who had to approve

5    payment of an invoice before it got paid, thinking

6    again when you arrived?

7        A.   I had to go through Vadim and get

8    authorization from Vadim.

9        Q.   So was there any standard procedure that

10   you followed to pay an invoice?

11       A.   At first it was ask him every single one.

12   I had no idea what I was doing and who gets paid

13   when and all that stuff back then.

14       Q.   Do you have check-writing authority for

15   KDC?

16       A.   I believe I do now.

17       Q.   Do you know when that became true?

18       A.   I don't.  We switched over to Rockland

19   Trust I don't know when, probably two years ago

20   maybe or more.  I don't recall if I was put on as a

21   signer onto our accounts then or how many or when,

22   but at some point, yes.

23       Q.   Who did KDC bank with before Rockland

24   Trust?

Daniel Gersh - Vol. 1 - 5/17/2018

29

1     A.   Santander.

2     Q.   Does KDC have all of its accounts with

3  Rockland now?

4     A.   Yes.

5     Q.   Does anyone other than you and Vadim have

6  check-writing authority on the KDC accounts?

7     A.   No, I don't believe so.

8     Q.   Do you have check-writing authority on the

9  project accounts?

10    A.   I believe I do.

11    Q.   When did that become true?

12    A.   I think for -- when we moved over to

13 Rockland, every time we opened a new account, a new

14 project, I should say, I was put on as a signer.

15    Q.   Does Vadim have signing authority for the

16 projects too?

17    A.   Yes.

18    Q.   Other than you and Vadim, does anyone else

19 have signing authority on the projects that Vadim is

20 working on?

21    A.   No.

22    Q.   When you first arrived, and I'm thinking

23 about the subcontractors on the projects, were there

24 any written contracts with the subcontractors on the

Daniel Gersh - Vol. 1 - 5/17/2018

30

1   projects?

2       A.   Some, a few maybe.  It depends on your

3   definition of contracts.  I guess my question is

4   what's your definition of a contract?

5       Q.   I think of it as some sort of signed

6   writing between the parties that lays out the

7   material terms and says we are going to charge you X

8   and we will do Y and kind of lays out what is going

9   to happen.

10      A.   There were definitely some.  Real corporate

11  companies, I can think of every time we sign the

12  contract with the alarm company we get an X-page

13  document that lays out the terms in the first couple

14  pages, the next bunch of pages of fine print, and

15  then a signature.  Others sometimes one page on the

16  back with the terms and signature, and other times

17  two little signatures at the back on a standard

18  proposal maybe that may ask for a signature.  But if

19  you're talking about your normal, day-to-day

20  subcontractors, good luck.

21      Q.   So for instance, if we think about the

22  electrician, I think it is Unicon is the one that

23  you typically use?

24      A.   Yes.

Daniel Gersh - Vol. 1 - 5/17/2018

32

1      Q.   In the interim since you've been there,

2   have you started requiring contracts between V&D and

3   any of the project companies?

4           MR. PERTEN:   Objection.

5      A.   I don't handle contracts, contract

6   negotiations, if you want to call it, no.

7      Q.   Before Mr. Kagan authorizes payment to one

8   of the subs, does he require them to submit an

9   invoice?

10           MR. PERTEN:   Objection.

11      A.   These days we implemented a policy of:   You

12   want to get paid, give me something.

13      Q.   When did that policy get implemented?

14      A.   I couldn't tell you.   That was me getting

15   angry with not being able to know who gets paid when

16   and having to call my boss 20 times a day.   It was

17   an informal everybody has to start getting with the

18   program.   A lot of these guys are old school.

19      Q.   So we can safely say it was after you

20   started work for KDC that the requirement was

21   implemented that subcontractors submit invoices

22   before they get paid?

23           MR. PERTEN:   Objection.

24      A.   No.   He definitely had said you guys need

Daniel Gersh - Vol. 1 - 5/17/2018

33

1   to give invoices, proposals, bills.  But I could not

2   tell you to what extent and how often subcontractors

3   actually did that every single time they got a

4   payment.  You're talking --

5            MR. PERTEN:  You answered the question.

6       Q.  As you sit here today, is there any process

7   or procedure that you have implemented that

8   subcontractors need to follow in order to get paid

9   on a project?

10           MR. PERTEN:  Objection.

11      A.  In terms of a purely black and white

12  everybody has to sign something and abide by

13  something, I do not have a policy like that in

14  place.

15      Q.  So to this day is it possible for Mr. Kagan

16  to come by and say send $10,000 to V&D Heating?

17           MR. PERTEN:  Objection.

18      A.  I can't answer that hypothetical question.

19      Q.  Did you still have instances to this day

20  where Mr. Kagan instructs you to issue a check to a

21  subcontractor with regard to which you have not yet

22  seen an invoice?

23           MR. PERTEN:  Objection.

24      A.  I don't believe that that has happened

Daniel Gersh - Vol. 1 - 5/17/2018

37

1    A.   I press the keys when entering in

2    spreadsheet numbers with Vadim.

3    Q.   So you sit with Mr. Kagan and he tells you

4    what to put in the budget.  Is that what you are

5    doing?

