EXHIBIT 8

Exhibits: 1-14                    Volume 1, Pages 1-170
          UNITED STATES BANKRUPTCY COURT
             DISTRICT OF MASSACHUSETTS
                (EASTERN DIVISION)
- - - - - - - - - - - - - - - - - - - - - - - - - - -
In Re:

                              Chapter 7
LYMAN-CUTLER, LLC,            Case No. 15-13881-FJB


          Debtor
- - - - - - - - - - - - - - - - - - - - - - - - - - -
LYMAN-CUTLER, LLC,


          Plaintiff
v.                           Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
          Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - -


          DEPOSITION OF KRISTINA BRUSENKOVA
          Tuesday, March 20, 2018, 1:15 p.m.
          Sheehan Phinney Bass + Green, P.A.
             255 State Street, 5th Floor
                Boston, Massachusetts


        - - - - - - - - - David A. Arsenault, RPR - - - - - - - - -
        daa@fabreporters.com   www.fabreporters.com
             Farmer Arsenault Brock LLC
                Boston, Massachusetts
                    617-728-4404

**38**

1  Q.  What is that person's name?
2  A.  Sergey Blyum.
3  Q.  What about somebody named Armand?
4  A.  What name?
5  Q.  Armand.
6  A.  This person didn't work at Otrada.
7  Q.  Did you have a relationship with Armand?
8  A.  Yes.
9  Q.  Where did he work?
10  A.  Right now?
11  Q.  No, then.
12  A.  REM Services.
13  Q.  What is that?
14  A.  A transportation company.
15  Q.  Was he a driver?
16  A.  He was a driver.
17  Q.  Do you know what his last name is?
18  A.  No.
19  Q.  After you were fired from Otrada, what did
20  you do next in terms of work?
21  A.  AGST Tax Corporation.
22  Q.  What is the business of that?
23  A.  Accounting.
24  Q.  Is that Mr. Lev Agranovich's firm?

**39**

1  A.  Yes.
2  Q.  Did you work for a pizza shop before that?
3  A.  Yes; same time.
4  Q.  So was AGST Tax Corp. part-time?
5  A.  Say it again?
6  Q.  Was it part-time or full-time?
7  A.  Full-time.
8  Q.  And you also worked at a pizza shop?
9  A.  Yes.
10  Q.  Fiorella's?
11  A.  Yes.
12  Q.  Did you have a sexual relationship with the
13  owner of the pizza shop?
14     MR. COHEN:  I'm going to object and ask
15  her not to answer the question.  I don't think you
16  have a right to ask her questions about her sexual
17  activity.  If you want to take it up with the judge,
18  go ahead.
19     MR. PERTEN:  I don't think you have the
20  right to instruct her not to answer, but that's your
21  call.
22     MR. COHEN:  I think you are getting into
23  an area that just because you are taking somebody's
24  deposition there are some limits as to how far you

**40**

1  can go asking about those type of things.
2  Q.  Can you answer my question?
3     MR. COHEN:  Can I consult with her?
4     MR. PERTEN:  Not while there's a
5  question pending.  You can instruct her not to
6  answer if that's what you want to do.
7     MR. COHEN:  I will instruct her not to
8  answer.  Can I consult with her?
9     MR. PERTEN:  Certainly.
10     Can you reflect that it is 2:02 by my
11  watch.
12     (Pause - 2:02-2:03)
13     MR. COHEN:  So I withdraw the
14  instruction about the question about the pizza shop.
15  Q.  Can you answer the question?
16  A.  Can you repeat it?
17  Q.  Did you have a sexual relationship with
18  somebody at the pizza shop?
19  A.  No.
20  Q.  Do you know somebody by the name of Shant?
21  A.  Yes.
22  Q.  Did you have a relationship with him?
23  A.  No.
24  Q.  What did you do at AGST Tax Corp.?

