# EXHIBIT 10

ORIGINAL

```
Exhibits: 1-18                    Volume 1, Pages 1-123
         UNITED STATES BANKRUPTCY COURT
           DISTRICT OF MASSACHUSETTS
              (EASTERN DIVISION)
------------------------------
In Re:
                                  Chapter 7
LYMAN-CUTLER, LLC,           Case No. 15-13881-FJB

         Debtor
------------------------------
LYMAN-CUTLER, LLC,

         Plaintiff
v.                                Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
         Defendants
------------------------------


         DEPOSITION OF VLADISLAV ABRAMSKIY
           Monday, June 18, 2018, 9:59 a.m.
           O'Connor Carnathan and Mack LLC
         1 Van de Graaff Drive, Suite 104
              Burlington, Massachusetts

       --------- David A. Arsenault, RPR ---------
       daa@fabreporters.com   www.fabreporters.com
              Farmer Arsenault Brock LLC
                 Boston, Massachusetts
                    617-728-4404
```

86

1  Q. I've placed in front of you Exhibit 14.
2  Does that bear your signature on the last page?
3  A. Yes.
4  Q. Does that memorialize the agreement that
5  you reached with Kagan?
6  A. We had no choice because they had send us a
7  threatening letter which states if we didn't agree
8  instead of 200,000 we would be paying 450,000. We
9  had to sign this in order to not lose the deal.
10  Q. Sir, you will agree that you signed this
11  agreement, correct?
12  A. Yes.
13  Q. And in fact will you agree with me as well
14  that everybody, both sides did what they were
15  supposed to do under this agreement?
16       MS. FULLER: Objection.
17  A. I signed it, but as far as the our
18  relations are concerned on the part of Kagan, he did
19  not fulfill anything that he had told us. I was put
20  in such a position that I had to sign it just to get
21  out of this.
22  Q. And, sir, if I could draw your attention to
23  the third page, there's the paragraph sort of in the
24  middle of the page that says: "Mr. Kagan has agreed

87

1  to contribute enough funds." Do you see that
2  paragraph?
3  A. Yes.
4  Q. And will you agree with me that you
5  received $132,373.17 at the closing and Kagan cut
6  you a separate check for $17,321.83?
7       MS. FULLER: Objection.
8  A. So this in totality was the amount of my
9  contribution to this project.
10  Q. You will agree with me, sir, that you
11  received those two sums at the closing, correct?
12  A. I only received the first one at the
13  closing and the second check came two weeks after.
14  Q. But you did receive it, did you not?
15  A. Yes.
16  Q. And this also called for you to transfer
17  your interest in Newton-Cynthia Road to Vadim Kagan
18  by July 1, 2015, correct?
19       MS. FULLER: Objection.
20  A. Yes.
21  Q. In fact, you did transfer your interest to
22  Vadim Kagan by July 1, 2015 in the Newton-Cynthia
23  Road, LLC, correct?
24  A. Yes.

88

1  Q. So you agree with me, sir, that as of July
2  1, 2015 you were done, you no longer had an interest
3  in the Newton-Cynthia Road, LLC, correct?
4  A. Yes.
5  Q. Now, after July 1, 2014 did you empty the
6  bank account that Newton-Cynthia Road, LLC
7  maintained?
8       MR. CALANDRELLI: Objection.
9       MS. FULLER: Objection.
10       THE INTERPRETER: You said 2014.
11       MR. PERTEN: 2015.
12  A. The agreement was that there was a person
13  who had done our taxes for four years. So we left
14  3,000 on the account because we needed to pay our
15  accountant.
16  Q. The account was an account in the name of
17  Newton-Cynthia Road, LLC, correct?
18  A. The account was in the name of
19  Newton-Cynthia Road, LLC Kagan Abramskiy Gassel.
20  Q. And you withdrew funds from that account
21  after July 1, 2015; is that correct?
22  A. I didn't empty the account or take money
23  out of the account. Vitaly transferred electronic
24  payment to the accountant, and I went to the bank to

