# EXHIBIT 12

ORIGINAL

Exhibits: 1-21                           Volume 1, Pages 1-159

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

------------------------------

In Re:

                                         Chapter 7
LYMAN-CUTLER, LLC,                       Case No. 15-13881-FJB

        Debtor
------------------------------
LYMAN-CUTLER, LLC,

        Plaintiff
v.                                       Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
        Defendants
------------------------------

DEPOSITION OF ELENA LANDE
Friday, June 22, 2018, 9:57 a.m.
Sheehan Phinney Bass + Green, P.A.
255 State Street, 5th Floor
Boston, Massachusetts

--------- David A. Arsenault, RPR ---------
daa@fabreporters.com   www.fabreporters.com
Farmer Arsenault Brock LLC
Boston, Massachusetts
617-728-4404

Elena Lande - Vol. 1 - 6/22/2018

20

### Page 74

1 unacceptable?
2 A. I do not remember.
3 Q. Did you have further questions or were
4 these issues laid to rest?
5     MR. CARNATHAN: Objection.
6 A. I don't understand the question.
7 Q. You raised a bunch of questions in the July
8 24, 2014 email, correct?
9 A. Yes.
10 Q. Which is Exhibit 7?
11 A. Yes.
12 Q. You got answers in Exhibit 8, correct?
13 A. Yes.
14 Q. Once you received those answers, had the
15 questions that you raised in Exhibit 7 been
16 addressed?
17 A. They were answered, yes.
18 Q. Did you have further questions on those
19 topics?
20 A. I don't remember.
21 Q. At that point as of August 2014, did you
22 tell Mr. Kagan to stop?
23 A. No.
24 Q. Looking at Exhibit Number 7, the July 24,

### Page 75

1 2014, let me draw your attention to Item 4. You
2 make the statement that the total number went up
3 $60,000. Do you see that in the last sentence?
4 A. Yes.
5 Q. Was it your understanding that as of July
6 24, 2014 that the construction costs according to
7 Kagan had gone up $60,000 over what you thought it
8 would cost originally?
9 A. I need a second.
10 Q. Sure.
11 A. I wouldn't say so because it says here
12 Expenses. I don't remember calling the complete
13 budget or whether it was addressing the expenses
14 going up by 60 K at that point.
15 Q. As of July 2014, how much had been spent of
16 the $1.7 million construction budget?
17 A. I don't remember.
18 Q. As of July of 2014, what was the status of
19 the construction? What percent was completed?
20 A. I'm not able to answer that question.
21 Q. Was the house completed then?
22 A. No.
23 Q. So you understood in July of 2014 that
24 construction was ongoing, correct?

### Page 76

1 A. Yes.
2 Q. And you understood that additional
3 construction costs were going to be incurred going
4 forward, correct?
5 A. Additional?
6 Q. Yes.
7 A. Yes.
8 Q. Now, at some point, Ms. Lande, did
9 Mr. Kagan agree to front any costs over $1.7
10 million?
11 A. Would you rephrase the question?
12 Q. At some point did you have a discussion
13 with Mr. Kagan wherein he agreed to front any
14 expenses that went above 1.7?
15 A. Yes.
16 Q. And did you understand that he expected to
17 be reimbursed at the closing for those monies that
18 he had fronted over and above $1.7 million?
19 A. This is a document that he signed but not
20 the document we provided him for signature.
21 Q. What was your understanding of the
22 agreement that you struck with Mr. Kagan?
23 A. That he was responsible for covering. I
24 think I sent you the copy and you have an exact

### Page 77

1 wording. I don't want to say. I'm pretty sure I
2 sent it to you. I think the idea was that he's not
3 going to go over a certain number.
4     (Marked, Exhibit 9, Email, 9/17/14.)
5 Q. Showing you what we marked as Exhibit 9,
6 Ms. Lande. Can you tell me what that document is?
7 A. This is the document that Kagan produced
8 and sent us in September.
9 Q. A couple of questions for you. This was a
10 document that I received in the litigation from the
11 other side. Is this a document that you provided to
12 Mr. Carnathan's office?
13 A. I don't remember. I don't believe so.
14 Q. Did you provide any documents to
15 Mr. Filippov?
16 A. Directly? I don't think so.
17 Q. Did you provide any documents to
18 Mr. Filippov indirectly?
19 A. To the attorney office, I did.
20 Q. Do you know Mr. Filippov?
21 A. No. I talked to him.
22 Q. When was the first time you spoke to
23 Mr. Filippov?
24 A. I think last year.

**FARMER ARSENAULT BROCK LLC**

### Page 78

1  Q. Was that a phone call or a face-to-face
2  meeting?
3  A. I have never met him in person.
4  Q. You spoke on the phone?
5  A. Yes.
6  Q. What do you recall about that conversation?
7  A. The first conversation?
8  Q. Sure. The first time you spoke to
9  Mr. Filippov.
10 A. He was -- we just discussed what he built
11 with Kagan and there were issues and they are suing
12 Kagan.
13 Q. Anything else, or is that the best that you
14 can recall?
15 A. The best that I can recall.
16 Q. How long did that phone call last?
17 A. I don't remember.
18 Q. Did he call you out of the blue?
19 A. No. I think he contacted me through some
20 social network.
21 Q. Did he tell you how he knew that you had
22 been involved with Mr. Kagan?
23 A. Not that I remember.
24 Q. Do you know Mr. Lipetsker, Nickolai

### Page 79

1  Lipetsker?
2  A. No.
3  Q. Have you ever spoken to Nickolai Lipetsker?
4  A. No.
5  Q. How many times have you spoken to
6  Mr. Filippov other than that initial phone call you
7  just told me about?
8  A. A few.
9  Q. Sorry?
10 A. A few times.
11 Q. When was the next time you spoke to
12 Mr. Filippov?
13 A. I don't remember.
14 Q. What do you recall about the next
15 conversation that you had with Filippov?
16 A. I don't remember. Maybe four or five times
17 in general.
18 Q. Do you remember anything about any of your
19 conversations with Mr. Filippov beyond what you've
20 already told me?
21 A. He told me about his project. I told him
22 about Kagan.
23 Q. Have you now exhausted your memory of what
24 you spoke about?

