# EXHIBIT D

Exhibits: 1-4                               Volume 1, Pages 1-160

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

------------------------------

In Re:

LYMAN-CUTLER, LLC,                  Chapter 7
                                    Case No. 15-13881-FJB

        Debtor
------------------------------
LYMAN-CUTLER, LLC,

        Plaintiff
v.                                  Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
        Defendants
------------------------------

DEPOSITION OF VON ALAN SALMI
Tuesday, October 16, 2018, 10:05 a.m.
O'Connor Carnathan and Mack LLC
1 Van de Graaff Drive, Suite 104
Burlington, Massachusetts

--------- Janis T. Young, RDR, CRR ---------
jty@fabreporters.com    fab.fabreporters.com
Farmer Arsenault Brock LLC
Boston, Massachusetts
617-728-4404

90

1 our experience in contracting, and my experience
2 working for various companies that I've worked for.
3 We found that we like to delineate, for
4 our purposes, the scope of work with a subcontractor
5 to try and tie that down to an exact scope of work,
6 so we have a cost that encompasses that scope of
7 work, so we can determine if a change order coming
8 forth is sometimes presented as a valid change order
9 or if it's something that would be included in the
10 original scope of work.
11 So it limits the amount of change orders
12 coming through; plus it gives our clients some
13 relative level of comfort that the bid is sufficient
14 to be able to perform the scope of work that's being
15 provided.
16 Q. Did you develop this bid-solicitation
17 methodology yourself, or did you learn it somewhere?
18 A. It's an amalgamation of various practices
19 at the various companies that I've worked for over
20 time.
21 Q. Does it incorporate any elements
22 recommended by any of the associations of which
23 you're a member?
24 MR. PERTEN: Objection.

91

1 A. Inadvertently it may, but I don't think we
2 have made a conscious effort to extract any
3 information from any of those elements.
4 Q. Do you still have copies of the bid
5 packages you sent to each of the subcontractors that
6 you reference in your report?
7 A. I believe we do.
8 Q. How did you convey those bid packages to
9 each of the subcontractors?
10 A. Either through mail, postal service, may
11 have been some FedEx, and then emailing.
12 Q. Did you have any follow-up correspondence
13 with any of the subcontractors who submitted bids to
14 you?
15 A. Follow-up correspondence in relation to...?
16 Q. Well, say Glenn Hines; you sent him the bid
17 package. Did you have any email correspondence with
18 the Glenn Hines subcontractor?
19 A. No; I think we had delineated everything
20 prior to that with the plans and all. They had
21 adequate information to be able to provide us with
22 the bids as requested.
23 Q. Did you have email correspondence with any
24 of the subcontractors who submitted bids?

92

1 A. There may have been. Very limited; just
2 for clarification, scope.
3 (Marked, Exhibit 4, group of bids.)
4 (Lunch recess)
5 Q. Mr. Salmi, I've marked as Exhibit 4 a
6 collection of the bids that were produced to us by
7 your counsel, Bates-stamped VS-7 through VS-81. Is
8 that a complete collection of the bids you received
9 in connection with forming your opinion in this
10 case?
11 A. It looks like it, yes.
12 Q. Did you just get one bid for each component
13 of your opinion?
14 A. Yes, we did.
15 Q. Why did you just get one?
16 A. Because these were already prequalified
17 contractors that we had had previous experience
18 with. They understood the requirements of this type
19 of work.
20 If we felt something was inordinately
21 awry in terms of their numbers, we would have sought
22 more bids.
23 We felt as though, again, they were all
24 qualified, because they had done this type of work

93

1 before.
2 Q. So in this case you didn't think that any
3 of the bids were inordinately awry?
4 A. No, we did not.
5 Q. For how long had you known Glenn Hines
6 before submitting a proposal from him in April of
7 2018?
8 MR. PERTEN: Objection.
9 A. I would say a period of maybe twenty years.
10 Q. On how many projects had you previously
11 used Glenn Hines as an excavation contractor?
12 A. Probably half a dozen.
13 Q. Did I understand earlier that you led
14 Mr. Hines to believe that he might actually be
15 bidding on a real job here?
16 A. We told everyone this could be a possible
17 job; that we'd been asked to take and price a house
18 up for a client, and we were looking for competitive
19 bids.
20 That was the same statement distributed
21 amongst all those that were bidding on the project.
22 Q. Is this one-page proposal the sum total of
23 what Hines sent back to you for his bid?
24 A. Yes, it is.

