UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| ——————————————— ) | | |
| *In re:* ) | | |
| ) | | |
| LYMAN-CUTLER, LLC, ) | Chapter 7 | |
| Debtor ) | Case No. 15-13881 FJB | |
| ———————————————) | | |
| | | |
| ——————————————— ) | | |
| ) | | |
| LYMAN-CUTLER, LLC, et al., ) | | |
| Plaintiffs, ) | | |
| ) | Adv. Case No. 1:16-ap-01120 | |
| v. ) | | |
| ) | | |
| VADIM KAGAN, *et al.*, ) | | |
| Defendants. ) | | |
| ———————————————) | | |

**PLAINTIFFS' MEMORANDUM IN OPPOSITION TO THE
MOTION FOR SUMMARY JUDGMENT OF VADIM KAGAN, KAGAN
DEVELOPMENT KDC CORP. and PROEXCAVATION CORP.**

Plaintiffs Lyman-Cutler, LLC (the "LLC" or the "Debtor"), Alex Filippov ("Filippov"),

and Nickolay Lipetsker ("Lipetsker") ("Plaintiffs") respectfully oppose the Motion for Summary

Judgment of Vadim Kagan, Kagan Development KDC Corp. and ProExcavation Corp.

("Defendants") (Doc. No. 354, Adv. Proc. No. 225) (the "Motion").

## INTRODUCTION

The evidence is overwhelming that Defendants have engaged in a bad faith, fraudulent

scheme to extort unfair profits from the Debtor in violation of Vadim Kagan's ("Kagan")

contractual and fiduciary duties.  Despite monumentally implausible testimony by Kagan, the

Defendants cannot get away from the evidence that Kagan persuaded Filippov and Lipetsker to

invest in his project at 77 Lyman Road, Brookline, Massachusetts (the "Project") by making

clear and explicit representations to them that he could build two homes for a budget of $1.6

1

million each, including carrying costs, and that he stood behind his guarantee by agreeing to pay the carrying costs himself if the houses did not sell within 23 months.

During the Project, the Defendants did not bother to keep track of the construction costs, and never communicated any cost overruns to Filippov or Lipetsker.  On May 7, 2015, after Kagan failed to complete construction on time and the houses failed to sell for months past the 23-month deadline, Kagan made an out-of-the-blue demand – through counsel – for over $1 million, and announced that he would not honor his obligation to pay the carrying costs.  When Filippov and Lipetsker rejected Kagan's demand, he doubled it, recording a June 22, 2015 mechanic's lien against the homes in the amount of $2,095,985.23 (the "Mechanic's Lien"), including massive fees and other charges through Kagan Development KDC Corp. ("KDC"), never before mentioned, pursuant to an alleged contract he signed for the LLC himself but which Filippov and Lipetsker had never seen.

In the face of these appalling facts, the Defendants argue that they cannot be held liable because there is no evidence that the Plaintiffs paid any specifically identifiable fraudulent charge.  They are badly mistaken.  In the first place, the evidence strongly supports the conclusion that the Defendants are liable for knowing fraud.  In the second place, Plaintiffs do not have to prove the elements of fraud to recover on their other claims.

## FACTS AND PROCEDURE

### A.    The Amended Complaint

Plaintiffs' Amended Complaint sounds eight counts, including:  Breach of Contract by Kagan (Count I), Breach of Fiduciary Duty by Kagan (Count II), Aiding and Abetting Breach of Fiduciary Duty by Tatiana Kagan ("Tatiana"), KDC and ProEx (Count III), Fraud by all Defendants (Count IV), Conspiracy (Count V), Violation of G.L. ch. 93A by Tatiana, KDC and

ProEx (Count VI), Breach of Contract by KDC (Count VII) and Equitable Subordination against

all Defendants (Count VIII).  Only Count IV of the Adversary Complaint depends upon proof of

the Defendants' fraud (although fraud would certainly constitute a breach fiduciary duty and

contract as well).  Defendants blatantly ignore every count in the Complaint except Count IV

(Fraud) and Count VII (Breach of Contract by KDC).  Simply asserting that "the entire

complaint ...  is predicated on the existence of fraud" does not raise a cognizable challenge to any

Count of the Complaint, except Count IV.  <u>See</u> Defendants' Memorandum, at 1.

### B.     <u>Statement of Disputed Material Facts</u>

Pursuant to D. Mass. Bankr. L.R. 7056-1 and D. Mass. L.R. 56-1, Plaintiffs incorporate

by reference their response to the Defendants' separate statement of material facts of record as to

which there is a genuine issue to be tried ("Plaintiffs' Fact Resp.").  Plaintiffs also respectfully

incorporate by reference the statement of undisputed material facts they submitted in support of

their Memorandum in Support of their Motion for Summary Judgment, Doc No. 350, Adv. Doc.

No. 220 ("Plaintiffs' First Memo"); Separate Statement of Material Facts, Doc No. 353, Adv.

Doc. No. 221 ("SSUMF").[1]   Plaintiffs will discuss the evidence in connection with their

arguments below.

### ARGUMENT

There is no explanation for Kagan's conduct that relieves him of liability in this case.

