UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| *In re:* | ) | |
| | ) | |
| LYMAN-CUTLER, LLC, | ) | Chapter 7 |
| Debtor | ) | Case No. 15-13881 FJB |
| | ) | |

| | | |
|---|---|---|
| LYMAN-CUTLER, LLC, ALEX FILIPPOV, and NICKOLAY LIPETSKER, | ) ) ) | |
| Plaintiffs, | ) ) | Adv. Case No. 1:16-ap-01120 |
| v. | ) ) | |
| VADIM KAGAN, TATIANA KAGAN, KAGAN DEVELOPMENT KDC, CORP. and PROEXCAVATION CORP. | ) ) ) ) | |
| Defendants. | ) ) | |

**PLAINTIFFS' OPPOSITION TO MOTION IN LIMINE TO PRECLUDE EVIDENCE RELATING TO KAGAN'S OTHER CONSTRUCTION PROJECTS**

Plaintiffs Lyman-Cutler, LLC (the "LLC"), Alex Filippov, and Nickolay Lipetsker (collectively, the "Plaintiffs") oppose the Defendants' Motions in Limine to Preclude Evidence Relating to "Other Projects" (Adv. P. No. 233; Bank. Doc. 362) ("Defendants' Motion").

**ARGUMENT**

**I.      Plaintiffs Are Not Seeking to Introduce Evidence of Kagan's Other Construction Projects to Prove That He Acted in Conformity With a Defect in Character.**

The primary basis of Defendants' Motion rests on a patently incorrect factual assumption. Contrary to Defendants' unsupported assertion, the Plaintiffs do not intend to introduce evidence of Vadim Kagan's other construction projects "merely to besmirch Kagan's character in the

1

hopes the finder of fact will conclude he acted improperly because of some perceived character flaw." See Defendants' Motion, at 13. Plaintiffs have never suggested as much. Rather, the evidence concerning the circumstances surrounding the construction costs Kagan charged on other projects is relevant to prove that Kagan acted with intent, had a plan at the outset and made no mistake when he presented the fixed construction budget to the Plaintiffs in connection with inducing them to invest in the Project. Evidence is expressly admissible for this purpose under the Federal Rules of Evidence, as the Defendants concede. Fed. R. Evid. 404(b)(2) (evidence of other acts are "admissible for another purpose, such as proving motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident").

Whether the evidence will be admissible is determined by a two-step test. United States v. Oppon, 863 F.2d 141, 146 (1st Cir. 1988). The Court must first determine whether the evidence has some probative value apart from proving a character trait of the defendant. Id. If it does, the Court must then weigh this probative value against the potential unfair prejudice to the opposing party. Id. The test *strongly* favors admissibility. As the First Circuit has observed, "The most striking aspect of this rule is its inclusive rather than exclusionary nature; should the evidence prove relevant in any other way it is admissible, subject to the rarely invoked limitations of Rule 403." United States v. Zeuli, 725 F.2d 813, 816 (1st Cir. 1984). The test does not even require that the Defendants first raise a defense of lack of intent, motive, or plan. The evidence may be admitted even when the Defendants' only defense is a general denial of the acts charged. Oppon, 863 F.2d at 146; see also United States v. Pelletier, 666 F.3d 1, 6 (1st Cir. 2011). It is especially appropriate in cases where, such as here, a conspiracy has been charged. United States v. Scelzo, 810 F.2d 2, 4 (1st Cir. 1987).

The Defendants primarily argue that the other projects are of no probative value because the investors on the other projects ultimately received a profit. See Defendants' Motion, at 10 ("This fact [that the investors made money], confirmed by their investors at their deposition, dramatically erodes the probative value of admitting the "Other Project" evidence in this trial"). The Defendants then question why the Plaintiffs are permitted to "introduce evidence of other projects in which the investors made money to attempt to prove Plaintiffs lost money on the Lyman-Cutler project?" See id.  The answer is simple:  that is not the purpose of the evidence. It is a mathematical reality that Plaintiffs will lose a substantial portion of their investment if Kagan's construction company, Kagan Development KDC Corp. ("KDC"), is entitled to collect the large construction "overruns" of over $2 million.  The Plaintiffs do not need the evidence of the other construction costs to prove this indisputable fact, and whether or not the other investors ultimately received any profit on their own projects is irrelevant.  The evidence is offered to prove many other important parallels between what Kagan did to the Plaintiffs and what he did to these other investors.

