# EXHIBIT 1

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| *In re:* | ) | |
| | ) | |
| LYMAN-CUTLER, LLC, | ) | Chapter 7 |
| | ) | |
| Debtor | ) | Case No. 15-13881 FJB |
| | ) | |

| | | |
|---|---|---|
| LYMAN-CUTLER, LLC, ALEX FILIPPOV, | ) | |
| and NICKOLAY LIPETSKER, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| v. | ) | Adv. Case No. 1:16-ap-01120 |
| | ) | |
| VADIM KAGAN, TATIANA KAGAN, | ) | |
| KAGAN DEVELOPMENT KDC, CORP.and | ) | |
| PROEXCAVATION CORP. | ) | |
| | ) | |
| Defendants. | ) | |

## **Introduction:**

1.     My name is Michael Goldman.  I am a Certified Public Accountant, a Certified Fraud Examiner, a Certified Valuation Analyst, and Certified in Financial Forensics.  I have a Bachelor of Arts degree from Rice University in Houston, Texas with majors in Economics and Managerial Studies.  I also have a Master of Management degree from the J.L. Kellogg Graduate School of Management at Northwestern University in Evanston, Illinois with concentrations in Accounting and Finance.

2.     I have been qualified as an expert witness in Federal court cases both in and out of bankruptcy and in State courts in the states of Illinois, Indiana, and Wisconsin.  My qualifications have been in the areas of Accounting, Internal Control, Insolvency, Fraud, Forensic Accounting, Business Valuation, and Business Management.  The list of cases that I have testified in is included in my Curriculum Vitae in Appendix 1.

3.      I have served as a court-appointed Examiner and have worked as a forensic accountant for bankruptcy trustees, banks, unsecured creditors, company owners, and the management teams of companies.  I have performed forensic accounting in shareholder disputes, marital dissolution, commercial damages, bank fraud, embezzlement, skimming, and personal damage cases.  A listing of the forensic accounting cases that I have worked in is in Appendix 1.

4.      I was a Senior Auditor at Touche Ross, now Deloitte, where a significant part of my responsibilities included the analysis, evaluation, or design of internal controls for companies ranging from start-ups to Sears Roebuck.

5.      I worked for 14 years as the Controller or Chief Financial Officer of Silvestri Corporation, Handy Andy Home Improvement Centers, Sportmart, and Office 1 Superstores where I was directly responsible for the design, establishment, maintenance, and execution of all company internal controls.  Internal Controls that I was directly responsible for were audited by the accounting firms of Deloitte, KPMG, PWC, and Arthur Andersen and no exceptions or problems were noted.

6.      I have authored chapters about investigation of fraud in peer-reviewed books published by the Association of Certified Fraud Examiners, the American Bankruptcy Institute, and Aspen Law and Business.  I authored a series of articles about accounting and internal control in The Corporate Counselor, a Law Journal Newsletter for in-house attorneys.  I have had a chapter I wrote about insolvency and taxes published in a book by Westlaw.  I have also had numerous other fraud, accounting, or finance related articles published in professional journals for business valuation professionals and matrimonial lawyers.  A listing of my publications is in Appendix 1.

7.      I have experience managing, consulting to, valuing, or investigating over 200 businesses in numerous industries, of numerous entity types, and of various sizes.  A representative client list is included in Appendix 1.

8.      As well as my hands-on experience with the financial management of growing mid-sized companies, I was on the faculty at the Lake Forest Graduate School of Management from 1998 to 2013 where I taught a course in Entrepreneurship that dealt with all aspects of starting and managing a new business.  I also designed and taught courses in Financial Management and Control in the Lake Forest Corporate Education Division of the school.

9.      From 2008 through the end of 2014 I was a member of the Editorial Board of The Value Examiner, a Professional Journal for the consulting disciplines and published by the National Association of Valuation Analysts.  In January 2012 I began a two-year term as Chairman of the Editorial Board.  In November 2016 I rejoined the Editorial Board.  The Value Examiner publishes articles on business valuation, forensic accounting, fraud risk management, business damages, and other topics for consultants.

10.      I have written articles that have been published in professional journals such as The Value Examiner, Illinois Family Law Report, American Journal of Family Law, the Journal of Corporate Renewal, and The Corporate Counselor.  I have written chapters in the following

published professional books: Fraud Casebook - Lessons from the Bad Side of Business, Valuing Professional Practices and Licenses, American Bankruptcy Institute's Commercial Fraud Manual, and Strategic Alternatives for Distressed Businesses.

11.     I have reviewed the accounting of other construction and excavation companies similar in size and type to Kagan Development Corp. including home builders and sole-proprietor excavators.  I have helped similar companies establish and / or maintain their accounting systems, I have prepared tax returns for similar companies, and I have performed forensic investigations on similar companies.

12.     KCP Advisory Group ("KCP") has been retained by O'Connor, Carnathan and Mack, LLC and the Tamposi Law Group, P.C. as counsel for Alex Filippov, Nickolay Lipetsker and Lyman-Cutler, LLC to assist with the litigation matter captioned above.  I am a Senior Managing Director of KCP.  I performed all of the work for this matter.

## Background of the case:

13.     The debtor / plaintiffs were investors in a project to build two luxury homes. Defendant Kagan served as the general contractor for the project.

14.     Plaintiff Lyman-Cutler LLC ("LCLLC" or the "Company") is a Massachusetts Limited Liability Company formed in November 2012.  Under the express terms of the LLC Agreement, Mr. Kagan was responsible for completing construction of the two new homes no later than March 30, 2014.

15.     LCLLC borrowed approximately $3.2 million to finance construction and carrying costs.  Most of this money was paid to Kagan Development KDC, Corp ("KDC"), Pro Excavation (a company related to KDC), and to subcontractors hired by KDC to perform the construction of two properties in Brookline; one at 55 Lyman Avenue and the other at 88 Cutler Lane.  These two properties arose out of the division of a parcel that previously contained one house with the address of 77 Lyman Avenue.

16.     Mr. Kagan failed to complete the construction of the two new homes on or before March 30, 2014. On the contrary, construction was not complete until either August or October 2014:

> a.     On August 15, 2014 Kristina Brusenkova, KDC's accountant and office manager, wrote an email to Mr. Filippov (KAGAN 01220) saying:
>
> "88 Cutler is 100% complete. There is a staging in the house and it is open for showing. Will be on the market on Tuesday. Price is $5,500,000.00
>
> 55 Lyman Rd will be on 98% complete at the end of next week, including landscaping."

b.     The two houses, at 55 Lyman Road and 88 Cutler Lane, both
received their Certificates of Occupancy from the Town of
Brookline on October 2, 2014

17.    On or about May 7, 2015 Mr. Kagan claimed for the first time that he had cost
overruns on the Project adding up to over $1 million. According to the letter from Alexander H.
Pyle, attorney for Mr. Kagan and Kagan Development Corporation, these overruns consisted of
$758,025.56 in unreimbursed construction costs, approximately $50,000 in additional expected
vendor costs and $251,000 in carrying costs.

18.    On June 22, 2015, Kagan Development KDC Corp. filed a mechanics lien against
LCLLC's properties, asserting a lien in the amount of $2,095,985.23. Documentation of this
claim was not provided until the litigation among the parties.

19.    The debtor / plaintiff alleges that the Kagan Defendants have acted together in a
self-dealing conspiracy to defraud the Plaintiffs by knowingly and intentionally inflating
purported construction charges and executing knowingly unauthorized and fraudulent contracts.

20.    Since commencing this action, Plaintiff has interviewed and/or deposed several
witnesses who are former investors in other various Kagan projects as the Plaintiffs are
experiencing and who have reported that they experienced the same type of conduct by Mr.
Kagan in connection with their projects. Specifically, Dmitry Zhukovskiy, Alexander
Fodymanow, Elena Lande, Mark Kayserman, and Vladislav Abramsky reported that Mr. Kagan
presented them with a budget at the outset of their projects, assured them that everything was
within budget until long after construction was complete and shortly before the homes sold, and
then announced extensive cost overruns and either filed a lien or threatened to file a lien unless
they agreed to the payment of these last minute purported cost overruns.

21.    I have been retained in this matter to assist with the review of documents provided
by Vadim Kagan and other evidence obtained in this matter and opine on the veracity of the
accounting information and documentary support provided by the Defendants with regard to the
mechanics lien.

22.    In conducting my analysis, I have reviewed various documents produced in this
matter including documents produced by Mr. Kagan to support his claims, QuickBooks files and
other documents from various Kagan projects other than the project in question, excerpts of
accounting records of KDC and Pro Excavation provided by Mr. Kagan and his outside CPA,
deposition transcripts, and other material provided by Plaintiff's attorneys.

23.    I reserve the right to modify or supplement this report as appropriate.

## Summary of Observations:

24.    Mr. Kagan produced a binder with 1,282 pages of documents to support his lien
claims on the two LCLLC properties. The binder includes QuickBooks print-outs of activity by
vendor, invoices from vendors, portions of credit card statements, some copies of specific
checks, and heavily redacted segments of bank statements. He subsequently provided

accounting files and records for KDC, Pro Excavation, and five of his other projects as part of the discovery process.

25.    Some of the documentation provided is for quotes and estimates as opposed to actual invoices. Real invoice copies are needed to verify the accuracy of all charges recorded were not provided.

26.    Many of the purported invoices and payments were dated as late as May 2015, well after the August or October 2014 substantial completion of the two properties. Some of the purported invoices were dated even later, into at least August 2015.

27.    It was noted from the partial records received that many documents, such as checks or invoices, were written out of sequence. In properly managed businesses checks are almost always written in sequence, although sometimes there are reasons for an occasional breach in the use of check numbers, such as emergency payments. I am not aware of any legitimate reason why invoice numbers would ever be used out of sequence.

28.    As will be discussed throughout this report, the documentation maintained and provided by Mr. Kagan is unreliable. Documentation is very important in a construction project because it is the only contemporaneous record of what was happening at any given time during the course of the project. Documentation is the framework on which a claim is built; without it, there is no contemporaneous evidence to prove a claim.

29.    Project documents kept on a contemporaneous basis provide a permanent record which allows the detailed reconstruction, review, and analysis of events and actions of the project. The destruction of or failure to maintain project documents is destruction of evidence which severely handicaps the impacted party in presenting its case to the trier of fact. Such destruction or failure to maintain proper records violates industry practice and may violate the law, depending on the circumstances. As detailed below, Mr. Kagan's record keeping was not complete or contemporaneous.

