UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| _____ | ) | |
| *In re:* | ) | |
| | ) | |
| LYMAN-CUTLER, LLC, | ) | Chapter 7 |
| Debtor | ) | Case No. 15-13881 FJB |
| _____ | ) | |
| | | |
| _____ | ) | |
| LYMAN-CUTLER, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adv. Case No. 1:16-ap-01120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |
| _____ | ) | |

**PLAINTIFFS' RESPONSES TO THE
CONCISE STATEMENT OF MATERIAL FACTS SUBMITTED BY VADIM KAGAN,
KAGAN DEVELOPMENT KDC, CORP. AND PROEXCAVATION CORP. IN
SUPPORT OF MOTION FOR SUMMARY JUDGMENT ON THE AMENDED
ADVERSARY COMPLAINT AND CLAIMS NOS. 1, 4, 6 AND 7**

Plaintiffs Lyman-Cutler, LLC, Alex Filippov and Nickolay Lipetsker respond to the

Concise Statement of Undisputed Facts for Vadim Kagan, Kagan Development KDC Corp. and

ProExcavation Corp.'s Motion for Summary Judgment on the Amended Adversary Complaint

and Claims Nos. 1, 4, 6 and 7.  Plaintiffs note as a preliminary matter that D. Mass. Bankr. R.

7056-1 and D. Mass. L.R. 56.1 require that Defendants support their assertions of allegedly

undisputed fact with citations to affidavits, depositions or other documentation, which in

numerous cases they have not done.  By rule, the Court should treat all such facts as disputed

unless Plaintiffs admit them as true.

1.      Plaintiffs Alex Filippov ("Filippov") and Nickolay Lipetsker ("Lipetsker") claim that Vadim Kagan ("Kagan") induced them to enter into a development project based upon his assurance that he would complete construction of two homes at a fixed cost of $1.6 million each, including carrying costs.  (Amd. Cmp., ¶¶14-17).

**Response:  Undisputed.**

2.      In furtherance of the project, the parties formed Lyman-Cutler, LLC (the "Debtor") and executed an Operating Agreement that governed their relationship.  (Id. at ¶¶16, 53; Operating Agreement ("OA"), Perten Aff., Exh. 1).

**Response:  Undisputed.**

3.      The Operating Agreement expressly delegated the construction of the homes to Kagan. (Id. at ¶25; OA, §5.2).  It provided that for the first 23 months following acquisition of the underlying properties, or until November 30, 2014, the Debtor would be responsible for paying carrying costs, defined as mortgage payments, taxes and insurance. (Id., §§4.1, 4.2).

**Response:  Disputed** only to the extent this assertion of fact does not acknowledge that the Parties agreed that the loan from Rockland Trust Company would include the carrying costs. See Operating Agreement ("OA"), § 4.1, Affidavit of Sean T. Carnathan, Nov. 16, 2018 (Doc. No. 355, Adv. Doc. No. 222) ("Carnathan Aff."), Ex. 1.

4.      The Operating Agreement also contemplated that the properties may not sell by November 30, 2014 and, if so, obligated Kagan to pay the carrying costs. (Id., §8.1).  If Kagan did not pay the carrying costs, the Operating Agreement puts that responsibility on Filippov. (Id.).  In that event, the Operating Agreement provides that Kagan's capital account and percentage interest in the Debtor would decrease by the amount Filippov advanced while Filippov's capital account and percentage would increase.  (Id.).

**Response:  Undisputed.**

5.      To finance the construction, Debtor took out two construction loans in the amount

of $1.6 million each.  (Amd. Cmp. at ¶21; OA, §4.1).

**Response:  Disputed.**  The Debtor entered into the two construction loans to finance the

construction costs and the carrying costs.  Carnathan Aff., <u>Ex. 1</u>, § 4.1; Deposition of Alex

Filippov, April 25, 2018, at 155-156, Second Transmittal Affidavit of Sean T. Carnathan in

Support of Plaintiffs' Oppositions to Defendants' Motions, Dec. 7, 2018 ("Second Carnathan

Aff."), <u>Ex. 21</u>; Deposition of Boris Maiden, ("Maiden Depo") at 99-101, Second Carnathan Aff.

<u>Ex. 25.</u>

6.      Construction proceeded through Kagan's construction company, Kagan

Construction KDC, Corp. ("KDC").  To reduce costs and increase efficiency, KDC

subcontracted some of its work to another of Kagan's companies, ProExcavation Corp.

("ProExcavation").

**Response:  Disputed.**  KDC provided no services whatsoever.  Kagan is KDC's only

operational employee.  Deposition of Vadim Kagan ("Kagan Dep.") at 40-42, Second Carnathan

Aff., <u>Ex.23</u>.  He supervised the construction as required under the Operating Agreement.  He ran

some costs through KDC, but also ran some through ProEx, paid some out of the LLC bank

account directly and generally kept no track of the financial status of the Project whatsoever

during the pendency of the Construction.  Deposition of Daniel Gersh ("Gersh Dep.") at 37-39,

Second Carnathan Aff., <u>Ex. 26</u>; <u>see</u> Expert Report of Michael Goldman ("Goldman Report"),

Carnathan Aff., <u>Ex. 20</u>, generally.  Filippov and Lipetsker were never made aware of any

contract with KDC until they saw reference to it in the Mechanic's Lien filed against the

properties and Lyman Cutler, LLC on or about June 22, 2015.  Filippov Supp. ATI No. 5 at 6,

3

Affidavit of John Perten, Nov. 16, 2018 ("Perten Aff."), <u>Ex. 7</u>. They never saw a copy of the contract until it was produced in litigation. <u>Id.</u>; Filippov Depo, at 178-79. There is no contract at all with ProExcavation. Kagan Dep. at 279. Plaintiffs acknowledge that some of the site work was done by Kirill Kagan and some other unnamed day laborers who apparently were paid by ProExcavation. Kagan did not use ProExcavation in order to reduce costs and increase efficiency. He used it in order to charge unfair amounts to the LLC that put additional profit dollars in Kagan's pocket in violation of the terms of the LLC Operating Agreement and contrary to the deal that the Parties made and in breach of his fiduciary duty to each of the Plaintiffs. Filippov Supp. ATI No. 5; Filippov Dep. at 99, 203; <u>see</u> Response No. 15 below.

7.     The Debtor drew down the full amount of the construction loans. (Amd. Cmp., ¶24).

**<u>Response:</u>  Undisputed.**

8.     Filippov had online access to the Debtor's bank accounts, received monthly bank statements and copies of all checks. His wife kept the Quickbooks account for the Debtor. (Filippov dep. at 69, 72; Perten Aff., Exh. 2).

**<u>Response:</u>  Undisputed.**  By way of further response, Plaintiffs note that the monthly bank statements, online access to the LLC bank account and copies of its checks were virtually the only records the LLC had in order to keep its books, because Kagan did not provide invoices or other documentation, despite repeated requests. Moreover, it was not possible to discern from the bank records that Kagan was overcharging for work his companies performed on the project. Filippov Depo, p.p. 71-72; <u>see</u> Goldman Report ¶¶ 51, 81-106.

9.     Filippov's wife communicated regularly with KDC's bookkeeper during construction. (Brusenkova dep. at 60, Perten Aff., Exh. 3; Filippov dep. at 71).

**Response:  Undisputed.**

10.     After completion of construction, Kagan advised Filippov that the Debtor had incurred significant costs beyond the amount of the construction loans, for which KDC was to be reimbursed upon the sale of the two homes.  (Id.; Kagan dep. at 98, 218-21, Perten Aff., Exh. 4).

**Response:  Undisputed.** By way of further answer, the first time Kagan gave Filippov any indication of any cost overruns was by letter from Attorney Alexander Pyle dated May 7, 2015 ("Pyle Letter") despite frequent requests to be kept informed  during construction**.**  Filippov Dep. at 82.

11.     Despite the expectations of the Debtor, the properties did not garner any offers after being on the market for several months. Kagan suggested that they reduce the selling price in effort to get them sold. He further advised Filippov that although the Debtor had been obligated to pay the carrying costs for the first 23 months, Kagan had been voluntarily fronting those costs and no longer wished to carry the burden of paying carrying costs alone.  (May 7, 2015 letter; Perten Aff., Exh. 5).

**Response:  Disputed**.  It is undisputed that the Properties had not sold as of May 7, 2015 and that Kagan asserted in the Pyle Letter that he had been paying the carrying costs and that they should reduce the selling price.  It is disputed that they had been actively and competently marketed by Ms. Kagan.  See generally Opposition to Motion for Summary Judgment of Tatiana Kagan and supporting materials.  It is also disputed that Kagan had been paying the carrying costs or that the other factual assertions in the letter are true.  Filippov Dep. at 46-47; Deposition of Kristina Brusenkova ("Brusenkova Dep.") at 139-40, Second Carnthan Aff., Ex. 24.

12.     Filippov claimed to be blindsided by the news that the construction costs exceeded his expectations.  (Amd. Cmp., ¶¶22, 37).

**Response:  Undisputed.**  Filippov was blindsided.  This was the first mention of cost overruns.

13.     Without any evidence, he accused Kagan of falsifying KDC's financial records, over- charging, double billing, failing to credit refunds or returns, and charging the Debtor for materials purchased for other projects.  (Id., ¶¶46-49, 54, 64).  He filed suit against Kagan in the Middlesex Superior Court alleging fraud.

**Response:  Disputed**.  Filippov had ample evidence of fraud and Defendants cite nothing to the contrary.  The initial complaint against Kagan did not include a count for fraud in the billing and financial records.  Only after further investigation and witness interviews, and only after KDC filed its false mechanic's lien did Filippov and the other Plaintiffs file an amended complaint asserting a count for fraud based on KDC's billing and charges.  Second Carnathan Aff. Exs. 1 and 2.

14.     Kagan, at that point, stopped paying the carrying costs, and Filippov, as required under the Operating Agreement, became obligated to pay the ongoing carrying costs.  (OA, §8.1).

