UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| *In re:* )<br><br>LYMAN-CUTLER, LLC, )<br>Debtor ) | Chapter 7<br>Case No. 15-13881 FJB |

| | |
|---|---|
| LYMAN-CUTLER, LLC, et al., )<br><br>Plaintiffs, )<br><br>v. )<br><br>VADIM KAGAN, et al., )<br><br>Defendants. ) | Adv. Case No. 1:16-ap-01120 |

**PLAINTIFFS' RESPONSES TO THE
CONCISE STATEMENT OF UNDISPUTED FACTS FOR TATIANA KAGAN'S
MOTION FOR SUMMARY JUDGMENT ON ALL COUNTS OF AMENDED
COMPLAINT AND ON PROOF OF CLAIM NO. 5**

Plaintiffs Lyman-Cutler, LLC, Alex Filippov and Nickolay Lipetsker ("Plaintiffs")

respond to the Concise Statement of Undisputed Facts for Tatiana Kagan's Motion for Summary

Judgment on all Counts of the Amended Complaint and on Proof of Claim No. 5. Plaintiffs note

as a preliminary matter that D. Mass. Bankr. R. 7056-1 and D. Mass. L.R. 56.1 require that

Tatiana Kagan support her assertions of allegedly undisputed fact with citations to affidavits,

depositions or other documentation, which in numerous cases she has not done. By rule, the

Court should treat all such facts as disputed unless Plaintiffs admit them as true.

1.      Defendant Tatiana Kagan ("Tatiana") is the wife of defendant Vadim Kagan ("Kagan").

**Response:  Undisputed.**

2.      She is not a member of Lyman-Cutler; not a manager of Lyman-Cutler, not a signatory to the Lyman-Cutler Operating Agreement, and had no check writing authority on any of the Lyman-Cutler accounts.

**Response:  Undisputed.**

3.      Tatiana is a real estate agent, and the members agreed that she would be given the listing for the new homes being built by Lyman-Cutler.

**Response:  Disputed.**   Tatiana cites no evidence to support this assertion and so it is insufficient for the purpose of her motion for summary judgment pursuant to D. Mass. Bankr. R. 7056-1 and D. Mass. L.R. 56.1.  In addition, pursuant to the Operating Agreement of Lyman-Cutler, LLC, Nov. 14, 2012, § 6.1(B)(6), the LLC's members agreed only that Tatiana would be given the listing agreement initially, but she could be removed at any time.  Prior to December 31, 2014, Tatiana could be removed by written consent of 81% of the Members.  After December 31, 2014, the Managing Member (Filippov) could remove her without any such consent.  See Transmittal Affidavit of Sean T. Carnathan, Nov. 16, 2018 (Doc. No. 355, Adv. Doc. No. 222) ("Carnathan Aff."), Exhibit 1, LLC Operating Agreement; see also Plaintiffs' Concise Statement of Undisputed Material Facts in Support of their Motion for Summary Judgment, Nov. 16, 2018 (Doc. No. 353, Adv. Doc. No. 221) ("SSUMF") ¶ 59 (Filippov's status as Managing Member).

4.      Although on paper she is an officer and director of defendants Kagan Development KDC, Corp. ("KDC") and ProExcavation Corp. ("ProExcavation"), she played no

substantive role whatsoever in the construction of the homes at issue in this litigation and took no

actions on behalf of KDC or ProExcavation.

**Response:  Disputed.**  Tatiana testified that her husband, Kagan, determines whether she

gets paid a commission on the sale of a property for him, and that if it is one of his properties,

she delivers her commission to "Dan Gersh," who is the Chief Financial Officer of KDC.  See

Deposition of Tatiana Kagan, May 18, 2018 ("Tatiana Dep.") at 57-62, Second Transmittal

Affidavit of Sean T. Carnathan, Dec. 7, 2018 ("Second Carnathan Aff."), Ex. 28; Deposition of

Daniel Gersh, May 17, 2018 ("Gersh Dep."), at 18-20, 38; Second Carnathan Aff., Ex. 27.

