# EXHIBIT 1

COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, SS
SUPERIOR COURT DEPT.
C.A. No.

| | |
|---|---|
| LYMAN-CUTLER, LLC, | ) |
| | ) |
| Plaintiff, | ) |
| | ) |
| v. | ) |
| | ) |
| VADIM KAGAN, TATIANA KAGAN, and | ) |
| CENTURY 21 COMMONWEALTH | ) |
| | ) |
| Defendants. | ) |

## VERIFIED COMPLAINT

Plaintiff Lyman-Cutler, LLC brings this Complaint against Defendants Vadim Kagan,

Tatiana Kagan, and Century 21 Commonwealth ("the Kagan Defendants") and states as follows:

## INTRODUCTION

1.      Plaintiff brings this action for immediate injunctive relief and to recover damages for

breach of contract, breach of fiduciary duty and related claims, arising out of the willful and

intentional misconduct of husband and wife Vadim and Tatiana Kagan, acting together in a self-

dealing conspiracy to execute a knowingly unauthorized and fraudulent listing agreement for two

homes owned by Plaintiff Lyman-Cutler LLC, a joint venture among Plaintiff's affiants Alex

Filippov and Nickolay Lipetsker and Defendant Vadim Kagan.

## PARTIES

2.      Plaintiff Lyman-Cutler LLC ("LCLLC" or the "Company") is a Massachusetts

limited liability formed in November 2012 with a principal place of business in Belmont,

Massachusetts.

3.     Defendant Vadim Kagan is an individual residing in Newton, Massachusetts.

4.     Defendant Tatiana Kagan is an individual residing in Newton, Massachusetts.

5.     Century 21 Commonwealth is a Delaware limited liability company with an office in Brookline, Massachusetts.

## JURISDICTION AND VENUE

6.     This Court has jurisdiction over the Defendants pursuant to G.L. c. 223A, § 2, because the Defendants reside or maintain their principal place of business in Massachusetts.

7.     Venue is proper in this court pursuant to G.L. c. 223, § 1, because the Plaintiff's principal place of business is in Middlesex County.

## FACTUAL BACKGROUND

8.     In October 2012, Mr. Lipetsker and Mr. Kagan approached Mr. Filippov and asked him to invest in a real estate development project they planned for a property in Brookline, Massachusetts (the "Project").

9.     In general terms, the Project involved the purchase of land in Brookline, Massachusetts to subdivide into two parcels and then construct on each separate parcel a high-end single family home.

10.     Mr. Lipetsker and Mr. Filippov were investors in the Project and Mr. Kagan, through his company, Kagan Development, was to serve as the general contractor for the Project.

11.     On or about October 25, 2012, as an inducement to Mr. Filippov and Mr. Lipetsker invest in the Project, Mr. Kagan presented to Mr. Filippov and Mr. Lipetsker a detailed budget and forecast of estimated returns on an investment in the Project (the "Kagan Presentation"). A true copy of the presentation is attached to this Complaint as **Exhibit 1**.

12.     Mr. Filippov and Mr. Lipetsker reasonably relied upon the Kagan Presentation in making their decision to invest in the Project.  Mr. Filippov invested $2 million and Mr. Lipetsker invested $250,000.

13.     In November 2012, Mr. Kagan, Mr. Filippov and Mr. Lipetsker formed a Massachusetts limited liability company, Plaintiff Lyman-Cutler LLC.  A true copy of the LLC Operating Agreement is attached to this Complaint as **Exhibit 2**.

14.     In return for their respective investments, Mr. Fillipov received an 80% interest in LCLLC, and Mr. Kagan and Mr. Lipetsker each received 10%.

15.     The LCLLC Operating Agreement expressly names Mr. Filippov as the managing member, and expressly enumerates his rights and authority as managing partner, including the exclusive authority to control the sale of the two new homes and the retention of any real estate brokers to sell them.

16.     Mr. Kagan's budget for the Project required $1.3 million for the construction of each home, which the parties understood would be paid to Kagan Development.  The budget forecast the need for an additional $200,000 for the "carrying costs" for the properties until such time as they could be sold, for a total budget for the construction, carrying and sale of each new home of $1.5 million.

17.     When it came time to borrow the additional funds necessary for the Project, Mr. Kagan persuaded Mr. Filippov that they should borrow an additional $100,000 for each new home for unexpected costs over and above the budget.  Mr. Filippov agreed.

18.     Accordingly, LCLLC borrowed $1.6 million for the construction and carrying costs of each new home. The LLC also borrowed an additional $1.6 million to finance the balance of the purchase price for the land for the Project.  In the aggregate, the LLC has

borrowed $4.8 million of which $3.2 million has been expended by Vadim Kagan, purportedly to finance construction and carrying costs for the Project. True copies of the two mortgages are attached hereto as **Exhibits 3 and 4.**

19.      At no time since October 25, 2012 did Mr. Kagan ever provide to Mr. Filippov or Mr. Lipetsker an updated budget or forecast for the costs of the Project. At no time during the construction of the homes did Mr. Kagan ever tell Mr. Filippov or Mr. Lipetsker that there were any cost overruns on either of the new homes. As recently as April 2015, Mr. Kagan expressly told Mr. Filippov that the construction and carrying costs for the two new homes were within budget.

20.      Throughout the life of the Project, Mr. Kagan had check-writing authority on the LCLLC bank account and drew funds from the account at will. Mr. Filippov monitored the withdrawal of funds from the account and tried to keep the books for the Project, but Mr. Kagan failed and refused to provide any invoices, receipts or other documentation for his withdrawals from the account. As of the date of this Complaint, Mr. Kagan has drawn down essentially all of the $3.2 million borrowed by LCLLC purportedly to finance construction and carrying costs, but has provided almost no documentation to support his expenditures.

21.      Under the express terms of the LLC Agreement, Mr. Kagan was responsible for completing construction of the two new homes no later than March 30, 2014 in accordance with plans and drawings approved by Mr. Filippov.

22.      Mr. Kagan failed to complete the construction of the two new homes on or before March 30, 2014. On the contrary, construction was not complete until October 2014.

23.      The address of one of the new homes is 55 Lyman Road, Brookline, Massachusetts.

24.     The address of the second of the new homes is 88 Cutler Lane, Chestnut Hill,
Massachusetts.

25.     The Project plan was to sell the two new homes by no later than November 2014
for projected selling prices of $4,900,000 each.

26.     Mr. Kagan's wife, Defendant Tatiana Kagan, is a real estate agent affiliated with
Defendant Century 21. Mrs. Kagan is also an officer and director of Kagan Development.

27.     At Mr. Kagan's request, Mr. Filippov and Mr. Lipetsker agreed that LCLLC
would list the new homes for sale with Mrs. Kagan. The LCLLC Agreement, however, provided
that the obligation to use Mrs. Kagan expired on December 31, 2014 and that only Mr. Filippov
as managing member had the authority to retain real estate brokers for the sale of the new homes.

28.     Without consulting Mr. Filippov or Mr. Lipetsker, the Kagans set the selling price
for each home at $5,499,000, or nearly $600,000 higher than the budgeted selling price for each
home. As of the date of this Complaint, neither home has been sold.

29.     Upon information and belief, based upon a statement by another real estate broker
in the Brookline area, in or about March 2015, a potential buyer made a bona fide offer of $4.5
million to buy the new home located at 88 Cutler Road, which Mrs. Kagan failed to present to
Mr. Filippov to consider.

30.     Upon information and belief, Mrs. Kagan rejected the offer and countered at $5
million, all without informing Mr. Filippov that an offer had been received. She thereby
breached her duty to the Company as a real estate agent. The buyer has since purchased another
home.

31.     By late April 2015, with the homes still unsold, Mr. Kagan called Mr. Filippov
and asked him to sign a new listing agreement with his wife to continue to try to sell the two new

5

homes. Unhappy that the homes remained unsold months beyond the Project's planned

completion date, Mr. Fillipov refused and stated his intention to seek other assistance.

32.     Without any authority whatsoever, and with actual knowledge that Mr. Filippov

had the sole authority to retain real estate brokers and that he had refused to sign the listing

agreement with Mrs. Kagan, Mr. Kagan executed a purported listing agreement with Century 21

shortly after Mr. Filippov refused to sign the agreement. A true copy of the unauthorized listing

agreement is attached hereto as **Exhibit 5.**

33.     Upon information and belief, based upon the fact that the Kagans are married and

business partners, Mrs. Kagan also knew or should have known that her husband did not have

authority to sign the listing agreement and that Mr. Filippov had refused to sign it.

34.     Because Mrs. Kagan is an agent of Century 21 Commonwealth, Mrs. Kagan's

knowledge is attributable to Century 21 Commonwealth.

35.     After signing the unauthorized listing agreement, Mr. Kagan forwarded a copy to

Mr. Filippov purporting to have signed it as they agreed. This statement is false. Mr. Filippov

never agreed that Mr. Kagan could sign the listing agreement; he expressly refused to sign it

himself.

36.     Shortly after that, on May 7, 2015 Mr. Kagan, through counsel, wrote to Mr.

Filippov making fabricated claims that Mr. Filippov had set the listing price for the two new

homes and had refused to reduce the price. To the contrary, the Kagans set the selling price

without ever consulting Mr. Filippov or Mr. Lipetsker (and indeed responded to an offer in

March 2015 without ever informing Mr. Filippov or Mr. Lipetsker). A true copy of the letter

from Mr. Kagan's attorney is attached to this Complaint as **Exhibit 6** (the "May Letter").

6

37.     In addition, Mr. Kagan claimed for the first time that he had cost overruns on the Project adding up to over $1 million and announced that he would no longer meet his obligation to pay for the carrying costs on the Project as required by Article 8.1 of the LCLLC Agreement.

38.     Upon information and belief, the Kagans knew that their demands in the May Letter would engender a dispute with the Company and the other members, Mr. Fillipov and Mr. Lipetsker, and they knowingly and intentionally entered into the fraudulent, unauthorized listing agreement shortly before sending the letter knowing full well that Mr. Filippov had refused to sign it.

## COUNT I

### BREACH OF CONTRACT by the COMPANY against VADIM KAGAN

39.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

40.     The LLC Agreement is a binding agreement, which states the Parties' rights, obligations and authority to act on behalf of the LLC.

41.     Mr. Kagan has breached the LLC Agreement in multiple ways, including, without limitation by:

    a.  Failing to complete construction of the new homes on time;

    b.  Signing a listing agreement with his wife, Tatiana Kagan, that he knew he lacked authority to sign;

    c.  Shortly thereafter asserting substantial claims against the Company for unauthorized, untimely and unsubstantiated cost overruns; and

    d.  Refusing to honor his obligation to pay the monthly carrying costs when the new homes did not sell within 23 months of the date of acquisition.

42.     As a result of Mr. Kagan's breach of the LLC Agreement, the Company has suffered damages in an amount to be determined at trial.

## COUNT II

## BREACH OF FIDUCIARY DUTY by the COMPANY against VADIM KAGAN

43.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

44.     At all relevant times, Mr. Kagan has owed a fiduciary duty to the Company.

45.     Mr. Kagan has breached his fiduciary duty to the Company by the conduct described in this Complaint.

46.     As a result of Mr. Kagan's breaches of his fiduciary duty to them, Plaintiff has suffered damages for which Mr. Kagan is liable in an amount to be determined at trial.

## COUNT III

## AIDING AND ABETTING BREACH OF FIDUCIARY DUTY by the COMPANY against TATIANA KAGAN and CENTURY 21 COMMONWEALTH

47.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

48.     Tatiana Kagan and Century 21 Commonwealth knowingly and intentionally aided and abetted Mr. Kagan's breach of his fiduciary duty to the Company.

49.     As a result of aiding and abetting Mr. Kagan's breach of fiduciary duty, Plaintiff has suffered damages for which Tatiana Kagan and Century 21 Commonwealth are liable in an amount to be determined at trial.

## COUNT IV

## FRAUD by the COMPANY against CENTURY 21 COMMONWEALTH, VADIM KAGAN and TATIANA KAGAN

50.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

51.     Mr. Kagan knowingly and intentionally executed a listing agreement with his wife, Tatiana Kagan, that he knew Mr. Filippov had refused to sign, shortly before disavowing his obligation to pay the carrying costs for the Project and asserting substantial unauthorized, untimely and undocumented claims against the Company for cost overruns.

52.     After signing the listing agreement with actual knowledge that it was unauthorized, Mr. Kagan has falsely stated that Mr. Fillipov authorized him to sign the listing agreement.

53.     Upon information and belief, Tatiana Kagan knows that her husband did not have authority to sign the listing agreement with her and her knowledge is attributable to Century 21 Commonwealth.

54.     As a result of this fraudulent conduct by the Kagans, the Company has suffered and may suffer further damages for which the Kagans should be held liable in an amount to be determined at trial.

## COUNT V

### CONSPIRACY against VADIM KAGAN, TATIANA KAGAN, and CENTURY 21 COMMONWEALTH

55.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

56.     Through the conduct described herein, Vadim Kagan, Tatiana Kagan and Century 21 Commonwealth have conspired to execute a knowingly fraudulent and unauthorized listing agreement.

57.     As a result of their unlawful conduct in furtherance of their conspiracy, each co-conspirator is jointly and severally liable to the Company for damages in an amount to be determined at trial.

## COUNT VI

### VIOLATION OF M.G.L. ch. 93A by the COMPANY against TATIANA KAGAN and CENTURY 21 COMMONWEALTH

58.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

59.     By asserting a knowingly unauthorized and fraudulent listing agreement against the Company, Tatiana Kagan and Century 21 Commonwealth have violated M.G.L. ch. 93A.

60.     By asserting knowingly fraudulent charges against the Company, Kagan Development has violated M.G.L. ch. 93A.

61.     For their violations of M.G.L. ch. 93A, Defendants Tatiana Kagan, Kagan Development and Century 21 Commonwealth are liable to the Company in an amount to be determined at trial, together with multiple damages and attorneys' fees.

## COUNT VII

### DECLARATORY JUDGMENT

62.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

63.     The parties have a bona fide dispute about their rights and obligations under the listing agreement, which constitutes a cloud on the title of the Properties, and which the Court can resolve by declaring the rights and duties thereunder.

64.     The Court should declare that:

a.   Vadim Kagan had no authority to execute the listing agreement and that the listing agreement is invalid;

b.   Vadim Kagan is liable for the carrying costs he is currently refusing to pay; and

c.   Article VIII of the LCLLC Agreement    allows the Company to reduce Vadim Kagan's share of the profits as a result of his wrongful conduct.

## COUNT VIII

### PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF by the COMPANY against TATIANA KAGAN and CENTURY 21 COMMONWEALTH

65.     Plaintiff repeats and realleges the foregoing allegations as if fully set forth herein.

66.     Despite having had the opportunity to sell the two new homes since October 2014, Tatiana Kagan and Century 21 Commonwealth have failed to do so. In that time, they have failed to honor their obligation to present a bona fide offer to the managing member (and only party authorized to sell the two new homes), and have engaged in a conspiracy with Vadim Kagan to execute a fraudulent, unauthorized listing agreement.

67.     Despite repeated demand, Century 21 Commonwealth has refused to remove its listings for the two new homes from the multiple listing service, refused to acknowledge the invalidity of the listing agreement and has blocked the Company from retaining new brokers in whom it has confidence to sell the two new homes.

68.     The Company has interviewed and has two other brokers lined up to take over selling the two homes, but cannot do so because Century 21 Commonwealth refuses to remove its listings from the multiple listing service.

69.     The Company does not trust Mrs. Kagan or Century 21 Commonwealth and does not believe they are suited to selling these properties.

70.     The selling season is passing rapidly and the Company will suffer potentially irreparable harm if it cannot list the two new homes promptly with brokers of its choosing.

71.     The Court should order Century 21 to remove its listings for the two new homes from the multiple listing service and cease and desist from any actions to block the retention of new brokers and sale of the two new homes.

**WHEREFORE**, Lyman-Cutler LLC asks that the Court:

A. Enter preliminary and permanent injunctive relief ordering Defendants Century 21 Commonwealth and Tatiana Kagan to remove their listing of the Properties from the Multiple Listing Service and cease and desist from any actions of any kind whatsoever to prevent LCLLC from listing the Properties for sale with other brokers;

B. Enter judgment in the Plaintiff's favor and against all Defendants in an amount sufficient to compensate Lyman Plaintiffs fully, plus interest and costs;

C. Award the Plaintiff triple damages and attorneys' fees against Century 21 Commonwealth and Tatiana Kagan; and

D. Grant them such other and further relief as is just or appropriate.

**PLAINTIFF DEMANDS A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.**

LYMAN-CUTLER, LLC,

By its attorneys,

Sean T. Carnathan (BBO # 636889)
scarnathan@ocmlaw.net
Joseph Calandrelli (BBO # 666128)
jcalandrelli@ocmlaw.net
O'Connor Carnathan and Mack LLC
1 Van De Graaff Drive, Suite 104
Burlington, MA 01803
Telephone: 781.359.9000
Facsimile: 781.359.90001

Dated: June 5, 2015

12

Verification

I, Alex Filippov, under the pains and penalties of perjury state that I am the managing member of the plaintiff, Lyman-Cutler LLC, that I am authorized to sign this verification on behalf of the company, and that the foregoing factual statements are true and accurate to the best of my knowledge.

Alex Filippov

{847-5846-9380 v. 1}

# EXHIBIT 2

## COMMONWEALTH OF MASSACHUSETTS

MIDDLESEX, ss.

SUPERIOR COURT
CIVIL ACTION
NO. 1581CV03977

———————————————————
LYMAN-CUTLER, LLC, ALEX FILIPPOV,
and NICKOLAY LIPETSKER,

          Plaintiffs,

    v.

VADIM KAGAN, TATIANA KAGAN,
CENTURY 21 COMMONWEALTH,
KAGAN DEVELOPMENT KDC, CORP. and
PROEXCAVATION CORP.

          Defendants.
———————————————————

    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )
    )

## FIRST AMENDED COMPLAINT

Plaintiffs Lyman-Cutler, LLC, Alex Filippov, and Nickolay Lipetsker (together "Plaintiffs") bring this Complaint against Defendants Vadim Kagan, Tatiana Kagan, Kagan Development KDC, Corp., ProExcavation Corp., and Century 21 Commonwealth (together, "the Kagan Defendants") and state as follows:

## INTRODUCTION

1.     Plaintiffs bring this action for injunctive relief and to recover damages for breach of contract, breach of fiduciary duty, fraud and related claims, arising out of the willful and intentional misconduct of husband and wife Vadim and Tatiana Kagan and entities they control or are affiliated with. The Kagan Defendants have acted together in a self-dealing conspiracy to defraud the Plaintiffs by knowingly and intentionally inflating purported construction charges and executing knowingly unauthorized and fraudulent contracts, including a purported contract

between Plaintiff Lyman-Cutler, LLC and KDC and a listing agreement for two homes owned by

the Plaintiff Lyman-Cutler LLC, which is a joint venture among Alex Filippov and Nickolay

Lipetsker and Defendant Vadim Kagan.  Most recently, the Kagans have caused KDC to file a

wholly false and fraudulent mechanics lien against the Plaintiffs' properties in a bad faith effort

to force the Plaintiffs to pay their fraudulent construction charges.

## PARTIES

2.      Plaintiff Lyman-Cutler LLC ("LCLLC" or the "Company") is a Massachusetts

limited liability formed in November 2012 with a principal place of business in Belmont,

Massachusetts.

3.      Plaintiff Alex Filippov is an individual residing in Belmont, Massachusetts.

4.      Plaintiff Nickolay Lipetsker is an individual residing in Newton, Massachusetts.

5.      Defendant Vadim Kagan is an individual residing in Newton, Massachusetts.

6.      Defendant Tatiana Kagan is an individual residing in Newton, Massachusetts.

7.      Defendant Century 21 Commonwealth ("Century 21") is a Delaware limited

liability company with an office in Brookline, Massachusetts.

8.      Defendant Kagan Development KDC, Corp. ("KDC") is a Massachusetts

corporation with a principal place of business in Newton, Massachusetts.

