# EXHIBIT 14

EXHIBIT

PENGAD 800-631-6989

Kayserman

104

6·1·18    9A

# OPERATING AGREEMENT
## OF
## DEBORAH ROAD, LLC

1.  THIS OPERATING AGREEMENT is entered into as of the *1* day of
May, 2012 by and between KAGAN DEVELOPMENT KDC, CORP a
Massachusetts Corporation, Mark Kayserman, Vadim Kagan, Tatyana Kagan
and Irina Kayserman.

WHEREAS, KAGAN DEVELOPMENT KDC, CORP,  Mr. Kayserman, Mr. Kagan,
Mrs. Kagan and Ms. Kayserman wish to form a limited liability company known as
DEBORAH ROAD, LLC (the "Company") pursuant to the Massachusetts Limited
Liability Company Act (as amended, the "Act") by filing a Certificate of Organization of
the Company with the Massachusetts Secretary of State's Office and by entering into this
Agreement;

NOW, THEREFORE, in consideration of the mutual agreements, promises and
conditions contained herein and for other good and valuable consideration, the receipt and
sufficiency of which are hereby acknowledged, KAGAN DEVELOPMENT KDC, CORP,
Mr. Kayserman, Mr. Kagan, Mrs. Kagan and Ms. Kayserman agree as follows:

### ARTICLE I - DEFINITIONS

1.1  Definitions.        Capitalized terms used in this Agreement and not otherwise
defined shall have the meanings assigned to them below:

(a)  "Agreement" means this operating Agreement, as amended, modified,
supplemented or restated from time to time.

(b)  "Certificate of Formation" means the Certificate of Formation of the
Company and any and all amendments thereto and restatements thereof
filed on behalf of the Company with the Commonwealth Secretary of
State's Office pursuant to the Act.

(c)  "Member" means a member of the Company identified on Schedule A
attached hereto, as the same may be amended from time to time.

(d) "Percentage Interest" shall refer to the percentage ownership interest of each Member in the Company. The Percentage Interests of the Members are set forth on Schedule A attached hereto and incorporated herein for all purposes by this reference.

## ARTICLE II - THE COMPANY

2.1 <u>Formation.</u>

(a) The Members hereby agree to form the Company as a limited liability company under and pursuant to the provisions of the Act and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein. Upon the execution of this Agreement, KAGAN DEVELOPMENT KDC, CORP, Mr. Kayserman, Mr. Kagan, Mrs. Kagan and Ms. Kayserman shall be Members of the Company.

(b) The name and mailing address of each Member and the amount contributed to the capital of the Company shall be listed on Schedule A.

2.2 <u>Name; Principal Place of Business.</u> The name of the Company shall be DEBORAH ROAD, LLC. The principal office of the Company shall be located at 16 Mohawk Road, Canton, MA 02021, or at such other place as the Members may from time to time determine.

2.3 <u>Term.</u> The term of the Company shall commence on the date of the filing of the Certificate of Organization in the Commonwealth of Massachusetts Secretary of State's Office and shall continue until May 30, 2032 unless dissolved before such date in accordance with the provisions of this Agreement.

2.4 <u>Registered Agent and Office.</u> The company's registered agent and office in Commonwealth of Massachusetts shall be as set forth in the Certificate of Organization of the Company filed with Commonwealth of Massachusetts Secretary of State's Office, as the same may from time to time be amended.

2

2.5 <u>Fiscal Year.</u>  The Company's fiscal year (the "Fiscal Year") shall be the calendar year.

2.6 <u>Taxation as Partnership.</u>  The Company shall be treated as a partnership for U.S. federal income tax purposes.

## ARTICLE III – PURPOSE AND POWERS OF THE COMPANY

<u>Nature of Business.</u>  The general character of the business of the LLC is to own (directly or through a nominee), invest in, develop, improve, operate, manage, lease and/or sell real estate in Commonwealth of Massachusetts.  To engage in any activities directly or indirectly related or incidental thereto including, but without limitation, everything necessary, suitable, convenient, or proper for the accomplishment of any of the foregoing activities, or the attainment of any one or more of the purposes, enumerated or incidental to the powers named, or which shall at any time appear conducive to or expedient for the production of benefit to the corporation, either as the holders of or interested in any property, or otherwise, with all the powers now or hereafter conferred by law

3.1 <u>Powers of the Company.</u>  The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to or for the furtherance of the purpose set forth in Section 3.1., including, but not limited to the powers permitted under the Act.

## ARTICLE 1V – CAPITAL CONTRIBUTIONS AND ACCOUNTS

4.1 <u>Capital Contributions.</u>  Each Member has transferred and contributed to the capital of the Company the capital amounts (the "Capital Contributions") as set forth on Schedule A.  Furthermore, Purchase Money Loan and Construction Loan shall be taken from Rockland Trust to pay for construction and carrying costs.   Carrying costs shall be defined to include but not limited

3

to mortgage payments, taxes and insurance for the subject property 6 DEBORAH ROAD, Newton, Massachusetts.

4.2 <u>Failure to Pay Carrying Costs.</u>  In the event that there is shortage in funds to pay carrying costs after the issuance of certificate of occupancy, then KAGAN DEVELOPMENT KDC, CORP shall be responsible for 50% of monthly carrying costs and Mr. Kayserman and Ms. Kayserman, each shall be responsible for 25% of monthly carrying costs.  Any member who fails to contribute his/her share of monthly carrying costs will trigger reduction his/her share of capital contribution by the same amount and subsequently his/her percentage interest in the Company.   In this event, Managing Members shall be responsible to contribute the necessary carrying costs and subsequently his capital contribution and percentage interest in the Company shall increase by the same amount and  percentage.

4.3 <u>Capital Accounts; Assets.</u>  An individual capital account (each a "Capital Account") shall be established and maintained for each Member in accordance with applicable regulations under the Internal Revenue Code of 1986 as from time to time amended (the "Code").  A Member shall not be entitled to interest on his or her Capital Contribution or Capital Account, or to withdraw any part of his or her Capital Contribution or Capital Account.  No Member shall have any right in or to any asset or property of the Company, but shall only have a right to the distributions as and when provided for in Sections 8.2 and 9.2 hereof.

4.4 <u>Maintenance of Capital Accounts.</u>  To the extent consistent with such regulations, there shall be credited to each Member's Capital Account the amount of any contribution of capital and carrying costs made by such Member to the Company, and such Member's share of the net profits of the Company and there shall be charged against each Member's Capital Account the amount of all distributions to such Member, and such member's share of the net losses of the Company.

4

**ARTICLE V - MEMBERS**

5.1  <u>Powers of Members.</u>  The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms of this Agreement.

5.2  <u>Admission of Members.</u>  No person shall be admitted as a Member of the Company after the date of formation of the Company without the written consent or approval of the Members owning at least seventy five (75%) of the Percentage Interests in the Company at the time of such admission, regardless of whether such person has previously acquired any rights in any existing Member's interest in the Company by assignment, sale or otherwise.  A Member's execution of a counterpart of this Agreement, or such other instrument as the Members may require, to evidence his or her admission.

5.3  <u>Transfer of Company Interest.</u>  No Member may transfer, sell, assign, pledge, mortgage, or dispose of or grant a security interest in his or her interest in the Company (each, a "Transfer") without the prior written consent of the Members owning at least seventy five (75%) of the Percentage Interests in the Company at the time of such Transfer.  Any purported Transfer in contravention of this Section 5.3 shall be null and void and the Member attempting such Transfer shall cease to be a Member of the Company shall be forfeited and reallocated to the remaining Members in accordance with their respective Percentage Interests.

5.4  <u>Rights of Assignee.</u>  The purchaser or other transferee of a Member's interest in the Company shall have only the right to receive the distributions and allocations of profits or losses to which the Member would have been entitled under this Agreement with respect to the transferred interest and shall not have or enjoy any right to participate in the management of the Company or to receive any financial information or reports relating to the Company or any

other rights of a Member unless and until the purchaser or transferee is admitted as a Member pursuant to Section 5.2.

5.5 Partition. Each Member waives any and all rights that he or she may have to maintain an action for partition of the Company's property.

## ARTICLE VI – MANAGEMENT

6.1 Management, duties, and Restrictions.

    (a) General Management. The management and control of the operations of the Company and the maintenance, development, sales and leasing of the property of the Company shall rest with the Managing Members.

    (b) Powers of Managing Member. Subject to such limitations as may be imposed pursuant to the terms of this Agreement, the Act or by operation of law, the Members are and shall be authorized and empowered to carry out and implement the purposes of the Company. In that connection, the powers of the Managing Member shall include, but not be limited to, the following:

        (1) to engage personnel, attorneys, accountants, or such other persons as may be deemed necessary or advisable;

        (2) to authorize or approve all actions with respect to distributions by the Company, dispositions of the assets of the Company or its nominee, execution of leases, mortgage contracts, bonds, promissory notes, loan agreements and other instruments on behalf of the Company or its nominee, and to execute any agreements, instruments or documents relating to or affecting such matters;

        (3) to acquire, mortgage, improve and convey real property and interests therein, including, but not limited to, easements and rights-of-way, and to execute any agreements, instruments or documents relating to or affecting such matters;

6

    (4)  to open, maintain, and close bank accounts and to draw checks and other orders for the payment of money; and

    (5)  to take such other actions and to incur such reasonable expenses on behalf of the Company as may be necessary or advisable in connection with the conduct of the affairs of the Company.

© Liability of Managing Member. In carrying out their duties, the Managing Member shall not be liable to the Company or to any other Members for any actions taken in good faith and reasonable believed to be in the best interest of the Company or which are taken upon the written advice of legal counsel for the Company.

(d) Reliance on Act of Managing Member. Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Managing Member. Any person other than a Member may and shall be entitled to rely on certificates, instructions, agreements or assignments signed or purporting to be signed by a Managing Member for or on behalf of the Company, and on the statements and agreements set forth therein, without inquiry as to the due authorization thereof or the authority of the person signing or purporting to sign such certificates, instructions, agreements or assignments.

(e) Delegation. The Managing Member may appoint Members only with such titles as they may elect, including the titles of President, Vice President, Treasurer and Secretary, to act on behalf of the Company with such power and authority as the Members may delegate in writing to any such person.

(f) Books and Records. The Company's books and records shall be maintained in accordance with good record keeping practices and federal and state income tax laws and regulations. All books and records of the Company shall be maintained at the principal office of the Company, and each of the Members shall have access thereto to review the same at any time upon reasonable notice and during normal business hours.

7

(g) <u>Reimbursement of</u> Managing Member. The Managing Member shall be reimbursed by the Company for all reasonable expenses (including attorney and accountant's fees) incurred or paid by them for or on behalf of the Company.

## ARTICLE VII – VOTING, MEMBER CONSENTS AND MEMBER GUARATEE, MEETINGS

7.1 <u>Voting.</u> Each Member shall be entitled to vote in proportion to his or her Percentage Interest in the Company from time to time. Such vote may be exercised by written or oral notification by a Member to the other Members.

7.2 <u>Member Consents.</u> The amendment of this Agreement shall require the vote and unanimous approval of all the Members. All other actions taken by the Company, including the admission of a new Member, shall require the vote and approval of Members owning seventy-five percent (75%) or more of the Percentage Interest at the time of such vote.

7.3 <u>Member Guarantee.</u> **Managing Member and Irina Kayserman** shall provide the prospective lender with joint and several personal guarantees for any loan obtained by the Company related to the property located at 6 DEBORAH ROAD, Newton, Massachusetts.

7.4 <u>Meetings of the Members.</u> The Members may, but shall not be required, to meet from time to time to consider the affairs of the Company and to take any action permitted to be taken by the Members by law or under this Agreement. Meetings of the Members may be called at any time by any Member. Notice of any meeting shall be given to all Members not less than two (2) days nor more than thirty (30) days prior to the date of such meeting. Each Member may authorize any person to act for it by proxy on all matters on which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or his or her attorney-in-fact. A quorum for each meeting shall be one more than one-half the number of all Members.

## ARTICLE VIII – ALLOCATIONS AND DISTRIBUTIONS

8.1 <u>Allocations of Profits or Losses.</u>  The net profits, net losses, net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members according to the Percentage Interests of Each Member.  Net profits and net losses shall, for both accounting and tax purposes, be net profits and net losses as determined for reporting on the Company's federal income tax return.  For tax purposes, all items of depreciation, gain, loss, deduction or credit shall be determined in accordance with the Code and, except to the extent otherwise required by the Code, allocated to and among the Members in the same percentages in which the Members share in net profits and net losses.

8.2 <u>Distribution to Members.</u>  *The distribution to Members shall be in accordance with their respective Capital Contribution first* and then then according to the Percentage Interests of Each Member as much of the Company's Net Cash From Operations as the Members may from time to time determine.  For the purposes hereof, the term "Net Cash From Operations" shall mean the gross cash proceeds from Company operations less the portion thereof used to pay or establish reserves for Company expenses, debt payments, capital improvements, replacements, and guaranteed payments, all as determined by the Members.  "Net Cash From Operations" shall not be reduced by depreciation , amortization, cost recovery deductions, or similar non-cash allowances, but shall be increased by any reductions of reserves previously established.

## ARTICLE IX - DISSOLUTION AND TERMINATION OF COMPANY

9.1 <u>Events of Dissolution.</u>  The Company shall be dissolved and its affairs shall be would up upon the occurrence of any of the following events:

9

(a) the death, insanity, dissolution, incompetency, bankruptcy, retirement, resignation or expulsion of a Member ("Retiring Member") unless there are at least two (2) remaining Members of the Company, and the remaining Members owning a "majority in interest" in the Company elect to continue the Company within ninety (90) days of the death, insanity, dissolution, bankruptcy, retirement, resignation or expulsion of the Retiring Member;

(b) the conclusion of the term of the Company set forth in Section 2.3. hereof;

(c) the sale or disposition of all or substantially all of the assets of the Company;

(d) the written consent of the Members owning seventy five (75%) or more of the Percentage Interests in the Company; or

(e) the entry of a decree of judicial dissolution in accordance with the provisions of the Act.

For the purpose of Section 9.1 (a) above, the term "majority in interest" means seventy five (75%) or more of the remaining Members' collective interest in profits and their respective Capital Accounts. For the purpose of the foregoing sentence, profits shall be determined and allocated based upon any reasonable estimate of profits from the date of the dissolution event to the projected termination of the Company taking into account present and future allocations of profits under this Agreement, and the Capital Account balances shall be determined upon the date of the dissolution event.

9.2 <u>Winding Up.</u> Upon the dissolution of the Company, the remaining Member or, if more than one Member then remains, the Member selected by the remaining Members (in either case, the "Liquidating Member"), shall proceed with the winding up of the Company and apply and distribute the Company's assets as provided in this Section 9.2. The assets shall first be applied to the payment of the liabilities of the Company (other than any loans that may have been made by the Members to the Company) and to the expenses of

10

liquidation. A reasonable time shall be allowed for the orderly liquidation of
the Company and for the discharge of liabilities to creditors, so as to enable
the Liquidating Member to minimize the normal losses attendant to a
liquidation. The remaining assets shall next be applied to the repayment of
any loans made by the Members to the Company. All assets then remaining
shall be distributed to the Members in accordance with their respective Capital
Accounts after giving effect to all contributions, distributions and allocations
for all periods. Notwithstanding any of the foregoing, the Liquidating
Member may retain a sum deemed necessary by him or her as a reserve for any
contingent liabilities, expenses and obligations of the Company. Upon the
final distribution of assets to the Members, each of the Members shall be
furnished with a statement which sets forth the assets and liabilities of the
Company as of the date of the complete liquidation.

## ARTICLE X - LIABILITY AND INDEMNIFICATION

10.1 <u>Liability.</u> Except as otherwise provided by the Act, the debts, obligations and
liabilities of the Company, whether arising in contract, tort, or otherwise, shall
be solely the debts, obligations and liabilities of the Company, and no Member
shall be obligated personally for any such debt, obligation or liability of the
Company solely by reason of being a Member.

10.2 <u>Indemnification.</u> The Company shall indemnify and hold harmless the
Members and their respective employees and authorized agents from and
against any loss, damage or claim incurred by reason of any act or omission
performed or omitted by such Member, employee or authorized agent in good
faith on behalf of the Company and reasonable believed to be within the scope
of authority conferred by this Agreement, except that no Member, employee or
authorized agent shall be entitled to be indemnified or held harmless from or
against any loss, damage or claim incurred by reason of such Member's,
employee's or authorized agent's gross negligence or willful misconduct;
provided, however, that any indemnity under this Section 10.2 shall be

11

provided out of and to the extent of Company assets only, and no Member shall have any personal liability on account thereof.

## ARTICLE XI - MISCELLANEOUS

11.1 <u>Governing Law.</u>  The Company and this Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts.

11.2 <u>Agreement Binding.</u>  This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective next-of-kin, legatees, administrators, executors, legal representatives, successors, and assigns.

11.3 <u>Notices.</u>  Notices to the Members or to the Company to be furnished hereunder shall be deemed to have been given when mailed, by prepaid registered or certified mail, or when deposited with an express courier service, addressed to the address set forth on Schedule A or as set forth in any notice of changes of address previously given in writing by the addressee to the addressor.

Executed as a Commonwealth of Massachusetts's instrument under seal on the day and year first above written.

_____

Mark Kayserman, Managing Member

_____

Vadim Kagan, Member

_____

Tatyana Kagan, Member

_____

KAGAN DEVELOPMENT KDC, CORP by its President - Vadim Kagan, Member

12

Irina Kayserman, Member

## SCHEDULE A

### Capital Contributions and Percentage Interests

| Member | | Capital Contribution | Percentage Interest |
|---|---|---|---|
| **Name:** | Mark Kayserman | **$74,000** | **25%** |
| **Address:** | 16 Mohawk Road, Canton, MA 02021 | | |
| **Name:** | Irina Kayserman | **$74,000** | **25%** |
| **Address:** | 16 Mohawk Road, Canton, MA 02021 | | |
| **Name:** | KAGAN DEVELOPMENT KDC, CORP | **$56,240** | **19%** |
| **Address:** | 99 Needham Street, Unit 1402, Newton, NA, 02461 | | |
| **Name:** | Vadim Kagan | **$35,520** | **12%** |
| **Address:** | 99 Needham Street, Unit 1402, Newton, NA, 02461 | | |
| **Name:** | Tatyana Kagan | **$56,240** | **19%** |
| **Address:** | 99 Needham Street, Unit 1402, Newton, NA, 02461 | | |

14

# EXHIBIT 15

EXHIBIT
ZHUKOVSKIY
3
JTY  3-6-18

AFFIDAVIT OF DMITRIY ZHUKOVSKIY

I, Dmitriy Zhukovskiy, having been duly sworn, state and depose as follows:

1. My name is Dmitry Zhukovskiy.  I am a former member of Hyde Avenue, LLC
(the "LLC"), a limited liability company in which I invested with Vadim Kagan ("Kagan"),
Tatiana Kagan ("Tatiana"), Kagan Development KDC, Corp. ("KDC") and Nickolay Lipetsker ("Lipetsker").

2. Early in 2012 Kagan offered an investment opportunity.  During our meeting, Kagan informed me that
he operated a construction company, KDC, and portrayed himself as a successful builder sighting
numerous projects he completed in the past.

3. Kagan informed us that he wanted to buy an old house in Newton, remodel it, built an addition and
sell the house for profit.  During our discussions, Kagan represented to me that the project could be
completed for $2.8 million, where:
(a) $1.6 million would go towards purchasing the old house;
(b) $1.2 million would cover the entire cost of construction, including interest on mortgage and
construction loan, real-estate taxes and insurance;

4. Kagan represented that, based on his experience and that of his wife's, Tatiana, whom I understood
to be a real estate broker, the property could be sold for a minimum of $3.7 million.  Kagan assured me
in his ability to complete the construction in 12 months with the reasonable construction cost margin of
error (5%).

5. In exchange for 50% of the gross profit, Kagan asked to:
(a) invest 50% of the amount necessary to make a down payment on the old house;
(b) invest 50% of the amount necessary to cover legal and financing expenses associated with
purchasing the house and obtaining mortgage and construction loan;
(c) personally guarantee mortgage and construction loan;

4. Relying on Kagan's budget and representations, I decided to invest in the project.  I agreed to
contribute 31% of the required initial investment and personally guarantee mortgage and construction
loan.  In addition to me, Kagan, Tatiana, KDC and Lipetsker all invested and became members in the LLC.
I was elected and named the LLC's Managing Member.  A copy of the LLC's Operating Agreement is
attached as **Exhibit A**.

5. On May 10th, 2012 LLC purchased the old house for a consideration of the $1,630,000 of which
$1,140,000 was financed through Rockland Trust.  During the following two month, Kagan provided
construction plans and budgets to Rockland Trust to secure an additional loan for the remaining
$1,200,000 necessary to complete the project.  I personally guaranteed both of these loans.

6. Throughout the project, I attempted to track the construction costs and carrying costs. Kagan sporadically provided me with some invoices, repeatedly sighting that he maintains complete records and copies of all of the invoices. When I asked him for a copies of the documentation supporting project expenditure, Kagan directed me to contact his bookkeeper ("Ryan"), who would in turn usually respond that he was too busy at the moment, promised me to send everything shortly or simply ignored my requests. Ultimately, neither Kagan nor his affiliates provided me with any invoices supporting most of the payments made by the LLC. To track down costs I was forced to rely on copies of cancelled checks included in the bank statements.

7. When filing annual tax returns for 2012 and 2013 Tax Years, I would provide Kagan a copy of my records and ask him to confirm their accuracy. While the information about amounts actually paid by the LLC was readily available through bank records, I would in particular ask Kagan to confirm that there were no outstanding liabilities (i.e. unpaid invoices) of the LLC. Kagan would always agree with my records without making any corrections. Kagan would confirm that everything was accurate and that all accounts were up-to date.

8. The property was completed sometimes during late summer of 2013. Kagan listed it for $4 million in the fall of 2013. By December of 2013, the funds of the LLC were depleted and members of the LLC began contributing towards the carrying costs. The property was sold in April of 2014 for $3.8 million.

9. During the period of shortly before and after the closing date, Kagan informed me that there was an additional amount of $510K in construction costs that had never previously been invoiced to the LLC:

(a) $170K for work allegedly performed by ProExcavation (company owned or closely affiliated with Kagan). Kagan did not provide any invoices for this work and simply told me that there was a lot of work which his company [ProExcavation] performed and for which LLC never paid.

(b) $126K for "unpaid" invoices from various outside contractors for work performed at different points in time. Kagan failed to show most of the invoices from these contractors and said that the invoices were "in boxes" and that he could find them later.

(c) $213K for invoices from various outside contractors for work performed at different points in time for which "KDC has paid out and was not reimbursed". Kagan told me that he forgot about these payments and that he had very poor bookkeeping stuff, who originally allocated these charges to other projects. He showed me the records of the checks he issued to contractors, most of which were written in the first half of 2013. Kagan failed to show most of the invoices from these contractors and said that the invoices were "in boxes" and he could find them later.

10. The total cost of construction, including bank interest, real estate taxes and carrying cost over the life of the project was $1.8 million, representing a $600K of additional costs relative the original budget of $1.2 million.

11. Throughout the project, Kagan:

(a) Continuously represented to me that the construction costs were in line with our initial budget;

(b) Never presented any evidence of competitive bidding;

(c) Failed to provide most of the invoices;

Signed under the pains and penalties of perjury on November 11, 2015.

Dmitry Zhukovskiy

# EXHIBIT 16



# OPERATING AGREEMENT
## OF
## NEWTON-CYNTHIA ROAD, LLC

1.      THIS OPERATING AGREEMENT is entered into as of the 26  day of
November, 2012 by and between Vadim Kagan, Vladislav Abramskiy and
Zina Gassel.

WHEREAS, Mr. Kagan,  Mr. Abramskiy and Ms. Gassel wish to form a limited liability
company known as NEWTON-CYNTHIA ROAD, LLC (the "Company") pursuant to the
Massachusetts Limited Liability Company Act (as amended, the "Act") by filing a
Certificate of Organization of the Company with the Massachusetts Secretary of State's
Office and by entering into this Agreement;

NOW, THEREFORE, in consideration of the mutual agreements, promises and
conditions contained herein and for other good and valuable consideration, the receipt and
sufficiency of which are hereby acknowledged, Mr. Kagan,  Mr. Abramskiy and Ms.
Gassel as follows:

## ARTICLE I - DEFINITIONS

1.1 <u>Definitions.</u>        Capitalized terms used in this Agreement and not otherwise
defined shall have the meanings assigned to them below:

(a) "Agreement" means this operating Agreement, as amended, modified,
supplemented or restated from time to time.

(b) "Certificate of Formation" means the Certificate of Formation of the
Company and any and all amendments thereto and restatements thereof
filed on behalf of the Company with the Commonwealth Secretary of
State's Office pursuant to the Act.

(c) "Member" means a member of the Company identified on Schedule A
attached hereto, as the same may be amended from time to time.

(d) "Percentage Interest" shall refer to the percentage ownership interest of
each Member in the Company.  The Percentage Interests of the

Members are set forth on Schedule A attached hereto and incorporated herein for all purposes by this reference.

## ARTICLE II - THE COMPANY

2.1 <u>Formation.</u>

    (a) The Members hereby agree to form the Company as a limited liability company under and pursuant to the provisions of the Act and agree that the rights, duties and liabilities of the Members shall be as provided in the Act, except as otherwise provided herein. Upon the execution of this Agreement, Mr. Kagan, Mr. Abramskiy and Ms. Gassel shall be Members of the Company.

    (b) The name and mailing address of each Member and the amount contributed to the capital of the Company shall be listed on Schedule A.

2.2 <u>Name; Principal Place of Business.</u> The name of the Company shall be NEWTON-CYNTHIA ROAD, LLC. The principal office of the Company shall be located at 1731 Beacon Street, Unit 23, Brookline, Massachusetts, 02446, or at such other place as the Members may from time to time determine.

2.3 <u>Term.</u> The term of the Company shall commence on the date of the filing of the Certificate of Organization in the Commonwealth of Massachusetts Secretary of State's Office and shall continue until November 30, 2015 unless dissolved before such date in accordance with the provisions of this Agreement.

2.4 <u>Registered Agent and Office.</u> The company's registered agent and office in Massachusetts shall be as set forth in the Certificate of Organization of the Company filed with Commonwealth of Massachusetts Secretary of State's Office, as the same may from time to time be amended.

2.5 <u>Fiscal Year.</u> The Company's fiscal year (the "Fiscal Year") shall be the calendar year.

2.6 <u>Taxation as Partnership.</u> The Company shall be treated as a partnership for U.S. federal income tax purposes.

### ARTICLE III - PURPOSE AND POWERS OF THE COMPANY

<u>Nature of Business.</u> The general character of the business of the LLC is to own (directly or through a nominee), invest in, develop, improve, operate, manage, lease and/or sell real estate in Commonwealth of Massachusetts. To engage in any activities directly or indirectly related or incidental thereto including, but without limitation, everything necessary, suitable, convenient, or proper for the accomplishment of any of the foregoing activities, or the attainment of any one or more of the purposes, enumerated or incidental to the powers named, or which shall at any time appear conducive to or expedient for the production of benefit to the corporation, either as the holders of or interested in any property, or otherwise, with all the powers now or hereafter conferred by law.

3.1 <u>Powers of the Company.</u> The Company shall have the power and authority to take any and all actions necessary, appropriate, proper, advisable, convenient or incidental to or for the furtherance of the purpose set forth in Section 3.1., including, but not limited to the powers permitted under the Act.

### ARTICLE 1V - CAPITAL CONTRIBUTIONS AND ACCOUNTS

4.1 <u>Capital Contributions.</u> Each Member has transferred and contributed to the capital of the Company the capital amounts (the "Capital Contributions") as set forth on Schedule A. Furthermore, Purchase Money Loan and Construction Loan shall be taken from Rockland Trust to pay for construction and carrying costs.

4.2 <u>Carrying Costs.</u> Carrying costs shall be defined to include but not limited to mortgage payments, taxes and insurance for the subject property 131 CYNTHIA ROAD, Newton, Massachusetts.

4.3 <u>Capital Accounts; Assets.</u> An individual capital account (each a "Capital Account") shall be established and maintained for each Member in accordance with applicable regulations under the Internal Revenue Code of 1986 as from time to time amended (the "Code"). A Member shall not be entitled to interest on his or her Capital Contribution or Capital Account, or to withdraw any part of his or her Capital Contribution or Capital Account. No Member shall have any right in or to any asset or property of the Company, but shall only have a right to the distributions as and when provided for in Sections 8.2 and 9.2 hereof.

4.4 <u>Maintenance of Capital Accounts.</u> To the extent consistent with such regulations, there shall be credited to each Member's Capital Account the amount of any contribution of capital and carrying costs made by such Member to the Company, and such Member's share of the net profits of the Company and there shall be charged against each Member's Capital Account the amount of all distributions to such Member, and such member's share of the net losses of the Company.

**ARTICLE V - MEMBERS**

5.1 <u>Powers of Members.</u> The Members shall have the power to exercise any and all rights or powers granted to the Members pursuant to the express terms of this Agreement.

5.2 <u>Admission of Members.</u> No person shall be admitted as a Member of the Company after the date of formation of the Company without the written consent or approval of the Members owning at least eighty one (81%) of the Percentage Interests in the Company at the time of such admission, regardless of whether such person has previously acquired any rights in any existing Member's interest in the Company by assignment, sale or otherwise. A Member's execution of a counterpart of this Agreement, or such other instrument as the Members may require, to evidence his or her admission.

5.3 <u>Transfer of Company Interest.</u>  No Member may transfer, sell, assign, pledge, mortgage, or dispose of or grant a security interest in his or her interest in the Company (each, a "Transfer") without the prior written consent of the Members owning at least forty (40%) of the Percentage Interests in the Company at the time of such Transfer.  Any purported Transfer in contravention of this Section 5.3 shall be null and void and the Member attempting such Transfer shall cease to be a Member of the Company shall be forfeited and reallocated to the remaining Members in accordance with their respective Percentage Interests.

5.4 <u>Rights of Assignee.</u>  The purchaser or other transferee of a Member's interest in the Company shall have only the right to receive the distributions and allocations of profits or losses to which the Member would have been entitled under this Agreement with respect to the transferred interest and shall not have or enjoy any right to participate in the management of the Company or to receive any financial information or reports relating to the Company or any other rights of a Member unless and until the purchaser or transferee is admitted as a Member pursuant to Section 5.2.

5.5 <u>Partition.</u>  Each Member waives any and all rights that he or she may have to maintain an action for partition of the Company's property.

5.6 <u>Member Duty.</u>    It shall be Mr. Kagan's duty and obligation to construct a single family house at the location currently known as 131 CYNTHIA ROAD, in Newton, Massachusetts in accordance with the plans, including drawings, procurred by Mr. Kagan.  The construction shall be substantially completed no later than November 30, 2013.  It is specifically understood by all Members that Mr. Kagan's compensation for this duty is outlined in Section 8.1 below. In the event that the CO is not issued by November 30, 2013, then Mr. Kagan will be responsible for all carrying costs until such time as the CO is issued.

**ARTICLE VI - MANAGEMENT**

6.1 <u>Management, duties, and Restrictions.</u>

(a) <u>General Management.</u> The management and control of the operations of the Company and the maintenance, development, sales and leasing of the property of the Company shall rest with the Managing Members.

(b) <u>Powers of Managing Member.</u> Subject to such limitations as may be imposed pursuant to the terms of this Agreement, the Act or by operation of law, the Members are and shall be authorized and empowered to carry out and implement the purposes of the Company. In that connection, the powers of the Managing Member shall include, but not be limited to, the following:

    (1) to engage personnel, attorneys, accountants, or such other persons as may be deemed necessary or advisable;

    (2) to authorize or approve all actions with respect to distributions by the Company, dispositions of the assets of the Company or its nominee, execution of leases, mortgage contracts, bonds, promissory notes, loan agreements and other instruments on behalf of the Company or its nominee, and to execute any agreements, instruments or documents relating to or affecting such matters;

    (3) to acquire, mortgage, improve and convey real property and interests therein, including, but not limited to, easements and rights-of-way, and to execute any agreements, instruments or documents relating to or affecting such matters;

    (4) to open, maintain, and close bank accounts and to draw checks and other orders for the payment of money; and

    (5) to take such other actions and to incur such reasonable expenses on behalf of the Company as may be necessary or advisable in connection with the conduct of the affairs of the Company.

    (6) The Managing Member hereby agrees to list the properties with Tatiana Kagan. In order to remove Tatiana Kagan as a listing

broker by September 30, 2014 will require a written consent of the Members owning at least eighty two (82%) of the Percentage Interests in the Company. After September 30, 2014 no such consent shall be required.

© Liability of Managing Member. In carrying out their duties, the Managing Member shall not be liable to the Company or to any other Members for any actions taken in good faith and reasonable believed to be in the best interest of the Company or which are taken upon the written advice of legal counsel for the Company.

(d) Reliance on Act of Managing Member. Third parties dealing with the Company shall be entitled to rely conclusively upon the power and authority of the Managing Member. Any person other than a Member may and shall be entitled to rely on certificates, instructions, agreements or assignments signed or purporting to be signed by a Managing Member for or on behalf of the Company, and on the statements and agreements set forth therein, without inquiry as to the due authorization thereof or the authority of the person signing or purporting to sign such certificates, instructions, agreements or assignments.

(e) Delegation. The Managing Member may appoint Members only with such titles as they may elect, including the titles of President, Vice President, Treasurer and Secretary, to act on behalf of the Company with such power and authority as the Members may delegate in writing to any such person.

(f) Books and Records. The Company's books and records shall be maintained in accordance with good record keeping practices and federal and state income tax laws and regulations. All books and records of the Company shall be maintained at the principal office of the Company, and each of the Members shall have access thereto to review the same at any time upon reasonable notice and during normal business hours.

(g) Reimbursement of Managing Member. The Managing Member shall be reimbursed by the Company for all reasonable expenses (including attorney

and accountant's fees) incurred or paid by them for or on behalf of the Company.

## ARTICLE VII - VOTING, MEMBER CONSENTS AND MEMBER GUARATEE, MEETINGS

7.1 <u>Voting.</u> Each Member shall be entitled to vote in proportion to his or her Percentage Interest in the Company from time to time. Such vote may be exercised by written or oral notification by a Member to the other Members.

7.2 <u>Member Consents.</u> The amendment of this Agreement shall require the vote and unanimous approval of all the Members. All other actions taken by the Company, including the admission of a new Member, shall require the vote and approval of Members owning eighty one percent (81%) or more of the Percentage Interest at the time of such vote.

7.3 <u>Member Guarantee.</u> Only Mr. Abramskiy and Ms. Gessel shall provide the prospective lender with joint and several personal guarantees for any loan obtained by the Company related to the property located at 131 CYNTHIA ROAD, Newton, Massachusetts.

7.4 <u>Meetings of the Members.</u> The Members may, but shall not be required, to meet from time to time to consider the affairs of the Company and to take any action permitted to be taken by the Members by law or under this Agreement. Meetings of the Members may be called at any time by any Member. Notice of any meeting shall be given to all Members not less than two (2) days nor more than thirty (30) days prior to the date of such meeting. Each Member may authorize any person to act for it by proxy on all matters on which a Member is entitled to participate, including waiving notice of any meeting, or voting or participating at a meeting. Every proxy must be signed by the Member or his or her attorney-in-fact. A quorum for each meeting shall be one more than one-half the number of all Members.

## ARTICLE VIII - ALLOCATIONS AND DISTRIBUTIONS

8.1 <u>Allocations of Profits or Losses.</u> *The net profits, net losses*, net cash flow and net proceeds of any sale or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows: Ms. Zina Gassel (25%) , Mr. Vladislav Abramskiy (25%) and Mr. Kagan (50%). Net profits and net losses shall, for both accounting and tax purposes, be net profits and net losses as determined for reporting on the Company's federal income tax return. For tax purposes, all items of depreciation, gain, loss, deduction or credit shall be determined in accordance with the Code and, except to the extent otherwise required by the Code, allocated to and among the Members in the same percentages in which the Members share in net profits and net losses. Any change to this paragraph will require a written consent of the Members owning at least eighty two (82%) of the Percentage Interests in the Company.

