# EXHIBIT 27

Exhibits: 27-28                    Volume 1, Pages 1-143
             UNITED STATES BANKRUPTCY COURT
                DISTRICT OF MASSACHUSETTS
                    (EASTERN DIVISION)
----------------------------
In Re:

                             Chapter 7

LYMAN-CUTLER, LLC,           Case No. 15-13881-FJB


           Debtor
----------------------------
LYMAN-CUTLER, LLC,


           Plaintiff

v.                           Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
           Defendants
----------------------------


          DEPOSITION OF JAMES JOSEPH COHEN
          Tuesday, May 8, 2018, 10:20 a.m.
          O'Connor Carnathan and Mack LLC
           1 Van de Graaff Drive, Suite 104
              Burlington, Massachusetts


      --------- David A. Arsenault, RPR ---------
      daa@fabreporters.com   www.fabreporters.com
             Farmer Arsenault Brock LLC
              Boston, Massachusetts
                  617-728-4404

103

1          MR. PERTEN:  Objection.

2     A.  I have no recollection of doing so.

3     Q.  Mr. Cohen, I'm showing you a document we

4  marked in Mr. Kagan's deposition as Exhibit 24.  Do

5  you recognize that?

6     A.  I do.

7     Q.  What is it?

8     A.  It is the mechanic's lien package that was

9  filed in Norfolk County.

10    Q.  You are the guy that drafted that

11 mechanic's lien?

12    A.  I did.

13    Q.  Did anyone help you draft it?

14    A.  No.

15    Q.  Look at the third page.  I see that the

16 mechanic's lien notice of claim asserts that there's

17 a balance due of $2,095,985.23.  Do you see that?

18    A.  I do.

19    Q.  How did you arrive at that figure, sir?

20    A.  That came from Mr. Gersh.

21    Q.  Earlier we looked at the Pyle letter,

22 Exhibit Kagan 5.  You helped with the drafting of

23 the Pyle letter to some extent too, right?

24    A.  I don't think I said that.

116

1    right?

2         A.   Yes.

3         Q.   Six days before the one that you drafted.

4         A.   Six days before the execution of the one I

5    drafted, yes.

6         Q.   Can you explain to me why Mr. Kagan signed

7    a different contract with himself than the one that

8    Mr. Filippov had signed?

9              MR. PERTEN:  Objection.

10        A.   I can tell you what he told me.  I can't

11   tell you what I know.

12        Q.   Please tell me what he told you.

13        A.   He told me that the sequence of events -- I

14   asked him about this.  He didn't even know that this

15   even existed.  Boris Maiden put this contract

16   together.  It is clearly incomplete.  It doesn't

17   speak to most of the issues that would need to be

18   done.  He just signed it because Boris called him:

19   I need you to sign a bunch of stuff.  In his trust

20   of Boris Maiden, he just signed every page that had

21   a signature sticker on it.  He didn't know this

22   existed until we got discovery from Boris Maiden.

23        Q.   Did you review the operating agreement with

24   Lyman-Cutler before you drafted the construction

117

1    management agreement we marked as Exhibit 25?

2         A.   I think I only reviewed a portion of it.

3         Q.   What portion of it did you review?

4         A.   The portion that obligated Kagan to build

5    the houses.  I just wanted to make sure that it was

6    properly done.  That was it.  I never reviewed the

7    rest of it.  I was uninterested.

8         Q.   What was it about that provision that you

9    reviewed in order to determine that it was properly

10   done?

11        A.   Just to make sure that he was the person

12   designated to build the properties.

13        Q.   That provision also stated that Mr. Kagan's

14   compensation for building the properties would be a

15   50 percent interest in the profits.  Is that fair?

16            MR. PERTEN:  Objection.

17        A.   I would have to review the agreement to see

18   where it actually says what.  I'm generally familiar

19   with what provisions are in the operating agreement

20   if you want me to think about that, but I can't tell

21   you what paragraph anything is in.

22        Q.   You reviewed it 50 to a hundred times, you

23   told me?

24        A.   Right.

118

1      Q.  But you don't remember the specifics of

2  what it said about Mr. Kagan's compensation?

3      A.  I did not say that.  You asked me if it is

4  in the same paragraph.  I don't recall that, if it

5  is in the same paragraph.

6      Q.  Setting aside what paragraph it is in,

7  would you agree with me that the operating agreement

8  provides that Mr. Kagan's compensation for building

9  the two homes would be a 50 percent interest in the

10  profits of the project?

11          MR. PERTEN:  Objection.

12      A.  Yes.

13      Q.  So did you take that into consideration

14  when you drafted the construction management

15  agreement between Lyman-Cutler and KDC?

16      A.  Yes.  And the specific provision within the

17  construction management agreement that declines to

18  compensate Mr. Kagan for his work.

19      Q.  Where is that?

20      A.  I'd have to look at the agreement to tell

21  you where it is.

22      Q.  Please do.

23      A.  Which exhibit?

24      Q.  25.

119

1    A.   Paragraph 7.3.2.1 says salary or other

2    compensation of the construction manager, general

3    contractors, employees at the principal office and

4    branch offices, including Vadim Kagan at no cost.

5    All his time was not billed to the project

6    whatsoever.

7    Q.   Would you give me the paragraph number

8    again?

9    A.   7.3.2.1.

10   Q.   This is on the page that has the Bates

11   stamp number Kagan 01266.  Do you see that?

12   A.   Yes.

13   Q.   Are you familiar with Bates stamps?

14   A.   I know you call them Bates stamps.

15   Q.   So 7.3.2.1 says that the LLC Lyman-Cutler

16   is going to pay Kagan's general office staff $75 an

17   hour but is not going to pay for Mr. Kagan's time.

18   Is that fair?

19   A.   Yes, that's correct.

20   Q.   If we map that to Exhibit 28, looking at

21   the last page on the invoice.

22   A.   Do you have a clearer copy?

23   Q.   That's as good as it gets.  I'm afraid

24   that's all we have.

123

1      A.  It looks like 6330.  You could be right.  I

2  don't know.

3      Q.  So the full charge as of June 15 is about

4  145 thousand, I think it says 814?

5      A.  Yeah, nearly three years ago.  So we have

6  36 months at that number.  Then you have to compound

7  it.  So you are talking about a couple hundred

8  thousand dollars more.  This invoice is a snapshot

9  in time had it been paid in time.  Now it is

10  substantially higher.

11      Q.  Am I right that the basis of asserting that

12  charge is also this contract that we have marked as

13  Exhibit 25?

14      A.  Yes.

15      Q.  How, sir, do you square that charge with

16  Mr. Kagan's obligation under the Lyman-Cutler

17  operating agreement to pay the carrying costs?

18      A.  He doesn't have an obligation to pay the

19  carrying costs.  I already covered that with you.

20      Q.  It is your assertion it is not an

21  obligation but there's a consequence to not paying

22  them, right?

23      A.  Absolutely.

24      Q.  So how do you square this provision in the

124

1   construction management agreement with the

2   consequences of Kagan not paying them under the

3   operating agreement?

4        A.   Off the top of my head, the obligation for

5   the first 23 months is that it be paid out of the

6   loan, which Mr. Filippov failed to do the right kind

7   of loan, and therefore it was not available.  Kagan,

8   as he does with a lot of his contracts, does things

9   on a good-faith basis.  So he caused that to be paid

10  for 23 months by KDC money.  Thereafter when it went

11  beyond the 23 months he assumed the obligation again

12  by causing KDC to continue to pay that money, none

13  of which was supposed to be paid by KDC.

14            Mr. Filippov had a permanent obligation

15  which he failed to do if Kagan failed to cause this

16  to be paid.  Mr. Filippov breached the agreement by

17  not doing it, and in my opinion he caused this

18  litigation.

19       Q.   So earlier you told me you had no

20  involvement in obtaining the construction loan.  Did

21  I get that part right?

22       A.   That's correct.  That doesn't mean I don't

23  read the documents that exist.

24       Q.   So what's your basis for your assertion now

# EXHIBIT 28

Exhibits:  51-54                    Volume 1, Pages 1-65

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

(EASTERN DIVISION)

----------------------------

In Re:

                                   Chapter 7

LYMAN-CUTLER, LLC,                 Case No. 15-13881-FJB


          Debtor

----------------------------

LYMAN-CUTLER, LLC,


          Plaintiff

v.                                 Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,

KAGAN DEVELOPMENT KDC CORP.

and PROEXCAVATION CORP.,

          Defendants

----------------------------


          DEPOSITION OF TATIANA KAGAN

        Friday, May 18, 2018, 11:47 a.m.

        O'Connor Carnathan and Mack LLC

        1 Van de Graaff Drive, Suite 104

           Burlington, Massachusetts


     --------- David A. Arsenault, RPR ---------

     daa@fabreporters.com   www.fabreporters.com

          Farmer Arsenault Brock LLC

           Boston, Massachusetts

             617-728-4404

38

1      Q.   Do you know why the Cutler property was put

2  on the market in August of 2014?

3      A.   Maybe it was ready to be sold at that time?

4      Q.   I'm asking you, ma'am.  I wasn't there.

5      A.   I'm assuming.

6      Q.   Well, you were the listing agent for

7  Cutler, right?

8      A.   Yes.

9      Q.   So after you became the listing agent for

10  Cutler, what did you do to try to sell it?

11      A.   I created a design box.  I picked out

12  colors for the walls, finishes, granite slabs, back

13  splashes, vanities.  The same thing I always do.

14      Q.   I'm talking about after the listing

15  agreement was signed and you became the listing

16  agent for the property, what did you do to sell the

17  property?

18      A.   Conducted open houses, public open houses,

19  broker open houses, my company advertised the

20  property.

21      Q.   How many open houses did you conduct?

22      A.   I do not recall.

23      Q.   How many broker open houses did you

24  conduct?

39

1      A.   I do not recall.

2      Q.   Where did you advertise the property?

3      A.   It was done by my company and they

4    submitted the list of places where it was advertised

5    in.  I do not recall exactly which ones.

6      Q.   Other than what's been produced already in

7    this lawsuit, are you aware of any other records

8    that would tell us how many open houses you

9    conducted?

10            MR. HARRIS:  Objection.

11            Go ahead.

12     A.   I do not recall.

13     Q.   Other than what's been produced in this

14   lawsuit, are you aware of what advertising was done

15   for the property?

16            MR. HARRIS:  Objection.

17            Go ahead.

18     A.   No.

19     Q.   Other than open houses and advertising,

20   what other efforts did you make to market or sell

21   the property?

22     A.   I reached out to every high-end agent in

23   the industry that potentially could bring clients.

24     Q.   What high-end agents in the industry did

57

1      A.   How is it going.

2      Q.   Are you speaking to Mr. Cohen about how it

3  is going during the construction of the property or

4  during the lawsuit or both?

5      A.   During the marketing the property.

6      Q.   So Mr. Cohen was asking you how the

7  marketing of the properties was going?

8      A.   It was a general question, how is it going.

9      Q.   Do you remember when that was?

10     A.   I do not recall.

11     Q.   Do you recall speaking to Mr. Cohen with

12 regard to anything else with regard to the

13 Lyman-Cutler properties?

14     A.   No, I do not.

15     Q.   Do you know how he happened to come to work

16 with your husband?

17     A.   I do not.

18     Q.   Did you know he used to go by another name?

19     A.   No.

20     Q.   Did you know he was convicted for mortgage

21 fraud?

22     A.   No.

23     Q.   On any of the properties where you've been

24 the listing agent for your husband or one of his

58

1    companies, has there ever been an agreement to split

2    the commission with the investors in the project?

3        A.  I do not know.

4        Q.  Have you ever split your commission with

5    any of the investors in one of your husband's

6    projects?

7        A.  I'm not involved in financial parts ever.

8        Q.  Not even your commissions?

9        A.  No.

10       Q.  How do the commissions get paid?

11       A.  By check.

12       Q.  To whom?

13       A.  To me.

14       Q.  And Century 21?

15       A.  Which commission are you talking about, to

16   me or Century 21?

17       Q.  I'm talking about the commission for the

18   sale of a property if you sell a property for your

19   husband.  How many properties have you sold for your

20   husband or his companies?

21       A.  All of them.

22       Q.  So is that ten?

23       A.  I do not recall.

24       Q.  More than 50?

59

1        A.   I do not recall.

2        Q.   Can't give me any estimate at all?

3        A.   No.

4        Q.   So when was the last time you sold a

5   property for your husband?

6        A.   Last month.

7        Q.   What was that property?

8        A.   420 Dudley Road in Newton.

9        Q.   Was a commission paid for that sale?

10       A.   I'm not sure.  Sometimes I waive commission

11   if nobody else is involved, just my husband's

12   company.

13       Q.   Do you do that if there are investors on

14   the project?

15       A.   I don't know how he handles it, to be

16   honest with you.

17       Q.   Does Century 21 ever object to you waiving

18   a commission for one of your husband's projects?

19       A.   No.

20       Q.   So the last time that you sold a property

21   for your husband and got paid a commission, who got

22   paid the commission?

23       A.   Cooperating agent, the one that represents

24   the buyer.

60

1      Q.   So in an instance where you sell the

2    property for one of your husband's companies and

3    actually collect a commission, does the check go

4    straight to you or does it go to Century 21?

5      A.   I believe Century 21 handles it and then

6    splits it between agents.  There is usually seller's

7    agent and buyer's agent and two real estate

8    companies that agents work for.  So it is split four

9    ways usually.  It depends on your agreement with

10   your firm.

11     Q.   So to the extent that you get paid for

12   selling a property, how does that money come to you?

13     A.   In the form of check.

14     Q.   From whom?

15     A.   From Century 21 or attorneys.

16     Q.   Does it get made out to you personally,

17   Tatiana Kagan?

18     A.   Sometimes, yeah --

19     Q.   Does it ever get made out to someone else?

20     A.   -- if there is a check.

21     Q.   Does the commission ever get paid to

22   somebody else?

23          MR. HARRIS:  Objection.

24     A.   No.  You have to be affiliated with a real

61

1   estate company and hold a valid license.

2       Q.   When was the last time you waived your

3   commission on a property you sold for your husband?

4       A.   I do not recall.

5       Q.   How many times have you waived your

6   commission on a property you sold for your husband?

7       A.   I do not recall how many times.

8       Q.   Can you tell me any particular properties

9   on which you've waived the commission?

10      A.   I cannot recall.  I'm not involved in

11  financial part.

12      Q.   Under what circumstances would you waive

13  your commission for a property you sold for your

14  husband?

15      A.   He handles all the finances.  I can't tell

16  you.  I don't know.

17      Q.   So your husband determines whether or not

18  you are going to get a commission when you sell the

19  property?

20      A.   If it is his house, yes.  If it is somebody

21  else's house, it comes directly from Century 21, it

22  comes directly to me.  And I deliver that check to

23  the office and hand it to Daniel Gersh.

24      Q.   What if it is a property that he owns part

62

1   of and has other investors in?

2        A.   I wouldn't know.  I'm not involved in those

3   agreements, conversations, financial part is not my

4   thing.  My direct responsibility is design box.

5              MR. CARNATHAN:  I guess I'm all set.

6              MR. HARRIS:  Thank you.

7              (1:11 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

# EXHIBIT 29

Exhibits: 55-73                    Volume 1, Pages 1-133

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

(EASTERN DIVISION)

----------------------------

In Re:

                                  Chapter 7

LYMAN-CUTLER, LLC,                Case No. 15-13881-FJB

           Debtor

----------------------------

LYMAN-CUTLER, LLC,

           Plaintiff

v.                                Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,

KAGAN DEVELOPMENT KDC CORP.

and PROEXCAVATION CORP.,

           Defendants

----------------------------

DEPOSITION OF JASON GORDON

Tuesday, May 22, 2018, 9:58 a.m.

O'Connor Carnathan and Mack LLC

1 Van de Graaff Drive, Suite 104

Burlington, Massachusetts 01803

--------- David A. Arsenault, RPR ---------

daa@fabreporters.com   www.fabreporters.com

Farmer Arsenault Brock LLC

Boston, Massachusetts

617-728-4404

63

1        Q.   When I look at the amended return, it

2    appears to me that those construction notes payable

3    have been eliminated.  Is that right?

4        A.   They are not reported on that tax return.

5        Q.   Where did those go?

6        A.   They were the liabilities of those

7    single-member LLCs.

8        Q.   Were there actual notes, underlying notes

9    for those figures?

10       A.   I believe those were bank loans.

11       Q.   Who calculated those amounts?

12       A.   If they were the bank loans, they would be

13   the bank.

14       Q.   We can put the tax returns away off to the

15   side.

16            I'm showing you a document we previously

17   marked as Exhibit 25.  Have you ever seen that

18   before?

19       A.   I don't believe that I have.

20       Q.   If you look at that first page, it is dated

21   June 24, 2013.  Do you see that?

22       A.   Yes.

23       Q.   Then if you turn with me to Page 1265 of

24   the same document, I'm looking at Paragraph 7.1.2.

66

1    Q.  I'm asking you to set aside the wording for

2 the moment and to assume with me for the sake of my

3 question that KDC has asserted an obligation of

4 several hundred thousand dollars based on this

5 contract based on a 15 percent construction

6 management fee.  Assuming that that is true, would

7 you have expected that to have been recorded in its

8 books somewhere sometime in the past?

9         MR. HARRIS:  Objection.

10         MR. NECHTEM:  Objection.

11         Go ahead.

12    A.  If it met certain conditions, it sounds

13 like it would.

14    Q.  What conditions would it need to meet?

15    A.  That it was truly earned and likely

16 payable.  I don't know if there was anything else

17 stipulated in the contract where Vadim might not get

18 that money.

19    Q.  Do you know when construction was complete

20 on the Lyman-Cutler project?

21    A.  I don't know.

22    Q.  If you assume with me that it was

23 substantially complete by no later than

24 October 2014, would you have expected to see this 15

97

1      Q.  I see they map together.  So 42 is B10, and

2   43 is B25 and they cross-reference one another; is

3   that right?

4      A.  Yes.  But that's all we typically would

5   have is the supporting ledger that goes to this.

6      Q.  As we scan down the list of accounts

7   payable on Exhibit 43, are any of those companies or

8   people your clients, setting aside KDC and

9   Proexcavation of which we are already aware.

10     A.  So not a trick question.  No, I don't

11  represent any of the other ones.

12     Q.  Have you ever seen Exhibit 26 before, sir?

13     A.  I don't believe so.

14          MR. CARNATHAN:  Let me break to pull my

15  exhibits together.

16          (A recess was taken.)

17     Q.  I'm going to show you Exhibit 34.  I'll

18  just ask you to identify that for me, please.

19     A.  It looks like it is the general ledger for

20  KDC for 2013.

21     Q.  That's all I want for that one.

22          Next I'll show you Exhibit 28.  In

23  particular, I want to show you the last page of

24  Exhibit 28, LCBK 2526.  Have you seen that document

# EXHIBIT 30

Exhibits: 1-21                    Volume 1, Pages 1-159
          UNITED STATES BANKRUPTCY COURT
             DISTRICT OF MASSACHUSETTS
                 (EASTERN DIVISION)
----------------------------
In Re:
                              Chapter 7

LYMAN-CUTLER, LLC,            Case No. 15-13881-FJB


          Debtor
----------------------------
LYMAN-CUTLER, LLC,


          Plaintiff

v.                            Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
          Defendants
----------------------------


            DEPOSITION OF ELENA LANDE
         Friday, June 22, 2018, 9:57 a.m.
         Sheehan Phinney Bass + Green, P.A.
          255 State Street, 5th Floor
             Boston, Massachusetts


     --------- David A. Arsenault, RPR ---------
     daa@fabreporters.com   www.fabreporters.com
          Farmer Arsenault Brock LLC
             Boston, Massachusetts
                617-728-4404

39

1      Q.   Did you approve of the building of that

2    property?

3      A.   He already had a plan.  That was part of

4    the business agreement, we are buying this property

5    and building that house, yes.

6      Q.   Other than showing you the architectural

7    plans and before you had made a decision that you

8    wanted to go forward with this project, what else,

9    if anything, did Mr. Kagan show you?

10     A.   I don't remember.

11     Q.   Did you have any discussions with him about

12   how much money he was looking to have you invest?

13     A.   Yes.

14     Q.   What do you recall about those

15   conversations, if anything?

16     A.   So I think, to the best of my knowledge, it

17   is probably in the emails you have of more correct

18   data.  I think it was 1.4 million that we were

19   putting in.  He was supposed to put a hundred

20   thousand dollars.  And then we were applying for the

21   loan.  So our investment I think was enough to cover

22   the purchase of land.  We were applying for the loan

23   for the construction.

24     Q.   How was the $1.4 million figure arrived at?

40

1          A.   I don't remember.

2          Q.   Do you remember the purchase price of the

3    property?

4          A.   It would around 1.4.  That was enough to

5    cover the purchase of the land.

6          Q.   You said you discussed the conditions under

7    which you would go into business with Mr. Kagan.

8    When did you have those discussions?

9          A.   Prior to forming the Yarmouth Road, LLC.

10         Q.   Where did you have that discussion?

11         A.   I don't remember.

12         Q.   What conditions do you recall discussing?

13         A.   We discussed the financial contributions.

14   We discussed the ownership of the company as far as

15   the percentages.  We discussed what's going to

16   happen if we don't build that on time, the

17   scenarios.

18         Q.   What were the financial conditions that you

19   discussed?

20         A.   The split was supposed to be 30 each for my

21   husband and I, and 40 percent Mr. Kagan on the

22   profit.  However, there was a condition that if we

23   don't obtain the CO I think by a certain date, I

24   think it was May or June of 2014, whatever, I don't

41

1    remember the exact dates, but if until a certain

2    point we don't obtain a CO, then the split changes

3    and it will become 35 each for my husband and I and

4    30 percent for Mr. Kagan, and he will have to cover

5    the carrying costs from that moment until he obtains

6    the CO on the building.

7        Q.   At this point have you exhausted your

8    memory as to any discussion regarding how you came

9    up with the 1.4 figure for the investment?

10       A.   Yes.

11       Q.   Do you recall any other business terms that

12   you discussed with Mr. Kagan prior to deciding to

13   invest in this project?

14       A.   Not that I remember.

15       Q.   Did you review any documents other than the

16   architectural plans and the documents that Mr. Kagan

17   showed you during the initial meeting prior to your

18   decision to invest in this project?

19       A.   He sent me the proposed budget for that

20   property.

21       Q.   Is that a document that you produced?

22       A.   Yeah, I think I forwarded that to you, to

23   the best of my knowledge.

24       Q.   What did that budget include?

44

1    Q.  This document marked as Exhibit 3, what did

2  you understand it to be?

3    A.  That the total cost of construction of the

4  building was going to be 1.7 million.

5    Q.  Do you recall any discussions with

6  Mr. Kagan about Exhibit 3?

7    A.  The only discussion was my questioning if

8  he goes over what's going to happen and we don't

9  have any money left.

10    Q.  Was this a discussion that you had before

11  or after you had decided to invest in this project?

12    A.  It was a continuous discussion.  Before.

13    Q.  What did he say when you asked what happens

14  if we go over?

15    A.  He showed me other budgets and says he

16  always builds in budget and that should be

17  definitely enough.

18    Q.  Did he say anything else?

19    A.  Not that I remember.

20    Q.  Did you have any reason to think that the

21  cost to construct this project would be more than

22  $1.7 million?

23    A.  No.

24    Q.  Why did you ask the question about whether

45

1   or not he might go over?

2        A.   It's a risk factor.

3        Q.   Was that part of your due diligence?

4        A.   Yes.

5        Q.   Did you do anything else as part of due

6   diligence before you decided to invest in the

7   Yarmouth Road project?

8        A.   Please define "anything else."

9        Q.   What factors went into your decision to

10  invest in the Yarmouth Road project?

11       A.   My husband's and my expertise.

12       Q.   In what areas?

13       A.   Financial and construction.

14       Q.   What financial expertise did you rely on to

15  make the decision to invest in the Yarmouth Road

16  project?

17       A.   We made some calculations.

18       Q.   Calculations based on what?

19       A.   On the proposed purchase price of the

20  property and the potential selling price of the

21  property.

22       Q.   Did you make any analysis as to how much

23  you expected to, how much profit you expected to

24  make?

57

1    signed sometime other than February 2013?

2        A.  I don't know.

3        Q.  Now, on the signature at the end, it says

4    next to your name Elena Lande managing manager.  Do

5    you see that?

6        A.  Yes.

7        Q.  What is the managing manager?

8        A.  In general, the person who manages the

9    business.

10       Q.  In particular with respect to the Yarmouth

11   Road project, were you the managing manager?

12       A.  Well, it says so here.

13       Q.  As managing manager, what understanding did

14   you have as far as your duties and responsibilities?

15       A.  Oversee the business.

16       Q.  When you say oversee the business, what do

17   you mean by that?

18       A.  Making sure that the business goes

19   according to the plan.

20       Q.  Was there a business plan, per se?

21       A.  No.

22       Q.  What did you do, if anything, while the

23   project was ongoing in furtherance of your duties as

24   the managing manager?

60

1  you asked Kristina to provide information to you?

2      A.   Because he was managing the construction.

3      Q.   Were you unsatisfied with the answers that

4  Kristina had provided?

5      A.   Yes.

6      Q.   What was the nature of your

7  dissatisfaction?

8      A.   The allocation of funds, the line items.

9      Q.   What was it about the allocation of funds

10 and line items that caused you concern?

11     A.   That certain expenses were becoming

12 increasingly high after those portions of the

13 construction were claimed to be completed.

14     Q.   And how did you make the determination that

15 certain things were becoming high?

16     A.   Well, as an example -- I don't remember the

17 exact numbers or exact line items -- but when the

18 building is already built, the excavation, the

19 primary excavation costs could not apply after the

20 building is already existing.

21     Q.   The costs for the excavation, the costs

22 that were charged for the excavation, do you know

23 when the excavation was done that was being charged

24 for?

61

1      A.   I can't recall the date, but I was told the

2  excavation was done at some point during the

3  construction period.

4      Q.   Do you know if it was paid for

5  contemporaneously with the services or billed for

6  after?

7      A.   I don't remember.  I was told at some point

8  that that was paid for.

9      Q.   Do you recall when you were told that?

10     A.   No.

11     Q.   The $1.4 million that you and your husband

12  invested, where did that money come from?

13     A.   That was my personal money.

14     Q.   Physically how did the money get from your

15  account to the Yarmouth Road?  Did you cut a check

16  to Maiden?  How did it go?

17     A.   I don't remember.

18     Q.   Do you recall that Mr. Kagan had to put in

19  more than a hundred thousand dollars for the initial

20  purchase of the property?

21     A.   No.

22     Q.   Do you recall he put in 121,000 roughly?

23     A.   I don't remember.

24     Q.   Were you involved at all in the negotiation

65

1    in terms of getting the demolition permit?

2        A.   I think there were minor delays.  I think

3    some inspector was in there.

4        Q.   When was the house completed?

5        A.   In December of 2014.

6        Q.   How did you make the determination that the

7    project was completed in December of 2014?

8        A.   I was onsite and I was told that

9    everything -- "completed," you mean CO obtained or

10   completed to the point where people can move in?

11       Q.   Let's take them both.  What was the state

12   of completion that you observed when the CO was

13   issued?

14       A.   When the CO was issued in December, I

15   wasn't there.  I was there at some point I think in

16   November when it was close to completion.  At that

17   point in time we already were negotiating the

18   selling price with the potential buyers.

19       Q.   How often were you onsite during the

20   construction?

21       A.   Occasionally.

22       Q.   Once a week, once a month?

23       A.   Once a month.

24       Q.   Did you take pictures while you were on the

69

1  $1.7 million, did you tell Mr. Kagan to stop?

2     A.  No.

3     Q.  Did you have any discussion with him about

4  who was going to pay the overage?

5     A.  At that point in time when we realized that

6  the project was going over $15,000, I raised the

7  question of making sure it will not go way more than

8  that.  In any construction project we were aware

9  that minor things -- at that point the major

10 construction was done.  So we were not expecting the

11 number to go much higher than that.

12    Q.  So you understood that the costs could be

13 slightly more than 1.7?

14    A.  Yes.

15    Q.  Did you have a discussion with Mr. Kagan in

16 May of 2014 as to how much more he expected it to

17 be?

18    A.  Yes.

19    Q.  And do you recall a specific conversation

20 in May of 2014 on that topic?

21    A.  We talked in front of that Yarmouth Road

22 building.  He said no more than extra 20 to $25,000.

23    Q.  Was that representation put down in writing

24 anywhere?

100

1     Q.   And were they able to answer questions for

2   you?

3     A.   No.

4     Q.   Were they able --

5     A.   They were not satisfying answers.

6     Q.   You were also provided an unpaid bills

7   detail, would you agree, attached to this Exhibit

8   15?

9     A.   I guess it was attached.

10     Q.   Do you recall reviewing that document?

11     A.   Is it the last page you are referring to?

12     Q.   Second to last page, two pages.

13     A.   Okay.

14     Q.   Do you recall receiving this unpaid bills

15   detail?

16     A.   I mean, I don't remember now.  I believe I

17   did if I forwarded it to you.

18     Q.   At any point did you determine that any of

19   the contractors listed on this unpaid bills detail

20   had billed for work they had not completed?

21     A.   I questioned some of who they were and what

22   they did.

23     Q.   Did you make any determination whether any

24   of these entities were billing for work that they

101

1    had not done?

2        A.   I don't remember.

3        Q.   Did you make any determination whether any

4    of these contractors were billing more than they

5    should have?

6        A.   I don't remember.

7             MR. PERTEN:  Off the record.

8             (Discussion off the record.)

9             (Marked, Exhibit 16, Email, 12/22/14.)

10       Q.   Do you recognize Exhibit 16?

11       A.   Yes.

12       Q.   Would you agree with me that at least the

13   face sheet, the email is an email that you received

14   on December 22?

15       A.   Yes.

16       Q.   And you were provided with balance sheets

17   and QuickBook reports, correct?

18       A.   Yes.

19       Q.   And a disbursement schedule, a draft

20   disbursement schedule?

21       A.   Yes.

22       Q.   With respect to the attachments, the draft

23   HUD statement, the balance sheet, and the

24   disbursement schedule, were there any numbers on

105

1    Q.  Is that an email, the top one an email that

2  you sent to Joseph Cohen on December 24, 2014 at

3  6:52 p.m.?

4    A.  Yes.

5    Q.  And you say:  "We agree to the terms that

6  we take $750,000 in profit and Vadim assumes all

7  responsibility for all warranties and claims on the

8  property."  Correct?

9    A.  Yes.

10    Q.  That was the deal you struck?

11    A.  Yes.

12    Q.  After you got your $750,000 you understood

13  that you were done with the project, correct?

14    A.  Would you define "done with the project"?

15    Q.  What other duties and responsibilities did

16  you have after the property closed, it was sold, you

17  got your $750,000?  Was the only thing left to do

18  was to close the bank account?

19    A.  I believe so.

20    Q.  Was there any money left in the bank

21  account?

22    A.  Yes.

23    Q.  Where did that money go?

24    A.  I withdrew that later.

116

1    kind of security that we can use paying the carrying

2    costs.  So there was an account to cover it all.

3        Q.  By the way, do you know when this property

4    was sold?

5        A.  December.

6        Q.  Of 2014?

7        A.  I don't know if the closing was in December

8    or January.

9        Q.  December of 2014, January 2015?

10       A.  Yes.

11       Q.  Let's look at Paragraph 5.  It says:  "I

12   was the managing member of the LLC, and my husband

13   and I were supposed to have control of the LLC

14   through our combined 80 percent voting power."

15           Do you see that?

16       A.  Yes.

17       Q.  You say you were supposed to have control.

18   Did you not have control?

19       A.  I didn't mean to put any kind of specific

20   mean or questioning that control.

21       Q.  What was the word "supposed," what were you

22   trying to say when you said you were supposed to

23   have that power?  Did you not have that power?

24       A.  Not towards the end of the agreement with

147

1      A.  Yes.

2      Q.  Do you know if he prepared it himself?

3      A.  I don't know.

4      Q.  I wasn't clear on when he gave it to you.

5  Did you have that before you decided to invest?

6      A.  I saw that.  I think this particular one

7  was part of the folder that we provided to the bank.

8  But he shared, I don't know if it is exactly this

9  one or a similar document, with us before we went.

10     Q.  Was the budget any different before you

11  decided to invest than when you applied for the bank

12  loan?

13     A.  You mean between the time we agreed to go

14  forward and the application?

15     Q.  Let me clean it up.  Exhibit 3, 1.7 million

16  is the budget, right?

17     A.  Yes.

18     Q.  That's what you gave to the bank to get the

19  bank loan?

20     A.  Yes.

21     Q.  When you decided to invest, was the budget

22  any different than 1.7 million?

23     A.  No, not that I remember.

24     Q.  Prior to May 19, 2014 when you apparently

148

1   received Exhibit 6, was there of any discussion of

2   going over the $1.7 million budget?

3       A.  No.

4       Q.  At any time in the project did Mr. Kagan

5   ever come to you and ask you to preapprove a cost

6   overrun and say I'm going to go over and would you

7   approve this?

8       A.  No.

9       Q.  When we look at Exhibit 13, the

10  December 2014 email correspondence, it looks like on

11  December 15, 2014 there was correspondence from Dan

12  telling you that the total construction costs were

13  $2,108,080.  Do I have that right?

14      A.  I believe so.

15      Q.  Was that the first time you were told the

16  construction costs were that high?

17      A.  Yes.

18      Q.  Before December 15, 2014, what did you

19  think the construction costs were?

20      A.  I don't remember the exact number.

21      Q.  If we look at Exhibit 15, looking at the

22  second to last page where we have got a list of

23  what's called unpaid bills detail.  Are you with me?

24      A.  Yes.

151

1    on how the carrying costs were going to be paid.

2    You said you didn't recall.  I'm asking you if this

3    refreshes your memory of how the carrying costs were

4    going to be paid.

5        A.   No.

6             (Marked, Exhibit 21, Operating agreement

7    of Yarmouth Road Development, LLC.)

8        Q.   Ms. Lande, Exhibit 5 was missing Pages 6

9    through 9, correct?

10       A.   Yes.

11       Q.   I want to show you this operating agreement

12   that was produced by another party and ask you to

13   take a look at it.  This one actually has Pages 6

14   through 9.  I guess I'm wondering whether you are

15   able to tell me whether or not those look like the

16   correct Pages 6 through 9?

17       A.   To the best that I remember, this is the

18   section.  It talks about the carrying costs and the

19   split.

