UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |
| | | |
| LYMAN-CUTLER, LLC, et al., | ) | |
| | ) | |
| Plaintiffs/ Defendants in Counterclaim, | ) | |
| | ) | Adv. Proc. No. 16-01120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, et al., | ) | |
| | ) | |
| Defendants/Plaintiffs in Counterclaim. | ) | |
| | ) | |

## THIRD AFFIDAVIT OF JOHN H. PERTEN, ESQ.

I, John H. Perten, depose and state on my own personal knowledge as follows:

1.  I am defendants' counsel of record in the above-caption matter.

2.  Attached hereto as Exhibit 1 is a true and accurate copy of plaintiffs' objection to KDC's Claim No. 1 (Docket No. 139).

3.  Attached hereto as Exhibit 2 are true and accurate copies of excerpts from the deposition of Alex Filippov taken on April 25, 2018.

4.  Attached hereto as Exhibit 3 are true and accurate copies of excerpts from the deposition of Tatiana Kagan taken on May 18, 2018.

SIGNED UNDER THE PAINS AND PENALTIES OF PERJURY THIS 17TH DAY OF DECEMBER, 2018.

/s/ John H. Perten

John H. Perten

EXHIBIT 1

UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MASSACHUSETTS
(EASTERN DIVISION)

| | | |
|---|---|---|
| In re: | ) | |
| Lyman-Cutler, LLC | ) | Chapter 11 |
| Debtor. | ) | |
| | ) | Case No. 15-13881 |

### VERIFIED OBJECTION TO CLAIM OF KAGAN DEVELOPMENT, KDC CORP. BY DEBTOR LYMAN-CUTLER, LLC AND ITS PRINCIPALS ALEX FILIPPOV AND NICKOLAY LIPETSKER

NOW COME the Debtor, by and through its counsel, the Tamposi Law Group, P.C. and its principals Alex Filippov[1] and Nickolay Lipetsker (together with the Debtor, the "Objectors"), by and through their counsel, O'Connor, Carnathan and Mack, LLC, and respectfully object to the claim of Kagan Development, KDC Corp. (collectively, "Kagan"), and in support hereof state as follows:

Background

The Objectors believe that all of the claims submitted by Kagan are entirely without merit. They are contrary to the terms of the Lyman-Cutler, LLC Operating Agreement (the "Operating Agreement"), a copy of which is attached hereto, and, indeed, upon information and belief are knowingly and intentionally fraudulent.

There is no dispute that Lyman-Cutler, LLC is a joint venture among Filippov, Nickolay Lipetsker ("Lipetsker") and Vadim Kagan ("Kagan"). In the fall 2012, Lipetsker introduced

---

[1]    Filippov is both a secured creditor of the Debtor and its principal member; therefore, he is a party-in-interest under 11 U.S.C. §502. Lipetsker is also a principal of the Debtor.

Filippov to Kagan, and Kagan made a proposal to Filippov to provide the lion's share of the

equity investment needed for a real estate development project. On or about October 25, 2012,

Kagan made a presentation to Filippov in which he proposed to purchase a property in

Brookline, Massachusetts, divide it into two (2) parcels and build two (2) new houses – 55

Lyman Road and 88 Cutler Lane. Kagan represented that the construction costs would be

approximately $1.3 million per house, and that the carrying costs through sale of the properties

would be approximately $200,000 per house. Filippov approved this budget and agreed to invest

$2 million based on a written operating agreement that the parties executed in December 2012.

The parties further agreed that they would borrow the funds necessary for the construction and

carrying costs, and borrow an additional $100,000 per house in order to cover cost overruns.

        The terms of the Operating Agreement are quite explicit that the only compensation

Kagan was to receive for handling the construction was his interest in the LLC; he was to receive

50% of the profits from the venture. The Operating Agreement obligated Kagan to complete

construction no later than March 30, 2014, and obligated him to personally pay the carrying costs

if the project was not completed and the homes sold on schedule.

