UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re: | ) | Chapter 7 |
| | ) | No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) | |
| | ) | |
| Debtor. | ) | |
| | ) | |

| | | |
|---|---|---|
| LYMAN-CUTLER, LLC, | ) | |
| ALEX FILIPPOV and | ) | |
| NICKOLAY LIPETSKER, | ) | |
| | ) | |
| Plaintiffs/Counterclaim Defendants, | ) | |
| | ) | Adv. Proc. No. 16-01120 |
| v. | ) | |
| | ) | |
| VADIM KAGAN, TATIANA KAGAN, | ) | |
| KAGAN DEVELOPMENT KDC, CORP. | ) | |
| and PROEXCAVATION CORP. | ) | |
| | ) | |
| Defendants/Counterclaim Plaintiffs. | ) | |

## JOINT MOTION PRETRIAL MEMORANDUM

Plaintiffs/Counterclaim Defendants Lyman-Cutler, LLC (the "Company"); Alex Filippov ("Filippov"); and Nickolay Lipetsker ("Lipetsker"); and Defendants/Counterclaim Plaintiffs Vadim Kagan ("Kagan"), Tatiana Kagan, Kagan Development KDC, Corp. ("KDC") and ProExcavation ("ProExcavation"), through their respective counsel, jointly submit the following Pretrial Memorandum pursuant to this Court's Scheduling and Pretrial Order dated August 3, 2016 (Doc. No. 155, Adv. Doc. No. 8).

{S1092323.2}

## I.      Witnesses and Expert Witnesses

### A.  Plaintiffs/Counterclaim Defendants

Please see chart attached as <u>Exhibit 1</u>.

### B.  Defendants/Counterclaim Plaintiffs

Please see chart attached as <u>Exhibit 2</u>.

### C.  Witnesses to be Presented by Means of Deposition Testimony

None.

Both Parties reserve the right to call witnesses or proposed witnesses from the other

Parties' list.


## II.     Exhibits

### A.  Plaintiffs/Counterclaim Defendants' Exhibits

Please see chart attached as <u>Exhibit 3</u>.

### B.  Defendants/Counterclaim Plaintiffs' Exhibits

Please see chart attached as <u>Exhibit 4</u>.

Both Parties reserve the right to offer exhibits or proposed exhibits from the other Parties'

list and to offer additional exhibits for impeachment.


## III.    Exchange of Exhibits

The Parties confirm that they have exchanged copies of the exhibits.

## IV.    Documents to Be Presented by Certification Pursuant to Fed. R. Evid. 902(11) or Fed. R. Evid. 902(12)

Plaintiff's Proposed Exhibit P00065.

## V.  <u>Statement Concerning Mediation</u>

The Parties have mediated twice formally and once informally and have failed to resolve their dispute.  Trial is necessary.

## VI.  <u>Facts to Which the Parties Have Stipulated</u>

None at this time. The Parties are working toward having a set of stipulated facts to submit before trial.

## VII.  <u>Issues of Fact for Trial</u>

### A. <u>Plaintiffs/Counterclaim Defendants' Statement</u>

1.    Whether Vadim Kagan ("Kagan") represented to Alex Filippov ("Filippov") and Nickolay Lipetsker ("Lipetsker") that he would build the two homes on the Lyman-Cutler Project for a fixed maximum price upon which they relied in agreeing to invest in the Project.

2.    Whether Kagan knowingly and intentionally misrepresented to Filippov and Lipetsker that he would build the homes for a fixed maximum price in order to induce them to invest, while planning to later demand larger payments.

3.    Whether Kagan acted with reckless disregard for the truth in misrepresenting the costs of construction to Filippov and Lipetsker in order to induce them to invest in his Project.

4.    Whether Filippov is the Managing Member of Lyman-Cutler, LLC ("Lyman-Cutler").

5.    Whether Kagan knew and has always known that Filippov is the Managing Member of Lyman-Cutler.

6.    Whether the June 24, 2013 contract that Kagan signed for both Kagan Development KDC Corp. ("KDC") and Lyman-Cutler (the "KDC Contract") is entirely fair to Lyman-Cutler, Filippov and Lipetsker.

7.      Whether Kagan breached the Operating Agreement by failing to substantially complete the homes by March 30, 2014.

8.      Whether Kagan knowingly and intentionally created the KDC Contract and asserted large charges under the KDC Contract, which he knew Filippov and Lipetsker had never agreed to, in bad faith in order to force them to settle his other claims.

9.      Whether ProEx's charges are entirely fair to Lyman-Cutler, Filippov and Lipetsker.

10.     Whether Kagan, KDC and ProEx knowingly and intentionally inflated charges to Lyman-Cutler.

11.     Whether the two Listing Agreements Kagan signed with his wife, Tatiana Kagan ("Tatiana") are entirely fair to Lyman-Cutler, Filippov and Lipetsker.

12.     Whether Kagan breached the Lyman-Cutler Operating Agreement by executing Listing Agreements retaining his wife beyond the term set in the Operating Agreement, without making any provision for Tatiana's removal as required by the Operating Agreement.

13.     Whether Kagan breached his fiduciary duty to Lyman-Cutler, Filippov and Lipetsker by executing Listing Agreements retaining his wife beyond the term set in the Operating Agreement, without making any provision for Tatiana's removal as required by the Operating Agreement.

