UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS - CENTRAL DIVISION

```
==============================  .
IN THE MATTER OF:              . Case #15-13881
                              .
LYMAN-CUTLER, LLC             .
                              . Boston, Massachusetts
                              . Monday, May 6, 2019
       Debtor.                . 9:17 a.m.
==============================  .
LYMAN-CUTLER, LLC, et al.,    . Adv. Proc. 16-01120
                              .
             Plaintiffs,       .
                              .
v.                            .
                              .
KAGAN, et al.,                .
                              .
             Defendants.       .
==============================
```

**TRANSCRIPT OF TRIAL DAY 1 ON:**
**(#1) COMPLAINT BY LYMAN-CUTLER LLC AGAINST VADIM KAGAN,**
**TATIANA KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION**
**CORP.;**
**(#167) OBJECTION TO CLAIM 9 OF CLAIMANT ALEX FILIPPOV FILED BY**
**INTERESTED PARTIES TATIANA KAGAN, VADIM KAGAN, KAGAN**
**DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.**

**BEFORE THE HONORABLE FRANK J. BAILEY**

APPEARANCES:

<u>For the Claimants Alex</u>          SEAN T. CARNATHAN, ESQ.
<u>Filippov and Nickolay</u>          O'Connor Carnathan and Mack
<u>Lipetsker:</u>                     LLC
                                 1 Van De Graaff Drive
                                 Suite 104
                                 Burlington, Massachusetts
                                 01803

                                 PETER N. TAMPOSI, ESQ.
                                 The Tamposi Law Firm
                                 159 Main Street
                                 Nashua, New Hampshire 03060



| | |
|---|---|
| For Vadim Kagan, Tatiana Kagan, ProExcavation Corp., and Kagan Development KDC, Corp.: | JOHN PERTEN, ESQ. Sheehan Phinney Bass & Green, P.A. 255 State Street Boston, Massachusetts, 02109 |
| | JAMES HARRIS, ESQ. Sheehan Phinney Bass & Green, P.C. 1000 Elm Street Manchester, New Hampshire 03105 |

Electronic Sound Recording Operator:  ELIZABETH LOMBARD


Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service
eScribers, LLC
7227 N. 16th Street, Suite #207
Phoenix, AZ 85020
973-406-2250; operations@escribers.net


(973) 406-2250 | operations@escribers.net | www.escribers.net

I N D E X

|                                    |        |       |          |         | VOIR |
| WITNESSES:                         | DIRECT | CROSS | REDIRECT | RECROSS | DIRE |
|                                    |        |       |          |         |      |

For The Plaintiffs:
ALEXANDER FILIPPOV
(By Mr. Carnathan)          29


| EXHIBITS:        | DESCRIPTION                                                                 | I.D. | EVID. |
|------------------|-----------------------------------------------------------------------------|------|-------|

For the Plaintiffs:

| 9   | PDF document of material from meeting at Mr. Maiden's office in 10/2012 |  | 34 |
| 27  | First two pages of packet of documents submitted to bank for construction loan, to include construction budget only |  | 70 |
| 26  | Email to parties 4/13 at 3:04 p.m. |  | 74 |
| 129 | Contract for ProExcavation to perform work on Lyman-Cutler project |  |  |
| 67  | Email from Joseph Cohen to Kagan, Filippov, Pyle, and Perten, dated 6/25/15 |  | 124 |
| 72  | QuickBooks printout summary of payments made by Filippov to Lyman-Cutler LLC - redacted to remove percentages |  | 145 |

1    (At 9:17 a.m.)

2              THE CLERK:  Court is now in session.

3              THE COURT:  Good morning.  Be seated.

4              MR. CARNATHAN:  Good morning.

5              THE CLERK:  Adversary proceeding 1120, Lyman-Cutler,

6    LLC vs. Kagan, et al.  This is day one of trial.  It's also

7    case 15-13381 (sic) Lyman-Cutler, LLC.  This is an evidentiary

8    hearing on document 167, objection to claim 9, claimant Alex

9    Filippov, filed by interested parties, Kagans, et al.

10             Will the parties please state their names for the

11   record?

12             MR. CARNATHAN:  Good morning, Your Honor.  Sean

13   Carnathan for Alex Filippov and Nickolay Lipetsker.

14             MR. TAMPOSI:  Good morning, Your Honor.  Peter

15   Tamposi for the same parties.

16             MR. PERTEN:  Good morning, Your Honor.  John Perten,

17   representing Vadim Kagan, Tatiana Kagan, ProExcavation Corp.,

18   and Kagan Development KDC, Corp.

19             MR. HARRIS:  Good morning, Your Honor.  James Harris

20   for the same parties.

21             THE COURT:  Okay.  Good morning everyone.

22             All right.  Any last-minute housekeeping matters

23   before we get launched?

24             MR. CARNATHAN:  Just one, Your Honor.

25             THE COURT:  Sure.

Page 5

```
 1              MR. CARNATHAN:  I believe we'd agreed at the pre-
 2      trial that, to the extent we have exhibits on the list that
 3      don't have objections next to them, they are admitted into
 4      evidence.
 5              I have a caveat to that.  There are several exhibits
 6      on my list that I put down as if needed, to which the
 7      defendants did not object, and I do not wish to offer to those
 8      at that time -- at this time, and that would be Exhibits 129,
 9      and numbers 151 through 158.  So --
10              THE COURT:  That's fine.  So those are reserved?
11              MR. CARNATHAN:  Those are reserved, yes thank you.
12              THE COURT:  They're on the list and, okay, that's
13      fine.
14              Now as I mentioned, it's fine, we can put these in
15      but if these exhibits are not mentioned and put in some
16      context to demonstrate their relevance, I won't consider them
17      in deciding the case because I have no context for them, so --
18      okay?
19              MR. CARNATHAN:  Understood, Your Honor.
20              THE COURT:  Anything else?
21              MR. PERTEN:  Not from our side, Your Honor.
22              THE COURT:  Okay.  Let's get started then.
23              And I remind you that we are timing, we'll just keep
24      a running log of the time that you spend, and if it gets
25      particularly uneven, I reserve the right to impose some
```

1    restrictions on the length of time that you take going

2    forward.  Okay?

3            MR. CARNATHAN:  Thank you, Your Honor.

4            THE COURT:  All right.

5            MR. CARNATHAN:  So the screens are going to come up.

6            THE COURT:  Oh, okay.

7            THE CLERK:  Yep, give me one second.

8            THE COURT:  I've got my -- I've got so many screens

9    up here right now.  Here's another one.  I need to pull that

10   closer so that we have that.  Yep.

11           The last trial we had in this courtroom was the trial

12   of Goldilocks with fourth graders, and I moved everything that

13   could be damaged away from here so I'm pulling things back

14   together.

15           It was a hung jury, by the way.

16           MR. CARNATHAN:  Is it connected?  All right.  Okay.

17           THE COURT:  So maybe that's through the evidence

18   selector, right?  Oh yeah, I see it.  Okay.  Can you make that

19   a little bigger?

20           UNIDENTIFIED SPEAKER:  Okay.

21           THE COURT:  That's perfect.  Okay.

22           MR. CARNATHAN:  All right.  Thank you, Your Honor.

23           I believe by now the Court is well acquainted with

24   the contours of what we expect the evidence to show during the

25   coming days.  So I'd like to particularly focus my comments

1  during my brief opening on what we expect the evidence to show

2  with regard to what the agreement was between the parties, and

3  what we expect the evidence will show that Mr. Kagan did

4  instead.

5       And so as an initial matter, I've brought up

6  Plaintiffs' Exhibit 15 which is in evidence, and that's the

7  operating agreement of Lyman-Cutler that the parties executed

8  back in November 2012.

9       And if we turn to section 5.2, which is on the fourth

10  page of Exhibit 15 in evidence, and we look at 5.2, which is

11  duties of the members, it specifically says that it shall be

12  Mr. Kagan's duty and obligation to construct two homes at the

13  location currently known at 77 Lyman Road in Brookline,

14  Massachusetts.  In accordance with the plans, and including

15  drawings supplied by Mr. Kagan, and approved by managing

16  member, the construction shall be substantially completed no

17  later than March 30th, 2014.

18       So I will pause there for a moment.  So one thing

19  that Mr. Kagan was obligated to do under the agreement among

20  the parties was to substantially complete the homes by March

21  30th, 2014.  The evidence is going to show that that did not

22  happen.  In fact, if we look at Exhibit 46 in evidence, on the

23  third page, we will see that they did not list the first

24  property, 88 Cutler, for sale until August 20th, 2014.

25       Now it makes precisely no sense that the parties

#15-13881; #16-01120                  5-6-2019

1    would sit out the 2014 selling season or the lion's share of

2    it, if the home had been substantially completed in March.  So

3    the evidence is going to show that Mr. Kagan breached that

4    term of the agreement.

5         If we look back at Section 5.2, it's also true that

6    5.2 says that Mr. Kagan is going to build the homes and it's

7    specifically understood by all members that Mr. Kagan's

8    compensation for this duty is outlined in section 8.1 below.

9         Section 8.1 appears on page 9, and specifically says

10   that his compensation is going to be his fifty percent share

11   of the profits from the venture.  Now that's an outsized

12   share.  I mean, Mr. Filippov put up $2,000,000; he's getting

13   forty percent of the profits.  Mr. Lipetsker put up $250,000;

14   he's getting ten percent of the profits.  Mr. Kagan, having

15   put up $250,000 is getting fifty percent of the profits.  And

16   that's because Mr. Kagan is being paid through the net profits

17   of the venture for building the two homes.

18        Now what did Mr. Kagan do instead?  Even if we

19   prepped some of the things that we expect the evidence are

20   going to show that he made up after the fact, there's no doubt

21   that Mr. Kagan has submitted this invoice from KDC in which he

22   purports to have hired his own company, KDC, as the general

23   contractor to build the homes and has charged some

24   approximately $777,000 to the project that's going straight

25   into his own pocket for building the homes before he

escribers

1    purportedly is going to take his share of the profits.

2         To make matters worse, his claim also includes

3    $916,800, which he claims is owed to another company that he

4    owns, ProExcavation.  And as far as we can tell, having sifted

5    through the documents with some care, the actual

6    out-of-pockets that the evidence will show ProExcavation

7    incurred, is something just north of $200,000.  When you add

8    up all the checks in evidence from ProExcavation, that

9    actually say Lyman-Cutler on them -- well see, there are some

10   checks that just don't say anything on them, we have no way to

11   connect those to the project -- but if we give him full credit

12   for everything that actually says Lyman-Cutler on it, even the

13   ones that have other companies on them, they add up to about

14   $225,958.05.

15        And when we look at the, or what the expected

16   testimony from Mr. Goldman, Mr. Goldman looked at

17   ProExcavation's own general ledger and found that it reflected

18   $204,441 in costs.

19        So if those numbers are approximately correct, that

20   means that ProExcavation is trying to charge another

21   approximately $700,000 in pure profit to Mr. Kagan here before

22   we split up the so-called net profits from the project.  So if

23   we put those two numbers together what Mr. Kagan's done here

24   instead is tried to claim the better part of $1.5 million that

25   he says is going to go into his own pocket before we split up

1    the profits here.

2        THE COURT:  When you say the -- I understand the

3    $204,000 number that you just showed on the screen.  The other

4    number that was just north of $200,000, where was that derived

5    from?

6        MR. CARNATHAN:  That 225,958.05 comes from us going

7    through all the records that ProExcavation produced and

8    finding all the checks that actually say Lyman-Cutler on the

9    memo line and adding them all up.

10       THE COURT:  Okay.

11       MR. CARNATHAN:  And that is Plaintiffs' Exhibit 5,

12   for identification, at this point it's been objected to, but

13   we expect to show that that is the sum total of the checks

14   from ProEx that actually say Lyman-Cutler on them.

15       So if that's right, then Mr. Kagan in obvious breach

16   of 5.2, is trying to claim almost a million and a half dollars

17   for himself before we even think about splitting up the

18   profits.

19       Now in addition, that same section 5.2 says that Mr.

20   Kagan will build the homes in accordance with the plans

21   approved by the managing member.  Now basically what they had

22   going into this project was the financial plan.  Right?  At

23   this October 2012 meeting, the evidence is going to show that

24   that Mr. Kagan told Lipetsker and Filippov that he knew

25   exactly what construction was going to cost, and that he would

1    deliver these homes for 1.3 million a home, plus 200,000 for

2    carrying costs, and then a few months later, towards the end

3    of April and the beginning of May, after a great deal of hand-

4    wringing, they agreed to increase that sum by a 100,000 per

5    home, and they agreed at the outset of the project that they

6    would have a budget of 1.4 million per home, plus 200,000 for

7    carrying costs.  And that's all that Mr. Filippov, as the

8    managing member, ever approved.

9         And we know quite well what Mr. Kagan did instead of

10    that.  Exhibit 50 in evidence is this May 7th demand letter.

11    Some eight months after construction was complete, Mr. Kagan

12    came around and announced that he had $758,000 in overruns

13    that he expected to collect, plus another 50,000 he expected

14    to be able to collect.  And also he wanted 251,000 in carrying

15    costs, which I'll talk about further in a moment, and several

16    weeks later he doubled that number to almost 2.1 million.

17    That is another obvious breach of paragraph 5.2.

18         Now there's an important point here that we've also

19    been disputing for some years.  If you look at page 13 of

20    Exhibit 15 in evidence you'll see that the operating agreement

21    specifically designates Filippov as the managing member.  Now

22    I get it, it's says managing manager on there; it's a typo.

23    It's pretty apparent that Mr. Filippov is the managing member

24    here.

25         And so why has Kagan been disputing that all these

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1   years?  Well, because he knows that it's important that he

2   have some authority to sign all of these self-dealing

3   contracts.  The evidence is going to show that Filippov was

4   the managing member and that Kagan has known that from day

5   one.

6          Let's talk about the listing agreements for just a

7   moment.  We have these two listing agreements with Mr. Kagan's

8   wife, Tatiana.  And if we look at page 6 of Exhibit 15,

9   section 6.1(b)(6), there's a provision that says that the

10  managing member, that being Filippov, is going to retain

11  Tatiana as the listing broker.  But that same provision quite

12  explicitly says that she can be removed at any time based upon

13  a vote of eighty-one percent of the membership.  Now bear in

14  mind that Filippov had eighty percent and Lipetsker had ten.

15  So that means that Filippov and Lipetsker had the right to

16  remove Tatiana from day one if they didn't approve of her

17  performance.  And certainly after December 31, Filippov had a

18  unilateral right to take her and remove her as the listing

19  broker as the managing member.  It's right in the operating

20  agreement.

21         Now what did Kagan do instead?  He signed these two

22  exclusive listing agreements with Tatiana and Century 21,

23  locking her in long beyond the period that he was entitled to

24  do so under the operating agreement.

25         And there's a dispute about the April one.  They

1    claim that Filippov authorized them to sign it.  You'll hear

2    that he never did that.

3         But the August 2014 one is truly an outrage.  No one

4    ever saw that listing agreement on our side of the V until the

5    litigation started.  And in that one, he purported to hire

6    Tatiana for eighteen months, all the way to March 2016, which

7    is longer than the operating agreement made the company last.

8    He signed that behind their backs, never even mentioned it to

9    them.  They had never heard of this agreement until after this

10   litigation started.

11        And Tatiana at her deposition admitted that she could

12   waive her commission at any time, step aside, Century 21

13   wouldn't object, and she just did what Vadim told her was her

14   testimony.  And so we expect that she'll be testifying to the

15   same effect here during this trial.  And that means that she

16   colluded -- conspired, if you will -- with Mr. Kagan, to

17   breach that term of the operating agreement as well.

18        Now finally, the carrying costs.  The carrying costs

19   were very specifically negotiated.

20        THE COURT:  Can I just ask this?  The first listing

21   agreement, if that's the right way to describe it --

22        MR. CARNATHAN:  Yes, Your Honor.

23        THE COURT:  -- who signed that on behalf of the LLC?

24        MR. CARNATHAN:  Mr. Kagan.

25        THE COURT:  All right.  And was that with the



```
 1    knowledge of, and approval of the others?

 2            MR. CARNATHAN:  Well, they knew that she was going to

 3    be retained as the listing broker, so that they knew she was

 4    going to be retained.

 5            THE COURT:  Right.

 6            MR. CARNATHAN:  They did not know about the terms of

 7    the listing agreement.  They did not know she was locked in

 8    for eighteen months.  They were never shown it, never talked

 9    about it --

10            THE COURT:  So the evidence you think will show that

11    they didn't see it before --

12            MR. CARNATHAN:  Correct, Your Honor.

13            THE COURT:  -- it got signed by Mr. Kagan.

14            MR. CARNATHAN:  Correct.

15            THE COURT:  Okay.

16            MR. CARNATHAN:  Thank you, Your Honor.

17            The last provision of the operating agreement I

18    wanted to touch on is the provision for the carrying costs.

19    And this was very specifically negotiated because the evidence

20    is going to show that when Mr. Kagan persuaded Mr. Filippov

21    and Mr. Lipetsker to invest in this project the risk that he

22    disclosed to them at some length was the risk for the time of

23    the project -- that there was risk the project wouldn't be

24    completed and the houses sold within a certain time frame.

25    And if that happened the profit could go down.  He never
```

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

1     disclosed any risk about the construction costs.

2            So during the negotiations, Mr. Filippov was heavily

3     focused on the risk of the time, and the risk of the carrying

4     costs going up, and that's a very major provision that he

5     negotiated specifically in this agreement, that if the

6     properties weren't sold within twenty-three months from the

7     date of acquisition -- the date of acquisition is December 31,

8     2012, that's the date that the deed for buying the land was

9     recorded --

10           THE COURT:  What section of the agreement are we

11    looking at on the screen?

12           MR. CARNATHAN:  We're looking at section 8.1 on page

13    9, Your Honor.

14           THE COURT:  Okay.

15           MR. CARNATHAN:  So this says that Mr. Kagan will be

16    responsible for the carrying costs if it's not sold within

17    twenty-three months from the date of the acquisition.  That

18    twenty-three month date is November 30th, 2014.

19           It then says that if Mr. Filippov has to step in and

20    pay them because Mr. Kagan fails, then Mr. Filippov's capital

21    contribution goes up for every dollar he spends and Mr.

22    Kagan's goes down.  That also was a specifically requested

23    provision by Mr. Filippov to deal with the eventuality of what

24    happens if Mr. Kagan breaches his obligation.  It doesn't say

25    that for Mr. Kagan.  It specifically doesn't say that for Mr.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1   Kagan.  If the homes aren't sold within twenty-three months

2   from the date of acquisition, he pays the carrying costs.

3        That was an incentive to get the project done on

4   time.  It was a penalty if he didn't get it done on time, and

5   he knew that because it was negotiated.  What did he do

6   instead?  Well, he actually initially paid them for the first

7   several months -- December 2014, January, February, April --

8   he actually paid them.  Each month, Mr. Filippov's wife,

9   Irina, would send a little email and say, hey, the loans are

10  due, the taxes are due, we don't have any money, and Dan

11  Gersh, the CFO, would respond, no problem, got it covered; he

12  put the money in, they'd pay.

13       All of a sudden out of the blue on May 7th, 2015, he

14  sends this letter, and he says I'm owed money.  I want my 251

15  back.  I'll tell you what, I'll split them with you if you put

16  in as much as I have, and we'll split them going forward.  And

17  so that was a breach, too.

18       There was a provision for what to deal with what

19  happens if Mr. Kagan didn't pay, but this denial of the terms

20  of the deal is a blatant bad faith breach.

21       And so even before we get to what we think the

22  evidence will show about -- invoices that we think are

23  fabricated -- that we think Your Honor's going to conclude

24  that Mr. Kagan made up after the fact to support these claims,

25  just looking at the terms of the deal and comparing them to

1    what Mr. Kagan actually did, he essentially breached every

2    material term of this deal.  And he did it knowingly, he did

3    it in bad faith.  He did in -- specifically to force Mr.

4    Kagan -- excuse me, Mr. Filippov and Mr. Lipetsker -- to pay

5    him money to which he was not entitled.  And at the end of

6    this trial, we're going to ask Your Honor not only to disallow

7    all of their proofs of claim and allow all of ours, but we're

8    going to ask for damages based on the harm that he's done to

9    this project and to my clients.

10            THE COURT:  Okay.

11            MR. CARNATHAN:  Thank you, Your Honor.

12            THE COURT:  Thank you.

13            Okay.  Whenever you're ready.

14            MR. PERTEN:  Thank you, Your Honor.

15            Your Honor, we've been before you for four years.

16   For four years, we've been telling you that there's been

17   accusations hurled of malfeasance.  For four years we've been

18   telling you that there's been accusation of cooking the books,

19   of forging documents, of doing all sorts of dastardly acts.

20   And for four years, we've been telling you that there is no

21   such evidence.

22            We're here today finally, and we believe the evidence

23   will establish what we've been saying all along.  There have

24   been very serious allegations that have been asserted against

25   my client and what you will hear in the evidence is not one of

1   them holds water.

2        I think very significantly Your Honor, from Mr.

3   Carnathan's presentation just now, what you haven't heard,

4   because there is no evidence of that, is any evidence of

5   damage suffered by the plaintiffs as a result of the conduct

6   that we're being charged with, not one penny.

7        The expert -- Your Honor, allowed the expert to

8   peruse all of our records, multiple other projects,

9   ProExcavation -- a very far-ranging forensic examination --

10  the expert did not come up with a thing.  There will be no

11  testimony by the plaintiffs that they paid anything in

12  reliance on these invoices that they claim are improper.

13  There will be no testimony that they suffered any damage

14  because they didn't.

15       So Your Honor, remember that there are two things

16  happening in parallel here, there's our proof of claim and

17  there's their adversary complaint.  The adversary complaint

18  seeks an affirmative recovery by the plaintiffs.  There will

19  be no evidence of damages, we don't believe, that would

20  entitle them to any damages on their affirmative claim.

21       Contrary to what you've heard, the evidence will be

22  very clear, that Mr. Kagan did exactly what the plaintiffs'

23  bargained for.  But they don't want to live up to their end of

24  the deal.  And to that end, what they do is cherry pick

25  portions of the operating agreement that they like, and ignore

1    or try and do an end-run around portions of the operating

2    agreement that they don't like.

3          The evidence will show what was Mr. Kagan hired to

4    do.  He was hired to build two luxury homes, and he did that.

5          The operating agreement does not cap construction at

6    anything.  The evidence is that he agreed in accordance with

7    the plans.  Mr. Filippov approved the plans, the construction

8    plans -- the contracts that were signed for construction, all

9    are open-ended; that was the deal.  And he delivered on that

10   deal.

11         The evidence will show that as expenses were

12   incurred, Mr. Filippov not only got copies of the checks from

13   us, he also had set up the bank account, was getting monthly

14   copies of all checks and bank statements, so he knew every

15   penny that was being spent on this project and sat back and

16   was content.  Why?  Because he wasn't putting in any more

17   money, and he made that very clear.  He made it very clear

18   that if there are cost overruns, you cover them, I'm not

19   paying it, and we did.

20         It's very interesting to hear the argument about

21   ProEx and the costs.  ProEx had a contract.  ProEx charged a

22   lump-sum contract.  ProEx did not charge at cost.  The

23   materials -- it doesn't include labor, the QuickBooks wouldn't

24   have labor, it wouldn't have insurance, it wouldn't have all

25   these other things -- it's a snapshot of some materials, but

1    that wasn't the deal.  ProEx did the job it was hired to do,

2    and build in accordance with the proposal that will come into

3    evidence, and built no more than the proposal.

4         The evidence will also show that ProEx's services

5    that it provided was reasonable and, in fact, below market.

6    So what's happening here is that the plaintiffs got what they

7    bargained for and simply don't want to pay for it.  They want

8    a free ride.  They want all the benefit without any of the

9    financial obligations.

10        Your Honor, the carrying costs -- I'm glad Mr.

11   Carnathan brought that up -- the agreement does say that after

12   twenty-three months it will be Mr. Kagan's responsibilities to

13   pay the carrying costs.  What Mr. Carnathan neglected to

14   mention to the Court is the agreement also says that for the

15   first twenty-three months it's Lyman-Cutler's responsibility.

16        Lyman-Cutler didn't have the money to pay these so

17   every month Mr. Kagan, through KDC, paid the carrying costs.

18   You will see evidence -- you will see emails that every month

19   there is a request from the Filippov side saying we need more

20   money, put more money in, and he complied, and he put money in

21   that technically he shouldn't have.

22        THE COURT:  Who?

23        MR. PERTEN:  Mr. Kagan, through KDC, was putting

24   money in every month to cover the carrying costs because the

25   LLC didn't have the money.



1          THE COURT:  That's the pre-twenty-three in the --

2          MR. PERTEN:  Pre-twenty-three.

3          MR. CARNATHAN:  -- in the first twenty-three months.

4          MR. PERTEN:  Correct.  He then continued it

5   afterwards.

6          Now the operating agreement also says in that section

7   8.1 that Mr. Carnathan directed the Court to, that yes it

8   says, after twenty-three months, it's Kagan's sole

9   responsibility.  Well, certainly if you give him credit for

10  the first twenty-three months he'd already, if you will,

11  that's twenty-three months in the bank, so to speak.

12         But what it also says, it contemplates -- it

13  expressly contemplates -- that there may come a time when Mr.

14  Kagan no longer pays it -- and it says, "in the event that Mr.

15  Kagan does not pay, then it shall be Mr. Filippov's

16  responsibility".  So it expressly -- in that operating

17  agreement, expressly contemplated the possibility that Mr.

18  Kagan wouldn't pay, and if he didn't, that it became Mr.

19  Filippov's responsibility.

20         And there was a -- assuming it was Mr. Kagan's -- it

21  was a penalty, if you will, that if Mr. Filippov has to step

22  up and pay, there's going to be a reduction in the capital

23  account.  So, far from being a breach, assuming he had any

24  obligation to pay at all if he gets no credit for the money

25  that he put in for the first twenty-three months.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1          Mr. Filippov had an obligation.  But what did Mr.

2     Filippov do?  There was a problem with the operating

3     agreement.  There were two clauses that he couldn't stand.

4          The first one was he was now on the hook for paying

5     carrying costs, and he didn't want to do it.  He had a

6     contractual obligation to pay it and he didn't want to do it.

7     That's a problem for him.

8          The second clause in the operating agreement that he

9     didn't like at all was the operating agreement says, "this LLC

10    will terminate on November 30th, 2015, and the properties will

11    be liquidated".  That's what it says.  It's in section 2.3 --

12    provides the term will be November 30th, 2015.

13         When Mr. Filippov set up this company, he lied under

14    pains and penalties of perjury to the Commonwealth of

15    Massachusetts, and filed an organizational document that says

16    there is no termination date there, this entity acts

17    indefinitely.

18         When he learned, or remembered, or was called on

19    that, through the May letter, and through letters from my

20    office that say, hey, we've got a deadline, we are willing to

21    extend it if you want to talk, but we have a deadline.  He

22    didn't want that either.  Why didn't he want that?  Because he

23    knew that if the LLC was dissolved that would be an event of

24    default under the loans.  He had guaranteed the loans, or a

25    portion of the loans.



1              So he was --

2              THE COURT:  When was the date on which the LLC -- you

3      say by -- in the operating agreement?

4              MR. PERTEN:  Yes.

5              THE COURT:  What was the date?

6              MR. PERTEN:  November 30th, 2015.

7              THE COURT:  Okay.

8              MR. PERTEN:  November 30th, 2015 --

9              THE COURT:  All right.

10             MR. PERTEN:  -- that's in section 2.3 of the

11     operating agreement.

12             THE COURT:  Right.  Okay.

13             MR. PERTEN:  So Mr. Filippov was concerned that he

14     might get stuck personally if this liquidated, and he was

15     concerned that he had personally agreed to pay carrying costs

16     in the event that Mr. Kagan did.  And in fact, he had invoked

17     that very clause.

18             So what does he do?  Without taking a vote, without

19     calling a member meeting, without doing anything, he

20     immediately files suit, and when the suit isn't resolved

21     immediately and that November 30th date is coming up, he files

22     for bankruptcy.  Once again, without calling a member meeting,

23     without calling a vote, he does it because -- and he testifies

24     at his deposition the reason I did this is I didn't want this

25     company to dissolve because I was afraid if it was dissolved,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    my guarantee might be called.  If he is the managing member as

2    he professes to be, that is a patent violation of his

3    fiduciary duty, he put his personal interests ahead.

4         And the evidence will also be that at the time he

5    filed suit, and I would suggest the evidence will show

6    inclusive up to today, he had no evidence of fraud.  This is

7    all one big invention.  This is all one big leverage, power

8    claim by a majority shareholder to try and get a minority

9    shareholder to capitulate.

10        Mr. Kagan had ten percent.  Mr. Lipetsker and Mr.

11   Filippov collectively have ninety percent of the voting

12   rights.  They could do whatever they wanted because we could

13   do nothing to stop them from a voting perspective.

14        This is a classic majority freeze out.  This is a

15   classic attempt to abuse the litigation process to force

16   somebody to capitulate, even though legally he has no

17   obligation to capitulate whatsoever.

18        Your Honor, at the end of the day, what you will see

19   is that the plaintiffs knew what was happening, they approved

20   what was happening, there was contemporaneous evidence that

21   they knew what was happening, they were content to sit back --

22   they didn't care because they had visions of dollars in their

23   eyes -- and buried their head in the sand, and now suddenly

24   profess innocence.  And that innocence, I would submit, the

25   evidence simply does not support.

1          The evidence does not support there was any guarantee

2    to build this at any current price or fixed price.  It's not

3    in the operating agreement.  It's not in the construction

4    contracts.  And in fact, Your Honor, you'll see that there

5    are, if you will, competing construction contracts.  There

6    were two different construction contracts, one signed by Mr.

7    Filippov.  That's not a fixed price contract either; it's

8    open-ended.  So that $1.3 million figure you're going to hear

9    about extensively, it's in none of the operative documents.

10   It's in none of the contracts.  That was never the deal.  Mr.

11   Kagan did what he was supposed to do, and they're trying to

12   get a free ride.

13         So at the end of the day, where does that leave us?

14   Mr. Kagan has submitted -- excuse me -- well, through KDC --

15   KDC has submitted, seeking to recover the amount of costs that

16   it incurred to build this home which weren't covered by the

17   construction loans, which it paid out of pocket and it's

18   entitled to do that.  That was the parties' deal.  There's

19   roughly $578,000 of hard out-of-pocket construction costs.  No

20   matter how you slice and dice it, these are monies that were

21   spent to get the desired result of this LLC to build the

22   houses.

23         The balance of the money due are, if you will, it was

24   a cost-plus contract.  It's the plus part.  It's the soft

25   costs that for supervision and the like.  You will see that

1   Mr. Kagan, as required under the operating agreement, did not

2   charge for his time.

3        They knew that KDC was doing the work, absolutely.

4   They knew that there had to be a general contractor,

5   somebody -- there had to be a company managing the subs.  They

6   knew that all along and that general contractor, KDC, is

7   entitled to be paid.

8        So the proof of claim, I would submit, is fairly

9   straightforward, and the experts will establish unequivocally

10  that the final amount that was charged, with the full

11  knowledge of the plaintiff, was well below what it would have

12  cost at a market rate had this gone out commercially, if you

13  will, by a developer -- significantly below.  He brought it in

14  way cheaper than had you just hired a developer on the street.

15  So they got what they bargained for.  That's the proof of

16  claim.

17       The adversary complaint, Your Honor, as I indicated

18  at the top, you will not hear evidence of damages that --

19  compensable damages suffered by them.  But in contrast, you

20  will hear evidence of compensable damages suffered by us.  You

21  will hear evidence that they refused to honor their

22  obligations under the operating agreement and under the

23  contract.

24       You will hear evidence that they conspired to prevent

25  Tatiana from getting her commission -- and were successful in

1    preventing her from getting her commission, which was part of

2    the bargain.

3           You will hear a patent breach of fiduciary duty by

4    Mr. Filippov.

5           What I ask, Your Honor -- and I know Your Honor will

6    do this -- but I would underscore for Your Honor is this is

7    D-Day -- this is the time.  For four years we've been hearing

8    Mr. Kagan is a crook, he should be locked up.  We've been

9    hearing very, very strong allegations.  This is the time for

10   them to either put up or not.  And I'm going to suggest to

11   this Court, the evidence does not support that.  It's a bunch

12   of allegations; it's a bunch of mud -- throw something out

13   there and hopefully something will stick.  And that's what

14   this case is about.

15          The evidence will be that there's been three and a

16   half million dollars sitting in a bank account for three years

17   because the plaintiffs are trying to use their majority

18   position to prevent Mr. Kagan from getting what he's entitled

19   to, and his company.

20          Thank you, Your Honor.

21          THE COURT:  Thank you.  Okay.  Anything else before

22   we start with the evidence.

23          MR. CARNATHAN:  We're ready to call our first

24   witness, Your Honor.

25          THE COURT:  Okay.  Go ahead.



1          MR. CARNATHAN:  The plaintiffs call Alex Filippov.

2          THE CLERK:  Please raise your right hand.

3                        ALEX FILIPPOV SWORN

4          THE CLERK:  Okay.  Please be seated.

5          THE COURT:  Good morning, Mr. Filippov.

6          THE WITNESS:  Good morning, Your Honor.

7          THE COURT:  I think you may have been around here

8    enough, maybe not, to know that we record -- that's what we're

9    doing with these microphones.  There's a microphone right in

10   front of you.  It's very important that -- you can sit

11   comfortably, but project into the microphone.  You'll hear it

12   amplify your voice the way my voice is now being amplified,

13   and then you'll know we're getting it.

14         But if you turn your head away, and my experience is

15   that witnesses sometimes turn their head away at just the

16   wrong moment, then we don't have your testimony recorded and

17   it won't turn up in the transcript, or it will be garbled.

18         So you can pull that microphone back and forth if you

19   want to sit back, feel comfortable, but please try to make

20   sure you project into the microphone.  Okay?

21         THE WITNESS:  Okay.

22         THE COURT:  All right.  Thank you.  And we have

23   agreed to breaks.  We're going to have a break at 11 this

24   morning.  If you need a break for any other reasons then you

25   just give us the hi sign, and I'll tell it to every witness,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    we'll take it that way.

2           I'll exercise some discretion with that.  I don't

3    want you to break in the middle of a question, if you

4    understand what I mean?

5           THE WITNESS:  Yep.

6           THE COURT:  Okay.  All right.

7           MR. CARNATHAN:  Thank you, Your Honor.

8                       DIRECT EXAMINATION

9    BY MR. CARNATHAN:

10        Q.   Would you state your Name, Mr. Filippov?

11   A.   My name is Alexander Filippov.

12        Q.   What do you do for work, sir?

13   A.   I'm running a company, a telecommunication company,

14   small -- small business.

15        Q.   For how long have you been running a telecom

16   company?

17   A.   Since 1994.

18        Q.   Have you ever worked in the construction industry,

19   sir?

20   A.   No.

21        Q.   Are you married?

22   A.   Yes.

23        Q.   For how long have you been married?

24   A.   Over thirty years.

25        Q.   Do you have children?



ALEXANDER FILIPPOV - Direct

1   A.   Yes, I do.

2        Q.   How many?

3   A.   One.

4        Q.   How old is he?

5   A.   He is forty years old.

6        Q.   Could you just briefly describe your education?

7   A.   I graduated from high school in -- back then it was

8   Leningrad, Russia, Soviet Union.  Then I graduated from the

9   University of Communications, got a master degree over there.

10  That was in 1978.  And that was my education.

11       Q.   Were you born in Russia, sir?

12  A.   Yes.

13       Q.   What year did you immigrate to the U.S.?

14  A.   1989.

15       Q.   So is Russian your first language?

16  A.   Yes.

17       Q.   Who's Nickolay Lipetsker?

18  A.   Nickolay Lipetsker is a friend of mine that I met while

19  immigrating to this country in 1989.

20       Q.   Ah.  So he was also born in Russia?

21  A.   Yes.

22       Q.   Yeah.  Who's Boris Maiden?

23  A.   Boris Maiden is an attorney in Russian community I've

24  known.

25       Q.   Is he also Russian born?



ALEXANDER FILIPPOV - Direct

1   A.   Yes.

2        Q.   What about Dmitriy Zhukovskiy?

3   A.   He is a nephew of Mr. Lipetsker wife, and he was born in

4   Russia.  He came here, I believe, 1994.  I don't remember

5   exactly.

6        Q.   And Mr. Kagan was born in Russia too, correct?

7   A.   As far as I know.

8        Q.   How did the potential to invest in the Lyman-Cutler

9   project first come to your attention?

10  A.   Mr. Lipetsker approached me, and it was a social event --

11  social party -- and he said that he is involved in the project

12  with a contractor, a developer, and it looks like it's

13  profitable, and they are looking for an investor to invest

14  money in another project.  And he asked if I would be

15  interested.  And --

16       Q.   What did you tell him?

17  A.   -- and I said sure, I can take a look.  It might be

18  interesting.  I was looking for a -- an investment at this

19  time, so -- and he told me many good things about the

20  developer, Mr. Kagan.  He said that he's honest, that he's

21  very professional, and he is able to do projects at

22  significantly lower costs than other contractors do.  And that

23  was the reason why he was working with Mr. Kagan basically.

24       Q.   About when did that happen?

25  A.   That was told at a social event.  He just, kind of, gave

ALEXANDER FILIPPOV - Direct

1    me the introduction and told me, why don't we, you know, meet

2    with Kagan.

3        Q.   What was the next thing that you did to investigate

4    the potential to invest in the Lyman-Cutler project?

5    A.   Then it was -- the meeting was arranged in the office of

6    Attorney Maiden in Brookline.

7        Q.   Did you know Mr. Maiden before that meeting?

8    A.   I had known him.  We were not close, but I known Mr.

9    Maiden, yes.

10       Q.   When was the meeting at Mr. Maiden's office?

11   A.   That was September 2012.

12       Q.   Just to refresh your recollection, sir, was it

13   actually October 2012?

14   A.   Well, October.  I apologize -- maybe, yeah.

15       Q.   Who attended that meeting?

16   A.   At that meeting was Mr. Lipetsker, Mr. Kagan, Mr.

17   Zhukovskiy, Mr. Maiden, and myself.

18       Q.   What language did you speak during that meeting?

19   A.   Russian.

20       Q.   Who did you think, or what did you think Mr.

21   Maiden's role was at that meeting?

22   A.   I assumed that he is an attorney for Mr. Kagan.

23       Q.   Did that ever change during the formation of

24   Lyman-Cutler; did you ever get any information to the

25   contrary?



ALEXANDER FILIPPOV - Direct

1    A.    No.

2         Q.    Who invited you to the meeting?

3    A.    I don't remember now.

4         Q.    Do you remember about how long the meeting lasted?

5    A.    It lasted for one and -- one hour, one and a half, around

6    this time.

7         Q.    In general terms, what was the substance of the

8    discussion at the meeting?

9    A.    The substance was Mr. Kagan and Mr. Zhukovskiy brought

10   materials to review.  These materials were a folder with

11   prospects of houses that Kagan built in the past, projects,

12   built houses, being sold -- houses being in the project, and

13   it also had Excel file presentation containing three or four

14   worksheets with numbers for this particular project.

15        MR. CARNATHAN:  Mr. Hartzell, could I have Exhibit 9

16   for identification on the screens?

17   BY MR. CARNATHAN:

18        Q.    Mr. Filippov, I've asked Mr. Hartzell to put on the

19   screen a document that we've marked as Plaintiffs' Trial

20   Exhibit number 9 for identification; do you recognize that

21   document, sir?

22   A.    Yes.

23        Q.    What is it?

24   A.    It's the copy of the file that had been presented at this

25   meeting, that Excel file -- it's actually it looks like PDF

ALEXANDER FILIPPOV - Direct

1    file.  And back then, I didn't see it on a computer, they just

2    did this particular printout.

3           MR. CARNATHAN:  Your Honor, the plaintiffs would

4    offer Trial Exhibit 9 for admission into evidence.

5           THE COURT:  Any objection?

6           MR. PERTEN:  No objection.

7           THE COURT:  No objection?  All right.  Just for

8    clarification, so I assume the yellow sticker on this that

9    says Exhibit 6, that's from a deposition?

10          MR. CARNATHAN:  Sorry.  Yes, Your Honor.  I'm sorry.

11          THE COURT:  Okay.  All right.  So these are not pre-

12   marked?

13          MR. CARNATHAN:  We did ours in the upper right

14   corners in red.  Hopefully it shows up on your screen.  We

15   used a computer program to mark them.

16          THE COURT:  Yeah.  It's pre-marked stamped -- it's

17   stamped with that --

18          MR. CARNATHAN:  That's correct, Your Honor.

19          THE COURT:  -- with that designation.  Okay.  All

20   right.

21          MR. CARNATHAN:  My apologies --

22          THE COURT:  So proposed Exhibit 9 then is admitted --

23          MR. CARNATHAN:  Thank you, Your Honor.

24          THE COURT:  -- with no objection, again.

25          PLAINTIFFS' EXHIBIT 9 WAS ADMITTED INTO EVIDENCE



(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    BY MR. CARNATHAN:

2        Q.   Okay.  So the front of the document bears the date

3    October 25th, 2012; does that sound like the right date for

4    this meeting?

5    A.    Yes.

6        Q.   And who presented this to you at the meeting, sir?

7    A.    Mr. Zhukovskiy.

8        Q.   And as best you can recall, who said what to whom

9    about this presentation during the meeting.

10        MR. PERTEN:  Objection, Your Honor.  I mean, if he's

11   going to testify about what Mr. Zhukovskiy told him, that's

12   hearsay.

13        MR. CARNATHAN:  Well, the fact of the statement's the

14   fact of evidentiary significance here, Your Honor.  It

15   doesn't, but --

16        THE COURT:  Overruled.

17   BY MR. CARNATHAN:

18        Q.   You may testify, sir.  What did Mr. Zhukovskiy say

19   about this presentation, to the best of your recollection

20   during the October 25, 2012 meeting?

21   A.    Mr. Zhukovskiy said that this is the file that's showing,

22   basically, financial plan -- planning of this particular

23   project.  It showed the budget.  It showed the cost --

24   carrying costs that were required to do this.  It showed the

25   plan.  It was just on the previous stage, a plan on the

ALEXANDER FILIPPOV - Direct

1    property that were meant to be bought.

2         This house on the property of 77 Lyman was to be raised.

3    This lot was supposed to be divided into two pieces, and two

4    new luxury homes -- similar homes, same design -- are going to

5    be built.

6         And then on the next page --

7         Q.   Let me stop you there.

8    A.   Yeah.

9         Q.   What about Mr. Kagan, what do you recall Mr. Kagan

10   saying during the presentation?

11   A.   Well, that was the presentation about lots and division,

12   et cetera.  That was by Mr. Kagan.  At this point I don't --

13   exactly can't say who said what because it was six years ago.

14   But basically, the presentation was done by specifics of the

15   project of the -- by the -- Mr. Kagan and everything that was,

16   you know, related to numbers was shared between Kagan and

17   Zhukovskiy.

18        Q.   All right.  If we look at the second page of Trial

19   Exhibit 9, which Mr. Hartzell has on the screen -- oh, it just

20   changed.  Sorry.  Did they explain to you what this map is, or

21   this -- I don't know if map's the right word -- did they

22   explain to you what this is?

23   A.   Yeah.  This is the lot that Kagan said that he has

24   negotiated to be purchased at 77 Lyman.  This lot is

25   approximately one acre, and it was -- it would be divided into

ALEXANDER FILIPPOV - Direct

1   two lots, and on each of them, a part of the newly divided lot

2   is going to be built two luxury homes, very similar --

3   identical design basically.  He said that will allow us to

4   save tremendous amount of money because it's the same design.

5        It was going to increase the speed of the whole process

6   and he said that he already arranged with the owner --

7   previous owner of the -- of the property -- to apply for

8   historical -- let me get back.

9        In Brookline, there is a necessity to -- to give one

10  year --

11       Q.   Well, let me stop you there and try to just --

12  A.   Okay.

13       Q.   -- put a little context on it.  So he told you he

14  already had some sort of a permit application; is that right?

15  A.   It -- it wasn't permit application, but he convinced the

16  original owner to apply for demolition of the house

17  beforehand, so he --

18       Q.   And what was the significance of that as Mr. Kagan

19  described to you at that meeting?

20  A.   He said that it's -- if we -- it takes one year before

21  the permit to demolish the house can be achieved.  So that

22  means that by the time we form the LLC and get the

23  construction loans and second loans, et cetera, the house will

24  be ready to start building and demolish by March basically --

25  by March 2015.



ALEXANDER FILIPPOV - Direct

1    Q.   So if we turn now to the third page of Trial Exhibit

2    number 9, what if anything do you recall Mr. Kagan saying

3    about the numbers presented on page 3 of Trial Exhibit 9?

4    A.   Well, that's -- on this particular page, he presented

5    with the construction budget, he presented with the carrying

6    costs, $200,000 in construction budget, one million -- $1.3

7    million.  He presented --

8    Q.   If we pause there for a moment, what did Mr. Kagan

9    say during the October 25, 2012 meeting about the construction

10   budget?

11   A.   He said that this is the maximum budget that we'll -- we

12   will need to build the houses.  Basically, he said it's more

13   than sufficient, most probably there's going to some leftovers

14   that will stay in the company, but $1.3 million is more than

15   enough to build these houses altogether.

16   Q.   I'm sorry, sir.  Were you finished with your answer?

17   A.   Yes.

18   Q.   What did Mr. Kagan tell you, if anything, during

19   this October 25 meeting about the carrying costs?

20   A.   He said that the carrying costs is going to be taken as

21   part of the mortgage, that a separate -- well, basically the

22   budget that he will produce to the bank will be inflated to --

23   slightly -- for $200,000 that we will be using as the carrying

24   costs on the project.

25       He said that this is the common practice, this is how

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1   it's used, every developer does it, his other project had been

2   using the same tactics.  This is the funding that you can get

3   from the bank to pay for the carrying costs.

4       Q.   Was Mr. Maiden present during this discussion?

5   A.   Yes.

6       Q.   Was there any concern expressed by anybody at the

7   meeting about whether this was a proper practice?

8   A.   No.

9       Q.   Just so I don't forget, when is the first time you

10  ever heard from anyone, at any time, that there was any

11  problem with borrowing the carrying costs as part of the

12  construction loan?

13  A.   At the litigation, when Mr. Kagan and Attorney Perten

14  voiced this objection saying that we didn't have any right to

15  do this.

16      Q.   If we turn to the next -- I'm sorry, we're, I guess

17  two pages in to page 5 of Trial Exhibit number 9.  Mr.

18  Hartzell has a slice of it up on the screen now.  Was there

19  any discussion of this construction loan distribution schedule

20  during the meeting?

21  A.   Yes.  Yeah.  This particular budget, it is already

22  inflated for 1.5 million -- or for this extra $200,000.  And

23  if you see at the bottom, the total budget here is listed as

24  $1.5 million rather than $1.3 million.

25      And there is still confusion see --

ALEXANDER FILIPPOV - Direct

1          MR. CARNATHAN:  Is it possible to get the dates in?

2          MR. HARTZELL:  I'm sorry?

3          MR. CARNATHAN:  If you expand it, is it possible to

4     get the dates in?  Oh, I see.

5     A.    -- there is still confusion see, and hold that occupancy

6     permit for $75,000 that's kind of cushioned, just -- just in

7     case, but basically this money should have been left

8     untouched.

9     BY MR. CARNATHAN:

10         Q.   So when you looked at this, and looked at the

11    numbers and the distributions dates; what were you thinking?

12    What did you conclude from reviewing this?

13    A.    Well, based on this, the project should be done by

14    January 17th, 2014.  This is the -- the last distribution of

15    the loan, basically, $45,000 landscaping, two percent of

16    debt -- one percent.  This is where the project should be

17    almost done, and the March target that we put in the agreement

18    was more than sufficient basically.

19         Kagan said it's going to be running very fast.  It's two

20    houses.  They are the same.  One single lot.  This is where

21    we're going to be by January 17th.

22         Q.   Was there any discussion at the October 25, 2012

23    meeting -- excuse me -- of potential risks in the project?

24    A.    Yes.

25         Q.   What sort of risks did you discuss during this

ALEXANDER FILIPPOV - Direct

1    October 25 meeting?

2    A.    There were two risks that have been discussed.  It was

3    a -- all this concern of the -- about the time we needed to

4    sell the property, we didn't know exactly how -- how quickly

5    the properties will sell, so the longer the period, the more

6    carrying costs involved.

7        And the -- the second concern was the actual price.  At

8    the beginning, Kagan said that it's going to be $4.9 million.

9    This was the target price to sell these houses, and all the

10   profit calculation and everything in this particular Excel

11   file were based on this target sales prices, $4.9 million, and

12   target project of month that will require for the project to

13   go and get sold.  And this table in particular, shows the

14   variations and --

15       Q.    So just to -- we're now on page 7 of Trial Exhibit

16   9.  Was this table shown to you during this meeting?

17   A.    Yes.

18       Q.    Is that your handwriting on that?  And is --

19   A.    Yes, and it's the telephone of Mr. Kagan because this was

20   the first time I asked Mr. Kagan telephone number, put it

21   down.

22       Q.    So that down the left hand column is the sales

23   price, is one variable; is that right?

24   A.    Yes.

25       Q.    And across the top, another variable is the project

ALEXANDER FILIPPOV - Direct

1    time line in months, correct?

2    A.    That's correct.  This table doesn't have any variable for

3    the construction costs.  It is not here because construction

4    costs, he said this is what going to cost.

5         Q.    Did you ask about that?

6    A.    Yes.

7         Q.    Okay.  And what did Mr. Kagan tell you about why

8    that was not a variable on the table?

9    A.    Because he said I'm extremely experienced builder, I know

10   how much it costs.  This amount of money that I'm asking for

11   the construction costs is more than enough; we are going to

12   have some -- some money left after this.

13        Q.    Back at this October 25, 2012 meeting, what did you

14   understand Mr. Zhukovskiy's role was?

15   A.    I -- I was absolutely positive that Mr. Kagan hired

16   Zhukovskiy to prepare this Excel file because Mr. Zhukovskiy

17   is financial professional.  He knows extremely well about, you

18   know, dealing with Microsoft Excel, and he knows how to deal

19   with financial numbers.  So that was the idea.

20        Q.    How much did Mr. Kagan ask you to invest?

21   A.    He first asked me to invest $2.2 million, I believe.

22        Q.    And how did you respond?

23   A.    I -- I refused to invest $2.2 million.  I said the

24   maximum I can do is $2 million.  That's my recollection.

25        Q.    Did you come to any kind of agreement during the

ALEXANDER FILIPPOV - Direct

1   October 25 meeting?

2   A.   No.

3   Q.   After the October 25 meeting concluded, what was the

4   next thing you did with regard to the potential investment in

5   the Lyman-Cutler project?

6   A.   After this meeting, I asked Mr. Kagan to show me more of

7   his projects, what projects he has done, what are being --

8   what projects are being done, and Mr. Kagan gave me and my

9   wife, Irina, a tour around Newton and Brookline.

10   Q.   About how many houses did he show you?

11   A.   Oh, he probably showed at least seven or eight houses --

12   houses that he has already built, that's being built, he had

13   showed the location of this particular property of where the

14   project was going to be, he had drove me around, brought --

15   brought to Mr. Kraft property, saying this is the most

16   desirable property.  This is exactly why these houses are

17   going to be sold that quickly for that amount of money because

18   everybody wants to be in this particular neighborhood of

19   Brookline.

20   Q.   And was it just one tour, or did you go on more than

21   one tour?

22   A.   It was -- it was two tours.

23   Q.   During the tours, was there any further discussion

24   of the carrying costs?

25   A.   No, it wasn't a discussion about carrying costs, it

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    was  -- I asked again about the budgets, and he said, look, I

2    got this under control.  I know how to build it.  I build it

3    extremely efficient.  It's going to be done.

4         Q.   So after you went on the tours, what was the next

5    thing you did?

6    A.   I Googled what I could do about Kagan, didn't find

7    anything suspicious, and then I asked Mr. Maiden to send the

8    operating agreement so I can review what was being agreed

9    upon.  But basically I -- at this point I said, yeah, I'm

10   considering it, and if -- if we agree with a deal then we can

11   go ahead.

12        MR. CARNATHAN:  Mr. Hartzell, could I have Exhibit 10

13   in evidence, please?

14   BY MR. CARNATHAN:

15        Q.   So Mr. Filippov, I've had Mr. Hartzell put Exhibit

16   10, which is in evidence, up on the screen.  And this is an

17   email from you dated October 29th to

18   kagandevelopment@gmail.com; whose email address is that?

19   A.   It's Mr. Kagan's email.

20        Q.   All right.  And also, to Mr. Maiden and Mr.

21   Lipetsker, correct?

22   A.   Right.  That's correct.

23        Q.   And to avoid belaboring the entire exhibit, I'll

24   skip to the second paragraph.  You say, "I as an investor, do

25   not have control over the actual construction schedule nor I

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1   have control over the time needed to sell the property" -- and

2   I realize there's odd typos there -- "both issues depend

3   mostly on the managing partner and on the broker.  Both

4   functions are in your hands."

5        Have I read that correctly?

6   A.   Yes.

7        Q.   At that time, who was contemplated to the managing

8   partner?

9   A.   At this time, I thought that Mr. Kagan was going to be

10  the managing partner.

11       Q.   And then you say, "There's also a cost of keeping

12  2.4 million invested beyond the planned project completion.  I

13  most definitely would be able to invest the money at five

14  percent or more."

15       Have I read that correctly?

16  A.   Yes.

17       Q.   Where's the 2.4 million come from?

18  A.   I -- $2.4 million, I -- I don't remember in this

19  particular case, maybe -- maybe the -- I don't remember why

20  it's 2.4 in this particular email.

21       Q.   Okay.  You then make a suggestion, and I'll try to

22  collapse it with the permission of all involved, that if

23  everything goes as planned, and in twenty months both

24  properties are sold for 4.9 million or more, then there's no

25  change in the profit-sharing.  But then you propose that if it

ALEXANDER FILIPPOV - Direct

1   takes longer, there will be a change in the profit-sharing,

2   fair enough?

3   A.    Yes.

4       Q.    And in fact, the last two pages of the exhibit give

5   a schedule which shows the profit-sharing changing, right?

6   A.    Yes.

7       Q.    Why is it you were so focused on the time, the

8   twenty months?

9   A.    Because if the project is going to go for longer, the

10  profit goes down and -- and the deal is becoming not

11  interesting to -- basically.

12      The reason you invest -- it is a risk investment.  To

13  invest $2 million in something, and don't count on a -- on a

14  good profit doesn't make sense.  So I really wanted to make

15  sure that it's -- it's a deal that makes sense to me.

16      So twenty month -- at twenty month, it was projected to

17  have a profit of twenty percent and that was kind of mark that

18  I was planning for.

19      Q.    So in the same email, you also propose down below

20  that if there's a construction delay, then the carrying costs

21  would be paid one hundred percent by the managing partner, and

22  then in other circumstances the carrying costs would be split

23  fifty-fifty, fair enough?

24  A.    Yes.

25      Q.    What kind of response did you get?  How did the

ALEXANDER FILIPPOV - Direct

1    parties in this case respond to your concerns?

2    A.   Well, we started negotiating this -- this price with Mr.

3    Maiden, I believe.  That's what happened.

4         MR. CARNATHAN:  Mr. Hartzell, can I have Trial

5    Exhibit number 11 in evidence, please?

6    BY MR. CARNATHAN:

7         Q.   Mr. Filippov, do you know whose handwriting that is

8    in the upper-right corner?

9    A.   I think it's Mr. Maiden.

10        Q.   All right, so is this one of the drafts of the

11   operating agreement that was circulated?

12   A.   Yes.

13        Q.   Do you remember how many drafts were circulated?

14   A.   Maybe four or five.

15        Q.   Okay.  And so this one, apparently by the writing on

16   there, was circulated, or drafted, on 10/30 at 12:30 p.m.,

17   fair enough?

18   A.   Yes.

19        Q.   Okay.

20        MR. PERTEN:  Your Honor --

21        THE COURT:  Yes.

22        MR. PERTEN:  -- I just want the record to be clear.

23   I think that handwriting is my handwriting from the

24   deposition.

25        MR. CARNATHAN:  I don't think so.



ALEXANDER FILIPPOV - Direct

1          MR. PERTEN:  I know so.  I mean, if you look at the

2     transcript, just so you know, because there were multiple

3     copies -- versions -- that we were trying to identify.  In

4     fact, Mr. Calandrelli objected at the deposition when I put

5     that on there.

6          MR. CARNATHAN:  If we're mistaken -- we thought we

7     got this out of the (indiscernible) --

8          THE COURT REPORTER:  Excuse me, Your Honor.  Can you

9     have him --

10          THE COURT:  Yeah.  Microphone.

11          MR. CARNATHAN:  I'm sorry.

12          THE COURT:  If you're going to have this colloquy,

13     it's fine.

14          Counsel has made his statement, your witness can use

15     his best recollection, and then he will be subject to cross-

16     examination on it.

17          MR. CARNATHAN:  All right.  And if we're wrong about

18     that, I still think this is the right time and date on the

19     exhibit.

20     BY MR. CARNATHAN:

21     Q.   So Mr. Filippov, I'm interested in the ninth page of

22     Trial Exhibit 11.  And so in this draft, the provision states

23     that "in the event the property is not sold within twenty

24     months from the date of acquisition, that Mr. Kagan shall be

25     responsible for all carrying costs until such time as the

ALEXANDER FILIPPOV - Direct

1    property is sold".

2        Have I read that correctly?

3    A.    Yes.

4        Q.    And if we look at section 8.2 just below it, it

5    provides, "the distribution to members shall be in accordance

6    with their respective capital contributions first, plus five

7    percent per annum on their respective capital contribution for

8    each day that the property is not sold after twenty months of

9    acquisition".

10        Have I read that correctly?

11   A.    Yes.

12       Q.    And then to Mr. Alex Filippov, forty percent, Mr.

13   Nickolay Lipetsker, ten percent, and Mr. Kagan, fifty percent,

14   correct?

15   A.    Yes.

16       Q.    Okay.  So apparently your suggestion to modify the

17   profits based on the schedule did not get accepted?

18   A.    Right.

19       Q.    But some accommodation was made on the carrying

20   costs, right?

21   A.    Yes.

22       Q.    If I could draw your attention briefly to page 5,

23   please?  At this point in the drafting process, paragraph 5.2

24   just says admission of members, correct?

25   A.    Correct.



ALEXANDER FILIPPOV - Direct

1    Q.   And if we look at page 6 -- next page -- and we look

2    at 6.1(b), it ends at 5, right?  There's no 6.1(b)(6) at this

3    point?

4    A.   Right.

5    Q.   And if we look at page 12, at this point in the

6    process the operating agreement identifies Mr. Kagan as the

7    managing manager, right?

8    A.   Correct.

9         MR. CARNATHAN:  If I could have Trial Exhibit 12 in

10   evidence, please?

11   BY MR. CARNATHAN:

12   Q.   So if we look at Trial Exhibit 12, this is an email

13   from you to Mr. Maiden, Mr. Kagan, and Mr. Lipetsker on

14   October 30th, 2012 at 3:30 p.m., right?

15   A.   Yes.

16   Q.   So that's a few hours after the little handwritten

17   date that we saw on Exhibit 11?

18   A.   Yes.

19   Q.   And so in Exhibit 12 in that first paragraph -- I'll

20   just skip to the last sentence -- last two -- "Mr. Kagan is

21   taking care of the carrying costs until properties are sold.

22   What will happen if for some reason the carrying cost is not

23   going to get paid?"

24        Have I read that correct?

25   A.   Yes.



ALEXANDER FILIPPOV - Direct

1    Q.   And in the same email, if we go down to the last --

2    yeah, okay we're there -- I'm looking at the paragraph just

3    above, we need to make this clear now so we do not get to it

4    later -- it says, "What funds are going to be used to pay the

5    five percent in case it was over a twenty-month period?  How

6    is it going got affect the profit shares?"

7        Have I read that correctly?

8    A.   Yes.

9        Q.   I'd now like to go to Exhibit 15 in evidence.  And

10   we are going to page 9, please.  Perhaps I skipped too

11   quickly, but Exhibit 15 in evidence is the actual signed LLC

12   agreement.  And I think we agree, it went through some

13   additional drafts in between Exhibit 11 and Exhibit 15, fair

14   enough?

15   A.   Yes.

16       Q.   So by the time we get to the final version, in

17   paragraph 8.1, it says, "If Mr. Kagan fails to pay monthly

18   carrying costs, then Mr. Filippov shall be responsible to

19   contribute the necessary carrying costs, and subsequently his

20   capital contribution and percentage interest in the company

21   shall increase by the same amount and percentage, and at the

22   same time, will trigger a reduction of Mr. Kagan's share of

23   capital contribution by the same amount, and subsequently his

24   higher percentage interest in the company."

25       Have I read that correctly?



ALEXANDER FILIPPOV - Direct

1    A.   Yes.

2         Q.   So was that added to the agreement in response to

3    your concerns or for some other reason?

4    A.   Correct.

5         Q.   If we turn to page 10, section 8.2, by the final

6    agreement specifically says, "The distribution to members

7    shall be in accordance with their respective capital

8    contribution first.  However, an additional five percent per

9    annum based upon members' respective capital contributions

10   shall be paid out of Mr. Kagan's net profit" for each share --

11   excuse me -- "net profit share, for each day that the property

12   is not sold after twenty-three months of the acquisition."

13        Have I read that correctly?

14   A.   Yes.

15        Q.   Was that also added in response to your concerns?

16   A.   Correct.

17        Q.   Now in the draft we were looking at in Exhibit 11,

18   it was twenty months, right?

19   A.   Yes.

20        Q.   And in 15 it's twenty-three months.  How did it

21   happen to get from twenty to twenty-three months; do you

22   recall?

23   A.   Well, I asked for twenty month and that was negotiated,

24   and they said that -- we agreed to twenty-three months

25   basically.  That was negotiated.



ALEXANDER FILIPPOV - Direct

1    Q.    And what was the deal for the first twenty-three

2   months?  Where were the carrying costs coming for the first

3   twenty-three months?

4   A.    And for the first twenty-three months the carrying costs

5   would be coming out of the loan, out of the construction loan

6   that we'd taken with Rock -- Rockland Trust Bank.

7        MR. CARNATHAN:  If I may next have Trial Exhibit 13,

8   please?

9   BY MR. CARNATHAN:

10   Q.    Trial Exhibit 13 is another email.  This one's dated

11  October 31, 2012 at 11:25 a.m. from you -- excuse me -- to

12  Maiden, Lipetsker, and Kagan, and you say, "I will need to

13  work with my attorney on this"; do you see that?

14  A.    Yes.

15   Q.    Did you have counsel?

16  A.    Yes.

17   Q.    Who was that?

18  A.    That was Mark Watson.  That was a real estate attorney I

19  used in -- previously, when I was purchasing the property in

20  Belmont.

21   Q.    And you say, "I just realized that I'm going to be

22  over ninety percent investor in this deal, including mortgage

23  and will have very little say in the LLC.  My voice must be

24  the loudest voice here."

25        Have I read that correctly?



ALEXANDER FILIPPOV - Direct

1   A.   Yes.

2        Q.   How did you arrive at the idea that you were going

3   to be the ninety percent investor?

4   A.   Well, I'm putting $2 million and I'm taking them $5

5   million mortgage.  So it's totaled $7 million.  It's more than

6   ninety percent of the total costs -- total investment.

7        Q.   Was anything done to address your concern expressed

8   in Trial Exhibit 13?

9   A.   Yes.  Hold on.  Just let me get concentrated on this.

10  Yeah, the result I was -- the managing -- managing member of

11  the LLC was changed to my name because I -- I wanted to have

12  full control.  It was my biggest risk.

13       MR. CARNATHAN:  So Mr. Hartzell, could I have the

14  page 13 of Trial Exhibit 15 in evidence?

15  BY MR. CARNATHAN:

16       Q.   And so in the final signed version they changed you

17  to managing manager where previously it had been Mr. Kagan,

18  right?

19  A.   Yes.

20       MR. CARNATHAN:  If I may next have Trial Exhibit 14

21  in evidence, please?

22  BY MR. CARNATHAN:

23       Q.   And I'm looking at the third page, and in

24  particular, I'm looking at this email, November 3rd, 2012 at

25  11:23 from you to Mr. Maiden; do you see that?



ALEXANDER FILIPPOV - Direct

1    A.   Yes.

2         Q.   Do you recall why you sent this to just Mr. Maiden,

3    rather than all three?

4    A.   I don't remember why.

5         Q.   If we look on page 2 toward the top, we can see from

6    the email chain that the email was eventually forwarded to the

7    group, right?

8    A.   Right.  Apparently I -- I sent email and then I realized

9    that everybody else should see the same email.  It was just an

10   error.

11        Q.   Well it's Mr. Maiden forwarding it.

12   A.   Well -- or Mr. Maiden forwarded it, yes.

13        Q.   If we could go back to page 3, please?  And in this

14   email, you say "Borya" -- that's a nickname for Mr. Maiden?

15   A.   Yes.  It's a nickname for Boris, yes.

16        Q.   Okay.  You say, "I just realized that the agreement

17   is missing a very important piece.  The piece missing is the

18   role of the investor Kagan.  We have described his investment

19   part in his profit.  What is not described here at all is the

20   reason why his profit part is fifty percent at all.  While I

21   understand that this is not going to happen, technically based

22   on the language of this agreement, Dima can say, I'm going to

23   have nothing to do with the development, find a developer who

24   will do the whole thing, and then when it is all done my share

25   if fifty percent."

ALEXANDER FILIPPOV - Direct

1        Have I read that correctly?

2    A.   Yes.

3        Q.   Was any change made to the agreement based on your

4    expressed concern there?

5    A.   Yes.  The result of the agreement was specified the role

6    of Kagan on this project.

7        Q.   So if we return to Exhibit 15 in evidence, paragraph

8    5.2 on page 4, by the time the final version came out there

9    was a new paragraph 5.2 called duties of members, right?

10   A.   Yes.

11       Q.   And that one says, "it shall be Mr. Kagan's duty and

12   obligation to construct two homes at the location currently

13   known as 77 Lyman Road" --

14           UNIDENTIFIED SPEAKER:  (Indiscernible).

15           THE COURT:  Yeah.  Microphone.  Just bring it with

16   you, if you want to --

17           MR. CARNATHAN:  My apologies.

18           THE COURT:  -- just pull it over.

19           MR. CARNATHAN:  Okay.

20   BY MR. CARNATHAN:

21       Q.   At the location currently known as 77 --

22           THE COURT:  Would you start that again?

23           MR. CARNATHAN:  Certainly, Your Honor.

24   BY MR. CARNATHAN:

25       Q.   "It shall be Mr. Kagan's duty and obligation to

ALEXANDER FILIPPOV - Direct

1   construct two homes at the location currently known as 77

2   Lyman Road in Brookline, Massachusetts in according with plans

3   including drawings supplied by Mr. Kagan and approved by

4   managing member.  The construction shall be substantially

5   completed no later than March 30, 2014.  It is specifically

6   understood by all members that Mr. Kagan's compensation for

7   this duty is outlined in section 8.1 below."

8        Have I read that correctly?

9   A.   Yes.

10        Q.   Now, if we look back at Exhibit 14, that same

11   paragraph, you say, "the reason Kolya" -- is that Mr.

12   Lipetsker?

13   A.   Yes.

14        Q.   "And I agreed to the deal was that Dima" -- is that

15   Mr. Kagan?

16   A.   Yes.

17        Q.   "Is going to take care of all parts of the process,

18   buying lots, creating project docs, building the property.

19   None of it is mentioned in the agreement.  This needs to be

20   corrected."

21        Did you understand that section 5.2 corrected that

22   problem?

23   A.   Yes.

24        Q.   You next say, "also the calculations and stages

25   prepared by Dima, Excel files, should be part of this

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    agreement as an addendum.  The docs might need to be tweaked

2    to reflect changes in the numbers."

3    A.    Yes.

4         Q.    Have I read that correctly?

5    A.    Correct.

6         Q.    Was the Excel file ever attached to the contract as

7    an addendum?

8    A.    It wasn't attached as an addendum, but the text of the

9    agreement was changed including what plans, which meaning

10   financial plans, because the only drawing that Mr. Kagan

11   provided at this point was a drawing of the lot with the old

12   house.  It wasn't any plans actually, for the new house, as

13   far as I remember.  So the plans were these financial plans

14   and that drawing that he put in.

15        MR. CARNATHAN:  If we return to Exhibit 15 in

16   evidence, please Mr. Hartzell, on page 6?

17   BY MR. CARNATHAN:

18        Q.    I'm looking now at that bottom, 6.1(b)(6), by the

19   final agreement.  It says, "The managing member hereby agrees

20   to list the properties with Tatiana Kagan."

21        How did that provision come to be in the operating

22   agreement?

23   A.    Mr. Kagan requested this to be part of the agreement.

24        Q.    It then goes on to say, "In order to remove Tatiana

25   Kagan as listing broker by December 31, 2014 will require a

ALEXANDER FILIPPOV - Direct

1    written consent of the members owning at least eighty-one

2    percent of the" -- then spills on to page 7 -- "percentage

3    interest in the company.  After December 31, 2014, no such

4    consent shall be required."

5        How did that part of 6.1(b)(6) come to be in the

6    agreement?

7    A.   I negotiated this specifically.  My concern was if the

8    broker is not able to sell houses, that means I should be able

9    to take the houses in my own hands, find a capable broker, and

10   sell the houses.  That was my concern, and it was an email, I

11   believe, or some other conversation on this subject that

12   caused to put this particular paragraph into the agreement.

13       Q.   At the time that you signed this agreement, how much

14   of the membership interest did you personally hold?

15   A.   Eighty percent.

16       Q.   How much did Mr. Lipetsker hold?

17   A.   Ten percent.

18       Q.   And how much did Mr. Kagan hold?

19   A.   Ten percent.

20       Q.   And that's on page 14 of the agreement?

21   A.   Yes.

22       Q.   Was there any negotiation over that date, the

23   December 31, 2014 date?

24   A.   I'm sorry, say that again?

25       Q.   I'm looking back at paragraph 6.1(b)(6) again, where

ALEXANDER FILIPPOV - Direct

1   it says that after December 31, 2014, no vote -- no such

2   consent is required for the managing member to remove --

3   A.    Right.

4       Q.    -- Ms. Kagan.

5   A.    I believe originally they wanted to have it longer,

6   bigger period -- more time -- and I requested that it be

7   shorter period.

8       Q.    What was your reasoning behind requesting the

9   shorter period?

10   A.    Because I was concerned that the profit is not going, or

11   that the project is not going to be sold, and that my concern

12   was that we will need to sell it if Tatiana Kagan is not

13   capable of doing this much quicker.  Because at the time, I

14   believe originally they wanted, like, thirty months, or

15   something; that was too long.

16       MR. CARNATHAN:  If I could have page 3 on Exhibit 15

17   in evidence, please?

18   BY MR. CARNATHAN:

19       Q.    So Mr. Filippov, I'm now interested in paragraph

20   4.1, just to stitch out the carrying cost issue.  The

21   operating agreement specifically says, "Purchase money loan

22   and construction loan shall be taken from Rockland Trust

23   Company" -- sorry about the little paragraph.  Great.

24       "Purchase money loan and construction loan shall be taken

25   from Rockland Trust Company to pay for construction and

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    carrying costs until the issuance of certificates of

2    occupancy, but in no event for more than twenty-three months

3    from the date of acquisition."

4         Have I read that correctly?

5    A.   Yes.

6         Q.   When you arranged for the construction loans, did

7    you understand you were borrowing money for the carrying

8    costs?

9    A.   Yes.

10         MR. CARNATHAN:  Could I have Exhibit 16 in evidence,

11   please Mr. Hartzell?  And maybe show Mr. Filippov the second

12   page as well?  Okay.

13   BY MR. CARNATHAN:

14         Q.   Do you recognize Exhibit 16, Mr. Filippov?

15         MR. CARNATHAN:  You can give him the first page back.

16   A.   Yeah.  It's a certificate of organization.  Yes, sure.

17   BY MR. CARNATHAN:

18         Q.   Sure.  And you signed that as the managing member

19   of --

20   A.   Yes.

21         Q.   Lyman-Cutler?  Who asked you to sign it?

22   A.   Mr. Maiden.

23         Q.   Did Mr. Maiden tell you what the purpose to it was?

24   A.   Oh, the certificate?

25         Q.   Yes.



ALEXANDER FILIPPOV - Direct

1    A.    Oh, I knew what a certificate.  It's not the first LLC

2    that I formed in my life so I know that to have a company you

3    have to file the certificate with the Commonwealth of

4    Massachusetts.

5         Q.    All right.

6              MR. CARNATHAN:  Could I just have Exhibit 17 in

7    evidence, please?

8    BY MR. CARNATHAN:

9         Q.    Who filed materials with the Secretary of the

10   Commonwealth to form the LLC, Mr. Filippov?

11   A.    Attorney Miden -- Maiden.

12             MR. CARNATHAN:  May I have next Exhibit 18 in

13   evidence, please?

14   BY MR. CARNATHAN:

15        Q.    So Mr. Filippov, you arranged for the loan to buy

16   the lot, correct?

17   A.    Yes.

18        Q.    Where did you go for the closing?

19   A.    To Attorney Maiden office.

20        Q.    Who attended the closing?

21   A.    As far as I recall, it was Attorney Maiden, Mr. Kagan,

22   Mr. Lipetsker.

23        Q.    Who was the closing attorney for the bank?

24   A.    Mr. Maiden.

25             MR. CARNATHAN:  If I could just briefly have Exhibit

ALEXANDER FILIPPOV - Direct

1    20 in evidence, please?

2    BY MR. CARNATHAN:

3        Q.   So when did you sign Exhibit 20 in evidence, Mr.

4    Filippov?

5    A.   Looks like -- the date is dated here, December 2012.

6        Q.   Right.  Was that --

7    A.   28th -- December 28th.  Yes.

8        Q.   -- that was at the closing for the purchase of the

9    lot?

10   A.   Correct, yes.

11       Q.   Mr. Kagan was there at the time?

12   A.   Yes, he was at the time and there is his signature on the

13   document.

14       Q.   And you signed this as the manager of the LLC,

15   right?

16   A.   Correct.

17           MR. CARNATHAN:  If I could have Exhibit 19 in

18   evidence, please?

19   BY MR. CARNATHAN:

20       Q.   And just briefly, this is the deed by which the LLC

21   acquired the parcel to build the project on, right?

22   A.   Correct.

23       Q.   And in the upper right, it was recorded at the

24   Registry of Deeds on 12/31/2012, correct?

25   A.   Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    Q.   All right.  After you acquired the lot, what's the

2    next thing that happened on the Lyman-Cutler project?

3    A.   It was a quiet period.  We were waiting for the permits

4    to be obtained.  We expected them to be update -- obtained by

5    March 11th, as far as I remember, but we didn't get that.  Mr.

6    Kagan said that there are some issues with town of Brookline,

7    so the permits, I believe, were obtained somewhere at the end

8    of May.

9    Q.   Okay.

10   A.   May or beginning of June.

11        MR. CARNATHAN:  If I could have Exhibit 21 in

12   evidence, please?

13   BY MR. CARNATHAN:

14   Q.   Mr. Filippov, Exhibit 21 in evidence is an email

15   exchange among you and Mr. Maiden, Mr. Kagan, John McGregor,

16   and Nickolay Lipetsker; do you see that?

17   A.   Yes.

18   Q.   Who is John McGregor?

19   A.   John MacGregor was a representative from Rockland Trust

20   Bank who basically signed off on the mortgage -- on the

21   construction loan.

22   Q.   Okay.  And there's a cc in the email underneath your

23   name.  It says, "cc Lyman-CutlerLLCgmail.com" (sic); do you

24   see that?

25   A.   Yes.



ALEXANDER FILIPPOV - Direct

1      Q.    Whose email is that?

2    A.    That email I created specifically for the company to

3    operate, and I put the four people on the distribution list.

4    It was Mr. Kagan, it was Mr. Lipetsker, it was my wife, Irina,

5    and it was myself.  So four people were getting emails every

6    time when the email would be sent Lyman-CutlerLLC@gmail.com.

7      Q.    Okay.  And so on February 19th, 2013, Mr. McGregor

8    emails you and says that he'll need two sets of construction

9    plans and budgets; that's for the loan right?

10   A.    Yes.  Construction loan.

11     Q.    For the construction loans?

12   A.    Yes.

13     Q.    And then when we go to the next email up, about

14   seven minutes later, you forward that to Dima; is that Mr.

15   Kagan?

16   A.    Yes.

17     Q.    You say it is in your hands, right?

18   A.    Correct.

19     Q.    And he says, working on the plans that he needs more

20   time?

21   A.    Correct, because coming back to the original

22   presentation, there were not any plans.  Plans came back later

23   when there were construction loans were needed to be

24   appraised.

25     Q.    Well, what plans did you have at this point?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    A.    We didn't have plans.  It was a plan to build two luxury

2    homes.  That's it -- and the drawing of the house, of the lot

3    and the house on it that needs to be divided.

4         Q.    How long did it take Mr. Kagan to come up with the

5    plans for the bank?

6    A.    I think it didn't take long.  I don't remember at this

7    time.

8              MR. CARNATHAN:  Mr. Hartzell, can I have Plaintiffs'

9    Exhibit 22 in evidence?

10   BY MR. CARNATHAN:

11        Q.    So Plaintiffs' Exhibit 22, I believe is a text

12   message from you to Mr. Kagan April 6th; is that right?

13   A.    Yes.

14        Q.    You say, "Dima just want you to keep in mind that

15   there was 20K left in the bank.  I will not be adding anything

16   to this as an investment."

17        Have I read that correctly?

18   A.    Yes.

19        Q.    So what's going on here on April 6th, 2013 that

20   leads to this text?

21   A.    At this point, the money that being left of -- do -- to

22   do the carrying costs to pay for the mortgage, for the

23   interest of the first loan, to pay taxes, et cetera, they

24   dried up on the account.  And because originally we planned

25   that the construction will start in March, and that will bring

ALEXANDER FILIPPOV - Direct

1    new money for the carrying costs, it didn't happen.  And by

2    April 6th, we got $20,000 left to -- to deal with the carrying

3    costs.

4         Q.   And so if we look at Exhibit 23 in evidence, you

5    sent a similar --

6              MR. CARNATHAN:  If I can have the second page,

7    please?

8    BY MR. CARNATHAN:

9         Q.   -- a similar email that same day to Lipetsker,

10   Kagan, and Maiden, and you say, "there's 20K left in the bank,

11   and we have new payments due coming shortly.  Under no

12   circumstance will I be adding any new investment money to this

13   project.  If there's no money left, we will have to sell the

14   land and take the loss.  I just wanted you to know this."

15        Have I read that correctly?

16   A.   Yes.

17        Q.   And if we go back to the first page toward the top,

18   Mr. Kagan proposes a meeting at Maiden's office on April 9th

19   at 4 p.m., right?

20   A.   Correct.

21        Q.   Yeah.  What happened at that meeting?

22   A.   It's hard for me to remember at this time, but I believe

23   by this time he presented the plans for the two new houses for

24   us to review, and I also believe at this time he asked for

25   additional $100,000 for the construction.



(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1     Q.   What discussion about that additional $100,000 took

2  place at that April 9th meeting, to the best of your

3  recollection?

4  A.   As -- as far as I remember, he has suggested that we can

5  build actually even more -- better houses over them because --

6  and sell for more, for better price, five and a quarter

7  million dollars and what will -- all it will take is by

8  changing slightly the finishing of the house and would take

9  $100,000 more in construction costs per house.

10     Q.   Did you agree with that at the April 9th meeting?

11  A.   With -- yeah.  We had a conversation with Nick, and

12  decided to agree to this.  Yes, we agreed to this in

13  particular.

14     There is very important idea that again, the construction

15  loan is not lump sum money that you get.  It's distribution of

16  money based on the need.  And the fact that we're applying for

17  a bigger loan, doesn't mean that we are going to be using the

18  whole amount of money that we're applying for.

19     Q.   So let me show you Exhibit 24 in evidence.  And so

20  in Exhibit 24 in evidence, it appears that the very next day,

21  Mr. Kagan submits plans to the bank, right?

22  A.   Yes.

23     MR. CARNATHAN:  If I could next have Exhibit 27 for

24  identification?

25  BY MR. CARNATHAN:

ALEXANDER FILIPPOV - Direct

1      Q.    This one's a packet.  I don't know if you need to

2    see the whole packet, but do you recognize Exhibit 27 for

3    identification?

4    A.    Yes.  This is the budget that Mr. Kagan submitted to the

5    bank for the loan.  Basically we submitted it.  Yeah, he

6    submitted it, but it was on behalf of the LLC.  Yeah.

7      Q.    Okay.

8           MR. CARNATHAN:  We would offer Plaintiffs' Exhibit 27

9    for identification.

10          MR. PERTEN:  For identification, sure.

11          MR. CARNATHAN:  Well, offering it --

12          THE COURT:  Well --

13          MR. CARNATHAN:  -- into evidence.  I'm --

14          THE COURT:  -- he's offering in evidence now, I

15   assume.

16          MR. PERTEN:  Your Honor, my only objection is this is

17   a multi-page document with many documents attached to it.

18   We've only -- so I can't agree to everything because I don't

19   know what he's going to say about the rest of it.

20          THE COURT:  Well --

21          MR. CARNATHAN:  Well, we can certainly go page by

22   page.  May I approach and show him my copy, maybe that's

23   faster than going screen by screen?  Is that --

24          THE COURT:  Absolutely you can do that.  Do you want

25   time to get your paper out?  Go ahead.

ALEXANDER FILIPPOV - Direct

1          MR. CARNATHAN:  If it's smoother, we can just do the

2     screen.  I just thought this would be faster.

3          THE COURT:  No, that's all right.  Yeah, just

4     remember that we can't -- you're not being recorded if you

5     speak from there, so hold one second.

6          Mr. Perten, let us know when you're ready for the

7     question.

8                              (Pause)

9          MR. PERTEN:  Your Honor, I don't have any objection

10    to the construction budget that I think Mr. Carnathan -- it's

11    probably the only document he cares about.

12          But to the extent that many of the other documents

13    have handwritten notations, and I candidly don't know who put

14    those there, it's not Mr. Kagan's handwriting.  That's my

15    objection.

16          There is building permits, there's notes, so --

17          MR. CARNATHAN:  It's true that we really only care

18    about the first two pages.  I'd be happy to offer the first

19    two pages of Exhibit 27 and tear off the rest.

20          THE COURT:  That's up to you.  If that obviates the

21    need for the objection, then it can go in as amended by you.

22          So the first two pages will go in as Exhibit 27 in

23    evidence.

24          PLAINTIFFS' EXHIBIT 27 AS AMENDED BY PLAINTIFFS WAS

25                    ADMITTED INTO EVIDENCE



ALEXANDER FILIPPOV - Direct

1          MR. CARNATHAN:  Thank you, Your Honor.

2     BY MR. CARNATHAN:

3          Q.   So just to clean up the record a bit, what do you

4     understand the first two pages of Exhibit 27 that just went

5     into evidence to be, Mr. Filippov?

6     A.    These are budgets for both houses to be built.  They have

7     XX because at this time, the street address wasn't known.   It

8     wasn't assigned, the lots hadn't been divided, and so XX Lyman

9     Road will become 55 Lyman Road.  And the second file XX will

10    become 88 Cutler Road.

11         Q.   Did you, as managing member, approve this budget for

12    the construction?

13    A.    Yes.

14         MR. CARNATHAN:  May I have Exhibit 26?

15         THE COURT:  Did you say 26?

16         MR. CARNATHAN:  Yes, thank you.  I'm just trying to

17    see if this one's objected to; it is.  This is 26 for

18    identification.

19    BY MR. CARNATHAN:

20         Q.   Mr. Filippov, do you recognize Exhibit 26 for

21    identification?

22    A.    Yes.

23         Q.   All right.  This is an email from you to the

24    Lyman-Cutler email address plus Mr. Maiden on April 13th at

25    3:04 p.m., right?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    A.    This is correct.  All members of the LLC plus Mr. Maiden

2    got this email.

3          Q.    All right.

4          MR. CARNATHAN:  We would offer Plaintiffs' Exhibit 26

5    into evidence.

6          MR. PERTEN:  Your Honor, we have an objection to this

7    exhibit.  Mr. Filippov can certainly talk about what he said,

8    or what he agreed to, but to the extent that this purports to

9    say what other people agreed to, that's rank hearsay.

10          THE COURT:  All right.  Hold on.  Let's see --

11          MR. CARNATHAN:  This is another one, Your Honor,

12    where the fact of the statement has independent evidentiary

13    significance because he's talking about that they've

14    apparently talked about the 1.6 million a couple days before.

15    He's coming back and saying, hey guys, we really think we

16    should stick to the 1.5.

17          I mean the fact that he is saying that to the Lyman-

18    Cutler Gmail account, which we've established includes Kagan,

19    Lipetsker, Filippov, and Irina, his wife, that is significant

20    aside from any truth of the matter involved.

21          THE COURT:  Okay.  So you're saying it's not hearsay

22    because it's not offered for the truth of the matter.  Is

23    that --

24          MR. CARNATHAN:  Right.  It's offered for the fact of

25    the statement.  It's important that he said this back on April

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1   13th, 2013.

2          THE COURT:  Okay.

3          MR. PERTEN:  To the extent it's being offered to

4   prove that this was said by the other people, it's hearsay.

5          THE COURT:  Yeah.  I don't see the distinction that

6   you're trying to draw.  However, it doesn't -- I'm going to

7   allow it.  You can cross-examine on it, and because the issue

8   seems to be what nonparties may have contributed to this

9   discussion.  But unless someone can straighten me out on this,

10  that's not very -- it's not clear to me on the face of the

11  document.  Do you understand what I'm saying?

12         Your objection is that -- Mr. Perten, your objection

13  is that it's hearsay because there are out-of-court statements

14  that are implicit in this; is that right -- that are by

15  someone other than a party?

16         MR. PERTEN:  Correct, Your Honor.  Kolya, Borya, and

17  I is Lipetsker, Maiden, and Filippov; it's not Kagan.

18         THE COURT:  Right.

19         MR. PERTEN:  And I discussed, and all of us agreed --

20  we agreed we did this, we did that; that's all hearsay.  What

21  we agreed to, what we said at the meeting, what -- each of

22  them can testify if they want to, but Mr. Filippov can't say

23  what everybody else agreed to.  I mean, he can't get inside

24  their heads.

25         I think this is just -- this is exactly what the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    hearsay rule is to prevent.

2           THE COURT:  All right.  I'm going to overrule that

3    objection.  It's admitted.  You can cross-examine, put on

4    whatever evidence you want --

5           MR. CARNATHAN:  Thank you, Your Honor.

6           THE COURT:  -- concerning the agreement.

7         PLAINTIFFS' EXHIBIT 26 WAS ADMITTED INTO EVIDENCE

8    BY MR. CARNATHAN:

9       Q.   So in the email you say to Dima -- again that's Mr.

10   Kagan?

11   A.   Yes.

12      Q.   "Kolya, Borya, and I discussed the issue of how much

13   we should loan from the bank.  All three of us agree that we

14   should be going by the numbers we agreed when we formed the

15   LLC, and apply for 1.5 million for each house:  1.3 million

16   construction, and .2 million carrying costs.  We already

17   strayed from the agreement when we took out 1.6 million loan

18   for land instead of 1.5 million as we agreed to, so let us try

19   to stay the course of the original deal."

20      Have I read that correctly?

21   A.   Yes.

22      Q.   What did Mr. Kagan do in response; how did he

23   respond?

24   A.   Oh, I -- I don't remember now.

25      Q.   Was there further discussion after April 13th about

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1   whether or not to take a $1.6 million loan against the land --

2   excuse me, for the construction costs?

3   A.   Just let me concentrate on this.  Yeah, that's -- I don't

4   remember exactly the timing, when it was -- it was April 15th

5   when we added this $100,000 for the -- to improve the value of

6   the house, but --

7          MR. CARNATHAN:  So just very quickly -- if I could

8   have 28 in evidence?

9   BY MR. CARNATHAN:

10         Q.   So Exhibit 28 in evidence is one of the April 17th,

11   2013 appraisals by the bank, right?

12   A.   Yes.

13         Q.   And these appraisals were done to support the

14   application for the construction loans?

15   A.   Correct.

16         Q.   And on the third page, the bottom left, the bank

17   appraised both properties at 5.3 million as built, right?

18   A.   Correct.

19         MR. CARNATHAN:  And so if we move ahead now, to

20   Exhibit 30 in evidence, please?

21   BY MR. CARNATHAN:

22         Q.   On April 30, you write to Mr. McGregor and say,

23   "After reviewing an appraisal we received from Rockland Trust,

24   Lyman-Cutler is going to ask for construction loans of 1.6

25   million per each house.  We are developing 3.2 million in

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1   total."

2        Have I read that correctly?

3   A.   Yes.

4        Q.   And again, that includes the Lyman-Cutler Gmail on

5   the cc, right?

6   A.   Yes.

7        Q.   And Mr. Maiden?

8   A.   Yes.

9            THE COURT:  I'm sorry.  What exhibit is that, 20 --

10           MR. CARNATHAN:  I'm sorry.  That was Exhibit 30 in

11   evidence, Your Honor.

12           THE COURT:  Exhibit 30.  Okay.  Thank you.

13           MR. CARNATHAN:  May I have 31, please?

14           THE COURT:  When you have a logical point, we'll take

15   a break.

16           MR. CARNATHAN:  This is fine.  Actually, the next

17   stretch I have to kind of do an extended --

18           THE COURT:  That's fine --

19           MR. CARNATHAN:  -- yep.  Okay.

20           THE COURT:  -- if you know this is the right moment.

21   Fifteen minutes?  Okay?

22           MR. CARNATHAN:  Perfect.  Thank you, Your Honor.

23           THE COURT:  All right.  We'll be in recess for

24   fifteen minutes.  Thank you.

25               (Off the record at 11:02:43 a.m.)



ALEXANDER FILIPPOV - Direct

1          (On the record at 11:24:47 a.m.)

2          THE COURT:  Please be seated.  Proceed.

3          MR. CARNATHAN:  Thank you, Your Honor.

4          THE COURT:  Thank you.

5                    RESUMED DIRECT EXAMINATION

6     BY MR. CARNATHAN:

7          Q.   So Mr. Filippov, when we left off, we had just

8     looked at Exhibit 30, where you told Mr. McGregor that you

9     were going to ask for construction loans of 1.6 million per

10    house, right?

11    A.   Correct.

12          MR. CARNATHAN:  Could I have Exhibit 31 in evidence,

13    please?

14    BY MR. CARNATHAN:

15         Q.   So in Exhibit 31, we are looking at the May 4th,

16    2013 email from you to the group, this time including Mr.

17    Zhukovskiy.  Why did you include Mr. Zhukovskiy on this?

18    A.   Because Mr. Zhukovskiy was a guy who helped Mr. Kagan to

19    build this Excel presentation, and he knew the calculations

20    and how Excel file formula was populated, and how it -- it --

21    the whole calculation, he knew better that anybody else.  Yes.

22         Q.   All right.  And so now we're at May 4th, 2013, a few

23    days after the email to McGregor.  And you say, "Dima K." --

24    that again is Mr. Kagan?

25    A.   Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1      Q.   "I am reviewing the original plan presented in

2   Excel.  Here is what was planned.  Original construction cost

3   was estimated at 1.3 million, original carrying cost loan was

4   estimated 200,000, original loan amount for land was planned

5   to be 750K, original construction loan was planned to be 1.5

6   million, sales price 4.9 million, annualized return".

7      You then say, "Here is where we are today, still at the

8   beginning of the project, construction costs as I understood

9   you, 1.4 million, carrying costs calculated 275,000, loan

10   amount for the land 800K, construction loan we are applying

11   for is 1.6 million, sales price 5.25 million, annualized

12   return, forty-one percent."

13      If we go to the next page, you say, "However, as you see,

14   1.6 million is not enough to carry us through the project.  We

15   are at least 16K short for each home.  This means that we need

16   to borrow 1.65 million for the construction of each home,

17   300,000 more than we originally planned.  As to the return,

18   there's hardly any gain for this."

19      Have I read that correctly?

20   A.   Yes.

21      Q.   How did you resolve the concern about the $16,000

22   you calculated that the project was short per home?

23   A.   Well, that's the reason I sent this.  I included Mr.

24   Zhukovskiy who -- with whom we continued that conversation

25   over email, and he explained to me that I -- I was making an



ALEXANDER FILIPPOV - Direct

1  error in my assumption and calculation, and counted taxes

2  twice in these particular calculations, and he told me that

3  we -- that the carrying cost is going to be below $200,000.

4         MR. CARNATHAN:  So if I could have Exhibit 32 in

5  evidence, please?

6  BY MR. CARNATHAN:

7         Q.   So this is an email from Mr. Zhukovskiy to you, Mr.

8  Lipetsker, Mr. Maiden, and Mr. Kagan, where he points out that

9  there's an overstatement of tax liability in the analysis,

10 correct?

11 A.   Correct.

12        Q.   And he says down in the second paragraph, "If you

13 think the project timing got extended to twenty-three months,

14 the estimated carrying cost is $219,804, instead of 252,836.

15 If we stick with the original estimate of twenty month, the

16 estimated carrying cost is 182,202."

17        Have I read that correctly?

18 A.   Yes.

19        Q.   And so what did you decide after reviewing Mr.

20 Zhukovskiy's calculations?

21 A.   I decided that borrowing $1.6 million for construction

22 loan would be sufficient to cover everything.

23        MR. CARNATHAN:  Could I briefly have Exhibit 89 in

24 evidence?

25 BY MR. CARNATHAN:



ALEXANDER FILIPPOV - Direct

1      Q.    This one's a May 5th email from you to Mr.

2    Lipetsker, right?

3    A.    Yes.

4      Q.    And this one's in Russian.  I can't pretend to read

5    it.  Can you tell us what the Russian part says?

6    A.    Yes.  This is a question addressed to Mr. Lipetsker.  Who

7    is paying Dmitriy, Dima -- which is Zhukovskiy -- for his

8    services, if it's not a secret -- because at this time, I

9    still didn't know who hired him, and I assumed that was Mr.

10   Kagan obviously, because he built out this presentation for

11   Mr. Kagan that took significant amount of work for Mr.

12   Zhukovskiy, I'm sure.

13     Q.    Okay.

14         MR. CARNATHAN:  There's one more thing I'd like to

15   look at on Exhibit 31, please?  And I'm looking at the third

16   page of Exhibit 31.  I think that's the fourth page.

17         MR. HARTZELL:  (Indiscernible).  The photo from the

18   display just doesn't work with it.

19         MR. CARNATHAN:  Oh yeah.  You're showing

20   (indiscernible).  Is there any way to get -- because it's just

21   not coming right, Bill?

22         MR. HARTZELL:  Which side can I blow up?

23         MR. CARNATHAN:  The upper right corner of page 3,

24   that's page 4.

25         MR. HARTZELL:  No, this is -- the display there is 3

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    and 4.

2              THE COURT:  Well, why don't you use paper?

3              MR. CARNATHAN:  Okay.  We are looking at Exhibit

4    31 --

5              THE COURT:  That's fine.  Hold on.

6              MR. CARNATHAN:  Unfortunately the paper though, the

7    print is so small you really can't see it.

8              THE COURT:  Oh, I see what you mean.  You'd like to

9    blow it up on the --

10             MR. CARNATHAN:  Exactly.  I actually use a magnifying

11   glass for the paper.

12             THE COURT:  I'm happy to use a magnifying glass.

13             This is 31, right?

14             MR. CARNATHAN:  31.

15             THE COURT:  I see.

16             MR. CARNATHAN:  There is no -- oh, he's got it.  All

17   right.  Good news.  Can you give me the table in the upper

18   right corner, Bill -- I'm sorry, Mr. Hartzell?

19             Okay.  We're back in business, Your Honor.  We've got

20   the proper piece of the exhibit up on the screen.

21             THE COURT:  All right.

22   BY MR. CARNATHAN:

23       Q.   Mr. Filippov, I'm looking at this portion of the

24   estimated project financials and risk analysis in Exhibit 31,

25   the section called profit allocation based on capital

ALEXANDER FILIPPOV - Direct

1   contribution and market costs; do you see that?

2   A.    Yes.

3       Q.    What's your understanding of what's being presented

4   in this table?

5   A.    Well, in this particular case, that was the -- that was

6   an exercise made by Zhukovskiy after showing me that if we

7   hire a third party contractor to do the whole project, and do

8   this without specific services of Mr. Kagan, what would it

9   cost us?  So this particular -- he put management fees line,

10  $200,000.  That's $200,000 if the fee that would -- we'd

11  contract the charge for -- for the job of building a house

12  that cost I -- you know, $5 million.  And that's -- that's

13  basic idea what it is here.

14      And he compares the option of having it built with Mr.

15  Kagan and without.  And the -- the result, we see that during

16  the project with Mr. Kagan will bring us extra $141,790 in

17  savings compared to if we hired a third party contractor to do

18  the job.

19      Q.    So in the top section where it says market cost of

20  construction and plugs in $200,000 in management fees, Mr.

21  Zhukovskiy is assuming that you would hire some third party

22  general contractor; is that right?

23  A.    Correct.  That's --

24          MR. PERTEN:  Objection, Your Honor.  How can he say

25  what Mr. Zhukovskiy is assuming?

ALEXANDER FILIPPOV - Direct

1          THE COURT:  Sustained.

2     BY MR. CARNATHAN:

3          Q.   Did you discuss this with Mr. Zhukovskiy?

4     A.   Yes, I did.

5          Q.   What did Mr. Zhukovskiy tell you about what the

6     $200,000 for management fees represented?

7          MR. PERTEN:  Objection, Your Honor.  It's hearsay.

8          MR. CARNATHAN:  Well, it's the fact of the statement,

9     Your Honor.  It goes to his state of mind in determining

10    whether to invest in the project or not.  He's deciding

11    whether to go forward with the $1.6 million budget.

12         Mr. Zhukovskiy is presenting this analysis to show

13    him that doing the deal with Kagan is a good deal, compared to

14    hiring somebody.

15         THE COURT:  All right.  I think it -- I mean that may

16    explain why he's doing it.  How is it that it's not an out --

17    it doesn't meet the definition of hearsay?

18         MR. CARNATHAN:  Because it's being offered for the

19    purpose of showing Mr. Filippov's thinking, the components

20    that went into his thinking in proceeding with this decision.

21         THE COURT:  So state of mind is an exception; is that

22    what --

23         MR. CARNATHAN:  Yes.

24         THE COURT:  -- you're relying on?

25         MR. CARNATHAN:  Yes, Your Honor.

ALEXANDER FILIPPOV - Direct

1            THE COURT:  Who is Zhukovskiy?

2            MR. CARNATHAN:  He's the fellow who put together the

3    presentation that we marked as Exhibit 9.  He put together the

4    spreadsheets that are here in Exhibit 31.  He'll be testifying

5    tomorrow, if all goes --

6            THE COURT:  Is he someone's agent?

7            MR. CARNATHAN:  I'm sorry?

8            THE COURT:  Is he someone's agent?

9            MR. PERTEN:  That's disputed.  He's --

10           MR. CARNATHAN:  Disputed.

11           MR. PERTEN:  -- Lipetsker's nephew.

12           MR. CARNATHAN:  Yeah.  Mr. Filippov has testified

13   that he didn't know who was paying him, but that he thought he

14   was working with Kagan.

15           I don't know what Kagan will say at this moment, but

16   Mr. Zhukovskiy will be on the stand tomorrow with any luck.

17   So I can put this in through Mr. Zhukovskiy too.

18           THE COURT:  Right.  Well, he can certainly tell us.

19   That's my expectation.

20           Well, without more foundation I don't think you've

21   made out the exception that you're pressing here.  So I'll

22   sustain the objection.

23           MR. CARNATHAN:  All right.  We'll rely on Mr.

24   Zhukovskiy for that piece.

25           All right.  If I could briefly have --



ALEXANDER FILIPPOV - Direct

 1  BY MR. CARNATHAN:

 2       Q.   Well, in any event, in May 2013, you went forward

 3  with the construction on this, correct?

 4  A.   Yes.

 5       Q.   And you arranged to borrow 1.6 million per home,

 6  right?

 7  A.   Yes.

 8       Q.   And what did you understand when you took out the

 9  loans, you were borrowing the money for?

10  A.   We were borrowing money to build two houses, and to pay

11  for construction loan, and that would be the total cost that

12  is required to -- to do the project.

13       Q.   What components went into the total cost of the

14  project?

15  A.   They are the construction costs, $1.4 million and

16  $200,000 in carrying costs.

17       Q.   When you closed the loan, where did you go for the

18  loan closing?

19  A.   Rockland Trust Bank.

20       Q.   And who acted as the closing attorney for Rockland

21  Trust?

22  A.   Attorney Maiden.

23            MR. CARNATHAN:  Could I have Exhibit 36 in evidence,

24  please?

25  BY MR. CARNATHAN:

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    Q.   Can you tell the Court what Exhibit 36 is, Mr.

2  Filippov?

3  A.   Yes.  This is the -- a part of the closing document on

4  the construction loan that was presented to me among, I don't

5  know, hundreds of other document that needed to be signed for

6  the mortgage.

7    And this is the -- a contract between Lyman-Cutler and

8  Classic Homes Development & Construction LLC, it's Kagan's

9  company.

10    And when I asked what this is all about at the signing, I

11  was told that this was just a formality because the bank does

12  require to have a contractor who is going to be working on

13  this project for them to issue the loan.

14    Q.   Who explained that to you?

15  A.   It was explained by Mr. Maiden and Mr. Kagan.

16        MR. CARNATHAN:  Could I have the third page of

17  Exhibit 26, please?

18  BY MR. CARNATHAN:

19    Q.   So was Mr. Kagan at the closing as well?

20  A.   Yes.

21    Q.   And so apparently the closing was June 18th, 2013?

22  A.   Yes.

23    Q.   And you both signed this contract at the closing,

24  right?

25  A.   Correct.



ALEXANDER FILIPPOV - Direct

1           MR. CARNATHAN:  May I have Exhibit 37 in evidence,

2      please?

3      BY MR. CARNATHAN:

4           Q.   So Exhibit 37 in evidence is the general -- excuse

5      me, construction management general contractor agreement dated

6      June 24th, 2013, by and between Lyman-Cutler LLC and Kagan

7      Development KDC Corp. that KDC relies on for the mechanic's

8      lien.

9           Mr. Filippov, when was the first time you ever laid eyes

10     on this contract that we've marked as Exhibit 37?

11     A.   That was after the litigation started, approximately July

12     2015.

13          Q.   At any time -- at any time had you ever talked to

14     Mr. Kagan about hiring KDC as a general contractor on this

15     project?

16     A.   No.

17          Q.   And again at any time had you ever talked to Mr.

18     Kagan about paying any fees to his company, KDC on this

19     project?

20     A.   No.

21          Q.   At any time did he ever ask you for permission to

22     sign a contract with KDC?

23     A.   No.

24          MR. CARNATHAN:  If I could have the seventh page of

25     Exhibit 37, please?

ALEXANDER FILIPPOV - Direct

1    BY MR. CARNATHAN:

2        Q.   Mr. Filippov, I'd just like to direct your attention

3    to 7.1.1 of Exhibit 37.  At any time did Mr. Kagan ever

4    mention to you the possibility of paying KDC a design fee of

5    $25,000?

6    A.   No.

7        Q.   Did he ever ask you for permission to do that?

8    A.   No.

9        Q.   Never came up at all?

10   A.   No.

11       Q.   If we look at 7.1.2, the construction phase fee of

12   fifteen percent, at any time did Mr. Kagan ever ask you if he

13   could pay KDC fifteen percent of a construction phase fee?

14   A.   No.

15       Q.   And that fifteen percent is based on the, at least

16   according to this, is based on the cost of work, right?

17   A.   Yes.

18       Q.   And so back in June 2013, you had approved a

19   construction budget of $1.4 million per house, right?

20   A.   Correct.

21       Q.   So a total of 2.8 million?

22   A.   Correct.

23       Q.   And so fifteen percent of that would have been

24   $420,000, right?

25   A.   Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    Q.   At any time did Mr. Kagan ever suggest to you or ask

2    you if Lyman-Cutler would pay KDC $420,000 as a construction

3    phase fee?

4    A.   No.

5    Q.   If we look at paragraph 7.1.3, the gist of that one

6    is that any of the funds that KDC advances are going to incur

7    a fee of seventeen and a half percent, fair enough?

8    A.   Yes.

9    Q.   At any time did Mr. Kagan ever ask you if KDC could

10   charge a fee of seventeen and a half percent on any funds it

11   advanced?

12   A.   No.

13   Q.   If we turn the page, next page I guess is page 8,

14   and I'm now looking at section 7.3.2.1, where it says that the

15   general office staff is going to be compensated at $75 an

16   hour; do you see that?

17   A.   Yes.

18   Q.   Did there ever come a moment at any time when Mr.

19   Kagan asked you if Lyman-Cutler would pay $75 an hour for his

20   general office staff?

21   A.   No.

22   Q.   Did anybody else, other than Mr. Kagan, anybody at

23   all, ever come to you and ask you about whether or not you

24   would pay fees to KDC on the Lyman-Cutler project?

25   A.   It's never discussed.



ALEXANDER FILIPPOV - Direct

1        MR. CARNATHAN:  While I'm thinking about it, Mr.

2   Hartzell, can I have Exhibit 129 for identification, please?

3        So this one -- this is one of the one's I

4   specifically am not offering into evidence, but I offer it

5   just to orient things.

6   BY MR. CARNATHAN:

7        Q.   Mr. Filippov, was there ever a moment at any time

8   when Mr. Kagan came and discussed with you paying fees to

9   ProExcavation on the Lyman-Cutler project?

10  A.   No.

11       Q.   When was the first time that you ever laid eyes on

12  any part of this proposal from ProExcavation?

13  A.   That was in the deposition of Mr. Kagan.

14       Q.   So after the litigation started?

15  A.   Long after the litigation, yes.

16       Q.   Did Mr. Kagan ever talk to you about whether KDC

17  could hire ProExcavation to do work on the project?

18  A.   No.

19       Q.   Did he ever talk to you about whether KDC could pay

20  ProExcavation money and then pass it through Lyman-Cutler?

21  A.   No.

22       Q.   Never?

23  A.   No.

24       Q.   Now you knew that KDC was doing something on the

25  project, right?

ALEXANDER FILIPPOV - Direct

1    A.    Yes.

2         Q.    What did you think it was doing?

3    A.    Well, the KDC was called was company of Kagan.  To me

4    Kagan and KDC are the same thing; there is no difference.  He

5    was doing the project.  He called it KDC, then it's KDC.  But

6    otherwise, it wasn't any separate from the contract with Kagan

7    doing his work.

8         Q.    All right.  And you were aware that ProExcavation

9    was doing something on the job, right?

10   A.    And the same with ProExcavation.  Similar, yes.

11        Q.    And you saw some checks issued to ProExcavation

12   along the way?

13   A.    Correct.

14        Q.    What did you think those were for?

15   A.    I thought that that was internal Kagan things, how he's

16   managing his job or finances.  It matters very little to me

17   because Kagan compensation was fifty percent of the profit,

18   period.  Nothing else.

19        Q.    So if we call up for a moment, Defendants' Exhibit

20   315 --

21             THE COURT:  Is this is in evidence or proposed?

22             MR. CARNATHAN:  I believe this is in evidence, right?

23   Yes, this one is in evidence, Your Honor.

24             THE COURT:  All right.

25             MR. CARNATHAN:  So I'm going to be brief on this one.

ALEXANDER FILIPPOV - Direct

1    I don't mean to make things hard.

2              Should I wait for Mary?

3              THE COURT:  No.  I think you can go ahead.

4              MR. CARNATHAN:  Yeah.  Okay.  Thank you, Your Honor.

5    BY MR. CARNATHAN:

6       Q.   So Exhibit 315 is a packet of checks, pictures of

7    checks, things that Mr. Kagan sent you during the project,

8    right?

9    A.   Yes.

10      Q.   Were the checks that he was sending you helpful to

11   you?

12   A.   To the extent that we could see the draw of the account

13   and make sure that the account is not depleted, yes.  To the

14   extent that we knew what -- what was happening, in terms of

15   project, probably not -- it just was checks.  It wasn't

16   invoices, it wasn't any sales receipt; it was just checks.

17      Q.   When you think about the period when construction

18   was underway, what period would you say the construction was

19   ongoing?

20   A.   I believe construction started somewhere in July 2013,

21   and was over completely by October 2015.

22      Q.   So if we think about that time period when

23   construction's underway, were you asking Mr. Kagan for

24   invoices and what not?

25   A.   Well, we specifically didn't ask for invoices because our

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1   understanding was that it doesn't matter.  It's all internal

2   matter of Mr. Kagan.  He is responsible for building this.

3   Here is his maximum budget, here is his maximum -- here --

4   here is his pay, and the only purpose of -- for this checks

5   was for us to keep the book of the LLC.

6       And when I'm saying book, to make sure that the account

7   is not overdrawn and our loans and the bank account is intact

8   and we have entries in the books about the amount being

9   dispersed.

10      Q.   So what were you keeping for books during the

11  project?

12  A.   We were keeping books during the project, entering all

13  these checks and making sure that the carrying cost is paid,

14  taxes are paid, interest rate is paid, and the account is not

15  overdrawn.

16      Q.   In your capacity as managing member during the

17  project, were there any other responsibilities you were

18  undertaking?

19  A.   Yes.  I was coming periodically to the site to see the

20  progress, making pictures of the progress, and I would ask

21  periodically Mr. Kagan how's things are going on, press -- and

22  would get a very convincing reply that everything is moving

23  smoothly, and we're on target, and everything is fine.

24      Q.   Were you also responsible for doing the tax returns?

25  A.   Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1     Q.   Okay.

2   A.   I was providing information to the accountant -- the

3   accounting firm that I hired for this, and they were providing

4   tax returns, yes.

5     Q.   So if we think about the period between when you

6   took out the loan at Rockland Bank for the $1.6 million and

7   May 7th, 2015, which is the date of the letter from Alexander

8   Pyle, which is in evidence as Exhibit 50, during that entire

9   time period was there ever a moment when Mr. Kagan asked you

10   to approve any cost overrun of any kind whatsoever?

11   A.   No, never.

12     Q.   During that same time period, from when you took out

13   the loan to when you got that May 7th, 2015 letter, was there

14   ever a moment where Mr. Kagan came to you and said he wanted

15   to upgrade anything in the property?

16   A.   No, never.

17     Q.   Did he ever ask you to approve a change order?

18   A.   No.

19     Q.   Did he ever tell you that there were any cost

20   overruns in the same time period, any time?

21   A.   No, never.

22     Q.   Did anyone else from KDC tell you that there were

23   any cost overruns?

24   A.   No.

25     Q.   If we think about that whole time period, you take

ALEXANDER FILIPPOV - Direct

1    out the loan to when you get the May 7th letter, did anybody

2    mention the potential for any cost overruns?

3    A.   No, never.  Nobody.  We were within the budget, that

4    was -- Kagan told us.  We were doing really well with the

5    project.

6        Q.   How often were you visiting the property during the

7    construction process?

8    A.   Probably once a month or so.

9        Q.   Did you happen to visit it somewhere in the March

10   2014 time frame?

11   A.   March 2014?  I don't remember.  Probably, I might -- I

12   don't remember.  I remember definitely July 2014.

13       Q.   Well, when you visited it in July 2014, how is it

14   you remember that specifically?

15   A.   That was a specific -- the only time that when we met

16   Kagan at the -- at the site.  So I came over there and he

17   showed us one of the house inside.

18       And also, it was Tatiana Kagan next that came to the

19   site.  This is the only time outside of social meeting that we

20   met once with Tatiana, I saw her.

21       And they showed us 55 -- no, he showed us 77 Lyman house,

22   and he showed us 10 Lyman house that was -- he just finished.

23   And the cleaners were working on finishing the property, so he

24   showed us this -- how it looks inside.

25       Q.   I'm sorry that was 10 Lyman?  Mr. --

ALEXANDER FILIPPOV - Direct

1    A.   10 Lyman.  That's another project of Mr. Kagan that was

2    with one of the investors he was doing.

3         Q.   So during that July visit, how close to finished do

4    you recall 55 Lyman being?

5    A.   55 Lyman was far from being done.  It didn't have -- it

6    didn't have floors.  It didn't have walls painted.  It was --

7    it was a lot of work to be done.  77 Cutler was closer to --

8    to finishing.

9         Q.   88 Cutler.

10   A.   88, I'm sorry.  I apologize.  Yes.

11        THE COURT:  Did you say 88 or 18?

12        THE WITNESS:  88, eight, eight.

13        THE COURT:  Eight, eight Cutler?

14        THE WITNESS:  Cutler, yes.  That's the second house.

15        THE COURT:  Okay.

16   BY MR. CARNATHAN:

17        Q.   All right.  Those are the two property addresses you

18   were eventually assigned, right?

19   A.   Correct.

20        Q.   One was 55 Lyman Road?

21   A.   Yes.

22        Q.   And one was 88 Cutler Lane?

23   A.   Correct.  Yes.  Originally it was 77 Lyman and the

24   address got divided into two new addresses.

25        THE COURT:  I see.



ALEXANDER FILIPPOV - Direct

1           MR. CARNATHAN:  So if I could have Exhibit 38 in

2     evidence, please?

3     BY MR. CARNATHAN:

4         Q.   So Exhibit 38 in evidence appears to me to be a text

5     message from you to Mr. Kagan on July 21, 2014; is that right?

6     A.   Yes.

7         Q.   And you say, "Dima" -- series of question marks --

8     "I'm very concerned with the speed things are progressing, and

9     the discrepancy between your forecast and actual progress."

10        Have I read that correctly?

11    A.   Yes.

12        Q.   Did you send this to him after you met with him at

13    the property?

14    A.   No.  I think it -- that was before.  We met maybe in few

15    days.  I -- I can't recall right now.

16        Q.   Okay.  Similar time frame?

17    A.   It's -- it's within few days of the meeting, yes.

18           MR. CARNATHAN:  All right.  Perhaps Exhibit 39 in

19    evidence, please?

20    BY MR. CARNATHAN:

21        Q.   So if we look at the second page of Exhibit 39 in

22    evidence, you emailed Dima again, so that's apparently Mr.

23    Kagan --

24    A.   Yes.

25        Q.   -- on July 24, 2014, and you said, "As we agree this

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1   morning on the phone call, please provide weekly progress

2   updates for both homes, 55 and 88.

3       "I would like you to provide an Excel file with every job

4   needed to be done for each house, for the completion of the

5   house listed there, the time when you are expecting it to be

6   done, and the actual completion of each job.

7       "Please send the first report no later than Friday, July

8   25th.  The time is running out.  These both houses were

9   supposed to be completed in accordance with OA no later than

10  March 2014.  It is the end of July, and I am very worried

11  about this."

12      Have I read that correctly?

13  A.   Yes.

14      Q.   And Mr. Kagan apparently responded later that day,

15  "will do this tomorrow," right?

16  A.   Yes.

17      Q.   And if we turn back to the first page, he did send

18  you an email on July 25th?

19  A.   Yes.

20      Q.   Did he ever send you the kind of Excel spreadsheet

21  you'd asked for?

22  A.   I've never seen any Excel files received from Kagan.

23      Q.   Okay.  So apparently on July 25th, 2014, the sod

24  installation for 88 Cutler was scheduled for the following

25  Friday.  So given that this is Friday, July 25th -- August

ALEXANDER FILIPPOV - Direct

1    1st, fair enough?

2    A.   Yes.

3         Q.   And he says "it means the project will be done on

4    ninety-eight percent, and will have only some touchups".   So

5    that's for 88 Cutler, right?

6    A.   Yes.

7         Q.   And 55 Lyman, he says, "Right now we are doing the

8    hardwood floor.   It will be completed in ten days.   When the

9    floor will be finished, we'll be completed on ninety percent

10   with this house.   Driveway will be done next week.   Sod is

11   going to be done in two weeks.   Estimated complete time

12   between three and four weeks."

13        Have I read that correctly?

14   A.   Yes.

15        Q.   So apparently in July there wasn't a driveway at 55

16   Lyman either, right?

17   A.   Neither hardwood floors.

18        Q.   And did you get the weekly updates that you'd asked

19   Mr. Kagan for?

20   A.   No.   That was the only update I got.

21        Q.   Okay.   So you go back to him on August 13th, and he

22   responds on August 15 -- actually August 15, it looks like

23   it's from Kristina; who's Kristina?

24   A.   Kristina is bookkeeper for Mr. Kagan.

25        Q.   Okay.   And so on August 15th, she tells you that 88

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1   Cutler is a hundred percent complete, right?

2   A.   Yes.

3           THE COURT:  What exhibit is this?

4           MR. CARNATHAN:  I'm on Exhibit 39 in evidence, Your

5   Honor.

6           THE COURT:  Still on 39?

7           MR. CARNATHAN:  Yes.

8           THE COURT:  Okay.

9   BY MR. CARNATHAN:

10      Q.   So if we now look briefly at Exhibit 46 in

11   evidence --

12          MR. HARTZELL:  Did you say 47?

13          MR. CARNATHAN:  46.

14          MR. HARTZELL:  46.

15          MR. CARNATHAN:  And I'm looking for the third page.

16   BY MR. CARNATHAN:

17      Q.   88 Cutler was actually listed for sale on August

18   20th, 2014, right?

19   A.   Yes.

20      Q.   Did you sign a listing agreement in 2014 for 88

21   Cutler?

22   A.   No.

23      Q.   Did anyone ask you to sign a listing agreement?

24   A.   No

25          MR. CARNATHAN:  Mr. Hartzell, could I have Exhibit 45

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1  in evidence?

2  BY MR. CARNATHAN:

3      Q.   So Exhibit 45 in evidence is an agreement for

4  exclusive right to sale for 88 Cutler Lane, dated August 12th,

5  2014, right Mr. Filippov?

6  A.   Correct.

7      Q.   And if we look at the second page, paragraph 5, it

8  states, "the period of the agreement shall be from August

9  20th, 2014, to and including March 1st, 2016", right?

10  A.   Yes.

11      Q.   And if we look at the third page, do you know whose

12  signature that is for the seller?

13  A.   Gregory Kiely, I believe.  No --

14      Q.   Kiely's from Century 21.  I'm looking at the --

15  A.   Yeah, Century.  And the seller -- it's Mr. Kagan's

16  signature, yes.

17      Q.   Okay.  When was the first time you ever laid eyes on

18  this document we've marked as Exhibit 45, Mr. Filippov?

19  A.   Only after the litigation started.

20      Q.   Did Mr. Kagan ever ask you for permission to sign

21  this?

22  A.   No.

23      Q.   Did he ever ask you for permission to give his wife

24  an exclusive listing through March 1st, 2016?

25  A.   No.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    Q.   And we heard a little bit about it this morning in

2    the openings, but when was the LLC supposed to dissolve?

3    A.   November 2015.

4    Q.   When was the first time that came to your attention

5    that you realized --

6    A.   About the dissolution?

7    Q.   Yeah.

8    A.   Well, Mr. Perten -- that letter that we start getting

9    from Mr. Kagan's attorney mentioned this -- before this week

10   just didn't pay attention -- I didn't pay attention to this.

11   It's -- it's unusual to put a dissolution date into the LLC.

12   It's just not usual.

13   Q.   So let's now think about the time period from when

14   the houses were listed, or excuse me, not both houses, 88

15   Cutler's listed in August 2014.  What happens over the next

16   several months?  What's going on with the properties after

17   August 2014?

18   A.   Oh.  Nothing is happening.  Supposedly Tatiana Kagan

19   making efforts to sell it.  There is nothing happening with

20   the properties.  They are -- when we ask, they say there --

21   there is some interest, but it's not the season, it's the

22   winter time, it's you know, properties are not selling.

23   Nothing is happening.

24   Q.   Did Tatiana ever contact you to tell you what was

25   going on with the properties?



ALEXANDER FILIPPOV - Direct

1    A.    No, never.

2         Q.    Did she ever reach out to you and tell you about any

3    showings that were happening at the property?

4    A.    No, never.

5         Q.    Did she ever reach out and tell you about any open

6    houses at the property?

7    A.    No.

8         Q.    Were you aware of any broker open house?

9    A.    No.

10        Q.    Were you aware of any advertisements for the sale of

11   the property?

12   A.    I didn't see any.

13        Q.    Were you aware of any offers for the property?

14   A.    I don't remember.

15        Q.    I'm still in this time frame of --

16   A.    Right.

17        Q.    -- the fall and winter '14/'15.

18   A.    Right.    I don't remember.

19        Q.    What's the first thing you heard from Tatiana Kagan

20   about the properties, the Lyman-Cutler properties?

21   A.    Well, she called me at the end of April 2015, I was on a

22   business trip in -- in Florida, and she called me out of blue

23   and said that she needs me to sign the listing agreement.

24        Q.    What did you think when she asked you to do that?

25   A.    I couldn't understand what -- what listing agreement she

ALEXANDER FILIPPOV - Direct

1   was talking about because before this I never -- it never was

2   any conversation about listing agreement.  My understanding

3   was that houses are being sold by Tatiana, and I hadn't seen

4   any listing agreement.  I didn't know what she's talking about

5   and what that Century 21 has to do with it basically.

6        Q.   What did you tell her -- well, did she ask you to

7   sign the listing agreement?

8   A.   Yes.  She -- she asked me to sign it.  She send me this

9   listing agreement and asked me to sign.  Then Mr. Kagan

10  called.  They were pushing, they were really pushing.  I

11  didn't have time to deal with this.  I was very busy on the

12  business trip, but they were quite pushy.  So I said send it

13  to me, I will review.

14       Q.   All right.

15            MR. CARNATHAN:  So can I have Defendants' Exhibit

16  266, please?  This is in evidence.

17            THE COURT:  I can look at these exhibits.  When you

18  say Defendants' 266 in evidence, is there a -- there's not a

19  plaintiffs' -- I'm sorry.  This is Defendants' 266.  There's

20  not a Plaintiffs' 266, right?

21            MR. CARNATHAN:  No.  We went sequential.  So really

22  it's just 266.  It's just the sticker says Defendants', so

23  I --

24            THE COURT:  All right.  It's where it came from.

25  It's who was offering it, but there's been no objection to it

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    so it came in through the defendants?

2           MR. CARNATHAN:  Correct, Your Honor.

3           THE COURT:  Okay.

4           MR. CARNATHAN:  And I think I used the first 173

5    numbers, I think.  And then I think Mr. Perten picked up from

6    there.

7           MR. PERTEN:  We started at 174.  Mr. Carnathan went

8    through 173.

9           THE COURT:  Okay.

10          MR. PERTEN:  So all of ours from 174 forward, we

11   stuck a sticker that said Defendants' Exhibit with a number

12   that corresponds to our list.

13          THE COURT:  All right.  Okay.

14          MR. CARNATHAN:  Yeah.

15          THE COURT:  Thank you.

16          MR. CARNATHAN:  Thank you, Your Honor.

17   BY MR. CARNATHAN:

18      Q.   So I put this before you Mr. Filippov because it

19   looks like on April 25th, 2015 -- I'm sorry, I'm mistaken --

20   it looks like on April 24th, 2015, you were sent the agreement

21   that they wanted you to sign, right?

22   A.   Yes.

23      Q.   Did you sign it?

24   A.   No.

25      Q.   Did you ever tell them that they could sign it?

ALEXANDER FILIPPOV - Direct

1    A.   No.

2         MR. CARNATHAN:   Now if I could have Defendants'

3    Exhibit 268, please?

4    BY MR. CARNATHAN:

5         Q.   So 268 is also in evidence.  This is an email from

6    kagandevelopment@gmail.com from Dan.  Do you know who Dan is?

7    A.   Dan became a bookkeeper for Kagan Development in 2015, I

8    guess.

9         Q.   And he says, "Per our earlier conversations, we

10   signed the agreement, with C21 to put 55 Lyman on the market

11   as agreed.  Please confirm receipt of this email.  Thank you.

12   Dan."

13        Have I read that correctly?

14   A.   Yes.

15        Q.   Had you ever spoken to Dan about the agreement?

16   A.   No.

17        Q.   And if we scroll down that same page to Alex's

18   response, you said, "I confirm."

19   A.   Yes.

20        Q.   What are you confirming there?

21   A.   I confirmed I received this and that agreement signed,

22   and I said -- and they asked me to confirm that I received

23   this agreement.  And I said, I confirm.

24        Q.   All right.  But now they've told you on April 28th

25   that they've signed the agreement, right?



ALEXANDER FILIPPOV - Direct

1    A.    That's correct.

2         Q.    So why didn't you object?

3    A.    Well, the truth is that first, I was very busy. Second, I

4    didn't want to start fight at this particular point and argue

5    about this.  And I was under the impression that my rights to

6    fire Tatiana Kagan as a broker is not violated by any of this

7    agreement.  So I said, okay, they did something, I will be

8    able to fix it.

9         MR. CARNATHAN:  Could I have -- I forget which

10   page -- page 6 of Exhibit 15 in evidence, please?

11   BY MR. CARNATHAN:

12        Q.    So Mr. Filippov, I'm looking down at paragraph 6.

13   Is that the right that you're referring to?

14   A.    Yes.

15        Q.    So after this interaction, if you will, concerning

16   the signing of the listing agreement, what's the next thing

17   that you heard from Mr. Kagan?

18   A.    The next thing, I -- we go Mr. Pyle letter.  It was a

19   demand for almost $1 million.

20        MR. CARNATHAN:  Could I have Exhibit 50 in evidence,

21   please?

22   BY MR. CARNATHAN:

23        Q.    When did you receive this Mr. Filippov?

24   A.    That was received on May 8th.

25        Q.    What was your reaction when you got it?



ALEXANDER FILIPPOV - Direct

1   A.   I was flabbergasted.  I -- I was shocked.  I -- I

2   couldn't believe that I'm reading this because it wasn't

3   comprehensible.

4        The property was built and finished completely nine month

5   ago.  There's no activity going on.  There is never was a

6   conversation about money, and all of the sudden we get

7   notified that somehow we owe money -- we owe money to Mr.

8   Kagan.  And that was -- that -- that didn't make much sense.

9   That was smelling huge fraud.

10       Q.   What was the first thing that you did after you

11  received this letter to deal with this letter?

12  A.   I dialed Mr. Kagan's phone number and left him a message.

13  He didn't answer the phone call.  I asked him to call me back

14  to discuss it.

15       Q.   Did Mr. Kagan ever call you back?

16  A.   No.

17       Q.   If we look at the letter in particular, I'm looking

18  at that first -- well, the big paragraph in the middle of the

19  first page, toward the bottom -- in that last sentence it

20  says, "To date, I understand that Mr. Filippov has refused to

21  approve any price change"; do you see that?

22  A.   Yes.

23       Q.   Had you refuse to approve any price change?

24  A.   No.  It was never discussed.

25       Q.   Did anyone ever asked you to approve a price

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    change --

2    A.   No.

3         Q.   -- at this point?  And Mr. Pyle points out in the

4    letter that "the need for a price reduction is particularly

5    important given the November 30, 2015 dissolution date of the

6    company, which is rapidly approaching.  It is not in the

7    interest of any of the members to have the homes sold as part

8    of a liquidation, particularly when the liquidation would

9    occur during the traditionally weak winter real estate

10   market."

11        Have I read that correctly?

12   A.   Yeah.  This is correct, and this is the first time we

13   kind of figured out that there is a dissolution date.

14        Q.   If we look at the fourth page of Exhibit 50 in

15   evidence, and we look at that list of alleged accounts payable

16   aging; do you see that?

17   A.   Yes.

18        Q.   Yeah.  When you got this letter, did you have any

19   awareness at all of any debt owed to BST Plumbing?

20   A.   No.

21        Q.   All right.  Did you have any awareness at all to any

22   debt owed to Decor Art?

23   A.   No.

24        Q.   Did you have any awareness at all of any debt owed

25   to Dream Flooring?



ALEXANDER FILIPPOV - Direct

1    A.    No.

2         Q.    Did you have any inkling that KDC might be owed

3    $244,276.56?

4    A.    No.

5         Q.    Had you any notion at all that ProExcavation might

6    be owed $325,000?

7    A.    No.

8         Q.    What about Sergei Nikolaev, were you aware of any

9    debt to him?

10   A.    No.

11        Q.    Were you aware of any debt to Unicom Electric?

12   A.    No.

13        Q.    Were you aware of any debt to B&D Heat?

14   A.    No.

15        Q.    Were you aware of any debts from the LLC at all?

16   A.    I wasn't aware of any debts, period.

17        Q.    I guess other than the bank loans?

18   A.    Well, bank loans, yes.  Bank loans -- bank loans we

19   were -- we had known about this, and we were maintaining and

20   paying mortgage, but that was a carrying cost.

21        Q.    If we return to the second page, and I'm looking at

22   the paragraph at the top.  I'm now looking at the sentence

23   that says, "In addition, since November 2013, Mr. Kagan has

24   made additional capital contributions totaling over 251,000 to

25   cover carrying costs associated with the homes.  While these

ALEXANDER FILIPPOV - Direct

1    additional capital contributions do not bear interest, they do

2    have the effect of increasing Mr. Kagan's capital account, and

3    thereby increasing his share of the proceeds available for

4    distribution when the company is liquidated."

5        Have I read that correctly?

6    A.    Yes.

7        Q.    What was your reaction to that assertion?

8    A.    My reaction was that this is quite nonsense because the

9    agreement of the LLC doesn't say about his capital -- his

10   carrying cost payments in any way increasing his capital

11   contribution.

12       Q.    So were you happy about the prospect of having to

13   pay the carrying costs?

14   A.    No.  Obviously not.  I already was out for $2 million,

15   and at this point I realized it's going to be problematic,

16   it's never -- it's not going to be a profitable project.

17       Q.    Nevertheless, after getting this letter, did you

18   start paying the carrying costs?

19   A.    Yes.  I start paying carrying costs because we had a loan

20   and it needs to be served, and it was my responsibility as the

21   manager, and the person who signed for those loans to -- to

22   keep them running.

23            MR. CARNATHAN:  Could I have Exhibit 51 in evidence,

24   please?

25   BY MR. CARNATHAN:



ALEXANDER FILIPPOV - Direct

1    Q.    This is an email dated May 9th that you sent to Mr.

2    Kagan at the Lyman-Cutler address, and to Mr. Pyle, right?

3    A.    Yes.

4    Q.    And you basically asked for the financial records

5    here?

6    A.    Correct.

7    Q.    How long did it take them to send you the financial

8    records?

9    A.    A couple of month maybe until we -- we -- we didn't get

10   complete financial records, but we got -- we got some

11   QuickBooks file that wasn't complete in May 2015.  It was

12   brought by Mr. Cohen.  But the actual records company, the

13   records we got maybe in July, if -- if you can call them

14   complete because they were never complete.

15   Q.    Okay.  So what did you determine you were going to

16   have to do after getting this letter as the managing partner

17   of the project?

18   A.    Well, at this point, I realized we need to sell the

19   property quickly, and in order to do this, I needed to find

20   different brokers, more capable than Tatiana Kagan.  And I

21   approached the best broker in this area, Deborah Gordon, from

22   Coldwell Banker who exclusively dealing with luxury homes on

23   the market, and I also approached another broker from Hammond

24   Real Estate, Kathy Krongel, who is also dealing with this.

25   And we had a -- three of us had a conversation.



ALEXANDER FILIPPOV - Direct

1      Q.   Well, let me stop you there.

2   A.   Yeah.  Okay.

3         MR. CARNATHAN:  Why don't I ask for 52 in evidence,

4   please?

5   BY MR. CARNATHAN:

6      Q.   So this is an email from you to Mr. Kagan, Mr. Pyle,

7   and the Lyman-Cutler LLC email account on May 11th, 2015,

8   right?

9   A.   Yes.

10     Q.   And in this one, you asked for the keys for

11  inspection?

12  A.   Correct.

13     Q.   And at some point did you get the keys?

14  A.   Yes.

15     Q.   Do you remember roughly when that was?

16  A.   That was probably May 16 or 15th.  This is where we met

17  with Mr. Cohen I believe.

18     Q.   All right.  Let's come back to that in just one

19  moment.

20         MR. CARNATHAN:  So in the interim, if I could have

21  Plaintiffs' Trial Exhibit 53 in evidence, please?

22  BY MR. CARNATHAN:

23     Q.   This one's an email from Joseph Cohen to you on May

24  12th, 2015, with a cc to Mr. Kagan and Alexander Pyle; do you

25  see that?



ALEXANDER FILIPPOV - Direct

1   A.   Yes.

2        Q.   When was the first time you ever heard of Joseph

3   Cohen?

4   A.   That email probably is the first time I heard something

5   of him.  I didn't know about his existence.

6        Q.   So did you know who he was when you got this email?

7   A.   Not really.

8        Q.   Okay.  Can we turn to the second page which is

9   already up on the screen?  In that slot in the upper right he

10  calls himself a strategic business manager; do you see that?

11  A.   Yes.

12       Q.   Did you ever find out what that meant?

13  A.   No.

14       Q.   Okay.  So in the first paragraph he says, "As you

15  are undoubtedly aware, the sale of either property owned by

16  Lyman-Cutler has not borne fruit.  While you are the managing

17  partner in the LLC, and as such the party authorized to

18  conduct the sale of the property, as a practical matter, Vadim

19  Kagan is the operating partner of the venture."

20       Have I read that correctly?

21  A.   Yes.

22       Q.   So after this dispute started, did Mr. Kagan turn

23  over the property to you?

24  A.   We got the keys at this point.

25       Q.   So let's talk about I guess the meeting where you

ALEXANDER FILIPPOV - Direct

1   get the keys.  Where did you meet to get the keys?

2   A.   At 55 Lyman.

3        Q.   And I think you said you thought that was around May

4   16th, give or take?

5   A.   May 16th, yes.  I think so, yes.

6        Q.   And who did you meet at 55 Lyman?

7   A.   Oh, we met Mr. Joseph Cohen.

8        Q.   And what happened during that meeting?  What did you

9   do?

10  A.   It was three of us.  It was myself, my wife, Irina, and

11  Mr. Cohen, and he brought the keys, and we asked him -- and we

12  kind of expected the condition of the house, not everything

13  was -- it -- there were few things that needed to be finished

14  in this house, and we had a short conversation where -- I

15  don't remember all the details of this conversation, it has

16  been a long time obviously, but Mr. Cohen promised to get us

17  the financials and -- and books that --

18       Q.   Do you remember anything in particular that Mr.

19  Cohen said while you were meeting him at the property in May

20  2015?

21  A.   Gee, I need to -- he didn't --

22       Q.   Was there any discussion of the outstanding debt

23  that they alleged against Lyman-Cutler?

24  A.   Right.  Well, at this point he was -- he was telling that

25  we'd better pay in accordance with Mr. Pyle letter or the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    property is not going to be sold, something in this -- in this

2    venue.

3         Q.   Okay.

4              MR. CARNATHAN:   Could I have Exhibit 54 in evidence,

5    please?

6    BY MR. CARNATHAN:

7         Q.   All right.  So in the same time period you retained

8    counsel?

9    A.   Correct.

10        Q.   You retained my firm?

11   A.   Yes.

12        Q.   Did you talk to Mr. Lipetsker before you retained my

13   firm?

14   A.   Yes.

15        Q.   Okay.  And what did Mr. Lipetsker say about that?

16   A.   He agreed.  Every decision I made was discussed with Mr.

17   Lipetsker.

18        Q.   Did you talk to Mr. Kagan about it before you hired

19   my firm?

20   A.   No.  We couldn't get hold of him.  He didn't return my

21   phone call.

22        Q.   Now if we look at the bottom of the second page of

23   Exhibit 54, among the things that we demanded, if you will, on

24   May 13th, 2015, is that you were going to replace Tatiana as

25   the broker; you remember that?



ALEXANDER FILIPPOV - Direct

1    A.    Yes.

2          Q.    Did Tatiana agree to step aside as the broker?

3    A.    No.

4          Q.    What in fact happened with regard to Tatiana's

5    status as the broker?

6    A.    She stayed as the broker, and she refused to yield even

7    though in my conversation with Deborah Gordon, who is a

8    experienced real estate broker, she said she --

9          MR. PERTEN:  Objection.

10         MR. CARNATHAN:  We'll stop him there.

11         THE COURT:  Yeah.  So I'll take his motion to strike.

12   I'll strike from the point where the witness testified

13   concerning what this other person said.

14         MR. CARNATHAN:  Right.

15   BY MR. CARNATHAN:

16         Q.    Why don't we just think for a moment about what's

17   going on with the loans at this point.  You've got three loans

18   outstanding against the properties, right?

19   A.    Correct.

20         Q.    You've got the loan that you initially took out to

21   buy the land?

22   A.    Yes.

23         Q.    And that was for 1.6 million?  And you've got two

24   construction loans, each for 1.6 million, right?

25   A.    Yes.

ALEXANDER FILIPPOV - Direct

1    Q.   When were those loans going to mature?

2   A.   In June, I believe.  June 2015.

3           MR. CARNATHAN:  Yeah.  If I could have Trial Exhibit

4   59 in evidence briefly, please?

5   BY MR. CARNATHAN:

6    Q.   So in Trial Exhibit 59 in evidence, you see at the

7   top that they were going to mature 6/18 and 6/28,

8   respectively, right?

9   A.   Yes.

10    Q.   So by May 20th, you were corresponding with Mr.

11   McGregor about extending those loans, right?

12   A.   Correct.

13    Q.   And if we look briefly at Plaintiffs' Exhibit 57,

14   the bank reappraised the properties in connection with your

15   effort to extend the maturity dates, right?

16   A.   Correct, yes.

17    Q.   And if we look at the third page, by now the

18   properties are complete and the bottom left, the two

19   properties both appraised at $5.2 million in May 2015, right?

20   A.   Correct.

21    Q.   And if we look briefly at Exhibit 60 in evidence,

22   you managed to secure an extension of the loans through

23   December, right?

24   A.   Yes.

25    Q.   So after you receive the keys from Mr. Cohen in the

ALEXANDER FILIPPOV - Direct

1    middle of May 2015, what did you start doing with regard to

2    the properties?

3    A.    There are few thing that requires, kind of fixing it, at

4    least I thought so.  The French doors wouldn't get open, they

5    needed to be fixed.  Some locks were missing, some -- a number

6    of things.

7         But most importantly, I was trying to get the listing to

8    people who could sell the house.  That was my main idea, but

9    these listings we couldn't -- we couldn't pass it to other

10   brokers.  Century 21 refused.

11        Q.    How often were you visiting the property after you

12   took over the keys in May 2015?

13   A.    Almost daily after this.

14        MR. CARNATHAN:  If I could have Exhibit 63 in

15   evidence?

16   BY MR. CARNATHAN:

17        Q.    So Exhibit 63 in evidence is an email dated June

18   4th, 2015 at 3:27 p.m., and it's sent from Vadim Kagan's email

19   address to you, Mr. Pyle, to me, and to Joseph Cohen, right?

20   A.    Yes.

21        Q.    It's titled the forward proposed response to be sent

22   via Vadim's non-Kagan Development Corp. account; do you see

23   that?

24   A.    Yes.

25        Q.    Do you know who actually wrote this email?



ALEXANDER FILIPPOV - Direct

 1   A.    I suspect it's Mr. Cohen.

 2         Q.    Why do you suspect that?

 3   A.    Well, based on everything I know about Joseph Cohen,

 4   that's his style.  That's -- that's why I think.

 5         Q.    So on June 4th, 2015, someone using Vadim's --

 6   Kagan's email address said to you, "Kagan Development Corp. is

 7   preparing a detailed invoice for submission.  I anticipate

 8   that we will receive the invoice next week.  I have requested

 9   that the invoice be detailed so that we can quickly assess the

10   allocation of our development costs in relation to the budget

11   submission to the bank."

12         Have I read that correctly?

13   A.    Yes.

14         Q.    So as of June 4th, 2015, had you ever seen any

15   invoice from Kagan Development Corp.?

16   A.    No.

17         Q.    Did you see one the following week?

18   A.    No.

19              MR. CARNATHAN:  Could I have Plaintiffs' Exhibit 66?

20   BY MR. CARNATHAN:

21         Q.    So Plaintiffs' Exhibit 66 is the mechanic's lien

22   that KDC recorded against the properties, dated June 22, 2015;

23   do you see that?

24   A.    Yes.

25         Q.    Yeah.  Do you happen to remember visiting the

ALEXANDER FILIPPOV - Direct

1    properties, Cutler and Lyman on June 22nd, 2015?

2    A.   I don't remember if I was there at this particular date.

3         Q.   Was there a date in June where you remember being

4    there and finding some workers there?

5    A.   Yes.  It was either that -- it was somewhere in this

6    period when I came and it -- two painters working on 88

7    Cutler.

8         Q.   Had you hired the painters?

9    A.   No, I didn't.

10        Q.   Did the painters tell you had hired them?

11   A.   Yeah.  They told me that Mr. Kagan told them to come and

12   do the work there.

13        I was surprised -- I'm sorry, because the houses were

14   fixed.  They didn't require any -- any work.  It had been nine

15   months -- ten months since they have been done.

16        Q.   How did you first find out about the mechanic's

17   lien?  How did you receive it?

18   A.   I think it was emailed to me.

19        Q.   Do you remember who emailed it to you?

20   A.   I think Mr. Cohen.

21        Q.   What was your reaction when you first saw this

22   mechanic's lien?

23   A.   I couldn't believe my eyes because this mechanic lien now

24   was for $2 million one month after they claimed $1 million.

25   It was -- I thought what's going to happen next, what else are

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    they going to claim?

2        Q.   And just to be clear, where it recites the virtue of

3    written contract dated June 24th, 2013, between Lyman-Cutler

4    LLC, owner, and Kagan Development KDC, Inc., contractor, as of

5    June 22nd, 2015, had you ever seen that contract?

6    A.   No.  And after this I requested to -- to provide this

7    contract because we never seen it before.  We don't know what

8    this contract is.

9        Q.   And when you asked to be provided a copy, did they

10   send you one?

11   A.   No.

12       Q.   As of June 22nd, 2015, had you ever seen an invoice

13   from KDC?

14   A.   No.

15       MR. CARNATHAN:  May I have Plaintiffs' Exhibit 67 for

16   identification, please?

17   BY MR. CARNATHAN:

18       Q.   So Plaintiffs' 67 for identification is an email

19   from Joseph Cohen to Vadim Kagan, Alex Filippov, Alexander

20   Pyle, and John Perten, dated June 25th, 2015, correct?

21   A.   Yes.

22       MR. CARNATHAN:  Your Honor, Plaintiff's would offer

23   Exhibit 67 into evidence.

24       THE COURT:  Any objection?

25       MR. CARNATHAN:  John?



ALEXANDER FILIPPOV - Direct

1        MR. PERTEN:  Your Honor, this appears to be a

2    settlement proposal.  So that was the basis of our objection.

3    If you look at the letter attached, it's proposing a

4    resolution of the dispute.

5        MR. CARNATHAN:  Well, the difficulty is, Your Honor,

6    is that this invoice attached for 2 million, ninety-five, et

7    cetera, has never been presented to us before.  This is the

8    very first time.  It's the only document that shows them

9    sending it to us.

10        It can't be a settlement proposal if it's the first

11    demand they've ever made.  There's no compromise here.

12    They're just sending us the demand and the so-called

13    settlement proposal is that they want payments over time.  But

14    our contention is that this is an extortion at demand, not a

15    settlement proposal.

16        THE COURT:  What do you say about that?

17        MR. PERTEN:  I think, I mean, it's a settlement

18    offer.  They didn't like it, they didn't accept it, that's

19    their prerogative.  They thought it was extreme, that's their

20    prerogative.  But at the end of the day, it's a proposal on

21    how to resolve this dispute.  It's a settlement offer.

22        They didn't like, that's their prerogative, but that

23    doesn't change it.  They can characterize it however they

24    want, but that's what it was.

25        MR. CARNATHAN:  Well, 408(b), Your Honor, which is

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1  the compromise offers and negotiations, I mean first, I would

2  insist that this is not a settlement proposal.  I mean, this

3  is the first time that we've heard from these guys -- excuse

4  me -- that we've received an invoice from them, and it's three

5  days after the mechanic's lien is filed.  And so for them to

6  assert that this is a settlement proposal is just not so.

7        THE COURT:  What do you say it was?

8        MR. CARNATHAN:  We say that this is actually an

9  extortion at demand, and this is the first presentation of the

10  invoice.  And so that's why I made the point of that email

11  earlier, where on June 4th, he's saying we're preparing a

12  detailed invoice and we'll send it to you next week.

13        And when you look at the last page of Exhibit 67, the

14  invoice purports to be dated June 1, 2015.  And so this is

15  more of that, if you will, falsifying documents.

16        This is Mr. Cohen making up a document, backdating it

17  to June 1, pretending he previously forwarded it so he then

18  can claim that he had a basis to file this mechanic's lien.

19        THE COURT:  All right.

20        MR. CARNATHAN:  It's part of the fraud.

21        THE COURT:  I'll overrule the objection under Federal

22  Rule of Evidence 408(b).  It's being admitted for a purpose

23  other than an earnest settlement proposal.

24        PLAINTIFFS' EXHIBIT 67 WAS ADMITTED INTO EVIDENCE

25        MR. CARNATHAN:  Thank you, Your Honor.



ALEXANDER FILIPPOV - Direct

1    BY MR. CARNATHAN:

2        Q.   So Mr. Filippov, if we look at the second page of

3    Plaintiffs' Exhibit 67 --

4            THE COURT:  So just to make certain, Exhibit 67 is in

5    evidence.

6            MR. CARNATHAN:  Thank you, Your Honor.

7    BY MR. CARNATHAN:

8        Q.   So I'm looking at the first full paragraph and this

9    is again, this is a letter from Joseph Cohen, purportedly as

10   the strategic business manager of, excuse me, KDC.

11       He says in the second sentence, "As evidenced from the

12   enclosed invoice, which had previously been forwarded, Kagan

13   Development KDC Corp., KDC, is the holder of a substantial

14   outstanding accounts receivable from Lyman-Cutler, for work it

15   performed for Lyman-Cutler under a construction

16   management/general contractor agreement, dated June 24, 2013,

17   the contract."

18       Had that invoice ever been forwarded to you prior to June

19   25, 2015?

20   A.   No.

21       Q.   So if we look at this invoice, which is the fifth

22   page of Exhibit 67 in evidence, you see in the upper right

23   corner, it purports to be dated June 1, 2015, right?

24   A.   Yes.

25       Q.   Before June 25, 2015, had you ever laid eyes on that

escribers

ALEXANDER FILIPPOV - Direct

1   invoice before?

2   A.   No.

3        Q.   And if we look at the charges on this invoice --

4             MR. CARNATHAN:   Can we blow up the box?

5   BY MR. CARNATHAN:

6        Q.   -- it lists a design fee of $25,000, right?

7   A.   Yep.

8        Q.   And to be clear, on June 25, 2015, had you ever

9   heard about a design fee before?

10  A.   No.

11       Q.   Then it lists the total construction costs of

12  $3,738,925.82.  Did you have any understanding of where that

13  number came from when this invoice arrived?

14  A.   No.

15       Q.   It then applies the general contractor construction

16  fee at the rate of fifteen percent, and it's hard to read, I

17  think it's $560,638.87.  Had you ever heard about a 560-odd-

18  thousand-dollar general construction fee before June 25?

19  A.   No.

20       Q.   It next purports to charge KDC office overhead, net

21  of Vadim Kagan, I think that says 820, at $200 an hour for

22  $164,000; do you see that?

23  A.   Yep.

24       Q.   Do you know what that means?

25  A.   No.



ALEXANDER FILIPPOV - Direct

1    Q.   Okay.  Then it seems to list 790 hours at $75 an

2    hour for a total of $59,250.  On June 25th, 2015 did you have

3    any idea in the world where that number was from?

4    A.   No.

5    Q.   It then lists the payment, total construction

6    payments through June 10, 2015 of $3,194,- -- I think it 615,

7    received from Rockland Trust construction advances plus fees

8    to the bank.  That number makes sense, huh?

9    A.   Probably, yeah because -- yeah.  The loan was $3.2

10   million.

11   Q.   Then lists carrying costs -- total carrying costs

12   from July 1, 2013 through June 10th, 2015, at $760,771.08,

13   right?

14   A.   Yes.

15   Q.   Did you have any notion where that number came from?

16   A.   No.

17   Q.   Do you remember what the number was in his letter of

18   six weeks earlier?

19   A.   For the carrying costs?

20   Q.   Right.

21   A.   231,000-something.

22   Q.   It's 251,000 --

23   A.   Or 51,000, yes.

24   Q.   Okay.  All right.  So somehow we've gone up a half a

25   million bucks in six weeks on the carrying costs, right?



ALEXANDER FILIPPOV - Direct

1    A.    Yes.

2         Q.    We then have a carrying cost advance fee at the rate

3    of 1.459 percent of the total accrued monthly carry advance, I

4    think it says, of -- well, he's got 23, and then 6,330.70, I

5    think.  But the total number is $145,814, and I think, 45

6    cents?

7    A.    Yes.

8         Q.    Did you have any idea where the carrying cost

9    advance fee came from?

10   A.    I don't know what it is.

11        Q.    Okay.  And this number, $2,095,985.23 maps back to

12   the number in the mechanic's lien they recorded at Trial

13   Exhibit 66, right?

14   A.    Correct.

15        Q.    If we look back at the first page of the letter, so

16   it's the second page of the exhibit --

17             THE COURT:    Page 2, Exhibit 67?

18             MR. CARNATHAN:    Correct, Your Honor.

19   BY MR. CARNATHAN:

20        Q.    So I'm now looking at that second paragraph.  And he

21   says, "As of this writing, KDC has substantially completed all

22   of its obligations under the contract save for ongoing

23   maintenance and warranty matters, if any."

24        Have I read that correctly?

25   A.    Yes.



Page 129

ALEXANDER FILIPPOV - Direct

1    Q.   Back in June 2015, did you have any idea what that

2    meant?

3    A.   No.

4    Q.   He then states that "Pursuant to section 2.3.20 of

5    the contract, a final inspection of the underlying property

6    was satisfactorily conducted, and KDC has turned over the

7    property keys to Lyman-Cutler."

8    Have I read that correctly?

9    A.   Yes.

10   Q.   Well, we know the keys were turned over.

11   A.   Right.

12   Q.   Do you know what he was talking about there in

13   section 2.3.20 of the contract?

14   A.   I -- I, no.  I don't about the contract because -- at

15   this point I believe -- what was date on this --

16   Q.   This was June 25th, 2015.

17   A.   -- with -- I don't think we -- we saw the contract.  I

18   don't remember when, exactly we saw the contract.  I think we

19   saw the contract in July.

20   Q.   Right.  It was after the dispute, so --

21   A.   Right.  After the dispute.  Yes.  So I -- I don't know

22   what it is.

23   Q.   But I guess what I getting at is had you conducted a

24   final inspection of the underlying property?

25   A.   No.

ALEXANDER FILIPPOV - Direct

1       Q.   If we look at the fourth page of Exhibit 67, which

2   is titled, balance workout proposal, and the workout proposal

3   is that "Lyman-Cutler LLC agrees to the following payment plan

4   to resolve its outstanding bill of $2,095,985.23 with KDC."

5       And then the next line down says, "Lyman-Cutler LLC will

6   pay KDC the sum of $1 million within ten days of this receipt

7   of this proposal."

8       Have I read that correctly?

9   A.   Yes.

10      Q.   Do you remember about how much money Lyman-Cutler

11  LLC had in the bank in June 2015?

12  A.   I do.  It was six --

13      Q.   About how much did they have?

14  A.   $6,700-something.

15      Q.   All right.  So if we look briefly at Trial Exhibit

16  69, that's the account statement for Lyman-Cutler for June

17  2015, right?

18  A.   Yes.  I was wrong.  Six hundred, one hundred, seventy-two

19  dollars (sic).

20      Q.   You were pretty close.

21  A.   Yeah.

22      Q.   Okay.  So what were you thinking when you got this

23  workout proposal?

24  A.   It was just crazy.  It's -- it's, like, where is the

25  person who put numbers on it without ever thinking what these

ALEXANDER FILIPPOV - Direct

1    numbers are?

2         Q.   Did Mr. Kagan have access to the bank account?

3    A.   Yes.

4         Q.   Did he have online access?

5    A.   Yes.

6         Q.   Okay.

7                              (Pause)

8         MR. CARNATHAN:   Could I briefly have Exhibit 64 in

9    evidence, please?

10   BY MR. CARNATHAN:

11        Q.   Okay.  So Mr. Filippov, I'm showing you the verified

12   complaint that my firm filed on behalf of Lyman-Cutler in the

13   Middlesex Superior Court back in 2015.

14        MR. CARNATHAN:   Could we have page 12 briefly?

15   BY MR. CARNATHAN:

16        Q.   So I'm really showing you this to orient you to the

17   dates.  So we filed this complaint on behalf of Lyman-Cutler

18   on or about June 5th, 2015, right?

19   A.   Yes.

20        Q.   Okay.  And you hired us to do that?

21   A.   Correct.

22        Q.   Okay.  Did you talk to Mr. Lipetsker before you did

23   that?

24   A.   Yes.

25        Q.   Did Mr. Lipetsker consent to the retention?



ALEXANDER FILIPPOV - Direct

1   A.   Yes.

2        Q.   Did you talk to Mr. Kagan about it?

3   A.   No.

4        Q.   Why not?

5   A.   As I said, at this point it was adversarial relations and

6   he didn't return my phone call.  We haven't heard from Kagan.

7   We heard only from Joseph Cohen and attorneys.

8        Q.   Okay.  Now you know that there's some claims

9   asserted by the Kagan parties about your contact with

10  witnesses in connection with this matter, right?

11  A.   Yes.

12       Q.   All right.  Had you started contacting any witnesses

13  before we filed this complaint?

14  A.   No.

15       Q.   Okay.  When did you first start reaching out,

16  looking for people who had similar experiences?

17  A.   I believe that was after the lien -- we got the lien.  I

18  believe that was end of June.

19       Q.   And how did you locate the people that you talked

20  to?

21  A.   Well, when we start looking in -- in the Commonwealth of

22  Massachusetts in the database, everything where Kagan name

23  shows up and we found all the -- all this LLC that had been

24  created for investing purposes from -- from people, members of

25  this LLC, and found their contacts, and that's how it -- it

ALEXANDER FILIPPOV - Direct

1    went.  Yes.

2         Q.   And do you remember the various people you talked

3    to?

4    A.   Yes.

5         Q.   Yeah.  Who did you talk to about this?

6    A.   I talked to Elena Lande.  I talked to Mr. Kayserman.  I

7    talked to Mr. Abramskiy.  I talked to Mr. Zhukovskiy.

8    Zhukovskiy I didn't have to look, obviously.  Right.  And I

9    talked to Mr. Fodymanow.

10        Q.   What about Ms. Brusenkova?

11   A.   I did talk to Ms. Brusenkova, who was a bookkeeper in the

12   past, yes.

13        Q.   How did you know to get in contact with her?

14   A.   Well, she -- we knew that she's -- she was a bookkeeper

15   and we start looking for all bookkeepers who were working

16   previously.  We were not able to find the -- another

17   bookkeeper, I believe his name O'Grady, but we were able to

18   find Kristina.  And we found her online.  You know, today's

19   social profiles and everything else, it's not a difficult task

20   to find a person.

21        Q.   At some point you did hold a meeting of the members

22   of Lyman-Cutler, right?

23   A.   Yes.

24             MR. CARNATHAN:  Could I have Exhibit 70 in evidence,

25   please?



ALEXANDER FILIPPOV - Direct

1          THE COURT:  Did you say 7?

2          MR. CARNATHAN:  Excuse me.  Exhibit 70, Your Honor.

3          THE COURT:  70?

4          MR. CARNATHAN:  Seven, zero, yeah.

5     BY MR. CARNATHAN:

6          Q.   So this document at least claims to be the minutes

7     of the meeting, right?

8     A.   Yes.

9          Q.   So you did hold a meeting on July 16th, 2015, right?

10    A.   Correct.

11         Q.   And it was held in the offices of my firm, right?

12    A.   Correct.

13         Q.   And it was attended by you?

14    A.   Yes.

15         Q.   And it was attended by Mr. Lipetsker?

16    A.   Yes.

17         Q.   And Mr. Cohen came on behalf of Mr. Kagan, right?

18    A.   Correct.

19         Q.   You see in the second paragraph, it says, "It was

20    agreed Cohen would record the official record of the meeting".

21    Do you see where it says that?

22    A.   Yes, I see that.  Not true.

23         Q.   Yeah.  Did that happen?  Did you ever agree that

24    Cohen could keep the official record of the meeting?

25    A.   No.  It -- no.



ALEXANDER FILIPPOV - Direct

1    Q.   Okay.  So without belaboring the issue, if we look

2    at the last page of this, these are the minutes that Mr. Cohen

3    purported to take, right?

4    A.   Yes.

5    Q.   Are there any inaccuracies in these minutes?

6    A.   As far as I remember, plenty.

7    Q.   Okay.

8    A.   There are many because I kept my own notes during the

9    meeting.

10    Q.   Okay.  But we can agree, if we go back to the first

11    page --

12    A.   I'm sorry, say that again?

13    Q.   I'm calling for the first page to come back.

14    A.   Oh.

15    Q.   Thank you.  Would you agree that Filippov called for

16    a vote to ratify his actions as a managing member; is that

17    part true?

18    A.   Yes.

19    Q.   And you and Lipetsker voted yes, and Mr. Cohen voted

20    no on behalf of Mr. Kagan, right?

21    A.   Correct.

22    Q.   Okay.  Setting aside the phrasing in number 2 at the

23    top of the second page of this exhibit, did you call for a

24    vote to ratify your action in hiring my firm?

25    A.   Yes.

ALEXANDER FILIPPOV - Direct

1    Q.   And Mr. Lipetsker and you voted yes, and Mr. Cohen,

2    for Mr. Kagan, voted no, right?

3    A.   Correct.

4    Q.   Okay.  Did you agree it was a unilateral action?

5    A.   I don't know.  There are some words here that, you know,

6    specifically put into these notes to show something, I guess,

7    many of them.

8    Q.   All right.  If we look at number 3, did you call for

9    a vote to ratify your request -- his word -- but your removal

10   or plan to remove Tatiana Kagan as the listing broker?

11   A.   Yes.  I did -- didn't vote, but this time it wasn't

12   required.  I had complete right to remove her.

13   Q.   Right.  But in any event, Lipetsker voted yes, you

14   voted --

15   A.   Yes.

16   Q.   -- yes, Cohen voted no.

17   A.   Yes.

18   Q.   And then if we look at number 3 -- oh no, I'm sorry,

19   we've already done 3.  If we turn the page and look at number

20   4, you called for a vote to ratify your actions in suing KDC,

21   Century 21, Vadim Kagan, Tatiana Kagan, and ProExcavation; is

22   that right?

23   A.   Correct.

24   Q.   And again, Lipetsker voted yes, you voted yes?

25   A.   Correct.

ALEXANDER FILIPPOV - Direct

1      Q.    Cohen voted no; is that right?

2   A.    Yes.

3      Q.    All right.  Let's talk about what led to your

4   decision to file for bankruptcy protection for the company.

5   When did you start thinking that that's what you were going to

6   need to do?

7   A.    We start thinking about this probably in August, I'm

8   guessing, end of summer 2015.

9          MR. CARNATHAN:  Let me ask for Exhibit 71 please, in

10  evidence.

11  BY MR. CARNATHAN:

12     Q.    You recognize Exhibit 71?

13  A.    Yes.

14     Q.    So this is a letter from Mr. Perten on behalf of the

15  Kagan side of the V, if you will, in which he points out that

16  the dissolution date is November 30th, 2015; do you see that

17  in the first sentence?

18  A.    Yes.

19     Q.    And he basically suggested he's going to petition

20  the court for an order to force you to dissolve if we don't

21  dissolve, right?

22  A.    Correct.

23     Q.    What was your reaction to that?

24  A.    Well, my reaction was that we had three bank loans, and

25  if there is no LLC, that's going to be dissolved in November,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    there is no loan.  And then with my guarantee for the loan,

2    and money, we are going to be in big trouble.  We will not be

3    able to serve these loans.  It's not going to be any loans.

4    They're -- the property will go to be auctioned by the bank

5    because they will call it.  And that was a lot of trouble.

6    And we -- and that -- that was serious issue to consider.

7         Q.    Before you filed for bankruptcy protection, did you

8    explore any other options?

9    A.    Yes.

10        Q.    What else did you look into?

11   A.    I've -- I was looking to sell the property quickly, and I

12   contacted JJ Manning auction company to see if we can quickly

13   put it up for the auction and sell it.

14        And I have few conversations with -- I can find the name,

15   I don't remember, person from JJ Manning -- and I asked what

16   kind of -- how quickly we can do this, what kind of price we

17   can get, and it wasn't -- it -- it -- in my understanding by

18   then it wasn't making much sense because we wouldn't get any

19   more than -- more than $4 million for these houses, and it

20   kind of wasn't -- wasn't a good decision.

21        Q.    So what wasn't a good decision?

22   A.    To put it through their auction.

23        Q.    So you retained Mr. Tamposi as bankruptcy counsel,

24   right?

25   A.    Correct.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEXANDER FILIPPOV - Direct

1    Q.   Did you interview other bankruptcy counsel before

2   retaining Mr. Tamposi?

3   A.   Yes.

4    Q.   Okay.  So as we approach the moment -- I believe you

5   filed for protection on October 7, 2015?

6   A.   Correct.

7    Q.   What were the factors in your head that you were

8   taking into account as you decided to make that filing?

9   A.   Well, as I said, there is a dissolution, there is a

10  Rockland Trust loans, three of them, $5 million, and there is

11  a lien sitting on the property that we -- we will not be able

12  to sell the property without removing the liens, and the best

13  way to remove the lien we -- we thought is bankruptcy.  And a

14  $2 million lien that was placed on both properties somehow

15  without identifying the property is -- make it almost

16  impossible to sell it.

17   Q.   Did you discuss the decision to file for bankruptcy

18  protection with Mr. Lipetsker before you filed?

19  A.   Yes.

20   Q.   Did Mr. Lipetsker approve the decision?

21  A.   Yes.

22   Q.   Did you discuss the decision with Mr. Kagan before

23  you filed?

24  A.   No.

25   Q.   Why not?



ALEXANDER FILIPPOV - Direct

1    A.    At this point the relationship was so bad, and he

2    basically was the person who put us in this position to file

3    for bankruptcy if we had to.  We didn't require his -- we knew

4    he was going to say no.  It was just waste of time to do this.

5    Exactly like at this meeting, everything we vote yes for, they

6    voted no.

7          MR. CARNATHAN:  Could I have Exhibit 75 in evidence,

8    please?

9    BY MR. CARNATHAN:

10        Q.    So Mr. Filippov, Exhibit 75 in evidence is the

11   mortgage that you signed with Lyman-Cutler, right?

12   A.    Yes.

13        Q.    All right.  Did you consult Mr. Lipetsker before you

14   signed that mortgage?

15   A.    Yes.

16        Q.    And did he consent to the mortgage?

17   A.    Yes.

18        Q.    Did you discuss it with Mr. Kagan?

19   A.    No.

20        Q.    Why not?

21   A.    The -- the same reason.  At this point, we didn't talk to

22   Mr. Kagan, and we knew the answer would be no anyway

23   regardless.  It was adversarial, so no we didn't consult him.

24          MR. CARNATHAN:  Could I have Exhibit 72 for

25   identification?



ALEXANDER FILIPPOV - Direct

1   BY MR. CARNATHAN:

2        Q.   Do you recognize the document we've marked as

3   Exhibit 72 for identification, Mr. Filippov?

4   A.   Yes.

5        Q.   What is it?

6   A.   It is a printout from the QuickBook that we get keeping

7   the -- all the carrying costs, all the payment that I made to

8   Lyman-Cutler account.

9        Q.   So this is a summary of the payments of that you

10  made into the LLC?

11  A.   Correct.

12       MR. CARNATHAN:   Your Honor, we would offer Exhibit 72

13  into evidence.

14       MR. PERTEN:   Your Honor, we'd object to the summary.

15  Amongst other things, it's illegible, and I can't read --

16       THE COURT:   It's what?

17       MR. PERTEN:   Illegible.

18       THE COURT:   Illegible.

19       MR. PERTEN:   It's too small, and it's been that way

20  since day one.

21       Number two, it is a summary.   I don't know if this is

22  a QuickBooks report, I don't know who prepared the QuickBooks,

23  how the QuickBooks were prepared, whether Mr. Filippov

24  prepared QuickBooks, whether somebody from his staff prepared

25  QuickBooks.   I know nothing about it so I think there's a lack

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 142

ALEXANDER FILIPPOV - Direct

1    of foundation to allow a QuickBooks summary.

2         MR. CARNATHAN:  Well, I mean it's legible as many of

3    the documents in the case, Your Honor.  And particularly when

4    we blow it up, you'll be able to read it.

5         I mean, I can ask Mr. Filippov who prepared it.  I'm

6    sure it's either him or his wife.  But also the checks that

7    back it up are already in evidence as Exhibit 91, so you can

8    map the checks back to Exhibit 91, but frankly, that's, you

9    know, inconvenient at best.  I think they are sufficiently

10   voluminous that it makes more sense just to let the QuickBook

11   report in, and we gave these things to Mr. Perten a couple of

12   weeks ago.

13        THE COURT:  Gave what things?

14        MR. CARNATHAN:  Our -- copies of our exhibits.

15        THE COURT:  Copies of the exhibits -- what about the

16   documents from which this document was constructed?

17        MR. CARNATHAN:  Well, he's got the copies of the

18   checks that went into evidence as Exhibit 91.  So if he wants

19   to map them and see if we've made a mistake, he certainly has

20   the opportunity.

21        THE COURT:  All right.  Okay.  Hold on.

22        MR. PERTEN:  Your Honor, I have no objection to the

23   checks and we didn't assert the checks, but this QuickBook

24   report goes further than that, it runs totals, it runs

25   percentages.  There's a bunch of other calculations on this

ALEXANDER FILIPPOV - Direct

1    summary sheet.

2         THE COURT:  So you say that the originals from which

3    this was derived were made available to Mr. Perten?

4         MR. CARNATHAN:  I would amend that just to say

5    that -- yeah, I mean they were derived because they were

6    entered in the QuickBooks as they went.  I mean we went back

7    and found all the checks so that we could go line by line and

8    say this check maps to that, this check maps to that.  And so

9    that's how we built Exhibit 91.  But as the report was being

10   prepared, they would issue a check and put it in the

11   QuickBooks.

12        THE COURT:  All right.  So I'm sure you're both

13   familiar Federal Rule of Evidence 1006, which provides that

14   the proponent may use a summary, a chart, or a calculation to

15   prove the contents of voluminous writings, recordings, or

16   photographs that cannot be conveniently examined in court.

17   The proponent must make originals or duplicates available for

18   examination, or copying, or both, or -- by other parties, or

19   at a reasonable time and place, and the court may order the

20   proponent to produce them in court.

21        So back to this.  I just want to get a clear answer

22   on this, the underlying documents from which this chart was

23   created, does it meet the requirements of Rule 1006?

24        MR. CARNATHAN:  I believe it does, Your Honor.  I

25   mean, the line items are going to be supported by the checks

ALEXANDER FILIPPOV - Direct

1   in Exhibit 91.

2          THE COURT:  Mr. Perten, anything else?

3          MR. PERTEN:  Your Honor, as the Court will see, we

4   did not object to Exhibit 91, which are copies of checks.  My

5   problem with this is if you look at it, the whole bottom

6   section of this, to the extent we can read it, not only does

7   it run totals, but it then runs percentage of partners'

8   interests, and calculations, reductions to Kagan's interest,

9   however they calculated -- 2.89.  There's a bunch of other

10  information on this sheet, so it is far more than simply a

11  summary of the checks.

12         MR. CARNATHAN:  I would offer to redact off the

13  remaining interest.  I don't think that's really our point

14  here.

15         THE COURT:  Remaining -- okay.

16         MR. CARNATHAN:  There's a percentage interest that

17  was calculated because that was a claim that's been raised

18  that when you look at that paragraph 8.1 in the operating

19  agreement, the percentage interest is supposed to change, but

20  it's not --

21         THE COURT:  Yeah, that's fine.  I understand.  And

22  the left part of the page, at the bottom of the page, that

23  starts with the word total --

24         MR. CARNATHAN:  Yeah, we --

25         THE COURT:  -- you're not proposing to redact that,

ALEXANDER FILIPPOV - Direct

1  right?

2          MR. CARNATHAN:  No.  I mean, I --

3          THE COURT:  It's merely -- that's just math.

4          MR. CARNATHAN:  It's doing the math.  Yeah.

5          THE COURT:  All right.

6          MR. CARNATHAN:  So I was going to have Mr. Filippov

7  explain the math.

8          THE COURT:  Okay.  All right.  You can cross-examine

9  on it.  I'm going to overrule the objection.  Although I will

10  ask that the document be redacted with the analysis on the

11  right side, at least at this stage -- you may be able to lay a

12  sufficient foundation for him to testify about that, but at

13  this point you have not.

14          So I'll accept it as a summary under Rule 1006, and

15  allow the total numbers on the left side of the page to come

16  in.  That's the current document that I'll allow in, and

17  that's Exhibit number 72, as redacted.

18   PLAINTIFFS' EXHIBIT 72 AS REDACTED WAS ADMITTED INTO EVIDENCE

19          MR. CARNATHAN:  Thank you, Your Honor.

20  BY MR. CARNATHAN:

21     Q.   So Mr. Filippov, Mr. Hartzell's already blown up the

22  part that we were interested in.  So the first total up there

23  is $2,435,533.95; am I reading that right?

24  A.   Yes.

25     Q.   There we go, he's blown it up bigger.  Could you

Page 146

ALEXANDER FILIPPOV - Direct

1   explain what that number is?

2   A.   This is the total amount of money I put into this -- into

3   Lyman-Cutler by -- by the date, I believe that before December

4   31st, 2015.

5        Q.   All right.  So it includes the $2 million that you

6   initially invested, right?

7   A.   Yes.

8        Q.   What about the $200,000 mortgage; is that

9   encompassed in there?

10  A.   Yes.

11       Q.   Okay.  And so that leaves us with $235,533.95,

12  right?

13  A.   Correct.

14       Q.   Okay.  And so how were you thinking about that

15  money?  What's that?

16  A.   This was the carrying -- the carrying costs and the legal

17  fees -- all the expenses that the LLC had to carry in -- in

18  that duration.

19       Q.   So when you have the line item, Kagan initial INV, I

20  think is investment, left, reduced by AF contributions --

21  A.   Yes.

22       Q.   14,466.05; do you see that?

23  A.   Yes.

24           MR. PERTEN:  Your Honor, I'm confused.  Didn't you

25  just say that doesn't come in, that part?



ALEXANDER FILIPPOV - Direct

1            MR. CARNATHAN:  I thought just the percentage

2    interest.  Am I --

3            THE COURT:  That's what I thought.  That's what I

4    ruled on, but I can't see what you're talking about right now,

5    can I?  When you --

6            MR. CARNATHAN:  Yes, Your Honor.  In the sort of

7    center column of numbers --

8            THE COURT:  Oh I see it, fourteen --

9            MR. CARNATHAN:  14,466.05.  I was going to ask Mr.

10   Filippov to explain where he got that number.

11           MR. PERTEN:  So this is an analysis, Your Honor.

12           THE COURT:  It's what?  He can -- there's no reason

13   he can't -- he can provide that testimony.  That's got nothing

14   to do with the underlying documents.  He can testify to it.

15   So as I just said, if he can provide a foundation that this is

16   admissible evidence, and within his capacity to testify to,

17   the whole document may come in.  And that's what I understand

18   is happening now.

19           I didn't say he couldn't ask him about it.

20           Go ahead.

21           MR. CARNATHAN:  Thank you, Your Honor.

22   BY MR. CARNATHAN:

23       Q.   So I was going to ask you to explain, Mr. Filippov,

24   how you calculated the 14,466.05?

25   A.   All it is simple math.  Kagan put $250,000 initial

ALEXANDER FILIPPOV - Direct

1  investment, his capital contribution, and I put $235,000 as

2  mine, and in accordance to agreement, his capital investment

3  is reduced by the amount I put in.

4      So if you take $250,000 and then subtract $235,533 that I

5  put in, his capital contribution is $14,466.  That's what's

6  left.

7      Q.   And so when we look up above that, is says AF total

8  investment, and we have the $2,435,533.95, and right below it

9  you have $2,235,533.95, what's the difference between those

10  two numbers?

11  A.   The mortgage -- $200,000 mortgage amount is the

12  difference.

13      Q.   So you deducted the amount of the mortgage from your

14  increased --

15  A.   Right.  It's not considered capital contribution here,

16  it's considered to be mortgage.  So otherwise, Mr. Kagan

17  contributions would be zero, negative.

18          MR. CARNATHAN:  I have nothing further for Mr.

19  Lipetsker -- excuse me, Mr. Filippov.

20          THE COURT:  I was going to say, that was a sleight of

21  hand, if I ever saw one, but let's talk about this exhibit

22  though.  Are you -- you had him testify about some of the

23  other figures on this document that I excluded.  Are you

24  moving to --

25          MR. CARNATHAN:  Oh, I guess I'm confused.  To the

1  extent I've done -- I would ask that it be admitted.  I

2  thought we were just excluding the percentages.  I may have

3  misunderstood, but I --

4          THE COURT:  I see what you're saying.

5          MR. CARNATHAN:  Yeah.

6          THE COURT: Yeah.  All right.  Okay.

7          MR. CARNATHAN:  But I would move for the admission of

8  the document with those redactions.

9          THE COURT:  All right.  Is there an objection to

10 that?

11         MR. PERTEN:  Yes, Your Honor.  I continue to object

12 to the calculations as opposed to the summary report.

13         THE COURT:  All right.  I'll overrule that.  You can

14 certainly cross-examine.  He gave testimony concerning it.

15         Okay.  Thank you.

16         MR. CARNATHAN:  Thank you, Your Honor.

17         THE COURT:  All right.  So we're going to pick up

18 tomorrow with the cross-examination.  I assume you have a few

19 questions, right?

20         MR. PERTEN:  One or two.  Five minutes.

21         THE COURT:  Okay.  All right.  So we'll move forward

22 tomorrow with that.

23         I would like to talk to you about the following.  I

24 prefer that -- and what's good for the goose is good for the

25 gander, you know that whatever -- you get the concept I'm

1   going to come up with here.  I normally ask witnesses not to

2   discuss the subject matter of their testimony, even with

3   counsel during a break, or certainly overnight.

4        Do the parties share my view in that regard?  I've

5   only had push-back on it one time from lawyers.

6        MR. PERTEN:  I guess, Your Honor, you're --

7        THE COURT:  In the microphone -- a little more in the

8   microphone.

9        MR. PERTEN:  -- is the Court suggesting that we can't

10  talk to our own client overnight?  That I have a problem with.

11        THE COURT:  Not about the subject matter -- yes,

12  because let's assume you were to do your cross-examination

13  right now, in the perfect world.  Then Mr. Carnathan wouldn't

14  have an opportunity to talk with his witness, who happens to

15  be his client to prepare him for tomorrow's examination.  I

16  think that would work an unfairness to you.

17        And so, yes he can talk anytime to his witness about

18  logistics, he can talk to his witness about any sort of

19  concern that he might have over privilege, anytime.

20        But I prefer not to have witnesses prepare, after

21  they've given their testimony, for the next day because I

22  think that it work an unfairness.

23        MR. PERTEN:  I appreciate where the Court is coming

24  from.  I will tell you, candidly Your Honor, that in over

25  thirty years of practice, I've never had somebody make that

1    request.  I mean, that is one of the occupational hazards, if

2    you will, of not finishing in a day, which we both suffer

3    from.

4           THE COURT:  Well, that's why I'm asking.  And unless

5    I have --

6           MR. PERTEN:  I mean, it makes me uncomfortable.  I

7    mean, I'm -- I've just never been asked that, so I'm caught a

8    little off guard, in candor.

9           MR. CARNATHAN:  It's okay with us, Your Honor.  I've

10   actually tried a case in -- I think Delaware does that to

11   you -- I mean, it varies jurisdiction to jurisdiction, but

12   I've certainly been through it before.

13          THE COURT:  It's in the rules in many states.

14          MR. PERTEN:  Well, we'll abide by the Court's

15   request, clearly.

16          THE COURT:  Of course.

17          MR. CARNATHAN:  And just to be clear, if I understand

18   it, it's once their sworn in you can't talk to them anymore,

19   but --

20          THE COURT:  That's right.  That's right.  That's how

21   I see it.  Once you're under oath, you're giving your

22   testimony, and the preparation time is over.

23          Again, I always allow for logistics and privilege if

24   that's something that is likely to come up.  The client has a

25   right to hear that, but he doesn't have the right to hear

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    tonight, knowing how the testimony went in, that tomorrow Mr.

2    Perten's going to hone in on X, Y, and Z, and let's go over

3    what that testimony might be.  Yes, he could have done that

4    yesterday or last night.  He certainly did, I'm sure.

5         But I think it works an unfairness, and so I'm going

6    to impose that.  All right?  I would, and again, he can't do

7    it tonight, but you can't do it next week.  All right?  Let's

8    go with it that way.

9         Then we'll get what this witness' unblemished and

10   unprepared testimony is based on where he is right now, and

11   that's what I think is the most fair.

12        I think New Hampshire has this rule.  I had a judge

13   up there scoot me away from a witness one time during a lunch.

14   I think I went up to talk to about where we were going to have

15   lunch, and she said, get away from that witness.

16        So it's my strong preference.  I've never been

17   appealed on it, and so I'm going to enter that rule.  All

18   right?  We all understand each other on this?

19        Okay.  I will see you tomorrow.

20        MR. PERTEN:  Your Honor, may I ask one question.

21        THE COURT:  Yes, of course.

22        MR. PERTEN:  What's happening on Thursday?  Your

23   Honor said you had to go to Washington.  It was unclear --

24        THE COURT:  Well, that's next Thursday.

25        MR. PERTEN:  That following Thursday --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1           THE COURT:  That following Thursday.

2           MR. PERTEN:  -- do you know whether we'll have trial

3    that morning or not?  We're just trying to --

4           THE COURT:  I have to look at my --

5           MR. PERTEN:  Okay.

6           THE COURT:  -- schedule.  Yeah.  And I thought we

7    would make that decision as we got a little bit closer.

8           MR. PERTEN:  That's fine.  I didn't know if the Court

9    plans were finite.  We're just trying to subpoena people and

10   line people up.

11          THE COURT:  Well, that's another thing.  Yeah.  I'll

12   check that out this afternoon.

13          MR. PERTEN:  All right.

14          THE COURT:  I'll let you know tomorrow.  Fair enough.

15   Okay?

16          Hold on.  Mary -- okay.

17          So just the only cleanup is yeah you can leave all

18   the boxes and stuff here.  Nobody's going to be in here.  And

19   we'll lock the door anyway.

20          If you could please, Mr. Carnathan, would you come in

21   tomorrow with a redacted version of that exhibit, whatever it

22   was -- number 72.

23          MR. CARNATHAN:  Okay, Your Honor.

24          THE COURT:  Run that by Mr. Perten, make sure you

25   guys agree on what my ruling was, and the redacted portion of

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1    it, provide that to Mary.  She'll take it out of the book and

 2    date the current one.  Okay?

 3             MR. CARNATHAN:  Thank you, Your Honor.

 4             THE COURT:  Anything else?  All right.

 5             And you understood my instruction that you're to talk

 6    only to -- you can speak to anybody you want about dinner, and

 7    you can speak to anybody you want -- you can speak with your

 8    lawyers about any concerns you might have about privilege, but

 9    please don't discuss the substance of your testimony during

10    the break.  Okay?

11             THE WITNESS:  Okay.

12             THE COURT:  All right.  I'll see you tomorrow.  And

13    you're -- you'll be under oath tomorrow, continuing under

14    oath.

15             All right.  Thank you.

16             MR. CARNATHAN:  Good evening, Your Honor.

17    (End at 1:16 PM)

18                          * * * * * * * * * *

19

20

21

22

23

24

25
```

1        I certify that the foregoing is a true and accurate

2   transcript from the digitally sound recorded record of the

3   proceedings.

4

5   

6

7   /s/ Michele A. Clutts                              May 29, 2019

8   _____

    ESCRIBERS LLC
9                           eScribers
                    7227 N. 16th Street, Suite #207
10                        Phoenix, AZ 85020
                            973-406-2250
11                  e-mail operations@escribers.net

12

13

14

15

16

17

18

19

20

21

22

23

24

25

Case 16-01120    Doc 340    Filed 06/04/19    Entered 06/04/19 12:58:46    Desc Main
Document    Page 156 of 176
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

May 6, 2019

## $

**$1 (3)**
107:19;121:24;130:6
**$1.3 (4)**
25:8;38:6,14;39:24
**$1.4 (2)**
85:15;88:19
**$1.5 (2)**
9:24;39:24
**$1.6 (4)**
75:1;79:21;83:11;
94:6
**$100,000 (4)**
67:25;68:1,9;75:5
**$14,466 (1)**
148:5
**$141,790 (1)**
82:16
**$145,814 (1)**
128:5
**$16,000 (1)**
78:21
**$164,000 (1)**
126:22
**$2 (7)**
42:24;46:13;54:4;
111:14;121:24;139:14;
146:5
**$2,000,000 (1)**
8:12
**$2,095,985.23 (2)**
128:11;130:4
**$2,235,533.95 (1)**
148:9
**$2,435,533.95 (2)**
145:23;148:8
**$2.2 (2)**
42:21,23
**$2.4 (1)**
45:18
**$20,000 (1)**
67:2
**$200 (1)**
126:21
**$200,000 (13)**
9:7;10:4;38:6,23;
39:22;79:3;82:10,10,
20;83:6;85:16;146:8;
148:11
**$204,000 (1)**
10:3
**$204,441 (1)**
9:18
**$219,804 (1)**
79:14
**$225,958.05 (1)**
9:14
**$235,000 (1)**
148:1
**$235,533 (1)**
148:4

**$235,533.95 (1)**
146:11
**$244,276.56 (1)**
110:3
**$25,000 (2)**
88:5;126:6
**$250,000 (4)**
8:13,15;147:25;
148:4
**$3,194- (1)**
127:6
**$3,738,925.82 (1)**
126:12
**$3.2 (1)**
127:9
**$325,000 (1)**
110:6
**$4 (1)**
138:19
**$4.9 (2)**
41:8,11
**$420,000 (2)**
88:24;89:2
**$45,000 (1)**
40:15
**$5 (3)**
54:4;82:12;139:10
**$5.2 (1)**
118:19
**$560,638.87 (1)**
126:17
**$578,000 (1)**
25:19
**$59,250 (1)**
127:2
**$6,700-something (1)**
130:14
**$7 (1)**
54:5
**$700,000 (1)**
9:21
**$75 (3)**
89:15,19;127:1
**$75,000 (1)**
40:6
**$758,000 (1)**
11:12
**$760,771.08 (1)**
127:12
**$777,000 (1)**
8:24
**$916,800 (1)**
9:3

## A

**abide (1)**
151:14
**able (12)**
11:14;31:21;45:13;
59:8,8;107:8;133:16,
17;138:3;139:11;
142:4;145:11

**above (2)**
51:3;148:7
**Abramskiy (1)**
133:7
**absolutely (3)**
26:3;42:15;69:24
**abuse (1)**
24:15
**accept (2)**
123:18;145:14
**accepted (1)**
49:17
**access (2)**
131:2,4
**accommodation (1)**
49:19
**accordance (9)**
7:14;10:20;19:6;
20:2;49:5;52:7;98:9;
115:25;148:2
**according (2)**
57:2;88:16
**account (17)**
19:13;21:23;27:16;
66:24;72:18;92:12,13;
93:6,7,14;111:2;113:7;
119:22;130:16;131:2;
139:8;141:8
**accountant (1)**
94:2
**accounting (1)**
94:3
**accounts (2)**
109:15;125:14
**accrued (1)**
128:3
**accusation (1)**
17:18
**accusations (1)**
17:17
**achieved (1)**
37:21
**acquainted (1)**
6:23
**acquired (2)**
63:21;64:1
**acquisition (8)**
15:7,7,17;16:2;
48:24;49:9;52:12;61:3
**acre (1)**
36:25
**across (1)**
41:25
**acted (1)**
85:20
**action (2)**
135:24;136:4
**actions (2)**
135:16;136:20
**activity (1)**
108:5
**acts (2)**
17:19;22:16

**actual (7)**
9:5;41:7;44:25;
51:11;97:9;98:6;
112:12
**actually (18)**
9:9,12;10:8,14;16:6,
8;17:1;32:13;33:25;
58:12;68:5;76:16;
81:10;99:22;100:17;
119:25;124:8;151:10
**add (2)**
9:7,13
**added (3)**
52:2,15;75:5
**addendum (3)**
58:1,7,8
**adding (3)**
10:9;66:15;67:12
**addition (2)**
10:19;110:23
**additional (6)**
51:13;52:8;67:25;
68:1;110:24;111:1
**address (8)**
44:18;54:7;71:7,24;
96:24;112:2;119:19;
120:6
**addressed (1)**
80:6
**addresses (2)**
96:17,24
**admissible (1)**
147:16
**admission (3)**
34:4;49:24;149:7
**admitted (11)**
5:3;13:11;34:22,25;
70:25;74:3,7;124:22,
24;145:18;149:1
**advance (3)**
128:2,3,9
**advanced (1)**
89:11
**advances (2)**
89:6;127:7
**adversarial (2)**
132:5;140:23
**Adversary (4)**
4:5;18:17,17;26:17
**advertisements (1)**
103:10
**AF (2)**
146:20;148:7
**affect (1)**
51:6
**affirmative (2)**
18:18,20
**afraid (1)**
23:25
**afternoon (1)**
153:12
**afterwards (1)**
21:5

**again (17)**
23:22;34:24;44:1;
56:22;59:24,25;68:14;
74:9;76:4;77:24;87:17;
97:22;125:9;135:12;
136:24;151:23;152:6
**against (5)**
17:24;75:1;115:23;
117:18;120:22
**agent (2)**
84:6,8
**aging (1)**
109:16
**ago (3)**
36:13;108:5;142:12
**agree (13)**
44:10;51:12;68:10,
12;69:18;74:13;97:25;
117:2;134:23;135:10,
15;136:4;153:25
**agreed (21)**
5:1;11:4,5;19:6;
23:15;28:23;44:8;
52:24;57:14;68:12;
72:8,9;73:19,20,21,23;
74:14,18;106:11;
116:16;134:20
**agreement (79)**
7:2,7,19;8:4;11:20;
12:20,24;13:4,7,9,17,
21;14:7,17;15:5,10;
18:25;19:2,5;20:11,14;
11:25;3:26:1,22;40:17;
42:25;44:8;47:11;50:6;
51:12;52:2,6;55:16,22;
56:3,5;57:19;58:1,9,19,
22,23;59:6,12,13,20;
60:21;74:6,17;87:5;
100:20,23;101:3,8;
103:23,25;104:2,4,7,9;
105:20;106:10,15,21,
23,25;107:7,16;111:9;
125:16;144:19;148:2
**agreements (1)**
12:6,7,22
**agrees (2)**
58:19;130:3
**Ah (1)**
30:20
**ahead (7)**
24:3;27:25;44:11;
69:25;75:19;92:3;
147:20
**al (2)**
4:6,9
**Alex (6)**
4:8,13;28:1,3;49:12;
122:19
**Alexander (4)**
29:11;94:7;113:24;
122:19
**Alex's (1)**

106:17
**allegations (3)**
17:24;27:9,12
**alleged (2)**
109:15;115:23
**allocation (2)**
81:25;120:10
**allow (7)**
17:7;37:3;73:7;
142:1;145:15,16;
151:23
**allowed (1)**
18:7
**almost (6)**
10:16;11:16;40:17;
107:19;119:13;139:15
**along (3)**
17:23;26:6;91:12
**Although (1)**
145:9
**altogether (1)**
38:15
**always (1)**
151:23
**amend (1)**
143:4
**amended (2)**
70:21,24
**among (4)**
7:19;64:15;86:4;
116:23
**Amongst (1)**
141:15
**amount (16)**
25:15;26:10;37:4;
42:10;43:17;51:21,23;
68:18;78:4,10;80:11;
93:8;146:2;148:3,11,
13
**amplified (1)**
28:12
**amplify (1)**
28:12
**analysis (5)**
79:9;81:24;83:12;
145:10;147:11
**announced (1)**
11:12
**annualized (2)**
78:6,11
**annum (2)**
49:7;52:9
**anticipate (1)**
120:7
**anymore (1)**
151:18
**apologies (2)**
34:21;56:17
**apologize (2)**
32:14;96:10
**apparent (1)**
11:23
**apparently (9)**

47:15;49:16;55:8;
72:14;86:21;97:22;
98:14,23;99:15
**appealed (1)**
152:17
**appears (4)**
8:9;68:20;97:4;
123:1
**application (3)**
37:14,15;75:14
**applies (1)**
126:15
**apply (3)**
37:7,16;74:15
**applying (3)**
68:16,18;78:10
**appraisal (1)**
75:23
**appraisals (2)**
75:11,13
**appraised (3)**
65:24;75:17;118:19
**appreciate (1)**
150:23
**approach (2)**
69:22;139:4
**approached (3)**
31:10;112:21,23
**approaching (1)**
109:6
**approval (1)**
14:1
**approve (8)**
12:16;71:11;94:10,
17;108:21,23,25;
139:20
**approved (7)**
7:15;10:21;11:8;
19:7;24:19;57:3;88:18
**approximately (5)**
8:24;9:19,21;36:25;
87:11
**April (19)**
11:3;12:25;16:7;
66:12,19;67:2,18;68:2,
10;71:24;72:25;74:25;
75:4,10,22;103:21;
105:19,20;106:24
**area (1)**
112:21
**argue (1)**
107:4
**argument (1)**
19:20
**around (7)**
11:12;19:1;28:7;
33:5;43:9,14;115:3
**arranged (5)**
32:5;37:6;61:6;
62:15;85:5
**arrive (1)**
54:2
**arrived (1)**

126:13
**Art (1)**
109:22
**aside (4)**
13:12;72:20;117:2;
135:22
**assert (2)**
124:6;142:23
**asserted (2)**
17:24;132:9
**assertion (1)**
111:7
**assess (1)**
120:9
**assigned (2)**
71:8;96:18
**associated (1)**
110:25
**assume (4)**
34:8;69:15;149:18;
150:12
**assumed (2)**
32:22;80:9
**assuming (4)**
21:20,23;82:21,25
**assumption (1)**
79:1
**attached (5)**
58:6,8;69:17;123:3,6
**attempt (1)**
24:15
**attended (4)**
32:15;62:20;134:13,
15
**attention (6)**
31:9;49:22;88:2;
102:4,10,10
**attorney (13)**
30:23;32:6,22;39:13;
53:13,18;62:11,19,21,
23;85:20,22;102:9
**attorneys (1)**
132:7
**auction (3)**
138:12,13,22
**auctioned (1)**
138:4
**August (13)**
7:24;13:3;98:25;
99:21,22,22,25;100:17;
101:4,8;102:15,17;
137:7
**authority (1)**
12:2
**authorized (2)**
13:1;114:17
**available (3)**
111:3;143:3,17
**avoid (1)**
44:23
**aware (10)**
91:8;103:8,10,13;
110:8,11,13,15,16;

114:15
**awareness (3)**
109:19,21,24
**away (5)**
6:13;28:14,15;
152:13,15

**B**

**B&D (1)**
110:13
**back (38)**
6:13;7:8;8:5;16:15;
19:15;24:21;28:18,19;
30:7;34:1;37:8;42:13;
55:13;57:10;59:25;
61:15;65:21,22;67:17;
72:15,25;81:19;88:18;
98:17;99:21;108:13,
15;113:18;128:11,15;
129:1;131:13;135:10,
13;142:7,8;143:6,21
**backdating (1)**
124:16
**backs (1)**
13:8
**bad (3)**
16:20;17:3;140:1
**balance (2)**
25:23;130:2
**bank (32)**
19:13,14;21:11;
27:16;38:22;39:3;53:6;
62:23;64:20;66:5,15;
67:10;68:21;69:5;
74:13;75:11,16;85:19;
86:11;93:7;94:6;
110:17,18,18,18;
118:14;120:11;127:8;
130:11;131:2;137:24;
138:4
**Banker (1)**
112:22
**bankruptcy (8)**
23:22;137:4;138:7,
23;139:1,13,17;140:3
**bargain (1)**
27:2
**bargained (3)**
18:23;20:7;26:15
**based (14)**
12:12;17:8;40:13;
41:11;49:17;52:9;
55:21;56:3;68:16;
81:25;88:15,16;120:3;
152:10
**basic (1)**
82:13
**basically (20)**
10:21;31:23;35:22;
36:14;37:3,24;38:12,
21;40:7,15,18;44:9;
46:11;52:25;64:20;

69:5;104:5;112:4;
137:19;140:2
**basis (2)**
123:2;124:18
**bear (2)**
12:13;111:1
**bears (1)**
35:2
**became (2)**
21:18;106:7
**become (2)**
71:9,10
**becoming (1)**
46:10
**beforehand (1)**
37:17
**beginning (4)**
11:3;41:8;64:10;
78:8
**behalf (7)**
13:23;69:6;131:12,
17;134:17;135:20;
137:14
**behind (2)**
13:8;60:8
**belaboring (2)**
44:23;135:1
**Belmont (1)**
53:20
**below (9)**
8:8;20:5;26:11,13;
46:19;49:4;57:7;79:3;
148:8
**benefit (1)**
20:8
**best (7)**
35:8;19;48:15;68:2;
112:21;139:12;142:9
**better (5)**
9:24;68:5,6;77:21;
115:25
**beyond (2)**
12:23;45:12
**big (4)**
24:7,7;108:18;138:2
**bigger (3)**
6:19;60:6;68:17;
145:25
**biggest (1)**
54:12
**Bill (3)**
80:21;81:18;130:4
**bit (3)**
71:3;102:1;153:7
**blatant (1)**
16:20
**blow (4)**
80:22;81:9;126:4;
142:4
**blown (2)**
145:21,25
**blue (2)**
16:13;103:22

Case 16-01120    Doc 340    Filed 06/04/19    Entered 06/04/19 12:58:46    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 158 of 176

May 6, 2019

**book (3)**
93:5,6;154:1
**bookkeeper (5)**
99:24;106:7;133:11,
14,17
**bookkeepers (1)**
133:15
**books (3)**
17:18;93:8,10,12;
115:17
**Boris (3)**
30:22,23;55:15
**born (5)**
30:11,20,25;31:3,6
**borne (1)**
114:16
**borrow (2)**
78:16;85:5
**borrowing (5)**
39:11;61:7;79:21;
85:9,10
**Borya (3)**
55:14;73:16;74:12
**both (14)**
45:2,3,23;71:6;
75:17;86:23;98:2,8;
102:14;118:19;139:14;
143:12,18;151:2
**bottom (8)**
39:23;58:18;75:16;
108:19;116:22;118:18;
144:5,22
**bought (1)**
36:1
**box (1)**
126:4
**boxes (1)**
153:18
**breach (7)**
10:15;11:17;13:17;
16:17,20;21:23;27:3
**breached (2)**
8:3;17:1
**breaches (1)**
15:24
**break (6)**
28:23,24;29:3;76:15;
150:3;154:10
**breaks (1)**
28:23
**brief (2)**
7:1;91:25
**briefly (13)**
30:6;49:22;62:25;
63:20;79:23;84:25;
100:10;118:4,13,21;
130:15;131:8,14
**bring (3)**
56:15;66:25;82:16
**broker (17)**
12:11,19;14:3;45:3;
58:25;59:8,9;103:8;
107:6;112:21,23;

116:25;117:2,5,6,8;
136:10
**brokers (2)**
112:20;119:10
**Brookline (7)**
7:13;32:6;37:9;43:9,
19;57:2;64:6
**brought (8)**
7:5;20:11;26:13;
33:9;43:14,15;112:12;
115:11
**Brusenkova (2)**
133:10,11
**BST (1)**
109:19
**bucks (1)**
127:25
**budget (17)**
11:6;35:23;38:5,6,
10,11,22;39:21,23;
69:4;70:10;71:11;
83:11;88:19;93:3;95:3;
120:10
**budgets (3)**
44:1;65:9;71:6
**build (17)**
8:6,23;10:20;19:4;
20:2;25:2,16,21;38:12,
15;44:2,2;63:21;66:1;
68:5;77:19;85:10
**builder (1)**
42:9
**building (7)**
8:17,25;37:24;57:18;
70:16;82:11;93:2
**built (13)**
20:3;33:11,12;36:5;
37:2;43:12,12;71:6;
75:17;80:10;82:14;
108:4;143:9
**bunch (4)**
27:11,12;142:25;
144:9
**buried (1)**
24:23
**business (6)**
29:14;81:19;103:22;
104:12;114:10;125:10
**busy (2)**
104:11;107:3
**buy (2)**
62:15;117:21
**buying (2)**
15:8;57:18

**C**

**C21 (1)**
106:10
**Calandrelli (1)**
48:4
**calculated (5)**
78:9,22;144:9,17;

147:24
**calculation (4)**
41:10;77:21;79:1;
143:14
**calculations (7)**
57:24;77:19;79:2,20;
142:25;144:8;149:12
**call (13)**
27:23;28:1;91:19;
98:1;108:13,13,15;
112:13;116:21;132:6;
135:23;136:8;138:5
**called (11)**
22:18;24:1;56:9;
81:25;91:3,5;103:21,
22;104:10;135:15;
136:20
**calling (4)**
23:19,22,23;135:13
**calls (1)**
114:10
**came (17)**
11:12;31:4;56:8;
65:22;88:9;90:8;94:14;
95:16,18;102:4;
104:24;105:1;121:6;
126:13;127:15;128:9;
134:17
**can (70)**
5:14;6:18;9:4;12:12;
13:20;28:10,18;31:17;
35:8;37:21;39:2;42:24;
44:8,10;47:4;48:8,14;
55:5,22;61:15;66:8;
67:6;68:4;69:21,24;
70:1,21;72:7;73:7,9,
22;74:3;80:5,22;81:17;
82:24;84:17,18;86:1;
90:2;92:3;104:15,17;
112:13;114:8;120:9;
123:23;124:18;126:4;
135:10;138:12,14,16,
17;142:5,7;144:6;
145:8;147:5,12,13,14,
15;149:13;150:17,18;
153:17;154:6,7,7
**candidly (2)**
70:13;150:24
**candor (1)**
151:8
**cap (1)**
19:5
**capable (3)**
59:9;60:13;112:20
**capacity (2)**
93:16;147:16
**capital (18)**
15:20;21:22;49:6,7;
51:20,23;52:7,9;81:25;
110:24;111:1,2,9,10;
148:1,2,5,15
**capitulate (3)**
24:9,16,17

**care (5)**
9:5;24:22;50:21;
57:17;70:17
**cares (1)**
70:11
**CARNATHAN (264)**
4:4,12,13,24;5:1,11,
19;6:3,5,16,22;10:6,11;
13:22,24;14:2,6,12,14,
16;15:12,15;17:11;
20:11,13;21:3,7;27:23;
28:1;29:7,9;33:15,17;
34:3,10,13,17;40:1,3,9;
44:12,14;47:4,6,25;
48:6,11,17,20;50:9,11;
53:7,9;54:13,15,20,22;
56:17,19,20,23,24;
58:15,17;60:16,18;
61:10,13,15,17;62:6,8,
12,14,25;63:2,17,19;
64:11,13;66:8,10;67:6,
8;68:23,25;69:8,11,13,
21;70:1,10,17;71:1,2,
14,16,19;72:4,11,24;
74:5,8;75:7,9,19,21;
76:10,13,16,19,22;
77:3,6,12,14;79:4,6,23,
25;80:14,19,23;81:3,6,
10,14,16,22;83:2,8,18,
23,25;84:2,7,10,12,23;
85:1,23,25;86:16,18;
87:1,3,24;88:1;90:1,6;
91:22,25;92:4,5;96:16;
97:1,3,18,20;100:4,7,9,
13,15,16,25;101:2;
104:15,21;105:2,4,7,
14,16,17;106:2,4;
107:9,11,20,22;111:23,
25;113:3,5,20,22;
116:4,6;117:10,14,15;
118:3,5;119:14,16;
120:19,20;122:15,17,
22,25;123:5,25;124:8,
20,25;125:1,6,7;126:4,
5;128:18,19;131:8,10,
14,15;133:24;134:2,4,
5;137:9,11;140:7,9,24;
141:1,12;142:2,14,17;
143:4,24;144:12,16,24;
145:2,4,6,19,20;147:1,
6,9,21,22;148:18,25;
149:5,7,16;150:13;
151:9,17;153:20,23;
154:3,16
**Carnathan's (1)**
18:3
**carry (3)**
78:14;128:3;146:17
**carrying (64)**
11:2,7,14;13:18,18;
14:18;15:3,16;16:2;
20:10,13,17,24;22:5;

23:15;35:24;38:5,19,
20,23;39:3,11;41:6;
43:24,25;46:20,22;
48:25;49:19;50:21,22;
51:18,19;53:2,4;60:20;
61:1,7;66:22;67:1,2;
74:16;78:3,9;79:3,14,
16;85:16;93:13;
110:20,25;111:10,13,
18,19;127:11,11,19,25;
128:2,8;141:7;146:16,
16
**case (10)**
4:7;5:17;27:14;40:7;
45:19;47:1;51:5;82:5;
142:3;151:10
**caught (1)**
151:7
**caused (1)**
59:12
**caveat (1)**
5:5
**cc (4)**
64:22,23;76:5;
113:24
**center (1)**
147:7
**cents (1)**
128:6
**Century (7)**
12:22;13:12;101:14,
15;104:5;119:10;
136:21
**certain (2)**
14:24;125:4
**certainly (11)**
12:17;21:9;56:23;
69:21;72:7;84:18;
142:19;149:14;150:3;
151:12;152:4
**certificate (4)**
61:16,24;62:1,3
**certificates (1)**
61:1
**cetera (4)**
36:12;37:23;66:23;
123:7
**CFO (1)**
16:11
**chain (1)**
55:6
**change (10)**
32:23;45:25;46:1;
56:3;94:17;108:21,23;
109:1;123:23;144:19
**changed (4)**
36:20;54:11,16;58:9
**changes (1)**
58:2
**changing (2)**
46:5;68:8
**characterize (1)**
123:23

Case 16-01120    Doc 340    Filed 06/04/19    Entered 06/04/19 12:58:46    Desc Main
LYMAN-CUTLER, LLC, et al. v.                    Document    Page 159 of 176
KAGAN, et al.                                                                              May 6, 2019

**charge (6)**
9:20;19:22;26:2;
82:11;89:10;126:20
**charged (4)**
8:23;18:6;19:21;
26:10
**charges (1)**
126:3
**chart (2)**
143:14,22
**cheaper (1)**
26:14
**check (4)**
143:8,8,10;153:12
**checks (23)**
9:8,10;10:8,13;
19:12,14;91:11;92:6,7,
10,15,16;93:4,13;
142:6,8,18,23,23;
143:7,25;144:4,11
**cherry (1)**
18:24
**children (1)**
29:25
**circulated (3)**
47:11,13,16
**circumstance (1)**
67:12
**circumstances (1)**
46:22
**claim (15)**
4:8;9:2,24;10:16;
13:1;17:7;18:12,16,20;
24:8;26:8,16;122:1;
124:18;144:17
**claimant (1)**
4:8
**claimed (1)**
121:24
**claims (4)**
9:3;16:24;132:8;
134:6
**clarification (1)**
34:8
**classic (3)**
24:14,15;86:8
**clause (2)**
22:8;23:17
**clauses (1)**
22:3
**clean (1)**
71:3
**cleaners (1)**
95:23
**cleanup (1)**
153:17
**clear (10)**
18:22;19:17,17;
47:22;51:3;73:10;
122:2;126:8;143:21;
151:17
**clearly (1)**
151:15

**CLERK (5)**
4:2,5;6:7;28:2,4
**client (4)**
17:25;150:10,15;
151:24
**clients (1)**
17:9
**close (3)**
32:8;96:3;130:20
**closed (1)**
85:17
**closer (3)**
6:10;96:7;153:7
**closing (10)**
62:18,20,23;63:8;
85:18,20;86:3,19,21,23
**Cohen (25)**
112:12;113:17,23;
114:3;115:7,11,16,19;
118:25;119:19;120:1,
3;121:20;122:19;
124:16;125:9;132:7;
134:17,20,24;135:2,19;
136:1,16;137:1
**Coldwell (1)**
112:22
**collapse (1)**
45:22
**collect (2)**
11:13,14
**collectively (1)**
24:11
**colloquy (1)**
48:12
**colluded (1)**
13:16
**column (2)**
41:22;147:7
**comfortable (1)**
28:19
**comfortably (1)**
28:11
**coming (10)**
6:25;23:21;53:2,5;
65:21;67:11;72:15;
80:21;93:19;150:23
**comments (1)**
6:25
**commercially (1)**
26:12
**commission (3)**
13:12;26:25;27:1
**common (1)**
38:25
**Commonwealth (4)**
22:14;62:3,10;
132:21
**Communications (1)**
30:9
**community (1)**
30:23
**companies (1)**
9:13

**company (26)**
8:22;9:3;13:7;22:13;
23:25;26:5;27:19;
29:13,13,16;38:14;
51:20,24;59:3;60:23,
25;62:2;65:2;86:9;
87:18;91:3;109:6;
111:4;112:12;137:4;
138:12
**compared (2)**
82:17;83:13
**compares (1)**
82:14
**comparing (1)**
16:25
**compensable (2)**
26:19,20
**compensated (1)**
89:15
**compensation (4)**
8:8,10;57:6;91:17
**competing (1)**
25:5
**complaint (6)**
18:17,17;26:17;
131:12,17;132:13
**complete (10)**
7:20;11:11;99:11;
100:1;112:10,11,14,14;
118:18;136:12
**completed (8)**
7:16;8:2;14:24;57:5;
98:9;99:8,9;128:21
**completely (2)**
92:21;108:4
**completion (3)**
45:12;98:4,6
**complied (1)**
20:20
**components (2)**
83:19;85:13
**comprehensible (1)**
108:3
**compromise (2)**
123:11;124:1
**computer (2)**
34:1,15
**concentrate (1)**
75:3
**concentrated (1)**
54:9
**concept (1)**
149:25
**concern (10)**
39:6;41:3,7;54:7;
56:4;59:7,10;60:11;
78:21;150:19
**concerned (4)**
23:13,15;60:10;97:8
**concerning (4)**
74:6;107:15;117:13;
149:14
**concerns (4)**

**conclude (2)**
16:23;40:12
**concluded (1)**
43:3
**condition (1)**
115:12
**conduct (2)**
18:5;114:18
**conducted (2)**
129:6,23
**confirm (4)**
106:11,18,22,23
**confirmed (1)**
106:21
**confirming (1)**
106:20
**confused (2)**
146:24;148:25
**confusion (2)**
39:25;40:5
**connect (1)**
9:11
**connected (1)**
6:16
**connection (2)**
118:14;132:10
**consent (5)**
59:1,4;60:2;131:25;
140:16
**consider (2)**
5:16;138:6
**considered (2)**
148:15,16
**considering (1)**
44:10
**conspired (2)**
13:16;26:24
**construct (3)**
7:12;56:12;57:1
**constructed (1)**
142:16
**construction (74)**
7:16;10:25;11:11;
15:1;19:5,7,8;25:3,5,6,
17,19;29:18;37:23;
38:5,6,9;39:12,19;42:3,
3,11;44:25;46:20;53:5;
57:4;60:22,24,25;61:6;
64:21;65:8,10,11,23;
66:25;67:25;68:9,14;
70:10;71:12;74:16;
75:2,14,24;77:9;78:2,5,
8,10,16;79:21;82:20;
85:3,11,15;86:4,8;
87:5;88:11,13,19;89:2;
92:17,18,20;95:7;
117:24;125:15;126:11,
15,18;127:5,7
**construction's (1)**
92:23
**consult (2)**
140:13,23

47:1;52:3,15;154:8
**conclude (2)**

**contact (3)**
102:24;132:9;133:13
**contacted (1)**
138:12
**contacting (1)**
132:12
**contacts (1)**
132:25
**containing (1)**
33:13
**contemplated (1)**
21:17;45:7
**contemplates (2)**
21:12,13
**contemporaneous (1)**
24:20
**content (2)**
19:16;24:21
**contention (1)**
123:14
**contents (1)**
143:15
**context (3)**
5:16,17;37:13
**continue (1)**
149:11
**continued (1)**
21:4;78:24
**continuing (1)**
154:13
**contours (1)**
6:24
**contract (24)**
19:21,22;25:7,24;
26:23;58:6;82:11;86:7,
23;87:10,22;91:6;
122:3,5,7,8;125:17;
128:22;129:5,13,14,17,
18,19
**contractor (13)**
8:23;26:4,6;31:12;
82:7,17,22;86:12;87:5,
14;122:4;125:16;
126:15
**contractors (1)**
31:22
**contracts (6)**
12:3;19:8;25:4,5,6,
10
**contractual (1)**
22:6
**Contrary (2)**
18:21;32:25
**contrast (1)**
26:19
**contribute (1)**
51:19
**contributed (1)**
73:8
**contribution (10)**
15:21;49:7;51:20,23;
52:8;82:1;111:11;
148:1,5,15

Case 16-01120    Doc 340    Filed 06/04/19    Entered 06/04/19 12:58:46    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 160 of 176

May 6, 2019

**contributions (6)**
49:6;52:9;110:24;
111:1;146:20;148:17
**control (4)**
44:2,25;45:1;54:12
**conveniently (1)**
143:16
**conversation (9)**
59:11;68:11;78:24;
104:2;108:6;112:25;
115:14,15;117:7
**conversations (2)**
106:9;138:14
**convinced (1)**
37:15
**convincing (1)**
93:22
**cooking (1)**
17:18
**copies (7)**
19:12,14;48:3;
142:14,15,17;144:4
**copy (3)**
33:24;69:22;122:9
**copying (1)**
143:18
**corner (4)**
47:8;80:23;81:18;
125:23
**corners (1)**
34:14
**Corp (7)**
4:17,18;87:7;119:22;
120:6,15;125:13
**corrected (2)**
57:20,21
**correctly (29)**
45:5,15;49:2,10;
51:7,25;52:13;53:25;
56:1;57:8;58:4;61:4;
66:17;67:15;74:20;
76:2;78:19;79:17;
97:10;98:12;99:13;
106:13;109:11;111:5;
114:20;120:12;128:24;
129:8;130:8
**corresponding (1)**
118:10
**corresponds (1)**
105:12
**cost (29)**
10:25;19:18,22;
26:12;35:23;42:4;
45:11;50:22;60:20;
78:2,3;79:3,14,16;82:9,
12,19;85:11,13;88:16;
93:13;94:10,19,23;
95:2;110:20;111:10;
128:2,8
**cost-plus (1)**
25:24
**costs (71)**
9:18;11:2,7,15;

13:18,18;14:18;15:1,4,
16;16:2;19:21;20:10,
13,17,24;22:5;23:15;
25:15,19,25;31:22;
35:24;38:6,19,20,24;
39:3,11;41:6;42:3,4,10,
11;43:24,25;46:20,22;
48:25;49:20;50:21;
51:18,19;53:2,4;54:6;
61:1,8;66:22;67:1,3;
68:9;74:16;75:2;78:8,
9;82:1;85:15,16;
110:25;111:13,18,19;
120:10;126:11;127:11,
11,19,25;141:7;146:16
**Counsel (6)**
48:14;53:15;116:8;
138:23;139:1;150:3
**count (1)**
46:13
**counted (1)**
79:1
**country (1)**
30:19
**couple (3)**
72:14;112:9;142:11
**course (3)**
74:19;151:16;152:21
**Court (170)**
4:2,3,21,25;5:10,12,
20,22;6:4,6,8,17,21,23;
10:2,10;13:20,23,25;
14:5,10,13,15;15:10,
14;17:10,12;20:14,22;
21:1,7;23:2,5,7,9,12;
27:11,21,25;28:5,7,22;
29:6;34:5,7,11,16,19,
22,24;35:16;47:21;
48:8,10,12;56:15,18,
22;69:12,14,20,24;
70:3,20;71:15;72:10,
21;73:2,5,18;74:2,6;
76:9,12,14,18,20,23;
77:2,4;81:2,5,8,12,15,
21;83:1,15,21,24;84:1,
6,8,18;86:1;91:21,24;
92:3;96:11,13,15,25;
100:3,6,8;104:17,24;
105:3,9,13,15;117:11;
122:24;123:16;124:7,
19,21;125:4;128:17;
131:13;134:1,3;
137:20;141:16,18;
142:13,15,21;143:2,12,
16,19,20;144:2,3,15,
21,25;145:3,5,8;147:3,
8,12;148:20;149:4,6,9,
13,17,21;150:7,9,11,
23;151:4,13,16,20;
152:21,24;153:1,4,6,8,
11,14,24;154:4,12
**courtroom (1)**
6:11

**Court's (1)**
151:14
**cover (3)**
19:18;20:24;79:22;
110:25
**covered (2)**
16:11;25:16
**crazy (1)**
130:24
**created (3)**
65:2;132:24;143:23
**creating (1)**
57:18
**credit (3)**
9:11;21:9,24
**crook (1)**
27:8
**cross- (1)**
48:15
**cross-examination (2)**
149:18;150:12
**cross-examine (4)**
73:7;74:3;145:8;
149:14
**current (3)**
25:2;145:16;154:2
**currently (4)**
7:13;56:12,21;57:1
**cushioned (1)**
40:6
**Cutler (16)**
7:24;71:10;72:18;
96:7,9,13,14,22;98:24;
99:5;100:1,17,21;
101:4;121:1,7
**Cutler's (1)**
102:15

**D**

**daily (1)**
119:13
**damage (2)**
18:5,13
**damaged (1)**
6:13
**damages (6)**
17:8;18:19,20;26:18,
19,20
**Dan (6)**
16:10;106:6,6,7,12,
15
**dastardly (1)**
17:19
**database (1)**
132:22
**date (30)**
15:7,7,8,17,18;16:2;
22:16;23:2,5,21;35:2,
3;48:18,24;50:17;
59:22,23;61:3;63:5;
94:7;102:11;108:20;
109:5,13;121:2,3;

129:15;137:16;146:3;
154:2
**dated (13)**
44:17;53:10;63:5;
87:5;101:4;112:1;
119:17;120:22;122:3,
20;124:14;125:16,23
**dates (5)**
40:1,4,11;118:15;
131:17
**day (14)**
4:6;12:4,16;24:18;
25:13;49:8;52:11;67:9;
68:20;98:14;123:20;
141:20;150:21;151:2
**days (8)**
6:25;72:14;77:23;
97:15,17;99:8;124:5;
130:6
**D-Day (1)**
27:7
**deadline (2)**
22:20,21
**deal (25)**
11:3;15:23;16:18,20,
25;17:2;18:24;19:9,10;
20:1;25:10,18;42:18;
44:10;46:10,15;53:1,
22;57:14;67:2;74:19;
83:13,13;104:11;
108:11
**dealing (3)**
42:18;112:22,24
**Deborah (2)**
112:21;117:7
**debt (8)**
40:16;109:19,22,24;
110:9,11,13;115:22
**debts (2)**
110:15,16
**December (11)**
12:17;15:7;16:7;
58:25;59:3,23;60:1;
63:5,7;118:23;146:3
**decide (2)**
79:19
**decided (3)**
68:12;79:21;139:8
**deciding (2)**
5:17;83:10
**decision (9)**
83:20;116:16;137:4;
138:20,21;139:17,20,
22;153:7
**Decor (1)**
109:22
**deducted (1)**
148:13
**deed (2)**
15:8;63:20
**Deeds (1)**
63:24
**default (1)**

22:24
**defendants (2)**
5:7;105:1
**Defendants' (7)**
91:19;104:15,18,19,
22;105:11;106:2
**definitely (2)**
45:13;95:12
**definition (1)**
83:17
**degree (1)**
30:9
**Delaware (1)**
151:10
**delay (1)**
46:20
**deliver (1)**
11:1
**delivered (1)**
19:9
**demand (6)**
11:10;107:19;
123:11,12,14;124:9
**demanded (1)**
116:23
**demolish (2)**
37:21,24
**demolition (1)**
37:16
**demonstrate (1)**
5:16
**denial (1)**
16:19
**depend (1)**
45:2
**depleted (1)**
92:13
**deposition (6)**
13:11;23:24;34:9;
47:24;48:4;90:13
**derived (3)**
10:4;143:3,5
**describe (2)**
13:21;30:6
**described (3)**
37:19;55:18,19
**design (6)**
36:4;37:3,4;88:4;
126:6,9
**designates (1)**
11:21
**designation (1)**
34:19
**desirable (1)**
43:16
**desired (1)**
25:21
**detailed (3)**
120:7,9;124:12
**details (1)**
115:15
**determine (1)**
112:15

Case 16-01120    Doc 340    Filed 06/04/19    Entered 06/04/19 12:58:46    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 161 of 176

May 6, 2019

**determining (1)**
83:9
**developer (6)**
26:13,14;31:12,20;
39:1;55:23
**developing (1)**
75:25
**Development (11)**
4:18;55:23;86:8;
87:7;106:7;119:22;
120:6,10,15;122:4;
125:13
**dialed (1)**
108:12
**dice (1)**
25:20
**difference (3)**
91:4;148:9,12
**different (2)**
25:6;112:20
**difficult (1)**
133:19
**difficulty (1)**
123:5
**Dima (10)**
55:22;57:14,25;
65:14;66:14;74:9;
77:23;80:7;97:7,22
**dinner (1)**
154:6
**DIRECT (3)**
29:8;77:5;88:2
**directed (1)**
21:7
**disallow (1)**
17:6
**disclosed (2)**
14:22;15:1
**discrepancy (1)**
97:9
**discretion (1)**
29:2
**discuss (8)**
40:25;83:3;108:14;
139:17,22;140:18;
150:2;154:9
**discussed (7)**
41:2;73:19;74:12;
89:25;90:8;108:24;
116:16
**discussion (10)**
33:8;39:4,19;40:22;
43:23,25;68:1;73:9;
74:25;115:22
**dispersed (1)**
93:9
**display (2)**
80:18,25
**dispute (6)**
12:25;114:22;123:4,
21;129:20,21
**disputed (2)**
84:9,10

**disputing (2)**
11:19,25
**dissolution (6)**
102:6,11;109:5,13;
137:16;139:9
**dissolve (4)**
23:25;102:2;137:20,
21
**dissolved (3)**
22:23;23:25;137:25
**distinction (1)**
73:5
**distribution (7)**
39:19;40:14;49:5;
52:6;65:3;68:15;111:4
**distributions (1)**
40:11
**divided (6)**
36:3,25;37:1;66:3;
71:8;96:24
**division (1)**
36:11
**Dmitriy (2)**
31:2;80:7
**docs (2)**
57:18;58:1
**document (22)**
4:8;22:15;33:19,21;
35:2;63:13;69:17;
70:11;73:11;86:3,5;
101:18;123:8;124:16;
134:6;141:2;142:16;
145:10,16;147:17;
148:23;149:8
**documents (10)**
9:5;17:19;25:9;
69:17;70:12;124:15;
142:3,16;143:22;
147:14
**dollar (1)**
15:21
**dollars (5)**
10:16;24:22;27:16;
68:7;130:19
**done (24)**
9:23;16:3,4;17:8;
36:14;40:13,17;43:7,8;
44:3;54:7;55:24;75:13;
96:5,7;98:4,6;99:3,10,
11;121:15;136:19;
149:1;152:3
**door (1)**
153:19
**doors (1)**
119:4
**doubled (1)**
11:16
**doubt (1)**
8:20
**down (12)**
5:6;14:25;15:22;
41:21,22;46:10,19;
51:1;79:12;106:17;

107:12;130:5
**draft (2)**
48:22;52:17
**drafted (1)**
47:16
**drafting (1)**
49:23
**drafts (3)**
47:10,13;51:13
**draw (3)**
49:22;73:6;92:12
**drawing (4)**
58:10,11,14;66:2
**drawings (2)**
7:15;57:3
**Dream (1)**
109:25
**dried (1)**
66:24
**Driveway (2)**
99:10,15
**drove (1)**
43:14
**due (4)**
16:10,10;25:23;
67:11
**duplicates (1)**
143:17
**duration (1)**
146:18
**during (32)**
6:24;7:1;13:15;15:2;
32:18,23;35:9,20;
36:10;38:9,18;39:4,20;
40:25;41:16;42:25;
43:23;82:15;92:7;
93:10,12,16;94:8,12;
95:6;96:3;109:9;115:8;
135:8;150:3;152:13;
154:9
**duties (2)**
7:11;56:9
**duty (7)**
7:12;8:8;24:3;27:3;
56:11,25;57:7

**E**

**earlier (3)**
106:9;124:11;127:18
**earnest (1)**
124:23
**education (2)**
30:6,10
**effect (2)**
13:15;111:2
**efficient (1)**
44:3
**effort (1)**
118:15
**efforts (1)**
102:19
**eight (6)**

11:11;43:11;96:12,
12,13,13
**eighteen (2)**
13:6;14:8
**eighty (2)**
12:14;59:15
**eighty-one (2)**
12:13;59:1
**either (7)**
22:22;25:7;27:10;
99:16;114:15;121:5;
142:6
**Electric (1)**
110:11
**Elena (1)**
133:6
**else (13)**
5:20;27:21;55:9;
73:23;77:21;89:22;
91:18;94:22;121:25;
133:19;138:10;144:2;
154:4
**email (47)**
16:9;44:17,18,19;
45:20;46:19;50:12;
51:1;53:10;54:24;55:6,
6,8,9,14;59:10;64:14,
22;65:1,2,6,13;67:9;
71:23,24;72:2;74:9;
77:16,23;78:25;79:7;
80:1;98:18;106:5,11;
112:1;113:6,7,23;
114:4,6;119:17,18,25;
120:6;122:18;124:10
**emailed (3)**
97:22;121:18,19
**emails (3)**
20:18;65:5,8
**enclosed (1)**
125:12
**encompassed (1)**
146:9
**end (13)**
11:2;17:5;18:23,24;
24:18;25:13;64:7;
98:10;103:21;123:20;
132:18;137:8;154:17
**end-run (1)**
19:1
**ends (1)**
50:2
**enough (11)**
28:8;38:15;42:11;
46:2,23;47:17;51:14;
78:14;89:7;99:1;
153:14
**enter (1)**
152:17
**entered (1)**
143:6
**entering (1)**
93:12
**entire (2)**

44:23;94:8
**entitle (1)**
18:20
**entitled (5)**
12:23;17:5;25:18;
26:7;27:18
**entity (1)**
22:16
**entries (1)**
93:8
**error (2)**
55:10;79:1
**essentially (1)**
17:1
**establish (2)**
17:23;26:9
**established (1)**
72:18
**estate (4)**
53:18;109:9;112:24;
117:8
**estimate (1)**
79:15
**estimated (6)**
78:3,4;79:14,16;
81:24;99:11
**et (6)**
4:6,9;36:12;37:23;
66:23;123:6
**Even (9)**
8:18;9:12;10:17;
13:8;16:21;24:16;68:5;
117:6;150:2
**evening (1)**
154:16
**event (9)**
21:14;22:23;23:16;
31:10,25;48:23;61:2;
85:2;136:13
**eventuality (1)**
15:23
**eventually (2)**
55:6;96:18
**everybody (2)**
43:18;55:9;73:23
**everyone (1)**
4:21
**evidence (133)**
5:4;6:17,24;7:1,3,6,
10,21,22;8:3,19;9:6,8;
10:23;11:10,20;12:3;
14:10,19;16:22;17:21,
22,25;18:4,4,19,21;
19:3,6,11;20:3,4,18;
24:4,5,6,20,25;25:1;
26:18,20,21,24;27:11,
15,22;34:4,25;44:13,
16;47:5;50:10;51:9,11;
54:14,21;56:7;58:16;
60:17;61:10;62:7,13;
63:1,3,18;64:12,14;
66:9;67:4;68:19,20;
69:13,14;70:23,25;

71:5;72:5;74:4,7;75:8,
10,20;76:11;77:12;
79:5,24;85:23;87:1,4;
90:4;91:21,22,23;94:8;
97:2,4,19,22;100:4,11;
101:1,3;104:16,18;
106:5;107:10,20;
109:15;111:23;113:3,
21;116:4;118:4,6,21;
119:15,17;122:23;
124:22,24;125:5,22;
131:9;133:24;137:10;
140:7,10;141:13;
142:7,18;143:13;
145:18;147:16
**evidenced (1)**
125:11
**evidentiary (3)**
4:7;35:14;72:12
**exactly (11)**
10:25;18:22;31:5;
36:13;41:4;43:16;
73:25;75:4;81:10;
129:18;140:5
**examination (6)**
18:9;29:8;48:16;
77:5;143:18;150:15
**examined (1)**
143:16
**Excel (13)**
33:13,25;41:10;
42:16,18;57:25;58:6;
77:19,20;78:2;98:3,20,
22
**exception (2)**
83:21;84:21
**exchange (1)**
64:15
**excluded (1)**
148:23
**excluding (1)**
149:2
**exclusive (3)**
12:22;101:4,24
**exclusively (1)**
112:22
**excuse (13)**
17:4;25:14;40:23;
48:8;52:11;53:11;75:2;
87:4;102:14;124:3;
125:10;134:2;148:19
**executed (1)**
7:7
**exercise (2)**
29:2;82:6
**Exhibit (159)**
7:6,10,22;10:11;
11:10,20;12:8;33:15,
20;34:4,9,22,25;36:19;
38:1,3;39:17;41:15;
44:12,15,23;46:4;47:5;
48:19,22;50:9,12,17,
19;51:9,11,13,13;

52:17;53:7,10;54:8,14,
20;56:7;57:10;58:15;
60:16;61:10,14;62:6,
12,25;63:3,17;64:11,
14;66:9,11;67:4;68:19,
20,23;69:2,8;70:19,22,
24;71:4,14,20;72:4,7;
74:7;75:10,20;76:9,10,
12;77:8,12,15;79:4,23;
80:15,16;81:3,20,24;
84:3,4;85:23;86:1,17;
87:1,4,10,25;88:3;
90:2;91:19;92:6;94:8;
97:1,4,18,21;100:3,4,
10,25;101:3,18;
104:15;105:11;106:3;
107:10,20;109:14;
111:23;113:21;116:4,
23;118:3,6,13,21;
119:14,17;120:19,21;
122:15,23;124:13,24;
125:3,4,22;128:13,16,
17;130:1,15;131:8;
133:24;134:2;135:23;
137:9,12;140:7,10,24;
141:3,12;142:7,8,18;
143:9;144:1,4;145:17,
18;148:21;153:21
**exhibits (7)**
5:2,5,8,15;104:17;
142:14,15
**existence (1)**
114:5
**expand (1)**
40:3
**expect (6)**
6:24;7:1,3;8:19;
10:13;13:14
**expectation (1)**
84:19
**expected (5)**
9:15;11:13,13;64:4;
115:12
**expecting (1)**
98:5
**expenses (2)**
19:11;146:17
**experience (1)**
28:14
**experienced (2)**
42:9;117:8
**experiences (1)**
132:16
**expert (3)**
18:7,7,10
**experts (1)**
26:9
**explain (7)**
36:20,22;83:16;
145:7;146:1;147:10,23
**explained (3)**
78:25;86:14,15
**explicitly (1)**

12:12
**explore (1)**
138:8
**expressed (3)**
39:6;54:7;56:4
**expressly (1)**
21:13,16,17
**extend (2)**
22:21;118:15
**extended (2)**
76:17;79:13
**extending (1)**
118:11
**extension (1)**
118:22
**extensively (1)**
25:9
**extent (8)**
5:2;70:12;72:8;73:3;
92:12,14;144:6;149:1
**extortion (2)**
123:14;124:9
**extra (2)**
39:22;82:16
**extreme (1)**
123:19
**extremely (3)**
42:9,17;44:3
**eyes (6)**
24:23;87:9;90:11;
101:17;121:23;125:25

**F**

**fabricated (1)**
16:23
**face (1)**
73:10
**fact (16)**
7:22;8:20;16:24;
20:5;23:16;25:4;35:13,
14;46:4;48:4;68:16;
72:12,17,24;83:8;
117:4
**factors (1)**
139:7
**fails (2)**
15:20;51:17
**fair (8)**
46:2,23;47:17;51:13;
89:7;99:1;152:11;
153:14
**fairly (1)**
26:8
**faith (2)**
16:20;17:3
**fall (1)**
103:17
**falsifying (1)**
124:15
**familiar (1)**
143:13
**far (10)**

9:4;21:23;31:7;
58:13;62:21;64:5;68:4;
96:5;135:6;144:10
**far-ranging (1)**
18:9
**fast (1)**
40:19
**faster (2)**
69:23;70:2
**February (2)**
16:7;65:7
**Federal (2)**
124:21;143:13
**fee (13)**
82:10;88:4,11,13;
89:3,7,10;126:6,9,16,
18;128:2,9
**feel (1)**
28:19
**fees (8)**
82:9,20;83:6;87:18;
89:24;90:8;127:7;
146:17
**fellow (1)**
84:2
**few (9)**
11:2;50:16;77:22;
97:14,17;115:13;
119:3;138:14;149:18
**fiduciary (2)**
24:3;27:3
**Fifteen (7)**
76:21,24;88:12,13,
15,23;126:16
**fifth (1)**
125:21
**fifty (6)**
8:10,15;49:13;55:20,
25;91:17
**fifty-fifty (1)**
46:23
**fight (1)**
107:4
**figure (1)**
25:8
**figured (1)**
109:13
**figures (1)**
148:23
**file (17)**
33:13,24,25;34:1;
35:21;41:11;42:16;
58:6;62:3;71:9;77:20;
98:3;112:11;124:18;
137:4;139:17;140:2
**filed (12)**
4:9;22:15;24:5;62:9;
124:5;131:12,17;
132:13;138:7;139:5,
18,23
**files (4)**
23:20,21;57:25;
98:22

**filing (1)**
139:8
**Filippov (79)**
4:9,13;8:12;10:24;
11:7,21,23;12:3,10,14,
15,17;13:1;14:20;15:2,
19,23;17:4;19:7,12;
20:19;21:21;22:1,2,13;
23:13;24:11;25:7;27:4;
28:1,3,5;29:10,11;
33:18;44:15;47:7;
48:21;49:12;51:18;
60:19;61:11,14;62:10,
15;63:4;64:14;71:5,20;
72:7,19;73:17,22;77:7;
81:23;84:12;86:2;87:9;
88:2;90:7;101:5,18;
105:18;107:12,23;
108:20;122:19;125:2;
131:11;135:15;140:10;
141:3,23;142:5;145:6,
21;147:10,23;148:19
**Filippov's (5)**
15:20;16:8;21:15,19;
83:19
**final (8)**
26:10;51:16;52:5;
54:16;56:8;58:19;
129:5,24
**finally (2)**
13:18;17:22
**finances (1)**
91:16
**financial (10)**
10:22;20:9;35:22;
42:17,19;58:10,13;
112:4,7,10
**financials (2)**
81:24;115:17
**find (10)**
44:6;55:23;59:9;
112:19;114:12;121:16;
133:16,18,20;138:14
**finding (2)**
10:8;121:4
**fine (10)**
5:10,13,14;48:13;
76:16,18;81:5;93:23;
144:21;153:8
**finished (6)**
38:16;95:22;96:3;
99:9;108:4;115:13
**finishing (4)**
68:8;95:23;96:8;
151:2
**finite (1)**
153:9
**fire (1)**
107:6
**firm (7)**
94:3;116:10,13,19;
131:12;134:11;135:24
**first (58)**

7:23;13:20;16:6;
20:15;21:3,10,25;22:4;
27:23;30:15;31:9;39:9;
41:20;42:21;49:6;
50:19;52:8;53:1,2,4;
61:15;62:1;66:23;
67:17;70:18,18,22;
71:4;87:9;90:11;98:7,
17;101:17;102:4;
103:19;105:4;107:3;
108:10,18,19;109:12;
114:2,4,14;121:16,21;
123:8,10;124:1,3,9;
125:8;128:15;132:15;
135:10,13;137:17;
145:22

**five (7)**
45:13;47:14;49:6;
51:5;52:8;68:6;149:20

**fix (1)**
107:8

**fixed (4)**
25:2,7;119:5;121:14

**fixing (1)**
119:3

**flabbergasted (1)**
108:1

**floor (2)**
99:8,9

**Flooring (1)**
109:25

**floors (2)**
96:6;99:17

**Florida (1)**
103:22

**focus (1)**
6:25

**focused (2)**
15:3;46:7

**Fodymanow (1)**
133:9

**folder (1)**
33:10

**following (6)**
98:24;120:17;130:3;
149:23;152:25;153:1

**force (3)**
17:3;24:15;137:20

**forecast (1)**
97:9

**forensic (1)**
18:9

**forget (2)**
39:9;107:9

**forging (1)**
17:19

**form (2)**
37:22;62:10

**formality (1)**
86:11

**formation (1)**
32:23

**formed (2)**

62:2;74:14

**formula (1)**
77:20

**forth (1)**
28:18

**forty (3)**
8:13;30:5;49:12

**forty-one (1)**
78:12

**forward (8)**
6:2;16:16;65:14;
83:11;85:2;105:10;
119:21;149:21

**forwarded (5)**
55:6,12;124:17;
125:12,18

**forwarding (1)**
55:11

**found (5)**
9:17;132:23,25;
133:18;143:7

**foundation (4)**
84:20;142:1;145:12;
147:15

**four (10)**
17:15,16,17,20;27:7;
33:13;47:14;65:3,5;
99:12

**fourteen (1)**
147:8

**fourth (5)**
6:12;7:9;80:16;
109:14;130:1

**frame (4)**
14:24;95:10;97:16;
103:15

**frankly (1)**
142:8

**fraud (3)**
24:6;108:9;124:20

**free (2)**
20:8;25:12

**freeze (1)**
24:14

**French (1)**
119:4

**Friday (3)**
98:7,25,25

**friend (1)**
30:18

**front (2)**
28:10;35:2

**fruit (1)**
114:16

**full (4)**
9:11;26:10;54:12;
125:8

**functions (1)**
45:4

**funding (1)**
39:2

**funds (3)**
51:4;89:6,10

**further (5)**
11:15;43:23;74:25;
142:24;148:18

**G**

**gain (1)**
78:18

**gander (1)**
149:25

**garbled (1)**
28:17

**gave (5)**
31:25;43:8;142:11,
13;149:14

**Gee (1)**
115:21

**general (13)**
8:22;9:17;26:4,6;
33:7;82:22;87:4,5,14;
89:15,20;126:15,18

**Gersh (1)**
16:11

**gets (2)**
5:24;21:24

**gist (1)**
89:5

**given (3)**
98:25;109:5;150:21

**giving (1)**
151:21

**glad (1)**
20:10

**glass (2)**
81:11,12

**Gmail (2)**
72:18;76:4

**goes (8)**
15:21,22;45:23;
46:10;58:24;83:9;84:5;
142:24

**Goldilocks (1)**
6:12

**Goldman (2)**
9:16,16

**Good (18)**
4:3,4,12,14,16,19,21;
28:5,6;31:19;46:14;
81:17;83:13;138:20,
21;149:24,24;154:16

**Googled (1)**
44:6

**goose (1)**
149:24

**Gordon (2)**
112:21;117:7

**graders (1)**
6:12

**graduated (2)**
30:7,8

**great (2)**
11:3;60:23

**Gregory (1)**

101:13

**group (2)**
55:7;77:16

**guarantee (3)**
24:1;25:1;138:1

**guaranteed (1)**
22:24

**guard (1)**
151:8

**guess (9)**
39:16;89:13;106:8;
110:17;114:25;129:23;
136:6;148:25;150:6

**guessing (1)**
137:8

**guy (1)**
77:18

**guys (3)**
72:15;124:3;153:25

**H**

**half (6)**
10:16;27:16;33:5;
89:7,10;127:24

**Hammond (1)**
112:23

**Hampshire (1)**
152:12

**hand (3)**
28:2;41:22;148:21

**hand- (1)**
11:3

**hands (3)**
45:4;59:9;65:17

**handwriting (5)**
41:18;47:7,23,23;
70:14

**handwritten (2)**
50:16;70:13

**happen (10)**
7:22;31:24;50:22;
52:21;55:21;67:1;95:9;
120:25;121:25;134:23

**happened (6)**
14:25;47:3;64:2;
67:21;115:8;117:4

**happening (12)**
18:16;20:6;24:19,20,
21;92:14;102:18,19,
23;103:3;147:18;
152:22

**happens (4)**
15:24;16:19;102:15;
150:14

**happy (3)**
70:18;81:12;111:12

**hard (4)**
25:19;67:22;92:1;
126:16

**hardly (1)**
78:18

**hardwood (2)**

99:8,17

**harm (1)**
17:8

**Harris (2)**
4:19,19

**Hartzell (20)**
33:15,18;36:19;
39:18;40:2;44:12,15;
47:4;54:13;58:16;
61:11;66:8;80:17,22,
25;81:18;90:2;100:12,
14,25

**Hartzell's (1)**
145:21

**hazards (1)**
151:1

**head (4)**
24:23;28:14,15;
139:7

**heads (1)**
73:24

**hear (12)**
13:1;17:25;19:20;
25:8;26:18,20,21,24;
27:3;28:11;151:25,25

**heard (14)**
13:9;18:3,21;39:10;
102:1;103:19;107:17;
114:2,4;124:3;126:9,
17;132:6,7

**hearing (4)**
4:8;27:7,9

**hearsay (9)**
35:12;72:9,21;73:4,
13,20;74:1;83:7,17

**Heat (1)**
110:13

**heavily (1)**
15:2

**held (1)**
134:11

**helped (1)**
77:18

**helpful (1)**
92:10

**hereby (1)**
58:19

**Here's (1)**
6:9

**hey (3)**
16:9;22:20;72:15

**hi (1)**
28:25

**high (1)**
30:7

**higher (1)**
51:24

**himself (2)**
10:17;114:10

**hire (4)**
13:5;82:7,21;90:17

**hired (13)**
8:22;19:3,4;20:1;

Case 16-01120   Doc 340   Filed 06/04/19   Entered 06/04/19 12:58:46   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 164 of 176

May 6, 2019

26:14;42:15;80:9;
82:17;94:3;116:18;
121:8,10;131:20
**hiring (3)**
83:14;87:14;135:24
**historical (1)**
37:8
**hold (13)**
40:5;54:9;59:14,16,
18;70:5;72:10;81:5;
116:20;133:21;134:9;
142:21;153:16
**holder (1)**
125:13
**holds (1)**
18:1
**home (9)**
8:2;11:1,5,6;25:16;
78:15,16,22;85:5
**homes (21)**
7:12,20;8:6,17,23,
25;10:20;11:1;16:1;
19:4;36:4,4;37:2;
56:12;57:1;66:2;86:8;
98:2;109:7;110:25;
112:22
**hone (1)**
152:2
**honest (1)**
31:20
**Honor (90)**
4:12,14,16,19,24;
5:19,21;6:3,22;13:22;
14:12,16;15:13;17:6,
11,14,15;18:2,7,15;
20:10;24:18;25:4;
26:17,21;27:5,5,6,20,
24;28:6;29:7;34:3,10,
18,23;35:10,14;47:20;
48:8;56:23;69:16;70:9;
71:1;72:6,11;73:16;
74:5;76:11,22;77:3;
81:19;82:24;83:7,9,25;
91:23;92:4;100:5;
105:2,16;122:22;
123:1,5,25;124:25;
125:6;128:18;134:2;
141:12,14;142:3,22;
143:24;144:3;145:19;
146:24;147:6,11,21;
149:11,16;150:6,24;
151:9;152:20,23;
153:23;154:3,16
**Honor's (1)**
16:23
**hook (1)**
22:4
**hopefully (2)**
27:13;34:14
**hour (5)**
33:5;89:16,19;
126:21;127:2
**hours (2)**

50:16;127:1
**house (27)**
36:2;37:16,21,23;
58:12,12;66:2,3;68:8,
9;74:15;75:6,25;77:10;
82:11;88:19;95:17,21,
22;96:14;98:4,5;99:10;
103:8;115:12,14;119:8
**housekeeping (1)**
4:22
**houses (27)**
14:24;25:22;33:11,
12,12;38:12,15;40:20;
41:9;43:10,11,12,16;
59:8,9,10;67:23;68:5;
71:6;85:10;98:8;
102:14,14;103:6;
104:3;121:13;138:19
**how's (1)**
93:21
**huge (1)**
108:9
**huh (1)**
127:8
**hundred (4)**
46:21;100:1;130:18,
18
**hundreds (1)**
86:5
**hung (1)**
6:15
**hurled (1)**
17:17

### I

**idea (8)**
42:19;54:2;68:14;
82:13;119:8;127:3;
128:8;129:1
**identical (1)**
37:3
**identification (14)**
10:12;33:16,20;
68:24;69:3,9,10;71:18,
21;90:2;122:16,18;
140:25;141:3
**identifies (1)**
50:6
**identify (1)**
48:3
**identifying (1)**
139:15
**ignore (1)**
18:25
**illegible (3)**
141:15,17,18
**immediately (2)**
23:20,21
**immigrate (1)**
30:13
**immigrating (1)**
30:19

**implicit (1)**
73:14
**important (7)**
11:18;12:1;28:10;
55:17;68:14;72:25;
109:5
**importantly (1)**
119:7
**impose (2)**
5:25;152:6
**impossible (1)**
139:16
**impression (1)**
107:5
**improper (1)**
18:12
**improve (1)**
75:5
**inaccuracies (1)**
135:5
**Inc (1)**
122:4
**incentive (1)**
16:3
**include (2)**
19:23;77:17
**included (1)**
78:23
**includes (4)**
9:2;72:18;76:4;
146:5
**including (6)**
7:14;53:22;57:3;
58:9;77:16;101:9
**inclusive (1)**
24:6
**inconvenient (1)**
142:9
**increase (3)**
11:4;37:5;51:21
**increased (1)**
148:14
**increasing (3)**
111:2,3,10
**incur (1)**
89:6
**incurred (3)**
9:7;19:12;25:16
**indefinitely (1)**
22:17
**independent (1)**
72:12
**indicated (1)**
26:17
**indiscernible (4)**
48:7;56:14;80:17,20
**industry (1)**
29:18
**inflated (2)**
38:22;39:22
**information (3)**
32:24;94:2;144:10
**initial (3)**

7:5;146:19;147:25
**initially (3)**
16:6;117:20;146:6
**inkling (1)**
110:2
**innocence (2)**
24:24,24
**inside (3)**
73:23;95:17,24
**insist (1)**
124:2
**inspection (3)**
113:11;129:5,24
**installation (1)**
98:24
**instead (8)**
7:4;8:18;9:24;11:9;
12:21;16:6;74:18;
79:14
**instruction (1)**
154:5
**insurance (1)**
19:24
**intact (1)**
93:7
**interaction (1)**
107:15
**interest (14)**
51:20,24;59:3,14;
66:23;93:14;102:21;
109:7;111:1;144:8,13,
16,19;147:2
**interested (5)**
4:9;31:15;48:21;
60:19;145:22
**interesting (3)**
19:20;31:18;46:11
**interests (2)**
24:3;144:8
**interim (1)**
113:20
**internal (2)**
91:15;93:1
**interview (1)**
139:1
**into (33)**
5:3;8:25;9:25;10:22;
20:2;28:11,20;34:4,25;
36:3,25;59:12;69:13;
70:25;71:5;72:5;74:7;
83:20;85:13;90:4;
96:24;102:11;122:23;
124:24;136:6;138:10;
139:8;141:10,13;
142:18;145:18;146:2,2
**introduction (1)**
32:1
**INV (1)**
146:19
**invention (1)**
24:7
**invest (11)**
14:21;31:8,13;32:4;

42:20,21,23;45:13;
46:12,13;83:10
**invested (2)**
45:12;146:6
**investigate (1)**
32:3
**investing (1)**
132:24
**investment (11)**
31:18;43:4;46:12;
54:6;55:18;66:16;
67:12;146:20;148:1,2,
8
**investor (5)**
31:13;44:24;53:22;
54:3;55:18
**investors (1)**
96:2
**invited (1)**
33:2
**invoice (17)**
8:21;120:7,8,9,15;
122:12;123:6;124:4,
10,12,14;125:12,18,21;
126:1,3,13
**invoices (5)**
16:22;18:12;92:16,
24,25
**invoked (1)**
23:16
**involved (4)**
31:11;41:6;45:22;
72:20
**Irina (5)**
16:9;43:9;65:4;
72:19;115:10
**issuance (1)**
61:1
**issue (7)**
60:20;73:7;74:12;
86:13;135:1;138:6;
143:10
**issued (1)**
91:11
**issues (2)**
45:2;64:6
**item (1)**
146:19
**items (1)**
143:25

### J

**James (1)**
4:19
**January (3)**
16:7;40:14,21
**JJ (2)**
138:12,15
**job (7)**
20:1;82:11,18;91:9,
16;98:3,6
**John (6)**

Case 16-01120     Doc 340     Filed 06/04/19     Entered 06/04/19 12:58:46     Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.     Document     Page 165 of 176

May 6, 2019

4:16;64:15,18,19;
122:20,25
**Joseph (8)**
113:23;114:2;115:7;
119:19;120:3;122:19;
125:9;132:7
**judge (1)**
152:12
**July (17)**
87:11;92:20;95:12,
13;96:3;97:5,25;98:7,
10,18,23,25;99:15;
112:13;127:12;129:19;
134:9
**June (34)**
64:10;86:21;87:6;
88:18;118:2,2;119:17;
120:5,14,22;121:1,3;
122:3,5,12,20;124:11,
14,17;125:16,18,23,25;
126:8,18;127:2,6,12;
129:1,16;130:11,16;
131:18;132:18
**jurisdiction (2)**
151:11,11
**jury (1)**
6:15

## K

**Kagan (202)**
4:6,17,17,18;7:3,15,
19;8:3,6,14,16,18,21;
9:21;10:15,20,24;11:9,
11,25;12:4,21;13:16,
24;14:13,20;15:15,20,
24,25;16:1,19,24;17:1,
4;18:22;19:3;20:17,23;
21:14,15,18;23:16;
24:10;25:11,14;26:1;
27:8,18;31:6,20,23;
32:2,16,22;33:9,11;
36:9,9,12,15,16,23;
37:18;38:2,8,18;39:13;
40:19;41:8,19,20;42:7,
15,20;43:6,8;44:6;
45:9;48:24;49:13;50:6,
13,20;51:17;53:12;
54:17;55:18;56:6;57:3,
15;58:10,20,23,25;
59:18;60:4,12;62:21;
63:11;64:6,15;65:4,15;
66:4,12;67:10,18;
68:21;69:4;72:18;
73:17;74:10,22;77:18,
24;79:8;80:10,11;82:8,
15,16;83:13;84:14,15;
86:15,19;87:6,14,18;
88:3,12;89:1,9,19,22;
90:8,13,16;91:3,4,6,15,
17;92:7,23;93:2,21;
94:9,14;95:4,16,18;
96:1;97:5,23;98:14,22;

99:19,24;101:20;
102:18;103:19;104:9;
106:7;107:6,17;108:8,
15;110:23;112:2,20;
113:6,24;114:19,22;
116:18;120:6,15;
121:11;122:4,19;
125:12;126:21;131:2;
132:2,6,9,22;134:17;
135:20;136:2,10,21,21;
137:15;139:22;140:18,
22;146:19;147:25;
148:16
kagandevelopment@gmailcom (2)
44:18;106:6
**Kagans (1)**
4:9
**Kagan's (23)**
7:12;8:7;9:23;12:7;
15:22;20:12;21:8,20;
44:19;51:22;52:10;
56:11,25;57:6;70:14;
86:8;101:15;102:9;
108:12;111:2;119:18;
120:6;144:8
**Kathy (1)**
112:24
**Kayserman (1)**
133:6
**KDC (41)**
4:18;8:21,22;20:17,
23;25:14,15;26:3,6;
87:7,7,14,18,22;88:4,
13;89:2,6,9,24;90:16,
19,24;91:3,4,5,5;94:22;
110:2;120:22;122:4,
13;125:10,13,13;
126:20;128:21;129:6;
130:4,6;136:20
**keep (5)**
5:23;66:14;93:5;
111:22;134:24
**keeping (4)**
45:11;93:10,12;
141:6
**kept (1)**
135:8
**keys (10)**
113:10,13;114:24;
115:1,1,11;118:25;
119:12;129:7,10
**Kiely (1)**
101:13
**Kiely's (1)**
101:14
**kind (14)**
31:25;40:6;42:25;
46:17,25;76:17;94:10;
98:20;109:13;115:12;
119:3;138:16,16,20
**knew (19)**
10:24;14:2,3;16:5;
19:14;22:23;24:19,21;

26:3,4,6;62:1;77:19,
21;90:24;92:14;
133:14;140:3,22
**knowing (1)**
152:1
**knowingly (1)**
17:2
**knowledge (2)**
14:1;26:11
**known (10)**
7:13;12:4;30:24;
32:8,8;56:13,21;57:1;
71:7;110:19
**knows (3)**
12:1;42:17,18
**Kolya (3)**
57:11;73:16;74:12
**Kraft (1)**
43:15
**Kristina (4)**
99:23,23,24;133:18
**Krongel (1)**
112:24

## L

**labor (2)**
19:23,24
**lack (1)**
141:25
**laid (4)**
87:9;90:11;101:17;
125:25
**land (7)**
15:8;67:14;74:18;
75:1;78:4,10;117:21
**Lande (1)**
133:6
**landscaping (1)**
40:15
**Lane (2)**
96:22;101:4
**language (3)**
30:15;32:18;55:22
**last (12)**
6:11;13:7;14:17;
40:14;46:4;50:20,20;
51:1;108:19;124:13;
135:2;152:4
**lasted (2)**
33:4,5
**last-minute (1)**
4:22
**later (10)**
7:17;11:2,16;51:4;
57:5;65:14,22;98:7,9,
14
**launched (1)**
4:23
**lawyers (2)**
150:5;154:8
**lay (1)**
145:11

**leads (1)**
66:20
**learned (1)**
22:18
**least (7)**
43:11;59:1;78:15;
88:15;119:4;134:6;
145:11
**leave (2)**
25:13;153:17
**leaves (1)**
146:11
**led (1)**
137:3
**ledger (1)**
9:17
**left (16)**
40:7;41:22;42:12;
66:15,21;67:2,10,13;
75:16;77:7;108:12;
118:18;144:22;145:15;
146:20;148:6
**leftovers (1)**
38:13
**legal (1)**
146:16
**legally (1)**
24:16
**legible (1)**
142:2
**length (2)**
6:1;14:22
**Leningrad (1)**
30:8
**letter (21)**
11:10;16:14;22:19;
94:7,13;95:1;102:8;
107:18;108:11,11,17;
109:4,18;111:17;
112:16;115:25;123:3;
125:9;127:17;128:15;
137:14
**letters (1)**
22:19
**leverage (1)**
24:7
**liability (1)**
79:9
**lied (1)**
22:13
**lien (13)**
87:8;120:21;121:17,
22,23;124:5,18;
128:12;132:17,17;
139:11,13,14
**liens (1)**
139:12
**life (1)**
62:2
**likely (1)**
151:24
**line (9)**
10:9;42:1;82:9;

130:5;143:7,7,25;
146:19;153:10
**lion's (1)**
8:1
**Lipetsker (42)**
4:13;8:13;10:24;
12:14,15;14:21;17:4;
24:10;30:17,18;31:3,
10;32:16;44:21;49:13;
50:13;53:12;57:12;
59:16;62:22;64:16;
65:4;67:9;72:19;73:17;
79:8;80:2,6;116:12,15,
17;131:22,25;134:15;
135:19;136:1,13,24;
139:18,20;140:13;
148:19
**Lipetsker's (1)**
84:11
**liquidated (3)**
22:11;23:14;111:4
**liquidation (2)**
109:8,8
**list (9)**
5:2,6,12;7:23;58:20;
65:3;105:12;109:15;
127:1
**listed (5)**
39:23;98:5;100:17;
102:14,15
**listing (22)**
12:6,7,11,18,22;13:4,
20;14:3,7;58:25;
100:20,23;101:24;
103:23,25;104:2,4,7,9;
107:16;119:7;136:10
**listings (1)**
119:9
**lists (6)**
126:6,11;127:5,11
**litigation (8)**
13:5;10;24:15;39:13;
87:11;90:14,15;101:19
**little (11)**
6:19;16:9;37:13;
50:16;53:23;60:23;
91:16;102:1;150:7;
151:8;153:7
**live (1)**
18:23
**LLC (37)**
4:6,7;13:23;20:25;
22:9,23;23:2;25:21;
37:22;51:11;53:23;
54:11;62:1,10;63:14,
20;69:6;72:1;74:15;
86:8;87:6;93:5;102:2,
11;110:15;111:9;
113:7;114:17;122:4;
130:3,5,11;132:23,25;
137:25;141:10;146:17
**loan (39)**
39:12,19;40:15;53:5,

Case 16-01120    Doc 340    Filed 06/04/19    Entered 06/04/19 12:58:46    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document      Page 166 of 176

May 6, 2019

5;60:21,22,24,24;
62:15;64:21;65:9,10;
66:23;68:15,17;69:5;
74:13,17;75:1;78:3,4,5,
9,10;79:22;85:11,17,
18;86:4,13;94:6,13;
95:1;111:19;117:20;
127:9;138:1,1

**loans (30)**
16:9;22:24,24,25;
25:17;37:23,23;61:6;
65:11,23;75:14,24;
77:9;85:9;93:7;110:17,
18,18,18;111:21;
117:17,17,24;118:1,11,
22;137:24;138:3,3;
139:10

**locate (1)**
132:19

**location (5)**
7:13;43:13;56:12,21;
57:1

**lock (1)**
153:19

**locked (2)**
14:7;27:8

**locking (1)**
12:23

**locks (1)**
119:5

**log (1)**
5:24

**logical (1)**
76:14

**logistics (2)**
150:18;151:23

**long (10)**
12:23;29:15,23;33:4;
60:15;66:4,6;90:15;
112:7;115:16

**longer (6)**
13:7;21:14;41:5;
46:1,9;60:5

**look (51)**
7:10,22;8:5;9:15;
11:19;12:8;31:17;
36:18;44:1;48:1;49:4;
50:1,1,5,12;55:5;
57:10;67:4;80:15;
88:11;89:5;97:21;
100:10;101:7,11;
104:17;108:17;109:14,
15;116:22;118:13,17,
21;123:3;124:13;
125:2,21;126:3;
128:15;130:1,15;
133:8;135:1;136:8,18,
19;138:10;144:5,18;
148:7;153:4

**looked (4)**
9:16;40:10,10;77:8

**looking (28)**
15:11,12;16:25;

31:13,18;51:2;52:17;
54:23,24;58:18;59:25;
77:15;80:15;81:3,23;
89:14;100:15;101:14;
107:12;108:17;110:21,
22;125:8;128:20;
132:16,21;133:15;
138:11

**looks (7)**
31:12;33:25;63:5;
95:24;99:22;105:19,20

**loss (1)**
67:14

**lot (12)**
36:3,23,24;37:1;
40:20;58:11;62:16;
63:9;64:1;66:2;96:7;
138:5

**lots (4)**
36:11;37:1;57:18;
71:8

**loudest (1)**
53:24

**lower (1)**
31:22

**luck (1)**
84:16

**lump (1)**
68:15

**lump-sum (1)**
19:22

**lunch (2)**
152:13,15

**luxury (5)**
19:4;36:4;37:2;66:1;
112:22

**Lyman (21)**
7:13;36:2,24;56:13;
57:2;71:8;99:5;21,22,
25;96:1,4,5,20,23;99:7,
16;106:10;115:2,6;
121:1

**Lyman- (1)**
72:17

**Lyman-Cutler (43)**
4:5;7;7:7;9:9,12;
10:8,14;20:16;31:8;
32:4,24;43:5;61:21;
64:2;71:24;75:24;76:4;
86:7;87:6;89:2,19,24;
90:9,20;103:20;112:2;
113:7;114:16;115:23;
122:3;125:14,15;
129:7;130:3,5,10,16;
131:12,17;133:22;
140:11;141:8;146:3

Lyman-CutlerLLC@gmailcom (1)
65:6
Lyman-CutlerLLCgmailcom (1)
64:23

**Lyman-Cutler's (1)**
20:15

**M**

**MacGregor (1)**
64:19

**magnifying (2)**
81:10,12

**Maiden (33)**
30:22,23;32:6,7,9,
17;39:4;44:7,20;47:3,
9;50:13;53:12;54:25;
55:2,11,12,14;61:22,
23;62:11,19,21,24;
64:15;67:10;71:24;
72:1;73:17;76:7;79:8;
85:22;86:15

**Maiden's (1)**
32:10,21;67:18

**main (1)**
119:8

**maintaining (1)**
110:19

**maintenance (1)**
128:23

**major (1)**
15:4

**majority (3)**
24:8,14;27:17

**makes (5)**
7:25;46:15;127:8;
142:10;151:6

**making (6)**
78:25;93:13,20;
102:19;124:16;138:18

**malfeasance (1)**
17:17

**managed (1)**
118:22

**management (4)**
82:9,20;83:6;87:5

**management/general (1)**
125:16

**manager (7)**
11:22;50:7;54:17;
63:14;111:21;114:10;
125:10

**managing (29)**
7:15;10:21;11:8,21,
22,23;12:4,10,19;24:1;
26:5;45:3,7,10;46:21;
50:7;54:10,10,17;57:4;
58:19;60:2;61:18;
71:11;91:16;93:16;
112:16;114:16;135:16

**Manning (2)**
138:12,15

**many (11)**
6:8;30:2;31:19;
43:10;47:13;69:17;
70:12;135:8;136:7;
142:2;151:13

**map (3)**
36:20;142:8,19

**maps (3)**
128:11;143:8,8

**map's (1)**
36:21

**March (15)**
7:17,20;8:2;13:6;
37:24,25;40:17;57:5;
64:5;66:25;95:9,11;
98:10;101:9,24

**mark (3)**
34:15;46:17;53:18

**marked (6)**
33:19;34:12;84:3;
87:10;101:18;141:2

**market (7)**
20:5;26:12;82:1,19;
106:10;109:10;112:23

**marks (1)**
97:7

**married (2)**
29:21,23

**Mary (3)**
92:2;153:16;154:1

**Massachusetts (5)**
7:14;22:15;57:2;
62:4;132:22

**master (1)**
30:9

**material (1)**
17:2

**materials (5)**
19:23,25;33:10,10;
62:9

**math (4)**
145:3,4,7;147:25

**matter (10)**
7:5;25:20;72:20,22;
93:1,2;114:18;132:10;
150:2,11

**matters (4)**
4:22;9:2;91:16;
128:23

**mature (2)**
118:1,7

**maturity (1)**
118:15

**maximum (3)**
38:11;42:24;93:3,3

**May (46)**
11:3,10;16:13;21:13;
22:19;28:7;35:18;53:7;
54:20;62:12;64:8,10;
69:22;71:14;73:8;
76:13;77:15,22;80:1;
83:15;85:2;87:1;94:7,
13;95:1;107:24;112:1,
11;113:7,16,23;115:3,
5,19;116:24;118:10,
19;119:11,12;122:15;
143:14,19;145:11;
147:17;149:2;152:20

**maybe (11)**
6:17;28:8;32:14;

45:19,19;47:14;61:11;
69:22;97:14;112:9,13

**McGregor (7)**
64:15,18;65:7;75:22;
77:8,23;118:11

**mean (23)**
8:12;29:4;35:10;
48:1;68:17;72:17;
73:23;81:8;83:15;92:1;
123:17;124:1,2;142:2,
5;143:5,6,25;145:2;
151:1,6,7,11

**meaning (1)**
58:9

**means (8)**
9:20;12:15;13:15;
37:22;59:8;78:15;99:3;
126:24

**meant (3)**
36:1;114:12;129:2

**mechanic (1)**
121:23

**mechanic's (7)**
87:7;120:21;121:16,
22;124:5,18;128:12

**meet (5)**
32:1;83:17;115:1,6;
143:23

**meeting (47)**
10:23;23:19,22;32:5,
7,10,15,16,18,21;33:2,
4,8,25;35:4,6,9,20;
37:19;38:9,19;39:7,20;
40:23;41:1,16;42:13;
43:1,3,6;67:18,21;68:2,
10;73:21;95:19;97:17;
114:25;115:8,19;
133:21;134:7,9,20,24;
135:9;140:5

**member (19)**
7:16;10:21;11:8,21,
23;12:4,10,19;23:19,
22;24:1;54:10;57:4;
58:19;60:2;61:18;
71:11;93:16;135:16

**members (12)**
7:11;8:7;49:5,24;
52:6;56:9;57:6;59:1;
72:1;109:7;132:24;
133:21

**members' (1)**
52:9

**membership (2)**
12:13;59:14

**memo (1)**
10:9

**mention (3)**
20:14;88:4;95:2

**mentioned (5)**
5:14,15;13:8;57:19;
102:9

**merely (1)**
145:3

Case 16-01120   Doc 340   Filed 06/04/19   Entered 06/04/19 12:58:46   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 167 of 176

May 6, 2019

**message (3)**
66:12;97:5;108:12
**met (3)**
30:18;95:15,20;
97:12,14;113:16;115:7
**microphone (8)**
28:9,11,18,20;48:10;
56:15;150:7,8
**microphones (1)**
28:9
**Microsoft (1)**
42:18
**middle (3)**
29:3;108:18;119:1
**Middlesex (1)**
131:13
**Miden (1)**
62:11
**might (10)**
23:14;24:1;31:17;
58:1;95:11;110:2,5;
150:19;152:3;154:8
**million (69)**
9:24;10:16;11:1,6,
16;25:8;27:16;38:6,7,
14;39:22,24,24;41:8,
11;42:21,23,24;45:12,
17,18,24;46:13;54:4,5,
5;68:7;72:14;74:15,15,
16,17,18;75:1,17,25,
25;77:9;78:3,6,6,9,11,
11,14,16;79:21;82:12;
83:11;85:5,15;88:19,
21;94:6;107:19;
111:14;117:23,24;
118:19;121:24,24;
123:6;127:10,25;
130:6;138:19;139:10,
14;146:5
**mind (4)**
12:14;66:14;83:9,21
**mine (2)**
30:18;148:2
**minority (1)**
24:8
**minutes (7)**
65:14;76:21,24;
134:6;135:2,5;149:20
**missing (3)**
55:17,17;119:5
**mistake (1)**
142:19
**mistaken (2)**
48:6;105:19
**misunderstood (1)**
149:3
**modify (1)**
49:16
**moment (15)**
7:18;11:15;12:7;
28:16;38:8;76:20;
84:15;89:18;90:7;
91:19;94:9,14;113:19;

117:16;139:4
**money (40)**
16:10,12,14;17:5;
19:17;20:16,20,20,20,
24,25;21:24;25:23;
31:14;37:4;40:7;42:10,
12;43:17;45:13;60:21,
24;61:7;66:21;67:1,12,
13;68:15,16,18;85:9,
10;90:20;108:6,7,7;
130:10;138:2;146:2,15
**monies (1)**
25:20
**month (14)**
15:18;16:8;20:17,18,
24;41:12;46:16,16;
52:23;79:15;95:8;
108:4;112:9;121:24
**monthly (3)**
19:13;51:17;128:3
**months (34)**
11:2,11;13:6;14:8;
15:6,17;16:1,7;20:12,
15;21:3,8,10,11,25;
42:1;45:23;46:8;48:24;
49:8;52:12,18,20,21,
24;53:2,3,4;60:14;
61:2;79:13;102:16;
121:15,15
**more (30)**
19:16;20:3,19,20;
38:12,14;40:18;41:5;
42:11;43:6,20;45:14,
24;54:5;60:6;61:2;
65:19;68:5,6,9;78:17;
80:14;84:20;112:20;
124:15;138:19,19;
142:10;144:10;150:7
**morning (12)**
4:3,4,12,14,16,19,21;
28:5,6,24;98:1;102:1;
153:3
**mortgage (15)**
38:21;53:22;54:5;
64:20;66:22;86:6;
110:20;140:11,14,16;
146:8;148:11,11,13,16
**most (5)**
38:13;43:15;45:13;
119:7;152:11
**mostly (1)**
45:3
**motion (1)**
117:11
**move (3)**
75:19;149:7,21
**moved (1)**
6:12
**moving (3)**
93:22;148:24
**much (12)**
16:16;42:10,20;
59:13,16,18;60:13;

74:12;108:8;130:10,
13;138:18
**mud (1)**
27:12
**multi-page (1)**
69:17
**multiple (2)**
18:8;48:2
**must (2)**
53:23;143:17
**myself (3)**
32:17;65:5;115:10

**N**

**Name (7)**
29:10,11;54:11;
64:23;132:22;133:17;
138:14
**names (1)**
4:10
**necessary (1)**
51:19
**necessity (1)**
37:9
**need (17)**
6:9;20:19;28:24;
38:12;51:3;53:12;58:1;
60:12;65:8;68:16;69:1;
70:21;78:15;109:4;
112:18;115:21;137:6
**needed (9)**
5:6;41:3;45:1;65:23;
86:5;98:4;112:19;
115:13;119:5
**needs (5)**
57:19;65:19;66:3;
103:23;111:20
**negative (1)**
148:17
**neglected (1)**
20:13
**negotiated (8)**
13:19;14:19;15:5;
16:5;36:24;52:23,25;
59:7
**negotiating (1)**
47:2
**negotiation (1)**
59:22
**negotiations (2)**
15:2;124:1
**neighborhood (1)**
43:18
**Neither (1)**
99:17
**nephew (2)**
31:3;84:11
**net (5)**
8:16;9:22;52:10,11;
126:20
**Nevertheless (1)**
111:17

**new (9)**
36:4;56:9;58:12;
67:1,11,12,23;96:24;
152:12
**newly (1)**
37:1
**news (1)**
81:17
**Newton (1)**
43:9
**next (31)**
5:3;32:3;36:6;39:16;
43:4;44:4;50:1;53:7;
54:20;57:24;62:12;
64:2;65:13;68:20,23;
76:16;78:13;89:13;
95:18;99:10;102:15;
107:16,18;120:8;
121:25;124:12;126:20;
130:5;150:21;152:7,24
**Nick (1)**
68:11
**nickname (2)**
55:14,15
**Nickolay (5)**
4:13;30:17,18;49:13;
64:16
**night (1)**
152:4
**Nikolaev (1)**
110:8
**nine (2)**
108:4;121:14
**ninety (5)**
24:11;53:22;54:3,6;
99:9
**ninety-eight (1)**
99:4
**ninety-five (1)**
123:6
**ninth (1)**
48:21
**Nobody (1)**
95:3
**Nobody's (1)**
153:18
**none (3)**
25:9,10;57:19
**non-Kagan (1)**
119:22
**nonparties (1)**
73:8
**nonsense (1)**
111:8
**nor (1)**
44:25
**normally (1)**
150:1
**north (2)**
9:7;10:4
**notations (1)**
70:13
**notes (3)**

70:16;135:8;136:6
**notified (1)**
108:7
**notion (2)**
110:5;127:15
**November (13)**
7:8;15:18;22:10,12;
23:6,8,21;54:24;102:3;
109:5;110:23;137:16,
25
**number (28)**
10:3,4;11:16;33:20;
38:2;39:17;41:20;47:5;
105:11;108:12;119:5;
126:13;127:3,8,15,17;
128:5,11,13;135:22;
136:8,18,19;141:21;
145:17;146:1;147:10;
153:22
**numbers (16)**
5:9;9:19,23;33:14;
36:16;38:3;40:11;
42:19;58:2;74:14;
105:5;130:25;131:1;
145:15;147:7;148:10

**O**

**OA (1)**
98:9
**oath (3)**
151:21;154:13,14
**object (6)**
5:7;13:13;107:2;
141:14;144:4;149:11
**objected (3)**
10:12;48:4;71:17
**objection (26)**
4:8;34:5,6,7,24;
35:10;39:14;69:16;
70:9,15,21;72:6;73:12,
12;74:3;82:24;83:7;
84:22;104:25;117:9;
122:24;123:2;124:21;
142:22;145:9;149:9
**objections (1)**
5:3
**obligated (1)**
7:19
**obligation (8)**
7:12;15:24;21:24;
22:1,6;24:17;56:12,25
**obligations (3)**
20:9;26:22;128:22
**obtained (3)**
64:4,4,7
**obviates (1)**
70:20
**obvious (2)**
10:15;11:17
**obviously (4)**
80:10;111:14;
115:16;133:8

Case 16-01120    Doc 340    Filed 06/04/19    Entered 06/04/19 12:58:46    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 168 of 176

May 6, 2019

**occupancy (2)**
40:5;61:2

**occupational (1)**
151:1

**occur (1)**
109:9

**October (17)**
10:23;32:13,14;35:3,
20;38:9,19;40:22;41:1;
42:13;43:1,3;44:17;
50:14;53:11;92:21;
139:5

**odd (1)**
45:2

**off (6)**
64:20;70:19;76:25;
77:7;144:12;151:8

**offer (11)**
5:7;34:4;69:8;70:18;
72:4;90:4;122:22;
123:18,21;141:12;
144:12

**offered (4)**
72:22,24;73:3;83:18

**offering (4)**
69:11,14;90:4;
104:25

**offers (2)**
103:13;124:1

**office (8)**
22:20;32:5,10;62:19;
67:18;89:15,20;126:20

**offices (1)**
134:11

**official (2)**
134:20,24

**often (2)**
95:6;119:11

**O'Grady (1)**
133:17

**old (3)**
30:4,5;58:11

**Once (5)**
23:22;95:8,20;
151:18,21

**one (61)**
4:6,24;6:7,9;7:18;
12:5,16,25;13:3,3,5;
17:25;18:6;22:4;24:7,
7;25:6;30:3;33:5,5,5;
36:25;37:9,20;38:6;
40:16,20;41:23;43:20,
21;46:21;47:10,15;
56:11;70:5;72:11;
75:10;80:14;89:5;90:3,
3;91:23,25;95:17;96:2,
20,22;113:10,18;
120:17;121:24;122:10;
130:18;141:20;148:21;
149:20;150:5;151:1;
152:13,20;154:2

**ones (1)**
9:13

**one's (7)**
53:10;69:1;71:17;
80:1,4;90:3;113:23

**ongoing (2)**
92:19;128:22

**online (1)**
131:4;133:18

**only (19)**
17:6;19:12;58:10;
69:16,18;70:11,17;
93:4;95:15,19;99:4,20;
101:19;123:8;132:7;
144:6;150:5;153:17;
154:6

**open (3)**
103:5,8;119:4

**open-ended (2)**
19:9;25:8

**opening (1)**
7:1

**openings (1)**
102:2

**operate (1)**
65:3

**operating (27)**
7:7;11:20;12:19,24;
13:7,17;14:17;18:25;
19:1,5;21:6,16;22:2,8,
9;23:3,11;25:3;26:1,
22;44:8;47:11;50:6;
58:21;60:21;114:19;
144:18

**operative (1)**
25:9

**opportunity (2)**
142:20;150:14

**opposed (1)**
149:12

**option (1)**
82:14

**options (1)**
138:8

**order (5)**
58:24;94:17;112:19;
137:20;143:19

**organization (1)**
61:16

**organizational (1)**
22:15

**orient (2)**
90:5;131:16

**original (9)**
37:16;65:21;74:19;
78:1,2,3,4,5;79:15

**originally (5)**
60:5,14;66:24;78:17;
96:23

**originals (2)**
143:2,17

**others (1)**
14:1

**otherwise (2)**
91:6;148:16

**ours (3)**
17:7;34:13;105:10

**out (37)**
8:1;16:13;24:14;
25:17;26:12;27:12;
48:7;52:10;53:5,5;
56:8;60:20;69:25;73:9;
74:17;79:8;80:10;
83:16;84:21;85:8;94:6,
12;95:1;98:8;103:2,5,
22;109:3,13;111:14;
114:12;117:20;121:16;
132:15;137:15;153:12;
154:1

**outlined (2)**
8:8;57:7

**out-of-court (1)**
73:13

**out-of-pocket (1)**
25:19

**out-of-pockets (1)**
9:6

**outrage (1)**
13:3

**outset (1)**
11:5

**outside (1)**
95:19

**outsized (1)**
8:11

**outstanding (4)**
115:22;117:18;
125:14;130:4

**Over (23)**
29:24;30:9;44:25;
45:1;51:5;53:22;56:18;
59:22;68:5;78:25;
92:21;95:16;102:15;
110:24;114:23;119:12;
123:13;129:6,10;
150:19,24;151:22;
152:2

**overdrawn (2)**
93:7,15

**overhead (1)**
126:20

**overnight (2)**
150:3,10

**overrule (1)**
74:2;124:21;145:9;
149:13

**Overruled (1)**
35:16

**overrun (1)**
94:10

**overruns (5)**
11:12;19:18;94:20,
23;95:2

**overstatement (1)**
79:9

**owe (2)**
108:7,7

**owed (7)**
9:3;16:14;109:19,22,
24;110:2,6

**own (7)**
8:22,25;9:17,25;
59:9;135:8;150:10

**owned (1)**
114:15

**owner (4)**
37:6,7,16;122:4

**owning (1)**
59:1

**owns (1)**
9:4

**P**

**packet (3)**
69:1,2;92:6

**page (76)**
7:10,23;8:9;11:19;
12:8;15:12;36:6,18;
38:1,3,4;39:17;41:15;
48:21;49:22;50:1,1,5;
51:10;52:5;54:14,23;
55:5,13;56:8;58:16;
59:2,20;60:16;61:12,
15;67:6,17;69:21,22;
75:16;78:13;80:16,16,
23,24;86:16;87:24;
89:13,13,13;97:21;
98:17;100:15;101:7,
11;106:17;107:10,10;
108:19;109:14;110:21;
114:8;116:22;118:17;
124:13;125:2,22;
128:15,16,17;130:1;
131:14;135:2,11,13,23;
136:19;144:22,22;
145:15

**pages (6)**
39:17;46:4;70:18,19,
22;71:4

**paid (13)**
8:16;16:6,8;18:11;
20:17;25:17;26:7;
46:21;50:23;52:10;
93:13,14,14

**pains (1)**
22:14

**painted (1)**
96:6

**painters (3)**
121:6,8,10

**paper (4)**
69:25;81:2,6,11

**paragraph (24)**
11:17;44:24;49:23;
50:19;51:2,17;56:7,9;
57:11;59:12,25;60:19,
23;79:12;89:5;101:7;
107:12;108:18;110:22;
114:14;125:8;128:20;
134:19;144:18

**parallel (1)**
18:16

**parcel (1)**
63:21

**part (20)**
9:24;25:24;27:1;
37:1;38:21;39:11;
55:19,20;57:25;58:23;
59:5;80:5;86:3;90:12;
109:7;124:20;135:17;
144:22;145:22;146:25

**particular (21)**
33:14;34:2;35:22;
38:4;39:21;41:10,13;
43:13,18;45:19,20;
54:24;59:12;68:13;
79:2;82:5,9;107:4;
108:17;115:18;121:2

**particularly (5)**
5:25;6:25;109:4,8;
142:3

**parties (12)**
4:9,10,15,20;7:2,7,
20,25;47:1;132:9;
143:18;150:4

**parties' (1)**
25:18

**partner (7)**
45:3,8,10;46:21;
112:16;114:17,19

**partners' (1)**
144:7

**parts (1)**
57:17

**party (6)**
31:11;73:15;82:7,17,
21;114:17

**pass (2)**
90:20;119:9

**past (2)**
33:11;133:12

**patent (1)**
24:2;27:3

**pause (2)**
7:18;38:8;70:8;
131:7

**pay (31)**
15:20;16:12,19;17:4;
20:7,13,16;21:15,18,
22,24;22:6;23:15;39:3;
51:4,17;60:25;66:22,
23;85:10;88:13;89:2,
19,24;90:19;93:4;
102:10,10;111:13;
115:25;130:6

**payable (1)**
109:15

**paying (10)**
19:19;22:4;80:7;
84:13;87:18;88:4;90:8;
110:20;111:18,19

**payment (3)**
127:5;130:3;141:7

Case 16-01120    Doc 340    Filed 06/04/19    Entered 06/04/19 12:58:46    Desc Main
Document    Page 169 of 176
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
May 6, 2019

payments (5)
67:11;111:10;
123:13;127:6;141:9
pays (2)
16:2;21:14
PDF (1)
33:25
penalties (1)
22:14
penalty (2)
16:4;21:21
penny (2)
18:6;19:15
people (11)
65:3,5;72:9;73:4;
119:8;132:16,19,24;
133:2;153:9,10
per (11)
11:4,6;49:7;52:8;
68:9;75:25;77:9;78:22;
85:5;88:19;106:9
percent (41)
8:10,13,14,15;12:13,
14;24:10,11;40:15,16;
45:14;46:17,21;49:7,
12,13,13;51:5;52:8;
53:22;54:3,6;55:20,25;
59:2,15,17,19;78:12;
88:12,13,15,23;89:7,
10;91:17;99:4,9;100:1;
126:16;128:3
percentage (8)
51:20,21,24;59:2;
144:7,16,19;147:1
percentages (2)
142:25;149:2
perfect (3)
6:21;76:22;150:13
performance (1)
12:17
performed (1)
125:15
Perhaps (2)
51:10;97:18
period (21)
12:23;41:5;51:5;
60:6,7,9;64:3;91:18;
92:17,18,22;94:5,9,12,
20,25;101:8;102:13;
110:16;116:7;121:6
periodically (2)
93:19,21
perjury (1)
22:14
permission (5)
45:22;87:21;88:7;
101:20,23
permit (4)
37:14,15,21;40:6
permits (3)
64:3,7;70:16
person (6)
111:21;117:13;

130:25;133:20;138:15;
140:2
personal (1)
24:3
personally (3)
23:14,15;59:14
perspective (1)
24:13
persuaded (1)
14:20
Perten (65)
4:16,16;5:21;17:14;
20:23;21:2,4;23:4,6,8,
10,13;34:6;35:10;
39:13;47:20,22;48:1;
69:10,16;70:6,9;72:6;
73:3,12,16,19;82:24;
83:7;84:9,11;102:8;
105:5,7,10;117:9;
122:20;123:1,17;
137:14;141:14,17,19;
142:11,22;143:3;
144:2,3;146:24;
147:11;149:11,20;
150:6,9,23;151:6,14;
152:20,22,25;153:2,5,
8,13,24
Perten's (1)
152:2
peruse (1)
18:8
Peter (1)
4:14
petition (1)
137:19
phase (3)
88:11,13;89:3
phone (5)
98:1;108:12,13;
116:21;132:6
photo (1)
80:17
photographs (1)
143:16
phrasing (1)
135:22
pick (2)
18:24;149:17
picked (1)
105:5
pictures (2)
92:6;93:20
piece (4)
55:17,17;81:20;
84:24
pieces (1)
36:3
place (2)
68:2;143:19
placed (1)
139:14
plaintiff (1)
26:11

plaintiffs (9)
18:5,11,18;20:6;
24:19;27:17;28:1;34:3;
70:24
Plaintiffs' (22)
7:6;10:11;18:22;
33:19;34:25;66:8,11;
69:8;70:24;72:4;74:7;
104:19,20;113:21;
118:13;120:19,21;
122:15,18;124:24;
125:3;145:18
Plaintiff's (1)
122:22
plan (8)
10:22;35:22,25,25;
66:1;78:1;130:3;
136:10
planned (7)
45:12,23;66:24;78:2,
4,5,17
planning (2)
35:22;46:18
plans (21)
7:14;10:20;19:7,7,8;
57:2;58:9,10,12,13,13;
65:9,19,22,22,25;66:1,
5;67:23;68:21;153:9
please (53)
4:10;28:2,4,19;
44:13;47:5;49:23;
50:10;51:10;53:8;
54:21;55:13;58:16;
60:17;61:11;62:7,13;
63:1,18;64:12;67:7;
75:20;76:13;77:2,13;
79:5;80:15;85:24;
86:17;87:2,25;90:2;
97:2,19;98:1,7;104:16;
106:3,11;107:10,21;
111:24;113:4,21;
116:5;118:4;122:16;
131:9;133:25;137:9;
140:8;153:20;154:9
plenty (1)
135:6
plugs (1)
82:20
Plumbing (1)
109:19
plus (8)
11:1,6,13;25:24;
49:6;71:24;72:1;127:7
pm (6)
47:16;50:14;67:19;
71:25;119:18;154:17
pocket (3)
8:25;9:25;25:17
point (28)
10:12;11:18;36:12;
44:9;49:23;50:3,5;
58:11;65:25;66:21;
76:14;107:4;109:3;

111:15;112:18;113:13;
114:24;115:24;117:12,
17;124:10;129:15;
132:5;133:21;140:1,
21;144:13;145:13
points (3)
79:8;109:3;137:15
populated (1)
77:20
portion (2)
22:25;81:23;153:25
portions (2)
18:25;19:1
position (2)
27:18;140:2
positive (1)
42:15
possibility (2)
21:17;88:4
possible (2)
40:1,3
potential (5)
31:8;32:4;40:23;
43:4;95:2
power (1)
24:7
practical (1)
114:18
practice (3)
38:25;39:7;150:25
pre- (2)
5:1;34:11
precisely (1)
7:25
prefer (2)
149:24;150:20
preference (1)
152:16
pre-marked (1)
34:16
preparation (1)
151:22
prepare (3)
42:16;150:15,20
prepared (7)
57:25;141:22,23,24,
24;142:5;143:10
preparing (2)
120:7;124:11
prepped (1)
8:19
prerogative (3)
123:19,20,22
present (1)
39:4
presentation (12)
18:3;33:13;35:9,19;
36:10,11,14;65:22;
77:19;80:10;84:3;
124:9
presented (11)
33:24;35:6;38:3,4,5,
7;67:23;78:1;82:3;

86:4;123:7
presenting (1)
83:12
press (1)
93:21
pressing (1)
84:21
pretend (1)
80:4
pretending (1)
124:17
pretty (2)
11:23;130:20
pre-twenty-three (2)
21:1,2
prevent (3)
26:24;27:18;74:1
preventing (1)
27:1
previous (2)
35:25;37:7
previously (6)
53:19;54:17;124:17;
125:12;133:16
price (15)
25:2,2,7;41:7,9,23;
47:2;68:6;78:6,11;
108:21,23,25;109:4;
138:16
prices (1)
41:11
print (1)
81:7
printout (2)
34:2;141:6
prior (1)
125:18
privilege (3)
150:19;151:23;154:8
probably (10)
38:13;43:11;70:11;
92:15;95:8,11;113:16;
114:4;127:9;137:7
problem (7)
16:11;22:2,7;39:11;
57:22;144:5;150:10
problematic (1)
111:15
Proceed (1)
77:2
proceeding (2)
4:5;83:20
proceeds (1)
111:3
process (6)
24:15;37:5;49:23;
50:6;57:17;95:7
produce (2)
38:22;143:20
produced (1)
10:7
ProEx (6)
10:14;19:21,21,21,

Case 16-01120    Doc 340    Filed 06/04/19    Entered 06/04/19 12:58:46    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 170 of 176

May 6, 2019

22;20:1
**ProExcavation (16)**
4:17;9:4,6,8,20;10:7;
18:9;90:9,12,17,20;
91:8,10,11;110:5;
136:21
**ProExcavation's (1)**
9:17
**ProEx's (1)**
20:4
**profess (1)**
24:24
**professes (1)**
24:2
**professional (2)**
31:21;42:17
**profiles (1)**
133:19
**profit (14)**
9:21;14:25;41:10;
46:10,14,17;51:6;
52:10,11;55:19,20;
60:10;81:25;91:17
**profitable (2)**
31:13;111:16
**profits (10)**
8:11,13,14,15,16;9:1,
22;10:1,18;49:17
**profit-sharing (3)**
45:25;46:1,5
**program (1)**
34:15
**progress (3)**
93:20,20;97:9;98:1
**progressing (1)**
97:8
**project (67)**
8:24;9:11,22;10:22;
11:5;14:21,23,23;16:3;
17:9;19:15;28:11,20;
31:9,11,14;32:4;33:12,
14;35:23;36:15;38:24;
39:1;40:13,16,23;
41:12,12,25;43:5,14;
45:12;46:9;56:6;57:18;
60:11;63:21;64:2;
67:13;78:8,14,22;
79:13;81:24;82:7,16;
83:10;85:12,14;86:13;
87:15,19;89:24;90:9,
17,25;91:5;92:7,15;
93:11,12,17;95:5;96:1;
99:3;111:16;112:17
**projected (1)**
46:16
**projects (6)**
18:8;31:21;33:11;
43:7,7,8
**promised (1)**
115:16
**proof (3)**
18:16;26:8,15
**proofs (1)**

17:7
**proper (2)**
39:7;81:20
**properties (21)**
15:6;22:10;41:5;
45:24;50:21;58:20;
75:17;102:16,20,22,25;
103:20,20;117:18;
118:14,18,19;119:2;
120:22;121:1;139:14
**property (40)**
7:24;36:1,2;37:7;
41:4;43:13,15,16;45:1;
48:23;49:1,8;52:11;
53:19;57:18;94:15;
95:6,23;96:17;97:13;
103:3,6,11,13;108:4;
112:19;114:15,18,23;
115:19;116:1;119:11;
129:5,7,24;138:4,11;
139:11,12,15
**proponent (3)**
143:14,17,20
**proposal (15)**
20:2,3;90:12;123:2,
10,13,15,20;124:2,6,
23;130:2,2,7,23
**propose (2)**
45:25;46:19
**proposed (3)**
34:22;91:21;119:21
**proposes (1)**
67:18
**proposing (2)**
123:3;144:25
**prospect (1)**
111:12
**prospects (1)**
33:11
**protection (4)**
137:4;138:7;139:5,
18
**prove (2)**
73:4;143:15
**provide (6)**
98:1,3;122:6;147:13,
15;154:1
**provided (3)**
20:5;58:11;122:9
**provides (3)**
22:12;49:5;143:13
**providing (2)**
94:2,3
**provision (9)**
12:9,11;14:17,18;
15:4,23;16:18;48:22;
58:21
**pull (3)**
6:9;28:18;56:18
**pulling (1)**
6:13
**Purchase (3)**
60:21,24;63:8

purchased (1)
36:24
**purchasing (1)**
53:19
**pure (1)**
9:21
**purported (2)**
13:5;135:3
**purportedly (2)**
9:1;125:9
**purports (5)**
8:22;72:8;124:14;
125:23;126:20
**purpose (4)**
61:23;83:19;93:4;
124:22
**purposes (1)**
132:24
**Pursuant (1)**
129:4
**push-back (1)**
150:5
**pushing (2)**
104:10,10
**pushy (1)**
104:12
**put (43)**
5:6,14,15;8:12,13,
15;9:23;16:12,15;
20:20,20;21:25;24:3;
27:10;33:18;37:13;
40:17;41:20;44:15;
48:4;58:14;59:12;65:3;
70:13;74:3;82:9;84:2,
3,17;102:11;105:18;
106:10;130:25;136:6;
138:13,22;140:2;
143:10;146:2;147:25;
148:1,3,5
**putting (1)**
19:16;20:23;54:4
**Pyle (9)**
94:8;107:18;109:3;
112:2;113:6,24;
115:25;119:19;122:20

**Q**

**quarter (1)**
68:6
**QuickBook (3)**
141:6;142:10,23
**QuickBooks (10)**
19:23;112:11;
141:22,22,23,24,25;
142:1;143:6,11
**quicker (1)**
60:13
**quickly (9)**
41:4;43:17;51:11;
75:7;112:19;120:9;
138:11,12,16
**quiet (1)**

64:3
**quite (4)**
11:9;12:11;104:12;
111:8

**R**

**raise (1)**
28:2
**raised (2)**
36:2;144:17
**rank (1)**
72:9
**rapidly (1)**
109:6
**rate (4)**
26:12;93:14;126:16;
128:2
**rather (2)**
39:24;55:3
**ratify (4)**
135:16,24;136:9,20
**reach (2)**
103:2,5
**reaching (1)**
132:15
**reaction (6)**
107:25;111:7,8;
121:21;137:23,24
**read (35)**
45:5,15;49:2,10;
50:24;51:7,25;52:13;
53:25;56:1;57:8;58:4;
61:4;66:17;67:15;
74:20;76:2;78:19;
79:17;80:4;97:10;
98:12;99:13;106:13;
109:11;111:5;114:20;
120:12;126:16;128:24;
129:8;130:8;141:15;
142:4;144:6
**reading (2)**
108:2;145:23
**ready (4)**
17:13;27:23;37:24;
70:6
**real (4)**
53:18;109:9;112:24;
117:8
**realize (1)**
45:2
**realized (6)**
53:21;55:8,16;102:5;
111:15;112:18
**really (10)**
46:14;70:17;72:15;
81:7;95:4;104:10,21;
114:7;131:16;144:13
**reappraised (1)**
118:14
**reason (6)**
23:24;31:23;46:12;
50:22;52:3;55:20;

57:11;78:23;140:21;
147:12
**reasonable (2)**
20:5;143:19
**reasoning (1)**
60:8
**reasons (1)**
28:24
**recall (8)**
35:8;36:9;38:2;
52:22;55:2;62:21;96:4;
97:15
**receipt (3)**
92:16;106:11;130:6
**receivable (1)**
125:14
**receive (4)**
107:23;118:25;
120:8;121:17
**received (8)**
75:23;98:22;106:21,
22;107:24;108:11;
124:4;127:7
**recess (1)**
76:23
**recites (1)**
122:2
**recognize (5)**
33:20;61:14;69:2;
71:20;137:12;141:2
**recollection (5)**
32:12;35:19;42:24;
48:15;68:3
**record (6)**
4:11;28:8;47:22;
71:3;76:25;77:1;
134:20,20,24
**recorded (6)**
15:9;28:16;63:23;
70:4;120:22;128:12
**recordings (1)**
143:15
**records (7)**
10:7;18:8;112:4,8,
10,12,13
**recover (1)**
25:15
**recovery (1)**
18:18
**red (1)**
34:14
**redact (2)**
144:12,25
**redacted (5)**
145:10,17,18;
153:21,25
**redactions (1)**
149:8
**reduced (2)**
146:20;148:3
**reduction (1)**
21:22;51:22;109:4
**reductions (1)**

Case 16-01120    Doc 340    Filed 06/04/19    Entered 06/04/19 12:58:46    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 171 of 176

May 6, 2019

144:8

**referring (1)**
107:13

**reflect (1)**
58:2

**reflected (1)**
9:17

**refresh (1)**
32:12

**refuse (1)**
108:23

**refused (5)**
26:21;42:23;108:20;
117:6;119:10

**regard (5)**
7:2;43:4;117:4;
119:1;150:4

**regardless (1)**
140:23

**Registry (1)**
63:24

**related (1)**
36:16

**relation (1)**
120:10

**relations (1)**
132:5

**relationship (1)**
140:1

**relevance (1)**
5:16

**reliance (1)**
18:12

**relies (1)**
87:7

**rely (1)**
84:23

**relying (1)**
83:24

**remaining (2)**
144:13,15

**remember (36)**
18:15;31:4;33:3,4;
45:18,19;47:13;55:4;
58:13;64:5;66:6;67:22;
68:4;70:4;74:24;75:4;
95:11,12,12,14;103:14,
18;113:15;115:15,18;
116:25;120:25;121:2,
3,19;127:17;129:18;
130:10;133:2;135:6;
138:15

**remembered (1)**
22:18

**remind (1)**
5:23

**removal (1)**
136:9

**remove (7)**
12:16,18;58:24;60:2;
136:10,12;139:13

**removed (1)**
12:12

**removing (1)**
139:12

**replace (1)**
116:24

**reply (1)**
93:22

**report (6)**
98:7;141:22;142:11,
24;143:9;149:12

**REPORTER (1)**
48:8

**representative (1)**
64:19

**represented (1)**
83:6

**representing (1)**
4:17

**request (4)**
20:19;136:9;151:1,
15

**requested (5)**
15:22;58:23;60:6;
120:8;122:6

**requesting (1)**
60:8

**require (5)**
41:12;58:25;86:12;
121:14;140:3

**required (6)**
26:1;35:24;59:4;
60:2;85:12;136:12

**requirements (1)**
143:23

**requires (1)**
119:3

**reserve (1)**
5:25

**reserved (2)**
5:10,11

**resolution (1)**
123:4

**resolve (3)**
78:21;123:21;130:4

**resolved (1)**
23:20

**respective (4)**
49:6,7;52:7,9

**respectively (1)**
118:8

**respond (4)**
16:11;42:22;47:1;
74:23

**responded (1)**
98:14

**responds (1)**
99:22

**response (6)**
46:25;52:2,15;74:22;
106:18;119:20

**responsibilities (2)**
20:12;93:17

**responsibility (5)**
20:15;21:9,16,19;

111:20

**responsible (5)**
15:16;48:25;51:18;
93:2,24

**rest (2)**
69:19;70:19

**restrictions (1)**
6:1

**result (5)**
18:5;25:21;54:10;
56:5;82:15

**RESUMED (1)**
77:5

**retain (1)**
12:10

**retained (6)**
14:3,4;116:7,10,12;
138:23

**retaining (1)**
139:2

**retention (1)**
131:25

**return (8)**
56:7;58:15;78:6,12,
17;110:21;116:20;
132:6

**returns (2)**
93:24;94:4

**review (4)**
33:10;44:8;67:24;
104:13

**reviewing (4)**
40:12;75:23;78:1;
79:19

**ride (2)**
20:8;25:12

**right (207)**
4:22;5:25;6:4,9,16,
18,22;10:15,22;12:15,
18,19;13:21,25;14:5;
23:9,12;28:2,9,22;
29:6;34:7,11,13,20;
35:3;36:18,21;37:14;
39:14;41:23;44:20,22;
46:5;47:10;48:17,18;
49:18,20;50:2,4,7,14;
52:18;54:18;55:7,8;
56:9;60:3;62:5;63:6,
15,21,23;64:1;65:9,17;
66:12;67:19;68:21;
70:3;71:23,25;72:3,10,
24;73:14,18;74:2;
75:11,17;76:5,20,23;
77:10,22;80:2,21,23;
81:13,17,18,21;82:22;
83:15;84:18,23,25;
85:6;86:24;88:16,19,
24;90:25;91:8,9,22,24;
92:8;96:17,18;97:5,15,
18;98:15;99:5,7,16;
100:1,18;101:4,5,9;
103:16,18;104:14,20,
24;105:13,21;106:24,

25;107:13;109:21;
112:2;113:8,18;114:9;
115:24;116:7;117:14,
18,24;118:8,11,15,19,
23;119:19;124:19;
125:22,23;126:6;
127:13,20,24,25;
128:13;129:11,20,21;
130:15,17;131:18;
132:10,12;133:8,22;
134:7,9,11,17;135:3,
20;136:2,8,12,13,22;
137:1,3,21;138:24;
140:11,13;142:21;
143:12;145:1,5,8,11,
23;146:5,6,12;147:4;
148:8,15;149:6,9,13,
17,19,21;150:13;
151:20,20,25,25;152:6,
7,10,18;153:13;154:4,
12,15

**rights (2)**
24:12;107:5

**risk (9)**
14:21,22,23;15:1,3,
3;46:12;54:12;81:24

**risks (3)**
40:23,25;41:2

**Road (7)**
7:13;56:13;57:2;
71:9,9,10;96:20

**Rock (1)**
53:6

**Rockland (10)**
53:6;60:22,25;64:19;
75:23;85:19,20;94:6;
127:7;139:10

**role (4)**
32:21;42:14;55:18;
56:5

**roughly (2)**
25:19;113:15

**rule (7)**
74:1;124:22;143:13,
23;145:14;152:12,17

**ruled (1)**
147:4

**rules (1)**
151:13

**ruling (1)**
153:25

**run (2)**
144:7;153:24

**running (6)**
5:24;29:13,15;40:19;
98:8;111:22

**runs (3)**
142:24,24;144:7

**Russia (5)**
30:8,11,20;31:4,6

**Russian (6)**
30:15,23,25;32:19;
80:4,5

---

**S**

**sale (6)**
7:24;100:17;101:4;
103:10;114:15,18

**sales (5)**
41:11,22;78:6,11;
92:16

**same (24)**
4:15,20;10:19;12:11;
13:15;36:4;37:4;39:2;
40:20;46:19;51:1,21,
22,23;55:9;57:10;67:9;
91:4,10;94:12,20;
106:17;116:7;140:21

**sand (1)**
24:23

**sat (1)**
19:15

**satisfactorily (1)**
129:6

**save (2)**
37:4;128:22

**savings (1)**
82:17

**saw (9)**
13:4;50:17;91:11;
95:20;121:21;129:17,
18,19;148:21

**saying (13)**
17:23;20:19;36:10;
38:2;39:14;43:15;
72:15,17,21;73:11;
93:6;124:11;149:4

**schedule (5)**
39:19;44:25;46:5;
49:17;153:6

**scheduled (1)**
98:24

**school (1)**
30:7

**scoot (1)**
152:13

**screen (12)**
10:3;15:11;33:19;
34:14;36:19;39:18;
44:16;69:23,23;70:2;
81:20;114:9

**screens (3)**
6:5,8;33:16

**scroll (1)**
106:17

**Sean (1)**
4:12

**season (2)**
8:1;102:21

**seated (3)**
4:3;28:4;77:2

**second (24)**
6:7;22:8;36:18;
37:23;41:7;44:24;
61:11;67:6;70:5;71:9;

Case 16-01120    Doc 340    Filed 06/04/19    Entered 06/04/19 12:58:46    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 172 of 176

May 6, 2019

79:12;96:14;97:21;
101:7;107:3;110:21;
114:8;116:22;125:2,
11;128:16,20;134:19;
135:23
**secret (1)**
80:8
**Secretary (1)**
62:9
**section (21)**
7:9;8:5,8,9;10:19;
12:9;15:10,12;21:6;
22:11;23:10;49:4;52:5;
57:7,21;81:25;82:19;
89:14;129:4,13;144:6
**secure (1)**
118:22
**seeking (1)**
25:15
**seeks (1)**
18:18
**seems (2)**
73:8;127:1
**selector (1)**
6:18
**self-dealing (1)**
12:2
**sell (16)**
41:4,5,9;45:1;59:8,
10;60:12;67:13;68:6;
102:19;112:18;119:8;
138:11,13;139:12,16
**seller (2)**
101:12,15
**selling (2)**
8:1;102:22
**send (11)**
16:9;44:7;97:12;
98:7,17,20;104:8,12;
112:7;122:10;124:12
**sending (3)**
92:10;123:9,12
**sends (1)**
16:14
**sense (7)**
7:25;46:14,15;108:8;
127:8;138:18;142:10
**sent (10)**
55:2,8;65:6;67:5;
78:23;92:7;105:20;
112:1;119:18,21
**sentence (5)**
50:20;108:19;
110:22;125:11;137:17
**separate (2)**
38:21;91:6
**September (1)**
32:11
**sequential (1)**
104:21
**Sergei (1)**
110:8
**series (1)**

97:7
**serious (2)**
17:24;138:6
**serve (1)**
138:3
**served (1)**
111:20
**services (3)**
20:4;80:8;82:8
**session (1)**
4:2
**set (2)**
19:13;22:13
**sets (1)**
65:8
**Setting (1)**
135:22
**settlement (9)**
123:2,10,13,15,17,
21;124:2,6,23
**seven (3)**
43:11;65:14;134:4
**seventeen (2)**
89:7,10
**seventh (1)**
87:24
**seventy-two (1)**
130:18
**several (4)**
5:5;11:15;16:7;
102:16
**shall (16)**
7:11,16;21:15;48:24;
49:5;51:18,21;52:7,10;
56:11,25;57:4;59:4;
60:22,24;101:8
**share (10)**
8:1,10,12;9:1;51:22;
52:10,11;55:24;111:3;
150:4
**shared (1)**
36:16
**shareholder (2)**
24:8,9
**shares (1)**
51:6
**sheet (2)**
143:1;144:10
**shocked (1)**
108:1
**short (3)**
78:15,22;115:14
**shorter (2)**
60:7,9
**shortly (1)**
67:11
**show (24)**
6:24;7:1,3,21;8:3,20;
9:6;10:13,23;12:3;
14:10,20;16:22;19:3,
11;20:4;24:5;43:6,10;
61:11;68:19;69:22;
83:12;136:6

**showed (11)**
10:3;35:23,23,24;
43:11,13;95:17,21,21,
22,24
**showing (6)**
35:21;80:19;82:6;
83:19;131:11,16
**showings (1)**
103:3
**shown (2)**
14:8;41:16
**shows (5)**
34:14;41:13;46:5;
123:8;132:23
**sic (3)**
4:7;64:23;130:19
**side (7)**
5:21;13:4;20:19;
80:22;137:15;145:11,
15
**sifted (1)**
9:4
**sign (16)**
12:2;13:1;28:25;
61:21;63:3;87:22;
100:20,23;101:20;
103:23;104:7,8,9;
105:21,23,25
**signature (3)**
63:12;101:12,16
**signed (20)**
12:21;13:8,23;14:13;
19:8;25:6;51:11;54:16;
59:13;61:18;63:14;
64:20;86:5,23;106:10,
21,25;111:21;140:11,
14
**significance (1)**
35:14;37:18;72:13
**significant (2)**
72:19;80:11
**significantly (3)**
18:2;26:13;31:22
**signing (2)**
86:10;107:16
**similar (7)**
36:4;37:2;67:5,9;
91:10;97:16;132:16
**simple (1)**
147:25
**simply (3)**
20:7;24:25;144:10
**single (1)**
40:20
**sit (4)**
8:1;24:21;28:10,19
**site (3)**
93:19;95:16,19
**sitting (2)**
27:16;139:11
**six (5)**
36:13;127:18,25;
130:12,18

**skip (2)**
44:24;50:20
**skipped (1)**
51:10
**sleight (1)**
148:20
**slice (2)**
25:20;39:18
**slightly (2)**
38:23;68:8
**slot (1)**
114:9
**small (5)**
29:14,14;81:7;
141:19
**smelling (1)**
108:9
**smoother (1)**
70:1
**smoothly (1)**
93:23
**snapshot (1)**
19:25
**so-called (1)**
9:22;123:12
**social (5)**
31:10,11,25;95:19;
133:19
**sod (2)**
98:23;99:10
**soft (1)**
25:24
**sold (17)**
14:24;15:6,16,16:1;
33:12;41:13;43:17;
45:24;48:23;49:1,8;
50:21;52:12;60:11;
104:3;109:7;116:1
**sole (1)**
21:8
**somebody (5)**
24:16;26:5;83:14;
141:24;150:25
**somehow (3)**
108:7;127:24;139:14
**someone (3)**
73:9,15;120:5
**someone's (2)**
84:6,8
**sometimes (1)**
28:15
**somewhere (4)**
64:7;92:20;95:9;
121:5
**sorry (20)**
34:10,10;36:20;
38:16;39:16;40:2;
48:11;59:24;60:23;
76:9,10;81:18;84:7;
95:25;96:10;104:19;
105:19;121:13;135:12;
136:18
**sort (4)**

37:14;40:25;147:6;
150:18
**sorts (2)**
17:19
**sound (1)**
35:3
**Soviet (1)**
30:8
**speak (6)**
21:11;32:18;70:5;
154:6,7,7
**SPEAKER (2)**
6:20;56:14
**specific (2)**
82:8;95:15
**specifically (19)**
7:11;8:7;9:1;11:21;
13:19;14:19;15:5,22,
25;17:3;52:6;57:5;
59:7;60:21;65:2;90:4;
92:25;95:14;136:6
**specifics (1)**
36:14
**specified (1)**
56:5
**speed (2)**
37:5;97:8
**spend (1)**
5:24
**spends (1)**
15:21
**spent (2)**
19:15;25:21
**spills (1)**
59:2
**split (5)**
9:22,25;16:15,16;
46:22
**splitting (1)**
10:17
**spoken (1)**
106:15
**spreadsheet (1)**
98:20
**spreadsheets (1)**
84:4
**staff (3)**
89:15,20;141:24
**stage (2)**
35:25;145:11
**stages (1)**
57:24
**stamped (2)**
34:16,17
**stand (2)**
22:3;84:16
**start (14)**
27:22;37:24;56:22;
66:25;102:8;107:4;
111:18,19;119:1;
132:15,21;133:15;
137:5,7
**started (11)**

5:22;13:5,10;47:2;
87:11;90:14;92:20;
101:19;105:7;114:22;
132:12

**starts (1)**
144:23

**state (4)**
4:10;29:10;83:9,21

**statement (5)**
48:14;72:12,25;83:8;
130:16

**statements (2)**
19:14;73:13

**statement's (1)**
35:13

**states (4)**
48:22;101:8;129:4;
151:13

**status (1)**
117:5

**stay (2)**
38:14;74:19

**stayed (1)**
117:6

**step (4)**
13:12;15:19;21:21;
117:2

**stick (3)**
27:13;72:16;79:15

**sticker (3)**
34:8;104:22;105:11

**still (7)**
39:25;40:5;48:18;
78:7;80:9;100:6;
103:15

**stitch (1)**
60:20

**stop (5)**
24:13;36:7;37:11;
113:1;117:10

**straight (1)**
8:24

**straighten (1)**
73:9

**straightforward (1)**
26:9

**strategic (2)**
114:10;125:10

**strayed (1)**
74:17

**street (2)**
26:14;71:7

**stretch (1)**
76:17

**strike (2)**
117:11,12

**strong (2)**
27:9;152:16

**stuck (2)**
23:14;105:11

**stuff (1)**
153:18

**style (1)**

120:4

**subject (4)**
48:15;59:11;150:2,
11

**submission (2)**
120:7,11

**submit (2)**
24:24;26:8

**submits (1)**
68:21

**submitted (6)**
8:21;25:14,15;69:4,
5,6

**subpoena (1)**
153:9

**subs (1)**
26:5

**subsequently (2)**
51:19,23

**substance (3)**
33:7,9;154:9

**substantial (1)**
125:13

**substantially (5)**
7:16,20;8:2;57:4;
128:21

**subtract (1)**
148:4

**successful (1)**
26:25

**sudden (2)**
16:13;108:6

**suddenly (1)**
24:23

**suffer (1)**
151:2

**suffered (4)**
18:5,13;26:19,20

**sufficient (4)**
38:13;40:18;79:22;
145:12

**sufficiently (1)**
142:9

**suggest (3)**
24:5;27:10;89:1

**suggested (2)**
68:4;137:19

**suggesting (1)**
150:9

**suggestion (2)**
45:21;49:16

**suing (1)**
136:20

**suit (3)**
23:20,20;24:5

**sum (4)**
10:13;11:4;68:15;
130:6

**summary (9)**
141:9,14,21;142:1;
143:1,14;144:11;
145:14;149:12

**summer (1)**

137:8

**Superior (1)**
131:13

**supervision (1)**
25:25

**supplied (2)**
7:15;57:3

**support (5)**
16:24;24:25;25:1;
27:11;75:13

**supported (1)**
143:25

**supposed (5)**
25:11;36:3;98:9;
102:2;144:19

**Supposedly (1)**
102:18

**Sure (15)**
4:25;28:20;31:17;
46:15;61:16,18;69:10;
80:12;92:13;93:6,13;
142:6;143:12;152:4;
153:24

**surprised (1)**
121:13

**suspect (2)**
120:1,2

**suspicious (1)**
44:7

**sustain (1)**
84:22

**Sustained (1)**
83:1

**SWORN (2)**
28:3;151:18

---

## T

**table (6)**
41:13,16;42:2,8;
81:17;82:4

**tactics (1)**
39:2

**talk (24)**
11:15;12:6;22:21;
72:7;90:16,19;114:25;
116:12,18;131:22;
132:2;133:5,11;137:3;
140:21;148:21;149:23;
150:10,14,17,18;
151:18;152:14;154:5

**talked (11)**
14:8;72:14;87:13,17;
132:19;133:2,6,6,7,7,9

**talking (5)**
72:13;104:1,4;
129:12;147:4

**TAMPOSI (4)**
4:14,15;138:23;
139:2

**target (5)**
40:17;41:9,11,12;
93:23

**task (1)**
133:19

**Tatiana (23)**
4:17;12:8,11,16,22;
13:6,11;26:25;58:20,
24;60:12;95:18,20;
102:18,24;103:19;
104:3;107:6;112:20;
116:24;117:2;136:10,
21

**Tatiana's (1)**
117:4

**tax (3)**
79:9;93:24;94:4

**taxes (4)**
16:10;66:23;79:1;
93:14

**tear (1)**
70:19

**technically (2)**
20:21;55:21

**telecom (1)**
29:15

**telecommunication (1)**
29:13

**telephone (2)**
41:19,20

**telling (4)**
17:16,18,20;115:24

**tells (1)**
99:25

**ten (9)**
8:14;12:14;24:10;
49:13;59:17,19;99:8;
121:15;130:6

**term (4)**
8:4;13:17;17:2;
22:12

**terminate (1)**
22:10

**termination (1)**
22:16

**terms (5)**
14:6;16:19,25;33:7;
92:14

**testified (2)**
84:12;117:12

**testifies (1)**
23:23

**testify (7)**
35:11,18;73:22;
145:12;147:14,16;
148:22

**testifying (2)**
13:14;84:4

**testimony (14)**
9:16;13:14;18:11,13;
28:16;147:13;149:14;
150:2,21;151:22;
152:1,3,10;154:9

**thereby (1)**
111:3

**thinking (9)**

40:11;83:19,20;90:1;
130:22,25;137:5,7;
146:14

**third (12)**
7:23;38:1;54:23;
75:16;80:15;82:7,17,
21;86:16;100:15;
101:11;118:17

**thirty (3)**
29:24;60:14;150:25

**though (4)**
24:16;81:6;117:7;
148:22

**thought (14)**
45:9;48:6;70:2;
84:13;91:15;115:3;
119:4;121:25;123:19;
139:13;147:1,3;149:2;
153:6

**thousand-dollar (1)**
126:18

**three (12)**
27:15,16;33:13;55:3;
74:13;99:12;112:25;
115:10;117:17;124:4;
137:24;139:10

**throw (1)**
27:12

**Thursday (4)**
152:22,24,25;153:1

**timing (3)**
5:23;75:4;79:13

**titled (2)**
119:21;130:2

**today (3)**
17:22;24:6;78:7

**today's (1)**
133:18

**together (4)**
6:14;9:23;84:2,3

**told (4)**
10:24;13:13;31:19,
25;32:1;35:11;37:13;
77:8;79:2;86:11;95:4;
106:24;121:11,11

**tomorrow (11)**
84:5,16;98:15;
149:18,22;152:1,19;
153:14,21;154:12,13

**tomorrow's (1)**
150:15

**tonight (2)**
152:1,7

**took (8)**
68:1;74:17;80:11;
85:8;94:6,12;117:20;
119:12

**top (8)**
26:18;41:25;55:5;
67:17;82:19;110:22;
118:7;135:23

**total (19)**
10:13;39:23;54:6,6,

76:1;85:11,13;88:21;
126:11;127:2,5,11;
128:3,5;144:23;
145:15,22;146:2;148:7
**totaled (1)**
54:5
**totaling (1)**
110:24
**totals (2)**
142:24;144:7
**touch (1)**
14:18
**touchups (1)**
99:4
**tour (3)**
43:9,20,21
**tours (3)**
43:22,23;44:4
**toward (3)**
55:5;67:17;108:19
**towards (1)**
11:2
**town (1)**
64:6
**traditionally (1)**
109:9
**transcript (2)**
28:17;48:2
**tremendous (1)**
37:4
**trial (28)**
4:6;5:2;6:11,11;
13:15;17:6;33:19;34:4;
36:18;38:1,3;39:17;
41:15;47:4;48:22;50:9,
12;53:7,10;54:8,14,20;
113:21;118:3,6;
128:12;130:15;153:2
**tried (2)**
9:24;151:10
**trigger (1)**
51:22
**trip (2)**
103:22;104:12
**trouble (2)**
138:2,5
**true (4)**
8:5;70:17;134:22;
135:17
**truly (1)**
13:3
**Trust (9)**
53:6;60:22,25;64:19;
75:23;85:19,21;127:7;
139:10
**truth (3)**
72:20,22;107:3
**try (6)**
19:1;24:8;28:19;
37:11;45:21;74:18
**trying (10)**
9:20;10:16;25:11;
27:17;48:3;71:16;73:6;

119:7;153:3,9
**turn (12)**
7:9;28:14,15,17;
38:1;39:16;52:5;89:13;
98:17;114:8,22;136:19
**turned (2)**
129:6,10
**tweaked (1)**
58:1
**twenty (11)**
45:23;46:8,16,16,17;
48:23;49:8;52:18,21,
23;79:15
**twenty-month (1)**
51:5
**twenty-three (20)**
15:6,17,18;16:1;
20:12,15;21:3,8,10,11,
25;52:12,20,21,24;
53:1,3,4;61:2;79:13
**twice (1)**
79:2
**two (39)**
7:12;8:17;9:23;12:7,
21;18:15;19:4;22:3;
25:6;36:3,3;37:1,2;
39:17;40:15,19;41:2;
43:22;46:4;50:20;
56:12;57:1;65:8;66:1;
67:23;70:18,19,22;
71:4;85:10;96:17,24;
99:11;117:23;118:18;
121:6;141:21;148:10;
149:20
**typo (1)**
11:22
**typos (1)**
45:2

## U

**unblemished (1)**
152:9
**unclear (1)**
152:23
**uncomfortable (1)**
151:6
**under (17)**
7:19;12:24;22:13,24;
26:1,22,22;44:2;67:11;
107:5;124:21;125:15;
128:22;145:14;151:21;
154:13,13
**underlying (4)**
129:5,24;143:22;
147:14
**underneath (1)**
64:22
**underscore (1)**
27:6
**Understood (5)**
5:19;8:7;57:6;78:8;
154:5

**undertaking (1)**
93:18
**underway (2)**
92:18,23
**undoubtedly (1)**
114:15
**unequivocally (1)**
26:9
**uneven (1)**
5:25
**unfairness (3)**
150:16,22;152:5
**Unfortunately (1)**
81:6
**Unicom (1)**
110:11
**UNIDENTIFIED (2)**
6:20;56:14
**unilateral (2)**
12:18;136:4
**Union (1)**
30:8
**University (1)**
30:9
**unless (2)**
73:9;151:4
**unprepared (1)**
152:10
**untouched (1)**
40:8
**unusual (1)**
102:11
**up (59)**
6:5,9;7:5;8:12,13,15,
20;9:8,13,22,25;10:9,
17;15:4,21;16:24;
18:10,23;19:13;20:11;
21:22;22:13;23:21;
24:6;27:8,10;28:17;
34:14;39:18;44:16;
65:13;66:4,24;70:20;
71:3;80:22;81:9,20;
88:9;91:19;105:5;
114:9;124:16;126:4;
127:24;132:23;138:13;
142:4,7;145:21,22,25;
148:7;149:17;150:1;
151:24;152:13,14;
153:10
**update (2)**
64:4;99:20
**updates (2)**
98:2;99:18
**upgrade (1)**
94:15
**upon (3)**
12:12;44:9;52:9
**upper (6)**
34:13;63:23;80:23;
81:17;114:9;125:22
**upper-right (1)**
47:8
**use (6)**

27:17;48:14;81:2,10,
12;143:14
**used (5)**
34:15;39:1;51:4;
53:19;105:4
**using (4)**
38:23;39:2;68:17;
120:5
**usual (1)**
102:12

## V

**Vadim (7)**
4:17;13:13;114:18;
119:18;122:19;126:21;
136:21
**Vadim's (2)**
119:22;120:5
**value (1)**
75:5
**variable (4)**
41:23,25;42:2,8
**variations (1)**
41:14
**varies (1)**
151:11
**various (1)**
133:2
**venture (3)**
8:11,17;114:19
**venue (1)**
116:2
**verified (1)**
131:11
**version (4)**
51:16;54:16;56:8;
153:21
**versions (1)**
48:3
**via (1)**
119:22
**view (1)**
150:4
**violated (1)**
107:6
**violation (1)**
24:2
**virtue (1)**
122:2
**visions (1)**
24:22
**visit (2)**
95:9;96:3
**visited (1)**
95:13
**visiting (3)**
95:6;119:11;120:25
**voice (4)**
28:12,12;53:23,24
**voiced (1)**
39:14
**voluminous (2)**

142:10;143:15
**vote (10)**
12:13;23:18,23;60:1;
135:16,24;136:9,11,20;
140:5
**voted (11)**
135:19,19;136:1,2,
13,14,16,24,24;137:1;
140:6
**voting (2)**
24:11,13
**vs (1)**
4:6

## W

**wait (1)**
92:2
**waiting (1)**
64:3
**waive (1)**
13:12
**walls (1)**
96:6
**wants (2)**
43:18;142:18
**warranty (1)**
128:23
**Washington (1)**
152:23
**waste (1)**
140:4
**water (1)**
18:1
**Watson (1)**
53:18
**way (13)**
6:15;9:10;13:6,21;
26:14;28:12;29:1;
80:20;91:12;111:10;
139:13;141:19;152:8
**weak (1)**
109:9
**week (6)**
99:10;102:9;120:8,
17;124:12;152:7
**weekly (1)**
98:1;99:18
**weeks (6)**
11:16;99:11,12;
127:18,25;142:12
**weren't (2)**
15:6;25:16
**what's (15)**
20:6;64:1;66:19;
82:3,3;102:16;103:19;
107:16;117:16;121:25;
146:15;148:5,9;
149:24;152:22
**whatsoever (2)**
24:17;94:10
**Whenever (1)**
17:13

**Where's (1)**
45:17
**whole (9)**
37:5;55:24;68:18;
69:2;77:21;82:7;94:25;
144:5;147:17
**Who's (3)**
30:17,22;99:23
**whose (4)**
44:18;47:7;65:1;
101:11
**wife (9)**
12:8;16:8;31:3;43:9;
65:4;72:19;101:23;
115:10;142:6
**willing (1)**
22:20
**winter (3)**
102:22;103:17;109:9
**wish (1)**
5:7
**within (9)**
14:24;15:6,16;16:1;
48:23;95:3;97:17;
130:6;147:16
**without (13)**
20:8;23:18,18,19,22,
23;82:8,15;84:20;
130:25;135:1;139:12,
15
**witness (15)**
27:24;28:6,21,25;
29:5;48:14;96:12,14;
117:12;150:14,17,18;
152:13,15;154:11
**witness' (1)**
152:9
**witnesses (5)**
28:15;132:10,12;
150:1,20
**word (3)**
36:21;136:9;144:23
**words (1)**
136:5
**work (14)**
26:3;29:12;53:13;
80:11,18;88:16;90:17;
91:7;96:7;121:12,14;
125:14;150:16,22
**worked (1)**
29:18
**workers (1)**
121:4
**working (7)**
31:23;65:19;84:14;
86:12;95:23;121:6;
133:15
**workout (3)**
130:2,2,23
**works (1)**
152:5
**worksheets (1)**
33:14

**world (2)**
127:3;150:13
**worried (1)**
98:10
**worse (1)**
9:2
**wringing (1)**
11:4
**write (1)**
75:22
**writing (2)**
47:15;128:21
**writings (1)**
143:15
**written (2)**
59:1;122:3
**wrong (3)**
28:16;48:17;130:18
**wrote (1)**
119:25

**X**

**XX (3)**
71:7,8,9

**Y**

**year (3)**
30:13;37:10,20
**years (12)**
11:19;12:1;17:15,16,
17,20;27:7,16;29:24;
30:5;36:13;150:25
**yellow (1)**
34:8
**Yep (6)**
6:7,10;29:5;76:19;
126:7,23
**yesterday (1)**
152:4
**yield (1)**
117:6

**Z**

**zero (2)**
134:4;148:17
**Zhukovskiy (29)**
31:2;32:17;33:9;
35:7,11,18,21;36:17;
42:16,16;77:17,17,18;
78:24;79:7;80:7,12;
82:6,21,25;83:3,5,12;
84:1,16,17,24;133:7,8
**Zhukovskiy's (2)**
42:14;79:20

**1**

**1 (4)**
124:14,17;125:23;
127:12

**1.3 (3)**
11:1;74:15;78:3
**1.4 (2)**
11:6;78:9
**1.459 (1)**
128:3
**1.5 (5)**
39:22;72:16;74:15,
18;78:5
**1.6 (9)**
72:14;74:17;75:24;
77:9;78:11,14;85:5;
117:23,24
**1.65 (1)**
78:16
**1:16 (1)**
154:17
**10 (7)**
44:12,16;52:5;95:22,
25;96:1;127:6
**10/30 (1)**
47:16
**100,000 (1)**
11:4
**1006 (3)**
143:13,23;145:14
**10th (1)**
127:12
**11 (6)**
28:23;47:5;48:22;
50:17;51:13;52:17
**11:02:43 (1)**
76:25
**11:23 (1)**
54:25
**11:24:47 (1)**
77:1
**11:25 (1)**
53:11
**1120 (1)**
4:5
**11th (2)**
64:5;113:7
**12 (5)**
50:5,9,12,19;131:14
**12/31/2012 (1)**
63:24
**12:30 (1)**
47:16
**129 (2)**
5:8;90:2
**12th (2)**
101:4;113:24
**13 (5)**
11:19;53:7,10;54:8,
14
**13th (5)**
71:24;73:1;74:25;
99:21;116:24
**14 (3)**
54:20;57:10;59:20
**14,466.05 (3)**
146:22;147:9,24

**14/'15 (1)**
103:17
**15 (15)**
7:6,10;11:20;12:8;
51:9,11,13;52:20;
54:14;56:7;58:15;
60:16;99:22,22;107:10
**151 (1)**
5:9
**15-13381 (1)**
4:7
**158 (1)**
5:9
**15th (3)**
75:4;99:25;113:16
**16 (3)**
61:10,14;113:16
**167 (1)**
4:8
**16K (1)**
78:15
**16th (3)**
115:4,5;134:9
**17 (1)**
62:6
**173 (2)**
105:4,8
**174 (2)**
105:7,10
**17th (3)**
40:14,21;75:10
**18 (2)**
62:12;96:11
**182,202 (1)**
79:16
**18th (1)**
86:21
**19 (1)**
63:17
**1978 (1)**
30:10
**1989 (2)**
30:14,19
**1994 (2)**
29:17;31:4
**19th (1)**
65:7
**1st (3)**
99:1;101:9,24

**2**

**2 (5)**
55:5;74:16;123:6;
128:17;135:22
**2.1 (1)**
11:16
**2.3 (2)**
22:11;23:10
**2.3.20 (2)**
129:4,13
**2.4 (3)**
45:12,17,20

**2.8 (1)**
88:21
**2.89 (1)**
144:9
**20 (3)**
63:1,3;76:9
**200,000 (3)**
11:1,6;78:4
**2012 (14)**
7:8;10:23;15:8;
32:11,13;35:3,20;38:9;
40:22;42:13;50:14;
53:11;54:24;63:5
**2013 (15)**
65:7;66:19;73:1;
75:11;77:16,22;85:2;
86:21;87:6;88:18;
92:20;110:23;122:3;
125:16;127:12
**2014 (27)**
7:17,21,24;8:1;13:3;
15:18;16:7;40:14;57:5;
58:25;59:3,23;60:1;
95:10,11,12,13;97:5,
25;98:10,23;100:18,
20;101:5,9;102:15,17
**2015 (52)**
16:13;22:10,12;23:6,
8;37:25;87:12;92:21;
94:7,13;102:3;103:21;
105:19,20;106:7;
109:5;112:11;113:7,
24;115:20;116:24;
118:2,19;119:1,12,18;
120:5,14,22;121:1;
122:5,12,20;124:14;
125:19,23,25;126:8;
127:2,6,12;129:1,16;
130:11,17;131:13,18;
134:9;137:8,16;139:5;
146:4
**2016 (3)**
13:6;101:9,24
**20K (2)**
66:15;67:10
**20th (4)**
7:24;100:18;101:9;
118:10
**21 (9)**
12:22;13:12;64:11,
14;97:5;101:14;104:5;
119:10;136:21
**22 (3)**
66:9,11;120:22
**225,958.05 (1)**
10:6
**22nd (3)**
121:1;122:5,12
**23 (2)**
67:4;128:4
**231,000-something (1)**
127:21
**24 (4)**

Case 16-01120    Doc 340    Filed 06/04/19    Entered 06/04/19 12:58:46    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 176 of 176

May 6, 2019

68:19,20;97:25;
125:16
**24th (3)**
87:6;105:20;122:3
**25 (12)**
35:20;38:9,19;40:22;
41:1;42:13;43:1,3;
125:19,25;126:8,18
**251 (1)**
16:14
**251,000 (3)**
11:14;110:24;127:22
**252,836 (1)**
79:14
**25th (9)**
35:3;98:8,18,23,25;
105:19;122:20;127:2;
129:16
**26 (7)**
71:14,15,17,20;72:4;
74:7;86:17
**266 (5)**
104:16,18,19,20,22
**268 (2)**
106:3,5
**27 (7)**
68:23;69:2,8;70:19,
22,24;71:4
**275,000 (1)**
78:9
**28 (2)**
75:8,10
**28th (3)**
63:7,7;106:24
**29th (1)**
44:17

**3**

**3 (8)**
38:3;55:13;60:16;
80:23,25;136:8,18,19
**3.2 (1)**
75:25
**3:04 (1)**
71:25
**3:27 (1)**
119:18
**3:30 (1)**
50:14
**30 (7)**
57:5;75:20,22;76:10,
12;77:8;109:5
**300,000 (1)**
78:17
**30th (10)**
7:17,21;15:18;22:10,
12;23:6,8,21;50:14;
137:16
**31 (17)**
12:17;15:7;53:11;
58:25;59:3,23;60:1;
76:13;77:12,15;80:15,

16;81:4,13,14,24;84:4
**315 (2)**
91:20;92:6
**31st (1)**
146:4
**32 (1)**
79:4
**36 (2)**
85:23;86:1
**37 (5)**
87:1,4,10,25;88:3
**38 (2)**
97:1,4
**39 (4)**
97:18,21;100:4,6
**3rd (1)**
54:24

**4**

**4 (5)**
56:8;67:19;80:24;
81:1;136:20
**4.1 (1)**
60:20
**4.9 (2)**
45:24;78:6
**408b (2)**
123:25;124:22
**45 (4)**
100:25;101:3,18;
128:5
**46 (4)**
7:22;100:10,13,14
**47 (1)**
100:12
**4th (6)**
77:15,22;119:18;
120:5,14;124:11

**5**

**5 (5)**
10:11;39:17;49:22;
50:2;101:7
**5.2 (11)**
7:9,10;8:5,6;10:16,
19;11:17;49:23;56:8,9;
57:21
**5.25 (1)**
78:11
**5.3 (1)**
75:17
**50 (4)**
11:10;94:8;107:20;
109:14
**50,000 (1)**
11:13
**51 (1)**
111:23
**51,000 (1)**
127:23
**52 (1)**

113:3
**53 (1)**
113:21
**54 (2)**
116:4,23
**55 (11)**
71:9;95:21;96:4,5,
20;98:2;99:7,15;
106:10;115:2,6
**560-odd- (1)**
126:17
**57 (1)**
118:13
**59 (2)**
118:4,6
**5th (2)**
80:1;131:18

**6**

**6 (6)**
12:8;34:9;50:1;
58:16;107:10,12
**6,330.70 (1)**
128:4
**6.1b (1)**
50:2
**6.1b6 (5)**
12:9;50:2;58:18;
59:5,25
**6/18 (1)**
118:7
**6/28 (1)**
118:7
**60 (1)**
118:21
**615 (1)**
127:6
**63 (2)**
119:14,17
**64 (1)**
131:8
**66 (3)**
120:19,21;128:13
**67 (10)**
122:15,18,23;
124:13,24;125:3,4,22;
128:17;130:1
**69 (1)**
130:16
**6th (3)**
66:12,19;67:2

**7**

**7 (4)**
41:15;59:2;134:1;
139:5
**7.1.1 (1)**
88:3
**7.1.2 (1)**
88:11
**7.1.3 (1)**

89:5
**7.3.2.1 (1)**
89:14
**70 (3)**
133:24;134:2,3
**71 (2)**
137:9,12
**72 (6)**
140:24;141:3,12;
145:17,18;153:22
**75 (2)**
140:7,10
**750K (1)**
78:5
**77 (9)**
7:13;36:2,24;56:13,
21;57:1;95:21;96:7,23
**790 (1)**
127:1
**7th (5)**
11:10;16:13;94:7,13;
95:1

**8**

**8 (1)**
89:13
**8.1 (7)**
8:8,9;15:12;21:7;
51:17;57:7;144:18
**8.2 (2)**
49:4;52:5
**800K (1)**
78:10
**820 (1)**
126:21
**88 (16)**
7:24;71:10;96:9,10,
11,12,22;98:2,24;99:5,
25;100:17,20;101:4;
102:14;121:6
**89 (1)**
79:23
**8th (1)**
107:24

**9**

**9 (15)**
4:8;8:9;15:13;33:15,
20;34:4,22,25;36:19;
38:2,3;39:17;41:16;
51:10;84:3
**9:17 (1)**
4:1
**91 (6)**
142:7,8,18;143:9;
144:1,4
**9th (4)**
67:18;68:2,10;112:1