### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS - EASTERN DIVISION

```
==============================  .
IN THE MATTER OF:               . Case #15-13881
                                .
LYMAN-CUTLER, LLC               .
                                . Boston, Massachusetts
                                . Tuesday, May 7, 2019
      Debtor.                   . 9:11 a.m.
==============================  .
LYMAN-CUTLER, LLC, ET AL.,      . Adv. Proc. 16-01120
                                .
      Plaintiffs,               .
v.                              .
                                .
KAGAN, ET AL.,                  .
                                .
      Defendants.               .
==============================  .
```

### TRANSCRIPT OF TRIAL DAY 2 ON:
### #167 OBJECTION TO CLAIM 9 OF CLAIMANT ALEX FILIPPOV FILED BY INTERESTED PARTIES TATIANA KAGAN, VADIM KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.

### #1 COMPLAINT BY LYMAN-CUTLER, LLC AGAINST VADIM KAGAN, TATIANA KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.

### BEFORE THE HONORABLE FRANK J. BAILEY

APPEARANCES:

For the Debtor:                 PETER N. TAMPOSI, ESQ.
                                The Tamposi Law Group, P.C.
                                159 Main Street
                                Nashua, NH 03060


For Creditors:                  SEAN T. CARNATHAN, ESQ.
                                O'Connor, Carnathan and Mack,
                                LLC
                                Landmark One
                                1 Van De Graaff Drive
                                Suite 104
                                Burlington, MA 01803

For the Defendants:                     JOHN H. PERTEN, ESQ.
                                        Sheehan Phinney Bass & Green,
                                        PA
                                        255 State Street
                                        5th Floor
                                        Boston, MA 02109

                                        JAMES P. HARRIS, ESQ.
                                        Sheehan Phinney Bass & Green,
                                        PA
                                        1000 Elm Street
                                        17th Floor
                                        Manchester, NH 03101


        Electronic Sound Recording Operator:   YVONNE WOODBURY


        Proceedings Recorded by Electronic Sound Recording
     Transcript Produced by Certified Transcription Service
                          eScribers, LLC
                7227 N. 16th Street, Suite #207
                        Phoenix, AZ 85020
              973-406-2250; operations@escribers.net

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|

For The Creditors:
ALEX FILIPPOV
(By Mr. Perten)              8

```
 1    (At 9:11 a.m.)

 2              THE CLERK:  Court is now in session.

 3              THE COURT:  Morning.

 4              IN UNISON:  Morning.

 5              MR. CARNATHAN:  Morning, Your Honor.

 6              THE COURT:  Be seated.  Okay.  Go ahead, please.

 7              THE CLERK:  I'll call it?

 8              THE COURT:  Yeah, sure.

 9              THE CLERK:  Now calling case number 15-13881, Lyman-

10    Cutler, LLC.  This is the second day of trial on objection to

11    claim 9 of claimant Alex Filippov, filed by interested parties

12    Tatiana Kagan, Vadim Kagan, Kagan Development KDC, Corp., and

13    ProExcavation Corp.  This is also a trial, day 2, on case

14    number 16-1120 (sic), Lyman-Cutler, LLC v. Kagan et al.

15              May the parties please state their names for the

16    record?

17              MR. CARNATHAN:  Good morning, Your Honor.  Sean

18    Carnathan for Alex Filippov and Nickolay Lipetsker.

19              MR. TAMPOSI:  Your Honor, Peter Tamposi for the

20    debtor, Lyman-Cutler.

21              MR. PERTEN:  Morning, Your Honor.  John Perten for

22    Vadim Kagan, Tatiana Kagan, ProExcavation Corp., and Kagan

23    Development KDC, Corp.

24              MR. HARRIS:  Morning, Your Honor.  James Harris for

25    the same parties.
```

1          THE COURT:  Very good.  Thank you.  Good morning,

2    everyone.

3          So you recognized Elizabeth.  She is usually over

4    here.  Yvonne is over here today.  Mary is -- was not in good

5    shape, as you saw yesterday, so I ordered her to stay home.

6    And in a rare -- in a rare event, she actually did what I told

7    her, so she's not here, better for all of us.

8          Any preliminaries, housekeeping matters?

9          MR. CARNATHAN:  I'd just let the Court know that we

10   did bring the redacted Exhibit 72, and it --

11         THE CLERK:  Um-hum.

12         MR. CARNATHAN:  -- should now be in, I believe --

13         THE COURT:  Thank you.

14         MR. CARNATHAN:  -- all the binders.

15         MR. PERTEN:  Your Honor, just to orient the Court,

16   we've asked the clerk to place three binders in front of you.

17   We have eight binders, but the first five is the backup for

18   the proof of claim, which we will probably not be referring to

19   at all today.

20         THE COURT:  Right.

21         MR. PERTEN:  So I've just put those three, which all,

22   if not most, of the documents will either be in Mr.

23   Carnathan's books or the three that we've placed there.

24         THE COURT:  I'm glad you raised that.  Just to be

25   clear, what I have in the initial six binders are all of the

1    agreed and proposed exhibits by both sides, right?

2          MR. PERTEN:  That's not entirely correct.  What you

3    have in the six that Mr. Carnathan provided you are all the

4    agreed and objected-to exhibits that he is proffering.  And

5    what you have in our binders is the same deal.  It's all the

6    agreed and objected ones that we will be proffering.  There

7    should be an index on the first page of each binder, which

8    indicates whether there's an objection or not.

9          THE COURT:  Okay.  I see that now, which raises an

10   issue -- a question that I have, which is definitely a

11   housekeeping issue, and that is when we're done, is it going

12   to be possible to provide me with a digital version of all of

13   the admitted exhibits?  It's enormously helpful to me when

14   drafting, so --

15         MR. CARNATHAN:  Certainly, Your Honor.  No problem.

16         MR. PERTEN:  Absolutely.

17         THE COURT:  That's great.  Okay.  That's fine.

18   Again, don't need that until we're finished with the trial.

19   But assuming you have these things digitally, you can get rid

20   of what doesn't get in or what you've chose not to use, give

21   me what's in, hopefully, identified by the exhibit number.

22   And we can take it from there.

23         MR. PERTEN:  And just to be clear, I think Mr.

24   Carnathan clarified this yesterday, but those exhibits for

25   which either we didn't assert an objection or he didn't --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1          THE COURT:  Right.

2          MR. PERTEN:  -- assert are in by stipulation, whether

3    we show them to a witness or not, just --

4          THE COURT:  Right.

5          MR. PERTEN:  -- to let you know.

6          MR. CARNATHAN:  Except for the small quantity I

7    reserved.  It was 129 and 151 through 158.

8          THE COURT:  Right.  Now, but Mr. Perten, let me be

9    clear again.  I've said this before.  If you don't show it to

10   a witness, I recognize it's in evidence, but you need to put

11   it in some context for me.

12         MR. PERTEN:  Correct.

13         THE COURT:  And I suppose that could be in your

14   proposed findings --

15         MR. PERTEN:  Correct.

16         THE COURT:  -- right?  You could say, document X;

17   it's in evidence, and it stands for this, and I'm going to

18   argue it from that.  But if I never hear about it --

19         MR. PERTEN:  No, understood.

20         THE COURT:  -- it's in evidence.  I can't put it in

21   context.  Yeah, you're shaking your head, so everybody

22   understands me.  I just don't want this to go up on appeal and

23   somebody say, well, he never even considered Exhibit 117-B; of

24   course, we never mentioned it to him.  And I think that would

25   be an unsuccessful effort on your part anyway, but I want to

Page 8

ALEX FILIPPOV - Cross

 1   avoid that eventuality, so -- okay.

 2          Anything else?  Good.  All right.  Let's get going,

 3   then.  We'll get Mr. Filippov back up on the stand.

 4          Good morning, Mr. Filippov.

 5          MR. FILIPPOV:  Good morning, Your Honor.

 6          THE COURT:  Just to remind you, you're under oath.

 7          MR. FILIPPOV:  Yes.

 8          THE COURT:  You continue to be under oath.  Okay.

 9   You can be seated and be comfortable.  Okay.  All right.

10          Mr. Perten, your witness.

11          MR. PERTEN:  May I proceed, Your Honor?

12          THE COURT:  You may.

13                ALEX FILIPPOV PREVIOUSLY SWORN

14                      CROSS-EXAMINATION

15   BY MR. PERTEN:

16      Q.   Good morning, Mr. Filippov.

17   A.   Good morning, Mr. Perten.

18      Q.   Now, Mr. Filippov, you've negotiated many contracts

19   over the course of your career; isn't that correct?

20   A.   Yes.

21      Q.   And you know the importance of reading things

22   carefully and making sure that you understand the terms of

23   contracts before you sign them; isn't that correct?

24   A.   Yes.

25      Q.   And you also understand, sir, that you're obligated,

ALEX FILIPPOV - Cross

1    once you sign a contract, to honor its terms.  You'd agree

2    with that, correct?

3    A.    Yes.

4         Q.    And you further understand that if there is a term

5    in a contract that, with hindsight, you don't like, that

6    doesn't mean you can ignore it; isn't that correct?

7    A.    That's -- I'm not sure about this.

8         Q.    Okay.  So if there's a clause in a contract that you

9    don't like, you believe you're still obligated to comply with

10   it?

11   A.    There are certain things in many contracts that not

12   always being enforced or -- or should be enforced.

13        Q.    Okay.  Let me hone down on that a little bit, Mr.

14   Filippov.  You understand that you're bound by all the terms

15   of the operating agreement, which we've introduced as Exhibit

16   15?

17   A.    Yes.

18        Q.    Okay.  And you certainly understand that if there's

19   something in the operating agreement which you now don't like

20   or didn't understand, you don't have the ability to ignore it;

21   you understand that?

22   A.    Yes.

23        Q.    Okay.  Now, with respect to that operating

24   agreement, you reviewed it pretty carefully before you signed

25   it; isn't that correct?



ALEX FILIPPOV - Cross

1    A.    Yes.

2          Q.    Now, you've been a friend of Mr. Lipetsker since

3    1989, correct?

4    A.    Yes.

5          Q.    You met in Italy; you immigrated together, correct?

6    A.    Yes.

7          Q.    You socialize; isn't that correct?

8    A.    Yes.

9          Q.    All right.  You have mutual friends; that correct?

10   A.    Yes.

11         Q.    You also know Mr. Lipetsker's nephew, Mr.

12   Zhukovskiy, correct?

13   A.    Yes.

14         Q.    And you've known him for many years as well, also

15   correct?

16   A.    Not closely, but yes.

17         Q.    Okay.  And you told us yesterday that you knew

18   Attorney Maiden prior to the Lyman-Cutler project, correct?

19   A.    Yes.

20         Q.    In fact, you more than knew Mr. Maiden; he had

21   represented you on some transactions prior to Lyman-Cutler;

22   isn't that correct?

23   A.    Yes.

24         Q.    Now, you first learned of this project from Mr.

25   Lipetsker, who asked you if you might be interested in the

ALEX FILIPPOV - Cross

1    project, correct?

2    A.   Yes.

3        Q.   And Mr. Lipetsker told you that he had invested with

4    Mr. Kagan before and had had a positive experience; isn't that

5    correct?

6    A.   Yes.

7        Q.   And in making your decisions about whether to do

8    this project, you relied heavily on the recommendations of Mr.

9    Lipetsker; isn't that correct?

10   A.   Yes.

11       Q.   And this was important to you because you knew him,

12   but you didn't know Mr. Kagan very well, correct?

13   A.   Yes.

14       Q.   And in fact, your impression of Mr. Kagan when you

15   first met him is he was doing a bit of a sales job; isn't that

16   correct?

17   A.   Yes.

18       Q.   Now, when you learned that the proposed deal was

19   that Mr. Kagan stood to make fifty percent of the profits, you

20   had a discussion with Mr. Lipetsker to make sure that was

21   okay; isn't that correct?

22   A.   Yes.

23       Q.   And in fact, it was Mr. Lipetsker who assured you,

24   don't worry; going to get it done quickly; you're going to get

25   at least twenty percent; isn't that correct?



ALEX FILIPPOV - Cross

1   A.   No.

2        Q.   Okay, sir.  Do you recall you gave a deposition in

3   this case?

4             MR. PERTEN:  May I approach, Your Honor?

5             THE COURT:  You may.

6   BY MR. PERTEN:

7        Q.   I'm going to hand you your transcripts.  They're --

8   A.   Yeah.

9        Q.   -- two volumes.

10            THE COURT:  You just have to remember that if you

11  want that on the record, you need to say it on --

12            MR. PERTEN:  Thank you.

13  BY MR. PERTEN:

14       Q.   Mr. Lipetsker (sic), I've just handed you the two

15  volumes of your transcript for the deposition.  And if I could

16  draw your attention, sir, in the first volume, to pages 31 and

17  32 --

18            MR. PERTEN:  Does the Court want --

19            THE COURT:  I like to have it.  Thank you.  Thank

20  you.

21  BY MR. PERTEN:

22       Q.   If I could draw your attention, sir, to the bottom

23  of page 31, you're talking about your conversation with Mr.

24  Lipetsker.  And you said, "I was going through numbers on

25  Excel spreadsheet because that was very important to me.  And

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    I remember having conversation with Nick about the amount of

2    money that Kagan was going to make.  And I remember this

3    conversation because I said, he's going to make tons of money

4    at fifty-percent project.  I said, do you understand that's

5    not standard, that generally, contractor fee is thirty

6    percent.  Contractors get thirty percent max, sometimes twenty

7    percent.  Fifty percent is extremely high.  That's what I told

8    Nick."  Did I read that correctly so far?

9    A.    Yes.

10        Q.    "And Nick said, yes, that's true, but we're going to

11   get it done in quick time.  The project is going to be short-

12   term.  We're going to get all that twenty percent in a year in

13   return."  Did I read that correctly?

14   A.    Yes.

15        Q.    So in fact, it was Mr. Lipetsker that told you, sir,

16   and assured you this project would be done quickly and that

17   you would get at least a twenty-percent return; isn't that

18   correct?

19   A.    He was one of the people who suggested that this was

20   going to happen.  And it was, you know, not at the first

21   meeting.  It was after we review Excel file and most

22   probably -- I don't remember, exactly, the timing of this, but

23   most probably after we already signed the LLC agreement.  I

24   don't know exactly when that conversation was.

25        Q.    And as part of that conversation, you also

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    acknowledged to Mr. Lipetsker that you understood that Mr.

2    Kagan, to use your words, stood to make a fortune, and you

3    were okay with that; isn't that correct?

4    A.   I'm sorry.  I don't remember the word "fortune".

5         Q.   Let me draw your attention, again, to the bottom of

6    page 32 of your deposition.  And starting with, sort of, the

7    middle of the page, line 15, "That was fine with" -- I'm

8    sorry.  Line 19, "And I said, yes, Kagan is going to make a

9    fortune on this.  But if you claim that he is honest and will

10   do this quickly, and we'll get the return on the investment,

11   that's fine with me if he gets paid fifty percent."  Did I

12   read that correctly?

13   A.   Yes, you read this --

14        Q.   Okay.

15   A.   -- correctly.  I'm --

16        Q.   So you've answered my question, sir.  So you

17   understood, sir, that this deal that you were agreeing to had

18   the potential, anyways, of being very lucrative for Mr. Kagan;

19   isn't that correct?

20   A.   Yes.

21        Q.   Okay.  And Mr. Kagan, however, never promised you

22   any guaranteed return; isn't that correct?

23   A.   There is no guaranteed return.

24        Q.   There was no guaranteed --

25   A.   That's correct.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    Q.    -- returns.  Now, you met with Mr. Kagan for the

2    first time at Boris Maiden's office, you were telling us

3    yesterday, in October of 2012; isn't that correct?

4    A.    Yes.

5    Q.    And Mr. Lipetsker, Mr. Maiden, Mr. Zhukovskiy were

6    also present at that meeting, correct?

7    A.    Yes.

8    Q.    And you met for about an hour or two was your

9    recollection; isn't that correct?

10   A.    Yes.

11   Q.    And you told us yesterday, and you told us at your

12   deposition, that you couldn't remember exactly what was said

13   by whom, correct?

14   A.    Yes.

15   Q.    Now, at the meeting, you told us yesterday and you

16   told us in your deposition, that Kagan described the project,

17   and he showed you photos of other houses he built; isn't that

18   correct?

19   A.    Yes.

20   Q.    And Mr. Zhukovskiy was there, and he had brought

21   with him some Excel spreadsheets that he had created, correct?

22   A.    Correct.

23   Q.    And so you understood at that meeting that those

24   Excel spreadsheets were something that Mr. Zhukovskiy had put

25   together for this meeting?



ALEX FILIPPOV - Cross

1    A.    On be -- on behalf of Mr. Kagan.

2         Q.    Okay.  And in fact, you have a general memory that

3    you reviewed the numbers at the meeting, correct?

4    A.    Yes.

5         Q.    And Mr. Zhukovskiy was there because he was the

6    person who could explain the numbers; isn't that correct?

7    A.    Yes.

8         Q.    And when you asked Mr. Kagan about the numbers, your

9    best recollection of what he said at the meeting was something

10   along the lines of, don't worry; I do this all the time; I'm

11   very experienced.  That's the best you could recall of what he

12   said; isn't that correct?

13   A.    Yes.

14        Q.    Okay.  So when you said that he specifically told

15   you that this would be $1.3 million guaranteed, in fact, what

16   he said was, don't worry; I do this all the time; I'm very

17   experienced.  That was the general gist of what he was saying,

18   but you don't recall him saying those exact words; isn't that

19   correct?

20   A.    It's impossible to remember what was said six years ago

21   at the meeting.

22        Q.    Okay.  And in fact, sir, when you brought suit

23   against Mr. Kagan and his companies, you alleged that the $1.3

24   million price was something you picked out of the Excel

25   spreadsheets, the presentation, correct?



ALEX FILIPPOV - Cross

1    A.    It -- it's one of the numbers that was shown for the

2    budget on that Excel spreadsheet.

3         Q.    And in fact, when you brought suit, you specifically

4    said that that was information that was contained in the Excel

5    spreadsheet, as opposed to something that Mr. Kagan

6    affirmatively told you; isn't that correct?

7    A.    I cannot recall what I said --

8         Q.    Okay.

9    A.    -- but Mr. Kagan said that there's going to be $1.3

10   million.

11        Q.    So now you remember he said that; is that what your

12   testimony is, sir?  Sir --

13            MR. PERTEN:  Mr. Harris, can I have Exhibit 64,

14   please, and if you could turn to paragraph 11?  Up, paragraph

15   11.  Thank you.

16   BY MR. PERTEN:

17        Q.    Now, I'm showing you, sir, the verified complaint

18   that you filed in Middlesex Court, which is an agreed exhibit,

19   number 64.  And it reads, "On or about" -- paragraph 11

20   states, "On or about October 25, 2012, as an inducement to Mr.

21   Filippov and Mr. Lipetsker to invest in the project, Mr. Kagan

22   presented to Mr. Filippov and Mr. Lipetsker a detailed budget

23   and forecast of estimated returns on an investment in the

24   project (the "Kagan presentation").  A true copy of the

25   presentation is attached to this complaint as Exhibit 1."

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1          MR. PERTEN:  Exhibit -- paragraph 12, Mr. Harris.

2     BY MR. PERTEN:

3          Q.   Paragraph 12 reads, "Mr. Filippov and Lipetsker

4     reasonably relied upon the Kagan presentation" -- defined as

5     that attachment -- "in making their decision to invest in the

6     project."  I read that correctly, didn't I?

7     A.   Yes.

8          Q.   You do not say that you relied on anything that Mr.

9     Kagan said.  You were relying on the spreadsheet.  That's what

10    you said in your complaint; isn't that correct?

11         MR. CARNATHAN:  Objection.

12         THE COURT:  Basis?

13         MR. CARNATHAN:  It's an incomplete.  He's only read

14    two paragraphs of the complaint.  He's trying to get the

15    witness to --

16         THE COURT:  Overruled.  You can read whatever you'd

17    like on redirect.

18    BY MR. PERTEN:

19         Q.   Sir, I read those sections of the complaint

20    accurately, correct?

21    A.   You read -- you read them accurately.

22         Q.   And in fact, sir, this was a verified complaint that

23    you signed under pains and penalties of perjury; isn't that

24    correct?

25    A.   Yes.



ALEX FILIPPOV - Cross

1      Q.   Okay.  Now, at the time of that meeting in October,

2   sir, there were no formal construction plans of any type;

3   isn't that correct?

4   A.   Correct.

5      Q.   And you didn't know exactly what you were going to

6   build yet; isn't that correct?

7   A.   Correct.

8      Q.   Now, we looked at, sir --

9          MR. PERTEN:  Mr. Harris, can you pull up Exhibit 15,

10   please?  I'm sorry.  Exhibit 9.  Are you able to rotate that?

11   All right, if you could move to the next page.  Keep going.

12   The spreadsheet.  Thank you.  Stop there.

13   BY MR. PERTEN:

14      Q.   Mr. Filippov, we looked at the presentation which

15   you identified yesterday at your testimony as Exhibit number

16   9, correct?  You recall this document?

17   A.   Yes.

18      Q.   And this is -- as you told us, was an Excel

19   spreadsheet, correct?

20   A.   Yes.

21      Q.   And you have an engineering background, and you're

22   very familiar with Excel, correct?

23   A.   Yes.

24      Q.   You understand that it's a tool that -- which has

25   certain formulas behind it so you can manipulate numbers, and

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1   it does whatever arithmetic it's programmed to do, correct?

2   A.   Yes.

3        Q.   Okay.  And in fact, sir, before you took out the

4   construction loan in this project, you made sure that you had

5   an electronic version of this spreadsheet so that you could

6   manipulate the numbers and see how things would filter

7   through, correct?

8   A.   Yes.

9        Q.   Okay.  And at your deposition, sir, we looked at

10  what has been marked as Trial Exhibit number 8.

11       MR. PERTEN:  Mr. Harris?

12  BY MR. PERTEN:

13       Q.   Which was a email from Mr. Zhukovskiy forwarding a

14  draft of this spreadsheet, correct?

15  A.   Yes.

16       Q.   And this draft, if you will, has three versions of

17  the spreadsheet attached; isn't that correct?

18  A.   Yes.

19       Q.   And you testified at your deposition that this was

20  the document that was handed out at that meeting; isn't that

21  correct?

22  A.   At what meeting?

23       Q.   At the October 25th, 2012 meeting to discuss the

24  project.

25  A.   It was a file that was labeled Lyman 1.  I don't know if

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    this is the one or another one.  It was labeled Lyman 1 on the

2    title sheet.

3        Q.   In fact, sir, you would agree with me that the

4    estimated project financials and risk analysis that were

5    handed out, that are Exhibit number 8, it's a different

6    version than what you identified as the document that we've

7    marked as Exhibit 9; isn't that correct?

8    A.   I would have to look into this.  I --

9        Q.   Sure.  Well --

10   A.   -- I cannot --

11       Q.   -- sir --

12   A.   -- tell you now.

13       Q.   -- if we could look at this first page in project

14   scenario and assumptions, we'd -- investment allocation says

15   there's investor 1 at eighty percent, investor 2 at twenty

16   percent, and zero for the managing partner, correct?

17   A.   Yes.

18       Q.   And if we go to the next page, please, that gives

19   you a scenario where investor 1 is a hundred percent, and

20   there's no other investments, correct?

21   A.   Yes.

22       Q.   And the next page gives you a scenario, also, of a

23   hundred percent, with a different profit-sharing allocation,

24   correct?

25   A.   Yes.



ALEX FILIPPOV - Cross

1        Q.   And if we go back to Exhibit 9, which was the

2   document you identified as having been handed out at the

3   meeting --

4   A.   Yes.

5        Q.   -- here, we have an eighty-twenty.  That's a

6   different investment allocation than the previous three we

7   just looked at; isn't that correct?

8   A.   Looks like it's different, but --

9        Q.   Okay.  So in fact, there were at least three

10  versions of this estimated project financials and risk

11  analysis, if not four, that were being discussed at the

12  October 25th meeting; isn't that correct?

13  A.   No.

14       Q.   Okay.

15  A.   It was one.  It has multiple worksheets with different

16  versions.  And this writing on this document is the writing in

17  the time of the meeting.  It's done with my hand, so this is

18  the original document.  I'm sure of this.

19       Q.   In fact, Mr. Filippov, at your deposition, you

20  testified you weren't sure when you'd put that writing on that

21  document; isn't that correct?

22  A.   It is.

23       Q.   It is correct?

24  A.   If it was put later, it was put next day when I took the

25  PDF file with me and was doing the calculation at home.  But

Page 23

ALEX FILIPPOV - Cross

 1   that was a document presented to me at the meeting.  There is

 2   no question about this.

 3        Q.   Okay.  Now, sir, you agree with me that Exhibit 9

 4   here, the page we have up, it's called "Estimated Project

 5   Financials and Risk Analysis", correct?

 6   A.   Yes.

 7        Q.   And you understood that this was exactly what it's

 8   titled; it was an estimate; isn't that correct?

 9   A.   It was estimated financial and risk analysis, yes.

10        Q.   Correct.  And you understood that the numbers in

11   there were estimates, and that's why it's titled, "Estimated

12   Project Financials and Risk Analysis"; isn't that correct?

13   A.   Yes.

14        Q.   And there's no notation or no asterisk or no

15   footnote that says, the $1.3 million construction price, that

16   is fixed, but everything else is an estimate?  There's nothing

17   on this page that indicates that; isn't that correct?

18   A.   On this, there's  --

19        Q.   Isn't that correct?  Yes or no, sir.

20   A.   It is on --

21        Q.   Yes or no, sir.

22   A.   -- this page.

23        MR. PERTEN:  Your Honor, can you --

24   A.   But it's --

25        MR. PERTEN:  -- please --



ALEX FILIPPOV - Cross

1            THE COURT:  I will.

2            Let me just tell you the way this works, okay?  So

3    this is Mr. Perten's opportunity to ask you questions, to have

4    you answer them.  He's going to be pretty much in control of

5    this process.  You will have an opportunity to have Mr.

6    Carnathan ask you to --

7            THE WITNESS:  Okay.

8            THE COURT:  -- elaborate.  It's okay for you to say,

9    I have more to say.  But it's Mr. Perten's option to say, I'd

10   like you to hold off; you've answered my question.

11           THE WITNESS:  Okay.

12           THE COURT:  Okay?  It'll go smoothly that way.  Thank

13   you.

14           THE WITNESS:  All right.

15           MR. PERTEN:  Thank you, Your Honor.

16   BY MR. PERTEN:

17       Q.   Now, you understood, sir, that the project scenario

18   and assumptions was all estimates; isn't that correct?

19   A.   Yes.

20       Q.   And sir, you also understood that -- it says,

21   "Project scenarios and assumptions".  You understood that

22   there were certain assumptions built into this model, correct?

23   A.   Yes.

24       Q.   And you understand, sir, that an assumption is

25   something that's being accepted for purposes of the analysis,

ALEX FILIPPOV - Cross

1    but it may or may not be true --

2    A.   Yes.

3        Q.   -- correct?  Okay.  Now, if we could scroll through,

4    down to the next page of this Exhibit 9 --

5            MR. PERTEN:  You'll need to rotate.

6    BY MR. PERTEN:

7        Q.   The next page, sir, is entitled, "Estimated

8    Settlement Statement for the Lot Purchase".  You see that?

9    A.   Yes.

10       Q.   And as of the time of this meeting, the lot hadn't

11   been purchased yet, correct?

12   A.   Yes.

13       Q.   And nobody had knew exactly what the settlement

14   charges would be or anything of that nature, correct?

15   A.   Yes.

16       Q.   So you understood that this page was all an estimate

17   as well; isn't that correct?

18   A.   Yes.

19           MR. PERTEN:  Next page, please, Mr. Harris.  Giving

20   you a workout on the rotates.

21           THE COURT:  Better him than me.

22           MR. PERTEN:  And me.

23   BY MR. PERTEN:

24       Q.   Now, sir, there was also a construction loan

25   distribution schedule that was part of this presentation;

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1   isn't that correct?

2   A.   Yes.

3        Q.   And the construction loan distribution schedule that

4   was provided had certain breakdowns of how the potential

5   construction loan would be allocated, correct?

6   A.   Yes.

7        Q.   And you'll agree with me there's a column that is --

8   says "Description", correct?  And then, it lists plans and

9   permits, foundation, and so on, correct?

10  A.   Yes.

11       Q.   You see that on the left side?

12  A.   Yes.

13       Q.   And nowhere in that list of disbursements does it

14  say anything about carrying cost, does it?

15  A.   No, it doesn't.

16       Q.   It does not.  Thank you.

17            MR. PERTEN:  Mr. Harris, can you continue scrolling

18  down?  Keep going.  Stop there.

19  BY MR. PERTEN:

20       Q.   There was also a page in Exhibit 9, sir, which was

21  entitled, Profit (Loss) Risk Analysis Overall Project.  Do you

22  see that?

23  A.   Yes.

24       Q.   And this was a demonstration, if you will, of

25  different potential scenarios as to what kind of money you

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    might be able to make, depending on how much the property sold

2    for and how long it was on the market, correct?

3    A.   Yes.

4         Q.   And in fact, sir, you'd agree with me that this

5    particular model went out thirty-six months, correct?

6    A.   Yes.

7         Q.   And you understood going in that there was no

8    guarantee as to when this property would sell.  It's out of

9    your control, correct?

10   A.   Yes.

11        Q.   Could sell in twenty months.  It could sell in

12   twenty-three months.  It could sell in five years.  You have

13   no way of knowing, correct?

14   A.   Yes.

15        Q.   And similarly, there -- you don't know the price.

16   And at the time of this meeting, you didn't know the price,

17   which is why we start at 3.4 million and go all the way down

18   to -- it looks like 5.3 million; isn't that correct, sir?

19   A.   Yes.

20        Q.   Now, Mr. Kagan told you, at that meeting, that the

21   target price was between five and five-and-a-quarter million;

22   isn't that correct?

23   A.   No.

24        Q.   In fact, sir, there was never any understanding that

25   these properties were going to be sold for 4.9 million; isn't

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 28

ALEX FILIPPOV - Cross

1    that correct?

2    A.    No.   It wasn't correct.   This particular document had the

3    sales price $4.9 million.

4         Q.    Sir, there was never an agreement to sell for 4.9;

5    isn't that correct?

6    A.    If -- I don't know what the agreement, but this

7    particular document specified the selling price $4.9 million.

8         Q.    Sir, let me draw your attention to page 146 of your

9    deposition.

10   A.    Say that again.   What page?

11        Q.    Page 146.

12   A.    It's volume 2?

13        Q.    Volume 1, page 146.   You have that, sir?   And we're

14   talking -- we're reviewing this document.   We're talking about

15   the meeting.   And let's start at the -- sort of at the top,

16   first question.

17        "As of October 2012, did you have a loan commitment

18   for the carrying costs, the construction loans?"   Answer,

19   "No."

20        "So you understood that the carrying costs that were

21   shown, they were an estimate, correct?"   Answer, "Carrying

22   cost was an estimate, yes, because that would be dependent on

23   the length of construction, how much time it would take for

24   Tatiana to sell, et cetera, yes."

25        And the sale price of four point meeting (sic) that's

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1   shown on the first -- and you interrupted and said, "The first

2   meeting was 4.9, yes."

3        And my question, "Ultimately, I think you told us earlier

4   this morning that it was either going to be five or five and a

5   quarter."  Answer, "Five and a quarter, yes."

6        "So that the sale price that was there was also an

7   estimate of what the parties were discussing at first?"

8   Answer, "Yes."

9        "But there never was a deal, was it, for 4.9 million?"

10  Answer, "No, it wasn't the deal."

11       Correct?  Did I read that correctly?

12  A.   You read this correctly.

13       Q.   So there never was a deal between the three of you

14  to sell these properties for $4.9 million.  That's what you

15  testified to, correct?

16  A.   $4.9 million was --

17       Q.   Sir, answer my question.  There was never a deal

18  between the three of you to sell this property for $4.9

19  million, yes or no?

20  A.   I don't know what the deal is.

21       Q.   You don't know what the --

22  A.   Define the word "deal".

23       Q.   Sir, there was never an agreement at that October

24  25th, 2012 meeting where you guys agreed that this property

25  would be sold at a hard, fixed cost of $4.9 million; isn't

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1   that correct?

2   A.   That number was provided on this document.

3       Q.   Sir, let's try my question.  There was never any

4   agreement in October 25th, 2012 that this property was going

5   to be sold for $4.9 million; isn't that correct?

6   A.   It wasn't any agreement in this particular meeting.

7       Q.   There was nothing at that particular meeting, and in

8   fact, Mr. Kagan had suggested to you, at that meeting, that

9   the price would probably be between five and five and a

10  quarter, correct?

11  A.   He said it would be high.

12      Q.   So sir, when you brought suit in this case and

13  alleged that there was a deal for $4.9 million, that was the

14  understanding; that wasn't true, was it?

15  A.   It's -- what -- just can you tell me again what are you

16  referring to about 4.9 or 5.2?

17      Q.   Sir, if I could draw your attention, in Exhibit

18  Number 64, which was your verified complaint, specifically, to

19  paragraph number 25, you say in paragraph 25, your sworn

20  complaint, "The project plan was to sell the two new homes by

21  no later than November 2014 for projected selling prices of

22  $4.9 million each."  That's not true, is it?

23  A.   It is true.

24      Q.   It is true.  So then, what is it, sir?  Was there a

25  deal at October 25th for 4.9 or wasn't?  Do you want to change

ALEX FILIPPOV - Cross

1    your testimony now?

2    A.    No.  But I'm reading, "The project plan" -- plan.  It

3    wasn't a deal.  It was a plan.

4         Q.    Okay.  And sir, but you do understand, sir, that

5    there was never any agreement to sell for 4.9; isn't that

6    correct?

7    A.    It wasn't any agreement to sell for any particular,

8    specific price because we knew that the price of -- of the

9    sale could vary.

10        Q.    And sir, ultimately, you agreed that the target

11   price would be five-and-a-quarter million; isn't that correct?

12   A.    By the time we're through with the construction.

13        Q.    Isn't that correct?  Yes or no.  Ultimately, you

14   agreed that the target price would be five-and-a-quarter

15   million; isn't --

16   A.    Ultimate --

17        Q.    -- that correct?

18   A.    Ultimately, yes

19        Q.    Okay.

20            MR. PERTEN:  So if we could scroll down, Mr. Harris,

21   to paragraph 28.  Scooch up a little bit.

22   BY MR. PERTEN:

23        Q.    Says, "Without consulting Mr. Filippov or Mr.

24   Lipetsker, the Kagans set the selling price for each home at

25   5.499, or nearly $600,000 higher than the budgeted selling

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    price for each home."  Now, sir, if, in fact, there never was

2    an agreement to sell for 4.9, you would agree with me that

3    it's impossible that the listing price at five point --

4    roughly, 5.5 was $600,000 higher than what you'd agreed upon;

5    isn't that correct?

6    A.   Can you repeat the question again?  I'm not sure I

7    follow.

8         Q.   Of course.  You alleged here -- and you made the

9    same allegation in the adversary complaint in this

10   bankruptcy -- that the listing price at 4 -- 5.499 was

11   $600,000 higher than the budgeted selling price.  That's not

12   true; isn't that correct?

13   A.   That could be not exactly accurate.

14        Q.   Yeah, that could be not exactly accurate.  And that

15   not exact accurate, sir, you also made that same allegation in

16   the adversary complaint, didn't you?

17   A.   It's hard for me to remember.

18        Q.   All right.  Well, let's look.  In paragraph 30 of

19   your adversary complaint -- let me put it up for you.

20        THE CLERK:  Yes.  Hold on one second.

21   BY MR. PERTEN:

22        Q.   Sir, I'm showing you the adversary complaint that

23   you filed in this case, paragraph 30, "Without consulting the

24   plaintiffs".  "Without consulting the plaintiffs, the Kagans

25   set the selling price for each home at 5.499 or nearly

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1   $600,000 higher than the budgeted selling price for each

2   home."  It's not accurate, is it?

3   A.   It's not exactly accurate.

4        Q.   No, it's not exactly accurate.  And in fact, at your

5   deposition, you attested to the fact that you had reviewed the

6   allegations in this complaint and that they were accurate;

7   isn't that correct?

8   A.   That's -- I don't remember.  I said that yesterday?

9        Q.   Sure.  We can look at that.  Sir, why don't you turn

10  to page 124 of your deposition, first volume.  Top of the

11  page, question, "Sir, I've placed in front of you Exhibit 5,

12  which is the amended adversary complaint that was filed in

13  this action.  Are you familiar with this document?"  Answer,

14  "I saw the document, yes."

15       Question, "Before it was filed, did you review it and

16  make sure that the factual allegations were accurate?"

17  Answer, "Yes."

18       Question, "And to the best of your knowledge, sir, were

19  the factual allegations in this document accurate?"  And you

20  answered, "Yes", correct?

21  A.   Yes.

22       Q.   So you were not being truthful at your deposition

23  either, because you've just told us that's one example of an

24  allegation that isn't true; isn't that correct?

25  A.   It could be inaccurate in -- because before the trial,

ALEX FILIPPOV - Cross

 1 | we --

 2 |        Q.    Thank you, sir.

 3 | A.    Okay.

 4 |        Q.    You've answered my question.  Now, you told us,

 5 | sir --

 6 |              THE COURT:  Well, in fairness, I'm not sure he did.

 7 |              MR. PERTEN:  Okay.  Then I'll withdraw the question,

 8 | Your Honor.

 9 |              THE COURT:  Okay.  Question's withdrawn.  Nothing

10 | more to say at this point.  Go ahead.

11 |              MR. PERTEN:  Thank you, Your Honor.

12 | BY MR. PERTEN:

13 |        Q.    Now, sir, you told us yesterday that the agreement

14 | was that $200,000 would be for the carrying costs, correct?

15 | A.    Yes.

16 |        Q.    And that was a number that was on that Excel

17 | spreadsheet that we discussed at length, Exhibit 9, correct?

18 | A.    Yes.

19 |        Q.    And you told us that the first twenty-three

20 | months -- excuse me -- the first twenty-three months, the

21 | carrying-cost payments were the responsibility of the LLC;

22 | isn't that correct?

23 | A.    Yes.

24 |        Q.    And if we divide twenty-three months into $200,000,

25 | that would give you the monthly allocation of carrying costs;

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    isn't that correct?

2    A.    Yes.

3        Q.    And would you agree with me that would come out to

4    about $6,500, give or take?

5    A.    Could be, yes.

6        Q.    Okay.   And in fact, the carrying costs were

7    significantly higher than $6,500 a month; isn't that correct?

8    A.    Yes.

9        Q.    And so you knew, going in, that if only $200,000 was

10   allotted to carrying costs, you were going to run short before

11   that twenty-three months ran out; isn't that correct?

12   A.    No.

13       Q.    And you also told us, sir, that you made it very

14   clear that you were not going to put another dime into this

15   project; isn't that correct?

16   A.    Correct.

17       Q.    So if there was insufficient funds in the Lyman-

18   Cutler account to cover carrying costs, they weren't -- and

19   those carrying costs had to be covered, you understood they

20   had to come from somewhere, and it wasn't coming from you,

21   correct?

22   A.    Correct.

23       Q.    And it wasn't coming from Mr. Lipetsker?

24   A.    No.

25       Q.    You understood, sir, however, that it was coming

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    from Mr. Kagan, that he was putting deposits in there --

2    A.    No.

3         Q.    -- isn't that correct?

4    A.    No.

5         Q.    Now, sir, other than the construction loans, there

6    were no other sources of income to the LLC -- isn't that

7    correct -- until the property sold?

8    A.    Correct.

9         Q.    So again, if it wasn't covered by the construction

10   loans, and it wasn't covered by you, and it wasn't covered by

11   Mr. Lipetsker, the only other possible source would have to be

12   Mr. Kagan or one of his companies; isn't that correct?

13   A.    Yes.

14        Q.    Now, sir, you've testified at length that this was

15   supposed to be a fixed price at $1.3 million; you recall that?

16   A.    Yes.

17        Q.    And I believe you testified yesterday that this was

18   a very important term to you, correct?

19   A.    Yes.

20        Q.    In fact, it was one of the central, most important

21   terms to you; isn't that correct?

22   A.    Correct.

23        Q.    Yet, despite that fact, sir, you'll agree with me

24   that the number $1.3-million fixed-price contract appears

25   nowhere in the operating agreement that you signed; isn't that

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    correct?

2    A.   No, it's not correct.

3        Q.   Okay.

4            MR. PERTEN:  Mr. Harris, can you bring up Exhibit

5    number -- I believe it's 15.

6    BY MR. PERTEN:

7        Q.   Sir, I'm showing you what's Exhibit number 15, which

8    is the operating agreement that you signed.

9            MR. PERTEN:  Why don't we scroll down?

10   BY MR. PERTEN:

11       Q.   Is it your testimony that, somewhere in this

12   document, it says this property will be sold for $1.3

13   million -- excuse me, the construction will be fixed at $1.3

14   million?

15   A.   It's my testimony that this document says that it's going

16   to be built in accordance with plans presented by Kagan.

17       Q.   Okay.

18           MR. PERTEN:  Let's move to section 5.2, Mr. Harris,

19   please.

20   BY MR. PERTEN:

21       Q.   So it's your testimony, sir, that when you insisted

22   that there be a clause in there that this will be constructed

23   in accordance with plans, including drawings supplied by Mr.

24   Kagan, that word "plans" meant the Excel spreadsheet

25   estimates?  That's your testimony?



ALEX FILIPPOV - Cross

1    A.    Correct, financial --

2        Q.    And you also --

3    A.    -- plans.

4        Q.    You also told us that you had counsel review this,

5    correct?

6    A.    The -- my counsel, you mean?

7        Q.    Yes, sir.

8    A.    I don't know if he reviewed the documents, but --

9        Q.    Well --

10   A.    -- he reviewed -- review Excel file.  I don't know.  I

11   don't remember this.

12       Q.    Yeah.  And sir, you had -- you told us Mark Watson,

13   an attorney, reviewed this document on your behalf, correct?

14   A.    Yes.

15       Q.    And you were working with Mr. Maiden to edit this

16   document, sir?

17   A.    Yes.

18       Q.    And you've drafted lots of contracts, and the $1.3

19   million was very important, and it's your testimony, just so

20   we're clear, that when you say they're going to build in

21   accordance with the plans, that word was broad enough to

22   encompass not just the plans that show you how to build it;

23   it's the Excel spreadsheet that was handed out, which was an

24   estimate?  Is that your testimony?

25   A.    The Excel file was --



ALEX FILIPPOV - Cross

1      Q.   Is that your testimony, sir?

2  A.   No.

3      Q.   It's not your testimony?

4  A.   No.

5      Q.   So in fact, plans is not the Excel spreadsheet;

6  isn't that correct?

7  A.   It's exactly Excel spreadsheet, the --

8      Q.   It is the --

9  A.   -- financial plans, yes.

10     Q.   Okay.  Now, isn't it a fact, sir, that you asked at

11  that meeting that Mr. Kagan guarantee 1.3 and asked him to

12  sign off on that budget, and he refused; isn't that correct?

13  A.   Can you repeat again, please?

14     Q.   You asked Mr. Kagan to sign that Excel spreadsheet

15  to affirm that these numbers were hard, and he refused; isn't

16  that correct?

17  A.   No.

18         MR. PERTEN:  Now, Mr. Harris, could you bring up

19  Exhibit 180?  Scroll down to the bottom to page S-302 on the

20  bottom.  It's two more pages.

21  BY MR. PERTEN:

22     Q.   Sir, I'm showing you an email that we looked at this

23  yesterday.  I have it as Exhibit Number 180.  And there is an

24  email to Mr. Maiden, "Also, the" -- and it says at the bottom,

25  "Also, the calculations and stages prepared by Dima (Excel

ALEX FILIPPOV - Cross

1   files) should be part of this agreement as an addendum.  These

2   docs might need to be tweaked to reflect changes in numbers."

3   Do you see that language?

4   A.   Yes.

5        Q.   And in fact, the reason you wanted it as an addendum

6   is because you knew, because you've negotiated many contracts,

7   that it's important to be precise, and you wanted that

8   addendum part of this agreement.  That's what you're

9   requesting; isn't that correct?

10  A.   Yes.

11       Q.   And you also knew that that addendum was -- that

12  those files -- excuse me, the Excel files, since they were

13  estimate, might need to be tweaked, correct?  It's what it

14  says, right?

15  A.   Possibly.

16       Q.   Possibly?

17  A.   Yeah.

18       Q.   "These docs might need to be tweaked to reflect

19  changes in numbers", correct?

20  A.   Might need.

21       Q.   Correct.  So you knew --

22  A.   Not necessarily.

23       Q.   -- that there was a --

24  A.   Might need.

25       Q.   -- possibility --



Page  41

ALEX FILIPPOV - Cross

1  A.   Yes.

2       Q.   -- that the numbers in the spreadsheet might need to

3  be changed; isn't that correct?

4  A.   Yes.

5       Q.   And despite the fact that you understood the

6  importance here of the addendum, because this was a central

7  thing, that Excel spreadsheet was not attached as an addendum,

8  and there was no tweaking in the document that you now say was

9  an agreed-upon deal; isn't that correct?

10  A.   It wasn't attached as an addendum, but it was included as

11  plans in the text.

12       Q.   Now, sir, after the October meeting, which took

13  about an hour -- somewhere between an hour and two, right?

14  A.   Yes.

15       Q.   After that, you did a couple of drive-arounds to see

16  other projects that Mr. Kagan did, correct?

17  A.   Yes.

18       Q.   And again, we spoke about this briefly, but you

19  recognize that there was a significant profit that Mr. Kagan

20  might be making on this, correct?

21  A.   Yes.

22       Q.   Now, you also understood, going in, that this was a

23  very risky investment; isn't that correct?

24  A.   Yes.

25       Q.   In fact, you said, it was a huge investment for me,

ALEX FILIPPOV - Cross

1    huge, very risky, as a matter of fact, correct?

2    A.   Yes.

3         Q.   And the reason you believed it was risky was that

4    you understood that, and you said, any real estate investment,

5    I consider to be a risky investment, correct?

6    A.   Yes.

7         Q.   So again, there was no guaranteed return, you've

8    told us, and you understood that this type of a deal is

9    inherently risky; isn't that correct?

10   A.   Yes.

11        Q.   So there was a possibility, and you knew this going

12   in, sir -- you went in with your eyes open.  You knew there

13   was a possibility you might lose your investment -- isn't that

14   correct -- or a portion of your investment?

15   A.   Yes.

16        Q.   Okay.  Now, incidentally, Tatiana Kagan was not part

17   of the discussions about this Excel spreadsheet.  She wasn't

18   even at that October meeting, correct?

19   A.   Correct.

20        Q.   She had nothing to do with the deal that you struck

21   with Mr. Kagan, other than he asked, and you agreed, that

22   she'd be the real estate broker, correct?

23   A.   Yes.

24        Q.   Okay.  Now, once you decided to do the deal, it fell

25   on Mr. Maiden -- Attorney Maiden to do the drafting of the

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1  operating agreement; isn't that correct?

2  A.   Yes.

3      Q.   And you understood, because you're an honest

4  businessman, sir, that it was important that the three

5  partners -- yourself, Mr. Kagan, and Mr. Lipetsker -- that

6  there be an open dialogue, correct?

7  A.   Yes.

8      Q.   And you certainly wouldn't want to go behind Mr.

9  Kagan's back and change the terms of the deal without making

10  sure he was okay with it; isn't --

11  A.   Yes.

12      Q.   -- that correct?

13  A.   Yes.

14      Q.   Now, you didn't sign an engagement letter with Mr.

15  Maiden, correct?

16  A.   Yes.

17      Q.   Yes, you did, or yes, you didn't?

18  A.   I didn't.

19      Q.   You did not?

20  A.   I did not.

21      Q.   And despite the fact, sir, that he had represented

22  you previously, you didn't have to sign any kind of a conflict

23  waiver, did you?

24  A.   I'm not sure if he did represent me as my attorney.  He

25  was a closing attorney for the -- for the bank.



(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1      Q.   Okay.  And you didn't tell Mr. Kagan that he had

2   been involved on a prior transaction, sir, that you had --

3   that you had done with him; isn't that correct?

4   A.   No, I didn't.

5      Q.   Okay.  Now, you also told us yesterday that, in

6   addition to drafting the operating agreement, Mr. Maiden

7   represented the bank on the closing of the loans, correct?

8   A.   Yes.

9      Q.   So you understood, sir, going in, that Mr. Maiden

10  was going to be wearing at least two hats, right?  He's going

11  to be representing the parties to draft the operating

12  agreement and representing the bank?

13  A.   No.

14     Q.   You didn't understand that?

15  A.   At that point, I didn't.

16     Q.   Okay.  But at some point, you certainly did, did you

17  not?

18  A.   Yes, after --

19     Q.   And --

20  A.   -- after the agreement was --

21     Q.   Okay.

22  A.   -- signed, yes.

23     Q.   Now, you're aware, based on your experience with Mr.

24  Kagan, that he doesn't do a lot of emailing; is that correct?

25  A.   Yes.



ALEX FILIPPOV - Cross

1    Q.    In fact, the best way to communicate with Mr. Kagan

2    is either text or pick up the phone or meet him in person;

3    isn't that correct?

4    A.    Yes.

5    Q.    Okay.  Now, the operating agreement, sir, went

6    through multiple iterations, and you read each draft pretty

7    carefully, didn't you?

8    A.    Yes.

9    Q.    And if there was something you didn't understand,

10   you would email Mr. Maiden and ask for clarification or edits,

11   correct?

12   A.    Yes.  Yes.

13   Q.    And during those negotiations, you don't recall ever

14   speaking to Mr. Kagan directly; isn't that correct?

15   A.    Yes, that's correct.

16   Q.    Okay.  So your negotiations were with Mr. Maiden,

17   not with Mr. Kagan; isn't that correct?

18   A.    Yes.

19   Q.    And the primary concern, as you told us yesterday,

20   you were concerned that you were putting up the bulk of the

21   money, and therefore, you wanted to be in control --

22   A.    Yes.

23   Q.    -- ultimately; isn't that correct?

24   A.    Yes.

25   Q.    And to address that concern that you had, you

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1   communicated directly with Mr. Maiden to make sure that those

2   concerns were addressed; isn't that correct?

3   A.   It isn't.

4       Q.   It is not correct?

5   A.   Because Mr. Kagan was on cc.  He was --

6       Q.   Okay.

7   A.   -- copied on all our communication, one way another.

8       Q.   Okay.  So Mr. Kagan was copied on all your

9   communications, one way or the other.  Okay.

10       MR. PERTEN:  Mr. Harris, can you bring up Trial

11  Exhibit 178, please?

12  BY MR. PERTEN:

13      Q.   Now, sir, I'm showing you Exhibit 178, which is an

14  October 30th, 2012 email that you sent to Mr. Maiden, Mr.

15  Kagan, and to Mr. Lipetsker, correct?

16  A.   Yes.

17      MR. PERTEN:  Could you scroll down, please, Mr.

18  Harris?

19  BY MR. PERTEN:

20      Q.   And this email lists a bunch of questions that you

21  had during the negotiations, right?

22  A.   Yes.

23      Q.   And the email's addressed to Borya, which is Mr.

24  Maiden --

25  A.   Boris, yes.



ALEX FILIPPOV - Cross

1      Q.   -- right?

2           THE COURT:  What exhibit?  I'm sorry.

3           MR. PERTEN:  I'm looking at Exhibit 178.

4           THE COURT:  Thank you.

5           MR. PERTEN:  Now, may I proceed?

6           THE COURT:  Oh, yes, of course.  Yes.

7    BY MR. PERTEN:

8      Q.   Now, when you sent this email to Mr. Maiden, he

9    responded to you, didn't he?

10   A.   Yes, sir.  Yeah.

11     Q.   Mr. Kagan did not respond to you by email, did he?

12   A.   No.

13     Q.   Okay.  And in response, if we scroll down, at 12:42,

14   Mr. Boris Maiden provided you with a copy of a updated and

15   said to you, "Please review and let me know your comments",

16   correct?

17   A.   Well, he sent that email to me, to Mr. --

18     Q.   Okay.

19   A.   -- Kagan, and Lipetsker.

20     Q.   All right.

21          MR. PERTEN:  Now, Mr. Harris, could you bring up

22   Exhibit 182, which is a continuation of this conversation?  If

23   you could scroll down, Mr. Harris, to the email at 5:11.

24   There we go.

25   BY MR. PERTEN:

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1      Q.   October 30th at 5:11 p.m., you emailed to Boris

2   Maiden, and you delete the cc to Mr. Kagan; isn't that

3   correct?  He's not copied on this?

4   A.   It's not delete.  I replied to, and apparently, forgot to

5   include the reply all.

6      Q.   Okay.

7   A.   That's not --

8      Q.   So you'll --

9   A.   -- delete.

10     Q.   -- you'll agree with me, sir, that this email was

11  not sent on October 30th at 5:11 to Mr. Kagan; isn't that

12  correct?

13  A.   As far as I remember, it was forwarded to Mr. --

14     Q.   Okay.  Let's --

15  A.   -- Kagan the next day.

16     Q.   -- scroll down.  And then, there's some information

17  about the Rockland Trust deal.

18          MR. PERTEN:  Keep going.

19  BY MR. PERTEN:

20     Q.   And then, Mr. Maiden does another response, asking

21  you to "review and let me know your comments", correct?

22  A.   Yes.

23     Q.   All right.  Now, sir, at 11:25 --

24          MR. PERTEN:  Scroll up a page.

25  BY MR. PERTEN:

ALEX FILIPPOV - Cross

1    Q.   11:25 a.m., part of this conversation, you're

2    letting everybody know that, again, you want to be the loudest

3    voice here; you're the one who's going to be on the hook for

4    seven-and-a-half million dollars, correct?

5    A.   Yes.

6    Q.   In point of fact, you were never on the hook for

7    seven-and-a-half million dollars; isn't that correct?

8    A.   At that time, I didn't know this, but --

9    Q.   Well, the way it shook out, sir, you were able,

10   using the bank that Mr. Kagan had a relationship with --

11   Rockland Trust Company -- you were only on the hook for a very

12   limited amount of money?

13   A.   At that point, I didn't know this --

14   Q.   I understand that.

15   A.   -- when this email was written.

16   Q.   But ultimately, that was not the case, correct?

17   A.   That was not the case, yes.

18   Q.   Okay.  Now, when you said, I want to be in charge,

19   and you want to be the loudest voice, you understood, sir,

20   that if you're going to be in charge and have the loudest

21   voice, that carried with it some responsibilities to keep

22   everybody apprised; isn't that correct?

23   A.   Yes.

24        MR. PERTEN:  Okay.  Now, Mr. Harris, can you bring up

25   183, please?  The email at 5:42.



ALEX FILIPPOV - Cross

 1  BY MR. PERTEN:

 2       Q.   At 5:42 p.m. on November 1st, Mr. Maiden replies

 3  privately to you with the question, "Do you want to be the

 4  manager?"  Do you see that?

 5  A.   Yes.

 6       Q.   Now, certainly, sir, you understood that if the deal

 7  changed so that you were the manager, instead of Mr. Kagan

 8  being the manager, that's a pretty significant change, isn't

 9  it?

10  A.   Yes.

11       Q.   Okay.  And Mr. Kagan is not copied on this email,

12  correct?

13  A.   Yes.

14          MR. PERTEN:  And let's scroll down at 5:53.  You're

15  going the wrong way.

16  BY MR. PERTEN:

17       Q.   5:53, your response, again, privately to Mr. Maiden,

18  all I care about is to make sure that without my vote, the

19  property can't -- cannot be sold at all and that my vote

20  should be a deciding vote in terms of the sales price and

21  decision you sell -- how you call is -- it's up to you.

22  Correct?

23  A.   Yes.

24       Q.   And again, this is a private conversation that

25  you're having with Mr. Maiden; isn't that correct?



ALEX FILIPPOV - Cross

 1   A.   I'm -- yes.

 2        Q.   Okay.  If we go to Exhibit number 184, please, and

 3   we find the continuation of the conversation 11/2 at 9:44 a.m.

 4   9:44 a.m., Mr. Maiden says to you, "Does that mean you want

 5   total control?  Example, you can decide to sell without the

 6   consent of other members."  And you responded, "Generally, I

 7   think I should have that right", correct?

 8   A.   Yes.

 9        Q.   And again, these are all emails, sir, that Mr. Kagan

10   is not copied on; isn't that correct?

11   A.   Yes.

12        Q.   And then, if we go to -- we're still on Exhibit 84.

13   Let's scroll to the 10:17 a.m.  Mr. Maiden responds to you

14   with another draft.  He says, "I think that this version gives

15   you total control.  I have not discussed this with Vadim or

16   Nickolay, but I don't think they have much of a choice.

17   Thanks, Boris.  P.S., the offer for four million was

18   accepted".  That would be the offer to purchase the property,

19   correct?

20   A.   Yes.

21        Q.   So in fact, sir, once again, you're -- this is a

22   private communication between yourself and Mr. Maiden about

23   giving you total control, and Mr. Maiden advises you he hasn't

24   even spoken to Kagan or Lipetsker; isn't that correct?

25   A.   Yes.

ALEX FILIPPOV - Cross

1      Q.   Now, sir, if we could --

2          MR. PERTEN:  Turn to Exhibit 187, Mr. Harris.

3  BY MR. PERTEN:

4      Q.   Now, at 11:23 the next day, November 3rd, you're

5  having further private conversations with Mr. Maiden.  We

6  looked at this yesterday.  You were concerned about the role

7  of investor Kagan.  And you wanted to make sure that it was

8  clear that he'd be the builder, correct?

9  A.   Yes.

10     Q.   And his answer at 11:41, he says, "In the past, the

11 bank required that LLC to sign contract with Kagan

12 Development.  Do you want to handle it the same way?  I'm in

13 the office.  Please give me a call."  Did I read that

14 correctly?

15 A.   Yes.

16     Q.   So Mr. Maiden let you know, on November 3rd, 2012,

17 that, typically, the bank requires a contract with Kagan

18 Development?

19 A.   Yes.

20     Q.   So when you testified yesterday that you had no idea

21 who Kagan Development was, that's not true, because, in fact,

22 on November 3rd, 2012, Mr. Maiden told you you're going to

23 need a contract with Kagan Development; isn't that correct?

24         MR. CARNATHAN:  Objection.  Misstates his testimony

25 from yesterday.



(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1          THE COURT:  The record will reflect that, one way or

2     the other, so the objection's overruled.  He can answer it.

3     BY MR. PERTEN:

4          Q.   Sir, you knew as of 11/3/2012 that there was going

5     to be a contract with Kagan Development, based upon what Mr.

6     Maiden told you on November 3rd, 2012 at 11:41 a.m.; isn't

7     that correct?

8     A.   It's not exactly correct, because it's Kagan Development.

9     And Kagan has different company with different names.  At this

10    time, I didn't know names.

11         Q.   Okay.  Well, let's work with that, sir.  You

12    understood that there was going to have to be a contract with

13    one of the Kagan companies, correct?

14    A.   Yes.

15         Q.   Okay.  And then, you told us yesterday that section

16    5.2 was added, which says Kagan will be the builder -- we

17    looked at that, to the operating agreement --

18    A.   Yes.

19         Q.   -- to address your concerns.  And notwithstanding

20    the fact that you were told that there was going to be a

21    company that's going to do the contract, you didn't insist, in

22    section 5.2, that it says Kagan or Kagan Development or some

23    other company will be the builder; isn't that correct?

24    A.   Can you repeat the question again?

25         Q.   Sure.  You didn't insist that the operating

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1   agreement specifically put in that there's a company who's

2   going to do the building?

3   A.   No, I didn't.

4        Q.   Okay.  Now, sir, if --

5            MR. PERTEN:  Mr. Harris, Exhibit number 14, if I

6   could have you scroll down, sir.

7   BY MR. PERTEN:

8        Q.  On 11/3 at 2:10, you send Mr. Maiden some comments

9   that your attorney wanted, Mark Watson, correct?

10  A.   Yes.

11       Q.   And once again, this is a private communication

12  between you and Mr. Maiden; isn't that correct?

13  A.   Yes.

14       Q.   And this --

15           MR. PERTEN:  Scroll up a bit, if we could.

16  BY MR. PERTEN:

17       Q.   And this was the genesis, if you will, of certain

18  paragraphs, 9.1(b), correct?

19  A.   Yes.

20       Q.   Okay.  And that --

21           MR. PERTEN:  Keep going, please.

22  BY MR. PERTEN:

23       Q.   And then, you asked another question, privately, on

24  November 9th, to Mr. Maiden.  Something in paragraph 8.1

25  doesn't look right to you, correct?

#15-13881; #16-01120                               5-7-2019

ALEX FILIPPOV - Cross

1   A.   Yes.

2        Q.   And section 8.1, if you recall, is the section that

3   talks about profits and losses --

4   A.   Okay.

5        Q.   -- and a forty-fifty-ten allocation.  You recall

6   that?

7   A.   Yes.

8        Q.   So you had a question about the profits.

9            MR. PERTEN:  Let's scroll up again.

10  BY MR. PERTEN:

11       Q.   And Mr. Maiden privately responds that he's revised

12  paragraph 8.1 to address your concerns, correct?

13  A.   Yes.

14           MR. PERTEN:  Scroll up.

15  BY MR. PERTEN:

16       Q.   And then, ultimately, on November 12th, you sign the

17  agreement and email it over to Mr. Maiden; isn't that correct?

18  A.   Yes.

19       Q.   So there wasn't actually any kind of a closing, if

20  you will.  You emailed that document?

21  A.   Correct.

22       Q.   Okay.  And at no point during this period of time,

23  through November 12th, did you have conversations directly

24  with Mr. Kagan?  You were assuming that Mr. Maiden was talking

25  with him, correct?



ALEX FILIPPOV - Cross

1   A.   Mr. Maiden was attorney for Mr. Kagan.  That was my --

2        Q.   That was your assumption; isn't that correct?

3   A.   Yeah, that was my assumption.

4        Q.   And it's not an --

5   A.   Yes.

6        Q.   -- assumption you ever confirmed, is it?

7   A.   No.

8        Q.   Okay.

9        MR. PERTEN:  Now, if we could pull up the operating

10  agreement, Exhibit 15, please.

11  BY MR. PERTEN:

12       Q.   Now, 5.2, which was put in at your request, makes it

13  clear that it's Mr. Kagan who's going to build at the

14  property, correct?

15  A.   Yes.

16       Q.   And you negotiated that with Mr. Maiden, correct?

17  A.   Yes.

18       Q.   And you reserved to your right, now that you're now

19  managing member, that the plans and drawings supplied have to

20  be approved by the managing member?

21  A.   Yes.

22       Q.   Now, you didn't say, by the way, the plans that I

23  already approved back in October had to be approved.  This is

24  forward-looking, isn't it?  There were no plans, drawings

25  supplied yet; isn't that correct?  There were no drawings;

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    there were no plans; there was no house plans, correct?

2    A.    It wasn't house plans.  It was only Excel file.

3         Q.    Okay.  And it goes on to say, the construction shall

4    be substantially completed no later than March 30th, 2014,

5    correct?

6    A.    Yes.

7         Q.    Now, that term, substantial completion, there was no

8    negotiation as to what that term meant, is there?

9    A.    No.

10        Q.    And you understand that substantial completion is

11   something less than final completion; isn't that correct?

12   A.    Yes.

13        Q.    Okay.  And you also -- in that section, other than

14   saying, I want to be able to approve the plans, you didn't

15   reserve any other rights, did you?

16   A.    No.

17        Q.    All right.  So you didn't say, I want -- and when

18   you do the construction, I want to make sure that all

19   subcontracts get run by me before you do it; isn't that

20   correct?

21   A.    Correct.

22        Q.    And you certainly understood that there were going

23   to be tradespeople working on this property, who were going to

24   get paid.  You understood that, correct?

25   A.    Yes.

ALEX FILIPPOV - Cross

1      Q.   And you certainly -- as managing member, you

2   certainly could have said, I want to see all those

3   subcontracts, correct?

4   A.   Yes.

5      Q.   And you could've been on-site every day, managing

6   these people yourself; isn't that correct?

7   A.   Yes.

8      Q.   And you made a decision, with your eyes open, that

9   you didn't want to be involved in that; that was Kagan's job;

10   isn't that correct?

11   A.   That was Kagan's job, yes.

12      Q.   And there's certainly nothing in there that says,

13   oh, you've got to get at least three bids on every

14   subcontract, correct?

15   A.   No.

16      Q.   And there's nothing in there that says, with every

17   requisition, I want lien waivers, or anything of that nature;

18   isn't that correct?

19   A.   Correct.

20      Q.   Now, section 6.1(b) talks about the powers of the

21   managing partner.  "Powers will include but not be limited

22   to" -- and you'll agree with me that there's nothing in there

23   that specifically relates to the construction; isn't that

24   correct?  In number 1, that's not specifically related to

25   construction, correct?

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    A.    Correct.

2         Q.    In number 2, same thing, not specifically related to

3    construction?

4              MR. PERTEN:  Scroll up a bit.

5    BY MR. PERTEN:

6         Q.    Is that correct?

7    A.    I'm reading.

8         Q.    Okay.

9                              (Pause)

10   A.    Paragraph 5 says, "To take such other actions and to

11   incur such reasonable expenses on behalf of the company as may

12   be necessary or advisable in connection with the conduct of

13   the affairs of the" -- Mr. -- go up --

14             MR. PERTEN:  You can scroll up, J.P.

15   A.    -- "of the company".

16   BY MR. PERTEN:

17        Q.    Okay.  So you understood that, generally, you could

18   exercise power, if you chose to do that, correct?

19   A.    Yes.

20        Q.    But there's nothing specifically saying that you're

21   in charge of the construction and everything has to be run by

22   you; isn't that correct?

23   A.    Correct.

24        Q.    Now, under the operating agreement, you were also

25   responsible for keeping the books and records of the LLC;

ALEX FILIPPOV - Cross

1   isn't that correct?

2   A.    Correct.

3         Q.    And to do that, you delegated to your wife Arina;

4   isn't that correct?

5   A.    Yes.

6         Q.    And so the LLC's books and records were kept by

7   Arina, correct?

8   A.    Correct.

9         Q.    And she interacted with the people at the Kagan

10  Development, as needed, over the course of the project; isn't

11  that correct?

12  A.    Correct.

13        Q.    So to the extent that there's any errors in the

14  LLC's books and records, ultimately, those were books and

15  records that you were keeping, not Kagan; isn't that correct?

16  A.    That's not correct.

17        Q.    Okay, sir.  So is it your testimony that Kagan was

18  keeping the LLC's books, or was Kagan keeping KDC's books and

19  ProEx's books?

20  A.    My understanding, that Kagan kept separate LLC books.

21  And that was confirmed by Dan Gersh.

22        Q.    So Kagan kept his own books of account for the LLC,

23  but the official LLC records were being kept by you; isn't

24  that correct?

25  A.    The records that we -- we could keep, based on the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    information we got from Kagan.

2        Q.    Now, under section 7.4 of the LLC agreement, the

3    operating agreement, you understood that, at any point, you

4    had the right -- in fact, any member had the right to call a

5    meeting, correct?

6    A.    Yes.

7        Q.    So certainly, if there ever came a situation where

8    you're not getting information you're requesting or things are

9    not going well, you understood that you had the absolute right

10    to call a meeting and get answers; isn't that correct?

11    A.    Yes.

12        Q.    And that's not something you ever invoked until

13    after the dispute arose; isn't that correct?

14    A.    Correct.

15        Q.    Okay.  Now, there was -- you told us earlier, sir,

16    that you didn't really know when the property would actually

17    sell, correct?

18    A.    Yes.

19        Q.    And so it might have been by November 14th of 2014,

20    or it might have been later, correct?

21    A.    Technically, possible --

22        Q.    I'm sorry?

23    A.    -- yes.  Yes.  I couldn't say with hundred-percent

24    probability when it's going to be sold.

25        Q.    Now, in your adversary complaint, at paragraph 27,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    you say, "The project plan was to sell the" two homes -- "two

2    new homes by no later than November 2014, for projected

3    selling prices of $4.9 million each."  Now, we've already

4    established, sir, that the projected selling price wasn't 4.9,

5    but in fact, it's also true there was no hard date for sale of

6    November 2014; isn't that correct?

7    A.   I can't tell you for sure now.  I -- I don't remember

8    this.

9        Q.   Okay.  Well, you certainly must've known it for sure

10   when you swore in a verified complaint and swore that the

11   allegations in the adversary complaint were true.  Was there a

12   hard drop-dead date of November 2014 or not?

13   A.   I -- I can't tell right now.  I don't remember.

14       Q.   Okay.  Now, you understood --

15           MR. PERTEN:  If we could skip on the operating

16   agreement, Mr. Harris, to section 8.1.  I'm sorry.  If you

17   could first go to 5.2.  Going the wrong way.

18   BY MR. PERTEN:

19       Q.   Sir, 5.2 we looked at a moment ago.  That's the

20   section that says Kagan's responsible for building.  You see

21   that?

22   A.   Yes.

23       Q.   In the last sentence of 5.2, it's specifically

24   understood that Mr. Kagan's compensation is outlined in

25   section 8.1 below.  Do you see that?



ALEX FILIPPOV - Cross

1    A.   Yes.

2              MR. PERTEN:  Could you now scroll to 8.1, please, Mr.

3    Harris?

4    BY MR. PERTEN:

5         Q.   Now, so 8.1, the section that deals with a variety

6    of things, including Mr. Kagan's compensation, says, "The net

7    profits, net cash flow, and net proceeds of any sale or

8    refinancing of the company, or upon liquidation of the

9    company, shall be allocated among the members as follows:  Mr.

10   Alex Filippov, forty percent; Mr. Nickolay Lipetsker, ten

11   percent; and Mr. Kagan, fifty percent", correct?

12   A.   Yes.

13        Q.   And then, if we drop down to the bold language in

14   the middle, it says, "In the event that the property is not

15   sold within twenty-three months from the date of acquisition,

16   then Mr. Kagan shall be responsible for all carrying costs"

17   and time -- "until such time as the property is sold."  Do you

18   see that language?

19   A.   Yes.

20        Q.   And then, it goes on to say, "If Mr. Kagan fails to

21   pay monthly carrying costs, then Mr. Filippov shall be

22   responsible to contribute the necessary carrying costs."  You

23   see that language?

24   A.   Yes.

25        Q.   So you understood, and in fact, you even

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1  contemplated that there could come a time that Mr. Kagan says,

2  no.  And in such event, you were contractually obligated to

3  step up to the plate and pay those costs; isn't --

4  A.  Yes.

5      Q.  -- that correct?  And it goes on to say that if, in

6  fact, he fails to pay them, that you -- and you do, your

7  capital account goes up, and his goes down.

8  A.  Yes.

9      Q.  So there'll be -- for example, if you paid ten --

10  $5,000 in, your capital account goes up by five; his goes down

11  by five.  So that's a $10,000 spread, correct?

12  A.  Yes.

13      Q.  So it's not that he gets diluted.  It's a double

14  whammy.  You go up, and he goes down, correct?

15  A.  Yes.

16      Q.  Okay.  And in fact, in this case, you've invoked

17  that clause; isn't that true?

18  A.  Yes.

19      Q.  Okay.  Now, if we could continue over to section

20  8.2, section 8.2 says, "Mr. Kagan" -- sort of fourth line

21  down -- "capital contribution shall be paid out of Mr. Kagan's

22  net profit share for each day that the property is not sold

23  after twenty-three months of acquisition."  Do you see that

24  language?

25  A.  Yes.



ALEX FILIPPOV - Cross

1    Q.   If the properties did not sell within twenty-three

2    months of acquisition, how much damages would the LLC suffer?

3    A.   In absolute values?

4    Q.   Yeah.

5    A.   I -- I can't tell you, exactly.

6    Q.   Okay.  Is it your testimony, sir -- do you believe

7    that the value of the property or you somehow will be damaged

8    $12,500 a day for each day that the property isn't sold?

9    A.   Where does $12,000 a day come from?

10   Q.   Work with me, sir.  Do you believe that it's going

11   to cost $12,500 per day for every day that the property is not

12   sold after twenty-three months?

13   A.   I don't know how you come up with this numbers.

14   Q.   Yes or no.  Do you believe it's twelve -- is it in

15   that order --

16   A.   I don't know.

17   Q.   -- order of magnitude?

18   A.   I don't know.

19   Q.   You have no idea?  Well, sir, you'll agree with me

20   that Mr. Kagan put in $250,000, correct?

21   A.   Yes.

22   Q.   And if he loses five percent a day until his capital

23   contribution is exhausted, that means the potential is he's

24   losing $12,500 a day; isn't that correct?

25   A.   It -- it doesn't say five percent a day.  Please read.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    Q.   It says, and the profit share is not sold, "Shall be

2    paid out of his net profit for each day that the property is

3    not sold."

4    A.   Five percent per annum.

5    Q.   Per annum for each day.

6    A.   Yeah, but it's based on five percent a year.

7    Q.   For each day, correct?

8    A.   Yes.

9    Q.   Okay.  Now, the first thing after you signed the

10   operating agreement, the next thing that had to happen was to

11   actually form the LLC, correct?

12   A.   Yes.

13   Q.   And in fact, the operating agreement was signed

14   before the LLC was even formed; isn't that correct?

15   A.   Can you repeat again?  I'm sorry.

16   Q.   The operating agreement was signed on November 12th;

17   the LLC was not formed until the end of November; isn't that

18   correct?

19   A.   Yes.

20   Q.   Okay.  Sir --

21       MR. PERTEN:  (Indiscernible) back to the operating

22   agreement.

23   BY MR. PERTEN:

24   Q.   Let me draw your attention to section 2.3 of the

25   operating agreement.  Says, "The term of the company shall

ALEX FILIPPOV - Cross

1   commence on the date of filing of the certificate of

2   organization in the Commonwealth of Massachusetts Secretary of

3   State's office and shall continue until November 30th, 2015,

4   unless dissolved before such date in accordance with the

5   provisions of this agreement."  I read that correctly,

6   correct?

7   A.   Yes.

8        Q.   All right.  Now, sir --

9             MR. PERTEN:  J.P., would you please bring us to

10  Exhibit 16?

11            THE WITNESS:  Excuse me.  May I get a cup of water?

12            MR. PERTEN:  You should have cups.

13            THE COURT:  Yes, of course.

14            THE WITNESS:  There are no cups.  Oh, I was

15  looking -- thank you.

16  BY MR. PERTEN:

17       Q.   Now, Mr. Filippov, I brought up Exhibit 16, which we

18  looked at yesterday.  That's the certificate of organization

19  that you signed; is that correct?

20  A.   Yes.

21            MR. PERTEN:  If you could scroll down, please, Mr.

22  Harris?  Keep going.

23  BY MR. PERTEN:

24       Q.   And paragraph number 5 says, "Date of dissolution,

25  the LLC shall have no fixed date on which it shall dissolve."

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    Do you see that language?

2    A.    Yes.

3         Q.    And that's not true because, in fact, the LLC

4    agreement says November 30th, 2015, correct?

5    A.    Yes.

6         Q.    Okay.

7              MR. PERTEN:  Scroll down.

8    BY MR. PERTEN:

9         Q.    So when you signed this under pains and penalties of

10   perjury, you weren't telling the truth, were you?

11   A.    That was in error.  It wasn't --

12        Q.    Okay.

13   A.    -- deliberate lie.

14        Q.    Now, sir, let's look at Exhibit 17.  It's the

15   electronic version of what was actually filed with the

16   Secretary of Commonwealth, correct?

17   A.    Yes.

18             MR. PERTEN:  And if we could scroll down.

19   BY MR. PERTEN:

20        Q.    Once again, box number 4, the latest date of

21   dissolution, if specified, it's left blank, correct?

22   A.    Yes.

23        Q.    So that, again, was not a true statement, because in

24   fact, the operating agreement that you agreed to says November

25   30th, 2015; isn't that correct?



ALEX FILIPPOV - Cross

1    A.    With the same vein, it wasn't intentional.

2         Q.    Sure.  But you understood that whether it wasn't

3    intentional or not, your deal was that this company was to

4    dissolve, was to terminate on November 30th, 2015; isn't that

5    correct?

6    A.    That was my omission, yes.

7         Q.    Okay.  In fact, sir, when this termination date was

8    brought to your attention in the letter that the attorney

9    sent, Alex Pyle, on May 7th, one of the topics was the LLC's

10   about to dissolve or is scheduled to dissolve on November

11   30th, correct?

12   A.    Correct.

13        Q.    And you didn't want to dissolve it on November 30th;

14   isn't that correct?

15   A.    I didn't know that it was supposed to be dissolved,

16   because that was an -- an omission that --

17        Q.    Well, once you were told, once it was brought to

18   your attention, you still refused to terminate the LLC on

19   November 30th; isn't that correct?

20   A.    Yes.

21        Q.    Okay.  So you decided -- notwithstanding that that

22   was your obligation as the managing partner in the LLC

23   agreement, you decided that you didn't like that date and you

24   weren't going to be bound by it; isn't that correct?

25   A.    It wasn't my personal decision.  It was LLC decision, but

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    yes.

2        Q.   It was your personal decision that you didn't have

3    to honor the terms of the operating agreement?

4    A.    It wasn't my personal decision.  There are two investors

5    that decided this, myself and Mr. Lipetsker.

6        Q.   Oh, so you and Mr. Lipetsker got together and

7    decided that you didn't have to dissolve the LLC on November

8    30th?  Is that your testimony?

9    A.    We didn't discuss the dissolution.  We were looking for

10   the best way to deal with the situation.

11       Q.   And this best way to deal with the situation was to

12   ignore the terms of the operating agreement and have private

13   discussions between yourselves, without discussing with Mr.

14   Kagan, correct?

15   A.    Mr. Kagan closed --

16       Q.   Correct?

17   A.    No.

18       Q.   You did not discuss this with Mr. Kagan, did you?

19   A.    We didn't discuss it with Mr. Kagan.

20       Q.   Now, after you signed the operating agreement, sir,

21   the next event that occurred was that you had to get the loan

22   to buy the property, correct?

23   A.    Yes.

24       Q.   And you ended up using Rockland Trust Company, which

25   was Kagan's bank, because they weren't insisting on an

ALEX FILIPPOV - Cross

1    unconditional loan -- guarantee?

2    A.   Correct.

3        Q.   Correct?

4    A.   It was also Mr. Maiden's bank.

5        Q.   All right.  So Mr. Maiden and Mr. Kagan had a

6    relationship with that bank, which would lend on more

7    favorable terms than Belmont, which was your bank, correct?

8    A.   Yes.

9        Q.   So you took advantage of that, as appropriate, and

10   got the better deal from Rockland Trust, correct?

11   A.   Yes.

12       Q.   Okay.  Now, when we looked at the Excel spreadsheet,

13   which was Exhibit 9, it initially was talking about a loan of

14   $750,000.  Do you recall that?

15   A.   Yes.

16       Q.   And in fact, that wasn't right, because you

17   ultimately ended up borrowing --

18   A.   800 --

19       Q.   -- 1.6 million?

20   A.   1.6, yes.

21       Q.   Okay.  Now, you told us that after the loan closed

22   and you purchased the property, there was a delay in getting

23   started because the Brookline Historical Commission (sic), or

24   whatever it was, delayed, and instead of being ready to go in

25   January, it was not until May, I believe your testimony was,

ALEX FILIPPOV - Cross

1  correct?

2  A.   It wasn't Historical Commission (sic) delay.

3       Q.   Whatever board it was.

4  A.   It was different reason.  Mr. Kagan couldn't get the

5  permits because he wasn't familiar with Brookline.

6       Q.   Okay.  You understood, sir, that the permits were

7  delayed --

8  A.   Yes.

9       Q.   -- correct?

10 A.   Yes.

11      Q.   And it wasn't until May, roughly, that you got the

12 permits, correct?

13 A.   Yes.

14      Q.   Okay.  So you knew before a shovel was in the ground

15 that this project has already slipped five months; isn't that

16 correct?

17 A.   Yes.

18      Q.   And you didn't send any kind of a demand or any kind

19 of a letter or anything saying, hey, this is not okay; five

20 months is not okay; you're in breach, or anything of those

21 nature?

22 A.   First, it wasn't five months.

23      Q.   Yes or no.

24 A.   I had a conversation --

25      Q.   Yes or no.



ALEX FILIPPOV - Cross

1    A.   I had a conversation with Kagan on this subject.  He

2    said, we'll catch up.

3         Q.   Now, Mr. Kagan kept you advised on the progress of

4    this proper -- of this project, didn't he?

5    A.   Yes.

6         Q.   And you exchanged emails and text messages, correct?

7    A.   Yes.

8         Q.   And in fact, the three of you and your spouses went

9    out for dinner at the Barcelona to sort of discuss things,

10   correct?

11   A.   That was before the construction loan.

12        Q.   Right.  And in fact, that was the first time you

13   even met Tatiana, correct?

14   A.   Correct.

15        Q.   So she had nothing to do with this until well after

16   the operating agreement was signed, and the permitting issue

17   was done, and so on and so forth?

18   A.   That I don't know.

19        Q.   Okay.  Well, you certainly had no dealings with her?

20   A.   I didn't talk to her, but I didn't know if she has

21   anything to do with this or not.  She was member of KDC.

22        Q.   But you didn't know what KDC was, is your testimony,

23   correct?

24   A.   At that time, no, I didn't.

25        Q.   Now, yesterday, you told us that you understood that

ALEX FILIPPOV - Cross

1   the bank was going to be doing an appraisal of the property,

2   and you relied on that appraisal in deciding how much money

3   you were going to take out for the construction loans,

4   correct?

5   A.   Can you repeat again, please?

6        Q.   Sure.  We looked at the appraisal.

7             MR. PERTEN:  Exhibit 196, please.

8   BY MR. PERTEN:

9        Q.   Remember we looked at this yesterday?

10  A.   Um-hum.

11       Q.   And this was an appraisal that you reviewed in order

12  to decide that you wanted to do $1.6 million for the

13  construction loan, correct?

14  A.   I don't know that was the reason for taking the loan out

15  for $1.6 million, not that appraisal, but appraisal was done.

16       Q.   Okay.  And you reviewed this document, correct?

17  A.   Yes.

18       Q.   Okay.

19             MR. PERTEN:  J.P., could you scroll to the next page?

20  Down just a little bit more.  Stop.

21  BY MR. PERTEN:

22       Q.   So and you'll agree with me that --

23             MR. PERTEN:  And is there any way you can make this a

24  little bigger?  And scroll it over.  And drop down.  Okay.

25  BY MR. PERTEN:



ALEX FILIPPOV - Cross

1    Q.   Now, you understood, based on this appraisal, that

2    what was being contemplated, if you look at -- on the right-

3    hand side below all the checkboxes, that it was going to be

4    6,730 square feet of gross living area.  See that?

5    A.   Yes.

6    Q.   So as of April, you understood that the house that

7    was under consideration had that dimension, 6,730?

8    A.   Yes.

9    Q.   Correct?  In actuality, the house that was built was

10   significantly larger than that; isn't that correct?

11   A.   No.

12   Q.   Okay.  Now, on page 2 of this appraisal, they value

13   the sale price at 5.3 million, correct?

14   A.   Yes.

15   Q.   Which was consistent with what Kagan told you up

16   front, that the target sale price should be about five and a

17   quarter, correct?

18   A.   Yes.

19   Q.   Incidentally, if the sale price target is five and

20   and a quarter, you'd agree with me that listing it at five and

21   a half is reasonable; isn't that correct?

22   A.   Could be.

23   Q.   Okay.  And this appraisal also indicates -- so the

24   sales comparison approach, 5.3 million; cost approach,

25   4.354275.  You see that?



ALEX FILIPPOV - Cross

1    A.    I'm not even sure what cost approach is here.

2          Q.    Well, you --

3    A.    Yes.

4          Q.    -- understood that this was appraised in two

5    manners, sir.  One was comparative sale, and they said it was

6    5.3, or the cost if you had to replace this or build it would

7    be 4.354.

8    A.    Probably.  I never --

9          Q.    Okay.

10   A.    -- looked at this number.

11         Q.    And you'll certainly agree that's significantly more

12   than 1.3, isn't it?  We can agree that $4.3 million is more

13   than $1.3 million, can't we?

14   A.    May I suggest something?

15         Q.    No, you can't, sir.  Would you agree with me

16   that's --

17   A.    No, I wouldn't.

18         Q.    So $1.3 million and 4.3 are the same?

19   A.    $5.3 million include the land.

20         Q.    Now, sir, it's your testimony that this was a fixed-

21   price contract for $1.3 million for construction; is that

22   correct?

23   A.    Was maximum budget, yes.

24         Q.    Okay.  In point of fact, sir, that number has

25   changed.  At some point, you said it was $1.6 million fixed;



ALEX FILIPPOV - Cross

1    isn't that correct?

2    A.    Including carrying costs, yes.

3                    (Pause)

4        Q.    Okay.  So do you remember, sir, that you had your

5    deposition taken in a pending lawsuit involving Kagan

6    Development and Kristina Brusenkova?

7    A.    Yes.

8        Q.    And let me show you a copy of your deposition, sir,

9    from that.

10   A.    Yeah.

11       Q.    And I'd ask you to turn to page 98.  Mr. Carnathan

12   represented you at that deposition, too, did he not?

13   A.    Yes.

14       Q.    And on page 98, the lawyer representing Kagan in

15   that suit, a Mr. Savara (ph.), was asking you what was the

16   deal.  And on the top of page 98, you said, "I can summarize

17   very quickly, without any extra deals.  We had an agreement to

18   build this project for the fixed price of 1.6 million for

19   both, for each house."  Fixed price.

20   A.    Yes.

21       Q.    Did I read that correctly?

22   A.    Yes.

23       Q.    So that's a little different than saying we had a

24   fixed price for one point --

25                THE COURT:  You're not going to be recorded.



(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1            MR. PERTEN:  Thank you.

2            THE COURT:  You want to ask that again?

3            MR. PERTEN:  Sure.

4   BY MR. PERTEN:

5       Q.   So that's a little different, sir, than your earlier

6   testimony that it was fixed price of 1.3, isn't it?

7   A.   What I just said, it was a fixed price, including

8   carrying costs, five -- 1.6, didn't I?

9       Q.   Now, you also said, sir, that if there was any money

10  left over, that it would come back to you; isn't that correct?

11  A.   Yes.

12      Q.   Well, if it was a fixed price and that was the

13  price, whether it cost $20 million or $2 million, how is it

14  possible that you'd get any money back?  That couldn't happen;

15  isn't --

16  A.   No.

17      Q.   -- that correct?

18  A.   It could.

19      Q.   So sir, is it your testimony that it was open-ended,

20  and if you didn't spend 1.3, you get money back?  Is that your

21  testimony?

22  A.   Yes.  And in the budget section was contingency, $75,000

23  for each house.  That was the line, and that's exactly what it

24  was.

25      Q.   Now, when you were deciding how much construction

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1   loan to do, you had some communications with Mr. Zhukovskiy to

2   better understand the numbers in the Excel spreadsheet that he

3   prepared, correct?

4   A.   Yes.

5        Q.   All right.

6        MR. PERTEN:  Now, can you pull up Exhibit 203,

7   please?  Keep scrolling down.

8   BY MR. PERTEN:

9        Q.   On May 4th, 2003 (sic) at 11:01 p.m., you send an

10  email to everybody, correct, to Mr. Zhukovskiy, Mr. Maiden,

11  Mr. Kagan, Mr. Lipetsker, correct?

12  A.   Yes.

13       Q.   Incidentally, I note you didn't do the

14  lymancutlerllc.com (ph.) address, because you knew that Mr. --

15  Mr. Kagan doesn't use that email; isn't that correct?

16  A.   No, it isn't.

17       Q.   Well, you use vadimkagan@yahoo.com (ph.) in this

18  one; is that correct?

19  A.   I use -- but it's not because Mr. Kagan doesn't get

20  Lyman-Cutler, LLC email.  He was getting all the emails.

21       Q.   How do you know that, sir?

22  A.   Because it was on the distribution.  Everybody -- four

23  people were getting emails sent to Lyman-Cutler, LLC

24  automatically.

25       Q.   All right.  So in this email, sir, this is your

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    language.  Dima K. -- this is an email to Mr. Kagan, correct?

2    A.   Yes.

3        Q.   "I'm reviewing the original plan."  Here's what

4    plan -- "Original construction cost was estimated at $1.3

5    million."  Do you see that?

6    A.   Yes.

7        Q.   Original carrying cost per home was estimated at

8    200,000, correct?

9    A.   Yes.

10        Q.   Now, that's your language.  You understood, and

11   you're reciting that that was all an estimate.  That's what

12   you said, correct?

13   A.   Yes.

14        MR. PERTEN:  Keep scrolling.

15   BY MR. PERTEN:

16        Q.   You were hoping for a return of forty percent.  And

17   then you go on to say, "Here's where we are today.

18   Construction cost, as I understand you, $1.4 million",

19   correct?

20   A.   Yes.

21        Q.   So you knew before the construction actually started

22   that Mr. Kagan, at least as you understood it, had already

23   advised you that it was going to be at least $200,000 more

24   than originally anticipated, correct?

25   A.   No.



Page 81

ALEX FILIPPOV - Cross

1    Q.   It went from 1.3 to 1.4.

2    A.   But not because of this reason.

3    Q.   Well, sir, whatever the reason is, you understood,

4    sir, that what is now being proposed was that the construction

5    cost would be 1.4 per house?

6    A.   Yes.

7    Q.   And you also understood that the carrying costs,

8    which you had run at 200,000, was now going to be at least

9    $275,000 --

10   A.   And that was --

11   Q.   -- correct?

12   A.   Correct.  And it --

13   Q.   Correct?

14   A.   -- was calculated --

15   Q.   So --

16   A.   -- in error.

17   Q.   So in fact, Mr. -- this is information that you got

18   from Mr. Kagan, correct?

19   A.   Which one?

20   Q.   The here's what I -- "Here's where we are today",

21   still at the beginning of the project.  "Construction cost, as

22   I understood you", that's information from him?

23   A.   Yes.  When he --

24   Q.   And so in fact, sir, you'll agree with me that, at

25   the time you wrote this email, you anticipated was going to be

ALEX FILIPPOV - Cross

1    an additional $200,000 of construction costs, an additional

2    $150,000 of carrying costs, because it's two homes; went from

3    200 to 275?

4    A.    No.

5         Q.   Well, that's what you said, did you not?

6    A.    And --

7         Q.   Yes or no?  That's what it says.

8    A.    And if you read email further, you will see that --

9         Q.   Okay.

10   A.    -- is not accurate.

11        Q.   And Mr. Zhukovskiy --

12           MR. PERTEN:  May I have Exhibit 204, please?

13   BY MR. PERTEN:

14        Q.   At 3:14 a.m., in the wee hours of the morning --

15           MR. PERTEN:  Oh, I'm sorry.  3:14 a.m.  There we go.

16   BY MR. PERTEN:

17        Q.   -- Mr. Zhukovskiy responds with his analysis of the

18   numbers, correct?

19   A.    Yes.

20        Q.   And the reason you were talking with Mr. Zhukovskiy

21   is because he's the numbers guy, correct?  He understands

22   numbers; he developed the spreadsheets, correct?

23   A.    There are two reasons.

24        Q.   Yes or no?  He was the guy who had developed the

25   spreadsheet, and you understood he was good at numbers; that's

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    his background, correct?

2    A.    That's one of the reason, yes.

3         Q.    Okay.  And in fact, although the initial email that

4    we looked at was addressed to Dima Kagan, you never got a

5    response from Dima Kagan on that?

6    A.    Correct.

7         Q.    So Mr. Zhukovskiy starts responding, and he gives

8    you an executive summary.  But he says, starting at the top,

9    "Please realize this is an abbreviated version, since it's 3

10   in the morning.  Besides apparent financial benefits of the

11   project expansion, there is some positive risk aspects, which

12   are harder to quantify numerically."  You see that language?

13   A.    Yes.

14        Q.    So in fact, the context of this was that there was a

15   project expansion that was under consideration; isn't that

16   correct?

17   A.    That's correct.

18        Q.    So when you testified yesterday that Mr. Kagan never

19   told you about the project, never discussed anything, in fact,

20   you knew that there was a project expansion that you were

21   being asked to weigh in on; isn't that correct?

22   A.    No, it isn't.

23        Q.    Well, sir, you just told us that the context was

24   that the parties are discussing a project expansion; isn't

25   that correct?



ALEX FILIPPOV - Cross

1    A.   I didn't testify yesterday of what you putting words in

2    my mouth.  I said --

3         Q.   Sir, two minutes ago, you just told us that the

4    parties were discussing a project expansion; isn't that

5    correct?

6    A.   Right.  But you just said that I yesterday --

7         Q.   Yes or no?  Forget about yesterday.  Two minutes

8    ago, you told me that the parties were discussing a project

9    expansion, correct?

10   A.   Before construction loans were taken, that's correct.

11        Q.   Correct.

12   A.   Yes.

13        Q.   And in fact, Mr. Kagan came to you with a proposal

14   to build some sort of a fancier house; isn't that correct?

15   A.   That's correct.

16        Q.   All right.  So again, you understood in May of 2013

17   that Mr. Kagan came to you to discuss making a larger and

18   fancier house; isn't that correct?

19   A.   Not larger.  Fancier.

20        Q.   Not larger?

21   A.   Yeah.

22        Q.   Okay.  We'll come back to that.  But certainly,

23   fancier?

24   A.   It was -- yeah.

25        Q.   And when I asked you about this at the deposition,

ALEX FILIPPOV - Cross

1   you couldn't really remember the details; do you remember

2   that?

3   A.   Correct, yes.

4        Q.   So in fact, when you -- you're not in any position,

5   sir, to refute, one way or the other, exactly what the nature

6   of the expansion was or what the fancier component was; isn't

7   that correct?  You don't remember?

8   A.   I don't remember, exactly, yes.

9        Q.   But you do remember there was absolutely a

10  conversation about changing the home, making it -- expanding

11  the project and making it fancier?

12  A.   Yes.

13       Q.   Okay.  And you under --

14            MR. PERTEN:  Strike that.

15  BY MR. PERTEN:

16       Q.   Now, if we scroll down on Mr. Zhukovskiy's

17  initial --

18            MR. PERTEN:  Go to the end of this email.

19  BY MR. PERTEN:

20       Q.   He goes through a whole analysis.  Then, on a

21  personal note -- really, really personal note -- "I think the

22  important takeaway is to understand that these calculations

23  are based on estimates".  So you understood, sir, that all of

24  the calculations are still based on estimates, correct?

25  A.   Yes.



ALEX FILIPPOV - Cross

1    Q.  Now, sir, the next thing -- let's move from this.  We

2    looked at Exhibit 187.  I'm sorry.  We looked at this where

3    you were told you were going to be signing a contract with

4    KDC.

5        MR. PERTEN:  Could you pull up Exhibit 36, please?

6    BY MR. PERTEN:

7    Q.   We looked at this contract, briefly, yesterday, the

8    Classic Homes Development & Construction, LLC contract,

9    correct?

10   A.   Yes.

11   Q.   And this is an agreement that you signed on behalf

12   of the LLC; isn't that correct?

13   A.   Yes.

14   Q.   And you understood, because you're a businessman and

15   you know what you're doing, that when you sign an agreement,

16   that carries with it certain obligations; isn't that correct?

17   A.   Yes.

18   Q.   And certainly, it would -- you wouldn't be signing

19   an agreement unless you intended to be bound by it; isn't that

20   correct?

21   A.   In this particular case, no.

22   Q.   Okay.  So you signed an agreement, and you did not

23   intend to be bound by it; is that your testimony?

24   A.   Correct.

25   Q.   All right.  So as the managing partner of the LLC,

ALEX FILIPPOV - Cross

1   you are signing a binding agreement which you don't intend to

2   comply with; is that correct?

3   A.    That was --

4         Q.    Yes or no?

5   A.    That was presented to me as a formality.

6         Q.    I didn't ask you why it was presented.  I asked you

7   did you understand --

8   A.    Yes.

9         Q.    Thank you.  Now, sir, let's scroll down on this

10  agreement.  You read this agreement before you signed it;

11  isn't that correct?

12  A.    I looked it through.

13        Q.    And in paragraph 2, it says, "The terms of this

14  contract include all documents specifically listed below."

15  And it says, "Architectural plans and drawings dated", and

16  it's not filled in, correct?

17  A.    Correct.

18        Q.    And the reason it's not filled in is because you

19  still didn't have plans at this point; isn't that correct?

20  A.    The reason it was -- that it was a formality, nobody --

21  at this point, nobody cared.

22        Q.    Nobody cared.  So it's your testimony, sir, that as

23  the managing partner of an LLC, you can just sign an agreement

24  and ignore it because nobody cares; is that your testimony?

25  A.    That was mortgage document.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1      Q.   That was a mortgage document.  So you would just

2   sign whatever needed to be signed, and you didn't care if it

3   was binding or not; is that your testimony?

4   A.   Correct.

5      Q.   All right.

6         MR. PERTEN:  Let's scroll down.  Keep going.

7   BY MR. PERTEN:

8      Q.   Now, this contract has completion time, and it says,

9   forty-four weeks.  You see that?

10  A.   Yes.

11     Q.   That's different than what you agreed to in the

12  operating agreement for substantial completion, isn't it?

13  A.   That was a template that never was edited or negotiated.

14     Q.   I'm sorry?

15  A.   That was a template agreement that never was edited or

16  negotiated.

17     Q.   Okay.  And let's keep going down.  "Contract price,

18  the builder agrees to construct a house according to the

19  plans.  As consideration for the builder constructing a house,

20  the owner agrees to pay the builders', contractors', and

21  trades' full cost and expenses on a weekly basis."  Do you see

22  that?

23  A.   Yes.

24     Q.   It doesn't say that the contract is capped at $1.3

25  million, does it?

ALEX FILIPPOV - Cross

1   A.    It doesn't.

2        Q.    In fact, the agreement that you signed was open-

3   ended:  you will pay for the cost.  That's what you agreed in

4   this agreement; isn't that correct?

5   A.    Yes.

6        Q.    And certainly, sir, if there was an agreement to cap

7   at $1.3 million, you wouldn't be signing a contract that was

8   open-ended.  That would be foolish; isn't that correct?

9   A.    Right.

10       Q.    And, sir, if you thought -- you understood that

11  Classic Homes was a Kagan company, correct?

12  A.    Yes.

13       Q.    And if you thought that Mr. Kagan's company was not

14  entitled to charge for its time, you certainly wouldn't be

15  signing a contract that obligated the LLC to pay money on a

16  weekly basis for the costs incurred by Mr. Kagan's company;

17  isn't that correct?

18  A.    I didn't read this agreement.  It was told to me that it

19  was a formality.  That agreement never was read, never was

20  edited.  That's why it has forty-four weeks.

21       Q.    Sir, let's turn to page 206 of your deposition --

22  206 of your deposition, sir, volume 1.  We're talking about

23  the Classic Homes contract.  And I asked you at the top, 206,

24  "Did you ever discuss this document with Mr. Kagan prior to

25  June 28th, 2013?"  Answer, "I don't remember."



ALEX FILIPPOV - Cross

1       Question, and you agree -- "And you agree that you read

2    this and signed this, correct?"

3    A.   Yes.

4       Q.   Your answer was, "Yes, during the signing, yes."  So

5    you read this agreement, sir.

6    A.   I --

7       Q.   You didn't just sign it, blindly.

8    A.   I looked it through, yes.

9       Q.   During the course of this project, you never saw any

10   checks to Classic Homes, correct?

11   A.   No.

12      Q.   And as far as you know, they never did any work on

13   this project, correct?

14   A.   Correct.

15      Q.   You never saw any bills from Classic Homes?

16   A.   No.

17      Q.   And you're the managing member.  You sign a

18   contract, which you read.  You don't ask any questions, do

19   you?

20   A.   I can repeat about formality of this contract that never

21   was part of the actual agreement.

22      Q.   And sir, you never saw any bills from Classic Homes,

23   correct?

24   A.   No.

25      Q.   But you did see checks that were being cut to KDC,

eg

ALEX FILIPPOV - Cross

1    Kagan Development --

2    A.   Yes.

3         Q.   -- didn't you?

4    A.   Yes.

5         Q.   And in fact, sir, when you went to the site, there

6    was a construction fence around, and you saw the sign on it

7    that said Kagan Development, KDC, correct?

8    A.   Yes.

9         Q.   And you saw on the few emails you got from the Kagan

10   people that it was always @kagandevelopment.com (ph.),

11   correct?

12   A.   Yes.

13        Q.   So you certainly knew there was large chunks of

14   money that were being sent to Kagan Development, correct?

15   A.   Yes.

16        Q.   And you also knew that Kagan Development was another

17   Kagan company, correct?

18   A.   Yes.

19        Q.   Yet you tell us that you didn't know we had a

20   contract.  So why didn't you ask?  Why didn't you ask, why are

21   we cutting checks to Kagan Development?  You never asked that

22   question, did you?

23   A.   No.

24        Q.   You're the managing partner, sir, of this LLC.  It's

25   your job to monitor everything that's going on.  You're seeing

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 92

ALEX FILIPPOV - Cross

1   checks, because they're telling you.  You're getting copies of

2   checks to Kagan Development.  And you never asked why those

3   are going to Kagan Development, correct?

4   A.   I never asked.  That's correct.

5        Q.   Okay.

6           MR. PERTEN:  Now, J.P., can you -- hold on a second.

7   BY MR. PERTEN:

8        Q.   You did find out, eventually, that KDC -- that there

9   was a contract that Mr. Kagan signed with Kagan Development,

10  correct?

11  A.   After the litigation started, yes.

12          MR. PERTEN:  Hey, could you bring up Exhibit 215,

13  please?

14  BY MR. PERTEN:

15       Q.   Isn't it true that Mr. Kagan sent you a copy of the

16  Kagan Development contract?

17  A.   Complete lie.

18       Q.   Sir, I've pulled up Exhibit 215.  Lyman-Cutler --

19  this is an email dated August 21st, 2013 to Vadim -- from

20  Vadim to Polly Savant (ph.) @hotmail.com to

21  lymancutlerllc@gmail.com (ph.).  You see that?

22  A.   Yes.

23       Q.   And the lymancutler@gmail.com (ph.) is the email

24  that you set up for this project, that everybody had access,

25  right?



ALEX FILIPPOV - Cross

1   A.   That's correct.

2        Q.   And this is an email from Ryan at Mr. Kagan's

3   office.  "At Vadim's request, I'm forwarding this conversation

4   and attachments.  I've included the GC agreement as Vadim

5   requested."

6   A.   Yes.

7        Q.   Did I read that correct?

8   A.   Yes.

9        Q.   So in fact, sir, there was an email that went to

10  lymancutlerllc.com with the GC contract; isn't that correct?

11  A.   No.  It isn't.  In fact, this is a fraud.  This --

12       Q.   This is a fraud?

13  A.   This email is --

14       Q.   Oh, okay.

15  A.   -- complete fraud.

16       Q.   And it's a fraud because you don't remember it; is

17  that correct?

18  A.   No.

19       Q.   Thank you, sir.

20  A.   There are diff -- different reason.  I can --

21       Q.   Now --

22  A.   -- provide you the answer.

23       Q.   Excuse me.

24           THE COURT:  When you're close to -- when you finish a

25  line, let me know.  It's 11 o'clock.  We'll take a --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1          MR. PERTEN:  We can take a break right now.

2          THE COURT:  Is now a good time?

3          MR. PERTEN:  Sure.

4          THE COURT:  Okay.  Let's take about a fifteen-minute

5    break, okay?

6          THE CLERK:  All rise.  Court's in recess.

7               (Off the record at 11:02:26 a.m.)

8               (On the record at 11:19:27 a.m.)

9          THE CLERK:  (Audio begins mid-sentence) is now in

10   session.

11         THE COURT:  Be seated.

12         Proceed whenever you're ready.

13         MR. PERTEN:  Thank you, Your Honor.

14               RESUMED CROSS-EXAMINATION

15   BY MR. PERTEN:

16    Q.   Now, Mr. Filippov, right before we broke, we were

17   talking about, briefly, the KDC contract, correct?  You

18   understand there was --

19   A.   Yes.

20    Q.   -- there was a contract with KDC, correct?

21   A.   It was a contract that -- we learned that there is a

22   contract --

23    Q.   Well --

24   A.   -- yes.

25    Q.   -- you understood, though, that that's an

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1   enforceable agreement; isn't that correct?

2   A.    No.

3       Q.    Okay.

4           MR. PERTEN:  Can I have this overhead, please?

5           THE CLERK:  Oh, sure.

6   BY MR. PERTEN:

7       Q.    Now, sir, in your adversary complaint, as we looked

8   at it earlier, you reviewed the allegations to make sure they

9   were all accurate, correct?

10  A.    I -- I don't remember right now what --

11      Q.    Well --

12  A.    -- the discussion is here.

13      Q.    Sir, let me read to you paragraph --

14          THE CLERK:  You might want to pull the microphone

15  over.

16          THE COURT:  Thank you.

17  BY MR. PERTEN:

18      Q.    Paragraph 78 of your adversary complaint states,

19  "The company", which is Lyman-Cutler, "entered into a contract

20  with defendant KDC that required, among other things, that KDC

21  perform its work in a good and workmanlike manner."  Do you

22  see that allegation?

23  A.    No, I don't.

24      Q.    The top of the --

25  A.    I --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

 1        Q.   -- page, page 78.

 2    A.   I see --

 3        Q.   -- paragraph --

 4    A.   -- 79.

 5        Q.   -- 78.  I'm sorry?

 6    A.   I see 79.  I do not see the top on my computer.  Yeah,

 7    here we go.  Yeah.

 8        Q.   You see that?

 9    A.   Yeah.

10        Q.   So you understand, sir, that you made an allegation

11    in this complaint that Lyman-Cutler had a contract with KDC.

12    You understand that, sir, don't you?

13    A.   No.

14        Q.   Because that's not -- and in fact, that's a true

15    statement.  You had a contract; isn't that correct?

16    A.   No.

17        Q.   So sir, when you filed a complaint and made a

18    factual allegation that there was a contract with KDC, were

19    you lying?

20    A.   I wasn't lying, but that's not accurate.

21        Q.   Okay.  So that's another inaccuracy?

22    A.   Yes.

23        Q.   Now, you did, eventually, review the KDC contract,

24    did you not?

25    A.   Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    Q.   And you saw that it, just like the Classic Homes

2    contract, was open-ended, correct?  It wasn't fixed price?

3    A.   Yes.

4    Q.   Okay.  So you understood that you were contractually

5    obligated to pay some Kagan company some amount of money for

6    costs incurred in the construction of this project?

7    A.   Absolutely not.

8    Q.   Now, sir, you told us that that Classic Homes

9    contract was part of the construction loan, correct?

10   A.   Yes.

11   Q.   And you understood that it was being submitted as

12   part of the documentation that the bank required in order to

13   close the loan, correct?

14   A.   Correct.

15   Q.   And I believe you testified at your deposition, sir,

16   that you're the guy who negotiated the construction loan with

17   Rockland Trust Company, correct?

18   A.   Correct.

19   Q.   So you're submitting what you claim are false

20   documents to Rockland Trust Company to support the

21   construction loan; is that your testimony?

22   A.   Yes.

23   Q.   Okay.  Now, you also understand, sir, that the

24   construction loan says that the money needs to be used for

25   construction costs, correct?



ALEX FILIPPOV - Cross

 1   A.   Yes.

 2        Q.   And it does not say it can be used for carrying

 3   costs, correct?

 4   A.   Yes.

 5        Q.   And notwithstanding that you understood that, under

 6   the operating agreement, it specifically said that you were

 7   supposed to get a construction loan that covered carrying

 8   costs, you agreed to a loan that did not include carrying

 9   costs; isn't that correct?

10   A.   Can you repeat again, please?

11        Q.   Sure.  The loan --

12             MR. PERTEN:  Can we pull up the operating agreement,

13   please?  It's Exhibit 12.  Scroll down to 4.1.

14   BY MR. PERTEN:

15        Q.   4.1 of the operating agreement says, "Each member

16   has transferred and contributed to the capital of the company

17   the capital amounts as set forth in Schedule A.  Furthermore,

18   a purchase-money loan and construction loan shall be taken

19   from Rockland Trust Company to pay for construction and

20   carrying costs until issuance of certificates of occupancy."

21   You see that language, sir?

22   A.   Yes.

23        Q.   So you understood, sir, that the construction loan

24   that you were taking out, that you were obligated to take out,

25   that you negotiated, was to cover carrying costs, correct?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    A.    Yes.

2         Q.    And you also understood that it did not, correct?

3    A.    No, I didn't.

4         Q.    Well, you certainly have read the documents and

5    understand that those are earmarked for construction?

6    A.    Not at the time of signing the mortgage.

7         Q.    But you've since learned that, correct?

8    A.    After the litigation, yes.

9         Q.    Okay.  And the reason you didn't know that the

10   documents actually prohibited using construction loans for

11   carrying costs was that you didn't read them at the closing;

12   isn't that correct?

13   A.    Correct.

14        Q.    And the reason you didn't read them is because there

15   was a stack of documents, and it was simply too voluminous to

16   expect you to read every document, correct?

17   A.    That's correct.

18        Q.    And your position on that fact, it really doesn't

19   matter, because you can't be expected to comply with every

20   law; isn't that what you testified about?

21   A.    I misuse the word "law" with every rule, yes.

22        Q.    All right.  So let's look at page 172 and 173 of

23   your deposition.  On page 172, we're talking about the

24   closing, starting at page 8 -- line 8, I'm sorry.  172, line

25   8, "Did Mr. Maiden go through the entire stack of documents

Page 100

ALEX FILIPPOV - Cross

1    and review them with you and tell you what you were signing?"

2    Answer, "I think so.  I don't remember.  I was at so many

3    closings in my life that I don't remember what that closing

4    was" -- what that closing was.

5        Question, "Well, you just said there was a stack of

6    documents and you just signed them without reading them; is

7    that correct?"  Answer, "Well, he probably explained to me.  I

8    don't remember the details of this particular date, yes."

9        Question, "And do you know, as you sit here today,

10   whether the construction loan that you signed permitted the

11   proceeds to be used for carrying costs?"  Answer, "I read that

12   it doesn't.  But at that point, again, Kagan said it's common

13   practice.  So if there are certain things that you sign, even

14   if it's common practice -- you know that it's how the business

15   is done -- and it was okay with me, actually.  Even though I

16   would be told you cannot do this, I would probably say, look,

17   there is no way to obey every law."

18       Did I read that correct?

19   A.   Yes.

20       Q.   And in fairness to you, you did send an errata sheet

21   and change the word "law" to "rule".  So your position is it's

22   okay if you don't obey every law, or it's okay if you don't

23   obey every rule, correct?

24   A.   It's okay not to obey certain rules, yes.  That's my --

25       Q.   Okay.

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    A.    -- position.

2         Q.    And it was your understanding, you told us

3    yesterday, that the construction budget that was submitted to

4    the bank as part of the loan documents, you understood it was

5    inflated so that carrying costs would be included in the

6    amount, correct?

7    A.    Yes.  Yes.

8         Q.    Notwithstanding that the disbursement schedule

9    doesn't actually say carrying costs; it's hidden in there,

10   correct?

11   A.    Yes.

12        Q.    And you knew that going in, correct?

13   A.    Yes.

14        Q.    So sir, not only are you submitting a construction

15   contract that you claim was of no force and effect, you're

16   also lying to the Rockland Trust Company and telling them that

17   it's going to be disbursed one way, knowing full well that you

18   were going to use it for carrying costs; isn't that correct?

19   A.    It's not just me lying.  Mr. Kagan lying the same way.

20        Q.    Well, sir, you signed the construction loan; isn't

21   that correct?

22   A.    Yes.

23        Q.    You guaranteed the construction loan; isn't that

24   correct?

25   A.    Yes.



ALEX FILIPPOV - Cross

1    Q.   You are the managing partner of the LLC; isn't that

2    correct?

3    A.   Yes.

4    Q.   And you understood, sir, as the managing partner of

5    the LLC, that if the bank caught on to the fact that you were

6    lying or misrepresenting, they could call that loan; you

7    understood that?

8    A.   Technically, yes, but they knew about this.  The bank

9    knew about this.

10   Q.   Sir, you understood that by signing a document and

11   making falsehoods, you were jeopardizing --

12   A.   Yes.

13   Q.   -- the LLC because the bank could certainly call the

14   loan and accuse you of some sort of fraud?

15   A.   Yes.

16   Q.   You understood that?

17   A.   Yes.

18   Q.   And you determined that it was in the best interests

19   of the LLC, did you not, to lie to the Rockland Trust Company;

20   isn't that correct?

21   A.   I didn't lie.

22   Q.   You didn't lie; you just submitted false material;

23   is that correct?

24   A.   I didn't read this particular sentence, back then, about

25   carrying costs not allowed.



Page 103

ALEX FILIPPOV - Cross

1      Q.   And when you did read it and you understood it, you

2   didn't contact the Rockland Trust Company and say, oops, I

3   misrepresented what I sent you, sorry, or words to that

4   effect, did you?

5   A.   After the litigation started?

6      Q.   Now, this whole thing -- you told us that Mr. Kagan

7   told you that the disbursement schedule was inflated; that's

8   your testimony, correct?

9   A.   Yes.

10     Q.   In fact, do you recall, at your deposition, you told

11  me that you actually had no memory of that, and in fact, you

12  had to email Mr. Zhukovskiy, and Mr. Zhukovskiy told you

13  that's what Mr. Kagan said?  Recall that?

14  A.   No.

15     Q.   Well, let's look at page 222, 223.

16        MR. PERTEN:  If you'd bring up Exhibit 277.

17  BY MR. PERTEN:

18     Q.   Now, let's look at number 277.  That's an email that

19  you sent to Mr. Zhukovskiy on May 25th, 2015, correct?

20  A.   Correct.

21     Q.   And that, if you will, May 25th, 2015 is about two

22  weeks after you received a lawyer letter on May 7th, 2015,

23  correct?

24  A.   Yes.

25     Q.   And you're reaching out to Mr. Zhukovskiy, who

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    you're calling Dima.  This isn't Dima Kagan; this is Dima

2    Zhukovskiy, correct?

3    A.   Correct.

4         Q.   And you ask a question.  "In the building budget

5    sheet, there's a budget shown for, one point -- 1,500,000.

6    There is no carrying costs included.  However, in the project

7    sheet, there's 1.3 million and 200 carrying costs.  There's

8    some discrepancy here, and Vadim is claiming it."  Do you

9    remember how that came out?

10   A.   Yes.

11        Q.   So in May of 2015, you had no recollection that

12   Vadim, supposedly, told you that these were inflated.  You had

13   to have Mr. Zhukovskiy remind you of that fact, right?

14   A.   No.  That's not what it says.

15        Q.   You're --

16   A.   I'm --

17        Q.   -- asking Mr. Zhukovskiy what happened?

18   A.   I'm asking if he have the memory.  It doesn't say that I

19   do not have a memory of this.

20        Q.   Okay.  Now, sir, part of your duties and

21   responsibilities as the managing partner was to pay the debt

22   service on these loans; isn't that correct?

23   A.   Yes.

24        Q.   And every time the balance went low and you couldn't

25   cover the debt service, you contacted Mr. Kagan and told him

ALEX FILIPPOV - Cross

1  to deposit more money; isn't that --

2  A.   Yes.

3      Q.   -- correct?

4  A.   Yes.

5          MR. PERTEN:  Can we see Consolidated Exhibit number

6  316, Mr. Harris?

7  BY MR. PERTEN:

8      Q.   So if you could agree with me on 316, "On 6/18/2014,

9  Dima called me.  There's not enough funds.  There's not enough

10  funds to pay loan today", correct?

11  A.   Yes.

12     Q.   Let's look at the next one, an email, July of 2013.

13  "Dima, we need more funds from bank to pay taxes", correct?

14  A.   Yes.

15         MR. PERTEN:  Keep going.

16  BY MR. PERTEN:

17     Q.   July 11th, "There's not enough funds in account.  As

18  of today, we only have" eleven -- sixteen-thousand --

19  eighteen -- "16,634", and you're asking for more funds,

20  correct?

21  A.   Yes.

22     Q.   7/18, "To cover payments, we need $3,500 to be

23  added", correct?

24  A.   Yes.

25     Q.   And you tell him what's coming up, correct?



ALEX FILIPPOV - Cross

1    A.   Yes.

2         Q.   "Dima, you've written checks", so he was sending you

3    copies of checks.  "You've written checks, but there's no

4    money in the account as of today", okay?

5    A.   Yes.

6         Q.   You want more money.  Let's keep going.  December

7    17th, "Vadim, there's several payments going out", and you

8    need funds transferred, correct?

9    A.   Yes.

10        Q.   January 13, "We're going to make advances.  As you

11   know, there's almost no funds in our bank account", correct?

12   A.   Yes, yes.

13            MR. PERTEN:  We've got some extras in there.  Keep

14   going.

15   BY MR. PERTEN:

16        Q.   Again, another text message from June of 2014,

17   "There's not enough funds to pay the loan today", correct?

18   A.   Yes.

19        Q.   Again, in June of '14, asking for more money?

20   A.   Yes.

21        Q.   And we could keep going and going.  There's multiple

22   times that you are saying to Mr. Kagan, we need more money in

23   the account.  And you understood, did you not, that when you

24   requested money, money was put in, correct?

25   A.   Yes.

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    Q.   And that money wasn't coming from the bank, from the

2    construction-loan disbursement, correct?

3    A.   No.

4    Q.   So you understood that Mr. Kagan, either himself or

5    his business, somebody was putting that money in, correct?

6    A.   No.

7    Q.   Well, where did the money come from?

8    A.   Kagan was taking money from the bank and then putting it

9    back.

10    Q.   Oh.  That's your story?

11    A.   That's my story.

12    Q.   Okay.  And in fact, sir, if we could look at Exhibit

13    291 --

14        MR. PERTEN:  You have to rotate that.  Can you make

15    it a little bigger?

16    BY MR. PERTEN:

17    Q.   Mr. Filippov, Exhibit 291 you had identified at your

18    deposition as the Lyman-Cutler QuickBooks accounts that you

19    kept.  You recognize that?

20    A.   Yes.

21    Q.   Okay.  And in fact, let's scroll down to the entry

22    on July 23rd.  There, it says, "Fund transfer", question mark,

23    "Kagan carrying cost".  You see that?

24    A.   Show me again.  Where?

25    Q.   It's July 23rd, "Kagan carrying costs, $3,500".



Page 108

ALEX FILIPPOV - Cross

1    A.    July -- yes.

2        Q.    Okay.  So that's your entry that Mr. Kagan was

3    putting in carrying costs, correct?  That's your entry?

4    A.    That's Arina's entries, and it's mislabeled.

5        Q.    Oh, so you didn't keep your QuickBooks accurately;

6    is that what your testimony is?

7    A.    Well, it could be kept accurately, but it's mislabeled.

8        Q.    Okay.  Well, certainly, sir, this whole case is

9    about your contention that we didn't properly keep our

10   QuickBooks accurately, but it's okay if you don't; is that

11   what your testimony is?

12   A.    There is no issue with numbers in the books we -- we

13   kept.

14       Q.    Okay.  So let's move on.  We also see September

15   19th, 2013.  Where are my notes?  Again, "Kagan carrying

16   costs".  Do you see that?

17   A.    Yes.

18       Q.    And we see it again on November 29th, 2013, "Kagan

19   carrying costs" again.  See that?

20   A.    Yes.

21       Q.    And we see it on January 8th, 2014 and January 15th,

22   2014?

23   A.    Yes.

24       Q.    And we see it on May 2nd, right?

25   A.    Yes.



ALEX FILIPPOV - Cross

1    Q.    And we see it on June 18th and July 1st -- excuse

2    me, July 3rd and October 9th and November 18th and November

3    25th, correct?

4    A.    Yes.

5    Q.    So your own books and records, sir, indicate that

6    these are Kagan paying the carrying costs; isn't that correct?

7    That's --

8    A.    It's --

9    Q.    -- what it says?

10   A.    If that's what it says, it's mislabeled.

11   Q.    Thank you.  Now, as the managing partner, you

12   understood that it's your responsibility to supervise the

13   whole project; isn't that correct?

14   A.    Yes.

15   Q.    Now, Kagan was sending you copies of checks in real

16   time, as payments were being made on this project; isn't that

17   correct?

18   A.    Sometimes, not in real times.

19   Q.    Well, let's look at Exhibit number 315.  It's a

20   consolidated exhibit.  We see on January 11th of 2013, he's

21   sending you a check.

22        MR. PERTEN:  You can scroll down.

23   A.    Yeah.

24   BY MR. PERTEN:

25   Q.    Showing that he paid a check to Peter Nolan (ph.),

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1   correct?

2   A.   Yes.

3        Q.   Then we see --

4             MR. PERTEN:   Keep going.

5   BY MR. PERTEN:

6        Q.   There's a better picture of that check to Peter

7   Nolan, correct?  Incidentally, that's a Kagan Development KDC,

8   Corp. check, correct?

9   A.   Yes.

10       Q.   So he's telling you, I'm paying -- making payments

11  and sending you copies of the check, correct?

12  A.   Yes.

13       Q.   All right.  Let's keep going.  Keep going, now the

14  Peter Nolan check.  And we have, June of 2013 -- what do we

15  have there?  He's sending you invoices for AJM Group, Inc.,

16  correct?

17  A.   Very rarely.

18       Q.   Well, certainly, sir, you got invoices, didn't you?

19  A.   Occasionally.  Very rarely.  Few invoices.  The check

20  from Mr. Nolan doesn't have invoice, as far as I remember.

21       Q.   Let's keep going.  Again, he sends you, in August, a

22  beautiful picture and then --

23  A.   Yeah.

24       Q.   -- another check on Lyman-Cutler to Ps Tree Service,

25  correct?



(973) 406-2250 | operations@escribers.net | www.escribers.net

A. Yes. No details.

Q. August 29th, NSTAR. He's telling you he's making payments to NSTAR, correct?

A. Yes.

Q. "Please see attached reimbursement to KDC" -- I'm sorry -- "for 55 Lyman and 88 Cutler." So he was telling you what he was reimbursing to KDC, correct?

A. Yes.

Q. And there it is. There's a check for 29,200, correct? And he tells you it's for building permits, right in the memo, correct?

A. Yes. Yes.

Q. And you didn't say, well, wait a minute; why is KDC providing -- getting building permits; I don't even know who they are? You didn't ask that question, did you?

A. No.

Q. Okay. Let's keep going. Again, we have more to AJM, correct, architectural and structural --

A. Yes.

Q. -- plans, sending you a copy of the check and the invoice?

A. No invoice for DaCosta.

Q. For DaCosta, another one of the contractors, for $10,000?

A. Yeah, but no invoice, just payment.

ALEX FILIPPOV - Cross

 1       Q.   Now, sir, I mean, we could keep going.  There's

 2   probably seventy or eighty checks here --

 3   A.   Yes.

 4       Q.   -- that were all sent to you, many of them with

 5   invoices, you'll agree?

 6   A.   Few.

 7       Q.   Few with invoices.  And as managing partner, when

 8   you saw a check with no invoice, you certainly had the right

 9   to ask for the invoice.  But you didn't care, did you?

10   A.   Correct.

11       Q.   I'm sorry?

12   A.   Correct.

13       Q.   Correct.  So when you, suddenly, are telling me and

14   telling this Court that it was a big deal that you got no

15   backup, in fact, you were sent copies of the checks and you

16   never asked, did you?

17   A.   Because it was fixed budget.

18       Q.   And the reason you didn't ask is because Mr. Kagan

19   was keeping you up to date, Mr. -- you knew what he was doing;

20   isn't that correct?

21   A.   No.

22       Q.   And as managing partner, when you saw checks being

23   cut, you didn't ask any questions; isn't that correct?

24   A.   It was a fixed budget.  It wasn't important.

25       Q.   And he also let you know, sir, that he was making

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1   checks to KDC.  We saw one of them.  Let's pull up Exhibit

2   229.

3   A.   Yes.

4        MR. PERTEN:  229, please.

5   A.   And that was his internal business.

6   BY MR. PERTEN:

7        Q.   Well, it's more than his internal business, sir.

8   You've alleged that he defrauded you by not telling him.  So

9   obviously, you feel this very strongly.  So here, sir, he sent

10  you a check, showing he'd made a payment to Kagan Development

11  of twenty grand, correct?

12  A.   Yes.

13       Q.   And let's look at 230, Exhibit 230.  Again, this

14  one's a copy of a payment he made for $80,000 to KDC?

15  A.   Yes.

16       Q.   So he's letting you know.  He's not doing this in

17  secret.  He's letting you know; isn't that correct?

18  A.   Letting us know what?

19       Q.   That he's cutting checks to Kagan Development.

20  A.   Yes.

21       Q.   So that's not a newsflash; you knew that?

22  A.   Yes.

23       Q.   All right.  236, Exhibit 236.

24  A.   We also knew that it's his company, own company.

25  Basically, he is doing this for himself.



ALEX FILIPPOV - Cross

1    Q.   236 is an invoice from KDC, which he paid.  And he

2    tells you what it is, reimbursements for Amex for closing,

3    correct?

4    A.   Yes.

5    Q.   All right.  Let's look at 237, please, another copy

6    of a check to Kagan Development.  So you'd agree you got all

7    these copies, correct?

8    A.   Yes.

9    Q.   And if you had concerns or if you thought there was

10   something nefarious, something untoward, you could've asked,

11   correct?

12   A.   Right.  At this --

13   Q.   All right.

14   A.   -- time, we didn't think it was nefarious.

15   Q.   And sir, let's look at 241.  Here again, we issued a

16   check to KDC for 99,000 and change for Amex, correct?

17   A.   Yes.

18   Q.   So he's telling you exactly what it is.  And you

19   have access to this, correct?

20   A.   Yes.

21   Q.   And in fact, sir, you get bank statements with

22   copies of the checks every month, correct?

23   A.   Correct.

24   Q.   And that is Exhibit 289.  These are Rockland Trust

25   accounts for Lyman-Cutler.



ALEX FILIPPOV - Cross

1           MR. PERTEN:  Scroll down.

2    BY MR. PERTEN:

3        Q.   And it's not just the bank statement.  It has copies

4    of the checks attached, too, doesn't it?

5    A.   Yes.

6        Q.   So you knew every deposit; you knew every debit and

7    every check; isn't that correct?

8    A.   Correct.

9        Q.   All right.  And he also told you what he was paying

10   to ProEx; isn't that correct?

11   A.   Yes.

12       Q.   So let's look at Exhibit 216, ProExcavation.  He's

13   letting you know, correct?  He's sending you a copy of the

14   check for excavation foundation --

15   A.   Yes.

16       Q.   -- correct?  And let's look at 231.

17           MR. PERTEN:  Keep going.

18   BY MR. PERTEN:

19       Q.   Another ProEx payment for $40,000, correct?

20   A.   Yes.

21       Q.   All right.  235, another check to ProExcavation,

22   correct?

23   A.   Yes.

24       Q.   238.

25           MR. PERTEN:  Would you go back?

ALEX FILIPPOV - Cross

1   BY MR. PERTEN:

2       Q.   "Please review issued checks during this week.  Also

3   was issued check 104 in the amount of 30,000 to ProEx."  So

4   he's letting you know, correct?

5   A.   Yes.

6       Q.   239, again, Arina.  That's to your wife.  "Just to

7   let you know, there were three checks issued to ProEx in the

8   amount of 45,000.  Also, a check for water and sewer and a

9   check for liability insurance to Segal Insurance", correct?

10  A.   Correct, yes.

11      Q.   And 258, again, he's letting you know that he's

12  sending checks -- cutting checks to ProExcavation, correct?

13  A.   Yes.

14      Q.   So he certainly wasn't being secretive or trying to

15  keep this from you.  He was telling you; isn't that correct?

16  A.   Correct.

17      Q.   And not only was he telling you that he was cutting

18  checks, he was also copying you on the disbursement requests

19  to the bank; isn't that correct?

20  A.   Disbursements --

21      Q.   The loan, the construction --

22  A.   The loan --

23      Q.   -- loan disbursement requests.

24  A.   Some of them, yes.

25      Q.   So let's look at 226, please.



ALEX FILIPPOV - Cross

1          MR. PERTEN:  Scroll.

2     BY MR. PERTEN:

3          Q.   88 Cutler and construction advance, and there is a

4     construction advance request, correct --

5     A.   Yes.

6          Q.   -- telling what is done, how much he's

7     requisitioning, correct?

8     A.   Yes.

9          Q.   And let's look at 227.  Lyman advance number 5, this

10    one example is.  And again, he's sending you the construction-

11    advance request form, so that you know what's happening,

12    correct?

13    A.   Yes.  Yes.

14         Q.   This is 228, advance number 6.  And again, he's

15    sending you that.  It's a small copy.  232 and 233, again,

16    he's letting you know once again, correct?

17    A.   Yes.

18         Q.   233 -- okay.  So Mr. Filippov, you've filed a

19    lawsuit, and you've alleged that you were being kept in the

20    dark.  In point of fact, sir, you got copies of checks,

21    correct?

22    A.   Yes.

23         Q.   You got bank statements showing every deposit and

24    every check that was cut, correct?

25    A.   Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1      Q.   You got emails from Mr. Kagan's office, telling you

2   that he's cutting checks to KDC, correct?

3   A.   Yes.

4      Q.   You got emails and copies of checks to

5   ProExcavation; isn't that correct?

6   A.   Yes.

7      Q.   You had every ability, if you had any questions, to

8   ask; isn't that correct?

9   A.   Yes.

10      Q.   And if you weren't getting information that you were

11   asking for, you could call a members' meeting, correct?

12   A.   Yes.

13      Q.   You could send an email, correct?

14   A.   Yes.

15      Q.   You could send a text message, correct?

16   A.   Yes.

17      Q.   And in fact, it wasn't until after you got counsel

18   involved, after the May 7th reason, when it's the first time

19   that, all of a sudden, you're starting to ask for invoices --

20   A.   Correct.

21      Q.   -- isn't that correct?

22   A.   Yes.

23      Q.   Before that, you didn't care because you knew, in

24   real time, exactly what was happening; isn't that correct?

25   A.   No.



ALEX FILIPPOV - Cross

1    Q.   Now, you also prepared tax returns or had tax

2    returns prepared for Lyman-Cutler for calendar years 2013,

3    '14, and '15; isn't it correct?

4    A.   Correct.

5    Q.   And as the managing partner of the LLC, you signed

6    those tax returns; isn't that correct?

7    A.   Yes.

8    Q.   And certainly, in order to prepare tax returns,

9    you'd have to know what the financial situation was; isn't

10   that correct?

11   A.   Yes.

12   Q.   And you understood that when you file tax returns,

13   you're making a representation to the Internal Revenue Service

14   that the financial information is accurate, correct?

15   A.   Yes.

16   Q.   So you understood, certainly, sir, that you had

17   enough information to feel comfortable that the numbers you

18   were presenting were the accurate numbers; isn't that correct?

19   A.   Yes.

20   Q.   Now, and to be clear, you're not alleging fraud in

21   the preparation of the LLC's books and records.  You're

22   alleging fraud on how Kagan Development kept its own books and

23   how ProEx kept its own books, correct?

24   A.   Correct.

25   Q.   And you're not an owner; you don't have an equity

ALEX FILIPPOV - Cross

1    interest of any sort in either KDC or ProEx, do you?

2    A.   Correct.

3         Q.   KDC didn't have any duty, fiduciary or otherwise, to

4    keep its books for you in any certain way; isn't that correct?

5    A.   Correct.

6         Q.   Nor did ProEx, correct?

7    A.   Correct.

8         Q.   Now, certainly, if its books weren't clear and

9    accurate, that might impact its ability to collect on its

10   claim, correct?

11   A.   Yes.

12        Q.   But certainly, as it relates to you, how it kept its

13   books is no -- it's not your business; isn't that correct?

14   A.   I do not know the answer to this question.

15        Q.   Now, under the operating agreement, I think we

16   discussed that you were obligated to list the properties with

17   Tatiana Kagan, correct?

18   A.   Yes.

19        Q.   And that was the only ongoing role that Tatiana had

20   in this project; isn't that correct?

21   A.   Yes.

22        Q.   Now, you never provided Tatiana with a copy of the

23   operating agreement?

24   A.   No.

25        Q.   And we looked, yesterday, at the language.   The

ALEX FILIPPOV - Cross

1    operating agreement does not provide a date by which the

2    listing agreements have to expire, does it?

3    A.   Correct.

4         Q.   What it says is, after December 31st, you can elect,

5    but it requires an affirmative act by you, correct?

6    A.   Yes.

7         Q.   It's not self-effectuating, correct?

8    A.   Yes.

9         Q.   And in fact, you didn't exercise that right until

10   after Mr. Pyle sent his letter in May of 2015; isn't that

11   correct?

12   A.   Correct.

13        Q.   So when you filed a lawsuit and you said in the

14   lawsuit that Mrs. Kagan knew or should've known that her

15   husband had no authority to sign a listing agreement beyond

16   December 31st, that's not true, is it?

17   A.   It is true.

18        Q.   And you went on.  In paragraph 29 of your adversary

19   complaint, you say, "The operating agreement, however,

20   provided that the obligation to use Mrs. Kagan expired on

21   December 31st, 2014."

22   A.   Obligation expired.  That's correct.

23        Q.   All right.  So is it your testimony now, sir, that

24   there was an affirmative obligation, as of December 31st,

25   2014, to not use Tatiana?



ALEX FILIPPOV - Cross

1    A.    No.

2         Q.    So in fact, there is no expiration, unless and until

3    you exercise that right?  So when --

4    A.    That's corr --

5         Q.    Correct?

6    A.    Yes.

7         Q.    So when you filed a lawsuit alleging in paragraph 29

8    that the agreement provided that the listing agreement had to

9    expire on December 31st, that wasn't true, was it?

10   A.    I don't think it says this.

11        Q.    It says, sir, paragraph 29, "The operating

12   agreement, however, provided that the obligation to use Mrs.

13   Kagan expired on December 31st, 2014 and that only Mr.

14   Filippov, as managing member, had the authority to retain real

15   estate brokers for the sale of the new homes."

16   A.    I might have difficulties with language, but the

17   obligation is not -- it's slightly different.

18        Q.    Now, when the houses were first listed, sir, Mr.

19   Kagan sent you a text so that you'd know they were listed;

20   isn't that correct?

21   A.    Repeat it again, please.  I'm sorry.

22        Q.    I'm sorry?

23   A.    Please repeat again.  I --

24        Q.    Certainly.

25   A.    I didn't get.



Page 123

ALEX FILIPPOV - Cross

1    Q.   When the houses were first listed, Kagan sent you a

2  text to tell you that they were being listed?

3  A.   Yes.

4    Q.   Okay.  So certainly, he wasn't trying to keep it a

5  secret from you that they were listed.  He told you --

6  A.   Yes.

7    Q.   -- isn't that correct?

8  A.   Yes.

9    Q.   And he also told you that they were listed at $5.5

10  million; isn't that correct?

11  A.   Yes.

12    Q.   So you knew all along, sir, that these were being

13  listed at $5.5 million; isn't that correct?

14  A.   Yes.

15    Q.   And you didn't object to the listing at $5.5

16  million, did you?

17  A.   Yes.

18    Q.   Yes, you objected, or --

19  A.   I didn't.

20    Q.   -- no, you didn't?

21  A.   I didn't.

22    Q.   So when you filed a lawsuit and alleged that,

23  without consulting the plaintiffs, the Kagans set the selling

24  price for each home at 5.499 or nearly $600,000 higher than

25  the budgeted selling price, that wasn't true; isn't that

Page 124

ALEX FILIPPOV - Cross

1    correct?  You knew they were listing for 5.5.

2    A.    I knew, but they didn't consult with me on price.

3         Q.    And you didn't say anything.  You didn't say, hey,

4    wait a minute; that's not okay --

5    A.    That's correct.

6         Q.    -- or words to that effect?

7    A.    That's correct.

8         Q.    So you affirmatively knew it was being listed.  You

9    affirmatively knew the listing price.  You said nothing.  You

10   had no complaint; isn't that correct?

11   A.    Correct.

12        Q.    And in fact, sir, on September 4th --

13            MR. PERTEN:  Could you pull up Exhibit 250?

14   BY MR. PERTEN:

15        Q.    On September 4th, sir, you went online and looked at

16   Zillow so you could review the listing?

17   A.    Yes.

18        Q.    And in fact, you were concerned, because it says the

19   listing on Zillow says 6,440, and you thought the houses were

20   bigger?

21   A.    Yes.

22        Q.    So you understood, because you were paying attention

23   when we talked about the expansion of the project, that the

24   original plan of 6,444 had been changed, and they were now

25   bigger?



ALEX FILIPPOV - Cross

1          MR. CARNATHAN:  Objection.

2     A.    No.

3          THE COURT:  Wait, wait.

4          MR. CARNATHAN:  The original plan certainly didn't

5     say 6,444.  That's just a total misstatement of the evidence.

6          THE COURT:  All right.  I'm going to sustain that.

7          Would you rephrase your question?

8          MR. PERTEN:  Certainly.

9     BY MR. PERTEN:

10        Q.   Sir, you certainly understood that 6,444 square feet

11    was smaller than the project was going to be; isn't that

12    correct?

13    A.    No.

14        Q.   Well, you asked the question -- I remember you

15    saying, the houses -- our houses are bigger, correct?

16    A.    Yes.

17        Q.   And in fact, the houses that were built were,

18    roughly, 7,400 square feet; isn't that correct?

19    A.    Correct.

20        Q.   All right.  So the houses got significantly bigger

21    than the house that was described in the appraisal that we

22    looked at this morning, which was 6,000 and change, correct?

23    A.    No.  That's not correct.

24        Q.   Okay.

25    A.    And appraisal does include garage.  And that 7,500 that

ALEX FILIPPOV - Cross

1  came, 1,000 extra square feet, is not the living space.  It's

2  garage space.

3      Q.   Okay.  Now, you certainly understood, because you

4  looked on Zillow, that there was a listing, correct?

5  A.   Yes.

6      Q.   And you didn't call anybody and say, whoa, whoa,

7  whoa, whoa -- or words to that effect -- I didn't authorize a

8  listing.  You didn't say that, did you?

9  A.   No.

10     Q.   And there was nothing that would prevent you from

11  calling up Kagan or Tatiana and say, hey, I'm looking at

12  Zillow; there's a listing, but I never signed a listing

13  agreement; what's this all about?  You didn't say words to

14  that effect, did you?

15  A.   I didn't know that the listing agreement has to be

16  signed.

17     Q.   Well, certainly, sir, you've bought and sold

18  properties before, correct?

19  A.   Yes.

20     Q.   And you understand that real estate brokers don't

21  just list without an agreement.  You understand that, don't

22  you?

23  A.   I didn't think about this at this time.

24     Q.   And in fact, when you look at Zillow, doesn't Zillow

25  tell you who the brokers are?



ALEX FILIPPOV - Cross

1    A.    Yes.

2         Q.    So you knew that there was a listing with Century

3    21, correct?

4    A.    Yes, probably.

5         Q.    Okay.  And --

6    A.    Tatiana Kagan.

7         Q.    And you also knew that Tatiana did not want to list

8    both properties at the same time because she thought that

9    might impact the ability to sell one property?

10   A.    Yes.

11        Q.    All right.  So once one property was on, the other

12   was off, correct?

13   A.    Yes.

14        Q.    So that if, in fact, one property's on and the other

15   one is not done, it really doesn't matter because it's not

16   listed; isn't that correct?

17   A.    No.

18        Q.    Now, in your deposition, sir, you testified that you

19   thought that -- at least, your testimony was that you thought

20   that the Lyman Avenue property was done at least by August of

21   2014, correct?

22   A.    No.  It's Cutler.  Property of Cutler was done in -- by

23   August or end of July, and property at Lyman was done later.

24        Q.    Okay.  So one of the properties, as you understood

25   it, was the end of July, and the other one was sometime in

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1   August?

2   A.    The other one was, I believe, almost done in -- finally

3   done in October.  That's when the certificate of occupancy --

4   I -- I might be mistaken.

5        Q.    Now, in your adversary complaint, you said, "Mr.

6   Kagan failed to complete the construction of the two new homes

7   on or before March 30th, 2014.  On the contrary, construction

8   was not complete until October 2014."  You remember saying

9   that?

10  A.    Yes.

11       Q.    Well, in fact, you just told us that at least one of

12  the houses was done, perhaps, as late July, and the other was

13  sometime in August, correct?

14  A.    I'm not sure about the August.  October, yes.  One of the

15  houses was end of July, yes.

16       Q.    So when you said the houses, plural, were not

17  completed until October 2014, that wasn't true, either, was

18  it?

19  A.    You can say so, yes.

20       Q.    Now, sir, we touched briefly, yesterday, on the

21  extension of the listing agreement in April 2015.  Do you

22  recall that?

23  A.    Yes.

24       Q.    Now, in April 2015, both Mr. Kagan and Mrs. Kagan

25  contacted you to discuss signing a listing agreement to extend

ALEX FILIPPOV - Cross

1    the listing, correct?

2    A.   Yes.

3         Q.   And in fact, Tatiana texted you on April 23rd,

4    Exhibit 260, "Hello, Alex.  This is Tatiana Kagan.  Please

5    give me a call.  This is regarding 55 Lyman Road."  Correct?

6    A.   Yes.

7         Q.   And Kagan also texted you, Exhibit 261, "We've put

8    55 Lyman on the market and take 88 Cutler off.  55 is staged,

9    freshly painted, floors refinished.  We need you to sign

10   Century 21's agreement to put it on the market."  Do you see

11   that?

12   A.   Yes.

13        Q.   So certainly, they weren't going behind your back.

14   They were telling you, we need you to look; we need a new

15   agreement signed; isn't that correct?

16   A.   On this date, yes.

17        Q.   Yes.  And then, Exhibit -- Tatiana actually

18   forwarded you a copy of the agreement for you to look at;

19   isn't that correct?

20   A.   Yes.

21        Q.   Okay.  So they told you, we're going to do it, and

22   they forwarded you a copy of the agreement that they wanted

23   signed, correct?

24   A.   Yes.

25        Q.   And you reviewed it.  And your only concern, when

ALEX FILIPPOV - Cross

 1  you read it, was you had a question about the five-percent

 2  commission; isn't that correct?

 3  A.   Yes.

 4         MR. PERTEN:  Exhibit 267, please.

 5  BY MR. PERTEN:

 6     Q.   And then later that afternoon of April 25th, you

 7  texted back, "Never mind about agreement five percent.  It's

 8  all clear."

 9  A.   Yes.

10     Q.   Right?  So that was the only concern that you had,

11  at that time, about that agreement, correct?

12  A.   No.

13     Q.   And then, Kagan, Exhibit 263, he sent you --

14         MR. PERTEN:  Scroll down.

15  BY MR. PERTEN:

16     Q.   -- copy of the agreement with his signature on it,

17  did he not?

18  A.   Yes.

19     Q.   So far from keeping you in the dark, they gave you

20  it to review.  He signed it and sent it to you; isn't that

21  correct?

22  A.   Yes.

23         MR. PERTEN:  And then, if we could pull up number

24  268, please.

25  BY MR. PERTEN:



ALEX FILIPPOV - Cross

1    Q.   We looked at this, briefly, yesterday.  You get an

2    email from Dan Gersh at Mr. Kagan's.  "Mr. Filippov, per our

3    earlier conversations, we signed the agreement with Century 21

4    to put 55 Lyman on the market, as agreed.  Please confirm

5    receipt of this email."  And you responded --

6         MR. PERTEN:  Can you scroll down?

7    BY MR. PERTEN:

8    Q.   -- "I confirm."  And then, he wrote back, "Greatly

9    appreciate the quick response.  If you have any questions

10   during the selling/closing process, please feel free to reach

11   out to me.  I'll be out of the office, however, on Thursday to

12   Tuesday, just FYI", correct?

13   A.   Yes.

14   Q.   So not only did they send it to you signed, they

15   asked for confirmation that you understood that it was signed.

16   And you said, "I confirm", correct?

17   A.   I confirm that I received that -- received this

18   agreement, yes.

19   Q.   And then, Tatiana also sent you an email after the

20   signature, correct?  Exhibit 269, she sent you a text, just

21   saying that she was trying to get a hold of you, correct?

22   A.   Where are the text?

23   Q.   Just text, Tati -- just her email address, correct?

24   No, no, she contacted you that same afternoon, correct?

25   A.   I don't know.  I don't know --



(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1        Q.   All right.

2    A.   -- what this is.

3        Q.   Okay.  And then, let's go to 260 -- I'm sorry, 270.

4    You told her you confirmed it; it was okay.  And she said,

5    thank you, correct?

6    A.   Okay.

7        Q.   Yes?

8    A.   Yes.

9        Q.   And certainly, if your -- had told her that you had

10   no authorization, she wouldn't be sending you a thank-you

11   text, would she?

12   A.   Repeat again, please?

13            MR. PERTEN:  Go back to 260, please.

14            MR. HARRIS:  260?

15            MR. PERTEN:  260.  Scroll down.

16   BY MR. PERTEN:

17       Q.   On April 28th, you sent to her, "I sent a confirming

18   email to Dan", which we just looked at, right?

19   A.   Yes.

20       Q.   So she checks in.  Dan checks in.  She contacts you

21   and said, I already sent a confirming email to Dan, correct?

22   A.   Yes.

23       Q.   You didn't say words to the effect, whoa, what are

24   you doing; I didn't authorize this; you're not supposed to do

25   that, or words to that effect?



ALEX FILIPPOV - Cross

1    A.    Correct.

2         Q.    So when you sued Kagan and alleged that they did

3    this behind your back, in fact, it was right in front of your

4    face; isn't that correct?

5    A.    I knew about this particular agreement, but I didn't sign

6    it.

7         Q.    And you didn't --

8    A.    And there is a reason why I didn't --

9         Q.    Yeah.

10   A.    -- sign it.

11        Q.    And you didn't object, did you?

12   A.    I didn't object at this time, yes.

13        Q.    Until you sued them, isn't that correct?

14   A.    Yes.  Until they refuse to give up the listing, yes.

15        Q.    Now, you also testified, sir, that you had no idea

16   what Tatiana was doing, in terms of marketing this project.

17   You remember that?

18   A.    Yes.

19        Q.    Well, sir, you testified yesterday that selling a

20   property was a pretty important thing to you; isn't that

21   correct?

22   A.    Correct.

23        Q.    I mean, that's the whole purpose of this deal was to

24   sell the properties.

25   A.    Yes.



(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1      Q.   So if you weren't getting information from Tatiana,

2   for over a year, of what she's doing, you certainly had the

3   ability to call her up; isn't that correct?

4   A.   Yes.

5      Q.   You certainly had the ability -- and you did.   You

6   checked Zillow to make sure it was listed, correct?

7   A.   Yes.

8      Q.   You knew it was on the multiple listing service,

9   didn't you?

10  A.   Yes.

11     Q.   You certainly had the ability to drive by and see a

12  sign, didn't you?

13  A.   Yes.

14     Q.   And in fact, before you filed litigation, but after

15  the Pyle letter, Century 21 sent you a letter describing

16  exactly what they did; isn't that true?

17  A.   Yes.

18          MR. PERTEN:   274, please.

19  BY MR. PERTEN:

20     Q.   So when you said you had no idea what she was doing,

21  in fact, on May 14th, 2015, Century 21 broke it out, in

22  detail, exactly what they had done to list and trying to sell

23  these properties; isn't that correct?

24  A.   That was after the litigation started, yes.

25     Q.   Well, do you have any reason to think this is



ALEX FILIPPOV - Cross

1   untrue?

2   A.   No.   But the -- the fact that I didn't know this is the

3   fact.

4        Q.   Now, let's look at the May 7th letter, Exhibit 50.

5   This was the first notice that you got of cost overruns,

6   correct?

7   A.   Yes.

8        Q.   Now, certainly -- let's --

9             MR. PERTEN:   Could you scroll down, please?

10  BY MR. PERTEN:

11       Q.   Okay.   Let's look at the opening sentence paragraph.

12  "I'm writing on behalf of our clients, Vadim Kagan, Kagan

13  Development, to open a discussion regarding several matters

14  pertaining to Lyman-Cutler", correct?

15  A.   Yes.

16       Q.   So this wasn't a demand letter.   This was an

17  invitation to start a dialogue, correct?

18  A.   Let's read further.

19       Q.   Okay.   Let's read, sir -- let's read further.   He's

20  asking for -- next paragraph, he's asking for a price

21  reduction.   "Under the current market conditions, a reduction

22  in the listing price is clearly necessary, but to date, I

23  understand that Mr. Filippov has refused to approve any price

24  change", correct?   That's what it says?

25  A.   Correct.



ALEX FILIPPOV - Cross

1    Q.   Now, I understand that you say you didn't refuse,

2    but needless to say, you agreed that, at this point, it was

3    listed for 5.5, and it's certainly not an unreasonable request

4    to say, it's not moving; we got to lower that price?

5    A.   Yeah, but it says --

6    Q.   Okay.

7    A.   -- that I refused, which is --

8    Q.   All right.

9    A.   -- a lie.

10   Q.   But certainly, the underlying premise that we need

11   to reduce the price, you'd agree with that?

12   A.   Yeah.

13   Q.   All right.  Let's go on.  "The need for price

14   reduction is particularly important, given the dissolution

15   date.  It's not in the interest of any of the members to have

16   the home sold as part of a liquidation, particularly, when the

17   liquidation would occur during the traditionally weak winter

18   real estate market."  That's true.  You'd agree --

19   A.   Yes.

20   Q.   -- with that, wouldn't you?

21   A.   Yes.

22        MR. PERTEN:  Scroll down.  Keep going.  Keep going.

23   BY MR. PERTEN:

24   Q.   And in one of the -- the bottom of the page, he

25   picks up on that theme.  "If you're amenable to the



ALEX FILIPPOV - Cross

1    compromise, I'd be happy to prepare an amendment to the

2    operating agreement which reflects this approach" -- and we'll

3    look at that in a minute -- "and also extends the term of the

4    company until November 30th, 2016, and clarifies the economic

5    rights and obligations."

6         So you understood that one of the things they were

7    proposing is that, instead of insisting on liquidation by

8    November 30th, they were offering to extend it for another

9    year?

10   A.   They're also offering to split the --

11        Q.   Work with me here.  You understood that was part of

12   what was being proposed, that it'd be kicked out, correct?

13   A.   Yes.

14        Q.   Okay.  And the reason, of course, that you were

15   interested in not dissolving was because you didn't want the

16   properties to go by liquidation, correct?

17   A.   Yes.

18        Q.   Yet when you filed for bankruptcy, that's exactly

19   what happened, isn't it?

20   A.   Yes.

21        Q.   Okay.

22            MR. PERTEN:  Let's go back up if we could, Mr.

23   Harris.

24   BY MR. PERTEN:

25        Q.   All right.  Top paragraph on page 2 talks about

ALEX FILIPPOV - Cross

1   substantial cost overruns, which is the first time you've

2   heard of this, correct?

3   A.   Yes.

4       Q.   And he's not making demand that this be paid

5   immediately, right?  Said, "Will be payable after repayment of

6   the existing bank debt and before any proceeds are available

7   for distribution to the company's members."  So he's not

8   demanding you cut a check today, is he?

9   A.   Not in this letter.

10      Q.   No.  And in fact, what he's suggesting is, heads up;

11  we'll be paid when the property is sold, correct?

12  A.   Yes, to which we do not agree.

13      Q.   So when you said -- yesterday, when you testified,

14  at the time you received this letter, it was so ridiculous

15  because it was only $6,000, or whatever it was, left in the

16  Lyman-Cutler bank account, he wasn't asking for immediate

17  payment; he was simply putting you on notice that, when the

18  property sells, he wants to get paid, correct?

19  A.   As far as I remember, yesterday, it was about different

20  document.

21      Q.   Okay.

22          MR. PERTEN:  Scroll down.

23  BY MR. PERTEN:

24      Q.   And he talks about the fact, in the next paragraph,

25  that he's been paying carrying costs from the beginning and

ALEX FILIPPOV - Cross

1   suggests that we should split it.  That's a suggestion.

2   A.   And --

3        Q.   You didn't agree.

4   A.   And a lie.

5        Q.   Okay.  And he also suggests a price reduction to

6   one -- 5.199, correct?

7   A.   Yes.

8        Q.   And again, we close, "If you're amenable to this

9   compromise, we'll be happy to provide an amendment to the

10  operating agreement."  So you'd agree with me, sir, that this

11  lawyer letter -- and it is a lawyer letter -- certainly raises

12  a situation and proposes some compromises?

13  A.   With a fraud.

14       Q.   Raises and proposes some compromises, correct?

15  A.   Yes, and --

16       Q.   And there's no demand for any immediate payment;

17  isn't that correct?

18  A.   Not at this time.

19       Q.   Okay.

20            MR. PERTEN:  Let's scroll down.

21  BY MR. PERTEN:

22       Q.   And again, it's desire of Kagan and KDC to arrive at

23  a mutually acceptable path that recognizes the contributions

24  that each of them has made to the company.  "I'd be pleased to

25  work with you or your counsel towards that goal, in a



ALEX FILIPPOV - Cross

1   cooperative and constructive manner.  Because the active

2   spring real estate market is currently underway, I would ask

3   that you give this matter your prompt attention", correct?

4   A.   Yes.

5        Q.   Now, in fact, your response, sir, was to have your

6   lawyer immediately write a letter accusing Kagan of all sorts

7   of fraud; isn't that correct?

8   A.   Yes.  This letter is a fraud.

9        Q.   And by the way, these overruns that are alleged in

10  this letter, you didn't pay them, did you?

11  A.   No.

12       Q.   You never paid them, did you?

13  A.   No.

14       Q.   So at worst, there's an attempt to get more money,

15  but you're too smart; you didn't pay it; isn't that correct?

16  A.   Correct.

17       Q.   Okay.  And the reaction was to have your counsel

18  immediately file a letter accusing Kagan of defrauding you,

19  correct?

20  A.   Yes.

21       Q.   And demanding that he turn over the keys to the

22  property, correct?

23  A.   Yes.

24       Q.   And demanding that he doesn't set foot on the

25  property again, correct?



(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 141

ALEX FILIPPOV - Cross

1   A.   Correct.

2       Q.   Demanding that he turns over all of his books and

3   records, immediately?

4   A.   Yes.

5       Q.   Correct?  And then, less than four weeks later, on

6   June 5th, you filed suit against him; isn't that correct?

7   A.   Yes.  It was filed after they refused to give up the --

8       Q.   Less than four weeks from getting that letter

9   inviting you to a dialogue, you filed suit and alleged fraud;

10  isn't that correct?

11  A.   It was action in between.

12      Q.   All right.  And in fact, sir, the only information

13  that you had to substantiate the allegation of fraud was that

14  you felt those numbers in there were ridiculous?

15  A.   Not just that.  They refused to give us listings --

16      Q.   All right.

17  A.   -- to sell the properties.

18      Q.   The fraud that you alleged in your Middlesex

19  complaint was that -- in sum and substance, that the books and

20  records were all fraudulent that KDC was maintaining.  That's

21  what you alleged, isn't it?

22  A.   I would have to review.  I don't remember.

23      Q.   Well, why don't we look at the Middlesex complaint,

24  then?  It's Exhibit 64.

25          MR. PERTEN:  Scroll down.  To the count -- fraud

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    count.  I'm sorry.  Just go -- one more.  Up to the fraud.

2    BY MR. PERTEN:

3         Q.   All right.  So part of the fraud here on paragraph

4    51, "He knowingly and intentionally executed a listing

5    agreement with his wife, Tatiana Kagan, that he knew Filippov

6    had refused to sign, shortly before disavowing his obligation

7    to pay carrying costs for the project and asserting

8    substantial unauthorized, untimely, unsubstantiated claims

9    against the company for cost overruns", correct?

10   A.   Yes.

11        Q.   And incidentally, that unauthorized listing

12   agreement was that April agreement that you confirmed that

13   they sent you the copy of; isn't that correct?

14   A.   Yes.

15        Q.   Unauthorized, undocumented claims, and this is the

16   basis for your fraud count, right?

17   A.   Yes.

18        Q.   And at this point of time, as of June 5th, the only

19   information that you had was a letter from counsel; you hadn't

20   received the backup, correct?

21   A.   I don't remember now.  I can't tell you for sure.

22        Q.   Well, sir, as of June 5th, three-and-a-half weeks

23   after the lawyer sent you a letter, you had not received the

24   information you had requested.  Your basis --

25   A.   I did.

ALEX FILIPPOV - Cross

1          Q.    -- for fraud --

2     A.    I did.

3          Q.    Your basis for fraud, as of June 5th, was that you

4     had gotten a demand seeking monies and making statements that

5     you didn't agree with; isn't that correct?

6     A.    I received at this -- by this time, we received, I

7     believe, from Mr. Cohen, the books for Lyman-Cutler, LLC that

8     Mr. Kagan kept.  It was -- he provided this on the USB stick.

9          Q.    And you allege that these books show all sorts of

10    double-billings, and mis-billings, and all those kinds of

11    things, correct?

12    A.    We looked at this, and we -- the -- the fact that there

13    is a cost overrun that never should have happened in the first

14    place, it is a fraud.

15         Q.    Okay.  So the fact that the lawyer sent you a

16    letter, that's a fraud; is that your testimony?

17    A.    The claim, it is a fraud.

18         Q.    The claim is a fraud?

19    A.    Yeah.

20         Q.    Okay.  Now, when I took your deposition three years

21    later, I asked you, can you show me a single example of

22    double-billing, and you were unable to do that; isn't that

23    correct?

24    A.    That's correct, yes.

25         Q.    All right.  And I asked you if you could identify

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    anything -- anything at all, supplies that were bought for one

2    project but wrongfully charged to Lyman-Cutler, and you

3    couldn't identify a single thing three years after you filed

4    your complaint, correct?

5    A.    I'm not the expert.

6         Q.    Correct?

7    A.    Correct.

8         Q.    And three years after you filed the complaint, I

9    asked you if you could identify any improper Amex -- American

10   Express -- payments.  You couldn't tell me --

11   A.    Yes.

12        Q.    -- correct?  So you'd agree with me that three

13   years, when we took your deposition in 2018 -- April 25th,

14   2018, so almost -- just shy of three years after you filed

15   your lawsuit, you still had no evidence, other than your

16   suspicion --

17   A.    No.

18        Q.    -- that this all happened?

19   A.    No.  We have plenty of evidence.

20        Q.    You had plenty of evidence.  You just weren't able

21   to tell me what it was; is that correct?

22   A.    At the time of deposition, yes.

23        Q.    Now, sir, the Cohen letter, that was sent -- Exhibit

24   67 -- June 25th, 2015.  We looked at that and how outraged you

25   were by the numbers.  By June 25th, you had already sued them;

ALEX FILIPPOV - Cross

1    isn't that correct?

2    A.    Say that again?  I'm sorry.

3        Q.    By June 25th, 2015, you had already brought suit in

4    the Middlesex Superior Court --

5    A.    Yes.

6        Q.    -- isn't that correct?

7    A.    Yes.

8        Q.    So again, let's look at the chronology.  May 7th,

9    letter from Alex Pyle.  June 5th, you file suit.  June 25th,

10   you get a strong letter, which you're outraged about, from Mr.

11   Cohen, correct?

12   A.    Yes.

13       Q.    Did it come as any surprise to you, after you had

14   sued them and alleged fraud, that you would get a strong

15   letter back?  Did that come as any big surprise to you?

16   A.    No.  But --

17       Q.    Okay.  So you weren't outraged.  It's what you

18   would've expected, had you been sued; isn't that correct?

19   A.    We were outraged by the numbers and invoices.

20       Q.    And in fact, sir, the lien that we looked at

21   yesterday, that was recorded on June 22nd, 2015; isn't that

22   correct?

23   A.    Yes.

24       Q.    So the lien was also filed after you filed suit

25   against Mr. Kagan, not before; isn't that correct?



(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 146

ALEX FILIPPOV - Cross

1  A.   That's correct.

2      Q.   So you file suit.  You run into court to try and get

3  an injunction, correct, to get out of the listing agreement,

4  correct?

5  A.   Yes.

6      Q.   Trial court says, no, you don't get the injunction.

7  And you certainly make it very clear that you're not going to

8  pay KDC a dime; isn't that correct?

9  A.   Correct.

10     Q.   And so you certainly understand that a contractor

11  who's been told it's not going to get paid has the right to

12  lien?  That's what the lien law's for, correct?

13  A.   Except the lien has to have a valid contract.

14     Q.   Okay.  And if you didn't believe there was a valid

15  contract, you had ways of dealing with that.  You could've

16  moved in the court to dissolve that lien; isn't that correct?

17  A.   Probably.  I --

18     Q.   You could've --

19  A.   That I don't know.  That's legal issue that I don't know.

20     Q.   You could've purchased a lien bond, correct?

21  A.   My understanding that that was very expensive.

22     Q.   A million dollars of legal fees later, it was

23  cheaper than that, correct?

24  A.   We didn't know that is going to be million dollar in

25  legal fees.



ALEX FILIPPOV - Cross

1    Q.   And certainly, sir, you could've, at a minimum,

2   called a meeting to discuss your concerns with Mr. Kagan,

3   couldn't you?

4   A.   We called Mr. Kagan.  He chose not to talk to us.

5    Q.   Sir, you had the right, under the operating

6   agreement, to call a meeting of the members at any time you

7   wanted, correct?

8   A.   Yes.

9    Q.   That was one of the things you bargained for; isn't

10   that correct?

11   A.   Yes.

12    Q.   And in fact, sir, if Mr. Kagan wasn't returning your

13   calls, you had the absolute right to request, call a formal

14   meeting, and get him there; isn't that correct?

15   A.   And we have the meeting.

16    Q.   You did not have a meeting before you filed suit;

17   isn't that correct?

18   A.   We didn't have the meeting before we filed the suit --

19    Q.   And you --

20   A.   -- yes.

21    Q.   -- didn't talk to him about that because he wasn't

22   returning your calls, correct?

23   A.   Correct.

24    Q.   So you and Mr. Lipetsker unilaterally decided you

25   were going to file suit in the name of Lyman-Cutler --

ALEX FILIPPOV - Cross

1    A.    Right.

2         Q.    -- without consulting with your partner, Mr. Kagan;

3    isn't that correct?

4    A.    That's correct.  We are major --

5         Q.    And you didn't go down to the site -- the project

6    site.  Since he wasn't returning your calls, you didn't go

7    down to the project site to talk to him, did you?

8    A.    He wasn't at the project site.  I went there many number

9    of times.  I met with Mr. Cohen on the project site.

10        Q.    And you didn't go -- you didn't go to his house.

11   You knew where he lived.

12   A.    No, I never went to --

13        Q.    You didn't --

14   A.    -- his house.

15        Q.    -- have Mr. Maiden intercede.

16   A.    Maiden?  I don't remember, at this point.  We might

17   consulted (sic) with Mr. Maiden.

18        Q.    So the end of the day, you're the managing partner.

19   You decide to file suit without any opportunity to have a

20   formal meeting to discuss the allegations; isn't that correct?

21   A.    We discussed this, as the majority holders, with Mr.

22   Lipetsker.  And we came up with this particular decision --

23        Q.    And --

24   A.    -- that Kagan is not going to be cooperating.

25        Q.    So you decided that Kagan was not going to



ALEX FILIPPOV - Cross

1    cooperate, and therefore, you didn't have to talk to him; is

2    that correct?

3    A.    Yes.

4         Q.    Did it occur to you, sir, that maybe you would've

5    had a dialogue and could've raised your questions and had a

6    discourse, and maybe something would've happened?  Did that

7    ever occur to you?

8    A.    We tried to communicate.  He refused to communicate.  He

9    sent Mr. Cohen, who was completely unacceptable person for

10   communication -- completely unacceptable.

11        Q.    Now, not only did you file suit without discussing

12   with Mr. Maiden, you filed a petition for bankrupt -- excuse

13   me, with Mr. Kagan.  You filed a bankruptcy petition without

14   consulting with Mr. Kagan; isn't that correct?

15   A.    Yes.

16        Q.    You didn't call a meeting to discuss filing a

17   bankruptcy?

18   A.    That's correct.

19        Q.    You just went ahead and did it?

20   A.    We discuss this with another member.  We were majority,

21   and we made that decision.

22        Q.    Now, at the time you filed the petition for

23   bankruptcy, sir, you had two completed homes waiting to be

24   sold, correct?

25   A.    Yes.



ALEX FILIPPOV - Cross

1          Q.   And you had about $110,000 sitting in the bank

2     account, correct?

3     A.   Yes.

4          Q.   So the LLC was not insolvent, correct?

5     A.   Yes.

6          Q.   And the only financial obligation that the LLC had

7     was to pay carrying costs until the property sold, correct?

8     A.   Carrying costs and expired mortgage that's going --

9          Q.   Right.

10    A.   -- to expire in one month.

11         Q.   That was part of the carrying costs?

12    A.   Yes.  No, not the carrying costs.  It was a axe hanging

13    on us.

14         Q.   Paying debt service is part of the carrying costs.

15    A.   No, that mortgage most probably wouldn't be extended.

16         Q.   And under the operating agreement, since Mr. Kagan

17    was no longer paying carrying costs, that fell on you.  You

18    understood that, correct?

19    A.   Yes.

20         Q.   And so you got the loan extended, didn't you?

21    A.   In June, yes.

22         Q.   Okay.  So you got the loan extended before you filed

23    for bankruptcy?

24    A.   Yes.

25         Q.   So that was no longer an issue at the time of the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1   bankruptcy, correct?

2   A.   No.  It was extended for six months.

3        Q.   Okay.  So it was out to December?

4   A.   November, I believe, yeah --

5        Q.   Okay.

6   A.   -- or December.

7        Q.   So certainly, it hadn't been called.  And in fact,

8   the only way that loan was going to fall into default was if

9   you stopped paying the carrying costs; isn't that correct?

10  A.   No.  If the company is dissolved, then the bank who

11  issued the loan to Lyman-Cutler would call it and auction the

12  houses.  It wouldn't be extended.

13       Q.   And so your concern was that there was a November

14  30th, 2015 termination date?

15  A.   Yes.

16       Q.   And you didn't want the company to terminate,

17  correct?

18  A.   Correct.

19       Q.   Even though that was the deal you struck, correct?

20  A.   That was an omission.

21       Q.   Okay.  And the reason you didn't want to terminate

22  is you were worried that might trigger a default, and you had

23  personally guaranteed the loan, correct?

24  A.   Yes.

25       Q.   And so what was motivating you was you didn't want

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    your personal assets to be reached by the bank if they called

2    the loan, correct?

3    A.   Well, what was the alternative for the bank?  They --

4        Q.   Correct?  You were concerned, because you had

5    personally guaranteed, that the loan would be called unless

6    you did something; isn't that correct?

7    A.   Yes.

8        Q.   So sir, right before you filed for bankruptcy, you

9    did a couple of things.  Let's look at those.

10           MR. PERTEN:  Can we pull up Exhibit 75?

11    BY MR. PERTEN:

12       Q.   Exhibit 75 is a mortgage that you made to yourself,

13    isn't it?

14    A.   Yes.

15       Q.   And you signed it on behalf of Lyman-Cutler,

16    correct?

17    A.   Correct.

18       Q.   And in fact, you recorded that mortgage the morning

19    that you filed your petition for bankruptcy, same day,

20    correct?

21    A.   Yes.

22       Q.   And the purpose of that mortgage was to secure a

23    loan that you claimed you made to the LLC, correct?

24    A.   Yes.

25       Q.   And that was a personal loan you made to the LLC,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1   correct?

2   A.   Correct.

3       Q.   And so the mortgage that you put on the property was

4   to secure your personal interest, right, your personal -- was

5   to secure the obligation that was owed to you, personally,

6   correct?

7   A.   Yes.

8       Q.   It wasn't to benefit the LLC, was it?

9   A.   No, the LLC needed money.  LLC needed to pay the carrying

10  costs.  Obviously, it was for the LLC.  What else?

11      Q.   And you also -- so as the managing member, you claim

12  you made a loan to the entity.  And on the day you filed

13  bankruptcy, you quickly write yourself a mortgage and record

14  it, correct?

15  A.   Yes.

16      Q.   And you didn't have any kind of a discussion with

17  Mr. Kagan to discuss whether or not the Lyman-Cutler should be

18  giving you a mortgage, did you?

19  A.   We discussed it with Mr. Lipetsker.  We were majority

20  holders.

21      Q.   Okay.  Because as majority holders, you can do

22  whatever you want, essentially; isn't that right?

23  A.   As a -- as a manager, I can do whatever I want,

24  basically.

25      Q.   As a manager, you can do whatever --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 154

ALEX FILIPPOV - Cross

1    A.    Yes.

2         Q.    -- you want, yes, including, sir, giving yourself a

3    mortgage to secure your personal obligation; is that correct?

4    A.    To provide company with financing.

5         Q.    Well, sir, this mortgage was given five months after

6    you say you loaned the money; isn't that correct?

7    A.    Some of the money.

8         Q.    Well, this loan --

9    A.    Just bear in mind that $107,000 of this mortgage got into

10   the bankruptcy.  It's still there.

11        Q.    At the time you filed this mortgage --

12   A.    Yes.

13        Q.    -- you had already lent the money that you claim you

14   lent?

15   A.    Yes.

16        Q.    This didn't happen simultaneously, correct?

17   A.    Yes.

18        Q.    So after the fact, you're about to file bankruptcy.

19   You decide that to protect yourself, you're going to give

20   yourself a mortgage, correct?

21   A.    No.

22        Q.    It's not correct?  Well, you certainly -- you

23   discussed it with Mr. Lipetsker, correct?

24   A.    Yes.

25        Q.    You did not discuss it with Mr. Kagan?




ALEX FILIPPOV - Cross

1    A.    Correct.

2         Q.    You understand that, notwithstanding that you

3    didn't -- that you weren't seeing eye to eye with Mr. Kagan,

4    he still was a member of this entity?

5    A.    Yes.

6         Q.    You understand, certainly, sir, that making a loan

7    to yourself is a self-dealing transaction?  You --

8    A.    No.

9         Q.    -- understand that?

10   A.    No.

11        Q.    You don't understand that giving yourself a mortgage

12   is a self-dealing transaction?

13   A.    No.

14        Q.    Who did this mortgage benefit?

15   A.    Company, LLC.

16        Q.    Who was it giving security to?  Was it giving

17   security to the LLC, the mortgage, or was it giving it to

18   yourself?

19   A.    LLC required some money.  It had carrying-cost

20   obligation, legal-cost obligations.

21        Q.    The LLC had carrying-cost obligations; is that your

22   testimony?

23   A.    No.  Well, LLC has to pay the mortgage, yes.

24        Q.    And in fact, sir, under the operating agreement,

25   when Mr. Kagan stopped paying, it was your obligation to pay



ALEX FILIPPOV - Cross

1    the carrying costs, not the LLC; isn't that correct?

2    A.    That's correct, yes.

3         Q.    All right.  So you had an obligation to pay.  You

4    put money to cover your obligation into the bank account.  And

5    then you gave yourself a mortgage, correct?

6    A.    Legal-cost obligation --

7         Q.    And in fact --

8    A.    -- was obligation of the LLC.

9         Q.    And in fact, sir, the cost of preparing that

10   mortgage, you charged back to the LLC, didn't you?

11   A.    Yes.

12        Q.    Incidentally, the cost to file the lawsuits, the

13   legal fees, that was coming out of LLC money, too, wasn't it?

14   A.    Yes.

15        Q.    And you didn't ask Mr. Kagan if he was okay

16   financing litigation without having a discussion first?

17   A.    Against Mr. Kagan, no, I didn't.

18        Q.    Now, sir, let's look at Exhibit 291 again, please,

19   last page.  Now, sir, this -- we looked at this earlier.  This

20   is the QuickBooks account that you were keeping on behalf of

21   the LLC, correct?

22   A.    Yes.

23             MR. PERTEN:  J.P., could you just scroll up a little

24   bit?

25   BY MR. PERTEN:

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    Q.   And this is printed on April 23rd, 2018, correct?

2    A.   Yes.

3    Q.   So this should have all the accounts, every -- all

4    the payments through April of 2018, correct?

5    A.   Correct.

6    Q.   Okay.

7         MR. PERTEN:  Now, scroll down.

8    BY MR. PERTEN:

9    Q.   According to this, sir, on 8/25/2015, you made a

10   payment of $23,000 and change to Mr. Carnathan's law firm;

11   isn't that correct?

12   A.   Yes.

13   Q.   And then, on September 22nd, 2015, you made another

14   payment to Mr. Carnathan's firm for $25,000 and change,

15   correct?

16   A.   Yes.

17   Q.   Now, in your bankruptcy petition, which you filed on

18   October, so after those two dates, in your schedule of

19   affairs, it says, "List each payment or other transfer to any

20   creditor made within ninety days immediately preceding the

21   commencement of the case."  Okay.  Let me show you this page.

22        MR. PERTEN:  If I could have this?

23        THE CLERK:  Um-hum.  Upside down.

24        MR. PERTEN:  I'm upside down.

25   BY MR. PERTEN:

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    Q.   Okay.  So you see you listed here the payment to Mr.

2    Carnathan's firm on July 28th, 2015, correct?

3    A.   Yes.

4    Q.   But you didn't list the other two payments to him,

5    the other, roughly, $50,000 that you paid him within the

6    ninety days preceding the bankruptcy petition, did you?

7    A.   Yes.

8    Q.   And the reason you did that, sir, is because you

9    wanted to make sure your lawyers were getting paid before

10   anybody else, and you didn't want it called back by the

11   trustee; isn't that correct?

12   A.   No.

13   Q.   While you signed under pains and penalties of

14   perjury that you'd made no additional payments, other than the

15   one you listed there, that wasn't true either, was it?

16   A.   Hard for me to say.  I need to review this.  It has been

17   years.

18   Q.   Well, should we look at that page again, sir?

19   A.   It would be more than this particular page.  I -- I can't

20   tell you right now, looking at this.

21   Q.   I got the wrong page now.  Well, look at that page

22   again, sir.  The only payment you've listed here is 7/28/15 in

23   the amount of $18,348, correct?

24   A.   Yes.

25   Q.   Now, if we could go back to Exhibit 291, sir, we see

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 159

ALEX FILIPPOV - Cross

1  that payment that you -- in July, right, right --

2  A.   Yeah.

3       Q.   -- there on July 28th.  That's the one listed in

4  your bankruptcy petition.  But we don't see the one on 8/25,

5  and we don't see the one on 9/22, do we?

6  A.   It appears not.  I don't know why.

7       Q.   So not only did you give yourself a mortgage on the

8  day of the bankruptcy, you also signed under pains and

9  penalties of perjury that you made no other payments within

10 ninety days, other than the ones listed, and you intentionally

11 left off $50,000 and change payable to your lawyers?

12 A.   Not intentionally.

13      Q.   And in fact, those lawyers were representing not

14 just the LLC; they were representing you guys, individually;

15 isn't that correct?

16 A.   Yes.

17      Q.   And you're using corporate monies, LLC monies, to

18 finance the litigation, which was -- also had claims for

19 yourselves, individually; isn't that correct?

20 A.   No.  We have an indemnity.

21      Q.   I'm sorry?

22 A.   My understanding, that we have an indemnity; LLC's paying

23 for our legal expenses.

24      Q.   Now, you understood, did you not, that when you

25 invoked the jurisdiction of this court, that there were

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    certain statutory costs that would be incurred, correct?

2    A.    No.

3          Q.    Well, you understand, sir, that the bankruptcy

4    trustee is entitled to some payments for his efforts, correct?

5    A.    No.

6          Q.    You didn't understand that?

7    A.    No.

8          Q.    Okay.  Well, certainly, Mr. Kagan, since you never

9    discussed it with him, he didn't force you to file bankruptcy,

10   did he?

11   A.    He did.

12         Q.    Oh, he did?

13   A.    By his actions, yes.

14         Q.    By his actions.  And what were his actions?  His

15   actions were sending you a demand letter --

16   A.    No.

17         Q.    -- and putting a lien on, correct?

18   A.    Lien -- fraudulent $2-million lien.  That's a serious

19   action.

20         Q.    And at that time, fraudulent lien -- it's fraudulent

21   because you don't agree with the number, correct?

22   A.    Because it's based on illegal, fraudulent contract,

23   because the number is completely bogus, yeah, it's very

24   fraudulent.

25         Q.    Okay.  And that's what justifies you coming into

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    this court and invoking the jurisdiction of this court is

2    because you think that lien is invalid, correct?

3    A.    That was a way to save the LLC and the whole project, in

4    my opinion, yes.

5        Q.    And in fact, sir, you understand that even if

6    there's a lien on the property, that won't prevent it from

7    being sold; isn't that correct?

8    A.    Say that again?  I'm sorry.

9        Q.    Sure.  If there is a lien on the property, that

10   doesn't prevent somebody from making an offer to purchase,

11   correct?

12   A.    It makes very improbable for the property to be sold with

13   a lien on it because the broker must disclose any lien.  And

14   no reasonable person would buy, at the not-discounted price, a

15   house that has a lien of $2 million on it.

16       Q.    So as a real estate expert, which apparently, you

17   are, sir -- are you a real estate expert?

18   A.    No.

19       Q.    No.  So sir, it's your testimony that, when this

20   property was listed, there was a big red flag that said, by

21   the way, there's a lien on the property?

22   A.    Yes.

23       Q.    It says that right on the listing agreement?

24   A.    Not on the listing agreement.  But Michelle Lane, as far

25   as I remember, testified that she has to disclose this to the

ALEX FILIPPOV - Cross

1    buyer.  And any broker --

2        Q.   You'd agree that, ultimately, there would be a title

3    exam, and it would come up during the title exam, correct?

4    A.   No, before this.  The broker must disclose this when the

5    offer is made.

6        Q.   Okay.

7    A.   That's Massachusetts law, as far as I know.

8        Q.   Okay.  And sir, you certainly understood that, if

9    necessary, you could've closed and put the proceeds in escrow

10   to handle the lien, correct?

11   A.   That was suggested to Kagan, by the way.

12       Q.   You could've done that.  You're the managing

13   partner.  You can do whatever you want.  You told us that,

14   correct?

15   A.   That was suggested to Kagan by Mr. Lipetsker, when he has

16   conversation --

17       Q.   Okay.

18   A.   -- with Kagan.

19       Q.   Sir?

20   A.   Yes?

21       Q.   Instead of filing for bankruptcy, you -- since you,

22   apparently, have the power, you could certainly have closed

23   and put the money in escrow, correct?

24   A.   I don't know.

25       Q.   You don't know.  You didn't consider that?



ALEX FILIPPOV - Cross

1   A.   We ask Kagan to agree to this, and he refused.

2        Q.   And the reason -- and you filed, originally, Chapter

3   11, correct?

4   A.   Yes.

5        Q.   And the reason you filed for Chapter 11 is that you

6   thought this would be a way you could gain control of the

7   property as a debtor in possession, correct?

8   A.   Yes.

9        Q.   And you didn't anticipate that the trustee would

10  be -- that there'd be a trustee appointed, correct?

11  A.   Correct.

12       Q.   And you were concerned, because your view of a

13  trustee is they're just trying to unload the property,

14  correct?

15  A.   Yes.

16       Q.   And in fact, the trustee converted to 7, right?

17  A.   Yes.

18       Q.   And you didn't object to that?

19  A.   Yes.

20       Q.   And then, the trustee listed the property for $4.5

21  million, correct?

22  A.   Yes.

23       Q.   And he used Deborah Gordon, who was your suggestion,

24  correct?

25  A.   Yes.



ALEX FILIPPOV - Cross

1    Q.   You wanted to give the listing to Deborah Gordon?

2    A.   Yes.

3    Q.   And Ms. Gordon, in fact, was the one who suggested

4    4.5 was the right price to list it at, correct?

5    A.   To sell it in two weeks' time, yes.

6    Q.   Well, to sell it in two weeks' time.  So is it your

7    testimony, sir, that you listed this below market value so

8    that you could do a quick sale?

9    A.   It wasn't me who listed this.

10    Q.   I'm sorry?

11    A.   It wasn't me who listed with Deborah Gordon.  It was the

12    trustee.

13    Q.   Oh, okay.  At any point, sir, did you tell anybody

14    that, wait, 4.5 is way low; this property is actually worth

15    significantly more; we'd better not list it at 4.5, or words

16    to that effect?

17    A.   We knew that it is low, yes.

18    Q.   And you didn't object to that listing?

19    A.   We needed to -- to be done with this.

20    Q.   And you needed to be done by it because you didn't

21    want to continue paying carrying costs; isn't that correct?

22    A.   That's correct, yes.

23    Q.   Now, in that pot of money that the bankruptcy

24    trustee is holding, you understand that it has two components,

25    correct?



ALEX FILIPPOV - Cross

1    A.   Yes.

2         Q.   So there is a chunk of money from the sale of the

3    real estate, right?  These properties each sold for $4.4

4    million, correct?

5    A.   Yes.

6         Q.   And then, after lawyers' fees and title searches and

7    all the closing costs, there was some sum left over, and that

8    went into the trustee's account, correct?

9    A.   Yes.

10        Q.   That's one pot of money.  And there is another pot

11   of money -- so that's the net, right?  The net proceeds went

12   in from the sale, right?

13   A.   Yes.

14        Q.   And then, there's another pot of money, which is,

15   roughly, $106-, $107,000, which is the remainder of what you

16   claim is a loan, correct?

17   A.   Yes.

18        Q.   Now, you understood --

19             MR. PERTEN:  Could we pull up the operating

20   agreement?  Exhibit 15, I believe.

21   BY MR. PERTEN:

22        Q.   Now, sir, we looked at the operating agreement.  And

23   section 5.1 said Kagan will be compensated per section 8.1,

24   correct?

25   A.   Yes.


(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1      Q.   And section 8.1 --

2           MR. PERTEN:  If we could roll to that.

3    BY MR. PERTEN:

4      Q.   -- it talks about how the money gets split up,

5    correct?

6    A.   Yes.

7      Q.   And that's how he's going to get paid.  And so we

8    have this pot of money, which is the net proceeds from the

9    real estate, and the other is the loan, correct?  Correct?

10   A.   Yes.

11     Q.   And 8.2 says --

12          MR. PERTEN:  You went down too far.  Go back up,

13   please.

14   BY MR. PERTEN:

15     Q.   There's a bunch of things.  The net profits, the net

16   cash flow, and net proceeds of any sale -- the net proceeds of

17   any sale is allocated fifty percent to Mr. Kagan, correct?

18   It's what it says.  You agree with me?  I read that language.

19   "The net profits, net cash flow, and net proceeds of any sale

20   or refinancing or upon liquidation shall be allocated

21   Filippov, forty percent; Lipetsker, ten percent; Kagan, fifty

22   percent", correct?

23   A.   That's what it says, yes.

24     Q.   So you understand, sir, that the net proceeds of the

25   sale are in the bank account, and the allocation, per 5.1,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ALEX FILIPPOV - Cross

1    he's going to get paid per section 8.1, the net proceeds get

2    allocated fifty percent to Mr. Kagan?

3    A.   I don't understand this.

4        Q.   Well -- right.  Now, if we could go back --

5            MR. PERTEN:  Can I see Exhibit 72, please?  This is

6    the unredacted one.  Do we have the redacted one?  It's all

7    right.  Just go ahead.

8            MR. HARRIS:  (Indiscernible).

9            MR. PERTEN:  I'm sorry?

10           MR. HARRIS:  Where would you like to focus?

11           MR. PERTEN:  I would like you to focus on the -- in

12   the middle, where there's a -- right there, a $132,000 charge.

13   BY MR. PERTEN:

14       Q.   Okay.  We looked at Exhibit 72 yesterday.  And you

15   said this represented the carrying costs that you put into the

16   project, correct?

17   A.   Yeah, the carrying costs, the legal fees.

18       Q.   Yes.  And in fact, included on that, it says, part

19   of $200,000 mortgage on 9/30/2015, correct?

20   A.   Yes.

21       Q.   So you put in this mortgage.  There's $132,000,

22   which you're now claiming is part of your carrying costs,

23   correct?

24   A.   Or legal fees.

25       Q.   Or legal fees.  And you're using that -- sir, you've

Page 168

ALEX FILIPPOV - Cross

1  also filed a proof of claim in this case, seeking to recover

2  the full 200,000, of which this 132 is a portion, correct?

3  A.   Yes.

4       Q.   So you're, in fact, claiming it's a carrying cost.

5  And then, at the same time, you're claiming it was a loan.

6  Which is it, sir?

7  A.   This mortgage was a loan.

8       Q.   Was a loan.  And incidentally, sir, if we go to

9  291 --

10        MR. PERTEN:  Last page.  Are we there?

11  BY MR. PERTEN:

12       Q.   This is your spreadsheet.  This is your QuickBooks

13  report of the LLC.  This doesn't --

14        MR. PERTEN:  Are we at the bottom?

15  BY MR. PERTEN:

16       Q.   Even though this is dated April of 2018, there are

17  no payments beyond November 2015, correct?

18  A.   Yes.

19       Q.   So in fact, you made no additional payments on the

20  LLC after November of 2015; isn't that correct?

21  A.   After November 15th (sic), I guess not.

22       Q.   Okay.  And remember, I asked you, at your

23  deposition, if you could identify which of these payments were

24  the so-called loan that you made?  You remember that?

25  A.   Yeah.



ALEX FILIPPOV - Cross

1    Q.   You were unable to do that; isn't that correct?

2    A.   Right.

3    Q.   The only way you could do it is you said, well, you

4    just look at my deposits, and when it adds up to $200,000,

5    those are loans, correct?

6    A.   Yes.

7    Q.   Is that good bookkeeping practice for a managing

8    partner of an LLC, sir?

9    A.   Probably not.

10    Q.   And in fact, there are no entries in this document

11    for a loan deposit that you made; isn't that correct?

12    A.   (Indiscernible).

13         MR. PERTEN:  You want to scroll up so he can see a

14    little bit more?

15    A.   Was entry in another --

16    BY MR. PERTEN:

17    Q.   Well, sir, if we look at the top, remember Mr. Pyle

18    sent you the lawyer letter on about -- on May 7th.  And then,

19    you took over the property at the -- you said, yesterday,

20    roughly mid-May-ish, towards the ends of May?

21    A.   It was $132,000 somewhere, the entry on the previous

22    sheet that --

23    Q.   You want to go to the previous sheet?

24    A.   Yeah.  Here, $132,000.

25    Q.   Right.  But I'm looking at your QuickBooks, sir.




ALEX FILIPPOV - Cross

1   A.   Yeah.

2        Q.   This is some summary that you did, but this is what

3   you told me -- what you've testified is the account that you

4   were keeping for Lyman-Cutler.  Those payments aren't there,

5   are they?

6   A.   It's hard for me to say.  Maybe not.

7        Q.   And in fact, sir, none of the payments that you

8   listed are listed as loans, are they?

9   A.   No.

10       Q.   There's something called Alex Filippov investments,

11  but we don't know if those are investments or loans or

12  carrying costs.  There's no way to know, right?

13  A.   Right.

14       Q.   And in fact, you don't even know; isn't that

15  correct?

16  A.   Correct.

17            MR. PERTEN:  Your Honor, if I may have thirty

18  seconds, I think I'm just --

19            THE COURT:  You may.

20            MR. PERTEN:  Thank you.

21                        (Pause)

22            MR. PERTEN:  Your Honor, I have no further questions

23  for Mr. Filippov.

24            THE COURT:  Okay.  I assume -- do you want to do a

25  few minutes of direct -- redirect, or do you want to --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 171

ALEX FILIPPOV - Cross

1          MR. CARNATHAN:  Yeah, absolutely.  Thank you, Your

2    Honor.

3          THE COURT:  You want to do that now?  Okay.

4          MR. CARNATHAN:  Tomorrow's fine, I mean, if you want

5    to call it here.

6          THE COURT:  Well, you're not going to finish it, I

7    assume.  I'll leave it to you.  You can use the time up to 1

8    o'clock, if you want?

9          MR. CARNATHAN:  I'd be happy to do it tomorrow.

10   It'll be cleaner, and I can start now.

11         THE COURT:  Seven minutes won't make a difference to

12   our trial schedule, I think, so why don't we wrap it up, then,

13   for today.  And we'll be back here tomorrow at 9.  I will not

14   be here at all on Thursday next week.  I'm going to have to

15   travel, so don't subpoena people here for then.

16         We've got four other days scheduled.  I think those

17   are scheduled for full days.  You know, we could talk, as we

18   move along, and sort of see what the rhythm of the trial is at

19   that point.

20         MR. PERTEN:  Your Honor, just -- it's more

21   housekeeping than anything else.

22         THE COURT:  Sure.

23         MR. PERTEN:  Just so that the Court's aware -- and I

24   had mentioned this to Mr. Carnathan a week ago -- Mr. Von

25   Salmi, my expert --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1              THE COURT:  Yes.

 2              MR. PERTEN:  -- has vacation plans is from June 6th

 3   to the 24th.  He said he could be here on the 25th, which is

 4   the last day that we're scheduled --

 5              THE COURT:  We've given you --

 6              MR. PERTEN:  -- for trial, so he'll be here that day.

 7   But I just wanted the Court to be aware, because he's gone.

 8   (Indiscernible).

 9              THE COURT:  I mean, that's fine, right?

10              MR. PERTEN:  Okay.

11              MR. CARNATHAN:  Yeah, absolutely.

12              THE COURT:  No objection there.  I mean, it's the end

13   of the trial.  It --

14              MR. CARNATHAN:  Sure.

15              THE COURT:  And it's one of the days we have, so it's

16   not even out of order, right?  It might be, from your --

17              MR. PERTEN:  Yeah.

18              THE COURT:  -- standpoint, but not from mine.  Okay.

19   Right.  Anything else?

20              All right.  Same instructions about no discussions,

21   other than -- you know the instructions.  Okay.

22              MR. CARNATHAN:  I guess one question, are we --

23              THE COURT:  Sure.

24              MR. CARNATHAN:  -- jury-boxing stuff, or are we

25   leaving it on the table again?
```

1          THE COURT:  Hold on.

2                    (Court and clerk confer)

3          THE COURT:  So all right.  First of all, as far as

4   storage is concerned, there will be no outsiders here.  I do

5   have a group from the administrative office in Washington

6   coming.  They're going to sit in the gallery while we talk

7   about some things, but they're all federal court employees.

8   So they'll be here, but if we can't trust them, we're in deep

9   trouble.  So we're not going to be touching anything.  You can

10  leave things on the table.  You don't --

11         MR. CARNATHAN:  Thank you, Your Honor.

12         THE COURT:  -- have to move a thing.

13         So Elizabeth asks the question, have we moved in --

14  this is a very fair question.

15         I assume -- so today was all cross.  It was all your

16  cross, Mr. Perten.  You referred to many exhibits.  Those are

17  all in evidence, right?

18         MR. PERTEN:  Right.

19         THE COURT:  Right.  There was nothing that you

20  didn't --

21         MR. PERTEN:  With one exception (indiscernible).

22         MR. CARNATHAN:  With one exception, Your Honor.

23         THE COURT:  One exception?

24         MR. PERTEN:  Which I referred to but didn't offer,

25  and that was the August 20 --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 174

```
 1              THE COURT:  You better get to the microphone on this,
 2    make sure we're getting it.
 3              Are you getting it?
 4              MR. CARNATHAN:  I forget the number, but it --
 5              THE COURT:  You can hear?
 6              MR. CARNATHAN:  -- was the email that Mr. Filippov --
 7    215.
 8              THE COURT:  All right.
 9              THE CLERK:  Okay.
10              THE COURT:  What's the status of Exhibit 215?
11              MR. PERTEN:  I have not offered that yet.  I'll get
12    it in through a different witness.
13              THE COURT:  Okay, that's fine.
14              MR. CARNATHAN:  At least, he'll try.
15              THE COURT:  It's not in, and we'll take it from --
16    take it from there.  He can offer it through a qualified
17    witness.  Otherwise, everything is in that was mentioned
18    today?  Okay.  Very well.
19              I'll see you tomorrow.  Thank you.
20              IN UNISON:  Thank you, Your Honor.
21              THE CLERK:  All rise.  Court's in recess.
22    (End at 12:56 PM)
23                        * * * * * * * * * *
24
25
```

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

1          I certify that the foregoing is a true and accurate

2    transcript from the digitally sound recorded record of the

3    proceedings.

4

5

6

7    /s/ Cheryl Odom                              May 29, 2019

8    _____

ESCRIBERS LLC
9                                eScribers
                        7227 N. 16th Street, Suite #207
10                           Phoenix, AZ 85020
                              973-406-2250
11                      e-mail operations@escribers.net

12

13

14

15

16

17

18

19

20

21

22

23

24

25

eScribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

Case 16-01120   Doc 341   Filed 06/04/19   Entered 06/04/19 13:01:14   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 176 of 194

May 7, 2019

**$**

**$1.3 (14)**
16:15,23;17:9;23:15;
36:15;37:12,13;38:18;
76:13,18,21;80:4;
88:24;89:7
**$1.3-million (1)**
36:24
**$1.4 (1)**
80:18
**$1.6 (3)**
74:12,15;76:25
**$10,000 (2)**
64:11;111:24
**$106- (1)**
165:15
**$107,000 (2)**
154:9;165:15
**$110,000 (1)**
150:1
**$12,000 (1)**
65:9
**$12,500 (3)**
65:8,11,24
**$132,000 (4)**
167:12,21;169:21,24
**$150,000 (1)**
82:2
**$18,348 (1)**
158:23
**$2 (2)**
78:13;161:15
**$20 (1)**
78:13
**$200,000 (7)**
34:14,24;35:9;80:23;
82:1;167:19;169:4
**$23,000 (1)**
157:10
**$25,000 (1)**
157:14
**$250,000 (1)**
65:20
**$275,000 (1)**
81:9
**$2-million (1)**
160:18
**$3,500 (2)**
105:22;107:25
**$4.3 (1)**
76:12
**$4.4 (1)**
165:3
**$4.5 (1)**
163:20
**$4.9 (10)**
28:3,7;29:14,16,18,
25;30:5,13,22;62:3
**$40,000 (1)**
115:19
**$5,000 (1)**

64:10
**$5.3 (1)**
76:19
**$5.5 (3)**
123:9,13,15
**$50,000 (2)**
158:5;159:11
**$6,000 (1)**
138:15
**$6,500 (2)**
35:4,7
**$600,000 (5)**
31:25;32:4,11;33:1;
123:24
**$75,000 (1)**
78:22
**$750,000 (1)**
71:14
**$80,000 (1)**
113:14

**@**

**@hotmailcom (1)**
92:20
**@kagandevelopmentcom (1)**
91:10

**A**

**abbreviated (1)**
83:9
**ability (7)**
9:20;118:7;120:9;
127:9;134:3,5,11
**able (5)**
19:10;27:1;49:9;
57:14;144:20
**absolute (3)**
61:9;65:3;147:13
**Absolutely (5)**
6:16;85:9;97:7;
171:1;172:11
**acceptable (1)**
139:23
**accepted (2)**
24:25;51:18
**access (2)**
92:24;114:19
**accordance (4)**
37:16,23;38:21;67:4
**according (2)**
88:18;157:9
**account (5)**
35:18;60:22;64:7,10;
105:17;106:4,11,23;
138:16;150:2;156:4,
20;165:8;166:25;170:3
**accounts (3)**
107:18;114:25;157:3
**accurate (15)**
32:13,14,15;33:2,3,4,
6,16,19;82:10;95:9;

96:20;119:14,18;120:9
**accurately (5)**
18:20,21;108:5,7,10
**accuse (1)**
102:14
**accusing (2)**
140:6,18
**acknowledged (1)**
14:1
**acquisition (3)**
63:15;64:23;65:2
**act (1)**
121:5
**action (3)**
33:13;141:11;160:19
**actions (3)**
59:10;160:13,14,14,
15
**active (1)**
140:1
**actual (1)**
90:21
**actuality (1)**
75:9
**actually (12)**
5:6;55:19;61:16;
66:11;68:15;80:21;
99:10;100:15;101:9;
103:11;129:17;164:14
**added (2)**
53:16;105:23
**addendum (7)**
40:1,5,8,11;41:6,7,10
**addition (1)**
44:6
**additional (4)**
82:1,1;158:14;
168:19
**address (5)**
45:25;53:19;55:12;
79:14;131:23
**addressed (3)**
46:2,23;83:4
**adds (1)**
169:4
**administrative (1)**
173:5
**admitted (1)**
6:13
**advance (5)**
117:3,4,9,11,14
**advances (1)**
106:10
**advantage (1)**
71:9
**adversary (11)**
32:9,16,19,22;33:12;
61:25;62:11;95:7,18;
121:18;128:5
**advisable (1)**
59:12
**advised (2)**
73:3;80:23

**advises (1)**
51:23
**affairs (2)**
59:13;157:19
**affirm (1)**
39:15
**affirmative (2)**
121:5,24
**affirmatively (3)**
17:6;124:8,9
**afternoon (2)**
130:6;131:24
**Again (55)**
6:18;7:9;14:5;28:10;
30:15;32:6;36:9;39:13;
41:18;42:7;49:2;50:17,
24;51:9,21;53:24;
54:11;55:9;66:15;
68:20,23;74:5;78:2;
84:16;98:10;100:12;
106:16,19;107:24;
108:15,18,19;110:21;
111:17;113:13;114:15;
116:6,11;117:10,14,15,
16;122:21,23;132:12;
139:8,22;140:25;
145:2,8;156:18;
158:18,22;161:8;
172:25
**against (5)**
16:23;141:6;142:9;
145:25;156:17
**ago (5)**
16:20;62:19;84:3,8;
171:24
**agree (33)**
9:1;21:3;23:3;26:7;
27:4;32:2;35:3;36:23;
48:10;58:2;65:19;
74:22;75:20;76:11,12,
15;81:24;90:1,1;105:8;
112:5;114:6;136:11,
18;138:12;139:3,10;
143:5;144:12;160:21;
162:2;163:1;166:18
**agreed (15)**
6:1,4,6;17:18;29:24;
31:10,14;32:4;42:21;
68:24;88:11;89:3;98:8;
131:4;136:2
**agreed-upon (1)**
41:9
**agreeing (1)**
14:17
**agreement (102)**
9:15,19,24;13:23;
28:4,6;29:23;30:4,6;
31:5,7;32:2;34:13;
36:25;37:8;40:1,8;
43:1;44:6,12,20;45:5;
53:17;54:1;55:17;
56:10;59:24;61:2,3;
62:16;66:10,13,16,22,

25;67:5;68:4,24;69:23;
70:3,12,20;73:16;
77:17;86:11,15,19,22;
87:1,10,10,23;88:12,
15;89:2,4,6,18,19;90:5,
21;93:4;95:1;98:6,12,
15;120:15,23;121:1,15,
19;122:8,8,12;126:13,
15,21;128:21,25;
129:10,15,18,22;130:7,
11,16;131:3,18;133:5;
137:2;139:10;142:5,
12,12;146:3;147:6;
150:16;155:24;161:23,
24;165:20,22
**agreements (1)**
121:2
**agrees (2)**
88:18,20
**ahead (4)**
4:6;34:10;149:19;
167:7
**AJM (2)**
110:15;111:18
**al (1)**
4:14
**Alex (8)**
4:11,18;8:13;63:10;
69:9;129:4;145:9;
170:10
**allegation (7)**
32:9,15;33:24;95:22;
96:10,18;141:13
**allegations (6)**
33:6,16,19;62:11;
95:8;148:20
**allege (1)**
143:9
**alleged (12)**
16:23;30:13;32:8;
113:8;117:19;123:22;
133:2;140:9;141:9,18,
21;145:14
**alleging (3)**
119:20,22;122:7
**allocated (5)**
26:5;63:9;166:17,20;
167:2
**allocation (6)**
21:14,23;22:6;34:25;
55:5;166:25
**allotted (1)**
35:10
**allowed (1)**
102:25
**almost (3)**
106:11;128:2;144:14
**along (3)**
16:10;123:12;171:18
**alternative (1)**
152:3
**although (1)**
83:3

Case 16-01120    Doc 341    Filed 06/04/19    Entered 06/04/19 13:01:14    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 177 of 194
May 7, 2019

**always (2)**
9:12;91:10
**amenable (2)**
136:25;139:8
**amended (1)**
33:12
**amendment (2)**
137:1;139:9
**American (1)**
144:9
**Amex (3)**
114:2,16;144:9
**among (2)**
63:9;95:20
**amount (7)**
13:1;49:12;97:5;
101:6;116:3,8;158:23
**amounts (1)**
98:17
**analysis (9)**
21:4;22:11;23:5,9,
12;24:25;26:21;82:17;
85:20
**annum (2)**
66:4,5
**answered (4)**
14:16;24:10;33:20;
34:4
**anticipate (1)**
163:9
**anticipated (2)**
80:24;81:25
**anyways (1)**
14:18
**apparent (1)**
83:10
**apparently (3)**
48:4;161:16;162:22
**appeal (1)**
7:22
**appears (2)**
36:24;159:6
**appointed (1)**
163:10
**appraisal (11)**
74:1,2,6,11,15,15;
75:1,12,23;125:21,25
**appraised (1)**
76:4
**appreciate (1)**
131:9
**apprised (1)**
49:22
**approach (5)**
12:4;75:24,24;76:1;
137:2
**appropriate (1)**
71:9
**approve (2)**
57:14;135:23
**approved (3)**
56:20,23,23
**April (11)**

**75:6;128:21,24;**
129:3;130:6;132:17;
142:12;144:13;157:1,
4;168:16
**Architectural (2)**
87:15;111:18
**area (1)**
75:4
**argue (1)**
7:18
**Arina (3)**
60:3,7;116:6
**Arina's (1)**
108:4
**arithmetic (1)**
20:1
**arose (1)**
61:13
**around (1)**
91:6
**arrive (1)**
139:22
**aspects (1)**
83:11
**assert (2)**
6:25;7:2
**asserting (1)**
142:7
**assets (1)**
152:1
**assume (3)**
170:24;171:7;173:15
**assuming (2)**
6:19;55:24
**assumption (4)**
24:24;56:2,3,6
**assumptions (4)**
21:14;24:18,21,22
**assured (2)**
11:23;13:16
**asterisk (1)**
23:14
**attached (6)**
17:25;20:17;41:7,10;
111:5;115:4
**attachment (1)**
18:5
**attachments (1)**
93:4
**attempt (1)**
140:14
**attention (10)**
12:16,22;14:5;28:8;
30:17;66:24;69:8,18;
124:22;140:3
**attested (1)**
33:5
**Attorney (8)**
10:18;38:13;42:25;
43:24,25;54:9;56:1;
69:8
**auction (1)**
151:11

**Audio (1)**
94:9
**August (9)**
92:19;110:21;111:2;
127:20,23;128:1,13,14;
173:25
**authority (2)**
121:15;122:14
**authorization (1)**
132:10
**authorize (2)**
126:7;132:24
**automatically (1)**
79:24
**available (1)**
138:6
**Avenue (1)**
127:20
**avoid (1)**
8:1
**aware (3)**
44:23;171:23;172:7
**axe (1)**
150:12

**B**

**back (25)**
8:3;22:1;43:9;56:23;
66:21;78:10,14,20;
84:22;102:24;107:9;
115:25;129:13;130:7;
131:8;132:13;133:3;
137:22;145:15;156:10;
158:10,25;166:12;
167:4;171:13
**background (2)**
19:21;83:1
**backup (3)**
5:17;112:15;142:20
**balance (1)**
104:24
**bank (32)**
43:25;44:7,12;49:10;
52:11,17;70:25;71:4,6,
7;74:1;97:12;101:4;
102:5,8,13;105:13;
106:11;107:1,8;
114:21;115:3;116:19;
117:23;138:6,16;
150:1;151:10;152:1,3;
156:4;166:25
**bankrupt (1)**
149:12
**bankruptcy (20)**
32:10;137:18;
149:13,17,23;150:23;
151:1;152:8,19;
153:13;154:10,18;
157:17;158:6;159:4,8;
160:3,9;162:21;164:23
**Barcelona (1)**
73:9

**bargained (1)**
147:9
**based (8)**
44:23;53:5;60:25;
66:6;75:1;85:23,24;
160:22
**Basically (2)**
113:25;153:24
**Basis (6)**
18:12;88:21;89:16;
142:16,24;143:3
**bear (1)**
154:9
**beautiful (1)**
110:22
**beginning (2)**
81:21;138:25
**begins (1)**
94:9
**behalf (7)**
16:1;38:13;59:11;
86:11;135:12;152:15;
156:20
**behind (4)**
19:25;43:8;129:13;
133:3
**Belmont (1)**
71:7
**below (4)**
62:25;75:3;87:14;
164:7
**benefit (2)**
153:8;155:14
**benefits (1)**
83:10
**Besides (1)**
83:10
**best (7)**
16:9,11;33:18;45:1;
70:10,11;102:18
**better (7)**
5:7;25:21;71:10;
79:2;110:6;164:15;
174:1
**beyond (2)**
121:15;168:17
**bids (1)**
58:13
**big (3)**
112:14;145:15;
161:20
**bigger (6)**
74:24;107:15;
124:20,25;125:15,20
**bills (2)**
90:15,22
**binder (1)**
6:7
**binders (5)**
5:14,16,17,25;6:5
**binding (2)**
87:1;88:3
**bit (8)**

**9:13;11:15;31:21;**
54:15;59:4;74:20;
156:24;169:14
**blank (1)**
68:21
**blindly (1)**
90:7
**board (1)**
72:3
**bogus (1)**
160:23
**bold (1)**
63:13
**bond (1)**
146:20
**bookkeeping (1)**
169:7
**books (22)**
5:23;59:25;60:6,14,
14,18,18,19,20,22;
108:12;109:5;119:21,
22,23;120:4,8,13;
141:2,19;143:7,9
**Boris (5)**
15:2;46:25;47:14;
48:1;51:17
**borrowing (1)**
71:17
**Borya (1)**
46:23
**both (4)**
6:1;77:19;127:8;
128:24
**bottom (7)**
12:22;14:5;39:19,20,
24;136:24;168:14
**bought (1)**
126:17;144:1
**bound (4)**
9:14;69:24;86:19,23
**box (1)**
68:20
**breach (1)**
72:20
**break (2)**
94:1,5
**breakdowns (1)**
26:4
**briefly (5)**
41:18;86:7;94:17;
128:20;131:1
**bring (9)**
5:10;37:4;39:18;
46:10;47:21;49:24;
67:9;92:12;103:16
**broad (1)**
38:21
**broke (2)**
94:16;134:21
**broker (4)**
42:22;161:13;162:1,
4
**brokers (3)**

122:15;126:20,25

**Brookline (2)**
71:23;72:5

**brought (8)**
15:20;16:22;17:3;
30:12;67:17;69:8,17;
145:3

**Brusenkova (1)**
77:6

**budget (10)**
17:2,22;39:12;76:23;
78:22;101:3;104:4,5;
112:17,24

**budgeted (4)**
31:25;32:11;33:1;
123:25

**build (7)**
19:6;38:20,22;56:13;
76:6;77:18;84:14

**builder (5)**
52:8;53:16,23;88:18,
19

**builders' (1)**
88:20

**building (5)**
54:2;62:20;104:4;
111:10,14

**built (5)**
15:17;24:22;37:16;
75:9;125:17

**bulk (1)**
45:20

**bunch (2)**
46:20;166:15

**business (5)**
100:14;107:5;113:5,
7;120:13

**businessman (2)**
43:4;86:14

**buy (2)**
70:22;161:14

**buyer (1)**
162:1

**C**

**calculated (1)**
81:14

**calculation (1)**
22:25

**calculations (3)**
39:25;85:22,24

**calendar (1)**
119:2

**call (16)**
4:7;50:21;52:13;
61:4,10;102:6,13;
118:11;126:6;129:5;
134:3;147:6,13;
149:16;151:11;171:5

**called (9)**
23:4;105:9;147:2,4;
151:7;152:1,5;158:10;

170:10

**calling (3)**
4:9;104:1;126:11

**calls (3)**
147:13,22;148:6

**came (6)**
61:7;84:13,17;104:9;
126:1;148:22

**can (55)**
6:19,22;8:9;9:6;
17:13;18:16;19:9,25;
23:23;26:17;30:15;
32:6;33:9;37:4;39:13;
46:10;49:24;51:5;53:2,
24;59:14;66:15;74:5,
23;76:12;77:16;79:6;
87:23;90:20;92:6;
93:20;94:1;95:4;98:2,
10,12;105:5;107:14;
109:22;121:4;128:19;
131:6;143:21;152:10;
153:21,23,25;162:13;
167:5;169:13;171:7,
10;173:9;174:5,16

**cap (1)**
89:6

**capital (6)**
64:7,10,21;65:22;
98:16,17

**capped (1)**
88:24

**care (4)**
50:18;88:2;112:9;
118:23

**cared (2)**
87:21,22

**career (1)**
8:19

**carefully (3)**
8:22;9:24;45:7

**cares (1)**
87:24

**CARNATHAN (30)**
4:5,17,18;5:9,12,14;
6:3,15,24;7:6;18:11,
13;24:6;52:24;77:11;
125:1,4;171:1,4,9,24;
172:11,14,22,24;
173:11,22;174:4,6,14

**Carnathan's (4)**
5:23;157:10,14;
158:2

**carried (1)**
49:21

**carries (1)**
86:16

**carrying (54)**
26:14;28:18,20,21;
34:14,25;35:6,10,18,
19;63:16,21,22;77:2;
78:8;80:7;81:7;82:2;
98:2,7,8,20,25;99:11;
100:11;101:5,9,18;

102:25;104:6,7;
107:23,25;108:3,15,19;
109:6;138:25;142:7;
150:7,8,11,12,14,17;
151:9;153:9;156:1;
164:21;167:15,17,22;
168:4;170:12

**carrying-cost (3)**
34:21;155:19,21

**case (12)**
4:9,13;12:3;30:12;
32:23;49:16,17;64:16;
86:21;108:8;157:21;
168:1

**cash (3)**
63:7;166:16,19

**catch (1)**
73:2

**caught (1)**
102:5

**cc (2)**
46:5;48:2

**central (2)**
36:20;41:6

**Century (5)**
127:2;129:10;131:3;
134:15,21

**certain (10)**
9:11;19:25;24:22;
26:4;54:17;86:16;
100:13,24;120:4;160:1

**Certainly (53)**
6:15;9:18;43:8;
44:16;50:6;57:22;58:1,
2,12;61:7;62:9;73:19;
76:11;84:22;86:18;
89:6,14;91:13;99:4;
102:13;108:8;110:18;
112:8;116:14;119:8,
16;120:8,12;122:24;
123:4;125:4,8,10;
126:3,17;129:13;
132:9;134:2,5,11;
135:8;136:3,10;
139:11;146:7,10;
147:1;151:7;154:22;
155:6;160:8;162:8,22

**certificate (3)**
67:1,18;128:3

**certificates (1)**
98:20

**cetera (1)**
28:24

**change (10)**
30:25;43:9;50:8;
100:21;114:16;125:22;
135:24;157:10,14;
159:11

**changed (4)**
41:3;50:7;76:25;
124:24

**changes (2)**
40:2,19

**changing (1)**
85:10

**Chapter (2)**
163:2,5

**charge (5)**
49:18,20;59:21;
89:14;167:12

**charged (2)**
144:2;156:10

**charges (1)**
25:14

**cheaper (1)**
146:23

**check (22)**
109:21,25;110:6,8,
11,14,19,24;111:9,20;
112:8;113:10;114:6,
16;115:7,14,21;116:3,
8,9;117:24;138:8

**checkboxes (1)**
75:3

**checked (1)**
134:6

**checks (26)**
90:10,25;91:21;92:1,
2;106:2,3,3;109:15;
112:2,15,22;113:1,19;
114:22;115:4;116:2,7,
12,12,18;117:20;118:2,
4;132:20,20

**choice (1)**
51:16

**chose (3)**
6:20;59:18;147:4

**chronology (1)**
145:8

**chunk (1)**
165:2

**chunks (1)**
91:13

**claim (12)**
4:11;5:18;14:9;
97:19;101:15;120:10;
143:17,18;153:11;
154:13;165:16;168:1

**claimant (1)**
4:11

**claimed (1)**
152:23

**claiming (4)**
104:8;167:22;168:4,
5

**claims (3)**
142:8,15;159:18

**clarification (1)**
45:10

**clarified (1)**
6:24

**clarifies (1)**
137:4

**Classic (8)**
86:8;89:11,23;90:10,
15,22;97:1,8

**changing (1)**
85:10

**clause (3)**
9:8;37:22;64:17

**cleaner (1)**
171:10

**clear (11)**
5:25;6:23;7:9;35:14;
38:20;52:8;56:13;
119:20;120:8;130:8;
146:7

**clearly (1)**
135:22

**CLERK (14)**
4:2,7,9;5:11,16;
32:20;94:6,9;95:5,14;
157:23;173:2;174:9,21

**clients (1)**
135:12

**close (3)**
93:24;97:13;139:8

**closed (4)**
70:15;71:21;162:9,
22

**closely (1)**
10:16

**closing (9)**
43:25;44:7;55:19;
99:11,24;100:3,4;
114:2;165:7

**closings (1)**
100:3

**Cohen (7)**
143:7;144:23;
145:11;148:9;149:9

**collect (1)**
120:9

**column (1)**
26:7

**comfortable (2)**
8:9;119:17

**coming (8)**
35:20,23,25;105:25;
107:1;156:13;160:25;
173:6

**commence (1)**
67:1

**commencement (1)**
157:21

**comments (3)**
47:15;48:21;54:8

**Commission (3)**
71:23;72:2;130:2

**commitment (1)**
28:17

**common (2)**
100:12,14

**Commonwealth (2)**
67:2;68:16

**communicate (3)**
45:1;149:8,8

**communicated (1)**
46:1

**communication (4)**
46:7;51:22;54:11;

Case 16-01120   Doc 341   Filed 06/04/19   Entered 06/04/19 13:01:14   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

Document     Page 179 of 194

May 7, 2019

149:10

**communications (2)**
46:9;79:1

**companies (3)**
16:23;36:12;53:13

**Company (34)**
49:11;53:9,21,23;
54:1;59:11,15;63:8,9;
66:25;69:3;70:24;
89:11,13,16;91:17;
95:19;97:5,17,20;
98:16,19;101:16;
102:19;103:2;113:24,
24;137:4;139:24;
142:9;151:10,16;
154:4;155:15

**company's (1)**
138:7

**comparative (1)**
76:5

**comparison (1)**
75:24

**compensated (1)**
165:23

**compensation (2)**
62:24;63:6

**complaint (28)**
17:17,25;18:10,14,
19,22;30:18,20;32:9,
16,19,22;33:6,12;
61:25;62:10,11;95:7,
18;96:11,17;121:19;
124:10;128:5;141:19,
23;144:4,8

**Complete (4)**
92:17;93:15;128:6,8

**completed (3)**
57:4;128:17;149:23

**completely (3)**
149:9,10;160:23

**completion (5)**
57:7,10,11;88:8,12

**comply (3)**
9:9;87:2;99:19

**component (1)**
85:6

**components (1)**
164:24

**compromise (2)**
137:1;139:9

**compromises (2)**
139:12,14

**computer (1)**
96:6

**concern (5)**
45:19,25;129:25;
130:10;151:13

**concerned (6)**
45:20;52:6;124:18;
152:4;163:12;173:4

**concerns (5)**
46:2;53:19;55:12;
114:9;147:2

**conditions (1)**
135:21

**conduct (1)**
59:12

**confer (1)**
173:2

**confirm (4)**
131:4,8,16,17

**confirmation (1)**
131:15

**confirmed (4)**
56:6;60:21;132:4;
142:12

**confirming (2)**
132:17,21

**conflict (1)**
43:22

**connection (1)**
59:12

**consent (1)**
51:6

**consider (2)**
42:5;162:25

**consideration (3)**
75:7;83:15;88:19

**considered (1)**
7:23

**consistent (1)**
75:15

**Consolidated (2)**
105:5;109:20

**construct (1)**
88:18

**constructed (1)**
37:22

**constructing (1)**
88:19

**construction (54)**
19:2;20:4;23:15;
25:24;26:3,5;28:18,23;
31:12;36:5,9;37:13;
57:3,18;58:23,25;59:3,
21;73:11;74:3,13;
76:21;78:25;80:4,18,
21;81:4,21;82:1;84:10;
86:8;91:6;97:6,9,16,21,
24,25;98:7,18,19,23;
99:5,10;100:10;101:3,
14,20,23;116:21;117:3,
4;128:6,7

**construction- (1)**
117:10

**construction-loan (1)**
107:2

**constructive (1)**
140:1

**consult (1)**
124:2

**consulted (1)**
148:17

**consulting (6)**
31:23;32:23,24;
123:23;148:2;149:14

**contact (1)**
103:2

**contacted (3)**
104:25;128:25;
131:24

**contacts (1)**
132:20

**contained (1)**
17:4

**contemplated (2)**
64:1;75:2

**contention (1)**
108:9

**context (4)**
7:11,21;83:14,23

**contingency (1)**
78:22

**continuation (2)**
47:22;51:3

**continue (5)**
8:8;26:17;64:19;
67:3;164:21

**contract (42)**
9:1,5,8;36:24;52:11,
17,23;53:5,12,21;
76:21;86:3,7,8;87:14;
88:8,17,24;89:7,15,23;
90:18,20;91:20;92:9,
16;93:10;94:17,20,21,
22;95:19;96:11,15,18,
23;97:2,9;101:15;
146:13,15;160:22

**contractor (2)**
13:5;146:10

**Contractors (2)**
13:6;111:23

**contractors' (1)**
88:20

**contracts (5)**
8:18,23;9:11;38:18;
40:6

**contractually (2)**
64:2;97:4

**contrary (1)**
128:7

**contribute (1)**
63:22

**contributed (2)**
98:16

**contribution (2)**
64:21;65:23

**contributions (1)**
139:23

**control (7)**
24:4;27:9;45:21;
51:5,15,23;163:6

**conversation (14)**
12:23;13:1,3,24,25;
47:22;49:1;50:24;51:3;
72:24;73:1;85:10;93:3;
162:16

**conversations (3)**
52:5;55:23;131:3

**converted (1)**
163:16

**cooperate (1)**
149:1

**cooperating (1)**
148:24

**cooperative (1)**
140:1

**copied (5)**
46:7,8;48:3;50:11;
51:10

**copies (10)**
92:1;106:3;109:15;
110:11;112:15;114:7,
22;115:3;117:20;118:4

**copy (14)**
17:24;47:14;77:8;
92:15;111:20;113:14;
114:5;115:13;117:15;
120:22;129:18,22;
130:16;142:13

**copying (1)**
116:18

**Corp (5)**
4:12,13,22,23;110:8

**corporate (1)**
159:17

**corr (1)**
122:4

**correctly (10)**
13:8,13;14:12,15;
18:6;29:11,12;52:14;
67:5;77:21

**cost (23)**
26:14;28:22;29:25;
65:11;75:24;76:1,6;
78:13;80:4,7,18;81:5,
21;88:21;89:3;107:23;
135:5;138:1;142:9;
143:13;156:9,12;168:4

**costs (56)**
28:18,20;34:14,25;
35:6,10,18,19;63:16,
21,22;64:3;77:2;78:8;
81:7;82:1,2;89:16;
97:6,25;98:3,8,9,20,25;
99:11;100:11;101:5,9,
18;102:25;104:6,7;
107:25;108:3,16,19;
109:6;138:25;142:7;
150:7,8,11,12,14,17;
151:9;153:10;156:1;
160:1;164:21;165:7;
167:15,17,22;170:12

**counsel (6)**
38:4,6;118:17;
139:25;140:17;142:19

**count (3)**
141:25;142:1,16

**couple (2)**
41:15;152:9

**course (8)**
7:24;8:19;32:8;47:6;

60:10;67:13;90:9;
137:14

**Court (83)**
4:2,3,6,8;5:1,9,13,15,
20,24;6:9,17;7:1,4,8,
13,16,20;8:6,8,12;12:5,
10,18,19;17:18;18:12,
16;24:1,8,12;25:21;
34:6,9;47:2,4,6;53:1;
67:13;77:25;78:2;
93:24;94:2,4,11;95:16;
112:14;125:3,6;145:4;
146:2,6,16;159:25;
161:1,1;170:19,24;
171:3,6,11,22;172:1,5,
7,9,12,15,18,23;173:1,
2,3,7,12,19,23;174:1,5,
8,10,13,15

**Court's (3)**
94:6;171:23;174:21

**cover (1)**
35:18;98:25;104:25;
105:22;156:4

**covered (5)**
35:19;36:9,10,10;
98:7

**created (1)**
15:21

**creditor (1)**
157:20

**cross (2)**
173:15,16

**CROSS-EXAMINATION (2)**
8:14;94:14

**cup (1)**
67:11

**cups (2)**
67:12,14

**current (1)**
135:21

**currently (1)**
140:2

**cut (4)**
90:25;112:23;
117:24;138:8

**Cutler (7)**
4:10;35:18;111:6;
117:3;127:22,22;129:8

**cutting (5)**
91:21;113:19;
116:12,17;118:2

**D**

**DaCosta (2)**
111:22,23

**damaged (1)**
65:7

**damages (1)**
65:2

**Dan (5)**
60:21;131:2;132:18,
20,21

Case 16-01120   Doc 341   Filed 06/04/19   Entered 06/04/19 13:01:14   Desc Main
Document   Page 180 of 194
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

May 7, 2019

**dark (2)**
117:20;130:19
**date (17)**
62:5,12;63:15;67:1,
4,24,25;68:20;69:7,23;
100:8;112:19;121:1;
129:16;135:22;136:15;
151:14
**dated (3)**
87:15;92:19;168:16
**dates (1)**
157:18
**day (24)**
4:10,13;22:24;48:15;
52:4;58:5;64:22;65:8,
8,9,11,11,22,24,25;
66:2,5,7;148:18;
152:19;153:12;159:8;
172:4,6
**days (6)**
157:20;158:6;
159:10;171:16,17;
172:15
**deal (27)**
6:5;11:18;14:17;
29:9,10,13,17,20,22;
30:13,25;31:3;41:9;
42:8,20,24;43:9;48:17;
50:6;69:3;70:10,11;
71:10;77:16;112:14;
133:23;151:19
**dealing (1)**
146:15
**dealings (1)**
73:19
**deals (2)**
63:5;77:17
**debit (1)**
115:6
**Deborah (3)**
163:23;164:1,11
**debt (4)**
104:21,25;138:6;
150:14
**debtor (2)**
4:20;163:7
**December (9)**
106:6;121:4,16,21,
24;122:9,13;151:3,6
**decide (4)**
51:5;74:12;148:19;
154:19
**decided (7)**
42:24;69:21,23;70:5,
7;147:24;148:25
**deciding (3)**
50:20;74:2;78:25
**decision (9)**
18:5;50:21;58:8;
69:25,25;70:2,4;
148:22;149:21
**decisions (1)**
11:7

**deep (1)**
173:8
**default (2)**
151:8,22
**defendant (1)**
95:20
**Define (1)**
29:22
**defined (1)**
18:4
**definitely (1)**
6:10
**defrauded (1)**
113:8
**defrauding (1)**
140:18
**delay (2)**
71:22;72:2
**delayed (2)**
71:24;72:7
**delegated (1)**
60:3
**delete (3)**
48:2,4,9
**deliberate (1)**
68:13
**demand (6)**
72:18;135:16;138:4;
139:16;143:4;160:15
**demanding (4)**
138:8;140:21,24;
141:2
**demonstration (1)**
26:24
**dependent (1)**
28:22
**depending (1)**
27:1
**deposit (4)**
105:1;115:6;117:23;
169:11
**deposition (27)**
12:2,15;14:6;15:12,
16;20:9,19;22:19;28:9;
33:5,10,22;77:5,8,12;
84:25;89:21,22;97:15;
99:23;103:10;107:18;
127:18;143:20;144:13,
22;168:23
**deposits (2)**
36:1;169:4
**described (2)**
15:16;125:21
**describing (1)**
134:15
**Description (1)**
26:8
**desire (1)**
139:22
**despite (3)**
36:23;41:5;43:21
**detail (1)**
134:22

**detailed (1)**
17:22
**details (3)**
85:1;100:8;111:1
**determined (1)**
102:18
**developed (2)**
82:22,24
**Development (27)**
4:12,23;52:12,18,21,
23;53:5,8,22;60:10;
77:6;86:8;91:1,7,14,16,
21;92:2,3,9,16;110:7;
113:10,19;114:6;
119:22;135:13
**dialogue (4)**
43:6;135:17;141:9;
149:5
**diff (1)**
93:20
**difference (1)**
171:11
**different (16)**
21:5,23;22:6,8,15;
26:25;53:9,9;72:4;
77:23;78:5;88:11;
93:20;122:17;138:19;
174:12
**difficulties (1)**
122:16
**digital (1)**
6:12
**digitally (1)**
6:19
**diluted (1)**
64:13
**Dima (10)**
39:25;80:1;83:4,5;
104:1,1,1;105:9,13;
106:2
**dime (2)**
35:14;146:8
**dimension (1)**
75:7
**dinner (1)**
73:9
**direct (1)**
170:25
**directly (3)**
45:14;46:1;55:23
**disavowing (1)**
142:6
**disbursed (1)**
101:17
**disbursement (5)**
101:8;103:7;107:2;
116:18,23
**disbursements (2)**
26:13;116:20
**disclose (3)**
161:13,25;162:4
**discourse (1)**
149:6

**discrepancy (1)**
104:8
**discuss (14)**
20:23;70:9,18,19;
73:9;84:17;89:24;
128:25;147:2;148:20;
149:16,20;153:17;
154:25
**discussed (9)**
22:11;34:17;51:15;
83:19;120:16;148:21;
153:19;154:23;160:9
**discussing (6)**
29:7;70:13;83:24;
84:4,8;149:11
**discussion (5)**
11:20;95:12;135:13;
153:16;156:16
**discussions (3)**
42:17;70:13;172:20
**dispute (1)**
61:13
**dissolution (4)**
67:24;68:21;70:9;
136:14
**dissolve (7)**
67:25;69:4,10,10,13;
70:7;146:16
**dissolved (3)**
67:4;69:15;151:10
**dissolving (1)**
137:15
**distribution (4)**
25:25;26:3;79:22;
138:7
**divide (1)**
34:24
**docs (2)**
40:2,18
**document (30)**
7:16;19:16;20:20;
21:6;22:2,16,18,21;
23:1;28:2,7,14;30:2;
33:13,14,19;37:12,15;
38:13,16;41:8;55:20;
74:16;87:25;88:1;
89:24;99:16;102:10;
138:20;169:10
**documentation (1)**
97:12
**documents (10)**
5:22;38:8;87:14;
97:20;99:4,10,15,25;
100:6;101:4
**dollar (1)**
146:24
**dollars (3)**
49:4,7;146:22
**done (21)**
6:11;11:24;13:11,16;
22:17;44:3;73:17;
74:15;100:15;117:6;
127:15,20,22,23;128:2,

3,12;134:22;162:12;
164:19,20
**double (1)**
64:13
**double-billing (1)**
143:22
**double-billings (1)**
143:10
**down (46)**
9:13;25:4;26:18;
27:17;31:20;37:9;
39:19;46:17;47:13,23;
48:16;50:14;54:6;
63:13;64:7,10,14,21;
67:21;68:7,18;74:20,
24;79:7;85:16;87:9;
88:6,17;98:13;107:21;
109:22;115:1;130:14;
131:6;132:15;135:9;
136:22;138:22;139:20;
141:25;148:5,7;157:7,
23,24;166:12
**draft (5)**
20:14,16;44:11;45:6;
51:14
**drafted (1)**
38:18
**drafting (3)**
6:14;42:25;44:6
**draw (6)**
12:16,22;14:5;28:8;
30:17;66:24
**drawings (5)**
37:23;56:19,24,25;
87:15
**drive (1)**
134:11
**drive-arounds (1)**
41:15
**drop (2)**
63:13;74:24
**drop-dead (1)**
62:12
**during (9)**
45:13;46:21;55:22;
90:4,9;116:2;131:10;
136:17;162:3
**duties (1)**
104:20
**duty (1)**
120:3

---

## E

**earlier (6)**
29:3;61:15;78:5;
95:8;131:3;156:19
**earmarked (1)**
99:5
**economic (1)**
137:4
**edit (1)**
38:15

Case 16-01120    Doc 341    Filed 06/04/19    Entered 06/04/19 13:01:14    Desc Main
Document    Page 181 of 194
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
May 7, 2019

edited (3)
88:13,15;89:20
edits (1)
45:10
effect (8)
101:15;103:4;124:6;
126:7,14;132:23,25;
164:16
effort (1)
7:25
efforts (1)
160:4
eight (1)
5:17
eighteen (1)
105:19
eighty (2)
21:15;112:2
eighty-twenty (1)
22:5
either (9)
5:22;6:25;29:4;
33:23;45:2;107:4;
120:1;128:17;158:15
elaborate (1)
24:8
elect (1)
121:4
electronic (2)
20:5;68:15
eleven (1)
105:18
Elizabeth (2)
5:3;173:13
else (6)
8:2;23:16;153:10;
158:10;171:21;172:19
email (40)
20:13;39:22,24;
45:10;46:14,20;47:8,
11,17,23;48:10;49:15,
25;50:11;55:17;79:10,
15,20,25;80:1;81:25;
82:8;83:3;85:18;92:19,
23;93:2,9,13;103:12,
18;105:12;118:13;
131:2,5,19,23;132:18,
21;174:6
emailed (2)
48:1;55:20
emailing (1)
44:24
emails (7)
51:9;73:6;79:20,23;
91:9;118:1,4
email's (1)
46:23
employees (1)
173:7
encompass (1)
38:22
end (8)
66:17;85:18;127:23,

25;128:15;148:18;
172:12;174:22
ended (3)
70:24;71:17;89:3
ends (1)
169:20
enforceable (1)
95:1
enforced (2)
9:12,12
engagement (1)
43:14
engineering (1)
19:21
enormously (1)
6:13
enough (6)
38:21;105:9,9,17;
106:17;119:17
entered (1)
95:19
entire (1)
99:25
entirely (1)
6:2
entitled (4)
25:7;26:21;89:14;
160:4
entity (2)
153:12;155:4
entries (1)
108:4;169:10
entry (5)
107:21;108:2,3;
169:15,21
equity (1)
119:25
errata (1)
100:20
error (2)
68:11;81:16
errors (1)
60:13
escrow (2)
162:9,23
essentially (1)
153:22
established (1)
62:4
estate (10)
42:4,22;122:15;
126:20;136:18;140:2;
161:16,17;165:3;166:9
estimate (9)
23:8,16;25:16;28:21,
22;29:7;38:24;40:13;
80:11
estimated (9)
17:23;21:4;22:10;
23:4,9,11;25:7;80:4,7
estimates (5)
23:11;24:18;37:25;
85:23,24

et (2)
4:14;28:24
even (15)
7:23;42:18;51:24;
63:25;66:14;73:13;
76:1;100:13,15;
111:14;151:19;161:5;
168:16;170:14;172:16
event (4)
5:6;63:14;64:2;
70:21
eventuality (1)
8:1
eventually (2)
92:8;96:23
everybody (6)
7:21;49:2,22;79:10,
22;92:24
everyone (1)
5:2
evidence (8)
7:10,17,20;125:5;
144:15,19,20;173:17
exact (2)
16:18;32:15
exactly (21)
13:22,24;15:12;19:5;
23:7;25:13;32:13,14;
33:3,4;39:7;53:8;65:5;
78:23;85:5,8;114:18;
118:24;134:16,22;
137:18
exam (2)
162:3,3
example (5)
33:23;51:5;64:9;
117:10;143:21
excavation (1)
115:14
Excel (24)
12:25;13:21;15:21,
24;16:24;17:2,4;19:18,
22;34:16;37:24;38:10,
23,25;39:5,7,14,25;
40:12;41:7;42:17;57:2;
71:12;79:2
Except (2)
7:6;146:13
exception (3)
173:21,22,23
exchanged (1)
73:6
excuse (7)
34:20;37:13;40:12;
67:11;93:23;109:1;
149:12
executed (1)
142:4
executive (1)
83:8
exercise (3)
59:18;121:9;122:3
exhausted (1)

65:23
Exhibit (76)
5:10;6:21;7:23;9:15;
17:13,18,25;18:1;19:9,
10,15;20:10;21:5,7;
22:1;23:3;25:4;26:20;
30:17;33:11;34:17;
37:4,7;39:19,23;46:11,
13;47:2,3,22;51:2,12;
52:2;54:5;56:10;67:10,
17;68:14;71:13;74:7;
79:6;82:12;86:2,5;
92:12,18;98:13;
103:16;105:5;107:12,
17;109:19,20;113:1,13,
23;114:24;115:12;
124:13;129:4,7,17;
130:4,13;131:20;
135:4;141:24;144:23;
152:10,12;156:18;
158:25;165:20;167:5,
14;174:10
exhibits (5)
6:1,4,13,24;173:16
existing (1)
138:6
expanding (1)
85:10
expansion (8)
83:11,15,20,24;84:4,
9;85:6;124:23
expect (1)
99:16
expected (2)
99:19;145:18
expenses (3)
59:11;88:21;159:23
expensive (1)
146:21
experience (2)
11:4;44:23
experienced (2)
16:11,17
expert (4)
144:5;161:16,17;
171:25
expiration (1)
122:2
expire (3)
121:2;122:9;150:10
expired (4)
121:20,22;122:13;
150:8
explain (1)
16:6
explained (1)
100:7
Express (1)
144:10
extend (3)
128:25;137:8
extended (5)
150:15,20,22;151:2,

12
extends (1)
137:3
extension (1)
128:21
extent (1)
60:13
extra (2)
77:17;126:1
extras (1)
106:13
extremely (1)
13:7
eye (1)
155:3,3
eyes (2)
42:12;58:8

F

face (1)
133:4
fact (108)
10:20;11:14,23;
13:15;16:2,15,22;17:3;
18:22;20:3;21:3;22:9,
19;27:4,24;30:8;32:1;
33:4,5;35:6;36:20,23;
39:5,10;40:5;41:5,25;
42:1;43:21;45:1;49:6;
51:21;52:21;53:20;
61:4;62:5;63:25;64:6,
16;66:13;68:3,24;69:7;
71:16;73:8,12;76:24;
81:17,24;83:3,14,19;
84:13;85:4;89:2;91:5;
93:9,11;96:14;99:18;
102:5;103:10,11;
104:13;107:12,21;
112:15;114:21;117:20;
118:17;121:9;122:2;
124:12,18;125:17;
126:24;127:14;128:11;
129:3;133:3;134:14,
21;135:2,3;138:10,24;
140:5;141:12;143:12,
15;145:20;147:12;
151:7;152:18;154:18;
155:24;156:7,9;
159:13;161:5;163:16;
164:3;167:18;168:4,
19;169:10;170:7,14
factual (3)
33:16,19;96:18
failed (1)
128:6
fails (2)
63:20;64:6
fair (1)
173:14
fairness (2)
34:6;100:20
fall (1)

Case 16-01120    Doc 341    Filed 06/04/19    Entered 06/04/19 13:01:14    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 182 of 194

May 7, 2019

151:8
**false (2)**
97:19;102:22
**falsehoods (1)**
102:11
**familiar (3)**
19:22;33:13;72:5
**fancier (6)**
84:14,18,19,23;85:6,
11
**far (10)**
13:8;48:13;90:12;
110:20;130:19;138:19;
161:24;162:7;166:12;
173:3
**favorable (1)**
71:7
**federal (1)**
173:7
**fee (1)**
13:5
**feel (3)**
13:9;119:17;131:10
**fees (7)**
146:22,25;156:13;
165:6;167:17,24,25
**feet (4)**
75:4;125:10,18;
126:1
**fell (2)**
42:24;150:17
**felt (1)**
141:14
**fence (1)**
91:6
**few (5)**
91:9;110:19;112:6,7;
170:25
**fiduciary (1)**
120:3
**fifteen-minute (1)**
94:4
**fifty (7)**
11:19;13:7;14:11;
63:11;166:17,21;167:2
**fifty-percent (1)**
13:4
**file (16)**
13:21;20:25;22:25;
38:10,25;57:2;119:12;
140:18;145:9;146:2;
147:25;148:19;149:11;
154:18;156:12;160:9
**filed (35)**
4:11;17:18;32:23;
33:12,15;68:15;96:17;
117:18;121:13;122:7;
123:22;134:14;137:18;
141:6,7,9;144:3,8,14;
145:24,24;147:16,18;
149:12,13,22;150:22;
152:8,19;153:12;
154:11;157:17;163:2,

5;168:1
**files (3)**
40:1,12,12
**filing (3)**
67:1;149:16;162:21
**Filippov (30)**
4:11,18;8:3,4,5,7,13,
16,18;9:14;17:21,22;
18:3;19:14;22:19;
31:23;63:10,21;67:17;
94:16;107:17;117:18;
122:14;131:2;135:23;
142:5;166:21;170:10,
23;174:6
**filled (2)**
87:16,18
**filter (1)**
20:6
**final (1)**
57:11
**finally (1)**
128:2
**finance (1)**
159:18
**financial (7)**
23:9;38:1;39:9;
83:10;119:9,14;150:6
**financials (4)**
21:4;22:10;23:5,12
**financing (2)**
154:4;156:16
**find (2)**
51:3;92:8
**findings (1)**
7:14
**fine (6)**
6:17;14:7,11;171:4;
172:9;174:13
**finish (2)**
93:24;171:6
**finished (1)**
6:18
**firm (3)**
157:10,14;158:2
**first (27)**
5:17;6:7;10:24;
11:15;12:16;13:20;
15:2;21:13;28:16;29:1,
1,7;33:10;34:19,20;
62:17;66:9;72:22;
73:12;118:18;122:18;
123:1;135:5;138:1;
143:13;156:16;173:3
**five (24)**
5:17;27:12,21;29:4,
4,5;30:9,9;32:3;64:10,
11;65:22,25;66:4,6;
72:15,19,22;75:16,19,
20;78:8;130:7;154:5
**five-and-a-quarter (3)**
27:21;31:11,14
**five-percent (1)**
130:1

**fixed (15)**
23:16;29:25;36:15;
37:13;67:25;76:25;
77:18,19,24;78:6,7,12;
97:2;112:17,24
**fixed- (1)**
76:20
**fixed-price (1)**
36:24
**flag (1)**
161:20
**floors (1)**
129:9
**flow (3)**
63:7;166:16,19
**focus (2)**
167:10,11
**follow (1)**
32:7
**follows (1)**
63:9
**foolish (1)**
89:8
**foot (1)**
140:24
**footnote (1)**
23:15
**force (2)**
101:15;160:9
**forecast (1)**
17:23
**Forget (2)**
84:7;174:4
**forgot (1)**
48:4
**form (2)**
66:11;117:11
**formal (3)**
19:2;147:13;148:20
**formality (4)**
87:5,20;89:19;90:20
**formed (2)**
66:14,17
**formulas (1)**
19:25
**forth (2)**
73:17;98:17
**fortune (3)**
14:2,4,9
**forty (3)**
63:10;80:16;166:21
**forty-fifty-ten (1)**
55:5
**forty-four (2)**
88:9;89:20
**forwarded (3)**
48:13;129:18,22
**forwarding (2)**
20:13;93:3
**forward-looking (1)**
56:24
**foundation (2)**
26:9;115:14

**four (7)**
22:11;28:25;51:17;
79:22;141:5,8;171:16
**fourth (1)**
64:20
**fraud (24)**
93:11,12,15,16;
102:14;119:20,22;
139:13;140:7,8;141:9,
13,18,25;142:1,3,16;
143:1,3,14,16,17,18;
145:14
**fraudulent (6)**
141:20;160:18,20,
20,22,24
**free (1)**
131:10
**freshly (1)**
129:9
**friend (1)**
10:2
**friends (1)**
10:9
**front (4)**
5:16;33:11;75:16;
133:3
**full (4)**
88:21;101:17;168:2;
171:17
**Fund (1)**
107:22
**funds (9)**
35:17;105:9,10,13,
17,19;106:8,11,17
**further (6)**
9:4;52:5;82:8;
135:18,19;170:22
**Furthermore (1)**
98:17
**FYI (1)**
131:12

**G**

**gain (1)**
163:6
**gallery (1)**
173:6
**garage (2)**
125:25;126:2
**gave (2)**
12:2;130:19;156:5
**GC (2)**
93:4,10
**general (2)**
16:2,17
**generally (3)**
13:5;51:6;59:17
**genesis (1)**
54:17
**Gersh (2)**
60:21;131:2
**gets (3)**

14:11;64:13;166:4
**gist (1)**
16:17
**given (3)**
136:14;154:5;172:5
**gives (4)**
21:18,22;51:14;83:7
**Giving (8)**
25:19;51:23;153:18;
154:2;155:11,16,16,17
**glad (1)**
5:24
**goal (1)**
139:25
**goes (9)**
57:3;63:20;64:5,7,7,
10,10,14;85:20
**Good (13)**
4:17;5:1,1,4;8:2,4,5,
16,17;82:25;94:2;
95:21;169:7
**Gordon (1)**
163:23;164:1,3,11
**grand (1)**
113:11
**great (2)**
6:17
**Greatly (1)**
131:8
**gross (1)**
75:4
**ground (1)**
72:14
**Group (2)**
110:15;173:5
**guarantee (3)**
27:8;39:11;71:1
**guaranteed (8)**
14:22,23,24;16:15;
42:7;101:23;151:23;
152:5
**guess (2)**
168:21;172:22
**guy (3)**
82:21,24;97:16
**guys (2)**
29:24;159:14

**H**

**half (1)**
75:21
**hand (3)**
12:7;22:17;75:3
**handed (5)**
12:14;20:20;21:5;
22:2;38:23
**handle (2)**
52:12;162:10
**hanging (1)**
150:12
**happen (4)**
13:20;66:10;78:14;

Case 16-01120   Doc 341   Filed 06/04/19   Entered 06/04/19 13:01:14   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 183 of 194
May 7, 2019

154:16
**happened (5)**
104:17;137:19;
143:13;144:18;149:6
**happening (2)**
117:11;118:24
**happy (3)**
137:1;139:9;171:9
**hard (7)**
29:25;32:17;39:15;
62:5,12;158:16;170:6
**harder (1)**
83:12
**Harris (27)**
4:24,24;17:13;18:1;
19:9;20:11;25:19;
26:17;31:20;37:4,18;
39:18;46:10;48:17,21,
23;49:24;52:2;54:5;
62:16;63:3;67:22;
105:6;132:14;137:23;
167:8,10
**hats (1)**
44:10
**head (1)**
7:21
**heads (1)**
138:10
**hear (2)**
7:18;174:5
**heard (1)**
138:2
**heavily (1)**
11:8
**Hello (1)**
129:4
**helpful (1)**
6:13
**Here's (4)**
80:3,17;81:20,20
**hey (4)**
72:19;92:12;124:3;
126:11
**hidden (1)**
101:9
**high (2)**
13:7;30:11
**higher (6)**
31:25;32:4,11;33:1;
35:7;123:24
**himself (2)**
107:4;113:25
**hindsight (1)**
9:5
**Historical (2)**
71:23;72:2
**hold (5)**
24:10;32:20;92:6;
131:21;173:1
**holders (3)**
148:21;153:20,21
**holding (1)**
164:24

**home (10)**
5:5;22:25;31:24;
32:1,25;33:2;80:7;
85:10;123:24;136:16
**homes (15)**
30:20;62:1,2;82:2;
86:8;89:11,23;90:10,
15,22;97:1,8;122:15;
128:6;149:23
**hone (1)**
9:13
**honest (2)**
14:9;43:3
**Honor (24)**
4:5,17,19,21,24;
5:15;6:15;8:5,11;9:1;
12:4;23:23;24:15;34:8,
11;70:3;94:13;170:17,
22;171:2,20;173:11,
22;174:20
**hook (3)**
49:3,6,11
**hopefully (1)**
6:21
**hoping (1)**
80:16
**hour (3)**
15:8;41:13,13
**hours (1)**
82:14
**house (15)**
57:1,2;75:6,9;77:19;
78:23;81:5;84:14,18;
88:18,19;125:21;
148:10,14;161:15
**housekeeping (3)**
5:8;6:11;171:21
**houses (12)**
15:17;122:18;123:1;
124:19;125:15,15,17,
20;128:12,15,16;
151:12
**huge (2)**
41:25;42:1
**hundred (2)**
21:19,23
**hundred-percent (1)**
61:23
**husband (1)**
121:15

## I

**I'm (1)**
122:22
**idea (4)**
52:20;65:19;133:15;
134:20
**identified (5)**
6:21;19:15;21:6;
22:2;107:17
**identify (4)**
143:25;144:3,9;

168:23
**ignore (4)**
9:6,20;70:12;87:24
**illegal (1)**
160:22
**immediate (2)**
138:16;139:16
**immediately (5)**
138:5;140:6,18;
141:3;157:20
**immigrated (1)**
10:5
**impact (2)**
120:9;127:9
**importance (2)**
8:21;41:6
**important (11)**
11:11;12:25;36:18,
20;38:19;40:7;43:4;
85:22;112:24;133:20;
136:14
**impossible (2)**
16:20;32:3
**impression (1)**
11:14
**improbable (1)**
161:12
**improper (1)**
144:9
**inaccuracy (1)**
96:21
**inaccurate (1)**
33:25
**Inc (1)**
110:15
**incidentally (7)**
42:16;75:19;79:13;
110:7;142:11;156:12;
168:8
**include (6)**
48:5;58:21;76:19;
87:14;98:8;125:25
**included (5)**
41:10;93:4;101:5;
104:6;167:18
**including (5)**
37:23;63:6;77:2;
78:7;154:2
**income (1)**
36:6
**incomplete (1)**
18:13
**incur (1)**
59:11
**incurred (3)**
89:16;97:6;160:1
**indemnity (2)**
159:20,22
**index (1)**
6:7
**indicate (1)**
109:5
**indicates (3)**

6:8;23:17;75:23
**Indiscernible (5)**
66:21;167:8;169:12;
172:8;173:21
**individually (2)**
159:14,19
**inducement (1)**
17:20
**inflated (3)**
101:5;103:7;104:12
**information (13)**
17:4;48:16;61:1,8;
81:17,22;118:10;
119:14,17;134:1;
141:12;142:19,24
**inherently (1)**
42:9
**initial (3)**
5:25;83:3;85:17
**initially (1)**
71:13
**injunction (2)**
146:3,6
**insist (2)**
53:21,25
**insisted (1)**
37:21
**insisting (2)**
70:25;137:7
**insolvent (1)**
150:4
**instead (4)**
50:7;71:24;137:7;
162:21
**instructions (2)**
172:20,21
**insufficient (1)**
35:17
**Insurance (2)**
116:9,9
**intend (2)**
86:23;87:1
**intended (1)**
86:19
**intentional (2)**
69:1,3
**intentionally (3)**
142:4;159:10,12
**interacted (1)**
60:9
**intercede (1)**
148:15
**interest (3)**
120:1;136:15;153:4
**interested (3)**
4:11;10:25;137:15
**interests (1)**
102:18
**internal (3)**
113:5,7;119:13
**interrupted (1)**
29:1
**into (12)**

21:8;24:22;34:24;
35:14;95:19;146:2;
151:8;154:9;156:4;
160:25;165:8;167:15
**introduced (1)**
9:15
**invalid (1)**
161:2
**invest (2)**
17:21;18:5
**invested (1)**
11:3
**investment (10)**
14:10;17:23;21:14;
22:6;41:23,25;42:4,5,
13,14
**investments (3)**
21:20;170:10,11
**investor (4)**
21:15,15,19;52:7
**investors (1)**
70:4
**invitation (1)**
135:17
**inviting (1)**
141:9
**invoice (7)**
110:20;111:21,22,
25;112:8,9;114:1
**invoices (7)**
110:15,18,19;112:5,
7;118:19;145:19
**invoked (3)**
61:12;64:16;159:25
**invoking (1)**
161:1
**involved (3)**
44:2;58:9;118:18
**involving (1)**
77:5
**issuance (1)**
98:20
**issue (6)**
6:10,11;73:16;
108:12;146:19;150:25
**issued (5)**
114:15;116:2,3,7;
151:11
**Italy (1)**
10:5
**iterations (1)**
45:6

## J

**James (1)**
4:24
**January (5)**
71:25;106:10;
108:21,21;109:20
**jeopardizing (1)**
102:11
**job (4)**

Case 16-01120   Doc 341   Filed 06/04/19   Entered 06/04/19 13:01:14   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document     Page 184 of 194
May 7, 2019

11:15;58:9,11;91:25

**John (1)**
4:21
**JP (5)**
59:14;67:9;74:19;
92:6;156:23
**July (14)**
105:12,17;107:22,
25;108:1;109:1,2;
127:23,25;128:12,15;
158:2;159:1,3
**June (17)**
89:25;106:16,19;
109:1;110:14;141:6;
142:18,22;143:3;
144:24,25;145:3,9,9,
21;150:21;172:2
**jurisdiction (2)**
159:25;161:1
**jury-boxing (1)**
172:24
**justifies (1)**
160:25

## K

**Kagan (193)**
4:12,12,12,14,22,22,
22;11:4,12,14,19;13:2;
14:2,8,18,21;15:1,16;
16:1,8,23;17:5,9,21,24;
18:4,9;27:20;30:8;
36:1,12;37:16,24;
39:11,14;41:16,19;
42:16,21;43:5;44:1,24;
45:1,14,17;46:5,8,15;
47:11,19;48:2,11,15;
49:10;50:7,11;51:9,24;
52:7,11,17,21,23;53:5,
8,9,13,16,22,22;55:24;
56:1,13;60:9,15,17,18,
20,22;61:1;63:11,16,
20;64:1,20;65:20;
70:14,15,18,19;71:5;
72:4;73:1,3;75:15;
77:5,14;79:11,15,19;
80:1,22;81:18;83:4,5,
18;84:13,17;89:11,24;
91:1,7,9,14,16,17,21;
92:2,3,9,9,15,16;97:5;
100:12;101:19;103:6,
13;104:1,25;106:22;
107:4,8,23,25;108:2,
15,18;109:6,15;110:7;
112:18;113:10,19;
114:6;119:22;120:17;
121:14,20;122:13,19;
123:1;126:11;127:6;
128:6,24,24;129:4,7;
130:13;133:2;135:12,
12;139:22;140:6,18;
142:5;143:8;145:25;
147:2,4,12;148:2,24,

25;149:13,14;150:16;
153:17;154:25;155:3,
25;156:15,17;160:8;
162:11,15,18;163:1;
165:23;166:17,21;
167:2
**Kagans (3)**
31:24;32:24;123:23
**Kagan's (13)**
43:9;58:9,11;62:20,
24;63:6;64:21;70:25;
89:13,16;93:2;118:1;
131:2
**KDC (29)**
4:12,23;73:21,22;
86:4;90:25;91:7;92:8;
94:17,20;95:20,20;
96:11,18,23;110:7;
111:5,7,13;113:1,14;
114:1,16;118:2;120:1,
3;139:22;141:20;146:8
**KDC's (1)**
60:18
**Keep (29)**
19:11;26:18;48:18;
49:21;54:21;60:25;
67:22;79:7;80:14;88:6,
17;105:15;106:6,13,
21;108:5,9;110:4,13,
13,21;111:17;112:1;
115:17;116:15;120:4;
123:4;136:22,22
**keeping (8)**
59:25;60:15,18,18;
112:19;130:19;156:20;
170:4
**kept (13)**
60:6,20,22,23;73:3;
107:19;108:7,13;
117:19;119:22,23;
120:12;143:8
**keys (1)**
140:21
**kicked (1)**
137:12
**kind (6)**
26:25;43:22;55:19;
72:18,18;153:16
**kinds (1)**
143:10
**knew (40)**
10:17,20;11:11;
25:13;31:8;35:9;40:6,
11,21;42:11,12;53:4;
72:14;79:14;80:21;
83:20;91:13,16;
101:12;102:8,9;
112:19;113:21,24;
115:6,6,18:23;
121:14;123:12;124:1,
2,8,9;127:2,7;133:5;
134:8;142:5;148:11;
164:17

**knowing (2)**
27:13;101:17
**knowingly (1)**
142:4
**knowledge (1)**
33:18
**known (3)**
10:14;62:9;121:14
**Kristina (1)**
77:6

## L

**labeled (2)**
20:25;21:1
**land (1)**
76:19
**Lane (1)**
161:24
**language (13)**
40:3;63:13,18,23;
64:24;68:1;80:1,10;
83:12;98:21;120:25;
122:16;166:18
**large (1)**
91:13
**larger (4)**
75:10;84:17,19,20
**last (4)**
62:23;156:19;
168:10;172:4
**late (1)**
128:12
**later (10)**
22:24;30:21;57:4;
61:20;62:2;127:23;
130:6;141:5;143:21;
146:22
**latest (1)**
68:20
**law (7)**
99:20,21;100:17,21,
22;157:10;162:7
**law's (1)**
146:12
**lawsuit (7)**
77:5;117:19;121:13,
14;122:7;123:22;
144:15
**lawsuits (1)**
156:12
**lawyer (8)**
77:14;103:22;
139:11,11;140:6;
142:23;143:15;169:18
**lawyers (3)**
158:9;159:11,13
**lawyers' (1)**
165:6
**learned (4)**
10:24;11:18;94:21;
99:7
**least (12)**

11:25;13:17;22:9;
44:10;58:13;80:22,23;
81:8;127:19,20;
128:11;174:14
**leave (2)**
171:7;173:10
**leaving (1)**
172:25
**left (6)**
26:11;68:21;78:10;
138:15;159:11;165:7
**legal (8)**
146:19,22,25;
156:13;159:23;167:17,
24,25
**legal-cost (2)**
155:20;156:6
**lend (1)**
71:6
**length (3)**
28:23;34:17;36:14
**lent (2)**
154:13,14
**less (3)**
57:11;141:5,8
**letter (27)**
43:14;69:8;72:19;
103:22;121:10;134:15,
15;135:4,16;138:9,14;
139:11,11;140:6,8,10,
18;141:8;142:19,23;
143:16;144:23;145:9,
10,15;160:15;169:18
**letting (8)**
49:2;113:16,17,18;
115:13;116:4,11;
117:16
**liability (1)**
116:9
**lie (7)**
68:13;92:17;102:19,
21,22;136:9;139:4
**lien (20)**
58:17;145:20,24;
146:12,12,13,16,20;
160:17,18,18,20;161:2,
6,9,13,13,15,21;162:10
**life (1)**
100:3
**limited (2)**
49:12;58:21
**line (7)**
14:7,8;64:20;78:23;
93:25;99:24,24
**lines (1)**
16:10
**Lipetsker (32)**
4:18;10:2,25;11:3,9,
20,23;12:14,24;13:15;
14:1;15:5;17:21,22;
18:3;31:24;35:23;
36:11;43:5;46:15;
47:19;51:24;63:10;

70:5,6;79:11;147:24;
148:22;153:19;154:23;
162:15;166:21
**Lipetsker's (1)**
10:11
**liquidation (6)**
63:8;136:16,17;
137:7,16;166:20
**list (9)**
26:13;120:16;
126:21;127:7;134:22;
157:19;158:4;164:4,15
**listed (24)**
87:14;122:18,19;
123:1,2,5,9,13;124:8;
127:16;134:6;136:3;
158:1,15,22;159:3,10;
161:20;163:20;164:7,
9,11;170:8,8
**listing (30)**
32:3,10;75:20;121:2,
15;122:8;123:15;
124:1,9,16,19;126:4,8,
12,12,15;127:2;128:21,
25;129:1;133:14;
134:8;135:22;142:4,
11;146:3;161:23,24;
164:1,18
**listings (1)**
141:15
**lists (2)**
26:8;46:20
**litigation (7)**
92:11;99:8;103:5;
134:14,24;156:16;
159:18
**little (9)**
9:13;31:21;74:20,24;
77:23;78:5;107:15;
156:23;169:14
**lived (1)**
148:11
**living (2)**
75:4;126:1
**LLC (59)**
4:10,14;13:23;34:21;
36:6;52:11;59:25;
60:20,22,23;61:2;65:2;
66:11,14,17;67:25;
68:3;69:18,22,25;70:7;
79:20,23;86:8,12,25;
87:23;89:15;91:24;
102:1,5,13,19;119:5;
143:7;150:4,6;152:23,
25;153:8,9,9,10;
155:15,17,19,21,23;
156:1,8,10,13,21;
159:14,17;161:3;
168:13,20;169:8
**LLC's (6)**
60:6,14,18;69:9;
119:21;159:22
**loan (54)**

Case 16-01120   Doc 341   Filed 06/04/19   Entered 06/04/19 13:01:14   Desc Main
Document   Page 185 of 194
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

May 7, 2019

20:4;25:24;26:3,5;
28:17;70:21;71:1,13,
21;73:11;74:13,14;
79:1;97:9,13,16,21,24;
98:7,8,11,18,18,23;
100:10;101:4,20,23;
102:6,14;105:10;
106:17;116:21,22,23;
150:20,22;151:8,11,23;
152:2,5,23,25;153:12;
154:8;155:6;165:16;
166:9;168:5,7,8,24;
169:11
**loaned (1)**
154:6
**loans (11)**
28:18;36:5,10;44:7;
74:3;84:10;99:10;
104:22;169:5;170:8,11
**long (1)**
27:2
**longer (2)**
150:17,25
**look (35)**
21:8,13;32:18;33:9;
54:25;68:14;75:2;
99:22;100:16;103:15,
18;105:12;107:12;
109:19;113:13;114:5,
15;115:12,16;116:25;
117:9;126:24;129:14,
18;135:4,11;137:3;
141:23;145:8;152:9;
156:18;158:18,21;
169:4,17
**looked (32)**
19:8,14;20:9;22:7;
39:22;52:6;53:17;
62:19;67:18;71:12;
74:6,9;76:10;83:4;
86:2,2,7;87:12;90:8;
95:7;120:25;124:15;
125:22;126:4;131:1;
132:18;143:12;144:24;
145:20;156:19;165:22;
167:14
**looking (6)**
47:3;67:15;70:9;
126:11;158:20;169:25
**Looks (2)**
22:8;27:18
**lose (1)**
42:13
**loses (1)**
65:22
**losing (1)**
65:24
**Loss (1)**
26:21
**losses (1)**
55:3
**Lot (3)**
25:8,10;44:24

**lots (1)**
38:18
**loudest (3)**
49:2,19,20
**low (3)**
104:24;164:14,17
**lower (1)**
136:4
**lucrative (1)**
14:18
**lying (6)**
96:19,20;101:16,19,
19;102:6
**Lyman (9)**
20:25;21:1;111:6;
117:9;127:20,23;
129:5,8;131:4
**Lyman- (2)**
4:9;35:17
**Lyman-Cutler (22)**
4:14,20;10:18,21;
79:20,23;92:18;95:19;
96:11;107:18;110:24;
114:25;119:2;135:14;
138:16;143:7;144:2;
147:25;151:11;152:15;
153:17;170:4
**lymancutler@gmailcom (1)**
92:23
**lymancutlerllc@gmailcom (1)**
92:21
**lymancutlerllccom (2)**
79:14;93:10

# M

**magnitude (1)**
65:17
**Maiden (45)**
10:18,20;15:5;38:15;
39:24;42:25,25;43:15;
44:6,9;45:10,16;46:1,
14,24;47:8,14;48:2,20;
50:2,17,25;51:4,13,22,
23;52:5,16,22;53:6;
54:8,12,24;55:11,17,
24;56:1,16;71:5;79:10;
99:25;148:15,16,17;
149:12
**Maiden's (2)**
15:2;71:4
**maintaining (1)**
141:20
**major (1)**
148:4
**majority (4)**
148:21;149:20;
153:19,21
**makes (2)**
56:12;161:12
**making (17)**
8:22;11:7;18:5;
41:20;43:9;84:17;

85:10,11;102:11;
110:10;111:2;112:25;
119:13;138:4;143:4;
155:6;161:10
**manager (5)**
50:4,7,8;153:23,25
**managing (23)**
21:16;56:19,20;58:1,
5,21;69:22;86:25;
87:23;90:17;91:24;
102:1,4;104:21;
109:11;112:7,22;
119:5;122:14;148:18;
153:11;162:12;169:7
**manipulate (2)**
19:25;20:6
**manner (2)**
95:21;140:1
**manners (1)**
76:5
**many (8)**
8:18;9:11;10:14;
40:6;100:2;112:4;
148:8;173:16
**March (2)**
57:4;128:7
**Mark (3)**
38:12;54:9;107:22
**marked (2)**
20:10;21:7
**market (8)**
27:2;129:8,10;131:4;
135:21;136:18;140:2;
164:7
**marketing (1)**
133:16
**Mary (1)**
5:4
**Massachusetts (2)**
67:2;162:7
**material (1)**
102:22
**matter (4)**
42:1;99:19;127:15;
140:3
**matters (2)**
5:8;135:13
**max (1)**
13:6
**maximum (1)**
76:23
**May (31)**
4:15;8:11,12;12:4,5;
25:1,1;47:5;59:11;
67:11;69:9;71:25;
72:11;76:14;79:9;
82:12;84:16;103:19,
21,22;104:11;108:24;
118:18;121:10;134:21;
135:4;145:8;169:18,
20;170:17,19
**maybe (3)**
149:4,6;170:6

**mean (8)**
9:6;38:6;51:4;112:1;
133:23;171:4;172:9,12
**means (1)**
65:23
**meant (2)**
37:24;57:8
**meet (1)**
45:2
**meeting (40)**
13:21;15:6,15,23,25;
16:3,9,21;19:1;20:20,
22,23;22:3,12,17;23:1;
25:10;27:16,20;28:15,
25;29:2,24;30:6,7,8;
39:11;41:12;42:18;
61:5,10;118:11;147:2,
6,14,15,16,18;148:20;
149:16
**member (11)**
56:19,20;58:1;61:4;
73:21;90:17;98:15;
122:14;149:20;153:11;
155:4
**members (5)**
51:6;63:9;136:15;
138:7;147:6
**members' (1)**
118:11
**memo (1)**
111:11
**memory (4)**
16:2;103:11;104:18,
19
**mentioned (3)**
7:24;171:24;174:17
**message (2)**
106:16;118:15
**messages (1)**
73:6
**met (6)**
10:5;11:15;15:1,8;
73:13;148:9
**Michelle (1)**
161:24
**microphone (2)**
95:14;174:1
**middle (3)**
14:7;63:14;167:12
**Middlesex (4)**
17:18;141:18,23;
145:4
**mid-May-ish (1)**
169:20
**mid-sentence (1)**
94:9
**might (20)**
10:25;27:1;40:2,13,
18,20,24;41:2,20;
42:13;61:19,20;95:14;
120:9;122:16;127:9;
128:4;148:16;151:22;
172:16

**million (55)**
16:15,24;17:10;
23:15;27:17,18,21,25;
28:3,7;29:9,14,16,19,
25;30:5,13,22;31:11,
15;36:15;37:13,14;
38:19;49:4,7;51:17;
62:3;71:19;74:12,15;
75:13,24;76:12,13,18,
19,21,25;77:18;78:13,
13;80:5,18;88:25;89:7;
104:7;123:10,13,16;
146:22,24;161:15;
163:21;165:4
**mind (2)**
130:7;154:9
**mine (1)**
172:18
**minimum (1)**
147:1
**minute (3)**
111:13;124:4;137:3
**minutes (4)**
84:3,7;170:25;
171:11
**mis-billings (1)**
143:10
**mislabeled (1)**
108:4,7;109:10
**misrepresented (1)**
103:3
**misrepresenting (1)**
102:6
**misstatement (1)**
125:5
**Misstates (1)**
52:24
**mistaken (1)**
128:4
**misuse (1)**
99:21
**model (2)**
24:22;27:5
**moment (1)**
62:19
**money (40)**
13:2,3;26:25;45:21;
49:12;74:2;78:9,14,20;
89:15;91:14;97:5,24;
105:1;106:4,6,19,22,
24,24;107:1,5,7,8;
140:14;153:9;154:6,7,
13;155:19;156:4,13;
162:23;164:23;165:2,
10,11,14;166:4,8
**monies (3)**
143:4;159:17,17
**monitor (1)**
91:25
**month (3)**
35:7;114:22;150:10
**monthly (1)**
34:25;63:21

Case 16-01120    Doc 341    Filed 06/04/19    Entered 06/04/19 13:01:14    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 186 of 194
May 7, 2019

**months (16)**
27:5,11,12;34:20,20,
24;35:11;63:15;64:23;
65:2,12;72:15,20,22;
151:2;154:5
**more (23)**
10:20;24:9;34:10;
39:20;71:6;74:20;
76:11,12;80:23;105:1,
13,19;106:6,19,22;
111:17;113:7;140:14;
142:1;158:19;164:15;
169:14;171:20
**Morning (16)**
4:3,4,5,17,21,24;5:1;
8:4,5,16,17;29:4;
82:14;83:10;125:22;
152:18
**mortgage (26)**
87:25;88:1;99:6;
150:8,15;152:12,18,22;
153:3,13,18;154:3,5,9,
11,20;155:11,14,17,23;
156:5,10;159:7;
167:19,21;168:7
**most (5)**
5:22;13:21,23;36:20;
150:15
**motivating (1)**
151:25
**mouth (1)**
84:2
**move (6)**
19:11;37:18;86:1;
108:14;171:18;173:12
**moved (2)**
146:16;173:13
**moving (1)**
136:4
**Mrs (4)**
121:14,20;122:12;
128:24
**much (8)**
24:4;27:1;28:23;
51:16;65:2;74:2;78:25;
117:6
**multiple (4)**
22:15;45:6;106:21;
134:8
**must (2)**
161:13;162:4
**must've (1)**
62:9
**mutual (1)**
10:9
**mutually (1)**
139:23
**myself (1)**
70:5

**N**

**name (1)**
147:25
**names (3)**
4:15;53:9,10
**nature (4)**
25:14;58:17;72:21;
85:5
**nearly (3)**
31:25;32:25;123:24
**necessarily (1)**
40:22
**necessary (4)**
59:12;63:22;135:22;
162:9
**need (21)**
6:18;7:10;12:11;
25:5;40:2,13,18,20,24;
41:2;52:23;105:13,22;
106:8,22;129:9,14,14;
136:10,13;158:16
**needed (6)**
60:10;88:2;153:9,9;
164:19,20
**needless (1)**
136:2
**needs (1)**
97:24
**nefarious (2)**
114:10,14
**negotiated (7)**
8:18;40:6;56:16;
88:13,16;97:16;98:25
**negotiation (1)**
57:8
**negotiations (3)**
45:13,16;46:21
**nephew (1)**
10:11
**net (17)**
63:6,7,7;64:22;66:2;
165:11,11;166:8,15,15,
16,16,19,19,19,24;
167:1
**new (5)**
30:20;62:2;122:15;
128:6;129:14
**newsflash (1)**
113:21
**next (17)**
19:11;21:18,22;
22:24;25:4,7,19;48:15;
52:4;66:10;70:21;
74:19;86:1;105:12;
135:20;138:24;171:14
**Nick (3)**
13:1,8,10
**Nickolay (3)**
4:18;51:16;63:10
**ninety (3)**
157:20;158:6;159:10
**nobody (5)**
25:13;87:20,21,22,
24
**Nolan (4)**

109:25;110:7,14,20
**none (1)**
170:7
**Nor (1)**
120:6
**notation (1)**
23:14
**not-discounted (1)**
161:14
**note (3)**
79:13;85:21,21
**notes (1)**
108:15
**notice (2)**
135:5;138:17
**notwithstanding (5)**
53:19;69:21;98:5;
101:8;155:2
**November (33)**
30:21;50:2;52:4,16,
22;53:6;54:24;55:16,
23;61:19;62:2,6,12;
66:16,17;67:3;68:4,24;
69:4,10,13,19;70:7;
108:18;109:2,2;137:4,
8;151:4,13;168:17,20,
21
**nowhere (1)**
26:13;36:25
**NSTAR (2)**
111:2,3
**number (33)**
4:9,14;6:21;17:19;
19:15;20:10;21:5;30:2,
18,19;34:16;36:24;
37:5,7;39:23;51:2;
54:5;58:24;59:2;67:24;
68:20;76:10,24;
103:18;105:5;109:19;
117:9,14;130:23;
148:8;160:21,23;174:4
**numbers (24)**
12:24;16:3,6,8;17:1;
19:25;20:6;23:10;
39:15;40:2,19;41:2;
65:13;79:2;82:18,21,
22,25;108:12;119:17,
18;141:14;144:25;
145:19
**numerically (1)**
83:12

**O**

**oath (2)**
8:6,8
**obey (4)**
100:17,22,23,24
**object (5)**
123:15;133:11,12;
163:18;164:18
**objected (2)**
6:6;123:18

**objected-to (1)**
6:4
**objection (7)**
4:10;6:8,25;18:11;
52:24;125:1;172:12
**objection's (1)**
53:2
**obligated (7)**
8:25;9:9;64:2;89:15;
97:5;98:24;120:16
**obligation (16)**
69:22;121:20,22,24;
122:12,17;142:6;
150:6;153:5;154:3;
155:20,25;156:3,4,6,8
**obligations (4)**
86:16;137:5;155:20,
21
**obviously (2)**
113:9;153:10
**Occasionally (1)**
110:19
**occupancy (2)**
98:20;128:3
**occur (3)**
136:17;149:4,7
**occurred (1)**
70:21
**o'clock (2)**
93:25;171:8
**October (21)**
15:3;17:20;19:1;
20:23;22:12;28:17;
29:23;30:4,25;41:12;
42:18;46:14;48:1,11;
56:23;109:2;128:3,8,
14,17;157:18
**off (6)**
24:10;39:12;94:7;
127:12;129:8;159:11
**offer (6)**
51:17,18;161:10;
162:5;173:24;174:16
**offered (1)**
174:11
**offering (2)**
137:8,10
**office (7)**
15:2;52:13;67:3;
93:3;118:1;131:11;
173:5
**official (1)**
60:23
**omission (3)**
69:6,16;151:20
**once (9)**
9:1;42:24;51:21;
54:11;68:20;69:17,17;
117:16;127:11
**one (56)**
13:19;17:1;21:1,1;
22:15;32:20;33:23;
36:12,20;46:7,9;49:3;

53:1,13;69:9;76:5;
77:24;79:18;81:19;
83:2;85:5;101:17;
104:5;105:12;111:23;
113:1;117:10;127:9,
11,14,15,24,25;128:2,
11,14;136:24;137:6;
139:6;142:1;144:1;
147:9;150:10;158:15;
159:3,4,5;164:3;
165:10;167:6,6;
172:15,22;173:21,22,
23
**ones (2)**
6:6;159:10
**one's (1)**
113:14
**ongoing (1)**
120:19
**online (1)**
124:15
**only (22)**
18:13;35:9;36:11;
49:11;57:2;101:14;
105:18;116:17;120:19;
122:13;129:25;130:10;
131:14;138:15;141:12;
142:18;149:11;150:6;
151:8;158:22;159:7;
169:3
**on-site (1)**
58:5
**oops (1)**
103:2
**open (4)**
42:12;43:6;58:8;
135:13
**open- (1)**
89:2
**open-ended (3)**
78:19;89:8;97:2
**opening (1)**
135:11
**operating (41)**
9:15,19,23;36:25;
37:8;43:1;44:6,11;
45:5;53:17,25;56:9;
59:24;61:3;62:15;
66:10,13,16,21,25;
68:24;70:3,12,20;
73:16;88:12;98:6,12,
15;120:15,23;121:1,
19;122:11;137:2;
139:10;147:5;150:16;
155:24;165:19,22
**opinion (1)**
161:4
**opportunity (3)**
24:3,5;148:19
**opposed (1)**
17:5
**option (1)**
24:9

**order (6)**
65:15,17;74:11;
97:12;119:8;172:16
**ordered (2)**
5:5
**organization (2)**
67:2,18
**orient (1)**
5:15
**original (6)**
22:18;80:3,4,7;
124:24;125:4
**originally (2)**
80:24;163:2
**otherwise (2)**
120:3;174:17
**out (30)**
16:24;20:3,20;21:5;
22:2;27:5,8;35:3,11;
38:23;49:9;64:21;66:2;
73:9;74:3,14;92:8;
98:24,24;103:25;
104:9;106:7;131:11,
11;134:21;137:12;
146:3;151:3;156:13;
172:16
**outlined (1)**
62:24
**outraged (4)**
144:24;145:10,17,19
**outsiders (1)**
173:4
**over (14)**
5:3,4;8:19;55:17;
60:10;64:19;74:24;
78:10;95:15;134:2;
140:21;141:2;165:7;
169:19
**Overall (1)**
26:21
**overhead (1)**
95:4
**Overruled (2)**
18:16;53:2
**overrun (1)**
143:13
**overruns (4)**
135:5;138:1;140:9;
142:9
**owed (1)**
153:5
**own (5)**
60:22;109:5;113:24;
119:22,23
**owner (2)**
88:20;119:25

**P**

**page (45)**
6:7;12:23;14:6,7;
19:11;21:13,18,22;
23:4,17,22;25:4,7,16,

19;26:20;28:8,10,11,
13;33:10,11;39:19;
48:24;74:19;75:12;
77:11,14,16;89:21;
96:1,1;99:22,23,24;
103:15;136:24;137:25;
156:19;157:21;158:18,
19,21,21;168:10
**pages (2)**
12:16;39:20
**paid (16)**
14:11;57:24;64:9,21;
66:2;109:25;114:1;
138:4,11,18;140:12;
146:11;158:5,9;166:7;
167:1
**pains (4)**
18:23;68:9;158:13;
159:8
**painted (1)**
129:9
**paragraph (27)**
17:14,14,19;18:1,3;
30:19,19;31:21;32:18,
23;54:24;55:12;59:10;
61:25;67:24;87:13;
95:13,18;96:3;121:18;
122:7,11;135:11,20;
137:25;138:24;142:3
**paragraphs (2)**
18:14;54:18
**part (19)**
7:25;13:25;25:25;
40:1,8;42:16;49:1;
90:21;97:9,12;101:4;
104:20;136:16;137:11;
142:3;150:11,14;
167:18,22
**particular (12)**
27:5;28:2,7;30:6,7;
31:7;86:21;100:8;
102:24;133:5;148:22;
158:19
**particularly (2)**
136:14,16
**parties (8)**
4:11,15,25;29:7;
44:11;83:24;84:4,8
**partner (7)**
21:16;58:21;69:22;
86:25;87:23;91:24;
102:1,4;104:21;
109:11;112:7,22;
119:5;148:2,18;
162:13;169:8
**partners (1)**
43:5
**past (1)**
52:10
**path (1)**
139:23
**Pause (3)**
59:9;77:3;170:21

**pay (21)**
63:21;64:3,6;88:20;
89:3,15;97:5;98:19;
104:21;105:10,13;
106:17;140:10,15;
142:7;146:8;150:7;
153:9;155:23,25;156:3
**payable (2)**
138:5;159:11
**paying (11)**
109:6;110:10;115:9;
124:22;138:25;150:14,
17;151:9;155:25;
159:22;164:21
**payment (12)**
111:25;113:10,14;
115:19;138:17;139:16;
157:10,14,19;158:1,22;
159:1
**payments (17)**
34:21;105:22;106:7;
109:16;110:10;111:3;
144:10;157:4;158:4,
14;159:9;160:4;
168:17,19,23;170:4,7
**PDF (1)**
22:25
**penalties (4)**
18:23;68:9;158:13;
159:9
**pending (1)**
77:5
**people (6)**
13:19;58:6;60:9;
79:23;91:10;171:15
**per (9)**
65:11;66:4,5;80:7;
81:5;131:2;165:23;
166:25;167:1
**percent (26)**
11:19,25;13:6,6,7,7,
12;14:11;21:15,16,19,
23;63:10,11,11;65:22,
25;66:4,6;80:16;130:7;
166:17,21,21,22;167:2
**perform (1)**
95:21
**perhaps (1)**
128:12
**period (1)**
55:22
**perjury (4)**
18:23;68:10;158:14;
159:9
**permits (6)**
26:9;72:5,6,12;
111:10,14
**permitted (1)**
100:10
**permitting (1)**
73:16
**person (4)**
16:6;45:2;149:9;

161:14
**personal (10)**
69:25;70:2,4;85:21,
21;152:1,25;153:4,4;
154:3
**personally (3)**
151:23;152:5;153:5
**pertaining (1)**
135:14
**Perten (238)**
4:21,21;5:15,21;6:2,
16,23;7:2,5,8,12,15,19;
8:10,11,15,17;12:4,6,
12,13,18,21;17:13,16;
18:1,2,18;19:9,13;
20:11,12;23:23,25;
24:15,16;25:5,6,19,22,
23;26:17,19;31:20,22;
32:21;34:7,11,12;37:4,
6,9,10,18,20;39:18,21;
46:10,12,17,19;47:3,5,
7,21,25;48:18,19,24,
25;49:24;50:1,14;
52:2,3;53:3;54:5,7,15,
16,21,22;55:9,10,14,
16;62:15,18;63:2,4;
66:21,23;67:9,12,16,
21,23;68:7,8,18,19;
74:7,8,19,21,23,25;
78:1,3,4;79:6,8;80:14,
15;82:12,13,15,16;
85:14,15,18,19;86:5,6;
88:6,7;92:6,7,12,14;
94:1,3,13,15;95:4,6,17;
98:12,14;103:16,17;
105:5,7,15,16;106:13,
15;107:14,16;109:22,
24;110:4,5;113:4,6;
115:1,2,17,18,25;
116:1;117:1,2;124:13,
14;125:8,9;130:4,5,14,
15,23,25;131:6,7;
132:13,15,16;134:18,
19;135:9,10;136:22,
23;137:22,24;138:22,
23;139:20,21;141:25;
142:2;152:10,11;
156:23,25;157:7,8,22,
24,25;165:19,21;166:2,
3,12,14;167:5,9,11,13;
168:10,11,14,15;
169:13,16;170:17,20,
22;171:20,23;172:2,6,
10,17;173:16,18,21,24;
174:11
**Perten's (2)**
24:3,9
**Peter (4)**
4:19;109:25;110:6,
14
**petition (7)**
149:12,13,22;

152:19;157:17;158:6;
159:4
**ph (8)**
77:15;79:14,17;
91:10;92:20,21,23;
109:25
**phone (1)**
45:2
**photos (1)**
15:17
**pick (1)**
45:2
**picked (1)**
16:24
**picks (1)**
136:25
**picture (2)**
110:6,22
**place (2)**
5:16;143:14
**placed (2)**
5:23;33:11
**plaintiffs (3)**
32:24,24;123:23
**plan (9)**
30:20;31:2,2,3;62:1;
80:3,4;124:24;125:4
**plans (23)**
19:2;26:8;37:16,23,
24;38:3,21,22;39:5,9;
41:11;56:19,22,24;
57:1,1,2,14;87:15,19;
88:19;111:20;172:2
**plate (1)**
64:3
**please (50)**
4:6,15;17:14;19:10;
21:18;23:25;25:19;
37:19;39:13;46:11,17;
47:15;49:25;51:2;
52:13;54:21;56:10;
63:2;65:25;67:9,21;
74:5,7;79:7;82:12;
83:9;86:5;92:13;95:4;
98:10,13;111:5;113:4;
114:5;116:2,25;
122:21,23;129:4;
130:4,24;131:4,10;
132:12,13;134:18;
135:9;156:18;166:13;
167:5
**pleased (1)**
139:24
**plenty (2)**
144:19,20
**plural (1)**
128:16
**pm (4)**
48:1;50:2;79:9;
174:22
**point (22)**
28:25;32:3;34:10;
44:15,16;49:6,13;

Case 16-01120   Doc 341   Filed 06/04/19   Entered 06/04/19 13:01:14   Desc Main
Document   Page 188 of 194
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
May 7, 2019

55:22;61:3;76:24,25;
77:24;87:19,21;
100:12;104:5;117:20;
136:2;142:18;148:16;
164:13;171:19
**Polly (1)**
92:20
**portion (2)**
42:14;168:2
**position (4)**
85:4;99:18;100:21;
101:1
**positive (2)**
11:4;83:11
**possession (1)**
163:7
**possibility (3)**
40:25;42:11,13
**possible (4)**
6:12;36:11;61:21;
78:14
**Possibly (2)**
40:15,16
**pot (5)**
164:23;165:10,10,
14;166:8
**potential (4)**
14:18;26:4,25;65:23
**power (2)**
59:18;162:22
**powers (2)**
58:20,21
**practice (3)**
100:13,14;169:7
**preceding (2)**
157:20;158:6
**precise (1)**
40:7
**preliminaries (1)**
5:8
**premise (1)**
136:10
**preparation (1)**
119:21
**prepare (2)**
119:8;137:1
**prepared (4)**
39:25;79:3;119:1,2
**preparing (1)**
156:9
**present (1)**
15:6
**presentation (6)**
16:25;17:24,25;18:4;
19:14;25:25
**presented (5)**
17:22;23:1;37:16;
87:5,6
**presenting (1)**
119:18
**pretty (5)**
9:24;24:4;45:6;50:8;
133:20

**prevent (3)**
126:10;161:6,10
**previous (3)**
22:6;169:21,23
**PREVIOUSLY (2)**
8:13;43:22
**price (50)**
16:24;23:15;27:15,
16,21;28:3,7,25;29:6;
30:9;31:8,8,11,14,24;
32:1,3,10,11,25;33:1;
36:15;50:20;62:4;
75:13,16,19;76:21;
77:18,19,24;78:6,7,12,
13;88:17;97:2;123:24,
25;124:2,9;135:20,22,
23;136:4,11,13;139:5;
161:14;164:4
**prices (2)**
30:21;62:3
**primary (1)**
45:19
**printed (1)**
157:1
**prior (4)**
10:18,21;44:2;89:24
**private (5)**
50:24;51:22;52:5;
54:11;70:12
**privately (4)**
50:3,17;54:23;55:11
**probability (1)**
61:24
**probably (12)**
5:18;13:22,23;30:9;
76:8;100:7,16;112:2;
127:4;146:17;150:15;
169:9
**problem (1)**
6:15
**proceed (3)**
8:11;47:5;94:12
**proceeds (11)**
63:7;100:11;138:6;
162:9;165:11;166:8,
16,16,19,24;167:1
**process (2)**
24:5;131:10
**ProEx (7)**
115:10,19;116:3,7;
119:23;120:1,6
**ProExcavation (6)**
4:13,22;115:12,21;
116:12;118:5
**ProEx's (1)**
60:19
**proffering (2)**
6:4,6
**Profit (5)**
26:21;41:19;64:22;
66:1,2
**profits (6)**
11:19;55:3,8;63:7;

166:15,19
**profit-sharing (1)**
21:23
**programmed (1)**
20:1
**progress (1)**
73:3
**prohibited (1)**
99:10
**project (57)**
10:18,24;11:1,8;
13:4,11,16;15:16;
17:21,24;18:6;20:4,24;
21:4,13;22:10;23:4,12;
24:17,21;26:21;30:20;
31:2;35:15;60:10;62:1;
72:15;73:4;77:18;
81:21;83:11,15,19,20,
24;84:4,8;85:11;90:9,
13;92:24;97:6;104:6;
109:13,16;120:20;
124:23;125:11;133:16;
142:7;144:2;148:5,7,8,
9;161:3;167:16
**projected (3)**
30:21;62:2,4
**projects (1)**
41:16
**promised (1)**
14:21
**prompt (1)**
140:3
**proof (2)**
5:18;168:1
**proper (1)**
73:4
**properly (1)**
108:9
**properties (12)**
27:25;29:14;65:1;
120:16;126:18;127:8,
24;133:24;134:23;
137:16;141:17;165:3
**property (44)**
27:1,8;29:18,24;
30:4;36:7;37:12;50:19;
51:18;56:14;57:23;
61:16;63:14,17;64:22;
65:7,8,11;66:2;70:22;
71:22;74:1;127:9,11,
20,22,23;133:20;
138:11,18;140:22,25;
150:7;153:3;161:6,9,
12,20,21;163:7,13,20;
164:14;169:19
**property's (1)**
127:14
**proposal (1)**
84:13
**proposed (5)**
6:1;7:14;11:18;81:4;
137:12
**proposes (2)**

139:12,14
**proposing (1)**
137:7
**protect (1)**
154:19
**provide (5)**
6:12;93:22;121:1;
139:9;154:4
**provided (9)**
6:3;26:4;30:2;47:14;
120:22;121:20;122:8,
12;143:8
**providing (1)**
111:14
**provisions (1)**
67:5
**PS (2)**
51:17;110:24
**pull (11)**
19:9;56:9;79:6;86:5;
95:14;98:12;113:1;
124:13;130:23;152:10;
165:19
**pulled (1)**
92:18
**Purchase (3)**
25:8;51:18;161:10
**purchased (3)**
25:11;71:22;146:20
**purchase-money (1)**
98:18
**purpose (2)**
133:23;152:22
**purposes (1)**
24:25
**put (22)**
5:21;7:10,20;15:24;
22:20,24,24;32:19;
35:14;54:1;56:12;
65:20;106:24;129:7,
10;131:4;153:3;156:4;
162:9,23;167:15,21
**putting (8)**
36:1;45:20;84:1;
107:5,8;108:3;138:17;
160:17
**Pyle (5)**
69:9;121:10;134:15;
145:9;169:17

## Q

**qualified (1)**
174:16
**quantify (1)**
83:12
**quantity (1)**
7:6
**quarter (5)**
29:5,5;30:10;75:17,
20
**Question's (1)**
34:9

**quick (3)**
13:11;131:9;164:8
**QuickBooks (6)**
107:18;108:5,10;
156:20;168:12;169:25
**quickly (5)**
11:24;13:16;14:10;
77:17;153:13

## R

**raised (2)**
5:24;149:5
**raises (3)**
6:9;139:11,14
**ran (1)**
35:11
**rare (2)**
5:6,6
**rarely (2)**
110:17,19
**reach (1)**
131:10
**reached (1)**
152:1
**reaching (1)**
103:25
**reaction (1)**
140:17
**read (39)**
13:8,13;14:12,13;
18:6,13,16,19,21,21;
29:11,12;45:6;52:13;
65:25;67:5;77:21;82:8;
87:10;89:18,19;90:1,5,
18;93:7;95:13;99:4,11,
14,16;100:11,18;
102:24;103:1;130:1;
135:18,19,19;166:18
**reading (4)**
8:21;31:2;59:7;
100:6
**reads (2)**
17:19;18:3
**ready (2)**
71:24;94:12
**real (13)**
42:4,22;109:15,18;
118:24;122:14;126:20;
136:18;140:2;161:16,
17;165:3;166:9
**realize (1)**
83:9
**really (6)**
61:16;85:1,21,21;
99:18;127:15
**reason (22)**
40:5;42:3;72:4;
74:14;81:2,3;82:20;
83:2;87:18,20;93:20;
99:9,14;112:18;
118:18;133:8;134:25;
137:14;151:21;158:8;

163:2,5
**reasonable (3)**
59:11;75:21;161:14
**reasonably (1)**
18:4
**reasons (1)**
82:23
**recall (6)**
12:2;16:11,18;17:7;
19:16;36:15;45:13;
55:2,5;71:14;103:10,
13;128:22
**receipt (1)**
131:5
**received (8)**
103:22;131:17,17;
138:14;142:20,23;
143:6,6
**recess (2)**
94:6;174:21
**reciting (1)**
80:11
**recognize (3)**
7:10;41:19;107:19
**recognized (1)**
5:3
**recognizes (1)**
139:23
**recollection (3)**
15:9;16:9;104:11
**recommendations (1)**
11:8
**record (6)**
4:16;12:11;53:1;
94:7,8;153:13
**recorded (3)**
77:25;145:21;152:18
**records (10)**
59:25;60:6,14,15,23,
25;109:5;119:21;
141:3,20
**recover (1)**
168:1
**red (1)**
161:20
**redacted (2)**
5:10;167:6
**redirect (2)**
18:17;170:25
**reduce (1)**
136:11
**reduction (4)**
135:21,21;136:14;
139:5
**referred (2)**
173:16,24
**referring (2)**
5:18;30:16
**refinancing (2)**
63:8;166:20
**refinished (1)**
129:9
**reflect (3)**

40:2,18;53:1
**reflects (1)**
137:2
**refuse (2)**
133:14;136:1
**refused (10)**
39:12,15;69:18;
135:23;136:7;141:7,
15;142:6;149:8;163:1
**refute (1)**
85:5
**regarding (2)**
129:5;135:13
**reimbursement (1)**
111:5
**reimbursements (1)**
114:2
**reimbursing (1)**
111:7
**related (2)**
58:24;59:2
**relates (2)**
58:23;120:12
**relationship (1)**
49:10;71:6
**relied (4)**
11:8;18:4,8;74:2
**relying (1)**
18:9
**remainder (1)**
165:15
**remember (40)**
12:10;13:1,2,22;
14:4;15:12;16:20;
17:11;32:17;33:8;
38:11;48:13;62:7,13;
74:9;77:4;85:1,1,7,8,9;
89:25;93:16;95:10;
100:2,3,8;104:9;
110:20;125:14;128:8;
133:17;138:19;141:22;
142:21;148:16;161:25;
168:22,24;169:17
**remind (2)**
8:6;104:13
**repayment (1)**
138:5
**repeat (10)**
32:6;39:13;53:24;
66:15;74:5;90:20;
98:10;122:21,23;
132:12
**rephrase (1)**
125:7
**replace (1)**
76:6
**replied (1)**
48:4
**replies (1)**
50:2
**reply (1)**
48:5
**report (1)**

168:13
**represent (1)**
43:24
**representation (1)**
119:13
**represented (5)**
10:21;43:21;44:7;
77:12;167:15
**representing (5)**
44:11,12;77:14;
159:13,14
**request (6)**
56:12;93:3;117:4,11;
136:3;147:13
**requested (3)**
93:5;106:24;142:24
**requesting (2)**
40:9;61:8
**requests (2)**
116:18,23
**required (4)**
52:11;95:20;97:12;
155:19
**requires (2)**
52:17;121:5
**requisition (1)**
58:17
**requisitioning (1)**
117:7
**reserve (1)**
57:15
**reserved (2)**
7:7;56:18
**respect (1)**
9:23
**respond (1)**
47:11
**responded (3)**
47:9;51:6;131:5
**responding (1)**
83:7
**responds (3)**
51:13;55:11;82:17
**response (6)**
47:13;48:20;50:17;
83:5;131:9;140:5
**responsibilities (2)**
49:21;104:21
**responsibility (2)**
34:21;109:12
**responsible (4)**
59:25;62:20;63:16,
22
**RESUMED (1)**
94:14
**retain (1)**
122:14
**return (7)**
13:13,17;14:10,22,
23;42:7;80:16
**returning (3)**
147:12,22;148:6
**returns (7)**

15:1;17:23;119:1,2,
6,8,12
**Revenue (1)**
119:13
**review (13)**
13:21;33:15;38:4,10;
47:15;48:21;96:23;
100:1;116:2;124:16;
130:20;141:22;158:16
**reviewed (10)**
9:24;16:3;33:5;38:8,
10,13;74:11,16;95:8;
129:25
**reviewing (2)**
28:14;80:3
**revised (1)**
55:11
**rhythm (1)**
171:18
**rid (1)**
6:19
**ridiculous (2)**
138:14;141:14
**Right (107)**
5:20;6:1;7:1,4,8,16;
8:2,9;10:9;19:11;
24:14;32:18;40:14;
41:13;44:10;46:21;
47:1,20;48:23;51:7;
54:25;56:18;57:17;
61:4,4,9;62:13;67:8;
71:5,16;73:12;79:5,25;
84:6,16;86:25;88:5;
89:9;92:25;94:1,16;
95:10;99:22;104:13;
108:24;110:13;111:10;
112:8;113:23;114:5,
12,13;115:9,21;121:9,
23;122:3;125:6,20;
127:11;130:10;132:1,
18;133:3;136:8,13;
137:25;138:5;141:12,
16;142:3,16;143:25;
146:11;147:5,13;
148:1;150:9;152:8;
153:4,22;156:3;
158:20;159:1,1;
161:23;163:16;164:4;
165:3,11,12;167:4,7,
12;169:2,25;170:12,
13;172:9,16,19,20;
173:3,17,18,19;174:8
**right- (1)**
75:2
**rights (2)**
57:15;137:5
**rise (2)**
94:6;174:21
**risk (2)**
21:4;22:10;23:5,9,
12;26:21;83:11
**risky (5)**
41:23;42:1,3,5,9

**Road (1)**
129:5
**Rockland (11)**
48:17;49:11;70:24;
71:10;97:17,20;98:19;
101:16;102:19;103:2;
114:24
**role (2)**
52:6;120:19
**roll (1)**
166:2
**rotate (3)**
19:10;25:5;107:14
**rotates (1)**
25:20
**roughly (6)**
32:4;72:11;125:18;
158:5;165:15;169:20
**rule (1)**
99:21;100:21,23
**rules (1)**
100:24
**run (3)**
35:10;57:19;59:21;
81:8;146:2
**Ryan (1)**
93:2

## S

**S-302 (1)**
39:19
**sale (10)**
28:25;29:6;31:9;
62:5;63:7;75:13,16,19;
76:5;122:15;164:8;
165:2,12;166:16,17,19,
25
**sales (4)**
11:15;28:3;50:20;
75:24
**Salmi (1)**
171:25
**same (14)**
4:25;6:5;32:9,15;
52:12;59:2;69:1;76:18;
101:19;127:8;131:24;
152:19;168:5;172:20
**Savant (1)**
92:20
**Savara (1)**
77:15
**save (1)**
161:3
**saw (11)**
5:5;33:14;90:9,15,
22;91:6,9;97:1;112:8,
22;113:1
**saying (10)**
16:17;58:7;14;
59:20;72:19;77:23;
106:22;125:15;128:8;
131:21

Case 16-01120    Doc 341    Filed 06/04/19    Entered 06/04/19 13:01:14    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 190 of 194
May 7, 2019

**scenario (4)**
21:14,19,22;24:17
**scenarios (2)**
24:21;26:25
**schedule (7)**
25:25;26:3;98:17;
101:8;103:7;157:18;
171:12
**scheduled (4)**
69:10;171:16,17;
172:4
**Scooch (1)**
31:21
**scroll (42)**
25:3;31:20;37:9;
39:19;46:17;47:13,23;
48:16,24;50:14;51:13;
54:6,15;55:9,14;59:4,
14;63:2;67:21;68:7,18;
74:19,24;85:16;87:9;
88:6;98:13;107:21;
109:22;115:1;117:1;
130:14;131:6;132:15;
135:9;136:22;138:22;
139:20;141:25;156:23;
157:7;169:13
**scrolling (3)**
26:17;79:7;80:14
**Sean (1)**
4:17
**searches (1)**
165:6
**seated (3)**
4:6;8:9;94:11
**second (3)**
4:10;32:20;92:6
**seconds (1)**
170:18
**secret (2)**
113:17;123:5
**Secretary (1)**
67:2;68:16
**secretive (1)**
116:14
**section (20)**
37:18;53:15,22;55:2,
2;57:13;58:20;61:2;
62:16,20,25;63:5;
64:19,20;66:24;78:22;
165:23,23;166:1;167:1
**sections (1)**
18:19
**secure (4)**
152:22;153:4,5;
154:3
**security (2)**
155:16,17
**seeing (2)**
91:25;155:3
**seeking (2)**
143:4;168:1
**Segal (1)**
116:9

**self-dealing (2)**
155:7,12
**self-effectuating (1)**
121:7
**sell (23)**
27:8,11,11,12;28:4,
24;29:14,18;30:20;
31:5,7;32:2;50:21;
51:5;61:17;62:1;65:1;
127:9;133:24;134:22;
141:17;164:5,6
**selling (12)**
28:7;30:21;31:24,25;
32:11,25;33:1;62:3,4;
123:23,25;133:19
**selling/closing (1)**
131:10
**sells (1)**
138:18
**send (7)**
54:8;72:18;79:9;
100:20;118:13,15;
131:14
**sending (12)**
106:2;109:15,21;
110:11,15;111:20;
115:13;116:12;117:10,
15;132:10;160:15
**sends (1)**
110:21
**sent (30)**
46:14;47:8,17;48:11;
69:9;79:23;91:14;
92:15;103:3,19;112:4,
15;113:9;121:10;
122:19;123:1;130:13,
20;131:19,20;132:17,
17,21;134:15;142:13,
23;143:15;144:23;
149:9;169:18
**sentence (3)**
62:23;102:24;135:11
**separate (1)**
60:20
**September (4)**
108:14;124:12,15;
157:13
**serious (1)**
160:18
**service (6)**
104:22,25;110:24;
119:13;134:8;150:14
**session (2)**
4:2;94:10
**set (6)**
31:24;32:25;92:24;
98:17;123:23;140:24
**Settlement (2)**
25:8,13
**Seven (1)**
171:11
**seven-and-a-half (2)**
49:4,7

**seventy (1)**
112:2
**several (2)**
106:7;135:13
**sewer (1)**
116:8
**shaking (1)**
7:21
**shall (12)**
57:3;63:9,16,21;
64:21;66:1,25;67:3,25,
25;98:18;166:20
**shape (1)**
5:5
**share (2)**
64:22;66:1
**sheet (6)**
21:2;100:20;104:5,7;
169:22,23
**shook (1)**
49:9
**short (1)**
35:10
**short- (1)**
13:11
**shortly (1)**
142:6
**shovel (1)**
72:14
**show (8)**
7:3,9;38:22;77:8;
107:24;143:9,21;
157:21
**showed (1)**
15:17
**showing (8)**
17:17;32:22;37:7;
39:22;46:13;109:25;
113:10;117:23
**shown (4)**
17:1;28:21;29:1;
104:5
**shy (1)**
144:14
**sic (8)**
4:14;12:14;28:25;
71:23;72:2;79:9;
148:17;168:21
**side (2)**
26:11;75:3
**sides (1)**
6:1
**sign (21)**
8:23;9:1;39:12,14;
43:14,22;52:11;55:16;
86:15;87:23;88:2;90:7,
17;91:6;100:13;
121:15;129:9;133:5,
10;134:12;142:6
**signature (2)**
130:16;131:20
**signed (35)**
9:24;13:23;18:23;

36:25;37:8;44:22;66:9,
13,16;67:19;68:9;
70:20;73:16;86:11,22;
87:10;88:2;89:2;90:2;
92:9;100:6,10;101:20;
119:5;126:12,16;
129:15,23;130:20;
131:3,14,15;152:15;
158:13;159:8
**significant (2)**
41:19;50:8
**significantly (5)**
35:7;75:10;76:11;
125:20;164:15
**signing (10)**
86:3,18;87:1;89:7,
15;90:4;99:6;100:1;
102:10;128:25
**similarly (1)**
27:15
**simply (2)**
99:15;138:17
**simultaneously (1)**
154:16
**single (2)**
143:21;144:3
**sit (2)**
100:9;173:6
**site (6)**
91:5;148:5,6,7,8,9
**sitting (1)**
150:1
**situation (5)**
61:7;70:10,11;119:9;
139:12
**six (4)**
5:25;6:3;16:20;
151:2
**sixteen-thousand (1)**
105:18
**skip (1)**
62:15
**slightly (1)**
122:17
**slipped (1)**
72:15
**small (2)**
7:6;117:15
**smaller (1)**
125:11
**smart (1)**
140:15
**smoothly (1)**
24:12
**so-called (1)**
168:24
**socialize (1)**
10:7
**sold (23)**
27:1,25;29:25;30:5;
36:7;37:12;50:19;
61:24;63:15,17;64:22;
65:8,12;66:1,3;126:17;

136:16;138:11;149:24;
150:7;161:7,12;165:3
**somebody (3)**
7:23;107:5;161:10
**somehow (1)**
65:7
**sometime (2)**
127:25;128:13
**sometimes (2)**
13:6;109:18
**somewhere (4)**
35:20;37:11;41:13;
169:21
**sorry (24)**
14:4,8;19:10;47:2;
61:22;62:16;66:15;
82:15;86:2;88:14;96:5;
99:24;103:3;111:6;
112:11;122:21,22;
132:3;142:1;145:2;
159:21;161:8;164:10;
167:9
**sort (8)**
14:6;28:15;64:20;
73:9;84:14;102:14;
120:1;171:18
**sorts (2)**
140:6;143:9
**source (1)**
36:11
**sources (1)**
36:6
**space (2)**
126:1,2
**speaking (1)**
45:14
**specific (1)**
31:8
**specifically (11)**
16:14;17:3;30:18;
54:1;58:23,24;59:2,20;
62:23;87:14;98:6
**specified (2)**
28:7;68:21
**spend (1)**
78:20
**split (3)**
137:10;139:1;166:4
**spoke (1)**
41:18
**spoken (1)**
51:24
**spouses (1)**
73:8
**spread (1)**
64:11
**spreadsheet (22)**
12:25;17:2,5;18:9;
19:12,19;20:5,14,17;
34:17;37:24;38:23;
39:5,7,14;41:2,7;
42:17;71:12;79:2;
82:25;168:12

spreadsheets (4)
15:21,24;16:25;
82:22
spring (1)
140:2
square (4)
75:4;125:10,18;
126:1
stack (3)
99:15,25;100:5
staged (1)
129:8
stages (1)
39:25
stand (1)
8:3
standard (1)
13:5
standpoint (1)
172:18
stands (1)
7:17
start (4)
27:17;28:15;135:17;
171:10
started (5)
71:23;80:21;92:11;
103:5;134:24
starting (4)
14:6;83:8;99:24;
118:19
starts (1)
83:7
state (1)
4:15
Statement (4)
25:8;68:23;96:15;
115:3
statements (3)
114:21;117:23;143:4
states (2)
17:20;95:18
State's (1)
67:3
status (1)
174:10
statutory (1)
160:1
stay (1)
5:5
step (1)
64:3
stick (1)
143:8
still (9)
9:9;51:12;69:18;
81:21;85:24;87:19;
144:15;154:10;155:4
stipulation (1)
7:2
stood (2)
11:19;14:2
Stop (3)

19:12;26:18;74:20
stopped (2)
151:9;155:25
storage (1)
173:4
story (2)
107:10,11
Strike (1)
85:14
strong (2)
145:10,14
strongly (1)
113:9
struck (2)
42:20;151:19
structural (1)
111:18
stuff (1)
172:24
subcontract (1)
58:14
subcontracts (2)
57:19;58:3
subject (1)
73:1
submitted (3)
97:11;101:3;102:22
submitting (2)
97:19;101:14
subpoena (1)
171:15
substance (1)
141:19
substantial (5)
57:7,10;88:12;138:1;
142:8
substantially (1)
57:4
substantiate (1)
141:13
sudden (1)
118:19
suddenly (1)
112:13
sued (5)
133:2,13;144:25;
145:14,18
suffer (1)
65:2
suggest (1)
76:14
suggested (5)
13:19;30:8;162:11,
15;164:3
suggesting (1)
138:10
suggestion (2)
139:1;163:23
suggests (2)
139:1,5
suit (15)
16:22;17:3;30:12;
77:15;141:6,9;145:3,9,

24;146:2;147:16,18,
25;148:19;149:11
sum (2)
141:19;165:7
summarize (1)
77:16
summary (2)
83:8;170:2
Superior (1)
145:4
supervise (1)
109:12
supplied (3)
37:23;56:19,25
supplies (1)
144:1
support (1)
97:20
suppose (1)
7:13
supposed (4)
36:15;69:15;98:7;
132:24
supposedly (1)
104:12
sure (38)
4:8;8:22;9:7;11:20;
20:4;21:9;22:18,20;
32:6;33:9,16;34:6;
43:10,24;46:1;50:18;
52:7;53:25;57:18;62:7,
9;69:2;74:6;76:1;78:3;
94:3;95:5,8;98:11;
128:14;134:6;142:21;
158:9;161:9;171:22;
172:14,23;174:2
surprise (2)
145:13,15
suspicion (1)
144:16
sustain (1)
125:6
swore (2)
62:10,10
SWORN (2)
8:13;30:19

T

table (2)
172:25;173:10
takeaway (1)
85:22
talk (7)
73:20;147:4,21;
148:7;149:1;171:17;
173:6
talked (1)
124:23
talking (9)
12:23;28:14,14;
55:24;71:13;82:20;
89:22;94:17;99:23

talks (5)
55:3;58:20;137:25;
138:24;166:4
Tamposi (2)
4:19,19
target (5)
27:21;31:10,14;
75:16,19
Tati (1)
131:23
Tatiana (19)
4:12,22;28:24;42:16;
73:13;120:17,19,22;
121:25;126:11;127:6,
7;129:3,4,17;131:19;
133:16;134:1;142:5
tax (5)
119:1,1,6,8,12
taxes (1)
105:13
Technically (2)
61:21;102:8
telling (16)
15:2;68:10;92:1;
101:16;110:10;111:2,
6;112:13,14;113:8;
114:18;116:15,17;
117:6;118:1;129:14
tells (2)
111:10;114:2
template (2)
88:13,15
ten (3)
63:10;64:9;166:21
term (7)
9:4;13:12;36:18;
57:7,8;66:25;137:3
terminate (4)
69:4,18;151:16,21
termination (2)
69:7;151:14
terms (11)
8:22;9:1,14;36:21;
43:9;50:20;70:3,12;
71:7;87:13;133:16
testified (15)
20:19;22:20;29:15;
36:14,17;52:20;83:18;
97:15;99:20;127:18;
133:15,19;138:13;
161:25;170:3
testify (1)
84:1
testimony (35)
17:12;19:15;31:1;
37:11,15,21,25;38:19,
24;39:1,3;52:24;60:17;
65:6;70:8;71:25;73:22;
76:20;78:6,19,21;
86:23;87:22,24;88:3;
97:21;103:8;108:6,11;
121:23;127:19;143:16;
155:22;161:19;164:7

texted (3)
129:3,7;130:7
Thanks (1)
51:17
thank-you (1)
132:10
theme (1)
136:25
there'd (1)
163:10
therefore (2)
45:21;149:1
there'll (1)
64:9
thirty (3)
13:5,6;170:17
thirty-six (1)
27:5
though (4)
94:25;100:15;
151:19;168:16
thought (8)
89:10,13;114:9;
124:19;127:8,19,19;
163:6
three (17)
5:16,21,23;20:16;
22:6,9;29:13,18;43:4;
58:13;73:8;116:7;
143:20;144:3,8,12,14
three-and-a-half (1)
142:22
Thursday (2)
131:11;171:14
times (3)
106:22;109:18;148:9
timing (1)
13:22
title (4)
21:2;162:2,3;165:6
titled (2)
23:8,11
today (13)
5:4,19;80:17;81:20;
100:9;105:10,18;
106:4,17;138:8;
171:13;173:15;174:18
together (3)
10:5;15:25;70:6
told (58)
5:6;10:17;11:3;13:7,
15;15:11,11,15,16;
16:14;17:6;19:18;
27:20;29:3;33:23;34:4,
13,19;35:13;38:4,12;
42:8;44:5;45:19;52:22;
53:6,15,20;61:15;
69:17;71:21;73:25;
75:15;83:19,23;84:3,8;
86:3;89:18;97:8;
100:16;101:2;103:6,7,
10,12;104:12,25;
115:9;123:5,9;128:11;

129:21;132:4,9;
146:11;162:13;170:3
**tomorrow (3)**
171:9,13;174:19
**Tomorrow's (1)**
171:4
**tons (1)**
13:3
**took (7)**
20:3;22:24;41:12;
71:9;143:20;144:13;
169:19
**tool (1)**
19:24
**top (9)**
28:15;33:10;77:16;
83:8;89:23;95:24;96:6;
137:25;169:17
**topics (1)**
69:9
**total (4)**
51:5,15,23;125:5
**touched (1)**
128:20
**touching (1)**
173:9
**towards (2)**
139:25;169:20
**trades' (1)**
88:21
**tradespeople (1)**
57:23
**traditionally (1)**
136:17
**transaction (3)**
44:2;155:7,12
**transactions (1)**
10:21
**transcript (1)**
12:15
**transcripts (1)**
12:7
**transfer (2)**
107:22;157:19
**transferred (2)**
98:16;106:8
**travel (1)**
171:15
**Tree (1)**
110:24
**trial (11)**
4:10,13;6:18;20:10;
33:25;46:10;146:6;
171:12,18;172:6,13
**tried (1)**
149:8
**trigger (1)**
151:22
**trouble (1)**
173:9
**true (25)**
13:10;17:24;25:1;
30:14,22,23,24;32:12;

33:24;52:21;62:5,11;
64:17;68:3,23;92:15;
96:14;121:16,17;
122:9;123:25;128:17;
134:16;136:18;158:15
**Trust (12)**
48:17;49:11;70:24;
71:10;97:17,20;98:19;
101:16;102:19;103:2;
114:24;173:8
**trustee (9)**
158:11;160:4;163:9,
10,13,16,20;164:12,24
**trustee's (1)**
165:8
**truth (1)**
68:10
**truthful (1)**
33:22
**try (3)**
30:3;146:2;174:14
**trying (6)**
18:14;116:14;123:4;
131:21;134:22;163:13
**Tuesday (1)**
131:12
**turn (6)**
17:14;33:9;52:2;
77:11;89:21;140:21
**turns (1)**
141:2
**tweaked (3)**
40:2,13,18
**tweaking (1)**
41:8
**twelve (1)**
65:14
**twenty (6)**
11:25;13:6,12;21:15;
27:11;113:11
**twenty-percent (1)**
13:17
**twenty-three (9)**
27:12;34:19,20,24;
35:11;63:15;64:23;
65:1,12
**two (24)**
12:9,14;15:8;18:14;
30:20;39:20;41:13;
44:10;62:1,1;70:4;
76:4;82:2,23;84:3,7;
103:21;128:6;149:23;
157:18;158:4;164:5,6,
24
**type (2)**
19:2;42:8
**typically (1)**
52:17

**U**

**Ultimate (1)**
31:16

**Ultimately (10)**
29:3;31:10,13,18;
45:23;49:16;55:16;
60:14;71:17;162:2
**Um-hum (3)**
5:11;74:10;157:23
**unable (2)**
143:22;169:1
**unacceptable (2)**
149:9,10
**unauthorized (3)**
142:8,11,15
**unconditional (1)**
71:1
**under (17)**
8:6,8;18:23;59:24;
61:2;68:9;75:7;83:15;
85:13;98:5;120:15;
135:21;147:5;150:16;
155:24;158:13;159:8
**underlying (1)**
136:10
**understands (2)**
7:22;82:21
**understood (75)**
7:19;14:1,17;15:23;
23:7,10;24:17,20,21;
25:16;27:7;28:20;
35:19,25;41:5,22;42:4,
8;43:3;44:9;49:19;
50:6;53:12;57:22,24;
59:17;61:3,9;62:14,24;
63:25;69:2;72:6;73:25;
75:1,6;76:4;80:10,22;
81:3,7,22;82:25;84:16;
85:23;86:14;89:10;
94:25;97:4,11;98:5,23;
99:2;101:4;102:4,7,10,
16;103:1;106:23;
107:4;109:12;119:12,
16;124:22;125:10;
126:3;127:24;131:15;
137:6,11;150:18;
159:24;162:8;165:18
**underway (1)**
140:2
**undocumented (1)**
142:15
**unilaterally (1)**
147:24
**UNISON (2)**
4:4;174:20
**unless (4)**
67:4;86:19;122:2;
152:5
**unload (1)**
163:13
**unreasonable (1)**
136:3
**unredacted (1)**
167:6
**unsubstantiated (1)**
142:8

**unsuccessful (1)**
7:25
**untimely (1)**
142:8
**untoward (1)**
114:10
**untrue (1)**
135:1
**up (64)**
7:22;8:3;17:14;19:9;
23:4;31:21;32:19;37:4;
39:18;45:2,20;46:10;
47:21;48:24;49:24;
50:21;54:15;55:9,14;
56:9;59:4,13,14;64:3,7,
10,14;65:13;67:17;
70:24;71:17;73:2;
75:15;79:6;86:5;92:12,
18,24;98:12;103:16;
105:25;112:19;113:1;
124:13;126:11;130:23;
133:14;134:3;136:25;
137:22;138:10;141:7;
142:1;148:22;152:10;
156:23;162:3;165:19;
166:4,12;169:4,13;
171:7,12
**updated (1)**
47:14
**upon (5)**
18:4;32:4;53:5;63:8;
166:20
**Upside (2)**
157:23,24
**USB (1)**
143:8
**use (10)**
6:20;14:2;79:15,17,
19;101:18;121:20,25;
122:12;171:7
**used (4)**
97:24;98:2;100:11;
163:23
**using (5)**
49:10;70:24;99:10;
159:17;167:25
**usually (1)**
5:3

**V**

**vacation (1)**
172:2
**Vadim (10)**
4:12,22;51:15;92:19,
20;93:4;104:8,12;
106:7;135:12
**vadimkagan@yahoocom (1)**
79:17
**Vadim's (1)**
93:3
**valid (2)**
146:13,14

**value (3)**
65:7;75:12;164:7
**values (1)**
65:3
**variety (1)**
63:5
**vary (1)**
31:9
**vein (1)**
69:1
**verified (4)**
17:17;18:22;30:18;
62:10
**version (6)**
6:12;20:5;21:6;
51:14;68:15;83:9
**versions (3)**
20:16;22:10,16
**view (1)**
163:12
**voice (3)**
49:3,19,21
**volume (2)**
12:16;28:12,13;
33:10;89:22
**volumes (2)**
12:9,15
**voluminous (1)**
99:15
**Von (1)**
171:24
**vote (3)**
50:18,19,20

**W**

**wait (5)**
111:13;124:4;125:3,
3;164:14
**waiting (1)**
149:23
**waiver (1)**
43:23
**waivers (1)**
58:17
**wants (1)**
138:18
**Washington (1)**
173:5
**water (2)**
67:11;116:8
**Watson (2)**
38:12;54:9
**way (30)**
24:2;12;27:13,17;
45:1;46:7,9;49:9;
50:15;52:12;53:1;
56:22;62:17;70:10,11;
74:23;85:5;100:17;
101:17,19;120:4;
140:9;151:8;161:3,21;
162:11;163:6;164:14;
169:3;170:12

**ways (1)**
146:15
**weak (1)**
136:17
**wearing (1)**
44:10
**wee (1)**
82:14
**week (3)**
116:2;171:14,24
**weekly (2)**
88:21;89:16
**weeks (6)**
88:9;89:20;103:22;
141:5,8;142:22
**weeks' (2)**
164:5,6
**weigh (1)**
83:21
**weren't (12)**
22:20;35:18;68:10;
69:24;70:25;118:10;
120:8;129:13;134:1;
144:20;145:17;155:3
**whammy (1)**
64:14
**what's (6)**
6:21;37:7;105:25;
117:11;126:13;174:10
**whenever (1)**
94:12
**whoa (5)**
126:6,6,7,7;132:23
**whole (6)**
85:20;103:6;108:8;
109:13;133:23;161:3
**who's (4)**
49:3;54:1;56:13;
146:11
**wife (3)**
60:3;116:6;142:5
**winter (1)**
136:17
**withdraw (1)**
34:7
**withdrawn (1)**
34:9
**within (5)**
63:15;65:1;157:20;
158:5;159:9
**Without (16)**
31:23;32:23,24;43:9;
50:18;51:5;70:13;
77:17;100:6;123:23;
126:21;148:2,19;
149:11,13;156:16
**witness (11)**
7:3,10;8:10;18:15;
24:7,11,14;67:11,14;
174:12,17
**word (6)**
14:4;29:22;37:24;
38:21;99:21;100:21

**words (10)**
14:2;16:18;84:1;
103:3;124:6;126:7,13;
132:23,25;164:15
**work (6)**
53:11;65:10;90:12;
95:21;137:11;139:25
**working (2)**
38:15;57:23
**workmanlike (1)**
95:21
**workout (1)**
25:20
**works (1)**
24:2
**worksheets (1)**
22:15
**worried (1)**
151:22
**worry (3)**
11:24;16:10,16
**worst (1)**
140:14
**worth (1)**
164:14
**wrap (1)**
171:12
**write (2)**
140:6;153:13
**writing (4)**
22:16,16,20;135:12
**written (3)**
49:15;106:2,3
**wrong (3)**
50:15;62:17;158:21
**wrongfully (1)**
144:2
**wrote (2)**
81:25;131:8

**Y**

**year (4)**
13:12;66:6;134:2;
137:9
**years (10)**
10:14;16:20;27:12;
119:2;143:20;144:3,8,
13,14;158:17
**yesterday (35)**
5:5;6:24;10:17;15:3,
11,15;19:15;33:8;
34:13;36:17;39:23;
44:5;45:19;52:6,20,25;
53:15;67:18;73:25;
74:9;83:18;84:1,6,7;
86:7;101:3;120:25;
128:20;131:1;133:19;
138:13,19;145:21;
167:14;169:19
**Yvonne (1)**
5:4

**Z**

**zero (1)**
21:16
**Zhukovskiy (19)**
10:12;15:5,20,24;
16:5;20:13;79:1,10;
82:11,17,20;83:7;
103:12,12,19,25;104:2,
13,17
**Zhukovskiy's (1)**
85:16
**Zillow (7)**
124:16,19;126:4,12,
24,24;134:6

**1**

**1 (9)**
17:25;20:25;21:1,15,
19;28:13;58:24;89:22;
171:7
**1,000 (1)**
126:1
**1,500,000 (1)**
104:5
**1.3 (6)**
39:11;76:12;78:6,20;
81:1;104:7
**1.4 (2)**
81:1,5
**1.6 (4)**
71:19,20;77:18;78:8
**10:17 (1)**
51:13
**104 (1)**
116:3
**11 (6)**
17:14,15,19;93:25;
163:3,5
**11/2 (1)**
51:3
**11/3 (1)**
54:8
**11/3/2012 (1)**
53:4
**11:01 (1)**
79:9
**11:02:26 (1)**
94:7
**11:19:27 (1)**
94:8
**11:23 (1)**
52:4
**11:25 (2)**
48:23;49:1
**11:41 (2)**
52:10;53:6
**117-B (1)**
7:23
**11th (2)**
105:17;109:20

**12 (3)**
18:1,3;98:13
**12:42 (1)**
47:13
**12:56 (1)**
174:22
**124 (1)**
33:10
**129 (1)**
7:7
**12th (3)**
55:16,23;66:16
**13 (1)**
106:10
**132 (1)**
168:2
**14 (3)**
54:5;106:19;119:3
**146 (3)**
28:8,11,13
**14th (2)**
61:19;134:21
**15 (8)**
9:16;14:7;19:9;37:5,
7;56:10;119:3;165:20
**151 (1)**
7:7
**15-13881 (1)**
4:9
**158 (1)**
7:7
**15th (2)**
108:21;168:21
**16 (2)**
67:10,17
**16,634 (1)**
105:19
**16-1120 (1)**
4:14
**17 (1)**
68:14
**172 (3)**
99:22,23,24
**173 (1)**
99:22
**178 (3)**
46:11,13;47:3
**17th (1)**
106:7
**180 (2)**
39:19,23
**182 (1)**
47:22
**183 (1)**
49:25
**184 (1)**
51:2
**187 (2)**
52:2;86:2
**18th (2)**
109:1,2
**19 (1)**
14:8

**196 (1)**
74:7
**1989 (1)**
10:3
**19th (1)**
108:15
**1st (2)**
50:2;109:1

**2**

**2 (7)**
4:13;21:15;28:12;
59:2;75:12;87:13;
137:25
**2.3 (1)**
66:24
**2:10 (1)**
54:8
**20 (1)**
173:25
**200 (2)**
82:3;104:7
**200,000 (3)**
80:8;81:8;168:2
**2003 (1)**
79:9
**2012 (10)**
15:3;17:20;20:23;
28:17;29:24;30:4;
46:14;52:16,22;53:6
**2013 (9)**
84:16;89:25;92:19;
105:12;108:15,18;
109:20;110:14;119:2
**2014 (16)**
30:21;57:4;61:19;
62:2,6,12;106:16;
108:21,22;121:21,25;
122:13;127:21;128:7,
8,17
**2015 (20)**
67:3;68:4,25;69:4;
103:19,21,22;104:11;
121:10;128:21,24;
134:21;144:24;145:3,
21;151:14;157:13;
158:2;168:17,20
**2016 (1)**
137:4
**2018 (5)**
144:13,14;157:1,4;
168:16
**203 (1)**
79:6
**204 (1)**
82:12
**206 (3)**
89:21,22,23
**21 (4)**
127:3;131:3;134:15,
21
**215 (4)**

92:12,18;174:7,10
**216 (1)**
  115:12
**21's (1)**
  129:10
**21st (1)**
  92:19
**222 (1)**
  103:15
**223 (1)**
  103:15
**226 (1)**
  116:25
**227 (1)**
  117:9
**228 (1)**
  117:14
**229 (2)**
  113:2,4
**22nd (2)**
  145:21;157:13
**230 (2)**
  113:13,13
**231 (1)**
  115:16
**232 (1)**
  117:15
**233 (2)**
  117:15,18
**235 (1)**
  115:21
**236 (3)**
  113:23,23;114:1
**237 (1)**
  114:5
**238 (1)**
  115:24
**239 (1)**
  116:6
**23rd (4)**
  107:22,25;129:3;
  157:1
**241 (1)**
  114:15
**24th (1)**
  172:3
**25 (3)**
  17:20;30:19,19
**250 (1)**
  124:13
**258 (1)**
  116:11
**25th (15)**
  20:23;22:12;29:24;
  30:4,25;103:19,21;
  109:3;130:6;144:13,
  24,25;145:3,9;172:3
**260 (5)**
  129:4;132:3,13,14,
  15
**261 (1)**
  129:7
**263 (1)**

130:13
**267 (1)**
  130:4
**268 (1)**
  130:24
**269 (1)**
  131:20
**27 (1)**
  61:25
**270 (1)**
  132:3
**274 (1)**
  134:18
**275 (1)**
  82:3
**277 (2)**
  103:16,18
**28 (1)**
  31:21
**289 (1)**
  114:24
**28th (4)**
  89:25;132:17;158:2;
  159:3
**29 (3)**
  121:18;122:7,11
**29,200 (1)**
  111:9
**291 (5)**
  107:13,17;156:18;
  158:25;168:9
**29th (2)**
  108:18;111:2
**2nd (1)**
  108:24

**3**

**3 (1)**
  83:9
**3.4 (1)**
  27:17
**3:14 (2)**
  82:14,15
**30 (2)**
  32:18,23
**30,000 (1)**
  116:3
**30th (16)**
  46:14;48:1,11;57:4;
  67:3;68:4,25;69:4,11,
  13,19;70:8;128:7;
  137:4,8;151:14
**31 (2)**
  12:16,23
**315 (1)**
  109:19
**316 (2)**
  105:6,8
**31st (6)**
  121:4,16,21,24;
  122:9,13
**32 (2)**

12:17;14:6
**36 (1)**
  86:5
**3rd (5)**
  52:4,16,22;53:6;
  109:2

**4**

**4 (2)**
  32:10;68:20
**4.1 (2)**
  98:13,15
**4.3 (1)**
  76:18
**4.354 (1)**
  76:7
**4.354275 (1)**
  75:25
**4.5 (3)**
  16:4,14,15
**4.9 (9)**
  27:25;28:4;29:2,9;
  30:16,25;31:5;32:2;
  62:4
**45,000 (1)**
  116:8
**4th (3)**
  79:9;124:12,15

**5**

**5 (4)**
  33:11;59:10;67:24;
  117:9
**5.1 (2)**
  165:23;166:25
**5.199 (1)**
  139:6
**5.2 (8)**
  30:16;37:18;53:16,
  22;56:12;62:17,19,23
**5.3 (4)**
  27:18;75:13,24;76:6
**5.499 (4)**
  31:25;32:10,25;
  123:24
**5.5 (3)**
  32:4;124:1;136:3
**5:11 (3)**
  47:23;48:1,11
**5:42 (2)**
  49:25;50:2
**5:53 (2)**
  50:14,17
**50 (1)**
  135:4
**51 (1)**
  142:4
**55 (5)**
  111:6;129:5,8,8;
  131:4
**5th (5)**

141:6;142:18,22;
143:3;145:9

**6**

**6 (1)**
  117:14
**6,000 (1)**
  125:22
**6,440 (1)**
  124:19
**6,444 (3)**
  124:24;125:5,10
**6,730 (2)**
  75:4,7
**6.1b (1)**
  58:20
**6/18/2014 (1)**
  105:8
**64 (4)**
  17:13,19;30:18;
  141:24
**67 (1)**
  144:24
**6th (1)**
  172:2

**7**

**7 (1)**
  163:16
**7,400 (1)**
  125:18
**7,500 (1)**
  125:25
**7.4 (1)**
  61:2
**7/18 (1)**
  105:22
**7/28/15 (1)**
  158:22
**72 (3)**
  5:10;167:5,14
**75 (2)**
  152:10,12
**78 (3)**
  95:18;96:1,5
**79 (2)**
  96:4,6
**7th (6)**
  69:9;103:22;118:18;
  135:4;145:8;169:18

**8**

**8 (5)**
  20:10;21:5;99:24,24,
  25
**8.1 (10)**
  54:24;55:2,12;62:16,
  25;63:2,5;165:23;
  166:1;167:1
**8.2 (3)**

64:20,20;166:11
**8/25 (1)**
  159:4
**8/25/2015 (1)**
  157:9
**800 (1)**
  71:18
**84 (1)**
  51:12
**88 (3)**
  111:6;117:3;129:8
**8th (1)**
  108:21

**9**

**9 (11)**
  4:11;19:10,16;21:7;
  22:1;23:3;25:4;26:20;
  34:17;71:13;171:13
**9.1b (1)**
  54:18
**9/22 (1)**
  159:5
**9/30/2015 (1)**
  167:19
**9:11 (1)**
  4:1
**9:44 (2)**
  51:3,4
**98 (3)**
  77:11,14,16
**99,000 (1)**
  114:16
**9th (2)**
  54:24;109:2