**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS - EASTERN DIVISION**

```
==============================  .
IN THE MATTER OF:              . Case #15-13881
                              .
LYMAN-CUTLER, LLC             .
                              . Boston, Massachusetts
      Debtor.                 . Wednesday, May 8, 2019
==============================   9:07 a.m.
LYMAN-CUTLER, LLC, et al.,    .
           Plaintiffs,        . Adv. Proc. 16-01120
                              .
v.                            .
                              .
KAGAN, et al.,.               .
                              .
           Defendants.        .
==============================
```

**TRANSCRIPT OF TRIAL DAY 3 ON:**
**(#1) COMPLAINT BY LYMAN-CUTLER LLC AGAINST VADIM KAGAN, TATIAN**
**KAGAN, KAGAN DEVELOPMENT KDC CORP., PROEXCAVATION CORP.;**
**(#167) OBJECTION TO CLAIM 9 OF CLAIMANT ALEX FILIPPOV FILED BY**
**INTERESTED PARTIES TATIANA KAGAN, VADIM KAGAN, KAGAN**
**DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.**

**BEFORE THE HONORABLE FRANK J. BAILEY**

APPEARANCES:

For the Defendants:                JOHN PERTEN, ESQ.
                                  Sheehan Phinney Bass & Green,
                                  P.A.
                                  255 State Street
                                  Boston, Massachusetts 02109

                                  JAMES HARRIS, ESQ.
                                  Sheehan Phinney Bass & Green,
                                  P.A.
                                  1000 Elm Street
                                  Manchester, New Hampshire
                                  03105



For the Plaintiffs/Debtors:          SEAN T. CARNATHAN, ESQ.
                                     O'Connor Carnathan and Mack
                                     LLC Landmark One
                                     1 Van De Graff Drive
                                     Suite 104
                                     Burlington, Massachusetts
                                     01803

                                     PETER N. TAMPOSI, ESQ.
                                     The Tamposi Law Group
                                     151 Main Street
                                     Nashua, New Hampshire 03060

Electronic Sound Recording Operator:  YVONNE WOODBURY

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service
eScribers, LLC
7227 N. 16th Street, Suite #207
Phoenix, AZ 85020
973-406-2250; operations@escribers.net


(973) 406-2250 | operations@escribers.net | www.escribers.net

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|

For The Plaintiffs:
ALEXANDER FILIPPOV

| | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| (By Mr. Perten) | | | | 25 | |
| (By Mr. Carnathan) | | | 6,34 | | |

DMITRIY ZHUKOVSKIY

| | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| (By Mr. Carnathan) | 35 | | 127 | | |
| (By Mr. Perten) | | 91 | | | 127 |

ELANA LANDE

| | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| (By Mr. Carnathan) | 131 | | 179 | | |
| (By Mr. Harris) | | 149 | | | |

| EXHIBITS: | DESCRIPTION | I.D. | EVID. |
|---|---|---|---|

For the Plaintiffs:

| | DESCRIPTION | I.D. | EVID. |
|---|---|---|---|
| A | Operating agreement, Hyde Avenue LLC | 76 | |
| C | Affidavit from Mr. Zhukovskiy | 89 | |
| B | Mr. Zhukovskiy's personal notes | 81 | |
| 119 | Operating Agreement Yarmouth Road LLC | | 136 |
| 121 | Construction costs of Yarmouth Road project | | 142 |
| 95 | Email from kagandevelopment@gmail.com regarding Yarmouth Road LLC | 145 | 146 |
| 169 | Ms. Lande's pretrial deposition | | 181 |
| 120 | Yarmouth Road LLC original agreement | | 139 |

1   (At 9:07 a.m.)

2           THE CLERK:  Court is now in session.

3           THE COURT:  Good morning.  Be seated.

4           MR. CARNATHAN:  Good morning.

5           THE CLERK:  Okay.  Now calling case number 15-13881,

6   Lyman-Cutler, LLC.  This is day three of trial.  It's on an

7   objection to Claim 9, a claim on Alex Filippov, filed by

8   interested parties Tatiana Kagan, Vadim Kagan, Kagan

9   Development, KDC Corp., and ProExcavation Corp.  It's also on

10  case number 16-1120, Lyman-Cutler, LLC v. Kagan, et al.  And

11  it's day three of trial.

12          May the parties please state their names for the

13  record?

14          MR. CARNATHAN:  Good morning, Your Honor.  Sean

15  Carnathan for Alex Filippov and Nickolay Lipetsker.

16          MR. TAMPOSI:  Good morning, Your Honor.  Peter

17  Tamposi for the debtor, Lyman-Cutler.

18          MR. PERTEN:  Good morning, Your Honor.  John Perten

19  for Vadim Kagan, Tatiana Kagan, Kagan Development, KDC Corp.,

20  and ProExcavation Corp.

21          MR. HARRIS:  Good morning, Your Honor.  James Harris

22  for the same parties.

23          THE COURT:  Okay.  Good morning, everyone.  Any

24  housekeeping or preliminaries today?

25          MR. PERTEN:  I think we're all set, Your Honor.

1           THE COURT:  Okay.  I still have the deposition

2      transcript.  I'll hold on to that a little bit longer.  I

3      just -- It's not an exhibit, is it?

4           MR. PERTEN:  No, Your Honor, it's not.

5           THE COURT:  Yeah.  That's fine.  Okay.  It shouldn't

6      be, but that's fine.

7           MR. PERTEN:  Okay.

8           THE COURT:  So at the end of whenever we're finished

9      using it I'll be sure to hand it back to you so it doesn't get

10     mixed in with things that ought not to be here.

11          So okay.  Why don't we get started?

12          MR. CARNATHAN:  Thank you, Your Honor.  We would like

13     to recall Mr. Filippov to the stand, please.

14          THE COURT:  Very well.  All right, Mr. Filippov.

15          MR. CARNATHAN:  My --

16          THE COURT:  Okay.

17          MR. CARNATHAN:  -- magnifying glass.

18          THE CLERK:  We were wondering what that was.

19          THE COURT:  Good morning.

20          MR. CARNATHAN:  Searching my bag.

21          THE COURT:  Good morning, Mr. Filippov.

22          THE WITNESS:  Good morning, Judge.

23          THE COURT:  I just want to confirm and remind you

24     that you're still under oath.

25          THE WITNESS:  Yes.

1        THE COURT:  Could you just acknowledge that orally?

2        THE WITNESS:  Yes, I do.  I do.

3        THE COURT:  Very well.  All right, thank you.

4                    RESUMED REDIRECT EXAMINATION

5    BY MR. CARNATHAN:

6        Q.   Good morning, Mr. Filippov.

7    A.   Good morning.

8        Q.   I'd like to start by just briefly reviewing the

9    timeline.

10        MR. CARNATHAN:  So if I could have Exhibit 50 in

11    evidence briefly, please?

12    BY MR. CARNATHAN:

13        Q.   So yesterday, Mr. Perten went over with you the

14    timeline between when you received Exhibit 50 in evidence and

15    when we filed the original lawsuit, which is Exhibit 64 in

16    evidence; do you remember that testimony?

17    A.   Yes.

18        Q.   And so if I remember right, you actually received

19    this letter on May 8th, 2015, right?

20    A.   Correct.

21        Q.   And I think Mr. Perten referred to this as some sort

22    of an invitation to discussion, something along those lines;

23    does that --

24    A.   Correct.

25        Q.   -- sound right?  And I think he persuaded you to

1    agree that the letter we sent on May 13th, which is Exhibit 54

2    in evidence, immediately screamed fraud, I think was his term,

3    do you recall that?

4    A.   Yes.

5          MR. CARNATHAN:   Could I have Exhibit 54 in evidence,

6    please?

7    BY MR. CARNATHAN:

8          Q.   I'd just like to invite you to take a moment, read

9    through the letter, and tell me what in Exhibit 13, if

10   anything, we say is false or fraudulent.

11   A.   As far as I can see, there is no word fraud here, and

12   just the description of the event, basically.

13         Q.   In fact, if we go to the second page of Exhibit 54

14   in the second full paragraph, the only place where we say

15   anything is false is at the second to last statement, where we

16   say, "The statement that Mr. Filippov has refused to approve a

17   price reduction is completely false.  He has never been

18   consulted."  Have I read that correctly?

19   A.   Yes.

20         Q.   And in fact, if we go to the next full paragraph,

21   where we address the assertion of additional costs, we say

22   that they are alleged and wildly excessive, and that none of

23   them were ever approved, and you expressly reject them, right?

24   A.   Yes.

25         Q.   And if we go down two more paragraphs, we refer

1    to --

2           MR. CARNATHAN:  I'm sorry, Bill, it's the next one,

3    please, Mr. Hartzel.

4           MR. HARTZEL:  On the next page?

5           MR. CARNATHAN:  No, no.  The next paragraph above

6    that one.  It starts with, "Contrary to your footnoted

7    assertion".

8    BY MR. CARNATHAN:

9        Q.   "We assert that Mr. Kagan has been grossly

10   negligent, has engaged in willful misconduct, breached the LLC

11   agreement and his fiduciary duty", correct?

12   A.   Yes.

13       Q.   But if you study the letter, we don't actually

14   assert that he's committed fraud, do we?

15   A.   Correct.

16       Q.   Do you recall what discussion was going on between

17   the date of our May 13th letter and the time that we filed

18   suit on June 5th, 2015?

19   A.   Yes.  We mostly were concerned with properties are not

20   being sold, and we were looking for the way to transfer -- to

21   change the broker, to exercise my right to change the broker.

22   And that was main concern back then.

23       Q.   And in general terms, how did the Kagans and Century

24   21 respond to our request to replace the broker?

25   A.   They rejected this and they refused to relinquish the --

1    their position being a broker, and we couldn't get the

2    properties to sell.

3    A.   So in fact, by the time that we first filed suit on --

4          MR. CARNATHAN:  If I could have, excuse me, Exhibit

5    64 in evidence, please?

6    BY MR. CARNATHAN:

7          Q.   That we first filed suit on or about June 5, 2015,

8    the discussion had been going on for roughly four weeks,

9    right, sir?

10   A.   Correct.

11         MR. CARNATHAN:  Just so I don't forget, could I have

12   the fifth page of Exhibit 64, please?

13         MR. HARTZEL:  50?

14         MR. CARNATHAN:  No, page 5, please.

15         MR. HARTZEL:  Page 5?

16   BY MR. CARNATHAN:

17         Q.   Mr. Perten was focused on paragraph 28 yesterday; do

18   you remember that?

19   A.   Yes.

20         Q.   Is the assertion here that without consulting Mr.

21   Filippov or Mr. Lipetsker, the Kagans set the selling price

22   for each home at $5,499,000, is that true?

23   A.   Yes.

24         Q.   And if we go now to page 8 and we look at the bottom

25   at -- Count IV is the fraud count, do you see that?

 1   A.    Yes.

 2        Q.    And we go to the next page, and we go to paragraph

 3   52, please.  As of June 5th, the fraud count was based on the

 4   assertion that after signing the listing agreement with actual

 5   knowledge that it was unauthorized, Mr. Kagan has falsely

 6   stated that Mr. Filippov authorized him to sign the listing

 7   agreement; do you see that?

 8   A.    Yes.

 9        Q.    Yeah.  Is that a true statement?

10   A.    Yes.

11        Q.    Do you remember when we first amended our complaint

12   to assert fraud claim based on the cost overruns?

13   A.    I don't remember the exact date, but it was way after --

14        Q.    All right.

15   A.    -- I believe.

16        Q.    Maybe I could show you the amended complaint in the

17   Middlesex case; would that refresh your memory?

18   A.    Yes.

19        Q.    So this is the first amended complaint in the

20   Middlesex case.

21             MR. CARNATHAN:  Mr. Hartzel, would you give me the

22   last page, please?

23             THE COURT:  What exhibit --

24             MR. CARNATHAN:  So the complaint --

25             THE COURT:  -- what exhibit is this?




1          MR. CARNATHAN:  This is not in evidence, Your Honor.

2     I'm just showing him it to refresh his memory.

3          THE COURT:  That's fine.

4     BY MR. CARNATHAN:

5          Q.   And so the amended complaint in the state court

6     proceeding is dated July 10th, 2015, correct?

7     A.   Correct, yes.

8          Q.   Does that refresh your memory --

9     A.   Yes.

10          Q.   -- that that's approximately when we filed it?

11     A.   Yes.

12          Q.   And in that complaint, in paragraph -- I'm sorry,

13     just waiting on the pages (indiscernible).  One moment.  Okay.

14          And in that complaint, Count IV now states, in paragraph

15     70 on the next page.

16          MR. PERTEN:  If this document was there for

17     refreshing his memory, that's one thing, but it sounds like

18     we're going beyond that, so --

19          THE COURT:  Right.  What are you going to do with

20     this?  It's certainly true that it's now being used for

21     purposes other than that.

22          MR. CARNATHAN:  Right.  Fair enough, Your Honor.

23     I'll move on.

24          THE COURT:  I mean, you could move its admission, you

25     could lay a foundation for it, but -- or you can move on.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    Whatever you'd like to do.

2            MR. CARNATHAN:  Well, all right.  Why don't we --

3    Bill, would you take that off the screen for a moment, get rid

4    of that page?

5    BY MR. CARNATHAN:

6        Q.   Do you recall what we alleged on July 10th, 2015

7    with regard to the cost overruns?

8    A.   Yes.

9        Q.   What did we allege?

10   A.   Well, that it was -- that the bills that Kagan

11   Development and ProExcavation provided are absolutely

12   excessive and have no actual foundation.  I don't remember the

13   exact wording.

14           MR. CARNATHAN:  If we could briefly look at Exhibit 9

15   in evidence, please?

16   BY MR. CARNATHAN:

17       Q.   I believe yesterday during the cross-examination you

18   agreed with Mr. Perten that this document contained

19   assumptions and estimates; is that fair?

20   A.   Yes.

21       Q.   Could you just explain what you understood the

22   assumptions and estimates in this document to be?

23   A.   The assumption were that A, is going to take a known

24   number of months to sell the property, and we didn't know the

25   exact price that we would get for -- for the property.  At no

```
 1    time the budget -- the cost of -- construction cost was a

 2    variable there.  And that was a fixed value.  So everything in

 3    these calculations, all the outcomes, possible outcomes, are

 4    only dependent on the sales price and the project timeline,

 5    not -- not the budget.

 6            MR. CARNATHAN:  If I could -- excuse me -- next have

 7    Exhibit 184, which is also in evidence?

 8    BY MR. CARNATHAN:

 9        Q.   Yesterday there were a number of question about the,

10    I think, the so-called private conversations with Mr. Maiden;

11    do you remember that?

12    A.   Yes.

13        Q.   And just to review, who did you believe Mr. Maiden

14    was representing?

15    A.   I believe Mr. Maiden represented Mr. Kagan.

16        Q.   Okay.  And one of the documents we looked at was

17    this Exhibit 184, which is the -- I think this version gives

18    you total control, email, do you remember that?

19    A.   Yes.

20        Q.   And if we look at the top of it, it's actually dated

21    November 2nd, 2012, right?

22    A.   Yes.

23        Q.   And if we look back at Exhibit 15, the actual

24    operating agreement was signed somewhere around November 14th,

25    2012, correct?
```



1    A.    Correct.

2          Q.    Now, if we stay with 184 for a moment, there's

3    actually a draft of the agreement attached to 184, right?

4    A.    Yes.

5          Q.    And if we look at the sixth page of 184 --

6          MR. CARNATHAN:  No, excuse me, it's the sixth page of

7    the draft, so -- perfect.

8    BY MR. CARNATHAN:

9          Q.    In 6.1(b)(6) of the draft that was attached to the

10   11/2 email, there is no 6.1(b)(6), right?

11   A.    Correct.

12         Q.    And if we look at Exhibit 15, the same section,

13   6.1(b)(6) is the provision about retaining Tatiana Kagan as

14   the broker, right?

15   A.    Correct.

16         Q.    Who asked for that provision?

17   A.    Mr. Kagan.

18         MR. CARNATHAN:  While I've got 15 on screen, Mr.

19   Hartzel, could I have page 10?

20   BY MR. CARNATHAN:

21         Q.    I'm looking at paragraph 8.2, toward the top where

22   it says, "The distribution to members shall be in accordance

23   with their respective capital contribution first.  However, an

24   additional five percent per annum payment, based upon the

25   members' respective capital contribution, shall be paid out of

1    Mr. Kagan's net profit share for each day the property's not

2    sold after twenty-three months of acquisition."  Do you

3    remember being asked about that?

4    A.    Yes.  I requested this.

5         Q.    Could you explain what that paragraph means?

6    A.    That means that if Mr. Kagan is not going to be able to

7    deliver on time, he is going to be paying for the capital we

8    kept in the project, so -- and his profits would be reduced by

9    five percent per year on the money we kept.

10        Q.    Did you understand that to penalize him five percent

11   per year every day?

12   A.    No.  I mean, yesterday I stated this.

13        Q.    I -- I might have misheard, but I thought that you

14   agreed yesterday with the proposition that 200,000 divided by

15   23 was about $6,500; did I hear that right?

16   A.    Yes.

17             MR. CARNATHAN:  Could I have the calculator on

18   screen?

19             MR. HARTZEL:  It's already up.

20   BY MR. CARNATHAN:

21        Q.    So if we take 200,000 and divide it by 23, how much

22   is 200,000 divided by 23?

23   A.    $8,695.  I didn't have a calculator with me, yeah.

24        Q.    That was for each house, right?

25   A.    Right.



1        Q.   So if we multiply that by two, the estimated

2    actually was 17,391 and 30 cents a month, right?

3    A.    Correct.

4        Q.   We had some questions yesterday about Exhibit 72 in

5    evidence.

6          MR. CARNATHAN:  And Mr. Hartzel, if you could just

7    blow up that bottom -- oh, wait, this one's not redacted.  Do

8    you have the redacted one?

9          MR. HARTZEL:  (Indiscernible).  Yeah, we haven't

10   caught up with the redaction yet.

11         MR. CARNATHAN:  Can you blow up just the numbers part

12   and skip the part that we redacted?  Okay, but I'm sorry.  I

13   actually need the --

14         MR. HARTZEL:  (Indiscernible).

15   BY MR. CARNATHAN:

16       Q.   So let me ask you first, Mr. Filippov, there was

17   some testimony yesterday about you omitting some things on the

18   bankruptcy petition, do you remember that?  I don't know --

19   A.    Yes.

20       Q.   -- if petition's the right word, but did you leave

21   anything out on purpose?

22   A.    You mean the money that left after when we filed for

23   bankruptcy?

24       Q.   No.  There was some questions about the payments to

25   my firm in the ninety days before filing; do you remember

 1  that?

 2  A.   Oh, yeah, yeah.

 3       Q.   Did you leave those off on purpose?

 4  A.   No.

 5       Q.   I got a little confused yesterday during cross about

 6  this chart.  Could you explain how the numbers lay out?

 7  You've got the total, the 2,435,033.

 8  A.   Right.  That's 2 million, that was initial investment,

 9  and then $435,000, this is the total debt I put into the LLC

10  in addition to $2 million.  200,000 of this $435,000 was the

11  mortgage.

12       Q.   And that's where we get left with the 235,533 --

13  A.   Right.

14       Q.   -- additional carrying cost, right?

15  A.   Correct.

16       Q.   Because you deducted the 200,000 for the mortgage?

17  A.   Correct.

18       Q.   Okay.

19       MR. CARNATHAN:  Now, Mr. Hartzel, if we could go back

20  to the line items, that would be helpful.  Can you blow up the

21  section starting with the -- the 9, I think it's 9/30.  Okay.

22  BY MR. CARNATHAN:

23       Q.   So if I read Exhibit 72 correctly, you put a check

24  for $132,788.53 into the company on 9/30/2015, right?

25  A.   Correct.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1          Q.   And if we look at Exhibit 91, I think we've got the

2     backup for that, right?

3          I think things also got a bit confused with regard to

4     your payments after the filing of the bankruptcy, all right?

5     So if we blow up --

6               MR. CARNATHAN:   I think it starts around 11/5 on

7     Exhibit 72.

8               MR. HARTZEL:   That's the mortgage payment.

9               MR. CARNATHAN:   All right.

10    BY MR. CARNATHAN:

11         Q.   So if we go forward, though, and we look at the line

12    items on Exhibit 72 -- and we can show the backup on 91 as we

13    go -- you continued to make payments on the Rockland Trust

14    loans after filing for bankruptcy, right?

15    A.   Correct.

16         Q.   And in fact, on November 5th you paid $6,333.33 to

17    Rockland Trust for one of the loans, right?

18    A.   Correct.

19         Q.   I think that was -- I'm working with blind hope,

20    great.   Okay.   So that was the -- that was the purchase loan,

21    right?

22    A.   Correct.

23         Q.   And that same day, you wrote a check for $6,649.99

24    on one of the construction loans?

25    A.   Correct.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1      Q.   And on that same day, you wrote one for $6,650 on

2    the other construction loan?

3    A.   Correct.

4      Q.   On that same day, you wrote a check for $13,949.50

5    for the Brookline taxes on 55 Lyman, right?

6    A.   Yes.

7      Q.   On that same day, you wrote a check for $13,950.35

8    for the Brookline taxes on 88 Cutler?

9    A.   Yes.

10     Q.   And in fact, if we look down the list -- and I won't

11   belabor it, but we can go to 91 and see the checks and

12   electronic payments -- you continued to make payments of the

13   bank loans and certain other costs into December, at least,

14   right?

15   A.   Correct.

16     Q.   Why were you doing that if you had already put the

17   company into bankruptcy?

18   A.   Because I was responsible for those loans.  That's my

19   responsibility.  Even though $107,000 remaining from the

20   mortgage was handed out to Trustee Madoff, basically went --

21   yeah.

22          MR. CARNATHAN:  Could we -- could I next have Exhibit

23   291 in evidence?

24   BY MR. CARNATHAN:

25     Q.   Okay.  So yesterday, we also heard some cross-

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    examination about the money that went in and out of KDC during

2    the project; do you remember that?

3    A.    Correct.

4        Q.    And at one point, you were looking at the line

5    item -- I believe it was on 7/23/2013 on Exhibit 291 in

6    evidence.

7            MR. CARNATHAN:  Are you able to blow that one up, Mr.

8    Hartzel?

9            MR. HARTZEL:  (Indiscernible).

10   BY MR. CARNATHAN:

11       Q.    Okay.  So on 7/23 there's a line item that says,

12   "Funds transfer??  If not, redeem" and then it says, "Kagan

13   carrying cost, 3,500", do you remember --

14   A.    Correct.

15       Q.    -- testifying about that?  I thought you said --

16   what did you say about that?

17   A.    We didn't know what this -- how to classify these funds.

18   Our understanding was, at the time, that Kagan was pulling

19   money out of the loan and then a few days later, he would put

20   the money back part of this.  We don't know -- didn't know how

21   to classify these payments.  That's why there are question

22   marks over there, and that line, Kagan carrying cost, actually

23   showed up later, much later.  It was posted in -- in this book

24   somewhere in August 2015, that labeling.  And --

25       Q.    So just --

1   A.   -- Irina, who was handling the books, didn't know how to

2   assign this.

3        Q.   So who had control over the construction loan

4   advances?

5   A.   Kagan.

6        Q.   So if we look briefly at Exhibit 41 in evidence, for

7   example and if we go through the whole packet, we'll find that

8   Mr. Kagan signed every one of the construction loan advances,

9   fair enough?

10  A.   Yes.

11       Q.   So what did you think was happening each time that

12  Mr. Kagan put money into the LLC account?  What do you

13  think -- what did you think happened after that?

14  A.   I -- I personally think that -- that he was pulling

15  maximum he could get for the stage from the bank, and then

16  depositing money.  He was basically drawing the account and

17  then putting money back as his own capital contribution.

18       Q.   So if we look back again at Exhibit 291 in

19  evidence --

20            MR. CARNATHAN:  And I'm now on the second page,

21  please.

22  BY MR. CARNATHAN:

23       Q.   Another one of the line items I believe you were

24  asked about yesterday was on 9/19/2013.

25            MR. CARNATHAN:  Maybe a quarter of the page, about a

```
 1   quarter.

 2   BY MR. CARNATHAN:

 3        Q.   And it says, "Funds transfer, may be other -??

 4   Kagan carrying costs, 15,000", right?

 5   A.   Yes.

 6        Q.   And then below that, a few days later, we have

 7   30,000 back out to Kagan Development, right?

 8   A.   Yes.

 9        Q.   And then another 30,000 out to Kagan Development?

10   A.   Correct.

11        Q.   And that one, interestingly enough, is listed as

12   being for the foundation?

13   A.   Yes.

14        Q.   And then another one below that for another 30,000,

15   correct?

16   A.   Yes.

17        Q.   And below that one, another one for 30,000?

18   A.   Correct.

19        Q.   When Mr. Kagan took funds out like that, did he tell

20   you exactly what they were for?

21   A.   No.  We got no explanation.  That's why there are these

22   question marks.

23        Q.   You were also asked some questions about why you

24   chose to file for bankruptcy; do you recall that?

25   A.   Yes.
```



(973) 406-2250 | operations@escribers.net | www.escribers.net

1          Q.   Yeah.  Do you remember how large your personal

2     guarantee was for the bank loans?

3     A.    I believe $600,000.

4          Q.   200,000 for each loan?

5     A.    Yes.

6          Q.   So in the big picture, what were you trying to

7     accomplish by filing for bankruptcy protection?

8     A.    Well, a few things.  First, I needed to make sure that

9     the bank loan we had, we wouldn't default on it.  Second, we

10    needed to make sure that we can sell properties, and that was

11    next to impossible with having a $2 million lien on this.  And

12    we needed to file for bankruptcy to avoid the property to

13    go -- to be auctioned by the bank.  Because then, as soon as

14    we dissolve, most probable outcome would be the bank didn't

15    have the entity that the money was lent to, and it would just

16    take it over and sell it at the auction.

17              MR. CARNATHAN:  Finally, if I could have Exhibit 215.

18    It's only been marked for identification at this point.

19    BY MR. CARNATHAN:

20         Q.   Yesterday, when you were shown Exhibit 215 for

21    identification, you said something to the effect that it was a

22    complete fraud; do you remember that?

23    A.    Yes, indeed.

24         Q.   And what's your reasoning behind saying that?

25    A.    This email is cooked email.  It never -- it never was

1    sent.  There are a number of reasons to believe so.  One of

2    them is sent to lymancutlerllc@gmail.com.  Not a single

3    recipient on this email, and there are four received this

4    email.

5        Q.   Can you remind me who's supposed to get the emails

6    on Lyman-Cutler gmail?

7    A.   An email was supposed to be received by Mr. Kagan by

8    myself, Irina, and Mr. Lipetsker.  A second -- that

9    kagandevelopment.com, the domain name wasn't used --

10            MR. PERTEN:  Objection, Your Honor.

11   A.   -- on August --

12            THE COURT:  Oop.  Stop, please.

13            MR. PERTEN:  He's now going to testify about domain

14   names and when they came into use or didn't come into use.

15   This man is not qualified to testify about that.

16            MR. CARNATHAN:  He's testifying based on his personal

17   knowledge, from being part of the project at the time.  This

18   is August 2013.  He's going to say that he never got an email.

19            THE COURT:  Overruled.  You can cross him on it.

20   A.   Yes.  As of August 2015, we never received any single

21   email that was sent from @kagandevelopment.com.  That domain

22   name wasn't used at this time, it became used later.

23   BY MR. CARNATHAN:

24       Q.   What domain name was in use by Mr. Kagan at that

25   time?

 1   A.   Gmail.  All emails were sent either from Yahoo or Gmail.

 2        Q.   So in fact, if we look down the page to the email

 3   directly below it, the kagandevelopment@gmail.com, is that the

 4   email that you were --

 5   A.   Correct.

 6        Q.   -- referring to?

 7   A.   Yes.  Kagan personal email was at Yahoo, I believe, and

 8   that was the email used for kagandevelopment@gmail.

 9        Q.   In that same time frame did you ever see an email

10   from (indiscernible)@hotmail.com?

11   A.   I never seen this email, nor I knew who is Joseph Cohen

12   is -- was.

13        MR. CARNATHAN:  I have nothing further for Mr.

14   Filippov, Your Honor.

15        THE COURT:  Okay.

16        Okay, Mr. Perten.  You can proceed whenever you're

17   ready.

18        MR. PERTEN:  Thank you.

19                     RECROSS-EXAMINATION

20   BY MR. PERTEN:

21        Q.   Good morning, Mr. Filippov.

22   A.   Good morning.

23        Q.   You spoke very briefly about negotiations of the

24   operating agreement; do you recall that?

25   A.   Yes.



1      Q.   And just to be clear, during the negotiation of the

2   operating agreement, you never spoke to Vadim Kagan; isn't

3   that correct?

4   A.   I can't tell you that.  I don't remember.

5      Q.   Well, sir, at your deposition do you recall

6   testifying that you never spoke to Vadim during negotiations

7   of the operating agreement?

8   A.   Again, the deposition was also a couple years ago.  I

9   don't remember now.

10      Q.   Sir, let me draw your attention to page -- let me

11   draw your attention to page 40.  And I ask you, on line 6,

12   "Did you have conversations with Mr. Kagan during the drafting

13   of the operating agreement?" and you said, "I don't remember

14   this."

15   A.   That's --

16      Q.   So --

17   A.   -- what I said now.

18      Q.   -- in point of fact, so you have no memory of ever

19   speaking with Mr. Kagan during the drafting of the operating

20   agreement; isn't that correct?

21   A.   Ever speaking?  No, I said I don't remember.  That's

22   different.

23      Q.   Oh, do you suddenly have a memory today, sir?

24   A.   No.  I said I don't remember.

25      Q.   Okay.  Now, Mr. Filippov, the carrying costs.  The

1    monthly carrying costs per house were greater than 6,895,

2    correct?

3    A.   Can you repeat again?  I'm sorry.

4         Q.   Yes.  The monthly carrying costs --

5    A.   Yes.

6         Q.   -- for each house was greater than $8,695, correct?

7    A.   Carrying cost for each house was greater, yes.

8         Q.   Okay.  So in fact, sir, if you took that 200,000

9    that you say was earmarked for carrying costs, divided it by

10   23 and got 8,695, you knew that you were going to be short

11   because the carrying cost for each house was greater than

12   8,695; isn't that correct?

13   A.   Well, I didn't think about this back then, and nobody --

14        Q.   Okay, thank you.

15   A.   -- we actually didn't count on twenty-three month.

16        Q.   Now, sir, you also testified a moment ago that you

17   thought -- I think the word you said was, I think that Mr.

18   Kagan was putting money in for carrying costs and simply

19   pulling it out afterwards; do you recall that testimony?

20   A.   Yes.

21        Q.   That's your assumption.  You have not -- you do not

22   have any evidence that that has happened; isn't that correct?

23   You don't know, correct?

24   A.   I do not know.

25        Q.   Okay, thank you.

1   A.    How can one --

2        Q.   Thank you, sir.

3   A.   -- know?

4        Q.   Now, the carrying costs that you did pay after Mr.

5   Kagan stopped paying, according to what Mr. Carnathan just

6   showed, you stopped paying in December 2015; isn't that

7   correct?

8   A.   Correct.

9        Q.   And in fact, the properties were not sold until

10  sometime in March time frame, correct?

11  A.    No.  Sometimes -- property was sold in February.

12  February 2016.

13       Q.   Are you sure of that, sir?

14  A.   Yeah.  I think so.

15       Q.   Both properties?

16  A.    One was sold, I believe, in January or even December, and

17  another was closed in February 26th, as far as I remember.

18       Q.   And point of -- the record -- there's motions in the

19  court on that, so we can confirm that --

20  A.   Right.

21       Q.   -- sir.  But you'll agree with me, sir that you made

22  no further payments to the bank after December 2015; isn't

23  that correct?

24  A.   Probably, yes.  I -- I -- maybe.

25       Q.   Okay.  Now, you also told  Mr. Carnathan that one of

1   the reasons that you filed for bankruptcy is you didn't want

2   this property to go -- you were afraid if the property -- if

3   you dissolved, the bank might call the loan, correct?

4   A.   Yes.

5        Q.   And you understood, as you testified yesterday, that

6   the operating agreement obligated you to dissolve by November

7   30th, 2015; isn't that correct?

8   A.   Yes.

9        Q.   So you made a unilateral decision to not follow the

10  operating agreement; isn't that correct?

11  A.   Unilateral agreement?  First, we consulted with Mr.

12  Lipetsker, it wasn't unilateral.

13       Q.   All right.  So you and Mr. Lipetsker --

14  A.   Yeah.

15       Q.    -- decided without consulting with Mr. Kagan that

16  you didn't have to follow the terms of the operating

17  agreement; isn't that correct?

18  A.   We were majority, we could decide this.  Yes.

19       Q.   Right.  Because as the majority -- because you have

20  eighty and he has ten, you could functionally do whatever you

21  wanted, correct?

22  A.   Not what -- whatever we want.  That was the best decision

23  for the interest of the company.

24       Q.   Okay.

25  A.   That's what we thought.



1    Q.   So let me try that again.

2    So you and Mr. Lipetsker, since collectively you had

3  ninety percent of the vote, you guys could decide what was

4  best for the company; isn't that correct?

5  A.   Yes.

6    Q.   And you didn't have to consult with Mr. Kagan

7  because he only had ten percent and therefore there was

8  nothing he could do about it, even if he disagreed; isn't that

9  correct?

10  A.   Mr. Kagan didn't talk to us and we knew the answer

11  anyway.

12    Q.   Okay.  Now, sir, you a moment ago were talking about

13  domain names and when Mr. Kagan started using

14  kagandevelopment.com?

15  A.   Yes.

16    Q.   Isn't it true, sir, that although you may not have

17  seen that email address you have no idea when he's been using

18  kagandevelopment.com?

19  A.   I do have ideas.

20    Q.   Sir, you do not know when Kagan Development first

21  started using that.

22  A.   I do --

23    Q.   You know when you first saw it, but you don't know

24  when he first started using it; isn't that correct?

25  A.   I do know this, sir.  There is information, you can



```
 1    Google it.

 2         Q.   Sir.

 3    A.    There is a Bluehost --

 4         Q.   Sir, you have no personal knowledge --

 5    A.    I do.

 6         Q.   -- when he started using that.

 7    A.    Okay.

 8         Q.   Now, sir, incidentally, according to the spreadsheet

 9    of your capital investments, Exhibit 72, when you stopped

10    paying the mortgage, that was right at the point where, more

11    or less, you calculated you had wiped out Mr. Kagan's

12    interest; isn't that correct?

13    A.    Can you repeat again?

14         Q.   Sure.  When you stopped paying carrying costs after

15    Mr. Kagan refused to pay any more, you stopped right at the

16    point where you had determined that you had effectively wiped

17    him out, to the extent that any money you put in served to

18    reduce his capital account --

19    A.    No.

20         Q.   -- isn't that correct?

21    A.    If I would be thinking about this, it would be zero.  I

22    would calculate.  I can figure out the remaining part of it.

23         Q.   Okay.  So it's pure coincidence that you went

24    $235,000, his interest was 250, and then you stopped?

25    A.    I don't know if it's coincidence or not.
```



1          MR. PERTEN:  Mr. Harris, could you pull up for us

2    Exhibit 54, please?  And actually, before you do that, the

3    operating agreement, Exhibit 15.  And if we could go look at

4    8.1, please?

5    BY MR. PERTEN:

6         Q.   Now, sir, you testified yesterday that there were

7    some changes in section 8.1 that were at your request; do you

8    recall that?  During the negotiation.

9    A.   Which part?

10          MR. CARNATHAN:  Objection, Your Honor.  We're outside

11   the scope.  I never asked about 8.1.

12          THE COURT:  I'll exercise my discretion to allow

13   it --

14          MR. PERTEN:  Thank you, Your Honor.

15          THE COURT:  -- to allow this within limits.  I am

16   going to hold you to the usual rule on --

17          MR. PERTEN:  Yep.

18          THE COURT:  -- federal court, on narrowing the

19   funnel, okay?  But you may continue with this line.

20          MR. PERTEN:  It will tie right in in a moment, Your

21   Honor.

22   BY MR. PERTEN:

23        Q.   Do you recall that section 8.1 has language that was

24   a result of negotiations and conversations you had with Mr.

25   Maiden?

1    A.    Yes.

2          MR. PERTEN:  And if you could scroll down to the end

3    of 8.1, Mr. Harris?

4    BY MR. PERTEN:

5      Q.    The last sentence that was there, "Any change to

6    this paragraph will require a written consent of the members

7    owning at least eighty-one" -- percent -- "percentage interest

8    in the company"; did I read that right?

9    A.    Yes.

10          MR. PERTEN:  And now, Mr. Harris, could you pull up

11   Exhibit 54?  Last page, last page.  The last page, please.

12   BY MR. PERTEN:

13     Q.    We looked at this letter that Mr. Carnathan sent

14   just after the May 7th letter that Mr. Pyle sent, a moment

15   ago.  And let me read you your last paragraph, part of the

16   last paragraph.  "I assure you that Mr. Lipetsker is in full

17   agreement with Mr. Filippov's position and that together they

18   have eighty-one percent of the vote required under 8.2 to make

19   changes in the allocation of the profits and losses of the

20   project if Mr. Kagan impedes its successful completion"; did I

21   read that correctly?

22   A.    Yes.

23     Q.    So you were threatening, were you not, to exercise

24   your majority vote to cut him out of all the profits; isn't

25   that correct?



 1   A.    We were reminding Mr. Kagan that --

 2         Q.   Sir, my question.  You were threatening --

 3   A.    No.

 4         Q.   -- that if Mr. Kagan did not accede to your request,

 5   you had the votes to cut him out of the profit --

 6   A.    No.

 7         Q.   -- isn't that correct?

 8             MR. PERTEN:  Your Honor, I have nothing further.

 9             THE COURT:  Okay.  Anything further?

10             MR. CARNATHAN:  One, perhaps two.  Thank you.

11                         REDIRECT EXAMINATION

12   BY MR. CARNATHAN:

13         Q.   Mr. Filippov, do you know how the carrying costs

14   were paid after December 2015 until the properties were sold?

15   A.    How the carrying cost was -- out of my pocket, yes.  I

16   believe, yes.

17             MR. CARNATHAN:  That's all from me, Your Honor.

18   A.    And we closed the loan.  We didn't default on it.  I make

19   sure it's paid.

20             MR. CARNATHAN:  I have nothing further.

21             THE COURT:  Okay.  Anything else?

22             MR. PERTEN:  No, Your Honor.

23             THE COURT:  All right.

24             Thank you, Mr. Filippov.  You can go back to the

25   gallery.

1           THE WITNESS:  Thank you.

2           THE COURT:  Okay.

3           MR. CARNATHAN:  Plaintiffs call Dmitry Zhukovskiy,

4    please.

5           THE COURT:  All right.  Okay, Elizabeth.  Thank you.

6                     DMITRIY ZHUKOVSKIY SWORN

7           MR. ZHUKOVSKIY:  I do.

8           THE COURT:  Good morning.

9           THE WITNESS:  Good morning.

10          THE COURT:  You may have caught on to this, but I

11   like to warn witnesses or give them a little instruction that

12   we record in this courtroom, and so it's important that you

13   speak into the microphone.  And if you hear it amplify, then

14   you'll know we're getting it.

15          THE WITNESS:  Um-hum.

16          THE COURT:  And but you can move that microphone

17   around if -- get comfortable, sit back.  Just keep the

18   microphone out in front, okay?

19          THE WITNESS:  Thank you.

20          THE COURT:  Thank you.

21          MR. CARNATHAN:  Thank you, Your Honor.

22                     DIRECT EXAMINATION

23   BY MR. CARNATHAN:

24      Q.   Would you state your name, please, sir.

25   A.   My name is Dmitriy Zhukovskiy.

1    Q.    What do you do for work, sir?

2    A.    I am a consulting actuary.

3    Q.    And what do you do as a consulting actuary?

4    A.    I help employers manage their pension plans.

5    Q.    Could you briefly describe your education and

6    training to become an actuary?

7    A.    Sure.  I have a high honors degree from Brandeis

8    University, I have completed the series of exams required to

9    become an enrolled actuary in the Fellow of the Society of

10   Actuaries, and I have the necessary work -- work experience of

11   performing responsible actuarial work to be called an actuary.

12   Q.    Am I right there are levels of actuarial

13   certification, if the term's right, yeah?

14   A.    Yes.

15   Q.    How many levels are there?

16   A.    There are essentially two levels and an enrollment

17   certificate.

18   Q.    All right.  And what level are you?

19   A.    I am at the highest level.

20   Q.    Are you married, sir?

21   A.    I am.

22   Q.    To whom are you married?

23   A.    I'm married to Ana Shloesberg (ph.).

24   Q.    Where does she work?

25   A.    She works at Attorney Maiden's office.



(973) 406-2250 | operations@escribers.net | www.escribers.net

 1          Q.    All right.  Could you just describe your

 2    relationship to Nikolay Lipetsker?

 3    A.    Nikolay is the husband of my aunt, so.

 4          Q.    Have you also engaged in any other business ventures

 5    with Mr. Lipetsker?

 6    A.    Yes, I have.

 7          Q.    Yeah.  What sort of business ventures have you

 8    engaged in with Mr. Lipetsker?

 9    A.    Some real estate investment ventures.

10          Q.    And about how many real estate investments have you

11    made with Mr. Lipetsker?

12    A.    I wouldn't be able to tell, but overall maybe about ten,

13    twelve, more.

14          Q.    How long have you known Alex Filippov?

15    A.    I knew who Alex Filippov was for very long time.  I saw

16    him here and there on the street or at my uncle's birthday,

17    for example.  But personally, we -- define the degree of

18    knowledge.

19          Q.    How about Vadim Kagan?  How long have you known

20    Vadim Kagan?

21    A.    I've probably known him since 2010.  Our kids went to the

22    same daycare, so I saw him regularly there.  In some of the

23    kids' performances I saw him as well.  So that's how we got

24    acquainted.

25          Q.    How would you describe your relationship with Mr.

1 Kagan?

2 A.    Friendly.

3      Q.    Mr. Zhukovskiy, how did you first become involved

4 with the Lyman-Cutler project?

5 A.    So in October of 2012, Mr. Kagan called me and asked me

6 if I could help him update presentation that he routinely

7 provided to his investors in the past.  And he told me that he

8 used to work with one of his relatives, but his relative was

9 either busy or didn't want to do it anymore, so he asked me if

10 I could help him with that.  He also told me --

11      Q.    Did -- I'm sorry.  Did he explain to you why he was

12 looking to you to help him?

13 A.    Well, he just said, hey, you know, you're good with

14 numbers.  I was wondering if you could help me with -- with

15 something like that.  And I said sure.

16      Q.    And did you consider yourself a friend of Mr.

17 Kagan's at the time?

18 A.    Absolutely.

19      Q.    Were you involved in any other projects with Mr.

20 Kagan at the time?

21 A.    I have.

22      Q.    What other project were you involved with Mr. Kagan

23 at the time?

24 A.    Hyde Avenue LLC (ph.).

25      Q.    What type of project was that?



1    A.    This was a development project, which entailed purchasing

2    an old house and rebuilding it, building some addition to it,

3    some new construction as well there.

4         Q.    Okay.  I'll come back to that.

5         Did Mr. Kagan offer to pay you for helping him?

6    A.    He did not at first, no.

7         Q.    Did he eventually offer to pay you?

8    A.    He eventually did, yes.

9         Q.    When was that?

10   A.    So at the time of the meeting, the day of the meeting,

11   we -- he asked me how much time I spent preparing the

12   presentation, and I told him it took me, you know, a day and a

13   half or so.  And he said, oh, you know, we really have to pay

14   you for that.  And I said, uh, and he said, no, no, no.  We'll

15   pay, just not now.  When this project is complete we'll pay

16   you something.

17        Q.    How did you respond to his offer to pay you?

18   A.    I don't remember if I ever responded.  I think I nodded

19   and said thank you.

20        Q.    Did Mr. Kagan give you anything as a starting place

21   for the work he wanted you to do?

22   A.    He did, yes.

23             MR. CARNATHAN:  Could I have trial Exhibit 7 in

24   evidence, please?

25   BY MR. CARNATHAN:

1          Q.   So Mr. Zhukovskiy, if we sort of ignore the stuff at

2     the top and look down at the email from Mr. Kagan -- at

3     kagandevelopment@gmail.com to you on October 20th, 2012, do

4     you see that?

5     A.   Yes.

6          Q.   Yeah.  Do you recognize that email?

7     A.   I do.

8          Q.   And if we skip to the next page, he's actually

9     forwarding you an email from a Boris Kagan, do you see that?

10    A.   Yes.

11         Q.   Could you explain to the Court what this email is?

12    A.   So during this conversation, when Kagan asked me to help

13    him with the presentation, he also told me that -- as I

14    mentioned already -- that he wanted me to update the

15    presentation that he used to share with his -- with his

16    prospective investors.  And, you know, his exact words he

17    said, I'm going to send you something, and make an iPad out of

18    that.  So this was a very unusual expression, so I did

19    remember that.

20         Q.   Do you know who Boris -- do you know who Boris Kagan

21    is?

22    A.   I have no idea, but I would presume that -- at least the

23    person who has the same last name.

24         Q.   Okay.  What, if anything, did you use, what Mr.

25    Kagan sent you, or how, if at all, did you use what Mr. Kagan

1    sent you in working up the presentation he wanted you to

2    prepare?

3    A.    So I looked at the presentation and I looked at the

4    formulas.  I don't remember exactly what issues I found, but I

5    did find some -- some issues with the calculations.

6        Also the format didn't quite make sense to me, and I

7    figured that his request to make an iPad out of that required

8    a certain amount of modernization to -- to this material.

9        Q.    What did you understand him to mean by make an iPad

10    out of it?

11    A.    Make it a little bit more transparent and make it -- make

12    it easier to understand and flashy.  Should I use the word

13    flashy?

14        Q.    So if we turn now to Exhibit 8 in evidence.  Do you

15    recognize Exhibit 8 in evidence, sir?

16    A.    Yes.

17        Q.    What is --

18            THE COURT:  I'm sorry, are you saying 8?

19            MR. CARNATHAN:  8, yes.  Sorry, Your Honor.

20            THE COURT:  No, no.  I -- go ahead.

21    BY MR. CARNATHAN:

22        Q.    Do you recognize this email, sir?

23    A.    I do.

24        Q.    Could you just explain what's going on here?

25    A.    Sure.  So after spending some time developing the

1    presentation, I forwarded the presentation itself -- actually

2    three scenarios, and I'll get to that -- to Mr. Kagan, Mr.

3    Maiden, and Mr. Lipetsker.  And I asked them to look at this

4    and make sure that, you know, they're comfortable with

5    everything.

6        I also asked Boris in particular --

7        Q.   If I could just stop you there.  Why are you sending

8    it to these people?  Why Lipetsker, Kagan, and Maiden?

9    A.   So I knew that Lipetsker was going to be at the meeting.

10   I knew that meeting was supposed to happen at Maiden's office.

11   And the other thing is that if you look at the second

12   paragraph, the one that says, "These two pages are for the

13   backup purposes", but where I might feel like looking at the

14   first one.  There are certain elements of this analysis

15   which -- which are specific to closing attorney's knowledge,

16   things like settlement costs.  So I used settlement costs from

17   some other project that I did and to the best of my

18   understanding of what those were.  But I felt that it was

19   important for Boris, whom I understood was supposed to be the

20   closing attorney, to look and make sure that things are, like,

21   you know, his fees that he would charge were correct.

22       Q.   Did Mr. Maiden give you any comments on the carrying

23   costs, as you requested?

24   A.   Mr. Maiden, no.  I don't think so.

25       Q.   There's a couple of sentences down below that I

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

1    believe are in Russian; is that right?

2    A.    Yes.

3         Q.    Yeah.  So were you actually born in Russia?

4    A.    Yes, I was.

5         Q.    Yeah.  And when did you come to the United States?

6    A.    1993.

7         Q.    So is Russian your first language?

8    A.    Yes.

9         Q.    Yeah.  How old were you when you came to the States?

10   A.    I was seventeen.

11        Q.    Okay.  Could you translate the Russian on here for

12   us?

13   A.    Sure.  The first sentence says, I will print out tomorrow

14   and give it to Anya or Corya (ph.).  So the -- the meaning of

15   this first sentence was that I was going to print out these

16   presentations and since Ana, my wife, works at Boris's office,

17   I was going to give it to her or to Ms. Cora and he (sic) can

18   give him the presentation so that he could bring it to the

19   meeting.

20        Q.    Why are you putting both English and Russian in the

21   same email?

22   A.    I don't know.  It's a standard, something that I -- I

23   usually do.  Stuff that is related to more of an official --

24   or things of substance I would usually write them in English.

25   It's easier for me like that.  But some informal sentences,

1    since we're all Russian-speaking individuals, I would write

2    them in Russian.  I don't discriminate against languages.

3         Q.   After you sent these drafts to the three men,

4    Lipetsker, Kagan, and Maiden, did you get comments back from

5    Mr. Lipetsker about the --

6    A.   Nope.

7         Q.   -- the draft?  I asked you about the carrying costs

8    with Mr. Maiden, but did Mr. Maiden give you any comments

9    about the draft?

10   A.   No.

11        Q.   What about Mr. Kagan?  Did he give you any comments?

12   A.   Mr. Kagan did give me comments.  As a matter of fact,

13   even before -- I want to say even before -- before the time

14   that I sent it -- actually before the meeting he gave me the

15   comments.  So I called him the night before, and -- on the

16   23rd or 24th, something like that -- and I asked him if

17   this -- these were the presentations that he would want to

18   show and if I got all of the numbers correctly and if that's

19   what he expected, and he said yes.

20        And in addition I think he made a comment -- so there are

21   three scenarios here.  And the scenarios are really as to how

22   the usual contribution and profit allocation would work, so

23   there are three alternatives.  And he suggested I want to say

24   a third alternative -- a fourth alternative, which I ended up

25   doing on my end and printing that and bringing it with me.  So

1    again, the total scope of the project did not change, it was

2    just an allocation among investors.

3        Q.   So if we turn to the third page of Exhibit 8 in

4    evidence, please.  Is this estimated project financials and

5    risk analysis your work, Mr. Zhukovskiy?

6    A.   Yes.

7        Q.   Yeah?  Did Mr. Kagan give you any of the inputs that

8    went in to this?

9    A.   He absolutely did, yes.

10        Q.   What inputs on this estimated project financials and

11    risk analysis did Mr. Kagan give you?

12    A.   So all of the inputs, which are -- and there are only --

13    the inputs are all shown in the first column, which -- which

14    is headed project scenario and assumptions.  So that's --

15    that's the one.  So all of those inputs were given to me by

16    Mr. Kagan.

17        Q.   So he gave you the --

18    A.   There's -- I'm sorry, with one exception.  With the

19    exception of the carrying cost margin.  So the $200,000, and

20    we can -- we can talk about how that was developed and what it

21    is, but --

22        Q.   All right.  Well, I'll come back to that in just a

23    moment.

24        But so Mr. Kagan gave you the investment allocation

25    inputs?



```
 1   A.    Yes.

 2         Q.    And Mr. Kagan gave you the project begin and end

 3   date inputs?

 4   A.    That's correct.

 5         Q.    Mr. Kagan gave you the lot purchase and down

 6   payment?

 7   A.    Correct.

 8         Q.    And Mr. Kagan gave you the construction budget?

 9   A.    Mr. Kagan gave me the construction budget as well, yes.

10         Q.    And he gave you the sale price?

11   A.    He gave the sale price.

12         Q.    And did he give you the interest rate?

13   A.    He told me to use the same interest rate as we're

14   using -- as we had for -- for the Hyde Avenue LLC.  So he

15   indicated that the same bank would finance the venture.

16         Q.    Okay.  But you said the carrying cost margin did not

17   come from Mr. Kagan; is that right?

18   A.    No.  The carrying cost budget did not come from Mr.

19   Kagan, but --

20         Q.    So where does that number come from?

21   A.    So this number is a derivative of all of the other

22   inputs.  So that number depends on the construction cost.  And

23   construction, by saying construction cost I mean the actual

24   cost of labor and materials.  It is a function of the duration

25   of the project, and it is -- it is also a function of things
```

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1     like real estate taxes and insurance and some of the soft

2     costs.

3          Q.   So this spreadsheet that you created is actually

4     calculating that carrying cost margin?

5     A.   Yes.

6          Q.   And you showed this to Mr. Kagan before the October

7     25 meeting, right?

8     A.   That is correct.

9          Q.   And so what parts of this spreadsheet, if you will,

10    did Mr. Kagan comment on before the meeting?

11    A.   So I asked him if all the numbers were correct and if I

12    understood him correctly.  And he said yes, that I understood

13    him correctly.  So I interpreted that as Mr. Kagan saying that

14    the purchase price of $2 million is correct, that the

15    construction budget of $1.3 million is correct, that the sale

16    price is correct, that the interest rate is correct, that

17    the -- the target duration of the project is correct, and the

18    $200,000 which I developed were reasonable in his opinion,

19    given his experience with other projects.

20         Q.   So we've got three versions of estimated project

21    financials and risk analysis attached to this email, right?

22    The --

23    A.   Yes.

24         Q.   -- third, fourth, and fifth page of the exhibit.  I

25    don't know what the easiest way to do this is, but can you

1    explain what the difference is among those three scenarios?

2    Do you need to look at them?

3    A.    Yes, absolutely.  They are all identical scenarios, with

4    the exception of one section.  And I have to draw your

5    attention to this very first column, and there's this little

6    section that says -- with the heading, partner, right?  And it

7    has, managing partner, investor 1, investor 2, and it has

8    investment allocation and it has profit sharing.  So these are

9    the two -- the two elements of the -- of this presentation

10   which were in question as to, you know, who needs to invest

11   what, and what portion of the net profit is considered

12   reasonable, relative to the investment, or agreeable or

13   acceptable for people.

14       Q.    So at this time, when we look at that far left

15   column, who did you mean by managing partner?

16   A.    So the managing partner is the individual who manage the

17   construction itself.  Meaning going to the site, talking to

18   the subcontractors, or actually performing the work, laying

19   the bricks, I don't know.  But Mr. Kagan is the managing

20   partner for the purposes of this presentation.

21       Q.    So in this scenario you're positing that he would

22   invest nothing and then receive 43.75 percent of the profits;

23   is that right?

24   A.    That is correct.

25       Q.    Okay.  And then investor 1, in this particular

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    scenario, would put up 100 percent of the funds and get 56.25

2    percent of the profits, right?

3    A.    That is correct.

4         Q.    When you were preparing this spreadsheet --

5    A.    Um-hum.

6         Q.    -- was this specifically for Alex Filippov, or was

7    this intended for use with other investors?

8    A.    It was not for Alex Filippov.  I didn't even know who was

9    supposed to be the investor.  I think I knew --

10                         (Phone ringing)

11         MR. CARNATHAN:  Oh, my goodness.  I'm so sorry.  I

12   could have sworn I did that this morning.

13   A.    Okay.

14         MR. CARNATHAN:  Excuse me.

15   A.    I think I know that by the time that we had the meeting,

16   maybe, like, the day before somebody told me.  I don't

17   remember.  But it was certainly -- when Kagan asked me to

18   perform this analysis, he did not tell me who the investor was

19   supposed to be.

20   BY MR. CARNATHAN:

21        Q.    Okay.  And so if we look at the three scenarios just

22   briefly, we've looked at the hundred-zero.  There's also one,

23   the prior page, the third page of the exhibit posits again,

24   zero investment by the managing partner for 43.75 percent

25   share.  This one says 80 percent by investor 1 for 45 percent

1   share, and 20 percent by investor 2 for an 11.25 percent

2   share, right?

3   A.   Um-hum.

4       Q.   And then, just very briefly, the -- two pages in,

5   the other one we haven't looked at yet again shows zero by the

6   managing partner for a fifty percent share and a hundred

7   percent by investor 1 for a fifty percent share, right?

8   A.   That is correct.

9       Q.   Now, if I could have Exhibit -- you know what?  Let

10  me stay with this one for another moment.

11  A.   I think I want to point out one thing.  That in the

12  second column where it says, investment and profit allocation,

13  if you look at the net profit, net profit and loss line, you

14  would see that this number of 1.075861 is the same for all

15  three scenarios.

16      Q.   Okay.  How are you calculating the net profit?  How

17  are you deriving that number?

18  A.   So the net profit here is calculated as -- it is, first

19  of all, it is calculated for a single lot.  So my

20  understanding was that there were two lots purchased,

21  ultimately, but this -- this analysis is done for a single

22  lot.

23      So the net profit is calculated in the following way.

24  You take the sale price of the -- of the house, you subtract

25  all of the legal fees and all of the fees that are associated,

1    and commissions, associated with actually selling the house

2    and that gives you the net proceeds, net sales proceeds.  Then

3    from this amount, from the net sales proceeds, you subtract

4    the loan amount, you subtract the initial contributions that

5    the investors have made, and the remaining is the net profit

6    and the loss.

7        Q.   All right.  And is that the process that you

8    followed in all of the spreadsheets you prepared?

9    A.   That is the process, yes.

10       Q.   All right.  And did Mr. Kagan have any comments on

11   how you were calculating the net profit?

12   A.   He did not, no.  It is exactly the same profit

13   calculation that was used in his original spreadsheet.  And

14   I'm not -- I'm not really seeing how that could be done any

15   other way, honestly.  But he did not comment on that and if

16   anything he agreed that all those numbers are consistent with

17   his -- his expectations and his analysis.

18       Q.   Okay.  If we look at the sixth -- page 6 of Trial

19   Exhibit 8 in evidence, please.  Can you explain what this

20   chart is -- what information this chart's conveying?

21   A.   Sure.  So this chart is an illustration of a systemic

22   risk associated with the real estate investment.  Meaning

23   that, obviously, the real estate market is a fairly volatile

24   market, and we're talking about a time (indiscernible) of

25   twenty months, so the project would be completed in twenty

1   month.

2   So many things could have happened over the twenty-months

3   period.  We could have another recession or we could have

4   another war.  So that could affect the real estate price and

5   liquidity of the real estate; those are risks.  So that's why

6   we are modeling this -- the sale of the property over the

7   period of, I believe -- what is that, sixteen months?  And so

8   that -- that illustrates the liquidity of the market.

9       And in addition, there's a range of -- there's a range of

10   sale prices.  Again, if -- if the real estate is not selling

11   and you're forced to reduce the price, then you're -- you're

12   looking at a different profit level.  So there is a -- there's

13   a series of -- there's a series of total profits, net total

14   profits for each scenario where the scenario is developed with

15   respect to the time required to sell and the price that the

16   venture would  be able to obtain for a single lot.

17       Q.   Do you know how many scenarios, different scenarios,

18   are presented in this chart?

19   A.   I wish I had my calculator with me, but you would need to

20   take the number of -- I would -- you know, the glance -- no, I

21   don't.  But it's -- it's more than 600, that's for sure.

22       Q.   How did you select the variables to use in creating

23   this chart?

24   A.   When you say variables, you mean the --

25       Q.   What are the variables?



1    A.    -- sale price -- sale price and budget?  So first, when

2    we did it, it was supposed to start at twenty months because

3    Kagan told me that it would take twenty months to complete the

4    project and put it on sale.  So plus two months of selling, so

5    that brings us to twenty months.  So if -- that's the -- sort

6    of a quick -- quick sale was supposed to happen in twenty

7    months.  And when I say sale, it's not the time of the offer,

8    but it's really when the money hits the account.

9         And then I just went, I believe, in $50,000 increments

10   from -- from the target point of 4.9.

11        Q.   How did you select the range of potential sales

12   prices?

13   A.    It was a fairly arbitrary choice, but -- but I always

14   believed that, for example, the house -- worse-case scenario

15   the house should cost the same amount as it costs to build, I

16   mean the materials and labor plus the cost of the land.  So

17   that's why I have the minimum of 3.4 as the lowest selling --

18   selling price.  I also didn't think that it was a target price

19   of 4.9 million, you know, twenty months duration, or even

20   thirty-six months' duration, would bring it much lower than

21   3.4.  So that's -- that's an unlikely scenario.

22        I didn't think that, you know, 5.3 million -- say a price

23   of 5.3 million would involve -- would be super, super likely

24   scenario as well.  But the same thing, that would be if it

25   should sell -- while it doesn't reduce the uncertainty into

1    the decision-making, it does not create a risk to investors.

2    So the risk is really the house stays on the market for a long

3    period of time and sells for the low price.  So that's the

4    risk that the investors are taking on.

5        Q.   To what extent did you consider putting in

6    construction costs as a variable in this chart?

7    A.   So the construction cost is embedded in the -- in the

8    total cost of the project, so that is netted out of the -- of

9    the -- of the total proceeds.

10       Q.   So what construction cost is embedded in this chart?

11   A.   1.3 million.

12       Q.   And did you consider doing a chart that varied the

13   1.3 million?

14   A.   No, I did not.

15       Q.   Why not?

16   A.   Because -- so I asked Mr. Kagan -- so this chart, again,

17   this chart illustrates systemic risk, as I mentioned.  So

18   these are the risks created by general economic scenarios and

19   general economic conditions.  1.3 million is not a variable

20   and it's a controlled -- controlled cost, which was controlled

21   by Mr. Kagan.  And when I asked him if he wants to model what

22   happens if the cost of constructing the house is different

23   from 1.3 he -- in his words, he told me that, you know, I know

24   exactly how much it's going to cost.  I've built many houses,

25   and I know exactly how much it's going to cost to build the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1  house with the specifications that I'm thinking.  So 1.3 is

2  not going to change.

3        MR. CARNATHAN:  Could I have the seventh page of

4  Exhibit 8, please, Mr. Hartzel?

5  BY MR. CARNATHAN:

6        Q.   Mr.  Zhukovskiy, did you also put together this

7  construction loan distribution schedule?

8  A.   I did not put that together.  I used a construction loan

9  budget which was provided by Kagan to -- what was

10  (indiscernible) for Hyde Avenue LLC, so -- for the loan.

11        Q.   So what information is the construction loan

12  distribution schedule conveying?

13  A.   So this is -- when you're taking a -- when you're taking

14  a construction loan, the -- the total amount of the

15  construction loan is 1.5 million here.  And what that is, that

16  is the loan that is provided by the bank.  And this loan is

17  distributed in accordance with a certain schedule.

18  And my understanding was that -- again, from the work that I

19  was involved in with Mr. Kagan for Hyde LLC, was that once you

20  complete a stage of the project, then you go to the bank and

21  you say, hey, you know, the stage is complete.  Please come

22  and see.  And the bank sends representative, and the

23  representative looks and ensures that the stage is complete.

24  And then they release a certain percent of the loan that will

25  secure it for construction.  So in this instance, it looks to

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1   me like it's 1.5 million, which represents the amount of the

2   construction loan.

3        Q.   All right.  Where's the 1.5 million derived from?

4   A.   So the 1.5 million is 1.3 of construction costs, meaning

5   labor and materials, plus $200,000 carrying cost margin.

6        Q.   So why isn't there a line item for carrying costs in

7   the budget here somewhere?

8   A.   Because -- because all of the construction costs here,

9   they -- they're loaded for -- for the carrying costs.  Meaning

10   that the costs of con -- there's, as I mentioned, the total

11   cost of constructing the house consists of two things -- three

12   things.  It consists of cost of materials, cost of labor, and

13   additional finance costs, which are embedded.  So that -- the

14   soft costs, I should call them.  So this soft costs include

15   things like interest, taxes, insurance.

16        Q.   Did you review the construction loan schedule with

17   Mr. Kagan before the October 25, 2012 meeting?

18   A.   I did not review that.  But when I reviewed it, he told

19   me to use the -- this -- this exhibit.

20        Q.   So if we look now at Exhibit 9 in evidence, please?

21   Do you recognize Exhibit 9 in evidence, Mr. Zhukovskiy?

22   A.   Yes, I do.

23        Q.   What is it?

24   A.   This is the presentation, which is dated October 25th,

25   2012.  And this is the presentation that supposedly is

1      provided to -- to Mr. Filippov during the -- the meeting.

2          Q.   All right.  Are you able to say either way yourself

3      whether this is the one that was presented --

4      A.   No.

5          Q.   -- to Mr. Filippov?

6      A.   Just looking at -- sorry.  Just looking at this first

7      page I am not able to say, but if I look at the actual

8      presentation -- the presentation itself, then I will be able

9      to --

10         Q.   All right, so --

11     A.   Well, that certainly -- yes.

12         Q.   All right.

13     A.   That's the one.

14         Q.   Okay.  How do you know this is the one that was

15     presented to Mr. Filippov?

16     A.   Because I can recognize the -- the numbers.

17         Q.   Which numbers in particular --

18     A.   So --

19         Q.   -- do you recognize?

20     A.   -- I recognize the number, the net profit and the loss of

21     1.075551, I recognize -- thank you.  Can you also expand the

22     very first section?

23         Q.   Project scenarios?

24     A.   Project scenarios and assumptions, that's right, yes.

25         Q.   Oh.



1   A.   So I recognize the allocation among the partners.

2        Q.   The eighty/twenty allocation, is that --

3   A.   The eighty/twenty allocation.

4        Q.   -- what you mean?

5   A.   That's right.

6        Q.   And forty/ten/fifty on the profit sharing, is that

7   right?

8   A.   Forty/ten/fifty, that -- that's correct, yes.

9        Q.   Okay.  Did you actually attend the meeting on

10  October 25, 2012?

11  A.   I did.

12       Q.   Who was there that day?

13  A.   So during the meeting there were four people:  Mr.

14  Lipetsker, Mr. Kagan, Mr. Maiden, and -- and myself.

15       Q.   Can you recount in substance what you recall about

16  what was discussed during that meeting on October 25, 2012?

17  A.   So Mr. Kagan presented a project.  He explained that he

18  was going to purchase -- he -- to Mr. Filippov he explained

19  that he was going to purchase a lot for $4 million altogether,

20  split it in two, and build two high-end houses and sell it for

21  profit.

22       He -- I believe he also shown a plot plan of the -- of

23  the lot that he was planning to purchase.  He brought with him

24  a portfolio of other projects that he had completed.  You

25  know, photos of the -- of the houses, and shared that with Mr.

 1    Filippov.  I don't know how many were there, but there were

 2    multiple -- multiple nice-looking houses.

 3         Q.   What was your role at the meeting, sir?

 4    A.   So my role was -- so Mr. Kagan -- I -- as we can see from

 5    the original email, I wasn't planning to come to the meeting

 6    originally.  But when I spoke to Mr. Kagan, he actually asked

 7    me to -- to participate in the meeting, in case Mr. Filippov

 8    had questions about the numbers in the presentation.  And the

 9    numbers that he feel that he wanted me to explain were how the

10    carrying costs were calculated and how the interest is

11    calculated.

12         Q.   So were you called upon at the meeting to explain

13    the carrying costs and the interest rate?

14    A.   Yes.

15         Q.   And what did you explain?

16    A.   So I explained that -- that interest depends on the

17    timing of the loan, when loan is taken out.  I explained that

18    there is a -- that there's a distribution schedule of the

19    loan, which drives the cost, the carrying cost amount.

20         I explained that depending on the time when the project,

21    when the houses were to be sold, the profit would change and

22    that the profits would also change depending on the sale price

23    of the house.

24         Q.   To what extent do you recall there being any

25    discussion of what the construction budget would be during

1    that October 25 meeting?

2    A.    Yes.  I actually remember because Mr. Filippov asked a

3    question.  He said, oh, yeah, you know, it all looks great,

4    and I understand that the amount of money that we can make

5    here depends on the sale price of the house, and I also

6    understand that the amount of money that we can make here

7    depends on -- on when they actually sell it because that

8    drives the carrying cost.  But he said, but how about -- how

9    do we know that we can build it at $1.3 million?  And Mr. --

10   at which point, Mr. Kagan essentially repeated what he told to

11   me.  He said, I -- I built many houses and I know how much it

12   costs.  And he said, yeah, I know all projects are different,

13   so there will be a little variation here, but nothing that

14   would drastically change these results or would directionally

15   move the needle.

16        Q.    After the October 25, 2012 meeting, what was your

17   next involvement with the Lyman-Cutler project?

18   A.    So I did not hear about this for a while, and then -- and

19   a few months later, Mr. Filippov, I believe, sent me an email

20   asking me to review an exhibit, and I think I might have sent

21   him the file as well.  So -- so before the meeting, he

22   actually asked me to -- if I would be able to send him the

23   file with the formulas so that he could look into how things

24   were developed, that he likes playing around with spreadsheets

25   as well.

 1         MR. CARNATHAN:  So can I have Exhibit 31 in evidence,

 2  please?

 3  BY MR. CARNATHAN:

 4      Q.   Do you recognize Exhibit 31 in evidence, sir?

 5  A.   I do.

 6      Q.   Okay.  And this is an email, May 4th, from Alex to

 7  vadimkagan@yahoo.com, Nick (ph.) Lipetsker, Boris Maiden, and

 8  you, right?

 9  A.   That is correct, yes.

10      Q.   Do you remember reviewing this email back at the

11  time?

12  A.   I do.

13      Q.   And what did you conclude, based on reviewing this

14  email?

15  A.   I know I reviewed it, I don't remember what I concluded.

16  But I think I've written some -- some narrative regarding --

17  regarding some of the numbers, which are here.

18      Q.   Let me ask you, so I don't forget.

19         MR. CARNATHAN:  Could I have the third page of

20  Exhibit 31, please?  It's doing that thing again.  And would

21  you highlight that profit allocation in the upper right

22  corner?

23  BY MR. CARNATHAN:

24      Q.   So Mr. Zhukovskiy, I can put exhibits back up if

25  that's helpful, but --

1    A.    Um-hum.

2         Q.    -- I believe that this is new, this section is new,

3    compared to Exhibits 8 and 9, right?  We didn't see the profit

4    allocation based on capital contribution and market costs in

5    the presentations back in October 2012, did we?

6    A.    That is correct, yes.

7         Q.    Where did this chart come from?

8    A.    So it was something that I developed with Mr. Filippov.

9    And --

10        Q.    What was the purpose of developing it?

11   A.    So the concern -- I believe that the concern was whether

12   the allocation of the profit is equitable with respect to the

13   capital invested.  And so then the narrative that Kagan was

14   giving was that he has a niche relative to the market, and

15   he's able to build things, you know, well and quickly, and

16   that the allocation of the profit that was considered, that

17   this was -- this was lucrative for -- for the investor.

18        And in order for us to test it, we did the following

19   analysis.  We said, okay, now, what happens if Mr. Kagan is

20   not involved and you have a group of investors which are

21   building a house?  And let's say that the bank is not involved

22   as well.  So it's all -- it's an all-cash deal, right?  So I

23   have -- you have -- you have a group of investors.  And the

24   total cost of the project, which we estimated in the

25   presentation, was 3.754.  So that's the first all costs,

1   right?

2        Q.   Where did you get the all costs number?  How did you

3   come up with that?

4   A.   So it's -- it --- it is in the presentation, if you go

5   back to the estimated project financials and the risk analysis

6   exhibit.  So if you start -- start blowing this up, you would

7   be able to find this number.  So --

8        Q.   Which column do you want?

9   A.   We're looking for the total cost of the project, which is

10  somewhere in this exhibit.  I'm afraid I'm not really able to

11  see, the font is too small.  No, that's -- that's not it.

12  It's probably in a different section somewhere.  It -- I would

13  imagine that it's somewhere in -- probably in the third

14  column.  Nope, it's not here.

15       Profit and loss?  Let's look at the profit and loss.

16  One, two, three, four -- fourth column on the right.  Yep.

17       So right here, there's a development of all costs, and it

18  says 3.754442.  Can you see that number?  That's all costs.

19  Almost the last number --

20       Q.   I --

21  A.   -- right above the net profit.

22       Q.   Okay.  So you're --

23  A.   So these costs --

24       Q.   -- you're taking that number and then that --

25  A.   Yes.



1        Q.    -- gets plugged into the all costs?

2   A.    That gets plugged in to the exhibit as well, that's

3   right.  So can we go back to the -- to the previous exhibit?

4        Q.    So we want to highlight the profit allocation one

5   again?

6   A.    That's right, yep.

7        Q.    All right.  So let's go back there.  So we know

8   where the all costs come.  What's the cost of capital line

9   item?

10  A.    So the cost of capital, that's how much in the project

11  that we were considering was -- was the usage of the Rockland

12  Trust, or whatever, the lender -- hypothetical lender, I

13  believe at this point -- financing.  So that includes a point

14  which they require to take out the loan, that includes the

15  interest that would be required to pay the loan.  So we're

16  adding this back.

17       So the -- this particular estimate was producing a cost

18  of capital of 189094.  So --

19       Q.    So you're saying that you're doing an all-cash

20  deal --

21  A.    That's right.

22       Q.    -- so you're putting back what it's going to cost

23  them to borrow the money and --

24  A.    That's correct --

25       Q.    -- pay points?

1    A.   Yes.  So we -- we went in the back.  Well, I'm sorry,

2    we're subtracting that.  So the cost -- the cost becomes

3    smaller.

4        But then we're saying, okay, now we don't have Kagan,

5    who's a friend of ours, and we're actually going on the

6    market, and we're finding an individual who, instead of

7    benefiting from -- from the profits of the company would

8    actually be paid to build this house (indiscernible).  So

9    we're going to pay $200,000 for that matter.  And that's the

10   new market cost, which I'm -- which I'm calling market cost.

11   So it's not the differential deal offered by Mr. Kagan, but

12   rather the market cost which Mr. Filippov would be able -- or

13   have -- be able to obtain if he were to go on the market and

14   do that himself.

15       Q.   So that -- so when I look at the management fees of

16   200,000, you're assuming that that means Kagan's not involved

17   and you have to go out and hire somebody to build the houses;

18   is that --

19   A.   That's exactly right, yes.

20       Q.   Okay.  And so through those numbers, you get to a

21   market cost for building the house, at 3,765,348, right?

22   A.   That is correct, yes.  Then -- then we have the net sale

23   proceeds, which is, you know, we're selling the house, and I

24   believe the starting point, again, I'm having a hard time

25   seeing the numbers, but I think it was five, five and a

1    quarter, the gross sale price for -- for this scenario.

2        Q.   So you're netting out the commission and closing

3    costs, something like that?

4    A.   That's we're doing, that's right.  So that -- these are

5    the net sales proceeds.  And then from the net sales proceeds,

6    we subtract the market costs of 3,765,348 and that becomes a

7    net market profit of 1.2215, $2 million dollars.

8        Now we are -- we need to divide this profit equitably

9    among the investors.  So in the scenarios that we're looking

10   with Kagan, Mr. Filippov's investment was supposed to be

11   1.08273 million dollars.

12       Q.   Where is that number from?

13   A.   So that's -- if you look at the section titled profit

14   allocation investor, so in this -- for this particular

15   section, investor meaning -- no, no, no.  Let's go back to --

16   so that's right.  So --

17       Q.   I guess at this point I'm asking where the

18   investor's capital of 1,082,738 --

19   A.   Oh.

20       Q.   -- comes from?

21   A.   So let's go back to the exhibit.  So stop blowing it up.

22   It's in the second column.  Second column, in the -- in the

23   little table called investor 1.  So here is the detailed

24   development of how 1.802 (sic) million was calculated.  And do

25   you -- do you need to go through this, or is that self-

1    explanatory?

2         Q.   I guess so.  You're, again, operating in the

3    hypothetical universe where you don't borrow the money, you

4    just put up cash --

5    A.   No.

6         Q.   -- is that right?

7    A.   So -- so this scenario is what happens if we go with

8    Kagan.  So if we go with Kagan, Mr. Filippov would be required

9    to invest 1 -- I'm going to call it $1.1 million.  Then in the

10   market scenario, again, we're saying that the total investment

11   required is -- can we go back to the section, profit

12   allocation?  Profit allocation on capital contribution, so the

13   very last section.  Okay.

14        So -- so total investment required is 3.7 -- I'm going to

15   call it $3.8 million.  Out of that $3.8 million, Mr.

16   Filippov's investment is $1.1 million, which represents 28.8

17   percent.  So he is entitled to 28.8 percent of the net profit,

18   net hypothetical profit that would be generated in the market

19   scenario approach of 1.2 million.  So that generates a fair

20   profit allocation of 3.51, so $351,000, give or take.

21        The deal offered by Kagan was the investment allocation

22   and -- investment income allocation and the capital

23   contributions required would generate a profit of 4.93,

24   $493,000.  See that?

25        Q.   Yeah, so the 1 --



```
 1    A.   So --

 2         Q.   -- 41,790 is what?

 3    A.   So the 141 is the access, which basically illustrates

 4    that the allocation of the required contributions and proposed

 5    allocation of the profit as described in the very first

 6    section under project scenarios and assumptions, that is at

 7    least equitable from the standpoint of view of the market,

 8    yes.

 9              MR. CARNATHAN:   Okay.   If we could go back to the

10    first page of Exhibit 31, please?

11    BY MR. CARNATHAN:

12         Q.   So just in an effort to move things along, the

13    discussion here is the financial merit of increasing the

14    construction budget from 1.3 million to 1.4 million, fair

15    enough?

16    A.   Yes.

17         Q.   And as of May 4th, 2013, Mr. Filippov is concerned

18    that that's going to increase the carrying costs by $75,000

19    per home to 275, right?

20    A.   That is correct, yes.

21         Q.   And on the next page, he expresses concern that

22    you're -- that the project is going to be $16,000 short per

23    home if all that's borrowed is 1.6 million, right?

24    A.   That is correct, yes.

25         Q.   Okay.   What did -- what was your input to that?
```

1    What was your analysis?

2    A.   So I believe that I looked at the spreadsheet that Alex

3    prepared, and I found some small discrepancies in some of his

4    calculations, which I believe that they maybe reduced the 16k

5    a little bit.  But my overall reaction was that the additional

6    investment was generating a return in excess of the original

7    investment, and therefore my suggestion that was you get --

8    essentially you get bigger bang for the buck if you do that.

9            MR. CARNATHAN:   Could I have Exhibit 32, please?

10   BY MR. CARNATHAN:

11       Q.   Looking at Exhibit 32 in evidence, there was some

12   back and forth, and on May 6th, 2013 you emailed Mr. Filippov,

13   Mr. Lipetsker, Mr. Maiden, and Mr. Kagan again, right?

14   A.   Um-hum.

15       Q.   Insurer, that's Mr. Filippov?

16   A.   Yes.

17       Q.   Okay.  And by then you had apparently realized that

18   you were double-counting the taxes, right?

19   A.   That is correct, yes.

20       Q.   And so if we look down at the second paragraph, you

21   recalculate that the estimated carrying cost is 219,804 if the

22   project goes twenty-three months, and if you make it within

23   the original estimate of twenty months, the estimated carrying

24   costs is 182,202, right?

25   A.   That is correct, yes.



1          Q.   All right.  I had asked you earlier about your other

2     investment with Mr. Kagan; do you remember that?

3     A.    Yes.

4          Q.   About when did that project start?

5     A.    So this project --

6               MR. PERTEN:  Your Honor, I'm going to object to this

7     line of questioning.  We're here to talk about Lyman-Cutler,

8     we're not here to talk about his other investments.  I don't

9     think there's any foundation that's been laid as to why other

10    investments have any relevance whatsoever to the Lyman and

11    Cutler project.

12              THE COURT:  Didn't I deal with this in a motion in

13    limine?

14              MR. PERTEN:  Your Honor, you did do it in a motion in

15    limine, but I have two observations to share with the Court.

16    The first is that, from a strictly procedural, my

17    understanding is I need to renew my objection to preserve it,

18    so I'm renewing it to preserve it, notwithstanding that we had

19    a motion in limine.  So that's just a procedural thing, as I

20    understand my obligation.

21              But the second part that when that motion was

22    presented to you originally, the representation that was

23    made -- there were two representations made.  That there were

24    going to be five people paraded in front of you.  I understand

25    that we're now down to four.  So the question is, is this

1    still a significant subset of the twenty-five or thirty

2    projects that it bears any relevance?

3          THE COURT:  I thought the way that this ended up

4    going was that you were given the opportunity as well to

5    present --

6          MR. PERTEN:  That's right.

7          THE COURT:  Right.

8          MR. PERTEN:  That's right, but there was a premise,

9    if you will, in the original presentation.  The second part,

10   based on Mr. Filippov's testimony yesterday, I don't think the

11   foundation has been established at all that, in fact, there

12   was an affirmative statement, much less a guarantee, of any

13   fixed price that was then exceeded.  To the contrary, I think

14   Mr. Filippov's testimony was quite clear that at best, at

15   best, there was some sort of an ambiguous I'm experienced, but

16   he specifically testified that he didn't rely on anything

17   Kagan said, he relied on his presentation number.

18          So we're far afield from the representations that had

19   been made to Your Honor when we argued the motions in limine.

20   So for that reason, Your Honor -- and I believe it's rule 404

21   I want to say, which deals with prior or character denigration

22   based on other projects, if that's where Mr. Carnathan is

23   going.  I just don't think we're there.  And I think we're --

24          THE COURT:  I just don't want to retread where we've

25   been in great detail both in discovery and then on motions in

1    limine.  And so --

2         MR. PERTEN:  I understand, Your Honor.  But I -- I'm

3    sorry, I didn't mean to interrupt.

4         THE COURT:  Your argument is that there's been a --

5    that now that we're at trial, circumstances have changed?

6         MR. PERTEN:  Essentially.  I don't think the evidence

7    that was adduced yesterday is nearly what Mr. Carnathan

8    represented the evidence would adduce before the trial

9    started, and I fear and I expect that we're going to be going

10   into a side show on other projects --

11        THE COURT:  That's been the discussion for months,

12   though.  And that -- I've cited, I've dealt with that -- that

13   point I've dealt with in some detail.

14        Okay.  I understand your argument, all right?

15        MR. PERTEN:  Thank you.

16        THE COURT:  And it's both technical -- I'm not sure

17   in federal court you need to preserve that way, but you've

18   done that.  Hold on.

19        Anything you'd like to say about that objection?

20        MR. CARNATHAN:  Well, certainly.  I mean, I think Mr.

21   Filippov's testimony adduced the evidence exactly what we said

22   we would prove.  And we proved that Mr. Kagan gave them a

23   fixed maximum at the outset of the project, that it was 1.3.

24   They agreed to 1.4, just like we always said, and that that

25   was the -- if you will, a worst-case scenario.  He actually

1    told them that they might get money back.  That 1.4 was the

2    most it was going to be.  And that they didn't hear a peep

3    from him about cost overruns until May 7th --

4            THE COURT:  Right.

5            MR. CARNATHAN:  -- 2015.

6            THE COURT:  That's enough.  The objection's

7    overruled.

8            MR. CARNATHAN:  Thank you, Your Honor.

9    BY MR. CARNATHAN:

10       Q.   So I started to ask you, where was the property in

11   which you invested with Mr. Kagan?

12   A.   So the property that I invested with Mr. Kagan was in

13   Newton, Massachusetts.  And the address, I believe it was Hyde

14   Avenue LLC, but I don't remember the house number.

15       Q.   How did the opportunity to invest in that project

16   come to your attention?

17   A.   So Mr. Kagan -- the exact details escape me, actually.

18   But I believe that Mr. Kagan approached me and -- so I knew

19   that he was a developer, he probably knew that I was looking

20   for investments.  So he approached me, and he asked if I would

21   want to participate in something like that.

22       Q.   How much did he ask you to invest?

23   A.   He ultimately asked me to invest thirty-one percent of

24   the amount necessary to purchase the house, which was a down

25   payment.  I believe it -- I believe it was thirty-one percent

1    of $500,000.

2         Q.   Who were the other investors in the project?

3    A.   So the other investors were Mr. Kagan himself, who

4    invested one half of that amount of $500,000 -- so $250,000 --

5    and Mr. Lipetsker as well, who invested the rest of it.

6         Q.   All right.  Did you form a company to hold the

7    venture, if you will?

8    A.   We did.

9         Q.   What kind of a company did you form?

10   A.   It was a limited liability company.

11        Q.   All right.  And who drafted the limited liability

12   company operating agreement?

13   A.   Mr. Maiden did.

14        Q.   Do you remember who the managing member of the LLC

15   was?

16   A.   I do not.  I know that I was responsible for taxes and I

17   think that it was -- it was me, most likely.

18        Q.   All right.  If I showed you a copy of the operating

19   agreement, would that refresh your memory?

20   A.   That would, certainly.

21             THE COURT:  Now, the document you're about to show

22   him, are you offering it --

23             MR. CARNATHAN:  I --

24             THE COURT:  -- or is it simply to refresh?

25             MR. CARNATHAN:  I'm not, Your Honor.  This is just to

1    refresh his memory.

2          THE COURT:  Okay.  Do we have an exhibit number on

3    it, just so that, for the record, we know what it is?

4          MR. CARNATHAN:  We didn't get this one on our list,

5    no.

6          THE WITNESS:  Can I -- can we scroll up a little bit?

7    Yeah.  So I was the managing member.

8          THE COURT:  Just hold on.  We're having a --

9          THE WITNESS:  Oh, I apologize.

10          THE COURT:  -- back and forth about the document.

11    Okay, all right.

12          I like things on the record to be identified so that

13    if there is any issue concerning it -- so I'm going to -- do

14    you have a list of documents that you're calling for

15    identification only?  We can call this Plaintiff's A for

16    identification, if necessary.  I just want something in the

17    record so we know what it is that you dealt with.

18          MR. CARNATHAN:  This is not on our exhibit list, so

19    perhaps calling it Plaintiff's A is the way to go.  This is

20    just the operating agreement from Hyde Avenue LLC, Your Honor.

21          THE COURT:  It's all fine.  So far I don't have any

22    problem with it, I don't have any objection to it, to showing

23    it to the witness.  But let's call this Plaintiff's Exhibit A

24    for identification, which can be stricken if it makes it into

25    evidence or something else.

```
 1              PLAINTIFF'S EXHIBIT A WAS MARKED FOR IDENTIFICATION

 2              MR. CARNATHAN:  Thank you, Your Honor.

 3              THE COURT:  Okay?  All right.

 4     BY MR. CARNATHAN:

 5         Q.   Do you remember when you started the project?

 6              THE COURT:  What's the name of the project, again?  I

 7     think I --

 8              MR. CARNATHAN:  This is the Hyde Avenue project.

 9              THE COURT:  High Avenue?

10              THE WITNESS:  Hyde, H-Y-D-E.  Hyde.

11              THE COURT:  Hyde Avenue.

12              THE WITNESS:  Um-hum.

13              THE COURT:  Thank you.

14              THE WITNESS:  Yep.

15              THE COURT:  All right.

16     BY MR. CARNATHAN:

17         Q.   When did you start the project?

18     A.   So it started in May 2012.

19         Q.   Okay.  And do you recall when you sold the property?

20     A.   It was sold in -- my timeline here.  It was sold in 2014,

21     in April of 2014.

22              MR. PERTEN:  Your Honor, at this point I'd at least

23     ask that this be removed from the screen so we can get his

24     testimony.

25              THE COURT:  Yeah, remove -- you're not doing anything
```

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    with it, yet.

2             MR. CARNATHAN:  Certainly.

3             THE COURT:  So --

4             MR. CARNATHAN:  My apologies.

5             THE COURT:  That's fine.

6             MR. PERTEN:  I'm also understanding that Mr.

7    Zhukovskiy's looking at some sort of a document that he's

8    testifying from.

9             THE WITNESS:  This is not a document.  My personal

10   notes and some calculations that --

11            THE COURT:  You're entitled to know if he's looking

12   at something, and he's --

13            MR. PERTEN:  Okay.

14            THE COURT:  You're entitled --

15            MR. PERTEN:  His personal notes and calculations,

16   he's just said.  I don't think that's appropriate that he has

17   personal notes and calculations that he's --

18            THE WITNESS:  That's fine.  I'll --

19            THE COURT:  No.  So the way it works is you're

20   entitled to see what he has, and you may do so --

21            MR. PERTEN:  Very good.

22            THE COURT:  -- at any time.

23            MR. CARNATHAN:  News to me, too.  May I --

24            THE COURT:  Say it again?

25            MR. CARNATHAN:  That is news to me as well.  Perhaps

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    I could look as well?

2         THE COURT:  Of course you can.  Just don't talk on

3    the -- don't try to talk because you're not on the record over

4    there.

5         THE WITNESS:  There is another page that I --

6         THE COURT:  No, hold on, hold on.

7         THE WITNESS:  -- have with me.

8         THE COURT:  All right.  There's not a question

9    pending, all right, Mr. --

10         THE WITNESS:  Zhukovskiy.

11         THE COURT:  I know that's easy for you to say.

12         THE WITNESS:  Dmitriy is fine.

13         THE COURT:  What is it?

14         THE WITNESS:  You can just call me Dmitriy.  Dmitriy,

15    my first name, is fine if you --

16         THE COURT:  Dmitriy?

17         THE WITNESS:  Yeah, Dmitriy.

18         THE COURT:  Dmitriy.

19         THE WITNESS:  Dmitriy, yes.

20         THE COURT:  I know that one.

21         THE WITNESS:  Okay.

22         THE COURT:  Dmitriy, could you show them everything

23    you have in front of you?

24         THE WITNESS:  Absolutely.

25         THE COURT:  Show them all the paper you brought to

1    the witness stand.

2          MR. CARNATHAN:  Well, we've removed the notes from

3    Mr. Zhukovskiy's hand.  I called him so I think it's probably

4    Mr. Perten's option whether he wants to mark the notes and put

5    them into evidence somehow, but he's going to be testifying

6    without them at this point.

7          THE COURT:  You're not choosing to do that?  You're

8    not marking them?  That's up to you.

9          MR. PERTEN:  We should probably mark them.

10          THE COURT:  For ID, or are you going to agree that

11    they go in, or what do you want to do?  I'm happy for you to

12    do nothing with them for the moment.  You can tell me as you

13    move along what you'd like to do with them.

14          If they become an issue -- if someone wants to

15    inquire of this witness concerning those notes, I want them

16    marked at least for identification so the record's clear what

17    it is you're asking him about.

18          MR. CARNATHAN:  I think I'd rather just put them

19    aside and let Mr. Zhukovskiy testify from --

20          MR. PERTEN:  Your Honor, if I may be heard on that

21    issue?

22          THE COURT:  Of course.

23          MR. PERTEN:  As I look at these notes they are

24    essentially, at least to my eye -- and perhaps the Court wants

25    to look at them as well -- an outline of what he's going to be

1     testifying about.  There's calculations, there's estimates,

2     unbiased, words, symbols.

3           We were unaware that he was reading from his notes or

4     refreshing his memory from his notes while he was testifying

5     this morning.  I don't think that's proper.  And to the extent

6     that this witness has not -- we were not told that he had

7     notes.  We didn't know until Mr. Harris just said, he's

8     looking at something.  I've got tainted testimony, if you

9     will, from this morning because he's got an outline here,

10    which I had no opportunity to look at before.  And we don't

11    know what he remembers and what he wrote down.

12          THE COURT:  You can cross-examine him about that.

13    That will preserve any -- I think that that deals with

14    whatever concerns that you might have.

15          MR. PERTEN:  I think -- with respect, Your Honor, I

16    don't know how you unring the bell.  I mean, I would suggest

17    that his testimony should be stricken.

18          THE COURT:  Yeah, it's --

19          MR. PERTEN:  It wasn't from memory, apparently it's

20    from whatever he wrote down.

21          THE COURT:  You can cross-examine on that.  I'll take

22    that as a motion to strike and deny the motion.  Okay?

23          MR. PERTEN:  Your Honor, can we at least have these

24    marked for identification before we go further?

25          THE COURT:  You absolutely can.  So we're going to

1     call them, for ease of reference -- we've got a Plaintiff's A

2     for ID, now we've got a Plaintiff's B for ID.

3        PLAINTIFF'S EXHIBIT B WAS MARKED FOR IDENTIFICATION

4        So we're at about 11.  I'm going to -- there's not a

5     question pending, is there?

6        MR. CARNATHAN:  I don't think so, Your Honor.  If

7     there is, I'll withdraw it from the testimony.

8        THE COURT:  Let's do that, okay?  So we'll consider

9     whatever -- if there is a question pending, and we don't read

10    back here for that reason, we'll say that that question is

11    withdrawn.

12        We're going to take our 11 o'clock break for fifteen

13    minutes.

14        MR. CARNATHAN:  Thank you, Your Honor.

15        THE COURT:  So I'll see you back here a little before

16    11:15, okay?

17        And as I've told other witnesses, once you're under

18    examination, and I hope you're going to be on and off today,

19    but during the break please don't consult with anyone

20    concerning the subject matter of your testimony, okay?

21        THE WITNESS:  Sure.

22        THE COURT:  You can talk about where the men's room

23    is, or many other kind of logistical issue, but not the

24    subject matter of your testimony.

25        THE WITNESS:  Sure.

1          THE COURT:  Very well.  Okay.  All right.  Fifteen

2     minutes.

3          THE CLERK:  All rise.  Court is in recess.

4               (Off the record at 10:59 a.m.)

5               (On the record at 11:24 a.m.)

6          THE COURT:  We're back on now.

7          MR. CARNATHAN:  We're good to go?  Okay.

8          MR. PERTEN:  Okay?

9          THE COURT:  We are ready to proceed.

10          MR. CARNATHAN:  Thank you, Your Honor.

11                 RESUMED DIRECT EXAMINATION

12     BY MR. CARNATHAN:

13          Q.   Mr. Zhukovskiy, have you ever testified in a court

14     before?

15     A.   I have, yes.

16          Q.   How many times?

17     A.   A few times.

18          Q.   Yeah?  What sorts of matters?

19     A.   Traffic ticket violation, parking ticket violation, those

20     matters.

21          Q.   I admit, I lost track a bit of where I was.  Did I

22     ask you when -- when did construction start on your project?

23     A.   The construction started sometimes (sic) in 2012.  I want

24     to say maybe -- maybe June.

25          Q.   Okay.  And do you recall about when construction was

 1  complete?

 2  A.   Yes.  The construction was complete in 2015, in the

 3  August-September time frame.

 4       Q.   Sorry, did you say 2015?

 5  A.   2015, yes.  No, I apologize.  It's not 2015, it's 2014.

 6       Q.   Well, am I right that the house --

 7  A.   '13, I apologize.  '13.  I need to get my numbers

 8  straight.  So it started in 2012, it ended approximately a

 9  year later, so it was 2013, September -- August-September of

10  2013.

11       Q.   Okay.  And when did the house actually sell?

12  A.   I believe that the closing was sometimes in April of

13  2014.

14       Q.   Okay.  Before construction began, did you have a

15  construction budget?

16  A.   There was a construction budget which was included with

17  the -- the loan application to the Rockland Trust.

18       Q.   All right.  And who provided the construction

19  budget?

20  A.   Mr. Kagan provided the construction budget.

21       Q.   About how much was it?

22  A.   It was $1.2 million.

23       Q.   And did you discuss it with him before construction

24  started?

25  A.   I did not.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1     Q.   During the time the construction was ongoing, from

2  mid-2012 until August or September of 2013 -- did I get that

3  right?

4  A.   Yes.

5     Q.   Did Mr. Kagan tell you about any construction cost

6  overruns?

7  A.   No.

8     Q.   Did he ever ask you to approve any construction cost

9  overruns?

10 A.   No.

11    Q.   Did he ever ask you to approve any upgrades to the

12 property?

13 A.   No.

14    Q.   Did there ever come a point where Mr. Kagan did come

15 to you with construction cost overruns?

16 A.   Not construction cost overruns.  I believe that towards

17 the end of the project the money from the loan were exhausted

18 and it was necessary to continue paying on our loan

19 obligation.  So there might have been a couple of times when

20 we were asked to -- I was asked to deposit some money to -- to

21 keep us afloat.

22    Q.   What happened shortly before the closing?

23 A.   Shortly before the closing, Mr. Kagan -- or somebody from

24 his office -- informed us that there were some cost overruns.

25 I do not believe that the numbers were given to us at the --

1    at that time, but he did send me a couple of invoices, some

2    large invoices.

3         Q.   How much were the cost overruns that he presented to

4    you shortly before closing?

5    A.   I want to say it was in excess of $100,000 or so.

6         Q.   Do you remember signing an affidavit back in

7    November 2015?

8    A.   Yes.

9             MR. CARNATHAN:  Do we have this one loaded up?

10   A.   So I just want to make -- I just want to clarify

11   something.  We were talking about --

12            MR. PERTEN:  Your Honor, there's no question pending.

13            THE COURT:  Yeah.  There's -- well, there's no

14   question pending, just hold on.

15   BY MR. CARNATHAN:

16        Q.   What would you like to clarify, Mr. Zhukovskiy?

17   A.   I would like to clarify the timing of those cost

18   overruns, when they were presented to me.  So there were two

19   instances where the cost overruns were presented.  You asked

20   me if it was presented, with the cost overruns prior to the

21   closing and I gave you the number of a little over $100,000.

22   There were -- the bulk of the cost overruns were presented to

23   me after the closing date, on April 26.

24        Q.   Okay.  So shortly before closing, you were informed

25   of about 100,000 in cost overruns and then after the closing

 1   there were more; is that what you're saying?

 2   A.   That is correct, yes.

 3        Q.   And about how much were the cost overruns that were

 4   first disclosed to you after the closing on the house?

 5   A.   So the total number of cost overruns which were presented

 6   to mein -- a few weeks before April 26 and on the April 26

 7   date were $510,000.

 8        Q.   Okay.  Did Mr. Kagan provide any explanation --

 9        THE COURT:  I'm sorry.  Did you say 500-some

10   thousand?

11        THE WITNESS:  5 -- $510,000, yes.

12        THE COURT:  Okay.  And what year?  Did you testify?

13        THE WITNESS:  It is in 2014, so --

14        THE COURT:  2014, April --

15        THE WITNESS:  April --

16        THE COURT:  -- 2014.

17        THE WITNESS:  That's right.  April 26 of 2014.

18        THE COURT:  Okay.

19        THE WITNESS:  Yes.

20   BY MR. CARNATHAN:

21        Q.   All right.  So just to review, the construction had

22   ended in August-September of 2013?

23   A.   Correct.

24        Q.   And you're hearing about $510,000 in cost overruns

25   for the first time in April of 2014; do I have that right?

1   A.    That is correct.

2        Q.    Did Mr. Kagan offer any explanation as to what

3   constituted these cost overruns?

4   A.    He -- yes.  He -- he -- he explained -- he didn't give

5   us -- he didn't give you just the number.  He -- those --

6   those cost overruns were itemized, yes.

7        Q.    Do you recall what any of the itemized overruns

8   consisted of?

9   A.    I don't remember, but I remember there was a large --

10  large amount for I believe it was either ProExcavation or KDC,

11  there was a large amount for unpaid invoices to other

12  contractors, which were never provided, but it was just from

13  Mr. Kagan's memory, as well.

14       Q.    Do you remember about how much the line item was for

15  ProExcavation?

16  A.    I do not, but perhaps you could refresh my memory.

17            MR. CARNATHAN:  Can I have paragraph 9 of Mr.

18  Zhukovskiy's affidavit?  The page -- the second page.

19            MR. PERTEN:  Your Honor, I'd object to refreshing

20  with an affidavit.  If this witness doesn't remember, he

21  doesn't remember.  He's got a sworn statement that he now

22  doesn't remember.

23            THE COURT:  Yeah, under 612 he can refresh him with

24  anything he wants.  But I -- the way you're going to have to

25  do this is -- it appears that you've exhausted his memory.

1    Show him what it is you'd like to refresh his memory with.

2    Mr. Perten, of course, can see that at the same time, but

3    don't leave it up on the screen.

4              MR. CARNATHAN:  Sure.

5              THE COURT:  All right?

6              MR. CARNATHAN:  Yeah.

7              THE COURT:  He gets to refresh.  Does it refresh your

8    memory, yes or no?  What's your memory, as refreshed?  Okay.

9              MR. CARNATHAN:  All right.  So --

10             THE COURT:  Okay.  Yes, you may.

11             MR. PERTEN:  Excuse me, Your Honor.  I'm sorry.  I'm

12   not trying to be obstreperous here.  I thought that he would

13   show him the paragraph that he wants to show him, now he's

14   proposing to hand him the entire document.  So --

15             THE COURT:  I don't know what he's doing.

16             MR. PERTEN:  Well, that's what he just said.  He's --

17             THE COURT:  Well, he's walking towards the witness

18   with the document that he wishes to use to refresh the

19   witness' memory.  He's permitted to do that.  He's not going

20   to leave it there.  He can show it to him, he can look at it,

21   then the next question is, is your memory refreshed?  After he

22   takes it away though, right?

23             MR. PERTEN:  Okay.

24             THE COURT:  Show it, take it away, is your memory

25   refreshed.  Back to the podium, yes or no, what's your memory

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1   as refreshed?  And under 612 you have the right to see that

2   document, you have the right to mark it, you have the right to

3   cross-examine with it, you have the right to introduce it into

4   evidence.  Or such portion as you deem appropriate to

5   introduce into evidence, okay?

6           MR. CARNATHAN:  All right.

7           MR. PERTEN:  Thank you.

8           THE COURT:  All right.  Now you're going to say you

9   don't want to do it, right?  You better do it.

10          MR. CARNATHAN:  All right.  So which one is it?

11  Should I mark this one for identification?

12          THE COURT:  What is that?

13          MR. CARNATHAN:  This is an affidavit of Dmitry

14  Zhukovskiy that was marked at his deposition as Zhukovskiy

15  Exhibit 3.

16          THE COURT:  All right.

17          MR. CARNATHAN:  Should I mark it as Plaintiff's B for

18  the purpose of the trial?

19          THE COURT:  I think we're up to C --

20          MR. CARNATHAN:  We're up to C?

21          THE COURT:  -- for identification.  Plaintiff's C for

22  identification.

23      PLAINTIFF'S EXHIBIT C WAS MARKED FOR IDENTIFICATION

24          THE CLERK:  Thank you.  Okay.

25          MR. CARNATHAN:  All right.  Show you that.

1    (Indiscernible) there.

2    BY MR. CARNATHAN:

3         Q.   So Mr. Zhukovskiy, having shown you the affidavit

4    marked as Plaintiff's Exhibit C for identification, is your

5    memory now refreshed concerning how much of the $510,000 was

6    for work allegedly performed by ProExcavation?

7    A.    Yes.

8         Q.   How much was that figure?

9    A.    $170,000.

10        Q.   Hundred and how much?

11   A.    $170,000.

12        Q.   Thank you.  Were you still friends with Mr. Kagan

13   when all this happened?

14             MR. PERTEN:  Can we take this --

15             MR. CARNATHAN:  Bill, yeah.  Sorry.

16             THE COURT:  What was that?

17             MR. PERTEN:  That was the affidavit that --

18             THE COURT:  Yeah.  So the whole purpose is to not

19   leave a document that's not in evidence in front of the

20   witness, okay?

21             MR. CARNATHAN:  Right.

22             THE COURT:  And you have a copy, right, Mr. Perten --

23             MR. PERTEN:  Yes, I do.

24             THE COURT:  -- of what they showed?  Okay.

25   BY MR. CARNATHAN:

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

 1      Q.   Were you still friends with Mr. Kagan when all this

 2   happened?

 3   A.   Yes, we were.

 4      Q.   Did you remain friends after it happened?

 5   A.   We remained in a friendly basis, yes.

 6      Q.   Okay.

 7           MR. CARNATHAN:  I have nothing further for Mr.

 8   Zhukovskiy, Your Honor.

 9           THE COURT:  Okay.

10                      CROSS-EXAMINATION

11   BY MR. PERTEN:

12      Q.   Good morning, Mr. Zhukovskiy.

13   A.   Good morning.

14      Q.   Now, you told us this morning that Mr. Lipetsker is

15   your uncle, correct?

16   A.   Mr. Lipetsker is -- is my -- I presume it is called

17   uncle, yes.

18      Q.   So obviously you've known him all your life?

19   A.   I have known him most of my life, yes.

20      Q.   In fact, your family and his family are close; is

21   that not correct?

22   A.   His family is -- his wife is my mother's sister.

23      Q.   And they babysat for you when you were a little

24   child, correct?

25   A.   Yes, they have.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1        Q.   Now, you've also told us that you've invested in

2    multiple real estate ventures with Mr. Lipetsker?

3    A.   Yes, I have.

4        Q.   And as to Mr. Filippov, you've known him since prior

5    to 2012; isn't that correct?

6    A.   That's correct, yes.

7        Q.   And Mr. Maiden, Attorney Maiden, represented you or

8    companies you were involved in on multiple real estate

9    ventures; isn't that correct?

10   A.   I do not believe that that is correct, no.  Mr. Maiden

11   had closed -- had represented the bank in some of my closings,

12   yes, but he never personally represented me.

13       Q.   So Mr. Maiden was involved in some capacity on many

14   of the ventures that you were involved in?

15   A.   That is correct, yes.

16       Q.   Okay.  And your relationship with Mr. Maiden, you do

17   things outside of the legal realm with him; isn't that

18   correct?

19   A.   Can you please be a little bit more specific?

20       Q.   Yeah.  You socialize with him outside of a

21   professional relationship?

22   A.   I occasionally attend birthdays, yes.

23       Q.   And in fact, your wife is an associate attorney at

24   his office; isn't that correct?

25   A.   I do not know her title now.



```
 1            Q.   Well, she is a lawyer, is she not?

 2    A.    She is a lawyer, yes.

 3            Q.   And she works at his office as a lawyer?

 4    A.    And she does work at his office, yes.

 5            Q.   Okay.  Now, sir --

 6            MR. PERTEN:  Can you bring up, please, Exhibit number

 7    7?  Scroll down.  Thank you.

 8    BY MR. PERTEN:

 9            Q.   Mr. Zhukovskiy, before we look at Exhibit number 7,

10    you were also present in the courtroom yesterday when Mr.

11    Filippov was testifying; is that correct?

12    A.    That is correct, yes.

13            Q.   Okay.  So you heard his story, correct?

14    A.    I was here, yes.

15            Q.   Okay.  Now, Exhibit 7, sir, was the template that

16    you testified that Mr. Kagan sent you to use in preparing the

17    iPad version, which was handed out at the October 2012

18    meeting, correct?

19    A.    That is not correct.

20            Q.   Okay.  What is Exhibit 7, sir?

21    A.    Exhibit 7 is the file that -- or portion of the file

22    which Mr. Kagan forwarded to me and indicated that this is

23    something that he used in prior presentations.

24            Q.   Okay.  And certainly the numbers that were included

25    in this version which we have up on the screen now, those
```

1    numbers have nothing to do with Lyman-Cutler, correct?

2    A.    These numbers have nothing to do with Lyman-Cutler,

3    that's correct.

4         Q.    Okay.  So he forwarded you a document from a

5    different project and asked you to create some sort of a new

6    template that covers the same type of material, correct?

7    A.    He forwarded me the file which he indicated was the file

8    that he -- the presentation that he used in prior

9    presentations.

10        Q.    Okay.

11             MR. PERTEN:  Can you bring up Exhibit 8, please?

12   BY MR. PERTEN:

13        Q.    Now, we looked at Exhibit 8 and the three estimated

14   project financials and risk analyses earlier this morning,

15   right?

16   A.    That is correct, yes.

17        Q.    That title, estimated project financials and risk

18   analysis, that's a title that you gave this, correct?

19   A.    That is correct.

20        Q.    And you gave it because you understood, did you not,

21   that what was being reflected here were estimated project

22   financials, correct?

23   A.    That is not correct.

24        Q.    And in fact, sir, the entire column to the left,

25   which is project scenario (sic) and assumptions, sir, those

1    are all estimates; isn't that true?

2    A.   It is not true.

3        Q.   Okay.  Sir, do you recall your deposition was taken

4    in this case?  Do you recall that?

5    A.   Can you refresh my memory?

6        Q.   Sure.  Do you recall you came to my office and you

7    gave a deposition in this matter?

8    A.   I do remember that, yes.

9            MR. PERTEN:  Your Honor?

10           THE COURT:  If you have one, thank you.  Thank you

11   very much.

12   BY MR. PERTEN:

13       Q.   Now, sir, if I could draw your attention to page 122

14   of your deposition, we were looking at the spreadsheets at

15   that time, and starting at line 8 I said, "Which numbers were

16   hard numbers in this?"  Your answer was, "All of the numbers

17   on the right to the column called project scenario and

18   assumptions, all of those numbers are exact numbers, based on

19   the assumptions entered into the first two columns."

20   Question:  "I'm sorry, all of the number in the project

21   scenario and assumptions are what?"  Answer:  "All the number

22   on the project scenarios and assumptions, these are all

23   estimated numbers."  Did I read that correctly?

24   A.   Yes, you did.

25       Q.   Okay.  And you, before you testified at the

1    deposition, sir, you swore an oath to be truthful; isn't that

2    correct?

3    A.    That is correct, yes.

4         Q.    Now, in order to prepare, sir, for today's testimony

5    did you -- you spoke with either Mr. Carnathan or somebody in

6    his office; isn't that correct?

7    A.    Yes, I did.

8         Q.    And he went through with you -- excuse me, was it

9    Mr. Carnathan?

10   A.    Yes.

11        Q.    And he went through with you what your anticipated

12   testimony would be; isn't that correct?

13   A.    That is not correct.

14        Q.    He went through with you what he expected you to be

15   asked; isn't that correct?

16   A.    That is not correct.

17        Q.    Okay.  Did you take notes at that meeting?

18   A.    I did not.

19        Q.    Okay.  In order, sir, to prepare for this deposition

20   today did you take notes for yourself?

21   A.    I did take notes for myself.

22        Q.    Okay.  Sir, let me hand you what has been marked as

23   Plaintiff's Exhibit B, as in -- is that correct -- Plaintiff's

24   Exhibit B for identification.  Are those -- sorry.  Are those

25   the notes that you took to help you remember what you wanted

1  to say in today's testimony, sir?

2  A.    These are the notes that I have taken by looking at my

3  emails and the information that I had provided to you during

4  my deposition and the summary of all of these exhibits, to

5  refresh my memory, yes.

6      Q.    And these were notes that you took and brought with

7  you to court this morning, correct?

8  A.    That is correct, yes.

9      Q.    And when you were testifying this morning, you were

10  reviewing those to make sure your testimony was accurate,

11  correct?

12  A.    That is not correct.

13      Q.    You certainly had those out in front of you on the

14  desk; is that not correct?

15  A.    They were in my folder, that's correct.

16      Q.    Okay.

17          MR. PERTEN:  Can you turn this on, please?

18          THE CLERK:  Sure.  It should be on.

19          MR. PERTEN:  Is there a button, a power button?

20          THE COURT:  Does everybody have a copy of this?

21          MR. PERTEN:  This is the document that he had at his

22  desk.  This is the only copy.

23          THE COURT:  I understand.  Let's just take a two-

24  second break and have Elizabeth copy that for us.  She's --

25  there's a machine right in the back, so.



1              Two-sided, are there four pages?

2              MR. PERTEN:  Whatever's easier.  Four's probably

3     easier than two-sided.

4              THE COURT:  All right.  So we'll just -- do you want

5     to pursue something else, or --

6              MR. PERTEN:  Sure.

7              THE COURT:  It --

8              MR. PERTEN:  I can continue and we can come back to

9     that if that facilitates --

10             THE COURT:  It will be a minute or two.

11             MR. PERTEN:  Do you need your clerk here, though?

12             MR. PERTEN:  No, I don't.  It's okay.

13    BY MR. PERTEN:

14        Q.   Now, Mr. Zhukovskiy, we were looking at Exhibit 8, I

15    believe.  And now we can't bring it up.

16             MR. PERTEN:  I think we should wait, Your Honor.

17             THE COURT:  That's fine.  We'll just wait.  She

18    really will be just a second.

19                              (Pause)

20             MR. PERTEN:  Thank you.

21             THE CLERK:  You've got the original one there.

22             MR. PERTEN:  Great.  Thank you.

23             THE COURT:  No, I'm not taking (indiscernible).

24    Thank you.

25             THE CLERK:  You're welcome.

1          MR. PERTEN:  May I proceed, Your Honor?

2          THE COURT:  Yes, of course.

3          MR. PERTEN:  Thank you, Your Honor.

4    BY MR. PERTEN:

5      Q.   Mr. Zhukovskiy, do you now have what we've marked as

6    Platiff's -- which has been marked as Plaintiff's Exhibit B

7    for identification?

8    A.   Yes.

9          THE COURT:  Does he --

10   BY MR. PERTEN:

11     Q.   And these are --

12         THE COURT:  -- does he -- hold on.  Does he have it?

13   You want him to have it?

14         MR. PERTEN:  I think --

15         THE COURT:  Counsel?

16         MR. PERTEN:  -- it's up on the screen.

17         THE COURT:  Oh, it's on the screen.

18         MR. PERTEN:  Yeah.

19         THE COURT:  Do you want him to have the paper?

20         MR. PERTEN:  I thought the clerk gave him --

21         THE CLERK:  I have the paper.

22         MR. PERTEN:  Yeah.

23         THE COURT:  She took it away.

24         MR. PERTEN:  Oh, I'm sorry.

25         THE COURT:  She's going to give it back to him now,

```
 1    as long as that's your --

 2             MR. PERTEN:  (Indiscernible).

 3             THE COURT:  That's good.  Thank you.

 4             THE CLERK:  Thank you.

 5    BY MR. PERTEN:

 6        Q.  And Mr. Zhukovskiy, do you now have Plaintiff's B

 7    for identification, B as in boy?

 8    A.  Yes.

 9        Q.  And these are notes that you took prior to today to

10    organize your thoughts, correct?

11    A.  That is correct, yes.

12        Q.  And you brought them with you today to make sure

13    that you wouldn't forget to say anything; isn't that correct?

14    A.  That is not correct.

15        Q.  Why did you bring them?

16    A.  I brought them with me to make sure that we have a speedy

17    trial, and in case -- if there are issues and I'm not able to

18    answer questions just by looking at the exhibits, I brought

19    these notes with me to facilitate me interpreting the numbers

20    that I was expected to show.

21        Q.  So you brought it with you to facilitate your

22    understanding of the numbers; is that correct?

23    A.  It's -- it is a summary of the exhibits, which had been

24    provided to you before.  And this is just a nifty way for me

25    to summarize this information, yes.
```



1    Q.   And sir, if we turn to the first page of this

2   exhibit, the one that has the little sticker on it --

3   A.   Yes.

4    Q.   -- in the upper right-hand corner, those are numbers

5   that you looked -- that you wrote down relating to the Hyde

6   Avenue project, correct?

7   A.   That is correct, yes.

8    Q.   And these are the numbers that you just testified

9   about, correct?

10   A.   That is correct, yes.

11    Q.   And then below that, below the numbers, there's some

12   more notes and more numbers relating to the Hyde Avenue

13   project, correct?

14   A.   Can you point me to that?

15    Q.   Right there, it says, "taxes matched budget", do you

16   see that?

17   A.   Yes.

18    Q.   And that was a note to yourself, to let you know

19   that the taxes met the budget, there was no increase in taxes,

20   correct?

21   A.   No, that's not what it means.

22    Q.   What does it mean?

23   A.   It means that I looked at the tax return and I looked at

24   the notes that I had -- at the summary of the checks that were

25   issued.  And I confirmed that the numbers shown on the tax

1    return are equivalent to the numbers that I had as a tally of

2    the checks.  So that is a note for me to -- that -- that this

3    was one of the checks that I had performed yesterday.

4         Q.   Now, sir, you also told us in your direct testimony,

5    sir, that when you asked Mr. Kagan whether the numbers in the

6    spreadsheet that you were creating were accurate, he said it

7    was consistent with his expectations; do you recall that

8    testimony?

9    A.   Yes.

10        Q.   Okay.  At that time, Mr. Kagan did not tell you what

11   his expectations were; isn't that correct?

12   A.   That is not correct.

13        Q.   Okay.  He didn't tell you exactly what kind of a

14   house he was going to build, did he?

15   A.   Can you please specify the question a little bit more?

16   So he did tell me that he was going to build a large house in

17   Brookline, so he did specify what kind of house he was going

18   to build.

19        Q.   Well you understood, sir, at that point that there

20   were no house plans just yet; isn't that correct?

21   A.   That is correct, yes.

22        Q.   Okay.  And you also told us that the carrying costs

23   was something that was calculated based upon the formulas that

24   you input into the Excel spreadsheet, correct?

25   A.   Carrying costs were -- was the number that was calculated

1    based on how the interest calculations work at the bank, and

2    the amounts of the real estate taxes and the insurance which

3    would be associated with carrying this project forward, yes.

4         Q.   And you also told us -- we were looking at Exhibit

5    8.

6              MR. PERTEN:  Can we bring that up again, please?

7    BY MR. PERTEN:

8         Q.   So when you looked at Exhibit --

9              MR. PERTEN:  Can you scroll down to the loan

10   disbursement summary sheet?  Thank you.

11   BY MR. PERTEN:

12        Q.   At your deposition do you recall that you drew a

13   distinction between a loan disbursement schedule and a

14   construction budget?

15   A.   I don't recall that, no.

16        Q.   Okay.  Do you understand that there is something

17   that's a construction budget and a construction loan

18   disbursement estimate are two different things?

19   A.   Yes, I do understand that.

20        Q.   Okay.  So would you agree with me, sir or --

21             MR. PERTEN:  Strike that.

22   BY MR. PERTEN:

23        Q.   Do you agree with me, sir, that this construction

24   loan distribution schedule is not the same thing as a

25   construction budget?  That's true; isn't that correct?

1   A.   I agree.

2        Q.   Thank you.  Now, you told us that you used -- when

3   creating the loan, construction loan distribution schedule,

4   that you used the Hyde Avenue distribution schedule as a

5   model, correct?

6   A.   That is correct, yes.

7        Q.   And the Hyde Avenue construction loan was $1.2

8   million; isn't that correct?

9   A.   I do not remember.  It might have been 1.2 or 1.14,

10  something like that.  1.2, probably.

11       Q.   Okay.  Well, it certainly wasn't more than 1.2;

12  isn't that correct?

13  A.   It was not more than 1.2, no.

14       Q.   Okay.  And so the numbers that you inserted to make

15  this 1.5, that came from somewhere else; isn't that correct?

16  A.   That is not correct, no.  If you look at the column

17  right -- so there are -- if you start looking at this exhibit,

18  the first column under heading description, these are the

19  various elements of the construction project that are

20  happening.  And next column, which -- which titled

21  percentages, so there's little percent sign on top -- these

22  are the percentages of the loan allocated to each stage of the

23  construction project.  And in order for you to develop these

24  numbers, you would take a total loan amount of $1.5 million

25  and you would multiply it by the appropriate percentage.



1      For example, the first line item called plans and

2   permits, it says three percent.  So three percent of the loan

3   would be advanced by the bank at the time when plans and

4   permits are -- plans and permit stage is complete.  So you

5   would take three percent and multiply it by $1.5 million, and

6   you would come up with an amount of $45,000, and that's the

7   amount the bank would release upon the completion of that

8   stage.

9      Q.   And you know that, sir, because you've been involved

10   in other real estate projects where there is a construction

11   loan; isn't that correct?

12   A.   I know this because I was involved in Hyde Avenue

13   construction project --

14      Q.   Okay.

15   A.   -- where the situation was very similar in terms of loan

16   distribution.

17      Q.   And you also, sir, understand that before the bank

18   agrees to release any money it sends an inspector out there to

19   confirm that the work that is claimed was actually completed,

20   correct?

21   A.   I believe that it depends on the type of the

22   distribution.  For example, if -- if -- if a portion of

23   construction is completed, they would send an inspector to

24   make sure that this happened.  Or if the materials were

25   purchased, for example, if the windows were purchased, you

1    could also request reimbursement for that.  In this instance,

2    you would not need to request an individual to come in and

3    make sure that the windows have arrived, instead providing the

4    receipts would be sufficient evidence for the bank to release

5    the appropriate loan amount.

6        Q.   Sir, in terms of the Lyman-Cutler project, you'd

7    agree with me that you don't know what the relationship was

8    for the construction loan financing; isn't that correct?

9    A.   I'm not sure I understand the -- the question.

10       Q.   Sure.  You were not part of the negotiations with

11   Rockland Trust company for the construction loans on Lyman-

12   Cutler, correct?

13   A.   I was not, no.

14       Q.   Okay.  So the procedure that you've just outlined,

15   you don't know if that's the procedure for Lyman-Cutler or

16   not, correct?

17   A.   I do know that this would be the procedure.

18       Q.   Okay.  So you know that they send inspectors out,

19   correct?

20   A.   I know that they send inspectors out, yes.

21       Q.   Okay.  And you also understand, do you not, that the

22   construction loan disbursement schedule is an important

23   document that the bank relies upon in deciding how much money

24   to disperse, correct?

25   A.   I do not know that.



1      Q.   Okay.  Well, what did you understand the purpose --

2           MR. PERTEN:  Strike that.

3   BY MR. PERTEN:

4      Q.   You are aware, based on your experience with Mr.

5   Kagan that there are construction loans, correct?

6   A.   I am aware that there are construction loans, yes.

7      Q.   And you are also aware, are you not, that one of the

8   documents that needs to be submitted to the bank is a

9   construction loan disbursement schedule, correct?

10  A.   That is correct.

11     Q.   And you understand that that is a requirement of any

12  bank?

13  A.   As a matter of fact --

14     Q.   Before --

15  A.   -- strike that.  I -- I don't know what is required by

16  the bank to -- I don't think it is called -- for the bank

17  purposes, I do not think it is called the construction loan

18  distribution schedule.  I believe that it is called a

19  construction budget.

20  Again, I don't know how the house is built.  I'm pretty sure

21  that at first you build the foundation and then you build the

22  roof at the end.  So I would imagine that the reimbursement

23  for the foundation would be requested prior to the

24  reimbursement for the roof.

25          Q.   Sir, when you were active in the Hyde Avenue

```
 1    project, you understood that there was a construction budget

 2    provided to the bank to support the construction loan on that

 3    project, correct?

 4    A.    Yes.

 5         Q.   And you understood that the bank required such a

 6    thing; isn't that correct?

 7    A.    I understood that the bank required the construction

 8    budget in order for a loan --

 9         Q.   Sir --

10    A.    -- to be underwritten.

11         Q.   -- I didn't ask you for an explanation.  You

12    understood that, correct?

13    A.    I am clarifying what I understood.

14         Q.   I understand you want to clarify.  Please listen to

15    my question.  You understood that that was a document that was

16    required on the Hyde Avenue project --

17    A.    Yes.

18         Q.   -- by the bank?  And as far as you know, a similar

19    document was required for Lyman-Cutler; isn't that correct?

20    A.    As far as I know, I would imagine that the bank would

21    require a similar budget, yes.

22         Q.   Okay.  And you understand as well that it's

23    important that the budget that is being submitted be accurate;

24    isn't that correct?

25    A.    I have no such understanding.
```



1    Q.   Well, sir, you were the managing partner for Hyde

2    Avenue; isn't that correct?

3    A.   That is correct, yes.

4    Q.   And you submitted, as part of the construction loan

5    documents for Hyde Avenue a construction loan budget, did you

6    not?

7    A.   I submitted it to the committee to be reviewed, yes.

8    Q.   All right.  And you certainly --

9    A.   As a matter of fact -- I apologize.  As a matter of fact

10   I did --

11   Q.   Excuse me.

12        THE COURT:  No, hold on.

13   Q.   There's no question pending.

14        THE COURT:  Yeah.  Let me have a moment.

15        So I don't know if you were here yesterday when I

16   gave some instructions to the witness that was on the stand at

17   that time, but this is Mr. Perten's chance to ask questions on

18   cross.  And so he's going to be pretty much in control of this

19   process.

20        If you feel that you need to add to your answer, to

21   clarify, to expand, you can simply say that.  But answer his

22   question first.  And then he will either ask you to go ahead

23   and do that or he'll allow Mr. Carnathan to ask you to

24   elaborate later.

25        THE WITNESS:  Thank you, Your Honor.



```
1            THE COURT:  Okay.

2            MR. PERTEN:  Thank you, Your Honor.  Now I've lost my

3    train of thought, of course.  All right.

4    BY MR. PERTEN:

5        Q.   Now, sir, you certainly, when you submitted the

6    construction budget to the bank in Hyde Avenue, you certainly

7    submitted a document that you believed to be accurate,

8    correct?

9    A.   I submitted a proposed budget for the bank to review and

10   determine whether it was adequate and accurate.

11       Q.   Okay.  And you would not have submitted a budget for

12   the construction loan that you believed was inaccurate; isn't

13   that correct?

14   A.   That is correct.

15       Q.   Now, you testified this morning that originally you

16   were not planning on being at the October 25th meeting,

17   correct?

18   A.   That is correct.

19       Q.   And somebody asked you to attend; isn't that

20   correct?

21   A.   That is correct.

22       Q.   And you don't remember who that somebody was; isn't

23   that correct?

24   A.   I don't remember, but I believe that it was Mr. Kagan who

25   asked me --
```

1    Q.   All right.  You --

2    A.   -- after I had the conversation with him on October 24th,

3    asking if the presentation that I provided was adequate and

4    consistent with his expectations --

5    Q.   Sir, if you could stick with my question, please?

6    When you sent the email to Mr. Kagan and the others with the

7    draft presentation, Exhibit 8, you did not receive an email

8    back from Mr. Kagan affirming anything, anything in response

9    to that; isn't that correct?

10   A.   That is correct.

11   Q.   And so the only person other than Mr. Kagan that was

12   party to that conversation was just you and him, correct?

13   A.   That is not correct.  I'm going to clarify that, can I?

14   Q.   Well, sir was anybody -- you told us about a

15   telephone call.  Was anyone other than you and Mr. Kagan on

16   that phone?

17   A.   No.

18   Q.   Thank you.  Now, you understood also at the end of

19   this meeting, on October 25th, that no decisions had been

20   reached by the parties as to whether they were going to

21   proceed with the project; isn't that correct?

22   A.   That is correct.

23   Q.   Okay.  And in fact, that ended your involvement

24   until the following May; isn't that correct?

25   A.   That is correct.



1      Q.   You had no further conversations with Mr. Filippov

2    until May of 2013; isn't that correct?

3    A.   I might have had some conversations with him around May

4    25th, around this email exchange, maybe few days before.  So

5    where he asked me a question about the presentation, or gave

6    me a sense that he was working on this presentation, but

7    nothing -- nothing in between.

8      Q.   So just to be clear, as it relates to the Lyman-

9    Cutler project you had -- after you left that meeting, you had

10   no involvement having to do with the Lyman-Cutler project

11   until you spoke with Mr. Filippov in May of 2013; isn't that

12   correct?

13   A.   I have no recollection of any such involvement.

14     Q.   And is it fair to say, sir, that you don't know what

15   conversations may have happened between Mr. Filippov and Mr.

16   Kagan when -- after the October 25th meeting?  Isn't that

17   correct?

18   A.   That is correct.

19     Q.   Now, sir, we looked at --

20        MR. PERTEN:  Exhibit 31, please.

21   BY MR. PERTEN:

22     Q.   Exhibit 31 -- if you scroll down -- this is where

23   you were trying to get your hands around how much this would

24   cost if you did an outside developer, as opposed to Mr. Kagan;

25   do you remember that testimony?



1  A.    Yes.

2       Q.    Now, sir, you're not a builder, are you?

3  A.    I am not.

4       Q.    And you don't have a background in construction, do

5  you?

6  A.    I do not.

7       Q.    And when you were running numbers to determine how

8  much it would cost to have a developer do this project as

9  opposed to having Mr. Kagan do this, you didn't put the

10 project out to bid, did you?

11 A.    I did not, no.

12      Q.    You didn't consult with Mr. Kagan at all in the

13 presentation of your analysis as to how much it might cost to

14 have an outside developer do this?

15 A.    That is correct.

16      Q.    So these were assumptions that you made without

17 verifying them; isn't that correct?

18 A.    No, they were not.

19      Q.    Okay, sir.  Well, you didn't get a bid, correct?

20 A.    That is correct.

21      Q.    You didn't bring the plans to somebody -- a

22 construction professional, did you?

23 A.    I did not.

24      Q.    Okay.  You made certain assumptions to come up with

25 numbers, didn't you?



1   A.    I did, yes.

2        Q.    Okay.  And you didn't verify those assumptions in

3   any fashion, did you?

4   A.    That is correct.

5        Q.    Now, given that Kagan was the builder and Kagan was

6   the one that presented the numbers, why didn't you consult

7   with him?

8   A.    There was nothing to consult on.

9        Q.    Okay.  And you also told us that it was Mr. Kagan

10  who asked you to prepare the spreadsheets, correct?

11  A.    That is correct.

12       Q.    And given that Mr. Kagan was the one that was

13  working with you to prepare the spreadsheets, according to

14  your testimony, why is it that you were responding to Mr.

15  Filippov in terms of how to manipulate those numbers?

16  A.    Mr. Kagan -- during this meeting Mr. Kagan asked me

17  specifically to be present at this meeting to help Mr.

18  Filippov to understand these numbers.  And my interpretation

19  of this request was that when Mr. Filippov looks at the

20  spreadsheet and asks me questions that I was asked to help him

21  understand these numbers by changing certain inputs in the

22  spreadsheet and seeing how things are changing.

23       Q.    Now, sir, you understood when you started looking at

24  this about May 4th, 2013, that what was prompting this request

25  was that there had been a request by Mr. Kagan relating to an

1    expansion of the project; do you recall that?

2    A.    I -- yes.

3        Q.    And you told us at deposition you didn't remember

4    exactly what was being proposed for expansion, correct?

5    A.    Absolutely, yes.

6        Q.    Absolutely you recall, or absolutely --

7    A.    I --

8        Q.    -- you don't recall?

9    A.    -- I do not recall what this expansion was.

10        Q.    Okay.  And so when you told us that the expansion

11    that was contemplated was $100,000, that was based on

12    information that Mr. Filippov provided you, not Mr. Kagan;

13    isn't that correct?

14    A.    Mr. Filippov provided me the -- provided me with the

15    scenario where the costs -- costs an additional $100,000 to

16    expand the project, yes.

17        Q.    Okay.  But you had no personal knowledge, one way or

18    the other, whether that number was right or wrong; isn't that

19    correct?

20    A.    I had no personal knowledge, no.

21        Q.    Okay.  Let's talk for a moment about Hyde Avenue.

22    Now, Hyde Avenue, in contrast to Lyman-Cutler, was not a new

23    construction; isn't that correct?

24    A.    I'm not sure.

25        Q.    Okay, let's try this.  There was an existing house

1    on the lot when it was purchased, correct?

2    A.    Yes.

3         Q.    And that house was not totally demolished, was it?

4    A.    It was not totally demolished.

5         Q.    There was some additions that were added to it,

6    correct?

7    A.    That is correct.

8         Q.    So again, in contrast to Lyman-Cutler, where the

9    existing house was entirely demolished and a new house was

10   built, Hyde Avenue involved a project where the house was --

11   remained, and additions were added to it, correct?

12   A.    I don't know.

13        Q.    Well, sir, you were the managing partner and you

14   didn't know what the project was?

15   A.    Oh, no.  I know what the -- what the project was for Hyde

16   Avenue, I don't know what the plans were for Lyman-Cutler.  I

17   know it was building a house.  Whether it was completely

18   demolishing one house and building another one, I don't know

19   what the plans were.

20        Q.    Okay, sir.  So you told us this morning that at the

21   October meeting Mr. Kagan presented the project and said the

22   house was going to be demolished and two ones -- two new ones

23   were going to be built; do you recall that testimony?

24   A.    Yes.

25        Q.    So in fact, sir, you understood, at least based on

1    the information that you received at the initial meeting that

2    the Lyman-Cutler existing house was going to be knocked down,

3    correct?

4    A.    Whether completely or partially I don't know.

5         Q.    Okay.  And is it your testimony, sir, that you did

6    not talk to your uncle about the project?

7    A.    That is not my testimony.  I'm sure I talked to my

8    uncle --

9         Q.    Okay.

10   A.    -- about this project.

11        Q.    And Mr. Lipetsker never told you that Lyman-Cutler

12   project involved knocking down a house and building two new

13   ones?

14   A.    I -- I probably learned about it at some point, yes.

15        Q.    Okay.  Now, your total investment, as I understood

16   your testimony, was about $155,000 in the Lyman -- excuse me,

17   in the Hyde Avenue project, correct?

18   A.    That sounds right, yes.

19        Q.    And you said thirty percent of $500,000 is what you

20   told us this morning; do you recall that testimony?

21   A.    I agreed to invest thirty-one percent, yes.

22        Q.    Okay.  And in fact, at the end of the project you

23   got back your investment plus some profit; isn't that correct?

24   A.    That is correct.

25        Q.    And during the project, Kagan did provide you with

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    some invoices, correct?

2    A.    That is correct.

3        Q.    And at the end of the project, he provided you with

4    a list of all the expenses that were incurred in this project;

5    isn't that correct?

6    A.    He outlined the expenses that were -- the additional

7    expenses by -- so he -- he and I doing -- so how that

8    happened, or --

9        Q.    No, sir.  Let me ask the question this way.  You

10   were provided with a list of every subcontractor and what was

11   paid to every subcontractor; were you not?

12   A.    That is correct.

13       Q.    And you went through that, in fact, and you put

14   little check marks next to the list to make -- once you

15   confirmed that everything was accurate; isn't that correct?

16   A.    That is correct.

17       Q.    Okay.  And you have no information that any of those

18   charges was somehow fictitious or invented; isn't that

19   correct?

20   A.    That is correct.

21       Q.    Okay.  And at the end of that project, sir, you

22   never contacted Mr. Kagan or wrote him --

23           MR. PERTEN:  Strike that.

24   BY MR. PERTEN:

25       Q.    You never wrote anything to Mr. Kagan saying that



```
 1    you were objecting to the way the finances were handled on

 2    this project, correct?

 3    A.    That is correct.

 4         Q.    You never sent him any kind of a demand objecting to

 5    the costs of the project; isn't that correct?

 6    A.    That is correct, too.

 7         Q.    You never told him that his numbers were wrong;

 8    isn't that correct?

 9    A.    That is correct.

10         Q.    And you told us at deposition, sir, that you asked

11    for information that you sometimes didn't get; do you recall

12    that?

13    A.    That is correct, too.

14         Q.    And when you were not getting that information, you

15    didn't sending any emails or threatening letters; isn't that

16    correct?

17    A.    That is correct.

18         Q.    You never threatened Kagan with suit or in fact

19    filed suit against him; isn't that correct?

20    A.    That is correct.

21         Q.    And you saw every check that was written on Hyde

22    Avenue; isn't that correct?

23    A.    That is correct.

24         Q.    And in fact, you had no further --

25         MR. PERTEN:  Strike that.  The first time -- strike that.
```



1    BY MR. PERTEN:

2        Q.   Until you were contacted by Mr. Filippov, you had

3    never provided an affidavit or anything complaining about Hyde

4    Avenue; isn't that correct?

5    A.   That is correct.

6        Q.   Okay.  So the affidavit that you signed was signed,

7    I'll represent to you, on November 11th, 2015; does that

8    square with your memory?

9    A.   Barely.

10       Q.   Well, let me show you this and see if this refreshes

11   your --

12   A.   Yes.

13       Q.   Having now looked at the affidavit that you

14   provided, does that refresh your recollection that you signed

15   it in November 2015?

16   A.   That is correct.

17       Q.   And so the project, the Hyde Avenue project, was

18   completed sometime in 2014, correct?

19   A.   Correct.

20       Q.   And you did nothing for over a year, until contacted

21   by Mr. Filippov; isn't that correct?

22   A.   That -- that's correct.

23       Q.   And you also understood, sir, that -- well, more

24   than understood -- Mr. Lipetsker was also an investor on the

25   Hyde Avenue project; isn't that correct?



 1   A.    Yes, I did understand that.

 2        Q.    And to the best of your knowledge, Mr. Lipetsker

 3   never complained about the way he was being treated on the

 4   Hyde Avenue project; isn't that correct?

 5   A.    I don't know whether he complained or not.

 6        Q.    All right.  Well, he certainly never complained in

 7   your presence; isn't that correct?

 8   A.    He expressed his concerns that the profit that was

 9   generated was not the profit that we expected to generate.  So

10   again --

11        Q.    Okay.  So part of your dissatisfaction was that the

12   profit that was generated was not as large as you had hoped

13   for; is that correct?

14   A.    Part of my dissatisfaction --

15        Q.    Sir, yes or no.  Part of your dissatisfaction was

16   you didn't make as much money as you had hoped to; isn't that

17   correct?

18   A.    Correct.

19        Q.    Now, I believe you told us that Hyde Avenue started

20   in 2012; is that correct?

21   A.    That is correct.

22        Q.    And the failure to get information when you

23   requested it, that was almost immediately; isn't that correct?

24   A.    That is not correct.

25        Q.    When did that start?




1    A.    It started towards the end of the project.  I want to say

2    maybe March or April of 2013.

3           Q.    March or April of 2013.  So when Mr. Filippov

4    contacted you in May of 2013, you didn't tell him that, hey,

5    beware of this guy, Kagan, because I'm having problems with

6    him already; isn't that correct?  Or words to that effect?

7    A.    That is correct; I never told him anything.

8           Q.    And you didn't say anything to your uncle, Mr.

9    Lipetsker, about any problems that you were experiencing while

10   working with Mr. Kagan; isn't that correct?

11   A.    That is not correct.

12          Q.    Okay.  You just don't remember what you said to him?

13   A.    I remember what I said to him.

14          Q.   To Mr. Lipetsker?

15   A.    To -- to Mr. Lipetsker, absolutely.

16          Q.    So now you remember that you spoke with him?

17   A.    About Hyde Avenue?

18          Q.    About Hyde Avenue, yes.

19   A.    I did speak to him about Hyde Avenue.  He was another

20   investor, absolutely.

21          Q.    Okay.  And Mr. Lipetsker, to the best of your

22   knowledge, never said anything about this problem to -- in

23   your presence -- to Mr. Filippov; isn't that correct?

24   A.    That is correct.

25          Q.    So certainly, if there was any dissatisfaction, to

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    the best of your knowledge, Mr. Lipetsker never shared that

2    with Mr. Filippov; isn't that correct?

3    A.    That is correct.

4        Q.    Now, at the time you gave your affidavit in November

5    2015, sir, you had no idea what the dispute was between the

6    Lyman-Cutler members; isn't that correct?

7    A.    That is correct.

8        Q.    So lawyer calls you, or Mr. Filippov contacts you,

9    asks you for an affidavit, and you just do it without having

10   any idea what they're fighting about; is that correct?

11   A.    That is correct.

12       Q.    And the reason you did that is because Mr. Lipetsker

13   is your uncle and Mr. Filippov is somebody you've known for

14   some time; isn't that correct?

15   A.    I don't know what the reason for doing that was.

16       Q.    And certainly, as of November of 2015 you were

17   disappointed at the amount of money that you had made on the

18   Hyde Avenue project; isn't that correct?

19   A.    That is not correct.

20       Q.    You weren't disappointed about the money you made on

21   Hyde project?

22   A.    I was not disappointed, no.

23       Q.    So you were okay with the result?

24   A.    I wasn't okay.

25       Q.    I'm sorry?



1    A.    I was not okay with this.

2         Q.    So you weren't disappointed, but you weren't okay;

3    you were something in the middle?

4    A.    I was something in the middle, yes.

5         Q.    And sir, and so somebody calls you out of the blue,

6    asks for an affidavit, and you don't even ask them what the

7    dispute is about?

8    A.    I'm trying to be helpful, so no.

9              MR. PERTEN:  Your Honor, if you just give me a

10   second, please?  Your Honor, that's all I have for this

11   witness.

12             THE COURT:  Okay.

13             MR. CARNATHAN:  Your Honor, I believe we marked the

14   affidavit as -- I've forgotten.  Plaintiff's Exhibit C for

15   identification?

16             THE COURT:  I think it was A, but I'm not certain.

17             THE CLERK:  It was C.

18             MR. CARNATHAN:  C.

19             THE COURT:  It was C, okay.

20             MR. CARNATHAN:  I would now offer it under Rule 612,

21   I believe Mr. Perten used it to refresh the witness'

22   recollections, and I now have the option to offer it into

23   evidence.

24             THE COURT:  Any objection?

25             MR. PERTEN:  Yes, Your Honor.  It's hearsay.



1          THE COURT:  Well, that may be.  But 612 --

2          MR. CARNATHAN:  It's 612(b).  Now that Mr. Perten's

3   used it to refresh his memory, I'm allowed to introduce any

4   portion that relates to his testimony.  I believe it all

5   relates to his testimony.

6                         (Pause)

7          THE COURT:  So 612(b) just deals with adverse party's

8   options.

9          MR. CARNATHAN:  Well, I'm adverse to Mr. Perten, and

10  he used it to refresh the witness' memory.  So at the point

11  where I used it to refresh, it was his option to put it in,

12  but not mine.  But once he used it to refresh, it became my

13  option to put it in.

14         MR. PERTEN:  Your Honor, if I may be heard on that.

15  That's not what 612(b) says.  At best, I showed him the date.

16  And so that portion of the affidavit, perhaps, is fair game

17  under 612.  But the entire affidavit is not.  And that's what

18  it says.  "Any portion that relates to the witness'

19  testimony".  The portion that related to his testimony is I

20  asked him to confirm the date.

21         THE COURT:  Right.  I'm going to -- what were you

22  going to do with this?  You've offered it.

23         MR. CARNATHAN:  I'm just offering it into evidence.

24  I was going to leave it at that, just put it into evidence.

25         THE COURT:  You're going to leave it at that?  All

1    right.  I'm going to reserve on this, okay?  Now, the only

2    issue is, is there any chance that if I reserve on it --

3    because we're going to finish in a half hour for the day --

4    that you would want to recall the witness?  Are you going to

5    need him on this, or is this purely an issue of law?

6          MR. CARNATHAN:  I see this as purely an issue of law,

7    Your Honor.  I just think it was an opportunity to put in the

8    rest of his affidavit.

9          THE COURT:  And your view of this, Mr. Perten?

10          MR. PERTEN:  As I stated, Your Honor, I think it at

11    best --

12          THE COURT:  No, I know your argument.

13          MR. PERTEN:  Yeah.

14          THE COURT:  But it's not going to cause you to have

15    to --

16          MR. PERTEN:  No, I'm not --

17          THE COURT:  -- inquire of this witness, right?

18          MR. PERTEN:  No.  I will be done with this witness

19    when Mr. Carnathan is finished.

20          THE COURT:  Okay.  So I'm going to reserve on this,

21    I'll take a look.  My initial reaction is that Mr. Perten's

22    right on this, that the portion -- that this may let you put

23    this in, but it's only as to the portion that he asked him

24    about.  It doesn't open the door wholesale to the document.

25          MR. CARNATHAN:  If I have someone look at the issue

1    tonight, may we submit something?

2          THE COURT:  It's a good idea.

3          MR. CARNATHAN:  Okay.

4          THE COURT:  You know, I hate to put you guys through

5    it, but why don't you do that, okay?  I'll take a -- I'm not

6    expecting more than a page.  So take a look at it.

7          MR. CARNATHAN:  Okay.  So with that said, I just have

8    really one question.

9                        REDIRECT EXAMINATION

10   BY MR. CARNATHAN:

11        Q.   Mr. Perten asked you a series of questions about why

12   you didn't object in 2014 to the cost overruns.  Could you

13   just explain why?

14   A.   We were friendly, and I just didn't think that Mr. Kagan

15   had any malicious intent to either defraud me or that those

16   charges were inadequate.  Or I don't know what the

17   construction costs are.  I was presented with those numbers,

18   and I believed him.

19         MR. CARNATHAN:  That's all from me, Your Honor.

20         THE COURT:  Okay.  Mr. Perten, anything else?

21                       RECROSS-EXAMINATION

22   BY MR. PERTEN:

23        Q.   Mr. Zhukovskiy, do you understand, sir, that when

24   doing a construction project which is not all new

25   construction, but marrying, if you will, existing building to

1   new building, that it's much more difficult to accurately

2   estimate what it's going to cost?

3          MR. CARNATHAN:  Objection, Your Honor.

4          THE COURT:  Basis?

5          MR. CARNATHAN:  Beyond the scope.  I asked one

6   question.

7          THE COURT:  Overruled.

8   A.   Can you repeat the question, please?

9   BY MR. PERTEN:

10     Q.   Sure.  Do you understand, sir, that a renovation

11   project where you are connecting new construction to old

12   construction, do you understand, sir, that it's much more

13   difficult to estimate costs in that kind of a project?

14   A.   I don't understand that, no.

15          MR. PERTEN:  Okay.  That's all, Your Honor.

16          THE COURT:  Okay.  Anything else?

17          MR. CARNATHAN:  No.  Thank you, Your Honor.

18          THE COURT:  All right.  Thank you, Dmitriy.  Okay,

19   you can --

20          THE WITNESS:  Thank you, Your Honor.

21          THE COURT:  -- leave the courtroom, you can do

22   whatever you want.

23          THE CLERK:  (Indiscernible).

24          THE COURT:  Yeah, I assume so, but I just want to

25   make sure that we have the documents that have now been

1    generated, where they stand.  So we have identification

2    documents by the plaintiff, or were marked under the

3    plaintiff, A, B, and C.  Is that right?  That's all we have?

4            MR. CARNATHAN:  That's all I recall --

5            THE COURT:  All right.

6            MR. CARNATHAN:  -- Your Honor, yes.  I think that's

7    right.

8            THE COURT:  Elizabeth, do you have those?

9            THE CLERK:  I have only B.  I do not have C or A.

10            THE COURT:  So A is -- I don't know what they are.

11    Let's just make sure that she has them.

12            THE CLERK:  A is the Hyde Avenue LLC operation

13    agreement, and C would be the affidavit of Dmitriy Zhukovskiy.

14            MR. CARNATHAN:  All right.  I am the likely culprit,

15    Your Honor.  May I have just one moment?

16            THE COURT:  Well, you can work this out after the --

17            MR. CARNATHAN:  Afterward?  All right.

18            THE COURT:  -- after we're finished.  I just don't

19    want to leave today without knowing that we're going to get

20    those.  And they'll stay with the record.

21            MR. CARNATHAN:  The plaintiffs call Elana Lande.

22            THE COURT:  Okay.

23                        ELANA LANDE SWORN

24            MS. LANDE:  I do.

25            THE CLERK:  Please be seated.

1              THE WITNESS:  Thank you.

2              MR. HARRIS:  Your Honor, before we start, just

3    procedurally we feel obligated just to restate the objection

4    that we made previously, that was handled through the motion

5    in limine prior to this.  Would you like us just to make a

6    standing objection one time to any of the other -- Ms. Lande,

7    Mr. Abramskiy, Mr. Kasierman --

8              THE COURT:  Yeah, I'll tell you, Mr. Harris, I think

9    that I would encourage you to go ahead and make that objection

10   each time, because I won't necessarily know what the witness

11   is here to testify about.  I would not have known that this

12   witness apparently falls into that category.

13             MR. HARRIS:  All right, so as --

14             THE COURT:  So you've objected --

15             MR. HARRIS:  We've objected on really the entire line

16   of testimony that Ms. Lande would offer because it relates to

17   one of the other projects, unrelated to Lyman-Cutler.

18             THE COURT:  I understand.  So I've dealt with that,

19   and I'll take it as a motion to reconsider my prior ruling.

20   And I'll deny that motion.

21             I will, however, remind Mr. Carnathan that I have

22   said from the beginning about this issue, both in discovery

23   and on the motion in limine, that I reserve my discretion to

24   limit the testimony concerning this.  We're not going to

25   litigate five other projects here.  So this is going to be

1    done, but within constraints.

2          MR. CARNATHAN:  I will try to be really brisk, Your

3    Honor.  We'll hit the high points, and --

4          THE COURT:  Okay.

5          MR. CARNATHAN:  -- move on.  Thank you, Your Honor.

6          THE COURT:  All right.  As long as that's -- I don't

7    want anybody to be surprised if at some point I cut off the

8    testimony on these other projects.  But go ahead.

9          MR. CARNATHAN:  Thank you, Your Honor.

10                     DIRECT EXAMINATION

11   BY MR. CARNATHAN:

12         Q.   Would you state your name, please?

13   A.    Elana Lande.

14         Q.   Where do you live?

15   A.    1 (indiscernible), Marblehead.

16         Q.   What do you do for work?

17   A.    Director of operations at Lux Research.

18         THE COURT:  Could I impose upon you to spell your

19   last name?

20         THE WITNESS:  Sure.  L-A-N-D-E.

21         THE COURT:  L-A-N-D-E?

22         THE WITNESS:  Yes.

23         THE COURT:  Okay.  Thank you.

24   BY MR. CARNATHAN:

25         Q.   And would you briefly state your education, please?

```
 1    A.    I did two years of accounting degree back in Moscow,

 2    Russia, I graduated with a management concentration and

 3    marketing degree from Bridgewater State, and then I followed

 4    up with an MBA from Babson College.

 5          Q.    Okay.  And so you were actually born in Russia?

 6    A.    Yes.

 7          Q.    And when did you come to the United States?

 8    A.    2000.

 9          Q.    And about how old were you then?

10    A.    Nineteen.

11          Q.    So is Russian your first language, then?

12    A.    Yes.

13          Q.    Let's jump right to the Yarmouth Road project.  You

14    are a person who has previously invested with Vadim Kagan,

15    right?

16    A.    Yes.

17          Q.    And would you just -- I guess identify the project;

18    what did you invest in?

19    A.    Mr. Kagan was -- had agreed with the owners of Yarmouth

20    Road -- I don't exactly remember the building, the number --

21    but we were to purchase the land, demolish the building, and

22    build a new building -- like a new construction -- which we

23    would sell later on, and -- and hopefully make money.  That

24    was the original proposal.

25          Q.    All right.  Was it 50 Yarmouth Road?
```

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1   A.   Yes.

2        Q.   Okay.  About when did that project start?

3   A.   Our -- we started talking about the project, I believe,

4   early 2013.  We formed an operating agreement in the spring of

5   2013 and applied for a construction loan.  The permits were

6   not received by Mr. Kagan, I think, until later that summer.

7        Q.   All right.  And you formed an entity to hold the

8   project, if you will?

9   A.   Yes.  It was Yarmouth Road LLC.

10       Q.   All right.  And who drafted the LLC agreement?

11  A.   Mr. Boris Maiden.

12            MR. CARNATHAN:  Could I have Exhibit 119 for

13  identification?

14  BY MR. CARNATHAN:

15       Q.   Ms. Lande, did you recognize the document that we

16  put up on screen?  It's Plaintiff's 119 for identification.

17  A.   Yes, I do.

18       Q.   What is it?

19  A.   It's an operating agreement that was initialed by my

20  husband and I and Mr. Kagan.

21       Q.   And it might be easier on this one to approach, Your

22  Honor, but if -- may I?

23            THE COURT:  You may approach.

24            MR. CARNATHAN:  And so I'm just going to show her my

25  copy of the --



1            THE COURT:  All right.  Just -- all right.

2            MR. CARNATHAN:  I guess the reason I am doing this is

3    we are --

4            THE COURT:  Well, hold on.  Are you trying to say

5    things on the record right now, or just --

6            MR. CARNATHAN:  Yeah.  It thought it might be useful

7    just to show -- just to say it out loud.  Is that --

8            THE COURT:  No, it's fine.  I just need to make sure

9    that it's being heard.

10           MR. CARNATHAN:  Got it.

11           THE COURT:  That's my main concern.  And let me ask

12   you this.  You're showing her a document, it's Exhibit 119 for

13   identification.  Mr. Perten has that?

14           MR. CARNATHAN:  Yeah.  I mean, I suppose I could

15   offer it now.  There's another point to make.

16           THE COURT:  Well, has he seen it?

17           MR. CARNATHAN:  Oh, sure.

18           THE COURT:  Okay.  That's all I'm trying to get at,

19   at the moment.

20           MR. CARNATHAN:  So I'll offer it now.

21           THE COURT:  All right.  So from the microphone.

22           MR. CARNATHAN:  Got it.  We offer Plaintiff's 119 for

23   identification into evidence, Your Honor.

24           MR. HARRIS:  This was subject to our objection to the

25   whole line of questioning, aside --

1           THE COURT:  So you object to the introduction of this

2    evidence --

3           MR. HARRIS:  We do.

4           THE COURT:  -- of this document.

5           MR. HARRIS:  Yes.

6           THE COURT:  And the basis for the objection?

7           MR. HARRIS:  It's the -- it relates to the -- we

8    object to the entire line of questioning about the other

9    projects.

10          THE COURT:  Okay.  And that's a relevance

11   objection --

12          MR. HARRIS:  Correct.

13          THE COURT:  -- is that right?

14          MR. HARRIS:  And 403, Your Honor.

15          THE COURT:  403?  Okay, all right.

16          MR. HARRIS:  I would just point out -- I think

17   Attorney Carnathan will deal with this issue -- this

18   particular issue is missing some pages, but I suspect he'll

19   handle that.

20          MR. CARNATHAN:  That was what I was about to get at,

21   Your Honor.  But I think the relevance and 403 is just a

22   restatement of the limine that we --

23          THE COURT:  Okay.  So that's overruled.  And I think

24   I heard an objection as to the completeness of the document as

25   well.  So I'll overrule that, subject to further foundation.

1           PLAINTIFF'S EXHIBIT 119 WAS ADMITTED INTO EVIDENCE

2    BY MR. CARNATHAN:

3           Q.   So Ms. Lande, to try to move it along, I think we

4    all know that this document is missing pages 6 through 9,

5    right?  Can you explain why it's missing pages 6 through 9?

6    A.   Absolutely.  So we drafted an operating agreement, there

7    were back and forth between Mr. Kagan, and we always copied

8    Boris Maiden on that.  My husband and I were the first ones to

9    sign the document.  We signed the document, and unfortunately

10   the middle pages were lost during scanning and resending the

11   file.  And therefore, Mr. Kagan signed just those pages that

12   we -- I -- we scanned and sent to him and Mr. Maiden.  So the

13   middle pages are what missing.

14          Q.   Okay.  So what we've marked for identification, and

15   I guess actually admitted as Exhibit 119, is the only executed

16   copy you have; is that right?

17   A.   Yes, that's correct.

18          Q.   All right.

19          MR. CARNATHAN:  Could I have Exhibit 120 for

20   identification?

21   BY MR. CARNATHAN:

22          Q.   Now, 120 for identification is one we marked at your

23   deposition that has all the pages; do you remember that?

24   A.   Yes, I do.

25          Q.   Could you explain what 120 for identification is?

 1    Should I -- perhaps I should approach?

 2    A.    Based on what I see, it's just the full -- I only see

 3    first page up here, but it's probably the full operating

 4    agreement, the one that was before signing?

 5        Q.    Right.  This one actually has pages 6 through 9.

 6    A.    Yes.

 7            MR. CARNATHAN:  So Bill's putting them up now.

 8            THE COURT:  That's fine.  So you represent that this

 9    is the same as 119, except that it has the missing pages?

10            MR. CARNATHAN:  This has the missing pages, but does

11    not have signatures.

12            THE COURT:  Okay, fine.  All right.  So that's the

13    document, it's been described.

14            MR. CARNATHAN:  Right.

15            THE COURT:  She can authenticate it as the -- is that

16    right?

17            THE WITNESS:  Yes.

18            THE COURT:  This is that document?  Okay.  And you're

19    offering it?

20            MR. CARNATHAN:  Well, I was going to ask her one

21    more, first.

22            THE COURT:  You may, go ahead.

23            MR. CARNATHAN:  Yeah.

24            THE COURT:  Of course.

25    BY MR. CARNATHAN:

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1          Q.   Are you able to say whether or not the pages 6

2     through 9 contained in Plaintiff's Exhibit 120 are the correct

3     pages 6 through 9 that were in the agreement that you

4     executed?  Am I correct?

5     A.   Not such a fast reader --

6              THE COURT:  Why don't you go ahead and show it to

7     her.  Just don't talk until you get to a microphone, please.

8              MR. CARNATHAN:  I'm just hesitating because this is

9     the one I'm inquiring from so I highlighted some pieces.  I

10    don't want to create problems.

11             MR. HARTZEL:  I can scroll at request, if she wants

12    to read from that, I can scroll.

13             MR. CARNATHAN:  Maybe you could scroll.

14             THE WITNESS:  If you can scroll to the next page.

15    I'm on page 6, so if you can scroll to page 7, that will

16    probably.

17             MR. CARNATHAN:  Thank you.

18             THE COURT:  All right.

19             THE WITNESS:  Can we scroll one more?

20             THE COURT:  He's going to show you the -- he's going

21    to scroll through the pages.

22             THE WITNESS:  Okay.

23             THE COURT:  Why don't you tell him when you're ready?

24             THE WITNESS:  Yep.  One more.  That looks correct.

25             MR. CARNATHAN:  Okay.  So at this point, we would

1    offer Plaintiff's Exhibit 120 for identification into

2    evidence.

3           MR. HARRIS:  Our objection remains with the whole

4    line of questioning.

5           THE COURT:  All right.  And so it's overruled.

6         PLAINTIFF'S EXHIBIT 120 WAS ADMITTED INTO EVIDENCE

7           MR. CARNATHAN:  Okay.

8    BY MR. CARNATHAN:

9       Q.   When you formed the LLC, Ms. Lande, who was the

10   managing member?

11   A.   I was.

12      Q.   All right.

13          MR. CARNATHAN:  And if we go to the last page of --

14   let's work with Exhibit 119.  That's -- I'm doing a bad job

15   with math in my head.  All right.  Thanks.

16   BY MR. CARNATHAN:

17      Q.   You're actually identified there as the managing

18   manager, correct?

19   A.   Yes, I am.

20      Q.   Did that make any impression on you at the time?

21   A.   In my mind it was giving me some kind of a control over,

22   I don't know, writing checks and making a few of the calls.

23   But other than that, no.

24      Q.   Okay.  And if we look back at the third page of

25   Exhibit 119 in evidence, I'm looking at paragraph 4.1, and it

1    says, "Purchase money loan and construction loan shall be

2    taken from Wellesley Bank to pay for construction and carrying

3    costs until the issuance of certificate of occupancy,

4    hereinafter CO, but in no event later than May 30th, 2014."

5    Have I read that correctly?

6    A.    Yes, that's correct.

7         Q.    Did you take out a loan to cover the carrying costs?

8    A.    Yes, we did.

9         Q.    Did you go to Wellesley Bank?

10   A.    We ended up with a loan from Rockland Trust.

11        Q.    Why did you end up going with Rockland Trust?

12   A.    Wellesley Bank denied the loan.

13        Q.    Okay.  How much did Mr. Kagan ask you to invest?

14   A.    $1.4 million.

15        Q.    And is that how much you actually invested?

16   A.    We invested $1.4 million, but then when we went to

17   Rockland Trust they requested an additional money to be put in

18   a savings account to -- to work as a cushion, I guess, for

19   disbursement of the funds once construction starts.

20        Q.    And how much money did you put in the savings

21   account?

22   A.    I believe it was $80,000.

23        Q.    Okay.  Did you talk about some kind of a

24   construction budget before you made the investment?

25   A.    Absolutely.



1        Q.    How much was the construction budget?

2    A.    1.7 million, I think, and 12,000.

3        Q.    And did you -- what did Mr. Kagan tell you about the

4    construction budget?

5    A.    That he's pretty sure that this is -- he was sure that

6    this is how much money we'll need.  He made a number of

7    constructions prior to that.  He already had plan -- the

8    construction plan and the sketches ready, and we were ready to

9    go, under the impression that this is the final construction

10   budget.

11           MR. CARNATHAN:  Could I have Exhibit 121 for

12   identification, please?

13      PLAINTIFF'S EXHIBIT 121 WAS MARKED FOR IDENTIFICATION

14   BY MR. CARNATHAN:

15       Q.    Do you recognize the document we've marked as

16   Exhibit 121 for identification, Ms. Lande?

17   A.    Yes.

18       Q.    What is it?

19   A.    The construction costs associated with the building at

20   Yarmouth road.

21       Q.    And who created this?

22   A.    Mr. Kagan.  Or Mr. Kagan's office, I don't know if he did

23   it himself.

24       Q.    Okay.

25           MR. CARNATHAN:  We would offer Plaintiff's 121 into

1    evidence.

2        MR. HARRIS:  Our same objection, Your Honor, to the

3    line of questioning.

4        THE COURT:  All right.  Same ruling.

5        PLAINTIFF'S EXHIBIT 121 WAS ADMITTED INTO EVIDENCE

6    BY MR. CARNATHAN:

7        Q.   Do you remember about when construction started?

8    A.   We hadn't obtained permits to start construction until, I

9    think, end of July of 2014 -- '13.

10        Q.   '13?  And do you recall about when the construction

11    was complete?

12    A.   It was complete in December of 2014.

13        Q.   Of 2014?

14    A.   Yes.

15        Q.   Okay.  During the construction process, did you

16    become aware at any point of any cost overruns?

17    A.   Yes, I did.

18        Q.   About when did you first become aware of some cost

19    overruns?

20    A.   The issue with accounting became obvious in May of 2014

21    when I requested accounting from Mr. Kagan's office.  The name

22    of the accountant was Kristina, I unfortunately don't remember

23    her last name.  There was inconsistent accounting documents

24    that were provided to me, and every question that I raised

25    wouldn't be handled correctly.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1        In August of 2014, they were starting to have significant

2    overruns, compared to budget.  And so we requested a meeting

3    with Mr. Kagan to discuss those overruns and we followed up

4    with a document that we drafted to -- so that Mr. Kagan can

5    sign, that if there's significant overruns he will have to

6    cover those costs up until the closing date, but also he will

7    only be reimbursed depending on the sale price of the

8    property.  He never signed that document.

9        However, he sent us a document stating that he will cover

10   full extra expenses from that moment up until the closing

11   date.  And he signed that, I think I provided a signed copy at

12   the deposition, but he never followed with that.  He still

13   took money out of the loan.

14       Q.   So in August 2014, when you ran into what you refer

15   to as, I think, significant cost overruns, about how much

16   money are we talking about, over and above the $1.7 million

17   budget?

18   A.   At that point in time, I think we were heading around

19   $100,000.  But the construction wasn't over.

20       Q.   And at some point did those cost overruns become

21   bigger?

22   A.   Yes.

23       Q.   When was that?

24   A.   I don't recall the date.  They were keep being bigger

25   than the projected construction costs.



1    Q.   Do you remember when they were in relation to when

2    the house sold?

3    A.   We -- we sold the property at the end of December, so the

4    construction was over just a week or maybe couple weeks before

5    the closing date.  We had to meet before the closing to agree

6    on the disbursement of profits that would happen after the

7    closing.  And this is where extra line items showed up.  And I

8    think we went over 300,000, around 300,000 extra.

9    Q.   On top of the 100,000 from August?

10   A.   I -- to the best of what I remember, yes.

11   Q.   So you were up north of $2.1 million that --

12   A.   We were at 2.1 and something, yes.

13   Q.   And did Mr. Kagan explain what was the cause of

14   those overruns?

15   A.   At that point there was no explanation provided.  At that

16   point, it was far away from being friendly conversations.

17   Q.   How did you react when he presented those cost

18   overruns?

19   A.   I was upset about it.

20   Q.   Did you agree with them?

21   A.   No, I did not.

22   Q.   Did you object to them?

23   A.   Yes, I did.

24   Q.   And then what happened?

25   A.   He kept saying, just agree to what it is.  You're walking

```
 1    away with a profit and you should be happy.  There was no

 2    explanation to the numbers.  There were some bills showed up

 3    in the explanation to the excavation costs where there are

 4    trees and stones and -- but they -- they started surfacing

 5    back in August, I believe.  So it had always been the trees

 6    and the stones and some extra expenses.

 7              MR. CARNATHAN:  Could I have Exhibit 95 for

 8    identification?

 9    BY MR. CARNATHAN:

10        Q.   So Ms. Lande, Exhibit 95 for identification is an

11    email from kagandevelopment@gmail.com to you and Joseph Cohen

12    on December 22, 2014; do you see that?

13    A.   Yes.

14        Q.   And it's got some attachments.

15              MR. CARNATHAN:  Mr. Hartzel, perhaps you could show

16    them to her briefly?

17    BY MR. CARNATHAN:

18        Q.   Do you recognize that email?

19    A.   I do.

20        Q.   Do you recognize it as an email you received from

21    kagandevelopment.com on December 22, 2014?

22    A.   Yes.

23        Q.   All right.  And we would offer Plaintiff's Exhibit

24    95 into evidence, please.

25              MR. HARRIS:  Same objection, Your Honor.
```

 1            THE COURT:  All right.  Same ruling, overruled.

 2         PLAINTIFF'S EXHIBIT 95 WAS ADMITTED INTO EVIDENCE

 3            MR. CARNATHAN:  Okay.

 4    BY MR. CARNATHAN:

 5       Q.   So if we go into the third page of the exhibit.

 6            MR. CARNATHAN:  That's the one.  Would you blow up

 7    the chart to the right?

 8    BY MR. CARNATHAN:

 9       Q.   So Ms. Lande, right, I'm interested in this chart,

10    remaining accounts payable, checks to disburse from Yarmouth

11    Road; do you see that?

12    A.   Yes, I do.

13       Q.   Do you know what that is?

14    A.   I think it's the outstanding bills that we had to pay at

15    the moment of -- when we met, prior to closing.

16       Q.   So this is December 22, 2014.  Pretty close to the

17    closing date, right?

18    A.   Yes.  That's correct.

19       Q.   And so apparently among the outstanding receivables

20    from your project was BST Plumbing, for $9,670?

21    A.   Yes.

22       Q.   Dream Flooring, for $10,067?

23    A.   Yes.

24       Q.   ProExcavation, for $65,000?

25    A.   Yes.



```
 1            Q.    Sergei Nickolaev, for $5,440?

 2    A.    That's correct.

 3            Q.    And V&D Heating, for $22,950, right?

 4    A.    Yes.   That's correct.

 5            Q.    Did you ever see any invoices for any of those?

 6    A.    I might have seen some of them, but definitely not a

 7    complete set of invoices.

 8            Q.    Do you know whose company ProExcavation is?

 9    A.    Mr. Kagan's.

10            Q.    If we look back at the first page of Exhibit 95 in

11    evidence, I'm really just working up to asking you, who's

12    Joseph Cohen?

13    A.    I'm -- I guess he worked with Mr. Kagan, but at the time

14    that he was first contacted me, I wasn't even sure.

15            Q.    And when did he first contact you?

16    A.    I believe it was December of -- or maybe even late

17    November.  But very close to the closing date of when we sold

18    the Yarmouth Road house.

19            Q.    How did he contact you?

20    A.    You mean the means of the contact?

21            Q.    Well, was it phone, or in person, or email?

22    A.    I've never met him.

23            Q.    Yeah.

24    A.    So it was -- I don't remember if the first contact was

25    email or phone, but I did have phone conversation, so -- and I
```

1   obviously received emails from him.

2       Q.   What can you recall about what Mr. Cohen said to you

3   on the phone in this time frame of December 2014?

4   A.   He was negotiating the deal of sharing the profit between

5   us and Mr. Kagan because Mr. Kagan wouldn't get in touch with

6   us and wouldn't return the calls.  It started as a -- he was

7   pretending to have a friendly conversation with me, kind of

8   reasoning me that we're making a lot of money.  We should take

9   the money and walk away and in no way delay the closing.

10  Because the buyers may walk away if we delay that, and then

11  we're going to be left with the property.

12      Q.   Did it become less friendly after a time?

13  A.   Yes.  And eventually he -- we had a call, which was I

14  think a few days before the closing.  He start threatening me

15  and he said they're -- they're going to put the mechanical

16  loan -- lien -- on the property.  We won't be able to sell it.

17      And eventually he called me and said, look, you're not in

18  a position to -- to go through this.  I was pregnant at the

19  time, I was eight months pregnant, and both Kagan and Cohen --

20  or Kagan and therefore I'm assuming Cohen -- were aware that

21  we lost a child a year before.  So it was a difficult time for

22  the family.  And he said, you don't want anything like that

23  happening again.  So you move -- you move forward, and save

24  your nerves.

25      Q.   So did you take the deal they were offering?

1    A.    We eventually took a deal and walked away with $750,000.

2         Q.    Right.  So you ended up making money on the

3    project --

4    A.    Yes.

5         Q.    -- right?  How did what you make compare to what you

6    thought you were going to make?

7    A.    It was significantly less.

8              MR. CARNATHAN:  That's all I have for Ms. Lande, Your

9    Honor.

10             THE COURT:  Okay.  Cross?

11                       CROSS-EXAMINATION

12   BY MR. HARRIS:

13        Q.    Ms. Lande, you testified that you received a

14   bachelor degree; is that correct?

15   A.    Yes.

16        Q.    And an MBA from Babson?

17   A.    Yes.

18        Q.    Okay.  And your husband is an HVAC engineer?

19   A.    Yes.

20        Q.    He has a bachelor's degree from Worcester Polytech

21   (sic)?

22   A.    That's correct.

23        Q.    And he also has an MBA; is that right?

24   A.    Yes.

25        Q.    From Tufts?




1  A.  Yes.

2       Q.  He's worked in the construction industry?

3  A.  Yes.

4       Q.  Your father owned a construction company?

5  A.  Yes, he did.

6       Q.  You've been involved in other real estate projects

7  besides the Yarmouth Road project that you've testified about;

8  is that right?

9  A.  Not before we did the Yarmouth.

10       Q.  Okay.  Well, the -- you invested in a project in

11  Randolph, Massachusetts; is that right?

12  A.  That's correct.

13       Q.  All right.  You are a member in an LLC that owns an

14  apartment building in New York?

15  A.  Yes.

16       Q.  You've owned other investment properties, including

17  an apartment building in Swamscott?

18  A.  Yes.

19       Q.  And it was part --

20  A.  Well, sorry.  Not -- we don't own that apartment

21  building, we own an apartment.

22       Q.  An apartment, fair enough.  And another apartment in

23  Boston?

24  A.  That's correct.

25       Q.  And another apartment in Brooklyn?




1   A.   Yes.

2        Q.   All right.  Attorney Maiden has represented you in

3   the past in connection with some of those real estate

4   transactions, is that right?

5   A.   He was the assigning attorney, yes.

6        Q.   Now, you and your husband, you evaluated the

7   Yarmouth Road project before you decided to invest, is that

8   right?

9   A.   Correct.

10       Q.   You used your collective financial and construction

11  experience to do so?

12  A.   Yes.

13       Q.   You looked at sales of other properties in the area?

14  A.   We did.

15       Q.   You evaluated the cost per square foot to build?

16  A.   I don't remember the -- the depth of the --

17       Q.   Okay.

18  A.   -- calculations on the square foot.

19       Q.   But you made some calculations on your own without

20  Vadim; is that right?

21  A.   Yes.  Absolutely.

22       Q.   You took into account the proposed purchase price?

23  A.   Yes.

24       Q.   And the proposed or the anticipated selling price?

25  A.   That's correct.



1    Q.   You performed your own analysis of how much profit

2    you expected to make?

3    A.   Can you define --

4    Q.   Well, we've gone through several factors that you

5    considered.  And before you decided to invest, you and your

6    husband considered the amount of profit you expected to make.

7    A.   At certain percentage, yes.

8    Q.   All right.  Now, you were not guaranteed a specific

9    return on your investment, were you?

10   A.   No.

11   Q.   Mr. Kagan never told you, I promise you're going to

12   make X percent, did he?

13   A.   No, he didn't.

14   Q.   You knew there was risk with this project?

15   A.   Absolutely.

16   Q.   And you decided to invest, despite the risk?

17   A.   Yes.

18   Q.   Now, you testified that you received $750,000 on

19   this Yarmouth Road project, correct?

20   A.   Yes.

21   Q.   That's after getting your $1.4 million back?

22   A.   Yes.

23   Q.   Did you also -- by the way, did you also get the

24   savings account back that you had to deposit with the bank?

25   A.   We got the full reimbursement of what we invested then,

1    and $750,000 --

2         Q.   Okay.

3    A.   -- after that.

4         Q.   And so what rate of return is that, approximately?

5    A.   Fifty percent.

6         Q.   Now, before deciding to invest in the 50 Yarmouth

7    Road project, you engaged in several discussions with Mr.

8    Kagan; is that right?

9    A.   That's correct.

10        Q.   And you requested information, and he sent it to

11   you; is that right?

12   A.   That's correct.

13        Q.   You asked questions on several topics, including the

14   budget.

15   A.   Yes.

16        Q.   You inquired as to who was actually going to build

17   the project?

18   A.   Can you define who?

19        Q.   Well, was it important to you to find out who was

20   going to build, actually build, the home?

21   A.   No.

22        Q.   Okay.  Didn't matter to you.

23   A.   Nope.

24        Q.   Did you understand, however, that Mr. Kagan's

25   company was going to be involved in building the home?

```
 1   A.    Yes.

 2         Q.    Now, you also had discussions -- pardon me -- with

 3   Mr. Kagan about the business terms of the relationship; is

 4   that right?

 5   A.    That's correct.

 6         Q.    You discussed with him, among other things, the

 7   split of the profits you anticipated to make?

 8   A.    Yes.

 9         Q.    You discussed with him the financial contributions

10   each party would make?

11   A.    Yes.

12         Q.    You also discussed with Mr. Kagan the bullet points

13   of what would later become the operating agreement?

14   A.    Yes.

15         Q.    You went to look at the Yarmouth road property

16   itself before you decided to invest?

17   A.    I honestly don't remember.

18         Q.    You don't remember?  Okay.

19   A.    I think we went on a trip with Mr. Kagan and driving

20   around in the neighborhood and looking at what he had built

21   before.

22         Q.    Okay.  But you don't remember going to the actual 50

23   Yarmouth Road property?

24   A.    No.  I don't recall that.

25         Q.    Okay.  You reviewed -- or did you review
```




 1    architectural plans that Mr. Kagan provided for the

 2    anticipated project?

 3    A.    I honestly don't remember.

 4         Q.    Okay.  Do you recall approving plans?

 5    A.    I knew the plans, I knew the square footage, and I think

 6    I saw the pictures of the front of the property.  But I never

 7    signed on anything.

 8         Q.    Okay.  But irrespective of whether you signed on

 9    something, you had an opportunity to review the plans and

10    approve them --

11    A.    Yes.

12         Q.    -- before construction started; is that right?

13    A.    That's correct.

14         Q.    All right.  You also reviewed a draft of the

15    operating agreement before you signed it; is that right?

16    A.    Absolutely.

17         Q.    And as you testified, Attorney Maiden is the one

18    that prepared that agreement?

19    A.    Yes.

20         Q.    You provided Attorney Maiden with some clarification

21    and changes for the operating agreement --

22    A.    Yes.

23         Q.    -- before you signed?

24    A.    Of course.

25         Q.    All right.  Now, at the time of the investment you

1    calculated the expected monthly costs, carrying costs, for

2    this project; is that right?

3    A.   I didn't do it myself, no.

4        Q.   Okay.  All right.  Do you remember, ma'am, you sat

5    for a deposition, Attorney Perten asked you questions?

6    A.   Yes.

7        Q.   All right.

8            MR. HARRIS:  May I approach the witness, Your Honor?

9            THE COURT:  You may.  Thank you.

10           THE CLERK:  Thank you.

11   BY MR. HARRIS:

12       Q.   Ma'am we handed you a copy of your deposition

13   transcript, and I've opened it to page 62.  Do you have that

14   in front of you?

15   A.   Yes, I do.

16       Q.   All right.  At the top of the page, at line 3, you

17   were asked, "At the time you decided to invest, what were you

18   expecting the monthly carrying costs to be?" and you answer,

19   "I don't remember.  We had certain calculations, but I don't

20   recall now."  Question:  "When you say you had certain

21   calculations, are you referring to you and your husband?"

22   "Yes."  "And those are calculations that you no longer have?"

23   "No."  Did I read that correctly?

24   A.   Yes.

25           MR. HARRIS:  Now, could you bring up Exhibit 120?

1          THE COURT:  Let's see how good he is at it now.

2          MR. PERTEN:  I'm old school, Your Honor.

3          THE COURT:  Yeah.

4          MR. PERTEN:  If it's not paper, I'm lost.

5          MR. HARRIS:  120's on the plaintiffs' side.  It

6    should be on the left-hand side.

7          MR. CARNATHAN:  I'd be willing to loan Mr. Harris Mr.

8    Hartzel, if that would help.

9          MR. PERTEN:  I've got it --

10          MR. HARRIS:  Seriously.

11          MR. PERTEN:  -- no.

12          THE COURT:  I think he's serious, and I --

13          MR. CARNATHAN:  I'm totally serious.

14          THE COURT:  I know you are.

15          MR. CARNATHAN:  Yeah.

16          MR. HARRIS:  I feel duty-bound on the record not to

17    accept that invitation.

18          THE COURT:  Well, it's --

19          MR. HARRIS:  But I appreciate it.  All right.

20          MR. PERTEN:  Can the record reflect that I figured it

21    out, Your Honor?

22          THE COURT:  Yeah, right.

23    BY MR. HARRIS:

24       Q.  All right, ma'am.  We've showed you -- on the screen

25    right now is Exhibit 120.  This is the version of the

1   operating agreement that has all the pages --

2   A.   Okay.

3        Q.   -- if you'll recall, all right?  And I'd like you --

4             MR. HARRIS:  If you can scroll down to paragraph 4.2,

5   please?  Okay.

6   BY MR. HARRIS:

7        Q.   Do you see paragraph 4.2 at the bottom of the screen

8   there?

9   A.   I do.

10       Q.   This relates to carrying costs; is that correct?

11  A.   That's correct.

12       Q.   And this -- the bolded part of this language says

13  that "after the issuance of the certificate of occupancy, but

14  in no event before May 30th of 2014, all carrying costs should

15  be paid in the following percentages".  You were to pay fifty

16  percent and Mr. Kagan was to pay fifty percent; is that

17  correct?

18  A.   Yes.

19       Q.   Now, before the issuance of the certificate of

20  occupancy, isn't it correct that the LLC, the company you

21  formed, was to pay the carrying costs?

22  A.   That's correct.

23       Q.   And as it turns out, neither you nor your husband

24  paid any money toward the carrying costs on this project, out

25  of your own pocket; is that right?



1    A.    Yes.

2         Q.    Now, the official address for this LLC was your home

3    address?

4    A.    That's correct.

5         Q.    And you had online access to the bank account

6    associated with this project; is that right?

7    A.    Yes.

8         Q.    And when we asked you in your deposition, you

9    couldn't recall at the time whether the bank account

10   statements were sent to your home address.  Do you have any

11   recollection one way or the other as you sit here today?

12   A.    I -- I don't recollect the account statements and Mr. --

13   I granted -- I acquired the password to the online account,

14   and it was given to Mr. Kagan.

15        Q.    You --

16   A.    And there was a token to go into the account.  So I maybe

17   logged in a couple of times, few times, but Mr. Kagan was in

18   control.  Or Mr. Kagan's office was in control of it.

19        Q.    You had online access to the account?

20   A.    I did.

21        Q.    Okay.  And you can't remember whether the bank

22   account statements were sent to your home or not?

23   A.    No, I do not.

24        Q.    As Attorney Carnathan pointed out to you, you were

25   defined as the managing manager for this --



```
 1    A.    Yes.

 2          Q.   -- LLC; is that correct?

 3    A.    That's correct.

 4          Q.   All right.

 5               MR. HARRIS:  If we could go to paragraph 6.1?

 6               THE WITNESS:  He just scrolled through it.

 7               MR. HARRIS:  There we are.

 8    BY MR. HARRIS:

 9          Q.   Now, as the managing member of the LLC, you

10    understood that you had an obligation to oversee the business;

11    is that correct?

12    A.    That's correct.

13          Q.   It was your obligation to review the accounting --

14    A.    Yes.

15          Q.   -- right?  And in fact, you drove to the site

16    several times to observe the progress; is that right?

17    A.    Yes.

18          Q.   You also testified, you spoke directly to the

19    bookkeeper at Mr. Kagan's company; is that right?

20    A.    That's correct.

21          Q.   Kristina was her name?

22    A.    Yes.

23          Q.   And then when Kristina left, you also communicated

24    with the gentleman that replaced her --

25    A.    Yes.
```



```
 1        Q.   -- is that right?

 2   A.   That's correct.

 3        Q.   And when you asked questions of Kristina that she

 4   couldn't answer, they were escalated to Mr. Kagan to answer;

 5   is that right?

 6   A.   He was in copy.

 7        Q.   I'm sorry?

 8   A.   I think he was in copy on those emails, and we discussed

 9   that in our meetings.

10        Q.   All right.  Now, you received accountings

11   periodically during the construction; is that right?

12   A.   Yes.

13        Q.   Right.

14        MR. HARRIS:  Could you go to Exhibit 243, please?

15   That would be in our -- the defendants' side.

16        MR. PERTEN:  Let's see if I can find it.  Your Honor,

17   if I could indulge Mr. Harris' assistance for a moment?

18        THE COURT:  Sure.

19   BY MR. HARRIS:

20        Q.   All right.  We've pulled up on the screen view

21   Exhibit 243.

22        THE COURT:  Is that in evidence?

23        MR. HARRIS:  I believe it is.

24        THE COURT:  243?

25        MR. CARNATHAN:  I doubt I objected.
```

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1          MR. HARRIS:  I believe it is, Your Honor.  I'm told

2     243 is in evidence.  I'm told 243 is in evidence.

3          THE COURT:  Okay.

4          MR. HARRIS:  Ma'am, we have Exhibit 243 up on the

5     screen for you.  Do you agree with me that this is an

6     accounting that was provided to you by Mr. Kagan or someone in

7     his company around May 19th of 2014?

8     A.    I believe so.

9          Q.   Okay.  And you reviewed accountings as you received

10    them from Mr. Kagan?

11    A.    Yes.

12         Q.   Now, this project was not complete in May of 2014,

13    you testified to that already.

14    A.    Yep.

15         Q.   So this was information provided to you during the

16    construction?

17    A.    That's correct.

18         Q.   And you knew that some of these numbers might

19    change, right?

20    A.    Right.

21         Q.   In fact, on this agreement, some of the notations on

22    the right-hand side indicate some of these numbers might, in

23    fact, change; is that correct?

24    A.    That's correct.

25         Q.   We see on the right-hand column, there are several

 1  that have depends on period of time, right?

 2  A.   Yes.

 3       Q.   You understood that the interest cost might go up?

 4  A.   That's correct.

 5       Q.   And the taxes might go up?

 6  A.   That's correct.

 7       Q.   Now, at your deposition you were asked if you could

 8  identify and find any numbers on this accounting that were

 9  inaccurate, and you couldn't identify any; is that right?

10  A.   I mean, it's been six years ago.  Probably -- I don't

11  remember.

12       Q.   Okay.

13  A.   And I try hard not to remember.

14       Q.   Right.  Okay.  So as you sit here today, you can't

15  identify any numbers on this accounting that are inaccurate?

16  A.   I can't identify because I don't see the accounting and

17  I'm not digging into the numbers.  But I can't tell you

18  whether they're accurate or inaccurate.

19            MR. HARRIS:  Can you scroll down just a little bit,

20  please?  Next page, sorry.

21  BY MR. HARRIS:

22       Q.   There's a total at the end of this Exhibit 243; do

23  you see that?

24  A.   Yes.

25       Q.   And the number's a little hard to read on screen,

```
 1    but the number's north of 1.7 million, you'd agree with that?

 2    A.   Yes, that's correct.

 3         Q.   So on May of 2014, the project is projected to

 4    exceed 1.7 million?

 5    A.   That's correct.

 6         Q.   And did you tell Mr. Kagan to stop?

 7    A.   No, I did not.

 8         Q.   I think you testified on direct that Mr. Kagan did

 9    provide you invoices for some of the vendors; is that right?

10    A.   Mr. Kagan's office did, yes.

11         Q.   Okay.

12            MR. HARRIS:  John, could you go to Exhibit 247?

13    Okay.  I believe this exhibit's also in evidence.

14    BY MR. HARRIS:

15         Q.   This is an email addressed to you, dated August 7th,

16    2014; would you agree with that?

17    A.   Yes.

18         Q.   And if you scroll down just a little bit, just to

19    establish who sent it, I believe this came from Kristina.  Is

20    that consistent with your recollection?

21    A.   Yes.

22         Q.   All right.  She was the bookkeeper at the time?

23    A.   I think it was summer of 2014 when the bookkeepers

24    switched, but -- so I don't exactly remember --

25         Q.   Okay.
```



1   A.   -- whose email that was.

2       Q.   In any event, you would agree that this email

3   provides information about several of the vendors that were

4   paid on your project; is that right?

5   A.   Yes, that's correct.

6       Q.   Okay.  And there's a breakdown of the excavation

7   costs, if we look at --

8   A.   Yes.

9       Q.   -- Exhibit number 3.  And if we scroll down a little

10  bit, you'll see there's a reference to five attachments to

11  this email.  Do you recall receiving those attachments?

12  A.   Yeah.

13      Q.   So here's in August, now you're provided with some

14  additional financial information about the project, correct?

15  A.   Yes, that's correct.

16      Q.   And did you tell Mr. Kagan to stop?

17  A.   No, I did not.

18      Q.   Now, you and your husband controlled eighty percent

19  of the votes in the operating -- I'm sorry, in the limited

20  liability company; is that right?

21  A.   Yes.

22      Q.   Okay.  And in fact, you testified that you called a

23  company meeting in September or October of 2014; is that

24  right?

25  A.   That's correct.



1        Q.   And you understood, then, that you had the ability

2   to call those meetings, it was your right under the operating

3   agreement.

4   A.    That's correct.

5        Q.   But the meeting in September-October was the only

6   meeting that you called?

7   A.    Officially, yes.

8        Q.   Now, you asked Mr. Kagan to be financially

9   responsible for any costs that exceeded $1.7 million; is that

10  right?

11  A.    Yes, that's correct.

12       Q.   And in fact, he fronted the money for those costs

13  above $1.7 million; is that right?

14  A.    Would you define, fronted the costs?

15       Q.   Well, as those costs were incurred, he paid them.

16  A.    From the loan money.

17       Q.   Okay.  Well, how much was the construction loan?

18  A.    It was way -- it was over the construction budget.  It

19  was more than the construction budget.

20       Q.   All right.  When the -- well, let's come at it this

21  way.  When costs exceeded $1.7 million, did either you or your

22  husband pay any of those vendors?

23  A.    No, we did not.

24       Q.   You asked Mr. Kagan to agree to be financially

25  responsible for any costs above 1.7 million; is that right?

 1    A.    That's correct.

 2          Q.    And he agreed to do so?

 3    A.    There was a disconnect between what exactly we asked him

 4    and the document that he signed.

 5          Q.    He wanted to be reimbursed at closing?

 6    A.    That's correct.

 7          Q.    Okay.  But he took the risk that it would be

 8    insufficient proceeds from the sale of the home to cover the

 9    expenses above 1.7 million, right?

10    A.    I'm not sure I understand your question.

11          Q.    Okay.  He agreed to be financially responsible in

12    the first instance, for costs above 1.7 million, correct?

13    A.    He signed the document that he will cover costs that --

14    that are in addition to what was already spent, yes.

15          Q.    Okay.  And he, therefore, took the risk that there

16    would be insufficient money at closing to pay him back for

17    those costs?

18    A.    I'm not sure what risk he took.

19          Q.    All right.  Well, did you or your husband undertake

20    that risk?

21    A.    I didn't take the risk because there were money left in

22    the -- still in the construction loan that Mr. Kagan keep --

23    kept using up until the closing date.

24          Q.    Do you agree that if a contractor did work on the

25    project, the contractor should be paid?



1   A.    Correct.

2         Q.    And you're not aware of any contractors that

3   submitted invoices or bills for your project that were

4   fraudulent?

5   A.    Well, define fraudulent in that case.

6         Q.    Are you aware of any subcontractors that submitted

7   invoices on your project that didn't actually do the work?

8   A.    No, I'm not.

9         Q.    Now, you knew that the property was to be listed for

10  sale by Tatiana Kagan; is that right?

11  A.    Yes.

12        Q.    And you approved of the listing price?

13  A.    I did not sign the listing or the listing price, and it

14  was decided by Mr. Kagan and he suggested that's the right

15  price.

16        Q.    Did you approve the listing price?

17  A.    Not in writing.

18        Q.    Okay.  Could you turn in your deposition to page 88,

19  please?  The transcript that I provided to you.

20  A.    Oh.  Sure.

21        Q.    Do you have that page?

22  A.    Yes, I do.

23        Q.    Okay.  Let's start at line 10.

24        Question:  "Did you have any role in deciding what to

25  list it at?"  Answer:  "No."  Question:  "As managing partner,



1    were you part of the discussion about how much the house

2    should be sold for?"  Answer:  "I was aware of it."  "And you

3    approved of whatever it was listed at?"  Answer:  "Yes."  Did

4    I read that correctly?

5    A.    Yes.

6         Q.    All right.  Now, when you invested at the very start

7    of the project, you thought that the final completed home

8    would sell safely for between 5.6 and $5.7 million; is that

9    right?

10   A.    I think the conversation was between 5.6 and 6.

11        Q.    Okay.  Can you turn to page 88 of your deposition?

12   A.    88?

13        Q.    Yes, ma'am.  88.

14   A.    Okay.  I'm there.

15        Q.    Line 20.  Question:  "What did you expect this

16   property would sell for when you first went into the deal?"

17   Answer:  "I think there was a discussion of 5-6, 5-7 to be on

18   the safe side."  Question:  "You were expecting 5-6, 5-7,

19   somewhere in that ballpark?"  Answer:  "We knew that was a

20   safe bet."  Did I read --

21   A.    That was a --

22        Q.    -- that correctly?

23   A.    -- safe bet, yes.

24        Q.    Okay.  Now, in fact, the home sold for close to 6

25   million; is that right?



 1    A.    That's correct.

 2         Q.    The final purchase price was $5,988,000; is that

 3    right?

 4    A.    Yeah.

 5         Q.    Yes?

 6    A.    Yes, that's correct.

 7         Q.    Okay.  So that's higher than the safe price you

 8    identified before you identified before you --

 9    A.    That's correct.

10         Q.    -- invested.  And you agreed to sell for 5.98

11    million?

12    A.    Yes.

13              MR. HARRIS:  Could we bring up Exhibit 169?  It will

14    be in the plaintiffs' section.

15              THE COURT:  Can you give me an idea of how much time

16    you need with this witness?

17              MR. HARRIS:  Five to ten minutes.

18              THE COURT:  Okay.  All right.

19              MR. PERTEN:  169?

20              MR. HARRIS:  169.

21    BY MR. HARRIS:

22         Q.    Have you ever seen this document before, ma'am?

23    A.    Yes, I did.

24         Q.    Okay.  This is -- we would agree, this is the

25    printout of the multiple listing service for the home that you

1    built; is that right?

2    A.    That's correct.

3         Q.    All right.

4              MR. HARRIS:   Attorney Perten, could you scroll all

5    the way down to the end, please?   I'm sorry, I misdirected

6    you.   The end of the actual text.

7    BY MR. HARRIS:

8         Q.    Okay.  Do you see the section, market history?

9    A.    Yes.

10        Q.    All right.  Now, this market history indicates that

11   the property was listed for sale on October 17th, 2014.  Is

12   that consistent with your memory?

13   A.    I think so.

14        Q.    All right.

15   A.    Yep.

16        Q.    And it says it was initially listed for 6,499,000.

17   Is that consistent with your memory?

18   A.    Yep.

19        Q.    That's the sale price that you approved?

20   A.    Honestly, I don't remember at --

21        Q.    Right.

22   A.    -- this point.

23        Q.    In any event, do you see the next line down, on

24   October 22nd, it says that it went under agreement five days

25   later; do you see that?

```
 1    A.    Yes, I do.

 2          Q.    Is that consistent with your memory?

 3    A.    I don't recall the --

 4          Q.    Right.

 5    A.    -- the date of it.

 6          Q.    Do you remember, however, that it was a quick sale?

 7    A.    There were multiple conversations and showings prior to

 8    listing the property.

 9          Q.    I understand.  But this indicates that the property

10    went on the market on October 17th.

11    A.    Yep.

12          Q.    Do you have any reason to doubt that date?

13    A.    No.

14          Q.    And it says it went under agreement five days later.

15    Do you have any reason --

16    A.    No.

17          Q.    -- to doubt that date?  Do you have any information

18    as to what Ms. Kagan did to market your property?

19    A.    I don't know the details, but I know there were showings

20    to clients before the property was listed.

21          Q.    All right.  And in any event, it went under

22    agreement in five days?

23    A.    Yes.

24          Q.    Now, let's talk about the extra costs.  You had some

25    discussions with Mr. Kagan about the extra costs?
```



Page 173

 1   A.   I did.

 2        Q.   All right.  And there was back and forth on that

 3   topic over the period -- over a period of several weeks; is

 4   that right?

 5   A.   That's correct.

 6        Q.   You also met with Dan Gersh, who worked at Mr.

 7   Vadim's company; is that right?

 8   A.   That's correct.

 9        Q.   To discuss the extra costs specifically?

10   A.   Yes.

11        Q.   All right.  Now, Mr. Gersh gave you a copy of the

12   Quickbooks file that the company, Mr. Kagan's company, kept

13   for the project; is that right?

14   A.   That's correct.

15        MR. HARRIS:  And if we look at Exhibit 255, John?  It

16   will be in the defendants' side.

17   BY MR. HARRIS:

18        Q.   Do you agree with me, ma'am, that this is a copy of

19   the Quickbooks file that was provided to you?

20   A.   Yes.

21        Q.   All right.  That you had the ability to analyze the

22   financial information that was being provided to you; is that

23   right?

24   A.   That's correct.

25        Q.   He also -- Mr. Gersh also provided you with a

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1   balance sheet and list of unpaid bills; is that right?

2   A.   That's -- yes.

3        Q.   Okay.  At deposition you were asked to identify any

4   contractors who billed on this project more than they should

5   have; do you remember that?

6   A.   I asked -- there were a lot of questions being asked, I

7   don't remember all of them.

8        Q.   All right.  Do you recall that you were unable to

9   identify any contractors who billed more than they should

10  have?

11  A.   In particular, no.

12       Q.   Okay.  Well, is that your -- today can you identify

13  any contractors that billed more than they should have?

14  A.   Well, there were overcharges by certain contractors.  One

15  of them being in excavation, one line item.

16       Q.   All right.  And that's the one you've identified?

17  A.   And I just know that excavation was spent more than it

18  was projected in the -- in the project costs.

19       Q.   Okay.  Do you have any information that the

20  excavation company did not provide --

21       MR. HARRIS:  Strike that.

22  BY MR. HARRIS:

23       Q.   Do you have any information about the scope of work

24  that the excavation company provided to your project?

25  A.   I don't know the details.



```
 1          Q.   in fact, you merely guessed that the final balance
 2   was improper or false; is that right?
 3   A.    Yes.
 4          Q.   You never confirmed your guess?
 5   A.    I'm not sure.
 6          Q.   You guessed that the final balance was too high, but
 7   you've never confirmed that guess; is that right?
 8   A.    I don't understand what you mean by confirming my guess.
 9          Q.   All right.  Well, did -- well, let's come at it this
10   way.  At the time of your deposition, you were asked if you
11   had any proof of fraud, and you identified nothing; do you
12   remember that?
13   A.    I don't have any proof.
14          Q.   Today you have no proof of fraud?
15   A.    No, I don't.
16          Q.   You consulted with -- I'm not asking you about the
17   communications you had -- the substance of the communications
18   that you had on this topic, but you in fact consulted with a
19   lawyer about the possibility of initiating suit against Mr.
20   Kagan, correct?
21   A.    That's correct.
22          Q.   And in fact, you filed a suit; is that right?
23   A.    That's correct.
24          Q.   And you dismissed it voluntarily?
25   A.    Yes, I did.
```



```
 1        Q.    Because you decided it was not worth pursuing?

 2   A.    Yes.

 3        Q.    You dropped that case because you had no

 4   justification; is that right?

 5   A.    No, that's -- that is not correct.

 6        Q.    All right.  Can you turn to page 145 in your

 7   deposition, please?

 8   A.    Sure.  Whenever you're ready.

 9        Q.    Okay.  145, there's actuallya  discussion at the top

10   of 145 about the possibility of bringing criminal charges

11   against Mr. Kagan.  That was something you considered; is that

12   right?

13   A.    That's correct.

14        Q.    All right.  But let's skip down a little bit.

15        Is it fair to say -- I'm at line 18.  Question:  "So is

16   it fair to say you were not aware of any criminal activity

17   that Mr. Kagan engaged in?"  Answer:  "There's definitely

18   fraud activity."  Question:  "What fraud?  To my knowledge, I

19   don't have justification.  That's why we dropped our case.  To

20   the best of my knowledge, I think there's fraud in here."

21   Now, when you were referring to dropping your case, you were

22   referring to the litigation you actually initiated; is that

23   right?

24   A.    Yes.

25        Q.    So you dropped that case because you didn't have
```

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    justification?

2    A.    We didn't have at the moment, and we decided not to

3    pursue looking for a justification.

4        Q.    Okay.  Now, you were dissatisfied with how the

5    profits of the endeavor were reflected on your tax return; is

6    that right?

7    A.    Yes.

8        Q.    And who prepared the tax return?

9    A.    Mr. Kagan's tax lawyer.

10       Q.    Jason Gordon?

11   A.    Yes.  That's correct.

12       Q.    All right.  Now, he characterized the money you

13   received as ordinary income; is that right?

14   A.    That's correct.

15       Q.    And you wanted it characterized it as capital gains?

16   A.    That's correct.

17       Q.    And you had several discussions with Mr. Gordon

18   about that; is that right?

19   A.    I did.

20       Q.    And in the end, it remained as ordinary income?

21   A.    He didn't -- yeah, he objected to adjust that.

22       Q.    Okay.  And am I correct that the plan for this

23   project, this property, was to build it and sell it; is that

24   right?

25   A.    Yes.



 1        Q.    It was never the intention to build this property

 2   and hold onto it and rent it?

 3   A.    No.

 4        Q.    Now, after receiving the Quickbooks files and the

 5   other financial information that we received, you ultimately

 6   reached an agreement with Mr. Kagan, you've testified to that;

 7   is that right?

 8   A.    Yes.

 9        Q.    And you told Mr. Kagan that you and your husband

10   would accept $750,000, right?

11   A.    That's correct.

12        Q.    That's a number that you provided to him.

13   A.    After back and forth, that was the number we agreed on.

14        Q.    All right.  You received your entire investment

15   back, 1.4 million, right?  And you said you got the $80,000

16   back from the savings account; is that right?

17   A.    Yep.

18        Q.    And an additional $750,000?

19   A.    That's correct.

20        Q.    Now, there was a company bank account, correct?

21   A.    That's correct.

22        Q.    And in exchange -- at the time you received the

23   $750,000, you transferred your interest in the LLC to Mr.

24   Kagan; is that right?

25   A.    I believe so.  I remember that part of the deal was

1    whoever becomes the manager of LLC, but I don't remember the

2    details at this point.

3         Q.   Okay.  And did you also withdraw the remaining

4    $3,000 that were in the company bank account?

5    A.   Yes, I did.

6         Q.   So you received $753,000?

7    A.   Yes, that's correct.

8         MR. HARRIS:  I believe I'm done.  If I could just

9    have one moment, Your Honor?  I have no further questions,

10   Your Honor.

11        THE COURT:  Okay.

12        MR. CARNATHAN:  Maybe just one or two.

13        THE COURT:  That's fine.

14                        REDIRECT EXAMINATION

15   BY MR. CARNATHAN:

16        Q.   Ms. Lande --

17        MR. CARNATHAN:  Bill, could I have that one back?

18        THE CLERK:  Oh, sorry.  One second.  There he is.

19        MR. CARNATHAN:  No, that's fine.  I think that was

20   247?

21   BY MR. CARNATHAN:

22        Q.   So when we look at the first page of 247, the

23   excavation, masonry, and landscaping numbers, do you see

24   those?

25   A.   Yes, I do.

1      Q.   So 130,000 for excavation, 160,000 for masonry,

2    150,000 for landscaping.  Do you know who that money was going

3    to get paid to?

4    A.   Mr. Kagan's excavation company, I believe.

5      Q.   And when we look at the attachments that were

6    provided, were any of these attachments giving you more

7    explanation about the basis for those charges?

8    A.   I guess the name of the construction -- of the

9    outsourcers.

10      Q.   So you decided not to proceed with your lawsuit

11    before going through discovery; is that right?  You didn't

12    request documents and do depositions and all that kind of

13    stuff?

14    A.   No, we did not.

15      Q.   No.  So other than what Mr. Kagan gave you, do you

16    have any way of knowing whether these subcontractors actually

17    charged him what he claims they charged him?

18    A.   No, we do not.

19          MR. CARNATHAN:  Your Honor, I have the same thought

20    with regard to the listing agreement that was shown to her,

21    Exhibit 169 for identification.  That was a hearsay document

22    that has now been used to refresh her recollection, so I think

23    now I'm entitled to offer it under 612(b).  So maybe the same

24    issue for tomorrow?

25          THE COURT:  Well, let's see if there's an objection

1    to it being entered into evidence.

2            MR. HARRIS:  We have no objection, Your Honor.

3            THE COURT:  All right.  So it's in --

4            MR. CARNATHAN:  Then, I'd offer 169, then.

5            THE COURT:  It's admitted.

6        PLAINTIFF'S EXHIBIT 169 WAS ADMITTED INTO EVIDENCE

7            MR. CARNATHAN:  Thank you.  That's all from me, Your

8    Honor.

9            THE COURT:  All right.  Any --

10           MR. HARRIS:  No, thank you.

11           THE COURT:  -- further cross?  Okay.

12           Thank you, ma'am.

13           MR. HARRIS:  Thank you, ma'am.

14           THE COURT:  Okay.  So anything else for today?  Where

15   are we, in terms of where you expected you might be?  Are we

16   on track, or --

17           MR. CARNATHAN:  We've fallen behind, unsurprisingly.

18           THE COURT:  Right.

19           MR. CARNATHAN:  It's become a little bit of a Tetris

20   game, trying to fit the witnesses together because we have the

21   additional difficulty of -- I've got a couple of witnesses who

22   need interpreters.  And having the interpreter here becomes

23   another factor in the Tetris puzzle.

24           So we've got a plan for tomorrow, I think.  But I was

25   going to call Joseph Cohen.  He can't probably be here exactly

1    by 9, he might not be here until 9:15.  I might be able to

2    call Mr. Kaiserman if Mr. Cohen doesn't make it because I've

3    got him subpoenaed for tomorrow.

4         The interpreter can't be here until 10:30 to help

5    with Mr. Lipetsker.  But then I've also got Mr. Goldman flying

6    in, who's only here for tomorrow and the next day.  And so

7    he's the expert who --

8         THE COURT:  Right.

9         MR. CARNATHAN:  And so I really want to get him in

10   and out tomorrow and Friday.  So it's a little tricky.  I'm

11   hoping to do a couple of the short witnesses, or at least one

12   of them, tomorrow morning and then go to Mr. Goldman to make

13   sure he's up and down while we've got him here --

14        THE COURT:  Right.

15        MR. CARNATHAN:  -- and then fill in the rest of it.

16   But it's becoming challenging, to be honest.

17        THE COURT:  Okay.  All right.  Is there anything we

18   can do with the time?  Can we adjust the time in some way, if

19   that would facilitate the situation?  I guess what I'm saying

20   is, if we went to a whole-day format for either tomorrow or

21   Friday?

22        MR. CARNATHAN:  I'd have to talk to my interpreter

23   and think about it.  I'm actually not sure because things

24   move.

25        THE COURT:  Okay.  Well, why don't we take that up

 1   first thing tomorrow morning?  And if we go to a full day then

 2   I would just have a lunch break.  I haven't actually looked at

 3   my schedule.

 4        So I have a conference call at 4, which I'd like to

 5   make.  But I'll take -- we'll consider whether going a longer

 6   day tomorrow would be helpful to getting the trial done.  So

 7   we'll come and talk about that first thing in the morning.

 8        Is that acceptable, Mr. Perten, to you, if we go

 9   longer tomorrow?

10        MR. PERTEN:  It's acceptable as long as I know who's

11   going to be called so that I can prepare.

12        THE COURT:  Well, that's -- I did make that ruling,

13   or gave that direction.  And make sure you tell them, all

14   right?

15        MR. CARNATHAN:  Of course, Your Honor.

16        THE COURT:  I think you may have heard the list just

17   now.

18        MR. PERTEN:  Yeah, no.  The reason I say that is

19   because we had been discussing during the break potential

20   witnesses and certain witnesses Mr. Carnathan was planning on

21   Friday.  So if it now comes to Thursday because we have more

22   time, I just need to know that.

23        THE COURT:  I understand.  Okay.  All right.

24        Well, why don't you guys talk about that?  And yeah,

25   he's got to know who you're going to call so he can come ready

1    to do it, okay?

2         Nothing else for today?

3         MR. CARNATHAN:  Are we jury boxing or leaving on the

4    table today, Your Honor?

5         THE COURT:  Yeah.  No one else here today, so you can

6    leave everything on the table, if you want.  Okay?

7         MR. CARNATHAN:  Okay.  Thank you.

8         THE COURT:  Very well.  See you tomorrow.

9         MR. HARRIS:  Thank you, Your Honor.

10         THE CLERK:  All rise.  Court's in recess.

11   (End at 1:29 PM)

12                  * * * * * * * * * *

13         I certify that the foregoing is a true and accurate

14   transcript from the digitally sound recorded record of the

15   proceedings.

16

17   *[signature]*

18

19   /s/ Colin Richilano                    May 30, 2019
     _____
20
     ESCRIBERS LLC
21                        eScribers
                    7227 N. 16th Street, Suite #207
22                     Phoenix, AZ 85020
                         973-406-2250
23              e-mail operations@escribers.net

24

25

     #15-13881; AP# 16-01120                5-8-2019

**$**

**$1.1 (2)**
67:9,16
**$1.2 (2)**
83:22;104:7
**$1.3 (2)**
47:15;60:9
**$1.4 (3)**
140:14,16;152:21
**$1.5 (2)**
104:24;105:5
**$1.7 (4)**
143:16;166:9,13,21
**$10,067 (1)**
146:22
**$100,000 (5)**
85:5,21;115:11,15;
143:19
**$107,000 (1)**
19:19
**$13,949.50 (1)**
19:4
**$13,950.35 (1)**
19:7
**$132,788.53 (1)**
17:24
**$155,000 (1)**
117:16
**$16,000 (1)**
68:22
**$170,000 (2)**
90:9,11
**$2 (4)**
17:10;23:11;47:14;
66:7
**$2.1 (1)**
144:11
**$200,000 (4)**
45:19;47:18;56:5;
65:9
**$22,950 (1)**
147:3
**$235,000 (1)**
31:24
**$250,000 (1)**
74:4
**$3,000 (1)**
179:4
**$3.8 (2)**
67:15,15
**$351,000 (1)**
67:20
**$4 (1)**
58:19
**$435,000 (2)**
17:9,10
**$45,000 (1)**
105:6
**$493,000 (1)**
67:24
**$5,440 (1)**

147:1
**$5,499,000 (1)**
9:22
**$5,988,000 (1)**
170:2
**$5.7 (1)**
169:8
**$50,000 (1)**
53:9
**$500,000 (3)**
74:1,4;117:19
**$510,000 (4)**
86:7,11,24;90:5
**$6,333.33 (1)**
18:16
**$6,500 (1)**
15:15
**$6,649.99 (1)**
18:23
**$6,650 (1)**
19:1
**$600,000 (1)**
23:3
**$65,000 (1)**
146:24
**$75,000 (1)**
68:18
**$750,000 (6)**
149:1;152:18;153:1;
178:10,18,23
**$753,000 (1)**
179:6
**$8,695 (2)**
15:23;27:6
**$80,000 (2)**
140:22;178:15
**$9,670 (1)**
146:20

**@**

@kagandevelopmentcom (1)
24:21

**A**

**ability (2)**
166:1;173:21
**able (17)**
15:6;20:7;37:12;
52:16;57:2,7,8;60:22;
62:15;63:7,10;65:12,
13;100:17;138:1;
148:16;182:1
**above (7)**
8:5;63:21;143:16;
166:13,25;167:9,12
**Abramskiy (1)**
130:7
**absolutely (16)**
12:11;38:18;45:9;
48:3;78:24;80:25;
115:5,6,6;122:15,20;

136:6;140:25;151:21;
152:15;155:16
**accede (1)**
34:4
**accept (2)**
157:17;178:10
**acceptable (3)**
48:13;183:8,10
**access (3)**
68:3;159:5,19
**accomplish (1)**
23:7
**accordance (1)**
14:22;55:17
**according (3)**
28:5;31:8;114:13
**account (18)**
21:12,16;31:18;53:8;
140:18,21;151:22;
152:24;159:5,9,12,13,
16,19,22;178:16,20;
179:4
**accountant (1)**
142:22
**accounting (9)**
132:1;142:20,21,23;
160:13;162:6;163:8,
15,16
**accountings (2)**
161:10;162:9
**accounts (1)**
146:10
**accurate (7)**
97:10;102:6;108:23;
110:7,10;118:15;
163:18
**accurately (1)**
128:1
**acknowledge (1)**
6:1
**acquainted (1)**
37:24
**acquired (1)**
159:13
**acquisition (1)**
15:2
**active (1)**
107:25
**activity (2)**
176:16,18
**actual (7)**
10:4;12:12;13:23;
46:23;57:7;154:22;
171:6
**actually (39)**
6:18;8:13;13:20;
14:3;16:2,13;20:22;
27:15;32:2;40:8;42:1;
43:3;44:14;47:3;48:18;
51:1;58:9;59:6;60:2,7,
22;65:5,8;72:25;73:17;
83:11;105:19;132:5;
136:15;137:5;139:17;

140:15;153:16,20;
168:7;176:22;180:16;
182:23;183:2
**actuallya (1)**
176:9
**actuarial (2)**
36:11,12
**Actuaries (1)**
36:10
**actuary (5)**
36:2,3,6,9,11
**add (1)**
109:20
**added (2)**
116:5,11
**adding (1)**
64:16
**addition (5)**
17:10;39:2;44:20;
52:9;167:14
**additional (11)**
7:21;14:24;17:14;
56:13;69:5;115:15;
118:6;140:17;165:14;
178:18;181:21
**additions (2)**
116:5,11
**address (6)**
7:21;30:17;73:13;
159:2,3,10
**addressed (1)**
164:15
**adduce (1)**
72:8
**adduced (2)**
72:7,21
**adequate (2)**
110:10;111:3
**adjust (2)**
177:21;182:18
**admission (1)**
11:24
**admit (1)**
82:21
**ADMITTED (7)**
136:1,15;139:6;
142:5;146:2;181:5,6
**advanced (1)**
105:3
**advances (2)**
21:4,8
**adverse (2)**
125:7,9
**affect (1)**
52:4
**affidavit (17)**
85:6;87:18,20;89:13;
90:3,17;120:3,6,13;
123:4,9;124:6,14;
125:16,17;126:8;
129:13
**affirmative (1)**
71:12

**affirming (1)**
111:8
**afield (1)**
71:18
**afloat (1)**
84:21
**afraid (2)**
29:2;63:10
**Afterward (1)**
129:17
**afterwards (1)**
27:19
**again (24)**
21:18;26:8;27:3;
30:1;31:13;45:1;49:23;
50:5;52:10;54:16;
55:18;61:20;64:5;
65:24;67:2,10;69:13;
76:6;77:24;103:6;
107:20;116:8;121:10;
148:23
**against (4)**
44:2;119:19;175:19;
176:11
**ago (5)**
26:8;27:16;30:12;
33:15;163:10
**agree (18)**
7:1;28:21;79:10;
103:20,23;104:1;
106:7;144:5,20,25;
162:5;164:1,16;165:2;
166:24;167:24;170:24;
173:18
**agreeable (1)**
48:12
**agreed (10)**
12:18;15:14;51:16;
72:24;117:21;132:19;
167:2,11;170:10;
178:13
**agreement (38)**
8:11;10:4,7;13:24;
14:3;25:24;26:2,7,13,
20;29:6,10,11,17;32:3;
33:17;74:12,19;75:20;
129:13;133:4,10,19;
136:6;137:4;138:3;
154:13;155:15,18,21;
158:1;162:21;166:3;
171:24;172:14,22;
178:6;180:20
**agrees (1)**
105:18
**ahead (6)**
41:20;109:22;130:9;
131:8;137:22;138:6
**al (1)**
4:10
**Alex (8)**
4:7,15;37:14,15;
49:6,8;61:6;69:2
**all-cash (2)**

62:22;64:19

**allege (1)**
12:9
**alleged (2)**
7:22;12:6
**allegedly (1)**
90:6
**allocated (1)**
104:22
**allocation (22)**
33:19;44:22;45:2,24;
48:8;50:12;58:1,2,3;
61:21;62:4,12,16;64:4;
66:14;67:12,12,20,21,
22;68:4,5
**allow (3)**
32:12,15;109:23
**allowed (1)**
125:3
**Almost (2)**
63:19;121:23
**along (4)**
6:22;68:12;79:13;
136:3
**alternative (2)**
44:24,24
**alternatives (1)**
44:23
**although (1)**
30:16
**altogether (1)**
58:19
**always (4)**
53:13;72:24;136:7;
145:5
**ambiguous (1)**
71:15
**amended (4)**
10:11,16,19;11:5
**among (6)**
45:2;48:1;58:1;66:9;
146:19;154:6
**amount (19)**
41:8;51:3,4;53:15;
55:14;56:1;59:19;60:4,
6;73:24;74:4;87:10,11;
104:24;105:6,7;106:5;
123:17;152:6
**amounts (1)**
103:2
**amplify (1)**
35:13
**Ana (2)**
36:23;43:16
**analyses (1)**
94:14
**analysis (13)**
42:14;45:5,11;47:21;
49:18;50:21;51:17;
62:19;63:5;69:1;94:18;
113:13;152:1
**analyze (1)**
173:21

**annum (1)**
14:24
**anticipated (4)**
96:11;151:24;154:7;
155:2
**Anya (1)**
43:14
**anymore (1)**
38:9
**apartment (7)**
150:14,17,20,21,22,
22,25
**apologies (1)**
77:4
**apologize (4)**
75:9;83:5,7;109:9
**apparently (4)**
69:17;80:19;130:12;
146:19
**appears (1)**
87:25
**application (1)**
83:17
**applied (1)**
133:5
**appreciate (1)**
157:19
**approach (5)**
67:19;133:21,23;
137:1;156:8
**approached (2)**
73:18,20
**appropriate (4)**
77:16;89:4;104:25;
106:5
**approve (5)**
7:16;84:8,11;155:10;
168:16
**approved (4)**
7:23;168:12;169:3;
171:19
**approving (1)**
155:4
**approximately (3)**
11:10;83:8;153:4
**April (11)**
76:21;83:12;85:23;
86:6,6,14,15,17,25;
122:2,3
**arbitrary (1)**
53:13
**architectural (1)**
155:1
**area (1)**
151:13
**argued (1)**
71:19
**argument (3)**
72:4,14;126:12
**around (11)**
13:24;18:6;35:17;
60:24;112:3,4,23;
143:18;144:8;154:20;

162:7
**arrived (1)**
106:3
**aside (1)**
79:19;134:25
**assert (3)**
8:9,14;10:12
**assertion (4)**
7:21;8:7;9:20;10:4
**assign (1)**
21:2
**assigning (1)**
151:5
**assistance (1)**
161:17
**associate (1)**
92:23
**associated (6)**
50:25;51:1,22;103:3;
141:19;159:6
**assume (1)**
128:24
**assuming (2)**
65:16;148:20
**assumption (2)**
12:23;27:21
**assumptions (13)**
12:19,22;45:14;
57:24;68:6;94:25;
95:18,19,21,22;113:16,
24;114:2
**assure (1)**
33:16
**attached (3)**
14:3,9;47:21
**attachments (5)**
145:14;165:10,11;
180:5,6
**attend (3)**
58:9;92:22;110:19
**attention (5)**
26:10,11;48:5;73:16;
95:13
**Attorney (12)**
36:25;42:20;92:7,23;
135:17;151:2,5;
155:17,20;156:5;
159:24;171:4
**attorney's (1)**
42:15
**auction (1)**
23:16
**auctioned (1)**
23:13
**August (11)**
20:24;24:11,18,20;
84:2;143:1,14;144:9;
145:5;164:15;165:13
**August-September (3)**
83:3,9;86:22
**aunt (1)**
37:3
**authenticate (1)**

137:15
**authorized (1)**
10:6
**Avenue (34)**
38:24;46:14;55:10;
73:14;75:20;76:8,9,11;
101:6,12;104:4,7;
105:12;107:25;108:16;
109:2,5;110:6;115:21,
22;116:10,16;117:17;
119:22;120:4,17,25;
121:4,19;122:17,18,19;
123:18;129:12
**avoid (1)**
23:12
**aware (10)**
107:4,6,7;142:16,18;
148:20;168:2,6;169:2;
176:16
**away (8)**
88:22,24;99:23;
144:16;145:1;148:9,
10;149:1

**B**

**Babson (2)**
132:4;149:16
**babysat (1)**
91:23
**bachelor (1)**
149:14
**bachelor's (1)**
149:20
**back (53)**
5:9;8:22;13:23;
17:19;20:20;21:17,18;
22:7;27:13;34:24;
35:17;39:4;44:4;45:22;
61:10,24;62:5;63:5;
64:3,7,16,22;65:1;
66:15,21;67:11;68:9;
69:12;73:1;75:10;
81:10,15;82:6;85:6;
88:25;97:25;98:8;
99:25;111:8;117:23;
132:1;136:7;139:24;
145:5;147:10;152:21,
24;167:16;173:2;
178:13,15,16;179:17
**background (1)**
113:4
**backup (3)**
18:2,12;42:13
**bad (1)**
139:14
**bag (1)**
5:20
**balance (3)**
174:1;175:1,6
**ballpark (1)**
169:19
**bang (1)**

69:8
**bank (40)**
19:13;21:15;23:2,9,
13,14;28:22;29:3;
46:15;55:16,20,22;
62:21;92:11;103:1;
105:3,7,17;106:4,23;
107:8,12,16,16;108:2,
5,7,18,20;110:6,9;
140:2,9,12;152:24;
159:5,9,21;178:20;
179:4
**bankruptcy (9)**
16:18,23;18:4,14;
19:17;22:24,23;23:7,12;
29:1
**Barely (1)**
120:9
**based (15)**
10:3,12;14:24;24:16;
61:13;62:4;71:10,22;
95:18;102:23;103:1;
107:4;115:11;116:25;
137:2
**basically (4)**
7:12;19:20;21:16;
68:3
**basis (4)**
91:5;128:4;135:6;
180:7
**bears (1)**
71:2
**became (3)**
24:22;125:12;142:20
**become (10)**
36:6,9;38:3;79:14;
142:16,18;143:20;
148:12;154:13;181:19
**becomes (4)**
65:2;66:6;179:1;
181:22
**becoming (1)**
182:16
**began (1)**
83:14
**begin (1)**
46:2
**beginning (1)**
130:22
**behind (2)**
23:24;181:17
**belabor (1)**
19:11
**bell (1)**
80:16
**below (7)**
22:6,14,17;25:3;
42:25;101:11,11
**benefiting (1)**
65:7
**besides (1)**
150:7
**best (12)**

29:22;30:4;42:17;
71:14,15;121:2;
122:21;123:1;125:15;
126:11;144:10;176:20
**bet (2)**
169:20,23
**better (1)**
89:9
**beware (1)**
122:5
**beyond (2)**
11:18;128:5
**bid (2)**
113:10,19
**big (1)**
23:6
**bigger (3)**
69:8;143:21,24
**Bill (4)**
8:2;12:3;90:15;
179:17
**billed (3)**
174:4,9,13
**bills (5)**
12:10;145:2;146:14;
168:3;174:1
**Bill's (1)**
137:7
**birthday (1)**
37:16
**birthdays (1)**
92:22
**bit (13)**
5:2;18:3;41:11;69:5;
75:6;82:21;92:19;
102:15;163:19;164:18;
165:10;176:14;181:19
**blind (1)**
18:19
**blow (6)**
16:7,11;17:20;18:5;
20:7;146:6
**blowing (2)**
63:6;66:21
**blue (1)**
124:5
**Bluehost (1)**
31:3
**bolded (1)**
158:12
**book (1)**
20:23
**bookkeeper (2)**
160:19;164:22
**bookkeepers (1)**
164:23
**books (1)**
21:1
**Boris (8)**
40:9,20,20;42:6,19;
61:7;133:11;136:8
**Boris's (1)**
43:16

**born (2)**
43:3;132:5
**borrow (2)**
64:23;67:3
**borrowed (1)**
68:23
**Boston (1)**
150:23
**Both (6)**
28:15;43:20;71:25;
72:16;130:22;148:19
**bottom (3)**
9:24;16:7;158:7
**boy (1)**
100:7
**Brandeis (1)**
36:7
**breached (1)**
8:10
**break (5)**
81:12,19;97:24;
183:2,19
**breakdown (1)**
165:6
**bricks (1)**
48:19
**Bridgewater (1)**
132:3
**briefly (10)**
6:8,11;12:14;21:6;
25:23;36:5;49:22;50:4;
131:25;145:16
**bring (10)**
43:18;53:20;93:6;
94:11;98:15;100:15;
103:6;113:21;156:25;
170:13
**bringing (2)**
44:25;176:10
**brings (1)**
53:5
**brisk (1)**
131:2
**broker (5)**
8:21,21,24;9:1;14:14
**Brookline (3)**
19:5,8;102:17
**Brooklyn (1)**
150:25
**brought (7)**
58:23;78:25;97:6;
100:12,16,18,21
**BST (1)**
146:20
**buck (1)**
69:8
**budget (38)**
13:1,5;46:8,9,18;
47:15;53:1;55:9;56:7;
59:25;68:14;83:15,16,
19,20;101:15,19;
103:14,17,25;107:19;
108:1,8,21,23;109:5;

110:6,9,11;140:24;
141:1,4,10;143:2,17;
153:14;166:18,19
**build (19)**
53:15;54:25;58:20;
60:9;62:15;65:8,17;
102:14,16,18;107:21,
21;132:22;151:15;
153:16,20,20;177:23;
178:1
**builder (2)**
113:2;114:5
**building (16)**
39:2;62:21;65:21;
116:17,18;117:12;
127:25;128:1;132:20,
21,22;141:19;150:14,
17,21;153:25
**built (7)**
54:24;60:11;107:20;
116:10,23;154:20;
171:1
**bulk (1)**
85:22
**bullet (1)**
154:12
**business (4)**
37:4,7;154:3;160:10
**busy (1)**
38:9
**button (2)**
97:19,19
**buyers (1)**
148:10

## C

**calculate (1)**
31:22
**calculated (10)**
31:11;50:18,19,23;
59:10,11;66:24;
102:23,25;156:1
**calculating (3)**
47:4;50:16;51:11
**calculation (1)**
51:13
**calculations (13)**
13:3;41:5;69:4;
77:10,15,17;80:1;
103:1;151:18,19;
156:19,21,22
**calculator (3)**
15:17,23;52:19
**call (17)**
29:3;35:3;56:14;
67:9,15;75:15,23;
78:14;81:1;111:15;
129:21;148:13;166:2;
181:25;182:2;183:4,25
**called (16)**
36:11;38:5;44:15;
59:12;66:23;79:3;

91:16;95:17;105:1;
107:16,17,18;148:17;
165:22;166:6;183:11
**calling (4)**
4:5;65:10;75:14,19
**calls (4)**
123:8;124:5;139:22;
148:6
**came (5)**
24:14;43:9;95:6;
104:15;164:19
**can (94)**
7:11;11:25;16:11;
17:20;18:12;19:11;
23:10;24:5,19;25:16;
27:3;28:1,19;30:25;
31:13,22;34:24;35:16;
43:17;45:20,20;47:25;
51:19;57:16,21;58:15;
59:4;60:4,6,9;61:1,24;
63:18;64:3;67:11;75:6,
6,15,24;76:23;78:2,14;
79:12;80:12,21,23,25;
81:22;87:17,23;88:2,
20,20;90:14;92:19;
93:6;94:11;95:5;97:17;
98:8,8;101:14;102:15;
103:6,9;109:21;
111:13;128:8,19,21;
129:16;136:5;137:15;
138:11,12,14,15,19;
143:4;148:2;152:3;
153:18;157:20;158:4;
161:16;163:19;169:11;
170:15;174:12;176:6;
182:18,18;183:11,25
**capacity (1)**
92:13
**capital (15)**
14:23,25;15:7;21:17;
31:9,18;62:4,18;64:8,
10,18;66:18;67:12,22;
177:15
**CARNATHAN (221)**
4:4,14,15;5:12,15,17,
20;6:5,10,12;7:5,7;8:2,
5,8;9:4,6,11,14,16;
10:21,24;11:1,4,22;
12:2,5,14,16;13:6,8;
14:6,8,18,20;15:17,20;
16:6,11,15;17:19,22;
18:6,9,10;19:22,24;
20:7,10;21:20,22,25;
22:2;23:17,19;24:16,
23;25:13;28:5,25;
32:10;33:13;34:10,12,
17,20;35:3,21,23;
39:23,25;41:19,21;
49:11,14,20;55:3,5;
61:1,3,19,23;68:9,11;
69:9,10;71:22;72:7,20;
73:5,8,9;74:23,25;75:4,
18;76:2,4,8,16;77:2,4,

23,25;79:2,18;81:6,14;
82:7,10,12;85:9,15;
86:20;87:17;88:4,6,9;
89:6,10,13,17,20,25;
90:2,15,21,25;91:7;
96:5,9;109:23;124:13,
18,20;125:2,9,23;
126:6,19,25;127:3,7,
10,19;128:3,5,17;
129:4,6,14,17,21;
130:21;131:2,5,9,11,
24;133:12,14,24;134:2,
6,10,14,17,20,22;
135:17,20;136:2,19,21;
137:7,10,14,20,23,25;
138:8,13,17,25;139:7,
8,13,16;141:11,14,25;
142:6;145:7,9,15,17;
146:3,4,6,8;149:8;
157:7,13,15;159:24;
161:25;179:12,15,17,
19,21;180:19;181:4,7,
17,19;182:9,15,22;
183:15,20
**carrying (42)**
17:14;20:13,22;22:4;
26:25;27:1,4,7,9,11,18;
28:4;31:14;34:13,15;
42:22;44:7;45:19;
46:16,18;47:4;56:5,6,
9;59:10,13,19;60:8;
68:18;69:21,23;
102:22,25;103:3;
140:2,7;156:1,18;
158:10,14,21,24
**case (12)**
4:5,10;10:17,20;
59:7;95:4;100:17;
168:5;176:3,19,21,25
**cash (1)**
67:4
**category (1)**
130:12
**caught (2)**
16:10;35:10
**cause (2)**
126:14;144:13
**cents (1)**
16:2
**Century (1)**
8:23
**certain (13)**
19:13;41:8;42:14;
55:17,24;113:24;
114:21;124:16;152:7;
156:19,20;174:14;
183:20
**certainly (15)**
11:20;49:17;57:11;
72:20;74:20;77:2;
93:24;97:13;104:11;
90:18;110:5,6;121:6;
122:25;123:16

Case 16-01120    Doc 342    Filed 06/04/19    Entered 06/04/19 13:04:08    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 188 of 206

May 8, 2019

**certificate (4)**
36:17;140:3;158:13,
19
**certification (1)**
36:13
**challenging (1)**
182:16
**chance (2)**
109:17;126:2
**change (10)**
8:21,21;33:5;45:1;
55:2;59:21,22;60:14;
162:19,23
**changed (1)**
72:5
**changes (3)**
32:7;33:19;155:21
**changing (2)**
114:21,22
**character (1)**
71:21
**characterized (2)**
177:12,15
**charge (1)**
42:21
**charged (2)**
180:17,17
**charges (4)**
118:18;127:16;
176:10;180:7
**chart (13)**
17:6;51:20,21;52:18,
23;54:6,10,12,16,17;
62:7;146:7,9
**chart's (1)**
51:20
**check (6)**
17:23;18:23;19:4,7;
118:14;119:21
**checks (6)**
19:11;101:24;102:2,
3;139:22;146:10
**child (2)**
91:24;148:21
**choice (1)**
53:13
**choosing (1)**
79:7
**chose (1)**
22:24
**circumstances (1)**
72:5
**cited (1)**
72:12
**claim (3)**
4:7,7;10:12
**claimed (1)**
105:19
**claims (1)**
180:17
**clarification (1)**
155:20
**clarify (6)**

85:10,16,17;108:14;
109:21;111:13
**clarifying (1)**
108:13
**classify (2)**
20:17,21
**clear (4)**
26:1;71:14;79:16;
112:8
**CLERK (19)**
4:2,5,5;18:8;82:3;
89:24;97:18;98:11,21,
25;99:20,21;100:4;
124:17;128:23;129:9,
12,25;156:10;179:18
**clients (1)**
172:20
**close (4)**
91:20;146:16;
147:17;169:24
**closed (3)**
28:17;34:18;92:11
**closing (25)**
42:15,20;66:2;83:12;
84:22,23;85:4,21,23,
24,25;86:4;143:6,10;
144:5,5,7;146:15,17;
147:17;148:9,14;
167:5,16,23
**closings (1)**
92:11
**CO (1)**
140:4
**Cohen (8)**
25:11;145:11;
147:12;148:2,19,20;
181:25;182:2
**coincidence (2)**
31:23,25
**collective (1)**
151:10
**collectively (1)**
30:2
**College (1)**
132:4
**column (15)**
45:13;48:5,15;50:12;
63:8,14,16;66:22,22;
94:24;95:17;104:16,
18,20;162:25
**columns (1)**
95:19
**comfortable (2)**
35:17;42:4
**comment (3)**
44:20;47:10;51:15
**comments (7)**
42:22;44:4,8,11,12,
15;51:10
**commission (1)**
66:2
**commissions (1)**
51:1

**committed (1)**
8:14
**committee (1)**
109:7
**communicated (1)**
160:23
**communications (2)**
175:17,17
**companies (1)**
92:8
**company (27)**
17:24;19:17;29:23;
30:4;33:8;65:7;74:6,9,
10,12;106:11;147:8;
150:4;153:25;158:20;
160:19;162:7;165:20,
23;173:7,12,12;174:20,
24;178:20;179:4;180:4
**compare (1)**
149:5
**compared (2)**
62:3;143:2
**complained (3)**
121:3,5,6
**complaining (1)**
120:3
**complaint (7)**
10:11,16,19,24;11:5,
12,14
**complete (13)**
23:22;39:15;53:3;
55:20,21,23;83:1,2;
105:4;142:11,12;
147:7;162:12
**completed (7)**
36:8;51:25;58:24;
105:19,23;120:18;
169:7
**completely (3)**
7:17;116:17;117:4
**completeness (1)**
135:24
**completion (2)**
33:20;105:7
**con (1)**
56:10
**concentration (1)**
132:2
**concern (5)**
8:22;62:11,11;68:21;
134:11
**concerned (2)**
8:19;68:17
**concerning (5)**
75:13;79:15;81:20;
90:5;130:24
**concerns (2)**
80:14;121:8
**conclude (1)**
61:13
**concluded (1)**
61:15
**conditions (1)**

54:19
**conference (1)**
183:4
**confirm (4)**
5:23;28:19;105:19;
125:20
**confirmed (4)**
101:25;118:15;
175:4,7
**confirming (1)**
175:8
**confused (2)**
17:5;18:3
**connecting (1)**
128:11
**connection (1)**
151:3
**consent (1)**
33:6
**consider (5)**
38:16;54:5,12;81:8;
183:5
**considered (5)**
48:11;62:16;152:5,6;
176:11
**considering (1)**
64:11
**consisted (1)**
87:8
**consistent (7)**
51:16;102:7;111:4;
164:20;171:12,17;
172:2
**consists (2)**
56:11,12
**constituted (1)**
87:3
**constraints (1)**
131:1
**constructing (2)**
54:22;56:11
**construction (108)**
13:1;18:24;19:2;
21:3,8;39:3;46:8,9,22,
23,23;47:15;48:17;
54:6,7,10;55:7,8,11,14,
15,25;56:2,4,8,16;
59:25;68:14;82:22,23,
25;83:2,14,15,16,18,
20,23;84:1,5,8,15,16;
86:21;103:14,17,17,23,
25;104:3,7,19,23;
105:10,13,23;106:8,11,
22;107:5,6,9,17,19;
108:1,2,7;109:4,5;
110:6,12;113:4,22;
115:23;127:17,24,25;
128:11,12;132:22;
133:5;140:1,2,19,24;
141:1,4,8,9,19;142:7,8,
10,15;143:19,25;
144:4;150:2,4;151:10;
155:12;161:11;162:16;

166:17,18,19;167:22;
180:8
**constructions (1)**
141:7
**consult (5)**
30:6;81:19;113:12;
114:6,8
**consulted (4)**
7:18;29:11;175:16,
18
**consulting (4)**
9:20;29:15;36:2,3
**contact (4)**
147:15,19,20,24
**contacted (5)**
118:22;120:2,20;
122:4;147:14
**contacts (1)**
123:8
**contained (2)**
12:18;138:2
**contemplated (1)**
115:11
**continue (3)**
32:19;84:18;98:8
**continued (2)**
18:13;19:12
**contractor (2)**
167:24,25
**contractors (6)**
87:12;168:2;174:4,9,
13,14
**Contrary (2)**
8:6;71:13
**contrast (2)**
115:22;116:8
**contribution (6)**
14:23,25;21:17;
44:22;62:4;67:12
**contributions (4)**
51:4;67:23;68:4;
154:9
**control (6)**
13:18;21:3;109:18;
139:21;159:18,18
**controlled (4)**
54:20,20,20;165:18
**conversation (6)**
40:12;111:2,12;
147:25;148:7;169:10
**conversations (8)**
13:10;26:12;32:24;
112:1,3,15;144:16;
172:7
**conveying (2)**
51:20;55:12
**cooked (1)**
23:25
**copied (1)**
136:7
**copy (13)**
74:18;90:22;97:20,
22,24;133:25;136:16;

Case 16-01120 Doc 342 Filed 06/04/19 Entered 06/04/19 13:04:08 Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document Page 189 of 206
May 8, 2019

143:11;156:12;161:6,
8;173:11,18
**Cora (1)**
43:17
**corner (2)**
61:22;101:4
**Corp (4)**
4:9,9,19,20
**correctly (12)**
7:18;17:23;33:21;
44:18;47:12,13;95:23;
140:5;142:25;156:23;
169:4,22
**Corya (1)**
43:14
**cost (75)**
10:12;12:7;13:1,1;
17:14;20:13,22;27:7,
11;34:15;45:19;46:16,
18,22,23,24;47:4;
53:15,16;54:7,8,10,20,
22,24,25;56:5,11,12,
12;59:19,19;60:8;
62:24;63:9;64:8,10,17,
22;65:2,2,10,10,12,21;
69:21;73:3;84:5,8,15,
16,24;85:3,17,19,20,
22,25;86:3,5,24;87:3,6;
112:24;113:8,13;
127:12;128:2;142:16,
18;143:15,20;144:17;
151:15;163:3
**costs (75)**
7:21;19:13;22:4;
26:25;27:1,4,9,18;
28:4;31:14;34:13;
42:16,16,23;44:7;47:2;
53:15;54:6;56:4,6,8,9,
10,13,14,14;59:10,13;
60:12;62:4,25;63:2,17,
18,23;64:1,8;66:3,6;
68:18;69:24;102:22,
25;115:15,15;119:5;
127:17;128:13;140:3,
7;141:19;143:6,25;
145:3;156:1,1,18;
158:10,14,21,24;165:7;
166:9,12,14,15,21,25;
167:12,13,17;172:24,
25;173:9;174:18
**Counsel (1)**
99:15
**Count (5)**
9:25,25;10:3;11:14;
27:15
**couple (8)**
26:8;42:25;84:19;
85:1;144:4;159:17;
181:21;182:11
**course (8)**
78:2;79:22;88:2;
99:2;110:3;137:24;
155:24;183:15

**Court (234)**
4:2,3,23;5:1,5,8,14,
16,19,21,23;6:1,3;
10:23,25;11:3,5,19,24;
24:12,19;25:15;28:19;
32:12,15,18,18;34:9,
21,23;35:2,5,8,10,16,
20;40:11;41:18,20;
70:12,15;71:3,7,24;
72:4,11,16,17;73:4,6;
74:21,24;75:2,8,10,21;
76:3,6,9,11,13,15,25;
77:3,5,11,14,19,22,24;
78:2,6,8,11,13,16,18,
20,22,25;79:7,10,22,
24;80:12,18,21,25;
81:8,15,22;82:1,3,6,9,
13;85:13;86:9,12,14,
16,18;87:23;88:5,7,10,
15,17,24;89:8,12,16,
19,21;90:16,18,22,24;
91:9;95:10;97:7,20,23;
98:4,7,10,17,23;99:2,9,
12,15,17,19,23,25;
100:3;109:12,14;
110:1;124:12,16,19,24;
125:1,7,21,25;126:9,
12,14,17,20;127:2,4,
20;128:4,7,16,18,21,
24;129:5,8,10,16,18,
22;130:8,14,18;131:4,
6,18,21,23;133:23;
134:1,4,8,11,16,18,21;
135:1,4,6,10,13,15,23;
137:8,12,15,18,22,24;
138:6,18,20,23;139:5;
142:4;146:1;149:10;
156:9;157:1,3,12,14,
18,22;161:18,22,24;
162:3;170:15,18;
179:11,13;180:25;
181:3,5,9,11,14,18;
182:8,14,17,25;183:12,
16,23
**courtroom (3)**
35:12;93:10;128:21
**cover (5)**
140:7;143:6,9;167:8,
13
**covers (1)**
94:6
**create (3)**
54:1;94:5;138:10
**created (3)**
47:3;54:18;141:21
**creating (3)**
52:22;102:6;104:3
**criminal (2)**
176:10,16
**cross (5)**
17:5;24:19;109:18;
149:10;181:11
**cross- (1)**

19:25
**cross-examination (3)**
12:17;91:10;149:11
**cross-examine (3)**
80:12,21;89:3
**culprit (1)**
129:14
**cushion (1)**
140:18
**cut (3)**
33:24;34:5;131:7
**Cutler (4)**
19:8;70:11;106:12;
112:9

**D**

**Dan (1)**
173:6
**date (17)**
8:17;10:13;46:3;
85:23;86:7;125:15,20;
143:6,11,24;144:5;
146:17;147:17;167:23;
172:5,12,17
**dated (1)**
11:6;13:20;56:24;
164:15
**day (16)**
4:6,11;15:1,11;
18:23;19:1,4,7;39:10,
12;49:16;58:12;126:3;
182:6;183:1,6
**daycare (1)**
37:22
**days (8)**
16:25;20:19;22:6;
112:4;148:14;171:24;
172:14,22
**deal (11)**
62:22;64:20;65:11;
67:21;70:12;135:17;
148:4,25;149:1;
169:16;178:25
**deals (3)**
71:21;80:13;125:7
**dealt (4)**
72:12,13;75:17;
130:18
**debt (1)**
17:9
**debtor (1)**
4:17
**December (12)**
19:13;28:6,16,22;
34:14;142:12;144:3;
145:12,21;146:16;
147:16;148:3
**decide (2)**
29:18;30:3
**decided (10)**
29:15;151:7;152:5,
16;154:16;156:17;

168:14;176:1;177:2;
180:10
**deciding (3)**
106:23;153:6;168:24
**decision (2)**
29:9,22
**decision-making (1)**
54:1
**decisions (1)**
111:19
**deducted (1)**
17:16
**deem (1)**
89:4
**default (2)**
23:9;34:18
**defendants' (2)**
161:15;173:16
**define (5)**
37:17;152:3;153:18;
166:14;168:5
**defined (1)**
159:25
**definitely (2)**
147:6;176:17
**defraud (1)**
127:1
**degree (6)**
36:7;37:17;132:1,3;
149:14,20
**delay (2)**
148:9,10
**deliver (1)**
15:7
**demand (1)**
119:4
**demolish (1)**
132:21
**demolished (4)**
116:3,4,9,22
**demolishing (1)**
116:18
**denied (1)**
140:12
**denigration (1)**
71:21
**deny (2)**
80:22;130:20
**dependent (1)**
13:4
**depending (1)**
59:20,22;143:7
**depends (6)**
46:22;59:16;60:5,7;
105:21;163:1
**deposit (2)**
84:20;152:24
**depositing (1)**
21:16
**deposition (24)**
5:1;26:5,8;89:14;
95:3,7,14;96:1,19;
97:4;103:12;115:3;

119:10;136:23;143:12;
156:5,12;159:8;163:7;
168:18;169:11;174:3;
175:10;176:7
**depositions (1)**
180:12
**depth (2)**
151:16
**derivative (1)**
46:21
**derived (1)**
56:3
**deriving (1)**
50:17
**describe (3)**
36:5;37:1,25
**described (3)**
68:5;137:13
**description (2)**
7:12;104:18
**desk (2)**
97:14,22
**despite (1)**
152:16
**detail (2)**
71:25;72:13
**detailed (1)**
66:23
**details (4)**
73:17;172:19;
174:25;179:2
**determine (2)**
110:10;113:7
**determined (1)**
31:16
**develop (1)**
104:23
**developed (4)**
45:20;47:18;52:14;
60:24;62:8
**developer (4)**
73:19;112:24;113:8,
14
**developing (2)**
41:25;62:10
**Development (9)**
4:9,19;12:11;22:7,9;
30:20;39:1;63:17;
66:24
**difference (1)**
48:1
**different (8)**
26:22;52:12,17;
54:22;60:12;63:12;
94:5;103:18
**differential (1)**
65:11
**difficult (3)**
128:1,13;148:21
**difficulty (1)**
181:21
**digging (1)**
163:17

Case 16-01120   Doc 342   Filed 06/04/19   Entered 06/04/19 13:04:08   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 190 of 206

May 8, 2019

**DIRECT (5)**
35:22;82:11;102:4;
131:10;164:8
**direction (1)**
183:13
**directionally (1)**
60:14
**directly (2)**
25:3;160:18
**Director (1)**
131:17
**disagreed (1)**
30:8
**disappointed (4)**
123:17,20,22;124:2
**disburse (1)**
146:10
**disbursement (7)**
103:10,13,18;
106:22;107:9;140:19;
144:6
**disclosed (1)**
86:4
**disconnect (1)**
167:3
**discovery (3)**
71:25;130:22;180:11
**discrepancies (1)**
69:3
**discretion (2)**
32:12;130:23
**discriminate (1)**
44:2
**discuss (3)**
83:23;143:3;173:9
**discussed (5)**
58:16;154:6,9,12;
161:8
**discussing (1)**
183:19
**discussion (9)**
6:22;8:16;9:8;59:25;
68:13;72:11;169:1,17;
176:9
**discussions (4)**
153:7;154:2;172:25;
177:17
**dismissed (1)**
175:24
**disperse (1)**
106:24
**dispute (2)**
123:5;124:7
**dissatisfaction (4)**
121:11,14,15;122:25
**dissatisfied (1)**
177:4
**dissolve (2)**
23:14;29:6
**dissolved (1)**
29:3
**distinction (1)**
103:13

**distributed (1)**
55:17
**distribution (10)**
14:22;55:7,12;59:18;
103:24;104:3,4;
105:16,22;107:18
**divide (2)**
15:21;66:8
**divided (3)**
15:14,22;27:9
**DMITRIY (12)**
35:6,25;78:12,14,14,
16,17,18,19,22;128:18;
129:13
**Dmitry (2)**
35:3;89:13
**document (35)**
11:16;12:18,22;
74:21;75:10;77:7,9;
88:14,18;89:2;90:19;
94:4;97:21;106:23;
108:15,19;110:7;
126:24;133:15;134:12;
135:4,24;136:4,9,9;
137:13,18;141:15;
143:4,8,9;167:4,13;
170:22;180:21
**documents (8)**
13:16;75:14;107:8;
109:5;128:25;129:2;
142:23;180:12
**dollars (2)**
66:7,11
**domain (5)**
24:9,13,21,24;30:13
**done (7)**
50:21;51:14;72:18;
126:18;131:1;179:8;
183:6
**door (1)**
126:24
**double-counting (1)**
69:18
**doubt (3)**
161:25;172:12,17
**down (26)**
7:25;19:10;25:2;
33:2;40:2;42:25;46:5;
69:20;70:25;73:24;
80:11,20;93:7;101:5;
103:9;112:22;117:2,
12;158:4;163:19;
164:18;165:9;171:5,
23;176:14;182:13
**draft (7)**
14:3,7,9;44:7,9;
111:7;155:14
**drafted (4)**
74:11;133:10;136:6;
143:4
**drafting (2)**
26:12,19
**drafts (1)**

44:3
**drastically (1)**
60:14
**draw (4)**
26:10,11;48:4;95:13
**drawing (1)**
21:16
**Dream (1)**
146:22
**drew (1)**
103:12
**drives (2)**
59:19;60:8
**driving (1)**
154:19
**dropped (3)**
176:3,19,25
**dropping (1)**
176:21
**drove (1)**
160:15
**duration (4)**
46:24;47:17;53:19,
20
**during (23)**
12:17;17:5;20:1;
26:1,6,12,19;32:8;
40:12;57:1;58:13,16;
59:25;81:19;84:1;97:3;
114:16;117:25;136:10;
142:15;161:11;162:15;
183:19
**duty (1)**
8:11
**duty-bound (1)**
157:16

**E**

**earlier (2)**
70:1;94:14
**early (1)**
133:4
**earmarked (1)**
27:9
**ease (1)**
81:1
**easier (5)**
41:12;43:25;98:2,3;
133:21
**easiest (1)**
47:25
**easy (1)**
78:11
**economic (2)**
54:18,19
**education (2)**
36:5;131:25
**effect (2)**
23:21;122:6
**effectively (1)**
31:16
**effort (1)**

68:12
**eight (1)**
148:19
**eighty (2)**
29:20;165:18
**eighty/twenty (2)**
58:2,3
**eighty-one (2)**
33:7,18
**either (9)**
25:1;38:9;57:2;
87:10;96:5;109:22;
127:15;166:21;182:20
**elaborate (1)**
109:24
**Elana (3)**
129:21,23;131:13
**electronic (1)**
19:12
**elements (3)**
42:14;48:9;104:19
**Elizabeth (3)**
35:5;97:24;129:8
**else (7)**
34:21;75:25;98:5;
104:15;127:20;128:16;
181:14
**email (40)**
13:18;14:10;23:25,
25;24:3,4,7,18,21;25:2,
4,7,8,9,11;30:17;40:2,
6,9,11;41:22;43:21;
47:21;59:5;60:19;61:6,
10,14;111:6,7;112:4;
145:11,18,20;147:21,
25;164:15;165:1,2,11
**emailed (1)**
69:12
**emails (6)**
24:5;25:1;97:3;
119:15;148:1;161:8
**embedded (3)**
54:7,10;56:13
**employers (1)**
36:4
**encourage (1)**
130:9
**end (18)**
5:8;33:2;44:25;46:2;
84:17;107:22;111:18;
117:22;118:3,21;
122:1;140:11;142:9;
144:3;163:22;171:5,6;
177:20
**endeavor (1)**
177:5
**ended (7)**
44:24;71:3;83:8;
86:22;111:23;140:10;
149:2
**engaged (5)**
8:10;37:4,8;153:7;
176:17

**engineer (1)**
149:18
**English (2)**
43:20,24
**enough (6)**
11:22;21:9;22:11;
68:15;73:6;150:22
**enrolled (1)**
36:9
**enrollment (1)**
36:16
**ensures (1)**
55:23
**entailed (1)**
39:1
**entered (2)**
95:19;181:1
**entire (6)**
88:14;94:24;125:17;
130:15;135:8;178:14
**entirely (1)**
116:9
**entitled (5)**
67:17;77:11,14,20;
180:23
**entity (2)**
23:15;133:7
**equitable (2)**
62:12;68:7
**equitably (1)**
66:8
**equivalent (1)**
102:1
**escalated (1)**
161:4
**escape (1)**
73:17
**essentially (5)**
36:16;60:10;69:8;
72:6;79:24
**establish (1)**
164:19
**established (1)**
71:11
**estate (14)**
37:9,10;47:1;51:22,
23;52:4,5,10;92:2,8;
103:2;105:10;150:6;
151:3
**estimate (5)**
64:17;69:23;103:18;
128:2,13
**estimated (12)**
16:1;45:4,10;47:20;
62:24;63:5;69:21,23;
94:13,17,21;95:23
**estimates (4)**
12:19,22;80:1;95:1
**et (1)**
4:10
**evaluated (2)**
151:6,15
**Even (10)**

Case 16-01120    Doc 342    Filed 06/04/19    Entered 06/04/19 13:04:08    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 191 of 206

May 8, 2019

19:19;28:16;30:8;
44:13,13;49:8;53:19;
124:6;147:14,16
**event (6)**
7:12;140:4;158:14;
165:2;171:23;172:21
**eventually (5)**
39:7,8;148:13,17;
149:1
**everybody (1)**
97:20
**everyone (1)**
4:23
**evidence (54)**
6:11,14,16;7:2,5;9:5;
11:1;12:15;13:7;16:5;
19:23;20:6;21:6,19;
27:22;39:24;41:14,15;
45:4;51:19;56:20,21;
61:1,4;69:11;72:6,8,
21;75:25;79:5;89:4,5;
90:19;106:4;124:23;
125:23,24;134:23;
135:2;136:1;139:2,6,
25;142:1,5;145:24;
146:2;147:11;161:22;
162:2,2;164:13;181:1,
6
**exact (6)**
10:13;12:13,25;
40:16;73:17;95:18
**exactly (13)**
22:20;41:4;51:12;
54:24,25;65:19;72:21;
102:13;115:4;132:20;
164:24;167:3;181:25
**EXAMINATION (9)**
6:4;20:1;34:11;
35:22;81:18;82:11;
127:9;131:10;179:14
**example (5)**
21:7;37:17;53:14;
105:1,22,25
**exams (1)**
36:8
**excavation (9)**
145:3;165:6;174:15,
17,20,24;179:23;180:1,
4
**exceed (1)**
164:4
**exceeded (3)**
71:13;166:9,21
**Excel (1)**
102:24
**except (1)**
137:9
**exception (3)**
45:18,19;48:4
**excess (2)**
69:6;85:5
**excessive (2)**
7:22;12:12

**exchange (2)**
112:4;178:22
**excuse (8)**
9:4;13:6;14:6;49:14;
88:11;96:8;109:11;
117:16
**executed (2)**
136:15;138:4
**exercise (3)**
8:21;32:12;33:23
**exhausted (2)**
84:17;87:25
**exhibit (115)**
5:3;6:10,14,15;7:1,5,
9,13;9:4,12;10:23,25;
12:14;13:7,17,23;
14:12;16:4;17:23;18:1,
7,12;19:22;20:5;21:6,
18;23:17,20;31:9;32:2,
3;33:11;39:23;41:14,
15;45:3;47:24;49:23;
50:9;51:19;55:4;56:19,
20,21;60:20;61:1,4,20;
63:6,10;64:2,3;66:21;
68:10;69:9,11;75:2,18,
23;76:1;81:3;89:15,23;
90:4;93:6,9,15,20,21;
94:11,13;96:23,24;
98:14;99:6;101:2;
103:4,8;104:17;111:7;
112:20,22;124:14;
133:12;134:12;136:1,
15,19;138:2;139:1,6,
14,25;141:11,13,16;
142:5;145:7,10,23;
146:2,5;147:10;
156:25;157:25;161:14,
21;162:4;163:22;
164:12;165:9;170:13;
173:15;180:21;181:6
**exhibits (3)**
61:24;62:3;97:4;
100:18,23
**exhibit's (1)**
164:13
**existing (4)**
115:25;116:9;117:2;
127:25
**expand (3)**
57:21;109:21;115:16
**expansion (4)**
115:1,4,9,10
**expect (2)**
72:9;169:15
**expectations (4)**
51:17;102:7,11;
111:4
**expected (8)**
44:19;96:14;100:20;
121:9;152:2,6;156:1;
181:15
**expecting (3)**
127:6;156:18;169:18

**expenses (6)**
118:4,6,7;143:10;
145:6;167:9
**experience (4)**
36:10;47:19;107:4;
151:11
**experienced (1)**
71:15
**experiencing (1)**
122:9
**expert (1)**
182:7
**explain (15)**
12:21;15:5;17:6;
38:11;40:11;41:24;
48:1;51:19;59:9,12,15;
127:13;136:5,25;
144:13
**explained (6)**
58:17,18;59:16,17,
20;87:4
**explanation (8)**
22:21;86:8;87:2;
108:11;144:15;145:2,
3;180:7
**explanatory (1)**
67:1
**expressed (1)**
121:8
**expresses (1)**
68:21
**expression (1)**
40:18
**expressly (1)**
7:23
**extent (4)**
31:17;54:5;59:24;
80:5
**extra (7)**
143:10;144:7,8;
145:6;172:24,25;173:9
**eye (1)**
79:24

**F**

**facilitate (3)**
100:19,21;182:19
**facilitates (1)**
98:9
**fact (32)**
7:13,20;9:3;18:16;
19:10;25:2;26:18;27:8;
28:9;44:12;71:11;
91:20;92:23;94:24;
107:13;109:9,9;
111:23;116:25;117:22;
118:13;119:18,24;
160:15;162:21,23;
165:22;166:12;169:24;
175:1,18,22
**factor (1)**
181:23

**factors (1)**
152:4
**failure (1)**
121:22
**Fair (10)**
11:22;12:19;21:9;
67:19;68:14;112:14;
125:16;150:22;176:15,
16
**fairly (2)**
51:23;53:13
**fallen (1)**
181:17
**falls (1)**
130:12
**false (4)**
7:10,15,17;175:2
**falsely (1)**
10:5
**family (4)**
91:20,20,22;148:22
**far (8)**
7:11;28:17;48:14;
71:18;75:21;108:18,
20;144:16
**fashion (1)**
114:3
**fast (1)**
138:5
**father (1)**
150:4
**fear (1)**
72:9
**February (3)**
28:11,12,17
**federal (2)**
32:18;72:17
**feel (5)**
42:13;59:9;109:20;
130:3;157:16
**fees (4)**
42:21;50:25,25;
65:15
**Fellow (1)**
36:9
**felt (1)**
42:18
**few (10)**
20:19;22:6;23:8;
60:19;82:17;86:6;
112:4;139:22;148:14;
159:17
**fictitious (1)**
118:18
**fiduciary (1)**
8:11
**fifteen (2)**
81:12;82:1
**fifth (2)**
9:12;47:24
**fifty (5)**
50:6,7;153:5;158:15,
16

**fighting (1)**
123:10
**figure (2)**
31:22;90:8
**figured (2)**
41:7;157:20
**file (11)**
22:24;23:12;60:21,
23;93:21,21;94:7,7;
136:11;173:12,19
**filed (10)**
4:7;6:15;8:17;9:3,7;
11:10;16:22;29:1;
119:19;175:22
**files (1)**
178:4
**filing (4)**
16:25;18:4,14;23:7
**Filippov (50)**
4:7,15;5:13,14,21;
6:6;7:16;9:21;10:6;
16:16;25:14,21;26:25;
34:13,24;37:14,15;
49:6,8;57:1,5,15;
58:18;59:1,7;60:2,19;
62:8;65:12;67:8;68:17;
69:12,15;92:4;93:11;
112:1,11,15;114:15,18,
19;115:12,14;120:2,
21;122:3,23;123:2,8,13
**Filippov's (6)**
33:17;66:10;67:16;
71:10,14;72:21
**fill (1)**
182:15
**final (5)**
141:9;169:7;170:2;
175:1,6
**Finally (1)**
23:17
**finance (2)**
46:15;56:13
**finances (1)**
119:1
**financial (6)**
68:13;151:10;154:9;
165:14;173:22;178:5
**financially (3)**
166:8,24;167:11
**financials (7)**
45:4,10;47:21;63:5;
94:14,17,22
**financing (2)**
64:13;106:8
**find (6)**
21:7;41:5;63:7;
153:19;161:16;163:8
**finding (1)**
65:6
**fine (14)**
5:5,6;11:3;75:21;
77:5,18;78:12,15;
98:17;134:8;137:8,12;

Case 16-01120   Doc 342   Filed 06/04/19   Entered 06/04/19 13:04:08   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 192 of 206
May 8, 2019

179:13,19
**finish (1)**
126:3
**finished (3)**
5:8;126:19;129:18
**firm (1)**
16:25
**first (51)**
9:3,7;10:11,19;
14:23;16:16;23:8;
29:11;30:20,23,24;
38:3;39:6;42:14;43:7,
13,15;45:13;48:5;
50:18;53:1;57:6,22;
62:25;68:5,10;70:16;
78:15;86:4,25;95:19;
101:1;104:18;105:1;
107:21;109:22;119:25;
132:11;136:8;137:3,
21;142:18;147:10,14,
15,24;167:12;169:16;
179:22;183:1,7
**fit (1)**
181:20
**five (12)**
14:24;15:9,10;65:25,
25;70:24;130:25;
165:10;170:17;171:24;
172:14,22
**fixed (3)**
13:2;71:13;72:23
**flashy (2)**
41:12,13
**Flooring (1)**
146:22
**flying (1)**
182:5
**focused (1)**
9:17
**folder (1)**
97:15
**follow (2)**
29:9,16
**followed (4)**
51:8;132:3;143:3,12
**following (4)**
50:23;62:18;111:24;
158:15
**font (1)**
63:11
**foot (2)**
151:15,18
**footage (1)**
155:5
**footnoted (1)**
8:6
**forced (1)**
52:11
**forget (3)**
9:11;61:18;100:13
**forgotten (1)**
124:14
**form (2)**

74:6,9
**format (2)**
41:6;182:20
**formed (4)**
133:4,7;139:9;
158:21
**formulas (3)**
41:4;60:23;102:23
**forth (5)**
69:12;75:10;136:7;
173:2;178:13
**forty/ten/fifty (2)**
58:6,8
**forward (3)**
18:11;103:3;148:23
**forwarded (4)**
42:1;93:22;94:4,7
**forwarding (1)**
40:9
**found (2)**
41:4;69:3
**foundation (8)**
11:25;12:12;22:12;
70:9;71:11;107:21,23;
135:25
**four (6)**
9:8;24:3;58:13;
63:16;70:25;98:1
**Four's (1)**
98:2
**fourth (3)**
44:24;47:24;63:16
**frame (4)**
25:9;28:10;83:3;
148:3
**fraud (12)**
7:2,11;8:14;9:25;
10:3,12;23:22;175:11,
14;176:18,18,20
**fraudulent (3)**
7:10;168:4,5
**Friday (3)**
182:10,21;183:21
**friend (2)**
38:16;65:5
**Friendly (6)**
38:2;91:5;127:14;
144:16;148:7,12
**friends (3)**
90:12;91:1,4
**front (7)**
35:18;70:24;78:23;
90:19;97:13;155:6;
156:14
**fronted (2)**
166:12,14
**full (8)**
7:14,20;33:16;137:2,
3;143:10;152:25;183:1
**function (2)**
46:24,25
**functionally (1)**
29:20

**Funds (6)**
20:12,17;22:3,19;
49:1;140:19
**funnel (1)**
32:19
**further (12)**
25:13;28:22;34:8,9,
20;80:24;91:7;112:1;
119:24;135:25;179:9;
181:11

### G

**gains (1)**
177:15
**gallery (1)**
34:25
**game (2)**
125:16;181:20
**gave (21)**
44:14;45:17,24;46:2,
5,8,9,10,11;72:22;
85:21;94:18,20;95:7;
99:20;109:16;112:5;
123:4;173:11;180:15;
183:13
**general (3)**
8:23;54:18,19
**generate (2)**
67:23;121:9
**generated (4)**
67:18;121:9,12;
129:1
**generates (1)**
67:19
**generating (1)**
69:6
**gentleman (1)**
160:24
**Gersh (3)**
173:6,11,25
**gets (3)**
64:1,2;88:7
**given (7)**
45:15;47:19;71:4;
84:25;114:5,12;159:14
**gives (2)**
13:17;51:2
**giving (3)**
62:14;139:21;180:6
**glance (1)**
52:20
**glass (1)**
5:17
**gmail (3)**
24:6;25:1,1
**goes (1)**
69:22
**Goldman (2)**
182:5,12
**Good (24)**
4:3,4,14,16,18,21,23;
5:19,21,22;6:6,7;25:21,

22;35:8,9;38:13;77:21;
82:7;91:12,13;100:3;
127:2;157:1
**goodness (1)**
49:11
**Google (1)**
31:1
**Gordon (2)**
177:10,17
**graduated (1)**
132:2
**granted (1)**
159:13
**great (4)**
18:20;60:3;71:25;
98:22
**greater (4)**
27:1,6,7,11
**gross (1)**
66:1
**grossly (1)**
8:9
**group (2)**
62:20,23
**guarantee (2)**
23:2;71:12
**guaranteed (1)**
152:8
**guess (12)**
66:17;67:2;132:17;
134:2;136:15;140:18;
147:13;175:4,7,8;
180:8;182:19
**guessed (2)**
175:1,6
**guy (1)**
122:5
**guys (3)**
30:3;127:4;183:24

### H

**half (3)**
39:13;74:4;126:3
**hand (4)**
5:9;79:3;88:14;
96:22
**handed (3)**
19:20;93:17;156:12
**handle (1)**
135:19
**handled (3)**
119:1;130:4;142:25
**handling (1)**
21:1
**hands (1)**
112:23
**happen (3)**
42:10;53:6;144:6
**happened (11)**
21:13;27:22;52:2;
84:22;90:13;91:2,4;
105:24;112:15;118:8;

144:24
**happening (3)**
21:11;104:20;148:23
**happens (3)**
54:22;62:19;67:7
**happy (2)**
79:11;145:1
**hard (4)**
65:24;95:16;163:13,
25
**Harris (58)**
4:21,21;32:1;33:3,
10;80:7;130:2,8,13,15;
134:24;135:3,5,7,12,
14,16;139:3;142:2;
145:25;149:12;156:8,
11,25;157:5,7,10,16,
19,23;158:4,6;160:5,7,
8;161:14,19,23;162:1,
4;163:19,21;164:12,
14;170:13,17,20,21;
171:4,7;173:15,17;
174:21,22;179:8;
181:2,10,13
**Harris' (1)**
161:17
**Hartzel (18)**
8:3,4;9:13,15;10:21;
14:19;15:19;16:6,9,14;
17:19;18:8;20:8,9;
55:4;138:11;145:15;
157:8
**hate (1)**
127:4
**head (1)**
139:15
**headed (1)**
45:14
**heading (3)**
48:6;104:18;143:18
**hear (4)**
15:15;35:13;60:18;
73:2
**heard (7)**
19:25;79:20;93:13;
125:14;134:9;135:24;
183:16
**hearing (1)**
86:24
**hearsay (2)**
124:25;180:21
**Heating (1)**
147:3
**help (11)**
36:4;38:6,10,12,14;
40:12;96:25;114:17,
20;157:8;182:4
**helpful (4)**
17:20;61:25;124:8;
183:6
**helping (1)**
39:5
**hereinafter (1)**

140:4

here's (1)
165:13

hesitating (1)
138:8

hey (1)
38:13;55:21;122:4

high (4)
36:7;76:9;131:3;
175:6

high-end (1)
58:20

higher (1)
170:7

highest (1)
36:19

highlight (2)
61:21;64:4

highlighted (1)
138:9

himself (3)
65:14;74:3;141:23

hire (1)
65:17

history (2)
171:8,10

hit (1)
131:3

hits (1)
53:8

hold (13)
5:2;32:16;72:18;
74:6;75:8;78:6,6;
85:14;99:12;109:12;
133:7;134:4;178:2

home (12)
9:22;68:19,23;
153:20,25;159:2,10,22;
167:8;169:7,24;170:25

honest (1)
182:16

honestly (4)
51:15;154:17;155:3;
171:20

Honor (81)
4:14,16,18,21,25;5:4,
12;11:1,22;24:10;
25:14;32:10,14,21;
34:8,17,22;35:21;
41:19;70:6,14;71:19,
20;72:2;73:8;74:25;
75:20;76:2,22;79:20;
80:15,23;81:6,14;
82:10;85:12;87:19;
88:11;91:8;95:9;98:16;
99:1,3;109:25;110:22;
124:9,10,13,25;125:14;
126:7,10;127:19;
128:3,15,17,20;129:6,
15;130:2;131:3,5,9;
133:22;134:23;135:14,
21;142:2;145:25;
149:9;156:8;157:2,21;

161:16;162:1;179:9,
10;180:19;181:2,8;
183:15

honors (1)
36:7

hope (2)
18:19;81:18

hoped (2)
121:12,16

hopefully (1)
132:23

hoping (1)
182:11

hour (1)
126:3

house (43)
15:24;27:1,6,7,11;
39:2;50:24;51:1;53:14,
15;54:2,22;55:1;56:11;
59:23;60:5;62:21;65:8,
21,23;73:14,24;83:6,
11;86:4;102:14,16,17,
20;107:20;115:25;
116:3,9,9,10,17,18,22;
117:2,12;144:2;
147:18;169:1

housekeeping (1)
4:24

houses (7)
54:24;58:20,25;59:2,
21;60:11;65:17

hundred (2)
50:6;90:10

hundred-zero (1)
49:22

husband (2)
37:3;133:20;136:8;
149:18;151:6;152:6;
156:21;158:23;165:18;
166:22;167:19;178:9

HVAC (1)
149:18

Hyde (37)
38:24;46:14;55:10,
19;73:13;75:20;76:8,
10,10,11;101:5,12;
104:4,7;105:12;
107:25;108:16;109:1,
5;110:6;115:21,22;
116:10,15;117:17;
119:21;120:3,17,25;
121:4,19;122:17,18,19;
123:18,21;129:12

H-Y-D-E (1)
76:10

hypothetical (3)
64:12;67:3,18

I

ID (3)
79:10;81:2,2

idea (6)

30:17;40:22;123:5,
10;127:2;170:15

ideas (1)
30:19

identical (1)
48:3

identification (34)
23:18,21;75:15,16,
24;76:1;79:16;80:24;
81:3;89:11,21,22,23;
90:4;96:24;99:7;100:7;
124:15;129:1;133:13,
16;134:13,23;136:14,
20,22,25;139:1;141:12,
13,16;145:8,10;180:21

identified (6)
75:12;139:17;170:8,
8;174:16;175:11

identify (8)
132:17;163:8,9,15,
16;174:3,9,12

ignore (1)
40:1

illustrates (3)
52:8;54:17;68:3

illustration (1)
51:21

imagine (3)
63:13;107:22;108:20

immediately (2)
7:2;121:23

impedes (1)
33:20

important (5)
35:12;42:19;106:22;
108:23;153:19

impose (1)
131:18

impossible (1)
23:11

impression (2)
139:20;141:9

improper (1)
175:2

inaccurate (4)
110:12;163:9,15,18

inadequate (1)
127:16

incidentally (1)
31:8

include (1)
56:14

included (1)
83:16;93:24

includes (2)
64:13,14

including (2)
150:16;153:13

income (3)
67:22;177:13,20

inconsistent (1)
142:23

increase (2)

68:18;101:19

increasing (1)
68:13

increments (1)
53:9

incurred (2)
118:4;166:15

indeed (1)
23:23

indicate (1)
162:22

indicated (3)
46:15;93:22;94:7

indicates (2)
171:10;172:9

indiscernible (12)
11:13;16:9,14;20:9;
51:24;55:10;65:8;90:1;
98:23;100:2;128:23;
131:15

indiscernible@hotmailcom (1)
25:10

individual (3)
48:16;65:6;106:2

individuals (1)
44:1

indulge (1)
161:17

industry (1)
150:2

informal (1)
43:25

information (20)
30:25;51:20;55:11;
97:3;100:25;115:12;
117:1;118:17;119:11,
14;121:22;153:10;
162:15;165:3,14;
172:17;173:22;174:19,
23;178:5

informed (2)
84:24;85:24

initial (4)
17:8;51:4;117:1;
126:21

initialed (1)
133:19

initially (1)
171:16

initiated (1)
176:22

initiating (1)
175:19

input (2)
68:25;102:24

inputs (9)
45:7,10,12,13,15,25;
46:3,22;114:21

inquire (2)
79:15;126:17

inquired (1)
153:16

inquiring (1)

138:9

inserted (1)
104:14

inspector (2)
105:18,23

inspectors (2)
106:18,20

instance (3)
55:25;106:1;167:12

instances (1)
85:19

instead (2)
65:6;106:3

instruction (1)
35:11

instructions (1)
109:16

insufficient (2)
167:8,16

insurance (3)
47:1;56:15;103:2

Insurer (1)
69:15

intended (1)
49:7

intent (1)
127:15

intention (1)
178:1

interest (15)
29:23;31:12,24;33:7;
46:12,13;47:16;56:15;
59:10,13,16;64:15;
103:1;163:3;178:23

interested (2)
4:8;146:9

interestingly (1)
22:11

interpretation (1)
114:18

interpreted (1)
47:13

interpreter (3)
181:22;182:4,22

interpreters (1)
181:22

interpreting (1)
100:19

interrupt (1)
72:3

into (38)
17:9,24;19:13,17;
21:12;24:14,14;35:13;
53:25;60:23;64:1;
72:10;75:24;79:5;89:3,
5;95:19;102:24;
124:22;125:23,24;
130:12;134:23;136:1;
139:1,6;141:25;142:5;
143:14;145:24;146:2,
5;151:22;159:16;
163:17;169:16;181:1,6

introduce (3)

89:3,5;125:3

**introduction (1)**
135:1

**invented (1)**
118:18

**invest (15)**
48:10,22;67:9;73:15,
22,23;117:21;132:18;
140:13;151:7;152:5,
16;153:6;154:16;
156:17

**invested (13)**
62:13;73:11,12;74:4,
5;92:1;132:14;140:15,
16;150:10;152:25;
169:6;170:10

**investment (24)**
17:8;37:9;45:24;
48:8,12;49:24;50:12;
51:22;66:10;67:10,14,
16,21,22;69:6,7;70:2;
117:15,23;140:24;
150:16;152:9;155:25;
178:14

**investments (5)**
31:9;37:10;70:8,10;
73:20

**investor (14)**
48:7,7,25;49:9,18,
25;50:1,7;62:17;66:14,
15,23;120:24;122:20

**investors (12)**
38:7;40:16;45:2;
49:7;51:5;54:1,4;
62:20,23;66:9;74:2,3

**investor's (1)**
66:18

**invitation (1)**
6:22;157:17

**invite (1)**
7:8

**invoices (9)**
85:1,2;87:11;118:1;
147:5,7;164:9;168:3,7

**involve (1)**
53:23

**involved (16)**
38:3,19,22;55:19;
62:20,21;65:16;92:8,
13,14;105:9,12;
116:10;117:12;150:6;
153:25

**involvement (4)**
60:17;111:23;
112:10,13

**iPad (4)**
40:17;41:7,9;93:17

**Irina (2)**
21:1;24:8

**irrespective (1)**
155:8

**issuance (3)**
140:3;158:13,19

**issue (13)**
75:13;79:14,21;
81:23;126:2,5,6,25;
130:22;135:17,18;
142:20;180:24

**issued (1)**
101:25

**issues (3)**
41:4,5;100:17

**item (7)**
20:5,11;56:6;64:9;
87:14;105:1;174:15

**itemized (2)**
87:6,7

**items (4)**
17:20;18:12;21:23;
144:7

**IV (2)**
9:25;11:14

**J**

**James (1)**
4:21

**January (1)**
28:16

**Jason (1)**
177:10

**job (1)**
139:14

**John (3)**
4:18;164:12;173:15

**Joseph (4)**
25:11;145:11;
147:12;181:25

**Judge (1)**
5:22

**July (3)**
11:6;12:6;142:9

**jump (1)**
132:13

**June (4)**
8:18;9:7;10:3;82:24

**justification (4)**
176:4,19;177:1,3

**K**

**Kagan (188)**
4:8,8,8,10,19,19,19;
8:9;10:5;12:10;13:15;
14:13,17;15:6;20:12,
18,22;21:5,8,12;22:4,7,
9,19;24:7,24;25:7;
26:2,12,19;27:18;28:5;
29:15;30:6,10,13,20;
31:15;33:20;34:1,4;
37:19,20;38:1,5,20,22;
39:5,20;40:2,9,12,20,
25,25;42:2,8;44:4,11,
12;45:7,11,16,24;46:2,
5,8,9,17,19;47:6,10,13;
48:19;49:17;51:10;

53:3;54:16,21;55:9,19;
56:17;58:14,17;59:4,6;
60:10;62:13,19;65:4,
11;66:10;67:8,8,21;
69:13;70:2;71:17;
72:22;73:11,12,17,18;
74:3;83:20;84:5,14,23;
86:8;87:2;90:12;91:1;
93:16,22;102:5,10;
107:5;110:24;111:6,8,
11,15;112:16,24;113:9,
12;114:5,5,9,12,16,16,
25;115:12;116:21;
117:25;118:22,25;
119:18;122:5,10;
127:14;132:14,19;
133:6,20;136:7,11;
140:13;141:3,22;
143:3,4;144:13;
147:13;148:5,5,19,20;
152:11;153:8;154:3,
12,19;155:1;158:16;
159:14,17;161:4;
162:6,10;164:6,8;
165:16;166:8,24;
167:22;168:10,14;
172:18,25;175:20;
176:11,17;178:6,9,24;
180:15

**kagandevelopment@gmail (1)**
25:8

**kagandevelopment@gmailcom (3)**
25:3;40:3;145:11

**kagandevelopmentcom (4)**
24:9;30:14,18;
145:21

**Kagans (2)**
8:23;9:21

**Kagan's (15)**
15:1;31:11;38:17;
65:16;87:13;141:22;
142:21;147:9;153:24;
159:18;160:19;164:10;
173:12;177:9;180:4

**Kaiserman (1)**
182:2

**Kasierman (1)**
130:7

**KDC (4)**
4:9,19;20:1;87:10

**keep (4)**
35:17;84:21;143:24;
167:22

**kept (5)**
15:8,9;144:25;
167:23;173:12

**kids (1)**
37:21

**kids' (1)**
37:23

**kind (10)**
74:9;81:23;102:13,
17;119:4;128:13;

139:21;140:23;148:7;
180:12

**knew (15)**
25:11;27:10;30:10;
37:15;42:9,10;49:9;
73:18,19;152:14;
155:5,5;162:18;168:9;
169:19

**knocked (1)**
117:2

**knocking (1)**
117:12

**knowing (2)**
129:19;180:16

**knowledge (12)**
10:5;24:17;31:4;
37:18;42:15;115:17,
20;121:2;122:22;
123:1;176:18,20

**known (9)**
12:23;37:14,19,21;
91:18,19;92:4;123:13;
130:11

**Kristina (5)**
142:22;160:21,23;
161:3;164:19

**L**

**labeling (1)**
20:24

**labor (4)**
46:24;53:16;56:5,12

**laid (1)**
70:9

**land (2)**
53:16;132:21

**Lande (15)**
129:21,23,24;130:6,
16;131:13;133:15;
136:3;139:9;141:16;
145:10;146:9;149:8,
13;179:16

**L-A-N-D-E (2)**
131:20,21

**landscaping (2)**
179:23;180:2

**language (4)**
32:23;43:7;132:11;
158:12

**languages (1)**
44:2

**large (7)**
23:1;85:2;87:9,10,
11;102:16;121:12

**last (14)**
7:15;10:22;33:5,11,
11,11,15,16;40:23;
63:19;67:13;131:19;
139:13;142:23

**late (1)**
147:16

**later (14)**

20:19,23,23;22:6;
24:22;60:19;83:9;
109:24;132:23;133:6;
140:4;154:13;171:25;
172:14

**law (2)**
126:5,6

**lawsuit (2)**
6:15;180:10

**lawyer (6)**
93:1,2,3;123:8;
175:19;177:9

**lay (2)**
11:25;17:6

**laying (1)**
48:18

**learned (1)**
117:14

**least (10)**
19:13;33:7;40:22;
68:7;76:22;79:16,24;
80:23;116:25;182:11

**leave (9)**
16:20;17:3;88:3,20;
90:19;125:24,25;
128:21;129:19

**left (8)**
16:22;17:12;48:14;
94:24;112:9;148:11;
160:23;167:21

**left-hand (1)**
157:6

**legal (2)**
50:25;92:17

**lender (2)**
64:12,12

**lent (1)**
23:15

**less (4)**
31:11;71:12;148:12;
149:7

**letter (7)**
6:19;7:1,9;8:13,17;
33:13,14

**letters (1)**
119:15

**level (3)**
36:18,19;52:12

**levels (3)**
36:12,15,16

**liability (3)**
74:10,11;165:20

**lien (2)**
23:11;148:16

**life (2)**
91:18,19

**likely (3)**
53:23;74:17;129:14

**likes (1)**
60:24

**limine (3)**
70:13,15,19;71:19;
72:1;130:5,23;135:22

Case 16-01120   Doc 342   Filed 06/04/19   Entered 06/04/19 13:04:08   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 195 of 206

May 8, 2019

**limit (1)**
130:24
**limited (1)**
74:10,11;165:19
**limits (1)**
32:15
**line (27)**
17:20;18:11;20:4,11,
22;21:23;26:11;32:19;
50:13;56:6;64:8;70:7;
87:14;95:15;105:1;
130:15;134:25;135:8;
139:4;142:3;144:7;
156:16;168:23;169:15;
171:23;174:15;176:15
**lines (1)**
6:22
**Lipetsker (33)**
4:15;9:21;24:8;
29:12,13;30:2;33:16;
37:2,5,8,11;42:3,8,9;
44:4,5;58:14;61:7;
69:13;74:5;91:14,16;
92:2;117:11;120:24;
121:2;122:9,14,15,21;
123:1,12;182:5
**liquidity (2)**
52:5,8
**list (10)**
19:10;75:4,14,18;
118:4,10,14;168:25;
174:1;183:16
**listed (6)**
22:11;168:9;169:3;
171:11,16;172:20
**listen (1)**
108:14
**listing (9)**
10:4,6;168:12,13,13,
16;170:25;172:8;
180:20
**litigate (1)**
130:25
**litigation (1)**
176:22
**little (24)**
5:2;17:5;35:11;
41:11;48:5;60:13;
66:23;69:5;75:6;81:15;
85:21;91:23;92:19;
101:2;102:15;104:21;
118:14;163:19,25;
164:18;165:9;176:14;
181:19;182:10
**live (1)**
131:14
**LLC (23)**
4:6,10;8:10;17:9;
21:12;38:24;46:14;
55:10,19;73:14;74:14;
75:20;129:12;133:9,
10;139:9;150:13;
158:20;159:2;160:2,9;

178:23;179:1
**loaded (2)**
56:9;85:9
**loan (63)**
18:20;19:2;20:19;
21:3,8;23:4,9;29:3;
34:18;51:4;55:7,8,10,
11,14,15,16,16,24;
56:2,16;59:17,17,19;
64:14,15;83:17;84:17,
18;103:9,13,17,24;
104:3,3,7,22,24;105:2,
11,15;106:5,8,22;
107:9,17;108:2,8;
109:4,5;110:12;133:5;
140:1,1,7,10,12;
143:13;148:16;157:7;
166:16,17;167:22
**loans (9)**
18:14,17,24;19:13,
18;23:2;106:11;107:5,
6
**logged (1)**
159:17
**logistical (1)**
81:23
**long (7)**
37:14,15,19;54:2;
100:1;131:6;183:10
**longer (4)**
5:2;156:22;183:5,9
**look (47)**
9:24;12:14;13:20,23;
14:5,12;18:1,11;19:10;
21:6,18;25:2;32:3;
40:2;42:3,11,20;48:2,
14;49:21;50:13;51:18;
56:20;57:7;60:23;
63:15;65:15;66:13;
69:20;78:1;79:23,25;
80:10;88:20;93:9;
104:16;126:21,25;
127:6;139:24;147:10;
148:17;154:15;165:7;
173:15;179:22;180:5
**looked (16)**
13:16;33:13;41:3,3;
49:22;50:5;69:2;94:13;
101:5,23,23;103:8;
112:19;120:13;151:13;
183:2
**looking (25)**
8:20;14:21;20:4;
38:12;42:13;52:12;
57:6,6;63:9;66:9;
69:11;73:19;77:7,11;
80:8;95:14;97:2;98:14;
100:18;103:4;104:17;
114:23;139:25;154:20;
177:3
**looks (5)**
55:23,25;60:3;
114:19;138:24

**loss (5)**
50:13;51:6;57:20;
63:15,15
**losses (1)**
33:19
**lost (5)**
82:21;110:2;136:10;
148:21;157:4
**lot (9)**
46:5;50:19,22;52:16;
58:19,23;116:1;148:8;
174:6
**lots (1)**
50:20
**loud (1)**
134:7
**low (1)**
54:3
**lower (1)**
53:20
**lowest (1)**
53:17
**lucrative (1)**
62:17
**lunch (1)**
183:2
**Lux (1)**
131:17
**Lyman (3)**
19:5;70:10;117:16
**Lyman- (2)**
106:11;112:8
**Lyman-Cutler (20)**
4:6,10,17;24:6;38:4;
60:17;70:7;94:1,2;
106:6,15;108:19;
112:10;115:22;116:8,
16;117:2,11;123:6;
130:17
**lymancutlerllc@gmailcom (1)**
24:2

## M

**ma'am (9)**
156:4,12;157:24;
162:4;169:13;170:22;
173:18;181:12,13
**machine (1)**
97:25
**Madoff (1)**
19:20
**magnifying (1)**
5:17
**Maiden (26)**
13:10,13,15;32:25;
42:3,8,22,24;44:4,8,8;
58:14;61:7;69:13;
74:13;92:7,7,10,13,16;
133:11;136:8,12;
151:2;155:17,20
**Maiden's (2)**
36:25;42:10

**main (2)**
8:22;134:11
**majority (3)**
29:18,19;33:24
**makes (1)**
75:24
**making (3)**
139:22;148:8;149:2
**malicious (1)**
127:15
**man (1)**
24:15
**manage (2)**
36:4;48:16
**management (2)**
65:15;132:2
**manager (3)**
139:18;159:25;179:1
**managing (15)**
48:7,15,16,19;49:24;
50:6;74:14;75:7;109:1;
116:13;139:10,17;
159:25;160:9;168:25
**manipulate (1)**
114:15
**many (10)**
36:15;37:10;52:2,17;
54:24;59:1;60:11;
81:23;82:16;92:13
**Marblehead (1)**
131:15
**March (3)**
28:10;122:2,3
**margin (2)**
45:19;46:16;47:4;
56:5
**mark (5)**
79:4,9;89:2,11,17
**marked (17)**
23:18;76:1;79:16;
80:24;81:3;89:14,23;
90:4;96:22;99:5,6;
124:13;129:2;136:14,
22;141:13,15
**market (21)**
51:23,24;52:8;54:2;
62:4,14;65:6,10,10,12,
13,21;66:6,7;67:10,18;
68:7;171:8,10;172:10,
18
**marketing (1)**
132:3
**marking (1)**
79:8
**marks (3)**
20:22;22:22;118:14
**married (3)**
36:20,22,23
**marrying (1)**
127:25
**masonry (2)**
179:23;180:1
**Massachusetts (2)**

73:13;150:11
**matched (1)**
101:15
**material (2)**
41:8;94:6
**materials (5)**
46:24;53:16;56:5,12;
105:24
**math (1)**
139:15
**matter (9)**
44:12;65:9;81:20,24;
95:7;107:13;109:9,9;
153:22
**matters (2)**
82:18,20
**maximum (2)**
21:15;72:23
**May (44)**
4:12;6:19;7:1;8:17;
22:3;30:16;32:19;
33:14;35:10;61:6;
68:17;69:12;73:3;
76:18;77:20,23;79:20;
88:10;99:1;111:24;
112:2,3,11,15;114:24;
122:4;125:1,14;
126:22;127:1;129:15;
133:22,23;137:22;
140:4;142:20;148:10;
156:8,9;158:14;162:7,
12;164:3;183:16
**Maybe (16)**
10:16;21:25;28:24;
37:12;49:16;69:4;
82:24,24;112:4;122:2;
138:13;144:4;147:16;
159:16;179:12;180:23
**MBA (3)**
132:4;149:16,23
**mean (7)**
11:24;15:12;16:22;
41:9;46:23;48:15;
52:24;53:16;58:4;72:3,
20;80:16;101:22;
134:14;147:20;163:10;
175:8
**meaning (6)**
43:14;48:17;51:22;
56:4,9;66:15
**means (6)**
15:5,6;65:16;101:21,
23;147:20
**mechanical (1)**
148:15
**meet (1)**
144:5
**meeting (35)**
39:10,10;42:9,10;
43:19;44:14;47:7,10;
49:15;56:17;57:1;58:9,
13,16;59:3,5,7,12;60:1,
16,21;93:18;96:17;

Case 16-01120 Doc 342 Filed 06/04/19 Entered 06/04/19 13:04:08 Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document Page 196 of 206

May 8, 2019

110:16;111:19;112:9,
16;114:16,17;116:21;
117:1;143:2;165:23;
166:5,6
**meetings (2)**
161:9;166:2
**mein (1)**
86:6
**member (5)**
74:14;75:7;139:10;
150:13;160:9
**members (3)**
14:22;33:6;123:6
**members' (1)**
14:25
**memory (29)**
10:17;11:2,8,17;
26:18,23;74:19;75:1;
80:4,19;87:13,16,25;
88:1,8,8,19,21,24,25;
90:5;95:5;97:5;120:8;
125:3,10;171:12,17;
172:2
**men (1)**
44:3
**men's (1)**
81:22
**mentioned (3)**
40:14;54:17;56:10
**merely (1)**
175:1
**merit (1)**
68:13
**met (4)**
101:19;146:15;
147:22;173:6
**microphone (5)**
35:13,16,18;134:21;
138:7
**mid-2012 (1)**
84:2
**middle (4)**
124:3,4;136:10,13
**Middlesex (2)**
10:17,20
**might (20)**
15:13;29:3;42:13;
60:20;73:1;80:14;
84:19;104:9;112:3;
113:13;133:21;134:6;
147:6;162:18,22;
163:3,5;181:15;182:1,
1
**million (50)**
17:8,10;23:11;47:14,
15;53:19,22,23;54:11,
13,19;55:15;56:1,3,4;
58:19;60:9;66:7,11,24;
67:9,15,15,16,19;
68:14,14,23;83:22;
104:8,24;105:5;
140:14,16;141:2;
143:16;144:11;152:21;

164:1,4;166:9,13,21,
25;167:9,12;169:8,25;
170:11;178:15
**mind (1)**
139:21
**mine (1)**
125:12
**minimum (1)**
53:17
**minute (1)**
98:10
**minutes (3)**
81:13;82:2;170:17
**misconduct (1)**
8:10
**misdirected (1)**
171:5
**misheard (1)**
15:13
**missing (6)**
135:18;136:4,5,13;
137:9,10
**mixed (1)**
5:10
**model (2)**
54:21;104:5
**modeling (1)**
52:6
**modernization (1)**
41:8
**moment (20)**
7:8;11:13;12:3;14:2;
27:16;30:12;32:20;
33:14;45:23;50:10;
79:12;109:14;115:21;
129:15;134:19;143:10;
146:15;161:17;177:2;
179:9
**money (41)**
15:9;16:22;20:1,19,
20;21:12,16,17;23:15;
27:18;31:17;53:8;60:4,
6;64:23;67:3;73:1;
84:17,20;105:18;
106:23;121:16;123:17,
20;132:23;140:1,17,
20;141:6;143:13,16;
148:8,9;149:2;158:24;
166:12,16;167:16,21;
177:12;180:2
**month (3)**
16:2;27:15;52:1
**monthly (4)**
27:1,4;156:1,18
**months (15)**
12:24;15:2;51:25;
52:7;53:2,3,4,5,7,19;
60:19;69:22,23;72:11;
148:19
**months' (1)**
53:20
**more (28)**
7:25;31:10,15;37:13;

41:11;43:23;52:21;
86:1;92:19;101:12,12;
102:15;104:11,13;
120:23;127:6;128:1,
12;137:21;138:19,24;
166:19;174:4,9,13,17;
180:6;183:21
**morning (31)**
4:3,4,14,16,18,21,23;
5:19,21,22;6:6,7;25:21,
22;35:8,9;49:12;80:5,
9;91:12,13,14;94:14;
97:7,9;110:15;116:20;
117:20;182:12;183:1,7
**mortgage (5)**
17:11,16;18:8;19:20;
31:10
**Moscow (1)**
132:1
**most (4)**
23:14;73:2;74:17;
91:19
**mostly (1)**
8:19
**mother's (1)**
91:22
**motion (10)**
70:12,14,19,21;
80:22,22;130:4,19,20,
23
**motions (3)**
28:18;71:19,25
**move (12)**
11:23,24,25;35:16;
60:15;68:12;79:13;
131:5;136:3;148:23,
23;182:24
**much (36)**
15:21;20:23;39:11;
53:20;54:24,25;60:11;
64:10;71:12;73:22;
83:21;85:3;86:3;87:14;
90:5,8,10;95:11;
106:23;109:18;112:23;
113:8,13;121:16;
128:1,12;140:13,15,20;
141:1,6;143:15;152:1;
166:17;169:1;170:15
**multiple (6)**
59:2,2;92:2,8;
170:25;172:7
**multiply (3)**
16:1;104:25;105:5
**myself (4)**
24:8;58:14;96:21;
156:3

## N

**name (14)**
24:9,22,24;35:24,25;
40:23;76:6;78:15;
131:12,19;142:21,23;

160:21;180:8
**names (3)**
4:12;24:14;30:13
**narrative (2)**
61:16;62:13
**narrowing (1)**
32:18
**nearly (1)**
72:7
**necessarily (1)**
130:10
**necessary (4)**
36:10;73:24;75:16;
84:18
**need (17)**
16:13;48:2;52:19;
66:8,25;70:17;72:17;
83:7;98:11;106:2;
109:20;126:5;134:8;
141:6;170:16;181:22;
183:22
**needed (3)**
23:8,10,12
**needle (1)**
60:15
**needs (2)**
48:10;107:8
**negligent (1)**
8:10
**negotiating (1)**
148:4
**negotiation (2)**
26:1;32:8
**negotiations (4)**
25:23;26:6;32:24;
106:10
**neighborhood (1)**
154:20
**neither (1)**
158:23
**nerves (1)**
148:24
**net (21)**
15:1;48:11;50:13,13,
16,18,23;51:2,2,3,5,11;
52:13;57:20;63:21;
65:22;66:5,5,7;67:17,
18
**netted (1)**
54:8
**netting (1)**
66:2
**new (15)**
39:3;62:2,2;65:10;
94:5;115:22;116:9,22;
117:12;127:24;128:1,
11;132:22,22;150:14
**News (2)**
77:23,25
**Newton (1)**
73:13
**next (19)**
7:20;8:2,4,5;10:2;

11:15;13:6;19:22;
23:11;40:8;60:17;
68:21;88:21;104:20;
118:14;138:14;163:20;
171:23;182:6
**nice-looking (1)**
59:2
**niche (1)**
62:14
**Nick (1)**
61:7
**Nickolaev (1)**
147:1
**Nickolay (1)**
4:15
**nifty (1)**
100:24
**night (1)**
44:15
**Nikolay (2)**
37:2,3
**Nineteen (1)**
132:10
**ninety (2)**
16:25;30:3
**nobody (1)**
27:13
**nodded (1)**
39:18
**none (1)**
7:22
**Nope (3)**
44:6;63:14;153:23
**nor (2)**
25:11;158:23
**north (2)**
144:11;164:1
**notations (1)**
162:21
**note (2)**
101:18;102:2
**notes (20)**
77:10,15,17;79:2,4,
15,23;80:3,4,7;96:17,
20,21,25;97:2,6;100:9,
19;101:12,24
**notwithstanding (1)**
70:18
**November (10)**
13:21,24;18:16;29:6;
85:7;120:7,15;123:4,
16;147:17
**number (35)**
4:5,10;12:24;13:9;
24:1;46:20,21,22;
50:14,17;52:20;57:20;
63:2,7,18,19,24;66:12;
71:17;73:14;75:2;
85:21;86:5;87:5;93:6,
9;95:20,21;102:25;
115:18;132:20;141:6;
165:9;178:12,13
**numbers (50)**

16:11;17:6;38:14;
44:18;47:11;51:16;
57:16,17;59:8,9;61:17;
65:20,25;83:7;84:25;
93:24;94:1,2;95:15,16,
16,18,18,23;100:19,22;
101:4,8,11,12,25;
102:1,5;104:14,24;
113:7,25;114:6,15,18,
21;119:7;127:17;
145:2;162:18,22;
163:8,15,17;179:23
**number's (2)**
163:25;164:1

## O

**oath (2)**
5:24;96:1
**object (6)**
70:6;87:19;127:12;
135:1,8;144:22
**objected (4)**
130:14,15;161:25;
177:21
**objecting (2)**
119:1,4
**objection (20)**
4:7;24:10;32:10;
70:17;72:19;75:22;
124:24;128:3;130:3,6,
9;134:24;135:6,11,24;
139:3;142:2;145:25;
180:25;181:2
**objection's (1)**
73:6
**obligated (2)**
29:6;130:3
**obligation (4)**
70:20;84:19;160:10,
13
**observations (1)**
70:15
**observe (1)**
160:16
**obstreperous (1)**
88:12
**obtain (2)**
52:16;65:13
**obtained (1)**
142:8
**obvious (1)**
142:20
**obviously (3)**
51:23;91:18;148:1
**occasionally (1)**
92:22
**occupancy (3)**
140:3;158:13,20
**o'clock (1)**
81:12
**October (20)**
38:5;40:3;47:6;

56:17,24;58:10,16;
60:1,16;62:5;93:17;
110:16;111:2,19;
112:16;116:21;165:23;
171:11,24;172:10
**off (5)**
12:3;17:3;81:18;
82:4;131:7
**offer (16)**
39:5,7,17;53:7;87:2;
124:20,22;130:16;
134:15,20,22;139:1;
141:25;145:23;180:23;
181:4
**offered (3)**
65:11;67:21;125:22
**offering (4)**
74:22;125:23;
137:19;148:25
**office (13)**
36:25;42:10;43:16;
84:24;92:24;93:3,4;
95:6;96:6;141:22;
142:21;159:18;164:10
**official (2)**
43:23;159:2
**Officially (1)**
166:7
**old (5)**
39:2;43:9;128:11;
132:9;157:2
**omitting (1)**
16:17
**once (5)**
55:19;81:17;118:14;
125:12;140:19
**one (78)**
8:2,6;11:13,17;
13:16;16:8;18:17,24;
19:1;20:4,7;21:8,23;
22:11,14,17,17;24:1;
28:1,16,25;34:10;38:8;
42:12,14;45:15,18;
48:4;49:22,25;50:5,10,
11;57:3,13,14;63:16;
64:4;74:4;75:4;78:20;
85:9;89:10,11;95:10;
98:21;101:2;102:3;
107:7;114:6,12;
115:17;116:18,18;
127:8;128:5;129:15;
130:6,17;133:21;
136:22;137:4,5,20;
138:9,19,24;146:6;
155:17;159:11;174:14,
15,16;179:9,12,17,18;
182:11
**ones (4)**
116:22,22;117:13;
136:8
**one's (1)**
16:7
**ongoing (1)**

84:1
**online (3)**
159:5,13,19
**only (16)**
7:14;13:4;23:18;
30:7;45:12;75:15;
97:22;111:11;126:1,
23;129:9;136:15;
137:2;143:7;166:5;
182:6
**onto (1)**
178:2
**Oop (1)**
24:12
**open (1)**
126:24
**opened (1)**
156:13
**operating (24)**
13:24;25:24;26:2,7,
13,19;29:6,10,16;32:3;
67:2;74:12,18;75:20;
133:4,19;136:6;137:3;
154:13;155:15,21;
158:1;165:19;166:2
**operation (1)**
129:12
**operations (1)**
131:17
**opinion (1)**
47:18
**opportunity (5)**
71:4;73:15;80:10;
126:7;155:9
**opposed (2)**
112:24;113:9
**option (4)**
79:4;124:22;125:11,
13
**options (1)**
125:8
**orally (1)**
6:1
**order (5)**
62:18;96:4,19;
104:23;108:8
**ordinary (2)**
177:13,20
**organize (1)**
100:10
**original (8)**
6:15;51:13;59:5;
69:6,23;71:9;98:21;
132:24
**originally (3)**
59:6;70:22;110:15
**others (1)**
111:6
**ought (1)**
5:10
**ours (1)**
65:5
**out (47)**

14:25;16:21;17:6;
19:20;20:1,19;22:7,9,
19;27:19;31:11,17,22;
33:24;34:5,15;35:18;
40:17;41:7,10;43:13,
15;50:11;54:8;59:17;
64:14;65:17;66:2;
67:15;93:17;97:13;
105:18;106:18,20;
113:10;124:5;129:16;
134:7;135:16;140:7;
143:13;153:19;157:21;
158:23,24;159:24;
182:10
**outcome (1)**
23:14
**outcomes (2)**
13:3,3
**outline (2)**
79:25;80:9
**outlined (2)**
106:14;118:6
**outset (1)**
72:23
**outside (5)**
32:10;92:17,20;
112:24;113:14
**outsourcers (1)**
180:9
**outstanding (2)**
146:14,19
**over (17)**
6:13;20:22;21:3;
23:16;52:2,6;78:3;
85:21;120:20;139:21;
143:16,19;144:4,8;
166:18;173:3,3
**overall (2)**
37:12;69:5
**overcharges (1)**
174:14
**overrule (1)**
135:25
**Overruled (6)**
24:19;73:7;128:7;
135:23;139:5;146:1
**overruns (30)**
10:12;12:7;73:3;
84:6,9,15,16,24;85:3,
18,19,20,22,25;86:3,5,
24;87:3,6,7;127:12;
142:16,19;143:2,3,5,
15,20;144:14,18
**oversee (1)**
160:10
**own (6)**
21:17;150:20,21;
151:19;152:1;158:25
**owned (2)**
150:4,16
**owners (1)**
132:19
**owning (1)**

33:7
**owns (1)**
150:13

## P

**packet (1)**
21:7
**page (54)**
7:13;8:4;9:12,14,15,
24;10:2,22;11:15;12:4;
14:5,6,19;21:20,25;
25:2;26:10,11;33:11,
11,11;40:8;45:3;47:24;
49:23,23;51:18;55:3;
57:7;61:19;68:10,21;
78:5;87:18,18;95:13;
101:1;127:6;137:3;
138:14,15,15;139:13,
24;146:5;147:10;
156:13,16;163:20;
168:18,21;169:11;
176:6;179:22
**pages (18)**
11:13;42:12;50:4;
98:1;135:18;136:4,5,
10,11,13,23;137:5,9,
10;138:1,3,21;158:1
**paid (12)**
14:25;18:16;34:14,
19;65:8;118:11;
158:15,24;165:4;
166:15;167:25;180:3
**paper (2)**
78:25;99:19,21;
157:4
**paraded (1)**
70:24
**paragraph (20)**
7:14,20;8:5;9:17;
10:2;11:12,14;14:21;
15:5;33:6,15,16;42:12;
69:20;87:17;88:13;
139:25;158:4,7;160:5
**paragraphs (1)**
7:25
**pardon (1)**
154:2
**parking (1)**
82:19
**part (18)**
16:11,12;20:20;
24:17;31:22;32:9;
33:15;70:21;71:9;
106:10;109:4;121:11,
14,15;150:19;158:12;
169:1;178:25
**partially (1)**
117:4
**participate (2)**
59:7;73:21
**particular (7)**
42:6;48:25;57:17;

Case 16-01120    Doc 342    Filed 06/04/19    Entered 06/04/19 13:04:08    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 198 of 206

May 8, 2019

64:17;66:14;135:18;
174:11
**parties (4)**
4:8,12,22;111:20
**partner (10)**
48:6,7,15,16,20;
49:24;50:6;109:1;
116:13;168:25
**partners (1)**
58:1
**parts (1)**
47:9
**party (2)**
111:12;154:10
**party's (1)**
125:7
**password (1)**
159:13
**past (2)**
38:7;151:3
**Pause (2)**
98:19;125:6
**pay (18)**
28:4;31:15;39:5,7,
13,15,15,17;64:15,25;
65:9;140:2;146:14;
158:15,16,21;166:22;
167:16
**payable (1)**
146:10
**paying (6)**
15:7;28:5,6;31:10,
14;84:18
**payment (4)**
14:24;18:8;46:6;
73:25
**payments (7)**
16:24;18:4,13;19:12,
12;20:21;28:22
**peep (1)**
73:2
**penalize (1)**
15:10
**pending (6)**
78:9;81:5,9;85:12,
14;109:13
**pension (1)**
36:4
**people (4)**
42:8;48:13;58:13;
70:24
**per (7)**
14:24;15:9,11;27:1;
68:19,22;151:15
**percent (34)**
14:24;15:9,10;30:3,
7;33:7,18;48:22;49:1,
2,24,25,25;50:1,1,6,7,
7;55:24;67:17,17;
73:23,25;104:21;
105:2,2,5;117:19,21;
152:12;153:5;158:16,
16;165:18

**percentage (3)**
33:7;104:25;152:7
**percentages (2)**
104:21,22;158:15
**perfect (1)**
14:7
**perform (1)**
49:18
**performances (1)**
37:23
**performed (3)**
90:6;102:3;152:1
**performing (2)**
36:11;48:18
**perhaps (8)**
34:10;75:19;77:25;
79:24;87:16;125:16;
137:1;145:15
**period (6)**
52:3,7;54:3;163:1;
173:3,3
**periodically (1)**
161:11
**permit (1)**
105:4
**permits (4)**
105:2,4;133:5;142:8
**permitted (1)**
88:19
**person (4)**
40:23;111:11;
132:14;147:21
**personal (9)**
23:1;24:16;25:7;
31:4;77:9,15,17;
115:17,20
**personally (3)**
21:14;37:17;92:12
**persuaded (1)**
6:25
**Perten (132)**
4:18,18,25;5:4,7;
6:13,21;9:17;11:16;
12:18;24:10,13;25:16,
18,20;32:1,5,14,17,20,
22;33:2,4,10,12;34:8,
22;70:6,14;71:6,8;
72:2,6,15;76:22;77:6,
13,15,21;79:9,20,23;
80:15,19,23;82:8;
85:12;87:19;88:2,11,
16,23;89:7;90:14,17,
22,23;91:11;93:6,8;
94:11,12;95:9,12;
97:17,19,21;98:2,6,8,
11,12,13,16,20,22;
99:1,3,4,10,14,16,18,
20,22,24;100:2,5;
103:6,7,9,11,21,22;
107:2,3;110:2,4;
112:20,21;118:23,24;
119:25;120:1;124:9,
21,25;125:9,14;126:9,

10,13,16,18;127:11,20,
22;128:9,15;134:13;
156:5;157:2,4,9,11,20;
161:16;170:19;171:4;
183:8,10,18
**Perten's (4)**
79:4;109:17;125:2;
126:21
**Peter (1)**
4:16
**petition (1)**
16:18
**petition's (1)**
16:20
**ph (4)**
36:23;38:24;43:14;
61:7
**Phone (6)**
49:10;111:16;
147:21,25,25;148:3
**photos (1)**
58:25
**picture (1)**
23:6
**pictures (1)**
155:6
**pieces (1)**
138:9
**place (2)**
7:14;39:20
**plaintiff (2)**
129:2,3
**Plaintiffs (2)**
35:3;129:21
**plaintiffs' (2)**
157:5;170:14
**Plaintiff's (28)**
75:15,19,23;76:1;
81:1,2,3;89:17,21,23;
90:4;96:23,23;99:6;
100:6;124:14;133:16;
134:22;136:1;138:2;
139:1,6;141:13,25;
142:5;145:23;146:2;
181:6
**plan (5)**
58:22;141:7,8;
177:22;181:24
**planning (4)**
58:23;59:5;110:16;
183:20
**plans (12)**
36:4;102:20;105:1,3,
4;113:21;116:16,19;
155:1,4,5,9
**Platiff's (1)**
99:6
**playing (1)**
60:24
**please (52)**
4:12;5:13;6:11;7:6;
8:3;9:5,12,14;10:3,22;
12:15;21:21;24:12;

32:2,4;33:11;35:4,24;
39:24;45:4;51:19;55:4,
21;56:20;61:2,20;
68:10;69:9;81:19;
92:19;93:6;94:11;
97:17;102:15;103:6;
108:14;111:5;112:20;
124:10;128:8;129:25;
131:12,25;138:7;
141:12;145:24;158:5;
161:14;163:20;168:19;
171:5;176:7
**plot (1)**
58:22
**plugged (2)**
64:1,2
**Plumbing (1)**
146:20
**plus (4)**
53:4,16;56:5;117:23
**pocket (2)**
34:15;158:25
**podium (1)**
88:25
**point (32)**
20:4,23:18;26:18;
28:18;31:10,16;50:11;
53:10;60:10;64:13,13;
65:24;66:17;72:13;
76:22;79:6;84:14;
101:14;102:19;117:14;
125:10;131:7;134:15;
135:16;138:25;142:16;
143:18,20;144:15,16;
171:22;179:2
**pointed (1)**
159:24
**points (3)**
64:25;131:3;154:12
**Polytech (1)**
149:20
**portfolio (1)**
58:24
**portion (10)**
48:11;89:4;93:21;
105:22;125:4,16,18,19;
126:22,23
**positing (1)**
48:21
**position (3)**
9:1;33:17;148:18
**posits (1)**
49:23
**possibility (2)**
175:19;176:10
**possible (1)**
13:3
**posted (1)**
20:23
**potential (2)**
53:11;183:19
**power (1)**
97:19

**pregnant (2)**
148:18,19
**preliminaries (1)**
4:24
**premise (1)**
71:8
**prepare (6)**
41:2;96:4,19;114:10,
13;183:11
**prepared (4)**
51:8;69:3;155:18;
177:8
**preparing (3)**
39:11;49:4;93:16
**presence (2)**
121:7;122:23
**present (3)**
71:5;93:10;114:17
**presentation (26)**
38:6;39:12;40:13,15;
41:1,3;42:1,1;43:18;
48:9,20;56:24,25;57:8,
8;59:8;62:25;63:4;
71:9,17;94:8;111:3,7;
112:5,6;113:13
**presentations (5)**
43:16;44:17;62:5;
93:23;94:9
**presented (15)**
52:18;57:3,15;58:17;
70:22;85:3,18,19,20,
22;86:5;114:6;116:21;
127:17;144:17
**preserve (5)**
70:17,18;72:17;
80:13
**presume (2)**
40:22;91:16
**pretending (1)**
148:7
**pretty (4)**
107:20;109:18;
141:5;146:16
**previous (1)**
64:3
**previously (2)**
130:4;132:14
**price (32)**
7:17;9:21;12:25;
13:4;46:10,11;47:14,
16;50:24;52:4,11,15;
53:1,1,18,18,22;54:3;
59:22;60:5;66:1;71:13;
143:7;151:22,24;
168:12,13,15,16;170:2,
7;171:19
**prices (2)**
52:10;53:12
**print (2)**
43:13,15
**printing (1)**
44:25
**printout (1)**

170:25
**prior (13)**
49:23;71:21;85:20;
92:4;93:23;94:8;100:9;
107:23;130:5,19;
141:7;146:15;172:7
**private (1)**
13:10
**probable (1)**
23:14
**Probably (14)**
28:24;37:21;63:12,
13;73:19;79:3,9;98:2;
104:10;117:14;137:3;
138:16;163:10;181:25
**problem (2)**
75:22;122:22
**problems (3)**
122:5,9;138:10
**procedural (2)**
70:16,19
**procedurally (1)**
130:3
**procedure (3)**
106:14,15,17
**proceed (5)**
25:16;82:9;99:1;
111:21;180:10
**proceeding (1)**
11:6
**proceeds (8)**
51:2,2,3;54:9;65:23;
66:5,5;167:8
**process (4)**
51:7,9;109:19;
142:15
**producing (1)**
64:17
**ProExcavation (8)**
4:9,20;12:11;87:10,
15;90:6;146:24;147:8
**professional (2)**
92:21;113:22
**profit (45)**
15:1;34:5;44:22;
48:8,11;50:12,13,13,
16,18,23;51:5,11,12;
52:12;57:20;58:6,21;
59:21;61:21;62:3,12,
16;63:15,15,21;64:4;
66:7,8,13;67:11,12,17,
18,20,23;68:5;117:23;
121:8,9,12;145:1;
148:4;152:1,6
**profits (12)**
15:8;33:19,24;48:22;
49:2;52:13,14;59:22;
65:7;144:6;154:7;
177:5
**progress (1)**
160:16
**project (128)**
13:4;15:8;20:2;

24:17;33:20;38:4,22,
25;39:1,15;42:17;45:1,
4,10,14;46:2,25;47:17,
20;51:25;53:4;54:8;
55:20;57:23,24;58:17;
59:20;60:17;62:24;
63:5,9;64:10;68:6,22;
69:22;70:4,5,11;72:23;
73:15;74:2;76:5,6,8,
17;82:22;84:17;94:5,
14,17,21,25;95:17,20,
22;101:6,13;103:3;
104:19,23;105:13;
106:6;108:1,3,16;
111:21;112:9,10;
113:8,10;115:1,16;
116:10,14,15,21;117:6,
10,12,17,22,22;118:3,
4,21;119:2,5;120:17,
17,25;121:4;122:1;
123:18,21;127:24;
128:11,13;132:13,17;
133:2,3,8;146:20;
149:3;150:7,10;151:7;
152:14,19;153:7,17;
155:2;156:2;158:24;
159:6;162:12;164:3;
165:4,14;167:25;
168:3,7;169:7;173:13;
174:4,18,24;177:23
**projected (3)**
143:25;164:3;174:18
**projects (13)**
38:19;47:19;58:24;
60:12;71:2,22;72:10;
105:10;130:17,25;
131:8;135:9;150:6
**promise (1)**
152:11
**prompting (1)**
114:24
**proof (3)**
175:11,13,14
**proper (1)**
80:5
**properties (8)**
8:19;9:2;23:10;28:9,
15;34:14;150:16;
151:13
**property (27)**
12:24,25;23:12;
28:11;29:2,2;52:6;
73:10,12;76:19;84:12;
143:8;144:3;148:11,
16;154:15,23;155:6;
168:9;169:16;171:11;
172:8,9,18,20;177:23;
178:1
**property's (1)**
15:1
**proposal (1)**
132:24
**proposed (5)**

68:4;110:9;115:4;
151:22,24
**proposing (1)**
88:14
**proposition (1)**
15:14
**prospective (1)**
40:16
**protection (1)**
23:7
**prove (1)**
72:22
**proved (1)**
72:22
**provide (4)**
86:8;117:25;164:9;
174:20
**provided (34)**
12:11;38:7;55:9,16;
57:1;83:18,20;87:12;
97:3;100:24;108:2;
111:3;115:12,14,14;
118:3,10;120:3,14;
142:24;143:11;144:15;
155:1,20;162:6,15;
165:13;168:19;173:19,
22,25;174:24;178:12;
180:6
**provides (1)**
165:3
**providing (1)**
106:3
**provision (2)**
14:13,16
**pull (2)**
32:1;33:10
**pulled (1)**
161:20
**pulling (3)**
20:18;21:14;27:19
**purchase (11)**
18:20;46:5;47:14;
58:18,19,23;73:24;
132:21;140:1;151:22;
170:2
**purchased (4)**
50:20;105:25,25;
116:1
**purchasing (1)**
39:1
**pure (1)**
31:23
**purely (2)**
126:5,6
**purpose (6)**
16:21;17:3;62:10;
89:18;90:18;107:1
**purposes (4)**
11:21;42:13;48:20;
107:17
**pursue (2)**
98:5;177:3
**pursuing (1)**

176:1
**put (26)**
17:9,23;19:16;20:19;
21:12;31:17;49:1;53:4;
55:6,8;61:24;67:4;
79:4,18;113:9;118:13;
125:11,13,24;126:7,22;
127:4;133:16;140:17,
20;148:15
**putting (6)**
21:17;27:18;43:20;
54:5;64:22;137:7
**puzzle (1)**
181:23
**Pyle (1)**
33:14

### Q

**qualified (1)**
24:15
**quarter (3)**
21:25;22:1;66:1
**quick (3)**
53:6,6;172:6
**Quickbooks (3)**
173:12,19;178:4
**quickly (1)**
62:15
**quite (2)**
41:6;71:14

### R

**raised (1)**
142:24
**ran (1)**
143:14
**Randolph (1)**
150:11
**range (3)**
52:9,9;53:11
**rate (5)**
46:12,13;47:16;
59:13;153:4
**rather (2)**
65:12;79:18
**reached (2)**
111:20;178:6
**react (1)**
144:17
**reaction (2)**
69:5;126:21
**read (14)**
7:8,18;17:23;33:8,
15,21;81:9;95:23;
138:12;140:5;156:23;
163:25;169:4,20
**reader (1)**
138:5
**reading (1)**
80:3
**ready (7)**

25:17;82:9;138:23;
141:8,8;176:8;183:25
**real (14)**
37:9,10;47:1;51:22,
23;52:4,5,10;92:2,8;
103:2;105:10;150:6;
151:3
**realized (1)**
69:17
**really (12)**
39:13;44:21;51:14;
53:8;54:2;63:10;98:18;
127:8;130:15;131:2;
147:11;182:9
**realm (1)**
92:17
**reason (8)**
71:20;81:10;123:12,
15;134:2;172:12,15;
183:18
**reasonable (2)**
47:18;48:12
**reasoning (2)**
23:24;148:8
**reasons (2)**
24:1;29:1
**rebuilding (1)**
39:2
**recalculate (1)**
69:21
**recall (41)**
5:13;7:3;8:16;12:6;
22:24;25:24;26:5;
27:19;32:8,23;58:15;
59:24;76:19;82:25;
87:7;95:3,4,6;102:7;
103:12,15;115:1,6,8,9;
116:23;117:20;119:11;
126:4;129:4;142:10;
143:24;148:2;154:24;
155:4;156:20;158:3;
159:9;165:11;172:3;
174:8
**receipts (1)**
106:4
**receivables (1)**
146:19
**receive (2)**
48:22;111:7
**received (18)**
6:14,18;24:3,7,20;
117:1;133:6;145:20;
148:1;149:13;152:18;
161:10;162:9;177:3;
178:5,14,22;179:6
**receiving (1)**
165:11;178:4
**recess (1)**
82:3
**recession (1)**
52:3
**recipient (1)**
24:3

Case 16-01120    Doc 342    Filed 06/04/19    Entered 06/04/19 13:04:08    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 200 of 206

May 8, 2019

recognize (14)
40:6;41:15,22;56:21;
57:16,19,20,21;58:1;
61:4;133:15;141:15;
145:18,20
recollect (1)
159:12
recollection (5)
112:13;120:14;
159:11;164:20;180:22
recollections (1)
124:22
reconsider (1)
130:19
record (13)
4:13;28:18;35:12;
75:3,12,17;78:3;82:4,
5;129:20;134:5;
157:16,20
record's (1)
79:16
recount (1)
58:15
RECROSS-EXAMINATION (2)
25:19;127:21
redacted (3)
16:7,8,12
redaction (1)
16:10
redeem (1)
20:12
REDIRECT (4)
6:4;34:11;127:9;
179:14
reduce (3)
31:18;52:11;53:25
reduced (2)
15:8;69:4
reduction (1)
7:17
refer (2)
7:25;143:14
reference (2)
81:1;165:10
referred (1)
6:21
referring (4)
25:6;156:21;176:21,
22
reflect (1)
157:20
reflected (2)
94:21;177:5
refresh (21)
10:17;11:2,8;74:19,
24;75:1;87:16,23;88:1,
7,7,18;95:5;97:5;
120:14;124:21;125:3,
10,11,12;180:22
refreshed (5)
88:8,21,25;89:1;90:5
refreshes (1)
120:10

refreshing (3)
11:17;80:4;87:19
refused (1)
7:16;8:25;31:15
regard (3)
12:7;18:3;180:20
regarding (2)
61:16,17
regularly (1)
37:22
reimbursed (2)
143:7;167:5
reimbursement (4)
106:1;107:22,24;
152:25
reject (1)
7:23
rejected (1)
8:25
related (2)
43:23;125:19
relates (7)
112:8;125:4,5,18;
130:16;135:7;158:10
relating (1)
101:5,12;114:25
relation (1)
144:1
relationship (6)
37:2,25;92:16,21;
106:7;154:3
relative (3)
38:8;48:12;62:14
relatives (1)
38:8
release (4)
55:24;105:7,18;
106:4
relevance (4)
70:10;71:2;135:10,
21
relied (1)
71:17
relies (1)
106:23
relinquish (1)
8:25
rely (1)
71:16
remain (1)
91:4
remained (3)
91:5;116:11;177:20
remaining (5)
19:19;31:22;51:5;
146:10;179:3
remains (1)
139:3
remember (74)
6:16,18;9:18;10:11,
13;12:12;13:11,18;
15:3;16:18,25;20:2,13;
23:1,22;26:4,9,13,21,

24;28:17;39:18;40:19;
41:4;49:17;60:2;61:10,
15;70:2;73:14;74:14;
76:5;85:6;87:9,9,14,20,
21,22;95:8;96:25;
104:9;110:22,24;
112:25;115:3;122:12,
13,16;132:20;136:23;
142:7,22;144:1,10;
147:24;151:16;154:17,
18,22;155:3;156:4,19;
159:21;163:11,13;
164:24;171:20;172:6;
174:5,7;175:12;
178:25;179:1
remembers (1)
80:11
remind (3)
5:23;24:5;130:21
reminding (1)
34:1
remove (1)
76:25
removed (2)
76:23;79:2
renew (1)
70:17
renewing (1)
70:18
renovation (1)
128:10
rent (1)
178:2
repeat (3)
27:3;31:13;128:8
repeated (1)
60:10
replace (1)
8:24
replaced (1)
160:24
represent (2)
120:7;137:8
representation (1)
70:22
representations (2)
70:23;71:18
representative (2)
55:22,23
represented (6)
13:15;72:8;92:7,11,
12;151:2
representing (1)
13:14
represents (2)
56:1;67:16
request (11)
8:24;32:7;34:4;41:7;
106:1,2;114:19,24,25;
138:11;180:12
requested (8)
15:4;42:23;107:23;
121:23;140:17;142:21;

143:2;153:10
require (3)
33:6;64:14;108:21
required (15)
33:18;36:8;41:7;
52:15;64:15;67:8,11,
14,23;68:4;107:15;
108:5,7,16,19
requirement (1)
107:11
Research (1)
131:17
resending (1)
136:10
reserve (4)
126:1,2,20;130:23
respect (3)
52:15;62:12;80:15
respective (2)
14:23,25
respond (2)
8:24;39:17
responded (1)
39:18
responding (1)
114:14
response (1)
111:8
responsibility (1)
19:19
responsible (6)
19:18;36:11;74:16;
166:9,25;167:11
rest (3)
74:5;126:8;182:15
restate (1)
130:3
restatement (1)
135:22
result (2)
32:24;123:23
results (1)
60:14
RESUMED (2)
6:4;82:11
retaining (1)
14:13
retread (1)
71:24
return (8)
69:6;101:23;102:1;
148:6;152:9;153:4;
177:5,8
review (9)
13:13;56:16,18;
60:20;86:21;110:9;
154:25;155:9;160:13
reviewed (6)
56:18;61:15;109:7;
154:25;155:14;162:9
reviewing (4)
6:8;61:10,13;97:10
rid (1)

12:3
right (287)
5:14;6:3,18,19,25;
7:23;8:21;9:9;10:14;
11:19,22;12:2;13:21;
14:3,10,14;15:15,24,
25;16:2,20;17:8,13,14,
24;18:2,4,9,14,17,21;
19:5,14,22:4,7;28:20;
29:13,19;31:10,15;
32:20;33:8;34:23;35:5;
36:12,13,18;37:1;43:1;
45:22;46:17;47:7,21;
48:6,23;49:2;50:2,7;
51:7,10;56:3;57:2,10,
12,24;58:5,7;61:8,21;
62:3,22;63:1,16,17,21;
64:3,6,7,21;65:19,21;
66:4,16;67:6;68:19,23;
69:13,18,24;70:1;71:6,
7,8;72:14;73:4;74:6,
11,18;75:11;76:3,15;
78:8,9;82:1;83:6,18;
84:3;86:17,21,25;88:5,
9,22;89:1,2,2,3,6,8,9,
10,16,25;90:21,22;
94:15;95:17;97:25;
98:4;101:15;104:17;
109:8;110:3;111:1;
115:18;117:18;121:6;
125:21;126:1,17,22;
128:18;129:3,5,7,14,
17;130:13;131:6;
132:13,15,25;133:7,10;
134:1,1,5,21;135:13,
15;136:5,16,18;137:5,
12,14,16;138:18;139:5,
12,15;142:4;145:23;
146:1,7,9,17;147:3;
149:2,5,23;150:8,11,
13;151:2,4,8,20;152:8;
153:8,11;154:4;
155:12,14,15,25;156:2,
4,7,16;157:19,22,24,
25;158:3,25;159:6;
160:4,15,16,19;161:1,
5,10,11,13,20;162:19,
20;163:1,9,14;164:9,
22;165:4,20,24;166:2,
10,13,20,25;167:9,19;
168:10,14;169:6,9,25;
170:3,18;171:1,3,10,
14,21;172:4,21;173:2,
4,7,11,13,21,23;174:1,
8,16;175:2,7,9,22;
176:4,6,12,14,23;
177:6,12,13,18,24;
178:7,10,14,15,16,24;
180:11;181:3,9,18;
182:8,14,17;183:14,23
right-hand (3)
101:4;162:22,25
ringing (1)

49:10
**rise (1)**
82:3
**risk (18)**
45:5,11;47:21;51:22;
54:1,2,4,17;63:5;94:14,
17;152:14,16;167:7,15,
18,20,21
**risks (2)**
52:5;54:18
**Road (13)**
132:13,20,25;133:9;
141:20;146:11;147:18;
150:7;151:7;152:19;
153:7;154:15,23
**Rockland (5)**
18:13,17;64:11;
83:17;106:11;140:10,
11,17
**role (3)**
59:3,4;168:24
**roof (2)**
107:22,24
**room (1)**
81:22
**roughly (1)**
9:8
**routinely (1)**
38:6
**rule (3)**
32:16;71:20;124:20
**ruling (4)**
130:19;142:4;146:1;
183:12
**running (1)**
113:7
**Russia (1)**
43:3;132:2,5
**Russian (6)**
43:1,7,11,20;44:2;
132:11
**Russian-speaking (1)**
44:1

## S

**safe (4)**
169:18,20,23;170:7
**safely (1)**
169:8
**sale (21)**
46:10,11;47:15;
50:24;52:6,10;53:1,1,4,
6,7;59:22;60:5;65:22;
66:1;143:7;167:8;
168:10;171:11,19;
172:6
**sales (7)**
13:4;51:2,3;53:11;
66:5,5;151:13
**same (26)**
4:22;14:12;18:23;
19:1,4,7;25:9;37:22;

40:23;43:21;46:13,15;
50:14;51:12;53:15,24;
88:2;94:6;103:24;
137:9;142:2,4;145:25;
146:1;180:19,23
**sat (1)**
156:4
**save (1)**
148:23
**savings (4)**
140:18,20;152:24;
178:16
**saw (6)**
30:23;37:15,22,23;
119:21;155:6
**saying (11)**
23:24;41:18;46:23;
47:13;64:19;65:4;
67:10;86:1;118:25;
144:25;182:19
**scanned (1)**
136:12
**scanning (1)**
136:10
**scenario (17)**
45:14;48:21;49:1;
52:14,14;53:14,21,24;
66:1;67:7,10,19;72:25;
94:25;95:17,21;115:15
**scenarios (15)**
42:2;44:21,21;48:1,
3;49:21;50:15;52:17,
17;54:18;57:23,24;
66:9;68:6;95:22
**schedule (13)**
55:7,12,17;56:16;
59:18;103:13,24;
104:3,4;106:22;107:9,
18;183:3
**school (1)**
157:2
**scope (4)**
32:11;45:1;128:5;
174:23
**screamed (1)**
7:2
**screen (14)**
12:3;14:18;15:18;
76:23;88:3;93:25;
99:16,17;133:16;
157:24;158:7;161:20;
162:5;163:25
**scroll (17)**
33:2;75:6;93:7;
103:9;112:22;138:11,
12,13,14,15,19,21;
158:4;163:19;164:18;
165:9;171:4
**scrolled (1)**
160:6
**Sean (1)**
4:14
**Searching (1)**

5:20
**seated (2)**
4:3;129:25
**second (18)**
7:13,14,15;21:20;
23:9;24:8;42:11;50:12;
66:22,22;69:20;70:21;
71:9;87:18;97:24;
98:18;124:10;179:18
**section (16)**
14:12;17:21;32:7,23;
48:4,6;57:22;62:2;
63:12;66:13,15;67:11,
13;68:6;170:14;171:8
**secure (1)**
55:25
**seeing (3)**
51:14;65:25;114:22
**select (2)**
52:22;53:11
**self- (1)**
66:25
**sell (15)**
9:2;12:24;23:10,16;
52:15;53:25;58:20;
60:7;83:11;132:23;
148:16;169:8,16;
170:10;177:23
**selling (8)**
9:21;51:1;52:10;
53:4,17,18;65:23;
151:24
**sells (1)**
54:3
**send (6)**
40:17;60:22;85:1;
105:23;106:18,20
**sending (2)**
42:7;119:15
**sends (2)**
55:22;105:18
**sense (2)**
41:6;112:6
**sent (22)**
7:1;24:1,2,21;25:1;
33:13,14;40:25;41:1;
44:3,14;60:19,20;
93:16;111:6;119:4;
136:12;143:9;153:10;
159:10,22;164:19
**sentence (3)**
33:5;43:13,15
**sentences (2)**
42:25;43:25
**September (3)**
83:9;84:2;165:23
**September-October (1)**
166:5
**Sergei (1)**
147:1
**series (4)**
36:8;52:13,13;
127:11

**serious (2)**
157:12,13
**Seriously (1)**
157:10
**served (1)**
31:17
**service (1)**
170:25
**session (1)**
4:2
**set (3)**
4:25;9:21;147:7
**settlement (2)**
42:16,16
**seventeen (1)**
43:10
**seventh (1)**
55:3
**several (8)**
152:4;153:7,13;
160:16;162:25;165:3;
173:3;177:17
**shall (3)**
14:22,25;140:1
**share (8)**
15:1;40:15;49:25;
50:1,2,6,7;70:15
**shared (2)**
58:25;123:1
**sharing (3)**
48:8;58:6;148:4
**sheet (2)**
103:10;174:1
**Shloesberg (1)**
36:23
**short (3)**
27:10;68:22;182:11
**shortly (1)**
84:22,23;85:4,24
**show (20)**
10:16;18:12;44:18;
72:10;74:21;78:22,25;
88:1,13,13,20,24;
89:25;100:20;120:10;
133:24;134:7;138:6,
20;145:15
**showed (9)**
20:23;28:6;47:6;
74:18;90:24;125:15;
144:7;145:2;157:24
**showing (3)**
11:2;75:22;134:12
**showings (2)**
172:7,19
**shown (6)**
23:20;45:13;58:22;
90:3;101:25;180:20
**shows (1)**
178:7
**sic (5)**
43:17;66:24;82:23;
94:25;149:21
**side (7)**

72:10;157:5,6;
161:15;162:22;169:18;
173:16
**sign (5)**
10:6;104:21;136:9;
143:5;168:13
**signatures (1)**
137:11
**signed (16)**
13:24;21:8;120:6,6,
14;136:9,11;143:8,11,
11;155:7,8,15,23;
167:4,13
**significant (4)**
71:1;143:1,5,15
**significantly (1)**
149:7
**signing (3)**
10:4;85:6;137:4
**similar (3)**
105:15;108:18,21
**simply (3)**
27:18;74:24;109:21
**single (5)**
24:2,20;50:19,21;
52:16
**sister (1)**
91:22
**sit (3)**
35:17;159:11;163:14
**site (2)**
48:17;160:15
**situation (2)**
105:15;182:19
**six (1)**
163:10
**sixteen (1)**
52:7
**sixth (3)**
14:5,6;51:18
**sketches (1)**
141:8
**skip (3)**
16:12;40:8;176:14
**small (2)**
63:11;69:3
**smaller (1)**
65:3
**so-called (1)**
13:10
**socialize (1)**
92:20
**Society (1)**
36:9
**soft (3)**
47:1;56:14,14
**sold (15)**
8:20;15:2;28:9,11,
16;34:14;59:21;76:19,
20,20;144:2,3;147:17;
169:2,24
**somebody (9)**
49:16;65:17;84:23;

96:5;110:19,22;
113:21;123:13;124:5
**somehow (2)**
79:5;118:18
**someone (3)**
79:14;126:25;162:6
**sometime (2)**
28:10;120:18
**Sometimes (4)**
28:11;82:23;83:12;
119:11
**somewhere (8)**
13:24;20:24;56:7;
63:10,12,13;104:15;
169:19
**soon (1)**
23:13
**sorry (26)**
8:2;11:12;16:12;
27:3;38:11;41:18,19;
45:18;49:11;57:6;65:1;
72:3;83:4;86:9;88:11;
90:15;95:20;96:24;
99:24;123:25;150:20;
161:7;163:20;165:19;
171:5;179:18
**sort (7)**
6:21;37:7;40:1;53:5;
71:15;77:7;94:5
**sorts (1)**
82:18
**sound (1)**
6:25
**sounds (2)**
11:17;117:18
**speak (2)**
35:13;122:19
**speaking (2)**
26:19,21
**specific (3)**
42:15;92:19;152:8
**specifically (4)**
49:6;71:16;114:17;
173:9
**specifications (1)**
55:1
**specify (2)**
102:15,17
**speedy (1)**
100:16
**spell (1)**
131:18
**spending (1)**
41:25
**spent (3)**
39:11;167:14;174:17
**split (2)**
58:20;154:7
**spoke (8)**
25:23;26:2,6;59:6;
96:5;112:11;122:16;
160:18
**spreadsheet (10)**

31:8;47:3,9;49:4;
51:13;69:2;102:6,24;
114:20,22
**spreadsheets (5)**
51:8;60:24;95:14;
114:10,13
**spring (1)**
133:4
**square (4)**
120:8;151:15,18;
155:5
**stage (7)**
21:15;55:20,21,23;
104:22;105:4,8
**stand (4)**
5:13;79:1;109:16;
129:1
**standard (1)**
43:22
**standing (1)**
130:6
**standpoint (1)**
68:7
**start (15)**
6:8;53:2;63:6,6;
70:4;76:17;82:22;
104:17;121:25;130:2;
133:2;142:8;148:14;
168:23;169:6
**started (20)**
5:11;30:13,21,24;
31:6;72:9;73:10;76:5,
18;82:23;83:8,24;
114:23;121:19;122:1;
133:3;142:7;145:4;
148:6;155:12
**starting (5)**
17:21;39:20;65:24;
95:15;143:1
**starts (3)**
8:6;18:6;140:19
**state (6)**
4:12;11:5;35:24;
131:12,25;132:3
**stated (3)**
10:6;15:12;126:10
**statement (5)**
7:15,16;10:9;71:12;
87:21
**statements (3)**
159:10,12,22
**states (4)**
11:14;43:5,9;132:7
**stating (1)**
143:9
**stay (3)**
14:2;50:10;129:20
**stays (1)**
54:2
**stick (1)**
111:5
**sticker (1)**
101:2

**still (7)**
5:1,24;71:1;90:12;
91:1;143:12;167:22
**stones (2)**
145:4,6
**Stop (5)**
24:12;42:7;66:21;
164:6;165:16
**stopped (6)**
28:5,6;31:9,14,15,24
**story (1)**
93:13
**straight (1)**
83:8
**street (1)**
37:16
**stricken (2)**
75:24;80:17
**strictly (1)**
70:16
**strike (5)**
80:22;103:21;107:2,
15;118:23;119:25,25;
174:21
**study (1)**
8:13
**stuff (3)**
40:1;43:23;180:13
**subcontractor (2)**
118:10,11
**subcontractors (3)**
48:18;168:6;180:16
**subject (4)**
81:20,24;134:24;
135:25
**submit (1)**
127:1
**submitted (10)**
107:8;108:23;109:4,
7;110:5,7,9,11;168:3,6
**subpoenaed (1)**
182:3
**subset (1)**
71:1
**substance (3)**
43:24;58:15;175:17
**subtract (4)**
50:24;51:3,4;66:6
**subtracting (1)**
65:2
**successful (1)**
33:20
**suddenly (1)**
26:23
**sufficient (1)**
106:4
**suggest (1)**
80:16
**suggested (2)**
44:23;168:14
**suggestion (1)**
69:7
**suit (7)**

8:18;9:3,7;119:18,
19;175:19,22
**summarize (1)**
100:25
**summary (4)**
97:4;100:23;101:24;
103:10
**summer (2)**
133:6;164:23
**super (2)**
53:23,23
**support (1)**
108:2
**suppose (1)**
134:14
**supposed (9)**
24:5,7;42:10,19;
49:9,19;53:2,6;66:10
**supposedly (1)**
56:25
**sure (49)**
5:9;23:8,10;28:13;
31:14;34:19;36:7;
38:15;41:25;42:4,20;
43:13;51:21;52:21;
72:16;81:21,25;88:4;
95:6;97:10,18;98:6;
100:12,16;105:24;
106:3,9,10;107:20;
115:24;117:7;128:10,
25;129:11;131:20;
134:8,17;141:5,5;
147:14;161:18;167:10,
18;168:20;175:5;
176:8;182:13,23;
183:13
**surfacing (1)**
145:4
**surprised (1)**
131:7
**suspect (1)**
135:18
**Swamscott (1)**
150:17
**switched (1)**
164:24
**swore (1)**
96:1
**SWORN (4)**
35:6;49:12;87:21;
129:23
**symbols (1)**
80:2
**systemic (2)**
51:21;54:17

**T**

**table (1)**
66:23
**tainted (1)**
80:8
**talk (15)**

30:10;45:20;70:7,8;
78:2,3;81:22;115:21;
117:6;138:7;140:23;
172:24;182:22;183:7,
24
**talked (1)**
117:7
**talking (6)**
30:12;48:17;51:24;
85:11;133:3;143:16
**tally (1)**
102:1
**TAMPOSI (2)**
4:16,17
**target (3)**
47:17;53:10,18
**Tatiana (4)**
4:8,19;14:13;168:10
**tax (5)**
101:23,25;177:5,8,9
**taxes (11)**
19:5,8;47:1;56:15;
69:18;74:16;101:15,
19,19;103:2;163:5
**technical (1)**
72:16
**telephone (1)**
111:15
**template (2)**
93:15;94:6
**ten (4)**
29:20;30:7;37:12;
170:17
**term (1)**
7:2
**terms (7)**
8:23;29:16;105:15;
106:6;114:15;154:3;
175:3
**term's (1)**
36:13
**test (1)**
62:18
**testified (18)**
27:16;29:5;32:6;
71:16;82:13;93:16;
95:25;101:8;110:15;
149:13;150:7;152:18;
155:17;160:18;162:13;
164:8;165:22;178:6
**testify (5)**
24:13,15;79:19;
86:12;130:11
**testifying (9)**
20:15;24:16;26:6;
77:8;79:5;80:1,4;
93:11;97:9
**testimony (32)**
6:16;16:17;27:19;
71:10,14;72:21;76:24;
80:8,17;81:7,20,24;
96:4,12;97:1,10;102:4,
8;112:25;114:14;

Case 16-01120    Doc 342    Filed 06/04/19    Entered 06/04/19 13:04:08    Desc Main
Document    Page 203 of 206
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
May 8, 2019

116:23;117:5,7,16,20;
125:4,5,19,19;130:16,
24;131:8
**Tetris (2)**
181:19,23
**Thanks (1)**
139:15
**that's (1)**
100:1
**therefore (5)**
30:7;69:7;136:11;
148:20;167:15
**thinking (2)**
31:21;55:1
**third (8)**
44:24;45:3;47:24;
49:23;61:19;63:13;
139:24;146:5
**thirty (2)**
71:1;117:19
**thirty-one (3)**
73:23,25;117:21
**thirty-six (1)**
53:20
**though (5)**
18:11;19:19;72:12;
88:22;98:11
**thought (12)**
15:13;20:15;27:17;
29:25;71:3;88:12;
99:20;110:3;134:6;
149:6;169:7;180:19
**thoughts (1)**
100:10
**thousand (1)**
86:10
**threatened (1)**
119:18
**threatening (4)**
33:23;34:2;119:15;
148:14
**three (16)**
4:6,11;42:2;44:3,21,
23;47:20;48:1;49:21;
50:15;56:11;63:16;
94:13;105:2,2,5
**Thursday (1)**
183:21
**ticket (2)**
82:19,19
**tie (1)**
32:20
**timeline (4)**
6:9,14;13:4;76:20
**times (6)**
82:16,17;84:19;
159:17,17;160:16
**timing (2)**
59:17;85:17
**title (3)**
92:25;94:17,18
**titled (2)**
66:13;104:20

**today (12)**
4:24;26:23;81:18;
96:20;100:9,12;
129:19;159:11;163:14;
174:12;175:14;181:14
**today's (2)**
96:4;97:1
**together (4)**
33:17;55:6,8;181:20
**token (1)**
159:16
**told (35)**
28:25;38:7,10;39:12;
40:13;46:13;49:16;
53:3;54:23;56:18;
60:10;73:1;80:6;81:17;
91:14;92:1;102:4,22;
103:4;104:2;111:14;
114:9;115:3,10;
116:20;117:11,20;
119:7,10;121:19;
122:7;152:11;162:1,2;
178:9
**tomorrow (11)**
43:13;180:24;
181:24;182:3,6,10,12,
20;183:1,6,9
**tonight (1)**
127:1
**took (13)**
22:19;27:8;39:12;
96:25;97:6;99:23;
100:9;143:13;149:1;
151:22;167:7,15,18
**top (7)**
13:20;14:21;40:2;
104:21;144:9;156:16;
176:9
**topic (2)**
173:3;175:18
**topics (1)**
153:13
**total (18)**
13:18;17:7,9;45:1;
52:13,13;54:8,9;55:14;
56:10;62:24;63:9;
67:10,14;86:5;104:24;
117:15;163:22
**totally (3)**
116:3,4;157:13
**touch (1)**
148:5
**toward (2)**
14:21;158:24
**towards (3)**
84:16;88:17;122:1
**track (2)**
82:21;181:16
**Traffic (1)**
82:19
**train (1)**
110:3
**training (1)**

36:6
**transactions (1)**
151:4
**transcript (3)**
5:2;156:13;168:19
**transfer (3)**
8:20;20:12;22:3
**transferred (1)**
178:23
**translate (1)**
43:11
**transparent (1)**
41:11
**treated (1)**
121:3
**trees (2)**
145:4,5
**trial (9)**
4:6,11;39:23;51:18;
72:5,8;89:18;100:17;
183:6
**tricky (1)**
182:10
**trip (1)**
154:19
**true (5)**
9:22;10:9;11:20;
30:16;95:1,2;103:25
**Trust (5)**
18:13,17;64:12;
83:17;106:11;140:10,
11,17
**Trustee (1)**
19:20
**truthful (1)**
96:1
**try (6)**
30:1;78:3;115:25;
131:2;136:3;163:13
**trying (7)**
23:6;88:12;112:23;
124:8;134:4,18;181:20
**Tufts (1)**
149:25
**turn (7)**
41:14;45:3;97:17;
101:1;168:18;169:11;
176:6
**turns (1)**
158:23
**twelve (1)**
37:13
**twenty (8)**
51:25,25;53:2,3,5,6,
19;69:23
**twenty-five (1)**
71:1
**twenty-months (1)**
52:2
**twenty-three (3)**
15:2;27:15;69:22
**two (25)**
7:25;16:1;34:10;

36:16;42:12;48:9,9;
50:4,20;53:4;56:11;
58:20,20;63:16;70:15,
23;85:18;95:19;98:10;
103:18;116:22,22;
117:12;132:1;179:12
**two- (1)**
97:23
**Two-sided (2)**
98:1,3
**type (3)**
38:25;94:6;105:21

## U

**uh (1)**
39:14
**ultimately (3)**
50:21;73:23;178:5
**Um-hum (6)**
35:15;49:5;50:3;
62:1;69:14;76:12
**unable (1)**
174:8
**unauthorized (1)**
10:5
**unaware (1)**
80:3
**unbiased (1)**
80:2
**uncertainty (1)**
53:25
**uncle (6)**
91:15,17;117:6,8;
122:8;123:13
**uncle's (1)**
37:16
**under (16)**
5:24;33:18;68:6;
81:17;87:23;89:1;
104:18;124:20;125:17;
129:2;141:9;166:2;
171:24;172:14,21;
180:23
**understood (22)**
12:21;29:5;42:19;
47:12,12;94:20;
102:19;108:1,5,7,12,
13,15;111:18;114:23;
116:25;117:15;120:23,
24;160:10;163:3;166:1
**undertake (1)**
167:19
**underwritten (1)**
108:10
**unfortunately (2)**
136:9;142:22
**unilateral (3)**
29:9,11,12
**United (2)**
43:5;132:7
**universe (1)**
67:3

**University (1)**
36:8
**unlikely (1)**
53:21
**unpaid (2)**
87:11;174:1
**unrelated (1)**
130:17
**unring (1)**
80:16
**unsurprisingly (1)**
181:17
**unusual (1)**
40:18
**up (57)**
15:19;16:7,10,11;
17:20;18:5;20:7,23;
32:1;33:10;41:1;44:24;
49:1;61:24;63:3,6;
66:21;67:4;71:3;75:6;
79:8;85:9;88:3;89:19,
20;93:6,25;94:11;
98:15;99:16;103:6;
105:6;113:24;132:4;
133:16;137:3,7;
140:10,11;143:3,6,10;
144:7,11;145:2;146:6;
147:11;149:2;156:25;
161:20;162:4;163:3,5;
167:23;170:13;182:13,
25
**update (2)**
38:6;40:14
**upgrades (1)**
84:11
**upon (6)**
14:24;59:12;102:23;
105:7;106:23;131:18
**upper (2)**
61:21;101:4
**upset (1)**
144:19
**usage (1)**
64:11
**use (12)**
24:14,14,24;40:24,
25;41:12;46:13;49:7;
52:22;56:19;88:18;
93:16
**used (21)**
11:20;24:9,22,22;
25:8;38:8;40:15;42:16;
51:13;55:8;93:23;94:8;
104:2,4;124:21;125:3,
10,11,12;151:10;
180:22
**useful (1)**
134:6
**using (8)**
5:9;30:13,17,21,24;
31:6;46:14;167:23
**usual (2)**
32:16;44:22

**usually (2)**
43:23,24

**V**

**V&D (1)**
147:3
**Vadim (8)**
4:8,19;26:2,6;37:19,
20;132:14;151:20
**vadimkagan@yahoocom (1)**
61:7
**Vadim's (1)**
173:7
**value (1)**
13:2
**variable (3)**
13:2;54:6,19
**variables (3)**
52:22,24,25
**variation (1)**
60:13
**varied (1)**
54:12
**various (1)**
104:19
**vendors (3)**
164:9;165:3;166:22
**venture (1)**
46:15;52:16;74:7
**ventures (6)**
37:4,7,9;92:2,9,14
**verify (1)**
114:2
**verifying (1)**
113:17
**version (4)**
13:17;93:17,25;
157:25
**versions (1)**
47:20
**view (3)**
68:7;126:9;161:20
**violation (2)**
82:19,19
**volatile (1)**
51:23
**voluntarily (1)**
175:24
**vote (3)**
30:3;33:18,24
**votes (2)**
34:5;165:19

**W**

**wait (3)**
16:7;98:16,17
**waiting (1)**
11:13
**walk (2)**
148:9,10
**walked (1)**

149:1
**walking (2)**
88:17;144:25
**wants (7)**
54:21;79:4,14,24;
87:24;88:13;138:11
**war (1)**
52:4
**warn (1)**
35:11
**way (25)**
8:20;10:13;47:25;
50:23;51:15;57:2;71:3;
72:17;75:19;77:19;
87:24;100:24;115:17;
118:9;119:1;121:3;
148:9;152:23;159:11;
166:18,21;171:5;
175:10;180:16;182:18
**week (1)**
144:4
**weeks (4)**
9:8;86:6;144:4;
173:3
**welcome (1)**
98:25
**Wellesley (3)**
140:2,9,12
**weren't (3)**
123:20;124:2,2
**Whatever's (1)**
98:2
**what's (5)**
23:24;41:24;64:8;
76:6;88:8,25
**whatsoever (1)**
70:10
**whenever (3)**
5:8;25:16;176:8
**Where's (1)**
56:3
**whole (4)**
21:7;90:18;134:25;
139:3
**whole-day (1)**
182:20
**wholesale (1)**
126:24
**who's (5)**
24:5;65:5;147:11;
182:6;183:10
**whose (2)**
147:8;165:1
**wife (1)**
43:16;91:22;92:23
**wildly (1)**
7:22
**willful (1)**
8:10
**willing (1)**
157:7
**windows (2)**
105:25;106:3

**wiped (2)**
31:11,16
**wish (1)**
52:19
**wishes (1)**
88:18
**withdraw (2)**
81:7;179:3
**withdrawn (1)**
81:11
**within (7)**
32:15;69:22;131:1
**without (7)**
9:20;29:15;79:6;
113:16;123:9;129:19;
151:19
**WITNESS (57)**
5:22,25;6:2;35:1,9,
15,19;75:6,9,23;76:10,
12,14;77:9,18;78:5,7,
10,12,14,17,19,21,24;
79:1,15;80:6;81:21,25;
86:11,13,15,17,19;
87:20;88:17;90:20;
109:16,25;124:11;
126:4,17,18;128:20;
130:1,10,12;131:20,22;
137:17;138:14,19,22,
24;156:8;160:6;170:16
**witness' (4)**
88:19;124:21;
125:10,18
**witnesses (7)**
35:11;81:17;181:20,
21;182:11;183:20,20
**wondering (2)**
5:18;38:14
**Worcester (1)**
149:20
**word (4)**
7:11;16:20;27:17;
41:12
**wording (1)**
12:13
**words (4)**
40:16;54:23;80:2;
122:6
**work (22)**
36:1,10,10,11,24;
38:8;39:21;44:22;45:5;
48:18;55:18;90:6;93:4;
103:1;105:19;129:16;
131:16;139:14;140:18;
167:24;168:7;174:23
**worked (3)**
147:13;150:2;173:6
**working (6)**
18:19;41:1;112:6;
114:13;122:10;147:11
**works (4)**
36:25;43:16;77:19;
93:3
**worse-case (1)**

53:14
**worst-case (1)**
72:25
**worth (1)**
176:1
**write (2)**
43:24;44:1
**writing (2)**
139:22;168:17
**written (3)**
33:6;61:16;119:21
**wrong (2)**
115:18;119:7
**wrote (9)**
18:23;19:1,4,7;
80:11,20;101:5;
118:22,25

**Y**

**Yahoo (2)**
25:1,7
**Yarmouth (14)**
132:13,19,25;133:9;
141:20;146:10;147:18;
150:7,9;151:7;152:19;
153:6;154:15,23
**year (6)**
15:9,11;83:9;86:12;
120:20;148:21
**years (3)**
26:8;132:1;163:10
**Yep (10)**
32:17;63:16;64:6;
76:14;138:24;162:14;
171:15,18;172:11;
178:17
**yesterday (19)**
6:13;9:17;12:17;
13:9;15:12,14;16:4,17;
17:5;19:25;21:24;
23:20;29:5;32:6;71:10;
72:7;93:10;102:3;
109:15
**York (1)**
150:14

**Z**

**zero (3)**
31:21;49:24;50:5
**Zhukovskiy (25)**
35:3,6,7,25;38:3;
40:1;45:5;55:6;56:21;
61:24;78:10;79:19;
82:13;85:16;89:14,14;
90:3;91:8,12;93:9;
98:14;99:5;100:6;
127:23;129:13
**Zhukovskiy's (3)**
77:7;79:3;87:18

**1**

**1 (8)**
48:7,25;49:25;50:7;
66:23;67:9,25;131:15
**1,082,738 (1)**
66:18
**1.075551 (1)**
57:21
**1.075861 (1)**
50:14
**1.08273 (1)**
66:11
**1.14 (1)**
104:9
**1.2 (5)**
67:19;104:9,10,11,
13
**1.2215 (1)**
66:7
**1.3 (8)**
54:11,13,19,23;55:1;
56:4;68:14;72:23
**1.4 (4)**
68:14;72:24;73:1;
178:15
**1.5 (5)**
55:15;56:1,3,4;
104:15
**1.6 (1)**
68:23
**1.7 (6)**
141:2;164:1,4;
166:25;167:9,12
**1.802 (1)**
66:24
**10 (2)**
14:19;168:23
**10:30 (1)**
182:4
**10:59 (1)**
82:4
**100 (1)**
49:1
**100,000 (1)**
85:25;144:9
**10th (2)**
11:6;12:6
**11 (2)**
81:4,12
**11.25 (1)**
50:1
**11/2 (1)**
14:10
**11/5 (1)**
18:6
**11:15 (1)**
81:16
**11:24 (1)**
82:5
**119 (7)**
133:12,16;134:12,

22;136:1,15;137:9;
139:14,25
**11th** (1)
120:7
**12,000** (1)
141:2
**120** (8)
136:19,22,25;138:2;
139:1,6;156:25;157:25
**120's** (1)
157:5
**121** (5)
141:11,13,16,25;
142:5
**122** (1)
95:13
**13** (5)
7:9;83:7,7;142:9,10
**130,000** (1)
180:1
**13th** (2)
7:1;8:17
**141** (1)
68:3
**145** (3)
176:6,9,10
**14th** (1)
13:24
**15** (4)
13:23;14:12,18;32:3
**15,000** (1)
22:4
**150,000** (1)
180:2
**15-13881** (1)
4:5
**160,000** (1)
180:1
**16-1120** (1)
4:10
**169** (6)
170:13,19,20;
180:21;181:4,6
**16k** (1)
69:4
**17,391** (1)
16:2
**17th** (2)
171:11;172:10
**18** (1)
176:15
**182,202** (1)
69:24
**184** (5)
13:7,17;14:2,3,5
**189094** (1)
64:18
**1993** (1)
43:6
**19th** (1)
162:7

**2**

**2** (3)
17:8;48:7;50:1
**2,435,033** (1)
17:7
**2.1** (1)
144:12
**20** (2)
50:1;169:15
**200,000** (8)
15:14,21,22;17:10,
16;23:4;27:8;65:16
**2000** (1)
132:8
**2010** (1)
37:21
**2012** (16)
13:21,25;38:5;40:3;
56:17,25;58:10,16;
60:16;62:5;76:18;
82:23;83:8;92:5;93:17;
121:20
**2013** (15)
24:18;68:17;69:12;
83:9,10;84:2;86:22;
112:2,11;114:24;
122:2,3,4;133:4,5
**2014** (30)
76:20,21;83:5,13;
86:13,14,16,17,25;
120:18;127:12;140:4;
142:9,12,13,20;143:1,
14;145:12,21;146:16;
148:3;158:14;162:7,
12;164:3,16,23;
165:23;171:11
**2015** (21)
6:19;8:18;9:7;11:6;
12:6;20:24;24:20;28:6,
22;29:7;34:14;73:5;
83:2,4,5,5;85:7;120:7,
15;123:5,16
**2016** (1)
28:12
**20th** (1)
40:3
**21** (1)
8:24
**215** (2)
23:17,20
**219,804** (1)
69:21
**22** (3)
145:12,21;146:16
**22nd** (1)
171:24
**23** (4)
15:15,21,22;27:10
**235,533** (1)
17:12
**23rd** (1)

44:16
**243** (7)
161:14,21,24;162:2,
2,4;163:22
**247** (3)
164:12;179:20,22
**24th** (2)
44:16;111:2
**25** (6)
47:7;56:17;58:10,16;
60:1,16
**250** (1)
31:24
**255** (1)
173:15
**25th** (5)
56:24;110:16;
111:19;112:4,16
**26** (4)
85:23;86:6,6,17
**26th** (1)
28:17
**275** (1)
68:19
**28** (1)
9:17
**28.8** (2)
67:16,17
**291** (3)
19:23;20:5;21:18
**2nd** (1)
13:21

**3**

**3** (3)
89:15;156:16;165:9
**3,500** (1)
20:13
**3,765,348** (2)
65:21;66:6
**3.4** (2)
53:17,21
**3.51** (1)
67:20
**3.7** (1)
67:14
**3.754** (1)
62:25
**3.754442** (1)
63:18
**30** (1)
16:2
**30,000** (4)
22:7,9,14,17
**300,000** (2)
144:8,8
**30th** (3)
29:7;140:4;158:14
**31** (6)
61:1,4,20;68:10;
112:20,22
**32** (2)

69:9,11

**4**

**4** (1)
183:4
**4.1** (1)
139:25
**4.2** (2)
158:4,7
**4.9** (2)
53:10,19
**4.93** (1)
67:23
**40** (1)
26:11
**403** (3)
135:14,15,21
**404** (1)
71:20
**41** (1)
21:6
**41,790** (1)
68:2
**43.75** (2)
48:22;49:24
**45** (1)
49:25
**4th** (3)
61:6;68:17;114:24

**5**

**5** (4)
9:7,14,15;86:11
**5.3** (2)
53:22,23
**5.6** (2)
169:8,10
**5.98** (1)
170:10
**50** (6)
6:10,14;9:13;132:25;
53:6;154:22
**500-some** (1)
86:9
**52** (1)
10:3
**54** (5)
7:1,5,13;32:2;33:11
**55** (1)
19:5
**5-6** (2)
169:17,18
**56.25** (1)
49:1
**5-7** (2)
169:17,18
**5th** (3)
8:18;10:3;18:16

**6**

**6** (10)
26:11;51:18;136:4,5;
137:5;138:1,3,15;
169:10,24
**6,499,000** (1)
171:16
**6,895** (1)
27:1
**6.1** (1)
160:5
**6.1b6** (3)
14:9,10,13
**600** (1)
52:21
**612** (5)
87:23;89:1;124:20;
125:1,17
**612b** (4)
125:2,7,15;180:23
**62** (1)
156:13
**64** (3)
6:15;9:5,12
**6th** (1)
69:12

**7**

**7** (7)
39:23;93:7,9,15,20,
21;138:15
**7/23** (1)
20:11
**7/23/2013** (1)
20:5
**70** (1)
11:15
**72** (5)
16:4;17:23;18:7,12;
31:9
**7th** (3)
33:14;73:3;164:15

**8**

**8** (15)
9:24;41:14,15,18,19;
45:3;51:19;55:4;62:3;
94:11,13;95:15;98:14;
103:5;111:7
**8,695** (2)
27:10,12
**8.1** (5)
32:4,7,11,23;33:3
**8.2** (2)
14:21;33:18
**80** (1)
49:25
**88** (5)
19:8;168:18;169:11,
12,13
**8th** (1)
6:19

**9**

**9 (13)**
    4:7;12:14;17:21;
    56:20,21;62:3;87:17;
    136:4,5;137:5;138:2,3;
    182:1
**9/19/2013 (1)**
    21:24
**9/30 (1)**
    17:21
**9/30/2015 (1)**
    17:24
**9:07 (1)**
    4:1
**9:15 (1)**
    182:1
**91 (3)**
    18:1,12;19:11
**95 (5)**
    145:7,10,24;146:2;
    147:10