**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS - EASTERN DIVISION**

```
=============================  .
IN THE MATTER OF:              . Case #15-13881
                              .
LYMAN-CUTLER, LLC,             .
                              .
                              . Boston, Massachusetts
                              . Thursday, May 9, 2019
     Debtor.                   . 9:13 a.m.
=============================  .
LYMAN-CUTLER, LLC, ET AL.      . Adv. Proc. 16-01120
                              .
     Plaintiffs,               .
v.                            .
                              .
KAGAN, ET AL.,                 .
                              .
     Defendants.               .
=============================  .
```

**TRANSCRIPT OF TRIAL Day 4 ON:**
**(#167) OBJECTION TO CLAIM 9 OF CLAIMANT ALEX FILIPPOV FILED BY**
**INTERESTED PARTIES TATIANA KAGAN, VADIM KAGAN, KAGAN**
**DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.**
**(#1) COMPLAINT BY LYMAN-CUTLER, LLC, AGAINST VADIM KAGAN,**
**TATIANA KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION**
**CORP.**

**BEFORE THE HONORABLE FRANK J. BAILEY**

APPEARANCES:
For the Debtor:                PETER N. TAMPOSI, ESQ.
                              The Tamposi Law Group
                              159 Main Street
                              Nashua, NH 03060

For Alex Filippov and Nickolay SEAN T. CARNATHAN, ESQ.
Lipetsker:                    O'Connor, Carnathan & Mack,
                              LLC
                              1 Van De Graaff Drive
                              Suite 104
                              Burlington, MA 01803

For Kagan, et al.:            JAMES P. HARRIS, ESQ.
                              Sheehan Phinney Bass & Green,
                              P.A.
                              1000 Elm Street
                              Manchester, NH 03105

JOHN PERTEN, ESQ.
Sheehan Phinney Bass & Green,
P.A.
255 State Street
Boston, MA 02109

Also Present:                   ANAHIT FLANAGAN
                                Interpreter


Electronic Sound Recording Operator:  YVONNE WOODBURY


Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service
eScribers, LLC
7227 N. 16th Street, Suite #207
Phoenix, AZ 85020
973-406-2250; operations@escribers.net

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Plaintiff: | | | | | |
| NICKOLAY LIPETSKER | | | | | |
| (By Mr. Carnathan) | 9 | | 81 | | |
| (By Mr. Perten) | | 34 | | | |
| | | | | | |
| JAMES JOSEPH COHEN | | | | | |
| (By Mr. Carnathan) | 84,123 | | | | |

1    (At 9:13 a.m.)

2              THE CLERK:  Court in now in session.

3              THE COURT:  Morning.

4              IN UNISON:  Good morning, Your Honor.

5              THE COURT:  You did -- be seated.  Or stand.

6    Whatever you feel like doing, I guess.

7              THE CLERK:  Now calling case number 15-13881, Lyman-

8    Cutler, LLC.  This is day four of trial on docket number 167,

9    objection to claim 9 of claimant Alex Filippov, filed by

10   interested parties Tatiana Kagan, Vadim Kagan, Kagan

11   Development KDC, Corp., ProExcavation Corp.  This is also day

12   four of trial on adversary case number 16-1120, Lyman-Cutler,

13   LLC, v. Kagan et al.

14             May the parties please state their names for the

15   record.

16             MR. CARNATHAN:  Good morning, Your Honor.  Sean

17   Carnathan for Alex Filippov and Nickolay Lipetsker.

18             MR. TAMPOSI:  Good morning.  I'm Peter Tamposi for

19   the debtor.

20             MR. PERTEN:  Good morning, Your Honor.  John Perten

21   for Kagan Development KDC, Corp., ProExcavation Corp., Tatiana

22   Kagan, and Vadim Kagan.

23             MR. HARRIS:  Good morning, Your Honor.  James Harris

24   for the same parties.

25             THE COURT:  Okay.  Good morning, everyone.  Any

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1   housekeeping from your standpoint?

2           MR. CARNATHAN:  I think a couple of things, Your

3   Honor.  Yesterday, we had talked about perhaps going long

4   today.  We've talked about it.  We will roll with that if Your

5   Honor prefers, but when we do the sort of hours in our head

6   and the way the witnesses lay out, we don't think we gain that

7   much.  So we'd be happy just to conclude at 1 if that works

8   for the Court.

9           THE COURT:  It does, of course.  It's been just

10  trying to, you know, get through it.  But okay, if that works,

11  it works.  Anything else?  Mr. Perten, any other housekeeping?

12          MR. PERTEN:  No housekeeping on our end.  No, thank

13  you.

14          MR. CARNATHAN:  I have one other.

15          THE COURT:  Yes?

16          MR. CARNATHAN:  Yesterday, I had offered Plaintiff's

17  Exhibit C for identification into evidence.  It was that

18  affidavit from Mr. --

19          THE COURT:  Yes.

20          MR. CARNATHAN:  -- Karpovsky (ph.).  And I said that

21  I would look at it last night and come back to Your Honor

22  about it.

23          THE COURT:  Yes.

24          MR. CARNATHAN:  I had someone in my office look at

25  it.  We didn't find anything in the First Circuit.  We

1  actually found a split in the circuits.  Sixth Circuit went

2  our way; Tenth Circuit went Mr. Perten's way.  We found a

3  couple of cases -- I want to say it was Southern District of

4  New York -- that went our way.  But given that there seems to

5  be not a clear answer for Your Honor, I would withdraw the

6  submission.  I don't think it's worth the -- asking you to

7  choose which circuit you want to follow.

8         THE COURT:  No, that's fine.  I mean, yeah, we don't

9  want to go down that road unless it's necessary.  We found the

10  same thing.  We looked ourselves.  The only thing I will add

11  to the discussion on this -- and I'll just accept the

12  withdrawal, but in case it comes up again, the footnote that I

13  would put on this rule -- on this issue under Rule 612 is that

14  I do apply the doctrine of completeness to -- really, to any

15  evidence, you know?  So you read a few lines of deposition

16  transcript, the other side gets to read, at that time, the

17  other words in the transcript that they believe are necessary

18  to put in context what was said.  And I'd like to hear that at

19  the time that the -- that they're aware of something that's

20  necessary in order to complete the evidence.

21         That doctrine, I think, still applies as to a

22  document as well.  So if you hand somebody a document and you

23  say read paragraph one; does that refresh your memory; yes, it

24  does; tell us.  I offer it; it comes in.  The other side says,

25  not the whole document, but the paragraph before it needs to

1    come in under the doctrine of completeness.  I could be

2    persuaded by that -- I mean, under the circumstances.  So

3    you -- just be aware of that approach that I think is the

4    right approach to take to that issue.  Okay?  All right.

5            So let's proceed, then.

6            MR. CARNATHAN:  Thank you, Your Honor.  The

7    plaintiffs call Nickolay Lipetsker.

8            MR. LIPETSKER:  Good morning.

9               ANAHIT FLANAGAN (INTERPRETER) SWORN

10           THE INTERPRETER:  I do.  Anahit Flanagan.  Good

11   morning, Judge.

12           THE COURT:  Good morning.  I'm sorry.  What's your

13   name?

14           THE INTERPRETER:  Anahit Flanagan.

15           THE COURT:  Annie?

16           THE INTERPRETER:  Anahit Flanagan.  Anahit.

17           THE COURT:  Okay.  Flanagan --

18           THE INTERPRETER:  Yes.

19           THE COURT:  -- is your last name?  All right.  Oh, I

20   can get that one out.

21           THE CLERK:  And I'm going to read you the oath to say

22   to him.

23                    NICKOLAY LIPETSKER SWORN

24           THE WITNESS:  Yes, I do swear.

25           Good morning.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1              THE COURT:  Good morning.

2              MR. CARNATHAN:  So Your Honor, just by way of

3     clarification, Mr. Lipetsker clearly speaks some English.

4              THE COURT:  Yes.

5              MR. CARNATHAN:  It's just some of the questions, he

6     doesn't get the nuances in English, and so we were, I guess,

7     to some extent, wondering what Your Honor's pleasure is.  We

8     could do things like "what's your name," no problem.  Or we

9     could go through the translator for every question.

10             THE COURT:  I don't have a problem with you -- with

11    him responding in English to the extent he can.  I leave it to

12    the witness.

13             Any issues with that, Mr. Perten?

14             MR. PERTEN:  No, Your Honor.

15             THE COURT:  Yeah.  The translator, from my

16    perspective, is here as a help to him.  And if he doesn't need

17    that help for -- on a given question, he can go ahead and

18    answer in English.  What -- and I'll warn him.  The thing I

19    can't have, though, is that he answers in English and then she

20    answers in English.  I've actually had that problem, and it's

21    got to be one answer per question.  Okay?

22             THE WITNESS:  Understood.

23             THE COURT:  Okay.  Very well.  And can I just -- has

24    he been -- have you been here for the trial so far?

25             THE WITNESS:  Yes, I've been.

NICKOLAY LIPETSKER - Direct

1          THE COURT:  All right.  So you're familiar with the

2    way that we do things.

3          THE WITNESS:  Yes, I do.

4          THE COURT:  And you're both going to have to share

5    that microphone, but it's very important that you speak into

6    it --

7          THE WITNESS:  Uh-huh.

8          THE COURT:  -- when you're intending to answer a

9    question.  Okay?

10         THE WITNESS:  Understood.

11         THE COURT:  All right.  Thank you.

12         MR. CARNATHAN:  Thank you, Your Honor.

13                    DIRECT EXAMINATION

14   BY MR. CARNATHAN:

15       Q.   Would you state your name please?

16   A.   My name is Nickolay Lipetsker.

17       Q.   What do you do for work, sir?

18   A.   I'm a -- I'm a dentist.

19       Q.   For long have you been a dentist?

20   A.   Here in United States, twenty-five years.  In Russia, ten

21   years.

22       Q.   So you were born in Russia, sir?

23   A.   Yes, I did.

24       Q.   When did you come to the United States?

25   A.   In 1990.

NICKOLAY LIPETSKER - Direct

1      Q.   And how old were you at that time?

2   A.   Almost thirty-six.

3      Q.   How long have you known Vadim Kagan, sir?

4   A.   First time I met him in 1995 or 1996.

5      Q.   How did you meet him?

6   A.   I saw him (indiscernible).

7      Q.   How would you describe your relationship with Mr.

8   Kagan in the past?

9   A.   Like a good relationship.

10      Q.   Were you friends?

11   A.   We becomes friends.

12         MR. PERTEN:  I'm sorry.  I wasn't able to hear.

13         THE COURT:  I didn't hear it either.

14         MR. CARNATHAN:  I didn't understand that one, either.

15   BY MR. CARNATHAN:

16      Q.   Could you repeat that answer, please?

17   A.   Yes.  We -- we -- we becomes the friends.

18         MR. PERTEN:  He needs to move back from the mic a

19   little more so --

20         THE COURT:  Hold one second.  I think we're --

21         MR. CARNATHAN:  So -- wait, perhaps we should have

22   the interpreter help with that one, please.

23         THE WITNESS:  Ms. Interpreter, yes.

24         We became friends.

25   BY MR. CARNATHAN:




(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Direct

1      Q.   For how long did you consider Mr. Kagan your friend?

2  A.   So beginning from 2010, 2011.

3      Q.   Did you socialize together?

4  A.   Yes, we did.

5      Q.   Did you ever go on vacation together?

6  A.   Yes, we did.

7      Q.   Where did you go?

8  A.   To the Germany.

9      Q.   When was that?

10  A.   Five years ago.  My (indiscernible), so I don't remember.

11         THE COURT:  I'm having a little trouble with that.  I

12  didn't understand where they went on vacation together, for

13  example.

14  A.   I -- it was five, six years ago.

15         THE COURT:  Where did you go on vacation?

16         THE WITNESS:  To Germany.

17         THE COURT:  To Germany?

18         THE WITNESS:  Yes.

19         MR. CARNATHAN:  Maybe we should default to more of

20  the interpreter --

21         THE COURT:  I think so.

22         MR. CARNATHAN:  -- just to help with the accent?

23         THE WITNESS:  Uh-huh.

24         MR. CARNATHAN:  If that's okay?

25  BY MR. CARNATHAN:




NICKOLAY LIPETSKER - Direct

 1          Q.   How long were you in Germany together?

 2     A.   About week.

 3          Q.   Who's Boris Maiden?

 4     A.   Boris Maiden is attorney.

 5          He's an attorney.

 6          Q.   Is he a friend of yours as well?

 7     A.   He is.

 8          Q.   Where is his office in relation to your office?

 9     A.   Around three, five minutes of walking the distance.

10          Q.   I'm sorry.  I didn't understand that one.

11     A.   About three, five minutes walking distance.

12          Q.   Who's Alex Fotimanau (ph.)?

13     A.   Alex Fotimanau a friend of mine from Russian medical

14     school.

15          Q.   Did he invest in a Kagan project at one time?

16     A.   Yes, he did.

17          Q.   Which project did he invest in?

18     A.   How he -- I re -- I remember it was Lyman 10 in

19     Brookline.

20          Q.   Did you say Lyman 10 in Brookline?

21     A.   Yes, I did.

22          Q.   Where does Mr. Fotimanau live?

23     A.   He live in Germany (indiscernible).

24          Q.   Is he currently in the United States?

25     A.   No.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Direct

 1          THE COURT:  Who is it we're talking about?  I didn't

 2   understand the --

 3          MR. CARNATHAN:  Mr. Fotimanau.  Mr. Perten yesterday

 4   said that we only have four people testifying now instead of

 5   five for the other projects.  One of the five was Mr.

 6   Fotimanau.  He lives in Germany.  So I just wanted that on the

 7   record.

 8          THE COURT:  I understand.

 9   BY MR. CARNATHAN:

10      Q.   Who is Dmitriy Zhukovskiy?

11   A.   He is my neighbor.

12      Q.   And you've also done a number of investments with

13   Dmitriy, right?

14   A.   Yes.

15      Q.   Approximately how many other investments -- let me

16   start that one over.  Approximately how many real estate

17   investments have you made with Mr. Zhukovskiy?

18   A.   I think around five.

19      Q.   How did you first become involved with the Lyman-

20   Cutler project?

21   A.   I met Mr. Kagan and Mr. Boris Maiden around

22   (indiscernible) in August and -- because they asked me if I

23   interested in this kind of investment.

24          MR. PERTEN:  Your Honor, I'm just a bit concerned

25   about the accent to the extent that --



NICKOLAY LIPETSKER - Direct

1          THE COURT:  Okay.

2          MR. PERTEN:  -- we're going to have a transcript,

3   even if we're understanding, because we can really focus and

4   watch the body language, which helps.

5          THE COURT:  I am concerned.

6          MR. PERTEN:  I worry.

7          THE COURT:  I think it's a combination of your

8   accent, sir, and I think you can sit back a little from the

9   microphone --

10         THE WITNESS:  Uh-huh.

11         THE COURT:  -- because your voice -- you have a deep

12  voice, and I think it's muffled, particularly with the accent.

13  I know you think I have an accent, so I'm aware of that.

14         THE WITNESS:  I do hear.

15         THE COURT:  I do hear.  Okay.

16         MR. CARNATHAN:  Well, if I may, I would again propose

17  that we go through the --

18         THE COURT:  Use the translator.

19         MR. CARNATHAN:  -- translator.

20         THE WITNESS:  Okay.  Thank you.

21         MR. CARNATHAN:  I think it would help.  I'm sorry,

22  but I think it --

23         THE WITNESS:  Thank you.

24         MR. CARNATHAN:  Yeah.

25         THE COURT:  It slows things down, but it makes for a

NICKOLAY LIPETSKER - Direct

1    much better transcript.  Okay.

2    BY MR. CARNATHAN:

3         Q.   Just because I struggled a bit to hear the last

4    answer, could we go through the translator and tell me again,

5    how did you first become involved with the Lyman-Cutler

6    project?

7    A.   So we met Mr. Kagan and -- and -- at Mr. Mason --

8    Maiden -- Maiden's office.  We met, and he -- they -- they

9    told me that they have a big project.  And they offered me to

10   be part of it.

11        Q.   When was that?

12   A.   It was in October 2012.

13        Q.   Did Mr. Kagan tell you more about what the project

14   was?

15   A.   Yes.

16        Q.   What did he tell you?

17   A.   So he told me that's it good land in the best part of

18   Brookline, and he's going to build two houses there, luxury

19   houses.

20        Q.   Did he ask you to invest in the project?

21   A.   Yes.  Uh-huh.

22        Q.   Did he tell you how much he wanted you to invest?

23   A.   Yes.

24        Q.   How much did Mr. Kagan tell you he wanted you to

25   invest?

NICKOLAY LIPETSKER - Direct

1   A.   $2,500,000.

2        Q.   How did you respond?

3   A.   I have no --

4        I don't have that kind of the money in order to invest.

5        Q.   What did Mr. Kagan say then?

6   A.   He asked me if I know anybody who can invest that kind of

7   money to this project.

8        Q.   How did you respond to that question?

9   A.   I told him that I have to think.  I don't know right now.

10        Q.   Who first brought up Alex Filippov's name?

11   A.   I don't remember Mr. Kagan or Mr. Maiden ask me if I can

12   talk to Mr. Filipp [sic].

13        Q.   Was it you who suggested Mr. Filippov for the first

14   time?

15   A.   No.

16        Q.   After that meeting among you, Mr. Maiden, and Mr.

17   Kagan, what is the next thing that happened with regard to the

18   Lyman-Cutler project?

19   A.   Okay.  So we met with Mr. Filippov in one of the

20   gatherings, and then I told him about this project.

21        Q.   Where did you meet with Mr. Filippov?

22   A.   I don't remember exactly, but it was in one of our

23   friend's house.

24        Q.   Who was there?

25   A.   I don't remember some people.



NICKOLAY LIPETSKER - Direct

1      Q.   What did you tell Mr. Filippov at that time?

2    A.   I told him I have a good friend, that he's a good

3    construction worker, and I told him I can recomm -- I do

4    recommend him, and if he -- he's willing, I can make the --

5    they can meet.

6      Q.   And did Mr. Filippov agree to meet with Mr. Kagan?

7    A.   Yes.

8      Q.   When was the first time that Mr. Filippov met with

9    Mr. Kagan?

10   A.   I don't remember exactly when they met because they met

11   without me knowing it.  So they call each other, maybe, and

12   met.

13     Q.   With regard to the Lyman-Cutler project, when's the

14   first time that Mr. Filippov and Mr. Kagan met?

15   A.   Maybe it was in October.

16     Q.   Did you go to a meeting at Boris Maiden's office

17   with Mr. Filippov and Mr. Kagan?

18   A.   Yes, I was at a meeting with Mr. Filippov and Mr. Kagan

19   at their office when Mr. Kagan was a pres -- was doing a

20   presentation on his project, Cutler-Lyman [sic].

21     Q.   Was Mr. Maiden present for that meeting as well?

22   A.   Yes, he did.

23     Q.   What do you recall about Mr. Kagan's presentation at

24   that meeting?

25   A.   Mr. Zhukovskiy presented plans of the project, and Mr.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Direct

1   Kagan presented the expenses connected with this project.

2          MR. CARNATHAN:  May I approach the witness while the

3   monitors come up?

4          THE COURT:  You may.

5   BY MR. CARNATHAN:

6      Q.   Mr. Lipetsker, I've just given you the paper copy of

7   Plaintiff's Exhibit 9 in evidence.  Would you take a moment

8   and look through that document?

9   A.   Yes.

10     Q.   Do you recognize that, sir?

11  A.   Yes, I do.

12     Q.   What is it?

13  A.   It -- it --

14     Q.   Stay with the interpreter, please --

15  A.   Okay.  Thank you.

16     Q.   -- so they can translate.

17  A.   This is the plan I was just talking about that Mr. Kagan

18  presented on -- during our meeting on October 25.  This is an

19  estimated finance -- financial plan.  Risk analysis.

20     Q.   During that October 25, 2012, meeting, what did Mr.

21  Kagan say about the costs of the project?

22  A.   So Mr. Kagan told us that the cost of the house would be

23  $1 million 300 -- $1,300,000.  And the carrying costs will be

24  200,000 for each house.

25     Q.   And you said that Mr. Zhukovskiy presented the

NICKOLAY LIPETSKER - Direct

1    plans; did I get that right?

2    A.   Yes, he brought the plan.

3         Q.   What do you recall Mr. Zhukovskiy telling you about

4    the plans at this meeting on October 25, 2012?

5                        (Pause)

6              THE INTERPRETER:  The interpreter has to break it a

7    little bit.

8    A.   So it -- there were three parts of it -- three components

9    of that presentation.  One of the time of the selling of the

10   house, second is a cost of the selling of the house.

11             THE INTERPRETER:  And now the interpreter has to ask

12   again to know the last part -- last response.

13   A.   And the -- the last part was the cost of the construction

14   and the carrying cost of -- the -- the carrying expenses.  And

15   that part was constant.

16             MR. CARNATHAN:  Mr. Hartzell, would put the last page

17   of Exhibit 9 on the screen, please?

18   BY MR. CARNATHAN:

19        Q.   Mr. Lipetsker, I've asked Mr. Hartzell to put the

20   last page of trial Exhibit 9 up on screen.  Do you see that?

21   A.   Yes.

22        Q.   Is that the presentation from Mr. Zhukovskiy to

23   which you are referring?

24   A.   Yes.

25        Q.   What, if anything, do you recall Mr. Zhukovskiy

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Direct

1    saying when he presented this?

2    A.    He told us that he did an -- an analysis of the projected

3    profit and based on the -- based on the cost of the -- the

4    selling and the time of the -- time of the selling of the --

5    the house.

6        Q.    When Mr. Zhukovskiy presented the table on the last

7    page of Exhibit 9, did Mr. Kagan say anything?

8    A.    He told us that he -- he completely agrees with this.

9        Q.    Were any questions asked during this meeting about

10   the construction costs?

11   A.    And if -- Mr. Filippov asked if this constant cost of

12   the -- the -- the house which I mentioned was the -- he asked

13   if this the cost and -- will be the -- and carrying --

14   carrying costs will be constant.  And he -- and Mr. Kagan said

15   yes, it will be.

16       Q.    Did you, Mr. Kagan, and Mr. Filippov reach any kind

17   of agreement at the October 25, 2012, meeting?

18   A.    I don't think so, because they do not -- they have, I

19   think, questions a lot.  Mr. Filippov had some questions.

20       Q.    We need to stick with the translator, Nickolay.

21   A.    Excuse me.  Excuse.

22       Q.    After the October --

23           THE COURT:  Yeah.  I think he wanted that answer --

24           MR. CARNATHAN:  Oh, I'm sorry.

25           THE COURT:  -- repeated.



NICKOLAY LIPETSKER - Direct

1          MR. PERTEN:  Please.  Thank you.

2          THE COURT:  And I agree with that.  So if --

3          MR. CARNATHAN:  I think the question was whether any

4    type of agreement was reached at the October 25 meeting in

5    substance.

6    BY MR. CARNATHAN:

7          Q.   So once again, Mr. Lipetsker, was any type of

8    agreement reached among you, Mr. Kagan, and Mr. Filippov at

9    the October 25, 2012, meeting?

10   A.    It was not a final agreement.  The agreement was signed

11   later.

12         Q.   After the October 25, 2012, meeting, to what extent

13   were you involved in the negotiation of the Lyman-Cutler

14   operating agreement?

15   A.    Mr. Kagan asked additional 1,000 -- 1,000 -- one --

16   $100,000 for each house.

17         Q.   Do you recall about when that happened?

18   A.    No, sir.  No.

19         MR. CARNATHAN:  Can I have Exhibit 30 in evidence,

20   please?

21   BY MR. CARNATHAN:

22         Q.   So Mr. Lipetsker, I'm showing you an exhibit that

23   we've placed in evidence as Exhibit 30.  It's an email from

24   Alex Filippov to John McGregor in which he says "after

25   reviewing an appraisal we received from Rockland Trust, Lyman-

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Direct

1    Cutler is going to ask for construction loans of 1.6 million

2    each house we are developing, 3.2 million in total".  Do you

3    see that?

4    A.   Yes.

5         Q.   That happened on April 30, 2013.

6    A.   Yes.

7         Q.   Right?

8              MR. CARNATHAN:  Let's take that away.

9    A.   Yes, I see.

10             MR. CARNATHAN:  Let's take that one away now, please.

11   BY MR. CARNATHAN:

12        Q.   So with that as context, does that refresh your

13   memory of about when Mr. Kagan asked for an additional 100,000

14   per home?

15   A.   It was before this date, because --

16        It was before that, because we -- we only agreed to the

17   final one when -- when -- we agreed to the final -- agreement

18   was done finally when we agreed on $100,000 for each house

19   later.

20        Q.   So you and Mr. Filippov agreed to the increase of

21   100,000 per home; is that right?

22   A.   Yes.

23        Q.   So if we think about when you did that in relation

24   to when the bank loan was taken for the construction, did you

25   agree to that before or after the bank loan was taken?



NICKOLAY LIPETSKER - Direct

1      Q.   After the bank loan was taken out for the

2   construction, did Mr. Kagan ever again ask you to increase the

3   budget for construction?

4   A.   No.

5      Q.   After the bank loan was taken, did you ever approve

6   any increase in the budget for construction?

7   A.   No.

8      Q.   After the bank loan was taken, did Mr. Kagan ever

9   consult you about any upgrades to the property?

10  A.   No.

11     Q.   After the bank loan was taken, did you ever approve

12  any upgrades to the property?

13  A.   No.

14         MR. CARNATHAN:  May I approach him, Your Honor?

15         THE COURT:  You may.

16  BY MR. CARNATHAN:

17     Q.   Mr. Lipetsker, I'm now showing you Plaintiff's trial

18  Exhibit number 37 in evidence, and I've directed you to the

19  paper copy so you can see the whole thing.  Back in -- oh,

20  I'll give you a second.  Back in 2013 -- you see where this is

21  dated June 24th, 2013?

22  A.   I see the date.

23     Q.   Did you ever see this contract in 2013?

24  A.   No.

25     Q.   Had you ever seen this contract before the



NICKOLAY LIPETSKER - Direct

1   litigation started between the parties?

2   A.   No.

3        Q.   Had Mr. Kagan ever asked you about signing a

4   contract with KDC before the litigation started?

5   A.   No.

6        Q.   Had Mr. Kagan ever asked you about paying any fees

7   to KDC before the litigation started in the Lyman-Cutler

8   project?

9   A.   No.

10       Q.   At any time, did Mr. Kagan ever ask you for your

11   permission to sign a contract between Lyman-Cutler and KDC?

12   A.   No.

13       Q.   If we skip to the seventh page and look at Section

14   7.0 -- I'm now looking at paragraph 7.1.1.

15   A.   Uh-huh.

16       Q.   At any time, did Mr. Kagan ever ask you about paying

17   KDC a design phase fee of $25,000?

18   A.   No.  No.

19       Q.   I'm now looking at paragraph 7.1.2.  At any time,

20   did Mr. Kagan ever talk to you about paying KDC a fee of

21   fifteen percent on top of the construction costs?

22   A.   No.

23       Q.   I'm now looking at paragraph 7.1.3.  At any time,

24   did Mr. Kagan ever talk to you about paying a fee of seventeen

25   and a half percent on any money that KDC advanced to the

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Direct

1    project?

2    A.    No.

3        Q.    Now looking at 7.1.4, at any time, did Mr. Kagan

4    ever ask you about paying seventeen and a half percent as a

5    fee for any post-construction services by KDC?

6    A.    No.

7        Q.    If we go now to the next page, please -- and I am

8    looking at the paragraph 7.3.2.1.  At any time, did Mr. Kagan

9    ever speak to you about paying KDC's general office staff $75

10   an hour?

11   A.    No.

12       MR. CARNATHAN:  Could I now have 129 for

13   identification, please?

14       May I approach again, Your Honor?

15       THE COURT:  Yes, you may.

16   BY MR. CARNATHAN:

17       Q.    Okay.  Mr. Lipetsker, I'm now showing you what has

18   been marked for identification as Plaintiff's Exhibit number

19   129.  And I've given you the paper copy, too.  Could you just

20   take a moment and look at that?  Just -- thanks.  Let me know

21   when he's ready.

22   A.    Excuse me.  Yes, I would -- uh-huh.

23       Q.    Okay.  Mr. Lipetsker, before this litigation

24   started, had you ever seen that proposal from ProExcavation?

25   A.    No.



NICKOLAY LIPETSKER - Direct

1     Q.   Had Mr. Kagan ever, at any time, discussed with you

2    paying any fees to ProExcavation for its services on the

3    Lyman-Cutler project?

4    A.   No.

5     Q.   Mr. Lipetsker, before the litigation started, had

6    you ever seen either of the listing agreements with Tatiana

7    Kagan?

8    A.   No.

9        MR. CARNATHAN:  Could I have Exhibit 50 in evidence,

10    please?

11    BY MR. CARNATHAN:

12     Q.   Do you recognize Exhibit 50 in evidence, Mr.

13    Lipetsker?

14    A.   Can you enlarge, please?

15        MR. CARNATHAN:  May I approach, Your Honor?

16        THE COURT:  Yes.

17              (Pause)

18    A.   Yes, I have -- recognize this.

19    BY MR. CARNATHAN:

20     Q.   Okay.  Do you remember receiving that letter?

21    A.   Yes.

22     Yes.

23     Q.   What did you think when you received it?

24    A.   Need a translation of the document.

25



(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Direct

1          (Pause)

2  A.   Who sent this letter?

3      Q.   If you look at, I think, page 3 -- or at the top.

4  Alexander Pyle.

5  A.   Yes, I -- I re -- I recognize this.

6      Yes, I did receive this letter.

7      Uh-huh.  Uh-huh.

8      Q.   And so my question is what did you think when you

9  received it?

10  A.   Yes.  On the second page.  Now, I remember.  It was a

11  shock for me.

12      Q.   Before you received this letter, had Mr. Kagan ever

13  mentioned to you that there were any unreimbursed construction

14  costs on the project for Lyman-Cutler?

15  A.   Never.

16       No.

17      Q.   Had he ever mentioned that there were any unexpected

18  excavation costs on the project?

19  A.   No mention.

20      MR. PERTEN:  Your Honor, could I just ask that Mr.

21  Hartzell not be blowing up things voluntarily unless he's

22  specifically asked to?

23      MR. CARNATHAN:  It seems helpful.  I mean, these

24  things are hard to read when they're small.  But I'm happy to

25  direct Mr. Hartzell on the particular provisions.



NICKOLAY LIPETSKER - Direct

1          THE COURT:  Well, why?

2          MR. PERTEN:  Your Honor, what is happening is that

3    in -- when Mr. Carnathan asks a question, Mr. Hartzell

4    anticipates the answer and blows up that portion of the

5    letter.

6          THE COURT:  I see.

7          MR. PERTEN:  And I don't --

8          THE COURT:  Suggesting --

9          MR. PERTEN:  Exactly.

10         THE COURT:  Perhaps suggesting an answer.

11         MR. PERTEN:  Uh-huh.

12         THE COURT:  Okay.  So let's go with that, and at

13   least if, Mr. Carnathan, if you direct that, then the record

14   will be clear that you directed that and --

15         MR. CARNATHAN:  Certainly.

16         THE COURT:  -- the witness --

17         MR. CARNATHAN:  Yeah.

18         THE COURT:  -- saw it that way.  Okay.

19         MR. CARNATHAN:  All right.  No trouble, Your Honor.

20         THE COURT:  All right.

21   BY MR. CARNATHAN:

22      Q.   Mr. Lipetsker, you're aware that Mr. Filippov

23   retained my firm to respond to this letter, right?

24   A.   Yes.

25      Q.   Did Mr. Filippov discuss retaining my law firm with

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Direct

1  you before he retained us?

2  A.   Yes.

3       Q.   And did you agree that we should be retained or not?

4  A.   Yes, I agree.

5       Q.   What was your reasoning behind agreeing that the law

6  firm should be retained?

7  A.   During our fir -- this is the first time during our whole

8  relationship and friendship with Mr. Kagan.  So I -- I got a

9  letter from Mr. Kagan -- from the attorney of Mr. Kagan.  It

10 was a very -- it's a -- it's out of blue for me.  It was a

11 shock for me.  He never discussed these problems with me

12 before.

13      MR. CARNATHAN:  Can I have Exhibit 64 in evidence,

14 please?

15 BY MR. CARNATHAN:

16      Q.   Mr. Lipetsker, I've asked Mr. Hartzell to put up on

17 screen Plaintiff's Exhibit 64 in evidence.  That's the

18 complaint that my firm filed on behalf of Lyman-Cutler against

19 Vadim Kagan, Tatiana Kagan, and Century 21.  You see that?

20 A.   Yes.

21      Q.   Did you discuss whether or not that complaint should

22 be filed with Mr. Filippov before it was filed.

23 A.   Yes.

24      Q.   And what was your view about whether or not it

25 should be filed?




NICKOLAY LIPETSKER - Direct

1   A.   So unfortunately, it was -- it was necessary.

2        Q.   And what was your reasoning behind why it was

3   necessary?

4   A.   Because we -- the -- all the contacts with Mr. Kagan was

5   ceased and stopped, and he stopped all the communication with

6   us.  And that letter that we received from his attorney showed

7   that there is no other way to do that than go through the --

8   and -- and the -- have -- have this lawsuit also.

9        Q.   Did you have a meeting with Mr. Kagan at some point

10  after the lawsuit started?

11  A.   Yes.

12       Q.   Do you recall when that was?

13  A.   It was in summer at the end of July -- June.

14       Q.   Do you recall was it before or after the mechanic's

15  lien had been recorded against the properties?

