### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS - EASTERN DIVISION

```
============================  .
IN THE MATTER OF:             . Case #15-13881
                              .
LYMAN-CUTLER, LLC             .
                              . Boston, Massachusetts
                              . Friday, May 10, 2019
     Debtor.                  . 9:07 a.m.
============================  .
LYMAN-CUTLER LLC, ET AL.,     . Adv. Proc. 16-01120
                              .
     Plaintiff,               .
v.                            .
                              .
KAGAN, ET AL.,                .
                              .
     Defendants.              .
============================  .
```

### TRANSCRIPT OF TRIAL DAY 5 ON:
#### #167 OBJECTION TO CLAIM 9 OF CLAIMANT ALEX FILIPPOV FILED BY INTERESTED PARTIES TATIANA KAGAN, VADIM KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.

#### #1 COMPLAINT BY LYMAN-CUTLER, LLC AGAINST VADIM KAGAN, TATIANA KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.

### BEFORE THE HONORABLE FRANK J. BAILEY

APPEARANCES:

For the Debtor:           PETER N. TAMPOSI, ESQ.
                          The Tamposi Law Group, P.C.
                          159 Main Street
                          Nashua, NH 03060


For the Plaintiff:        SEAN T. CARNATHAN, ESQ.
                          O'Connor, Carnathan and Mack,
                          LLC
                          1 Van De Graaff Drive
                          Suite 104
                          Burlington, MA 01803



<u>For the Defendants:</u>                    JOHN PERTEN, ESQ.
                                          Sheehan Phinney Bass & Green
                                          PA
                                          255 State Street
                                          5th Floor
                                          Boston, MA 02109

                                          JAMES HARRIS, ESQ.
                                          Sheehan Phinney Bass & Green
                                          PA
                                          1000 Elm Street
                                          17th Floor
                                          Manchester, NH 03101


        Electronic Sound Recording Operator:  YVONNE WOODBURY


         Proceedings Recorded by Electronic Sound Recording
        Transcript Produced by Certified Transcription Service
                          eScribers, LLC
                7227 N. 16th Street, Suite #207
                        Phoenix, AZ 85020
               973-406-2250; operations@escribers.net

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| **For The Plaintiff:** | | | | | |
| MICHAEL GOLDMAN | | | | | |
| (By Mr. Carnathan) | 13 | | 170 | | |
| (By Mr. Perten) | | 91 | | 177 | |

| EXHIBITS: | DESCRIPTION | I.D. | EVID. |
|---|---|---|---|
| For the Plaintiff: | | | |
| D | Mr. Goldman's CV | 15 | 15 |

1    (At 9:07 a.m.)

2              THE CLERK:  The court is now in session.

3              THE COURT:  Good morning.  Be seated.

4              UNIDENTIFIED SPEAKER:  Good morning.

5              THE CLERK:  Now calling case number 15-13881, Lyman-

6    Cutler LLC.  This is day five of trial.  On document number

7    167, objection to claim 9 of claimant Alex Filippov, filed by

8    interested parties Tatiana Kagan, Vadim Kagan, Kagan

9    Development KDC Corp., ProExcavation Corp.  This is also on

10   case number 16-1120, Lyman-Cutler LLC v. Kagan et al., and it

11   is day five of trial.

12             May the parties please state their names for the

13   record?

14             MR. CARNATHAN:  Good morning, Your Honor.  Sean

15   Carnathan for Alex Filippov and Nickolay Lipetsker.

16             MR. TAMPOSI:  Good morning, Your Honor.  Peter

17   Tamposi for the debtor.

18             MR. PERTEN:  Good morning, Your Honor.  John Perten

19   for ProExcavation Corp., Kagan Development KDC Corp., Tatiana

20   Kagan, and Vadim Kagan.

21             MR. HARRIS:  Good morning, Your Honor.  James Harris

22   for the same parties.

23             THE COURT:  All right.  Good morning, everyone.  Any

24   housekeeping?

25             MR. PERTEN:  One housekeeping from my perspective,

```
 1   Your Honor.  I wanted to report to the Court that, right after

 2   I arrived back at my office after we closed yesterday, I

 3   received a phone call from Mr. Cohen who had been on the

 4   stand, as Your Honor will recall.  After admonishing him that

 5   we are not permitted to talk about his testimony, which he

 6   understood and we did not, he advised me that in fact one of

 7   his convictions for child support, he did not get out of

 8   prison until 2011.

 9           So that's apparently what Mr. Carnathan was referring

10   to.  The other conviction -- there's only two that I'm aware

11   of -- that did pre-date the ten years so that the scope, if

12   you will, of the 609 and 404 dispute, at least as to one of

13   the convictions, is narrowed, and I advised Mr. Carnathan

14   immediately knowing the briefing schedule.

15           THE COURT:  So do --

16           MR. PERTEN:  So it's live issues, but --

17           THE COURT:  Does that mean that your conceit -- I

18   know nobody likes that word, but -- that it's not in play any

19   longer, that he can be cross-examined on that conviction?

20           MR. PERTEN:  On the con --

21           THE COURT:  On the child support conviction?

22           MR. PERTEN:  It does not fall within 609, Your Honor.

23   I think there still is a question under 404(b) whether that

24   conviction for child support can be used for the purposes that

25   Mr. Carnathan outlined in his argument.  So that's in play --
```

escribers

1              THE COURT:  That's fine.

2              MR. PERTEN:  -- as to that conviction, but the

3     609(b), which was the ten-year thing -- and again I felt

4     obligated not only to let Mr. Carnathan know but to let the

5     court know as well -- so it's narrowed a bit.

6              THE COURT:  All right.  Okay.

7              MR. CARNATHAN:  Thank you, Your Honor.  And I confirm

8     Mr. Perten did inform me yesterday afternoon.  And we've

9     looked at that a little harder at this point.  Mr. Calandrelli

10    will be making our filing this morning, as directed.  We think

11    Mr. Cohen is still being untruthful about when he got out of

12    prison for what, and so we'll address that more fully in our

13    filing.  But there it is.

14             THE COURT:  All right.  Well, we'll take it up when

15    we see it, then.  When is he coming back?  Monday?

16             MR. PERTEN:  You ordered him to be here Monday at

17    around 10 o'clock, I believe, and I confirmed with him that he

18    would be here Monday at 10 o'clock.

19             THE COURT:  Okay.  Well, I needn't commit to when

20    I'll rule on it.  Ideally, I'd rule on it before we come in on

21    Monday, but I can't guarantee that.  So it may be that I'll

22    just rule orally on Monday morning.  So -- okay?

23             All right.  Anything else?

24                       (No audible response)

25             THE COURT:  All right.

1        MR. CARNATHAN:  The plaintiffs call Michael Goldman,

2   Your Honor.

3        Your Honor, the plaintiffs intend to give Mr. Goldman

4   his report to refer to during his examination, and he's got a

5   few notes in here, too.

6        THE COURT:  Any objections to him using the --

7        MR. PERTEN:  His report, no.  His notes, yes.

8        THE COURT:  Oh, that may --

9        MR. PERTEN:  Not his report.

10       THE COURT:  When you say notes, what do you mean?

11       MR. CARNATHAN:  He's made some bullet points from the

12   report to focus him on the particular (indiscernible) dates

13   we're going to show and the points he wants to make in the

14   testimonies.

15       THE COURT:  Okay.  Let's hold on one second.

16       Go ahead and swear him in.

17       THE CLERK:  Will you please raise your right hand?

18                  MICHAEL GOLDMAN SWORN

19       THE CLERK:  Please be seated.

20       THE COURT:  All right.  So I think where we are on

21   the notes is that he would like to use notes.  What are we

22   talking about for notes here?

23       MR. CARNATHAN:  Should I hand them up so Your Honor

24   can look at them?

25       THE COURT:  Yeah.

1          MR. CARNATHAN:  Thank you.

2          THE COURT:  I'm just looking at them kind of to

3   get -- okay -- I get a feel for what we're talking about here.

4          So there's unnumbered pages.

5          All right.  Let me hand them back, because I don't

6   necessarily want to have them (indiscernible).

7          All right.  What's your position as to -- well, first

8   of all, let's see what the objection is.

9          MR. PERTEN:  Thank you, Your Honor.  Your Honor, the

10  defendants have no objection to him referring to his report,

11  which has been disclosed to us, and we have a copy of it.

12         THE COURT:  I got that.

13         MR. PERTEN:  But to the extent that they're now

14  functionally seeking to supplement the report by highlighting

15  for him which portions of the report he should emphasize,

16  those are not notes which I've had previously.  I mean, I make

17  a judgement call about where I think he's going to go but

18  obviously have no way of knowing.  So I don't think it's

19  appropriate for him to be having extraneous materials.

20         And again, had his appendix said, I also relied on

21  notes, and I failed to ask for them, that's on me.  But this

22  is not something that was listed anywhere in the appendix of

23  documents that he relied upon.  So in a sense, that's

24  extraneous --

25         THE COURT:  So you're saying it's a supplement,

1    and --

2              MR. PERTEN:  Functionally yes, Your Honor.

3              THE COURT:  -- and it's too late to supplement?

4              MR. PERTEN:  Functionally, that is my position.

5              MR. CARNATHAN:  Well, first of all, we didn't make

6    the notes, Your Honor.  Mr. Goldman did.

7              THE COURT:  No, I understand.

8              MR. CARNATHAN:  And they're a distillation of his --

9    he's taking his (indiscernible) and he's making bullet points

10   of the points he wants to make.  It's a long report.  I'm not

11   really planning to walk paragraph by paragraph through things

12   here this morning.  We're going to try to hit the important

13   points and get this done by the 11 o'clock break, and that's

14   going to be it.

15             THE COURT:  All right.

16             MR. CARNATHAN:  And so that's all it is.

17             THE COURT:  Yeah, I --

18             MR. CARNATHAN:  We can do it without them, but --

19             THE COURT:  Well, does anybody want to cite any law

20   to me on this?  Is there a rule that applies?

21             MR. CARNATHAN:  Well, I mean, I think it's the

22   refreshment of recollection kind of thing.  He's an expert

23   testifying to a really big report with --

24             THE COURT:  Can't be though.  I mean, first of all,

25   he hasn't shown any inability to recall anything yet, so it

Page 10

1    just doesn't work that way.  And you weren't going to offer

2    them into evidence, were you?

3              MR. CARNATHAN:  No.  No, Your Honor.

4              THE COURT:  Yeah.  So I mean, it's not that.  So I'll

5    sustain the objection at this time.  My view of his

6    recollection being refreshed is that you can pretty much show

7    him anything; he just can't keep it.  So you can show him

8    things.  Then, of course, counsel has a right to -- if we go

9    back in that rule, counsel has a right to see it and has a

10   right to offer it, and we take it from there.

11             But he can't go up there on the stand with a

12   distillation of his work, which is essentially a supplement to

13   his report, and that comes too late.

14             MR. CARNATHAN:  Okay.  But I can give him the report

15   to have with him, right?  We're agreed on that?

16             THE COURT:  Yes, if there's no objection to that.

17             MR. PERTEN:  No.  Your Honor, if I might, I just

18   would like to clarify something for the Court.  My

19   understanding is that an expert can refer to documents that

20   would otherwise be admissible, even if they're not in

21   evidence.  That's sort of the universe.  So he can show him

22   anything that in theory could have been introduced, and I

23   would suggest that --

24             THE COURT:  Well, I don't know that I agree with that

25   characterization.

1          MR. PERTEN:  Okay.

2          THE COURT:  I don't agree with that.  He can rely on

3    things that are not necessarily admissible.  An expert can

4    rely on the things that an expert in his area of expertise

5    would rely on, whether admissible or not.

6          MR. PERTEN:  Again, I would submit, going back to

7    these notes -- and I don't want to snatch defeat from the jaws

8    of victory, if you will, on the objection -- but I don't think

9    other than -- even to refresh recollection, I don't --

10         THE COURT:  You --

11         MR. PERTEN:  You can refresh recollection for facts.

12         THE COURT:  He hasn't done it yet.

13         MR. PERTEN:  Okay.

14         THE COURT:  All right?

15         MR. PERTEN:  The other thing I would just like to

16   bring to the attention of the Court, hopefully to move this

17   along, as we did with Ms. Lande and so on and so forth, we had

18   previously filed a motion with respect to Mr. Goldman, which

19   the Court denied, saying that we didn't believe the area that

20   he's about to testify or that we anticipate he's about to

21   testify is relevant to this dispute or that he's demonstrated

22   full competence on some of the areas in his report.

23         We did raise that with the Court.  The Court denied

24   the motion.  And again, as we've done before, I believe I'm

25   obligated to restate that.  So I'm doing that, and again I

1    don't want to interrupt Mr. Carnathan's --

2          THE COURT:  Yeah.  I'll take it as a motion for

3    reconsideration.  The motion's denied.

4          MR. PERTEN:  Okay.  And again, not to be

5    interrupting, I did want some direction from the Court how you

6    wanted me to handle it during the course of his testimony.

7    When he strays into another project, which I expect he will

8    do, part of me feels obligated to pop up and say objection --

9          THE COURT:  I hear you.

10         MR. PERTEN:  -- but I also don't want to be

11   interrupting and messing with Mr. Carnathan's flow.  So maybe

12   if we have a standing objection or something along those

13   lines --

14         THE COURT:  I'm not a fan of standing objections.  I

15   mean, I know that they happen all the time in depositions, and

16   it happens from time to time at trial.  But I worry, then, if

17   I'm the reviewing court --

18         MR. PERTEN:  Okay.

19         THE COURT:  -- would he have objected to this?

20         MR. PERTEN:  So --

21         THE COURT:  And you'll say later -- well within your

22   rights to say -- I had a standing objection, so I would have

23   objected to that testimony, but Bailey told me I didn't have

24   to.  So you better --

25         MR. PERTEN:  Okay.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

1              THE COURT:  You better make --

2              MR. PERTEN:  I just didn't want the Court to think I

3      was objecting or interrupting --

4              THE COURT:  No, I appreciate that.  That's a

5      housekeeping matter.  If you raise an eyebrow, I know you

6      object, but we'll put it on the record, okay?

7              MR. PERTEN:  Very good.  Thank you, Your Honor.

8              THE COURT:  I think it's the smartest way to go.

9              MR. PERTEN:  Appreciate it.  Thank you.

10             THE COURT:  Okay?  All right.

11             MR. CARNATHAN:  Yeah.  Thank you, Your Honor.

12                            DIRECT EXAMINATION

13     BY MR. CARNATHAN:

14         Q.   Would you state your name, sir?

15     A.   Michael Goldman.

16         Q.   Why are you here today, sir?

17     A.   I've been retained by Mr. Filippov to review documents in

18     this case.

19         Q.   Mr. Goldman, would you look at Exhibit 1 to

20     Plaintiff's Exhibit 166 for identification?

21             MR. CARNATHAN:  That's his CV, Your Honor.

22     BY MR. CARNATHAN:

23         Q.   Mr. Goldman, are you the person who prepared this

24     CV?

25     A.   Yes, I am.



(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

1        Q.    To the best of your ability, is it all accurate?

2    A.    Yes, it's -- it's a little out of date.  There are a few

3    more cases on here, but it's accurate.

4        Q.    How far out of date is it?

5    A.    I think this version was from a year ago.

6        Q.    So the report was dated July 30th, 2018, if I

7    remember right.  Is that roughly when this --

8    A.    Yes.

9        Q.    -- traces back to?

10   A.    Yes.

11       Q.    And so you graduated from Rice University in 1978

12   with a Bachelor of Arts in economics and managerial studies,

13   right?

14   A.    Yes.

15       Q.    And you have a master's of management from 1981 from

16   Northwestern with a specialization in accounting and majors in

17   finance and accounting, right?

18   A.    Yes.

19       Q.    You are a certified public accountant, sir?

20   A.    Yes.

21       Q.    You are a certified valuation analyst?

22   A.    Yes.

23       Q.    You are a certified fraud examiner?

24   A.    Yes.

25       Q.    You're also certified in financial forensics, right,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

1    sir?

2    A.    Yes.

3        Q.    Can you tell the Court roughly how many -- I don't

4    know -- insolvency engagements have you done over the years?

5    A.    Probably close to a hundred.

6        Q.    And how much work have you done in the turnaround

7    and restructurings phase?

8    A.    That -- I consider those two the same.

9        Q.    How many fraud investigations have you been hired to

10    conduct?

11    A.    Somewhere between thirty and fifty.

12        Q.    And about how any times have you previously been

13    qualified to testify as an expert in a court proceeding?

14    A.    Twenty, twenty-five.

15        MR. CARNATHAN:    Your Honor, I actually want to do his

16    credentials as briefly as possible, so I would propose to

17    offer his CV into evidence as Plaintiff's Exhibit C -- D, I'm

18    sorry -- for identification.    Is that where we are?

19        PLAINTIFF'S EXHIBIT D WAS MARKED FOR IDENTIFICATION

20        THE COURT:    Any objection --

21        MR. CARNATHAN:    And then move on.

22        THE COURT:    -- to his CV?

23        MR. PERTEN:    No, Your Honor.

24        THE COURT:    All right.    So that's admitted.

25        PLAINTIFF'S EXHIBIT D WAS ADMITTED INTO EVIDENCE



MICHAEL GOLDMAN - Direct

1          THE COURT:  Was that a proposed exhibit?

2          MR. CARNATHAN:  It's part of Exhibit 166.  For

3    identification it's just D.

4          THE COURT:  Microphone.

5          MR. CARNATHAN:  Oh, sorry.

6          THE COURT:  You know what I'm going to do?  I'll

7    offer you this.  I have a lapel mic.  And then you don't

8    have -- both of you can use it.  I mean -- now, the only

9    problem with the lapel mic is, I'll warn you now, that I've

10   had people go out in the hallway, and a half hour from now,

11   I'm listening to them talk about what a bad ruling I just

12   made.  So -- I'm making that up, but you do need to be aware

13   that you're mic'ed.

14          Would you like the lapel mic?

15          MR. CARNATHAN:  Thank you, Your Honor.  Super

16   tempting.  I think for Mr. Goldman I'm going to be planted

17   here for most of the morning, but in --

18          THE COURT:  Okay.

19          MR. CARNATHAN:  -- the rest of the trial, that may be

20   attractive, because I do move around a little bit.  Yeah.

21          THE COURT:  That's all right, and I appreciate that.

22   I like to move around.  So -- okay, just bear in mind.  So

23   whatever you just said, you need to say again.

24          MR. CARNATHAN:  Thank you, Your Honor.  Your --

25          THE COURT:  I asked you whether or not the document

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

1    was -- is it in the binder?  Is it --

2              MR. CARNATHAN:  Yes, Your Honor.  It's --

3              THE COURT:  -- a proposed exhibit?

4              MR. CARNATHAN:  It appears in the binder as Exhibit 1

5    to Exhibit 166 for identification.

6              THE COURT:  Got you.

7              MR. CARNATHAN:  The 166 for identification's the full

8    report.

9              THE COURT:  That's fine.  Okay.

10             MR. CARNATHAN:  Yep.

11             THE COURT:  All right.  Mr. Perten, you were moving

12   toward the microphone, so --

13             MR. PERTEN:  Well, I was just -- I think Mr.

14   Carnathan has clarified.  The report is marked.  We're not

15   agreeing to the admissibility of the report.  But to the

16   extent that exhibit is part of that report, there is no

17   objection.

18             THE COURT:  Okay.

19             MR. CARNATHAN:  I'm sorry.  I think I may have kept a

20   page at the podium that should have been part of the exhibit.

21   I think the cover that says it's his named --

22             THE COURT:  I'll give it back.  And this is marked D

23   for identification.  That's not it, though.  This is now

24   admitted in evidence.  So it was previously marked what

25   number?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

1           MR. CARNATHAN:  I inadvertently kept the cover page.

2           THE COURT:  Oh, it's 1 to --

3           MR. CARNATHAN:  Right, right.

4           THE COURT:  It's Exhibit 1 to proposed exhibit --

5           MR. CARNATHAN:  Well, what we initially marked was

6   incomplete, because I still had the cover page.

7           THE COURT:  That's fine.

8           MR. CARNATHAN:  Yeah.

9           THE COURT:  You can take it back.

10          MR. CARNATHAN:  Yeah.

11          THE COURT:  We haven't done anything with it, so --

12          MR. CARNATHAN:  Right.  So it's now a complete

13  exhibit.  So if we can just keep it as Exhibit D for

14  identification and admit it, that would now be complete.

15          THE COURT:  That's fine.  We'll work out the numbers

16  later.  All right.

17          MR. CARNATHAN:  Thank you, Your Honor.

18          THE COURT:  All right.

19  BY MR. CARNATHAN:

20      Q.   Mr. Goldman, would you describe what you were asked

21  to do in this case?

22      A.   I -- I was asked to give an opinion on the veracity of

23  the claim that the Kagan companies made and to determine

24  what -- give an opinion whether or not it was -- I thought it

25  had validity.

MICHAEL GOLDMAN - Direct

1    Q.    And in the course of performing that review, what

2    materials did you review?

3    A.    I reviewed all of the claim documents.  I reviewed

4    QuickBooks files that were provided; excerpts of QuickBooks

5    files; tax returns; there were some emails that were produced;

6    and deposition copies.

7    Q.    Did you review materials from other projects other

8    than Lyman and Cutler?

9    A.    Yes, I did.

10    Q.    And to what extent did you consider those materials

11    in the course of your review?

12    A.    I -- I consider them to be significant because when

13    you're -- when you're doing a fraud investigation or looking

14    to see if -- if documents are valid, a lot of times the

15    context is important, and you need a large enough sample to be

16    able to look at patterns and to get a feel for how the

17    documents were created.

18    Q.    Why don't we talk a little bit about your experience

19    with other businesses and whether or not they tend to follow a

20    standard set of accounting and operating procedures?  Can you

21    speak a little bit about that?

22    A.    Sure.  I -- I've -- over the decades, I -- I've been in

23    hundreds of businesses, mostly in the accounting area and the

24    operations areas.  I've seen how they function, how they do

25    their accounting.  And there's the whole concept of internal

MICHAEL GOLDMAN - Direct

1   control, which applies to every company doing accounting, and

2   where you need -- you need to set up procedures so that your

3   accounting and recording is accurate.

4       One of the basic tenets of internal control is pre-

5   numbered documents -- that you number your documents, you use

6   them sequentially, and that's how you keep track of who owes

7   you, who you owe, what checks you've written.

8       Q.   Why is that important, Mr. Goldman?

9   A.   With -- without that pre-numbering, you basically -- you

10  have no control.  You can lose invoices.  You can lose checks.

11  You can lose track of your business.

12      Q.   In your experience over the years, do most

13  businesses follow a standard set of accounting and operating

14  procedures?

15  A.   Not all the same, but they all follow the -- pretty much

16  the same principles.

17      Q.   You mentioned internal controls.  What are internal

18  controls?

19  A.   Internal controls are the pro -- the procedures and the

20  process that are used to run your accounting system, your

21  management information system, to ensure that the information

22  you have is accurate, that it's timely, that it's supportable,

23  that if you were to be audited, say by the IRS or in a

24  lawsuit, that you can actually prove sufficiently what -- what

25  you've recorded.

MICHAEL GOLDMAN - Direct

1    Q.   Am I right that in broad strokes, there are kind of

2    two types of internal controls?

3    A.   Yes.

4    Q.   Could you tell the Court what the two types are?

5    A.   Preventive and detective.  Preventive controls are

6    designed up front to keep errors or defalcations from

7    happening, and then detective controls are more on the back

8    end to determine if something bad has happened and to correct

9    it.

10    Q.   Could you give the Court some examples of preventive

11    controls?

12    A.   A locked door would be one of the best ones.  If you

13    keep -- you keep your checks in a locked room, you require a

14    signature, that prevents somebody else from using them.

15    Q.   What about some examples of detective controls?

16    A.   One great example of the detective control is to re -- to

17    reconcile your bank statements every month and make sure that

18    everything that went through the bank was -- should have gone

19    through the bank and went as expected.

20    Q.   And what are the -- in general terms -- the risks

21    that one incurs when one does not have proper internal

22    controls?

23    A.   The -- the risk is that the information being generated

24    is going to be unreliable; that somebody could be defrauding

25    you if you don't have good internal controls; you could be

MICHAEL GOLDMAN - Direct

 1  committing fraud against others, such as the IRS.  There's --

 2  without good internal controls, the information is just not

 3  reliable.

 4      Q.   What work did you do to examine the internal

 5  controls at KDC?

 6  A.   Well, unfortunately, I couldn't be there to see

 7  firsthand, which is the best way to do it.  But I reviewed the

 8  deposition testimony of the two accountants and Mr. Kagan and

 9  how the information there was put together.  I also reviewed

10  audit trails from the QuickBooks file, which show you --

11  they -- they go deeper than just the entry they made.  It

12  keeps a -- keeps track of when each entry was made and what

13  changes were made to it over time.

14      I also reviewed the documents that were provided with the

15  case to determine how they were accounted for, if it appeared

16  that they were accounted for properly, if it appeared that

17  they were being used properly.

18      Q.   What work along the same lines did you do with

19  regard to the internal controls at ProEx?

20  A.   The same.

21      Q.   Thinking first about the results of your inquiry

22  with regard to KDC, did you review the general ledgers at KDC?

23  A.   Yes, I did.

24      Q.   And in general terms, what did you find when you

25  were reviewing the KDC general ledgers?

MICHAEL GOLDMAN - Direct

1  A.   Confusion.  I don't know if it was ineptitude or what,

2  but the -- a lot of the entries were made very late.  A lot of

3  the entries had inexplicable changes to amounts.  The

4  accounting was not consistent as to how certain items would be

5  coded.

6      It -- it actually -- it wasn't even consistent which

7  entity was being used, that payments for the Lyman-Cutler

8  projects -- some of them were out of the Lyman-Cutler LLC;

9  some of them were from KDC.  ProEx was purported to have made

10  payments on behalf of Lyman-Cutler.  And then there -- there

11  was nothing that was standardized.

12      Q.   Did KDC use its checks in sequence?

13  A.   No.  There were many times I noticed checks were used out

14  of sequence.

15      Q.   In your experience over the years, does that mean

16  anything?

17  A.   It -- it depends on the frequency.  If an occasional

18  check is used out of sequence, that happens.  There's always

19  emergencies that need to be paid.  When there's a large number

20  used out of sequence, that -- at best, it indicates poor

21  internal control.

22      Q.   What does it indicate at worst?

23  A.   At -- at worst, it's -- it -- it could be fraud.

24      Q.   What about invoices?  Were the invoice numbers you

25  found in the KDC materials in sequence?

Page 24

MICHAEL GOLDMAN - Direct

1    A.    No.   There were times when they were in sequence.   There

2    were times when they were wildly out of sequence.

3         Q.    And in your experience over the years, what might

4    that indicate?

5    A.    The same -- anything from weak controls to incompetence

6    to fraud.   There's -- I -- I really can't think of a reason

7    why invoice numbers would be generated out of sequence.

8         Q.    When you were reviewing the KDC general ledgers, did

9    you find any intercompany transactions?

10   A.    Yes.

11        Q.    And what sort of intercompany transactions did you

12   find?

13   A.    There were numerous transactions.   The -- the ones I

14   focused on were cash going back and forth between the

15   companies.   There -- there seemed to be some commingling of

16   monies back and forth.

17        Q.    And you said back and forth between the companies --

18   between which companies?

19   A.    KDC, ProEx.   Sometimes another one of the projects would

20   be involved.

21        Q.    If we think in particular about the assertion of

22   charges by KDC against Lyman-Cutler in this case, what

23   support, if any, did you find in the general ledger for the

24   assertion of charges that KDC has made against Lyman-Cutler in

25   this case?



MICHAEL GOLDMAN - Direct

1   A.   We're -- we're talking about the -- the claim?

2       Q.   The claim -- I mean, my number's 777,000 -- but the

3   various charges that KDC has asserted against Lyman-Cutler --

4   did you find support for those in the general ledger?

5   A.   There -- there was -- there was support.  I don't

6   consider it to be reliable.  I think we're going to go through

7   some of the documents that I -- I think were very

8   questionable.  When you look at the accounting, there were

9   entries that weren't supported.  There were entries that don't

10  relate to the documents.  There were entries that were

11  changed.  There were entries that were added long after the

12  date that the transaction supposedly occurred on.

13      So I -- I -- I found a lot of issues with the reliability

14  of the data.

15      Q.   And what about with regard to ProEx?  What support,

16  if any, did you find in the general ledgers for ProEx to

17  support its claims?

18  A.   Even less than K -- than for KDC.

19          MR. CARNATHAN:  Mr. Hartzell, could I have the chart

20  that's found after page 108 -- excuse me, paragraph 108 -- in

21  Plaintiff's 166 for identification?

22                      (Pause)

23          MR. CARNATHAN:  Would you blow up the chart, in

24  particular, Mr. Hartzell?

25  BY MR. CARNATHAN:

MICHAEL GOLDMAN - Direct

1    Q.   So Mr. Goldman, I've asked Mr. Hartzell to blow up

2    this chart that's found in your report after page 108.  Could

3    you explain what this chart is recounting?

4    A.   Yes.  I -- I went through the general ledger reports that

5    were printed out and provided to us from the defendant and

6    summarized all of the costs that I could find that were

7    specifically tagged as being related to Lyman-Cutler.  And

8    these were the results I got.  The total was $204,000.

9    Q.   So if I'm understanding you correctly, in the

10   general ledger from ProExcavation, you were able to confirm

11   $204,441 of expenses that were actually incurred on the Lyman-

12   Cutler project; is that right?

13   A.   I'd rephrase that a little bit.  They were recorded as

14   being for the Lyman-Cutler project.

15   Q.   Thank you.  If we could, I'd like to walk through

16   some of the specific examples of things that you found during

17   your examination of the books and records.  And I'm right,

18   aren't I, that you've prepared some illustrative aids to show

19   the Court during your testimony?

20   A.   Yes.

21   Q.   And what did you use to make those illustrative

22   aids?

23   A.   They're -- they're all excerpts from the appendices to

24   the report that I issued.

25   Q.   Okay.  And would presenting those illustrative aids

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

 1   help you in explaining your testimony to the Court?

 2   A.   Very much so.

 3          MR. CARNATHAN:  Mr. Hartzell, could I have the first

 4   page under Decor Art?

 5   BY MR. CARNATHAN:

 6      Q.   Okay.  So what work did you do, Mr. Goldman, to

 7   examine the component of the KDC claim based on the Decor Art

 8   billing?

 9   A.   Well, one of -- one of the -- one of the basic tenets

10   that's used in a fraud examination is that people tend to be

11   consistent; companies tend to be consistent.  If you write a

12   date in a certain format, you will use that all the time, even

13   though other people may use different formats.  If you set up

14   standard documents, that template will be used over and over

15   again.  That whether -- whether it's right or wrong, people

16   tend to make -- do the same things over and over again.

17          And so as I reviewed the documents and I noticed an awful

18   lot of abnormalities or anomalies in -- in many of the vendors

19   for which documents were provided, and this is the first

20   example.  These are two invoices that were provided for --

21   from Decor Art.  And as you go through, you notice on the

22   second line, in one invoice, they use capital letters.  In the

23   next invoice, there -- there's lowercase in one, capitalized

24   in the other.

25      Q.   And so sir, just to be clear, when we look at the

MICHAEL GOLDMAN - Direct

1    one on the right, and we see the little -- on my screen kind

2    of purpley highlighting, that's your markings?

3    A.    Yes.

4        Q.    And so as a predicate, I noticed the one on the left

5    is from the 24 Druid Hill project, and the one on the right is

6    the 50 Yarmouth Road project.  So why are you showing us those

7    in connection with the Lyman-Cutler project?

8    A.    I -- I was trying to get as big a sample size as possible

9    to use in reviewing documents to determine their consistency

10   and authenticity.

11       Q.    And so I'm sorry; I kind of derailed you a bit, but

12   you were comparing the "where quality comes first" on the two

13   of them?

14   A.    Yes.  In -- in one document --

15       Q.    And what did you discover?

16   A.    -- it's lowercase, and the other document it's uppercase.

17   If you go to the next line, you'll see the word "painting" is

18   misspelled.  It's -- it's not common for a painter to misspell

19   the word "painting".

20       If you go to the next line where -- or down to the

21   telephone numbers, the order that they're presented in has

22   switched.  One has the office first and then the cell phone;

23   the other has the cell phone first and then the office.

24   There's also different symbols used.  You've got the -- the

25   little telephone, the old-fashioned telephone, and then on the

MICHAEL GOLDMAN - Direct

 1   other invoice it looks more like a cell phone.

 2        Then, if you get down towards the bottom of the page, you

 3   can see in the invoice on the left, it's very nicely boxed

 4   out.  The invoice on the right is not so nice.  It's -- it's a

 5   different template.  And typically, a business sets up a

 6   template and uses that same template over and over and over

 7   again.  It's -- it's very rare to see this many variations.

 8        Q.   So sir, based on your training and experience and

 9   based on your examination of these two particular invoices in

10   particular, did you reach any conclusion about either of these

11   invoices in particular?

12   A.   These very much appear to be prepared by some -- by

13   different people or different entities.

14        Q.   And if I could -- did you conclude that either one

15   of them appears to be a fabrication?

16   A.   I -- I would say the one on the right, where painting is

17   misspelled, is -- is likely to be fabricated.

18        MR. CARNATHAN:  Could we have the next page in the

19   Decor Art section please, Mr. Hartzell?

20   BY MR. CARNATHAN:

21        Q.   So Mr. Goldman, we now have a comparison of an

22   invoice on the 88 Cutler with an invoice on 55 Lyman.  Can you

23   explain to me what you're showing us these to illustrate?

24   A.   Yes.  What I think is significant here is that the

25   invoice number -- it's -- it's in that shaded bar.  It's a

MICHAEL GOLDMAN - Direct

1  little difficult to read, but in both invoices, it's invoice

2  number 1020.

3      Q.   So Mr. Hartzell's now showing us the left-hand one,

4  I guess, and now the right-hand one.  When you blow it up, you

5  can see that it is the same invoice number.

6  A.   Yes.

7      Q.   And so --

8  A.   And these --

9      Q.   Why is that significant?

10 A.   These are obviously different invoices.  If -- if you

11 could take away the blowup now, you can see that they're

12 different dates, different properties.  They're stamped and

13 indicated as being separately paid.  There -- there's really

14 no reason for a company to use invoice numbers if you're going

15 to duplicate them.  If you're going to start duplicating

16 invoice numbers, you -- it defeats the purpose of having them.

17     Q.   Anything else you wanted to remark upon in this

18 particular comparison?

19 A.   No.

20     Q.   No?

21     MR. CARNATHAN:  May I have the next slide for Decor

22 Art, Mr. Hartzell?

23 BY MR. CARNATHAN:

24     Q.   So now we've got, I guess, a comparison of two

25 invoices from 88 Cutler Road.  Can you explain to the Court

MICHAEL GOLDMAN - Direct

1    what it is that you're highlighting here?

2    A.    The -- the invoice on the left -- it looks like somebody

3    took a strip of white paper and blocked out a bit -- part of

4    it.  You could see the cell phone number is missing, and down

5    below where you're highlighted, that box just got chopped off.

6         Q.    Okay.

7    A.    So --

8         Q.    So the cell phone's missing on -- the one on the

9    upper left has been blanked out for some reason?

10   A.    Yes.

11        And so -- so this appears like it's been altered in some

12   way.  I -- I also noted on here that these -- both of these

13   invoices -- the description of what's being billed for is in

14   capital letters.  In other invoices from Decor Art, they use

15   lowercase letters.  And again, neither is right or wrong.

16   It's just peop -- com -- people and companies tend to be

17   consistent, and so inconsistencies are noticeable.

18        Q.    Are we finished with this slide?

19   A.    Yes.

20        Q.    Okay.

21            MR. CARNATHAN:  May I have the next slide, please?

22   A.    Okay.  What's -- what's highlighted here is gaps in

23   the -- I can't think of the word -- in the lining --

24            MR. CARNATHAN:  Bill, I think we're missing part of

25   the slide.

MICHAEL GOLDMAN - Direct

1   BY MR. CARNATHAN:

2       Q.   Okay.  We now have the full slide onscreen.  Can you

3   explain what it is that you're illustrating in this slide?

4   A.   Yeah.  Well, first of all there's the lowercase, where in

5   the previous slide we saw uppercase.  Also, gaps in the

6   template here tend to be significant because it's -- it --

7   when a company is using its own template, you don't see those

8   gaps.  Those gaps usually mean that -- it could be whiteout;

9   it could be a flaw in the way it was copied -- but when you

10  see gaps like that, it indicates that something is different.

11      Q.   Okay.  I believe that's all for the slides we have

12  for Decor Art.  Were there other points in particular that you

13  noticed during your examination with regard to Decor Art?

14  A.   Well, as we go through all of this, I have many more

15  points in my report.  I don't know if we want to go through

16  the entire report or just hit some of the illustrative

17  concepts I -- I brought here.

18      Q.   I'm trying to hit the highpoints so that we get

19  through this shortly.  But in particular, do you recall

20  examining the deposition testimony of Jose Porto?

21  A.   Yes, I do.

22      Q.   And do you recall what you learned from reviewing

23  Mr. Porto's deposition testimony that you thought was

24  significant enough to include in your report?

25  A.   I think he was the one who said he didn't use invoices,

MICHAEL GOLDMAN - Direct

1   but I want to refresh my memory on that.

2       Q.   It's paragraph 61(i) in your report.

3   A.   Yes.  Mr. Porto testified that his practice was not to

4   issue invoices and that he -- he would verbally ask for -- for

5   payment, and that he would be paid upfront.

6       Q.   And I think he also testified that he would stop

7   doing work if he's not paid within a week of requesting

8   payment, right?

9   A.   Yes.

10      Q.   And so to what extent did you consider that

11  significant in your examination of the Decor Art invoices?

12  A.   Well, these invoices were used to support a claim.  It

13  begs the question of who -- who prepared them or where they

14  came from.

15      Q.   And did the Decor Art claim include bills that were

16  unpaid?

17  A.   I believe so, yes.

18      Q.   Could I refer you to paragraph 61(j) of your report,

19  please?

20  A.   Yes.

21      Yes, there were unpaid Decor Art bills in the claim.

22      Q.   And in fact, you discovered in one instance that

23  invoice 1057 for $8,750 does not appear in the QuickBooks file

24  produced by the defendants, even though the file had entries

25  in it that were made as late as 5/11/'15, right?



MICHAEL GOLDMAN - Direct

1   A.   Yes.

2        Q.   Let's move on to BST Plumbing, please.

3            So Mr. Hartzell has put up on the screen the first

4   of the slides for BST Plumbing.  Could you explain to the

5   Court what you're illustrating in this slide?

6   A.   Okay.  There -- there's a series of invoices for BST

7   Plumbing that all use invoice numbers, but the invoice numbers

8   are used out of sequence.

9        In -- in this first page, invoice 1158 was from December

10  of 2014, and now I can't read the next one.

11       Invoice 1164 was from March of 2015.

12       And then, we should move on to the next.

13       Q.   You want the next slide in the sequence, or --

14  A.   Yes.

15       Q.   Okay.

16           MR. CARNATHAN:  Maybe just go to the whole slide.

17  BY MR. CARNATHAN:

18       Q.   Okay.  So now we have the next slide in sequence.

19  A.   Yes.  Okay.  Now, all of a sudden we're in March 2015,

20  and we're down to invoice number 160.  And this invoice number

21  was actually used twice.

22       Q.   So he used -- or someone used invoice 160 for both 7

23  Fredette and 451 Parker; is that what you're showing us?

24  A.   Yes.  And they're -- they're both stamped as being paid

25  on the same date but in different amounts.



MICHAEL GOLDMAN - Direct

1      Q.   And why is that significant?

2   A.   Well, a -- again, invoice numbers out of sequence tend to

3   raise suspicion or -- or doubts as to their authenticity.

4   When the invoice number is used twice, again it's -- it's just

5   very strange.   No -- there's no reason to use an invoice

6   number at all if you're going to be duplicating them.

7      Q.   Is there anything else on this particular slide that

8   you wanted to draw the Court's attention to?

9   A.   I don't believe so.

10      Q.   All right.

11          MR. CARNATHAN:   Could we move on to the next BST

12   Plumbing slide, please?

13   BY MR. CARNATHAN:

14      Q.   And so what is this slide illustrating?

15   A.   Okay.   Here -- here we are again.   We've got invoice

16   number 1165, and then there was 216 and 217.

17      Q.   So the dates are challenging, but it looks like 1165

18   was on February 14th -- I actually can't make out the year.

19   Do you know what year that -- oh, looks like 2015.

20          Does that look right to you, and can you make out

21   the date?

22   A.   Yeah, that -- that looks like a 15.

23      Q.   And then if we go to highlight invoice number 216,

24   that's all the way out in August 2015, right?

25   A.   Yes.

MICHAEL GOLDMAN - Direct

1      Q.    Is the fact that the invoice is dated in August

2   2015, when the construction was completed a year earlier,

3   significant in any way?

4   A.    It's puzzling.  The -- the plumbing was already inspected

5   and approved by the Town of Brookline.  Occupancy permit had

6   been issued.

7      Q.    Is there anything further that you wanted to

8   highlight on this BST Plumbing invoice?

9   A.    You -- you can't tell from the invoices I chose, but when

10  I went through the QuickBooks files I -- I found some strange

11  things.  Some of the BST invoices were entered for one amount,

12  and then, the amount was later changed.  I also found some

13  invoices that, apparently, were paid before the invoice was

14  issued.

15     Q.    Do you remember any particular instances where an

16  invoice was entered for one amount and then later changed?

17        Maybe I could refer you to your report.

18  A.    Yes.  I'm -- I'm looking at 65(d).  There were two

19  invoices for $11,360 that were changed to 19,670.

20     Q.    And how much time passed between when they were

21  entered and when they were changed?

22  A.    Twenty-seven minutes.

23     Q.    And that happened on what day?

24  A.    April 29th, 2015.

25     Q.    So the 11,360 was entered at 10:14 a.m. on April

MICHAEL GOLDMAN - Direct

1    29th, 2015, and it was changed to 19,670 on 10:41 a.m. on

2    April 29th, 2015, right?

3    A.    Yes.

4         And I -- I also noted for invoices 1165 and 1166 -- they

5    appear to have been paid on checks from 2014, even though the

6    invoices are dated 2015.

7         Q.    Did you do some work to try to map together the

8    Ferguson materials bills with the AmEx bills?

9    A.    Yes.

10        Q.    And what did you find?

11   A.    It appeared to me that the Ferguson bills were actually

12   paid by BST, that they bought the materials for the jobs.  But

13   the -- the Ferguson bills -- the quotes -- are also included

14   in the claim.

15        Q.    And did you also examine the records for the Town of

16   Brookline to see when the plumbing inspections were done?

17   A.    Yes.

18        Q.    And what did you find when you examined the permits

19   of the Town of Brookline?

20   A.    The rough plumbing inspection was done in January 2014.

21   The final inspection was September 26th, 2014, which is

22   significantly earlier than some of these invoices.

23        Q.    I noticed that you also looked at the invoices for

24   Yarmouth Road.  Do you remember doing that?

25   A.    Yes.

MICHAEL GOLDMAN - Direct

1   Q.   And what did you find with regard to the BST

2   Plumbing invoice for Yarmouth Road?

3   A.   There were two copies of invoice 1158.  One of them was

4   for 33,670, and the other was for 36,640.

5   Q.   What about when you compared the invoices 1165 and

6   1166 for BST Plumbing -- what did you find?

7   A.   These -- these I found they appear to have been paid

8   prior to the invoice date.

9   Q.   Okay.  And if we look at -- in particular, I'm

10  looking at paragraph 65(b).  Did you find that they were

11  identical?

12  A.   Yes.  Other -- other than the date -- I mean, other than

13  the project name, they were identical.

14  Q.   All right.  For two different houses, right?

15  A.   Yes.

16  Q.   Yeah.  And what about the payment information that

17  you found for them?

18  A.   That's -- that's what I just mentioned.  They were --

19  they were paid in February -- wait, I'm sorry.

20      It appears that they were paid in March 2014, even though

21  the invoices are dated February of 2015.

22  Q.   Okay.  And in both instances, they were paid 20,000,

23  and in both instances, it was reflected as 19,670 outstanding,

24  right?

25  A.   Yes.



MICHAEL GOLDMAN - Direct

1          MR. CARNATHAN:  Why don't we move on to DaCosta

2   Construction?

3          MR. HARTZELL:  Sorry, which one?

4          MR. CARNATHAN:  I'm on DaCosta.

5   BY MR. CARNATHAN:

6      Q.   So Mr. Hartzell has put the first slide up on from

7   the DaCosta materials.  What is this slide illustrating?

8   A.   I took snips of the invoice number on a number of the

9   DaCosta invoices to show them all next to each other as a

10   comparison.  And as you go through here, you can see a number

11   of inconsistencies.

12          Invoice numbers are used out of sequence.  April is

13   spelled differently.  Some of the times, it's spelled Abril,

14   which you -- you see typically from a European tradesman who's

15   creating invoices, but other times, it's spelled April.  In

16   one of the invoices, the April is not capitalized.  In the

17   others, it is.

18          Some of the months are written with numbers and slashes,

19   and the month isn't spelled out.  There's one invoice where

20   it's written as May 5th with the "th", where that isn't done

21   anywhere else.

22          And then, the change order invoice, which was part of the

23   claim, has the date written, again, in a totally different

24   format and uses an invoice number that's way outside of what

25   this vendor was using, and there's no record of that invoice

MICHAEL GOLDMAN - Direct

1   number in the accounting records.

2        MR. CARNATHAN:  Can we have the next slide for

3   DaCosta, please?

4   A.   Again, these --

5        MR. CARNATHAN:  Bill, can you get the whole slide up?

6   You've only got half of it.

7   BY MR. CARNATHAN:

8        Q.   You can start, Mr. Goldman, just to --

9   A.   Okay.

10       Q.   -- use our time.

11   A.   Who -- whoever prepared this invoice template has it

12   backwards.  The -- DaCosta is not -- shouldn't be the "ship

13   to".  DaCosta is the company that's creating the bills, and

14   Kagan Development should have been the "ship to".

15       Throughout the DaCosta invoices, a number of them, if you

16   look on top here between DaCosta and P.O. Box, it looks like

17   something was cut and pasted on top of the invoice.

18       There's inconsistencies here.  Some of the invoices, if

19   you look down below, have used that bar on the titles.  The

20   invoice above is missing the bar or has it printed

21   differently.

22       And then in the second invoice, he forgot to put the word

23   "Construction" after DaCosta.

24       Q.   What about -- there's another little arrow on the

25   top one pointing to the "Paul Cordeiro, DaCosta Construction";

MICHAEL GOLDMAN - Direct

1   do you see that?

2   A.   Yeah.   That -- that's what I mentioned -- that -- that

3   void space where part of the P.O. box number is -- is blanked

4   out.   Looks like there -- somebody had been cutting -- cutting

5   and pasting to make the copy.

6        MR. CARNATHAN:   Could I have the next slide for

7   DaCosta, Mr. Hartzell?

8   BY MR. CARNATHAN:

9        Q.   What are you illustrating in this slide, sir?

10  A.   Okay.   Again, just some of the inconsistencies in the --

11  in the type, in the type -- the font.   Again, there's that

12  void that looks like something was cut and pasted,

13  inconsistencies in the bars in the titling on the invoice.

14       MR. CARNATHAN:   And then the next slide for DaCosta,

15  please.

16  BY MR. CARNATHAN:

17       Q.   Why are you focused on this email in particular,

18  sir?

19  A.   There -- there were a number of reasons.   One is it -- it

20  appears that he was asked to restate his invoice, supposedly

21  for mistakes that he had -- he had made long before.

22       Q.   So that's where he says, "We have revised all our

23  records as you request.   All our files.   We find some mistake

24  on invoice N. 1405 from house/job 88 Cutler Road, Brookline,

25  Mass., date 4/15/2014, line N. 4 on extra on frame.   We

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

1  mistake didn't add total, which was supposed to be 35,500 on

2  extras.  We have correct the invoiv (sic).  Now all the number

3  will match."

4  A.   Yes.

5       Q.   Have I read that correctly?

6  A.   Yes.

7       Q.   And that was on September 2nd, 2015, right?

8  A.   Yes.  Now, I circled invoice number 1405, which he makes

9  reference to, I didn't find in the claim, I didn't find any

10  accounting records.

11       Q.   So in the materials provided, you couldn't find an

12  invoice number 1405?

13  A.   Correct.  And something else that I think is missing from

14  this invoice that you would expect a small contractor who

15  hadn't been paid $23,000 or whatever else he's asking for --

16  he'd be asking to be paid.  That was another consistent theme

17  I noticed as I go through these invoices of small vendors who

18  were supposedly underpaid and delaying paid, and there's none

19  of the begging or threatening or pleading or whatever for

20  payment that you typically see that small -- when small

21  companies haven't been paid.

22       Q.   Did you also review the audit trail of the Lyman-

23  Cutler QuickBooks file?

24  A.   Yes.

25       Q.   And if I -- I'm guessing you're not going to

MICHAEL GOLDMAN - Direct

1  remember this one specifically.  If you look at paragraph

2  70(f) of your report, what did you find when you reviewed the

3  audit trail that the Kagan parties provided us for the

4  QuickBooks file for Lyman-Cutler?

5  A.   There were two invoices that didn't have invoice numbers

6  that were entered into the -- into the QuickBooks file.  One

7  was for $20,350 and the other for 28,350 thousand (sic).  They

8  were both deleted the next day, and this occurred late in

9  April of 2015.  And then, the change order for 18,500 that's

10  referred to here and that we saw a copy of before didn't

11  appear in the accounting records that I had.

12      Q.   And just referring to paragraph 70(h), what were

13  invoices 1403 and 1406?

14  A.   They had payment amounts that were not -- that were

15  incorrect.  The math was wrong.

16      Q.   Let's move on to Dream Flooring.

17          MR. CARNATHAN:  Can I have the first Dream Flooring

18  slide?

19  BY MR. CARNATHAN:

20      Q.   So what are you showing us in this first slide for

21  Dreams Flooring (sic)?  Excuse me.  What are you showing us in

22  this slide, Mr. Goldman?

23  A.   Dream Flooring -- I forget what his name was, but he was

24  subpoenaed, and he provided invoice copies.

25      Q.   And so which invoice on here is from the Dream

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

1   Flooring guy, and which one is from Kagan?

2   A.   The one on the left is from Dream Flooring.  The one on

3   the right is from the Kagan claim.  The one on the left says,

4   "Job is completed; paid in full".  The one on the right says,

5   "Job is completed; amount due".

6        Q.   Did you also examine the QuickBooks files provided

7   by the Kagan parties with regard to Dream Flooring?

8   A.   Yes.

9        Q.   And what did you find when you did that?

10  A.   It looked like he had been paid previously and that some

11  of the amounts due on the invoices provided weren't correct.

12       Q.   If we look at paragraph 69(c) of your report, "Mr.

13  Kagan's documentation shows that Dream Flooring was owed

14  $52,210", right?

15  A.   Yes.

16       Q.   And what did you find when you looked at the

17  QuickBooks files?

18  A.   That Dream Flooring was paid three times, for a total of

19  $20,000, all before February in 2014.  And significantly, it

20  was before the invoice date.  This mon -- and this money was

21  paid from the Rockland Trust account.

22            MR. CARNATHAN:  Why don't we go to the next slide?

23  BY MR. CARNATHAN:

24       Q.   What did you find -- or what are you illustrating

25  here, sir?



MICHAEL GOLDMAN - Direct

1    A.    Again, the vendor provided an invoice copy that said

2    "completed, paid in full".  The claim contains a copy that

3    says a balance is due.  This is in a very different font than

4    we saw in the previous invoice, and the word "due" is spelled

5    wrong.

6        But it's -- it's another one of the inconsistent

7    formatting that we find over and over again.

8            MR. CARNATHAN:  Could I have the next Dream Flooring

9    slide, please?

10   BY MR. CARNATHAN:

11       Q.    And so what's being illustrated in this slide?

12   A.    A -- a third example.  This -- this is similar to the

13   first.

14       Q.    Where the --

15   A.    The invoice that was produced says "paid in full".  The

16   invoice for the claim says "amount due".  And the font is the

17   same as the first invoice set that we saw, different than the

18   second set that we saw.

19       Q.    Okay.  And if we look at the invoice dates, it's

20   June 21, 2014, right?

21   A.    Yes.

22       Q.    So when you looked at the QuickBooks ledgers -- and

23   I'm now looking at paragraph 69(g) -- what did you find?

24   A.    20,000 of this was paid before February 20th, 2014.  So

25   the in -- the invoice should not have stated that the -- the

MICHAEL GOLDMAN - Direct

1    full amount was due.

2         MR. CARNATHAN:  Could I now have the first slide for

3    ProExcavation, please?

4    BY MR. CARNATHAN:

5         Q.   What are you illustrating in this slide, Mr.

6    Goldman?

7    A.   Okay.  This is -- this is from the Lyman-Cutler

8    QuickBooks file.  It was maintained by somebody in the Kagan

9    organization.  And --

10        Q.   So what's the difference between the top and the

11   bottom?

12   A.   The -- the top excerpt is from the claim documentation.

13   I've got the page reference Kagan 01006.

14        Q.   And what's the bottom from?

15   A.   The bottom is from the QuickBooks file that I had to work

16   for that was produced to us as -- as a result of discovery.

17        Q.   And what are you pointing out here?

18   A.   There's -- the one in the claim file has an extra $20,000

19   that, supposedly, was from a bill in October of 2014, and that

20   never occurred -- never appeared in the file that I had.  And

21   you could see the date that I ran this --

22                        (Alarm sounding)

23        THE COURT:  That's fire, but hold on.

24                        (Announcement sounding)

25        THE COURT:  Okay.  The problem is that's going to be



MICHAEL GOLDMAN - Direct

1  repeated.

2              (Alarm and announcement sounding)

3          THE COURT:  Okay.  We can try to press on.  Let's see

4  what happens here.

5          MR. CARNATHAN:  Thank you, Your Honor.

6  BY MR. CARNATHAN:

7      Q.  So in terms of the timing of when the $20,000 was

8  entered, are you able to say anything about when that

9  apparently was made?

10  A.  Yes.  I -- I went through, and I compared the QuickBooks

11  file that was produced to Mr. Filippov to the documentation

12  that was provided in the claim.  And it appears that the file

13  that we had -- it was -- there was nothing recorded after

14  middle of May in 2015.  And so since this entry, even though

15  it's dated October 2014, was never in the file that I had,

16  then it was -- it was recorded sometime after May in 2015.

17      Q.  Okay.  And just to refresh your memory, paragraph 74

18  of your report.

19          I think you concluded it had to have been entered

20  after May 14th, 2015, right?

21  A.  Yes, that's correct.

22      Q.  Is that it for this slide?

23  A.  Yes.

24      Q.  Yep.  All right.

25          MR. CARNATHAN:  May I have the next slide, please?

MICHAEL GOLDMAN - Direct

1   BY MR. CARNATHAN:

2        Q.   And so what's being compared here, Mr. Goldman?

3   A.   Okay.  This is similar.  I'm comparing, again, the

4   QuickBooks file that I had to work with to the QuickBooks file

5   that was used to generate the claim.

6        Q.   So in this case, the one at the bottom is the one

7   for the claim, and the one at the top is --

8   A.   Yes.

9        Q.   -- the one that was produced in the litigation?

10  A.   Yes.

11       Q.   And so what's the difference?

12  A.   In the file I had, there was an invoice for $45,000 that

13  was dated October 6th.  In the file used in the claim, that

14  invoice disappears and was replaced with a $75,000 invoice

15  that was dated February 2014.

16       Q.   Okay.  So they rolled the date back eight months and

17  added $30,000; have I got that right?

18  A.   Yes.

19           MR. CARNATHAN:  May I have the next slide, please?

20  BY MR. CARNATHAN:

21       Q.   All right.  And what are you showing us on this

22  slide, sir?

23  A.   Again, this is similar.  The -- the top ledger came from

24  the file that I had to work with.  The bottom came from the

25  claim.  My file had a $90,000 invoice dated October 2014, and

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

1    it looks like that invoice was changed to 120,000.  And then,

2    on the bottom, there was a $4,600 landscaping invoice added

3    with May 28, 2015, so that was past the date when my file was

4    generated.

5         Q.   So again, these were changes that were made after

6    May 14th?

7    A.   After May 14th, yes.

8         Q.   All right.

9              MR. CARNATHAN:  May I have the next slide, just to be

10   safe?  But I think we've already gone over it.

11             Right.  Okay.  Let's take that one down.

12             Can I have the first slide for Unicon Electric?

13   BY MR. CARNATHAN:

14        Q.   What are you illustrating here, Mr. Goldman, with

15   regard to the Unicon Electric invoices --

16   A.   Actually, these --

17        Q.   -- or proposals, I should say.

18   A.   Technically these are proposals.  They are -- they were

19   submitted, though, as invoices and considered to be invoices.

20   There are actually four copies of this document, and three of

21   them, the only difference is the address.  And where I circled

22   was to show some of the indications where I'm saying these are

23   the same document, because it's very difficult if you're

24   handwriting this out to have your -- everything lined up the

25   exact same way each time.  So I'm assuming that this is --

MICHAEL GOLDMAN - Direct

1  these were generated by copies, only changing the project

2  addresses.

3       Q.   So these are handwritten documents that are exactly

4  the same, other than the addresses; have I got that right?

5  A.   Yes.

6       Q.   And you say that's across four different properties?

7  A.   Yes.  If you go to the next slide, you'll see these

8  two --

9            (Alarm and announcement sounding)

10           MR. CARNATHAN:   Good to go?

11           THE COURT:   Yes, they usually -- go ahead.

12           MR. CARNATHAN:   Thank you, Your Honor.

13  BY MR. CARNATHAN:

14       Q.   So Mr. Goldman, we were looking at the slide

15  comparing 10 Lyman Road and 50 Yarmouth Road.  It looks like

16  the price on this one's different, too, though, isn't it?

17  A.   Yes.  The one on the right was changed -- was $75,000.

18       Q.   How can you tell it was changed to 75,000?

19  A.   I -- I shouldn't have used the word changed.  It's --

20  it's written as $75,000 instead of 65,000.

21       Q.   What other inquiry did you make into the veracity of

22  the Unicon Electric bill, sir?

23  A.   I looked to see what was paid for according to

24  QuickBooks, and for the two Lyman-Cutler projects, a total of

25  65,000 was paid, which would be one of these proposals, not



MICHAEL GOLDMAN - Direct

 1   both of them.

 2           MR. CARNATHAN:  Mr. Hartzell, could I have the chart

 3   that follows paragraph 71 in Mr. Goldman's report?

 4           MR. HARTZELL:  Which paragraph?

 5           MR. CARNATHAN:  71.

 6           Maybe just blow up the chart in the middle.

 7   A.   Okay --

 8   BY MR. CARNATHAN:

 9       Q.   So what work did you do to prepare this chart?

10           MR. PERTEN:  Objection, Your Honor.  This chart and

11   the paragraph to which he refers -- this expert is about to

12   testify based on his report about what kind of electrical

13   amperage should be in which house and what is the cost for

14   electrical amperage.  This witness has no demonstrated

15   competence to know anything about electricity or about

16   amperage or anything else, so I think he's not competent to

17   testify about this chart.

18           MR. CARNATHAN:  Well, that's not exactly what he's

19   going to testify to, Your Honor.  I mean, I could do a little

20   more foundation, but that's not what he's going to say.  I

21   mean, he's comparing the projects with investors, projects

22   without investors, and the with investors, it always says 400

23   amps in the proposals; without, it always says 200.

24           THE COURT:  All right.

25           MR. CARNATHAN:  But -- yeah.





MICHAEL GOLDMAN - Direct

1          THE COURT:  Overruled without prejudice to renewal in

2    the event that the testimony moves in a direction in which he

3    has not demonstrated an expertise.

4          Go ahead.

5          MR. CARNATHAN:  All right.

6    BY MR. CARNATHAN:

7       Q.   So Mr. Goldman, why don't we just do a couple of

8    foundational questions before you comment on the chart?  All

9    right.  So what work did you do to prepare this chart?

10   A.   This -- this was based -- I reviewed the documentation on

11   the five additional projects that I was provided with, as well

12   as the two houses in the Lyman-Cutler project.

13      Q.   And what were you trying to accomplish by comparing

14   those documents?

15   A.   I -- I was looking a -- again for context that -- do

16   these make sense?  I -- I would have felt more comfortable if

17   the electrical prices for the homes were more in line.  It

18   looks like there may be a difference, which is why I

19   highlighted the difference in amperage.  I tried to confirm

20   the difference in amperage based on information online, and I

21   couldn't.  For two of the houses, a real estate site said it

22   was 200 amps and not 400, and I don't consider that to be

23   incredibly reliable.

24         But I tried to determine if this price difference in

25   amperage made sense, and the most I could verify was that --

MICHAEL GOLDMAN - Direct

1   to expect a difference of maybe $3 or $4,000 with the

2   increased amperage.  So I'm looking -- just looking at the

3   pattern and seeing that the -- the in-house projects were --

4   seemed to be done with a lot less cost than the investor

5   projects.

6         MR. PERTEN:  Your Honor, again I would renew my

7   objection and move to strike to the extent that he's now

8   purporting to testify how much 400-amp projects should cost

9   versus 200-amp projects.  He's not an electrician.  There's no

10  showing, frankly, other than the fact that one had investors

11  and one didn't, that these (indiscernible) were the same, that

12  the houses were the same, that the size was the same.  So

13  there's no foundation that he's comparing apples to apples.

14  So again, I think this goes beyond what he's competent to

15  testify to.

16         MR. CARNATHAN:  I mean, he's a certified fraud --

17            (Alarm and announcement sounding)

18         THE COURT:  It's going to happen again.  Just hold

19  on.

20         MR. CARNATHAN:  Two each time.

21            (Alarm and announcement sounding)

22         MR. CARNATHAN:  So Your Honor, I mean, he's a

23  certified fraud examiner looking for context, looking for

24  things that make sense, looking for things that don't make

25  sense.  He's not claiming to be a construction expert.  He's

MICHAEL GOLDMAN - Direct

1    not claiming to testify to what it costs to install

2    electricity.

3            But he's noticing the startling fact that every time

4    Mr. Kagan does a project with investors, he lists it a 400

5    amps, and somehow the investors pay 65 to 75,000.  Every time

6    he does a house for himself, it's 200 amps, and he pays 30 to

7    35,000.  All by itself, that fact might not mean much.  But

8    when you add it into the whole mosaic of all the other facts

9    that he found, it's a piece of the puzzle.

10           THE COURT:  All right.

11           MR. CARNATHAN:  That's all he's saying.

12           THE COURT:  I'll overrule the objection.  It'll

13   stand.

14   BY MR. CARNATHAN:

15       Q.   So with apologies, I lost the thread of exactly what

16   you had said before we got to that colloquy, but could you

17   explain to the Court why this chart played a role in your

18   analysis?

19   A.   A -- again, I'm look -- I'm looking for patterns, for

20   context, for the overall flows of how everything is working

21   to -- to see what makes sense and what needs to be challenged

22   more.  And as was just stated, the investor projects had

23   significantly higher electric costs than the noninvestor

24   projects.

25           And if you -- if you look at what was in the QuickBooks

MICHAEL GOLDMAN - Direct

 1    file for these houses, this electric company was paid more

 2    along the lines of the noninvestor projects.

 3        Q.    And did you also review the town permits for the

 4    electrical work in connection with your analysis of the Unicon

 5    invoices?

 6    A.    Yes, I did.

 7        Q.    And what did you find there?

 8    A.    The permit for the electrical work was issued on February

 9    5th, 2014.  Final inspection was September 25th, 2014.  And

10    then, accounts payable entries for an additional $65,000 were

11    made on April 29th, 2015.

12        Q.    Okay.  And why are those dates significant?

13    A.    A lot of these additions all appear to be made in late

14    April and approximately six months after the houses were

15    deemed to be completed.

16        Q.    All right.

17            MR. CARNATHAN:  Did we have another slide for Unicon?

18            Let's move on to -- I think V&D Heating is next in

19    the --

20    BY MR. CARNATHAN:

21        Q.    So Mr. Goldman, what is being illustrated in this

22    slide that we just put up with regard to V&D Heating?

23    A.    A -- again, this is a vendor who was subpoenaed and asked

24    to produce documentation.  And it appears that the

25    documentation that the vendor provided is exactly the same as

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

1    the documentation that was provided in the claim.  It's as if

2    they shared the document.  And this -- this is based on the --

3    that paperclip that I circled -- that, typically, when you're

4    comparing documents that came from two different sources, you

5    don't see identical paperclips like that.

6        Q.    So could you explain a bit further?  I'm not clear

7    on why it's significant.  What's the paperclip telling us?

8    A.    It -- it looks like a sharing of documents, that either

9    the vendor or the Kagan entities -- one of them provided the

10   document to the other to be produced.

11       Q.    Provided the photocopy?

12   A.    Yes.

13       Q.    And so in fact, the paperclip is showing us that the

14   exact same photocopy was allegedly in the files of both Mr.

15   Kagan and the vendor; have I got that right?

16   A.    Yes.

17       Q.    And so if we go to the next slide --

18            MR. CARNATHAN:  I think the first slide was 88

19   Cutler.

20   BY MR. CARNATHAN:

21       Q.    Okay, and so now we're on to 55 Lyman.

22   A.    Yes, and this --

23       Q.    What are you showing us here?

24   A.    This is the -- this is the same thing, except there's a

25   staple instead of a paperclip.

MICHAEL GOLDMAN - Direct

1      Q.   And so the staple mark shows that exactly the same

2    photocopy was produced by both Mr. Kagan and the alleged

3    vendor, right?

4    A.   Yes.  And also, I'm highlighting here the date that this

5    proposal was supposedly written, December of 2013.

6      Q.   Why is that important?

7    A.   Because the actual payments -- the down payment on these

8    was -- were made in October of 2013.

9      Q.   So that's the next slide --

10   A.   Yes.

11     Q.   -- when we see the checks on the next slide?

12          And why is it significant that payment was made

13   before a proposal was given?

14   A.   It's not the typical order that things are done.  The --

15   it raises questions as to the veracity of the documentation.

16          MR. CARNATHAN:  Not sure what they're --

17               (Announcement sounding)

18          THE COURT:  All right.

19          MR. CARNATHAN:  Sounded like good news.

20          THE COURT:  I think we're done.

21          MR. CARNATHAN:  All right.

22          THE COURT:  But they may -- usually they want to tell

23   you that three more times, but I think it's probably done.

24   BY MR. CARNATHAN:

25     Q.   Did you also review the town permits with regard to

MICHAEL GOLDMAN - Direct

1   the V&D Heating work, sir?

2   A.   Yes.

3       Q.   And what did you find when you reviewed the town

4   permits?

5   A.   Can you refresh me to my paragraph?

6       Q.   We're on paragraph 68(f).

7   A.   Yes.  In the QuickBooks file that was used for the claim,

8   there were two invoices entered again on April 29th, 2015.

9   One was for 13,950.  The other was for 23,950.  The Town of

10  Brookline had done the final inspection in September 2014.

11      Q.   Okay.  Did you find anything in the KDC general

12  ledgers regarding V&D Heating that you felt was significant?

13  A.   Yes.  According to the ledgers, KDC owed V&D Heating -- I

14  think it was $260,000 that had been sitting there for at least

15  a couple years, and there was no activity in that account; no

16  payments were being made.

17      Q.   Are you drawing any inference from that fact?

18  A.   You know, I -- when I -- when it looks like two parties

19  are using the same document, I try to ask myself, why does

20  this make sense?  And if -- if V& -- it may mean that V&D has

21  a vested interest in -- in the Kagan entities if it's owed

22  that type of money.

23          MR. CARNATHAN:  Could I have the next slide?  I think

24  it's going to be Construction Specialties.

25  A.   This slide is the one that shows --

1    BY MR. CARNATHAN:

2         Q.   Oh, I'm sorry.

3    A.   -- V&D -- the V&D loan.

4         Q.   Okay.  All right, now we're on to Construction

5    Specialties.

6    A.   Okay.  Again, I am comparing the QuickBooks file that was

7    produced to us, which is the bottom half, to the QuickBooks

8    ledger that was provided with the claim.  And the top item --

9    in the file I had, the amount was 8,982.  In the file that was

10   produced as part of the claim, that amount has been changed to

11   14,130.  And I did go back to the American Express bill and

12   verify what the correct amount is.  The 8,982 is the one that

13   ties to the American Express bill.

14        Q.   When you looked at the American Express bills, did

15   you find any support for the 14,130?

16   A.   No.

17        MR. CARNATHAN:  Could I have the next slide, please?

18   BY MR. CARNATHAN:

19        Q.   What are you illustrating here, Mr. Goldman?

20   A.   This is the same thing.  I flipped the order as to which

21   one is on top, but it's for the other project.  The previous

22   slide was for the 88 Cutler building.  This is for the 55

23   Lyman building.  And again, the 8,982 was changed to 14,130.

24        Q.   And so in fact, it's exactly the same numbers on the

25   two projects, right?



MICHAEL GOLDMAN - Direct

1    A.   Yes.  And in many, many instances, bills were just split

2    evenly between the two houses.

3           MR. CARNATHAN:   Could I have the next slide, please?

4    BY MR. CARNATHAN:

5       Q.   And so what are you bringing to our attention in

6    this slide, Mr. Goldman?

7    A.   I ran an audit trail report on this in -- on this invoice

8    that had been changed to see if I could determine when or how

9    it was changed, and --

10      Q.   Can you first explain what's an audit trail report?

11   A.   An -- an audit trail is a feature of QuickBooks that

12   shows you every change that's been made to -- to whatever

13   entries you have in there.  So anything that you change will

14   show up in the audit trail.

15      Q.   Okay.  And so you ran the audit trail for

16   Construction Specialties; is that what this is?

17   A.   Yes.  And I could not find where the 8,932 was changed to

18   the $14,000 number in my audit trail, which was how I first

19   determined that I was using a different -- I was given a

20   different file than the one that was used for the claim.

21      Q.   So is this two different audit trails here, or

22   what --

23   A.   No.

24      Q.   No?

25   A.   There was a change made to this invoice.  It was a minor

MICHAEL GOLDMAN - Direct

1    change at first.  The -- what's bolded about halfway down is

2    what changed.

3        Q.   And so what's significant about that?

4    A.   The significance of this is that there's nothing in my

5    file that shows how it went from 8,000, which was originally

6    entered, to 14,000.  So that -- that was my first hint that I

7    was given a different file than the one that was used to

8    generate the claim.

9        Q.   I'm sorry.  So you're saying that the QuickBooks

10   file that was produced in the discovery is not the same

11   QuickBooks file that was used to generate the proof of claim?

12   A.   Yes.

13           MR. CARNATHAN:  Could I have the next --

14           THE COURT:  I just want to ask this question.  Tell

15   me again how you know that.

16           THE WITNESS:  Because there are entries -- there --

17   there have been a few times where I've showed comparative

18   ledgers.  And there are entries in the claim printouts from

19   QuickBooks that do not appear in my file at all, and --

20           THE COURT:  When you say "your file" --

21           THE WITNESS:  The -- the file that was produced to

22   me.

23           THE COURT:  Okay.  So something was produced in

24   discovery; that's what you were dealing with --

25           THE WITNESS:  Yes.



MICHAEL GOLDMAN - Direct

1          THE COURT:  -- when you're saying "your file".

2          THE WITNESS:  Yes.

3          THE COURT:  And when you say the claim file, that's

4    what was produced in support of the claim?

5          THE WITNESS:  Not produced.  It was -- it was printed

6    out, and the printouts were used as documentation of the

7    claim.

8          THE COURT:  Okay.

9    BY MR. CARNATHAN:

10        Q.   So the printouts in the proof of claim binders, is

11   that right?

12   A.   Yes.

13        Q.   Yeah.

14        THE COURT:  I see.

15        THE WITNESS:  And the reason I showed the audit trail

16   here was to show that there's no way to get from the number

17   that was in the file that was produced to me in the -- in that

18   file, to the number that was used in the claim.

19        THE COURT:  Okay, thank you.

20        MR. CARNATHAN:  Could I have the next slide, please?

21   BY MR. CARNATHAN:

22        Q.   So Mr. Goldman, would you explain this slide,

23   please?

24   A.   Yes.  This -- this is one page out of many, many pages of

25   American Express bills, and I was going through and comparing

MICHAEL GOLDMAN - Direct

1   the American Express bills to the accounting.  And I'm just

2   showing that, where I have the arrow for Constru -- and

3   circled Construction Specialties, the $8,000 number that

4   appeared in the file that was produced to me is the correct

5   number.  I verified that number on the American Express.  I

6   couldn't verify the $14,000 number that was in the -- that was

7   in the other file.

8        Q.   Okay.  And so we've got -- the next page is another

9   American Express.

10            And so is that the same concept, or is there more to

11   be told?

12   A.   Yeah.  This -- if you take the number that's on this page

13   and add it to the previous number and divide by two, you'll

14   get the numbers that were charged to each house originally.

15        Q.   So that's how you derived that 8,000 -- I forget the

16   exact number -- 900 odd --

17   A.   Yes.  I didn't derive it.  I verified it.

18        Q.   Okay, thank you.

19            Can I direct your attention to paragraph 58(e) of

20   your report?

21            So at some point, you also compared other details.

22   Could you explain to me what you found when you compared the

23   QuickBook reports and the detailed supporting invoices?

24   A.   Yes.  The -- the documentation that was provided added up

25   to $27,280, which was very close to the amount that was in the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

1   QuickBooks file that was produced to me.  The QuickBooks

2   reports in the claim total $36,530, so it looks like the --

3   again that the -- what was in the claim was overstated.

4        MR. CARNATHAN:  Let's move on to the next slide for

5   Huntington Home Systems, please.

6   BY MR. CARNATHAN:

7        Q.   And what does this slide illustrate, sir?

8   A.    This is a simpler one.  These are -- these are excerpts

9   from invoices that were in the files, purporting to be from

10  Huntington Homes.  In the top two invoices, the invoice

11  numbers are five digits long.  These two invoices are both

12  dated April 22nd, and there's a spread of 132 invoices between

13  them.

14       And I looked at a calendar; April 22nd is a Tuesday.

15  This is a small business that sells -- a home improvement

16  center -- home improvement equipment.  The -- the invoice --

17  that would be a lot of transactions on a Tuesday in April for

18  this kind of business.

19       MR. PERTEN:  Objection, Your Honor.

20       THE COURT:  Yeah.

21       MR. PERTEN:  Move to strike that.

22       THE COURT:  On the basis of?

23       MR. PERTEN:  On the basis that this witness has no

24  competence to say what Huntington Home Systems' business would

25  be on a Tuesday in April.  He's not a marketing specialist.



MICHAEL GOLDMAN - Direct

1    He can talk about numbers, but to say there's no way that they

2    would have only had this many sales or that number of sales on

3    a business like this -- unless there's foundation that he can

4    tell us that he investigated Huntington Home Systems, there's

5    absolutely no way that this witness can make any

6    representation about how many sales a day or a week Huntington

7    sales should have had.

8            MR. CARNATHAN:  He's offering observations that he's

9    making about these invoices based on his twenty-odd years of

10   experience as a certified fraud examiner and an accountant,

11   and he's pointing out discrepancies that strike him as

12   difficult to explain.  He's not purporting to say in any one

13   instance that this is --

14           THE COURT:  It's overruled.

15           MR. CARNATHAN:  Yeah.

16   BY MR. CARNATHAN:

17       Q.   And I'm sorry.  I've lost the thread in the colloquy

18   again.  Have you explained everything you wanted to explain

19   about that particular discrepancy?

20   A.   Why don't we jump down to the bottom two invoices?

21           Here we have -- and this is al -- the top one is also --

22   you confused me, sorry -- the top one is also April 2015.  Now

23   we're in six digits.  These are obviously computer-generated

24   invoices.  Computers don't jump back and forth like that from

25   five to six digits in the invoice numbers.  They go

MICHAEL GOLDMAN - Direct

1  sequentially.  That's one of the advantages of using a

2  computer.

3       I also looked at invoices -- there's -- there's a three-

4  month difference between these two invoices, and in that three

5  months, there was only a 273-invoice spread, which is very

6  inconsistent with the spread that we just talked about,

7  where -- what was it -- 132 invoices in one day.  In the six-

8  digit invoices, there were only 273 invoices in a three-month

9  period.

10      Q.   So sir, based on your review of the Huntington TV

11 invoices provided in support of the mechanic's lien, did you

12 draw any conclusions?

13 A.   Again, there's a -- there's this pattern of -- of such

14 inconsistency that araise -- it raises questions to the

15 authenticity of the documents provided.

16      Q.   If I could refer you to paragraph 60 of your report.

17      Did you reach any conclusion about whether or not

18 the invoices appear to be fabricated?

19 A.   It appears that some of them were, yes.

20      MR. CARNATHAN:  Let's move to the next slide for

21 Horner Millworks (sic), please.

22 BY MR. CARNATHAN:

23      Q.   Would you please explain the slide that we've got up

24 on screen now regarding the charges by Horner Millworks (sic)?

25 A.   Yes.  Again, this is another example of differences in

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

1    the multiple QuickBooks files.  The top portion is from what

2    was provided in the claim.  And KDC invoice number 316 is

3    charged here for 35,060.  In the file that was produced that I

4    used, invoice number 316 from KDC was only 26,936.

5        Q.   So even the invoice number that's used is the same,

6    but the number has been increased by $8-odd-thousand; is that

7    right?

8    A.   Yes.  And this -- this was an internally generated

9    invoice from KDC's file.

10       Q.   So if we go to the next slide -- and I guess, just

11   trying to move it along, precisely the same thing happened

12   on --

13   A.   Same --

14       Q.   -- 88 Cutler?

15   A.   Same thing, other house.

16       Q.   Did you also compare the Horner Millworks (sic)

17   charges to the AmEx bills that were made available to us?  I'm

18   at paragraph 59 of your report.

19   A.   Yes, I did.

20       Q.   What did you find in the AmEx bills?

21   A.   The amount that was entered in the file that was produced

22   to me was the correct amount, and I couldn't explain why the

23   file that was produced with the claim was higher.

24       Q.   So just to clarify, the AmEx bills supported the

25   charge of $26,938.92 that was in the file that was produced in

MICHAEL GOLDMAN - Direct

1    discovery, right?

2    A.   Yes.

3        Q.   But you could not find support in the AmEx bills for

4    the charge submitted with the mechanic's lien for 35,060.84;

5    do I have that straight?

6    A.   Yes.

7            MR. CARNATHAN:   Let's move on to PaveTech, please.

8    A.   This is from PaveTech's website, and the reason I chose

9    this -- they -- they appear to be a very professional-looking

10   company.   They've been in business since 1989.

11   BY MR. CARNATHAN:

12       Q.   Okay.   So then we go to the next slide.   What did

13   you find when you looked at the invoices?

14   A.   In 2014, they were only on invoice number 5, which --

15       Q.   Why is that significant?

16   A.   If they had been using invoice numbers since 1989, I

17   would expect they'd have generated more than five invoices.

18   Also, invoice number 5 was used twice on two different

19   invoices.

20       Q.   Is that unusual for a company that's been in

21   business thirty years?

22   A.   Very -- very unusual.

23           MR. CARNATHAN:   Could we go to the next slide,

24   please?

25   A.   Two more invoices from PaveTech.   They're both invoice

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

1    number 6 even though they have different dates.

2    BY MR. CARNATHAN:

3        Q.   So on June 28th and June -- excuse me -- July 28th

4    and July 29, 2014, we saw invoice number 5 from PaveTech.   A

5    month later, we see invoice number 6 --

6    A.   Yes.

7        Q.   -- and a month after that we see invoice number 6

8    again, right?

9    A.   Yes.

10       Q.   In your experience, is that unusual?

11   A.   It's -- it's highly unusual.   There's no reason to be

12   using invoices if you're going to be doing this.   Invoice

13   numbers, I mean.   I'm sorry.

14       MR. CARNATHAN:   Could I have the next slide, please?

15   BY MR. CARNATHAN:

16       Q.   What are you bringing to the Court's attention in

17   this slide, sir?

18   A.   Two of these invoices did not use invoice numbers.   Down

19   below, we have invoice number 8.   And there are formatting

20   differences here, too.   If you look at the top two invoices,

21   the ad -- the address has the word "to" in it.   If you look at

22   the bottom, there isn't a -- the word "to".   And again, when

23   you're -- if you're using your computers to generate invoices,

24   which it appears this company is, you wouldn't see that

25   inconsistency.

MICHAEL GOLDMAN - Direct

1    Q.   And just to be clear, on the bottom one, they got to

2    invoice number 8 apparently on November 11th, 2014.  At least

3    that's what the invoice says, right?

4    A.   Yes.

5    Q.   Looking briefly at your report, what did you find

6    when you reviewed the QuickBooks files provided for PaveTech?

7    A.   Which paragraph are we on?

8    Q.   I'm looking at paragraph 64(h).

9    A.   There was another discrepancy between the two QuickBooks

10   files.

11   The check --

12   Q.   I'm sorry.  Could you explain the discrepancy?

13   A.   Check number 1120 for 7,662 was issued on August 24th and

14   cleared the bank, and so it should be in the file.  It's in

15   the file that was used to prepare the mechanic's lien claim

16   but was not in the file that was produced to us.

17         MR. CARNATHAN:  Let's move on to the next slide for

18   Paul DiGiacomo.

19   BY MR. CARNATHAN:

20   Q.   So what are you highlighting here for us, sir?

21   A.   Again, differences in the template, differences in the

22   way this whole invoice is laid out, which, again, you don't

23   usually see when somebody's using a computer.  Also in the

24   invoice numbering, in 2014 he used -- looks like he was using

25   the date 2014 concatenated with an invoice number; in 2015, he

MICHAEL GOLDMAN - Direct

1    just start -- he's just down to invoice number 9.

2         MR. CARNATHAN:  Could I have the next slide, please?

3    BY MR. CARNATHAN:

4         Q.   What's significant on this slide, sir?

5    A.   In addition to a -- a third invoice format -- and again,

6    he's using the invoice date, but it's way over on the left

7    this time -- on the bottom, I'm not even sure what that is.

8    He's not using the invoice template.  But I think the most

9    significant item is up on the top where he misspelled his

10   name.  That's typically not something that people do.

11        Q.   What did you conclude about the DiGiacomo

12   documentation based on your review of the materials provided?

13   A.   My -- my suspicion, especially when somebody misspells

14   their own name, is that the -- the invoice is not an accurate

15   representation of what happened.

16        Q.   Okay.  And did you reach any conclusion about

17   whether or not any of these invoices appear to be fabricated?

18   A.   Yes.  These -- these --

19        Q.   What did you conclude?

20   A.   These do appear to be fabricated.

21        Q.   Did we have invoice 9 among our materials?

22   A.   It was a previous slide.

23        Q.   So I'm just looking at, frankly, your report and the

24   date on invoice 9.  So invoice 9 is dated August 6th, 2015,

25   right?



MICHAEL GOLDMAN - Direct

1  A.   Yes.

2       Q.   And how much was that invoice for?

3  A.   The bottom is cut off.  Do you have a paragraph number?

4       Q.   I'm looking at 62(e).

5  A.   $35,805.

6       Q.   Okay.  And how does the August 15th date compare

7  to -- August 2015 date compare to when the roofing was done?

8  A.   It's significantly later.

9       Q.   Okay.  So Mr. Goldman, we know that we're dealing

10 with people in the trades.  We know that some of them may not

11 be all that educated.  Some of them may not even be from this

12 country.  Why can't these discrepancies be explained as

13 sloppiness, mistakes, run-of-the-mill stuff?

14 A.   I -- I would have a couple answers to that.  One is that

15 these people are tradesmen, and tradesmen tend to be very

16 detail oriented.  But even -- even so, it's not uncommon,

17 especially when you're dealing with small business owners who

18 came from other countries, to see some of these things.  And

19 you do see that once in a while.

20      To see such a preponderance of anomalies like this --

21 it -- it starts begging the question, are these really each --

22 every one of these vendors that are doing this, or is it more

23 from the source and the -- and the entity that provided them?

24 Especially when you're dealing with a company like PaveTech,

25 they -- they don't look like they would be making those kind

MICHAEL GOLDMAN - Direct

1  of -- these kinds of mistakes.

2      And so I -- again, any -- any invoice here, you could

3  write off as a mistake.  It's the preponderance of them and

4  the pattern that I think raises a lot of questions.

5      Q.  So for how many years have you been conducting fraud

6  investigations?

7  A.   Twenty-two.

8      Q.   And I think you said you had done over a hundred?

9  A.   No, I -- that was insolvency engagements.  Probably

10  somewhere between thirty and fifty.

11      Q.   Thank you.  So --

12  A.   I've -- I've been in -- I've got forty years of

13  experience.  I've been in an awful lot of companies, even

14  before I was on the consulting side.  I'm very familiar with

15  accounting systems and how they operate.

16      Q.   So based on all that experience, how pervasive are

17  these problems compared to what you've seen in the past?

18          MR. PERTEN:  Objection, Your Honor.

19          THE COURT:  Basis?

20          MR. PERTEN:  What he has seen in the past or what he

21  has concluded in the past based on other projects and other

22  situations has no relevance to this project.  If he wants

23  to -- and frankly, that's the problem with his report; there's

24  nothing about this project.  We're talking about this project,

25  not what he found in some project he looked at twenty years

MICHAEL GOLDMAN - Direct

1    ago.

2         MR. CARNATHAN:  Well, I mean, that's what he's here

3    for.  He's an expert.  He's got decades of experience.  He's

4    offering testimony that may not be in the common can of

5    somebody that doesn't do this kind of work, and that's --

6         THE COURT:  It's overruled.

7         MR. CARNATHAN:  Okay.  Yep.

8    BY MR. CARNATHAN:

9         Q.   So again, sir, based on your many years of

10   experience and many prior investigations and work in other

11   companies, how pervasive are the problems that you found in

12   this documentation compared to what you've seen in the past?

13   A.    These are on the extremes end of the spectrum.

14        Q.   How many other times have you seen analogously

15   pervasive issues with documentation?

16   A.    To this degree, just a few.  And in each case, it was

17   determined that fraud had been committed.

18        Q.   Based on your training and experience, based on all

19   the work you did, based on all the materials you reviewed,

20   have you reached any conclusions about the reliability and

21   veracity of the documentation that's been submitted in support

22   of the proof of claim by KDC?

23        MR. PERTEN:  Your Honor, we'd object to that

24   question.  The same reason that we objected in the motion in

25   limine -- the veracity of the documents, the truthfulness of

MICHAEL GOLDMAN - Direct

 1   the documents is this Court's prerogative.  The witness is not

 2   permitted to testify as to the ultimate question, are these

 3   believable?  That's for Your Honor to decide.  That's not for

 4   the witness to opine.  That's just simply out of the can, if

 5   you will, of permissible expert testimony, so we would object

 6   to the question.

 7        MR. CARNATHAN:  That's actually an odd mirror image

 8   of what his objection was before.  We were the ones who said

 9   that he would not opine to the ultimate issue and he would

10   leave that for Your Honor, but he's going to offer an opinion

11   that would support Your Honor reaching the conclusion that we

12   advocate.  And that's what I expect him to say.

13        THE COURT:  Yeah.  So under the federal rules, he is

14   actually permitted with my -- he is permitted to testify as to

15   the ultimate issue.  I'm not certain that's what he's doing

16   here.  It's expert testimony concerning the veracity of

17   certain documents, and he's using his expertise to provide an

18   opinion based on his learning and experience.  The objection's

19   overruled.

20        MR. CARNATHAN:  Thank you, Your Honor.

21   BY MR. CARNATHAN:

22        Q.   Hopefully, you've still got my question in mind and

23   I can just say, what conclusion did you reach?

24   A.   Yes.  And actually, I agree with counsel.  The standards

25   that I work under don't allow me to draw a conclusion that

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

1  there was or wasn't fraud.  But based on my accounting

2  experience, as well as my fraud investigation experience, I --

3  I do have serious issues with the reliability of the data and

4  the information that was provided as part of the claim.

5      Q.   Based on the pervasiveness of the problems you found

6  in the documentation, do you believe that pervasiveness

7  supports a conclusion of fraud by the Court?

8          MR. PERTEN:  Objection, Your Honor.  I don't think he

9  gets to say that.  He said what he said, but I think that --

10         THE COURT:  I think he just told me he couldn't say

11  that.

12         MR. CARNATHAN:  Well, he said he couldn't reach the

13  conclusion.  I'm asking him if he believes that the evidence

14  supports that conclusion by Your Honor.

15         MR. PERTEN:  I think that's inappropriate, Your

16  Honor.  Your Honor will make that decision.

17         THE COURT:  Well, I hear you.  I hear you.

18         That's overruled, as well, on the basis that he can

19  testify, and you can cross-examine him on it.

20         MR. PERTEN:  Your Honor --

21         THE COURT:  He can testify as to ultimate issue.

22         MR. PERTEN:  In his expert disclosure, his report --

23         THE COURT:  Yeah?

24         MR. PERTEN:  -- his ultimate conclusion was that,

25  basically, it's either incompetence, or it may be fraudulent.

MICHAEL GOLDMAN - Direct

1   He did not conclude that it was fraudulent.  He, in fact, did

2   not even conclude that it was more likely than not fraudulent.

3   So if he is now going to be testifying --

4         THE COURT:  All right.  Well, that's a whole

5   different thing.

6         MR. PERTEN:  -- beyond that, I think it's --

7         THE COURT:  That's different.  All right.  So that,

8   then, is beyond or varies what his statement was in his

9   disclosure, which is the notice that he gave to the Kagan

10  parties.

11        MR. CARNATHAN:  Well, Your Honor, it's not true.

12        THE COURT:  Oh.  All right.  Well, that's a whole

13  other thing.

14        MR. CARNATHAN:  I mean, in his paragraph 39 of his

15  report, he says that "my conclusion is that the accounting

16  processes employed by Mr. Kagan are severely deficient and

17  that attempts to recreate the data" -- "was never properly

18  captured the first time and are not at all convincing.  The

19  claim, as it's presented now, is not supported with reliable

20  information, and based on how pervasive the problems are, may

21  be knowingly fraudulent".  I mean, I'm trying to elicit --

22        MR. PERTEN:  May be fraudulent.  That is not more

23  likely than not.  It may be fraudulent; it may not be

24  fraudulent.

25        THE COURT:  No.  I actually think it's unnecessary --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

1    I'll sustain the objection based on notice.

2            MR. CARNATHAN:  Okay.

3            THE COURT:  Is this a good time for a --

4            MR. CARNATHAN:  Sure, sure.

5            THE COURT:  I know you're probably pretty close, but

6    I --

7            MR. CARNATHAN:  Yeah.  This is fine, Your Honor.  I

8    mean, I'd like to wrap up soon so Mr. Perten can do his cross

9    and we can let Mr. Goldman go home, but --

10           THE COURT:  People have to have a break.

11           MR. CARNATHAN:  Yeah.  Absolutely, Your Honor.  Yeah,

12   yeah.

13           THE COURT:  So we're going to do that.  Okay?  So

14   we'll take a short break.

15           Are you trying to get on an airplane later today?  Is

16   that it?

17           THE WITNESS:  I -- I have a night flight, yes.

18           THE COURT:  You have a night flight.  Oh.

19           MR. CARNATHAN:  He'll be fine if we go a little over,

20   but -- yeah.  I don't want to ask the Court to do that.

21           THE COURT:  Night will come.  Okay.  All right.

22   We'll be back in fifteen minutes.

23           MR. PERTEN:  Thank you, Your Honor.

24           MR. CARNATHAN:  Thank you, Your Honor.

25           THE CLERK:  All rise.  The court is now in recess.

MICHAEL GOLDMAN - Direct

1              (Off the record at 11:01 a.m.)

2               (On the record at 11:26 a.m.)

3          THE CLERK:  All rise.  Court is in session.

4          THE COURT:  You may be seated.

5          I did not destroy government property.  It's

6     detachable.

7          Okay.  Whenever you're ready to resume.

8          MR. CARNATHAN:  Thank you, Your Honor.

9                    RESUMED DIRECT EXAMINATION

10    BY MR. CARNATHAN:

11         Q.   Mr. Goldman, before the break, you mentioned some

12    standards that apply to your work that govern whether or not

13    you can conclude that there has been fraud.  Do you remember

14    that?

15    A.   Yes.

16         Q.   What standards govern your work?

17    A.   The standards for the Association of Certified Fraud

18    Examiners.

19         Q.   And how do those affect whether or not you're able

20    to conclude that there was fraud?

21    A.   I'm not able to make that conclusion.  Only the trier of

22    fact can.

23         Q.   Okay.  You're not suggesting that all of the

24    documents here are fabricated; are you, sir?

25    A.   No.

MICHAEL GOLDMAN - Direct

1      Q.   No.  We know that two $5-million houses were built,

2   right?

3   A.   Yes.

4      Q.   If you assume with me for the moment that the

5   documentation provided is, in fact, valid, that all the

6   paperwork is valid, what conclusion would you then reach, sir?

7           THE COURT:  No, no.  Objection?

8           MR. PERTEN:  I think so, Your Honor.  Yes.

9           THE COURT:  Basis?

10          MR. PERTEN:  There is an objection because, if I

11   understand Mr. Carnathan's question, I believe he's asking him

12   to give an opinion as to the value of the claim.

13          THE COURT:  I'm going to sustain on the -- I don't

14   understand the question.

15          MR. CARNATHAN:  I'll rephrase it.

16          THE COURT:  So I'll call it vague.

17          MR. CARNATHAN:  Yeah.  Okay.  I'll do better.

18   BY MR. CARNATHAN:

19      Q.   Sir, if you assume with me for the moment that all

20   of the paperwork that you've reviewed is indeed valid, what

21   conclusion would you reach about the competency of ProEx and

22   KDC?

23          MR. PERTEN:  Objection, Your Honor.  I don't even

24   know what competency means in this context.

25          THE COURT:  I'll sustain.  I don't know what you mean

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

1    by valid -- assume it's all valid.

2              But you can't do it through me.

3              MR. CARNATHAN:  No, no, I'm thinking about it.

4              THE COURT:  You looked like you were going to tell

5    me, but he needs to tell --

6              MR. CARNATHAN:  Yeah, yeah, yeah.

7              THE COURT:  You need to tell him and get him to agree

8    with you.

9              MR. CARNATHAN:  Right.

10   BY MR. CARNATHAN:

11       Q.   Assume with me for the moment, Mr. Goldman, that

12   none of the paperwork was actually fabricated, that it's just

13   error-riddled but not intentionally fraudulent.  What

14   conclusion would you reach about the people who prepared that

15   documentation?

16             MR. PERTEN:  I would object.  What conclusion about

17   the people?  Is he going to say that these people are liars,

18   or they're -- I don't know where this is going.  It's a

19   bizarre question.

20             MR. CARNATHAN:  It's --

21             THE COURT:  Well, I don't either, but I'll overrule.

22   At least I understand the question.  I don't know what his

23   answer is.

24             Go ahead.

25             THE WITNESS:  Can I answer?



MICHAEL GOLDMAN - Direct

1          THE COURT:  You can answer.

2    BY MR. CARNATHAN:

3          Q.   Yes, you may.  You may answer it.

4    A.   Oh.   There -- there's a lot of other evidence that is

5    cited in my report.  I call it thrashing around in the

6    accounting file -- all the changes, the very late entries, the

7    corrections or modifications of those entries.  There's the

8    deposition testimony, where both bookkeepers or accountants

9    stated that they couldn't really support what was in their

10   numbers, and they made entries without support.

11         Based on things like that, my conclusion would be, again,

12   that internal control was weak.  There's not a -- there's not

13   a lot of reliability to these numbers when -- when it's been

14   testified that nobody knows what's in some of them and you can

15   see it happening in the accounting records.  I -- I'd say that

16   the -- the information generated from that system is not

17   reliable.

18         Q.   So I guess what I'm looking to elicit is, what's the

19   alternative?  If it's not fraud, sir, then what is it?

20   A.   I -- I see similar things that turn out to be just

21   incompetence.

22                          (Sneeze)

23         THE COURT:  Bless you.

24         MR. CARNATHAN:  Bless you.

25         THE COURT:  You can't get sick.



(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Direct

1              THE CLERK:  No, I can't.

2              MR. CARNATHAN:  Mr. Hartzell, would you put up the

3      chart after paragraph 49, please?

4      BY MR. CARNATHAN:

5          Q.   So Mr. Goldman, what are you presenting in this

6      chart from your report?

7      A.   This is a tabulation of other projects that KDC has done

8      that had unexpected overruns.  And the -- the amount of the

9      overruns is significant -- in some cases, astounding.

10         Q.   And so why are you evaluating the overruns in the

11     other projects?

12     A.   This -- this dovetails in with my testimony or my opi --

13     my opinion that the information isn't reliable.  If a company

14     is overrunning its projects consistently like this in these

15     significant amounts, that im -- that implies, again, a company

16     that's out of control, at least financially.  And frankly,

17     I'm -- I'm not sure how you stay in business when you have

18     these repeated overruns like this.

19             MR. CARNATHAN:  Mr. Hartzell, could I have the chart

20     after paragraph 50, please?

21     BY MR. CARNATHAN:

22         Q.   So Mr. Goldman, what comparison are you drawing in

23     this chart, sir?

24     A.   In this chart, I went through the QuickBooks files, and

25     I -- I just wanted to compare again for context how the

MICHAEL GOLDMAN - Direct

1    investor-owned projects were having money spent compared to

2    the noninvestor-owned projects.

3         Q.   And what did you find?

4    A.   In -- in most of these categories, the amount spent on

5    the investor projects is significantly higher than on the

6    noninvestor projects.

7         And when you --

8         Q.   So --

9    A.   When you get down to the bottom of cost per square foot,

10   the -- the cost per square foot is almost double on the

11   investor projects than the noninvestor projects.

12        Q.   So when we look at this chart, the four investor

13   projects you tallied up were 55 Lyman, 88 Cutler, 10 Lyman,

14   and Yarmouth Road, right?

15   A.   Yes.

16        Q.   And for 55 Lyman, you found a per-square-foot cost

17   of $250 per square foot, right?

18   A.   Yes.

19        Q.   In 88 Cutler, you found $236 per square foot, right?

20   A.   Yes.

21        Q.   In 10 Lyman, you found $272 per square foot?

22   A.   Yes.

23        Q.   And for Yarmouth Road, you found $262 per square

24   foot, right?

25   A.   Yes.

MICHAEL GOLDMAN - Direct

1      Q.   And then the three projects that KDC did with no

2   outside investors -- that's Parker, Fredette, and Druid,

3   right?

4   A.   Yes.

5      Q.   And so for Parker, you found a total per-square-foot

6   cost of $144 per square foot, right?

7   A.   Yes.

8      Q.   And for Fredette, you found $130 per square foot?

9   A.   Yes.

10     Q.   And for Druid, you found $144 per square foot?

11  A.   Yes.

12     Q.   All right, you're not a construction expert; are

13  you, sir?

14  A.   No, I'm not.

15     Q.   So you're just tallying up the numbers that you

16  found in their own books, right?

17  A.   Yes.

18     Q.   So what did you notice about the National Lumber

19  cost, in particular?

20  A.   Significant variation.  On the -- the two Lyman-Cutler

21  houses, they were 270,000 and 250,000.  On the 10 Lyman and on

22  the Parker houses, they were only in the high 60s -- 66,000

23  and 68-.  Two other houses, Fredette and Druid -- 43,000 and

24  72,000 for lumber.  The only other house that came close was

25  Yarmouth, which was at 178,000.



MICHAEL GOLDMAN - Direct

1    Q.   You're aware that one of the concerns raised in this

2    case was whether materials were commingled -- used on one

3    project and charged to another -- right, sir?

4    A.   Yes.

5    Q.   Did you try to verify whether or not that happened?

6    A.   That -- that would be very difficult to verify with

7    the -- with the data that I had.  My -- my concern was,

8    because so many projects were going on in such a small

9    geographic location, that it was possible to have materials

10   shipped to one location and then distributed out from there.

11   Q.   So based on your work, were you able to confirm or

12   refute, either way, whether materials were commingled on

13   projects?

14   A.   No.

15   Q.   And why was that?

16   A.   The -- again, I'm not a construction expert.  I'm not --

17   it's -- I'm not sure how much lumber should be in a house.  I

18   think some circumstantial things here, like whether it's

19   249,000 or 66,000 for hou -- for houses that aren't that huge

20   a difference in square footage -- whether that makes sense or

21   not -- I'm just -- I'm raising the question.

22   Q.   Okay.

23        MR. CARNATHAN:  And I have nothing further for Mr.

24   Goldman, Your Honor.

25        THE COURT:  Okay.



MICHAEL GOLDMAN - Direct

1        MR. PERTEN:  Your Honor, if I could just orient the

2   Court --

3        THE COURT:  Yes, thank you.

4        MR. PERTEN:  -- the clerk was kind enough to place on

5   the Court's bench 1 -- yeah -- 1 of 8, 2 of 8, through 5 of 8,

6   and take away from you, if you will, 6, 7, and 8.  What those

7   are ,just so that you know -- and we'll refer to them a little

8   bit, but not a lot, but if I do, I wanted you to be able to

9   follow along --

10        THE COURT:  What are they?

11        MR. PERTEN:  Those are the proof of claim binders.

12        THE COURT:  Okay.

13        MR. PERTEN:  And so the first two, 1 of 8 and 2 of 8,

14   are the backup for the Lyman Road property.  3 and 4 are the

15   Cutler Road property.  And then, 5 -- if you recall, Mr.

16   Carnathan had made certain objections as to authenticity, so

17   since those weren't stipulated, I broke them out into a

18   separate binder, which is what 5 is.  So you've got two for

19   Lyman, two for Cutler, and then 5 is actually Lyman and

20   Cutler, but it's --

21        THE COURT:  Mixed with -- yeah.

22        MR. PERTEN:  And to make it easier, again, you'll see

23   in the front of each of those binders a little index.  And if

24   it says, like, L-7, you know that's Lyman tab 7, and if it

25   says C-7, you'll see that's Cutler dash 7.  So just so that

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1     the Court can -- if you open the thing, you'll see a little

2     index.

3           THE COURT:  So --

4           MR. PERTEN:  Just so that you know.

5           THE COURT:  What's in evidence, of these binders?

6           MR. PERTEN:  1, 2, 3, 4 are in evidence.

7           THE COURT:  That's what I thought.  Okay.  So --

8           MR. PERTEN:  5 is not in evidence subject to

9     inauthenticity and some other objections that Mr. Carnathan

10     raised --

11           THE COURT:  All right.

12           MR. PERTEN:  -- in advance.

13           THE COURT:  And Mr. Harris is going to put these up

14     as you go, as well, or not?

15           MR. PERTEN:  We're probably going to work from paper

16     for those --

17           THE COURT:  Okay.

18           MR. PERTEN:  -- because we have them as -- we asked

19     the copy center to break them out, and they gave us a PDF,

20     which is the entire thing as one exhibit.

21           THE COURT:  I see.  Okay.

22           MR. PERTEN:  So we have it electronically, but we'd

23     have to sort of count the pages and float down.  By the time

24     we do that with the few that we're going to, it'll probably be

25     easier to use paper.

Page 89

```
1              THE COURT:  That's fine.  Okay.

2              MR. PERTEN:  But there --

3              THE COURT:  All right.  I understand.

4              MR. PERTEN:  There won't be a lot of that, but I just

5    wanted again to orient the Court.  And Mr. Goldman will have,

6    as needed --

7              THE COURT:  A set just like that?  Okay.

8              MR. PERTEN:  Yes.

9              THE COURT:  All right.

10             MR. PERTEN:  May I proceed, Your Honor?

11             THE COURT:  You may, but I'm going to do what I hated

12   when judges did to me.  How long do you think you have with

13   this witness on cross?

14             MR. PERTEN:  Couple to three hours.

15             THE COURT:  Okay.  So we're going beyond our

16   normal --

17             MR. PERTEN:  I --

18             THE COURT:  -- day here?

19             MR. PERTEN:  Yes, I think so.  I mean, this is one of

20   the critical witnesses.

21             THE COURT:  No, no, I'm not saying that.

22             MR. PERTEN:  Yes.

23             THE COURT:  It's only a matter of when we're going

24   to -- normally, as you know, we go until 1 p.m.

25             MR. PERTEN:  Yes, sir.
```

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1          THE COURT:  You're going to go beyond that,

2     possibly -- likely.  And so then, the question is, do I need

3     to take a lunch break?  I can't keep staff --

4          MR. PERTEN:  Right.

5          THE COURT:  -- you know --

6          MR. PERTEN:  Understood, Your Honor.

7          THE COURT:  -- out.

8          MR. PERTEN:  Why don't we see where we are at 1, and

9     Your Honor can make whatever determination you deem

10    appropriate?  I'll have a better sense then.  I understand

11    that Mr. Goldman has a flight tonight, so I'm as anxious as

12    anybody to get him in and out.

13         THE COURT:  I understand.

14         MR. CARNATHAN:  I just wanted to ask about the parity

15    concept that we talked about where -- I mean, I got mine in in

16    about two hours.  And I think yesterday, as Your Honor noted,

17    I did Lipetsker in forty minutes, and he did -- I don't

18    know -- two hours.

19         THE COURT:  Yeah.

20         MR. CARNATHAN:  So if we do parity here, then it

21    shouldn't be that much beyond the normal day.

22         THE COURT:  I agree with that.  We ought really to

23    be -- close to 1:30 ought to be --

24         MR. PERTEN:  I'll do my best, Your Honor.

25         THE COURT:  -- we ought to be close to done with him.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1              MR. PERTEN:  I will do my best.

 2              THE COURT:  Okay, I know you will.  All right.

 3              MR. PERTEN:  Thank you, Your Honor.

 4              THE COURT:  Hold on one second.

 5              Yeah.  I have an off-the-record discovery conference

 6     at 2, but I also will determine when we get close --

 7              Elizabeth, I may postpone that if --

 8              ESR OPERATOR:  Okay.

 9              THE COURT:  -- if we're -- and we need to get this

10     done first.

11              Okay, go ahead.

12              MR. PERTEN:  Very good.  Thank you, Your Honor.

13                         CROSS-EXAMINATION

14     BY MR. PERTEN:

15         Q.   It's still half morning.  Good morning, Mr. Goldman.

16     A.   Good morning.

17         Q.   Mr. Goldman, before we go any further, let's just

18     cut to the end.  You haven't formed any opinion, have you, as

19     to whether there was fraud on this project; isn't that

20     correct?

21     A.   That's correct.

22         Q.   And you haven't formed any opinion, have you, or

23     quantified --

24              MR. PERTEN:  Strike that.

25     BY MR. PERTEN:
```

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1      Q.   You haven't formed any opinion as to the value of

2   the work that was performed; isn't that correct?

3   A.   Correct.

4      Q.   And in fact, your opinion, ultimately, was that this

5   may be a product of gross incompetency, or it may be fraud;

6   isn't that correct?

7   A.   Yes.

8      Q.   And you are unable to say which one was more likely

9   than not.  You don't know; isn't that correct?

10   A.   No, I -- I think they both lead to the same

11   unreliability, but I can't say between the two.

12      Q.   Okay.  So in other words, your ultimate conclusion

13   is you don't trust the records, but you don't know whether

14   that's innocent, uninnocent, or -- if that's a word -- you

15   just don't know, correct?

16   A.   Correct.  I have no opinion.

17      Q.   Okay.  Now sir, you're being paid $335 an hour for

18   this?

19   A.   Yes.

20      Q.   And how much are you getting paid for your

21   testimony?

22   A.   I'm not getting paid for my testimony.  I'm getting paid

23   for my time.

24      Q.   Okay.  And your travel?

25   A.   Yes.



(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1    Q.    And you've never qualified as an expert in

2    Massachusetts; is that correct?

3    A.    Correct.

4    Q.    Okay.  And your report is July of 2018.  When were

5    you first engaged?

6    A.    I think in 2016.  I'd have to look.

7    Q.    Okay.  Now as I understand it, very few of the

8    companies that you investigated are what I call mom and pop

9    type companies -- small, one or two person companies --

10   correct?

11   A.    Probably more than you think.  I do divorce work also.

12   Q.    And in looking at your CV, sir, I did not note any

13   small one or two person construction companies; is that

14   correct?

15   A.    No.

16   Q.    Nothing on your CV?

17   A.    No.  There -- if -- do I have my CV?  Yeah, yeah.

18   Do you have a copy of my CV I could borrow?

19   Q.    I have one, but it's annotated.

20   A.    Well, if you look in the valuations for divorce -- here

21   we go -- there are a number of contracting companies in here.

22   Q.    And on those contracting companies, what you were

23   being asked there was to value the company for purposes of a

24   divorce, correct?

25   A.    That's the official engagement.  A lot of times, the --

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1   the judges won't outright approve a forensic investigation.

2   So I come in to do a valuation, and then that usually turns up

3   the need for a forensic investigation.

4       Q.   Okay.  Now, sir, you understand that before

5   rendering any kind of opinion, it's important to know what the

6   underlying facts are; isn't that correct?

7   A.   Yes.

8       Q.   And certainly, sir, you would agree with me that

9   it's important to -- it's better, if you will -- to be doing

10  your analysis closer in time to when the actual events are

11  happening than two or three years later; wouldn't you agree

12  with that?

13  A.   For the most part.

14      Q.   For the most part?  And certainly, if you were

15  engaged in 2016, you had the opportunity to consult with

16  counsel and suggest certain avenues of discovery if you found

17  something that you couldn't explain; isn't that correct?

18  A.   Yes.

19      Q.   And you understand, sir, that there was a sum total

20  of two subcontractors whose depositions were taken, correct?

21  A.   I believe so, yes.

22      Q.   And so that when you're making comments about the

23  bookkeeping practices relating to subcontractors, other than

24  those two depositions, you have no evidence directly from the

25  contractor as to how it keeps its books, correct?



MICHAEL GOLDMAN - Cross

1   A.   To how it keeps its books?

2        Q.   Yes.

3   A.   Correct.

4        Q.   So you're working on paper, but you had no

5   opportunity, sir, to look beyond the paper that you were

6   provided; isn't that correct?

7   A.   Well, I was able to relate it to the accounting records.

8        Q.   Understood.  And speaking of the accounting records,

9   sir, we spent a lot of time talking about QuickBooks.  Do you

10  recall that testimony?

11  A.   Yes.

12       Q.   And you had two sets of QuickBook accounts, correct?

13  A.   Yes.

14       Q.   Right?  There was one that was provided initially

15  right after Mr. Filippov demanded that he take over the

16  company, and then one that was produced in discovery a few

17  years later, correct?

18  A.   I believe that's correct.

19       Q.   Okay.  And sir, you understand that QuickBooks is a

20  tool, correct?

21  A.   Yes.

22       Q.   And QuickBooks is only as good as the data that's

23  entered; isn't that correct?

24  A.   Absolutely.

25       Q.   And QuickBooks is also a powerful tool.  It allows

Page 96

MICHAEL GOLDMAN - Cross

1    you to use -- it's all sorts of potential reports that you can

2    run using QuickBooks; isn't that correct?

3    A.   Yes.

4        Q.   And not every company uses every one of the tools;

5    isn't that correct?

6    A.   Yes.

7        Q.   And the ability to use QuickBooks is largely

8    dependent on the skill and knowledge of whoever is entering

9    the data into QuickBooks; isn't that correct?

10   A.   Yes.

11       Q.   And in fact, QuickBooks has a feature that if data

12   is not entered accurately, it can be changed; isn't that

13   correct?

14   A.   Yes.

15       Q.   And part of the internal controls that you testified

16   to this morning is that, at some point, you should always look

17   back at your accounting records and make sure they're

18   accurate; isn't that correct?

19   A.   Yes.

20       Q.   And if, in fact, you notice something that was

21   inaccurate, it would be irresponsible, would it not, not to go

22   back and correct the entry; isn't that correct?

23   A.   Yes.

24       Q.   And in fact, you read Mr. Gersh's testimony -- Mr.

25   Gersh, the CFO for KDC -- and he testified, did he not, that,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1  in fact, he went back into the QuickBooks, verified all the

2  expenses, and made corrections to it; you recall that, don't

3  you?

4  A.  Yes.

5       Q.  So the fact that there were entries made after May

6  2015 should come as no surprise at you because Mr. Gersh told

7  you he made changes after 2015; isn't that correct?

8  A.  Not really.  What surprises me is the timing of them.

9  When --

10      Q.  Okay.

11  A.  When entries that are over a year old are corrected,

12  that -- that is surprising.

13      Q.  All right.  And if there's entries that are over a

14  year old that are corrected, that tells you one of two things.

15  Either they didn't have the internal controls in place such

16  that they weren't -- I'm going to use the word loosely --

17  auditing the books and records more frequently, correct?

18  A.  Yes.

19      Q.  Or it may be that they found a bill that they had

20  somehow overlooked before; isn't that correct?

21  A.  That's possible.  I --

22      Q.  And that's possible.

23  A.  I somewhat doubt that.

24      Q.  Yep, that's certainly possible.  It may be even

25  possible that there was a bill that was never entered; isn't

MICHAEL GOLDMAN - Cross

1   that correct?

2   A.   That -- that I find harder to believe, because these

3   people want to get paid, and --

4        Q.   Well --

5   A.   -- either they were paid outside the system or something

6   else happened.  But I can't -- I can't believe the

7   subcontractor's going that long --

8        Q.   Well --

9   A.   -- without wanting money.

10        Q.   Sir, you don't know because you haven't spoken to

11   these subcontractors.  That's an assumption that you're

12   making; isn't that correct?

13   A.   It -- it's more than assumption.  I -- in forty years of

14   experience, I've always seen people want to get paid for their

15   work.

16        Q.   Well, what is Mr. Kagan's relationship with most of

17   these subcontractors?  Does he give them a lot of work?

18   A.   I believe so.

19        Q.   Okay.  And has he known them for years?

20   A.   It appears that way.

21        Q.   And is he engaging them on multiple projects?

22   A.   He seems to, yes.

23        Q.   And is it your testimony, sir, just so that we're

24   clear, that if Mr. Kagan is employing these people at length

25   and says words to the effect, I know I owe you money; we're in

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

 1  a dispute; I'll continue to pay you on all the other projects,

 2  but this one you're going to have to wait until we resolve the

 3  dispute -- that's not fraud, is it?

 4  A.   No, that's not fraud.

 5       Q.   All right.  In fact, that's a perfectly plausible

 6  explanation, isn't it?

 7  A.   I -- I think it's somewhat unlikely for people to go that

 8  long and not get paid.

 9       Q.   So your personal opinion, it's unlikely, but you

10  don't know one way or the other, do you?

11  A.   No.

12       Q.   Okay.  Now, when you did your analysis, you didn't

13  find any kickbacks, did you?

14  A.   No.

15       Q.   And you were unable to identify any materials that

16  had been returned for which there was no credit; isn't that

17  correct?

18  A.   Correct.

19       Q.   And I think you told us in response to direct that

20  you weren't able to ascertain whether there was any material

21  that was purchased for one project that was then charged to

22  the Lyman-Cutler project; isn't that correct?

23  A.   Correct.

24       Q.   In fact you said you couldn't figure it at all;

25  there's no way to know that, correct?



MICHAEL GOLDMAN - Cross

1  A.   Yes.

2       Q.   So if, in fact, the plaintiffs -- Mr. Filippov and

3  Mr. Lipetsker and Lyman-Cutler -- stated that they had hard

4  evidence that there were kickbacks, you're not in a position

5  to support that; isn't that correct?

6  A.   I -- I have not seen that evidence.

7       Q.   Right.  And if they said there were insufficient

8  credits, despite your forensic review, you don't know if that

9  happened; isn't that correct?

10  A.   Correct.

11       Q.   And about charges from other projects to this, same

12  thing -- despite your analysis, you don't know that; isn't

13  that correct?

14  A.   The analysis implies it, but I don't know for sure.

15       Q.   Now, you also know, sir, that you looked very

16  detailedly -- if that's a word; my English is really suffering

17  this morning -- with great attention to all the invoices that

18  were provided, correct?

19  A.   Yes.

20       Q.   And you also understood that the QuickBooks that was

21  attached to the proof of claim binders was the QuickBooks that

22  Mr. Gersh had reviewed and corrected, correct?

23  A.   Yes.

24       Q.   So you understand, do you not, that Kagan

25  Development is relying upon the corrected QuickBooks, not the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1   original unaudited QuickBooks?  And I don't use "audit" in a

2   CPA manner; "audited" meaning it hadn't been reviewed and

3   verified by the client, correct?

4   A.   Yes.

5        Q.   Okay.  So if you found a number that was on the --

6   I'm going to -- unaudited -- we'll use that in quotation

7   marks -- the "unaudited" QuickBooks that you didn't see on the

8   audited QuickBooks, you understood that, for purposes of this

9   claim, Kagan is going with the corrected version of the books.

10  He's not relying upon the prior ones for anything; isn't that

11  correct?

12  A.   Since I got my information long after all these changes,

13  I -- it just confused me why I didn't get the correct version.

14       Q.   Well, you got both versions, didn't you?

15  A.   No.

16       Q.   You never got the proof of claim binders?

17  A.   They weren't electronic.  I got -- so I couldn't run

18  audit trails on them, but I got printouts of --

19       Q.   Okay.  So let's review, sir.  What you're saying is

20  you did not have the revised QuickBooks that would enable you

21  to ascertain if the QuickBooks that were used to support the

22  proof of claim were accurate?

23  A.   Not in an electronic format.

24       Q.   And that, in fact, sir, without the electronic

25  format, it's your testimony, sir, that you were unable to do

MICHAEL GOLDMAN - Cross

1    certain analyses; isn't that correct?

2    A.    Yes.  For example --

3         Q.    So --

4    A.    -- I couldn't run an audit trail.

5         Q.    So you would agree with me, sir, that, at best, your

6    analysis is incomplete; isn't that correct?

7    A.    It's complete for what I had.  I was given the wrong

8    material.

9         Q.    Okay.  So your counsel gave you the wrong material;

10   is that your testimony, sir?

11   A.    I was given the wrong material.

12        Q.    Okay.  And you certainly had the ability, since you

13   were engaged way back in 2016, to request for your counsel to

14   get additional material; isn't that correct?

15   A.    Yes.

16        Q.    Okay.  Now, sir, you've raised a lot of questions

17   about invoices that we've reviewed this morning, correct?

18   A.    Yes.

19        Q.    You had concerns about font size and misspellings,

20   correct?

21   A.    Yes.

22        Q.    And about sequential numbers and things of that

23   nature; you recall that testimony, correct?

24   A.    Yes.

25        Q.    And because, as a CPA and a fraud examiner, you're

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1   detail oriented, and you recognize that you, too, need some

2   sort of internal controls before you draw any conclusions;

3   isn't that correct?

4   A.   Yes.

5       Q.   So the mere fact that you have a question about an

6   invoice -- that, in and of itself, is not enough to conclude

7   anything, other than you need to investigate further; isn't

8   that correct?

9   A.   Yes, or view it in the context of all of the other

10   material.

11       Q.   Okay.  And certainly, if you are looking at, for

12   example, an invoice -- let's use -- just by way of example, I

13   think we were looking at the Unicon invoices.  There were two

14   invoices, one for each house -- identical invoices for $65,000

15   each.

16   A.   Yes.

17       Q.   Recall that?

18   A.   Yes.

19       Q.   And one of your concerns was it would appear to be

20   identical invoices and weren't showing in the QuickBooks that

21   $65,000 was actually paid and the other was outstanding.  And

22   you raised a question, correct?

23   A.   Yes.

24       Q.   Now, sir, the fact that there are two identical

25   invoices -- again, in and of itself, it's a legitimate

MICHAEL GOLDMAN - Cross

1    question, but you can't draw a conclusion, correct?

2    A.   Not -- not in isolation like that.

3         Q.   Okay.  And in fact, sir, you understood that one of

4    the questions that I --

5             MR. PERTEN:  Strike that.

6    BY MR. PERTEN:

7         Q.   One of the questions that you would want to look at

8    is, if there is a total of 65,000 per house being charged --

9    so $130,000 for the entire project -- one of the questions

10   that you'd want to know is how much should the electrical

11   cost; isn't that correct?

12   A.   Yes.

13        Q.   And in fact, you didn't have that analysis as to how

14   much it should have been; isn't that correct?

15   A.   Can you rephrase that?

16        Q.   Sure.  Let's use the electricity.  You had no

17   information that the value of the electrical for the two

18   houses combined should only be $65,000; isn't that correct?

19   A.   No.  I -- the first time I had -- the first information I

20   had was what was actually paid in 2014, which totaled 65,000

21   for the two houses.

22        Q.   Correct.

23   A.   The second thing I had was -- I would not call it

24   unimpeachable evidence, but I did do some research on the

25   difference between 200 and 400 amp.  And in -- informally --

MICHAEL GOLDMAN - Cross

1    internet research -- it looked like the different should be

2    4,000 not 35,000.

3         Q.   Okay.  And so let's stick with this as an example,

4    sir.  You understood, did you not, that the plaintiffs had a

5    construction expert who purported to be able to value the

6    components of this construction; isn't that correct?

7    A.   I knew there was an expert retained, yes.

8         Q.   And you didn't speak -- his name is Mr. Doddridge --

9    you didn't speak with Mr. Doddridge to ask him how much should

10   the electricity have been; isn't that correct?

11   A.   There was actually one email when I raised the question,

12   and I didn't understand his answer.

13        Q.   Okay.  So sir, you would agree with me that, if you

14   were suggesting that invoices totaling $130,000 for

15   electricity appear to be twice as much because you could only

16   account for one, that the internal controls that you would

17   want to do is to determine how much should it have cost; isn't

18   that correct?

19   A.   Which -- which I did on a small research basis.

20        Q.   On a small research basis, which was off the

21   internet and not enough to draw any conclusions; isn't that

22   correct?

23   A.   No.  Again because this is -- this is one fact out of

24   many --

25        Q.   Okay.


(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1    A.    -- as -- as opposed --

2         Q.   Well --

3    A.    -- to an isolated incidence.

4         Q.   -- on any of the invoices, sir, that you've

5    identified this morning that you found suspicious for whatever

6    reason, you did not go the extra step to determine how much

7    the items that were listed in that invoice should have cost;

8    isn't that correct?

9    A.    No, I -- I'm under the impression that there'll be a

10   construction expert.

11        Q.   And in fact, sir, you did not do the extra step to

12   find out if the work described in that invoice even occurred,

13   correct?

14   A.    Correct.

15        Q.   So in fact, one of the questions that I would think

16   you would have, sir, is that if you're thinking that there was

17   an invoice that was fabricated -- let's just make up a story.

18   You have an invoice for a television set.  Okay?  Work with me

19   here.  Assume you have an invoice for a television set, and

20   you think that invoice is somehow fraudulent, overstated,

21   whatever -- it's questionable.  You with me?

22   A.    Yes.

23        Q.   Wouldn't one of the questions you want to ask is, is

24   there a television set in this project?  Wouldn't that be an

25   important piece of information?



MICHAEL GOLDMAN - Cross

1  A.   It would be useful.

2       Q.   And not only would you want to find out if there was

3  a television set in this project; you would want to see

4  whether there were any other bills in this backup where they

5  already paid for that television set.  Wouldn't you want to

6  know that, too?

7  A.   Yes.

8       Q.   And then you'd third want to know, well, okay, if

9  there is a television set, what kind of a television set is

10 it; is it a fifty-four-inch plasma or a thirteen-inch black

11 and white -- correct? -- so you could get a sense of whether

12 the value reflected in the invoice has any basis in reality.

13 That would be an important piece of information, wouldn't it?

14 A.   That -- that is starting to stray out the -- out of the

15 area of my expertise.

16      Q.   Certainly.  But that's the kind of information that,

17 if you had those internal controls, you could get from the

18 construction expert that the plaintiffs engaged; isn't that

19 correct?

20 A.   My area of expertise does not overlap with the

21 construction.

22      Q.   Well, certainly, to the extent that you're alleging

23 that these invoices appear to be fraudulent, wouldn't you

24 agree with me that you would -- in your ordinary professional

25 work, that you'd want to do some sort of analysis to confirm

MICHAEL GOLDMAN - Cross

1    your suspicion?  Wouldn't you agree?

2    A.   I would do some.  I would not recreate the entire

3    construction project.

4        Q.   So then you would agree with me, sir, that merely

5    because you had a question as to an invoice doesn't mean that

6    the actual charge is improper somehow; isn't that correct?

7    A.   For each individual invoice, yes, it is.

8        Q.   That's right.  And you didn't make any analysis as

9    to which of these invoices was proper/improper.  You had

10   questions; isn't that correct?

11   A.   Yes.

12       Q.   Okay.  Now, at the end of the day, would you agree

13   with me what's important is what was actually paid and what

14   was -- I mean, we're talking dollars.  At the end of the day,

15   what's important is where did the money go, correct?

16   A.   Yes.

17       Q.   How much money was spent and to who it was paid,

18   correct?

19   A.   Yes.

20       Q.   And you would agree with me, as a general

21   proposition, sir, that if somebody does work, they're entitled

22   to be paid -- as a general proposition?

23   A.   Yes.

24       Q.   Okay.  And in fact, sir, even if there was no

25   invoice whatsoever -- zero invoice -- you would agree with me

MICHAEL GOLDMAN - Cross

1   that if the work was done on the project, as a general

2   proposition, that contractor would be entitled to be paid;

3   isn't that correct?

4   A.    I'm not sure I agree with that.  I -- I think you have to

5   follow business protocol and that these projects should be

6   properly documented, and that is a part of the service.  If --

7   if you're supplying the lumber but not supplying the

8   paperwork, the paperwork is an integral part of proving this

9   project cost.

10       Q.    All right.  Well, sir, you would agree with me that,

11   certainly, as accountants and as lawyers, we love paper,

12   correct?  And in the perfect world, every "i" is dotted, and

13   every "t" is crossed, and we have contracts, and we have

14   invoices and all the controls that you outline in your report;

15   isn't that correct?

16   A.    Yes.

17       Q.    You also recognize, do you not, that especially when

18   you're dealing with small, one/two-person subcontractors, and

19   especially many of them who barely speak English, that these

20   controls are not always in place; isn't that correct?

21   A.    Yes.

22       Q.    And again, kudos to you -- appropriate to raise the

23   question.  But raising the question isn't enough, is it?

24   A.    Well, it's -- it's not just me that's raising the

25   question.  The IRS has regulations, state departments of



MICHAEL GOLDMAN - Cross

1   revenue.  You need to be able to prove your business activity.

2        Q.   And you understand, sir, that KDC works very closely

3   with its accountant, don't you?

4   A.   Yes.

5        Q.   And so does ProEx; you understand that, don't you?

6   A.   Yes.

7        Q.   And you understand that they work closely with their

8   accountant to do year-end reconciliations; you understand

9   that, don't you?

10  A.   Yes.

11       Q.   And in fact, when you -- as a CPA, you know -- when

12  you do a year-end reconciliation, that's the time to go back

13  into the QuickBooks and see if there's anything that doesn't

14  tie out, correct?

15  A.   No.  That should be done on a weekly or monthly basis.

16       Q.   In the perfect world, it should be done on a weekly

17  or monthly basis, but we don't always work in the perfect

18  world; isn't that correct?

19  A.   Yes.

20       Q.   And in fact, in these kinds of projects, there's

21  really only one transaction, ultimately, that happens.

22  There's a house built, and then it's sold, correct?

23  A.   I disagree with that.  There's a transaction every time a

24  supply -- a supplier provides something.  And --

25       Q.   Agreed.  There's expenses.



MICHAEL GOLDMAN - Cross

1   A.   Yep.  Every one of those needs to be documented as -- for

2   the -- for bank regulations, for tax regulations, for investor

3   reasons.

4        Q.   Um-hum.

5   A.   You -- it's not just one transaction.

6        Q.   Okay.  And again, in the perfect world, those books

7   would be updated monthly, weekly, every bank statement --

8   there are better ways, correct?

9   A.   Absolutely.

10       Q.   But you also know, because you've done this for a

11  long time, that some businesses don't reconcile for six

12  months.  You understand that, don't you?

13  A.   Yes.

14       Q.   And so it's certainly within the realm of

15  possibility, you would agree, that KDC is behind on its

16  reconciliations; isn't that correct?

17  A.   Yes.

18       Q.   And that's not fraud.  It may be less than what, as

19  lawyers and accountants, we like, but that's not fraud, is it?

20  A.   No, but it still raises --

21       Q.   Thank you, sir.

22  A.   -- reliability issues.

23       Q.   Thank you, sir.  Now, in terms of the QuickBooks and

24  the veracity of the information, you understood, did you not,

25  that QuickBooks was originally set up by KDC and ProEx's



MICHAEL GOLDMAN - Cross

1   accountant; you understood that, didn't you?

2   A.   I had no knowledge on that.

3        Q.   Okay.  Nobody told you that their accountant set up

4   the QuickBooks in 2013?

5   A.   No.

6        Q.   You weren't told that?

7   A.   No.

8        Q.   Well, sir, you also recognize, do you not, that the

9   people who enter data into the QuickBooks, they do require

10  some sort of training; isn't that correct?

11  A.   Yes.

12       Q.   And you don't know who was entering the data when

13  this was first entered -- when the QuickBooks first came

14  online, correct?

15  A.   Yes.

16       Q.   Yes, you don't know?

17  A.   Yes, you're correct.

18       Q.   Okay.  And in fact, sir, did you ever come to learn

19  that when this was first set up, the accountant, a Mr.

20  Agranovich, was sending people out every month to enter the

21  information into QuickBooks; were you told that?

22  A.   No.

23       Q.   Okay.  Well, certainly, when you have multiple hands

24  entering data, a different person potentially every month sent

25  by the accountants, you recognize that different people have

MICHAEL GOLDMAN - Cross

1    different skill sets with respect to QuickBooks, correct?

2    A.    Yes.

3        Q.    And so it's certainly not inconceivable -- in fact,

4    it's probably highly likely -- that different people have

5    different ways of entering data; isn't that correct?

6    A.    There's not -- there's not so much opportunity for

7    differences in QuickBooks.

8        Q.    You would agree with me that, human nature being

9    what it is, some people are more careful than others, correct?

10   A.    Yes.

11       Q.    And you certainly would agree with me that, when

12   those errors were discovered, it would be grossly

13   irresponsible not to correct them; isn't that correct?

14   A.    Yes.

15       Q.    Now, you said in your report that Kristina

16   Brusenkova was an accountant; do you recall that in your

17   report?

18   A.    Yes.

19       Q.    In point of fact, Kristina Brusenkova is not an

20   accountant; did you know that?

21   A.    No, I remember looking at her credentials.  I -- I

22   thought she was trained in accounting in Russia.

23       Q.    She has a degree in accounting, but she is not an

24   accountant; would you agree with that?

25   A.    No, I can't agree with that.



(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1    Q.   Okay.  And sir, you also said that Mr. Gersh is a

2  CPA; do you recall that?

3  A.   Yes.

4    Q.   Did Mr. Gersh ever tell you that he was a CPA?

5  A.   I believe I saw that in his deposition.

6    Q.   Well, that's an important fact, isn't it?

7  A.   It's a fact.

8    Q.   Well, it was an important fact because you said in

9  your report words to the effect that, given that I've got two

10  accountants and one is a CPA, they clearly should have known

11  better than to be sloppy -- or words to that effect, correct?

12  A.   I agree with that, yes.

13    Q.   On page 17 of Mr. Gersh's deposition, the question

14  was asked, are you a CPA?  Answer:  I'm not.  So would you

15  agree with me that the deposition that you read, in fact,

16  advised you that he was not a CPA?

17  A.   I'd have to go back and look.

18    Q.   Well, sir, would you like to see that page?

19  A.   I'm sure you read it properly.

20    Q.   Okay.  And so certainly, somebody who is not a CPA

21  would have less facility, if you will, with numbers, more

22  likely than somebody who has spent years and taken all the

23  exams and whatever you CPA people do to get CPA certification,

24  correct?

25  A.   Not necessarily.



MICHAEL GOLDMAN - Cross

1    Q.   Well, certainly, as to Mr. Gersh or Ms. Brusenkova,

2    you don't know what training they had on QuickBooks; isn't

3    that correct?

4    A.   Yes, I'm trying to remember if it was in the deposition,

5    but offhand, I can't remember.

6        Q.   Okay.  Now, incidentally, KDC is on an accrual or

7    cash basis?

8    A.   Accrual, I believe.

9        Q.   Okay.  What about ProEx?  Do you recall if it's on

10   an accrual or cash basis?

11   A.   I don't think it was doing either of them well.

12       Q.   I didn't ask you if they were doing it well.  My

13   question was, do you recall whether they were on an accrual or

14   a cash basis?

15   A.   Given that most of the entries were made at the end of

16   the year, I don't even know if it matters.  I don't remember,

17   though.

18       Q.   Okay.  Well, let's work with that for a moment, sir.

19   You just said that most of the entries were made at the end of

20   the year; did you just say that?

21   A.   Yes.

22       Q.   And you understand that when there are companies on

23   an accrual basis, it is very typical to make the entries at

24   the end of the year, correct?

25   A.   Adjusting entries.  You still -- as transactions are

MICHAEL GOLDMAN - Cross

1   happening, you still --

2        Q.   Sure.

3   A.   -- make them as they're happening.

4        Q.   But certainly, you would make adjusting entries,

5   because the nature of a company on an accrual basis is that

6   you want to make sure you're not paying taxes on a full amount

7   because you don't have the money yet, correct?

8   A.   I don't think I can agree with that.

9        Q.   Well, there's a booking before you actually receive

10  the cash --

11  A.   Yes.

12       Q.   -- isn't that correct?  So one of the things that

13  accountants do with their clients is make a determination as

14  to how much should be booked in any given year, because that's

15  the amount you're going to be paying tax on; isn't that

16  correct?  That's part of the exercise?

17  A.   No, that's not correct, because it's not driven on tax

18  avoidance or tax minimization.  It's -- accrual accounting is

19  when actual economic substance happens.

20       Q.   Understood.  But the tax that you paid is based on

21  what you declare for that year when you're on an accrual

22  basis; wouldn't you agree with that?

23  A.   Yes, but you have to declare it based on economic

24  substance.  You can't --

25       Q.   Exactly.



MICHAEL GOLDMAN - Cross

1  A.    -- decide what your taxes are going to be for the year.

2       Q.   And that's part of the discussion that one typically

3  has with their accountant at year-end, correct?

4  A.   Sometimes.

5       Q.   Yes.  And in fact, sir, you understood that Mr.

6  Jason Gordon is an outside accountant that works closely with

7  KDC and ProEx; you understand that, don't you?

8  A.   Yes.

9       Q.   In fact, you read his deposition, didn't you?

10  A.   Yes.

11       Q.   And so you understood that one of the things that he

12  does every year at the end of the year, especially if they're

13  on an accrual basis, is review the accountings and have those

14  kinds of discussions with his clients; you understand that,

15  correct?

16  A.   There -- there's different types of discussions.  This

17  discussion of what you want your taxes to be is a very unusual

18  discussion.

19       Q.   Um-hum.  And certainly, you also understand that, at

20  year-end, one of the things that often happens is certain

21  numbers are reclassified, for example?  You understood there's

22  a --

23  A.   Yes.

24       Q.   -- reclassification process, right?

25  A.   Yes.

MICHAEL GOLDMAN - Cross

1    Q.    So the client may have classified some number --

2    coded it -- one way, and the accountant looks at it and says,

3    well, you didn't take into account depreciation or something

4    of that nature and reclassifies some of the numbers?

5    A.    Yes.

6        Q.    Okay.  So again, certainly that there were changes

7    at the end of the year -- that's certainly what you would

8    expect to see -- reclassification kind of changes, correct?

9    A.    There are reclassifications, yes.  The -- the magnitude

10   of the changes was surprising.

11       Q.    And you're not suggesting, sir, are you, that the

12   outside CPA firm is somehow complicit in some sort of a fraud,

13   are you?

14   A.    No.

15       Q.    And you understand that the outside CPA firm with

16   whom KDC and ProEx works very closely is an independent

17   accounting company?

18   A.    Yes.

19       Q.    They're not on the payroll of KDC, correct?

20   A.    They're -- they're paid by KDC, not on the pay --

21       Q.    They're paid by KDC --

22   A.    Yeah.

23       Q.    -- like any other client --

24   A.    Yes.

25       Q.    -- correct?  But it's an independent group, correct?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1   A.   Yes.

2       Q.   Now, you also understood, sir, that many of the

3   payments on this project to vendors, to subcontractors, went

4   directly out of the Lyman-Cutler account as opposed to the KDC

5   account, correct?

6   A.   Yes.

7       Q.   So in order to get a full picture of what's

8   happening financially, you understood that you would not only

9   have to look at the KDC accounts and the ProEx accounts, but

10  you have to look at the Lyman-Cutler account; isn't that

11  correct?

12  A.   Yes.

13      Q.   And you understood that Lyman-Cutler had a

14  QuickBooks accounting that --

15          UNIDENTIFIED SPEAKER:  Excuse me.  Excuse me, Your

16  Honor?

17          THE COURT:  I'm sorry?

18          UNIDENTIFIED SPEAKER:  I'm not picking up what you're

19  saying, sir.

20          MR. PERTEN:  I'm sorry.  Thank you.  You'll --

21          THE COURT:  All right.  And let me just -- I'm a

22  little worried about your answers.  Just pull that microphone

23  a little closer.  That's fine.

24          MR. PERTEN:  May I proceed?

25          THE COURT:  Yes, you may.



Page 120

MICHAEL GOLDMAN - Cross

1          MR. PERTEN:  Thank you.  Of course, I've lost my

2     train of thought now.

3     BY MR. PERTEN:

4          Q.   Mr. Goldman, you understood that the Lyman-Cutler

5     entity through Mr. Filippov or his wife Arina was keeping the

6     Lyman-Cutler books and records, correct?

7     A.   Actually, there were two different QuickBooks files that

8     were both titled Lyman-Cutler.

9          Q.   Okay.  Well, you understood that KDC kept books and

10    records where it broke things out by different projects,

11    correct?

12    A.   Yes.

13         Q.   And one of those was Lyman-Cutler, correct?

14    A.   Yes.

15         Q.   And that also each project had its own dedicated

16    account, correct?

17    A.   Yes.

18         Q.   Okay.  And incidentally, each of them had their own

19    separate credit cards, correct?

20    A.   No.  It looked like they were all on the same American

21    Express card.

22         Q.   Broken out by project, correct?

23    A.   Sometimes.

24         Q.   Okay.  Well, certainly there was a dedicated credit

25    card for Lyman-Cutler, wasn't there?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1   A.    I'm not aware of that.  I -- it's --

2       Q.    Really?

3   A.    I'm remembering everything was on one American Express

4   bill.

5       Q.    Oh, we'll look at that in a moment.  And certainly,

6   sir, you not only understood that, in order to do a complete

7   forensic analysis, you'd have to look at not only the KDC

8   records and the ProEx records; you'd need to look at the

9   Lyman-Cutler records, as well.  Isn't that correct?

10  A.    Yes.

11      Q.    And in fact, sir, in order to understand exactly

12  where the money went, to follow the money trail, since there

13  were a lot of payments being made directly by Lyman-Cutler

14  opposed to KDC or ProEx, you needed to integrate the analysis

15  of what they paid into your review; isn't that correct?

16  A.    Yes.

17      Q.    And sir, nowhere in your appendix, nowhere in your

18  report is there any indication that you reviewed the Lyman-

19  Cutler records.  You were just looking at KDC and ProEx; isn't

20  that correct?

21  A.    No, that's absolutely wrong.

22      Q.    So you failed to put that in your report; is that

23  it?

24  A.    No, it's in the report.  Some of the ledgers that I

25  showed as examples were Lyman-Cutler ledgers.



(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1      Q.    Now, you said in your report that the LLC borrowed

2    approximately $3.2 million; do you recall that?

3    A.    No.   Where was that?

4      Q.    Paragraph number 15 of your report.

5    A.    Okay.

6      Q.    And as a CPA and somebody who makes his living

7    dealing with numbers, you like exact numbers; isn't that

8    correct?

9    A.    I use approximate sometimes.

10     Q.    Okay.   Well, you know it wasn't approximately 3.2;

11   it was actually 3.2.

12   A.    Okay.

13     Q.    Isn't that correct?

14   A.    Yes.

15     Q.    Okay.   And you also know that there were a number of

16   deposits that were made into the Lyman-Cutler account over the

17   life of the project, correct?

18   A.    Yes.

19     Q.    Did you run a tally to determine how much money was

20   deposited into the Lyman-Cutler account over the life of this

21   project?

22   A.    I don't recall whether I did.

23     Q.    Well, sir, if Lyman-Cutler had one source of revenue

24   and that was a construction loan for $3.2 million, wouldn't

25   you want to know if more money was going out of the account

MICHAEL GOLDMAN - Cross

1  than $3.2 million?

2  A.   I would have if all the money being spent on the project

3  came out of Lyman-Cutler, but everything was commingled

4  between ProEx and KDC and Lyman-Cutler.  They were all paying

5  the bills.

6      Q.   Well, sir, when you say everything was commingled,

7  in point of fact, they had separate accounts for each,

8  correct?

9  A.   Yes, but they moved -- they moved money back and forth --

10     Q.   They --

11  A.   -- and they paid bills out of all of them.

12     Q.   That's right.  So sir, it wasn't a situation where

13  there's one KDC bank account, and they're moving money back

14  and forth and after the project is over is (sic) trying to

15  ascertain which payment went to which project; it was

16  segregated, correct?

17  A.   In the sense that there were separate accounts, yes.

18     Q.   Yes, sir.

19  A.   In the sense of what was being paid from which

20  accounts --

21     Q.   And --

22  A.   -- it wasn't segregated.

23     Q.   -- you also -- sir, you said there was a possibility

24  of commingling.  You didn't make any determination that, in

25  fact, there was commingling; isn't that correct?



MICHAEL GOLDMAN - Cross

1    A.    Correct.

2         Q.    And you also understand, sir, that when you're

3    dealing with small companies with common ownership, that it is

4    not at all atypical that, if one company's low on cash flow,

5    that one of the other companies or the owner puts some more

6    money in, and when the cash flow picks up, pays themselves

7    back.  That's pretty typical, isn't it?

8    A.    Not as much as you're making it sound to be, and it --

9    and usually, it's -- those transactions happen once in a

10   while.  For a company that's really doing things right,

11   they're all documented.

12        Q.    And in fact, sir, you understood that, when there's

13   money transferred in, QuickBooks automatically lists it as

14   loan or something like that, correct?

15   A.    No, that's absolutely not true.

16        Q.    Well, you certainly, when you were making your chart

17   about money going back and forth, the entries that you did,

18   they were all labeled loan.

19   A.    That was how they were coded by the person who did the

20   data entry --

21        Q.    That's how they were coded.

22   A.    -- not by QuickBooks.

23        Q.    So far from trying to hide anything, they were

24   actually labeling it explicitly -- what was happening,

25   correct?



MICHAEL GOLDMAN - Cross

1   A.   Yes.

2       Q.   And although you say that maybe it's not as

3   prevalent as I might believe that owners of company advance

4   money, you certainly see that, correct?

5   A.   Yes.

6       Q.   And the mere fact that a single-owner company floats

7   money from one company to another -- there's nothing wrong

8   with that; is that correct?

9   A.   In this context, you're defeating the purpose of having

10  separate accounts for each projects (sic) if you're going to

11  move money around between the accounts all the time.

12      Q.   Unless it ties out, correct?

13  A.   Ties out to what?

14      Q.   Money in, money out, correct?

15  A.   Can you rephrase that question?

16      Q.   Sure.  Certainly, from a tax perspective, you

17  understand that as sub S corps, this is all going on Mr.

18  Kagan's tax return, correct?

19  A.   No, there are other investors involved.

20      Q.   On KDC and ProEx?

21  A.   No, but on these projects where they have separate bank

22  accounts, there are other investors involved with some of

23  them.

24      Q.   Right.  But I'm referring you to KDC and ProEx,

25  correct?

MICHAEL GOLDMAN - Cross

1    A.    Just those two, yes.

2         Q.    Yeah.  So certainly, whether the money transfers

3    from KDC or ProEx and then back from ProEx to KDC, ultimately,

4    from a tax perspective, there's no difference; it gets

5    declared right on Mr. Kagan's tax returns.  Isn't that

6    correct?

7    A.    Yes.  But I -- I understand --

8         Q.    Okay.  Thank you, sir.  Now -- bear with me just a

9    moment.

10         If I could draw your attention, sir, to paragraph

11   38 -- I'm sorry, 36 of your report.

12         And you state, in part -- well, I'll read the whole

13   paragraph.  You said, "The detail provided for support for

14   some of the charges for some of the vendors has serious

15   credibility problems.  In over twenty years of forensic

16   investigation, I've only seen this much inconsistency and

17   incredibility in one other set of documentation, and that was

18   in a case where it was determined that a significant fraud had

19   been perpetrated", correct?

20   A.    Yes.

21        Q.    Did I read that accurately?

22   A.    Yes.

23        Q.    And you're not suggesting that your universe of one

24   has any bearing on this case, are you?

25   A.    I -- I'm suggesting that this is an ex --

MICHAEL GOLDMAN - Cross

 1     Q.   Sir --

 2   A.   I'm suggesting this is extreme.

 3     Q.   -- you're not suggesting that your universe of one

 4   is statistically important for purposes --

 5          THE COURT:  No.  Mr. Perten, he's an expert.  You're

 6   asking about his report.  Stop cutting him off.

 7          MR. PERTEN:  Okay.

 8          THE COURT:  All right?

 9          MR. PERTEN:  Yes, Your Honor.

10          THE COURT:  I want to hear his answers.

11          MR. PERTEN:  Thank you, Your Honor.

12   A.   I'm suggesting that this is an anomaly, just like that

13   other case was.

14   BY MR. PERTEN:

15     Q.   Okay.  So you had one other case, and you drew the

16   conclusion that in that one other case there was fraud -- that

17   you think there might be fraud in this case; is that your

18   point?

19   A.   No.  My -- my point is that, if I had had many of those

20   cases, it would be easier to draw a conclusion that maybe this

21   wasn't fraudulent.

22     Q.   And despite, sir, the fact that, in that one other

23   case, there was a determination of fraud, you still were not

24   able to opine in this case that there was any fraud; isn't

25   that correct?



Page 128

MICHAEL GOLDMAN - Cross

1  A.   I'm not able to opine in any case that there's -- that

2  there's fraud.

3       Q.   Okay.  Now, you understand, sir, that the Lyman-

4  Cutler LLC project filed tax returns every year?

5  A.   Yes.

6       Q.   And in fact, you understood that those were prepared

7  either by Mr. Filippov or somebody who is an accountant and

8  hired by him, correct?

9  A.   I believe so.

10      Q.   And in order to prepare tax returns, you understand

11  that there needs to be some -- what's the word I'm looking

12  for -- confidence in the numbers that you're entering in the

13  tax returns; isn't that correct?

14  A.   You'd make your best effort, yes.

15      Q.   All right.  And so certainly as a -- under the IRS

16  rules, if you don't believe the numbers, you shouldn't be

17  filing tax returns; isn't that correct?

18  A.   Yes.

19      Q.   That is correct?  That is correct, sir?

20  A.   You -- you make your best effort.  If -- if you have

21  con -- if you believe in the numbers at the time you file,

22  then you sign the return.

23      Q.   Now, if I could draw your attention, sir, to

24  paragraph 49, if you could pull up your report.

25           Do you recall you looked at that chart, sir?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1   A.   Yes.

2        Q.   And I want to draw your attention, specifically, to

3   Elena Lande, where you say there was an overage of $1,074,000;

4   do you see that?

5   A.   Yes.

6        Q.   Where did you get that number from?

7   A.   I'm trying to remember.  I believe there were affidavits.

8        Q.   Okay.  Now, sir, you understood that Elena Lande

9   testified and provided an affidavit where she said that the

10  construction budget was $1.7 million, correct?

11  A.   I read her affidavit.  I didn't hear her testimony.

12       Q.   Okay.  Well, you understood there was a construction

13  budget of $1.7 million; isn't that correct?

14  A.   I'm going to have to take your word for that now.

15       Q.   Well, let me read to you from Ms. Lande's --

16  paragraph 6 of her affidavit:  "We purchased the property on

17  or about April 3, 2013, for a purchase price of 2.4 million.

18  The construction budget was 1.7 million."  Does that refresh

19  your recollection that this was a $1.7-million project?

20  A.   I read this years ago.  I don't remember in that detail.

21       Q.   Okay.  And in fact, sir, the final -- according to

22  her affidavit -- the final cost of her project was

23  2,092,920.88; do you recall that?

24  A.   I'm not recalling these numbers, no.

25       Q.   Well, sir, you'll agree with me that the difference

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1  between $1.7 million and 2.092- is not 1,074,000?

2  A.   Correct.

3       Q.   In fact, it's closer to about $300,000, isn't it?

4  A.   Yes.

5       Q.   Okay.  And certainly, before you used that number of

6  1,074,000, that's something that you would verify,

7  independently, isn't it?

8  A.   I would -- I would look at what -- the source that I had

9  for it.  I don't remember right now.

10      Q.   Okay.  Now, again, I'll represent to you that in Ms.

11  Lande's affidavit, the 1.074 number is the difference between

12  how much was spent in June 2014 -- when the project was not

13  yet complete -- of 1,017,964.73 and the total -- that's what

14  her affidavit says; will you work with me -- accept that for

15  now?

16  A.   Can you -- can you repeat it?

17      Q.   Sure.  You know what?  I'm going to offer you just

18  paragraph 17 so you can have this in front of you.

19           MR. PERTEN:  May I?

20           THE COURT:  Yes, you may.

21  BY MR. PERTEN:

22      Q.   Do you see those numbers, sir?

23  A.   I'm reading the paragraph.

24      Yes.

25      Q.   And you will agree with me that there's a chart that

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1  says, in June 2014, the total she spent was 1,017,964.73,

2  correct?

3  A.   Yes.

4       Q.   And that at the end of the project, the claim -- the

5  increase that she has is 1,074,956.13, correct?

6  A.   Yes.

7       Q.   Which is the number that you've incorporated into

8  your chart on paragraph 49, correct?

9  A.   Yes.

10      Q.   Now, would you agree with me, if the budget was 1.7,

11 the fact that, at June 2014, when the project wasn't finished,

12 they were only at 1,017,000 is relatively insignificant for

13 purposes of determining what the overage was, correct?

14 A.   Can you say that again?

15      Q.   Sure.  Until you hit the 1.7 million, there is no

16 overage; isn't that correct?

17 A.   Correct.

18      Q.   So in fact, if the ultimate number was 2,092,000,

19 the overage is not 1,074,956; it's significantly smaller.

20 Wouldn't you agree with that?

21 A.   Yes.

22      Q.   So that when you put in your report that there was

23 an overage of 1,074,956, that was overstated by at least three

24 times; isn't that correct?

25 A.   I would want to go -- I may have used the wrong word in

MICHAEL GOLDMAN - Cross

1    "overrun".  I maybe should have used "unexpected cost".  But

2    I'd want to go back and read this to get the context.

3        Q.   And sir, still looking at paragraph 59 -- I'm sorry,

4    49 -- of your report, you talk about an overage for a Mr.

5    Abramskiy of 171,933; you see that?

6    A.   Yes.

7        Q.   And you reviewed Mr. Abramskiy's deposition, didn't

8    you?

9    A.   Yes.

10       Q.   And do you recall he testified at his deposition

11   that, early on, Mr. Kagan told him that he had hit ledge and

12   that it would cost an additional $70,000; do you recall that

13   testimony?

14   A.   I -- I am not recalling the specifics of these.

15       Q.   Well, certainly, when you made that chart, you took

16   into account all the information, didn't you?

17   A.   Yes.

18       Q.   And if, in fact, there was testimony that there was

19   a charge of $70,000 that was identified early on, that would

20   be something you'd want to factor in to your unexpected

21   overrun column; isn't that correct?

22   A.   I would want to go back and get the right context.  If --

23   if these are all unexpected cost increases as opposed to

24   overruns, then the point is still valid.

25       Q.   All right.  Let's turn to paragraph 56 if we

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1   could -- I'm sorry, 58 of your --

2           MR. HARRIS:  Do you want that on the screen, John?

3           MR. PERTEN:  No, it's not necessary.

4   BY MR. PERTEN:

5       Q.   58 of your report.  And that dealt with a company

6   called Construction Specialties.  Do you recall we discussed

7   that this morning?

8   A.   Yes.

9       Q.   And you said in your report --

10          MR. PERTEN:  Actually, you can pull it up so it'd be

11   easier to read along.

12   BY MR. PERTEN:

13      Q.   You said in your report that you confirmed that

14   17,965 was fine, right?  That amount you could account for.

15   The total charges -- you saw it, and you saw the AmEx, and

16   there were four invoices.  That tied out, correct?

17   A.   Yes.

18      Q.   And so that's the point you make in (a) and (b),

19   correct?

20   A.   Yes.

21      Q.   Okay.  And then, the concern that you had is that

22   there was --

23          MR. PERTEN:  Let's scroll down a little bit.

24   BY MR. PERTEN:

25      Q.   -- there was $10,295 that you couldn't account for,

MICHAEL GOLDMAN - Cross

1    correct?

2    A.   Yes.

3        Q.   And you said that you looked at the AmEx bill, and

4    you couldn't find that, correct?

5    A.   Yes.

6        Q.   Now, if I could draw --

7            MR. PERTEN:  If you could bring Exhibit 174, page

8    266.

9            No, I must have the wrong -- the AmEx.  Maybe it's

10   164.

11           MR. HARRIS:  Exhibit 164?

12           You're saying Exhibit 164?

13           MR. PERTEN:  The AmEx -- just AmEx bills.

14           MR. HARRIS:  Give me the page number again, John.

15           MR. PERTEN:  One second.

16   BY MR. PERTEN:

17       Q.   Look in your appendix to your report, sir.

18   A.   Which tab?

19       Q.   Excuse me -- Exhibit 2 to your appendix.

20   A.   Okay.

21       Q.   And you found and you saw that there was a payment

22   for $15,705, correct?

23           You circled it, as a matter of fact, correct?

24   A.   That sounds familiar.  I'm not finding the exact page

25   right now.

MICHAEL GOLDMAN - Cross

1    Q.   Well, look at the page, sir, page 266.  It's tab 2

2    of your appendix.

3         MR. PERTEN:  May I approach, Your Honor?

4         THE COURT:  Yes, you may.

5    BY MR. PERTEN:

6    Q.   Page 266.

7    A.   Okay.  It's not circled on this one.  Yes.

8    Q.   15,705.  And you see Construction Specialties is

9    listed there, right?  Correct?

10   A.   Yes.

11   Q.   And in fact, this particular AmEx bill has a phone

12   number of the company, 781-438-5978; you see that on the AmEx

13   bill?

14   A.   Yes.

15   Q.   And you understand that, when people charge things

16   on charge cards, sometimes the name of the company that shows

17   on the bill doesn't necessarily match the trade name; you know

18   that, right?

19   A.   Yes.

20   Q.   Like, you go to a restaurant John's Grille, and your

21   bill says J&P Food Service or something like that; you get

22   that?

23   A.   But when it does that, it's consistent --

24   Q.   Okay.

25   A.   -- with every charge.

MICHAEL GOLDMAN - Cross

1    Q.   Now, sir, turn to the prior page of your exhibit,

2    page 265 of your appendix.  And do you see an entry down at

3    the bottom for Intuit Construction Stonum (ph.)?

4    A.   Yes.

5    Q.   And that is in fact $10,295, which is the exact

6    amount that you couldn't find, correct?

7    A.   Yes.

8    Q.   And in fact, it also has a phone number, and it's

9    the same phone number; you notice that?

10   A.   Yes.

11   Q.   So in fact, when you said that you couldn't account

12   for 10,295, it is accounted for.  It's right there.  You just

13   didn't know what you were looking for; isn't that correct?

14   A.   Well, I've got a tick mark next to it, so I want to --

15   I'd want to make sure that that also wasn't picked up

16   somewhere else.

17       I would need to find where that flows, because I ticked

18   that off as having been accounted for.

19   Q.   Well, sir, if you take that 17,965 that you found

20   was right and add the 10,295, which has the same phone number

21   and the same time frame with a slightly different name, you'd

22   agree that would add up to exactly the amount that's being

23   charged for that particular item by --

24   A.   Yes.  What -- what I'm saying is I want to make sure

25   that -- I would want to make sure that that 10,000 isn't

MICHAEL GOLDMAN - Cross

1   picked up, also, separately.

2       Q.   Okay.  Well, certainly, that was an analysis, I

3   would suspect, that you would have done before finalizing your

4   report; isn't that correct?

5   A.   Yes.

6       Q.   So when you said there's no conceivable reason,

7   other than the fact we inflated the lien, apparently, there is

8   another conceivable reason, and that is you didn't know that

9   some of these charges went on another name, correct?

10  A.   That's possible.

11      Q.   And you would also know that, to the extent that

12  there was a dedicated AmEx account, which you're looking at,

13  part of your analysis would be to make sure that every charge

14  to that property -- to that account -- was reflected in the

15  QuickBooks, correct?

16  A.   No, because these charges were for multiple projects.

17      Q.   Sir, we'll get back to that in a moment.

18          MR. PERTEN:  Can you bring up Exhibit 164, please?

19  BY MR. PERTEN:

20      Q.   Sir, Exhibit 164 are all the AmEx statements for

21  Kagan Development and Vadim Kagan, which are in evidence.

22          MR. PERTEN:  Would you scroll down a bit, Mr. Harris?

23          Keep going.

24  BY MR. PERTEN:

25      Q.   So we're looking at Vadim Kagan charges.



MICHAEL GOLDMAN - Cross

1          MR. PERTEN:  Now stop.

2     BY MR. PERTEN:

3          Q.   Here we have a breakout of charges to a card to

4     Kirill Kagan; do you see that?

5     A.   Yes.

6          MR. PERTEN:  Keep going.

7     BY MR. PERTEN:

8          Q.   Then we have Tatiana Kagan, correct?

9     A.   Yes.

10         Q.   Hyde Avenue, which is one of the projects -- there's

11    a dedicated account to Hyde Avenue; you see that?

12    A.   Yes.

13         Q.   Deborah Road is another project that KDC was

14    involved.  There's a dedicated card to Deborah Road; do you

15    see that?

16    A.   Yes.

17         Q.   So does that refresh your recollection, sir, that

18    there's a dedicated account to Lyman-Cutler?

19    A.   Yes.

20         Q.   Okay.  So in fact, part of the analysis that you

21    would be doing is to make sure that everything charged to the

22    Lyman-Cutler card is accounted for somewhere in the books and

23    records, correct?

24    A.   I -- and I mentioned in my report, I wasn't able to find

25    some charges that were not in the -- that were on the American

MICHAEL GOLDMAN - Cross

1    Express card but not in the books and records.

2         Q.    Okay.  But this particular charge is there; isn't

3    that correct?

4    A.    Which particular charge?

5         Q.    The 10,295 we just found.

6    A.    Yes.

7         Q.    All right.  Let's talk paragraph 59 of your report.

8    We looked at that -- Horner Millwork.

9              And on that one, sir, you agreed that the charges of

10   26,938.92 were accurate, correct?

11   A.    Yes.

12        Q.    But your concern was that the total claimed was

13   35,060.84, so you couldn't account for 16,243.84, correct?

14   A.    Yes.

15        Q.    So sir, let's look again at the AmEx, which is part

16   of your tab 3.

17             MR. PERTEN:  Mr. Harris, Exhibit 64, page 303,

18   please.

19   BY MR. PERTEN:

20        Q.    And sir, you see --

21             MR. PERTEN:  Scroll down, please.

22             Keep going.

23             Get to the -- I'm sorry -- scroll up.

24             Keep going up, please.

25             I just want to make sure we're in the Lyman-Cutler.



MICHAEL GOLDMAN - Cross

1    This is Wallace.  My bad.

2    BY MR. PERTEN:

3        Q.   So anyways on the AmEx, what you have is tab -- it's

4    page 303.

5            MR. PERTEN:  Did I say 3 -- 303.

6            All right.  Well, we'll do it through his tabs.

7    BY MR. PERTEN:

8        Q.   On your tab 3 at page 303 --

9            MR. PERTEN:  That's what I'm doing wrong, right?

10    BY MR. PERTEN:

11        Q.   You have page 303 of your tab 3?

12    A.   Yes.

13        Q.   And there's two charges to something called

14    Mansfield Inside (ph.); do you see that?  One on May 2nd for

15    15,084.54?

16    A.   Yes.

17        Q.   And one on May 2nd for 1,159.30?

18    A.   Yes.

19        Q.   And if you add those two, you agree with me that

20    equals 16,243.84, which is the exact amount that you claim you

21    couldn't find; isn't that correct?

22    A.   Yes.

23        Q.   And if you look at the very last page of your tab

24    3 --

25            Do you have that?



MICHAEL GOLDMAN - Cross

1    A.    Yep.

2        Q.   And you see there's two entries for Mansfield

3    Inside, each for 8,121.92, correct?

4    A.   On the last page?  I'm not seeing those.

5            MR. PERTEN:  May I?

6            THE COURT:  You may, yes.

7    BY MR. PERTEN:

8        Q.   You're on tab 3?

9    A.    Yep.

10       Q.   The expense statement, sir, do you see that?

11   A.   Oh, this -- this is -- yes, this is an internally

12   prepared bill for KDC.

13       Q.   And there's two entries for Mansfield Inside for

14   8,121.92, correct?

15   A.   Yes, they were billed separately from Horner.

16       Q.   Which is the exact number that you claimed you

17   couldn't find; isn't that correct?

18           Two times 8,121 is the exact number that you claimed

19   you couldn't account for; isn't that correct?

20   A.   We -- we need to determine if the final bill, which I

21   don't have, still includes those Mansfield and added that

22   amount to Horner --

23       Q.   Well, sir, in terms of working on internal controls,

24   that's something that you would typically do before you write

25   a report; isn't that correct?



MICHAEL GOLDMAN - Cross

1   A.   And I didn't find -- I didn't --

2        Q.   Okay.  And certainly, to the extent part of the

3   backup, which you've included as your tab, was in fact the

4   statement showing those two charges, you'd want to track those

5   two charges to something, wouldn't you?

6   A.   I did.  They're tracked -- they track right to this bill.

7   They're billed separately from Horner Millwork.

8        Q.   And it's the exact amount that you couldn't find,

9   correct?  Quite a coincidence, would you agree with that?

10  A.   A lot of coincidences here.

11       Q.   Yep.  Now, let's look at paragraph 60 of your

12  report.  That's the Huntington TV.

13            And the Huntington TV is at tab 4 of your appendix.

14            You have that there?

15  A.   Yes.

16       Q.   And two pages from the back, there's a statement,

17  correct?

18  A.   Yes.

19       Q.   And the concern that you have is that there is a

20  charge for 996.99 (sic) that you couldn't find; isn't that

21  correct?

22  A.   My concern is more than that.  Like --

23       Q.   Well, let's focus on that one first.  One of your

24  concerns was that there was the charge for 996.99 (sic) that

25  you couldn't find, correct?



MICHAEL GOLDMAN - Cross

1   A.   I want to look -- I want to look at the statement.

2       Q.   966.99.  Do you see that?

3   A.   Yes.

4       Q.   Okay.  And in fact, sir, that 966.99 -- in fact,

5   there's an AmEx statement backing up that that was actually

6   paid; isn't that correct?

7   A.   I -- I have a very different concern with this document.

8       Q.   Well --

9   A.   This is another one that looks fabricated, and --

10      Q.   Sir, we're talking about the 966.99 charge, which

11  you say you could not account for.  In fact, there is an AmEx

12  bill which shows that very charge; isn't that correct?

13  A.   I don't think I said I could not account for this.

14          MR. CARNATHAN:  Could I just get in an objection that

15  that's not what his report says about that charge?

16          THE COURT:  Yeah.  I don't know if that's an

17  objection.  It might be for redirect.

18          How much more do you have with this witness?

19          MR. PERTEN:  I'd give it maybe an hour.

20          THE COURT:  You're going to not get an hour, all

21  right?

22          MR. PERTEN:  Okay.

23          THE COURT:  So you're going to get less than an hour.

24          MR. PERTEN:  Okay.

25          THE COURT:  All right?



MICHAEL GOLDMAN - Cross

1          How much redirect do you have so far?

2          MR. CARNATHAN:  Just a handful, Your Honor.  Five

3    minutes.  I'll be quick.

4          THE COURT:  Okay.  All right.  So I need you to be

5    finished by no later than 1:30, okay?  We'll go straight

6    through.

7          MR. PERTEN:  Very good, Your Honor.

8          THE COURT:  All right?

9          MR. PERTEN:  Very good.  Thank you, Your Honor.

10   A.   My -- my report wasn't that I couldn't account for this

11   number.  My report was that this document doesn't make sense.

12   It's a statement -- it says statement, but it's formatted as

13   an invoice, and it has the information as an invoice.

14   BY MR. PERTEN:

15       Q.   Okay.  Well, so you had a question about the

16   statement, but you didn't verify whether the numbers on the

17   statement actually track, did you?

18   A.   I had a question as to the authenticity of the document.

19       Q.   Okay.  But again, it's not the invoice that we care

20   about.  It's the money -- was there money paid out; would you

21   agree with me?

22   A.   No.  It's -- the accounting for it is also -- and the

23   validity is also important because the money could have been

24   paid, but if we don't know what it was paid for, then that

25   goes to the total dollars spent that are at issue.

MICHAEL GOLDMAN - Cross

1        Q.   Okay.  Now sir, we'll skip Decor Art because they'll

2   be here to testify.  Let's look at Paul DiGiacomo, paragraph

3   62 of your report.

4        Now, with Mr. DiGiacomo, sir, you're not saying that

5   the work wasn't done, are you?

6   A.   No.

7        Q.   You're simply questioning the invoice, correct?

8   A.   Yes.

9        Q.   And you made no effort to ascertain whether he did

10  the work or not; isn't that correct?

11  A.   I assumed that there was work done.

12       Q.   And if there was work done, you'd also assume he's

13  entitled to be paid for it; isn't that correct?

14  A.   Yes.

15       Q.   Okay.

16                          (Pause)

17  BY MR. PERTEN:

18       Q.   Now, sir, you showed us a bunch of copies of

19  invoices where you were concerned because there was a whiteout

20  or a portion of a line was obliterated, correct?

21  A.   Yes.

22       Q.   Now, you didn't make any effort to ascertain whether

23  the numbers had been altered, correct?

24  A.   I -- I assume if -- you don't -- why would you alter an

25  address and not the numbers?  I -- I assume that --

MICHAEL GOLDMAN - Cross

1    Q.   I didn't ask you -- I asked you, sir, when you were

2  raising concerns because there were gaps in gridlines, you

3  didn't go the extra step to ascertain whether or not the

4  numbers had been changed and the work had been done; isn't

5  that correct?

6  A.   I -- I traced a number of these back to QuickBooks, or

7  tried to.  In some cases, I found they were there.  In some

8  cases, I found they weren't there.  In some cases, I found

9  they were there but different amounts.

10    Q.   Now, sir, we'll have ProEx testify, but with respect

11  to the ProEx -- ProExcavation -- bills, you understood that

12  ProEx's proposal was for a lump sum; isn't that correct?

13  A.   I believe so.

14    Q.   Okay.  And so conversely, you understood they were

15  not billing separately for materials; isn't that correct?

16  A.   I believe so.

17    Q.   So when you said that you couldn't map the materials

18  of ProEx to the ProEx bills, you understood that ProEx wasn't

19  billing for materials; isn't that correct?

20  A.   But the -- I was -- I was looking to accounting.

21    Q.   Okay.  And certainly, you also know that the

22  accounting doesn't break out labor charges, correct?

23  A.   This accounting didn't, no.

24    Q.   It did not.  And certainly, you knew that ProEx

25  people had to get paid, correct?



MICHAEL GOLDMAN - Cross

1    A.    People who did the work should be paid, yes.

2         Q.    Sure.  And you also know that it didn't break out by

3    specific project insurance, correct?

4    A.    No, but if -- if you're going to charge cost overruns,

5    how do you even know what the overruns are if you're not

6    accounting for it that way?

7         Q.    Well, sir, if you're going to charge cost

8    overruns -- you're making an assumption, sir, that there was a

9    fixed-price contract such that there was a cost overrun; isn't

10   that correct?

11   A.    I -- I think you made that assumption if -- or you made

12   that statement if -- if you're just billing, either way, you

13   still need to know what your costs are.

14        Q.    You still need to know what your costs are, but

15   that's very different from saying we agreed that we were going

16   to not exceed a certain amount; you'd agree that (sic)?

17   A.    Even so, you would want to know what your costs are --

18        Q.    I --

19   A.    -- even if you weren't going to file a claim.

20        Q.    I understand that, sir, but your analysis assumes,

21   does it not, that there was an agreement to build for a fixed

22   price; isn't that correct?

23   A.    No.  My -- I -- my analysis assumes that there were

24   claims for ProEx costs, and I looked to see what support there

25   was for those, and there wasn't much.



MICHAEL GOLDMAN - Cross

1    Q.   Okay.  And your analysis, also -- your point was, if

2    we can only tie into $200-some-odd-thousand of ProEx expenses,

3    there's no way they could have billed a number higher than

4    that; is that correct?

5    A.   No.  My -- my point is that the billings above that

6    aren't supported in the accounting records.

7    Q.   Okay, say you.  Okay, let me ask you a question,

8    sir.  If ProEx bills on a lump-sum basis and it does fifty

9    percent of the work, would you agree to me that it's due fifty

10   percent of whatever its total fixed price was, correct?

11   A.   Yes.

12   Q.   And that would be so whether it spent $2 on

13   materials or $2 million on material, correct?

14   A.   Yes.

15   Q.   And you understand, sir, that's what happened here;

16   isn't that correct?

17   A.   No.  My understanding is they filed a claim for

18   additional costs.

19   Q.   ProEx filed a claim for additional costs in this

20   case?

21   A.   No.  The -- the Kagan entities.

22   Q.   Based on a lump-sum contract -- you understood that,

23   didn't you?

24   A.   My understanding was that there were -- I don't know if

25   cost overruns is the right word, but there were additional

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1   costs.

2        Q.   And that's based on information that your client,

3   ultimately -- that your client or client's counsel gave you,

4   correct?

5   A.   Yes.

6        Q.   Okay.  That's not something you independently

7   verified; isn't that correct?

8   A.   Yes.

9        Q.   And in fact, sir, when you took the total that ProEx

10  charged, you didn't make any investigation as to whether that

11  charge was reasonable for the work that ProEx did; isn't that

12  correct?

13  A.   No.  I only tried to determine if it was supported.

14       Q.   Okay.  So in fact, if ProEx did $800,000 worth of

15  work and charged $800,000, that wouldn't be shocking, would

16  it?

17  A.   It would be supported.  I don't know if it would --

18  what -- you know, it would depend on the agreement, but at

19  least it would be supported.

20       Q.   It would depend on the agreement.  Correct.

21  A.   Yes.

22       Q.   And you don't know what that agreement is, so you're

23  not in any position to say that ProEx overcharged or

24  undercharged; isn't that correct?

25  A.   I'm saying that their charges are not reliably supported.

MICHAEL GOLDMAN - Cross

1      Q.    Let's turn to paragraph 63 of your report, which is

2    also tab 7 of your appendix.

3           And one of the -- this is J.W. Campbell Construction

4    -- one of your concerns is that there was an estimate for

5    4,800 but has 4,022 handwritten on it as the amount paid, and

6    that is the amount in the QuickBooks ledger, correct?

7    A.    Yes.

8      Q.    So in fact, the amount that's claimed is less than

9    the estimate, correct?

10   A.    Yes.

11     Q.    And it's your testimony that fraudsters usually pay

12   less than the amount of the invoice; is that your testimony,

13   sir?

14   A.    I've never testified to that.

15     Q.    Okay.  Now, you also --

16                         (Pause)

17   BY MR. PERTEN:

18     Q.    Now, sir, looking still at your estimate, you'd

19   agree it was an estimate of $4,800, and we paid 4,022,

20   correct?

21   A.    Yes.

22     Q.    And you found that odd, correct?

23   A.    No.  I -- I've noted it as just some -- just something I

24   saw.  I didn't draw any conclusions from that.

25     Q.    Okay.  But it was some sort of an anomaly that you

Page 151

MICHAEL GOLDMAN - Cross

1  noticed that, even though the estimate was $4,800, there was

2  only a payment for 4,222, correct?

3  A.   Yes.

4      Q.   And sir, if you look at your tab 7 at KDC 1085,

5  which is the estimate --

6          Do you have that there?

7  A.   Yes.

8      Q.   That's the estimate for 4,800, correct?

9  A.   Yes.

10     Q.   And the next page is the invoice for $4,000,

11 correct?

12 A.   Yes.

13     Q.   And sir, when it says "quantity", what does it say?

14 It says .833 is what that bill is for, correct?

15 A.   Actually, you just refreshed my memory why I listed that

16 point.  Every other invoice from this vendor says

17 "bill/invoice".

18     Q.   Well --

19 A.   This says -- this says estimate, which the question was,

20 why would an estimate be paid if this vendor issues invoices?

21     Q.   Okay.  So there was an estimate for 4,800.  There

22 was a bill for .8333 of that estimated amount, which was

23 $4,000, which is what was paid, correct?

24 A.   Yes.  And actually, the invoice and the estimate are both

25 for the same thing, which leaves the possibility of double

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

 1  payment.

 2       Q.   But you weren't able to ascertain whether, in fact,

 3  there was double payment; isn't that correct?

 4  A.   It --

 5       Q.   You don't know?

 6  A.   It certainly looks like double payment, that this -- that

 7  an estimate was paid for the same amount as the invoice.

 8       Q.   Sir, you don't know whether there was a double

 9  payment.  Despite your forensic analysis, you were not able to

10  ascertain and conclude that there was a double payment; isn't

11  that correct?

12  A.   No, but I'd say it's very probable.

13       Q.   Very?

14  A.   Probable.

15       Q.   It's very probable, but you were not able to

16  conclude that, correct?

17  A.   Not with a hundred percent certainty, no.

18       Q.   Now, you talked about checks being out of sequence

19  as something that struck you as odd, correct?

20  A.   Yes.

21       Q.   Now, you recognize that, when people enter check

22  numbers into QuickBooks, they have a bunch of -- it's done

23  different ways, correct?

24  A.   There's not that much latitude in how you --

25       Q.   Okay, well --



MICHAEL GOLDMAN - Cross

1   A.    -- how to do it.

2        Q.    -- one of the ways is you put the date you write the

3   check.  So you write the check on June 1st, and you enter it

4   on June 1st, correct?

5   A.    Yes.

6        Q.    And if you're working off bank statements, you may,

7   in fact, enter them based on the day they cleared the bank on

8   the bank statement, correct?

9   A.    That's possible.

10       Q.    So if, in fact, the checks are out of sequence, did

11  you go back to the bank statements to see if, in fact, they

12  tracked the dates they cleared as opposed to the dates they

13  were written?

14  A.    No.

15       Q.    Well, wouldn't that, sir, be something you'd want to

16  know before concluding that checks out of sequence were

17  problematic?

18  A.    It was more than just a few days like that.  The time

19  differences were significant, and I think the numbering

20  sequences used were significantly -- there were big gaps.

21       Q.    Well, sir, is it not your experience that sometimes

22  checks are written and don't clear for sometimes months at a

23  time?

24  A.    Yes, but typically not when you're paying small vendors

25  like this.  They need the money right away.



MICHAEL GOLDMAN - Cross

1    Q.   Well, unless you know the financial situation of the

2    small vendors -- what they're working on, what their cash flow

3    is -- that's just speculation on your part, isn't it?

4    A.   It's speculation either way.  I think mine is based more

5    in experience.

6    Q.   Okay.  Well, the good news is we'll hear from the

7    subcontractor, sir.

8    A.   Okay.

9    Q.   Now, we looked a lot at a bunch of invoices from

10   PaveTech; do you recall that?

11   A.   Yes.

12   Q.   And you based your analysis, in part, on a website,

13   and you said, based on the website, it looks like a very

14   professional company.  Do you recall your testimony this

15   morning?

16   A.   Yes.

17   Q.   In point of fact, sir, you did no further

18   investigation into what the nature of the business of PaveTech

19   is, did you?

20   A.   I read Yelp reviews.  I read whatever I could find on

21   Google.

22   Q.   Okay.  And the fact that it has a fancy website or

23   what you call a professional website does not indicate

24   anything about its bookkeeping practices, correct?

25   A.   It's indicative of an attention to detail that usually

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1    carries on throughout a company.

2         Q.   Do you know what the name of the principal of

3    PaveTech is?

4    A.   No.

5         Q.   Have you ever spoken to somebody who goes by the

6    name of Fat Eddy (ph.)?

7    A.   No.

8         Q.   Now, in terms of your concern about invoices which

9    are dated after payments, you recall your testimony that that

10   was a concern to you --

11   A.   Yes.

12        Q.   -- correct?  You're certainly aware that, especially

13   with contractors who the general contractor has worked with

14   for years, it's not at all uncommon for a subcontractor to

15   pick up the phone and say words to the effect, hey, I've got

16   to buy whatever, you know, another thirty-six pounds of nails;

17   can you give me a check for 5,000, and I'll send the paperwork

18   after?  You know that happens, correct?

19   A.   Sometimes, yes.

20        Q.   So the mere fact that an invoice comes after the

21   payment in and of itself is not indicative of anything; isn't

22   that correct?

23   A.   No.  Again, it's preponderance.  Every isolated instance

24   by itself is innoc -- could be innocuous.

25        Q.   And unless you know the relationship between the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1    parties, you don't know if that's an anomaly or not; isn't

2    that correct?

3    A.    Yes.

4         Q.    What's important, though, is that the money can be

5    tracked.  It's not all that important when the invoice hit.

6    It's, was there an invoice for ten widgets and was there a

7    payment for ten widgets, correct?

8    A.    Can you repeat that?

9         Q.    Sure.  What's most important is not so much the date

10   of the invoice but the fact that you can track that, in fact,

11   there was something purchased and something paid for, correct?

12            We're dealing with cash, correct?

13   A.    Yes, that's more important.

14            THE WITNESS:  I'm sorry.  Could we take a restroom

15   break?

16            THE COURT:  Yes, of course.  Okay, we'll take a short

17   break.

18            THE WITNESS:  Thank you.

19            MR. PERTEN:  I'm close, Your Honor.

20            THE COURT:  Okay.

21            THE CLERK:  All rise.  Court's in recess.

22                (Off the record at 12:59 p.m.)

23                (On the record at 1:04 p.m.)

24            THE CLERK:  All rise.  The court is now in session.

25            THE COURT:  Okay, be seated.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1        MR. PERTEN:  Mr. Harris?

2        May I proceed, Your Honor?

3        THE COURT:  I'm sorry -- yes, please do.

4        MR. PERTEN:  Mr. Harris, can you pull up the report,

5   please, first?  Mr. Goldman's report, paragraph 61(h).

6        61, yeah.

7                    RESUMED CROSS-EXAMINATION

8   BY MR. PERTEN:

9        Q.   Mr. Goldman, this is part of the Decor Art

10  paragraph, and one of your concerns on (h) was invoice number

11  1076 was used twice on two separate invoices to 88 Cutler.  Do

12  you see that?

13  A.   Yes.

14       Q.   So you had two invoices -- and that was one of the

15  pictures that Mr. Carnathan put up -- two invoices with the

16  same number.  One was for 8,750; one was for 4,250, and they

17  were both dated in May of 2015; do you recall that?

18  A.   Don't recall the dates.  I recall these invoices.

19       Q.   Okay.  Now, you understand, did you not, that the

20  actual amount that was claimed was not 8,750; it was 4,250.

21  Isn't that correct -- the lower one?

22  A.   I'd have to look at the detail.

23       Q.   Well, look at your tab, sir.

24  A.   Which tab are we on?

25       Q.   It's Decor Art tab 5.



MICHAEL GOLDMAN - Cross

1                              (Pause)

2          MR. PERTEN:  And Your Honor, if you -- it is in

3   book -- same document as in book -- exhibit -- the little

4   skinny book, 5 of 8.

5          THE COURT:  Okay, thank you.

6          MR. PERTEN:  If you want it.  It's C-31.

7          THE COURT:  Okay.

8                              (Pause)

9          MR. PERTEN:  Your Honor, if I can approach the

10  witness, I can probably expedite --

11         THE COURT:  You may.

12  A.   Okay, I found them.

13  BY MR. PERTEN:

14      Q.   Oh, the two invoices?

15  A.   Yes.

16      Q.   Okay.  Mr. Goldman, you found the two invoices; one

17  for 8,750, and one for 4,250, which have the same date and

18  same description, correct?

19  A.   They don't have the date.  Oh, 27.  Yes, correct.

20      Q.   Okay.  And if you go to the QuickBooks summary on

21  the beginning --

22         MR. PERTEN:  Strike that.

23  BY MR. PERTEN:

24      Q.   Do you know which of these two invoices were

25  actually paid?

MICHAEL GOLDMAN - Cross

1   A.    I'd have to go back and look.

2         Q.    Well, I'm going to represent to you, sir, that it

3   was the lower one that was paid.  Is that consistent with your

4   memory?

5   A.    No, I would have -- I would want to verify that.

6         Q.    Okay.

7         MR. CARNATHAN:  Excuse me.  Just so I can follow

8   along, are we in tab L-35 of Exhibit 175?

9         MR. PERTEN:  No, it's C-31.

10        MR. CARNATHAN:  Thanks.

11  BY MR. PERTEN:

12        Q.    I placed in front of you Exhibit 175 at tab C-31.

13  Do you see where the QuickBooks indicates that it was the

14  4,250 version that was paid?

15  A.    This is listed as a deposit, not as a check.

16        Q.    There was also a payment, correct?

17  A.    No, I just see the deposit.

18        Q.    Okay.  Well, you would agree with me, sir, that

19  typically if somebody is trying to overstate or over-collect

20  that they would actually pay the higher bill than the lower

21  bill; isn't that correct?

22  A.    This isn't a payment.  This is a deposit that's on here.

23        Q.    Okay.  But referring to the invoices, sir -- forget

24  about that for right this minute -- you would agree that if

25  there were two invoices for the same thing, a higher one and a

MICHAEL GOLDMAN - Cross

1    lower one, if you were trying to be dishonest, you would pay

2    the higher one, not the lower one; isn't that correct?

3    A.    Sometimes, yes.

4         Q.    And did Mr. Filippov tell you what was happening at

5    the end of May 2015, when this invoice for painting was

6    issued, invoice 1076?

7    A.    No.

8         Q.    Did you understand that he testified that he came

9    onsite and there were people painting and he told them to get

10   out of there?  Did you hear that story?

11   A.    I didn't hear his testimony.

12        Q.    And if, in fact, the painters were onsite and were

13   told to leave and they didn't finish doing what they were

14   supposed to be doing, it wouldn't strike you as odd that they

15   billed for less than the full amount, correct?

16   A.    Correct.

17        Q.    Now, we looked at a bunch of invoices which were

18   identical -- handwritten invoices that were identical; do you

19   recall that?

20   A.    Yes.

21        Q.    Now you understand, do you not, that the two

22   houses -- the Lyman and the Cutler home -- are identical

23   houses, correct?

24   A.    Yes.

25        Q.    So for example, Unicon Electric -- there were two

MICHAEL GOLDMAN - Cross

1  identical invoices, same handwriting, same everything but for

2  the property address, correct?

3  A.   Actually, there were four, with one of them having a

4  different amount.

5       Q.   Okay.  Well, certainly, sir, you understand that,

6  especially with small contractors, it's not at all atypical

7  for them simply -- since it's the same house, the same

8  system -- instead of writing the same invoice three times or

9  proposal three times, that they would just copy it and write

10  the different address on the top; isn't that correct?

11  A.   That's plausible, yes.

12       Q.   Okay.  Let's quickly and briefly -- you talked about

13  check numbers being out of sequence; do you recall that

14  testimony?

15  A.   Yes.

16       Q.   Well, you understand, do you not, that, especially

17  in the construction industry, it's not at all uncommon for

18  somebody in the field to have a checkbook with him or her to

19  pay for onsite expenses every day, correct?

20  A.   That's plausible, yes.

21       Q.   So in fact, in the construction world it's not at

22  all atypical for numbers to be out of sequence because

23  sometimes there's a checkbook in the office, and sometime

24  there's a checkbook in the field, correct?

25  A.   Yes.



MICHAEL GOLDMAN - Cross

1        Q.   Sir, in paragraph 97 of your report --

2             MR. PERTEN:  Mr. Harris, if you want to scroll down.

3    BY MR. PERTEN:

4        Q.   And if I could draw your attention to 97(e) as in

5    Edith, you talk about "invoice issued to Classic Condominiums

6    LLC (ph.), a related Kagan entity"; you see that language?

7    A.   Yes.

8        Q.   How did you make the determination that this was a

9    related Kagan entity?

10   A.   I'm trying to remember.  I think I looked it up and saw

11   the owner, or I saw -- I saw something that indicated that Mr.

12   Kagan was --

13       Q.   Okay.

14   A.   -- also an owner there.

15       Q.   Would it surprise you, sir, to know that one of the

16   projects at 143 Florence Street -- the entity that was

17   developing that was called Classic Condominiums LLC?

18   A.   No.

19       Q.   Just like the entity doing the Lyman-Cutler project

20   was Lyman-Cutler LLC, this one was called Classic Condominiums

21   LLC, correct?

22   A.   Yes.

23       Q.   Okay.  So assuming that to be the case, when you say

24   it's a related Kagan entity, it's related to the extent that

25   he might have been an investor, but it's a project entity; you

MICHAEL GOLDMAN - Cross

1  understood that, didn't you?

2  A.   Yes.

3       Q.   On paragraph 98 --

4       MR. PERTEN:   If you could scroll down just a little

5  bit.

6  BY MR. PERTEN:

7       Q.   Paragraph (b) as in boy.   You're talking about two

8  checks, checks number 1309, which you found very suspicious

9  because they were out of sequence and there were two checks

10  numbered 1309, correct?

11  A.   Yes.

12       MR. PERTEN:   Mr. Harris, would you bring up trial

13  Exhibit 308, please?

14       And if you could blow that up just a little bit.

15  Page 1.

16  BY MR. PERTEN:

17       Q.   There's one of those checks.   See that?   Check

18  number 1309 for 193.99?

19  A.   Yes.

20       Q.   And that's some sort of -- it looks like a temporary

21  check or something like that, correct?

22  A.   Yes.

23       Q.   All right.

24       MR. PERTEN:   And then, let's move to the third page

25  of Exhibit 308.



MICHAEL GOLDMAN - Cross

1    BY MR. PERTEN:

2        Q.   And there's the other one -- check number 1309.

3    It's payable to Newton Excavation (ph.), correct?

4    A.   Yes.

5        Q.   So in fact, you were able to verify because you had

6    access to all these checks that, yeah, there were two numbers,

7    but there were two checks for two different amounts to two

8    entities, and one was a temporary check; isn't that correct?

9    A.   I don't remember if I had access to all of these checks

10   because most of them were redacted, but my -- my point was

11   just that the number was used twice, which is true.

12       Q.   Okay.  But there's nothing suspicious about the

13   number being used twice when you see that one of them was a

14   temporary check issued by the bank and the other was the pre-

15   printed one.  What's important is that they're two checks, and

16   they were paid; isn't that correct?

17   A.   Yes, I didn't raise suspicion on that one.

18       Q.   And is it your testimony, sir, that you were not

19   given access to the checks?

20   A.   No, I -- I -- not to the physical checks.  I had

21   printouts that were redacted.

22           MR. PERTEN:  Your Honor, if I can have about thirty

23   seconds, I may be done.

24           THE COURT:  Okay.

25                   (Pause)



(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1        MR. PERTEN:  Mr. Harris?  Mr. Harris, would you pull

2    up, please, the report at paragraph 71?

3        Thank you.

4    BY MR. PERTEN:

5        Q.   Mr. Goldman, you testified briefly about this chart

6    in your paragraph 71, dealing with amperage and prices for

7    investor and noninvestor properties; do you recall that?

8    A.   Yes.

9        Q.   You recognize that each of those properties is

10   different, correct?

11   A.   Yes.

12       Q.   And each of them are different sizes, correct?

13   A.   The two -- the two Lymans are the same.  Others -- others

14   are different sizes.

15       Q.   And each of them have different formations, with the

16   exception of the Cutler and the Lyman, correct?

17   A.   What do you mean by formations?

18       Q.   They're not the same house.

19   A.   I'll accept that.

20       Q.   Okay.  And they have different finishes, correct?

21   A.   Yes.

22       Q.   And some of them might have wiring for future

23   expansion; isn't that correct?

24   A.   Yes.

25       Q.   And some of them might have a pool, which needs some

MICHAEL GOLDMAN - Cross

1   electrical current; isn't that correct?

2   A.   Yes.

3        Q.   And so there's a host of circumstances, you would

4   agree with me, that would dictate how much an electrical

5   subcontractor would charge; isn't that correct?

6   A.   Yes.  And part of my point was that the -- that should

7   have been specified in the invoice so that you could tell.

8        Q.   Well, sir, you did no -- again -- you did no

9   analysis to compare these properties and to ascertain whether

10  they were the same relative properties or not; isn't that

11  correct?  You don't know?

12  A.   I need you to rephrase that.

13       Q.   Sure.  With respect to each of those properties, you

14  did no side-by-side comparison of the -- one, two, three,

15  four -- seven properties; isn't that correct?

16  A.   Actually, I did.  I have another chart in my exhibit --

17       Q.   Okay.

18  A.   -- in my report where I do compare them.

19       Q.   Which chart in your exhibit are you re --

20  A.   That -- that was the one that compared the -- the line

21  item costs and the total costs.

22       Q.   Okay.  Let's look at that.

23            MR. PERTEN:  Mr. Harris, could you pull up, please,

24  paragraph 50 -- the chart on paragraph 50?

25  BY MR. PERTEN:



MICHAEL GOLDMAN - Cross

1      Q.   Is this the chart you were referring to, Mr.

2   Goldman?

3   A.   Yes.

4      Q.   Now, with respect to this chart you do not know,

5   sir, the square footage of the yards, do you?

6   A.   Actually, I did.

7      Q.   On each property?  You know how much is grass?

8   A.   Not off the top of my head, but I pick -- I pulled up the

9   Zillow or -- yeah, the different real estate services.  I

10   think you use a different one here in Massachusetts.  But in

11   my work papers, I do have pictures of each home.  I have all

12   the statistics.  I have the layouts.

13      Q.   And does Zillow typically tell you how big the yard

14   is?

15   A.   It gives you a lot size.

16      Q.   Gives you a lot size.  And do you know, sir, how big

17   the yard was that needed to be sprinkled?

18   A.   I could have figured it out.

19      Q.   You could have figured it out, but you didn't; isn't

20   that correct?

21   A.   No.  I'm looking at the relative differences where I

22   don't remember the lot sizes being three times as large --

23      Q.   Okay.

24   A.   -- as the costs were.

25      Q.   And you don't know, sir -- we looked at the National

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1    Lumber figure.  You didn't look at the invoices from National

2    Lumber to determine whether what was bought from National

3    Lumber on each project was the same, did you?

4    A.   I did look at National Lumber invoices, and that was

5    beyond my expertise to evaluate the different grades, types,

6    and lengths of lumber that were on there.

7         Q.   Okay.  So you don't know, when you compared the

8    prices of lumber, whether you're comparing apples to apples or

9    apples to oranges; isn't that correct?

10   A.   I -- I think when you look at the order of magnitude

11   here, and it's a factor of four times the costs, I -- I -- I'm

12   not a construction expert, but I didn't see four times more

13   house in one than I did in another.

14        Q.   And the conclusion that you drew is that it's

15   "striking", correct?

16   A.   Yes.

17        Q.   And so the best you can give us, after your entire

18   forensic analysis and chart, is that it's "striking".  Is that

19   a term of art, sir?

20   A.   No.  The best I can give you is that this certainly

21   looks -- this is unusual, and it's cer -- it's -- along with

22   everything else, I think there's a strong implication that,

23   along with the accounting being reliable, some of these costs

24   may have been overstated.

25        Q.   Okay.  And how much excavation was needed on each

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1    property, sir?  Do you know?

2    A.    No.

3        Q.    Okay.  So you don't know whether the fact that it

4    was 300,000 in 55 Lyman is at all suspicious when it was a

5    lower number in one of the other properties; isn't that

6    correct?

7    A.    Other than them being all in the same general area within

8    a couple miles of each other, no.

9        Q.    Okay.  And the same is true for every other entry on

10   this chart.  You're just making certain assumptions without

11   knowing; isn't that correct?

12   A.    No.  I'm looking at the preponderance.  If it was

13   randomly spread out, you would expect that these noninvestor

14   houses would have some things -- places where they were more

15   expensive than the other houses.  This is a consistent

16   pattern --

17       Q.    And --

18   A.    -- and that was my point.

19       Q.    -- isn't construction cost also a factor of how much

20   money the investors have been willing to put in?

21   A.    That's one factor, yes.

22       Q.    So if the investors put in, collectively, $4 million

23   for one property but only $2 million for another property, you

24   would expect the corresponding costs to be less, too, wouldn't

25   you?


(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Cross

1    A.   Well, my understanding is that a lot of investors are

2    being asked to put in a lot more money than they expected to.

3         Q.   All right.  But let's work with my question, sir.

4    The construction costs will largely depend on how much money

5    is available, how much has been invested; you'd agree with

6    that, wouldn't you?

7    A.   Yes, you can -- you can upgrade with more money.

8         Q.   Very good.

9              MR. PERTEN:  Thank you, Your Honor.  I have nothing

10   further.

11             THE COURT:  Any redirect?

12             MR. CARNATHAN:  Thank you, Your Honor.

13             MR. PERTEN:  I'm sorry.  Thank you.  You want my

14   water glass?

15             MR. CARNATHAN:  I might.

16                        REDIRECT EXAMINATION

17   BY MR. CARNATHAN:

18        Q.   Mr. Goldman, you didn't base your conclusion in this

19   case on any one discrepancy; did you, sir?

20   A.   No.

21        Q.   And so in fact, if Mr. Perten's able to explain away

22   one, two, three, four, five, ten discrepancies, does that

23   change your opinion?

24   A.   No.

25        Q.   No.  I'd like to look at just a couple of the ones

MICHAEL GOLDMAN - Redirect

1   that he actually brought up.  I'll start with this one because

2   it's in front of me.

3        When we look at tab C-31 in Defendant's Exhibit 175 for

4   identification -- that's the Decor Art tab -- Mr. Perten asked

5   you some questions to the effect of, if the testimony was that

6   there were painters onsite and they were asked to leave early,

7   would that surprise you that they invoiced or were paid less

8   than they originally invoiced -- something to that effect.  Do

9   you remember that?

10  A.   Yes.

11       Q.   And so when I look at this tab C-31 and you look at

12  the invoice we were talking about, that 4,250, do you see the

13  date when that was put into the QuickBooks?

14       Well, I'll try to move it along.

15  A.   Okay.

16       Q.   I'll tell you it's May 28th, 2015.

17  A.   Okay.

18       Q.   All right, so hold that thought in your mind.  If I

19  were to tell you that the testimony was that Mr. Filippov

20  found the painters at the property on June 22nd, 2015, would

21  it strike you as odd that the bill appeared in the QuickBooks

22  on May 28th, 2015?

23  A.   Yes, especially under the scenario we discussed with the

24  reduced amount.

25       Q.   There was also some questions about that $996 -- I

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Redirect

1  think it was for Huntington TV.  Do you remember that?

2  A.   Yes.

3      Q.   And I think the gist of it was that that 996 bucks

4  could be tied out to the AmEx charge, I think, right?

5  A.   Yes.

6      Q.   That's not actually the concern that you raised in

7  your report; is it, sir?

8  A.   No.

9      Q.   In fact, if we go to paragraph 60(d) of your report,

10  what was the concern that you actually raised about that

11  particular invoice?

12  A.   I can't find the paragraph, but off -- off of memory, it

13  was -- it -- it looked like a fabricated document.  The 999

14  may have been spent with Lyman's credit card, but we don't

15  know what it was spent for.

16      Q.   Right.

17          MR. CARNATHAN:  May I approach and just show him the

18  paragraph to refresh his memory?

19          THE COURT:  Yes, yes, of course.

20  BY MR. CARNATHAN:

21      Q.   It's right there.

22  A.   Okay.  Yeah.  The whole -- the whole purpose of a

23  statement is to say what invoices are still open.  It's not

24  something that looks like an invoice or gets paid like an

25  invoice.



MICHAEL GOLDMAN - Redirect

1    Q.   I think the other one that we heard about was J.W.

2   Campbell, right?  And in that one, you were asked some

3   questions about the $4,800 invoice compared to the 40 -- I

4   forget -- the 4,000-ish payment; do you remember that?

5   A.   Yeah, the estimate that looked like it was paid.

6    Q.   All right.  Are you able to find paragraph 63(c) in

7   your report, sir?

8   A.   Yes.

9    According to the QuickBooks file, J.W. Campbell billed or

10   was paid over $171,919.  Other than a few canceled checks,

11   there is no support for any of these charges in the

12   documentation provided with the mechanic's liens.

13    Q.   Okay.  So the $4,800 invoice was hardly the backbone

14   of your opinion about J.W. Campbell, right?

15   A.   Correct.

16    Q.   You were also read a question and answer by Mr.

17   Gersh to establish that he testified that he was not a CPA at

18   his deposition; do you remember that?

19   A.   Yes.

20    Q.   At his deposition, in the next couple of lines --

21   I'm now at page 17 in Mr. Gersh's deposition -- I asked him,

22   do you hold any professional licenses?  Answer:  I was a

23   certified fraud examiner for several years.

24        MR. CARNATHAN:  I offer that for completeness.

25        MR. PERTEN:  Offer that for what?



MICHAEL GOLDMAN - Redirect

1              THE COURT:  Completeness.

2              MR. CARNATHAN:  The rule of completeness.

3              MR. PERTEN:  Fine.

4    BY MR. CARNATHAN:

5         Q.   You were asked about the materials that you looked

6    at about the QuickBooks files.  Did you review all the

7    QuickBooks files that were produced by the Kagan parties?

8    A.   I reviewed everything I had, yes.

9         Q.   And there was some suggestion about not going back

10   to ask for more.  Do you remember giving me an affidavit in

11   support of our motion to compel the production of more

12   documents?

13   A.   Yes.

14        Q.   All right.  And so after we compelled production of

15   their records, you looked at everything they gave us, right?

16   A.   Yes.  And actually, I assumed the files were the same.

17   It took me a while to figure out that I had a different

18   version.

19        Q.   Would you turn to paragraph 84(a) in your report?

20   A.   Okay.

21        Q.   Mr. Perten asked you some questions about Mr.

22   Gersh's work with the outside accountants; do you remember

23   that?

24   A.   Yes.

25        Q.   And in fact, you did look at the correspondence

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MICHAEL GOLDMAN - Redirect

1   between Mr. Gersh and the outside accountants, right?

2   A.   Yes.

3       Q.   And you cited a few of them in your report, right?

4   A.   Yes.

5       Q.   Would you just recount to the Court which ones

6   struck you as important in the conduct of your analysis?

7   A.   The first one I cited where he says -- and this is a

8   quote -- "This might be a repeat of last year where we simply

9   make up some journal entries to get certain things closed

10  instead of wasting time trying to figure them out.  Sucks that

11  it's like this again".

12      Q.   So --

13  A.   And then --

14      Q.   -- in your experience over your many years of

15  reviewing financial records and conducting investigations,

16  what kind of a practice is it to make up journal entries?

17  A.   Not a good one.  It -- it doesn't lend any credence or

18  reliability to the numbers.

19      Q.   And in the next email that you cite in your report,

20  what does Mr. Gersh say to the -- oh, I'm sorry, the CPA says

21  to Mr. Gersh?

22  A.   The CPA asks, "How much do you actually want to show as

23  excavation expense on the P&L?"

24      Q.   And so in your experience, what kind of a practice

25  is that?

MICHAEL GOLDMAN - Redirect

 1    A.    Again, it's not one that gives you comfort in the

 2    reliability of the numbers.

 3         Q.    And then, there's a paragraph (c) there.    What does

 4    that one say?

 5    A.    The CPA emailed to Mr. Gersh that he, "cannot figure out

 6    how the reimbursement accounts tie out on KDC to the

 7    properties' QuickBooks".

 8         Q.    Why is that significant?

 9    A.    The transactions between -- when you have transactions

10    between two separate companies, they're supposed to match -- a

11    debit on one and a credit on the other.    And he -- he was

12    saying that they're -- they're out of wack, they don't match;

13    he can't trace the money back and forth between them.

14         Q.    And what does that tell you in connection with your

15    examination of the books and records?

16    A.    Again, it -- it brings great questions to the reliability

17    of the numbers.

18         Q.    Mr. Perten asked you about paragraph 97 of the

19    report, in which you noted that there was a $416,260 of

20    invoices issued to Classic Condominiums; do you remember that?

21    A.    Yes.

22         Q.    Would you look at -- and that was paragraph 97(e) --

23    would you look at the prior paragraph?

24    A.    Yes.

25         Q.    And so what were you noting in that paragraph?

MICHAEL GOLDMAN - Redirect

1   A.   The total amount that was recorded as sales for

2   ProExcavation was $1.9 million, but only three issue -- only

3   three invoices were issued.  They totaled only 466,000.

4        Q.   So --

5   A.   And most of that was to Classic Condominiums.

6        Q.   All right.  So we've got, by my quick lawyer math,

7   50,000 bucks in invoices other than what was issued to Classic

8   Condominium, right?

9   A.   Yes, and a million and a half of recorded sales that had

10  no invoices at all.

11       Q.   So based on the points that Mr. Perten made during

12  his cross, has your opinion about the reliability of the

13  documentation submitted to support the KDC proof of claim

14  changed in any way?

15  A.   No, it has not.

16       Q.   And what is that opinion?

17  A.   It's not reliable.

18       Q.   Thank you.

19                        RECROSS-EXAMINATION

20  BY MR. PERTEN:

21       Q.   Mr. Goldman, the emails that Mr. Carnathan has just

22  read to you -- you don't know the context of those emails, do

23  you?

24  A.   I read a lot of documents around those.  I -- there was a

25  lot of production from the --



MICHAEL GOLDMAN - Recross

1    Q.    Okay.

2    A.    -- CPA firm.

3    Q.    And you understand that, when working with the

4    accountant, it's not at all uncommon for questions to be asked

5    about what gets allocated to profit and loss and what gets

6    allocated out in other places, especially when books are kept

7    on an accrual basis -- you'd agree with that, wouldn't you?

8    A.    I -- I found these to be very notable, or I wouldn't have

9    cited them.  These -- these are beyond what you typically see

10   between an accountant and their client.

11   Q.    And certainly, part of the reconciliation that one

12   does at the end of the year is to make sure, as you said, that

13   everything ties out; isn't that correct?

14   A.    Yes.

15   Q.    And so certainly, if the bookkeeper at Kagan sees a

16   number that he can't tie out, it's entirely appropriate for

17   him to highlight that for his accountant and say this number

18   isn't tying out.  That's exactly why we're doing a

19   reconciliation; isn't that correct?

20   A.    Yes, but what's not appropriate is to say, let's just

21   book some -- make something up instead of figuring it out.

22   Q.    Okay.  Well, we'll hear from Mr. Gersh on that.  But

23   thank you, sir.

24        MR. CARNATHAN:  I have nothing further, Your Honor.

25        THE COURT:  All right.  All right.  Thank you, Mr.



MICHAEL GOLDMAN - Recross

1    Goldman.

2           THE WITNESS:  Thank you.

3           THE COURT:  So we'll see some pleadings filed or some

4    briefs filed over the next day, and I'll see you Monday at 9.

5    Anything else that we have left hanging today?

6           MR. PERTEN:  I just wanted to know if you need us to

7    clear out for the weekend, or --

8           MR. CARNATHAN:  Oh, good question.

9           THE COURT:  Well, I don't think so.  Yeah.  I think

10   that's right.  You won't be able to get back in, but --

11          MR. PERTEN:  Right.

12          THE COURT:  -- but no one will be in here --

13          MR. PERTEN:  Thank you.

14          THE COURT:  -- the rest of today or before you're

15   back on Monday.

16          MR. CARNATHAN:  Thank you, Your Honor.

17          THE COURT:  Okay, thank you.

18   (End at 1:34 PM)

19                    * * * * * * * * * *

20

21

22

23

24

25

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1          I certify that the foregoing is a true and accurate

2    transcript from the digitally sound recorded record of the

3    proceedings.

4

5

6

7

/s/ Hannah Stowe                              May 29, 2019

8    _____

9    ESCRIBERS LLC
                              eScribers
10                   7227 N. 16th Street, Suite #207
                          Phoenix, AZ 85020
11                           973-406-2250
                     e-mail operations@escribers.net

12

13

14

15

16

17

18

19

20

21

22

23

24

25

#15-13881; #16-01120                    5-10-2019

## $

**$1,074,000 (1)**
129:3
**$1.7 (3)**
129:10,13;130:1
**$1.7-million (1)**
129:19
**$1.9 (1)**
177:2
**$10,295 (2)**
133:25;136:5
**$11,360 (1)**
36:19
**$130 (1)**
85:8
**$130,000 (2)**
104:9;105:14
**$14,000 (2)**
60:18;63:6
**$144 (2)**
85:6,10
**$15,705 (1)**
134:22
**$171,919 (1)**
173:10
**$2 (3)**
148:12,13;169:23
**$20,000 (3)**
44:19;46:18;47:7
**$20,350 (1)**
43:7
**$200-some-odd-thousand (1)**
148:2
**$204,000 (1)**
26:8
**$204,441 (1)**
26:11
**$23,000 (1)**
42:15
**$236 (1)**
84:19
**$250 (1)**
84:17
**$26,938.92 (1)**
67:25
**$260,000 (1)**
58:14
**$262 (1)**
84:23
**$27,280 (1)**
63:25
**$272 (1)**
84:21
**$3 (1)**
53:1
**$3.2 (3)**
122:2,24;123:1
**$30,000 (1)**
48:17
**$300,000 (1)**
130:3

**$335 (1)**
92:17
**$35,805 (1)**
72:5
**$36,530 (1)**
64:2
**$4 (1)**
169:22
**$4,000 (3)**
53:1;151:10,23
**$4,600 (1)**
49:2
**$4,800 (4)**
150:19;151:1;173:3,
13
**$416,260 (1)**
176:19
**$45,000 (1)**
48:12
**$52,210 (1)**
44:14
**$5-million (1)**
80:1
**$65,000 (4)**
55:10;103:14,21;
104:18
**$70,000 (2)**
132:12,19
**$75,000 (3)**
48:14;50:17,20
**$8,000 (1)**
63:3
**$8,750 (1)**
33:23
**$800,000 (2)**
149:14,15
**$8-odd-thousand (1)**
67:6
**$90,000 (1)**
48:25
**$996 (1)**
171:25

## A

**ability (3)**
14:1;96:7;102:12
**able (21)**
19:16;26:10;47:8;
79:19,21;86:11;87:8;
95:7;99:20;105:5;
110:1;127:24;128:1;
138:24;152:2,9,15;
164:5;170:21;173:6;
179:10
**abnormalities (1)**
27:18
**above (2)**
40:20;148:5
**Abramskiy (1)**
132:5
**Abramskiy's (1)**
132:7

**Abril (1)**
39:13
**absolutely (6)**
65:5;78:11;95:24;
111:9;121:21;124:15
**accept (2)**
130:14;165:19
**access (3)**
164:6,9,19
**accomplish (1)**
52:13
**according (4)**
50:23;58:13;129:21;
173:9
**account (25)**
44:21;58:15;105:16;
118:3;119:4,5,10;
120:16;122:16,20,25;
123:13;132:16;133:14,
25;136:11;137:12,14;
138:11,18;139:13;
141:19;143:11,13;
144:10
**accountant (17)**
14:19;65:10;110:3,8;
112:1,3,19;113:16,20,
24;117:3,6;118:2;
128:7;178:4,10,17
**accountants (9)**
22:8;82:8;109:11;
111:19;112:25;114:10;
116:13;174:22;175:1
**accounted (5)**
22:15,16;136:12,18;
138:22
**accounting (35)**
14:16,17;19:20,23,
25;20:1,3,13,20;23:4;
25:8;40:1;42:10;43:11;
63:1;73:15;76:1;77:15;
82:6,15;95:7,8;96:17;
113:22,23;116:18;
118:17;119:14;144:22;
146:20,22,23;147:6;
148:6;168:23
**accountings (1)**
117:13
**accounts (11)**
55:10;95:12;119:9,9;
123:7,17,20;125:10,11,
22;176:6
**accrual (10)**
115:6,8,10,13,23;
116:5,18,21;117:13;
178:7
**accurate (8)**
14:1,3;20:3,22;
71:14;96:18;101:22;
139:10
**accurately (2)**
96:12;126:21
**across (1)**
50:6

**activity (2)**
58:15;110:1
**actual (5)**
57:7;94:10;108:6;
116:19;157:20
**actually (38)**
15:15;20:24;23:6;
26:11;34:21;35:18;
37:11;49:16,20;75:7,
14,24;77:25;81:12;
87:19;103:21;104:20;
105:11;108:13;116:9;
120:7;122:11;124:24;
133:10;143:5;144:17;
151:15,24;158:25;
159:20;161:3;166:16;
167:6;171:1;172:6,10;
174:16;175:22
**ad (1)**
69:21
**add (6)**
42:1;54:8;63:13;
136:20,22;140:19
**added (5)**
25:11;48:17;49:2;
63:24;141:21
**addition (1)**
71:5
**additional (7)**
52:11;55:10;102:14;
132:12;148:18,19,25
**additions (1)**
55:13
**address (6)**
6:12;49:21;69:21;
145:25;161:2,10
**addresses (2)**
50:2,4
**Adjusting (2)**
115:25;116:4
**admissibility (1)**
17:15
**admissible (3)**
10:20;11:3,5
**admit (1)**
18:14
**admitted (3)**
15:24,25;17:24
**admonishing (1)**
5:4
**advance (2)**
88:12;125:3
**advantages (1)**
66:1
**advised (3)**
5:6,13;114:16
**advocate (1)**
75:12
**affect (1)**
79:19
**affidavit (7)**
129:9,11,16,22;
130:11,14;174:10

**affidavits (1)**
129:7
**afternoon (1)**
6:8
**again (65)**
6:3;8:20;11:6,24,25;
12:4;16:23;27:15,16;
29:7;31:15;35:2,4,15;
39:23;40:4;41:10,11;
45:1,7;48:3,23;49:5;
52:15;53:6,14,18;
54:19;55:23;58:8;59:6,
23;61:15;64:3;65:18;
66:13,25;69:8,22;
70:21,22;71:5;73:2;
74:9;82:11;83:15,25;
86:16;87:22;89:5;
103:25;105:23;109:22;
111:6;118:6;130:10;
131:14;134:14;139:15;
144:19;155:23;166:8;
175:11;176:1,16
**against (4)**
22:1;24:22,24;25:3
**ago (3)**
14:5;74:1;129:20
**Agranovich (1)**
112:20
**agree (42)**
10:24;11:2;75:24;
81:7;90:22;94:8,11;
102:5;105:13;107:24;
108:1,4,12,20,25;
109:4,10;111:15;
113:8,11,24,25;114:12,
15;116:8,22;129:25;
130:25;131:10,20;
136:22;140:19;142:9;
144:21;147:16;148:9;
150:19;159:18,24;
166:4;170:5;178:7
**agreed (4)**
10:15;110:25;139:9;
147:15
**agreeing (1)**
17:15
**agreement (4)**
147:21;149:18,20,22
**ahead (4)**
7:16;50:11;52:4;
81:24;91:11
**aids (3)**
26:18,22,25
**airplane (1)**
78:15
**al (2)**
4:10;65:11
**Alarm (5)**
46:22;47:2;50:9;
53:17,21
**Alex (2)**
4:7,15
**alleged (1)**

Case 16-01120   Doc 344   Filed 06/04/19   Entered 06/04/19 13:06:36   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 182 of 203

May 10, 2019

57:2

**allegedly (1)**
56:14

**alleging (1)**
107:22

**allocated (2)**
178:5,6

**allow (1)**
75:25

**allows (1)**
95:25

**almost (1)**
84:10

**along (11)**
11:17;12:12;22:18;
55:2;67:11;87:9;
133:11;159:8;168:21,
23;171:14

**alter (1)**
145:24

**altered (2)**
31:11;145:23

**alternative (1)**
82:19

**although (1)**
125:2

**always (7)**
23:18;51:22,23;
96:16;98:14;109:20;
110:17

**American (10)**
59:11,13,14;62:25;
63:1,5,9;120:20;121:3;
138:25

**AmEx (19)**
37:8;67:17,20,24;
68:3;133:15;134:3,9,
13,13;135:11,12;
137:12,20;139:15;
140:3;143:5,11;172:4

**among (1)**
71:21

**amount (34)**
36:11,12,16;44:5;
45:16;46:1;59:9,10,12;
63:25;67:21,22;83:8;
84:4;116:6,15;133:14;
136:6,22;140:20;
141:22;142:8;147:16;
150:5,6,8,12;151:22;
152:7;157:20;160:15;
161:4;171:24;177:1

**amounts (7)**
23:3;34:25;43:14;
44:11;83:15;146:9;
164:7

**amp (1)**
104:25

**amperage (8)**
51:13,14,16;52:19,
20,25;53:2;165:6

**amps (4)**
51:23;52:22;54:5,6

**analogously (1)**
74:14

**analyses (1)**
102:1

**analysis (23)**
54:18;55:4;94:10;
99:12;100:12,14;
102:6;104:13;107:25;
108:8;121:7,14;137:2,
13;138:20;147:20,23;
148:1;152:9;154:12;
166:9;168:18;175:6

**analyst (1)**
14:21

**annotated (1)**
93:19

**Announcement (6)**
46:24;47:2;50:9;
53:17,21;57:17

**anomalies (2)**
27:18;72:20

**anomaly (3)**
127:12;150:25;156:1

**anticipate (1)**
11:20

**anxious (1)**
90:11

**anyways (1)**
140:3

**apologies (1)**
54:15

**apparently (5)**
5:9;36:13;47:9;70:2;
137:7

**appear (14)**
29:12;33:23;37:5;
38:7;43:11;55:13;
61:19;66:18;68:9;
71:17,20;103:19;
105:15;107:23

**appeared (6)**
22:15,16;37:11;
46:20;63:4;171:21

**appears (10)**
17:4;29:15;31:11;
38:20;41:20;47:12;
55:24;66:19;69:24;
98:20

**appendices (1)**
26:23

**appendix (9)**
8:20,22;121:17;
134:17,19;135:2;
136:2;142:13;150:2

**apples (5)**
53:13,13;168:8,8,9

**applies (2)**
9:20;20:1

**apply (1)**
79:12

**appreciate (2)**
13:4,9;16:21

**approach (3)**
135:3;158:9;172:17

**appropriate (5)**
8:19;90:10;109:22;
178:16,20

**approve (1)**
94:1

**approved (1)**
36:5

**approximate (1)**
122:9

**approximately (3)**
55:14;122:2,10

**April (16)**
36:24,25;37:2;39:12,
15,16;43:9;55:11,14;
58:8;64:12,14,17,25;
65:22;129:17

**araise (1)**
66:14

**area (6)**
11:4,19;19:23;
107:15,20;169:7

**areas (2)**
11:22;19:24

**argument (1)**
5:25

**Arina (1)**
120:5

**around (6)**
6:17;16:20,22;82:5;
125:11;177:24

**arrived (1)**
5:2

**arrow (2)**
40:24;63:2

**Art (16)**
27:4,7,21;29:19;
30:22;31:14;32:12,13;
33:11,15,21;145:1;
157:9,25;168:19;171:4

**Arts (1)**
14:12

**ascertain (9)**
99:20;101:21;
123:15;145:9,22;
146:3;152:2,10;166:9

**asserted (1)**
25:3

**assertion (2)**
24:21,24

**Association (1)**
79:17

**assume (8)**
80:4,19;81:1,11;
106:19;145:12,24,25

**assumed (2)**
145:11;174:16

**assumes (2)**
147:20,23

**assuming (2)**
49:25;162:23

**assumption (4)**
98:11,13;147:8,11

**assumptions (1)**
169:10

**astounding (1)**
83:9

**attached (1)**
100:21

**attempts (1)**
77:17

**attention (11)**
11:16;35:8;60:5;
63:19;69:16;100:17;
126:10;128:23;129:2;
154:25;162:4

**attractive (1)**
16:20

**atypical (3)**
124:4;161:6,22

**audible (1)**
6:24

**audit (14)**
22:10;42:22;43:3;
60:7,10,11,14,15,18,
21;62:15;101:1,18;
102:4

**audited (3)**
20:23;101:2,8

**auditing (1)**
97:17

**August (6)**
35:24;36:1;70:13;
71:24;72:6,7

**authenticity (5)**
28:10;35:3;66:15;
87:16;144:18

**automatically (1)**
124:13

**available (2)**
67:17;170:5

**Avenue (2)**
138:10,11

**avenues (1)**
94:16

**avoidance (1)**
116:18

**aware (5)**
5:10;16:12;86:1;
121:1;155:12

**away (4)**
30:11;87:6;153:25;
170:21

**awful (2)**
27:17;73:13

**B**

**Bachelor (1)**
14:12

**back (38)**
5:2;6:15;8:5;10:9;
11:6;14:9;17:22;18:9;
21:7;24:14,16,17;
48:16;59:11;65:24;
78:22;96:17,22;97:1;

102:13;110:12;114:17;
123:9,13;124:7,17;
126:3;132:2,22;
137:17;142:16;146:6;
153:11;159:1;174:9;
176:13;179:10,15

**backbone (1)**
173:13

**backing (1)**
143:5

**backup (13)**
87:14;107:4;142:3

**backwards (1)**
40:12

**bad (3)**
16:11;21:8;140:1

**Bailey (1)**
12:23

**balance (1)**
45:3

**bank (13)**
21:17,18,19;70:14;
111:2,7;123:13;
125:21;153:6,7,8,11;
164:14

**bar (3)**
29:25;40:19,20

**barely (1)**
109:19

**bars (1)**
41:13

**base (1)**
170:18

**based (32)**
27:7;29:8,9;51:12;
52:10,20;56:2;65:9;
66:10;71:12;73:16,21;
74:9,18,18,19;75:18;
76:1,5;77:20;78:1;
82:11;86:11;116:20,
23;148:22;149:2;
153:7;154:4,12,13;
177:11

**basic (2)**
20:4;27:9

**basically (2)**
20:9;76:25

**basis (19)**
64:22,23;73:19;
76:18;80:9;105:19,20;
107:12;110:15,17;
115:7,10,14,23;116:5,
22;117:13;148:8;178:7

**bear (2)**
16:22;126:8

**bearing (1)**
126:24

**begging (2)**
42:19;72:21

**beginning (1)**
158:21

**begs (1)**
33:13

Case 16-01120 Doc 344 Filed 06/04/19 Entered 06/04/19 13:06:36 Desc Main
LYMAN-CUTLER, LLC, et al. v. Document Page 183 of 203
KAGAN, et al.

May 10, 2019

**behalf (1)**
23:10
**behind (1)**
111:15
**believable (1)**
75:3
**believes (1)**
76:13
**below (3)**
31:5;40:19;69:19
**bench (1)**
87:5
**best (11)**
14:1;21:12;22:7;
23:20;90:24;91:1;
102:5;128:14,20;
168:17,20
**better (7)**
12:24;13:1;80:17;
90:10;94:9;111:8;
114:11
**beyond (9)**
53:14;77:6,8;89:15;
90:1,21;95:5;168:5;
178:9
**big (5)**
9:23;28:8;153:20;
167:13,16
**Bill (23)**
31:24;40:5;46:19;
50:22;59:11,13;97:19,
25;121:4;134:3;
135:11,13,17,21;
141:12,20;142:6;
143:12;151:14,22;
159:20,21;171:21
**bill/invoice (1)**
151:17
**billed (6)**
31:13;141:15;142:7;
148:3;160:15;173:9
**billing (4)**
27:8;146:15,19;
147:12
**billings (1)**
148:5
**bills (22)**
33:15,21;37:8,8,11,
13;40:13;59:14;60:1;
62:25;63:1;67:17,20,
24;68:3;107:4;123:5,
11;134:13;146:11,18;
148:8
**binder (3)**
17:1,4;87:18
**binders (6)**
62:10;87:11,23;88:5;
100:21;101:16
**bit (13)**
6:5;16:20;19:18,21;
26:13;28:11;31:3;56:6;
87:8;133:23;137:22;
163:5,14

**bizarre (1)**
81:19
**black (1)**
107:10
**blanked (2)**
31:9;41:3
**Bless (2)**
82:23,24
**blocked (1)**
31:3
**blow (5)**
25:23;26:1;30:4;
51:6;163:14
**blowup (1)**
30:11
**bolded (1)**
61:1
**book (4)**
158:3,3,4;178:21
**booked (1)**
116:14
**booking (1)**
116:9
**bookkeeper (1)**
178:15
**bookkeepers (1)**
82:8
**bookkeeping (2)**
94:23;154:24
**books (13)**
26:17;85:16;94:25;
95:1;97:17;101:9;
111:6;120:6,9;138:22;
139:1;176:15;178:6
**borrow (1)**
93:18
**borrowed (1)**
122:1
**both (19)**
16:8;30:1;31:12;
34:22,24;38:22,23;
43:8;51:1;56:14;57:2;
64:11;68:25;82:8;
92:10;101:14;120:8;
151:24;157:17
**bottom (15)**
29:2;46:11,14,15;
48:6,24;49:2;59:7;
65:20;69:22;70:1;71:7;
72:3;84:9;136:3
**bought (2)**
37:12;168:2
**box (3)**
31:5;40:16;41:3
**boxed (1)**
29:3
**boy (1)**
163:7
**break (10)**
9:13;78:10,14;79:11;
88:19;90:3;146:22;
147:2;156:15,17
**breakout (1)**

138:3
**briefing (1)**
5:14
**briefly (4)**
15:16;70:5;161:12;
165:5
**briefs (1)**
179:4
**bring (4)**
11:16;134:7;137:18;
163:12
**bringing (2)**
60:5;69:16
**brings (1)**
176:16
**broad (1)**
21:1
**broke (2)**
87:17;120:10
**Broken (1)**
120:22
**Brookline (5)**
36:5;37:16,19;41:24;
58:10
**brought (2)**
32:17;171:1
**Brusenkova (3)**
113:16,19;115:1
**BST (9)**
34:2,4,6;35:11;36:8,
11;37:12;38:1,6
**bucks (2)**
172:3;177:7
**budget (4)**
129:10,13,18;131:10
**build (1)**
147:21
**building (2)**
59:22,23
**built (1)**
80:1;110:22
**bullet (2)**
7:11;9:9
**bunch (4)**
145:18;152:22;
154:9;160:17
**business (13)**
20:11;29:5;64:15,18,
24;65:3;68:10,21;
72:17;83:17;109:5;
110:1;154:18
**businesses (4)**
19:19,23;20:13;
111:11
**buy (1)**
155:16

**C**

**C-31 (5)**
158:6;159:9,12;
171:3,11
**C-7 (1)**

87:25
**Calandrelli (1)**
6:9
**calendar (1)**
64:14
**call (8)**
5:3;7:1;8:17;80:16;
82:5;93:8;104:23;
154:23
**called (4)**
133:6;140:13;
162:17,20
**calling (1)**
4:5
**came (9)**
33:14;48:23,24;56:4;
72:18;85:24;112:13;
123:3;160:8
**Campbell (4)**
150:3;173:2,9,14
**can (82)**
5:19,24;7:24;9:18;
10:6,7,14,19,21;11:2,3,
11;15:3;16:8;18:9,13;
19:20;20:10,10,11,24;
29:3,22;30:5,11,25;
32:2;35:20;39:10;40:2,
5,8;43:17;47:3;49:12;
50:18;58:5;60:10;
63:19;65:1,3,5;74:4;
75:4,23;76:18,19,21;
78:8,9;79:13,22;81:25;
82:1,14;88:1;90:9;
96:1,12;104:15;116:8;
125:15;130:16,16,18;
131:14;133:10;137:18;
148:2;155:17;156:4,8,
10;157:4;158:9,10;
159:7;164:22;168:17,
20;170:7,7
**canceled (1)**
173:10
**capital (2)**
27:22;31:14
**capitalized (2)**
27:23;39:16
**captured (1)**
77:18
**card (7)**
120:21,25;138:3,14,
22;139:1;172:14
**cards (2)**
120:19;135:16
**care (1)**
144:19
**careful (1)**
113:9
**CARNATHAN (188)**
4:14,15;5:9,13,25;
6:4,7;7:1,11,23;8:1;
9:5,8,16,18,21;10:3,14;
13:11,13,21,22;15:15,
21;16:2,5,15,19,24;

17:2,4,7,10,14,19;18:1,
3,5,8,10,12,17,19;
25:19,23,25;27:3,5;
29:18,20;30:21,23;
31:21,24;32:1;34:16,
17;35:11,13;39:1,4,5;
40:2,5,7;41:6,8,14,16;
43:17,19;44:22,23;
45:8,10;46:2,4;47:5,6,
25;48:1,19,20;49:9,13;
50:10,12,13;51:2,5,8,
18,25;52:5,6;53:16,20,
22;54:11,14;55:17,20;
56:18,20;57:16,19,21,
24;58:23;59:1,17,18;
60:3,4;61:13;62:9,20,
21;64:4,6;65:8,15,16;
66:20,22;68:7,11,23;
69:2,14,15;70:17,19;
71:2,3;74:2,7,8;75:7,
20,21;76:12;77:11,14;
78:2,4,7,11,19,24;79:8,
10;80:15,17,18;81:3,6,
9,10,20;82:2,24;83:2,4,
19,21;86:23;87:16;
88:9;90:14,20;143:14;
144:2;157:15;159:7,
10;170:12,15,17;
172:17,20;173:24;
174:2,4;177:21;
178:24;179:8,16
**Carnathan's (3)**
12:1,11;80:11
**carries (1)**
155:1
**case (22)**
4:5,10;13:18;18:21;
22:15;24:22,25;48:6;
74:16;86:2;126:18,24;
127:13,15,16,17,23,24;
128:1;148:20;162:23;
170:19
**cases (6)**
14:3;83:9;127:20;
146:7,8,8
**cash (9)**
24:14;115:7,10,14;
116:10;124:4,6;154:2;
156:12
**categories (1)**
84:4
**cell (5)**
28:22,23;29:1;31:4,8
**center (2)**
64:16;88:19
**cer (1)**
168:21
**certain (11)**
23:4;27:12;75:15,17;
87:16;94:16;102:1;
117:20;147:16;169:10;
175:9
**certainly (37)**

Case 16-01120    Doc 344    Filed 06/04/19    Entered 06/04/19 13:06:36    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 184 of 203

May 10, 2019

94:8,14;97:24;
102:12;103:11;107:16,
22;109:11;111:14;
112:23;113:3,11;
114:20;115:1;116:4;
117:19;118:6,7;
120:24;121:5;124:16;
125:4,16;126:2;
128:15;130:5;132:15;
137:2;142:2;146:21,
24;152:6;155:12;
161:5;168:20;178:11,
15
**certainty (1)**
152:17
**certification (1)**
114:23
**certified (9)**
14:19,21,23,25;
53:16,23;65:10;79:17;
173:23
**CFO (1)**
96:25
**challenged (1)**
54:21
**challenging (1)**
35:17
**change (7)**
39:22;43:9;60:12,13,
25;61:1;170:23
**changed (19)**
25:11;36:12,16,19,
21;37:1;49:1;50:17,18,
19;59:10,23;60:8,9,17;
61:2;96:12;146:4;
177:14
**changes (9)**
22:13;23:3;49:5;
82:6;97:7;101:12;
118:6,8,10
**changing (1)**
50:1
**characterization (1)**
10:25
**charge (20)**
67:25;68:4;108:6;
132:19;135:15,16,25;
137:13;139:2,4;
142:20,24;143:10,12,
15;147:4,7;149:11;
166:5;172:4
**charged (9)**
63:14;67:3;86:3;
99:21;104:8;136:23;
138:21;149:10,15
**charges (20)**
24:22,24;25:3;66:24;
67:17;100:11;126:14;
133:15;137:9,16,25;
138:3,25;139:9;
140:13;142:4,5;
146:22;149:25;173:11
**chart (31)**

25:19,23;26:2,3;
51:2,6,9,10,17;52:8,9;
54:17;83:3,6,19,23,24;
84:12;124:16;128:25;
130:25;131:8;132:15;
165:5;166:16,19,24;
167:1,4;168:18;169:10
**check (14)**
23:18;70:11,13;
152:21;153:3,3;
155:17;159:15;161:13;
163:17,21;164:2,8,14
**checkbook (3)**
161:18,23,24
**checks (22)**
20:7,10;21:13;23:12,
13;37:5;57:11;152:18;
153:10,16,22;163:8,8,
9,17;164:6,7,9,15,19,
20;173:10
**child (3)**
5:7,21,24
**chopped (1)**
31:5
**chose (2)**
36:9;68:8
**circled (6)**
42:8;49:21;56:3;
63:3;134:23;135:7
**circumstances (1)**
166:3
**circumstantial (1)**
86:18
**cite (2)**
9:19;175:19
**cited (4)**
82:5;175:3,7;178:9
**claim (55)**
4:7;18:23;19:3;25:1,
2;27:7;33:12,15,21;
37:14;39:23;42:9;44:3;
45:2,16;46:12,18;
47:12;48:5,7,13,25;
56:1;58:7;59:8,10;
60:20;61:8,11,18;62:3,
4,7,10,18;64:2,3;67:2,
23;70:15;74:22;76:4;
77:19;80:12;87:11;
100:21;101:9,16,22;
131:4;140:20;147:19;
148:17,19;177:13
**claimant (1)**
4:7
**claimed (5)**
139:12;141:16,18;
150:8;157:20
**claiming (2)**
53:25;54:1
**claims (2)**
25:17;147:24
**clarified (1)**
17:14
**clarify (2)**

10:18;67:24
**Classic (6)**
162:5,17,20;176:20;
177:5,7
**classified (1)**
118:1
**clear (6)**
27:25;56:6;70:1;
98:24;153:22;179:7
**cleared (3)**
70:14;153:7,12
**clearly (1)**
114:10
**CLERK (10)**
4:2,5;7:17,19;78:25;
79:3;83:1;87:4;156:21,
24
**client (6)**
101:3;118:1,23;
149:2,3;178:10
**clients (2)**
116:13;117:14
**client's (1)**
149:3
**close (8)**
15:5;63:25;78:5;
85:24;90:23,25;91:6;
156:19
**closed (2)**
5:2;175:9
**closely (4)**
110:2,7;117:6;
118:16
**closer (3)**
94:10;119:23;130:3
**coded (4)**
23:5;118:2;124:19,
21
**Cohen (2)**
5:3;6:11
**coincidence (1)**
142:9
**coincidences (1)**
142:10
**collectively (1)**
169:22
**colloquy (2)**
54:16;65:17
**column (1)**
132:21
**com (1)**
31:16
**combined (1)**
104:18
**comfort (1)**
176:1
**comfortable (1)**
52:16
**coming (1)**
6:15
**comment (1)**
52:8
**comments (1)**

94:22
**commingled (4)**
86:2,12;123:3,6
**commingling (3)**
24:15;123:24,25
**commit (1)**
6:19
**committed (1)**
74:17
**committing (1)**
22:1
**common (3)**
28:18;74:4;124:3
**companies (19)**
18:23;24:15,17,18;
27:11;31:16;42:21;
73:13;74:11;93:8,9,9,
13,21,22;115:22;124:3,
5;176:10
**company (25)**
20:1;30:14;32:7;
40:13;55:1;68:10,20;
69:24;72:24;83:13,15;
93:23;95:16;96:4;
116:5;118:17;124:10;
125:3,6,7;133:5;
135:12,16;154:14;
155:1
**company's (1)**
124:4
**comparative (1)**
61:17
**compare (6)**
67:16;72:6,7;83:25;
166:9,18
**compared (11)**
38:5;47:10;48:2;
63:21,22;73:17;74:12;
84:1;166:20;168:7;
173:3
**comparing (10)**
28:12;48:3;50:15;
51:21;52:13;53:13;
56:4;59:6;62:25;168:8
**comparison (6)**
29:21;30:18,24;
39:10;83:22;166:14
**compel (1)**
174:11
**compelled (1)**
174:14
**competence (3)**
11:22;51:15;64:24
**competency (2)**
80:21,24
**competent (2)**
51:16;53:14
**complete (5)**
18:12,14;102:7;
121:6;130:13
**completed (5)**
36:2;44:4,5;45:2;
55:15

**completeness (3)**
173:24;174:1,2
**complicit (1)**
118:12
**component (1)**
27:7
**components (1)**
105:6
**computer (2)**
66:2;70:23
**computer-generated (1)**
65:23
**Computers (2)**
65:24;69:23
**con (2)**
5:20;128:21
**concatenated (1)**
70:25
**conceit (1)**
5:17
**conceivable (2)**
137:6,8
**concept (3)**
19:25;63:10;90:15
**concepts (1)**
32:17
**concern (10)**
86:7;133:21;139:12;
142:19,22;143:7;
155:8,10;172:6,10
**concerned (1)**
145:19
**concerning (1)**
75:16
**concerns (7)**
86:1;102:19;103:19;
142:24;146:2;150:4;
157:10
**conclude (10)**
29:14;71:11,19;77:1,
2;79:13,20;103:6;
152:10,16
**concluded (2)**
47:19;73:21
**concluding (1)**
153:16
**conclusion (23)**
29:10;66:17;71:16;
75:11,23,25;76:7,13,
14,24;77:15;79:21;
80:6,21;81:14,16;
82:11;92:12;104:1;
127:16,20;168:14;
170:18
**conclusions (5)**
66:12;74:20;103:2;
105:21;150:24
**Condominium (1)**
177:8
**Condominiums (5)**
162:5,17,20;176:20;
177:5
**conduct (2)**

5:10;175:6
**conducting (2)**
73:5;175:15
**conference (1)**
91:5
**confidence (1)**
128:12
**confirm (5)**
6:7;26:10;52:19;
86:11;107:25
**confirmed (2)**
6:17;133:13
**confused (2)**
65:22;101:13
**Confusion (1)**
23:1
**connection (3)**
28:7;55:4;176:14
**consider (6)**
15:8;19:10,12;25:6;
33:10;52:22
**considered (1)**
49:19
**consistency (1)**
28:9
**consistent (9)**
23:4,6;27:11,11;
31:17;42:16;135:23;
159:3;169:15
**consistently (1)**
83:14
**Constru (1)**
63:2
**construction (31)**
36:2;39:2;40:23,25;
53:25;58:24;59:4;
60:16;63:3;85:12;
86:16;93:13;105:5,6;
106:10;107:18,21;
108:3;122:24;129:10,
12,18;133:6;135:8;
136:3;150:3;161:17,
21;168:12;169:19;
170:4
**consult (1)**
94:15
**consulting (1)**
73:14
**contains (1)**
45:2
**context (11)**
19:15;52:15;53:23;
54:20;80:24;83:25;
103:9;125:9;132:2,22;
177:22
**continue (1)**
99:1
**contract (2)**
147:9;148:22
**contracting (2)**
93:21,22
**contractor (4)**
42:14;94:25;109:2;

155:13
**contractors (2)**
155:13;161:6
**contracts (1)**
109:13
**control (7)**
20:1,4,10;21:16;
23:21;82:12;83:16
**controls (22)**
20:17,18,19;21:2,5,7,
11,15,22,25;22:2,5,19;
24:5;96:15;97:15;
103:2;105:16;107:17;
109:14,20;141:23
**conversely (1)**
146:14
**conviction (5)**
5:10,19,21,24;6:2
**convictions (2)**
5:7,13
**convincing (1)**
77:18
**copied (1)**
32:9
**copies (6)**
19:6;38:3;43:24;
49:20;50:1;145:18
**copy (8)**
8:11;41:5;43:10;
45:1,2;88:19;93:18;
161:9
**Cordeiro (1)**
40:25
**Corp (4)**
4:9,9,19,19
**corps (1)**
125:17
**corrected (5)**
97:11,14;100:22,25;
101:9
**corrections (2)**
82:7;97:2
**correctly (2)**
26:9;42:5
**correspondence (1)**
174:25
**corresponding (1)**
169:24
**cost (21)**
51:13;53:4,8;84:9,
10,16;85:6,19;104:11;
105:17;106:7;109:9;
129:22;132:1,12,23;
147:4,7,9;148:25;
169:19
**costs (17)**
26:6;54:1,23;147:13,
14,17,24;148:18,19;
149:1;166:21,21;
167:24;168:11,23;
169:24;170:4
**counsel (7)**
10:8,9;75:24;94:16;

102:9,13;149:3
**count (1)**
88:23
**countries (1)**
72:18
**country (1)**
72:12
**couple (7)**
52:7;58:15;72:14;
89:14;169:8;170:25;
173:20
**course (7)**
10:8;12:6;19:1,11;
120:1;156:16;172:19
**court (207)**
4:2,3,23;5:1,15,17,
21;6:1,5,6,14,19,25;
7:6,8,10,15,20,25;8:2,
12,25;9:3,7,15,17,19,
24;10:4,16,18,24;11:2,
10,12,14,16,19,23,23;
12:2,5,9,14,17,19,21;
13:1,2,4,8,10;15:3,13,
20,22,24;16:1,4,6,18,
21,25;17:3,6,9,11,18,
22;18:2,4,7,9,11,15,18;
21:4,10;26:19;27:1;
30:25;34:5;46:23,25;
47:3;50:11;51:24;52:1;
53:18;54:10,12,17;
57:18,20,22;61:14,20,
23;62:1,3,8,14,19;
64:20,22;65:14;73:19;
74:6;75:13;76:7,10,17,
21,23;77:4,7,12,25;
78:3,5,10,13,18,20,21,
25;79:3,4;80:7,9,13,16,
25;81:4,7,21;82:1,23,
25;86:25;87:2,3,10,12,
21;88:1,3,5,7,11,13,17,
21;89:1,3,5,7,9,11,15,
18,21,23;90:1,5,7,13,
19,22,25;91:2,4,9;
119:17,21,25;127:5,8,
10;130:20;135:4;
141:6;143:16,20,23,25;
144:4,8;156:16,20,24,
25;157:3;158:5,7,11;
164:24;170:11;172:19;
174:1;175:5;178:25;
179:3,9,12,14,17
**Court's (5)**
35:8;69:16;75:1;
87:5;156:21
**cover (3)**
17:21;18:1,6
**CPA (19)**
101:2;102:25;
110:11;114:2,4,10,14,
16,20,23,23;118:12,15;
122:6;173:17;175:20,
22;176:5;178:2
**created (1)**

19:17
**creating (2)**
39:15;40:13
**credence (1)**
175:17
**credentials (2)**
15:16;113:21
**credibility (1)**
126:15
**credit (5)**
99:16;120:19,24;
172:14;176:11
**credits (1)**
100:8
**critical (1)**
89:20
**cross (3)**
78:8;89:13;177:12
**crossed (1)**
109:13
**CROSS-EXAMINATION (2)**
91:13;157:7
**cross-examine (1)**
76:19
**cross-examined (1)**
5:19
**current (1)**
166:1
**cut (4)**
40:17;41:12;72:3;
91:18
**Cutler (21)**
4:6;19:8;26:12;
29:22;30:25;41:24;
42:23;56:19;59:22;
67:14;84:13,19;87:15,
19,20,25;121:19;
128:4;157:11;160:22;
165:16
**cutting (3)**
41:4,4;127:6
**CV (8)**
13:21,24;15:17,22;
93:12,16,17,18

**D**

**DaCosta (13)**
39:1,4,7,9;40:3,12,
13,15,16,23,25;41:7,14
**dash (1)**
87:25
**data (12)**
25:14;76:3;77:17;
86:7;95:22;96:9,11;
112:9,12,24;113:5;
124:20
**date (25)**
14:2,4;25:12;27:12;
34:25;35:21;38:8,12;
39:23;41:25;44:20;
46:21;48:16;49:3;57:4;
70:25;71:6,24;72:6,7;

153:2;156:9;158:17,
19;171:13
**dated (12)**
14:6;36:1;37:6;
38:21;47:15;48:13,15,
25;64:12;71:24;155:9;
157:17
**dates (9)**
7:12;30:12;35:17;
45:19;55:12;69:1;
153:12,12;157:18
**day (13)**
4:6,11;36:23;43:8;
65:6;66:7;89:18;90:21;
108:12,14;153:7;
161:19;179:4
**days (1)**
153:18
**dealing (9)**
61:24;72:9,17,24;
109:18;122:7;124:3;
156:12;165:6
**dealt (1)**
133:5
**debit (1)**
176:11
**Deborah (2)**
138:13,14
**debtor (1)**
4:17
**decades (2)**
19:22;74:3
**December (2)**
34:9;57:5
**decide (2)**
75:3;117:1
**decision (1)**
76:16
**declare (2)**
116:21,23
**declared (1)**
126:5
**Decor (15)**
27:4,7,21;29:19;
30:21;31:14;32:12,13;
33:11,15,21;145:1;
157:9,25;171:4
**dedicated (6)**
120:15,24;137:12;
138:11,14,18
**deem (1)**
90:9
**deemed (1)**
55:15
**deeper (1)**
22:11
**defalcations (1)**
21:6
**defeat (1)**
11:7
**defeating (1)**
125:9
**defeats (1)**

Case 16-01120    Doc 344    Filed 06/04/19    Entered 06/04/19 13:06:36    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 186 of 203

May 10, 2019

30:16
**defendant (1)**
26:5
**defendants (2)**
8:10;33:24
**Defendant's (1)**
171:3
**deficient (1)**
77:16
**defrauding (1)**
21:24
**degree (2)**
74:16;113:23
**delaying (1)**
42:18
**deleted (1)**
43:8
**demanded (1)**
95:15
**demonstrated (3)**
11:21;51:14;52:3
**denied (3)**
11:19,23;12:3
**departments (1)**
109:25
**depend (3)**
149:18,20;170:4
**dependent (1)**
96:8
**depends (1)**
23:17
**deposit (3)**
159:15,17,22
**deposited (1)**
122:20
**deposition (15)**
19:6;22:8;32:20,23;
82:8;114:5,13,15;
115:4;117:9;132:7,10;
173:18,20,21
**depositions (3)**
12:15;94:20,24
**deposits (1)**
122:16
**depreciation (1)**
118:3
**derailed (1)**
28:11
**derive (1)**
63:17
**derived (1)**
63:15
**describe (1)**
18:20
**described (1)**
106:12
**description (2)**
31:13;158:18
**designed (1)**
21:6
**despite (4)**
100:8,12;127:22;
152:9

**destroy (1)**
79:5
**detachable (1)**
79:6
**detail (6)**
72:16;103:1;126:13;
129:20;154:25;157:22
**detailed (1)**
63:23
**detailedly (1)**
100:16
**details (1)**
63:21
**detective (4)**
21:5,7,15,16
**determination (5)**
90:9;116:13;123:24;
127:23;162:8
**determine (13)**
18:23;21:8;22:15;
28:9;52:24;60:8;91:6;
105:17;106:6;122:19;
141:20;149:13;168:2
**determined (3)**
60:19;74:17;126:18
**determining (1)**
131:13
**developing (1)**
162:17
**Development (5)**
4:9,19;40:14;100:25;
137:21
**dictate (1)**
166:4
**difference (14)**
46:10;48:11;49:21;
52:18,19,20,24;53:1;
66:4;86:20;104:25;
126:4;129:25;130:11
**differences (7)**
66:25;69:20;70:21,
21;113:7;153:19;
167:21
**different (51)**
27:13;28:24;29:5,13,
13;30:10,12,12;32:10;
34:25;38:14;39:23;
45:3,17;50:6,16;56:4;
60:19,20,21;61:7;
68:18;69:1;77:5,7;
105:1;112:24,25;
113:1,4,5;117:16;
120:7,10;136:21;
143:7;146:9;147:15;
152:23;161:4,10;
164:7;165:10,12,14,15,
20;167:9,10;168:5;
174:17
**differently (2)**
39:13;40:21
**difficult (4)**
30:1;49:23;65:12;
86:6

**DiGiacomo (4)**
70:18;71:11;145:2,4
**digit (1)**
66:8
**digits (3)**
64:11;65:23,25
**DIRECT (4)**
13:12;63:19;79:9;
99:19
**directed (1)**
6:10
**direction (2)**
12:5;52:2
**directly (3)**
94:24;119:4;121:13
**disagree (1)**
110:23
**disappears (1)**
48:14
**disclosed (1)**
8:11
**disclosure (2)**
76:22;77:9
**discover (1)**
28:15
**discovered (2)**
33:22;113:12
**discovery (7)**
46:16;61:10,24;68:1;
91:5;94:16;95:16
**discrepancies (3)**
65:11;72:12;170:22
**discrepancy (4)**
65:19;70:9,12;
170:19
**discussed (2)**
133:6;171:23
**discussion (3)**
117:2,17,18
**discussions (2)**
117:14,16
**dishonest (1)**
160:1
**dispute (4)**
5:12;11:21;99:1,3
**distillation (2)**
9:8;10:12
**distributed (1)**
86:10
**divide (1)**
63:13
**divorce (3)**
93:11,20,24
**document (14)**
4:6;16:25;28:14,16;
49:20,23;56:1,20;
58:19;143:7;144:11,
18;158:3;172:13
**documentation (20)**
44:13;46:12;47:11;
52:10;55:24,25;56:1;
57:15;62:6;63:24;
71:12;74:12,15,21;

76:6;80:5;81:15;
126:17;173:12;177:13
**documented (3)**
109:6;111:1;124:11
**documents (26)**
8:23;10:19;13:17;
19:3,14,17;20:5,5;
22:14;25:7,10;27:14,
17,19;28:9;50:3;52:14;
56:4,8;66:15;74:25;
75:1,17;79:24;174:12;
177:24
**Doddridge (2)**
105:8,9
**dollars (2)**
108:14;144:25
**done (30)**
9:13;11:12,24;15:4,
6;18:11;37:16,20;
39:20;53:4;57:14,20,
23;58:10;72:7;73:8;
83:7;90:25;91:10;
109:1;110:15,16;
111:10;137:3;145:5,
11,12;146:4;152:22;
164:23
**door (1)**
21:12
**dotted (1)**
109:12
**double (6)**
84:10;151:25;152:3,
6,8,10
**doubt (1)**
97:23
**doubts (1)**
35:3
**dovetails (1)**
83:12
**down (19)**
28:20;29:2;31:4;
34:20;40:19;49:11;
57:7;61:1;65:20;69:18;
71:1;84:9;88:23;
133:23;136:2;137:22;
139:21;162:2;163:4
**draw (13)**
35:8;66:12;75:25;
103:2;104:1;105:21;
126:10;127:20;128:23;
129:2;134:6;150:24;
162:4
**drawing (2)**
58:17;83:22
**Dream (9)**
43:16,17,23,25;44:2,
7,13,18;45:8
**Dreams (1)**
43:21
**drew (2)**
127:15;168:14
**driven (1)**
116:17

**Druid (1)**
28:5;85:2,10,23
**due (7)**
44:5,11;45:3,4,16;
46:1;148:9
**duplicate (1)**
30:15
**duplicating (2)**
30:15;35:6
**during (6)**
7:4;12:6;26:16,19;
32:13;177:11

## E

**earlier (2)**
36:2;37:22
**early (3)**
132:11,19;171:6
**easier (4)**
87:22;88:25;127:20;
133:11
**economic (2)**
116:19,23
**economics (1)**
14:12
**Eddy (1)**
155:6
**Edith (1)**
162:5
**educated (1)**
72:11
**effect (6)**
98:25;114:9,11;
155:15;171:5,8
**effort (4)**
128:14,20;145:9,22
**eight (1)**
48:16
**either (12)**
29:10,14;56:8;76:25;
81:21;86:12;97:15;
98:5;115:11;128:7;
147:12;154:4
**Electric (6)**
49:12,15;50:22;
54:23;55:1;160:25
**electrical (9)**
51:12,14;52:17;55:4,
8;104:10,17;166:1,4
**electrician (1)**
53:9
**electricity (5)**
51:15;54:2;104:16;
105:10,15
**electronic (3)**
101:17,23,24
**electronically (1)**
88:22
**Elena (2)**
129:3,8
**elicit (2)**
77:21;82:18

Case 16-01120 Doc 344 Filed 06/04/19 Entered 06/04/19 13:06:36 Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document Page 187 of 203

May 10, 2019

**Elizabeth (1)**
91:7
**else (12)**
6:23;21:14;30:17;
35:7;39:21;42:13,15;
51:16;98:6;136:16;
168:22;179:5
**email (3)**
41:17;105:11;175:19
**emailed (1)**
176:5
**emails (3)**
19:5;177:21,22
**emergencies (1)**
23:19
**emphasize (1)**
8:15
**employed (1)**
77:16
**employing (1)**
98:24
**enable (1)**
101:20
**end (14)**
21:8;74:13;91:18;
108:12,14;115:15,19,
24;117:12;118:7;
131:4;160:5;178:12;
179:18
**engaged (4)**
93:5;94:15;102:13;
107:18
**engagement (1)**
93:25
**engagements (2)**
15:4;73:9
**engaging (1)**
98:21
**English (2)**
100:16;109:19
**enough (6)**
19:15;32:24;87:4;
103:6;105:21;109:23
**ensure (1)**
20:21
**enter (5)**
112:9,20;152:21;
153:3,7
**entered (14)**
36:11,16,21,25;43:6;
47:8,19;58:8;61:6;
67:21;95:23;96:12;
97:25;112:13
**entering (5)**
96:8;112:12,24;
113:5;128:12
**entire (5)**
32:16;88:20;104:9;
108:2;168:17
**entirely (1)**
178:16
**entities (5)**
29:13;56:9;58:21;

148:21;164:8
**entitled (3)**
108:21;109:2;145:13
**entity (9)**
23:7;72:23;120:5;
162:6,9,16,19,24,25
**entries (27)**
23:2,3;25:9,9,10,11;
33:24;55:10;60:13;
61:16,18;82:6,7,10;
97:5,11,13;115:15,19,
23,25;116:4;124:17;
141:2,13;175:9,16
**entry (7)**
22:11,12;47:14;
96:22;124:20;136:2;
169:9
**equals (1)**
140:20
**equipment (1)**
64:16
**error-riddled (1)**
81:13
**errors (2)**
21:6;113:12
**especially (11)**
71:13;72:17,24;
109:17,19;117:12;
155:12;161:6,16;
171:23;178:6
**ESR (1)**
91:8
**essentially (1)**
10:12
**establish (1)**
173:17
**estate (2)**
52:21;167:9
**estimate (13)**
150:4,9,18,19;151:1,
5,8,19,20,21,24;152:7;
173:5
**estimated (1)**
151:22
**et (1)**
4:10
**European (1)**
39:14
**evaluate (1)**
168:5
**evaluating (1)**
83:10
**even (26)**
10:20;11:9;23:6;
25:18;27:12;33:24;
37:5;38:20;47:14;67:5;
69:1;71:7;72:11,16,16;
73:13;77:2;80:23;
97:24;106:12;108:24;
115:16;147:5,17,19;
151:1
**evenly (1)**
60:2

**event (1)**
52:2
**events (1)**
94:10
**everyone (1)**
4:23
**evidence (15)**
10:2,21;15:17,25;
17:24;76:13;82:4;88:5,
6,8;94:24;100:4,6;
104:24;137:21
**ex (1)**
126:25
**exact (10)**
49:25;56:14;63:16;
122:7;134:24;136:5;
140:20;141:16,18;
142:8
**exactly (10)**
50:3;51:18;54:15;
55:25;57:1;59:24;
116:25;121:11;136:22;
178:18
**examination (10)**
7:4;13:12;26:17;
27:10;29:9;32:13;
33:11;79:9;170:16;
176:15
**examine (4)**
22:4;27:7;37:15;
44:6
**examined (1)**
37:18
**examiner (5)**
14:23;53:23;65:10;
102:25;173:23
**Examiners (1)**
79:18
**examining (1)**
32:20
**example (10)**
21:16;27:20;45:12;
66:25;102:2;103:12,
12;105:3;117:21;
160:25
**examples (4)**
21:10,15;26:16;
121:25
**exams (1)**
114:23
**Excavation (3)**
164:3;168:25;175:23
**exceed (1)**
147:16
**except (1)**
56:24
**exception (1)**
165:16
**excerpt (1)**
46:12
**excerpts (3)**
19:4;26:23;64:8
**excuse (7)**

25:20;43:21;69:3;
119:15,15;134:19;
159:7
**exercise (1)**
116:16
**Exhibit (33)**
13:19,20;15:17,19,
25;16:1,2;17:3,4,5,16,
20;18:4,4,13,13;88:20;
134:7,11,12,19;136:1;
137:18,20;139:17;
158:3;159:8,12;
163:13,25;166:16,19;
171:3
**expansion (1)**
165:23
**expect (8)**
12:7;42:14;53:1;
68:17;75:12;118:8;
169:13,24
**expected (2)**
21:19;170:2
**expedite (1)**
158:10
**expense (2)**
141:10;175:23
**expenses (5)**
26:11;97:2;110:25;
148:2;161:19
**expensive (1)**
169:15
**experience (20)**
19:18;20:12;23:15;
24:3;29:8;65:10;69:10;
73:13,16;74:3,10,18;
75:18;76:2,2;98:14;
153:21;154:5;175:14,
24
**expert (20)**
9:22;10:19;11:3,4;
15:13;51:11;53:25;
74:3;75:5,16;76:22;
85:12;86:16;93:1;
105:5,7;106:10;
107:18;127:5;168:12
**expertise (6)**
11:4;52:3;75:17;
107:15,20;168:5
**explain (17)**
26:3;29:23;30:25;
32:3;34:4;54:17;56:6;
60:10;62:22;63:22;
65:12,18;66:23;67:22;
70:12;94:17;170:21
**explained (2)**
65:18;72:12
**explaining (1)**
27:1
**explanation (1)**
99:6
**explicitly (1)**
124:24
**Express (10)**

59:11,13,14;62:25;
63:1,5,9;120:21;121:3;
139:1
**extent (9)**
8:13;17:16;19:10;
33:10;53:7;107:22;
137:11;142:2;162:24
**extra (5)**
41:25;46:18;106:6,
11;146:3
**extraneous (2)**
8:19,24
**extras (1)**
42:2
**extreme (1)**
127:2
**extremes (1)**
74:13
**eyebrow (1)**
13:5

**F**

**fabricated (9)**
29:17;66:18;71:17,
20;79:24;81:12;
106:17;143:9;172:13
**fabrication (1)**
29:15
**facility (1)**
114:21
**fact (83)**
5:6;33:22;36:1;
53:10;54:3,7;56:13;
58:17;59:24;77:1;
79:22;80:5;92:4;96:11,
20,24;97:1,5;99:5,24;
100:2;101:24;103:5,
24;104:3,13;105:23;
106:11,15;108:24;
110:11,20;112:18;
113:3,19;114:6,7,8,15;
117:5,9;121:11;123:7,
25;124:12;125:6;
127:22;128:6;129:21;
130:3;131:11,18;
132:18;134:23;135:11;
136:5,8,11;137:7;
138:20;142:3;143:4,4,
11;149:9,14;150:8;
152:2;153:7,10,11;
154:17,22;155:20;
156:10,10;160:12;
161:21;164:5;169:3;
170:21;172:9;174:25
**factor (4)**
132:20;168:11;
169:19,21
**facts (3)**
11:11;54:8;94:6
**failed (2)**
8:21;121:22
**fall (1)**

Case 16-01120    Doc 344    Filed 06/04/19    Entered 06/04/19 13:06:36    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 188 of 203

May 10, 2019

5:22
**familiar (2)**
73:14;134:24
**fan (1)**
12:14
**fancy (1)**
154:22
**far (3)**
14:4;124:23;144:1
**Fat (1)**
155:6
**feature (2)**
60:11;96:11
**February (7)**
35:18;38:19,21;
44:19;45:24;48:15;
55:8
**federal (1)**
75:13
**feel (2)**
8:3;19:16
**feels (1)**
12:8
**felt (3)**
6:3;52:16;58:12
**Ferguson (3)**
37:8,11,13
**few (10)**
7:5;14:2;61:17;
74:16;88:24;93:7;
95:16;153:18;173:10;
175:3
**field (2)**
161:18,24
**fifteen (1)**
78:22
**fifty (4)**
15:11;73:10;148:8,9
**fifty-four-inch (1)**
107:10
**figure (5)**
99:24;168:1;174:17;
175:10;176:5
**figured (2)**
167:18,19
**figuring (1)**
178:21
**file (52)**
22:10;33:23,24;
42:23;43:4,6;46:8,15,
18,20;47:11,12,15;
48:4,4,12,13,24,25;
49:3;55:1;58:7;59:6,9,
9;60:20;61:5,7,10,11,
19,20,21;62:1,3,17,18;
63:4,7;64:1;67:3,9,21,
23,25;70:14,15,16;
82:6;128:21;147:19;
173:9
**filed (7)**
4:7;11:18;128:4;
148:17,19;179:3,4
**files (16)**

19:4,5;36:10;41:23;
44:6,17;56:14;64:9;
67:1;70:6,10;83:24;
120:7;174:6,7,16
**filing (3)**
6:10,13;128:17
**Filippov (10)**
4:7,15;13:17;47:11;
95:15;100:2;120:5;
128:7;160:4;171:19
**final (6)**
37:21;55:9;58:10;
129:21,22;141:20
**finalizing (1)**
137:3
**finance (1)**
14:17
**financial (3)**
14:25;154:1;175:15
**financially (2)**
83:16;119:8
**find (49)**
22:24;24:9,12,23;
25:4,16;26:6;37:10,18;
38:1,6,10;41:23;42:9,9,
11;43:2;44:9,16,24;
45:7,23;55:7;58:3,11;
59:15;60:17;67:20;
68:3,13;70:5;84:3;
98:2;99:13;106:12;
107:2;134:4;136:6,17;
138:24;140:21;141:17;
142:1,8,20,25;154:20;
172:12;173:6
**finding (1)**
134:24
**fine (10)**
6:1;17:9;18:7,15;
78:7;19;89:1;119:23;
133:14;174:3
**finish (1)**
160:13
**finished (3)**
31:18;131:11;144:5
**finishes (1)**
165:20
**fire (1)**
46:23
**firm (3)**
118:12,15;178:2
**first (36)**
8:7;9:5,24;22:21;
27:3,19;28:12,22,23;
32:4;34:3,9;39:6;
43:17,20;45:13,17;
46:2;49:12;56:18;
60:10,18;61:1,6;77:18;
87:13;91:10;93:5;
104:19,19;112:13,13,
19;142:23;157:5;175:7
**firsthand (1)**
22:7
**five (8)**

4:6,11;52:11;64:11;
65:25;68:17;144:2;
170:22
**fixed (2)**
147:21;148:10
**fixed-price (1)**
147:9
**flaw (1)**
32:9
**flight (3)**
78:17,18;90:11
**flipped (1)**
59:20
**float (1)**
88:23
**floats (1)**
125:6
**Flooring (10)**
43:16,17,21,23;44:1,
2,7,13,18;45:8
**Florence (1)**
162:16
**flow (4)**
12:11;124:4,6;154:2
**flows (2)**
54:20;136:17
**focus (2)**
7:12;142:23
**focused (2)**
24:14;41:17
**follow (7)**
19:19;20:13,15;87:9;
109:5;121:12;159:7
**follows (1)**
51:3
**font (4)**
41:11;45:3,16;
102:19
**Food (1)**
135:21
**foot (9)**
84:9,10,17,19,21,24;
85:6,8,10
**footage (2)**
86:20;167:5
**forensic (7)**
94:1,3;100:8;121:7;
126:15;152:9;168:18
**forensics (1)**
14:25
**forget (4)**
43:23;63:15;159:23;
173:4
**forgot (1)**
40:22
**format (5)**
27:12;39:24;71:5;
101:23,25
**formations (2)**
165:15,17
**formats (1)**
27:13
**formatted (1)**

144:12
**formatting (2)**
45:7;69:19
**formed (3)**
91:18,22;92:1
**forth (9)**
11:17;24:14,16,17;
65:24;123:9,14;
124:17;176:13
**forty (3)**
73:12;90:17;98:13
**found (38)**
23:25;25:13,20;26:2,
16;36:10,12;38:7,17;
54:9;63:22;73:25;
74:11;76:5;84:16,19,
21,23;85:5,8,10,16;
94:16;97:19;101:5;
106:5;134:21;136:19;
139:5;146:7,8,8;
150:22;158:12,16;
163:8;171:20;178:8
**foundation (3)**
51:20;53:13;65:3
**foundational (1)**
52:8
**four (9)**
49:20;50:6;84:12;
133:16;161:3;166:15;
168:11,12;170:22
**frame (2)**
41:25;136:21
**frankly (4)**
53:10;71:23;73:23;
83:16
**fraud (34)**
14:23;15:9;19:13;
22:1;23:23;24:6;27:10;
53:16,23;65:10;73:5;
74:17;76:1,2,7;79:13,
17,20;82:19;91:19;
92:5;99:3,4;102:25;
111:18,19;118:12;
126:18;127:16,17,23,
24;128:2;173:23
**fraudsters (1)**
150:11
**fraudulent (11)**
76:25;77:1,2,21,22,
23,24;81:13;106:20;
107:23;127:21
**Fredette (4)**
34:23;85:2,8,23
**frequency (1)**
23:17
**frequently (1)**
97:17
**front (5)**
21:6;87:23;130:18;
159:12;171:2
**full (10)**
11:22;17:7;32:2;
44:4;45:2,15;46:1;

116:6;119:7;160:15
**fully (1)**
6:12
**function (1)**
19:24
**functionally (3)**
8:14;9:2,4
**further (8)**
36:7;56:6;86:23;
91:17;103:7;154:17;
170:10;178:24
**future (1)**
165:22

## G

**gaps (7)**
31:22;32:5,8,8,10;
146:2;153:20
**gave (5)**
77:9;88:19;102:9;
149:3;174:15
**general (16)**
21:20;22:22,24,25;
24:8,23;25:4,16;26:4,
10;58:11;108:20,22;
109:1;155:13;169:7
**generate (4)**
48:5;61:8,11;69:23
**generated (7)**
21:23;24:7;49:4;
50:1;67:8;68:17;82:16
**geographic (1)**
86:9
**Gersh (12)**
96:25;97:6;100:22;
114:1,4;115:1;173:17;
175:1,20,21;176:5;
178:22
**Gersh's (4)**
96:24;114:13;
173:21;174:22
**gets (5)**
76:9;126:4;172:24;
178:5,5
**gist (1)**
172:3
**given (9)**
57:13;60:19;61:7;
102:7,11;114:9;
115:15;116:14;164:19
**gives (3)**
167:15,16;176:1
**giving (1)**
174:10
**glass (1)**
170:14
**goes (3)**
53:14;144:25;155:5
**Goldman (44)**
7:1,3,18;9:6;11:18;
13:15,19,23;16:16;
18:20;20:8;26:1;27:6;

29:21;40:8;43:22;46:6;
48:2;49:14;50:14;52:7;
55:21;59:19;60:6;
62:22;72:9;78:9;79:11;
81:11;83:5,22;86:24;
89:5;90:11;91:15,17;
120:4;157:9;158:16;
165:5;167:2;170:18;
177:21;179:1

**Goldman's (2)**
51:3;157:5

**Good (23)**
4:3,4,14,16,18,21,23;
13:7;21:25;22:2;50:10;
57:19;78:3;91:12,15,
16;95:22;144:7,9;
154:6;170:8;175:17;
179:8

**Google (1)**
154:21

**Gordon (1)**
117:6

**govern (2)**
79:12,16

**government (1)**
79:5

**grades (1)**
168:5

**graduated (1)**
14:11

**grass (1)**
167:7

**great (5)**
21:16;100:17;176:16

**gridlines (1)**
146:2

**Grille (1)**
135:20

**gross (1)**
92:5

**grossly (1)**
113:12

**group (1)**
118:25

**guarantee (1)**
6:21

**guess (4)**
30:4,24;67:10;82:18

**guessing (1)**
42:25

**guy (1)**
44:1

---

**H**

**half (5)**
16:10;40:6;59:7;
91:15;177:9

**halfway (1)**
61:1

**hallway (1)**
16:10

**hand (3)**

7:17,23;8:5

**handful (1)**
144:2

**handle (1)**
12:6

**hands (1)**
112:23

**handwriting (2)**
49:24;161:1

**handwritten (3)**
50:3;150:5;160:18

**hanging (1)**
179:5

**happen (3)**
12:15;53:18;124:9

**happened (8)**
21:8;36:23;67:11;
71:15;86:5;98:6;100:9;
148:15

**happening (8)**
21:7;82:15;94:11;
116:1,3;119:8;124:24;
160:4

**happens (7)**
12:16;23:18;47:4;
110:21;116:19;117:20;
155:18

**hard (1)**
100:3

**harder (2)**
6:9;98:2

**hardly (1)**
173:13

**Harris (15)**
4:21,21;88:13;133:2;
134:11,14;137:22;
139:17;157:1,4;162:2;
163:12;165:1,1;166:23

**Hartzell (14)**
25:19,24;26:1;27:3;
29:19;30:22;34:3;39:3,
6;41:7;51:2,4;83:2,19

**Hartzell's (1)**
30:3

**hated (1)**
89:11

**head (1)**
167:8

**hear (9)**
12:9;76:17,17;
127:10;129:11;154:6;
160:10,11;178:22

**heard (1)**
173:1

**Heating (5)**
55:18,22;58:1,12,13

**help (1)**
27:1

**hey (1)**
155:15

**hide (1)**
124:23

**high (1)**

85:22

**higher (7)**
54:23;67:23;84:5;
148:3;159:20,25;160:2

**highlight (3)**
35:23;36:8;178:17

**highlighted (3)**
31:5,22;52:19

**highlighting (5)**
8:14;28:2;31:1;57:4;
70:20

**highly (2)**
69:11;113:4

**highpoints (1)**
32:18

**Hill (1)**
28:5

**himself (1)**
54:6

**hint (1)**
61:6

**hired (2)**
15:9;128:8

**hit (6)**
9:12;32:16,18;
131:15;132:11;156:5

**hold (6)**
7:15;46:23;53:18;
91:4;171:18;173:22

**Home (8)**
64:5,15,16,24;65:4;
78:9;160:22;167:11

**homes (2)**
52:17;64:10

**Honor (77)**
4:14,16,18,21;5:1,4,
22;6:7;7:2,3,23;8:9,9;
9:2,6;10:3,17;13:7,11,
21;15:15,23;16:15,24;
17:2;18:17;47:5;50:12;
51:10,19;53:6,22;
64:19;73:18;74:23;
75:3,10,11,20;76:8,14,
16,16,20;77:11;78:7,
11,23,24;79:8;80:8,23;
86:24;87:1;89:10;90:6,
9,16,24;91:3,12;
119:16;127:9,11;
135:3;144:2,7,9;
156:19;157:2;158:2,9;
164:22;170:9,12;
178:24;179:16

**hopefully (2)**
11:16;75:22

**Horner (7)**
66:21,24;67:16;
139:8;141:15,22;142:7

**host (1)**
166:3

**hou (1)**
86:19

**hour (5)**
16:10;92:17;143:19,

20,23

**hours (3)**
89:14;90:16,18

**house (12)**
51:13;54:6;63:14;
67:15;85:24;86:17;
103:14;104:8;110:22;
161:7;165:18;168:13

**house/job (1)**
41:24

**housekeeping (3)**
4:24,25;13:5

**houses (18)**
38:14;52:12,21;
53:12;55:1,14;60:2;
80:1;85:21,22,23;
86:19;104:18,21;
160:22,23;169:14,15

**huge (1)**
86:19

**human (1)**
113:8

**hundred (3)**
15:5;73:8;152:17

**hundreds (1)**
19:23

**Huntington (9)**
64:5,10,24;65:4,6;
66:10;142:12,13;172:1

**Hyde (2)**
138:10,11

---

**I**

**Ideally (1)**
6:20

**identical (10)**
38:11,13;56:5;
103:14,20,24;160:18,
18,22;161:1

**identification (9)**
13:20;15:18,19;16:3;
17:5,23;18:14;25:21;
171:4

**identification's (1)**
17:7

**identified (2)**
106:5;132:19

**identify (1)**
99:15

**illustrate (2)**
29:23;64:7

**illustrated (2)**
45:11;55:21

**illustrating (9)**
32:3;34:5;35:14;
39:7;41:9;44:24;46:5;
49:14;59:19

**illustrative (4)**
26:18,21,25;32:16

**im (1)**
83:15

**image (1)**

75:7

**immediately (1)**
5:14

**implication (1)**
168:22

**implies (2)**
83:15;100:14

**important (20)**
9:12;19:15;20:8;
57:6;94:5,9;106:25;
107:13;108:13,15;
114:6,8;127:4;144:23;
156:4,5,9,13;164:15;
175:6

**impression (1)**
106:9

**improper (1)**
108:6

**improvement (2)**
64:15,16

**inability (1)**
9:25

**inaccurate (1)**
96:21

**inadvertently (1)**
18:1

**inappropriate (1)**
76:15

**inauthenticity (1)**
88:9

**incidence (1)**
106:3

**incidentally (2)**
115:6;120:18

**include (2)**
32:24;33:15

**included (2)**
37:13;142:3

**includes (1)**
141:21

**incompetence (3)**
24:5;76:25;82:21

**incompetency (1)**
92:5

**incomplete (2)**
18:6;102:6

**inconceivable (1)**
113:3

**inconsistencies (5)**
31:17;39:11;40:18;
41:10,13

**inconsistency (3)**
66:14;69:25;126:16

**inconsistent (2)**
45:6;66:6

**incorporated (1)**
131:7

**incorrect (1)**
43:15

**increase (1)**
131:5

**increased (2)**
53:2;67:6

**increases (1)**
132:23

**incredibility (1)**
126:17

**incredibly (1)**
52:23

**incurred (1)**
26:11

**incurs (1)**
21:21

**indeed (1)**
80:20

**independent (2)**
118:16,25

**independently (2)**
130:7;149:6

**index (2)**
87:23;88:2

**indicate (1)**
23:22;24:4;154:23

**indicated (2)**
30:13;162:11

**indicates (3)**
23:20;32:10;159:13

**indication (1)**
121:18

**indications (1)**
49:22

**indicative (2)**
154:25;155:21

**indiscernible (4)**
7:12;8:6;9:9;53:11

**individual (1)**
108:7

**industry (1)**
161:17

**ineptitude (1)**
23:1

**inexplicable (1)**
23:3

**inference (1)**
58:17

**inflated (1)**
137:7

**inform (1)**
6:8

**informally (1)**
104:25

**information (22)**
20:21,21;21:23;22:2,
9;38:16;52:20;76:4;
77:20;82:16;83:13;
101:12;104:17,19;
106:25;107:13,16;
111:24;112:21;132:16;
144:13;149:2

**in-house (1)**
53:3

**initially (2)**
18:5;95:14

**innoc (1)**
155:24

**innocent (1)**

**92:14**

**innocuous (1)**
155:24

**inquiry (2)**
22:21;50:21

**Inside (3)**
140:14;141:3,13

**insignificant (1)**
131:12

**insolvency (2)**
15:4;73:9

**inspected (1)**
36:4

**inspection (4)**
37:20,21;55:9;58:10

**inspections (1)**
37:16

**install (1)**
54:1

**instance (3)**
33:22;65:13;155:23

**instances (4)**
36:15;38:22,23;60:1

**instead (5)**
50:20;56:25;161:8;
175:10;178:21

**insufficient (1)**
100:7

**insurance (1)**
147:3

**integral (1)**
109:8

**integrate (1)**
121:14

**intend (1)**
7:3

**intentionally (1)**
81:13

**intercompany (2)**
24:9,11

**interest (1)**
58:21

**interested (1)**
4:8

**internal (19)**
19:25;20:4,17,17,19;
21:2,21,25;22:2,4,19;
23:21;82:12;96:15;
97:15;103:2;105:16;
107:17;141:23

**internally (2)**
67:8;141:11

**internet (2)**
105:1,21

**interrupt (1)**
12:1

**interrupting (3)**
12:5,11;13:3

**into (24)**
10:2;12:7;15:17,25;
43:6,6;50:21;54:8;
87:17;96:9;97:1;
110:13;112:9,21;

**118:3;121:15;122:16,**
20;131:7;132:16;
148:2;152:22;154:18;
171:13

**introduced (1)**
10:22

**Intuit (1)**
136:3

**invested (1)**
170:5

**investigate (1)**
103:7

**investigated (2)**
65:4;93:8

**investigation (7)**
19:13;76:2;94:1,3;
126:16;149:10;154:18

**investigations (4)**
15:9;73:6;74:10;
175:15

**investor (8)**
53:4;54:22;84:5,11,
12;111:2;162:25;165:7

**investor-owned (1)**
84:1

**investors (12)**
51:21,22,22;53:10;
54:4,5;85:2;125:19,22;
169:20,22;170:1

**invoice (140)**
23:24;24:7;27:22,23;
29:1,3,4,22,22,25;30:1,
5,14,16;31:2;33:23;
34:7,7,9,11,20,20,22;
35:2,4,5,15,23;36:1,8,
13,16;38:2,3,8;39:8,12,
19,22,24,25;40:11,17,
20,22;41:13,20,24;
42:8,12,14;43:5,24,25;
44:20;45:1,4,15,16,17,
19,25;48:12,14,14,25;
49:1,2;60:7,25;64:10,
16;65:25;67:2,4,5,9;
68:14,16,18,25;69:4,5,
7,12,18,19;70:2,3,22,
24,25;71:1,5,6,8,14,21,
24,24;72:2;73:2;103:6,
12;106:7,12,17,18,19,
20;107:12;108:5,7,25,
25;144:13,13,19;
145:7;150:12;151:10,
16,24;152:7;155:20;
156:5,6,10;157:10;
160:5,6;161:8;162:5;
166:7;171:12;172:11,
24,25;173:3,13

**invoiced (2)**
171:7,8

**invoices (99)**
20:10;23:24;27:20;
29:9,11;30:1,10,25;
31:13,14;32:25;33:4,
11,12;34:6;36:9,11,13,

**19;37:4,6,22,23;38:5,**
21;39:9,15,16;40:15,
18;42:17;43:5,13;
44:11;49:15,19,19;
55:5;58:8;63:23;64:9,
10,11,12;65:9,20,24;
66:3,4,7,8,8,11,18;
68:13,17,19,25;69:12,
18,20,23;71:17;
100:17;102:17;103:13,
14,14,20,25;105:14;
106:4;107:23;108:9;
109:14;133:16;145:19;
151:20;154:9;155:8;
157:11,14,15,18;
158:14,16,24;159:23,
25;160:17,18;161:1;
168:1,4;172:23;
176:20;177:3,7,10

**invoiv (1)**
42:2

**involved (4)**
24:20;125:19,22;
138:14

**irresponsible (2)**
96:21;113:13

**IRS (4)**
20:23;22:1;109:25;
128:15

**isolated (2)**
106:3;155:23

**isolation (1)**
104:2

**issue (6)**
33:4;75:9,15;76:21;
144:25;177:2

**issued (11)**
26:24;36:6,14;55:8;
70:13;160:6;162:5;
164:14;176:20;177:3,7

**issues (6)**
5:16;25:13;74:15;
76:3;111:22;151:20

**item (4)**
59:8;71:9;136:23;
166:21

**items (2)**
23:4;106:7

**J**

**J&P (1)**
135:21

**James (1)**
4:21

**January (1)**
37:20

**Jason (1)**
117:6

**jaws (1)**
11:7

**Job (2)**
44:4,5

**jobs (1)**
37:12

**John (3)**
4:18;133:2;134:14

**John's (1)**
135:20

**Jose (1)**
32:20

**journal (2)**
175:9,16

**judgement (1)**
8:17

**judges (2)**
89:12;94:1

**July (4)**
14:6;69:3,4;93:4

**jump (2)**
65:20,24

**June (9)**
45:20;69:3,3;130:12;
131:1,11;153:3,4;
171:20

**JW (4)**
150:3;173:1,9,14

**K**

**Kagan (39)**
4:8,8,8,10,19,20,20;
18:23;22:8;40:14;43:3;
44:1,3,7;46:8,13;54:4;
56:9,15;57:2;58:21;
77:9,16;98:24;100:24;
101:9;132:11;137:21,
21,25;138:4,8;148:21;
162:6,9,12,24;174:7;
178:15

**Kagan's (4)**
44:13;98:16;125:18;
126:5

**KDC (51)**
4:9,19;22:5,22,22,
25;23:9,12,25;24:8,19,
22,24;25:3,18;27:7;
58:11,13;67:2,4;74:22;
80:22;83:7;85:1;96:25;
110:2;111:15,25;
115:6;117:7;118:16,
19,20,21;119:4,9;
120:9;121:7,14,19;
123:4,13;125:20,24;
126:3,3;138:13;
141:12;151:4;176:6;
177:13

**KDC's (1)**
67:9

**keep (11)**
10:7;18:13;20:6;
21:6,13,13;90:3;
137:23;138:6;139:22,
24

**keeping (1)**
120:5

**keeps (4)**
22:12,12;94:25;95:1
**kept (4)**
17:19;18:1;120:9;
178:6
**kickbacks (2)**
99:13;100:4
**kind (16)**
8:2;9:22;21:1;28:1,
11;51:12;64:18;72:25;
74:5;87:4;94:5;107:9,
16;118:8;175:16,24
**kinds (3)**
73:1;110:20;117:14
**Kirill (1)**
138:4
**knew (2)**
105:7;146:24
**knowing (3)**
5:14;8:18;169:11
**knowingly (1)**
77:21
**knowledge (2)**
96:8;112:2
**known (2)**
98:19;114:10
**knows (1)**
82:14
**Kristina (2)**
113:15,19
**kudos (1)**
109:22

## L

**L-35 (1)**
159:8
**L-7 (1)**
87:24
**labeled (1)**
124:18
**labeling (1)**
124:24
**labor (1)**
146:22
**laid (1)**
70:22
**Lande (3)**
11:17;129:3,8
**Lande's (2)**
129:15;130:11
**landscaping (1)**
49:2
**language (1)**
162:6
**lapel (3)**
16:7,9,14
**large (3)**
19:15;23:19;167:22
**largely (2)**
96:7;170:4
**last (3)**
140:23;141:4;175:8

**late (7)**
9:3;10:13;23:2;
33:25;43:8;55:13;82:6
**later (10)**
12:21;18:16;36:12,
16;69:5;72:8;78:15;
94:11;95:17;144:5
**latitude (1)**
152:24
**law (1)**
9:19
**lawsuit (1)**
20:24
**lawyer (1)**
177:6
**lawyers (2)**
109:11;111:19
**layouts (1)**
167:12
**lead (1)**
92:10
**learn (1)**
112:18
**learned (1)**
32:22
**learning (1)**
75:18
**least (7)**
5:12;58:14;70:2;
81:22;83:16;131:23;
149:19
**leave (3)**
75:10;160:13;171:6
**leaves (1)**
151:25
**ledge (1)**
132:11
**ledger (7)**
24:23;25:4;26:4,10;
48:23;59:8;150:6
**ledgers (10)**
22:22,25;24:8;25:16;
45:22;58:12,13;61:18;
121:24,25
**left (8)**
28:4;29:3;31:2,9;
44:2,3;71:6;179:5
**left-hand (1)**
30:3
**legitimate (1)**
103:25
**lend (1)**
175:17
**length (1)**
98:24
**lengths (1)**
168:6
**less (10)**
25:18;53:4;111:18;
114:21;143:23;150:8,
12;160:15;169:24;
171:7
**letters (3)**

27:22;31:14,15
**liars (1)**
81:17
**licenses (1)**
173:22
**lien (4)**
66:11;68:4;70:15;
137:7
**liens (1)**
173:12
**life (2)**
122:17,20
**likely (7)**
29:17;77:2,23;90:2;
92:8;113:4;114:22
**likes (1)**
5:18
**limine (1)**
74:25
**line (7)**
27:22;28:17,20;
41:25;52:17;145:20;
166:20
**lined (1)**
49:24
**lines (4)**
12:13;22:18;55:2;
173:20
**lining (1)**
31:23
**Lipetsker (3)**
4:15;90:17;100:3
**listed (5)**
8:22;106:7;135:9;
151:15;159:15
**listening (1)**
16:11
**lists (2)**
54:4;124:13
**litigation (1)**
48:9
**little (21)**
6:9;14:2;16:20;
19:18,21;26:13;28:1,
25;30:1;40:24;51:19;
78:19;87:7,23;88:1;
119:22,23;133:23;
158:3;163:4,14
**live (1)**
5:16
**living (1)**
122:6
**LLC (9)**
4:6,10;23:8;122:1;
128:4;162:6,17,20,21
**loan (4)**
59:3;122:24;124:14,
18
**location (2)**
86:9,10
**locked (2)**
21:12,13
**long (9)**

9:10;25:11;41:21;
64:11;89:12;98:7;99:8;
101:12;111:11
**longer (1)**
5:19
**look (53)**
7:24;13:19;19:16;
25:8;27:25;35:20;38:9;
40:16,19;43:1;44:12;
45:19;54:19,25;69:20,
21;72:25;84:12;93:6,
20;95:5;96:16;104:7;
114:17;119:9,10;
121:5,7,8;130:8;
134:17;135:1;139:15;
140:23;142:11;143:1,
1;145:2;151:4;157:22,
23;159:1;166:22;
168:1,4,10;170:25;
171:3,11,11;174:25;
176:22,23
**looked (27)**
6:9;37:23;44:10,16;
45:22;50:23;59:14;
64:14;66:3;68:13;
73:25;81:4;100:15;
105:1;120:20;128:25;
134:3;139:8;147:24;
154:9;160:17;162:10;
167:25;172:13;173:5;
174:5,15
**looking (32)**
8:2;19:13;36:18;
38:10;45:23;50:14;
52:15;53:2,2,23,23,24;
54:19;70:5,8;71:23;
72:4;82:18;93:12;
103:11,13;113:21;
121:19;128:11;132:3;
136:13;137:12,25;
146:20;150:18;167:21;
169:12
**looks (22)**
29:1;31:2;35:17,19,
22;40:16;41:4,12;49:1;
50:15;52:18;56:8;
58:18;64:2;70:24;
118:2;143:9;152:6;
154:13;163:20;168:21;
172:24
**loosely (1)**
97:16
**lose (3)**
20:10,10,11
**loss (1)**
178:5
**lost (3)**
54:15;65:17;120:1
**lot (28)**
19:14;23:2,2;25:13;
27:18;53:4;55:13;
64:17;73:4,13;82:4,13;
87:8;89:4;93:25;95:9;

98:17;102:16;121:13;
142:10;154:9;167:15,
16,22;170:1,2;177:24,
25
**love (1)**
109:11
**low (1)**
124:4
**lower (6)**
157:21;159:3,20;
160:1,2;169:5
**lowercase (4)**
27:23;28:16;31:15;
32:4
**Lumber (10)**
85:18,24;86:17;
109:7;168:1,2,3,4,6,8
**lump (1)**
146:12
**lump-sum (2)**
148:8,22
**lunch (1)**
90:3
**Lyman (17)**
19:8;29:22;50:15;
56:21;59:23;84:13,13,
16,21;85:21;87:14,19,
19,24;160:22;165:16;
169:4
**Lyman- (5)**
4:5;26:11;42:22;
121:18;128:3
**Lyman-Cutler (38)**
4:10;23:7,8,10;
24:22,24;25:3;26:7,14;
28:7;43:4;46:7;50:24;
52:12;85:20;99:22;
100:3;119:4,10,13;
120:4,6,8,13,25;121:9,
13,25;122:16,20,23;
123:3,4;138:18,22;
139:25;162:19,20
**Lymans (1)**
165:13
**Lyman's (1)**
172:14

## M

**magnitude (2)**
118:9;168:10
**maintained (1)**
46:8
**majors (1)**
14:16
**makes (4)**
42:8;54:21;86:20;
122:6
**making (11)**
6:10;9:9;16:12;65:9;
72:25;94:22;98:12;
124:8,16;147:8;169:10
**management (2)**

Case 16-01120 Doc 344 Filed 06/04/19 Entered 06/04/19 13:06:36 Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document Page 192 of 203

May 10, 2019

14:15;20:21
**managerial (1)**
14:12
**manner (1)**
101:2
**Mansfield (4)**
140:14;141:2,13,21
**many (22)**
15:3,9;23:13;27:18;
29:7;32:14;60:1,1;
62:24,24;65:2,6;73:5;
74:9,10,14;86:8;
105:24;109:19;119:2;
127:19;175:14
**map (2)**
37:7;146:17
**March (3)**
34:11,19;38:20
**mark (2)**
57:1;136:14
**MARKED (5)**
15:19;17:14,22,24;
18:5
**marketing (1)**
64:25
**markings (1)**
28:2
**marks (1)**
101:7
**Mass (1)**
41:25
**Massachusetts (2)**
93:2;167:10
**master's (1)**
14:15
**match (4)**
42:3;135:17;176:10,
12
**material (7)**
99:20;102:8,9,11,14;
103:10;148:13
**materials (21)**
8:19;19:2,7,10;
23:25;37:8,12;39:7;
42:11;71:12,21;74:19;
86:2,9,12;99:15;
146:15,17,19;148:13;
174:5
**math (2)**
43:15;177:6
**matter (3)**
13:5;89:23;134:23
**matters (1)**
115:16
**May (64)**
4:12;6:21;7:8;16:19;
17:19;27:13;30:21;
31:21;39:20;47:14,16,
20,25;48:19;49:3,6,7,9;
52:18;57:22;58:20;
72:10,11;74:4;76:25;
77:20,22,23,23;79:4;
82:3,3;89:10,11;91:7;

92:5,5;97:5,19,24;
111:18;118:1;119:24,
25;130:19,20;131:25;
135:3,4;140:14,17;
141:5,6;153:6;157:2,
17;158:11;160:5;
164:23;168:24;171:16,
22;172:14,17
**maybe (10)**
12:11;34:16;36:17;
51:6;53:1;125:2;
127:20;132:1;134:9;
143:19
**mean (29)**
5:17;7:10;8:16;9:21,
24;10:4;12:15;16:8;
23:15;25:2;32:8;38:12;
51:19,21;53:16,22;
54:7;58:20;69:13;74:2;
77:14,21;78:8;80:25;
89:19;90:15;108:5,14;
165:17
**meaning (1)**
101:2
**means (1)**
80:24
**mechanic's (4)**
66:11;68:4;70:15;
173:12
**memory (6)**
33:1;47:17;151:15;
159:4;172:12,18
**mentioned (5)**
20:17;38:18;41:2;
79:11;138:24
**mere (1)**
103:5;125:6;155:20
**merely (1)**
108:4
**messing (1)**
12:11
**mic (3)**
16:7,9,14
**mic'ed (1)**
16:13
**Michael (3)**
7:1,18;13:15
**Microphone (3)**
16:4;17:12;119:22
**middle (2)**
47:14;51:6
**might (11)**
10:17;24:3;54:7;
125:3;127:17;143:17;
162:25;165:22,25;
170:15;175:8
**miles (1)**
169:8
**million (14)**
122:2,24;123:1;
129:10,13,17,18;130:1;
131:15;148:13;169:22,
23;177:2,9

**Millwork (2)**
139:8;142:7
**Millworks (3)**
66:21,24;67:16
**mind (3)**
16:22;75:22;171:18
**mine (2)**
90:15;154:4
**minimization (1)**
116:18
**minor (1)**
60:25
**minute (1)**
159:24
**minutes (4)**
36:22;78:22;90:17;
144:3
**mirror (1)**
75:7
**missing (5)**
31:4,8,24;40:20;
42:13
**misspell (1)**
28:18
**misspelled (3)**
28:18;29:17;71:9
**misspellings (1)**
102:19
**misspells (1)**
71:13
**mistake (3)**
41:23;42:1;73:3
**mistakes (3)**
41:21;72:13;73:1
**Mixed (1)**
87:21
**modifications (1)**
82:7
**mom (1)**
93:8
**moment (7)**
80:4,19;81:11;
115:18;121:5;126:9;
137:17
**mon (1)**
44:20
**Monday (7)**
6:15,16,18,21,22;
179:4,15
**money (34)**
44:20;58:22;84:1;
98:9,25;108:15,17;
116:7;121:12,12;
122:19,25;123:2,9,13;
124:6,13,17;125:4,7,
11,14,14;126:2;144:20,
20,23;153:25;156:4;
169:20;170:2,4,7;
176:13
**monies (1)**
24:16
**month (7)**
21:17;39:19;66:4;

69:5,7;112:20,24
**monthly (3)**
110:15,17;111:7
**months (6)**
39:18;48:16;55:14;
66:5;111:12;153:22
**more (36)**
6:12;14:3;21:7;29:1;
32:14;51:20;52:16,17;
54:22;55:1;57:23;
63:10;68:17,25;72:22;
77:2,22;92:8;93:11;
97:17;98:13;113:9;
114:21;122:25;124:5;
142:22;143:18;153:18;
154:4;156:13;168:12;
169:14;170:2,7;
174:10,11
**morning (20)**
4:3,4,14,16,18,21,23;
6:10,22;9:12;16:17;
91:15,15,16;96:16;
100:17;102:17;106:5;
133:7;154:15
**mosaic (1)**
54:8
**most (13)**
16:17;20:12;52:25;
71:8;84:4;94:13,14;
98:16;115:15,19;
156:9;164:10;177:5
**mostly (1)**
19:23
**motion (5)**
11:18,24;12:2;74:24;
174:11
**motion's (1)**
12:3
**move (20)**
11:16;15:21;16:20,
22;34:2,12;35:11;39:11;
43:16;53:7;55:18;64:4,
21;66:20;67:11;68:7;
70:17;125:11;163:24;
171:14
**moved (2)**
123:9,9
**moves (1)**
52:2
**moving (2)**
17:11;123:13
**much (37)**
10:6;15:6;20:15;
27:2;29:12;36:20;53:8;
54:7;72:2;86:17;90:21;
92:20;104:10,14;
105:9,15,17;106:6;
108:17;113:6;116:14;
122:19;124:8;126:16;
130:12;143:18;144:1;
147:25;152:24;156:9;
166:4;167:7;168:25;
169:19;170:4,5;175:22

**multiple (4)**
67:1;98:21;112:23;
137:16
**must (1)**
134:9
**myself (1)**
58:19

## N

**nails (1)**
155:16
**name (12)**
13:14;38:13;43:23;
71:10,14;105:8;
135:16,17;136:21;
137:9;155:2,6
**named (1)**
17:21
**names (1)**
4:12
**narrowed (2)**
5:13;6:5
**National (5)**
85:18;167:25;168:1,
2,4
**nature (5)**
102:23;113:8;116:5;
118:4;154:18
**necessarily (4)**
8:6;11:3;114:25;
135:17
**necessary (1)**
133:3
**need (22)**
16:12,23;19:15;20:2,
2;23:19;81:7;90:2;
91:9;94:3;103:1,7;
110:1;121:8;136:17;
141:20;144:4;147:13,
14;153:25;166:12;
179:6
**needed (4)**
89:6;121:14;167:17;
168:25
**needn't (1)**
6:19
**needs (5)**
54:21;81:5;111:1;
128:11;165:25
**neither (1)**
31:15
**news (2)**
57:19;154:6
**Newton (1)**
164:3
**next (45)**
27:23;28:17,20;
29:18;30:21;31:21;
34:10,12,13,18;35:11;
39:9;40:2;41:6,14;
43:8;44:22;45:8;47:25;
48:19;49:9;50:7;55:18;

56:17;57:9,11;58:23;
59:17;60:3;61:13;
62:20;63:8;64:4;66:20;
67:10;68:12,23;69:14;
70:17;71:2;136:14;
151:10;173:20;175:19;
179:4

**nice (1)**
29:4

**nicely (1)**
29:3

**Nickolay (1)**
4:15

**night (3)**
78:17,18,21

**nobody (3)**
5:18;82:14;112:3

**none (2)**
42:18;81:12

**noninvestor (6)**
54:23;55:2;84:6,11;
165:7;169:13

**noninvestor-owned (1)**
84:2

**normal (2)**
89:16;90:21

**normally (1)**
89:24

**Northwestern (1)**
14:16

**notable (1)**
178:8

**note (1)**
93:12

**noted (5)**
31:12;37:4;90:16;
150:23;176:19

**notes (10)**
7:5,7,10,21,21,22;
8:16,21;9:6;11:7

**notice (6)**
27:21;77:9;78:1;
85:18;96:20;136:9

**noticeable (1)**
31:17

**noticed (7)**
23:13;27:17;28:4;
32:13;37:23;42:17;
151:1

**noticing (1)**
54:3

**noting (1)**
176:25

**November (1)**
70:2

**nowhere (2)**
121:17,17

**number (84)**
4:5,6,10;17:25;20:5;
23:19;29:25;30:2,5;
31:4;34:20,20;35:4,6,
16,23;39:8,8,10,24;
40:1,15;41:3,19;42:2,8,

12;60:18;62:16,18;
63:3,5,5,6,12,13,16;
65:2;67:2,4,5,6;68:14,
18;69:1,4,5,7,19;70:2,
13,25;71:1;72:3;93:21;
101:5;118:1;122:4,15;
129:6;130:5,11;131:7,
18;134:14;135:12;
136:8,9,20;141:16,18;
144:11;146:6;148:3;
157:10,16;163:8,18;
164:2,11,13;169:5;
178:16,17

**numbered (2)**
20:5;163:10

**numbering (2)**
70:24;153:19

**numbers (45)**
18:15;23:24;24:7;
28:21;30:14,16;34:7,7;
35:2;39:12,18;43:5;
59:24;63:14;64:11;
65:1,25;68:16;69:13,
18;82:10,13;85:15;
102:22;114:21;117:21;
118:4;122:7,7;128:12,
16,21;129:24;130:22;
144:16;145:23,25;
146:4;152:22;161:13,
22;164:6;175:18;
176:2,17

**number's (1)**
25:2

**numerous (1)**
24:13

## O

**object (4)**
13:6;74:23;75:5;
81:16

**objected (3)**
12:19,23;74:24

**objecting (1)**
13:3

**objection (24)**
4:7;8:8,10;10:5,16;
11:8;12:8,12,22;15:20;
17:17;51:10;53:7;
54:12;64:19;73:18;
75:8;76:8;78:1;80:7,
10,23;143:14,17

**objections (4)**
7:6;12:14;87:16;
88:9

**objection's (1)**
75:18

**obligated (3)**
6:4;11:25;12:8

**obliterated (1)**
145:20

**observations (1)**
65:8

**obviously (3)**
8:18;30:10;65:23

**occasional (1)**
23:17

**Occupancy (1)**
36:5

**occurred (4)**
25:12;43:8;46:20;
106:12

**o'clock (3)**
6:17,18;9:13

**October (5)**
46:19;47:15;48:13,
25;57:8

**odd (6)**
63:16;75:7;150:22;
152:19;160:14;171:21

**off (12)**
31:5;72:3;73:3;79:1;
105:20;127:6;136:18;
153:6;156:22;167:8;
172:12,12

**offer (8)**
10:1,10;15:17;16:7;
75:10;130:17;173:24,
25

**offering (2)**
65:8;74:4

**offhand (1)**
115:5

**office (4)**
5:2;28:22,23;161:23

**official (1)**
93:25

**off-the-record (1)**
91:5

**often (1)**
117:20

**old (2)**
97:11,14

**old-fashioned (1)**
28:25

**once (2)**
72:19;124:9

**One (172)**
4:25;5:6,12;7:15;
20:4;21:12,16,21,21;
24:19;27:9,9,9,22,23;
28:1,4,5,14,22;29:14,
16;30:3,4;31:8;32:25;
33:22;34:10;36:11,16;
38:3;39:3,16,19;40:25;
41:19;43:1,6;44:1,2,2,
3,4;45:6;46:18;48:6,6,
7,9;49:11;50:17,25;
53:10,11;56:9;58:9,25;
59:12,21;60:20;61:7;
62:24;64:8;65:12,21,
22;66:1,7;70:1;72:14,
22;86:1,2,10;88:20;
89:19;91:4;92:8;93:9,
13,19;95:14,16;96:4;
97:14;99:2,10,21;

103:14,19;104:3,7,9;
105:11,16,23;106:15,
23;110:21;111:1,5;
114:10;116:12;117:2,
11,20;118:2;120:13;
121:3;122:23;123:13;
124:4,5;125:7;126:17,
23;127:3,15,16,22;
134:15;135:7;138:10;
139:9;140:14,17;
142:23,23;143:9;
150:3,4;153:2;157:10,
14,16,16,21;158:16,17;
159:3,25;160:1,2,2;
161:3;162:15,20;
163:17;164:2,8,13,15,
17;166:14,20;167:10;
168:13;169:5,21,23;
170:19,22;171:1;
173:1,2;175:7,17;
176:1,4,11;178:11;
179:12

**one/two-person (1)**
109:18

**ones (6)**
21:12;24:13;75:8;
101:10;170:25;175:5

**one's (1)**
50:16

**online (2)**
52:20;112:14

**only (32)**
5:10;6:4;16:8;40:6;
49:21;50:1;65:2;66:5,
8;67:4;68:14;79:21;
85:22,24;89:23;95:22;
104:18;105:15;107:2;
110:21;119:8;121:6,7;
126:16;131:12;148:2;
149:13;151:2;169:23;
177:2,2,3

**onscreen (1)**
32:2

**onsite (4)**
160:9,12;161:19;
171:6

**open (2)**
88:1;172:23

**operate (1)**
73:15

**operating (2)**
19:20;20:13

**operations (1)**
19:24

**OPERATOR (1)**
91:8

**opi (1)**
83:12

**opine (4)**
75:4,9;127:24;128:1

**opinion (17)**
18:22,24;75:10,18;
80:12;83:13;91:18,22;

92:1,4,16;94:5;99:9;
170:23;173:14;177:12,
16

**opportunity (3)**
94:15;95:5;113:6

**opposed (5)**
106:1;119:4;121:14;
132:23;153:12

**orally (1)**
6:22

**oranges (1)**
168:9

**order (10)**
28:21;39:22;43:9;
57:14;59:20;119:7;
121:6,11;128:10;
168:10

**ordered (1)**
6:16

**ordinary (1)**
107:24

**organization (1)**
46:9

**orient (2)**
87:1;89:5

**oriented (2)**
72:16;103:1

**original (1)**
101:1

**originally (4)**
61:5;63:14;111:25;
171:8

**others (5)**
22:1;39:17;113:9;
165:13,13

**otherwise (1)**
10:20

**ought (5)**
90:22,23,25

**out (80)**
5:7;6:11;14:2,4;
16:10;18:15;23:8,13,
18,20;24:2,7;26:5;
29:4;31:3,9;34:8;35:2,
18,20,24;39:12,19;
41:4;46:17;49:24;62:6,
24;65:11;70:22;75:4;
82:20;83:16;86:10;
87:17;88:19;90:7,12;
105:23;106:12;107:2,
14,14;110:14;112:20;
119:4;120:10,22;
122:25;123:3,11;
125:12,13,14;133:16;
144:20;146:22;147:2;
152:18;153:10,16;
160:10;161:13,22;
163:9;167:18,19;
169:13;172:4;174:17;
175:10;176:5,6,12;
178:6,13,16,18,21;
179:7

**outline (1)**

Case 16-01120    Doc 344    Filed 06/04/19    Entered 06/04/19 13:06:36    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 194 of 203

May 10, 2019

109:14
**outlined (1)**
5:25
**outright (1)**
94:1
**outside (8)**
39:24;85:2;98:5;
117:6;118:12,15;
174:22;175:1
**outstanding (2)**
38:23;103:21
**over (29)**
15:4;19:22;20:12;
22:13;23:15;24:3;
27:14,14,16,16;29:6,6,
6;45:7,7;49:10;71:6;
73:8;78:19;95:15;
97:11,13;122:16,20;
123:14;126:15;173:10;
175:14;179:4
**overage (6)**
129:3;131:13,16,19,
23;132:4
**overall (1)**
54:20
**overcharged (1)**
149:23
**over-collect (1)**
159:19
**overlap (1)**
107:20
**overlooked (1)**
97:20
**overrule (2)**
54:12;81:21
**Overruled (5)**
52:1;65:14;74:6;
75:19;76:18
**overrun (3)**
132:1,21;147:9
**overrunning (1)**
83:14
**overruns (9)**
83:8,9,10,18;132:24;
147:4,5,8;148:25
**overstate (1)**
159:19
**overstated (4)**
64:3;106:20;131:23;
168:24
**owe (2)**
20:7;98:25
**owed (3)**
44:13;58:13,21
**owes (1)**
20:6
**own (5)**
32:7;71:14;85:16;
120:15,18
**owner (3)**
124:5;162:11,14
**owners (2)**
72:17;125:3

**ownership (1)**
124:3

**P**

**P&L (1)**
175:23
**page (33)**
17:20;18:1,6;25:20;
26:2;27:4;29:2,18;
34:9;46:13;62:24;63:8,
12;114:13,18;134:7,14,
24;135:1,1,6;136:1,2;
139:17;140:4,8,11,23;
141:4;151:10;163:15,
24;173:21
**pages (4)**
8:4;62:24;88:23;
142:16
**paid (68)**
23:19;30:13;33:5,7;
34:24;36:13;37:5,12;
38:7,19,20,22;42:15,
16,18,21;44:4,10,18,
21;45:2,15,24;50:23,
25;55:1;92:17,20,22,
22;98:3,5,14;99:8;
103:21;104:20;107:5;
108:13,17,22;109:2;
116:20;118:20,21;
121:15;123:11,19;
143:6;144:20,24,24;
145:13;146:25;147:1;
150:5,19;151:20,23;
152:7;156:11;158:25;
159:3,14;164:16;
171:7;172:24;173:5,10
**painter (1)**
28:18
**painters (3)**
160:12;171:6,20
**painting (5)**
28:17,19;29:16;
160:5,9
**paper (6)**
31:3;88:15,25;95:4,
5;109:11
**paperclip (4)**
56:3,7,13,25
**paperclips (1)**
56:5
**papers (1)**
167:11
**paperwork (6)**
80:6,20;81:12;109:8,
8;155:17
**paragraph (58)**
9:11,11;25:20;33:2,
18;38:10;43:1,12;
44:12;45:23;47:17;
51:3,4,11;58:5,6;
63:19;66:16;67:18;
70:7,8;72:3;77:14;

83:3,20;122:4;126:10,
13;128:24;129:16;
130:18,23;131:8;
132:3,25;139:7;
142:11;145:2;150:1;
157:5,10;162:1;163:3,
7;165:2,6;166:24,24;
172:9,12,18;173:6;
174:19;176:3,18,22,23,
25
**parity (2)**
90:14,20
**Parker (4)**
34:23;85:2,5,22
**part (27)**
12:8;16:2;17:16,20;
31:3,24;39:22;41:3;
59:10;76:4;94:13,14;
96:15;109:6,8;116:16;
117:2;126:12;137:13;
138:20;139:15;142:2;
154:3,12;157:9;166:6;
178:11
**particular (20)**
7:12;24:21;25:24;
29:9,10,11;30:18;
32:12,19;35:7;36:15;
38:9;41:17;65:19;
85:19;135:11;136:23;
139:2,4;172:11
**parties (9)**
4:8,12,22;43:3;44:7;
58:18;77:10;156:1;
174:7
**passed (1)**
36:20
**past (5)**
49:3;73:17,20,21;
74:12
**pasted (2)**
40:17;41:12
**pasting (1)**
41:5
**pattern (4)**
53:3;66:13;73:4;
169:16
**patterns (2)**
19:16;54:19
**Paul (3)**
40:25;70:18;145:2
**Pause (6)**
25:22;145:16;
150:16;158:1,8;164:25
**PaveTech (8)**
68:7,25;69:4;70:6;
72:24;154:10,18;155:3
**PaveTech's (1)**
68:8
**pay (7)**
54:5;99:1;118:20;
150:11;159:20;160:1;
161:19
**payable (2)**

55:10;164:3
**paying (4)**
116:6,15;123:4;
153:24
**payment (20)**
33:5,8;38:16;42:20;
43:14;57:7,12;123:15;
134:21;151:2;152:1,3,
6,9,10;155:21;156:7;
159:16,22;173:4
**payments (7)**
23:7,10;57:7;58:16;
119:3;121:13;155:9
**payroll (1)**
118:19
**pays (2)**
54:6;124:6
**PDF (1)**
88:19
**peop (1)**
31:16
**people (28)**
16:10;27:10,13,15;
29:13;31:16;71:10;
72:10,15;78:10;81:14,
17,17;98:3,14,24;99:7;
112:9,20,25;113:4,9;
114:23;135:15;146:25;
147:1;152:21;160:9
**per (10)**
84:9,10,17,19,21,23;
85:6,8,10;104:8
**percent (3)**
148:9,10;152:17
**perfect (4)**
109:12;110:16,17;
111:6
**perfectly (1)**
99:5
**performed (1)**
92:2
**performing (1)**
19:1
**period (1)**
66:9
**permissible (1)**
75:5
**permit (2)**
36:5;55:8
**permits (4)**
37:18;55:3;57:25;
58:4
**permitted (4)**
5:5;75:2,14,14
**perpetrated (1)**
126:19
**person (5)**
13:23;93:9,13;
112:24;124:19
**personal (1)**
99:9
**perspective (3)**
4:25;125:16;126:4

**per-square-foot (2)**
84:16;85:5
**Perten (172)**
4:18,18,25;5:16,20,
22;6:2,8,16;7:7,9;8:9,
13;9:2,4;10:17;11:1,6,
11,13,15;12:4,10,18,
20,25;13:2,7,9;15:23;
17:11,13;51:10;53:6;
64:19,21,23;73:18,20;
74:23;76:8,15,20,22,
24;77:6,22;78:8,23;
80:8,10,23;81:16;87:1,
4,11,13,22;88:4,6,8,12,
15,18,22;89:2,4,8,10,
14,17,19,22,25;90:4,6,
8,24;91:1,3,12,14,24,
25;104:5,6;119:20,24;
120:1,3;127:5,7,9,11,
14;130:19,21;133:3,4,
10,12,23,24;134:7,13,
15,16;135:3,5;137:18,
19,22,24;138:1,2,6,7;
139:17,19,21;140:2,5,
7,9,10;141:5,7;143:19,
22,24;144:7,9,14;
145:17;150:17;156:19;
157:1,4,8;158:2,6,9,13,
22,23;159:9,11;162:2,
3;163:4,6,12,16,24;
164:1,22;165:1,4;
166:23,25;170:9,13;
171:4;173:25;174:3,
21;176:18;177:11,20;
179:6,11,13
**Perten's (1)**
170:21
**pervasive (4)**
73:16;74:11,15;
77:20
**pervasiveness (2)**
76:5,6
**Peter (1)**
4:16
**ph (5)**
136:3;140:14;155:6;
162:6;164:3
**phase (1)**
15:7
**phone (10)**
5:3;28:22,23;29:1;
31:4;135:11;136:8,9,
20;155:15
**phone's (1)**
31:8
**photocopy (1)**
56:11,14;57:2
**physical (1)**
164:20
**pick (2)**
155:15;167:8
**picked (2)**
136:15;137:1

Case 16-01120    Doc 344    Filed 06/04/19    Entered 06/04/19 13:06:36    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 195 of 203

May 10, 2019

**picking (1)**
119:18

**picks (1)**
124:6

**picture (1)**
119:7

**pictures (2)**
157:15;167:11

**piece (3)**
54:9;106:25;107:13

**place (3)**
87:4;97:15;109:20

**placed (1)**
159:12

**places (2)**
169:14;178:6

**plaintiffs (5)**
7:1,3;100:2;105:4;
107:18

**Plaintiff's (5)**
13:20;15:17,19,25;
25:21

**planning (1)**
9:11

**planted (1)**
16:16

**plasma (1)**
107:10

**plausible (3)**
99:5;161:11,20

**play (2)**
5:18,25

**played (1)**
54:17

**pleading (1)**
42:19

**pleadings (1)**
179:3

**please (36)**
4:12;7:17,19;29:19;
31:21;33:19;34:2;
35:12;40:3;41:15;45:9;
46:3;47:25;48:19;
59:17;60:3;62:20,23;
64:5;66:21,23;68:7,24;
69:14;71:2;83:3,20;
137:18;139:18,21,24;
157:3,5;163:13;165:2;
166:23

**Plumbing (10)**
34:2,4,7;35:12;36:4,
8;37:16,20;38:2,6

**pm (4)**
89:24;156:22,23;
179:18

**PO (2)**
40:16;41:3

**podium (1)**
17:20

**point (16)**
6:9;63:21;96:16;
113:19;123:7;127:18,
19;132:24;133:18;

**148:1,5;151:16;**
154:17;164:10;166:6;
169:18

**pointing (3)**
40:25;46:17;65:11

**points (8)**
7:11,13;9:9,10,13;
32:12,15;177:11

**pool (1)**
165:25

**poor (1)**
23:20

**pop (2)**
12:8;93:8

**portion (2)**
67:1;145:20

**portions (1)**
8:15

**Porto (2)**
32:20;33:3

**Porto's (1)**
32:23

**position (4)**
8:7;9:4;100:4;
149:23

**possibility (3)**
111:15;123:23;
151:25

**possible (9)**
15:16;28:8;86:9;
97:21,22,24,25;137:10;
153:9

**possibly (1)**
90:2

**postpone (1)**
91:7

**potential (1)**
96:1

**potentially (1)**
112:24

**pounds (1)**
155:16

**powerful (1)**
95:25

**practice (3)**
33:3;175:16,24

**practices (2)**
94:23;154:24

**pre- (2)**
20:4;164:14

**precisely (1)**
67:11

**pre-date (1)**
5:11

**predicate (1)**
28:4

**prejudice (1)**
52:1

**pre-numbering (1)**
20:9

**prepare (4)**
51:9;52:9;70:15;
128:10

**prepared (8)**
13:23;26:18;29:12;
33:13;40:11;81:14;
128:6;141:12

**preponderance (4)**
72:20;73:3;155:23;
169:12

**prerogative (1)**
75:1

**presented (2)**
28:21;77:19

**presenting (2)**
26:25;83:5

**press (1)**
47:3

**pretty (4)**
10:6;20:15;78:5;
124:7

**prevalent (1)**
125:3

**Preventive (3)**
21:5,5,10

**prevents (1)**
21:14

**previous (5)**
32:5;45:4;59:21;
63:13;71:22

**previously (5)**
8:16;11:18;15:12;
17:24;44:10

**price (5)**
50:16;52:24;129:17;
147:22;148:10

**prices (3)**
52:17;165:6;168:8

**principal (1)**
155:2

**principles (1)**
20:16

**printed (4)**
26:5;40:20;62:5;
164:15

**printouts (5)**
61:18;62:6,10;
101:18;164:21

**prior (5)**
38:8;74:10;101:10;
136:1;176:23

**prison (2)**
5:8;6:12

**pro (1)**
20:19

**probable (3)**
152:12,14,15

**Probably (9)**
15:5;57:23;73:9;
78:5;88:15,24;93:11;
113:4;158:10

**problem (3)**
16:9;46:25;73:23

**problematic (1)**
153:17

**problems (5)**

**73:17;74:11;76:5;**
77:20;126:15

**procedures (2)**
19:20;20:2,14,19

**proceed (3)**
89:10;119:24;157:2

**proceeding (1)**
15:13

**process (2)**
20:20;117:24

**processes (1)**
77:16

**produce (1)**
55:24

**produced (25)**
19:5;33:24;45:15;
46:16;47:11;48:9;
56:10;57:2;59:7,10;
61:10,21,23;62:4,5,17;
63:4;64:1;67:3,21,23,
25;70:16;95:16;174:7

**product (1)**
92:5

**production (3)**
174:11,14;177:25

**ProEx (33)**
22:19;23:9;24:19;
25:15,16;80:21;110:5;
115:9;117:7;118:16;
119:9;121:8,14,19;
123:4;125:20,24;
126:3,3;146:10,11,18,
18,18,24;147:24;148:2,
8,19;149:9,11,14,23

**ProExcavation (6)**
4:9,19;26:10;46:3;
146:11;177:2

**ProEx's (2)**
111:25;146:12

**professional (4)**
107:24;154:14,23;
173:22

**professional-looking (1)**
68:9

**profit (1)**
178:5

**project (44)**
12:7;26:12,14;28:5,
6,7;38:13;50:1;52:12;
54:4;59:21;73:22,24,
24,25;86:3;91:19;
99:21,22;104:9;
106:24;107:3;108:3;
109:1,9;119:3;120:15,
22;122:17,21;123:2,14,
15;128:4;129:19,22;
130:12;131:4,11;
138:13;147:3;162:19,
25;168:3

**projects (40)**
19:7;23:8;24:19;
50:24;51:21,21;52:11;
53:3,5,8,9;54:22,24;

**55:2;59:25;73:21;83:7,**
11,14;84:1,2,5,6,11,11,
13;85:1;86:8,13;98:21;
99:1;100:11;109:5;
110:20;120:10;125:10,
21;137:16;138:10;
162:16

**proof (8)**
61:11;62:10;74:22;
87:11;100:21;101:16,
22;177:13

**proper (1)**
21:21

**proper/improper (1)**
108:9

**properly (5)**
22:16,17;77:17;
109:6;114:19

**properties (9)**
30:12;50:6;165:7,9;
166:9,10,13,15;169:5

**properties' (1)**
176:7

**property (11)**
79:5;87:14,15;
129:16;137:14;161:2;
167:7;169:1,23,23;
171:20

**proposal (4)**
57:5,13;146:12;
161:9

**proposals (4)**
49:17,18;50:25;
51:23

**propose (1)**
15:16

**proposed (3)**
16:1;17:3;18:4

**proposition (3)**
108:21,22;109:2

**protocol (1)**
109:5

**prove (2)**
20:24;110:1

**provide (1)**
75:17

**provided (33)**
19:4;22:14;26:5;
27:19,20;42:11;43:3,
24;44:6,11;45:1;47:12;
52:11;55:25;56:1,9,11;
59:8;63:24;66:11,15;
67:2;70:6;71:12;72:23;
76:4;80:5;95:6,14;
100:18;126:13;129:9;
173:12

**provides (1)**
110:24

**proving (1)**
109:8

**public (1)**
14:19

**pull (6)**

119:22;128:24;
133:10;157:4;165:1;
166:23
**pulled (1)**
167:8
**purchase (1)**
129:17
**purchased (3)**
99:21;129:16;156:11
**purpley (1)**
28:2
**purported (2)**
23:9;105:5
**purporting (3)**
53:8;64:9;65:12
**purpose (3)**
30:16;125:9;172:22
**purposes (5)**
5:24;93:23;101:8;
127:4;131:13
**put (16)**
13:6;22:9;34:3;39:6;
40:22;55:22;83:2;
88:13;121:22;131:22;
153:2;157:15;169:20,
22;170:2;171:13
**puts (1)**
124:5
**puzzle (1)**
54:9
**puzzling (1)**
36:4

## Q

**qualified (2)**
15:13;93:1
**quality (1)**
28:12
**quantified (1)**
91:23
**quantity (1)**
151:13
**questionable (2)**
25:8;106:21
**quick (2)**
144:3;177:6
**QuickBook (2)**
63:23;95:12
**QuickBooks (75)**
19:4,4;22:10;33:23;
36:10;42:23;43:4,6;
44:6,17;45:22;46:8,15;
47:10;48:4,4;50:24;
54:25;58:7;59:6,7;
60:11;61:9,11,19;64:1,
1;67:1;70:6,9;83:24;
95:9,19,22,25;96:2,7,9,
11;97:1;100:20,21,25;
101:1,7,8,20,21;
103:20;110:13;111:23,
25;112:4,9,13,21;
113:1,7;115:2;119:14;

120:7;124:13,22;
137:15;146:6;150:6;
152:22;158:20;159:13;
171:13,21;173:9;
174:6,7;176:7
**quickly (1)**
161:12
**Quite (1)**
142:9
**quotation (1)**
101:6
**quote (1)**
175:8
**quotes (1)**
37:13

## R

**raise (6)**
7:17;11:23;13:5;
35:3;109:22;164:17
**raised (7)**
86:1;88:10;102:16;
103:22;105:11;172:6,
10
**raises (4)**
57:15;66:14;73:4;
111:20
**raising (4)**
86:21;109:23,24;
146:2
**ran (3)**
46:21;60:7,15
**randomly (1)**
169:13
**rare (1)**
29:7
**re (2)**
21:16;166:19
**reach (8)**
29:10;66:17;71:16;
75:23;76:12;80:6,21;
81:14
**reached (1)**
74:20
**reaching (1)**
75:11
**read (19)**
30:1;34:10;42:5;
96:24;114:15,19;
117:9;126:12,21;
129:11,15,20;132:2;
133:11;154:20,20;
173:16;177:22,24
**reading (1)**
130:23
**ready (1)**
79:7
**real (2)**
52:21;167:9
**reality (1)**
107:12
**really (12)**

9:11,23;24:6;30:13;
72:21;82:9;90:22;97:8;
100:16;110:21;121:2;
124:10
**realm (1)**
111:14
**reason (11)**
24:6;30:14;31:9;
35:5;62:15;68:8;69:11;
74:24;106:6;137:6,8
**reasonable (1)**
149:11
**reasons (2)**
41:19;111:3
**recall (29)**
5:4;9:25;32:19,22;
87:15;95:10;97:2;
102:23;103:17;113:16;
114:2;115:9,13;122:2,
22;128:25;129:23;
132:10,12;133:6;
154:10,14;155:9;
157:17,18,18;160:19;
161:13;165:7
**recalling (2)**
129:24;132:14
**receive (1)**
116:9
**received (1)**
5:3
**recess (2)**
78:25;156:21
**reclassification (2)**
117:24;118:8
**reclassifications (1)**
118:9
**reclassified (1)**
117:21
**reclassifies (1)**
118:4
**recognize (6)**
103:1;109:17;112:8,
25;152:21;165:9
**recollection (6)**
9:22;10:6;11:9,11;
129:19;138:17
**reconcile (2)**
21:17;111:11
**reconciliation (3)**
110:12;178:11,19
**reconciliations (2)**
110:8;111:16
**reconsideration (1)**
12:3
**record (7)**
4:13;13:6;39:25;
79:1,2;156:22,23
**recorded (6)**
20:25;26:13;47:13,
16;177:1,9
**recording (1)**
20:3
**records (24)**

26:17;37:15;40:1;
41:23;42:10;43:11;
82:15;92:13;95:7,8;
96:17;97:17;120:6,10;
121:8,8,9,19;138:23;
139:1;148:6;174:15;
175:15;176:15
**recount (1)**
175:5
**recounting (1)**
26:3
**recreate (2)**
77:17;108:2
**RECROSS-EXAMINATION (1)**
177:19
**redacted (2)**
164:10,21
**redirect (4)**
143:17;144:1;
170:11,16
**reduced (1)**
171:24
**refer (6)**
7:4;10:19;33:18;
36:17;66:16;87:7
**reference (2)**
42:9;46:13
**referred (1)**
43:10
**referring (6)**
5:9;8:10;43:12;
125:24;159:23;167:1
**refers (1)**
51:11
**reflected (3)**
38:23;107:12;137:14
**refresh (8)**
11:9,11;33:1;47:17;
58:5;129:18;138:17;
172:18
**refreshed (2)**
10:6;151:15
**refreshment (1)**
9:22
**refute (1)**
86:12
**regard (9)**
22:19,22;25:15;
32:13;38:1;44:7;49:15;
55:22;57:25
**regarding (2)**
58:12;66:24
**regulations (3)**
109:25;111:2,2
**reimbursement (1)**
176:6
**relate (2)**
25:10;95:7
**related (5)**
26:7;162:6,9,24,24
**relating (1)**
94:23
**relationship (2)**

98:16;155:25
**relative (2)**
166:10;167:21
**relatively (1)**
131:12
**relevance (1)**
73:22
**relevant (1)**
11:21
**reliability (9)**
25:13;74:20;76:3;
82:13;111:22;175:18;
176:2,16;177:12
**reliable (8)**
22:3;25:6;52:23;
77:19;82:17;83:13;
168:23;177:17
**reliably (1)**
149:25
**relied (2)**
8:20,23
**rely (3)**
11:2,4,5
**relying (2)**
100:25;101:10
**remark (1)**
30:17
**remember (22)**
14:7;36:15;37:24;
43:1;79:13;113:21;
115:4,5,16;129:7,20;
130:9;162:10;164:9;
167:22;171:9;172:1;
173:4,18;174:10,22;
176:20
**remembering (1)**
121:3
**rendering (1)**
94:5
**renew (1)**
53:6
**renewal (1)**
52:1
**repeat (3)**
130:16;156:8;175:8
**repeated (2)**
47:1;83:18
**rephrase (5)**
26:13;80:15;104:15;
125:15;166:12
**replaced (1)**
48:14
**report (84)**
5:1;7:4,7,9,12;8:10,
14,15;9:10,23;10:13,
14,11;22:14;6;17:8,14,
15,16;26:2,24;32:15,
16,24;33:2,2,18;36:17;
43:2;44:12;47:18;51:3,
12;60:7,10;63:20;
66:16;67:18;70:5;
71:23;73:23;76:22;
77:15;82:5;83:6;93:4;

109:14;113:15,17;
114:9;121:18,22,24;
122:1,4;126:11;127:6;
128:24;131:22;132:4;
133:5,9,13;134:17;
137:4;138:24;139:7;
141:25;142:12;143:15;
144:10,11;145:3;
150:1;157:4,5;162:1;
165:2;166:18;172:7,9;
173:7;174:19;175:3,
19;176:19
**reports (4)**
26:4;63:23;64:2;
96:1
**represent (2)**
130:10;159:2
**representation (2)**
65:6;71:15
**request (2)**
41:23;102:13
**requesting (1)**
33:7
**require (2)**
21:13;112:9
**research (4)**
104:24;105:1,19,20
**resolve (1)**
99:2
**respect (5)**
11:18;113:1;146:10;
166:13;167:4
**response (2)**
6:24;99:19
**rest (2)**
16:19;179:14
**restate (2)**
11:25;41:20
**restaurant (1)**
135:20
**restroom (1)**
156:14
**restructurings (1)**
15:7
**result (1)**
46:16
**results (2)**
22:21;26:8
**resume (1)**
79:7
**RESUMED (2)**
79:9;157:7
**retained (2)**
13:17;105:7
**return (2)**
125:18;128:22
**returned (1)**
99:16
**returns (6)**
19:5;126:5;128:4,10,
13,17
**revenue (2)**
110:1;122:23

**review (16)**
13:17;19:1,2,7,11;
22:22;42:22;55:3;
57:25;66:10;71:12;
100:8;101:19;117:13;
121:15;174:6
**reviewed (18)**
19:3,3;22:7,9,14;
27:17;43:2;52:10;58:3;
70:6;74:19;80:20;
100:22;101:2;102:17;
121:18;132:7;174:8
**reviewing (6)**
12:17;22:25;24:8;
28:9;32:22;175:15
**reviews (1)**
154:20
**revised (2)**
41:22;101:20
**Rice (1)**
14:11
**right (151)**
4:23;5:1;6:6,14,23,
25;7:17,20;8:5,7;9:15;
10:8,9,10,15;11:14;
13:10;14:7,13,17,25;
15:24;16:21;17:11;
18:3,3,12,16,18;21:1;
26:12,17;27:15;28:1,5;
29:4,16;31:15;33:8,25;
35:10,20,24;37:2;
38:14,14,24;42:7;44:3,
4,14;45:20;47:20,24;
48:17,21;49:8,11;50:4,
17;51:24;52:5,9;54:10;
55:16;56:15;57:3,18,
21;59:4,25;62:11;67:7;
68:1;69:8;70:3;71:25;
77:4,7,12;78:21;80:2;
81:9;84:14,17,19,24;
85:3,6,12,16;86:3;
88:11;89:3,9;90:4;
91:2;95:14,15;97:13;
99:5;100:7;108:8;
109:10;117:24;119:21;
123:12;124:10;125:24;
126:5;127:8;128:15;
130:9;132:22,25;
133:14;134:25;135:9,
18;136:12,20;139:7;
140:6,9;142:6;143:21,
25;144:4,8;148:25;
153:25;159:24;163:23;
170:3;171:18;172:4,
16,21;173:2,6,14;
174:14,15;175:1,3;
177:6,8;178:25,25;
179:10,11
**right-hand (1)**
30:4
**rights (1)**
12:22
**rise (4)**

78:25;79:3;156:21,
24
**risk (1)**
21:23
**risks (1)**
21:20
**Road (13)**
28:6;30:25;37:24;
38:2;41:24;50:15,15;
84:14,23;87:14,15;
138:13,14
**Rockland (1)**
44:21
**role (1)**
54:17
**rolled (1)**
48:16
**roofing (1)**
72:7
**room (1)**
21:13
**rough (1)**
37:20
**roughly (2)**
14:7;15:3
**rule (6)**
6:20,20,22;9:20;
10:9;174:2
**rules (2)**
75:13;128:16
**ruling (1)**
16:11
**run (5)**
20:20;96:2;101:17;
102:4;122:19
**run-of-the-mill (1)**
72:13
**Russia (1)**
113:22

## S

**safe (1)**
49:10
**sales (6)**
65:2,2,6,7;177:1,9
**same (57)**
4:22;15:8;20:15,16;
22:18,20;24:5;27:16;
29:6;30:5;34:25;45:17;
49:23,25;50:4;53:11,
12,12;55:25;56:14,24;
57:1;58:19;59:20,24;
61:10;63:10;67:5,11,
13,15;74:24;92:10;
100:11;120:20;136:9,
20,21;151:25;152:7;
157:16;158:3,17,18;
159:25;161:1,1,7,7,8;
165:13,18;166:10;
168:3;169:7,9;174:16
**sample (2)**
19:15;28:8

**saw (14)**
32:5;43:10;45:4,17,
18;69:4;114:5;133:15,
15;134:21;150:24;
162:10,11,11
**saying (15)**
8:25;11:19;49:22;
54:11;61:9;62:1;89:21;
101:19;119:19;134:12;
136:24;145:4;147:15;
149:25;176:12
**scenario (1)**
171:23
**schedule (1)**
5:14
**scope (1)**
5:11
**screen (1)**
28:1;34:3;66:24;
133:2
**scroll (5)**
133:23;137:22;
139:21,23;162:2;163:4
**Sean (1)**
4:14
**seated (4)**
4:3;7:19;79:4;
156:25
**second (7)**
7:15;27:22;40:22;
45:18;91:4;104:23;
134:15
**seconds (1)**
164:23
**section (1)**
29:19
**seeing (2)**
53:3;141:4
**seeking (1)**
8:14
**seemed (2)**
24:15;53:4
**seems (1)**
98:22
**sees (1)**
178:15
**segregated (2)**
123:16,22
**sells (1)**
64:15
**send (1)**
155:17
**sending (1)**
112:20
**sense (13)**
8:23;52:16,25;53:24,
25;54:21;58:20;86:20;
90:10;107:11;123:17,
19;144:11
**sent (1)**
112:24
**separate (8)**
87:18;120:19;123:7,

17;125:10,21;157:11;
176:10
**separately (5)**
30:13;137:1;141:15;
142:7;146:15
**September (4)**
37:21;42:7;55:9;
58:10
**sequence (19)**
23:12,14,18,20,25;
24:1,2,7;34:8,13,18;
35:2;39:12;152:18;
153:10,16;161:13,22;
163:9
**sequences (1)**
153:20
**sequential (1)**
102:22
**sequentially (2)**
20:6;66:1
**series (1)**
34:6
**serious (2)**
76:3;126:14
**service (2)**
109:6;135:21
**services (1)**
167:9
**session (3)**
4:2;79:3;156:24
**set (18)**
19:20;20:2,13;27:13;
45:17,18;89:7;106:18,
19,24;107:3,5,9,9;
111:25;112:3,19;
126:17
**sets (3)**
29:5;95:12;113:1
**seven (1)**
166:15
**several (1)**
173:23
**severely (1)**
77:16
**shaded (1)**
29:25
**shared (1)**
56:2
**sharing (1)**
56:8
**ship (2)**
40:12,14
**shipped (1)**
86:10
**shocking (1)**
149:15
**short (2)**
78:14;156:16
**shortly (1)**
32:19
**show (12)**
7:13;10:6,7,21;
22:10;26:18;39:9;

Case 16-01120    Doc 344    Filed 06/04/19    Entered 06/04/19 13:06:36    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 198 of 203

May 10, 2019

49:22;60:14;62:16;
172:17;175:22
**showed (4)**
61:17;62:15;121:25;
145:18
**showing (13)**
28:6;29:23;30:3;
34:23;43:20,21;48:21;
53:10;56:13,23;63:2;
103:20;142:4
**shown (1)**
9:25
**shows (7)**
44:13;57:1;58:25;
60:12;61:5;135:16;
143:12
**sic (11)**
42:2;43:7,21;66:21,
24;67:16;123:14;
125:10;142:20,24;
147:16
**sick (1)**
82:25
**side (1)**
73:14
**side-by-side (1)**
166:14
**sign (1)**
128:22
**signature (1)**
21:14
**significance (1)**
61:4
**significant (22)**
19:12;29:24;30:9;
32:6,24;33:11;35:1;
36:3;55:12;56:7;57:12;
58:12;61:3;68:15;71:4,
9;83:9,15;85:20;
126:18;153:19;176:8
**significantly (7)**
37:22;44:19;54:23;
72:8;84:5;131:19;
153:20
**similar (4)**
45:12;48:3,23;82:20
**simpler (1)**
64:8
**simply (4)**
75:4;145:7;161:7;
175:8
**single-owner (1)**
125:6
**site (1)**
52:21
**sitting (1)**
58:14
**situation (2)**
123:12;154:1
**situations (1)**
73:22
**six (4)**
55:14;65:23,25;

111:11
**six- (1)**
66:7
**size (5)**
28:8;53:12;102:19;
167:15,16
**sizes (3)**
165:12,14;167:22
**skill (2)**
96:8;113:1
**skinny (1)**
158:4
**skip (1)**
145:1
**slashes (1)**
39:18
**slide (64)**
30:21;31:18,21,25;
32:2,3,5;34:5,13,16,18;
35:7,12,14;39:6,7;40:2,
5;41:6,9,14;43:18,20,
22;44:22;45:9,11;46:2,
5;47:22,25;48:19,22;
49:9,12;50:7,14;55:17,
22;56:17,18;57:9,11;
58:23,25;59:17,22;
60:3,6;62:20,22;64:4,
7;66:20,23;67:10;
68:12,23;69:14,17;
70:17;71:2,4,22
**slides (2)**
32:11;34:4
**slightly (1)**
136:21
**sloppiness (1)**
72:13
**sloppy (1)**
114:11
**small (16)**
42:14,17,20,20;
64:15;72:17;86:8;93:9,
13;105:19,20;109:18;
124:3;153:24;154:2;
161:6
**smaller (1)**
131:19
**smartest (1)**
13:8
**snatch (1)**
11:7
**Sneeze (1)**
82:22
**snips (1)**
39:8
**sold (1)**
110:22
**somebody (15)**
21:14,24;31:2;41:4;
46:8;71:13;74:5;
108:21;114:20,22;
122:6;128:7;155:5;
159:19;161:18
**somebody's (1)**

70:23
**somehow (5)**
54:5;97:20;106:20;
108:6;118:12
**someone (1)**
34:22
**sometime (2)**
47:16;161:23
**Sometimes (10)**
24:19;117:4;120:23;
122:9;135:16;153:21,
22;155:19;160:3;
161:23
**somewhat (2)**
97:23;99:7
**Somewhere (4)**
15:11;73:10;136:16;
138:22
**soon (1)**
78:8
**sorry (22)**
15:18;16:5;17:19;
28:11;38:19;39:3;59:2;
61:9;65:17,22;69:13;
70:12;119:17,20;
126:11;132:3;133:1;
139:23;156:14;157:3;
170:13;175:20
**sort (9)**
10:21;24:11;88:23;
103:2;107:25;112:10;
118:12;150:25;163:20
**sorts (1)**
96:1
**sound (1)**
124:8
**Sounded (1)**
57:19
**sounding (7)**
46:22,24;47:2;50:9;
53:17,21;57:17
**sounds (1)**
134:24
**source (3)**
72:23;122:23;130:8
**sources (1)**
56:4
**space (1)**
41:3
**speak (4)**
19:21;105:8,9;
109:19
**SPEAKER (3)**
4:4;119:15,18
**speaking (1)**
95:8
**specialist (1)**
64:25
**specialization (1)**
14:16
**Specialties (6)**
58:24;59:5;60:16;
63:3;133:6;135:8

**specific (2)**
26:16;147:3
**specifically (3)**
26:7;43:1;129:2
**specifics (1)**
132:14
**specified (1)**
166:7
**spectrum (1)**
74:13
**speculation (2)**
154:3,4
**spelled (5)**
39:13,13,15,19;45:4
**spent (12)**
84:1,4;95:9;108:17;
114:22;123:2;130:12;
131:1;144:25;148:12;
172:14,15
**split (1)**
60:1
**spoken (2)**
98:10;155:5
**spread (4)**
64:12;66:5,6;169:13
**sprinkled (1)**
167:17
**square (11)**
84:9,10,17,19,21,23;
85:6,8,10;86:20;167:5
**staff (1)**
90:3
**stamped (2)**
30:12;34:24
**stand (3)**
5:4;10:11;54:13
**standard (3)**
19:20;20:13;27:14
**standardized (1)**
23:11
**standards (4)**
75:24;79:12,16,17
**standing (3)**
12:12,14,22
**staple (2)**
56:25;57:1
**start (4)**
30:15;40:8;71:1;
171:1
**starting (1)**
107:14
**startling (1)**
54:3
**starts (1)**
72:21
**state (4)**
4:12;13:14;109:25;
126:12
**stated (4)**
45:25;54:22;82:9;
100:3
**statement (14)**
77:8;111:7;141:10;

142:4,16;143:1,5;
144:12,12,16,17;
147:12;153:8;172:23
**statements (4)**
21:17;137:20;153:6,
11
**statistically (1)**
127:4
**statistics (1)**
167:12
**stay (1)**
83:17
**step (3)**
106:6,11;146:3
**stick (1)**
105:3
**still (16)**
5:23;6:11;18:6;
75:22;91:15;111:20;
115:25;116:1;127:23;
132:3,24;141:21;
147:13,14;150:18;
172:23
**stipulated (1)**
87:17
**Stonum (1)**
136:3
**stop (3)**
33:6;127:6;138:1
**story (2)**
106:17;160:10
**straight (2)**
68:5;144:5
**strange (2)**
35:5;36:10
**stray (1)**
107:14
**strays (1)**
12:7
**Street (1)**
162:16
**strike (8)**
53:7;64:21;65:11;
91:24;104:5;158:22;
160:14;171:21
**striking (2)**
168:15,18
**strip (1)**
31:3
**strokes (1)**
21:1
**strong (1)**
168:22
**struck (2)**
152:19;175:6
**studies (1)**
14:12
**stuff (1)**
72:13
**sub (1)**
125:17
**subcontractor (3)**
154:7;155:14;166:5

Case 16-01120    Doc 344    Filed 06/04/19    Entered 06/04/19 13:06:36    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 199 of 203

May 10, 2019

**subcontractors (6)**
94:20,23;98:11,17;
109:18;119:3
**subcontractor's (1)**
98:7
**subject (1)**
88:8
**submit (1)**
11:6
**submitted (4)**
49:19;68:4;74:21;
177:13
**subpoenaed (2)**
43:24;55:23
**substance (2)**
116:19,24
**Sucks (1)**
175:10
**sudden (1)**
34:19
**suffering (1)**
100:16
**sufficiently (1)**
20:24
**suggest (2)**
10:23;94:16
**suggesting (8)**
79:23;105:14;
118:11;126:23,25;
127:2,3,12
**suggestion (1)**
174:9
**sum (2)**
94:19;146:12
**summarized (1)**
26:6
**summary (1)**
158:20
**Super (1)**
16:15
**supplement (4)**
8:14,25;9:3;10:12
**supplier (1)**
110:24
**supply (1)**
110:24
**supplying (2)**
109:7,7
**support (24)**
5:7,21,24;24:23;
25:4,5,15,17;33:12;
59:15;62:4;66:11;68:3;
74:21;75:11;82:9,10;
100:5;101:21;126:13;
147:24;173:11;174:11;
177:13
**supportable (1)**
20:22
**supported (8)**
25:9;67:24;77:19;
148:6;149:13,17,19,25
**supporting (1)**
63:23

**supports (2)**
76:7,14
**supposed (3)**
42:1;160:14;176:10
**supposedly (5)**
25:12;41:20;42:18;
46:19;57:5
**Sure (28)**
19:22;21:17;57:16;
71:7;78:4,4;83:17;
86:17;96:17;100:14;
104:16;109:4;114:19;
116:2,6;125:16;
130:17;131:15;136:15,
24,25;137:13;138:21;
139:25;147:2;156:9;
166:13;178:12
**surprise (3)**
97:6;162:15;171:7
**surprises (1)**
97:8
**surprising (2)**
97:12;118:10
**suspect (1)**
137:3
**suspicion (4)**
35:3;71:13;108:1;
164:17
**suspicious (4)**
106:5;163:8;164:12;
169:4
**sustain (4)**
10:5;78:1;80:13,25
**swear (1)**
7:16
**switched (1)**
28:22
**SWORN (1)**
7:18
**symbols (1)**
28:24
**system (5)**
20:20,21;82:16;98:5;
161:8
**Systems (3)**
64:5;65:4;73:15
**Systems' (1)**
64:24

**T**

**tab (21)**
87:24;134:18;135:1;
139:16;140:3,8,11,23;
141:8;142:3,13;150:2;
151:4;157:23,24,25;
159:8,12;171:3,4,11
**tabs (1)**
140:6
**tabulation (1)**
83:7
**tagged (1)**
26:7

**talk (7)**
5:5;16:11;19:18;
65:1;132:4;139:7;
162:5
**talked (4)**
66:6;90:15;152:18;
161:12
**talking (9)**
7:22;8:3;25:1;73:24;
95:9;108:14;143:10;
163:7;171:12
**tallied (1)**
84:13
**tally (1)**
122:19
**tallying (1)**
85:15
**TAMPOSI (2)**
4:16,17
**Tatiana (3)**
4:8,19;138:8
**tax (14)**
19:5;111:2;116:15,
17,18,20;125:16,18;
126:4,5;128:4,10,13,17
**taxes (3)**
116:6;117:1,17
**Technically (1)**
49:18
**telephone (3)**
28:21,25,25
**television (7)**
106:18,19,24;107:3,
5,9,9
**telling (1)**
56:7
**tells (1)**
97:14
**template (9)**
27:14;29:5,6,6;32:6,
7;40:11;70:21;71:8
**temporary (3)**
163:20;164:8,14
**tempting (1)**
16:16
**ten (4)**
5:11;156:6,7;170:22
**tend (8)**
19:19;27:10,11,16;
31:16;32:6;35:2;72:15
**tenets (2)**
20:4;27:9
**ten-year (1)**
6:3
**term (1)**
168:19
**terms (6)**
21:20;22:24;47:7;
111:23;141:23;155:8
**testified (11)**
33:3,6;82:14;96:15,
25;129:9;132:10;
150:14;160:8;165:5;

173:17
**testify (15)**
11:20,21;15:13;
51:12,17,19;53:8,15;
54:1;75:2,14;76:19,21;
145:2;146:10
**testifying (2)**
9:23;77:3
**testimonies (1)**
7:14
**testimony (34)**
5:5;12:6,23;22:8;
26:19;27:1;32:20,23;
52:2;74:4;75:5,16;
82:8;83:12;92:21,22;
95:10;96:24;98:23;
101:25;102:10,23;
129:11;132:13,18;
150:11,12;154:14;
155:9;160:11;161:14;
164:18;171:5,19
**th (1)**
39:20
**Thanks (1)**
159:10
**theme (1)**
42:16
**theory (1)**
10:22
**there'll (1)**
106:9
**Thinking (3)**
22:21;81:3;106:16
**third (4)**
45:12;71:5;107:8;
163:24
**thirteen-inch (1)**
107:10
**thirty (4)**
15:11;68:21;73:10;
164:22
**thirty-six (1)**
155:16
**though (13)**
9:24;17:23;27:13;
33:24;37:5;38:20;
47:14;49:19;50:16;
69:1;115:17;151:1;
156:4
**thought (6)**
18:24;32:23;88:7;
113:22;120:2;171:18
**thousand (1)**
43:7
**thrashing (1)**
82:5
**thread (2)**
54:15;65:17
**threatening (1)**
42:19
**three (15)**
44:18;49:20;57:23;
66:4;85:1;89:14;94:11;

131:23;161:8,9;
166:14;167:22;170:22;
177:2,3
**three- (1)**
66:3
**three-month (1)**
66:8
**Throughout (2)**
40:15;155:1
**tick (1)**
136:14
**ticked (1)**
136:17
**tie (4)**
110:14;148:2;176:6;
178:16
**tied (2)**
133:16;172:4
**ties (1)**
59:13;125:12,13;
178:13
**timely (1)**
20:22
**times (19)**
15:12;19:14;23:13;
24:1,2;39:13,15;44:18;
57:23;61:17;74:14;
93:25;131:24;141:18;
161:8,9;167:22;
168:11,12
**timing (2)**
47:7;97:8
**titled (1)**
120:8
**titles (1)**
40:19
**titling (1)**
41:13
**today (4)**
13:16;78:15;179:5,
14
**together (2)**
22:9;37:7
**told (11)**
12:23;63:11;76:10;
97:6;99:19;112:3,6,21;
132:11;160:9,13
**tonight (1)**
90:11
**took (5)**
31:3;39:8;132:15;
149:9;174:17
**tool (2)**
95:20,25
**tools (1)**
96:4
**top (17)**
40:16,17,25;46:10,
12;48:7,23;59:8,21;
64:10;65:21,22;67:1;
69:20;71:9;161:10;
167:8
**total (17)**

Case 16-01120    Doc 344    Filed 06/04/19    Entered 06/04/19 13:06:36    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 200 of 203
May 10, 2019

26:8;42:1;44:18;
50:24;64:2;85:5;94:19;
104:8;130:13;131:1;
133:15;139:12;144:25;
148:10;149:9;166:21;
177:1
**totaled (2)**
104:20;177:3
**totaling (1)**
105:14
**totally (1)**
39:23
**toward (1)**
17:12
**towards (1)**
29:2
**Town (7)**
36:5;37:15,19;55:3;
57:25;58:3,9
**trace (1)**
176:13
**traced (1)**
146:6
**traces (1)**
14:9
**track (7)**
20:6,11;22:12;142:4,
6;144:17;156:10
**tracked (3)**
142:6;153:12;156:5
**trade (1)**
135:17
**trades (1)**
72:10
**tradesman (1)**
39:14
**tradesmen (2)**
72:15,15
**trail (11)**
42:22;43:3;60:7,10,
11,14,15,18;62:15;
102:4;121:12
**trails (3)**
22:10;60:21;101:18
**train (1)**
120:2
**trained (1)**
113:22
**training (4)**
29:8;74:18;112:10;
115:2
**transaction (4)**
25:12;110:21,23;
111:5
**transactions (8)**
24:9,11,13;64:17;
115:25;124:9;176:9,9
**transferred (1)**
124:13
**transfers (1)**
126:2
**travel (1)**
92:24

**trial (5)**
4:6,11;12:16;16:19;
163:12
**tried (4)**
52:19,24;146:7;
149:13
**trier (1)**
79:21
**true (4)**
77:11;124:15;
164:11;169:9
**Trust (2)**
44:21;92:13
**truthfulness (1)**
74:25
**try (6)**
9:12;37:7;47:3;
58:19;86:5;171:14
**trying (14)**
28:8;32:18;52:13;
67:11;77:21;78:15;
115:4;123:14;124:23;
129:7;159:19;160:1;
162:10;175:10
**Tuesday (3)**
64:14,17,25
**turn (5)**
82:20;132:25;136:1;
150:1;174:19
**turnaround (1)**
15:6
**turns (1)**
94:2
**TV (4)**
66:10;142:12,13;
172:1
**Twenty (3)**
15:14;73:25;126:15
**twenty-five (1)**
15:14
**twenty-odd (1)**
65:9
**Twenty-seven (1)**
36:22
**Twenty-two (1)**
73:7
**twice (7)**
34:21;35:4;68:18;
105:15;157:11;164:11,
13
**two (86)**
5:10;15:8;21:2,4;
22:8;27:20;28:12;29:9;
30:24;36:18;38:3,14;
43:5;50:8,24;52:12,21;
53:20;56:4;58:8,18;
59:25;60:2,21;63:13;
64:10,11;65:20;66:4;
68:18,25;69:18,20;
70:9;80:1;85:20,23;
87:13,18,19;90:16,18;
92:11;93:9,13;94:11,
20,24;95:12;97:14;

103:13,24;104:17,21;
114:9;120:7;126:1;
140:13,19;141:2,13,18;
142:4,5,16;157:11,14,
15;158:14,16,24;
159:25;160:21,25;
163:7,9;164:6,7,7,7,15;
165:13,13;166:14;
170:22;176:10
**tying (1)**
178:18
**type (4)**
41:11,11;58:22;93:9
**types (4)**
21:2,4;117:16;168:5
**typical (3)**
57:14;115:23;124:7
**typically (11)**
29:5;39:14;42:20;
56:3;71:10;117:2;
141:24;153:24;159:19;
167:13;178:9

**U**

**ultimate (7)**
75:2,9,15;76:21,24;
92:12;131:18
**ultimately (4)**
92:4;110:21;126:3;
149:3
**Um-hum (2)**
111:4;117:19
**unable (3)**
92:8;99:15;101:25
**unaudited (3)**
101:1,6,7
**uncommon (4)**
72:16;155:14;
161:17;178:4
**under (7)**
5:23;27:4;75:13,25;
106:9;128:15;171:23
**undercharged (1)**
149:24
**underlying (1)**
94:6
**underpaid (1)**
42:18
**understood (28)**
5:6;90:6;95:8;
100:20;101:8;104:3;
105:4;111:24;112:1;
116:20;117:5,11,21;
119:2,8,13;120:4,9;
121:6;124:12;128:6;
129:8,12;146:11,14,18;
148:22;163:1
**unexpected (4)**
83:8;132:1,20,23
**unfortunately (1)**
22:6
**Unicon (7)**

49:12,15;50:22;55:4,
17;103:13;160:25
**UNIDENTIFIED (3)**
4:4;119:15,18
**unimpeachable (1)**
104:24
**uninnocent (1)**
92:14
**universe (3)**
10:21;126:23;127:3
**University (1)**
14:11
**unless (4)**
65:3;125:12;154:1;
155:25
**unlikely (2)**
99:7,9
**unnecessary (1)**
77:25
**unnumbered (1)**
8:4
**unpaid (2)**
33:16,21
**unreliability (1)**
92:11
**unreliable (1)**
21:24
**untruthful (1)**
6:11
**unusual (6)**
68:20,22;69:10,11;
117:17;168:21
**up (56)**
6:14;7:23;10:11;
12:8;16:12;20:2;21:6;
25:23;26:1;27:13;29:5;
30:4;34:3;39:6;40:5;
49:24;51:6;55:22;
60:14;63:24;66:23;
71:9;78:8;83:2;84:13;
85:15;88:13;94:2;
106:17;111:25;112:3,
19;119:18;124:6;
128:24;133:10;136:15,
22;137:1,18;139:23,
24;143:5;155:15;
157:4,15;162:10;
163:12,14;165:2;
166:23;167:8;171:1;
175:9,16;178:21
**updated (1)**
111:7
**upfront (1)**
33:5
**upgrade (1)**
170:7
**upon (4)**
8:23;30:17;100:25;
101:10
**upper (1)**
31:9
**uppercase (2)**
28:16;32:5

**use (26)**
7:21;16:8;20:5;
23:12;26:21;27:12,13,
22;28:9;30:14;31:14;
32:25;34:7;35:5;40:10;
69:18;88:25;96:1,7;
97:16;101:1,6;103:12;
104:16;122:9;167:10
**used (41)**
5:24;20:20;22:17;
23:7,13,18,20;27:10,
14;28:24;33:12;34:8,
21,22,22;35:4;39:12;
40:19;48:5,13;50:19;
58:7;60:20;61:7,11;
62:6,18;67:4,5;68:18;
70:15,24;86:2;101:21;
130:5;131:25;132:1;
153:20;157:11;164:11,
13
**useful (1)**
107:1
**uses (3)**
29:6;39:24;96:4
**using (16)**
7:6;21:14;32:7;
39:25;58:19;60:19;
66:1;68:16;69:12,23;
70:23,24;71:6,8;75:17;
96:2
**usually (8)**
32:8;50:11;57:22;
70:23;94:2;124:9;
150:11;154:25

**V**

**V& (1)**
58:20
**V&D (8)**
55:18,22;58:1,12,13,
20;59:3,3
**Vadim (4)**
4:8,20;137:21,25
**vague (1)**
80:16
**valid (7)**
19:14;80:5,6,20;
81:1,1;132:24
**validity (2)**
18:25;144:23
**valuation (2)**
14:21;94:2
**valuations (1)**
93:20
**value (6)**
80:12;92:1;93:23;
104:17;105:5;107:12
**variation (1)**
85:20
**variations (1)**
29:7
**varies (1)**

77:8

**various (1)**
25:3

**vendor (9)**
39:25;45:1;55:23,25;
56:9,15;57:3;151:16,
20

**vendors (7)**
27:18;42:17;72:22;
119:3;126:14;153:24;
154:2

**veracity (7)**
18:22;50:21;57:15;
74:21,25;75:16;111:24

**verbally (1)**
33:4

**verified (5)**
63:5,17;97:1;101:3;
149:7

**verify (9)**
52:25;59:12;63:6;
86:5,6;130:6;144:16;
159:5;164:5

**version (5)**
14:5;101:9,13;
159:14;174:18

**versions (1)**
101:14

**versus (1)**
53:9

**vested (1)**
58:21

**victory (1)**
11:8

**view (2)**
10:5;103:9

**void (2)**
41:3,12

**W**

**wack (1)**
176:12

**wait (2)**
38:19;99:2

**walk (2)**
9:11;26:15

**Wallace (1)**
140:1

**wants (3)**
7:13;9:10;73:22

**warn (1)**
16:9

**wasting (1)**
175:10

**water (1)**
170:14

**way (27)**
8:18;10:1;13:8;22:7;
31:12;32:9;35:24;36:3;
39:24;49:25;62:16;
65:1,5;70:22;71:6;
86:12;98:20;99:10,25;

102:13;103:12;118:2;
147:6,12;148:3;154:4;
177:14

**ways (4)**
111:8;113:5;152:23;
153:2

**weak (2)**
24:5;82:12

**website (5)**
68:8;154:12,13,22,
23

**week (2)**
33:7;65:6

**weekend (1)**
179:7

**weekly (3)**
110:15,16;111:7

**weren't (12)**
10:1;25:9;44:11;
87:17;97:16;99:20;
101:17;103:20;112:6;
146:8;147:19;152:2

**What's (25)**
8:7;31:13,22,22;
45:11;46:10,14;48:2,
11;56:7;60:10;61:1,3;
71:4;82:14,18;88:5;
108:13,15;119:7;
128:11;156:4,9;
164:15;178:20

**whatsoever (1)**
108:25

**Whenever (1)**
79:7

**white (2)**
31:3;107:11

**whiteout (2)**
32:8;145:19

**whole (10)**
19:25;34:16;40:5;
54:8;70:22;77:4,12;
126:12;172:22,22

**who's (1)**
39:14

**whose (1)**
94:20

**widgets (2)**
156:6,7

**wife (1)**
120:5

**wildly (1)**
24:2

**willing (1)**
169:20

**wiring (1)**
165:22

**within (5)**
5:22;12:21;33:7;
111:14;169:7

**without (10)**
9:18;20:9;22:2;
51:22,23;52:1;82:10;
98:9;101:24;169:10

**witness (19)**
51:14;61:16,21,25;
62:2,5,15;64:23;65:5;
75:1,4;78:17;81:25;
89:13;143:18;156:14,
18;158:10;179:2

**witnesses (1)**
89:20

**word (16)**
5:18;28:17,19;31:23;
40:22;45:4;50:19;
69:21,22;92:14;97:16;
100:16;128:11;129:14;
131:25;148:25

**words (5)**
92:12;98:25;114:9,
11;155:15

**work (50)**
10:1,12;15:6;18:15;
22:4,18;27:6;33:7;
37:7;46:15;48:4,24;
51:9;52:9;55:4,8;58:1;
74:5,10,19;75:25;
79:12,16;86:11;88:15;
92:2;93:11;98:15,17;
106:12,18;107:25;
108:21;109:1;110:7,
17;115:18;130:14;
145:5,10,11,12;146:4;
147:1;148:9;149:11,
15;167:11;170:3;
174:22

**worked (1)**
155:13

**working (6)**
54:20;95:4;141:23;
153:6;154:2;178:3

**works (3)**
110:2;117:6;118:16

**world (5)**
109:12;110:16,18;
111:6;161:21

**worried (1)**
119:22

**worry (1)**
12:16

**worst (2)**
23:22,23

**worth (1)**
149:14

**wrap (1)**
78:8

**write (6)**
27:11;73:3;141:24;
153:2,3;161:9

**writing (1)**
161:8

**written (8)**
20:7;39:18,20,23;
50:20;57:5;153:13,22

**wrong (12)**
27:15;31:15;43:15;
45:5;102:7,9,11;

121:21;125:7;131:25;
134:9;140:9

**Y**

**yard (2)**
167:13,17

**yards (1)**
167:5

**Yarmouth (7)**
28:6;37:24;38:2;
50:15;84:14,23;85:25

**year (18)**
14:5;35:18,19;36:2;
97:11,14;115:16,20,24;
116:14,21;117:1,12,12;
118:7;128:4;175:8;
178:12

**year-end (4)**
110:8,12;117:3,20

**years (22)**
5:11;15:4;20:12;
23:15;24:3;58:15;65:9;
68:21;73:5,12,25;74:9;
94:11;95:17;98:13,19;
114:22;126:15;129:20;
155:14;173:23;175:14

**Yelp (1)**
154:20

**Yep (8)**
17:10;47:24;74:7;
97:24;111:1;141:1,9;
142:11

**yesterday (3)**
5:2;6:8;90:16

**Z**

**zero (1)**
108:25

**Zillow (2)**
167:9,13

**0**

**01006 (1)**
46:13

**1**

**1 (11)**
13:19;17:4;18:2,4;
87:5,5,13;88:6;89:24;
90:8;163:15

**1,017,000 (1)**
131:12

**1,017,964.73 (2)**
130:13;131:1

**1,074,000 (2)**
130:1,6

**1,074,956 (2)**
131:19,23

**1,074,956.13 (1)**

131:5

**1,159.30 (1)**
140:17

**1.074 (1)**
130:11

**1.7 (3)**
129:18;131:10,15

**1:04 (1)**
156:23

**1:30 (2)**
90:23;144:5

**1:34 (1)**
179:18

**10 (6)**
6:17,18;50:15;84:13,
21;85:21

**10,000 (1)**
136:25

**10,295 (3)**
136:12,20;139:5

**10:14 (1)**
36:25

**10:41 (1)**
37:1

**1020 (1)**
30:2

**1057 (1)**
33:23

**1076 (2)**
157:11;160:6

**108 (3)**
25:20,20;26:2

**1085 (1)**
151:4

**11 (1)**
9:13

**11,360 (1)**
36:25

**11:01 (1)**
79:1

**11:26 (1)**
79:2

**1120 (1)**
70:13

**1158 (2)**
34:9;38:3

**1164 (1)**
34:11

**1165 (4)**
35:16,17;37:4;38:5

**1166 (2)**
37:4;38:6

**11th (1)**
70:2

**12:59 (1)**
156:22

**120,000 (1)**
49:1

**13,950 (1)**
58:9

**1309 (4)**
163:8,10,18;164:2

**132 (2)**

64:12;66:7
**14,000 (1)**
  61:6
**14,130 (3)**
  59:11,15,23
**1403 (1)**
  43:13
**1405 (3)**
  41:24;42:8,12
**1406 (1)**
  43:13
**143 (1)**
  162:16
**14th (4)**
  35:18;47:20;49:6,7
**15 (2)**
  35:22;122:4
**15,084.54 (1)**
  140:15
**15,705 (1)**
  135:8
**15-13881 (1)**
  4:5
**15th (1)**
  72:6
**16,243.84 (2)**
  139:13;140:20
**160 (2)**
  34:20,22
**16-1120 (1)**
  4:10
**164 (5)**
  134:10,11,12;
  137:18,20
**166 (5)**
  13:20;16:2;17:5,7;
  25:21
**167 (1)**
  4:7
**17 (3)**
  114:13;130:18;
  173:21
**17,965 (2)**
  133:14;136:19
**171,933 (1)**
  132:5
**174 (1)**
  134:7
**175 (3)**
  159:8,12;171:3
**178,000 (1)**
  85:25
**18,500 (1)**
  43:9
**19,670 (3)**
  36:19;37:1;38:23
**193.99 (1)**
  163:18
**1978 (1)**
  14:11
**1981 (1)**
  14:15
**1989 (2)**

68:10,16
**1st (2)**
  153:3,4

---

## 2

**2 (6)**
  87:5,13;88:6;91:6;
  134:19;135:1
**2,092,000 (1)**
  131:18
**2,092,920.88 (1)**
  129:23
**2.092- (1)**
  130:1
**2.4 (1)**
  129:17
**20,000 (2)**
  38:22;45:24
**200 (4)**
  51:23;52:22;54:6;
  104:25
**200-amp (1)**
  53:9
**2011 (1)**
  5:8
**2013 (4)**
  57:5,8;112:4;129:17
**2014 (24)**
  34:10;37:5,20,21;
  38:20;44:19;45:20,24;
  46:19;47:15;48:15,25;
  55:9,9;58:10;68:14;
  69:4;70:2,24,25;
  104:20;130:12;131:1,
  11
**2015 (29)**
  34:11,19;35:19,24;
  36:2,24;37:1,2,6;
  38:21;42:7;43:9;47:14,
  16,20;49:3;55:11;58:8;
  65:22;70:25;71:24;
  72:7;97:6,7;157:17;
  160:5;171:16,20,22
**2016 (3)**
  93:6;94:15;102:13
**2018 (2)**
  14:6;93:4
**20th (1)**
  45:24
**21 (1)**
  45:20
**216 (2)**
  35:16,23
**217 (1)**
  35:16
**22nd (3)**
  64:12,14;171:20
**23,950 (1)**
  58:9
**24 (1)**
  28:5
**249,000 (1)**

86:19
**24th (1)**
  70:13
**250,000 (1)**
  85:21
**25th (1)**
  55:9
**26,936 (1)**
  67:4
**26,938.92 (1)**
  139:10
**265 (1)**
  136:2
**266 (3)**
  134:8;135:1,6
**26th (1)**
  37:21
**27 (1)**
  158:19
**270,000 (1)**
  85:21
**273 (1)**
  66:8
**273-invoice (1)**
  66:5
**28 (1)**
  49:3
**28,350 (1)**
  43:7
**28th (4)**
  69:3,3;171:16,22
**29 (1)**
  69:4
**29th (5)**
  36:24;37:1,2;55:11;
  58:8
**2nd (3)**
  42:7;140:14,17

---

## 3

**3 (9)**
  87:14;88:6;129:17;
  139:16;140:5,8,11,24;
  141:8
**3.2 (2)**
  122:10,11
**30 (1)**
  54:6
**300,000 (1)**
  169:4
**303 (5)**
  139:17;140:4,5,8,11
**308 (2)**
  163:13,25
**30th (1)**
  14:6
**316 (2)**
  67:2,4
**33,670 (1)**
  38:4
**35,000 (2)**
  54:7;105:2

**35,060 (1)**
  67:3
**35,060.84 (2)**
  68:4;139:13
**35,500 (1)**
  42:1
**36 (1)**
  126:11
**36,640 (1)**
  38:4
**38 (1)**
  126:11
**39 (1)**
  77:14

---

## 4

**4 (4)**
  41:25;87:14;88:6;
  142:13
**4,000 (1)**
  105:2
**4,000-ish (1)**
  173:4
**4,022 (2)**
  150:5,19
**4,222 (1)**
  151:2
**4,250 (5)**
  157:16,20;158:17;
  159:14;171:12
**4,800 (3)**
  150:5;151:8,21
**4/15/2014 (1)**
  41:25
**40 (1)**
  173:3
**400 (4)**
  51:22;52:22;54:4;
  104:25
**400-amp (1)**
  53:8
**404 (1)**
  5:12
**404b (1)**
  5:23
**43,000 (1)**
  85:23
**451 (1)**
  34:23
**466,000 (1)**
  177:3
**49 (4)**
  83:3;128:24;131:8;
  132:4

---

## 5

**5 (10)**
  68:14,18;69:4;87:5,
  15,18,19;88:8;157:25;
  158:4
**5,000 (1)**

155:17
**5/11/'15 (1)**
  33:25
**50 (5)**
  28:6;50:15;83:20;
  166:24,24
**50,000 (1)**
  177:7
**55 (6)**
  29:22;56:21;59:22;
  84:13,16;169:4
**56 (1)**
  132:25
**58 (2)**
  133:1,5
**58e (1)**
  63:19
**59 (3)**
  67:18;132:3;139:7
**5th (2)**
  39:20;55:9

---

## 6

**6 (5)**
  69:1,5,7;87:6;129:16
**60 (2)**
  66:16;142:11
**609 (2)**
  5:12,22
**609b (1)**
  6:3
**60d (1)**
  172:9
**60s (1)**
  85:22
**61 (1)**
  157:6
**61h (1)**
  157:5
**61i (1)**
  33:2
**61j (1)**
  33:18
**62 (1)**
  145:3
**62e (1)**
  72:4
**63 (1)**
  150:1
**63c (1)**
  173:6
**64 (1)**
  139:17
**64h (1)**
  70:8
**65 (1)**
  54:5
**65,000 (4)**
  50:20,25;104:8,20
**65b (1)**
  38:10
**65d (1)**

Case 16-01120    Doc 344    Filed 06/04/19    Entered 06/04/19 13:06:36    Desc Main
Document    Page 203 of 203
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

May 10, 2019

36:18
**66,000 (2)**
  85:22;86:19
**68- (1)**
  85:23
**68f (1)**
  58:6
**69e (1)**
  44:12
**69g (1)**
  45:23
**6th (2)**
  48:13;71:24

---

**7**

**7 (6)**
  34:22;87:6,24,25;
  150:2;151:4
**7,662 (1)**
  70:13
**70f (1)**
  43:2
**70h (1)**
  43:12
**71 (4)**
  51:3,5;165:2,6
**72,000 (1)**
  85:24
**74 (1)**
  47:17
**75,000 (2)**
  50:18;54:5
**777,000 (1)**
  25:2
**781-438-5978 (1)**
  135:12

---

**8**

**8 (9)**
  69:19;70:2;87:5,5,5,
  6,13,13;158:4
**8,000 (2)**
  61:5;63:15
**8,121 (1)**
  141:18
**8,121.92 (2)**
  141:3,14
**8,750 (3)**
  157:16,20;158:17
**8,932 (1)**
  60:17
**8,982 (3)**
  59:9,12,23
**833 (1)**
  151:14
**8333 (1)**
  151:22
**84a (1)**
  174:19
**88 (9)**
  29:22;30:25;41:24;

56:18;59:22;67:14;
84:13,19;157:11

---

**9**

**9 (6)**
  4:7;71:1,21,24,24;
  179:4
**9:07 (1)**
  4:1
**900 (1)**
  63:16
**966.99 (3)**
  143:2,4,10
**97 (2)**
  162:1;176:18
**97e (2)**
  162:4;176:22
**98 (1)**
  163:3
**996 (1)**
  172:3
**996.99 (2)**
  142:20,24
**999 (1)**
  172:13