### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS - EASTERN DIVISION

```
============================  .
IN THE MATTER OF:             . Case #15-13881
                             .
LYMAN-CUTLER, LLC             .
                             . Boston, Massachusetts
                             . Monday, May 13, 2019
     Debtor.                  . 9:13 a.m.
============================  .
LYMAN-CUTLER, LLC, et al.     . Adv. Proc. 16-01120
                             .
     Plaintiffs,             .
v.                            .
                             .
KAGAN, et al.                 .
                             .
     Defendants.              .
============================  .
```

### TRANSCRIPT OF JURY TRIAL - DAY 6 ON:
### #167 OBJECTION TO CLAIM #9 ON CLAIM ON ALEX FILIPPOV FILED BY INTERESTED PARTIES TATIANA KAGAN, VADIM KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.
### #1 COMPLAINT BY LYMAN-CUTLER, LLC AGAINST VADIM KAGAN, TATIANA KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.

### BEFORE THE HONORABLE FRANK J. BAILEY

APPEARANCES:

For the Debtor:              PETER N. TAMPOSI, ESQ.
                             The Tamposi Law Group, P.C.
                             159 Main Street
                             Nashua, NH 03060


For Alex Filippov and Nickolay    SEAN T. CARNATHAN, ESQ.
Lipetsker:                   O'Connor, Carnathan and Mack,
:                            LLC
                             One Van De Graaff Drive
                             Suite 104
                             Burlington, MA 01803


For the Defendants:          JAMES P. HARRIS, ESQ.
                             Sheehan Phinney
                             1000 Elm Street
                             17th Floor
                             Manchester, NH 03105



<pre>
For the Defendants:            JOHN H. PERTEN, ESQ.
                               Sheehan Phinney
                               255 State Street
                               5th Floor
                               Boston, MA 02109


Also Present:                  ANAHIT FLANAGAN
                               Court Certified Interpreter


     Electronic Sound Recording Operator:  YVONNE WOODBURY


      Proceedings Recorded by Electronic Sound Recording
    Transcript Produced by Certified Transcription Service
                      eScribers, LLC
           7227 N. 16th Street, Suite #207
                   Phoenix, AZ 85020
          973-406-2250; operations@escribers.net
</pre>

```
                        I N D E X
```

|                              | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|------------------------------|--------|-------|----------|---------|-----------|
| WITNESSES:                   |        |       |          |         |           |
| **For The Plaintiff:**       |        |       |          |         |           |
| JAMES JOSEPH COHEN           |        |       |          |         |           |
| (By Mr. Carnathan)           | 15     |       |          |         |           |
| (By Mr. Perten)              |        | 66    |          |         |           |
| VLADISLAV ABRAMSKIY          |        |       |          |         |           |
| (By Mr. Carnathan)           | 87     |       | 114      |         |           |
| (By Mr. Harris)              |        | 102   |          |         |           |
| MARK KAISERMAN               |        |       |          |         |           |
| (By Mr. Carnathan)           | 120    |       |          |         |           |
| (By Mr. Harris)              |        | 124   | 135      |         |           |

| EXHIBITS: | DESCRIPTION | I.D. | EVID. |
|-----------|-------------|------|-------|
| For the Plaintiff: | | | |
| 317 | Mr. Cohen's injunction | 21 | 24 |
| F | Certified conviction document titled "Judgment in a Criminal Case" | 27 | |
| 319 | 7/12/2005 conviction of Mr. Cohen | 33 | 38 |
| 320 | 1/2007 conviction | 40 | 40 |
| 321 | Certified copy of the motion of Jamie Edelkind | 44 | 45 |
| J | Jamie Edelkind's complaint | 51 | |
| 322 | Letter from Mr. Cohen to ADA in Middelsex | 55 | 59 |
| 323 | Application for complaint | 59 | 63 |
| 108 | Newton-Cynthia Road, LLC operating agreement | | 89 |
| 92 | 3/4/2015 letter | | 98 |
| 94 | 6/15/2015 letter | | 98 |
| 128 | Deborah Road, LLC operating agreement | | 123 |



For the Defendants:
324              ICANN and WHOIS search              76


RULINGS                                              PAGE

Objection to admission of the evidence              11

of crimes - overruled

Ruling that the requirements of Rule               12

902(13) regarding metadata have been

met.

1   (At 9:13 a.m.)

2          THE CLERK:  Court is now in session.

3          THE COURT:  Good morning.

4          MR. CARNATHAN:  Good morning.

5          MR. PERTEN:  Good morning.

6          THE COURT:  You may be seated.

7          THE CLERK:  Now calling case number 15-13881 for

8   Lyman-Cutler, LLC.  This is day six of trial on docket number

9   167, objection to claim 9 of claimant Alex Filippov filed by

10  interested parties Tatiana Kagan, Vadim Kagan, Kagan

11  Development KDC, Corp., ProExcavation Corp.

12          This is also on case number 16-1120 Lyman-Cutler, LLC

13  v. Kagan, et al., and it's on the complaint.

14          May the parties please state their names for the

15  record?

16          MR. CARNATHAN:  Good morning, Your Honor.  Sean

17  Carnathan for Alex Filippov and Nickolay Lipetsker.

18          MR. TAMPOSI:  Good morning, Your Honor.  Peter

19  Tamposi for the debtor.

20          MR. PERTEN:  Good morning, Your Honor.  John Perten

21  for Vadim Kagan, Tatiana Kagan, Kagan Development KDC, Corp.,

22  and ProExcavation Corp.

23          MR. HARRIS:  Good morning, Your Honor.  James Harris

24  for the same parties.

25          THE COURT:  All right.  Good morning, everyone.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1   Well, Mother's Day got pretty well rained out, didn't it?  But

2   I hope you were there.

3          Housekeeping.  Anything from you?

4          MR. CARNATHAN:  Do we have a decision on the

5   evidentiary issues, Your Honor?

6          THE COURT:  We do, I just wanted to see if there was

7   anything else.

8          MR. PERTEN:  No, Your Honor.

9          THE COURT:  I haven't issued it, but I'll read it

10  now, okay?  All right, so based on the briefs that were

11  received over the weekend and Friday, I guess, there are two

12  issues.  One is the admission of evidence of crimes committed

13  by a witness, Mr. Cohen, who was on the stand on Thursday and

14  is, I guess, resuming his testimony today, and the other has

15  to do with the admission of metadata in connection with

16  proposed Exhibit 65, correct?

17         MR. PERTEN:  That's right, Your Honor.

18         THE COURT:  All right.  So let me first deal with the

19  issue concerning Mr. Cohen's testimony.  All right, this will

20  take a minute.  If I had more time, I'd have written a shorter

21  answer to this, but I'll read it in.  I may fix it up and put

22  it in and issue it, but here's what it is.

23         The plaintiffs, Lyman-Cutler, LLC, Alex Filippov, and

24  Nickolay Lipetsker, seek to offer evidence of the crimes and

25  other bad acts of a witness, Mr. James Joseph Cohen.  It seems

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    that Mr. Cohen was convicted of certain financial crimes and

2    of willful failure to pay child support, another crime.

3         It also appears that at his deposition, Cohen

4    testified that he was released from prison in 2009, testimony

5    that he later sought to correct with an errata sheet stating

6    that he was, in fact, released in February 2008, which

7    testimony plaintiffs allege was false.

8         The plaintiffs seek to use evidence of these crimes

9    in three ways:  under Federal Rule of Evidence 609, to impeach

10   Cohen's character for truthfulness.  Second, under Federal

11   Rule of Evidence 404, to demonstrate not that Cohen acted in

12   conformity with an alleged character for untruthfulness, but

13   as evidence of a plan by the defendants, aided by Cohen, to

14   defraud investors in real estate projects, including the

15   project at issue in this case.  And third, as garden variety

16   impeachment because Cohen was untruthful, it is alleged, at

17   his deposition and afterward in an errata sheet.

18        Under Rule 609, a party may, under certain

19   circumstances, use criminal convicts to impeach a witness.

20   Under Rule 404, on the other hand, a party is permitted the

21   introduction of direct evidence of prior crimes to demonstrate

22   a person's character.  I deal with them, 404 and 609, in

23   order.

24        Under Rule 609, evidence of a criminal conviction of

25   a crime is punishable by incarceration -- let me go back on

1    that, I'm missing a word.  Under Federal Rule of Evidence 609,

2    evidence of a criminal conviction that is punishable by

3    incarceration for more than a year may be admitted to impeach

4    a witness' credibility unless its probative value is

5    substantially outweighed by its prejudicial -- by its unfair

6    prejudice.  In fact, Federal Rule of Evidence 609 provides

7    that such evidence "must be admitted" in a civil case where

8    the witness is not a defendant.

9         Here, it is undisputed that the crimes at issue were

10   punishable by incarceration for more than a year.  I am also

11   persuaded that the probative value of the evidence outweighs

12   its unfair prejudice.

13        609, in turn, has three limitations; first, the

14   evidence must -- I'm sorry -- the evidence may not be used if

15   the witness' conviction and confinement ended more than ten

16   years ago.  The defendants concede that Cohen's confinement

17   for child-support crimes ended in 2011, which is fewer than

18   ten years ago.  It also appears that his confinement for the

19   financial crimes ran consecutively with the child-support

20   crimes, so confinement for those also would have ended in

21   2011; thus, this limitation does not apply.

22        Second, Rule 609 provides that evidence of crimes

23   should not be permitted if the Court determines that their

24   unfair prejudice outweighs their probative value.  I have

25   already determined that there is no bar to the evidence

1   proposed here on that basis.

2          And third, Rule 609 requires that the party proposing

3   to introduce the evidence provide reasonable written notice of

4   an intent to offer the evidence so that the opposing party can

5   contest the evidence.  In this case, the plaintiffs concede

6   that they did not provide a written notice and that said so in

7   so many words.  They did not say "we intend to offer this

8   evidence at trial", but plaintiff's use of this evidence is no

9   surprise.  In fact, in connection with the plaintiff's cross-

10  motions for summary judgment more than six months ago, the

11  plaintiff spelled out in detail the crimes for which Cohen was

12  convicted and incarcerated, demonstrating their intent to use

13  that information in connection with this case.

14         Rule 609 is not a wooden exercise.  If the plaintiffs

15  had captioned their summary judgment submission with the word

16  "and notice" it could not have been more clear that they

17  intended to impeach Cohen, in the event he were a witness,

18  with this evidence, and the defendants had ample time to

19  contest the use of this evidence, and in fact, they have.

20         For these reasons, the defendants' objection to the

21  use of evidence of the crimes for impeachment is overruled.

22         Under Rule 404 of the Federal Rules of Evidence, the

23  plaintiffs seek to introduce evidence of the crimes at issue

24  to support their claim that the defendants had a plan to

25  defraud investors.  Although Rule 404 prohibits the use of

1    such evidence to demonstrate that a witness acted in

2    conformity with those crimes, such evidence may be offered for

3    another purpose.

4         One of the specified other purposes or collateral

5    purposes is that evidence of prior crimes or bad acts may be

6    admitted to prove that the witness participated in a plan or

7    scheme that is consistent with what he did in connection with

8    the prior acts or crimes.  Cohen was convicted of financial

9    fraud.  Here, the plaintiffs allege that the defendants

10   engaged in a plan or scheme to defraud investors in certain

11   real estate projects.  That is precisely the kind of

12   collateral purpose for which this exception was designed.

13        Finally, the evidence of the crimes may be used to

14   impeach Cohen's credibility if he testified under oath at his

15   deposition in a manner that differs from the facts otherwise

16   provable or stipulated.  This is merely ordinary, garden

17   variety impeachment.  A witness cannot testify falsely at a

18   deposition and then later argue that he may not be impeached

19   on that testimony if indeed the deposition testimony was

20   false.  He may not argue or be heard to argue that the

21   evidence concerning the falsehood, the alleged falsehood,

22   involved crimes.

23        I make no finding at this time as to whether or not

24   this information is, in fact, impeachment.  However, it is

25   admissible for the three reasons that I've identified.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1          All right, so the objection to admission of the

2     evidence of crimes is overruled.

3          Same ruling on the -- well, let me make -- I'll make

4     this record.  The plaintiffs offered Exhibit number 65, a

5     document that included at its last page a printout of what is

6     commonly called metadata.  The Federal Rules of Evidence were

7     amended in 2017 to address the very issue that has arisen with

8     respect to this evidence.

9          The defendants object to that one page and say that

10    it is necessary for the plaintiffs to produce an expert in

11    order to certify the information that is contained in that one

12    page.  What the plaintiffs have done is they've had a

13    paralegal, Mr. Hartzell, from the firm file a certification

14    that articulates his action, action that he states in his

15    affidavit is something that he does routinely and has done

16    routinely for many years, and that is to print out from the

17    native Word document which he was -- with which he was

18    provided, the one-page metadata report.

19         This raises an issue under Federal Rule of Evidence

20    902(13).  I won't read from the committee notes.  The

21    committee notes, I think, make clear, very clear, that the

22    purpose of the rule was -- as would be true of all self-

23    authenticating evidence, to make clear that a party is not

24    required to go through the burden and expense of producing a

25    forensic expert in order to produce something as routine as

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    metadata.  Metadata involves pressing a button and I concluded

2    that the requirements of Rule 902(13) are easily met.

3           If the defendants wished to cross-examine Mr.

4    Hartzell, I would allow that, but in my view, this falls well

5    easily within what the intention of Rule 902(13) was adopted

6    to deal with.

7           Okay, I'm not looking for arguments on these points.

8    Those are my rulings, but are there any -- are there any

9    comments about the implications of it; Mr. Perten?

10           MR. PERTEN:  Yes, thank you, Your Honor.  Obviously,

11    we have a different view and so be it.

12           THE COURT:  Sure.

13           MR. PERTEN:  There is two observations that I would

14    like to share with the Court and ask the Court to keep in

15    mind.

16           THE COURT:  Yes.

17           MR. PERTEN:  One is as regards to the metadata issue.

18    I would just like to remind the Court that there is no expert

19    that has been disclosed who is supposed to testify as to what

20    that metadata means.  So I understand, respectfully disagree,

21    but I understand the Court's ruling that that sheet comes in.

22           THE COURT:  Its own authentication.

23           MR. PERTEN:  But I want to remind the Court that what

24    the implications of that are, what it means or how to

25    interpret that.  It's our opinion that would be expert

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    testimony so it's a piece of paper but nobody's here to

2    connect the dots if there are any dots to connect, so that's

3    my comment on that.

4        THE COURT:  Your objection is reserved, certainly, on

5    that point.

6        MR. PERTEN:  Okay, and as it relates to the

7    conviction issue, and again --

8        THE COURT:  Yes.

9        MR. PERTEN:  -- I appreciate what the Court's

10   decision is and I will refrain from arguing that motion again.

11       THE COURT:  I know, I've read your very well and very

12   quickly drafted brief on the issue.

13       MR. PERTEN:  In candor, Your Honor, I have to give

14   the credit to Mr. Harris because I was preparing for trial, so

15   --

16       THE COURT:  I understand.

17       MR. PERTEN:  -- Mr. Harris did that, not me.

18       THE COURT:  Well, then I commend Mr. Harris, it was a

19   good brief.

20       MR. PERTEN:  The one thing, Your Honor, there was a

21   factual finding, if you will, implicit in your ruling that the

22   bank fraud -- the consecutive terms of the bank fraud, and

23   thus he was incarcerated through 2011, as it relates to the

24   bank-fraud issue.  I don't believe that's in the record.  I'm

25   quite confident Mr. Cohen will tell you that he was in for the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    child support, but his term for the bank fraud had expired,

2    and since you don't have the conviction in evidence and Mr.

3    Cohen hasn't testified about that, I just wanted to just alert

4    the Court to that portion of your finding, that the bank fraud

5    is outside of that ten-year limit, so I just wanted to make

6    the Court aware of that.

7            THE COURT:  Okay, I -- sorry -- I'm relying on -- I

8    want to allow you to comment.

9            MR. CARNATHAN:  Yeah, thank you, Your Honor.  I guess

10   taking Mr. Perten's comments in order, the metadata is a

11   screen shot.  It says what it says.  It says it was last

12   printed on June 17th, 2015.  I don't think we need an expert

13   to explain that.  I agree, if the defendants wanted to try to

14   explain that away and come up with a different explanation,

15   they would need an expert, which they don't have, so --

16           THE COURT:  That may be.

17           MR. CARNATHAN:  -- I view that as their difficulty.

18           In terms of the way that the convictions line up, I

19   mean, I've got them all here with me.  We plan to offer them.

20   I think Your Honor will find that Mr. Cohen isn't credible

21   about the convictions just like he's not credible about other

22   things about them, so we'll put that all into evidence.

23           THE COURT:  What I do have is Exhibit 3 to the

24   plaintiff's submission in which Mr. Cohen states under oath,

25   "I was continuously in federal custody, serving sentences for

1    federal white-collar offenses from October 4, 2004, through

2    August 4, 2011."  So that's support for the conclusion that

3    these sentences ran consecutively.

4          Okay, let's move forward.

5          MR. CARNATHAN:  Okay.  Mr. Cohen's here.  I think

6    we'd prefer to lead by completing Mr. Cohen.

7          THE COURT:  Okay.

8          Good morning, Mr. Cohen.

9          THE WITNESS:  Good morning.

10         THE COURT:  Just remember the microphone; you're

11   going to be talking into that today.  And I'll remind you,

12   you're still under oath.  Are you aware of that?

13         THE WITNESS:  I am.

14         THE COURT:  All right, thank you.

15               RESUMED DIRECT EXAMINATION

16   BY MR. CARNATHAN:

17     Q.   I'm sorry for the delay.

18         Do we have your deposition here?

19   A.   I don't know.

20     Q.   Good morning, Mr. Cohen.  I believe when we were

21   last -- when you were here last, we established that you

22   helped put together the invoice that purports to be dated June

23   1, 2015; do you remember that?

24   A.   I recall that.

25     Q.   Okay.  And so you did help put that invoice

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1    together, right?

2    A.    I don't know what role I played in it, but I did help.

3        Q.    Well, you certainly have testified before that you

4    helped put it together, right?

5    A.    Yes, I helped, but I don't know which particular role I

6    played.

7        Q.    Okay.  And who else participated in putting that

8    together?

9    A.    I believe that was Dan Gersh.

10        Q.    So sir, I'd like to talk about some of your prior

11    wrongs, if you will, picking them up chronologically.  Would

12    you agree with me, sir, that as you sit here at this very

13    moment, you are subject to a permanent injunction based on a

14    Securities and Exchange Commission enforcement action against

15    you from back in the mid-1990s?

16    A.    You mean an injunction says that one should not lie when

17    they do securities?

18        Q.    Yeah, that's the gist of it, right?

19    A.    Um-hum.

20        Q.    And so you'll agree, you're subject to that as you

21    sit here right now, right?

22    A.    As is everybody.

23        Q.    Well, you in fact have a particular injunction

24    entered in a court proceeding against you, don't you, sir?

25    A.    It was a settlement, it was not a court proceeding.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1   Q.   Well, you were in fact sued by the Securities and

2   Exchange Commission v. Sage Technology, Inc., Jamie Edelkind

3   and William R. Thiele in the United States District Court for

4   the Northern District of Georgia in 1996; isn't that right,

5   sir?

6   A.   That's correct.  Bill Thiele put some documents together

7   and it had my name on it as long as with his.  In settling

8   out, we agreed to comply with the Securities laws.

9   Q.   So you're saying that was all Mr. Thiele's work,

10  that wasn't your doing?

11  A.   Yes.

12  Q.   Okay, but you were the president, founder, and

13  principal shareholder of Sage Technologies, weren't you, sir?

14  A.   I was.

15  Q.   And in fact, you conducted a public offering for

16  Sage trying to raise $2 million and raised at least 350,000

17  through the sale of notes, right?

18  A.   A private offering.

19  Q.   And in connection with that offering, you

20  represented to investors in your private placement memorandum

21  that Sage had assets of over $18 million, right?

22  A.   That's incorrect.

23  Q.   So you didn't represent to investors?

24  A.   Bill Thiele did.  He was a vice president of Penske and

25  he put the whole package together in with a group of his

escribers

JAMES JOSEPH COHEN - Direct

1  investors.

2       Q.   Did you ever look at the private placement

3  memorandum in your capacity as the president, founder, and

4  principal shareholder of the company that was raising the

5  money?

6  A.   I did, and that's not what he filed.

7       Q.   Did the private placement memorandum also

8  misrepresent that you had a doctorate in physics from

9  Georgetown?

10 A.   Yes, it did.

11      Q.   Okay, and that was also Mr. Thiele's work, that

12 wasn't you?

13 A.   That is correct.

14      Q.   Okay.  But you consented to a permanent injunction

15 that permanently restrains and enjoins you from violating

16 Section 17(a) of the Securities Act of 1933, right?

17 A.   I don't remember those numbers.

18      Q.   Okay.  Well, you agreed to the entry of a permanent

19 injunction that restrains you from committing fraud in

20 connection with the offering of securities, right?

21 A.   Absolutely.

22      Q.   And you're still subject to that to this day, right?

23 A.   As is everybody.

24      Q.   Okay.  And that was -- well, you in particular have

25 an actual injunction entered against you in a federal court,

JAMES JOSEPH COHEN - Direct

1   right?

2   A.    It is a notice to me.   It -- it affects you and everyone

3   else exactly the same.

4         MR. CARNATHAN:  I'd like to mark the injunction as --

5   I think we're up to Plaintiff's Exhibit E for identification.

6   I just have a little bit of a -- I guess this is a

7   housekeeping matter, but we got things certified, of course.

8   When they sent us this one, they bundled it all together with

9   a ribbon.  So what I would propose to do is -- I'm showing Mr.

10  Perten-- is just take out the injunction as opposed to putting

11  in the whole record.

12        MR. PERTEN:  Your Honor, we have no objection to

13  marking for identification.  If it's being offered, then it's

14  a different position.

15        THE COURT:  Right.  All right, we'll start with that.

16        MR. CARNATHAN:  We just didn't want to pull it

17  apart --

18        THE COURT:  So his question is -- he's going to have

19  to take the ribbon out, I guess.

20        MR. PERTEN:  And we're fine with that, absolutely.

21        THE COURT:  All right.

22        MR. CARNATHAN:  Okay.

23        THE COURT:  So he'll disassemble it so it'll -- he'll

24  use it piecemeal if necessary.

25        MR. CARNATHAN:  And a swish of scissors.  The

JAMES JOSEPH COHEN - Direct

1    ribbon's not --

2          THE CLERK:  I do not have scissors.

3          THE COURT:  I'm not surprised.  We can get them,

4    don't --

5          THE CLERK:  We can get them.

6          MR. CARNATHAN:  Who knew the ribbon would be so

7    tenacious, I'm sorry.

8          THE COURT:  That's why they use it.  You want us to

9    get something to help you out?  I don't think I have one up

10   here either, but.

11         MR. CARNATHAN:  Do you have any (indiscernible)?

12         THE CLERK:  Yeah, I know I don't have them in there.

13         THE COURT:  Just --

14         MR. CARNATHAN:  You know what?  I'm just going to rip

15   the paper a little bit; I hope we can restaple it.

16         THE COURT:  Okay.  Really, I think a perfectly

17   reasonable approach would be to mark the whole thing for

18   identification -- it's not coming in -- and then rip the pages

19   out when the deed's been done, so all right.  It's all right.

20   Just show that to --

21         THE CLERK:  So that, too?

22         THE COURT:  No, it's just ID.  I'm fine.  I may want

23   a copy depending on where it goes, but make sure Mr. Perten

24   sees it -- what we've marked as -- what are we calling this?

25         MR. CARNATHAN:  I think this is Plaintiff's E for

JAMES JOSEPH COHEN - Direct

1  identification.

2          THE CLERK:  Plaintiff's E for identification.

3          THE COURT:  E, Plaintiff's E for identification.

4      PLAINTIFF'S EXHIBIT E WAS MARKED FOR IDENTIFICATION

5          MR. CARNATHAN:  May I approach, Your Honor?

6          THE COURT:  You may.

7  BY MR. CARNATHAN:

8      Q.   Mr. Cohen, I'm showing you a document we've marked

9  as Plaintiff's E for identification which is a consent to

10 order a permanent injunction and other relief in the Northern

11 District of Georgia in the United States Federal Court; do you

12 see that?

13 A.   I do.

14     Q.   And you're one of the named defendants under your

15 prior name, Jamie Edelkind, right?

16 A.   That is correct.

17     Q.   And on the fourth page of the document, that's your

18 signature, right, sir?

19 A.   It is.

20         MR. CARNATHAN:  We would offer Plaintiff's E for

21 identification into evidence, Your Honor.

22         MR. PERTEN:  Your Honor, we'd object to the

23 introduction of that as a full exhibit for a variety of

24 reasons; one is, again, as we discussed with regard to the

25 criminal conviction, we've plowed that field.  We certainly

JAMES JOSEPH COHEN - Direct

1    were not provided with an SEC injunction.  It's not on the

2    witness -- on the exhibit list.  It was not mentioned, to my

3    recollection, in any summary judgment, so the first time we're

4    hearing about this document is today.

5          The second reason, Your Honor, is this is a consent

6    decree as opposed to something that was issued involuntarily,

7    and in my brief perusal when Mr. Carnathan gave it to me a

8    moment ago, it specifically provides that the defendants are

9    not admitting the truth or voracity of any of the underlying

10   facts.  They're reserving the right to contest that and it's a

11   consent decree.  As Mr. Cohen has testified, it was part of a

12   settlement with the government.

13         So for those reasons, Your Honor -- it's also from

14   1996 which is ancient history.  Lack of notice, lack of any

15   adjudication per se, it was a consent decree -- I don't

16   believe it's admissible.  Thank you.

17         MR. CARNATHAN:  We'll try to take them in order.  The

18   SEC proceedings were listed in that footnote that Your Honor

19   read or referred to earlier; it's definitely in there.

20         THE COURT:  So the proceeding was listed --

21         MR. CARNATHAN:  Proceedings.

22         THE COURT:  -- if not the specific document.

23         MR. CARNATHAN:  Right.  I don't think this actually

24   is a crime.  This is some sort of a quasi-crime.  I don't

25   really know what a SEC enforcement action qualifies as, but

JAMES JOSEPH COHEN - Direct

1   it's offered a as prior wrong because it's part of the overall

2   pattern.

3          When we look at the whole timeline, what we're going

4   to find is that Mr. Cohen has basically been living through

5   fraud his whole adult life.  I mean we're talking the '90s

6   through into the 2000s.  He goes to prison in 2004, so he's

7   committing crimes all the way through 2004.  He goes to prison

8   for seven years.  He comes out and in 2011/2012, he joins Mr.

9   Kagan and we say, or try to prove here today, that he resumed

10  that program and so this stitches together into one long

11  mosaic.

12         It also is offered to impeach him because he's

13  testifying that everyone in the courtroom is subject to some

14  sort of an order not to violate the securities fraud.  I mean,

15  at some level, right, there's statutes out there that none of

16  us would violate.  But he in particular is subject to an

17  injunction by a federal court.  I'm not.  I doubt anyone else

18  in the courtroom is, so --

19         THE COURT:  All right.

20         MR. CARNATHAN:  -- it impeaches him for that.

21         THE COURT:  I will overrule the objection.  It's

22  admissible under 609, it's admissible under --

23         MR. CARNATHAN:  404.

24         THE COURT:  I'm sorry, it's admissible under 404.  It

25  may be used for impeachment under 609.



(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1          What is that now, Elizabeth?  What --

2          MR. HARTZELL:  That's Plaintiff's E for

3   identification that we just admitted, Your Honor.

4          THE COURT:  No, I know what it is.  What's the --

5   we're assigning a number to it now.  What exhibit is it in

6   evidence?

7          MR. PERTEN:  317, Your Honor.

8          MR. CARNATHAN:  317?

9          THE COURT:  317?

10         THE CLERK:  317.

11         MR. CARNATHAN:  Yeah.

12         THE COURT:  All right.  We'll call it 317.

13      PLAINTIFF'S EXHIBIT 317 WAS ADMITTED INTO EVIDENCE

14         THE COURT:  Are you going to be using this with the

15   witness now?

16         MR. CARNATHAN:  No, I think the point's made there,

17   Your Honor.  I was going to move to the next thing.

18         THE COURT:  All right.

19         MR. CARNATHAN:  Yup.

20                    (Pause)

21         THE COURT:  Go ahead, go ahead.

22   BY MR. CARNATHAN:

23     Q.   So Mr. Cohen, you are also the same person who was

24   convicted of bank fraud on July 21, 2004, in the United States

25   District Court for the Northern District of Georgia; is that

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 25

JAMES JOSEPH COHEN - Direct

1    right, sir?

2    A.   I don't remember the exact date.  I pled guilty to aiding

3    and abetting.

4         Q.   You actually pled guilty to one count of bank fraud,

5    didn't you, sir?

6    A.   That's correct.

7         Q.   Okay.  And in fact, in that indictment, you were

8    charged with twenty-five counts of fraud, right?

9    A.   I have no recollection.

10        Q.   And the other twenty-four counts were all for

11   forging checks, right?

12   A.   I was not convicted of anything related to that.

13        Q.   Well, that's because you pleaded guilty to Count I

14   for defrauding First Union National Bank for $221,000, right?

15   A.   That's incorrect.

16        Q.   I'm sorry, that's incorrect?

17   A.   Your statement is incorrect.

18        Q.   So you didn't avoid the other twenty-four counts by

19   pleading guilty to Count I?

20   A.   No, that's -- you're incorrect.  I avoided the other

21   counts because they were lies.

22        Q.   Okay, so the U.S. Attorney's Office was lying about

23   you in the other twenty-four counts?

24   A.   That is not correct.  My ex-wife was lying about --

25        Q.   Okay.  Did the checks that you forged include checks

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1    from Sage Technology, sir?

2          MR. PERTEN:  Objection, Your Honor.  There's been no

3    testimony that he forged any checks.  There's an indictment

4    that never resulted in conviction.

5          MR. CARNATHAN:  I'll rephrase.

6    BY MR. CARNATHAN:

7      Q.   Did you forge checks from Sage Technology, sir?

8    A.   No, I was a signatory on the Sage Technology account.

9      Q.   Okay.  And the allegations were that you committed

10   the bank fraud in November 1998, right?

11   A.   I don't recall.

12     Q.   May I approach, Your Honor?

13         THE COURT:  Yes, you may.

14         MR. CARNATHAN:  So Mr. --

15         THE COURT:  I just need you to -- I'm worried I'm not

16   going to get this on the record.

17         MR. CARNATHAN:  I can --

18         THE COURT:  I don't like when you hover over a

19   witness either, all right?  Unless it's your witness, and

20   although he is your witness, he certainly isn't associated

21   with you, so you want to --

22         MR. CARNATHAN:  Maybe I'll read from here, walk over,

23   show it to him, and then walk back?

24         THE COURT:  Why don't you use the evidence display?

25         MR. CARNATHAN:  Oh, okay, certainly.



JAMES JOSEPH COHEN - Direct

1           THE COURT:  It's very, very easy.  So Elizabeth will

2    get it on for you, then he probably can see it if it's a

3    decent --

4           And Mr. Cohen, if you want to see it in paper, just

5    ask.

6           THE WITNESS:  Thank you.

7    BY MR. CARNATHAN:

8       Q.   All right, sir, I'm showing you paragraph 1 of Count

9    I to which you pleaded guilty in 2004 in the Northern District

10   of Georgia; do you see that?

11   A.   I did not plead guilty to that.  What I pled guilty to,

12   to be clear, was I -- an information that -- well, that we had

13   a colloquy with the judge is not specifically that.

14          MR. CARNATHAN:  May I mark the certified conviction

15   document as Plaintiff's Exhibit F for identification, please?

16          THE COURT:  You may.

17       PLAINTIFF'S EXHIBIT F WAS MARKED FOR IDENTIFICATION

18          THE COURT:  Has Mr. Perten seen it?

19          MR. CARNATHAN:  Yes, I gave him a copy.  It's the

20   same as what was also attached to my filing Friday.

21          THE COURT:  Okay.

22          MR. CARNATHAN:  It's just this one's certified.

23          THE COURT:  Got you.

24   BY MR. CARNATHAN:

25       Q.   So Mr. Edelkind, I'm putting up on the screen --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1    A.    Excuse me, my name is Joseph Cohen.

2         Q.    I apologize, Mr. Cohen.   I'm putting up on the

3    screen the page of Plaintiff's F for identification called

4    "Judgment in a Criminal Case" and it says the defendant

5    pleaded guilty to Count I of the indictment.   Accordingly, the

6    defendant is adjudged guilty of such count which involves the

7    following offense:   18 USC Section 1344(1) and (2), bank

8    fraud, Count I."   You pleaded guilty to that, didn't you, sir?

9    A.    I did.

10        Q.    Okay, and that was on July 21, 2004; right?

11   A.    No, I think that was the date of the sentence.

12        Q.    Fair enough.   It lists two Social Security numbers

13   there for you, sir; did you have two Social Security numbers?

14   A.    No.

15             MR. CARNATHAN:   I think I probably scribble those out

16   of the document that goes into evidence, shouldn't I, Your

17   Honor?

18             THE COURT:   Oh, I -- yes, at least all but maybe the

19   last three digits should be redacted.

20             MR. CARNATHAN:   So John, with your permission, I'm

21   just going to go --

22             MR. PERTEN:   Yes, though I also noted over the

23   weekend that it was not redacted in the court filing over the

24   weekend.

25             THE COURT:   Fair enough, but that's a bigger issue,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1  actually, so let's deal with that, too.

2         I need you to provide a redacted version of this so

3  we can substitute it for what's on file.

4         MR. CARNATHAN:  Right.

5         THE COURT:  I mean, I don't -- I can read, too, and

6  it says there are two Social Security numbers.  I don't know

7  if one of those is active.

8         MR. CARNATHAN:  Right.

9         THE COURT:  But if it is, it ought to be redacted.

10        MR. CARNATHAN:  So we'll fix the filing.  Our

11  apologies, just going too fast, you miss things.

12        Fair enough.  I blanked out the Social Security

13  numbers.

14        THE COURT:  All right.

15        MR. CARNATHAN:  We would offer Plaintiff's F for

16  identification into evidence, Your Honor.

17        MR. PERTEN:  Your Honor, we would object to the

18  admission of F for a variety of reasons.  Exhibit F is much

19  more than just the judgment.  Exhibit F has a docket sheet --

20  the court's docket sheet attached to it.  It also has an

21  indictment.  As Mr. Cohen has testified to and there's been no

22  counter evidence at all, he pled guilty to Count Number I.  He

23  did not plead guilty to any of the other counts, and there is

24  no finding, so I don't think the indictment comes in.

25        Secondarily, Your Honor, I notice that Count I,



JAMES JOSEPH COHEN - Direct

1    contrary to the representations, has nothing to do with

2    uttering false checks.  Count I alleges what he pleaded guilty

3    to relates to a deed which they claim was untruthful for real

4    estate in supporting a mortgage.

5           THE COURT:  It's what -- it is what it is.

6           MR. PERTEN:  It is what is --

7           MR. CARNATHAN:  Right.

8           MR. PERTEN:  -- but what I'm saying is that, again,

9    we've had a mischaracterization of the indictment.  The

10   indictment shouldn't come in.  The judgment as a standalone

11   page, I think, I don't object to that.  That is what it is --

12          THE COURT:  All right, let's deal with that.

13          MR. PERTEN:  -- but the balance.

14          THE COURT:  Let's deal with that.  You can say

15   more --

16          MR. CARNATHAN:  Right.

17          THE COURT:  -- but I just don't see any reason to

18   disagree with that.

19          MR. CARNATHAN:  No, although I disagree that I ever

20   said that he pleaded guilty to the forging of the checks.  I

21   asked him if he did and said the counts --

22          THE COURT:  No, I understand that.

23          MR. CARNATHAN:  Yeah, yeah.

24          THE COURT:  I understand that.  That's an

25   overstatement, but --



JAMES JOSEPH COHEN - Direct

1           MR. CARNATHAN:  Yeah.

2           THE COURT:  -- what isn't an overstatement is that

3    the portion that you have confronted the witness with is what

4    should be admitted, not extraneous things.  And I haven't seen

5    the document, so it --

6           MR. CARNATHAN:  Right.  My understanding is this is

7    what we got when we asked for the certified conviction.  So if

8    we want to pare that down to avoid putting improper things in

9    the record, that's fine with us.  We --

10          THE COURT:  Yes, I think that's right.  So that

11   exhibit should be redacted, meaning pages can be removed,

12   except for the portion that shows what he was convicted --

13   that it was Count I, I think you said.

14          MR. CARNATHAN:  Yeah.  There's five pages sort of in

15   the middle of it that just say, "Judgment in a Criminal Case";

16   perhaps that's the appropriate five pages?

17          THE COURT:  Is that right?

18          MR. PERTEN:  That appears to be correct.

19          THE COURT:  The judgment comes in.  It's five pages,

20   okay.  Not the indictment.

21          MR. CARNATHAN:  Right.  So from a mechanical

22   standpoint, should we pull it apart and --

23          THE COURT:  I think we better.

24          MR. CARNATHAN:  Right.

25          THE COURT:  I'm happy to solve this in a little

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1    while, so I'm happy to solve it at the end of the day, you

2    know?

3            MR. HARRIS:  Well, let's do that and keep it moving.

4            THE COURT:  Keep it moving.  All right, just whatever

5    you do, show it to Mr. Perten and Mr. Harris.