6         MR. PERTEN:  Objection.

7    A.   We discuss and put something together.

8    Q.   When was the last time you did that with

9    Mr. Kagan?

10   A.   Last summer, I want to say.

11   Q.   If we think in particular about that

12   process of creating some sort of a budget last

13   summer, was that for the bank or for some other

14   purpose?

15   A.   For the bank.

16   Q.   And as Mr. Kagan told you what numbers to

17   put into the budget, did he consult any records?

18        MR. PERTEN:  Objection.

19   A.   I can't recall.

20   Q.   If we think about the state of the

21   financial books when you arrived back in November

22   of 2014, what issues, if any, did you find with

23   them, what problems when you arrived?

24        MR. PERTEN:  Objection.

Daniel Gersh - Vol. 1 - 5/17/2018

38

1    A.  Unclear; lack of support and documentation;

2  not everything was there, to my liking at least;

3  messiness.

4    Q.  And if we think about it as you sit here

5  today, what changes have you implemented in the way

6  the books are maintained for Mr. Kagan's companies

7  since you arrived?

8    A.  Definitely stressed getting proposals and

9  invoices in ahead of payment, ahead of agreement;

10  getting hard copies, electronic copies.  And I

11  personally have tried to make everything electronic,

12  safely stored and saved electronically so that it is

13  easier to keep track of, find, look up.  There was

14  minimal saved electronically when I joined.

15    Q.  So if we think specifically about the

16  Lyman-Cutler books when you arrived, what did they

17  consist of when you arrived?

18    A.  The Lyman-Cutler QuickBooks or Lyman-Cutler

19  project?

20    Q.  Was there more to it than the Lyman-Cutler

21  QuickBooks?

22    A.  You said books.  Do you mean the QuickBooks

23  themselves?

24    Q.  I'm thinking about the financial records

FARMER ARSENAULT BROCK LLC

Daniel Gersh - Vol. 1 - 5/17/2018

39

1   for the Lyman-Cutler.  What financial records were

2   there for that project when you arrived?

3       A.  The same as the others at the time; some

4   invoices and proposals and bills, some tracking of

5   payments made.  The QuickBooks at the time were --

6   when I came in, Kristina was behind on work.  I

7   don't know what specific time frame we were at in

8   the Lyman-Cutler QuickBooks.

9       Q.  I don't understand what you mean by that,

10  what time frame you were at the QuickBooks.

11      A.  The QuickBooks is pretty much a

12  documentation of your transactions.  If today is

13  May, we could have entered nothing in QuickBooks for

14  the last six months on a certain project.  But we

15  could put it all in once we look at the bank

16  accounts and put it in and reconcile.  I could not

17  tell you what date or completedness level

18  Lyman-Cutler was when I joined.

19      Q.  What's the first thing that you did in

20  connection with the Lyman-Cutler financial records?

21      A.  I couldn't tell you.  Just to catch it up

22  and enter it in.

23      Q.  Do you remember Mr. Kagan ever asking you

24  to do anything in particular with regard to the

Daniel Gersh - Vol. 1 - 5/17/2018

43

1    Q.   In our project we have transactions between

2  KDC, for instance, and Lyman-Cutler?

3    A.   Sure.

4    Q.   If you are in that circumstance, do you

5  simultaneously go into the KDC books and make an

6  entry and go into the Lyman-Cutler books and make an

7  entry?

8               MR. PERTEN:   Objection.

9    A.   QuickBooks?

10   Q.   The QuickBooks, yeah.

11   A.   It is not simultaneously.  Most QuickBooks

12 you can only do one at a time.  I believe we have

13 the ability to do two.  That doesn't necessarily

14 mean you are doing Kagan Development and also a

15 property.  For example, these days we usually do one

16 property or company at a time for a whole month and

17 reconciliation, then we go on to the next one.  In

18 terms of just because a transaction in real life

19 happened between KDC and a property simultaneously,

20 because they are like that (gesturing), the

21 QuickBooks does not necessarily timewise do it like

22 that but it is reflected in the QuickBooks.

23   Q.   Do you have some kind of process or system

24 to make sure that the books map together properly?

Daniel Gersh - Vol. 1 - 5/17/2018

44

1      A.  Yes.

2      Q.  What's that?

3      A.  Monthly reconciliation.  We lean heavily on

4   our all-star accountants to help us sift through the

5   mess that was Kristina and me as a new bookkeeper

6   and other bookkeepers.

7      Q.  To what extent did you need to sift through

8   a mess on the Lyman-Cutler when you arrived?

9             MR. PERTEN:  Objection.

10     A.  Each person had their own way of

11  documenting items.  So it was tough to track and

12  understand certain work that Kristina had done.

13     Q.  Any items in particular that you remember

14  having trouble tracking and understanding that

15  Kristina had done on the Lyman-Cutler project?

16     A.  In particular, no.  It is a wide-range of

17  payment and reimbursements.

18     Q.  What went into the wide range of payments

19  and reimbursements that you had difficulty tracking

20  and understanding on the Lyman-Cutler project from

21  the Kristina era?

22     A.  It was all projects.  One person did things

23  one way.  Me as a new bookkeeper coming in, trying

24  to learn the business, trying to figure out how it

Daniel Gersh - Vol. 1 - 5/17/2018

45

1  should be done, what it meant, and how it should be

2  done and improved going forward.