**41**

1  A.  Clarify your question.
2  Q.  You said you worked for AGST Tax Corp.,
3  correct?
4  A.  Yes.
5  Q.  What did you do for them?
6  A.  Office manager and bookkeeping.
7  Q.  What were your duties and responsibilities
8  as an office manager and bookkeeper?
9  A.  Answer the phones, greeting the clients.
10  Everything.
11  Q.  Did you do anything at AGST?
12  A.  Bookkeeping.
13  Q.  When you say bookkeeping, what do you mean
14  by that?
15  A.  QuickBooks.
16  Q.  What did you do with QuickBooks?
17  A.  Enter the information.
18  Q.  Whose information?
19  A.  Clients'.
20  Q.  What kind of information?
21  A.  Information from bank statements.
22  Q.  Information from bank statements?
23  A.  Yes.
24  Q.  Anything else that you did for AGST Tax

42

1    Corp.?
2        A. I was responsible to do all bookkeeping for
3    my boss's companies, Lev Agranovich.
4        Q. How long did you work for AGST Tax Corp.?
5        A. Almost one year.
6        Q. Why did you leave?
7        A. Mr. Kagan asked me to work for his company.
8        Q. And why did you leave Lev Agranovich's
9    company?
10        A. I just answered the question.
11        Q. You didn't answer my question.  Why did you
12    leave AGST Tax Corp.?
13            MR. COHEN:  She answered the question.
14            MR. PERTEN:  I asked her why she left
15    and she said Mr. Kagan asked her to come work for
16    him.  She didn't say that's why she left.
17            MR. COHEN:  I think that was implied.
18            MR. PERTEN:  Well, I don't work well
19    with implications.
20        Q. Can you answer the question?
21        A. Repeat your question.
22        Q. Why did you leave AGST Tax Corp.?
23        A. Because Mr. Kagan asked me to work for his
24    company.

43

1        Q. And did you decide to work for Mr. Kagan's
2    company?
3        A. Yes.
4        Q. Did you work for Baren-Boym Company?
5        A. Yes.
6        Q. When did you work there?
7        A. I'm still working.
8        Q. When did you start working there?
9        A. At some point at the end of 2012.
10        Q. And you worked there from 2012 through to
11    today?
12        A. Yes.
13        Q. What do you do for Baren-Boym Corporation?
14        A. Bookkeeping.
15        Q. And specifically what do you do for them?
16        A. Enter transactions from bank statements.
17        Q. Anything else?
18        A. No.
19        Q. Now, in 2012 when you were at Baren-Boym,
20    was that a full-time or part-time job?
21        A. Part-time.
22        Q. How many hours a week would you typically
23    work?
24        A. Repeat the question.

44

1        Q. How many hours a week would you typically
2    work in 2012 for that company?
3        A. Two hours.
4        Q. Two hours a week?
5        A. Yes.
6        Q. How about in 2013, how many hours a week
7    did you typically work for Baren-Boym Company?
8        A. One business day.
9        Q. A full day?
10        A. Yes.
11        Q. How about in 2013, how much did you work
12    for that company?
13            MR. COHEN:  You just asked about 2013.
14            MR. PERTEN:  Thank you.
15        Q. In 2014 how often did you work at
16    Baren-Boym Company?
17        A. I want to correct my answer.  In 2013 I
18    worked two hours a week.  In 2014 I worked one day.
19        Q. Okay.  One day a week in 2014.  What about
20    in 2015?
21        A. It depends on the schedule.  One or two
22    days a week.
23        Q. One to two days a week.  And 2016?
24        A. Two hours.

45

1        Q. Two hours a week roughly?
2        A. Mm-hmm.
3        Q. That's a yes?
4        A. Yes.
5        Q. When did you leave AGST Tax Corp.?
6        A. November 2013.
7        Q. At that point who were you employed with
8    after that?
9        A. Mr. Kagan.
10        Q. Directly by him or one of his companies?
11        A. KDC.
12        Q. Would that be Kagan Development KDC Corp.?
13        A. Yes.
14        Q. Did you tell Mr. Agranovich that you were
15    going to work for Kagan Development KDC Corp. before
16    you left?
17        A. Yes.
18        Q. And did he give you permission to leave?
19            MR. CARNATHAN:  Objection.
20        Q. You can answer.
21        A. I don't understand your question.
22        Q. Did you sign a noncompete agreement at AGST
23    Tax Corp.?
24        A. Yes.