89

1  close the account because we didn't want our names
2  associated with it.
3  Q. At the time that Vitaly transferred the
4  funds, were you aware that he was going to do that?
5  A. Yes.
6  Q. And did you tell Mr. Kagan before you did
7  that that he was going to withdraw the funds from
8  the account?
9  A. We didn't have any communication with
10  Mr. Kagan at this point. That was the agreement
11  made prior to that.
12  Q. And Vitaly was not a member of the LLC, was
13  he?
14  A. No.
15  Q. Was his name on the account or was his
16  wife's name on the account?
17  A. I don't remember, but for the three years
18  Vitaly was the one who made all the payments and
19  transfers of the account. For some reason the
20  Kagans didn't have any questions then.
21  Q. Now, sir, after the LLC account was
22  emptied, did you have occasion, sir, to be contacted
23  by Alex Filippov?
24  A. Yes, I think I told you about it.

### Page 90

1  Q. Mr. Filippov called you?
2  A. I don't remember.
3  Q. What do you recall he said to you and you
4  said to him?
5  A. When we met?
6  Q. Before you met, did you have a phone call?
7  A. We did, but just to agree that we would
8  meet.
9  Q. And did you meet with him in or about
10 November of 2015?
11 A. I don't remember. We must have. I don't
12 remember the dates.
13 Q. Would you agree that it was certainly a few
14 months after you sold your interest back to Kagan?
15 A. Yes.
16 Q. And where did you meet with him?
17 A. We met at the Starbucks in Chestnut Hill
18 Plaza.
19 Q. Who was present at the Starbucks other than
20 yourself and Mr. Kagan?
21 A. Artur, Vitaly and Nickolay Lipetsker.
22 Q. Can you tell us everything that was said at
23 that meeting?
24 A. They told us their story, we told them our

### Page 91

1  story and our stories were identical.
2  Q. What did you tell them?
3  A. The same information that's contained in my
4  affidavit.
5  Q. Did Mr. Filippov ask you to sign an
6  affidavit?
7  A. I don't remember.
8  Q. At some point, sir, did you prepare an
9  affidavit?
10 A. Yes.
11 Q. How did that come about?
12 A. I wanted to tell people the story that had
13 happened to us.
14 Q. Did Mr. Filippov request an affidavit?
15 A. I don't remember.
16 Q. At some point did you meet with
17 Mr. Filippov's lawyers?
18 A. Yes.
19 Q. How long after the meeting at Starbucks did
20 you meet with Mr. Filippov's lawyers?
21 A. I don't remember exactly; about two or
22 three weeks.
23 Q. At the meeting in Starbucks, sir, did you
24 provide Mr. Filippov with any documents?

### Page 92

1  A. No, we just came as is.
2  Q. And did he provide you with any documents?
3  A. I don't remember, but I don't think so.
4  Q. Did you discuss any documents at that
5  meeting?
6  A. We had a fairly superficial discussion.
7  There was no need to provide any documents.
8  Everything was clear as it was.
9       (Marked, Exhibit 15, Email, top email
10 11/13/15, and Affidavit of Vladislav Abramskiy.)
11 Q. Can you identify Exhibit 15?
12 A. Yes.
13 Q. Did Attorney Calandrelli prepare an
14 affidavit for your review after you met with him?
15      MR. CALANDRELLI: Objection.
16 A. Yes.
17 Q. Did you meet with Mr. Calandrelli or with
18 additional lawyers?
19 A. There was just one lawyer.
20 Q. Was it just you and the lawyer or was
21 somebody else there too?
22 A. My son.
23 Q. Anybody else?
24 A. No.