### Page 80

1  A. Yes.
2  Q. Is that the best you can do in terms of any
3  detail you discussed?
4  A. We discussed the projects. That's it.
5  Q. What do you recall discussing about the
6  projects, if anything? I know it is a long time.
7  A. Just general information. Nothing
8  specific.
9  Q. If I can direct your attention back to
10 Exhibit 9. Would you agree that this is an email
11 from Vadim Kagan to you which encloses a signed
12 document?
13 A. Yes.
14 Q. You received that on or about September 17?
15 A. Yes.
16 Q. Do you agree that Mr. Kagan agreed to fund
17 the construction beyond 1.75 million?
18 A. Yes.
19 Q. And that was consistent with your
20 understanding that he was going to fund beyond 1.75
21 million?
22 A. Yes.
23 Q. Is it fair to say that as of September 2014
24 you understood that the project might cost more than

### Page 81

1  $1.75 million?
2  A. Yes.
3  Q. Did you have any discussions with Mr. Kagan
4  as to why the project might cost more than 1.75
5  million?
6  A. I tried.
7  Q. What do you recall about that conversation?
8  A. At that point in time Mr. Kagan had become
9  less responsive to phone calls or emails and
10 conversations.
11 Q. Did you understand that Mr. Kagan expected
12 to be reimbursed for any monies beyond 1.75 at the
13 time of the closing?
14 A. That wasn't my expectation because that was
15 his. He created this document and he send this
16 document. It was never signed by us or agreed with
17 us on those terms and conditions.
18 Q. Did you understand -- whether you agreed to
19 it or not, did you understand that Mr. Kagan was
20 fronting costs over $1.7 million?
21 A. No, I never agreed to that.
22 Q. I didn't ask you if you agreed. I said did
23 you have any understanding that he was fronting
24 monies above and beyond the $1.7 million loan?

### 154

1  A. It wasn't one conversation; it was a number
2  of conversations. There were a few phone calls that
3  I had with him. In the beginning he was trying to
4  be really nice. But then it progressed to being a
5  very fired conversation. Eventually he went into
6  the personal life, threatening me and taking points
7  out of my personal life where I said I couldn't
8  handle it anymore. Other than threatening with the
9  carrying costs and saying that we are being
10 ridiculous for not taking an offer and trying to
11 make sense out of it, he then went into facts about
12 personal life. I realized that something is going
13 on there more than just business relationship.
14    Q. Do you remember any specifics about what he
15 raised about your personal life?
16    A. Yes.
17    Q. Could you tell me what in particular he
18 said?
19    A. I was pregnant at the time. I was eight
20 months pregnant and we lost the child a year prior
21 to that. He pointed to that and said you are not in
22 a position to lose another one.
23    Q. Did he raise any other points from your
24 personal life?

### 155

1    A. Not that I remember.
2    Q. Other than what you have recounted already,
3  do you remember anything else that Mr. Cohen said to
4  you that you perceived as a threat?
5       MR. PERTEN: Objection.
6    A. Would you repeat the question?
7    Q. Other than what you have already recounted
8  today, do you recall anything else that Mr. Cohen
9  said to you that you perceived as a threat?
10      MR. PERTEN: Objection.
11      You can answer.
12   A. Other than money and the personal stuff,
13 no.
14      MR. CARNATHAN: I'm all set.
15      MR. PERTEN: One follow-up question.
16      EXAMINATION
17 BY MR. PERTEN:
18   Q. The $750,000 that you got for this project,
19 what percentage of the net profit did that turn out
20 to be?
21   A. I think you have it. I don't remember.
22      MR. PERTEN: That's all I have got.
23   Q. You will get me more documents on the list?
24   A. Yes.

### 156

1       MR. PERTEN: Technically I will suspend,
2  but I don't expect we will need to speak with you
3  again in deposition. We are good.
4       THE WITNESS: I'll send you that.
5       MR. PERTEN: If you send by email, copy
6  Mr. Carnathan on that email.
7       The reporter will send you the
8  transcript for reading and signing to your email
9  address, elenalande@gmail.com.
10      (1:38 p.m.)

### 157

CERTIFICATE OF COURT REPORTER

I, David A. Arsenault, Registered Professional Reporter, do certify that the deposition of ELENA LANDE, in the matter of Lyman-Cutler vs Kagan, et al., on June 22, 2018, was stenographically recorded by me; that the witness provided satisfactory evidence of identification, as prescribed by Executive Order 455 (03-13) issued by the Governor of the Commonwealth of Massachusetts, before being sworn by me, a Notary Public in and for the Commonwealth of Massachusetts; that the transcript produced by me is a true and accurate record of the proceedings to the best of my ability; that I am neither counsel for, related to, nor employed by any of the parties to the above action; and further that I am not a relative or employee of any attorney or counsel employed by the parties thereto, nor financially or otherwise interested in the outcome of the action.

Transcript review was requested of the reporter.

_____ 7.3.18
David A. Arsenault, RPR