**Page 114**

1   they're closed out, we file them away, put them
2   away; and after seven years I destroy the records.
3       Q.  Me too.
4       A.  It would be a lot of paper.
5       Q.  If we can move to the next section, if you
6   will, you've got a quote from Andersen Windows and a
7   quote from Marvin Windows.  Is that two quotes for
8   the same windows, or are those two different sets of
9   windows?
10      A.  Two quotes for the same windows.
11      Q.  Why did you get two quotes in that
12  instance?
13      A.  Let's see; there was a reason specifically
14  for that.  I'm trying to think what it was.
15          (Pause)
16      A.  I think we wanted to get a comparative
17  cost.  There was no spec for the specific windows.
18  I think we wanted to get a comparative cost between
19  the two to see comparatively which would be the
20  higher, which might be the lower.  They seemed to be
21  relatively close.
22      Q.  Which one did you use in forming your
23  opinion in Exhibit 1?
24      A.  I think it may have been the Marvin quote.

**Page 115**

1   I believe it was about a $500 difference between the
2   two.
3       Q.  What information did you provide to
4   Andersen and Marvin in order to solicit their bids?
5       A.  The plans and specifications.
6       Q.  Same as we've been discussing?
7       A.  Same as we've discussed.
8       Q.  Did you work with anyone in particular at
9   Andersen?
10      A.  I think that number -- where did that come
11  from?
12          That number came from Concord Lumber
13  also.  They did both window quotes.
14      Q.  Did you work with anyone in particular at
15  Concord Lumber?
16      A.  Brad Cutter.
17      Q.  How long have you known Brad?
18      A.  Twenty-plus years.
19      Q.  Did Brad also believe that he was bidding
20  on a job that might actually occur?
21      A.  Yes.
22      Q.  And I'm sorry, I forgot if I asked already;
23  but did you give the same specs and plans to Concord
24  Lumber that we've already discussed, or did you give

**Page 116**

1   anything more to them?
2       A.  The same.
3       Q.  If we could turn to VS-55, the Kenneth
4   Castellucci & Associates bid.
5       A.  Yes.
6       Q.  It looks like you worked with someone named
7   Robert A. Packard there?
8       A.  Yes.
9       Q.  How long have you known Robert Packard?
10      A.  Twenty-five-plus years.
11      Q.  Has he been with Kenneth Castellucci all
12  that time?
13      A.  He's just retired, so he had been there for
14  over 43 years.
15      Q.  Did you provide any different materials to
16  Mr. Packard than what we've discussed with regard to
17  the other subs?
18      A.  I think the only thing we sent him was a
19  few pictures of the kitchen slabs.  We told him we
20  were looking for something similar, because we were
21  looking for a detail on the edge of the slabs.
22      Q.  Did Kenneth Castellucci provide the stone
23  for the Countryside project?
24      A.  No, they did not.

**Page 117**

1       Q.  Who did?
2       A.  It may have been Cumar Stone; I'm not sure.
3   May have been Cumar.
4       Q.  Why didn't you use Castellucci for the
5   Countryside project?
6       A.  Schedule.  They didn't have the time when
7   we needed it.
8       Q.  You approached them for it?
9       A.  Yes.
10      Q.  Why didn't you use Cumar to bid the faux
11  job that formed the basis for your opinion?
12      A.  I had a longer-standing relationship with
13  Castellucci.
14      Q.  In general, in soliciting the bids on which
15  you based your opinion, did you try to choose people
16  with whom you had longstanding relationships?
17      A.  I did.
18      Q.  If we turn to VS-57, Installations Plus,
19  Inc., that seems to run through either Page 60 or
20  61.  Can you tell me, is 61 part of the
21  Installations Plus bid?
22      A.  That is the cost-of-tile summary.
23          The cost of tile was not included,
24  because all of Installation Plus's work was