His willful bad faith and fraudulent conduct has cost the Plaintiffs millions of dollars in lost

expectancy and out of pocket losses.  The record strongly supports liability for fraud, but a

verdict of fraud is not required to call the Defendants to account for this misconduct.  Kagan has

---

[1]     For the purpose of opposing Defendants' Motion, Plaintiffs do <u>not</u> accept as true Kagan's
version of the facts as they did in connection with their Motion for Summary Judgment.

also breached the LLC's Operating Agreement and his fiduciary duty, and the other Defendants

have aided and abetted him in doing so.

**I.      The Record Developed in Discovery is Replete with Evidence of Defendants' Fraud.**

Defendants doggedly contend there is no evidence of fraud in this case.  This particular

bit of chutzpah is predicated on the Defendants' contention that Plaintiffs are somehow obligated

to identify specific fraudulent invoices among the sea of detritus Defendants created in 2015 to

"support" KDC's Proof of Claim.  They are mistaken.  It is common knowledge, recognized in

hundreds of court decisions, that proof of fraud almost always relies on circumstantial evidence.

United States v. Goodchild, 25 F.3d 55, 60 (1st Cir. 1994) ("Fraud is usually proven by

circumstantial evidence.  Direct proof of a knowing intent to defraud is rare. . . ."); see also

ABCD Holdings, LLC v. Hannon (In re Hannon), 512 B.R. 1, 16-17 (Bankr. D. Mass. 2014)

(court must exercise caution ruling on summary judgment in fraud case); Beal Bank, SSB v.

Pittorino, 177 F.3d 65, 69 (1st Cir. 1999) ("confluence of several badges of fraud may be

conclusive evidence of fraudulent intent"); Xerox Fin. Servs. Life Ins. Co. v. Sterman (In re

Sterman), 244 B.R. 499, 504 (D. Mass. 1999) (family relationship may be a badge of fraud).

**A.      Did Kagan Commit Fraud When he Persuaded Filippov and Lipetsker to Invest in the Lyman-Cutler Project?**

The evidence is overwhelming that Kagan made exactly the representations to Filippov

and Lipetsker that the Plaintiffs assert.  Not only will Filippov and Lipetsker so testify, but so too

will third parties Attorney Boris Maiden and Dimitry Zhukovskiy.  Plaintiffs Fact Resp. No. 15.

Kagan's bizarre testimony disclaiming his initial representations is evidence of his guilty

state of mind.  At his deposition, Kagan claimed that he had no budget or plans when he first met

with Filippov and Lipetsker, and that they (a dentist and a telecom executive) presented the $1.3

million budget figure to Kagan!  See Deposition of Vadim Kagan ("Kagan Dep."), at 77,

attached to Transmittal Affidavit of Sean T. Carnathan, Dec. 7, 2018 ("Second Carnathan Aff."),

Ex. 23. Kagan testified that the construction budget was "laughable," and claimed that he did not

provide the estimated carrying costs or the length of time to complete the Project. Id., at 120,

212. According to Kagan, Filippov and Lipetsker agreed to invest in the Project without

knowing what the construction costs would be. Id., at 88. Kagan is so acutely aware of his

wrongdoing that he asks this Court to believe that a dentist and a telecom executive presented the

construction costs and time to completion to a professional builder, and then agreed to invest

$2.25 million in a Project with no construction budget.[2]

The only serious question is whether: (1) Kagan planned to blindside Filippov and

Lipetsker at the eleventh hour when he made these representations; or (2) Kagan decided to

trump up the cost overruns after he failed to complete and sell the homes within the contractual

deadlines. Kagan's pattern of inflicting the same strategy on at least 5 other previous and

contemporaneous investors known to the Plaintiffs supports the conclusion that he had a plan to

cheat Filippov and Lipetsker when he persuaded them to invest. Alternatively, where it is

undisputed that Kagan did not bid out any of the subcontracted work and had only minimal plans

and no specifications when he was presenting the construction costs to Plaintiffs, the evidence

supports a verdict that Kagan's representations were made with reckless disregard for the truth.

Geresy v. Dommert, 2004 Mich. App. LEXIS 1397, at *24 (June 3, 2004) (affirming verdict that

---

[2]       Kagan's testimony that he, Filippov, and Lipetsker approved the cost overruns and agreed
to upgrade every finish in the two houses is similarly preposterous. The correspondence between
Filippov and Zhukovskiy in May 2013 shows Filippov demanding detailed analysis of a potential
carrying cost overrun of $16,000. See Zhukovskiy Dep. Ex. 16, Second Carnathan Aff., Ex. 37.
Filippov is not a man who would cavalierly agree to hundreds of thousands of dollars of cost
overruns on each house based on a conversation at the property. Furthermore, if Kagan had truly
kept Filippov and Lipetsker informed, he would not have felt the need to hire an attorney to send
the May 7, 2015 Pyle letter.

contractor who under estimated construction costs without supporting bids was liable for fraud based on reckless disregard for the truth).

**B.     There is No Innocent Explanation for the KDC Contract, Invoice and Mechanic's Lien.**

The underlying support for the fraud claim against KDC is simple and is based on KDC's own document:  its invoice for alleged cost overruns first presented to Filippov on June 25, 2015. This was three days <u>after</u> Kagan caused KDC to record the June 22, 2015 Mechanic's Lien in which Kagan caused KDC to encumber the Project's Properties, and which is the basis of KDC's proof of claim in this bankruptcy proceeding.   Perten Aff. <u>Ex. 7</u>, Filippov Supp. ATI No. 5 at 6.