Kagan is an experienced builder.  He has constructed over 30 homes, most of which are in the multi-million dollar range. See Deposition of Vadim Kagan ("Kagan Dep."), at 17, Transmittal Affidavit of Sean T. Carnathan, November 16, 2018 (Doc. No. 355; Adv. P. No. 222 ("Carnathan Aff"), Exs. 25 and 26.  Prior to and during the same time period that Kagan was working on this Project, he was involved in a multitude of other multi-million dollar construction projects in the Newton/Brookline area, including one on the very same street (10 Lyman Road) and numerous others within just a few miles.

The parallels between the Lyman-Cutler Project and the other construction projects are striking and go to the heart of a number of the disputed issues in this case.  Each of the other

investors have testified that Kagan presented to them a budget at the outset of their respective projects which Kagan represented he knew would be the ultimate costs of the construction. Kagan persuaded the other investors to invest the bulk of the financial commitment while he received a larger share of the profits to compensate him for his construction work.  Kagan promised to complete the projects by a certain time and further agreed to be penalized financially if he failed to do so, in addition to having to be personally responsible for the increased carrying costs.  While Kagan managed the construction, the investors were named the managing members of the LLC and were told throughout the construction process that the costs were on budget.  In each instance, as happened to the Plaintiffs, Kagan presented invoices for substantially higher costs as the project finally neared the end (much later than was agreed to in the Operating Agreement).  Again, as happened to the Plaintiffs, most of these "costs" allegedly were incurred by his solely-owned excavation company, ProExcavation Corp. ("ProEx").  In those other cases, he also threatened to place liens on the properties if the investors did not agree to his financial terms.  Specifically, the investors testified as follows:

*Elena Lande* – In February of 2013, Kagan persuaded Ms. Lande to invest $1.4 million into Yarmouth Road Development, LLC (compared to Kagan's $100,000) based on his representation that the costs of construction would not exceed $1.7 million.  See Deposition of Elena Lande ("Lande Dep."), at 39, 44-45, 61, 147-148, attached to the Second Transmittal Affidavit of Sean T. Carnathan in Support of Plaintiffs' Oppositions to Defendants' Motions, Dec. 7, 2018 ("Second Carnathan Aff.") as Ex. 30; Yarmouth Road Construction Budget, attached to the Second Carnathan Aff. as Ex. 12; Yarmouth Road Operating Agreement, attached to the Second Carnathan Aff. as Ex. 13.  The Operating Agreement was substantially the same as that of the Lyman-Cutler Project and named Ms. Lande as the manager ("Managing Manager").

4

See Lande Dep., at 57, 116.  The homes were to be completed by May 2014, see Operating Agreement, § 5.2 ("construction shall be completed and CO issued no later than May 30, 2014") and if they were not, then Kagan would take a reduced share of the profits and be personally responsible for paying the additional carrying costs.  See Lande Dep., at 40-41; Operating Agreement, § 8.1.  Throughout construction, Kagan represented that the costs were on budget except for maybe a few items that together would not cost more than $20,000 - $25,000 extra.  See Lande Dep., at 69.  However, as the construction was nearing completion six months later than originally agreed, Kagan presented numerous "unpaid bills" from his subcontractors – including his own excavation company, ProEx – which caused the construction costs to exceed the budget by over $400,000.  See Lande Dep., at 60-61, 65, 100-101, 148.  When Ms. Lande began to question these costs, Kagan, through his henchman Cohen, threatened to place a lien on the property unless Ms. Lande would agree to Kagan's financial terms, which lien would include a purported "construction management fee" to which Ms. Lande had never previously agreed.  See Lande Dep., at 105, 152.