30.    Documentation for construction projects generally consists of the following items:

    a.    Contracts between the Owner and Contractor

    b.    Contracts between the Owner, Architect, Design Sub-Consultants, Contractor, and Subcontractors

    c.    Contract drawings, including index and revisions

    d.    Specifications, including general conditions, special conditions, technical specifications, and revisions

    e.    Construction Schedules:

        i.    Baseline

        ii.    Updated

        iii.    As-Built

f.      Purchase orders

g.      Invoices for materials

h.      Bid analysis sheet

i.      Monthly payment requisitions with itemized breakdowns of amounts

j.      Monthly payments to contractor

k.      Payments to subcontractors and suppliers

l.      Change Orders - including all relevant back-up computations, and their status (i.e. requested, in process, or approved)

m.      Contractor payroll records and time cards

n.      Contractor cost reports

o.      Construction progress photos

p.      Itemized equipment hours charged to the project

q.      Procurement records for major items or long-lead items

**Most of these items were either totally missing from the documentation provided or, as discussed throughout this report, were not maintained in a proper manner.**

31.      During the pendency of the LCLLC project work, according to Defendants' answers to interrogatories as well as Kagan Development's web site, Ms. Brusenkova, and other sources such as real estate sites such as Zillow, Trulia, and Redfin, Mr. Kagan may have been working on the following projects, among others, whose timelines would have overlapped with the two LCLLC projects:

a.      10 Lyman Rd in Brookline.  7/9/12 - 5/1/15   According to Google Maps, this property is 0.1 miles from the LCLLC properties.

b.      50 Yarmouth Rd in Brookline.  1/23/13 – 10/29/14   According to Google Maps, this property is 0.6 miles from the LCLLC properties

c.      51 Parker Ter in Newton.  3/12/14 – 5/13/15   According to Google Maps, this property is 3.4 miles from the LCLLC properties

d.      131 Cynthia Rd in Newton.  12/26/12 – 5/13/15   According to Google Maps, this property is 3.5 miles from the LCLLC properties

e.      7 Fredette Rd in Newton.  12/31/13 – 3/31/15   According to Google Maps, this property is 3.8 miles from the LCLLC properties

f.      30 Hyde Ave in Newton.  5/10/12 – 4/18/14   According to Google Maps, this property is 4.0 miles from the LCLLC properties

g.     53 Wallace St, Newton.  9/16/13 – 2/24/15   According to Google Maps, this property is 4.4 miles from the LCLLC properties

h.     24 Druid Hill Road, Newton.  6/21/13-8/7/14    According to Google Maps, this property is 4.8 miles from the LCLLC properties    Note that there was also a Kagan property at 40 Druid Hill Road outside the time frame that this report covers.  24 Druid Hill Road is the property referred to in this report.

i.     6 Deborah Road, Newton.   6/1/12 – 8/22/13

j.     40 Druid Hill Rd, Newton (renovation) 10/1/15 – 9/1/16

k.     104 Dorcar Rd, Newton   10/19/12 -12/17/13

l.     73 Fuller Street, Newton   4/3/12 – 12/17/14

m.     143 Florence St, Newton   10/17/12 – 6/6/14

n.     80 Dorcar Rd, Newton   6/28/12 – 4/23/15

o.     1657 Centre St, Newton   8/14/14 – 2/3/16

p.     18 Valley Spring, Newton   5/13/14 – 6/2/16

q.     1580 Beacon St, Newton   8/26/14 – 10/7/16

r.     12 Valley Spring, Newton   6/22/15 – 4/28/17

s.     1664 Centre St, Newton   6/30/15 – 8/18/17

32.     As can be seen from the proximity of all of the projects, it is conceivable that materials could have been purchased for multiple sites and all delivered and charged to one site or multiple sites. Without working internal controls such as budgets and monitoring of actual costs to planned costs, there would be no way to detect if this were occurring.  Cost inconsistencies between the projects indicate that materials may have been paid for by one project but used at another.

33.     Mr. Kagan had check writing authority on the LCLLC bank account and drew funds from the account at his sole discretion.

34.     Expenses related for the LCLLC projects were sometimes paid from the LCLLC account and sometimes paid from a Kagan Development KDC Corp checking or credit card account.  This is not a proper practice and no explanation has been provided as to what would be paid out of one company or the other, and why.  The lack of controls and oversight opened the possibility for a commingling of entities and / or a commingling of projects.

## Summary of Opinions and Conclusions:

Based on the specific observations made below, my opinion and conclusion is that the claims made by the Defendant for the mechanics lien claim are not reliable or credible. Specifically:

35.    The summary sheets used in the mechanics lien claim made by the Defendant are problematic:

  a.    It appears that some of the Summary Sheets by Vendor are altered versions of the original accounting records and that they have incorrect, overstated amounts.

  b.    The totals accounted for on the Summary Sheets by Vendor often are not adequately supported. There are many instances in which the detail presented does not add up to the amount being claimed on the summary sheet.

  c.    Based on the QuickBooks file that was provided, there are expenses in QuickBooks which were not documented at all in the mechanic's lien claim binder.

36.    The detail provided for support for some of the charges for some of the vendors has serious credibility problems. In over twenty years of forensic investigation I have only seen this much inconsistency and incredibility in one other set of documentation, and that was in a case where it was determined that a significant fraud had been perpetrated.

37.    The accounting processes used by the Defendant had material control weaknesses and cannot be relied upon to provide accurate information.

38.    None of the KDC representatives were able to adequately defend their documentation in deposition. The company CFO admitted that much of the support for the accounting records did not exist and was created long after the fact. As detailed in the "Specific Questions regarding the veracity of invoices and payments claimed" section below, these recreations of what people thought may or may not have happened are sloppy, inaccurate, and highly suspect. They do not provide adequate evidence on which to base a claim of this size and nature.

39.    Based on the deposition testimony of Mr. Kagan and his current and former employees, on my review of the accounting records and documents purporting to support the mechanic's lien claim, and on my extensive experience reviewing the books, records, and claims of many companies over the years, **my conclusion is that the accounting processes employed by Mr. Kagan are severely deficient and that the attempts to recreate data that was never properly captured the first time are not at all convincing**. The claim as it is presented now is not supported with reliable information and, based on how pervasive the problems are, may be knowingly fraudulent.

## Overview KDC's Accounting in the Context of Competency and Fraud:

40.     According to the U.S. Small Business Association, "The term "record keeping"
refers to the orderly and disciplined practice of storing business records. Record keeping is one
of your most important responsibilities as a small business owner. The success of your business
depends on creating and maintaining an effective record system, whether your business is a sole
proprietorship, partnership, or corporation."

41.     Record keeping is not solely about fulfilling regulations or legal requirements.
Record keeping is also about understanding your business, now and in the future. Reasons why
companies should keep good records include:

     a.    Detail Tracking: Owning a small business requires tracking a significant
            amount of information, such as customers, sales, and inventory. Without a
            proper record keeping system, owners lose sight of important business
            details that very often lead to problems and ultimate insolvency.

     b.    Planning:  Planning is one of the most important functions of
            management, and without reliable information good planning is almost
            impossible.  Without detailed plans and adequate information to monitor
            progress towards the planned goals, good project management becomes
            virtually impossible.

     c.    Legal compliance: Companies typically execute contracts and are required
            to hold various licenses and permits. Employers are required to maintain
            and report employee payroll for tax purposes.  Local, state, and federal
            governments require various business licenses and permits. Most
            commercial construction activities require a license or permit.  A company
            that hires employees needs a good enough record system to comply with
            numerous local, state, and federal payroll and personnel legal
            requirements.

     d.    Tax preparation (federal, state, and local)

42.     One of the most basic tenets of having a good accounting system is the use of pre-
numbered or sequentially numbered documents.  In addition to the amount due, the invoice
number is the second most important number on an invoice or payment record. Methodically
assigning a unique number to each invoice provide a means to identify it. Using a numbering
system facilitates the search for an invoice or payment.

43.     Consecutive or sequential invoice numbers help to ensure that each invoice is
unique and each business transaction can be clearly and comprehensively organized and
referenced – for accounting reasons as well as customer support and making sure that the invoice
gets paid. While a receipt is generally used as proof of payment and therefore documents a

finalized sale, an invoice is a request for payment that includes more detailed payment or contact information in addition to pricing information for the goods or services rendered. Having a proper invoice numbering system helps to avoid both lost or duplicate payments that can amount to large losses for a company.

44.    An error-free invoice is an important requirement for businesses who want to avoid legal conflicts with customers or the IRS. Though invoices are not subject to strict regulation in the US, it is always better to have clear documentation and most reputable businesses do so.  Proper invoices usually contain:

      a.     The name and address of both the seller and the recipient

      b.     The date of the sale or service provided

      c.     A detailed description of the sale or service provided

      d.     The price of each sale or service provided

      e.     An itemization of all additional charges

      f.     The due date and terms

      g.     An invoice number and date

45.    Invoices from reputable contractors usually include additional information specific to their business that customers usually ask for such as their Tax ID number, their License number, the words "licensed and bonded", and warranty information.  Usually contractors have their invoices pre-printed or they use accounting software such as QuickBooks which have document templates and sequentially number each document.  With both pre-printed and computer-generated documents, each invoice will look essentially the same as every other invoice, and there should not be variance in document format or appearance and there should not be numbers used out of sequence.

46.    As will be discussed below, many of KDC's sub-contractors and vendors did not follow the basic protocols of invoicing as described above.  KDC also did not follow these protocols for most of the time period under review.  While it is not unusual to come across an occasional small business with poor documentation or sloppy controls, it has been my experience that every other time I have seen this pattern of pervasive conduct within a group of companies doing business together, it has ultimately been found that there was fraud involved.

47.    Kristina Brusenkova, KDC's accountant, testified that she had a master's degree in Accounting, business, economics, and auditing from a college in Russia.  Daniel Gersh, the KDC accountant after Ms. Brusenkova, testified that he had both an undergraduate and a master's degree in accounting from Bentley.  Both testified that they had prior accounting experience before joining KDC.  In Mr. Gersh's case, he is a Certified Public Accountant who had experience with KPMG, a "Big-4" accounting firm.  Each of these two accountants should have known the basics of accounting and internal control, yet the accounting files that they were

involved with that were produced showed **consistent lack of either competence or integrity**. Problems noted include:

   a.   An insufficient audit trail including unsupported balances or transactions, or missing support or documents. Audit trails provide a critical component in both control of the business and in both fraud prevention and detection by proving the legitimacy of transactions. A clear audit trail consists of source documents that are easily retrievable and a clear record of how they were accounted for. As will be discussed below, **the audit trails at KDC and Pro Excavation were insufficient**. Had documents been handled and assembled in a way that leaves an easy to follow audit trail it is unlikely that there would be huge surprise cost overruns at the ends of the projects.

   b.   **Transactions that were not recorded in a complete, timely, or proper manner**. My review of the accounting files for six of the KDC projects showed many transactions that were recorded 6 or more months after they occurred. Many transactions were recorded in lump-sum, which obscured their details. Key and basic functionality of the QuickBooks software such as the invoicing and accounts payable modules were barely or improperly used. Poor accounting practice is evident in that in 2015 the outside CPAs proposed **$3.2 million of adjusting entries** for that one year to correct the books of KDC and properly prepare the tax return.

   c.   **Commingling of assets or transactions** across business entities occurred in numerous instances. Commingling payment methods was also prevalent, with no apparent pattern as to when an invoice would be paid by LCLLC, by KDC via check, or by KDC via credit card. Typically this degree of commingling or complexity in the handling of cash is either done to disguise or confuse the nature of individual transactions. Sometimes it is indicative of a just-in-time crisis mentality at a company that is unable to properly anticipate and manage its affairs.

   d.   It is very **poor payment practice** to pay anything (quotes, estimates, pro-forma invoices, etc.) other than real, valid invoices or statements. Not only were these all of these non-invoices used as alleged support for payments claimed in the documentation of the mechanic's lien, but payments were even purportedly made or amounts added to the alleged claim simply on the basis of email notes asking for money.

   e.   The documents presented as proof of costs in the mechanic's lien often **displayed inadequate authorization or support for the disbursements being made and the payment of invoices that looked spurious on their face.**

     f.     Poor accounting practices often lead to inaccurate tax filings.  There are emails in the record between KDC and its CPA about "making up" journal entries to complete tax returns.  KDC's 2014 and 2015 tax returns were amended due to errors regarding the ownership of the project entities.