**Response:  Disputed.**  The carrying costs were financed with the Rockland Trust loan. OA § 4.1; Filippov Dep. at 46-47; Brusenkova Dep. at 139-40.  Filippov paid the carrying costs after receiving the May 7, 2015 Pyle Letter.  Filippov Dep. at 46-47, and 113-114.

15.     KDC, who was owed significant monies for the construction, recorded a mechanics lien against the properties.  As required by statute, it filed suit to perfect its lien. The two state court proceedings were consolidated, and then stayed upon filing of the bankruptcy.

**Response:  Disputed.**  KDC is not owed anything for the construction and did not perfect a lien in compliance with the statute.  The contract cited in the mechanic's lien is a sham or

6

otherwise void because Kagan signed it for both parties without authorization and it is a self-dealing contract with regard to which he cannot prove entire fairness.  See Plaintiffs' Motion for Summary Judgment, Nov. 16, 2018 and supporting papers; Plaintiffs' Motion in Limine, Nov. 16, 2018 and supporting papers.  KDC never sent any invoice to the LLC prior to recording the mechanic's lien and the first time the invoice purportedly dated June 1, 2015 was presented to the LLC was by email on June 25, 2015.  Fillipov Supp. ATI No. 5; Carnathan Aff. Exs. 6 and 16.

Kagan was responsible for the construction under the terms of the Operating Agreement in return for a 50% share of the net profits from the Project and his self-dealing effort to allocate to himself massive additional profits by contracting with his own Companies, KDC and ProEx, is a clear violation of his contractual and fiduciary duties.  OA, §§ 5.2, 8.1; see also Plaintiffs' Motion for Summary Judgment, Nov. 16, 2018 and supporting papers; Plaintiffs' Motion in Limine, Nov. 16, 2018 and supporting papers.  Kagan expressly represented to the Plaintiffs that the cost of construction and carrying costs through the sale of the Property would be no more than $1.6 million, and stood behind his guarantee by agreeing to pay the carrying costs himself if the Properties were not sold within 23 months.  OA § 8.1; Deposition of Nickolay Lipetsker ("Lipetsker Dep.") at 27-28 ("Mr. Kagan said he knew exactly what the cost of construction would be"), Second Carnathan Aff., Ex. 22; Maiden Dep. at 52-54, 58-59; Filippov Dep. at 19-20, 41-45, 72; Filippov Supplemental ATI No. 5 at 3; Deposition of Dmitriy Zhukovksiy ("Zhukovskiy Dep.") at 126, 137, 192, Second Carnathan Aff., Ex. 31.

The Kagan Defendants failed to make any good faith effort to track the costs of construction during the Project and made up the documentation they proffer in support of KDC's proof of claim after this dispute arose.  See Plaintiffs' Motion for Summary Judgment, Nov. 16,

2018 and supporting papers.  The records they created after the fact are riddled with evidence of

fabrication and the problems are so pervasive that it is fair to conclude they engaged in knowing

fraud.  See Goldman Report generally, conclusion at paragraphs 39, 114(h); see Filippov Supp.

ATI No. 5.  Ms. Brusenkova will testify that Kagan, as a matter of standard practice, added to the

charges by his subcontractors at the end of projects and always charged more for ProEx than it

spent.  Brusenkova Dep. at 133-34, 137-38.

The evidence strongly suggests that the contract on which KDC relies was forged in June

2015 in order to inflate the charges in the mechanic's lien that Kagan caused KDC to file.  KDC

"officer" James Joseph Cohen testified that he drafted the KDC contract and the Mechanic's

Lien.  Deposition of James Joseph Cohen ("Cohen Dep.") at 116-17, Second Carnathan Aff., Ex.

27.  Cohen is a career criminal with multiple fraud and forgery convictions.  See September 26,

1997 Securities and Exchange Commission Press Release regarding SEC v. Sage Technologies,

Jamie Edelkind, and William Thiele, Civil Action 1:96-cv-00361 in the Northern District of

Georgia, Second Carnathan Aff. Ex. 3;  July 22, 2004 Order of Judgment in U.S. v. Jamie

Edelkind, 1:03-cr-00364 in the Northern District of Georgia, Second Carnathan Aff. Ex. 4; July

12, 2005 Order of Judgment in U.S. v. Jamie Edelkind, 1:04-cr-10066 in the District of

Massachusetts, Second Carnathan Aff. Ex. 5; January 4, 2007 Order of Judgment in U.S. v.

Jamie Edelkind, 6:05-cr-60067 in the Western District of Louisiana, Second Carnathan Aff. Ex.

6.

After Plaintiffs challenged the authenticity of the KDC contract at the depositions, the

Kagan Defendants "found" a purported email conveying the KDC contract from Cohen to Kagan

for execution, purportedly on June 24, 2013.  See e-mail and attachments bates number KAGAN

003024-3037, Second Carnathan Aff. Exhibit 7.  The metadata for the attached word document,

however, shows that the document was created at 7:50 p.m. and last modified one minute later at 7:51 p.m. – an impossibility given the number of custom modifications.  Still more impossible, the attachment was last printed on **June 17, 2015**, two years after it was purportedly attached to this email and **five days before Kagan and Cohen recorded the Mechanic's Lien**.  Second Carnathan Aff. Ex. 8; Filippov Supp. ATI No. 5 at 6.

Filippov and Lipetsker never saw the KDC contract until it was produced in this litigation.  Filippov Supp. ATI No. 5 at 6; Lipetsker Dep. at 65.  Neither KDC's accountant nor bookkeeper had ever seen the KDC contract and the fees and charges based on it appear nowhere in KDC's books.  Gersh Dep. at 82-83; Deposition of Jason Gordon ("Gordon Dep.") at 63, 66, 97, Second Carnathan Aff., Ex. 29.  The supposed KDC contract is dated June 24, 2013, six days after the Classic Homes contract, signed by Kagan and Filippov and submitted to Rockland Bank to get the construction loans (which contract does not provide for all these fees and charges).  Second Carnathan Aff. Ex. 39.

Many of the charges with regard to which KDC seeks "reimbursement" were never paid and KDC cannot properly be permitted to serve as a vehicle for subcontractors to circumvent the requirements of the mechanic's lien statute.  Brick Constr. Corp. v. CEI Dev. Corp., 46 Mass. App. Ct. 837, 840 (1999) (""In the absence of a lien perfected under G.L.c. 254, an owner who enters into a general contract for improvements on real property is not ordinarily liable to subcontractors whose sole contractual arrangements are with the general contractor."); Certified Power Sys. v. Dominion Energy Brayton Point, LLC, 2011 Mass. Super. LEXIS 317, at *162 (Dec. 30, 2011) (same).  These charges total **$707,702.68** according to the accounts payable component of KDC's claim, and include:

- BST Plumbing: $39,340 (nearly half of the total claimed due BST)

- ■ DaCosta: $23,000 (a claimed "invoicing error" raised Sept. 2, 2015)

- ■ Décor Art: $20,870

- ■ Dream Flooring: $31,120

- ■ ProEx: $461,800

- ■ Unicom Electric: $65,000 (exactly half of what is claimed due)

- ■ V&D Heating & Cooling: $39,000

Second Carnathan Aff. Ex. 35.

These unpaid amounts also just so happen to be allegedly still owed to the vendors whose "documentation" among the most highly problematic. See Second Carnathan Aff. Exs. 10 and 11 (invoices that are obvious photocopies of same invoice with address changed); Goldman Report, ¶¶ 61, 65, 66, 68, 69, 70, 71, 74 (detailing discrepancies with these charges); see also Filippov's Supp. ATI, No. 5 (outlining basis for assertion that KDC's charges are excessive and improper).

In particular, a large portion of the claim for "reimbursement" is for sums allegedly owed to ProExcavation Corp. ("ProEx"), which is also Kagan's company, has no contract with KDC or the Debtor and the books and records of which reflect that these charges were recorded well after construction was complete. Furthermore, Kagan claims he has no idea how much of this is profit. See Plaintiffs' Concise Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment, Nov. 16, 2018 (Doc. No. 353, Adv. Doc. No. 221) ("SSUMF") ¶ 48. Based on the forensic accounting work of Michael Goldman, however, the evidence shows that the ProEx charges include **$571,465** of profit for ProEx (Kagan). See Goldman Report ¶ 108 (able to confirm only $345,335 of ProEx costs and materials on Project). Kagan admits that

he does not recall ever even showing the ProEx "proposal" to Filippov and Lipetsker.  Kagan
Dep. at 279.

By Plaintiffs' calculation, no less than **$1,349,249.41** of the claimed sums in the
mechanic's lien is simply pure profit to Kagan, which he unfairly attempts to take for himself in
direct violation of the Operating Agreement and the covenant of good faith and fair dealing
therein.  SSUMF ¶¶ 39-42, 47, 51; Goldman Report ¶ 108; OA §§ 5.1, 8.1.

Goldman's Report recounts innumerable reasons why the KDC books and records for the
Project are unreliable and riddled with evidence of fraud.