In particular, Tatiana testified as follows:

> Q. Under what circumstances would you waive your commission for a property
> you sold for your husband?
> A. He handles all the finances. I can't tell you. I don't know.
> Q. So your husband determines whether or not you are going to get a commission
> when you sell the property?
> A. If it is his house, yes. If it is somebody else's house, it comes directly from
> Century 21, it comes directly to me. And I deliver that check to the office and
> hand it to Daniel Gersh.

Tatiana Dep. at 61.

She further testified:

> Q. Does Century 21 ever object to you waiving a commission for one of your
> husband's projects?
> A. No.

Tatiana Dep. at 59.

One of the claims by Plaintiffs in this case is that the Kagans worked together to sign the

unauthorized listing agreements in order to give themselves unfair leverage when Kagan sent the

surprise May 7, 2015 Alexander Pyle Demand Letter, in which Kagan for the first time

announced purported cost over runs.  SSUMF ¶¶ 21-22; Amended Adversary Complaint, Nov. 7,

2017 (Adv. Doc. No.52) ¶ 38.  These cost overruns are all included in the KDC Proof of Claim,

which includes alleged charges from ProEx.  See Proof of Claim No. 1.  Tatiana stands to benefit

from the Defendants' extortionate scheme not only through potential receipt of a commission,

but as one of 2 shareholders – with her husband – of KDC and ProEx.  SSUMF ¶¶ 14-15.

Under the Operating Agreement, as of May 2015, Filippov had express authority to

remove Tatiana as the listing agent without any vote of the members.  Carnathan Aff. Ex. 1, §

6.1.(b)(1).  But when this dispute arose, Century 21 refused to release the listing, which became

the subject of litigation, and Lyman-Cutler was not able to hire a different broker until it rejected

the listing agreements in the bankruptcy proceeding.  See Affidavit of John Perten, November

16, 2018 (Doc. No. 357; Adv. P. No. 227) ("Perten Aff."), Ex. 21, Affidavit of Greg Keily, Ex. D

(May 26, 2015 Letter demanding that Century 21 step aside).  If, as Tatiana explicitly testified:

(1) she only charges commissions on Kagan's projects when he tells her to; (2) she can waive her

commission whenever she likes and Century 21 does not object; and (3) she turns her

commissions over the Mr. Gersh, the CFO of KDC, then it is fair to infer that Century 21 refused

to release the listings at Tatiana's direction, which by her own testimony would have been at

Kagan's direction.  It is fair to infer that, as the Plaintiffs allege, Tatiana acted in concert with

Kagan, KDC and ProEx to try and force the Plaintiffs to accept the unfair and fraudulent cost

overruns.  This inference is further supported by the 18 month term of the listing agreement that

was never produced until the litigation.  Carnathan Aff., Ex. 31 (August 2014 Listing

Agreement).

5.      She had nothing to do with any of the project billings or project expenditures.

**Response:**  **Disputed.**  Tatiana increases or decreases project expenditures by charging

or waiving her commission, as directed by Kagan.  See supra Response 4.

6.      Plaintiffs offer no expert testimony to support any allegations against Tatiana.

**Response:** **Disputed.** Plaintiffs offer the Expert Report of Morgan Fennell to support their damages claim and the Expert Report of Michael Goldman to support their assertion of fraudulent billing, for which Tatiana is liable as a co-conspirator as set forth in Response 4 above.

7.    Kagan, Alex Filippov ("Filippov"), and Nickolay Lipetsker ("Lipetsker") formed Lyman- Cutler, LLC ("Lyman-Cutler") to construct and sell two luxury homes.

**Response:** **Undisputed.**

8.    Tatiana is first mentioned substantively in paragraph 28 of the Amended Adversary Complaint, where she is identified as a real estate agent affiliated with "Defendant Century 21" [1] and as an officer and director of KDC. (Amd. Cmp., ¶28).

**Response:** **Disputed.** Amd. Cmp. ¶ 1.

9.    Plaintiffs allege that they planned to sell the new homes for $4.9 million each and that they agreed to list the homes for sale with Tatiana.   (Id., ¶¶27, 29).

**Response:**   **Undisputed** that those are the allegations of the Complaint.  But see Response No. 3 (Tatiana could be removed at any time).