9.      Defendant ProExcavation is a Massachusetts corporation with a principal place of

business in Newton, Massachusetts.

## JURISDICTION AND VENUE

10.     This Court has jurisdiction over the Defendants pursuant to G.L. c. 223A, § 2,

because the Defendants reside or maintain their principal place of business in Massachusetts.

11.     Venue is proper in this court pursuant to G.L. c. 223, § 1, because the Plaintiffs

and Defendants other than Century 21 reside or have a principal place of business in Middlesex

County.

## FACTUAL BACKGROUND

12.     In October 2012, Mr. Lipetsker and Mr. Kagan approached Mr. Filippov and

asked him to invest in a real estate development project they planned for a property in Brookline,

Massachusetts (the "Project").

13.     In general terms, the Project involved the purchase of land in Brookline,

Massachusetts to subdivide into two parcels and then construct on each separate parcel a high-

end single family home.

14.     Mr. Lipetsker and Mr. Filippov were investors in the Project and Mr. Kagan was

to serve as the general contractor for the Project.

15.     On or about October 25, 2012, as an inducement to Mr. Filippov and Mr.

Lipetsker invest in the Project, Mr. Kagan presented to Mr. Filippov and Mr. Lipetsker a detailed

budget and forecast of estimated returns on an investment in the Project (the "Kagan

Presentation"). A true copy of the presentation is attached to this Complaint as **Exhibit 1**.

16.     Mr. Filippov and Mr. Lipetsker reasonably relied upon the Kagan Presentation in

making their decision to invest in the Project. Mr. Filippov invested $2 million and Mr.

Lipetsker invested $250,000.

17.     In November 2012, Mr. Kagan, Mr. Filippov and Mr. Lipetsker formed a

Massachusetts limited liability company, Plaintiff Lyman-Cutler LLC. A true copy of the LLC

Operating Agreement is attached to this Complaint as **Exhibit 2**.

18.     In return for their respective investments, Mr. Filippov received an 80% interest
in the Company, and Mr. Kagan and Mr. Lipetsker each received 10%.

19.     The LCLLC Operating Agreement expressly names Mr. Filippov as the managing
member, and expressly enumerates his rights and authority as managing member, including the
exclusive authority to control the sale of the two new homes and the retention of any real estate
brokers to sell them.

20.     Mr. Kagan's budget for the Project required $1.3 million for the construction of
each home.  The budget forecast the need for an additional $200,000 for the "carrying costs" for
the properties until such time as they could be sold, for a total budget for the construction,
carrying and sale of each new home of $1.5 million.

21.     When it came time to borrow the additional funds necessary for the Project, Mr.
Kagan persuaded Mr. Filippov that they should borrow an additional $100,000 for each new
home for unexpected costs over and above the budget.  Mr. Filippov agreed.

22.     Accordingly, LCLLC borrowed $1.6 million for the construction and carrying
costs of each new home.  LCLLC also borrowed an additional $1.6 million to finance the balance
of the purchase price for the land for the Project.  In the aggregate, the Company has borrowed
$4.8 million.  True copies of the two mortgages are attached hereto as **Exhibits 3 and 4**.

23.     At no time since October 25, 2012 did Mr. Kagan ever provide to Mr. Filippov or
Mr. Lipetsker an updated budget or forecast for the costs of the Project.  At no time during the
construction of the homes did Mr. Kagan ever tell Mr. Filippov or Mr. Lipetsker that there were
any cost overruns on either of the new homes.  As recently as April 2015, Mr. Kagan expressly
told Mr. Filippov that the construction and carrying costs for the two new homes were within
budget.

24.     Throughout the life of the Project, Mr. Kagan had check-writing authority on the LCLLC bank account and drew funds from the account at will. Mr. Filippov monitored the withdrawal of funds from the account and tried to keep the books for the Project, but Mr. Kagan failed and refused to provide any invoices, receipts or other documentation for his withdrawals from the account. To this day, Mr. Kagan has failed to provide any invoices, receipts or other documentation of his purported construction costs.

25.     As of the date of the original Complaint, Mr. Kagan had drawn down essentially all of the $3.2 million borrowed by LCLLC to finance the construction and carrying costs. The lion's share of this sum was paid to KDC, ProExcavation and to subcontractors hired by KDC to perform the construction of the Lyman-Cutler properties.

26.     Under the express terms of the LLC Agreement, Mr. Kagan was responsible for completing construction of the two new homes no later than March 30, 2014 in accordance with plans and drawings approved by Mr. Filippov.

27.     Mr. Kagan failed to complete the construction of the two new homes on or before March 30, 2014. On the contrary, construction was not complete until October 2014.

28.     The Project plan was to sell the two new homes by no later than November 2014 for projected selling prices of $4,900,000 each.

29.     Mr. Kagan's wife, Defendant Tatiana Kagan, is a real estate agent affiliated with Defendant Century 21. Mrs. Kagan is also an officer and director of KDC.

30.     At Mr. Kagan's request, Mr. Filippov and Mr. Lipetsker agreed that LCLLC would list the new homes for sale with Mrs. Kagan. The LCLLC Agreement, however, provided that the obligation to use Mrs. Kagan expired on December 31, 2014 and that only Mr. Filippov as managing member had the authority to retain real estate brokers for the sale of the new homes.

31.     Without consulting Mr. Filippov or Mr. Lipetsker, the Kagans set the selling price for each home at $5,499,000, or nearly $600,000 higher than the budgeted selling price for each home. As of the date of this Complaint, neither home has been sold.

32.     Upon information and belief, based upon a statement by another real estate broker in the Brookline area, in or about March 2015, a potential buyer made a bona fide offer of $4.5 million to buy the new home located at 88 Cutler Road, which Mrs. Kagan failed to present to Mr. Filippov to consider.

33.     Upon information and belief, Mrs. Kagan rejected the offer and countered at $5 million, all without informing Mr. Filippov that an offer had been received. She thereby breached her duty to the Company as a real estate agent. The buyer has since purchased another home.

34.     By late April 2015, with the homes still unsold, and Mrs. Kagan doing little or nothing to market them actively, Mr. Kagan called Mr. Filippov and asked him to sign a new listing agreement with his wife to continue to try to sell the two new homes. Unhappy that the homes remained unsold months beyond the Project's planned completion date, Mr. Filippov refused and stated his intention to seek other assistance.

35.     Without any authority whatsoever, and with actual knowledge that Mr. Filippov had the sole authority to retain real estate brokers and that he had refused to sign the listing agreement with Mrs. Kagan, Mr. Kagan executed a purported listing agreement with Century 21 shortly after Mr. Filippov refused to sign the agreement. A true copy of the unauthorized listing agreement is attached hereto as **Exhibit 5**.

36.    Upon information and belief, based upon the fact that the Kagans are married and business partners, Mrs. Kagan also knew or should have known that her husband did not have authority to sign the listing agreement and that Mr. Filippov had refused to sign it.

37.    Because Mrs. Kagan is an agent of Century 21, Mrs. Kagan's knowledge is attributable to Century 21.

38.    Shortly after signing the unauthorized listing agreement, on May 7, 2015 Mr. Kagan, through counsel, wrote to Mr. Filippov making fabricated claims that Mr. Filippov had set the listing price for the two new homes and had refused to reduce the price. To the contrary, the Kagans set the selling price without ever consulting Mr. Filippov or Mr. Lipetsker (and indeed responded to an offer in March 2015 without ever informing Mr. Filippov or Mr. Lipetsker). A true copy of the letter from Mr. Kagan's attorney is attached to this Complaint as **Exhibit 6** (the "May Letter").

39.    In addition, Mr. Kagan claimed for the first time that he had cost overruns on the Project adding up to over $1 million and announced that he would no longer meet his obligation to pay for the carrying costs on the Project as required by Article 8.1 of the LCLLC Agreement.

40.    Upon information and belief, the Kagans knew that their demands in the May Letter would engender a dispute with Mr. Filippov and Mr. Lipetsker and they knowingly and intentionally entered into the fraudulent, unauthorized listing agreement shortly before sending the letter knowing full well that Mr. Filippov had refused to sign it.

41.    After the filing of the original Complaint in this action and in connection with prior proceedings in which LCLLC sought injunctive relief, the Defendants produced for the very first time another listing agreement, purportedly signed on August 12, 2014 by Vadim Kagan granting an exclusive listing to Century 21 and his wife, Tatiana, for a term of

approximately 18 months, extending through March 1, 2016. A true copy of this purported

listing agreement is attached hereto as **Exhibit 7**.

42.     Kagan knew or should have known at the time that he executed this listing

agreement that he had authority to retain his wife, Tatiana, as the exclusive agent to sell the

properties only through December 31, 2014. Mrs. Kagan also knew or should have known that

her husband had no authority to sign a listing agreement extending beyond December 31, 2014.

43.     Prior to the service of this document upon counsel for LCLLC in connection with

the hearing on the motion for preliminary injunction on June 11, 2015, neither Mr. Filippov nor

Mr. Lipetsker had ever seen or been informed about the purported August 2014 listing

agreement.

44.     Upon information and belief, eighteen months is three times as long as the

industry standard for an exclusive listing agreement.

45.     Two weeks after the hearing on the motion for injunctive relief and before the

Defendants answered the original Complaint in this matter, on or about June 22, 2015, Kagan

caused his company, KDC, to file a mechanics lien against the Company's properties, asserting a

lien in the amount of $2,095,985.23 (the "Mechanics Lien") -- nearly triple the amount he had

asserted in unreimbursed construction costs as of May 7, 2015 when he claimed that the

unreimbursed construction costs amounted to $758,025.56. See **Exhibit 6** hereto. A true copy

of the Mechanics Lien is attached hereto as **Exhibit 8**.

46.     In addition to falsely asserting that the unreimbursed construction costs tripled in

a six-week period some eight months after construction was completed in October 2014, the

Mechanics Lien purports to arise out of a contract between the Company and KDC dated June

24, 2013. As of the date of this Amended Complaint, neither Mr. Filippov nor Mr. Lipetsker has

ever seen the purported June 2013 contract. The first time they were ever informed about it was

in when it was cited in the Mechanics Lien.

47.     Since receiving the Mechanics Lien, Mr. Filippov and Mr. Lipetsker have

requested a copy of the purported June 2013 contract, but no copy has been provided. To the

extent this contract exists, it is an undisclosed, self-dealing contract signed by Mr. Kagan in

favor of his own company, KDC.

48.     Since commencing this action, Plaintiff has interviewed several witnesses who are

former investors in Kagan projects and who have reported that they experienced the same type of

fraudulent conduct by Mr. Kagan in connection with their projects as the Plaintiffs are

experiencing. Specifically, multiple witnesses report that Kagan presented them with a budget at

the outset of the project, assured them that everything was within budget until long after

construction was complete and shortly before the homes sold, and then announced extensive cost

overruns and either filed a lien or threatened to file a lien unless they agreed to the payment of

these last minute purported cost overruns.

49.     In addition, since commencing this action, Plaintiffs have interviewed KDC's

former bookkeeper, who reports that Kagan uses ProExcavation as a vehicle to double-bill

expenses to his projects, mixes expenses for projects on his American Express card and pockets

himself funds received for return of unused materials, does not keep accurate records of his

subcontracting costs, receives cash kickbacks from some of his subcontractors, and intentionally

inflates excavation charges.

50.     Upon information and belief based upon the facts recited above, the Mechanics

Lien and the cost overruns asserted by Kagan through KDC and ProExcavation are false and

fraudulent.

51.     Upon information and belief based upon the facts recited above, Kagan, KDC and
ProExcavation use the extortionate tactics described herein intentionally and plan to do so
throughout each project.  They intentionally mislead investors into investing in the project and
mislead them into believing that the project is within budget, planning all along to inflate the
construction costs and wrongfully force them to accept those costs through falsified claims for
construction and carrying costs and untimely and fraudulent mechanics liens.  They have done
exactly that to the Plaintiffs in this case.

52.     Construction on both of the properties was completed in October 2014, making
the filing of the Mechanics Lien by KDC untimely.  Upon information and belief based upon the
facts recited above, to the extent that any work was done by KDC on the properties within the
statutory period to support a Mechanics Lien, such work was done in bad faith to support the
assertion of this fraudulent Mechanics Lien.

53.     Recent inspection of the properties also revealed shoddy and defective
construction, causing property damage and requiring significant expense to correct.  The
properties have never been properly prepared or staged for sale.  The failure to build the
properties in a workmanlike manner and to act professionally in connection with the sale of the
properties is all directly attributable to the professional negligence of the Defendants.

## COUNT I

### BREACH OF CONTRACT by the COMPANY against VADIM KAGAN

54.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

55.     The LLC Agreement is a binding agreement among the parties, which states their
rights, obligations and authority to act on behalf of the LLC.

56.     Mr. Kagan has breached the LLC Agreement in multiple ways, including, without limitation by:

      a.  Failing to complete construction of the new homes on time;

      b.  Signing listing agreements with his wife, Tatiana Kagan, that he knew he lacked authority to sign;

      c.  Signing a contract with KDC without ever submitting it to the other members for review and approval;

      d.  Asserting claims against the Company for unauthorized, untimely and unsubstantiated cost overruns;

      e.  Double billing the Plaintiff and otherwise falsifying claims for construction costs; and

      f.  Refusing to honor his obligation to pay the monthly carrying costs when the new homes did not sell within 23 months of the date of acquisition.

57.     As a result of Mr. Kagan's breach of the LLC Agreement, the Company has suffered damages in an amount to be determined at trial.

## COUNT II

### BREACH OF FIDUCIARY DUTY by the PLAINTIFFS against VADIM KAGAN

58.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

59.     At all relevant times, Mr. Kagan has owed a fiduciary duty to each of the Plaintiffs.

60.     Mr. Kagan has breached his fiduciary duty to each of the Plaintiffs by the conduct described in this Complaint.

61.    As a result of Mr. Kagan's breaches of his fiduciary duty to them, Plaintiffs have suffered damages for which Mr. Kagan is liable in an amount to be determined at trial.

## COUNT III

### AIDING AND ABETTING BREACH OF FIDUCIARY DUTY by the PLAINTIFFS against TATIANA KAGAN, CENTURY 21 COMMONWEALTH, KDC and PROEXCAVATION

62.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

63.    Tatiana Kagan, Century 21 Commonwealth, KDC and ProExcavation knowingly and intentionally aided and abetted Mr. Kagan's breach of his fiduciary duty to the Plaintiffs.

64.    As a result of aiding and abetting Mr. Kagan's breach of fiduciary duty, Plaintiffs have suffered damages for which Tatiana Kagan, Century 21 Commonwealth, KDC and ProExcavation are liable in an amount to be determined at trial.

## COUNT IV

### FRAUD by the COMPANY against ALL DEFENDANTS

65.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

66.    Mr. Kagan knowingly and intentionally executed a listing agreement with his wife in August 2014, with actual or constructive knowledge that he had no authority to execute an 18-month listing agreement.

67.    Mr. Kagan knowingly and intentionally executed a listing agreement with his wife, Tatiana Kagan, that he knew Mr. Filippov had refused to sign, shortly before disavowing his obligation to pay the carrying costs for the Project and asserting substantial unauthorized, untimely and undocumented claims against the Company for cost overruns.

68.     After signing the listing agreement with actual knowledge that it was unauthorized, Mr. Kagan has falsely stated that Mr. Filippov authorized him to sign the listing agreement.

69.     Upon information and belief, Tatiana Kagan knows that her husband did not have authority to sign either of the listing agreements with her and her knowledge is attributable to Century 21 Commonwealth.

70.     Mr. Kagan has used KDC and ProExcavation to assert false and fraudulent charges for construction costs against the Company and has caused KDC to file a false and fraudulent mechanics lien against the Company's properties.

71.     As a result of this fraudulent conduct by the Kagans, the Company has suffered and may suffer further damages for which the Kagans should be held liable in an amount to be determined at trial.

## COUNT V

### CONSPIRACY against ALL DEFENDANTS

72.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

73.     Through the conduct described herein, the Defendants have conspired to defraud the Company.

74.     As a result of their unlawful conduct in furtherance of their conspiracy, each co-conspirator is jointly and severally liable to the Plaintiffs for damages in an amount to be determined at trial.

## COUNT VI

### VIOLATION OF M.G.L. ch. 93A by the COMPANY against TATIANA KAGAN, CENTURY 21 COMMONWEALTH, KDC and PROEXCAVATION

75.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

76.    By asserting two knowingly unauthorized and fraudulent listing agreements against the Company, Tatiana Kagan and Century 21 Commonwealth have violated M.G.L. ch. 93A.

77.    By asserting knowingly fraudulent charges against the Company, KDC and ProExcavation have violated M.G.L. ch. 93A.

78.    By filing a fraudulent Mechanics Lien against the Properties, KDC has violated M.G.L. ch. 93A.

79.    For their violations of M.G.L. ch. 93A, Defendants Tatiana Kagan, Century 21 Commonwealth, KDC and ProExcavation are liable to the Company in an amount to be determined at trial, together with multiple damages and attorneys' fees.

## COUNT VII

## DECLARATORY JUDGMENT

80.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

81.    The parties have a bona fide dispute about their rights and obligations under the listing agreement, which constitutes a cloud on the title of the Properties, and which the Court can resolve by declaring the rights and duties thereunder.

82.    The Court should declare that:

a.    Vadim Kagan had no authority to execute the listing agreements and that the listing agreements are invalid;

b.    Vadim Kagan had no authority to execute any contract with KDC without submitting that contract to the other members of the LLC for review and approval;

c.      Vadim Kagan is responsible for all carrying costs with regard to the properties; and

d.      Article VIII of the LCLLC Agreement allows the Company to reduce Vadim Kagan's share of the profits as a result of his wrongful conduct, including by charging the attorneys' fees and costs incurred in connection with this litigation against his share of the Company profits (if any).

## COUNT VIII

**PRELIMINARY AND PERMANENT INJUNCTIVE RELIEF by the COMPANY against TATIANA KAGAN and CENTURY 21 COMMONWEALTH**

82.      Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

83.      Despite having had the opportunity to sell the two new homes since October 2014, Tatiana Kagan and Century 21 Commonwealth have failed to do so.  In that time, they have failed to honor their obligation to present a bona fide offer to the managing member (and only party authorized to sell the two new homes), and have engaged in a conspiracy with Vadim Kagan to execute a fraudulent, unauthorized listing agreement.

84.      Despite repeated demand, Century 21 Commonwealth has refused to remove its listings for the two new homes from the multiple listing service, refused to acknowledge the invalidity of the listing agreement and has blocked the Company from retaining new brokers in whom it has confidence to sell the two new homes.

85.      The selling season is passing rapidly and the Company will suffer potentially irreparable harm if it cannot list the two new homes promptly with brokers of its choosing. Century 21 has not provided competent professional real estate brokerage services and has breached its duty to present offers to the property owner.

86.     The Court should order Century 21 to remove its listings for the two new homes
from the multiple listing service and cease and desist from any actions to block the retention of
new brokers and sale of the two new homes.

87.     The Court should further declare in equity that Century 21 is entitled to no
commission based on the unauthorized listing agreements.

## COUNT IX

### PROFESSIONAL NEGLIGENCE by the COMPANY against
### TATIANA KAGAN AND CENTURY 21

88.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

89.     Tatiana Kagan and Century 21 have failed to perform their duties in accordance
with reasonable standards of professional care and loyalty.

90.     As a result of their failure to meet professional standards of conduct, the
Properties remain unsold and the Company has suffered increased carrying costs for which
Tatiana Kagan and Century 21 are properly held liable.

## COUNT X

### BREACH OF CONTRACT by the COMPANY against KDC

91.     Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

92.     LCLLC entered into a contract with Defendant KDC that required, among other
things, that KDC perform its work in a good and workmanlike manner.

93.     KDC breached its contract by failing to complete its work in a good and
workmanlike manner.

94.     As a result of KDC's failure to complete construction in a good and workmanlike
manner, LCLLC has suffered and is suffering damages in connection with remedying the shoddy
construction for which KDC is properly held liable.