8.2 <u>Distribution to Members.</u> *The distribution to Members shall be in accordance with their respective Capital Contribution first and then then according to Section 8.1 above as much of the Company's Net Cash From Operations as the Members may from time to time determine.* For the purposes hereof, the term "Net Cash From Operations" shall mean the gross cash proceeds from Company operations less the portion thereof used to pay or establish reserves for Company expenses, debt payments, capital improvements, replacements, and guaranteed payments, all as determined by the Members. "Net Cash From Operations" shall not be reduced by depreciation , amortization, cost recovery deductions, or similar non-cash allowances, but shall be increased by any reductions of reserves previously established.

## ARTICLE IX - DISSOLUTION AND TERMINATION OF COMPANY

9.1 <u>Events of Dissolution.</u> The Company shall be dissolved and its affairs shall be would up upon the occurrence of any of the following events:

(a) the death, insanity, dissolution, incompetency, bankruptcy, retirement, resignation or expulsion of a Member ("Retiring Member") unless there are at least two (2) remaining Members of the Company, and the remaining Members owning a "majority in interest" in the Company elect to continue the Company within ninety (90) days of the death, insanity, dissolution, bankruptcy, retirement, resignation or expulsion of the Retiring Member;

(b) the conclusion of the term of the Company set forth in Section 2.3. hereof;

(c) the sale or disposition of all or substantially all of the assets of the Company;

(d) the written consent of the Members owning eighty one (81%) or more of the Percentage Interests in the Company; or

(e) the entry of a decree of judicial dissolution in accordance with the provisions of the Act.

For the purpose of Section 9.1 (a) above, the term "majority in interest" means eighty one (81%) or more of the remaining Members' collective interest in profits and their respective Capital Accounts.  For the purpose of the foregoing sentence, profits shall be determined and allocated based upon any reasonable estimate of profits from the date of the dissolution event to the projected termination of the Company taking into account present and future allocations of profits under this Agreement, and the Capital Account balances shall be determined upon the date of the dissolution event.

9.2 Winding Up.  Upon the dissolution of the Company, the remaining Member or, if more than one Member then remains, the Member selected by the remaining Members (in either case, the "Liquidating Member"), shall proceed with the winding up of the Company and apply and distribute the Company's assets as provided in this Section 9.2.  The assets shall first be applied to the payment of the liabilities of the Company (other than any loans that may have been made by the Members to the Company) and to the expenses of

liquidation. A reasonable time shall be allowed for the orderly liquidation of the Company and for the discharge of liabilities to creditors, so as to enable the Liquidating Member to minimize the normal losses attendant to a liquidation. The remaining assets shall next be applied to the repayment of any loans made by the Members to the Company. All assets then remaining shall be distributed to the Members in accordance with their respective Capital Accounts after giving effect to all contributions, distributions and allocations for all periods. Notwithstanding any of the foregoing, the Liquidating Member may retain a sum deemed necessary by him or her as a reserve for any contingent liabilities, expenses and obligations of the Company. Upon the final distribution of assets to the Members, each of the Members shall be furnished with a statement which sets forth the assets and liabilities of the Company as of the date of the complete liquidation.

## ARTICLE X – LIABILITY AND INDEMNIFICATION

10.1 Liability. Except as otherwise provided by the Act, the debts, obligations and liabilities of the Company, whether arising in contract, tort, or otherwise, shall be solely the debts, obligations and liabilities of the Company, and no Member shall be obligated personally for any such debt, obligation or liability of the Company solely by reason of being a Member.

10.2 Indemnification. The Company shall indemnify and hold harmless the Members and their respective employees and authorized agents from and against any loss, damage or claim incurred by reason of any act or omission performed or omitted by such Member, employee or authorized agent in good faith on behalf of the Company and reasonable believed to be within the scope of authority conferred by this Agreement, except that no Member, employee or authorized agent shall be entitled to be indemnified or held harmless from or against any loss, damage or claim incurred by reason of such Member's, employee's or authorized agent's gross negligence or willful misconduct; provided, however, that any indemnity under this Section 10.2 shall be

provided out of and to the extent of Company assets only, and no Member shall have any personal liability on account thereof.

## ARTICLE XI - MISCELLANEOUS

11.1 <u>Governing Law.</u>  The Company and this Agreement shall be governed by, and construed in accordance with, the laws of the Commonwealth of Massachusetts.

11.2 <u>Agreement Binding.</u>  This Agreement shall inure to the benefit of, and be binding upon, the parties hereto and their respective next-of-kin, legatees, administrators, executors, legal representatives, successors, and assigns.

11.3 <u>Notices.</u>  Notices to the Members or to the Company to be furnished hereunder shall be deemed to have been given when mailed, by prepaid registered or certified mail, or when deposited with an express courier service, addressed to the address set forth on Schedule A or as set forth in any notice of changes of address previously given in writing by the addressee to the addressor.

Executed as a Commonwealth of Massachusetts's instrument under seal on the day and year first above written.

_____
Vladislav Abramskiy, Managing Manager

_____
Vadim Kagan, Member

_____
Zina Gassel, Member

## SCHEDULE A

### Capital Contributions and Percentage Interests

| Member | | Capital Contribution | Percentage Interest |
|---|---|---|---|
| Name: | Vladislav Abramsky | $120,000.00 | 40.5% |
| Address: | 1731 Beacon Street, Unit 23, Brookline, Massachusetts | | |
| Name: | Zina Gassel | $120,000.00 | 40.5% |
| Address: | 2400 Beacon Street, Unit 401, Chestnut Hill, Massachusetts | | |
| Name: | Vadim Kagan | $100.00 | 19% |
| Address: | 99 Needham Street, Unit 1402, Newton, MA, 02461 | | |

# EXHIBIT 17



## APPRAISAL OF REAL PROPERTY

### LOCATED AT:
77 Lyman Rd
Chestnut Hill, MA  02467

### FOR:
Rockland Trust Company
120 Liberty Street
Brockton, MA 02301

### AS OF:
4/17/2013

### BY:
Nicholas Morris
Commonwealth Appraisal Services
115 Gulliver Street
Milton, MA 02186

# Uniform Residential Appraisal Report

| | | | |
|---|---|---|---|
| The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property. | | | |

**SUBJECT**

| | | | |
|---|---|---|---|
| Property Address 77 Lyman Rd | City Chestnut Hill | State MA | Zip Code 02467 |
| Borrower Vadim Kagan | Owner of Public Record Lyman Cutler LLC | | County Norfolk |

Legal Description At The Norfolk County Registry of Deeds Book 13087 Page 355
Assessor's Parcel # Map: 437 Block: 27 Lot: 37-A-B  Tax Year 2013  R.E. Taxes $ 36,000.00 Est.
Neighborhood Name Chestnut Hill  Map Reference 437-27-37-A-B  Census Tract 4011.00
Occupant ☒ Owner ☐ Tenant ☐ Vacant  Special Assessments $ 0.00  ☐ PUD  HOA $ N/A  ☐ per year ☐ per month
Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)
Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) To Determine Market Value
Lender/Client Rockland Trust Company  Address 120 Liberty Street, Brockton, MA 02301
Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☒ Yes ☐ No
Report data source(s) used, offering price(s), and date(s).  See attached addenda.

**CONTRACT**

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $  Date of Contract  Is the property seller the owner of public record? ☐ Yes ☐ No  Data Source(s)
Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No
If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location | ☐ Urban ☒ Suburban ☐ Rural | | Property Values | ☒ Increasing ☐ Stable ☐ Declining | | PRICE $(000) | AGE (yrs) | One-Unit | 85 % |
| Built-Up | ☒ Over 75% ☐ 25-75% ☐ Under 25% | | Demand/Supply | ☐ Shortage ☒ In Balance ☐ Over Supply | | Low 560 | New | 2-4 Unit | 5 % |
| Growth | ☐ Rapid ☒ Stable ☐ Slow | | Marketing Time | ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | High 9,200 | 160 | Multi-Family | 5 % |
| Neighborhood Boundaries | | | The neighborhood is bound to the north by Route 9, to the south by The Country | | | Pred. 1,900 | 62 | Commercial | 5 % |
| | | | Club, to the east by Lee Street, and to the west by Hammond Street. | | | | | Other | % |

Neighborhood Description  See attached addenda.

Market Conditions (including support for the above conclusions)  Current market conditions appear to have stabilized after a period of property value decline which was a result of a market correction after a long period of increasing property values. Marketing time has been three to six months or less for reasonably priced homes.

**SITE**

Dimensions Approximately 100 feet of frontage  Area 33,908 s/f  Shape Rectangular  View Neighborhood
Specific Zoning Classification Residential Single Family 25;  Zoning Description 30ff. - 25,000 sf
Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)
Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Paved asphalt | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley No | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone X  FEMA Map # 25021C0034E  FEMA Map Date 07/17/2012
Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No  If No, describe
Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No  If Yes, describe
I have inspected the property for any adverse site conditions or external factors (easements, encroachment, environmental, land use etc.) Based on my exterior inspection I found no adverse site conditions or external factors.

**IMPROVEMENTS**

| General Description | | Foundation | | Exterior Description | materials/condition | Interior | materials/condition |
|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | | ☐ Concrete Slab ☐ Crawl Space | | Foundation Walls | Concrete/New | Floors | HW/Marble/New |
| # of Stories 2 | | ☒ Full Basement ☐ Partial Basement | | Exterior Walls | WdShngle/New | Walls | Drywall/New |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | | Basement Area 3,245 sq.ft. | | Roof Surface | AsphltShgle/New | Trim/Finish | Wood/New |
| ☐ Existing ☒ Proposed ☐ Under Const. | | Basement Finish 0 % | | Gutters & Downspouts | Alum/Alum/New | Bath Floor | Marble/New |
| Design (Style) Contemporary | | ☐ Outside Entry/Exit ☐ Sump Pump | | Window Type | D-hung/New | Bath Wainscot | Marble/New |
| Year Built 2013 | | Evidence of ☐ Infestation NoneNoted | | Storm Sash/Insulated | Yes/Yes/New | Car Storage | None |
| Effective Age (Yrs) New | | ☐ Dampness ☐ Settlement | | Screens | Combo/New | ☒ Driveway # of Cars 6 |
| Attic ☐ None | | Heating ☒ FWA ☐ HWBB ☐ Radiant | | Amenities ☐ Woodstove(s) # | | Driveway Surface Asphalt |
| ☐ Drop Stair ☐ Stairs | | ☐ Other FHA  Fuel Gas | | ☒ Fireplace(s) # 3 ☒ Fence Side/Rear | | ☒ Garage # of Cars 3 |
| ☐ Floor ☒ Scuttle | | Cooling ☒ Central Air Conditioning | | ☒ Patio/Deck Dk/Pt ☒ Porch Front | | ☐ Carport # of Cars |
| ☐ Finished ☐ Heated | | ☐ Individual ☐ Other | | ☐ Pool ☐ Other Balcony | | ☒ Att. ☐ Det. ☐ Built-in |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☐ Disposal ☒ Microwave P Washer/Dryer ☐ Other (describe)
Finished area above grade contains: 12 Rooms  6 Bedrooms  6.2 Bath(s)  6,730 Square Feet of Gross Living Area Above Grade
Additional features (special energy efficient items, etc.)  See attached addenda.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).  The subject will be at excellent construction quality and in new overall condition. It will be a custom colonial style home that will appear very well maintained. See addendum page for features of the home. 300 amp electric via circuit breakers provides adequate electricity.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No  If Yes, describe
At the time of inspection, no adverse conditions that would affect the livability, soundness, or structural integrity of the property were evident to the appraiser.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No  If No, describe
The subject property is similar in style, condition, and use to other properties in the subject neighborhood area.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

Main File No. Described Exhibit

14170

File # S2975

# Uniform Residential Appraisal Report

| | | There are | 5 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 3,450,000 | to $ 10,500,000 | . |
| | | There are | 5 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 3,500,000 | to $ 11,000,000 | . |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | 77 Lyman Rd | 113 Heath St | | 7 Cutler Ln | | 25 Moorfield Rd | |
| | Chestnut Hill, MA 02467 | Chestnut Hill, MA 02467 | | Chestnut Hill, MA 02467 | | Chestnut Hill, MA 02467 | |
| Proximity to Subject | | 0.15 miles SE | | 0.13 miles E | | 0.96 miles W | |
| Sale Price | $ | | $ 4,375,000 | | $ 4,700,000 | | $ 5,130,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 733.94 sq.ft. | | $ 727.67 sq.ft. | | $ 619.27 sq.ft. | |
| Data Source(s) | | MLS #71269386 / B&T DOM 310 | | MLS #71240547 / B&T DOM 31 | | MLS #71147515 / B&T DOM 560 | |
| Verification Source(s) | | Exterior Inspection / Assessor | | Exterior Inspection / Assessor | | Exterior Inspection / Assessor | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | Conv Fin | | Conv Fin | | Conv Fin | |
| Concessions | | None Known | | None Known | | None Known | |
| Date of Sale/Time | | 7/23/2012 SD | | 8/1/2011 SD | | 8/23/2012 SD | |
| Location | Residential | Inferior 3% | +131,250 | Residential | | Inferior 5% | +256,500 |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 33,908 s/f | 40,118 s/f | | 44,001 s/f | | 43,043 s/f | |
| View | Neighborhood | Neighborhood | | Neighborhood | | Nghbrhd/Water | -100,000 |
| Design (Style) | Contemporary | Colonial | | Colonial | | Contemporary | |
| Quality of Construction | Excellent | Inferior 10% | +437,500 | Inferior 10% | +470,000 | Similar | |
| Actual Age | New | 1 yr | | 1 yr | | 13 yrs | |
| Condition | New | Similar | | Similar | | Inferior 5% | +256,500 |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 12   6   6.2 | 10   4   6.2 | | 11   6   6.1 | +5,000 | 12   7   5.1 | +15,000 |
| Gross Living Area | 6,730 sq.ft. | 5,961 sq.ft. | +96,125 | 6,459 sq.ft. | +33,875 | 8,284 sq.ft. | -194,250 |
| Basement & Finished | Full | Full | | Full | | Full | |
| Rooms Below Grade | Unfinished | Unfinished | | Unfinished | | Finished | -100,000 |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FHA / Central | FHA / Central | | FHA / Central | | FHA / Central | |
| Energy Efficient Items | Average | Average | | Average | | Average | |
| Garage/Carport | 3 car attached | 3 car attached | | 3 car attached | | 3 car built-in | |
| Porch/Patio/Deck | Prch,Ptio,Blcny | Deck, Patio | | Deck, Patio | +5,000 | Deck, Patio | |
| Fireplace | 3 F.P. | 3 F.P. | | 3 F.P. | | 3 F.P. | |
| Pool / Outbuildings | None | None | | None | | None | |
| Net Adjustment (Total) | | ☒ + ☐ - | $ 664,875 | ☒ + ☐ - | $ 513,875 | ☒ + ☐ - | $ 133,750 |
| Adjusted Sale Price | | Net Adj. 15.2 % | | Net Adj. 10.9 % | | Net Adj. 2.6 % | |
| of Comparables | | Gross Adj. 15.2 % | $ 5,039,875 | Gross Adj. 10.9 % | $ 5,213,875 | Gross Adj. 18.0 % | $ 5,263,750 |

(left margin, vertical) SALES COMPARISON APPROACH

☒ I ☐ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)    MLS/Banker & Tradesman
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)    MLS/Banker & Tradesman
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 12/31/2012 | None in the last year | None in the last year | None in the last year |
| Price of Prior Sale/Transfer | 4,000,000 | | | |
| Data Source(s) | Assessor / B&T | Assessor / B&T | Assessor / B&T | Assessor / B&T |
| Effective Date of Data Source(s) | Date of Inspection | Date of Inspection | Date of Inspection | Date of Inspection |

Analysis of prior sale or transfer history of the subject property and comparable sales    The subject transferred on December 31, 2012 for $4,000,000. This was a arms length transaction that sold at market levels. This property is in the process of being demolished with construction of a new custom colonial design to follow. The comparables have not transferred in the last 12 months.

Summary of Sales Comparison Approach    See attached addenda.

Indicated Value by Sales Comparison Approach $  5,300,000

(left margin, vertical) RECONCILIATION

Indicated Value by: Sales Comparison Approach $ 5,300,000    Cost Approach (if developed) $ 4,354,275    Income Approach (if developed) $

The Sales Comparison approach to value is considered the best indicator of the estimated value of the subject property and is most weighted by informed purchasers. The Cost Approach is supportive and used as a check. The Income Approach does not apply as the subject is not utilized for income purposes and is owner occupied.

This appraisal is made ☐ "as is", ☒ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair: Subject to completion per specs and plans. The square footage and specs used by the appraiser were provided by the developer.

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $  5,300,000  , as of  4/17/2013  , which is the date of inspection and the effective date of this appraisal.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

14170
File # S2975

File No. [illegible]

**ADDITIONAL COMMENTS**

The subject will be a six bedroom, six and two half bath new construction colonial style home. The property is located in a area of Chestnut Hill with homes of similar style and age. The property generally conforms to the surrounding neighborhood.

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

Estimated site value was determined by analyzing the recent land sales in the subject area and by the extraction method.

| | | | | | |
|---|---|---|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | | =$ | 1,500,000 |
| Source of cost data  Local builders / Marshall and Swift | DWELLING | 6,730 Sq.Ft. @ $ | 285.00 | =$ | 1,918,050 |
| Quality rating from cost service  Exc/Int    Effective date of cost data  Current | | 3,245 Sq.Ft. @ $ | 185.00 | =$ | 600,325 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | Refinements | | | =$ | 150,000 |
| The land to total value ratio is typical for the City of Brookline. | Garage/Carport | 718 Sq.Ft. @ $ | 50.00 | =$ | 35,900 |
| Depreciation is based on an age/life schedule and depreciation and cost | Total Estimate of Cost-New | | | =$ | 2,704,275 |
| estimates are derived from the Marshal and Swift Residential Cost | Less    Physical | Functional | External | | |
| Handbook and from estimates from local builders. Remaining estimated | Depreciation | | | =$( | ) |
| economic life 60 years based on a 60 year life. | Depreciated Cost of Improvements | | | =$ | 2,704,275 |
| | "As-is" Value of Site Improvements | | | =$ | 150,000 |
| Estimated Remaining Economic Life (HUD and VA only)          60 Years | INDICATED VALUE BY COST APPROACH | | | =$ | 4,354,275 |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

| | | | |
|---|---|---|---|
| Estimated Monthly Market Rent $ | X Gross Rent Multiplier | = $ | Indicated Value by Income Approach |
| Summary of Income Approach (including support for market rent and GRM) | | | |

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No   Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| | | |
|---|---|---|
| Total number of phases | Total number of units | Total number of units sold |
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No  If Yes, date of conversion.

Does the project contain any multi-dwelling units? ☐ Yes ☐ No  Data Source

Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:**  The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:**  The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:**  The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:**  The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:**  The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1.  The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2.  The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3.  The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4.  The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5.  The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6.  The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

14170
File # S2975

## Uniform Residential Appraisal Report

**APPRAISER'S CERTIFICATION:**  The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

---

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

File # S2975

14170

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature *Nicholas Morris* | Signature _____ |
| Name  Nicholas Morris | Name _____ |
| Company Name  Commonwealth Appraisal Services | Company Name _____ |
| Company Address  115 Gulliver Street | Company Address _____ |
| Milton, MA 02186 | _____ |
| Telephone Number  781-500-9871 | Telephone Number _____ |
| Email Address  nickmorris217@yahoo.com | Email Address _____ |
| Date of Signature and Report  April 25, 2013 | Date of Signature _____ |
| Effective Date of Appraisal  4/17/2013 | State Certification # _____ |
| State Certification #  75215 | or State License # _____ |
| or State License # _____ | State _____ |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License _____ |
| State  MA | |
| Expiration Date of Certification or License  10/15/2013 | **SUBJECT PROPERTY** |

**ADDRESS OF PROPERTY APPRAISED**

77 Lyman Rd
Chestnut Hill, MA 02467

APPRAISED VALUE OF SUBJECT PROPERTY $  5,300,000

**LENDER/CLIENT**

Name _____
Company Name  Rockland Trust Company
Company Address  120 Liberty Street Brockton, MA 02301

Email Address _____

**SUBJECT PROPERTY**

☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
　Date of Inspection _____
☐ Did inspect interior and exterior of subject property
　Date of Inspection _____

**COMPARABLE SALES**

☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
　Date of Inspection _____

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

14170
File # S2975

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | 77 Lyman Rd | 130 Warren St | | 30 Clyde St | | 125 Rockwood St | |
| | Chestnut Hill, MA 02467 | Chestnut Hill, MA 02445 | | Chestnut Hill, MA 02467 | | Brookline, MA 02445 | |
| Proximity to Subject | | 0.89 miles E | | 0.44 miles SE | | 1.10 miles SE | |
| Sale Price | $ | | $ 9,200,000 | | $ 5,250,000 | | $ 6,199,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 1228.96 sq.ft. | | $ 789.24 sq.ft. | | $ 916.20 sq.ft. | |
| Data Source(s) | | MLS#71357077 / B&T DOM 423 | | MLS #71394332 / B&T DOM 779 | | MLS #71350456 / B&T DOM 408 | |
| Verification Source(s) | | Exterior Inspection / Assessor | | Exterior Inspection / Assessor | | Exterior Inspection / Assessor | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | Conv Fin | | None known | | None known | |
| Concessions | | None Known | | | | | |
| Date of Sale/Time | | 9/17/2012 SD | | Active - 4% | -210,000 | Active - 4% | -247,980 |
| Location | Residential | Superior 5% | -460,000 | Residential | | Residential | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 33,908 s/f | 160,977 s/f | -1,750,000 | 35,148 s/f | | 40,055 s/f | |
| View | Neighborhood | Neighborhood | | Neighborhood | | Neighborhood | |
| Design (Style) | Contemporary | Colonial | | Colonial | | Colonial | |
| Quality of Construction | Excellent | Similar | | Inferior 5% | +262,500 | Similar | |
| Actual Age | New | 13 yrs | | 15 yrs | | 102 yrs / 5 yrs | |
| Condition | New | Similar | | Inferior 5% | +262,500 | Similar | |
| Above Grade | Total | Bdrms. | Baths | Total | Bdrms. | Baths | Total | Bdrms. | Baths | Total | Bdrms. | Baths |
| Room Count | 12 | 6 | 6.2 | 10 | 5 | 5.2 | +15,000 | 12 | 4 | 4.1 | +30,000 | 15 | 6 | 7.4 | -15,000 |
| Gross Living Area | 6,730 sq.ft. | 7,486 sq.ft. | -94,500 | 6,652 sq.ft. | +9,750 | 6,766 sq.ft. | -4,500 |
| Basement & Finished | Full | Full | | Full | | Full | |
| Rooms Below Grade | Unfinished | Unfinished | | Unfinished | | Unfinished | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FHA / Central | FHA / Central | | FHW / Central | | FHA / Central | |
| Energy Efficient Items | Average | Average | | Average | | Average | |
| Garage/Carport | 3 car attached | 4 car garage | -10,000 | 4 car attached | -10,000 | 4 car attached | -10,000 |
| Porch/Patio/Deck | Prch,Ptio,Blcny | Deck, Patio | | Patio | +5,000 | Deck,Ptio,Prch | -3,000 |
| Fireplace | 3 F.P. | 3 F.P. | | 2 F.P. | +2,000 | 5 F.P. | -4,000 |
| Pool / Outbuildings | None | Carriage House | | None | | Carriage House | -142,375 |
| Net Adjustment (Total) | | ☐ + ☒ - | $ -2,620,375 | ☒ + ☐ - | $ 351,750 | ☐ + ☒ - | $ -426,835 |
| Adjusted Sale Price | | Net Adj. 28.5 % | | Net Adj. 6.7 % | | Net Adj. 6.9 % | |
| of Comparables | | Gross Adj. 28.8 % | $ 6,579,625 | Gross Adj. 15.1 % | $ 5,601,750 | Gross Adj. 6.9 % | $ 5,772,165 |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 12/31/2012 | None in the last year | None in the last year | None in the last year |
| Price of Prior Sale/Transfer | 4,000,000 | | | |
| Data Source(s) | Assessor / B&T | Assessor / B&T | Assessor / B&T | Assessor / B&T |
| Effective Date of Data Source(s) | Date of Inspection | Date of Inspection | Date of Inspection | Date of Inspection |

Analysis of prior sale or transfer history of the subject property and comparable sales   Sale 4 and comparables 5 and 6 have not transferred in the last year.

Analysis/Comments   See attached addenda.

Supplemental Addendum

| | | | | | | |
|---|---|---|---|---|---|---|
| Borrower/Client | Vadim Kagan | | | | | File No. S2975 |
| Property Address | 77 Lyman Rd | | | | | |
| City | Chestnut Hill | | County  Norfolk | | State  MA | Zip Code  02467 |
| Lender | Rockland Trust Company | | | | | |

This appraisal is a summary report as defined by the Appraisal Standards Board of the Appraisal Foundation and complies with USPAP.

RE: Comparables over 6 months in age and/or over 1 mile in distance:

The scarcity of recent comparable sales in the subject neighborhood may have made it necessary to utilize sales over one mile in distance from the subject and over six months in age. These sales were used for their similar appeal and utility. Additional sales transactions were different in age, appeal, and style, thus were not utilized. Every effort has been made to conform to FNMA guidelines and investor underwriting standards.

RE: Sales Comparison Approach

The living area adjustments were calculated on a dollar per square foot ($/sqft.) basis. All sales were "arms length" transactions with no financing concessions noted. Data sources include assessors field cards, Multiple Listing Service and Banker and Tradesman records.

RE: Depreciation:

No adverse external factors were noted at the time of the inspection. Physical depreciation was calculated by the age-life method. Cost Approach figures are derived from the Marshall and Swift Cost Handbook and quotes from local builders.

RE: Environmental Conditions:

The appraiser is not qualified to detect hazardous waste and/or toxic substances. Any comment by the appraiser that might suggest the possibility of presence of such substances should not be taken as confirmation of the presence of hazardous waste and/or toxic materials. Such determination would require investigation by a qualified expert in the the field of environmental assessment. No responsibility is assumed for any environmental conditions.

RE: Definition of Legal Non-Conforming  Zoning:

Under Massachusetts General Law 40A when a property is damaged by fire or natural causes it may be rebuilt to the original footprint. However, it must meet all applicable current building codes and time restrictions. Should further details or clarification become necessary, please refer to the local building department authority as this appraiser is not qualified to make legal determinations.

RE: Estimate of site value:

The site value indicated in the Cost Approach is based on a review of recent recorded land sales, the extraction method, listings and neighborhood land assessments. Land to value ratios are typical for this market.

RE: File Photos:

The appraiser has made an exterior visual inspection of each of the comparable sales in this report, and in most cases a photograph was taken at that time.  However, in some instances a photograph may have been used from a previous appraisal or from the office files because the appearance and condition of the property has not changed since the photo was taken.

RE: Electronic Signatures and Digital Photographs:

All signatures that appear in this appraisal report are placed electronically and are secured by a password. Electronic signatures have been approved and accepted by most major lending institutions and banks. According to USPAP, electronically affixing a signature to a report carries the same level of authenticity and responsibility as an ink signature on a paper copy report. All photographs submitted with this appraisal report are original digital images printed in color or black and white.These digital photographs have not been altered or modified in any way.

RE:  Intended User

The intended user of this appraisal report is the lender/client. The intended user is to evaluate the property that is the subject of this appraisal for a mortgage finance transaction, subject to the state scope of work, purpose of the appraisal, reporting requirements of this appraisal report form, and definition of market value. No additional intended users are identified by the appraiser.

RE: Gross Living Area

Gross living area is taken from public records, town assessor field cards and measurements.

**URAR : Subject - Data Source(s), Offering Price(s), Date(s)**

MLS / Broker - The subject was listed for sale on 3/27/2012 for $5,190,000. It was reduced twice down to $4,390,000. After a total of 467 days listed on MLS the subject listing went under agreement. The subject was also on 6/15/2012 for $2,995,000 which included only one lot consisting of 42,741 sf. This was listed separately at a lower list price to generate more interest. The subject's sale price reflects a total of two lots consisting of 67,741 sf.

Supplemental Addendum

File No. S2975

| Borrower/Client | Vadim Kagan | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 77 Lyman Rd | | | | | |
| City | Chestnut Hill | County | Norfolk | State | MA | Zip Code | 02467 |
| Lender | Rockland Trust Company | | | | | |

**URAR : Improvements - Additional Features**

There will be a high end custom Colonial style colonial located in a highly desirable neighborhood. Features will include a custom gourmet chef's kitchen with viking oven, stone countertops, and custom wood cabinets. Each bedroom will be a suite style design with a custom bath featuring marble tile, stone countertops, jacuzzi and steam shower in the master bath. Front porch, patio in rear, fireplaces located in the family room and master bedroom, central air, hardwood flooring, full security and intercom systems. Full walk-out unfinished basement with the potential to be finished. Custom wood shingle exterior, a three car attached garage, and a six car asphalt driveway will provide off street parking. Finishes will be considered to be superior to previous properties constructed by this developer and will be reflected in a list price of $5,500,000 per conversation with the developer.

**URAR : Neighborhood - Description**

The subject is located in the highly desirable Chestnut Hill neighborhood of Brookline. It is within a short driving distance to local shopping, schools, recreational areas. Easy access to major highways and connecting roadways such as Route 9. The economy remains stable in the area and proximity to employment is good. The subject's neighborhood consists of a mixture of homes constructed before 1960 and properties that have been constructed within the last ten years. Due to the limited vacant land available properties are commonly purchased and demolished with construction of a new high end designs shortly after. The subject's neighborhood is considered to be highly desirable with strong overall value trends.

**URAR : Sales Comparison Analysis - Summary of Sales Comparison Approach**

Comparables used are the best available as of this report. All comps were adjusted at $125 per square foot. Finished basement and amenities were adjusted based on utility.

Sales 1 and 2 are each the most recent similar new construction sales located in the subject's immediate neighborhood. Sale 1 was adjusted for a location on Heath Street which was inferior in privacy and appeal. Each sale was recently constructed with high end finishes and were considered to be similar in condition, design, amenities, GLA, lot size, and appeal. Sales 1 and 2 were each adjusted for inferior quality of finishes as the subject's custom finishes are considered to be superior in appeal per review of construction documents, conversation with the developer, and exterior inspection of each comparable. Finishes for sales 1 and 2 are reflected in the sale price per conversation with multiple local brokers. Sale 2 is over 12 months in age but is considered to be a strong indicator of value due to the low turnover rate of new construction sales in the immediate neighborhood. Sales 1 and 2 were each weighed very heavily in the final estimate of value.

Sale 3 recently closed in a nearby Chestnut Hill neighborhood. This location is considered to be slightly inferior in terms of values and appeal per mls sales data and conversation with multiple local brokers. This sale is located in a highly desirable neighborhood that features views of Hammond Pond. Sale 3 was built in 2002 with custom high end finishes and materials that were considered to be similar in appeal. Sale 3 features a custom kitchen, baths, built-ins, smart house technology, custom outdoor patio's with kitchen, and media room. Sale 3 was adjusted for being over 15% larger than the subject in terms of GLA. Sale 3 was also adjusted for a lack of similar new construction condition. Condition adjustment was confirmed per exterior inspection, review of mls data, and conversation with multiple local brokers. Sale 3 is the most recent sale in Chestnut Hill that was considered to be similar in appeal. This sale was used to support neighborhood values in Chestnut Hill.

Sale 4 is located in Chestnut Hill on nearby Warren Street. This sale is located on a private parcel that consisted of over 3.5 acres. Buyers in Chestnut Hill will pay a premium for a private parcels similar in this size. Sale 4 was completely remodeled approximately 13 years ago with custom high end finishes per review of mls notes and conversation with the listing broker. Sale 4 features a 2,567 sf carriage house that was adjusted at $125.00 per sq ft. Carriage houses are considered to be highly desirable for potential buyers in this value range. The sale price for sale 4 reflects it's highly desirable location and lot size, finished carriage house that conforms with the main dwelling, and the 7,486 sf home that has been remodeled with custom finishes and has been well maintained. Sale 4 is considered to be superior in appeal and was used to support the sale range in the immediate neighborhood.

Comparable 5 is currently listed for sale located in a the subject's immediate neighborhood. The sale price to list price ratio for similar properties in the subjects neighborhood is 96%. Therefore a 4% adjustment was used to reflect the future expected sale price. This listing has been on the market for over 775 days and has been reduced three times per mls notes. Comparable 5 was constructed in 1998 with custom high end finishes from this time period. Since this construction there has been some remodeling and renovations per conversation with the listing agent. Comparable 5 was adjusted for inferior finishes in the kitchen, baths, bedrooms, and exterior. Comparable 5 was also adjusted for a inferior effective age and lack of new construction condition. Comparable 5 was considered to be similar in location, GLA, amenities, and appeal. This listing was used to support values in the immediate neighborhood.

Comparable 6 is currently listed for sale located in a nearby neighborhood in Chestnut Hill. This location is considered to be inferior in values and appeal per review of mls sales data and conversation with multiple local brokers. The sale price to list price ratio for similar properties in the subjects neighborhood is 96%. Therefore a 4% adjustment was used to reflect the future expected sale price. Comparable 6 was adjusted for a superior 1,139 sf carriage house that has been recently remodeled and well maintained. Comparable 6 features a similar lot size, GLA, bedroom count, quality of finishes throughout, and design. Comparable 6 was used due to the limited new construction / remodeled sales in the neighborhood. Comparable 6 was used to support the subject's appraised value.