20       Q.   At least with regard to Paragraph 8.1, to

21   the best of your recollection, that's an accurate

22   statement of what the agreement was?

23       A.   Yes.

24       Q.   Between the time that Mr. Gersh sent you

152

1    that email on December 15, 2014 --

2        A.   Mr. Gersh?

3        Q.   Dan.  It was Exhibit 13, I think.

4             -- and the time that you agreed to the

5    $750,000 profit in Exhibit 17, did Mr. Kagan or

6    Mr. Cohen threaten to assert any additional costs

7    against the project if you didn't agree to their

8    terms?

9        A.   Would you repeat the question?

10       Q.   In the email Exhibit 13 on December 15 the

11   number was $2,108,080.  Did Mr. Kagan ever threaten

12   to increase that number if you didn't agree to a

13   deal with him?

14       A.   Mr. Cohen did.

15       Q.   What did he say?

16       A.   The conversation I had with Mr. Cohen is

17   that he basically told me I don't have an option

18   because if we don't sell it we will lose this and

19   the costs will go up.  And I asked him what he

20   meant.  He said a lot of different costs.  My

21   assumption at the time was whatever carrying costs.

22   When I said the carrying costs are your

23   responsibility, he said you have got to make a

24   decision now.

# EXHIBIT 31

Exhibits: 1-47                Volume 1, Pages 1-197

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

(EASTERN DIVISION)

----------------------------

In Re:

                              Chapter 7

LYMAN-CUTLER, LLC,            Case No. 15-13881-FJB

          Debtor

----------------------------

LYMAN-CUTLER, LLC,

          Plaintiff

v.                            Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,

KAGAN DEVELOPMENT KDC CORP.

and PROEXCAVATION CORP.,

          Defendants

----------------------------


          DEPOSITION OF DIMITRIY ZHUKOVSKIY

          Tuesday, March 6, 2018, 10:01 a.m.

          Sheehan Phinney Bass + Green, P.A.

          255 State Street, 5th Floor

          Boston, Massachusetts


     --------- Janis T. Young, RDR, CRR ---------

     jty@fabreporters.com   www.fabreporters.com

          Farmer Arsenault Brock LLC

50 Congress Street, Boston, Massachusetts 02109

          617-728-4404   Fax 617-728-4403

16

1    Q.  Was it within the last five years?

2    A.  Yes.

3    Q.  How about 4 Wall LLC?  Do you recall when

4  the closing was on that one?

5    A.  I do not.

6    Q.  Was that within the last five years?

7    A.  Yes.

8    Q.  And with respect to 1880 Beacon Street, do

9  you recall when that was?

10   A.  I do not.

11   Q.  Was that within the last five years?

12   A.  Yes.

13   Q.  And are you a member of each of the LLCs

14  that owns the properties that you've identified?

15   A.  Yes.

16   Q.  Are you a manager of any of the LLCs that

17  owns those four properties?

18   A.  No.

19   Q.  Were you the manager of Hyde Avenue LLC?

20   A.  Yes.

21   Q.  Is that the only one, to your recollection,

22  that you ever acted as manager?

23   A.  Yes.

24   Q.  Do you socialize with Mr. Maiden?

96

1    Q.   Is there any document that you're aware of

2  that says that you were supposed to get 25 percent?

3    A.   Yes.

4    Q.   What document?

5    A.   Tax returns which were filed by the

6  corporation, where I am listed as a 25 percent share

7  investor.

8    Q.   Were you a 25 percent share investor?

9    A.   I was a 25 percent profit-share investor.

10   Q.   The second Paragraph 4 of your affidavit

11 says you contributed 31 percent.

12   A.   Correct.

13   Q.   So are you a 25 percent, or a 31 percent,

14 investor?

15        MR. CARNATHAN:   Objection.

16   A.   I am a 25 percent profit-share investor.

17   Q.   Now, sir, what was your role in Hyde Avenue

18 LLC?

19   A.   I agreed to 31 percent of the required

20 initial investment and personally guaranteed

21 mortgage and construction loan.

22   Q.   Were you the managing member?

23   A.   Yes.

24   Q.   And as managing member, did you have any

107

1    any document saying I'm accepting this under

2    protest, or words to that effect?

3        A.   No.

4        Q.   Did you express any displeasure to

5    Mr. Kagan regarding the distribution that you

6    received?

7        A.   Can you please rephrase the question?

8        Q.   Did you tell him that this was the wrong

9    number?

10       A.   No.

11       Q.   Now, as managing member of this LLC, did

12   you understand that you had the ultimate authority

13   to decide whether this project went forward or not?

14       A.   Yes.

15       Q.   And you authorized the project to go

16   forward; correct?

17       A.   No.

18       Q.   You didn't authorize the project to go

19   forward?

20       A.   I never objected to the project going

21   forward.

22       Q.   Well, would you describe your role as

23   passive, or --

24       A.   Yes.

124

1    Construction Loan Distribution Schedule.  Do you see

2    that?

3        A.   Yes.

4        Q.   Where do these numbers come from?

5        A.   These numbers came from a project that I

6    did for Hyde Avenue.  There was a budget which was

7    provided to Rockland Trust; and in the budget

8    provided to Rockland Trust there was a schedule of

9    the distribution of the construction loan.

10             I have taken the schedule of

11   distribution for the construction loan and used that

12   for this project.

13       Q.   Why did you use the schedule from Hyde

14   Avenue for this project?

15       A.   I asked Mr. Kagan if he has a budget.  He

16   said no, and he suggested that I use the budget from

17   the Hyde Avenue.

18       Q.   And what is the construction budget that

19   you used?

20       A.   I used the construction budget of $1.5

21   million.

22             It's not a construction budget, I have

23   to tell you; it is a construction loan.  So it's not

24   a distribution of construction budget, it's the

126

1    million.  This is the total amount of the

2    construction loan.

3              On the first page, there are two numbers

4    under heading Construction Funding; Construction

5    Budget $1.3 million, and Carrying Cost Margin

6    $200,000.

7              The total of these two numbers generates

8    the number $1.5 million which is equal to the amount

9    of the construction loan of $1.5 shown on Page 5.

10        Q.   Did Mr. Kagan tell you that the $200,000

11   was loaded into these separate items on the

12   construction distribution schedule?

13        A.   Yes.

14        Q.   When did he tell you that?

15        A.   When we discussed the inputs for this

16   model.

17        Q.   What did he say?

18        A.   He said he's going to purchase the land for

19   $2 million, he's going to spend $1.3 million on the

20   construction, and he's going to take a loan totaling

21   the construction costs and soft costs.

22        Q.   And from that you calculated the carrying

23   cost, correct?

24        A.   From the schedule of the distributions,

137

1    that depending on the sale price the profitability

2    for this project might change, and I understand that

3    with the duration of time the profitability of this

4    project might change; how about if the profitability

5    of this project was a function of construction

6    costs?

7              And Mr. Kagan gave a very specific

8    answer.  He said, I know exactly how much it costs

9    to construct a house of this specifications, and

10   this number cannot change.

11        Q.  And at that point, sir, was there an

12   agreement on the kind of house to build?

13        A.  I don't know.

14        Q.  Was there any discussion about the kind of

15   house that was going to be built?

16        A.  I don't know.  Not with me.

17        Q.  All right.

18              And the next time that you spoke with

19   Mr. Filippov was when he called you to ask some

20   questions?

21        A.  Either called me or emailed me or asked.  I

22   don't know how it happened.  He probably called me.

23              (Marked, Exhibit 8.)

24        Q.  Can you tell me what Exhibit 8 is?

192

1    further, Sean.

2                         EXAMINATION

3    BY MR. CARNATHAN:

4        Q.   If I may, I'm going to ask like five

5    questions.

6                 If we can look at Exhibit 7 again.  I

7    think that's the one that you identified as the one

8    that was shown at the October 2012 meeting; did I

9    get that right?

10       A.   Yes.

11       Q.   And so, if we count in the pages, the sixth

12   page in, that's the document you called the risk

13   document?  Did I get that right?

14       A.   Yes.

15       Q.   So that's the 663 different financial

16   scenarios that you modeled?

17       A.   Correct.

18       Q.   And did I understand correctly that the

19   construction-cost input is the same in all 663 of

20   those scenarios?

21       A.   Yes.

22       Q.   And why is the construction cost the same

23   in all 663 scenarios?

24       A.   Because Mr. Kagan informed me that he knows

# EXHIBIT 32

Exhibits: 103-111                Volume 1, Pages 1-89

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

(EASTERN DIVISION)

----------------------------

In Re:

                                 Chapter 7

LYMAN-CUTLER, LLC,               Case No. 15-13881-FJB


         Debtor

----------------------------

LYMAN-CUTLER, LLC,


         Plaintiff

v.                               Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,

KAGAN DEVELOPMENT KDC CORP.

and PROEXCAVATION CORP.,

         Defendants

----------------------------


         DEPOSITION OF MARK KAYSERMAN

         Friday, June 1, 2018, 2:00 p.m.

         O'Connor Carnathan and Mack LLC

         1 Van de Graaff Drive, Suite 104

         Burlington, Massachusetts


    --------- David A. Arsenault, RPR ---------

    daa@fabreporters.com   www.fabreporters.com

         Farmer Arsenault Brock LLC

         Boston, Massachusetts

         617-728-4404

21

1    the managing member.  Do you see that?

2        A.  Correct.

3        Q.  Do you have any understanding as to what

4    your role was as managing member?

5        A.  Mostly interacting with the bank, pay

6    mortgage, construction loans.  We didn't get into

7    details what that really means.

8        Q.  Was there a loan taken from the bank to

9    finance the purchase of the property?

10       A.  Yes.

11       Q.  Was there a second loan for the

12   construction?

13       A.  Correct.

14       Q.  What was your involvement with respect to

15   the first loan?

16       A.  I was the recipient of the mortgage, I

17   guess.  The mortgage was in my name, all of it in my

18   name.

19       Q.  Did you interact with anyone in particular

20   at the bank?

21       A.  Over the phone.

22       Q.  One person in particular?

23       A.  Yes.

24       Q.  What was his name?

26

1      Q.   That's Mr. Kagan's company, correct?

2      A.   Which one?

3      Q.   Kagan Development KDC Corp.

4      A.   It could be.  He had so many companies; I

5  don't know which one it was.  At that time it didn't

6  matter.  Everything was rosy.

7      Q.   Then it shows a $35,520 contribution by

8  Mr. Kagan, correct?

9      A.   There could have been.  There was a total

10  of $300,000 roughly.  How it was broken down, that's

11  how it must be.

12      Q.   As you sit here today, do you have any

13  doubt that the Kagan entity, Mr. Kagan and

14  Mrs. Kagan made the contributions reflected on this

15  sheet?

16      A.   I believe it was 50/50.  Whatever it adds

17  up to.  How it was broken down in his company was

18  not my concern at the time.

19      Q.   Was the intention to utilize proceeds from

20  the loans from the bank to pay any of the carrying

21  costs associated with the project?

22      A.   Yes.

23      Q.   What carrying costs were contemplated that

24  would be covered by the loan proceeds?

27

1      A.   Mortgage, real estate tax, electricity,

2   utilities, water.

3      Q.   Any others?

4      A.   And construction costs.

5      Q.   When you said mortgage as a carrying cost,

6   what did you mean by that?

7      A.   Interest on the mortgage.

8      Q.   So the intention was to use the loan

9   proceeds to cover the interest expense on the loan?

10     A.   Mm-hmm.

11     Q.   You have to say yes or no.

12     A.   Yes.

13     Q.   And was that how it actually happened, that

14   loan proceeds were used to pay the interest costs?

15     A.   Yes.

16     Q.   Did you participate to any degree in the

17   closing that resulted in the purchase of the

18   property?

19     A.   Yes.

20     Q.   Were you provided a settlement statement in

21   advance or in connection with that closing?

22     A.   Yes.

23     Q.   Did Attorney Maiden handle that closing?

24     A.   You know what, I don't remember.  Did he?

29

1      A.   The mortgage, yes.

2      Q.   The second line from the top, there's a

3  deposit.  Do you see that?

4      A.   Yes.

5      Q.   Do you know who contributed the deposit?

6      A.   No.  It could have been Vadim.

7      Q.   At the time you signed the operating

8  agreement, what was your understanding of the cost

9  expected to construct the new home?

10     A.   Roughly 800,000, $850,000.

11     Q.   What's the basis of that understanding?

12     A.   Vadim's work and experience doing that.

13     Q.   When you say experience, your experience?

14     A.   No, Vadim's experience.

15     Q.   Vadim's.  Can you tell me anything that you

16  recall with any specificity with respect to any

17  discussions that you had with Vadim on the

18  construction costs?

19     A.   He explained that based on his experience

20  that's what it typically takes to build a house of

21  this magnitude.

22     Q.   Did he show you a budget?

23     A.   I don't remember.

24     Q.   Did you do any investigation or due

34

1   me because of our prior personal relationship.

2   There was no need for anything else.

3       Q.  Did the general contractor in this instance

4   charge a fee for its services?

5       A.  Not that I know of.  It is not directly

6   reflected on the paperwork.  It could have been

7   buried somewhere else but I don't know.

8       Q.  Did you ever see a written contract between

9   the LLC and the general contractor for your project?

10      A.  No.

11      Q.  I asked you what you understood the

12  construction cost was going to be; you gave me a

13  range of 800 to $850,000.  Is that the discussion

14  that you had with Vadim, that he gave you a range?

15      A.  I don't remember exactly.  I remember

16  ballpark, it was around $800,000.

17      Q.  Did Vadim guarantee to you that the

18  construction costs would be fixed at a certain

19  price?

20      A.  No.

21      Q.  When you decided to invest, did you have

22  any expectation that you would have to pay from your

23  personal funds for any of the carrying costs?

24      A.  We were hoping to avoid that.

37

1      A.   No.

2      Q.   Did you have any discussions with Vadim

3   that the budget had changed in any way?

4      A.   No.   Everything was on plan, on budget.   I

5   would stop by once in a while just to take a look at

6   it, the house beautiful, good-quality work.   I had

7   no reason to believe anything can go wrong.

8      Q.   Were there any unexpected conditions in

9   demolishing the house?

10      A.   No.

11      Q.   Any weather delays?

12      A.   No.

13      Q.   Any ledge on the site?

14      A.   Not that I recall.   There may have been

15   some delays in getting inspectors in.   I don't know.

16   Nothing that I can recall that put a wrench into the

17   whole project.   Vadim knew what he was doing.   He's

18   a brilliant builder.

19      Q.   Did Rockland Trust Bank send you periodic

20   statements in connection with the account?

21      A.   Yes.

22      Q.   And they were addressed to you?

23      A.   I don't remember.

24      Q.   Why don't you hold on.   I'll show you some

46

1    it is 5 percent is 50,000.  That's roughly.  If

2    another broker is involved, it would be half of

3    that.  That was one.

4              The other one is I received the surprise

5    bill a couple days prior to closing which was in

6    excess of a hundred thousand dollars.  There was no

7    explanation -- there was an explanation for the work

8    done prior.  And that was a surprise.

9        Q.  So let me ask you about the real estate

10   commission part of it.  So it was your expectation

11   that you and your wife would be responsible for only

12   50 percent of the real estate commission to be paid

13   to Tatiana Kagan?

14             MR. CARNATHAN:  Objection.

15       A.  No.

16       Q.  Explain.

17       A.  My expectation was for Vadim and Tatiana to

18   split the commission with my wife and I 50/50.

19       Q.  Sorry.  So if Tatiana's commission was

20   $50,000, you expected you and your wife would

21   receive $25,000?

22       A.  Correct.

23       Q.  If I understand your testimony, that did

24   not occur?

50

1      Q.   Let's get your testimony as clearly as we

2    can.

3      A.   Sure.

4      Q.   As you sit here today, can you recall

5    whether the bill you testified about receiving

6    shortly before closing came from Kagan Development

7    Company, Proexcavation, or some other entity?

8      A.   I can't recall.

9      Q.   But your testimony is that it was just a

10   bit above 100,000?

11     A.   111,000.

12     Q.   Do you have any understanding what work was

13   encompassed in that bill, what work it represented?

14     A.   Yes.

15     Q.   What's your understanding of it?

16     A.   A variety of things.  American Express

17   card -- there's a variety of items.

18     Q.   Why don't we do this while we are on the

19   record.  You brought several documents with today.

20   Are these documents we can keep or do you want them

21   back?

22     A.   These are the only documents I have.  If

23   you can make a copy.

24          MR. HARRIS:  Could you?

52

1      Q.   So the invoice came from KDC?

2      A.   It must be.  I don't see the invoice.  I

3   would imagine, yes.

4      Q.   Tell me the circumstances under which you

5   received this document.

6      A.   As we were getting close to the finishing

7   up the construction and putting it on the market, I

8   was asking Vadim on a weekly basis how we are doing

9   with the budget, do we have enough money.  The

10  answer was yes.  So he said that we have money in

11  the budget with money to spare.  I was happy to hear

12  that we were on budget, on time.  Closing is

13  scheduled.  A couple of days, a few days -- I can't

14  remember exactly -- prior to closing I received this

15  final invoice.

16     Q.   When Vadim told you about being within

17  budget, did you understand that to mean you were

18  within the funds available from the bank?

19     A.   Yes.

20     Q.   Prior to that had you had any discussions

21  with Vadim about any cost overruns at all?

22     A.   It could have been.  If it was, it was

23  minor.  I don't recall any.  I don't recall.

24     Q.   Do you recall that during the project there

57

1   educated guess.

2       Q.   Well, you have had access to the bank

3   account statements, correct?

4       A.   Correct.

5       Q.   Did you go back to see if Vadim deposited

6   any funds along the way?

7       A.   I don't recall.

8       Q.   If he did, as you did, you would have

9   expected him to be reimbursed from the loan?

10      A.   That sounds logical.

11      Q.   There's a $50 payment to the City of

12  Newton.  Do you know what that relates to?

13      A.   I don't know.

14      Q.   There's a $1,767 payment to the City of

15  Newton.  Do you know what that is?

16      A.   I don't know.

17      Q.   As you sit here today, do you have any

18  information to suggest that any of the charges

19  associated with the project were fraudulent?

20      A.   I don't have anything to suggest that.  The

21  only thing I have problem is that this was presented

22  to me two days before closing.

23      Q.   So it is the timing?

24      A.   The timing and any backup information to

83

1   because I didn't really care.  It wasn't my problem.

2   It was upsetting to me that I've been dealing with

3   this.

4       Q.  At one point I think you testified that it

5   was your intention to pay carrying costs out of the

6   bank loan.  Is that fair?

7       A.  Yes.

8       Q.  How did you form that intention?  Did you

9   ever talk about it with Mr. Kagan?

10      A.  That was Mr. Kagan's recommendation.  I've

11  never taken a construction loan before.  So he

12  explained it to me that that's how he funds all his

13  projects.

14      Q.  Do you recall anything else about what

15  Mr. Kagan told you about funding the carrying costs

16  through the bank loan?

17      A.  No.

18      Q.  Was there anybody else with you when you

19  had that conversation?

20      A.  No.

21      Q.  How did you determine that the project

22  would last about a year?

23      A.  Based on the word from Mr. Kagan.

24      Q.  How long did it actually last?

85

1   statement?

2       A.  Yes.

3       Q.  The top of Page 2 reflects payment of

4   $97,500 in brokerage fees?

5       A.  Yes.

6       Q.  Was that deducted from the $609,000?

7       A.  I don't know.  I don't know if it was.

8       Q.  You see at the top it says Paid from

9   Seller's Funds at Settlement?

10      A.  I see.  I don't know.

11      Q.  Then there are further expenses as you move

12  down Page 2 that are also in that column, Paid from

13  Seller's Funds at Settlement, that would include

14  things like recording fees and tax stamps?

15      A.  Yes.

16      Q.  That's all I have.  Thank you.  Thank you

17  for your time today.

18          MR. CARNATHAN:  I have got to follow up.

19          EXAMINATION

20  BY MR. CARNATHAN:

21      Q.  So the 97,500 commission was apparently

22  paid to Classic Interior, Inc.; is that right?

23      A.  It must have been another one of his

24  companies.

# EXHIBIT 33

Exhibits: 1-18                    Volume 1, Pages 1-123

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

-----------------------------

In Re:

                                 Chapter 7

LYMAN-CUTLER, LLC,          Case No. 15-13881-FJB


            Debtor

-----------------------------

LYMAN-CUTLER, LLC,


            Plaintiff

v.                          Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,

            Defendants

-----------------------------


        DEPOSITION OF VLADISLAV ABRAMSKIY
         Monday, June 18, 2018, 9:59 a.m.
         O'Connor Carnathan and Mack LLC
        1 Van de Graaff Drive, Suite 104
             Burlington, Massachusetts


    --------- David A. Arsenault, RPR ---------
    daa@fabreporters.com   www.fabreporters.com
          Farmer Arsenault Brock LLC
            Boston, Massachusetts
                617-728-4404

Vladislav Abramskiy - Vol. 1 - 6/18/2018

36

1    Q.   What additional details did you ask for?

2    A.   How it would all happen, how much money.

3    Q.   Did you ask for anything else?

4    A.   He said that, he talked about the cost

5    total.  He said we didn't need to worry about

6    anything, that I and Vitaly would contribute 120,000

7    each.  And then for the construction and expenses,

8    he would send all the information to the bank to

9    take out a construction loan for 850,000.  And that

10   loan would cover all the operational expenses.

11   Q.   Is this a conversation that took place in a

12   single meeting or is this a summation of many

13   meetings?

14   A.   I don't remember now.

15   Q.   Did he tell you anything else?

16   A.   No.

17   Q.   What happened next with respect to the

18   project?

19   A.   Then we bought the house.

20   Q.   How many times did you meet -- strike that.

21   How many times did you speak with Mr. Kagan about

22   the Newton-Cynthia project before you decided to

23   invest in it?

24   A.   I don't remember exactly, two or three

37

1    times, maybe.

2        Q.   Have you now exhausted your memory, sir, as

3    to everything Mr. Kagan told you before you decided

4    to invest in the Newton-Cynthia Road project?

5        A.   I think that's it.

6        Q.   Did you have any conversations with

7    Mr. Gassel, Vitaly Gassel, prior to investing in the

8    Cynthia Road project about the proposed business

9    venture?

10       A.   We discussed that with Vitaly.  We decided

11   that Dima looked like a trustworthy person and we

12   decided to go into business with him.

13       Q.   Prior to deciding to invest, did you review

14   any documents prior to investing?

15       A.   I only saw the documents that Vadim sent to

16   the bank on the construction loan.

17       Q.   And that was after your decision to invest?

18       A.   Yes.  Initially it was a verbal discussion

19   and then it was formalized.

20       Q.   Have you now exhausted your memory, sir, as

21   to everything relating to the verbal discussion that

22   you had before you decided to invest in this

23   project?

24       A.   I asked several times whether that 850,000

38

1   would include all the expenses.  He said yes.  In

2   regards to that 850,000, I asked him several times

3   whether it would cover the construction and

4   operational expenses.  But he would always try to

5   avoid answering me directly and he would say that I

6   shouldn't worry, he had constructed 14 or 15 houses

7   and I should deal with my business and he will deal

8   with his.

9      Q.  Before deciding to invest in this project,

10  sir, did you do any investigation of your own into

11  the project or into Mr. Kagan?

12     A.  He gave us the amount, so we trusted him.

13  We didn't have any doubts in him.  We didn't look at

14  his checkbook ever.

15     Q.  And you decided to invest $120,000; is that

16  correct?

17     A.  Yes.

18     Q.  At the time you decided to invest in this

19  project, had you reviewed any house plans?

20     A.  I only saw what he sent to the bank and

21  also only superficially.

22     Q.  When you say what was sent to the bank, was

23  that what was sent to the bank to support the

24  construction loans?

40

1    purchased?

2         A.   Rockland Trust where Dima brought us.

3         Q.   That was the construction loan?

4         A.   It was the purchase and the construction

5    loans were taken out from Rockland Trust, Vadim went

6    with us.

7         Q.   Once you agreed to invest in this project,

8    sir, what happened next?

9         A.   We purchased the house.

10        Q.   Did you engage a lawyer to help you

11   formalize the business relationship that you were

12   going into with Mr. Kagan and the Gassels?

13        A.   I wanted to involve a lawyer but then I got

14   a call from Mr. Kagan.  I wanted to involve a

15   lawyer, but Mr. Kagan called and said that he had a

16   permanent relationship with Boris, that they had a

17   relationship of working concept and we shouldn't

18   have any worries, there was no need to involve

19   anybody else.  We decided not to argue in the

20   beginning and that was it.

21        Q.   And at this point, sir, you already knew

22   Attorney Maiden, correct?

23        A.   Yes.

24        Q.   So was Mr. Maiden the person who drafted

41

1   the business documents for this project?

2        A.   Yes.

3        Q.   Who did you understand Mr. Maiden was

4   representing in that process?

5        A.   LLC.

6        Q.   When you say the LLC, you are referring to

7   the Newton-Cynthia Road, LLC?

8        A.   Yes.

9        Q.   To speed this up, when I say LLC going

10  forward, will you understand that I mean the

11  Newton-Cynthia Road, LLC?

12       A.   Yes.

13       Q.   So did you understand that Mr. Maiden was

14  going to be drafting the documents to form the LLC?

15       A.   Yes.

16       Q.   And did you review drafts of the LLC

17  documents from Mr. Maiden?

18       A.   Yes.

19       Q.   Did your son Artur have any role in the

20  LLC?

21       A.   The family were together.

22       Q.   Did you discuss with your son Artur your

23  decision to invest in the LLC?

24       A.   Yes.

54

1    Road project?

2        A.   I don't remember.  When that happened I

3    looked through it but I don't know much about it.

4        Q.   To the best of your knowledge, sir, did

5    these plans ever change?

6        A.   I don't think so.

7        Q.   Did you discuss these house plans with your

8    son Artur?

9        A.   I don't remember, but neither one of us

10   knows much about it.

11       Q.   Did you ask any questions regarding these

12   plans of anybody when you received them?

13       A.   No.

14            (A recess was taken.)

15       Q.   Now, sir, you told us this morning earlier

16   that Mr. Kagan told you that the construction budget

17   would be $850,000, correct?

18       A.   I didn't say that.  What I said was that

19   all construction costs and all the expenses would

20   not exceed 850,000.

21       Q.   What other expenses did you understand to

22   be included in that 850,000 in addition to actual

23   construction costs?

24       A.   The expenses was taxes, attorneys' fees,

55

1   banking costs for the loans, for the two loans.

2               (Marked, Exhibit 6, Email, 1/2/13, and

3   document re: Construction cost.)

4       Q.   Mr. Abramskiy, I've placed in front of you

5   what we marked as Exhibit 6.  Is this a document

6   that you received on or about January 2, 2013?

7               MS. FULLER:  Objection.

8       A.   Can you repeat the question?

9       Q.   Is this an email with an attachment that

10  you received on or about January 2, 2013?

11      A.   Yes, I've seen this.

12      Q.   You saw it on or about January 2, 2013 for

13  the first time; is that correct?

14      A.   It must be.  I don't remember now.

15      Q.   Upon receiving this document, did you

16  review it?

17      A.   Yes, I looked at it.

18      Q.   Are you familiar with the term carrying

19  costs?  Let me strike that question.  If I could ask

20  you, sir, to turn to Exhibit 4.  And in specific,

21  Page 3, Section 4.2 at the bottom of the page.  My

22  question is, did you understand that there were

23  going to be carrying costs that would include but

24  not be limited to mortgage payments, taxes and

56

1    insurance?

2             MS. FULLER:  Objection.

3        A.  We discussed with Dima and he explained

4    that was their scheme that he exaggerates the

5    numbers in order to have the loan that will cover

6    all the carrying costs.

7        Q.  And when did he tell you this?

8        A.  He would always say that.  We discussed it.

9    And he would say that he exaggerates the cost for

10   the bank in order to have enough money so that the

11   members, the partners didn't have to invest anything

12   additional as the project goes along.

13       Q.  When did he first tell you that?

14       A.  When we started discussing his scheme in

15   more detail.

16       Q.  And when he told you that, what was your

17   response?

18       A.  Okay.

19       Q.  Did you understand, sir, that you were the

20   one as the manager that was going to be signing the

21   construction loans documents for the bank?

22       A.  I wasn't thinking about it.  I didn't have

23   that in mind.

24       Q.  Didn't have what in mind?

61

1    due to the bank in connection with this loan?

2        A.   I understood that, but because Dima was

3    providing everything it was my understanding that it

4    was included in the construction loan amount.

5        Q.   That it was going to be deducted from the

6    construction loan, correct?

7        A.   I don't know.  I do not understand this

8    question.  What he said, that amount, 850,000

9    included all the expenses, bank fees, carrying

10   costs, operational expenses, taxes.

11       Q.   For what period of time did the

12   construction loan cover the carrying costs?  How

13   long?

14       A.   I asked him but he never gave me an answer

15   to this question.  He would just say don't worry,

16   everything is under control.

17       Q.   Okay.  If I could ask you to turn to after

18   the fourth of fifth page, Construction Loan

19   Supplement in Exhibit 7.  Do you have the section of

20   Exhibit 7 entitled Construction Loan Supplement in

21   front of you, sir?

22       A.   Yes.

23       Q.   Do you see the section that says, titled on

24   the top of the page Use of Loan Proceeds?  Do you

66

1          A.   Yes.

2          Q.   And was Mr. Kagan going to front that cost

3    and get paid from the closing for the amount he

4    fronted?

5          A.   Yes.

6          Q.   So is it fair to say, sir, that when you

7    found out about the ledge you already knew, sir,

8    that there was going to be an additional $60,000

9    that he was going to front because the construction

10   loan was lower, and there was going to be some

11   additional cost with respect to the ledge, correct?

12         A.   Yes.

13         Q.   Now, would you agree with me that the house

14   was certainly completed by October of 2014?

15         A.   I don't remember exactly, but I know that

16   there was at least a two-month delay as compared to

17   the terms of the agreement.

18         Q.   Now, sir, I'm going to represent to you

19   that in the documents that you have provided to me

20   there's a gap from late March of 2013 until

21   October 2014.  Do you have any documents in your

22   possession, sir, that is in that period of

23   April 2013 to September 2014?

24         A.   I must not have them.

67

1    Q.  Do you recall that there were documents

2  during that period or was there just no written

3  communications during that period?

4    A.  There must not have been any written

5  communication.

6         (Marked, Exhibit 8, Color printout of

7  text messages.)

8    Q.  Can you tell me what Exhibit 8 is?

9    A.  Vadim sent me a message, just me, that they

10  had gotten an offer for 1.8-plus million.

11    Q.  And on this Exhibit 8 is it fair to say

12  that the responses that are in the color blue are

13  your responses and the gray is Vadim's?

14    A.  Yes.

15    Q.  And, sir, would you agree with me that as

16  of October 6, 2014 the property was completed and

17  had been listed with Tatiana?

18         MR. CALANDRELLI:  Objection.

19    A.  Yes, it must be true.

20    Q.  How was it decided at what price to list

21  the property?

22    A.  We primarily consulted with Tatiana, but

23  since it was finished and not selling, we started

24  getting worried.  We started talking about maybe

68

1   lowering the price, and all the partners were in on

2   that discussion.

3       Q.   Were all the partners in on the discussion

4   on what to list the property for originally?

5       A.   We listened to what Tatiana and Dima said

6   about it.  They suggested that we would get at least

7   around $2 million and we just went with it because

8   they represented themselves as professionals in this

9   field.

10      Q.   So looking at Exhibit 8, sir, on October 6,

11  2014 at 5:53 p.m. you got a text telling you that

12  there had been an offer, correct?

13      A.   Yes.

14      Q.   Can you translate the Russian for me on

15  this page?

16      A.   I asked him if he had told Vitaly Gassel.

17      Q.   And did he reply?

18      A.   I called Vitaly.  We had a conversation and

19  we wanted to agree to accept this offer.  I called

20  Dima, called back Dima.  So what he replied was that

21  they knew the person who gave this offer.  He had

22  given offers previously on four of his properties

23  and that he always gives lowball offer.  It turned

24  out that Vadim had already counteroffered this

69

1  person without consulting with us.  And we basically

2  lost this deal.

3      Q.  When did you find out that Vadim had

4  counteroffered?

5      A.  I called him right away.  That's why there

6  is no further text conversation.

7      Q.  So you called him on October 6, 2014; is

8  that correct?

9      A.  After I had the conversation with Vitaly

10 and we decided that we were willing to accept this

11 offer, I called Vadim.  He said, as I mentioned,

12 that he had had previously four offers from the same

13 person, that he always gives a low amount offer.

14 Vadim had already counteroffered him but did not get

15 the reply.  So the following day I'm asking him if

16 he had any news.

17     Q.  So this was a conversation that you had

18 with Vadim on October 6, 2014, correct?

19     A.  Yes, correct.

20     Q.  And when he told you that he had done that,

21 what did you say to him?

22     A.  I told him that he needs to consult with

23 us.  But Vadim says that he knows this person, this

24 person would never have bought the house.  I asked

70

1   him to consult with us in the future.

2       Q.   Did you tell him to contact the broker

3   immediately and say that you would accept the price

4   that the offer was made at?

5           MS. FULLER:  Objection.

6       A.   He said it was too late.

7       Q.   How did you know it was too late?

8       A.   Vadim said it was.

9       Q.   Vadim said it was too late?

10      A.   Yes.

11      Q.   At some point did you send any emails or

12  any text or any written document to Vadim

13  complaining about the fact that he had made a

14  counteroffer without your permission?

15      A.   We didn't do anything in writing, but

16  during the general meeting of the partners we told

17  him that in the future we wanted him to consult with

18  us if he gets an offer.

19      Q.   When was the general meeting when you had

20  this discussion?

21      A.   It was the next meeting after this.

22      Q.   When was that?

23      A.   I don't remember.

24      Q.   Was it days, weeks, months?

76

1      Q.   At some point, sir, did the property sell

2  and then the mortgage was discharged?

3      A.   Yes.

4      Q.   And did Mr. Kagan in fact make sure that

5  you got your original investment back?

6           MS. FULLER:  Objection.

7      A.   Yes.

8      Q.   And you understood, did you not, sir, that

9  he paid to make up the difference between the sale

10  price and the amount of your capital contribution to

11  make sure that you could get your full amount back?

12           MS. FULLER:  Objection.

13      A.   At that time all I understood was that that

14  was all words.

15      Q.   Well, sir, you did get your full investment

16  back, correct?

17      A.   Yes.

18           (Marked, Exhibit 11, Email, 4/26/15, and

19  Massachusetts mandatory licensee consumer

20  relationship disclosure.)