        The houses were completed months late (October 2, 2014 compared to a contract date of

March 30, 2014) and, as a result, did not sell on time, resulting in increased carrying costs and a

dispute among the joint venturers. At no time during the construction did Kagan ever mention

any cost overruns. Rather, he uniformly represented that the project was being completed within

budget. Only some seven (7) months after completion of construction did Kagan announce, out

of the blue, that he was owed over $1 million in purported cost overruns and carrying costs, all of

which were contrary to the terms of the Operating Agreement. When Filippov and Lipetsker

disputed Kagan's claims and litigation commenced, Kagan more than doubled his purported

claim just six (6) weeks later, when he filed a mechanic's lien against the properties for over $2.1 million, which the Objectors believe is fraudulent and asserted in bad faith to force them to pay some portion of these false claims. Kagan's bad faith tactics eventually led to the Debtor filing for relief under Chapter 11 of the United States Bankruptcy Code.

KDC, which is the party that purports to have a claim against the Debtor, is Kagan's company, and the contract upon which it purports to base its claim was signed only by Kagan, and without the knowledge of Filippov or Lipetsker. Indeed, neither Filippov nor Lipetsker ever saw a copy of this purported contract until after this litigation commenced.

In fact, on June 18, 2013, Mr. Filippov, as managing partner, signed a construction contract between Lyman-Cutler, LLC and "Classic Homes Development & Construction, LLC" (the "Classic Homes Agreement") as part of the loan closing with Rockland Trust. Classic Homes is another Kagan entity formed July 15, 2010. This contract, together with the Operating Agreement, collectively outline the parties' respective rights and duties with respect to the construction of the homes in question. It is believed that Classic Homes Development & Construction, LLC performed no part of the construction in question.

On June 24, 2013, Kagan allegedly signed a Construction Management/General Contractor Agreement on behalf of both Lyman-Cutler LLC (of which he was *not* the manager) and Kagan Development, KDC Corp. (the "KDC Agreement"). This Agreement differs from both the terms of the Operating Agreement and the Classic Homes Agreement in that it purports to require payment to Kagan of a Design Phase Fee of $25,000, and a Construction Fee of 15% (of what it does not say). The KDC Agreement further purports to require a payment for post-construction services at the rate of "actual cost plus a fee of 17.5%." Given that Mr. Filippov and Mr. Lipetsker never approved or even saw the KDC Agreement until disputes later arose, the

3

Objectors believe it is entirely unenforceable as a matter of law.

In paragraph II of Kagan's proof of claim, Kagan asserts a summarization of his various purported claims. Those claims are addressed below.

    A.   <u>Design Fee - $25,000</u>

Neither Kagan nor Classic Homes was not entitled to a design fee and these costs were paid directly by the Debtor to the professional who provided these services. The Debtor paid AJM Architects $21,000 for design fees and paid RAV & Associates $9,075 for engineering services. Neither the Operating Agreement nor the Classic Homes Agreement provide for any compensation to Kagan for design fees. Moreover, the construction costs were described in detail in a spreadsheet that accompanied the presentation by Kagan essentially selling the plan to Messrs. Filippov and Lipetsker (the "Spreadsheet"). The Spreadsheet outlining the costs of construction (total of $1,500,000) included $45,000 for "Plans & Permits," so these costs were included in the $1,500,000 that was already paid to Kagan, and there is no basis to conclude that Kagan was entitled to separate fees for design.

    B.   <u>Cost of Construction - $578,528.49</u>

These appear to be claims for contract overages Kagan asserts the Debtor owes to Kagan or his other entities and a few small subcontractors. The Debtor does not owe these. On October 25, 2012, Kagan gave a presentation to Mr. Filippov putting forth the costs of construction, carrying costs, and the projected selling prices and net profits. The costs were $1,300,000 for construction costs per house plus $200,000 for carrying costs. This document was assembled by Dmitry Zhukovskiy, a financial professional hired by Kagan to assist with its sales pitch. At the meeting on October 25, 2012 among Messrs. Kagan, Lipetsker, and Filippov, Kagan reassured the investors that the cost of construction would be $1,300,000 per house, with a reasonable

margin of error. Kagan also told Messrs. Lipetsker and Filippov that any deviation from the budget would be "immaterial." Kagan claimed that he was a very experienced builder and knew exactly what the cost of construction would be. The spreadsheets from that meeting were also provided to Rockland Trust in connection with securing the loan on the property. Kagan presented a clear budget that the owners all approved. It was understood the loans were intended to cover *all* construction and carrying costs. Kagan made submissions to Rockland Trust as the project progressed, and construction was completed and Certificates of Occupancy issued on October 2, 2014. Kagan did not raise any overruns until May 7, 2015, more than *seven (7) months* after completion.