14.     Whether Tatiana tortiously interfered with the Operating Agreement and/or aided and abetted Kagan in breaching his fiduciary duty by refusing to honor Filippov's demand to release Lyman-Cutler from the Listing Agreements.

15.     Whether the Proof of Claim submitted by KDC contains knowingly false and fraudulent charges asserted against Lyman-Cutler.

16.    Whether the documentation submitted by KDC in support of its Proof of Claim is unreliable.

17.    Whether the carrying costs were part of the Lyman-Cutler Construction Budget, and were included in the construction loans from Rockland Trust.

18.    Whether KDC and ProEx have already been fully reimbursed for all legitimate out of pocket expenses.

19.    Whether Kagan is responsible for payment of carrying costs after November 30, 2014 under the terms of the Operating Agreement.

20.    Whether Kagan, KDC and ProEx were grossly negligent in the management of the construction costs.

21.    Whether KDC and ProEx performed any services at all beyond those which Kagan was obligated to provide under the terms of the Operating Agreement.

22.    Whether Kagan failed to ever disclose, discuss or seek approval for any construction cost overruns during the Project prior to the May 7, 2015 letter from Alexander Pyle.

23.    Whether Tatiana is an agent of a member of Lyman-Cutler for purpose of indemnification under Section 10.2 of the Operating Agreement.

24.    Whether KDC is an agent of a member of Lyman-Cutler for purpose of indemnification under Section 10.2 of the Operating Agreement.

25.    Whether ProEx is an agent of a member of Lyman-Cutler for purpose of indemnification under Section 10.2 of the Operating Agreement.

26.    Whether Kagan's misconduct precludes any indemnification under Section 10.2 of the Operating Agreement.

27.     Whether Kagan breached the Operating Agreement by refusing to pay the carrying costs after May 7, 2015.

28.     Whether Lyman-Cutler was permitted or expected to pay for carrying costs from the proceeds of the construction loans.

29.     What percentage membership interest does each of the members own in Lyman-Cutler.

30.     Whether the Defendants caused KDC to file the June 22, 2015 Mechanics' Lien against the Project properties in bad faith, knowing it included false and unauthorized charges, in order to force the Plaintiffs to settle their claims.

31.     Whether Kagan breached the Operating Agreement, covenant of good faith and fair dealing and his fiduciary duties by asserting claims for fees and charges he knew to be false and/or in violation of the deal among the Parties.

32.     Whether Kagan, KDC, ProEx and Tatiana committed fraud.

33.     Whether the Defendants' unlawful conduct caused financial distress that in turn caused the Plaintiffs to file for bankruptcy protection for Lyman-Cutler.

34.     Whether the Defendants' conduct caused the Plaintiffs to suffer damages and if so, in what amount.

35.     Whether the Defendants' inequitable conduct equitably subordinates any claim they may have to a full recovery by the Plaintiffs.

36.     Whether Kagan breached the Operating Agreement.

37.     Whether Kagan breached the covenant of good faith and fair dealing.

38.     Whether Kagan breached his fiduciary duty.

39.     Whether ProEx, KDC and/or Tatiana violated M.G.L ch. 93A.

40.     Whether the violations of M.G.L. 93A by ProEx, KDC and/or Tatiana are knowing and intentional.

41.     Whether ProEx, KDC and or Tatiana are liable for double or treble damages for violation of M.G.L ch. 93A.

### B.  Defendants/Counterclaim Plaintiffs' Statement

Among the larger remaining factual issues are the following:

1.     Whether Kagan ever agreed to construct the underlying project at a fixed price of $1.3 million.

2.     Whether Lyman-Cutler complied with its obligation to pay carrying costs for the first 23 months of the project.

3.     The amount of carrying costs that KDC can recover.

4.     Whether plaintiffs were fully apprised of the costs being incurred and the progress of the construction.

5.     Whether plaintiffs understood that KDC would be constructing the project and expected to be paid for its work.

6.     Whether the KDC contract is fair.

7.     Whether plaintiffs were aware that the homes had been listed for $4.99 million and failed to object.

8.     Whether plaintiffs authorized the listing of the homes for $4.99 million.

9.     Whether there was ever a valid offer that Tatiana Kagan failed to present.

10.     Whether plaintiffs authorized the listing of 55 Lyman in April 2015.

11.     Whether Tatiana Kagan had anything whatsoever to do with the construction of the project, its billing or finances.

12.     Whether plaintiffs obtained proper corporate authorization to initiate suit in the state court.

13.     Whether plaintiffs were authorized to file a petition for bankruptcy.

14.     Whether plaintiffs ever consulted with Kagan before deciding to initiate litigation or file for bankruptcy.

15.     Whether plaintiffs breached their fiduciary duty, by *inter alia*, failing to pay carrying costs; falsely accusing Defendants of fraud; causing Lyman-Cutler, LLC to file bankruptcy; refusing to lower the sale price of the homes; refusing to amend the operating agreement; leveraging the loan maturity to extract improper benefits; and conspiring with Kristina Brusenkova.

16.     The amount of money that KDC is entitled to based on its proof of claim.

17.     The amount of money owed to each of the defendants for indemnification.

18.     Whether there was any double billing, false or inflated charges, kickbacks, mixed expenses for projects, uncredited returns.