16  A.   After.

17       Q.   Where did you meet?

18  A.   At a coffee shop.  Peet's, Newton Centre.  Coffee shop.

19       Q.   Peet's Coffee Shop in Newton Centre?  Is that right?

20  Is that the right --

21  A.   That's right.

22       Q.   For how long did you meet?

23  A.   Maybe half an hour, maybe forty-five minutes.

24       Q.   As best you can recall, what did you say to Mr.

25  Kagan and what did he say to you during that meeting?

NICKOLAY LIPETSKER - Direct

```
 1          MR. PERTEN:  Objection.  The basis for the objection

 2   is my understanding of what's about to be discussed is that

 3   there was a very brief conversation to discuss whether there

 4   was a way of settling the case.  And if that's where he's

 5   going, settlement communications shouldn't be coming in

 6   because they were unsuccessful apparently.

 7          MR. CARNATHAN:  Well, we're not offering to prove

 8   liability or not, but there -- I mean, there has been -- I

 9   don't know what the right word is, but the allegation that we

10   jumped right to fraud and made no effort to find other ways to

11   resolved, and it's just not so.  And so this meeting, what Mr.

12   Kagan said and what Mr. Lipetsker, goes to the travel of how

13   we got to where we ended up.

14          THE COURT:  All right.  I'll overrule but take it for

15   the limited purpose that was just described by Mr. Carnathan.

16   Okay.

17   BY MR. CARNATHAN:

18      Q.   So Mr. Lipetsker, you've been allowed to answer the

19   question.  During the meeting with Mr. Kagan at Peet's Coffee

20   Shop in Newton, as best you can recall, what did you say to

21   him and what did he say to you?

22   A.   So we discussed the -- with Mr. Kagan so that -- to put a

23   mechanic's lien on it -- on the houses.  I'm sorry.  Take off

24   the mechanic's lien.

25          THE INTERPRETER:  So sorry.  Interpreter's mistake.
```

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Direct

1   A.   And put the -- sell the houses on the marketplace -- for

2   the market price and then pay off the bank loan, then

3   distribute initial investments without any penalties to -- to

4   distribute the portion that belongs to Kagan.

5   BY MR. CARNATHAN:

6        Q.   When you say "the portion that belongs to Kagan,"

7   what do you mean?

8   A.   I mean initial ten -- ten percent -- $250,000.

9        Q.   And do I understand right, that was your proposal to

10  him; is that right?

11  A.   That's right.

12       That's right.

13       Q.   What was your proposal?  What were you proposing to

14  do with the rest of the money, any leftover after the bank was

15  paid off and the capital contributions were returned?

16  A.   So to -- to sit down and discuss whatever the remainder

17  of the -- the money will be, to discuss how to distribute that

18  in a peaceful way.

19       Q.   How did Mr. Kagan respond to your proposal?

20  A.   Mr. Kagan told us he's not going to discuss any -- this

21  proposal until they pay me $1 million.

22       Q.   Mr. --

23           THE COURT:  I'm sorry.  I can't -- as my -- we don't

24  read back here.  Can someone repeat the answer to me?  Does --

25  Ms. Flanagan?



NICKOLAY LIPETSKER - Direct

1          THE INTERPRETER:  Yes?

2          THE COURT:  Can you repeat that answer?

3          No, no.  Not a new answer, just trying to get you to

4     repeat what you just said.

5          THE INTERPRETER:  We -- we will discuss this

6     proposal -- he told us -- Mr. Kagan told us that we'll discuss

7     this proposal only after we pay him $1 million, and that's it.

8          THE COURT:  Thank you.

9     BY MR. CARNATHAN:

10         Q.   Mr. Lipetsker, you're aware that Lyman-Cutler filed

11    for bankruptcy protection, right?

12    A.   Yes.

13         Q.   Did Mr. Filippov discuss the decision to file for

14    bankruptcy protection with you before the company filed?

15    A.   Yes.

16         Q.   Did you agree with that decision?

17    A.   Yes, I did.

18         Q.   What was your reasoning behind why that was the

19    right thing to do?

20                        (Pause)

21    A.   So because if -- in a situation that the bank doesn't

22    extend our loan, we -- the houses will be sold in a auction

23    and including all our personal inves -- investments.  And we

24    could just lo -- lose it.

25         Q.   You're also aware, sir, that Mr. Filippov signed a

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1    mortgage between Lyman-Cutler and himself around the same time

2    that he filed for bankruptcy for the company?

3    A.    I did.

4        Q.    Did Mr. Filippov discuss the mortgage between him

5    and Lyman-Cutler before he signed that mortgage?

6    A.    He discussed with me.

7        Q.    Did you agree that he should do that?

8    A.    I did.

9        Q.    What was your reasoning behind agreeing that he

10    should do that?

11    A.    We needed money to continue the -- op -- operation --

12    operation.

13            MR. CARNATHAN:    That's all I have for Mr. Lipetsker,

14    Your Honor.

15            THE COURT:    Okay.

16                    CROSS-EXAMINATION

17    BY MR. PERTEN:

18        Q.    Morning, Mr. Lipetsker.

19    A.    Good morning, Mr. Perten.

20        Q.    Mr. Lipetsker, you've been a friend of Mr. Filippov

21    for about thirty years; isn't that correct?

22    A.    It's correct.

23        Q.    And you met him at approximately 1989, correct?

24    A.    It's correct.

25        Q.    You met him in Italy when you were both waiting for

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1   permission to come to the United States, correct?

2   A.   It's right.

3        Q.   And you've been good friends since then, correct?

4   A.   Yes.

5        Q.   So you've been a friend of his for over thirty

6   years, correct?

7   A.   Right.

8        Q.   And Mr. Zhukovskiy is your nephew; isn't that

9   correct?

10  A.   It's correct.

11       Q.   And you've been close with him for his entire life

12  as well; isn't that correct?

13  A.   Yes, it is.

14       Q.   And you have also known Attorney Maiden for about

15  twenty years; isn't that correct?

16  A.   That's correct.

17       Q.   And Mr. Maiden -- Attorney Maiden -- has represented

18  you or companies that you're involved in in several real

19  estate ventures; isn't that correct?

20  A.   Yes.  He represent company.  He never represent me,

21  personally.

22       Q.   In fact, you have been involved in several real

23  estate ventures prior to Lyman-Cutler; isn't that correct?

24  A.   Yes, that's correct.

25       Q.   And you had worked with Mr. Kagan on other

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1    properties on other investments; isn't that correct?

2    A.    I did.

3        Q.    And your experience with Kagan was positive; wasn't

4    that -- isn't that correct?

5    A.    Yes, absolutely positive.

6        Q.    Okay.  And in those other projects, you didn't lose

7    any money; isn't that correct?

8    A.    I didn't lose any money on any pro -- project.

9        Q.    Okay.  In fact, you made profits, correct?

10   A.    Two out of three, yes.

11       Q.    Okay.  And on the third one, you got your investment

12   back, correct?

13   A.    Yes, it is.

14       Q.    Now, the initial meeting regarding Lyman-Cutler, you

15   told us, was at Mr. Maiden's office; is that correct?

16   A.    Yes.

17       Q.    Okay.  And you were not personally involved in many

18   of the discussions between Mr. Filippov and Mr. Kagan

19   regarding this project; isn't that correct?

20   A.    No, I wasn't involved, personal.

21       Q.    In fact, you weren't present for most of the

22   negotiation between Mr. Filippov and Mr. Kagan; isn't that

23   correct?

24   A.    One more time, please?

25       Q.    In fact, you weren't present during much of the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1  negotiations between Mr. Filippov and Mr. Kagan; isn't that

2  correct?

3  A.   No, practically no.  I --

4       Q.   Okay.  Now, at the October 25th, 2012, meeting that

5  you testified, you didn't take any notes, correct?

6  A.   No.

7       Q.   And you understood, did you not, that the purpose of

8  that meeting was to decide whether there was any interest in

9  even going forward with that project, correct?

10 A.   Correct.

11      Q.   And your nephew, Mr. Zhukovskiy, was there, and he

12 brought with him the spreadsheets that were discussed,

13 correct?

14 A.   Correct.

15      Q.   And you understood that Mr. Kagan is not, shall we

16 say, computer savvy, correct?

17 A.   I think so.

18      Q.   You think he is computer savvy, or you think he's

19 not?

20 A.   I never saw him in front of the computer.

21      Q.   Okay.  And you understood that those spreadsheets

22 were prepared by Mr. Zhukovskiy; isn't that correct?

23 A.   In this form, yes.

24      Q.   Okay.

25 A.   It was prepared by Mr. Zhukovskiy.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1    Q.   And you personally did not study the numbers on that

2    spreadsheet prior to the meeting; isn't that correct?

3    A.   No.

4    Q.   No, it's not correct or no, you did not study?

5    A.   I didn't study.

6    Q.   Okay.  And at that meeting, you had no idea what the

7    potential profit might be; isn't that correct?

8    A.   Before that, Dima Kagan told me that the project is a

9    good project and we could have a profit from 1- to $2 million.

10   That's why he asked me to -- to invest.

11   Q.   Okay.  But you weren't concerned particularly how

12   much profit; isn't that correct?

13   A.   No, it wasn't.  I didn't think about it.

14   Q.   In fact, you didn't actually care; isn't that true?

15   A.   Of course, I was concerned, and I wanted some profit, but

16   I trusted Mr. Kagan so much that I was -- I knew that he -- he

17   will do it right.

18          MR. PERTEN:  Your Honor?

19          THE COURT:  You may approach.  Thank you.  Thank you

20   very much.

21   BY MR. PERTEN:

22   Q.   Now, Mr. Lipetsker, do you recall that you came to

23   my office for a deposition in April of 2018?

24   A.   Yes.

25   Q.   And you had an interpreter there for that as well so

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1   that there was no question that you understood my questions;

2   isn't that correct?

3   A.   Correct.

4        Yes, correct.

5        Q.   Let me draw your attention to page 33 of your

6   transcript.  And we were looking at the spreadsheets that Mr.

7   Zhukovskiy had prepared, and I -- questions starting on page

8   5.  Let me --

9   A.   Where?

10       Q.   -- show you Exhibit 6.  Is that the

11  A.   Okay.

12       Q.   -- email that you were referencing, which was an

13  email with the spreadsheets attached?

14  A.   Which page?  Could you show us, please?

15       Q.   I'm sorry?

16  A.   Which page?

17       Q.   33.

18  A.   We can't find it.

19           MR. PERTEN:  May I?

20           THE COURT:  Yes.  So on page 9.

21  BY MR. PERTEN:

22       Q.   And starting at line 7, your answer says "let's see.

23  What is page 1?  These numbers, I remember definitively.

24  Construction budget and cost.  That, I remember

25  definitively -- definity [sic].  All the rest, the other

NICKOLAY LIPETSKER - Cross

1   possible outcomes, how long it will take to sell, I didn't

2   care too much if construction cost was fixed.  It didn't

3   matter how long it would take to sell.  My profit may vary

4   between five and twenty percent.  I didn't care much".  Did I

5   read that correctly?

6   A.   Yes, it's exactly what you say.  But I don't remember

7   this.

8        Q.   Sir --

9   A.   Uh-huh.

10       Q.   -- and in fact, at your deposition, when I showed

11  you what was the presentation which -- Exhibit 9 -- you were

12  not even able to identify it; isn't that correct?

13  A.   Yes, it's correct.  I know why.

14       Q.   I'm sorry?

15  A.   Yes, it's correct.  You're correct.  And then I know why.

16       Q.   Okay.  In fact, let's turn to page 35 of your

17  deposition.  And at the bottom of the page starting on line

18  23.  Was this document Exhibit 7 to the Filippov deposition?

19  Was that document handed out at the presentation meeting?

20  Your answer was "I don't remember".

21  A.   Uh-huh.

22       Q.   Correct?

23  A.   Correct.

24       Q.   So three years later, you weren't even sure if this

25  was the presentation that had been offered at that meeting;

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1    isn't that correct?

2    A.   So the presentation --

3         Q.   Excuse me.  It's a yes-no answer.  You were not

4    able.

5    A.   On presentation to --

6              MR. PERTEN:  Your Honor, could you please?

7              THE COURT:  All right.

8    A.   I don't understand.

9         Will you please --

10             THE COURT:  I didn't understand that last point.

11   What did he say?

12             THE INTERPRETER:  Will you please repeat the

13   question?

14             MR. PERTEN:  Sure.

15             THE COURT:  Okay.

16             MR. PERTEN:  I'd be happy to repeat the question.

17   BY MR. PERTEN:

18        Q.   You'd agree with me that, three years later, you

19   were unable to identify the presentation that was handed out

20   at the October 25th meeting?

21   A.   This is not the full document.

22        Q.   So is it your testimony, sir, that Exhibit 9 is only

23   a partial portion of a document that was handed out at October

24   25th, 2012?

25   A.   I don't see anything else, except the -- the beginning.



NICKOLAY LIPETSKER - Cross

1    Q.   Okay.

2    A.   The name of the document.

3    Q.   We'll scroll down.

4        THE COURT:  Why don't you show them --

5        MR. PERTEN:  The paper?

6        THE COURT:  -- the paper document so he really sees

7    it?

8    A.   Now -- now, I recognize this document.

9        Now I recognize this document.

10   BY MR. PERTEN:

11   Q.   So you didn't recognize it at your deposition, but

12   you recognize it today; is that correct?

13   A.   It came as an Excel file, which I couldn't open on my

14   computer.

15   Q.   Okay.  So when you got this document that you

16   couldn't open on your computer, does that mean you didn't

17   study it at all before the meeting; isn't that correct?

18   A.   This document -- I -- I saw this document only during the

19   meeting on the 25th of October.

20   Q.   Now, sir, at the time of the October 25th meeting,

21   there were no construction plans; isn't that correct?

22   A.   What do you mean by the plan?

23   Q.   Were there plans that showed a builder what to

24   build?

25   A.   The -- the -- just the general words that we have to

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1   build two luxury houses.

2       Q.   Okay.  So the sum total of the description of the

3   project, as it relates to the structures, is we're going to

4   build a house -- a luxury house; is that correct?

5           MR. PERTEN:  Your Honor?

6   A.   So --

7           MR. PERTEN:  Excuse me.  There is a long discourse.

8   It was a yes-no answer.  So can you have the witness --

9           THE COURT:  No, I can't do that.  I mean, the -- if

10  there's a discourse, it may be that she's trying to get him to

11  understand the question.  I don't know.

12          MR. PERTEN:  But this -- the -- it was a one-way

13  discourse.  It was -- his explanation to her was extensive,

14  and it was a yes-no answer.

15          THE COURT:  I can't deal with it until I hear an

16  answer.  All right.  Do you have any answer to that question?

17  Has he given you an answer to it?  I'll give him the

18  instruction in a moment.

19          MR. PERTEN:  Thank you.

20          THE COURT:  I just need to understand.

21          THE WITNESS:  He told me that he's going to build two

22  luxury houses, like castles, and -- and what cost and that's

23  it.

24          THE COURT:  All right.  Let me just mention to him

25  the following.  I know he's been here, so I think he's heard

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1    me say this, but maybe it wasn't translated to him.  You can

2    translate as I go.

3           All right.  When Mr. Perten asks you a question and

4    you have -- and you would like to elaborate on an answer, you

5    can saw that, that I can't answer it yes or no and I need to

6    elaborate.  But you'll have that chance when Mr. Carnathan

7    asks you questions in a few moments.  You should do your best

8    just to answer Mr. Perten's questions at this point, without

9    elaboration, okay?

10          THE WITNESS:  Thank you.  Understood.

11          THE COURT:  Understood?

12          THE WITNESS:  Understood.  Thank you.

13          THE COURT:  Thank you.

14          MR. PERTEN:  Thank you.

15   BY MR. PERTEN:

16     Q.   Now, so Mr. Kagan was going to build two houses that

17   were like castles, I think is your testimony; correct?

18   A.   It's correct.

19     Q.   And in fact, that's what he did; isn't that correct?

20   A.   Some sort of.

21     Q.   Excuse me?

22   A.   Some sort of.

23     Q.   Some sort of?  Well, how did the houses that he

24   built not -- how is it inconsistent with what he described at

25   the meeting?



NICKOLAY LIPETSKER - Cross

1    A.    First, the intention was to bring one -- to build one

2    house from brick and the second house from stone.  But -- but

3    eventually he built both houses with wood.  Mostly with wood.

4         Q.    And when did you first learn this?

5    A.    During the construction.

6         Q.    Now, during the construction, Mr. Lipetsker, you

7    came on site fairly regularly; isn't that correct?

8    A.    No.  Time to time.  No, I wouldn't call it regularly.

9         Q.    Well, you were there certainly frequently enough to

10   observe that the plans that what you had -- excuse me.  You

11   were there frequently enough to observe that the houses he was

12   building was different than you had originally envisioned;

13   isn't that correct?

14   A.    It's correct.

15        Q.    And when you saw that, you didn't say anything, did

16   you?

17   A.    I did.

18        Q.    And what did Mr. Kagan say?

19   A.    So he said -- first of all, he said this is the more --

20   most popular -- the material that we're going to use now, and

21   second of all, he said it's too late to change the design.

22   And because of the -- the land -- compared to land -- so

23   the -- the ratio between the land and the -- and the house

24   square feet is -- there is a ratio there.  If we do it with

25   the stone, so we're going to go out of this ratio.  And we

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1    won't be -- we won't be completing that according to the plan.

2        Q.   Now, Mr. Maiden prepared the operating agreement;

3    isn't that correct?

4    A.   It's correct.

5        Q.   And you didn't review any of the drafts of the

6    operating agreement until the final version; isn't that

7    correct?

8    A.   No, I didn't see the drafts.  I saw the final result.

9        Q.   So you weren't checking your email when Mr. Maiden

10   was circulating drafts, were you?

11   A.   Not always.  I'm not very savvy in computers --

12   computers.

13       Q.   Okay.  So until it was actually time to sign it, you

14   had never even reviewed the draft operating agreement; isn't

15   that correct?

16   A.   We -- we -- I saw the whole -- the -- the document, only

17   the operating agree -- operating agreement only at the time

18   that it was time to sign the document, and Mr. Maiden read for

19   me, in Russian, the entire document.

20       Q.   And sir, you understand that you are bound by the

21   terms of that operating agreement, correct?

22   A.   Yes.

23       Q.   And you also understand, sir, that if, at some point

24   subsequent to your signing, you didn't like the term in the

25   agreement, you had no ability to disregard it?  You understood

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1    that, correct?

2    A.   Yes.

3        Q.   Now, you'll agree with me, sir, since you read the

4    operating agreement, that the figure, $1.3 million fixed-cost

5    construction, it doesn't say that anywhere in the operating

6    agreement, does it?

7        Excuse me.  That was a yes or no.  It doesn't say that,

8    does it?

9    A.   The answer is yes, but I'd have to --

10       Q.   So you agree it's -- that figure, $1.3 million, is

11   not in the operating agreement, correct?

12   A.   Would you please say the information because I think the

13   girl mistranslation.

14       Q.   All right.  I'm sorry.  Could you --

15           THE INTERPRETER:  One more time, please, question?

16   BY MR. PERTEN:

17       Q.   Sure.  Would you agree, sir, that the operating

18   agreement that you reviewed and signed does not contain $1.3

19   million construction budget?

20   A.   I -- I saw this amount.

21       Q.   In the operating agreement?

22   A.   Yes.

23           MR. PERTEN:  Would you pull up the operating

24   agreement, please?  Thank you.

25   BY MR. PERTEN:

eScribers
(973)406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1    Q.   Mr. Lipetsker, would you --

2    A.   Yes.

3    Q.   You have Exhibit 15 in front of you which is the

4    operating agreement which you signed.  Can you show us where

5    it says that construction will be $1.3 million, please?

6                        (Pause)

7    A.   I did not see right now numbers.  I did not see right now

8    numbers.

9    Q.   So you're not able to identify any place in this

10   agreement that you now reviewed where it says that the cost

11   will be fixed at $1.3 million; is that correct?

12   A.   Right now, no.

13   Q.   Okay.  And certainly, sir, if that was an important

14   factor in this transaction, you would have expected that would

15   have been in the operating agreement; isn't that correct?

16   A.   I don't know.

17   Q.   Now, you also understood, sir, that Mr. Filippov was

18   going to be the managing partner; isn't that correct?

19   A.   It's correct.

20   Q.   And he was the one who was going to be involved in

21   the day-to-day operations of the Lyman-Cutler, LLC, correct?

22   A.   I don't know how -- about managing member.

23   Q.   And you understood, did you not, that Mr. Kagan was

24   sending him copies of checks as they were being cut while the

25   construction proceeded?  You understood that?



NICKOLAY LIPETSKER - Cross

1   A.   I didn't see those checks.

2        Q.   Well, did -- are you --

3   A.   I -- I didn't follow those.

4        Q.   Okay.  You weren't following -- you weren't

5   monitoring the expenses; is that correct?

6   A.   Yes, correct.

7        Q.   Okay.  And Mr. Filippov didn't tell you that he was

8   receiving copies of checks, did he?

9   A.   At some point, he mentioned it.

10       Q.   At some point after the litigation was filed,

11  correct?

12  A.   No, I think before.

13       Q.   When?

14  A.   I think it was at the beginning of the construction.

15       Q.   Okay.  So you knew from the beginning of the

16  construction that Mr. Kagan was sending copies of checks to

17  Mr. Filippov, correct?

18  A.   Yes, correct.

19       Q.   And you understood that Mr. Kagan was sending copies

20  of checks that were cut to ProExcavation, correct?

21  A.   I didn't -- I never read who they were addressed to or

22  sent to.

23       Q.   Okay.  Did Mr. Filippov ever tell you that he was

24  receiving copies of checks that were cut to ProExcavation?

25  A.   We didn't talk about this.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1    Q.   Okay.  And Mr. Filippov didn't tell you that he was

2    receiving copies of checks cut to KDC, correct?

3    A.   We didn't -- we didn't discuss this financial things.

4    Q.   Okay.  And did Mr. Filippov tell you that, when the

5    account balances were low, he was requesting that Mr. Kagan

6    put in more money?

7    A.   I don't know about this.

8    Q.   And are you aware, sir, that there was multiple

9    texts and emails from Mr. Filippov to the Kagan side

10   requesting more money?

11   A.   No, I'm not aware of that.  All the emails went without

12   me -- me being included.

13   Q.   And this -- and you've never been told that by Mr.

14   Filippov; is that correct?

15   A.   It's correct.

16   Q.   Okay.  Now, during the progress of the construction,

17   you never dealt with Tatiana Kagan on the construction side of

18   things, correct?

19   A.   Correct.

20   Q.   As far as you knew, she had nothing to do with the

21   construction, correct?

22   A.   I think it's correct.

23   Q.   So you --

24   A.   Correct.

25   Q.   Correct?



(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1  A.   Correct.

2       Q.   Correct.  She was the real estate person, right?

3  A.   Yes.

4       Q.   Okay.  You never discussed billings on the Lyman-

5  Cutler construction project with Tatiana, did you?

6  A.   Never.

7       Q.   And as far as you know, she had no role in preparing

8  the construction billings for Lyman-Cutler, correct?

9  A.   Yeah.  I -- I don't know about this.

10      Q.   Okay.  And you never gave her a copy of the

11  operating agreement, did you?

12  A.   I didn't.

13      Q.   And she was not part of any negotiations that you're

14  aware of regarding the formation of the project, correct?

15  A.   Correct.

16      Q.   She wasn't present at that October meeting, correct?

17  A.   Correct.

18      Q.   And sir, in fact, other than as it related to

19  attempts to sell the properties once they were completed, you

20  had no dealings with Tatiana; isn't that correct?

21  A.   It's correct.

22      Q.   Now, you --

23           MR. PERTEN:  Strike that.

24  BY MR. PERTEN:

25      Q.   Other than the $250,000 investment that you made,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1    you haven't contributed any additional monies to the project;

2    isn't that correct?

3    A.   It's correct.

4        Q.   Now, you understood, sir, that Mr. Kagan was going

5    to be hiring contractors to do the work; isn't that correct?

6    A.   Yes.

7        Q.   Okay.  And you certainly would agree with me that

8    contractors who came on site to do work are entitled to be

9    paid for the work they did for Lyman-Cutler; isn't that

10   correct?

11   A.   It's correct.

12       Q.   And you never requested to see any of the underlying

13   contracts that related to the construction, did you?

14   A.   I personal did not.

15       Q.   Okay.  You did not.  And sir, in the operating

16   agreement --

17            MR. PERTEN:  Good.  It's still up.  Would you scroll

18   down to 5.2?

19   BY MR. PERTEN:

20       Q.   Section 5.2 of the operating agreement is the

21   section that says Mr. Kagan will build the property.  Do you

22   remember that section?

23   A.   Yes, I read it now.  Uh-huh.

24       Q.   You understood, did you not, that in this clause you

25   were essentially giving him or delegating him to the



(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1  obligation to build, correct?

2  A.   Yes.

3       Q.   And you didn't reserve to yourselves anything other

4  than to approve the plans; isn't that correct?

5  A.   It's correct.

6       Q.   Okay.  And you certainly didn't expect Mr. Kagan to

7  be running every subcontract by you before those workers did

8  the work; isn't that correct?

9  A.   It's correct.

10       Q.   Now, you understood from your prior projects that

11  Mr. Kagan uses Kagan Development -- KDC -- as the general

12  contractor on these projects; isn't that correct?

13  A.   I know he was using that, but I don't know who the people

14  are.

15       Q.   In fact, sir, isn't it a fact that Lyman-Cutler

16  engaged KDC to be the general contractor for this project?

17  A.   Yes.

18       Q.   All right.  So you understood, you hired them to be

19  the general contractor -- KDC; isn't that correct?

20  A.   I am not.

21       I personally didn't.

22       Q.   Okay.  But you knew that the company -- Lyman-Cutler

23  LLC -- hired Kagan Development -- KDC -- to be the general

24  contractor for this project?

25  A.   My understanding, yes.



NICKOLAY LIPETSKER - Cross

1      Q.   Okay.  And in fact, sir, that was the deal from the

2   beginning, that KDC was going to be the general contractor;

3   isn't that correct?

4   A.   I don't remember that.

5      Q.   And you understood --

6         MR. PERTEN:  Strike that.

7   BY MR. PERTEN:

8      Q.   Do you recall you gave an affidavit that was in the

9   lawsuit?  You recall that?

10  A.   Yes.

11        Yes.

12     Q.   I'm going to read paragraph 4 of your affidavit to

13  you where you describe what happened.  You said -- paragraph

14  4 -- "we planned to purchase of land in Brookline,

15  Massachusetts, subdivide into two parcels, and then construct

16  on each separate parcel a high-end, single-family home.  Mr.

17  Kagan, through his company Kagan Development, was to serve as

18  the general contractor for the project".  Do you recall that?

19  A.   Yes.

20     Q.   Okay.  So any suggestion, sir, that you didn't know

21  that KDC was going to be the general contractor is simply not

22  true; isn't that correct?

23  A.   No.

24        Mr. Kagan had two companies -- many companies under

25  different names.  So I was not even interested which company

NICKOLAY LIPETSKER - Cross

 1   is going to take over the project.  I didn't know which

 2   company's going to do this project.

 3        Q.   Well, you certainly knew that one of his companies

 4   was going to be doing the project, correct?

 5   A.   I just assu -- I -- I just assumed that because usually

 6   he was using those companies.

 7        Q.   Well, you knew he wasn't going to be the guy up

 8   there with a hammer pounding nails, correct?

 9   A.   Yes, I didn't see him with a hammer, correct.

10        Q.   Okay.  And you filed a sworn affidavit that, in

11   fact, KDC was going to be the general contractor.  We just

12   read that language, correct?

13   A.   If I said so, so that means I thought so.

14        Q.   Okay.  And if you thought it was somebody other than

15   KDC -- other than Kagan Development, you would have said in

16   your affidavit that it was a different company; isn't that

17   correct?

18   A.   I didn't think about that.

19        Q.   Well, sir, you understand when you sign something

20   under pains and penalties of perjury that you are swearing to

21   tell the truth?  You understood that, correct?

22   A.   Yes, I do.  Yes.

23        At that point, that's what I was thinking.

24        Q.   And if I suggest to you, sir, that you signed this

25   affidavit under pains and penalties of perjury on June 5th,

NICKOLAY LIPETSKER - Cross

1  2015, would you agree with me?

2  A.   Yes.

3      Q.   And certainly, June the 5th, 2015, was much closer

4  in proximity to when the project was completed than today;

5  isn't that correct?

6  A.   It's correct.

7      Q.   So certainly, you would expect that your memory

8  three years ago -- four years ago, in June of 2015, was better

9  than it is today; isn't that correct?

10 A.   If I understand your question right, of course, I have my

11 memory.  It's -- it's even worse now than before because of my

12 age.

13     Q.   Yes.  Now, sir, you had access to the email address

14 lymancutlerllc.com, correct?

15 A.   Yes.  It's correct.

16     Q.   Okay.  And you were receiving emails at that

17 address, correct?

18 A.   Yes.

19     Q.   Now, Kagan told you from the beginning that these

20 homes would sell in the vicinity, we're hoping, of $5.5

21 million; isn't that correct?

22 A.   He was -- he was hoping for it, and he told me that he

23 would try it.

24     Q.   Okay.  And that was understood from the very

25 beginning, that the goal was to sell for about $5.5 million,

NICKOLAY LIPETSKER - Cross

1  correct?

2  A.   It was Kagan's goal.

3      Q.   Okay.  And you understood that from day one,

4  correct?

5  A.   I understood that it was his goal, yes.

6      Q.   Okay.  And in fact, there never was an agreement to

7  sell it for $4.9 million, was there?

8  A.   I didn't see that.

9      Q.   So if, when you filed your lawsuit and alleged that

10  there was an agreement to sell for $4.9 million, that wasn't

11  true, was it?

12  A.   During the course of time, the -- the -- the numbers were

13  changing and there were negotiations with Mr. Filippon

14  [sic] -- Filippov, and I was not part of it.

15      Q.   Okay.  So you don't have any personal knowledge what

16  was agreed to in terms of the sale price; is that correct?  Or

17  the hoped-for sale price?

18  A.   Correct.  Basically, yes.

19      Q.   So you when you signed a complaint --

20          MR. PERTEN:  Strike that.

21  BY MR. PERTEN:

22      Q.   You saw the complaint, Exhibit 64, that was filed in

23  Middlesex, correct?  You reviewed that complaint before it was

24  filed, correct?

25  A.   Yes.



NICKOLAY LIPETSKER - Cross

1      Yes.

2          Q.   And you made sure that the allegations in that

3    complaint were accurate before it was filed, correct?

4    A.   That's what I thought, yes.

5          Q.   Okay.  Paragraph 25 says "the project plan was to

6    sell the two new homes by no later than November 2014 for

7    projected selling prices of $4.9 million each".  You see that?

8    A.   Yes, of course.

9          Q.   That's not true, is it?

10   A.   I don't know.

11         Q.   Now, you also understood that the properties were

12   going to be listed at $5.5 million, didn't you?

13   A.   Yes, at the very beginning.  Yes.

14         Q.   Okay.  In fact, once the properties were listed, you

15   looked at Zillow and the MLS service to see what the listing

16   was; isn't that correct?

17   A.   Yes, I saw it in Zillow.

18         Q.   And when you saw that the properties had been listed

19   and had been listed for $5.5 million, you didn't object, did

20   you?

21   A.   So I thought Tatiana Kagan and Kagan, that they were

22   experts, not me.

23         Q.   My question, sir, is you did not object when you saw

24   that not only were the properties listed, but they were listed

25   for $5.5 million.  You didn't object, did you?


(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1   A.   I thought that's -- that's what they thought, that's what

2   they considered.

3        Q.   Okay.  Mr. Lipetsker, listen to my question, please.

4   Did -- you did not object to Mr. Kagan or Tatiana and say --

5   A.   I didn't.

6        Q.   So you did not object, correct?

7   A.   It was long time ago.  And as far as I remember, I -- I

8   didn't object.

9        Q.   And so when we look at your complaint, paragraph

10  number 28, "without consulting Mr. Filippov or Mr. Lipetsker,

11  the Kagans set the selling price for each home at 5,499,000,

12  or nearly $600,000 higher than the budgeted selling price for

13  each home," that's not a true statement, is it?

14  A.   So it said "without consulting," so they didn't consult

15  me.

16       Q.   Okay.  And let's go with that.  So they didn't

17  consult you, but you certainly knew you had done it, correct?

18  A.   Correct.

19       Q.   And you didn't object, correct?

20  A.   It's correct.

21       Q.   And it certainly wasn't $600,000 higher than the

22  budgeted selling price, because the goal was $5.5 million,

23  wasn't it?

24  A.   Yeah.

25       Q.   Now, there was some testimony from -- by Mr.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1    Filippov regarding the April 2015 extension of the listing

2    agreement.  Do you recall that testimony when you sitting here

3    in court?

4          MR. CARNATHAN:  Objection.  It wasn't an extension of

5    the listing agreement.  There were two different listing

6    agreements.  Misstating the evidence.

7          MR. PERTEN:  Let me withdraw the question, Your

8    Honor.

9          THE COURT:  Fine, I had thought so.  Why don't you?

10   BY MR. PERTEN:

11       Q.   Mr. Lipetsker, do you recall testimony by Mr.

12   Filippov regarding the execution of a listing agreement in

13   April 2015?

14   A.   Yes.  Partially, I remember this, yes.

15       Q.   Okay.  And isn't is a fact, sir, that you have no

16   personal knowledge at all about what happened with respect to

17   the listing agreement in April 2015?

18   A.   I know only about the phone conversation and the email --

19   email -- email and a message conversation between Tatiana,

20   Kagan, and Filippov.

21       Q.   Sir, you were not -- you only know about

22   conversations because Mr. Filippov told you his version of

23   what went down; isn't that correct?

24   A.   It's correct.

25       Q.   It's correct?



(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1   A.    It's correct.

2        Q.    So again, you don't know personally one way or the

3   other what happened in April 2015 with respect to the listing

4   agreement; isn't that correct?

5   A.    I personally didn't involve.

6        Q.    I'm sorry.  Was there an answer?

7   A.    I was -- I was personally -- I wasn't involved

8   personally.

9        Q.    Now, you're -- you have no evidence that Tatiana

10  Kagan committed any kind of fraud against you; isn't that

11  correct?

12           MR. CARNATHAN:  Objection.

13           THE COURT:  Basis.

14           MR. CARNATHAN:  He's asking Mr. Lipetsker to assess

15  the evidence in all the case, so it's just not an appropriate

16  question.

17           THE COURT:  Sustained.  It calls for a legal

18  conclusion.

19           MR. PERTEN:  Your Honor, I -- with respect, I think

20  fraud also has meaning outside of a legal analysis, and he can

21  certainly testify if he believes that.

22           THE COURT:  You can ask him about facts.

23  BY MR. PERTEN:

24        Q.    Do you have any facts that Tatiana was untruthful to

25  you in any fashion?



NICKOLAY LIPETSKER - Cross

1    A.    Only one.

2         Q.    What is that?

3    A.    When Tatiana signed a contract with Dmitriy for eighteen

4    months, we didn't know about.

5         Q.    Okay.  So the only thing, as far as you're aware,

6    that Tatiana did what you believe was untruthful was signing a

7    listing agreement for a longer period than you expected; is

8    that correct?

9    A.    So she signed the contract with Kagan without us knowing

10   it and consulting us.