6            MR. CARNATHAN:  Right.

7            THE COURT:  Before giving it back to us.

8    BY MR. CARNATHAN:

9        Q.    Okay, and so Mr. Edelkind, you received a sentence

10    of --

11    A.    All right, I'm not going to do that again.

12        Q.    I'm apologizing.  I'm looking at the, you know --

13    what do you call it -- the convictions.  I'm not doing it on

14    purpose.

15            Mr. Cohen, so you received a sentence of twelve

16    months and one day in prison for that particular conviction,

17    right?

18    A.    That is correct.

19        Q.    Followed by a term of supervised release of five

20    years, right?

21    A.    Yes.

22            MR. CARNATHAN:  May I ask that the next one be marked

23    as Plaintiff's Exhibit G for identification, please?

24            THE COURT:  Yes, it should be marked as Plaintiff's G

25    for identification.



JAMES JOSEPH COHEN - Direct

1           PLAINTIFF'S EXHIBIT G WAS MARKED FOR IDENTIFICATION

2                THE COURT:  Has Mr. Perten seen this?

3                MR. PERTEN:  Yes, I did.

4                THE COURT:  You've provided him with a copy.

5       BY MR. CARNATHAN:

6           Q.   Mr. Cohen, would you also agree with me that on July

7       12th, 2005, you were convicted after jury trial of four counts

8       of bank fraud and aiding and abetting bank fraud, sir?

9       A.   I'm unsure how to answer that.

10          Q.   All right, sir.  I'm showing you now a copy of the

11      conviction that we've marked as Plaintiff's Exhibit G for

12      identification and you see that the box is checked that you

13      were found guilty on Counts I-SS, II-SS, III-SS, and IV-SS; do

14      you see that?

15      A.   I do.

16          Q.   And then the counts are listed below that, which

17      include both bank fraud and aiding and abetting bank fraud for

18      each count, right?

19      A.   I do.

20          Q.   And the first date of offense concluded was

21      September 12, 2001, right?

22      A.   Yes.

23          Q.   And the second one was May 9th, 2002, right?

24      A.   Yes.

25          Q.   And the third one was 3/17/2003, right?

JAMES JOSEPH COHEN - Direct

1    A.    Yes.

2         Q.    And you went to prison originally in 2004, right?

3    A.    That's correct.

4         Q.    And the date of this judgment is July 12th, 2005,

5    right?

6    A.    Correct.

7              THE COURT:   Mr. Carnathan, I note this one has Social

8    Security numbers still as well, too.

9              MR. CARNATHAN:   I'm sorry.   We'll square that up,

10   too.

11   BY MR. CARNATHAN:

12        Q.    And so for this particular conviction, you received

13   a term of sixty months, right?

14   A.    Concurrent with the one out of Atlanta.

15        Q.    I'm sorry, I didn't hear you?

16   A.    Concurrent with the one out of Atlanta.

17        Q.    And then followed by a term of three years of

18   supervised release, right?

19   A.    That is correct.

20        Q.    Yeah.   Each time you got convicted of a new crime,

21   was that a violation of the terms of your release, sir?

22   A.    No.

23        Q.    We'll agree that you were in prison straight through

24   to August 2011, right?

25   A.    I was.



(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1    Q.   You were?

2    A.   I were.

3    Q.   All right.  In fact, you were released on August

4    4th, 2011, right?

5    A.   From my -- from the child support.

6    Q.   Okay, but that was after seven continuous years of

7    imprisonment, right; you'd been in prison straight through?

8    A.   That's correct, but as -- I finished the first sentence

9    after one year, the second sentence four years later, then

10   there was consecutive served with the child support out of

11   Louisiana.

12   Q.   Do you remember what you told me at your deposition

13   about your convictions, sir?

14   A.   No.

15   Q.   If you look -- if you would look with me at page 18

16   of your deposition transcript?  Actually, I'm sorry, the

17   exchange begins on page 17.  So I'm at line 17 of page 17, and

18   I ask you, "Have you ever been convicted of a crime, Mr.

19   Cohen?"  And you say, "I have."

20        And I say, "What crime was that?"  And you say,

21   "Failure to pay court-ordered child support.  It was a very

22   contentious divorce."

23        "Have you ever been convicted of any other crimes?"

24        "Yes."

25        "What other crimes?"



JAMES JOSEPH COHEN - Direct

1          "In connection with the same thing, aiding and

2     abetting my ex-wife's mortgage fraud."

3          Let's pause there for a moment.  The woman that you

4     were married to at the time, was it Linda Edelkind; do I have

5     that right?

6     A.   No.

7          Q.   Isn't she the one who was involved with --

8     A.   Let's be clear, which one are you talking about; the

9     first conviction out of Georgia or the one that is -- this

10    supposed conviction out of Massachusetts?

11         Q.   I'm talking about the woman who took $271-odd-

12    thousand to Norway from the bank fraud.

13    A.   Are you talking about the one out of Massachusetts?

14         Q.   Who were you married to that you had the willful

15    nonpayment of child support conviction from, sir?

16    A.   Louisiana.

17         Q.   What was the woman's name?

18    A.   Suzanne Boudreaux.

19         Q.   And then who were you married to that participated

20    in the bank fraud?

21    A.   I didn't say she participated in any bank fraud.

22         Q.   I thought you claimed to just be aiding and abetting

23    her bank fraud?

24    A.   I didn't make any claims about that.  I was talking about

25    the first one.

JAMES JOSEPH COHEN - Direct

1    Q.   So I'm confused now.  I'm just trying to ask who

2   were you married to that participated in the bank fraud?

3   A.   Suzanne Boudreaux, my ex-wife.

4    Q.   Okay, and that's the same woman that you had the

5   conviction for willful nonpayment of child support; is that

6   right?

7   A.   Correct.  I couldn't pay child support while in custody.

8    Q.   Okay, and then who is Linda Edelkind?

9   A.   That's my second ex-wife, who lives in Norway with my

10   older children.

11    Q.   Okay, and she left for Norway with $273,000 of the

12   proceeds from the bank fraud, right?

13   A.   I don't agree with that.

14    Q.   Okay.  Well, I got that right out of the First

15   Circuit decision; are you saying the First Circuit got it

16   wrong?

17   A.   Morris Lasker got a lot wrong.

18    Q.   I'm sorry, I couldn't hear that answer?

19   A.   Morris Lasker got a lot wrong; that's not factual.

20    Q.   Morris Lasker was the presiding judge over the

21   trial?

22   A.   He was.

23    Q.   Okay.  Was he also wrong that $47,000 was withdrawn

24   from ATMs in Massachusetts and Norway between August and

25   December 2004?



JAMES JOSEPH COHEN - Direct

1   A.    I have no idea about that.

2        Q.   Well, by then, Linda was in Norway, right?

3   A.    What dates?

4        Q.   August and December 2004?

5   A.    I don't think she was in Norway in August 2004; I could

6   be wrong.

7        MR. CARNATHAN:  I don't think I've yet offered

8   Plaintiff's Exhibit G for identification into evidence.  I'd

9   like to do so now, please.

10        THE COURT:  Any objection?

11        MR. PERTEN:  No objection, Your Honor.

12        THE COURT:  Okay.  So we'll mark this as 218 -- I'm

13   sorry --

14        MR. PERTEN:  319, I believe, Your Honor.

15        THE COURT:  319.

16      PLAINTIFF'S EXHIBIT 319 WAS ADMITTED INTO EVIDENCE

17        MR. CARNATHAN:  May I approach briefly?  We've got

18   the Social Security I'd like to scratch out.

19        THE COURT:  Yes, I'm going to hand this back to you.

20        Liz?

21   BY MR. CARNATHAN:

22        Q.   So Mr. Cohen, you were also ordered to pay

23   $3,298,197.45 in restitution in connection with that

24   conviction, right, sir?

25   A.    That's correct.

JAMES JOSEPH COHEN - Direct

1      Q.   In January 2007, you were also convicted of willful

2   nonpayment of child support, right, sir?

3   A.   That's correct.

4      Q.   And for that conviction, you were sentenced to a

5   total of twenty-four months in prison to run consecutively

6   with one year of supervised release to run concurrently with

7   the other cases, right?

8   A.   You said that incorrectly.

9      Q.   I'm now putting on the screen the term of

10   imprisonment, which was twenty-four months to run

11   consecutively; do you see that?

12   A.   That is correct.

13      Q.   And the supervised release is for a term of one year

14   to run concurrently --

15   A.   That is correct.

16      Q.   -- with the other cases, right?

17   A.   Yes.

18      Q.   Right.  And you'll agree with me that mandatory

19   condition number 2 is that you shall not commit any other

20   crime, right?

21   A.   Yes.

22      Q.   And that was true for your other convictions, too;

23   right, sir?

24   A.   That is correct.

25      Q.   So when you committed another crime, that was a

JAMES JOSEPH COHEN - Direct

1   violation of the terms of your supervised release?

2   A.   No.

3        MR. CARNATHAN:  Your Honor, I've asked the clerk to

4   mark for me the next conviction as Plaintiff's Exhibit H for

5   identification, and we'd like to offer it into evidence,

6   please.

7        PLAINTIFF'S EXHIBIT H WAS MARKED FOR IDENTIFICATION

8        THE COURT:  H?  All right, so that's the one that you

9   were just -- have you asked questions about that yet?  Have

10  you asked questions about that one?

11       MR. CARNATHAN:  I did just ask questions about that,

12  Your Honor, yes.

13       THE COURT:  Okay, let me get a look.  Thank you.  I

14  see.  Okay, so it's marked as H, and now you're offering it?

15       MR. CARNATHAN:  Yes, Your Honor.

16       THE COURT:  All right.  Any objection?

17       MR. PERTEN:  Your Honor has already ruled on the

18  motion, so no objection.

19       THE COURT:  Okay.  All right, so that's admitted as

20  320 into evidence.

21       PLAINTIFF'S EXHIBIT 320 WAS ADMITTED INTO EVIDENCE

22  BY MR. CARNATHAN:

23   Q.   Mr. Cohen, returning to the deposition transcript,

24  on page 18 at line 5, I asked you, "What was your sentence for

25  aiding and abetting your ex-wife's mortgage fraud?"  And you

JAMES JOSEPH COHEN - Direct

1    said, "I believe it was thirty-six months."

2            I said, question, "In prison?"  And you said, "Yes,

3    it was a federal offense."

4            Do you remember that?

5    A.  Yes, I do.

6        Q.   You actually got five years, right, sir?

7    A.    Yes.

8        Q.   And then I asked, "How much time did you serve?"

9    And you said, "Between that and the failure to pay court-

10   ordered child support, it was a total of about fifty-some-odd

11   months."  Do you see that?

12   A.   I do.

13       Q.   I've read that correctly, right?

14   A.   Yes.

15       Q.   And in fact, it was more like eighty-four months,

16   right, sir?

17   A.   I'm not exactly sure.

18       Q.   Well, you said in your affidavit that you submitted

19   in connection with your motion to travel that you were in

20   prison continuously for seven years, right?

21   A.    Yes.

22       Q.   So I'm just multiplying seven times twelve, I get

23   eighty-four, right?

24   A.   Well, I'm unsure you were talk -- what we were talking

25   about altogether, but the total amount of time I did serve was

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 42

JAMES JOSEPH COHEN - Direct

1    something less than eighty-four months.

2         Q.   Okay.  In fact, a few lines down, I ask you, "In

3    what court were you convicted of aiding and abetting mortgage

4    fraud?"  You said, "Same."  And I apologized if up above you,

5    you said, "First Circuit", right?

6    A.   They -- that's an error.  It's Fifth Circuit, not First.

7         Q.   Well, actually, the first one was in the Northern

8    District of Georgia, right?

9    A.   That is correct.

10        Q.   And the second one was in the District of

11   Massachusetts, right?

12   A.   Correct.  The child support was in the Fifth Circuit.

13        Q.   Louisiana, yes?

14   A.   That's part of it.

15        Q.   Yeah.  And then I said, "How long ago was that

16   conviction entered and you said 2004."  See that?

17   A.   Yes.

18        Q.   So you never mentioned the one from 2005, right?

19   A.   I didn't deliberately not mention it to you.  You were

20   asking around and I was trying to be accurate to your

21   questions at the time and as I heard them.

22        Q.   Okay.  Well, in the next question I just said when

23   did you get out of prison and you said 2009; that's just not

24   so, is it, sir?

25   A.   That's incorrect.




JAMES JOSEPH COHEN - Direct

1      Q.   And in fact, you went back and on your errata sheet,

2   you corrected that, right?

3   A.   I don't recall.

4      Q.   You, in fact, specifically changed it to February

5   2008, didn't you, sir?

6   A.   I don't recall.

7      Q.   So Mr. Cohen, I'm now putting up on the screen a

8   copy of your errata sheet in connection with your deposition;

9   do you recognize that?

10   A.   No.

11      Q.   No.  Do you recognize your signature down there,

12   signing it under the pains and penalties of perjury?

13   A.   Yes.

14      Q.   Okay.  And if we look back to the very first line

15   where it says -- page 18, line 23, it says, "2009 should read

16   February 2008", see that?

17   A.   It's just an error.  It should have read February 2011.

18      Q.   Well, in fact, in your affidavit previously, you

19   said August 2011, right?

20   A.   It should be February 2011.

21           MR. CARNATHAN:  May I approach?

22           THE COURT:  You may.

23           MR. CARNATHAN:  I've just handed the clerk a

24   certified copy of the motion of Jamie Edelkind for permission

25   to travel.  Could we mark that as Plaintiff's I for




(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1   identification, please?

2           THE COURT:  Yes, we can.  That's marked as I.

3        PLAINTIFF'S EXHIBIT I WAS MARKED FOR IDENTIFICATION

4   BY MR. CARNATHAN:

5       Q.   So sir, I'm putting up on screen an excerpt from

6   your affidavit submitted in support of this motion for

7   permission to travel which says that you were continuously in

8   federal custody, serving sentences for federal white-collar

9   offenses, from October 4, 2004, through August 4, 2011; have I

10  read that correctly?

11  A.   Yes.

12      Q.   All right.  So that's what you said under oath in

13  that preceding U.S. v. Edelkind, criminal number 041066MEL

14  back in 2011, right?

15  A.   That's correct.

16          MR. CARNATHAN:  We would offer Plaintiff's I into

17  evidence please, Your Honor.

18          MR. PERTEN:  Your Honor, I would object to this.  I

19  mean, it's a motion that's been provided to me.  There is no

20  order that I see accompanying this motion.  It's a motion and

21  he's testified to what it says, so.

22          THE COURT:  Counsel?

23          MR. CARNATHAN:  Well, he's testified to four

24  different dates now as to when he got out of prison.  I think

25  he said 2009 -- he said that was wrong.  Then he fixed his

JAMES JOSEPH COHEN - Direct

1   errata sheet and he said February 2008, and then he said that

2   was wrong.  And then he said no, I meant February 2011.  It

3   turns out he said under oath in 2011, it was August 2011.

4          THE COURT:  All right.  It's admitted for the limited

5   purpose of impeachment of the witness with respect to his

6   prior statements including statements made here today

7   concerning the date of his release.  So it's admitted, though,

8   and it's 321 into evidence.

9       PLAINTIFF'S EXHIBIT 321 WAS ADMITTED INTO EVIDENCE

10         MR. CARNATHAN:  Thank you, Your Honor.

11  BY MR. CARNATHAN:

12      Q.  Sir, I think on Thursday we established that you

13  have access to Westlaw, right?

14  A.  Not anymore, but yes.

15      Q.  Yeah.  You've been known to do your own legal

16  research, right?

17  A.  Right.

18      Q.  Did you go back and study Federal Rule of Evidence

19  609 between the time that you testified at your deposition and

20  when you filled out your errata sheet?

21  A.  No.

22      Q.  So just to review the facts, if we think back to the

23  time when you were committing the crimes for which you were

24  convicted in the District of Massachusetts in July 2005, you

25  were facing bankruptcy in the summer of 2000, right?



JAMES JOSEPH COHEN - Direct

 1   A.    I don't think so.

 2           THE COURT:  Did you say I don't think so or I --

 3           THE WITNESS:  Yeah, I don't.

 4           THE COURT:  I just didn't hear you.

 5           THE WITNESS:  I don't think so.

 6           THE COURT:  Get the microphone closer.  Just pull --

 7   yeah, that's better.  And talk into it.

 8           Go ahead.

 9   BY MR. CARNATHAN:

10      Q.    Okay.  And so you concocted a false resume for your

11   stay-at-home wife, Linda, right, sir?

12   A.    I did not.

13      Q.    Okay.  You in fact forged documents to make her

14   appear to be a well-paid executive in a sham technology

15   company called Apostle, Inc., right?

16   A.    That's not true.

17      Q.    Okay.  I'll just tell you, sir, I'm reading the

18   facts right out of --

19   A.    You're read -- no --

20      Q.     -- the First Circuit opinion.

21   A.    No, you're not.  What you're doing is you're

22   mischaracterizing dicta which is untrue.

23      Q.    Okay, so you're saying the First Circuit got these

24   things wrong?

25   A.    Yes, they did because they were culled full cloth from

Page 47

JAMES JOSEPH COHEN - Direct

1  the accusations by the prosecutor.  They're not part of a

2  decision.  It's just dicta and it's wrong.

3       Q.   Well, you were convicted after trial, sir, right?

4  A.   No -- well, you want to relitigate the whole thing, I'm

5  happy to.  And the answer is, if you read all this stuff, I

6  don't agree with that as well.

7       Q.   Okay.

8  A.   Now, did I serve this entire term?  Yes.  Is there a

9  record of my conviction?  Yes.  I don't agree with the rest.

10      Q.   Okay.  So you deny that any of these facts are true?

11 A.   The facts that you've so far read, they are untrue.

12      Q.   All right.  Well, I'll run a few more by you.  You

13 used forged documents to get an $800,000 mortgage from

14 America's MoneyLine in your wife Linda's name, right?

15 A.   Untrue.

16      Q.   Then you used that money to purchase the Honey Fitz

17 mansion in Hull, Massachusetts, right?

18 A.   It -- it was the first mortgage on that property that my

19 ex-wife purchased.

20      Q.   Okay.  And then you repeatedly refinanced the Hull

21 property for larger and larger amounts, each time paying down

22 outstanding previous loans and retaining the surplus or cash-

23 out amount, right?

24 A.   The house was undergoing extensive renovations and

25 these -- these were for the renovations on the property.

JAMES JOSEPH COHEN - Direct

1      Q.   Okay, but in connection with each one of those

2   refinancings, you used false representations and fabricated

3   documents, including tax forms, showing your wife, Linda, to

4   be earning between 200,000 to over $1 million a year, right,

5   sir?

6   A.   That's false.

7      Q.   And in September 2001, you took out a $1 million

8   mortgage in Linda's name from the South Shore Savings Bank,

9   right?

10  A.   I didn't take out any loans.

11     Q.   Well, it was in your wife's name, right?

12  A.   I didn't take out any loans.

13     Q.   Did you help her get the loan?

14  A.   What -- and what would you characterize help?

15     Q.   Forging documents for her?

16  A.   Absolutely not.

17     Q.   You retained $143,781.53 from the MoneyLine loan,

18  right, sir?

19  A.   I didn't retain any money.

20     Q.   Okay.  In spring 2002, you used the property as

21  collateral to obtain several home equity loans in Linda's

22  name, including a $350,000 line of credit from Wells Fargo,

23  right?

24  A.   I did not obtain any loans.

25     Q.   In March 2003, you refinanced the whole property

JAMES JOSEPH COHEN - Direct

1   again with a $2.1 million mortgage in Linda's name, right?

2   A.   Untrue.

3        Q.   Okay.  And you retained $205,370.29 from those

4   mortgages, right?

5   A.   I never got any money out of that.

6        Q.   Okay.

7   A.   By August 2004, you told Fairmont Funding that Linda's

8   income was over $1.1 million a year in order to get a $3.3

9   million loan, right, sir?

10  A.   I didn't tell Fairmont anything.

11       Q.   Okay.  And you used the proceeds to pay off the

12  prior loans and ended up with a $569,878.83 cash surplus,

13  right?

14  A.   I didn't get any cash.

15       Q.   Okay, and by the time that you did that one, you had

16  already been indicted for three prior crimes, right?

17  A.   No.

18       Q.   For the record, Your Honor, I would propose that the

19  Court take judicial notice of the First Circuit opinion.  I'm

20  forgetting the cite right now, but it's 487 F3d -- I'll have

21  to check the cite, but these facts are all right out of the

22  Federal First Circuit Court of Appeals decision affirming Mr.

23  Cohen's convictions.

24            THE COURT:  Any objection to the Court taking

25  judicial notice of the opinion -- of the judicial decision of

JAMES JOSEPH COHEN - Direct

1    the First Circuit?

2          MR. PERTEN:  Your Honor, we would object again,

3    certainly on the grounds of relevance, because I haven't seen

4    anything tying this to Lyman-Cutler.  The decision says what

5    it says.  I don't know what the issue is up on appeal, so I'm

6    not suggesting there isn't an appeal.  I'm not suggesting

7    there isn't a reported case and the Court can certainly look

8    at it, but I would object on the basis that there's simply no

9    connection between this line and the Lyman-Cutler project.

10         THE COURT:  It's admitted, or -- I will take judicial

11   notice of the opinion for the purpose of impeachment of this

12   witness.

13         MR. CARNATHAN:  Thank you, Your Honor.

14   BY MR. CARNATHAN:

15     Q.   In fact, Mr. Cohen, while you were in prison you

16   sued the victims of your crimes, right, and claimed that they

17   had committed perjury?

18   A.   I -- the way you characterized the question, I can't

19   answer, so maybe you can recharacterize it?

20     Q.   Okay.  But would you agree with me, sir, that on

21   December 10th, 2006, you filed a civil action against Fairmont

22   Funding, Aurora Loan Services, Lehman Brothers Bank, Lehman

23   Brothers Holdings, and Isaac Aryeh, seeking $96 million in

24   damages?

25   A.   That's correct.



JAMES JOSEPH COHEN - Direct

1    Q.   And you alleged in that civil action that the

2    defendants committed both perjury and fraud to be perpetrated

3    in and on the Court in Boston, Massachusetts, right, sir?

4    A.   I'd have to refresh my memory.  That sounds about

5    accurate.

6         MR. CARNATHAN:  May I have one marked for

7    identification please?

8         THE COURT:  You may.  It's Exhibit J for

9    identification.

10        PLAINTIFF'S EXHIBIT J WAS MARKED FOR IDENTIFICATION

11   BY MR. CARNATHAN:

12   Q.   So sir, I'm just putting a paragraph from your

13   complaint up on the screen where you say, "The criminal

14   proceedings against Plaintiff Jamie Edelkind, in which the

15   defendants committed both perjury and fraud to be perpetrated

16   in and on the Court, occurred in Boston, Massachusetts."  Have

17   I read that correctly?

18   A.   You have.

19   Q.   I'm now putting up another paragraph in which you

20   say, "It is specifically alleged that the sale of the putative

21   loan to Aurora/LBB/LBH was a fraudulent transaction inasmuch

22   as the loan did not exist" --

23   A.   I'm not -- where are you?

24   Q.   I am right here.  No, I'm sorry.

25        THE COURT:  What is that Exhibit -- or paragraph



JAMES JOSEPH COHEN - Direct

1    marked in Roman, XLI?

2         MR. CARNATHAN:  Yeah.  It's actually XXXIX, so what's

3    that, 39?

4         THE COURT:  Oh.

5    BY MR. CARNATHAN:

6    Q.   So I'm now -- I'm right here is where I was trying

7    to read from, right there.  I'm sorry, no, next one up.  They

8    all start with "it is specifically alleged".

9         "It is specifically alleged that the sale of the

10   putative loan to Aurora/LBB/LBH was a fraudulent transaction

11   in as much as the loan did not exist as a matter of law, and

12   today, it is a continuing artifice in fraud perpetrated by the

13   defendants."  Have I read that correctly?

14   A.   You have.

15   Q.   I'm now looking at Roman LIV on page 15 where you

16   say,  "It is specifically alleged that the defendants

17   conspired together to trump up a fictional law scenario

18   against the plaintiff, Jamie Edelkind, in order to illegally

19   secure the property against the claims as propounded herein.

20   Such conspiracy, in addition to procuring the property as a

21   specific aim, sought further to enhance the punishment against

22   Jamie Edelkind" for a noncrime cover-up -- "for a noncrime to

23   cover up their meretricious and illegal conduct.  It is

24   anticipated that the defendants will use Jamie Edelkind's

25   conviction as a means to deflect scrutiny from their

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1    contumacious conduct."  Have I read that correctly?

2    A.    You have.

3         Q.    What's contumacious mean, sir?

4    A.    I guess, in this context, it would be that conduct which

5    would be reprehensible to society.

6         Q.    Then going down to paragraph -- I guess it's 47,

7    XLVII.  "It is specifically alleged that an object of the

8    fraud by Fairmont was to defraud LBB and others by

9    misrepresenting the nature of the August 25, 2004,

10   transaction."  Have I read that correctly?

11   A.    You have.

12        Q.    And you kept this action alive in the courts for

13   like three years, didn't you, sir?

14   A.    I did.

15        Q.    And it was eventually dismissed, right?

16   A.    That is correct.

17        Q.    Okay.  Now, I think we've established at this point

18   that you got out of prison in August 2011; do you agree with

19   that now?

20   A.    No, I don't.

21        Q.    Would you agree with me that you started working

22   with Mr. Kagan by somewhere in the 2011/2012 time frame?

23   A.    I think that's about right.

24        Q.    Okay.  So sir, when you started working with Mr.

25   Kagan, you were the strategic business manager for KDC, right?



JAMES JOSEPH COHEN - Direct

1    A.    No.

2         Q.    Well, during the time period that we're interested

3    in, the 2015 time period, you were the strategic business

4    manager for Mr. Kagan or for KDC, right?

5    A.    That is correct.

6         Q.    And in connection with that role, you were

7    consulting with him about litigation matters, right?

8    A.    That was one of the things he asked me to help him with.

9         Q.    Do you recall, Mr. Cohen, when you first found out

10   that Ms. Brusenkova had given us an affidavit in connection

11   with this dispute?

12   A.    No, I don't recall as I sit here.

13        Q.    Was it in the September/October 2015 time frame,

14   sir?

15   A.    I would need something to refresh my memory.

16        Q.    Well, certainly, you knew about it by November 2015,

17   would you agree with that?

18   A.    I knew what?

19        Q.    That you knew that Ms. Brusenkova had given us an

20   affidavit in this case, right?

21   A.    I would need something to refresh my memory as to when

22   she gave you that.

23        Q.    Would you agree that once you found out that she was

24   going to testify for us, you went on a mission, if you will,

25   to intimidate or discredit her?



JAMES JOSEPH COHEN - Direct

1    A.    Absolutely not.

2        Q.    Did you in fact file a series of criminal complaints

3    against her?

4    A.    I did not file anything against her.  I, on behalf of

5    KDC, assisted them.  I have no personal animus towards her.

6        Q.    Did you write to the Middlesex District Attorney's

7    Office on November 20th, 2015, and claim that she had paid her

8    husband to marry her so that she stay in this country?

9    A.    Yes.

10       Q.    Okay.

11   A.    I'm not sure about the date, though.

12           MR. CARNATHAN:  I've asked the clerk to mark the next

13   exhibit.  I think we're up to Plaintiff's K for

14   identification?

15           THE COURT:  That's right.

16        PLAINTIFF'S EXHIBIT K WAS MARKED FOR IDENTIFICATION

17   BY MR. CARNATHAN:

18       Q.    All right, so I'm putting a letter up on screen.

19   And that's you in the upper right corner, right; you wrote

20   this letter, sir, right?

21   A.    And you wrote it to Assistant District Attorney Whitney

22   Williams, at the Middlesex DA's Office, right?

23   A.    I did.

24       Q.    And the subject was "Proposed indictment", correct?

25   A.    That is correct.



JAMES JOSEPH COHEN - Direct

1    Q.   And in the background, you assert that she paid her

2    husband $12,000 to marry her and $14,000 more upon receipt of

3    a green card, right?

4    A.   Yes.

5    Q.   And you'll agree with me that you knew about her

6    affidavit by now because you specifically reference it in this

7    letter, right?  I'll read it for you.

8    A.   The -- the part you're showing me, I don't see it.

9    Q.   I am looking right there.

10   A.   Oh, I'm sorry, yes.

11   Q.   You say, "She has tortiously interfered in the

12   business of Kagan Development" --

13   A.   Yes.

14   Q.   -- "I'm aligning the business practices in the form

15   of sworn testimony.  See attached affidavit of Brusenkova

16   received through discovery in Superior Court litigation

17   fomented by Brusenkova."  I've read that correctly?

18   A.   Yes, you have.

19   Q.   The DA didn't go forward with anything based on your

20   letter, did it, sir -- did she, sir?

21   A.   She was doing it -- she actually referred it to the

22   police to do an investigation and she was trying to put

23   together a case against her.

24   Q.   Okay.  In fact, when nothing happened as a result of

25   your letter on November 30th, 2015, you personally went down

JAMES JOSEPH COHEN - Direct

1    to the Newton Police Department and swore out a criminal

2    complaint against Ms. Brusenkova; isn't that right, sir?

3    A.   I made application for a criminal warrant on behalf of

4    KDC.

5            MR. CARNATHAN:  I'm sorry.  I would offer that last

6    Plaintiff's Exhibit J for identification into evidence.

7            MR. PERTEN:  Your Honor, we object on a variety of

8    grounds, not the least of which is Your Honor entered an

9    order, a pre-trial order in this case asking us to pre-mark

10   and identify exhibits.  This is not on any exhibit list.  This

11   is the first I'm seeing this document from Mr. Carnathan.

12           Mr. Cohen has not testified to anything contrary to

13   what he said in here, so it's certainly not impeachment, but

14   more importantly, it's not on any exhibit list, nor have any

15   of these other convictions, frankly, been.  You know, you

16   entered an order.  We abided by the order.  I think what's

17   good for the goose --

18           THE COURT:  I right.

19           MR. PERTEN:  -- is good for the gander so to speak,

20   thank you.

21           MR. CARNATHAN:  Well, I actually did ask him if he

22   went after Ms. Brusenkova after he found out that she was

23   going to testify for us, and I'm now going to show a series of

24   things that he did to try to intimidate or discredit her.

25   He's already denied that he did that, so now I'm showing

JAMES JOSEPH COHEN - Direct

1   that's not true.

2          THE COURT:  So for impeachment only.

3          Did you understand that argument?  I'm just giving

4   you a chance to respond.

5          MR. TAMPOSI:  I think there's just some -- I think

6   Attorney Carnathan just tried to move in J, which is the civil

7   complaint.

8          MR. CARNATHAN:  J was the letter that Mr. Cohen wrote

9   to the DA.

10         THE CLERK:  K.

11         MR. TAMPOSI:  K is the letter.

12         MR. CARNATHAN:  K, oh, excuse me.  I'm so sorry.

13         MR. TAMPOSI:  So I think --

14         THE COURT:  Yeah, you're absolutely right.

15         MR. TAMPOSI:  -- we're talking at each other.

16         MR. CARNATHAN:  Yeah.

17         THE COURT:  So what are you moving on, K?

18         MR. CARNATHAN:  I'm sorry.  I mean K.  J --

19         THE COURT:  You meant K?

20         MR. CARNATHAN:  J, I was going to leave aside.

21         THE COURT:  Right.  That's his letter to the DA in

22   Middlesex, right, the ADA?

23         MR. CARNATHAN:  That's right, Your Honor.

24         THE COURT:  Okay.  All right.  And so you're offering

25   it for impeachment purposes because you -- I understand why.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Direct

1    MR. CARNATHAN:  Right.

2    MR. PERTEN:  Impeachment for what?  There's been no

3  evidence contrary to what he's alleged --

4    THE COURT:  He asked -- it's for impeachment and it

5  does tend to impeach.  I listened to the testimony just three

6  minutes ago.  So it's admitted for purposes of impeachment and

7  it's -- what is it now?

8      PLAINTIFF'S EXHIBIT 322 WAS ADMITTED INTO EVIDENCE

9    THE CLERK:  322.

10    THE COURT:  322?

11    THE CLERK:  Yes, 322.

12  BY MR. CARNATHAN:

13    Q.   Okay, sir --

14    MR. CARNATHAN:  Why don't I mark this one for

15  identification, too, please?

16    THE COURT:  Okay.

17     PLAINTIFF'S EXHIBIT L WAS MARKED FOR IDENTIFICATION

18    THE COURT:  Let me also be clear that my order didn't

19  require a listing of documents that might be used for

20  impeachment purposes; is there anything wrong with that

21  statement?

22    MR. CARNATHAN:  No, Your Honor, that's correct.

23    THE COURT:  Mr. Perten?

24    MR. PERTEN:  My understanding and again, Your Honor,

25  I could be -- without pulling up the order -- I don't -- my

JAMES JOSEPH COHEN - Direct

1   understanding was you asked us to pre-mark exhibits that we

2   knew or believed we were going to be utilizing.  Honestly, as

3   I stand here today --

4           THE COURT:  All right.

5           MR. PERTEN:  -- I don't recall if you excised or

6   excluded impeachment documentation.

7           THE COURT:  My standard order would exclude documents

8   used for impeachment or information because the lawyer doesn't

9   know until --

10          MR. PERTEN:  Yes.

11          THE COURT:  -- until he hears the testimony that

12  impeachment is appropriate.

13          MR. PERTEN:  Well, Your Honor, I don't object to

14  using a document for impeachment, but I think there's a

15  difference between showing the witness a document for

16  impeachment purposes and having it admitted into evidence as a

17  full exhibit.  So that's where I disagree, frankly, that if he

18  wants to ask him about things he did and he didn't have any

19  obligation to show me, that's fair game.  But he's offering

20  these as affirmative evidence, and once they're in, they're

21  in.  And I guess --

22          THE COURT:  But I said it was admitted for a limited

23  purpose, that's why.

24          MR. PERTEN:  All right, I understand that, I just

25  think, respectfully, Your Honor, I think it's inappropriate to

JAMES JOSEPH COHEN - Direct

1    admit them as evidentiary exhibits, especially where they were

2    not on the exhibit list, which I believe -- and again, without

3    having it in front of me I don't want to misrepresent, but

4    that was not my understanding of Your Honor's order.

5            THE COURT:  All right.

6            Go ahead.

7            MR. CARNATHAN:  Thank you, Your Honor.

8            THE COURT:  What are you showing us now?  Has this

9    been marked?

10           MR. CARNATHAN:  This has marked as Exhibit L for

11   identification, Your Honor.

12           THE COURT:  All right.

13   BY MR. CARNATHAN:

14       Q.   So Mr. Cohen, you actually went down to the Newton

15   Police Department on November 30th, 2015, right?

16   A.   I guess so, I don't know.

17       Q.   You don't remember doing that?

18   A.   I don't remember the date.

19       Q.   Okay, but you'll agree with me you're listed as the

20   reporting person on this, right?

21   A.   Yes, and that's key here.  I'm not the -- this was not me

22   going against her.  This is stuff that happened to the

23   company, that because Vadim's command of language is less than

24   perfect, that he requested that I do these things.  I didn't

25   do these of my own will or my own animus against her.  I've

JAMES JOSEPH COHEN - Direct

1    been trying to tell you that since the beginning.

2         Q.   Anything else you want to get off your chest now?

3    A.   Nothing that you'd like to hear.

4         Q.   So you and this complaint -- swore out a complaint

5    against Ms. Brusenkova for embezzlement, right?

6    A.   It was an application.

7         Q.   Okay.  And that went to a hearing before the clerk

8    magistrate, right?

9    A.   I believe so.

10        Q.   Well, you testified at it, didn't you, sir?

11   A.   I testified at one hearing.  I didn't testify at the

12   other, so I'm not sure which one this was.

13        Q.   Yeah.  Did you show up at that hearing with copies

14   of checks that you had altered to make them look like --

15   A.   Absolutely not.

16        Q.   -- a "smoking gun"?  Didn't happen?

17   A.   That's a lie.

18        Q.   The hearing was on --

19            THE COURT:  Just let him finish the question, though.

20            MR. CARNATHAN:  Yeah.

21            THE WITNESS:  He keeps accusing me of things.

22            THE COURT:  You'll have your -- not your counsel, but

23   counsel for the defendants will have an opportunity to examine

24   you.

25            Go ahead.



JAMES JOSEPH COHEN - Direct

1    BY MR. CARNATHAN:

2         Q.   So that hearing before the clerk's magistrate was

3    held on January 15th, 2016; isn't that right, sir?

4    A.   I don't know.  That's when it was scheduled when this

5    application was made.  I don't know when it actually occurred.

6         Q.   Okay.  Would you agree with me that the clerk

7    magistrate found no probable cause to issue a criminal

8    complaint on that?

9    A.   He said there was insufficient evidence.

10        Q.   Right, and declined to issue the criminal complaint,

11   right?

12   A.   He said to come back when there was more evidence.

13           MR. CARNATHAN:  We would offer Exhibit L into

14   evidence for impeachment purposes.

15           MR. PERTEN:  Same objection, Your Honor.  I don't

16   think it's proper to have this admitted as an exhibit.

17           THE COURT:  All right, same ruling.

18           It's admitted.  So it's 323.  323?

19           THE CLERK:  Yes.

20       PLAINTIFF'S EXHIBIT 323 WAS ADMITTED INTO EVIDENCE

21   BY MR. CARNATHAN:

22        Q.   So sir, after the clerk magistrate declined to find

23   probable cause on the claim for embezzlement, you and Mr.