3      Q.  How do you map the monthly reconciliations

4  to make sure the books map together properly?

5      A.  We do proposals, invoices, bills, whatever,

6  coming in and out with paper, emails, make stacks,

7  go through them with the bookkeeper, enter them into

8  the QuickBooks.

9          And then at the end of each month when

10 bank statements come in the mail, we do an

11 additional reconciliation.  There's a step in

12 QuickBooks that says reconciliation.  It is a

13 double-check.  It gives you the starting balance of

14 the month, which happens to be what your previous

15 month should have ended at, which should have been

16 the previous bank statement.  And then it lists for

17 you all the credits and debits for that month.  You

18 are looking at the bank statement, you are looking

19 at the computer, they should all match one by one.

20 We check each one; starting balance and ending

21 balance should be the same.

22     Q.  Do you reconcile, for instance, the KDC

23 books to the Proex books each month?

24          MR. PERTEN:  Objection.

Daniel Gersh - Vol. 1 - 5/17/2018

46

1      A.   No.   Each book is reconciled against its

2    own bank statement.   At year end we do our annual

3    reconciliation of everything.

4      Q.   When you do a reconciliation, is there any

5    kind of report that's generated that's saved

6    somewhere?

7            MR. PERTEN:   Objection.

8      A.   Which one are you referring to?   Which

9    reconciliation?

10     Q.   I'm thinking of the monthly reconciliation.

11   Am I confused?

12     A.   No.   There are monthly reconciliations.   I

13   don't know if they make reports that are saved on a

14   monthly basis.   I'm still no QuickBooks expert.   I

15   know that if I found a mistake and I'm trying to go

16   back to figure out where it was, if it was six

17   months earlier, I would have to undo six months of

18   reconciliations to get back to it.   I don't know if

19   there's a way to press a report file, save twelve

20   months, six months, or 36 months of reconciliations.

21   I know it is a thing you can do.   I don't know if it

22   is a report or something you can save.

23     Q.   Each month as you do a reconciliation, you

24   go in and correct any things that don't match?   Is

Daniel Gersh - Vol. 1 - 5/17/2018

49

1          I do not recall exactly when they
2    updated their standards and procedures, but probably
3    two years ago they -- either they made or I made
4    that spreadsheet that Vadim handwrote side to side
5    to electronic to better keep track of things.  They
6    also updated their forms where you fill everything
7    out now as an Excel spreadsheet and you just submit
8    it electronically to a designated email at the bank.
9          Q.  So you mentioned a spreadsheet that tracks
10   something side by side.  That tracks the budget
11   versus the requests?
12              MR. PERTEN:  Objection.
13         A.  It tracks the construction loan amounts,
14   budget -- I don't know what the term is.  It tracks
15   the amounts designated to each item that the bank is
16   allowed to reimburse against when you request it and
17   when you receive it.
18         Q.  Is Mr. Kagan still working with Rockland
19   Bank on his construction loans?
20         A.  Yes, he is.
21         Q.  Is this side-by-side spreadsheet something
22   you are submitting to Rockland?
23         A.  Yes.
24         Q.  Does Rockland require that work be

FARMER ARSENAULT BROCK LLC

Daniel Gersh - Vol. 1 - 5/17/2018

53

1          (Marked, Exhibit 29, Email, 11/18/14.)

2     Q.  Mr. Gersh, I've asked the court reporter to

3  mark an email as Exhibit 29.  Do you recognize it?

4     A.  It appears as an email that I sent, yes.

5     Q.  And so just based on who it went to

6  Arina@ldpost.com and ldpost@gmail.com, it looks to

7  me like you were sending this to the Lyman-Cutler

8  people.  Is that fair?

9     A.  Yes.

10    Q.  Did you send something like this to all the

11  different projects?

12    A.  I don't know exactly, but most likely.

13    Q.  Did you get any response from anyone on the

14  Lyman-Cutler project about issues or questions they

15  wanted to run by you?

16    A.  I don't remember.

17    Q.  If you think in particular about the

18  Lyman-Cutler project, what, if anything, did you do

19  to clean up, reorganize and square away the

20  bookkeeping for the Lyman-Cutler project?

21    A.  In general terms, tried to get invoices

22  when possible, tried to get documentation of

23  payments or balances and support whenever I could.

24  Just keep track of items.

FARMER ARSENAULT BROCK LLC

Daniel Gersh - Vol. 1 - 5/17/2018

54

1    Q.  How did you go about tracking down

2  documentation and invoices for the Lyman-Cutler

3  project?

4    A.  Requests, whether it be emails to whatever

5  vendors that actually used email then, or multiple

6  requests of subs, anybody else in person or over the

7  phone.

8    Q.  So you had to go out and ask for

9  documentation from the vendors and subs after you

10  arrived?

11          MR. PERTEN:  Objection.

12    A.  Yes.

13    Q.  Do you remember in particular any vendors

14  or subs that you had to ask for documentation of

15  their invoices after you arrived?

16    A.  I could not recall specifically which ones

17  when, no.

18    Q.  Was there any Lyman-Cutler file of invoices

19  or what not on the project when you arrived?