## 50

1    Q. So what was your job when investors were
2  there to check numbers?
3    A. To go over the numbers, to check if they
4  match. If not, to fix it or explain why we have
5  this number and they have that number.
6    Q. Anything else that you did for Kagan?
7    A. I can't recall.
8    Q. So you have exhausted your memory now of
9  the things you did for Kagan Development KDC?
10    A. I can't recall.
11    Q. Did you have any duties and
12  responsibilities for any other companies that
13  Mr. Kagan was involved in while you were working for
14  Kagan Development KDC?
15    A. Repeat your question.
16    Q. Did you have any duties and
17  responsibilities for any other company in which
18  Mr. Kagan was an owner?
19    A. Yes.
20    Q. What other companies?
21    A. Proexcavation.
22    Q. And what did you do for Proexcavation?
23    A. Bookkeeping.
24    Q. And what specifically did you do for

## 51

1  Proexcavation?
2    A. Entering transactions from bank statements,
3  issuing the checks, preparing the invoices. All the
4  stuff that usually a bookkeeper do.
5    Q. Other than the three items that you just
6  mentioned, are those the only items that you can
7  remember as you sit here today?
8    A. Which ones?
9    Q. Entering information from bank statements,
10  issuing checks, and preparing invoices?
11    A. Dealing with banks. Working on
12  construction -- on advances.
13    Q. What did you do in terms of bank advances?
14    A. We had a budget. Mr. Kagan usually asked
15  me to calculate how much we have left, how much we
16  have to request, help him to calculate the numbers.
17    Q. And these things that you have just
18  identified, did you do that for KDC as well?
19    A. This was for KDC.
20    Q. So what did you do for Proexcavation?
21    A. Bookkeeping.
22    Q. Did you do anything different for
23  Proexcavation than what you did for KDC?
24    A. I can't recall.

## 52

1    Q. Anything else that you did for Kagan
2  Development KDC other than entering transactions
3  from bank statements, issuing checks, preparing
4  invoices, helping with bank advances and helping him
5  understand the budgets?
6    A. I can't recall more.
7    Q. That's all you can recall as you sit here?
8    A. Yes.
9      (Marked, Exhibit 4, Nondisclosure
10  agreement.)
11    Q. Can you identify what we marked as Exhibit
12  4?
13    A. No.
14    Q. Is that your signature on the second page?
15    A. No.
16    Q. Is that your initials on the first page?
17    A. No.
18    Q. Have you ever seen this document before?
19    A. No.
20    Q. Never have?
21    A. Once.
22    Q. When?
23    A. Last week.
24    Q. And you have no recollection of this

## 53

1  document?
2    A. No.
3    Q. Were you ever asked to sign a nondisclosure
4  agreement while working at Kagan Development KDC?
5    A. No.
6    Q. What was the business of KDC?
7    A. Repeat the question?
8    Q. What business were they in, KDC?
9    A. Construction.
10    Q. Construction of what?
11    A. Buildings, residential properties.
12    Q. When you came to Kagan Development -- by
13  the way, when I say KDC, do you understand that I
14  mean Kagan Development KDC Corp.?
15    A. Yes.
16    Q. When you came to work for KDC, had you
17  worked for a construction company before?
18    A. No.
19    Q. Did you have any background in
20  construction?
21    A. Only four months.
22    Q. So before you came?
23    A. Before I joined his company I had an
24  experience of four months working in construction

54

1  company.
2      Q.  What construction company did you work in
3  for four months?
4      A.  Kagan Development.
5      Q.  Was that the experience that you got while
6  working at AGST Tax Corp.?
7      A.  Yes.
8      Q.  So at AGST Tax Corp. did you help
9  Mr. Agranovich with the accounting records for Kagan
10  Development?
11      A.  Yes.
12      Q.  Other than that, did you have any
13  experience with construction before you started
14  working directly for KDC?
15      A.  Yes.  I used to work for another
16  construction company for two months before I started
17  to work for Kagan Development.
18      Q.  What construction company was that?
19      A.  MIR Realty Group.
20      Q.  This was something that you worked for
21  directly or another account that Mr. Agranovich had?
22      A.  Another client.
23      Q.  Any other experience working with
24  construction companies prior to your arrival at KDC?

55

1      A.  No.
2      Q.  At Mass. Bay or Northeastern, had you taken
3  any construction courses?
4      A.  No.
5      Q.  Had you taken construction courses anywhere
6  else?
7      A.  No.
8      Q.  When you were at KDC, did you get involved
9  in the bidding for construction projects?
10      A.  I don't understand you.
11      Q.  Did you get involved in the selection of
12  subcontractors that KDC might use on a project?
13      A.  No.
14      Q.  Now, at the time you got to Kagan
15  Development, who else worked there?
16      A.  Rephrase the question.
17      Q.  When you arrived at KDC, who else worked
18  there?
19      A.  Mr. Kagan.
20      Q.  Anybody else?
21      A.  Eugene Agureev.
22      Q.  What was Mr. Agureev's position?
23      A.  Construction supervisor.
24      Q.  Anybody else?