### Page 93

1  Q. How long did you meet with Mr. Calandrelli?
2       MR. CALANDRELLI: Objection.
3  A. Also there was Vitaly Gassel present.
4  Q. Was there an affidavit from Mr. Gassel as
5  well?
6  A. I don't know. I don't think so.
7  Q. Do you recall Mr. Gassel being asked during
8  that meeting whether he would sign an affidavit?
9  A. I don't remember.
10 Q. At that meeting with the lawyer
11 Mr. Calandrelli, did you review any documents?
12 A. I don't remember. It was a long time ago.
13 Q. If we can look at Exhibit 15. Would you
14 agree with me that, if you go to the second page,
15 reading backwards, that on or about November 3, 2015
16 Mr. Calandrelli sent you a draft of an affidavit?
17 A. It says so. It must.
18 Q. Is that draft affidavit the document that's
19 stapled to this email?
20      MS. FULLER: Objection.
21 A. Yes, it is.
22 Q. On the first page of the exhibit, not the
23 attachment, there's an email of November 6, 2015 at
24 12:22 at the bottom. Does that email, sir, refer to

**118**

1  THE INTERPRETER: I want to clarify for
2  the deponent, you are asking him to review the whole
3  affidavit?
4  MR. CALANDRELLI: Yes.
5  Q. My question is, is there anything else you
6  wanted to clarify in the affidavit?
7  A. Can you repeat the question?
8  Q. You made a clarification for me with
9  respect to the first sentence of Paragraph 6. With
10 the exception of that, is everything else contained
11 in that affidavit still true and accurate?
12 A. Yes.
13 MR. CALANDRELLI: I have no further
14 questions.
15 MR. PERTEN: Do you have any questions?
16 MS. FULLER: No.
17 MR. PERTEN: I have a couple of
18 follow-up.
19 MS. FULLER: I'm going to object. It is
20 well past the four-hour window. We have tried to be
21 very accommodating. If we go more than a couple of
22 minutes, I would like to stop.
23 EXAMINATION
24 BY MR. PERTEN:

**119**

1  Q. Mr. Abramskiy, you looked at the letter
2  from Mr. Cohen which Mr. Calandrelli marked as
3  Exhibit 18 and the invoice attached. Do you recall
4  that?
5  A. Yes.
6  Q. You never paid that invoice; is that
7  correct?
8  MS. FULLER: Objection.
9  A. No.
10 Q. In fact, Mr. Kagan ended up paying you an
11 additional $17,000 and change, correct?
12 MR. CALANDRELLI: Objection.
13 MS. FULLER: Objection.
14 A. They put us in such position that we would
15 lose if we didn't accept the conditions so we had to
16 do it.
17 Q. Did you have counsel at the time you
18 received this?
19 MS. FULLER: Do you understand the
20 question?
21 A. You are asking about the attorney that
22 represented the LLC?
23 Q. I'm asking in June of 2015 did you have a
24 lawyer representing you?

**120**

1  A. No.
2  MR. PERTEN: Nothing further. You can
3  object, but I'm going to suspend pending you getting
4  back to me as to whether there are any additional
5  documents.
6  MS. FULLER: I'm objecting to that on
7  the grounds those documents could have been obtained
8  before this deposition from the Lyman-Cutler party.
9  There was no reason why it was not obtained prior to
10 this deposition. We are objecting to the suspension
11 of this deposition. We are also objecting to the
12 length beyond the four hours of today's deposition.
13 We do object to bringing him back.
14 MR. PERTEN: Thank you.
15 We are suspending.
16 (3:14 p.m.)

**121**

CERTIFICATE OF COURT REPORTER

I, David A. Arsenault, Registered
Professional Reporter, do certify that the
deposition of VLADISLAV ABRAMSKIY, in the matter of
Lyman-Cutler vs Kagan, et al., on June 18, 2018, was
stenographically recorded by me; that the witness
provided satisfactory evidence of identification, as
prescribed by Executive Order 455 (03-13) issued by
the Governor of the Commonwealth of Massachusetts,
before being sworn by me, a Notary Public in and for
the Commonwealth of Massachusetts; that the
transcript produced by me is a true and accurate
record of the proceedings to the best of my ability;
that I am neither counsel for, related to, nor
employed by any of the parties to the above action;
and further that I am not a relative or employee of
any attorney or counsel employed by the parties
thereto, nor financially or otherwise interested in
the outcome of the action.

Transcript review was requested of the reporter.

*[signature]* 6.27.18
David A. Arsenault, RPR