**1.     Even if not Deemed Fraudulent, the KDC Contract is Bad Faith Self-Dealing.**

The Mechanic's Lien recites that it is based on a contract between the Debtor and KDC, which purports to be dated June 24, 2013, and which Kagan signed for both sides of the alleged deal (the "KDC Contract").  Setting aside KDC's alleged reimbursement claims for the moment, the fees and charges that go directly into KDC's (Kagan's) pocket based upon this purported contract total **$777,784.41** out of the total lien of $2,095,985.23.  SSUMF ¶¶ 38-44.[3]

Kagan admits, as he must, that the LLC's Operating Agreement obligates him to build the two houses in return for a 50% share of the profits from the Project, but testified that his 50% share was calculated after paying KDC its fees.  Kagan Dep., at 233,  KDC "officer" James Joseph Cohen testified that he drafted the KDC Contract and reviewed the Operating Agreement when he did so.  <u>See</u> Deposition of J. Joseph Cohen ("Cohen Dep."), at 116-17, Second Carnathan Aff., <u>Ex. 27</u>.  Cohen testified that because the Operating Agreement provided for

---

[3]     The Proof of Claim lards on hundreds of thousands more in interest and "administrative fees."  <u>See</u> Claims Register No. 1-2.

Kagan to build the homes in return for a 50% share of the Project profits, they did not charge for

Kagan's <u>personal time</u>. <u>Id.</u>, at 118-19; <u>see</u> SSUMF ¶ 45 (Kagan Defendants value Kagan's time

at $164,000).  Cohen also testified that the terms of the Operating Agreement, obligating Kagan

to pay the carrying costs after 23 months, had no impact on the provision of the KDC Contract

charging a carrying costs advance fee.  <u>Id.</u>, at 123-24.  Cohen also drafted the Mechanic's Lien,

which Kagan signed for KDC.  <u>Id.</u> at 103; Kagan Dep. at 222, (participated in preparing

Mechanic's Lien); Transmittal Affidavit of Sean Carnathan, <u>Ex. 6</u> (Mechanic's Lien) (Doc. No.

355; Adv. P. No. 222).[4]

Cohen's effort to draft around the Operating Agreement to add $777,841.41 in fees on

top of Kagan's share of the net profits is not in good faith.  <u>See</u> <u>Anthony's Pier Four, Inc. v. HBC</u>

<u>Assocs.</u>, 411 Mass. 451, 471-72 (1991) ("neither party shall do anything that will have the effect

of destroying or injuring the right of the other party to receive the fruits of the contract").  This is

---

[4]      Mr. Cohen, formerly known as Jamie Edelkind, is a career criminal who has been
convicted twice of bank fraud, sentenced to years in prison and ordered to make millions in
restitution.  Second Transmittal Affidavit of Sean T. Carnathan ("Second Carnathan Aff."), <u>Exs.</u>
<u>3-6</u>.  On March 11, 1996, the United States District Court for the District of Northern Georgia, in
an enforcement action brought by the Securities and Exchange Commission ("SEC")
permanently enjoined Mr. Cohen, a/k/a Edelkind, from violations of securities law based upon
misrepresentations made in connection with a company called Sage Technology, Inc.  Second
Carnathan Aff. <u>Ex. 3.</u>   On September 17, 1997, the Court issued civil penalties against Mr.
Cohen and further ordered disgorgement.  <u>Id.</u>  On July 22, 2004, Mr. Cohen was convicted of
Bank Fraud in the United States District Court for the Northern District of Georgia, and
sentenced to one year and one day in prison, five years probation, plus fines and restitution of
$221,000.  Second Carnathan Aff. <u>Ex. 4.</u>   On July 12, 2005, Mr. Cohen was again convicted of
four counts of bank fraud and aiding and abetting bank fraud in the United States District Court
for the District of Massachusetts. Second Carnathan Aff. <u>Ex. 5.</u>  He was sentenced to five years
in prison, three years probation, fines and ordered to make restitution in the amount of
$3,298,197.45.  <u>Id.</u>  On January 9, 2007, he was convicted in the United States District Court for
the Western District of Louisiana for the willful failure to pay child support.  Second Carnathan
Aff. <u>Ex. 6</u>.  He was sentenced to two years in prison, one year of probation and ordered to make
restitution in the amount of $94,443.88.  <u>Id.</u>  According to Kagan at his deposition, Cohen has
been an officer of KDC "for a few years" as of May 3, 2018.  Kagan Dep. at 29.

particularly true where Kagan (who was not the managing member of the LLC nor authorized to sign on its behalf) signed the alleged contract with himself, and no one else ever saw or approved of the charges.  See also Plaintiffs' First Memo.

To make matters worse, **$916,800** of the charges included in the KDC billing are for fees and expenses to ProEx, which Kagan and his wife own.  SSUMF ¶¶ 15, 47.  Kagan claims he has no idea how much of this is profit.  SSUMF ¶¶ 48-49.  Based on the forensic accounting work of Michael Goldman, however, this sum includes **$571,465** of profit for ProEx (Kagan).  See Carnathan Aff., Ex. 20, Expert Report of Michael Goldman ¶ 108 (able to confirm only $345,335 of ProEx costs and materials on Project) ("Goldman Report").  Thus, the evidence will show that of the $2,095,985.23 asserted against the LLC in the Mechanic's Lien, no less than **$1,349,306.41** is simply pure profit to Kagan, which he unfairly attempts to take for himself in direct violation of the Operating Agreement and the covenant of good faith and fair dealing therein.  See Carnathan Aff., Ex. 1,  Operating Agreement ("OA"), §§ 5.1, 8.1; Anthony's Pier Four, 411 Mass. at 471-72.