  *Mark Kayserman* – On May 1, 2012, Mr. Kayserman invested 50% of the money needed to fund Deborah Road, LLC, a venture with Kagan to demolish and build a new home in Newton.  See Deposition of Mark Kayersman ("Kayserman Dep."), at 21, attached to the Second Carnathan Aff. as Ex. 32; Deborah Road Operating Agreement, attached to the Second Carnathan Aff. as Ex. 14.  Mr. Kayserman was appointed the Managing Member in a very similar Operating Agreement also prepared by Attorney Maiden.  See Kayserman Dep., at 21; see Operating Agreement.  Being a smaller house, Kagan represented to Mr. Kayserman that the construction costs would be $850,000.  See Kayserman Dep., at 29, 34.  At Kagan's recommendation, they agreed to borrow enough money from the bank to not only fund the

construction, but also to pay for the carrying costs. See Kayserman Dep., at 26-27, 83; see Operating Agreement, § 4.1. Kagan represented throughout the project that they were right on budget. See Kayserman Dep., at 37. Even up to a week before the closing, Kagan represented to Mr. Kayserman that they actually had room in the budget to spare. Id., at 52. Two days before the closing, however, Kagan presented Mr. Kayserman with a "surprise bill" that included nearly $112,000 (over 13%) in alleged cost overruns. Id., at 46, 50, 57. Mr. Kayserman had no choice but to agree to pay it to ensure that the property sale closed. Id., at 59. At the end of the project, Tatiana Kagan earned three times the amount in a commission ($97,500) than Mr. Kayserman earned as a profit ($37,000). Id., at 65, 85.

*Dmitry Zhukovskiy* – In 2012, Kagan persuaded Dmitriy Zhukovskiy to invest in Hyde Avenue, LLC. Mr. Zhukovskiy did, was named the LLC's Manager, and was required to personally guarantee the loans obtained from the bank. See Deposition of Dmitriy Zhukovskiy ("Zhukovskiy Dep."), at 16, 96, 107, attached to the Second Caranthan Aff. as Ex. 31; see November 11, 2015 Affidavit of Zhukovksiy ("Zhukovskiy Aff."), at ¶ 4, attached to the Second Carnathan Aff. as Ex. 15. Kagan represented to Mr. Zhukovskiy that the construction costs would not exceed $1.3 million (give or take 5%), and arranged for the LLC to borrow an extra $200,000 to pay for carrying costs. See Zhukovskiy Dep., at 124-126; Zhukovskiy Aff., ¶¶ 3-4. Despite telling Zhukovskiy throughout the project that the costs remained on budget, Kagan near the end of the project presented increased costs of approximately $600,000 (nearly a 50% overrun), a third of which was being charged for ProEx. See Zhukovskiy Aff., ¶¶ 10-11.

*Vlad Abramskiy* – On November 26, 2012, Mr. Abramskiy and another investor together invested $240,000 into Newton-Cynthia Road, LLC, a venture formed with Kagan to build a new home on Cynthia Road in Newton. See Newton-Cynthia Road Operating Agreement, §§ 1, 2.2,

and page 13, attached to the Second Carnathan Aff. as Ex. 16. Kagan invested a mere $100. Id., at 13. Kagan had represented to Mr. Abramskiy that the construction and operating costs for the project, including carrying costs, would not exceed $850,000 and that they should borrow a construction loan to pay both. See Deposition of Vlad Abramskiy ("Abramskiy Dep."), at 36, 37-38, 54-55, 56, 61, attached to the Second Carnathan Aff. as Ex. 33. Mr. Abramskiy was named the Managing Member of the LLC in an Operating Agreement prepared by Attorney Maiden and was required to personally guarantee the LLC's loan repayments. See Operating Agreement, § 7.3, and page 12; see Abramskiy Dep., at 40-41. Per the Operating Agreement, Kagan was required to complete the homes by November 30, 2013 or otherwise be financially responsible for payment of the additional carrying costs. See Operating Agreement, § 5.6. During the project, Kagan informed Mr. Abramskiy that he had encountered ledge but that ProEx could remove it for "less" than the $60,000 - $70,000 other contractors would charge. See Abramskiy Dep., at 66. Shortly before closing the sale of the property, Joseph Cohen, Kagan's "Strategic Business Manager," sent Mr. Abramskiy a threatening letter, asserting surprise cost overruns of $408,172.77, and demanding "immediate" payment or KDC would file a mechanic's lien. Second Carnathan Aff., Ex. 36. Mr. Abramskiy ultimately agreed to sell his interest in the LLC for the mere return of his investment rather than be forced to confront any of Kagan's additional charges. Id., at 76-77, 86. Kagan refused to ever let Mr. Abramskiy physically inspect the ledge he says he encountered. Id., at 66-70.[1]