While none of these findings by themselves are proof of fraud, the pervasive presence of all of these findings together in the presence of accountants who should know better are strongly **indicative of either gross incompetence or fraud**.

48.     Mr. Kagan is a licensed contractor in the Commonwealth of Massachusetts.  As such he should be aware of the need to have contracts with his sub-contractors, to obtain estimates and proposals, to have individual budgets and schedules, to have material requirements and bills of materials, to adequately track payments and amounts due to sub-contractors, and to obtain lien waivers from all sub-contractors upon their work's completion.  None of these were consistently provided in the evidence produced to us.  In fact, not a single lien waiver was obtained. The fact that these project management and documentation tools did not exist is evident in the fact that huge cost overruns are suddenly discovered at the end of several of KDC's projects.  The refusal or inability to following basic construction management and accounting procedures is indicative of either gross incompetence or fraudulent activity.

49.     One of the final determinants of proper accounting is that it makes sense in relation to the business and economic environment that the firm is operating in.  In addition to the construction cost overruns being claimed in this case, according to several affiants and former investors with Mr. Kagan, KDC has a history of unexpected cost overruns that only appear months after construction was completed:

| Affiant | Project | Unexpected Overrun |
|---|---|---|
| Dmitriy Zhukovskiy | Hyde Avenue | 510,000 |
| Alexander Fodymanow | Lyman Road | 418,495 |
| Elena Lande | Yarmouth Rd | 1,074,956 |
| Mark Kayserman | Deborah Rd | 111,000 |
| Vladislav Abramskiy | Cynthia Rd | 171,933 |

In my experience of 22 years working with small businesses and insolvent companies, a company the size of KDC could not stay solvent and operating with such poor cost control that it had unexpected overruns of this size and frequency.  Furthermore, the sub-contractors being used by KDC, who apparently cannot afford to buy either the pre-printed forms or the small business accounting package that would allow them to bill and collect their receivables in a timely manner, could not survive for many months while being owed the magnitude of money that KDC claims they had not previously billed but were in fact owed.

50.     Another test of whether the numbers for a particular project make sense is to compare the various KDC projects to each other.  Based on the QuickBooks files provided for each project, the 4 houses that KDC built with investors (10 Lyman, 55 Lyman, 88 Cutler, and 50 Yarmouth) were on average 27% larger (which would not impact many of these costs) but

cost on average 80% more to build than the three projects built without investors (Parker, Fredette, and 24 Druid Hill). Although I am not a construction expert and I have not done a feature by feature comparison of each house, some of the differences in cost, the usage of materials, and the expenditures on labor between the investor-houses and the KDC-only houses are absolutely striking:

| KDC Homes - Project Comparison based on Selected Costs recorded in QuickBooks files | | | | | | | |
|---|---|---|---|---|---|---|---|
| | Built with Investors | | | | KDC Only | | |
| | 55 Lyman | 88 Cutler | 10 Lyman | Yarmouth | Parker | Fredette | Druid |
| Affordable Lawn Sprinklers | 8,400 | 8,400 | 8,620 | 8,600 | 2,176 | 1,775 | 3,400 |
| Architecture | 10,500 | 10,500 | 7,100 | 13,000 | 5,800 | 5,800 | |
| Dream Flooring | 56,120 | 41,550 | 45,067 | 45,067 | other less expensive co's used | | |
| Electrical Services | 65,000 | 65,000 | 65,000 | 75,000 | 30,000 | 20,000 | 25,000 |
| Engineering | 9,075 | 9,075 | 3,680 | 9,600 | 2,663 | 3,060 | |
| Excavation | 300,000 | 300,000 | 304,800 | 195,000 | 180,000 | 170,000 | 180,000 |
| Framing | 188,435 | 194,420 | 107,280 | 104,050 | 39,200 | | 37,800 |
| Heating and Cooling | 59,500 | 59,500 | 65,500 | 59,500 | 36,000 | 34,150 | 46,550 |
| Home Depot | 67,683 | 64,311 | 55,841 | 68,662 | 32,455 | 25,627 | 29,006 |
| Horner Millwork | 123,390 | 117,196 | 125,090 | 121,946 | 34,609 | 25,528 | 42,686 |
| Huntington TV | 7,597 | 6,600 | 741 | 10,024 | 6,752 | 5,417 | 4,000 |
| JW Campbell Construction | 90,069 | 81,851 | 82,538 | 44,029 | 31,074 | 32,255 | |
| Landscaping - Other | 45,285 | 49,201 | 111,404 | 110,740 | 18,032 | | 4,500 |
| Masonry | 90,000 | 90,000 | 166,906 | 145,000 | | 8,877 | |
| National Lumber | 269,918 | 249,995 | 66,148 | 178,153 | 68,047 | 43,707 | 72,232 |
| Paul DiGiacomo | 47,605 | 36,905 | 38,850 | 55,360 | 1,150 | | 1,800 |
| Plastering | 21,500 | 24,002 | 23,429 | 23,778 | 14,102 | 12,761 | 16,211 |
| Plumbing | 40,170 | 39,670 | 31,360 | 37,340 | 18,000 | 20,336 | |
| Protection | 5,937 | 5,925 | 5,980 | 5,822 | 1,402 | 1,495 | 1,603 |
| Sergey Nikolaev | 24,660 | 24,660 | 26,700 | 25,440 | 15,000 | 10,000 | 17,000 |
| | | | | | | | |
| square footage | 7,478 | 7,478 | 6,726 | 7,007 | 5,891 | 5,090 | 5,989 |
| total cost / sq ft | $ 250 | $ 236 | $ 272 | $ 262 | $ 144 | $ 130 | $ 144 |

Note that the total cost shown above is the total of all costs, not just the selected costs actually shown.

## Specific Questions regarding the veracity of invoices and payments claimed

51.    **As discussed in detail below, the claim documentation provided by the Defendant has so many inconsistencies, inaccuracies, mistakes, missing documents, unexplained changes to "historical" information, etc. that it I cannot conclude that it is credible.**

52.    Construction subcontractors typically provide lien waivers to evidence that they have been paid and do not have a claim to the property. Lien waivers typically state the subcontractor's name, the address of the property worked on, a description of the work performed, and the exact amount of payment. They are legal documents and usually are signed

and notarized. **Mr. Kagan did not provide any lien waivers in the documentation supporting his claim.**

53.    Ms. Brusenkova alleged in her affidavit that KDC overpaid some subcontractors and then took kickbacks. While there was no direct proof of this in the evidence provided by Mr. Kagan (nor would it be expected to be), this possibility should be kept in mind while reading the deficiencies, irregularities, and unusual items found in the documentation supporting the mechanic's lien.

54.    **Most businesses follow a standard set of accounting and operating procedures**, both because they enhance control of the business and because they make running the business simpler. For example;

    a.    Most companies sequentially number their important documents such as checks and invoices and adhere to the integrity of the numerical sequence. Document numbers are usually pre-printed, and if not they tend to be computer generated from accounting software such as QuickBooks.

    b.    Most companies and even most individual sole proprietors use a standard template for their forms because either they are computer-generated, they are preprinted, or it is just plain easier to use a template in a word processing or spreadsheet program than it is to create the form from scratch each time it is needed.

    c.    Even in cases where business owners do not use computers or pre-printed forms, people are habitual. For example, some people always put their area code in parentheses, and some people never do, but hardly anybody randomly switches back and forth from one convention to the other. Likewise, most people consistently write dates in the same format. When there are variances in common data fields such as these they are usually an indication that multiple parties have prepared the documents.

    d.    In almost every case I have seen where the integrity of numerical documents has been frequently violated, or common forms that are able to be standardized or fit into a template appear instead to be created from scratch each time, or people do not follow normal habitual patterns, these anomalies have been reliable indications of the documents being fraudulent. These anomalies have sometimes been found to be explainable, but the more often they are found the greater the likelihood that the documents are not authentic.

    e.    When business owners misspell their own name, there is a very high probability that the invoice is not authentic.

    f.    Computers are consistent – when a name is entered into a field, that name stays the same on document after document. When computer generated

documents have inconsistencies within the same field, that is often an indication that some of the documents are not authentic.

g.    While it is not uncommon for small businesses or individual sole proprietors to not have what would be considered proper form on business documents, it is very uncommon for them to be inconsistent (to use states in some addresses but not others, to vary the use of upper and lower cap cases, to use invoice numbers or not to use invoice numbers, etc.). In every case where I have seen numerous inconsistencies among numerous vendors, accompanied by claims of cost overruns, it has been determined that fraud was being committed.

55.    The documentation shows that some expenses were paid by LCLLC, some were paid by KDC via check, some were paid somehow by Pro Excavation, and some were paid by KDC via credit card. There was no discernable pattern as to how an invoice would be paid. There were no sufficient reconciliations provided to ensure that costs were not double paid.

56.    Evidence relating to vendors discussed below is included in appendices attached to this report. It should also be kept in mind while reviewing these write-ups of invoices that were issued in February, April, and May of 2015 that both homes were completed by October 2014.

57.    As described below, the QuickBooks file that was produced by the Defendant differs from the QuickBooks reports used in the documentation submitted to support the mechanic's lien claim. When reviewing the supporting evidence in the appendices to this report note the following:

a.    Reports from the documentation provided with the mechanic's lien claim have a KAGAN bates number on them.

b.    Reports generated from the QuickBooks file produced by the Defendant, which has significant differences than that that was used in the claim documentation, have a July 2018 date in the upper left corner and do not have a bates number.