He identifies specific charges that appear to be fabricated based on his expert forensic
accounting analysis.  By way of example, only:

- ■ Mr. Goldman concludes that KDC's records are so haphazard and incomplete that it
  is impossible to confirm that Kagan did not charge materials to the Project and then
  use them on other projects.  Goldman Report, ¶¶ 28-32 (Kagan failed to maintain
  <u>most</u> of the documentation he should have and as a result, there is no way to detect
  the intermingling of his projects).
- ■ He concludes that the claim based on charges by Construction Specialties are
  overstated by $10,295.  <u>Id.</u> ¶ 58.
- ■ He concludes that it is likely that "at some point Defendants took the original
  accounting file and cloned it and then modified it to inflate the amounts on the lien."
  <u>Id.</u> ¶ 58(d).
- ■ He concludes that the charges for Horner Millworks is overstated by $16, 243.84 for
  May 2014 alone. <u>Id.</u> ¶ 59.
- ■ He concludes that the "invoices provided in the mechanic's lien for Huntington TV
  appear fabricated."  <u>Id.</u> ¶ 60.
- ■ He concluded that the Décor Art invoices look "suspicious" and several appear
  "fabricated."  <u>Id.</u> ¶ 61.
- ■ He notes numerous inconsistencies in the invoices from Paul DiGiacomo, "which
  strongly imp[y] that they were fabricated."  <u>Id.</u> ¶ 62.
- ■ He observes significant inconsistencies in the invoices for Pave Tech, BST Plumbing,
  Ferguson, Sergei Nikolaev, V&D Heating, DaCosta Construcion, Unicon Electric,
  Affordable Lawn Sprinklers and ProEx.  <u>Id.</u> ¶ 64-68, 70-72, 74.
- ■ He explicitly opines that the "Dream Flooring invoices appear fabricated," and
  explains why.  <u>Id.</u> ¶ 69.
- ■ He explicitly opines that the Eastcoast Pipelines invoice appears fabricated.  <u>Id.</u> ¶ 73.

11

- He opines that while ProEx billed the LLC $23,000 for snow removal, other projects were not billed at all, suggesting the LLC may have paid for their snow removal. <u>Id.</u> ¶ 75.
- He opines that the records produced are insufficient to refute Ms. Brusenkova's testimony that Kagan routinely billed double for ProEx work, once through ProEx and once through KDC. <u>Id.</u> ¶ 78.

16.     Pursuant to the Operating Agreement, the Debtor was obligated to dissolve on November 30, 2015.  (OA, §2.3).  Upon dissolution, the Debtor's assets were to be liquidated. (Id., §9.2).

**<u>Response:</u>  Undisputed that the term of the LLC was through November 30, 2015.** Kagan demanded dissolution in September 2015 as an additional bad faith tactic to pressure the Plaintiffs into paying KDC's purported charges. <u>See</u> Perten letter dated September 11, 2015, Second Carnathan Aff., <u>Ex. 9</u>.

17.     Despite the fact that this was part of the deal he agreed to, Filippov did not want to liquidate.  He also did not want to pay carrying costs, despite his obligation to do so, and was clearly frustrated at his inability to address KDC's mechanics lien. Unilaterally, though with the acquiescence of Lipetsker, Filippov determined that by filing a petition for bankruptcy under Chapter 11, he could avoid his obligations under the Operating Agreement by not having to dissolve the entity or continue paying carrying costs.  He also presumed that a bankruptcy would stave off a foreclosure by either the bank or KDC under its lien.  (Filippov dep. at 112-13, 122, 128-29).

**<u>Response:</u>  Disputed** in part.  The Defendants' recitation misstates the cited testimony by Filippov.  **Disputed** that Filippov ever tried to avoid any obligations under the Operating Agreement.  To the contrary, Filippov did the best he could to preserve the assets of the Debtor and maximize the outcome for all concerned, which was obviously in his own best interest as the 80% member with over $2 million in capital tied up in the LLC and at risk of loss.  Filippov at

all times paid the carrying costs after Kagan breached his duties by disclaiming his obligation to pay them, both before and after the bankruptcy filing.  Perten Aff. Ex. 2, Filippov Dep. at 113 ("I was paying the carry costs because Kagan leaved [sic]").

It is **Undisputed** that in the months immediately before the bankruptcy filing on October 7, 2015, Kagan caused KDC to file the mechanic's lien against the LLC's Properties, and that Kagan demanded dissolution and liquidation of the LLC assets in a bad faith effort to force payment of the purported claims.  Second Carnathan Aff., Ex. 9.

It is **Undisputed** that Filippov was unhappy about having to pay the carrying costs, which he did faithfully before and after the bankruptcy filing.  It is **Undisputed** that the bankruptcy filing was intended to give the Debtor breathing room to conduct an orderly sale of the assets rather than being forced into a foreclosure or Sheriff's sale, and intended to provide a forum to oppose the fraudulent mechanic's lien asserted by KDC and to reject the above-market Listing Agreements improperly entered into with Tatiana Kagan ("Tatiana").

18.    Without consulting Kagan, he caused the Debtor to file a Chapter 11 petition. (Id. at 113).

**Response:  Undisputed.**  Filippov was managing member and he and Lipetsker together controlled 90% of the LLC membership interest.  In addition, Kagan was adversarial to not only Filippov and Lipetsker but also to the LLC.  Second Carnathan Aff. Ex. 9; see Perten Aff. Ex. 2, Filippov Dep. at 113 ("Kagan wouldn't even show up at the meeting"); id. at 115; see also Responses 13-15 above.

19.    Shortly after filing the petition, the Chapter 11 Trustee (who was appointed without objection), moved to convert the case to Chapter 7 as the only remaining business of the

Debtor was to liquidate its two assets which could be done more efficiently and economically in a Chapter 7.  (Docket No. 44).

**Response:  Undisputed.**

20.    The Debtor did not object to the conversion.  The Chapter 7 Trustee moved for authority to engage a real estate broker to list and sell the properties. (Docket No. 47).

**Response:  Undisputed.**  The Trustee hired Deborah Gordon of Coldwell Banker.  Doc. No. 47.

21.    The listing price for each home was to be $4.5 million. The Trustee's motion was allowed, again without objection. Some months later, the Trustee received offers to purchase the homes for $4.4 million each.  Again without objection[1], the Court approved the sale of the homes at the offered price. (Docket Nos. 67, 75).

**Response:  Undisputed.**

22.    After paying the secured lender, the Trustee is holding approximately $3.5 million in escrow.

**Response:  Undisputed.**

23.    The only parties interested in the escrowed funds are plaintiffs and defendants. KDC filed two proofs of claim. Claim No. 1 sought recovery for the amounts expended beyond the payments made by the construction loans for completing the construction. Debtor filed an objection to Claim No. 1.  KDC's second proof of claim, Claim No. 4, was for indemnity under Section 10.2 of the Operating Agreement.  No objection was ever filed against Claim No. 4.

---

[1]    Debtor did file a limited objection to ensure that Tatiana Kagan, Kagan's wife, who was the real estate agent designated in the Operating Agreement, would not earn a commission. **Disputed.**  The limited objection objected to payment to Century 21. Doc. No. 82.  Plaintiffs agree, however, that Tatiana was not entitled to any commission.

Kagan and ProExcavation also filed claims for indemnity under Section 10.2.  (Claim Nos. 6 and

7).  As against these, Debtor filed a bare bones objection.  (Docket Nos. 141 and142).

**Response:  Disputed.**  As the Claims Register clearly reflects. Plaintiffs objected to

Claim No. 4 as well: " 05/25/2016 Objection to Claim 1,4 of Claimant Kagan Development,

KDC Corp. with certificate of service filed by Debtor Lyman-Cutler, LLC and Creditors Alex

Filippov and Nickolay Lipetsker. (Tamposi, Peter)."  The Objection spans 8 pages and opens

with the plain assertion that:  "The Objectors believe that all of the claims submitted by Kagan

are entirely without merit. They are contrary to the terms of the Lyman-Cutler, LLC Operating

Agreement (the "Operating Agreement") and, indeed, upon information and belief are knowingly

and intentionally fraudulent."  Claims Register No. 116 (KDC had earlier been defined as

"Kagan" in the objection).  The Court later overruled the objection by the Debtor but not by

Filippov and Lipetsker.  <u>See</u> Claims Register 208.  In addition, Plaintiffs answered the

corresponding counterclaim by KDC for indemnification in the adversary proceeding in the

customary way and their opposition to all claims by KDC has been emphatic from the outset of

the case.  <u>See</u> Adv. Proc. Doc. No. 109 (Answer to Counterclaims); <u>see also</u> Plaintiffs' Memo in

Support of their Motion for Summary Judgment, Nov. 16, 2016 (Doc. No. 350, Adv. Doc. No.

220) (incorporated herein by reference with supporting documentation).

24.     Over two months after the bar date, Filippov filed a late proof of claim seeking

the recovery of an alleged $200,000 loan to the Debtor, secured by a mortgage that he granted to

himself on the eve of the bankruptcy filing. (Claim No. 9).

**Response:  Undisputed** that Filippov's proof of claim was late filed, but the Court has

already ruled on the timeliness objection allowed it to proceed and these facts are irrelevant to

any issue presented now.  <u>See</u> Claims Register No. 236.

25.     Filippov failed to respond to defendants' objections to that claim and this Court initially stated that, as a result, the claim would be rejected. The Court ultimately decided to give Filippov a second chance despite his lateness.  (Docket No. 212).

**Response:  Undisputed** but irrelevant to any issue presented now.

26.     Filippov explained at his deposition that the loan was an aggregate of monies he deposited to the Debtor over time.  At his deposition, he was unable to identify the specific entries in the Debtor's QuickBooks ledger which reflected the loan amounts.  In that ledger, all of Filippov's deposits are labelled "Alex Filippov Investments."  Filippov initially testified that these "investments" were capital contributions but then explained that labelling them as "investments" was an error as some of them were loans, though he still could not identify which deposits were capital contributions as opposed to loans. (Filippov dep. 256-60).

**Response:  Disputed.** "Alex Filippov Investments" is merely the name of the account from which these funds were deposited by Mr. Filippov into the Debtor, they name is not meant to qualify the nature of the loan/investment.  As the Managing Member, Mr. Filippov had the inherent authority to borrow money and to mortgage the assets of the LLC to secure such loans (OA, §6.1), with or without the assent of Mr. Kagan. In fact, he was obligated to incur such debt if necessary to protect the company. While Mr. Filippov invested funds to cover carrying costs that Kagan was obligated to cover, he received a corresponding increase in his capital account and equity investment.  See OA, §6.1.  However, Mr. Filippov was also required to loan the Debtor funds to retain counsel to fend off KDC's bad faith, fraudulent lien claim and ultimately to file Chapter 11. Mr. Filippov does not seek a corresponding increase in his equity position by virtue of these loans, but his mortgage interest in the Debtor's real property attaches to the

proceeds from the sale and remains a secured claim of the estate without challenge as a

preference by the Trustee.  See Responses No. 15, 33.