10.    They further allege that, without consulting them, the "Kagans" set the selling price for the houses at $5.499 million, "nearly $600,000 higher than the budgeted selling price." (Id., ¶30).

**Response:**   **Undisputed**.

---

[1] Century 21 is not a defendant. It was, however, a defendant in the state court incarnation of this complaint. The pronoun "Defendant" appears to be a vestige from the earlier state court pleading.

11.    The plaintiffs allege, "upon information and belief," that in March, 2015, Tatiana received a "bona fide offer" to purchase one of the properties for $4.5 million and failed to present it to Filippov. (Id., ¶¶31, 32).

**Response:  Undisputed**.

12.    Plaintiffs allege that Tatiana did "little or nothing to market" the properties.  (Id., ¶33).

**Response:  Undisputed**.

13.    In April, 2015, plaintiffs allege that Kagan [not Tatiana] called Filippov and asked him to sign a new listing agreement for one of the properties, 55 Lyman Street.  Filippov claims that he refused to sign the new listing agreement and stated his intention to list the properties with someone else. (Id.)

**Response:  Undisputed.**

14.    Despite his refusal to sign the listing agreement, "Kagan [not Tatiana] unilaterally executed a purported listing agreement with his wife and Century 21…" (Emphasis added)(Id., ¶34).

**Response:  Undisputed** that the quoted text, absent the bracketed [not Tatiana] appears in the Amended Complaint.  **Disputed**, however, to the extent the quotation is intended to insinuate that Tatiana is not responsible for the listing agreement "with his wife [Tatiana] and Century 21."  <u>See</u> <u>also</u> Response No. 4 (explaining in detail Tatiana's conduct).

15.    Plaintiffs then plead that "upon information and belief, based on the fact that the Kagans are married and business partners, Mrs. Kagan also knew or should have known that her husband did not have authority to sign the listing agreement and that Mr. Filippov had refused to sign it." (Id. ¶35).

**Response:  Undisputed**.

16.     Plaintiffs point to a letter sent on May 7, 2015 on behalf of Kagan [not Tatiana] wherein he allegedly made fabricated claims that it was Filippov who set the selling price for the homes and refused to lower that price when requested to do so by Kagan.  (Id., ¶36, Perten Aff., Exh. 5).

**Response:  Undisputed** that the Pyle letter is dated May 7, 2015 and that it contains fabricated claims.  **Disputed** to the extent the assertion (unsupported by any evidence) is intended to insinuate that Tatiana had nothing to gain from the Defendants extortionate scheme.

17.     Plaintiffs claim that the "Kagans" knew that sending the letter would "engender a dispute," and that they intentionally entered into the unauthorized listing agreement with Century 21 in April "to give themselves unfair leverage" in connection with the demand letter.  (Id., ¶38).

**Response:  Undisputed.**

18.     Lyman-Cutler filed suit against Kagan, Tatiana and Century 21 in the Middlesex Superior Court.

**Response:  Undisputed**, by way of further answer, however, Plaintiffs state that they first repeatedly requested that Century 21 step aside and allow Filippov to retain a different broker.  See Perten Aff. Ex. 21.

19.     Through discovery in that action, Plaintiffs claim to have learned, for the first time, about a listing agreement with Century 21 which had been signed by Kagan [not Tatiana] on August 12, 2014.  (Id., ¶¶39, 41).

**Response:  Undisputed.**

20.     Plaintiffs claim that the duration of this listing agreement, eighteen months, was unreasonably long.  Plaintiffs allege that Tatiana knew or should have known that her husband had no authority to sign that listing agreement.  (Id., ¶40).

**Response:  Undisputed.**

21.     Plaintiffs allege against Tatiana is that "[t]he Kagans have complete control over both KDC and ProExcavation and at all times controlled the funds of the Company [defined as Lyman-Cutler].  They allegedly abused their fiduciary position of power and trust to inflate charges and fraudulently milk the project for their own unjust enrichment." (Id., ¶ 48).

**Response:  Undisputed.**

22.     Tatiana was not a member or manager of Lyman-Cutler and did not have signatory power on Lyman-Cutler's bank account.

**Response:  Undisputed.**

23.     In the Complaint, Count III alleges that Tatiana "knowingly and intentionally aided and abetted Kagan's breach of his fiduciary duty to the Plaintiffs." (Id., ¶61).