## COUNT XI

### NEGLIGENCE by the COMPANY against KDC

95.    Plaintiffs repeat and reallege the foregoing allegations as if fully set forth herein.

96.    KDC owed a duty to LCLLC to perform its work in a good and workmanlike manner and in accordance with industry standards.

97.    KDC breached its duty by performing substandard and deficient work.

98.    KDC's breach has caused LCLLC damages in the form of property damage and remedial costs, among other things.

WHEREFORE, Plaintiffs ask that the Court:

A.  Enter preliminary and permanent injunctive relief ordering Defendants Century 21 Commonwealth and Tatiana Kagan to remove their listing of the Properties from the Multiple Listing Service and cease and desist from any actions of any kind whatsoever to prevent LCLLC from listing the Properties for sale with other brokers;

B.  Declare the false and fraudulent Mechanics Lien void;

C.  Enter judgment in the Plaintiff's favor and against all Defendants in an amount sufficient to compensate Plaintiffs fully, plus interest and costs;

D.  Award the Plaintiff triple damages and attorneys' fees against Century 21 Commonwealth, Tatiana Kagan, KDC and ProExcavation;

E.  Issue a declaratory judgment declaring the rights and obligations of the parties; and

F.  Grant them such other and further relief as is just or appropriate.

PLAINTIFFS DEMAND A TRIAL BY JURY ON ALL ISSUES SO TRIABLE.

LYMAN CUTLER, LLC, ALEX FILIPPOV and
NICKOLAY LIPETSKER

By their attorneys,

_____
Sean T. Carnathan (BBO # 636889)
scarnathan@ocmlaw.net
Joseph Calandrelli (BBO #666128)
jcalandrelli@ocmlaw.net
O'Connor Carnathan and Mack LLC
1 Van De Graaff Drive, Suite 104
Burlington, MA 01803
Telephone:  781.359.9000
Facsimile:  781.359.90001

Dated:  July 10, 2015

4812-5784-0421, v. 1

# EXHIBIT 3

UNITED STATES SECURITIES AND EXCHANGE COMMISSION

Litigation Release 15512 / September 26, 1997

SECURITIES AND EXCHANGE COMMISSION V. SAGE TECHNOLOGY, INC., JAMIE
EDELKIND, AND WILLIAM R. THIELE, Civil Action No. 1:96-CV-361-HTW (N.D.
Ga.)

     The Securities and Exchange Commission announced that on September 17,
1997, the Honorable Horace T. Ward, United States District Judge for the
Northern District of Georgia, entered an Order on Disgorgement and Civil
Penalties as to Jamie Edelkind ("Edelkind").  Disgorgement was set in the
amount of $23,852.64, representing the ill-gotten gains received by
Edelkind, and prejudgment interest thereon in the amount of $3,343.10.
Edelkind was further ordered to pay a civil penalty in the amount of
$23,852.64. Edelkind was ordered to pay the disgorgement and prejudgment
interest within thirty (30) days of the date of the order and to make
payments on the civil penalty with the first payment due within thirty (30)
days of the date of the order.

     The Commission's complaint, filed on February 15, 1996, alleged that
Edelkind made material misrepresentations and omissions regarding the
financial condition of Sage Technology, Inc. ("Sage"), its ongoing default
on interest payments owed to purchasers of Sage notes, and the credentials
of Edelkind, the president, chief scientist and principal shareholder of
Sage.  On March 11, 1996, an order of permanent injunction was entered
against Sage, Thiele and Edelkind enjoining them from future violations of
the securities laws.  For further information, see LR-14818, LR-14834, LR-
14846 and LR-15370.

======END OF PAGE 1======

Tuesday, May 22, 2018

# EXHIBIT 4



FILED IN CHAMBERS
7/22/04 Page 1 of 5
Luther D. Thomas, Clerk
Deputy Clerk

## UNITED STATES DISTRICT COURT
## NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

UNITED STATES OF AMERICA

-vs-

**Case No. 1:03-CR-364-CAP**

JAMIE EDELKIND

**Defendant's Attorney:**
**Steven H. Sadow**

## JUDGMENT IN A CRIMINAL CASE
### (For Offenses Committed On or After November 1, 1987)

The defendant plead guilty to Count(s) 1 of the Indictment.

Accordingly, the defendant is adjudged guilty of such count(s) which involves the following offense:

| Title & Section | Nature of Offense | Count No. |
|---|---|---|
| 18 USC §§1344 (1) and (2) | Bank Fraud | 1 |

The defendant is sentenced as provided in pages 2 through 5 of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

It is ordered that the defendant shall pay the special assessment of $ 100.00 which shall be due immediately.

**IT IS FURTHER ORDERED** that the defendant shall notify the United States attorney for this district within thirty days of any change of name, residence, or mailing address until all fines, restitution, costs and special assessments imposed by this judgment are fully paid.

Defendant's Soc. Sec. No.   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
Other SSN:   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
Defendant's Date of Birth:   April 11, 1963
Defendant's Mailing Address:
940 Nantasket Avenue
Hull, Massachusetts   02045

Date of Imposition of Sentence:
July 21, 2004

Signed this ___22___ Day of July, 2004.

CERTIFIED

DEC 2 ' 20??

**CHARLES A. PANNELL, JR.**
UNITED STATES DISTRICT JUDGE

1:03-CR-364-CAP : JAMIE EDELKIND

## IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned
for a term of Twelve (12) months and one (1) day.

The Court recommends that if the defendant is eligible, that the Bureau of Prisons consider the defendant
for participation in the Community Confinement Center.

The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons
as notified by the United States Marshal, but not before September 14, 2004.

## RETURN

I have executed this judgment as follows:

_____

_____

_____

_____

Defendant delivered on _____ to _____

at _____, with a certified copy of this
judgment.

_____
UNITED STATES MARSHAL

By:_____
Deputy U.S. Marshal

Case 16-01120  Doc 254-1  Filed 12/07/18  Entered 12/07/18 16:00:55  Desc Exhibit
Case 1:11-cr-10399  Document 2-2  Filed 12/07/18  Page 3 of 5
1-13  Page 39 of 115
Case 1:03-cr-00364-CAP-CCH  Document 55  Filed 07/22/04  Page 3 of 5

1:03-CR-364-CAP : JAMIE EDELKIND

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of Five (5) years.

While on supervised release, the defendant shall not commit another federal, state or local crime and shall not illegally possess a controlled substance. The defendant shall comply with the standard and special conditions that have been adopted by this court (set forth below). If this judgment imposes a restitution obligation, it shall be a condition of supervised release that the defendant pay any such restitution that remains unpaid at the commencement of the term of supervised release. The defendant shall comply with the following additional conditions:

Within 72 hours of release from the custody of the Bureau of Prisons, the defendant shall report in person to the probation office in the district to which the defendant is released.

The defendant shall perform 100 hours of community service under the guidance of the probation officer.

The defendant shall not own, possess or have under his control any firearm, dangerous weapon or other destructive device.

The defendant shall submit to a search of his person, property, real or personal, residence, place of business or employment, and/or vehicle(s) at the request of the United States Probation Officer

The defendant shall make a full and complete disclosure of finances and submit to an audit of financial documents, at the request of the United States Probation Officer.

The defendant shall pay any financial penalty that is imposed by this judgment.

The defendant shall not incur new credit charges or open additional lines of credit without the approval of the probation officer.

The defendant shall pay any portion of the restitution, as well as the fine, that is not paid in full at the time of the defendant's release from imprisonment as a condition of supervision to be paid at the monthly rate of not less than $150.00 plus 24% of any gross monthly income in excess of $2,000.00.

Case 16-01120   Doc 254-13   Filed 12/07/18   Entered 12/07/18 16:00:55   Desc Exhibit
Case 1:21-cr-00395   Document 2-2   Filed 12/07/18   Page 2 of 5
1-13   Page 40 of 115
Case 1:03-cr-00364-CAP-CCH   Document 55   Filed 07/22/04   Page 4 of 5

**1:03-CR-364-CAP : JAMIE EDELKIND**

## STANDARD CONDITIONS OF SUPERVISION

While the defendant is on supervised release pursuant to this judgment, the defendant shall not commit another federal, state or local crime. In addition:

1.    The defendant shall not leave the judicial district without the permission of the court or probation officer;

2.    The defendant shall report to the probation officer as directed by the court or probation officer and shall submit a truthful and complete written report within the first five days of each month;

3.    The defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;

4.    The defendant shall support his or her dependents and meet other family responsibilities;

5.    The defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training, or other acceptable reasons;

6.    The defendant shall notify the probation officer within 72 hours of any change in residence or employment;

7.    The defendant shall refrain from the excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any narcotic or other controlled substance, or any paraphernalia related to such substances, except as prescribed by a physician, and shall submit to periodic urinalysis tests as directed by the probation officer to determine the use of any controlled substance;

8.    The defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;

9.    The defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;

10.   The defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view by the probation officer;

11.   The defendant shall notify the probation officer within 72 hours of being arrested or questioned by a law enforcement officer;

12.   The defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;

13.   As directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

Case 16-01120  Doc 254-13  Filed 12/07/18  Entered 12/07/18 16:00:55  Desc Exhibit
1-13    Page 41 of 115
Case 1:03-cr-00364-CAP-CCH   Document 55   Filed 07/22/04   Page 5 of 5

Page 5 of 5

1:03-CR-364-CAP : JAMIE EDELKIND

## FINE

The defendant shall pay a fine of $5,000.00

The fine shall be paid in full immediately. The defendant shall make fine payments from any wages he may earn in prison in accordance with the Bureau of Prisons Financial Responsibility Program. Any portion of the fine that is not paid in full at the time of the defendant's release from imprisonment shall become a condition of supervision to be paid at the monthly rate of not less that $150.00 plus 25% of any gross monthly income in excess of $2,000.00.

This fine includes any costs of incarceration and supervision.

If the fine is not paid, the court may sentence this defendant to any sentence which might have been originally imposed.  See 18 USC 3614.

## RESTITUTION

The defendant shall make restitution to the following person(s) in the following amount:

| Name of Payee | Amount of Restitution |
|---|---|
| Old Republic Title Company<br>1105 Sanctuary Parkway<br>Alpharetta, Georgia 30004 | $221,000.00 |

The restitution shall be paid in full immediately.  The defendant shall make restitution payments from any wages he may earn in prison in accordance with the Bureau of Prisons Financial Responsibility Program. Any portion of the restitution that is not paid in full at the time of the defendant's release from imprisonment shall become a condition of supervision and be paid at the monthly rate of not less than $150.00 plus 25% interest of any gross monthly income in excess of $2,000.00.

The defendant shall notify the United States Attorney for this district within 30 days of any change of mailing or residence address that occurs while any portion of the restitution remains unpaid.

# EXHIBIT 5

AO 245B Sheet 1 - Judgment in a Criminal Case - D. Massachusetts (03/02)

# United States District Court

## District of Massachusetts

| | |
|---|---|
| UNITED STATES OF AMERICA<br>V.<br>**JAMIE EDELKIND** | **AMENDED JUDGMENT IN A CRIMINAL CASE**<br>(For Offenses Committed On or After November 1, 1987)<br><br>**Case Number: 1: 04 CR 10066 - 001 - MEL**<br><br>Michael J. Liston<br>Defendant's Attorney |

## THE DEFENDANT:

☐ pleaded guilty to count(s): _____

☐ pleaded nolo contendere to counts(s) _____ which was accepted by the court.

☒ was found guilty on count(s) 1ss,2ss,3ss,4ss _____ after a plea of not guilty.

Accordingly, the court has adjudicated that the defendant is guilty of the following offense(s):

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 USC § 1344 | Bank Fraud | 09/12/01 | 1ss |
| 18 USC § 2 | Aiding and Abetting | | |
| 18 USC § 1344 | Bank Fraud | 05/09/02 | 2ss |
| 18 USC § 2 | Aiding and Abetting | | |
| 18 USC § 1344 | Bank Fraud | 03/17/03 | 3ss |
| 18 USC § 2 | Aiding and Abetting | | |

☒ See continuation page

The defendant is sentenced as provided in pages 2 through _7_ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

☐ The defendant has been found not guilty on counts(s) _____ and is discharged as to such count(s).

☐ Count(s) _____ is dismissed on the motion of the United States.

IT IS FURTHER ORDERED that the defendant shall notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant shall notify the court and United States Attorney of any material change in the defendant's economic circumstances.

Defendant's Soc. Sec. No.: 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

Defendant's Date of Birth: 00/00/63

Defendant's USM No.: 11866-035

Defendant's Residence Address:
Essex County House of Correction
20 Manning Ave.,Middleton, MA.01949

Defendant's Mailing Address:
same

07/12/05

Date of Imposition of Judgment

_Signature of Judicial Officer_

The Honorable Morris E. Lasker
Name and Title of Judicial Officer

Senior Judge, U.S. District Court

Date 87/27/05

Continuation Page - Judgnent in a Criminal Case

CASE NUMBER: **1: 04 CR 10066 - 001 - MEL**

DEFENDANT: **JAMIE EDELKIND**

Judgment - Page 2    of  7

## ADDITIONAL COUNTS OF CONVICTION

| Title & Section | Nature of Offense | Date Offense Concluded | Count Number(s) |
|---|---|---|---|
| 18 USC § 1344 | Bank Fraud | 08/25/04 | 4ss |
| 18 USC § 2 | Aiding and Abetting | | |

AO 245B Sheet 2 - Imprisonment - D. Massachusetts (10/01)

CASE NUMBER: **1: 04 CR 10066  - 001 - MEL**
DEFENDANT:                                    Judgment - Page   3  of   7
                    **JAMIE EDELKIND**

# IMPRISONMENT

The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of    60    month(s)

On each count to be served concurrently
That this sentence be served concurrently with the sentence imposed in the Court of Atlanta, Georgia

[x]  The court makes the following recommendations to the Bureau of Prisons:

That the defendant serve his time at Fort Devens, Mass.

[x]  The defendant is remanded to the custody of the United States Marshal.

[ ]  The defendant shall surrender to the United States Marshal for this district:
     [ ] at _____ on _____
     [ ] as notified by the United States Marshal.

[ ]  The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
     [ ] before _____ on _____
     [ ] as notified by the United States Marshal.
     [ ] as notified by the Probation or Pretrial Services Officer.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

Defendant delivered on _____ to _____

at _____ , with a certified copy of this judgment.


                                        _____
                                            UNITED STATES MARSHAL


                                        By _____
                                            Deputy U.S. Marshal

AO 245B Sheet 3 - Supervised Release - D. Massachusetts (10/01)

CASE NUMBER: **1: 04 CR 10066  - 001 - MEL**                    Judgment - Page  4 of  7
DEFENDANT:
                              **JAMIE EDELKIND**

## SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of      3    year(s)

On each count, all such terms to run concurrently.

[x] See continuation page

The defendant shall report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

The defendant shall not commit another federal, state, or local crime.

The defendant shall not illegally possess a controlled substance.

*For offenses committed on or after September 13, 1994:*

The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as directed by the probation officer.

[x]    The above drug testing condition is suspended based on the court's determination that the defendant poses a low risk of future substance abuse. (Check if applicable.)

[x]    The defendant shall not possess a firearm, destructive device, or any other dangerous weapon.

If this judgment imposes a fine or a restitution obligation, it shall be a condition of supervised release that the defendant pay any such fine or restitution that remains unpaid at the commencement of the term of supervised release in accordance with the Schedule of Payments set forth in the Criminal Monetary Penalties sheet of this judgment.

The defendant shall comply with the standard conditions that have been adopted by this court (set forth below). The defendant shall also comply with the additional conditions on the attached page (if indicated above).

## STANDARD CONDITIONS OF SUPERVISION

1)  the defendant shall not leave the judicial district without the permission of the court or probation officer;
2)  the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3)  the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4)  the defendant shall support his or her dependants and meet other family responsibilities;
5)  the defendant shall work regularly at a lawful occupation unless excused by the probation officer for schooling, training or other acceptable reasons;
6)  the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7)  the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8)  the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9)  the defendant shall not associate with any persons engaged in criminal activity, and shall not associate with any person convicted of a felony unless granted permission to do so by the probation officer;
10)  the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11)  the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12)  the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13)  as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics, and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

Continuation Page - Supervised Release/Probation

| | | |
|---|---|---|
| CASE NUMBER: **1: 04 CR 10066 - 001 - MEL** | | Judgment - Page   5 of   7 |
| DEFENDANT: | **JAMIE EDELKIND** | |

## Continuation of Conditions of ☒ Supervised Release ☐ Probation

The defendant shall submit to the collection of a DNA sample as directed by the Probation Officer.
The defendant is prohibited from possessing a firearm or other dangerous weapon.
The defendant is to pay the balance of the restitution according to a court -ordered repayment schedule.
The defendant is prohibited from incurring new credit charges or opening additional line of credit without
the approval of the probation officer.
The defendant is to provide the probation officer access to any requested financial information.
The financial information provided to the Probation Office by the defendant may be shared with the Financial
Litigation Unit of the U. S. Attorney's Office.

AO 245B  Judgment in a Criminal Case - D. Massachusetts (10/01)
Sheet 5, Part A — Criminal Monetary Penalties

Judgment - Page 6 of 7

CASE NUMBER: **1: 04 CR 10066  - 001 - MEL**
DEFENDANT:                    JAM IE EDELKIND

## CRIMINAL MONETARY PENALTIES

The defendant shall pay the following total criminal monetary penalties in accordance with the schedule of payments set forth on Sheet 5, Part B.

|  | **Assessment** | **Fine** | **Restitution** |
|---|---|---|---|
| **TOTALS** | $400.00 | | $3,298,197.45 |

☐ The determination of restitution is deferred until _____ . An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

☐ The defendant shall make restitution (including community restitution) to the following payees in the amount listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below.  However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid in full prior to the United States receiving payment.

| **Name of Payee** | **\*Total Amount of Loss** | **Amount of Restitution Ordered** | **Priority Order or Percentage of Payment** |
|---|---|---|---|
| Lehman Brothers/Aurora Loan | | $3,298,197.45 | |
| Services, | | | |
| 10350 Park Meadows Drive | | See Attached Schedule A | |
| Littleton, CO.80124 | | | |
| Attn:Cashiering Department | | | |
| | | | ☐ See Continuation Page |
| **TOTALS** | $0.00 | $3,298,197.45 | |

☐ If applicable, restitution amount ordered pursuant to plea agreement _____

☐ The defendant shall pay interest on any fine or restitution of more than $2,500, unless the fine or restitution is paid in full before the fifteenth day after the date of the judgment, pursuant to 18 U.S.C. § 3612(f).  All of the payment options on Sheet 5, Part B may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. § 3612(g).

☐ The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

    ☐ the interest requirement is waived for the    ☐ fine and/or    ☐ restitution.

    ☐ the interest requirement for the    ☐ fine and/or    ☐ restitution is modified as follows:

\* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18, United States Code, for offenses committed on or after September 13, 1994 but before April 23, 1996.

UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS


UNITED STATES OF AMERICA,
          Plaintiff,

                        CRIMINAL NO. 04-10066-MEL

JAMIE EDELKIND,
          Defendant.


LASKER, D.J.

SCHEDULE A
JUDGMENT - CRIMINAL MONETARY PENALTIES

        Defendant shall be given credit, for purposes of
satisfying his restitution obligations, for any amounts
ultimately paid to any victim/mortgage holder as a result of the
forfeiture and liquidation of the residence at 940 Nantasket
Avenue, Hull, Massachusetts.  Such credit shall include all
amounts paid on account of, or in satisfaction of, the mortgage
and accompanying note, dated August 25, 2004, whether the payee
is Fairmont Funding, Ltd., Aurora Loans Services, Lehman Brothers
Bank, FSB, or an assignee of any of those entities.  Defendant
shall not be given credit, for purposes of satisfying his
restitution obligations, for any amounts that may be paid to non-
victim lien-holders, such as taxing authorities, municipalities
and others, who may receive payments as a result of the
forfeiture and liquidation.