Lyman Road is considered to be one of the most sought after street's in Chestnut Hill. The search of recent sales located in Chestnut Hill revealed limited new construction sales similar in appeal. Buyers typically will pay a premium for this new construction design featuring custom high end finishes and materials. It was necessary to use a sale over twelve months in age that was considered to be strong indicator of value. It was also necessary to use multiple comparables that exceeded the 20% gross adjustment guideline. The four closed sales were weighed accordingly in the final estimate of value. Sales 1 and 2 are the most recent new construction sales in the immediate neighborhood and were considered to be a strong indicator of neighborhood values. Sales 3 and 4 are each located in nearby Chestnut Hill neighborhood that differ in values and appeal. Each of these sales were used to support values of high end custom homes in the neighborhood. Comparables 5 and 6 were used to support the subject's appraised value. Current market conditions support a slight increase in sales values / listings in Chestnut Hill per review of mls data. The subject property will comparable favorably to each comparable in this report. Local brokers with custom home sale experience were consulted throughout this appraisal process.

| Borrower/Client | Vadim Kagan | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 77 Lyman Rd | | | | | |
| City | Chestnut Hill | County | Norfolk | State | MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | | | |



### Subject Front

77 Lyman Rd

| | |
|---|---|
| Sales Price | |
| Gross Living Area | 6,730 |
| Total Rooms | 12 |
| Total Bedrooms | 6 |
| Total Bathrooms | 6.2 |
| Location | Residential |
| View | Neighborhood |
| Site | 33,908 s/f |
| Quality | Excellent |
| Age | New |



### Subject Rear



### Subject Street

Comparing Photo Page

| | |
|---|---|
| Borrower/Client | Vadim Kagan |
| Property Address | 77 Lyman Rd |
| City | Chestnut Hill |
| Lender | Rockland Trust Company |

County Norfolk    State MA    Zip Code 02467



### Comparable 1

113 Heath St
Prox. to Subject    0.15 miles SE
Sale Price    4,375,000
Gross Living Area    5,961
Total Rooms    10
Total Bedrooms    4
Total Bathrooms    6.2
Location    Inferior 3%
View    Neighborhood
Site    40,118 s/f
Quality    Inferior 10%
Age    1 yr



### Comparable 2

7 Cutler Ln
Prox. to Subject    0.13 miles E
Sale Price    4,700,000
Gross Living Area    6,459
Total Rooms    11
Total Bedrooms    6
Total Bathrooms    6.1
Location    Residential
View    Neighborhood
Site    44,001 s/f
Quality    Inferior 10%
Age    1 yr



### Comparable 3

25 Moorfield Rd
Prox. to Subject    0.96 miles W
Sale Price    5,130,000
Gross Living Area    8,284
Total Rooms    12
Total Bedrooms    7
Total Bathrooms    5.1
Location    Inferior 5%
View    Nghbrhd/Water
Site    43,043 s/f
Quality    Similar
Age    13 yrs

| Borrower/Client | Vadim Kagan | | | | |
|---|---|---|---|---|---|
| Property Address | 77 Lyman Rd | | | | |
| City | Chestnut Hill | County | Norfolk | State MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | | |



### Comparable 4

130 Warren St
| | |
|---|---|
| Prox. to Subject | 0.89 miles E |
| Sales Price | 9,200,000 |
| Gross Living Area | 7,486 |
| Total Rooms | 10 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.2 |
| Location | Superior 5% |
| View | Neighborhood |
| Site | 160,977 s/f |
| Quality | Similar |
| Age | 13 yrs |



### Comparable 5

30 Clyde St
| | |
|---|---|
| Prox. to Subject | 0.44 miles SE |
| Sales Price | 5,250,000 |
| Gross Living Area | 6,652 |
| Total Rooms | 12 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4.1 |
| Location | Residential |
| View | Neighborhood |
| Site | 35,148 s/f |
| Quality | Inferior 5% |
| Age | 15 yrs |



### Comparable 6

125 Rockwood St
| | |
|---|---|
| Prox. to Subject | 1.10 miles SE |
| Sales Price | 6,199,000 |
| Gross Living Area | 6,766 |
| Total Rooms | 15 |
| Total Bedrooms | 6 |
| Total Bathrooms | 7.4 |
| Location | Residential |
| View | Neighborhood |
| Site | 40,055 s/f |
| Quality | Similar |
| Age | 102 yrs / 5 yrs |



FIRST FLOOR PLAN



SECOND FLOOR PLAN



Location Map

| | |
|---|---|
| Borrower/Client | Vadim Kagan |
| Property Address | 77 Lyman Rd |
| City | Chestnut Hill | County | Norfolk | State | MA | Zip Code | 02467 |
| Lender | Rockland Trust Company |



# COMMONWEALTH OF MASSACHUSETTS

## DIVISION OF PROFESSIONAL LICENSURE - BOARD OF
### REAL ESTATE APPRAISERS
### CERT RES. REAL ESTATE APPRAISER

ISSUES THE ABOVE LICENSE TO:

NICHOLAS A MORRIS

285 EMERSON ST
UNIT 1
S BOSTON                MA 02127-3137

75215          10/15/13          54689

| LICENSE NO. | EXPIRATION DATE | SERIAL NO. |

Signature

Fold, Then Detach Along All Perforations

# Real Estate Appraisers Professional Liability



**Liberty International Underwriters.**
Member of Liberty Mutual Group

| Date Issued | Policy Number | Previous Policy Number |
|---|---|---|
| 11/27/2012 | LIU011599-006 | LIU011599-005 |

## LIBERTY INSURANCE UNDERWRITERS, INC.

(A Stock Insurance Company, hereinafter the "Company")
55 Water Street, 18th Floor
New York, NY 10041

**THIS IS A CLAIMS MADE AND REPORTED POLICY. PLEASE READ IT CAREFULLY.**

Item                                   DECLARATIONS

| | |
|---|---|
| 1. | Customer ID: 161341<br>Named Insured:<br>COMMONWEALTH APPRAISAL SERVICES<br>Nicholas Morris<br>115 Gulliver Street<br>Milton, MA 02186 | |
| 2. | **Policy Period:**<br>**From:** 12/05/2012   **To:** 12/05/2013<br>12:01 A.M. Standard Time at the address stated in<br>Item 1. | |
| 3. | **Deductible: $1,000**   Each Claim | |
| 4. | **Retroactive Date:**   12/05/2007 | |
| 5. | **Inception Date:**   12/05/2007 | |
| 6. | **Limits of Liability:**<br>**A.** $1,000,000   Each Claim<br>**B.** $2,000,000   Aggregate | **The Limit of Liability for Each Claim and in the Aggregate is reduced by Damages and Claims Expenses as defined in the Policy.** |
| 7. | **Mail All Notices to Agent:** | LIA Administrators & Insurance Services<br>1600 Anacapa Street<br>Santa Barbara, California 93101<br>(805) 963-6624;   Fax: (805) 962-0652 |
| 8. | **Annual Premium:**   $899.00 | |
| 9. | Number of Appraisers:   1 | |
| 10. | Forms attached at issue:   LIA002 (10/11)   LIA012 (08/11)   LIA018 (03/10)   LIA020 (03/10)<br>OFAC (08/09) | |

This Declarations Page together with the completed and signed Policy Application including all attachments and exhibits thereto, and the Real Estate Appraisers Professional Liability Insurance Policy shall constitute the contract between the Named Insured and the Company.

By _____

LIA001 (04/10)                                        Authorized Signature

# EXHIBIT 18



## APPRAISAL OF REAL PROPERTY

### LOCATED AT:
Cutler Rd
Chestnut Hill, MA  02467

### FOR:
Rockland Trust Company
120 Liberty Street
Brockton, MA 02301

### AS OF:
4/17/2013

### BY:
Nicholas Morris
Commonwealth Appraisal Services
115 Gulliver Street
Milton, MA 02186

14171
File # S2976

# Uniform Residential Appraisal Report

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | | | |
|---|---|---|---|
| Property Address Cutler Rd | City Chestnut Hill | State MA | Zip Code 02467 |

**SUBJECT**

| | |
|---|---|
| Borrower Vadim Kagan | Owner of Public Record Lyman Cutler LLC | County Norfolk |

Legal Description At The Norfolk County Registry of Deeds

| Assessor's Parcel # Map: 437 Block: 27 Lot: 36-A-B | Tax Year 2013 | R.E. Taxes $ 36,000.00 Est. |
|---|---|---|

| Neighborhood Name Chestnut Hill | Map Reference 437-27-36-A-B | Census Tract 4011.00 |
|---|---|---|

Occupant ☒ Owner ☐ Tenant ☐ Vacant    Special Assessments $ 0.00    ☐ PUD    HOA $ N/A    ☐ per year ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Fee Simple

Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe) To Determine Market Value

Lender/Client Rockland Trust Company    Address 120 Liberty Street Brockton, MA 02301

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal? ☒ Yes ☐ No

Report data source(s) used, offering price(s), and date(s).    See attached addenda.

**CONTRACT**

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $ _____ Date of Contract _____ Is the property seller the owner of public record? ☐ Yes ☐ No  Data Source(s) _____

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower? ☐ Yes ☐ No

If Yes, report the total dollar amount and describe the items to be paid.

**NEIGHBORHOOD**

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location ☐ Urban ☒ Suburban ☐ Rural | | | Property Values ☐ Increasing ☒ Stable ☐ Declining | | | PRICE $(000) | AGE (yrs) | One-Unit | 65 % |
| Built-Up ☒ Over 75% ☐ 25-75% ☐ Under 25% | | | Demand/Supply ☐ Shortage ☒ In Balance ☐ Over Supply | | | Low 560 | New | 2-4 Unit | 5 % |
| Growth ☐ Rapid ☒ Stable ☐ Slow | | | Marketing Time ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | | High 9,200 | 160 | Multi-Family | 5 % |
| Neighborhood Boundaries  The neighborhood is bound to the north by Route 9, to the south by The Country | | | | | | Pred. 1,900 | 62 | Commercial | 5 % |
| Club, to the east by Lee Street, and to the west by Hammond Street. | | | | | | | | Other | % |

Neighborhood Description    See attached addenda.

Market Conditions (including support for the above conclusions)    Current market conditions appear to have stabilized after a period of property value decline which was a result of a market correction after a long period of increasing property values. Marketing time has been three to six months or less for reasonably priced homes.

**SITE**

Dimensions Approximately 100 feet of frontage    Area 33,908 s/f    Shape Rectangular    View Neighborhood

Specific Zoning Classification Residential Single Family 25;    Zoning Description 30ff. - 25,000 sf

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use? ☒ Yes ☐ No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Paved asphalt | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley No | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No  FEMA Flood Zone X    FEMA Map # 25021C0034E    FEMA Map Date 07/17/2012

Are the utilities and off-site improvements typical for the market area? ☒ Yes ☐ No  If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)? ☐ Yes ☒ No  If Yes, describe

I have inspected the property for any adverse site conditions or external factors: easements, encroachment, environmental, land use etc.) Based on my exterior inspection I found no adverse site conditions or external factors.

**IMPROVEMENTS**

| General Description | | Foundation | | Exterior Description | materials/condition | Interior | materials/condition |
|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | | ☐ Concrete Slab ☐ Crawl Space | | Foundation Walls | Concrete/New | Floors | HW/Marble/New |
| # of Stories 2 | | ☒ Full Basement ☐ Partial Basement | | Exterior Walls | WdShngle/New | Walls | Drywall/New |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | | Basement Area 3,245 sq.ft. | | Roof Surface | AsphltShgle/New | Trim/Finish | Wood/New |
| ☐ Existing ☒ Proposed ☐ Under Const. | | Basement Finish 0 % | | Gutters & Downspouts | Alum/Alum/New | Bath Floor | Marble/New |
| Design (Style) Contemporary | | ☐ Outside Entry/Exit ☐ Sump Pump | | Window Type | D-hung/New | Bath Wainscot | Marble/New |
| Year Built 2013 | | Evidence of ☐ Infestation NoneNoted | | Storm Sash/Insulated | Yes/Yes/New | Car Storage | None |
| Effective Age (Yrs) New | | ☐ Dampness ☐ Settlement | | Screens | Combo/New | ☒ Driveway # of Cars 6 |
| Attic ☐ None | | Heating ☒ FWA ☐ HWBB ☐ Radiant | | Amenities | ☐ Woodstove(s) # | Driveway Surface | Asphalt |
| ☐ Drop Stair ☐ Stairs | | ☐ Other FHA  Fuel Gas | | ☒ Fireplace(s) # 3 | ☒ Fence Side/Rear | ☒ Garage # of Cars 3 |
| ☐ Floor ☒ Scuttle | | Cooling ☒ Central Air Conditioning | | ☒ Patio/Deck Dk/Pt | ☒ Porch Front | ☐ Carport # of Cars |
| ☐ Finished ☐ Heated | | ☐ Individual ☐ Other | | ☐ Pool | ☐ Other Balcony | ☒ Att. ☐ Det. ☐ Built-in |
| Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☐ Disposal ☐ Microwave ☒ Washer/Dryer ☐ Other (describe) | | | | | | | |

Finished area above grade contains:    12 Rooms    6 Bedrooms    6.2 Bath(s)    6,730 Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.).    See attached addenda.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).    The subject will be of excellent construction quality and in new overall condition. It will be a custom colonial style home that will appear very well maintained. See addendum page for features of the home. 300 amp electric via circuit breakers provides adequate electricity. ** As of 4/25/2013 there has not been a recorded number on Cutler Road for the subject property. **

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property? ☐ Yes ☒ No  If Yes, describe

At the time of inspection, no adverse conditions that would affect the livability, soundness, or structural integrity of the property were evident to the appraiser.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)? ☒ Yes ☐ No  If No, describe

The subject property is similar in style, condition, and use to other properties in the subject neighborhood area.

Freddie Mac Form 70 March 2005                    Page 1 of 6                    Fannie Mae Form 1004 March 2005

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

14171
File # S2976

## Uniform Residential Appraisal Report

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| There are | 5 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 3,450,000 to $ 10,500,000 . | | | | | |
| There are | 5 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 3,500,000 to $ 11,000,000 . | | | | | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | | COMPARABLE SALE # 2 | | COMPARABLE SALE # 3 | |
|---|---|---|---|---|---|---|---|
| Address | Cutler Rd Chestnut Hill, MA 02467 | 113 Heath St Chestnut Hill, MA 02467 | | 7 Cutler Ln Chestnut Hill, MA 02467 | | 25 Moorfield Rd Chestnut Hill, MA 02467 | |
| Proximity to Subject | | 0.06 miles S | | 0.01 miles NE | | 1.09 miles W | |
| Sale Price | $ | | $ 4,375,000 | | $ 4,700,000 | | $ 5,130,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 733.94 sq.ft. | | $ 727.67 sq.ft. | | $ 619.27 sq.ft. | |
| Data Source(s) | | MLS #71269386 / B&T DOM 310 | | MLS #71240547 / B&T DOM 31 | | MLS #71147515 / B&T DOM 560 | |
| Verification Source(s) | | Exterior Inspection / Assessor | | Exterior Inspection / Assessor | | Exterior Inspection / Assessor | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | Conv Fin | | Conv Fin | | Conv Fin | |
| Concessions | | None Known | | None Known | | None Known | |
| Date of Sale/Time | | 7/23/2012 SD | | 8/1/2011 SD | | 8/23/2012 SD | |
| Location | Residential | Inferior 3% | +131,250 | Residential | | Inferior 5% | +256,500 |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 33,908 s/f | 40,118 s/f | | 44,001 s/f | | 43,043 s/f | |
| View | Neighborhood | Neighborhood | | Neighborhood | | Nghbrhd/Water | -100,000 |
| Design (Style) | Contemporary | Colonial | | Colonial | | Contemporary | |
| Quality of Construction | Excellent | Inferior 10% | +437,500 | Inferior 10% | +470,000 | Similar | |
| Actual Age | New | 1 yr | | 1 yr | | 13 yrs | |
| Condition | New | Similar | | Similar | | Inferior 5% | +256,500 |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 12  6  6.2 | 10  4  6.2 | | 11  6  6.1 | +5,000 | 12  7  5.1 | +15,000 |
| Gross Living Area | 6,730 sq.ft. | 5,961 sq.ft. | +96,125 | 6,459 sq.ft. | +33,875 | 8,284 sq.ft. | -194,250 |
| Basement & Finished | Full | Full | | Full | | Full | |
| Rooms Below Grade | Unfinished | Unfinished | | Unfinished | | Finished | -100,000 |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FHA / Central | FHA / Central | | FHA / Central | | FHA / Central | |
| Energy Efficient Items | Average | Average | | Average | | Average | |
| Garage/Carport | 3 car attached | 3 car attached | | 3 car attached | | 3 car built-in | |
| Porch/Patio/Deck | Prch,Ptio,Blcny | Deck, Patio | | Deck, Patio | +5,000 | Deck, Patio | |
| Fireplace | 3 F.P. | 3 F.P. | | 3 F.P. | | 3 F.P. | |
| Pool / Outbuildings | None | None | | None | | None | |
| Net Adjustment (Total) | | ☒ +  ☐ - | $ 664,875 | ☒ +  ☐ - | $ 513,875 | ☒ +  ☐ - | $ 133,750 |
| Adjusted Sale Price of Comparables | | Net Adj. 15.2 % Gross Adj. 15.2 % | $ 5,039,875 | Net Adj. 10.9 % Gross Adj. 10.9 % | $ 5,213,875 | Net Adj. 2.6 % Gross Adj. 18.0 % | $ 5,263,750 |

☐ I  ☒ did  ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☒ did  ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)    MLS/Banker & Tradesman
My research ☐ did  ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)    MLS/Banker & Tradesman
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 12/31/2012 | None in the last year | None in the last year | None in the last year |
| Price of Prior Sale/Transfer | 4,000,000 | | | |
| Data Source(s) | Assessor / B&T | Assessor / B&T | Assessor / B&T | Assessor / B&T |
| Effective Date of Data Source(s) | Date of Inspection | Date of Inspection | Date of Inspection | Date of Inspection |

Analysis of prior sale or transfer history of the subject property and comparable sales    77 Lyman Road transferred on December 31, 2012 for $4,000,000. This
was a arms length transaction that sold at market levels. This property is in the process of being demolished with construction of a new custom
colonial design to follow. As stated the subject property will be constructed on a parcel of land divided from 77 Lyman Road. The comparables have
not transferred in the last 12 months.

Summary of Sales Comparison Approach    See attached addenda.

Indicated Value by Sales Comparison Approach $  5,300,000

Indicated Value by: Sales Comparison Approach $  5,300,000    Cost Approach (if developed) $  4,354,275    Income Approach (if developed) $
The Sales Comparison approach to value is considered the best indicator of the estimated value of the subject property and is most weighted by
informed purchasers. The Cost Approach is supportive and used as a check. The Income Approach does not apply as the subject is not utilized for
income purposes and is owner occupied.
This appraisal is made ☐ "as is", ☒ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been
completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the
following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:  Subject to completion per specs
and plans. The square footage and specs used by the appraiser were provided by the developer.
Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting
conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$  5,300,000 , as of  4/17/2013 , which is the date of inspection and the effective date of this appraisal.

## Uniform Residential Appraisal Report

File No. Descalzo Exhibit

14171
File # S2976

The subject will be a six bedroom, six and two half bath new construction colonial style home. The property is located in a area of Chestnut Hill with homes of similar style and age. The property generally conforms to the surrounding neighborhood.

**ADDITIONAL COMMENTS**

### COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

Estimated site value was determined by analyzing the recent land sales in the subject area and by the extraction method.

| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | | | =$ | 1,500,000 |
|---|---|---|---|---|---|---|
| Source of cost data  Local builders / Marshall and Swift | DWELLING | 6,730 Sq.Ft. @ $ | 285.00 | | =$ | 1,918,050 |
| Quality rating from cost service  Excllnt    Effective date of cost data  Current | | 3,245 Sq.Ft. @ $ | 185.00 | | =$ | 600,325 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | Refinements | | | | =$ | 150,000 |
| The land to total value ratio is typical for the City of Brookline. | Garage/Carport | 718 Sq.Ft. @ $ | 50.00 | | =$ | 35,900 |
| Depreciation is based on an age/life schedule and depreciation and cost | Total Estimate of Cost-New | | | | =$ | 2,704,275 |
| estimates are derived from the Marshal and Swift Residential Cost | Less      Physical | Functional | External | | | |
| Handbook and from estimates from local builders. Remaining estimated | Depreciation | | | | =$( | ) |
| economic life 60 years based on a 60 year life. | Depreciated Cost of Improvements | | | | =$ | 2,704,275 |
| | *As-is* Value of Site Improvements | | | | =$ | 150,000 |
| Estimated Remaining Economic Life (HUD and VA only)          60 Years | INDICATED VALUE BY COST APPROACH | | | | =$ | 4,354,275 |

### INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $ | X Gross Rent Multiplier | = $ | Indicated Value by Income Approach |
|---|---|---|---|

Summary of Income Approach (including support for market rent and GRM)

### PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)? ☐ Yes ☐ No   Unit type(s) ☐ Detached ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD? ☐ Yes ☐ No  If Yes, date of conversion.

Does the project contain any multi-dwelling units? ☐ Yes ☐ No  Data Source

Are the units, common elements, and recreation facilities complete? ☐ Yes ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association? ☐ Yes ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

14171
File # S2976

# Uniform Residential Appraisal Report

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

14171
File # S2976

## Uniform Residential Appraisal Report

**APPRAISER'S CERTIFICATION:**   The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Freddie Mac Form 70 March 2005                      Page 5 of 6                      Fannie Mae Form 1004 March 2005

# Uniform Residential Appraisal Report

21.  The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22.  I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23.  The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24.  If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25.  Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:** The Supervisory Appraiser certifies and agrees that:

1.  I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2.  I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3.  The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4.  This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5.  If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature _Nicholas Morris_ | Signature _____ |
| Name  Nicholas Morris | Name _____ |
| Company Name  Commonwealth Appraisal Services | Company Name _____ |
| Company Address  115 Gulliver Street | Company Address _____ |
| Milton, MA 02186 | _____ |
| Telephone Number  781-500-9871 | Telephone Number _____ |
| Email Address  nickmorris217@yahoo.com | Email Address _____ |
| Date of Signature and Report  April 25, 2013 | Date of Signature _____ |
| Effective Date of Appraisal  4/17/2013 | State Certification # _____ |
| State Certification #  75215 | or State License # _____ |
| or State License # _____ | State _____ |
| or Other (describe) _____ State # _____ | Expiration Date of Certification or License _____ |
| State  MA | |
| Expiration Date of Certification or License  10/15/2013 | **SUBJECT PROPERTY** |
| | ☐ Did not inspect subject property |
| **ADDRESS OF PROPERTY APPRAISED** | ☐ Did inspect exterior of subject property from street |
| Cutler Rd | Date of Inspection _____ |
| Chestnut Hill, MA 02467 | ☐ Did inspect interior and exterior of subject property |
| APPRAISED VALUE OF SUBJECT PROPERTY $  5,300,000 | Date of Inspection _____ |
| **LENDER/CLIENT** | |
| Name _____ | **COMPARABLE SALES** |
| Company Name  Rockland Trust Company | |
| Company Address  120 Liberty Street Brockton, MA 02301 | ☐ Did not inspect exterior of comparable sales from street |
| | ☐ Did inspect exterior of comparable sales from street |
| Email Address _____ | Date of Inspection _____ |

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

File No. Case 16-01120

14171
File # S2976

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE # 6 | |
|---|---|---|---|---|---|---|---|
| Address | Cutler Rd | 130 Warren St | | 30 Clyde St | | 125 Rockwood St | |
| | Chestnut Hill, MA 02467 | Chestnut Hill, MA 02445 | | Chestnut Hill, MA 02467 | | Brookline, MA 02445 | |
| Proximity to Subject | | 0.77 miles E | | 0.34 miles SE | | 1.00 miles SE | |
| Sale Price | $ | | $ 9,200,000 | | $ 5,250,000 | | $ 6,199,000 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 1228.96 sq.ft. | | $ 789.24 sq.ft. | | $ 916.20 sq.ft. | |
| Data Source(s) | | MLS#71357077 / B&T DOM 423 | | MLS #71394332 / B&T DOM 779 | | MLS #71350456 / B&T DOM 408 | |
| Verification Source(s) | | Exterior Inspection / Assessor | | Exterior Inspection / Assessor | | Exterior Inspection / Assessor | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | Conv Fin | | None known | | None known | |
| Concessions | | None Known | | | | | |
| Date of Sale/Time | | 9/17/2012 SD | | Active - 4% | -210,000 | Active - 4% | -247,960 |
| Location | Residential | Superior 5% | -460,000 | Residential | | Residential | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 33,908 s/f | 160,977 s/f | -1,750,000 | 35,148 s/f | | 40,055 s/f | |
| View | Neighborhood | Neighborhood | | Neighborhood | | Neighborhood | |
| Design (Style) | Contemporary | Colonial | | Colonial | | Colonial | |
| Quality of Construction | Excellent | Similar | | Inferior 5% | +262,500 | Similar | |
| Actual Age | New | 13 yrs | | 15 yrs | | 102 yrs / 5 yrs | |
| Condition | New | Similar | | Inferior 5% | +262,500 | Similar | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 12  6  6.2 | 10  5  5.2 | +15,000 | 12  4  4.1 | +30,000 | 15  6  7.4 | -15,000 |
| Gross Living Area | 6,730 sq.ft. | 7,486 sq.ft. | -94,500 | 6,652 sq.ft. | +9,750 | 6,766 sq.ft. | -4,500 |
| Basement & Finished | Full | Full | | Full | | Full | |
| Rooms Below Grade | Unfinished | Unfinished | | Unfinished | | Unfinished | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FHA / Central | FHA / Central | | FHW / Central | | FHA / Central | |
| Energy Efficient Items | Average | Average | | Average | | Average | |
| Garage/Carport | 3 car attached | 4 car garage | -10,000 | 4 car attached | -10,000 | 4 car attached | -10,000 |
| Porch/Patio/Deck | Prch,Ptio,Blcny | Deck, Patio | | Patio | +5,000 | Deck,Ptio,Prch | -3,000 |
| Fireplace | 3 F.P. | 3 F.P. | | 2 F.P. | +2,000 | 5 F.P. | -4,000 |
| Pool / Outbuildings | None | Carriage House | -320,875 | None | | Carriage House | -142,375 |
| Net Adjustment (Total) | | ☐ + ☒ - | $ -2,620,375 | ☒ + ☐ - | $ 351,750 | ☐ + ☒ - | $ -426,835 |
| Adjusted Sale Price | | Net Adj.  28.5 % | | Net Adj.  6.7 % | | Net Adj.  6.9 % | |
| of Comparables | | Gross Adj. 28.8 % | $ 6,579,625 | Gross Adj. 15.1 % | $ 5,601,750 | Gross Adj. 6.9 % | $ 5,772,165 |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE # 6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 12/31/2012 | None in the last year | None in the last year | None in the last year |
| Price of Prior Sale/Transfer | 4,000,000 | | | |
| Data Source(s) | Assessor / B&T | Assessor / B&T | Assessor / B&T | Assessor / B&T |
| Effective Date of Data Source(s) | Date of Inspection | Date of Inspection | Date of Inspection | Date of Inspection |

Analysis of prior sale or transfer history of the subject property and comparable sales    Sale 4 and comparables 5 and 6 have not transferred in the last year.

Analysis/Comments    See attached addenda.

Form 1004.(AC) — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

## Supplemental Addendum

File No. S2976

| Borrower/Client | Vadim Kagan | | | | | |
|---|---|---|---|---|---|---|
| Property Address | Cutler Rd | | | | | |
| City | Chestnut Hill | County | Norfolk | State | MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | | | |

This appraisal is a summary report as defined by the Appraisal Standards Board of the Appraisal Foundation and complies with USPAP.

RE: Comparables over 6 months in age and/or over 1 mile in distance:

The scarcity of recent comparable sales in the subject neighborhood may have made it necessary to utilize sales over one mile in distance from the subject and over six months in age. These sales were used for their similar appeal and utility. Additional sales transactions were different in age, appeal, and style, thus were not utilized. Every effort has been made to conform to FNMA guidelines and investor underwriting standards.

RE: Sales Comparison Approach

The living area adjustments were calculated on a dollar per square foot ($/sqft.) basis. All sales were "arms length" transactions with no financing concessions noted. Data sources include assessors field cards, Multiple Listing Service and Banker and Tradesman records.

RE: Depreciation:

No adverse external factors were noted at the time of the inspection. Physical depreciation was calculated by the age-life method. Cost Approach figures are derived from the Marshall and Swift Cost Handbook and quotes from local builders.

RE: Environmental Conditions:

The appraiser is not qualified to detect hazardous waste and/or toxic substances. Any comment by the appraiser that might suggest the possibility of presence of such substances should not be taken as confirmation of the presence of hazardous waste and/or toxic materials. Such determination would require investigation by a qualified expert in the the field of environmental assessment. No responsibility is assumed for any environmental conditions.

RE: Definition of Legal Non-Conforming  Zoning:

Under Massachusetts General Law 40A when a property is damaged by fire or natural causes it may be rebuilt to the original footprint. However, it must meet all applicable current building codes and time restrictions. Should further details or clarification become necessary, please refer to the local building department authority as this appraiser is not qualified to make legal determinations.

RE: Estimate of site value:

The site value indicated in the Cost Approach is based on a review of recent recorded land sales, the extraction method, listings and neighborhood land assessments. Land to value ratios are typical for this market.

RE: File Photos:

The appraiser has made an exterior visual inspection of each of the comparable sales in this report, and in most cases a photograph was taken at that time.  However, in some instances a photograph may have been used from a previous appraisal or from the office files because the appearance and condition of the property has not changed since the photo was taken.

RE: Electronic Signatures and Digital Photographs:

All signatures that appear in this appraisal report are placed electronically and are secured by a password. Electronic signatures have been approved and accepted by most major lending institutions and banks. According to USPAP, electronically affixing a signature to a report carries the same level of authenticity and responsibility as an ink signature on a paper copy report. All photographs submitted with this appraisal report are original digital images printed in color or black and white.These digital photographs have not been altered or modified in any way.

RE:  Intended User

The intended user of this appraisal report is the lender/client. The intended user is to evaluate the property that is the subject of this appraisal for a mortgage finance transaction, subject to the state scope of work, purpose of the appraisal, reporting requirements of this appraisal report form, and definition of market value. No additional intended users are identified by the appraiser.

RE: Gross Living Area

Gross living area is taken from public records, town assessor field cards and measurements.

### URAR : Subject - Data Source(s), Offering Price(s), Date(s)

MLS / Broker - The subject lot will be divided from 77 Lyman Road. 77 Lyman Road was listed for sale on 3/27/2012 for $5,190,000. It was reduced twice down to $4,390,000. After a total of 467 days listed on MLS the subject listing went under agreement. The subject was also on 6/15/2012 for $2,995,000 which included only one lot consisting of 42,741 sf. This was listed separately at a lower list price to generate more interest. The subject's sale price reflects a total of two lots consisting of 67,741 sf.

Supplemental Addendum

File No. S2976

| Borrower/Client | Vadim Kagan | | | | |
|---|---|---|---|---|---|
| Property Address | Cutler Rd | | | | |
| City | Chestnut Hill | County Norfolk | | State MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | | |

**URAR : Improvements - Additional Features**

There will be a high end custom Colonial style colonial located in a highly desirable neighborhood. Features will include a custom gourmet chef's kitchen with viking oven, stone countertops, and custom wood cabinets. Each bedroom will be a suite style design with a custom bath featuring marble tile, stone countertops, jacuzzi and steam shower in the master bath. Front porch, patio in rear, fireplaces located in the family room and master bedroom, central air, hardwood flooring, full security and intercom systems. Full walk-out unfinished basement with the potential to be finished. Custom wood shingle exterior, a three car attached garage, and a six car asphalt driveway will provide off street parking. Finishes will be considered to be superior to previous properties constructed by this developer and will be reflected in a list price of $5,500,000 per conversation with the developer.

**URAR : Neighborhood - Description**

The subject is located in the highly desirable Chestnut Hill neighborhood of Brookline. It is within a short driving distance to local shopping, schools, recreational areas. Easy access to major highways and connecting roadways such as Route 9. The economy remains stable in the area and proximity to employment is good. The subject's neighborhood consists of a mixture of homes constructed before 1960 and properties that have been constructed within the last ten years. Due to the limited vacant land available properties are commonly purchased and demolished with construction of a new high end designs shortly after. The subject's neighborhood is considered to be highly desirable with strong overall value trends.

**URAR : Sales Comparison Analysis - Summary of Sales Comparison Approach**

Comparables used are the best available as of this report. All comps were adjusted at $125 per square foot. Finished basement and amenities were adjusted based on utility.

Sales 1 and 2 are each the most recent similar new construction sales located in the subject's immediate neighborhood. Sale 1 was adjusted for a location on Heath Street which was inferior in privacy and appeal. Each sale was recently constructed with high end finishes and were considered to be similar in condition, design, amenities, GLA, lot size, and appeal. Sales 1 and 2 were each adjusted for inferior quality of finishes as the subject's custom finishes are considered to be superior in appeal per review of construction documents, conversation with the developer, and exterior inspection of each comparable. Finishes for sales 1 and 2 are reflected in the sale price per conversation with multiple local brokers. Sale 2 is over 12 months in age but is considered to be a strong indicator of value due to the low turnover rate of new construction sales in the immediate neighborhood. Sales 1 and 2 were each weighed very heavily in the final estimate of value.

Sale 3 recently closed in a nearby Chestnut Hill neighborhood. This location is considered to be slightly inferior in terms of values and appeal per mls sales data and conversation with multiple local brokers. This sale is located in a highly desirable neighborhood that features views of Hammond Pond. Sale 3 was built in 2002 with custom high end finishes and materials that were considered to be similar in appeal. Sale 3 features a custom kitchen, baths, built-ins, smart house technology, custom outdoor patio's with kitchen, and media room. Sale 3 was adjusted for being over 15% larger then the subject in terms of GLA. Sale 3 was also adjusted for a lack of similar new construction condition. Condition adjustment was confirmed per exterior inspection, review of mls data, and conversation with multiple brokers. Sale 3 is the most recent sale in Chestnut Hill that was considered to be similar in appeal. This sale was used to support neighborhood values in Chestnut Hill.

Sale 4 is located in Chestnut Hill on nearby Warren Street. This sale is located on a private parcel that consisted of over 3.5 acres. Buyers in Chestnut Hill will pay a premium for a private parcels similar in this size. Sale 4 was completely remodeled approximately 13 years ago with custom high end finishes per review of mls notes and conversation with the listing broker. Sale 4 features a 2,567 sf carriage house that was adjusted at $125.00 per sq ft. Carriage houses are considered to be highly desirable for potential buyers in this value range. The sale price for sale 4 reflects it's highly desirable location and lot size, finished carriage house that conforms with the main dwelling, and the 7,486 sf home that has been remodeled with custom finishes and has been well maintained. Sale 4 is considered to be superior in appeal and was used to support the sale range in the immediate neighborhood.

Comparable 5 is currently listed for sale located in a the subject's immediate neighborhood. The sale price to list price ratio for similar properties in the subjects neighborhood is 96%. Therefore a 4% adjustment was used to reflect the future expected sale price. This listing has been on the market for over 775 days and has been reduced three times per mls notes. Comparable 5 was constructed in 1998 with custom high end finishes from this time period. Since this construction there has been some remodeling and renovations per conversation with the listing agent. Comparable 5 was adjusted for inferior finishes in the kitchen, baths, bedrooms, and exterior. Comparable 5 was also adjusted for a inferior effective age and lack of new construction condition. Comparable 5 was considered to be similar in location, GLA, amenities, and appeal. This listing was used to support values in the immediate neighborhood.

Comparable 6 is currently listed for sale located in a nearby neighborhood in Chestnut Hill. This location is considered to be inferior in values and appeal per review of mls sales data and conversation with multiple local brokers. The sale price to list price ratio for similar properties in the subjects neighborhood is 96%. Therefore a 4% adjustment was used to reflect the future expected sale price. Comparable 6 was adjusted for a superior 1,139 sf carriage house that has been recently remodeled and well maintained. Comparable 6 features a similar lot size, GLA, bedroom count, quality of finishes throughout, and design. Comparable 6 was used due to the limited new construction / remodeled sales in the neighborhood. Comparable 6 was used to support the subject's appraised value.