21      Q.   Can you identify Exhibit 11 for us?

22      A.   This is the last offer that we accepted and

23  sold the property.

24      Q.   Is it fair to say, sir, that on or about

77

1  April 26, 2015 the LLC accepted an offer to sell the

2  property for $1,899,000?

3      A.  Yes.

4      Q.  And you were in agreement to sell for that

5  price, correct?

6      A.  Yes.

7      Q.  And in fact would you agree with me that

8  that was more money than had been offered earlier,

9  the earlier offer we looked at?

10     A.  Yes, it is true.  But in that year we

11  incurred a lot of payments.

12     Q.  How much payments did you incur during that

13  year?

14     A.  Are you asking how many or the amount?

15     Q.  How much, the amount.

16     A.  Approximately the same difference.

17     Q.  Now, sir, in connection with the

18  negotiations with Mr. Kagan to have him buy you out,

19  were you represented by counsel?

20     A.  Yes, we sought counsel from an attorney.

21     Q.  And who was your attorney?

22     A.  Joe Brooks.

23     Q.  And was Mr. Brooks also engaged to draft

24  the purchase and sale agreement or to represent you

86

1      Q.   I've placed in front of you Exhibit 14.

2  Does that bear your signature on the last page?

3      A.   Yes.

4      Q.   Does that memorialize the agreement that

5  you reached with Kagan?

6      A.   We had no choice because they had send us a

7  threatening letter which states if we didn't agree

8  instead of 200,000 we would be paying 450,000.  We

9  had to sign this in order to not lose the deal.

10     Q.   Sir, you will agree that you signed this

11  agreement, correct?

12     A.   Yes.

13     Q.   And in fact will you agree with me as well

14  that everybody, both sides did what they were

15  supposed to do under this agreement?

16          MS. FULLER:  Objection.

17     A.   I signed it, but as far as the our

18  relations are concerned on the part of Kagan, he did

19  not fulfill anything that he had told us.  I was put

20  in such a position that I had to sign it just to get

21  out of this.

22     Q.   And, sir, if I could draw your attention to

23  the third page, there's the paragraph sort of in the

24  middle of the page that says:  "Mr. Kagan has agreed

# EXHIBIT 34

## ES12C0326CA In the matter of: Edelkind, Jamie

| | |
|---|---|
| **Case Type** | Change of Name Managed |
| **Case Status** | Closed |
| **File Date** | 10/25/2012 |
| **DCM Track:** | |
| **Initiating Action:** | Change of name |
| **Status Date:** | 04/18/2013 |
| **Case Judge:** | |
| **Next Event:** | |

**All Information**    **Party**    **Disposition**

### Party Information

**Edelkind, Jamie** - Petitioner

**DOD**                                **Alias**

| **Party Attorney** | |
|---|---|
| **Attorney** | Pro Se |
| **Bar Code** | PROPER |
| **Address** | **Phone Number** |

More Party Information

**Edelkind, Jamie** - Subject/Respondent

**DOD**                                **Alias**

| **Party Attorney** | |
|---|---|
| **Attorney** | Pro Se |
| **Bar Code** | PROPER |
| **Address** | **Phone Number** |

More Party Information

**Cohen, James Joseph** - New Name

**DOD**                                **Alias**
                                       **AKA**          Edelkind, Jamie

| **Party Attorney** | |
|---|---|
| **Attorney** | Pro Se |
| **Bar Code** | PROPER |
| **Address** | **Phone Number** |

More Party Information

### Case Disposition

| Disposition | Date | Case Judge |
|---|---|---|
| Decree of Name Change | 04/18/2013 | |

# EXHIBIT 35

KDC 00499

07/27/15

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Num | Name | Memo | Clr | Split | Original Amount | Paid Amount | Balance |
|------|------|-----|------|------|-----|-------|-----------------|-------------|---------|
| **55 Lyman Building & Improvement** | | | | | | | | | |
| **Outside Service** | | | | | | | | | |
| **Plumbing** | | | | | | | | | |
| Check | 03/12/14 | 1040 | BST Plumbing | | | Rockland Tru... | 20,000.00 | 20,000.00 | 20,000.00 |
| Check | 10/16/14 | 1108 | EastCoast Pipelines | | | Rockland Tru... | 500.00 | 500.00 | 20,500.00 |
| Bill | 04/28/15 | | BST Plumbing | | | Accounts Pa... | 19,670.00 | 19,670.00 | 40,170.00 |
| Total Plumbing | | | | | | | | 40,170.00 | 40,170.00 |
| Total Outside Service | | | | | | | | 40,170.00 | 40,170.00 |
| Total 55 Lyman Building & Improvement | | | | | | | | 40,170.00 | 40,170.00 |
| **TOTAL** | | | | | | | | 40,170.00 | 40,170.00 |

07/27/15

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Num | Name | Memo | Clr | Split | Original Amount | Paid Amount | Balance |
|------|------|-----|------|------|-----|-------|-----------------|-------------|---------|
| **88 Cutler Building & Improvemen** | | | | | | | | | |
| **Outside Service** | | | | | | | | | |
| **Plumbing** | | | | | | | | | |
| Check | 02/04/14 | 1017 | BST Plumbing | | | Rockland Tru... | 20,000.00 | 20,000.00 | 20,000.00 |
| Bill | 04/28/15 | | BST Plumbing | | | Accounts Pa... | 19,670.00 | 19,670.00 | 39,670.00 |
| Total Plumbing | | | | | | | | 39,670.00 | 39,670.00 |
| Total Outside Service | | | | | | | | 39,670.00 | 39,670.00 |
| Total 88 Cutler Building & Improvemen | | | | | | | | 39,670.00 | 39,670.00 |
| **TOTAL** | | | | | | | | 39,670.00 | 39,670.00 |

KDC 01102

KDC 00353

07/24/15

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Num | Name | Memo | Clr | Split | Original Amount | Paid Amount | Balance |
|---|---|---|---|---|---|---|---|---|---|
| **55 Lyman Building & Improvement** | | | | | | | | | |
| **Outside Service** | | | | | | | | | |
| **Framing** | | | | | | | | | |
| Check | 09/23/13 | 1068 | DaCosta | 55 Lyman Rd | * | Rockland Tru... | 10,000.00 | 10,000.00 | 10,000.00 |
| Check | 10/22/13 | 1082 | DaCosta | 55 Lyman - ... | * | Rockland Tru... | 10,000.00 | 10,000.00 | 20,000.00 |
| Check | 11/04/13 | 1093 | DaCosta | 55 Lyman - ... | * | Rockland Tru... | 10,000.00 | 10,000.00 | 30,000.00 |
| Check | 12/30/13 | 1006 | DaCosta | | | Rockland Tru... | 10,000.00 | 10,000.00 | 40,000.00 |
| Check | 01/22/14 | 1027 | DaCosta | | | Rockland Tru... | 20,000.00 | 20,000.00 | 60,000.00 |
| Check | 02/21/14 | 1023 | DaCosta | | | Rockland Tru... | 10,000.00 | 10,000.00 | 70,000.00 |
| Check | 03/10/14 | 1039 | DaCosta | | | Rockland Tru... | 30,000.00 | 30,000.00 | 100,000.00 |
| Check | 04/18/14 | 1057 | DaCosta | | | Rockland Tru... | 30,000.00 | 30,000.00 | 130,000.00 |
| Check | 05/07/14 | 1085 | DaCosta | | | Rockland Tru... | 4,350.00 | 4,350.00 | 134,350.00 |
| Check | 05/29/14 | 1069 | DaCosta | | | Rockland Tru... | 7,000.00 | 7,000.00 | 141,350.00 |
| Check | 07/29/14 | 1097 | DaCosta | | | Rockland Tru... | 10,000.00 | 10,000.00 | 151,350.00 |
| Check | 09/04/14 | 1105 | KDC | kdc paid w/ ... | | Rockland Tru... | 5,000.00 | 5,000.00 | 156,350.00 |
| Check | 08/25/14 | 1115 | DaCosta | | | Rockland Tru... | 15,000.00 | 15,000.00 | 171,350.00 |
| Check | 08/27/14 | 1116 | KDC | kdc paid da... | | Rockland Tru... | 10,000.00 | 10,000.00 | 181,350.00 |
| **Total Framing** | | | | | | | | 181,350.00 | 181,350.00 |
| **Total Outside Service** | | | | | | | | 181,350.00 | 181,350.00 |
| **Total 55 Lyman Building & Improvement** | | | | | | | | 181,350.00 | 181,350.00 |
| **TOTAL** | | | | | | | | 181,350.00 | 181,350.00 |

KAG 02075

I/17/15

**Lyman-Cutler, LLC**
**Account QuickReport**
**All Transactions**

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|------|------|-----|------|------|-------|--------|---------|
| **88 Cutler Building & Improvemen** | | | | | | | |
| **Outside Service** | | | | | | | |
| **Framing** | | | | | | | |
| Check | 09/26/13 | 1069 | DaCosta | 88 Cutler | Rockland ... | 10,000.00 | 10,000.00 |
| Check | 10/22/13 | 1081 | DaCosta | 88 Cutler – Fraim | Rockland ... | 10,000.00 | 20,000.00 |
| Check | 11/04/13 | 1094 | DaCosta | 88 Cutler – Fraim | Rockland ... | 10,000.00 | 30,000.00 |
| Check | 11/19/13 | 123 | DaCosta | 88 Cutler – Fralming | Rockland ... | 20,000.00 | 50,000.00 |
| Check | 11/19/13 | 123 | DaCosta | 88 Cutler – Fralming | Rockland ... | 20,000.00 | 70,000.00 |
| Check | 12/30/13 | 1006 | DaCosta | | Rockland ... | 10,000.00 | 80,000.00 |
| Check | 01/22/14 | 1027 | DaCosta | | Rockland ... | 20,000.00 | 100,000.00 |
| Check | 02/21/14 | 1023 | DaCosta | | Rockland ... | 10,000.00 | 110,000.00 |
| Check | 03/12/14 | 1038 | DaCosta | | Rockland ... | 20,000.00 | 130,000.00 |
| Check | 04/29/14 | 1061 | DaCosta | | Rockland ... | 28,350.00 | 158,350.00 |
| Bill | 04/16/15 | | DaCosta | Invoicing Error by Vendor – $23k balance remaining | Accounts ... | 23,000.00 | 181,350.00 |
| | | | | | | | |
| **Total Framing** | | | | | | 181,350.00 | 181,350.00 |
| | | | | | | | |
| **Total Outside Service** | | | | | | 181,350.00 | 181,350.00 |
| | | | | | | | |
| **Total 88 Cutler Building & Improvemen** | | | | | | 181,350.00 | 181,350.00 |
| | | | | | | | |
| **TOTAL** | | | | | | 181,350.00 | 181,350.00 |

KDC 00327

1/01/15

**Lyman-Cutler, LLC**
**Account QuickReport**
**All Transactions**

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|------|------|-----|------|------|-------|--------|---------|
| **55 Lyman Building & Improvement** | | | | | | | |
| **Outside Service** | | | | | | | |
| **Decor Art** | | | | | | | |
| Check | 11/04/13 | 1095 | Decor Art | 55 Lyman | Rockland Tru... | 10,000.00 | 10,000.00 |
| Check | 01/21/14 | 1028 | Decor Art | 88 Cutler | Rockland Tru... | 15,000.00 | 25,000.00 |
| Check | 06/03/14 | 1079 | Decor Art | | Rockland Tru... | 5,000.00 | 30,000.00 |
| Check | 07/02/14 | 1083 | Decor Art | | Rockland Tru... | 6,000.00 | 36,000.00 |
| Check | 07/28/14 | 1100 | Decor Art | | Rockland Tru... | 8,000.00 | 44,000.00 |
| Check | 08/25/14 | 1114 | Decor Art | | Rockland Tru... | 10,000.00 | 54,000.00 |
| Check | 01/23/15 | 1133 | Decor Art | | Rockland Tru... | 3,350.00 | 57,350.00 |
| Bill | 02/12/15 | | Decor Art | | Accounts Pay... | 8,750.00 | 66,100.00 |
| Check | 02/18/15 | 1141 | Decor Art | | Rockland Tru... | 6,000.00 | 72,100.00 |
| Bill | 05/28/15 | | Decor Art | Cleaning, re... | Accounts Pay... | 1,420.00 | 73,520.00 |
| Total Decor Art | | | | | | 73,520.00 | 73,520.00 |
| Total Outside Service | | | | | | 73,520.00 | 73,520.00 |
| Total 55 Lyman Building & Improvement | | | | | | 73,520.00 | 73,520.00 |
| TOTAL | | | | | | 73,520.00 | 73,520.00 |

Page

KDC 01540

1/01/15

**Lyman-Cutler, LLC**
**Account QuickReport**
**All Transactions**

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|------|------|-----|------|------|-------|--------|---------|
| **88 Cutler Building & Improvemen** | | | | | | | |
| **Outside Service** | | | | | | | |
| **Decor Art** | | | | | | | |
| Check | 11/04/13 | 1096 | Decor Art | 88 Cutler | Rockland Tru... | 10,000.00 | 10,000.00 |
| Check | 04/18/14 | 1050 | Decor Art | | Rockland Tru... | 5,000.00 | 15,000.00 |
| Check | 07/02/14 | 1063 | Decor Art | | Rockland Tru... | 10,000.00 | 25,000.00 |
| Check | 07/28/14 | 1101 | Decor Art | | Rockland Tru... | 8,000.00 | 33,000.00 |
| Check | 08/25/14 | 1114 | Decor Art | | Rockland Tru... | 18,450.00 | 51,450.00 |
| Check | 03/19/15 | 1142 | Decor Art | | Rockland Tru... | 3,600.00 | 55,050.00 |
| Deposit | 04/17/15 | 1143 | Decor Art | Deposit | Rockland Tru... | 3,000.00 | 58,050.00 |
| Bill | 04/28/15 | | Decor Art | | Accounts Pay... | 6,450.00 | 64,500.00 |
| Deposit | 05/28/15 | | Decor Art | Deposit | Accounts Pay... | 4,250.00 | 68,750.00 |
| Total Decor Art | | | | | | 68,750.00 | 68,750.00 |
| Total Outside Service | | | | | | 68,750.00 | 68,750.00 |
| Total 88 Cutler Building & Improvemen | | | | | | 68,750.00 | 68,750.00 |
| TOTAL | | | | | | 68,750.00 | 68,750.00 |

KCC 00337

1/16/15

**Lyman-Cutler, LLC**
**Account QuickReport**
**All Transactions**

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|------|------|-----|------|------|-------|--------|---------|
| **55 Lyman Building & Improvement** | | | | | | | |
| **Outside Service** | | | | | | | |
| **Dream Flooring** | | | | | | | |
| Check | 11/21/13 | 123 - T5 | Dream Flo... | | Rockland Tr... | 10,000.00 | 10,000.00 |
| Check | 02/10/14 | 1019 | Dream Flo... | 88 Cutler | Rockland Tr... | 5,000.00 | 15,000.00 |
| Check | 02/19/14 | 1031 | Dream Flo... | | Rockland Tr... | 5,000.00 | 20,000.00 |
| Check | 09/02/14 | 1119 | Dream Flo... | | Rockland Tr... | 15,000.00 | 35,000.00 |
| Bill | 03/23/15 | | Dream Flo... | Floor re-work/repair, remaining 55 Lym... | Accounts Pa... | 14,710.00 | 49,710.00 |
| Bill | 07/02/15 | 289 | KDC | Payment of partial balance remaining f... | Accounts Pa... | 2,500.00 | 52,210.00 |
| **Total Dream Flooring** | | | | | | 52,210.00 | 52,210.00 |
| **Total Outside Service** | | | | | | 52,210.00 | 52,210.00 |
| **Total 55 Lyman Building & Improvement** | | | | | | 52,210.00 | 52,210.00 |
| **TOTAL** | | | | | | 52,210.00 | 52,210.00 |

Page

KDC 00974

l/16/15

**Lyman-Cutler, LLC**
**Account QuickReport**
**All Transactions**

| Type | Date | Num | Name | Memo | Split | Amount | Balance |
|------|------|-----|------|------|-------|--------|---------|
| **88 Cutler Building & Improvemen** | | | | | | | |
| **Outside Service** | | | | | | | |
| **Dream Flooring** | | | | | | | |
| Check | 11/21/13 | 123 - TG | Dream Floor... | 88 Cutler | Rockland Tru... | 10,000.00 | 10,000.00 |
| Check | 02/10/14 | 1019 | Dream Floor... | 88 Cutler | Rockland Tru... | 5,000.00 | 15,000.00 |
| Check | 02/19/14 | 1031 | Dream Floor... | | Rockland Tru... | 5,000.00 | 20,000.00 |
| Check | 09/02/14 | 1119 | Dream Floor... | | Rockland Tru... | 15,000.00 | 35,000.00 |
| Bill | 04/28/15 | | Dream Floor... | Remaining balance Dream Flooring 88 Cut... | Accounts Pay... | 11,410.00 | 46,410.00 |
| Bill | 07/02/15 | 289 | KDC | Payment of partial balance remaining for L-C | Accounts Pay... | 2,500.00 | 48,910.00 |
| **Total Dream Flooring** | | | | | | 48,910.00 | 48,910.00 |
| **Total Outside Service** | | | | | | 48,910.00 | 48,910.00 |
| **Total 88 Cutler Building & Improvemen** | | | | | | 48,910.00 | 48,910.00 |
| **TOTAL** | | | | | | 48,910.00 | 48,910.00 |

09/23/15

 

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Num | Adj | Name | Memo | Split | Debit | Credit | Original Amount | Balance |
|------|------|-----|-----|------|------|-------|-------|--------|-----------------|---------|
| **55 Lyman Building & Improvement** | | | | | | | | | | |
| **Outside Service** | | | | | | | | | | |
| **Excavation** | | | | | | | | | | |
| Check | 08/28/13 | 1057 | | ProExcavation | Excavation/... | Rockland Tru... | 45,000.00 | | 45,000.00 | 45,000.00 |
| Check | 09/25/13 | 1073 | | ProExcavation | 55 Lyman | Rockland Tru... | 30,000.00 | | 30,000.00 | 75,000.00 |
| Check | 09/25/13 | 1074 | | ProExcavation | 55 Lyman F... | Rockland Tru... | 30,000.00 | | 30,000.00 | 105,000.00 |
| Check | 09/25/13 | 1072 | | ProExcavation | 55 Lyman - ... | Rockland Tru... | 15,000.00 | | 15,000.00 | 120,000.00 |
| Check | 11/29/13 | 123 | | ProExcavation | payment | Rockland Tru... | 5,000.00 | | 5,000.00 | 125,000.00 |
| Check | 11/29/13 | 123 | | ProExcavation | payment | Rockland Tru... | 5,000.00 | | 5,000.00 | 130,000.00 |
| Bill | 10/06/14 | | | ProExcavation | | Accounts Pay... | 20,000.00 | | 20,000.00 | 150,000.00 |
| **Total Excavation** | | | | | | | 150,000.00 | 0.00 | | 150,000.00 |
| **Total Outside Service** | | | | | | | 150,000.00 | 0.00 | | 150,000.00 |
| **Total 55 Lyman Building & Improvement** | | | | | | | 150,000.00 | 0.00 | | 150,000.00 |
| **TOTAL** | | | | | | | 150,000.00 | 0.00 | | 150,000.00 |

KDC 01274




09/23/15

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Num | Adj | Name | Memo | Split | Debit | Credit | Original Amount | Balance |
|------|------|-----|-----|------|------|-------|-------|--------|-----------------|---------|
| **55 Lyman Building & Improvement** | | | | | | | | | | |
| **Outside Service** | | | | | | | | | | |
| **Landscaping** | | | | | | | | | | |
| **ProExcavation** | | | | | | | | | | |
| Check | 09/25/13 | 1072 | | ProExcavation | 55 Lyman - ... | Rockland Tru... | 15,000.00 | | 15,000.00 | 15,000.00 |
| Check | 09/25/13 | 1075 | | ProExcavation | 55 Lyman F... | Rockland Tru... | 30,000.00 | | 30,000.00 | 45,000.00 |
| Check | 01/27/14 | 1014 | | ProExcavation | payment | Rockland Tru... | 15,000.00 | | 15,000.00 | 60,000.00 |
| Bill | 10/06/14 | | | ProExcavation | | Accounts Pay... | 120,000.00 | | 120,000.00 | 180,000.00 |
| Check | 10/10/14 | 1126 | | ProExcavation | | Rockland Tru... | 20,000.00 | | 20,000.00 | 200,000.00 |
| Bill | 05/28/15 | | | ProExcavation | Landscaping... | Accounts Pay... | 4,600.00 | | 4,600.00 | 204,600.00 |
| Total ProExcavation | | | | | | | 204,600.00 | 0.00 | | 204,600.00 |
| Total Landscaping | | | | | | | 204,600.00 | 0.00 | | 204,600.00 |
| Total Outside Service | | | | | | | 204,600.00 | 0.00 | | 204,600.00 |
| Total 55 Lyman Building & Improvement | | | | | | | 204,600.00 | 0.00 | | 204,600.00 |
| TOTAL | | | | | | | 204,600.00 | 0.00 | | 204,600.00 |

Page 1

KDC 01279




09/23/15

Lyman-Cutler, LLC
Transactions by Account
All Transactions

| Type | Date | Num | Adj | Name | Memo | Split | Debit | Credit | Original Amount | Balance |
|------|------|-----|-----|------|------|-------|-------|--------|-----------------|---------|
| **55 Lyman Building & Improvement** | | | | | | | | | | |
| **Outside Service** | | | | | | | | | | |
| **Masonry** | | | | | | | | | | |
| Check | 10/21/13 | 1085 | | ProExcavation | payment | Rockland Tru... | 20,000.00 | | 20,000.00 | 20,000.00 |
| Check | 11/05/13 | 1097 | | ProExcavation | payment | Rockland Tru... | 20,000.00 | | 20,000.00 | 40,000.00 |
| Check | 02/19/14 | 1025 | | ProExcavation | payment | Rockland Tru... | 22,500.00 | | 22,500.00 | 62,500.00 |
| Bill | 10/06/14 | | | ProExcavation | | Accounts Pay... | 27,500.00 | | 27,500.00 | 90,000.00 |
| Bill | 05/28/15 | | | ProExcavation | Masonry Re... | Accounts Pay... | 4,300.00 | | 4,300.00 | 94,300.00 |
| Total Masonry | | | | | | | 94,300.00 | 0.00 | | 94,300.00 |
| Total Outside Service | | | | | | | 94,300.00 | 0.00 | | 94,300.00 |
| Total 55 Lyman Building & Improvement | | | | | | | 94,300.00 | 0.00 | | 94,300.00 |
| TOTAL | | | | | | | 94,300.00 | 0.00 | | 94,300.00 |

KDC 01299

KDC 00520

07/27/15

**Lyman-Cutler, LLC**
Transactions by Account
All Transactions

| Type | Date | Num | Name | Memo | Clr | Split | Original Amount | Paid Amount | Balance |
|------|------|-----|------|------|-----|-------|-----------------|-------------|---------|
| **55 Lyman Building & Improvement** | | | | | | | | | |
| **Outside Service** | | | | | | | | | |
| **Snow Removal** | | | | | | | | | |
| Check | 02/27/15 | 000 | Paul Digiacomo | | | Rockland Tru... | 2,000.00 | 2,000.00 | 2,000.00 |
| Bill | 03/15/15 | | ProExcavation | Plow and B... | | Accounts Pa... | 9,500.00 | 9,500.00 | 11,500.00 |
| Total Snow Removal | | | | | | | | 11,500.00 | 11,500.00 |
| Total Outside Service | | | | | | | | 11,500.00 | 11,500.00 |
| Total 55 Lyman Building & Improvement | | | | | | | | 11,500.00 | 11,500.00 |
| **TOTAL** | | | | | | | | 11,500.00 | 11,500.00 |





09/23/15

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Num | Adj | Name | Memo | Split | Debit | Credit | Original Amount | Balance |
|------|------|-----|-----|------|------|-------|-------|--------|-----------------|---------|
| **88 Cutler Building & Improvemen** | | | | | | | | | | |
| **Outside Service** | | | | | | | | | | |
| **Excavation** | | | | | | | | | | |
| Check | 08/28/13 | 1057 | | ProExcavation | Excavation/... | Rockland Tru... | 45,000.00 | | 45,000.00 | 45,000.00 |
| Check | 09/18/13 | 1056 | | ProExcavation | 88 Water/Se... | Rockland Tru... | 30,000.00 | | 30,000.00 | 75,000.00 |
| Check | 11/29/13 | 123 | | ProExcavation | payment | Rockland Tru... | 5,000.00 | | 5,000.00 | 80,000.00 |
| Check | 11/29/13 | 123 | | ProExcavation | payment | Rockland Tru... | 5,000.00 | | 5,000.00 | 85,000.00 |
| Bill | 02/06/14 | | | ProExcavation | | Accounts Pay... | 75,000.00 | | 75,000.00 | 160,000.00 |
| **Total Excavation** | | | | | | | 160,000.00 | 0.00 | | 160,000.00 |
| **Total Outside Service** | | | | | | | 160,000.00 | 0.00 | | 160,000.00 |
| **Total 88 Cutler Building & Improvemen** | | | | | | | 160,000.00 | 0.00 | | 160,000.00 |
| **TOTAL** | | | | | | | 160,000.00 | 0.00 | | 160,000.00 |

Page 1

KAG 02056




09/23/15

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Num | Adj | Name | Memo | Split | Debit | Credit | Original Amount | Balance |
|------|------|-----|-----|------|------|-------|-------|--------|-----------------|---------|
| **88 Cutler Building & Improvemen** | | | | | | | | | | |
| **Outside Service** | | | | | | | | | | |
| **Landscaping** | | | | | | | | | | |
| **ProExcavation** | | | | | | | | | | |
| Check | 01/27/14 | 1014 | | ProExcavation | payment | Rockland Tru... | 15,000.00 | | 15,000.00 | 15,000.00 |
| Bill | 02/06/14 | | | ProExcavation | | Accounts Pay... | 155,000.00 | | 155,000.00 | 170,000.00 |
| Check | 10/10/14 | 1126 | | ProExcavation | | Rockland Tru... | 20,000.00 | | 20,000.00 | 190,000.00 |
| Bill | 05/28/15 | | | ProExcavation | Landscaping... | Accounts Pay... | 4,600.00 | | 4,600.00 | 194,600.00 |
| Total ProExcavation | | | | | | | 194,600.00 | 0.00 | | 194,600.00 |
| Total Landscaping | | | | | | | 194,600.00 | 0.00 | | 194,600.00 |
| Total Outside Service | | | | | | | 194,600.00 | 0.00 | | 194,600.00 |
| Total 88 Cutler Building & Improvemen | | | | | | | 194,600.00 | 0.00 | | 194,600.00 |
| TOTAL | | | | | | | 194,600.00 | 0.00 | | 194,600.00 |

Page 1

KAG 02067





09/23/15

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Num | Adj | Name | Memo | Split | Debit | Credit | Original Amount | Balance |
|------|------|-----|-----|------|------|-------|-------|--------|-----------------|---------|
| **88 Cutler Building & Improvemen** | | | | | | | | | | |
| **Outside Service** | | | | | | | | | | |
| **Masonry** | | | | | | | | | | |
| Check | 10/21/13 | 1085 | | ProExcavation | payment | Rockland Tru... | 20,000.00 | | 20,000.00 | 20,000.00 |
| Check | 11/05/13 | 1097 | | ProExcavation | payment | Rockland Tru... | 20,000.00 | | 20,000.00 | 40,000.00 |
| Bill | 02/06/14 | | | ProExcavation | | Accounts Pay... | 27,500.00 | | 27,500.00 | 67,500.00 |
| Check | 02/19/14 | 1025 | | ProExcavation | payment | Rockland Tru... | 22,500.00 | | 22,500.00 | 90,000.00 |
| Bill | 05/28/15 | | | ProExcavation | Masonry Re... | Accounts Pay... | 4,300.00 | | 4,300.00 | 94,300.00 |
| **Total Masonry** | | | | | | | 94,300.00 | 0.00 | | 94,300.00 |
| **Total Outside Service** | | | | | | | 94,300.00 | 0.00 | | 94,300.00 |
| **Total 88 Cutler Building & Improvemen** | | | | | | | 94,300.00 | 0.00 | | 94,300.00 |
| **TOTAL** | | | | | | | 94,300.00 | 0.00 | | 94,300.00 |

KDC 01188

KDC 01123

07/27/15

**Lyman-Cutler, LLC**
Transactions by Account
All Transactions

| Type | Date | Num | Name | Memo | Clr | Split | Original Amount | Paid Amount | Balance |
|------|------|-----|------|------|-----|-------|-----------------|-------------|---------|
| 88 Cutler Building & Improvemen | | | | | | | | | |
| Outside Service | | | | | | | | | |
| Snow Removal | | | | | | | | | |
| Check | 02/27/15 | 001 | Paul Digiacomo | | | Rockland Tru... | 2,000.00 | 2,000.00 | 2,000.00 |
| Bill | 03/15/15 | | ProExcavation | Plow and B... | | Accounts Pa... | 9,500.00 | 9,500.00 | 11,500.00 |
| Total Snow Removal | | | | | | | | 11,500.00 | 11,500.00 |
| Total Outside Service | | | | | | | | 11,500.00 | 11,500.00 |
| Total 88 Cutler Building & Improvemen | | | | | | | | 11,500.00 | 11,500.00 |
| TOTAL | | | | | | | | 11,500.00 | 11,500.00 |

KDC 00341

07/24/15

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Num | Name | Memo | Clr | Split | Original Amount | Paid Amount | Balance |
|------|------|-----|------|------|-----|-------|-----------------|-------------|---------|
| **55 Lyman Building & Improvement** | | | | | | | | | |
| **Outside Service** | | | | | | | | | |
| **Electrical Services** | | | | | | | | | |
| Check | 09/25/13 | 1070 | Unicon Electric | 55 Lyman | * | Rockland Tru... | 10,000.00 | 10,000.00 | 10,000.00 |
| Check | 02/21/14 | 1030 | Unicon Electric | | | Rockland Tru... | 10,000.00 | 10,000.00 | 20,000.00 |
| Check | 03/13/14 | 1041 | Unicon Electric | | | Rockland Tru... | 5,000.00 | 5,000.00 | 25,000.00 |
| Check | 04/18/14 | 1058 | Unicon Electric | | | Rockland Tru... | 10,000.00 | 10,000.00 | 35,000.00 |
| Bill | 04/28/15 | | Unicon Electric | | | Accounts Pa... | 30,000.00 | 30,000.00 | 65,000.00 |
| **Total Electrical Services** | | | | | | | | 65,000.00 | 65,000.00 |
| **Total Outside Service** | | | | | | | | 65,000.00 | 65,000.00 |
| **Total 55 Lyman Building & Improvement** | | | | | | | | 65,000.00 | 65,000.00 |
| **TOTAL** | | | | | | | | 65,000.00 | 65,000.00 |

KDC 00977

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

07/24/15

| Type | Date | Num | Name | Memo | Clr | Split | Original Amount | Paid Amount | Balance |
|------|------|-----|------|------|-----|-------|-----------------|-------------|---------|
| **88 Cutler Building & Improvemen** | | | | | | | | | |
| **Outside Service** | | | | | | | | | |
| **Electrical Services** | | | | | | | | | |
| Check | 09/26/13 | 1071 | Unicon Electric | 88 Cutler | | Rockland Tru... | 10,000.00 | 10,000.00 | 10,000.00 |
| Check | 01/15/14 | 1008 | Unicon Electric | 88 Cutler | | Rockland Tru... | 10,000.00 | 10,000.00 | 20,000.00 |
| Check | 02/21/14 | 1030 | Unicon Electric | | | Rockland Tru... | 5,000.00 | 5,000.00 | 25,000.00 |
| Check | 03/13/14 | 1041 | Unicon Electric | | | Rockland Tru... | 5,000.00 | 5,000.00 | 30,000.00 |
| Bill | 04/28/15 | | Unicon Electric | | | Accounts Pa... | 35,000.00 | 35,000.00 | 65,000.00 |
| **Total Electrical Services** | | | | | | | | 65,000.00 | 65,000.00 |
| **Total Outside Service** | | | | | | | | 65,000.00 | 65,000.00 |
| **Total 88 Cutler Building & Improvemen** | | | | | | | | 65,000.00 | 65,000.00 |
| **TOTAL** | | | | | | | | 65,000.00 | 65,000.00 |

KDC 00380

**Lyman-Cutler, LLC**
**Transactions by Account**
**All Transactions**

| Type | Date | Name | Memo | Split | Debit | Original A... | Balance |
|------|------|------|------|-------|-------|-------------|---------|
| **55 Lyman Building & Improvement** | | | | | | | |
| **Outside Service** | | | | | | | |
| **Healing and Cooling** | | | | | | | |
| Check | 10/28/13 | V&D Heat | 55 Lyman | Rockland ... | 10,000.00 | 10,000.00 | 10,000.00 |
| Check | 03/07/14 | V&D Heat | 88 Cutler | Rockland ... | 25,000.00 | 25,000.00 | 35,000.00 |
| Check | 04/18/14 | V&D Heat | | Rockland ... | 10,000.00 | 10,000.00 | 45,000.00 |
| Bill | 07/08/14 | V&D Heat | Actual Invoice paid 7/8/14 check #1088 (not part of p... | Accounts ... | 550.00 | 550.00 | 45,550.00 |
| Bill | 04/28/15 | V&D Heat | | Accounts ... | 14,500.00 | 14,500.00 | 60,050.00 |
| **Total Healing and Cooling** | | | | | 60,050.00 | | 60,050.00 |
| **Total Outside Service** | | | | | 60,050.00 | | 60,050.00 |
| **Total 55 Lyman Building & Improvement** | | | | | 60,050.00 | | 60,050.00 |
| **TOTAL** | | | | | 60,050.00 | | 60,050.00 |



Page

KAG 02032

Lyman-Cutler, LLC
Transactions by Account
All Transactions

| Type | Date | Num | Name | Memo | Split | Debit | Original A... | Balance |
|------|------|-----|------|------|-------|-------|--------------|---------|
| **88 Cutler Building & Improvemen** | | | | | | | | |
| **Outside Service** | | | | | | | | |
| **Heating and Cooling** | | | | | | | | |
| Check | 10/28/13 | 1092 | V&D Heat | 88 Cutler | Rockland Tru... | 10,000.00 | 10,000.00 | 10,000.00 |
| Check | 01/07/14 | 1007 | V&D Heat | 88 Cutler | Rockland Tru... | 25,000.00 | 25,000.00 | 35,000.00 |
| Bill | 07/08/14 | 6032... | V&D Heat | Actual invoice paid 7/8/14 check #1088 (not part of prop... | Accounts Pay... | 550.00 | 550.00 | 35,550.00 |
| Bill | 04/28/15 | | V&D Heat | | Accounts Pay... | 24,500.00 | 24,500.00 | 60,050.00 |
| **Total Heating and Cooling** | | | | | | 60,050.00 | | 60,050.00 |
| **Total Outside Service** | | | | | | 60,050.00 | | 60,050.00 |
| **Total 88 Cutler Building & Improvemen** | | | | | | 60,050.00 | | 60,050.00 |
| **TOTAL** | | | | | | 60,050.00 | | 60,050.00 |

# EXHIBIT 36

EXHIBIT

Abramskiy 18
6·18·18  DA

6/15/2015

Joseph Cohen
**Strategic Business Manager**
Kagan Development Corporation Inc.
239 Nahanton Street
Newton, Ma. 02459
[j.cohen@kagandevelopment.com]
[kagandevelopment@gmail.com]

Messrs:
Vladislav Abramskiy
Vadim Kagan
Mrs. Zina Gassel
As Members of Newton-Cynthia Road, LLC
1731 Beacon Street, Unit 23
Brookline, MA 02446

In Re: Sale of Newton-Cynthia Rd. LLC

Dear Newton Cynthia Road LLC,

Pursuant to previous correspondence for which your response time has expired, I am sending this advisory. It is the intention of Kagan Development Corporation Inc. (KDC) to protect its interests by perfecting a mechanics lien upon 137 Cynthia Road. You are accordingly noticed that unless the parties agree to the previously proposed workout advanced by Mr. Kagan, this alternative will be put into play.