The single largest "overage" alleged by Kagan is for ProExcavation, which is another Company that Kagan owns and controls. The Kagan QuickBooks show $345,000 in payments to ProExcavation, $40,000 of which was only recorded on the books as of April 26, 2015 (although apparently for work allegedly done October 10, 2014). Kagan then attempted to add another $325,000 on top of that for a total of $665,000 allegedly due to ProExcavation. The $325,000 was added in October 2014, so that is different from the vendor payables, which were largely added in late April 2015.

Mr. Filippov's construction expert will testify that the value of the excavation work was a small fraction of this sum – on the order of $60,000-$70,000 per property. This means Kagan is trying to charge something on the order of five (5) times the value of the work he actually performed. This is the single most obviously fraudulent claim by Kagan, but others are likely to be revealed in discovery.

C.      General Contractor Construction Fee – 15% of construction costs

Neither the Operating Agreement nor the Classic Homes Agreement provide for any

5

compensation to Kagan for a construction fee, nor were any such fees paid by the Debtor during

the course of the construction. As with the Design Fee, this appears to a feature of the *ultra vires*

KDC Agreement and is directly contrary to all of the other documentation describing the

construction costs and duties of the parties.

        D.    <u>Kagan office overhead - $59,250</u>

        Neither the Operating Agreement nor the Classic Homes Agreement provide for any

compensation to Kagan for its overhead. The Spreadsheet does not budget for any overhead fee

either. As with the Design Fee, this appears to a feature of the *ultra vires* KDC Agreement and

is directly contrary to all of the other documentation describing the construction costs and duties

of the parties.

        E.    <u>Total Carrying Costs Advanced by Kagan - $665,545</u>

        Kagan was not entitled to charge his carrying costs to the project. The testimony and

documentation will demonstrate that the carrying costs were supposed to be covered by the

construction loan, and then paid for by Kagan. Had Kagan completed the project on time, the

funds from the construction loan would have been sufficient to cover all carrying costs. Under

the Operating Agreement, if Kagan had not sold the properties within 23 months of the date of

acquisition, he was penalized by having to pay all carrying costs thereafter. In the event he was

not able to cover those carrying costs and Mr. Filippov was required to do so, Mr. Kagan was

further penalized by having his equity shares in the endeavor reduced by the amount of carrying

cost borne by Mr. Filippov.

        Kagan did not obtain certificates of occupancy nor sell the properties in the promised

time frame and Kagan was ultimately unable to pay carrying costs – *i.e.*, interest on the loan

from Rockland Savings Bank, lawn mowing, plowing, taxes, electrical, heat and other

maintenance. Mr. Filippov then took over paying for these costs. Under the Operating Agreement, every such payment by Mr. Filippov served to reduce Kagan's equity shares in the Debtor. The amount of carrying costs paid by Mr. Filippov ultimately reduced Kagan's member equity interest to 2.89%. The structure for payment of carrying costs was designed to encourage Kagan to complete the project on time and provided a corresponding penalty for finishing the project late. Having caused the project to be completed in an untimely fashion, it is incongruous that Kagan should be compensated for paying carrying costs caused by his poor performance. In addition, Kagan's asserted carrying costs are grossly inflated.

F.    Carrying Cost Advance Fee - $127,562

Neither the Operating Agreement nor the Classic Homes Agreement provide for any compensation to Kagan for carrying cost advance fees.

G.    Interest at 12% - $233,865

Neither the Operating Agreement nor the Classic Homes Agreement provide for any compensation to Kagan for interest.

H.    Administrative Fees and Expense - $141,191.25

Neither the Operating Agreement nor the Classic Homes Agreement provide for any compensation to Kagan for administrative fees.