**VIII.   Issues of Law to be Determined**

**A.   Plaintiffs/Counterclaim Defendants' Statement**

1.     Whether the Listing Agreements Kagan signed for Lyman-Cutler, LLC with his wife are subject to entire fairness review.  See Bergeron v. Ridgewood Sec. Corp., 610 F. Supp. 2d 113, 116 n.10 (D. Mass. 2009) (a fiduciary must prove entire fairness if he "appeared on both sides of a transaction or derived a personal benefit from a transaction in the sense of self-

dealing"); Pereira v. Cogan, 294 B.R. 449, 532 (S.D.N.Y. 2003) (loans director caused company

to make to his wife subject to entire fairness); International Communications Assn., Inc. v. 258

St. Nicholas Ave. LLC, 2018 N.Y. Misc. LEXIS 531, at *14 (N.Y. Supr. Ct. Feb. 15, 2018)

(payments defendant caused company to make to his wife subject to entire fairness).

2.      Whether a defendant may not attempt to use equitable principles to circumvent

the doctrine of entire fairness.  See, e.g., SFF-TIR, LLC v. Stephenson, 250 F. Supp. 3d 856,

1030 (N.D. Ok. 2017) (relying on In re JCC Holding Co. S'holder Litig., 843 A.2d 713 (Del. Ch.

Ct. 2003)); Meehan v. Shaugnessy, 404 Mass. 419, 436 (1989); Durfee v. Durfee & Canning,

Inc., 323 Mass. 187, 196 (1948).

3.      Whether KDC cannot recover for "reimbursement" of sums it has never paid as

part of its Proof of Claim.  Brick Constr. Corp. v. CEI Dev. Corp., 46 Mass. App. Ct. 837, 840

(1999) (""In the absence of a lien perfected under G.L. c. 254, an owner who enters into a

general contract for improvements on real property is not ordinarily liable to subcontractors

whose sole contractual arrangements are with the general contractor."); Certified Power Sys. v.

Dominion Energy Brayton Point, LLC, 2011 Mass. Super. LEXIS 317, at *162 (Dec. 30, 2011)

(same).

4.      Whether fraudulent mechanics lien is the basis for a claim for fraud, even if the

Plaintiffs never relied on it in the sense that they accepted and paid additional charges beyond the

contract price, when the lien inflicts enforced "reliance" on the Plaintiffs by operation of law.

McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000) (fraud encompasses "any deceit, artifice,

trick, or design involving direct and active operation of the mind, used to circumvent and cheat

another"); see In re: Lawson, 791 F.3d 214, 220 (1st Cir. 2015) (actual fraud "is not limited to

fraud effected by misrepresentation"); Bailey v. Community Bank of Homewood-Flossmoor,

145 B.R. 919, 927 (Bankr. N.D. Ill. 1992) (debtor denied discharge for fabricating fraudulent mechanics' lien); Cordeck Sales, Inc. v. Construction Sys., Inc., 382 Ill. App. 3d 334, 399 (Ill. App. Ct. 2008) ("[w]hen there is evidence that a lien claimant knowingly recorded a claim that contained a substantial overcharge, the claim will be defeated on the basis of constructive fraud the effect of his actions is to give an appearance of a greater encumbrance on the property than that to which he is entitled").  Cf. Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-72 (1991) (covenant of good faith and fair dealing means that "neither party shall do anything that will have the effect of destroying or injuring the right of the other party to receive the fruits of the contract").

5.      Whether a professional general contractor who presents a construction budget to his investors without obtaining any bids for the work or estimates for the materials, and understates the costs by 40% is liable for fraud for acting with reckless disregard for the truth. Geresy v. Dommert, 2004 Mich. App. LEXIS 1397, at *24 (June 3, 2004) (affirming verdict that contractor who under estimated construction costs without supporting bids was liable for fraud based on reckless disregard for the truth).

6.      Whether Filippov and Lipetsker's efforts to find witnesses to testify in this matter are absolutely privileged.  Harihar v. United States Bank Nat'l Ass'n, 2017 U.S. Dist. LEXIS 50596, at *32-33 (D. Mass. Mar. 31, 2017) ("[u]nder Massachusetts law, **statements by a party**, counsel or witness in the institution of, or during the course of, a judicial proceeding are absolutely privileged provided such statements relate to that proceeding") (emphasis added); Taylor v. Swartwout, 429 F. Supp. 2d 209, 214-15 (D. Mass. 2009) (attorney's absolute litigation privilege applies to alleged actions by private investigators).

7.     Whether a Proof of Claim based solely on a mechanic's lien which is supported by a written contract that is not entirely fair to the fiduciaries involved must be disallowed.  See In re Paxon Elec. Co., 248 B.R. 451, 463 (M.D. Fla. Bankr. 2000) (finding abandonment of equitable claims where proof of claim "makes no reference to amounts owed based on equitable principles"); In re Grove Instruments, Inc., 573 B.R. 307, 310 (D. Mass. Bankr. 2017) (noting that certain claim was not "explicitly referenced in . . . proof of claim"); Applied Sci. Int'l, LLC v. Torres, 2010 Bankr. LEXIS 2533, at *8-10 (M.D.N.C. Bankr. July 30, 2010) (proof of claim failed to include claims for fraud, negligent misrepresentation, or punitive damages).