11        Q.    And that's the only transgression that you believe

12   Tatiana did; is that correct?

13   A.    Correct.

14        It's correct.

15        Q.    Okay.  And certainly, with respect to any aspect of

16   the construction of the project, you have no facts that

17   Tatiana did anything wrong; isn't that correct?

18   A.    It's correct.

19        Q.    Now, with respect to --

20        THE COURT:  Did you get an answer to that question?

21        MR. PERTEN:  He said that's correct.

22        THE COURT:  Thank you.

23        Can you just translate that to him?  I want to make

24   sure that that answer got on the record.  I couldn't hear it.

25        THE INTERPRETER:  Yes, that is correct.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1   BY MR. PERTEN:

2       Q.   So you have no facts that Tatiana did anything wrong

3   on the project, other than your allegation that she signed --

4   A.   It's correct.

5       Q.   Let me finish -- that she signed a listing agreement

6   without your permission?

7   A.   It's correct.

8        It's correct.

9       Q.   Now, with regard to payments that were made on the

10  Lyman-Cutler project, you have no personal knowledge of any

11  improper payments; isn't that correct?

12  A.   It's correct.

13      Q.   Now, sir, at the time you filed suit in June of 2015

14  in the State court, one of the allegations was that ProEx --

15  ProExcavations had charged more than double the value of its

16  work.  Do you recall that allegation?

17  A.   Yes, I do.

18      Q.   And in fact, sir, you have no idea what exactly

19  ProEx did on this project; isn't that correct?

20  A.   It's correct.

21      Q.   So in fact, you have no idea whether they were

22  overcharging or undercharging, for that matter; isn't that

23  correct?

24  A.   I have explanations.

25       I have an explanation for that.



NICKOLAY LIPETSKER - Cross

1    Q.   Well, sir, let's try my question.

2   A.   Okay.

3    Q.   You have -- you personally, since you don't know

4   what they did, have no understanding of whether they

5   overcharged, undercharged, or charged just right; isn't that

6   correct?

7   A.   It's correct.

8    Q.   Okay.  And in fact, at your deposition, your

9   assumption was ProExcavation, the only thing they did was

10  excavation; isn't that correct?

11  A.   I -- I don't know what the work excavation includes,

12  maybe just not digging, maybe something else.  But I'm not

13  aware of that.

14   Q.   And sir, the only information that you have as to

15  whether the price charged by ProExcavation was proper is based

16  on what Mr. Filippov told you; isn't that correct?

17  A.   Yes.

18       Yes.

19       MR. PERTEN:  Would you just scroll down to 4.7?

20       THE COURT:  So we're at 11.  Do you --

21       MR. PERTEN:  We can break at this point.

22       THE COURT:  -- have much more?

23       MR. PERTEN:  I will be going a little bit longer,

24  yes.  So why don't we --

25       THE COURT:  That's fine.  But even if you're not,

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1   okay.  We'll take a five -- we'll take a fifteen-minute break.

2   Okay.

3            MR. PERTEN:  Thank you, Your Honor.

4            THE CLERK:  All right.  Court's in recess.

5                  (Off the record at 11:02 a.m.)

6                  (On the record at 11:22 a.m.)

7            THE CLERK:  Court is now in session.

8            THE COURT:  Please be seated.  Yes, come up.

9            I'll just remind Mr. Lipetsker that he's still under

10  oath.  If you could just give me an oral acknowledgement.

11           THE WITNESS:  Yes.

12           THE COURT:  Okay.

13           MR. PERTEN:  May I proceed, Your Honor?

14           THE COURT:  Yes, please do.

15           MR. PERTEN:  Thank you.

16                  RESUMED CROSS-EXAMINATION

17  BY MR. PERTEN:

18       Q.   Now, Mr. Lipetsker, you understand that one of the

19  accusations against Mr. Kagan and his companies is that they

20  double-billed on the Lyman-Cutler project.  You understand

21  that, correct?

22  A.   Yes.

23       Q.   And in fact, sir, when I took your deposition in

24  April of 2018, you have no facts to support the allegation of

25  double-billing; isn't that correct?



NICKOLAY LIPETSKER - Cross

1   A.   So the -- the cost of the houses doubled, and that's why

2   I assumed that it was double-billing.

3        Q.   And so you assumed it was double-billing because the

4   cost of the houses was higher than you expected; is that your

5   testimony, sir?

6   A.   Right now, yes.

7        Right now, yes.

8        Q.   Were you expecting it to change anytime soon, sir?

9   A.   I'm not the expert.

10       Q.   Okay.  Now, you also said that there were false and

11  inflated charges.  You're not aware of any false and inflated

12  charges, are you?

13  A.   I -- I don't remember it right now.  I don't know right

14  now.

15       Q.   Okay.  So here we are at trial and you're not able

16  to tell us a single inflated charge; is that correct?

17  A.   Excuse me.

18                          (Pause)

19       Q.   Before your answer, let me withdraw the question and

20  try one more time.

21  A.   Yes.

22       Q.   As you sit here today, you cannot identify a

23  specific improper charge; isn't that correct?

24           MR. CARNATHAN:  I sort of object to the withdrawal of

25  the question after he's answered through the translator.



NICKOLAY LIPETSKER - Cross

1    Shouldn't the translator have been able to translate his

2    answer before Mr. Perten asked to withdraw the question?  It

3    seems --

4         THE COURT:  I think that's fair enough.  It did

5    appear that she was about to answer the question, having had

6    the witness tell her his testimony.  So --

7         MR. PERTEN:  Your Honor, we also -- in fairness,

8    there was a three-minute answer that he was giving the

9    translator to a yes-no question.  So it was apparent we were

10   going to get a speech.  So I'm trying to narrow it down to

11   just the yes-no.  That's what I'm trying to do.

12        THE COURT:  An again, you will have to deal with

13   that.

14        MR. PERTEN:  But again, with respect, Your Honor, how

15   do we deal with that because, if you get the long answer, do

16   we --

17        THE COURT:  I'll show you how we deal with it.  Here

18   we go.

19        MR. PERTEN:  Okay.  Fair enough.  Thank you.

20        THE COURT:  What was the answer to the question that

21   was pending before it was withdrawn?

22        THE WITNESS:  When I got a letter from Mr. Kagan and

23   there were many numbers about the design and -- and the

24   excavation and there were many numbers that they said that it

25   was the expenses were more than $600,000, and there were no

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1    explanation of that.

2    BY MR. PERTEN:

3         Q.   And is that -- so that is your total testimony?  The

4    only reason you believed there's wrong numbers is you don't

5    know what the numbers were; is that correct?

6    A.   I didn't see during -- those numbers during the whole

7    construction.  I saw them only after nine months, after the

8    construction finished.

9         Q.   And you don't know, as you sit here today, whether

10   those numbers are right or wrong; isn't that correct?

11   A.   They never -- they never showed me the numbers for

12   approval.

13        Q.   I understand that.  My question, sir, as you sit

14   here today -- I understand you don't trust the numbers, but

15   you don't know one way or the other whether the numbers are

16   right or wrong; you have assumptions, correct?

17   A.   The -- the -- these numbers were higher than our budget.

18   That's why I am -- maximum bud -- budget -- that's why I

19   think -- that's why I doubt those numbers.

20        Q.   Now, sir, you understand, in this lawsuit, you've

21   also alleged that Mr. Kagan was pocketing certain money from

22   returns.  Do you recall that?

23   A.   I don't have any direct proof of that.

24        Q.   Okay.  And sir, you also don't have any direct proof

25   or any proof that there were certain credits that were due to

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1    the Lyman-Cutler project that were not being properly applied;

2    isn't that correct?

3              MR. CARNATHAN:  Objection.

4              THE COURT:  Basis.

5              MR. CARNATHAN:  Legal conclusion.  He's asking what

6    proof he has of these things.

7              MR. PERTEN:  Mr. -- I'll withdraw and rephrase --

8              THE COURT:  It's withdrawn.

9              MR. PERTEN:  -- it, Your Honor.

10             MR. CARNATHAN:  He has no personal knowledge.

11             THE COURT:  Go ahead.

12   BY MR. PERTEN:

13       Q.   Mr. Lipetsker, you don't have any facts to support

14   the contention that there were credits that were supposed to

15   come to Lyman-Cutler that did not come; isn't that correct?

16             MR. CARNATHAN:  May I object and ask that he phrase

17   in terms of personal knowledge?  The facts thing seems to me

18   to be a variation on the same concept.  What facts did he

19   have?  Well, we've got a whole trial going on here.  What

20   personal knowledge does he have?  Fair enough.

21             THE COURT:  All right.  No, I think that's a

22   perfectly understandable and appropriate question.  So that

23   objection's overruled.

24       A.   Please repeat the question?

25   BY MR. PERTEN:



NICKOLAY LIPETSKER - Cross

1    Q.   Sir, as you sit here today, you have no facts to

2    support an allegation that there were credits that should have

3    come to the Lyman-Cutler project that did not; isn't that

4    correct?

5    A.   At this point, now, no, I don't have.

6    Q.   Okay.  Now, sir, you also have no facts that Kagan

7    charged to the Lyman-Cutler project for materials that were

8    purchased for one of his other projects; isn't that correct?

9    A.   This is a question to the expert, not to me.  And

10   personally, I don't have a knowledge.

11   Q.   Okay.  And at the time you filed suit in June of

12   2015, the only facts that you had to support the allegations

13   that were asserted in that lawsuit were that you had received

14   a letter from a lawyer with numbers that you didn't

15   understand; isn't that correct?

16   A.   No, that's not true.

17   Q.   Okay.  Well, let's review.  You didn't have any

18   facts of improper charges, correct?

19   A.   After we got a letter --

20        THE INTERPRETER:  I'm sorry.  Interpreter has to ask

21   one more time --

22        MR. PERTEN:  Sure.

23        THE INTERPRETER:  -- the answer.

24   A.   After I got the letter from -- after I got the letter

25   from attorney, after nine months after we finish the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1   construction project, the cost of the -- the construction

2   increased by eighty percent.  So -- and I don't think -- and I

3   think the -- the legit [sic] -- litigation of this lawsuit it

4   has to sort it out what was going on.

5        Q.   Okay.  So again, sir, it was, you didn't believe

6   what the lawyer letter said, and that was the basis for the

7   lawsuit; is that correct?

8   A.   Yes.

9        Q.   Okay.  Now, before filing the lawsuit -- before

10  filing the lawsuit on June 5th, 2015, you did not consult with

11  Mr. Kagan; isn't that correct?

12  A.   One more time, the date?

13       Q.   Sure.  You filed the State court litigation on June

14  5th, 2015.  Before filing that lawsuit, you did not consult

15  with Mr. Kagan, did you?

16  A.   Mr. Kagan doesn't answer any questions -- any calls.

17       Mr. Kagan didn't answer all -- none of my phone calls and

18  didn't give me an opportunity to talk to him.

19       Q.   And you didn't go down to his house?  You know where

20  he lives, don't you?

21  A.   I never go to anybody's house without invi -- invitation.

22       Q.   And you didn't go down to his office, did you?

23  A.   So at that time, he has a home office.

24       Q.   You didn't send him any text messages, did you?

25  A.   I don't have a text messaging in my phone, so I --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1      Q.   You didn't --

2   A.   -- only phoned.  I only called him on the phone.

3      Q.   And you didn't send him any emails, did you?

4   A.   We never co -- we never communicate through the emails

5   with him, so no, I didn't send him email.

6      Q.   And you didn't call a member meeting, as you're

7   entitled to under the operating agreement; isn't that correct?

8   A.   We didn't even have an opportunity to have -- communicate

9   with him.

10      Q.   And sir, the sense of urgency you had was because

11   there were carrying costs that were continuing to accrue; is

12   that correct?

13   A.   So can you just explain and define "carrying costs"?

14      Q.   Sure.  You had to pay the mortgage and the taxes

15   still, correct?

16   A.   Correct.

17      Q.   And insurance, correct?

18   A.   Correct.

19      Q.   And part of the calculation was -- that was a lot of

20   money that you were spending, correct?

21   A.   Correct.

22      Q.   And you understood, did you not, that under the

23   operating agreement, once Mr. Kagan stopped paying the

24   carrying costs, this was the obligation of Mr. Filippov?  You

25   understood that, didn't you?



NICKOLAY LIPETSKER - Cross

1   A.   Yes.

2        Q.   So in point of fact, the carrying costs should have

3   been paid; isn't that correct?

4   A.   I think so.

5        Q.   And in fact, it was contemplated when you entered

6   into the operating agreement, that if Mr. Kagan didn't pay,

7   Mr. Filippov would; isn't that correct?

8   A.   Yes.

9        Q.   And sir, when you filed suit, the legal fees were

10  being paid by Lyman-Cutler, not by you personally, correct?

11  A.   So the legal fees were paid by the LC [sic] -- LC

12  [sic] --

13       Q.   LLC

14  A.   -- LLC -- LLC.  Oh, because LLC filed the lawsuit.

15       Q.   And was there actually a vote between you and Mr.

16  Filippov to file suit?

17  A.   Yes, we did.

18       Q.   Was Mr. Kagan present for that vote?

19  A.   No, he was not present because we lost all the

20  communications with him.

21       Q.   Did you send him a letter saying words to the

22  effect, we're going to take a vote about whether we should

23  file suit; if you want to be part of it, show up?

24  A.   No.

25       Q.   Now, sir, you told us briefly about a conversation

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1  that you had with Mr. Kagan after you filed suit and after he

2  put the mechanic's liens on the property.  Do you recall that

3  testimony?

4  A.   Yes.  I -- I saw him once, and we did talk, as I worded.

5       Q.   Right.  At Peet's Coffee, correct?

6  A.   Yes.  Correct.

7       Q.   Okay.  And the deal that you were offering was take

8  off your liens, correct?

9  A.   Correct.

10      Q.   We'll sell the property?

11  A.   On market price, yes.

12      Q.   And we won't pay you anything about your capital

13  investment, correct?

14  A.   Correct.

15      Q.   Okay.  Give up your security.  You understand that a

16  lien is security, correct?

17  A.   I don't consider a lien as a security because lien was

18  put fraudulently.

19      Q.   And you didn't offer to dismiss the lawsuit, did

20  you?

21  A.   Which one?

22      Q.   The State court action, the only one that was

23  pending at that time.

24  A.   Yes.  Yes.  I -- I was trying to do everything to avoid

25  that lawsuit, and then I -- we did talk about it, yes.



NICKOLAY LIPETSKER - Cross

1      Q.   Okay.  And you just forgot to tell us this morning;

2  is that correct?

3  A.   Okay.  So when we met at the coffee shop, we discussed

4  that so we -- we can withdraw the lawsuit.

5      Q.   Okay.  Now --

6  A.   And I -- I -- I --

7      Q.   Sir, let's talk about the bankruptcy real quickly.

8  In October 2016, you and Mr. Filippov decided to file for

9  bankruptcy; isn't that correct?

10 A.   Correct.

11     Q.   And once again, you did not have a member meeting to

12 discuss that filing; isn't that correct?

13 A.   It's correct.

14     Q.   And you didn't take a vote, did you?

15 A.   No, we did.

16     Q.   You and Mr. Filippov voted privately, correct?

17 A.   Yes, two of us.  Yes.

18     Q.   And the reason you filed for bankruptcy, again, was

19 that you were incurring ongoing maintenance costs, debt

20 service, and things of that nature, correct?

21 A.   So we wanted to file for the bankruptcy for two reasons.

22 First, because the bank didn't extend the loan.  And in that

23 case, the houses would be sold on auction.  And also, there

24 was a mechanical law [sic] on the -- the -- the properties

25 by -- fraudulently put on them because they -- mechan --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1    mechanical lien -- and then they -- they didn't allow to sell

2    the houses properly.

3         Q.   Probably?

4    A.   Properly.

5         Q.   Okay.  So that -- you don't know whether the liens

6    would've impacted the ability to sell the house.  It was just

7    your belief that it probably would be a problem, correct?

8    A.   Many of my -- the acquaintances, people who knew -- well,

9    who are real estate agents, they told me it's very difficult

10   to sell the house when there is a lien on it.

11        Q.   Now, sir, at the time of the bankruptcy petition,

12   you understood there was about $106,000 in the Lyman-Cutler

13   account?  You understood that, didn't you?

14   A.   Yes.

15        Q.   And you also understood that the entity had two

16   houses that were valued collectively at about at least $9

17   million, correct?

18   A.   No, I didn't see them.  I didn't know.

19        Q.   Well, you understood, sir, that there certainly was

20   equity in those houses, correct?

21   A.   I was not sure until they put the houses in -- after nine

22   months after the construction and $2 million, and I was not

23   sure.

24        Q.   So is it your testimony, sir, that we took out $4.8

25   million of loans, correct?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Cross

1   A.   Yes, around that.  Around that.

2       Q.   And the lien is about two million, so that's about

3   $6.8 million of attachments or liens against the property,

4   correct?

5   A.   I don't know how the math works.  So I don't -- I -- I

6   don't know this math works, but I understand it differently.

7       Q.   Okay, sir.  Well, you certainly believed that each

8   house should sell for more than $3.4 million; isn't that

9   correct?

10  A.   In what case?

11      Q.   On the market.

12  A.   Well, they --

13      I didn't understand what you --

14      Q.   Okay.

15  A.    They did, about.

16      Q.   No.  Sir, do you recall at your deposition I asked

17  you why you put the company in bankruptcy?  Do you recall what

18  you said?

19  A.   So because we were in the situation -- we were put in the

20  situation that we had to pay the bank money that we didn't

21  have.

22      Q.   Sir, let's look at page 55 of your deposition.

23  Starting at line 13.  It says "Question:  Why did you put

24  Lyman-Cutler in bankruptcy?"  Your answer is "We had

25  absolutely no money left in the Lyman-Cutler accounts.



NICKOLAY LIPETSKER - Cross

1   Bank" -- I'm sorry.

2   A.   Excuse me.  What --

3        Just a second.  We didn't --

4        Q.   Page 55.

5   A.   55.  Here?

6        Q.   55, starting here.

7   A.   Uh-huh.

8        Q.   Let's take this line by line.  "Question:" --

9   A.   Uh-huh.

10       Q.   -- "Why did you put Lyman-Cutler in bankruptcy?"

11  First sentence:  "We had absolutely no money left in the

12  Lyman-Cutler accounts -- bank accounts".  Do you see that?

13  A.   Yes, of course.

14       Q.   And in point of fact, you had $106,000 in the

15  account; isn't that correct?

16  A.   Actually, I don't remember when Ms. -- I don't remember.

17       Q.   Well, you recall that Mr. Filippov says that he put

18  a $200,000 loan into the Lyman-Cutler accounts?  You recall

19  that testimony, don't you?

20  A.   Yes.  Yes.

21       Q.   So you knew that there had been additional monies

22  that Mr. Filippov put into the bank account; isn't that

23  correct?

24  A.   I don't remember when he put this money.

25       Q.   So you would agree with me that the statement that

NICKOLAY LIPETSKER - Cross

1   "We had absolutely no money left in the Lyman-Cutler accounts"

2   is not a true statement; isn't that correct?

3   A.   Yes.  The statement correct right here.

4        Q.   I'm sorry?

5   A.   I really didn't know this $2,000, when it was put and

6   where did it go.

7        Q.   So you didn't know anything about the loan that Mr.

8   Filippov says he put into this project; is that your

9   testimony, sir?

10  A.   I -- I knew that he put this money there, but I didn't

11  know where this money were allocated and when.

12       Q.   Was there ever a meeting to discuss giving Mr.

13  Filippov a mortgage from Lyman-Cutler?

14  A.   So I -- I really didn't know our debts or where the money

15  is going to go.  Yes, I knew -- I did know about this money.

16  I didn't know where they go.

17       Q.   And when did you find out about this money?

18  A.   I don't remember.

19       Q.   How long before the bankruptcy petition was the loan

20  made?

21  A.   I don't remember the date.

22       Q.   What interest terms were there on the loan, if any?

23  A.   Yes.

24       Q.   Do you know what the terms of the loan were?

25  A.   I think it was the same percentage that the bank was

NICKOLAY LIPETSKER - Cross

1   giving, but around five.

2           THE COURT:  Just hold one second.

3                       (Pause)

4           THE COURT:  All right.  So how much longer do you

5   have?

6           MR. PERTEN:  Three minutes.

7           THE COURT:  Okay.  All right.  Just for your

8   information, we're going to be looking for some efficiency

9   here, and --

10          MR. PERTEN:  I understand.

11          THE COURT:  -- the direct was about forty minutes, a

12  little over.  We're now an hour and a half into cross.  Okay?

13          MR. PERTEN:  I'll shut it down in three minutes.

14          THE COURT:  Let's be targeted.  Okay.

15          MR. PERTEN:  Okay.

16  BY MR. PERTEN:

17      Q.  So you also said at your deposition, sir, that "We

18  had to pay" -- we're reading at page 55 -- "We had to pay bank

19  interest monthly.  We had to taxes to the city each quarter.

20  It was necessary to maintain the properties, both houses and

21  the grounds.  We had to keep heating, air conditioning at a

22  certain level.  It is very expensive."  Do you see that

23  language?

24      A.  Yes.

25      Q.  You understood that was all Mr. Filippov's





NICKOLAY LIPETSKER - Redirect

 1   obligation under the operating agreement; isn't that correct?

 2   A.   I really don't -- I -- I knew that his obligation was to

 3   pay the carrying costs, and then I don't know what -- what the

 4   needs would be included.

 5        Q.   Okay.  One final question for you, sir.  When you

 6   got the lawyer letter on May 7th telling you about the cost

 7   overruns, you haven't paid any of those, have you?

 8   A.   What -- what do you mean?  Paying for the -- the letter

 9   or what?

10        Q.   You haven't paid any of the additional monies which

11   Mr. Kagan says is owed to him, correct?

12   A.   No.

13             MR. PERTEN:  Thank you, Your Honor.

14             THE COURT:  Okay.  Redirect?

15                       REDIRECT EXAMINATION

16   BY MR. CARNATHAN:

17        Q.   Mr. Lipetsker, as a starting place, I'd like to

18   return to your answer on page 55 because Mr. Perten didn't

19   complete the answer.  And so I think he left off at "It is

20   very expensive".  Are you with me?

21   A.   Uh-huh.

22        Q.   The rest of the answer was "In addition to

23   everything, there were liens placed on both houses which

24   prevented them from being sold.  In addition, at any moment,

25   the bank could request that the home mortgage was repaid, and

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

NICKOLAY LIPETSKER - Redirect

1   it could be a total catastrophe".  Have I read that correctly?

2   A.   Yes.

3        Q.   Also, during the cross, at one point, Mr. Perten

4   asked you about -- it's actually Exhibit 9 in evidence, but it

5   was about the fact that you couldn't remember it at your

6   deposition.  Do you remember that testimony?  Would you look

7   with me, please at Exhibit -- I'm sorry -- your deposition

8   transcript and page 34?

9   A.   34.  34.  Um-hum.

10        MR. CARNATHAN:  I guess as a predicate, I've asked

11   Mr. Hartzell to put Exhibit 8 up on the screen.

12   BY MR. CARNATHAN:

13        Q.   So Mr. Lipetsker, the question at the bottom part of

14   page 34, where it says "afternoon session" -- the question is

15   "Before we broke for lunch, we were looking at what was marked

16   as Exhibit number 6 of the Filippov deposition.  I'm wondering

17   if you are able to identify the attachment to that email as

18   the document that was reviewed at the presentation meeting

19   that we were speaking about before lunch?  Answer:  Yes".  Do

20   you remember that testimony?

21   A.   Yes.

22        MR. CARNATHAN:  If I may approach, Your Honor?  I

23   just want to show him Filippov Exhibit 6.

24        THE COURT:  Sure.  Yes.

25   BY MR. CARNATHAN:



NICKOLAY LIPETSKER - Redirect

1    Q.   Sir, I'll -- I'm just putting them up side.  And

2    would just suggest that Filippov Exhibit 6 --

3         THE COURT:  Well, hold on.  You're -- we're --

4    BY MR. CARNATHAN:

5    Q.   Filippov Exhibit 6 is the same as Plaintiff's

6    Exhibit 8 in evidence, except that Filippov Exhibit 6 has a

7    Filippov sticker on it.

8    A.  Is the same.

9         MR. PERTEN:  Your Honor, some -- this shows

10   (indiscernible).

11        MR. CARNATHAN:  That's the next page.  Exhibit 34.

12   You showed him this one.

13        MR. PERTEN:  Yeah.

14        MR. CARNATHAN:  You showed him the other one.

15        MR. PERTEN:  Okay.

16   BY MR. CARNATHAN:

17   Q.   Sir, Mr. Perten also read you a piece from your

18   affidavit dated June 5, 2015.  Do you remember that?  As of

19   June 5, 2015, had you ever seen that KDC contract that we

20   looked at --

21   A.   No.

22   Q.   -- this morning?  Did you have any concerns about

23   KDC serving as the general contractor on the project?

24   A.   No.

25   Q.   Why not?



NICKOLAY LIPETSKER - Redirect

1   A.   I -- I didn't know who's going to be the general

2   contractor.

3        Q.   Did you have any understanding that you were going

4   to pay anything to Mr. Kagan personally or through his

5   companies beyond what it said in the operating agreement?

6   A.   No.

7             MR. CARNATHAN:  I have nothing more for Mr.

8   Lipetsker.

9             THE COURT:  Okay.  All right.  You're finished?

10            MR. PERTEN:  Nothing further, Judge.

11            THE COURT:  All right.  Thank you, Mr. Lipetsker.

12            THE WITNESS:  Thank you very much.

13            THE COURT:  All right.

14            THE WITNESS:  Go on.

15            MR. CARNATHAN:  The plaintiffs call Joseph Cohen,

16  Your Honor.

17            THE CLERK:  Good morning.

18            MR. COHEN:  Morning.

19                 JAMES JOSEPH COHEN SWORN

20            THE WITNESS:  Yes, I do.

21            THE CLERK:  Please be seated.

22                    DIRECT EXAMINATION

23  BY MR. CARNATHAN:

24       Q.   Good morning, sir.

25  A.   Good morning.



JAMES JOSEPH COHEN - Direct

1    Q.    Would you state your name?

2   A.    James Joseph Cohen.

3    Q.    What do you do for work, sir?

4   A.    I am the chief technology officer for a company called

5   Sarc, Inc.

6    Q.    And do you also serve as the strategic business

7   manager for KDC?

8   A.    I used to.

9    Q.    When did you stop being the strategic business

10  manager for KDC?

11  A.    It's been a couple years.

12          THE COURT:  Yes?

13          MR. CARNATHAN:  May I approach, Your Honor?

14          THE COURT:  You may.  Thank you.

15                  (Pause)

16  BY MR. CARNATHAN:

17    Q.    Sir, I took your deposition May 8th, 2018.  Do you

18  remember that?

19  A.    Vaguely.

20    Q.    And I think Mr. Perten was there with you, right?

21  A.    That's correct.

22    Q.    And you understood you were under oath?

23  A.    That's right.

24    Q.    And if you'd look at page 40 with me?

25  A.    All right.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1    Q.    On May 8th, I asked you "Are you a strategic

2    business manager of any particular company or companies for

3    Mr. Kagan?" and you said "Just KDC".  Have I read that

4    correctly?

5    A.    Yes.

6    Q.    So at least as of May 8th, 2018, you told me you

7    were the strategic business manager for KDC, right?

8    A.    Yes.

9    Q.    Okay.  But you're not now?

10   A.    No.

11   Q.    Okay. And at one time you were a director of KDC,

12   right?

13   A.    I was an officer.  I'm not sure if I was director or

14   secretary, but yes.

15   Q.    Well, if you look back at page 39, on that day, on

16   May 8th, 2018, I said "For which company or companies were a

17   director?" and you said "Kagan Development KDC, Corp.," right?

18   A.    Yes.

19   Q.    And in fact, you were a director KDC Corp from 2000

20   or -- excuse me -- 2012 or 2013 through approximately 2017,

21   right?

22   A.    It sounds about right, but I'd have to check the

23   corporate records to be more precise.

24   Q.    Okay.  Well, that's what you told me on May 8th,

25   2018, right?


(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1    A.   If that's what I said, then that would be probably

2    accurate.  I haven't thought about it since then.

3         THE COURT:  Mr. Cohen, can you pull the microphone

4    closer to yourself and -- we record here, so if you hear it

5    amplify, you'll know we're getting it.  All right?

6         THE WITNESS:  All right.

7         THE COURT:  So make sure you speak into the

8    microphone.  You don't have to hover over it, but make sure

9    you're directed toward it.

10        THE WITNESS:  Of course.

11   BY MR. CARNATHAN:

12        Q.   And in your role as strategic business manager, you

13   were involved with talking with and helping manage litigation,

14   including the litigation that brings us here today, right?

15   A.   Yes.

16        Q.   And you were also involved in the dispute, if you

17   will, with Elena Londe, right?

18   A.   Yes.

19        Q.   And you were involved in other disputes on behalf of

20   Mr. Kagan as well, correct?

21   A.   That is correct.

22        Q.   You don't speak Russian, do you, sir?

23   A.   I do not.

24        MR. CARNATHAN:  Bill, could I have Exhibit 50 in

25   evidence?



JAMES JOSEPH COHEN - Direct

1          THE COURT:  Mary, could -- no, you got it?

2    BY MR. CARNATHAN:

3          Q.   Do you recognize that letter, Mr. Cohen?

4    A.    I do.

5          Q.   That's the May 7th, 2015, Alex Pyle letter to

6    Filippov, Lipetsker, and Kagan, right?

7    A.    That is correct.

8          Q.   And you edited that letter, right?

9    A.    I made edits to it, yes.

10         Q.   Okay.  And before that letter was sent, Mr. Kagan

11   asked you about his obligation to pay carrying costs, right?

12   A.    I -- I don't think -- I -- the -- your timing is

13   accurate, but I don't think one was a causal of the other.

14         Q.   Okay.  So on page 84 of your transcript.  At your

15   deposition, I asked you "When was it that he inquired to you

16   about his obligation to pay the carrying costs?" and you say

17   "prior to Alex Pyle letter.  I don't know exactly how far

18   prior".  Have I read that correctly?

19   A.    Yes, and that's consistent with my answer.

20         Q.   And at that time, you reviewed the operating

21   agreement, right?

22   A.    Yes.

23         Q.   And in fact, between that time -- or over time,

24   before your deposition, you had reviewed the operating

25   agreement some fifty to a hundred times, right?



JAMES JOSEPH COHEN - Direct

1    A.    More now.

2         Q.    And at the time that you reviewed the operating

3    agreement in response to Mr. Kagan's question about the

4    carrying costs, you gave him the opinion that he had no

5    obligation to pay carrying costs, but there was a consequence

6    if he did not, right?

7    A.    That was my reading of it, yes.

8         Q.    And you've discussed the other terms of the

9    operating agreement with Mr. Kagan many times, right?

10   A.    Yes.

11        Q.    Now, if I understood you correctly in the past, you

12   deny that Mr. Filippov is the managing member of Lyman-Cutler,

13   right?

14   A.    I -- I have no facts to support that he is.  And I -- my

15   perspective is that he was never installed as a managing

16   member, and he's not the managing member.  That's my

17   perspective.

18        Q.    All right.  So the short answer is yes, you deny

19   that he's the managing member, right?

20   A.    I don't agree that he is.  I don't have the -- the legal

21   basis to deny him something.

22        Q.    So you're not a lawyer?

23   A.    I am not.

24        Q.    No.  But when I showed you -- maybe I can --

25             MR. CARNATHAN:  Exhibit 15, please.



(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1              UNIDENTIFIED SPEAKER:  50?

2              MR. CARNATHAN:  15.

3    BY MR. CARNATHAN:

4         Q.   Do you recognize Exhibit 15 in evidence, Mr. Cohen?

5    A.   I do.

6         Q.   And that's the operating agreement that you've

7    reviewed now, I think you told me more than a hundred times a

8    little while ago.

9    A.   That's correct.

10        Q.   How many more than a hundred times?

11   A.   I have no way of knowing.

12        Q.   And so if we look at the -- I want to say second-to-

13   last page.  I think it's 13.  So I showed you that page at

14   your deposition.  Do you remember that?  And we looked at

15   where it says "Alex Filippov, managing manager"?

16   A.   Yes, it's hard -- it's a little blurry, but yes.

17        Q.   Okay.  But you disagree that that means that he's

18   the managing member, right?

19   A.   I -- I think a clear reading of it supports my contention

20   that he's not the managing member.

21        Q.   I'm sorry.  So he's -- so you do deny that he's the

22   managing member?  Did I mishear you?

23   A.   I think that -- yes, I deny.

24             MR. CARNATHAN:  Could I have Exhibit 53 in evidence,

25   please?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1   BY MR. CARNATHAN:

2        Q.   You recognize Exhibit 53 in evidence, Mr. Cohen?

3   And perhaps --

4           MR. CARNATHAN:  Bill --

5   BY MR. CARNATHAN:

6        Q.   Have you read the first page, sir?  Would you like

7   the next page?  I don't want to --

8   A.   Yeah.  I -- I don't recognize it, but the --

9           MR. CARNATHAN:  May I approach, Your Honor?  I'll

10  give him the paper.

11          THE COURT:  You may.

12  BY MR. CARNATHAN:

13       Q.   Mr. Cohen, (indiscernible)?

14  A.   Sure.

15       Q.   All right.  So Mr. Cohen, I've given you the paper

16  version.  Would you agree with me that you wrote that email

17  that we've marked as Plaintiff's Exhibit 53 and the letter

18  that's attached to it?

19  A.   Yes.

20       Q.   And you'll agree with me that in the very first

21  paragraph of the letter --

22          MR. CARNATHAN:  Bill, could I have the second page of

23  the exhibit and perhaps extend that.  Blow up the first

24  paragraph.  Thank you.

25  BY MR. CARNATHAN:



JAMES JOSEPH COHEN - Direct

1    Q.   You refer to Mr. Filippov as the managing partner,

2    right?

3    A.   Yes.

4    Q.   And in your deposition, you told me that you

5    deliberately chose that term to avoid the term "managing

6    member," right?

7    A.   Yes.  It's -- I recollect that.

8    Q.   And in fact, you're calling him the managing partner

9    three times in this letter, right?

10   A.   I'd have to review the letter.  I don't recall it.

11       MR. CARNATHAN:  Bill, can we go back to full?  Give

12   me the fourth paragraph.

13   BY MR. CARNATHAN:

14   Q.   And yet in the fourth paragraph down, you say "I

15   request that you share your books with us so that any

16   discrepancies may be identified and rectified.  It is the

17   responsibility of the managing member to maintain a full set

18   of books.  Further, as a member, we are entitled to inspect

19   these books as often and as diligently as we desire, provided

20   that these inspections are done during normal business hours".