24   Kagan went back down to the police department on February 1,

25   2016, and swore out a complaint against Ms. Brusenkova for

JAMES JOSEPH COHEN - Direct

1   intimidating a witness, specifically Viktor Sergeyev, right,

2   sir?

3   A.   We reported what Mr. Sergeyev told us.

4        Q.   But he didn't even go with you to the police

5   station, did he, sir?

6   A.   I don't remember.

7        Q.   Not a fantastic copy, but I'm looking now at the

8   narrative on the second page where the police report says, "I

9   spoke with the victim, Vadim Kagan, and John Cohen.  I spoke

10  with Mr. Sergeyev on his cell phone."  Do you see where it

11  says that?

12  A.   Yes, I see that.

13       Q.   So it was actually you and Mr. Kagan down at the

14  police station without Mr. Sergeyev, right, sir?

15  A.   That's the way it appears on this occasion, but they got

16  my name wrong and, obviously, my date of birth.

17       Q.   But you did have an affidavit from Mr. Sergeyev,

18  right?

19  A.   Yes.

20       Q.   Did you write this affidavit?

21  A.   I drafted it.

22       Q.   Okay.  And so the gist of it is that Mr. Sergeyev

23  was in fear for his safety, well-being, and that of his family

24  and his business, right, sir?

25  A.   Yes.



JAMES JOSEPH COHEN - Direct

1    Q.    Okay.  And the clerk magistrate found no probable

2    cause on that complaint, too, right, sir?

3    A.    This was a police report.  I don't think this was the

4    magistrate, but I could be mistaken because I don't remember

5    if there was ever a clerk's hearing on that.

6    Q.    All right.  So when that didn't work, you and Mr.

7    Kagan arranged to file a civil lawsuit against Ms. Brusenkova,

8    right, sir?

9    A.    I never filed a civil lawsuit against her.

10   Q.    Well, Kagan Development KDC, Corp., Vadim Kagan, and

11   Tatiana Kagan sued Ms. Brusenkova, MK Properties, and Igor

12   Kladov in April 2016, right, sir?

13   A.    They did.

14   Q.    And that case actually is scheduled for trial next

15   month, right?

16   A.    I believe that's true.

17   Q.    Okay.  And in fact, the complaint alleges twenty-

18   seven separate counts against Ms. Brusenkova, right?

19   A.    I don't remember.

20   Q.    Okay.  How many lawyers have you gone through on

21   that case, sir?

22   A.    That's something you'd have to ask Mr. Kagan.

23   Q.    All right.  Is it true that KDC is on its fourth set

24   of lawyers in that case?

25   A.    I no longer work for KDC except as an occasional

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 66

JAMES JOSEPH COHEN - Cross

 1   consultant.  I don't know who is representing them in that

 2   case right now.

 3        Q.   All right, so filing the civil suit against Ms.

 4   Brusenkova wasn't your idea?

 5   A.   No, it was definitely not my idea.

 6           MR. CARNATHAN:  That's all I have for Mr. Cohen.

 7           THE COURT:  Okay.

 8           MR. PERTEN:  Good morning, Mr. Cohen.

 9           THE WITNESS:  Good morning.

10                       CROSS-EXAMINATION

11   BY MR. PERTEN:

12        Q.   Now, in connection with KDC, sir, you're not an

13   employee; is that correct?

14   A.   That's correct.

15        Q.   And you've never been an employee of KDC, correct?

16   A.   That is correct.

17        Q.   You have no day-to-day responsibilities at KDC;

18   isn't that correct?

19   A.   That's correct.

20        Q.   And you've --

21           THE CLERK:  Excuse me.  I'm not getting --

22           MR. PERTEN:  Sorry -- am I now?

23           THE CLERK:  Okay.

24           MR. PERTEN:  Sorry.

25           THE COURT:  Who are you not getting?



Page 67

JAMES JOSEPH COHEN - Cross

1              MR. PERTEN:  Me, Your Honor.

2              THE COURT:  Oh.

3              MR. PERTEN:  I'm sorry.

4    BY MR. PERTEN:

5         Q.   So sir, you have no everyday responsibilities for

6    KDC; isn't that correct?

7    A.   That is correct.

8         Q.   And the same is true for ProExcavation Corp.,

9    correct?

10   A.   Correct.

11        Q.   Now you don't have an office at KDC; isn't that

12   correct?

13   A.   Correct.

14        Q.   You didn't have any daily responsibilities

15   whatsoever for the Lyman-Cutler project, did you?

16   A.   No.

17        Q.   Were you involved in any aspect in preparing

18   subcontractor payments?

19   A.   Subcontract pay -- oh, you mean payment to outside

20   contractors?

21        Q.   Correct.

22   A.   No.

23        Q.   While the construction was going on, were you

24   involved in any of the interactions with subcontractors?

25   A.   No.  Can I clarify?



(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Cross

1    Q.   Let me help you out.  You certainly weren't dealing

2  with contractor scheduling issues, correct?

3  A.   No.

4    Q.   And you weren't dealing with contractor payment

5  issues, were you?

6  A.   No.

7    Q.   Okay.  Now, in 2013, did you help prepare the KDC

8  construction contract?

9  A.   The construction management agreement?

10    Q.   Yes.

11  A.   Yes.

12    Q.   That would be Exhibit 65.

13      MR. PERTEN:  Could you bring that up, please?

14  A.   Do you want me to turn to it?

15    Q.   No.  No, no.  There's no question, just let them

16  bring it up.

17      MR. PERTEN:  If you could scroll down to the

18  emails -- before that.  Scroll up a little bit?  All right,

19  stop there.

20  BY MR. PERTEN:

21    Q.   Mr. Cohen, as part of Exhibit 65, I'm seeing an

22  email dated June 24th, 2013; do you see that?

23  A.   I do.

24    Q.   And sir, is that consistent with your memory as to

25  when you were drafting the KDC contract?



(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Cross

1    A.   I don't have a memory to the exact date, but it's the

2    same general time frame.

3         Q.   Well, the suggestion has been made that you actually

4    prepared this in 2015 and it was backdated.  Did that happen?

5    A.   That did not happen.

6         Q.   Okay.  Why did you prepare the contract in 2013 as

7    opposed to Mr. Kagan, if you know?

8    A.   I was trying to bring formality to some of his business

9    practices, and I put together from a template this agreement,

10   as well as several others that he used.

11        Q.   Okay.

12            MR. PERTEN:  Mr. Harris, would you scroll down,

13   please, to the last page?

14            MR. HARRIS:  The very last?

15            MR. PERTEN:  Please.

16            Scroll down, thank you.

17   BY MR. PERTEN:

18        Q.   This has been admitted with some metadata, do you

19   see that?

20   A.   I do.

21        Q.   The bottom line says, "last printed 6/17/2015"; do

22   you see that?

23   A.   I do.

24        Q.   Would you have also printed this contract off when

25   you created it back in 2013?



JAMES JOSEPH COHEN - Cross

1   A.   Yes.

2        Q.   Okay.  You participated as well in the preparation

3   of the lien documents; do you recall that testimony?

4   A.   I was the primary person who drafted the lien.

5        Q.   And the lien documents, I'll represent to you, were

6   recorded on June 22nd, 2015; does that sound roughly right to

7   you?

8   A.   Roughly right.

9        Q.   Okay.  And did you print off the contract roughly a

10  week before the lien document so that you could prepare them?

11  A.   Absolutely.

12       Q.   Absolutely?

13  A.   Yes.

14       Q.   Thank you.  Now, when you prepared the KDC contract

15  in 2013, how long did it take you?

16  A.   A long time, over the course of several days, hours.

17       Q.   Okay.  And I believe you told us you started with a

18  template of some sort?

19  A.   Yes.

20       Q.   And when you had finished making whatever changes to

21  the template, did you hit the save button and name the

22  document and save it on your computer?

23  A.   Yes.

24       Q.   And prior to hitting the save button, did that

25  document exist on your computer anywhere?



JAMES JOSEPH COHEN - Cross

1    A.    Yes, but as a -- but not -- not as the Lyman-Cutler

2    agreement.  It would be a -- it'd be some other agreement from

3    which I edited and created the Lyman-Cutler agreement.

4         Q.    Okay.  Now, in connection with preparing the -- you

5    understand KDC has submitted a proof of claim in this case?

6    A.    I do.

7         Q.    And in connection with preparing the so-called

8    proof-of-claim binders -- the binders that have all the

9    invoices and checks -- did you have any role in preparing

10   those?

11   A.    None.

12        Q.    Did you have any role whatsoever in getting the

13   invoices together?

14   A.    None.

15        Q.    Did you have any role whatsoever in connection with

16   preparing QuickBooks?

17   A.    No.

18        Q.    Did you ever have any role in entering matters into

19   QuickBooks?

20   A.    No.

21        Q.    As it relates to Lyman-Cutler?

22   A.    I did no QuickBooks for KDC at all.

23        Q.    Okay.  In your responsibilities, sir, did you have

24   any responsibility for recording payments and debits in the

25   KDC QuickBooks?



Page 72

JAMES JOSEPH COHEN - Cross

1   A.   No.

2        Q.   How about in the ProEx QuickBooks?

3   A.   No.

4        Q.   Now after you drafted the contract in 2013, the KDC

5   contract, what was your next involvement, if you can recall,

6   having to do with the Lyman-Cutler project?

7   A.   A meeting with Vadim about a problem with runoff into a

8   neighbor's swimming pool.

9        Q.   Okay, and when was that, roughly?

10  A.   2014, sometime.

11       Q.   2014-ish?

12  A.   Yeah, they -- the houses were -- no landscaping was done

13  when I was out there.  They had just finished a stone wall

14  behind the house, separating it from the neighbor's, and they

15  were -- the neighbor had complained and was going -- wanted to

16  file a lawsuit for damaging his pool.

17       Q.   His pool?

18  A.   His pool.

19       Q.   And was that -- again, if we go the chronology from

20  the time you dealt with the construction contract in June of

21  2013 to the time in 2014, when you got involved in the

22  neighbor dispute, had you had any other substantive role with

23  Lyman-Cutler?

24  A.   That was the first time I had any role at all.

25       Q.   What happened with that dispute; what was the end

JAMES JOSEPH COHEN - Cross

1    result?

2    A.   Worked it out.  We paid a pool-cleaning service.

3         Q.   I'm sorry?

4    A.   We paid a pool -- I recommended to Vadim that he hire a

5    pool cleaning service and see if that dealt with the problem,

6    which he did; and that solved the issue.

7         MR. PERTEN:  Can you scroll back up, Mr. Harris, on

8    Exhibit 65?  No, back to the email, please.  Okay, okay.

9    BY MR. PERTEN:

10        Q.   Are you familiar with the email domain name

11   KaganDevelopment.com?

12   A.   I am.

13        Q.   Did you set up that email address?

14   A.   I --

15        Q.   When did you do that?

16   A.   2012 with -- I think it was with Blue Host; I could be

17   wrong.

18        Q.   Sir --

19        MR. PERTEN:  May I approach, Your Honor?

20        THE COURT:  You may.

21   BY MR. PERTEN:

22        Q.   Mr. Cohen, I've handed you a document; does that

23   refresh your memory as to when you set up the

24   KaganDevelopment.com domain name?

25   A.   I'm going to ask if you could blow this up.  I can't read

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Cross

 1    it being so small.

 2         MR. PERTEN:  May I approach again, Your Honor?

 3         THE COURT:  Yes.

 4    BY MR. PERTEN:

 5         Q.   Let me show you.

 6    A.   Much better.

 7         Q.   Mr. Cohen, I'm showing you the WHOIS search results

 8    for the domain name; does that refresh your recollection as to

 9    when you set up the domain name Lyman-Cutler.com -- I'm sorry,

10    KaganDevelopment.com?

11    A.   It does.

12         Q.   And what is the date?

13    A.   3/20/2013.

14         MR. PERTEN:  I'd would like to offer this this as the

15    next article of evidence exhibit.

16         THE COURT:  Any objection?

17         MR. CARNATHAN:  Yes, I mean he's only used it to

18    refresh recollection.  I don't think that makes it admissible

19    in this instance.

20         THE COURT:  Is that all you used it for?

21         MR. PERTEN:  Excuse me?

22         THE COURT:  Is that all you're using it for, is to

23    refresh recollection?

24         MR. PERTEN:  The suggestion by Mr. Filippov was that

25    this domain name didn't even exist back then, and this



Page  75

JAMES JOSEPH COHEN - Cross

1   certainly establishes that it did.  In fact, it was already

2   there for six months.

3            THE COURT:  Well, that may be, but are you -- what

4   was your purpose in showing him the document?

5            MR. PERTEN:  I did show it to him to refresh his

6   recollection.

7            THE COURT:  Okay, so I don't believe that is your

8   option then to mark it for admission.

9            MR. PERTEN:  Okay.

10           THE COURT:  The other side can unless your

11  recollect -- or your understanding of the rules is different

12  than mine?

13           MR. PERTEN:  Let try instead of --

14           THE COURT:  That's fine.

15           MR. PERTEN:  -- a different foundation.

16           THE COURT:  That's fine.

17           MR. PERTEN:  May I approach again, Your Honor?

18           THE COURT:  You may.

19  BY MR. PERTEN:

20      Q.  Mr. Cohen, I've placed in front of you the WHOIS

21  search results; are you the person --

22           MR. PERTEN:  Strike that.

23  BY MR. PERTEN:

24      Q.  Did you do the search under WHOIS to confirm when

25  you set up the domain name KaganDevelopment.com?



JAMES JOSEPH COHEN - Cross

1   A.   I did two searches, both ICANN and WHOIS.

2        Q.   And is this the search that you did?

3   A.   Yes.

4        MR. PERTEN:  Your Honor, I would offer this as the

5   next exhibit, please.

6        MR. CARNATHAN:  Why, I think it's still problematic.

7   I mean, he's not using it to impeach Mr. Cohen, he's using it

8   to support Mr. Cohen, and it's not on his witness list.  So I

9   don't think he gets to backdoor it this way by purporting to

10  refresh his recollection and then having him authenticate it.

11       THE COURT:  Is that true; it's not on -- it's not on

12  your list as affirmative evidence?

13       MR. PERTEN:  It's not on my list as affirmative

14  evidence but this is to impeach Mr. Filippov's testimony

15  through this witness.

16       THE COURT:  All right, it's admitted for impeachment

17  purposes.

18       MR. PERTEN:  Thank you, Your Honor.

19     DEFENDANTS' EXHIBIT 324 WAS ADMITTED INTO EVIDENCE

20       MR. PERTEN:  May I proceed?

21       THE COURT:  Right, so that's --

22       MR. PERTEN:  324?

23       THE CLERK:  324, thank you.

24       THE COURT:  324.

25       THE CLERK:  Yes.

JAMES JOSEPH COHEN - Cross

 1   BY MR. PERTEN:

 2       Q.   Now, Mr. Cohen, there was a significant amount of

 3   testimony this morning regarding various criminal convictions;

 4   do you recall that?

 5   A.   I do.

 6       Q.   When did your sentence for the bank fraud run out;

 7   when had you fully completed that sentence?

 8   A.   There were two sentences.

 9       Q.   Okay.  When was -- let's start with the first one;

10   what was your first sentence for?

11   A.   Georgia, for a year and a day, and I -- but it ended in

12   sometime in 2015.

13       Q.   In 2015?

14   A.   I'm sorry, that's incorrect -- 2005.

15       Q.   2005.  And then the next conviction for bank fraud

16   and aiding and abetting; when did that -- when did your

17   incarceration end on that conviction?

18   A.   About 2008 or 2009.

19       Q.   Okay.  And the child support --

20           MR. PERTEN:  Strike that.

21   BY MR. PERTEN:

22       Q.   After 2009, how is it that you remained incarcerated

23   through 2011?

24   A.   The child-support matter out of Louisiana was a

25   consecutive sentence to -- that was run after the completion

JAMES JOSEPH COHEN - Cross

1    of my previous ones.

2        Q.   Okay.  So after you had served your time for the

3    prior two convictions, they didn't let you out and then

4    reincarcerate you, correct?

5    A.   That's correct.

6        Q.   So you did serve consecutively -- excuse me,

7    continuously through 2011; isn't that correct?

8    A.   Yes, through -- I'd like you to help me to clarify those

9    two dates that keep coming up, February and August.

10       Q.   Sure.

11   A.   I was released the beginning of February 2011, but I was

12   given home confinement into August, and so those two dates,

13   even though I was out of custody, I was still serving home

14   confinement until then, and that's why.  That ended in August.

15       Q.   Okay.  And sir, after 2009, is it your understanding

16   that the only reason you were still incarcerated was due to

17   the child-support conviction?

18   A.   That was the only reason.

19           MR. PERTEN:  Now, Mr. Harris, can you bring up

20   Exhibit 66, and if you could scroll down to the invoice?  Of

21   course, there is no invoice.  Okay, my bad.

22   BY MR. PERTEN:

23       Q.   The invoice, sir, that was prepared for KDC, what

24   role did you have in preparing that invoice?

25   A.   I know I discussed it with Vadim and Dan, that I needed

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Cross

1    the latest invoice for the purposes of filing the mechanic's

2    lien.  I don't recall what role, if any, I played in crafting

3    the invoice itself.

4         Q.   Sir, I've placed on the screen the KDC invoice which

5    is part of the proof of claim that was filed by KDC; do you

6    recall this document?

7    A.   I do.

8         Q.   The total construction cost that's listed, did you

9    have any role in calculating that number?

10   A.   The total construction cost line item?

11        Q.   Yes.

12   A.   No, I had no role in that.

13        Q.   Is that a number that you got from Mr. Gersh?

14   A.   Yes, definitely from Mr. Gersh.

15        Q.   Okay, and then the percentage add-ons, the general

16   contractor construction fee, fifteen percent; were those

17   numbers that you calculated?

18   A.   They are.

19        Q.   And how did you go about calculating those numbers?

20   A.   I took the contract and I took the information from Dan

21   and I simply combined them together to get the percentages and

22   the calculation.

23        Q.   Okay, could you keep your voice up, sir?

24   A.   Certainly.

25             THE COURT:  So we're a little past 11.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Cross

1          MR. PERTEN:  Do you want to break now?  I'll be maybe

2    ten, fifteen minutes, not more than that.

3          THE COURT:  I think then we should, let's take a

4    break now.

5          MR. PERTEN:  Okay.

6          THE COURT:  All right?  Fifteen minutes, thank you.

7          THE CLERK:  All rise.  The court is in recess.

8                (Off the record at 11:05 a.m.)

9                (On the record at 11:26 a.m.)

10          THE CLERK:  Court is now in session.

11          THE COURT:  Please be seated.

12          All right, whenever you're ready.

13          MR. PERTEN:  Thank you, Your Honor.

14                   RESUMED CROSS-EXAMINATION

15    BY MR. PERTEN:

16     Q.   Mr. Cohen, in or about May of 2015, did you have

17    occasion to meet with Mr. Filippov to turn over the keys to

18    the property?

19    A.    I did.

20     Q.   Did you have conversation with him on the site

21    during that meeting?

22    A.    Yes, we met in one house, I let him in, walked all the

23    way through and, you know, let him look at everything and make

24    comments.  Then we walked to the next-door house and we went

25    inside, did the same, and then we sat down in, I guess, what

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Cross

 1   would be in either a breakfast area or a dining room to have a

 2   conversation.

 3       Q.   And to the best of your ability, can you recall what

 4   that conversation was?

 5   A.   Yes, I asked if there was any way to try and figure out

 6   an amiable workout of this issue between him and Vadim, and he

 7   was with his -- I believe it was his wife was there at the

 8   time, and he got very agitated and made some threats against

 9   Vadim, including that he would not stop till he saw his blood

10   under the door; that's a quote.

11       Q.   Okay.  And then, sir, in July after the state

12   lawsuit was filed, did you have occasion to attend a members'

13   meeting?

14   A.   I did.

15       Q.   Did you attend as the proxy for Mr. Kagan?

16   A.   I did.

17           MR. PERTEN:  Can you pull up Exhibit 283 please?

18   BY MR. PERTEN:

19       Q.   Mr. Cohen, Exhibit 283, which is admitted into

20   evidence, is this a list of questions that was generated prior

21   to the meeting of things you wanted to discuss at that

22   meeting?

23   A.   Yes.

24       Q.   And did in fact you attend a meeting, a members'

25   meeting?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JAMES JOSEPH COHEN - Cross

1   A.   At Sean Carnathan's office.

2       Q.   Okay.

3   A.   No -- yes.

4       Q.   And who was present at the meeting?

5   A.   In the meeting was just --

6       Q.   In the meeting?

7   A.   -- three of us.  It was myself, Mr. Lipetsker, and Mr.

8   Filippov.

9       Q.   Okay, and did you take minutes of that meeting?

10  A.   I did.

11       MR. PERTEN:  Mr. Harris, could you pull up Exhibit

12  70, please?

13  BY MR. PERTEN:

14       Q.   Exhibit 70, which is also admitted into evidence,

15  sir, are these meeting minutes that you took?

16  A.   This is a transcription of my minutes, which were

17  handwritten.

18       Q.   All right.

19       MR. PERTEN:  Mr. Harris, could you scroll down,

20  please?

21  BY MR. PERTEN:

22       Q.   So let's look at number one.  Filippov called for a

23  vote to ratify his actions as a managing member, and then

24  there's subparagraphs A, B, C, and D; do you see that?

25  A.   I do.



JAMES JOSEPH COHEN - Cross

1      Q.    And are subparagraphs A, B, C, and D, to the best of

2   your recollection, a true and accurate description of what was

3   discussed on that issue?

4   A.    Yes.

5      Q.    And is the vote that's reflected there, that

6   Lipetsker voted yes, Filippov voted yes, and you voted no, is

7   that accurate?

8   A.    It is.

9      Q.    All right.

10       MR. PERTEN:  Will you scroll down to number 2,

11   please?

12   BY MR. PERTEN:

13      Q.    Did you have a conversation during that meeting

14   about hiring the O'Connor, Carnathan and Mack lawsuit (sic) to

15   bring a lawsuit; did that topic come up?

16   A.    Yes, I brought it up and then Mr. Filippov called for the

17   vote to say it was okay.

18      Q.    And do subparagraphs A through H, were those

19   contemporaneous records of what was discussed at the meeting

20   on that topic?

21   A.    We actually -- Mr. Filippov refused to discuss it, so

22   there was no discussing -- discussion as to, with him, as to

23   the subject matter but we -- I did try to drill down on some

24   other issues.

25      Q.    Okay.  And at the end of the discussion or at the

JAMES JOSEPH COHEN - Cross

1    end of that topic, was it voted Lipetsker and Filippov yes, in

2    favor of ratification, and Kagan no?

3    A.    That's correct.

4         Q.    All right.

5              MR. PERTEN:  Can we scroll down again?

6    BY MR. PERTEN:

7         Q.    Did you also discuss the request to remove Tatiana

8    Kagan as the listing broker?

9    A.    Yes.

10         Q.    And did Lipetsker and Filippov again vote yes, in

11   favor of removal, and you voted no?

12   A.    Yes.

13             MR. PERTEN:  Let's go down to four.

14   BY MR. PERTEN:

15         Q.    Did you discuss the action of suing KDC in the state

16   court?

17   A.    Yeah, I brought it up.

18         Q.    And was there a discussion?

19   A.    No, they refused to discuss it.

20         Q.    And is the vote that's reflected in your minutes

21   accurate, that Lipetsker and Filippov voted yes, in favor of

22   ratification, and Kagan, via proxy, voted no?

23   A.    Correct.

24             MR. PERTEN:  Continue please, Mr. Harris.

25   BY MR. PERTEN:





JAMES JOSEPH COHEN - Cross

1    Q.   Did you have a discussion of carrying costs and

2    payment?

3    A.   Yes.

4    Q.   And is what's in paragraph 5, is that a fair and

5    accurate recitation of the discussion that occurred about the

6    payment of carrying costs?

7    A.   Yes.

8        MR. PERTEN:  Mr. Harris, can you flip down?  Keep

9    going.  Keep going.

10   BY MR. PERTEN:

11      Q.   Now, was there a discussion --

12        MR. PERTEN:  Strike that.

13   BY MR. PERTEN:

14      Q.   Were there any other discussions at that meeting

15   other than as set forth in Exhibit number 70?

16   A.   Nothing material.

17      Q.   At any point, sir -- at any point -- did you ever

18   alter any documents relating to Lyman-Cutler project?

19   A.   I made many edits to documents on behalf of them.

20      Q.   In terms of invoices and subcontractor documents,

21   did you ever alter anything?

22   A.   No.

23      Q.   Did you ever alter any checks?

24   A.   No.

25        MR. PERTEN:  Nothing further, Your Honor.

Page 86

JAMES JOSEPH COHEN - Cross

1           THE COURT:  Okay, any redirect?

2           MR. CARNATHAN:  No, I have nothing more for Mr.

3    Cohen, Your Honor.

4           THE COURT:  All right.  Mr. Cohen, thank you.

5           MR. CARNATHAN:  The plaintiffs call Vladislav

6    Abramskiy.

7           THE COURT:  Good morning.

8                    VLADISLAV ABRAMSKIY SWORN

9           THE COURT:  Good morning, is it Abramskiy?  Good

10   morning.

11          THE WITNESS:  Good morning.

12          THE COURT:  I don't know that we got your affirmation

13   on the record, but when Elizabeth gave you the oath, you said

14   yes, that you would testify to the best of your ability,

15   correct, and truthfully?

16          THE WITNESS:  Yes.

17          THE COURT:  Yes, okay.

18          Just to be certain he understands that if he -- okay,

19   so we'll -- are you going to be interpreting everything that

20   goes on here?

21          THE INTERPRETER:  Yes, Your Honor.

22          THE COURT:  Okay, that's fine.  All right.  All

23   right, so you want to get the microphone to yourself then.

24   That's really what matters, okay?  All right.

25          All right, Mr. Harris?



VLADISLAV ABRAMSKIY - Direct

1          MR. HARRIS:  Your Honor, just to remind you, this is

2     one of the other projects, so for the purposes or preserving

3     the record, I just want to restate our objection.

4          THE COURT:  I understand, okay, that your objection

5     is noted.

6          All right.

7                         DIRECT EXAMINATION

8     BY MR. CARNATHAN:

9     Q.   Would you state your name, sir?

10    A.   Vladislav Abramskiy.

11    Q.   Where do you live?

12    A.   1731 Brookline Avenue.  Oh, Beacon -- I'm sorry.  Beacon

13    Street, apartment number 23, Brookline, Massachusetts, 02245.

14    Q.   What do you do for work, sir?

15    A.   I am a -- a dental technician.

16    Q.   Would you describe your education, please?

17    A.   I graduated the high school in Kiev and then I graduated

18    as a -- in -- as a dental technician.

19    Q.   Also in Kiev, sir?

20    A.   Yes.

21    Q.   When did you come to this country?

22    A.   1997.

23    Q.   How old were you at that time?

24    A.   Twenty-five.

25    Q.   How do you know Vadim Kagan, sir?

Page 88

VLADISLAV ABRAMSKIY - Direct

1   A.   We were introduced to each other by the common -- mutual

2   friend.

3        Q.   Who was the mutual friend?

4   A.   Dr. Rayev (ph.).

5        Q.   When was that?

6   A.   It was around '10 -- the year of 2010/2011.

7        Q.   At any time, did you previously have a social

8   relationship with Mr. Kagan?

9   A.   Maybe I saw him once or twice.

10        Q.   How did you first become involved with the project

11   on Cynthia Road in Newton?

12   A.   After we got introduced to each other, we have another

13   mutual friend, and we began to talk about the future project.

14        Q.   How did you specifically learn about the opportunity

15   to invest in a project at Cynthia Road in Newton?

16   A.   So we were talking with Dima to have some -- to put

17   together some business and to be into some business, and then

18   he told me that he's looking for an opportunity in looking for

19   the house.  And in six months, he called me back and said he

20   had a house, he found a house.

21        Q.   When you say "Dima", is that Mr. Kagan?

22   A.   Yes.

23        Q.   When Mr. Kagan told you he had found a house, what

24   did he tell you about the project?

25   A.   So he just simply told me that he found a house for the

VLADISLAV ABRAMSKIY - Direct

1   project.

2       Q.   At some point, did you agree to invest in this

3   project with Mr. Kagan?

4   A.   Yes.

5       Q.   Do you remember about when that was?

6   A.   Before he began to look for the house, we already agreed

7   on everything.

8           MR. CARNATHAN:   Mr. Hartzell, could I have 108?

9   BY MR. CARNATHAN:

10      Q.   Mr. Abramskiy, we've put up on the TV screen a

11  document that has been marked Plaintiff's Trial Exhibit number

12  108 for identification; do you recognize that document, sir?

13  A.   Yes.

14      Q.   What is it?

15  A.   So this is an agreement between the -- the parties and

16  according to this agreement.

17      Q.   Okay.  Do you recognize this as the operating

18  agreement of Newton-Cynthia Road, LLC, sir?

19  A.   It looks like.

20      Q.   Yeah.  We would offer Plaintiff's Exhibit 108 for

21  identification into evidence, Your Honor.

22          MR. HARRIS:   Your Honor, we object on the grounds

23  that it relates to a project unrelated to Lyman-Cutler.

24          THE COURT:   Overruled.

25       PLAINTIFF'S EXHIBIT 108 WAS ADMITTED INTO EVIDENCE

VLADISLAV ABRAMSKIY - Direct

1    BY MR. CARNATHAN:

2        Q.   Mr. Abramskiy, do you recognize your signature on

3    page 12?

4    A.   Yes.

5        Q.   Do you recall being designated the managing manager

6    of the Newton-Cynthia Road, LLC?

7    A.   Yes.

8        Q.   How did you become the managing manager of Newton-

9    Cynthia Road, LLC?

10   A.   The attorney, Mr. Maiden, who put together this -- this

11   agreement, he told me that the banker, John McGregor, asked me

12   to do that.  Asked him to do the -- asked me to be the manager

13   in this project.

14       Q.   What duties, if any, did you understand yourself to

15   have as the managing manager of the LLC?

16   A.   I really -- I really didn't get into the -- my duties on

17   this project.

18       Q.   At some point, did you talk to Mr. Kagan about how

19   much construction would cost?

20   A.   We -- we talked many times about this -- the meeting

21   about this project with Vitaly (ph.), me and Mr. -- Dima.  So

22   he told me that he is raising his -- he had some kind of a

23   plan that -- about the cost that it will include -- he's

24   raising the cost of the -- the construction so it will include

25   the cost, the carrying cost and the fees for the attorneys and

VLADISLAV ABRAMSKIY - Direct

1   banks -- and the payment to the banks for taxes and insurance.

2   And all the -- all the payments will be connected with this

3   specific project.

4         Q.   When did he tell you that, sir?

5   A.   He told me many times.

6         Q.   All right.  And who is Vitaly Gessl (ph.)?

7   A.   This is -- this is Xena (ph.)'s husband.

8         Q.   And Xena Gessl also invested in the Newton-Cynthia

9   Road, LLC; is that right?

10  A.   Yes.

11        Q.   How much did Mr. Kagan say that the project would

12  cost?

13  A.   He told -- he told us that it would cost $850,000

14  including all the carrying costs and everything included.

15        Q.   Where did you take out the loan to pay for the

16  project?

17  A.   I don't understand the question.

18        Q.   From what bank did you take out the loan in order to

19  pay for the project?

20  A.   Rockland Trust -- Rockland Trust.

21        Q.   Were you able to borrow the entire $850,000?

22  A.   So when the appraisal came from back, it -- they

23  appraised the project 700 -- around 750, 795 -- $797,000,

24  sorry.

25        Q.   I'm sorry, 795- to 797,000?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VLADISLAV ABRAMSKIY - Direct

1  A.    Thousand, 97.

2      Q.    797?  Thank you.

3          Did you talk to Mr. Kagan about what you would do

4  when the appraisal came in lower than expected?

5  A.    Yes.

6      Q.    What did he say?

7  A.    So he told me that the appraiser was not very good.

8  Okay.  He said don't even worry about that, and the difference

9  between 797 and 850 -- we'll get back to that -- the

10 difference, so don't worry.  Everything is going as planned.

11     Q.    I'm just not sure I followed the answer, I'm sorry.

12 So were you still planning to spend 850,000 on the project

13 after the appraisal came in at 797?

14 A.    Okay.  So the difference, which will be like 53,550- --

15 so he said after the -- they sell the house, Dima will take

16 that difference, that money back so it will be back, so it's

17 not a problem.

18     Q.    Using the operating agreement just as sort of an

19 anchor in time -- so the operating agreement is dated November

20 26th, 2012; do you remember when construction started?

21 A.    Maybe two, three months after the -- after they drafted

22 the agreement.

23     Q.    And do you remember approximately when construction

24 finished?

25 A.    Maybe it take -- it took fifteen months.



VLADISLAV ABRAMSKIY - Direct

1    Q.   Okay.  If we think about that fifteen-month period

2  when construction was in progress, did there come a point

3  where Mr. Kagan told you there would be additional costs on

4  the project?

5  A.   So after a month -- month, while the construction was in

6  progress we met at a restaurant and he told that -- he told me

7  that there was a big rock that fell?

8        THE INTERPRETER:  I'm sorry, interpreter is

9  clarifying about the rock.

10  A.   Oh, oh, oh, yes.  It was a big ledge inside the on the

11  ground and it will cost about 50-, 60-, $70,000 to remove it.

12  BY MR. CARNATHAN:

13    Q.   Did Mr. Kagan say anything about how much his

14  company would charge to remove it?

15  A.   So he was trying to avoid to answer that question and he

16  told us that he will do for his own clients, he will do for

17  less and -- and he will talk to his partner, Vitaly.  And I

18  was not present at that meeting, and it will cost about 30-,

19  $40,000.

20    Q.   After that meeting at the restaurant, did there come

21  a point where additional costs -- where Mr. Kagan told you

22  about additional costs on the project?

23  A.   Okay.  So he didn't talk about it, but we knew all along

24  that the difference between 750 and 850, we have to -- 795 and

25  850, we have to pay him and that will be about $110,000.  We

VLADISLAV ABRAMSKIY - Direct

1  knew that.  All together.  Okay.  It's the difference between

2  the construction loan and to -- for removal of the ledge.

3      Q.   So you were aware of the difference between the

4  construction loan plus the ledge he told you about, and that

5  together added up to about 110,000; did I get that right?

6  A.   Yes.  Yes, about 100,000/$110,000.  Yes.

7      Q.   Other than that money, did Mr. Kagan ever tell you

8  about any additional cost overruns on the project before

9  construction was finished?

10  A.   He never talked about it, but when the house was not

11  sell -- was not sold for a long time and we began to worry

12  about it, so we asked Dima if he wants to buy us out.

13  Before, it was just an oral conversation and then after that

14  meeting, he asked us to write everything on the paper.

15  So okay.  So after we wrote down and sent it to Vadim and we

16  got the email signed by Mr. Cohen that LLC -- Cohen, sorry

17  about that.  Mr. Cohen, Joseph Cohen, that the LLC owes 145-,

18  150,000.

19          MR. CARNATHAN:  Mr. Hartzell, could I have

20  Plaintiff's Exhibit 92?

21  BY MR. CARNATHAN:

22      Q.   So Mr. Abramskiy, I'm showing you an email dated

23  March 4th, 2015, from Joseph Cohen to, I guess, your son,

24  Arthur.  Oh, no, there you are up top, sorry.  It was

25  forwarded to you on March 4th, 2015.  Do you see that?

Page 95

VLADISLAV ABRAMSKIY - Direct

1    A.   Yes.

2         Q.   And if we turn to the second page, is that the

3    letter from Mr. Cohen to which you were just referring?

4    A.   I don't think so.  The -- okay.  So this is the last

5    letter.  I'm talking about the first letter that we got --

6              THE INTERPRETER:  What?

7    A.   -- that we got from Mr. Cohen.  Maybe this is it.

8    BY MR. CARNATHAN:

9         Q.   Well, let me show you a subsequent letter to orient

10   you.

11             MR. CARNATHAN:  Could I have Plaintiff's Exhibit 94,

12   please?

13   BY MR. CARNATHAN:

14        Q.   So Mr. Abramskiy, this one is a letter from Mr.

15   Cohen dated June 15th, 2015; do you see that?

16   A.   Yeah.  Yes.

17        Q.   So if we compare the page of Exhibit 92 from March

18   4th, 2015, to the --

19             MR. CARNATHAN:  Can you put them both up on the

20   screen at the same time?  Yeah.  Yeah.

21   BY MR. CARNATHAN:

22        Q.   All right, so now we've got on screen to the right-

23   hand side is Exhibit 92 that's for identification and that was

24   the one dated March 4th, 2015; are you with me so far?

25   A.   Yes.

VLADISLAV ABRAMSKIY - Direct

1    Q.   Okay, and in that one, he says the LLC currently has

2    accounts payable to vendors of 141,900 subject to minor

3    revision; have I read that correctly?

4    A.   Yes, this is the first letter, correct.

5    Q.   First letter, great.  And then the one to the left

6    is a letter from him June 15th, 2015, and in that one, the

7    number has become 408,172.77.  Sorry, it's covered up, hang

8    on.

9    A.   After we got this first letter, it was a shock for us and

10   we called a meeting of all the investors; Dima and Tatiana

11   were present.  Okay.  And we asked him a question, what's

12   that, and who is Joseph Cohen?  Okay.  And he looked down.  He

13   didn't look at us, he looked down, and he didn't answer the

14   question.  He said this was a mistake.