20    A.  Of what was already at the office?

21    Q.  Right.

22    A.  There probably was, but I believe

23  Kristina's organization then was by alphabetical

24  order of subcontractors or vendors.  There was a

Daniel Gersh - Vol. 1 - 5/17/2018

55

1  Lyman-Cutler that maybe had some documents of

2  construction advances and stuff like that.  Any

3  subcontractors or vendors I believe her organization

4  was by alphabetical order.

5       Q.  So when you went to clean up the

6  documentation of the invoices from the vendors and

7  subcontractors, you just couldn't pull out a

8  Lyman-Cutler file and look through it?

9       A.  No, no way.

10           (Marked, Exhibit 30, Lyman-Cutler

11  transaction list by vendor spreadsheet.)

12       Q.  Mr. Gersh, I'm going to show you a document

13  the court reporter has marked for me as Exhibit 30.

14  Do you recognize that?

15       A.  It looks to be a transaction, a list of all

16  transactions from the Lyman-Cutler QuickBooks.

17       Q.  Is this a document that you printed out?

18       A.  I couldn't tell you.

19       Q.  You see the date in the upper left corner

20  06-02-15?

21       A.  Yes.

22       Q.  Can you tell me what that means?

23       A.  This means that this report has all the

24  transactions listed as of June 2, 2015.  I think

Daniel Gersh - Vol. 1 - 5/17/2018

60

1  specific example?

2      Q.  More open-ended than that.  I would like to

3  know everything that Mr. Kagan told you that he

4  would like you to do with regard to Lyman-Cutler.

5      A.  Nothing specific.  Oversee the financials,

6  enter them into the QuickBooks, keep track of

7  things.

8      Q.  Was that true in general for all of the

9  different projects?

10      A.  Every single one.

11      Q.  Is there any particular reason why in late

12  April 2015 you were making entries in Lyman-Cutler

13  QuickBooks?

14      A.  Easy.  The BST Plumbing proposal invoice

15  for each property said 39,670, guessing, based on

16  the math there.

17      Q.  Was that an invoice that you had to get

18  from BST Plumbing after you arrived?

19      A.  I don't recall specifically.  I know that

20  that was very common, that Kristina would not put in

21  total proposal or total invoice amounts.  She would

22  only put in payments.  That is what made everything

23  so difficult to track and organize all that stuff.

24  I'm glad you brought this up.  This is a perfect

Daniel Gersh - Vol. 1 - 5/17/2018

61

1  example.

2  Q.  So why was it that you were going back and

3  recreating the financials for Lyman-Cutler in

4  April 2015 when the construction was already done?

5  MR. PERTEN:  Objection.

6  A.  Number one, the date of the entered and

7  last modified and also the date that is in the next

8  column does not necessarily mean something

9  simultaneous to that date.  There were times when

10  the date entered could be the date that was on the

11  invoice.  If there's no date on the invoice, it

12  could be when I received it or when somebody emailed

13  something.  And the date that's under date entered

14  or last modified certainly does not correlate to

15  anything relating to a transaction.  It could be a

16  name change or a spelling change or a date change.

17  So I could not tell you if April 29 has any bearing

18  to when 19,670 was entered.

19  Q.  So you're saying that the date entered Last

20  Modified may not be the date that you made the entry

21  in the QuickBooks.  Is that what you're telling me?

22  A.  Correct.  I believe this column in this

23  report shows either the date that it was entered if

24  it was only entered and never modified, or the last

Daniel Gersh - Vol. 1 - 5/17/2018

62

1   modified time stamp.

2      Q.  So is there any field or report that can be

3   generated in QuickBooks that will tell you when it

4   was first entered?

5      A.  Yes.  We provided those reports.  It is

6   called audit trail.

7      Q.  So if we find a report called audit trail

8   we can see when the entries were first made?

9      A.  And any changes to them, if they were

10  changed a hundred times.

11     Q.  What about the date column, you see it says

12  April 28, 2015; what information is that conveying?

13     A.  I wish I could tell you that it only meant

14  one thing.  Even to this day the bookkeeper and I,

15  we struggle over entering what date to enter

16  something, the invoice date, the date of payment,

17  the date that it hits our account.  Back then it was

18  impossible.  It was extremely hard to -- I could not

19  tell you what that date means.  I'd have to look at

20  the document and look at the email.

21     Q.  You are the person who made that entry,

22  correct?

23          MR. PERTEN:  Objection.

24     A.  Correct, I believe.  I do not recall

Daniel Gersh - Vol. 1 - 5/17/2018

63

1    exactly, but I believe so.

2        Q.  I mean is it a fair conclusion where the

3    date is 4/28/15 and the entered last modified is

4    4/29/15 that you obtained the BST Plumbing bill on

5    April 28, 2015?

6        A.  Absolutely not.

7        Q.  What other meanings could the April 28,

8    2015 date have?

9        A.  It may have been the date I was entering

10   it, literally.

11       Q.  Do you have any other possibilities as to

12   what you may have meant by putting in April 28, 2015

13   in the date column?

14           MR. PERTEN:  Objection.

15       A.  I could not tell you.

16       Q.  If we look at this report, it is sort of a

17   macro level, if you will.  We look at Decor Art,

18   there are a number of bills entered, entered last

19   modified April 28, 2015, April 16, 2015, April 20,

20   2015.  Turning the page, look at Dream Flooring, a

21   number of entries in April and May throughout 2015.