56

1      A.  His daughter-in-law but she was from
2  Classic Interior from his wife's company.
3      Q.  What was her position?
4      A.  I don't know.
5      Q.  Who else?
6      A.  Ryan O'Grady.
7      Q.  What was Mr. O'Grady's position?
8      A.  I'm not sure what he did there.
9      Q.  Who was doing the bookkeeping function
10  before you arrived, do you know?
11      A.  He didn't have a QuickBooks.  He didn't do
12  bookkeeping.
13      Q.  So was one of your tasks when you arrived
14  at Kagan Development to set up the QuickBooks?
15      A.  We did prior I arrived, I joined KDC.
16      Q.  What role, if any, did you have for setting
17  up QuickBooks for KDC?
18      A.  Rephrase the question.
19      Q.  What did you do in connection with setting
20  up the QuickBooks accounts for KDC?
21      A.  Everything.
22      Q.  So are you the person who downloaded the
23  programs, the QuickBooks programs?
24      A.  We don't need to download the program.

57

1      Q.  Are you the person who made all the entries
2  into the QuickBooks?
3      A.  Yes.
4      Q.  And you did that for Agranovich?
5      A.  I'm sorry?
6      Q.  You did that while work at AGST Tax Corp.?
7      A.  Yes.
8      Q.  Did you have any other role in
9  transitioning from KDC to QuickBooks?
10      A.  Repeat the question.
11      Q.  Other than what you just testified about,
12  did you have any other responsibilities to get
13  QuickBooks up and running for KDC?
14      A.  I don't understand the question.
15      Q.  What exactly did you do to make sure that
16  the accounting function was handled with QuickBooks
17  for KDC?
18      A.  Entering information in for the previous
19  years for all companies.
20      Q.  And what information did you enter?
21      A.  All information from bank statements, check
22  register books, credit cards, HUDs.
23      Q.  Anything else?
24      A.  Mortgage companies, but the same as bank

Kristina Brusenkova - Vol. 1 - 3/20/2018

---

**58**

1   statements.
2   Q.  Anything else?
3   A.  I can't recall.
4   Q.  Now, when you arrived at KDC in November
5   of 2013, I think you said --
6       Is that correct?
7   A.  Yes.
8   Q.  -- what projects was KDC working on?
9   A.  Hyde Avenue.
10  Q.  Anything else?
11  A.  Dorcar 2 and Dorcar 1.
12  Q.  Anything else?
13  A.  I can't recall.
14  Q.  Were they already working on the
15  Lyman-Cutler projects?
16  A.  I can't recall.
17  Q.  So November 2013 do you have any
18  understanding if the Lyman-Cutler projects were
19  already under way?
20  A.  Repeat the question.
21  Q.  Do you know what Lyman-Cutler, LLC is?
22  A.  I don't understand your question.
23  Q.  Have you ever heard of Lyman-Cutler, LLC?
24  A.  In what period?

**59**

1   Q.  Any period.
2   A.  Yes.
3   Q.  When did you first hear of Lyman-Cutler,
4   LLC?
5   A.  I can't recall.
6   Q.  Was it when you first got to KDC?
7   A.  I can't answer the question.
8   Q.  What did you understand Lyman-Cutler, LLC
9   to be?
10  A.  It's a company that has two buildings.
11  Q.  Two buildings?
12  A.  Two buildings, two houses.
13  Q.  One on Lyman Street and one on Cutler?
14  A.  Yes.
15  Q.  Who were the investors in that project, do
16  you know?
17  A.  Fillippov.  I can't recall others.
18  Q.  And when did you first become aware that
19  there was a project for two buildings that
20  Lyman-Cutler, LLC was building?
21  A.  Repeat the question.
22  Q.  When did you become aware that
23  Lyman-Cutler, LLC was building two buildings?
24  A.  I can't recall.