### 2. The Evidence Supports the Conclusion that Kagan and Cohen Forged the KDC Contract in June 2015.

Worse still, the evidence shows that Kagan and Cohen forged the KDC Contract on or about June 17, 2015, only five days before the Mechanics' Lien was recorded.  Filippov and Lipetsker never saw the KDC Contract until it was produced in this litigation.  Plaintiffs Fact Resp. No. 15.  Neither KDC's accountant nor bookkeeper had ever seen the KDC Contract and the fees and charges based on it are nowhere in KDC's books.  Id.  The supposed KDC Contract is dated June 24, 2013, six days after the Classic Homes contract, signed by Kagan and Filippov and submitted to Rockland Bank to get the construction loans (which contract does not provide for all these fees and charges).  The Defendants have never produced the original of the KDC

Contract. Id.  After being pressed about it at the depositions, they "found" an email that purports

to convey an electronic copy of it from Cohen to Kagan on June 24, 2013, but the metadata on

the attachment shows that it was created at 7:50 p.m. and last modified one minute later at 7:51

p.m. – an impossibility given the number of custom modifications.  Still more impossible, the

attachment was last printed on **June 17, 2015**, two years after it was purportedly attached to this

email and **five days before Kagan and Cohen recorded the Mechanic's Lien**. Id.  This

evidence shows that Kagan and Cohen created the KDC Contract in June 2015 for the specific

purpose of inflicting the greatly inflated charges in the Mechanic's Lien on the Plaintiffs.[5]

    **C.**    **The So-Called Documentation of the Construction Costs is Replete with Indicia of Fraud.**

The proffered documentation assembled by Gersh and Kagan <u>after</u> the May 7, 2015 Pyle

letter and after the litigation commenced in order to support purported KDC charges is replete

with indicia of fraud.  First, it is undisputed that Kagan did not keep track of the construction

costs as the Project proceeded and instead recreated it after the fact.  SSUMF ¶¶ 17-20.  Gersh

relied on Kagan in many instances and could not recall what documentation he tracked down and

what documentation Kagan did.  Id.  Kristina Brusenkova will testify that Kagan, as a matter of

standard practice, added to the charges by his subcontractors at the end of projects and always

charged more for ProEx than it spent.  See Deposition of Kristina Brusenkova ("Brusenkova

Dep.") at 133-34, 137-38. Second Carnathan Aff. Ex. 24.[6]

---

[5]    Moreover, even if Kagan signed it with himself in 2013, and then kept it hidden until it was time to spring his trap, this would also evidence fraudulent conduct and intent.

[6]    Brusenkova's first-hand account of Kagan's dishonest business practices is damning evidence.  It is no surprise that Brusenkova does not recall specific instances of specifically fabricated charges on the Lyman-Cutler Project in particular.  What she can testify to is an overall routine pattern and practice of inflated billing.  See Fed. R. Evid. 406 ("Evidence of a person's habit or an organization's routine practice may be admitted to prove that on a particular occasion the person or organization acted in accordance with the habit or routine practice.").

Expert Michael Goldman details extensive indicia of fraud in the documentation the Defendants provided in support of their claims.  <u>See</u> Goldman Report.  Mr. Goldman concludes that "the accounting process employed by Mr. Kagan are severely deficient and … the attempts to recreate data that was never properly captured the first time are not at all convincing.  The claim as it is presented now is not supported with reliable information and, <u>based on how pervasive the problems are, may be knowingly fraudulent</u>."  <u>Id.</u> ¶ 39 (emphasis added); <u>see also id.</u> ¶ 114(h) (bold conclusion on final page).[7]

One telling calculation in the Goldman Report is a chart comparing the per square foot construction costs of projects Kagan did alone versus the ones he did with investors.  Kagan's average per square foot cost construction costs on projects with investors is **$255**; on projects without investors, it is **$139** per square foot.  Goldman Report ¶ 50.  This comparison strongly evidences the conclusion that Kagan inflates his construction costs when he has investors – which is a direct violation of the Operating Agreement, his representations to the Plaintiffs and his fiduciary duty.  <u>See</u> OA §§ 5.2, 8.1.  At $139 per square foot, Kagan completed the homes on the Lyman-Cutler Project well within budget, which again means that the charges asserted in the KDC Invoice, Mechanic's Lien and Proof of Claim are intentionally and knowingly inflated.

In addition, no less than **$707,702.68** of the alleged construction cost overruns consists of sums never paid to the subcontractor.  Plaintiffs Fact Resp. No. 15.  None of these subcontractors (including ProEx) ever followed the mechanic's lien process themselves, perhaps because <u>none of them have a written contract or actually did the work alleged by Kagan</u>.  These sums are not properly included in a claim by KDC, which has never itself paid any of these subcontractors the

---

[7]    Goldman's Report recounts innumerable reasons why the KDC books and records for the Project are unreliable and riddled with evidence of fraud.  Plaintiffs' Fact Resp. No. 15.

sums they seek.  See Brick Constr. Corp. v. CEI Dev. Corp., 46 Mass. App. Ct. 837, 840 (1999)

("In the absence of a lien perfected under G.L. c. 254, an owner who enters into a general

contract for improvements on real property is not ordinarily liable to subcontractors whose sole

contractual arrangements are with the general contractor."); Certified Power Sys. v. Dominion

Energy Brayton Point, LLC, 2011 Mass. Super. LEXIS 317, at *162 (Dec. 30, 2011) (same).