Kagan used many of the same sub-contractors and suppliers on those other projects as he did in this project. Second Carnathan Aff., Ex. 10 (invoices of subcontractors on this project).

---

[1] A fifth investor, Alexander Fodymanow, received the same treatment from Kagan. Mr. Fodymanow, however, lives in Europe and is not likely to be available to testify at trial.

Some even provided as "back-up" to Kagan the <u>very same</u> invoice duplicated among different projects (changed only to reflect different property address).  Second Carnathan Aff., <u>Ex. 11</u>, (invoices of subcontractors for the Other Projects).

The evidence of Kagan's other construction projects is not limited to those on which he took on outside investors.  There were others that he financed by himself.  The price differences between what Kagan incurred on the homes he built with investors compared to the costs he incurred when he was financially responsible for the construction is starkly illuminating.  Where Kagan's purported construction costs averaged approximately $255 per square foot for investor-funded projects, he was somehow able to decrease those costs by $139 per square foot when he had the personal investment in the project.  <u>See</u> Expert Report of Michael Goldman, ¶ 50, attached to the Carnathan Aff. as <u>Exhibit 20</u>.

It is not a coincidence that Kagan finds a way to incur "unanticipated cost overruns" only on projects where he has a limited personal investment at stake, such as this one.  <u>See</u> <u>Oppon</u>, 868 F.2d at 147 ("a high degree of similarity and temporal proximity strongly favor admissibility").  Kagan clearly uses those projects on which he induces other investors to line his pockets from the increased payments he charges from his construction companies rather than the profit he would receive as a member of the limited liability company – even going so far as to use virtually duplicate invoices from his preferred subcontractors.  That he may have ultimately left some of the investors with some profit to placate them is completely immaterial to the Plaintiffs' assertion that Kagan has knowledge and experience with construction costs, that he intentionally misrepresented those costs to induce the Plaintiffs to invest, and that he artificially increased his costs on this project after he successfully induced the Plaintiffs to front the vast majority of the project's costs.

8

Kagan's singular focus on his assertion that the other investors lack information necessary to conclusively prove from a legal perspective that they were defrauded on those projects is misplaced. Defendants do not provide any authority to support their implied assertion that Plaintiffs need prove that there was actual fraud on those other projects to make them admissible. Rule 404(b)(2) requires nothing of the sort. Whether or not there was actionable fraud on the other projects, the Plaintiffs are entitled to introduce evidence from these projects to prove that Kagan planned to defraud the Plaintiffs. See United States v. Parker, 872 F.3d 1, 11 (1st Cir. 2017) (admission of prior uncharged instances of unlawful gun and ammunition purchases to show knowledge of unlawful purchasing scheme).

This evidence also goes to a number of points on which Kagan has testified falsely. The fact that Kagan presented a construction budget to these other investors, guaranteed he would complete construction within that budget, and bear financial penalties including paying carrying costs if he failed is consistent with Plaintiffs' testimony and inconsistent with Kagan's. The format of the documents is consistent with Plaintiffs' account and inconsistent with Kagan's. The fact that these investors were all designated in the Operating Agreements, prepared by the same attorney, as managing members (or managing manager or manager) is consistent with Plaintiffs' testimony that Filippov was the managing member and inconsistent with Kagan's. The photocopying of invoices with changed addresses supports Plaintiffs' contention that the Defendants fabricated documentation to support KDC's purported charges. In short, this evidence is admissible much like the numerous other cases throughout the First Circuit and other jurisdictions that routinely permit the introduction of other act evidence for a non-character purpose. See Oppon, 863 F.2d at 147 (admission of prior instances where defendant lied about citizenship status on employment applications in case charging him with unlawfully representing