58.    The documentation provided for **Construction Specialties** indicates that the **QuickBooks file that was produced to the Plaintiffs by Mr. Kagan is either not the same QuickBooks file that was used to produce the mechanic's lien claim, or a clone of the QuickBooks file was made and subsequently altered to prepare the mechanic's lien claim:**

a.    There are total charges for $17,965 to Construction Specialties on the March 2014 Amex card to LCLLC. This is for 4 invoices issued in Feb and Mar 2014.

b.    In the LCLLC QuickBooks file that was produced by Mr. Kagan, this charge shows up correctly for $8,982.50 to each house, total $17,965.

c.      According to the claim documentation for the mechanic's lien that was
submitted by Mr. Kagan, the QuickBooks report shows that each house
was charged $14,130 for Construction Specialties on the March 2014
Amex reimbursement. **The Amex billing for March 2014 listed in the
mechanics lien claim was overstated by a total of $10,295.**

d.      I ran an audit trail report for all transactions on the March 2014 Amex
billing and they show the amount for Construction Specialties has always
been $8,982.50 per house. The $14,130 charges never show up. This
means that either the Plaintiff was given a totally different file than the
one that was used to prepare the mechanics lien claim, or more likely at
some point Defendants took the original accounting file and cloned it and
then modified it to inflate the amounts on the lien, but they produced the
original unmodified version. **There is no other conceivable reason for
this discrepancy.**

e.      The detail supporting invoices for Construction Specialties that were
produced to back up the amounts on the QuickBooks reports total
$36,530. One invoice for $9,250 has a printed note saying "revised" and a
handwritten note saying "not paid?" and if this is subtracted the total of
the invoices are $27,280. The total payments for Construction Specialties
according to the QuickBooks file I have is $27,625. **Again, this shows
the mechanics lien claim is overstated.**

59.     Based on the QuickBooks file produced by the Defendant, charges to each house
for **Horner Millworks** for the May American Express bill were $26,938.92. I verified from the
AMEX bill that this is the correct amount. However, the QuickBooks reports used in the
mechanic's lien claim for Horner Millwork are for $35,060.84. **The QuickBooks reports used
in the mechanic's lien claim for Horner Millworks were inexplicably changed and
overstated by a total of $16,243.84 for the month of May 2014 alone.**

60.     When compared to invoices from other projects, **the invoices provided in the
mechanic's lien claim for Huntington TV appear to be fabricated:**

a.      The invoices from the other projects use 6-digit invoice numbers and have
compact spacing in the body of the invoice.

b.      The invoices purported to be for LCLLC have wasted spacing and
unnecessary printing in the invoice body and only have 5-digit invoice
numbers.

c.      There are two invoices, both dated 4/22/14, with invoice numbers 132
apart. Huntington is a family-owned retailer for digital theater & music
systems, plus installation services. April 22 was a Tuesday, one of the
slowest days of the week for retailers. It is unlikely that there would have

been 132 other sales in-between processing order for the two LCLLC homes.

d.  One of the purported invoices from Huntington is actually titles "Statement". The "statement", which uses a 6-digit invoice number, is nonsensical: An invoice number is listed but shows an "amount" for $996.99 and a "balance" for $8,108.89. The past due amounts are $5,900.30 for 30 days and $2,208.39 for 60 days. These should correspond to invoices that were issued, because the purpose of a statement is to recap the invoices still due to be paid. There is not correspondence of the amounts on the statement to anything.

e.  The purported invoice copies that were provided do not agree to the QuickBooks reports provided in the mechanic's lien claim.

61.  **Décor Art** was a sub-contractor to both of the LCLLC projects as well as the Druid Hill, Yarmouth, and Lyman Road projects. The Décor Art production consists mostly of undated invoices and proposals, many of which look suspicious. A review of the invoices supplied by KDC from Décor Art (see Appendix) showed:

a.  Some of the invoices used "MA" in the address. Most did not use the state as part of the address. Invoice preparers are usually consistent and if prepared by one person the state would either always be there or always not be there.

b.  Décor Art's invoices used a colored bar in the middle of them that contained the invoice number. On non-LCLLC projects, the bar is solid. On most of the invoices for LCLLC the bar has a gradient to it that is not seen on the non-LCLLC invoices. This is not related to time, as when the invoices are sorted in invoice number order there are still differences in the gradient of the invoice number bar between LCLLC and non-LCLLC invoices.

c.  Invoices #1015 to 88 Cutler Road and #1016 to 50 Yarmouth Rd have a different invoice body than all other invoices – there are no grid lines. **Differences such as this indicate a possibly fabricated invoice.**

d.  **Invoice #1016 to 50 Yarmouth Road appears to be a fabrication.** It has different fonts than any other invoice. It also capitalizes the first letter in each word in the slogan "where quality comes first", while none of the other invoices do that. It also lists the phone numbers in opposite order than all other invoices do. It also spells the word "Painting" wrong in the masthead that is supposedly a constant portion of all Décor Art stationary.

e.  Invoice # 1020 was used twice, once on an invoice to 88 Cutler for $10,000 and once on an invoice to 55 Lyman for $5,000. They were paid

two months apart.  **Duplicate invoice numbers often indicate fabrication.**

f.  Invoices 1047 to 88 Cutler and 1048 to 55 Lyman both have the same gap in the grid work that contains the body of the invoice.  No other Décor Art invoices have that gap.

g.  Some of the invoices use all lower-case letters, some use all upper-case letters, and some use proper sentence protocol in capitalization.

h.  Invoice #1076 was used twice on two separate invoices to 88 Cutler.  On the invoice for $8,750, the invoice bar appears to have been cut and pasted on to the document.  The other invoice for $4,250 has indications on it that the bottom portion of the document was obliterated from being copied.

i.  Jose Porto testified in deposition that he formed Décor Art in November 2012.  He stated that his typical practice – which he used for this project – is to make verbal requests for payment 4 or 5 times throughout the project, which each request based upon 25% job completion (at start, ¼ way through, ½, ¾, and final payment).  He stops doing work if he is not paid within a week of requesting payment.  He does not prepare written invoices, unless he was asked to perform extra work.  Even though he will not work if he is not paid, the records indicate significant amounts of money were owed to him.

j.  The claim files have unpaid bills for $15,450 allegedly dated 2/12/15, 4/28/15, and 5/28/15.  One of these late invoices, #1057 for $8,750, does not appear in the QuickBooks file produced by the Defendants even though that file had entries in it that were made as late as 5/11/15.

k.  Invoice #1067 for $420 is listed as being for $1,420 in the QuickBooks report used in the mechanic's lien claim.

62.  **Paul DiGiacomo** is a subcontractor of KDC who was reported to have been paid about $100,000 for work on the LCLLC projects.  According to the Wellesley Patch, he was arrested on March 12, 2012 for numerous warrants including larceny over $250 by false pretense – being an unlicensed home improvement contractor.  The exhibits show invoices that were all issued within a few months of each other but are each substantially different from the others which strongly implies that they were fabricated:

a.  Invoice 20140028 dated 6/6/14 appears to be generated on a QuickBooks template but is missing the detail amounts that QuickBooks requires to prepare an invoice.  Only the total amount is present.  The area code of Mr. DiGiacomo's phone number is typed in parentheses.

b.  Invoice 20140066 dated 7/3/14 appears to be properly generated on a QuickBooks template.  The amount of $1,500 has been entered in the

detail section of the invoice but is usually left-justified. This amount has
been manually typed because it is right-justified. The area code of Mr.
DiGiacomo's phone number is typed in parentheses.

c.     Invoice 20140069 has been typed free-form style instead of using the
template of the previous two invoices. DiGiacomo's name is on the right,
Kagan's name is on the left, and the phone number area code has no
parentheses. The "g" in "DiGiacomo" is not capitalized as it is in the
other three invoices.

d.     The invoice for the week of August 8th has no invoice number,
DiGiacomo's name is centered, Kagan's name is on the right, and the
word "Tasks" is not used as it is in all the other invoices.

e.     Invoice #9 dated 8/6/15 for $35,805 misspelled Mayfield, Lyman, and
Kagan's email address. Unlike any of the other invoices, this one was
produced by a web service www.aynax.com. This invoice was for
roofing, which had already passed inspection many months earlier.

f.     No detail was provided for the charges in the claim relating to Cutler.

g.     Other than a couple of emails, none of the other projects had invoices from
DiGiacomo in the files that were produced by the Defendant. There were
two instances where Mr. DiGiacomo simply emailed a request for money.

h.     Charges for snow cleaning in 2014 and early 2015 were added to the claim
after the QuickBooks file of 5/14/15 was produced by the Defendant.

63.     **JW Cambell Construction** issued numerous invoices to LCLLC. They appear to
be computer-generated from an accounting software package similar to QuickBooks. All of the
invoices that were paid directly by LCLLC show the "Work Performed at:" address as "88 Cutler
Rd., Brookline". For some reason three invoices relating to LCLLC were paid by KDC instead
of LCLLC. Those specific invoices are different from the invoices paid by LCLLC directly:

a.     One of these, invoice 2647 for Hutch and Pantry Bar and paid 6/11/14 for
$4,022 has a number of anomalies:

i.     The Location is "88 Cutler Ln., Brookline", not "Cutler Rd." as in
the other invoices

ii.     The estimate was for $4,800 but has $4,022 handwritten on it as
the amount paid, and that is the amount on the QuickBooks ledger.

iii.     The invoice was for $4,000 but has the "amount paid" handwritten
in on it as $4,800.

iv.     Invoice 2661 for $800 appears to be for the remainder of the Hutch
and Pantry Bar project and is marked as paid, but neither the

amount ($800) or the check number (1361) shows up on the
QuickBooks ledger sheet for payments to this vendor.

b.    Another of these invoices paid by KDC instead of LCLLC, but charged to
LCLLC in the ledger sheet, does not list the address of the property at all
in the "Work Performed at" box

c.    According to the QuickBooks file JW Campbell billed or was paid over
$171,919. Other than a few cancelled checks, there is no support for any
of these charges in the documentation provided with the mechanics liens.