27.    Filippov's counsel also filed a proof of claim which this Court initially stated

would be rejected due to failure to file a timely response to defendants' objection. (Claim No. 2).

Here too, the Court exercised its discretion, and gave plaintiffs a second chance. (Docket No.

213).

**Response:  Undisputed** but irrelevant to any issue presented.

28.    Filippov admitted that counsel represented not just the Debtor but also himself,

individually, notwithstanding that counsel seeks to have his entire fee paid by the Debtor. (Id. at

266-68).

**Response:  Undisputed** that Filippov, Lipetsker and Lyman-Cutler, LLC retained

O'Connor, Carnathan and Mack, LLC pre-petition to represent them in the litigation with the

Defendants.  Their interests were then aligned and remain so; there is no conflict among them

and the work necessary to prosecute their claims and interests, represent Filippov and Lipetsker

as intervenors and counter-claim defendants in the Adversary Proceeding and object to the

Defendants' Proofs of Claims is substantially the same.  The Debtor is obligated to indemnify

Mr. Filippov for any fees he expended in protecting the LLC from Kagan's attacks, so the fees

he has paid for OCM are compensable by the Debtor.

29.    Lipetsker, Filippov and Kagan each also filed a proof of interest. (Claim Nos. 10,

11, and 12, respectively).  Filippov claimed that his equity interest increased from the amount

stated in the Operating Agreement due to the fact that he paid carrying costs once Kagan ceased

doing so. According to Filippov, these payments resulted in an increase of his equity and a

decrease to Kagan's under Section 8.1 of the Operating Agreement.  (Id. at 269-70).

**Response:  Undisputed.**

30.     Filippov and Lipetsker filed an adversary complaint seeking an affirmative recovery, essentially mirroring the basis for their objections to defendants' proofs of claim.  In summary, they accused Kagan, KDC and ProExcavation of massive fraud as to the actual costs of construction and of shoddy workmanship.  Tatiana Kagan ("Tatiana"), whose only role was as a real estate agent, was named simply because she was married to Kagan and was also an officer or director of his companies.[2]   (Amd. Cmp., ¶¶28, 35).

**Response:  Disputed**.  **Undisputed** that the adversary complaint mirrors in many respects and amplifies the objections to the proofs of claim and that Plaintiffs believe they are entitled to an affirmative recovery for Defendants' wrongdoing.  **Undisputed** that Kagan, KDC and ProEx engaged in massive fraud, but **disputed** that this accurately summarizes the Adversary Complaint, which includes claims for breach of fiduciary duty, breach of contract, breach of the covenant of good faith and fair dealing, fraud, aiding and abetting breach of fiduciary duty, conspiracy, violation of M.G.L. 93A, and Equitable Subordination.  See Adv. Doc. No. 1, 52.  **Disputed** that Tatiana's only role was as a real estate agent or that she was sued "simply because" she is married to Kagan and is an officer and director of KDC and ProEx.  See Memorandum in Opposition to Motion for Summary Judgement of Tatiana Kagan, Dec. 7, 2018 (incorporated herein by reference with supporting documentation).

31.     The defendants answered and counterclaimed.  (Docket No. 106).

**Response:  Undisputed** but irrelevant to any issue presented.

---

[2]     Tatiana is simultaneously filing her own motion for summary judgment, and joins in the relief requested hereunder.  **Disputed** that Tatiana is entitled to summary judgment.  See Plaintiffs' Opposition to Motion for Summary Judgment of Tatiana Kagan with supporting papers.

32.     Filippov, Lipetsker and the Debtor were provided and examined each and every project invoice, proposal and QuickBooks entry for the Debtor, KDC and ProExcavation.  They deposed all the parties, subpoenaed credit card and phone records, and deposed KDC's accountant.  They obtained leave to examine the financial doings of five other projects that were occurring simultaneously, ostensibly to find evidence that Kagan was charging the Debtor project for labor and materials used on those other projects.

**Response:**  **Undisputed** that Plaintiffs conducted discovery.  **Disputed** that they were provided every project invoice, proposal and QuickBooks entry for the Debtor, KDC and ProExcavation.  Further **Disputed** that Defendants accurately recount the sole reason for doing the discovery.  Where Defendants cite nothing in support of this assertion, Plaintiffs bear no burden to present evidence in dispute.  See <u>nevertheless</u> Goldman Report generally (explaining innumerable deficiencies in Kagan Defendants' documentation).

33.     Plaintiffs have failed to uncover any damages caused by KDC's and ProExcavation's allegedly "cooked books."

**Response:  Disputed**.

The Debtor asserts and can evidence the following damages:

**The Debtor Against KDC:**

■ Damages for the diminished sale price of the two Project properties in the aggregate amount of $1.4 million.

■ Increased costs incurred as a result of the bankruptcy filing, including $17,986.83 in fees paid to Rabobank, N.A. and bond fees of $3,910.83, as well as any fees due to the Trustee;

■ Attorneys' fees and costs and treble damages pursuant to Chapter 93A.

The Debtor also seeks disallowance of KDC's Proofs of Claim and any equitable or further relief the Court deems appropriate. Lyman-Cutler, LLC's Supplemental Answers to Kagan Development KDC Corp.'s First Set of Interrogatories, Sept. 2018, Supp. ATI No. 9; Expert Report of Morgan Fennell, July 30, 2018.

### The Debtor Against Kagan

The Debtor asserts that Kagan is jointly and severally liable with KDC for all damages outlined above. See Lyman-Cutler, LLC's Supplemental Answers to Vadim Kagan's First Set of Interrogatories, Sept. 2018, Supp. ATI No. 9, Perten Aff., Ex. 8.

### The Debtor Against ProEx:

The Debtor asserts that ProEx is jointly and severally liable with KDC for all damages outlined above. Lyman-Cutler, LLC's Supplemental Answers to ProExcavation Corp.'s First Set of Interrogatories, Sept. 2018, Supp. ATI No. 9  Perten Aff. Ex. 8.

### The Debtor Against Tatiana:

The Debtor asserts that Tatiana is jointly and severally liable with KDC for all damages outlined above. Lyman-Cutler, LLC's Supplemental Answers to Tatiana Kagan's First Set of Interrogatories, Sept. 2018, Supp. ATI No. 9. , Perten Aff., Ex. 20. Filippov asserts and can evidence the following damages:

### Filippov Against KDC:

In addition to the damages sought by the Debtor and disallowance of KDC's Proofs of Claim, Fillipov seeks

- Recovery of the carrying costs he has been force to pay out of pocket since May 2015 in the amount of $493,759.12;

- Damages for loss of use of his money, including 5% on unreturned capital pursuant to Operating Agreement § 8.2 in the amount of $160,000 through February 2016;

- Damages for loss of use of money on all of the funds tied up in the Trustee's escrow at the rate of 5%, which as of September 2018 amounted to approximately $265,000, which sum continues to grow.

- Attorneys' fees and costs and treble damages pursuant to Chapter 93A.

Fillipov also seeks disallowance of KDC's Proofs of Claim and any equitable or further relief the Court deems appropriate.  Alex Filippov's Supplemental Answers to Kagan Development KDC Corp.'s First Set of Interrogatories, Sept. 2018, Supp. ATI No. 9; Expert Report of Morgan Fennell, July 30, 2018. Perten Aff., Ex. 7.

**Filippov Against Kagan:**

Filippov asserts that Kagan is jointly and severally liable with KDC for all damages outlined above.  Alex Filippov's Supplemental Answers to Vadim Kagan's First Set of Interrogatories, Sept. 2018, Supp. ATI No. 9. Perten Aff., Ex. 7.

**Filippov Against ProEx:**

Filippov asserts that ProEx is jointly and severally liable with KDC for all damages outlined above.  Alex Filippov's Supplemental Answers to ProExcavation Corp.'s First Set of Interrogatories, Sept. 2018, Supp. ATI No. 9. Perten Aff., Ex. 7.

**Filippov Against Tatiana:**

Filippov asserts that Tatiana is jointly and severally liable with KDC for all damages outlined above.  Alex Filippov's Supplemental Answers to Tatiana Kagan's First Set of Interrogatories, Sept. 2018, Supp. ATI No. 9.  Perten Aff., Ex. 20.

Lipetsker asserts and can evidence the following damages:

**Lipetsker Against KDC**:

In addition to the damages sought by the Debtor and Filippov and disallowance of KDC's Proofs of Claim, Lipetsker seeks

- Damages for loss of use of his money, including 5% on unreturned capital pursuant to Operating Agreement § 8.2 in the amount of $15,625  through February 2016;

- His pro rata share of damages for loss of use of money on all of the funds tied up in the Trustee's escrow at the rate of 5%, which as of September 2018 amounted to approximately $265,000, which sum continues to grow.

- Attorneys' fees and costs and treble damages pursuant to Chapter 93A.

Lipetsker also seeks disallowance of KDC's Proofs of Claim and any equitable or further relief the Court deems appropriate.  Nickolay Lipetsker's Supplemental Answers to Kagan Development KDC Corp.'s First Set of Interrogatories, Sept. 2018, Supp. ATI No. 9; Perten Aff., Ex. 9. Expert Report of Morgan Fennell, July 30, 2018. Carnathan Second Aff. Ex. 38.

**Lipetsker Against Kagan:**

Lipetsker asserts that Kagan is jointly and severally liable with KDC for all damages outlined above.  Nickolay Lipetsker's Supplemental Answers to Vadim Kagan's First Set of Interrogatories, Sept. 2018, Supp. ATI No. 9 Perten Aff., Ex. 9.

**Lipetsker Against ProEx:**

Lipetsker asserts that ProEx is jointly and severally liable with KDC for all damages outlined above.  Nickolay Lipetsker's Supplemental Answers to ProExcavation Corp.'s First Set of Interrogatories, Sept. 2018, Supp. ATI No. 9. Perten Aff., <u>Ex. 9</u>.