**Response:  Undisputed.**

24.     Count IV alleges that Tatiana is liable for fraud by conspiring to have her husband sign the listing agreements despite knowing that he did not have authority to do so.

**Response:  Undisputed.**

25.     Plaintiffs allege she is "individually responsible for the fraudulent acts of KDC and ProExcavation" solely "because she is an owner and director of both Companies." (Id., ¶65).

**Response:  Disputed.**  Tatiana misstates the allegation of the Complaint, which says:

Tatiana Kagan has individually participated in fraud by conspiring with her husband to have him sign contracts with her when she knew her husband did not have authority to sign either of the listing agreements with her.  Tatiana is also

responsible for the fraudulent acts of KDC and ProExcavation because she is an owner and director of both Companies.

26.    Count V alleges that Tatiana and all the other defendants "have conspired to defraud the Plaintiffs." (Id., ¶70).

**Response:  Undisputed.**

27.    Count VI alleges that Tatiana violated M.G.L. c. 93A "by asserting two knowingly unauthorized and fraudulent listing agreements…" (Id., ¶73).

**Response:  Undisputed.**

28.    The plaintiffs do not assert a negligence claim against Tatiana arising from her conduct as the listing agent for the properties.

**Response:  Undisputed.**

29.    In June, 2015, at the request of Filippov, Century 21 voluntarily removed Tatiana as the listing agent and replaced her with Michelle Lane, another Century 21 agent. After the filing of the bankruptcy petition, the Debtor moved to reject the Century 21 listing agreements, which motion was allowed.  (Docket No. 42). Thereafter, the Trustee engaged Deborah Gordon of Coldwell Banker to list the properties in Century 21's stead.  (Docket No. 47).  The bankruptcy trustee listed the properties at $4.5 million and each sold for $4.4 million, without objection as to the sale price.[2]  (Docket Nos. 67, 75).

**Response:  Undisputed.**

30.    Tatiana did not have any role in the development of this project other than acting as the listing agent trying to sell the properties.  She played no role in the construction of the

---

[2]    Plaintiffs filed a limited objection to ensure that Tatiana did not receive a commission for her efforts. Given the complete lack of support for the allegations against, as set forth therein, this insistence was nothing but spite.  **Disputed.**  This is nothing but rhetoric from counsel, contrary to the mountain of evidence against the Defendants.

homes other than assisting with paint color selections. (Tatiana dep. at 14- 15, Perten Aff., Exh.

19).

**Response:** **Disputed**. <u>See</u> Response No. 4 above.

31.     She had no knowledge regarding KDC's activities on the project. (Id.).

**Response:** **Disputed.** Tatiana's self-serving testimony does not establish that she had

"no knowledge regarding KDC's activities on the project." <u>See</u> Response No. 4 above.

32.     She had no input into the financial records of either KDC or ProExcavation. (Id.

at 19).

**Response:** **Disputed.** <u>See</u> Response No. 4 above (in particular stating that she gave her

checks to Dan Gersh, CFO of KDC).

33.     Tatiana also never even saw the Operating Agreement for Lyman-Cutler. (Id. at

22).

**Response:** **Disputed.** Tatiana's self serving testimony does not establish this fact.  It is

fair to infer from the other facts and circumstances that she has seen it. <u>See</u> Response No. 4

above; Perten Aff. <u>Ex. 21</u>.

34.     Filippov testified that he understood from the outset that Tatiana would be

responsible for the sales and marketing of the properties.  (Fillipov dep. at 47, Perten Aff., Exh.

2).

**Response:** **Undisputed** but Filippov also understood he could remove her.  Filippov

Dep. at 138-40, 149-51, 220, attached to the Second Carnathan Aff. as <u>Ex. 21</u>; Carnathan Aff.

<u>Ex.1</u> § 6.1(b)(6).

35.     Filippov claims to have had only two communications with Tatiana over the course of the entire Project. The first occurred in July, 2014, a year and a half after the creation of Lyman-Cutler, wherein she allegedly told them that there was a lot of interest in the homes.