                                      Honorable Morris E. Lasker
                                      U.S. District Judge

AO 245B Judgment in a Criminal Case - D. Massachusetts (10/01)
Sheet 5, Part B — Criminal Monetary Penalties

CASE NUMBER: **1: 04 CR 10066 - 001 - MEL**
DEFENDANT: **JAMIE EDELKIND**

Judgment - Page 7 of 7

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A  [✗] Lump sum payment of ____$400.00____ due immediately, balance due

      [ ] not later than _____ , or
      [ ] in accordance with [ ] C, [ ] D, or [✗] E below; or

B  [ ] Payment to begin immediately (may be combined with C, D, or E below); or

C  [ ] Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after the date of this judgment; or

D  [ ] Payment in _____ (e.g., equal, weekly, monthly, quarterly) installments of _____ over a period of
      _____ (e.g., months or years), to commence _____ (e.g., 30 or 60 days) after release from imprisonment to a
      term of supervision; or

E  [✗] Special instructions regarding the payment of criminal monetary penalties:

> The restitution shall be paid in according to a court-ordered repayment schedule. Payment shall be made
> to the Clerk, U. S. District Court for transfer to Lehman Brothers/Aurora Loan Services
> 10350 park Meadows Drive
> Littleton CO.80124
> Attn: Cashiering Department

Unless the court has expressly ordered otherwise in the special instruction above, if this judgment imposes a period of imprisonment, payment of criminal monetary penalties shall be due during the period of imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility Program, are made to the clerk of the court, unless otherwise directed by the court, the probation officer, or the United States attorney.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.

[ ] Joint and Several

      Case Number, Defendant Name, and Joint and Several Amount:

[ ] See Continuation Page

[ ] The defendant shall pay the cost of prosecution.

[ ] The defendant shall pay the following court cost(s):

[✗] The defendant shall forfeit the defendant's interest in the following property to the United States:
      The Court further orders forfeiture as set forth in the preliminary order previously entered by this Court.

Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5) community restitution, (6) fine interest (7) penalties, and (8) costs, including cost of prosecution and court costs.

# ACCOUNT ESTABLISHMENT FORM

## 1: 04 CR 10066   - 001 - MEL
### JAMIE EDELKIND

ACCOUNT ESTABLISHMENT FORM

| Name of Payee | Address | **Total Amount of Loss | Amount of Restitution Ordered | Priority Order or % of Pymnt |
|---|---|---|---|---|
| Lehman Brothers/Aurora Loa | | | $3,298,197.45 | |

Services,

10350 Park Meadows Drive

Littleton, CO.80124

Attn:Cashiering Department

ACCOUNT ESTABLISHMENT FORM

# EXHIBIT 6

AO245B   Judgment in a Criminal Case (Rev. 06/05)
Sheet 1

**RECEIVED**

USDC, WESTERN DISTRICT OF LA
ROBERT H. SHEMWELL, CLERK
DATE __1_/_9_/_07c&___

# United States District Court

## Western District of Louisiana

### Lafayette Division

UNITED STATES OF AMERICA
V.

JAMIE EDELKIND

**JUDGMENT IN A CRIMINAL CASE**

Case Number:     6:05CR60067-001

USM Number:

Randal P. McCann
Defendant's Attorney

**THE DEFENDANT:**

[ ]   pleaded guilty to count(s): ___
[ ]   pleaded nolo contendere to count(s) ___ which was accepted by the court.
[✓]   was found guilty on count(s) I of the Indictment after a plea of not guilty.

The defendant is adjudicated guilty of these offenses:

| Title & Section | Nature of Offense | Count Number(s) | Date Offense Concluded |
|---|---|---|---|
| 18 U.S.C. § 228(a)(3) | Willful Nonpayment of Child Support | I | 10/15/2005 |

The defendant is sentenced as provided in pages 2 through _6_ of this judgment. The sentence is imposed pursuant to the Sentencing Reform Act of 1984.

[ ]   The defendant has been found not guilty on count(s) ___.

[ ]   Count(s) ___ [] is [] are dismissed on the motion of the United States.

IT IS ORDERED that the defendant must notify the United States Attorney for this district within 30 days of any change of name, residence, or mailing address until all fines, restitution, costs, and special assessments imposed by this judgment are fully paid. If ordered to pay restitution, the defendant must notify the court and the United States attorney of any material changes in the defendant's economic circumstances.

_COPY SENT_
_DATE_ 1-9-07
_BY_ CB
_TO_ USMS 3cc
        USPO 3cc

January 4, 2007
Date of Imposition of Judgment

Signature of Judicial Officer

REBECCA F. DOHERTY, United States District Judge
Name & Title of Judicial Officer

Jan. 9, 2007
Date

AO245B   Judgement in a Criminal Case (Rev. 06/05)
Sheet 2 — Imprisonment

DEFENDANT:        JAMIE EDELKIND                                    Judgment - Page 2 of 6
CASE NUMBER:    6:05CR60067-001

# IMPRISONMENT

    The defendant is hereby committed to the custody of the United States Bureau of Prisons to be imprisoned for a total term of **24 months, to run consecutively.**

[✓]    The court makes the following recommendations to the Bureau of Prisons:

    The court recommends that the defendant be given credit for time served.  The court also recommends that the defendant participate in the inmate financial responsibility program as to his special assessment and restitution payments owed.

[✓]    The defendant is remanded to the custody of the United States Marshal.

[ ]    The defendant shall surrender to the United States Marshal for this district:
    [ ] at ___ [] a.m.    [] p.m.   on ___.
    [ ] as notified by the United States Marshal.

[ ]    The defendant shall surrender for service of sentence at the institution designated by the Bureau of Prisons:
    [ ] before 2 p.m. on ___.
    [ ] as notified by the United States Marshal.
    [ ] as notified by the Probation or Pretrial Services Office.

# RETURN

I have executed this judgment as follows:

_____

_____

_____

    Defendant delivered on_____ to _____

at _____ , with a certified copy of this judgment.

                                             _____
                                             UNITED STATES MARSHAL

                                         By _____
                                         DEPUTY UNITED STATES  MARSHAL

Judgment - Page 3 of 6

DEFENDANT: JAMIE EDELKIND
CASE NUMBER: 6:05CR60067-001

# SUPERVISED RELEASE

Upon release from imprisonment, the defendant shall be on supervised release for a term of 1 year, to run concurrently with the terms of supervised release for the defendant's cases in the Northern District of Georgia and the District of Massachusetts..

# MANDATORY CONDITIONS (MC)

1. The defendant must report to the probation office in the district to which the defendant is released within 72 hours of release from the custody of the Bureau of Prisons.

2. The defendant shall not commit another federal, state, or local crime.

3. The defendant shall not unlawfully possess a controlled substance. The defendant shall refrain from any unlawful use of a controlled substance. The defendant shall submit to one drug test within 15 days of release from imprisonment and at least two periodic drug tests thereafter, as determined by the court.

4. [✓] The above drug testing condition is suspended, based on the court's determination that the defendant poses a low risk of future substance abuse. (Check, if applicable.)

5. [✓] The defendant shall not possess a firearm, ammunition, destructive device, or any other dangerous weapon. (Check, if applicable.)

6. [✓] The defendant shall cooperate in the collection of DNA as directed by the probation officer. (Check, if applicable.)

7. [ ] The defendant shall register with the state sex offender registration agency in the state where the defendant resides, works, or is a student, as directed by the probation officer. (Check, if applicable.)

8. [ ] The defendant shall participate in an approved program for domestic violence. (Check, if applicable.)

9. If this judgment imposes a fine or a restitution, it is a condition of supervised release that the defendant pay in accordance with the Schedule of Payments sheet of this judgment.

10. The defendant must comply with the standard conditions that have been adopted by this court as well as with any additional conditions on the attached page.

# STANDARD CONDITIONS OF SUPERVISION (SC)

1) the defendant shall not leave the judicial district without permission of the court or probation officer;
2) the defendant shall report to the probation officer and shall submit a truthful and complete written report within the first five days of each month;
3) the defendant shall answer truthfully all inquiries by the probation officer and follow the instructions of the probation officer;
4) the defendant shall support his or her dependants and meet other family responsibilities;
5) the defendant shall work regularly at a lawful occupation, unless excused by the probation officer for schooling, training, or other acceptable reasons;
6) the defendant shall notify the probation officer at least ten days prior to any change in residence or employment;
7) the defendant shall refrain from excessive use of alcohol and shall not purchase, possess, use, distribute, or administer any controlled substance or any paraphernalia related to any controlled substances, except as prescribed by a physician;
8) the defendant shall not frequent places where controlled substances are illegally sold, used, distributed, or administered;
9) the defendant shall not associate with any persons engaged in criminal activity and shall not associate with any person convicted of a felony, unless granted permission to do so by the probation officer;
10) the defendant shall permit a probation officer to visit him or her at any time at home or elsewhere and shall permit confiscation of any contraband observed in plain view of the probation officer;
11) the defendant shall notify the probation officer within seventy-two hours of being arrested or questioned by a law enforcement officer;
12) the defendant shall not enter into any agreement to act as an informer or a special agent of a law enforcement agency without the permission of the court;
13) as directed by the probation officer, the defendant shall notify third parties of risks that may be occasioned by the defendant's criminal record or personal history or characteristics and shall permit the probation officer to make such notifications and to confirm the defendant's compliance with such notification requirement.

AO245B Judgment in a Criminal Case (Rev. 12/03)
Sheet 3A - Supervised Release

Judgment - Page 4 of 6

DEFENDANT: JAMIE EDELKIND
CASE NUMBER: 6:05CR60067-001

## SPECIAL CONDITIONS OF SUPERVISION (SP)

1. The defendant shall make restitution totaling $94,443.88, to the United Sates Clerk of Court, 300 Fannin Street, Suite 1167, Shreveport, Louisiana, 71101-3083 for disbursement to Louisiana Department of Support Enforcement, P.O. Box 260222, Baton Rouge, Louisiana, 70826-0222, at a rate of no less than $2500.00 per month, to begin 30 days after commencement of supervised release. In the event the entire amount of criminal monetary penalties imposed is not paid prior to the termination of supervision, the U.S. Attorney's Office shall pursue collection of the amount due, and shall request the court to establish a payment schedule if appropriate.

2. The defendant shall stay current on all child support payments.

3. The defendant shall not incur any new credit charges or open any additional lines of credit without approval of the probation officer.

4. The defendant shall provide the probation officer with any requested financial information.

AO245B  Judgment in a Criminal Case (Rev.06/05)
Sheet 5 — Criminal Monetary Penalties

Judgment — Page 5 of 6

DEFENDANT:  JAMIE EDELKIND
CASE NUMBER:  6:05CR60067-001

# CRIMINAL MONETARY PENALTIES

The defendant must pay the total criminal monetary penalties under the schedule of payments on Sheet 6.

| | Assessment | Fine | Restitution |
|---|---|---|---|
| Totals: | $ 100.00 | $ | $ 94,443.88 |

[ ]  The determination of restitution is deferred until _. An *Amended Judgment in a Criminal Case* (AO 245C) will be entered after such determination.

[✔]  The defendant must make restitution (including community restitution) to the following payees in the amounts listed below.

If the defendant makes a partial payment, each payee shall receive an approximately proportioned payment, unless specified otherwise in the priority order or percentage payment column below. However, pursuant to 18 U.S.C. § 3664(i), all nonfederal victims must be paid before the United States is paid.

| Name of Payee | *Total Loss | Restitution Ordered | Priority or Percentage |
|---|---|---|---|
| U.S. Clerk of Court
300 Fannin Street, Suite 1167
Shreveport, LA 71101-3083 | | | |
| TOTALS: | $ 94,443.88 | $ 94,443.88 | |

[ ]  Restitution amount ordered pursuant to plea agreement $ _

[✔]  The defendant must pay interest on restitution and a fine of more than $2500, unless the restitution or fine is paid in full before the fifteenth day after the date of judgment, pursuant to 18 U.S.C. §3612(f). All of the payment options on Sheet 6 may be subject to penalties for delinquency and default, pursuant to 18 U.S.C. §3612(g).

[ ]  The court determined that the defendant does not have the ability to pay interest, and it is ordered that:

[ ] The interest requirement is waived for the  [ ] fine  [ ] restitution.

[ ] The interest requirement for the  [ ] fine  [ ] restitution is modified as follows:

* Findings for the total amount of losses are required under Chapters 109A, 110, 110A, and 113A of Title 18, for offenses committed on or after September 13, 1994 but before April 23, 1996.

AO245B  Judgment in a Criminal Case (Rev. 06/05)
Sheet 6 — Schedule of Payments

DEFENDANT:        JAMIE EDELKIND                              Judgment — Page 6 of 6
CASE NUMBER:      6:05CR60067-001

# SCHEDULE OF PAYMENTS

Having assessed the defendant's ability to pay, payment of the total criminal monetary penalties shall be due as follows:

A   [ ]   Lump sum payment of $_ due immediately, balance due

          [ ] not later than _, or
          [ ] in accordance with          [ ]C,     [ ]D, or   [ ]E or [ ]F below; or

B   [ ]   Payment to begin immediately (may be combined with [ ]C,   [ ]D, or      [ ]F below); or

C   [ ]   Payment in equal___ (e.g., weekly, monthly, quarterly) installments of $ _ over a period of _ (e.g., months or years), to commence _
          (e.g., 30 or 60 days) after the date of this judgment; or

D   [✓]   Payment in equal_ monthly_ installments of $ 2500.00_ to commence 30 days after commencement of supervised release. In the event
          the entire amount of criminal monetary penalties imposed is not paid prior to the termination fo supervision, the U.S. Attorney's Office
          shall pursue collection of the amount due, and shall request the court to establish a payment schedule if appropriate.

E   [ ]   Payment during the term of supervised release will commence within __ (e.g., 30 or 60 days) after release from imprisonment. The court
          will set the payment plan based on an assessment of the defendant's ability to pay at that time; or

F   [ ]   Special instructions regarding the payment of criminal monetary penalties:


Unless the court has expressly ordered otherwise, if this judgment imposes imprisonment, payment of criminal monetary penalties is due during
imprisonment. All criminal monetary penalties, except those payments made through the Federal Bureau of Prisons' Inmate Financial Responsibility
Program, are made to the clerk of court.

The defendant shall receive credit for all payments previously made toward any criminal monetary penalties imposed.


[ ]   Joint and Several

      Defendant and Co-Defendant Names and Case Numbers (including defendant number), Total Amount, Joint and Several Amount, and
      corresponding payee, if appropriate.


[ ]   The defendant shall pay the cost of prosecution.

[ ]   The defendant shall pay the following court cost(s):

[ ]   The defendant shall forfeit the defendant's interest in the following property to the United States:


Payments shall be applied in the following order: (1) assessment, (2) restitution principal, (3) restitution interest, (4) fine principal, (5)fine interest,
(6) community restitution, (7) penalties, and (8) costs, including cost of prosecution and court costs.

# EXHIBIT 7

Message

| | |
|---|---|
| **From**: | Joseph Cohen [polysavant@hotmail.com] |
| **Sent**: | 5/22/2018 5:02:02 PM |
| **To**: | j.cohen@kagandevelopment.com |
| **Subject**: | Fwd: CONSTRUCTION MANAGEMENT Lyman Cutler Executable |
| **Attachments**: | CONSTRUCTION MANAGEMENT Lyman Cutler Executable |

Confidential

Message

| | |
|---|---|
| **From**: | Joseph Cohen [polysavant@hotmail.com] |
| **Sent**: | 6/24/2013 11:56:36 PM |
| **To**: | vadim.kagan@yahoo.com |
| **Subject**: | CONSTRUCTION MANAGEMENT Lyman Cutler Executable |
| **Attachments**: | CONSTRUCTION MANAGEMENT Lyman Cutler Executable.docx |

Vadim I made the final final corrections.  This should be printable.

I left it in doc format if you need to make any edits.

Joseph

Confidential                                                                                      KAGAN 003025

# CONSTRUCTION MANAGEMENT/
# GENERAL CONTRACTOR AGREEMENT

THIS AGREEMENT is made and entered into June 24, 2013, by and between Lyman Cutler LLC (hereinafter referred to as the "Owner" or "Company"), and Kagan Development KDC, Corp. (hereinafter referred to  as the "Construction Manager/General Contractor" or "CM/GC"), for services in connection with the following   described Project:

_____

_____

This Contract shall be performed in conjunction with the services of the Owners Project **Manager, Vadim Kagan (hereinafter the OPM)**.

Therefore, in consideration of the mutual covenants and provisions contained herein, the parties agree as follows:

## 1.0    THE CONSTRUCTION TEAM AND EXTENT OF AGREEMENT

1.1      The CM/GC accepts the relationship of trust and confidence established with the Owner by this Agreement. He covenants with the Owner to furnish his best skill and judgment and to cooperate with the OPM in furthering the interests of the Owner. He agrees to furnish efficient business administration  and superintendence and to use his best efforts to perform the Work in the best and soundest way and in the most expeditious and economical manner consistent with the interests of the Owner.

1.1.1      <u>The Construction Team</u>: The CM/GC, the Owner, and the OPM, collectively referred to as the "Construction Team" shall work from the beginning of design through construction completion. The CM/GC shall provide leadership to the Construction Team on all matters relating to construction.

1.1.2      <u>Extent of Agreement</u>: This Agreement and the General Conditions to the Agreement represent the entire agreement between the Owner and the CM/GC and supersedes all prior negotiations, representations or agreements. When plans and specifications are complete, they shall be identified as part of the Contract Documents. This Agreement shall not be superseded by any provisions of the documents for construction and may be amended only by written instrument executed by both the Owner and the CM/GC. Nothing contained herein shall be deemed to create any contractual relationship between the CM/GC and the OPM, or any of the contractors, subcontractors or material suppliers on the Project;  nor shall anything contained herein be deemed to give any third party any claim or right of action against the Owner or the CM/GC which does not otherwise exist without regard to this Agreement.

1.1.3      <u>Contract Documents</u>: The provisions of the General Conditions and all of the "Contract Documents" for the Project as that term is defined therein are incorporated by this reference into this Construction Management/General Contractor Agreement, to the extent those documents and their provisions are not in conflict with specific provisions herein.

## 2.0    CONSTRUCTION MANAGER/GENERAL CONTRACTOR SERVICES

2.1      The CM/GC's basic services under this Agreement shall consist of the two  phases described below:

2.2      <u>Design Phase</u>. As part of the Design Phase services, the CM/GC will:

KAGAN 003026

2.2.1    Consultation During Project Development - Attend regularly scheduled meetings with the OPM during the development of conceptual and preliminary design to advise on site use and improvements, selection of materials, building systems and equipment. Provide recommendations on construction feasibility, availability of materials and labor, time requirements for installation and construction and factors related to cost including costs of alternative designs or materials, preliminary budgets and possible economies.

2.2.2    Scheduling - Develop a Project Time Schedule that coordinates and integrates the OPM's design efforts with construction schedules. Update the Project Time Schedule incorporating a detailed schedule for the construction operations of the Project, including realistic activity sequences and durations, allocation of labor and materials, processing of shop drawings and samples and delivery of products requiring long lead-time procurement. Include the Owner's occupancy requirements showing portions of the Project having occupancy priority.

2.2.3    Project Construction Budget - Review the Owner's established Project budget as soon as major program requirements have been identified and update the budget periodically for the Owner's approval. Prepare an estimate based on a quantity survey of drawings and specifications at the end of the Schematic Design Phase for approval by the Owner as the Project Construction Budget. Update and refine this estimate for Owner's approval as the development of the drawings and specifications proceeds. Advise the Owner and the OPM if it appears that the Project Construction Budget will not be met and, in that event, make recommendations for corrective action.

2.2.4    Value Engineering - Provide technical review and analysis of systems and materials being considered in the design to produce the greatest value for the least cost.

2.2.5    Coordination of Contract Documents - Review the drawings and specifications as they are being prepared, recommending alternative solutions whenever design details affect construction feasibility or schedules without, however, assuming any of the OPM's customary responsibilities for design.