Cutler Road is considered to be one of the most sought after street's in Chestnut Hill. The search of recent sales located in Chestnut Hill revealed limited new construction sales similar in appeal. Buyers typically will pay a premium for this new construction design featuring custom high end finishes and materials. It was necessary to use a sale over twelve months in age that was considered to be strong indicator of value. It was also necessary to use multiple comparables that exceeded the 20% gross adjustment guideline. The four closed sales were weighed accordingly in the final estimate of value. Sales 1 and 2 are the most recent new construction sales in the immediate neighborhood and were considered to be a strong indicator of neighborhood values. Sales 3 and 4 are each located in nearby Chestnut Hill neighborhood that differ in values and appeal. Each of these sales were used to support values of high end custom homes in the neighborhood. Comparables 5 and 6 were used to support the subject's appraised value. Current market conditions support a slight increase in sales values / listings in Chestnut Hill per review of mls data. The subject property will comparable favorably to each comparable in this report. Local brokers with custom home sale experience were consulted throughout this appraisal process.

| Borrower/Client | Vadim Kagan | | | | | |
|---|---|---|---|---|---|---|
| Property Address | Cutler Rd | | | | | |
| City | Chestnut Hill | County | Norfolk | State | MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | | | |



### Subject Front

| | |
|---|---|
| Cutler Rd | |
| Sales Price | |
| Gross Living Area | 6,730 |
| Total Rooms | 12 |
| Total Bedrooms | 6 |
| Total Bathrooms | 6.2 |
| Location | Residential |
| View | Neighborhood |
| Site | 33,908 s/f |
| Quality | Excellent |
| Age | New |



### Subject Rear



### Subject Street

**Comparable Photo Page**

| | |
|---|---|
| Borrower/Client | Vadim Kagan |
| Property Address | Cutler Rd |
| City | Chestnut Hill |
| County | Norfolk |
| State | MA |
| Zip Code | 02467 |
| Lender | Rockland Trust Company |



### Comparable 1

113 Heath St

| | |
|---|---|
| Prox. to Subject | 0.06 miles S |
| Sale Price | 4,375,000 |
| Gross Living Area | 5,961 |
| Total Rooms | 10 |
| Total Bedrooms | 4 |
| Total Bathrooms | 6.2 |
| Location | Inferior 3% |
| View | Neighborhood |
| Site | 40,118 s/f |
| Quality | Inferior 10% |
| Age | 1 yr |



### Comparable 2

7 Cutler Ln

| | |
|---|---|
| Prox. to Subject | 0.01 miles NE |
| Sale Price | 4,700,000 |
| Gross Living Area | 6,459 |
| Total Rooms | 11 |
| Total Bedrooms | 6 |
| Total Bathrooms | 6.1 |
| Location | Residential |
| View | Neighborhood |
| Site | 44,001 s/f |
| Quality | Inferior 10% |
| Age | 1 yr |



### Comparable 3

25 Moorfield Rd

| | |
|---|---|
| Prox. to Subject | 1.09 miles W |
| Sale Price | 5,130,000 |
| Gross Living Area | 8,284 |
| Total Rooms | 12 |
| Total Bedrooms | 7 |
| Total Bathrooms | 5.1 |
| Location | Inferior 5% |
| View | Nghbrhd/Water |
| Site | 43,043 s/f |
| Quality | Similar |
| Age | 13 yrs |

Comparable Photo Page

| Borrower/Client | Vadim Kagan | | | | |
|---|---|---|---|---|---|
| Property Address | Cutler Rd | | | | |
| City | Chestnut Hill | County | Norfolk | State MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | | |



### Comparable 4
130 Warren St
| | |
|---|---|
| Prox. to Subject | 0.77 miles E |
| Sales Price | 9,200,000 |
| Gross Living Area | 7,486 |
| Total Rooms | 10 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.2 |
| Location | Superior 5% |
| View | Neighborhood |
| Site | 160,977 s/f |
| Quality | Similar |
| Age | 13 yrs |



### Comparable 5
30 Clyde St
| | |
|---|---|
| Prox. to Subject | 0.34 miles SE |
| Sales Price | 5,250,000 |
| Gross Living Area | 6,652 |
| Total Rooms | 12 |
| Total Bedrooms | 4 |
| Total Bathrooms | 4.1 |
| Location | Residential |
| View | Neighborhood |
| Site | 35,148 s/f |
| Quality | Inferior 5% |
| Age | 15 yrs |



### Comparable 6
125 Rockwood St
| | |
|---|---|
| Prox. to Subject | 1.00 miles SE |
| Sales Price | 6,199,000 |
| Gross Living Area | 6,766 |
| Total Rooms | 15 |
| Total Bedrooms | 6 |
| Total Bathrooms | 7.4 |
| Location | Residential |
| View | Neighborhood |
| Site | 40,055 s/f |
| Quality | Similar |
| Age | 102 yrs / 5 yrs |



FIRST FLOOR PLAN



SECOND FLOOR PLAN



Location Map

| Borrower/Client | Vadim Kagan | | | | |
|---|---|---|---|---|---|
| Property Address | Cutler Rd | | | | |
| City | Chestnut Hill | County | Norfolk | State | MA | Zip Code | 02467 |
| Lender | Rockland Trust Company | | | | |



# COMMONWEALTH OF MASSACHUSETTS

## DIVISION OF PROFESSIONAL LICENSURE - BOARD OF

## REAL ESTATE APPRAISERS
## CERT RES. REAL ESTATE APPRAISER

ISSUES THE ABOVE LICENSE TO:

NICHOLAS A MORRIS

285 EMERSON ST
UNIT 1
S BOSTON                MA 02127-3137

75215          10/15/13          54689

| LICENSE NO. | EXPIRATION DATE | SERIAL NO. |
| --- | --- | --- |

Signature

Fold, Then Detach Along All Perforations

# Real Estate Appraisers Professional Liability



**Liberty**
**International**
**Underwriters.**
Member of Liberty Mutual Group

| Date Issued | Policy Number | Previous Policy Number |
|---|---|---|
| 11/27/2012 | LIU011599-006 | LIU011599-005 |

## LIBERTY INSURANCE UNDERWRITERS, INC.

(A Stock Insurance Company, hereinafter the "Company")
55 Water Street, 18th Floor
New York, NY 10041

**THIS IS A CLAIMS MADE AND REPORTED POLICY. PLEASE READ IT CAREFULLY.**

Item                                    DECLARATIONS

1.  Customer ID: 161341
    Named Insured:
    COMMONWEALTH APPRAISAL SERVICES
    Nicholas Morris
    115 Gulliver Street
    Milton, MA 02186

2.  **Policy Period:**
    **From:** 12/05/2012        **To:** 12/05/2013
    12:01 A.M. Standard Time at the address stated in
    Item 1.

3.  **Deductible: $1,000**        Each Claim

4.  **Retroactive Date:**        12/05/2007

5.  **Inception Date:**        12/05/2007

6.  **Limits of Liability:**        **The Limit of Liability for Each Claim and in**
    A.  $1,000,000    Each Claim    **the Aggregate is reduced by Damages and**
    B.  $2,000,000    Aggregate    **Claims Expenses as defined in the Policy.**

7.  **Mail All Notices to Agent:**
    LIA Administrators & Insurance Services
    1600 Anacapa Street
    Santa Barbara, California 93101
    (805) 963-6624;   Fax: (805) 962-0652

8.  **Annual Premium:**        **$899.00**

9.  Number of Appraisers:        1

10. Forms attached at issue:    LIA002 (10/11)  LIA012 (08/11)  LIA018 (03/10)  LIA020 (03/10)
    OFAC (08/09)

This Declarations Page together with the completed and signed Policy Application including all attachments and exhibits thereto, and the Real Estate Appraisers Professional Liability Insurance Policy shall constitute the contract between the Named Insured and the Company.

By _____

LIA001 (04/10)                                    Authorized Signature

# EXHIBIT 19



## APPRAISAL OF REAL PROPERTY

### LOCATED AT:
55 Lyman Rd
Chestnut Hill, MA  02467

### FOR:
Rockland Trust Company
120 Liberty Street
Brockton, MA 02301

### AS OF:
5/26/2015

### BY:
Nicholas Morris
Commonwealth Appraisal Services
115 Gulliver Street
Milton, MA 02186

# Uniform Residential Appraisal Report

18091
File # S3802

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| | | | |
|---|---|---|---|
| Property Address 55 Lyman Rd | City Chestnut Hill | State MA | Zip Code 02467 |
| Borrower Vadim Kagan | Owner of Public Record Lyman Road LLC | | County Norfolk |

Legal Description  At The Norfolk County Registry of Deeds Book 13087 Page 355

| | | |
|---|---|---|
| Assessor's Parcel #  Map: 437 Block: 27 Lots: 1 | Tax Year 2015 | R.E. Taxes $ 27,225 |
| Neighborhood Name Chestnut Hill | Map Reference 437-27-1 | Census Tract 4011.00 |

Occupant ☐ Owner ☐ Tenant ☒ Vacant    Special Assessments $  0.00    ☐ PUD    HOA $ N/A    ☐ per year    ☐ per month

Property Rights Appraised ☒ Fee Simple ☐ Leasehold ☐ Other (describe)

Assignment Type ☐ Purchase Transaction ☐ Refinance Transaction ☒ Other (describe)  To Determine Market Value

Lender/Client  Rockland Trust Company    Address  120 Liberty Street, Brockton, MA 02301

Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?    ☒ Yes    ☐ No

Report data source(s) used, offering price(s), and date(s).   MLS / Owner - This is currently for sale for $5,499,999. It has been listed for 31+ days.

(Contract section)

I ☐ did ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed.

Contract Price $    Date of Contract    Is the property seller the owner of public record? ☐ Yes ☐ No  Data Source(s)

Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower?  ☐ Yes  ☐ No
If Yes, report the total dollar amount and describe the items to be paid.

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location | ☒ Urban ☐ Suburban ☐ Rural | | Property Values | ☒ Increasing ☐ Stable ☐ Declining | | PRICE $ (000) | AGE (yrs) | One-Unit | 85 % |
| Built-Up | ☒ Over 75% ☐ 25-75% ☐ Under 25% | | Demand/Supply | ☐ Shortage ☒ In Balance ☐ Over Supply | | 560 Low New | | 2-4 Unit | 5 % |
| Growth | ☐ Rapid ☒ Stable ☐ Slow | | Marketing Time | ☐ Under 3 mths ☒ 3-6 mths ☐ Over 6 mths | | 10,500 High 160 | | Multi-Family | 5 % |
| | | | | | | 1,900 Pred. 62 | | Commercial | 5 % |
| | | | | | | | | Other | % |

Neighborhood Boundaries  The neighborhood is bound to the north by Route 9, to the south by The Country Club, to the east by Lee Street, and to the west by Hammond Street.

Neighborhood Description   See attached addenda.

Market Conditions (including support for the above conclusions)    See attached addenda.

| | | | |
|---|---|---|---|
| Dimensions Approximately 87 feet of frontage | Area 25,000 s/f | Shape Rectangular | View Neighborhood |

Specific Zoning Classification Residential Single Family 40;   Zoning Description 30ff. - 40,000 sf

Zoning Compliance ☒ Legal ☐ Legal Nonconforming (Grandfathered Use) ☐ No Zoning ☐ Illegal (describe)

Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use?  ☒ Yes  ☐ No  If No, describe

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street Paved asphalt | | |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley No | | |

FEMA Special Flood Hazard Area ☐ Yes ☒ No   FEMA Flood Zone X    FEMA Map # 25021C0034E    FEMA Map Date 07/17/2012

Are the utilities and off-site improvements typical for the market area?  ☒ Yes ☐ No  If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)?  ☐ Yes ☒ No  If Yes, describe

I have inspected the property for any adverse site conditions or external factors (easements, encroachment, environmental conditions, land use etc.) Based on my exterior inspection I found no adverse site conditions or external factors.

| General Description | | Foundation | | Exterior Description | materials/condition | Interior | materials/condition |
|---|---|---|---|---|---|---|---|
| Units ☒ One ☐ One with Accessory Unit | | ☐ Concrete Slab ☐ Crawl Space | | Foundation Walls | Concrete/New | Floors | HW/Marble/New |
| # of Stories 2 | | ☒ Full Basement ☐ Partial Basement | | Exterior Walls | Stone/Shngle/New | Walls | Drywall/New |
| Type ☒ Det. ☐ Att. ☐ S-Det./End Unit | | Basement Area  3,306  sq.ft. | | Roof Surface | Slate/New | Trim/Finish | Wood/New |
| ☒ Existing ☐ Proposed ☐ Under Const. | | Basement Finish  0  % | | Gutters & Downspouts | Alum/Alum/New | Bath Floor | Marble/New |
| Design (Style) Colonial | | ☐ Outside Entry/Exit ☐ Sump Pump | | Window Type | D-Hung/Csmt/New | Bath Wainscot | Marble/New |
| Year Built 2014 | | Evidence of ☐ Infestation NoneNoted | | Storm Sash/Insulated | Yes/Yes/New | Car Storage | None |
| Effective Age (Yrs) New | | ☐ Dampness ☐ Settlement | | Screens | Combo/New | ☒ Driveway  # of Cars 8 |  |
| Attic ☐ None | | Heating ☒ FWA ☐ HWBB ☐ Radiant | | Amenities ☐ Woodstove(s) # | | Driveway Surface | Asphalt |
| ☐ Drop Stair ☐ Stairs | | ☐ Other FHA  Fuel Gas | | ☒ Fireplace(s) # 4 ☒ Fence Side/Rear | | ☒ Garage  # of Cars 3 | |
| ☐ Floor ☒ Scuttle | | Cooling ☒ Central Air Conditioning | | ☒ Patio/Deck Patio ☐ Porch | | ☐ Carport  # of Cars | |
| ☐ Finished ☐ Heated | | ☐ Individual ☐ Other | | ☐ Pool ☐ Other | | ☐ Att. ☐ Det. ☐ Built-in | |

Appliances ☒ Refrigerator ☒ Range/Oven ☒ Dishwasher ☐ Disposal ☒ Microwave ☐ Washer/Dryer ☐ Other (describe)

Finished area above grade contains:  13  Rooms  6  Bedrooms  5.2  Bath(s)  6,527  Square Feet of Gross Living Area Above Grade

Additional features (special energy efficient items, etc.).   See attached addenda.

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).    The subject is of excellent construction quality and in new overall condition. It is a custom new construction colonial style home that appears very well maintained. See addendum page for features of the home. 300 amp electric via circuit breakers provides adequate electricity. Interior photo's were taken from the broker due to camera malfunction from the rain.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property?  ☐ Yes ☒ No  If Yes, describe
At the time of inspection, no adverse conditions that would affect the livability, soundness, or structural integrity of the property were evident to the appraiser.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)?  ☒ Yes ☐ No  If No, describe
The subject property is similar in style, condition, and use to other properties in the subject neighborhood area.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

File No. S3802

18091
File # S3802

| | | | |
|---|---|---|---|
| There are | 3 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 3,950,000 to $ 6,875,000 . | |
| There are | 4 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 4,000,000 to $ 7,000,000 . | |

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Address | 55 Lyman Rd<br>Chestnut Hill, MA 02467 | 10 Lyman Rd<br>Chestnut Hill, MA 02467 | 48 Laurel Rd<br>Chestnut Hill, MA 02467 | 50 Lyman Rd<br>Chestnut Hill, MA 02467 |
| Proximity to Subject | | 0.08 miles SE | 1.15 miles SW | 0.01 miles E |
| Sale Price | $ | $ 5,000,000 | $ 5,200,000 | $ 5,641,047 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 832.22 sq.ft. | $ 800.00 sq.ft. | $ 832.50 sq.ft. |
| Data Source(s) | | MLS #71704082 / B&T DOM 289 | MLS #71758070 / B&T DOM 5 | MLS #71747031 / B&T DOM 5 |
| Verification Source(s) | | Exterior Inspection / Assessor | Exterior Inspection / Assessor | Exterior Inspection / Assessor |

| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Sales or Financing | | Conv Fin | | Conv Fin | | Conv Fin | |
| Concessions | | None Known | | None Known | | None Known | |
| Date of Sale/Time | | 5/19/2015 SD | | 11/17/2014 SD | | 5/18/2015 SD | |
| Location | Residential | Residential | | Residential | | Residential | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 25,000 s/f | 40,098 s/f | | 28,054 s/f | | 33711 s/f | |
| View | Neighborhood | Neighborhood | | Neighborhood | | Neighborhood | |
| Design (Style) | Colonial | Colonial | | Contemporary | | Colonial | |
| Quality of Construction | Excellent | Similar | | Similar | | Superior 5% | -282,052 |
| Actual Age | 1 yr | 1 yr | | New | | 1 yr | |
| Condition | Excellent | Similar | | Similar | | Similar | |
| Above Grade | Total / Bdrms / Baths<br>13 / 6 / 5.2 | Total / Bdrms / Baths<br>12 / 5 / 6.2 | -10,000 | Total / Bdrms / Baths<br>11 / 5 / 5.1 | +5,000 | Total / Bdrms / Baths<br>12 / 6 / 6.2 | -10,000 |
| Room Count | | | | | | | |
| Gross Living Area | 6,527 sq.ft. | 6,008 sq.ft. | +59,685 | 6,500 sq.ft. | +3,105 | 6,776 sq.ft. | -28,635 |
| Basement & Finished | Full | Full | | Full | | Full | |
| Rooms Below Grade | Unfinished | Unfinished | | Partial | -50,000 | Unfinished | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FHA / Central | FHA / Central | | FHA / Central | | FHA / Central | |
| Energy Efficient Items | Average | Average | | Average | | Average | |
| Garage/Carport | 3 car attached | 3 car attached | | 3 car attached | | 3 car attached | |
| Porch/Patio/Deck | Patio | Patio | | Deck, Patio | -5,000 | Porch | |
| Fireplace | 4 F.P. | 3 F.P. | +1,000 | 2 F.P. | +2,000 | 3 F.P. | +1,000 |
| Pool / Outbuildings | None | None | | None | | None | |
| Net Adjustment (Total) | | ☒ + ☐ - | $ 50,685 | ☐ + ☒ - | $ -44,895 | ☐ + ☒ - | $ -319,687 |
| Adjusted Sale Price<br>of Comparables | | Net Adj. 1.0 %<br>Gross Adj. 1.4 % | $ 5,050,685 | Net Adj. 0.9 %<br>Gross Adj. 1.3 % | $ 5,155,105 | Net Adj. 5.7 %<br>Gross Adj. 5.7 % | $ 5,321,360 |

☐ I ☒ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ☒ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)   MLS/Banker & Tradesman
My research ☐ did ☒ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)   MLS/Banker & Tradesman
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 12/31/2012 | None in the last year | None in the last year | None in the last year |
| Price of Prior Sale/Transfer | 4,000,000 | | | |
| Data Source(s) | Assessor / B&T | Assessor / B&T | Assessor / B&T | Assessor / B&T |
| Effective Date of Data Source(s) | Date of Inspection | Date of Inspection | Date of Inspection | Date of Inspection |

Analysis of prior sale or transfer history of the subject property and comparable sales   The subject property transferred as part of 77 Lyman Rd which featured 67,741 total parcel. This property was purchased and divided into two lots (55 Lyman Rd & 88 Cutler Ln). The comparables have not transferred in the last 12 months.

Summary of Sales Comparison Approach   See attached addenda.

Indicated Value by Sales Comparison Approach $   5,200,000

Indicated Value by: Sales Comparison Approach $ 5,200,000   Cost Approach (if developed) $ 4,814,200   Income Approach (if developed) $

The Sales Comparison approach to value is considered the best indicator of the estimated value of the subject property and is most weighted by informed purchasers. The Cost Approach is supportive and used as a check. The Income Approach does not apply as the subject is not utilized for income purposes and is owner occupied.

This appraisal is made ☒ "as is", ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is $   5,200,000   , as of   5/26/2015   , which is the date of inspection and the effective date of this appraisal.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

*Sidebar labels: SALES COMPARISON APPROACH, RECONCILIATION*

# Uniform Residential Appraisal Report

18091
File # S3802

The subject is a six bedroom, five and two half bath new construction colonial style home. The property is located in a area of Chestnut Hill with homes of similar style and age. The property generally conforms to the surrounding neighborhood.

**ADDITIONAL COMMENTS**

---

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

Estimated site value was determined by analyzing the recent land sales in the subject area and by the extraction method. Properties that were sold in below average condition for their land value were utilized. There is limited vacant / buildable land in Brookline per review of MLS sales data and conversation with local brokers. These sales and conversation with the Assessor department were used to support this site value.

| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE | | =$ 1,985,000 |
|---|---|---|---|
| Source of cost data  Local builders / Marshall and Swift | DWELLING  6,527 Sq.Ft. @ $ 300.00 | =$ | 1,958,100 |
| Quality rating from cost service  Excl/Int    Effective date of cost data  Current |  3,306 Sq.Ft. @ $ 100.00 | =$ | 330,600 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | Refinements | =$ | 250,000 |
| The land to total value ratio is typical for the City of Brookline. | Garage/Carport  810 Sq.Ft. @ $ 50.00 | =$ | 40,500 |
| Depreciation is based on an age/life schedule and depreciation and cost | Total Estimate of Cost-New | =$ | 2,579,200 |
| estimates are derived from the Marshal and Swift Residential Cost | Less        Physical        Functional        External | | |
| Handbook and from estimates from local builders. Remaining estimated | Depreciation | =$( | ) |
| economic life 60 years based on a 60 year life. | Depreciated Cost of Improvements | =$ | 2,579,200 |
| | *As-is* Value of Site Improvements | =$ | 250,000 |
| Estimated Remaining Economic Life (HUD and VA only)  60 Years | INDICATED VALUE BY COST APPROACH | = $ | 4,814,200 |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

| Estimated Monthly Market Rent $ | X Gross Rent Multiplier | = $ | Indicated Value by Income Approach |
|---|---|---|---|

Summary of Income Approach (including support for market rent and GRM)

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?  ☐ Yes  ☐ No    Unit type(s)  ☐ Detached  ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| Total number of phases | Total number of units | Total number of units sold |
|---|---|---|
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD?  ☐ Yes  ☐ No  If Yes, date of conversion.

Does the project contain any multi-dwelling units?  ☐ Yes  ☐ No  Data Source

Are the units, common elements, and recreation facilities complete?  ☐ Yes  ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?  ☐ Yes  ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

# Uniform Residential Appraisal Report

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:**   The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:**   The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:**   The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:**   The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:**   The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1.  The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2.  The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3.  The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4.  The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5.  The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6.  The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

18091
File # S3802

# Uniform Residential Appraisal Report

**APPRAISER'S CERTIFICATION:** The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

18091
File # S3802

## Uniform Residential Appraisal Report

21.  The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22.  I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23.  The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24.  If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25.  Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:**  The Supervisory Appraiser certifies and agrees that:

1.  I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2.  I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3.  The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4.  This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5.  If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|
| Signature | Signature |
| Name  Nicholas Morris | Name |
| Company Name   Commonwealth Appraisal Services | Company Name |
| Company Address      115 Gulliver Street | Company Address |
| Milton, MA 02186 | |
| Telephone Number   781-500-9871 | Telephone Number |
| Email Address  nickmorris217@yahoo.com | Email Address |
| Date of Signature and Report    June 02, 2015 | Date of Signature |
| Effective Date of Appraisal     5/26/2015 | State Certification # |
| State Certification #   75215 | or State License # |
| or State License # | State |
| or Other (describe)                          State # | Expiration Date of Certification or License |
| State  MA | |
| Expiration Date of Certification or License     10/15/2015 | SUBJECT PROPERTY |
| | ☐ Did not inspect subject property |
| ADDRESS OF PROPERTY APPRAISED | ☐ Did inspect exterior of subject property from street |
| 55 Lyman Rd | Date of Inspection |
| Chestnut Hill, MA 02467 | ☐ Did inspect interior and exterior of subject property |
| APPRAISED VALUE OF SUBJECT PROPERTY $     5,200,000 | Date of Inspection |
| LENDER/CLIENT | |
| Name | COMPARABLE SALES |
| Company Name   Rockland Trust Company | |
| Company Address   120 Liberty Street  Brockton, MA 02301 | ☐ Did not inspect exterior of comparable sales from street |
| | ☐ Did inspect exterior of comparable sales from street |
| Email Address | Date of Inspection |

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

18091

File # S3802

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE #6 | |
|---|---|---|---|---|---|---|---|
| Address | 55 Lyman Rd | 50 Yarmouth Rd | | 88 Cutler Ln | | | |
| | Chestnut Hill, MA 02467 | Chestnut Hill, MA 02467 | | Chestnut Hill, MA 02467 | | | |
| Proximity to Subject | | 0.36 miles SW | | 0.06 miles NW | | | |
| Sale Price | $ | | $ 5,986,000 | | $ 5,499,000 | | $ |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 854.57 sq.ft. | | $ 809.75 sq.ft. | | $ sq.ft. | |
| Data Source(s) | | MLS #71758647 / B&T DOM 4 | | MLS #71841000 / B&T DOM 262 | | | |
| Verification Source(s) | | Exterior Inspection / Assessor | | Exterior Inspection / Assessor | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing | | Conv Fin | | None Known | | | |
| Concessions | | None Known | | | | | |
| Date of Sale/Time | | 12/29/2014 SD | | Active - 4% | -219,960 | | |
| Location | Residential | Superior 5% | -299,400 | Residential | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | | |
| Site | 25,000 s/f | 42,055 s/f | | 42,741 s/f | | | |
| View | Neighborhood | Neighborhood | | Neighborhood | | | |
| Design (Style) | Colonial | Colonial | | Colonial | | | |
| Quality of Construction | Excellent | Similar | | Similar | | | |
| Actual Age | 1 yr | New | | 1 yr | | | |
| Condition | Excellent | Similar | | Similar | | | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 13   6   5.2 | 15   6   6.2 | -10,000 | 16   6   6.2 | -10,000 | | |
| Gross Living Area | 6,527 sq.ft. | 7,007 sq.ft. | -55,200 | 6,791 sq.ft. | -30,360 | sq.ft. | |
| Basement & Finished | Full | Full | | Full | | | |
| Rooms Below Grade | Unfinished | Unfinished | | Unfinished | | | |
| Functional Utility | Average | Average | | Average | | | |
| Heating/Cooling | FHA / Central | FHA / Central | | FHA / Central | | | |
| Energy Efficient Items | Average | Average | | Average | | | |
| Garage/Carport | 3 car attached | 3 car attached | | 3 car attached | | | |
| Porch/Patio/Deck | Patio | Patio | | Patio | | | |
| Fireplace | 4 F.P. | 3 F.P. | +1,000 | 3 F.P. | +1,000 | | |
| Pool / Outbuildings | None | None | | None | | | |
| | | | | | | | |
| Net Adjustment (Total) | | ☐ +  ☒ - | $ -363,600 | ☐ +  ☒ - | $ -259,320 | ☐ +  ☐ - | $ |
| Adjusted Sale Price | | Net Adj.   6.1  % | | Net Adj.   4.7  % | | Net Adj.   % | |
| of Comparables | | Gross Adj.   6.1  % | $ 5,624,400 | Gross Adj.   4.8  % | $ 5,239,680 | Gross Adj.   % | $ |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE #6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 12/31/2012 | None in the last year | None in the last year | |
| Price of Prior Sale/Transfer | 4,000,000 | | | |
| Data Source(s) | Assessor / B&T | Assessor / B&T | Assessor / B&T | |
| Effective Date of Data Source(s) | Date of Inspection | Date of Inspection | Date of Inspection | |

Analysis of prior sale or transfer history of the subject property and comparable sales     Sale 4 and comparable 5 have not transferred in the last year.

Analysis/Comments     See attached addenda.

Freddie Mac Form 70 March 2005

Fannie Mae Form 1004 March 2005

Form 1004.(AC) — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

| Borrower/Client | Vadim Kagan | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 55 Lyman Rd | | | | | |
| City | Chestnut Hill | County | Norfolk | State | MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | | | |

This appraisal report as defined by the Appraisal Standards Board of the Appraisal Foundation and complies with USPAP.

RE: Comparables over 6 months in age and/or over 1 mile in distance:

The scarcity of recent comparable sales in the subject neighborhood may have made it necessary to utilize sales over one mile in distance from the subject and over six months in age. These sales were used for their similar appeal and utility. Additional sales transactions were different in age, appeal, and style, thus were not utilized. Every effort has been made to conform to FNMA guidelines and investor underwriting standards.

RE: Sales Comparison Approach

The living area adjustments were calculated on a dollar per square foot (S/sqft.) basis. All sales were "arms length" transactions with no financing concessions noted. Data sources include assessors field cards, Multiple Listing Service and Banker and Tradesman records.

RE: Depreciation:

No adverse external factors were noted at the time of the inspection. Physical depreciation was calculated by the age-life method. Cost Approach figures are derived from the Marshall and Swift Cost Handbook and quotes from local builders.

RE: Environmental Conditions:

The appraiser is not qualified to detect hazardous waste and/or toxic substances. Any comment by the appraiser that might suggest the possibility of presence of such substances should not be taken as confirmation of the presence of hazardous waste and/or toxic materials. Such determination would require investigation by a qualified expert in the the field of environmental assessment. No responsibility is assumed for any environmental conditions.

RE: Definition of Legal Non-Conforming Zoning:

Under Massachusetts General Law 40A when a property is damaged by fire or natural causes it may be rebuilt to the original footprint. However, it must meet all applicable current building codes and time restrictions. Should further details or clarification become necessary, please refer to the local building department authority as this appraiser is not qualified to make legal determinations.

RE: Estimate of site value:

The site value indicated in the Cost Approach is based on a review of recent recorded land sales, the extraction method, listings and neighborhood land assessments. Land to value ratios are typical for this market.

RE: File Photos:

The appraiser has made an exterior visual inspection of each of the comparable sales in this report, and in most cases a photograph was taken at that time. However, in some instances a photograph may have been used from a previous appraisal or from the office files because the appearance and condition of the property has not changed since the photo was taken.

RE: Electronic Signatures and Digital Photographs:

All signatures that appear in this appraisal report are placed electronically and are secured by a password. Electronic signatures have been approved and accepted by most major lending institutions and banks. According to USPAP, electronically affixing a signature to a report carries the same level of authenticity and responsibility as an ink signature on a paper copy report. All photographs submitted with this appraisal report are original digital images printed in color or black and white.These digital photographs have not been altered or modified in any way.

RE: Intended User

The intended user of this appraisal report is the lender/client. The intended user is to evaluate the property that is the subject of this appraisal for a mortgage finance transaction, subject to the state scope of work, purpose of the appraisal, reporting requirements of this appraisal report form, and definition of market value. No additional intended users are identified by the appraiser.

RE: Gross Living Area

Gross living area is taken from public records, town assessor field cards and measurements.

### URAR : Improvements - Additional Features

New construction high end Colonial style design in the Chestnut Hill  neighborhood. Features include a custom gourmet chef's kitchen with viking oven, stone countertops, and custom wood cabinets. Each bedroom features a suite style design with a custom bath featuring marble tile, stone countertops, jacuzzi and steam shower in the master bath. Patio in rear, fireplaces located in the family room and master bedroom, central air, hardwood flooring, full security and intercom systems. Full walk-out unfinished basement with the potential to be finished. Stone / Wood Shingle exterior, asphalt shingle roof, a three car attached garage, and a six car asphalt driveway will provide off street parking. Finishes are considered to be superior to previous properties constructed by this developer.

Supplemental Addendum

File No. S3802

| Borrower/Client | Vadim Kagan | | | | | | |
|---|---|---|---|---|---|---|---|
| Property Address | 55 Lyman Rd | | | | | | |
| City | Chestnut Hill | County | Norfolk | | State | MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | | | | |

### URAR : Neighborhood - Description

The subject is located in the highly desirable Chestnut Hill neighborhood of Brookline. It is within a short driving distance to local shopping, schools, recreational areas. Easy access to major highways and connecting roadways such as Route 9. The economy remains stable in the area and proximity to employment is good. The subject's neighborhood consists of a mixture of homes constructed before 1960 and properties that have been constructed within the last ten years. Due to the limited vacant land available properties are commonly purchased and demolished with construction of a new high end designs shortly after. The subject's neighborhood is considered to be highly desirable with strong overall value trends.

### URAR : Neighborhood - Market Conditions

The real estate market in the subject's area appears to be stable. Typical marketing time is considered to be three to six months for homes in the neighborhood that are priced accordingly. Concessions do not appear necessary when properties are reasonably priced and properly marketed. There has been a slight sale volume increase in the last ten months per a review of MLS sales data. This increase is partially due to the attractive mortgage interest rate that has remained stable within the last six months. This trend is expected continue per conversation with lenders and local brokers.

### URAR : Sales Comparison Analysis - Summary of Sales Comparison Approach

Comparables used are the best available as of this report. All comps were adjusted at $115 per square foot. Finished basement and amenities were adjusted based on utility.

Sale 1 was recently constructed by the same developer as the subject property. Finishes are considered to be similar in appeal per review of mls sales data and conversation with the developer. Sale 1 was also adjusted for being approximately 8% smaller in GLA. Sale 1 was determined to be a strong indicator of value and was weighed heavily.

Sale 2 is a new construction colonial located in a nearby Chestnut Hill neighborhood similar in values and appeal. This sale was constructed with high end finishes throughout the property and is located on a lot similar in appeal. Sale 2 features a similar location, GLA, design, amenities, garage access, and appeal.

Sale 3 is a new construction property located directly across from the subject property. This sale was adjusted for superior custom finishes throughout per mls notes and conversation with local brokers. Sale 3 features a slightly superior GLA and bath count. Finishes for sale 3 are reflected in the extremely low days on the market. Sale 3 is considered to be a strong indicator of values in the immediate neighborhood.

Sale 4 is a new construction colonial located in a nearby Chestnut Hill neighborhood superior in values and appeal. Sale 4 was recently constructed by the same developer as the subject property. Finishes are considered to be similar in appeal per review of mls sales data and conversation with the developer. Sale 4 was also adjusted for being over 10% larger in GLA. Sale 4 was determined to be a strong indicator of value and was weighed heavily.

Comparable 5 is currently listed for sale located in a the subjects immediate neighborhood. The sale price to list price ratio for similar properties in the subjects neighborhood is 96%. Therefore a 4% adjustment was used to reflect the future expected sale price. Comparable 5 was recently constructed by the same developer as the subject property. Finishes are considered to be similar in appeal per interior inspection, review of mls sales data, and conversation with the developer. Comparable 5 is considered to be a strong reflection of current market conditions / values in the neighborhood.

The search of recent sales located in Chestnut Hill revealed limited new construction sales similar in appeal. Buyers in the area generally will pay a premium for this new construction homes featuring custom finishes and materials. It was necessary to use a sales beyond the one mile radius. The search of similar new construction sales in all of Chestnut Hill in the last 12 months determined sales 1 and 3 to be the strongest available. These two sales were weighed most heavily in the final estimate of value. The subject property comparables favorably to each comparable in this report.

Subject Photo Page

| Borrower/Client | Vadim Kagan | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 55 Lyman Rd | | | | | |
| City | Chestnut Hill | County | Norfolk | State | MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | | | |



### Subject Front

| | |
|---|---|
| 55 Lyman Rd | |
| Sales Price | |
| Gross Living Area | 6,527 |
| Total Rooms | 13 |
| Total Bedrooms | 6 |
| Total Bathrooms | 5.2 |
| Location | Residential |
| View | Neighborhood |
| Site | 25,000 s/f |
| Quality | Excellent |
| Age | 1 yr |



### Subject Rear



### Subject Street

Form PICPIX.SR — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

| Borrower/Client | Vadim Kagan | | | | |
| Property Address | 55 Lyman Rd | | | | |
| City | Chestnut Hill | County | Norfolk | State | MA | Zip Code | 02467 |
| Lender | Rockland Trust Company | | | | |










| Borrower/Client | Vadim Kagan | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 55 Lyman Rd | | | | | |
| City | Chestnut Hill | County | Norfolk | State | MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | | | |










**Comparable Photo Page**

| Borrower/Client | Vadim Kagan | | | |
|---|---|---|---|---|
| Property Address | 55 Lyman Rd | | | |
| City | Chestnut Hill | County Norfolk | State MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | |



### Comparable 1

10 Lyman Rd

| | |
|---|---|
| Prox. to Subject | 0.08 miles SE |
| Sale Price | 5,000,000 |
| Gross Living Area | 6,008 |
| Total Rooms | 12 |
| Total Bedrooms | 5 |
| Total Bathrooms | 6.2 |
| Location | Residential |
| View | Neighborhood |
| Site | 40,098 s/f |
| Quality | Similar |
| Age | 1 yr |



### Comparable 2

48 Laurel Rd

| | |
|---|---|
| Prox. to Subject | 1.15 miles SW |
| Sale Price | 5,200,000 |
| Gross Living Area | 6,500 |
| Total Rooms | 11 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.1 |
| Location | Residential |
| View | Neighborhood |
| Site | 28,054 s/f |
| Quality | Similar |
| Age | New |



### Comparable 3

50 Lyman Rd

| | |
|---|---|
| Prox. to Subject | 0.01 miles E |
| Sale Price | 5,641,047 |
| Gross Living Area | 6,776 |
| Total Rooms | 12 |
| Total Bedrooms | 6 |
| Total Bathrooms | 6.2 |
| Location | Residential |
| View | Neighborhood |
| Site | 33711 s/f |
| Quality | Superior 5% |
| Age | 1 yr |

## Comparable Photo Page

| Borrower/Client | Vadim Kagan | | | |
|---|---|---|---|---|
| Property Address | 55 Lyman Rd | | | |
| City | Chestnut Hill | County Norfolk | State MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | |



### Comparable 4

50 Yarmouth Rd

| | |
|---|---|
| Prox. to Subject | 0.36 miles SW |
| Sales Price | 5,988,000 |
| Gross Living Area | 7,007 |
| Total Rooms | 15 |
| Total Bedrooms | 6 |
| Total Bathrooms | 6.2 |
| Location | Superior 5% |
| View | Neighborhood |
| Site | 42,055 s/f |
| Quality | Similar |
| Age | New |



### Comparable 5

88 Cutler Ln

| | |
|---|---|
| Prox. to Subject | 0.06 miles NW |
| Sales Price | 5,499,000 |
| Gross Living Area | 6,791 |
| Total Rooms | 16 |
| Total Bedrooms | 6 |
| Total Bathrooms | 6.2 |
| Location | Residential |
| View | Neighborhood |
| Site | 42,741 s/f |
| Quality | Similar |
| Age | 1 yr |

### Comparable 6

| | |
|---|---|
| Prox. to Subject | |
| Sales Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

Location Map

| Borrower/Client | Vadim Kagan | | | | |
|---|---|---|---|---|---|
| Property Address | 55 Lyman Rd | | | | |
| City | Chestnut Hill | County | Norfolk | State MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | | |









COMMONWEALTH OF MASSACHUSETTS
DIVISION OF PROFESSIONAL LICENSURE
BOARD OF
REAL ESTATE APPRAISERS
ISSUES THE FOLLOWING LICENSE AS A
CERT RES. REAL ESTATE APPRAISER

NICHOLAS A MORRIS

115 GULLIVER ST

MILTON          MA 02186-3114
    75215      10/15/15        109606
LICENSE NUMBER   EXPIRATION DATE   SERIAL NUMBER

LICENSEE SIGNATURE

# Real Estate Appraisers Professional Liability



**Liberty International Underwriters.**

| Date Issued | Policy Number | Previous Policy Number |
|---|---|---|
| 10/24/2014 | LIU011599-008 | LIU011599-007 |

## LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Company")
55 Water Street, 18th Floor
New York, NY 10041

THIS IS A CLAIMS MADE AND REPORTED POLICY. PLEASE READ IT CAREFULLY.