KDC has been the General Contractor for Newton-Cynthia Road LLC. (NCR) since November 2012. In that capacity, KDC has satisfied each and every component of its contract. Attached hereto is the final bill due pursuant to that contract which must be paid in hand by good funds by 12:00 PM June 16, 2015.

The bill referenced above is in the principal amount of $1,128,890.57 is through Friday the 12th of June 2015. Reflected in this bill are payments of $787,500.00. It includes the costs associated with the construction work ($981,643.97) as well as the 15% GC fee ($147,246.60), less payments already received (787,500.00), leaving a balance due of $341,390.57. For that work which remains unpaid, there is an additional 18% accrual fee for factoring the unreimbursed amounts due under this invoice, or precisely, $66,782.20.

The total due under this invoice is therefore $1,195,672.77 less the payment of $787,500.00 leaving the balance due of $408,172.77.

In summary, NCR is required to pay the total amount of $408,172.77 - immediately. This must be paid by attorney check or certified check no later than 12:00 PM June 16, 2015 in order to avoid having the property being liened. KDC will, if pursuing the mechanics lien, send a conformed copy of the lien to the closing attorney for the buyers in order to ensure that the lien is paid out of closing.

Should this mechanism be utilized it is estimated that NCR will realize $118,827.23 for settlement and distribution to its members.

Settlement charges of 10,000.00 are expected. This leaves 108,827.23 for distribution to NCR.

Currently the Members have established Capital Accounts into which their investments have been credited. These accounts currently have the following balances:

Capital Accounts

| | | | |
|---|---|---|---|
| i. | Vladislav Abramskiy | $149,695.00 | (%41.34 of total capital contribution) |
| ii. | Zina Gassel | $149,695.00 | (%41.34 of total capital contribution) |
| iii. | Vadim Kagan | $62,675 | (%17.32 of total capital contribution) |

The total Capital contributions by members at this time are $362,065.00 and in the above listed pro-rata components.

This means that ~ $108,827.23 is available to wind up the affairs of the LLC and distribute to the members. Winding up costs are modest and believed to be under $2,200.00; provided that the members cooperate one to the other in winding up the affairs without discord.

Actual expected distribution to members according to the percentages established above, would then be $106,627.23 per the following list:

| | | | |
|---|---|---|---|
| I. | Vladislav Abramskiy | $44,079.70 | (net loss of $105,615.03) |
| II. | Zina Gassel | $44,079.70 | (net loss of $105,615.03) |
| III. | Vadim Kagan | $18,467.83 | (net loss of $44,207.17) |

Please note, these numbers are imprecise; we cannot incorporate more exact figures until the HUD is created. That being said, these estimates but should be very close to the actual final accounting.

I remind the members that this sale is a commitment on behalf of the LLC and by extension its members. There are no options to void this sale without incurring serious monetary and legal consequences. All of you have been apprised of the financial situation of the enterprise prior to entering into the Purchase and Sale agreement. Therefore, it is incumbent upon all members to mitigate the losses by cooperating in facilitating this transaction.

It is, of course, disappointing to have a loss, under this work out, quite serious a serious deficit. However, the selling price is ultimately dictated by many factors, only a few of which are under our control.

Further, and of note, Vadim Kagan expects additional vendor expenses during the pre and post-closing process to total approximately $10,000 and an additional $10,000-$20,000 in warranty expense items covered for the new owners within the first year of purchase Therefore, Mr. Kagan expects to have a total additional charge to members of approximately $30,000 relating to winding up the LLC. This amount would be charged as occurred in the pro-rata means established above.

In response to your earlier email:
1. We agree that your capital accounting is correct, and has been adjusted accordingly.

2. There was never any agreement to mitigate commission for the agent unless the property sold at a profit.

3. We agree that an approximate $3,000 amount is necessary to leave in the account for the purpose of taxes and closing the LLC by year-end.

Further, the previous email transposed the two loans on the property. It has been corrected but the total remains unchanged.

If there are any questions please forward those questions to me by phone or via email at jcohen@kagandevelopment.com and kagandevelopment@gmail.com. I will seek the appropriate response and if necessary and upon the request of the member, will discuss the issue(s) with you, or your authorized professional representative. But, given the timing, I must request that any questions be raised expeditiously.

I remain available to discuss these numbers and analysis by phone at 347-902-3512 or by email at j.cohen@kagandevelopment.com and kagandevelopment@gmail.com. I will make my responses by email with copies to all members.

Respectfully, J. Joseph Cohen

Strategic Business Manger
KDC Corp
347-902-3512

Cc: Atty John Pertern, Atty Alex Pyle, Atty Robin F. Wallace

# *Invoice*

**Kagan Development Corporation, INC.**

239 Nahanton Street
Newton, MA 02459

| | |
|---|---|
| Date: | June 12, 2015 |
| Invoice #: | 14695 |
| Customer ID: | Newton-Cynthia, LLC. |

To:

Newton-Cynthia Road, LLC
1731 Beacon Street, Unit 23
Brookline, MA 02446

| Salesperson | Job | Payment Terms | Due Date |
|---|---|---|---|
| Vadim Kagan | Newton-Cynthia Road, LLC | **Payment due immediately upon receipt** | 6/15/15 |

| Qty | Description | Unit Price | Line Total |
|---|---|---|---|
| 1 | Total Construction Cost as of 6/12/2015 | $ 981,643.97 | $ 981,643.97 |
| | This price is work done as of 6/12/2015 | | |
| 1 | General Contractor's Fee (15%) | 147,246.60 | 147,246.60 |
| | Total Construction Cost Extended | 1,128,890.57 | |
| 1 | Payment Against Balance - (Construction Finanicing Loan): | (787,500.00) | (787,500.00) |
| | Running balance | 341,390.57 | |
| 1 | Factoring Fee - 1.5% per month compunded monthly | 66,782.20 | 66,782.20 |
| | 23 months of unpaid aged amounts with 18% per annum | | |

| | | |
|---|---|---|
| Subtotal | $ | 408,172.77 |
| Sales Tax | | |
| Total | $ | 408,172.77 |

Make all checks payable to KDC

Thank you for your business!

239 Nahanton Street, Newton, MA 02459  (617)-610-1276   kagandevelopment@gmail.com

# EXHIBIT 37

**Barbara A. Capone**

EXHIBIT
ZHUKOVSKIY
16
JTY   3-6-18

| | |
|---|---|
| **From:** | Dmitriy Zhukovskiy <dfzhukov@gmail.com> |
| **Sent:** | Monday, September 28, 2015 3:03 PM |
| **To:** | John Perten |
| **Subject:** | Fwd: Carrying Cost and the loan needed |
| **Attachments:** | Presentation_3_Lyman_70_525_DZ.xls |

---------- Forwarded message ----------
From: **Dmitriy Zhukovskiy** <dfzhukov@gmail.com>
Date: Sun, May 5, 2013 at 3:14 AM
Subject: Re: Carrying Cost and the loan needed
To: Alex Filippov <alex@ldpost.com>
Cc: Vadim Kagan <vadim.kagan@yahoo.com>, "Boris B. Maiden" <bmaiden@bmaidenlaw.com>, Nick
Lipetsker <nlipetsker@gmail.com>

Shura,

Please realize that this is abbreviated version (since it is 3:00 in the morning).  Besides apparent financial
benefits of the project expansion, there are some positive risk-related aspects which are harder to quantify
numerically, but I will comment of those nevertheless.

**Executive summary:**
- When compared to the original estimates, the expansion of the project would allow you to generate an
additional $70K, representing 16% increase in your profit.
- Additional carrying cost due to higher construction loan amount is $5K
- According to your estimates, there appears to be a 3-month delay in construction timing.  This delay results in
additional carrying cost of $19K (representing 3 month of interest payments and taxes).
- Expected funding deficiency of the expanded project is $25K and total carrying cost is $253K.
- After reflecting the delay and expanded project, your new estimated annual return is 22.7%, relative to 21.9%
in the original estimate.
- By expanding the project you are able to leverage low interest rates, generating additional revenue.
- By building a more sophisticated (read "desirable") property, you might be able to shorten the sale period and
recapture some revenue lost due to initial delays. For example, if expanding the project increases construction
period by 1 month and shortens the sale period by 2 months, you annualized return increases to 24%.

Since I have not been a part of your group discussions and have not had an opportunity to neither review
settlement statements nor adjusted time line, I am having hard time to validated certain elements of your
analysis.  I also noticed that you altered some of the calculations, and these changes rippled through producing
some erroneous results.  I am attaching the updated version of the model with some of your inputs and true-ups.
Please review and let's discuss.

**Here are some details of my analysis:**

1. Pre-construction time was extended from 2 months to 5 month (4m 20 days to be exact)

1

- Is this true that the first closing was on 1/1/2013?
- Can you please confirm the period between the time you purchased the lot and the time you closed on the construction loan. Obviously these are crucial details affecting the return.

2. I assume that your financials were sufficient to absolve you from any escrow requirements imposed by the bank.

3. According to Town of Brookline, 2013 real estate tax liability is $37,751. You specified a slightly different number of $30,687. I'm not sure of the origin of the lower number, so I'll assume that the rate specified on the towns website is the right rate and will not change for the duration of the project. Again, I think it might be beneficial to look at the settlement statement.

4. I presume you pulled other settlement statement entries from the actual statement so I used them "as is".

5. Not sure what the insurance rates are, but I would be surprised that they substantially deviate from $15K per year. In any instance, the sensitivity of the result to this variable is quite low.

6. It appears that you altered some of my calculations, which ripple through tho produce some erroneous results (for example fist quarter taxes have been equated to annual taxes, resulting in overestimation of of carrying cost by more than $20,000).

7. After making the adjustments to your calculations, I came-up with the the overall project expected return of 41.4% and your ROI is 48.9%.


**On the personal note,** (REALLY-REALLY PERSONAL NOTE) - I think the important take-away is to understand that these calculations are based on estimates (hopefully within tolerance levels) and illustrate directional movement. The model is here to help one make strategically right decisions which create opportunity, rather than to entice meditation on the noise of real-estate tax rates deviations and additional months of interest payments (albeit ultimately important). But perhaps I am totally missing the point of the exercise...




On Sat, May 4, 2013 at 11:34 PM, Dmitriy Zhukovskiy <dfzhukov@gmail.com> wrote:

I'll review later tonight.

On May 4, 2013 11:02 PM, "Alex Filippov" <alex@ldpost.com> wrote:
Dima K,

I am reviewing the original plan presented in Excel.

Here is what was planned:


1. Original construction cost was estimated at $1.3 M
2. Original Carrying cost per home was estimated $200K
3. Original loan amount for the land was planned to be $750K

2

4. Original construction loan was planned to be $1.5M
5. Sales price $4.9M

Annualized Return: 40%

Here is where we are today - still at the beginning of the project

1. Construction cost ( as I understood you) $1.4M
2. Carrying Cost - Calculated - $275K
3. Loan amount for the land - $800K
4. Construction loan we are applying is $1.6M
5. Sales Price $5.25 M

Annualized Return: 41%

However - as you see $1.6 M is not enough to carry us through the project. We are at least $16K short for each home. This means that we need to borrow $1.65 M for the construction of each home - 300K more than we originally planned.  As to the return - there is hardly any gain for this.

Dima Zh,

Can you please review updated Excel. I had to make few minor corrections.


Thank you

Alex Filippov

# Estimated Project Financials and Risk Analysis

## Project Scenario and Assumptions

### Allocations

| | Investor 1 | Investor 2 | Managing Partner |
|---|---|---|---|
| Investment | 80.00% | 20.00% | 00.00% |
| Profit/(Loss) | 40.00% | 10.00% | 50.00% |
| Loan Guarantee | 100.00% | 00.00% | 00.00% |
| Funding Shortfall | 00.00% | 00.00% | 100.00% |

### Project Timeline

| | Begin Date | End Date |
|---|---|---|
| Date | 01/01/2013 | 12/01/2014 |

### Project Timeline

| | Pre-Construction | Construction | Sale |
|---|---|---|---|
| Months | 5 | 12 | 6 |

### Project Costs

| | Lot Purchase Price | Construction Budget | Carrying Cost Margin |
|---|---|---|---|
| Amount | $ 2,000,000 | $ 1,400,000 | $ 200,000 |

| | |
|---|---|
| Gross Sale Price | $ 5,250,000 |

| | | |
|---|---|---|
| Down Payment | $ 1,200,000 | 60.0% |
| Reset to equal | | $ 1,500,000 |

| | |
|---|---|
| Commissions | 5.000% |

### Loan Terms

| | |
|---|---|
| Project Appraisal Requirement | $ 3,428,571 |
| Interest Rate | 4.750% * |
| Points | 1.000% |
| Escrow (months of interest) | 0 |

*Assumed to remain flat for the duration of the project.*

### Actual Construction Costs as % of Budget: 100.00%

### Annual Carrying Costs

| | Real Estate Tax Rate | Insurance Premium |
|---|---|---|
| Pre-Construction | $ 37,751 | $ 15,000 |
| Post-Construction | $ 37,751 | $ 15,000 |

## Investment and Profit Allocation

### Overall Project

| | | |
|---|---|---|
| Initial Deposit | 11/01/2012 | $ 100,000 |
| Lot Purchase Closing | 01/01/2013 | 1,129,360 |
| Pre-Construction Carrying Costs | 01/01/2013 | 28,354 |
| Construction Loan Closing | 06/01/2013 | 22,475 |
| Funding Shortfall | 06/01/2013 | 24,482 |
| Total Cash Commitment | | $ 1,304,671 |
| | | |
| Net Profit / (Loss) | 12/01/2014 | $ 1,250,850 |
| Return on Investment | | 95.9% |
| Annualized Return | | 41.4% |

### Investor 1

| | | |
|---|---|---|
| Initial Deposit | 11/01/2012 | $ 80,000 |
| Lot Purchase Closing | 01/01/2013 | 903,488 |
| Pre-Construction Carrying Costs | 01/01/2013 | 22,684 |
| Construction Loan Closing | 06/01/2013 | 17,980 |
| Funding Shortfall | 06/01/2013 | - |
| Total Cash Commitment | | $ 1,024,151 |
| | | |
| Net Profit / (Loss) | 12/01/2014 | $ 500,340 |
| Return on Investment | | 48.9% |
| Annualized Return | | 22.7% |

### Investor 2

| | | |
|---|---|---|
| Initial Deposit | 11/01/2012 | $ 20,000 |
| Lot Purchase Closing | 01/01/2013 | 225,872 |
| Pre-Construction Carrying Costs | 01/01/2013 | 5,671 |
| Construction Loan Closing | 06/01/2013 | 4,495 |
| Funding Shortfall | 06/01/2013 | - |
| Total Cash Commitment | | $ 256,038 |
| | | |
| Net Profit / (Loss) | 12/01/2014 | $ 125,085 |
| Return on Investment | | 48.9% |
| Annualized Return | | 22.7% |

### Managing Partner

| | | |
|---|---|---|
| Initial Deposit | 11/01/2012 | $ - |
| Lot Purchase Closing | 01/01/2013 | - |
| Pre-Construction Carrying Costs | 01/01/2013 | - |
| Construction Loan Closing | 06/01/2013 | - |
| Funding Shortfall | 06/01/2013 | 24,482 |
| Total Cash Commitment | | $ 24,482 |
| | | |
| Net Profit / (Loss) | 12/01/2014 | $ 625,425 |
| Return on Investment | | 2554.7% |
| Annualized Return | | 761.9% |

## Project Financing

### Lot Purchase Closing: 01/01/2013

| | |
|---|---|
| Down Payment | $ 1,200,000 |
| Points | 8,000 |
| Settlement Charges | 9,047 |
| LLC Filing and Representation | 2,875 |
| Real Estate Taxes | 9,438 |
| Escrow Deposit | - |
| Total | $ 1,229,360 |

### Construction Loan Closing: 06/01/2013

| | |
|---|---|
| Points | $ 16,000 |
| Settlement Charges | 3,975 |
| Legal Fees | 2,500 |
| Escrow Deposit | - |
| Total | $ 22,475 |

### Pre-Construction Carrying Costs

| | |
|---|---|
| 01/01/2013 - 05/31/2013 | $ 28,354 |

### Total Initial Investment

| | |
|---|---|
| To be made by 06/01/2013 | $ 1,280,189 |

### Loan Amounts

| | |
|---|---|
| Lot Purchase Mortgage | $ 800,000 |
| Construction Loan | 1,600,000 |
| Total | $ 2,400,000 |

### Construction Loan Shortfall / (Excess)

| | |
|---|---|
| Loan Amount | $ 1,600,000 |
| Cost of Construction | 1,400,000 |
| Carrying Costs | 224,482 |
| Funding Shortfall / (Excess) | $ 24,482 |

### Cash Commitment

| | | |
|---|---|---|
| Initial Deposit | 11/01/2012 | $ 100,000 |
| Lot Purchase Closing | 01/01/2013 | 1,129,360 |
| Pre-Construction Carrying Costs | 01/01/2013 | 28,354 |
| Construction Loan Closing | 06/01/2013 | 22,475 |
| Funding Shortfall | 06/01/2013 | 24,482 |
| Total | | $ 1,304,671 |

### Reconciliation Account

| | |
|---|---|
| Cash at Closing | $ 2,555,520 |
| Total Initial Investment | (1,280,189) |
| Funding (Shortfall) / Excess | (24,482) |
| Net Profit / (Loss) | $ 1,250,850 |

## Profit (and Loss) Statement

| | |
|---|---|
| Sale Proceeds | |
| Sale Price | $ 5,250,000 |
| Commissions | 262,500 |
| Net Proceeds | $ 4,987,500 |
| | |
| Lot Purchase Price | $ 2,000,000 |
| | |
| Cost of Construction | $ 1,400,000 |

### Closing Costs and Legal Fees

| | |
|---|---|
| Legal Fees | |
| - LLC Filing and Representation | 2,875 |
| - Construction Loan | 2,500 |
| - Sale Closing | 3,000 |
| Points | |
| - Lot Purchase | 8,000 |
| - Construction Loan | 16,000 |
| Settlement Charges and Stamps | |
| - Lot Purchase | 9,047 |
| - Construction Loan | 3,975 |
| - Sale | 24,240 |
| Real Estate Taxes | |
| - Lot Purchase | 9,438 |
| - Sale | (3,283) |
| Interest paid at Sale Closing | |
| - Lot Purchase Loan | 3,167 |
| - Construction Loan | 4,856 |
| Total | $ 83,814 |

### Carrying Costs, 01/01/2013 - 05/31/2013

| | |
|---|---|
| Mortgage Interest Payments | $ 12,667 |
| Real Estate Taxes | 9,438 |
| Insurance | 6,250 |
| Total | $ 28,354 |

### Carrying Costs, 06/01/2013 - 11/30/2014

| | |
|---|---|
| Lot Purchase Loan Interest Payments | $ 57,950 |
| Construction Loan Interest Payments | 84,780 |
| Construction Loan Distribution Fees | 2,625 |
| Real Estate Taxes | 56,627 |
| Insurance | 22,500 |
| Total | $ 224,482 |

| | |
|---|---|
| All Costs | $ 3,736,650 |
| | |
| Net Profit / (Loss) | $ 1,250,850 |

## Profit Allocation Based on Capital Contribution and Market Costs

### Market Cost of Constuction

| | |
|---|---|
| All Costs | $ 3,736,650 |
| Cost of Capital (points and Interesrt) | (190,044) |
| Management Fees | 525,000 |
| Market Cost | $ 4,071,606 |

| | |
|---|---|
| Net Sale Proceeds | $ 4,987,500 |
| | |
| Net Market Profit | $ 915,894 |

### Profit Allocation: Investor

| | |
|---|---|
| Investor's Capital | $ 1,024,151 |
| % of Market Cost | 25.2% |
| Fair Profit Allocation | $ 230,379 |
| | |
| Actual Profit Granted | $ 500,340 |
| Excess/(Shortfall) | $ 269,961 |

## Profit / (Loss) Risk Analysis - Investor (40% Profit Allocation)

| Sale Price ($000) | Project Timeline (months) | | | | | | | | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | 18 | 19 | 20 | 21 | 22 | 23 | 24 | 25 | 26 | 27 | 28 | 29 | 30 | 31 | 32 | 33 | 34 | 35 | 36 |
| 5,500 | 623 | 617 | 612 | 606 | 600 | 595 | 589 | 583 | 578 | 573 | 567 | 561 | 556 | 550 | 544 | 539 | 533 | 528 | 522 |
| 5,475 | 614 | 608 | 602 | 597 | 591 | 585 | 580 | 574 | 569 | 563 | 558 | 552 | 546 | 541 | 535 | 529 | 524 | 518 | 512 |
| 5,450 | 604 | 598 | 593 | 587 | 582 | 576 | 570 | 565 | 559 | 554 | 548 | 542 | 537 | 531 | 525 | 520 | 514 | 509 | 503 |
| 5,425 | 595 | 589 | 583 | 578 | 572 | 567 | 561 | 555 | 550 | 544 | 539 | 533 | 527 | 522 | 516 | 510 | 505 | 499 | 493 |
| 5,400 | 585 | 580 | 574 | 568 | 563 | 557 | 551 | 546 | 540 | 535 | 529 | 523 | 518 | 512 | 506 | 501 | 495 | 490 | 484 |
| 5,375 | 576 | 570 | 564 | 559 | 553 | 548 | 542 | 536 | 531 | 525 | 520 | 514 | 508 | 503 | 497 | 492 | 486 | 480 | 475 |
| 5,350 | 566 | 561 | 555 | 549 | 544 | 538 | 532 | 527 | 522 | 516 | 510 | 505 | 499 | 493 | 488 | 482 | 476 | 471 | 465 |
| 5,325 | 557 | 551 | 545 | 540 | 534 | 529 | 523 | 517 | 512 | 506 | 501 | 495 | 490 | 484 | 478 | 473 | 467 | 461 | 456 |
| 5,300 | 547 | 542 | 536 | 530 | 525 | 519 | 514 | 508 | 503 | 497 | 491 | 486 | 480 | 474 | 469 | 463 | 457 | 452 | 446 |
| 5,275 | 538 | 532 | 527 | 521 | 515 | 510 | 504 | 498 | 493 | 487 | 482 | 476 | 471 | 465 | 459 | 454 | 448 | 442 | 437 |
| 5,250 | 528 | 523 | 517 | 512 | 506 | 500 | 495 | 489 | 484 | 478 | 472 | 467 | 461 | 455 | 450 | 444 | 439 | 433 | 427 |
| 5,225 | 519 | 513 | 508 | 502 | 496 | 491 | 485 | 479 | 474 | 469 | 463 | 457 | 452 | 446 | 440 | 435 | 429 | 424 | 418 |
| 5,200 | 510 | 504 | 498 | 493 | 487 | 481 | 476 | 470 | 465 | 459 | 454 | 448 | 442 | 437 | 431 | 425 | 420 | 414 | 408 |
| 5,175 | 500 | 494 | 489 | 483 | 478 | 472 | 466 | 461 | 455 | 450 | 444 | 438 | 433 | 427 | 421 | 416 | 410 | 405 | 399 |
| 5,150 | 491 | 485 | 479 | 474 | 468 | 463 | 457 | 451 | 446 | 440 | 435 | 429 | 423 | 418 | 412 | 406 | 401 | 395 | 389 |
| 5,125 | 481 | 476 | 470 | 464 | 459 | 453 | 447 | 442 | 436 | 431 | 425 | 419 | 414 | 408 | 402 | 397 | 391 | 386 | 380 |
| 5,100 | 472 | 466 | 460 | 455 | 449 | 444 | 438 | 432 | 427 | 421 | 416 | 410 | 404 | 399 | 393 | 388 | 382 | 376 | 371 |
| 5,075 | 462 | 457 | 451 | 445 | 440 | 434 | 428 | 423 | 418 | 412 | 406 | 401 | 395 | 389 | 384 | 378 | 372 | 367 | 361 |
| 5,050 | 453 | 447 | 441 | 436 | 430 | 425 | 419 | 413 | 408 | 402 | 397 | 391 | 386 | 380 | 374 | 369 | 363 | 357 | 352 |
| 5,025 | 443 | 438 | 432 | 426 | 421 | 415 | 410 | 404 | 399 | 393 | 387 | 382 | 376 | 370 | 365 | 359 | 353 | 348 | 342 |
| 5,000 | 434 | 428 | 423 | 417 | 411 | 406 | 400 | 394 | 389 | 383 | 378 | 372 | 367 | 361 | 355 | 350 | 344 | 338 | 333 |
| 4,975 | 425 | 419 | 413 | 408 | 402 | 396 | 391 | 385 | 380 | 374 | 368 | 363 | 357 | 351 | 346 | 340 | 335 | 329 | 323 |
| 4,950 | 415 | 409 | 404 | 398 | 392 | 387 | 381 | 375 | 370 | 365 | 359 | 353 | 348 | 342 | 336 | 331 | 325 | 320 | 314 |
| 4,925 | 406 | 400 | 394 | 389 | 383 | 377 | 372 | 366 | 361 | 355 | 350 | 344 | 338 | 333 | 327 | 321 | 316 | 310 | 304 |
| 4,900 | 396 | 390 | 385 | 379 | 374 | 368 | 362 | 357 | 351 | 346 | 340 | 334 | 329 | 323 | 317 | 312 | 306 | 301 | 295 |
| 4,875 | 387 | 381 | 375 | 370 | 364 | 359 | 353 | 347 | 342 | 336 | 331 | 325 | 319 | 314 | 308 | 302 | 297 | 291 | 285 |
| 4,850 | 377 | 372 | 366 | 360 | 355 | 349 | 343 | 338 | 332 | 327 | 321 | 315 | 310 | 304 | 298 | 293 | 287 | 282 | 276 |
| 4,825 | 368 | 362 | 356 | 351 | 345 | 340 | 334 | 328 | 323 | 317 | 312 | 306 | 300 | 295 | 289 | 284 | 278 | 272 | 267 |
| 4,800 | 358 | 353 | 347 | 341 | 336 | 330 | 324 | 319 | 314 | 308 | 302 | 297 | 291 | 285 | 280 | 274 | 268 | 263 | 257 |
| 4,775 | 349 | 343 | 337 | 332 | 326 | 321 | 315 | 309 | 304 | 298 | 293 | 287 | 282 | 276 | 270 | 265 | 259 | 253 | 248 |
| 4,750 | 339 | 334 | 328 | 322 | 317 | 311 | 306 | 300 | 295 | 289 | 283 | 278 | 272 | 266 | 261 | 255 | 249 | 244 | 238 |
| 4,725 | 330 | 324 | 319 | 313 | 307 | 302 | 296 | 290 | 285 | 279 | 274 | 268 | 263 | 257 | 251 | 246 | 240 | 234 | 229 |
| 4,700 | 321 | 315 | 309 | 304 | 298 | 292 | 287 | 281 | 276 | 270 | 264 | 259 | 253 | 247 | 242 | 236 | 231 | 225 | 219 |
| 4,675 | 311 | 305 | 300 | 294 | 288 | 283 | 277 | 271 | 266 | 261 | 255 | 249 | 244 | 238 | 232 | 227 | 221 | 216 | 210 |
| 4,650 | 302 | 296 | 290 | 285 | 279 | 273 | 268 | 262 | 257 | 251 | 246 | 240 | 234 | 229 | 223 | 217 | 212 | 206 | 200 |
| 4,625 | 292 | 286 | 281 | 275 | 270 | 264 | 258 | 253 | 247 | 242 | 236 | 230 | 225 | 219 | 213 | 208 | 202 | 197 | 191 |
| 4,600 | 283 | 277 | 271 | 266 | 260 | 255 | 249 | 243 | 238 | 232 | 227 | 221 | 215 | 210 | 204 | 198 | 193 | 187 | 181 |
| 4,575 | 273 | 268 | 262 | 256 | 251 | 245 | 239 | 234 | 228 | 223 | 217 | 211 | 206 | 200 | 194 | 189 | 183 | 178 | 172 |
| 4,550 | 264 | 258 | 252 | 247 | 241 | 236 | 230 | 224 | 219 | 213 | 208 | 202 | 196 | 191 | 185 | 180 | 174 | 168 | 163 |
| 4,525 | 254 | 249 | 243 | 237 | 232 | 226 | 220 | 215 | 210 | 204 | 198 | 193 | 187 | 181 | 176 | 170 | 164 | 159 | 153 |
| 4,500 | 245 | 239 | 233 | 228 | 222 | 217 | 211 | 205 | 200 | 194 | 189 | 183 | 178 | 172 | 166 | 161 | 155 | 149 | 144 |

## Initial Loan Interest Schedule

| | Closing Date | Loan Amount | Project End Date | 4.75% 02/01/2013 | 4.75% 03/01/2013 | 4.75% 04/01/2013 | 4.75% 05/01/2013 | 4.75% 06/01/2013 | 4.75% 07/01/2013 | 4.75% 08/01/2013 | 4.75% 09/01/2013 | 4.75% 10/01/2013 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lot Purchase | 01/01/2013 | $800,000 | 12/01/2014 | $3,272 | $2,956 | $3,272 | $3,167 | $3,272 | $3,167 | $3,272 | $3,272 | $3,167 |

## Construction Loan Distribution Schedule

| Description | % | Budget | Week | Date | Fee | 4.75% 07/08/2013 | 4.75% 08/08/2013 | 4.75% 09/08/2013 | 4.75% 10/08/2013 | 4.75% 11/08/2013 | 4.75% 12/08/2013 | 4.75% 01/08/2014 | 4.75% 02/08/2014 | 4.75% 03/08/2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Plans & Permits | 3.0% | $48,000 | 1 | 06/08/2013 | $125 | $190 | $196 | $196 | $190 | $196 | $190 | $196 | $196 | $177 |
| Foundation (As-built required) | 9.0% | $144,000 | 3 | 06/22/2013 | $125 | $304 | $589 | $589 | $570 | $589 | $570 | $589 | $589 | $532 |
| Framing | 9.0% | $144,000 | 5 | 07/06/2013 | $125 | $38 | $589 | $589 | $570 | $589 | $570 | $589 | $589 | $355 |
| Sheathing | 6.0% | $96,000 | 5 | 07/06/2013 | $0 | $25 | $393 | $393 | $380 | $393 | $380 | $393 | $393 | $118 |
| Roof Boarding | 2.0% | $32,000 | 8 | 07/27/2013 | $125 | $0 | $51 | $131 | $127 | $131 | $127 | $131 | $131 | $118 |
| Roof Shingle | 2.0% | $32,000 | 8 | 07/27/2013 | $0 | $0 | $51 | $131 | $127 | $131 | $127 | $131 | $131 | $118 |
| Exterior Doors & Windows | 6.0% | $96,000 | 9 | 08/03/2013 | $125 | $0 | $63 | $393 | $380 | $393 | $380 | $393 | $393 | $355 |
| Exterior Siding Installed | 3.0% | $48,000 | 9 | 08/03/2013 | $0 | $0 | $32 | $196 | $190 | $196 | $190 | $196 | $196 | $177 |
| Interior & Exterior Paint | 4.0% | $64,000 | 10 | 08/10/2013 | $125 | $0 | $0 | $245 | $253 | $262 | $253 | $262 | $262 | $236 |
| Chimney & Fireplace | 3.0% | $48,000 | 11 | 08/17/2013 | $125 | $0 | $0 | $139 | $190 | $196 | $190 | $196 | $196 | $177 |
| Rough Plumbing (sign off required) | 3.0% | $48,000 | 14 | 09/07/2013 | $125 | $0 | $0 | $6 | $190 | $196 | $190 | $196 | $196 | $177 |
| Rough Electric (sign off required) | 3.0% | $48,000 | 14 | 09/07/2013 | $0 | $0 | $0 | $6 | $190 | $196 | $190 | $196 | $196 | $177 |
| Rough Heat | 2.0% | $32,000 | 15 | 09/14/2013 | $125 | $0 | $0 | $0 | $101 | $131 | $127 | $131 | $131 | $118 |
| Sewer/Septic (Cert of Compliance required) | 3.0% | $48,000 | 8 | 07/27/2013 | $0 | $0 | $76 | $196 | $190 | $196 | $190 | $196 | $196 | $177 |
| Water | 2.0% | $32,000 | 8 | 07/27/2013 | $0 | $0 | $51 | $131 | $127 | $131 | $127 | $131 | $131 | $118 |
| Insulation (sign off required) | 2.0% | $32,000 | 20 | 10/19/2013 | $125 | $0 | $0 | $0 | $0 | $84 | $127 | $131 | $131 | $118 |
| Drywall/Plaster | 5.0% | $80,000 | 22 | 11/02/2013 | $125 | $0 | $0 | $0 | $0 | $63 | $317 | $327 | $327 | $296 |
| Interior Doors | 2.0% | $32,000 | 24 | 11/16/2013 | $125 | $0 | $0 | $0 | $0 | $0 | $93 | $131 | $131 | $118 |
| Interior Finish (woodwork) | 4.0% | $64,000 | 26 | 11/30/2013 | $125 | $0 | $0 | $0 | $0 | $0 | $68 | $262 | $262 | $236 |
| Finish Plumbing (sign off required) | 1.0% | $16,000 | 40 | 03/08/2014 | $125 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Finish Electric (sign off required) | 1.0% | $16,000 | 40 | 03/08/2014 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Finish Heat | 2.0% | $32,000 | 40 | 03/08/2014 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $59 |
| Cellar & Garage finish floor | 1.0% | $16,000 | 10 | 08/10/2013 | $0 | $0 | $0 | $61 | $63 | $65 | $63 | $65 | $65 | $59 |
| Bath & Kitchen finish floor | 2.0% | $32,000 | 36 | 02/08/2014 | $125 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $118 |
| Hardwood/Carpet finish floor | 3.0% | $48,000 | 38 | 02/22/2014 | $125 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $89 |
| Kitchen Cabinets w/ tops | 5.0% | $80,000 | 25 | 11/23/2013 | $125 | $0 | $0 | $0 | $0 | $0 | $158 | $327 | $327 | $296 |
| Appliances | 1.0% | $16,000 | 30 | 12/28/2013 | $125 | $0 | $0 | $0 | $0 | $0 | $0 | $23 | $65 | $59 |
| Driveway (2%) & Steps (1%) | 3.0% | $48,000 | 44 | 04/05/2014 | $125 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Landscaping (2%) & Deck (1%) | 3.0% | $48,000 | 46 | 04/19/2014 | $125 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Contingency & Holdback-Occupancy Permit 5% | 5.0% | $80,000 | 47 | 04/26/2014 | $125 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 | $0 |
| Total | 100.0% | $1,600,000 | | 06/01/2014 | $2,625 | $557 | $2,090 | $3,403 | $3,838 | $4,140 | $4,625 | $5,193 | $5,236 | $4,936 |