Subscribed and Sworn this _19_ day of July, 2016

_Alex Filippov_
Alex Filippov

WHEREFORE, Lyman-Cutler, LLC, Alex Filippov and Nikolay Lipetsker respectfully move and pray that this Court:

A.    Dismiss Kagan Development, KDC Corp.'s claim in its entirety; and

7

B.    Grant such further relief as is just an appropriate.


Respectfully Submitted,

LYMAN-CUTLER, LLC

Dated: July 21, 2016                    /s/ Peter N. Tamposi
                                        Peter N. Tamposi (BBO #639497)
                                        The Tamposi Law Group, P.C.
                                        159 Main St.
                                        Nashua, NH 03060
                                        603-204-5513
                                        peter@thetamposilawgroup.com


                                        Respectfully Submitted,
                                        ALEX FILIPPOV and NIKOLAY LIPETSKER

Dated: July 21, 2016                    /s/ Sean T. Carnathan
                                        Sean T. Carnathan (BBO #639497)
                                        O'Connor, Carnathan and Mack, LLC
                                        Landmark One, 1 Van de Graaff Dr., #104
                                        Burlington, MA 01803
                                        781-359-9000
                                        scarnathan@ocmlaw.net

## CERTIFICATE OF SERVICE

I, Peter N. Tamposi, hereby certify that on July 21, 2016, I caused copies of the

foregoing Objection to be served electronically via the Court's CM/ECF system upon all parties

that have requested such notice.


Dated: July 21, 2016                    /s/ Peter N. Tamposi
                                        Peter N. Tamposi (BBO #639497)


8

# EXHIBIT 2

# ORIGINAL

Exhibits: 1-30                    Volume 1, Pages 1-230
         UNITED STATES BANKRUPTCY COURT
          DISTRICT OF MASSACHUSETTS
              (EASTERN DIVISION)
- - - - - - - - - - - - - - - - - - - - - - - - - - - -
In Re:
                                Chapter 7
LYMAN-CUTLER, LLC,              Case No. 15-13881-FJB


          Debtor
- - - - - - - - - - - - - - - - - - - - - - - - - - -
LYMAN-CUTLER, LLC,


          Plaintiff
v.                              Adv. Case No. 16-01120
VADIM KAGAN, TATIANA KAGAN,
KAGAN DEVELOPMENT KDC CORP.
and PROEXCAVATION CORP.,
          Defendants
- - - - - - - - - - - - - - - - - - - - - - - - - - -

         DEPOSITION OF LYMAN-CUTLER, LLC, By Its
         Representative ALEX FILIPPOV, and
            of ALEX FILIPPOV Individually
      Wednesday, April 25, 2018, 10:06 a.m.
        Sheehan Phinney Bass + Green, P.A.
         255 State Street, 5th Floor
            Boston, Massachusetts

      - - - - - - - - - Janis T. Young, RDR, CRR - - - - - - - - -
      jty@fabreporters.com   www.fabreporters.com
         Farmer Arsenault Brock LLC
            Boston, Massachusetts
               617-728-4404

Alex Filippov - Vol. 1 - 4/25/2018

32

---

**122**

1  company into bankruptcy?
2     A. No.
3     Q. When did you make the decision to put the
4  company into bankruptcy?
5     A. I believe that was done probably one week
6  before. It was really urgent. A decision, it was
7  probably one week before we put the company in
8  bankruptcy. It was done very quickly.
9     Q. When you say one week before, it was really
10  urgent, what made it urgent?
11     A. The dissolution. The company dissolution.
12     Q. The dissolution date in the operating
13  agreement?
14     A. Yes.
15        Let me remind you that you were writing
16  letters to us about this.
17     Q. How did the mechanic's lien impact the
18  ability to sell the property?
19     A. No reasonable buyer will buy a house that
20  has a lien on this.
21     Q. How do you know that?
22     A. It's common knowledge. Would you?
23     Q. Did you receive any offers on the property?
24     A. It was offered on the property, and those

---

**123**

1  offers were made without the buyer actually knowing
2  that there is a lien. It was made to Michelle Lane,
3  who was designated by the court and we agreed, to be
4  the real estate broker; and the offer was $4.1
5  million, and then $4.2 million.
6        Both offers, as far as I know, were done
7  in such a way so the buyer even didn't know about
8  the lien.
9     Q. Is it your experience, sir, that when
10  people make an offer on the property they don't
11  typically do a title exam or anything before the
12  offer?
13     A. It depends on the person who does it. We
14  don't know.
15        I'm not sure, but I think I asked
16  Michelle Lane about this; and she said that I will
17  have to disclose it to them, because I think the
18  offer was contingent on this.
19     Q. Did the listing disclose that there's a
20  lien on the property?
21     A. No, I don't think so.
22     MR. PERTEN: Off the record.
23     (Discussion off the record)
24     (Marked, Exhibit 5, amended adversary