8.     Whether a contractor is precluded from recovery on a mechanic's lien when the only work performed within the mandatory statutory time period was performed solely for the purpose of enlarging the time within which to file a lien.  See O'Driscoll v. Bradford, 171 Mass. 231, 232 (1898) (work done for purpose of enlarging the time for filing a lien not to be considered in determining timeliness of statutory compliance).

9.     Whether the Defendants cannot legally recover on claims for quantum meruit, promissory estoppel, or unjust enrichment where there was an undisputed written agreement (the Operating Agreement) among the members that governed the subject matter.  See CareOne Mgmt., LLC v. NaviSite, Inc., 2017 Mass. Super. LEXIS 58, at *25 (Mass. Super. Ct. Apr. 24, 2017) ("[o]rdinarily, a claim of unjust enrichment will not lie where there is a valid contract that defines the obligations of the parties . . . That is because a valid contract defines the obligations of the parties as to matters within its scope, displacing to that extent any inquiry into unjust enrichment") (citing Metropolitan Life Ins. Co. v. Cotter, 464 Mass. 623, 641 (2013)); Biltcliffe v. CitiMortgage, Inc., 772 F.3d 925, 931 (1st Cir. 2014) ("[u]nder Massachusetts law, the existence of a contractual relationship between the parties typically precludes an unjust

enrichment claim arising out of that contract); Boston Med. Ctr. Corp. v. Sec'y of the Exec.

Office of HHS, 463 Mass. 447, 467 (2012) ("[a] plaintiff is not entitled to recovery on a theory

of quantum meruit where there is a valid contract that defines the obligations of the parties");

Robinson v. Spencer Stuart, Inc., 2015 U.S. Dist. LEXIS 183961, at *12-13 (D. Mass. Feb. 24,

2015) ("[p]romissory estoppel and unjust enrichment are equitable remedies available in the

absence of a contract only").

      10.    Whether a third party construction company hired by a limited liability company

to perform construction work is an agent of one of the members for purposes of seeking

indemnification under the limited liability company's Operating Agreement.  See Restatement

(Third) of Agency, § 1.01 (agency requires a fiduciary relationship); CNE Direct, Inc. v.

Blackberry Corp., 821 F.3d 146, 150 (1st Cir. 2016) (one of the "essential ingredients" of a

principal-agent relationship under Massachusetts law is "a fiduciary relationship toward the

principal regarding matters within the scope of the agency").

      11.    Whether a subcontractor to a third party construction company hired by a limited

liability company to perform construction work is an agent of one of the members for purposes

of seeking indemnification under the limited liability company's Operating Agreement.  See

Restatement (Third) of Agency, § 1.01 (agency requires a fiduciary relationship); CNE Direct,

Inc. v. Blackberry Corp., 821 F.3d 146, 150 (1st Cir. 2016) (one of the "essential ingredients" of

a principal-agent relationship under Massachusetts law is "a fiduciary relationship toward the

principal regarding matters within the scope of the agency").

      12.    Whether a real estate agent hired by a limited liability company to assist in selling

the limited liability company's asset is an agent of one of the members for purposes of seeking

indemnification under the limited liability company's Operating Agreement.  See Restatement

(Third) of Agency, § 1.01 (agency requires a fiduciary relationship); CNE Direct, Inc. v.

Blackberry Corp., 821 F.3d 146, 150 (1st Cir. 2016) (one of the "essential ingredients" of a

principal-agent relationship under Massachusetts law is "a fiduciary relationship toward the

principal regarding matters within the scope of the agency").

13.     Whether a member is "frozen out" of a limited liability company as a result of the

managing member's exercise of authority specifically granted to him under the terms of the

limited liability company's Operating Agreement.  See Selmark Assocs. v. Ehrlich, 467 Mass.

525, 537 (2014) ("Thus, when the challenged conduct at issue is clearly contemplated by the

terms of the parties' written agreements, we have declined to find liability for breach of fiduciary

duty"); Chokel v. Genzyme Corp., 449 Mass. 272, 278 (2007) ("When a director's contested

action falls entirely within the scope of a contract between the director and the shareholders, it is

not subject to question under fiduciary duty principles").

14.     Whether a party who materially breaches its contract must forfeit any claim to

compensation it has arising out of the transaction.  See G4S Tech. LLC v. Massachusetts Tech.

Park Corp., 479 Mass. 721, 723 (2018) (holding that a contractor's numerous false certifications

and intentional payment delays constituted a material breach of contract and, "standing alone,

preclude recovery for breach of contract"); see also Hastings Assocs., Inc. v. Local 369 Building

Fund, Inc., 42 Mass. App. Ct. 162, 171 (1997).

15.     Whether a party who breaches his fiduciary duty must forfeit any claim to

compensation it has arising out of the transaction.  MAZ Partners LP v. Shear (In re PHC, Inc.

S'holder Litig.), 894 F. 3d 419, 426 & 438 (1st Cir. 2018) (disgorgement was an "altogether

fitting remedy" for shareholder who breached his fiduciary duty).