21   Have I read that correctly?

22   A.   Yes.

23   Q.   So you seem to recognize Mr. Filippov as the

24   managing member in that paragraph, don't you, sir?

25   A.   I don't read it the way you just did.



JAMES JOSEPH COHEN - Direct

1          THE COURT:  I'm sorry.  I didn't hear you.  Say --

2          THE WITNESS:  I don't -- my -- I don't draw the same

3    conclusion he does from the way he read it.  I read -- I mean

4    something different than that.

5          THE COURT:  Listen.  That's fine.

6          MR. CARNATHAN:  Let's just say yes or no.

7          THE COURT:  I just wanted to hear what you said.

8    Okay.

9    BY MR. CARNATHAN:

10         Q.   And you didn't get any help from legal counsel to

11   draft that letter, right?  You did that one on your own?

12   A.   I believe I did that by myself, yes.

13         Q.   Right.  In fact, no one ever helps you with

14   drafting?

15   A.   That's incorrect.

16         Q.   Well, would you look at page 102 of your deposition,

17   sir?  So on page 102, while we were looking at this very

18   letter, I said "Did Mr. Pyle help you with the drafting of

19   this letter?" and your answer was "No one ever helps me with

20   drafting".  Have I read that correctly?

21   A.   Which line are you looking at?

22         Q.   I'm at line 20 through 22 on page 102, sir.  But

23   I've read that correctly, haven't I?

24   A.   Yes, you have.

25         Q.   Now, you are also the person -- the primary

Page 94

JAMES JOSEPH COHEN - Direct

1  person -- who put the KDC mechanic's lien together, right?

2  A.   Yes, with the help -- with the help of one other person.

3       Q.   And who was that person?

4  A.   Dan Gersh.

5       Q.   So you did the drafting, right?  You drafted the

6  lien?

7  A.   Yes.

8       Q.   And in fact, if we look at page 103 of your

9  deposition, at lines 13 and 14, on May 8th, 2018, I asked you

10 "Did anyone help you draft it?" and your answer was "no",

11 right?

12 A.   Correct.  That's consistent with my answer right now.

13      Q.   Well, I thought about thirty seconds ago, you told

14 me Dan Gersh helped you?

15 A.   No, you didn't ask me who helped me draft it.  I said

16 that --

17      Q.   So you're making a distinction between putting it

18 together and drafting it?

19 A.   Well, of course.  I -- the numbers didn't come from me.

20      Q.   Okay.  So you drafted it by yourself?

21 A.   Correct.

22      Q.   Okay.  And legal counsel had zero involvement in the

23 preparation of the mechanic's lien, right?

24 A.   That's correct.

25      Q.   Right.  So Mr. Perten's firm didn't give you any

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1     advice about the mechanic's lien?

2     A.    Not at all.

3         Q.    You didn't consult them?

4     A.    No, we did not.

5         Q.    They deserve no credit, no blame; they weren't

6     involved, right?

7             MR. PERTEN:  Your Honor, we're getting very

8     dangerously close to attorney-client privilege, what we may

9     have said or didn't say.

10            THE COURT:  Overruled.

11    BY MR. CARNATHAN:

12        Q.    So I think my last question was they deserve no

13    credit, no blame --

14    A.    I've already answered it.

15        Q.    -- they weren't involved?

16    A.    I've already answered that question twice now.

17        Q.    So what was the answer, sir?

18    A.    The same.  No one helped me draft it.

19        Q.    And then, just to be clear, no help at all from Mr.

20    Perten's firm?

21    A.    You want me to it answer again, again?

22        Q.    I do.  Yes, please.

23            THE COURT:  Mr. Cohen, answer the question.

24            THE WITNESS:  Of course.

25    A.    No one has helped me draft this.



JAMES JOSEPH COHEN - Direct

1   BY MR. CARNATHAN:

2       Q.   Okay.  No other law firm, right?  Any law firm in

3   the world.  No other law firm helped you?

4   A.   No one helped me draft it.

5           THE COURT:  All right.  Let's be clear about

6   something.  This is Mr. Carnathan's opportunity to ask you

7   questions.  He's entitled to have you answer those questions.

8   I'm sitting here.  I'm the trier of fact.  I listened to you

9   three times.  You didn't answer his question.  All right, you

10  can look quizzically at me, but you didn't answer his

11  question.  Listen carefully.  You're a bright fellow.  And

12  answer his questions.  Otherwise, we'll be here a very long

13  time.

14          MR. CARNATHAN:  Thank you, Your Honor.

15  BY MR. CARNATHAN:

16      Q.   Now, you did talk to Mr. Kagan in connection with

17  preparing the mechanic's lien; isn't that right, sir?

18  A.   Yes.

19      Q.   And in fact, you discussed with Mr. Kagan his

20  obligation under Section 5.2 of the operating agreement in

21  connection with preparing the mechanic's lien, right, sir?

22  A.   I'd have to re -- refer back to operating agreement, see

23  what 5.2 says.

24      Q.   Well, let's begin by referring to page 88 of your

25  deposition transcript, please.  And I'm sorry, it begins on

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1  the top of page 87 to make it make sense.  And so I asked you

2  at the bottom of page, at line 23, "Setting aside discussions

3  with counsel and focusing on Section 5.2 -- focusing on 5.2

4  where it describes Mr. Kagan's duty and obligation to

5  construct two homes.  Did you ever discuss that provision with

6  Mr. Kagan?"  Do I understand your question -- I'm sorry; your

7  answer.  "Do I understand your question, for clarification,

8  that this is not involving counsel?"  And then I [sic] say

9  "Yes, we are setting aside privileged conversations involving

10  counsel and trying to focus on conversations that you had with

11  Mr. Kagan outside of the presence of counsel".  And then you

12  answer "Yes, this was involved with my discussions with Kagan

13  about the mechanic's lien, this particular paragraph".  I've

14  read that correctly, right, sir?

15  A.   Yes.

16      Q.   You also discussed with Mr. Kagan, in connection

17  with preparing the mechanic's lien, what the term

18  "substantially completed" means, right, sir?

19  A.   Yes.

20      Q.   And when you asked Mr. Kagan what "substantially

21  complete" means, he told you that it means what it says:

22  substantially complete, right?

23  A.   Yes.

24      Q.   And you explained to him "That's not good enough;

25  "if you want to make an argument for substantial completion,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1   you have to give me something to anchor it to".  That's what

2   you said in response, right?

3   A.   Well, yes.

4        Q.   And so you did that because you determined that, in

5   order to do a final invoice for the homes, the homes had to be

6   substantially complete, right?

7   A.   Yes.

8        Q.   And so it's you who told Mr. Kagan what

9   substantially complete means?

10  A.   I did research and presented him with the research and

11  then told him what I thought it meant.

12       Q.   Right.  You actually did legal research in

13  connection with preparing the mechanic's lien, right?

14  A.   That's correct.

15       Q.   And you apparently have access to Westlaw?

16  A.   I do.

17       Q.   So based on your research, did you know that you

18  needed a written contract in order to record a mechanic's

19  lien?

20  A.   Yes, it's one of the components.

21       Q.   And did you know that you had to record it within

22  ninety days after the last person provides labor and materials

23  on the project?

24  A.   Yes.

25       Q.   Did your research include reading Mr. Perten's

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1   article on mechanic liens?

2   A.   No.   I didn't know he wrote one.

3        Q.   He was representing you by that time, right?

4   A.   Yes.

5        Q.   Did you and Mr. Kagan decide to send some painters

6   out to the property on June 22nd, 2015?

7   A.   Did I and Mr. Kagan?

8        Q.   Right.

9   A.   I don't recall.

10       Q.   Did you tell him to do that because you knew you

11  needed to have people on site within ninety days of recording

12  the mechanic's lien?

13  A.   I don't recall.

14       Q.   So you might have?

15  A.   I don't recall.   I've had many conversations with Mr.

16  Kagan, and I don't recall whether or not that conversation

17  ever took place.

18       Q.   You agree with me that there were painters on site

19  at the properties on June 2nd, 2015, that Mr. Kagan sent

20  there, right?

21  A.   I was not on the property and saw painters.

22       Q.   Well, do you have any other basis to know either

23  way?

24  A.   Only if I have records to pro -- that would indicate

25  that.   And I believe there was an invoice, but I don't know

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1    the dates off the top of my head.

2                    (Pause)

3           MR. CARNATHAN:  May I approach, Your Honor?

4           THE COURT:  Yes, you may.

5    BY MR. CARNATHAN:

6      Q.   Sir, I'd like to show you an email --

7           THE COURT:  You just can't talk while you walk over

8    there because it's not going to be recorded.

9    BY MR. CARNATHAN:

10     Q.   Mr. Cohen, I'm showing you an email dated June 26th,

11   2015, from Mr. Filippov.  Have you seen that email before,

12   sir?  I'm interested in this paragraph.

13   A.   I don't recall right now whether I've seen this or not.

14     Q.   Does that refresh your recollection that there were

15   painters on site June 22nd, 2015, Mr. Kagan sent there?

16   A.   No, tha -- that would not refresh my memory.  It would

17   have to be invoice or something from Vadim.

18     Q.   Actually -- sorry.

19           MR. CARNATHAN:  May I approach again?

20           THE COURT:  You may.

21   BY MR. CARNATHAN:

22     Q.   If we look at this again, sir, you'll see Mr.

23   Filippov sent you an email on June 26th, 2015, and says "This

24   Monday, June 22nd, 2015, I visited both 55 Lyman and 88 Cutler

25   properties.  I found two workers hired by Kagan Development at



Page 101

JAMES JOSEPH COHEN - Direct

1  88 Cutler working on redoing some caulking and repainting.

2  Please provide exact status of completion for both houses and

3  explain why there are works to be done when your houses are

4  ready for sale".  Now, what I'm interested in is the response.

5  This comes from the kagandevelopment@gmail.com account on that

6  same day, June 26th, about half an hour later, right?

7  A.    Um-hum.

8      Q.    And the phrase "because the parties are in

9  litigation, we would prefer that all communications be

10  directed to counsel".  Did you write that, sir?

11  A.    I have no recollection of that.

12      Q.    You would agree me that's not Mr. Kagan's kind of

13  phrasing?

14  A.    Doesn't appear to be.

15      Q.    Were you writing emails for Mr. Kagan during that

16  time period?

17  A.    I've never written emails for Kagan that I am aware of.

18  I may have advised him about what to say, but I've never

19  written emails for him.

20      Q.    You've never written an email for him?

21  A.    When you mean draft content, like a letter, yes, but I've

22  never written mails for him.

23          MR. CARNATHAN:  Could I have Exhibit 63 in evidence,

24  please?

25  BY MR. CARNATHAN:



JAMES JOSEPH COHEN - Direct

1      Q.   Mr. Cohen, I'm showing you now Exhibit 63 in

2   evidence, which we actually marked as Exhibit 27 at your

3   deposition.  Do you see that?

4   A.   Yes.

5      Q.   This is an email dated June 4th, 2015, that purports

6   to come from Mr. Kagan's kagandevelopment@gmail.com account to

7   Mr. Filippov, Mr. Pyle, myself, and you on June 4th, 2015.  Do

8   you see that?

9   A.   Yes.

10      Q.   And it's responding to an email, the subject of

11   which is "forward Lyman-Cutler accountants" -- down lower; do

12   you see that?  Down towards the bottom; it's kind of in bold.

13   A.   Yes.

14      Q.   And the response, however, has the subject that says

15   "forward proposed response to be sent via Vadim's non-Kagan

16   Development account."  Do you see that?

17   A.   No.

18      Q.   Very top line where it says "subject".

19   A.   Yes.  I see it now.

20      Q.   Okay.  So I showed you that at your deposition.  I'm

21   now on pages 108 and 109.

22   A.   Of my deposition?

23      Q.   Yes, please.  And at the bottom of page 108, line

24   23, I say "I'm focused on the email on the first page from

25   Vadim Kagan to Alex Filippov, Alex Pyle, me, and you, dated

JAMES JOSEPH COHEN - Direct

1    June 4th, 2015, at 3:27 p.m.  Do you see that?  I do."  And

2    that I ask "Did you actually write that for Mr. Kagan?"

3    Answer:  "I did.  Can you tell by the style?"  That was your

4    testimony back in 2018, right?

5    A.    Yes.

6         Q.    So did you write that email for Mr. Kagan?

7    A.    I did not write the email.  What I did is I composed the

8    information, sent it to Vadim.  I never wrote an email for

9    Vadim.

10        Q.    So you're now saying you didn't write this email?

11   A.    To be clear, drafting, language, and stuff is something

12   that I have done repeatedly, but I've never sent an email

13   purporting to be from Vadim to anybody.  And that's -- and so

14   you have to -- if you're saying if I've ever written an email,

15   I've certainly drafted language, but I've never sent an email.

16        Q.    So if I'm following you right, sir, you admit that

17   you wrote the words on the email or you're just saying you

18   didn't send it?

19   A.    If it came from Vadim, it was sent by Vadim, not by me.

20        Q.    Now, in the first sentence of this paragraph, you

21   say "Kagan Development Corp. is preparing a detailed invoice

22   for submission."  Do you see that?

23   A.    Yes.

24        Q.    When you wrote stuff for Vadim, did you write true

25   things?

JAMES JOSEPH COHEN - Direct

1   A.   Yes, of course.

2        Q.   So that statement was true when made on June 4th,

3   2015?

4   A.   If that's what it says, then that's what it is.  It --

5        MR. CARNATHAN:  Could we go now to Exhibit 67 in

6   evidence, please?

7   BY MR. CARNATHAN:

8        Q.   Is it easier for you to look at the paper, sir,

9   or -- do you recognize Exhibit 67?

10  A.   Sort of, yes.

11       MR. CARNATHAN:  Mr. Hartzell, could you give him the

12  second page?

13  BY MR. CARNATHAN:

14       Q.   This is another document that you drafted, right,

15  sir?

16       MR. CARNATHAN:  Give him the next page, Mr. Hartzell.

17  A.   Can I have it in print?  It's very hard for me to see.

18  BY MR. CARNATHAN:

19       Q.   Yeah.

20       MR. CARNATHAN:  May I approach, Your Honor?

21       THE COURT:  Yes, please do.

22                      (Pause)

23  BY MR. CARNATHAN:

24       Q.   So would you agree with me, sir, that you signed

25  this letter, right, J. Joseph Cohen, strategic business



JAMES JOSEPH COHEN - Direct

1   manager.

2   A.   Yes.

3        Q.   So you wrote this letter, right?

4   A.   Yes.

5        Q.   Did you write this one without any help, too?

6   A.   I believe I did.

7        Q.   And this was sent June 25th, 2015, right?

8   A.   I believe it was dated 6/24.  The cover sheet says 6/25,

9   so I'm not sure.

10       Q.   Well, the letter certainly says 6/24, but the email

11  conveying it is dated 6/25, right?

12  A.   Yes.

13       Q.   Either way, this is after you recorded the

14  mechanic's lien, right?

15  A.   I believe so.

16       Q.   I'll give you a chance to look at that in a moment.

17  And if we look to the invoice toward the back -- this invoice,

18  in the upper right corner, purports to be dated June 1, 2015,

19  right?

20  A.   Yes.

21       Q.   But as of June 4th, you were still preparing a

22  detailed invoice, right?

23  A.   I'm sorry.  I can't -- it's very blurry.  I can't read

24  it, so I can't really know what's what.

25       Q.   Well, this is the only invoice KDC ever sent, right?

JAMES JOSEPH COHEN - Direct

1   A.   I'm unsure.  I know this is the one that was included

2   with this letter, but I'm not sure if this the only invoice

3   that's ever been sent.

4        Q.   Okay.  It was never sent before June 25th, 2015, was

5   it, sir?

6   A.   No, if it says it was sent June 4th, then that's when it

7   was sent.

8        Q.   Okay.

9             MR. CARNATHAN:  Could we --

10  A.   Hold on.

11            MR. CARNATHAN:  -- have the page that says "balance

12  of workout proposal"?  Yeah.  Balance workout proposal.

13  BY MR. CARNATHAN:

14       Q.   Sir, do you recognize the balance workout proposal?

15  A.   Yes, I do.

16       Q.   All right.  And you drafted that, too, right?

17  A.   I did.

18       Q.   And so I guess three lines below the heading, you

19  say "Lyman-Cutler, LLC, will pay KDC the sum of $1 million

20  within ten days of its receipt of this proposal".  Have I read

21  that correctly?

22  A.   Yes.

23       Q.   Do you know how much money Lyman-Cutler, LLC, had in

24  late June 2015?

25  A.   I had no idea.



(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 107

JAMES JOSEPH COHEN - Direct

1  Q.   Did you know when you wrote this?

2  A.   No.

3  Q.   No?  You didn't know that it had about $6,000 in the

4  bank?

5  A.   No.

6  Q.   No?  So this wasn't directed at Alex Filippov to put

7  pressure on him?

8  A.   No.  It was addressed to all three of the members.

9  Q.   Including Mr. Kagan, right?

10 A.   That's correct.

11 Q.   Right.  And Kagan's the one who's demanding the

12 money, right?

13 A.   No, KDC was.

14 Q.   So you were making a distinction.  It's KDC's that's

15 demanding the money, not Kagan?

16 A.   That's correct.

17 Q.   Now, sir, you're also the guy who drafted the KDC

18 contract that Mr. Kagan relies upon for the mechanic's lien,

19 right?

20 A.   I did the template, and I did draft this contract, yes.

21     MR. CARNATHAN:  Can I have Exhibit 37 in evidence,

22 please?

23 BY MR. CARNATHAN:

24 Q.   Now -- I'm sorry.  This is the contract that you

25 drafted based on a template, I think you told me, right?

JAMES JOSEPH COHEN - Direct

1   A.   Yes.

2        Q.   And you've actually disposed of the contract that

3   you drafted this on, right, sir?

4   A.   Disposed of it?

5        Q.   Yes.   Yep.   You disposed of the contract that you

6   drafted this on, right?

7   A.   I'm uncertain what you mean.

8        Q.   Well, in fact, at your deposition, you blurted that

9   out in response to a question that I didn't even ask it yet,

10  right?

11  A.   I don't know.   Why don't you refresh my memory?

12       Q.   I'd be delighted.   Would you look at page 10,

13  please, in your deposition?   I said "Did you review any other

14  contracts" --

15           THE COURT:   What line?

16           MR. CARNATHAN:   Excuse me.   I'm on line 14, Your

17  Honor.

18  BY MR. CARNATHAN:

19       Q.   So I asked you "Did you review any other

20  construction contracts in prep to testify here today?"   You

21  said "no, I didn't have them available."   And I said --

22  question: "Why didn't you have them available?"   And you said

23  "Because these documents are old.   The computer that they were

24  originally on, I no longer have.   This one I have is easy

25  because it was attached to an email, so it was easy for me to

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1  find".

2  A.   That's accurate.

3      Q.   So you actually got rid of the contract on which you

4  drafted -- excuse me -- the computer on which you drafted this

5  contract, right?

6  A.   I -- yes.  And many other things were on that computer as

7  well.

8      Q.   And just for completeness, I'm sorry, but a couple

9  lines down on page 11, I ask you that, and you tell me.  So

10 you're telling me is that the computer that you drafted the

11 construction contract from Lyman-Cutler is no longer in your

12 possession?  Is that what you were saying when you say "a long

13 time, yes", right?

14 A.   Oh, I see.  Next page.  Yes.

15     Q.   Now, you'll agree with me that you reviewed the

16 operating agreement -- the Lyman-Cutler operating agreement --

17 in connection with drafting this contract, right?

18 A.   In the terms that were making sure it was appropriate.

19     Q.   Right.  In fact, you specifically reviewed the

20 provision that obligates Mr. Kagan to build the homes, right?

21 A.   Yes.

22     Q.   And so you specifically understood, when you drafted

23 this contract, that the operating agreement says that Mr.

24 Kagan's compensation for building the two homes is a fifty

25 percent interest in the profits of the project, right?



JAMES JOSEPH COHEN - Direct

1    A.   Yes.

2         Q.   So you specifically drafted around that provision

3    when you drafted this contract, right?

4    A.   I incorporated it to make sure it was consistent.

5         Q.   In fact, because you had reviewed that provision,

6    you specifically put in paragraph 7.3.2.1 on page 7 -- I'm

7    sorry; that's 8 -- page 8.  And so what you did, to take care

8    of that provision, was you put in that Vadim Kagan's personal

9    time would be at no cost, right?

10   A.   Yes.

11        Q.   Now, you also customized the substantial completion

12   portion of this contract, right?

13   A.   Yes.

14        Q.   So by now, you had reviewed the provision of the

15   contract that dealt with -- excuse me -- the operating

16   agreement that mentioned substantial completion?

17   A.   By now, I reviewed the whole document and tried to cull

18   those things that were relevant.

19        Q.   And in fact, you put, in Exhibit I to Exhibit 37 --

20   you put in a definition of substantial completion that says it

21   "shall be drafted in" -- excuse me -- "defined as in excess of

22   ninety-five percent and further be showable to prospective

23   purchasers in a marketable condition by the State".  That was

24   your definition of substantial completion, right?

25   A.   Yes.  It's one that I got from the Architects Association

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1    of America (ph.) that they use.

2         Q.   From the AIA?

3    A.   That may be it, yes.

4         Q.   Sorry.  That one surprised me a little bit.  I

5    actually asked you about the AIA at your deposition.  Do you

6    remember that?

7    A.   No, I don't.

8         Q.   Would you look at page 91?  And so I asked you on 19

9    of page 91 "Do you" -- I misspoke.  I meant to say "did," but

10   "Do you ever check the AIA definition of substantial

11   completion?"  Then you told me "I believe I did.  I think that

12   the reference was that it should be something that is locked

13   down in each particular project.  In cases, it should be when

14   it is dried in.  In other cases, they don't have a specific

15   singular definition of it, as far as I can recall sitting

16   before you today".  I then asked you "Would you agree with me

17   that the AIA is an authoritative source for definitions in the

18   construction industry?"  Mr. Perten objected.  And you said

19   "No".  And I said "What's your basis for disagreeing with me?"

20   and you said "Because they are not a licensing body or

21   statutorily comprised body.  They are self-serving".  I read

22   that correctly?

23   A.   Um-hum.  Yes.

24        Q.   And yet you now say that you took their definition

25   and put it into the contract?



JAMES JOSEPH COHEN - Direct

1   A.   I -- I use -- as you see in here, I did look them up, and

2   I obviously used pieces of it.  But as, you know, you

3   refreshed my memory, it is what it is.

4        Q.   Now, you also put in a provision, Section 5.5 of the

5   supposed KDC contract, creating a penalty of $500 a day if KDC

6   failed to achieve substantial completion on time, right?

7   A.   Yes.

8             MR. CARNATHAN:  Can you have that on one screen, Mr.

9   Hartzell?

10  BY MR. CARNATHAN:

11       Q.   But you also tucked into that provision that KDC

12  would only be subject to that if they failed to complete the

13  work due to negligence, neglect, or mismanagement.  Do you see

14  that?

15  A.   Yes.

16       Q.   And you had determined, based on your research, that

17  those were terms of art in the industry, right?

18  A.   As to this provision, I don't remember.

19       Q.   But you denied that there was any recognized

20  definition of substantial completion in the industry, right?

21  A.   Yes.

22       Q.   Right.  And your legal research got thrown out on

23  the old computer, too, right?

24  A.   I don't typically save the legal research.

25       Q.   Okay.  Well, on the -- toward the bottom of page 33,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1    that line 19 --

2    A.   Of my deposition?

3         Q.   Yes, thank you.  As you were telling me about your

4    legal research on page 133, I asked you --

5    A.   133 or 33?

6              THE COURT:  Yeah.  Did --

7              MR. CARNATHAN:  Oh, excuse me.  133.

8              THE COURT:  133.

9    A.   Sorry.

10   BY MR. CARNATHAN:

11        Q.   I asked you, on line 19 -- I can read the whole page

12   if it's useful, but if you look up above, we're talking about

13   the legal research.  "Do you still have those materials?"

14   Answer:  "They would be on the old computer.  It's possible I

15   have some notes somewhere.  I wouldn't even know where to

16   begin.  It's too easy to recreate."  Have I read that

17   correctly?

18   A.   Yes.

19             MR. CARNATHAN:  Could I have Exhibit 65 for

20   identification?

21             MR. PERTEN:  We have an issue with this exhibit that

22   we need to address.

23             THE COURT:  All right.

24             MR. PERTEN:  I have no problem with the first three

25   pages of this exhibit.  But Mr. Carnathan has annexed



JAMES JOSEPH COHEN - Direct

1   something, some sort of metadata, to it which there is no

2   expert.  There's no nothing.  We don't think -- the first

3   three pages, no objection -- the letter and the coversheet.

4   But when you start getting into metadata, that's a whole

5   different animal, so we -- I think that's something we're

6   going to need to address.

7         MR. CARNATHAN:  I'm going to ask Mr. Cohen about it.

8   It's his document.  I also put this one on the pre-trial.  We

9   have a Rule 902 affidavit from Mr. Hartzell authenticating the

10  metadata printout.  And I can hand that up if Your Honor would

11  like to see it now or --

12        THE COURT:  Why don't you -- I'll -- lay some

13  foundation for this, and we'll just see where it goes.

14  BY MR. CARNATHAN:

15     Q.   So sir, during your deposition on May 8th, 2018, as

16  we were talking about the KDC contract, I demanded the native

17  file for that, right?  Remember that?

18  A.   Yes.

19     Q.   And then two weeks later, on May 22nd, 2018, you

20  sent the email that we have marked as Plaintiff's Exhibit 65

21  for identification, I guess, to yourself, right?  You sent

22  this from your polysavant@hotmail.com (ph.) address to

23  jcohen@kagandevelopment.com, right?

24  A.   Yes.

25     Q.   And the subject and attachment are "construction

JAMES JOSEPH COHEN - Direct

1   management, Lyman-Cutler executable", right?

2   A.   Yes.

3       Q.   And attached to that, following -- well, attached to

4   that was a Word file that purported to be the contract, the

5   native file of the contract, right?

6   A.   I think you're confusing something.  So I'll answer yes,

7   but you may want to have some explanation.

8       Q.   No, yes, is fine with me.  Thank you.  So the

9   next -- what? -- three pages are -- however many pages -- how

10  many do we have?  Next several pages are the Word document or

11  a printout of the Word document?

12  A.   Yes.

13      Q.   Okay.  And when we get to the last page of this

14  exhibit --

15  A.   Yes.

16      Q.   You recognize that as a printout of the properties

17  for that file that you forwarded to yourself that day?

18  A.   Yes.

19      Q.   It even says Sarc is the company, right?

20          MR. PERTEN:  Your Honor --

21  A.   Yes.

22          MR. CARNATHAN:  We would offer Plaintiff's Exhibit 65

23  for identification.

24          MR. PERTEN:  Your Honor, I don't believe -- for the

25  metadata, I don't believe that's admissible, and I also point

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1   out to the Court, there is no expert who has been designated

2   who can interpret metadata, who can tell us what it means, so

3   there's no foundation to allow this, and this is an attempt to

4   get around the expert disclosure.  There are no experts who

5   are going to testify about metadata.

6           THE COURT:  All right.  Well, hold on.  Tell me about

7   this.  What is this?

8           MR. CARNATHAN:  This is -- Your Honor may be

9   familiar, when you go into a Word document and you hit the

10  properties tab and you get --

11          THE COURT:  No, I know that.  So what we have here --

12  where does the objection begin on this document?  I could see

13  a copy of this one in paper?

14          MR. CARNATHAN:  Okay.

15          THE COURT:  Do I have it here?

16          MR. CARNATHAN:  You do, Your Honor.

17          THE COURT:  I've been so blessed not to be pulling

18  things off.  Where is it?  So it's --

19          MR. CARNATHAN:  It's Exhibit 65 for identification,

20  Your Honor.

21          THE COURT:  Proposed.

22          MR. CARNATHAN:  It should be in the second --

23          THE COURT:  Yeah.  Okay.

24          MR. CARNATHAN:  -- binder.

25          THE COURT:  65.  Okay.  So I have it in front of me

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1    in paper, and where does the objection begin?  You said you've

2    no objection to --

3             MR. PERTEN:  The metadata only.  I have no objection

4    to --

5             THE COURT:  But you need to tell me what that is

6    so --

7             MR. PERTEN:  The very last page.

8             THE COURT:  The -- just the very last page.

9             MR. PERTEN:  Just the very last page.  I have no

10   objection to the rest of the document, because that's what was

11   sent.

12            MR. CARNATHAN:  Well, Your Honor, a couple of things.

13   I mean, the Federal Rule specifically deal with this, which is

14   why we've got a Federal Rule of Evidence --

15            THE COURT:  Yeah.  Okay.

16            MR. CARNATHAN:  -- 902.

17            THE COURT:  Go ahead.

18            MR. CARNATHAN:  Yeah.  The 902 affidavit is the

19   proper method to put electronic evidence into evidence.  And

20   we're really over-glorifying this a bit.  I mean, this is a

21   printout of the properties page from the document that Mr.

22   Cohen sent that he just identified as the properties page from

23   the document he just sent.  I mean, I don't understand why you

24   need an expert to confirm that that is a printout of --

25   basically, I don't want to mess up the term, but I think it's

JAMES JOSEPH COHEN - Direct

1    a screenshot of the properties page that we printed out.  This

2    is not that complicated, Your Honor.

3              THE COURT:  I see.  So your objection is that it's

4    beyond the ability of the trier of fact to understand without

5    the benefit of expert testimony?

6              MR. PERTEN:  There's two aspects, Your Honor.  As Mr.

7    Carnathan just said, they went and hit a properties button and

8    printed out a screenshot of whatever that properties thing

9    says.  Rule 902 -- and we have a brief memo for the Court if

10   you'd like it -- does provide a vehicle for getting things in,

11   but the 902 certification that Mr. Carnathan sent to us just

12   two days before trial does not comply with the requirements of

13   Rule 902.  So again, the fact that his law firm hit a

14   properties button and made a screenshot and now he wants to

15   introduce this into evidence and ask questions or draw

16   conclusions as to what the properties screen means, what it

17   says, how to interpret it, this is the metadata concern.  And

18   again, Your Honor, we do have a memorandum if the Court would

19   like it on that issue that the 902 certification which Mr.

20   Carnathan is proffered simply does not comply with what the

21   Court -- what the case law and what the rules require.

22             MR. CARNATHAN:  902(13) just requires that a record

23   generated by an electronic process or system that produces an

24   accurate result, as shown by the certification of a qualified

25   person, complies with the certification requirements.



Page 119

JAMES JOSEPH COHEN - Direct

1          THE COURT:  I see.

2          MR. PERTEN:  And --

3          MR. CARNATHAN:  Sorry.  Got in front of you.

4          MR. PERTEN:  We don't have a qualified person.

5    That's the problem.

6          THE COURT:  Well, what if --

7          MR. PERTEN:  That would be an expert.

8          THE COURT:  What about that qualified person?

9          MR. CARNATHAN:  Well, I mean, it -- an expert witness

10   to call up the --

11         THE COURT:  Well, hold on.  I --

12         MR. CARNATHAN:  -- properties tab up and hit print.

13   I mean, this is --

14         MR. PERTEN:  No.

15         MR. CARNATHAN:  We're providing to the Court an

16   accurate printout of the properties page of a document that

17   they gave us.  This is --

18         THE COURT:  All right.  And so your argument is that

19   the rule requires certification by a qualified person.

20   That -- and that certification must, itself, comply with

21   902(11) and 902(12).

22         MR. CARNATHAN:  Well, that's correct, Your Honor.  I

23   mean, I don't want to over-glorify the screenshot.  I mean,

24   this is pretty simple stuff, but Mr. Hartzell's been a

25   paralegal for a long time.  He's got twenty years of

JAMES JOSEPH COHEN - Direct

1   experience.  He's been dealing with electronic data, pretty

2   complex stuff.

3            THE COURT:  Well, I'm not sure if it should have, you

4   know -- that it should -- I don't recall this being in the

5   pre-trial memorandum, so I wasn't -- so I'm not entirely

6   prepared for this.

7            MR. PERTEN:  Your Honor --

8            THE COURT:  I didn't know it was coming up.

9            MR. PERTEN:  Nor did we until two days before trial.

10  But can I hand up to the Court --

11           THE COURT:  Yeah.  Of course.

12           MR. PERTEN:  -- some law on that, please?

13           THE COURT:  Right.  That's fine.

14           MR. PERTEN:  It's property from just (indiscernible).

15           THE COURT:  Hand it up, and --

16           MR. CARNATHAN:  Well, I mean, it was in the drafts of

17  our pre-trial from a week or two before trial.  We gave them

18  the 902 affidavit a couple of days before -- well, yeah.  Four

19  days before trial.  We gave it to them the Thursday before,

20  but we raised the issue long ago.  And it's --

21           THE COURT:  Do I have the certification?  Has that

22  been --

23           MR. CARNATHAN:  I was going to offer to hand that up

24  now, Your Honor.

25           THE COURT:  All right.  Well, hand it up.



JAMES JOSEPH COHEN - Direct

1          MR. CARNATHAN:  And could we mark this Exhibit

2     (indiscernible)?

3          THE COURT:  I'm not sure that's the right thing to do

4     yet.  I mean, what is it?  This is a -- we don't usually mark

5     things in the nature of -- is it a memorandum.

6          MR. CARNATHAN:  I mean, if we were going to get a

7     motion to strike Mr. Hartzell's certification, shouldn't I

8     have gotten it before this moment?  I -- they've had it for

9     quite some time.

10         THE COURT:  When did you actually provide this

11    certification?

12         MR. CARNATHAN:  I gave it to them the Thursday before

13    trial started.  So that was last week, a week ago today, and

14    I'm being handed this now?

15         THE COURT:  All right.  I'm going to have to take

16    this and deal with it.  It's ten of 1.  Do you need to --

17    how -- I absolutely need to take a few minutes and look at

18    this now.  But where are you with this witness?

19         MR. CARNATHAN:  I have aways to go.  I mean, I --

20         THE COURT:  So he's coming back tomorrow anyway.

21         MR. CARNATHAN:  Yep.

22         THE COURT:  Okay.

23         MR. CARNATHAN:  What -- perhaps we could respond to

24    the motion to strike?

25         THE COURT:  You mean file something?

JAMES JOSEPH COHEN - Direct

1         MR. CARNATHAN:  Yeah, something.  I --

2         THE COURT:  Or you want to --

3         MR. CARNATHAN:  Yeah, I'm going -- yeah.  Yeah.

4         THE COURT:  You mean between now and 1 o'clock?  Or

5    do you mean overnight?