15   Q.   And do I follow correctly, that's after you got the

16   first letter in March 2015, right?

17   A.   Yes, yes.  After the first letter, the amount was

18   $141,000.

19        MR. CARNATHAN:  Okay.  I'd like to offer both 92 and

20   94 into evidence please, Your Honor.

21        MR. HARRIS:  Your Honor, with respect to each, we

22   have the objection that these are irrelevant.  They relate to

23   something other than Lyman-Cutler.  However, I have an

24   additional objection with respect to Exhibit 92 and that is

25   that it's a settlement communication between the parties.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VLADISLAV ABRAMSKIY - Direct

1          MR. CARNATHAN:  Well, we had similar responses to the

2     last time the settlement objection came up.  In particular,

3     because this is about another project, it can't be a

4     settlement offer in our project, so I think -- I don't think

5     408 applies at all.  But also, it's our contention that these

6     aren't settlement offers at all.  These are made-up numbers by

7     Mr. Cohen that are used to force investors into paying them

8     money.

9          MR. HARRIS:  The record thus far from Mr. Abramskiy

10    is that Mr. Abramskiy asked to be bought out, and this is

11    furtherance of that trying to reach a compromise on what the

12    parties' financial positions were going to be as a result of

13    that request.  So I understand the gloss they want to put on

14    it, but the reality is this is Exhibit 92 is at a time when

15    the parties were trying to settle up with each other.

16          MR. CARNATHAN:  Well, the point that's being made

17    here is on March 4th, the number is 141,900.  I'll briefly

18    show that that number, I think, went up to 170-odd in April.

19    The house went under agreement in May and then suddenly, the

20    number went to 408,000 after the house went into agreement,

21    which is part and parcel of the scheme that we are proposing

22    to prove here this week.

23          And if I'm looking in particular at 408, I don't

24    think I can use this to prove or disprove the disputed claim

25    between Mr. Abramskiy and KDC or Kagan or whoever is

VLADISLAV ABRAMSKIY - Direct

1    purporting to send this, but it can be offered for a variety

2    of other purposes under 408(b).

3           THE COURT:  Right.  Overruled based on 408(b).  It's

4    not being offered to prove the settlement.  It's being offered

5    for another purpose.

6           PLAINTIFF'S EXHIBIT 92 WAS ADMITTED INTO EVIDENCE

7           PLAINTIFF'S EXHIBIT 94 WAS ADMITTED INTO EVIDENCE

8    BY MR. CARNATHAN:

9    Q.    Okay, so just to reorient us, on March 4th, 2015,

10   you're told that the number payable to vendors is 141,900,

11   subject to minor revision.  And how did you react to that

12   information back in March 2015?

13   A.    And we -- we were in shock and then we called a meeting

14   right away and Dima told us that it was a mistake.

15   Q.    And then after that March 4th, 2015, were any

16   further cost overruns raised?

17   A.    Nobody told us anything about it.

18   Q.    When's the next time that cost overruns were brought

19   to your attention after this March 4th letter?

20   A.    After they gave us an -- we received an offer.

21   Q.    Let me briefly show you, this is Exhibit 271 in

22   evidence.  It's exactly the same as 110 for identification.

23   That teed up instead.

24          Mr. Abramskiy, do you recall seeing an email from

25   someone called Donya (ph.) on April 29th, 2015?



VLADISLAV ABRAMSKIY - Direct

1  A.   I remember that some -- somebody named Donya appeared.

2       Q.   Okay, do you know who Donya was?

3  A.   No, we didn't know.  We asked Dima and it's written here.

4  So we constantly were asking him about this, about Donya and

5  everybody, and he -- after we received an offer about --

6  between the offer and the closing and before -- between the

7  offer and the -- before the closing, Dima disappeared.

8       Q.   So if we look at the second page of this exhibit,

9  this -- I'm looking at the email April 27th from

10  KaganDevelopment@gmail.com, and it says, "Good morning, all.

11  Congratulations on the offer and agreement.  It's very good

12  news, especially at asking price."  Have I read that

13  correctly?

14  A.   Yes.

15       Q.   And so looking another third of the way down the

16  page at the accounts-payable line, it looks to me like they're

17  telling you now that the accounts payable are up to

18  171,933.97; do you see that?

19  A.   Yes, I see.

20       Q.Anotherid you react to getting this message from Donya?

21  A.   Okay.  So we were shocked and we wanted to talk to Dima

22  and we called Donya and we told, you know, in that previous

23  email, you see that we're asking Donya to -- to communicate,

24  to meet with Dima, but we lost all the communications with

25  Dima.  He was not answering our -- any emails or anything.

VLADISLAV ABRAMSKIY - Direct

1    Q.   Was anyone from Mr. Kagan's company in communication

2    with you at this time?

3    A.   Just Donya was sending us emails.

4        MR. CARNATHAN:   Could I briefly have Exhibit 273,

5    please?

6    BY MR. CARNATHAN:

7    Q.   So Mr. Abramskiy, do you recognize this as the

8    purchase and sale agreement for Newton-Cynthia Road?

9    A.   Yes, it looks like.   Yes.

10   Q.   Okay.   And it's dated May 13th, 2015, right, sir?

11   A.   Yes.

12       MR. CARNATHAN:   Could I have Exhibit 94 again,

13   please?

14   BY MR. CARNATHAN:

15   Q.   So sir, we looked at this earlier.   This is now

16   Exhibit 94 in evidence, and I'm looking at the fourth

17   paragraph down where Mr. Cohen says the total due under this

18   invoice is therefore 1,195,672.77 less payment of 787,500,

19   leaving the balance due of $408,172.77.   Have I read that

20   correctly?

21   A.   Yes.

22   Q.   Had you ever been told that there was going to be a

23   balance due of over $408,000 before June 15th, 2015?

24   A.   Never.

25   Q.   Okay.   Before you got this letter on June 15th,



Page 101

VLADISLAV ABRAMSKIY - Direct

1   2015, had anyone ever mentioned to you a fifteen percent GC

2   fee -- excuse me, GC fee on the project?

3   A.   Never.

4        Q.   Did you ever see a contract between Newton-Cynthia

5   Road, LLC and Kagan Development KDC, Corp.?

6   A.   Never.

7        Q.   Did you ever talk about one with Mr. Kagan?

8   A.   Never.

9        Q.   This letter also refers to something called an

10  eighteen percent accrual fee, adding up to $66,782.20; do you

11  see that, sir?

12  A.   Yes, I do see.

13       Q.   Before you got this letter, had anyone ever

14  mentioned to you an eighteen percent accrual fee?

15  A.   Never.

16       Q.   Even now as you sit here, do you know what that is?

17  A.   As far as I understand, this is the money that he

18  invested and these are the percentage of the money he got.

19       Q.   All right.

20  A.   He -- he invested.

21       Q.   After you got this letter, did you have any further

22  discussion with Mr. Kagan?

23  A.   Yes, and then a week -- as I already told you, it was a

24  week before the closing, we got the -- we talked to him and he

25  said that we have to sign this deal, this contract; otherwise,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VLADISLAV ABRAMSKIY - Direct

1    they're going to put a -- a lien on the property and we will

2    lose -- we will lose -- oh, we will lose the deal and they

3    will stop -- he will stop paying half of the payment, and we

4    have to pay this $400,000.

5        Q.   So what did you do as a result, sir?

6    A.   Okay.  So we discussed that and we decided not to lose

7    this deal and sign this and pay him, no?  Okay, okay, okay.

8    And pay, so agree to that deal and not to lose the deal, and

9    to exit with a zero -- zero profit.

10       Q.   Okay, but you got your investment back; was that the

11   deal?

12   A.   Yes.

13           MR. CARNATHAN:  That's all I have for Mr. Abramskiy.

14                    CROSS-EXAMINATION

15   BY MR. HARRIS:

16       Q.   Good afternoon, sir.  You have been involved in

17   other real estate projects besides the Newton-Cynthia Road

18   project; is that right?

19   A.   Yes.

20       Q.   222 Washington Street is an investment property you

21   own?

22   A.   This is my property.  This is an investment property.

23       Q.   Okay, and 1600 Beacon Street, another investment

24   property?

25   A.   Yes.



VLADISLAV ABRAMSKIY - Cross

1      Q.   And an apartment at 300 Tremont Street?

2    A.   16, yes.

3      Q.   Okay, and another apartment at 17 Aspinwall Avenue

4    in Brookline?

5    A.   Yes.

6      Q.   And you own your residence, I assume, right?

7    A.   Yes.

8      Q.   Now, you also have managed some limited liability

9    companies in addition to the one we talked about already; is

10   that right?

11   A.   Yes.  Yes.

12     Q.   237 to 243 Emerson, LLC; you manage that?

13   A.   Yes.

14     Q.   That's a four-apartment house that you rent out?

15   A.   Yes.

16     Q.   257 Silver Street, LLC?

17   A.   259.

18     Q.   259, okay.  835 to 837 East Second Street, LLC?

19   A.   Yes.

20     Q.   And then also Medal of Honor Park, LLC?

21   A.   Yes.

22     Q.   And finally, 626 East Fifth Street, LLC?

23   A.   Yes.

24     Q.   Now, before deciding to invest, you did not do a

25   deep investigation of Mr. Kagan or the project, did you?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VLADISLAV ABRAMSKIY - Cross

1    A.    No, I didn't do any research on that because we're very

2    good friends and we're going to each other's house and I

3    trusted him.

4         Q.    Okay.  You only superficially reviewed the plans?

5    A.    I don't know these plans very well, I can't really see --

6         Q.    You consulted with your adult son, Arthur, before

7    investing, however?

8    A.    Yes.

9         Q.    Now, Mr. Kagan did not give you a written

10   construction budget, did he?

11   A.    Oh, he send it to bank.

12        Q.    Okay, but did he provide you with a written

13   construction budget?

14   A.    I don't remember.

15        Q.    Okay.

16   A.    I don't think so.

17        Q.    All right.  You didn't insist on seeing one before

18   you invested, did you?

19   A.    I don't remember.

20        Q.    Okay.  You were asked a few questions about a

21   contract with a general contractor; you didn't ask to see

22   that, either?

23   A.    Which contractor you mean?

24        Q.    The contract with the company that built the home.

25   A.    We had only one contract with Dima Kagan and he was as --

VLADISLAV ABRAMSKIY - Cross

1   he was the general contractor.

2        Q.   You're referring to the operating agreement; is that

3   right?

4   A.   Yes.

5        Q.   Okay.  Now, during construction, you did not track

6   any of the costs, did you?

7   A.   So Dima took all my -- the checking -- check --

8   checkbook, and he said don't even worry.  He took this

9   checkbook away from me and say don't worry, everything will be

10   okay.  And I trusted him.

11        Q.   Okay, so you did not monitor the costs as the

12   contract -- as the project was going on, did you?

13   A.   No.

14        Q.   Now, you testified that the loan from the bank was

15   taken to pay the construction costs and all costs associated

16   with the project; is that right?

17   A.   That's what Dima told me.

18        Q.   All right, including the carrying costs?

19   A.   Yes.

20        Q.   Okay, and you signed the loan paperwork for the

21   bank; is that right?

22   A.   Maybe, maybe.  I don't remember now.

23        Q.   Do you recall, sir, that Mr. McGregor at the bank

24   asked for you to be the managing manager; is that right?

25   A.   So this -- I was told that by the attorney who was doing

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VLADISLAV ABRAMSKIY - Cross

1    the closing and who was putting together the agreement.

2        Q.    Okay.  And so you were at the closing for the

3    construction loan and you signed documents on behalf of the

4    company; is that right?

5    A.    Yes.

6        Q.    Okay.  So you submitted documents to the bank that

7    included costs beyond the construction of the home; is that

8    right?

9    A.    I don't understand the question.

10        Q.    Okay.  The $850,000 was to pay for the costs to

11   build the home and all of the carrying costs; is that your

12   testimony?

13   A.    Yes.

14        Q.    Okay.  And in fact, the loan that you were able to

15   take was for less than $850,000; is that right?

16   A.    They gave us 8 -- 8 -- $787,000.

17        Q.    787,000?

18   A.    Yes.

19        Q.    But you understood when you took out the loan that

20   the loan was to pay for the construction and all of the

21   carrying costs?

22   A.    So we always knew that we have to give Dima $63,000 after

23   we sell the house.

24        Q.    Yeah.

25   A.    It's the difference.



VLADISLAV ABRAMSKIY - Cross

1    Q.   Right.  We will get to that in a minute.  My

2  question -- would you please tell him that we'll get to that

3  in a minute?  Okay.  My question is, you were going to use the

4  loan proceeds to pay carrying costs; is that right?

5  A.   And the construction, yes.

6    Q.   Okay.  Now, could we make sure we have the number

7  correct, because earlier you testified that the loan was for

8  795 or 797.  Just now, you mentioned 787,000; which number is

9  correct?

10  A.   I just saw in the paper 787,000.

11    Q.   Okay.  So Mr. Kagan had to make up the difference

12  between 787,000 and 850,000; is that right?

13  A.   Yes, he told us that he will pay for it and he will take

14  it back after they sell the house.

15    Q.   About $63,000; is that right?

16  A.   Yes.

17    Q.   Okay.  And so Mr. Kagan took that risk; is that

18  right?

19  A.   I don't know.

20    Q.   Okay, well, he advanced that money without asking

21  you to advance money; is that right?

22  A.   Maybe.

23    Q.   Okay.  Well did you invest any more money than your

24  initial investment?

25  A.   Yes.



VLADISLAV ABRAMSKIY - Cross

1      Q.   Okay.  What did you invest beyond your initial

2  investment?

3  A.   Initial -- besides the initial investment of 120,000, I

4  put another 30,000.

5      Q.   You understood, however -- you've testified that Mr.

6  Kagan would be reimbursed for the $63,000 when the property

7  sold?

8  A.   Yes, and we never argued with that.

9      Q.   Okay.  Now, in addition to the $63,000, you

10 testified you also encountered ledge during construction?

11 A.   Okay.  So it didn't interpret correctly, but we have to

12 find out which part.  After we found out about the ledge, we

13 talked to the partners and they all agreed that after we sell

14 the house -- they sell the house, that Dima has to take back

15 to be reimbursed 30 -- or take money after selling the house

16 30-, $40,000 out of $110,000.

17      THE INTERPRETER:  Sorry, the last part, the

18 interpreter has to clarify.

19 A.   Okay, so we need to -- between the different between the

20 loans, 63 thou -- between the remainder of -- difference

21 between $63,000 and we have to pay him $110,000.  63 plus 30

22 or $40,000, we have to pay him 110 -- 100 -- $110,000.

23 BY MR. HARRIS:

24      Q.   The --

25      MR. HARRIS:  Strike that.



VLADISLAV ABRAMSKIY - Cross

1   BY MR. HARRIS:

2       Q.   Now, you've testified that you were shocked when you

3   received Exhibit 92?

4   A.   Yes.

5       Q.   Okay.  But at the time, you had already expected to

6   pay back $110,000; is that right?

7   A.   Yes, you know it was also in the email and we knew that

8   we have to pay for this investment.

9       Q.   Okay.  And then you were shown another exhibit

10  regarding $170,000 being owed; do you remember that?

11  A.   I say yes, that's true.

12      Q.   Okay.  And again, you had expected that Mr. Kagan

13  would reimbursed for $110,000; is that right?

14  A.   Um-hum.  So we didn't -- we knew all along that we had to

15  pay $110,000, but when we got the email, we are very surprised

16  and that's why we wanted to meet with him and discuss that

17  money -- that overhead, overruns.

18      Q.   Okay.  Now, you were also shown Exhibit 94, which

19  had the $408,000 number in it; do you remember that?

20  A.   Yes.

21      Q.   Okay.  And in fact, that $408,000 was to be split up

22  among all of the members; isn't that right?

23  A.   Okay.  So this demand of $480,000 was sent to us in order

24  to scare us so we can agree to pay 200- and close the case.

25      Q.   But my question, sir, is the $480,000 was an



Page 110

VLADISLAV ABRAMSKIY - Cross

1    obligation of all the members, not just you?

2    A.    Yes, for the whole LLC, correct.

3        Q.    Now, I want to ask you about listing the home for

4    sale.  Okay.  You were consulted about the sale price; is that

5    correct?

6    A.    And one of the -- Dima asked us about -- one of the deals

7    that we're asked, that Dima requested that his wife, Tatiana,

8    will be a dealer.  She will be a broker, and we -- we

9    consulted her about the price, the selling price.

10       Q.    And you set the initial selling price at $2.4

11   million; isn't that right?

12   A.    I don't remember.  I don't think so.

13       Q.    Do you recall, sir, that -- do you recall lowering

14   the price from your initial price?

15   A.    Yes, we did lower it.

16       Q.    Okay.  And you were shown you accepted the offer at

17   1.899 million, correct?

18   A.    Yes.

19       Q.    All right.  Now, you eventually reached a deal with

20   Mr. Kagan to buy you out; is that correct?

21   A.    I don't remember.

22       Q.    Did you reach an agreement with Mr. Kagan?

23   A.    Yes, we agree on that price of 1,900,000.

24       Q.    But did you also reach an agreement with Mr. Kagan

25   to wrap up the financial affairs of the LLC that you formed?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VLADISLAV ABRAMSKIY - Cross

1    A.   Yes.

2         Q.   The property was sold and the mortgage was

3    discharged, correct?

4    A.   Yes.

5         Q.   You got your money back, correct?

6    A.   Yes.

7         Q.   You were shown --

8              MR. HARRIS:  One minute, Your Honor.

9              Could you bring up Exhibit 271, please?

10   BY MR. HARRIS:

11        Q.   You were shown this exhibit, it's Exhibit 271 in

12   evidence; do you remember seeing this before, sir?

13   A.   I don't remember.

14        Q.   You were asked about it by Attorney Carnathan a few

15   moments ago; do you remember seeing it?

16   A.   Maybe.

17        Q.   Okay, you were asked some questions about Donya; do

18   you know who was serving as the bookkeeper for KDC in April of

19   2015?

20   A.   Maybe Donya.

21        Q.   Does the name Dan Gersh mean anything to you?

22   A.   Maybe this is the same person?

23        Q.   No.  He -- if you look at paragraph number 1, I want

24   to ask you to look at the part that is underlined?  The author

25   of this email says that --

                    VLADISLAV ABRAMSKIY - Cross

 1              MR. HARRIS:  Strike that.

 2      BY MR. HARRIS:

 3          Q.   Do you agree that in April of 2015, you were

 4      provided some financial information about the project?

 5      A.   Which letter we are talking about --

 6          Q.   This one.

 7      A.   -- from Cohen -- Mr. Cohen or?

 8          Q.   No, I'm asking you in connection with this email

 9      that we are looking at, you were provided financial

10      information?

11      A.   Me?

12          Q.   Yes.

13      A.   Who?  Who did I give financial information?

14          Q.   No, no.  Do you recall receiving this email, sir?

15      A.   I don't remember.

16          Q.   Okay.  Do you deny receiving it?

17      A.   No, I'm not denying it, but I just don't recall it.

18          Q.   Okay.  Do you --

19              MR. HARRIS:  Could you scroll down a little bit?  I

20      guess we can just stop right there.

21      BY MR. HARRIS:

22          Q.   Do you recall that there were attachments --

23      receiving attachments to this email, sir?

24      A.   Yes, I remember this one.

25          Q.   Okay.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VLADISLAV ABRAMSKIY - Cross

1          MR. HARRIS:  Now could you scroll back up?

2    BY MR. HARRIS:

3          Q.   Okay, now I want to ask you again about the

4    underlined section.  The author of this email tells you that

5    the information provided to you at this time was not final; do

6    you see that?

7    A.    Maybe.

8          Q.   Let me just ask, do you need the translator to

9    translate the email for you?

10          MR. HARRIS:  Could you just read him the underlined

11    section, please?

12    A.    Yes, I see this, but I don't remember that.  It was, kind

13    of, a -- it's not in my memory.

14    BY MR. HARRIS:

15          Q.   Okay.  And the author of this email tells you that

16    many vendors that are old school that provide paper copies of

17    proposals or invoices; do you see that?

18    A.    Yes.

19          Q.   Okay.  And do you agree, sir, that included with

20    this email, you were provided with some of the invoices for

21    the project?

22    A.    I don't remember.

23          Q.   Were you also provided with copies of statements for

24    the American Express card for your project?

25    A.    I -- it was something there, but nobody remembers those

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VLADISLAV ABRAMSKIY - Cross

1   anymore.

2       Q.   And you did not determine that any of the invoices

3   were inaccurate, did you?

4   A.   So we didn't talk with invoices, and during the whole

5   time, we didn't get any invoices or anything.  All we talked

6   this were the general terms that we owe him $110,000.

7       Q.   You didn't identify any of these invoices that are

8   inaccurate, did you?

9   A.   I -- I wasn't even looking.

10      Q.   And you have no personal knowledge of the actual

11  construction costs for this project, do you?

12  A.   Only -- only from the words of Dima, $850,000.

13      Q.   At closing, you received $132,000?

14  A.   Yes.

15      Q.   And Mr. Kagan also gave you an additional check for

16  $17,000?

17  A.   Yes, he gave me, yeah.

18      Q.   All right.

19          MR. HARRIS:  Could you bring up Exhibit 279, please?

20  BY MR. HARRIS:

21      Q.   Sir, do you recognize this document?

22          MR. HARRIS:  This is in evidence, Your Honor, so.

23  A.   I don't recall it.

24          MR. HARRIS:  All right.  Could you scroll down a

25  little bit?  Keep going, yeah.



(973) 406-2250 | operations@escribers.net | www.escribers.net

VLADISLAV ABRAMSKIY - Cross

1   BY MR. HARRIS:

2       Q.   All right, you were shown this letter earlier; do

3   you remember seeing this letter?

4   A.   Yes, I saw it.

5       Q.   Okay.  If you scroll down a little bit, you see

6   paragraph 1.  The parties agree to sell the home as we've

7   discussed, correct?

8   A.   Yes.

9           MR. HARRIS:  Scroll down, please.  Go to the next

10  page, please.  Okay, stop there, please.

11  BY MR. HARRIS:

12      Q.   Do you see it in the middle of what's on the screen

13  right now, there's a little chart that shows the distribution

14  to the members?

15  A.   Yes.

16      Q.   And next to your name, in parentheses, it shows a

17  net loss of just above $17,000, correct?

18  A.   I -- yes, I see that, but I -- it was not our interest at

19  that point because we know that we're -- we're -- the LLC is

20  going to be dissolved and we're come out with -- come out of

21  this project with zero, so we're not very interested in that.

22      Q.   Mr. Kagan paid you the $17,000 loss shown on this

23  document, correct?

24  A.   So we exited from this project with zero, and with

25  nothing.  And this is just the paper can take anything, so

VLADISLAV ABRAMSKIY - Cross

1    it's written here just to show something.

2        Q.   Mr. Kagan --

3    A.   It's doing something.

4        Q.   Mr. Kagan covered your loss, didn't he?

5    A.   On paper, yes.  On paper, yes.  Yes, maybe.  Allegedly,

6    he did pay me on the paper, but in life, no.

7        Q.   But you got a check for $132,000, right?

8    A.   Yes.

9        Q.   And you got a check for $17,000?

10   A.   Yes.

11       Q.   Now, as part of the deal you've reached with Mr.

12   Kagan, you transferred your ownership in the LLC to him; is

13   that correct?

14   A.   Maybe.

15       Q.   Okay.  And after you did so, you withdrew money from

16   the limited liability company's account, correct?

17   A.   No, I didn't withdraw the money.  So my partner -- I

18   didn't withdraw the money, but my partner -- okay, so -- and

19   they going to transfer the money and distribute the money,

20   what was left there, in order to pay to -- we talked to Dima

21   and Vitaly about it, that it's going to be transferred to --

22   for all the expenses that accounting did that for us, worked

23   for us in his services for the period of time the LLC was

24   in -- was working.  Sorry, the continuation -- and the $3,000

25   that was left in the account is for this, to cover these

VLADISLAV ABRAMSKIY - Cross

1    expenses.

2         Q.   Is it your testimony that Mr. Kagan knew you

3    withdrew those funds before you withdrew them?

4    A.   We didn't withdraw.  Okay.  So Vitaly who was dealing

5    with this accounting, he was paying for the mortgage and

6    everything.  He took the money and electronically --

7    electronically sent to the accounting.

8         Q.   My question is, is it your testimony that Mr. Kagan

9    knew you were doing that?

10   A.   No.

11        Q.   You did that without telling him?

12   A.   Maybe.

13        Q.   Okay.  And Vitaly was never a member of this

14   company, was he?

15   A.   So Vitaly was doing it for Xena.  Xena was never appeared

16   in any meeting or anywhere.  She was nowhere.  And Vitaly was

17   doing all the work for her and he was the -- the only one who

18   was doing, actually, all this previous three years, all the

19   accounting and everything that LLC was dealing with.

20        Q.   He was not a member, was he?

21   A.   No.

22        MR. HARRIS:  Okay.  Just one minute, Your Honor,

23   please?

24        Okay, nothing further.  Thank you.

25        THE COURT:  Yes?



(973) 406-2250 | operations@escribers.net | www.escribers.net

VLADISLAV ABRAMSKIY - Redirect/Recross

1                    REDIRECT EXAMINATION

2    BY MR. CARNATHAN:

3        Q.   Mr. Abramskiy, before you invested in the project,

4    how much did Mr. Kagan tell you you could reasonably expect to

5    earn by way of profit by investing in the project?

6    A.   50-, $60,000.

7            MR. CARNATHAN:  Thank you, sir.

8            MR. HARRIS:  Two questions, Your Honor.

9            THE COURT:  Sure.

10                   RECROSS-EXAMINATION

11   BY MR. HARRIS:

12       Q.   Did Mr. Kagan guarantee that return?

13   A.   We didn't get into each other's souls so deeply.

14       Q.   Did he use the word I guarantee you're going to get

15   that return?

16   A.   So he was -- he was always avoiding the -- to answer to

17   that question and he say don't worry and we'll all -- sharpen

18   your teeth and we'll get all the money back.

19       Q.   You knew there was some risk you would not make

20   money on this project, correct?

21   A.   There's always a risk.

22           MR. HARRIS:  Okay, thank you.

23           Nothing more from me, Your Honor.

24           THE COURT:  So thank you, sir.

25           Do you have a quick witness?



MR. CARNATHAN:  We could try to get Mr. Kaiserman up
and down if we're fast.  Do you guys -- but I don't know --

THE COURT:  I know they're not going to commit.  I
mean, I wouldn't either.  How long do you have with -- is he
here?

MR. CARNATHAN:  He is still here, Your Honor.

THE COURT:  Yeah, I really -- so just give me a
lawyerly-type guesstimate.

MR. CARNATHAN:  Well, he won't need an interpreter,
and I can try to cut it down to -- you know, try to do it in
ten or fifteen minutes and then turn it over to them; is that
all right?

MR. HARRIS:  I'm about fifteen minutes.

THE COURT:  All right.  Let's -- because he may not
want to come back, you know.  He's probably been here all day,
so let's see if we can get him on and off.  Hold on just one
second.

Okay, let's give it a try.

MR. CARNATHAN:  Thank you, Your Honor.  The
plaintiffs call Mark Kaiserman.

THE COURT:  Thank you, very much.

MARK KAISERMAN SWORN

MR. HARRIS:  Your Honor, this is another one of the
other project lines, so we object.

THE COURT:  All right.



MARK KAISERMAN - Direct

1              Go ahead.

2                      DIRECT EXAMINATION

3    BY MR. CARNATHAN:

4         Q.   Would you state your name, sir?

5    A.   Mark Kaiserman.

6         Q.   What do you do for work, Mr. Kaiserman?

7    A.   I'm a services director.  I work for a software company

8    in California.

9         Q.   Would you briefly describe your education, Mr.

10   Kaiserman?

11   A.   I have what's called an equivalent of master's degree in

12   electrical engineering.

13        Q.   Did you earn that in Russia, sir?

14   A.   I did.

15        Q.   What year did you come to this country?

16   A.   Thirty-eight years ago today.

17        Q.   How did you first meet Vadim Kagan?

18   A.   We met through his wife, Tatiana.

19        Q.   And how did you first meet Tatiana?

20   A.   We've been in immigration together.  We met in Italy

21   thirty-eight years ago.

22        Q.   And when did she first introduce you to Vadim Kagan?

23   A.   I can't recall exactly, but it's roughly twenty years

24   ago.

25        Q.   Would you previously have described yourself as

MARK KAISERMAN - Direct

1    friends with the Kagans?

2    A.    Very close friends.

3          Q.    Have you invested with Mr. Kagan before?

4    A.    Yes, I have.

5          Q.    By before, I'm thinking of before the Deborah Road

6    project, right?

7    A.    Yeah, I understood your question.  The answer is yes.

8          Q.    Yeah.  And so moving things along, that was in about

9    2008?

10   A.    Roughly, yes.

11         Q.    And in short version, what was that project?

12   A.    The project was Vadim was building a two -- townhouses in

13   Newton Center and he offered an investment with him in return

14   for forty percent profit from -- on my investment.

15         Q.    All right.  And that did investment work out all

16   right?

17   A.    Yes, it did.

18         Q.    How did you first become involved in the Deborah

19   Road project?

20   A.    Vadim and I had been discussing various investment

21   opportunities, and in 2012, he proposed a project on the

22   property that he just made an offer to and it seemed like a

23   great opportunity, and I agreed to become his investor on the

24   property.

25         Q.    What did Mr. Kagan tell you about the project that

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MARK KAISERMAN - Direct

1    made it seem like a great opportunity in which you were

2    willing to invest?

3    A.   It was a great location in the desirable neighborhood of

4    Newton.  Real estate market at the time was going up.  There

5    was relatively low risk and the property that Vadim was

6    planning to build was a high-end home close to $2 million.

7    The house that he purchased to be demolished and lots to be

8    used to build the house was roughly $700,000, so there was

9    plenty of room for a good profit margin.

10        Q.   What did Mr. Kagan tell you about how much the

11   project would cost?

12   A.   He told me that operating to build a house is roughly

13   800- to $850,000.

14        Q.   Did you also talk to him about the carrying costs?

15   A.   It came up, but it really wasn't a topic for discussion.

16        Q.   I understand you formed an LLC to operate the

17   project?

18   A.   That is correct.

19        MR. CARNATHAN:  Could I have Exhibit 128 for

20   identification, please?  128.

21   BY MR. CARNATHAN:

22        Q.   Do you recognize the document we've marked as

23   Exhibit 128 for identification, Mr. Kaiserman?

24   A.   I do.

25        Q.   What is it?



MARK KAISERMAN - Direct

1    A.   It's an operating agreement for the Deborah Road, LLC,

2    the property we were planning to build.

3          MR. CARNATHAN:  We would offer Plaintiff's Exhibit

4    128 for identification into evidence, please.

5          MR. HARRIS:  We object on the grounds it relates to

6    something other than Lyman-Cutler.

7          THE COURT:  Overruled.  It's admitted.

8          PLAINTIFF'S EXHIBIT 128 WAS ADMITTED INTO EVIDENCE

9    BY MR. CARNATHAN:

10         Q.   Who drafted the operating agreement for Deborah

11   Road?

12   A.   It was drafted by Attorney Boris Maiden.

13         Q.   And were you familiar with Mr. Maiden before you got

14   involved in the Deborah Road project?

15   A.   Yes, I was.

16         Q.   How did you know Mr. Maiden before Deborah Road?

17   A.   Boris Maiden was one of the first real estate attorneys

18   in Boston and he was, for the most part, servicing Russian

19   community in various real estate transactions.

20         Q.   How much money did you invest in Deborah Road?

21   A.   Between my wife and I, we invested $148,000, which was a

22   down payment to mortgage the property.

23         Q.   Were you also responsible for taking out the loan to

24   finance the construction?

25   A.   I was one of the cosigners on the construction loan as

MARK KAISERMAN - Direct

1    well, yes.

2         Q.   Who was the other cosigner?

3    A.   I believe it was Vadim.

4         Q.   Okay.  And if we look at page 12 of the operating

5    agreement, Exhibit 128 in evidence --

6              MR. CARNATHAN:  I think I want the page before that,

7    please.

8    BY MR. CARNATHAN:

9         Q.   Do you see there where you're designated as the

10   managing member, Mr. Kaiserman?

11   A.   Yes, I do.

12        Q.   How did you become the managing member?

13   A.    To be honest with you, I don't know.  One of us had to

14   become a manage -- managing member, so it just happened to be

15   me.

16        Q.   What did you understand your duties were, if any, as

17   the managing member?

18   A.   To be honest with you, it was never discussed.  We were

19   close friends, so it really didn't matter who is the managing

20   member, who's not.  To me, it was just a equal shareholder.

21        Q.   Was there any discussion about who the listing

22   broker would be for the property?

23   A.   It was suggested that Tatiana would be listing broker.

24   She's been a real estate broker for a number of years and it

25   was natural to make that assumption, yeah.



MARK KAISERMAN - Direct

1    Q.   And did Mr. Kagan tell you anything about the

2    brokerage fee for Tatiana being the listing broker?

3    A.   Yes, he did.   It was agreed that real estate fee would be

4    split between the -- all the members of the agreement.

5    Q.   When the property sold, did Mr. Kagan split the real

6    estate fee with you?

7    A.   No, he did not.

8    Q.   What did he say then?

9    A.   Why would I do that?   He did also offer to pay me $10,000

10   for this discussion to be closed, but he actually never came

11   through on his promise.

12   Q.   When the project started, did Mr. Kagan tell you

13   anything about how much profit you could reasonably anticipate

14   from your investment?

15   A.   We discussed that, assuming that the mortgage -- I'm

16   sorry, the property was acquired for 700,000 and the

17   construction loan for $800,000, the expectation was that the

18   profit would be roughly $300,000 gross.

19   Q.   Is that total to split among the members?

20   A.   Well, gross minus different commissions and whatever

21   additional expenses might be.

22   Q.   And that was based on what selling price projected?

23   A.   It was based on $1.8 million selling price.

24   Q.   And how much did the house actually sell for?

25   A.   1.95.



MARK KAISERMAN - Direct

1      Q.    And how much profit did you actually end up making?

2    A.    37,000.

3      Q.    Do you remember about when construction was

4    finished?

5    A.    It was finished in the middle of the summer of 2013, I

6    would say towards the end of July, maybe beginning of August.

7    I -- I can't remember exactly.

8      Q.    At any time prior to the completion of construction,

9    did Mr. Kagan ever talk to you about any cost overruns?

10   A.    I -- the question came up practically every month and

11   my -- the indication was there were no any cost overruns.

12   Everything was running smoothly.

13     Q.    How did the question come up every month?

14   A.    I would ask the question.

15     Q.    And he would respond that everything was running

16   smooth?

17   A.    Everything's fine.

18     Q.    Did he ever talk to you about any upgrades to the

19   property, anything like that?

20   A.    No, it never came up.

21     Q.    At some point, did the topic of cost overruns come

22   up?

23   A.    The only time the cost overruns actually entered the

24   picture is a few days prior to the closing, I received the

25   invoice for the $111,000 for some work that was completed a

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

MARK KAISERMAN - Direct

1    year prior to that, and so that was very questionable.  The

2    timing was questionable and the amount was questionable, but

3    at that time, the arguing over it was pointless.  I did

4    discuss the whereabouts of this invoice, where did it come

5    from, but I didn't get any adequate explanation.

6        Q.   You mentioned it was for work that had been done a

7    year prior; what kind of work was it?

8    A.   It was a variety of things, primarily work that was done

9    by Kagan Excavation Company.

10       Q.   Did Mr. Kagan ever explain to you how that happened

11   to come up a year after the work was done?

12   A.   I don't remember the details.  At that point, I wasn't

13   pretty happy about the fact that it actually occurred.  And at

14   that point, I have lost any kind of trust in the relationship

15   and I was just looking forward to get out of this deal.

16       Q.   At some point, did Mr. Kagan's use of his American

17   Express account come up in conversation between the two of

18   you?

19   A.   Yes, it did.  Vadim explained to me that he is using --

20   he is opening American Express account for all of his

21   projects, some projects where he has partners, some projects

22   where he is the sole investor.  One interesting thing that he

23   did mention to me is that sometimes he uses an American

24   Express card from one account to cover the expenses for the

25   other account.  It kind of became kind of suspicious to me at

MARK KAISERMAN - Direct

1   the time, and I was wondering is the same happening on my

2   account or not, and it kind of rubbed me the wrong way, but I

3   didn't do anything about the information I received.

4       Q.   At the time that he told you that, were you still

5   close friends?

6   A.   It was towards the tail end of our project and the

7   relationship started to deteriorate by then.

8       Q.   Do you still think of yourself as friends with Mr.

9   Kagan as you sit here now?

10  A.   I do not.

11      Q.   When was the last time you talked to Mr. Kagan?

12  A.   2013.

13          MR. CARNATHAN:  That's all I have for Mr. Kaiserman.

14                  CROSS-EXAMINATION

15  BY MR. HARRIS:

16      Q.   Good afternoon, sir.  You have a master's degree in

17  electrical engineering; is that right?

18  A.   An equivalent of master's degree.

19      Q.   Okay.  And you have real estate investment

20  experience beyond the Deborah Road project; isn't that right?

21      A.   I did. I  Okay.  You owned a property in Brighton,

22  correct?