22   That's consistent throughout this document.  Were

23   you working on the Lyman-Cutler books in late

24   April 2015?

Daniel Gersh - Vol. 1 - 5/17/2018

69

1      A.   I don't recall if they were kept in email

2   folders or they were trashed and archived after the

3   30-day gmail period.  I could not speak to one

4   specific email from three years ago.

5      Q.   Let me show you a document we marked at

6   Mr. Kagan's deposition as Exhibit 5.  Do you

7   recognize that?

8      A.   Yes.

9      Q.   What is it?

10      A.   It is a letter from Mr. Pyle to the

11   managers of Lyman-Cutler.

12      Q.   So if I look at the second page in the

13   first paragraph, in the second line it says:  "KDC's

14   best accounting as to the unreimbursed construction

15   costs as of May 7, 2015 total 758,025.50 exclusive

16   of interest charges with approximately 50,000 of

17   additional vendor costs anticipated."

18             Have I read that correctly?

19      A.   Correct.

20      Q.   Did you calculate those figures?

21      A.   I believe I was requested for an aging, an

22   AP report of Lyman-Cutler at the time.

23      Q.   Who asked you to provide an aging AP

24   report?

Daniel Gersh - Vol. 1 - 5/17/2018

70

1      A.  I cannot remember.

2      Q.  What did you do to provide that aging AP

3  report?

4      A.  Simple; went into the QuickBooks and just

5  ran an as-of-today accounts payable aging report.

6      Q.  Do you know where the $50,000 of additional

7  vendor cost figure came from?

8      A.  Right now, no.

9      Q.  Is it that you have forgotten?  Did you

10  know back then?

11      A.  I may have known back then, but I don't

12  remember what additional charges were left to go.

13      Q.  Prior to running the aging AP report in

14  connection with the drafting of this letter, had you

15  realized that there were cost overruns on the

16  Lyman-Cutler project?

17          MR. PERTEN:  Objection.

18      A.  I was not aware of all the big stuff around

19  the case, the additional stuff.

20      Q.  I'm not asking about the big stuff on the

21  case.  I'm not sure what you mean by that.  I'm

22  asking about the cost overruns.  Did there come a

23  moment prior to May 7, 2015 when you realized that

24  there were cost overruns on the Lyman-Cutler

FARMER ARSENAULT BROCK LLC

Daniel Gersh - Vol. 1 - 5/17/2018

73

1   cost overruns on the Lyman-Cutler project?

2        MR. PERTEN:  Objection.

3        A.  I don't think I can say I spoke to anybody

4   about any cost overruns.  That's honestly not a term

5   I've ever said or heard during this time frame, or

6   discussed.

7        Q.  So other than printing out an aging AP

8   report from the Lyman-Cutler QuickBooks, did you

9   provide any other information with regard to the

10  unreimbursed construction costs referenced in the

11  letter we marked as Exhibit 5?

12       A.  Other than overseeing the QuickBooks up to

13  that date, no.

14       Q.  So if we look at the last page of Exhibit

15  5, is that the aging AP that you printed out?

16       A.  It is.

17       Q.  So when we look at that last page which is

18  Bates-stamped LCDK 000311, it has a little 0515 in

19  the upper left-hand corner.  Do you see that?

20       A.  Yes.

21       Q.  Does that mean you printed that out on

22  05/07/15?

23       A.  Yes.

24       Q.  As of 05/07/15, how much work had you done

FARMER ARSENAULT BROCK LLC

Daniel Gersh - Vol. 1 - 5/17/2018

74

1   on the Lyman-Cutler books?

2         MR. PERTEN:  Objection.

3     A.  Not that much.

4     Q.  Had you already gone back and requested

5   invoices from subcontractors and vendors?

6     A.  Not above standard day-to-day, no, I had

7   not.

8     Q.  How much work did you do on the

9   Lyman-Cutler books after May 7, 2015?

10    A.  Significant.

11    Q.  And during what time period did you do

12  significant work on the Lyman-Cutler books?

13    A.  Right around then to I don't know when.  I

14  don't know what steps.  It was all a blur.  There

15  were many, many hours, lots of years of my life

16  taken off for the next several months.

17    Q.  What work do you recall doing on the

18  Lyman-Cutler books after May 7, 2015?

19    A.  Going through every account, every payment,

20  every bank reconciliation, every folder, every email

21  I could find, anything and everything to clean

22  everything up and get it accurate.

23    Q.  So did you go back to the subs and vendors

24  to get documentation after this letter went out?

Daniel Gersh - Vol. 1 - 5/17/2018

75

1            MR. PERTEN:  Objection.

2       A.  I don't remember exactly when I needed to

3  do that.  It was not much.

4       Q.  So you don't recall whether you went back

5  to the vendors and subcontractors to get

6  documentation before or after this letter went out?

7       A.  I definitely can't tell you which date I

8  did what.  My significant amount of time spent on

9  the Lyman-Cutler was after this letter was sent out

10 by Mr. Pyle.

11      Q.  Who asked you to do that work?

12      A.  I don't know who specifically did.

13      Q.  Were you told why they wanted that work

14 done?

15      A.  I could not tell you why.

16      Q.  Was it because Mr. Filippov and Lipetsker

17 challenged the cost overruns?