**60**

1   Q.  When you got to KDC, did you review any
2   documents relating to Lyman-Cutler, LLC?
3   A.  I can't recall.
4   Q.  Did you have any role with respect to
5   Lyman-Cutler, LLC?
6   A.  Clarify your question.
7   Q.  Did you do anything while you were at KDC
8   relating to Lyman-Cutler?
9   A.  Yes.
10  Q.  What did you do?
11  A.  Bookkeeping.
12  Q.  What did that entail?
13  A.  Entering transactions, cut checks,
14  coordinate with Fillippov's wife.
15  Q.  Anything else?  Did you do anything else
16  with respect to the Lyman-Cutler project?
17  A.  Paying bills.
18  Q.  Anything else?
19  A.  Reconciliation.
20  Q.  Anything else?
21  A.  I can't recall.
22  Q.  When you say you coordinated with
23  Fillippov's wife, what did you mean by that?
24  A.  Sometimes she sent us emails with some kind

**61**

1   of request and I replied.
2   Q.  Did she send those emails to you at Kagan
3   or to your personal email account?
4   A.  KaganDevelopment@gmail.com.
5   Q.  So your email address there was
6   KaganDevelopment@gmail.com?
7   A.  Correct.
8   Q.  Did you use any other email addresses which
9   related to Kagan Development work?
10  A.  No.
11  Q.  Did you use Kristina.Brusenkova@gmail.com
12  for Kagan Development work?
13  A.  Yes.
14  Q.  When did you use your personal email
15  account for Kagan Development work?
16  A.  2014.
17  Q.  Why did you use your personal account
18  rather than the company account?
19  A.  It was set up by our payroll company.  I
20  cannot know why it was under my personal name.
21  Q.  Other than payroll, did you use your
22  personal email address for any other purpose while
23  employed at Kagan Development?
24  A.  I can't recall.

Kristina Brusenkova - Vol. 1 - 3/20/2018

19

### 70

1    A.  I can't recall.
2    Q.  For what purpose did you review them?
3    A.  To insert all transactions into QuickBooks.
4    Q.  So you would look at the bank statements
5  and the bank statements would indicate a
6  transaction.  And then you would take that
7  information and put it into QuickBooks; is that
8  correct?
9    A.  I had access to bank account, online bank
10  account.
11    Q.  Did you take the information -- I want to
12  focus on Lyman-Cutler.  Did you take information
13  from the Lyman-Cutler bank account and enter it into
14  the QuickBooks?
15    A.  Yes.
16    Q.  So if the Lyman-Cutler bank account showed
17  a deposit, you would enter that deposit into
18  QuickBooks?
19    A.  Correct.
20    Q.  And if the Lyman-Cutler bank account showed
21  a check was drawn, you would enter that into
22  QuickBooks?
23    A.  Yes.
24    Q.  And is this the same general process that

### 71

1  you followed on all Kagan Development projects while
2  you were there?
3    A.  Yes.
4    Q.  Did you ever go to see the Lyman-Cutler
5  project, go to the job site?
6    A.  Yes.
7    Q.  When did you do that?
8    A.  In 2014.
9    Q.  For what purpose?
10    A.  Mr. Kagan wanted to show me all his houses.
11    Q.  So other than that occasion, did you go
12  there more than once?
13    A.  Yes.
14    Q.  How many times were you there on the
15  Lyman-Cutler site?
16    A.  I can't recall.
17    Q.  Other than to show you the projects, what
18  other reasons, if you recall, did you go to the
19  Lyman-Cutler site?
20    A.  Repeat the question.
21    Q.  Other than to show you the site, what other
22  reasons did you go to the Lyman-Cutler site?
23    A.  To prepare the house.  We went there after
24  hours at nighttime.

### 72

1    Q.  Why?
2    A.  We had an affair over there.
3    Q.  How often did you go to the house for that
4  purpose?
5    A.  I can't recall.
6    Q.  For what period of time did that go on?
7    A.  One year, almost one year.
8    Q.  Okay.  Any other reasons that you went to
9  the site?
10    A.  To help with the house.
11    Q.  Was that when it was about to be put on the
12  market?
13    A.  No.
14    Q.  When was that?
15    A.  When he had party there.
16    Q.  Any other times?
17    A.  For this particular, no.
18    Q.  Now, with respect to the Lyman-Cutler, when
19  was the first time you spoke with Mr. Fillippov?
20    A.  Repeat the question.
21    Q.  When was the first time you spoke to
22  Mr. Fillippov?
23    A.  In 2015.
24    Q.  When in 2015?