## II.    Whether Plaintiffs Relied on Defendants' Fraud is an Issue of Fact for Trial.

A key fallacy in the Defendants' position is that they cannot be called to account for their

fraud because Plaintiffs did not rely on it.  According to the Defendants, unless Plaintiffs actually

paid the false charges, they have no claim.  This contention is wrong for three reasons.

First, of course, the evidence shows Plaintiffs relied on Kagan's initial presentation.  If

the Court concludes Kagan's construction budget was knowingly false when made, then all

subsequent losses flow from the Plaintiffs' reliance on Kagan's initial misrepresentations even if

the Court were for some reason to conclude that Kagan's construction costs are real and

otherwise recoverable (which for many reasons it should not).  See Geresy, 2004 Mich. App.

LEXIS 1397, at *24 (affirming fraud judgment against contractor for recklessly underbidding

construction costs).

Second, even if the Court does not conclude Kagan fraudulently induced Filippov and

Lipetsker to invest, but instead decided late in the game to cheat them, his conduct in pressing

claims and recording a Mechanic's Lien laden with knowingly false charges is a cognizable act

of fraud for which the Plaintiffs can recover.

As explained by Judge Posner of the 7th Circuit, actual fraud is

> **any deceit, artifice, trick, or design involving direct and active
> operation of the mind, used to circumvent and cheat another**. . . No
> learned inquiry into the history of fraud is necessary to establish that it is
> not limited to misrepresentations and misleading omissions.  Fraud is a

> generic term, which **embraces all the multifarious means which human
> ingenuity can devise and which are resorted to by one individual to
> gain an advantage over another by false suggestions or by the
> suppression of truth**.  No definite and invariable rule can be laid down as
> a general proposition defining fraud, and it includes all surprise, trick,
> cunning, dissembling, and any unfair way by which another is cheated.

McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000) (emphasis added); see In re: Lawson,

791 F.3d 214, 220 (1st Cir. 2015) (actual fraud "is not limited to fraud effected by

misrepresentation"); Bailey v. Community Bank of Homewood-Flossmoor, 145 B.R. 919, 927

(Bankr. N.D. Ill. 1992) (debtor denied discharge for fabricating fraudulent mechanics' lien).

By making claims for charges to which they know they are not entitled, and encumbering

the Project Properties with a false Mechanic's Lien, the Kagan Defendants unilaterally

transferred to themselves an interest in the Project Properties commensurate with their false

claim, which the Plaintiffs have battled ever since at great cost.  In re Maher, 144 F. 503 (D.

Mass. 1906) ("In a fraudulent transfer the fraud is actual, the bankrupt has secured an advantage

for himself out of what in law should belong to his creditors, and not to him"); Cordeck Sales,

Inc. v. Construction Sys., Inc., 382 Ill. App. 3d 334, 399 (Ill. App. Ct. 2008) ("[w]hen there is

evidence that a lien claimant knowingly recorded a claim that contained a substantial overcharge,

the claim will be defeated on the basis of constructive fraud the effect of his actions is to give an

appearance of a greater encumbrance on the property than that to which he is entitled").  The

Defendants cannot escape liability for this wrongdoing by asserting that the Plaintiffs did not rely

on their falsehoods.[8]

---

[8]     If the Court agrees that the Parties agreement was for Kagan to construct the homes for
$1.6 million, and the Kagan Defendants have knowingly asserted a claim in this court for over
$2.4 million for "cost overruns" to which he knows he is not entitled, then his Proofs of Claim
and contentions in the Adversary Proceeding are themselves a fraud.

The third reason the Defendants are wrong is that reliance is not an element of any of Plaintiffs' claims other than Count IV (fraud). It is not an element of breach of contract (Count I), breach of fiduciary duty (Count II) or violation of Chapter 93A (Count VI). <u>UBS Financial Services, Inc. v. Aliberti</u>, 94 Mass. App. Ct. 180, 186 (2018) (elements of breach of contract); <u>New Faith Missionary Baptist Church v. Pizziferri</u>, 2012 Mass. App. Unpub. LEXIS 207, at *8 (Feb. 23, 2012) ("reasonable reliance is not a necessary element of a c. 93A claim"); <u>Dann v. Patten</u>, 2008 Mass. App. Unpub. LEXIS 300, at *2-3 (Nov. 17, 2008) (elements of breach of fiduciary duty); <u>see In re Parmalat Sec. Litig.</u>, 684 F. Supp. 2d 453, 481 n.173 (S.D.N.Y. 2010) ("reliance is not an element of a claim for breach of fiduciary duty under New York law"); <u>Medina v. Sarkisian</u>, 2015 Cal. App. Unpub. LEXIS 6926, at *21 n.7 (Cal. Ct. App. Sept. 29, 2015) ("Reliance is not an element of breach of fiduciary duty"); <u>Hendricks v. Grant Thornton Int'l</u>, 973 S.W.2d 348, 360 (Tx. Ct. App. 1998) ("reliance is not an element of civil conspiracy, breach of fiduciary duty, . . . , and breach of contract").[9]