9

himself as a U.S. citizen); United States v. Cassiere, 4 F.3d 1006, 1022 (1st Cir. 1993) (admission of prior instances of unlawful land flip arrangements to show defendant's knowledge of how a land flip was arranged to defraud a lender); Parker, 872 F.3d at 11 (admission of prior uncharged instances of unlawful gun and ammunition purchases to show knowledge of unlawful purchasing scheme); Scelzo, 810 F.2d at 4-5 (admission of prior participation in similar unlawful credit card scheme to show defendant's conspiratorial intent to enter into this particular unlawful credit card scheme); Zahorik v. Smith Barney, Harris Upham & Co., 1987 U.S. Dist. LEXIS 14087 (N.D. Ill. 1987); United States v. Kakande, 771 F. Supp. 2d 86 (D. Me. 2011) (stating that defendant's prior participation in unlawful marriage fraud four years prior would likely be admissible in current action to show intent and knowledge of the immigration process).

## II.     The Introduction of This Evidence Will Not Impede the Trial.

The Defendants do not argue that they will be unfairly prejudiced by the introduction of this evidence nor do they offer any evidence to support their claim that permitting evidence of Kagan's other projects will result in "distracting mini-trials."  Plaintiffs have never suggested that they intend to run through a tedious forensic analysis of the costs incurred on each of Kagan's other projects.  Again, Plaintiffs are not required to prove that there was actionable fraud on those other projects.  The information gleaned from the documents Kagan submitted for those 5 select projects, when coupled with the anticipated testimony of the other investors, is enough to show that Kagan knew precisely what he was doing when he induced Plaintiffs to invest in this project.  It also belies his testimony on a number of important issues.  Though some trial time will undoubtedly be needed to introduce this evidence, additional time is not sufficient reason by itself to deny Plaintiffs their opportunity to introduce all relevant evidence, particularly given the inherent complexity involved in a fraud claim.  United States v. Goodchild, 25 F.3d 55,

60 (1st Cir. 1994) ("Fraud is usually proven by circumstantial evidence. Direct proof of a knowing intent to defraud is rare. . . . "There is no pat formula for such proof; factual circumstances may signal fraudulent intent in ways as diverse as the manifestations of fraud itself.") (citation omitted). More importantly, there is ample time already reserved during the 2 weeks allotted in May to account for this evidence. If, for whatever reason, the Court finds during the trial that the introduction of this evidence is unintentionally impeding the trial, it can exercise its inherent power to limit this portion of the case. See Fed. R. Evid. 611(a)(2) (court has power to "exercise reasonable control over the mode and order of examining witnesses and presenting evidence so as to … avoid wasting time"); see also United States v. Cadden, 2018 U.S. Dist. LEXIS 135010, at *3 (D. Mass. Aug. 10, 2018). But Defendants' bald assertions fall far short of warranting a wholesale preclusion of this entire category of relevant and highly probative evidence.

## CONCLUSION

For the foregoing reasons, the Court should deny the Defendants' Motion in Limine to Preclude Evidence Relating to "Other Projects."

| | |
|---|---|
| LYMAN-CUTLER, LLC,<br>By its attorney, | ALEX FILIPPOV and<br>NICKOLAY LIPETSKER,<br>By their attorneys, |
| */s/ Peter Tamposi*<br>Peter N. Tamposi, BBO No. 639497<br>The Tamposi Law Group, P.C.<br>159 Main Street<br>Nashua, NH 03060<br>T: (603) 204-5513 | */s/ Sean T. Carnathan*<br>Sean T. Carnathan, BBO No. 636889<br>scarnathan@ocmlaw.net<br>Joseph P. Calandrelli, BBO No. 666128<br>jcalandrelli@ocmlaw.net<br>O'Connor, Carnathan and Mack, LLC<br>1 Van de Graaff Dr. Suite 104<br>Burlington, MA 01803<br>T: 781-359-9000 |
| Dated: December 7, 2018 | |

<u>Certificate of Service</u>

    I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on December 7, 2018.

          */s/ Sean T. Carnathan*

4838-0621-3505, v. 1