64.    According to its website, **Pave Tech** has been in business since 1989. A company
this well-established would be expected to use sequential invoice numbers, to have invoice
numbers that were 4-digits long or more, and to have more than one sale per month. The
documentation provided by Mr. Kagan shows that:

a.    On 7/28/14 invoice #5 was issued for $15,037

b.    On 7/29/14 invoice # 5 was issued again, for $10,533

c.    On 8/24/14 invoice #6 was issued for $7,662

d.    On 9/29/14 invoice #6 was issued again for $7,022

e.    Invoices for other projects that were produced were:

    i.    On 11/11/14 Invoice #8 was issued to Yarmouth for $8,158

    ii.    On 12/5/14 an invoice with no invoice number was issued to
Parker for $12,000

    iii.    On 12/17/14 an invoice with no invoice number was issued to
Fredette for $6,436

    iv.    On 6/9/15 an invoice with no invoice number was issued to Parker
for $7,500

f.    It is very unusual for companies to issue invoices with invoice numbers
and then stop using invoice numbers.

g.    The invoices that do not have invoice numbers are printed slightly
differently than those that do have invoice numbers: The former have the
word "To" in the address and the latter do not. They also address to
"Kagan Development Corp" while the numbered invoices all address to
"Kagan Development".

h.    Check # 1120 for $7,662 was issued in August 2014 and cleared the bank
that month. It is recorded in the QuickBooks file used for the mechanic's
lien but not in the file produced by the Defendant. That means the check
was entered after 5/11/15, 9 months after it was written. If it took 9

months to find this omission and enter it, that indicates that the **bank
account had not been reconciled for 9 months.**

65.     **BST Plumbing** issued invoice #1165 on 2/14/15 and invoice #1166 on 3/1/15,
indicating no other sales during the two weeks between them.  Except for the invoice numbers
and dates, the two invoices are identical.  The invoices are for plumbing, which had already
passed final inspection many months earlier.

  f.  On 8/18/15 BST issued additional invoices #216 and 217 (out of
     sequence) for materials and rough plumbing.  BST responded to a
     subpoena for information and the response showed:

  a.  BST invoice 1165 was dated 2/14/15 and invoice 1166 was dated 3/1/15.

  b.  Invoices 1165 and 1166 are identical, even though they are for two
     different houses.

  c.  Each of the invoices are marked in handwriting that $20,000 was paid and
     $19,670 is still outstanding.

  d.  According to LLLLC's QuickBooks audit trail report, two invoices each
     for $11,360 from BST Plumbing were entered into the accounts payable
     system on 4/29/15 at 10:14 a.m.  27 minutes later, at 10:41 a.m. the
     amounts of both invoices was changed to $19,670.

  e.  For 55 Lyman, invoice 1165 is dated 2/14/15 and the QuickBooks record
     shows the $20,000 payment as having been on check 1040 dated 3/12/14.
     The check was written before the invoice date.

  f.  For 88 Cutler, invoice 1166 is dated 3/1/15 and the QuickBooks record
     shows the $20,000 payment as having been on check 1017 dated 2/4/14.
     The check was written before the invoice date.

  g.  The remaining $19,670 allegedly open on both of the above invoices was
     entered into QuickBooks for each house separately as a new bill dated
     4/28/15

  h.  BST invoices 216 and 217 are for the two houses and are identical to each
     other.  They are dated 8/18/15, five months later than invoices 1165 and
     1166 (invoices not being issued in numerical sequence).  Both invoices are
     for rough materials and both indicate that $3,500 was paid.

  i.  The documentation for the rough materials comes from Ferguson
     Enterprises.  There is a set of quotes for each home.  Each set has two
     quotes and the two quotes in one set are identical to the two quotes in the
     other set except their time stamp and bid numbers are different.  The
     Ferguson quotes are dated 8/19/15, one day after the invoices for these
     exact materials were prepared by BST.

j.   If the quotes are for actual materials purchased for these two houses, the materials were all purchased months after the work was done by BST and months after the houses were listed for sale.

k.   BST provided two handwritten notes in its deposition materials stating that $3,500 of the materials for each house was paid directly to Ferguson Plumbing Supply. According to KDC's QuickBooks production these payments were made on 10/29/14, 10 months before Ferguson quoted on them to BST and BST invoiced them to the projects.

l.   Mr. Kagan produced an AMEX receipt for a charge at Ferguson made on 10/9/14 for $7,000. There is no detail provided with this, nothing like the extensive quotations that Ferguson supplied to BST.

m.   The quotations prepared by Ferguson in August 2015 do not give credit for the $7,000 paid in October 2014, even though BST does on its invoices.

n.   The Town of Brookline issued the plumbing permit for 88 Cutler on August 29, 2013, with a start date for the work of September 17, 2013. The rough plumbing inspection was January 29, 2014 and the final inspection was September 26, 2014. On 55 Lyman Road, the Town of Brookline issued the plumbing permit to BST on September 25, 2013 with a work start date of October 1, 2013. The underground plumbing was inspected on November 18, 2013. The rough inspection of the plumbing was March 6, 2014. The final inspection was September 24, 2014. The Town of Brookline issued a gas line installation permit to BST Plumbing on March 20, 2014 with a start date of March 26, 2014. The rough inspection was March 26, 2014 and the final inspection was September 24, 2014. These dates are consistent with the initial payments to BST, but well before the invoices and amounts being claimed as they appear in the documentation.

o.   On the Lyman Road project, it appears that BST was paid $31,360 based on a blank, unsigned proposal (FIVEPROJ001126).

p.   On the 50 Yarmouth project, the copies of invoice #1158 were produced. One is for $33,670 and the other for $36,640.

q.   Two copies of Invoice #160 were produced. One of these was for $6,789 to the 51 Parker project and has markings indicating it was paid by both AMEX and by check. The other is for $4,558 to the 7 Fredette project and is marked paid by Amex.

66.   There are billings from **Ferguson** in the claim totaling $25,630 for which no activity exists in the QuickBooks file that was produced by the Defendant. The billings are for materials used by BST Plumbing. The invoices from Ferguson that are being claimed in the

mechanic's lien claim are for material sold to BST in August 2015, long after all plumbing work was finished.

67.     **Sergey Nikolaev** issued an invoice for $24,660 for each LCLLC property for Tile Work on 4/10/15, months after the final inspections had been done.  No invoice numbers were used and invoices did not have any description to show what work was being paid for.  On 4/29/15 entries were made into LCLLC's QuickBooks file that $9,660 was payable for each invoice.  On 5/13/15 the files were changed to show these amounts were due to KDC.  Handwritten numbers, particularly 4's and 9's, are different on these two invoices than they are on an invoice from Mr. Nikolaev to 50 Yarmouth.

68.     **V&D Heating** provided two handwritten proposals that were identical except for the header – property address and date.  Each proposal mentions that it will install two HVAC systems.  It appears as if one proposal was copied to create the other.  The ledger sheets showing payments are not consistent with the proposal.  The payment ledger sheets are also not consistent with each other.  The Cutler sheet shows $24,500 and the Lyman sheet shows $14,500 billed in April 2015, many months after final inspections and more than a year after the bulk of the work that was paid for was done.  V&D responded to a data subpoena and the response showed that:

    a.    The check copies that V&D provided agree to the QuickBooks ledgers produced by Mr. Kagan.

    b.    The two quotations provided by V&D were both dated 12/5/13 and call for an initial payment of $25,000 each.  In fact, the initial payments on both were $10,000 and occurred on 10/26/13, more than a month before the proposals were written.

    c.    The copies of the proposals provided by V&D are identical to the copies of proposals produced by Mr. Kagan, including where paper clips are located and where text is cut off.  It appears that one of the two (V&D or Mr. Kagan) copied the other's documentation for purposes of production.  Furthermore, the two proposals have different dates and proposal numbers, but other than that they are identical in terms of the writing; it appears that one was copied onto the other.

    d.    The proposals were each for $57,000.  The ledgers both show costs incurred for V&D to be $60,050 with substantial amounts still due.

    e.    The documents produced by Mr. Kagan show invoices 607088 and 607086 issued from V&D on 11/25/14 for $2,500 each.  These invoices do not separately appear on the QuickBooks ledger sheets and were not produced by V&D in response to the subpoena.

    f.    According to the LCLLC QuickBooks file, invoices from V&D Heat for $13,950 and $23,950 were entered on 4/29/15.  The Town of Brookline issued the permit to install the heating system at 55 Lyman on February 12, 2014 and did the final inspection September 25, 2014.  On 88 Cutler,

the permit was issued December 30, 2013 and the final inspection was also done on September 25, 2014.

g.  According to KDC's QuickBooks general ledger KDC has owed V&D Heating $260,000 for at least three years with no payments being made.

69.  **Dream Flooring** invoices appear to be fabricated.

a.  Dream Flooring responded to subpoenas for information and provided two invoices related to 55 Lyman Rd in its deposition response.  The invoices are not numbered.  One invoice for $48,910 is dated 7/3/14 and states "Job is completed paid in full".   The other invoice is dated 3/23/15 and is not totaled but shows a "remain balance" of $8,910 and additional work of $3,300.   This invoice also says "Job is completed paid in full".

b.  The total charges on the two invoices above are $48,910 + $3,300 = 52,210

c.  The documentation produced by Mr. Kagan shows $52,210 of total charges for Dream Flooring.  However, according to the QuickBooks file:

  i.  Dream Floors was paid three times for a total of $20,000 all before 2/20/14, significantly before its invoice date, and $15,000 on 9/2/14.  All of this money was paid from the Rockland Trust account.

  ii.  The QuickBooks file shows a bill dated 3/23/15 for $14,710 and another dated 7/2/15 for $2,500.

d.  The invoice dated 3/23/15 produced by Mr. Kagan says at the bottom of it "Balance deu (sic) is $12,210.

e.  Dream Flooring provided one invoice related to 88 Cutler Lane in its deposition response.  The invoice is not numbered and is dated 6/21/14 for $48,910.  It states "Job is completed paid in full".

f.  The invoice copy produced by Mr. Kagan is also dated 6/21/14 and states "Job is completed amount due $48,910".  **The invoice that Dream Flooring previously stated as paid in full is now being claimed as fully owed.**

g.  According to the QuickBooks ledger produced by Mr. Kagan, total charges from Dream Flooring were $48,910 and $20,000 of this was paid prior to 2/20/14, so an invoice prepared on 6/21/14 should not have stated that the whole amount of $48,910 was still due.

h.  According to the QuickBooks ledger $11,410 of the $48,910 was billed on 4/28/15 and $2,500 of the $48,910 is now owed to KDC for paying Dream Flooring on 7/2/15.

i.        On 5/13/15 an invoice for $6,550 and dated 4/28/15 was added to the QuickBooks file for Cutler. Sometime after that invoice was deleted from the QuickBooks file used to prepare the claim and in its place two other invoices were added: one dated 3/23/15 for $14,710 and one dated 7/2/15 for $2,500. The later invoice has an invoice number assigned to it, despite none of the other Dream Flooring invoices having invoice numbers.

j.        On 5/13/15 an invoice for $8,910 and dated 4/28/15 was added to the QuickBooks file for Lyman. Sometime after that invoice was deleted from the QuickBooks file used to prepare the claim and in its place two other invoices were added: one dated 4/28/15 for $11,410 and one dated 7/2/15 for $2,500. The later invoice has an invoice number assigned to it, despite none of the other Dream Flooring invoices having invoice numbers.

k.        One other invoice for Dream Flooring was found in the files for the other projects. The invoice states that the job total is $42,690 and $25,000 is still due. This would imply payments of $17,690 had already been made. According to the QuickBooks file for the Lyman project, only $10,000 had been paid to date. The file also indicates that the Lyman project paid $15,000 to Dream Flooring directly and all other payments to the vendor were supposedly paid through KDC.