**Lipetsker Against Tatiana:**

Lipetsker asserts that Tatiana is jointly and severally liable with KDC for all damages outlined above.  Nickolay Lipetsker's Supplemental Answers to Tatiana Kagan's First Set of Interrogatories, Sept. 2018, Supp. ATI No. 9. Perten Aff., <u>Ex. 20</u>.; <u>see</u> <u>generally</u> Plaintiffs Memoranda in Opposition to the Motions for Summary Judgment by Vadim Kagan, Kagan Development KDC Corp. and ProExcavation Corp and by Tatiana Kagan, incorporated by reference (addressing Defendant's contentions).

34.     In response to interrogatories seeking itemization of damages, **plaintiffs have not identified any damages attributed to supposedly fraudulent charges.**

**Response:  Disputed**.  <u>See</u> Response 33 above; <u>see</u> Memorandum in Opposition to Defendants MSJ, Dec. 7, 2018, filed herewith and incorporated by reference.

35.     Despite years of assertions that Kagan orchestrated a conspiracy to "cook" KDC's and ProExcavation's books, plaintiffs have failed to identify a single dollar spent in reliance on this alleged fraud.  According to plaintiffs, the cost of construction for each home, with carrying costs, was fixed at $1.6 million ($1.3 million construction, $200,000 carrying costs, $100,000 contingency).  (Amd. Cmp., ¶15; Filippov dep. at 41, 74- 75,155-56, 204-05; Lipetsker dep. at 29, Perten Aff., Exh. 6).

**Response:  Disputed** that Plaintiffs have failed to identify damages in reliance on Defendants' Fraud.  <u>See</u> Response No. 33 and materials cited.  **Undisputed** that the cost of

construction was represented by Kagan to be fixed at $1.6 million maximum per home, including

$1.3 million construction costs, $200,000 carrying costs and $100,000 contingency).

36. When asked if he was concerned that Kagan may have been making deposits to

and withdrawing monies out of the Debtor's account Filippov stated:

> No, but it wasn't my concern. **It was a fixed-price project.** I didn't really care much.
> All I cared, that we didn't blow the bank account, and we wouldn't need to deal with Rockland
> Trust. But how he [Kagan] deposit, take money back, its his business.

(Filippov dep. at 74)(Emphasis added).

**Response: Undisputed.** By way of further answer, Kagan's mismanagement, fraud and

self-dealing in the Project only became relevant when the Kagan Defendants tried to disregard

the contract, disclaim the agreement that the Project would be completed for a fixed price,

asserted false and inflated charges and tried to extort payment from the Plaintiffs. See Other

Responses generally, Response No. 15 specifically.

37. Plaintiffs have failed to identify any damages relating to the allegation that KDC

fraudulently claimed monies beyond the fixed price amount. In interrogatories, defendants asked

each plaintiff to itemize damages. None of them itemized a single penny overpaid in reliance on

the allegedly falsified records. Fillipov Supp. Resp. to KDC Int. No. 9, Kagan No. 2,

ProExcavation No. 8, Perten Aff., Exh. 7; Debtor Supp. Resp. to KDC Int. No. 9, Kagan No. 2,

ProExcavation Int. No. 8, Perten Aff., Exh. 8; Lipetsker Sup Response to KDC Int. No. 10,

Kagan Int. No. 2 , ProExcavation Int. No. 8, Perten Aff., Exh. 9.

**Response: Disputed.** KDC misapprehends the damages recoverable for its fraud and

aiding and abetting of Kagan's breach of fiduciary duty. See Response No. 33 and materials

cited.

38.     Plaintiffs claim entitlement to the delta between the property sale price obtained

by the bankruptcy Trustee in 2016 and the fair market value of those properties at that time. The

Debtor's supplemental response to KDC's damage interrogatory, incorporated into the other

plaintiffs' responses, was:

[b]ecause of Kagan's [not ProExcavation's or KDC's] wrongful conduct… the LLC was
subjected to a false mechanics' lien and self-dealing realtor listing agreements, and forced into
bankruptcy which resulted in a distressed sale of the LLC's two primary assets …   The LLC's
damages include the difference between the selling price of the properties - $4,400,000 per house
– and the fair market value each house would have sold for but for Kagan's [not ProExcavation
or KDC] conduct - $5,100,000 per house. The damages for the diminished selling price of the
homes equal $1.4M, plus interest.  The LLC will rely on expert testimony by Morgan Fennell as
set forth in his two expert reports one for 55 Lyman Road and one for 88 Cutler Lane, produced
on July 30, 2018.

(Debtor's Supp. Resp. to KDC Int. No. 9, Perten Aff., Exh. 7).

**Response:  Disputed**.  The Kagan Defendants have edited the Response to add material

in brackets.  To the extent the Kagan Defendants are trying to suggest that the interrogatory

answer is intended to blame only Kagan and not his co-conspirators, they are misreading it in a

self-serving and illogical way.  The Plaintiffs' contentions are and have always been clear that

the Defendants are jointly and severally liable.   Kagan controlled KDC and ProEx.

39.     Plaintiffs' expert, Hugh Fennell, appraised the properties as of March 11, 2016

(for 55 Lyman Road) and as of January 29, 2016 (for 88 Cutler Lane).  Fennell Apraisals

attached to motions in limine.

**Response:  Dates of appraisals undisputed**. Mr. Fennell goes by Morgan.

40.     Fennell provided no discussion of the causal link between the allegedly "false

mechanics' lien," "self-dealing realtor listing agreements" and "forced bankruptcy" which

plaintiffs claim to be the cause of the supposedly low sale price.  Id.

**Response:  Disputed.**  See Opposition to Motion in Limine to Strike Expert Report of Morgan Fennell, Dec. 7, 2018, filed herewith and incorporated by reference.

41.    Mr. Fennell offers no opinion of value as of November, 2014, the date by which plaintiffs claim the properties should have sold according to their agreement, (Amd. Cmp., ¶¶25-27), or even 2015 when plaintiffs took over the project.

**Response:  Undisputed.**

42.    Additionally, no information is offered to compare the value of the properties in 2014 or 2015 with the value in 2016 to determine if there even was a loss.  Id.

**Response:  Disputed.**  See Opposition to Motion in Limine to Strike Expert Report of Morgan Fennell, Dec. 7, 2018, filed herewith and incorporated by reference.

43.    Without objection, the Trustee listed the properties for sale at $4.5 million in November 2015, thereby virtually assuring that there would not be an offer for $5.1 million. (Docket No. 47).

**Response:  Undisputed.**

44.    According to the Debtor's self-serving interrogatory response, three alleged transgressions chargeable to defendants lead to the diminished sale price: the mechanics lien, the "self-serving" listing agreements, and the "forced" bankruptcy.  This causal link between those items and the sale price, however, is not established by Mr. Fennell's reports.

**Response:  Disputed.**  See Opposition to Motion in Limine to Strike Expert Report of Morgan Fennell, Dec. 7, 2018, filed herewith and incorporated by reference.

45.    Mr. Fennell offers no analysis of the allegedly "forced bankruptcy" or its impact on the sale price.  Fennell Reports, Addendum.

**Response:  Disputed.**  See Opposition to Motion in Limine to Strike Expert Report of Morgan Fennell, Dec. 7, 2018, filed herewith and incorporated by reference.

46.    According to the bankruptcy schedules, the Debtor was not insolvent at the time of the petition.  It had assets valued at approximately $9.7 million against liabilities of approximately $7.4 million.  (Docket No. 1).

**Response:  Disputed.**  The solvency of the Debtor is not relevant in this adversary proceeding nor in assessing proofs of claim. Moreover, "insolvency" encompasses both the balance sheet insolvency upon which Defendants rely for their erroneous assertion and the inability of a Debtor to meet its obligations as they come due or cash flow insolvency. "Insolvency" is not required to file for Chapter 11 protection, only "financial distress."  See In re Miller, 2009 Bankr. LEXIS 3351, at *6 (Bankr. D. Mass. Oct. 16, 2009).  At the time of the filing of the bankruptcy in this matter, the Debtor was out of money, had no ongoing source of revenue and was relying on loans and equity contributions from Filippov, resulting in both an increase in his equity share of the Debtor and a mortgage and a proof of claim in this matter. While one partner was trying to keep the Debtor alive, another, Kagan (through KDC), was attacking it through a fraudulent $2.1 million Mechanics' Lien and a demand of an immediate payment of $1 million, plus additional subsequent payments.  Carnathan Aff. Ex. 14 (Cohen Dep. Ex. 28, June 25, 2015 e-mail and attachment including a "Proposal" demanding immediate $1 million payment and other subsequent payments).  Kagan and Tatiana were conspiring to force the Debtor to continue to use her and Century 21 as the listing broker, even though they had failed to sell either property since August 2014 and Filippov believed a more experienced and aggressive broker was needed to sell the Properties.  See Plaintiffs' Opposition to Motion for Summary Judgment of Tatiana Kagan with supporting materials.  Kagan was also demanding

that the LLC dissolve and its assets be liquidated, which could have led to property sales at such

distressed prices as to lead to balance sheet insolvency (even setting aside KDC's fraudulent

claims).   Second Carnathan Aff. Ex. 9 (Perten letter, Sept. 11, 2015).  All of these factors

contributed to the decision to see relief in this Court.

47.     At his deposition, Filippov admitted that he did not discuss filing the petition with

Kagan, despite the fact that Kagan was a member of the Debtor and a vote was required.

(Filippov dep. at 113).

**Response:  Disputed**.  The cited testimony does not say that.  No vote by Kagan was

required.  OA § 9.1  There is no dispute that Filippov and Lipetsker, who together held 90% of

the membership interest, decided to cause the filing of the Petition without consulting Kagan.

Lipetsker Dep. at 55; Filippov Dep. at 113.