**Response:**  Tatiana cites no evidence in support of this assertion and so no response is required.  In any event, **Disputed**.  See Perten Aff. Ex. 10, ATI No. 1.

36.     The second communication occurred nine months later, in April, 2015, when Filippov and Tatiana "exchanged a text message that has been produced in discovery."  (Filippov Resp. to Int. No. 1 propounded by Tatiana, Perten Aff., Exh. 10; Debtor Resp. to Int. No. 1 propounded by Tatiana, Perten Aff., Exh. 11).

**Response:**  **Undisputed** that there was a text message from Tatiana in April 2015 produced in discovery.

37.     Lipetsker, for his part, claims to have never spoken with Tatiana. (Lipetsker Int. Ans. No. 1 propounded by Tatiana, Perten Aff., Exh. 12).

**Response:**  **Disputed.**  What Lipetsker says is he does not recall having spoken to her about the Project.

38.     At his deposition, Filippov recalled an additional communication with Tatiana. He testified that he met Tatiana at a social engagement, a dinner, sometime after agreeing to work together with Kagan and he was comfortable with her when he learned that she, like he, had grown up in St. Petersburg, Russia. (Filippov dep. at 66).

**Response:**  **Undisputed** that Filippov testified concerning a social engagement.

39.     At his deposition, Lipetsker testified that he rarely, if ever, spoke to Tatiana during construction. (Lipetsker dep. at 51, Perten Aff., Exh. 6).

**Response:**  **Undisputed.**

40.     Filippov testified that the actual plan was to sell the properties for between $5 million and $5.25 million.  (Fillipov dep. at 46, 51).

**Response:  Undisputed.**

41.     Filippov testified that when the first home was listed [88 Cutler Lane], Kagan sent him a text message to let him know that the property was listed.  (Id. at 91).  After receiving Kagan's text, Filippov testified that he went on-line to review the listing and observed that the listing price was $5.5 million. (Id. at 92).

**Response:  Undisputed.**

42.     Upon noting that the listing price was $5.5 million, Filippov asked Kagan [not Tatiana] if he thought that that the listing price was reasonable.  According to Filippov, Kagan told him that it was a reasonable listing price and Filippov voiced no further concern.(Filippov dep. at 92).  Filippov then asked Kagan why both properties were not listed simultaneously, and Kagan advised that he did not want people to think the two adjacent homes were "cookie cutter" copies of each other as that could adversely affect the selling price.  (Id.).  Filippov also noted a discrepancy in the property description set forth in the listing, the square footage of the home was understated, and had Tatiana fix that listing error.  (Id. at 91).

**Response:  Undisputed.**

43.     Lipetsker testified that he too was aware that the properties were listed at $5.5 million and voiced no objection to that listing price.  (Lipetsker dep. at 48).

**Response:  Undisputed.**

44.     When 88 Cutler Lane did not sell as quickly as everyone had hoped, it was removed from the listing service and the other property, 55 Lyman Road, was listed [in April 2015]. (Filippov dep. at 92).

**Response:  Undisputed.**

45.     Filippov testified that he was also aware of this listing and knew that the listing price for this property too was $5.5 million. (Id. at 93).

**Response:  Undisputed.**

46.     He voiced no objection to the $5.5 million listing price. (Id.).

**Response:  Undisputed.**

47.     Filippov testified that he had no conversations whatsoever with Tatiana about the fact that the properties were listed or about the price at which they were listed. (Id. at 94).

**Response:  Undisputed.**

48.     Filippov recalled that both Tatiana and Kagan reached out to him in April, 2015 about signing a new listing agreement, and he believes that he may have spoken to both of them about that listing.  (Id. at 213).

**Response:  Undisputed.**

49.     Tatiana texted him on April 23, 2015 and asked him to call her about the listing. Filippov admits he received her text.   (Id.).

**Response:  Undisputed.**

50.     He also admits that he received an additional text from Kagan that same day which stated, "We have to put 55 Lyman on the market and take 88 Cutler off … We need you to sign C21s agreement to put it on the market."  (Id. at 213, Exh. 23, Perten Exh. 13).

**Response:  Undisputed.**

51.     Filippov admits that on April 24, 2015, Tatiana sent him an unsigned copy of the listing agreement for 55 Lyman Road to review. (Id. at 214, Exh. 25; Perten Aff., Exh. 22).