2.2.6    Construction Planning - Recommend for purchase and expedite the procurement of long-lead items to ensure their delivery by the required dates.

2.2.7    Division of Work - Make recommendations to the Owner and the OPM regarding the division of the Work in the plans and specifications to facilitate the bidding and awarding of subcontractors and to allow for phased construction, taking into consideration such factors as time of performance, availability of labor, overlapping trade jurisdictions, provisions for temporary facilities and other matters.

2.2.8    Construction Document Review - Perform final review of plans and specifications with the OPM and Owner to eliminate areas of conflict or misinterpretation and to assure proper coordination, accuracy and completeness.

2.2.9    Labor - Analyze the types, quantity and availability of appropriate categories of labor required for various phases of the Project.

2.2.10    Bidding - Prepare pre-qualification criteria for bidders and develop subcontractor interest in the Project. As working drawings and specifications are completed, establish bidding schedules and conduct pre-bid conferences to familiarize bidders with bidding documents, management techniques and any special systems, materials or methods. Receive competitive bids on the Work from various subcontractors, pursuant to bidding procedures acceptable to the Owner. Analyze all bids, review them with the Owner and OPM, make recommendations for contract awards and award subcontractors.

2.2.11    <u>Conferences</u> - Conduct pre-construction conferences with successful subcontractors.

2.2.12    <u>Equal Employment Opportunity</u> - Determine applicable requirements for equal employment opportunity programs for inclusion in Project bidding documents.

2.3    <u>Construction Phase</u>. As part of the Construction Phase services, the CM/GC will:

2.3.1    <u>Project Control</u> - Supervise the Work of the subcontractors and coordinate the Work with the activities and responsibilities of the Owner and OPM in order to complete the Project in accordance with the Owner's objectives of cost, time and quality.

2.3.2    <u>Staffing</u> - Maintain a competent full-time staff at the Project site to coordinate, provide overall direction of the Work, and monitor progress of the subcontractors on the Project.

2.3.3    <u>Organization</u> - Establish on-site organization and lines of authority in order to carry out the overall plans of the Construction Team.

2.3.4    <u>Coordination</u> - Establish and implement procedures for coordination among the Owner, OPM, subcontractors and the CM/GC with respect to all aspects of the Project.

2.3.5    <u>Scheduling</u> - Schedule and conduct progress meetings at which subcontractors, the Owner, OPM and the CM/GC can discuss jointly such matters as procedures, progress, problems and scheduling. Provide a detailed schedule for the operations of the CM/GC and subcontractors on the Project, including realistic activity sequences and durations, allocation of labor and materials, processing of shop drawings and samples and delivery of products requiring long lead-time procurement. Include the Owner's occupancy requirements in all schedules showing portions of the Project having occupancy priority, if any.

2.3.6    <u>Monitoring</u> - Provide regular monitoring of the schedule as construction progresses. Identify potential variances between scheduled and probable completion dates.  Review schedule for work not started or incomplete and recommend to the Owner and subcontractors adjustments in the schedule to meet the scheduled completion date. Provide summary reports of such monitoring activities and document all changes in the schedule.

2.3.7    <u>Evaluation</u> - Determine the adequacy of the subcontractors' personnel and equipment and the availability of materials and supplies to meet the schedule.

2.3.8    <u>Cost Control</u> - Develop and implement an effective system of Project cost control.

2.3.9    <u>Change Orders</u> - Develop and implement a system for the expeditious review and processing of Change Orders. Initiate necessary or desirable changes to the Owner and the OPM, review requests for changes, submit recommendations to the Owner and the OPM and assist in  negotiating Change Orders, in accordance with section 17.00 of the General Conditions of the Agreement.

2.3.10    <u>Permits</u> - Secure or assist the Owner in securing all necessary permits, licenses and inspections for the proper completion and execution of the Work, in accordance with section 12.00 of the General Conditions of the Agreement.

2.3.11    <u>Carrying Costs</u> – Advance such funds as required to provide all needed services for the establishment and maintenance of the Work, whether or not such accounts as established are in the name of the Owner or the CM/GC

2.3.12    <u>Owner's Consultants</u> - If required, assist the Owner in selecting, retaining and coordinating professional services of a surveyor, testing laboratories and any special consultants.

Confidential                                                                                              KAGAN 003028

2.3.13    <u>Superintendent</u> - Keep on the Project, during the work, a competent superintendent and any necessary assistants, all satisfactory to the OPM and the Owner, in accordance with section 16.00 of the General Conditions of the Agreement. The superintendent shall not be changed except with the consent of the OPM and the Owner, unless the superintendent proves to be unsatisfactory to the CM/GC and ceases to be in his employ. The superintendent shall represent the CM/GC in his absence and all directions given to him shall be as binding as if given to the CM/GC. The OPM and the Owner shall not be responsible for the acts or omissions of the superintendent or his assistants.

2.3.13.1    The superintendent shall provide full-time, qualified and efficient supervision of the Work, using his best skill and attention. Carefully study and compare all drawings, specifications and other instructions and immediately report to the OPM any error, inconsistency or omission which may be discovered. Inspect the Work of the subcontractors at all stages and at final completion and guard the Owner against defects and deficiencies in such Work. The CM/GC shall be responsible to the Owner for the acts and omissions of all his employees and of all subcontractors, their agents and employees and all other persons performing any of the Work, for which the CM/GC has supervisory or inspection responsibility hereunder.

2.3.13.2    The superintendent shall see that the Work is carried out in accordance with the Contract Documents and in a thorough and first class manner in every respect. The CM/GC's superintendent shall establish all lines, levels and marks necessary to facilitate the operations of all concerned in subcontract work. He shall lay out the Work in a manner satisfactory to the OPM, making permanent records of all lines and levels required for excavation, grading and foundations and for all other portions of the Work. He shall, together with the OPM, authorize the commencement and certify the proper completion of the various stages of construction. The CM/GC shall be responsible for construction means, methods, techniques, sequences and procedures and for carrying out the Work in accordance with the Contract Documents.

2.3.14    <u>Safety Measures</u> - Establish procedures and measures for the safety of persons and property at and around the site of the Work. Assure compliance with all federal, state and local statutes, rules, regulations and orders applicable to the conduct of the Work.

2.3.15    <u>Contract Interpretations</u> - Refer all questions relative to interpretation of design intent to the OPM in writing.

2.3.16    <u>Shop Drawings and Samples</u> - In collaboration with the OPM, establish and implement procedures for expediting the processing and approval of shop drawings and samples, in accordance with section 8.00 of the General Conditions of the Agreement.

2.3.17    <u>Reports and Project Site Documents</u> - Record the progress in written progress reports and summaries of meetings to the Owner and the OPM, including information on the subcontractors' work and the percentage of completion at the request of the OPM.

2.3.18    <u>Record Sets</u> - Maintain at the Project site, on a current basis, records of all necessary contracts, shop drawings, samples, purchases, materials, equipment, maintenance and operating manuals and instructions and any other documents and revisions thereto which arise out of the Agreement or the Work, in accordance with section 7.00 of the General Conditions of the Agreement. Obtain data from subcontractors and maintain a current set of record drawings, specifications, operating manuals, warranties and guarantees. At the completion of the Project submit all such documents to the OPM for delivery to the Owner.

2.3.19    <u>Completion</u> - Determine completion of the Work or designated portions thereof and prepare for the OPM a list of incomplete or unsatisfactory items together with a schedule for their completion, in accordance with section 50.00 of the General Conditions of the Agreement.

2.3.20    <u>Start-Up</u> - With the Owner's maintenance personnel and the OPM, direct the checkout of utilities, operating systems and equipment for readiness and assist in their initial start-up and testing by the subcontractors.

2.3.21    <u>Completion</u> - Determine final completion and provide written notice to the Owner and OPM that the Work is ready for final inspection. Secure and transmit to the OPM required guarantees, tax affidavits, certificates, releases, bonds and waivers. Turn over to the Owner all keys and maintenance stocks.

2.3.22    <u>Warranty</u> - During the one-year warranty period at no additional cost to the Owner, perform four quarterly warranty inspections and ensure that Work which proves defective or deficient during such time is corrected either by the subcontractors or such other means as shall be required. Administer the one-year warranty period by the Owner's Warranty Work Request process and attend four quarterly warranty work request meetings, in accordance with section 53.00 of the General Conditions of the Agreement.

2.4    <u>Additional Services</u> - Additional services shall be performed only upon the express, prior written authorization of the Owner and paid for as provided herein. Additional services shall include the following:

2.4.1    <u>Analysis of Existing Improvements</u> - Services related to investigation, appraisals or valuations of existing conditions, facilities or equipment; or verifying the accuracy of existing drawings or other Owner-furnished information.

2.4.2    <u>Owner-Furnished Equipment</u> - Services related to Owner furnished equipment, furniture and furnishings which are not a part of the Work.

2.4.3    <u>Expert Witness</u> - Preparing to serve or serving as an expert witness in connection with any public hearing or legal proceeding.

2.4.4    <u>After Completion</u> - Inspections of and services related to the Project after completion of the services under this Agreement.

2.4.5    <u>Other</u> - Providing any other service not otherwise included in this Agreement.

## 3.0    THE OWNER'S RESPONSIBILITIES

3.1    <u>Information</u> - The Owner shall provide full information regarding its requirements for the Project.

3.2    <u>Owner's Representative</u> - The Owner shall designate a representative who shall be acquainted with the scope of the Work; has authority to approve budgets and adjustments thereto, as contemplated by Paragraph 2.2.3 within the Project Cost Estimate, and otherwise furnish information.

3.3    <u>OPM</u> - The Owner shall retain an OPM to provide design services and to prepare construction documents for the Project. The OPM's services, duties and responsibilities are described in the Agreement between the Owner and the OPM, a copy of which will be furnished to the CM/GC.

3.4    <u>Professional Services</u> - The Owner shall furnish such legal services as may be necessary for the Project, and such auditing services as it may require.

3.5    <u>Documentation</u> - The CM/GC will be furnished, without charge, all copies of drawings and specifications reasonably necessary for the execution of the Work.

3.6    <u>Defects</u> - If the Owner becomes aware of any fault or defect in the Project or nonconformance with the Contract Documents, it shall give prompt written notice thereof to the CM/GC. This provision shall not, however, charge the Owner with any obligation to make inspections and shall in no manner be construed to discharge or modify the CM/GC's obligations to supervise, inspect and to otherwise complete the Project in accordance with the Contract Documents.

3.7    <u>Surveys and Special Testing</u> - So far as the Project contemplated by this Agreement may require, the CM/GC shall be entitled to information giving a complete and accurate survey of the

building site  and the existing grades and lines of streets, pavements and adjoining properties; information as to the rights,  restrictions, easements, surface water courses, boundaries  and contours of the building site; and  full  information as to existing sanitary sewer, storm sewer, water, gas and electrical services. The Owner, at its  expense, shall furnish all such data, upon request. The Owner likewise shall pay for all borings or test pits  and for any mechanical, chemical or other tests as well as professional verifications and inspections incident  to proper appraisal of the site for the contemplated structure. A copy of all reports of such tests and borings  shall be filed with the Owner and shall be available to the CM/GC, upon request.

       3.8    <u>Owner's Expenses </u> -  The services, information, surveys and reports required by Paragraphs 3.3 through 3.5 and 3.7, shall be furnished at the Owner's expense.

## 4.0    SUBCONTRACTS

       4.1    <u>Bidding </u>- All Work, performed at the direction of the OPM shall be exempt from bidding. Notwithstanding, KDC shall use its expertise in providing appropriate services at industry standard pricing for the market and timing required by the OPM.

       4.2    <u>Award </u> -  The CM/GC w h e n  n e e d e d ,  shall request and receive proposals from subcontractors and subcontracts will be awarded by the CM/GC after the proposals are reviewed by the CM/GC with  the OPM.

       4.3    <u>Substitution </u>-  If the OPM refuses to accept a subcontractor recommended by the CM/GC,  the CM/GC shall recommend an acceptable substitute. The Guaranteed Maximum Price, if applicable, shall  be increased or decreased by the difference in cost occasioned by such substitution and an appropriate   Change Order shall be issued.

       4.4    <u>Forms </u>-  The form of the subcontract, including the General and Supplementary Conditions  applicable thereto, shall be satisfactory to the, OPM and the CM/GC.

## 5.0    CONTRACT TIME SCHEDULE

       5.1    <u>Schedule </u>-  The services and work to be performed under this Contract shall be in general  accordance with the Contract Time Schedule attached hereto as Exhibit 1.

       5.2    <u>Time of Completion </u>– This date shall be established at the time a Guaranteed Maximum  Price is established or prior to the award of any subcontracts if a GMP is not established.

       5.3    <u>Revision </u>-  At the time a Guaranteed Maximum Price is fixed, as provided for in Paragraph  6, a new Contract Time Schedule shall also be established.

       5.4    <u>Delays and Extension of Time </u>-  If the CM/GC is delayed at any time in the progress of the  Work by any act or neglect of the Owner or the OPM or by any employee of either; or by any separate  contractor employed by the Owner; or by changes ordered in the Work; or by labor disputes, fire unusual  delay in transportation, unavoidable casualties or any causes beyond the CM/GC's control;  or by delay  authorized by the Owner; the Contract Time Schedule shall be extended.

KAGAN 003031

5.5     <u>Liquidated Damages</u> - The CM/GC understands and agrees that the completion of the entire Project within the time specified is an essential feature of this Agreement and that the Owner will sustain substantial damages, the amount of which is not possible to accurately determine at the time of contracting and which may be difficult to prove, if the Work is not so completed. The CM/GC, therefore, agrees to proceed with due diligence, taking all precautions and making all necessary arrangements to insure the completion of the Work within the prescribed time. The CM/GC further agrees that his failure to fully and finally complete the Work due to negligence, neglect, or mismanagement, within the time allowed shall be considered a material breach of this Agreement and shall entitle the Owner to collect liquidated damages for the delay in completion in accordance with the General Conditions in the sum of five hundred dollars ($500.00) per calendar day.

**6.0     GUARANTEED MAXIMUM PRICE**

6.1     <u>Establishment</u> - When the design, plans and specifications are sufficiently complete to make the final cost estimates and prior to awarding any subcontracts, the CM/GC will, if desired by the Owner, and requested in writing, fix a Guaranteed Maximum Price (GMP), guaranteeing the maximum cost to the Owner for the Cost of the Work and the CM/GC's Fees. Such GMP will be guaranteed by the CM/GC, subject only to modification for Changes in the Work as provided in the General Conditions of the Agreement 17.00 <u>Changes in the Work</u> and for additional costs arising from delays caused by the Owner or the OPM.

6.2     <u>Subcontracts</u> - When the CM/GC provides a GMP, the subcontracts will contain the necessary provisions to allow the CM/GC to control the performance of the Work.

**7.0     CONSTRUCTION MANAGER/GENERAL CONTRACTOR'S FEE**

7.1     <u>Determination</u> - In consideration of the performance of this Agreement, the Owner agrees to pay the CM/GC in current funds as compensation for his services a CM/GC's Fee as set forth in Paragraph 7.1.1 and 7.1.2.

7.1.1     <u>Design Phase Fee</u> - For the performance of the Design Phase services, as defined in Paragraph 2.2, a fee of $25,000.00.

7.1.2     <u>Construction Phase Fee</u> - For work or services performed during the Construction Phase, as defined in Paragraph 2.3, a fee of 15% fifteen percent, which shall be paid proportionately to the ratio the monthly payment for the Cost of the Work bears to the total Cost of the Work. Any balance of this fee shall be paid the time of final payment.

7.1.3     <u>Operational Advances</u> – For any capital outlay advanced by the CM/GC done in order to facilitate the advancement of this agreement or the project as defined in the Scope of Work, attached hereto, or as directed by the Owner, whether or not this advance occurs during or post the construction phase, but in all events prior to the sale or disposal of the property, the CM/GC shall be reimbursed the full amount of the Operational Advance plus a fee of 17.5% (seventeen and one half percent). Any balance remaining unpaid beyond 30 days after being advanced shall accrue additional interest at 12% (twelve percent) per annum compounded monthly.

7.1.4     Post Construction Services – For the support work performed by KDC in maintaining, and keeping the project properties in Marketable Condition, services to be billed at actual cost plus a fee of 17.5% seventeen and one half percent.

7.2     <u>Adjustments</u> - Adjustments in Fee shall be made as follows:

7.2.1     <u>Change in Scope</u> - The CM/GC fee shall be adjusted only for owner approved changes which involve a substantial change in the scope of Work. The CM/GC fee shall be adjusted percent (5 % ) of the Cost of the Work for substantial changes in the scope of the Work. A "substantial

change in the scope of the Work" for purposes of this Article is defined as follows:

        7.2.1.1      Changes which vary the scope of Work in excess of 10% of the original scope of Work, based either on square footage of floor area or estimated construction cost.

        7.2.1.2      Change orders involving the procurement of additional subcontractors, not previously contemplated by the Contract Documents.

        7.2.1.3      Changes which involve the revision or modification of major systems not contemplated in the original scope of Work.

        7.2.2      <u>Delays</u> - For delays in the Work, other than for weather, in excess of seven (7) calendar days and which are not the responsibility of the CM/GC, there will be an equitable adjustment in the Fee to compensate the CM/GC for verified and documented increased expenses.

        7.2.3      <u>Additional Services</u> - Additional services, as described in Paragraph 2.4 shall be computed as follows:

        **Labor**:   Direct Personnel Expense (base wage) times 1.5

        **Expenses**: Actual cost.

7.3      <u>Items Included in Fee</u> - Included in the CM/GC's Fee for the Construction Phase are the following:

        7.3.1      <u>Profit</u> - Before tax profit.

        7.3.2      <u>Overhead</u> - Off-site costs for general management of the Project including:

        7.3.2.1      Salaries or other compensation of the CM/GC's employees at the principal office and branch offices including:

        Vadim Kagan - at no cost.

        General Office staff at $75.00 per hour

to provide support in scheduling the Work, cost estimating, cost accounting, processing payment requests, processing Change Orders, processing shop drawings/samples, etc.

        7.3.2.2      General operating expenses of the CM/GC's principal office.

        7.3.2.3      Any part of the CM/GC's capital expenses, including interest @ 16% on the CM/GC's capital employed for the Work.

        7.3.2.4      Costs due to the negligence of the CM/GC, any subcontractor, anyone directly or indirectly employed by any of them, or for whose acts any of them may be liable, including but not limited to, the correction of defective or nonconforming Work, disposal of materials and equipment wrongly supplied, or making good any damage to property.

        7.3.2.5      Overhead or general expenses of any kind, except as may be expressly included in Paragraph 8.

        7.3.2.6      Costs in excess of the GMP, if any, as set forth in Paragraph 6 and adjusted pursuant to the General Conditions of the Agreement, 17.00 <u>Changes in the Work</u>.

**8.0      COST OF THE WORK**

Confidential                KAGAN 003033

8.1      Definition - The term Cost of the Work shall mean costs necessarily incurred in the proper performance of the Work during either the Design or Construction Phase, and paid by the CM/GC. Such costs shall be at the lowest responsible competitive rates not higher than the standard paid in the locality of the Work except with prior consent of the Owner, and shall include the items set forth below in this Paragraph. The Owner agrees to pay the CM/GC for the Cost of the Work as defined in this Paragraph 8. Such payment shall be in addition to the CM/GC's Fee stipulated in Paragraph 7.

8.2      Cost Items Included - On-site costs of the Work including General Conditions and the aggregate cost of subcontracts.

8.2.1   General Condition Costs - Those costs for work outlined in the General Conditions of the Contract that are the responsibility of the CM/GC unless specific items of Work are included in the subcontract work.

8.2.1.1     Wages paid for labor in the direct employ of the CM/GC in the performance of the Work under applicable collective bargaining agreements, or under a salary or wage schedule agreed upon by the Owner and CM/GC and including such welfare or other benefits, if any, as may be payable with respect thereto.

8.2.1.2     Cost of ordinary employee benefits and taxes, such as pension contributions, hospitalization, vacations, medical insurance, assessments or taxes for such items as unemployment compensation and Social Security, insofar as such cost is based on wages, salaries or other remuneration paid to employees of the CM/GC and included in the Cost of the Work.