**Item**      DECLARATIONS

1. Customer ID: 161341
   Named Insured:
   COMMONWEALTH APPRAISAL SERVICES
   Nicholas Morris
   115 Gulliver Street
   Milton, MA 02186

2. **Policy Period:**
   **From:** 12/05/2014     **To:** 12/05/2015
   12:01 A.M. Standard Time at the address stated in Item 1.

3. **Deductible: $1,000**     Each Claim

4. **Retroactive Date:**     12/05/2007

5. **Inception Date:**     12/05/2007

6. **Limits of Liability:**
      A.   $1,000,000     Each Claim
      B.   $2,000,000     Aggregate

   **The Limit of Liability for Each Claim and in the Aggregate is reduced by Damages and Claims Expenses as defined in the Policy.**

7. **Mail all notices, including notice of claim, to Agent:**
   LIA Administrators & Insurance Services
   1600 Anacapa Street
   Santa Barbara, California 93101
   (800) 334-0652;   Fax: (805) 962-0652

8. **Annual Premium:**     **$899.00**

9. **Number of Appraisers:**     1

10. Forms attached at issue:   LIA002 (10/11)   LIA012 (08/11)   LIA018 (03/10)   LIA020 (03/10)
    OFAC (08/09)

This Declarations Page together with the completed and signed Policy Application including all attachments and exhibits thereto, and the Real Estate Appraisers Professional Liability Insurance Policy shall constitute the contract between the Named Insured and the Company.

By _____

Authorized Signature

LIA001 (04/10)

# EXHIBIT 20



**APPRAISAL OF REAL PROPERTY**

**LOCATED AT:**
88 Cutler Ln
Chestnut Hill, MA  02467

**FOR:**
Rockland Trust Company
120 Liberty Street
Brockton, MA 02301

**AS OF:**
5/26/2015

**BY:**
Nicholas Morris
Commonwealth Appraisal Services
115 Gulliver Street
Milton, MA 02186

# Uniform Residential Appraisal Report

File # S3803

18092

The purpose of this summary appraisal report is to provide the lender/client with an accurate, and adequately supported, opinion of the market value of the subject property.

| SUBJECT | | |
|---|---|---|
| Property Address  88 Cutler Ln | City  Chestnut Hill | State  MA   Zip Code  02467 |
| Borrower  Vadim Kagan | Owner of Public Record  Lyman Cutler LLC | County  Norfolk |
| Legal Description  At The Norfolk County Registry of Deeds Book 13087 Page 355 | | |
| Assessor's Parcel #  Map: 437 Block: 27 Lots: 1 | Tax Year  2015 | R.E. Taxes $  27,225 |
| Neighborhood Name  Chestnut Hill | Map Reference  437-27-1 | Census Tract  4011.00 |
| Occupant  ☐ Owner  ☐ Tenant  ☒ Vacant | Special Assessments $  0.00 | ☐ PUD  HOA $ N/A  ☐ per year  ☐ per month |
| Property Rights Appraised  ☒ Fee Simple  ☐ Leasehold  ☐ Other (describe) | | |
| Assignment Type  ☐ Purchase Transaction  ☐ Refinance Transaction  ☒ Other (describe)  To Determine Market Value | | |
| Lender/Client  Rockland Trust Company | Address  120 Liberty Street, Brockton, MA 02301 | |
| Is the subject property currently offered for sale or has it been offered for sale in the twelve months prior to the effective date of this appraisal?  ☒ Yes  ☐ No | | |
| Report data source(s) used, offering price(s), and date(s).  MLS / Owner - This is currently for sale for $5,499,000. It has been listed for 264+ days. | | |

| CONTRACT | |
|---|---|
| I  ☐ did  ☐ did not analyze the contract for sale for the subject purchase transaction. Explain the results of the analysis of the contract for sale or why the analysis was not performed. | |
| Contract Price $          Date of Contract          Is the property seller the owner of public record?  ☐ Yes  ☐ No  Data Source(s) | |
| Is there any financial assistance (loan charges, sale concessions, gift or downpayment assistance, etc.) to be paid by any party on behalf of the borrower?  ☐ Yes  ☐ No | |
| If Yes, report the total dollar amount and describe the items to be paid. | |

Note: Race and the racial composition of the neighborhood are not appraisal factors.

| NEIGHBORHOOD | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **Neighborhood Characteristics** | | | **One-Unit Housing Trends** | | | **One-Unit Housing** | | **Present Land Use %** |
| Location | ☒ Urban  ☒ Suburban  ☐ Rural | | Property Values | ☐ Increasing  ☒ Stable  ☐ Declining | | PRICE $ (000) | AGE (yrs) | One-Unit  65 % |
| Built-Up | ☒ Over 75%  ☐ 25-75%  ☐ Under 25% | | Demand/Supply | ☐ Shortage  ☒ In Balance  ☐ Over Supply | | 560 Low | New | 2-4 Unit  5 % |
| Growth | ☐ Rapid  ☒ Stable  ☐ Slow | | Marketing Time | ☐ Under 3 mths  ☒ 3-6 mths  ☐ Over 6 mths | | 10,500 High | 160 | Multi-Family  5 % |
| Neighborhood Boundaries  The neighborhood is bound to the north by Route 9, to the south by The Country | | | | | | 1,900 Pred. | 62 | Commercial  5 % |
| Club, to the east by Lee Street, and to the west by Hammond Street. | | | | | | | | Other  % |
| Neighborhood Description  See attached addenda. | | | | | | | | |
| | | | | | | | | |
| Market Conditions (including support for the above conclusions)  See attached addenda. | | | | | | | | |

| SITE | | | | |
|---|---|---|---|---|
| Dimensions  Approximately 87 feet of frontage | Area  25,000 s/f | | Shape  Rectangular | View  Neighborhood |
| Specific Zoning Classification  Residential Single Family 40; | | Zoning Description 30ff. - 40,000 sf | | |
| Zoning Compliance  ☒ Legal  ☐ Legal Nonconforming (Grandfathered Use)  ☐ No Zoning  ☐ Illegal (describe) | | | | |
| Is the highest and best use of subject property as improved (or as proposed per plans and specifications) the present use?  ☒ Yes  ☐ No  If No, describe | | | | |

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements – Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | ☒ | | Water | ☒ | | Street  Paved asphalt | ☒ | |
| Gas | ☒ | | Sanitary Sewer | ☒ | | Alley  No | | |

FEMA Special Flood Hazard Area  ☐ Yes  ☒ No   FEMA Flood Zone  X          FEMA Map #  25021C0034E          FEMA Map Date  07/17/2012

Are the utilities and off-site improvements typical for the market area?  ☒ Yes  ☐ No  If No, describe

Are there any adverse site conditions or external factors (easements, encroachments, environmental conditions, land uses, etc.)?  ☐ Yes  ☒ No  If Yes, describe

I have inspected the property for any adverse site conditions or external factors (easements, encroachment, environmental conditions, land use etc.) Based on my exterior inspection I found no adverse site conditions or external factors.

| IMPROVEMENTS | | | | | | | |
|---|---|---|---|---|---|---|---|
| **General Description** | | **Foundation** | | **Exterior Description**  materials/condition | | **Interior**  materials/condition | |
| Units  ☒ One  ☐ One with Accessory Unit | | ☐ Concrete Slab  ☐ Crawl Space | | Foundation Walls | Concrete/New | Floors | HW/Marble/New |
| # of Stories  2 | | ☒ Full Basement  ☐ Partial Basement | | Exterior Walls | Brick/Shngle/New | Walls | Drywall/New |
| Type  ☒ Det.  ☐ Att.  ☐ S-Det./End Unit | | Basement Area  2,430 sq.ft. | | Roof Surface | Slate/New | Trim/Finish | Wood/New |
| ☒ Existing  ☐ Proposed  ☐ Under Const. | | Basement Finish  0  % | | Gutters & Downspouts | Alum/Alum/New | Bath Floor | Marble/New |
| Design (Style)  Colonial | | ☐ Outside Entry/Exit  ☐ Sump Pump | | Window Type | D-hng/Csmt/New | Bath Wainscot | Marble/New |
| Year Built  2014 | | Evidence of  ☐ Infestation  NoneNoted | | Storm Sash/Insulated | Yes/Yes/New | Car Storage | None |
| Effective Age (Yrs)  New | | ☐ Dampness  ☐ Settlement | | Screens | Combo/New | ☒ Driveway  # of Cars  3 |
| Attic  ☐ None | | Heating  ☒ FWA  ☐ HWBB  ☐ Radiant | | Amenities  ☐ Woodstove(s) # | | Driveway Surface  Asphalt |
| ☐ Drop Stair  ☐ Stairs | | ☐ Other FHA  Fuel  Gas | | ☒ Fireplace(s) #  3  ☒ Fence  Side/Rear | | ☒ Garage  # of Cars  3 |
| ☐ Floor  ☒ Scuttle | | Cooling  ☒ Central Air Conditioning | | ☒ Patio/Deck  Patio  ☐ Porch | | ☐ Carport  # of Cars |
| ☐ Finished  ☐ Heated | | ☐ Individual  ☐ Other | | ☐ Pool  ☐ Other | | ☐ Att.  ☐ Det.  ☐ Built-in |
| Appliances  ☒ Refrigerator  ☒ Range/Oven  ☒ Dishwasher  ☐ Disposal  ☒ Microwave  ☒ Washer/Dryer  ☐ Other (describe) | | | | | | | |
| Finished area **above grade** contains:  16  Rooms  6  Bedrooms  6.2  Bath(s)  6,791  Square Feet of Gross Living Area Above Grade | | | | | | | |
| Additional features (special energy efficient items, etc.).  See attached addenda. | | | | | | | |

Describe the condition of the property (including needed repairs, deterioration, renovations, remodeling, etc.).  The subject is of excellent construction quality and in new overall condition. It is a custom new construction colonial style home that appears very well maintained. See addendum page for features of the home. 300 amp electric via circuit breakers provides adequate electricity.

Are there any physical deficiencies or adverse conditions that affect the livability, soundness, or structural integrity of the property?  ☐ Yes  ☒ No  If Yes, describe
At the time of inspection, no adverse conditions that would affect the livability, soundness, or structural integrity of the property were evident to the appraiser.

Does the property generally conform to the neighborhood (functional utility, style, condition, use, construction, etc.)?  ☒ Yes  ☐ No  If No, describe
The subject property is similar in style, condition, and use to other properties in the subject neighborhood area.

| | | |
|---|---|---|
| Freddie Mac Form 70 March 2005 | Page 1 of 6 | Fannie Mae Form 1004 March 2005 |

File No. Chestnut Hill
18092
File # S3803

# Uniform Residential Appraisal Report

|  | There are | 3 | comparable properties currently offered for sale in the subject neighborhood ranging in price from $ 3,950,000 | to $ 6,875,000 | . |
|---|---|---|---|---|---|

| There are | 4 | comparable sales in the subject neighborhood within the past twelve months ranging in sale price from $ 4,000,000 | to $ 7,000,000 | . |
|---|---|---|---|---|

| FEATURE | SUBJECT | COMPARABLE SALE # 1 | COMPARABLE SALE # 2 | COMPARABLE SALE # 3 |
|---|---|---|---|---|
| Address | 88 Cutler Ln | 10 Lyman Rd | 48 Laurel Rd | 50 Lyman Rd |
| | Chestnut Hill, MA 02467 | Chestnut Hill, MA 02467 | Chestnut Hill, MA 02467 | Chestnut Hill, MA 02467 |
| Proximity to Subject | | 0.14 miles SE | 1.14 miles SW | 0.07 miles SE |
| Sale Price | $ | $ 5,000,000 | $ 5,200,000 | $ 5,641,047 |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 832.22 sq.ft. | $ 800.00 sq.ft. | $ 832.50 sq.ft. |
| Data Source(s) | | MLS #71704082 / B&T DOM 289 | MLS #71758070 / B&T DOM 5 | MLS #71747031 / B&T DOM 5 |
| Verification Source(s) | | Exterior Inspection / Assessor | Exterior Inspection / Assessor | Exterior Inspection / Assessor |

| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Sales or Financing | | Conv Fin | | Conv Fin | | Conv Fin | |
| Concessions | | None Known | | None Known | | None Known | |
| Date of Sale/Time | | 5/19/2015 SD | | 11/17/2014 SD | | 5/18/2015 SD | |
| Location | Residential | Residential | | Residential | | Residential | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 25,000 s/f | 40,098 s/f | | 28,054 s/f | | 33711 s/f | |
| View | Neighborhood | Neighborhood | | Neighborhood | | Neighborhood | |
| Design (Style) | Colonial | Colonial | | Contemporary | | Colonial | |
| Quality of Construction | Excellent | Similar | | Similar | | Superior 5% | -282,052 |
| Actual Age | 1 yr | 1 yr | | New | | 1 yr | |
| Condition | Excellent | Similar | | Similar | | Similar | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 16  6  6.2 | 12  5  6.2 | | 11  5  5.1 | +15,000 | 12  6  6.2 | |
| Gross Living Area | 6,791 sq.ft. | 6,008 sq.ft. | +90,045 | 6,500 sq.ft. | +33,465 | 6,776 sq.ft. | +1,725 |
| Basement & Finished | Full | Full | | Full | | Full | |
| Rooms Below Grade | Unfinished | Unfinished | | Partial | -50,000 | Unfinished | |
| Functional Utility | Average | Average | | Average | | Average | |
| Heating/Cooling | FHA / Central | FHA / Central | | FHA / Central | | FHA / Central | |
| Energy Efficient Items | Average | Average | | Average | | Average | |
| Garage/Carport | 3 car attached | 3 car attached | | 3 car attached | | 3 car attached | |
| Porch/Patio/Deck | Patio | Patio | | Deck, Patio | -5,000 | Porch | |
| Fireplace | 3 F.P. | 3 F.P. | | 2 F.P. | +1,000 | 3 F.P. | |
| Pool / Outbuildings | None | None | | None | | None | |
| Net Adjustment (Total) | | ⊠ + ☐ - | $ 90,045 | ☐ + ⊠ - | $ -5,535 | ☐ + ⊠ - | $ -280,327 |
| Adjusted Sale Price | | Net Adj. 1.8 % | | Net Adj. 0.1 % | | Net Adj. 5.0 % | |
| of Comparables | | Gross Adj. 1.8 % | $ 5,090,045 | Gross Adj. 2.0 % | $ 5,194,465 | Gross Adj. 5.0 % | $ 5,360,720 |

I ⊠ did ☐ did not research the sale or transfer history of the subject property and comparable sales. If not, explain

My research ⊠ did ☐ did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.
Data Source(s)   MLS/Banker & Tradesman
My research ☐ did ⊠ did not reveal any prior sales or transfers of the comparable sales for the year prior to the date of sale of the comparable sale.
Data Source(s)   MLS/Banker & Tradesman
Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE #1 | COMPARABLE SALE #2 | COMPARABLE SALE #3 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 12/31/2012 | None in the last year | None in the last year | None in the last year |
| Price of Prior Sale/Transfer | 4,000,000 | | | |
| Data Source(s) | Assessor / B&T | Assessor / B&T | Assessor / B&T | Assessor / B&T |
| Effective Date of Data Source(s) | Date of Inspection | Date of Inspection | Date of Inspection | Date of Inspection |

Analysis of prior sale or transfer history of the subject property and comparable sales   The subject property transferred as part of 77 Lyman Rd which featured
67,741 total parcel. This property was purchased and divided into two lots (55 Lyman Rd & 88 Cutler Ln). The comparables have not transferred in
the last 12 months.

Summary of Sales Comparison Approach   See attached addenda.

Indicated Value by Sales Comparison Approach $  5,200,000

Indicated Value by: Sales Comparison Approach $  5,200,000   Cost Approach (if developed) $  4,801,200   Income Approach (if developed) $
The Sales Comparison approach to value is considered the best indicator of the estimated value of the subject property and is most weighted by
informed purchasers. The Cost Approach is supportive and used as a check. The Income Approach does not apply as the subject is not utilized for
income purposes and is owner occupied.
This appraisal is made ⊠ "as is",  ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been
completed,  ☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed, or ☐ subject to the
following required inspection based on the extraordinary assumption that the condition or deficiency does not require alteration or repair:

Based on a complete visual inspection of the interior and exterior areas of the subject property, defined scope of work, statement of assumptions and limiting
conditions, and appraiser's certification, my (our) opinion of the market value, as defined, of the real property that is the subject of this report is
$  5,200,000 , as of  5/26/2015 , which is the date of inspection and the effective date of this appraisal.

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

File No. Description Exhibit
18092
File # S3803

The subject is a six bedroom, five and two half bath new construction colonial style home. The property is located in an area of Chestnut Hill with homes of similar style and age. The property generally conforms to the surrounding neighborhood.

**ADDITIONAL COMMENTS**

## COST APPROACH TO VALUE (not required by Fannie Mae)

Provide adequate information for the lender/client to replicate the below cost figures and calculations.

Support for the opinion of site value (summary of comparable land sales or other methods for estimating site value)

Estimated site value was determined by analyzing the recent land sales in the subject area and by the extraction method. Properties that were sold in below average condition for their land value were utilized. There is limited vacant / buildable land in Brookline per review of MLS sales data and conversation with local brokers. These sales and conversation with the Assessor department were used to support this site value.

| | | | |
|---|---|---|---|
| ESTIMATED ☐ REPRODUCTION OR ☒ REPLACEMENT COST NEW | OPINION OF SITE VALUE | =$ | 1,985,000 |
| Source of cost data  Local builders / Marshall and Swift | DWELLING   6,791 Sq.Ft. @ $   300.00 | =$ | 2,037,300 |
| Quality rating from cost service  Exc/Int   Effective date of cost data  Current | 2,430 Sq.Ft. @ $   100.00 | =$ | 243,000 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | Refinements | =$ | 250,000 |
| The land to total value ratio is typical for the City of Brookline. | Garage/Carport   718 Sq.Ft. @ $   50.00 | =$ | 35,900 |
| Depreciation is based on an age/life schedule and depreciation and cost | Total Estimate of Cost-New | =$ | 2,566,200 |
| estimates are derived from the Marshal and Swift Residential Cost | Less   Physical   Functional   External | | |
| Handbook and from estimates from local builders. Remaining estimated | Depreciation | =$( | ) |
| economic life 60 years based on a 60 year life. | Depreciated Cost of Improvements | =$ | 2,566,200 |
| | "As-is" Value of Site Improvements | =$ | 250,000 |
| Estimated Remaining Economic Life (HUD and VA only)   60 Years | INDICATED VALUE BY COST APPROACH | = $ | 4,801,200 |

## INCOME APPROACH TO VALUE (not required by Fannie Mae)

| | | |
|---|---|---|
| Estimated Monthly Market Rent $   X Gross Rent Multiplier   = $ | | Indicated Value by Income Approach |
| Summary of Income Approach (including support for market rent and GRM) | | |

## PROJECT INFORMATION FOR PUDs (if applicable)

Is the developer/builder in control of the Homeowners' Association (HOA)?  ☐ Yes  ☐ No   Unit type(s)  ☐ Detached  ☐ Attached

Provide the following information for PUDs ONLY if the developer/builder is in control of the HOA and the subject property is an attached dwelling unit.

Legal Name of Project

| | | |
|---|---|---|
| Total number of phases | Total number of units | Total number of units sold |
| Total number of units rented | Total number of units for sale | Data source(s) |

Was the project created by the conversion of existing building(s) into a PUD?  ☐ Yes   ☐ No  If Yes, date of conversion.

Does the project contain any multi-dwelling units?  ☐ Yes  ☐ No  Data Source

Are the units, common elements, and recreation facilities complete?  ☐ Yes   ☐ No  If No, describe the status of completion.

Are the common elements leased to or by the Homeowners' Association?  ☐ Yes   ☐ No  If Yes, describe the rental terms and options.

Describe common elements and recreational facilities.

## Uniform Residential Appraisal Report

This report form is designed to report an appraisal of a one-unit property or a one-unit property with an accessory unit; including a unit in a planned unit development (PUD). This report form is not designed to report an appraisal of a manufactured home or a unit in a condominium or cooperative project.

This appraisal report is subject to the following scope of work, intended use, intended user, definition of market value, statement of assumptions and limiting conditions, and certifications. Modifications, additions, or deletions to the intended use, intended user, definition of market value, or assumptions and limiting conditions are not permitted. The appraiser may expand the scope of work to include any additional research or analysis necessary based on the complexity of this appraisal assignment. Modifications or deletions to the certifications are also not permitted. However, additional certifications that do not constitute material alterations to this appraisal report, such as those required by law or those related to the appraiser's continuing education or membership in an appraisal organization, are permitted.

**SCOPE OF WORK:** The scope of work for this appraisal is defined by the complexity of this appraisal assignment and the reporting requirements of this appraisal report form, including the following definition of market value, statement of assumptions and limiting conditions, and certifications. The appraiser must, at a minimum: (1) perform a complete visual inspection of the interior and exterior areas of the subject property, (2) inspect the neighborhood, (3) inspect each of the comparable sales from at least the street, (4) research, verify, and analyze data from reliable public and/or private sources, and (5) report his or her analysis, opinions, and conclusions in this appraisal report.

**INTENDED USE:** The intended use of this appraisal report is for the lender/client to evaluate the property that is the subject of this appraisal for a mortgage finance transaction.

**INTENDED USER:** The intended user of this appraisal report is the lender/client.

**DEFINITION OF MARKET VALUE:** The most probable price which a property should bring in a competitive and open market under all conditions requisite to a fair sale, the buyer and seller, each acting prudently, knowledgeably and assuming the price is not affected by undue stimulus. Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby: (1) buyer and seller are typically motivated; (2) both parties are well informed or well advised, and each acting in what he or she considers his or her own best interest; (3) a reasonable time is allowed for exposure in the open market; (4) payment is made in terms of cash in U. S. dollars or in terms of financial arrangements comparable thereto; and (5) the price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions* granted by anyone associated with the sale.

*Adjustments to the comparables must be made for special or creative financing or sales concessions. No adjustments are necessary for those costs which are normally paid by sellers as a result of tradition or law in a market area; these costs are readily identifiable since the seller pays these costs in virtually all sales transactions. Special or creative financing adjustments can be made to the comparable property by comparisons to financing terms offered by a third party institutional lender that is not already involved in the property or transaction. Any adjustment should not be calculated on a mechanical dollar for dollar cost of the financing or concession but the dollar amount of any adjustment should approximate the market's reaction to the financing or concessions based on the appraiser's judgment.

**STATEMENT OF ASSUMPTIONS AND LIMITING CONDITIONS:** The appraiser's certification in this report is subject to the following assumptions and limiting conditions:

1. The appraiser will not be responsible for matters of a legal nature that affect either the property being appraised or the title to it, except for information that he or she became aware of during the research involved in performing this appraisal. The appraiser assumes that the title is good and marketable and will not render any opinions about the title.

2. The appraiser has provided a sketch in this appraisal report to show the approximate dimensions of the improvements. The sketch is included only to assist the reader in visualizing the property and understanding the appraiser's determination of its size.

3. The appraiser has examined the available flood maps that are provided by the Federal Emergency Management Agency (or other data sources) and has noted in this appraisal report whether any portion of the subject site is located in an identified Special Flood Hazard Area. Because the appraiser is not a surveyor, he or she makes no guarantees, express or implied, regarding this determination.

4. The appraiser will not give testimony or appear in court because he or she made an appraisal of the property in question, unless specific arrangements to do so have been made beforehand, or as otherwise required by law.

5. The appraiser has noted in this appraisal report any adverse conditions (such as needed repairs, deterioration, the presence of hazardous wastes, toxic substances, etc.) observed during the inspection of the subject property or that he or she became aware of during the research involved in performing the appraisal. Unless otherwise stated in this appraisal report, the appraiser has no knowledge of any hidden or unapparent physical deficiencies or adverse conditions of the property (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) that would make the property less valuable, and has assumed that there are no such conditions and makes no guarantees or warranties, express or implied. The appraiser will not be responsible for any such conditions that do exist or for any engineering or testing that might be required to discover whether such conditions exist. Because the appraiser is not an expert in the field of environmental hazards, this appraisal report must not be considered as an environmental assessment of the property.

6. The appraiser has based his or her appraisal report and valuation conclusion for an appraisal that is subject to satisfactory completion, repairs, or alterations on the assumption that the completion, repairs, or alterations of the subject property will be performed in a professional manner.

---

## Uniform Residential Appraisal Report

**APPRAISER'S CERTIFICATION:**   The Appraiser certifies and agrees that:

1. I have, at a minimum, developed and reported this appraisal in accordance with the scope of work requirements stated in this appraisal report.

2. I performed a complete visual inspection of the interior and exterior areas of the subject property. I reported the condition of the improvements in factual, specific terms. I identified and reported the physical deficiencies that could affect the livability, soundness, or structural integrity of the property.

3. I performed this appraisal in accordance with the requirements of the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

4. I developed my opinion of the market value of the real property that is the subject of this report based on the sales comparison approach to value. I have adequate comparable market data to develop a reliable sales comparison approach for this appraisal assignment. I further certify that I considered the cost and income approaches to value but did not develop them, unless otherwise indicated in this report.

5. I researched, verified, analyzed, and reported on any current agreement for sale for the subject property, any offering for sale of the subject property in the twelve months prior to the effective date of this appraisal, and the prior sales of the subject property for a minimum of three years prior to the effective date of this appraisal, unless otherwise indicated in this report.

6. I researched, verified, analyzed, and reported on the prior sales of the comparable sales for a minimum of one year prior to the date of sale of the comparable sale, unless otherwise indicated in this report.

7. I selected and used comparable sales that are locationally, physically, and functionally the most similar to the subject property.

8. I have not used comparable sales that were the result of combining a land sale with the contract purchase price of a home that has been built or will be built on the land.

9. I have reported adjustments to the comparable sales that reflect the market's reaction to the differences between the subject property and the comparable sales.

10. I verified, from a disinterested source, all information in this report that was provided by parties who have a financial interest in the sale or financing of the subject property.

11. I have knowledge and experience in appraising this type of property in this market area.

12. I am aware of, and have access to, the necessary and appropriate public and private data sources, such as multiple listing services, tax assessment records, public land records and other such data sources for the area in which the property is located.

13. I obtained the information, estimates, and opinions furnished by other parties and expressed in this appraisal report from reliable sources that I believe to be true and correct.

14. I have taken into consideration the factors that have an impact on value with respect to the subject neighborhood, subject property, and the proximity of the subject property to adverse influences in the development of my opinion of market value. I have noted in this appraisal report any adverse conditions (such as, but not limited to, needed repairs, deterioration, the presence of hazardous wastes, toxic substances, adverse environmental conditions, etc.) observed during the inspection of the subject property or that I became aware of during the research involved in performing this appraisal. I have considered these adverse conditions in my analysis of the property value, and have reported on the effect of the conditions on the value and marketability of the subject property.

15. I have not knowingly withheld any significant information from this appraisal report and, to the best of my knowledge, all statements and information in this appraisal report are true and correct.

16. I stated in this appraisal report my own personal, unbiased, and professional analysis, opinions, and conclusions, which are subject only to the assumptions and limiting conditions in this appraisal report.

17. I have no present or prospective interest in the property that is the subject of this report, and I have no present or prospective personal interest or bias with respect to the participants in the transaction. I did not base, either partially or completely, my analysis and/or opinion of market value in this appraisal report on the race, color, religion, sex, age, marital status, handicap, familial status, or national origin of either the prospective owners or occupants of the subject property or of the present owners or occupants of the properties in the vicinity of the subject property or on any other basis prohibited by law.

18. My employment and/or compensation for performing this appraisal or any future or anticipated appraisals was not conditioned on any agreement or understanding, written or otherwise, that I would report (or present analysis supporting) a predetermined specific value, a predetermined minimum value, a range or direction in value, a value that favors the cause of any party, or the attainment of a specific result or occurrence of a specific subsequent event (such as approval of a pending mortgage loan application).

19. I personally prepared all conclusions and opinions about the real estate that were set forth in this appraisal report. If I relied on significant real property appraisal assistance from any individual or individuals in the performance of this appraisal or the preparation of this appraisal report, I have named such individual(s) and disclosed the specific tasks performed in this appraisal report. I certify that any individual so named is qualified to perform the tasks. I have not authorized anyone to make a change to any item in this appraisal report; therefore, any change made to this appraisal is unauthorized and I will take no responsibility for it.

20. I identified the lender/client in this appraisal report who is the individual, organization, or agent for the organization that ordered and will receive this appraisal report.

Uniform Residential Appraisal Report

21. The lender/client may disclose or distribute this appraisal report to: the borrower; another lender at the request of the borrower; the mortgagee or its successors and assigns; mortgage insurers; government sponsored enterprises; other secondary market participants; data collection or reporting services; professional appraisal organizations; any department, agency, or instrumentality of the United States; and any state, the District of Columbia, or other jurisdictions; without having to obtain the appraiser's or supervisory appraiser's (if applicable) consent. Such consent must be obtained before this appraisal report may be disclosed or distributed to any other party (including, but not limited to, the public through advertising, public relations, news, sales, or other media).

22. I am aware that any disclosure or distribution of this appraisal report by me or the lender/client may be subject to certain laws and regulations. Further, I am also subject to the provisions of the Uniform Standards of Professional Appraisal Practice that pertain to disclosure or distribution by me.

23. The borrower, another lender at the request of the borrower, the mortgagee or its successors and assigns, mortgage insurers, government sponsored enterprises, and other secondary market participants may rely on this appraisal report as part of any mortgage finance transaction that involves any one or more of these parties.

24. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

25. Any intentional or negligent misrepresentation(s) contained in this appraisal report may result in civil liability and/or criminal penalties including, but not limited to, fine or imprisonment or both under the provisions of Title 18, United States Code, Section 1001, et seq., or similar state laws.

**SUPERVISORY APPRAISER'S CERTIFICATION:**  The Supervisory Appraiser certifies and agrees that:

1. I directly supervised the appraiser for this appraisal assignment, have read the appraisal report, and agree with the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

2. I accept full responsibility for the contents of this appraisal report including, but not limited to, the appraiser's analysis, opinions, statements, conclusions, and the appraiser's certification.

3. The appraiser identified in this appraisal report is either a sub-contractor or an employee of the supervisory appraiser (or the appraisal firm), is qualified to perform this appraisal, and is acceptable to perform this appraisal under the applicable state law.

4. This appraisal report complies with the Uniform Standards of Professional Appraisal Practice that were adopted and promulgated by the Appraisal Standards Board of The Appraisal Foundation and that were in place at the time this appraisal report was prepared.

5. If this appraisal report was transmitted as an "electronic record" containing my "electronic signature," as those terms are defined in applicable federal and/or state laws (excluding audio and video recordings), or a facsimile transmission of this appraisal report containing a copy or representation of my signature, the appraisal report shall be as effective, enforceable and valid as if a paper version of this appraisal report were delivered containing my original hand written signature.

| APPRAISER | SUPERVISORY APPRAISER (ONLY IF REQUIRED) |
|---|---|

**APPRAISER**

Signature
Name  Nicholas Morris
Company Name  Commonwealth Appraisal Services
Company Address  115 Gulliver Street
Milton, MA 02186
Telephone Number  781-500-9871
Email Address  nickmorris217@yahoo.com
Date of Signature and Report  June 02, 2015
Effective Date of Appraisal  5/26/2015
State Certification #  75215
or State License #
or Other (describe) _____ State # _____
State  MA
Expiration Date of Certification or License  10/15/2015

ADDRESS OF PROPERTY APPRAISED
86 Cutler Ln
Chestnut Hill, MA 02467
APPRAISED VALUE OF SUBJECT PROPERTY $   5,200,000
LENDER/CLIENT
Name
Company Name  Rockland Trust Company
Company Address  120 Liberty Street  Brockton, MA 02301
Email Address

**SUPERVISORY APPRAISER (ONLY IF REQUIRED)**

Signature
Name
Company Name
Company Address

Telephone Number
Email Address
Date of Signature
State Certification #
or State License #
State
Expiration Date of Certification or License

SUBJECT PROPERTY
☐ Did not inspect subject property
☐ Did inspect exterior of subject property from street
   Date of Inspection
☐ Did inspect interior and exterior of subject property
   Date of Inspection

COMPARABLE SALES
☐ Did not inspect exterior of comparable sales from street
☐ Did inspect exterior of comparable sales from street
   Date of Inspection

Form 1004 — "WinTOTAL" appraisal software by a la mode, inc. — 1-800-ALAMODE

# Uniform Residential Appraisal Report

18092
File # S3803

| FEATURE | SUBJECT | COMPARABLE SALE # 4 | | COMPARABLE SALE # 5 | | COMPARABLE SALE #6 | |
|---|---|---|---|---|---|---|---|
| Address | 88 Cutler Ln Chestnut Hill, MA 02467 | 50 Yarmouth Rd Chestnut Hill, MA 02467 | | 55 Lyman Rd Chestnut Hill, MA 02467 | | | |
| Proximity to Subject | | 0.38 miles SW | | 0.06 miles SE | | | |
| Sale Price | $ | | $ 5,986,000 | | $ 5,499,999 | | $ |
| Sale Price/Gross Liv. Area | $ sq.ft. | $ 854.57 sq.ft. | | $ 842.65 sq.ft. | | $ sq.ft. | |
| Data Source(s) | | MLS #71758647 / B&T DOM 4 | | MLS #71826901 / B&T DOM 32 | | | |
| Verification Source(s) | | Exterior Inspection / Assessor | | Exterior Inspection / Assessor | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sales or Financing Concessions | | Conv Fin None Known | | None Known | | | |
| Date of Sale/Time | | 12/29/2014 SD | | Active - 4% | -220,000 | | |
| Location | Residential | Superior 5% | -299,400 | Residential | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | | |
| Site | 25,000 s/f | 42,055 s/f | | 25,000 s/f | | | |
| View | Neighborhood | Neighborhood | | Neighborhood | | | |
| Design (Style) | Colonial | Colonial | | Colonial | | | |
| Quality of Construction | Excellent | Similar | | Similar | | | |
| Actual Age | 1 yr | New | | 1 yr | | | |
| Condition | Excellent | Similar | | Similar | | | |
| Above Grade | Total 16 Bdrms. 6 Baths 6.2 | Total 15 Bdrms. 6 Baths 6.2 | | Total 13 Bdrms. 6 Baths 5.2 | +10,000 | Total Bdrms. Baths | |
| Room Count | | | | | | | |
| Gross Living Area | 6,791 sq.ft. | 7,007 sq.ft. | -24,840 | 6,527 sq.ft. | +30,360 | sq.ft. | |
| Basement & Finished Rooms Below Grade | Full Unfinished | Full Unfinished | | Full Unfinished | | | |
| Functional Utility | Average | Average | | Average | | | |
| Heating/Cooling | FHA / Central | FHA / Central | | FHA / Central | | | |
| Energy Efficient Items | Average | Average | | Average | | | |
| Garage/Carport | 3 car attached | 3 car attached | | 3 car attached | | | |
| Porch/Patio/Deck | Patio | Patio | | Patio | | | |
| Fireplace | 3 F.P. | 3 F.P. | | 3 F.P. | | | |
| Pool / Outbuildings | None | None | | None | | | |
| Net Adjustment (Total) | | ☐ + ☒ - | $ -324,240 | ☐ + ☒ - | $ -179,640 | ☐ + ☐ - | $ |
| Adjusted Sale Price of Comparables | | Net Adj. 5.4 % Gross Adj. 5.4 % | $ 5,663,760 | Net Adj. 3.3 % Gross Adj. 4.7 % | $ 5,320,359 | Net Adj. % Gross Adj. % | $ |

Report the results of the research and analysis of the prior sale or transfer history of the subject property and comparable sales (report additional prior sales on page 3).

| ITEM | SUBJECT | COMPARABLE SALE # 4 | COMPARABLE SALE # 5 | COMPARABLE SALE #6 |
|---|---|---|---|---|
| Date of Prior Sale/Transfer | 12/31/2012 | None in the last year | None in the last year | |
| Price of Prior Sale/Transfer | 4,000,000 | | | |
| Data Source(s) | Assessor / B&T | Assessor / B&T | Assessor / B&T | |
| Effective Date of Data Source(s) | Date of Inspection | Date of Inspection | Date of Inspection | |

Analysis of prior sale or transfer history of the subject property and comparable sales    Sale 4 and comparable 5 have not transferred in the last year.