## Real Estate Taxes and Insurance Payments

| | Pre-Construction | Post-Construction | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Tax Rates | $37,751 | $37,751 | 05/01/2013 $9,438 | 08/01/2013 $9,438 | 11/01/2013 $9,438 | 02/01/2014 $9,438 | 05/01/2014 $9,438 | 08/01/2014 $9,438 | 11/01/2014 $9,438 | - | - |

| | Pre-Construction | Post-Construction | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|
| Insurance Rates | $15,000 | $15,000 | 01/01/2013 $1,250 | 02/01/2013 $1,250 | 03/01/2013 $1,250 | 04/01/2013 $1,250 | 05/01/2013 $1,250 | 06/01/2013 $1,250 | 07/01/2013 $1,250 | 08/01/2013 $1,250 | 09/01/2013 $1,250 |

## Initial Loan Interest Schedule

| | Closing Date | Loan Amount | Project End Date | 4.75% 11/01/2013 | 4.75% 12/01/2013 | 4.75% 01/01/2014 | 4.75% 02/01/2014 | 4.75% 03/01/2014 | 4.75% 04/01/2014 | 4.75% 05/01/2014 | 4.75% 06/01/2014 | 4.75% 07/01/2014 | 4.75% 08/01/2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Lot Purchase | 01/01/2013 | $800,000 | 12/01/2014 | $3,272 | $3,167 | $3,272 | $3,272 | $2,956 | $3,272 | $3,167 | $3,272 | $3,167 | $3,272 |

## Construction Loan Distribution Schedule

| Description | % | Budget | Week | Date | Fee | 4.75% 04/08/2014 | 4.75% 05/08/2014 | 4.75% 06/08/2014 | 4.75% 07/08/2014 | 4.75% 08/08/2014 | 4.75% 09/08/2014 | 4.75% 10/08/2014 | 4.75% 11/08/2014 | 4.75% 12/01/2014 | - |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Plans & Permits | 3.0% | $48,000 | 1 | 06/08/2013 | $125 | $196 | $190 | $196 | $190 | $196 | $196 | $190 | $196 | $146 | - |
| Foundation (As-built required) | 9.0% | $144,000 | 3 | 06/22/2013 | $125 | $589 | $570 | $589 | $570 | $589 | $589 | $570 | $589 | $437 | - |
| Framing | 9.0% | $144,000 | 5 | 07/06/2013 | $125 | $589 | $570 | $589 | $570 | $589 | $589 | $570 | $589 | $437 | - |
| Sheathing | 6.0% | $96,000 | 5 | 07/06/2013 | $0 | $393 | $380 | $393 | $380 | $393 | $393 | $380 | $393 | $291 | - |
| Roof Boarding | 2.0% | $32,000 | 8 | 07/27/2013 | $125 | $131 | $127 | $131 | $127 | $131 | $131 | $127 | $131 | $97 | - |
| Roof Shingle | 2.0% | $32,000 | 8 | 07/27/2013 | $0 | $131 | $127 | $131 | $127 | $131 | $131 | $127 | $131 | $97 | - |
| Exterior Doors & Windows | 6.0% | $96,000 | 9 | 08/03/2013 | $125 | $393 | $380 | $393 | $380 | $393 | $393 | $380 | $393 | $291 | - |
| Exterior Siding Installed | 3.0% | $48,000 | 9 | 08/03/2013 | $0 | $196 | $190 | $196 | $190 | $196 | $196 | $190 | $196 | $146 | - |
| Interior & Exterior Paint | 4.0% | $64,000 | 10 | 08/10/2013 | $125 | $262 | $253 | $262 | $253 | $262 | $262 | $253 | $262 | $194 | - |
| Chimney & Fireplace | 3.0% | $48,000 | 11 | 08/17/2013 | $125 | $196 | $190 | $196 | $190 | $196 | $196 | $190 | $196 | $146 | - |
| Rough Plumbing (sign off required) | 3.0% | $48,000 | 14 | 09/07/2013 | $125 | $196 | $190 | $196 | $190 | $196 | $196 | $190 | $196 | $146 | - |
| Rough Electric (sign off required) | 3.0% | $48,000 | 14 | 09/07/2013 | $0 | $196 | $190 | $196 | $190 | $196 | $196 | $190 | $196 | $146 | - |
| Rough Heat | 2.0% | $32,000 | 15 | 09/14/2013 | $125 | $131 | $127 | $131 | $127 | $131 | $131 | $127 | $131 | $97 | - |
| Sewer/Septic (Cert of Compliance required) | 3.0% | $48,000 | 8 | 07/27/2013 | $0 | $196 | $190 | $196 | $190 | $196 | $196 | $190 | $196 | $146 | - |
| Water | 2.0% | $32,000 | 8 | 07/27/2013 | $0 | $131 | $127 | $131 | $127 | $131 | $131 | $127 | $131 | $97 | - |
| Insulation (sign off required) | 2.0% | $32,000 | 20 | 10/19/2013 | $125 | $131 | $127 | $131 | $127 | $131 | $131 | $127 | $131 | $97 | - |
| Drywall/Plaster | 5.0% | $80,000 | 22 | 11/02/2013 | $125 | $327 | $317 | $327 | $317 | $327 | $327 | $317 | $327 | $243 | - |
| Interior Doors | 2.0% | $32,000 | 24 | 11/16/2013 | $125 | $131 | $127 | $131 | $127 | $131 | $131 | $127 | $131 | $97 | - |
| Interior Finish (woodwork) | 4.0% | $64,000 | 26 | 11/30/2013 | $125 | $262 | $253 | $262 | $253 | $262 | $262 | $253 | $262 | $194 | - |
| Finish Plumbing (sign off required) | 1.0% | $16,000 | 40 | 03/08/2014 | $125 | $65 | $63 | $65 | $63 | $65 | $65 | $63 | $65 | $49 | - |
| Finish Electric (sign off required) | 1.0% | $16,000 | 40 | 03/08/2014 | $0 | $65 | $63 | $65 | $63 | $65 | $65 | $63 | $65 | $49 | - |
| Finish Heat | 2.0% | $32,000 | 40 | 03/08/2014 | $0 | $131 | $127 | $131 | $127 | $131 | $131 | $127 | $131 | $97 | - |
| Cellar & Garage finish floor | 1.0% | $16,000 | 10 | 08/10/2013 | $0 | $65 | $63 | $65 | $63 | $65 | $65 | $63 | $65 | $49 | - |
| Bath & Kitchen finish floor | 2.0% | $32,000 | 36 | 02/08/2014 | $125 | $131 | $127 | $131 | $127 | $131 | $131 | $127 | $131 | $97 | - |
| Hardwood/Carpet finish floor | 3.0% | $48,000 | 38 | 02/22/2014 | $125 | $196 | $190 | $196 | $190 | $196 | $196 | $190 | $196 | $146 | - |
| Kitchen Cabinets w/ tops | 5.0% | $80,000 | 25 | 11/23/2013 | $125 | $327 | $317 | $327 | $317 | $327 | $327 | $317 | $327 | $243 | - |
| Appliances | 1.0% | $16,000 | 30 | 12/28/2013 | $125 | $65 | $63 | $65 | $63 | $65 | $65 | $63 | $65 | $49 | - |
| Driveway (2%) & Steps (1%) | 3.0% | $48,000 | 44 | 04/05/2014 | $125 | $19 | $190 | $196 | $190 | $196 | $196 | $190 | $196 | $146 | - |
| Landscaping (2%) & Deck (1%) | 3.0% | $48,000 | 46 | 04/19/2014 | $125 | $0 | $120 | $196 | $190 | $196 | $196 | $190 | $196 | $146 | - |
| Contingency & Holdback-Occupancy Permit 5% | 5.0% | $80,000 | 47 | 04/26/2014 | $125 | $0 | $127 | $327 | $317 | $327 | $327 | $317 | $327 | $243 | - |
| Total | 100.0% | $1,600,000 | | 06/01/2014 | $2,625 | $5,844 | $6,074 | $6,544 | $6,333 | $6,544 | $6,544 | $6,333 | $6,544 | $4,856 | $0 |

## Real Estate Taxes and Insurance Payments

| | Pre-Construction | Post-Construction | | | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Tax Rates | $37,751 | $37,751 | - | - | - | - | - | - | - | - | - | - | - |

| | Pre-Construction | Post-Construction | 10/01/2013 | 11/01/2013 | 12/01/2013 | 01/01/2014 | 02/01/2014 | 03/01/2014 | 04/01/2014 | 05/01/2014 | 06/01/2014 | 07/01/2014 |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| Insurance Rates | $15,000 | $15,000 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 | $1,250 |

## Initial Loan Interest Schedule

| | Closing Date | Loan Amount | Project End Date | 4.75% 09/01/2014 | 4.75% 10/01/2014 | 4.75% 11/01/2014 | 4.75% 12/01/2014 |
|---|---|---|---|---|---|---|---|
| Lot Purchase | 01/01/2013 | $800,000 | 12/01/2014 | $3,272 | $3,167 | $3,272 | $3,167 |

## Construction Loan Distribution Schedule

| Description | % | Budget | Distribution Week | Distribution Date | Fee | - | - | - | - |
|---|---|---|---|---|---|---|---|---|---|
| Plans & Permits | 3.0% | $48,000 | 1 | 06/08/2013 | $125 | - | - | - | - |
| Foundation (As-built required) | 9.0% | $144,000 | 3 | 06/22/2013 | $125 | - | - | - | - |
| Framing | 9.0% | $144,000 | 5 | 07/06/2013 | $125 | - | - | - | - |
| Sheathing | 6.0% | $96,000 | 5 | 07/06/2013 | $0 | - | - | - | - |
| Roof Boarding | 2.0% | $32,000 | 8 | 07/27/2013 | $125 | - | - | - | - |
| Roof Shingle | 2.0% | $32,000 | 8 | 07/27/2013 | $0 | - | - | - | - |
| Exterior Doors & Windows | 6.0% | $96,000 | 9 | 08/03/2013 | $125 | - | - | - | - |
| Exterior Siding Installed | 3.0% | $48,000 | 9 | 08/03/2013 | $0 | - | - | - | - |
| Interior & Exterior Paint | 4.0% | $64,000 | 10 | 08/10/2013 | $125 | - | - | - | - |
| Chimney & Fireplace | 3.0% | $48,000 | 11 | 08/17/2013 | $125 | - | - | - | - |
| Rough Plumbing (sign off required) | 3.0% | $48,000 | 14 | 09/07/2013 | $125 | - | - | - | - |
| Rough Electric (sign off required) | 3.0% | $48,000 | 14 | 09/07/2013 | $0 | - | - | - | - |
| Rough Heat | 2.0% | $32,000 | 15 | 09/14/2013 | $125 | - | - | - | - |
| Sewer/Septic (Cert of Compliance required) | 3.0% | $48,000 | 8 | 07/27/2013 | $0 | - | - | - | - |
| Water | 2.0% | $32,000 | 8 | 07/27/2013 | $0 | - | - | - | - |
| Insulation (sign off required) | 2.0% | $32,000 | 20 | 10/19/2013 | $125 | - | - | - | - |
| Drywall/Plaster | 5.0% | $80,000 | 22 | 11/02/2013 | $125 | - | - | - | - |
| Interior Doors | 2.0% | $32,000 | 24 | 11/16/2013 | $125 | - | - | - | - |
| Interior Finish (woodwork) | 4.0% | $64,000 | 26 | 11/30/2013 | $125 | - | - | - | - |
| Finish Plumbing (sign off required) | 1.0% | $16,000 | 40 | 03/08/2014 | $125 | - | - | - | - |
| Finish Electric (sign off required) | 1.0% | $16,000 | 40 | 03/08/2014 | $0 | - | - | - | - |
| Finish Heat | 2.0% | $32,000 | 40 | 03/08/2014 | $0 | - | - | - | - |
| Cellar & Garage finish floor | 1.0% | $16,000 | 10 | 08/10/2013 | $0 | - | - | - | - |
| Bath & Kitchen finish floor | 2.0% | $32,000 | 36 | 02/08/2014 | $125 | - | - | - | - |
| Hardwood/Carpet finish floor | 3.0% | $48,000 | 38 | 02/22/2014 | $125 | - | - | - | - |
| Kitchen Cabinets w/ tops | 5.0% | $80,000 | 25 | 11/23/2013 | $125 | - | - | - | - |
| Appliances | 1.0% | $16,000 | 30 | 12/28/2013 | $125 | - | - | - | - |
| Driveway (2%) & Steps (1%) | 3.0% | $48,000 | 44 | 04/05/2014 | $125 | - | - | - | - |
| Landscaping (2%) & Deck (1%) | 3.0% | $48,000 | 46 | 04/19/2014 | $125 | - | - | - | - |
| Contingency & Holdback-Occupancy Permit 5% | 5.0% | $80,000 | 47 | 04/26/2014 | $125 | - | - | - | - |
| Total | 100.0% | $1,600,000 | | 06/01/2014 | $2,625 | $0 | $0 | $0 | $0 |

## Real Estate Taxes and Insurance Payments

| | Pre-Construction | Post-Construction | - | - | - | - |
|---|---|---|---|---|---|---|
| Tax Rates | $37,751 | $37,751 | - | - | - | - |
| | Pre-Construction | Post-Construction | 08/01/2014 | 09/01/2014 | 10/01/2014 | 11/01/2014 |
| Insurance Rates | $15,000 | $15,000 | $1,250 | $1,250 | $1,250 | $1,250 |

**Estimated Settlement Statement - Lot Purchase**

**Charges**

| | | | | |
|---|---|---|---|---|
| **Sale Price** | | | $ | 2,000,000 |
| **Settlement Charges** | | | $ | 19,922 |
| Points | 1.000% | 8,000 | | |
| Title Search | | 133 | | |
| Lender's Title Insurance | $ 2.50 | 2,000 | | |
| Owner's Title Insurance | $ 4.00 | 6,175 | | |
| Appraisal | | 375 | | |
| Flood Certificate | | 10 | | |
| Municipal Lien Certificate | | 65 | | |
| Recording Charges | | 289 | | |
| LLC Representation | | 2,625 | | |
| LLC Filing | | 250 | | |
| **Escrow Deposit** | | | $ | - |
| **City Taxes** | | | $ | 9,438 |
| **Total Charges** | | | $ | 2,029,359.75 |

| | | |
|---|---|---|
| 0 | 4.75% | |

| | | | | |
|---|---|---|---|---|
| 01/01/2013 | 01/01/2013 | 03/31/2013 | $ 37,751 | $ 9,438 |

**Credits**

| | | | | |
|---|---|---|---|---|
| **Initial Deposit** | 5.00% | | $ | 100,000.00 |
| **Loan Amount** | | | $ | 800,000.00 |
| **Total Credits** | | | $ | 900,000.00 |
| **Cash at Closing** | | | $ | 1,129,360 |

**Estimated Settlement Statement - Construction Loan**

| | | | | |
|---|---|---|---|---|
| **Loan Amount** | | | $ | 1,600,000 |

**Charges**

| | | | | |
|---|---|---|---|---|
| **Settlement Charges** | | | $ | 22,475.00 |
| Point | 1.000% | 16,000 | | |
| Lenders Title Insurance Cost | $ 1.50 | 2,400 | | |
| Lenders Title Insurance Loading | $ 0.50 | 800 | | |
| Appraisal | | 350 | | |
| Recording Charges | | 300 | | |
| Run Down Title Fee | | 125 | | |
| Legal Fees | | 2,500 | | |
| **Escrow Deposit** | | | $ | - |
| **Cash at Closing** | | | $ | 22,475.00 |

| | | |
|---|---|---|
| 0 | 4.75% | |

**Estimated Settlement Statement - Construction Loan**

**Charges**

| | | | | |
|---|---|---|---|---|
| **Loan Repayments** | | | | |
| Lot Purchase | | | $ | 800,000 |
| Construction Loan | | | $ | 1,600,000 |
| **Settlement Charges** | | | $ | 297,762 |
| Commissions | 5.00% | 262,500 | | |
| Stamps | $ 4.56 | 23,940 | | |
| Recording Charges | | 300 | | |
| Legal Fees | | 3,000 | | |
| **Remaining Interest** | | | | |
| Lot Purchase Loan | | 3,167 | | |
| Construction Loan | | 4,856 | | |
| **City Taxes** | | | $ | - |
| **Total Charges** | | | $ | 2,697,762 |

| | |
|---|---|
| 12/01/2014 | |

| | | | | |
|---|---|---|---|---|
| 11/30/2014 | 10/01/2014 | 12/31/2014 | $ 37,751 | $ 6,155 |

**Credits**

| | | | | |
|---|---|---|---|---|
| **Sale Price** | | | $ | 5,250,000 |
| **Escrow Return** | | | $ | - |
| **City Taxes** | | | $ | 3,283 |
| **Total Credits** | | | $ | 5,253,283 |
| **Cash at Closing** | | | $ | 2,555,520 |

# EXHIBIT 38



File No. 182800

**APPRAISAL OF**

A PROPERTY

**LOCATED AT:**

55 Lyman Rd
Brookline, MA  02467

**CLIENT:**

O'Connor, Carnathan and Mack
1 Van de Graaff Drive #104
Burlington, MA 01803

**AS OF:**

March 11, 2016

**BY:**

Morgan Fennell
C.G.R.E.A. #75272

The Appraisers Group

## Residential Appraisal Report

File No. 182800

**PURPOSE**

The purpose of this appraisal report is to provide the client with a credible opinion of the defined value of the subject property, given the intended use of the appraisal.

Client Name/Intended User O'Connor, Carnathan and Mack     E-mail

Client Address 1 Van de Graaff Drive #104     City Burlington     State MA     Zip 01803

Additional Intended User(s) Any duly authorized representatives of the client.

Intended Use To assist with pending litigation. This is a retrospective valuation, with an effective date of March 11, 2016.

**SUBJECT**

Property Address 55 Lyman Rd     City Brookline     State MA     Zip 02467

Owner of Public Record Paris and Marie Claire Panayiotopoulos     County Norfolk

Legal Description Book 33914, Page 233, Dated 3/11/2016

Assessor's Parcel # 437-27-01; 2016 assessment $5,079,400     Tax Year 2016     R.E. Taxes $ 52,927.00

Neighborhood Name Chestnut Hill     Map Reference MSA# 14454     Census Tract 4011.00

Property Rights Appraised [X] Fee Simple     [ ] Leasehold     [ ] Other (describe)

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Prior Sale/Transfer:   Date 3/11/2016     Price 4,400,000     Source(s) Norfolk Registry of Deeds

**SALES HISTORY**

Analysis of prior sale or transfer history of the subject property (and comparable sales, if applicable)   See Attached Addendum

Offerings, options and contracts as of the effective date of the appraisal     None

**NEIGHBORHOOD**

| Neighborhood Characteristics | | | | One-Unit Housing Trends | | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|---|---|
| Location | [ ] Urban | [X] Suburban | [ ] Rural | Property Values | [X] Stable | [ ] Declining | | PRICE | AGE | One-Unit | 85 % |
| Built-Up | [X] Over 75% | [ ] 25-75% | [ ] Under 25% | Demand/Supply | [ ] Shortage | [X] In Balance | [ ] Over Supply | $(000) | (yrs) | 2-4 Unit | 5 % |
| Growth | [ ] Rapid | [X] Stable | [ ] Slow | Marketing Time | [ ] Under 3 mths | [X] 3-6 mths | [ ] Over 6 mths | 635 Low | 2 | Multi-Family | 5 % |

Neighborhood Boundaries   The subject neighborhood is bound by Rt. 9 to the north, The Country     13,500 High    135   Commercial    5 %
Club and West Roxbury Pkwy to the south, Lee St. to the east and Hammond St. to the west.     1,950 Pred.    90   Other    %

Neighborhood Description   See Attached Addendum

Market Conditions (including support for the above conclusions)   See Attached Addendum

**SITE**

Dimensions 240.29 FF along Lyman Rd     Area 33,908 sf     Shape Irregular     View Residential

Specific Zoning Classification S-25/Residential SF     Zoning Description Minimum: Lot Size, 25,000; sf; Maximum FAR, .2

Zoning Compliance [X] Legal   [ ] Legal Nonconforming (Grandfathered Use)   [ ] No Zoning   [ ] Illegal (describe) See attached addendum

Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No   If No, describe. See Attached Addendum

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | | Street paved | [X] | |
| Gas | [X] | | Sanitary Sewer | [X] | | Alley none | | |

Site Comments   See Attached Addendum

**IMPROVEMENTS**

| GENERAL DESCRIPTION | | FOUNDATION | | EXTERIOR DESCRIPTION   materials | | INTERIOR   materials | |
|---|---|---|---|---|---|---|---|
| Units [X] One [ ] One w/Acc. unit | | [ ] Concrete Slab [ ] Crawl Space | | Foundation Walls Concrete/good | | Floors Wood/tile/good | |
| # of Stories 2 | | [X] Full Basement [ ] Partial Basement | | Exterior Walls Wood/good | | Walls Drywall/good | |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | | Basement Area 3438 sq. ft. | | Roof Surface AsphShing/good | | Trim/Finish Wood/good | |
| [X] Existing [ ] Proposed [ ] Under Const. | | Basement Finish 0 % | | Gutters & Downspouts Metal/good | | Bath Floor Tile/good | |
| Design (Style) Colonial | | [X] Outside Entry/Exit [ ] Sump Pump | | Window Type Double hung/good | | Bath Wainscot Tile/dry/good | |
| Year Built 2013 | | | | Storm Sash/Insulated Double pane/good | | [X] Driveway # of Cars 3 | |
| Effective Age (Yrs) 0 | | Heating [X] FWA [ ] HW [ ] Radiant | | Screens Yes/good | | Driveway Surface Asphalt | |
| Attic [ ] None | | [ ] Other   Fuel gas | | Amenities WoodStove(s) #0 | | [X] Garage # of Cars 3 | |
| [X] Drop Stair [ ] Stairs | | Cooling [X] Central Air Conditioning | | [X] Fireplace(s) # 3 [ ] Fence None | | [ ] Carport # of Cars 0 | |
| [ ] Floor [ ] Scuttle | | [ ] Individual [ ] Other | | [X] Patio/Deck Patio [X] Porch Open | | [X] Att. [ ] Det. [ ] Built-in | |
| [ ] Finished [ ] Heated | | | | [ ] Pool None [ ] Other None | | | |
| Appliances [X] Refrigerator [X] Range/Oven [X] Dishwasher [X] Disposal [X] Microwave [X] Washer/Dryer [ ] Other (describe) | | | | | | | |

Finished area above grade contains:   12 Rooms   6 Bedrooms   6.5 Bath(s)   6,791 Square Feet of Gross Living Area Above Grade

Additional Features   The subject property features high end finishes throughout both the first and second floors.

Comments on the Improvements   See Attached Addendum

This form Copyright © 2005-2016 ACI, a First American Company. All Rights Reserved.
GPAR™) General Purpose Appraisal Report   1/2014
GPARSUM_14  01/202016



The Appraisers Group

## Residential Appraisal Report

File No. 182800

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | | COMPARABLE SALE NO. 2 | | COMPARABLE SALE NO. 3 | |
|---|---|---|---|---|---|---|---|
| Address | 55 Lyman Rd  Brookline, MA 02467 | 50 Lyman Rd  Brookline, MA 02467 | | 10 Lyman Rd  Brookline, MA 02467 | | 407 Warren St  Brookline, MA 02445 | |
| Proximity to Subject | | 0.02 miles SE | | 0.11 miles SE | | 0.40 miles SE | |
| Sale Price | $ | | $ 5,641,047 | | $ 5,000,000 | | $ 5,686,100 |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 837.07 sq. ft. | | $ 815.13 sq. ft. | | $ 775.73 sq. ft. | |
| Data Source(s) | | Assessor records/exterior view | | MLSPIN/DOM 289 | | MLSPIN/DOM 408 | |
| Verification Source(s) | | Assessor records/exterior view | | Assessor records/exterior view | | Assessor records/exterior view | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | Conventional  0 | | Conventional  0 | | Conventional  0 | |
| Date of Sale/Time | | 5/19/2015 | | 5/19/2015 | | 9/18/2015 | |
| Location | Suburban | Suburban | | Sl. Inferior | 125,000 | Suburban | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 33,908 sf | 33,712 sf | | 40,098 sf | | 1.24 ac | -150,000 |
| View | Residential | Residential | | Residential | | Residential | |
| Design (Style) | Colonial | Colonial | | Colonial | | Colonial | |
| Quality of Construction | Very Good | Very Good | | VeryGood | | Very Good | |
| Actual Age | 3 | 2 | | 3 | | 3 | |
| Condition | Good | Good | | Good | | Good | |
| Room Count | Total 12 Bdrms 6 Baths 6.5 | Total 12 Bdrms 6 Baths 7 | -12,500 | Total 11 Bdrms 6 Baths 7 | -12,500 | Total 11 Bdrms 6 Baths 6 | +12,500 |
| Gross Living Area | 150.00 6,791 sq. ft. | 6,739 sq. ft. | 7,800 | 6,134 sq. ft. | 98,600 | 7,330 sq. ft. | -80,900 |
| Basement & Finished Rooms Below Grade | Full  Unfinished | Full  Unfinished | | Full  Unfinished | | Full  1RRm | -25,000 |
| Functional Utility | Typical | Typical | | Typical | | Typical | |
| Heating/Cooling | Central/CAC | Central/CAC | | Central/CAC | | Central/CAC | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 3 Car Garage | 3 Car Garage | | 3 Car Garage | | 3 Car Garage | |
| Porch/Patio/Deck | Porch/patio/balc | 2 Patios | +5,000 | Patio/outdrFP | +5,000 | Patio/balcony | +5,000 |
| Kitchen condition | Professional | Professional | | Professional | | Professional | |
| Fireplaces | 3 Fireplaces | 3 Fireplaces | | 3 Fireplaces | | 3 Fireplaces | |
| Appeal | See Comments | Superior | -141,026 | Superior | -125,000 | Superior | -142,153 |
| Net Adjustment (Total) | | [X] + [ ] - $ | 140,726 | [X] + [ ] - $ | 91,100 | [X] + [X] - $ | 380,553 |
| Adjusted Sale Price of Comparables | | Net Adj. -2.5%  Gross Adj. 2.9% $ | 5,500,321 | Net Adj. 1.8%  Gross Adj. 7.3% $ | 5,091,100 | Net Adj. -6.7%  Gross Adj. 7.3% $ | 5,305,547 |

Summary of Sales Comparison Approach   See Attached Addendum

### COST APPROACH TO VALUE

Site Value Comments

| ESTIMATED [ ] REPRODUCTION OR [ ] REPLACEMENT COST NEW | OPINION OF SITE VALUE ........................... = $ | |
|---|---|---|
| Source of cost data | Dwelling Sq. Ft. @ $ .......... = $ | 0 |
| Quality rating from cost service   Effective date of cost data | Sq. Ft. @ $ .......... = $ | 0 |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) | | |
| The cost approach was not developed as most buyers of single family homes in the market do not rely upon this valuation method. | Garage/Carport 710 Sq. Ft. @ $ .......... = $ | 0 |
| | Total Estimate of Cost-New .......... = $ | 0 |
| | Less   Physical   Functional   External | |
| | Depreciation = $ ( | 0) |
| | Depreciated Cost of Improvements ........................ = $ | 0 |
| | "As-is" Value of Site Improvements ........................ = $ | |
| | INDICATED VALUE BY COST APPROACH ........................ = $ | 0 |

### INCOME APPROACH TO VALUE

Estimated Monthly Market Rent $ _____ X Gross Rent Multiplier _____ = $ _____ Indicated Value by Income Approach

Summary of Income Approach (including support for market rent and GRM)   The Income Approach was not developed as single family homes are not typically purchased for their income producing capabilities.

Methods and techniques employed: [X] Sales Comparison Approach   [ ] Cost Approach   [ ] Income Approach   [ ] Other:   Discussion of methods and techniques employed, including reason for excluding an approach to value:   The best indication of value is represented by the sales comparison approach, which is most indicative of current market trends.   The Income Approach was not developed as single family homes are not typically purchased for their income producing capabilities.   The cost approach was not developed as most buyers of single family homes in the market do not rely upon this valuation method,

Reconciliation comments:   See attached addendum

Based on the scope of work, assumptions, limiting conditions and appraiser's certification, my (our) opinion of the defined value of the real property that is the subject of this report as of 3/11/2016 , which is the effective date of this appraisal, is:

[X] Single point $ 5,100,000 [ ] Range $ _____ to $ _____ [ ] Greater than [ ] Less than $ _____

This appraisal is made [X] "as is," [ ] subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed, [ ] subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed [ ] subject to the following:



Produced using ACI software, 800.234.8727 www.aciweb.com
Page 2 of 4
This form Copyright © 2005-2016 ACI, a First American Company. All Rights Reserved.
(gPAR™) General Purpose Appraisal Report 1/2014
GPAR1034_14 02/2020016

THE APPRAISERS GROUP

The Appraisers Group
## Residential Appraisal Report

File No. 182800

| FEATURE | SUBJECT | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
|---|---|---|---|---|---|---|---|
| | 55 Lyman Rd | 48 Laurel Rd | | | | | |
| Address Brookline, MA 02467 | | Chestnut Hill, MA 02467 | | | | | |
| Proximity to Subject | | 1.15 miles SW | | | | | |
| Sale Price | $ | $ 5,200,000 | | $ | | $ | |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 841.70 sq. ft. | | $ sq. ft. | | $ sq. ft. | |
| Data Source(s) | | MLSPIN/DOM 5 | | | | | |
| Verification Source(s) | | Assessor records/exterior view | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | | Conventional | | | | | |
| Concessions | | 0 | | | | | |
| Date of Sale/Time | | 11/17/2014 | | | | | |
| Location | Suburban | Suburban | | | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | | | | |
| Site | 33,908 sf | 28,045 sf | | | | | |
| View | Residential | Residential | | | | | |
| Design (Style) | Colonial | Colonial | | | | | |
| Quality of Construction | Very Good | Very Good | | | | | |
| Actual Age | 3 | 4 | | | | | |
| Condition | Good | Good | | | | | |
| Above Grade | Total Bdrms. Baths | Total Bdrms. Baths | | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | 12  6  6.5 | 11  5  5.5 | +25,000 | | | | |
| Gross Living Area 150.00  6,791 sq. ft. | | 6,178 sq. ft. | 92,000 | sq. ft. | | sq. ft. | |
| Basement & Finished | Full | Full | | | | | |
| Rooms Below Grade | Unfinished | 1BR1FBa1HBa | -62,500 | | | | |
| Functional Utility | Typical | Typical | | | | | |
| Heating/Cooling | Central/CAC | Central/CAC | | | | | |
| Energy Efficient Items | None | None | | | | | |
| Garage/Carport | 3 Car Garage | 3 Car Garage | | | | | |
| Porch/Patio/Deck | Porch/patio/balc | Patio | +10,000 | | | | |
| Kitchen condition | Professional | Professional | | | | | |
| Fireplaces | 3 Fireplaces | 2 Fireplaces | +5,000 | | | | |
| Appeal | See Comments | Superior | -130,000 | | | | |
| Net Adjustment (Total) | | ☐+ ☒- $ | 60,500 | ☒+ ☐- $ | 0 | ☐+ ☐- $ | 0 |
| Adjusted Sale Price | | Net Adj. -1.2% | | Net Adj. 0.0% | | Net Adj. % | |
| of Comparables | | Gross Adj. 6.2% $ | 5,139,500 | Gross Adj. 0.0% $ | 0 | Gross Adj. % $ | 0 |

SALES COMPARISON APPROACH

Summary of Sales Comparison Approach

par™
Produced using ACI software, 800.234.8727 www.aciweb.com
Additional Comparables

This form Copyright © 2005-2016 ACI, a First American Company. All Rights Reserved.
(a)PAR™) General Purpose Appraisal Report 1/2014
GPARSUM_14  07/28/2016

**Residential Appraisal Report**                                        File No.  182800

### Scope of Work, Assumptions and Limiting Conditions

Scope of work is defined in the Uniform Standards of Professional Appraisal Practice as " the type and extent of research and analyses in an assignment." In short, scope of work is simply what the appraiser did and did not do during the course of the assignment. It includes, but is not limited to: the extent to which the property is identified and inspected, the type and extent of data researched, the type and extent of analyses applied to arrive at opinions or conclusions.

The scope of this appraisal and ensuing discussion in this report are specific to the needs of the client, other identified intended users and to the intended use of the report. This report was prepared for the sole and exclusive use of the client and other identified intended users for the identified intended use and its use by any other parties is prohibited. The appraiser is not responsible for unauthorized use of the report.