---

**124**

1  complaint.)
2     Q. Sir, I've placed in front of you Exhibit 5,
3  which is the amended adversary complaint that was
4  filed in this action. Are you familiar with that
5  document?
6     A. I saw the document, yes.
7     Q. Before it was filed, did you review it and
8  make sure that the factual allegations were
9  accurate?
10     A. Yes.
11     Q. And to the best of your knowledge, sir,
12  were the factual allegations in this document
13  accurate?
14     A. Yes.
15     Q. If I could ask you, sir, to turn to
16  Paragraph 46.
17     A. Okay.
18     Q. Just take a moment and read Paragraph 46 to
19  yourself, and let me know when you've done that.
20     (Pause)
21     A. Okay.
22     Q. The former bookkeeper that is referenced
23  there would be Kristina Brusenkova, correct?
24     A. That's correct.

---

**125**

1     Q. We covered some of this this morning.
2        This alleges that Mr. Kagan "mixes
3  expenses for projects on his American Express card."
4  Do you see that?
5     A. Yes.
6     Q. As you sit here today, do you have any
7  examples that you can give me of charges to the
8  American Express card which were improper?
9     A. Not yet.
10     Q. Did you obtain any formal estimates of
11  Proexcavation's work?
12     A. Estimates? I'm not sure I follow your
13  question.
14     Q. Take a look at Paragraph 47, which says,
15  "Proexcavation's alleged charges on the project are
16  double what any conceivable legitimate charges for
17  the work it performed on the project would be."
18        Do you see that language?
19     A. Yes. But I also see the language, "In
20  addition, plaintiff has interviewed KDC former
21  bookkeeper, who reports."
22     Q. Got it.
23        In Paragraph 47, what is the basis for
24  the allegation that Proex's charges are double?

---

Alex Filippov - Vol. 1 - 4/25/2018

59

230

Sent to counsel/witness on 5/4/18

ALEX FILIPPOV
SIGNATURE PAGE/ERRATA SHEET INFORMATION
For deposition taken on: April 25, 2018
In Re: Lyman-Cutler, LLC

SIGNATURE INFORMATION FOR COUNSEL
The original signature page/errata sheet has been sent to Sean
T. Carnathan, Esq. to obtain signature from the deponent. When
complete, please send original to John H. Perten, Esq. A copy
of any errata should be sent to each party of record present at
the deposition.

WITNESS INSTRUCTIONS
After reading the transcript of your deposition, please note any
change or correction and the reason on the errata/signature
page. DO NOT make any notations on the transcript itself. If
necessary, continue the format on a separate page.

PLEASE SIGN AND DATE the errata/signature page and return it to

your counsel.

# EXHIBIT 3

Exhibits:  51-54              Volume 1, Pages 1-65

UNITED STATES BANKRUPTCY COURT

DISTRICT OF MASSACHUSETTS

(EASTERN DIVISION)

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

In Re:

                              Chapter 7

LYMAN-CUTLER, LLC,            Case No. 15-13881-FJB


        Debtor

- - - - - - - - - - - - - - - - - - - - - - - - - - - -

LYMAN-CUTLER, LLC,


        Plaintiff

v.                           Adv. Case No. 16-01120

VADIM KAGAN, TATIANA KAGAN,

KAGAN DEVELOPMENT KDC CORP.

and PROEXCAVATION CORP.,

        Defendants

- - - - - - - - - - - - - - - - - - - - - - - - - - - -


        DEPOSITION OF TATIANA KAGAN

     Friday, May 18, 2018, 11:47 a.m.

     O'Connor Carnathan and Mack LLC

     1 Van de Graaff Drive, Suite 104

        Burlington, Massachusetts


  - - - - - - - - - David A. Arsenault, RPR - - - - - - - - -

  daa@fabreporters.com   www.fabreporters.com

      Farmer Arsenault Brock LLC

        Boston, Massachusetts

            617-728-4404

Tatiana Kagan - Vol. 1 - 5/18/2018

37

1      A.  Not any different.

2      Q.  If you turn to the second page of Exhibit

3   54, the Cutler listing agreement.  In this one --

4   again looking at Paragraph 5:  "The period of this

5   agreement shall be from August 20, 2014 to and

6   including March 1, 2016."