16.     Whether a party who attempts to extract additional benefits out of a transaction

using wrongful means violates the implied covenant of good faith and fair dealing, commits an

unfair and deceptive act in violation of G.L. c. 93A, and forfeits its right to compensation owed

as a result of its unclean hands.  See Anthony's Pier Four, Inc. v. HSBC Assocs., 411 Mass. 451,

471-472 (1991) ("neither party shall do anything that will have the effect of destroying or

injuring the right of the other party to receive the fruits of the contract"); Ahern v. Scholz, 85

F.3d 774, 798 (1st Cir. 1996) (conduct in disregard of known contractual arrangements is a

violation of Chapter 93A); see also Hannon v. Original Gunite Aquatech Pools, Inc., 385 Mass.

813, 825 (1982) ("low-balling" or bidding less than job requires and then demanding more

money violates Chapter 93A); Amerada Hess Corp. v. Garabedian, 416 Mass. 149, 156 (1993) (a

party's "unclean hands" denies equitable relief to one tainted with inequitableness or bad faith

affecting the matter in which it seeks relief); Conway v. Licata, 2015 U.S. Dist. LEXIS 116310,

at *54 (D. Mass. Aug. 31, 2015) ("While equity does not demand that its suitors shall have led

blameless lives . . . as to other matters, it does require that they shall have acted fairly and

without fraud or deceit as to the controversy in issue").

17.     Whether damages resulting from a forced bankruptcy are recoverable.  Selmark,

467 Mass. at 545 (damages that arise reasonably from a breach of duty are recoverable);

Primavera Familienstiftung v. Askin, 130 F. Supp. 2d 450, 534-535 (S.D.N.Y. 2001) (holding

that plaintiffs could recover damages for bankruptcy-related expenses).

18.     Whether the Court should draw a negative inference against Kagan based upon

his failure to identify any projects for rebuttal of Plaintiffs' evidence of projects in which Kagan

inflicted the same scheme on his investors, despite the Court's Order (Doc. No. 417) giving him

nearly two months in which to identify such rebuttal evidence.  See Grajales-Romero v. Am.

Airlines, Inc., 194 F.3d 288, 293, 298 (1st Cir. 1999) (A missing witness instruction and adverse

inference is permissible where a witness is either (1) favorably disposed to testify for a party, by

virtue of status or relationship with the party or (2) peculiarly available to that party, such as

being within the party's exclusive control); Colon-Millin v. Sears Roebuck de P.R., Inc., 455

F.3d 30, 34 n.2 (1st Cir. 2006); Lacourse Builders, LLC v. D'Anello (In re D'Anello), 477 B.R.

13, 27-28 (D. Mass. Bankr. 2012); Irish Bank Resolution Corp. (In re Special Liquidation) v.

Drumm (In re Drumm), 524 B.R. 329, 373 (D. Mass. Bankr. 2015) (drawing negative inference

from failing to call witness).

### B.  **Defendants/Counterclaim Plaintiffs' Statement**

Among the remaining legal issues are:

1.      Whether the plaintiffs' breached the Operating Agreement, *inter alia* by failing to

terminate the company on the date provided for in the agreement and failing to cause the LLC to

pay carrying costs.

2.      Whether plaintiffs can carry their initial burden to shift the burden of persuasion

to Vadim Kagan to prove the entire fairness of transactions in which he or companies he owns

were involved.

3.      Whether plaintiffs' actual and constructive awareness of the transactions vitiates

their claims.

4.      Whether the KDC contract is fair.

5.      Whether the costs incurred to construct the project are fair and reasonable.

6.      Whether plaintiffs' allegations are frivolous and violate applicable rules against

filing suits without evidentiary support.

7.      Whether evidence of Kagan's alleged conduct on other projects is admissible and has any relevance to the instant dispute.

8.      Whether plaintiffs improperly froze out Kagan from the business of the LLC and improperly exercised their majority vote.

9.      Whether plaintiffs breached their fiduciary duty owed to Kagan.

10.     Whether the LLC breached its contract with KDC by failing to pay for project costs incurred.

11.     Whether plaintiffs breached the implied covenant of good faith and fair dealing.

12.     Whether defendants are entitled to indemnification under the terms of the Operating Agreement.

13.     Whether plaintiffs have been unjustly enriched.

14.     Whether plaintiffs' conduct estops them from recovering on any claims.

15.     Whether plaintiffs improperly interfered with the KDC contract and the Operating Agreement.

16.     Whether plaintiffs conspired against defendants.

17.     Whether plaintiffs have proven any compensable damages.

18.     How the net proceeds from the sales of the properties should be divided among the members.

19.     The parties' interest in the LLC and the distribution of assets.

20.     Defendants incorporate by reference their answer and counterclaim.

21.     Whether any of the defendants are jointly liable for anything.

22.     Whether the testimony of plaintiffs' experts is admissible.

23.     Whether Filippov breached his fiduciary duty and self-dealt by placing his personal interests ahead of the interests of the LLC and Kagan.

24.     Whether plaintiffs utilized corporate assets to cover personal costs.

IX.     **Case Summaries**

A.     **Plaintiffs/Counterclaim Defendants' Statement**

This case is about a dishonest developer, Vadim Kagan ("Kagan"), who failed to complete the project at issue on time.  When he therefore did not sell the houses as quickly as expected, he tried to ensure that he would profit anyway at his investors' expense by asserting hundreds of thousands of dollars in false cost overruns months after construction was complete. These claims are directly contrary to the Parties' agreement.  When his co-venturers, Alex Filippov ("Filippov") and Nickolay Lipetsker ("Lipetsker") rejected his wrongful demands, he falsely doubled his demands in an egregious bad faith effort to force Filippov and Lipetsker to settle with him.