6         MR. CARNATHAN:  Oh, no, I --

7         THE COURT:  You mean overnight?

8         MR. CARNATHAN:  Yeah, I mean, I actually respectfully

9    suggest this is a pretty straightforward --

10         THE COURT:  It might be.

11         MR. CARNATHAN:  -- issue under the rules.

12         THE COURT:  It might be, but it doesn't -- I

13    understand what you're saying, that this is much ado about

14    nothing.  I -- obviously, that's not the way Mr. Perten and

15    his team see it.  They've obviously spent some time preparing

16    for this moment and, in fact, have handed me a multipage

17    memorandum:  five pages with citations and authorities.

18    And --

19         MR. CARNATHAN:  Why don't I ask -- how about if I

20    ask --

21         THE COURT:  It must be -- of course, it's important

22    enough for them to have gone through that trouble.  It's a --

23    is there anything else you can do with this witness, I guess

24    is what I'm saying, so that I have an opportunity to look this

25    over?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1              MR. CARNATHAN:  Well, let --

2                        RESUMED DIRECT EXAMINATION

3    BY MR. CARNATHAN:

4         Q.   Mr. Cohen, would you admit that you last printed

5    this contract on June 17th, 2015, at 9:45 a.m.?

6              MR. PERTEN:  He's being asked to interpret the

7    metadata.

8              THE COURT:  No, he's being asked a question.

9    That's -- if that's an objection, that's overruled.  He can

10   answer it.

11   A.   No.

12   BY MR. CARNATHAN:

13        Q.   You don't admit that?

14   A.   No.

15             MR. CARNATHAN:  Well, I think we'd like the metadata

16   to -- that so-called metadata -- the screenshot, if you

17   will -- to come in.

18             THE COURT:  Okay.  All right.  What else do you have

19   with this witness that you can accomplish?

20   BY MR. CARNATHAN:

21        Q.   So Mr. Cohen, would you agree with me that you and

22   Mr. Kagan put this contract together in June 2015 for the

23   specific purpose of supporting that mechanic's lien you filed

24   on June 22nd?

25   A.   No.

JAMES JOSEPH COHEN - Direct

1      Q.   In fact, you specifically, together, cooked up this

2   KDC contract so you could double the demand that you had made

3   back in May and put pressure on Mr. Filippov and Mr. Lipetsker

4   to settle; isn't that right, sir?

5   A.   No.

6      Q.   Mr. Cohen, your name used to be Jamie Edelkind,

7   right?

8   A.   Yes.

9      Q.   And you changed your name in 2013, right?

10  A.   Yes.

11     Q.   And why did you do that, sir?

12  A.   It was a personal choice.

13     Q.   Was it a personal choice because you've got multiple

14  criminal convictions, sir?

15          MR. PERTEN:  Objection, Your Honor.

16          THE COURT:  Basis?

17          MR. PERTEN:  Your Honor, he is trying to go into an

18  ancient history, and Rule 609(b) specifically precludes that.

19  Mr. Cohen did have some criminal convictions more than ten

20  years ago, has led a stellar life since then.  We've argued

21  this before.  We talked about it, and Rule 609(b) specifically

22  says, if it's greater than ten years, probative value must be

23  greater and the proponent gives an adverse party reasonable

24  notice of intent.  There's been no reason -- there's been no

25  notice of intent to go down that path.  He testified at his

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1    deposition that he had a conviction, that he got out of

2    incarceration more than ten years ago.  And so at this point,

3    this is old news that has nothing to do with Mr. Cohen's

4    involvement in this case and is directly prohibited under Rule

5    609(b), as well as 404(b)(1), which talks about character.

6            MR. CARNATHAN:  Well, I've got several answers for

7    that, Your Honor.

8            THE COURT:  All right.  Go ahead.

9            MR. CARNATHAN:  First of all, it's not true that more

10   than ten years have passed since he was released from

11   incarceration.  He testified at his deposition that he was

12   released in 2009.

13           MR. PERTEN:  And there was an errata sheet correction

14   that was submitted to you.

15           MR. CARNATHAN:  I could have overlooked that, I

16   suppose, but it's also true that I -- as I read one of these

17   convictions, it looks to me like he didn't get out until 2011.

18   In addition, this evidence -- and it's going to be quite a lot

19   of it -- is offered not only under 609 to impeach his

20   character for truthfulness, but it's also true that under

21   404(b), I'm entitled to offer this evidence for a variety of

22   other reasons.  Let me find my page.  The only thing I can't

23   offer it for is to show action and conformity with his prior

24   conduct.  But I can show -- offer it show opportunity, intent,

25   reparation, plan, knowledge, absence of mistake.

Page 126

JAMES JOSEPH COHEN - Direct

1          And this evidence is going to show that Mr. Cohen is

2   a career criminal.  He's got multiple convictions over at

3   least a decade.  The convictions involve forgery and fraud and

4   all the things we say they did.  And he's a sophisticated

5   financial criminal.  And so this is also going to rebut the

6   claim that this is just the Keystone Kops.  You know, that

7   these guys are just -- I don't know -- unsophisticated and put

8   together the documents after the fact, and gee whiz, maybe

9   it's a mess, but it's all just a misunderstanding.  It's not a

10  misunderstanding.  This is a carefully orchestrated plan by a

11  man who's got skills.  Evil skills, but skills.

12          MR. PERTEN:  Your Honor, that's a great speech, but

13  factually, it's just simply inadequate.  Mr. --

14          THE COURT:  Well, the only way I can know that if --

15  he's going to have to lay some foundation for this, but before

16  we go much further, under 609(b)(2), the proponent is supposed

17  to give reasonable notice of its intent to use this.  Have

18  you?

19          MR. CARNATHAN:  If it requires in writing, no.  I

20  mean, I certainly asked about it at his deposition.  I missed

21  that I should've sent him something in writing.

22          THE COURT:  Does it require writing?

23          MR. PERTEN:  It does.  It says you have to give

24  note -- well, it doesn't say written, but you have to give

25  notice of intent.  And he doesn't give him any notice orally

JAMES JOSEPH COHEN - Direct

1    or in writing.  The fact that he inquired about it at

2    deposition, we inquire about lots of things at deposition.

3    That doesn't mean it's coming in at trial.

4              THE COURT:  No, it says --

5              MR. CARNATHAN:  Well -- and if I may, Your Honor, I

6    just wanted to --

7              THE COURT:  It says -- hold on.  It says reasonable

8    written notice of the intent.

9              MR. CARNATHAN:  Well, I'm -- it's occurring to me as

10   we go, didn't I put this in the joint pre-trial?  Or I know I

11   certainly had it in the summary judgment motions.  I mean, I

12   had a long footnote about the convictions.  I laid them all

13   out.  I can't imagine it's a surprise to anybody that this was

14   coming, given the written materials that we filed along the

15   way here.  I'd actually have to look at the pre-trial to see

16   if I put it in there.

17             MR. PERTEN:  You did not.

18             THE COURT:  Well, was it --

19             MR. CARNATHAN:  But I did not give him specific

20   written notice.

21             MR. PERTEN:  It was not in the pre-trial memorandum.

22             THE COURT:  All right.  Good.

23             MR. PERTEN:  The rule requires notice, and frankly,

24   to be honest, I was surprised I didn't get it, but I said,

25   great, he's not going to use it; that's perfect.  Because I

Page 128

JAMES JOSEPH COHEN - Direct

1   don't think he's entitled to use it because he didn't follow

2   the rule.  And so here we are.  That's -- the rule is very

3   clear.

4           THE COURT:  And too --

5           MR. CARNATHAN:  Well, where else --

6           THE COURT:  Yeah, go ahead.

7           MR. CARNATHAN:  We're also at the breaking point for

8   the day.  I can give him written notice in the next two hours,

9   and he can prepare, and he can do what he wants to do tomorrow

10  when I continue the line of questions.

11          MR. PERTEN:  That's not the way it works.

12          THE COURT:  "Reasonable" it says.  Reasonable written

13  notice.  So you -- I'm going to need some law that says that's

14  reasonable written notice.  I'm also going to need some law --

15  if that's what you're going to rely on -- or I'm going to need

16  some law that says that providing -- you know, putting it in a

17  motion for summary judgment constitutes written notice of an

18  intent to use it.

19          MR. CARNATHAN:  And to follow up on the thought,

20  though, Your Honor, that only applies under the 609(b) to

21  specifically impeach his character for truthfulness.  I also

22  have 404(b), which is more expansive and allows me to use

23  evidence of crimes, wrongs, or other acts for basically any

24  purpose other than to show action and conformity therewith.

25  And again, I mean, 404(b)(2) lists out that it may be

escribers

JAMES JOSEPH COHEN - Direct

1    admissible for another purpose, such as motive, opportunity,

2    intent, preparation, plan, knowledge, identity.  I mean, I'm

3    offering it for intent, preparation, knowledge, plan, absence

4    of mistake.  I mean, this evidence has a lot of purposes.

5         THE COURT:  609(b) doesn't trump 404?

6         MR. CARNATHAN:  Well, it's a separate concept.  On

7    the one hand, you can use evidence of a crime to impeach

8    somebody just to say you're being untruthful.  On the other

9    hand, you can also put in evidence of crimes, wrongs, or other

10   acts for other purposes on a substantive basis.  And that's

11   different than impeaching somebody.  Two totally separate

12   rules.

13        MR. PERTEN:  Your Honor, that's a reach.  Frankly,

14   you know, notice, intent -- because he had a crime ten years

15   ago, is irrelevant to what he might have been thinking today.

16   That's an attempt to do a complete end run-around and,

17   frankly, write it out of the evidentiary rules.  609(b) is

18   very clear.  And trying to use this evidence of something that

19   happened more than ten years ago, where there has been -- he's

20   not a career criminal.  He has had no run-ins with the law

21   since he served his time.  And what this is -- and this is

22   what we said in the summary judgment -- it's really an effort

23   to impugn the character of Mr. Cohen.  What he did, he did.

24   He's -- it's ancient history.  And in our society and the way

25   it works, is you've got a window.  You've got a window in

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1    which to use that against somebody to say, oh, he's a bad

2    person then, so he must've been a bad person now.  And people

3    who do those things are going to do it again now, and this

4    is -- you have a window, and it's ten years.  And we don't

5    hold this against somebody for the rest of their life, and

6    that's exactly what's going on now.  It's been more than

7    ten --

8            THE COURT:  What's the evidence going to be

9    concerning when this conviction occurred?

10           MR. PERTEN:  Mr. Cohen can testify and that he was --

11   it was 2000 -- he was -- I mean --

12           THE COURT:  Why don't you ask him, then?  Just get

13   the dates.  At least we have that.

14           MR. CARNATHAN:  Well, there's several of them, Your

15   Honor.  Do you want to do the -- I'm not sure --

16           THE COURT:  Well --

17           MR. CARNATHAN:  -- how you want me to inquire, but --

18           THE COURT:  Were any within the last -- any

19   conviction within the last ten years, I think is what --

20           MR. CARNATHAN:  Not the actual conviction but the

21   prison term.  And I should look at the errata sheet.  I

22   remember it as 2009.  I could've missed that.

23           MR. PERTEN:  Your Honor, I can give you the errata

24   sheet.

25           MR. CARNATHAN:  But I also have -- I've got to find

JAMES JOSEPH COHEN - Direct

1    it.  I had something that I thought showed that he got out in

2    2011.  So I was going to suggest that that was not true,

3    either.

4         THE COURT:  All right.  It is -- the rule does say

5    conviction or release from confinement.  I assume the later of

6    would be the start point.

7         MR. CARNATHAN:  Yeah.  I mean, if I look at the front

8    page of the Georgia conviction, it says dates of probation,

9    supervised release from April 10th, 2011, until August 4th,

10   2014, which I thought meant he got out in 2011.  So I was

11   going to impeach him for saying he got in earlier than that,

12   but I could be wrong about that.

13        THE COURT:  Well, the words of the rule are "release

14   from confinement".  It sounds like everybody agrees that he's

15   had no criminal convictions -- convictions -- within the last

16   ten years.  Is there any dispute about that?

17        MR. CARNATHAN:  We have no evidence of any criminal

18   convictions in the past ten years.

19        THE COURT:  Okay.

20        MR. CARNATHAN:  We have some spanning about a decade

21   before that, one of which is an SEC enforcement action.

22        THE COURT:  All right.  So I mean, we're going to

23   have -- I'm going to have to take a look at 404 and 609

24   together.  But you do have evidence that he was released from

25   confinement in fewer than ten years ago?



JAMES JOSEPH COHEN - Direct

1      MR. CARNATHAN:  Well, I have the suggestion of it on

2  the front of the Georgia conviction where it says dates of

3  probation, supervised release April 10th, 2011, to August 4th,

4  2014, which I've thought meant that you got out of prison, you

5  went to supervised release, but that's what I'm relying on.

6      MR. PERTEN:  That's not my understanding.  Mr. Cohen

7  can testify under oath when he got out of prison.

8      THE COURT:  All right.  It's 1 o'clock.  All right.

9  I'm going to take a look at this, and we'll come back

10 tomorrow.

11      So Mr. Cohen, what I instruct you is that you should

12 have no communication concerning the subject matter of your

13 testimony with anyone until we resume.  You understand?

14      THE WITNESS:  I do.

15      THE COURT:  Okay.  If you felt like you needed to

16 talk to counsel -- any counsel -- concerning privilege,

17 something like that -- I won't say something like that;

18 privilege is about it -- you may do so.  But in terms of the

19 subject matter of your testimony, including impeachment, that

20 is not for you to have discussions with anyone between now and

21 when we resume your testimony, okay?

22      THE WITNESS:  I understand.

23      THE COURT:  All right.  Okay.  Now, when do you want

24 to do -- does anybody want to give me any more law here?

25 It's --



JAMES JOSEPH COHEN - Direct

1        MR. CARNATHAN:  I'm sure we'd be happy to submit

2    something that -- we'll have to go pretty high speed, but --

3        THE COURT:  Oh, yeah.  You're going to have to go

4    high speed.

5        Do I have everything from you, Mr. Perten, that you

6    want me to have?

7        MR. PERTEN:  Yes, Your Honor.

8        THE COURT:  I mean, pending seeing what you might

9    get.

10       MR. PERTEN:  Right.

11       THE COURT:  Which is always something that you can

12   reply to.

13       MR. PERTEN:  Right.  You know, it --

14       THE COURT:  And so you might want to give me

15   something, Mr. Carnathan, about metadata.

16       MR. CARNATHAN:  I'm sorry.  About --

17       THE COURT:  Metadata.

18       MR. CARNATHAN:  Yes, Your Honor.

19       THE COURT:  You might want to give me something on

20   that.  And I don't have any briefing on the 404 and 609 issue.

21       MR. CARNATHAN:  Okay.  We'll submit something on

22   that, too.

23       THE COURT:  All right.  Since you're proposing the

24   evidence, I think that it starts with you, all right?  Now,

25   here's a tough one.  What time can you get me that?

JAMES JOSEPH COHEN - Direct

1    MR. CARNATHAN:  What time's it now?  It's 1?  I can

2    get somebody going on it right away, but I mean, a couple,

3    three hours, best-case scenario.  Right now, it's going to

4    be --

5    THE COURT:  Yeah.  So let's look for something by 5

6    o'clock, okay?  It -- let's look for something by 4 o'clock.

7    Do the best you can, okay?

8    And then, Mr. Perten, if you can reply to that by --

9    you know, on our CM/ECF system by 7:30 tomorrow morning?

10    MR. PERTEN:  Certainly.

11    THE COURT:  Okay.

12    MR. PERTEN:  Thank you, Your Honor.

13    THE COURT:  I'll have everything on that issue.  If I

14    don't get anything, I don't get anything.  That's okay.  But I

15    do need something from your side in support of this testimony.

16    MR. CARNATHAN:  I guess I would just maybe plea for a

17    little more time.  I mean, I get until 4, and then he gets the

18    rest of the day.  I mean, that's -- I get three hours, and he

19    gets --

20    THE COURT:  The rest of his day is night, but all

21    right, you can take until 5 --

22    MR. CARNATHAN:  Thank you, Your Honor.

23    THE COURT:  -- today.  Okay?  I'll be looking for

24    something at 5.  I don't know what else to do, all right?

25    Coming up in the middle of a trial.  So you know, you want to

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1   support it --

2           MR. CARNATHAN:  Understood, Your Honor.

3           THE COURT:  -- but I have to leave myself a little

4   time to read it and have my law clerk take a look at it as

5   well.  So -- in order to make a reasonable ruling.  We'll look

6   before then.  Okay?  That's the time.  Let's go with that.  So

7   5 o'clock; 7:30 tomorrow morning.

8           MR. PERTEN:  Very good, Your Honor.

9           MR. CARNATHAN:  Thank you, Your Honor.

10          THE COURT:  Anything else?

11          THE WITNESS:  One thing, Your Honor.

12          THE COURT:  Yes, of course.

13          THE WITNESS:  Unfortunately, I have to drive about

14  fifty miles to get here, and it's nearly impossible for me to

15  get here by 9.  I have to drop my son off at school before I

16  come in.  My wife cannot do so.  I can get here like I did

17  today, approximately 9:30.

18          THE COURT:  Do you have anything that we can do --

19  have this discussion.

20          MR. CARNATHAN:  Well, I thought we could put Mr.

21  Goldman on tomorrow, bring Mr. Cohen back Monday because Mr.

22  Goldman's my expert that's in from Chicago, so I was --

23          THE COURT:  That's fine with me.

24          MR. CARNATHAN:  And that would give us more time to

25  brief the issues, too, and you could take a day or something.

JAMES JOSEPH COHEN - Direct

1          THE COURT:  Should've said so.  I mean, I -- what

2     about that?

3          MR. PERTEN:  Well, we're --

4          THE COURT:  You're okay with that?

5          MR. PERTEN:  I'm fine with that.

6          THE COURT:  All right.  Let's suggest --

7          MR. PERTEN:  Whatever works best for the Court, we're

8     open.

9          THE COURT:  Well, what works best for the Court -- I

10    mean, it's a completely understandable request, you know, that

11    he's driving fifty miles and has a parental duty tomorrow

12    morning.  So --

13         MR. PERTEN:  Or the other thought, Your Honor, is I

14    understood from Mr. Carnathan that he has another very short

15    witness, Mr. -- was it Mr. Abramskiy or Mr. Kaiserman?  We

16    knock them off in half an hour and --

17         MR. CARNATHAN:  I've already pushed them to Monday

18    because we had a plan --

19         MR. PERTEN:  Okay.

20         MR. CARNATHAN:  -- which keeps changing every day.

21         THE COURT:  You have an expert?  Right?

22         MR. CARNATHAN:  Yes.  And I really need to get him up

23    and down tomorrow, if at all possible.

24         THE COURT:  Right.  And is that -- how long is --

25    what do you think on timing?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1        MR. CARNATHAN:  Well, I think I'll be a couple of

2   hours and Mr. Perten probably the same.  I think he's going to

3   need a whole day.

4        THE COURT:  He's going to take tomorrow?

5        MR. CARNATHAN:  Yeah.

6        THE COURT:  Okay.  Let's come back with Mr. Cohen on

7   Monday, then.  Now, you still have that 9 a.m. problem on

8   Monday?  It's still hard for you?

9        MR. CARNATHAN:  On Monday, I've got more flexibility

10  because I've got Mr. Kaiserman and Mr. Abramskiy lined up.

11  And so we could do one or both or whatever and --

12        THE COURT:  All right.  Why don't you be here by 10

13  on Monday?

14        THE WITNESS:  Thank you.

15        THE COURT:  Okay.  And we'll fill in some -- you may

16  have to cool your heels here a little longer.

17        THE WITNESS:  It's all right.

18        THE COURT:  But we'll do that, okay?  So that'll be

19  the -- that's what we'll have.  Goldman tomorrow and Mr. Cohen

20  back at 10, and you can fill in whatever witnesses you think

21  will fit comfortably in that time.  But I'd like to get Mr.

22  Cohen off and on then on Monday so that's he's -- doesn't have

23  to come back.

24        MR. CARNATHAN:  And so where does that leave us with

25  the briefing schedule now?

JAMES JOSEPH COHEN - Direct

1        THE COURT:  Yeah.  Good question.  So you tell me

2    now.  What's a -- I want the best brief you can give me in the

3    time we have.  So --

4        MR. CARNATHAN:  Well, I want as much time as I can,

5    and he does, too.

6        MR. PERTEN:  As long as I don't have to work on

7    Mother's Day, because that would be bad.

8        MR. CARNATHAN:  What if I had until, you know, close

9    of business tomorrow, and you've got until close of business

10   Saturday?  And then you've got Sunday -- Mother's Day.

11       THE COURT:  So I'm the guy that has to work on

12   Mother's Day.  I get it.

13       MR. CARNATHAN:  That's okay with Mr. Perten and me,

14   sir.

15       THE COURT:  Yeah.  I'm positive it is.  Right.  It's

16   like the associate that hands you the brief on Friday at 7

17   p.m. and say, all right, edit this.

18       MR. CARNATHAN:  Whatever schedule suits Your Honor.

19       THE COURT:  No, I understand.  Close of business

20   tomorrow?  Yeah, I think we can go with -- well, what if we

21   did this:  Midday tomorrow; midday Saturday?

22       MR. PERTEN:  Fair enough.

23       THE COURT:  Okay?  You know, 1 o'clock in both

24   instances, okay?

25       MR. PERTEN:  My wife thanks you, Your Honor.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1    THE COURT:  All right.  So anything else that we need

2    to accomplish today?  All right.  Thank you, all.

3    MR. PERTEN:  Thank you, Your Honor.

4    MR. CARNATHAN:  Thank you, Your Honor.

5    THE CLERK:  (Indiscernible).

6    THE COURT:  Yeah, fair enough.  Before we break, I've

7    been handed two things, and this is right to raise it with me.

8    I'm going to -- is there any -- make sure I hang onto my

9    microphone.  I think that I ought to place the certification

10   of Mr. Hartzell and the motion to strike certification on the

11   ECF system in this adversary proceeding and in the main case.

12   MR. PERTEN:  We can refile it from the office if

13   that's easier for the Court when we get back.

14   THE COURT:  It is easier for us, so --

15   MR. PERTEN:  I'll just -- we're fifteen minutes away.

16   You'll have it --

17   THE COURT:  Yeah, when you get back --

18   THE CLERK:  We can just scan it right in.

19   THE COURT:  You can.  Let her do it, then.

20   MR. PERTEN:  And the --

21   THE COURT:  No, it's -- you don't have to.

22   MR. PERTEN:  -- certification is actually attached as

23   an exhibit to our --

24   THE CLERK:  Yeah.

25   MR. PERTEN:  -- motion.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1          THE COURT:  Right.  But it ought to be --

2          THE CLERK:  I'm going to --

3          THE COURT:  -- in a principal --

4          MR. PERTEN:  Okay.

5          THE COURT:  -- as a document itself.  All right?  So

6    she'll -- you don't need to.  They'll be on; you'll see them.

7          MR. PERTEN:  So we don't need to ECF?

8          THE COURT:  You don't need to.

9          MR. PERTEN:  Very good.

10          THE COURT:  Nope.  She'll scan them in and put them

11   on ECF, okay?

12          MR. PERTEN:  All right.

13          THE COURT:  Thank you.

14          MR. PERTEN:  Thank you, Your Honor.

15          MR. CARNATHAN:  Thank you, Your Honor.

16   (End at 1:10 PM)

17                    * * * * * * * * * *

18

19

20

21

22

23

24

25

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1        I certify that the foregoing is a true and accurate

2    transcript from the digitally sound recorded record of the

3    proceedings.

4

5

6    *Suzanne Baldridge*

7    /s/ Suzanne Baldridge                    May 29, 2019

8    _____

ESCRIBERS LLC

9                        eScribers
                7227 N. 16th Street, Suite #207
10                      Phoenix, AZ 85020
                        973-406-2250
11              e-mail operations@escribers.net

12

13

14

15

16

17

18

19

20

21

22

23

24

25

113:12

**$**

**$1 (4)**
18:23;32:21;33:7;
106:19
**$1,300,000 (1)**
18:23
**$1.3 (5)**
47:4,10,18;48:5,11
**$100,000 (2)**
21:16;22:18
**$106,000 (2)**
76:12;78:14
**$2 (2)**
38:9;76:22
**$2,000 (1)**
79:5
**$2,500,000 (1)**
16:1
**$200,000 (1)**
78:18
**$25,000 (1)**
24:17
**$250,000 (2)**
32:8;51:25
**$3.4 (1)**
77:8
**$4.8 (1)**
76:24
**$4.9 (3)**
57:7,10;58:7
**$5.5 (6)**
56:20,25;58:12,19,
25;59:22
**$500 (1)**
112:5
**$6,000 (1)**
107:3
**$6.8 (1)**
77:3
**$600,000 (3)**
59:12,21;67:25
**$75 (1)**
25:9
**$9 (1)**
76:16

**[**

**[sic] (9)**
16:12;17:20;39:25;
57:14;71:3;73:11,12;
75:24;97:8

**A**

**ability (3)**
46:25;76:6;118:4
**able (7)**
10:12;40:12;41:4;
48:9;66:15;67:1;82:17
**above (1)**

Abramskiy (2)
136:15;137:10
**absence (1)**
125:25;129:3
**absolutely (5)**
36:5;77:25;78:11;
79:1;121:17
**accent (5)**
11:22;13:25;14:8,12,
13
**accept (1)**
6:11
**access (2)**
56:13;98:15
**accomplish (2)**
123:19;139:2
**according (1)**
46:1
**account (7)**
50:5;76:13;78:15,22;
101:5;102:6,16
**accountants (1)**
102:11
**accounts (5)**
77:25;78:12,12,18;
79:1
**accrue (1)**
72:11
**accurate (6)**
58:3;87:2;88:13;
109:2;118:24;119:16
**accusations (1)**
65:19
**achieve (1)**
112:6
**acknowledgement (1)**
65:10
**acquaintances (1)**
76:8
**action (4)**
74:22;125:23;
128:24;131:21
**acts (2)**
128:23;129:10
**actual (1)**
130:20
**actually (18)**
6:1;8:20;38:14;
46:13;73:15;78:16;
82:4;98:12;100:18;
102:2;103:2;108:2;
109:3;111:5;121:10;
122:8;127:15;139:22
**add (1)**
6:10
**addition (3)**
81:22,24;125:18
**additional (5)**
21:15;22:13;52:1;
78:21;81:10
**address (5)**
56:13,17;113:22;

114:6,22
**addressed (2)**
49:21;107:8
**admissible (2)**
115:25;129:1
**admit (3)**
103:16;123:4,13
**ado (1)**
122:13
**advanced (1)**
24:25
**adversary (2)**
4:12;139:11
**adverse (1)**
124:23
**advice (1)**
95:1
**advised (1)**
101:18
**affidavit (10)**
5:18;54:8,12;55:10,
16,25;83:18;114:9;
117:18;120:18
**afternoon (1)**
82:14
**again (21)**
6:12;14:16;15:4;
19:12;21:7;23:2;25:14;
61:2;67:12,14;71:5;
75:11,18;95:21,21;
100:19,22;118:13,18;
128:25;130:3
**against (7)**
29:18;30:15;61:10;
65:19;77:3;130:1,5
**age (1)**
56:12
**agents (1)**
76:9
**ago (14)**
11:10,14;56:8,8;
59:7;90:8;94:13;
120:20;121:13;124:20;
125:2;129:15,19;
131:25
**agree (24)**
17:6;21:2;22:25;
29:3,4;33:16;34:7;
41:18;46:17;47:3,10,
17;52:7;56:1;78:25;
89:20;91:16,20;99:18;
101:12;104:24;109:15;
111:16;123:21
**agreed (5)**
22:16,17,18,20;
57:16
**agreeing (2)**
29:5;34:9
**agreement (50)**
20:17;21:4,8,10,10,
14;22:17;46:2,6,14,17,
21,25;47:4,6,11,18,21,
24;48:4,10,15;51:11;

52:16,20;57:6,10;60:2,
5,12,17;61:4;62:7;
63:5;72:7,23;73:6;
81:1;84:5;88:21,25;
89:3,9;90:6;96:20,22;
109:16,16,23;110:16
**agreements (2)**
26:6;60:6
**agrees (2)**
20:8;131:14
**ahead (5)**
8:17;69:11;117:17;
125:8;128:6
**AIA (4)**
111:2,5,10,17
**air (1)**
80:21
**al (1)**
4:13
**Alex (12)**
4:9,17;12:12,13;
16:10;21:24;88:5,17;
90:15;102:25,25;107:6
**Alexander (1)**
27:4
**allegation (5)**
31:9;63:3,16;65:24;
70:2
**allegations (3)**
58:2;63:14;70:12
**alleged (2)**
57:9;68:21
**allocated (1)**
79:11
**allow (2)**
76:1;116:3
**allowed (1)**
31:18
**allows (1)**
128:22
**Almost (1)**
10:2
**along (1)**
127:14
**always (2)**
46:11;133:11
**America (1)**
111:1
**among (2)**
16:16;21:8
**amount (1)**
47:20
**amplify (1)**
87:5
**ANAHIT (5)**
7:9,10,14,16,16
**analysis (3)**
18:19;20:2;61:20
**anchor (1)**
98:1
**ancient (2)**
124:18;129:24
**animal (1)**

114:5
**annexed (1)**
113:25
**Annie (1)**
7:15
**answered (3)**
66:25;95:14,16
**anticipates (1)**
28:4
**apparent (1)**
67:9
**apparently (2)**
31:6;98:15
**appear (2)**
67:5;101:14
**applied (1)**
69:1
**applies (2)**
6:21;128:20
**apply (1)**
6:14
**appraisal (1)**
21:25
**approach (13)**
7:3,4;18:2;23:14;
25:14;26:15;38:19;
82:22;85:13;91:9;
100:3,19;104:20
**appropriate (3)**
61:15;69:22;109:18
**approval (1)**
68:12
**approve (3)**
23:5,11;53:4
**Approximately (5)**
13:15,16;34:23;
86:20;135:17
**April (9)**
22:5;38:23;60:1,13,
17;61:3;65:24;131:9;
132:3
**Architects (1)**
110:25
**argued (1)**
124:20
**argument (2)**
97:25;119:18
**Around (9)**
12:9;13:18,21;34:1;
77:1,1;80:1;110:2;
116:4
**art (1)**
112:17
**article (1)**
99:1
**aside (2)**
97:2,9
**aspect (1)**
62:15
**aspects (1)**
118:6
**asserted (1)**
70:13

Case 16-01120    Doc 343    Filed 06/04/19    Entered 06/04/19 13:05:34    Desc Main
LYMAN-CUTLER, LLC, et al. v.                    Document    Page 143 of 158
KAGAN, et al.                                                                    *May 9, 2019*

**assess (1)**
61:14
**associate (1)**
138:16
**Association (1)**
110:25
**assu (1)**
55:5
**assume (1)**
131:5
**assumed (3)**
55:5;66:2,3
**assumption (1)**
64:9
**assumptions (1)**
68:16
**attached (6)**
39:13;91:18;108:25;
115:3,3;139:22
**attachment (2)**
82:17;114:25
**attachments (1)**
77:3
**attempt (2)**
116:3;129:16
**attempts (1)**
51:19
**attention (1)**
39:5
**attorney (7)**
12:4,5;29:9;30:6;
35:14,17;70:25
**attorney-client (1)**
95:8
**auction (1)**
33:22;75:23
**August (3)**
13:22;131:9;132:3
**authenticating (1)**
114:9
**authoritative (1)**
111:17
**authorities (1)**
122:17
**available (2)**
108:21,22
**avoid (2)**
74:24;92:5
**aware (13)**
6:19;7:3;14:13;
28:22;33:10,25;50:8,
11;51:14;62:5;64:13;
66:11;101:17
**away (3)**
22:8,10;134:2;
139:15
**aways (1)**
121:19

---

**B**

**back (21)**
5:21;10:18;14:8;

23:19,20;32:24;36:12;
86:15;92:11;96:22;
103:4;105:17;121:20;
124:3;132:9;135:21;
137:6,20,23;139:13,17
**bad (3)**
130:1,2;138:7
**balance (3)**
106:11,12,14
**balances (1)**
50:5
**bank (18)**
22:24,25;23:1,5,8,
11;32:2,14;33:21;
75:22;77:20;78:1,12,
22;79:25;80:18;81:25;
107:4
**bankruptcy (12)**
33:11,14;34:2;75:7,
9,18,21;76:11;77:17,
24;78:10;79:19
**based (6)**
20:3,3;64:15;98:17;
107:25;112:16
**Basically (3)**
57:18;117:25;128:23
**basis (9)**
31:1;61:13;69:4;
71:6;89:21;99:22;
111:19;124:16;129:10
**became (1)**
10:24
**become (2)**
13:19;15:5
**becomes (2)**
10:11,17
**begin (4)**
96:24;113:16;
116:12;117:1
**beginning (8)**
11:2;41:25;49:14,15;
54:2;56:19,25;58:13
**begins (1)**
96:25
**behalf (2)**
29:18;87:19
**behind (4)**
29:5;30:2;33:18;
34:9
**belief (1)**
76:7
**believes (1)**
61:21
**belongs (2)**
32:4,6
**below (1)**
106:18
**benefit (1)**
118:5
**best (8)**
15:17;30:24;31:20;
44:7;134:7;136:7,9;
138:2

**best-case (1)**
134:3
**better (2)**
15:1;56:8
**beyond (2)**
84:5;118:4
**big (1)**
15:9
**Bill (4)**
87:24;91:4,22;92:11
**billings (2)**
51:4,8
**binder (1)**
116:24
**bit (6)**
13:24;15:3;19:7;
64:23;111:4;117:20
**blame (2)**
95:5,13
**blessed (1)**
116:17
**Blow (1)**
91:23
**blowing (1)**
27:21
**blows (1)**
28:4
**blue (1)**
29:10
**blurry (1)**
90:16;105:23
**blurted (1)**
108:8
**body (3)**
14:4;111:20,21
**bold (1)**
102:12
**books (3)**
92:15,18,19
**Boris (4)**
12:3,4;13:21;17:16
**born (1)**
9:22
**both (9)**
9:4;34:25;45:3;
80:20;81:23;100:24;
101:2;137:11;138:23
**bottom (6)**
40:17;82:13;97:2;
102:12,23;112:25
**bound (1)**
46:20
**break (4)**
19:6;64:21;65:1;
139:6
**breaking (1)**
128:7
**brick (1)**
45:2
**brief (5)**
31:3;118:9;135:25;
138:2,16
**briefing (2)**