23  A.   I did once, yes.

24      Q.   And you owned property in Newton Center you told us

25  about, correct?



MARK KAISERMAN - Cross

 1   A.   We owned the project in New -- well, it wasn't really an

 2   owner in Newton Center.  It was Vadim's project.  I was co-

 3   investor.

 4        Q.   All right.  That was new construction, correct?

 5   A.   That was.

 6        Q.   And you received a forty percent return on your

 7   investment, you told us?

 8   A.   That is correct.

 9        Q.   You have acted as a general contractor of sorts on

10   your own projects, haven't you?

11   A.   I have.

12        Q.   You consider yourself to be handy?

13   A.   To a certain degree.

14        Q.   Handier than most?

15   A.   I would call -- I would say so, yes.

16        Q.   All right.  Now, prior to your investment in Deborah

17   Road, Mr. Kagan showed you the plans, correct?

18   A.   We discussed plans.

19        Q.   All right.  And you didn't negotiate any of the

20   terms of the loan, did you?

21   A.   Loan, the mortgage --

22        Q.   Correct.

23   A.   -- or the construction loan?

24        Q.   Either.

25   A.   We discussed what the terms are prior to applying for a

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MARK KAISERMAN - Cross

1    loan, so I knew what we're getting ourselves into as far as

2    the interest rate, the closing costs, that type of thing.

3    Yes, we did.

4        Q.   You don't recall Mr. Kagan showing you a

5    construction budget before you invested, do you?

6    A.   We -- he didn't show me the detailed construction budget

7    at the time.  We did discuss roughly what it costs to build

8    4,000 square feet new home, but I did see rough outline of the

9    construction budget when we applied for construction loan.

10       Q.   Now, you performed your own due diligence of sorts

11   to confirm the projected or the estimated construction costs;

12   isn't that right?

13   A.   Very rough, yes.

14       Q.   But you did some, correct?

15   A.   I did some, yes.

16       Q.   You used your experience and used the number of $200

17   per square foot to build; is that right?

18   A.   That is correct.

19       Q.   Okay.

20   A.   In addition to that, I have also used advice of my close

21   friends.

22       Q.   All right.  And so that, the $200 per square foot

23   times 4,000 square feet, brought you right within the $800,000

24   range, correct?

25   A.   Sounds about right.



MARK KAISERMAN - Cross

1    Q.   All right.  Mr. Kagan did not guarantee the fixed

2    construction costs to you, did he?

3    A.   He did not.

4    Q.   You understood there was a risk that you might have

5    to use your personal funds to bring the project to completion?

6    A.   I did.

7    Q.   When you invested, you appreciated there was a risk

8    that the construction costs might exceed $850,000?

9    A.   It was understood.

10   Q.   You also appreciated the risk that it might take

11   longer than expected to sell this home?

12   A.   It was understood as well.

13   Q.   Now when you invested, you expected that the new

14   home would sell for $1.8 million; isn't that right?

15   A.   That was the initial expectation, yes.

16   Q.   Okay.  There was no guarantee from Mr. Kagan that it

17   would sell for that amount, however?

18   A.   There was no guarantee.

19   Q.   Isn't it correct, sir, that the construction loan

20   was used to pay some of the carrying costs?

21   A.   That is correct.

22   Q.   Including interest back to the bank?

23   A.   That is correct.

24   Q.   You understood and expected when you entered into

25   this project that the general contractor would be reimbursed

MARK KAISERMAN - Cross

1   for costs expended, correct?

2   A.   No.

3       Q.   I'm sorry?

4   A.   I was not.

5       Q.   You didn't think the general contractor would be

6   paid for materials it purchased?

7   A.   For materials, that is correct, yes.

8       Q.   And you expected the subcontractors to be paid,

9   correct?

10  A.   That is correct.

11      Q.   Now, is it your testimony, sir, that you did not

12  expect the general contractor to earn anything above the

13  actual out of pocket?

14  A.   Moreover, that -- I asked that question explicitly

15  whether Vadim is charging any general contractor's fee for

16  construction of the house and the answer was no.

17          MR. HARRIS:  Can you bring up Exhibit 128, please,

18  Mr. Perten?  Yup, it's the operating agreement.

19  BY MR. HARRIS:

20      Q.   All right.  Now, I just want to focus you on the

21  very first paragraph of this.  This is the operating

22  agreement; we agree with that, right?

23  A.   Yes.

24      Q.   And the members in this operating agreement included

25  Kagan Development KDC, Corp.; do you see that?



MARK KAISERMAN - Cross

1    A.   Yes.

2         MR. HARRIS:  Now can you scroll down to paragraph

3    8.1, please?

4    BY MR. HARRIS:

5         Q.   This paragraph 8.1 deals with allocations of profits

6    or losses; do you see that?

7    A.   I see what it says, yes.

8         Q.   Okay.  And I'm going to paraphrase it a little bit,

9    but just confirm for me you're following along.  It says the

10   "net profits"..."of the company shall be allocated among the

11   members", correct?

12   A.   Makes sense.

13        Q.   And Kagan Development KDC, Corp., was a member?

14   A.   That's correct.

15        Q.   So that company was going to get profits from this

16   endeavor, correct?

17   A.   There was no concern about that, yes.

18        Q.   Now, there were times when the funds in the bank

19   account ran low and you put in some of your own money to pay

20   bills associated with the construction, correct?

21   A.   That is correct.

22        Q.   And when you -- later, subsequent to that, the bank

23   would advance funds, correct?

24   A.   That is correct.

25        Q.   Those funds would go into the account and you would

MARK KAISERMAN - Cross

1  pay yourself back for whatever you outlaid?

2  A.   That is correct.

3       Q.   And so you would write checks to yourself from the

4  LLC account?

5  A.   That is correct.

6       Q.   And you don't recall investing any more than the

7  initial $148,000 that you and your wife put in, correct?

8  A.   Not that I recall.

9       MR. HARRIS:  Okay, bring up Exhibit 191, please?

10 This is a full exhibit, I believe.  It would be in the

11 defendants'.

12 BY MR. HARRIS:

13      Q.   Sir, I'm showing you what we've marked as Exhibit

14 191.  Would you agree with me this is a copy of a bank

15 statement for your project?

16 A.   It seems that way, yes.

17      Q.   And the address, 16 Mohawk Road, whose address is

18 that?

19 A.   That is my home address.

20      Q.   All right.  So the bank statements were being sent

21 to you, right?

22 A.   That is correct.

23      Q.   You also had online access to the account?

24 A.   I did.

25      Q.   And you could inspect all the payments that were

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MARK KAISERMAN - Cross

1   made, correct?

2   A.   I could see all the payments that were made out of the

3   account, correct.

4        MR. HARRIS:  Can you pull up Exhibit 296, please?

5   It's also a full exhibit.

6   BY MR. HARRIS:

7        Q.   You agree with me, sir, this is a loan-payment

8   notice from Rockland Trust relating to your project?

9   A.   It looks about right.

10       Q.   And again we see your address, correct?

11  A.   Yes.

12       Q.   All right.  And this, if we scroll down just a

13  little bit, we'll see some activity with respect to the loan,

14  correct?

15  A.   Yes.

16       Q.   All right.  And you were receiving these in real

17  time?

18  A.   That's correct.

19       Q.   Now, you testified that Mrs. Kagan was the listing

20  agent for the home, correct?

21  A.   Yes.

22       Q.   And in fact, it sold in a matter of just a couple of

23  weeks, right?

24  A.   It was very fast.

25       Q.   You have no idea what she did to market the home,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MARK KAISERMAN - Cross

1   however?

2   A.   Not really.

3        Q.   Whatever she did, it worked, right?

4   A.   Whatever, yes.

5        Q.   All right.  It sold for 1.95 million?

6   A.   That is correct.

7        Q.   More than what you anticipated at the beginning of

8   the project?

9   A.   That is correct.

10       Q.   So you received your 148- -- you and your wife

11  received your $148,000 back, correct?

12  A.   We did.

13       Q.   And an additional $37,000?

14  A.   That is correct.

15       Q.   And that's a twenty-five percent return?

16  A.   Not exactly, but close.

17       Q.   Close.

18  A.   Yes, it's about twenty percent.

19       Q.   This discussion about splitting the real estate

20  commission, was that written down anywhere?

21  A.   No, it was not.

22       Q.   All right.  Do you hold a real estate license?

23  A.   I do not.

24       Q.   You were asked some -- or you testified about some

25  charges that were presented to you regarding the project.  You



MARK KAISERMAN - Cross

1   can't contest any of those charges, can you?

2   A.    That's why I didn't.

3        Q.    You don't know one way or the other whether they're

4   legitimate or illegitimate?

5   A.    I do not.

6        Q.    You have no information to suggest any of those

7   charges are fraudulent, do you?

8   A.    Well, kind of.  Two days before the closing for the work

9   that was done a year prior; that would look suspicious.  I

10  didn't know the fraudulent, but suspicious, yes.

11       Q.    So your principal objection was that they were

12  presented to you just before closing?

13  A.    Seemed very suspicious.  Timing wasn't very good.

14       Q.    You have no information to believe that Mr. Kagan

15  use the American Express card for your project to pay for

16  expenses for any other project, do you?

17  A.    I have no evidence, but again, suspicion, yes.

18            MR. HARRIS:  Can you bring up Exhibit 297, please?

19  BY MR. HARRIS:

20       Q.    All right, sir, I'm going to show you portions of

21  the -- if you agree with me, this is the tax return for the

22  Deborah Road project; will you agree with me on that part?

23  A.    It seems to agree, yeah.

24       Q.    Okay.  If you can -- the accountant on this tax

25  return, is that someone that you retained?

MARK KAISERMAN - Cross

 1   A.   I ended up retaining the same accounting firm to do my

 2   personal income tax as well.

 3        Q.   Okay, but you retained him -- Mr. Agranovich?

 4   A.   We did this together.  It was Vadim's accountant firm and

 5   we agreed that we are going to use them for income tax return

 6   preparation.

 7        Q.   All right.

 8        MR. HARRIS:  Can you go down to page 17 of the pdf

 9   please, Mr. Perten?

10   BY MR. HARRIS:

11        Q.   All right.  I'm going to show you, this is the K-1

12   for the tax return and you see your name in box F?

13   A.   Yes.

14        Q.   Okay, and if you look at box 9A, you see there's a

15   long-term capital gain that's attributed to you?

16   A.   Yes.

17        MR. HARRIS:  All right.  Scroll down a bit more to

18   the next K-1.  The next page, please.

19   BY MR. HARRIS:

20        Q.   This is the K-1 for your wife.  She also has $18,000

21   and change, right?

22   A.   Looks about right.

23        MR. HARRIS:  And the next page, please?  Scroll down

24   one more, sorry.  And if we scroll down, we will see -- no, I

25   need to get to the -- go up a little bit, please.  I think I

MARK KAISERMAN - Cross

1    need you to be at page 21, maybe.  All right, just scroll down

2    a little bit so we can see whose name is on this K-1.

3    BY MR. HARRIS:

4         Q.   All right, this is the K-1 for Kagan Development

5    KDC; do you see that?

6    A.   Yes.

7         Q.   And do you see any profit attributed to them, box

8    9A?

9    A.   I don't.

10         MR. HARRIS:  All right.  And will you scroll down to

11    the next K-1?

12         MR. PERTEN:  I should stick to my day job, Your

13    Honor.

14         MR. HARRIS:  I think you've got to go down, please,

15    Mr. Perten, page 23.

16         MR. PERTEN:  Whoops.

17         THE COURT:  Yeah, I'm starting to agree.

18    BY MR. HARRIS:

19         Q.   Okay, if we scroll down a little bit, this is Mr.

20    Kagan's K-1; any profit for him?

21    A.   Not on this one.

22         Q.   In fact, you were so pleased at the conclusion of

23    this project, you bought Mr. Kagan a bottle of scotch, isn't

24    that right?

25    A.   I don't remember that.  I do remember him buying me a

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MARK KAISERMAN - Recross

1    bottle of scotch on the previous project, but not on this one.

2           MR. HARRIS:  Okay.  I have nothing further.

3           THE COURT:  Yes.

4                      REDIRECT EXAMINATION

5    BY MR. CARNATHAN:

6        Q.   Mr. Kaiserman, during Mr. Harris' cross, you stated

7    to say that at one point, you specifically asked Mr. Kagan

8    about what he would charge as a general contractor; do you

9    remember that?

10   A.   I do.

11       Q.   I don't think you got to say how he responded.

12   Could you tell us how he responded?

13   A.   His response was that his profit from the project is the

14   net profit after the construction and sale's complete.  That's

15   his reward.

16       Q.   That is stated in the operating agreement?

17   A.   I don't remember what is stated in the agreement, but

18   during us, the discussion, that's how we agreed.  There

19   was -- in our relationship, we kind of built -- which was

20   built on trust, we pay less attention to paper than --

21   handshake is probably worth more than anything else, and

22   that's why it hurts more, being here today.

23          MR. CARNATHAN:  I have nothing further, Your Honor.

24          MR. HARRIS:  Nothing further, Your Honor.  Thank you.

25          THE COURT:  Okay.  Thank you, sir.



MARK KAISERMAN - Recross

1          All right.  One issue that I have is Exhibit number

2    297.  I don't know where that came from.  I'm not even sure

3    what it is now.  Let's put it up.  Okay.  It's on the --

4          MR. HARRIS:  The tax return, Your Honor?

5          THE COURT:  Yeah, we -- I think we have Social

6    Security numbers on there.

7          MR. HARRIS:  All right.  We will --

8          THE COURT:  It wouldn't surprise me, yeah.

9          MR. HARRIS:  We'll redact them out.

10         THE COURT:  So -- well, you can substitute that in

11   after you redact.

12         MR. HARRIS:  Yes, sir.

13         THE COURT:  Okay.  Anything else for today?

14         MR. CARNATHAN:  No, Your Honor.

15         THE COURT:  What's tomorrow look like?  She thinks

16   she's going, so.

17         MR. CARNATHAN:  Perhaps I need to speak to Ms.

18   Brusenkova.  I told her I would get her up today --

19         THE COURT:  I see.

20         MR. CARNATHAN:  -- and the day went longer than

21   expected, so I feel bad about that.  So I think we need to

22   talk logistics a little bit among ourselves, but I also have

23   Irina -- I'm going to mess up her name, Mr. Filippov's wife.

24   I was going to put on Mr. Hartzell to authenticate the Summary

25   Exhibits 1 through 6.  I have a few questions for Tatiana.  I

MARK KAISERMAN - Recross

1  think we've agreed to put the forms 1 and 2 from Mr. Madoff

2  into evidence by stipulation to avoid having to call him.

3         And although I should think a moment to make sure I'm

4  not forgetting somebody -- oh, and then Mr. Maiden, we're

5  going to do June 18th?

6         MR. HARTZELL:  Fennel?.

7         MR. CARNATHAN:  Fennel, that's right.  My real estate

8  expert, Mr. Fennell.

9         THE COURT:  Okay.

10         MR. CARNATHAN:  So we've got a full day.

11         THE COURT:  Okay.  All right.  Anything else we can

12  do today?

13         All right.  Thank you, all.  See you tomorrow.

14         MR. PERTEN:  May we leave our stuff here or do you

15  need us to clear?

16         THE COURT:  Yeah.  No, right Liz?  No one in here?

17         THE CLERK:  No one's in here.

18         THE COURT:  Yup, it's perfectly safe.

19  (End at 1:20 PM)

20                   * * * * * * * * * *

21

22

23

24

25

1          I certify that the foregoing is a true and accurate

2     transcript from the digitally sound recorded record of the

3     proceedings.

4

5

6

7     _Jennifer J. Naus_

8

9     /s/ Jennifer J. Naus                    June 3, 2019
      _____

10
      ESCRIBERS LLC
11                              eScribers
                       7227 N. 16th Street, Suite #207
12                          Phoenix, AZ 85020
                               973-406-2250
13                     e-mail operations@escribers.net

14

15

16

17

18

19

20

21

22

23

24

25

Case 16-01120   Doc 345   Filed 06/04/19   Entered 06/04/19 13:07:41   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 144 of 163

May 13, 2019

## $

**$1 (2)**
48:4,7
**$1.1 (1)**
49:8
**$1.8 (2)**
125:23;131:14
**$10,000 (1)**
125:9
**$110,000 (8)**
93:25;108:16,21,22;
109:6,13,15;114:6
**$111,000 (1)**
126:25
**$12,000 (1)**
56:2
**$132,000 (2)**
114:13;116:7
**$14,000 (1)**
56:2
**$141,000 (1)**
96:18
**$143,781.53 (1)**
48:17
**$148,000 (3)**
123:21;134:7;136:11
**$17,000 (4)**
114:16;115:17,22;
116:9
**$170,000 (1)**
109:10
**$18 (1)**
17:21
**$18,000 (1)**
138:20
**$2 (2)**
17:16;122:6
**$2.1 (1)**
49:1
**$2.4 (1)**
110:10
**$200 (2)**
130:16,22
**$205,370.29 (1)**
49:3
**$221,000 (1)**
25:14
**$271-odd- (1)**
36:11
**$273,000 (1)**
37:11
**$3,000 (1)**
116:24
**$3,298,197.45 (1)**
38:23
**$3.3 (1)**
49:8
**$300,000 (1)**
125:18
**$350,000 (1)**
48:22

**$37,000 (1)**
136:13
**$40,000 (3)**
93:19;108:16,22
**$400,000 (1)**
102:4
**$408,000 (3)**
100:23;109:19,21
**$408,172.77 (1)**
100:19
**$47,000 (1)**
37:23
**$480,000 (2)**
109:23,25
**$569,878.83 (1)**
49:12
**$60,000 (1)**
118:6
**$63,000 (5)**
106:22;107:15;
108:6,9,21
**$66,782.20 (1)**
101:10
**$70,000 (1)**
93:11
**$700,000 (1)**
122:8
**$787,000 (1)**
106:16
**$797,000 (1)**
91:23
**$800,000 (3)**
47:13;125:17;130:23
**$850,000 (7)**
91:13,21;106:10,15;
114:12;122:13;131:8
**$96 (1)**
50:23

## A

**abetting (8)**
25:3;33:8,17;36:2,
22;40:25;42:3;77:16
**abided (1)**
57:16
**ability (2)**
81:3;86:14
**able (2)**
91:21;106:14
**above (3)**
42:4;115:17;132:12
**Abramskiy (15)**
86:6,8,9;87:10;
89:10;90:2;94:22;
95:14;97:9,10,25;
98:24;100:7;102:13;
118:3
**Absolutely (8)**
18:21;19:20;48:16;
55:1;58:14;62:15;
70:11,12
**accepted (1)**

110:16
**access (2)**
45:13;134:23
**accompanying (1)**
44:20
**according (1)**
89:16
**Accordingly (1)**
28:5
**account (13)**
26:8;116:16,25;
127:17,20,24,25;128:2;
133:19,25;134:4,23;
135:3
**accountant (2)**
137:24;138:4
**accounting (5)**
116:22;117:5,7,19;
138:1
**accounts (2)**
96:2;99:17
**accounts-payable (1)**
99:16
**accrual (2)**
101:10,14
**accurate (6)**
42:20;51:5;83:2,7;
84:21;85:5
**accusations (1)**
47:1
**accusing (1)**
62:21
**acquired (1)**
125:16
**Act (1)**
18:16
**acted (3)**
7:11;10:1;129:9
**action (8)**
11:14,14;16:14;
22:25;50:21;51:1;
53:12;84:15
**actions (1)**
82:23
**active (1)**
29:7
**activity (1)**
135:13
**acts (3)**
6:25;10:5,8
**actual (3)**
18:25;114:10;132:13
**actually (21)**
22:23;25:4;29:1;
35:16;41:6;42:7;52:2;
56:21;57:21;61:14;
63:5;64:13;65:14;69:3;
83:21;117:18;125:10,
24;126:1,23;127:13
**ADA (1)**
58:22
**added (1)**
94:5

**adding (1)**
101:10
**addition (4)**
52:20;103:9;108:9;
130:20
**additional (8)**
93:3,21,22;94:8;
96:24;114:15;125:21;
136:13
**add-ons (1)**
79:15
**address (6)**
11:7;73:13;134:17,
17,19;135:10
**adequate (1)**
127:5
**adjudged (1)**
28:6
**adjudication (1)**
22:15
**admissible (6)**
10:25;22:16;23:22,
22,24;74:18
**admission (5)**
6:12,15;11:1;29:18;
75:8
**admit (1)**
61:1
**admitted (30)**
8:3,7;10:6;24:3,13;
31:4;38:16;40:19,21;
45:4,7,9;50:10;59:6,8;
60:16,22;63:16,18,20;
69:18;76:16,19;81:19;
82:14;89:25;98:6,7;
123:7,8
**admitting (1)**
22:9
**adopted (1)**
12:5
**adult (2)**
23:5;104:6
**advance (2)**
107:21;133:23
**advanced (1)**
107:20
**advice (1)**
130:20
**affairs (1)**
110:25
**affects (1)**
19:2
**affidavit (10)**
11:15;41:18;43:18;
44:6;54:10,20;56:6,15;
64:17,20
**affirmation (1)**
86:12
**affirmative (3)**
60:20;76:12,13
**affirming (1)**
49:22
**afternoon (2)**

102:16;128:16
**afterward (1)**
7:17
**again (19)**
13:7,10;21:24;30:8;
32:11;49:1;50:2;59:24;
61:2;72:19;74:2;75:17;
84:5,10;100:12;
109:12;113:3;135:10;
137:17
**against (21)**
16:14,24;18:25;
50:21;51:14;52:18,19,
21;55:3,4;56:23;57:2;
61:22,25;62:5;63:25;
65:7,9,18;66:3;81:8
**agent (1)**
135:20
**agitated (1)**
81:8
**ago (10)**
8:16,18;9:10;22:8;
42:15;59:6;111:15;
120:16,21,24
**Agranovich (1)**
138:3
**agree (31)**
14:13;16:12,20;33:6;
34:23;37:13;39:18;
47:6,9;50:20;53:18,21;
54:17,23;56:5;61:19;
63:6;89:2;102:8;
109:24;110:23;112:3;
113:19;115:6;132:22;
134:14;135:7;137:21,
22,23;139:17
**agreed (9)**
17:8;18:18;89:6;
108:13;121:23;125:3;
138:5;140:18;142:1
**agreement (29)**
68:9;69:9;71:2,2,3;
89:15,16,18;90:11;
92:18,19,22;97:19,20;
99:11;100:8;105:2;
106:1;110:22,24;
123:1,10;124:5;125:4;
132:18,22,24;140:16,
17
**ahead (6)**
24:21,21;46:8;61:6;
62:25;120:1
**aided (1)**
7:13
**aiding (8)**
25:2;33:8,17;36:1,
22;40:25;42:3;77:16
**aim (1)**
52:21
**al (1)**
5:13
**alert (1)**
14:3

**Alex (3)**
  5:9,17;6:23
**aligning (1)**
  56:14
**alive (1)**
  53:12
**allegations (1)**
  26:9
**allege (2)**
  7:7;10:9
**alleged (10)**
  7:12,16;10:21;51:1,
  20;52:8,9,16;53:7;59:3
**Allegedly (1)**
  116:5
**alleges (2)**
  30:2;65:17
**allocated (1)**
  133:10
**allocations (1)**
  133:5
**allow (2)**
  12:4;14:8
**along (4)**
  93:23;109:14;121:8;
  133:9
**alter (3)**
  85:18,21,23
**altered (1)**
  62:14
**Although (4)**
  9:25;26:20;30:19;
  142:3
**altogether (1)**
  41:25
**always (3)**
  106:22;118:16,21
**amended (1)**
  11:7
**American (5)**
  113:24;127:16,20,
  23;137:15
**America's (1)**
  47:14
**amiable (1)**
  81:6
**among (4)**
  109:22;125:19;
  133:10;141:22
**amount (6)**
  41:25;47:23;77:2;
  96:17;127:2;131:17
**amounts (1)**
  47:21
**ample (1)**
  9:18
**anchor (1)**
  92:19
**ancient (1)**
  22:14
**animus (2)**
  55:5;61:25
**anticipate (1)**

**anticipated (2)**
  52:24;136:7
**anymore (2)**
  45:14;114:1
**apart (2)**
  19:17;31:22
**apartment (3)**
  87:13;103:1,3
**apologies (1)**
  29:11
**apologize (1)**
  28:2
**apologized (1)**
  42:4
**apologizing (1)**
  32:12
**Apostle (1)**
  46:15
**appeal (2)**
  50:5,6
**Appeals (1)**
  49:22
**appear (1)**
  46:14
**appeared (2)**
  99:1;117:15
**appears (4)**
  7:3;8:18;31:18;
  64:15
**application (3)**
  57:3;62:6;63:5
**applied (1)**
  130:9
**applies (1)**
  97:5
**apply (1)**
  8:21
**applying (1)**
  129:25
**appraisal (3)**
  91:22;92:4,13
**appraised (1)**
  91:23
**appraiser (1)**
  92:7
**appreciate (1)**
  13:9
**appreciated (2)**
  131:7,10
**approach (8)**
  20:17;21:5;26:12;
  38:17;43:21;73:19;
  74:2;75:17
**appropriate (2)**
  31:16;60:12
**approximately (1)**
  92:23
**April (6)**
  65:12;97:18;98:25;
  99:9;111:18;112:3
**area (1)**
  81:1

**argue (3)**
  10:18,20,20
**argued (1)**
  108:8
**arguing (2)**
  13:10;127:3
**argument (1)**
  58:3
**arguments (1)**
  12:7
**arisen (1)**
  11:7
**around (3)**
  42:20;88:6;91:23
**arranged (1)**
  65:7
**Arthur (2)**
  94:24;104:6
**article (1)**
  74:15
**articulates (1)**
  11:14
**artifice (1)**
  52:12
**Aryeh (1)**
  50:23
**aside (1)**
  58:20
**aspect (1)**
  67:17
**Aspinwall (1)**
  103:3
**assert (1)**
  56:1
**assets (1)**
  17:21
**assigning (1)**
  24:5
**Assistant (1)**
  55:21
**assisted (1)**
  55:5
**associated (3)**
  26:20;105:15;133:20
**assume (1)**
  103:6
**assuming (1)**
  125:15
**assumption (1)**
  124:25
**Atlanta (2)**
  34:14,16
**ATMs (1)**
  37:24
**attached (3)**
  27:20;29:20;56:15
**attachments (1)**
  112:22,23
**attend (1)**
  81:12,15,24
**attention (2)**
  98:19;140:20
**Attorney (6)**

**55:21;58:6;90:10;**
  105:25;111:14;123:12
**attorneys (2)**
  90:25;123:17
**Attorney's (2)**
  25:22;55:6
**attributed (2)**
  138:15;139:7
**August (16)**
  15:2;34:24;35:3;
  37:24;38:4,5;43:19;
  44:9;45:3;49:7;53:9,
  18;78:9,12,14;126:6
**Aurora (1)**
  50:22
**Aurora/LBB/LBH (2)**
  51:21;52:10
**authenticate (1)**
  76:10;141:24
**authenticating (1)**
  11:23
**authentication (1)**
  12:22
**author (3)**
  111:24;113:4,15
**Avenue (2)**
  87:12;103:3
**avoid (4)**
  25:18;31:8;93:15;
  142:2
**avoided (1)**
  25:20
**avoiding (1)**
  118:16
**aware (3)**
  14:6;15:12;94:3
**away (3)**
  14:14;98:14;105:9

**B**

**back (32)**
  7:25;16:15;26:23;
  32:7;38:19;43:1,14;
  44:14;45:18,22;63:12,
  24;69:25;73:7,8;74:25;
  88:19;91:22;92:9,16,
  16;98:12;102:10;
  107:14;108:14;109:6;
  111:5;113:1;118:18;
  131:22;134:1;136:11
**backdated (1)**
  69:4
**backdoor (1)**
  76:9
**background (1)**
  56:1
**bad (4)**
  6:25;10:5;78:21;
  141:21
**balance (3)**
  30:13;100:19,23
**bank (34)**

**13:22,22;14:1,4;**
  24:24;25:4,14;26:10;
  28:7;33:8,8,17,17;
  36:12,20,21,23;37:2,
  12;48:8;50:22;77:6,15;
  91:18;104:11;105:14,
  21,23;106:6;131:22;
  133:18,22;134:14,20
**banker (1)**
  90:11
**bank-fraud (1)**
  13:24
**bankruptcy (1)**
  45:25
**banks (2)**
  91:1,1
**bar (1)**
  8:25
**based (6)**
  6:10;16:13;56:19;
  98:3;125:22,23
**basically (1)**
  23:4
**basis (2)**
  9:1;50:8
**Beacon (3)**
  87:12,12;102:23
**became (1)**
  127:25
**become (7)**
  88:10;90:8;96:7;
  121:18,23;124:12,14
**began (3)**
  88:13;89:6;94:11
**beginning (4)**
  62:1;78:11;126:6;
  136:7
**begins (1)**
  35:17
**behalf (4)**
  55:4;57:3;85:19;
  106:3
**behind (1)**
  72:14
**below (1)**
  33:16
**besides (2)**
  102:17;108:3
**best (3)**
  81:3;83:1;86:14
**better (3)**
  31:23;46:7;74:6
**beyond (3)**
  106:7;108:1;128:20
**big (2)**
  93:7,10
**bigger (1)**
  28:25
**Bill (2)**
  17:6,24
**bills (1)**
  133:20
**binders (2)**

Case 16-01120   Doc 345   Filed 06/04/19   Entered 06/04/19 13:07:41   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 146 of 163
May 13, 2019

71:8,8
**birth (1)**
64:16
**bit (13)**
19:6;20:15;68:18;
112:19;114:25;115:5;
133:8;135:13;138:17,
25;139:2,19;141:22
**blanked (1)**
29:12
**blood (1)**
81:9
**blow (1)**
73:25
**Blue (1)**
73:16
**bookkeeper (1)**
111:18
**Boris (2)**
123:12,17
**borrow (1)**
91:21
**Boston (3)**
51:3,16;123:18
**both (6)**
33:17;51:2,15;76:1;
95:19;96:19
**bottle (2)**
139:23;140:1
**bottom (1)**
69:21
**Boudreaux (2)**
36:18;37:3
**bought (2)**
97:10;139:23
**box (4)**
33:12;138:12,14;
139:7
**break (2)**
80:1,4
**breakfast (1)**
81:1
**brief (3)**
13:12,19;22:7
**briefly (5)**
38:17;97:17;98:21;
100:4;120:9
**briefs (1)**
6:10
**Brighton (1)**
128:21
**bring (11)**
68:13,16;69:8;78:19;
83:15;111:9;114:19;
131:5;132:17;134:9;
137:18
**broker (6)**
84:8;110:8;124:22,
23,24;125:2
**brokerage (1)**
125:2
**Brookline (3)**
87:12,13;103:4

**Brothers (2)**
50:22,23
**brought (4)**
83:16;84:17;98:18;
130:23
**Brusenkova (13)**
54:10,19;56:15,17;
57:2,22;62:5;63:25;
65:7,11,18;66:4;
141:18
**budget (5)**
104:10,13;130:5,6,9
**build (7)**
106:11;122:6,8,12;
123:2;130:7,17
**building (1)**
121:12
**built (3)**
104:24;140:19,20
**bundled (1)**
19:8
**burden (1)**
11:24
**business (8)**
53:25;54:3;56:12,14;
64:24;69:8;88:17,17
**button (3)**
12:1;70:21,24
**buy (2)**
94:12;110:20
**buying (1)**
139:25

## C

**calculated (1)**
79:17
**calculating (2)**
79:9,19
**calculation (1)**
79:22
**California (1)**
120:8
**call (5)**
24:12;32:13;86:5;
129:15;142:2
**called (12)**
11:6;28:3;46:15;
82:22;83:16;88:19;
96:10;98:13,25;99:22;
101:9;120:11
**calling (2)**
5:7;20:24
**came (9)**
91:22;92:4,13;97:2;
122:15;125:10;126:10,
20;141:2
**can (38)**
9:4;20:3,5,15;26:17;
27:2;29:3,5;30:14;
31:11;44:2;50:7,19;
67:25;72:5;73:7;75:10;
78:19;81:3,17;84:5;

85:8;95:19;97:24;98:1;
109:24;112:20;115:25;
132:17;133:2;135:4;
137:1,18,24;138:8;
139:2;141:10;142:11
**candor (1)**
13:13
**capacity (1)**
18:3
**capital (1)**
138:15
**captioned (1)**
9:15
**card (4)**
56:3;113:24;127:24;
137:15
**CARNATHAN (152)**
5:4,16,17;6:4;14:9,
17;15:5,16;19:4,16,22,
25;20:6,11,14,25;21:5,
7,20;22:7,17,21,23;
23:20,23;24:8,11,16,
19,22;26:5,6,14,17,22,
25;27:7,14,19,22,24;
28:15,20;29:4,8,10,15;
30:7,16,19,23;31:1,6,
14,21,24;32:6,8,22;
33:5;34:7,9,11;38:7,17,
21;40:3,11,15,22;
43:21,23;44:4,16,23;
45:10,11;46:9;50:13,
14;51:6,11;52:2,5;
55:12,17;57:5,11,21;
58:6,8,12,16,18,20,23;
59:1,12,14,22;61:7,10,
13;62:20;63:1,13,21;
66:6;74:17;76:6;83:14;
86:2,5;87:8;89:8,9;
90:1;93:12;94:19,21;
95:8,11,13,19,21;
96:19;97:1,16;98:8;
100:4,6,12,14;102:13;
111:14;118:2,7;120:3;
122:19,21;123:3,9;
124:6,8;128:13;140:5,
23;141:14,17,20;142:7,
10
**Carnathan's (1)**
82:1
**carrying (10)**
85:1,6;90:25;91:14;
105:18;106:11,21;
107:4;122:14;131:20
**case (18)**
5:7,12;7:15;8:7;9:5,
13;28:4;31:15;50:7;
54:20;56:23;57:9;
65:14,21,24;66:2;71:5;
109:24
**cases (2)**
39:7,16
**cash (2)**
49:12,14

**cash- (1)**
47:22
**cause (3)**
63:7,23;65:2
**cell (1)**
64:10
**Center (3)**
121:13;128:24;129:2
**certain (5)**
7:1,18;10:10;86:18;
129:13
**certainly (12)**
13:4;16:3;21:25;
26:20,25;50:3,7;54:16;
57:13;68:1;75:1;79:24
**certification (1)**
11:13
**certified (5)**
19:7;27:14,22;31:7;
43:24
**certify (1)**
11:11
**chance (1)**
58:4
**change (1)**
138:21
**changed (1)**
43:4
**changes (1)**
70:20
**character (3)**
7:10,12,22
**characterize (1)**
48:14
**characterized (1)**
50:18
**charge (2)**
93:14;140:8
**charged (1)**
25:8
**charges (3)**
136:25;137:1,7
**charging (1)**
132:15
**chart (1)**
115:13
**check (5)**
49:21;105:7;114:15;
116:7,9
**checkbook (2)**
105:8,9
**checked (1)**
33:12
**checking (1)**
105:7
**checks (11)**
25:11,25,25;26:3,7;
30:2,20;62:14;71:9;
85:23;134:3
**chest (1)**
62:2
**child (12)**
7:2;14:1;35:5,10,21;

36:15;37:5,7;39:2;
41:10;42:12;77:19
**children (1)**
37:10
**child-support (4)**
8:17,19;77:24;78:17
**chronologically (1)**
16:11
**chronology (1)**
72:19
**Circuit (10)**
37:15,15;42:5,6,12;
46:20,23;49:19,22;
50:1
**circumstances (1)**
7:19
**cite (2)**
49:20,21
**civil (7)**
8:7;50:21;51:1;58:6;
65:7,9;66:3
**claim (8)**
5:9;9:24;30:3;55:7;
63:23;71:5;79:5;97:24
**claimant (1)**
5:9
**claimed (2)**
36:22;50:16
**claims (2)**
36:24;52:19
**clarify (3)**
67:25;78:8;108:18
**clarifying (1)**
93:9
**cleaning (1)**
73:5
**clear (8)**
9:16;11:21,21,23;
27:12;36:8;59:18;
142:15
**CLERK (26)**
5:2,7;20:2,5,12,21;
21:2;24:10;40:3;43:23;
55:12;58:10;59:9,11;
62:7;63:6,19,22;65:1;
66:21,23;76:23,25;
80:7,10;142:17
**clerk's (2)**
63:2;65:5
**clients (1)**
93:16
**close (8)**
109:24;121:2;122:6;
124:19;128:5;130:20;
136:16,17
**closed (1)**
125:10
**closer (1)**
46:6
**closing (10)**
99:6,7;101:24;106:1,
2;114:13;126:24;
130:2;137:8,12

Case 16-01120    Doc 345    Filed 06/04/19    Entered 06/04/19 13:07:41    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 147 of 163