18           MR. PERTEN:  Objection.

19      A.  If you would like me to guess.

20           MR. PERTEN:  Don't guess.

21      A.  I do not know.

22      Q.  Did Mr. Kagan say something to you to the

23 effect:  Mr. Filippov and Lipetsker object to these

24 charges; I need you to go document them?

Daniel Gersh - Vol. 1 - 5/17/2018

79

1   this exactly before.

2       Q.  So is that invoice, which is the last page

3   of the exhibit, LCDK 002526, is that one of the

4   things you reviewed in preparation for today?

5       A.  Yes.

6       Q.  Did you prepare that invoice yourself?

7       A.  No, I did not prepare it myself.

8       Q.  Who did?

9       A.  In combination with at least Joseph.  I

10  don't recall how much involvement Vadim had with it

11  or any attorneys.

12      Q.  What was your input into the creation of

13  this invoice?

14      A.  On the QuickBooks side, construction costs,

15  carrying costs.

16      Q.  If we compare Exhibit 28, the last page,

17  with Exhibit 5, the second page --

18      A.  Could you repeat that?

19      Q.  I'm comparing that invoice that's the last

20  page of Exhibit 28 with the second page of Exhibit

21  5.  Can you explain to me how the number grew so

22  much between May 7th and June 1st?

23              MR. PERTEN:  Objection.

24      A.  Sure.  They are related and not directly

Daniel Gersh - Vol. 1 - 5/17/2018

80

1   related at the same time.  The $758,000 number from

2   the May 7th letter, which is a point in time open

3   balance, what's the open balance today right now in

4   QuickBooks for Lyman-Cutler, as of that second this

5   report was run saying Lyman-Cutler owes these people

6   this much money.

7           All of the amounts within the 758

8   outstanding are captured in one of two numbers here

9   on the invoice.

10       Q.  What are those two numbers?

11       A.  Either the total construction costs or

12   total carrying costs.  One of those two.  They are

13   costs related to the project.  The AP report doesn't

14   differentiate construction versus carrying.  We had

15   separated out construction costs versus carrying

16   costs.

17       Q.  So how did you differentiate the

18   construction versus the carrying costs?

19       A.  Discussions of what we consider carrying

20   costs and construction costs.

21       Q.  Who participated in the discussion of what

22   was construction and what was carrying costs?

23       A.  I don't remember specifically.  To be

24   honest, that's going to be my response to every

Daniel Gersh - Vol. 1 - 5/17/2018

83

1    the KDC QuickBooks?

2        A.   I did not.

3        Q.   Why not?

4        A.   I was never asked to.

5        Q.   That number nearly equals the entire cost

6    overrun, does it not?

7                 MR. PERTEN:   Objection.

8        A.   I don't know about the cost overruns.

9        Q.   They were $758,000 as of May 7th, correct?

10               MR. PERTEN:   Objection.

11       A.   Incorrect.   758,000 is a current open

12   balance as of May 7th.   It definitely has nothing to

13   do with cost overruns.   I know that.   We never

14   discussed cost overruns.   But if I have a definition

15   of cost overruns, this AP aging has nothing to do

16   with any kind of over or under.   It is just

17   outstanding.

18       Q.   So when the letter asserts that they were

19   unreimbursed construction costs based on that AP

20   report that you gave them, that's an incorrect

21   statement?

22               MR. PERTEN:   Objection.

23       A.   Repeat that question again.

24       Q.   I think I just heard you tell me that the

FARMER ARSENAULT BROCK LLC

Daniel Gersh - Vol. 1 - 5/17/2018

84

1    aging AP report that is attached to this letter has

2    nothing to do with determining unreimbursed cost

3    overruns.  Do I understand that correctly?

4              MR. PERTEN:  Objection.

5         A.  No.  They are two separate things.  It can

6    be a part of an overrun, but you can't look at this

7    and tell me based on that there's an overrun.

8         Q.  So I can't look at the 758,000 and tell you

9    there's a cost overrun.

10        A.  Correct.  This is just somebody said what

11   do we owe right now out of the Lyman-Cutler.  The AP

12   aging would say we owe 758,000.

13        Q.  So what else would you have to look at to

14   determine whether or not that's a cost overrun?

15             MR. PERTEN:  Objection.

16        A.  You would have to see how much is left in

17   the bank account or how much more money is coming

18   into the bank, maybe.

19        Q.  Earlier you told me that you were at one

20   time a certified fraud examiner.

21        A.  Correct.

22        Q.  You mentioned that you were trained in what

23   constitutes red flags of fraud?

24        A.  Mm-hmm.

Daniel Gersh - Vol. 1 - 5/17/2018

88

1    Development, we have not had many projects with

2    partners.  I haven't seen these that were before my

3    time.

4              (A luncheon recess was taken.)

5

6

7

8              AFTERNOON SESSION

9         Q.  Mr. Gersh, I think this morning you told me

10   that one of the difficulties with the books and

11   records on your arrival at KDC is that Kristina

12   would input payments but not invoices.  Did I get

13   that right?

14        A.  Not necessarily.  For the most part, yes,

15   she would put point-in-time payments into the

16   QuickBooks instead of running balances or something

17   like that.