### 73

1    A.  June, July.
2    Q.  Was that the first time you spoke with
3  Mr. Fillippov was in June or July of 2015?
4    A.  I can't recall before.
5    Q.  When did you first meet Mr. Fillippov?
6    A.  In 2015.
7    Q.  In June or July of 2015?
8    A.  Yes.
9    Q.  When was the first time, if ever, that you
10  spoke to Mr. Lipetsker?
11    A.  December 2013, January 2014.
12    Q.  The conversation that you had with
13  Mr. Lipetsker in December 2013, was that a
14  face-to-face conversation or was it a phone call?
15    A.  Face-to-face conversation.
16    Q.  When did that occur?
17    A.  In Kagan Development office.
18    Q.  What do you recall about that conversation?
19    A.  It was about the other project.
20    Q.  What other project?
21    A.  Hyde Avenue.
22    Q.  What do you recall Mr. Lipetsker saying
23  about Hyde Avenue?
24    A.  I can't recall.

FARMER ARSENAULT BROCK LLC

Kristina Brusenkova - Vol. 1 - 3/20/2018

43

---

**166**

1    Q.  Are you the person who prepared the checks
2    for Proexcavation?
3    A.  Along with Mr. Kagan.
4    Q.  And is it your testimony that you never saw
5    these proposals?
6    A.  No.
7    MR. CARNATHAN:  For clarification, are
8    you saying no, that's not your testimony or no,
9    you've never seen them?
10   THE WITNESS:  I've never seen them.
11   MR. COHEN:  It is four hours right now.
12   Like we said at the beginning, that's the amount of
13   time that the court afforded you for the deposition.
14   MR. PERTEN:  We'll agree to disagree.
15   I'm going to suspend because I think your client did
16   not bring documents that she was supposed to bring.
17   We know of an email.  We know of medical records.
18   We know of phone records.  So I'm not going to argue
19   the point.
20   MR. COHEN:  If that's the kind of thing
21   you want to spend your time doing, okay.  My
22   understanding is that she's not obligated to go look
23   for documents that she doesn't have in her
24   possession and get them from doctors and the phone

---

**167**

1    company and spend money and whatever trying to get
2    those kind of records.  She's also given you the
3    names.  If you want to subpoena them, you can do
4    that.
5    MR. PERTEN:  You've made your point.
6    MR. COHEN:  I think it would be improper
7    and kind of abusive to bring some kind of a motion.
8    MR. PERTEN:  We'll let the court decide.
9    We will suspend at this point at the request of
10   Mr. Cohen.
11   MR. CARNATHAN:  You're saying we are
12   suspending.  It is our position this is over.  We
13   are not consenting to that.
14   MR. PERTEN:  I understand.  I'm not
15   consenting to termination.  So the record is clear.
16   MR. COHEN:  All right.
17   (5:33 p.m.)
18
19
20
21
22
23
24

---

**168**

1    CERTIFICATE OF COURT REPORTER
2
3
4
5
6    I, David A. Arsenault, Registered
7    Professional Reporter, do certify that the
     deposition of KRISTINA BRUSENKOVA, in the matter of
8    Lyman-Cutler vs. Kagan, et al., on March 20, 2018,
     was stenographically recorded by me; that the
9    witness provided satisfactory evidence of
     identification, as prescribed by Executive Order 455
10   (03-13) issued by the Governor of the Commonwealth
     of Massachusetts, before being sworn by me, a Notary
11   Public in and for the Commonwealth of Massachusetts;
     that the transcript produced by me is a true and
12   accurate record of the proceedings to the best of my
     ability; that I am neither counsel for, related to,
13   nor employed by any of the parties to the above
     action; and further that I am not a relative or
14   employee of any attorney or counsel employed by the
     parties thereto, nor financially or otherwise
15   interested in the outcome of the action.
16
17
18   Transcript review was requested of the reporter.
19
20
21
22
23   _____   3.29.18
24   David A. Arsenault, RPR

---

**169**

WITNESS:  KRISTINA BRUSENKOVA
CASE:  Lyman-Cutler vs. Kagan, et al.
         SIGNATURE PAGE/ERRATA SHEET
PAGE   LINE   CHANGE OR CORRECTION AND REASON
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
_____ _____ _____
I have read the transcript of my deposition taken March 20,
2018.  Except for any corrections or changes noted above I
hereby subscribe to the transcript as an accurate record of the
statements made by me.
Signed under the pains and penalties of perjury.

_____DATE_____
Deponent, KRISTINA BRUSENKOVA
NOTARY (if requested)
On this _____ day of _____, 20___, before me, the
undersigned notary public, personally appeared KRISTINA
BRUSENKOVA, who presented satisfactory evidence of
identification, to wit, _____, and
signed this document in my presence.

_____
Notary Public in and for _____
My commission expires _____

---

FARMER ARSENAULT BROCK LLC