Fraudulent assertion of overcharges is manifestly a breach of Kagan's fiduciary duty, and participation by KDC and ProEx subjects them to liability for aiding and abetting. <u>See</u> <u>e.g.,</u> <u>Demoulas v. Demoulas Super Mkts., Inc.</u>, 1995 Mass. Super. LEXIS 870, at *270 (Aug. 2, 1995) (finding defendants who participated in breach liable for aiding and abetting). The overcharges are a violation of the Operating Agreement regardless of whether they are intentionally fraudulent. <u>See</u> OA §§ 4.2, 8.1. Conduct in disregard of known contractual arrangements is also a recognized violation of Chapter 93A. <u>Anthony's Pier Four, Inc.</u>, 411 Mass. at 474; <u>Certified</u>

---

[9]     Reliance is, accordingly, also not an element of Count III (aiding and abetting breach of fiduciary duty) or Count V (conspiracy). <u>See</u> <u>Fine v. Sovereign Bank</u>, 634 F. Supp. 2d 126, 128 (D. Mass. 2008) (elements of aiding and abetting claim); <u>Grant v. John Hancock Mut. Life Ins. Co.</u>, 183 F. Supp. 2d 344, 362 (D. Mass. 2002) (elements of conspiracy claim).

Power Sys, 2011 Mass. Super. LEXIS 317, at *167; see also Hannon v. Original Gunite

Aquatech Pools, Inc., 385 Mass. 813, 825 (1982) ("low-balling" or bidding less than job requires

and then demanding more money violates Chapter 93A).

### III.   Plaintiffs Are Entitled to an Award of Damages Sufficient to Make them Whole for the Financial Harm Inflicted By the Defendants' Wrongdoing.

Defendants' attack on the Plaintiffs' damages is based on a self-serving reconstruction of

their claims.  The standard measure of damages for breach of contract under Massachusetts law

is "expectancy" – an award to put the Plaintiffs in as good a position as they would have been if

there had been no breach.  Sullivan v. O'Connor, 363 Mass. 579, 583 (1973); see Hendricks &

Assoc., Inc. v. Daewoo Corp., 923 F.2d 209, 213 (1st Cir. 1991) (measure for breach of contract

may include lost profits).  The measure for breach of fiduciary duty is effectively the same --

One to One Interactive, LLC v. Landrith, 76 Mass. App. Ct. 142, 147 (2010) ("injured party

entitled to 'those benefits which she reasonably expected, but has not received because of the

fiduciary breach'") (quoting Brodie v. Jordan, 447 Mass. 866, 871 (2006)).  Chapter 93A affords

the Plaintiffs damages, equitable relief and attorneys' fees.  M.G.L. ch. 93A, § 11; Multi

Technology, Inc. v. Mitchell Management Systems, Inc., 25 Mass. App. Ct. 333, 337-38 (1988)

("proper measure [of damages] was the loss causally connected to those acts which were found

to be unfair and deceptive").

### A.   The Diminished Selling Price of the Properties is a Recoverable Element of Plaintiffs' Damages.

Defendants attack the claim for the diminished sale price of the Properties, but both of

their contentions are wrong.  Plaintiffs are entitled to recover reasonably foreseeable lost profits

as a component of their damages.  Hendricks & Assoc., 923 F.2d at 213.  The "difference in

value" measure of damages is well recognized.  See, e.g., Lambert v. Weyerhaeuser Co. (In re

Paragon Trade Brands, Inc.), 324 B.R. 829, 899 (Bankr. N.D. Ga. 2005) ("difference-in-value

measure of damages . . . measures the difference between the market value of the property, as

warranted, on the date of sale and its actual value on that date, with the defect").  First, they say

there is no admissible evidence of the diminished sale price.  This is not right.  Each Property

sold for $4.4 million, and the Expert Report of Morgan Fennell establishes that at the time of

each sale, they were worth $5.1 million.  See Expert Report of Morgan Fennell, July 30, 2018,

Second Carnathan Aff. Ex.38.

      Defendants also argue causation, but this is a fact for trial.  Fennell opines on causation.

See Plaintiffs' Opposition to Defendants' Motion to Preclude Fennell Opinion, Dec. 7, 2018,

filed herewith and incorporated by reference.  ("Opp. To Fennell Motion").  The trier of fact may

also otherwise find causation.   The evidence is sufficient for the trier of fact to conclude that but

for the Defendants wrongdoing, the homes could have been sold in the ordinary, non-distressed

course of business for their market value.[10]  Opp. To Fennell Motion at 6 (gathering cases).

      The fact that the Plaintiffs did not object to the selling price after the Trustee listed the

Properties with Coldwell Banker does not insulate the Defendants from liability.  None of the

cases they cite say any such thing.  In In re HHG Corp., 2006 Bankr. LEXIS 768 (Bankr.

S.D.N.Y. May 2, 2006), the Court rejected a claim to ownership of certain assets sold by the

Trustee two years earlier pursuant to a court order approving the sale.  In In re DeArakie, 199

B.R. 821, 827 (S.D.N.Y. 1996), the debtor unsuccessfully tried to enjoin the sale of one of the

---

[10]      With regard to the Listing Agreement skullduggery, Plaintiffs incorporate by reference
their Opposition to the Motion for Summary Judgment by Tatiana Kagan and supporting papers.
The Operating Agreement provided only that the Managing Member (Filippov) would list the
properties with Tatiana, subject to her removal. Carnathan Aff. Ex. 1, § 6.1(b)(6).  Prior to
December 31, 2014, her removal required written consent by 81% of the members (and Filippov
and Lipetsker held 90%).  Id.  After December 31, 2014, Filippov could unilaterally remove her
as listing broker under the Operating Agreement.  Id.

assets of the bankruptcy estate.  In <u>Canino v. Bleu (In re Canino)</u>, 185 B.R. 584, 595 (9th Cir.