70.    The invoice dates on the invoices from **Da Costa Construction** appear to have been prepared by multiple different people, as shown by the manner in which the dates were typed:

a.        Invoices were numbered and dated as follows:

| | | | |
|---|---|---|---|
| i. | #1402 dated | "October 10, 2013" | to Lyman Road |
| ii. | #1403 dated | "October 10, 2013" | to LLLLC |
| iii. | #1406 dated | "Abril 25 2014" | to LLLLC |
| iv. | #1407 dated | "08/29/2014" | to LLLLC |
| v. | #1409 dated | "April 15, 2013" | to Yarmouth |
| vi. | #1410 dated | "Abril 27, 2014" | to Lyman Rd |
| vii. | #1470 dated | "April 28, 2015" | to Lyman Rd |
| viii. | #1420 dated | "May, 5th 2014" | to Fredette |
| ix. | #1416 dated | "10/02/2014" | to Parker |
| x. | #2033 dated | "01 March 2015" | to LLLLC (change order) |

b.  Note that in addition to different date formats, invoices 1407, 1409, 1470, and 1420 appear to be out of sequence.

c.  Invoices 1402 and 1403 appear to have been edited on a copy machine.

d.  Invoice 1407 to LLLLC includes charges on it related to the other Lyman Rd project

e.  There are colored bars and grid lines on the invoices, and there is significant variance between these from invoice to invoice. This variance usually does not occur on preprinted forms or forms that were all printed on the same printer.

f.  According to the audit trail of the Lyman-Cutler, LLC QuickBooks file, two invoices without invoice numbers were entered into LLLLC's QuickBooks accounts payable system on 4/28/15: One for $20,350 and one for $28,350. Both were deleted one day later, on 4/29/15. The change order #2033 dated 3/1/15 for $18,500 does not appear in the accounting records.

g.  On September 2, 2015 Paulo Cordeiro sent an email to Mr. Kagan informing him that there had been a mistake on invoice #1405 and that when corrected he is owed a total of $23,000 from LLLLC. As can be seen from the list above, there never was an invoice #1405 produced by Mr. Kagan.

h.  Invoices #1403 and #1406 have payment amounts that are both factually incorrect and not properly subtracted to arrive at the balance due.

i.  Invoice #2033 is missing the word "Construction" from the usual "DeCosta Construction" in the invoice letterheads.

71.  The documentation for **Unicon Electric** shows:

a.  Two identical handwritten proposals for electric work (one appears to be a copy of the other), one on each property, for each property. The proposals are not dated and are for $65,000 each.

b.  A ledger sheet showing that Unicon was paid $30,000 for the Cutler property prior to 3/15/14

c.  A ledger sheet showing that Unicon was paid $35,000 for the Lyman property prior to 4/19/14

d.  The total paid while the houses were being built was $65,000

e.   On 4/18/15, a year after the final payments, another $65,000 is being
     shown as billed on the ledger sheets - $35,000 for Cutler and $30,000 for
     Lyman

f.   In reviewing the other Kagan projects for which documentation was
     provided, as well as the LCLLC project, in each instance the proposals
     from Unicom are the only documentation provided of the cost.  They may
     not be authentic and the costs on the investor-financed properties may be
     inflated.  4 of the proposals look to be exact copies of each other except
     for the amount.  3 other proposals differ slightly, but are also copies of
     each other except for the amounts.  The main difference between the two
     sets of proposals is that the 4 investor-owned properties are listed to get
     400 amp service while the 3 KDC-owned properties are listed to get 200
     amp service.   Estately.com listed two of the investor-owned homes as
     only having 200 amp service and did not provide amperage information on
     the two LCLLC homes.  My understanding from research is that the cost
     differential between a 200 amp installation and a 400 amp installation is
     between $500 - $4,000 and that the typical large house has 200 amp
     service.  A comparison of the homes built by KDC is as follows:

| Property | Ownership Structure | Sq Feet | Proposal AMPS | Estately.com AMPS | Unicom Cost |
|---|---|---|---|---|---|
| 88 Cutler | investors | 7,478 | 400 | n/a | 65,000 |
| 55 Lyman | investors | 7,478 | 400 | n/a | 65,000 |
| 10 Lyman | investors | 6,276 | 400 | 200 | 65,000 |
| 50 Yarmouth | investors | 7,007 | 400 | 200 | 75,000 |
| | | | | | |
| 26 Druid Hill | KDC | 5,968 | 200 | n/a | 35,000 |
| 51 Parker | KDC | 5,891 | 200 | 200 | 35,000 |
| 7 Fredette | KDC | 5,090 | 200 | 200 | 30,000 |

     If actual invoices had been prepared or provided, as is typically done by reputable
contractors and sub-contractors, those invoices would have listed the equipment installed and
would have clearly stated whether 200 amp or 400 amp service was installed.  The detail
invoices, if produced, would also easily explain the extreme cost differences between the
investor projects and the Kagan-only projects.

a.   The Town of Brookline issued the permit for the electrical work on 88
     Cutler on February 5, 2014.  The online information indicates that the
     Electrical was "signed off."  It appears that the electrical was inspected
     and signed off during the final inspection September 25, 2014.  On 55
     Lyman Road, the Town of Brookline issued the electrical permit on March
     3, 2014.  The rough inspection was March 13, 2014 and the final was
     September 23, 2014.  However, the accounts payables entries of $35,000

and $30,000 for Unicom in LCLLC's QuickBooks file were not made until 4/29/15.

72. **Affordable Lawn Sprinklers** installed sprinklers in all the KDC projects I reviewed. The costs for KDC owned properties was less than half of the cost of investor properties. I noted the following:

    a.     Invoice 9300 for $8,440 is addressed to 88 Cutler, but is provided as the support for the 55 Lyman charge

    b.     The mechanic's lien has no documentation of the charge for 88 Cutler, but the QuickBooks file has an entry for $8,400 each for both houses.

    c.     Affordable was paid the $8,400 for invoice #9300 twice – once with KDC check 1436 and once with LCLLC check 1108. Both checks reference payment for 88 Cutler. It is possible that both houses were installed under the same address and that either the overpayment was refunded and not credited to LCLLC, or that it was applied to some of the other KDC projects.

    d.     Based on the documentation provided it appears that invoice #9300 for $8,400 was double paid and whether this was intentional or accidental, it should not be charged to LCLLC in the mechanic's lien claim.

73. An invoice without an invoice number from **Eastcoast Pipelines** shows services performed for 4 of the properties that Mr. Kagan was working on, including the two LCLLC properties. The detail is blocked out and the entire invoice was paid by LCLLC. Two other invoices found in other project documentation are different enough from the invoice included in the mechanic's lien documentation that they all appear to be fabricated. The invoice for 10 Lyman Road printed on two pages in a way that no vendor would ever send to their customer, suggesting it was printed from a spreadsheet program in-house.

74. The claim for **Pro Excavation** costs does not enumerate all of the costs being claimed. Additionally;

    a.     The QuickBooks claim sheet for 55 Lyman has a bill dated 10/6/14 for $20,000. Since this is not in the QuickBooks file produced by the Defendant, it must have been entered after May 14, 2015.

    b.     The QuickBooks claim sheet for 88 Cutler had a bill dated 10/6/14 for $75,000. Since this is not in the QuickBooks file produced by the Defendant, it must have been entered after May 14, 2015.

    c.     The QuickBooks claim sheet for 88 Cutler has a bill dated 2/6/14 for $45,000 that is no longer there. It appears that the early 2014 invoice mentioned above was replaced. Since this is not in the QuickBooks file produced by the Defendant, this must have happened after May 14, 2015.

      d.      A charge from Pro Ex to the Lyman house dated 10/6/14 for $90,000 was inexplicably changed to $120,000 in the claim, and another invoice for $4,600 dated 5/28/15 was also added to the claim.

      e.      A charge from Pro Ex to the Cutler house dated 10/6/14 for $135,000 was inexplicably changed to $155,000 in the claim.

      f.      None of the above invoices appear in Pro Excavation's 2014 or 2015 general ledger (i.e. they are not on Pro Excavation's books).

      75.     Pro Excavation charged LCLLC $23,000 for snow removal, primarily from Paul Digiacomo. According to documentation from other projects, Mr. Digiacomo billed other projects for snow removal, but those projects were not billed, making it appear that all of the cost for other projects was billed to LCLLC.

      76.     As shown above (paragraph 50), the amounts spent on **National Lumber** far and away exceeded the amounts spent on any other of the projects. KDC was making many deposits on AMEX with this vendor. There is no reconciliation between the deposits paid and the product received at LCLLC. It also appears as if there were double billings where KDC requested reimbursement from LCLLC and then billed LCLLC again for the AMEX charges. Many of the American Express charges appear to be deposits and the deposits were charged to LCLLC as if they were purchases. The detail with the claim indicates that some purchases that were paid with deposits were also billed to LCLLC, causing a double billing.

      77.     An invoice from **Umanas Plastering** for $2,501.97 and dated 10/15/14 was added to the claim but was not in the QuickBooks file as of 5/14/15. There was no supporting detail for this invoice. There are two invoices in the file purportedly from Mr. Canas of Umanas Plastering. Both invoices are factually incorrect regarding payment made and mathematically incorrect in terms of the amounts still due. It is possible that the total cost of the jobs was changed on the invoice faces. None of the other projects had any invoices on file from Mr. Umanas except for the Fredette project, in which he asked for money via email.

      78.     Kristina Brusenkova stated in her affidavit (p 2) that **Pro Excavation** billed for excavation and landscaping work twice; once by having LCLLC pay the charges directly or to KDC, and then a second time in billings from Pro Excavation. There was not enough detail provided to support the Pro Excavation billings that would allow anyone to dispute this statement. The size of the charges compared to the charges for other similarly sized projects lends credence to Ms. Brusenkova's statement.

      79.     The tax payments recorded in QuickBooks do not match up to the tax bills in the file.

      80.     Many of the expenses being claimed are not supported, particularly the expenses billed by or paid to Pro Excavation. Mr. Kagan testified in his deposition (p 19) that all of the documents that he has to support the claims made by KDC have been produced.

## Weak Internal Controls make accounting information from KDC and Pro Excavation unreliable

81.     Dan Gersh, the Chief Financial Officer at KDC, testified at his deposition that the books and records of KDC and Pro Excavation were disarrayed and unsupportable and needed extensive re-creation (i.e. after the fact documentation) to make them supportable. This supports the above observations that all point to the documentation that was provided not being contemporaneous or accurate, and that it cannot be relied upon. (pp 53 – 69, 74 - 75)

82.     Mr. Gersh also testified that:

a.     He joined KDC near the end of 2014 and he announced in an email that he was going to clean up and reorganize the accounting. In his deposition he described the accounting as an unorganized "mismash", always a mess. (pp 26 – 28)

b.     When Mr. Gersh arrived at KDC the books "lacked support and documentation" (pp 37 – 38) and that he went back to subcontractors to recreate documentation and support for accounting entries (pp 53 – 55). He later added that after May 7, 2015 he went back and did further significant reconstruction of the accounting records (pp 68, 74 – 75, 86, 88 - 91).

c.     Mr. Gersh stated that it is "not realistically possible" to track expenses to budget (a procedure that most companies of all sizes do routinely) (pp 35 – 36)

d.     Mr. Gersh stated that nobody can map the Pro Excavation charges in the proof of claim to the proposals (pp 125 – 128)

e.     Mr. Gersh emailed to his CPA (SGC-001513) "Centre Street – I don't see any AR from Centre ST for 2014. We can certainly play around with that property and throw in a healthy amount to AR if we need it. Total Proposal is $170k, and I can check with Vadim, but I think we can put $75-125k as earned in 2014 if needed."