48.     Filippov explained that he put the Debtor into bankruptcy because he did not want

to dissolve it on November 30, 2015, as required by the Operating Agreement, as that would

have triggered a liquidation of the properties. (Id. at 112, 122; OA, §§2.3, 9.1 and 9.2).

**Response:  Undisputed** that concern about the impact of a dissolution and forced sale

was one of the factors Filippov and Lipetsker considered in deciding to have the Debtor file for

bankruptcy protection**.  Disputed** that this was the only factor.  See Response No. 46.

49.     Filippov was also concerned that the loans might be called, apparently not

recognizing that filing a bankruptcy petition does not "undo" a default and, because the bank

held a mortgage, obtaining leave to foreclose would likely prove relatively routine. (Fillipov dep.

at 112).

**Response:  Disputed.**  The cited testimony supports only the assertion that Filippov was worried about the bank calling the loans.  The rest of the alleged "fact" is argument by counsel, requiring no factual response.  See also Response No. 46.

50.   Filippov also unilaterally determined that no "reasonable buyer" would buy the property if there was a lien, (Id. at 122), though no expert backs up his assertion.

**Response:  Disputed**.  The cited testimony establishes only that one of the reasons for the bankruptcy filing was the concern that they could not sell the properties with KDC's mechanic's lien against them.

51.   At his deposition, Filippov candidly admitted that although he understood that bankruptcy could adversely affect the sale price, he believed that he could avoid this problem by filing Chapter 11. As he explained:

> I wasn't expecting that it was going to have to be Chapter 7 bankruptcy.  I was expecting that I was going to be selling the houses [as a debtor-in-possession]; not the trustee whose only goal is just to get rid of it. So, it wasn't obvious to me when I was putting in the bankruptcy that its going to be sold for less.  All I was caring was that that would remove the lien of the property, and we would be able to sell it.

(Fillipov dep. at 128-29).  See Lipetsker dep. at 55-56.

**Response:  Undisputed** that the Debtor expected greater control over the sale process than came to pass after Kagan moved to covert the case to a case under Chapter 7.  The Court can take judicial notice that Chapter 7 Trustees usually do not get market price for properties. But in Filippov's business judgment, that avenue was better than a foreclosure by the bank or a sheriff's sale by KDC particularly where the Kagan Defendants maintained an ongoing assault on the Debtor.  See also Lipetsker Dep. at 38-39 (Lipetsker met with Kagan to try and avoid legal battles by agreeing to remove the lien, sell the houses, repay the bank and escrow the net funds while they worked out the dispute).

52.     There is no expert opinion that there was anything improper about the listing agreements and virtually no discussion about how they were "self-dealing" or how this alleged "self- dealing" somehow deflated the sale price.

**Response:  Disputed**.  Defendants again make assertions without offering any evidentiary support as required by D. Mass. Bankr. R. 7056-1.  Plaintiffs agree there is no expert opinion proffered concerning the self-dealing listing agreements.  The rest of this alleged "fact" has no evidentiary support and requires no further response.  But see Opposition to MSJ of Tatiana, Dec. 7, 2018, and supporting materials, filed herewith and incorporated by reference; see also Plaintiffs' Motion in Limine, Nov. 16, 2018, incorporated herein by reference.

53.     Tatiana is specifically identified in the Operating Agreement as the listing agent so far from being "self-dealing" her getting the listing was exactly what the parties had agreed to do.  (OA, §6.1(b)(6)).

**Response:  Disputed.**  This "fact" again includes improper argument by counsel.  See Opposition to MSJ of Tatiana, Dec. 7, 2018, and supporting materials, filed herewith and incorporated by reference.  A contract between husband and wife is plainly self-dealing.  See Plaintiffs' Motion in Limine, Nov. 16, 2018 (Doc. No. 348, Adv. Doc. No. 218).

54.     As noted in Tatiana's parallel motion for summary judgment, Filippov was well aware of the listing agreements and voiced no objections thereto.  Tatiana Stmt. Of Facts.

**Response:  Disputed.**  See Opposition to MSJ of Tatiana, Dec. 7, 2018, and supporting materials, filed herewith and incorporated by reference.

55.     There is also no expert evidence that the listing agreements were inconsistent with industry standards or that the marketing effort put in by Tatiana somehow contributed to the inability to sell the properties.

**Response:  Undisputed.**  Disputed that any is necessary.  See Opposition to Motion for Summary Judgment of Tatiana Kagan and supporting materials.

56.     While Mr. Fennell concludes, with no analysis and in less than a sentence, that a lack of effective marketing contributed to the low sale price, in his recitation of the facts relied upon, the only facts bearing on the marketing effort were that "[t]he investors were not provided any information on the marketing process, how the homes were received in the market, or how involved the listing broker was during this process." (Fennell Reports, Addendum p. 1/5).

**Response:  Undisputed** that the quotation is accurate, but only a fragment of the sentence.  **Disputed** to the extent the Kagan Defendants insinuate that there is no evidence of inadequate and incompetent marketing efforts.  See Opposition to Motion for Summary Judgment of Tatiana Kagan and supporting materials.

57.     The mechanics lien was filed by KDC.

**Response:  Undisputed** that KDC recorded the Mechanic's Lien but Kagan controls KDC and caused it to file the Mechanic's Lien and the Lien includes charges from ProEx, Kagan's other company.  Career Criminal Joseph Cohen drafted and signed it.  See Response No. 15 above.

58.     In his report, Mr. Fennell, who, according to his CV is not a real estate agent and therefore not qualified to opine on this topic in any event, does not explain why, even prior to the mechanics lien, the property did not sell.  Fennell Appraisals.

**Response:  Disputed.**  See Opposition to Motion to Strike Expert Report of Morgan Fennell, Dec. 7, 2018, filed herewith and incorporated by reference.

59.     Filippov testified that he was not guaranteed any fixed rate of return on his investment. (Filippov dep. at 51).

**Response:  Undisputed.**

60.     Filippov has already submitted a proof of interest arguing that his payment of carrying costs were additional capital contributions which had the effect of increasing his capital contribution and membership interest per Section 8.1. (Claim No. 11).

**Response:  Undisputed.**  Filippov contributed capital to cover carrying costs, as provided for in the OA, and lent money to the Debtor on a secured basis to fund the defense of the claims asserted by KDC and to protect the assets of the Debtor in this proceeding.  Filippov has personally provided hundreds of thousands of dollars of ongoing support to the Debtor as a direct result of the wrongdoing of the Kagan Defendants.  Filippov Supp. ATI No. 9.

61.     At his deposition, Filippov admitted that the increase he claimed in his equity interest was based on his payment of carrying costs and application of Sections 8.1 and 8.2 of the Operating Agreement.  (Filippov dep. at 268-70).

**Response:  Undisputed.**

62.     The distribution of profit under the Operating Agreement does not track the parties' equity interests.  Although Kagan initially had a 10% equity interest, Section 8.1 of the Operating Agreement provides that upon liquidation, the proceeds of any sale shall be allocated 50% to Kagan.  Operating Agreement, §8.1

**Response:  Disputed.**  Section 8.1 provides for Kagan to receive 50% of the profits, meaning the net proceeds, after payment of expenses and return of capital contributions.  OA, § 8.1.  To the extent Kagan suggests that he should get 50% of the gross proceeds of any liquidation, this is extreme bad faith but perhaps explains his September 2015 demands for dissolution of the Debtor, which is just further bad faith breach of his fiduciary duties.

63.     Section 8.1 goes on to say:

**In the event that the property is not sold within twenty three (23) months from the date of acquisition, then Mr. Kagan shall be responsible for all carrying costs until such time as the property is sold. If Mr. Kagan fails to pay the monthly carrying costs, then Mr. Filippov shall be responsible to contribute the necessary carry costs and subsequently his capital contribution and percentage interest in the Company shall increase by the same amount and percentage and at the same time will trigger reduction of Mr. Kagan's share of capital contribution by the same amount and subsequently his/her percentage interest in the Company.**

(OA, ¶8.1 at p. 9, emphasis in the original).

**Response:  Undisputed**.

64.    Section 8.2 of the Operating Agreement is entitled "Distribution to Members." It

provides:

**The distribution to Members shall be in accordance with their respective Capital Contribution first, however, an additional five (5%) percent per annum based upon the Members' respective Capital Contributions shall be paid out of Mr. Kagan's net profit share for each day that the property is not sold after twenty three (23) months of acquisition.**

(OA, §8.2, emphasis in original).

**Response:  Undisputed.**

65.    Ms. Brusenkova submitted an affidavit in support of plaintiffs' claims of

malfeasance. She also figures prominently in plaintiffs' complaint. (Amd. Cmp., ¶46;

Brusenkova dep. at 102).

**Response:  Undisputed.**

66.    At her deposition, Ms. Brusenkova was unable to identify any specific instances

of financial malfeasance relating to the Debtor's project.  She admitted she had no detail as to

any improper financial dealings on the project.  (Brusenkova dep. at 95).

**Response:  Disputed.**  The cited testimony does not say that.  At her deposition,

Brusenkova testified, among other things that:

- ■ She prepared checks for KDC at Kagan's direction.  Id. at 64.

- ■ Kirill Kagan texted her what to pay from ProEx.  Id. at 65.

- ■ She believes Kagan double billed Lyman Cutler for the landscaping.  Id. at 125-26.

- ■ At the end of each project, Kagan would review the books and if he thought the amounts paid to a subcontractor looked low, he would add charges.  Id. at 133-34.

- ■ Whenever ProEx did work, Kagan would charge more than they spent.  Id. at 137-38.

- ■ Lyman-Cutler paid the carrying costs with investor money or with bank advances.  Id. at 139-40.

- ■ She never saw the ProEx Proposal.  Id. at 164.

67.     Her only understanding that Kagan was trying to "steal" money on this project was based on statements that Filippov made to her and not on any personal knowledge. (Id. at 102).