**Response:  Undisputed.**

52.     After reviewing the proposed listing agreement, the only concern he raised related to Tatiana's commission rate.  He raised no other objection and received a satisfactory response to his question regarding Tatiana's commission rate. (Id., Exh, 26, Perten Aff., Exh. 14).

**Response:  Disputed**.  Filippov asked about the commission rate, but never authorized Kagan or Tatiana to sign it.  See Filippov Dep. at 212-19.  Tatiana and Kagan knew for a fact that Filippov had not authorized them to sign the listing agreement and did so anyway.  Alex Filippov's Supplemental Answers to Kagan Development KDC Corp.'s First Set of Interrogatories, Sept. 2018 ("Filippov Supp. ATI") No. 5 at 4, attached to the Perten Aff. as Ex.7.

53.     Dan Gersh ("Gersh") is KDC's CFO. (Gersh dep. at 20, Perten Aff., Exh. 15).

**Response:  Undisputed.**

54.     On April 28, 2015, he confirmed back to Filippov by e-mail "Per our earlier conversations, we signed the agreement with C21 to put 55 Lyman on the market, as agreed. Please confirm receipt of this e-mail."  (Filippov dep. at 216, Exh. 27, Perten Aff, Exh. 16)([Emphasis added).

**Response:  Undisputed.**

55.     Filippov immediately replied, "I confirm.  Thank you."

**Response:**      Tatiana cites nothing in support of this assertion and so no response is required.  **Undisputed,** nevertheless, that Filippov replied, confirming receipt of the email and nothing more.  See Filippov Dep. at 216.

56.     Upon receiving Filippov's confirmation, Gersh responded: "Greatly appreciate the quick response. If you have any questions during the selling/closing process, please feel free to reach out to me." (Id.)

**Response:  Undisputed.**

57.     Later that afternoon, Tatiana too texted Filippov to confirm that she was authorized to list the properties. Filippov texted back "I sent confirming e-mail to Dan [Gersh]". (Filippov dep. at 212-13; Exh. 22, Perten Aff., Exh. 17).

**Response:  Disputed**.  The cited materials do not support that assertion beyond the fact of the texts.  By way of further answer, Plaintiffs state that being authorized to list a property and receiving a 6-month exclusive listing that the Kagan Defendants would later refuse to relinquish despite the terms of the Operating Agreement are two very different things.  See Response No. 4.

58.     When shown these texts and e-mails at his deposition, Filippov claimed that he had not focused on the word "signed" in Gersh's e-mail and simply intended to confirm that the agreement had been "received".  (Filippov dep. at 217).

**Response:  Disputed**.  Tatiana mischaracterizes the testimony.  What Filippov says is that the email asked him to "confirm receipt of this email," and he confirmed receipt.  Filippov Dep. at 216-17.  See Response No. 57.

59.     He testified that he knew that "they put it on the market and listed it." (Id.).

**Response:  Undisputed.**  Again, being aware that they listed the property, which everyone wanted, and understanding that the Kagans had signed a 6-month exclusive listing that the Kagan Defendants would later refuse to relinquish despite the terms of the Operating Agreement are two very different things.  See Response No. 4.

60.     Filippov also confirmed that despite Gersh's telling him that the agreement was signed and the property listed, and the fact that Gersh referenced the selling/closing process that would now proceed, he never sent any e-mail, text message or other communication stating that he did not authorize the signing of the agreement or the listing of the property.  (Id. at 218).

**Response:  Undisputed**.  See Response No. 59.

61.     He also conceded that had he told Gersh that he would not authorize the signature of the listing agreement, Gersh's "Thank you" follow up would have been quite odd. (Id. at 219).

**Response:  Undisputed**.  It is not difficult to see, however, that there was a misunderstanding between Gersh and Filippov.

62.     In response to interrogatories, plaintiffs revealed that the source for their information about the "offer" was another broker, Deborah Gordon, and that there was no written offer.  (Filippov's Resp. to Tatiana's Int. No. 3, Perten Aff., Exh. 10).