8.2.1.3     The proportion of reasonable transportation, traveling and hotel expenses of the CM/GC or of his officers or employees incurred in discharge of duties connected with the Work, when the necessity for such expenditures is approved in advance by the Owner.

8.2.1.4     Cost of all materials, supplies and equipment incorporated in the Work, including costs of transportation thereof.

8.2.1.5     Cost, including transportation and maintenance, of all materials, supplies, equipment and hand tools not owned by the workmen employed by the CM/GC, which are employed or consumed in the performance of the Work and cost less salvage value on such items used but not consumed which remain the property of the CM/GC.

8.2.1.6     Rental charges of all necessary machinery and equipment, exclusive of hand tools, used at the site of the Work, whether rented from the CM/GC or other, including installation, repairs and replacements, dismantling, removal, costs of lubrication, transportation and delivery costs thereof, at rental charges consistent with those prevailing in the area. All equipment which the CM/GC intends to rent to the Owner and the rates therefor must be approved by the Owner in writing prior to use.

8.2.1.7     Cost of the premiums for all bonds and insurance which are required by the Contract Documents.

8.2.1.8     Unavoidable sales taxes, if approved in writing in advance by the Owner.

8.2.1.9     Permit fees, licenses, tests and royalties.

8.2.1.10    Minor expenses such as telegrams, long distance telephone calls, telephone service at the site, expressage and similar petty cash items in connection with the Work.

8.2.1.11   Cost of removal of all debris, snow removal, interim and final cleaning.

8.2.1.12    Costs incurred due to an emergency affecting the safety of persons or property, to the extent not compensated by insurance or otherwise, and not attributable to the fault of the

Confidential                                                                                    KAGAN 003034

CM/GC or his subcontractor.

    8.2.1.13  Cost of site security during construction, if requested by the Owner, and the cost of site safety measures, such as fences, signs, and barricades.

    8.2.1.14  Cost of computer services as required at the field office.

    8.2.1.15  Cost of construction support activities such as Work items included in the General Conditions of the Contract and in the specifications unless they are provided by subcontractors.

    8.2.1.16  The cost of adequate, weatherproofed, heated and well lighted office space with telephone service at the site of the Work for the use of the CM/GC and the OPM and Owner representatives.

    8.2.1.17  The cost of providing and maintaining neat, sanitary and adequate temporary toilet facilities for all personnel at the construction site.

    8.2.1.18  The cost of providing suitable temporary facilities and quarters for workmen and of maintaining on premises water tight storage sheds and tool houses for storage of building materials and tools.

    8.2.1.19  The cost of providing temporary facilities required to supply all the power, light, water and heat needed for the proper execution and completion of the Work. Unless provided by subcontractors, the cost of all power, light, water and heat for the duration of the Work.

    8.2.1.20  The cost of providing temporary weather protection and temporary heating as required for the expeditious prosecution of the Work.

    8.2.1.21  Other costs incurred in the performance of the Work if and to the extent approved in advance in writing by the Owner.

    8.2.1.22  All costs directly incurred in the performance of the Work and not included in the CM/GC Fee as defined in Paragraph 7.

    8.2.2  Subcontracts - The cost of Work performed by subcontractors.

    8.2.3  Estimates - The CM/GC shall when requested, furnish detailed and itemized estimate of General Condition costs.

## 9.0  DISCOUNTS

    9.1  All discounts for prompt payment shall accrue to the Owner to the extent the Costs of the Work are paid directly by the Owner or from a fund made available by the Owner to the CM/GC for such payments. To the extent the Costs of the Work are paid with funds of the CM/GC, all cash discounts shall accrue to the CM/GC, provided, however, that all costs claimed pursuant to Paragraph 8, billed to the Owner, reflect such discounts. All trade discounts, rebates and refunds, and all returns from sale of surplus materials and equipment, shall accrue to the Owner, and the CM/GC shall make provisions so that they can be secured.

## 10.0  MISCELLANEOUS PROVISIONS

10.1    Assignment - Neither party to this Agreement shall assign its interests herein in whole or in part without the written consent of the other; nor shall the CM/GC assign any moneys due or to become due to him hereunder, without the previous written consent of the Owner.

10.2     <u>Limitation of Actions</u> - Any actions against the CM/GC, his employees or agents brought to  recover damages for injury to person or defects in or damage to property, including the Work itself, caused  by the administration, superintendence or efforts of the CM/GC or those under his control relating to this   Project shall be brought within six (6) years after such claim for relief arises and is discovered by the Owner.

10.3     <u>Binding Effect</u> - This Agreement shall be binding upon the heirs, personal representatives,   successors and assigns of the respective parties.

10.4     <u>Controlling Law</u> - This Agreement is being executed and is to be performed in the State of  Massachusetts, and shall be enforced and construed according to the laws of the State of Massachusetts.

10.5     <u>Waiver</u> - Any failure of the Owner or the CM/GC to require strict performance or any waiver  of any provision herein shall not be construed as a consent or waiver to any other breach of the same or any   other provision.

10.6     <u>Severability</u> - If in any instance any provision hereof shall be determined to be invalid or   unenforceable under any applicable law, such provision shall not apply in such instances, but the remaining   provisions shall be given effect in accordance with their terms.

10.7     <u>Notices</u> - Any notices required or permitted under this Agreement shall be deemed given when  personally delivered or when deposited in the United States Certified Mail, postage prepaid  and   addressed to Owner:

**Owner:**

> **Attention:**
> **Vadim Kagan**
> **99 Needham St,**
> **Newton, MA**
> **02461**

**CM/GC:**

> **c/o Vadim**
> **Kagan 99**
> **Needham St,**
> **Newton, MA**
> **02461**

This Agreement is effective the day and year first written above upon the signatures of the undersigned  parties.

General Contractor:  Kagan Development, KDC Corp

By:_____

Title:  President Kagan Development KDC, Corp

Owner:
Lyman Cutler Road LLC


By:_____
        Vadim Kagan – Member

KAGAN 003036

# Exhibit I

Services and Work to be preformed

## Scope of Work:

The CM/GC shall build two residences on the subdivided lots formerly known as 77 Lyman Road.  These residences shall be of commensurate quality of materials, style, and workmanship for the area and inn particular shall be of a size and structure for a target sale price of approximately $5,000,000.00, each. Best efforts shall be to maximize the value of the build to emphasize the marketability of the properties. These efforts shall include consultation with Vadim Kagan, and Century 21 as well as other professionals for input as to design and implementation.

Final design approval shall vest with the Owner.

## Completion time:

The residences shall be substantially completed by March 30th of 2014.  Substantial completion shall be defined as in excess of 95%, and shall further be showable to prospective purchasers in a marketable condition by this date.  In the event that the residences are not marketable by this date, The GC shall credit the owner according to section 5.5 – Liquidated Damages.

## Budget:

The Construction Manager/General Contractor shall charge the Owner in accordance with the provisions of this Construction Management agreement.

CM/GC: Kagan Development, KDC Corp


By:_____ Date_____
        President: Vadim Kagan

Owner:
Lyman Cutler Road LLC


By:_____ Dare_____
        Manager: Vadim Kagan:

Confidential                                                                                          KAGAN 003037

# EXHIBIT 8

# Properties

| | |
|---|---|
| Size | 67.5KB |
| Pages | |
| Words | |
| Total Editing Time | 2 Minutes |
| Title | None |
| Tags | None |
| Comments | None |
| Template | Normal |
| Status | None |
| Categories | None |
| Subject | None |
| Hyperlink Base | None |
| Company | SARC |

## Related Dates

| | |
|---|---|
| Last Modified | 6/24/2013 7:51 PM |
| Created | 6/24/2013 7:50 PM |
| Last Printed | 6/17/2015 9:45 AM |

## Related People

| | |
|---|---|
| Manager | None |
| Author | Vadim Kagan |
| Last Modified By | Joseph Cohen |

Show Fewer Properties

# EXHIBIT 9

SHEEHAN
PHINNEY
BASS +
GREEN
PROFESSIONAL
ASSOCIATION



ATTORNEYS AT LAW

BOSTON
255 STATE STREET
BOSTON, MA
02109
T 617 897-5600
F 617 439-9363

MANCHESTER
1000 ELM STREET
MANCHESTER, NH
03101
T 603 668-0300
F 603 627-8121

CONCORD
TWO EAGLE SQUARE
CONCORD, NH
03301
T 603 223-2020
F 603 224-8899

HANOVER
17 ½ LEBANON STREET
HANOVER, NH
03755
T 603 643-9070
F 603 643-3679

WWW.SHEEHAN.COM

John H. Perten
617.897.5641 (Direct)
617.439.9363 (Fax #)
jperten@sheehan.com

September 11, 2015

<u>Via E-Mail and Regular Mail</u>
Sean T. Carnathan, Esq.
O'Connor Carnathan and Mack LLC
1 Van De Graaff Drive
Burlington, MA  01803

> Re:    *Lyman-Cutler, LLC, et al. v. Vadim Kagan, et al.*
> *Middlesex Civil Action No. 1581cv03977*

Dear Sean:

As you know, the Operating Agreement for Lyman-Cutler, LLC specifies the dissolution date for that entity as November 30, 2015. <u>See</u> Section 2.3. For whatever reason, the Certificate of Organization for Lyman-Cutler filed by Mr. Filippov, a copy of which is enclosed, does not specify the agreed upon dissolution date. Accordingly, the Certificate of Organization needs to be amended to reflect the agreed upon dissolution date. As the Certificate of Organization also purports that Mr. Filippov is the manager and only person authorized to file documents on behalf of the LLC with the Secretary of State (<u>see</u> ¶7 of the Certificate), without waiving our right to contest his status as such, we request that Mr. Filippov immediately file the necessary amendment to reflect the agreed upon dissolution date.

Regardless of the pending disputes between our clients, I do not think there can be any dispute as to the agreed upon dissolution date. I draw your attention to Massachusetts General Laws c. 156C, §16(a). I would hope that you do not force me to petition the Court for an order compelling Mr. Filippov to do what he is required to do. That indeed would be a waste of judicial resources.

Please advise no later than September 18th as to your client's intention. Thank you.

Very truly yours,

John H. Perten

JHP
Enclosure



# The Commonwealth of Massachusetts
## William Francis Galvin

Minimum Fee: $500.00

Secretary of the Commonwealth, Corporations Division
One Ashburton Place, 17th floor
Boston, MA 02108-1512
Telephone: (617) 727-9640

## Certificate of Organization
(General Laws, Chapter )

**Federal Employer Identification Number:** 001095519 *(must be 9 digits)*

**1. The exact name of the limited liability company is:** LYMAN-CUTLER, LLC

**2a. Location of its principal office:**

| | |
|---|---|
| No. and Street: | 130 TRAPELO ROAD |
| City or Town: | BELMONT    State: MA    Zip: 02478    Country: USA |

**2b. Street address of the office in the Commonwealth at which the records will be maintained:**

| | |
|---|---|
| No. and Street: | 130 TRAPELO ROAD |
| City or Town: | BELMONT    State: MA    Zip: 02478    Country: USA |

**3. The general character of business, and if the limited liability company is organized to render professional service, the service to be rendered:**

THE GENERAL CHARACTER OF THE BUSINESS OF THE LLC IS TO OWN (DIRECTLY OR THROUGH A NOMINEE), INVEST IN, DEVELOP, IMPROVE, OPERATE, MANAGE, LEASE AND/OR SELL REAL ESTATE IN COMMONWEALTH OF MASSACHUSETTS. TO ENGAGE IN ANY ACTIVITIES DIRECTLY OR INDIRECTLY RELATED OR INCIDENTAL THERETO INCLUDING, BUT WITHOUT LIMITATION, EVERYTHING NECESSARY, SUITABLE, CONVENIENT, OR PROPER FOR THE ACCOMPLISHMENT OF ANY OF THE FOREGOING ACTIVITIES, OR THE ATTAINMENT OF ANY ONE OR MORE OF THE PURPOSES ENUMERATED OR INCIDENTAL TO THE POWERS NAMED, OR WHICH SHALL AT ANY TIME APPEAR CONDUCTIVE TO OR EXPEDIENT FOR THE PRODUCTION OF BENEFIT TO THE CORPORATION, EITHER AS THE HOLDERS OF OR INTERESTED IN ANY PROPERTY, OR OTHERWISE, WITH ALL THE POWERS NOW OR HEREAFTER CONFERRED BY LAW.

**4. The latest date of dissolution, if specified:**

**5. Name and address of the Resident Agent:**

| | |
|---|---|
| Name: | ALEX FILIPPOV |
| No. and Street: | 130 TRAPELO ROAD |
| City or Town: | BELMONT    State: MA    Zip: 02478    Country: USA |

**I, ALEX FILIPPOV** resident agent of the above limited liability company, consent to my appointment as the resident agent of the above limited liability company pursuant to G. L. Chapter 156C Section 12.

**6. The name and business address of each manager, if any:**

| Title | Individual Name | Address (no PO Box) |
|---|---|---|
| | First, Middle, Last, Suffix | Address, City or Town, State, Zip Code |
| MANAGER | ALEX FILIPPOV | 130 TRAPELO ROAD BELMONT, MA 02478 USA |

**7. The name and business address of the person(s) in addition to the manager(s), authorized to execute documents to be filed with the Corporations Division, and at least one person shall be named if there are no managers.**

| Title | Individual Name | Address (no PO Box) |
|---|---|---|
| | First, Middle, Last, Suffix | Address, City or Town, State, Zip Code |
| | | |

**8. The name and business address of the person(s) authorized to execute, acknowledge, deliver and record any recordable instrument purporting to affect an interest in real property:**

| Title | Individual Name | Address (no PO Box) |
|---|---|---|
| | First, Middle, Last, Suffix | Address, City or Town, State, Zip Code |
| REAL PROPERTY | ALEX FILIPPOV | 130 TRAPELO ROAD BELMONT, MA 02478 USA |

**9. Additional matters:**

**SIGNED UNDER THE PENALTIES OF PERJURY, this 26 Day of December, 2012,**
ALEX FILIPPOV

*(The certificate must be signed by the person forming the LLC.)*

© 2001 - 2012 Commonwealth of Massachusetts
All Rights Reserved

MA SOC   Filing Number: 201212562980    Date: 12/26/2012 12:08:00 PM

THE COMMONWEALTH OF MASSACHUSETTS

I hereby certify that, upon examination of this document, duly submitted to me, it appears

that the provisions of the General Laws relative to corporations have been complied with,

and I hereby approve said articles; and the filing fee having been paid, said articles are

deemed to have been filed with me on:

December 26, 2012 12:08 PM

WILLIAM FRANCIS GALVIN

*Secretary of the Commonwealth*

# EXHIBIT 10

**BST Plumbing & Heating**        **Invoice # 1165**

18 Alden Rd.
Swampscott, MA 01907
Phone/Fax: (781) 249-5716

Date: 2-14-2015

Invoice Submitted To:
Name: Kagan Development
Job Location: 55 Lyman , Brookline, MA

| QT. | Description | | Unit Price | Total |
|---|---|---|---|---|
| | PLUMBING FOR A NEW HOUSE | | | |
| | FIRST FLOOR | | | |
| | KITCHEN (2 SINKS) | | | |
| | 2 HALF BATHROOMS | | | |
| | FULL BATHROOM(WC, VANITY , SHOWER) | | | |
| | SECOND FLOOR | | | |
| | MASTER BATHROOM (WC, BIDET, DOUBLE VANITY, SHOWER WITH BODY | | | |
| | SPRAYS AND STEAM GENERATOR, TUB FAUCET WITH A HAND SPRAY) | | | |
| | 4 BATHROOMS (WC, VANITY, TUB) | | | |
| | LAUNDRY CONNECTION AND A SINK | | | |
| | | | $36530 | |
| | | | | |
| | RECIRCULATION, PUMP | $650 | | |
| | RADON | $500 | | |
| | SECOND WATER METER | $1100 | | |
| | POT FILLER | $350 | | |
| | 4 TUB DRAINS | $190 | | |
| | 3 SHOWER LINERS AND STRAINERS | $350 | | |
| | | | $3140 | |
| | | | | |
| | | | | $39670 |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

KDC 00500

**BST Plumbing & Heating**
18 Alden Rd.
Swampscott, MA 01907
Phone/Fax: (781) 249-5716

**Invoice # 216**

Date: 8-18-2015

Invoice Submitted To:
Name:  Kagan Development
Job Location:  55 Lyman , Brookline, MA

| QT. | Description | Unit Price | Total |
|---|---|---|---|
| | ROUGH PLUMBING MATERIALS  ( Ferguson ) | $3060.76 | |
| | FINISH PLUMBING  MATERIALS  ( " ) | $9570.18 | |
| | | | $12630.94 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

KDC 00575

**BST Plumbing & Heating**          **Invoice # 1166**

18 Alden Rd.
Swampscott, MA 01907
Phone/Fax: (781) 249-5716

Date: 3-1-2015

Invoice Submitted To:
Name: Kagan Development
Job Location: 88 Cuttler , Brookline, MA

| QT. | Description | Unit Price | Total |
|---|---|---|---|
| | PLUMBING FOR A NEW HOUSE | | |
| | FIRST FLOOR | | |
| | KITCHEN (2 SINKS) | | |
| | 2 HALF BATHROOMS | | |
| | FULL BATHROOM(WC, VANITY , SHOWER) | | |
| | SECOND FLOOR | | |
| | MASTER BATHROOM (WC, BIDET, DOUBLE VANITY, SHOWER WITH BODY | | |
| | SPRAYS AND STEAM GENERATOR, TUB FAUCET WITH A HAND SPRAY) | | |
| | 4 BATHROOMS (WC, VANITY, TUB) | | |
| | LAUNDRY CONNECTION AND A SINK | | |
| | | $36530 | |
| | | | |
| | RECIRCULATION, PUMP          $650 | | |
| | RADON          $500 | | |
| | SECOND WATER METER          $1100 | | |
| | POT FILLER          $350 | | |
| | 4 TUB DRAINS          $190 | | |
| | 3 SHOWER LINERS AND STRAINERS          $350 | | |
| | | $3140 | |
| | | | |
| | | | $39670 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

KDC 01103

**BST Plumbing & Heating**
18 Alden Rd.
Swampscott, MA 01907
Phone/Fax: (781) 249-5716

**Invoice # 217**

Date: 8-18-2015

Invoice Submitted To:
Name:  Kagan Development
Job Location:  88 Cuttler , Brookline, MA

| QT. | Description | Unit Price | Total |
|---|---|---|---|
| | ROUGH PLUMBING MATERIALS | $3060.76 | |
| | FINISH PLUMBING MATERIALS | $9570.18 | |
| | | | $12630.94 |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |
| | | | |

KDC 01357

*Unicon Electric*
*617 921 9910*
*52 Charles st Natick MA 01760*

**Proposal**

| | |
|---|---|
| PROPOSAL NO. | |
| SHEET NO. | |
| DATE | |

**PROPOSAL SUBMITTED TO:**

NAME

ADDRESS  *55 Lyman rd*
*Brookline MA*

PHONE NO.

**WORK TO BE PERFORMED AT:**

ADDRESS

DATE OF PLANS

ARCHITECT

We hereby propose to furnish the materials and perform the labor necessary for the completion of *Electrical works:*

1. *Wiring and installation devices by NEC*
2. *Installation 400 A electrical service*
3. *Installation Lift. Light system*
4. *Connection appliances HVAC system.*
5. *Heated floor in the bathrooms.*
6. *Connect steam generator.*

All material is guaranteed to be as specified, and the above work to be performed in accordance with the drawings and specifications submitted for above work and completed in a substantial workmanlike manner for the sum of *Sixty five Thousand*
_____ Dollars ($ *65.000* ) with payments to be made as follows.

Any alteration or deviation from above specifications involving extra costs will be executed only upon written order, and will become an extra charge over and above the estimate. All agreements contingent upon strikes, accidents, or delays beyond our control.