Analysis/Comments    See attached addenda.

Freddie Mac Form 70 March 2005

Fannie Mae Form 1004 March 2005

**Supplemental Addendum**

File No. S3803

| Borrower/Client | Vadim Kagan | | | | | |
|---|---|---|---|---|---|---|
| Property Address | 88 Cutler Ln | | | | | |
| City | Chestnut Hill | County | Norfolk | State | MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | | | |

This appraisal report as defined by the Appraisal Standards Board of the Appraisal Foundation and complies with USPAP.

RE: Comparables over 6 months in age and/or over 1 mile in distance:

The scarcity of recent comparable sales in the subject neighborhood may have made it necessary to utilize sales over one mile in distance from the subject and over six months in age. These sales were used for their similar appeal and utility. Additional sales transactions were different in age, appeal, and style, thus were not utilized. Every effort has been made to conform to FNMA guidelines and investor underwriting standards.

RE: Sales Comparison Approach

The living area adjustments were calculated on a dollar per square foot ($/sqft.) basis. All sales were "arms length" transactions with no financing concessions noted. Data sources include assessors field cards, Multiple Listing Service and Banker and Tradesman records.

RE: Depreciation:

No adverse external factors were noted at the time of the inspection. Physical depreciation was calculated by the age-life method. Cost Approach figures are derived from the Marshall and Swift Cost Handbook and quotes from local builders.

RE: Environmental Conditions:

The appraiser is not qualified to detect hazardous waste and/or toxic substances. Any comment by the appraiser that might suggest the possibility of presence of such substances should not be taken as confirmation of the presence of hazardous waste and/or toxic materials. Such determination would require investigation by a qualified expert in the the field of environmental assessment. No responsibility is assumed for any environmental conditions.

RE: Definition of Legal Non-Conforming Zoning:

Under Massachusetts General Law 40A when a property is damaged by fire or natural causes it may be rebuilt to the original footprint. However, it must meet all applicable current building codes and time restrictions. Should further details or clarification become necessary, please refer to the local building department authority as this appraiser is not qualified to make legal determinations.

RE: Estimate of site value:

The site value indicated in the Cost Approach is based on a review of recent recorded land sales, the extraction method, listings and neighborhood land assessments. Land to value ratios are typical for this market.

RE: File Photos:

The appraiser has made an exterior visual inspection of each of the comparable sales in this report, and in most cases a photograph was taken at that time. However, in some instances a photograph may have been used from a previous appraisal or from the office files because the appearance and condition of the property has not changed since the photo was taken.

RE: Electronic Signatures and Digital Photographs:

All signatures that appear in this appraisal report are placed electronically and are secured by a password. Electronic signatures have been approved and accepted by most major lending institutions and banks. According to USPAP, electronically affixing a signature to a report carries the same level of authenticity and responsibility as an ink signature on a paper copy report. All photographs submitted with this appraisal report are original digital images printed in color or black and white.These digital photographs have not been altered or modified in any way.

RE: Intended User

The intended user of this appraisal report is the lender/client. The intended user is to evaluate the property that is the subject of this appraisal for a mortgage finance transaction, subject to the state scope of work, purpose of the appraisal, reporting requirements of this appraisal report form, and definition of market value. No additional intended users are identified by the appraiser.

RE: Gross Living Area

Gross living area is taken from public records, town assessor field cards and measurements.

**URAR : Improvements - Additional Features**

New construction high end colonial style design located in a desirable Chestnut Hill neighborhood. Features include a custom gourmet chef's kitchen with viking oven, stone countertops, and custom wood cabinets. Each bedroom features a suite style design with a custom bath featuring marble tile, stone countertops, jacuzzi and steam shower in the master bath. Patio in rear, fireplaces located in the family room and master bedroom, central air, hardwood flooring, full security and intercom systems. Full walk-out unfinished basement with the potential to be finished. Brick / Wood Shingle exterior, asphalt shingle roof, a three car attached garage, and a six car asphalt driveway will provide off street parking. Finishes are considered to be superior to previous properties constructed by this developer.

**Supplemental Addendum**

File No. S3803

| Borrower/Client | Vadim Kagan | | | | |
|---|---|---|---|---|---|
| Property Address | 88 Cutler Ln | | | | |
| City | Chestnut Hill | County Norfolk | | State MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | | |

**URAR : Neighborhood - Description**

The subject is located in the highly desirable Chestnut Hill neighborhood of Brookline. It is within a short driving distance to local shopping, schools, recreational areas. Easy access to major highways and connecting roadways such as Route 9. The economy remains stable in the area and proximity to employment is good. The subject's neighborhood consists of a mixture of homes constructed before 1960 and properties that have been constructed within the last ten years. Due to the limited vacant land available properties are commonly purchased and demolished with construction of a new high end designs shortly after. The subject's neighborhood is considered to be highly desirable with strong overall value trends.

**URAR : Neighborhood - Market Conditions**

The real estate market in the subject's area appears to be stable. Typical marketing time is considered to be three to six months for homes in the neighborhood that are priced accordingly. Concessions do not appear necessary when properties are reasonably priced and properly marketed. There has been a slight sale volume increase in the last ten months per a review of MLS sales data. This increase is partially due to the attractive mortgage interest rate that has remained stable within the last six months. This trend is expected continue per conversation with lenders and local brokers.

**URAR : Sales Comparison Analysis - Summary of Sales Comparison Approach**

Comparables used are the best available as of this report. All comps were adjusted at $115 per square foot. Finished basement and amenities were adjusted based on utility.

Sale 1 was recently constructed by the same developer as the subject property. Finishes are considered to be similar in appeal per review of mls sales data and conversation with the developer. Sale 1 was also adjusted for being approximately 12% smaller in GLA. Sale 1 was determined to be a strong indicator of value and was weighed heavily.

Sale 2 is a new construction colonial located in a nearby Chestnut Hill neighborhood similar in values and appeal. This sale was constructed with high end finishes throughout the property and is located on a lot similar in appeal. Sale 2 features a similar location, GLA, design, amenities, garage access, and appeal.

Sale 3 is a new construction property located directly across from the subject property. This sale was adjusted for superior custom finishes throughout per mls notes and conversation with local brokers. Finishes for sale 3 are reflected in it's low days on the market. Sale 3 features a similar GLA bed / bath count, design, amenities, and location. Sale 3 is considered to be a strong indicator of values in the immediate neighborhood.

Sale 4 is a new construction colonial located in a nearby Chestnut Hill neighborhood superior in values and appeal. Sale 4 was recently constructed by the same developer as the subject property. Finishes are considered to be similar in appeal per review of mls sales data and conversation with the developer. Sale 4 was determined to be a strong indicator of value and was weighed heavily.

Comparable 5 is currently listed for sale located in a the subject's immediate neighborhood. The sale price to list price ratio for similar properties in the subjects neighborhood is 96%. Therefore a 4% adjustment was used to reflect the future expected sale price. Comparable 5 was recently constructed by the same developer as the subject property. Finishes are considered to be similar in appeal per interior inspection, review of mls sales data, and conversation with the developer. Comparable 5 is considered to be a strong reflection of current market conditions / values in the neighborhood.

The search of recent sales located in Chestnut Hill revealed limited new construction sales similar in appeal. Buyers in the area generally will pay a premium for this new construction homes featuring custom finishes and materials. It was necessary to use a sales beyond the one mile radius. The search of similar new construction sales in all of Chestnut Hill in the last 12 months determined sales 1 and 3 to be the strongest available. These two sales were weighed most heavily in the final estimate of value. The subject property comparables favorably to each comparable in this report.

Subject Photo Page

| Borrower/Client | Vadim Kagan | | | | |
|---|---|---|---|---|---|
| Property Address | 88 Cutler Ln | | | | |
| City | Chestnut Hill | County  Norfolk | | State  MA | Zip Code  02467 |
| Lender | Rockland Trust Company | | | | |



**Subject Front**

| | |
|---|---|
| 88 Cutler Ln | |
| Sales Price | |
| Gross Living Area | 6,791 |
| Total Rooms | 16 |
| Total Bedrooms | 6 |
| Total Bathrooms | 6.2 |
| Location | Residential |
| View | Neighborhood |
| Site | 25,000 s/f |
| Quality | Excellent |
| Age | 1 yr |



**Subject Rear**



**Subject Street**

Case 16-01120    Doc 254-2    Filed 12/07/18    Entered 12/07/18 16:00:55    Desc Exhibit
Subject Interior Photo Page    Page 108 of 222

Case No. Desc Exhibit

| Borrower/Client | Vadim Kagan | | | | |
|---|---|---|---|---|---|
| Property Address | 88 Cutler Ln | | | | |
| City | Chestnut Hill | County Norfolk | | State MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | | |










| Borrower/Client | Vadim Kagan | | | | |
| Property Address | 88 Cutler Ln | | | | |
| City | Chestnut Hill | County | Norfolk | State MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | | |










### Comparable Photo Page

| Borrower/Client | Vadim Kagan | | | | |
|---|---|---|---|---|---|
| Property Address | 88 Cutler Ln | | | | |
| City | Chestnut Hill | County Norfolk | | State MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | | |



**Comparable 1**

10 Lyman Rd

| | |
|---|---|
| Prox. to Subject | 0.14 miles SE |
| Sale Price | 5,000,000 |
| Gross Living Area | 6,008 |
| Total Rooms | 12 |
| Total Bedrooms | 5 |
| Total Bathrooms | 6.2 |
| Location | Residential |
| View | Neighborhood |
| Site | 40,098 s/f |
| Quality | Similar |
| Age | 1 yr |



**Comparable 2**

48 Laurel Rd

| | |
|---|---|
| Prox. to Subject | 1.14 miles SW |
| Sale Price | 5,200,000 |
| Gross Living Area | 6,500 |
| Total Rooms | 11 |
| Total Bedrooms | 5 |
| Total Bathrooms | 5.1 |
| Location | Residential |
| View | Neighborhood |
| Site | 28,054 s/f |
| Quality | Similar |
| Age | New |



**Comparable 3**

50 Lyman Rd

| | |
|---|---|
| Prox. to Subject | 0.07 miles SE |
| Sale Price | 5,641,047 |
| Gross Living Area | 6,776 |
| Total Rooms | 12 |
| Total Bedrooms | 6 |
| Total Bathrooms | 6.2 |
| Location | Residential |
| View | Neighborhood |
| Site | 33711 s/f |
| Quality | Superior 5% |
| Age | 1 yr |

| Borrower/Client | Vadim Kagan | | | | |
|---|---|---|---|---|---|
| Property Address | 88 Cutler Ln | | | | |
| City | Chestnut Hill | County  Norfolk | | State  MA | Zip Code  02467 |
| Lender | Rockland Trust Company | | | | |



### Comparable 4

50 Yarmouth Rd

| | |
|---|---|
| Prox. to Subject | 0.38 miles SW |
| Sales Price | 5,988,000 |
| Gross Living Area | 7,007 |
| Total Rooms | 15 |
| Total Bedrooms | 6 |
| Total Bathrooms | 6.2 |
| Location | Superior 5% |
| View | Neighborhood |
| Site | 42,055 s/f |
| Quality | Similar |
| Age | New |



### Comparable 5

55 Lyman Rd

| | |
|---|---|
| Prox. to Subject | 0.06 miles SE |
| Sales Price | 5,499,999 |
| Gross Living Area | 6,527 |
| Total Rooms | 13 |
| Total Bedrooms | 6 |
| Total Bathrooms | 5.2 |
| Location | Residential |
| View | Neighborhood |
| Site | 25,000 s/f |
| Quality | Similar |
| Age | 1 yr |

### Comparable 6

| | |
|---|---|
| Prox. to Subject | |
| Sales Price | |
| Gross Living Area | |
| Total Rooms | |
| Total Bedrooms | |
| Total Bathrooms | |
| Location | |
| View | |
| Site | |
| Quality | |
| Age | |

Location Map

| Borrower/Client | Vadim Kagan | | | |
|---|---|---|---|---|
| Property Address | 88 Cutler Ln | | | |
| City | Chestnut Hill | County Norfolk | State MA | Zip Code 02467 |
| Lender | Rockland Trust Company | | | |





FIRST FLOOR PLAN



SECOND FLOOR PLAN



# COMMONWEALTH OF MASSACHUSETTS
## DIVISION OF PROFESSIONAL LICENSURE
BOARD OF

REAL ESTATE APPRAISERS
ISSUES THE FOLLOWING LICENSE AS A
CERT RES. REAL ESTATE APPRAISER

NICHOLAS A MORRIS

115 GULLIVER ST

MILTON              MA 02186-3114
    75215        10/15/15        109606
LICENSE NUMBER    EXPIRATION DATE    SERIAL NUMBER

LICENSEE SIGNATURE

## Real Estate Appraisers Professional Liability



**Liberty International Underwriters.**

| Date Issued | Policy Number | Previous Policy Number |
|---|---|---|
| 10/24/2014 | LIU011599-008 | LIU011599-007 |

# LIBERTY INSURANCE UNDERWRITERS INC.

(A Stock Insurance Company, hereinafter the "Company")
55 Water Street, 18th Floor
New York, NY 10041

**THIS IS A CLAIMS MADE AND REPORTED POLICY. PLEASE READ IT CAREFULLY.**

Item                                    DECLARATIONS

| | |
|---|---|
| 1. Customer ID: 161341<br>Named Insured:<br>COMMONWEALTH APPRAISAL SERVICES<br>Nicholas Morris<br>115 Gulliver Street<br>Milton, MA 02186 | |
| 2. **Policy Period:**<br>**From:** 12/05/2014        **To:** 12/05/2015<br>12:01 A.M. Standard Time at the address stated in<br>Item 1. | |
| 3. **Deductible: $1,000**        Each Claim | |
| 4. **Retroactive Date:**        12/05/2007 | |
| 5. **Inception Date:**        12/05/2007 | |
| 6. **Limits of Liability:**<br>A. $1,000,000        Each Claim<br>B. $2,000,000        Aggregate | **The Limit of Liability for Each Claim and in<br>the Aggregate is reduced by Damages and<br>Claims Expenses as defined in the Policy.** |
| 7. **Mail all notices, including notice of claim, to Agent:** | LIA Administrators & Insurance Services<br>1600 Anacapa Street<br>Santa Barbara, California 93101<br>(800) 334-0652;  Fax:  (805) 962-0652 |
| 8. **Annual Premium:**        $899.00 | |
| 9. Number of Appraisers:        1 | |
| 10. Forms attached at issue:  LIA002 (10/11)  LIA012 (08/11)  LIA018 (03/10)  LIA020 (03/10)<br>OFAC (08/09) | |

This Declarations Page together with the completed and signed Policy Application including all attachments and exhibits thereto, and the
Real Estate Appraisers Professional Liability Insurance Policy shall constitute the contract between the Named Insured and the Company.

By _____

Authorized Signature

LIA001 (04/10)

# EXHIBIT 21

Exhibits: 1-30                    Volume 1, Pages 1-230
            UNITED STATES BANKRUPTCY COURT
                DISTRICT OF MASSACHUSETTS
                   (EASTERN DIVISION)
----------------------------
In Re:
                           Chapter 7
LYMAN-CUTLER, LLC,         Case No. 15-13881-FJB

            Debtor
----------------------------
LYMAN-CUTLER, LLC,

            Plaintiff
v.                         Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
            Defendants
----------------------------

      DEPOSITION OF LYMAN-CUTLER, LLC, By Its
         Representative ALEX FILIPPOV, and
          of ALEX FILIPPOV Individually
      Wednesday, April 25, 2018, 10:06 a.m.
         Sheehan Phinney Bass + Green, P.A.
            255 State Street, 5th Floor
               Boston, Massachusetts

      --------- Janis T. Young, RDR, CRR ---------
      jty@fabreporters.com   www.fabreporters.com
            Farmer Arsenault Brock LLC
               Boston, Massachusetts
                  617-728-4404

19

1     A.   Yes.  I wish I had a better memory of this.

2     Q.   Did Mr. Lipetsker share with you his

3  experiences on other projects with Kagan, other than

4  just to tell you that he had had other businesses

5  with him?

6     A.   I don't remember.  He might; I don't

7  remember.

8     Q.   What happened next in connection with what

9  ultimately became the Lyman-Cutler project?

10    A.   He suggested, I believe, to have a meeting

11 with Kagan in Boris Maiden's office; and honestly, I

12 had no idea what to expect.

13         So it was somewhere in October, this

14 meeting; I don't remember the date.  But it was

15 October 2012.  I came to the Boris Maiden office;

16 and there were Nick Lipetsker, Dmitriy Zhukovskiy,

17 Kagan, and Boris Maiden there, when I came.

18    Q.   And Kagan?

19    A.   And Kagan, yes.

20    Q.   Who set up that meeting, if you know?

21    A.   I don't know.  I was suggested to come.  I

22 said, okay, I will come.  Who set it up, I don't

23 know.

24    Q.   Did you know in advance that Mr. Lipetsker,

20

1    Mr. Zhukovskiy, and Mr. Maiden would be there?

2        A.  I don't think so.  I don't remember.

3            If I'm going to office of Mr. Maiden, I

4    know he's going to be there.  I didn't know about

5    Zhukovskiy; I don't think I knew about this.  I'm

6    sure I knew Nick was going to be there, and Kagan

7    was supposed to be there.

8            So the only person I was surprised about

9    was Zhukovskiy.

10       Q.  And this meeting took place in a conference

11   room at Mr. Maiden's office?

12       A.  Yes.

13       Q.  How long did the meeting take?

14       A.  Probably a couple hours.  I don't remember.

15   Anyway, between one hour and two hours.

16       Q.  And to the best of your recollection, what

17   occurred at that meeting?

18       A.  At that meeting, a few things happened.

19           Mr. Kagan showed me his property that he

20   built and sold.

21       Q.  Property, or properties?

22       A.  Properties.

23       Q.  Plural?

24       A.  Yes, plural.  It was a folder with nice

41

1   did ask, and I did ask Kagan about carrying costs

2   and how it's going to be done.

3           And he said carrying costs, that's what

4   Kagan said; carrying costs, this was the number,

5   $1.5 million per house, and that includes

6   everything, including carrying costs.  And I take

7   care of this.

8       Q.  Was that during the first meeting?

9       A.  Yes, during the first meeting, yes; because

10  that was instant question that came to my mind.

11      Q.  And between that first meeting and the

12  period in which you were drafting the operating

13  agreement, did you have any further discussions with

14  Mr. Kagan about any aspect of the project?

15      A.  I don't remember.

16      Q.  Did you have any conversations with anybody

17  about the project that you haven't already told us

18  about from the time of the first meeting up to and

19  including the day that you signed the operating

20  agreement?

21      A.  I don't remember.

22      Q.  You said that you left the first meeting

23  and you had a PDF of the Excel spreadsheet.

24      A.  PDF, and then they emailed me the actual

42

1    spreadsheet.

2         Q.   You had an electronic version as well?

3         A.   Yes.

4         Q.   Who emailed you an electronic --

5         A.   Zhukovskiy.

6         Q.   You have to let me finish the question.

7    It's an artificial way of having a conversation.

8         A.   I understand.

9         Q.   Who emailed you the electronic version of

10   the spreadsheet that was discussed at the initial

11   meeting?

12        A.   Dmitriy Zhukovskiy.

13        Q.   And did you ask him for that, or did he

14   just take it upon himself to --

15        A.   I asked at the meeting to send me all

16   documents in electronic format.

17        Q.   Why did you want them in electronic format?

18        A.   First, spreadsheet is much easier to

19   analyze when you have the actual document, so you

20   can play with the numbers if you want to.

21             Second, you can see where the numbers

22   are coming from.  That's most important.  When you

23   build the Excel spreadsheet, each number in the

24   spreadsheet arrived from another cell on the

43

1   spreadsheet.  There is a logic in it.  I wanted to

2   see the logic, how it was done, so I dug pretty

3   deeply into this document to understand how it was

4   built.

5       Q.  And was it your understanding that

6   Mr. Zhukovskiy had created the cells or the formulas

7   that were behind the spreadsheet?

8       A.  I assumed that that was him, yes.

9       Q.  Did you ask Mr. Zhukovskiy at any point up

10  to the date that you signed the operating agreement

11  what assumptions he made when entering the formulas

12  or whatever one enters into an Excel spreadsheet to

13  make it do its thing?

14              MR. CARNATHAN:  Objection.

15              MR. PERTEN:  I'm technologically

16  challenged.

17      A.  No, I don't remember, but it was pretty

18  logical.  It was clear to me where the numbers are

19  coming from.

20              I asked where the numbers are coming

21  from for the construction cost; he said that's

22  construction costs that was provided.  That's

23  construction costs.

24              Who provided that; Kagan, Zhukovskiy?

44

1   I'm sure Zhukovskiy didn't take it off the ceiling.

2   He is not the builder.

3        Q.  Did you confirm that assumption in any

4   fashion?

5        A.  No.  I didn't have to.  It wasn't my

6   question.

7        Q.  Now, you said something along the lines of,

8   when you had it in the electronic version of the

9   spreadsheet, you dug very deeply into it.  What did

10  you do?

11       A.  I looked into each cell and how the formula

12  was written for each cell, where the number came

13  from, how it was calculated, based on what, et

14  cetera.

15            Because there are calculations, there

16  are formulas.  There is a basic input, and there are

17  variables in the Excel spreadsheet that I wanted to

18  check to make sure there are no errors.

19       Q.  Did you run any additional calculations or

20  change numbers to see what it would do to the

21  spreadsheet as part of your digging deep into that

22  document?

23       A.  Not at the beginning.

24            Later on, I believe in April or May

45

1   2013, when we were about to get the construction

2   loans, I believe I reviewed documents again; and I

3   had some correspondence with Zhukovskiy, because I

4   had some questions about the interest rate, the

5   taxes, et cetera, to make sure that everything is

6   fine.

7            And we went back and forth with

8   Zhukovskiy over email discussing these numbers, and

9   he basically explained to me where I was making an

10  error in my assumption; and I was satisfied with

11  this.

12       Q.   Now, in order to reach a final operating

13  agreement, I'm assuming, and please correct me if

14  I'm wrong, that at some point you agreed to go into

15  this venture; correct?

16       A.   Yes.

17       Q.   To whom did you communicate that "Okay,

18  I've looked this over, I'm interested, and I'm in"?

19       A.   I believe to Maiden.

20       Q.   And why did you communicate that to Maiden

21  and not to Lipetsker or Kagan?

22       A.   Because he was the legal guy.  I had no

23  idea -- well, I was under the impression that he

24  represents Kagan.  He's an attorney; I'm talking to

46

1   attorney.

2          Maybe I sent it to Kagan; I don't

3   remember.

4      Q.  Was this an oral conversation, or an email

5   or a letter?  How did you communicate?

6      A.  We exchanged a few emails with Maiden.

7          Maybe I did send an email to Kagan.  To

8   tell the truth, I don't remember.

9      Q.  And what was the deal that you were

10  agreeing to, as you understood it?

11     A.  The deal was this.

12          Kagan -- the company, not Kagan -- the

13  company bought that property at 77 Lyman Road in

14  Brookline, razed the existing structure, divided the

15  lots into two buildable lots, and put two similar

16  houses.  Each would cost $5,000 when sold, the

17  luxury houses.

18     Q.  Each would cost --

19     A.  I'm sorry; $5 million when sold.  And Kagan

20  would be responsible for construction.

21          And the cost would be $1.3 million for

22  each house, and $200,000 would be for the carrying

23  cost.  And we would take loans to buy the land, and

24  then construction loans to build the houses.  Each

47

1   of the loans would be $1.5 million.

2            That will cover the construction costs

3   and the carrying costs.

4       Q.  Have you now exhausted your memory as to

5   what the terms of the agreement you reached were

6   relative to the Lyman-Cutler project?

7       A.  It was the deal that I believe the sales

8   and marketing of the property will be done by his

9   wife, Tatiana.

10      Q.  Do you recall -- I'm sorry; go ahead.

11      A.  And that the construction will start in

12  March 2013, and it will take no more than one year

13  to build these houses.

14            So the agreement was that by March 2014

15  houses would be ready for sale.  That was the

16  agreement, yes.

17      Q.  Have you now exhausted your memory as to

18  your understanding of what the deal was that you had

19  agreed to which would be reflected in the operating

20  agreement?

21      A.  I think so, yes.

22      Q.  Now, you said that sales and marketing

23  would be handled by Mr. Kagan's wife, Tatiana.  Do

24  you recall that?

48

1        A.   Yes.

2        Q.   Do you recall a conversation leading up to

3    the execution of the operating agreement wherein you

4    discussed the sales and marketing by Tatiana with

5    anybody?

6        A.   We discussed it with Nick, and Nick said

7    that she is capable, she can sell.

8             And I said that I don't like the idea

9    that, if she's not going to sell the houses within a

10   certain period, that she is going to be selling them

11   indefinitely.  I didn't like this, and I insisted on

12   changing the agreement to make sure I can take

13   houses away and sell myself.

14       Q.   And this was a conversation that you had

15   with Nick Lipetsker?

16       A.   With Maiden.

17       Q.   With Maiden?

18       A.   Yes.  I don't remember if Kagan was there.

19   Or was it at the second meeting, or it wasn't?  I

20   think it was at the second meeting.

21       Q.   Did you discuss --

22       A.   It was in the second meeting, yes.

23       Q.   So this is the meeting that occurred after

24   you did the drive-by's of various projects?

71

1   just referring to this initially?

2       A.   Initially.  But also, I don't remember, we

3   were going there at least ten times or fifteen

4   times, to the office in Watertown.

5       Q.   And who had check-signing authority for the

6   Lyman-Cutler account?

7       A.   I did, I believe Arina did, and Kagan did.

8       Q.   Now, you said that Arina --

9       A.   I'm not sure about Arina, if she did or

10  not.  I'm not sure; I don't remember.

11      Q.   You said that Arina kept the books and

12  records of the LLC?

13      A.   Yes.  She was helping me.

14      Q.   What were her duties and responsibilities

15  in that regard, as you understood them?

16      A.   She was putting into QuickBooks, into

17  financial software, checks.  She was watching the

18  balance of the bank account to make sure it's not

19  overdrafted.

20           And Kagan wasn't very accurate with

21  this.  We had a few emails and messages that we had

22  to send him to warn him about low balance of the

23  account, because he wasn't watching the account

24  balance.

72

1              And we were trying to monitor the

2      balance on the account and all checks; and if we got

3      a copy of the invoice, which almost never happened,

4      it would be entered into the books on our side.  We

5      were trying to keep track of the expenses.

6          Q.   And the bank statements and copies of

7      checks, those went to your address?

8          A.   Yes.  They were available online, but --

9          Q.   The hard copies came to you?

10         A.   Yes.

11         Q.   Now, you mentioned that there were times

12     when the balance got low.  Do you recall that?

13         A.   Yes.

14         Q.   When the balance got low, did you have

15     communications with Mr. Kagan to let him know that

16     the balance was low?

17         A.   Yes.

18         Q.   And was he able to deposit funds to bring

19     the balance back up?

20         A.   I think so.

21         Q.   And what were the sources of revenue for

22     deposit into the bank account?

23              MR. CARNATHAN:  Objection.

24         A.   Sources?  I had to deposit my personal

82

1      A.   Yes.   June or July, end of June or July; I

2   think June, yes.

3      Q.   At the time you met with Kristina

4   Brusenkova, had you already formed an opinion that

5   Mr. Kagan was dishonest?

6      A.   Yes.

7      Q.   And what was the basis for that opinion

8   that you formed?

9      A.   As soon as we got the letter from Mr. Pyle

10   with the demand for extra cost, that was the first

11   time that we learned that there is extra cost after

12   the construction was finished in October.

13          We realized that the guy was just a

14   crook, because no reasonable developer or contractor

15   can carry the cost for nine month without telling

16   anybody; and besides, the agreement that we signed

17   with him clearly demanded him to request the

18   permission for any extra cost.

19          So he told us in this letter that

20   basically he incurred somehow this extra cost

21   without ever asking our permission for this cost.

22      Q.   And when you say the agreement required him

23   to ask you for any extra costs, what agreement are

24   you referencing?

94

1   Cutler property was listed?

2       A.   I think October or November 2014.  I can't

3   tell for sure.

4       Q.   And was that before or after you became

5   aware that Lyman was listed?

6       A.   After.

7       Q.   So Lyman was listed earlier?

8       A.   I think so.

9       Q.   Did you have any conversations with Tatiana

10  about the listing of Cutler in October-November of

11  2014?

12      A.   No.  The only time I talked to Tatiana

13  about this, the only other time I met outside of the

14  Barcelona restaurant meeting, I believe it was July

15  2014 when I asked Kagan to meet me at the property.

16          Yes, I think so, yes; asked Kagan to

17  meet me at the property.  I came there, and Tatiana

18  came there also.  She came separately in her white

19  Mercedes, I remember.

20          And they was finishing 10 Lyman at this

21  time.

22      Q.   That's a different project?

23      A.   That's a different project, 10 Lyman.

24          And it just happened that we all were

97

1              But my idea was to have two different

2    brokers instead of one for two different houses.  So

3    I knew that one is going to be Deborah Gordon, and I

4    wanted a second one.

5              And when I looked around, I found the

6    person who specialized in high-luxury houses in

7    Brookline; Hammond, Krongel, yes.

8         Q.  And did Ms. Gordon indicate that she thinks

9    the property should be listed at a different price?

10        A.  Yes.

11        Q.  What did she tell you?

12        A.  I believe she said $5 million, and

13   Ms. Krongel said five and a quarter million dollars.

14        Q.  5.25?

15        A.  Yes.

16        Q.  While we're on the subject of Ms. Gordon,

17   you've made an allegation that there was an offer

18   that she presented.  Did you have a discussion with

19   Ms. Gordon about an offer that she had received on

20   either of the properties?

21        A.  Yes.  I was in her office.  That was in May

22   2015.  I don't remember the date.

23              And when I explained to her the

24   situation that I'm looking for the broker, she said,

99

1      Q.  The offer.

2      A.  I don't think so.  Maybe I asked who it

3   was, maybe I didn't ask it.  It wasn't important,

4   basically, to me.

5            What was important to me, that there was

6   an offer that none of us were aware.

7      Q.  Now, we'll look at this after the break,

8   perhaps, in more detail, but you've alleged in this

9   lawsuit that there has been double-billing; correct?

10     A.  Yes.

11     Q.  Can you give me any specific examples of

12  double-billing that you're aware of on this project?

13     A.  We're still digging into the books that

14  Kagan conveniently didn't provide yet, because what

15  he provided is nonsense.  It's not books of a

16  contractor.  There is no details, there is no

17  invoicing, there is nothing but numbers that he

18  provided.

19            Billed by KDC, billed by Proexcavation;

20  looks like for the same job made.  Proexcavation

21  billed KDC, then KDC billed Lyman-Cutler.

22     Q.  My question, sir, though, was, can you give

23  me specific examples of double-billing that occurred

24  on this project?  Are you able to do that as you sit

113

1   cheated anybody.  So when you say that you are not

2   going to pay the loan, to me it's cheating.  That's

3   my kind of attitude to the whole thing.

4            So it's not just my responsibility, the

5   $200,000.  If I borrow money from somebody, I'm

6   going to give it back.

7        Q.  Was there a vote of the members of Lyman-

8   Cutler prior to filing the petition for bankruptcy?

9        A.  We discussed it with Nick Lipetsker on the

10   phone, that was probably September 2015; and we

11   agreed that that was the best solution.

12           And because we were more than 81 percent

13   interest holder, that was in accordance with LLC

14   operational agreement.

15       Q.  Did you discuss it with Kagan before doing

16   it?

17       A.  We didn't.  We didn't talk to Kagan.  Kagan

18   wouldn't even show up at the meeting.

19       Q.  At the time you and Mr. Lipetsker made the

20   decision to put the company in bankruptcy, was the

21   LLC insolvent?

22           MR. CARNATHAN:  Objection.

23       A.  No.  I was paying.  I was paying the

24   carrying costs because Kagan leaved.

114

1      Q.  And at some point, did you stop paying the

2   carrying costs?

3      A.  I paid it all the way until the loans were

4   closed.

5          I paid through the terms of the loan.

6   When it was in the bankruptcy, I was still paying

7   it.  Well, I provided money, funds, to the company

8   account so the payment could be made.  And we never

9   defaulted on the loans.

10      Q.  The loans were never in default?

11      A.  No.  I don't think they were, no.

12      Q.  Now, did you ever make loans to the LLC?

13      A.  Yes.

14      Q.  When did you make a loan to the LLC?

15      A.  Well, when you say loan, I'm sorry; that

16   mortgage, $200,000, in September.

17      Q.  So you made a $200,000 loan to the company?

18      A.  Yes.

19      Q.  When did you make that loan?

20      A.  I was loaning the money to the company

21   without organizing it into the mortgage; and we

22   organized it into the mortgage in I believe October,

23   end of October, 2015.

24      Q.  For what purpose did you loan money to the

138

1    the ones you mentioned this morning about her

2    efforts as a real estate broker?

3        A.   It was a call.  She called me.  Kagan

4    called me, Tatiana called me, end of April 2015.

5    She wanted me to sign the listing agreement.

6             I was in Miami on a business trip at the

7    telecom show, and I couldn't understand what she

8    wanted, because I didn't see any agreements ever

9    signed with Tatiana.

10            I didn't know that they were signed or

11   should be signed, because I assumed there is an

12   operational agreement --

13       Q.   There is what?

14       A.   Operational agreement, that said that she

15   will be the broker.  I didn't think about the

16   listing agreement with the broker.

17            So she called and was trying to explain

18   to me that she needed the agreement to sell house on

19   55 Lyman, I believe.  And I couldn't understand.

20            I called Nick and asked, what's this all

21   about?  He said, I don't know.

22            And I said, well, send it to me; I will

23   review.  She sent it to me.  I believe I asked a few

24   questions about the agreement, but then they sent me

140

phone calls, messages, anything.

1

Q.   So when you received the signed listing

2

agreement in April of 2015 for 55 Lyman, did you

3

send an email or a text to the effect of, what the

4

heck is this; I didn't tell you you could sign it?

5

A.   No, I didn't say.  I said I got it, and I

6

went to start looking for different brokers, because

7

I didn't like this.

8

I understood by this time that there is

9

a problem, and signing a six-month agreement with

10

Tatiana; who already managed not to sell it for so

11

long, is a problem.

12

Q.   How long was it after you received the

13

signed listing agreement for 55 Lyman Road that you

14

started talking to other brokers?

15

A.   Next week, as soon as I got back to Boston,

16

I started looking for brokers, yes.

17

Q.   While you were looking for brokers, who had

18

the listing?

19

A.   I have no idea.

20

Q.   Well, were you aware it was on the market?

21

A.   I don't know.

22

Q.   Did you check online?

23

A.   No, I didn't.

24

149

1    to be the managing partner; isn't that correct?

2        A.   Yes.   Before I researched the deal, yes.

3        Q.   And then again, in this project scenario,

4    this estimated project financials and risk analysis,

5    the first one, which is the third page of this

6    exhibit, did you understand that the boxes called

7    Investor 1 and Investor 2 were all estimates if this

8    particular project scenario was being used?