The appraiser's certification appearing in this appraisal report is subject to the following conditions and to such other specific conditions as are set forth by the appraiser in the report. All extraordinary assumptions and hypothetical conditions are stated in the report and might have affected the assignment results.

1. The appraiser assumes no responsibility for matters of a legal nature affecting the property appraised or title thereto, nor does the appraiser render any opinion as to the title, which is assumed to be good and marketable. The property is appraised as though under responsible ownership.

2. Any sketch in this report may show approximate dimensions and is included only to assist the reader in visualizing the property. The appraiser has made no survey of the property.

3. The appraiser is not required to give testimony or appear in court because of having made the appraisal with reference to the property in question, unless arrangements have been previously made thereto.

4. Neither all, nor any part of the content of this report, copy or other media thereof (including conclusions as to the property value, the identity of the appraiser, professional designations, or the firm with which the appraiser is connected), shall be used for any purposes by anyone but the client and other intended users as identified in this report, nor shall it be conveyed by anyone to the public through advertising, public relations, news, sales, or other media, without the written consent of the appraiser.

5. The appraiser will not disclose the contents of this appraisal report unless required by applicable law or as specified in the Uniform Standards of Professional Appraisal Practice.

6. Information, estimates, and opinions furnished to the appraiser, and contained in the report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items furnished to the appraiser is assumed by the appraiser.

7. The appraiser assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. The appraiser assumes no responsibility for such conditions, or for engineering or testing, which might be required to discover such factors. This appraisal is not an environmental assessment of the property and should not be considered as such.

8. The appraiser specializes in the valuation of real property and is not a home inspector, building contractor, structural engineer, or similar "expert", unless otherwise noted. The appraiser did not conduct the intensive type of field observations of the kind intended to seek and discover property defects. The viewing of the property and any improvements is for purposes of developing an opinion of the defined value of the property, given the intended use of this assignment. Statements regarding condition are based on surface observations only. The appraiser claims no special expertise regarding issues including, but not limited to: foundation settlement, basement moisture problems, wood destroying (or other) insects, pest infestation, radon gas, lead based paint, mold or environmental issues. Unless otherwise indicated, mechanical systems were not activated or tested.

This appraisal report should not be used to disclose the condition of the property as it relates to the presence/absence of defects. The client is invited and encouraged to employ qualified experts to inspect and address areas of concern. If negative conditions are discovered, the opinion of value may be affected.

**Unless otherwise noted, the appraiser assumes the components that constitute the subject property improvement(s) are fundamentally sound and in working order.**

Any viewing of the property by the appraiser was limited to readily observable areas. Unless otherwise noted, attics and crawl space areas were not accessed. The appraiser did not move furniture, floor coverings or other items that may restrict the viewing of the property.

9. Appraisals involving hypothetical conditions related to completion of new construction, repairs or alteration are based on the assumption that such completion, alteration or repairs will be competently performed.

10. Unless the intended use of this appraisal specifically includes issues of property insurance coverage, this appraisal should not be used for such purposes. Reproduction or Replacement cost figures used in the cost approach are for valuation purposes only, given the intended use of the assignment. The Definition of Value used in this assignment is unlikely to be consistent with the definition of Insurable Value for property insurance coverage/use.

**11. The ACI General Purpose Appraisal Report (GPAR™) is not intended for use in transactions that require a Fannie Mae 1004/Freddie Mac 70 form, also known as the Uniform Residential Appraisal Report (URAR).**

**Additional Comments Related To Scope Of Work, Assumptions and Limiting Conditions**



The Appraisers Group
## Residential Appraisal Report
File No. 182800

### Appraiser's Certification

**The appraiser(s) certifies that, to the best of the appraiser's knowledge and belief:**

1.  The statements of fact contained in this report are true and correct.

2.  The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are the appraiser's personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3.  Unless otherwise stated, the appraiser has no present or prospective interest in the property that is the subject of this report and has no personal interest with respect to the parties involved.

4.  The appraiser has no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5.  The appraiser's engagement in this assignment was not contingent upon developing or reporting predetermined results.

6.  The appraiser's compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7.  The appraiser's analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

8.  Unless otherwise noted, the appraiser has made a personal inspection of the property that is the subject of this report.

9.  Unless noted below, no one provided significant real property appraisal assistance to the appraiser signing this certification.  Significant real property appraisal assistance provided by:

**Additional Certifications:**

The appraiser would like to acknowledge Christine Alban who provided assistance in the preparation of this report; assisting in the inspection of the subject and the collection and analysis of data. (MA RE Llc # 75549)

---

**Definition of Value:**   [X] Market Value      [ ] Other Value:

Source of Definition: Federal Register, vol. 55, no. 163, August 22, 1990, pages 34228 and 34229.

Market Value is defined as:

**The most probable price which a property should bring in competitive and open market under all conditions requisite to a fair sale, the buyer and seller each acting prudently and knowledgeably, and assuming the price is not affected by undue stimulus.** Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1.  Buyer and seller are typically motivated;
2.  Both parties are well informed or well advised, and acting in what they consider their own best interests;
3.  A reasonable time is allowed for exposure in the open  market;
4.  Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and

5.  The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

---

ADDRESS OF THE PROPERTY APPRAISED:

55 Lyman Rd

Brookline, MA  02467

EFFECTIVE DATE OF THE APPRAISAL: 3/11/2016

APPRAISED VALUE OF THE SUBJECT PROPERTY $ 5,100,000

**APPRAISER**

Signature: *Morgan Fennell*

Name:  Morgan Fennell

Company Name:  The Appraisers Group

Company Address:  44 Trapelo Road

Belmont, MA 02478

Telephone Number:  617-489-2003

Email Address:  value@appraisersgroup.com

State Certification #  C.G.R.E.A. #75272

or License #

or Other (describe): _____ State #:

State:  MA

Expiration Date of Certification or License:  09/12/2019

Date of Signature and Report:  07/30/2018

Date of Property Viewing:  2/14/2017

Degree of property viewing:

[ ] Interior and Exterior    [X] Exterior Only    [ ] Did not personally view

**SUPERVISORY APPRAISER**

Signature: _____

Name: _____

Company Name: _____

Company Address: _____

Telephone Number: _____

Email Address: _____

State Certification # _____

or License # _____

State:  MA

Expiration Date of Certification or License: _____

Date of Signature: _____

Date of Property Viewing: _____

Degree of property viewing:

[ ] Interior and Exterior    [ ] Exterior Only    [ ] Did not personally view



Produced using ACI software, 800.234.8727 www.aciweb.com
Page 4 of 4

This form Copyright © 2005-2016 ACI, a First American Company. All Rights Reserved.
(g/PAR™) General Purpose Appraisal Report  1/2016
GPARSUM_14  07/20/2016

THE APPRAISERS GROUP

**Clarification of Intended Use and Intended User**
The Intended Use is to evaluate the property that is the subject of this appraisal for pending litigation,
subject to the stated Scope of Work and reporting requirements of this appraisal
report form, and the Definition of Market Value. No additional Intended Users are identified by
the appraiser.

**Exposure Time**
The appraiser has estimated an exposure time of less than 90 days for the subject property.  The
exposure time assumes that the property is free of legal encumbrances as of the effective date of this
report, and was determined by MLS data, the appraiser's expertise in the local market, and
conversations with the local brokers, as well as the number of days on market of the comparables
selected in this report.  Frequently, new construction like several of the selected Comps, is listed for
sale prior to completion which may lead to longer marketing times.  The exposure time chosen is
deemed reasonable and reliable.  USPAP defines exposure time as "The estimated length of time that
the property interest being appraised would have been offered on the market prior to the hypothetical
consummation of a sale at market value on the effective date of the appraisal."

**Additional Appraiser Certifications**
I have performed no services, as an appraiser or in any other capacity, regarding the property that is
the subject of this report within the three-year period immediately preceding acceptance of this
assignment.

This report was prepared in accordance with the requirements of the Appraisal Report option of
Uniform Standards of Professional Appraisal Practice and Title XI of the Financial Institutions Reform,
Recovery and Enforcement Act of 1989, as amended (12 U.S.C. 3331et seq.), and any implementing
regulations.
**Prior Sales Comments**
There was no prior sale of the subject in the past three years or of Comparables 1-5 in the previous
12 months.

**Discussion of Property Development History & Bankruptcy**
Based on information provided by the client, the appraiser has summarized the development history,
marketing process and bankruptcy of the subject property below.

-A partnership was formed in November of 2012 between the developer and the investors by way of a
limited liability company, Lyman-Cutler LLC (LCLLC), to build two new single family homes at 55
Lyman Road and 88 Cutler Road.
-As part of this development, the builder agreed to have the new homes completed no later than
March 30, 2014 in an attempt to market the homes during the Spring.
-The homes were not completed by this date and were instead finished in October of 2014, which also
missed the Fall selling market.
-As part of the LLC agreement the homes were to be sold by November 2014.
-The marketing and listing of these homes was handled by the wife of the builder, who is a local real
estate agent.
-The homes were not sold by the agreed upon date. The investors were not provided any information
on the marketing process, how the homes were recieved in the market, or how involved the listing
agent was during this process.
-The builder and investors disagreed on marketing/listing the homes going forward.
-In June of 2015 the builder placed Mechanics Liens on both new homes claiming money owed from
cost overruns.
-In Bankruptcy Court, Lyman-Cutler LLC filed Chapter 11 on 10/7/15

*Based on the appraisers findings in this report, the extended construction period, lack of
effective marketing, and legal dispute between the builder and investors significantly impacted
the eventual selling price of both new homes. This is reflected in the difference between the
appraised value of the subject property and the actual selling price.*

**Neighborhood Description**
The subject Brookline neighborhood known as Chestnut Hill is south of Rt. 9 near The Country Club.
The immediate neighborhood is comprised of a few interlocking streets with estate style properties
similar in size to the subject.  Nearby Rt. 9 amenities, including retail shops and service oriented
businesses are located within approximately 2 miles and are not considered adverse to marketability.
Rt. 9 access is within less than 1 mile and provides a direct route to Boston and points west.  The
nearby Boston hospital district is a significant employment center.  Public transportation to Boston and

ADDENDUM                                                    File No.   182800

points west is available via MBTA Greenline within 2 miles.

**Neighborhood Market Conditions**
The following charts display historical and current market activity of high end single family properties in Brookline. As there were few properties sold at the highest price point of the Brookline market, the appraiser expanded the group of properties to include all transfers.

The first chart shows the current activity for houses listed for sale as of the effective date (3/11/2016) along with the average days on market (DOM) and the median price. The chart compares year over year listing history on the effective date of the appraisal. The second chart demonstrates sold activity for single family Brookline properties in the above price range as of the effective date, as compared to the same period one year earlier. The chart includes the total sales, days on market, and median price.

All of the surveys are based on data from the Multiple Listing Service (MLS), as of the effective date of this report (3/11/2016).

| Brookline Single Family Listings | | | |
| --- | --- | --- | --- |
| Year | Number of Listings | Avg. Days on Market | Median Asking Price |
| 11-Mar-15 | 19 | 226 | $3,199,000 |
| 11-Mar-16 | 38 | 80 | $2,322,500 |
| Change (%) | 100.0% | -64.6% | -27.4% |

**Active Listings** - The number of single family listings in Brookline on the effective date of this appraisal compared to the same date a year prior increased from 19 to 38, while the average number of days on market declined significantly on a percentage basis. The median asking price decreased from one year to the next. This decrease was due, in part, to a single listing in 2015 for over $18M. The increase in listings indicated a more active market and sellers were recognizing this trend. The decrease in market times illustrates that the buyers were moving much more quickly to purchase homes during 2016 than in 2015. The near term market for Brookline properties in the subject price range remained positive and stable overall.

| Brookline Single Family Sales | | | |
| --- | --- | --- | --- |
| | Number Sold | Avg. Days on Market | Median Sale Price |
| 3/12/14 - 3/11/15 | 174 | 83 | $1,599,500 |
| 3/12/15 - 3/11/16 | 173 | 71 | $1,590,000 |
| Change (%) | -0.6% | -14.5% | -0.6% |

**Closed Sales** - Year over year, the number of sales remained almost unchanged in this price range. The average number of days on market had declined, suggesting continued buyer demand overall. The median sale price was stable.

**Subject Market History**
The subject property initially was listed for sale on 4/30/2015 for $5,499,999. On 6/11/2015 the asking price was dropped to $5,150,000 and then dropped again to $4,699,000 as of 8/20/2015, before expiring on 10/28/2015. The property was listed again on 11/30/2015 for $4,500,000 before going under agreement on 12/11/2015 for $4,400,000. The property sold on 3/11/2016.

Please see property development history and bankruptcy for further discussion.

**Highest and Best Use**
The existing use was the highest and best use due to the zoning of the property, neighboring property uses and the dwelling's significant contributory value.

**Site Comments**
The subject site appears to be legally conforming based on its site size and frontage. The subject parcel of land was subdivided from a larger parcel (formerly known as 77 Lyman Rd.). The site is generally level and has approximately 240 feet of frontage along Lyman Rd.

The property has a granite front walk between Lyman Rd. and the dwelling. The property is landscaped with trees and shrubs along Lyman Rd. and the other property lines. The foundation walls of the garage and dwelling are landscaped with smaller shrubs and plantings. At the back of the property is a large granite patio.

**Quality and Condition of Property**
The appraiser was unable to gain access to the property for inspection. Observations of the exterior

facade and the front yard were made from the street, however the three other sides of the home and the back yard were not visible. The appraiser relied upon the following sources:

1- Assessor records
2- Subject MLS listing sheet, including interior photographs
3- Google Maps in order to confirm interior and exterior attributes.

The subject property is a two story wood clapboard and stone colonial style home with a three car attached garage. The roof is asphalt shingle. The property has thermopane windows, metal downspouts and gutters and a concrete foundation.

The property features 12 rooms, 6 bedrooms and 6.5 bathrooms. The first floor includes a dining room, living room, library, office, family room, kitchen, mud room and a bedroom with an ensuite full bathroom. The kitchen includes high end, professional grade appliances, custom cabinetry, hardwood floors and marble counter tops. Most ceilings throughout the first floor are tray with ambient lighting or coffered. The library is wood panelled and features a built in wall unit on one side. The mud room features built in benches and cubby style storage.

The second floor includes 5 additional bedrooms each with ensuite bathrooms. The master bedroom includes high end custom closet storage systems.

**Based on public information, pictures from the subject's MLS listing as well as other real estate websites, the overall quality, condition, floor plans and amenities were considered high end construction and market accepted in the Brookline Market as of the effective date of this report. Assessor records and MLS floorplans were used to develop the sketch of the property contained in this report.**

**Appeal & Marketability**
The subject property is located in a neighborhood comprised of mostly large colonial, estate style properties. The neighborhood affords easy access to Chestnut Hill amenities (public transportation, retail stores and restaurants) which is considered desirable by buyers, as well as The Country Club and several prestigious area private schools. Marketing times for new properties in the subject's neighborhood ranges from under 30 days to over one year, depending on when the property was listed for sale (during construction or after completion).

Overall, the subject property was in good condition and was of good construction quality at the time of sale. If the subject were placed on the market fully completed and in new condition like at the time of sale, and priced correctly, it would appeal to buyers within this price range and likely would sell in 90 days or less, if unencumbered by bankruptcy proceedings.

**Comments on Sales Comparison**
The appraiser analyzed the Brookline real estate market as of the date of sale for comparable closed and pending sales as well as active listings that were most similar to the subject property. Sources for this analysis included Multiple Listing Service and Assessor records as well as conversations with real estate agents involved with the transactions. The appraiser searched for suitable sales as far back as 12-18 months prior to the appraisal date and notes that there were several comparable properties available from which to choose. The appraiser also selected one sale that sold soon within +/-3 months of the effective date of this report as there is no indication of a change in market conditions from the date of sale of the subject to the date of sale of Comp 4.

The appraiser selected 5 closed sales that were deemed the comparables most similar in design, style and/or location to the subject. All comparables are homes which are similar to the subject in size and appeal, and all were high quality, new construction at the time of sale. The appraiser attempted to confirm all sales with at least one agent involved in the transaction and was able to reach most of the agents. All other data was verified through public records, including assessor data and deeds.

It should be noted that several of the comparables in this report were listed for sale while under construction, leading to their longer marketing times.

**Sale #1 - 50 Lyman Rd**
This property was listed for sale on 9/22/2014 for $5,500,000, and had an accepted offer of $5,641,047 within 5 days. The property sold on 5/18/2015, approximately 8 months after being listed for sale.

The site size is comparable to that of the subject and is unadjusted. The property, located across the street from the subject, had finishes comparable to those of the subject and was of comparable quality of construction. Like the subject, the property does not have any finished basement space or any finished third floor space.

**Sale #2 - 10 Lyman Rd**
This property, located on the same street as the subject, on the corner of Heath St. and Lyman Rd., was listed for sale on 6/24/2014 for $5,250,000. The property had an accepted offer on 7/23/2015 and was on the market for a total of 289 days before going under agreement on 8/7/2015. It sold 21 days later for $5,000,000. The property had been listed for sale prior to completion.

This sale is located at the corner of Heath Street, which experiences greater traffic patterns and noise. A 2.5% upward adjustment has been applied to this sale for slightly inferior location.

At the time of sale, the property was comparable to the subject in condition and quality of construction. The design/style of the home , including the layout and interior finishes, according to the agent, may have played a role in its lower sale price. This property also did not have any finished basement or third floor space. The home was built by the same builder as the subject property.

**Sale #3 - 407 Warren St**
This property, listed for sale on 6/10/2014 for $6,200,000 had an accepted offer after 408 days on the market. The asking price was reduced twice, first to $5,999,900 on 10/16/2014 and then again on 6/1/2015 to $5,750,000. The property went under agreement within 30 days of the last price reduction and sold on 9/18/2015. This property also had been listed for sale prior to completion.

This property's superior site size, approximately a half acre larger than the subject, is adjusted downward $150,000. The property, also new construction, was comparable to the subject property in condition and construction quality.

**Sale #4 - 48 Laurel Rd**
48 Laurel Rd was listed for sale on 10/16/2014 for $5,500,000 and had an accepted offer within 5 days. The property went under agreement on 10/21/2014 and sold on 11/17/2014 for $5,200,000.

Although located outside of the subject's immediate neighborhood, this property is located in a comparable area of Chestnut Hill. This comparable's site size, just +/-5,000 sf smaller than the subject's site, is unadjusted as the difference in size is nominal. The property, like the subject, was new at the time of sale and had comparable finishes.

All adjustments are rounded to the nearest $100.

**Adjustments**

Gross Living Area: differences are adjusted $150 per square foot. The subject's GLA of 6,791 sf is taken from Assessor records as the appraiser was unable to measure the subject property.

Full Bathroom: adjustment is $25,000 per bathroom; half bathroom adjustment is $12,500.

Finished Basement: Below grade room adjustment is $25,000 per room, $25,000 per full bathroom and $12,500 per half bathroom.

Porch/Patio/Deck/Outdoor Fireplace: adjustment is $5,000 per amenity.

Fireplace: adjustment is $5,000 per unit.

Appeal:
The appraiser has applied a downward adjustment of 2.5% to all comparables for greater appeal. The subject, and the abutting property at 88 Cutler Lane, are identical homes. While they have some exterior differences in paint color and shingle style, the homes are virtually identical in size, floor plan and shape. Buyers in this price range often want customized homes, which stand out from other homes in the area. Having an identical home directly next door reduces the customized nature and appeal of the subject.

All Comps were weighted in the determination of value. The appraiser has trended toward the lower end of the range. Sale #2 was built by the same developer and is a smaller home. The appraiser has reconciled to the value opinion above the adjusted value of sale #2.

**Test of Resonablness**

As a test of reasonablness for the appraisers opinion of value, I have analyzed all sales which transferred in Brookline from the beginning of 2012 through current. I narrowed the focus to homes which were built after 2010 and sold for over $4,000,000. This criteria best reflects homes which compete directly with the subject property. Through this analysis, I was able to locate 9 sales of new, or newer, high-end properties in the subject community. I analyzed these sales on a price per square foot basis. Below are my findings:

| No. | Address | Sale Date | Sale Price | GLA | Lot Size | $/sq. ft. |
|-----|---------|-----------|-----------|-----|----------|-----------|
| 1 | 113 Heath Street | 7/23/2012 | $4,375,000 | 5961 | 40118 | $733.94 |
| 2 | 10 Lyman Road | 5/19/2015 | $5,000,000 | 6134 | 40098 | $815.13 |
| 3 | 48 Laurel Sroad | 11/17/2014 | $5,200,000 | 6178 | 28054 | $841.70 |
| 4 | 21 Cedar Road | 6/30/2016 | $5,500,000 | 6006 | 27854 | $915.75 |
| 5 | 50 Lyman Road | 5/19/2015 | $5,641,047 | 6739 | 33712 | $837.07 |
| 6 | 407 Warren Street | 9/18/2015 | $5,686,100 | 7330 | 54188 | $775.73 |
| 7 | 50 Yarmouth Road | 12/29/2014 | $5,988,000 | 6750 | 42055 | $887.11 |
| 8 | 33 Sagent Beechwood | 5/15/2014 | $4,600,000 | 5958 | 40163 | $772.07 |
| 9 | 33 Lyman Road | Active | $5,380,000 | 6044 | 30000 | $890.14 |
| | | | | | | |
| | High | 6/30/2016 | $5,988,000 | 7330 | 54188 | $915.75 |
| | Median | 3/9/2015 | $5,380,000 | 6134 | 40098 | **$837.07** |
| | Low | 7/23/2012 | $4,375,000 | 5958 | 27854 | $733.94 |
| | | | | | | |
| | 55 Lyman Road | 3/11/2016 | **$4,400,000** | 6791 | 33908 | **$647.92** |

The gross living area figures cited reflect above-grade living area. Several of the homes were sold with finished basement space, which would affect the price per square foot if included. That said, the analysis indicates that the subject's selling price of $647.92 per square foot is approximately 29% lower than the median selling price of the 9 comparable sales. It should be noted that comparable #2 and #7 were built by the same builder as the subject property. Both of these sales transferred at above $800 per square foot. While a price per square foot analysis in the subject market does not account for specific differences between properties, it provides general trend lines and a reasonable methodology for a credible opinion of value.

Based on this analysis, and assuming the subject property is relatively similar to the comparable sales in overall quality and appeal, it appears to have sold significantly below other competative properties in the immediate market.

**FLOORPLAN SKETCH**

File No. 182800



DIMENSION LIST ADDENDUM

**File No.** 182800

| GROSS BUILDING AREA (GBA) | | | 6,791 |
|---|---|---|---|
| GROSS LIVING AREA (GLA) | | | 6,791 |

| Area(s) | Area | % of GLA | % of GBA |
|---|---|---|---|
| Living | 6,791 | | 100.00 |
| Level 1 | 3,458 | 50.92 | 50.92 |
| Level 2 | 3,334 | 49.09 | 49.09 |
| Level 3 | 0 | 0.00 | 0.00 |
| Other | | | |
| Basement | GBA ☐ | | |
| Garage | ☐ | 710 | |
| | ☐ | | |

| Area Measurements | | | | Area Type | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Measurements | | Factor | Total | Level 1 | Level 2 | Level 3 | Other | Bsmt. | Garage |
| 3.30 x 9.00 x 1.00 = | | | 29.32 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 8.00 x 13.00 x 1.00 = | | | 104.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 12.30 x 4.50 x 0.36 = | | | 19.89 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 13.00 x 2.00 x 0.50 = | | | 13.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 11.00 x 7.80 x 0.50 = | | | 41.67 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 15.50 x 2.40 x 0.50 = | | | 18.48 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 3.00 x 4.90 x 0.35 = | | | 5.25 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 3.70 x 9.20 x 0.49 = | | | 16.84 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 3.60 x 16.00 x 0.50 = | | | 28.44 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 7.50 x 4.60 x 0.38 = | | | 13.19 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 12.00 x 2.00 x 0.50 = | | | 12.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 2.00 x 13.20 x 0.49 = | | | 13.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 7.40 x 11.10 x 0.49 = | | | 40.25 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 11.00 x 5.20 x 0.40 = | | | 23.22 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 13.40 x 4.40 x 0.41 = | | | 24.33 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 13.00 x 5.80 x 0.29 = | | | 21.93 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 15.70 x 9.60 x 0.49 = | | | 74.52 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 10.00 x 16.10 x 0.43 = | | | 70.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 14.40 x 16.40 x 0.49 = | | | 115.56 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 9.20 x 15.80 x 0.20 = | | | 29.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 14.70 x 18.00 x 0.50 = | | | 131.58 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 14.30 x 12.20 x 0.18 = | | | 32.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 26.00 x 1.60 x 0.32 = | | | 13.64 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 24.50 x 20.80 x 0.50 = | | | 254.53 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 21.20 x 13.00 x 0.39 = | | | 108.64 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 16.90 x 30.90 x 0.42 = | | | 219.30 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 24.60 x 16.30 x 0.48 = | | | 192.50 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 32.80 x 7.60 x 0.37 = | | | 93.58 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 24.10 x 38.30 x 0.49 = | | | 455.83 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 42.50 x 19.60 x 0.50 = | | | 416.27 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 33.00 x 42.10 x 0.49 = | | | 673.96 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1.70 x 9.20 x 0.49 = | | | 7.84 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 11.00 x 15.30 x 0.26 = | | | 44.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 12.00 x 16.10 x 0.25 = | | | 48.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 15.30 x 8.00 x 0.43 = | | | 52.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 11.00 x 16.00 x 1.00 = | | | 176.00 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 1.00 x 52.00 x 1.00 = | | | 52.00 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 8.00 x 1.00 x 1.00 = | | | 8.00 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 2.00 x 13.00 x 1.00 = | | | 26.00 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 12.00 x 41.50 x 1.00 = | | | 498.00 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 22.20 x 50.00 x 1.00 = | | | 1,112.50 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 13.00 x 5.80 x 0.29 = | | | 21.93 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 7.00 x 9.00 x 0.50 = | | | 31.50 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 11.00 x 1.90 x 0.50 = | | | 10.45 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 13.20 x 17.00 x 0.50 = | | | 112.39 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 4.90 x 3.00 x 0.39 = | | | 5.79 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 6.50 x 3.90 x 0.31 = | | | 7.71 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 21.40 x 5.20 x 0.40 = | | | 45.07 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 11.20 x 9.10 x 0.49 = | | | 50.05 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 12.30 x 4.50 x 0.36 = | | | 19.89 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 7.40 x 15.80 x 0.29 = | | | 33.38 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 2.50 x 3.90 x 0.46 = | | | 4.38 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 2.80 x 15.80 x 0.31 = | | | 13.50 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |

DIMENSION LIST ADDENDUM

**File No.** 182800

## Additional Dimensions

| Area Measurements | | | Area Type | | | | | |
|---|---|---|---|---|---|---|---|---|
| Measurements | Factor | Total | Level 1 | Level 2 | Level 3 | Other | Bsmt. | Garage |
| 11.00 x 8.90 x 0.50 = | | 49.05 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 15.60 x 13.70 x 0.50 = | | 106.94 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 15.50 x 14.20 x 0.49 = | | 107.02 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 18.00 x 20.80 x 0.49 = | | 182.25 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 23.30 x 24.80 x 0.49 = | | 282.96 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 21.50 x 3.70 x 0.50 = | | 39.46 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 35.10 x 31.40 x 0.31 = | | 337.64 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 21.00 x 6.50 x 0.50 = | | 68.25 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 11.00 x 6.00 x 0.50 = | | 33.00 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 3.50 x 5.50 x 0.50 = | | 9.68 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 5.00 x 6.40 x 0.31 = | | 9.83 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 15.40 x 12.50 x 0.43 = | | 83.00 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 22.00 x 22.00 x 0.48 = | | 231.00 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 1.70 x 3.90 x 0.07 = | | 0.49 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 21.00 x 26.10 x 0.30 = | | 182.75 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 11.10 x 5.60 x 0.50 = | | 30.90 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 14.10 x 15.50 x 0.37 = | | 81.12 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

**LOCATION MAP**

File No. 182800



## AERIAL MAP

File No. 182800



44 Trapelo Road, Belmont, MA  02478   (617) 489-2003   Fax (617) 489-2033

## FLOOD MAP

File No. 182800



**FLOOD INFORMATION**

**Community:** Town of Brookline
Property is NOT in a FEMA Special Flood Hazard Area
**Map Number:** 25021C0034E
**Panel:** 0034E
**Zone:** X
**Map Date:** 07-17-2012
**FIPS:** 25021
**Source:** FEMA DFIRM

**LEGEND**

= FEMA Special Flood Hazard Area   High Risk

= Moderate and Minimal Risk Areas

**Road View:**

= Forest        = Water

**Sky Flood™**

File No. 182800



**FRONT VIEW OF
SUBJECT PROPERTY**

Appraised Date: March 11, 2016
Appraised Value: $ 5,100,000



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE**



File No. 182800



Living room and sitting area



Office



Library



Kitchen



Master bedroom



Master bathroom

interior photos from online sources

**File No.** 182800



Second floor room



Foyer



Butler's pantry with view to dining room



Mud room



Master bathroom shower stall



Second floor sitting area with balcony access

Interior photos from online sources

File No. 182800



Custom master bedroom closet system

**File No.** 182800



**COMPARABLE SALE #1**

50 Lyman Rd
Brookline, MA 02467
Sale Date: 5/19/2015
Sale Price: $ 5,641,047



**COMPARABLE SALE #2**

10 Lyman Rd
Brookline, MA 02467
Sale Date: 5/19/2015
Sale Price: $ 5,000,000



**COMPARABLE SALE #3**

407 Warren St
Brookline, MA 02445
Sale Date: 9/18/2015
Sale Price: $ 5,686,100



File No. 182800



**COMPARABLE SALE #4**

48 Laurel Rd
Chestnut Hill, MA 02467
Sale Date: 11/17/2014
Sale Price: $ 5,200,000

**COMPARABLE SALE #5**

Sale Date:
Sale Price: $

**COMPARABLE SALE #6**

Sale Date:
Sale Price: $



File No. 182800

Bk 33914 Pg233  #21908
03-11-2016 @ 02:15p

MASSACHUSETTS STATE EXCISE TAX
Norfolk Registry of Deeds
Date: 03-11-2016 @ 02:15pm
Ct1#: 1261        Doc#: 21908
Fee: $20,064.00  Cons: $4,400,000.00

### TRUSTEE'S DEED

I, David B. Madoff, c/o Madoff & Khoury LLP, 124 Washington Street, Suite 202, Foxborough, MA  02035, the Chapter 7 Trustee of Lyman-Cutler, LLC, the Debtor in *In re Lyman-Cutler, LLC*, Chapter 7 Case No. 15-13881-FJB, pending in the United States Bankruptcy Court for the District of Massachusetts, pursuant to the Trustee's Motion for Authority to Sell Assets Free and Clear By Private Sale [55 Lyman Road, Chestnut Hill, MA], and an Order approving same, a certified copy of which is recorded herewith~~attached hereto~~, for consideration of Four Million Four Hundred Thousand and 00/100 Dollars ($4,400,000.00), grants to Paris Panagiotopoulos and Marie-Claire Panayiotopoulos, of 55 Lyman Road, Brookline (Chestnut Hill), Massachusetts, as tenants by the entirety,

### WITH QUITCLAIM COVENANTS,

The land with buildings and improvements thereon, presently numbered 55 Lyman Road in Brookline, Norfolk County Massachusetts, being shown as Lot 33-B on a plan entitled, "77 Lyman Road, Brookline, MA, scale 1" = 20'," dated 5/24/13 by Peter Nolan & Associates LLC, which Plan is recorded as Plan 33 of 2013 in Plan Book 623.

Said lot contains 33,908+/- square feet according to said Plan.

Being a portion of the premises conveyed to Lyman-Cutler, LLC, by deed of James A. Swartz and Joan E. Swartz Siff, as Trustee of the Freedom Trust, dated December 13, 2012, and recorded in the Norfolk County Registry of Deeds in Book 30866, Page 40. See also deed of Edward M. Swartz dated August 6, 1998 and recorded in said Registry in Book 13087 Page 355.

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS
DEDHAM, MA

CERTIFY



55 Lyman Road, Brookline (Chestnut Hill), MA 02467

44 Trapelo Road, Belmont, MA  02478   (617) 489-2003   Fax (617) 489-2033

Deed / Page 2

**File No.** 182800

**Bk 33914 Pg234 #21908**

Executed this 11th day of March, 2016.



David B. Madoff, Trustee of Lyman-Cutler, LLC

### COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS                                    March 11 , 2016

On this 11th day of March, 2016, before me, the undersigned notary public, personally appeared David B. Madoff, Trustee for Lyman-Cutler, LLC, proved to me through satisfactory evidence of identification, which was a Rhode Island driver's license, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose.

Steffani M.P. Nicholson
My commission expires: 11/18/21



Assessor property record card

**File No.** 182800



Brookline Assessors Property Database - www.brooklinema.gov/assessors          Page 1 of 1

Town of Brookline, MA          Residential Property Record Card          FY 2017

**Parcel ID**          **Location**          **State Class**          101
437-27-01          55 LYMAN RD          101 ONE FAMILY HOUSE          Neighborhood Information

**Owner Information**
PANAYIOTOPOULOS  PARIS & MARIE CLAIRE
55 LYMAN RD
CHESTNUT HILL, MA  02467

**Deed Information**
Legal Ref.: 33914/233          **Land Area:** 33,908
**Sale Date:** 3/11/2016          **Sale Price:** $4,400,000

**Dwelling Information**
Class Code:          101
Occupancy:          1
Stories:          2
Rooms:          13
Bedrooms:          6
Overall Condition:          Excellent
Grade:          VERY-GOOD
Fireplaces:          3
Extra Kitchens:          0
Kitchen Quality:          MODERN
Full Baths:          6
Half Baths:          2
Bath Quality:          MODERN
Air Conditioning:          YES
Living Area:          6,791
Finished Basement:
-Finished Basement is not included in Living Area.
Fn Basement Grade:
Attached Garage:          710
Basement Garage:          0
Year Built:          2013

**History**          **Valuation/Taxes**
FY 2016: $ 5,079,400          **Residential Value 2017: $5,435,000**
FY 2015: $ 2,549,200          **Residential Exemption: N**
FY 2014: $ 1,038,300          **FY17 Real Estate Tax: $53,698**
FY 2013: $ 1,008,000          **FY17 Preliminary 1st Half Tax: $27,522**
FY 2012: $ 1,008,000
FY 2011: $ 960,600
FY 2010: $ 960,600
FY 2009: $ 955,700
FY 2008: $ 935,800
FY 2007: $ 955,000

**Property Picture**

**Building Sketch**

**GIS Viewer**
For Maps, Aerial Views, Zoning,
Parks, and Historic Information

Parcel map

File No. 182800



61 ft

44 Trapelo Road, Belmont, MA 02478   (617) 489-2003  Fax (617) 489-2033

License

File No. 182800

# COMMONWEALTH OF MASSACHUSETTS
## DIVISION OF PROFESSIONAL LICENSURE
### BOARD OF
### REAL ESTATE APPRAISERS
### ISSUES THE FOLLOWING LICENSE
### CERT GEN. REAL ESTATE APPRAISER

**HUGH M FENNELL**
**44 LORING ST**
**WESTWOOD, MA 02090-1418**

LICENSEE SIGNATURE

| 75272 | 09/12/2019 | 317287 |
|---|---|---|
| LICENSE NUMBER | EXPIRATION DATE | SERIAL NUMBER |



44 Trapelo Road, Belmont, MA 02478   (617) 489-2003   Fax (617) 489-2033

File No.  182800



44 Trapelo Road
Belmont, MA 02478

*The*
**APPRAISERS**
*Group*

617.489.2003
appraisersgroup.com
fax 617.489.2033

**CURRICULUM VITAE**
**_MORGAN FENNELL_**
MA CERTIFIED GENERAL REAL ESTATE APPRAISER #75272

*Appraisal Experience*

**11/00 – Present**      **The Appraisers Group**, Belmont, MA
                *Vice President / Legal Services*

Manages appraisal services for attorneys and private clients – Responsible for coordinating the residential and commercial staff throughout all aspects of completing a large volume of private work including divorce, estate planning, and tax abatements.