7            Have I read that correctly?

8      A.  Yes.

9      Q.  Was there any negotiation of the period of

10  the Cutler agreement?

11     A.  No.

12     Q.  Can you explain to me why the Cutler

13  agreement has a period of 18 months?

14     A.  No, I don't...

15     Q.  Would you agree with me that that's three

16  times the industry standard length of time?

17     A.  There is no such a thing as industry

18  standard.  It is whatever market determines at the

19  time of the sale.  Apparently it took much longer to

20  sell those properties.  Naturally Century 21

21  extended it.  It is pretty much common sense.

22     Q.  Do you know why the Cutler property was put

23  on the market in August of 2014?

24     A.  Again, please?

Tatiana Kagan - Vol. 1 - 5/18/2018

59

1    A.  I do not recall.

2    Q.  Can't give me any estimate at all?

3    A.  No.

4    Q.  So when was the last time you sold a

5  property for your husband?

6    A.  Last month.

7    Q.  What was that property?

8    A.  420 Dudley Road in Newton.

9    Q.  Was a commission paid for that sale?

10   A.  I'm not sure.  Sometimes I waive commission

11  if nobody else is involved, just my husband's

12  company.

13   Q.  Do you do that if there are investors on

14  the project?

15   A.  I don't know how he handles it, to be

16  honest with you.

17   Q.  Does Century 21 ever object to you waiving

18  a commission for one of your husband's projects?

19   A.  No.

20   Q.  So the last time that you sold a property

21  for your husband and got paid a commission, who got

22  paid the commission?

23   A.  Cooperating agent, the one that represents

24  the buyer.

Tatiana Kagan - Vol. 1 - 5/18/2018

61

1  estate company and hold a valid license.

2      Q.  When was the last time you waived your

3  commission on a property you sold for your husband?

4      A.  I do not recall.

5      Q.  How many times have you waived your

6  commission on a property you sold for your husband?

7      A.  I do not recall how many times.

8      Q.  Can you tell me any particular properties

9  on which you've waived the commission?

10     A.  I cannot recall.  I'm not involved in

11 financial part.

12     Q.  Under what circumstances would you waive

13 your commission for a property you sold for your

14 husband?

15     A.  He handles all the finances.  I can't tell

16 you.  I don't know.

17     Q.  So your husband determines whether or not

18 you are going to get a commission when you sell the

19 property?

20     A.  If it is his house, yes.  If it is somebody

21 else's house, it comes directly from Century 21, it

22 comes directly to me.  And I deliver that check to

23 the office and hand it to Daniel Gersh.

24     Q.  What if it is a property that he owns part

FARMER ARSENAULT BROCK LLC

Tatiana Kagan - Vol. 1 - 5/18/2018

62

1  of and has other investors in?

2      A.  I wouldn't know.  I'm not involved in those

3  agreements, conversations, financial part is not my

4  thing.  My direct responsibility is design box.

5          MR. CARNATHAN:  I guess I'm all set.

6          MR. HARRIS:  Thank you.

7          (1:11 p.m.)

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

Tatiana Kagan - Vol. 1 - 5/18/2018

63

```
CERTIFICATE OF COURT REPORTER
```

1
2
3
4
5
6      I, David A. Arsenault, Registered
Professional Reporter, do certify that the
7  deposition of TATIANA KAGAN, in the matter of
Lyman-Cutler vs. Kagan, et al., on May 18, 2018, was
8  stenographically recorded by me; that the witness
provided satisfactory evidence of identification, as
9  prescribed by Executive Order 455 (03-13) issued by
the Governor of the Commonwealth of Massachusetts,
10  before being sworn by me, a Notary Public in and for
the Commonwealth of Massachusetts; that the
11  transcript produced by me is a true and accurate
record of the proceedings to the best of my ability;
12  that I am neither counsel for, related to, nor
employed by any of the parties to the above action;
13  and further that I am not a relative or employee of
any attorney or counsel employed by the parties
14  thereto, nor financially or otherwise interested in
the outcome of the action.
15
16
17
18  Transcript review was requested of the reporter.
19
20
21
22
23  _____  ^ DEL DATE
24  David A. Arsenault, RPR

FARMER ARSENAULT BROCK LLC
```