In October 2012, Kagan approached Filippov and Lipetsker seeking investors for a project he planned in Brookline, Massachusetts.  Kagan planned to purchase an older home located at 77 Lyman Road, Brookline, Massachusetts, tear it down, divide the lot in two and build two new homes.  On October 25, 2012, at the law office of Attorney Boris Maiden, Kagan made a presentation to Filippov and Lipetsker, which he had developed with the help of Dimitriy Zhukovskiy.  Kagan told Filippov and Lipetsker that he "knew exactly what the construction would cost," and that he would build the two homes for a budget of $1.3 million each, plus $200,000 in carrying costs.  He presented 363 different profit scenarios to Filippov and Lipetsker

with two variables – selling price and time to sale.  The construction budget was the same in all 363 scenarios.

Filippov was acutely aware, therefore, that the time to sale was the variable in the deal that could mean the difference between profit and loss.  Because he was simply an investor and Kagan would be responsible for building the homes, Kagan was also largely responsible for the time to sale.  Accordingly, as a key, negotiated term of the deal, Kagan agreed that he would stand behind his promises by paying the carrying costs out of his own pocket if the homes did not sell within 23 months from the "Date of Acquisition," defined in the Operating Agreement as the date of recording of the deed in which the venture purchased the property.  Filippov also specifically insisted that the Operating Agreement spell out explicitly that Kagan was responsible for building the homes in accordance with plans and specification approved by Filippov, and that his compensation for doing so was his share of the profits from the venture.

On or about November 14, 2012, the three men signed an Operating Agreement forming Lyman-Cutler, LLC, which states exactly those terms.  The Operating Agreement spells out that Kagan is responsible for building the homes, to substantially complete them by March 30, 2014, that he must use plans and specifications approved by Filippov, and that his compensation for building the homes is his share of the profits from the venture.  That share of profits was five times his ownership interest (50% profit share, 10% ownership interest) specifically to compensate him for building the houses.  In reliance on their agreement, Filippov invested $2 million and Lipetsker invested $250,000.  Kagan also invested $250,000.  In April and May 2013, after much debate, the Parties agreed to increase the construction budget by $100,000 per home.

Kagan built the homes, but during construction he failed to keep track of his costs in any organized way whatsoever. He paid expenses willy nilly out of the Lyman-Cutler account, the bank account for his construction company, Kagan Development KDC Corp. ("KDC"), his excavation company, ProExcavation Corp. ("ProEx") and on various American Express cards. For a time, he took pictures of checks and sent them to Filippov as he wrote them out of the Lyman-Cutler account, but he provided few supporting invoices and Filippov and Lipetsker had little if any visibility into what was being spent on what during construction. At no time did Kagan ever discuss with Filippov or Lipetsker any cost overruns or get any approval whatsoever for any "upgrades" or increased cost. **Not once**.

Kagan failed to complete the homes by the contractual deadline of March 30, 2014, and instead the homes were not substantially completed until mid August 2014. As a result, the first home was not listed for sale until August 20, 2014, effectively missing the 2014 selling season. At first, Kagan paid the carrying costs out of his pocket as agreed. Each month, Filippov's wife, Arina Rudyakova would email Dan Gersh, who had joined KDC as its "CFO" in November 2014, and point out the loan payments or property tax payments coming due and Gersh would deposit funds in the Lyman-Cutler account to pay them.

Then out of the blue on May 7, 2015, Kagan, caused an attorney, Alexander Pyle, to send a demand letter to Filippov and Lipetsker, demanding $1,059,025.56 in purported cost overruns, including asserting he was entitled to be reimbursed for carrying costs. This was the very first time Kagan ever claimed any cost overruns. Kagan knew when he made this demand that he was demanding payments that were contrary to the deal the parties had made and contrary to the express terms of the Operating Agreement. Filippov and Lipetsker were shocked, upset and afraid that their substantial investments were at risk.

As Managing Member of Lyman-Cutler, Filippov demanded that he be given control of the homes and the selling process and took steps to replace Tatiana as the listing agent. Filippov did not believe that Tatiana had done anything to market the properties properly and did not believe she had the skills or contacts necessary to sell the homes. He planned to replace her with Deborah Gordon of Coldwell Banker. The Operating Agreement expressly gave him the unilateral right to remove Tatiana as the listing agent at any time after December 31, 2014.

Tatiana, and Century 21, however, refused to relinquish the listing, relying on an exclusive listing agreement that Kagan had signed less than two weeks before sending Filippov and Lipetsker his $1,059,025.56 demand letter. Filippov and Lipetsker were again shocked and upset. The venture was not only being subjected to the duress of a seven-figure demand from Kagan, but was also saddled with a lazy, incompetent realtor. Kagan's rush to sign the listing agreement with Tatiana just before firing off his May 7, 2015 Demand Letter is further proof that he knew he was violating the Operating Agreement and about to touch off a legal battle. Signing the listing agreement was a self-dealing act to solidify his position before the battle commenced. Filippov and Lipetsker would later learn in discovery that Kagan had also signed a listing agreement in August 2014 for a term of 18 months, through March 2016. Kagan knew when he signed that agreement as well that he was violating the Operating Agreement.