133:20;137:25
**briefly (1)**
73:25
**bright (1)**
96:11
**bring (2)**
45:1;135:21
**brings (1)**
87:14
**broke (1)**
82:15
**Brookline (4)**
12:19,20;15:18;
54:14
**brought (3)**
16:10;19:2;37:12
**bud (1)**
68:18
**budget (6)**
23:3,6;39:24;47:19;
68:17,18
**budgeted (2)**
59:12,22
**build (10)**
15:18;42:24;43:1,4,
21;44:16;45:1;52:21;
53:1;109:20
**builder (1)**
42:23
**building (2)**
45:12;109:24
**built (1)**
44:24;45:3
**business (10)**
85:6,9;86:2,7;87:12;
92:20;104:25;138:9,9,
19
**button (2)**
118:7,14

---

**C**

**calculation (1)**
72:19
**call (6)**
7:7;17:11;45:8;72:6;
84:15;119:10
**called (2)**
72:2;85:4
**calling (2)**
4:7;92:8
**calls (3)**
61:17;71:16,17
**came (3)**
38:22;42:13;45:7;
52:8;103:19
**can (72)**
7:20;8:11,17,23;
14:3,8;16:6,11;17:3,4,
5;18:16;21:19;23:19;
26:14;29:13;30:24;
31:20;32:24;33:2;43:8;
44:1,5;48:4;61:20,22;

62:23;64:21;72:13;
75:4;87:3;89:24;92:11;
96:10;103:3;104:17;
107:21;111:15;112:8;
113:11;114:10;116:2,
2;120:10;122:23;
123:9,19;125:24;
126:14;128:8,9,9;
129:7,9;130:10,23;
132:7;133:11,25;
134:1,7,8,21;135:16,
18;137:20;138:2,4,20;
139:12,18,19
**capital (2)**
32:15;74:12
**care (4)**
38:14;40:2,4;110:7
**career (2)**
126:2;129:20
**carefully (2)**
96:11;126:10
**CARNATHAN (220)**
4:16,17;5:2,14,16,20,
24;7:6;8:2,5;9:12,14;
10:14,15,21,25;11:19,
22,24,25;13:3,9;14:16,
19,21,24;15:2;18:2,5;
19:16,18,20;24:21:3,6,
19,21;22:8,10,11;
23:14,16;25:12,16;
26:9,11,15,19;27:23;
28:3,13,15,17,19,21;
29:13,15;31:7,15,17;
32:5;33:9;34:13;44:6;
60:4;61:12,14;66:24;
69:3,5,10,16;71:16;
82:10,12,22,25;83:4,
11,14,16;84:7,15,23;
85:13,16;87:11,24;
88:2;89:25;90:2,3,24;
91:1,4,5,9,12,22,25;
92:11,13;93:6,9;95:11;
96:1,14,15;100:3,5,9,
19,21;101:23,25;104:5,
7,11,13,16,18,20,23;
106:9,11,13;107:21,23;
108:16,18;112:8,10;
113:7,10,19,25;114:7,
14;115:22;116:8,14,16,
19,22,24;117:12,16,18;
118:7,11,20,22;119:3,
9,12,15,22;120:16,23;
121:1,6,12,19,21,23;
122:1,3,6,8,11,19;
123:1,3,12,15,20;
125:6,9,15;126:19;
127:5,9,19;128:5,7,19;
129:6;130:14,17,20,25;
131:7,17,20;132:1;
133:1,15,16,18,21;
134:1,16,2;135:2,9,
20,24;136:14,17,20,22;
137:1,5,9,24;138:4,8,

---

13,18;139:4;140:15
**Carnathan's (1)**
96:6
**carrying (14)**
18:23;19:14,14;
20:13,14;72:11,13,24;
73:2;81:3;88:11,16;
89:4,5
**case (10)**
4:7,12;6:12;31:4;
61:15;75:23;77:10;
118:21;125:4;139:11
**cases (3)**
6:3;111:13,14
**castles (2)**
43:22;44:17
**catastrophe (1)**
82:1
**caulking (1)**
101:1
**causal (1)**
88:13
**ceased (1)**
30:5
**Centre (2)**
30:18,19
**Century (1)**
29:19
**certain (3)**
68:21,25;80:22
**Certainly (19)**
28:15;45:9;48:13;
52:7;53:6;55:3;56:3,7;
59:17,21;61:21;62:15;
76:19;77:7;103:15;
105:10;126:20;127:11;
134:10
**certification (12)**
118:11,19,24,25;
119:19,20;120:21;
121:7,11;139:9,10,22
**chance (2)**
44:6;105:16
**change (2)**
45:21;66:8
**changed (1)**
124:9
**changing (2)**
57:13;136:20
**character (4)**
125:5,20;128:21;
129:23
**charge (2)**
66:16,23
**charged (4)**
63:15;64:5,15;70:7
**charges (2)**
66:11,12;70:18
**check (2)**
86:22;111:10
**checking (1)**
46:9
**checks (7)**

48:24;49:1,8,16,20,
24;50:2
**Chicago (1)**
135:22
**chief (1)**
85:4
**choice (2)**
124:12,13
**choose (1)**
6:7
**chose (1)**
92:5
**Circuit (4)**
5:25;6:1,2,7
**circuits (1)**
6:1
**circulating (1)**
46:10
**circumstances (1)**
7:2
**citations (1)**
122:17
**city (1)**
80:19
**claim (2)**
4:9;126:6
**claimant (1)**
4:9
**clarification (2)**
8:3;97:7
**clause (1)**
52:24
**clear (8)**
6:5;28:14;90:19;
95:19;96:5;103:11;
128:3;129:18
**clearly (1)**
8:3
**CLERK (12)**
4:2,7;7:21;65:4,7;
84:17,21;135:4;139:5,
18,24;140:2
**close (5)**
35:11;95:8;138:8,9,
19
**closer (2)**
56:3;87:4
**CM/ECF (1)**
134:9
**co (1)**
72:4
**coffee (6)**
30:18,18,19;31:19;
74:5;75:3
**Cohen (29)**
84:15,18,19;85:2;
87:3;88:3;90:4;91:2,
13,15;95:23;100:10;
102:1;104:25;114:7;
117:22;123:4,21;
124:6,19;126:1;
129:23;130:10;132:6,
11;135:21;137:6,19,22

**Cohen's (1)**
125:3
**collectively (1)**
76:16
**combination (1)**
14:7
**comfortably (1)**
137:21
**coming (6)**
31:5;120:8;121:20;
127:3,14;134:25
**committed (1)**
61:10
**communicate (2)**
72:4,8
**communication (2)**
30:5;132:12
**communications (3)**
31:5;73:20;101:9
**companies (9)**
35:18;54:24,24;55:3,
6;65:19;84:5;86:2,16
**company (12)**
33:14;34:2;35:20;
53:22;54:17,25;55:16;
77:17;85:4;86:2,16;
115:19
**company's (1)**
55:2
**compared (1)**
45:22
**compensation (1)**
109:24
**complaint (7)**
29:18,21;57:19,22,
23;58:3;59:9
**complete (8)**
6:20;81:19;97:21,22;
98:6,9;112:12;129:16
**completed (3)**
51:19;56:4;97:18
**completely (2)**
20:8;136:10
**completeness (3)**
6:14;7:1;109:8
**completing (1)**
46:1
**completion (9)**
97:25;101:2;110:11,
16,20,24;111:11;112:6,
20
**complex (1)**
120:2
**complicated (1)**
118:2
**complies (1)**
118:25
**comply (3)**
118:12,20;119:20
**components (2)**
19:8;98:20
**composed (1)**
103:7

**comprised (1)**
111:21
**computer (11)**
37:16,18,20;42:14,
16;108:23;109:4,6,10;
112:23;113:14
**computers (2)**
46:11,12
**concept (2)**
69:18;129:6
**concern (1)**
118:17
**concerned (4)**
13:24;14:5;38:11,15
**concerning (3)**
130:9;132:12,16
**concerns (1)**
83:22
**conclude (1)**
5:7
**conclusion (3)**
61:18;69:5;93:3
**conclusions (1)**
118:16
**condition (1)**
110:23
**conditioning (1)**
80:21
**conduct (1)**
125:24
**confinement (3)**
131:5,14,25
**confirm (1)**
117:24
**conformity (2)**
125:23;128:24
**confusing (1)**
115:6
**connected (1)**
18:1
**connection (5)**
96:16,21;97:16;
98:13;109:17
**consequence (1)**
89:5
**consider (2)**
11:1;74:17
**considered (1)**
59:2
**consistent (3)**
88:19;94:12;110:4
**constant (3)**
19:15;20:11,14
**constitutes (1)**
128:17
**construct (2)**
54:15;97:5
**construction (37)**
17:3;19:13;20:10;
22:1,24;23:2,3,6;
24:21;27:13;39:24;
40:2;42:21;45:5,6;
47:5,19;48:5,25;49:14,

16;50:16,17,21;51:5,8;
52:13;62:16;68:7,8;
71:1,1;76:22;108:20;
109:11;111:18;114:25
**consult (6)**
23:9;59:14,17;71:10,
14;95:3
**consulting (1)**
59:10,14;62:10
**contacts (1)**
30:4
**contain (1)**
47:18
**contemplated (1)**
73:5
**content (1)**
101:21
**contention (2)**
69:14;90:19
**context (2)**
6:18;22:12
**continue (2)**
34:11;128:10
**continuing (1)**
72:11
**contract (29)**
23:23,25;24:4,11;
62:3,9;83:19;98:18;
107:18,20,24;108:2,5;
109:3,5,11,17,23;
110:3,12,15;111:25;
112:5;114:16;115:4,5;
123:5,22;124:2
**contractor (10)**
53:12,16,19,24;54:2,
18,21;55:11;83:23;
84:2
**contractors (2)**
52:5,8
**contracts (3)**
52:13;108:14,20
**contributed (1)**
52:1
**contributions (1)**
32:15
**conversation (5)**
31:3;60:18,19;73:25;
99:16
**conversations (4)**
60:22;97:9,10;99:15
**conveying (1)**
105:11
**conviction (7)**
125:1;130:9,19,20;
131:5,8;132:2
**convictions (9)**
124:14,19;125:17;
126:2,3;127:12;
131:15,15,18
**cooked (1)**
124:1
**cool (1)**
137:16

Case 16-01120   Doc 343   Filed 06/04/19   Entered 06/04/19 13:05:34   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 145 of 158

May 9, 2019

copies (6)
48:24;49:8,16,19,24;
50:2
copy (5)
18:6;23:19;25:19;
51:10;116:13
corner (1)
105:18
Corp (7)
4:11,11,21,21;86:17,
19;103:21
corporate (1)
86:23
correction (1)
125:13
correctly (12)
40:5;82:1;86:4;
88:18;89:11;92:21;
93:20,23;97:14;
106:21;111:22;113:17
cost (16)
18:22;19:10,13,14;
20:3,11,13;39:24;40:2;
43:22;48:10;66:1,4;
71:1;81:6;110:9
costs (17)
18:21,23;20:10,14;
24:21;27:14,18;72:11,
13,24;73:2;75:19;81:3;
88:11,16;89:4,5
counsel (9)
93:10;94:22;97:3,8,
10,11;101:10;132:16,
16
couple (8)
5:2;6:3;85:11;109:8;
117:12;120:18;134:2;
137:1
course (13)
5:9;38:15;56:10;
57:12;58:8;78:13;
87:10;94:19;95:24;
104:1;120:11;122:21;
135:12
Court (243)
4:2,3,5,25;5:8,9,15,
19,23;6:8;7:12,15,17,
19;8:1,4,10,15,23;9:1,
4,8,11;10:13,20;11:11,
15,17,21;13:1,8;14:1,5,
7,11,15,18,25;18:4;
20:23,25;21:2;23:15;
25:15;26:16;28:1,6,8,
10,12,16,18,20;31:14;
32:23;33:2,8;34:15;
38:19;39:20;41:7,10,
15;42:4,6;43:9,15,20,
24;44:11,13;60:3,9;
61:13,17,22;62:20,22;
63:14;64:20,22,25;
65:7,8,12,14;67:4,12,
17,20;69:4,8,11,21;
71:13;74:22;80:2,4,7,

11,14;81:14;82:24;
83:3;84:9,11,13;85:12,
14;87:3,7;88:1;91:11;
93:1,5,7;95:10,23;
96:5;100:4,7,20;
104:21;108:15;113:6,
8,23;114:12;116:1,6,
11,15,17,21,23,25;
117:5,8,15,17;118:3,9,
18,21;119:1,6,8,11,15,
18;120:3,8,10,11,13,
15,21,25;121:3,10,15,
20,22,25;122:2,4,7,10,
12,21;123:8,18;
124:16;125:8;126:14,
22;127:4,7,18,22;
128:4,6,12;129:5;
130:8,12,16,18;131:4,
13,19,22;132:8,15,23;
133:3,8,11,14,17,19,
23;134:5,11,13,20,23;
135:3,10,12,18,23;
136:1,4,6,7,9,9,21,24;
137:4,6,12,15,18;
138:1,11,15,19,23;
139:1,6,13,14,17,19,
21;140:1,3,5,8,10,13
Court's (1)
65:4
cover (1)
105:8
coversheet (1)
114:3
creating (1)
112:5
credit (2)
95:5,13
credits (3)
68:25;69:14;70:2
crime (2)
129:7,14
crimes (2)
128:23;129:9
criminal (7)
124:14,19;126:2,5;
129:20;131:15,17
cross (2)
80:12;82:3
CROSS-EXAMINATION (2)
34:16;65:16
cull (1)
110:17
currently (1)
12:24
customized (1)
110:11
cut (4)
48:24;49:20,24;50:2
Cutler (6)
4:8;13:20;22:1;51:5;
100:24;101:1
Cutler-Lyman (1)
17:20

D

Dan (2)
94:4,14
dangerously (1)
95:8
data (1)
120:1
date (4)
22:15;23:22;71:12;
79:21
dated (8)
23:21;83:18;100:10;
102:5,25;105:8,11,18
dates (4)
100:1;130:13;131:8;
132:2
day (16)
4:8,11;57:3;86:15;
101:6;112:5;115:17;
128:8;134:18,20;
135:25;136:20;137:3;
138:7,10,12
days (7)
98:22;99:11;106:20;
118:12;120:9,18,19
day-to-day (1)
48:21
deal (8)
43:15;54:1;67:12,15,
17;74:7;117:13;121:16
dealing (1)
120:1
dealings (1)
51:20
dealt (2)
50:17;110:15
debt (1)
75:19
debtor (1)
4:19
debts (1)
79:14
decade (2)
126:3;131:20
decide (2)
37:8;99:5
decided (1)
75:8
decision (2)
33:13,16
deep (1)
14:11
default (1)
11:19
define (1)
72:13
defined (1)
110:21
definition (6)
110:20,24;111:10,
15,24;112:20

definitions (1)
111:17
definitively (2)
39:23,25
definity (1)
39:25
delegating (1)
52:25
deliberately (1)
92:5
delighted (1)
108:12
demand (1)
124:2
demanded (1)
114:16
demanding (2)
107:11,15
denied (1)
112:19
dentist (2)
9:18,19
deny (5)
89:12,18,21;90:21,
23
deposition (35)
6:15;38:23;40:10,17,
18;42:11;64:8;65:23;
77:16,22;80:17;82:6,7,
16;85:17;88:15,24;
90:14;92:4;93:16;94:9;
96:25;102:3,20,22;
108:8,13;111:5;113:2;
114:15;125:1,11;
126:20;127:2,2
describe (2)
10:7;54:13
described (2)
31:15;44:24
describes (1)
97:4
description (1)
43:2
deserve (2)
95:5,12
design (3)
24:17;45:21;67:23
designated (1)
116:1
desire (1)
92:19
detailed (2)
103:21;105:22
determined (2)
98:4;112:16
developing (1)
22:2
Development (10)
4:11,21;53:11,23;
54:17;55:15;86:17;
100:25;102:16;103:21
different (7)
45:12;54:25;55:16;

60:5;93:4;114:5;
129:11
differently (1)
77:6
difficult (1)
76:9
digging (1)
64:12
diligently (1)
92:19
Dima (1)
38:8
DIRECT (8)
9:13;27:25;28:13;
68:23,24;80:11;84:22;
123:2
directed (5)
23:18;28:14;87:9;
101:10;107:6
directly (1)
125:4
director (4)
86:11,13,17,19
disagree (1)
90:17
disagreeing (1)
111:19
disclosure (1)
116:4
discourse (3)
43:7,10,13
discrepancies (1)
92:16
discuss (14)
28:25;29:21;31:3;
32:16,17,20;33:5,6,13;
34:4;50:3;75:12;79:12;
97:5
discussed (11)
26:1;29:11;31:2,22;
34:6;37:12;51:4;75:3;
89:8;96:19;97:16
discussion (2)
6:11;135:19
discussions (4)
36:18;97:2,12;
132:20
dismiss (1)
74:19
disposed (3)
108:2,4,5
dispute (2)
87:16;131:16
disputes (1)
87:19
disregard (1)
46:25
distance (2)
12:9,11
distinction (2)
94:17;107:14
distribute (1)
32:3,4,17

Case 16-01120   Doc 343   Filed 06/04/19   Entered 06/04/19 13:05:34   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 146 of 158

May 9, 2019

**District (1)**
6:3
**Dmitriy (3)**
13:10,13;62:3
**docket (1)**
4:8
**doctrine (3)**
6:14,21;7:1
**document (32)**
6:22,22,25;18:8;
26:24;40:18,19;41:21,
23;42:2,6,8,9,15,18,18;
46:16,18,19;82:18;
104:14;110:17;114:8;
115:10,11;116:9,12;
117:10,21,23;119:16;
140:5
**documents (2)**
108:23;126:8
**done (6)**
13:12;22:18;59:17;
92:20;101:3;103:12
**double (2)**
63:15;124:2
**double-billed (1)**
65:20
**double-billing (3)**
65:25;66:2,3
**doubled (1)**
66:1
**doubt (1)**
68:19
**down (18)**
6:9;14:25;32:16;
42:3;52:18;60:23;
64:19;67:10;71:19,22;
80:13;92:14;102:11,
12;109:9;111:13;
124:25;136:23
**draft (9)**
46:14;93:11;94:10,
15;95:18,25;96:4;
101:21;107:20
**drafted (16)**
94:5,20;103:15;
104:14;106:16;107:17,
25;108:3,6;109:4,4,10,
22;110:2,3,21
**drafting (7)**
93:14,18,20;94:5,18;
103:11;109:17
**drafts (4)**
46:5,8,10;120:16
**draw (3)**
39:5;93:2;118:15
**dried (1)**
111:14
**drive (1)**
135:13
**driving (1)**
136:11
**drop (1)**
135:15

**due (2)**
68:25;112:13
**during (19)**
18:18,20;20:9;29:7,
7;30:25;31:19;36:25;
42:18;45:5,6;50:16;
57:12;68:6,6;82:3;
92:20;101:15;114:15
**duty (2)**
97:4;136:11

# E

**earlier (1)**
131:11
**easier (1)**
104:8;139:13,14
**easy (2)**
108:24,25;113:16
**ECF (3)**
139:11;140:7,11
**Edelkind (1)**
124:6
**edit (1)**
138:17
**edited (1)**
88:8
**edits (1)**
88:9
**effect (1)**
73:22
**efficiency (1)**
80:8
**effort (2)**
31:10;129:22
**eighteen (1)**
62:3
**eighty (1)**
71:2
**either (6)**
10:13,14;26:6;99:22;
105:13;131:3
**elaborate (2)**
44:4,6
**elaboration (1)**
44:9
**electronic (3)**
117:19;118:23;120:1
**Elena (1)**
87:17
**else (9)**
5:11;41:25;64:12;
122:23;123:18;128:5;
134:24;135:10;139:1
**email (30)**
21:23;39:12,13;46:9;
56:13;60:18,19,19;
72:5;82:17;91:16;
100:6,10,11,23;101:20;
102:5,10,24;103:6,7,8,
10,12,14,15,17;105:10;
108:25;114:20
**emails (8)**

50:9,11;56:16;72:3,
4;101:15,17,19
**end (4)**
5:12;30:13;129:16;
140:16
**ended (1)**
31:13
**enforcement (1)**
131:21
**engaged (1)**
53:16
**English (6)**
8:3,6,11,18,19,20
**enlarge (1)**
26:14
**enough (9)**
45:9,11;67:4,19;
69:20;97:24;122:22;
138:22;139:6
**entered (1)**
73:5
**entire (2)**
35:11;46:19
**entirely (1)**
120:5
**entitled (6)**
52:8;72:7;92:18;
96:7;125:21;128:1
**entity (1)**
76:15
**envisioned (1)**
45:12
**equity (1)**
76:20
**errata (3)**
125:13;130:21,23
**essentially (1)**
52:25
**estate (5)**
13:16;35:19,23;51:2;
76:9
**estimated (1)**
18:19
**et (1)**
4:13
**even (12)**
14:3;37:9;40:12,24;
46:14;54:25;56:11;
64:25;72:8;100:8,9;
113:15;115:19
**eventually (1)**
45:3
**everybody (1)**
131:14
**everyone (1)**
4:25
**evidence (40)**
5:17;6:15,20;18:7;
21:19,23,23:18;26:9,
12;29:13,17;60:6;61:9,
15;82:4;83:6;87:25;
90:4,24;91:2;101:23;
102:2;104:6;107:21;

117:14,19,19;118:15;
125:18,21;126:1;
128:23;129:4,7,9,18;
130:8;131:17,24;
133:24
**evidentiary (1)**
129:17
**Evil (1)**
126:11
**exact (1)**
101:2
**exactly (7)**
16:22;17:10;28:9;
40:6;63:18;88:17;
130:6
**EXAMINATION (4)**
9:13;81:15;84:22;
123:2
**example (1)**
11:13
**excavation (4)**
27:18;64:10,11;
67:24
**Excel (1)**
42:13
**except (2)**
41:25;83:6
**excess (1)**
110:21
**Excuse (16)**
20:21,21;25:22;41:3;
43:7;44:21;45:10;47:7;
66:17;78:2;86:20;
108:16;109:4;110:15,
21;113:7
**executable (1)**
115:1
**execution (1)**
60:12
**Exhibit (54)**
5:17;18:7;19:17,20;
20:7;21:19,22,23;
23:18;25:18;26:9,12;
29:13,17;39:10;40:11,
18;41:22;48:3;57:22;
82:4,7,11,16,23;83:2,5,
6,6,11;87:24;89:25;
90:4,24;91:2,17,23;
101:23;102:1,2;104:5,
9;107:21;110:19,19;
113:19,21,25;114:20;
115:14,22;116:19;
121:1;139:23
**expansive (1)**
128:22
**expect (2)**
53:6;56:7
**expected (3)**
48:14;62:7;66:4
**expecting (1)**
66:8
**expenses (4)**
18:1;19:14;49:5;

67:25
**expensive (2)**
80:22;81:20
**experience (2)**
36:3;120:1
**expert (11)**
66:9;70:9;114:2;
116:1,4;117:24;118:5;
119:7,9;135:22;136:21
**experts (2)**
58:22;116:4
**explain (2)**
72:13;101:3
**explained (1)**
97:24
**explanation (4)**
43:13;63:25;68:1;
115:7
**explanations (1)**
63:24
**extend (3)**
33:22;75:22;91:23
**extension (2)**
60:1,4
**extensive (1)**
43:13
**extent (4)**
8:7,11;13:25;21:12

# F

**fact (41)**
35:22;36:9,21,25;
38:14;40:10,16;44:19;
51:18;53:15,15;54:1;
55:11;57:6;58:14;
60:15;63:18,21;64:8;
65:23;73:2,5;78:14;
82:5;86:19;88:23;92:8;
93:13;94:8;96:8,19;
108:8;109:19;110:5,
19;118:4,13;122:16;
124:1;126:8;127:1
**factor (1)**
48:14
**facts (3)**
61:22,24;62:16;63:2;
65:24;69:13,17,18;
70:1,6,12,18;89:14
**factually (1)**
126:13
**failed (2)**
112:6,12
**fair (5)**
67:4,19;69:20;
138:22;139:6
**fairly (1)**
45:7
**fairness (1)**
67:7
**false (2)**
66:10,11
**familiar (2)**

9:1;116:9

**far (7)**
8:24;50:20;51:7;
59:7;62:5;88:17;
111:15

**fashion (1)**
61:25

**Federal (2)**
117:13,14

**fee (4)**
24:17,20,24;25:5

**feel (1)**
4:6

**fees (4)**
24:6;26:2;73:9,11

**feet (1)**
45:24

**fellow (1)**
96:11

**felt (1)**
132:15

**few (3)**
6:15;44:7;121:17

**fewer (1)**
131:25

**fifteen (2)**
24:21;139:15

**fifteen-minute (1)**
65:1

**fifty (4)**
88:25;109:24;
135:14;136:11

**figure (2)**
47:4,10

**file (11)**
33:13;42:13;73:16,
23;75:8,21;114:17;
115:4,5,17;121:25

**filed (23)**
4:9;29:18,22,22,25;
33:10,14;34:2;49:10;
55:10;57:9,22,24;58:3;
63:13;70:11;71:13;
73:9,14;74:1;75:18;
123:23;127:14

**filing (4)**
71:9,10,14;75:12

**Filipp (1)**
16:12

**Filippon (1)**
57:13

**Filippov (69)**
4:9,17;16:13,19,21;
17:1,6,8,14,17,18;
20:11,16,19;21:8,24;
22:20;28:22,25;29:22;
33:13,25;34:4,20;
36:18,22;37:1;40:18;
48:17;49:7,17,23;50:1,
4,9,14;57:14;59:10;
60:1,12,20,22;64:16;
72:24;73:7,16;75:8,16;
78:17,22;79:8,13;

82:16,23;83:2,5,6,7;
88:6;89:12;90:15;92:1,
23;100:11,23;102:7,
25;107:6;124:3

**Filippov's (2)**
16:10;80:25

**fill (2)**
137:15,20

**final (7)**
21:10;22:17,17;46:6,
8;81:5;98:5

**finally (1)**
22:18

**finance (1)**
18:19

**financial (3)**
18:19;50:3;126:5

**find (7)**
5:25;31:10;39:18;
79:17;109:1;125:22;
130:25

**fine (8)**
6:8;60:9;64:25;93:5;
115:8;120:13;135:23;
136:5

**finish (2)**
63:5;70:25

**finished (2)**
68:8;84:9

**fir (1)**
29:7

**firm (10)**
28:23,25;29:6,18;
94:25;95:20;96:2,2,3;
118:13

**First (22)**
5:25;10:4;13:19;
15:5;16:10,13;17:8,14;
29:7;45:1,4,19;75:22;
78:11;91:6,20,23;
102:24;103:20;113:24;
114:2;125:9

**fit (1)**
137:21

**Five (11)**
11:10,14;12:9,11;
13:5,5,18;40:4;65:1;
80:1;122:17

**fixed (2)**
40:2;48:11

**fixed-cost (1)**
47:4

**FLANAGAN (6)**
7:9,10,14,16,17;
32:25

**flexibility (1)**
137:9

**focus (2)**
14:3;97:10

**focused (1)**
102:24

**focusing (2)**
97:3,3

**follow (4)**
6:7;49:3;128:1,19

**following (4)**
43:25;49:4;103:16;
115:3

**footnote (2)**
6:12;127:12

**forgery (1)**
126:3

**forgot (1)**
75:1

**form (1)**
37:23

**formation (1)**
51:14

**forty (1)**
80:11

**forty-five (1)**
30:23

**forward (3)**
37:9;102:11,15

**forwarded (1)**
115:17

**Fotimanau (5)**
12:12,13,22;13:3,6

**found (4)**
6:1,2,9;100:25

**foundation (3)**
114:13;116:3;126:15

**four (5)**
4:8,12;13:4;56:8;
120:18

**fourth (2)**
92:12,14

**frankly (3)**
127:23;129:13,17

**fraud (4)**
31:10;61:10,20;
126:3

**fraudulently (2)**
74:18;75:25

**frequently (2)**
45:9,11

**Friday (1)**
138:16

**friend (6)**
11:1;12:6,13;17:2;
34:20;35:5

**friends (5)**
10:10,11,17,24;35:3

**friend's (1)**
16:23

**friendship (1)**
29:8

**front (6)**
37:20;48:3;116:25;
119:3;131:7;132:2

**full (3)**
41:21;92:11,17

**further (4)**
84:10;92:18;110:22;
126:16

## G

**gain (1)**
5:6

**gatherings (1)**
16:20

**gave (7)**
51:10;54:8;89:4;
119:17;120:17,19;
121:12

**gee (1)**
126:8

**general (12)**
25:9;42:25;53:11,16,
19,23;54:2,18,21;
55:11;83:23;84:1

**generated (1)**
118:23

**Georgia (2)**
131:8;132:2

**Germany (6)**
11:8,16,17;12:1,23;
13:6

**Gersh (2)**
94:4,14

**gets (3)**
6:16;134:17,19

**girl (1)**
47:13

**given (7)**
6:4;8:17;18:6;25:19;
43:17;91:15;127:14

**gives (1)**
124:23

**giving (4)**
52:25;67:8;79:12;
80:1

**goal (2)**
56:25;57:2,5;59:22

**goes (2)**
31:12;114:13

**Goldman (2)**
135:21;137:19

**Goldman's (1)**
135:22

**Good (27)**
4:4,16,18,20,23,25;
7:8,10,12,25;8:1;10:9;
15:17;17:2,2;34:19;
35:3;38:9;52:17;84:17,
24,25;97:24;127:22;
135:8;138:1;140:9

**great (2)**
126:12;127:25

**greater (2)**
124:22,23

**grounds (1)**
80:21

**guess (7)**
4:6;8:6;82:10;
106:18;114:21;122:23;
134:16

**guy (3)**
55:7;107:17;138:11

**guys (1)**
126:7

## H

**half (6)**
24:25;25:4;30:23;
80:12;101:6;136:16

**hammer (2)**
55:8,9

**hand (8)**
6:22;114:10;120:10,
15,23,25;129:7,9

**handed (5)**
40:19;41:19,23;
121:14;122:16;139:7

**hands (1)**
138:16

**hang (1)**
139:8

**happened (7)**
16:17;21:17;22:5;
54:13;60:16;61:3;
129:19

**happening (1)**
28:2

**happy (4)**
5:7;27:24;41:16;
133:1

**hard (4)**
27:24;90:16;104:17;
137:8

**Harris (2)**
4:23,23

**Hartzell (12)**
19:16,19;27:21,25;
28:3;29:16;82:11;
104:11,16;112:9;
114:9;139:10

**Hartzell's (2)**
119:24;121:7

**head (2)**
5:5;100:1

**heading (1)**
106:18

**hear (11)**
6:18;10:12,13;14:14,
15;15:3;43:15;62:24;
87:4;93:1,7

**heard (1)**
43:25

**heating (1)**
80:21

**heels (1)**
137:16

**help (12)**
8:16,17;10:22;11:22;
14:21;93:10,18;94:2,2,
10;95:19;105:5

**helped (6)**
94:14,15;95:18,25;

96:3,4
**helpful (1)**
27:23
**helping (1)**
87:13
**helps (3)**
14:4;43:13,19
**here's (1)**
133:25
**high (2)**
133:2,4
**high-end (1)**
54:16
**higher (4)**
59:12,21;66:4;68:17
**himself (1)**
34:1
**hired (3)**
53:18,23;100:25
**hiring (1)**
52:5
**history (2)**
124:18;129:24
**hit (4)**
116:9;118:7,13;
119:12
**Hold (8)**
10:20;80:2;83:3;
106:10;116:6;119:11;
127:7;130:5
**home (7)**
22:14,21;54:16;
59:11,13;71:23;81:25
**homes (7)**
56:20;58:6;97:5;
98:5,5;109:20,24
**honest (1)**
127:24
**Honor (78)**
4:4,16,20,23;5:3,5,
21;6:5;7:6;8:2,14;9:12;
13:24;23:14;25:14;
26:15;27:20;28:2,19;
34:14;38:18;41:6;43:5;
60:8;61:19;65:3,13;
67:7,14;69:9;81:13;
82:22;83:9;84:16;
85:13;91:9;95:7;96:14;
100:3;104:20;108:17;
114:10;115:20,24;
116:8,16,20;117:12;
118:2,6,18;119:22;
120:7,24;124:15,17;
125:7;126:12;127:5;
128:20;129:13;130:15,
23;133:7,18;134:12,
22;135:2,8,9,11;
136:13;138:18,25;
139:3,4;140:14,15
**Honor's (1)**
8:7
**hoped-for (1)**
57:17

**hoping (2)**
56:20,22
**hour (5)**
25:10;30:23;80:12;
101:6;136:16
**hours (6)**
5:5;92:20;128:8;
134:3,18;137:2
**house (20)**
16:23;18:22,24;
19:10,10;20:5,12;
21:16;22:2,18;43:4,4;
45:2,2,23;71:19,21;
76:6,10;77:8
**housekeeping (3)**
5:1,11,12
**houses (22)**
15:18,19;31:23;32:1;
33:22;43:1,22;44:16,
23;45:3,11;66:1,4;
75:23;76:2,16,20,21;
80:20;81:23;101:2,3
**hover (1)**
87:8
**hundred (3)**
88:25;90:7,10

## I

**idea (4)**
38:6;63:18,21;
106:25
**identification (7)**
5:17;25:13,18;
113:20;114:21;115:23;
116:19
**identified (2)**
92:16;117:22
**identify (5)**
40:12;41:19;48:9;
66:22;82:17
**identity (1)**
129:2
**imagine (1)**
127:13
**impacted (1)**
76:6
**impeach (4)**
125:19;128:21;
129:7;131:11
**impeaching (1)**
129:11
**impeachment (1)**
132:19
**important (3)**
9:5;48:13;122:21
**impossible (1)**
135:14
**improper (3)**
63:11;66:23;70:18
**impugn (1)**
129:23
**inadequate (1)**

126:13
**Inc (1)**
85:5
**incarceration (2)**
125:2,11
**include (1)**
98:25
**included (3)**
50:12;81:4;106:1
**includes (1)**
64:11
**including (4)**
33:23;87:14;107:9;
132:19
**inconsistent (1)**
44:24
**incorporated (1)**
110:4
**incorrect (1)**
93:15
**increase (3)**
22:20;23:2,6
**increased (1)**
71:2
**incurring (1)**
75:19
**indicate (1)**
99:24
**indiscernible (9)**
10:6;11:10;12:23;
13:22;83:10;91:13;
120:14;121:2;139:5
**industry (3)**
111:18;112:17,20
**inflated (3)**
66:11,11,16
**information (4)**
47:12;64:14;80:8;
103:8
**initial (3)**
32:3,8;36:14
**inquire (2)**
127:2;130:17
**inquired (2)**
88:15;127:1
**inspect (1)**
92:18
**inspections (1)**
92:20
**installed (1)**
89:15
**instances (1)**
138:24
**instead (1)**
13:4
**instruct (1)**
132:11
**instruction (1)**
43:18
**insurance (1)**
72:17
**intending (1)**
9:8