May 13, 2019

**cloth (1)**
46:25
**co- (1)**
129:2
**Cohen (63)**
6:13,25;7:1,3,11,13,
16;9:11,17;10:8;13:25;
14:3,20,24;15:6,8,20;
21:8;22:11;23:4;24:23;
27:4;28:1,2;29:21;
32:15;33:6;35:19;
38:22;40:23;43:7;
50:15;54:9;57:12;58:8;
61:14;64:9;66:6,8;
68:21;73:22;74:7;
75:20;76:7,8;77:2;
80:16;81:19;86:3,4;
94:16,16,17,17,23;
95:3,7,15;96:12;97:7;
100:17;112:7,7
**Cohen's (6)**
6:19;7:10;8:16;
10:14;15:5;49:23
**collateral (3)**
10:4,12;48:21
**colloquy (1)**
27:13
**combined (1)**
79:21
**coming (2)**
20:18;78:9
**command (1)**
61:23
**commend (1)**
13:18
**comment (2)**
13:3;14:8
**comments (3)**
12:9;14:10;80:24
**Commission (3)**
16:14;17:2;136:20
**commissions (1)**
125:20
**commit (1)**
39:19
**committed (6)**
6:12;26:9;39:25;
50:17;51:2,15
**committee (2)**
11:20,21
**committing (3)**
18:19;23:7;45:23
**common (1)**
88:1
**commonly (1)**
11:6
**communicate (1)**
99:23
**communication (2)**
96:25;100:1
**communications (1)**
99:24
**community (1)**

123:19
**companies (1)**
103:9
**company (12)**
18:4;46:15;61:23;
93:14;100:1;104:24;
106:4;117:14;120:7;
127:9;133:10,15
**company's (1)**
116:16
**compare (1)**
95:17
**complained (1)**
72:15
**complaint (11)**
5:13;51:13;57:2;
58:7;62:4,4;63:8,10,
25;65:2,17
**complaints (1)**
55:2
**complete (1)**
140:14
**completed (2)**
77:7;126:25
**completing (1)**
15:6
**completion (3)**
77:25;126:8;131:5
**comply (1)**
17:8
**compromise (1)**
97:11
**computer (2)**
70:22,25
**concede (2)**
8:16;9:5
**concern (1)**
133:17
**concerning (3)**
6:19;10:21;45:7
**concluded (2)**
12:1;33:20
**conclusion (2)**
15:2;139:22
**concocted (1)**
46:10
**Concurrent (1)**
34:14,16
**concurrently (2)**
39:6,14
**condition (1)**
39:19
**conduct (3)**
52:23;53:1,4
**conducted (1)**
17:15
**confident (1)**
13:25
**confinement (6)**
8:15,16,18,20;78:12,
14
**confirm (3)**
75:24;130:11;133:9

**conformity (2)**
7:12;10:2
**confronted (1)**
31:3
**confused (1)**
37:1
**Congratulations (1)**
99:11
**connect (2)**
13:2,2
**connected (1)**
91:2
**connection (19)**
6:15;9:9,13;10:7;
17:19;18:20;36:1;
38:23;41:19;43:8;48:1;
50:9;54:6,10;66:12;
71:4,7,15;112:8
**consecutive (3)**
13:22;35:10;77:25
**consecutively (5)**
8:19;15:3;39:5,11;
78:6
**consent (4)**
21:9;22:5,11,15
**consented (1)**
18:14
**consider (1)**
129:12
**consistent (2)**
10:7;68:24
**conspiracy (1)**
52:20
**conspired (1)**
52:17
**constantly (1)**
99:4
**construction (44)**
67:23;68:8,9;72:20;
79:8,10,16;90:19,24;
92:20,23;93:2,5;94:2,4,
9;104:10,13;105:5,15;
106:3,7,20;107:5;
108:10;114:11;123:24,
25;125:17;126:3,8;
129:4,23;130:5,6,9,9,
11;131:2,8,19;132:16;
133:20;140:14
**consultant (1)**
66:1
**consulted (3)**
104:6;110:4,9
**consulting (1)**
54:7
**contained (1)**
11:11
**contemporaneous (1)**
83:19
**contention (1)**
97:5
**contentious (1)**
35:22
**contest (4)**

9:5,19;22:10;137:1
**context (1)**
53:4
**continuation (1)**
116:24
**Continue (1)**
84:24
**continuing (1)**
52:12
**continuous (1)**
35:6
**continuously (4)**
14:25;41:20;44:7;
78:7
**contract (16)**
68:8,25;69:6,24;
70:9,14;72:4,5,20;
79:20;101:4,25;
104:21,24,25;105:12
**contractor (11)**
68:2,4;79:16;104:21,
23;105:1;129:9;
131:25;132:5,12;140:8
**contractors (1)**
67:20
**contractor's (1)**
132:15
**contrary (3)**
30:1;57:12;59:3
**contumacious (2)**
53:1,3
**conversation (6)**
80:20;81:2,4;83:13;
94:13;127:17
**convicted (14)**
7:1;9:12;10:8;24:24;
25:12;31:12;33:7;
34:20;35:18,23;39:1;
42:3;45:24;47:3
**conviction (25)**
7:24;8:2,15;13:7;
14:2;21:25;26:4;27:14;
31:7;32:16;33:11;
34:12;36:9,10,15;37:5;
38:24;39:4;40:4;42:16;
47:9;52:25;77:15,17;
78:17
**convictions (9)**
14:18,21;32:13;
35:13;39:22;49:23;
57:15;77:3;78:3
**convicts (1)**
7:19
**copies (3)**
62:13;113:16,23
**copy (8)**
20:23;27:19;33:4,10;
43:8,24;64:7;134:14
**corner (1)**
55:19
**Corp (9)**
5:11,11,21,22;65:10;
67:8;101:5;132:25;

133:13
**corrected (1)**
43:2
**correctly (12)**
41:13;44:10;51:17;
52:13;53:1,10;56:17;
96:3,15;99:13;100:20;
108:11
**cosigner (1)**
124:2
**cosigners (1)**
123:25
**cost (19)**
79:8,10;90:19,23,24,
25,25;91:12,13;93:11,
18;94:8;98:16,18;
122:11;126:9,11,21,23
**costs (25)**
85:1,6;91:14;93:3,
21,22;105:6,11,15,15,
18;106:7,10,11,21;
107:4;114:11;122:14;
130:2,7,11;131:2,8,20;
132:1
**Counsel (3)**
44:22;62:22,23
**count (12)**
25:4,13,19;27:8;
28:5,6,8;29:22,25;
30:2;31:13;33:18
**counter (1)**
29:22
**country (3)**
55:8;87:21;120:15
**counts (11)**
25:8,10,18,21,23;
29:23;30:21;33:7,13,
16;65:18
**couple (1)**
135:22
**course (3)**
19:7;70:16;78:21
**Court (193)**
5:2,3,6,25;6:6,9,18;
8:23;12:12,14,14,16,
18,22,23;13:4,8,11,16,
18;14:4,6,7,16,23;15:7,
10,14;16:24,25;17:3;
18:25;19:15,18,21,23;
20:3,8,13,16,22;21:3,6,
11;22:20,22;23:17,19,
21,24;24:4,9,12,14,18,
21,25;26:13,15,18,24;
27:1,16,18,21,23;
28:18,23,25;29:5,9,14;
30:5,12,14,17,22,24;
31:2,10,17,19,23,25;
32:4,7,24;33:2,4;34:7;
38:10,12,15,19;40:8,
13,16,19;42:3;43:2;43:22;
44:2,22;45:4;46:2,4,6;
49:19,22,24,24;50:7,
10;51:3,8,16,25;52:4;

55:15;56:16;57:18;
58:2,14,17,19,21,24;
59:4,10,16,18,23;60:4,
7,11,22;61:5,8,12;
62:19,22;63:17;66:7,
25;67:2;73:20;74:3,16,
20,22;75:3,7,10,14,16,
18;76:11,16,21,24;
79:25;80:3,6,7,10,11;
84:16;86:1,4,7,9,12,17,
22;87:4;89:24;98:3;
117:25;118:9,24;
123:7;139:17;140:3,
25;141:5,8,10,13,15,
19;142:9,11,16,18
**court- (1)**
 41:9
**court-ordered (1)**
 35:21
**courtroom (2)**
 23:13,18
**courts (1)**
 53:12
**Court's (3)**
 12:21;13:9;29:20
**cover (3)**
 52:23;116:25;127:24
**covered (1)**
 96:7;116:4
**cover-up (1)**
 52:22
**crafting (1)**
 79:2
**created (2)**
 69:25;71:3
**credibility (2)**
 8:4;10:14
**credible (2)**
 14:20,21
**credit (2)**
 13:14;48:22
**crime (8)**
 7:2,25;22:24;34:20;
35:18,20;39:20,25
**crimes (25)**
 6:12,24;7:1,8,21;8:9,
17,19,20,22;9:11,21,
23;10:2,5,8,13,22;11:2;
23:7;35:23,25;45:23;
49:16;50:16
**criminal (14)**
 7:19,24;8:2;21:25;
28:4;31:15;44:13;
51:13;55:2;57:1,3;
63:7,10;77:3
**cross (1)**
 140:6
**cross- (1)**
 9:9
**CROSS-EXAMINATION (4)**
 66:10;80:14;102:14;
128:14
**cross-examine (1)**

12:3
**culled (1)**
 46:25
**currently (1)**
 96:1
**custody (4)**
 14:25;37:7;44:8;
78:13
**Cynthia (3)**
 88:11,15;90:9

# D

**DA (3)**
 56:19;58:9,21
**daily (1)**
 67:14
**damages (1)**
 50:24
**damaging (1)**
 72:16
**Dan (4)**
 16:9;78:25;79:20;
111:21
**DA's (1)**
 55:22
**date (10)**
 25:2;28:11;33:20;
34:4;45:7;55:11;61:18;
64:16;69:1;74:12
**dated (7)**
 15:22;68:22;92:19;
94:22;95:15,24;100:10
**dates (4)**
 38:3;44:24;78:9,12
**day (9)**
 5:8;6:1;18:22;32:1,
16;77:11;139:12;
141:20;142:10
**days (3)**
 70:16;126:24;137:8
**day-to-day (1)**
 66:17
**deal (15)**
 6:18;7:22;12:6;29:1;
30:12,14;101:25;
102:2,7,8,8,11;110:19;
116:11;127:15
**dealer (1)**
 110:8
**dealing (4)**
 68:1,4;117:4,19
**deals (2)**
 110:6;133:5
**dealt (1)**
 72:20;73:5
**debits (1)**
 71:24
**Deborah (10)**
 121:5,18;123:1,10,
14,16,20;128:20;
129:16;137:22
**debtor (1)**

5:19
**December (3)**
 37:25;38:4;50:21
**decent (1)**
 27:3
**decided (1)**
 102:6
**deciding (1)**
 103:24
**decision (7)**
 6:4;13:10;37:15;
47:2;49:22,25;50:4
**declined (2)**
 63:10,22
**decree (3)**
 22:6,11,15
**deed (1)**
 30:3
**deed's (1)**
 20:19
**deep (1)**
 103:25
**deeply (1)**
 18:13
**defendant (3)**
 8:8;28:4,6
**defendants (16)**
 7:13;8:16;9:18,24;
10:9;11:9;12:3;14:13;
21:14;22:8;51:2,15;
52:13,16,24;62:23
**defendants' (3)**
 9:20;76:19;134:11
**definitely (3)**
 22:19;66:5;79:14
**deflect (1)**
 52:25
**defraud (4)**
 7:14;9:25;10:10;
53:8
**defrauding (1)**
 25:14
**degree (4)**
 120:11;128:16,18;
129:13
**delay (1)**
 15:17
**deliberately (1)**
 42:19
**demand (1)**
 109:23
**demolished (1)**
 122:7
**demonstrate (3)**
 7:11,21;10:1
**demonstrating (1)**
 9:12
**denied (1)**
 57:25
**dental (2)**
 87:15,18
**deny (2)**
 47:10;112:16

**denying (1)**
 112:17
**Department (3)**
 57:1;61:15;63:24
**depending (1)**
 20:23
**deposition (11)**
 7:3,17;10:15,18,19;
15:18;35:12,16;40:23;
43:8;45:19
**describe (2)**
 87:16;120:9
**described (1)**
 120:25
**description (1)**
 83:2
**designated (2)**
 90:5;124:9
**designed (1)**
 10:12
**desirable (1)**
 122:3
**detail (1)**
 9:11
**detailed (1)**
 130:6
**details (1)**
 127:12
**deteriorate (1)**
 128:7
**determine (1)**
 114:2
**determined (1)**
 8:25
**determines (1)**
 8:23
**Development (8)**
 5:11,21;56:12;65:10;
101:5;132:25;133:13;
139:4
**dicta (2)**
 46:22;47:2
**difference (11)**
 60:15;92:8,10,14,16;
93:24;94:1,3;106:25;
107:11;108:20
**different (8)**
 12:11;14:14;19:14;
44:24;75:11,15;
108:19;125:20
**differs (1)**
 10:15
**difficulty (1)**
 14:17
**digits (1)**
 28:19
**diligence (1)**
 130:10
**Dima (21)**
 88:16,21;90:21;
92:15;94:12;96:10;
98:14;99:3,7,21,24,25;
104:25;105:7,17;

106:22;108:14;110:6,
7;114:12;116:20
**dining (1)**
 81:1
**direct (4)**
 7:21;15:15;87:7;
120:2
**director (1)**
 120:7
**disagree (4)**
 12:20;30:18,19;
60:17
**disappeared (1)**
 99:7
**disassemble (1)**
 19:23
**discharged (1)**
 111:3
**disclosed (1)**
 12:19
**discovery (1)**
 56:16
**discredit (2)**
 54:25;57:24
**discuss (8)**
 81:21;83:21;84:7,15,
19;109:16;127:4;130:7
**discussed (10)**
 21:24;78:25;83:3,19;
102:6;115:7;124:18;
125:15;129:18,25
**discussing (2)**
 83:22;121:20
**discussion (12)**
 83:22,25;84:18;85:1,
5,11;101:22;122:15;
124:21;125:10;136:19;
140:18
**discussions (1)**
 85:14
**dismissed (1)**
 53:15
**display (1)**
 26:24
**disprove (1)**
 97:24
**dispute (3)**
 54:11;72:22,25
**disputed (1)**
 97:24
**dissolved (1)**
 115:20
**distribute (1)**
 116:19
**distribution (1)**
 115:13
**District (11)**
 17:3,4;21:11;24:25,
25;27:9;42:8,10;45:24;
55:6,21
**divorce (1)**
 35:22
**docket (3)**

Case 16-01120    Doc 345    Filed 06/04/19    Entered 06/04/19 13:07:41    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 149 of 163

May 13, 2019

5:8;29:19,20

**doctorate (1)**
18:8

**document (23)**
11:5,17;21:8,17;
22:4,22;27:15;28:16;
31:5;57:11;60:14,15;
70:10,22,25;73:22;
75:4;79:6;89:11,12;
114:21;115:23;122:22

**documentation (1)**
60:6

**documents (14)**
17:6;46:13;47:13;
48:3,15;59:19;60:7;
70:3,5;85:18,19,20;
106:3,6

**domain (6)**
73:10,24;74:8,9,25;
75:25

**done (8)**
11:12,15;20:19;
72:12;127:6,8,11;
137:9

**Donya (10)**
98:25;99:1,2,4,20,22,
23;100:3;111:17,20

**door (1)**
81:10

**dots (2)**
13:2,2

**doubt (1)**
23:17

**down (41)**
31:8;42:2;43:11;
47:21;53:6;56:25;
61:14;63:24;64:13;
68:17;69:12,16;78:20;
80:25;82:19;83:10,23;
84:5,13;85:8;94:15;
96:12,13;99:15;
100:17;112:19;114:24;
115:5,9;123:22;133:2;
135:12;136:20;138:8,
17,23,24;139:1,10,14,
19

**Dr (1)**
88:4

**drafted (7)**
13:12;64:21;70:4;
72:4;92:21;123:10,12

**drafting (1)**
68:25

**drill (1)**
83:23

**due (5)**
78:16;100:17,19,23;
130:10

**during (8)**
54:2;80:21;83:13;
105:5;108:10;114:4;
140:6,18

**duties (3)**

90:14,16;124:16

---

## E

**earlier (4)**
22:19;100:15;107:7;
115:2

**earn (3)**
118:5;120:13;132:12

**earning (1)**
48:4

**easily (2)**
12:2,5

**East (2)**
103:18,22

**easy (1)**
27:1

**Edelkind (11)**
17:2;21:15;27:25;
32:9;36:4;37:8;43:24;
44:13;51:14;52:18,22

**Edelkind's (1)**
52:24

**edited (1)**
71:3

**edits (1)**
85:19

**education (2)**
87:16;120:9

**eighteen (2)**
101:10,14

**eighty-four (3)**
41:15,23;42:1

**either (5)**
20:10;26:19;81:1;
104:22;129:24

**electrical (1)**
120:12;128:17

**electronically (2)**
117:6,7

**Elizabeth (3)**
24:1;27:1;86:13

**else (8)**
6:7;16:7;19:3;23:17;
62:2;140:21;141:13;
142:11

**email (19)**
68:22;73:8,10,13;
94:16,22;98:24;99:9,
23;109:7,15;111:25;
112:8,14,23;113:4,9,
15,20

**emails (3)**
68:18;99:25;100:3

**embezzlement (2)**
62:5;63:23

**Emerson (1)**
103:12

**employee (2)**
66:13,15

**encountered (1)**
108:10

**end (9)**

32:1;72:25;77:17;
83:25;84:1;126:1,6;
128:6;142:19

**endeavor (1)**
133:16

**ended (7)**
8:15,17,20;49:12;
77:11;78:14;138:1

**enforcement (2)**
16:14;22:25

**engaged (1)**
10:10

**engineering (2)**
120:12;128:17

**enhance (1)**
52:21

**enjoins (1)**
18:15

**enough (3)**
28:12,25;29:12

**entered (7)**
16:24;18:25;42:16;
57:8,16;126:23;131:24

**entering (1)**
71:18

**entire (2)**
47:8;91:21

**entry (1)**
18:18

**equal (1)**
124:20

**equity (1)**
48:21

**equivalent (2)**
120:11;128:18

**errata (6)**
7:5,17;43:1,8;45:1,
20

**error (2)**
42:6;43:17

**especially (2)**
61:1;99:12

**established (3)**
15:21;45:12;53:17

**establishes (1)**
75:1

**estate (14)**
7:14;10:11;30:4;
102:17;122:4;123:17,
19;124:24;125:3,6;
128:19;136:19,22;
142:7

**estimated (1)**
130:11

**et (1)**
5:13

**even (8)**
64:4;74:25;78:13;
92:8;101:16;105:8;
114:9;141:2

**event (1)**
9:17

**eventually (2)**

53:15;110:19

**everybody (3)**
16:22;18:23;99:5

**everyday (1)**
67:5

**everyone (3)**
5:25;19:2;23:13

**Everything's (1)**
126:17

**evidence (84)**
6:12,24;7:8,9,11,13,
21,24;8:1,2,6,7,11,14,
14,22,25;9:3,4,5,8,8,18,
19,21,22,23;10:1,2,5,
13,21;11:2,6,8,19,23;
26:24;28:16;29:16,22;
38:8,16;40:5,20,21;
44:17;45:8,9,18;57:6;
59:3,8;60:16,20;63:9,
12,14,20;74:15;76:12,
14,19;81:20;82:14;
89:21,25;96:20;98:6,7,
22;100:16;111:12;
114:22;123:4,8;124:5;
137:17;142:2

**evidentiary (2)**
6:5;61:1

**exact (2)**
25:2;69:1

**exactly (6)**
19:3;41:17;98:22;
120:23;126:7;136:16

**EXAMINATION (5)**
15:15;87:7;118:1;
120:2;140:4

**examine (1)**
62:23

**Excavation (1)**
127:9

**exceed (1)**
131:8

**except (2)**
31:12;65:25

**exception (1)**
10:12

**excerpt (1)**
44:5

**Exchange (3)**
16:14;17:2;35:17

**excised (1)**
60:5

**exclude (1)**
60:7

**excluded (1)**
60:6

**Excuse (6)**
28:1;58:12;66:21;
74:21;78:6;101:2

**executive (1)**
46:14

**exercise (1)**
9:14

**Exhibit (88)**
6:16;11:4;14:23;
19:5;21:4,23;22:2;
24:5,13;27:15,17;
29:18,19;31:11;32:23;
33:1,11;38:8,16;40:4,7,
21;44:3;45:9;51:8,10,
25;55:13,16;57:6,10,
14;59:8,17;60:17;61:2,
10;63:13,16,20;68:12,
21;73:8;74:15;76:5,19;
78:20;81:17,19;82:11,
14;85:15;89:11,20,25;
94:20;95:11,17,23;
96:24;97:14;98:6,7,21;
99:8;100:4,12,16;
109:3,9,18;111:9,11,
11;114:19;122:19,23;
123:3,8;124:5;132:17;
134:9,10,13;135:4,5;
137:18;141:1

**exhibits (4)**
57:10;60:1;61:1;
141:25

**exist (4)**
51:22;52:11;70:25;
74:25

**exit (1)**
102:9

**exited (1)**
115:24

**expect (2)**
118:4;132:12

**expectation (2)**
125:17;131:15

**expected (8)**
92:4;109:5,12;
131:11,13,24;132:8;
141:21

**expended (1)**
132:1

**expense (1)**
11:24

**expenses (5)**
116:22;117:1;
125:21;127:24;137:16

**experience (2)**
128:20;130:16

**expert (7)**
11:10,25;12:18,25;
14:12,15;142:8

**expired (1)**
14:1

**explain (3)**
14:13,14;127:10

**explained (1)**
127:19

**explanation (2)**
14:14;127:5

**explicitly (1)**
132:14

**Express (5)**
113:24;127:17,20,

24;137:15
**extensive (1)**
47:24
**extraneous (1)**
31:4
**ex-wife (4)**
25:24;37:3,9;47:19
**ex-wife's (2)**
36:2;40:25

## F

**F3d (1)**
49:20
**fabricated (1)**
48:2
**facing (1)**
45:25
**fact (27)**
7:6;8:6;9:9,19;
10:24;16:23;17:1,15;
25:7;35:3;41:15;42:2;
43:1,4,18;46:13;50:15;
55:2;56:24;65:17;75:1;
81:24;106:14;109:21;
127:13;135:22;139:22
**facts (7)**
10:15;22:10;45:22;
46:18;47:10,11;49:21
**factual (2)**
13:21;37:19
**failure (3)**
7:2;35:21;41:9
**Fair (5)**
28:12,25;29:12;
60:19;85:4
**Fairmont (4)**
49:7,10;50:21;53:8
**falls (1)**
12:4
**false (6)**
7:7;10:20;30:2;
46:10;48:2,6
**falsehood (2)**
10:21,21
**falsely (1)**
10:17
**familiar (2)**
73:10;123:13
**family (1)**
64:23
**fantastic (1)**
64:7
**far (5)**
47:11;95:24;97:9;
101:17;130:1
**Fargo (1)**
48:22
**fast (2)**
29:11;135:24
**favor (3)**
84:2,11,21
**fear (1)**

64:23
**February (10)**
7:6;43:4,16,17,20;
45:1,2;63:24;78:9,11
**Federal (17)**
7:9,10;8:1,6;9:22;
11:6,19;14:25;15:1;
18:25;21:11;23:17;
41:3;44:8,8;45:18;
49:22
**fee (9)**
79:16;101:2,2,10,14;
125:2,3,6;132:15
**feel (1)**
141:21
**fees (1)**
90:25
**feet (2)**
130:8,23
**fell (1)**
93:7
**Fennel (2)**
142:6,7
**Fennell (1)**
142:8
**few (6)**
42:2;47:12;104:20;
111:14;126:24;141:25
**fewer (1)**
8:17
**fictional (1)**
52:17
**field (1)**
21:25
**fifteen (5)**
79:16;80:2,6;92:25;
101:1
**fifteen-month (1)**
93:1
**Fifth (3)**
42:6,12;103:22
**fifty-some-odd (1)**
41:10
**figure (1)**
81:5
**file (6)**
11:13;29:3;55:2,4;
65:7;72:16
**filed (6)**
5:9;18:6;50:21;65:9;
79:5;81:12
**filing (5)**
27:20;28:23;29:10;
66:3;79:1
**Filippov (13)**
5:9,17;6:23;74:24;
80:17;82:8,22;83:6,16,
21;84:1,10,21
**Filippov's (2)**
76:14;141:23
**filled (1)**
45:20
**final (1)**

113:5
**Finally (2)**
10:13;103:22
**finance (1)**
123:24
**financial (8)**
7:1;8:19;10:8;97:12;
110:25;112:4,9,13
**find (4)**
14:20;23:4;63:22;
108:12
**finding (4)**
10:23;13:21;14:4;
29:24
**fine (7)**
19:20;20:22;31:9;
75:14,16;86:22;126:17
**finish (1)**
62:19
**finished (7)**
35:8;70:20;72:13;
92:24;94:9;126:4,5
**firm (3)**
11:13;138:1,4
**first (38)**
6:18;8:13;22:3;
25:14;33:20;35:8;36:9,
25;37:14,15;42:5,6,7;
43:14;46:20,23;47:18;
49:19,22;50:1;54:9;
57:11;72:24;77:9,10;
88:10;95:5;96:4,5,9,16,
17;120:17,19,22;
121:18;123:17;132:21
**Fitz (1)**
47:16
**five (5)**
31:14,16,19;32:19;
41:6
**fix (2)**
6:21;29:10
**fixed (2)**
44:25;131:1
**flip (1)**
85:8
**focus (1)**
132:20
**follow (1)**
96:15
**Followed (3)**
32:19;34:17;92:11
**following (2)**
28:7;133:9
**fomented (1)**
56:17
**foot (2)**
130:17,22
**footnote (1)**
22:18
**force (1)**
97:7
**forensic (1)**
11:25

**forge (1)**
26:7
**forged (4)**
25:25;26:3;46:13;
47:13
**forgetting (2)**
49:20;142:4
**forging (3)**
25:11;30:20;48:15
**form (1)**
56:14
**formality (1)**
69:8
**formed (2)**
110:25;122:16
**forms (2)**
48:3;142:1
**forth (1)**
85:15
**forty (2)**
121:14;129:6
**forward (3)**
15:4;56:19;127:15
**forwarded (1)**
94:25
**found (10)**
33:13;54:9,23;57:22;
63:7;65:1;88:20,23,25;
108:12
**foundation (1)**
75:15
**founder (2)**
17:12;18:3
**four (4)**
33:7;35:9;44:23;
84:13
**four-apartment (1)**
103:14
**fourth (3)**
21:17;65:23;100:16
**frame (3)**
53:22;54:13;69:2
**frankly (2)**
57:15;60:17
**fraud (32)**
10:9;13:22,22;14:1,
4;18:19;23:5,14;24:24;
25:4,8;26:10;28:8;
33:8,8,17,17;36:2,12,
20,21,23;37:2,12;
40:25;42:4;51:2,15;
52:12;53:8;77:6,15
**fraudulent (4)**
51:21;52:10;137:7,
10
**Friday (2)**
6:11;27:20
**friend (3)**
88:2,3,13
**friends (7)**
104:2;121:1,2;
124:19;128:5,8;130:21
**front (2)**

61:3;75:20
**full (6)**
21:23;46:25;60:17;
134:10;135:5;142:10
**fully (1)**
77:7
**Funding (2)**
49:7;50:22
**funds (5)**
117:3;131:5;133:18,
23,25
**further (8)**
52:21;85:25;98:16;
101:21;117:24;140:2,
23,24
**furtherance (1)**
97:11
**future (1)**
88:13

## G

**gain (1)**
138:15
**game (1)**
60:19
**gander (1)**
57:19
**garden (2)**
7:15;10:16
**gave (8)**
22:7;27:19;54:22;
86:13;98:20;106:16;
114:15,17
**GC (2)**
101:1,2
**general (11)**
69:2;79:15;104:21;
105:1;114:6;129:9;
131:25;132:5,12,15;
140:8
**generated (1)**
81:20
**Georgetown (1)**
18:9
**Georgia (7)**
17:4;21:11;24:25;
27:10;36:9;42:8;77:11
**Gersh (4)**
16:9;79:13,14;
111:21
**Gessl (2)**
91:6,8
**gets (1)**
76:9
**gist (2)**
16:18;64:22
**given (3)**
54:10,19;78:12
**giving (2)**
32:7;58:3
**gloss (1)**
97:13

Case 16-01120   Doc 345   Filed 06/04/19   Entered 06/04/19 13:07:41   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 151 of 163

May 13, 2019

**goes (5)**
20:23;23:6,7;28:16;
86:20
**Good (28)**
5:3,4,5,16,18,20,23,
25;13:19;15:8,9,20;
57:17,19;66:8,9;86:7,9,
9,11;92:7;99:10,11;
102:16;104:2;122:9;
128:16;137:13
**goose (1)**
57:17
**government (1)**
22:12
**graduated (2)**
87:17,17
**great (4)**
96:5;121:23;122:1,3
**green (1)**
56:3
**gross (2)**
125:18,20
**ground (1)**
93:11
**grounds (4)**
50:3;57:8;89:22;
123:5
**group (1)**
17:25
**guarantee (5)**
118:12,14;131:1,16,
18
**guess (12)**
6:11,14;14:9;19:6,
19;53:4,6;60:21;61:16;
80:25;94:23;112:20
**guilty (15)**
25:2,4,13,19;27:9,11,
11;28:5,6,8;29:22,23;
30:2,20;33:13
**gun (1)**
62:16

**H**

**half (1)**
102:3
**hand (3)**
7:20;38:19;95:23
**handed (2)**
43:23;73:22
**Handier (1)**
129:14
**handshake (1)**
140:21
**handwritten (1)**
82:17
**handy (1)**
129:12
**hang (1)**
96:7
**happen (3)**
62:16;69:4,5

**happened (5)**
56:24;61:22;72:25;
124:14;127:10
**happening (1)**
128:1
**happy (4)**
31:25;32:1;47:5;
127:13
**HARRIS (72)**
5:23,23;13:14,17,18;
32:3,5;69:12,14;73:7;
78:19;82:11,19;84:24;
85:8;86:25;87:1;89:22;
96:21;97:9;102:15;
108:23,25;109:1;
111:8,10;112:1,2,19,
21;113:1,2,10,14;
114:19,20,22,24;115:1,
9,11;117:22;118:8,11,
22;123:5;128:15;
132:17,19;133:2,4;
134:9,12;135:4,6;
137:18,19;138:8,10,17,
19,23;139:3,10,14,18;
140:2,24;141:4,7,9,12
**Harris' (1)**
140:6
**Hartzell (7)**
11:13;12:4;24:2;
89:8;94:19;141:24;
142:6
**hear (4)**
34:15;37:18;46:4;
62:3
**heard (2)**
10:20;42:21
**hearing (7)**
22:4;62:7,11,13,18;
63:2;65:5
**hears (1)**
60:11
**held (1)**
63:3
**help (9)**
15:25;16:2;20:9;
48:13,14;54:8;68:1,7;
78:8
**helped (3)**
15:22;16:4,5
**herein (1)**
52:19
**here's (1)**
6:22
**high (1)**
87:17
**high-end (1)**
122:6
**hire (1)**
73:4
**hiring (1)**
83:14
**history (1)**
22:14

**hit (1)**
70:21
**hitting (1)**
70:24
**hold (1)**
136:22
**Holdings (1)**
50:23
**home (15)**
48:21;78:12,13;
104:24;106:7,11;
110:3;115:6;122:6;
130:8;131:11,14;
134:19;135:20,25
**honest (2)**
124:13,18
**Honestly (1)**
60:2
**Honey (1)**
47:16
**Honor (76)**
5:16,18,20,23;6:5,8,
17;12:10;13:13,20;
14:9,20;19:12;21:5,21,
22;22:5,13,18;24:3,7,
17;26:2,12;28:17;
29:16,17,25;38:11,14;
40:3,12,15,17;44:17,
18;45:10;49:18;50:2,
13;57:7,8;58:23;59:22,
24;60:13,25;61:7,11;
63:15;67:1;73:19;74:2;
75:17;76:4,18;80:13;
85:25;86:3,21;87:1;
89:21,22;96:20,21;
103:20;111:8;114:22;
117:22;118:8,23;
139:13;140:23,24;
141:4,14
**Honor's (1)**
61:4
**hope (2)**
6:2;20:15
**Host (1)**
73:16
**hours (1)**
70:16
**house (26)**
47:24;72:14;80:22,
24;88:19,20,20,23,25;
89:6;92:15;94:10;
97:19,20;103:14;
104:2;106:23;107:14;
108:14,14,15;122:7,8,
12;125:24;132:16
**Housekeeping (2)**
6:3;19:7
**houses (1)**
72:12
**hover (1)**
26:18
**Hull (2)**
47:17,20

**hurts (1)**
140:22
**husband (3)**
55:8;56:2;91:7

**I**

**ICANN (1)**
76:1
**ID (1)**
20:22
**idea (4)**
38:1;66:4,5;135:25
**identification (39)**
19:5;13:20;18:21:1,
2,3,4,9,21;24:3;27:15,
17;28:3;29:16;32:23,
25;33:1,12;38:8;40:5,
7;44:1,3;51:7,9,10;
55:14,16;57:6;59:15,
17;61:11;89:12,21;
95:23;98:22;122:20,
23;123:4
**identified (1)**
10:25
**identify (2)**
57:10;114:7
**Igor (1)**
65:11
**III-SS (1)**
33:13
**II-SS (1)**
33:13
**illegal (1)**
52:23
**illegally (1)**
52:18
**illegitimate (1)**
137:4
**immigration (1)**
120:20
**impeach (9)**
7:9,19;8:3;9:17;
10:14;23:12;59:5;76:7,
14
**impeached (1)**
10:18
**impeaches (1)**
23:20
**impeachment (21)**
7:16;9:21;10:17,24;
23:25;45:5;50:11;
57:13;58:2,25;59:2,4,6,
20;60:6,8,12,14,16;
63:14;76:16
**implications (2)**
12:9,24
**implicit (1)**
13:21
**importantly (1)**
57:14
**imprisonment (2)**
35:7;39:10

**improper (1)**
31:8
**inaccurate (2)**
114:3,8
**inappropriate (1)**
60:25
**inasmuch (1)**
51:21
**Inc (2)**
17:2;46:15
**incarcerated (4)**
9:12;13:23;77:22;
78:16
**incarceration (4)**
7:25;8:3,10;77:17
**include (4)**
25:25;33:17;90:23,
24
**included (5)**
11:5;91:14;106:7;
113:19;132:24
**including (8)**
7:14;45:6;48:3,22;
81:9;91:14;105:18;
131:22
**income (3)**
49:8;138:2,5
**incorrect (7)**
17:22;25:15,16,17,
20;42:25;77:14
**incorrectly (1)**
39:8
**indeed (1)**
10:19
**indication (1)**
126:11
**indicted (1)**
49:16
**indictment (9)**
25:7;26:3;28:5;
29:21,24;30:9,10;
31:20;55:24
**indiscernible (1)**
20:11
**information (14)**
9:13;10:24;11:11;
27:12;60:8;79:20;
98:12;112:4,10,13;
113:5;128:3;137:6,14
**initial (8)**
107:24;108:1,3,3;
110:10,14;131:15;
134:7
**injunction (11)**
16:13,16,23;18:14,
19,25;19:4,10;21:10;
22:1;23:17
**inside (2)**
80:25;93:10
**insist (1)**
104:17
**inspect (1)**
134:25

Case 16-01120    Doc 345    Filed 06/04/19    Entered 06/04/19 13:07:41    Desc Main
Document    Page 152 of 163
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
May 13, 2019

**instance (1)**
74:19
**instead (2)**
75:13;98:23
**insufficient (1)**
63:9
**insurance (1)**
91:1
**intend (1)**
9:7
**intended (1)**
9:17
**intent (2)**
9:4,12
**intention (1)**
12:5
**interactions (1)**
67:24
**interest (3)**
115:18;130:2;131:22
**interested (3)**
5:10;54:2;115:21
**interesting (1)**
127:22
**interfered (1)**
56:11
**interpret (2)**
12:25;108:11
**INTERPRETER (6)**
86:21;93:8,8;95:6;
108:17,18
**interpreting (1)**
86:19
**intimidate (2)**
54:25;57:24
**intimidating (1)**
64:1
**into (44)**
14:22;15:11;21:21;
23:6,10;24:13;28:16;
29:16;38:8,16;40:5,20,
21;44:16;45:8,9;46:7;
57:6;59:8;60:16;63:13,
20;71:18;72:7;76:19;
78:12;81:19;82:14;
88:17;89:21,25;90:16;
96:20;97:7,20;98:6,7;
118:13;123:4,8;130:1;
131:24;133:25;142:2
**introduce (3)**
9:3,23;120:22
**introduced (2)**
88:1,12
**introduction (2)**
7:21;21:23
**invest (7)**
88:15;89:2;103:24;
107:23;108:1;122:2;
123:20
**invested (10)**
91:8;101:18,20;
104:18;118:3;121:3;
123:21;130:5;131:7,13

**investigation (2)**
56:22;103:25
**investing (3)**
104:7;118:5;134:6
**investment (16)**
102:10,20,22,23;
107:24;108:2,3;109:8;
121:13,14,15,20;
125:14;128:19;129:7,
16
**investor (3)**
121:23;127:22;129:3
**investors (8)**
7:14;9:25;10:10;
17:20,23;18:1;96:10;
97:7
**invoice (12)**
15:22,25;78:20,21,
23,24;79:1,3,4;100:18;
126:25;127:4
**invoices (9)**
71:9,13;85:20;
113:17,20;114:2,4,5,7
**involuntarily (1)**
22:6
**involved (9)**
10:22;36:7;67:17,24;
72:21;88:10;102:16;
121:18;123:14
**involvement (1)**
72:5
**involves (2)**
12:1;28:6
**Irina (1)**
141:23
**irrelevant (1)**
96:22
**Isaac (1)**
50:23
**I-SS (1)**
33:13
**issue (19)**
6:19,22;7:15;8:9;
9:23;11:7,19;12:17;
13:7,12,24;28:25;50:5;
63:7,10;73:6;81:6;
83:3;141:1
**issued (2)**
6:9;22:6
**issues (5)**
6:5,12;68:2,5;83:24
**Italy (1)**
120:20
**item (1)**
79:10
**IV-SS (1)**
33:13