18        Q.  I guess what I'm wondering is how did you

19   know which subcontractors and vendors you needed to

20   go to to get more documentation from?

21        A.  I didn't necessarily until we were doing

22   our final review of the project.  Or if they came to

23   us saying where is our additional payments, that was

24   the difficulty in this, trying to figure out what

Daniel Gersh - Vol. 1 - 5/17/2018

89

1    were the balances at times.

2        Q.  So you did some kind of final review of the

3    project?

4        A.  As much as we could at the time of this

5    becoming a case, yes.  Normally we would do final

6    accounting around the time of the closing -- the

7    sale of the property, the closings.

8        Q.  When did you do your final review of the

9    Lyman-Cutler project?

10       A.  An unofficial final review was during the

11   May and June timeline of those letters.

12       Q.  And who participated in the final review?

13       A.  The same group as mentioned previously.

14       Q.  So it was you?

15       A.  Doing the numbers.

16       Q.  Mr. Kagan?

17       A.  Mm-hmm.

18       Q.  Yes or no?

19       A.  Me, Mr. Kagan, Joseph.

20       Q.  Joseph Cohen?

21       A.  Joseph Cohen when it comes to asking what

22   the numbers and totals were.  Again, for me just me

23   and the vendors and Vadim.

24       Q.  Did Mr. Kagan identify to you any of the

Daniel Gersh - Vol. 1 - 5/17/2018

102

1    change, right?

2        A.   Correct.

3        Q.   And according to the KDC general ledger as

4    of 12/31/2014 KDC had been overreimbursed by 13,000

5    and change.  Am I reading that right?

6        A.   That's what this report at this point in

7    time is showing, yes.

8        Q.   Are you suggesting there's something wrong

9    with this report?

10       A.   Absolutely, yes.

11       Q.   Why is that?

12       A.   Because there's edits that need to be

13   changed, corrected.  There's also a timing issue.

14   The reimbursement category of the general ledger is

15   as of year end, so 12/31.  That does not take into

16   account the fact that our American Express bill is

17   dated I think a few days before.  You should see

18   that they are right around the end of the month but

19   not necessarily the end of the month.  So like that

20   one is December 29, 2014.  The one before that is

21   November 29.  So there's a slight timing issue that

22   comes with that.  We only invoice around that date.

23   But expenses go through the actual date, so 12/31.

24   That's number one.

FARMER ARSENAULT BROCK LLC

Daniel Gersh - Vol. 1 - 5/17/2018

103

1        Number two, any other additional

2    reimbursements that were not on the American

3    Express, like checks, are not contained within a set

4    date range.  So if someone had put in the fact that

5    Kagan Development had paid a vendor $15,000 from the

6    Kagan Development checkbook instead of the

7    Lyman-Cutler checking account, which was done back

8    then, maybe an invoice wasn't created or vice versa,

9    maybe an invoice was created, whatever it is.  But

10   this is not -- this is not a good way or accurate

11   way, official way to tell you how dates and amounts

12   line up to that point in time.

13       Q.  What would be a good and accurate way to

14   figure out what lined up as of that date and time?

15       A.  A year after a project is completed.

16       Q.  So did you go through and make changes or

17   make additions and deletions to the KDC general

18   ledger for the Lyman-Cutler project after this date?

19       A.  Yes.  We filed extensions.  We go into

20   several months after year end of correcting entries,

21   et cetera.

22       Q.  For instance, if I go into Exhibit 36, this

23   I understand to be the general ledger for KDC as of

24   June 30, 2015, correct?

FARMER ARSENAULT BROCK LLC

Daniel Gersh - Vol. 1 - 5/17/2018

104

1      A.   Yes.

2      Q.   Now looking at Page SGC 000203.

3      A.   Yes.

4      Q.   I think about, a little bit down from the

5   top of the page is the reimbursement account for

6   Lyman-Cutler.  Are you with me?

7      A.   Yes.

8      Q.   I only see there 38,833 in charges.  Does

9   that look right to you?

10     A.   Correct.

11     Q.   And another 13,372 in payments, right?

12     A.   Correct.  Not necessarily payments.  They

13  are debits and credits.  When it says invoice,

14  that's our way of capturing the credit side of it.

15     Q.   So as of June 30 the reimbursement account

16  on Lyman-Cutler shows an amount due and owing to KDC

17  of 12,378 and 70 something, a little over 12 grand?

18     A.   Yes.

19     Q.   And you had been keeping the general ledger

20  for seven or so months by then, right?

21     A.   Correct.

22     Q.   So had you done your best to put in all the

23  charges and debits and credits at that point?

24     A.   Yes and no.  KDC's QuickBooks is a monster

Daniel Gersh - Vol. 1 - 5/17/2018

105

1   compared to Lyman-Cutler or any other project.  By

2   June of 2015 I had yet to really go after doing a

3   full and thorough accounting review of KDC's

4   QuickBooks.

5       Q.  Well, the SGC means we got these from your

6   accountant.  You gave these to your accountant,

7   apparently?

8       A.  Sure.

9       Q.  By June 30th you certainly knew there was a

10  dispute with Filippov and Lipetsker, right?

11      A.  Correct.

12      Q.  And by that point you had done your best to

13  update the Lyman-Cutler books, right?