B.A.P. 1995), the court addressed the timeliness of claims of exemptions by the debtor in estate

property and objections by the trustee to those objections.  In <u>Folder Adma Sec., inc. v.

Dematteis</u>, 1998 U.S. Dist. LEXIS 18806, at *9 (E.D. Pa. Nov. 24, 1998) merely stands for the

proposition that when a creditor receives notice of a sale and does not object, it consents to the

sale.  Not one of these cases stands for the proposition that a third party accused of wrongdoing

can rely upon consent to the sale of an asset as a defense to claims against him, her or it.  Nor

does that proposition make any logical sense.  The purpose of 11 U.S.C. § 363(m) is to allow the

sale of assets free and clear of claims and to give good title to the buyer.  <u>Fleet Nat'l Bank v.

Doorcrafters</u>, 155 B.R. 271, 285 (D. Mass. Bankr. 1993).  Nothing in § 363 modifies claims

arising against a third party. <u>See</u> <u>In re Genesys Research Inst., Inc.</u>, 2016 Bankr. LEXIS 2376, at

*65-66 (D. Mass. Bankr. June 24, 2016) ("[t]he purpose of § 363(f)(4) is to permit property of

the estate to be sold free and clear of interests that are disputed by the representative of the estate

so that liquidation of the estate's assets need not be delayed while such disputes are being

litigated") (citations omitted).   No statutory or common law authority supports precluding a

claim against a third party based on the lack of an objection to a Trustee sale.  <u>See</u> <u>also</u> Plaintiffs'

Opposition to Preclude Testimony of Morgan Fennell, filed simultaneously herewith (discussing

why Plaintiffs are not equitably estopped from seeking damages for diminished price).

The Plaintiffs do not challenge the sale of the Properties.  By the time of the sales, the

damage was done – the sales had been delayed, the properties encumbered, the bankruptcy

commenced, the damage done.  There was (and is) no reason to believe any better price could

have been obtained for the Properties by that time and under those circumstances.  That is

Plaintiffs' point.  The actual sale prices are compared against the market value of the Properties

to calculate the damages.  Lambert, 324 B.R. at 899; see also Nat'l Fire Prot. Ass'n v. Int'l Code

Council, Inc., 2006 U.S. Dist. LEXIS 14360, at *86 (D. Mass. Mar. 29, 2006) ("The measure of

damage to business property, such as good will, is based on the measurement of the difference in

value of the property before and after the injury.") [11]

**B.      Fees and Costs Resulting from Bankruptcy are Recoverable.**

Defendants cite no authority for their contention that additional costs incurred in

connection with the bankruptcy proceedings cannot be recovered as an element of Plaintiffs'

damages.  Instead, they argue the facts, contending that the Plaintiffs chose this forum and

therefore must bear the costs.

Plaintiffs are entitled to recover as damages all reasonably foreseeable losses and costs

associated with the Defendants' breaches.  Selmark Assocs. v. Erlich, 467 Mass. 525, 545 (2014)

("Expectation damages for breach of contract includes consequential damages, i.e., "those that

cannot be reasonably prevented and arise naturally from the breach, or which are reasonably

contemplated by the parties").  Costs incurred attempting to mitigate the harm caused by a

defendant's wrongdoing, including the costs of a bankruptcy proceeding, are recoverable as

consequential damages.  Primavera Familienstiftung v. Askin, 130 F. Supp. 2d 450, 534-35

(S.D.N.Y. 2001) (denying summary judgment and holding that plaintiffs could recover damages

---

[11]      Defendants also contend that their misconduct did not force the LLC to file for
bankruptcy protection, but this is also, at best, a factual issue for trial.  Having inflicted massive
financial distress on the Debtor and on Filippov and Lipetsker, Defendants cannot properly be
heard to complain that the Plaintiffs should have thought of some better way to survive than ask
this Court for relief.  Similarly, Defendants argue that a dissolution and liquidation would have
yielded the same result, but absent the protection of the Bankruptcy Code, the LLC would have
been unable to replace Century 21, which was singularly ineffectual in selling the Properties.
Also, Defendants' misconduct was responsible for putting the LLC in a position where
dissolution and liquidation encumbered by a false Mechanic's Lien was the Company's fate
absent a bankruptcy filing.  Arguing that the selling price would have been just as bad outside
bankruptcy does not excuse the Defendants.

for liquidation and bankruptcy-related expenses); <u>Lambert</u>, 324 B.R. at 911("the bankruptcy

costs Paragon incurred to rehabilitate itself from Weyerhaeuser's breach are recoverable as

consequential damages"). Defendants' contention that Plaintiffs could have pursued other

avenues to mitigate the impact of their wrongdoing is a factual contention for trial (at best).