83.     In an email to his CPA (SGC-001959-001996 p4) Mr. Kagan discusses a problem he is having getting a loan reviewed and states "…let me know if there is anything I/we should be concerned about right away, that requires us reshuffling or making any transactions before yearend? Maybe we need advance some services to KDC from certain properties?"

84.     There are numerous emails between Mr. Gersh and his outside CPAs about deciding what they wanted the numbers (financial results on the tax returns) to be, about where to shift income and expenses to, etc.

a.     Mr. Gersh in an email to his CPA said "This might be a repeat of last year where we simply make up some journal entries to get certain things closed

instead of wasting time trying to figure it out.  Sucks that it's like this again" (Gersh dep p 110)

    b.    An email from the CPA to Mr. Gersh (SGC-Druid-000017) asks "How much do you actually want to show as excavation expense on the P&L"

    c.    An email from the CPA to Mr. Gersh (SGC-000657) states that the CPA "cannot figure out how the "Reimbursement" accounts tie out on KDC to the properties QBs".

85.    Kristina Brusenkova, the accountant before Mr. Gersh, testified (p 63, 65) that there were no contracts with subcontractors and the only information she had to tell her what to pay was what Mr. Kagan told her. Mr. Kagan throughout his deposition testimony was unable to remember details about almost every invoice he was asked about.

86.    A significant amount of the claims being made either arose in Feb – May 2015 or were not recorded in the accounting records until after mid-May 2015.  At this point both houses had already been completed for at least 7 months.

    a.    The concerns with the documentation noted above can easily support the conclusion that much of the cost documentation has been fabricated and is unsupportable

    b.    If in fact all of the paperwork discussed above is valid, it raises serious questions regarding the competency of any organization that allowed that much in cost overruns to go unnoticed and unpaid for so long.  An organization too incompetent to be able to notice a million dollar cost overrun as it progresses is not competent to be able to report on it and file claims after the fact.  Most businesses have a set of internal controls to prevent these types of mistakes.  This section discusses and evaluates the Defendant's accounting information and system of internal control in more detail in order to provide an opinion on overall reliability of information (and claims) generated by the Defendant.

87.    Elena Lande, and investor in the Yarmouth project, testified to a similar experience with Mr. Kagan where he made large unexpected claims and then was unable to satisfactorily answer any questions regarding them. (p 5)

88.    Having reviewed the documentation for the mechanics lien claim, the ledgers and QuickBooks files of six KDC projects, the ledgers and reports provided by the Defendant, and the material produced by the Defendant's CPA, I am of the opinion that accounting information produced by the Defendant cannot be relied upon.

89.    **Internal Control**, as defined in accounting, is a process for assuring achievement of

    a.    an organization's objectives in operational effectiveness and efficiency

      b.    reduction of the risk of asset loss

      c.    financial reporting that is complete, accurate, and reliable

      d.    compliance with laws, regulations, and policies

90.    There are two types of Internal Control:

      a.    <u>Preventive controls</u> are usually the most cost effective because they help prevent the loss of assets and are not very expensive to implement. Examples of preventive controls are:

           i.    employee training

           ii.    the use of pre-numbered documents

           iii.    timely accounting and reporting

           iv.    having adequate support for all payments and accounting entries

           v.    establishing and adequately communicating the prices and other terms of sale with both customers and suppliers

           vi.    comparison of vendor invoices to estimates, purchase orders, or budgets

           vii.    periodic review of unmatched, unpaid, or not-received invoices with budgets, plans, or other indications of activity such as customer billings

           viii.    Management approval, authorization, and verification of employee activity

           ix.    Accounting performed in adequate groupings (such as by project)

           x.    Establishment of separate and distinct entities for separate and distinct business practices, and not commingling assets, liabilities, or activities between them.

      b.    <u>Detective Controls</u> are used to identify when preventive controls were lacking or failed. Examples of detective controls are:

           i.    reconciling the company's books to its bank statements

           ii.    maintaining adequate files of important evidentiary documents such as invoices paid

           iii.    preparing and reviewing financial statements on a regular basis

           iv.    comparing financial results to plans or budgets

           v.    routine employee performance reviews

91.     The Control Environment and Management Tone set the character for the entire
organization. Inappropriate management behavior sets a bad example for other employees to
follow. Management actions send a clear message to employees regarding the owner's
commitment to integrity and ethical values.

92.     Control exists to keep performance within the ranges of what is expected,
allowed, or accepted and to take corrective action when performance is outside of those ranges.

93.     Ultimate responsibility for the establishment and use of proper internal controls in
small business falls upon the CEO or owner of the company.

94.     Management may be in a position to override or ignore basic control procedures,
enabling a dishonest management or owner to intentionally misrepresent results to cover its
tracks.

95.     **Without proper internal controls being established and used, the financial
statements and other information provided by a company are generally unreliable.** For
example, invoice or check numbers being used out of sequence or not being used at all tends to
be a very strong indicator that the accounting information is not reliable because there is no
check on integrity or proper timing of wrongly numbered documents.

96.     Indications of inadequate internal exist throughout the data that was turned over in
discovery, as detailed in the examples below:

97.     Pro Excavation LLC General Ledger 2013  (SGC-001297 – SGC-001335)

    a.     QuickBooks offers numerous ways to account for revenues and costs by
project:  Class accounting, setting up the chart of accounts by project, or
job accounting.   It does not appear as if any of these options were used.
The company was aware of the ability to do this, because some (but not
all) project materials purchased on AMEX were accounted for by project
and some (but not most) of the labor was designated by project in the
memo field.

    b.     There were Sales / Deposits from unidentified sources:

        vi.     1/2/13 "Service Income" $29,960

        vii.     10/3/13 Unidentified sale and deposit of $100,000

        viii.     10/18/13 Unidentified sale and deposit of $95,000

    c.     Check numbers used out of sequence

    d.     Although there was $1.9 million of sales recorded, only three invoices
totaling $466,260 were issued.  All other customers apparently paid Pro
Excavation without invoice, or the invoices were issued but not recorded
in the accounting records.

e.    $416,260 of the invoices issued were to Classic Condominiums LLC, a related Kagan entity. The invoice, number 1001, was issued on 4/10/13. There is no other indication in any of the accounting records of work being done for Classic. Classic paid $80,000 in April/May and $45,000 in Nov/Dec, leaving a balance of $291,260 at year end.

f.    KDC loaned $338,000 to Pro Excavation during 2013 and was paid back $168,000. Given the sizes of the companies, these are significant amounts and could be indicative of commingling (see below for a discussion of why this is a problem).

g.    Payments on the TD Bank car note were paid irregularly.

h.    Vadim Kagan loaned $375,000 during 2014 and was paid back $220,000. Given the sizes of the companies, these are significant amounts and could be indicative of commingling.

98.    Pro Excavation LLC General Ledger 2014 (SGC-001336 – SGC-001370).

a.    QuickBooks offers numerous ways to account for revenues and costs by project: Class accounting, setting up the chart of accounts by project, or job accounting. It does not appear as if any of these options were used. The company was aware of the ability to do this, because some (but not all) project materials purchased on AMEX were accounted for by project and some (but not most) of the labor was designated by project in the memo field.

b.    Either some check numbers were used out of sequence (and some duplicated (1309)) or entries not made in a timely manner.

c.    Very few bills were being set up as accounts payable, most were paid and entered directly through cash.

d.    On 6/10/14 Classic Condominium paid the $291,260 it supposedly still owed from 4/10/13.

e.    On 12/31/14 invoices numbered 14 – 22 were issued to various Kagan projects for a total of $1,021,360 representing approximately 63% of the entire year's income. The remaining income consists of payments made to the company without it having issued any invoices. Invoice numbers 3 – 13 are unaccounted for.

f.    American Express charges for the year totaled $577,684. Some of these expenses were accounted for by project, indicating the ability to do so. Many of the charges were not accounted for by project and the accounting does not distinguish which project they belong to.

g.  On 12/31/14 there are entries totaling $290,792 that add to the amount that Pro Excavation owed to KDC, but there was no cash that changed hands between these two entities on that date.

    i.  $275,000 of these entries were to reduce the amount of sales recorded from Druid Hill Road

    ii.  On 8/11/14 $290,000 of sales from Druid Hill had been recorded and money from Druid Hill road had been deposited into Pro Excavation's bank account via check.

    iii.  According to Druid Hill's QuickBooks Audit Trail extract (KAGA 003013), the $290,000 consists of checks #1065, 1066, 1067, and 1069.   All were recorded as costs of Building and Outside Improvements.  Check 1068 for $25,000 was also written at the same time but payable to Classic Homes, a related entity.

    iv.  On 8/12/14 and 8/13/14 a total of $242,000 was transferred from Pro Excavation to KDC.

    v.  The net impact of this set of transactions was to transfer Druid Hill cash to KDC via Pro Excavation.  KDC appears to have ultimately recorded a profit of $321,323 on Druid Hill (SGC-000569).

| Druid Hill -> Pro Ex -> KDC | | | | | | |
|---|---|---|---|---|---|---|
| | Druid Hill Building Costs | Druid Hill Cash | Pro Ex Income | Pro Ex Cash | KDC Cash | KDC Note |
| August 2014 | 290,000 | (290,000) | 290,000 | 290,000 (242,000) | 242,000 | (242,000) |
| 12/31/2014 | | | | (275,000) | | 275,000 |
| Total Effect | 290,000 | (290,000) | 15,000 | 48,000 | 242,000 | 33,000 |

h.  KDC loaned $502,792 to Pro Excavation during 2014 and was paid back $419,216.  Given the sizes of the companies, these are significant amounts and could be indicative of commingling.

i.  Vadim Kagan loaned $441,000 during 2014 and was paid back $106,707. Given the sizes of the companies, these are significant amounts and could be indicative of commingling.

j.  Prior to 12/31/14 Pro Excavation recorded $995,000 of Service Income but did not generate any invoices related to this income (payments were made by other entities without invoices).