**Response:  Disputed**.  The cited testimony does not say that. See also Response No. 66.

68.     She testified that despite plaintiffs' allegation that ProExcavation grossly overcharged (Amd. Cmp., ¶47), she had no idea exactly what services ProExcavation provided, what it charged on this project, or what its work was worth. (Brusenkova dep. at 117-18).

**Response:  Disputed**.  The cited testimony does not say that.  Brusenkova testified that ProExcavation did site preparation and maybe landscaping and masonry.  Id.

69.     As to Debtor's project, she could not recall any instances of overcharging (Id. at 119), any improper uses of the company credit card (Id. at 123), or any instances of double-billing.  (Id. at 125, 132).

**Response:  Disputed.**  The cited testimony does not support the assertion.  Ms. Brusenkova testified that ProEx double billed for landscaping.  Perten Aff. Ex. 3, Brusenkova Dep. at 125; see also Response No. 66 (pattern and practice of adding to bills).

70.    She could not identify any subcontractors or suppliers who were overpaid.  (Id. at 133).  She could not identify any improper charges to the company credit card.  (Id. at 135)  Finally, with respect to the allegation that Kagan failed to properly credit the project for refunds or goods returned, Ms. Brusenkova could not say that this ever happened on this project.  (Id. at 137).

**Response:  Disputed.**  With regard to ProExcavation, Ms. Brusenkova testified that with regard to surveyor costs, Kagan told her "If he has an investor with a particular house, the invoice will be $1400.  If it is his personal, it will be 1,000."  Brusenkova Dep. at 120.  Ms. Brusenkova further testified "every time when we pay something for ProExcavation, we are supposed to get reimbursed from the companies.  But he never did this.  He just overcharge them."  Perten Aff., Ex. 3, Brusenkova Dep. at 137 (emphasis added); see also Response No. 66.

71.    At his deposition, Filippov too testified that he had no details to support his spurious allegations.  He could not provide any specific instances of double billing.  (Filippov dep. at 99-100).

**Response:  Disputed**.  The alleged "fact" is improper argument by counsel.  Filippov is responsible only for testifying to his personal knowledge and is entitled to rely upon the evidence adduced by counsel in discovery and the testimony and work of his expert witnesses, including Michael Goldman.  In any event, Filippov also testified at the cited pages that:

> We're still digging into the books that Kagan conveniently didn't provide yet, because what he provided is nonsense.  It's not books of a contractor.  There is no details, there is no invoicing, there is nothing but numbers that he provided.  Billed by KDC, billed b ProExcavation, looks like for the same job made . . . .

Perten Aff. Ex. 2, Filippov Dep. at 99; <u>see</u> <u>also</u> Response No. 15.

72.     Other than hearsay statement from other contractors, none of which have been identified as an expert on this case, he had nothing to support the allegation that ProExcavation overcharged.  (Id. at 100-109, 126-27).

**Response:  Disputed.**  Filippov Supp. ATI No. 4.  Filippov is responsible only for testifying to his personal knowledge and is entitled to rely upon the evidence adduced by counsel in discovery and the testimony and work of his expert witness, Michael Goldman.  <u>See also</u> Response No. 15.

73.     He testified that he could not identify any items that were purchased for another project but charged to this project. (Id. at 111).

**Response:  Undisputed**, but irrelevant.  Filippov is responsible only for testifying to his personal knowledge and is entitled to rely upon the evidence adduced by counsel in discovery and the testimony and work of his expert witness, Michael Goldman.  <u>See</u> Goldman Report ¶¶ 28-34 (books and records are so intermingled and chaotic that materials cannot be traced to specific projects).   It is Defendants' burden to prove their charges are entirely fair.

74.     He could not identify any improper AMEX charges. (Id. at 125). He could not even identify which invoices he questioned.  (Id. at 246).

**Response:  Undisputed**, but irrelevant.  Filippov is responsible only for testifying to his personal knowledge and is entitled to rely upon the evidence adduced by counsel in discovery and the testimony and work of his expert witness, Michael Goldman.  <u>See</u> Goldman Report ¶¶ 55-80 (discussing haphazard payments by LLC, KDC and KDC Amex, and identifying specific overcharges, including, for example, for Construction Specialties showing an overstatement of

the charges of $10,295 for March 2014 alone, id. ¶ 58(c), for Horner Millworks an overstatement of $16,243.84 for May 2014 alone, id. ¶ 59).

75.    Lipetsker too admitted that he had no facts to support the allegations that had been made. (Lipetsker dep. at 42-46).

**Response:  Disputed.**  The cited testimony establishes only that Lipetsker does not have personal knowledge of illegitimate charges or expenses.  The assertion that he has "no facts to support the allegations" is a serious overstatement and is not supported by the cited testimony. Lipetsker testified to numerous important facts that "support the allegations that [have] been made, including without limitation:

He first heard of the Lyman Cutler project from Attorney Boris Maiden, and Kagan was looking for investors.  Lipetsker Dep. at 19 (this contradicts some of Kagan's bizarre testimony). Kagan was looking for an investor to put up $2.5 million in cash and take out a $5 million loan. Id. at 23.

Zhukovksiy prepared the risk analysis spreadsheet based upon Kagan's numbers.  Id. at 26, 30.  Kagan said the spreadsheet was "what [he] wanted."  Id. at 26.  Kagan quoted the construction budget as $1.3 million plus $200,000 carrying costs per house, and later asked for another $100,000 for construction.  Id. at 29.  "Mr. Kagan said that he knew exactly what the cost of construction would be.  He said he knew exactly what the expenses would be."  Id. at 27. Filippov would not invest until they specifically defined all of the costs, including construction costs, bank payments, insurance, and taxes.  Id. at 27-28 ("Filippov said that until the time he was able to get all those numbers he wasn't going to participate in this project").

They discussed various profit scenarios based upon difference in duration of construction or sale price, but the cost of construction was a constant.  Id. at 28-30.  Filippov and Kagan reached an agreement on all of the project costs.  Id. at 36.

After Kagan sent his letter in May 2015, Lipetsker feared he would lose his investment. Id. at 38.  He met with Kagan to try and avoid a legal dispute.  Id.  Lipetsker proposed the Kagan remove the lien, and they would sell the properties and escrow the proceeds while they resolved the issues between them.  Id.

Lipetsker never discussed changing the finishes in the home or building a more expensive home with Kagan and never discussed increasing the square footage.  Id. at 52.  Kagan said early on that they were building the maximum allowable size.  Id.

Lipetsker knows Filippov did not want to have a new listing agreement with Tatiana.  Id. at 57.

76.     The long anticipated forensic accounting report of Michael Goldman arrived on July 30, 2018.[3]  Nowhere in his 41-page report is there any opinion that, more likely than not, there was fraud committed on this project. Nowhere is there any itemization of damages incurred by plaintiffs due to the alleged fabricated or improper billings.  Goldman Report, annexed to motion in limine.

**Response:  Disputed.**         See Opposition to Motion to Strike Expert Report of Michael Goldman, Dec. 7, 2018, filed herewith and incorporated by reference; see also Expert Report of Michael Goldman, July 30, 2018 (Carnathan Aff. Ex. 20).  Mr. Goldman offers other highly specific opinions based upon decades of experience as a forensic fraud investigator.  For

---

[3]     Defendants have filed a motion in limine to strike the expert opinions offered by Mr. Goldman, which is incorporated herein by reference. A copy of his report is annexed to that motion.

example, he notes that Kagan commingled payment methods "with no apparent pattern" among the LLC, KDC and KDC by credit card.  Id. ¶ 47(c).  "Typically, this degree of commingling or complexity in the handling of cash is done to disguise or confuse the nature of individual transactions."  Id.  Among the specifics in the Goldman Report, without limitation, are the following:

Mr. Goldman concludes that KDC's records are so haphazard and incomplete that it is impossible to confirm that Kagan did not charge materials to the Project and then use them on other projects.  Goldman Report, ¶¶ 28-32 (Kagan failed to maintain most of the documentation he should have and as a result, there is no way to detect the intermingling of his projects). Kagan further clouded the financial record by haphazardly paying expenses sometimes from KDC, sometimes from the LLC and sometimes on a credit card.  Id. ¶ 34.

The mechanics lien and the quick books reports do not match.  Id. ¶ 35.  In over twenty years of forensic work, Mr. Goldman has only ever seen one other set of documentation containing so much "inconsistency and incredibility" and there was significant fraud in that case. Id. ¶ 36.  KDC's CFO admitted creating documentation after the fact.  Id. ¶ 38.

Mr. Goldman concludes that "the accounting process employed by Mr. Kagan are severely deficient and … the attempts to recreate data that was never properly captured the first time are not at all convincing.  The claim as it is presented now is not supported with reliable information and, **based on how pervasive the problems are, may be knowingly fraudulent**." Id. ¶ 39 (emphasis added); see also id. ¶ 114(h) (bold conclusion on final page).

Mr. Goldman also notes that a number of the invoices presented appear "spurious on their face," but were apparently paid anyway.  Id. ¶ 47(e).

Mr. Goldman also opines that "a company the size of KDC could not stay solvent and operating with such poor cost control that it had unexpected overruns of this size and frequency." Id. ¶ 49.

Mr. Goldman also took the Quick Books files the Defendants produced for the Other Construction Projects and prepared a comparison of the costs of construction for project where Kagan had investors compared to projects he did without investors.  The results, as Mr. Goldman says, are striking:  On the projects with investors (55 Lyman, 88 Cutler, 10 Lyman and Yarmouth Road), Kagan had per square foot construction costs of $250, $236, $272 and $262 respectively.  On projects he did without investors (Parker Road, Fredette and Druid Hill), he had per square foot costs of $144, $130 and $144.  Id. ¶ 50.  The average is $255 per square foot when Kagan has investors, $139 per square foot when he does not.