**Response:  Undisputed.**

63.     Ms. Gordon was the agent who ultimately received the listing for the properties after this Court approved the rejection of the executory Century 21 listing agreements.

**Response:  Undisputed.**

64.     When the Trustee subsequently moved for authority to engage Ms. Gordon as the listing agent once the Century 21 contracts were rejected, Debtor failed to disclose its prior relationship with Ms. Gordon nor that she likely would be a central witness if there truly was any merit to the allegations regarding the alleged offer.  Similarly, as part of the application to employ her, Ms. Gordon denied any "connection" to Debtor, parties in interest, or creditors.  See Docket No. 47.

**Response:  Disputed.**  Ms. Gordon's conversation with the Debtor's representative does not create "relationship" that would defeat the standard of disinterestedness and disqualify her for retention by the Trustee. See 11 U.S.C. § 327.

65.     Tatiana testified at her deposition that she received a single phone call from Ms. Gordon.  Ms. Gordon told her that she had a client that might be interested in making an offer, but it never materialized.  Ultimately, Ms. Gordon told Tatiana that her client elected not to make

an offer because the client was not qualified to purchase a home at that price. (Tatiana dep. at 43,
Perten Aff, Exh. 18).

**Response:**  **Undisputed** that Tatiana so testified.

66.     Ms. Gordon too had no memory whatsoever of having her client, a Ms. Franklin,
ever actually make an offer for the Lyman-Cutler properties, and no memory of ever speaking
with Tatiana about such an offer.  (Gordon dep. at 36-38, 41, Perten Aff., Ex. 19). She testified
that it is not uncommon for a buyer's broker to call and feel out the listing broker as to whether
there are other offers or what kind of money the sellers might be looking for, though she had no
recollection of doing so on this occasion. She agreed, however, that until a written offer is
obtained, there is no binding offer for the listing agent to convey to the seller.  (Id. at 31).

**Response:**  **Disputed**.  Ms. Gordon testified that her client Alana Franklin was interested
in one of the Lyman Cutler properties and arranged a showing for her.  Id. at 36-37.  She testified
that she did not think she had given Tatiana a written offer, but even if she had, there would be
no written record of it.  Id. at 38, 41.  When Ms. Gordon reviewed her more contemporaneous
email correspondence with Filippov dated June 2, 2015, Ms. Gordon agreed that she confirmed
at that time that Ms. Franklin had made an offer of $4.5 million for 88 Cutler Lane about 3
weeks prior to the email exchange and that her memory was better then than it was at the time of
her deposition.  Id. at 46-48.  The email exchange further states that Tatiana "countered at $5
million."  Id. at 48.  Ms. Franklin bought another property, which suggests she was a qualified
buyer.  Id.

67.     In interrogatories, Tatiana asked for details as to the damages which plaintiffs
sought to collect from her.  Each of the defendants answered identically:

[Filippov, Lipetsker, LLC] objects to this interrogatory as premature. Discovery is
ongoing and damages are subject to expert analysis and report which will be produced in due

course. In general terms, Tatiana is liable for damages for failing to convey the offer for 88 Cutler, failing to competently market the Properties, supporting the enforcement of listing agreements she knew to be fraudulent, and for participating in the Defendants' scheme to overbill the Project.

(Filippov, Lipetsker and Lyman-Cutler Resp. to Tatiana Interrogatory No. 4, Perten Aff., Exh. 20).

**Response:  Undisputed.**

68.    After expert disclosures, plaintiffs supplemented their interrogatory responses. (Perten Aff., Exh. 20). Again, each plaintiff provided identical answers to Interrogatory No. 4 which effectively said nothing:

Tatiana is equally culpable along with the other Defendants for the wrongful conduct described in the LLC's supplemental response to the interrogatories propounded to it by KDC, which are incorporated by reference. The LLC asserts that Tatiana is jointly and severally liable for all damages described in those supplemental responses.

**Response:  Undisputed.**  See Plaintiffs' Responses to the Concise Statement of Material Facts Submitted by Vadim Kagan, Kagan Development KDC Corp. and ProExcavation Corp. in Support of Motion for Summary Judgment on the Amended Adversary Complaint and Claims Nos. 1, 4, 6,and 7, Dec. 7, 2018 ("Plaintiffs Disputed Facts") ¶ 33 (outlining damages).