Respectfully
submitted _____

Per _____

Note — this proposal may be withdrawn by us if not accepted within _____ days.

**ACCEPTANCE OF PROPOSAL**

The above prices, specifications, and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payments will be made as outlined above.

Signature _____

KDC 00342

*Unicon Electric*
*617 921 9910*
*52 Charles st Natick MA 01760*

**Proposal**

| | |
|---|---|
| PROPOSAL NO. | |
| SHEET NO. | |
| DATE | |

PROPOSAL SUBMITTED TO:

NAME

ADDRESS  *88 Cutler rd*
*Brookline MA*

PHONE NO.

WORK TO BE PERFORMED AT:

ADDRESS

DATE OF PLANS

ARCHITECT

We hereby propose to furnish the materials and perform the labor necessary for the completion of *Electrical works:*

1. *Wiring and installation devices by NEC*
2. *Installation 400 A electrical service*
3. *Installation Lift Light system*
4. *Connection appliances HVAC system*
5. *Heated floor in the bathrooms*
6. *Connection steam generator.*

All material is guaranteed to be as specified, and the above work to be performed in accordance with the drawings and specifications submitted for above work and completed in a substantial workmanlike manner for the sum of _*Sixty five Thousand*_ _____ Dollars ($ *65.000* ) with payments to be made as follows.

Any alteration or deviation from above specifications involving extra costs will be executed only upon written order, and will become an extra charge over and above the estimate. All agreements contingent upon strikes, accidents, or delays beyond our control.

Respectfully submitted

Per _____

Note — this proposal may be withdrawn by us if not accepted within _____ days.

## ACCEPTANCE OF PROPOSAL

he above prices, specifications, and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payments will be made as outlined above.

Signature _____

KDC 00978

V & D Heating and Cooling
25 Van Wart Path
Newton, MA 02459

SHEET NO.
/

DATE
12/06/13

PROPOSAL SUBMITTED TO:

NAME
55 Lyman LLC

ADDRESS
55 Lyman Rd
Brookline MA

PHONE NO.

WORK TO BE PERFORMED AT:

ADDRESS

DATE OF PLANS

ARCHITECT

We hereby propose to furnish the materials and perform the labor necessary for the completion of *Installation
of the two A/c + hydronic heating systems by
Carrier 16 SEER "Infinity" with 4 zones,
gas fired hot water boiler "Buderus",
GB 142/60 with SSU-80 water heater and
heating zone for garage by baseboards
Price included: Labor, materials, equipment, Controls,
Kitchen, bathrooms, Laundry exast, sumpums,
thermostat wiring one year free service*

All material is guaranteed to be as specified, and the above work to be performed in accordance with the drawings and specifications submitted for above work and completed in a substantial workmanlike manner for the sum of *Fifty seven
thousand 00/100* ———————— Dollars ($ _____ )

with payments to be made as follows. *Down payment $25,000.00
After install duct works A/c $10,000.00
After install boiler — $15,000.00
Grills + Condens. — $7,000.00* Respectfully submitted *Viktor Sergea*

Any alteration or deviation from above specifications involving extra costs
will be executed only upon written order, and will become an extra charge
over and above the estimate. All agreements contingent upon strikes, ac-
cidents, or delays beyond our control.

Per _____

Note — This proposal may be withdrawn
by us if not accepted within _____ days

ACCEPTANCE OF PROPOSAL
The above prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work
as specified. Payments will be made as outlined above.

Signature _____

Date _____    Signature _____

KDC 00381

Carbonless

# PROPOSAL

V & D Heating and Cooling
25 Van Wart Path
Newton, MA 02459

PROPOSAL NO. 2231
SHEET NO. 1
DATE 12/05/13

PROPOSAL SUBMITTED TO:

NAME 88 Cuttler LLC

ADDRESS 88 Cuttler Ln

Brookline MA

PHONE NO.

WORK TO BE PERFORMED AT:

ADDRESS

DATE OF PLANS

ARCHITECT

We hereby propose to furnish the materials and perform the labor necessary for the completion of _Installation_
_of the two A/c + hydronic heating systems by_
_Carrier 16 SEER "Infinity" with 4 zones,_
_Gas fired hot water boiler "Buderus"_
_GB 142/60 with SSU-80 water heater and_
_heating zone for garage by baseboards_
_Price includes: Labor, materials, equipment, Controls,_
_Kitchen, bathrooms, Laundry exacts, sumpruns,_
_thermostat wiring one year free service_

All material is guaranteed to be as specified, and the above work to be performed in accordance with the drawings and specifi-
cations submitted for above work and completed in a substantial workmanlike manner for the sum of _Fifty seven_
_thousand_ °°/₁₀₀ ─────────────── Dollars ($ ─────────────── )

with payments to be made as follows. _Down payment $25,000.00_
_After install duct works A/c   $10,000.00_
_After install boiler - $15,000.00_
_Grills + Condens. - $7,000.00_ Respectfully submitted _Viktor Sergev_

Any alteration or deviation from above specifications involving extra costs
will be executed only upon written order, and will become an extra charge
over and above the estimate. All agreements contingent upon strikes, ac-
cidents, or delays beyond our control.

Per _____

Note — This proposal may be withdrawn

by us if not accepted within _____ days.

## ACCEPTANCE OF PROPOSAL

The above prices, specifications and conditions are satisfactory and are hereby accepted. You are authorized to do the work
as specified. Payments will be made as outlined above.

Signature _____

Signature _____

# EXHIBIT 11

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

*Unicon Electric*

617 921 9910

52 Charles St Watick MA 01760

**Proposal**

| | |
|---|---|
| PROPOSAL NO. | |
| SHEET NO. | |
| DATE | |

PROPOSAL SUBMITTED TO:

NAME

ADDRESS  53 Parker terra.

PHONE NO.

WORK TO BE PERFORMED AT:

ADDRESS

DATE OF PLANS

ARCHITECT

We hereby propose to furnish the materials and perform the labor necessary for the completion of *electaical works*

1) Wiring and installation devices, by NEC
2) Fire alarm system : smoke detectores, CO, heat detectors.
3) Heated floors in the bathrooms.
4) Connecting appliances , HVAC
5) Installation 200 A electrical service
6) Installation lift light system
7) Prewiring for emergency generator.

All material is guaranteed to be as specified, and the above work to be performed in accordance with the drawings and specifications submitted for above work and completed in a substantial workmanlike manner for the sum of ___Thirty five Thousand___ _____ Dollars ($ 35,000 ) with payments to be made as follows.

Any alteration or deviation from above specifications involving extra costs will be executed only upon written order, and will become an extra charge over and above the estimate. All agreements contingent upon strikes, accidents, or delays beyond our control.

Respectfully submitted _____

Per _____

Note — this proposal may be withdrawn by us if not accepted within _____ days.

**ACCEPTANCE OF PROPOSAL**

The above prices, specifications, and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payments will be made as outlined above.

Signature _____

Date _____          Signature _____

3-12

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

Unicon Electric
617   921   9910
52  Charles St  Watick MA   01760

**Proposal**

PROPOSAL NO.

SHEET NO.

DATE

PROPOSAL SUBMITTED TO:

NAME

ADDRESS
24  Druid Hill
rd

PHONE NO.
New ton  MA

WORK TO BE PERFORMED AT:

ADDRESS

DATE OF PLANS

ARCHITECT

We hereby propose to furnish the materials and perform the labor necessary for the completion of  *electrical  works*

1) Wiring  and  installation  devices  by NEC
2) Fire  alarm  system : smoke detectors,
   CO  heat detectors.
3) Heated  floors  in  the  bathrooms.
4) Connecting  appliances  HVAC
5) Installation  200 A  electrical  service
6) Installation  lift  light  system
7) Prewiring  for  Emergency  generator.

All material is guaranteed to be as specified, and the above work to be performed in accordance with the drawings and specifications submitted for above work and completed in a substantial workmanlike manner for the sum of  *Thirty five thousand*
*dollars*  Dollars ($  35,000  ) with payments to be made as follows.

Any alteration or deviation from above specifications involving extra costs will be executed only upon written order, and will become an extra charge over and above the estimate.  All agreements contingent upon strikes, accidents, or delays beyond our control.

Respectfully
submitted

Per

Note — this proposal may be withdrawn by us if not accepted within _____ days.

**ACCEPTANCE OF PROPOSAL**
The above prices, specifications, and conditions are satisfactory and are hereby accepted.  You are authorized to do the work as specified.  Payments will be made as outlined above.

Signature

Date

Signature

FIVEPRO J003436

Unicon Electric
617  921  9910
52 Charles st Natick MA  01760

**Proposal**

PROPOSAL NO.

SHEET NO.

DATE

PROPOSAL SUBMITTED TO:

NAME

ADDRESS  10 Lyman rd
Chestnut Hill
PHONE NO.  Brookline

WORK TO BE PERFORMED AT:

ADDRESS

DATE OF PLANS

ARCHITECT

We hereby propose to furnish the materials and perform the labor necessary for the completion of electrical works:

1. Wiring and installation devices by NEC
2. Installation 400 A electrical service
3. Installation Lift light system
4. Connection appliances HVAC system.
5. Heated floor in the bathrooms.
6. Connection steam generator.

All material is guaranteed to be as specified, and the above work to be performed in accordance with the drawings and specifications submitted for above work and completed in a substantial workmanlike manner for the sum of  Sixty five thousand
_____ Dollars ($ 65.000 ) with payments to be made as follows.

Any alteration or deviation from above specifications involving extra costs will be executed only upon written order, and will become an extra charge over and above the estimate. All agreements contingent upon strikes, accidents, or delays beyond our control.

Respectfully submitted

Per _____

Note — this proposal may be withdrawn by us if not accepted within _____ days.

## ACCEPTANCE OF PROPOSAL

The above prices, specifications, and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payments will be made as outlined above.

Signature _____

Date

Signature _____

FIVEPROJ003437

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

# Unicon Electric

617   921   9910

52 Charles St Natick MA   01760

**Proposal**

| | |
|---|---|
| PROPOSAL NO. | |
| SHEET NO. | |
| DATE | |

**PROPOSAL SUBMITTED TO:**

NAME

ADDRESS  7 Fredette rd
Newton MA

PHONE NO.

**WORK TO BE PERFORMED AT:**

ADDRESS

DATE OF PLANS

ARCHITECT

We hereby propose to furnish the materials and perform the labor necessary for the completion of *electical works*

1) Wiring and installation devices by NEC
2) Fire alarm system : smoke detectors, CO heat detectors.
3) Heated floors in the bathrooms.
4) Connecting appliances, HVAC
5) Installation 200 A electrical service
6) Installation lift light System
7) Prewiring for Emergency generator.

All material is guaranteed to be as specified, and the above work to be performed in accordance with the drawings and specifications submitted for above work and completed in a substantial workmanlike manner for the sum of _____ *Thirty thousand* _____

_____ Dollars ($ *30.000* ) with payments to be made as follows.

Any alteration or deviation from above specifications involving extra costs will be executed only upon written order, and will become an extra charge over and above the estimate. All agreements contingent upon strikes, accidents, or delays beyond our control.

Respectfully submitted _____

Per _____

Note — this proposal may be withdrawn by us if not accepted within _____ days.

## ACCEPTANCE OF PROPOSAL

The above prices, specifications, and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payments will be made as outlined above.

Signature _____

Date _____   Signature _____

CONFIDENTIAL-SUBJECT TO PROTECTIVE ORDER

*Unicon Electric*
*617  921  9910*
*52 Charles st Natick MA    01760*

## Proposal

| | |
|---|---|
| PROPOSAL NO. | |
| SHEET NO. | |
| DATE | |

**PROPOSAL SUBMITTED TO:** 

**WORK TO BE PERFORMED AT:**

| | |
|---|---|
| NAME | ADDRESS |
| ADDRESS  *50 Yarmouth rd Brookline MA* | DATE OF PLANS |
| PHONE NO. | ARCHITECT |

We hereby propose to furnish the materials and perform the labor necessary for the completion of *Electrical    works:*

1. *Wiring  and installation devices  by NEC*
2. *Installation    400 A electrical service*
3. *Installation    Lift light  system*
4. *Connection    appliances  HVAC system.*
5. *Heated  floor in the  bathrooms.*
6. *Connection  steam generator.*

All material is guaranteed to be as specified, and the above work to be performed in accordance with the drawings and specifications submitted for above work and completed in a substantial workmanlike manner for the sum of *Seventy five Thousand*

_____ Dollars ($ *75.000* ) with payments to be made as follows.

Any alteration or deviation from above specifications involving extra costs will be executed only upon written order, and will become an extra charge over and above the estimate. All agreements contingent upon strikes, accidents, or delays beyond our control.

Respectfully submitted

Per _____

Note — this proposal may be withdrawn by us if not accepted within _____ days.

## ACCEPTANCE OF PROPOSAL

The above prices, specifications, and conditions are satisfactory and are hereby accepted. You are authorized to do the work as specified. Payments will be made as outlined above.

Signature _____

Date _____    Signature _____

FIVEPROJ003439

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

| | |
|---|---|
| **From:** | Viktor Sergeev <sergvikmk@gmail.com> |
| **Sent:** | Saturday, November 29, 2014 8:19 PM |
| **To:** | Kagan Development <kagandevelopment@gmail.com> |
| **Subject:** | extra payments |
| **Attach:** | dima lyman cuttler walles yarmouth.pdf |

FIVEPROJ003700

**V & D Heating and Cooling**
25 Van Wart Path
Newton, MA 02459

607088

**Invoice**

| SOLD TO | 88 Cuttler LLC | SHIP TO | |
|---|---|---|---|
| ADDRESS | 88 Cuttler Ln | ADDRESS | |
| CITY, STATE, ZIP | Brookline MA | CITY, STATE, ZIP | |

| CUSTOMER ORDER NO. | SOLD BY Viktor | TERMS | F.O.B. | DATE 11/25/14 |
|---|---|---|---|---|

| ORDERED | SHIPPED | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|---|
| | | Payment for basement | | | |
| | | heating zone | | | |
| | | | | | |
| | | Total | | | 2,500 00 |
| | | Viktor Sergeev | | | |

A-5840  T-46706/46721                                        01-11

---

**V & D Heating and Cooling**
25 Van Wart Path
Newton, MA 02459

607087

**Invoice**

| SOLD TO | Lyman LLC | SHIP TO | |
|---|---|---|---|
| ADDRESS | 10 Lyman Rd | ADDRESS | |
| CITY, STATE, ZIP | Brookline MA | CITY, STATE, ZIP | |

| CUSTOMER ORDER NO. | SOLD BY Viktor | TERMS | F.O.B. | DATE 11/25/14 |
|---|---|---|---|---|

| ORDERED | SHIPPED | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|---|
| | | Payment for basement | | | |
| | | heating zone | | | |
| | | | | | |
| | | Total | | | 2,500 00 |
| | | Viktor Sergeev | | | |

A-5840  T-46706/46721                                        01-11

FIVEPROJ003701

## V & Π Heating and Cooling
25 Van Wart Path
Newton, MA 02459

**607085**

**Invoice**

| | |
|---|---|
| SOLD TO | Yarmouth LLC |
| ADDRESS | 50 Yarmouth Rd |
| CITY, STATE, ZIP | Brookline MA |

| SHIP TO | |
|---|---|
| ADDRESS | |
| CITY, STATE, ZIP | |

| CUSTOMER ORDER NO. | SOLD BY Viktor | TERMS | F.O.B. | DATE 11/25/14 |
|---|---|---|---|---|

| ORDERED | SHIPPED | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|---|
| | | Payment for installation | | | |
| | | heating system for basement | | | |
| | | Total | | | 2,500 00 |
| | | Viktor Sergeev | | | |

A-5840 T-46706/46721          01-11

## V & Π Heating and Cooling
25 Van Wart Path
Newton, MA 02459

**607086**

**Invoice**

| | |
|---|---|
| SOLD TO | 55 Lyman LLC |
| ADDRESS | 55 Lyman Rd |
| CITY, STATE, ZIP | Brookline MA |

| SHIP TO | |
|---|---|
| ADDRESS | |
| CITY, STATE, ZIP | |

| CUSTOMER ORDER NO. | SOLD BY Viktor | TERMS | F.O.B. | DATE 11/25/14 |
|---|---|---|---|---|

| ORDERED | SHIPPED | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---|---|---|---|---|---|
| | | Payment for basement | | | |
| | | heating zone | | | |
| | | Total | | | 2,500 00 |
| | | Viktor Sergeev | | | |

A-5840 T-46706/46721          01-11

FIVEPROJ003702

CONFIDENTIAL SUBJECT TO PROTECTIVE ORDER

**Invoice**

V & D Heating and Cooling
25 Van Wart Path
Newton, MA 02459

607084

**SOLD TO** Walles LLC

**ADDRESS** Walles St

**CITY, STATE, ZIP** Newton MA 02459

**SHIP TO**

**ADDRESS**

**CITY, STATE, ZIP**

**CUSTOMER ORDER NO.**

**SOLD BY** Viktor

**TERMS**

**F.O.B.**

**DATE** 11/28/14

| ORDERED | SHIPPED | DESCRIPTION | PRICE | UNIT | AMOUNT |
|---------|---------|-------------|-------|------|--------|
| | | Payment for replacing: baseboards for basement, air ducts for 1st floor system and thermostat for garage | | | |
| | | Total | | | 5,500 00 |
| | | Viktor Sergeev | | | |

A-5840  T-46706/46721

01-11

FIVEPROJ003703

# EXHIBIT 12

EXHIBIT

Lender 3
6·20·18DA

## 50 Yarmouth rd. Brookline Construction Cost

| Description | Cost | % |
|---|---|---|
| Architectural Services | $12,000 | 1% |
| Engineering Services | $8,000 | 0% |
| Survey Services | $6,000 | 0% |
| Permits & Fees | $24,000 | 1% |
| Demolition | $26,000 | 2% |
| Concrete Cutting | | 0% |
| Excavation & Grading | $44,000 | 3% |
| Foundation & Slabs (Labor & Materials) | $65,000 | 4% |
| Water/Sewer & Drainage | $35,000 | 2% |
| Framing/Roofing/Decking(Labor) | $85,000 | 5% |
| Exterior Siding & Stucco (Labor) | | 0% |
| Exterior brick/stone (labor & materials) | 155,000 | 9% |
| Chimneys & Fireplaces | $32,000 | 2% |
| Building Materials | $95,000 | 6% |
| Windows & Doors (Materials) | $85,000 | 5% |
| Guters (Labor & Material) | $17,000 | 1% |
| Insulation (Labor & Material) | $45,000 | 3% |
| Plumbing (Labor & Material) | $58,000 | 3% |
| Plumbing Fixtures | $22,000 | 1% |
| Heating & Cooling (Labor & Material) | $98,000 | 6% |
| Electrical (Labor & Material) | $47,000 | 3% |
| Electrical Fixtures | $16,000 | 1% |
| Plastering (Labor & Material) | $48,000 | 3% |
| Millwork (Material) | $72,000 | 4% |
| Millwork (Labor) | $68,000 | 4% |
| Kitchen Cabinets | $65,000 | 4% |
| Kitchen Appliances | $37,000 | 2% |
| Kitchen Countertops | $18,000 | 1% |
| Flooring (Hardwood) (Labor & Material) | $56,000 | 3% |
| Flooring (Carpeting) (Labor & Material) | | 0% |
| interior marble/stone (material) | $36,000 | 2% |
| Interior marble/stone (labor) | $38,000 | 2% |
| Bathroom Cabinets & Vanities | $21,000 | 1% |
| Bathroom Fixtures & Inclosures | $18,000 | 1% |
| Closets & Shelving (Labor & Materials) | $20,000 | 1% |
| Interior Paint (Labor & Materials) | $48,000 | 3% |
| Exterior Paint (Labor & Materials) | $17,000 | 1% |
| Metal Work (Labor & Metal) | | 0% |
| Fencing (Labor & Materials) | | 0% |
| Exterior Fixtures | | 0% |
| landscape architect services | $3,000 | 0% |
| Driveway (labor & materials) | $22,000 | 1% |
| Exterior stone site work (materials) | $24,000 | 1% |
| Exterior Stone Site Work (Labor) | $22,000 | 1% |
| Plants (Materials) | $40,000 | 2% |
| Grading & Planting (Labor) | $42,000 | 2% |
| Sprinklers (Labor & Material) | $10,000 | 1% |
| Miscellaneous Expenses | | 0% |
| Total Cost | $1,700,000 | |

# EXHIBIT 13



# OPERATING AGREEMENT
## OF
## YARMOUTH ROAD DEVELOPMENT, LLC

1.     THIS OPERATING AGREEMENT is entered into as of the   day of February, 2013 by and between Vadim Kagan, Yury Lande and Elena Lande.