9        A.   Yes.

10       Q.   Now, if we go to the next column, called

11   Project Financing, did you understand, sir, that

12   those were estimates?

13       A.   Yes.

14       Q.   And the final column to the right, Profit

15   and Loss Statement, did you understand that the

16   numbers in the profit and loss statement were

17   estimates?

18       A.   Yes.   But they were all based on accurate

19   numbers pulled out, not out of the bottom part but

20   of actual experience of the person who is providing

21   me these numbers.

22       Q.   Would you agree with me, sir, that the

23   profit or loss that you would make on this project

24   would depend in part on the sales price and how long

150

1   the project was on the market?

2       A.   Yes.

3       Q.   So the longer the carrying costs, obviously

4   that eats into the profit; correct?

5       A.   That's correct.

6       Q.   And would you agree that the ability to

7   sell is somewhat out of your hands?  I mean, it can

8   be listed and marketed, but it's dependent on

9   somebody actually putting in an offer; correct?

10      A.   Not just depends on somebody putting the

11  offer.  It also depends on the person who is selling

12  this, on their experience, access to the market, the

13  buyers, et cetera.  That was a big issue.

14      Q.   Is it your contention that Tatiana Kagan

15  did not have the experience and access to the market

16  that was necessary for this property?

17      A.   That's what I learned by the end of the

18  whole story.

19      Q.   And how did you learn that?

20      A.   I talked to Deborah Gordon, who has tons of

21  experience, who sold many, many houses.

22           When I realized the access, the mail

23  marketing that they have, the number of potential

24  customers they have, the access of Coldwell Banker

151

compared to Tatiana, I realized that we're talking

about a thousand times difference in terms of access

to potential buyers.

　　　　　And I didn't see Tatiana advertising it

anywhere.

　　Q.　Now, sir, you're aware that Tatiana worked

with Century 21; correct?

　　A.　Yes.

　　Q.　What access did Coldwell Banker have that

Century 21 didn't?

　　A.　Century 21, that's what I learned later,

they are not luxury-home real estate.  Coldwell

Banker have that division and Hammond has that

division, but not Century 21.

　　Q.　What was Tatiana's experience in the luxury

market?

　　A.　She was only selling Kagan's home.

　　Q.　And how many homes had she sold in the

luxury market?

　　A.　It's hard for me to tell.  I don't know;

ten, fifteen, maybe.

　　Q.　Incidentally, what do you consider luxury

market?

　　A.　A luxury market is, anyway, above $4

155

1          Yes.  For the lot purchase it looks

2    like, yes.

3       Q.  Now, beneath the lot there's something

4    titled Construction Loan Distribution Schedule,

5    correct?  Do you see that?

6       A.  This one?  Yes, okay.

7       Q.  And below that topic heading there is a

8    distribution schedule.  Do you see that?

9       A.  Yes.

10       Q.  What did you understand that to be showing?

11       A.  The distribution of the construction loan

12    for a single home based on the phases finished; so

13    when he gets plans and permits he gets the first

14    $45,000, then for foundation $135,000, et cetera,

15    all the way to $1.5 million.

16          And this number of $1.5 million was

17    inflated to include the carrying costs;

18    deliberately.

19       Q.  And where are the carrying costs listed?

20       A.  The carrying costs on this particular one

21    is not listed because it's built in.  It's $200,000.

22          If you go back, you will see that the

23    cost of construction, one point three, and two

24    hundred and point two million dollars is built into

156

1    this number.

2         Q.   Who told you that --

3         A.   Kagan did.

4         Q.   Let me finish the question.

5              Who told you that this $1.5 million

6    construction loan distribution schedule was inflated

7    to include carrying costs?

8         A.   Kagan did.

9         Q.   When did he tell you that?

10        A.   At the meeting.  I asked him.  He said

11   that's a common practice; that's what we do.

12        Q.   Did you have any further conversation about

13   that at that meeting?

14        A.   I don't think so.

15        Q.   Ultimately, sir, the construction loan that

16   you ultimately took out was not $1.5 million;

17   correct?  It was higher than that, correct?

18        A.   On the second meeting, he asked just in

19   case another $100,000 for each home.  And we'll kind

20   of talk to each other; and he said, well, whatever

21   money is going to be left over, we're going to

22   return back to capital, just in case not to get dry.

23        Q.   If I could ask you to turn to the last page

24   of this exhibit.  At the top it says Estimated

178

1      Q.  Now, sir, let me ask you to turn your

2    attention to Page 12.

3            Specifically in Section 10.2, which is

4    entitled Indemnification, you assert that there's no

5    indemnity obligation for Kagan, because he acted

6    with gross negligence or willful misconduct.

7      A.  Yes.

8      Q.  What did he do that you think is grossly

9    negligent?

10           MR. CARNATHAN:  Objection.

11     A.  First, he didn't finish the project on

12   time.

13           Second, he signed the bogus agreement

14   with his wife to market the property for 18 months,

15   taking away my rights of this agreement by doing

16   this.

17           He signed the contract with himself,

18   with Kagan Development Corporation, coming up with

19   charges that were not ever discussed and were not

20   charged as part of this operational agreement.

21           The agreement that we signed on the

22   mortgage document was luxury homes, not with KDC;

23   and the agreement was completely different.

24           And the agreement he signed with

179

1    himself, signed "VK, VK," was signed one week,

2    supposedly one week, after.  Hopefully the expert

3    can identify that it was actually signed in July

4    2015, not in 2014.

5            He signed the completely bogus agreement

6    with himself with charges, design fees, construction

7    fees, all made-up fees, that he is not entitled.

8        Q.   How do you know they're all made up?

9        A.   Because he is not entitled to them.

10       Q.   Anything else that you believe was --

11       A.   He never asked me about this, he never

12   asked Nick about this; he just signed it with

13   himself.

14       Q.   Anything else that you believe was either

15   grossly negligent, or evidence of willful

16   misconduct?

17       A.   Obviously, his liens that he put on the

18   company, the result is an act of willful misconduct,

19   with $2 million that he came up with in charges.  I

20   don't know how to characterize it any other way.

21       Q.   Anything else?

22       A.   Possibly there is something else.  It's

23   hard for me to tell you.  I think it's plenty.

24       Q.   Have you exhausted your memory on that

203

1      Q.   Did you ever see any checks made out to

2  Classic Homes Development and Construction?

3      A.   I didn't.

4      Q.   Did you ever ask Kagan who Kagan

5  Development KDC was, and what their role was?

6      A.   I don't remember.

7      Q.   Do you understand that KDC acted as a

8  general contractor on this project?

9      A.   No.

10      Q.   What role did KDC play on this project?

11      A.   I do not know.  My understanding was that

12  Kagan is responsible for building this.

13           I don't know why he had to use

14  Proexcavation; I don't know why he had to use KDC.

15  I just don't know this.  It doesn't make any sense

16  to me.

17      Q.   Did you ask him?

18      A.   No, I didn't.

19      Q.   Now, this document, Exhibit 20, you said

20  was part of the Rockland Trust Company loan package?

21      A.   Yes.

22      Q.   Before you signed it, did you read it?

23      A.   I don't remember now, but I'm thinking yes.

24      Q.   Let's look at this document.

212

1      A.   I just got this, actually.  That was an

2  email I sent to Kagan about inaccurate listing on

3  Zillow.

4      Q.   So this is what you testified about earlier

5  this morning?

6      A.   Yes.

7      Q.   Would you agree with me that on or about

8  September 4, 2014 you looked at the listing for 88

9  Cutler?

10      A.   Yes.  I believe they just listed it for 88

11  Cutler.

12           And for Lyman, both of them were small,

13  actually, and somehow they were different.

14           (Marked, Exhibit 22, text message

15  string, top message 4-23, 2:05 p.m.)

16      Q.   I've placed in front of you Exhibit No. 22.

17  Do you recall receiving this fax --

18      A.   Text.

19      Q.   -- I'm sorry, text; on April 23, 2015?

20      A.   Yes.

21      Q.   Was this the beginning of the conversation

22  about signing the new listing agreement that you

23  spoke about earlier?

24      A.   For 55 Lyman, yes.

213

1      Q.   So this is Tatiana reaching out to you,

2  asking you to give her a call; right?

3      A.   Yes.

4      Q.   Did you call her at this point?

5      A.   I don't remember.  Either I called or she

6  called; I don't remember.  But we talked, yes.

7      Q.   And did you also receive a communication

8  about extending the listing agreement from Vadim

9  Kagan?

10     A.   I think we had talked also to him.  I don't

11 remember if it was written communication or verbal.

12 I don't remember.

13              I was busy; I was on a business trip.

14              (Marked, Exhibit 23, text message,

15 4-23-15.)

16     Q.   Is Exhibit 23 a text message that you

17 received from Vadim regarding getting a listing

18 agreement for 55 Lyman?

19     A.   Yes.

20     Q.   And did you receive that?

21     A.   Yes.

22     Q.   And you received that on April 23, 2015?

23     A.   Yes.  That's the same date as here, Exhibit

24 22; and this is the first time I heard about any

214

1   listing agreement.

2          (Marked, Exhibit 24, text message,

3   4-24-15.)

4      A.   And I couldn't understand why.

5      Q.   Is this your response to Vadim asking him

6   to call you?

7      A.   Yes.

8      Q.   And did he in fact call you?

9      A.   I think he did.  When he needed this, he

10  was calling.

11     Q.   And you told us, I think, that in fact they

12  sent you the listing agreement for you to look at;

13  correct?

14     A.   Emailed it to me, yes.

15         (Marked, Exhibit 25, email string, top

16  email 4-25-15, with attached listing agreement.)

17     Q.   Is this the email that you received,

18  together with the unsigned listing agreement?

19     A.   I guess so, yes.

20     Q.   So you received that on 4-25 at roughly

21  9:53 a.m.; correct?

22     A.   That's what the timestamp says, yes.

23  Otherwise I don't remember.

24     Q.   And do you recall that, after reviewing the

215

1   listing agreement which is part of Exhibit No. 25,

2   you had a question about the rate of the commission

3   and whether 5 percent was good or bad?

4        A.   Yes.  I don't --

5             Yes, I had some question, yes.

6        Q.   And did you ultimately agree that 5 percent

7   was acceptable?

8        A.   No; I said I understood what it is.

9   I believe that's what I said.

10       Q.   So let's look at this document now.

11            (Marked, Exhibit 26, text message,

12   4-25-15.)

13       Q.   Is that a text message that you sent on

14   April 25 --

15       A.   Yes, that's what I said.  It was clear.

16       Q.   So you reviewed the agreement.

17            The questions that you had regarding the

18   commission and 5 percent, you understood?

19       A.   They answered about the 5 percent question

20   that I had; and I said never mind, it's clear, about

21   5 percent.

22       Q.   And did you in fact understand at that time

23   that the agreement was signed and the property was

24   put on the market in accordance with the exclusive

216

1   agreement that they had sent you a copy of?

2       A.   Actually, no; I'm not sure if I understood

3   this.

4             They sent me the agreement.  As far as I

5   remember, they sent me the agreement; because I

6   didn't sign it.  I assume it's not signed.

7       Q.   Let's look at this document.

8             (Marked, Exhibit 27, email string, top

9   email 4-28-15.)

10      Q.   Is this an email string that you recall

11  receiving?

12      A.   Yes.

13      Q.   Would you agree with me that the top email,

14  April 28, 2015, at 10:02, from Dan at Kagan says,

15  "Per our conversations, we signed the agreement with

16  Chapter C-21 to put 55 Lyman on the market as

17  agreed.  Please confirm receipt of this email."

18      A.   Yes.  And I confirmed the receipt.

19      Q.   So would you agree with me that you were

20  aware that they had signed the agreement and put it

21  on?

22      A.   I didn't pay attention to the word

23  "signed," et cetera.  I just confirmed, I agreed I

24  got the email.  I didn't sign it.

217

1      Q.   But would you agree with me that they

2    signed it; that's what it says?  Would you agree

3    with that?

4      A.   That's what they said, yes.

5      Q.   And you got that email, didn't you?

6      A.   Yes, I did.

7      Q.   Also looking back at Exhibit 22, you told

8    Tatiana when she inquired about the agreement that

9    you sent a confirming email to Dan; correct?

10     A.   Yes.  That I received the email, yes.

11     Q.   And the confirming email, sir, referenced

12   in Exhibit No. 22 would be the middle email on

13   Exhibit No. 27 to Dan; correct?  "I confirm"?

14     A.   I confirm that I received the agreement,

15   yes.

16     Q.   So you knew this property was on the market

17   and listed; correct?

18     A.   Yes.  They put it on the market and listed

19   it, yes.

20     Q.   And after you confirmed back to Tatiana

21   that you had confirmed to Dan, she in fact contacted

22   you to say Thank you; correct?

23     A.   I don't remember.

24     Q.   Let's look at that.

218

1          (Marked, Exhibit 28, text message,

2    4-28-15.)

3        A.  Yes, okay.

4        Q.  Is that your response to Tatiana or Tanya

5    Kagan?

6        A.  Yes.

7        Q.  Did you ever send an email or a text saying

8    words to the effect "Do not sign, you're not

9    authorized to sign," or anything like that?

10       A.  No.

11       Q.  And after you learned that this property

12   was listed, because Dan told you, did you ask to see

13   a copy of the signed agreement?

14       A.  No.

15       Q.  Looking back at Exhibit No. 27, Dan says to

16   you, "Greatly appreciate the quick response.  If you

17   have any questions during the selling/closing

18   process, please feel free to reach out to me.  I

19   will, however, be out of the office this Thursday

20   and Tuesday, just FYI.  Thank you again," from Dan.

21          Do you recall receiving that?

22       A.  That one I don't remember, but if it's

23   there it's there; yes.

24       Q.  And did you ever call him with any

219

1    questions?

2        A.   No.   I don't think I ever talked to him,

3    except for emails that we exchanged.

4              He materialized too late on the horizon.

5    This is probably the first time I heard from him, in

6    April 2015.

7        Q.   Now, did it strike you at all odd that, if

8    you told him that you would not sign this agreement,

9    that they would send you an email that says Thank

10   you?

11       A.   Yes.   Well, it is odd.

12             I'll tell you, I felt very conflicted

13   about this.   I didn't want to sign them.   They were

14   pushing.   I didn't want to sign this myself, and

15   that's the reason why you don't see this.   I know

16   how to electronically sign documents; I do this all

17   the time, every day.   Do you understand?   I didn't

18   sign this document.

19             They were doing something, and I

20   discussed it at this time.   I called Nick and said,

21   I don't like this; we need to deal with this; we

22   don't want another six months of no selling.   The

23   season is coming and they're not selling; they're

24   not doing anything.

220

1      Q.   And on April 28, when this exchange was

2   happening relative to the listing agreement, how

3   long was it before you identified a different broker

4   that you wanted to use?

5      A.   I believe ten days.

6      Q.   And did you send any communication within

7   ten days saying I want a different broker?

8      A.   No, I didn't.

9      Q.   Why not?

10      A.   Why do I have to?  I was under the

11   impression that I can change my broker any time

12   based on --

13           I signed the agreement with Kagan LLC.

14   That was the governing document of the whole thing,

15   not the agreement with Century 21.  Actually, this

16   is the first time I heard about Century 21

17   altogether.

18           My idea is that I will take it from

19   Tatiana Kagan.  And by the way, when I talked to

20   Deborah Gordon, she said they would be stupid not to

21   give back this listing, because that's what people

22   do in real estate.

23           She told me.  She was absolutely

24   positive she will get the listing, when I talked to

221

1    her.

2             (Marked, Exhibit 29, email, 5-18-15.)

3        Q.   Is that an email that you sent on May 18,

4    2015?

5        A.   Yes.

6        Q.   What is the issue with Tatiana that you are

7    referencing?

8        A.   This is the issue with that listing

9    agreement, that we are taking away both properties

10   to put it with Coldwell Banker, Deborah Gordon and

11   Kathy Krongel.  That was the issue.

12       Q.   And as of May 18, was that your

13   understanding; that the listing had been removed

14   from Century 21 and given to Deborah Gordon?

15       A.   I thought so.  That's the reason for this

16   email.

17       Q.   Had you had conversations with

18   Mr. Lipetsker between April 28 and May 18 of 2015

19   regarding the listing agreement?

20       A.   We had talked about this, yes.

21       Q.   Did you share the emails and exchanges you

22   had had with him that we marked as Exhibit 22

23   through 27?

24       A.   No, I didn't.  We had a conversation.

# EXHIBIT 22

Exhibits: 38-39                    Volume 1, Pages 1-68
          UNITED STATES BANKRUPTCY COURT
              DISTRICT OF MASSACHUSETTS
                  (EASTERN DIVISION)
----------------------------
In Re:

                              Chapter 7

LYMAN-CUTLER, LLC,            Case No. 15-13881-FJB


          Debtor
----------------------------
LYMAN-CUTLER, LLC,


          Plaintiff

v.                            Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
          Defendants
----------------------------


          DEPOSITION OF NICKOLAY LIPETSKER
        Thursday, April 26, 2018, 11:30 a.m.
         Sheehan Phinney Bass + Green, P.A.
            255 State Street, 5th Floor
               Boston, Massachusetts


     --------- David A. Arsenault, RPR ---------
     daa@fabreporters.com   www.fabreporters.com
          Farmer Arsenault Brock LLC
            Boston, Massachusetts
               617-728-4404

19

1    other than your lawyer to prepare for today's

2    deposition?

3        A.   I didn't talk with anybody else about

4    today's deposition.  I don't think it is anybody's

5    business.

6        Q.   Did you consult with Mr. Filippov?

7        A.   No.  I think I'm quite capable to think

8    about everything on my own.

9        Q.   Did you review any documents?

10       A.   Yes, I did have some documents.  I paged

11   through them.  I don't know much about legal

12   documents, don't understand much.  This work for me

13   is somewhat difficult.  There are things that are

14   important to me and I can talk about them.

15       Q.   Have you finished your answer?

16       A.   I think so.

17       Q.   How did you first hear about the

18   Lyman-Cutler project?

19       A.   Again, I was at the office of Boris Maiden.

20   Our offices are located virtually five minutes away

21   from each other.  Oftentimes if I have a little

22   break, I stop by his office to have a smoke and have

23   a chat.  At that time, again, Maiden happened to be

24   with Dima.  Dima asked me if I wanted to participate

23

1      Q.   What was your next involvement with the

2   Lyman-Cutler project after making the introduction

3   to Mr. Filippov?

4      A.   Mr. Kagan mentioned that he needed $2.5

5   million as the first investment.  He also needed

6   somebody to take out the personal loan for $5

7   million.  The numbers are approximate, again, as I

8   don't see the numbers in front of me.  As far as I

9   recall, Mr. Filippov wanted his initial investment

10  to be $2 million and the remaining 500,000 would be

11  somebody else's, preferably Mr. Kagan's.  Mr. Kagan

12  then offered, suggested that I invest 250,000

13  explaining that it was 10 percent, very good terms.

14  I considered it a good offer and I agreed.

15     Q.   This sounds like you are summarizing

16  several conversations; is that correct?

17     A.   I don't think quite understand the

18  question.  What conversations are you talking about?

19     Q.   When Kagan told you that he needed a $2.5

20  million investment, was that a phone call or a

21  meeting?

22     A.   It was a face-to-face meeting, as far as I

23  remember, yes.

24     Q.   Where did that meeting take place?

26

1   the Lyman-Cutler project?

2       A.   I only know about one service.  If you can

3   call it a service, I call it work.

4       Q.   What did he do?

5       A.   As far as I know, Mr. Kagan asked

6   Mr. Zhukovskiy, based on the documents that

7   Mr. Kagan provided to Zhukovskiy and other

8   information that Kagan provided to Zhukovskiy, he

9   did some documents, some spreadsheet, what we call a

10  risk analysis.  And this document was to reflect the

11  estimates as to what profit or what expenses -- what

12  the profit would be, what expenses would be incurred

13  depending on various circumstances.  That's to the

14  to the best of my knowledge.

15      Q.   What made you have that knowledge?  Were

16  you present when Mr. Kagan made that request of

17  Mr. Zhukovskiy?

18      A.   I don't remember exactly all the

19  conversations, but I remember exactly the time when

20  Mr. Zhukovskiy brought this spreadsheet or this

21  document for a presentation and he asked Mr. Kagan

22  is that what you wanted, and Mr. Kagan said yes,

23  that's what I wanted.

24      Q.   Were you present at a meeting where that

27

1    presentation was discussed?

2        A.   Yes.

3        Q.   Where did that meeting occur?

4        A.   It happened in a conference room in

5    Attorney Maiden's office.

6        Q.   Who was present at that meeting?

7        A.   I was, Kagan, Zhukovskiy, Filippov, Maiden.

8    That's it.

9        Q.   What do you recall was said at that

10   meeting?

11       A.   To a large extent that meeting was

12   definitive in deciding whether the project was going

13   to go forward.  At that meeting Mr. Kagan said when

14   he presented this project that the important thing

15   for him was that building these two houses wall to

16   wall next to each other was less expensive than

17   building two single houses.  And Mr. Kagan said that

18   he knew exactly what the cost of construction would

19   be.  He said he knew exactly what the expenses would

20   be.

21           And the main question, the main question

22   of Mr. Filippov was to get the exact numbers, not

23   just the construction costs but all the expenses,

24   the bank payments, including insurance, including

28

1  taxes.  He insisted on getting those numbers.  And

2  Mr. Filippov said that until the time that he was

3  able to get all those numbers he wasn't going to

4  participate in this project.

5      Q.  Do you recall anything else that was said

6  at that meeting?

7      A.  I recall that the most important thing that

8  was said at the presentation in terms of risk

9  assessment was that the profit might vary depending

10  on the duration of the construction and the sale

11  price.  But the constant thing there was the cost of

12  construction.

13      Q.  Do you remember anything else that was said

14  at that meeting?

15      A.  Not at this time.

16      Q.  Have you now told us everything you can

17  remember about that presentation?

18      A.  As far as I remember, people at my age....

19          There was one important question that

20  was raised when the numbers were discussed.  It was

21  the question that Mr. Filippov focused on, and he

22  asked Mr. Kagan if bank interest was included in

23  that amount.  And the answer was yes.  He was

24  talking about the total cost of the project.

29

1      Q.  When you say was interest included in that

2   amount, what amount are you referencing?

3      A.  I will try to be as exact as possible.

4   Initially 1.3 million was the cost of construction

5   for each of the houses.  200,000 was preliminary

6   estimate for a mortgage, making it a total of 1.5

7   million.  And again, I may not be exact about what

8   happened when.  Dima, Mr. Kagan, asked for an

9   additional 100,000 per each house.  This amount was

10   supposed to provide some financial security for the

11   whole project.  And as far as I remember,

12   Mr. Filippov agreed.

13      Q.  The discussion about an additional $100,000

14   did that occur after, at a subsequent meeting after

15   the project, after everybody had agreed on the

16   project?

17      A.  If memory serves, it was not on the date of

18   the presentation.  Again, as far as I recall, it was

19   at a later date but I may be mistaken.

20      Q.  Do you remember anything else being

21   discussed at the meeting, the presentation meeting?

22      A.  As I recall, certain terms and aspects were

23   discussed, how long the construction will take, what

24   the expected sales price would be, who was

30

1    responsible for what, who will pay for what,

2    Mr. Kagan or Alex, whose initial investment will the

3    expenses come out of.  I didn't focus too much on it

4    because it didn't relate to me.

5        Q.  Did Mr. Zhukovskiy say anything at the

6    meeting?

7        A.  Again to the best of my recollection, I

8    remember exactly that Mr. Zhukovskiy asked if that

9    spreadsheet is exactly what Mr. Kagan wanted to see,

10   and he was told yes.  And he wanted to leave but

11   Mr. Kagan asked him to stay in case any of the

12   investors will have any questions and then he will

13   be able to answer them.  That's all I remember.  I

14   don't remember anything else that day.

15       Q.  Did any of the investors have any questions

16   of Mr. Zhukovskiy?

17       A.  I didn't.  If I knew that you would be

18   asking me these questions today, I would have

19   remembered that.

20       Q.  Were there any agreements reached at that

21   meeting or did negotiations continue and agreements

22   happen at some later date?

23       A.  I had an impression that the basic idea of

24   the agreement was there, but Mr. Filippov wanted to

1  the presentation meeting?

2     A.  I don't remember.

3     Q.  After the presentation meeting, what

4  happened next with regard to the Lyman-Cutler

5  project?

6     A.  As far as I remember, Filippov and Kagan

7  agreed on the numbers, on all the numbers and all

8  the terms.  And after that there was an agreement

9  made up between us and we signed it.

10     Q.  Were you present during the subsequent

11  negotiations between Filippov and Kagan relative to

12  the numbers and terms?

13     A.  No, I wasn't present.

14     Q.  When you say we signed an agreement, are

15  you referring to the operating agreement?

16     A.  Yes.

17     Q.  Let me show you what we marked as Exhibit

18  Number 10.  Is that the agreement that you were

19  referencing?

20     A.  Yes, it looks like the one to me.

21     Q.  Does that have your signature on the next

22  to the last page?

23     A.  Yes.

24     Q.  And did you initial every page?  You have

38

1   whatever I couldn't understand was translated word

2   for word for me.

3       Q.   By Boris Maiden?

4       A.   Yes.

5       Q.   Now, sir, understand that you have brought

6   a lawsuit against Mr. Kagan and his companies,

7   correct?

8       A.   Yes.

9       Q.   Why did you bring a lawsuit against him?

10      A.   Several things.  First of all, in my

11  understanding the main document is our agreement.

12  After I received the letter from Mr. Kagan nine

13  months after the completion of the construction of

14  the house, which stated that we still owed more than

15  a million dollars, I began to understand that the

16  additional expenses can lead to the loss of the

17  initial investment.  In addition, a lien was placed

18  on those houses, a mechanical lien, which put the

19  sale of those houses in jeopardy.  And every month

20  it costs a lot of money because of the necessity to

21  pay bank interest, taxes to the city and maintenance

22  of the property.

23           I had a meeting with Mr. Kagan.  I

24  wanted to avoid legal proceedings and wanted to

39

1   settle this matter peacefully.  I suggested that the

2   liens be removed.  I suggested that we sell the

3   houses at the highest possible price, repay all that

4   was owed to the bank, which would lead to certainly

5   a decrease in our financial expenses.  And I

6   suggested that the remaining money be put in an

7   escrow account.  After all that we could try to come

8   to resolve all the issues.

9       Q.   Have you finished your answer?

10      A.   Yes.

11      Q.   Now, sir, you have alleged -- let me show

12  you what we marked as Exhibit Number 5.  Are you

13  familiar with that document?

14      A.   I think I've seen this.

15      Q.   Do you understand that as a copy of the

16  complaint that was filed on your behalf, the

17  lawsuit?

18      A.   Yes.

19      Q.   Before this was filed, did you have a

20  chance to review the allegations that are contained

21  in this?

22      A.   Yes.

23      Q.   And was everything that was alleged true

24  and accurate?

52

1   Towards the end he just avoided those conversations.

2       Q.   Did you ever review the construction plans

3   for the project?

4       A.   I didn't really review it.  I saw the plans

5   on paper, but I didn't really study it.

6       Q.   When did you see the plans on paper?

7       A.   I think it was, I think it was either

8   shortly after the commencement of the construction

9   or in the first few months.  But I don't understand

10  much about those plans.

11      Q.   Did you see the plans prior to the signing

12  of the operating agreement?

13      A.   I don't remember.

14      Q.   Were you involved at all in the

15  negotiations to obtain a construction loan for the

16  project?

17      A.   As far as I understand it, the construction

18  loan of 5.2 million was taken out by Mr. Filippov

19  with personal guarantees.

20      Q.   Were you involved at all in the

21  negotiations for the construction loans?

22      A.   What kind of negotiations?  What exactly

23  are you talking about?  Maybe I did participate.  I

24  just don't know exactly what you are asking.

55

1     A.   No, he didn't have those conversations with

2   me.  He has his own vendors with good prices.

3     Q.   Did you have conversations with him about

4   the type of stone countertops to be used in the

5   houses?

6     A.   No.

7     Q.   Now, Mr. Lipetsker, you are aware that

8   Lyman-Cutler filed for bankruptcy, correct?

9     A.   Yes.

10     Q.   Were you part of the decision-making

11   process to put it into bankruptcy?

12     A.   Yes.

13     Q.   Why did you put Lyman-Cutler in bankruptcy?

14     A.   We had absolutely no money left in the

15   Lyman-Cutler accounts, bank accounts.  We had to pay

16   bank interest monthly.  And we had to pay taxes to

17   the city each quarter.  It was necessary to maintain

18   the properties, both houses, and the grounds.  We

19   had to keep heating, air-conditioning at a certain

20   level.  It is very expensive.  In addition to

21   everything, there were liens placed on both houses

22   which prevented them from being sold.

23          In addition at any moment the bank could

24   request that the whole mortgage was repaid and it

57

1      affidavit that bears your signature?

2          A.   Yes.

3          Q.   Was this affidavit translated into Russian

4      for you before you signed it?

5          A.   Yes.

6          Q.   Who translated it for you?

7          A.   I don't know but it was definitely

8      translated.

9          Q.   Now, I want to draw your attention, sir, to

10     Paragraph Number 5.  Let me represent to you that

11     this affidavit did not have any exhibits attached to

12     it.  So I'm just trying to find out what was

13     supposed to be attached.  Do you know what Exhibit 1

14     was supposed to be?

15              MR. CARNATHAN:  It actually recites that

16     it was attached to the complaint.

17              MR. PERTEN:  You are absolutely right.

18     I'll withdraw the question.  I apologize.

19         Q.   Let me draw your attention instead to

20     Paragraph Number 10.  In Paragraph 10 you are

21     reciting a conversation with Mr. Filippov; is that

22     correct?  It says:  "Mr. Filippov told me during

23     this conversation that Mr. Kagan had asked

24     Mr. Filippov to sign a new listing agreement with

65

1    Q.   Did you ever review the construction

2  project, the construction contract for the

3  Lyman-Cutler project?

4    A.   Agreement between who and who?

5    Q.   Any agreement for the construction.

6    A.   I don't remember that.

7    Q.   Have you ever spoken with Kathy Krongel,

8  the broker?

9    A.   No, never.

10           MR. PERTEN:   I don't have anything else.

11           MR. CARNATHAN:   I have no questions.

12           MR. PERTEN:   Thank you.

13           (3:59 p.m.)

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT 23

Exhibits: 1-26                    Volume 1, Pages 1-239

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

(EASTERN DIVISION)

----------------------------

In Re:

                                  Chapter 7

LYMAN-CUTLER, LLC,                Case No. 15-13881-FJB


            Debtor

----------------------------

LYMAN-CUTLER, LLC,


            Plaintiff

v.                                Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,

KAGAN DEVELOPMENT KDC CORP.

and PROEXCAVATION CORP.,

            Defendants

----------------------------

30(b)(6) DEPOSITION of KAGAN DEVELOPMENT KDC CORP.

30(b)(6) DEPOSITION of PROEXCAVATION

By VADIM KAGAN and VADIM KAGAN Individually

Thursday, May 3, 2018, 10:02 a.m.

O'Connor Carnathan and Mack LLC

1 Van de Graaff Drive, Suite 104

Burlington, Massachusetts

--------- David A. Arsenault, RPR ---------

daa@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

Boston, Massachusetts

617-728-4404

29

1       A.   Vadim Kagan.

2       Q.   Anyone else?

3       A.   Tatiana.

4       Q.   What position do you hold as a corporate

5   officer in KDC?

6       A.   Can you repeat the question?

7       Q.   Which officer for KDC are you?

8       A.   I don't know.  I'm the officer.

9       Q.   Are you the president?

10      A.   Yeah.

11      Q.   What about Tatiana, what title does she

12  hold?

13      A.   Just the officer of KDC.

14      Q.   Has that been true since 2013?

15      A.   I think so.

16      Q.   During that same time period since 2013

17  have there ever been any other officers of KDC?

18      A.   I think Joseph Cohen.

19      Q.   How long has Mr. Joseph Cohen been an

20  officer of KDC?

21      A.   A few years.

22      Q.   When did Mr. Cohen come to work for KDC?

23      A.   He's not working for KDC.  He's working for

24  himself.

40

1   did KDC have in the middle of 2013?

2       A.   Probably two.

3       Q.   Who were they?

4       A.   What I remember is Vadim Kagan and Ryan

5   O'Grady.

6       Q.   Starting with Mr. O'Grady, when did he

7   start work for KDC?

8       A.   2011 or 2012.

9       Q.   Does he still work for KDC today?

10      A.   No.

11      Q.   When did he leave?

12      A.   Probably the fall 2013 or something.

13      Q.   Why did he leave?

14           MR. PERTEN:  Objection.

15      A.   I don't know.

16      Q.   Did you ever talk to him about why he left?

17      A.   He wanted to do something different.  I

18  don't know.

19      Q.   So he quit?

20      A.   Yes.

21      Q.   When was the last time you talked to Ryan

22  O'Grady?

23      A.   Two months ago.

24      Q.   Where was that?

41

1      A.   In the street.

2      Q.   Was there anyone else there?

3      A.   No.

4      Q.   Did you talk about this lawsuit at all?

5      A.   No.

6      Q.   How often do you see Mr. O'Grady?

7      A.   Once a month.

8      Q.   Where does Mr. O'Grady live?

9      A.   In Dedham.

10     Q.   What's his address?

11     A.   I don't know.

12     Q.   What's Mr. O'Grady's phone number?

13     A.   I don't know.

14     Q.   Was Mr. O'Grady ever responsible for

15   keeping the books for KDC?

16     A.   No.

17     Q.   Was Mr. O'Grady ever responsible for

18   keeping the books for Proexcavation?

19     A.   No.

20     Q.   Was Mr. O'Grady ever responsible for

21   keeping the books for Lyman-Cutler?

22     A.   No.

23     Q.   In general terms, what were Mr. O'Grady's

24   day-to-day duties when he worked for KDC?

42

1      A.   Make the phone calls; and if I asked him to

2   cut the check, he's going to cut the check.

3      Q.   Cut checks from where?

4      A.   From the company.

5      Q.   From KDC?

6      A.   Yeah.

7      Q.   What about from Lyman-Cutler?

8      A.   Also.

9      Q.   Also?

10      A.   Yes.

11      Q.   And your other projects, would he cut

12   checks for other projects too?

13      A.   If I had other projects, yes.

14      Q.   Was Mr. O'Grady responsible for issuing

15   invoices for KDC?

16      A.   No.

17      Q.   During the time that Mr. O'Grady worked for

18   KDC, who if anyone was responsible for issuing

19   invoices for KDC?

20      A.   Me.

21      Q.   In general terms, what were your day-to-day

22   duties working for KDC in that same time frame?

23      A.   Make sure everything running proper in the

24   business.

77

1    that says that's when we had the meeting, I can tell

2    you whether or not it is the date.

3              (Marked, Exhibit 6, Project Lyman

4    document, 10-25-12.)

5         Q.   Do you recognize Exhibit 6, Mr. Kagan?

6         A.   I saw similar spreadsheet that I did

7    before.

8         Q.   Is this in fact a spreadsheet that you

9    caused to be prepared?

10        A.   No.

11        Q.   It's not?

12        A.   It's not.

13        Q.   What's your understanding of who prepared

14   this spreadsheet?

15        A.   What is my understanding is who prepared

16   the spreadsheet?

17        Q.   Yes.

18        A.   Lipetsker and Filippov.

19        Q.   You are saying that Lipetsker and Filippov

20   prepared this spreadsheet?

21        A.   What I'm understanding is that

22   Mr. Zhukovskiy helped him do this spreadsheet, from

23   what I understand.

24        Q.   Are you familiar with the concept of a

88

1      A.   We have to finalize plans building the

2   house.   We have to finalize what we are going to do,

3   what house we are going to build, what is our

4   target, what is our size of the property.

5   Everything is variable.   It depends how much money

6   we will throw in landscaping, what kind of customers

7   do we want to bring in.   If we are going to finalize

8   this, we are going to go forward.

9      Q.   Have you now told me everything that you

10  can recall saying at that October 25, 2012 meeting?

11     A.   Yes.

12     Q.   As best you can recall, what did

13  Mr. Filippov say during that meeting?

14     A.   Let's finalize the numbers, let's finalize

15  our plans.   We will come back to the conversation

16  again.