Mr. Fennell's appraisal experience includes the valuation of all types of commercial real estate including industrial, office, retail, multi-family residential, developable land, residential subdivisions, mixed-use property, residential and commercial redevelopments

**12/98 – 11/00**      **Hippauf & Associates**, Santa Fe, NM
                *Staff Appraiser*

Preparation of FNMA form reports of single family, multi-family, condominium and vacant land. Provided significant assistance in preparation of commercial appraisal reports.

*Court Testimony*

Mr. Fennell has appeared before the Suffolk, Middlesex and Norfolk Probate & Family Courts and U.S. Bankruptcy Court and is qualified as an expert witness.

*Education*

**1995**            **Whittier College**, Whittier, CA
                BA, Political Science

*Appraisal Education*

**The Appraisal Institute**

| | |
|---|---|
| 2015 | Residential Report Writing and Case Studies |
| 2015 | Case Studies in Appraising Green Residential Buildings |
| 2014 | Residential Site Valuation and Cost Approach |
| 2014 | Business Practices and Ethics |
| 2013 | Introduction to Green Buildings: Principles and Concepts |
| 2013 | Real Estate Finance, Statistics & Valuation Modeling |
| 2013 | Valuation Case Studies: Multi- discipline Appraisal Overview |
| 2013 | Residential Market Highest & Best Use |
| 2013 | The Discounted Cash Flow Model: Concepts, Issues & Applications |
| 2011 | Analyzing Operating Expenses |



Appraiser CV

File No. 182800

| 2011 | Forecasting Revenue |
|---|---|
| 2011 | Intro to Valuing Commercial Green Buildings |
| 2011 | Apartment Appraisal, Concepts & Applications |
| 2007 | General Appraiser Income Approach |
| 2003 | 410 National USPAP Course |
| 2003 | The FHA and the Appraisal Process |
| 2003 | Residential Property Construction and Inspection |
| 2001 | Appraisal of non-conforming uses |
| 2000 | Appraising from blueprints and specifications |
| 1999 | Supporting sales comparison grid adjustments for residential properties |
| 1999 | 120 Appraisal procedures |
| 1998 | 110 Appraisal principles |

**Massachusetts Board of Real Estate Appraisers**

| 2012 | USPAP Update Seminar, MBREA |
|---|---|
| 2010 | USPAP Update Seminar, MBREA |
| 2009 | USPAP Update Seminar, MBREA |
| 2003 | Appraising Complex Residential Properties |
| 2001 | Unique and Unusual Residential Properties |

**Other Education**

| 1998 | Uniform standards of professional appraisal practice -New Mexico Board of Realtors |
|---|---|
| 1998 | Appraising the single family residence -Santa Fe Community College |

*Memberships and Affiliations*

Massachusetts General Certified Real Estate Appraiser #75272
Member of the Massachusetts Board of Real Estate Appraisers

*Partial Client List*

| | |
|---|---|
| Cambridge Savings Bank | Burns & Levinson LLP |
| Cambridge Trust | Todd & Weld LLP |
| Citibank | Lee & Rivers LLP |
| Dedham Savings Bank | Kajko, Weisman & Colasanti LLP |
| East Boston Savings Bank | Boston Law Collaborative |
| East Cambridge Savings Bank | Kates & Barlow PC |
| First Republic Bank | Verrill Dana LLP |
| Leader Bank | Witmer, Karp, Warner & Ryan LLP |
| Middlesex Savings Bank | |
| Northern Bank & Trust | |
| Salem Five Cent Savings Bank | |
| Winter Hill Savings Bank | |

2





File No. 182799

**APPRAISAL OF**

A PROPERTY

**LOCATED AT:**

88 Cutler Ln
Brookline, MA  02467

**CLIENT:**

O'Connor, Carnathan and Mack
1 Van de Graaff Drive #104
Burlington, MA 01803

**AS OF:**

January 29, 2016

**BY:**

Morgan Fennell
C.G.R.E.A. #75272

The Appraisers Group

## Residential Appraisal Report

File No. 182799

The purpose of this appraisal report is to provide the client with a credible opinion of the defined value of the subject property, given the intended use of the appraisal.

**PURPOSE**

Client Name/Intended User **O'Connor, Carnathan and Mack**   E-mail

Client Address **1 Van de Graaff Drive #104**   City **Burlington**   State **MA**   Zip **01803**

Additional Intended User(s) **Any duly authorized representatives of the client.**

Intended Use **To assist with pending litigation.**

**SUBJECT**

Property Address **88 Cutler Ln**   City **Brookline**   State **MA**   Zip **02467**

Owner of Public Record **Olga Zheleznyak**   County **Norfolk**

Legal Description **Book 33823, Page 506, Dated 1/29/2016**

Assessor's Parcel # **437-27-02; 2016 Assessment of $4,839,500**   Tax Year **2016**   R.E. Taxes $ **50,428.00**

Neighborhood Name **Chestnut Hill**   Map Reference **MSA# 14454**   Census Tract **4011.00**

Property Rights Appraised [X] Fee Simple   [ ] Leasehold   [ ] Other (describe)

My research [ ] did [X] did not reveal any prior sales or transfers of the subject property for the three years prior to the effective date of this appraisal.

Prior Sale/Transfer:   Date **1/29/2016**   Price **4,400,000**   Source(s) **Norfolk Registry of Deeds**

Analysis of prior sale or transfer history of the subject property (and comparable sales, if applicable)   **See Attached Addendum**

**SALES HISTORY**

Offerings, options and contracts as of the effective date of the appraisal   **None**

**NEIGHBORHOOD**

| Neighborhood Characteristics | | | One-Unit Housing Trends | | | One-Unit Housing | | Present Land Use % | |
|---|---|---|---|---|---|---|---|---|---|
| Location | [ ] Urban [X] Suburban [ ] Rural | | Property Values | [X] Increasing [ ] Stable [ ] Declining | | PRICE | AGE | One-Unit | 85 % |
| Built-Up | [X] Over 75% [ ] 25-75% [ ] Under 25% | | Demand/Supply | [ ] Shortage [X] In Balance [ ] Over Supply | | $(000) | (yrs) | 2-4 Unit | 5 % |
| Growth | [ ] Rapid [X] Stable [ ] Slow | | Marketing Time | [ ] Under 3 mths [X] 3-6 mths [ ] Over 6 mths | | 635 Low | 2 | Multi-Family | 5 % |
| Neighborhood Boundaries  The subject neighborhood is bound by Rt. 9 to the north, The Country | | | | | | 13,500 High | 135 | Commercial | 5 % |
| Club and West Roxbury Pkwy to the south, Lee St. to the east and Hammond St. to the west. | | | | | | 1,950 Pred. | 90 | Other | % |

Neighborhood Description   **See Attached Addendum**

Market Conditions (including support for the above conclusions)   **See Attached Addendum**

**SITE**

Dimensions **323.25 Front feet along Cutler Ln**   Area **33908 sf**   Shape **Irregular**   View **Residential**

Specific Zoning Classification **S-25/Residential SF**   Zoning Description **Minimum: Lot Size, 25,000 sf; Maximum FAR, .2**

Zoning Compliance [X] Legal   [ ] Legal Nonconforming (Grandfathered Use)   [ ] No Zoning   [ ] Illegal (describe) **See attached addendum**

Is the highest and best use of the subject property as improved (or as proposed per plans and specifications) the present use? [X] Yes [ ] No  If No, describe. **See Attached Addendum**

| Utilities | Public | Other (describe) | | Public | Other (describe) | Off-site Improvements—Type | Public | Private |
|---|---|---|---|---|---|---|---|---|
| Electricity | [X] | | Water | [X] | | Street **paved** | [X] | |
| Gas | [X] | | Sanitary Sewer | [X] | | Alley **none** | | |

Site Comments   **See Attached Addendum**

**IMPROVEMENTS**

| GENERAL DESCRIPTION | | FOUNDATION | | EXTERIOR DESCRIPTION | materials | INTERIOR | materials |
|---|---|---|---|---|---|---|---|
| Units [X] One [ ] One w/Acc. unit | | [ ] Concrete Slab [ ] Crawl Space | | Foundation Walls | **Concrete/good** | Floors | **Wood/tile/good** |
| # of Stories **2** | | [X] Full Basement [ ] Partial Basement | | Exterior Walls | **Wood/good** | Walls | **Drywall/good** |
| Type [X] Det. [ ] Att. [ ] S-Det./End Unit | | Basement Area **3458** sq. ft. | | Roof Surface | **AsphShing/good** | Trim/Finish | **Wood/good** |
| [X] Existing [ ] Proposed [ ] Under Const. | | Basement Finish **0** % | | Gutters & Downspouts | **Metal/good** | Bath Floor | **Tile/good** |
| Design (Style) **Colonial** | | [X] Outside Entry/Exit [ ] Sump Pump | | Window Type | **Double hung/good** | Bath Wainscot | **Tile/dry/good** |
| Year Built **2013** | | | | Storm Sash/Insulated | **Double pane/good** | Car Storage | [ ] None |
| Effective Age (Yrs) **0** | | | | Screens | **Yes/good** | [X] Driveway   # of Cars **3** |
| Attic | [ ] None | Heating [X] FWA [ ] HW [ ] Radiant | | Amenities | [ ] WoodStove(s) #**0** | Driveway Surface **Asphalt** |
| [X] Drop Stair | [ ] Stairs | [ ] Other   Fuel **gas** | | [X] Fireplace(s) # **3** | [X] Fence **None** | [X] Garage   # of Cars **3** |
| [ ] Floor | [ ] Scuttle | Cooling [X] Central Air Conditioning | | [X] Patio/Deck **Patio** | [X] Porch **Open** | [ ] Carport   # of Cars **0** |
| [ ] Finished | [ ] Heated | [ ] Individual [ ] Other | | [ ] Pool **None** | [ ] Other **None** | [X] Att. [ ] Det. [ ] Built-in |
| Appliances [X] Refrigerator [X] Range/Oven [X] Dishwasher [X] Disposal [X] Microwave [X] Washer/Dryer [ ] Other (describe) | | | | | | | |

Finished area above grade contains:   **12** Rooms   **6** Bedrooms   **6.5** Bath(s)   **6,791** Square Feet of Gross Living Area Above Grade

Additional Features **The subject property featured high-end finishes throughout both the first and second floors.**

Comments on the Improvements   **See Attached Addendum**



The Appraisers Group

## Residential Appraisal Report

File No. **182799**

| FEATURE | SUBJECT | COMPARABLE SALE NO. 1 | +(-) $ Adjustment | COMPARABLE SALE NO. 2 | +(-) $ Adjustment | COMPARABLE SALE NO. 3 | +(-) $ Adjustment |
|---|---|---|---|---|---|---|---|
| Address | 88 Cutler Ln Brookline, MA 02467 | 50 Lyman Rd Brookline, MA 02467 | | 10 Lyman Rd Brookline, MA 02467 | | 407 Warren St Brookline, MA 02445 | |
| Proximity to Subject | | 0.06 miles SE | | 0.15 miles SE | | 0.44 miles SE | |
| Sale Price | $ | $ 5,641,047 | | $ 5,000,000 | | $ 5,686,100 | |
| Sale Price/Gross Liv. Area | $ 0.00 sq.ft. | $ 837.07 sq.ft. | | $ 815.13 sq.ft. | | $ 775.73 sq.ft. | |
| Data Source(s) | | MLSPIN/DOM 5 | | MLSPIN/DOM 289 | | MLSPIN/DOM 408 | |
| Verification Source(s) | | Assessor records/exterior view | | Assessor records/exterior view | | Assessor records/exterior view | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing Concessions | | Conventional 0 | | Conventional 0 | | Conventional 0 | |
| Date of Sale/Time | | 5/19/2015 | | 5/19/2015 | | 9/18/2015 | |
| Location | Suburban | Suburban | | Inferior | 125,000 | Suburban | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | Fee Simple | | Fee Simple | |
| Site | 33908 sf | 33712 sf | | 40098 sf | | 1.24 ac | -150,000 |
| View | Residential | Residential | | Residential | | Residential | |
| Design (Style) | Colonial | Colonial | | Colonial | | Colonial | |
| Quality of Construction | Good | Good | | Good | | Good | |
| Actual Age | 3 | 2 | | 3 | | 3 | |
| Condition | Very Good | Very Good | | Very Good | | Very Good | |
| Above Grade Room Count | Total 12 Bdrms. 6 Baths 6.5 | Total 12 Bdrms. 6 Baths 7 | -12,500 | Total 11 Bdrms. 6 Baths 7 | -12,500 | Total 11 Bdrms. 6 Baths 6 | +12,500 |
| Gross Living Area | 150.00 6,791 sq.ft. | 6,739 sq.ft. | 0 | 6,134 sq.ft. | 98,600 | 7,330 sq.ft. | -80,900 |
| Basement & Finished Rooms Below Grade | Full Unfinished | Full Unfinished | | Full Unfinished | | Full 1RRm | -25,000 |
| Functional Utility | Typical | Typical | | Typical | | Typical | |
| Heating/Cooling | Central/CAC | Central/CAC | | Central/CAC | | Central/CAC | |
| Energy Efficient Items | None | None | | None | | None | |
| Garage/Carport | 3 Car Garage | 3 Car Garage | | 3 Car Garage | | 3 Car Garage | |
| Porch/Patio/Deck | Porch/patio/balc | 2 Patios | +5,000 | Patio/outdrFP | +5,000 | Patio/balcony | +5,000 |
| Kitchen condition | Professional | Professional | | Professional | | Professional | |
| Fireplaces | 3 Fireplaces | 3 Fireplaces | | 3 Fireplaces | | 3 Fireplaces | |
| Appeal | See Comments | Superior | -141,026 | Superior | -125,000 | Superior | -142,153 |
| Net Adjustment (Total) | | ☐ + ☒ - $ | 148,526 | ☒ + ☐ - $ | 91,100 | ☐ + ☒ - $ | 380,553 |
| Adjusted Sale Price of Comparables | | Net Adj. -2.6% Gross Adj. 2.8% $ | 5,492,521 | Net Adj. 1.8% Gross Adj. 7.3% $ | 5,091,100 | Net Adj. -6.7% Gross Adj. 7.3% $ | 5,305,547 |

Summary of Sales Comparison Approach

**COST APPROACH TO VALUE**

Site Value Comments

| ESTIMATED ☐ REPRODUCTION OR ☐ REPLACEMENT COST NEW | OPINION OF SITE VALUE ..................................... = $ | |
|---|---|---|
| Source of cost data | Dwelling Sq. Ft. @ $ ............. = $ | |
| Quality rating from cost service    Effective date of cost data | Sq. Ft. @ $ ............. = $ | |
| Comments on Cost Approach (gross living area calculations, depreciation, etc.) The cost approach was not developed as most buyers of single | Garage/Carport 710 Sq. Ft. @ $ ............. = $ | 0 |
| family homes in the market do not rely upon this valuation method. | Total Estimate of Cost-New ............. = $ | 0 |
| | Less  Physical  Functional  External | |
| | Depreciation = $( | 0) |
| | Depreciated Cost of Improvements .................................. = $ | 0 |
| | *As-is* Value of Site Improvements .................................. = $ | |
| | INDICATED VALUE BY COST APPROACH .................... = $ | 0 |

**INCOME APPROACH TO VALUE**

Estimated Monthly Market Rent $ _____ X Gross Rent Multiplier _____ = $ _____ Indicated Value by Income Approach _____

Summary of Income Approach (including support for market rent and GRM)  The Income Approach was not developed as single family homes are not typically purchased for their income producing capabilities.

Methods and techniques employed: ☒ Sales Comparison Approach  ☐ Cost Approach  ☐ Income Approach  ☐ Other:

Discussion of methods and techniques employed, including reason for excluding an approach to value:  The best indication of value is represented by the sales comparison approach, which is most indicative of current market trends. The Income Approach was not developed as single family homes are not typically purchased for their income producing capabilities. The cost approach was not developed as most buyers of single family homes in the market do not rely upon this valuation method.

Reconciliation comments:  See attached addendum

Based on the scope of work, assumptions, limiting conditions and appraiser's certification, my (our) opinion of the defined value of the real property that is the subject of this report as of    January 29, 2016    , which is the effective date of this appraisal, is:

☒ Single point $ 5,100,000    ☐ Range $ _____ to $ _____    ☐ Greater than  ☐ Less than  $ _____

This appraisal is made ☒ "as is,"  ☐ subject to completion per plans and specifications on the basis of a hypothetical condition that the improvements have been completed,
☐ subject to the following repairs or alterations on the basis of a hypothetical condition that the repairs or alterations have been completed  ☐ subject to the following:



The Appraisers Group

## Residential Appraisal Report

File No. **182799**

| FEATURE | SUBJECT | COMPARABLE SALE NO. 4 | | COMPARABLE SALE NO. 5 | | COMPARABLE SALE NO. 6 | |
|---|---|---|---|---|---|---|---|
| Address | 88 Cutler Ln<br>Brookline, MA 02467 | 48 Laurel Rd<br>Chestnut Hill, MA 02467 | | | | | |
| Proximity to Subject | | 1.14 miles SW | | | | | |
| Sale Price | $ | $ 5,200,000 | | $ | | $ | |
| Sale Price/Gross Liv. Area | $ 0.00 sq. ft. | $ 841.70 sq. ft. | | $ 0.00 sq. ft. | | $ sq. ft. | |
| Data Source(s) | | MLSPIN/DOM 5 | | | | | |
| Verification Source(s) | | Assessor records/exterior view | | | | | |
| VALUE ADJUSTMENTS | DESCRIPTION | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment | DESCRIPTION | +(-) $ Adjustment |
| Sale or Financing | | Conventional | | | | | |
| Concessions | | 0 | | | | | |
| Date of Sale/Time | | 11/17/2014 | | | | | |
| Location | Suburban | Suburban | | | | | |
| Leasehold/Fee Simple | Fee Simple | Fee Simple | | | | | |
| Site | 33908 sf | 28045 sf | | | | | |
| View | Residential | Residential | | | | | |
| Design (Style) | Colonial | Colonial | | | | | |
| Quality of Construction | Good | Good | | | | | |
| Actual Age | 3 | 3 | | | | | |
| Condition | Very Good | Very Good | | | | | |
| Above Grade | Total 12 Bdrms. 6 Baths 6.5 | Total 11 Bdrms. 5 Baths 5.5 | +25,000 | Total Bdrms. Baths | | Total Bdrms. Baths | |
| Room Count | | | | | | | |
| Gross Living Area 150.00 | 6,791 sq. ft. | 6,178 sq. ft. | 92,000 | sq. ft. | | sq. ft. | |
| Basement & Finished | Full | Full | | | | | |
| Rooms Below Grade | Unfinished | 1BR1FBa1HBa | -62,500 | | | | |
| Functional Utility | Typical | Typical | | | | | |
| Heating/Cooling | Central/CAC | Central/CAC | | | | | |
| Energy Efficient Items | None | None | | | | | |
| Garage/Carport | 3 Car Garage | 3 Car Garage | | | | | |
| Porch/Patio/Deck | Porch/patio/balc | Patio | +10,000 | | | | |
| Kitchen condition | Professional | Professional | | | | | |
| Fireplaces | 3 Fireplaces | 2 Fireplaces | +5,000 | | | | |
| Appeal | See Comments | Superior | -130,000 | | | | |
| Net Adjustment (Total) | | ☐ + ☒ - | $ 60,500 | ☒ + ☐ - | $ 0 | ☐ + ☐ - | $ |
| Adjusted Sale Price | | Net Adj. -1.2% | | Net Adj. 0.0% | | Net Adj. % | |
| of Comparables | | Gross Adj. 6.2% $ | 5,139,500 | Gross Adj. 0.0% $ | 0 | Gross Adj. % $ | |

Summary of Sales Comparison Approach

Produced using ACI software, 800.234.8727 www.aciweb.com
Additional Comparables

This form Copyright © 2005-2016 ACI, a First American Company. All Rights Reserved.
(lyPAR™) General Purpose Appraisal Report 10C14
GPARGIAL_14 8/2016

The Appraisers Group

## Residential Appraisal Report

File No. 182799

### Scope of Work, Assumptions and Limiting Conditions

Scope of work is defined in the Uniform Standards of Professional Appraisal Practice as " the type and extent of research and analyses in an assignment." In short, scope of work is simply what the appraiser did and did not do during the course of the assignment. It includes, but is not limited to: the extent to which the property is identified and inspected, the type and extent of data researched, the type and extent of analyses applied to arrive at opinions or conclusions.

The scope of this appraisal and ensuing discussion in this report are specific to the needs of the client, other identified intended users and to the intended use of the report. This report was prepared for the sole and exclusive use of the client and other identified intended users for the identified intended use and its use by any other parties is prohibited. The appraiser is not responsible for unauthorized use of the report.

The appraiser's certification appearing in this appraisal report is subject to the following conditions and to such other specific conditions as are set forth by the appraiser in the report. All extraordinary assumptions and hypothetical conditions are stated in the report and might have affected the assignment results.

1. The appraiser assumes no responsibility for matters of a legal nature affecting the property appraised or title thereto, nor does the appraiser render any opinion as to the title, which is assumed to be good and marketable. The property is appraised as though under responsible ownership.

2. Any sketch in this report may show approximate dimensions and is included only to assist the reader in visualizing the property. The appraiser has made no survey of the property.

3. The appraiser is not required to give testimony or appear in court because of having made the appraisal with reference to the property in question, unless arrangements have been previously made thereto.

4. Neither all, nor any part of the content of this report, copy or other media thereof (including conclusions as to the property value, the identity of the appraiser, professional designations, or the firm with which the appraiser is connected), shall be used for any purposes by anyone but the client and other intended users as identified in this report, nor shall it be conveyed by anyone to the public through advertising, public relations, news, sales, or other media, without the written consent of the appraiser.

5. The appraiser will not disclose the contents of this appraisal report unless required by applicable law or as specified in the Uniform Standards of Professional Appraisal Practice.

6. Information, estimates, and opinions furnished to the appraiser, and contained in the report, were obtained from sources considered reliable and believed to be true and correct. However, no responsibility for accuracy of such items furnished to the appraiser is assumed by the appraiser.

7. The appraiser assumes that there are no hidden or unapparent conditions of the property, subsoil, or structures, which would render it more or less valuable. The appraiser assumes no responsibility for such conditions, or for engineering or testing, which might be required to discover such factors. This appraisal is not an environmental assessment of the property and should not be considered as such.

8. The appraiser specializes in the valuation of real property and is not a home inspector, building contractor, structural engineer, or similar "expert", unless otherwise noted. The appraiser did not conduct the intensive type of field observations of the kind intended to seek and discover property defects. The viewing of the property and any improvements is for purposes of developing an opinion of the defined value of the property, given the intended use of this assignment. Statements regarding condition are based on surface observations only. The appraiser claims no special expertise regarding issues including, but not limited to: foundation settlement, basement moisture problems, wood destroying (or other) insects, pest infestation, radon gas, lead based paint, mold or environmental issues. Unless otherwise indicated, mechanical systems were not activated or tested.

This appraisal report should not be used to disclose the condition of the property as it relates to the presence/absence of defects. The client is invited and encouraged to employ qualified experts to inspect and address areas of concern. If negative conditions are discovered, the opinion of value may be affected.

Unless otherwise noted, the appraiser assumes the components that constitute the subject property improvement(s) are fundamentally sound and in working order.

Any viewing of the property by the appraiser was limited to readily observable areas. Unless otherwise noted, attics and crawl space areas were not accessed. The appraiser did not move furniture, floor coverings or other items that may restrict the viewing of the property.

9. Appraisals involving hypothetical conditions related to completion of new construction, repairs or alteration are based on the assumption that such completion, alteration or repairs will be competently performed.

10. Unless the intended use of this appraisal specifically includes issues of property insurance coverage, this appraisal should not be used for such purposes. Reproduction or Replacement cost figures used in the cost approach are for valuation purposes only, given the intended use of the assignment. The Definition of Value used in this assignment is unlikely to be consistent with the definition of Insurable Value for property insurance coverage/use.

11. The ACI General Purpose Appraisal Report (GPAR™) is not intended for use in transactions that require a Fannie Mae 1004/Freddie Mac 70 form, also known as the Uniform Residential Appraisal Report (URAR).

Additional Comments Related To Scope Of Work, Assumptions and Limiting Conditions



This form Copyright © 2005-2016 ACI, a First American Company. All Rights Reserved.
(GPAR™) General Purpose Appraisal Report 1/2014
GPARGMC_14 07232016

The Appraisers Group
**Residential Appraisal Report**                                    File No. 182799

## Appraiser's Certification

**The appraiser(s) certifies that, to the best of the appraiser's knowledge and belief:**

1. The statements of fact contained in this report are true and correct.

2. The reported analyses, opinions, and conclusions are limited only by the reported assumptions and limiting conditions and are the appraiser's personal, impartial, and unbiased professional analyses, opinions, and conclusions.

3. Unless otherwise stated, the appraiser has no present or prospective interest in the property that is the subject of this report and has no personal interest with respect to the parties involved.

4. The appraiser has no bias with respect to the property that is the subject of this report or to the parties involved with this assignment.

5. The appraiser's engagement in this assignment was not contingent upon developing or reporting predetermined results.

6. The appraiser's compensation for completing this assignment is not contingent upon the development or reporting of a predetermined value or direction in value that favors the cause of the client, the amount of the value opinion, the attainment of a stipulated result, or the occurrence of a subsequent event directly related to the intended use of this appraisal.

7. The appraiser's analyses, opinions, and conclusions were developed, and this report has been prepared, in conformity with the Uniform Standards of Professional Appraisal Practice.

8. Unless otherwise noted, the appraiser has made a personal inspection of the property that is the subject of this report.

9. Unless noted below, no one provided significant real property appraisal assistance to the appraiser signing this certification. Significant real property appraisal assistance provided by:

**Additional Certifications:**

The appraiser would like to acknowledge Christine Alban who provided assistance in the preparation of this report; assisting in the inspection of the subject and the collection and analysis of data. (MA RE Lic # 75549)

---

**Definition of Value:** [X] Market Value    [ ] Other Value:

Source of Definition: Federal Register, vol. 55, no. 163, August 22, 1990, pages 34228 and 34229.

Implicit in this definition is the consummation of a sale as of a specified date and the passing of title from seller to buyer under conditions whereby:

1. Buyer and seller are typically motivated;
2. Both parties are well informed or well advised, and acting in what they consider their own best interests;
3. A reasonable time is allowed for exposure in the open market;
4. Payment is made in terms of cash in U.S. dollars or in terms of financial arrangements comparable thereto; and
5. The price represents the normal consideration for the property sold unaffected by special or creative financing or sales concessions granted by anyone associated with the sale.

---

ADDRESS OF THE PROPERTY APPRAISED:

88 Cutler Ln

Brookline, MA 02467

EFFECTIVE DATE OF THE APPRAISAL: January 29, 2016

APPRAISED VALUE OF THE SUBJECT PROPERTY $ 5,100,000

| APPRAISER | SUPERVISORY APPRAISER |
|---|---|
| Signature: *Morgan Fennell* | Signature: |
| Name: Morgan Fennell | Name: |
| Company Name: The Appraisers Group | Company Name: |
| Company Address: 44 Trapelo Road | Company Address: |
| Belmont, MA 02478 | |
| Telephone Number: 617-489-2003 | Telephone Number: |
| Email Address: value@appraisersgroup.com | Email Address: |
| State Certification # C.G.R.E.A. #75272 | State Certification # |
| or License # | or License # |
| or Other (describe): _____ State #: _____ | State: MA |
| State: MA | Expiration Date of Certification or License: |
| Expiration Date of Certification or License: 09/12/2019 | Date of Signature: |
| Date of Signature and Report: 07/30/2018 | Date of Property Viewing: |
| Date of Property Viewing: 2/14/2017 | Degree of property viewing: |
| Degree of property viewing: | [ ] Interior and Exterior  [ ] Exterior Only  [ ] Did not personally view |
| [ ] Interior and Exterior  [X] Exterior Only  [ ] Did not personally view | |



Produced using ACI software, 800.234.8727 www.aciweb.com
Page 4 of 4

This form Copyright © 2003-2016 ACI, a First American Company. All Rights Reserved.
(gPAR™) General Purpose Appraisal Report 1/2014
GPARSUM_14 07282016

**THE APPRAISERS GROUP**

**Clarification of Intended Use and Intended User**
The Intended Use is to evaluate the property as the subject of this appraisal for pending litigation, subject to the stated Scope of Work and reporting requirements of this appraisal
report form, and the Definition of Market Value. No additional Intended Users are identified by the appraiser.

**Exposure Time**
The appraiser has estimated an exposure time of less than 90 days for the subject property as of the effective date of this report. The exposure time assumes that the property is free of legal encumbrances and is priced correctly as of the effective date of this report, and was determined by MLS data, the appraiser's expertise in the local market, and conversations with the local brokers, as well as the number of days on market of the comparables selected in this report. Frequently, new construction like several of the selected Comps, is listed for sale prior to completion, which may lead to longer marketing times.   The exposure time chosen is deemed reasonable and reliable. USPAP defines exposure time as "The estimated length of time that the property interest being appraised would have been offered on the market prior to the hypothetical consummation of a sale at market value on the effective date of the appraisal."

**Additional Appraiser Certifications**
I have performed no services, as an appraiser or in any other capacity, regarding the property that is the subject of this report within the three-year period immediately preceding acceptance of this assignment.

This report was prepared in accordance with the requirements of the Appraisal Report option of Uniform Standards of Professional Appraisal Practice and Title XI of the Financial Institutions Reform, Recovery and Enforcement Act of 1989, as amended (12 U.S.C. 3331et seq.), and any implementing regulations.
**Prior Sales Comments**
There was no prior sale of the subject in the past three years or of Comparables 1-5 in the previous 12 months.

**Discussion of Property Development History & Bankruptcy**
Based on information provided by the client, the appraiser has summarized the development history, marketing process and bankruptcy of the subject property below.

-A partnership was formed in November of 2012 between the developer and the investors by way of a limited liability company, Lyman-Cutler LLC (LCLLC), to build two new single family homes at 55 Lyman Road and 88 Cutler Road.
-As part of this development, the builder agreed to have the new homes completed no later than March 30, 2014 in an attempt to market the homes during the Spring.
-The homes were not completed by this date and were instead finished in October of 2014, which also missed the Fall selling market.
-As part of the LLC agreement the homes were to be sold by November 2014.
-The marketing and listing of these homes was handled by the wife of the builder, who is a local real estate agent.
-The homes were not sold by the agreed upon date. The investors were not provided any information on the marketing process, how the homes were recieved in the market, or how involved the listing agent was during this process.
-The builder and investors disagreed on marketing/listing the homes going forward.
-In June of 2015 the builder placed Mechanics Liens on both new homes claiming money owed from cost overruns.
-In Bankruptcy Court, Lyman-Cutler LLC filed Chapter 11 on 10/7/15

*Based on the appraisers findings in this report, the extended construction period, lack of effective marketing, and legal dispute between the builder and investors significantly impacted the eventual selling price of both new homes. This is reflected in the difference between the appraised value of the subject property and the actual selling price.*

**Neighborhood Description**
The subject Brookline neighborhood known as Chestnut Hill is south of Rt. 9 near The Country Club. The immediate neighborhood is comprised of a few interlocking streets with estate style properties similar in size to the subject.  Nearby Rt. 9 amenities, including retail shops and service oriented businesses are located within approximately 2 miles and are not considered adverse to marketability. Rt. 9 access is within less than 1 mile and provides a direct route to Boston and points west.  The

nearby Boston hospital district is a significant employment center. Public transportation to Boston and points west is available via MBTA Greenline within 2 miles.

**Neighborhood Market Conditions**
The following charts display historical and current market activity of high end single family properties in Brookline. As there were few properties sold at the highest price point of the Brookline market, the appraiser expanded the group of properties to include transfers over $2,000,000.

The first chart shows the current activity for houses listed for sale as of the effective date (1/29/2016) along with the average days on market (DOM) and the median price. The chart compares year over year listing history on the effective date of the appraisal. The second chart demonstrates sold activity for single family Brookline properties in the above price range as of the effective date, as compared to the same period one year earlier. The chart includes the total sales, days on market, and median price.

All of the surveys are based on data from the Multiple Listing Service (MLS), as of the effective date of this report (1/29/2016).

**Brookline Single Family Listings**

| Year | Number of Listings | Avg. Days on Market | Median Asking Price |
|---|---|---|---|
| 29-Jan-15 | 26 | 194 | $2,737,500 |
| 29-Jan-16 | 27 | 110 | $2,898,000 |
| Change (%) | 3.8% | -43.3% | 5.9% |

**Active Listings** - The number of single family listings in Brookline on the effective date of this appraisal compared to the same date a year prior increased from 26 to 27, while the average number of days on market declined significantly on a percentage basis. The median asking price increased from one year to the next. The increase in listings indicated a more active market and sellers were recognizing this trend. The decrease in market times illustrates that the buyers were moving much more quickly to purchase homes during 2016 than in 2015. The near term market for Brookline properties in the subject price range remained positive and stable overall.