There is no good explanation for the May 7, 2015 Demand Letter for Kagan. Plaintiffs submit that the evidence is overwhelming that the letter is knowingly fraudulent. Kagan knew it was directly contrary to the Operating Agreement. It contains large charges from ProEx that were never discussed and are pure profit to Kagan. He was "recreating" the allegedly supporting invoices behind it in the weeks immediately prior to sending it, and in some cases after sending it. His former bookkeeper, Kristina Brusenkova, will testify that he had a routine practice of

making up charges on his Projects.  The subcontractors listed on the attachment to the May 7,

2015 letter had all long since completed their work and been paid in full.  Their invoices appear

to have been fabricated in connection with the May 7, 2015 demand.  The only reliable records

in this case – the bank records – show that the payments into KDC closely match the payments

out of KDC, which means KDC had been paid in full for all its out of pocket expenses (even if

this were not a fixed maximum price deal, which it was).  The pile of detritus Kagan proffers in

support of his alleged cost overruns is wholly unreliable.

But even if the Court concludes that the May 7, 2015 was not knowingly false and

fraudulent, it was indisputably the product of gross negligence and reckless disregard for the

truth and for Kagan's fiduciary obligations.  He obtained no bids from any subcontractors and no

estimates for materials from any vendors before quoting the costs of construction to Filippov and

Lipetsker and assuring them that he "knew exactly what construction would cost."  He failed to

track his costs during construction and frankly had no idea whatsoever what his total costs were

at any time during the Project.  He was forced to recreate books and records, and solicit invoices

from subcontractors long after construction was complete.

Kagan's next move was even worse.  On June 22, 2015, he caused KDC to encumber the

properties with a mechanic's lien (the "Mechanic's Lien"), in which he approximately doubled

his purported claim to $2,095,985.23.  This was a breathtaking act of bad faith, specifically

intended to force Filippov and Lipetsker to settle his original claims in the May 7, 2015 letter.

The basis for the Mechanic's Lien and the lion's share of the purported surge in charges against

Lyman-Cutler is a contract between Lyman-Cutler and KDC, which Kagan signed for both sides,

allegedly on June 24, 2013.  Neither Filippov nor Lipetsker had ever seen this alleged contract.

Kagan had never discussed it with them.  The evidence strongly suggests that Kagan, in fact,

signed it on or about June 17, 2015, specifically to increase his claims and unlawfully force

Filippov and Lipetsker to settle.  Even if he signed it in 2013, however, it is a blatant and

knowing violation of the Operating Agreement, used by Kagan as a vehicle to inflict

$777,784.41 in self-dealing fees and charges to KDC, which had never before that time been

mentioned to Filippov or Lipetsker.  Neither had they ever seen the "invoice" purportedly dated

June 1, 2015, but which was presented on June 25, 2015, three days after the Mechanic's Lien

was recorded.

In the meantime, the three loans from Rockland Trust had been set to mature on June 18,

2015 (construction loans) and June 28, 2015 (property acquisition loan) respectively.  In early

June 2015, Filippov secured extensions of the loans for an additional six months through

December 18, 2015 and December 28, 2015 respectively.  Kagan next demanded that the LLC be

dissolved.  Filippov was fearful that the properties could not be sold for a good price and fearful

that Rockland Trust would not extend the loans again where the properties were now burdened

with a Mechanic's Lien and the members of the LLC were in litigation.  If the LLC dissolved,

then Rockland Trust would surely refuse to extend the loans.  Lyman-Cutler was still also forced

to work with a real estate broker in whom Filippov and Lipetsker had no confidence could sell

the properties under the best of circumstances.  Subject to extreme financial duress, intentionally

inflicted on the LLC and Filippov and Lipetsker by Kagan with the knowing assistance of KDC,

ProEx and Tatiana (all together, the "Kagan Parties"), Filippov and Lipetsker decided in good

faith that filing for bankruptcy protection was the best way to deal with the Mechanic's Lien, the

listing agreements, and the orderly sale of the properties.

The Kagan Parties worked together to inflict this financial duress. Kagan is ultimately

responsible for all of it, but the Mechanic's Lien and Proof of Claim is asserted through KDC.

The KDC Claims include $916,800 of charges alleged due to ProEx.  Tatiana admits that she could waive a commission at any time, and simply does what Kagan tells her to do.  She and Kagan worked together to breach the Operating Agreement and Kagan's fiduciary duty by refusing to honor Filippov's right to choose another real estate broker after December 31, 2014.

The overarching question is whether Kagan planned his financial assault on his business partners from the beginning, and intentionally defrauded them from the start, or whether he hatched the scheme after he failed to finish the homes on time and failed to sell them with 23 months of the Acquisition Date, as a result of which his profits began to dwindle as he paid the carrying costs out of his own pocket.  The fact that Kagan inflicted the same pattern of announcing large cost overruns – largely payable to his own companies – on several other investors suggests he had a plan from the start.[1]  But either way, his liability, and the liability of his co-conspirators, is plain.