**intent (10)**
124:24,25;125:24;
126:17,25;127:8;
128:18;129:2,3,14
**intention (1)**
45:1
**interest (4)**
37:8;79:22;80:19;
109:25
**interested (5)**
4:10;13:23;54:25;
100:12;101:4
**interpret (3)**
116:2;118:17;123:6
**INTERPRETER (23)**
7:9,10,14,16,18;
10:22,23;11:20;18:14;
19:6,6,11,11;31:25;
33:1,5;38:25;41:12;
47:15;62:25;70:20,20,
23
**Interpreter's (1)**
31:25
**into (16)**
5:17;9:5;54:15;73:6;
78:18,22;79:8;80:12;
87:7;111:25;112:11;
114:4;116:9;117:19;
118:15;124:17
**introduce (1)**
118:15
**inves (1)**
33:23
**invest (8)**
12:15,17;15:20,22,
25;16:4,6;38:10
**investment (4)**
13:23;36:11;51:25;
74:13
**investments (6)**
13:12,15,17;32:3;
33:23;36:1
**invi (1)**
71:21
**invitation (1)**
71:21
**invoice (9)**
98:5;99:25;100:17;
103:21;105:17,17,22,
25;106:2
**involve (2)**
61:5;126:3
**involved (15)**
13:19;15:5;21:13;
35:18,22;36:17,20;
48:20;61:7;87:13,16,
19;95:6,15;97:12
**involvement (2)**
94:22;125:4
**involving (2)**
97:8,9
**irrelevant (2)**
129:15

**issue (8)**
6:13;7:4;113:21;
118:19;120:20;122:11;
133:20;134:13
**issues (2)**
8:13;135:25
**Italy (1)**
34:25

## J

**James (3)**
4:23;84:19;85:2
**Jamie (1)**
124:6
**jcohen@kagandevelopmentcom (1)**
114:23
**John (2)**
4:20;21:24
**joint (1)**
127:10
**Joseph (4)**
84:15,19;85:2;
104:25
**Judge (7)**
7:11;84:10
**judgment (1)**
127:11;128:17;
129:22
**July (1)**
30:13
**jumped (1)**
31:10
**June (31)**
23:21;30:13;55:25;
56:3,8;63:13;70:11;
71:10,13;83:18,19;
99:6,19;100:10,15,23,
24;101:6;102:5,7;
103:1;104:2;105:7,18,
21;106:4,6,24;123:5,
22,24

## K

**Kagan (141)**
4:10,10,10,13,21,22,
22;10:3,8;11:1;12:15;
13:21;15:7,13,24;16:5,
11,17;17:6,9,14,17,18,
19;18:1,17,21,22;20:7,
14,16;21:8,15;22:13;
23:2,8;24:3,6,10,16,20,
24;25:3,8;26:1,7;
27:12;29:8,9,9,19,19;
30:4,9,25;31:12,19,22;
32:4,6,19,20;33:6;
35:25;36:3,18,22;37:1,
15;38:8,16;44:16;
45:18;48:23;49:16,19;
50:5,9,17;52:4,21;53:6,
11,11,23;54:17,17,24;
55:15;56:19;58:21,21;

Case 16-01120   Doc 343   Filed 06/04/19   Entered 06/04/19 13:05:34   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 149 of 158

May 9, 2019

59:4;60:20;61:10;62:9;
65:19;67:22;68:21;
70:6;71:11,15,16,17;
72:23;73:6,18;74:1;
81:11;84:4;86:3,17;
87:20;88:6,10;89:9;
96:16,19;97:6,11,12,
16,20;98:8;99:5,7,16,
19;100:15,25;101:15,
17;102:25;103:2,6,21;
107:9,15,18;109:20;
123:22

**kagandevelopment@gmailcom (2)**
101:5;102:6
**Kagans (1)**
59:11
**Kagan's (9)**
17:23;57:2;89:3;
97:4;101:12;102:6;
107:11;109:24;110:8
**Kaiserman (2)**
136:15;137:10
**Karpovsky (1)**
5:20
**KDC (37)**
4:11,21;24:4,7,11,17,
20,25;25:5;50:2;53:11,
16,19,23;54:2,21;
55:11,15;83:19,23;
85:7,10;86:3,7,11,17,
19;94:1;105:25;
106:19;107:13,17;
112:5,5,11;114:16;
124:2
**KDC's (2)**
25:9;107:14
**keep (1)**
80:21
**keeps (1)**
136:20
**Keystone (1)**
126:6
**kind (7)**
13:23;16:4,6;20:16;
61:10;101:12;102:12
**knew (13)**
38:16;49:15;50:20;
53:22;55:3,7;59:17;
76:8;78:21;79:10,15;
81:2;99:10
**knock (1)**
136:16
**knowing (3)**
17:11;62:9;90:11
**knowledge (10)**
57:15;60:16;63:10;
69:10,17,20;70:10;
125:25;129:2,3
**known (2)**
10:3;35:14
**Kops (1)**
126:6

## L

**labor (1)**
98:22
**laid (1)**
127:12
**land (5)**
15:17;45:22,22,23;
54:14
**language (5)**
14:4;55:12;80:23;
103:11,15
**last (22)**
5:21;7:19;15:3;
19:12,12,13,16,20;
20:6;41:10;90:13;
95:12;98:22;115:13;
117:7,8,9;121:13;
123:4;130:18,19;
131:15
**late (2)**
45:21;106:24
**later (8)**
21:11;22:19;40:24;
41:18;58:6;101:6;
114:19;131:5
**law (15)**
28:25;29:5;75:24;
96:2,2,3;118:13,21;
120:12;128:13,14,16;
129:20;132:24;135:4
**lawsuit (15)**
30:8,10;54:9;57:9;
68:20;70:13;71:3,7,9,
10,14;73:14;74:19,25;
75:4
**lawyer (4)**
70:14;71:6;81:6;
89:22
**lay (3)**
5:6;114:12;126:15
**LC (2)**
73:11,11
**learn (1)**
45:4
**least (5)**
28:13;76:16;86:6;
126:3;130:13
**leave (3)**
8:11;135:3;137:24
**led (1)**
124:20
**left (4)**
77:25;78:11;79:1;
81:19
**leftover (1)**
32:14
**legal (13)**
61:17,20;69:5;73:9,
11;89:20;93:10;94:22;
98:12;112:22,24;
113:4,13

**legit (1)**
71:3
**letter (35)**
26:20;27:2,6,12;
28:5,23;29:9;30:6;
67:22;70:14,19,24,24;
71:6;73:21;81:6,8;
88:3,5,8,10,17;91:17,
21;92:9,10;93:11,18,
19;101:21;104:25;
105:3,10;106:2;114:3
**level (1)**
80:22
**liability (1)**
31:8
**licensing (1)**
111:20
**lien (23)**
30:15;31:23,24;
74:16,17,17;76:1,10;
77:2;94:1,6,23;95:1;
96:17,21;97:13,17;
98:13,19;99:12;
105:14;107:18;123:23
**liens (6)**
74:2,8;76:5;77:3;
81:23;99:1
**life (3)**
35:11;124:20;130:5
**limited (1)**
31:15
**line (15)**
39:22;40:17;77:23;
78:8,8;93:21,22;97:2;
102:18,23;108:15,16;
113:1,11;128:10
**lined (1)**
137:10
**lines (4)**
6:15;94:9;106:18;
109:9
**Lipetsker (39)**
4:17;7:7,8,23;8:3;
9:16;18:6;19:19;21:7,
22;23:17;25:17,23;
26:5,13;28:22;29:16;
31:12,18;33:10;34:13,
18,20;38:22;45:6;48:1;
59:3,10;60:11;61:14;
65:9,18;69:13;81:17;
82:13;84:8,11;88:6;
124:3
**listed (6)**
58:12,14,18,19,24,24
**listen (3)**
59:3;93:5;96:11
**listened (1)**
96:8
**listing (10)**
26:6;58:15;60:1,5,5,
12,17;61:3;62:7;63:5
**lists (1)**
128:25

**litigation (11)**
24:1,4,7;25:23;26:5;
49:10;71:3,13;87:13,
14;101:9
**little (12)**
10:19;11:11;14:8;
19:7;64:23;80:12;90:8,
16;111:4,4;134:17;
135:3;137:16
**live (2)**
12:22,23
**lives (2)**
13:6;71:20
**LLC (10)**
4:8,13;48:21;53:23;
73:13,14,14,14;106:19,
23
**lo (1)**
33:24
**loan (14)**
22:24,25;23:1,5,8,
11;32:2;33:22;75:22;
78:18;79:7,19,22,24
**loans (2)**
22:1;76:25
**locked (1)**
111:12
**Londe (1)**
87:17
**long (19)**
5:3;9:19;10:3;11:1;
12:1;30:22;40:1,3;
43:7;59:7;67:15;79:19;
96:12;109:12;119:25;
120:20;127:12;136:24;
138:6
**longer (6)**
62:7;64:23;80:4;
108:24;109:11;137:16
**look (34)**
5:21,24;18:8;24:13;
25:20;27:3;59:9;77:22;
82:6;85:24;86:15;
90:12;93:16;94:8;
96:10;100:22;104:8;
105:16,17;108:12;
111:8;112:1;113:12;
121:17;122:24;127:15;
130:21;131:7,23;
132:9;134:5,6;135:4,5
**looked (4)**
6:10;58:15;83:20;
90:14
**looking (11)**
24:14,19,23;25:3,8;
39:6;80:8;82:15;93:17,
21;134:23
**looks (1)**
125:17
**lose (3)**
33:24;36:6,8
**lost (1)**
73:19

**lot (4)**
20:19;72:19;125:18;
129:4
**lots (1)**
127:2
**low (1)**
50:5
**lower (1)**
102:11
**lunch (2)**
82:15,19
**luxury (4)**
15:18;43:1,4,22
**Lyman (3)**
12:18,20;100:24
**Lyman- (4)**
4:7;13:19;21:25;
51:4
**Lyman-Cutler (42)**
4:12;15:5;16:18;
17:13;21:13;24:7,11;
26:3;27:14;29:18;
33:10;34:1,5;35:23;
36:14;48:21;51:8;52:9;
53:15,22;63:10;65:20;
69:1,15;70:3,7;73:10;
76:12;77:24,25;78:10,
12,18;79:1,13;89:12;
102:11;106:19,23;
109:11,16;115:1
**lymancutlerllccom (1)**
56:14

## M

**Maiden (13)**
12:3,4;13:21;15:8;
16:11,16;17:21;35:14,
17,17;46:2,9,18
**Maiden's (3)**
15:8;17:16;36:15
**mails (1)**
101:22
**main (1)**
139:11
**maintain (2)**
80:20;92:17
**maintenance (1)**
75:19
**makes (1)**
14:25
**making (3)**
94:17;107:14;109:18
**man (1)**
126:11
**manage (1)**
87:13
**management (1)**
115:1
**manager (7)**
85:7,10;86:2,7;
87:12;90:15;105:1
**managing (15)**

48:18,22;89:12,15,
16,19;90:15,18,20,22;
92:1,5,8,17,24
**many (13)**
13:15,16;36:17;
54:24;67:23,24;76:8;
89:9;90:10;99:15;
109:6;115:9,10
**mark (2)**
121:1,4
**marked (5)**
25:18;82:15;91:17;
102:2;114:20
**market (3)**
32:2;74:11;77:11
**marketable (1)**
110:23
**marketplace (1)**
32:1
**Mary (1)**
88:1
**Mason (1)**
15:7
**Massachusetts (1)**
54:15
**material (1)**
45:20
**materials (4)**
70:7;98:22;113:13;
127:14
**math (2)**
77:5,6
**matter (4)**
40:3;63:22;132:12,
19
**maximum (1)**
68:18
**May (46)**
4:14;14:16;18:2,4;
23:14,15;25:14,15;
26:15;38:19;39:19;
40:3;43:10;65:13;
69:16;81:6;82:22;
85:13,14,17;86:1,6,16,
24;88:5;91:9,11;92:16;
94:9;95:8;100:3,4,19,
20;101:18;104:20;
111:3;114:15,19;
115:7;116:8;124:3;
127:5;128:25;132:18;
137:15
**Maybe (11)**
11:19;17:11,15;
30:23,23;44:1;64:12,
12;89:24;126:8;134:16
**McGregor (1)**
21:24
**mean (44)**
6:8;7:2;27:23;31:8;
32:7,8;42:16,22;43:9;
81:8;93:3;101:21;
108:7;117:13,20,23;
119:9,13,23,23;120:16;

121:4,6,19,25;122:4,5,
7,8;126:20;127:3,11;
128:25;129:2,4;
130:11;131:7,22;
133:8;134:2,17,18;
136:1,10
**meaning (1)**
61:20
**means (8)**
55:13;90:17;97:18,
21,21;98:9;116:2;
118:16
**meant (4)**
98:11;111:9;131:10;
132:4
**mechan (1)**
75:25
**mechanic (1)**
99:1
**mechanical (2)**
75:24;76:1
**mechanic's (17)**
30:14;31:23,24;74:2;
94:1,23;95:1;96:17,21;
97:13,17;98:13,18;
99:12;105:14;107:18;
123:23
**medical (1)**
12:13
**meet (6)**
10:5;16:21;17:5,6;
30:17,22
**meeting (34)**
16:16;17:16,18,21,
24;18:18,20;19:4;20:9,
17;21:4,9,12;30:9,25;
31:11,19;36:14;37:4,8;
38:2,6;40:19,25;41:20;
42:17,19,20;44:25;
51:16;72:6;75:11;
79:12;82:18
**member (14)**
48:22;72:6;75:11;
89:12,16,16,19;90:18,
20,22;92:6,17,18,24
**members (1)**
107:8
**memo (1)**
118:9
**memorandum (5)**
118:18;120:5;121:5;
122:17;127:21
**memory (7)**
6:23;22:13;56:7,11;
100:16;108:11;112:3
**mention (2)**
27:19;43:24
**mentioned (5)**
20:12;27:13,17;49:9;
110:16
**mess (2)**
117:25;126:9
**message (1)**

60:19
**messages (1)**
71:24
**messaging (1)**
71:25
**met (13)**
10:4;13:21;15:7,8;
16:19;17:8,10,10,12,
14;34:23,25;75:3
**metadata (13)**
114:1,4,10;115:25;
116:2,5;117:3;118:17;
123:7,15,16;133:15,17
**method (1)**
117:19
**mic (1)**
10:18
**microphone (5)**
9:5;14:9;87:3,8;
139:9
**midday (2)**
138:21,21
**middle (1)**
134:25
**Middlesex (1)**
57:23
**might (8)**
38:7;99:14;122:10,
12;129:15;133:8,14,19
**miles (2)**
135:14;136:11
**million (27)**
18:23;22:1,2;32:21;
33:7;38:9;47:4,10,19;
48:5,11;56:21,25;57:7,
10;58:7,12,19,25;
59:22;76:17,22,25;
77:2,3,8;106:19
**mine (1)**
12:13
**minutes (8)**
12:9,11;30:23;80:6,
11,13;121:17;139:15
**mishear (1)**
90:22
**mismanagement (1)**
112:13
**missed (2)**
126:20;130:22
**misspoke (1)**
111:9
**Misstating (1)**
60:6
**mistake (3)**
31:25;125:25;129:4
**mistranslation (1)**
47:13
**misunderstanding (2)**
126:9,10
**MLS (1)**
58:15
**moment (7)**
18:7;25:20;43:18;

81:24;105:16;121:8;
122:16
**moments (1)**
44:7
**Monday (8)**
100:24;135:21;
136:17;137:7,8,9,13,22
**money (25)**
16:4,7;24:25;32:14,
17;34:11;36:7,8;50:6,
10;68:21;72:20;77:20,
25;78:11,24;79:1,10,
11,14,15,17;106:23;
107:12,15
**monies (3)**
52:1;78:21;81:10
**monitoring (1)**
49:5
**monitors (1)**
18:3
**monthly (1)**
80:19
**months (4)**
62:4;68:7;70:25;
76:22
**more (30)**
10:19;11:19;15:13;
36:24;45:19;47:15;
50:6,10;63:15;64:22;
66:20;67:25;70:21;
71:12;77:8;84:7;86:23;
89:1;90:7,10;124:19;
125:2,9;128:22;
129:19;130:6;132:24;
134:17;135:24;137:9
**Morning (23)**
4:3,4,16,18,20,23,25;
7:8,11,12,25;8:1;34:18,
19;75:1;83:22;84:17,
18,24,25;134:9;135:7;
136:12
**mortgage (6)**
34:1,4,5;72:14;
79:13;81:25
**most (2)**
36:21;45:20
**Mostly (1)**
45:3
**Mother's (3)**
138:7,10,12
**motion (5)**
121:7,24;128:17;
139:10,25
**motions (1)**
127:11
**motive (1)**
129:1
**move (1)**
10:18
**much (18)**
5:7;15:1,22,24;
36:25;38:12,16,20;
40:2,4;56:3;64:22;

80:4;84:12;106:23;
122:13;126:16;138:4
**muffled (1)**
14:12
**multipage (1)**
122:16
**multiple (3)**
50:8;124:13;126:2
**must (3)**
119:20;122:21;
124:22
**must've (1)**
130:2
**myself (1)**
93:12;102:7;135:3

# N

**nails (1)**
55:8
**name (10)**
7:13,19;8:8;9:15,16;
16:10;42:2;85:1;124:6,
9
**names (2)**
4:14;54:25
**narrow (1)**
67:10
**native (2)**
114:16;115:5
**nature (2)**
75:20;121:5
**nearly (2)**
59:12;135:14
**necessary (6)**
6:9,17,20;30:1,3;
80:20
**need (21)**
8:16;20:20;26:24;
43:20;44:5;113:22;
114:6;117:5,24;
121:16,17;128:13,14,
15;134:15;136:22;
137:3;139:1;140:6,7,8
**needed (4)**
34:11;98:18;99:11;
132:15
**needs (3)**
6:25;10:18;81:4
**neglect (1)**
112:13
**negligence (1)**
112:13
**negotiation (2)**
21:13;36:22
**negotiations (3)**
37:1;51:13;57:13
**neighbor (1)**
13:11
**nephew (2)**
35:8;37:11
**New (3)**
6:4;33:3;58:6

**news (1)**
125:3
**Newton (3)**
30:18,19;31:20
**next (9)**
16:17;25:7;83:11;
91:7;104:16;109:14;
115:9,10;128:8
**Nickolay (5)**
4:17;7:7,23;9:16;
20:20
**night (2)**
5:21;134:20
**nine (3)**
68:7;70:25;76:21
**ninety (2)**
98:22;99:11
**ninety-five (1)**
110:22
**none (1)**
71:17
**non-Kagan (1)**
102:15
**Nope (1)**
140:10
**Nor (1)**
120:9
**normal (1)**
92:20
**note (1)**
126:24
**notes (2)**
37:5;113:15
**notice (13)**
124:24,25;126:17,
25,25;127:8,20,23;
128:8,13,14,17;129:14
**November (1)**
58:6
**nuances (1)**
8:6
**number (8)**
4:7,8,12;13:12;
23:18;25:18;59:10;
82:16
**numbers (18)**
38:1;39:23;48:7,8;
57:12;67:23,24;68:4,5,
6,10,11,14,15,17,19;
70:14;94:19

## O

**oath (4)**
7:21;65:10;85:22;
132:7
**object (9)**
58:19,23,25;59:4,6,8,
19;66:24;69:16
**objected (1)**
111:18
**objection (15)**
4:9;31:1,1;60:4;

**61:12;69:3;114:3;**
116:12;117:1,2,3,10;
118:3;123:9;124:15
**objection's (1)**
69:23
**obligates (1)**
109:20
**obligation (9)**
53:1;72:24;81:1,2;
88:11,16;89:5;96:20;
97:4
**observe (2)**
45:10,11
**obviously (3)**
112:2;122:14,15
**occurred (1)**
130:9
**occurring (1)**
127:9
**o'clock (6)**
122:4;132:8;134:6,6;
135:7;138:23
**October (17)**
15:12;17:15;18:18,
20;19:4;20:17,22;21:4,
9,12;37:4;41:20,23;
42:19,20;51:16;75:8
**off (11)**
31:23;32:2,15;65:5;
74:8;81:19;100:1;
116:18;135:15;136:16;
137:22
**offer (7)**
6:24;74:19;115:22;
120:23;125:21,23,24
**offered (4)**
5:16;15:9;40:25;
125:19
**offering (3)**
31:7;74:7;129:3
**office (12)**
5:24;12:8,8;15:8;
17:16,19;25:9;36:15;
38:23;71:22,23;139:12
**officer (2)**
85:4;86:13
**often (1)**
92:19
**old (5)**
10:1;108:23;112:23;
113:14;125:3
**once (6)**
21:7;51:19;58:14;
72:23;74:4;75:11
**one (67)**
5:14;6:23;7:20;8:21;
10:14,20,22;12:10,15;
13:5,16;16:19,22;19:9;
21:15;22:10,17;36:11,
24;45:1,1;47:15;48:20;
55:3;57:3;61:2;62:1;
63:14;65:18;66:20;
68:15;70:8,21;71:12;

**74:21,22;80:2;81:5;**
82:3;83:12,14;86:11;
88:13;93:11,13,19;
94:2;95:18,25;96:4;
98:20;99:2;105:5;
106:1;107:11;108:24;
110:25;111:4;112:8;
114:8;116:13;125:16;
129:7;131:21;133:25;
135:11;137:11
**one-way (1)**
43:12
**ongoing (1)**
75:19
**only (31)**
6:10;13:4;22:16;
33:7;41:22;42:18;
46:16,17;58:24;60:18,
21;62:1,5,11;64:9,14;
68:4,7;70:12;72:2,2;
74:22;99:24;105:25;
106:2;112:12;117:3;
125:19,22;126:14;
128:20
**onto (1)**
139:8
**op (1)**
34:11
**open (3)**
42:13,16;136:8
**operating (34)**
21:14;46:2,6,14,17,
17,21;47:4,5,11,17,21,
23;48:4,15;51:11;
52:15,20;72:7,23;73:6;
81:1;84:5;88:20,24;
89:2,9;90:6;96:20,22;
109:16,16,23;110:15
**operation (2)**
34:11,12
**operations (1)**
48:21
**opinion (1)**
89:4
**opportunity (6)**
71:18;72:8;96:6;
122:24;125:24;129:1
**oral (1)**
65:10
**orally (1)**
126:25
**orchestrated (1)**
126:10
**order (5)**
6:20;16:4;98:5,18;
135:5
**originally (2)**
45:12;108:24
**Otherwise (1)**
96:12
**ought (2)**
139:9;140:1
**ourselves (1)**

**6:10**
**out (27)**
5:6;7:20;23:1;29:10;
36:10;40:19;41:19,23;
45:25;71:4;76:24;
79:17;99:6;108:9;
112:22;116:1;118:1,8;
125:1,17;127:13;
128:25;129:17;131:1,
10;132:4,7
**outcomes (1)**
40:1
**outside (2)**
61:20;97:11
**over (9)**
13:16;35:5;55:1;
80:12;87:8;88:23;
100:7;122:25;126:2
**overcharged (1)**
64:5
**overcharging (1)**
63:22
**over-glorify (1)**
119:23
**over-glorifying (1)**
117:20
**overlooked (1)**
125:15
**overnight (2)**
122:5,7
**overrule (1)**
31:14
**overruled (3)**
69:23;95:10;123:9
**overruns (1)**
81:7
**owed (1)**
81:11
**own (1)**
93:11

## P

**page (62)**
19:16,20;20:7;24:13;
25:7;27:3,10;39:5,7,14,
16,20,23;40:16,17;
77:22;78:4;80:18;
81:18;82:8,14;83:11;
85:24;86:15;88:14;
90:13,13;91:6,7,22;
93:16,17,22;94:8;
96:24;97:1,2;102:23,
24;104:12,16;106:11;
108:12;109:9,14;
110:6,7;111:8,9;
112:25;113:4,11;
115:13;117:7,8,9,21,
22;118:1;119:16;
125:22;131:8
**pages (7)**
102:21;113:25;
114:3;115:9,9,10;

**122:17**
**paid (7)**
32:15;52:9;73:3,10,
11;81:7,10
**pains (2)**
55:20,25
**painters (4)**
99:5,18,21;100:15
**paper (10)**
18:6;23:19;25:19;
42:5,6;91:10,15;104:8;
116:13;117:1
**paragraph (19)**
6:23,25;24:14,19,23;
25:8;54:12,13;58:5;
59:9;91:21,24;92:12,
14,24;97:13;100:12;
103:20;110:6
**paralegal (1)**
119:25
**parcel (1)**
54:16
**parcels (1)**
54:15
**parental (1)**
136:11
**part (10)**
15:10,17;19:12,13,
15;51:13;57:14;72:19;
73:23;82:13
**partial (1)**
41:23
**Partially (1)**
60:14
**particular (4)**
27:25;86:2;97:13;
111:13
**particularly (2)**
14:12;38:11
**parties (5)**
4:10,14,24;24:1;
101:8
**partner (3)**
48:18;92:1,8
**parts (1)**
19:8
**party (1)**
124:23
**passed (1)**
125:10
**past (3)**
10:8;89:11;131:18
**path (1)**
124:25
**Pause (10)**
19:5;26:17;27:1;
33:20;48:6;66:18;80:3;
85:15;100:2;104:22
**pay (5)**
32:2,21;33:7;72:14;
73:6;74:12;77:20;
80:18,18;81:3;84:4;
88:11,16;89:5;106:19

Case 16-01120    Doc 343    Filed 06/04/19    Entered 06/04/19 13:05:34    Desc Main
LYMAN-CUTLER, LLC, et al. v.                    Document      Page 152 of 158
KAGAN, et al.                                                                              May 9, 2019

**paying (9)**
24:6,16,20,24;25:4,
9;26:2;72:23;81:8
**payments (2)**
63:9,11
**peaceful (1)**
32:18
**Peet's (1)**
30:18,19;31:19;74:5
**penalties (3)**
32:3;55:20,25
**penalty (1)**
112:5
**pending (3)**
67:21;74:23;133:8
**people (6)**
13:4;16:25;53:13;
76:8;99:11;130:2
**per (3)**
8:21;22:14,21
**percent (8)**
24:21,25;25:4;32:8;
40:4;71:2;109:25;
110:22
**percentage (1)**
79:25
**perfect (1)**
127:25
**perfectly (1)**
69:22
**perhaps (6)**
5:3;10:21;28:10;
91:3,23;121:23
**period (2)**
62:7;101:16
**perjury (2)**
55:20,25
**permission (3)**
24:11;35:1;63:6
**person (12)**
51:2;93:25;94:1,2,3;
98:22;118:25;119:4,8,
19;130:2,2
**personal (12)**
33:23;36:20;52:14;
57:15;60:16;63:10;
69:10,17,20;110:8;
124:12,13
**personally (12)**
35:21;36:17;38:1;
53:21;61:2,5,7,8;64:3;
70:10;73:10;84:4
**perspective (3)**
8:16;89:15,17
**persuaded (1)**
7:2
**Perten (148)**
4:20,20;5:11,12;
8:13,14;10:12,18;13:3,
24;14:2,6;21:1;27:20;
28:2,7,9,11;31:1;34:17,
19;38:18,21;39:19,21;
41:6,14,16,17;42:5,10;

43:5,7,12,19;44:3,14,
15;47:16,23,25;51:23,
24;52:17,19;54:6,7;
57:20,21;60:7,10;
61:19,23;62:21;63:1;
64:19,21,23;65:3,13,
15,17;67:2,7,14,19;
68:2;69:7,9,12,25;
70:22;80:6,10,13,15,
16;81:13,18;82:3;83:9,
13,15,17;84:10;85:20;
95:7;111:18;113:21,
24;115:20,24;117:3,7,
9;118:6;119:2,4,7,14;
120:7,9,12,14;122:14;
123:6;124:15,17;
125:13;126:12,23;
127:17,21,23;128:11;
129:13;130:10,23;
132:6;133:5,7,10,13;
134:8,10,12;135:8;
136:3,5,7,13,19;137:2;
138:6,13,22,25;139:3,
12,15,20,22,25;140:4,
7,9,12,14
**Perten's (5)**
6:2;44:8;94:25;
95:20;98:25
**Peter (1)**
4:18
**petition (2)**
76:11;79:19
**ph (4)**
5:20;12:12;111:1;
114:22
**phase (1)**
24:17
**phone (4)**
60:18;71:17,25;72:2
**phoned (1)**
72:2
**phrase (2)**
69:16;101:8
**phrasing (1)**
101:13
**piece (1)**
83:17
**pieces (1)**
112:2
**place (4)**
48:9;81:17;99:17;
139:9
**placed (2)**
21:23;81:23
**plaintiffs (2)**
7:7;84:15
**Plaintiff's (9)**
5:16;18:7;23:17;
25:18;29:17;83:5;
91:17;114:20;115:22
**plan (1)**
18:17,19;19:2;42:22;
46:1;58:5;125:25;

126:10;129:2,3;136:18
**planned (1)**
54:14
**plans (7)**
17:25;19:1,4;42:21,
23;45:10;53:4
**plea (1)**
134:16
**please (41)**
4:14;9:15;10:16,22;
18:14;19:17;21:1,20;
22:10;25:7,13;26:10,
14;29:14;36:24;39:14;
41:6,9,12;47:12,15,24;
48:5;59:3;65:8,14;
69:24;82:7;84:21;
89:25;90:25;95:22;
96:25;101:2,24;
102:23;104:6,21;
107:22;108:13;120:12
**pleasure (1)**
8:7
**pm (3)**
103:1;138:17;140:16
**pocketing (1)**
68:21
**point (16)**
30:9;41:10;44:8;
46:23;49:9,10;55:23;
64:21;70:5;73:2;78:14;
82:3;115:25;125:2;
128:7;131:6
**polysavant@hotmailcom (1)**
114:22
**popular (1)**
45:20
**portion (5)**
28:4;32:4,6;41:23;
110:12
**positive (3)**
36:3,5;138:15
**possession (1)**
109:12
**possible (3)**
40:1;113:14;136:23
**post-construction (1)**
25:5
**potential (1)**
38:7
**pounding (1)**
55:8
**practically (1)**
37:3
**precise (1)**
86:23
**precludes (1)**
124:18
**predicate (1)**
82:10
**prefer (1)**
101:9
**prefers (1)**
5:5

**prep (1)**
108:20
**preparation (3)**
94:23;129:2,3
**prepare (1)**
128:9
**prepared (5)**
37:22,25;39:7;46:2;
120:6
**preparing (8)**
51:7;96:17,21;97:17;
98:13;103:21;105:21;
122:15
**pres (1)**
17:19
**presence (1)**
97:11
**present (6)**
17:21;36:21,25;
51:16;73:18,19
**presentation (11)**
17:20,23;19:9,22;
40:11,19,25;41:2,5,19;
82:18
**presented (7)**
17:25;18:1,18,25;
20:1,6;98:10
**pressure (2)**
107:7;124:3
**pre-trial (6)**
114:8;120:5,17;
127:10,15,21
**pretty (4)**
119:24;120:1;122:9;
133:2
**prevented (1)**
81:24
**price (8)**
32:2;57:16,17;59:11,
12,22;64:15;74:11
**prices (1)**
58:7
**primary (1)**
93:25
**principal (1)**
140:3
**print (2)**
104:17;119:12
**printed (3)**
118:1,8;123:4
**printout (6)**
114:10;115:11,16;
117:21,24;119:16
**prior (6)**
35:23;38:2;53:10;
88:17,18;125:23
**prison (3)**
130:21;132:4,7
**privately (1)**
75:16
**privilege (3)**
95:8;132:16,18
**privileged (1)**

97:9
**pro (2)**
36:8;99:24
**Probably (4)**
76:3;7;87:1;137:2
**probation (2)**
131:8;132:3
**probative (1)**
124:22
**problem (7)**
8:8,10,20;76:7;
113:24;119:5;137:7
**problems (1)**
29:11
**proceed (2)**
7:5;65:13
**proceeded (1)**
48:25
**proceeding (1)**
139:11
**process (1)**
118:23
**produces (1)**
118:23
**ProEx (2)**
63:14,19
**ProExcavation (8)**
4:11,21;25:24;26:2;
49:20,24;64:9,15
**ProExcavations (1)**
63:15
**proffered (1)**
118:20
**profit (6)**
20:3;38:7,9,12,15;
40:3
**profits (2)**
36:9;109:25
**progress (1)**
50:16
**prohibited (1)**
125:4
**project (51)**
12:15,17;13:20;15:6,
9,13,20;16:7,18,20;
17:13,20,25;18:1,21;
24:8;25:1;26:3;27:14,
18;36:8,19;37:9;38:8,
9;43:3;51:5,14;52:1;
53:16,24;54:18;55:1,2,
4;56:4;58:5;62:16;
63:3,10,19;65:20;69:1;
70:3,7;71:1;79:8;
83:23;98:23;109:25;
111:13
**projected (2)**
20:2;58:7
**projects (5)**
13:5;36:6;53:10,12;
70:8
**proof (6)**
68:23,24,25;69:6
**proper (2)**

64:15;117:19

**properly (3)**
69:1;76:2,4

**properties (22)**
30:15;36:1;51:19;
58:11,14,18,24;75:24;
80:20;99:19;100:25;
115:16;116:10;117:21,
22;118:1,7,8,14,16;
119:12,16

**property (9)**
23:9,12;52:21;74:2,
10;77:3;99:6,21;
120:14

**proponent (2)**
124:23;126:16

**proposal (11)**
25:24;32:9,13,19,21;
33:6,7;106:12,12,14,20

**propose (1)**
14:16

**proposed (2)**
102:15;116:21

**proposing (2)**
32:13;133:23

**prospective (1)**
110:22

**protection (2)**
33:11,14

**prove (1)**
31:7

**provide (3)**
101:2;118:10;121:10

**provided (1)**
92:19

**provides (1)**
98:22

**providing (2)**
119:15;128:16

**provision (9)**
97:5;109:20;110:2,5,
8,14;112:4,11,18

**provisions (1)**
27:25

**proximity (1)**
56:4

**pull (2)**
47:23;87:3

**pulling (1)**
116:17

**purchase (1)**
54:14

**purchased (1)**
70:8

**purchasers (1)**
110:23

**purported (1)**
115:4

**purporting (1)**
103:13

**purports (2)**
102:5;105:18

**purpose (5)**

31:15;37:7;123:23;
128:24;129:1

**purposes (2)**
129:4,10

**pushed (1)**
136:17

**put (41)**
6:13,18;19:16,19;
29:16;31:22;32:1;50:6;
74:2,18;75:25;76:21;
77:17,19,23;78:10,17,
22,24;79:5,8,10;82:11;
94:1;107:6;110:6,8,19,
20;111:25;112:4;
114:8;117:19;123:22;
124:3;126:7;127:10,
16;129:9;135:20;
140:10