**J**

**James (2)**
5:23;6:25
**Jamie (7)**

17:2;21:15;43:24;
51:14;52:18,22,24
**January (2)**
39:1;63:3
**job (1)**
139:12
**John (4)**
5:20;28:20;64:9;
90:11
**joins (1)**
23:8
**Joseph (5)**
6:25;28:1;94:17,23;
96:12
**judge (2)**
27:13;37:20
**judgment (9)**
9:10,15;22:3;28:4;
29:19;30:10;31:15,19;
34:4
**judicial (4)**
49:19,25,25;50:10
**July (7)**
24:24;28:10;33:6;
34:4;45:24;81:11;
126:6
**June (10)**
14:12;15:22;68:22;
70:6;72:20;95:15;96:6;
100:23,25;142:5
**jury (1)**
33:7

**K**

**K-1 (7)**
138:11,18,20;139:2,
4,11,20
**Kagan (84)**
5:10,10,10,13,21,21,
21;23:9;53:22,25;54:4;
56:12;63:24;64:9,13;
65:7,10,10,11,22;69:7;
81:15;84:2,8,22;87:25;
88:8,21,23;89:3;90:18;
91:11;92:3;93:3,13,21;
94:7;97:25;101:5,7,22;
103:25;104:9,25;
107:11,17;108:6;
109:12;110:20,22,24;
114:15;115:22;116:2,
4,12;117:2,8;118:4,12;
120:17,22;121:3,25;
122:10;125:1,5,12;
126:9;127:9,10;128:9,
11;129:17;130:4;
131:1,16;132:25;
133:13;135:19;137:14;
139:4,23;140:7
KaganDevelopment@gmailcom (1)
99:10
**KaganDevelopmentcom (1)**
73:11,24;74:10;

75:25
**Kagans (1)**
121:1
**Kagan's (3)**
100:1;127:16;139:20
**Kaiserman (7)**
120:5,6,10;122:23;
124:10;128:13;140:6
**KDC (31)**
5:11,21;53:25;54:4;
55:5;57:4;65:10,23,25;
66:12,15,17;67:6,11;
68:7,25;70:14;71:5,22,
25;72:4;78:23;79:4,5;
84:15;97:25;101:5;
111:18;132:25;133:13;
139:5
**keep (8)**
12:14;32:3,4;78:9;
79:23;85:8,9;114:25
**keeps (1)**
62:21
**kept (1)**
53:12
**key (1)**
61:21
**keys (1)**
80:17
**Kiev (2)**
87:17,19
**kind (10)**
10:11;90:22;113:12;
127:7,14,25,25;128:2;
137:8;140:19
**Kladov (1)**
65:12
**knew (15)**
20:6;54:16,18,19;
56:5;60:2;93:23;94:1;
106:22;109:7,14;
117:2,9;118:19;130:1
**knowledge (1)**
114:10
**known (1)**
45:15

**L**

**lack (2)**
22:14,14
**landscaping (1)**
72:12
**language (1)**
61:23
**larger (2)**
47:21,21
**Lasker (3)**
37:17,19,20
**last (13)**
11:5;14:11;15:21,21;
28:19;57:5;69:13,14,
21;95:4;97:2;108:17;
128:11

**later (4)**
7:5;10:18;35:9;
133:22
**latest (1)**
79:1
**law (2)**
52:11,17
**laws (1)**
17:8
**lawsuit (6)**
65:7,9;72:16;81:12;
83:14,15
**lawyer (1)**
60:8
**lawyers (2)**
65:20,24
**LBB (1)**
53:8
**lead (1)**
15:6
**learn (1)**
88:14
**least (3)**
17:16;28:18;57:8
**leave (2)**
58:20;142:14
**leaving (1)**
100:19
**ledge (5)**
93:10;94:2,4;108:10,
12
**left (4)**
37:11;96:5;116:20,
25
**legal (1)**
45:15
**legitimate (1)**
137:4
**Lehman (2)**
50:22,22
**less (6)**
42:1;61:23;93:17;
100:18;106:15;140:20
**letter (27)**
55:18,20;56:7,20,25;
58:8,11,21;95:3,5,5,9,
14;96:4,5,6,9,16,17;
98:19;100:25;101:9,
13,21;112:5;115:2,3
**level (1)**
23:15
**liability (2)**
103:8;116:16
**license (1)**
136:22
**lie (2)**
16:16;62:17
**lien (6)**
70:3,4,5,10;79:2;
102:1
**lies (1)**
25:21
**life (2)**

Case 16-01120    Doc 345    Filed 06/04/19    Entered 06/04/19 13:07:41    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 153 of 163
May 13, 2019

23:5;116:6
**limit (1)**
 14:5
**limitation (1)**
 8:21
**limitations (1)**
 8:13
**limited (4)**
 45:4;60:22;103:8;
 116:16
**Linda (3)**
 36:4;37:8;38:2;
 46:11;48:3
**Linda's (5)**
 47:14;48:8,21;49:1,7
**line (10)**
 14:18;35:17;40:24;
 43:14,15;48:22;50:9;
 69:21;79:10;99:16
**lines (1)**
 42:2
**Lipetsker (7)**
 5:17;6:24;82:7;83:6;
 84:1,10,21
**list (8)**
 22:2;57:10,14;61:2;
 76:8,12,13;81:20
**listed (5)**
 22:18,20;33:16;
 61:19;79:8
**listened (1)**
 59:5
**listing (7)**
 59:19;84:8;110:3;
 124:21,23;125:2;
 135:19
**lists (1)**
 28:12
**litigation (2)**
 54:7;56:16
**little (15)**
 19:6;20:15;31:25;
 68:18;79:25;112:19;
 114:25;115:5,13;
 133:8;135:13;138:25;
 139:2,19;141:22
**LIV (1)**
 52:15
**live (1)**
 87:11
**lives (1)**
 37:9
**living (1)**
 23:4
**Liz (2)**
 38:20;142:16
**LLC (26)**
 5:8,12;6:23;89:18;
 90:6,9,15;91:9;94:16,
 17;96:1;101:5;103:12,
 16,18,20,22;110:2,25;
 115:19;116:12,23;
 117:19;122:16;123:1;

134:4
**loan (30)**
 48:13,17;49:9;50:22;
 51:21,22;52:10,11;
 91:15,18;94:2,4;
 105:14,20;106:3,14,19,
 20;107:4,7;123:23,25;
 125:17;129:20,21,23;
 130:1,9;131:19;135:13
**loan-payment (1)**
 135:7
**loans (7)**
 47:22;48:10,12,21,
 24;49:12;108:20
**location (1)**
 122:3
**logistics (1)**
 141:22
**long (6)**
 17:7;23:10;42:15;
 70:15,16;94:11
**longer (3)**
 65:25;131:11;141:20
**long-term (1)**
 138:15
**look (19)**
 18:2;23:3;35:15,15;
 40:13;43:14;50:7;
 62:14;80:23;82:22;
 89:6;96:13;99:8;
 111:23,24;124:4;
 137:9;138:14;141:15
**looked (3)**
 96:12,13;100:15
**looking (14)**
 12:7;32:12;52:15;
 56:9;64:7;88:18,18;
 97:23;99:9,15;100:16;
 112:9;114:9;127:15
**looks (5)**
 89:19;99:16;100:9;
 135:9;138:22
**lose (5)**
 102:2,2,2,6,8
**loss (3)**
 115:17,22;116:4
**losses (1)**
 133:6
**lost (2)**
 99:24;127:14
**lot (2)**
 37:17,19
**lots (1)**
 122:7
**Louisiana (4)**
 35:11;36:16;42:13;
 77:24
**low (2)**
 122:5;133:19
**lower (2)**
 92:4;110:15
**lowering (1)**
 110:13

**lying (2)**
 25:22,24
**Lyman-Cutler (15)**
 5:8,12;6:23;50:4,9;
 67:15;71:1,3,21;72:6,
 23;85:18;89:23;96:23;
 123:6
**Lyman-Cutlercom (1)**
 74:9

**M**

**Mack (1)**
 83:14
**made-up (1)**
 97:6
**Madoff (1)**
 142:1
**magistrate (6)**
 62:8;63:2,7,22;65:1,
 4
**Maiden (6)**
 90:10;123:12,13,16,
 17;142:4
**makes (2)**
 74:18;133:12
**making (2)**
 70:20;126:1
**manage (2)**
 103:12;124:14
**managed (1)**
 103:8
**management (1)**
 68:9
**manager (7)**
 53:25;54:4;90:5,8,
 12,15;105:24
**managing (10)**
 82:23;90:5,8,15;
 105:24;124:10,12,14,
 17,19
**mandatory (1)**
 39:18
**manner (1)**
 10:15
**mansion (1)**
 47:17
**many (7)**
 9:7;11:16;65:20;
 85:19;90:20;91:5;
 113:16
**March (11)**
 48:25;94:23,25;
 95:17,24;96:16;97:17;
 98:9,12,15,19
**margin (1)**
 122:9
**mark (10)**
 19:4;20:17;27:14;
 38:12;40:4;43:25;
 55:12;59:14;75:8;
 120:5
**marked (22)**

20:24;21:4,8;27:17;
 32:22,24;33:1,11;40:7,
 14;44:2,3;51:6,10;
 52:1;55:16;59:17;61:9,
 10;89:11;122:22;
 134:13
**market (2)**
 122:4;135:25
**marking (1)**
 19:13
**married (4)**
 36:4,14,19;37:2
**marry (2)**
 55:8;56:2
**Massachusetts (9)**
 36:10,13;37:24;
 42:11;45:24;47:17;
 51:3,16;87:13
**master's (3)**
 120:11;128:16,18
**material (1)**
 85:16
**materials (2)**
 132:6,7
**matter (3)**
 19:7;52:11;77:24;
 83:23;124:19;135:22
**matters (3)**
 54:7;71:18;86:24
**may (38)**
 5:6,14;6:21;7:18;8:3,
 14;10:2,5,13,18,20;
 14:16;20:22;21:5,6;
 23:25;26:12,13;27:14,
 16;32:22;33:23;38:17;
 43:21,22;51:6,8;73:19,
 20;74:2;75:3,17,18;
 76:20;80:16;97:19;
 100:10;142:14
**Maybe (20)**
 26:22;28:18;50:19;
 80:1;88:9;92:21,25;
 95:7;105:22,22;
 107:22;111:16,20,22;
 113:7;116:5,14;
 117:12;126:6;139:1
**McGregor (2)**
 90:11;105:23
**mean (13)**
 14:19;16:16;23:5,14;
 29:5;44:19;53:3;58:18;
 67:19;74:17;76:7;
 104:23;111:21
**meaning (1)**
 31:11
**means (3)**
 12:20,24;52:25
**meant (2)**
 45:2;58:19
**mechanical (1)**
 31:21
**mechanic's (1)**
 79:1

**Medal (1)**
 103:20
**meet (5)**
 80:17;99:24;109:16;
 120:17,19
**meeting (22)**
 72:7;80:21;81:13,21,
 22,24,25;82:4,5,6,9,15;
 83:13,19;85:14;90:20;
 93:18,20;94:14;96:10;
 98:13;117:16
**member (9)**
 82:23;117:13,20;
 124:10,12,14,17,20;
 133:13
**members (7)**
 109:22;110:1;
 115:14;125:4,19;
 132:24;133:11
**members' (2)**
 81:12,24
**memorandum (3)**
 17:20;18:3,7
**memory (7)**
 51:4;54:15,21;68:24;
 69:1;73:23;113:13
**mention (3)**
 42:19;127:23
**mentioned (6)**
 22:2;42:18;101:1,14;
 107:8;127:6
**merely (1)**
 10:16
**meretricious (1)**
 52:23
**mess (1)**
 141:23
**message (1)**
 99:20
**met (5)**
 12:2;80:22;93:6;
 120:18,20
**metadata (9)**
 6:15;11:6,18;12:1,1,
 17,20;14:10;69:18
**microphone (3)**
 15:10;46:6;86:23
**mid-1990s (1)**
 16:15
**middle (3)**
 31:15;115:12;126:5
**Middlesex (3)**
 55:6,22;58:22
**might (5)**
 59:19;125:21;131:4,
 8,10
**million (14)**
 17:16,21;48:4,7;
 49:1,8,9;50:23;110:11,
 17;122:6;125:23;
 131:14;136:5
**mind (1)**
 12:15

Case 16-01120    Doc 345    Filed 06/04/19    Entered 06/04/19 13:07:41    Desc Main
Document      Page 154 of 163
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

May 13, 2019

**mine (1)**
75:12
**minor (1)**
96:2;98:11
**minus (1)**
125:20
**minute (5)**
6:20;107:1,3;111:8;
117:22
**minutes (7)**
59:6;80:2,6;82:9,15,
16;84:20
**mischaracterization (1)**
30:9
**mischaracterizing (1)**
46:22
**misrepresent (2)**
18:8;61:3
**misrepresenting (1)**
53:9
**miss (1)**
29:11
**missing (1)**
8:1
**mission (1)**
54:24
**mistake (2)**
96:14;98:14
**mistaken (1)**
65:4
**MK (1)**
65:11
**Mohawk (1)**
134:17
**moment (4)**
16:13;22:8;36:3;
142:3
**moments (1)**
111:15
**money (25)**
18:5;47:16;48:19;
49:5;92:16;94:7;97:8;
101:17,18;107:20,21,
23;108:15;109:17;
111:5;116:15,17,18,19,
19;117:6;118:18,20;
123:20;133:19
**MoneyLine (2)**
47:14;48:17
**monitor (1)**
105:11
**month (5)**
65:15;93:5,5;126:10,
13
**months (13)**
9:10;32:16;34:13;
39:5,10;41:1,11,15;
42:1;75:2;88:19;92:21,
25
**more (23)**
6:20;8:3,10,15;9:10,
16;29:19;30:15;41:15;
47:12;56:2;57:14;

63:12;80:2;86:2;
107:23;118:23;134:6;
136:7;138:17,24;
140:21,22
**Moreover (1)**
132:14
**morning (19)**
5:3,4,5,16,18,20,23,
25;15:8,9,20;66:8,9;
77:3;86:7,9,10,11;
99:10
**Morris (3)**
37:17,19,20
**mortgage (13)**
30:4;36:2;40:25;
42:3;47:13,18;48:8;
49:1;111:2;117:5;
123:22;125:15;129:21
**mortgages (1)**
49:4
**mosaic (1)**
23:11
**most (2)**
123:18;129:14
**Mother's (1)**
6:1
**motion (8)**
13:10;40:18;41:19;
43:24;44:6,19,20,20
**motions (1)**
9:10
**move (3)**
15:4;24:17;58:6
**moving (4)**
32:3,4;58:17;121:8
**Mrs (1)**
135:19
**much (13)**
29:18;41:8;52:11;
74:6;90:19;91:11;
93:13;118:4;122:10;
123:20;125:13,24;
126:1
**multiplying (1)**
41:22
**must (2)**
8:7,14
**mutual (3)**
88:1,3,13
**myself (1)**
82:7

**N**

**name (24)**
17:7;21:15;28:1;
36:17;47:14;48:8,11,
22;49:1;64:16;70:21;
73:10,24;74:8,9,25;
75:25;87:9;111:21;
115:16;120:4;138:12;
139:2;141:23
**named (2)**

21:14;99:1
**names (1)**
5:14
**narrative (1)**
64:8
**National (1)**
25:14
**native (1)**
11:17
**natural (1)**
124:25
**nature (1)**
53:9
**necessary (2)**
11:10;19:24
**need (13)**
14:12,15;26:15;29:2;
54:15,21;108:19;
113:8;138:25;139:1;
141:17,21;142:15
**needed (1)**
78:25
**negotiate (1)**
129:19
**neighbor (2)**
72:15,22
**neighborhood (1)**
122:3
**neighbor's (2)**
72:8,14
**net (3)**
115:17;133:10;
140:14
**new (5)**
34:20;129:1,4;130:8;
131:13
**news (1)**
99:12
**Newton (8)**
57:1;61:14;88:11,15;
121:13;122:4;128:24;
129:2
**Newton- (1)**
90:8
**Newton-Cynthia (6)**
89:18;90:6;91:8;
100:8;101:4;102:17
**next (18)**
24:17;32:22;40:4;
42:22;52:7;55:12;
65:14;72:5;74:15;76:5;
77:15;98:18;115:9,16;
138:18,18,23;139:11
**next-door (1)**
80:24
**Nickolay (2)**
5:17;6:24
**Nobody (2)**
98:17;113:25
**nobody's (1)**
13:1
**noncrime (2)**
52:22,22

**none (3)**
23:15;71:11,14
**nonpayment (3)**
36:15;37:5;39:2
**nor (1)**
57:14
**Northern (5)**
17:4;21:10;24:25;
27:9;42:7
**Norway (6)**
36:12;37:9,11,24;
38:2,5
**note (1)**
34:7
**noted (2)**
28:22;87:5
**notes (3)**
11:20,21;17:17
**notice (10)**
9:3,6,16;19:2;22:14;
29:25;49:19,25;50:11;
135:8
**November (6)**
26:10;54:16;55:7;
56:25;61:15;92:19
**nowhere (1)**
117:16
**number (27)**
5:7,8,12;11:4;24:5;
29:22;39:19;44:13;
79:9,13;82:22;83:10;
85:15;87:13;89:11;
96:7;97:17,18,20;
98:10;107:6,8;109:19;
111:23;124:24;130:16;
141:1
**numbers (10)**
18:17;28:12,13;29:6,
13;34:8;79:17,19;97:6;
141:6

**O**

**oath (6)**
10:14;14:24;15:12;
44:12;45:3;86:13
**object (12)**
11:9;21:22;29:17;
30:11;44:18;50:2,8;
53:7;57:7;60:13;89:22;
123:5
**objection (20)**
5:9;9:20;11:1;13:4;
19:12;23:21;26:2;
38:10,11;40:16,18;
49:24;63:15;74:16;
87:3,4;96:22,24;97:2;
137:11
**obligation (2)**
60:19;110:1
**observations (1)**
12:13
**obtain (2)**

48:21,24
**Obviously (2)**
12:10;64:16
**occasion (1)**
64:15;80:17;81:12
**occasional (1)**
65:25
**occurred (4)**
51:16;63:5;85:5;
127:13
**O'Connor (1)**
83:14
**October (2)**
15:1;44:9
**off (5)**
49:11;62:2;69:24;
70:9;80:8
**offense (3)**
28:7;33:20;41:3
**offenses (2)**
15:1;44:9
**offer (24)**
6:24;9:4,7;14:19;
21:20;29:15;40:5;
44:16;57:5;63:13;
74:14;76:4;89:20;
96:19;97:4;98:20;99:5,
6,7,11;110:16;121:22;
123:3;125:9
**offered (10)**
10:2;11:4;19:13;
23:1,12;38:7;98:1,4,4;
121:13
**offering (7)**
17:15,18,19;18:20;
40:14;58:24;60:19
**offers (1)**
97:6
**Office (5)**
25:22;55:7,22;67:11;
82:1
**old (2)**
87:23;113:16
**older (1)**
37:10
**once (4)**
54:23;60:20;88:9;
128:23
**One (74)**
6:12;10:4;11:9,11;
12:17;13:20;16:16;
19:8;20:9;21:14,24;
22:33;23,25;34:7,14,
16;35:9;36:7,8,9,13,25;
39:6,13;40:8,10;42:7,
10,18;48:1;49:15;51:6;
52:7;54:8;59:14;62:11,
12;77:9;80:22;82:22;
87:2;95:14,24;96:1,5,
6;101:7;103:9;104:17,
25;110:6,6;111:8;
112:6,24;117:17,22;

123:17,25;124:13;
127:22,24;137:3;
138:24;139:21;140:1,
7;141:1;142:16
**one-page (1)**
11:18
**ones (1)**
78:1
**one's (2)**
27:22;142:17
**online (1)**
134:23
**only (9)**
58:2;74:17;78:16,18;
104:4,25;114:12,12;
117:17;126:23
**opening (1)**
127:20
**operate (1)**
122:16
**operating (12)**
89:17;92:18,19;
105:2;122:12;123:1,
10;124:4;132:18,21,
24;140:16
**opinion (5)**
12:25;46:20;49:19,
25;50:11
**opportunities (1)**
121:21
**opportunity (5)**
62:23;88:14,18;
121:23;122:1
**opposed (1)**
19:10;22:6;69:7
**opposing (1)**
9:4
**option (1)**
75:8
**oral (1)**
94:13
**order (21)**
7:23;11:11,25;14:10;
21:10;22:17;23:14;
44:20;49:8;52:18;57:9,
9,16,16;59:18,25;60:7;
61:4;91:18;109:23;
116:20
**ordered (2)**
38:22;41:10
**ordinary (1)**
10:16
**orient (1)**
95:9
**originally (1)**
34:2
**others (2)**
53:8;69:10
**other's (2)**
104:2;118:13
**otherwise (2)**
10:15;101:25
**ought (1)**

29:9
**ourselves (2)**
130:1;141:22
**out (64)**
6:1;9:11;11:16;17:8;
19:10,19;20:9,19;23:8,
15;28:15;29:12;34:14,
16;35:10;36:9,10,13;
37:14;38:18;42:23;
44:24;45:3,20;46:18;
47:23;48:7,10,12;49:5,
21;53:18;54:9,23;57:1,
22;62:4;63:25;68:1;
72:13;73:2;77:6,24;
78:3,13;81:5;91:15,18;
94:12;97:10;103:14;
106:19;108:12,12,16;
110:20;115:20,20;
121:15;123:23;127:15;
132:13;135:2;141:9
**outlaid (1)**
134:1
**outline (1)**
130:8
**outside (2)**
14:5;67:19
**outstanding (1)**
47:22
**outweighed (1)**
8:5
**outweighs (2)**
8:11,24
**over (13)**
6:11;17:21;26:18,22;
28:22,23;37:20;48:4;
49:8;70:16;80:17;
100:23;127:3
**overall (1)**
23:1
**overhead (1)**
109:17
**overrule (1)**
23:21
**overruled (5)**
9:21;11:2;89:24;
98:3;123:7
**overruns (8)**
94:8;98:16,18;
109:17;126:9,11,21,23
**overstatement (2)**
30:25;31:2
**owe (1)**
114:6
**owed (1)**
109:10
**owes (1)**
94:17
**own (10)**
12:22;45:15;61:25,
25;93:16;102:21;
103:6;129:10;130:10;
133:19
**owned (3)**

128:21,24;129:1
**owner (1)**
129:2
**ownership (1)**
116:12

# P

**package (1)**
17:25
**page (27)**
11:5,9,12;21:17;
28:3;30:11;35:15,17,
17;40:24;43:15;52:15;
64:8;69:13;90:3;95:2,
17;99:8,16;115:10;
124:4,6;138:8,18,23;
139:1,15
**pages (5)**
20:18;31:11,14,16,
19
**paid (7)**
55:7;56:1;73:2,4;
115:22;132:6,8
**pains (1)**
43:12
**paper (11)**
13:1;20:15;27:4;
94:14;107:10;113:16;
115:25;116:5,5,6;
140:20
**paperwork (1)**
105:20
**paragraph (12)**
27:8;51:12,19,25;
53:6;85:4;100:17;
111:23;115:6;132:21;
133:2,5
**paralegal (1)**
11:13
**paraphrase (1)**
133:8
**parcel (1)**
97:21
**pare (1)**
31:8
**parentheses (1)**
115:16
**Park (1)**
103:20
**part (14)**
22:11;23:1;42:14;
47:1;56:8;68:21;79:5;
97:21;108:12,17;
111:24;116:11;123:18;
137:22
**participated (6)**
10:6;16:7;36:19,21;
37:2;70:2
**particular (8)**
16:5,23;18:24;23:16;
32:16;34:12;97:2,23
**parties (7)**

5:10,14,24;89:15;
96:25;97:15;115:6
**parties' (1)**
97:12
**partner (3)**
93:17;116:17,18
**partners (2)**
108:13;127:21
**party (5)**
7:18,20;9:2,4;11:23
**past (1)**
79:25
**pattern (1)**
23:2
**Pause (2)**
24:20;36:3
**pay (32)**
7:2;35:21;37:7;
38:22;41:9;49:11;
67:19;91:15,19;93:25;
102:4,7,8;105:15;
106:10,20;107:4,13;
108:21,22;109:6,8,15,
24;116:6,20;125:9;
131:20;133:19;134:1;
137:15;140:20
**payable (3)**
96:2;98:10;99:17
**paying (4)**
47:21;97:7;102:3;
117:5
**payment (8)**
67:19;68:4;85:2,6;
91:1;100:18;102:3;
123:22
**payments (5)**
67:18;71:24;91:2;
134:25;135:2
**pdf (1)**
138:8
**penalties (1)**
43:12
**Penske (1)**
17:24
**per (3)**
22:15;130:17,22
**percent (8)**
79:16;101:1,10,14;
121:14;129:6;136:15,
18
**percentage (2)**
79:15;101:18
**percentages (1)**
79:21
**perfect (1)**
61:24
**perfectly (2)**
20:16;142:18
**performed (1)**
130:10
**perhaps (2)**
31:16;141:17
**period (4)**

54:2,3;93:1;116:23
**perjury (4)**
43:12;50:17;51:2,15
**permanent (4)**
16:13;18:14,18;
21:10
**permanently (1)**
18:15
**permission (3)**
28:20;43:24;44:7
**permitted (2)**
7:20;8:23
**perpetrated (3)**
51:2,15;52:12
**person (5)**
24:23;61:20;70:4;
75:21;111:22
**personal (4)**
55:5;114:10;131:5;
138:2
**personally (1)**
56:25
**person's (1)**
7:22
**persuaded (1)**
8:11
**PERTEN (115)**
5:5,20,20;6:8,17;
12:9,10,13,17,23;13:6,
9,13,17,20;19:12,20;
20:23;21:22;24:7;26:2;
27:18;28:22;29:17;
30:6,8,13;31:18;32:5;
33:2,3;38:11,14;40:17;
44:18;50:2;57:7,19;
59:2,23,24;60:5,10,13,
24;63:15;66:8,11,22,
24;67:1,3,4;68:13,17,
20;69:12,15,17;73:7,9,
19,21;74:2,4,14,21,24;
75:5,9,13,15,17,19,22,
23;76:4,13,18,20,22;
77:1,20,21;78:19,22;
80:1,5,13,15;81:17,18;
82:11,13,19,21;83:10,
12;84:5,6,13,14,24,25;
85:8,10,12,13,25;
132:18;138:9;139:12,
15,16;142:14
**Perten- (1)**
19:10
**Perten's (1)**
14:10
**perusal (1)**
22:7
**Peter (1)**
5:18
**ph (4)**
88:4;90:21;91:6;
98:25
**phone (1)**
64:10
**ph's (1)**

Case 16-01120    Doc 345    Filed 06/04/19    Entered 06/04/19 13:07:41    Desc Main
Document    Page 156 of 163
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

May 13, 2019

91:7

**physics (1)**
18:8

**picking (1)**
16:11

**picture (1)**
126:24

**piece (1)**
13:1

**piecemeal (1)**
19:24

**placed (2)**
75:20;79:4

**placement (3)**
17:20;18:2,7

**plaintiff (3)**
9:11;51:14;52:18

**plaintiffs (11)**
6:23;7:7,8;9:5,14,23;
10:9;11:4,10,12;86:5

**plaintiff's (45)**
9:8,9;14:24;19:5;
20:25;21:2,3,4,9,20;
24:2,13;27:15,17;28:3;
29:15;32:23,24;33:1,
11;38:8,16;40:4,7,21;
43:25;44:3,16;45:9;
51:10;55:13,16;57:6;
59:8,17;63:20;89:11,
20,25;94:20;95:11;
98:6,7;123:3,8

**plan (6)**
7:13;9:24;10:6,10;
14:19;90:23

**planned (1)**
92:10

**planning (3)**
92:12;122:6;123:2

**plans (4)**
104:4,5;129:17,18

**played (3)**
16:2,6;79:2

**plead (2)**
27:11;29:23

**pleaded (6)**
25:13;27:9;28:5,8;
30:2,20

**pleading (1)**
25:19

**please (46)**
5:14;27:15;32:23;
38:9;40:6;44:1,17;
51:7;59:15;68:13;
69:13,15;73:8;76:5;
80:11;81:17;82:12,20;
83:11;84:24;87:16;
95:12;96:20;100:5,13;
107:2;111:9;113:11;
114:19;115:9,10,10;
117:23;122:20;123:4;
124:7;132:17;133:3;
134:9;135:4;137:18;
138:9,18,23,25;139:14

**pleased (1)**
139:22

**pled (4)**
25:2,4;27:11;29:22

**plenty (1)**
122:9

**plowed (1)**
21:25

**plus (2)**
94:4;108:21

**PM (1)**
142:19

**pocket (1)**
132:13

**point (15)**
13:5;53:17;85:17,17;
89:2;90:18;93:2,21;
97:16;115:19;126:21;
127:12,14,16;140:7

**pointless (1)**
127:3

**points (1)**
12:7

**point's (1)**
24:16

**police (8)**
56:22;57:1;61:15;
63:24;64:4,8,14;65:3

**pool (6)**
72:8,16,17,18;73:4,5

**pool-cleaning (1)**
73:2

**portion (3)**
14:4;31:3,12

**portions (1)**
137:20

**position (1)**
19:14

**positions (1)**
97:12

**practically (1)**
126:10

**practices (2)**
56:14;69:9

**preceding (1)**
44:13

**precisely (1)**
10:11

**prefer (1)**
15:6

**prejudice (3)**
8:6,12,24

**prejudicial (1)**
8:5

**pre-mark (2)**
57:9;60:1

**preparation (2)**
70:2;138:6

**prepare (3)**
68:7;69:6;70:10

**prepared (3)**
69:4;70:14;78:23

**preparing (7)**

13:14;67:17;71:4,7,
9,16;78:24

**present (3)**
82:4;93:18;96:11

**presented (2)**
136:25;137:12

**preserving (1)**
87:2

**president (3)**
17:12,24;18:3

**presiding (1)**
37:20

**pressing (1)**
12:1

**pre-trial (1)**
57:9

**pretty (2)**
6:1;127:13

**previous (5)**
47:22;78:1;99:22;
117:18;140:1

**previously (3)**
43:18;88:7;120:25

**price (10)**
99:12;110:4,9,9,10,
14,14,23;125:22,23

**primarily (1)**
127:8

**primary (1)**
70:4

**principal (3)**
17:13;18:4;137:11

**print (2)**
11:16;70:9

**printed (3)**
14:12;69:21,24

**printout (1)**
11:5

**prior (19)**
7:21;10:5,8;16:10;
21:15;23:1;45:6;49:12,
16;70:24;78:3;81:20;
126:8,24;127:1,7;
129:16,25;137:9

**prison (14)**
7:4;23:6,7;32:16;
34:2,23;35:7;39:5;
41:2,20;42:23;44:24;
50:15;53:18

**private (4)**
17:18,20;18:2,7

**probable (3)**
63:7,23;65:1

**probably (3)**
27:2;28:15;140:21

**probative (3)**
8:4,11,24

**problem (2)**
72:7;73:5;92:17

**problematic (1)**
76:6

**proceed (1)**
76:20

**proceeding (3)**
16:24,25;22:20

**proceedings (3)**
22:18,21;51:14

**proceeds (3)**
37:12;49:11;107:4

**procuring (1)**
52:20

**produce (2)**
11:10,25

**producing (1)**
11:24

**ProEx (1)**
72:2

**ProExcavation (3)**
5:11,22;67:8

**profit (11)**
102:9;118:5;121:14;
122:9;125:13,18;
126:1;139:7,20;
140:13,14

**profits (2)**
133:5,15

**profitsof (1)**
133:10

**program (1)**
23:10

**progress (2)**
93:2,6

**prohibits (1)**
9:25

**project (66)**
7:15;50:9;67:15;
72:6;85:18;88:10,13,
15,24;89:1,3,23;90:13,
17,21;91:3,11,16,19,
23;92:12;93:4,22;94:8;
97:3,4;101:2;102:18;
103:25;105:12,16;
112:4;113:21,24;
114:11;115:21,24;
118:3,5,20;121:6,11,
12,19,21,25;122:11,17;
123:14;125:12;128:6,
20;129:1,2;131:5,25;
134:15;135:8;136:8,
25;137:15,16,22;
139:23;140:1,13

**projected (2)**
125:22;130:11

**projects (8)**
7:14;10:11;87:2;
102:17;127:21,21,21;
129:10

**promise (1)**
125:11

**proof (2)**
71:5;79:5

**proof-of-claim (1)**
71:8

**proper (1)**
63:16

**Properties (1)**

65:11

**property (26)**
47:18,21,25;48:20,
25;52:19,20;80:18;
102:1,20,22,22,24;
108:6;111:2;121:22,
24;122:5;123:2,22;
124:22;125:5,16;
126:19;128:21,24

**proposals (1)**
113:17

**propose (2)**
19:9;49:18

**proposed (4)**
6:16;9:1;55:24;
121:21

**proposing (2)**
9:2;97:21

**propounded (1)**
52:19

**prosecutor (1)**
47:1

**provable (1)**
10:16

**prove (5)**
10:6;23:9;97:22,24;
98:4

**provide (5)**
9:3,6;29:2;104:12;
113:16

**provided (9)**
11:18;22:1;33:4;
44:19;112:4,9;113:5,
20,23

**provides (3)**
8:6,22;22:8

**proxy (2)**
81:15;84:22

**public (1)**
17:15

**pull (5)**
19:16;31:22;46:6;
81:17;82:11;135:4

**pulling (1)**
59:25

**punishable (3)**
7:25;8:2,10

**punishment (1)**
52:21

**purchase (2)**
47:16;100:8

**purchased (3)**
47:19;122:7;132:6

**purporting (2)**
76:9;98:1

**purports (1)**
15:22

**purpose (9)**
10:3,1;11:22;32:14;
45:5;50:11;60:23;75:4;
98:5

**purposes (11)**
10:4,5;58:25;59:6,

Case 16-01120    Doc 345    Filed 06/04/19    Entered 06/04/19 13:07:41    Desc Main
Document    Page 157 of 163
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

May 13, 2019

20;60:16;63:14;76:17;
79:1;87:2;98:2
**put (21)**
6:21;14:22;15:22,25;
16:4;17:6,25;56:22;
69:9;88:16;89:10;
90:10;95:19;97:13;
102:1;108:4;133:19;
134:7;141:3,24;142:1
**putative (2)**
51:20;52:10
**putting (12)**
16:7;19:10;27:25;
28:2;31:8;39:9;43:7;
44:5;51:12,19;55:18;
106:1

## Q

**QAnotherid (1)**
99:20
**qualifies (1)**
22:25
**quasi-crime (1)**
22:24
**questionable (3)**
127:1,2,2
**quick (1)**
118:25
**QuickBooks (5)**
71:16,19,22,25;72:2
**quickly (1)**
13:12
**quite (1)**
13:25
**quote (1)**
81:10

## R

**rained (1)**
6:1
**raise (1)**
17:16
**raised (2)**
17:16;98:16
**raises (1)**
11:19
**raising (3)**
18:4;90:22,24
**ran (3)**
8:19;15:3;133:19
**range (1)**
130:24
**rate (1)**
130:2
**ratification (2)**
84:2,22
**ratify (1)**
82:23
**Rayev (1)**
88:4
**reach (3)**

97:11;110:22,24
**reached (2)**
110:19;116:11
**react (2)**
98:11;99:20
**read (26)**
6:9,21;11:20;13:11;
22:19;26:22;29:5;
41:13;43:15,17;44:10;
46:19;47:5,11;51:17;
52:7,13;53:1,10;56:7,
17;73:25;96:3;99:12;
100:19;113:10
**reading (1)**
46:17
**ready (1)**
80:12
**real (15)**
7:14;10:11;30:3;
102:17;122:4;123:17,
19;124:24;125:3,5;
128:19;135:16;136:19,
22;142:7
**reality (1)**
97:14
**Really (10)**
20:16;22:25;86:24;
90:16,16;104:5;
122:15;124:19;129:1;
136:2
**reason (4)**
22:5;30:17;78:16,18
**reasonable (2)**
9:3;20:17
**reasonably (2)**
118:4;125:13
**reasons (5)**
9:20;10:25;21:24;
22:13;29:18
**recall (26)**
15:24;26:11;43:3,6;
54:9,12;60:5;70:3;
72:5;77:4;79:2,6;81:3;
90:5;98:24;105:23;
110:13,13;112:14,17,
22;114:23;120:23;
130:4;134:6,8
**receipt (1)**
56:2
**received (14)**
6:11;32:9,15;34:12;
56:16;98:20;99:5;
109:3;114:13;126:24;
128:3;129:6;136:10,11
**receiving (4)**
112:14,16,23;135:16
**recess (1)**
80:7
**recharacterize (1)**
50:19
**recitation (1)**
85:5
**recognize (8)**