14      A.  Correct.

15      Q.  But you hadn't done the KDC books yet?

16      A.  Just as they relate to each other.  But the

17  whole KDC QuickBooks is 50, a hundred times larger

18  than Lyman-Cutler's QuickBooks.

19      Q.  But as of this date, June 30, 2015, KDC was

20  asserting a debt from Lyman-Cutler to KDC of

21  something like 2.1 million bucks, right?

22      A.  This is reimbursements specifically.

23      Q.  Is there someplace else I can look in the

24  general ledger to find the $2.1 million obligation

Daniel Gersh - Vol. 1 - 5/17/2018

106

1    that KDC asserted against Lyman-Cutler as of June

2    30, 2015?

3        A.  No.  The QuickBooks wouldn't relate to

4    those amounts and numbers.

5        Q.  Why not?

6        A.  Those are separate contracts and other

7    items that I don't, I didn't create or see how those

8    numbers correlate.

9        Q.  Among the obligations was -- I'm going to

10   go back to Exhibit 28, the KDC invoice as of June 1,

11   2015.  So the bottom line there, 2,095,000-odd

12   dollars?

13       A.  Yes.

14       Q.  Just as a matter of bookkeeping practice,

15   shouldn't an obligation of that magnitude appear in

16   the general ledger somewhere?

17       A.  No, because you remember what I previously

18   said that the invoice term that is the opposite of

19   the debit or credit, whatever it is, the debit.

20   That's just putting something in the books that says

21   an invoice has been created.

22            So in the KDC's general ledger the

23   reimbursement says only that Kagan Development

24   created an invoice that said the January AmEx was

FARMER ARSENAULT BROCK LLC

Daniel Gersh - Vol. 1 - 5/17/2018

135

1      A.  Probably all of the above.  I don't know
2  where it is captured.
3      Q.  Can you tell me why BST Plumbing went from
4  39,340 in the May 7 spreadsheet to $57,601.88 in the
5  October 6, 2016 spreadsheet?
6      A.  Off the top of my head, no.  I know as a
7  pattern, BST Plumbing has an initial proposal and
8  then he has additional invoices that he gets from
9  finished materials and/or labor of installing those
10  as the project progresses.
11      Q.  How about Decor Art, do you know why Decor
12  Art went from 11,250 to 20,870?
13      A.  I don't without looking at the documents
14  but additional work always happens, especially a
15  project that lasts for a long time.  The longer it
16  lasts the more paint work there is to do later.
17      Q.  So you are suggesting that Decor Art did
18  more painting after May 7, 2015?
19      A.  No.  The May 7th date is before I did a
20  thorough review.  There's multiple contributing
21  factors that could have increased or decreased these
22  numbers between this October 6th date and the May
23  7th.  The May 7th one was a point in time, press a
24  button, here is the AP aging before all of the many

FARMER ARSENAULT BROCK LLC

Daniel Gersh - Vol. 1 - 5/17/2018

136

1  hours and weeks and months that we spent gathering

2  everything.

3       Q.  Do you know why Sergey Nikolaev was listed

4  at 19,320, May 7, 2015 and no longer appears on the

5  aging summary on October 6, 2016?

6       A.  I think I do because I believe I saw it on

7  35 or 36.  What pages were we looking at?  Sergey

8  Nikolaev was not one of the vendors who could afford

9  to wait for a Lyman-Cutler lawsuit to work its way

10  and could afford to keep an open balance with us.  I

11  think he lives far away in New York or something.

12           So we took out of our pocket, KDC, and

13  on May 10, 2015 we paid him his final balances, two

14  checks, 226 and 227, for 9660 each.  I don't know

15  what your number was over there.  That's why the

16  number probably went from 19320 to zero, probably.

17  That 19320 now went into KDC.  Now KDC needs to be

18  reimbursed that amount.  Even though KDC's number

19  went down, it is probable because we made

20  adjustments, corrections, duplicates, omissions

21  whatever we did to get to whatever is the final

22  number.  That includes the fact that we added 19 and

23  it still went down.  It was a plus/minus.  It was a

24  long, long time of double checking and triple

FARMER ARSENAULT BROCK LLC

Daniel Gersh - Vol. 1 - 5/17/2018

177

1            CERTIFICATE OF COURT REPORTER
2
3
4
5
6            I, David A. Arsenault, Registered
Professional Reporter, do certify that the
7    deposition of DANIEL GERSH, in the matter of
Lyman-Cutler vs. Kagan, et al., on May 17, 2018, was
8    stenographically recorded by me; that the witness
provided satisfactory evidence of identification, as
9    prescribed by Executive Order 455 (03-13) issued by
the Governor of the Commonwealth of Massachusetts,
10   before being sworn by me, a Notary Public in and for
the Commonwealth of Massachusetts; that the
11   transcript produced by me is a true and accurate
record of the proceedings to the best of my ability;
12   that I am neither counsel for, related to, nor
employed by any of the parties to the above action;
13   and further that I am not a relative or employee of
any attorney or counsel employed by the parties
14   thereto, nor financially or otherwise interested in
the outcome of the action.
15
16
17
18   Transcript review was requested of the reporter.
19
20
21
22
23   _____ 6.1.18
24   David A. Arsenault, RPR

FARMER ARSENAULT BROCK LLC