### C.    Lost Use of Money Damages are Recoverable.

Damages for the loss of use of money is a well-recognized element of damages,

particularly where a fiduciary causes the loss. <u>See</u>, <u>e.g.</u>, <u>Arthur D. Little, Inc. v. Dooyang Corp.</u>,

147 F.3d 47, 56 (1st Cir. 1998) ("the loss of the use of money 'is precisely the type of damage we

have described as appropriately being subject to multiplication . . . under c. 93A'"); <u>Auto Flat

Car Crushers, Inc. v. Hanover Insurance Company</u>, 469 Mass. 813, 827  (2014) (damages for

insurer's failure to settle include loss of use of funds); <u>Chestnut Hill Dev. Corp. v. Otis Elevator

Co.</u>, 739 F. Supp. 692, 702 (D. Mass. 1990) ("Customarily, construction contracts, particularly

large contracts, require third-party financing. Ordinarily, delay in completion requires an

extension of the term of construction financing. The interest costs incurred and the interest

revenue lost during such an extended term are predictable results of the delay and are, therefore,

compensable direct damages.")

A 5% interest rate makes perfect sense as Filippov's and Lipetsker's capital contributions

have been tied up for years as a result of Defendants' wrongdoing.  Section 8.2 of the Operating

Agreement is not a liquidated damages clause; it provides for how the carrying costs will be paid

if the homes are not completed and sold within the time frame Kagan promised at the outset.

This section deals only with delay in construction and sale, it does not deal with fraud, self-

dealing, other breaches of contract or breaches of good faith and fair dealing.  All of the funds

that Filippov and Lipetsker have been forced to infuse into the Debtor to deal with the

18

Defendants' wrongdoing are properly allocated to them in a return of capital, but that does not

mean that the Defendants are not otherwise liable for those same costs as damages.

**IV.**   **Plaintiffs are Entitled to Equitable Relief, Including Equitable Subordination.**

Defendants also ignore Plaintiffs' entitlement to equitable relief.  This Court has broad

equitable powers to make things right.  M.G.L. ch. 93A, § 11 (equitable relief for violation);

Brodie, 447 Mass. at 871 (broad discretion to fashion a remedy for the breach of fiduciary duty;

see also Maz Partners LP v. Shear, 265 F. Supp. 3d 109, 116 (D. Mass. 2017) (equitable

remedies may be awarded for breach of fiduciary duty without showing of damages or

causation); Amended Complaint, Count VIII (Equitable Subordination).  The Defendants'

fraudulent scheme has inflicted massive damage on the Plaintiffs.  The Court in equity can enter

such relief as it deems just.

**V.**   **KDC Incorrectly Asserts that Plaintiffs Did Not Object to its Proof of Claim No. 4.**

Plaintiffs are puzzled by KDC's assertion that they did not object to its proof of claim for

Indemnification, Claims Register No. 4.  As the online docket clearly states, they did object.  In

addition, KDC brought a corresponding claim in the Adversary Proceeding (Count V of the

Amended Counterclaim), which Plaintiffs denied in the usual way.  On the merits KDC cannot

claim indemnification from the LLC because it is not the agent of a member of the LLC as

required under the Operating Agreement.  Carnathan Aff. Exhibit 1 § 10.2.  It also cannot claim

indemnification because the contract between it and the LLC is a fraudulent, self-dealing

contract signed by Kagan for both sides of the transaction and because it has engaged in willful

misconduct, or at minimum, gross negligence.  Plaintiffs Fact Resp. No. 15.

**VI.**     **The Plaintiffs Withdraw Count VII – Breach of Contract by KDC.**

      Although Plaintiffs disagree that there is no evidence of KDC's shoddy workmanship, the evidence adduced in discovery establishes beyond purview that KDC never had any lawful contract with the LLC. Any damages attributable to its shoddy work are eclipsed by the damages for its other wrongdoing. Accordingly, Plaintiffs withdraw and consent to the dismissal of Count VII, asserting breach of contract against KDC for the quality of its construction.

**VII.**     **The Evidence Rebutting the Proofs of Claim is Overwhelming.**

      As set forth herein and in the Plaintiffs' Motion for Summary Judgment and the supporting papers submitted with these filings, the evidence rebutting the Defendants' Proofs of Claim is overwhelming. In addition to the legal deficiencies outlined in the Plaintiffs' Motion for Summary Judgment, the Defendants cannot be indemnified where the evidence establishes willful misconduct or, at minimum, gross negligence. See OA § 10.2; Plaintiffs' Fact Resp. No. 15. The Court should not only deny them summary judgment, it should grant the Plaintiffs summary judgment disallowing those proofs of claim.

## CONCLUSION

      The Court should deny the Defendants' Motion for Summary Judgment.

LYMAN-CUTLER, LLC,            ALEX FILIPPOV and
By its attorney,                NICKOLAY LIPETSKER,
                               By their attorneys,

/s/ Peter Tamposi                /s/ Sean T. Carnathan
Peter N. Tamposi, BBO No. 639497      Sean T. Carnathan, BBO No. 636889
The Tamposi Law Group, P.C.         scarnathan@ocmlaw.net
159 Main Street                 Joseph P. Calandrelli, BBO No. 666128
Nashua, NH 03060             jcalandrelli@ocmlaw.net
T: (603) 204-5513             O'Connor, Carnathan and Mack, LLC
                               1 Van de Graaff Dr. Suite 104
                               Burlington, MA 01803
                               T: 781-359-9000

Dated: December 7, 2018

20

<u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on December 7, 2018.

*/s/ Sean T. Carnathan*