99.  Pro Excavation LLC General Ledger 2015  (SGC-001371 – SGC-001383)

a.  There was very little bank activity recorded and the last cash entry made was on 6/30/15. There was a total of $535,393 left in three bank accounts and no accounting for what its final disposition was as the company closed.

b.  The company issued 7 invoices to customers in 2015. Invoice numbers were sporadic and out of sequence. For example, the first invoice of the year was on 1/1/15 given #24 for $100,000 to Lyman-Cutler. The second invoice was dated 3/15/15 given invoice number 40 for $19,000 also to Lyman Cutler. The next three invoices were given #31, #33, and #34 and the last two were given #41 and #42.

c.  A total of $859,136 in open invoices to customers remained on the books when the company stopped doing its accounting in June 2015.

   i.   Invoice #31, for $170,000 to 1657 Centre St, only had $30,000 recorded as being paid against it before the company stopped doing its accounting.

   ii.  Invoice #33 to 1580 Beacon Street for $65,000 has no payments recorded against it.

   iii. Invoice #34 to 18 Valley Spring for $130,000 has no payments recorded against it.

d.  The $100,000 invoiced to Lyman Cutler on 1/2/15 was recorded as deferred revenue, not sales or income.

e.  $213,576 owed to KDC and $489,294 owed to Vadim Kagan are not resolved in the final general ledger for Pro Excavation.

100. KDC Corp General Ledger 2013  (SGC-000010 – SGC-000084)

a.  Some checks were written out of numerical sequence

b.  Invoice numbers used were wildly out of sequence. On 1/1/13 invoices were issued with number 1071, 36 – 41, 136, 167, 202, 46, 75, and 123. A similarly disbursed set of numbers was used around the end of January. Invoice numbers continue to jump around during the year with no discernable pattern.

c.  KDC and its related entities only used the accounts payable functionality built into QuickBooks in a very minimal fashion with just a few bills from a few vendors.

101. KDC Corp General Ledger 2014  (SGC-000085 – SGC-000187)

a.  Check numbers appear to be used sequentially this year.

    b.    Invoice numbers were barely used. The sporadic invoice numbers that were used are in no discernable pattern.

    c.    According to the general ledger account 1250 (SGC-000117), Lyman Cutler owed $108,600 as of 12/31/14 for "loans".

102.    KDC Corp General Ledger 2015 (SGC-000188 – SGC-000229)

    a.    In order to close the books in 2015 the outside CPA firm made $3,171,514 in adjusting entries (corrections) to the 2015 QuickBooks file (SGC-000674 – SGC-000679).

    b.    According to the general ledger account 1350 (SGC-000117 – SGC-000123), Lyman Cutler owes $33,614 to KDC as of 12/31/15. This is the net of an opening balance of $3,532 that Lyman Cutler owed KDC at 12/31/13, $1,053,276 in expenses that KDC incurred in behalf of Lyman Cutler, and $1,107,612 of payments from Lyman Cutler or accounts receivable billed to Lyman Cutler.

103.    Amounts that KDC and Pro Excavation claim they are owed by Lyman Cutler in their legal filings are not consistent with their accounting records:

    a.    Pro Excavation LLC General Ledger 2013  (SGC-001297 – SGC-001335) show no amounts due from Lyman Cutler as of 12/31/13.

    b.    Pro Excavation LLC General Ledger 2014  (SGC-001336 – SGC-001370) show no amounts due from Lyman Cutler as of 12/31/14.

    c.    Pro Excavation LLC General Ledger 2015  (SGC-001371 – SGC-001383) shows $114,137 of accounts receivable from LCLLLC as of June 30, 2015.

104.    KDC Corp General Ledger 2013  (SGC-000010 – SGC-000084) show:

    a.    KDC set up separate reimbursement accounts receivable for each project to track expenses. The account that was set up for Lyman Cutler, account # 1350, shows that in 2013 (according to the accounting SGC-000031 - 33):

        i.    The year started with a balance owed to KDC from Lyman Cutler of $251,000

        ii.    $520,744 was spent in Lyman Cutler's behalf

        iii.    $517,211 was reimbursed by Lyman Cutler either in cash payments or invoices billed to Lyman Cutler

        iv.    On 12/31/13 the $251,000 opening balance that was originally accounted for a reimbursement due from Lyman Cutler was reclassified to be due from the 143 Florence project.

   v.  The net of all the above left a total balance in the reimbursement account as $3,532 owed to KDC.

105. KDC Corp General Ledger 2014  (SGC-000085 – SGC-000187) show that

  a.  According to the general ledger account 1350 (SGC-000117 – SGC-000123), Lyman Cutler is owed $13,083 by KDC as of 12/31/14.  This is the net of an opening balance of $3,532 that Lyman Cutler owed KDC at 12/31/13, $1,053,276 in expenses that KDC incurred in behalf of Lyman Cutler, and $1,107,612 of payments from Lyman Cutler or accounts receivable billed to Lyman Cutler.

  b.  The amount of accounts payable billed to Lyman Cutler and showing as unpaid in KDC's accounting records as of 12/31/14 (and finalized by the CPA firm in July 2015) is $164,674 (SGC-000510).

  c.  According to the general ledger account 1250 (SGC-000117), Lyman Cutler owed $264,100 as of 12/31/15 for "loans"

106. KDC Corp General Ledger as of 6/30/15 showed:

  a.  According to the general ledger account 1250 Loan to Lyman Cutler, Lyman Cutler owed KDC $264,100 (SGC-000202 – SGC-000203)

  b.  According to the general ledger account 1350 Reimb – Lyman Cutler Building, which includes invoices to KDC for Lyman Cutler, Lyman Cutler only owed KDC $12,378.76 (SGC-000203).

## Other Observations on Pro Excavation:

107. Pro Excavation billed LCLLC or was paid by LCLLC at least $749,300 as documented in the mechanic's lien claim documentation binder.

108. Pro Excavation's accounting does not support the level of activity that was billed for.  Pro Excavation's accounting attempted to break out costs by specific projects.  The costs that were recorded for LCLLC, per the QuickBooks general ledger reports were:

|  | 55 Lyman | | | 88 Cutler | | | Grand Total |
|---|---|---|---|---|---|---|---|
|  | 2013 | 2014 | Total | 2013 | 2014 | Total | |
| Materials Expense | 86,111 | 41,914 | 128,025 | 32,379 | 25,020 | 57,399 | |
| Other Costs | 10,800 | 2,069 | 12,869 | 6,148 | | 6,148 | |
| Total | 96,911 | 43,983 | 140,894 | 38,527 | 25,020 | 63,547 | 204,441 |

No other costs in the accounting records were identified as being for LCLLC.

109.    Kirill Kagan testified at deposition that he did not keep any records related to Pro-Excavation (p 17)

110.    In his second day of deposition Vadim Kagan answered most of the questions related to Pro Excavation by stating that he could not explain any of the billings to LCLLC; what they were for, how much of a mark-up was on them, what they were based on, what support there was for them, etc. were all inexplicable.

111.    Kristina Brusenkova testified (p 63, 65) that there were no contracts with subcontractors and the only information she had to tell her what to pay was what Mr. Kagan told her.

112.    Dan Gersh testified at his deposition that he cannot explain or support these billings.

113.    Apparently, nobody is able to explain or support the costs of work done for LCLLC and the Pro Excavation charges to LCLLC and there is no supporting detail that would even help them in trying to re-create the economic activity.

114.    There appears to have been significant commingling between KDC and Pro Excavation.  This means that there is very little actual distinction between two entities that profess to be separate:

      d.    The two companies shared a common management, administration, and facilities.

      e.    Cash flowed back and forth between Pro Excavation, KDC, and Mr. Kagan as if they were all just separate pockets in the same pair of pants. For example, the following direct transfers of cash to or from Pro-Excavation were made:

| | Kagan - In | Kagan - out | KDC - In | KDC - Out |
|---|---|---|---|---|
| 3/1/2013 | 20,000 | | | |
| 3/11/2013 | | 20,000 | | |
| 3/15/2013 | | | 3,000 | |
| 3/29/2013 | 20,000 | | | |
| 4/5/2013 | 10,000 | | | |
| 5/8/2013 | | | 20,000 | |
| 5/20/2013 | | | 10,000 | |
| 5/21/2013 | | | 20,000 | |
| 5/29/2013 | | | 55,000 | |
| 5/29/2013 | | | 45,000 | |
| 6/5/2013 | | | | 55,000 |
| 6/18/2013 | | | 10,000 | |
| 7/1/2013 | 65,000 | | | |
| 7/16/2013 | | | | 50,000 |
| 7/19/2013 | | | | |
| 7/22/2013 | 10,000 | | 25,000 | |
| 7/22/2013 | 20,000 | | | |
| 8/8/2013 | | | 20,000 | |
| 8/21/2013 | | | 20,000 | |
| 8/26/2013 | | | 20,000 | |
| 8/27/2013 | | | 25,000 | |
| 10/18/2013 | 30,000 | | | |
| 10/28/2013 | | | 15,000 | |
| 10/24/2013 | | | | 60,000 |
| 11/27/2013 | | | 20,000 | |
| 12/2/2013 | 200,000 | | | |
| 12/2/2013 | | 200,000 | | |
| 12/24/2013 | | | 30,000 | |
| | 375,000 | 220,000 | 308,000 | 165,000 |

f.   Other transfers of cash appear to have been facilitated through third party entities such as Druid Hill, where Pro Excavation received $290,000 from Druid Hill in August 2014 and then remitted $242,000 to KDC.

g.   Commingling blurs the distinctions between entities. This matters in this case because of the way profits are to be split between the LLC members:

   i.   The November 14, 2012 Operating Agreement of LCLLC states:

   Paragraph 5.2 "It shall be Mr. Kagan's duty and obligation to construct two (2) homes at the location currently known as 77 Lyman Road, in Brookline, Massachusetts in accordance with the plans, including drawings, supplied by Mr. Kagan and approved by Managing Member. The construction shall be substantially completed by no later than March 30, 2014. It is specifically understood by all Members that Mr. Kagan's compensation for this duty is outlined in Section 8.1 below."

ii.  Paragraph 8.1, which allocates 50% of the net profits to Mr. Kagan, subject to conditions regarding the issuance of the demolition permit and the sale of the property within 23 months of acquisition.

h.  If KDC and Pro Excavation are deemed to be distinguishable entities, and there are no limits on Pro Excavation's and KDC's profit margins, than Pro Excavation and KDC could become vehicles for siphoning off more profits from the construction than the parties agreed in the LLC Operating Agreement.

**Based on the deposition testimony of Mr. Kagan and his current and former employees, on my review of the accounting records and documents purporting to support the mechanic's lien claim, and on my extensive experience reviewing the books, records, and claims of many companies over the past years, my conclusion is that the accounting processes employed by Mr. Kagan are severely deficient and that the attempts to recreate data that was never properly captured the first time were not at all convincing. The claim as it is presented now is not supported with reliable information and, based on how pervasive the problems are, may knowingly be fraudulent.**

Dated:  7/27/18

Michael Goldman

4839-3115-2238, v. 1