Mr. Goldman makes complex comparisons of the QuickBooks files produced at various junctures by the Defendants, the Amex charges and the claims of specific vendors and subcontractors.  For example:

- He concludes that the claim based on charges by Construction Specialties are overstated by $10,295.  Id. ¶ 58.
- He concludes that it is likely that "at some point Defendants took the original accounting file and cloned it and then modified it to inflate the amounts on the lien." Id. ¶ 58 (d).
- He concludes that the charges for Horner Millworks is overstated by $16, 243.84 for May 2014 alone Id. ¶ 59.
- He concludes that the "invoices provided in the mechanic's lien for Huntington TV appear fabricated." Id. ¶ 60.
- He concluded that the Décor Art invoices look "suspicious" and several appear "fabricated." Id. ¶ 61.
- He notes numerous inconsistencies in the invoices from Paul DiGiacomo, "which strongly imp[y] that they were fabricated." Id. ¶ 62.
- He observes significant inconsistencies in the invoices for Pave Tech, BST Plumbing, Ferguson, Sergei Nikolaev, V&D Heating, DaCosta Constrution, Unicon Electric, Affordable Lawn Sprinklers and ProEx.  Id. ¶¶ 64-68, 70-72, 74.
- He explicitly opines that the "Dream Flooring invoices appear fabricated," and explains why.  Id. ¶ 69.

- He explicitly opines that the Eastcoast Pipelines invoice appears fabricated. Id. ¶ 73.
- He opines that while ProEx billed the LLC $23,000 for snow removal, other projects were not billed at all, suggesting the LLC may have paid for their snow removal. Id. ¶ 75.
- He opines that the records produced are insufficient to refute Ms. Brusenkova's testimony that Kagan routinely billed double for ProEx work, once through ProEx and once through KDC. Id. ¶ 78.

Mr. Goldman also reviews the accounting records of KDC and ProEx and concludes they are unreliable. Id. ¶¶ 81-106.

Notably, when Mr. Goldman reviewed ProEx's accounting records, he found that the records showed billings of $749,300 to the LLC. Id. ¶ 107. This sum is $167,000 less than ProEx's proof of claim for **$916,800**. Compare Goldman Report ¶ 107 with SSUMF ¶ 47 (ProEx proof of claim tally). More important, Mr. Goldman could confirm only a grand total of **$345,335** in materials and other costs expended by ProEx on the Project. ¶ 108 ($140,894 for 55 Lyman and $204,441 for 88 Cutler).

77.  Goldman was retained only to "opine on the veracity of the accounting information and documentary support provided by the Defendants with regard to the mechanics lien," i.e. KDC's proof of claim. (Goldman Report, ¶21). Consistent with his limited scope, Mr. Goldman's opinion was not that he found fraud which may entitle plaintiffs to damages, but only that "the documentation maintained and provided by Mr. Kagan is unreliable" and that "attempts to recreate data that was never properly captured the first time are not at all convincing." (Id., ¶¶28, 39).

**Response:  Disputed.**  Mr. Goldman reports that "The claim as it is presented now is not supported with reliable information and, based on how pervasive the problems are, may be knowingly fraudulent." Goldman Report ¶ 39 (emphasis added); see also id. ¶ 114(h) (bold conclusion on final page); see Response No. 76.

41

78.     Mr. Goldman scrupulously opined simply that "my opinion and conclusion is that the claims made by the Defendant for the mechanics lien are not reliable or credible. (Id. at Summary of Opinions and Conclusions).

**Response:  Disputed.**  Plaintiffs agree that Mr. Goldman's opinion is scrupulously presented but dispute that the Defendants accurately characterize his opinion.  Mr. Goldman does not purport to invade the role of the fact-finder by reaching conclusions about Kagan's mens rea, but instead offers his professional, expert opinion that the pervasiveness of the problems with Kagan's accounting records support the conclusion that Kagan is engaged in knowing fraud.  See Response No. 76.  This is proper expert testimony.  See Plaintiffs' Opposition to Defendants Motion in Limine to Preclude Opinions of Michael Goldman, Dec. 7, 2018, filed contemporaneously herewith and incorporated by reference.

79.     With respect to the allegations that materials from other projects were improperly charged to this project, Mr. Goldman offered that although it was "conceivable," "there would be no way to detect if this was occurring."  (Id. ¶32).

**Response:  Disputed**.  Defendants inaccurately portray Mr. Goldman's conclusions in a self-serving way.  Mr. Goldman's point is that the so-called financial records of KDC and ProEx are so deficient and commingled that material charges cannot be traced to particular projects. Goldman Report ¶¶ 24-34.   It is Defendants' burden to prove the contrary to satisfy entire fairness, which they cannot do.

80.     As to improper charges to credit cards, all he could say is that "the lack of controls and oversight opened the possibility for a commingling of entities and/or a commingling of projects", though he did not opine that this, in fact, occurred. (Id., ¶34, emphasis added).

**Response:  Disputed** that the Defendants' quotation of a fragment of a sentence from Mr. Goldman's report accurately recounts his opinion.  <u>See</u> Response No. 79.

81.    He noted that his perceived discrepancies in the records showed a "lack of competence or integrity," though he could not determine which was more likely. (Id., ¶47) (Emphasis added).

**Response:  Disputed.**  The Kagan Defendants mischaracterize Mr. Goldman's Report. The cited paragraph in particular says: "While none of these findings by themselves are proof of fraud, the pervasive presence of all of these findings together in the presence of accountants who should know better are strongly **indicative of either gross incompetence or fraud.**  Goldman Report ¶ 47 (emphasis added).

82.    Mr. Goldman's ultimate conclusion is simply that he did not believe the records that were produced to support KDC's claim.   See Id., ¶51 ("The claim documentation provided by the Defendant has so many inconsistencies, inaccuracies, mistakes, missing documents, unexplained changes to "historical" information, etc. that I cannot conclude that it is credible.").

**Response:  Disputed.**  The Defendants mischaracterize Mr. Goldman's report.  <u>See</u> Responses No. 76-81; Goldman Report, generally.

83.    The only reliance plead by plaintiffs is on the pre-project representation by Kagan as to the construction costs.  (Amd. Cmp., ¶17).  Plaintiffs do not claim reliance on KDC's books and records.

**Response:  Disputed.**  Plaintiffs relied on Kagan's pre-Project construction costs in the sense that he made (mis)representations to them, they believed him, and they invested together $2.25 million in the Project in reliance on Kagan's (mis) representations.  As the Project

proceeded, however, they relied upon Kagan to honor the bargain he made and construct the homes for the budget they agreed upon.

When Kagan chose instead to manufacture books and records months after construction was complete, present massive cost overruns to the LLC for payment, then manufacture more alleged charges and lie about the deal the parties made and the course of the Project to try and force payment of his false cost overruns, he committed additional fraud for which he and his co-conspirators are liable without showing detrimental reliance on any particular misstatement. See Plaintiffs' Memorandum in Opposition to Defendants' Motion for Summary Judgment, Dec. 7, 2018, filed herewith and incorporated by reference.

84.    In Count VII, Debtor alleges that it "entered into a contract with Defendant KDC that required, among other things, that KDC perform its work in a good and workmanlike manner." (Amd. Comp., ¶78).

**Response: Undisputed**, that Plaintiffs originally asserted a claim against KDC in Count VII for failure to perform in a good and workmanlike manner but this claim was pleaded in the alternative. To the extent KDC performed work for the LLC (and the existence of any contract is vigorously disputed), it was obligated to perform the construction in a good and workmanlike manner. There is no contract with KDC and the damages for KDC's shoddy work are eclipsed by the other damages in this case. Plaintiffs withdraw Count VII.

85.    No construction expert reviewed the construction and opined that it was not performed in a good and workmanlike manner, this claim fails. The only expert comment bearing on the quality of construction was an observation by plaintiffs' real estate appraiser, who opined, "Overall, the subject property was in good condition and was of good construction quality at the time of the sale." (Fennell Report, Addendum, p. 3 of 5).

**Response:  Undisputed** that there is no expert testimony concerning the quality of the construction.

86.     KDC's Claim No.4 sought indemnity under Section 10.2 of the Operating Agreement. The deadline for objection to proofs of claim was May 3, 2016.  (Docket No. 71). Plaintiffs never objected to Claim No. 4.

**Response:  Disputed**.  See Response No. 23 above.

87.     Kagan and ProExcavation also seek indemnity under Section 10.2 of the Operating Agreement.  (Claim Nos. 6 and 7). Section 10.2 provides:

The Company shall indemnify and hold harmless the Members and their respective employees and authorized agents from and against any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member, employee or authorized agent in good faith on behalf of the Company and reasonable believed to be within the scope of authority conferred by this Agreement, except that no Member, employ or authorized agent shall be entitled to be indemnified or held harmless from or against any loss, damage or claim incurred by reason of such Member's, employee's or authorized agent's gross negligence or willful misconduct.

**Response:  Undisputed** that Kagan and ProExcavation seek indemnity and that the quotation above is accurate.  **Disputed** that they are entitled to indemnification.  See Plaintiffs' Motion for Summary Judgment, Nov. 16, 2018 and supporting papers; Response No. 15 above.

88.     Under the Operating Agreement, the members delegated Kagan full responsibility to build the houses.  (OA, §5.2).

**Response:  Undisputed.**

LYMAN-CUTLER, LLC,
By its attorney,


ALEX FILIPPOV and
NICKOLAY LIPETSKER,
By their attorneys,


*/s/ Peter Tamposi*
Peter N. Tamposi, BBO No. 639497
The Tamposi Law Group, P.C.
159 Main Street
Nashua, NH 03060
T: (603) 204-5513


*/s/ Sean T. Carnathan*
Sean T. Carnathan, BBO No. 636889
scarnathan@ocmlaw.net
Joseph P. Calandrelli, BBO No. 666128
jcalandrelli@ocmlaw.net
O'Connor, Carnathan and Mack, LLC
1 Van de Graaff Dr. Suite 104
Burlington, MA 01803
T:  781-359-9000


Dated:  December 7, 2018


## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on December 7 2018.

*/s/ Sean T. Carnathan*
Sean T. Carnathan