69.    Plaintiffs claim that Tatiana failed to competently market the properties. Tatiana testified at her deposition that she held multiple public open houses, multiple broker's only open houses, advertised, reached out to brokers who typically represent high end purchasers, contacted anyone she knew who might have a potential buyer, and made multiple individual showings to potential purchasers.  (Tatiana dep. at 38-41).

**Response:  Undisputed** that Plaintiffs challenge Tatiana's marketing and that Tatiana testified along the lines described.  **Disputed** that Tatiana's self-serving testimony establishes the adequacy of her marketing efforts.

70.    Century 21 provided a summary of all the efforts it made.  (Keily Affidavit;

Perten Aff., Ex. 21).

**Response:**  **Undisputed.**  By way of further answer, Plaintiffs note that Mr. Keily's

account of all of Century 21's efforts contradicts Tatiana's testimony.  Compare Perten Aff. Ex.

21 with Tatiana testimony recounted in Assertion No. 69 above.

71.    Tatiana is not a party to the Operating Agreement and testified that she had never

seen the Operating Agreement.  (Tatiana dep. at 22).

**Response:**  **Undisputed.**

72.    The Operating Agreement provides that if the members wish to remove the listing

from Tatiana prior to December 31, 2014, they can do so only by a vote of 81% of the members.

(Operating Agreement, §6.1(b)(6), Perten Aff., Ex. 1).  It does not set any outside limit on the

duration of any agreement with Tatiana.

**Response:**  **Undisputed**.  By way of further answer, Filippov and Lipetsker together held

90% of the membership interest and so were entitled to remove Tatiana at any time.  The

Operating Agreement does not guarantee Tatiana any minimum period as listing agent.

Operating Agreement § 6.1(b)(6).

73.    When the Trustee moved to sell the properties, Plaintiffs did not object to the sale

price. Plaintiffs' only objection was that they wanted to ensure that Tatiana did not get a

commission for the sale. (Docket No. 82).

**Response:**   **Disputed.**  The Limited Objection objects to the payment of a commission to

Century 21 and outlines the reasons why.  (Doc. No. 82).

74.    Tatiana filed a proof of claim (Claim No. 5) seeking indemnity under Section 10.2

of the Operating Agreement.  Section 10.2 provides:

The Company shall indemnify and hold harmless the Members and their respective employees and authorized agents from and against any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member, employee or authorized agent in good faith on behalf of the Company and reasonable believed to be within the scope of authority conferred by this Agreement, except that no Member, employ or authorized agent shall be entitled to be indemnified or held harmless from or against any loss, damage or claim incurred by reason of such Member's, employee's or authorized agent's gross negligence or willful misconduct.

**Response:**  **Undisputed.**

75.     The Operating Agreement itself which specifically identifies Tatiana as the listing agent. (Oper. Agr., §6.1(b)(6)).

**Response:**  **Disputed** as set forth in Response No. 3.   By way of further response, Plaintiffs state that during the time that Tatiana was the listing agent, she was acting as an agent for the LLC and not for any of the Members.  See Plaintiffs' Memorandum in Support of their Motion for Summary Judgment, Nov. 16, 2018 and supporting documentation.

LYMAN-CUTLER, LLC,
By its attorney,

ALEX FILIPPOV and
NICKOLAY LIPETSKER,
By their attorneys,

/s/ Peter Tamposi
Peter N. Tamposi, BBO No. 639497
The Tamposi Law Group, P.C.
159 Main Street
Nashua, NH 03060
T: (603) 204-5513

/s/ Sean T. Carnathan
Sean T. Carnathan, BBO No. 636889
scarnathan@ocmlaw.net
Joseph P. Calandrelli, BBO No. 666128
jcalandrelli@ocmlaw.net
O'Connor, Carnathan and Mack, LLC
1 Van de Graaff Dr. Suite 104
Burlington, MA 01803
T:  781-359-9000

Dated:  December 7, 2018

**Certificate of Service**

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on December 7, 2018.

/s/ Sean T. Carnathan
Sean T. Carnathan

4832-7590-8994, v.  1