WHEREAS, Mr. Kagan and Ms. Lande wish to form a limited liability company known as YARMOUTH ROAD DEVELOPMENT, LLC (the "Company") pursuant to the Massachusetts Limited Liability Company Act (as amended, the "Act") by filing a Certificate of Organization of the Company with the Massachusetts Secretary of State's Office and by entering into this Agreement;

NOW, THEREFORE, in consideration of the mutual agreements, promises and conditions contained herein and for other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, Mr. Kagan, Mr. Lande and Ms. Lande as acknowledge and agree as follows:

### ARTICLE I - DEFINITIONS

1.1 <u>Definitions.</u>        Capitalized terms used in this Agreement and not otherwise defined shall have the meanings assigned to them below:

    (a) "Agreement" means this operating Agreement, as amended, modified, supplemented or restated from time to time.

    (b) "Certificate of Formation" means the Certificate of Formation of the Company and any and all amendments thereto and restatements thereof filed on behalf of the Company with the Commonwealth Secretary of State's Office pursuant to the Act.

    (c) "Member" means a member of the Company identified on Schedule A attached hereto, as the same may be amended from time to time.

    (d) "Percentage Interest" shall refer to the percentage ownership interest of each Member in the Company.  The Percentage Interests of the Members are set forth on Schedule A attached hereto and incorporated herein for all purposes by this reference.

1

CONFIDENTIAL

(e) "Date of Acquisition" shall refer to deed recording date for 50 Yarmouth Road, Brookline property into the Company.

### ARTICLE II - THE COMPANY

2.1 Formation.

    (a) The Members hereby agree to form the Company as a limited liability company under and pursuant to the provisions of the Act and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein.  Upon the execution of this Agreement, Mr. Kagan, Mr. Lande  and Ms. Lande shall be Members of the Company.

    (b) The name and mailing address of each Member and the amount contributed to the capital of the Company shall be listed on Schedule A.

2.2 Name; Principal Place of Business.  The name of the Company shall be YARMOUTH ROAD DEVELOPMENT, LLC.  The principal office of the Company shall be located at 1 Richard Road, Marblehead, Essex County, Massachusetts, or at such other place as the Members may from time to time determine.

2.3 Term.  The term of the Company shall commence on the date of the filing of the Certificate of Organization in the Commonwealth of Massachusetts Secretary of State's Office and shall continue until  November 30, 2025 unless dissolved before such date in accordance with the provisions of this Agreement.

2.4 Registered Agent and Office.  The company's registered agent and office in Massachusetts shall be as set forth in the Certificate of Organization of the Company filed with Commonwealth of Massachusetts Secretary of State's Office, as the same may from time to time be amended.

2.5 Fiscal Year.  The Company's fiscal year (the "Fiscal Year") shall be the calendar year.

2

SGC-Yarmouth-000076

2.6 <u>Taxation as Partnership.</u>  The Company shall be treated as a partnership for U.S. federal income tax purposes.

### ARTICLE III - PURPOSE AND POWERS OF THE COMPANY

<u>Nature of Business.</u>  The general character of the business of the LLC is to own (directly or through a nominee), invest in, develop, improve, operate, manage, lease and/or sell real estate in Commonwealth of Massachusetts.  To engage in any activities directly or indirectly related or incidental thereto including, but without limitation, everything necessary, suitable, convenient, or proper for the accomplishment of any of the foregoing activities, or the attainment of any one or more of the purposes, enumerated or incidental to the powers named, or which shall at any time appear conducive to or expedient for the production of benefit to the corporation, either as the holders of or interested in any property, or otherwise, with all the powers now or hereafter conferred by law, and for all lawful purposes.

3.1 <u>Powers of the Company.</u>  The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to or for the furtherance of the purpose set forth in Article 3., including, but not limited to the powers permitted under the Act.

### ARTICLE IV - CAPITAL CONTRIBUTIONS AND ACCOUNTS

4.1 <u>Capital Contributions.</u>  Each Member has transferred and contributed to the capital of the Company the capital amounts (the "Capital Contributions") as set forth on Schedule A.  Furthermore, Purchase Money Loan and Construction Loan shall be taken from Wellesley Bank to pay for construction and carrying costs until the issuance of Certificate of Occupancy (hereinafter "CO") but in no event later than May 30, 2014.

4.2 <u>Carrying Costs.</u>   Carrying costs shall be defined to include but not limited to mortgage payments, taxes and insurance for the subject property 50 Yarmouth Road, Brookline, Massachusetts.  *After the issuance of the CO, but in no event before May 30, 2014, all carrying costs shall be paid in the following percentages:  Ms. Elena Lande (50%)  and Mr. Kagan (50%).*

3

SGC-Yarmouth-000077

4.3 <u>Capital Accounts; Assets.</u>  An individual capital account (each a "Capital Account") shall be established and maintained for each Member in accordance with applicable regulations under the Internal Revenue Code of 1986 as from time to time amended (the "Code").  A Member shall not be entitled to interest on his or her Capital Contribution or Capital Account, or to withdraw any part of his or her Capital Contribution or Capital Account.  No Member shall have any right in or to any asset or property of the Company, but shall only have a right to the distributions as and when provided for in Sections 8.2 and 9.2 hereof.

4.4 <u>Maintenance of Capital Accounts.</u>  To the extent consistent with such regulations, there shall be credited to each Member's Capital Account the amount of any contribution of capital and carrying costs made by such Member to the Company, and such Member's share of the net profits of the Company and there shall be charged against each Member's Capital Account the amount of all distributions to such Member, and such member's share of the net losses of the Company.

### ARTICLE V - MEMBERS

5.1 <u>Powers of Members.</u>  The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms of this Agreement.

5.2 <u>Duties of Members.</u>   It shall be Mr. Kagan's duty and obligation to construct a single family home at the location currently known as 50 Yarmouth Road, in Brookline, Massachusetts in accordance with the plans, including drawings, supplied by Mr. Kagan and approved by Managing Member.  The construction shall be completed and CO issued no later than May 30, 2014.  It is specifically understood by all Members that Mr. Kagan's compensation for this duty is outlined in Section 8.1 below.

5.3 <u>Admission of Members.</u>  No person shall be admitted as a Member of the Company after the date of formation of the Company without the written consent or approval of the Members owning at least eighty (80%) of the

4

SGC-Yarmouth-000078

Percentage Interests in the Company at the time of such admission, regardless of whether such person has previously acquired any rights in any existing Member's interest in the Company by assignment, sale or otherwise. A Member's execution of a counterpart of this Agreement, or such other instrument as the Members may require, shall  evidence his or her admission.

5.4 <u>Transfer of Company Interest.</u>  No Member may transfer, sell, assign, pledge, mortgage, or dispose of or grant a security interest in his or her interest in the Company (each, a "Transfer") without the prior written consent of the Members owning at least eighty (80%) of the Percentage Interests in the Company at the time of such Transfer. Any purported Transfer in contravention of this Section 5.3 shall be null and void and the Member attempting such Transfer shall cease to be a Member of the Company shall be forfeited and reallocated to the remaining Members in accordance with their respective Percentage Interests.

5.5 <u>Rights of Assignee.</u>  The purchaser or other transferee of a Member's interest in the Company shall have only the right to receive the distributions and allocations of profits or losses to which the Member would have been entitled under this Agreement with respect to the transferred interest and shall not have or enjoy any right to participate in the management of the Company or to receive any financial information or reports relating to the Company or any other rights of a Member unless and until the purchaser or transferee is admitted as a Member pursuant to Section 5.2.

5.6 <u>Partition.</u>  Each Member waives any and all rights that he or she may have to maintain an action for partition of the Company's property.

## ARTICLE VI - MANAGEMENT

6.1 <u>Management, duties, and Restrictions.</u>

    (a) <u>General Management.</u> The management and control of the operations of the Company and the maintenance, development, sales and leasing of the property of the Company shall rest with the Managing Members.

5

(b) <u>Powers of Managing Member.</u> Subject to such limitations as may be imposed pursuant to the terms of this Agreement, the Act or by operation of law, the Members are and shall be authorized and empowered to carry out and implement the purposes of the Company. In that connection, the powers of the Managing Member shall include, but not be limited to, the following:

(1) to engage, dismiss, and replace personnel, attorneys, accountants, brokers or such other persons as may be deemed necessary or advisable by Managing Member;

(2) to authorize or approve all actions with respect to distributions by the Company, dispositions of the assets of the Company or its nominee, execution of leases, mortgage contracts, bonds, promissory notes, loan agreements and other instruments on behalf of the Company or its nominee, and to execute any agreements, instruments or documents relating to or affecting such matters;

(3) to acquire, mortgage, improve and convey real property and interests therein, including, but not limited to, easements and rights-of-way, and to execute any agreements, instruments or documents relating to or affecting such matters;

(4) to open, maintain, and close bank accounts and to draw checks and other orders for the payment of money; and

(5) to take such other actions and to incur such reasonable expenses on behalf of the Company as may be necessary or advisable in connection with the conduct of the affairs of the Company.

(6) The Managing Member hereby agrees to list the property with Tatiana Kagan.

(c) <u>Liability of Managing Member.</u> In carrying out their duties, the Managing Member shall not be liable to the Company or to any other Members for any

6

SGC-Yarmouth-000080

actions taken in good faith and reasonable believed to be in the best interest of the
Company or which are taken upon the written advice of legal counsel for the
Company.

(d) Reliance on Act of Managing Member. Third parties dealing with the
Company shall be entitled to rely conclusively upon the power and authority
of the Managing Member. Any person other than a Member may and shall be
entitled to rely on certificates, instructions, agreements or assignments signed
or purporting to be signed by a Managing Member for or on behalf of the
Company, and on the statements and agreements set forth therein, without
inquiry as to the due authorization thereof or the authority of the person
signing or purporting to sign such certificates, instructions, agreements or
assignments.

(e) Delegation. The Managing Member may appoint Members only with such
titles as they may elect, including the titles of President, Vice President,
Treasurer and Secretary, to act on behalf of the Company with such power and
authority as the Members may delegate in writing to any such person.

(f) Books and Records. The Company's books and records shall be maintained in
accordance with good record keeping practices and federal and state income
tax laws and regulations. All books and records of the Company shall be
maintained at the principal office of the Company, and each of the Members
shall have access thereto to review the same at any time upon reasonable
notice and during normal business hours.

(g) Reimbursement of Managing Member. The Managing Member shall be
reimbursed by the Company for all reasonable expenses (including attorney
and accountant's fees) incurred or paid by them for or on behalf of the
Company.

7

CONFIDENTIAL

## ARTICLE VII - VOTING, MEMBER CONSENTS AND MEMBER GUARATEE, MEETINGS

7.1 <u>Voting.</u> Each Member shall be entitled to vote in proportion to his or her Percentage Interest in the Company from time to time. Such vote may be exercised by written or oral notification by a Member to the other Members.

7.2 <u>Member Consents.</u> The amendment of this Agreement shall require the vote and unanimous approval of all the Members. All other actions taken by the Company, including the admission of a new Member, shall require the vote and approval of Members owning eighty percent (80%) or more of the Percentage Interest at the time of such vote.

7.3 <u>Member Guarantee.</u> **Mr. and Mrs. Lande** shall provide that lender with an unlimited personal guarantee for all loans obtained by the Company related to the property located at 50 Yarmouth Road, Brookline, Massachusetts.

7.4 <u>Meetings of the Members.</u> The Members may, but shall not be required, to meet from time to time to consider the affairs of the Company and to take any action permitted to be taken by the Members by law or under this Agreement. Meetings of the Members may be called at any time by any Member. Notice of any meeting shall be given to all Members not less than two (2) days nor more than thirty (30) days prior to the date of such meeting. Each Member may authorize any person to act for it by proxy on all matters on which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or his or her attorney-in-fact. A quorum for each meeting shall be one more than one-half the number of all Members.

## ARTICLE VIII - ALLOCATIONS AND DISTRIBUTIONS

8.1 <u>Allocations of Profits or Losses.</u> *The net profits,* net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows: Mr. Yury Lande (30%), Ms. Elena Lande (30%) and Mr. Kagan (40%). *In*

8

SGC-Yarmouth-000082

*the event that house is not sold by May 30, 2015* OR CO is not obtained by
May 30, 2014, then the net profits, net cash flow and net proceeds of any sale
or refinancing of any property of the Company or upon liquidation of the
Company shall be allocated among the Members as follows:  Mr. Yury Lande
(35%),  Ms. Elena Lande (35%)  and Mr. Kagan (30%) and Mr. Kagan shall
be responsible for all carrying costs until such time as the property is sold.   If
Mr. Kagan fails to pays to pay monthly carrying costs, then Ms. Lande shall be
responsible to contribute the necessary carrying costs and subsequently her
capital contribution in the Company shall increase by the same amount and at
the same time will trigger reduction of Mr. Kagan's share of capital
contribution by the same amount.  The net losses from any sale of any
property of the Company or upon liquidation of the Company shall be
allocated among the Members according to the Percentage Interests of Each
Member.  Net profits and net losses shall, for both accounting and tax
purposes, be net profits and net losses as determined for reporting on the
Company's federal income tax return.  For tax purposes, all items of
depreciation, gain, loss, deduction or credit shall be determined in accordance
with the Code and, except to the extent otherwise required by the Code,
allocated to and among the Members in the same percentages in which the
Members share in net profits and net losses.   Any change to this paragraph
will require a written consent of the Members owning at least eighty one
(81%) of the Percentage Interests in the Company.

8.2   Distribution to Members.  ***The distribution to Members shall be in
accordance with their respective Capital Contribution first.***   For the
purposes hereof, the term "Net Cash From Operations" shall mean the gross
cash proceeds from Company operations less the portion thereof used to pay
or establish reserves for Company expenses, debt payments, capital
improvements, replacements, and guaranteed payments, all as determined by
the Members. "Net Cash From Operations" shall not be reduced by
depreciation , amortization, cost recovery deductions, or similar non-cash

9

SGC-Yarmouth-000083

allowances, but shall be increased by any reductions of reserves previously
established.

**ARTICLE IX - DISSOLUTION AND TERMINATION OF COMPANY**

9.1 <u>Events of Dissolution.</u>  The Company shall be dissolved and its affairs shall
be wind up upon the occurrence of any of the following events:

    (a) the death, insanity, dissolution, incompetency, bankruptcy, retirement,
resignation or expulsion of a Member ("Retiring Member") unless
there are at least two (2) remaining Members of the Company, and the
remaining Members owning a "majority in interest" in the Company
elect to continue the Company within ninety (90) days of the death,
insanity, dissolution, bankruptcy, retirement, resignation or expulsion
of the Retiring Member;

    (b) Notwithstanding the above paragraph, in the event of the death,
insanity, dissolution, incompetency, bankruptcy, retirement or
resignation of Ms. Lande, her interest in this Company and control of
this Company will automatically pass to her spouse by operation of
this Agreement;

    (c) the conclusion of the term of the Company set forth in Section 2.3.
hereof;

    (d) the sale or disposition of all or substantially all of the assets of the
Company;

    (e) the written consent of the Members owning eighty (80%) or more of
the Percentage Interests in the Company; or

    (f) the entry of a decree of judicial dissolution in accordance with the
provisions of the Act.

For the purpose of Section 9.1 (a) above, the term "majority in interest" means
eighty (80%) or more of the remaining Members' collective interest in profits and
their respective Capital Accounts.  For the purpose of the foregoing sentence,
profits shall be determined and allocated based upon any reasonable estimate of
profits from the date of the dissolution event to the projected termination of the

10

CONFIDENTIAL

Company taking into account present and future allocations of profits under this Agreement, and the Capital Account balances shall be determined upon the date of the dissolution event.

9.2 <u>Winding Up.</u> Upon the dissolution of the Company, the remaining Member or, if more than one Member then remains, the Member selected by the remaining Members (in either case, the "Liquidating Member"), shall proceed with the winding up of the Company and apply and distribute the Company's assets as provided in this Section 9.2. The assets shall first be applied to the payment of the liabilities of the Company (other than any loans that may have been made by the Members to the Company) and to the expenses of liquidation. A reasonable time shall be allowed for the orderly liquidation of the Company and for the discharge of liabilities to creditors, so as to enable the Liquidating Member to minimize the normal losses attendant to a liquidation. The remaining assets shall next be applied to the repayment of any loans made by the Members to the Company. All assets then remaining shall be distributed to the Members in accordance with their respective Capital Accounts after giving effect to all contributions, distributions and allocations for all periods. Notwithstanding any of the foregoing, the Liquidating Member may retain a sum deemed necessary by him or her as a reserve for any contingent liabilities, expenses and obligations of the Company. Upon the final distribution of assets to the Members, each of the Members shall be furnished with a statement which sets forth the assets and liabilities of the Company as of the date of the complete liquidation.

## ARTICLE X - LIABILITY AND INDEMNIFICATION

10.1 <u>Liability.</u> Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member

11

shall be obligated personally for any such debt, obligation or liability of the
Company solely by reason of being a Member.

10.2 <u>Indemnification.</u>  The Company shall indemnify and hold harmless the
Members and their respective employees and authorized agents from  and
against any loss, damage or claim incurred by reason of any act or omission
performed or omitted by such Member, employee or authorized agent in good
faith on behalf of the Company and reasonable believed to be within the scope
of authority conferred by this Agreement, except that no Member, employee or
authorized agent shall be entitled to be indemnified or held harmless from or
against any loss, damage or claim incurred by reason of such Member's,
employee's or authorized agent's gross negligence or willful misconduct;
provided, however, that any indemnity under this Section 10.2 shall be
provided out of and to the extent of Company assets only, and no Member shall
have any personal liability on account thereof.

**ARTICLE XI - MISCELLANEOUS**

11.1 <u>Governing Law.</u>  The Company and this Agreement shall be governed by, and
construed in accordance with, the laws of the Commonwealth of
Massachusetts.

11.2 <u>Agreement Binding.</u>  This Agreement shall inure to the benefit of, and be
binding upon, the parties hereto and their respective next-of-kin, legatees,
administrators, executors, legal representatives, successors, and assigns.

11.3 <u>Notices.</u>  Notices to the Members or to the Company to be furnished
hereunder shall be deemed to have been given when mailed, by prepaid
registered or certified mail, or when deposited with an express courier service,
addressed to the address set forth on Schedule A or as set forth in any notice
of changes of address previously given in writing by the addressee to the
addressor.

Executed as a Commonwealth of Massachusetts's instrument under seal on the
day and year first above written.

12

CONFIDENTIAL

SGC-Yarmouth-000086

_____

Vadim Kagan, Member

_____

Yury Lande, Member

_____

Elena Lande, Managing Manager

## SCHEDULE A

### Capital Contributions and Percentage Interests

| Member | | Capital Contribution | Percentage Interest |
|---|---|---|---|
| **Name:** | **Elena Lande** | **$700,000.00** | **40%** |
| **Address:** | **1 Richard Road, Marblehead, Essex County, Massachusetts** | | |
| **Name:** | **Yury Lande** | **$700,000.00** | **40%** |
| **Address:** | **1 Richard Road, Marblehead, Essex County, Massachusetts** | | |
| **Name:** | **Vadim Kagan** | **$100,000.00** | **20%** |
| **Address:** | 239 Nahanton Street, Newton, MA 02459 | | |

13

CONFIDENTIAL

SGC-Yarmouth-000087