17     Q.   Was Mr. Filippov willing to invest $2

18  million without having final numbers?

19     A.   No problem, yes.

20     Q.   So he was okay with that, I'll put in my $2

21  million and you tell me later what we are going to

22  do?

23     A.   Probably.   It is up to Mr. Filippov.

24     Q.   So it is your testimony that Mr. Filippov

120

1    may be different in these scenarios?

2        A.   I said 1.3 is laughable construction cost

3    to do big house.  It is a simple house but not going

4    to cost us 1.3.

5        Q.   You said 1.3 was laughable during the

6    October 25 --

7        A.   Exactly, if you want to do a big house,

8    yes.  If you want to do a simple house, yes.

9        Q.   What did you tell Mr. Filippov,

10   Mr. Lipetsker and Mr. Maiden would be a reasonable

11   budget to build a big house at the October 25, 2012

12   meeting?

13       A.   Minimum 1.5 to even start this conversation

14   for reasonable size house.  So somewhere close to

15   4.8 million, 4.7 million, more reasonable.

16       Q.   Do you recall what Mr. Zhukovskiy said

17   during this October 25, 2012 meeting about the

18   profit and loss risk analysis?

19       A.   Yes.

20       Q.   What did he say?

21       A.   He said, Guys, I'm just helping my uncle.

22   This is a hypothetic number.  You have to all talk

23   together.  This has nothing to do with me.  I'm just

24   helping.  That's what he said.  He said, I spent

212

1  Kagan?

2      A.  Yes.  Yeah, two, two and a half years

3  project since we start building the house.

4      Q.  You were the guy that built 30 or 40 houses

5  and sold them at this point?

6      A.  Yes.

7      Q.  Weren't you the person who knows how long

8  it took to build and sell a house?

9      A.  It depends on the season.  Yes.

10      Q.  Certainly you knew a lot more about it than

11  Filippov, the SIM card salesman, and Lipetsker the

12  dentist, correct?

13              MR. PERTEN:  Objection.

14      A.  First of all, Lipetsker is not just the

15  dentist.  He is a very experienced real estate

16  investor.

17      Q.  But you were the guy in the industry,

18  right?

19      A.  Yes.

20      Q.  So are you saying you did not come up with

21  the 23-month time frame?

22      A.  I didn't come up with 23-months time frame.

23      Q.  Did you ever agree with it?

24      A.  We said it was approximately a two-year

222

1      A.  Yes.

2      Q.  Did you approve it to go out?

3      A.  Yeah.  I don't remember it now.

4      Q.  Did you believe it was accurate when

5   Mr. Pyle sent it out?

6      A.  I believe, but I don't remember it now.

7              (Marked, Exhibit 24, Notice of

8   contract.)

9      Q.  Do you recognize Exhibit 24, Mr. Kagan?

10     A.  Yes.

11     Q.  What is it?

12     A.  It is a lien.

13     Q.  Did you cause this lien to be filed against

14   88 Cutler and 55 Lyman in the Norfolk County

15   Registry of Deeds?

16     A.  Yeah, we filed this on behalf of the

17   company.

18     Q.  When you say we, who is we?

19     A.  Joseph Cohen.

20     Q.  Anyone else?

21     A.  No.  He did this.  He at that time was the

22   secretary and director of the company.  He did this.

23              MR. PERTEN:  Excuse me.  You gave me two

24   sets.

233

1   construction phase fee.  Do you see that?

2       A.   Construction fee, yes.

3       Q.   So that states that the owner,

4   Lyman-Cutler, will pay KDC a fee of 15 percent; is

5   that right?

6       A.   Yes.

7       Q.   And so at the time you signed this contract

8   with yourself --

9            MR. PERTEN:  Objection.

10      Q.   -- the budget for the combined construction

11  was $3.2 million, right?

12      A.   Yes.

13      Q.   1.6 million for each house?

14      A.   Yes.

15      Q.   So 15 percent of that was $480,000; is that

16  right?

17      A.   Probably.

18      Q.   So you were signing a deal with your own

19  company to obligate your partnership to pay your

20  company no less than $480,000; is that right?

21      A.   Kagan Development is the subcontractor like

22  the rest of the companies.

23      Q.   How did you square that provision with

24  Exhibit 4, Paragraph 5.2 and 8.1, which together say

Exhibits: 74-81                    Volume 2, Pages 240-305

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

------------------------------

In Re:

                                  Chapter 7

LYMAN-CUTLER, LLC,                Case No. 15-13881-FJB


          Debtor
------------------------------
LYMAN-CUTLER, LLC,


          Plaintiff

v.                                Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,

          Defendants
------------------------------


CONTINUED 30(b)(6) DEPOSITION OF KAGAN DEVELOPMENT
  KDC CORP., 30(b)(6) DEPOSITION OF PROEXCAVATION
  By VADIM KAGAN, and VADIM KAGAN, Individually
        Wednesday, May 23, 2018, 1:53 p.m.
         O'Connor Carnathan and Mack LLC
         1 Van de Graaff Drive, Suite 104
            Burlington, Massachusetts


     --------- Janis T. Young, RDR, CRR ---------
     jty@fabreporters.com   www.fabreporters.com
          Farmer Arsenault Brock LLC
            Boston, Massachusetts
                 617-728-4404

279

1              MR. PERTEN:  Objection.

2        A.   On 88 Cutler, based on Proexcavation

3    proposal for $418,150.  This is the proposal price.

4              Whatever it says on Page 1192, that's

5    the number.

6        Q.   When you created that proposal, did you

7    show it to anybody else?

8        A.   Don't remember.

9        Q.   Did you ever give it to Mr. Filippov?

10       A.   Don't remember.

11             Mr. Filippov has all the backup

12   documents on the proposal and invoices for Lyman-

13   Cutler.

14             (Marked, Exhibit 80, Lyman-Cutler, LLC

15   transactions by account, KDC 00477 - 487.)

16             (Marked, Exhibit 81, Lyman-Cutler, LLC

17   transactions by account, KDC 01078 - 1091.)

18             MR. PERTEN:  You just marked two?

19             MR. CARNATHAN:  Yes.  One should be for

20   55 Lyman, and one should be for 88 Cutler.  Exhibit

21   80 is a copy of the material contained in Tab 48 of

22   the Lyman binder; Exhibit 81 is a copy of what's

23   contained in Tab 46 of the Cutler binder.

24       Q.   So Mr. Kagan, if we could just look at

# EXHIBIT 24

Exhibits: 1-14                    Volume 1, Pages 1-170

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

(EASTERN DIVISION)

----------------------------

In Re:

                                  Chapter 7

LYMAN-CUTLER, LLC,                Case No. 15-13881-FJB

         Debtor

----------------------------

LYMAN-CUTLER, LLC,

         Plaintiff

v.                                Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
         Defendants

----------------------------

DEPOSITION OF KRISTINA BRUSENKOVA

Tuesday, March 20, 2018, 1:15 p.m.

Sheehan Phinney Bass + Green, P.A.

255 State Street, 5th Floor

Boston, Massachusetts

--------- David A. Arsenault, RPR ---------

daa@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

Boston, Massachusetts

617-728-4404

64

1    other reasons?

2        A.   No.

3        Q.   Did you have authority to sign checks on

4    behalf of KDC?

5        A.   Only by stamp.

6        Q.   So there was a stamp signature that you

7    were allowed to use?

8        A.   Yes.  And sometimes when Mr. Kagan was not

9    in the office he asked me to put his personalized

10   name on the check and give the check to the

11   contractor.  It was several times.

12       Q.   Okay.  You told us earlier, I believe, that

13   you prepared, you paid invoices?

14       A.   Yes.

15       Q.   For KDC.  How did you determine what

16   invoices needed to be paid?

17       A.   Mr. Kagan told me.

18       Q.   Other than what he told you, did you see

19   anything else?  Did you have any other basis for

20   paying invoices?

21       A.   Operating, carrying costs and invoices.

22       Q.   So other than Mr. Kagan telling you to pay

23   certain monies, did you review any documents to

24   determine how much to prepare the checks for?

65

1      A.   Repeat the question.

2      Q.   Was part of your job responsibilities for

3  KDC to prepare checks?

4      A.   Yes.

5      Q.   How did you know how much to make the

6  checks for and who to pay?

7      A.   Mr. Kagan told me the amount and who I have

8  to pay.

9      Q.   Other than what he told you, is that the

10  only source of information that you had to determine

11  what checks to write?

12      A.   For KDC, yes.

13      Q.   Was it different for any of the other

14  companies that Mr. Kagan owned?

15      A.   Yes.

16      Q.   What other companies did you write checks

17  for?

18      A.   Proexcavation; Classic Interior and

19  Proexcavation.

20      Q.   For Proexcavation how did you determine

21  what numbers to write the checks for and to whom?

22      A.   His brother, Kirill Kagan sent me text

23  messages with the amounts.

24      Q.   What was for Proex?

117

1    was W-2.  I've never been paid twice.

2         Q.   Okay.  Let's look at Paragraph 4 of your

3    affidavit.  What subcontractors did construction and

4    excavation work on projects hired by Mr. Kagan?

5         A.   What is your question?

6         Q.   You say:  "The actual construction and

7    excavation work on the projects was done by

8    subcontractors hired by Mr. Kagan."  Do you see that

9    language, the last sentence of Paragraph 4 of your

10   affidavit?

11        A.   Yes.

12        Q.   Is that an accurate statement?

13        A.   Yes.

14        Q.   Does Proex do any work?

15        A.   I don't understand the question.

16        Q.   Does Proexcavation own some construction

17   equipment?

18        A.   Yes.

19        Q.   And does it do demolition work?

20        A.   I'm not aware of this.

21        Q.   Well, do you know if Proexcavation did work

22   on the Lyman-Cutler project?

23        A.   Proexcavation?  I believe so.

24        Q.   What work did Proexcavation do on the

118

1    Lyman-Cutler project?

2        A.   Site preparation.   Maybe landscaping and

3    masonry, but I left the company.

4        Q.   So when we look at Paragraph 4 of your

5    affidavit, you say:   "The actual construction and

6    excavation work on the projects was done by

7    subcontractors hired by Mr. Kagan."  Do I understand

8    your testimony that Proexcavation did excavation

9    work on the Lyman-Cutler project?

10              MR. COHEN:   Objection.

11       A.   Repeat the question.

12       Q.   Did Proexcavation do excavation work on the

13   Lyman-Cutler project?

14       A.   Yes.

15       Q.   Now, let's look at Paragraph 5.   You say

16   when you got to the Kagan Development all records

17   were kept on the copy page in the checkbooks,

18   correct?

19       A.   Yes.

20       Q.   And cost estimates were calculated based on

21   data that had been recorded in the checkbooks,

22   correct?

23       A.   Repeat the question?

24       Q.   You said in your affidavit that cost

120

1    projects where Mr. Kagan had investors he paid more

2    to the survey company for the same work that he paid

3    for less on his projects.

4        A.   Yes.

5        Q.   Did you ever see the invoices from the

6    survey company for Lyman-Cutler?

7        A.   Yes.

8        Q.   And how much did they overcharge?

9        A.   I cannot recall the amount.

10       Q.   How do you know they overcharged?

11       A.   I can compare with other companies.

12       Q.   And how do you know that surveying costs

13   the same on every project?

14       A.   This is what Mr. Kagan told me.  If he has

15   an investor with a particular house, the invoice

16   will be $1400.  If it is his personal, it will be

17   1,000.

18       Q.   So is it a $400 discrepancy that you are

19   talking about?

20       A.   As I can remember, yes.

21       Q.   And is the survey cost for a two-house lot

22   the same price as the survey cost for a one-house

23   lot?

24       A.   Repeat?

125

1      A.   I don't understand your question.

2      Q.   Where did you get the information that

3  enabled you to say what you said in Paragraph 6 of

4  your affidavit?

5      A.   He usually create a company, a partnership.

6      Q.   And do you believe that's improper?

7      A.   I didn't say this.

8      Q.   I didn't say you did.  I just asked the

9  question.  Is that improper somehow?

10     A.   No.

11     Q.   Now, you say in Paragraph Number 7 that he

12 regularly double-billed projects.  Do you see that?

13     A.   Yes.

14     Q.   On the Lyman-Cutler project specifically

15 when did he double-bill?

16     A.   I can't recall.

17     Q.   Did he ever?

18     A.   Based on the information that I saw, the

19 information that Fillippov provided me, yes, for

20 landscaping.

21     Q.   So you believe he double-billed for

22 landscaping?

23     A.   I believe, yes.

24     Q.   Anything else?

126

1    A.  I can't recall right now.

2    Q.  Do you believe there was other things?

3    A.  I don't know.

4    Q.  Look at Paragraph Number 8.  This talks

5  about the landscaping work.  Do you see that?

6    A.  Yes.

7    Q.  You say:  "I've reviewed some QuickBooks

8  reports for the Lyman-Cutler project and it appears

9  to me that Mr. Kagan billed the project twice for

10  excavation and landscaping work."

11         Do you see that language?

12    A.  Yes.

13    Q.  What QuickBooks reports did you look at?

14    A.  The one that I was provided by Fillippov.

15    Q.  And prior to seeing what Mr. Fillippov

16  provided, were you aware of that problem?

17    A.  I cannot recall it.

18         (A recess was taken, 4:11 - 4:18.)

19    Q.  When Mr. Fillippov showed you QuickBooks

20  records at Starbucks, how long did you look at them?

21    A.  I can't recall.

22    Q.  Do you recall how long you were at

23  Starbucks with him?

24    A.  No.

133

1    7.   Look at Paragraph Number 10.   What

2    subcontractors did Mr. Kagan pay more than the job

3    was worth?

4         A.   I can't recall the names.

5         Q.   How did you make a determination that there

6    were payments in excess of what the job was worth?

7         A.   When the work was done, he usually came to

8    my desk and he asked me to pull all the numbers that

9    were paid to this particular person.   So when he saw

10   this number he said, you know, it is a little low.

11   Can we had an additional $2,000.

12        Q.   So try my question, though.   First of all,

13   did that happen in Lyman-Cutler?

14        A.   I can't recall.

15        Q.   Do you have any basis for knowing what the

16   proper charge from a subcontractor should be?

17        A.   No.

18        Q.   Now, with respect to the American Express

19   situation, looking at Paragraph Number 12 of your

20   affidavit, would you agree with me, Ms. Brusenkova,

21   that the American Express cards were used to

22   purchase items for projects?

23        A.   Yes.

24        Q.   Would you also agree with me that it was

134

1      proper for the items that were bought for a project

2      to be billed to that project?

3              MR. CARNATHAN:  Objection.

4          A.  Repeat the question.

5          Q.  Is there anything wrong with billing a

6      project for goods that were purchased for that

7      project?

8          A.  I don't understand the question.

9          Q.  Well, you say he bought materials using his

10     American Express card and didn't keep track, right?

11         A.  Yes.

12         Q.  If he was able to determine what products

13     were purchased for which project, was it proper to

14     charge those items to that project?

15             MR. CARNATHAN:  Objection.

16         A.  I don't understand your question, your

17     statement.

18         Q.  How do you know that Mr. Kagan improperly

19     assigned AmEx charges to the Lyman-Cutler project?

20         A.  I didn't say that he did it improper.  I

21     said that every time that he purchased for

22     Proexcavation on American Express card, he never

23     tracked the, keep a track of these expenses.  He

24     used one account for all expenses.  I think it was

137

1    magnitude?

2         A.   1,000, 1500, I don't know; not a huge

3    amount.

4         Q.   Do you know whether this happened on

5    Lyman-Cutler?

6         A.   I don't know.

7         Q.   Now let's look at your Paragraph Number 14.

8    You say:  "When Mr. Kagan submitted bills to

9    projects for Proexcavation, he would arbitrarily

10   charge whatever fee he felt like he could get away

11   with.  There was no direct connection between the

12   charge submitted to the project and the cost that

13   KDC or Proexcavation had incurred for the materials

14   or for paying the subcontractors."

15              Did I read that correctly?

16        A.   Yes.

17        Q.   How did you determine that there was no

18   direct connection between the charges submitted, as

19   you state in your affidavit?

20        A.   As he explained to me, every time when we

21   pay something for Proexcavation, we are supposed to

22   get reimbursed from the companies.  But he never did

23   this.  He just overcharge them.

24        Q.   How did you determine that there was an

138

1    overcharge?  As I understood your testimony this

2    morning or earlier today, you said you didn't know

3    exactly what Proexcavation did on this project; is

4    that correct?

5        A.  I said that the Proexcavation did site

6    preparation.

7        Q.  You gave me categories.

8        A.  Yes.

9        Q.  But you don't know specifically what they

10   did, correct?

11       A.  No.

12       Q.  So how do you know they overcharged?

13       A.  Every time when Proexcavation pays for

14   materials, he said that we are supposed to be

15   reimbursed for this money.  But we never did, we

16   never invoiced the company with the same amount of

17   money that he spent for Proexcavation.  Instead he

18   prepared the invoice with higher amount on it.

19       Q.  Let's continue on Paragraph 14.  You say

20   that he increased the excavation project cost when

21   he hit rock.  Do you see that language?

22       A.  Yes.

23       Q.  In your experience, Ms. Brusenkova, are

24   excavation costs more expensive when ledge is

139

1    encountered?

2         A.   Based on his words.

3         Q.   But you don't know one way or the other?

4         A.   No.  Probably yes.

5         Q.   Now, with respect to the carrying costs on

6    the Lyman-Cutler project, where did that money come

7    from?

8         A.   Rephrase the question.

9         Q.   Where did the money that was used to pay

10   carrying costs for the Lyman-Cutler project come

11   from?

12        A.   From the bank or from the investors.

13        Q.   Do you know?

14        A.   Do I know what?

15        Q.   Do you know where it came from?

16        A.   I usually send an email asking to deposit

17   more funds into the account.

18        Q.   Did you send emails asking KDC to deposit

19   more funds into the account to cover carrying costs

20   on Lyman-Cutler?

21        A.   Not KDC.  I send emails to investors.

22        Q.   Do you know who covered the carrying costs

23   on Lyman-Cutler?

24        A.   Lyman-Cutler usually paid for carrying

140

1    costs.

2       Q.   Where did Lyman-Cutler get the money to pay

3    for carrying costs?

4       A.   Advances from the bank or investors' money.

5       Q.   Do you recall which investors put in money

6    for the carrying costs?

7       A.   No.

8               (Marked, Exhibit 9, Emails.)

9       Q.   Ms. Brusenkova, do you recognize the emails

10   that are all part of Exhibit 9?

11      A.   Repeat the question.

12      Q.   Do you recognize these emails?

13      A.   No.

14      Q.   Would you flip over to the email that's

15   dated November 14, 2014.

16      A.   November 14?

17      Q.   Yes.

18      A.   Yes.

19      Q.   Do you recall getting emails from Arina

20   where she advises about payments on the loan?

21      A.   On November 14th I didn't work for Kagan

22   Development.

23      Q.   Do you remember emails like this where she

24   advised that she was making payments on the loans?

164

1      Q.  I've given you what we have marked as

2    Exhibit 14.  Can you tell me what that is?

3      A.  Some kind of proposal.

4      Q.  Do you recognize that as a proposal from

5    Proexcavation?

6      A.  There is a name, Proexcavation.

7      Q.  Have you ever seen that before?

8      A.  No.

9      Q.  If you would take a moment and look at the

10    first -- have you taken a moment to look at this

11    proposal?

12            MR. COHEN:  It looks like several

13    proposals.

14            MR. PERTEN:  It is.

15            MR. COHEN:  It might make sense to

16    identify it by the Bates numbers, 1280 through 1304.

17            MR. PERTEN:  That's not going to work.

18            MR. COHEN:  They are not consecutive;

19    you skipped some.

20            MR. PERTEN:  I pulled out some

21    QuickBooks.

22      Q.  If I could ask you to look at 1280, 1281,

23    1283 and 1284 first.

24      A.  (Witness complies.)

# EXHIBIT 25

Exhibits: 1-12                    Volume 1, Pages 1-142

COMMONWEALTH OF MASSACHUSETTS

Middlesex County                    Superior Court

----------------------------------

LYMAN-CUTLER, LLC, ALEX FILIPPOV,

and NICKOLAY LIPETSKER,

                Plaintiff

vs.                        C.A. No. 1581CV03977

VADIM KAGAN, TATIANA KAGAN,

CENTURY 21 COMMONWEALTH,

KAGAN DEVELOPMENT CORP.

and PROEXCAVATION CORP.,

                Defendants

----------------------------------

DEPOSITION OF BORIS B. MAIDEN

Wednesday, September 9, 2015, 12:53 p.m.

Sheehan Phinney Bass + Green, P.A.

255 State Street, 5th Floor

Boston, Massachusetts

--------- Janis T. Young, RDR, CRR ---------

jty@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

617-728-4404   Fax 617-728-4403

52

1   that Mr. Zhukovskiy played at the initial meeting?

2       A.   No, other than preparing those

3   spreadsheets.

4       Q.   Let's turn now to that second meeting that

5   you recall.  Who was present at the second meeting?

6       A.   Nickolay, Vadim and Filippov.

7       Q.   Was Zhukovskiy there?

8       A.   No.

9       Q.   You were there?

10      A.   Yes.

11      Q.   And that occurred in your office?

12      A.   That's correct.

13      Q.   How long after the first meeting was it

14   that the second meeting occurred?

15      A.   Within a week.

16      Q.   And what do you recall about that meeting?

17      A.   That they agreed on the general terms.

18   They asked me to prepare a template which generally

19   describes what they are agreed on.  And I asked them

20   to email it to everyone, and that's what they did.

21      Q.   When you say they agreed on the general

22   terms, what general terms do you mean they agreed

23   upon?

24      A.   Usually the percentage interest of profit,

53

1   who invests how much money, who does what for --

2   basically the most important in terms of I think the

3   profit allocation, the initial contribution,

4   possibly the dates of completion.  Those were the

5   initial terms.

6        Q.   And do you remember as you sit here today

7   the specifics of what those initial terms were?

8             Let me take them one by one.  Do you

9   know at the second meeting -- so this is before

10  anything has been drafted; correct?

11       A.   Yes.

12       Q.   Did you come to any understanding as to

13  what was the agreement relative to profits and

14  losses?

15       A.   Yes.

16       Q.   What was your understanding?

17       A.   40/10/50, something of that sort, if I

18  remember.

19       Q.   Who was 40, who was 10, and who was 50?

20       A.   Either -- I think Filippov was 50, Vadim

21  was 40, and Nickolay 10.

22       Q.   And what do you recall, if anything, about

23  the initial investment?  Who was putting up how

24  much?

54

1      A.   That, I do remember.  Two million dollars

2  for Filippov, two fifty for Vadim, and two fifty for

3  Nickolay.

4      Q.   You said they told you who does what.  Did

5  they relate to you what each person's respective

6  role would be?

7      A.   Well, part of the discussion was to

8  familiarize Filippov with the way the construction

9  loans operate.

10      Q.   I'm sorry; the way the...?

11      A.   The way that construction loans operate,

12  that they need to open an account which is going to

13  be funded by the bank, out of which Filippov will

14  have to give Vadim access to the account in order to

15  do the construction.

16           It was always understood that Vadim, it

17  goes without saying, does everything with the

18  design, the construction, the sale of the property.

19  That was part of what they have agreed on.

20      Q.   And if Vadim is doing everything, what was

21  the role, if any, of Lipetsker?

22      A.   Silent partner.

23      Q.   Silent partner?  What about the role of

24  Filippov?

58

1   estate?

2       A.   That's correct.

3       Q.   As I understand it -- correct me if I'm

4   wrong -- there actually would have been two

5   closings.   There was the closing for the purchase of

6   the property, and then at some later date there were

7   the construction loans; correct?

8       A.   Could have been two or three, yes, after

9   that.

10      Q.   But when you say "the closing," right now

11  you're referring to --

12      A.   The purchase.

13      Q.   -- the purchase of the property?

14      A.   Correct.

15      Q.   And was there a discussion at the second

16  meeting as to how much money was going to be needed

17  to get borrowed?   Let me rephrase that; it was

18  terrible grammar.

19           Was there any discussion as to how much

20  of a borrowing was necessary to purchase the

21  property?

22      A.   Yes.

23      Q.   What do you recall about that?

24      A.   Simple math.   It was purchased for $4

59

1   million; total investment, 2.5.  So they needed at

2   least 1.5 to purchase, plus the expenses, bank

3   charges, the points.  So I think they borrowed

4   $100,000 more than necessary to purchase, about 1.6.

5       Q.  1.6, and that was to cover bank charges,

6   points, and that kind of stuff, bank fees?

7       A.  Correct.

8       Q.  Would it have covered things like title

9   insurance?

10      A.  Title insurance, my legal fee,

11  title search, surveyor; everything that goes on it.

12      Q.  Did you get an engagement letter for this

13  transaction with anybody?

14      A.  No.

15      Q.  Did you discuss with the three of them any

16  potential conflicts of interest in representing the

17  three of them to put this deal together?

18              MR. CALANDRELLI:  Objection.

19      A.  I don't think so, not on that particular

20  deal.

21      Q.  Were you concerned that there was a

22  conflict, or was there no conflict that you were

23  concerned about?

24      A.  I was not concerned.

99

1          So would you agree with me, sir, that

2    this projection goes out three years?

3         A.   Yes.

4         Q.   And the longer the property remains unsold,

5    that would cut into the profit; correct?

6         A.   It would lower what is described here as

7    the managing partner's profit.

8         Q.   Vadim's profit?

9         A.   Yes.

10         Q.   And then he gives examples in this email as

11    to how that profit will change; correct?

12         A.   Yes.

13         Q.   And upon receiving this email on October

14    29, at or about 9:54 p.m., did you in fact draft the

15    operating agreement to reflect what Mr. Filippov was

16    suggesting in this email?

17         A.   I think so, yes.

18         Q.   Do you recall any discussions as the deal

19    was being put together as to who would be

20    responsible for paying carrying costs?

21         A.   Yes.

22         Q.   What do you recall?

23         A.   My understanding and my recollection is

24    that it would be coming out of construction costs.

100

1     Q.   So that was part of the overall cost of the

2  project?

3     A.   Yes.   The understanding was that until

4  there is construction money, all the carrying costs

5  will be coming out of there.

6     Q.   Out of where?

7     A.   Out of the construction loan.

8     Q.   And what did you understand the term

9  "carrying costs" to mean?

10     A.   Taxes, interest, insurance.

11     Q.   And is it your experience, sir, that

12  construction loans usually cover taxes and

13  insurance, as opposed to hammers and nails and hard

14  construction costs?

15     A.   The actual -- if you're asking me if there

16  is a line item in a budget provided by the builder

17  to the bank as a carrying cost, then the answer is

18  no.

19     Q.   And is it your experience, sir, that the

20  construction loan documents themselves would dictate

21  what the money could be used for?

22     A.   Absolutely.

23     Q.   And based upon your experience, if a

24  borrower used construction loan moneys for something

101

1   which was not permissible under the loan documents,

2   that would be a default; correct?

3            MR. CALANDRELLI:  Objection.

4       A.  Most likely you're correct.

5       Q.  Do you recall, sir, specific discussions

6   about carrying costs and how they would be allocated

7   in this deal?

8       A.  Yes.

9       Q.  What do you recall?  And when did those

10  conversations occur?

11      A.  During the second meeting.

12      Q.  And during the second meeting, what do you

13  recall the discussion being as to carrying costs?

14      A.  That the carrying costs until the

15  certificate of occupancy is issued are being paid

16  out of the construction loan.

17      Q.  Now, you've alluded several times to a

18  penalty in the event the project doesn't occur

19  within the time parameters that have been discussed.

20  Do you recall that testimony?

21      A.  Yes.

22      Q.  So again, I draw your attention to Exhibit

23  No. 3.  In the middle of the page there, that starts

24  with the letter A, "The profit sharing is changing,"

# EXHIBIT 26

Exhibits: 29-50                    Volume 1, Pages 1-178
            UNITED STATES BANKRUPTCY COURT
              DISTRICT OF MASSACHUSETTS
                  (EASTERN DIVISION)
----------------------------
In Re:

                                   Chapter 7

LYMAN-CUTLER, LLC,                 Case No. 15-13881-FJB


            Debtor
----------------------------
LYMAN-CUTLER, LLC,


            Plaintiff

v.                                 Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
            Defendants
----------------------------
30(b)(6) DEPOSITION of KAGAN DEVELOPMENT KDC CORP.
        30(b)(6) DEPOSITION of PROEXCAVATION
     By DANIEL GERSH and DANIEL GERSH Individually
        Thursday, May 17, 2018, 10:03 a.m.
            O'Connor Carnathan and Mack LLC
            1 Van de Graaff Drive, Suite 104
                Burlington, Massachusetts
      --------- David A. Arsenault, RPR ---------
      daa@fabreporters.com   www.fabreporters.com
            Farmer Arsenault Brock LLC
              Boston, Massachusetts
                  617-728-4404

18

1    the four.  I don't remember exactly the names of the

2    other ones.  It was interesting stuff, how to

3    interview, what tests -- the definitions of fraud

4    and a lot of the key features that go into it, how

5    to look for it, certain procedures, certain

6    programs, red flags, interview guidelines, a bunch

7    of things.

8         Q.   How did the -- am I right that you are

9    employed by KDC?

10        A.   Correct.

11        Q.   Are you a W-2 employee?

12        A.   Yes.

13        Q.   That's since sometime around the end

14   of 2014?

15        A.   Correct.

16        Q.   How did the opportunity to work at KDC come

17   to your attention?

18        A.   I don't remember specifically if it was

19   Vadim who reached out to me.  Probably it wasn't

20   because I didn't know him other than meeting him

21   randomly before that.

22             MR. PERTEN:  If you don't know, you

23   don't know.

24        A.   Someone reached out to me.  Whether it was

19

1    him or my wife's brother, somebody mentioned that I

2    was an accountant, had an accounting background and

3    he was looking for a bookkeeper.  I don't remember

4    the dates and who reached out to whom.

5        Q.   Did you have to interview for the position?

6        A.   Yes.  I guess not your standard corporate

7    interview, but it was a meeting, discussion and

8    interview process, sure.

9        Q.   Did you submit a resume?

10       A.   I can't remember.  I can't remember that

11   detail.

12       Q.   Who did you have the meeting with to talk

13   about working for KDC?

14       A.   I can't remember exactly, but I think just

15   Vadim.

16       Q.   Can you tell me what Vadim told you about

17   the position at KDC when you met with him to talk

18   about working there?

19       A.   I could not tell you the details.  Standard

20   bookkeeping, financial position for a small company,

21   probably doing some more day-to-day things, emails

22   and working with subs and stuff like that.

23       Q.   What enticed you to take the position?

24       A.   At first it was more of a kind of trial to

20

1   see how it is after just getting laid off again.  My

2   wife and I were thinking about moving as well.  It

3   was just one of those things where he needed help

4   and I was weighing options and possibilities.  It

5   was just kind of seeing how it was.  It was

6   different.  I had been in the corporate world for

7   eight years or whatever it was.  So day to day for a

8   small company with flexibility, tangible operations,

9   real estate, it was something different.  I liked it

10   and still like it.

11       Q.   How are you compensated by KDC?

12       A.   Salary.

13       Q.   Do you get an annual bonus or anything like

14   that?

15       A.   No.

16       Q.   Do you have any equity in any Mr. Kagan's

17   companies?

18       A.   I do not.

19       Q.   Do you hold a position in any of his

20   companies?

21       A.   I'm the CFO of KDC, Kagan Development.

22       Q.   Do you have any position with Proex?

23       A.   No, technically, I do not.  Just a salary

24   from KDC.

37

1      A.   I press the keys when entering in

2   spreadsheet numbers with Vadim.

3      Q.   So you sit with Mr. Kagan and he tells you

4   what to put in the budget.  Is that what you are

5   doing?

6           MR. PERTEN:   Objection.

7      A.   We discuss and put something together.

8      Q.   When was the last time you did that with

9   Mr. Kagan?

10      A.   Last summer, I want to say.

11      Q.   If we think in particular about that

12   process of creating some sort of a budget last

13   summer, was that for the bank or for some other

14   purpose?

15      A.   For the bank.

16      Q.   And as Mr. Kagan told you what numbers to

17   put into the budget, did he consult any records?

18           MR. PERTEN:   Objection.

19      A.   I can't recall.

20      Q.   If we think about the state of the

21   financial books when you arrived back in November

22   of 2014, what issues, if any, did you find with

23   them, what problems when you arrived?

24           MR. PERTEN:   Objection.

38

1       A.   Unclear; lack of support and documentation;

2  not everything was there, to my liking at least;

3  messiness.

4       Q.   And if we think about it as you sit here

5  today, what changes have you implemented in the way

6  the books are maintained for Mr. Kagan's companies

7  since you arrived?

8       A.   Definitely stressed getting proposals and

9  invoices in ahead of payment, ahead of agreement;

10  getting hard copies, electronic copies.  And I

11  personally have tried to make everything electronic,

12  safely stored and saved electronically so that it is

13  easier to keep track of, find, look up.  There was

14  minimal saved electronically when I joined.

15       Q.   So if we think specifically about the

16  Lyman-Cutler books when you arrived, what did they

17  consist of when you arrived?

18       A.   The Lyman-Cutler QuickBooks or Lyman-Cutler

19  project?

20       Q.   Was there more to it than the Lyman-Cutler

21  QuickBooks?

22       A.   You said books.  Do you mean the QuickBooks

23  themselves?

24       Q.   I'm thinking about the financial records

39

1    for the Lyman-Cutler.  What financial records were

2    there for that project when you arrived?

3        A.  The same as the others at the time; some

4    invoices and proposals and bills, some tracking of

5    payments made.  The QuickBooks at the time were --

6    when I came in, Kristina was behind on work.  I

7    don't know what specific time frame we were at in

8    the Lyman-Cutler QuickBooks.

9        Q.  I don't understand what you mean by that,

10   what time frame you were at the QuickBooks.

11       A.  The QuickBooks is pretty much a

12   documentation of your transactions.  If today is

13   May, we could have entered nothing in QuickBooks for

14   the last six months on a certain project.  But we

15   could put it all in once we look at the bank

16   accounts and put it in and reconcile.  I could not

17   tell you what date or completedness level

18   Lyman-Cutler was when I joined.

19       Q.  What's the first thing that you did in

20   connection with the Lyman-Cutler financial records?

21       A.  I couldn't tell you.  Just to catch it up

22   and enter it in.

23       Q.  Do you remember Mr. Kagan ever asking you

24   to do anything in particular with regard to the

82

don't know.

Q.   Independently of the dates, I'm asking you

whether you remember whether it was before or after

the lien got filed.

A.   I don't know.  I was on the QuickBooks

numbers side, not a part of the discussion of the

lien.

Q.   Do you know what the basis is for the

design fee that's listed on this invoice?

A.   I do not.

Q.   Do you know what the basis is for the

general contractor construction fee of 580-odd

thousand dollars?

A.   That was above my pay grade at the time.  I

was not a part of those discussions.

Q.   Do you know what the basis is, as you sit

here today?

A.   From my understanding, it was from whatever

documents were the basis of the agreement for the

construction of the projects.

Q.   Did you ever input a general contractor

construction fee into the Lyman-Cutler QuickBooks?

A.   I did not, no.

Q.   Did you ever put that as a receivable on

83

1    the KDC QuickBooks?

2         A.   I did not.

3         Q.   Why not?

4         A.   I was never asked to.

5         Q.   That number nearly equals the entire cost

6    overrun, does it not?

7              MR. PERTEN:  Objection.

8         A.   I don't know about the cost overruns.

9         Q.   They were $758,000 as of May 7th, correct?

10             MR. PERTEN:  Objection.

11        A.   Incorrect.  758,000 is a current open

12   balance as of May 7th.  It definitely has nothing to

13   do with cost overruns.  I know that.  We never

14   discussed cost overruns.  But if I have a definition

15   of cost overruns, this AP aging has nothing to do

16   with any kind of over or under.  It is just

17   outstanding.

18        Q.   So when the letter asserts that they were

19   unreimbursed construction costs based on that AP

20   report that you gave them, that's an incorrect

21   statement?

22             MR. PERTEN:  Objection.

23        A.   Repeat that question again.

24        Q.   I think I just heard you tell me that the