**Brookline Single Family Sales**

| | Number Sold | Avg. Days on Market | Median Sale Price |
|---|---|---|---|
| 1/30/14 - 1/29/15 | 174 | 84 | $1,599,500 |
| 1/30/15 - 1/29/16 | 172 | 72 | $1,605,000 |
| Change (%) | -1.1% | -14.3% | 0.3% |

**Closed Sales** - Year over year, the number of sales remained almost unchanged. The average number of days on market had declined, suggesting continued buyer demand overall. The median sale price was stable.

**Subject Market History**
The subject property initially was listed for sale on 8/20/2014 for $5,499,999. On 4/30/2015, the listing was temporarily withdrawn until 5/8/2015, when it was cancelled. The property was listed for sale again on 5/21/2015 for $5,499,000 until 6/11/2015 when the price was reduced to $4,999,000. The listing on MLSPIN was withdrawn, cancelled and then put back on the market over the course of the next 11 months until the property went under agreement on 11/16/2015 and finally sold on 1/29/2016 for $4,400,000.

**Highest and Best Use**
The existing use was the highest and best use due to the zoning of the property, neighboring property uses and the dwelling's significant contributory value.

**Site Comments**
The subject site appears to be legally conforming based on its site size and frontage. The subject parcel of land was subdivided from a larger parcel (formerly known as 77 Lyman Rd.). The site is generally level and has approximately 323 feet of frontage along Cutler Ln. and Lyman Rd.

The property has a granite front walk and is landscaped with trees and shrubs along Lyman Rd. and the other property lines. The foundation walls of the garage and dwelling are landscaped with smaller shrubs and plantings. At the back of the property is a large granite patio.

**Quality and Condition of Property**
The appraiser was unable to gain access to the property for inspection. Observations of the exterior facade and the front yard were made from the street, however the three other sides of the home and

the back yard were not visible.  The appraiser relied on the followingsources:

1- Assessor records
2- Subect MLS listing sheet, including interior photographs
3- Google Maps to confirm exterior attributes.

The subject property is a two story wood clapboard and brick colonial style home with a three car attached garage.  The roof is asphalt shingle.  The property has high end thermopane windows, metal downspouts and gutters and a concrete foundation.

The property features 12 rooms, 6 bedrooms and 6.5 bathrooms.  The first floor includes a dining room, living room, library, office, family room, kitchen, mud room and a bedroom with an ensuite full bathroom.  The kitchen includes high end, professional grade appliances, custom cabinetry, hardwood floors and marble counter tops.  Most ceilings throughout the first floor are tray with ambient lighting or coffered.  The library is wood panelled and features a built in wall unit on one side.  The mud room features built in benches and cubby style storage.

The second floor includes 5 additional bedrooms each with ensuite bathrooms.  The master bedroom includes high end custom closet storage systems.

**Based on public information, pictures from the subject's MLS listing as well as other real estate websites, the overall quality, condition, floor plans and amenities were considered high end construction and market accepted in the Brookline Market as of the effective date of this report.  Assessor records and MLS floorplans were used to develop the sketch of the property contained in this report.**

### Appeal & Marketability
The subject property is located in a neighborhood comprised of mostly large colonial, estate style properties.  The neighborhood affords easy access to Chestnut Hill amenities (public transportation, retail stores and restaurants) which is considered desirable by buyers, as well as The Country Club and several prestigious area private schools.  Marketing times for new properties in the subject's neighborhood ranges from under 30 days to over one year, depending on when the property was listed for sale (during construction or after completion).

Overall, the subject property was in good condition and was of good construction quality at the time of sale.  If the subject were placed on the market fully completed and in new condition like at the time of sale, and priced correctly, it would appeal to buyers within this price range and likely would sell in 90 days or less, if unencumbered by bankruptcy proceedings.

### Comments on Sales Comparison
The appraiser analyzed the Brookline real estate market as of the date of sale for comparable closed and pending sales as well as active listings that were most similar to the subject property.  Sources for this analysis included Multiple Listing Service and Assessor records as well as conversations with real estate agents.  The appraiser searched for suitable sales as far back as 12-18 months prior to the appraisal date and notes that there were several comparable properties available from which to choose.  The appraiser also selected one sale that 5 months after the effective date of this report as there is no indication of a change in market conditions from the date of sale of the subject to the date of sale of Comp 4.

The appraiser selected 5 closed sales that were most similar in design, style and/or location to the subject.  All comparables are similar to the subject in size and appeal, and all were high quality, new construction at the time of sale.  The appraiser attempted to confirm all sales with at least one agent involved in the transaction and was able to reach most of the agents.  All other data was verified through public records, including assessor data and deeds.

It should be noted that several of the comparables in this report were listed for sale while under construction, leading to their longer marketing times.

### Sale #1 - 50 Lyman Rd
This property was listed for sale on 9/22/2014 for $5,500,000, and had an accepted offer of $5,641,047 within 5 days.  The property sold on 5/18/2015, approximately 8 months after being listed for sale.

The site size is comparable to that of the subject and is unadjusted.  The property, located across the

street from the subject, had finishes comparable to those of the subject and was of comparable quality of construction.  Like the subject, the property does not have any finished basement space or any finished third floor space.

**Sale #2 - 10 Lyman Rd**
This property, located on the same street as the subject, on the corner of Heath St. and Lyman Rd., was listed for sale on 6/24/2014 for $5,250,000.  The property had an accepted offer on 7/23/2015 and was on the market for a total of 289 days before going under agreement on 8/7/2015.  It sold 21 days later for $5,000,000.  The property had been listed for sale prior to completion.

The location of this property on the corner of Lyman Rd. and busier Heath St. is inferior to that of the subject and is adjusted upward 2.5%.

At the time of sale, the property was comparable to the subject in condition and quality of construction.  The design/style of the home, including the layout and interior finishes, according to the agent, may have played a role in its lower sale price.  This property also did not have any finished basement or third floor space.  The site size, just under an acre, is unadjusted as the difference of approximately 7,000 sf is nominal.

**Sale #3 - 407 Warren St**
This property, listed for sale on 6/10/2014 for $6,200,000 had an accepted offer after 408 days on the market.  The asking price was reduced twice, first to $5,999,900 on 10/16/2014 and then again on 6/1/2015 to $5,750,000.  The property went under agreement within 30 days of the last price reduction and sold on 9/18/2015.  This property also had been listed for sale prior to completion.

This property's superior site size, approximately a half acre larger than the subject, is adjusted downward $125,000.  The property, also new construction, was comparable to the subject property in condition and construction quality.

**Sale #4 - 48 Laurel Rd**
48 Laurel Rd was listed for sale on 10/16/2014 for $5,500,000 and had an accepted offer within 5 days.  The property went under agreement on 10/21/2014 and sold on 11/17/2014 for $5,200,000.

Although located outside of the subject's immediate neighborhood, this property is located in a comparable area of Chestnut Hill.  This comparable's site size, just +/-5,000 sf smaller than the subject's site, is unadjusted as the difference in size is nominal.  The property, like the subject, was new at the time of sale and had comparable finishes.

All adjustments are rounded to the nearest $100.

**Adjustments**

Gross Living Area: differences are adjusted $150 per square foot.  The subject's GLA of 6,791 sf is taken from Assessor records as the appraiser was unable to measure the subject property.

Full Bathroom: adjustment is $25,000 per bathroom; half bathroom adjustment is $12,500.

Finished Basement: Below grade Room adjustment is $25,000 per room, $25,000 per full bathroom and $12,500 per half bathroom.

Porch/Patio/Deck/Outdoor Fireplace: adjustment is $5,000 per amenity.

Fireplace: adjustment is $5,000 per unit.

All Comps were weighted in the determination of value.

Appeal:
The appraiser has applied a downward adjustment of 2.5% to all comparables for greater appeal. The subject, and the abutting property at 55 Lyman Road, are identical homes. While they have some exterior differences in paint color and shingle style, the homes are virtually identical in size, floor plan and  shape. Buyers in this price range often want customized homes, which stand out from other homes in the area. Having an identical home directly next door reduces the customized nature and appeal of the subject.

All Comps were weighted in the determination of value. The appraiser has trended toward the lower

ADDENDUM                                                                    File No.   182799

end of the range. Sale #2 was built by the same developer and is a smaller home. The appraiser has reconciled to the value opinion above the adjusted value of sale #2.

**Test of Reasonableness**
As a test of reasonableness for the appraisers opinion of value, I have analyzed all sales which transferred in Brookline from the beginning of 2012 through current. I narrowed the focus to homes which were built after 2010 and sold for over $4,000,000. This criteria best reflects homes which compete directly with the subject property. Through this analysis, I was able to locate 9 sales of new, or newer, high-end properties in the subject community. I analyzed these sales on a price per square foot basis. Below are my findings:

| No. | Address | Sale Date | Sale Price | GLA | Lot Size | $/sq. ft. |
|---|---|---|---|---|---|---|
| 1 | 113 Heath Street | 7/23/2012 | $4,375,000 | 5961 | 40118 | $733.94 |
| 2 | 10 Lyman Road | 5/19/2015 | $5,000,000 | 6134 | 40098 | $815.13 |
| 3 | 48 Laurel Sroad | 11/17/2014 | $5,200,000 | 6178 | 28054 | $841.70 |
| 4 | 21 Cedar Road | 6/30/2016 | $5,500,000 | 6006 | 27854 | $915.75 |
| 5 | 50 Lyman Road | 5/19/2015 | $5,641,047 | 6739 | 33712 | $837.07 |
| 6 | 407 Warren Street | 9/18/2015 | $5,686,100 | 7330 | 54188 | $775.73 |
| 7 | 50 Yarmouth Road | 12/29/2014 | $5,988,000 | 6750 | 42055 | $887.11 |
| 8 | 33 Sagent Beechwood | 5/15/2014 | $4,600,000 | 5958 | 40163 | $772.07 |
| 9 | 33 Lyman Road | Active | $5,380,000 | 6044 | 30000 | $890.14 |
| | | | | | | |
| | High | 6/30/2016 | $5,988,000 | 7330 | 54188 | $915.75 |
| | Median | 3/9/2015 | $5,380,000 | 6134 | 40098 | **$837.07** |
| | Low | 7/23/2012 | $4,375,000 | 5958 | 27854 | $733.94 |
| | | | | | | |
| | **88 Cutler Lane** | 1/29/2016 | **$4,400,000** | 6791 | 33908 | **$647.92** |

The gross living area figures cited reflect above-grade living area. Several of the homes were sold with finished basement space, which would affect the price per square foot if included. That said, the analysis indicates that the subject's selling price of $647.92 per square foot is approximately 29% lower than the median selling price of the 9 comparable sales. It should be noted that comparable #2 and #7 were built by the same builder as the subject property. Both of these sales transferred at above $800 per square foot. While a price per square foot analysis in the subject market does not account for specific differences between properties, it provides general trend lines and a reasonable methodology for a credible opinion of value.

Based on this analysis, and assuming the subject property is relatively similar to the comparable sales in overall quality and appeal, it appears to have sold significantly below other competative properties in the immediate market.

**FLOORPLAN SKETCH**

File No. 182799



DIMENSION LIST ADDENDUM

File No. 182799

| GROSS BUILDING AREA (GBA) | | 6,791 | |
|---|---|---|---|
| GROSS LIVING AREA (GLA) | | 6,791 | |
| Area(s) | Area | % of GLA | % of GBA |
| Living | 6,791 | | 100.00 |
| Level 1 | 3,458 | 50.92 | 50.92 |
| Level 2 | 3,334 | 49.09 | 49.09 |
| Level 3 | 0 | 0.00 | 0.00 |
| Other | | | |
| | GBA | | |
| Basement | ☐ | | |
| Garage | ☐ | 710 | |
| | ☐ | | |

| Area Measurements | | | | Area Type | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| Measurements | | Factor | Total | Level 1 | Level 2 | Level 3 | Other | Bsmt. | Garage |
| 2.00 x 13.00 x 1.00 = | | | 26.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 34.50 x 12.00 x 1.00 = | | | 414.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 5.00 x 9.00 x 1.00 = | | | 45.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 4.50 x 8.00 x 1.00 = | | | 36.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 16.00 x 18.00 x 0.50 = | | | 144.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 13.00 x 16.00 x 0.50 = | | | 104.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 4.60 x 7.50 x 0.38 = | | | 13.19 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 8.00 x 10.30 x 0.32 = | | | 26.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 7.60 x 11.00 x 0.50 = | | | 41.67 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 4.90 x 3.00 x 0.35 = | | | 5.25 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 9.00 x 1.90 x 0.50 = | | | 8.40 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 2.00 x 12.00 x 0.50 = | | | 12.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 3.00 x 18.00 x 0.50 = | | | 27.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 5.00 x 30.40 x 0.49 = | | | 75.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 20.60 x 7.40 x 0.49 = | | | 74.75 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 4.50 x 12.30 x 0.36 = | | | 19.89 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 4.40 x 13.40 x 0.41 = | | | 24.33 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 13.00 x 5.20 x 0.28 = | | | 19.50 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 17.50 x 21.70 x 0.49 = | | | 186.90 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 16.30 x 5.80 x 0.11 = | | | 10.58 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 1.90 x 24.10 x 0.29 = | | | 13.28 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 15.80 x 7.30 x 0.20 = | | | 23.07 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 20.60 x 22.70 x 0.50 = | | | 232.85 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 9.50 x 20.40 x 0.16 = | | | 30.67 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 25.50 x 29.60 x 0.50 = | | | 376.04 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 30.40 x 2.30 x 0.28 = | | | 19.40 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 22.00 x 32.20 x 0.49 = | | | 346.71 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 31.60 x 25.60 x 0.50 = | | | 404.45 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 35.10 x 41.00 x 0.45 = | | | 647.01 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 12.60 x 4.00 x 0.47 = | | | 24.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 0.10 x 9.00 x 0.50 = | | | 0.60 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 10.30 x 6.50 x 0.39 = | | | 26.00 | ☒ | ☐ | ☐ | ☐ | ☐ | ☐ |
| 2.00 x 13.00 x 1.00 = | | | 26.00 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 4.30 x 8.00 x 1.00 = | | | 34.22 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 3.00 x 9.00 x 1.00 = | | | 27.00 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 36.00 x 1.00 x 0.50 = | | | 18.00 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 13.00 x 16.00 x 0.50 = | | | 104.00 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 13.00 x 5.20 x 0.29 = | | | 19.50 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 8.00 x 10.30 x 0.32 = | | | 26.00 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 7.60 x 11.00 x 0.50 = | | | 41.67 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 17.00 x 7.60 x 0.50 = | | | 64.22 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 3.40 x 13.40 x 0.41 = | | | 18.83 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 4.50 x 12.30 x 0.36 = | | | 19.89 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 15.80 x 7.40 x 0.29 = | | | 33.38 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 18.00 x 0.50 x 0.50 = | | | 4.50 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| x x = | | | | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 15.60 x 5.80 x 0.09 = | | | 8.18 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 17.50 x 11.00 x 0.49 = | | | 94.71 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 12.00 x 10.00 x 0.50 = | | | 59.76 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 21.10 x 8.40 x 0.46 = | | | 81.28 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 21.30 x 22.40 x 0.49 = | | | 235.83 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 32.80 x 8.00 x 0.50 = | | | 131.05 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 28.50 x 15.60 x 0.32 = | | | 142.01 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |

DIMENSION LIST ADDENDUM

File No. 182799

## Additional Dimensions

| Measurements | | Factor | Total | Level 1 | Level 2 | Level 3 | Other | Bsmt. | Garage |
|---|---|---|---|---|---|---|---|---|---|
| 54.00 x 11.80 | x | 0.50 | = 317.96 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 25.70 x 4.50 | x | 0.37 | = 43.18 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 10.00 x 28.80 | x | 0.37 | = 107.15 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 41.70 x 33.50 | x | 0.50 | = 698.99 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 55.60 x 36.30 | x | 0.46 | = 931.67 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 0.20 x 8.00 | x | 0.50 | = 0.89 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 10.30 x 6.50 | x | 0.39 | = 26.00 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 4.00 x 9.80 | x | 0.46 | = 18.00 | ☐ | ☒ | ☐ | ☐ | ☐ | ☐ |
| 6.50 x 21.00 | x | 0.50 | = 68.25 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 6.00 x 11.00 | x | 0.50 | = 33.00 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 5.50 x 3.50 | x | 0.50 | = 9.68 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 6.40 x 5.00 | x | 0.31 | = 9.83 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 12.50 x 15.40 | x | 0.43 | = 83.00 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 22.00 x 22.00 | x | 0.48 | = 231.00 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 3.90 x 1.70 | x | 0.07 | = 0.49 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 26.10 x 21.00 | x | 0.30 | = 162.75 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 5.60 x 11.10 | x | 0.50 | = 30.90 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |
| 15.50 x 14.10 | x | 0.37 | = 81.12 | ☐ | ☐ | ☐ | ☐ | ☐ | ☒ |

**LOCATION MAP**

File No. 182799



44 Trapelo Road, Belmont, MA  02478   (617) 489-2003   Fax (617) 489-2033

AERIAL MAP

File No. 182799



**FLOOD MAP**

File No. 182799



**FLOOD INFORMATION**

**Community:** Town of Brookline
**Property is NOT in a FEMA Special Flood Hazard Area**
**Map Number:** 25021C0034E
**Panel:** 0034E
**Zone:** X
**Map Date:** 07-17-2012
**FIPS:** 25021
**Source:** FEMA DFIRM

**LEGEND**

= FEMA Special Flood Hazard Area   High Risk

= Moderate and Minimal Risk Areas

**Road View:**

= Forest       = Water

**Sky Flood™**

No representation is made as to any party concerning the content, accuracy or completeness of this flood report, including any warranty of merchantability or fitness for a particular purpose is implied or provided. Visual scaling factors when between map scale and actual ground level flood zone information or marker location.

SUBJECT PROPERTY PHOTO ADDENDUM

File No. 182799



**FRONT VIEW OF
SUBJECT PROPERTY**

Appraised Date: January 29, 2016
Appraised Value: $ 5,100,000



**REAR VIEW OF
SUBJECT PROPERTY**



**STREET SCENE**



Interior photos from online sources

**File No.** 182799



Living room and sitting area



Office



Library



Kitchen



Master bedroom



Master bathroom

File No. 182799







Second floor room

Foyer





Butler's pantry with view to dining room

Mud room





Master bathroom shower stall

Second floor sitting area with balcony access

Interior photos from online sources

**File No.** 182799



Custom master bedroom closet system

COMPARABLE PROPERTY PHOTO ADDENDUM

File No. 182799



**COMPARABLE SALE #1**

50 Lyman Rd
Brookline, MA 02467
Sale Date: 5/19/2015
Sale Price: $ 5,641,047



**COMPARABLE SALE #2**

10 Lyman Rd
Brookline, MA 02467
Sale Date: 5/19/2015
Sale Price: $ 5,000,000



**COMPARABLE SALE #3**

407 Warren St
Brookline, MA 02445
Sale Date: 9/18/2015
Sale Price: $ 5,686,100



**COMPARABLE PROPERTY PHOTO ADDENDUM**

File No. 182799



**COMPARABLE SALE #4**

48 Laurel Rd
Chestnut Hill, MA 02467
Sale Date: 11/17/2014
Sale Price: $ 5,200,000

**COMPARABLE SALE #5**

Sale Date:
Sale Price: $

**COMPARABLE SALE #6**

Sale Date:
Sale Price: $



Subject Deed

File No. 182799

```
Bk 33823 Pg506   #9048
01-29-2016 a 12:09p
```

### TRUSTEE'S DEED

I, David B. Madoff, c/o Madoff & Khoury LLP, 124 Washington Street, Suite 202, Foxborough, MA 02035, the Chapter 7 Trustee of Lyman-Cutler, LLC, the Debtor in *In re Lyman-Cutler, LLC*, Chapter 7 Case No. 15-13881-FJB, pending in the United States Bankruptcy Court for the District of Massachusetts, pursuant to the Trustee's Motion for Authority to Sell Assets Free and Clear By Private Sale [88 Cutler Lane, Chestnut Hill, MA], and an Order approving same, a certified copy of which is attached hereto, for consideration of Four Million Four Hundred Thousand and 00/100 Dollars ($4,400,000.00), grants to Olga Zheleznyak, of 88 Cutler Lane, Brookline (Chestnut Hill), Massachusetts,

#### WITH QUITCLAIM COVENANTS,

The land with buildings and improvements thereon, presently numbered 88 Cutler Lane in Brookline, Norfolk County Massachusetts, being shown as Lot 33-A on a plan entitled, "77 Lyman Road, Brookline, MA, scale 1" = 20'," dated 5/24/13 by Peter Nolan & Associates LLC, which Plan is recorded as Plan 33 of 2013 in Plan Book 623.

Said lot contains 33,908+/- square feet according to said Plan.

Being a portion of the premises conveyed to Lyman-Cutler, LLC, by deed of James A. Swartz and Joan E. Swartz Siff, as Trustee of the Freedom Trust, dated December 13, 2012, and recorded in the Norfolk County Registry of Deeds in Book 30866, Page 40. See also deed of Edward M. Swartz dated August 6, 1998 and recorded in said Registry in Book 13087 Page 355.

Executed this 25 day of January, 2016.



David B. Madoff, Trustee of Lyman-Cutler, LLC

```
MASSACHUSETTS STATE EXCISE TAX
Norfolk Registry of Deeds
Date: 01-29-2016 a 12:09pm
Ctl#: 875        Doc#: 9048
Fee: $20,064.00  Cons: $4,400,000.00
```

*margin text (vertical):* 88 Cutler Lane, Brookline (Chestnut Hill), MA 02467

### COMMONWEALTH OF MASSACHUSETTS

NORFOLK, SS                                         January 25, 2016

On this 25 day of January, 2016, before me, the undersigned notary public, personally appeared David B. Madoff, Trustee for Lyman-Cutler, LLC, proved to me through satisfactory evidence of identification, which was a Rhode Island driver's license, to be the person whose name is signed on the preceding or attached document, and acknowledged to me that he signed it voluntarily for its stated purpose.

RECEIVED AND RECORDED
NORFOLK COUNTY
REGISTRY OF DEEDS

Steffani M A Nicholson



Assessor property record card

File No. 182799

Brookline Assessors Property Database - www.brooklinema.gov assessors          Page 1 of 1



Town of Brookline, MA          Residential Property Record Card          [Print]   FY 2017

New Search

| Parcel ID | Location | State Class | 101 |
|---|---|---|---|
| 437-27-02 | 88 CUTLER LN | 101 ONE FAMILY HOUSE | Neighborhood Information |

**Owner Information**
THE CUTLER LANE LLC
101 SOUTH MAIN AVE SUITE 310
SIOUX FALLS , SD   57104

**Property Picture**

**Deed Information**
| Legal Ref.: 34110/104 | Land Area: 33,908 |
|---|---|
| Sale Date: 5/24/2016 | Sale Price: $1 |

**Dwelling Information**
| Class Code: | 101 |
|---|---|
| Occupany: | 1 |
| Stories: | 2 |
| Rooms: | 16 |
| Bedrooms: | 6 |
| Overall Condition: | Excellent |
| Grade: | GOOD-V-GOOD |
| Fireplaces: | 3 |
| Extra Kitchens: | 0 |
| Kitchen Quality: | MODERN |
| Full Baths: | 6 |
| Half Baths: | 1 |
| Bath Quality: | MODERN |
| Air Conditioning: | YES |
| Living Area: | 6,791 |
| Finished Basement: | |
| *Finished Basement is not included in Living Area. | |
| Fn Basement Grade: | |
| Attached Garage: | 710 |
| Basement Garage: | 0 |
| Year Built: | 2013 |

**Building Sketch**

**History**
FY 2016: $ 4,639,500
FY 2015: $ 2,783,400
FY 2014: $ 3,466,000
FY 2013: $ 3,240,400
FY 2012: $ 3,240,400
FY 2011: $ 3,214,900
FY 2010: $ 3,214,900
FY 2009: $ 3,215,700
FY 2008: $ 3,309,700
FY 2007: $ 3,447,600

**Valuation/Taxes**
Residential Value 2017: $5,166,800
Residential Exemption: N
FY17 Real Estate Tax: $51,048
FY17 Preliminary 1st Half Tax: $26,222

GIS Viewer
For Maps, Aerial Views, Zoning,
Parks, and Historic Information



Parcel map

File No. 182799



44 Trapelo Road, Belmont, MA  02478   (617) 489-2003   Fax (617) 489-2033

License

File No. 182799

# COMMONWEALTH OF MASSACHUSETTS
## DIVISION OF PROFESSIONAL LICENSURE
### BOARD OF
### REAL ESTATE APPRAISERS
### ISSUES THE FOLLOWING LICENSE
### CERT GEN. REAL ESTATE APPRAISER

HUGH M FENNELL
44 LORING ST
WESTWOOD, MA 02090-1418

LICENSEE SIGNATURE

| 75272 | 09/12/2019 | 317287 |
|---|---|---|
| LICENSE NUMBER | EXPIRATION DATE | SERIAL NUMBER |



44 Trapelo Road, Belmont, MA 02478    (617) 489-2003    Fax (617) 489-2033

File No. 182799

44 Trapelo Road
Belmont, MA 02478

## *The* **APPRAISERS** *Group*

617.489.2003
appraisersgroup.com
fax 617.489.2033

**CURRICULUM VITAE**
**_MORGAN FENNELL_**
**MA CERTIFIED GENERAL REAL ESTATE APPRAISER #75272**

*Appraisal Experience*

**11/00 – Present**    **The Appraisers Group**, Belmont, MA
*Vice President / Legal Services*

Manages appraisal services for attorneys and private clients – Responsible for coordinating the residential and commercial staff throughout all aspects of completing a large volume of private work including divorce, estate planning, and tax abatements.

Mr. Fennell's appraisal experience includes the valuation of all types of commercial real estate including industrial, office, retail, multi-family residential, developable land, residential subdivisions, mixed-use property, residential and commercial redevelopments

**12/98 – 11/00**    **Hippauf & Associates**, Santa Fe, NM
*Staff Appraiser*

Preparation of FNMA form reports of single family, multi-family, condominium and vacant land. Provided significant assistance in preparation of commercial appraisal reports.

*Court Testimony*

Mr. Fennell has appeared before the Suffolk, Middlesex and Norfolk Probate & Family Courts and U.S. Bankruptcy Court and is qualified as an expert witness.

*Education*

**1995**    **Whittier College**, Whittier, CA
**BA, Political Science**

*Appraisal Education*

**The Appraisal Institute**

| | |
|---|---|
| 2015 | Residential Report Writing and Case Studies |
| 2015 | Case Studies in Appraising Green Residential Buildings |
| 2014 | Residential Site Valuation and Cost Approach |
| 2014 | Business Practices and Ethics |
| 2013 | Introduction to Green Buildings: Principles and Concepts |
| 2013 | Real Estate Finance, Statistics & Valuation Modeling |
| 2013 | Valuation Case Studies: Multi- discipline Appraisal Overview |
| 2013 | Residential Market Highest & Best Use |
| 2013 | The Discounted Cash Flow Model: Concepts, Issues & Applications |
| 2011 | Analyzing Operating Expenses |



Appraiser CV

File No. 182799

| 2011 | Forecasting Revenue |
| 2011 | Intro to Valuing Commercial Green Buildings |
| 2011 | Apartment Appraisal, Concepts & Applications |
| 2007 | General Appraiser Income Approach |
| 2003 | 410 National USPAP Course |
| 2003 | The FHA and the Appraisal Process |
| 2003 | Residential Property Construction and Inspection |
| 2001 | Appraisal of non-conforming uses |
| 2000 | Appraising from blueprints and specifications |
| 1999 | Supporting sales comparison grid adjustments for residential properties |
| 1999 | 120 Appraisal procedures |
| 1998 | 110 Appraisal principles |

**Massachusetts Board of Real Estate Appraisers**

| 2012 | USPAP Update Seminar, MBREA |
| 2010 | USPAP Update Seminar, MBREA |
| 2009 | USPAP Update Seminar, MBREA |
| 2003 | Appraising Complex Residential Properties |
| 2001 | Unique and Unusual Residential Properties |

**Other Education**

| 1998 | Uniform standards of professional appraisal practice |
| | -New Mexico Board of Realtors |
| 1998 | Appraising the single family residence |
| | -Santa Fe Community College |

*Memberships and Affiliations*

Massachusetts General Certified Real Estate Appraiser #75272
Member of the Massachusetts Board of Real Estate Appraisers

*Partial Client List*

| | |
|---|---|
| Cambridge Savings Bank | Burns & Levinson LLP |
| Cambridge Trust | Todd & Weld LLP |
| Citibank | Lee & Rivers LLP |
| Dedham Savings Bank | Kajko, Weisman & Colasanti LLP |
| East Boston Savings Bank | Boston Law Collaborative |
| East Cambridge Savings Bank | Kates & Barlow PC |
| First Republic Bank | Verrill Dana LLP |
| Leader Bank | Wilmer, Karp, Warner & Ryan LLP |
| Middlesex Savings Bank | |
| Northern Bank & Trust | |
| Salem Five Cent Savings Bank | |
| Winter Hill Savings Bank | |

2



# EXHIBIT 39



EXHIBIT
FILIPPOV
20
4-25-18

CONTRACT TO BUILD TWO HOUSES AT 55 Lyman Road, Brookline,
Massachusetts and 88 Cutler Lane, Brookline, Massachusetts

### I. Contract Parties

Now comes *CLASSIC HOMES DEVELOPMENT & CONSTRUCTION, LLC*
of 239 Nahanton Street, Newton, Massachusetts and *LYMAN-CUTLER, LLC*
of 130 Trapelo Road, Belmont, Massachusetts, *whereas* CLASSIC HOMES
DEVELOPMENT & CONSTRUCTION, LLC hereby agree to build two
houses at 55 Lyman Road, Brookline, Massachusetts and 88 Cutler Lane,
Brookline, Massachusetts and legally described in Exhibit A

### II. Contract Documents

The terms of this contract include all the documents specifically listed below, and
constitute the entire terms of the agreement between the parties. The terms of this
contract shall prevail over any conflicting provision in the documents
incorporated by reference.

1. Architectural Plans and Drawings date _____ with _____ number of
pages is hereby incorporated into this document.

### III. Building Plans

The builder agrees to construct the home in accordance with the plans, including
drawings, supplied by the *Owner* and incorporated by reference into paragraph II. The
builder assumes no responsibility or liability for defects in the design or engineering in
these plans.

The owner represents to the builder that the owner is the sole owner of the plans
or has the legal right to use the plans. The owner agrees to indemnify and hold the builder
harmless for any copyright action which may be asserted as a result of the use of the
plans.

The owner warrants that the plans are adequate and that the builder can rely on
them. The owner will be liable for any damages caused by defects in the plans, including,
but not limited to, additional material costs, additional labor costs, pro rata overhead and
profit.

Owner is solely responsible for completing, selecting all cabinetry, bathroom
fixtures, finish work, paint colors, stucco color, stone, appliances, hardwood, carpet, tile,
marble color of roof.  Builder will send owner to all of his suppliers.

### IV. Completion Time

Assuming all conditions are satisfied and weather permits, the work to be performed under the contract shall be substantially completed in a 44 week time frame. The work shall commence within 10 days after the permits necessary, to start work have been issued, and the owner shall have supplied the builder with a correct statement of the recorded legal title of the property and the owner's interest in the property.

Any time lost by reason of changes to the contract or changes in plans by the owner, other acts of the owner, strikes, weather conditions not reasonably anticipated, or any other condition not within builder's control shall be added to the specified time for completion. For any delays which are not the builder's responsibility, the contract time frame shall increase.

Owner has to stay on Builder's schedule with picking products out on time so there are no delays. Builder shall not be responsible for any delays due to weather, or hold ups by the owners or inspections from the Town of Brookline.

## V. Contract Price

The builder agrees to construct the house according to the plans. As consideration for the builder constructing the house, the owner agrees to pay the builder's contractors and trades, full costs and expenses, on a weekly basis.

The owner will make a regular payment to the builder and subcontractors on first Monday of each week.

## VI. Permits and Surveys

The owner shall obtain and furnish all necessary surveys describing the physical characteristics of the property, the location of all utilities, and the location of all easements to the building that are necessary to allow the builder to complete his performance. If additional easements are necessary to complete the work, the owner shall obtain those easements promptly.

If no soil report is available, the owner shall provide one at his own expense.

The builder shall obtain building permits, licenses, building inspections and approvals required by local law.

If a covenant or architectural review committee requires the approval of plans and specifications, the owner shall be responsible for obtaining these approvals and paying for any fees connected with them.

## VII. Insurance and Risk Management

The builder shall obtain all workers' compensation, commercial general liability insurance and comprehensive liability insurance necessary to protect builder from claims

for damages due to bodily injury, including death, and for damages to property that may arise out of and during operations under this contract.

The owner shall purchase his own liability insurance including fire and casualty insurance to the full insurable value of the house and shall name the builder as an additional insured.

Each party shall issue a certificate of insurance to the other prior to the commencement of construction.

## VIII. Warranties

All warranties are limited to the implied warranties of habitability and workmanlike construction and are limited to a period of one year from the date of the issuance of a certificate of occupancy by the local building code enforcement authority. This limited warranty is the only express warranty provided by the builder.

If Owner wants to use a sub- contractor that builder has not used, the warranty on that item will not be covered by the Builder.

## IX. Disputes

Should any dispute arise relative to the performance of this contract that the parties cannot resolve, the dispute shall be referred to a single arbitrator acceptable to the builder and the owner. If the builder and the owner cannot agree upon an arbitrator, the dispute shall be referred to the American Arbitration Association for resolution.

All attorney fees that shall be incurred in the resolution of disputes shall be the responsibility of the party not prevailing in the dispute.

## X. The Governing Law and Assignment

This contract will be construed, interpreted, and applied according to the law of the state where the property is located. This contract shall not be assigned without the written consent of all parties.

## XI. Effective Date and Signature

This contract shall become effective on the date it is signed by both parties
We, the undersigned, have read, understood, and agree to each of the provisions of this contract and hereby acknowledge receipt of a copy of this contract.

By: Vadim Kagan on behalf of CLASSIC HOMES DEVELOPMENT & CONSTRUCTION, LLC

Title: _____    Date: 6-18-13

By: Alex Filippov on behalf of LYMAN-CUTLER, LLC, LLC

Title: _____    Date: June 18, 2013