Not only should KDC recover nothing on its Proof of Claim, but the entirety of the sum held in escrow by the Trustee (after Trustee fees and proper bankruptcy expenses) should be awarded to Filippov and Lipetsker.  They should recover the entirety of their investment in the Project.  Any claim by Kagan to any compensation, reimbursement or share of any "profits" should be declared void for his many material breaches of the Operating Agreement and covenant of good faith and fair dealing, his breaches of fiduciary duty and his outright fraud.  As provided in the Operating Agreement, Kagan's capital contribution should be reduced and eliminated by Filippov's payment of carrying costs after Kagan disclaimed his responsibility.  In addition, the Court should award the Plaintiffs damages and attorneys' fees against the Kagan

---

[1]     The Court will recall that Kagan demanded the opportunity to present evidence of up to five other successful Projects to rebut the evidence of other projects that the Plaintiffs will present, and the Court set specific disclosure deadlines for any such evidence.  Tellingly, Kagan did not identify a single other such project.

Parties, who are jointly and severally liable for the harm they have caused.  The Court should

award treble damages and attorneys' fees against KDC, ProEx and Tatiana under M.G.L. ch.

93A.

### B.  Defendants/Counterclaim Plaintiffs' Statement

As set forth in the defendants' motions for summary judgment, plaintiffs have failed to

carry their burden.  There are two parallel proceedings pending.  One is an objection to KDC's

(and its co-defendants') proofs of claim and the other is the adversary proceeding commenced by

the plaintiffs.  In summary, defendant Kagan fully complied with his obligation to construct two

luxury homes for Lyman-Cutler.  The parties agreed to build bigger, more luxurious, homes than

originally envisioned, with a corresponding increase in construction costs.  KDC, with the full

knowledge of the plaintiffs, fronted all the costs beyond the construction loans to build the

homes, including carrying costs, with the understanding that upon sale, it would be reimbursed

before any partner took a profit.  The homes did not sell as quickly as the parties' had hoped.

When Kagan advised that he was no longer willing to carry the financial burden himself and

invited a dialogue, plaintiffs accused him of fraud and, in violation of their fiduciary duties,

almost immediately filed a shotgun suit, with patently fabricated allegations, financed by Lyman-

Cutler.  Plaintiffs then flexed their majority ownership muscle, to the detriment of Kagan, by

taking over the project, freezing him out of the discussions, voting against him at every turn.

After plaintiffs refused to speak with Kagan and brought suit, KDC, as is its legal right, asserted

a mechanics lien to secure the payment to which it was entitled. Compounding their

transgressions and in further violation of their fiduciary duties, without any vote or discussion

with Kagan, plaintiffs put Lyman-Cutler into bankruptcy thereby causing, unnecessarily,

increased costs to all parties. Well after the fact, plaintiffs purported to hold a member meeting to ratify their improper conduct.

Plaintiffs' affirmative claims (and objection to the proofs of claim) are without basis whatsoever.  They have failed to identify any damages that would, if proven, allow them to make any affirmative recovery.  At best, if they could prove fraud (they cannot) the alleged fraud might support their objection to KDC's proof of claim.  In fact, other than unsubstantiated suspicions, plaintiffs have been unable to adduce any evidence to support their spurious claims. Despite a purported forensic examination into all of defendants' books and records, plaintiffs have found no fraud because there was none.  Their forensic accountant merely opined that he did not find defendants' records reliable but stopped well short of opining that he had found fraud.  Plaintiffs' construction expert's analysis is grossly flawed and incomplete, and their real estate expert is simply not qualified to render the opinions which he purports to hold.

Defendants will demonstrate that they performed their work competently, with full disclosure and, most importantly, that they constructed the underlying luxury homes at a cost far below market value. The underlying contracts were fair and enforceable in all respects. Defendants' expert will opine that the prices charged were more than fair and reasonable.

## X.      <u>Length of Trial</u>

The Parties are concerned that the trial may run longer than the allotted two weeks.

Dated:   April 26, 2019

Respectfully submitted,

VADIM KAGAN,
TATIANA KAGAN,
KAGAN DEVELOPMENT KDC, CORP. and
PROEXCAVATION CORP.,

By their Attorneys,

/s/ John H. Perten
John H. Perten, BBO# 548728
James P. Harris
SHEEHAN PHINNEY BASS & GREEN, PA
255 State Street, 5th Floor
Boston, MA  02109
Tel:  617-897-5600
Fax: 617-439-9363
E-mail: ccandon@sheehan.com

and

ALEX FILIPPOV
NICKOLAY LIPETSKER

By their Attorneys,

LYMAN-CUTLER, LLC

By its Attorney,

THE TAMPOSI LAW GROUP, P.C.

O'CONNOR, CARNATHAN AND
MACK, LLC

/s/ Peter N. Tamposi
Peter N. Tamposi, BBO# 639497
The Tamposi Law Group, P.C.
159 Main St.
Nashua, NH 03060
Tel: 603-204-5513
peter@thetamposilawgroup.com

/s/ Sean T. Carnathan
Sean T. Carnathan, BBO# 636889
O'Connor, Carnathan and Mack, LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772
Tel: 781-359-9021
scarnathan@ocmlaw.net

{S1092323.2}

26

## **CERTIFICATE OF SERVICE**

I hereby certify that on this 26th day of April, 2019, a copy of the foregoing was served via ECF.

/s/ Sean T. Carnathan
Sean T. Carnathan

4815-1831-8171, v. 1

{S1092323.2}

27