**putting (3)**
83:1;94:17;128:16

**Pyle (6)**
27:4;88:5,17;93:18;
102:7,25

**Q**

**qualified (4)**
118:24;119:4,8,19

**quarter (1)**
80:19

**quickly (1)**
75:7

**quite (2)**
121:9;125:18

**quizzically (1)**
96:10

**R**

**raise (1)**
139:7

**raised (1)**
120:20

**ratio (3)**
45:23,24,25

**re (3)**
12:18;27:5;96:22

**reach (2)**
20:16;129:13

**reached (2)**
21:4,8

**read (32)**
6:15,16,23;7:21;
27:24;32:24;40:5;
46:18;47:3;49:21;
52:23;54:12;55:12;
82:1;83:17;86:3;88:18;
91:6;92:21,25;93:3,3,
20,23;97:14;105:23;
106:20;111:21;113:11,
16;125:16;135:4

**reading (4)**
80:18;89:7;90:19;

98:25

**ready (2)**
25:21;101:4

**real (6)**
13:16;35:18,22;51:2;
75:7;76:9

**really (10)**
6:14;14:3;42:6;79:5,
14;81:2;105:24;
117:20;129:22;136:22

**reason (3)**
68:4;75:18;124:24

**reasonable (7)**
124:23;126:17;
127:7;128:12,12,14;
135:5

**reasoning (4)**
29:5;30:2;33:18;
34:9

**reasons (2)**
75:21;125:22

**rebut (1)**
126:5

**recall (29)**
17:23;19:3,25;21:17;
30:12,14,24;31:20;
38:22;54:8,9,18;60:2,
11;63:16;68:22;74:2;
77:16,17;78:17,18;
92:10;99:9,13,15,16;
100:13;111:15;120:4

**receipt (1)**
106:20

**receive (1)**
27:6

**received (6)**
21:25;26:23;27:9,12;
30:6;70:13

**receiving (2)**
26:20;49:8,24;50:2;
56:16

**recess (1)**
65:4

**recognize (16)**
18:10;26:12,18;27:5;
42:8,9,11,12;88:3;
90:4;91:2,8;92:23;
104:9;106:14;115:16

**recognized (1)**
112:19

**recollect (1)**
92:7

**recollection (2)**
100:14;101:11

**recomm (1)**
17:3

**recommend (1)**
17:4

**record (10)**
4:15;13:7;28:13;
62:24;65:5,6;87:4;
98:18,21;118:22

**recorded (3)**

30:15;100:8;105:13

**recording (1)**
99:11

**records (2)**
86:23;99:24

**recreate (1)**
113:16

**rectified (1)**
92:16

**Redirect (2)**
81:14,15

**redoing (1)**
101:1

**refer (2)**
92:1;96:22

**reference (1)**
111:12

**referencing (1)**
39:12

**referring (2)**
19:23;96:24

**refile (1)**
139:12

**refresh (5)**
6:23;22:12;100:14,
16;108:11

**refreshed (1)**
112:3

**regard (3)**
16:17;17:13;63:9

**regarding (5)**
36:14,19;51:14;60:1,
12

**regularly (2)**
45:7,8

**related (2)**
51:18;52:13

**relates (1)**
43:3

**relation (2)**
12:8;22:23

**relationship (3)**
10:7,9;29:8

**release (5)**
131:5,9,13;132:3,5

**released (3)**
125:10,12;131:24

**relevant (1)**
110:18

**relies (1)**
107:18

**rely (1)**
128:15

**relying (1)**
132:5

**remainder (1)**
32:16

**remember (32)**
11:10;12:18;16:11,
22,25;17:10;26:20;
27:10;39:23,24;40:6,
20;52:22;54:4;59:7;
60:14;66:13;78:16,16,

24;79:18,21;82:5,6,20;
83:18;85:18;90:14;
111:6;112:18;114:17;
130:22

**remind (1)**
65:9

**repaid (1)**
81:25

**repainting (1)**
101:1

**reparation (1)**
125:25

**repeat (7)**
10:16;32:24;33:2,4;
41:12,16;69:24

**repeated (1)**
20:25

**repeatedly (1)**
103:12

**rephrase (1)**
69:7

**reply (2)**
133:12;134:8

**represent (1)**
35:20,20

**represented (1)**
35:17

**representing (1)**
99:3

**request (3)**
81:25;92:15;136:10

**requested (1)**
52:12

**requesting (2)**
50:5,10

**require (2)**
118:21;126:22

**requirements (2)**
118:12,25

**requires (4)**
118:22;119:19;
126:19;127:23

**research (10)**
98:10,10,12,17,25;
112:16,22,24;113:4,13

**reserve (1)**
53:3

**resolved (1)**
31:11

**respect (6)**
60:16;61:3,19;62:15,
19;67:14

**respectfully (1)**
122:8

**respond (5)**
16:2,8;28:23;32:19;
121:23

**responding (2)**
8:11;102:10

**response (7)**
19:12;89:3;98:2;
101:4;102:14,15;108:9

**responsibility (1)**

Case 16-01120    Doc 343    Filed 06/04/19    Entered 06/04/19 13:05:34    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 154 of 158

May 9, 2019

92:17
**rest (7)**
32:14;39:25;81:22;
117:10;130:5;134:18,
20
**result (2)**
46:8;118:24
**resume (2)**
132:13,21
**RESUMED (2)**
65:16;123:2
**retained (4)**
28:23;29:1,3,6
**retaining (1)**
28:25
**return (1)**
81:18
**returned (1)**
32:15
**returns (1)**
68:22
**review (5)**
46:5;70:17;92:10;
108:13,19
**reviewed (14)**
46:14;47:18;48:10;
57:23;82:18;88:20,24;
89:2;90:7;109:15,19;
110:5,14,17
**reviewing (1)**
21:25
**rid (1)**
109:3
**right (192)**
7:4,4,19;9:1,11;
13:13;16:9;19:1;22:7,
21;28:19,20,23;30:19,
20,21;31:9,10,14;32:9,
10,11,12;33:11,19;
35:2,7;38:17;41:7;
43:16,24;44:3;47:14;
48:7,7,12;51:2;53:18;
56:10;64:5;65:4;66:6,
7,13,13;68:10,16;
69:21;74:5;79:3;80:4,
7;84:9,11,13;85:20,23,
25;86:7,12,17,21,22,
25;87:5,6,14,17;88:6,8,
11,21,25;89:6,9,13,18,
19;90:18;91:15;92:2,6,
9;93:11,13;94:1,5,11,
12,23,25;95:6;96:2,5,9,
17,21;97:14,18,22;
98:2,6,12,13;99:3,8,20;
100:13;101:6;103:4,
16;104:14,25;105:3,7,
11,14,18,19,22,25;
106:16,16;107:9,11,12,
19,25;108:3,6,10;
109:5,13,17,19,20,25;
110:3,9,12,24;112:6,
17,20,22,23;113:23;
114:17,21,23;115:1,5,

19;116:6;119:18;
120:13,25;121:3,15;
123:18;124:4,7,9;
125:8;127:22;131:4,
22;132:8,8,23;133:10,
13,23,24;134:2,3,21,
24;136:6,21,24;137:12,
17;138:15,17;139:1,2,
7,18;140:1,5,12
**Risk (1)**
18:19
**road (1)**
6:9
**Rockland (1)**
21:25
**role (2)**
51:7;87:12
**roll (1)**
5:4
**Rule (16)**
6:13,13;114:9;
117:13,14;118:9,13;
119:19;124:18,21;
125:4;127:23;128:2,2;
131:4,13
**rules (4)**
118:21;122:11;
129:12,17
**ruling (1)**
135:5
**run-around (1)**
129:16
**run-ins (1)**
129:20
**running (1)**
53:7
**Russia (2)**
9:20,22
**Russian (3)**
12:13;46:19;87:22

**S**

**sale (3)**
57:16,17;101:4
**same (11)**
4:24;6:10;34:1;
69:18;79:25;83:5,8;
93:2;95:18;101:6;
137:2
**Sarc (2)**
85:5;115:19
**Saturday (2)**
138:10,21
**save (1)**
112:24
**savvy (3)**
37:16,18;46:11
**saw (16)**
10:6;28:18;37:20;
42:18;44:5;45:15;46:8,
16;47:20;57:22;58:17,
18,23;68:7;74:4;99:21

saying (9)
20:1;73:21;103:10,
14,17;109:12;122:13,
24;131:11
**scan (2)**
139:18;140:10
**scenario (1)**
134:3
**schedule (2)**
137:25;138:18
**school (2)**
12:14;135:15
**screen (6)**
19:17,20;29:17;
82:11;112:8;118:16
**screenshot (5)**
118:1,8,14;119:23;
123:16
**scroll (3)**
42:3;52:17;64:19
**Sean (1)**
4:16
**seated (3)**
4:5;65:8;84:21
**SEC (1)**
131:21
**second (11)**
10:20;19:10;23:20;
27:10;45:2,21;78:3;
80:2;91:22;104:12;
116:22
**seconds (1)**
94:13
**second-to- (1)**
90:12
**secretary (1)**
86:14
**Section (7)**
24:13;52:20,21,22;
96:20;97:3;112:4
**security (3)**
74:15,16,17
**seeing (1)**
133:8
**seem (1)**
92:23
**seems (4)**
6:4;27:23;67:3;
69:17
**sees (1)**
42:6
**self-serving (1)**
111:21
**sell (14)**
32:1;40:1,3;51:19;
56:20,25;57:7,10;58:6;
74:10;76:1,6,10;77:8
**selling (8)**
19:9,10;20:4,4;58:7;
59:11,12,22
**send (6)**
71:24;72:3,5;73:21;
99:5;103:18

**sending (3)**
48:24;49:16,19
**sense (2)**
72:10;97:1
**sent (24)**
27:2;49:22;88:10;
99:19;100:15,23;
102:15;103:8,12,15,19;
105:7,25;106:3,4,6,7;
114:20,21;117:11,22,
23;118:11;126:21
**sentence (2)**
78:11;103:20
**separate (3)**
54:16;129:6,11
**serve (2)**
54:17;85:6
**served (1)**
129:21
**service (2)**
58:15;75:20
**services (2)**
25:5;26:2
**serving (1)**
83:23
**session (3)**
4:2;65:7;82:14
**set (2)**
59:11;92:17
**Setting (2)**
97:2,9
**settle (1)**
124:4
**settlement (1)**
31:5
**settling (1)**
31:4
**seventeen (2)**
24:24;25:4
**seventh (1)**
24:13
**several (5)**
35:18,22;115:10;
125:6;130:14
**shall (2)**
37:15;110:21
**share (2)**
9:4;92:15
**sheet (4)**
105:8;125:13;
130:21,24
**shock (2)**
27:11;29:11
**shop (5)**
30:18,18,19;31:20;
75:3
**short (2)**
89:18;136:14
**show (13)**
39:10,14;42:4;48:4;
67:17;73:23;82:23;
100:6;125:23,24,24;
126:1;128:24

**showable (1)**
110:22
**showed (10)**
30:6;40:10;42:23;
68:11;83:12,14;89:24;
90:13;102:20;131:1
**showing (5)**
21:22;23:17;25:17;
100:10;102:1
**shown (1)**
118:24
**shows (1)**
83:9
**shut (1)**
80:13
**side (6)**
6:16,24;50:9,17;
83:1;134:15
**sign (4)**
24:11;46:13,18;
55:19
**signed (12)**
21:10;33:25;34:5;
47:18;48:4;55:24;
57:19;62:3,9;63:3,5;
104:24
**signing (3)**
24:3;46:24;62:6
**simple (1)**
119:24
**simply (3)**
54:21;118:20;126:13
**single (1)**
66:16
**single-family (1)**
54:16
**singular (1)**
111:15
**sit (6)**
14:8;32:16;66:22;
68:9,13;70:1
**site (5)**
45:7;52:8;99:11,18;
100:15
**sitting (3)**
60:2;96:8;111:15
**situation (3)**
33:21;77:19,20
**six (1)**
11:14
**Sixth (1)**
6:1
**skills (3)**
126:11,11,11
**skip (1)**
24:13
**slows (1)**
14:25
**small (1)**
27:24
**so-called (1)**
123:16
**socialize (1)**

**11**:3

**society (1)**
129:24

**sold (3)**
33:22;75:23;81:24

**somebody (7)**
6:22;55:14;129:8,11;
130:1,5;134:2

**someone (2)**
5:24;32:24

**somewhere (1)**
113:15

**son (1)**
135:15

**soon (1)**
66:8

**sophisticated (1)**
126:4

**sorry (29)**
7:12;10:12;12:10;
14:21;20:24;31:23,25;
32:23;39:15;40:14;
47:14;61:6;70:20;78:1;
79:4;82:7;90:21;93:1;
96:25;97:6;100:18;
105:23;107:24;109:8;
110:7;111:4;113:9;
119:3;133:16

**sort (8)**
5:5;44:20,22,23;
66:24;71:4;104:10;
114:1

**sounds (2)**
86:22;131:14

**source (1)**
111:17

**Southern (1)**
6:3

**spanning (1)**
131:20

**speak (4)**
9:5;25:9;87:7,22

**SPEAKER (1)**
90:1

**speaking (1)**
82:19

**speaks (1)**
8:3

**specific (4)**
66:23;111:14;
123:23;127:19

**specifically (10)**
27:22;109:19,22;
110:2,6;117:13;124:1,
18,21;128:21

**speech (2)**
67:10;126:12

**speed (2)**
133:2,4

**spending (1)**
72:20

**spent (1)**
122:15

**split (1)**
6:1

**spreadsheet (1)**
38:2

**spreadsheets (4)**
37:12,21;39:6,13

**square (1)**
45:24

**staff (1)**
25:9

**stand (1)**
4:5

**standpoint (1)**
5:1

**start (3)**
13:16;114:4;131:6

**started (7)**
24:1,4,7;25:24;26:5;
30:10;121:13

**starting (6)**
39:7,22;40:17;77:23;
78:6;81:17

**starts (1)**
133:24

**state (7)**
4:14;9:15;63:14;
71:13;74:22;85:1;
110:23

**statement (5)**
59:13;78:25;79:2,3;
104:2

**States (4)**
9:20,24;12:24;35:1

**status (1)**
101:2

**statutorily (1)**
111:21

**Stay (1)**
18:14

**stellar (1)**
124:20

**stick (1)**
20:20

**sticker (1)**
83:7

**still (8)**
6:21;52:17;65:9;
72:15;105:21;113:13;
137:7,8

**stone (2)**
45:2,25

**stop (1)**
85:9

**stopped (3)**
30:5,5;72:23

**straightforward (1)**
122:9

**strategic (6)**
85:6,9;86:1,7;87:12;
104:25

**Strike (5)**
51:23;54:6;57:20;
121:7,24;139:10

**structures (1)**
43:3

**struggled (1)**
15:3

**study (4)**
38:1,4,5;42:17

**stuff (4)**
103:11,24;119:24;
120:2

**style (1)**
103:3

**subcontract (1)**
53:7

**subdivide (1)**
54:15

**subject (7)**
102:10,14,18;
112:12;114:25;132:12,
19

**submission (2)**
6:6;103:22

**submit (1)**
133:1,21

**submitted (1)**
125:14

**subsequent (1)**
46:24

**substance (1)**
21:5

**substantial (8)**
97:25;110:11,16,20,
24;111:10;112:6,20

**substantially (5)**
97:18,20,22;98:6,9

**substantive (1)**
129:10

**suggest (5)**
55:24;83:2;122:9;
131:2;136:6

**suggested (1)**
16:13

**Suggesting (2)**
28:8,10

**suggestion (2)**
54:20;132:1

**suit (6)**
63:13;70:11;73:9,16,
23;74:1

**suits (1)**
138:18

**sum (2)**
43:2;106:19

**summary (3)**
127:11;128:17;
129:22

**summer (1)**
30:13

**Sunday (1)**
138:10

**supervised (3)**
131:9;132:3,5

**support (7)**
65:24;69:13;70:2,12;

89:14;134:15;135:1

**supporting (1)**
123:23

**supports (1)**
90:19

**suppose (1)**
125:16

**supposed (3)**
69:14;112:5;126:16

**sure (24)**
40:24;41:14;47:17;
58:2;62:24;70:22;
71:13;72:14;76:21,23;
82:24;86:13;87:7,8;
91:14;105:9;106:2;
109:18;110:4;120:3;
121:3;130:15;133:1;
139:8

**surprise (1)**
127:13

**surprised (2)**
111:4;127:24

**Sustained (1)**
61:17

**swear (1)**
7:24

**swearing (1)**
55:20

**SWORN (4)**
7:9,23;55:10;84:19

**system (3)**
118:23;134:9;139:11

---

**T**

**tab (2)**
116:10;119:12

**table (1)**
20:6

**talk (11)**
16:12;24:20,24;
49:25;71:18;74:4,25;
75:7;96:16;100:7;
132:16

**talked (3)**
5:3,4;124:21

**talking (5)**
13:1;18:17;87:13;
113:12;114:16

**talks (1)**
125:5

**Tamposi (2)**
4:18,18

**targeted (1)**
80:14

**Tatiana (17)**
4:10,21;26:6;29:19;
50:17;51:5,20;58:21;
59:4;60:19;61:9,24;
62:3,6,12,17;63:2

**taxes (2)**
72:14;80:19

**team (1)**

**122**:15

**technology (1)**
85:4

**telling (4)**
19:3;81:6;109:10;
113:3

**template (2)**
107:20,25

**ten (17)**
9:20;32:8,8;106:20;
121:16;124:19,22;
125:2,10;129:14,19;
130:4,7,19;131:16,18,
25

**Tenth (1)**
6:2

**term (6)**
46:24;92:5,5;97:17;
117:25;130:21

**terms (9)**
46:21;57:16;69:17;
79:22,24;89:8;109:18;
112:17;132:18

**testified (3)**
37:5;124:25;125:11

**testify (5)**
61:21;108:20;116:5;
130:10;132:7

**testifying (1)**
13:4

**testimony (20)**
41:22;44:17;59:25;
60:2,11;66:5;67:6;
68:3;74:3;76:24;78:19;
79:9;82:6,20;103:4;
118:5;132:13,19,21;
134:15

**texts (1)**
50:9

**tha (1)**
100:16

**thanks (2)**
25:20;138:25

**that'll (1)**
137:18

**therewith (1)**
128:24

**thinking (2)**
55:23;129:15

**third (1)**
36:11

**thirty (3)**
34:21;35:5;94:13

**thirty-six (1)**
10:2

**though (2)**
8:19;128:20

**thought (16)**
55:13,14;58:4,21;
59:1,1;60:9;87:2;
94:13;98:11;128:19;
131:1,10;132:4;
135:20;136:13

Case 16-01120    Doc 343    Filed 06/04/19    Entered 06/04/19 13:05:34    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 156 of 158

May 9, 2019

**three (19)**
12:9,11;19:8,8;
36:10;40:24;41:18;
56:8;80:6,13;92:9;
96:9;106:18;107:8;
113:24;114:3;115:9;
134:3,18
**three-minute (1)**
67:8
**thrown (1)**
112:22
**Thursday (2)**
120:19;121:12
**times (6)**
88:25;89:9;90:7,10;
92:9;96:9
**time's (1)**
134:1
**timing (2)**
88:12;136:25
**today (16)**
5:4;42:12;56:4,9;
66:22;68:9,14;70:1;
87:14;108:20;111:16;
121:13;129:15;134:23;
135:17;139:2
**together (10)**
11:3,5,12;12:1;94:1,
18;123:22;124:1;
126:8;131:24
**told (32)**
15:9,17;16:9,20;
17:2,3;18:22;20:2,8;
32:20;33:6,6;36:15;
38:8;43:21;50:13;
56:19,22;60:22;64:16;
73:25;76:9;86:6,24;
90:7;92:4;94:13;97:21;
98:8,11;107:25;111:11
**tomorrow (13)**
121:20;128:9;
132:10;134:9;135:7,
21;136:11,23;137:4,
19;138:9,20,21
**took (5)**
65:23;76:24;85:17;
99:17;111:24
**top (5)**
24:21;27:3;97:1;
100:1;102:18
**total (4)**
22:2;43:2;68:3;82:1
**totally (1)**
129:11
**tough (1)**
133:25
**toward (3)**
87:9;105:17;112:25
**towards (1)**
102:12
**transaction (1)**
48:14
**transcript (8)**

6:16,17;14:2;15:1;
39:6;82:8;88:14;96:25
**transgression (1)**
62:11
**translate (4)**
18:16;44:2;62:23;
67:1
**translated (1)**
44:1
**translation (1)**
26:24
**translator (9)**
8:9,15;14:18,19;
15:4;20:20;66:25;67:1,
9
**travel (1)**
31:12
**trial (19)**
4:8,12;8:24;19:20;
23:17;66:15;69:19;
118:12;120:9,17,19;
121:13;127:3;134:25
**tried (1)**
110:17
**trier (2)**
96:8;118:4
**trouble (3)**
11:11;28:19;122:22
**true (13)**
38:14;54:22;57:11;
58:9;59:13;70:16;79:2;
103:24;104:2;125:9,
16,20;131:2
**trump (1)**
129:5
**Trust (2)**
21:25;68:14
**trusted (1)**
38:16
**truth (1)**
55:21
**truthfulness (2)**
125:20;128:21
**try (3)**
56:23;64:1;66:20
**trying (9)**
5:10;33:3;43:10;
67:10,11;74:24;97:10;
124:17;129:18
**tucked (1)**
112:11
**turn (1)**
40:16
**twenty (3)**
35:15;40:4;119:25
**twenty-five (1)**
9:20
**twice (1)**
95:16
**two (24)**
15:18;36:10;43:1,21;
44:16;54:15,24;58:6;
60:5;75:17,21;76:15;

77:2;97:5;100:25;
109:24;114:19;118:6,
12;120:9,17;128:8;
129:11;139:7
**type (2)**
21:4,7
**typically (1)**
112:24

**U**

**Um-hum (3)**
82:9;101:7;111:23
**unable (1)**
41:19
**uncertain (1)**
108:7
**under (19)**
6:13;7:1,2;54:24;
55:20,25;65:9;72:7,22;
81:1;85:22;96:20;
122:11;125:4,19,20;
126:16;128:20;132:7
**undercharged (1)**
64:5
**undercharging (1)**
63:22
**underlying (1)**
52:12
**understandable (2)**
69:22;136:10
**Understood (36)**
8:22;9:10;37:7,15,
21;39:1;44:10,11,12;
46:25;48:17,23,25;
49:19;52:4,24;53:10,
18;54:5;55:21;56:24;
57:3,5;58:11;72:22,25;
76:12,13,15,19;80:25;
85:22;89:11;109:22;
135:2;136:14
**unexpected (1)**
27:17
**unfortunately (2)**
30:1;135:13
**UNIDENTIFIED (1)**
90:1
**UNISON (1)**
4:4
**United (4)**
9:20,24;12:24;35:1
**unless (2)**
6:9;27:21
**unreimbursed (1)**
27:13
**unsophisticated (1)**
126:7
**unsuccessful (1)**
31:6
**unsure (1)**
106:1
**untruthful (3)**
61:24;62:6;129:8

**up (33)**
6:12;16:10;18:3;
19:20;27:21;28:4;
29:16;31:13;47:23;
52:17;55:7;65:8;73:23;
74:15;82:11;83:1;
91:23;112:1;113:12;
114:10;117:25;119:10,
12;120:8,10,15,23,25;
124:1;128:19;134:25;
136:22;137:10
**upgrades (2)**
23:9,12
**upon (1)**
107:18
**upper (1)**
105:18
**urgency (1)**
72:10
**Use (12)**
14:18;45:20;111:1;
112:1;126:17;127:25;
128:1,18,22;129:7,18;
130:1
**used (3)**
85:8;112:2;124:6
**useful (1)**
113:12
**uses (1)**
53:11
**using (2)**
53:13;55:6
**usually (2)**
55:5;121:4

**V**

**vacation (3)**
11:5,12,15
**Vadim (13)**
4:10,22;10:3;29:19;
100:17;102:25;103:8,
9,13,19,19,24;110:8
**Vadim's (1)**
102:15
**Vaguely (1)**
85:19
**value (2)**
63:15;124:22
**valued (1)**
76:16
**variation (1)**
69:18
**variety (1)**
125:21
**vary (1)**
40:3
**vehicle (1)**
118:10
**ventures (2)**
35:19,23
**version (3)**
46:6;60:22;91:16

**via (1)**
102:15
**vicinity (1)**
56:20
**view (1)**
29:24
**visited (1)**
100:24
**voice (2)**
14:11,12
**voluntarily (1)**
27:21
**vote (2)**
73:15,18,22;75:14
**voted (1)**
75:16

**W**

**wait (1)**
10:21
**waiting (1)**
34:25
**walk (1)**
100:7
**walking (2)**
12:9,11
**wants (2)**
118:14;128:9
**warn (1)**
8:18
**watch (1)**
14:4
**way (22)**
5:6;6:2,2,4;8:2;9:2;
28:18;30:7;31:4;32:18;
61:2;68:15;90:11;
92:25;93:3;99:23;
105:13;122:14;126:14;
127:15;128:11;129:24
**ways (1)**
31:10
**week (4)**
12:2;120:17;121:13,
13
**weeks (1)**
114:19
**weren't (9)**
36:21,25;38:11;
40:24;46:9;49:4,4;
95:5,15
**Westlaw (1)**
98:15
**What's (8)**
7:12;8:8;31:2;
105:24;111:19;130:6,
8;138:2
**when's (1)**
17:13
**whiz (1)**
126:8
**whole (10)**
6:25;23:19;29:7;

46:16;68:6;69:19;
110:17;113:11;114:4;
137:3
**Who's (5)**
12:3,12;84:1;107:11;
126:11
**wife (2)**
135:16;138:25
**willing (1)**
17:4
**window (3)**
129:25,25;130:4
**withdraw (6)**
6:5;60:7;66:19;67:2;
69:7;75:4
**withdrawal (2)**
6:12;66:24
**withdrawn (2)**
67:21;69:8
**within (6)**
98:21;99:11;106:20;
130:18,19;131:15
**without (11)**
17:11;32:3;44:8;
50:11;59:10,14;62:9;
63:6;71:21;105:5;
118:4
**WITNESS (42)**
7:24;8:12,22,25;9:3,
7,10;10:23;11:16,18,
23;14:10,14,20,23;
18:2;28:16;43:8,21;
44:10,12;65:11;67:6,
22;84:12,14,20;87:6,
10;93:2;95:24;119:9;
121:18;122:23;123:19;
132:14,22;135:11,13;
136:15;137:14,17
**witnesses (2)**
5:6;137:20
**wondering (2)**
8:7;82:16
**wood (2)**
45:3,3
**word (5)**
31:9;115:4,10,11;
116:9
**worded (1)**
74:4
**words (5)**
6:17;42:25;73:21;
103:17;131:13
**work (11)**
9:17;52:5,8,9;53:8;
63:16;64:11;85:3;
112:13;138:6,11
**worked (1)**
35:25
**worker (1)**
17:3
**workers (2)**
53:7;100:25
**working (1)**

---

101:1
**workout (3)**
106:12,12,14
**works (10)**
5:7,10,11;77:5,6;
101:3;128:11;129:25;
136:7,9
**world (1)**
96:3
**worry (1)**
14:6
**worse (1)**
56:11
**worth (1)**
6:6
**write (8)**
101:10;103:2,6,7,10,
24;105:5;129:17
**writing (5)**
101:15;126:19,21,
22;127:1
**written (14)**
98:18;101:17,19,20,
22;103:14;126:24;
127:8,14,20;128:8,12,
14,17
**wrong (6)**
62:17;63:2;68:4,10,
16;131:12
**wrongs (2)**
128:23;129:9
**wrote (7)**
91:16;99:2;103:8,17,
24;105:3;107:1

**Y**

**years (24)**
9:20,21;11:10,14;
34:21;35:6,15;40:24;
41:18;56:8,8;85:11;
119:25;124:20,22;
125:2,10;129:14,19;
130:4,19;131:16,18,25
**Yep (2)**
108:5;121:21
**yes-no (1)**
41:3;43:8,14;67:9,11
**Yesterday (3)**
5:3,16;13:3
**York (1)**
6:4

**Z**

**zero (1)**
94:22
**Zhukovskiy (13)**
13:10,17;17:25;
18:25;19:3,22,25;20:6;
35:8;37:11,22,25;39:7
**Zillow (2)**
58:15,17

---

**1**

**1 (8)**
5:7;39:23;105:18;
121:16;122:4;132:8;
134:1;138:23
**1- (1)**
38:9
**1,000 (2)**
21:15,15
**1.6 (1)**
22:1
**1:10 (1)**
140:16
**10 (5)**
12:18,20;108:12;
137:12,20
**100,000 (2)**
22:13,21
**102 (3)**
93:16,17,22
**103 (1)**
94:8
**108 (2)**
102:21,23
**109 (1)**
102:21
**10th (2)**
131:9;132:3
**11 (2)**
64:20;109:9
**11:02 (1)**
65:5
**11:22 (1)**
65:6
**129 (2)**
25:12,19
**13 (3)**
77:23;90:13;94:9
**133 (4)**
113:4,5,7,8
**14 (2)**
94:9;108:16
**15 (4)**
48:3;89:25;90:2,4
**15-13881 (1)**
4:7
**16-1120 (1)**
4:12
**167 (1)**
4:8
**17th (1)**
123:5
**19 (3)**
111:8;113:1,11
**1989 (1)**
34:23
**1990 (1)**
9:25
**1995 (1)**
10:4
**1996 (1)**

---

10:4

**2**

**20 (1)**
93:22
**200,000 (1)**
18:24
**2000 (2)**
86:19;130:11
**2009 (2)**
125:12;130:22
**2010 (1)**
11:2
**2011 (6)**
11:2;125:17;131:2,9,
10;132:3
**2012 (9)**
15:12;18:20;19:4;
20:17;21:9,12;37:4;
41:24;86:20
**2013 (6)**
22:5;23:20,21,23;
86:20;124:9
**2014 (3)**
58:6;131:10;132:4
**2015 (30)**
56:1,3,8;60:1,13,17;
61:3;63:13;70:12;
71:10,14;83:18,19;
88:5;99:6,19;100:11,
15,23,24;102:5,7;
103:1;104:3;105:7,18;
106:4,24;123:5,22
**2016 (1)**
75:8
**2017 (1)**
86:20
**2018 (10)**
38:23;65:24;85:17;
86:6,16,25;94:9;103:4;
114:15,19
**21 (1)**
29:19
**22 (1)**
93:22
**22nd (6)**
99:6,19;100:15,24;
114:19;123:24
**23 (3)**
40:18;97:2;102:24
**24th (1)**
23:21
**25 (8)**
18:18,20;19:4;20:17;
21:4,9,12;58:5
**25th (7)**
37:4;41:20,24;42:19,
20;105:7;106:4
**26th (3)**
100:10,23;101:6
**27 (1)**
102:2

---

**28 (1)**
59:10

**3**

**3 (1)**
27:3
**3.2 (1)**
22:2
**3:27 (1)**
103:1
**30 (3)**
21:19,23;22:5
**300 (1)**
18:23
**33 (4)**
39:5,17;112:25;
113:5
**34 (5)**
82:8,9,9,14;83:11
**35 (1)**
40:16
**37 (3)**
23:18;107:21;110:19
**39 (1)**
86:15

**4**

**4 (4)**
54:12,14;134:6,17
**4.7 (1)**
64:19
**40 (1)**
85:24
**404 (3)**
129:5;131:23;133:20
**404b (2)**
125:21;128:22
**404b1 (1)**
125:5
**404b2 (1)**
128:25
**4th (8)**
102:5,7;103:1;104:2;
105:21;106:6;131:9;
132:3

**5**

**5 (7)**
39:8;83:18,19;134:5,
21,24;135:7
**5,499,000 (1)**
59:11
**5.2 (6)**
52:18,20;96:20,23;
97:3,3
**5.5 (1)**
112:4
**50 (4)**
26:9,12;87:24;90:1
**53 (3)**

---

90:24;91:2,17
**55 (7)**
 77:22;78:4,5,6;
 80:18;81:18;100:24
**5th (4)**
 55:25;56:3;71:10,14

---

**6**

---

**6 (6)**
 39:10;82:16,23;83:2,
 5,6
**6/24 (2)**
 105:8,10
**6/25 (2)**
 105:8,11
**609 (3)**
 125:19;131:23;
 133:20
**609b (6)**
 124:18,21;125:5;
 128:20;129:5,17
**609b2 (1)**
 126:16
**612 (1)**
 6:13
**63 (2)**
 101:23;102:1
**64 (3)**
 29:13,17;57:22
**65 (5)**
 113:19;114:20;
 115:22;116:19,25
**67 (2)**
 104:5,9

---

**7**

---

**7 (4)**
 39:22;40:18;110:6;
 138:16
**7.0 (1)**
 24:14
**7.1.1 (1)**
 24:14
**7.1.2 (1)**
 24:19
**7.1.3 (1)**
 24:23
**7.1.4 (1)**
 25:3
**7.3.2.1 (2)**
 25:8;110:6
**7:30 (2)**
 134:9;135:7
**7th (2)**
 81:6;88:5

---

**8**

---

**8 (4)**
 82:11;83:6;110:7,7
**84 (1)**

88:14
**87 (1)**
 97:1
**88 (3)**
 96:24;100:24;101:1
**8th (7)**
 85:17;86:1,6,16,24;
 94:9;114:15

---

**9**

---

**9 (11)**
 4:9;18:7;19:17,20;
 20:7;39:20;40:11;
 41:22;82:4;135:15;
 137:7
**9:13 (1)**
 4:1
**9:30 (1)**
 135:17
**9:45 (1)**
 123:5
**902 (8)**
 114:9;117:16,18;
 118:9,11,13,19;120:18
**90211 (1)**
 119:21
**90212 (1)**
 119:21
**90213 (1)**
 118:22
**91 (2)**
 111:8,9