43:9,11;89:12,17;
90:2;100:7;114:21;
122:22
**recollect (1)**
75:11
**recollection (8)**
22:3;25:9;74:8,18,
23;75:6;76:10;83:2
**recommended (1)**
73:4
**record (13)**
5:15;11:4;13:24;
19:11;26:16;31:9;47:9;
49:18;80:8,9;86:13;
87:3;97:9
**recorded (1)**
70:6
**recording (1)**
71:24
**records (1)**
83:19
**RECROSS-EXAMINATION (1)**
118:10
**redact (2)**
141:9,11
**redacted (5)**
28:19,23;29:2,9;
31:11
**redirect (3)**
86:1;118:1;140:4
**reference (1)**
56:6
**referred (2)**
22:19;56:21
**referring (2)**
95:3;105:2
**refers (1)**
101:9
**refinanced (2)**
47:20;48:25
**refinancings (1)**
48:2
**reflected (2)**
83:5;84:20
**refrain (1)**
13:10
**refresh (9)**
51:4;54:15,21;73:23;
74:8,18,23;75:5;76:10
**refused (2)**
83:21;84:19
**regard (1)**
21:24
**regarding (3)**
77:3;109:10;136:25
**regards (1)**
12:17
**reimbursed (4)**
108:6,15;109:13;
131:25
**reincarcerate (1)**
78:4
**relate (1)**

96:22
**related (1)**
25:12
**relates (6)**
13:6,23;30:3;71:21;
89:23;123:5
**relating (2)**
85:18;135:8
**relationship (4)**
88:8;127:14;128:7;
140:19
**relatively (1)**
122:5
**release (7)**
32:19;34:18,21;39:6,
13;40:1;45:7
**released (4)**
7:4,6;35:3;78:11
**relevance (1)**
50:3
**relief (1)**
21:10
**relitigate (1)**
47:4
**relying (1)**
14:7
**remainder (1)**
108:20
**remained (1)**
77:22
**remember (37)**
15:10,23;18:17;25:2;
35:12;41:4;61:17,18;
64:6;65:4,19;89:5;
92:20,23;99:1;104:14,
19;105:22;109:10,19;
110:12,21;111:12,13,
15;112:15,24;113:12,
22;115:3;126:3,7;
127:12;139:25,25;
140:9,17
**remembers (1)**
113:25
**remind (4)**
12:18,23;15:11;87:1
**removal (2)**
84:11;94:2
**remove (3)**
84:7;93:11,14
**removed (1)**
31:11
**renovations (2)**
47:24,25
**rent (1)**
103:14
**reorient (1)**
98:9
**repeatedly (1)**
47:20
**rephrase (1)**
26:5
**report (3)**
11:18;64:8;65:3

**reported (2)**
50:7;64:3
**reporting (1)**
61:20
**reprehensible (1)**
53:5
**represent (2)**
17:23;70:5
**representations (2)**
30:1;48:2
**represented (1)**
17:20
**representing (1)**
66:1
**request (2)**
84:7;97:13
**requested (2)**
61:24;110:7
**require (1)**
59:19
**required (1)**
11:24
**requirements (1)**
12:2
**requires (1)**
9:2
**research (2)**
45:16;104:1
**reserved (1)**
13:4
**reserving (1)**
22:10
**residence (1)**
103:6
**respect (5)**
11:8;45:5;96:21,24;
135:13
**respectfully (2)**
12:20;60:25
**respond (2)**
58:4;126:15
**responded (2)**
140:11,12
**response (1)**
140:13
**responses (1)**
97:1
**responsibilities (4)**
66:17;67:5,14;71:23
**responsibility (1)**
71:24
**responsible (1)**
123:23
**rest (1)**
47:9
**restaple (1)**
20:15
**restate (1)**
87:3
**restaurant (2)**
93:6,20
**restitution (1)**
38:23

Case 16-01120    Doc 345    Filed 06/04/19    Entered 06/04/19 13:07:41    Desc Main
Document      Page 158 of 163
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

May 13, 2019

restrains (2)
18:15,19
result (4)
56:24;73:1;97:12;
102:5
resulted (1)
26:4
results (2)
74:7;75:21
resume (1)
46:10
RESUMED (3)
15:15;23:9;80:14
resuming (1)
6:14
retain (1)
48:19
retained (4)
48:17;49:3;137:25;
138:3
retaining (2)
47:22;138:1
return (10)
118:12,15;121:13;
129:6;136:15;137:21,
25;138:5,12;141:4
returning (1)
40:23
review (1)
45:22
reviewed (1)
104:4
revision (2)
96:3;98:11
reward (1)
140:15
ribbon (3)
19:9,19;20:6
ribbon's (1)
20:1
right (271)
5:25;6:10,17,18,19;
11:1;15:14;16:1,4,18,
21,21;17:4,17,21;
18:16,20,22;19:1,15,
15,21;20:19,19;21:15,
18;22:10,23,23;15,19;
24:12,18;25:1,8,11,14;
26:10,19;27:8;28:10;
29:4,8,14;30:7,12,16;
31:6,10,17,24;32:4,
6,11,17,20;33:10,18,
21,23,25;34:2,5,13,18,
24;35:3,4,7;36:5;37:6,
12,14;38:2,24;39:2,7,
16,18,20,23;40:8,16,
19;41:6,13,16,20,23;
42:5,8,11,18;43:2,19;
44:12,14;45:4,13,16,
17,25;46:11,15,18;
47:3,12,14,17,23;48:4,
9,11,18,23;49:1,4,9,13,
16,20,21;50:16;51:3,

24;52:6,7;53:15,23,25;
54:4,7,20;55:15,18,19,
19,20,22;56:3,7,9;57:2,
18;58:14,21,22,23,24;
59:1;60:4,24;61:5,12,
15,20;62:5,8;63:3,10,
11,17;64:1,14,18,24;
65:2,6,8,12,15,18,23;
66:2,3;68:18;70:6,8;
76:16,21;80:6,12;
82:18;83:9;84:4;86:4,
22,23,24,25;87:6;91:6,
9;94:5;95:22;96:16;
98:3,14;100:10;
101:19;102:18;103:6,
10;104:17;105:3,16,18,
21,24;106:4,8,15;
107:1,4,12,15,18,21;
109:6,13,22;110:11,19;
112:20;114:18,24;
115:2,13;116:7;121:6,
15,16;128:17,20;129:4,
16,19;130:12,17,22,23,
25;131:1,14;132:20,
22;134:20,21;135:9,12,
16,23;136:3,5,22;
137:20;138:7,11,17,21,
22;139:1,4,10,24;
141:1,7;142:7,11,13,16
right- (1)
95:22
rip (2)
20:14,18
rise (1)
80:7
risk (7)
107:17;118:19,21;
122:5;131:4,7,10
Road (20)
88:11,15;89:18;90:6,
9;91:9;100:8;101:5;
102:17;121:5,19;
123:1,11,14,16,20;
128:20;129:17;134:17;
137:22
rock (2)
93:7,9
Rockland (3)
91:20,20;135:8
role (13)
16:2,5;54:6;71:9,12,
15,18;72:22,24;78:24;
79:2,9,12
Roman (2)
52:1,15
room (2)
81:1;122:9
rough (2)
130:8,13
roughly (10)
70:6,8,9;72:9;
120:23;121:10;122:8,
12;125:18;130:7

routine (1)
11:25
routinely (2)
11:15,16
rubbed (1)
128:2
Rule (17)
7:9,11,18,20,24;8:1,
6,22;9:2,14,22,25;
11:19,22;12:2,5;45:18
ruled (1)
40:17
Rules (3)
9:22;11:6;75:11
ruling (4)
11:3;12:21;13:21;
63:17
rulings (1)
12:8
run (7)
39:5,6,10,14;47:12;
77:6,25
running (2)
126:12,15
runoff (1)
72:7
Russia (1)
120:13
Russian (1)
123:18

---

## S

safe (1)
142:18
safety (1)
64:23
Sage (7)
17:2,13,16,21;26:1,7,
8
sale (6)
17:17;51:20;52:9;
100:8;110:4,4
sale's (1)
140:14
same (8)
5:24;11:3;19:3;
24:23;27:20;36:1;37:4;
42:4;63:15,17;67:8;
69:2;80:25;95:20;
98:22;111:22;128:1;
138:1
sat (1)
80:25
save (3)
70:21,22,24
Savings (1)
48:8
saw (4)
81:9;88:9;107:10;
115:4
saying (4)
17:9;30:8;37:15;

46:23
scare (1)
109:24
scenario (1)
52:17
scheduled (2)
63:4;65:14
scheduling (1)
68:2
scheme (3)
10:7,10;97:21
school (2)
87:17;113:16
scissors (2)
19:25;20:2
scotch (2)
139:23;140:1
scratch (1)
38:18
screen (13)
14:11;27:25;28:3;
39:9;43:7;44:5;51:13;
55:18;79:4;89:10;
95:20,22;115:12
scribble (1)
28:15
scroll (22)
68:17,18;69:12,16;
73:7;78:20;82:19;
83:10;84:5;112:19;
113:1;114:24;115:5,9;
133:2;135:12;138:17,
23,24;139:1,10,19
scrutiny (1)
52:25
se (1)
22:15
Sean (2)
5:16;82:1
search (4)
74:7;75:21,24;76:2
searches (1)
76:1
seated (2)
5:6;80:11
SEC (3)
22:1,18,25
Second (11)
7:10;8:22;22:5;
33:23;35:9;37:9;42:10;
64:8;95:2;99:8;103:18
Secondarily (1)
29:25
Section (4)
18:16;28:7;113:4,11
secure (1)
52:19
Securities (7)
16:14,17;17:1,8;
18:16,20;23:14
Security (7)
28:12,13;29:6,12;
34:8;38:18;141:6

seeing (7)
57:11;68:21;98:24;
104:17;111:12,15;
115:3
seek (3)
6:24;7:8;9:23
seeking (1)
50:23
seem (1)
122:1
seemed (2)
121:22;137:13
seems (3)
6:25;134:16;137:23
sees (1)
20:24
self- (1)
11:22
sell (11)
92:15;94:11;106:23;
107:14;108:13,14;
115:6;125:24;131:11,
14,17
selling (5)
108:15;110:9,10;
125:22,23
send (2)
98:1;104:11
sending (1)
100:3
sense (1)
133:12
sent (5)
19:8;94:15;109:23;
117:7;134:20
sentence (10)
28:11;32:9,15;35:8,
9;40:24;77:6,7,10,25
sentenced (1)
39:4
sentences (4)
14:25;15:3;44:8;
77:8
separate (1)
65:18
separating (1)
72:14
September (2)
33:21;48:7
September/October (1)
54:13
Sergeyev (6)
64:1,3,10,14,17,22
series (2)
55:2;57:23
serve (4)
41:8,25;47:8;78:6
served (2)
35:10;78:2
service (2)
73:2,5
Services (3)
50:22;116:23;120:7

Case 16-01120 Doc 345 Filed 06/04/19 Entered 06/04/19 13:07:41 Desc Main
Document Page 159 of 163
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

May 13, 2019

**servicing (1)**
123:18
**serving (3)**
14:25;44:8;78:13;
111:18
**session (2)**
5:2;80:10
**set (7)**
65:23;73:13,23;74:9;
75:25;85:15;110:10
**settle (1)**
97:15
**settlement (7)**
16:25;22:12;96:25;
97:2,4,6;98:4
**settling (1)**
17:7
**seven (5)**
23:8;35:6;41:20,22;
65:18
**several (3)**
48:21;69:10;70:16
**shall (2)**
39:19;133:10
**sham (1)**
46:14
**share (1)**
12:14
**shareholder (3)**
17:13;18:4;124:20
**sharpen (1)**
118:17
**sheet (9)**
7:5,17;12:21;29:19,
20;43:1,8;45:1,20
**shock (2)**
96:9;98:13
**shocked (2)**
99:21;109:2
**Shore (1)**
48:8
**short (1)**
121:11
**shorter (1)**
6:20
**shot (1)**
14:11
**show (15)**
20:20;26:23;32:5;
57:23;60:19;62:13;
74:5;75:5;95:9;97:18;
98:21;116:1;130:6;
137:20;138:11
**showed (1)**
129:17
**showing (14)**
19:9;21:8;27:8;
33:10;48:3;56:8;57:25;
60:15;61:8;74:7;75:4;
94:22;130:4;134:13
**shown (7)**
109:9,18;110:16;
111:7,11;115:2,22

**shows (3)**
31:12;115:13,16
**sic (1)**
83:14
**side (2)**
75:10;95:23
**sign (2)**
101:25;102:7
**signatory (1)**
26:8
**signature (3)**
21:18;43:11;90:2
**signed (3)**
94:16;105:20;106:3
**significant (1)**
77:2
**signing (1)**
43:12
**Silver (1)**
103:16
**similar (1)**
97:1
**simply (3)**
50:8;79:21;88:25
**sit (5)**
16:12,21;54:12;
101:16;128:9
**site (1)**
80:20
**six (4)**
5:8;9:10;75:2;88:19
**sixty (1)**
34:13
**small (1)**
74:1
**smoking (1)**
62:16
**smooth (1)**
126:16
**smoothly (1)**
126:12
**so-called (1)**
71:7
**Social (8)**
28:12,13;29:6,12;
34:7;38:18;88:7;141:5
**society (1)**
53:5
**software (1)**
120:7
**sold (6)**
94:11;108:7;111:2;
125:5;135:22;136:5
**sole (1)**
127:22
**solve (2)**
31:25;32:1
**solved (1)**
73:6
**somebody (2)**
99:1;142:4
**someone (2)**
98:25;137:25

**sometime (2)**
72:10;77:12
**sometimes (1)**
127:23
**somewhere (1)**
53:22
**son (2)**
94:23;104:6
**sorry (36)**
8:14;14:7;15:17;
20:7;23:24;25:16;34:9,
15;35:16;37:18;38:13;
51:24;52:7;56:10;57:5;
58:12,18;66:22,24;
67:3;73:3;74:9;77:14;
87:12;91:24,25;92:11;
93:8;94:16,24;96:7;
108:17;116:24;125:16;
132:3;138:24
**sort (5)**
22:24;23:14;31:14;
70:18;92:18
**sorts (2)**
129:9;130:10
**sought (2)**
7:5;52:21
**souls (1)**
118:13
**sound (1)**
70:6
**sounds (2)**
51:4;130:25
**South (1)**
48:8
**speak (2)**
57:19;141:17
**specific (3)**
22:22;52:21;91:3
**specifically (12)**
22:8;27:13;43:4;
51:20;52:8,9,16;53:7;
56:6;64:1;88:14;140:7
**specified (1)**
10:4
**spelled (1)**
9:11
**spend (1)**
92:12
**split (4)**
109:21;125:4,5,19
**splitting (1)**
136:19
**spoke (2)**
64:9,9
**spring (1)**
48:20
**square (5)**
34:9;130:8,17,22,23
**stand (2)**
6:13;60:3
**standalone (1)**
30:10
**standard (1)**

60:7
**standpoint (1)**
31:22
**start (3)**
19:15;52:8;77:9
**started (6)**
53:21,24;70:17;
92:20;125:12;128:7
**starting (1)**
139:17
**state (5)**
5:14;81:11;84:15;
87:9;120:4
**stated (3)**
140:6,16,17
**statement (3)**
25:17;59:21;134:15
**statements (4)**
45:6,6;113:23;
134:20
**states (5)**
11:14;14:24;17:3;
21:11;24:24
**stating (1)**
7:5
**station (2)**
64:5,14
**statutes (1)**
23:15
**stay (1)**
55:8
**stay-at-home (1)**
46:11
**stick (1)**
139:12
**still (9)**
15:12;18:22;34:8;
76:6;78:13,16;92:12;
128:4,8
**stipulated (1)**
10:16
**stipulation (1)**
142:2
**stitches (1)**
23:10
**stone (1)**
72:13
**stop (6)**
68:19;81:9;102:3,3;
112:20;115:10
**straight (2)**
34:23;35:7
**strategic (2)**
53:25;54:3
**Street (7)**
87:13;102:20,23;
103:1,16,18,22
**Strike (5)**
75:22;77:20;85:12;
108:25;112:1
**study (1)**
45:18
**stuff (3)**

47:5;61:22;142:14
**Subcontract (1)**
67:19
**subcontractor (2)**
67:18;85:20
**subcontractors (2)**
67:24;132:8
**subject (9)**
16:13,20;18:22;
23:13,16;55:24;83:23;
96:2;98:11
**submission (2)**
9:15;14:24
**submitted (4)**
41:18;44:6;71:5;
106:6
**subparagraphs (3)**
82:24;83:1,18
**subsequent (2)**
95:9;133:22
**substantially (1)**
8:5
**substantive (1)**
72:22
**substitute (2)**
29:3;141:10
**suddenly (1)**
97:19
**sued (3)**
17:1;50:16;65:11
**suggest (1)**
137:6
**suggested (1)**
124:23
**suggesting (2)**
50:6,6
**suggestion (2)**
69:3;74:24
**suing (1)**
84:15
**suit (1)**
66:3
**summary (4)**
9:10,15;22:3;141:24
**summer (2)**
45:25;126:5
**superficially (1)**
104:4
**Superior (1)**
56:16
**supervised (5)**
32:19;34:18;39:6,13;
40:1
**support (16)**
7:2;9:24;14:1;15:2;
35:5,10,21;36:15;37:5,
7;39:2;41:10;42:12;
44:6;76:8;77:19
**supporting (1)**
30:4
**supposed (2)**
12:19;36:10
**Sure (11)**

12:12;20:23;41:17;
55:11;62:12;78:10;
92:11;107:6;118:9;
141:2;142:3
**surplus (2)**
47:22;49:12
**surprise (2)**
9:9;141:8
**surprised (2)**
20:3;109:15
**suspicion (1)**
137:17
**suspicious (4)**
127:25;137:9,10,13
**Suzanne (2)**
36:18;37:3
**swimming (1)**
72:8
**swish (1)**
19:25
**swore (3)**
57:1;62:4;63:25
**sworn (2)**
56:15;86:8

## T

**tail (1)**
128:6
**talk (15)**
16:10;41:24;46:7;
88:13;90:18;92:3;
93:17,23;99:21;101:7;
114:4;122:14;126:9,
18;141:22
**talked (8)**
90:20;94:10;101:24;
103:9;108:13;114:5;
116:20;128:11
**talking (11)**
15:11;23:5;36:8,11,
13,24;41:24;58:15;
88:16;95:5;112:5
**TAMPOSI (6)**
5:18,19;58:5,11,13,
15
**Tatiana (11)**
5:10,21;65:11;84:7;
96:10;110:7;120:18,
19;124:23;125:2;
141:25
**tax (7)**
48:3;137:21,24;
138:2,5,12;141:4
**taxes (1)**
91:1
**technician (2)**
87:15,18
**Technologies (1)**
17:13
**Technology (5)**
17:2;26:1,7,8;46:14
**teed (1)**

98:23
**teeth (1)**
118:18
**telling (2)**
99:17;117:11
**tells (2)**
113:4,15
**template (1)**
69:9;70:18,21
**ten (3)**
8:15,18;80:2
**tenacious (1)**
20:7
**tend (1)**
59:5
**ten-year (1)**
14:5
**term (7)**
14:1;32:19;34:13,17;
39:9,13;47:8
**terms (8)**
13:22;14:18;34:21;
40:1;85:20;114:6;
129:20,25
**testified (19)**
7:4;10:14;14:3;16:3;
22:11;29:21;44:21,23;
45:19;57:12;62:10,11;
105:14;107:7;108:5,
10;109:2;135:19;
136:24
**testify (6)**
10:17;12:19;54:24;
57:23;62:11;86:14
**testifying (1)**
23:13
**testimony (18)**
6:14,19;7:4,7;10:19,
19;13:1;26:3;56:15;
59:5;60:11;70:3;76:14;
77:3;106:12;117:2,8;
132:11
**therefore (1)**
100:18
**Thiele (3)**
17:3,6,24
**Thiele's (2)**
17:9;18:11
**thinking (1)**
121:5
**third (4)**
7:15;9:2;33:25;
99:15
**Thirty-eight (2)**
120:16,21
**thirty-six (1)**
41:1
**thou (1)**
108:20
**though (5)**
28:22;45:7;55:11;
62:19;78:13
**thought (1)**

36:22
**thousand (2)**
36:12;92:1
**threats (1)**
81:8
**three (11)**
7:9;8:13;10:25;
28:19;34:17;49:16;
53:13;59:5;82:7;92:21;
117:18
**Thursday (2)**
6:13;45:12
**thus (3)**
8:21;13:23;97:9
**till (1)**
81:9
**timeline (1)**
23:3
**times (5)**
41:22;90:20;91:5;
130:23;133:18
**timing (2)**
127:2;137:13
**today (12)**
6:14;15:11;22:4;
23:9;45:6;52:12;60:3;
120:16;140:22;141:13,
18;142:12
**together (20)**
15:22;16:1,4,8;17:6,
25;19:8;23:10;52:17;
56:23;69:9;71:13;
79:21;88:17;90:10;
94:1,5;106:1;120:20;
138:4
**told (33)**
35:12;49:7;64:3;
70:17;88:18,23,25;
90:11,22;91:5,13,13;
92:7;93:3,6,6,16,21;
94:4;98:10,14,17;
99:22;100:22;101:23;
105:17,25;107:13;
122:12;128:4,24;
129:7;141:18
**tomorrow (2)**
141:15;142:13
**took (11)**
36:11;48:7;79:20,20;
82:15;92:25;105:7,8;
106:19;107:17;117:6
**top (1)**
94:24
**topic (5)**
83:15,20;84:1;
122:15;126:21
**tortiously (1)**
56:11
**total (7)**
39:5;41:10,25;79:8,
10;100:17;125:19
**towards (3)**
55:5;126:6;128:6

**townhouses (1)**
121:12
**track (1)**
105:5
**transaction (3)**
51:21;52:10;53:10
**transactions (1)**
123:19
**transcript (2)**
35:16;40:23
**transcription (1)**
82:16
**transfer (1)**
116:19
**transferred (2)**
116:12,21
**translate (1)**
113:9
**translator (1)**
113:8
**travel (3)**
41:19;43:25;44:7
**Tremont (1)**
103:1
**trial (8)**
5:8;9:8;13:14;33:7;
37:21;47:3;65:14;
89:11
**tried (1)**
58:6
**true (11)**
11:22;39:22;46:16;
47:10;58:1;65:16,23;
67:8;76:11;83:2;
109:11
**trump (1)**
52:17
**Trust (5)**
91:20,20;127:14;
135:8;140:20
**trusted (2)**
104:3;105:10
**truth (1)**
22:9
**truthfully (1)**
86:15
**truthfulness (1)**
7:10
**try (7)**
14:13;22:17;23:9;
57:24;75:13;81:5;
83:23
**trying (10)**
17:16;37:1;42:20;
52:6;56:22;62:1;69:8;
93:15;97:11,15
**turn (4)**
8:13;68:14;80:17;
95:2
**turns (1)**
45:3
**TV (1)**
89:10

**twelve (1)**
32:15;41:22
**twenty (2)**
120:23;136:18
**twenty- (1)**
65:17
**twenty-five (3)**
25:8;87:24;136:15
**twenty-four (5)**
25:10,18,23;39:5,10
**twice (1)**
88:9
**two (15)**
6:11;12:13;28:12,13;
29:6;76:1;77:8;78:3,9,
12;92:21;118:8;
121:12;127:17;137:8
**tying (1)**
50:4
**type (1)**
130:2

## U

**Um-hum (2)**
16:19;109:14
**under (25)**
7:9,10,18,18,20,24;
8:1;9:22;10:14;11:19;
14:24;15:12;21:14;
23:22,22,24,25;43:12;
44:12;45:3;75:24;
81:10;97:19;98:2;
100:17
**undergoing (1)**
47:24
**underlined (3)**
111:24;113:4,10
**underlying (1)**
22:9
**understands (1)**
86:18
**understood (7)**
106:19;108:5;121:7;
131:4,9,12,24
**undisputed (1)**
8:9
**unfair (3)**
8:5,12,24
**Union (1)**
25:14
**United (3)**
17:3;21:11;24:24
**unless (3)**
8:4;26:19;75:10
**unrelated (1)**
89:23
**unsure (2)**
33:9;41:24
**untrue (4)**
46:22;47:11,15;49:2
**untruthful (1)**
7:16;30:3

**untruthfulness (1)**
7:12
**up (75)**
6:21;14:14,18;16:11;
19:5;20:9;27:25;28:2;
34:9;42:4;43:7;44:5;
49:12;50:5;51:13,19;
52:7,17,23;55:13,18;
59:25;62:13;68:13,16,
18;73:7,13,23,25;74:9;
75:25;78:9,19;79:23;
81:17;82:11;83:15,16;
84:17;89:10;94:5,24;
95:19;96:7;97:2,15,18;
98:23;99:17;101:10;
107:11;109:21;110:25;
111:9;113:1;114:19;
122:4,15;126:1,10,13,
20,22;127:11,17;
132:17;134:9;135:4;
137:18;138:1,25;
141:3,18,23
**upgrades (1)**
126:18
**upon (1)**
56:2
**upper (1)**
55:19
**USC (1)**
28:7
**use (18)**
7:8,19;9:8,12,19,21,
25;19:24;20:8;26:24;
52:24;97:24;107:3;
118:14;127:16;131:5;
137:15;138:5
**used (19)**
8:14;10:13;23:25;
47:13,16;48:2,20;
49:11;59:19;60:8;
69:10;74:17,20;97:7;
122:8;130:16,16,20;
131:20
**uses (1)**
127:23
**using (7)**
24:14;60:14;74:22;
76:7,7;92:18;127:19
**utilizing (1)**
60:2
**uttering (1)**
30:2

**V**

**Vadim (19)**
5:10,21;64:9;65:10;
72:7;73:4;78:25;81:6,
9;87:25;94:15;120:17,
22;121:12,20;122:5;
124:3;127:19;132:15
**Vadim's (3)**
61:23;129:2;138:4

**value (3)**
8:4,11,24
**variety (7)**
7:15;10:17;21:23;
29:18;57:7;98:1;127:8
**various (3)**
77:3;121:20;123:19
**vendors (3)**
96:2;98:10;113:16
**version (2)**
29:2;121:11
**via (1)**
84:22
**vice (1)**
17:24
**victim (1)**
64:9
**victims (1)**
50:16
**view (3)**
12:4,11;14:17
**Viktor (1)**
64:1
**violate (2)**
23:14,16
**violating (1)**
18:15
**violation (2)**
34:21;40:1
**Vitaly (8)**
90:21;91:6;93:17;
116:21;117:4,13,15,16
**Vladislav (3)**
86:5,8;87:10
**voice (1)**
79:23
**voracity (1)**
22:9
**vote (2)**
82:23;83:5,17;84:10,
20
**voted (7)**
83:6,6,6;84:1,11,21,
22

**W**

**walk (2)**
26:22,23
**walked (2)**
80:22,24
**wall (1)**
72:13
**wants (2)**
60:18;94:12
**warrant (1)**
57:3
**Washington (1)**
102:20
**way (12)**
14:18;23:7;50:18;
64:15;76:9;80:23;81:5;
99:15;118:5;128:2;

134:16;137:3
**ways (1)**
7:9
**week (4)**
70:10;97:22;101:23,
24
**weekend (3)**
6:11;28:23,24
**weeks (1)**
135:23
**well-being (1)**
64:23
**well-paid (1)**
46:14
**Wells (1)**
48:22
**weren't (3)**
17:13;68:1,4
**Westlaw (1)**
45:13
**What's (10)**
24:4;29:3;52:2;53:3;
57:16;85:4;96:11;
115:12;120:11;141:15
**whatsoever (3)**
67:15;71:12,15
**whenever (1)**
80:12
**When's (1)**
98:18
**whereabouts (1)**
127:4
**white-collar (2)**
15:1;44:8
**Whitney (1)**
55:21
**WHOIS (4)**
74:7;75:20,24;76:1
**whole (9)**
17:25;19:11;20:17;
23:3,5;47:4;48:25;
110:2;114:4
**Whoops (1)**
139:16
**who's (1)**
124:20
**whose (2)**
134:17;139:2
**wife (1)**
46:11;47:14;48:3;
81:7;110:7;120:18;
123:21;134:7;136:10;
138:20;141:23
**wife's (1)**
48:11
**willful (4)**
7:2;36:14;37:5;39:1
**William (1)**
17:3
**Williams (1)**
55:22
**willing (1)**
122:2

**wished (1)**
12:3
**withdraw (3)**
116:17,18;117:4
**withdrawn (1)**
37:23
**withdrew (3)**
116:15;117:3,3
**within (2)**
12:5;130:23
**without (5)**
59:25;61:2;64:14;
107:20;117:11
**witness (30)**
6:13,25;7:19;8:8;
9:17;10:1,6,17;15:9,
13;22:2;24:15;26:19,
19,20;27:6;31:3;45:5;
46:3,5;50:12;60:15;
62:21;64:1;66:9;76:8,
15;86:11,16;118:25
**witness' (2)**
8:4,15
**woman (3)**
36:3,11;37:4
**woman's (1)**
36:17
**wondering (1)**
128:1
**wooden (1)**
9:14
**word (4)**
8:1;9:15;11:17;
118:14
**words (2)**
9:7;114:12
**work (15)**
17:9;18:11;65:6,25;
87:14;117:17;120:6,7;
121:15;126:25;127:6,
7,8,11;137:8
**Worked (3)**
73:2;116:22;136:3
**working (3)**
53:21,24;116:24
**workout (1)**
81:6
**worried (1)**
26:15
**worry (6)**
92:8,10;94:11;105:8,
9;118:17
**worth (1)**
140:21
**wrap (1)**
110:25
**write (4)**
55:6;64:20;94:14;
134:3
**written (8)**
6:20;9:3,6;99:3;
104:9,12;116:1;136:20
**wrong (14)**

23:1;37:16,17,19,23;
38:6;44:25;45:2;46:24;
47:2;59:20;64:16;
73:17;128:2
**wrongs (1)**
16:11
**wrote (4)**
55:19,21;58:8;94:15

**X**

**Xena (4)**
91:7,8;117:15,15
**XLI (1)**
52:1
**XLVII (1)**
53:7
**XXXIX (1)**
52:2

**Y**

**year (14)**
8:3,10;35:9;39:6,13;
48:4;49:8;77:11;88:6;
120:15;127:1,7,11;
137:9
**years (16)**
8:16,18;11:16;23:8;
32:20;34:17;35:6,9;
41:6,20;53:13;117:18;
120:16,21,23;124:24
**Yup (3)**
24:19;132:18;142:18

**Z**

**zero (4)**
102:9,9;115:21,24

**0**

**02245 (1)**
87:13
**041066MEL (1)**
44:13

**1**

**1 (7)**
15:23;27:8;63:24;
111:23;115:6;141:25;
142:1
**1,195,672.77 (1)**
100:18
**1,900,000 (1)**
110:23
**1.899 (1)**
110:17
**1.95 (2)**
125:25;136:5
**1:20 (1)**
142:19

**10 (1)**
88:6
**100 (1)**
108:22
**100,000/$110,000 (1)**
94:6
**108 (4)**
89:8,12,20,25
**10th (1)**
50:21
**11 (1)**
79:25
**11:05 (1)**
80:8
**11:26 (1)**
80:9
**110 (2)**
98:22;108:22
**110,000 (1)**
94:5
**12 (3)**
33:21;90:3;124:4
**120,000 (1)**
108:3
**128 (7)**
122:19,20,23;123:4,
8;124:5;132:17
**12th (1)**
33:7;34:4
**13441 (1)**
28:7
**13th (1)**
100:10
**141,900 (3)**
96:2;97:17;98:10
**145- (1)**
94:17
**148- (1)**
136:10
**15 (3)**
52:15
**150,000 (1)**
94:18
**15-13881 (1)**
5:7
**15th (5)**
63:3;95:15;96:6;
100:23,25
**16 (2)**
103:2;134:17
**1600 (1)**
102:23
**16-1120 (1)**
5:12
**167 (1)**
5:9
**17 (5)**
35:17,17,17;103:3;
138:8
**170-odd (1)**
97:18
**171,933.97 (1)**
99:18

**1731 (1)**
87:12
**17a (1)**
18:16
**17th (1)**
14:12
**18 (4)**
28:7;35:15;40:24;
43:15
**18th (1)**
142:5
**191 (2)**
134:9,14
**1933 (1)**
18:16
**1996 (2)**
17:4;22:14
**1997 (1)**
87:22
**1998 (1)**
26:10

**2**

**2 (4)**
28:7;39:19;83:10;
142:1
**200- (1)**
109:24
**200,000 (1)**
48:4
**2000 (1)**
45:25
**2000s (1)**
23:6
**2001 (2)**
33:21;48:7
**2002 (2)**
33:23;48:20
**2003 (1)**
48:25
**2004 (14)**
15:1;23:6,7;24:24;
27:9;28:10;34:2;37:25;
38:4,5;42:16;44:9;
49:7;53:9
**2005 (6)**
33:7;34:4;42:18;
45:24;77:14,15
**2006 (1)**
50:21
**2007 (1)**
39:1
**2008 (6)**
7:6;43:5,16;45:1;
77:18;121:9
**2009 (7)**
7:4;42:23;43:15;
44:25;77:18,22;78:15
**2010/2011 (1)**
88:6
**2011 (18)**
8:17,21;13:23;15:2;

34:24;35:4;43:17,19,
20;44:9,14;45:2,3,3;
53:18;77:23;78:7,11
**2011/2012 (2)**
23:8;53:22
**2012 (3)**
73:16;92:20;121:21
**2013 (9)**
68:7,22;69:6,25;
70:15;72:4,21;126:5;
128:12
**2014 (2)**
72:10,21
**2014-ish (1)**
72:11
**2015 (29)**
14:12;15:23;54:3,13,
16;55:7;56:25;61:15;
69:4;70:6;77:12,13;
80:16;94:23,25;95:15,
18,24;96:6,16;98:9,12,
15,25;100:10,23;
101:1;111:19;112:3
**2016 (3)**
63:3,25;65:12
**2017 (1)**
11:7
**20th (1)**
55:7
**21 (3)**
24:24;28:10;139:1
**218 (1)**
38:12
**222 (1)**
102:20
**22nd (1)**
70:6
**23 (3)**
43:15;87:13;139:15
**237 (1)**
103:12
**243 (1)**
103:12
**24th (1)**
68:22
**25 (1)**
53:9
**257 (1)**
103:16
**259 (2)**
103:17,18
**26th (1)**
92:20
**271 (3)**
98:21;111:9,11
**273 (1)**
100:4
**279 (1)**
114:19
**27th (1)**
99:9
**283 (2)**
81:17,19

**296 (1)**
135:4
**297 (2)**
137:18;141:2
**29th (1)**
98:25

**3**

**3 (1)**
14:23
**3/17/2003 (1)**
33:25
**3/20/2013 (1)**
74:13
**30 (2)**
108:15,21
**30- (2)**
93:18;108:16
**30,000 (1)**
108:4
**300 (1)**
103:1
**30th (2)**
56:25;61:15
**317 (6)**
24:7,8,9,10,12,13
**319 (3)**
38:14,15,16
**320 (2)**
40:20,21
**321 (2)**
45:8,9
**322 (4)**
59:8,9,10,11
**323 (3)**
63:18,18,20
**324 (4)**
76:19,22,23,24
**350,000 (1)**
17:16
**37,000 (1)**
126:2
**39 (1)**
52:3

**4**

**4 (4)**
15:1,2;44:9,9
**4,000 (2)**
130:8,23
**404 (7)**
7:11,20,22;9:22,25;
23:23,24
**408 (2)**
97:5,23
**408,000 (1)**
97:20
**408,172.77 (1)**
96:7
**408b (2)**
98:2,3

**47 (1)**
53:6
**487 (1)**
49:20
**4th (9)**
35:4;94:23,25;95:18,
24;97:17;98:9,15,19

**5**

**5 (2)**
40:24;85:4
**50- (2)**
93:11;118:6
**53,550- (1)**
92:14

**6**

**6 (1)**
141:25
**6/17/2015 (1)**
69:21
**60- (1)**
93:11
**609 (13)**
7:9,18,22,24;8:1,6,
13,22;9:2,14;23:22,25;
45:19
**626 (1)**
103:22
**63 (2)**
108:20,21
**65 (5)**
6:16;11:4;68:12,21;
73:8
**66 (1)**
78:20

**7**

**70 (3)**
82:12,14;85:15
**700 (1)**
91:23
**700,000 (1)**
125:16
**750 (2)**
91:23;93:24
**787,000 (4)**
106:17;107:8,10,12
**787,500 (1)**
100:18
**795 (3)**
91:23;93:24;107:8
**795- (1)**
91:25
**797 (4)**
92:2,9,13;107:8
**797,000 (1)**
91:25

Case 16-01120   Doc 345   Filed 06/04/19   Entered 06/04/19 13:07:41   Desc Main
Document   Page 163 of 163
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

May 13, 2019

**8**

**8 (2)**
    106:16,16
**8.1 (2)**
    133:3,5
**800- (1)**
    122:13
**835 (1)**
    103:18
**837 (1)**
    103:18
**850 (3)**
    92:9;93:24,25
**850,000 (2)**
    92:12;107:12

**9**

**9 (1)**
    5:9
**9:13 (1)**
    5:1
**90213 (3)**
    11:20;12:2,5
**90s (1)**
    23:5
**92 (8)**
    94:20;95:17,23;
    96:19,24;97:14;98:6;
    109:3
**94 (6)**
    95:11;96:20;98:7;
    100:12,16;109:18
**97 (1)**
    92:1
**9A (2)**
    138:14;139:8
**9th (1)**
    33:23