**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS - EASTERN DIVISION**

```
=============================== .
IN THE MATTER OF:              . Case #15-13881
                               .
LYMAN-CUTLER, LLC              .
                               . Boston, Massachusetts
                               . Tuesday, May 14, 2019
     Debtor.                   . 9:07 a.m.
=============================== .
LYMAN-CUTLER, LLC, ET AL.      . Adv. Proc. 16-01120
                               .
     Plaintiffs,               .
v.                             .
                               .
KAGAN, ET AL.,                 .
                               .
     Defendants.               .
=============================== .
```

**TRANSCRIPT OF TRIAL DAY 7 ON:**
**(#167) OBJECTION TO CLAIM 9 OF CLAIMANT ALEX FILIPPOV**
**(#1) COMPLAINT BY LYMAN-CUTLER, LLC AGAINST VADIM KAGAN,**
**TATIANA KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION**
**CORP.**

**BEFORE THE HONORABLE FRANK J. BAILEY**

APPEARANCES:

For the Plaintiff:              PETER N. TAMPOSI, ESQ.
                                The Tamposi Law Group, P.C.
                                159 Main Street
                                Nashua, NH 03060


For Alex Filippov and Nickolay  SEAN T. CARNAHAN, ESQ.
Lipetsker:                      O'Connor, Carnathan and Mack,
                                LLC
                                1 Van De Graaff Drive
                                Suite 104
                                Burlington, MA 01803


For the Defendants:             JAMES P. HARRIS, ESQ.
                                Sheehan Phinney
                                1000 Elm Street
                                17th Floor
                                Manchester, NH 03105



Page 2

<u>For the Defendants:</u>                    JOHN H. PERTEN, ESQ.
                                  Sheehan Phinney
                                  255 State Street
                                  5th Floor
                                  Boston, MA 02109


     Electronic Sound Recording Operator:  ELIZABETH LOMBARD


     Proceedings Recorded by Electronic Sound Recording
    Transcript Produced by Certified Transcription Service
                   eScribers, LLC
              7227 N. 16th Street, Suite #207
                   Phoenix, AZ 85020
           973-406-2250; operations@escribers.net

<pre>
 1                          I N D E X

 2

 3                                                          VOIR
     WITNESSES:           DIRECT  CROSS  REDIRECT  RECROSS  DIRE
 4
     For the Plaintiff:
 5   ARINA RUDYAKOVA
     (By Mr. Carnathan)      11
 6   (By Mr. Perten)                15

 7
     WILLIAM HARTZELL
 8   (By Mr. Carnathan)      21
     (By Mr. Harris)                31
 9

10   KRISTINA BRUSENKOVA
     (By Mr. Carnathan)      38            80
11   (By Mr. Perten)                46

12
     MORGAN FENNELL
13   (By Mr. Carnathan)      84           117
     (By Mr. Harris)               105
14

15   TATIANA KAGAN
     (By Mr. Carnathan)     119
16   (By Mr. Harris)              127

17
     EXHIBITS:            DESCRIPTION       I.D.    EVID.
18
     For the Plaintiff:
19   325          Packet of the trustee             7
                  financial forms
20   1            Chart - payments made            24
                  from the
21                Lyman-Cutler, LLC operating account
                  to Kagan Development
22                through checks written from
                  the operating account
23   2            Chart - payments made            24
                  from the operating
24                account of Kagan
                  Development, KDC, to the project
25   3            Chart - payments coming from      26
</pre>



| 1  |   | Kagan Development KDC, into |    |
|    |   | Lyman-Cutler, LLC operating |    |
| 2  |   | account before November 30th, |    |
|    |   | 2014 |    |
| 3  | 4 | Chart - payments into | 29 |
|    |   | the LLC operating |    |
| 4  |   | account from Kagan |    |
|    |   | Development after November 30th |    |
| 5  | 5 | Chart - payments made | 30 |
|    |   | by ProExcavation |    |
| 6  |   | Corp. into the project |    |
|    | 6 | Chart - listing of | 31 |
| 7  |   | payments made by the |    |

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1    (At 9:07 a.m.)

2              THE BAILIFF:  The court's now in session.

3              THE COURT:  Good morning.  Be seated.

4              THE BAILIFF:  Adversarial proceeding 16-1120, Lyman-

5    Cutler, LLC v. Kagan, et al.  This is day seven of trial.  And

6    case 15-13881, Lyman-Cutler, LLC, day seven of document 167,

7    objection to claim 9 of claimant Alex Filippov.  Will the

8    parties please state their names for the record?

9              MR. CARNATHAN:  Good morning, Your Honor.  Sean

10   Carnathan for Alex Filippov and Nickolay Lipetsker.

11             MR. TAMPOSI:  Good morning, Your Honor.  Peter

12   Tamposi for the Debtor.

13             MR. PERTEN:  Good morning, Your Honor.  John Perten

14   for Vadim Kagan, Tatiana Kagan, ProExcavation Corp., and Kagan

15   Development KDC Corp.

16             MR. HARRIS:  Good morning, Your Honor.  James Harris

17   for the same parties.

18             THE COURT:  All right.  Good morning, everyone.  Any

19   preliminaries today?

20             MR. CARNATHAN:  A couple of things, Your Honor.

21             THE COURT:  Sure.

22             MR. CARNATHAN:  Yesterday, we talked about paring

23   down Exhibit 318 in evidence to eliminate the indictment and

24   the docket sheets and leave just the judgment of conviction.

25   And so we went over it with the clerk this morning, and we've

1    cut it down to the five pages we talked about yesterday, plus

2    the cover sheet that just shows that it came from the Court

3    and is certified.

4              THE COURT:  Okay.  And Mr. Perten's seen it?

5              MR. PERTEN:  Yes.  We're fine with it --

6              THE COURT:  All right.

7              MR. PERTEN:  -- Your Honor.

8              THE COURT:  And that's acceptable --

9              MR. PERTEN:  Yes, Your Honor.

10             THE COURT:  -- in that form?  Okay.  So it's 65?

11   What's that exhibit number?

12             MR. CARNATHAN:  That was 318 in evidence, Your Honor.

13             THE COURT:  318, yeah, that's right.  Yeah, okay.

14   Okay?

15             MR. CARNATHAN:  Then we have another exhibit that

16   we'd like to put in by agreement.  I think it's going to be

17   325, if I'm keeping track properly.

18             THE COURT:  Do you have that, Mary?

19             THE CLERK:  22, 23, 325.

20             MR. CARNATHAN:  May I approach?

21             THE COURT:  Yes, you may.

22             MR. CARNATHAN:  So what we are marking as Exhibit 325

23   is a packet of the trustee financial forms.  It's the property

24   record and report and the cash receipts and disbursements

25   record.  And so we've agreed that that may go into evidence as

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    Exhibit 325.

2              THE COURT:  Okay.  Acceptable to the defendants?

3              MR. PERTEN:  Yes, Your Honor.  We're trying to avoid

4    having to drag Mr. Madoff in, so we're in by stipulation.  So

5    hopefully, we don't have to call him at all.

6              THE COURT:  Very well.  Okay, so that's in as Exhibit

7    325.

8              PLAINTIFF'S EXHIBIT 325 WAS ADMITTED INTO EVIDENCE

9              MR. CARNATHAN:  I guess the last point I would just

10   make is that if all goes as envisioned, I should complete my

11   case-in-chief today subject to calling Mr. Maiden out of order

12   on June 18th.

13             And so the plan is that I would call Tatiana Kagan as

14   my last witness, ask her a handful of questions for the

15   purpose of my case and then turn her over to Mr. Perten, who

16   will then ask her whatever he likes.  But at that point we'll

17   sort of be transitioning away from the plaintiff's case into

18   the Kagan parties' case.

19             THE COURT:  All right.  So Mrs. Kagan is your last

20   witness?

21             MR. CARNATHAN:  That's the plan.  Yes, Your Honor.

22             THE COURT:  All right.  But you have some experts or

23   at least one other expert.

24             MR. CARNATHAN:  I have some witnesses to call before

25   her.  I was anticipating Ms. Brusenkova would be here at this

 1    moment.  She does not appear to be here yet.  So perhaps I

 2    will call Arina Rudyakova as --

 3              THE COURT:  I --

 4              MR. CARNATHAN:  -- my first witness.

 5              THE COURT:  I understand what you're telling me.  All

 6    right.

 7              MR. CARNATHAN:  Yeah.

 8              THE COURT:  And so Mrs. Kagan was to be -- is to be

 9    your last witness but not your next witness --

10              MR. CARNATHAN:  Correct --

11              THE COURT:  -- in your plan?

12              MR. CARNATHAN:  -- Your Honor.

13              THE COURT:  Okay.

14              MR. PERTEN:  And just to follow up, Your Honor, we

15    will not necessarily be rolling right into Mrs. Kagan as our

16    first witness.  We may call her to the stand in a different

17    order --

18              THE COURT:  That's fine.

19              MR. PERTEN:  -- when we start our case-in-chief.

20              THE COURT:  That's fine.  Okay.  Are you ready to

21    call a witness tomorrow then?

22              MR. PERTEN:  We will be.  It sounded from the lineup

23    that Mr. Carnathan shared with us that he'll fill today.  And

24    then we'll be here 9 o'clock ready to start with Mr. Kagan,

25    which my bet is will fill the day.

1              THE COURT:  Right.

2              MR. PERTEN:  I can't imagine it --

3              THE COURT:  I'm sorry.

4              MR. PERTEN:  -- won't.

5              THE COURT:  Say that again.  I've been thinking about

6    Mary leaving the room.  So go ahead.  Say that again, Mr. --

7              MR. PERTEN:  Thank you --

8              THE COURT:  -- Perten.  I --

9              MR. PERTEN:  -- Your Honor.  The plan as of right

10   now, I'm guessing that Mr. Carnathan will fill the day.  He

11   has five witnesses.  So our expectation is we'll fill today.

12   And I understand the Court has a hard stop, so even more so --

13             THE COURT:  I do at 1, yeah.  Um-hum.

14             MR. PERTEN:  And then tomorrow morning, our plan is

15   to call Mr. Kagan, Vadim Kagan, as our first witness.  And

16   again, my expectation is he would probably fill -- I --

17             THE COURT:  Yeah.

18             MR. PERTEN:  I can't imagine he won't fill the whole

19   day with Mr. Carnathan's cross.  But my hope, we can get him

20   on and off and be done with him by the end of tomorrow --

21             THE COURT:  That sounds --

22             MR. PERTEN:  That's --

23             THE COURT:  That sounds logical.

24             MR. PERTEN:  That's my goal.

25             THE COURT:  That's fine.  I get it.  Okay.  All

```
 1    right.  All right.  Anything else, preliminaries?

 2              MR. CARNATHAN:  I think that's all for me, Your

 3    Honor.

 4              THE COURT:  All right.  Thanks for the information

 5    about where we stand.

 6              MR. CARNATHAN:  Okay.  The plaintiffs call Arina

 7    Rudyakova.

 8                        ARINA RUDYAKOVA SWORN

 9              THE COURT:  Good morning.

10              THE WITNESS:  Good morning.

11              THE COURT:  I don't know if you've been in the

12    courtroom, but we record here in this courtroom.  And so it's

13    important to speak into the microphone.  That's right.

14              And if you'll hear your voice being amplified, you'll

15    know we're getting it.  If you don't hear your voice being

16    amplified, it's going to be harder to imagine that we're

17    actually getting it.  Okay?

18              THE WITNESS:  Thank you.

19              THE COURT:  All right.  Thank you.

20              You know what, just hold one second.

21              MR. CARNATHAN:  Certainly.

22              THE COURT:  Okay.

23                    (Off the record at 9:14 a.m.)

24                    (On the record at 9:23 a.m.)

25              THE BAILIFF:  All right.  Be seated, please.
```

ARINA RUDYAKOVA - Direct

1          THE COURT:  Let's try again here.  Whenever you're

2     ready.

3          MR. CARNATHAN:  Okay.  Thank you, Your Honor.

4                        DIRECT EXAMINATION

5     BY MR. CARNATHAN:

6          Q.   Would you state your name, please?

7     A.   My name is Irina Rudyakova.

8          Q.   Are you married?

9     A.   Yes, I am.

10         Q.   To whom are you married?

11    A.   Alex Filippov.

12         Q.   For how long have you been married?

13    A.   Thirty years.

14         Q.   What do you do for work?

15    A.   I own half of the businesses that my husband own.

16         Q.   Would you briefly describe your education, please?

17    A.   I have master degree in computer science and applied

18    mathematics from Leningrad University.  I worked as a

19    programmer, then worked as a technical writer here at big

20    technical companies like BDM, GTE, so on.

21         Q.   When did you first meet Vadim Kagan?

22    A.   I first met him it was either September, October on the

23    12th, I think, when he was trying to persuade my husband to

24    invest money.  And he was showing us several houses that he

25    was building either at the beginning point of the construction

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ARINA RUDYAKOVA - Direct

1   or the endpoint of the construction.

2       Q.   What, if anything, do you recall Mr. Kagan telling

3   you while he was showing you the houses back in 2012?

4   A.   One thing that -- one thing --

5            THE COURT:   I think you're doing fine.

6            THE WITNESS:   Thank you.

7            THE COURT:   Just like you were was fine.

8            THE WITNESS:   Thank you.

9   A.   One thing that I remember that struck me, actually, that

10  Mr. Kagan mentioned that he always creates LLC companies for

11  particular product -- project and then dissolves them, like in

12  a year or so, in order not to have any problems with the

13  follow-up after the construction.

14  BY MR. CARNATHAN:

15      Q.   Do you recall discussing the construction costs at

16  all during the tour with Mr. Kagan?

17  A.   Not at that time.

18      Q.   Okay.  Did you ever meet Mr. Kagan again after that?

19  A.   We met the second time socially when all the three

20  members of LLC and their wives gathered in the restaurant to

21  sort of celebrate the beginning of the project.

22      Q.   Okay.  Other than those two occasions, have you ever

23  seen Mr. Kagan in person?

24  A.   No.

25      Q.   Okay.  Am I right, Ms. Rudyakova, that you made an

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ARINA RUDYAKOVA - Direct

1    effort to keep some sort of books for the Lyman-Cutler

2    project?

3    A.   Yes because it's -- it's not really the books.  It's just

4    trying to keep the records because it's our money that we're

5    invested there.  It's our name on all the loans that were

6    taken from Rockland Trust.  And I was trying, just for myself,

7    to make sure that everything is -- at least there is no zero

8    balance on the accounts.

9            MR. CARNATHAN:  Can I have Exhibit 43 in evidence?

10   And in particular, I'm interested in what I believe is going

11   to be Page 25.

12   BY MR. CARNATHAN:

13       Q.   Ms. Rudyakova, is this an email that you sent to the

14   kagandevelopment@gmail.com address on December 15th, 2014?

15   A.   I believe so, yes.

16       Q.   So what I'm interested in is when the construction

17   loans were fully drawn down, what did you do in order to see

18   that the loans and taxes continued to be paid?

19   A.   It was my understanding that according to LLC agreement,

20   if the houses were not sold after twenty-something months --

21   don't remember the exact number -- Mr. Kagan was responsible

22   for paying all the monetary responsibilities.

23       Q.   Okay.  So when you sent this email to the Kagan

24   Development, the gmail.com address, and said you needed

25   $19,000 to be deposited, did they put money in the account?

ARINA RUDYAKOVA - Direct

1   A.   Yes, they did.

2        Q.   And for how long did they continue to do that?

3   A.   Approximately until -- May 2015.

4        Q.   Okay.  Before the May 2015 did they ever respond no,

5   we're not doing that?

6   A.   No.

7        Q.   So thinking again about that sort of May 2015 time

8   frame, when was the first time you met Joseph Cohen?

9   A.   Don't remember exactly the timing.  It was either April

10  or May already when he was touring, showing us the houses,

11  because he mentioned, actually, before that there was some

12  damage after the winter, severe winter.  He was showing off

13  the houses, what stage they were and --

14       Q.   Had you ever seen Mr. Cohen other than that one time

15  at the houses?

16  A.   I don't remember.  I think that was the only time.

17       Q.   Who else was there at the time?

18  A.   My husband, Alex Filippov.

19       Q.   As best you can recall, what did your husband say

20  during that meeting with Mr. Cohen?

21  A.   I don't remember that he said anything particular except

22  that we need the keys to take responsibilities of the houses,

23  and that's it.

24       Q.   All right.  Do you recall your husband making any

25  threats during that meeting with Mr. Cohen?



ARINA RUDYAKOVA - Cross

1    A.    To Mr. Cohen?

2         Q.    Right.

3    A.    No.

4         Q.    No.   Did he say anything about blood on the floor or

5    blood on the door or something like that?

6    A.    I haven't heard anything like that from my husband at

7    all.

8         Q.    Do you recall anything that Mr. Cohen said during

9    that meeting at the houses, that time in April or May 2015?

10   A.    I remember that first, he wasn't able actually to show

11   the damage after the winter storm.   And the other thing that I

12   remember vividly because it was rather like a -- I felt

13   threatened and frightened because he said that if we're not

14   going to agree to pay the amount that they presented that we

15   owe or some additional cost, they're going to put the lien on

16   the house, and they're going to take all our money.   We'll

17   never get anything back.

18             MR. CARNATHAN:   That's all I have for Ms. Rudyakova.

19             THE COURT:   Okay.

20             Whenever you're ready.

21                       CROSS-EXAMINATION

22   BY MR. PERTEN:

23        Q.    Good morning, Ms. Rudyakova.

24   A.    Good morning.

25        Q.    Now, you understand -- or your understanding was

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ARINA RUDYAKOVA - Cross

1    that there would be a separate LLC agreement formed for this

2    project, correct?

3    A.   It was mentioned to me that this separate LLC agreement

4    was -- appeared in 2015 when the project was actually almost

5    done.

6         Q.   Okay.  Well, you understand there was an LLC

7    agreement signed by your husband, Mr. Kagan, and Mr. Lipetsker

8    in November of 2012?  You understand that, don't you?

9    A.   Yes.

10        Q.   And you told us that Mr. Kagan told you at the

11   outset that these LLC agreements usually only last about a

12   year, and then they're dissolved, correct?

13   A.   A year after the project is finished.

14        Q.   Okay.  So certainly, you understood that the

15   duration of these LLC agreements was not open ended.  It had a

16   fixed termination date, correct?

17   A.   Maybe.

18        Q.   I'm sorry?

19   A.   I don't know.

20        Q.   Okay.

21   A.   I'm not a lawyer.

22        Q.   Now, you read the operating agreement, correct?

23   A.   Many years ago, yeah.

24        Q.   And you certainly read it sufficiently to understand

25   that Mr. -- that -- excuse me -- that after twenty-three

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ARINA RUDYAKOVA - Cross

1    months if the properties hadn't sold, Mr. Kagan was

2    responsible for carrying costs, correct?

3    A.    Yes.

4         Q.    And you also understood that during the first

5    twenty-three months it was the obligation of the Lyman-Cutler,

6    LLC, correct?

7    A.    Correct.

8         Q.    And did you also -- or you also understood, did you

9    not, that the operating agreement specifically provides that

10   if Mr. Kagan does not pay the carrying costs after twenty-

11   three months, that it would be the obligation of your husband?

12   You understood that, didn't you?

13   A.    Um-hum.

14        Q.    I'm sorry?  Yes?

15   A.    Yes.

16        Q.    Okay.  Now, Mr. Carnathan showed you an email a

17   moment ago from December of 2014 where you were asking for

18   more funds to be deposited into the account to cover the

19   mortgage payment.  Do you recall that?

20   A.    Yes.

21        Q.    That wasn't the first time that you sent emails

22   regarding the need for additional funds to be deposited, were

23   it?

24   A.    Yes.

25        Q.    Yes, it was the first time, or --

ARINA RUDYAKOVA - Cross

1    A.    No.  It was not --

2          Q.    -- no, it was not?

3    A.    -- the first time.

4          Q.    And, in fact, isn't it true that you were monitoring

5    the account balances throughout the life of the project?

6    And --

7    A.    I was trying.

8          Q.    And each time the account balance went low, you

9    would contact Mr. Kagan and ask him to put more money in;

10   isn't that correct?

11   A.    Yes.

12         Q.    Okay.  And you also were in touch during the

13   project, during the life of the project, with the bookkeeper

14   at Kagan Development, correct, Ms. Brusenkova?

15   A.    I was in touch through email with Ryan, then with

16   Kristina --

17         Q.    Okay.

18   A.    -- then with Dan.

19         Q.    Okay.

20   A.    I have no idea who they were because sometimes Vadim will

21   answer the email; sometimes they will.

22         Q.    Okay.  So you were in touch with Ryan O'Grady, and

23   then when he left you were in touch with Kristina Brusenkova.

24   And then you were in touch with Dan Gersh, correct?

25   A.    That's correct.

ARINA RUDYAKOVA - Cross

1     Q.   And you were in touch with them because you were

2    sending them emails asking questions, correct?

3    A.   Because I was sending email to Kagan Development.  I

4    didn't even know who will answer my email.

5     Q.   And in response to those emails, one of the three of

6    them, depending on which time frame it would be, would

7    respond, correct?

8    A.   Yes.

9     Q.   And you also received from Kagan Development copies

10   of checks that they were paying to various subcontractors;

11   isn't that correct?

12   A.   Not very often, but sometimes.

13    Q.   And you received the bank statements with copies of

14   checks every month; isn't that correct?

15   A.   Not at the beginning.

16    Q.   Well, certainly, you understand that the statement

17   account address was your home address, correct?

18   A.   Yes.

19    Q.   And you had online access to that account --

20   A.   Yes.

21    Q.   -- from the beginning, correct?  Yes?

22   A.   Yes.

23    Q.   So, you were able to see every check that was being

24   drawn on that account in real time if you chose to do so;

25   is --



(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 20

ARINA RUDYAKOVA - Cross

1    A.    If I --

2         Q.    -- that right?

3    A.    -- chose to do that.

4         Q.    Yes.  And you also understood, did you not, that

5    there were payments being made to KDC, correct?

6    A.    Yes.

7         Q.    And you understood that there were payments being

8    made to ProExcavation, Corp.; isn't that correct?

9    A.    Yes.

10         Q.    And at no point did you send an email to anybody at

11   Kagan asking for additional backup once you were provided with

12   copies of those checks; isn't that correct?

13   A.    I didn't ask for the additional information because I

14   wasn't the bookkeeper for the LLC.

15         Q.    Well, you understand that your husband was the

16   managing manager?  You understand that?

17   A.    Yes.

18         Q.    And you understand that the operating agreement

19   provides that the books and records will be kept at your home

20   address?  You understand that?

21   A.    Now I do.

22         Q.    Okay.  And you understood that as managing manager,

23   it was your husband's obligation ultimately to keep the LLC's

24   books and records?  Do you understand that?

25   A.    I'm not sure.

ARINA RUDYAKOVA - Cross

1      Q.   Did he ever tell you that?

2    A.   We discussed that we just have to keep an account that is

3    on LLC name in balance.  That's it.

4      Q.   Okay.  So you had a discussion with your husband at

5    the beginning that you needed to keep track of the expenses,

6    correct?

7    A.   Yes.

8           MR. PERTEN:  Okay.  Thank you.

9           I have nothing further, Your Honor.

10           THE COURT:  Okay.

11           MR. CARNATHAN:  I have nothing further, Your Honor.

12           THE COURT:  All right.  Thank you, ma'am.  You can go

13    back to the gallery.

14           THE WITNESS:  Thank you.

15           THE COURT:  Okay.

16           MR. CARNATHAN:  The plaintiffs call William Hartzell,

17    Your Honor.

18           THE COURT:  Okay.

19                    WILLIAM HARTZELL SWORN

20           THE COURT:  Okay.

21                    DIRECT EXAMINATION

22    BY MR. CARNATHAN:

23      Q.   Would you state your name, please?

24    A.   William Hartzell.

25      Q.   What do you do for work, sir?




WILLIAM HARTZELL - Direct

1   A.    I'm a paralegal.

2        Q.    Where do you work?

3   A.    At O'Connor, Carnathan and Mack.

4        Q.    And for how long have you been working at O'Connor,

5   Carnathan and Mack?

6   A.    Just past seven years here in April.

7        Q.    Would you briefly describe your education and

8   training, please?

9   A.    I have a paralegal certificate from Northeastern

10  University in 1996.  I was already employed at a law firm

11  beginning in 1994 in a more clerical position, and so I moved

12  up a little bit.  And then in 2000, I moved to a different law

13  firm with Barry D. Lang, and then in 2012, moved to O'Connor,

14  Carnathan and Mack.

15       Q.    All right.  So for how long total have you been a

16  paralegal, sir?

17  A.    Twenty years, twenty-two, -three.

18           MR. CARNATHAN:  All right.  We are now going to

19  attempt to have Mr. Tamposi take over the IT.  Could I have

20  Plaintiff's Exhibit 1 for identification, please?

21           MR. TAMPOSI:  The good news, Your Honor, is that I

22  set the bar pretty low.

23           MR. CARNATHAN:  I'm hoping I can crawl over it.

24  Well, we got the first one up.  We'll see how it goes.

25           THE COURT:  All right.  We're off to a good start.

WILLIAM HARTZELL - Direct

1   Of course it's -- is that Exhibit 001?

2          MR. CARNATHAN:  That's right, Your Honor.

3          THE COURT:  Yeah.  And we'll see if he can get to 2.

4          MR. CARNATHAN:  Exactly.

5   BY MR. CARNATHAN:

6      Q.   Mr. Hartzell, who prepared the chart that is up on

7   screen as Plaintiff's Trial Exhibit number 1 for

8   identification?

9   A.   I did.

10     Q.   And what information are you recounting on this

11  chart?

12  A.   This is payments made from the Lyman-Cutler, LLC

13  operating account to Kagan Development through checks written

14  from the operating account.

15     Q.   And how did you go about preparing this chart?

16  A.   We had all of the bank statements.  They were produced in

17  discovery.  And they're Trial Exhibit 74 or -5, whatever it

18  is.  So just sitting down, going through the bank statements

19  month by month, identifying checks that are written to KDC,

20  noting the date of the check, the posting date, and the bank

21  account, the check number, the amount, and then any memo that

22  was on the check.  But mostly, we're looking for the payee to

23  be Kagan Development or KDC.

24     Q.   Okay.  And so, to the best of your ability, does

25  this chart fairly and accurately reflect the content of the

WILLIAM HARTZELL - Direct

1    underlying documents?

2    A.    Yes.

3          MR. CARNATHAN:  We would offer Plaintiff's Exhibit

4    number 1 into evidence, Your Honor.

5          THE COURT:  Any objection?

6          MR. PERTEN:  No, Your Honor.

7          THE COURT:  All right.  It's admitted.

8        PLAINTIFF'S EXHIBIT 1 WAS ADMITTED INTO EVIDENCE

9          MR. CARNATHAN:  Okay.  Here we go.

10         THE WITNESS:  Okay.

11         MR. CARNATHAN:  May I have Plaintiff's 2 for

12   identification, please, sir?

13         THE COURT:  You really are going after 2.

14         MR. CARNATHAN:  Here's the test.

15         MR. TAMPOSI:  I'm beginning to feel optimistic.

16         THE COURT:  Yeah.  Looks like you got it.

17   BY MR. CARNATHAN:

18       Q.    Okay.  Mr. Hartzell, are you also the person who

19   prepared the chart that we have marked as Plaintiff's Exhibit

20   2 for identification?

21   A.    Yes.

22       Q.    And what information have you recounted on the chart

23   that we've marked as Plaintiff's 2 for identification?

24   A.    This is payments made from the operating account of Kagan

25   Development, KDC, to the project as best we could tell from

WILLIAM HARTZELL - Direct

1    the bank statements that were produced in discovery.  And it

2    also includes the American Express summaries that were part of

3    the proof of claim made by KDC.

4         Q.   And so what records did you review in order to

5    prepare this chart?

6    A.   The bank statements of Kagan Development KDC, that were

7    produced in the course of discovery, the American Express

8    summaries that are part of the proof of claim.  And also you

9    can see at the sort of lower quarter of the chart there it

10   says Rockland Trust KDC account.

11        I guess KDC opened a operating account at Rockland Trust

12   at some time in 2015.  And there were a couple of checks

13   written from that account later on that show up in the proof-

14   of-claim documents.

15        Q.   And so with regard to the checks that were selected

16   to be placed on Trial Number Exhibit 2 for identification, how

17   did you determine which checks to include?

18   A.   Again, working through the bank statements that were

19   available in discovery for the two-and-a-half-year duration of

20   the project and looking at the memo lines and identifying

21   anything related to the Lyman-Cutler project.  You can see

22   that 77 Lyman was the original address of the property there.

23        And then you see 5588, a few things where we were able to

24   identify the address, but we couldn't really read what was on

25   the memo line beyond the 55 or 88 because these are all

WILLIAM HARTZELL - Direct

1    handwritten checks.

2        Q.   And with regard to the Amex summaries, did -- how

3    did you pick what to put on there for Amex summaries?

4    A.   Well, the Amex summaries were identified as being

5    specific to Lyman-Cutler.  So we just used the total at the

6    bottom of those pages or at the end of those documents;

7    they were -- the summaries for the most active years.  2013

8    and '14 were like seven or eight pages or even longer.  So we

9    just used the total there because it is the Lyman-Cutler

10   American Express account.

11       Q.   So for the purposes of this chart, am I right that

12   you gave KDC credit for a hundred percent of whatever was on

13   those Amex summaries; is that right?

14   A.   All inclusive, yeah.

15       Q.   And so with regard to this chart, to the best of

16   your ability, does it fairly and accurately reflect the

17   content of the underlying documents?

18   A.   Yes.

19           MR. CARNATHAN:  We would offer Plaintiff's Exhibit 2

20   into evidence, Your Honor.

21           THE COURT:  Mr. Harris?

22           MR. HARRIS:  No objection, Your Honor.

23           THE COURT:  All right.  It's admitted as 2.

24        PLAINTIFF'S EXHIBIT 2 WAS ADMITTED INTO EVIDENCE

25           MR. CARNATHAN:  Okay.  May I have Plaintiff's 3,



WILLIAM HARTZELL - Direct

 1   please?

 2   BY MR. CARNATHAN:

 3       Q.   Mr. Hartzell, are you also the person who prepared

 4   this chart?

 5   A.   Yes.

 6       Q.   And what information are you recounting on this

 7   chart?

 8   A.   This is payments coming from Kagan Development KDC, into

 9   the Lyman-Cutler, LLC operating account before November 30th,

10   2014, which is that twenty-three-month cutoff date that's part

11   of the LLC agreement.

12       Q.   Okay.  And what did you do in order to prepare this

13   chart?

14   A.   Again, review of the KDC operating account statements

15   that were produced in discovery and paging through, looking at

16   the check images, seeing which are written to Lyman-Cutler,

17   LLC, noting the memo, noting the Bates number.  And, of

18   course, we did correspond these to deposits actually in the

19   LLC account.

20       Q.   So you mapped together the KDC checks to the LLC

21   account deposits?

22   A.   Right.  You know, where we have a check here for $3,500

23   on the first line, we would expect to see a $3,500 deposit in

24   the LLC operating account.  So it was -- it was double-checked

25   that way if it's not shown on the chart here.  But --



(973) 406-2250 | operations@escribers.net | www.escribers.net

WILLIAM HARTZELL - Direct

1      Q.   Okay.  And to the best of your ability, does this

2  document fairly and accurately reflect the content of the

3  underlying documents?

4  A.   Yes.

5           MR. CARNATHAN:  We would offer Plaintiff's 3 into

6  evidence, Your Honor.

7           MR. HARRIS:  No objection, Your Honor.

8           THE COURT:  All right.  It's admitted as 3.

9        PLAINTIFF'S EXHIBIT 3 WAS ADMITTED INTO EVIDENCE

10          MR. CARNATHAN:  May I have Plaintiff's 4, please, Mr.

11 Tamposi?

12 BY MR. CARNATHAN:

13     Q.   Mr. Hartzell, I believe you were also the person who

14 prepared this chart, right?

15 A.   Yes.

16     Q.   And what does this chart reflect?

17 A.   This is payments into the LLC operating account from

18 Kagan Development after November 30th, after that twenty-

19 three-month cutoff.

20     Q.   And what did you do in order to prepare this chart?

21 A.   Again, worked through the bank statements that were

22 produced in discovery, check the payee, map it back to a

23 deposit into the LLC account.  There's a handful on this chart

24 that we only see on the LLC operating account as a deposit --

25 you can see where it says "cash deposit" -- and the others

WILLIAM HARTZELL - Direct

1    where there's no check memo.  I believe those were electronic

2    fund transfers into the LLC.

3        Again, I think that Kagan Development opened an account

4    with Rockland Trust sometime in 2015 and started doing direct

5    transfers of those last few entries that you see on the chart.

6    We don't have access to the Rockland Trust KDC account.  But

7    we see the deposit in the Lyman-Cutler account.  And we know

8    from Mr. Filippov that those deposits in April of 2015 were

9    not made by him.  So we are attributing that to KDC as

10   discussed in those emails you looked at with Arina.

11       Q.   Okay.  So to the best of your ability, sir, does

12   this document fairly and accurately reflect the content of the

13   underlying documents?

14   A.   Yes.

15       MR. CARNATHAN:  We would offer Plaintiff's 4 into

16   evidence, Your Honor.

17       MR. HARRIS:  No objection, Your Honor.

18       THE COURT:  All right.  It's admitted as 4.

19       PLAINTIFF'S EXHIBIT 4 WAS ADMITTED INTO EVIDENCE

20   BY MR. CARNATHAN:

21       Q.   And we now have Plaintiff's 5 up on screen.  Mr.

22   Hartzell, did you prepare this chart that has been marked as

23   Plaintiff's Exhibit 5 for identification?

24   A.   Yes.

25       Q.   And what information -- what information does the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

WILLIAM HARTZELL - Direct

1    chart on Plaintiff's Exhibit 5 for identification convey?

2    A.    This is payments made by ProExcavation Corp. into the

3    project.  And this was very inclusive.  You can see in the

4    title there one hundred percent credit for checks that have

5    memos indicating other projects.

6         Q.    So even if the memo line referenced another

7    project -- say, for instance, Yarmouth Road, about six down --

8    we gave them a hundred percent credit on this chart, right?

9    A.    Right.  We just used the total amount of the check here.

10   Again, this was using the ProEx account statements from

11   Santander Bank that were produced in discovery.  And again,

12   they were all handwritten checks.  Many of them had no memo

13   line at all.  But where the memos indicated anything relating

14   to Lyman-Cutler, we just used the total amount to get a

15   picture of what was being spent by ProExcavation.

16        Q.    Okay.  And to the best of your ability, does this

17   chart fairly and accurately reflect the content of the

18   underlying documents?

19   A.    Yes.

20        MR. CARNATHAN:  We would offer Plaintiff's 5 into

21   evidence, Your Honor.

22        MR. HARRIS:  No objection, Your Honor.

23        THE COURT:  All right.  It's admitted.

24        PLAINTIFF'S EXHIBIT 5 WAS ADMITTED INTO EVIDENCE

25   BY MR. CARNATHAN:



(973) 406-2250 | operations@escribers.net | www.escribers.net

WILLIAM HARTZELL - Direct

1    Q.   We now have Plaintiff's 6 for identification up on

2    screen.  Mr. Hartzell, are you the person who prepared

3    Plaintiff's Exhibit 6 for identification?

4    A.   Yes.

5    Q.   And what information is conveyed on Plaintiff's 6

6    for identification?

7    A.   This is a listing of payments made by the LLC from the

8    Lyman-Cutler operating account with checks written to

9    ProExcavation.

10    Q.   And what did you do in order to prepare this chart?

11    A.   Go through the LLC bank statements looking for checks

12    written to ProExcavation, marking off the particulars that you

13    see on the chart, and tallying up.

14    Q.   All right.  And to the best of your ability, does

15    this chart fairly and accurately reflect the content of the

16    underlying documents?

17    A.   Yes.

18         MR. CARNATHAN:  All right.  We would offer

19    Plaintiff's 6 into evidence.

20         MR. HARRIS:  No objection, Your Honor.

21         THE COURT:  All right.  It's admitted.

22      PLAINTIFF'S EXHIBIT 6 WAS ADMITTED INTO EVIDENCE

23         MR. CARNATHAN:  That's all I have for Mr. Hartzell.

24         THE COURT:  All right.

25                    CROSS-EXAMINATION

KRISTINA BRUSENKOVA - Direct

1    BY MR. HARRIS:

2         Q.   Good morning, sir.

3    A.   Hello.

4         Q.   Good morning.  As you stated, you're a paralegal in

5    the firm that represents the plaintiffs in this matter?

6    A.   Yes.

7         Q.   I assume your firm wants to win?

8    A.   We represent our clients.

9         Q.   Okay.  You don't have a finance or accounting

10   background, do you?

11   A.   No.

12        Q.   And finance and accounting is not what you do every

13   day at the firm, is it?

14   A.   Not every day, but we spend a lot of time figuring out

15   where the money went in some of these cases.

16        Q.   Do you know who Dan Gersh is?

17   A.   I've heard the name.

18        Q.   Okay.  You understand that he's the present

19   bookkeeper for KDC?

20   A.   Yes.

21        Q.   Do you agree with me that Mr. Gersh has a far more

22   intimate knowledge of KDC's finances than do you?

23   A.   I -- I would imagine.

24        Q.   Do you know who Jason Gordon is?

25   A.   I've heard the name.



KRISTINA BRUSENKOVA - Direct

1    Q.   All right.  He's an outside accountant that provides

2    for services to Mr. Kagan's companies?

3    A.   Um-hum.

4    Q.   Yes?

5    A.   Yes.

6    Q.   You would agree that he has a far more intimate

7    knowledge of the company's finances than do you?

8    A.   I would imagine he does.

9    Q.   Now, I want to ask you about Exhibit 2.

10        MR. HARRIS:  Mr. Perten, could you bring that up,

11   please?

12        MR. PERTEN:  Ms. -- thank you.

13   BY MR. HARRIS:

14   Q.   I believe this is Exhibit 2 up on the screen.  You

15   told us this was a compilation of payments from KDC on the

16   project, correct?

17   A.   Correct.

18   Q.   All right.  Now, you analyzed -- in order to create

19   this chart, you analyzed the checks and the American Express

20   account statements, correct?

21   A.   Right.

22   Q.   Now, you started with -- let's just focus on the

23   checks for a moment.  You started with the checks as opposed

24   to looking at the information in the proof-of-claim binders?

25   A.   I went to the Santander bank accounts, the full bank

KRISTINA BRUSENKOVA - Direct

1   statements that were produced during discovery.

2       Q.   Okay.  But did you start with the proof-of-claim

3   information and then go back to try to find the checks that

4   corresponded to those expenses?

5   A.   No.  I worked through the bank statements page by page.

6       Q.   All right.  Did you start with the QuickBooks report

7   that KDC provided and then work backwards to try to find the

8   payments associated with that?

9   A.   No.  I used the bank statements.

10      Q.   So you began and ended your analysis with the bank

11  statements?

12  A.   No.  I began with the bank statements.  And if you look

13  at the chart, you see on the right-hand edge, it says Bates

14  reference.  And then it has the Kagan and a number.  That's

15  the Bates number of the bank statements from discovery.  And

16  then the next column over, which is a little obscured right

17  now where it says "secondary", you can see where that check is

18  also in the proof of claim.  So I verified that it was in the

19  proof of claim, and I verified that it was in the bank

20  statement.

21      Q.   But the right-hand column, this secondary reference,

22  is merely another reference for the check that you had

23  identified by looking at the bank statement, correct?

24  A.   Right.  It was sort of a double-check that I looked and

25  saw first in the bank statement, which is a complete record of

KRISTINA BRUSENKOVA - Direct

1  the KDC bank statement.  And then I went back and I looked at

2  the proof-of-claim binder, and I said oh, there it is.  So it

3  did match.

4      And it also became a double-check if there was anything

5  that was in the proof of claim binder that I did not find in

6  the bank statement, I would have wanted to, you know, take a

7  closer look.  These are all handwritten checks.  It's hard to

8  read some of them.  But I do recall that I actually -- I

9  actually hit them all.

10      Q.   Okay.  So this analysis, as you just mentioned,

11  turns on your ability to interpret the handwriting in the memo

12  line, correct?

13  A.   To a point.

14      Q.   I assumed there were some checks where you could not

15  decipher the memo line; is that right?

16  A.   You can see the notation and the memo there where -- for

17  instance, about three-quarters of the way down, the current

18  view there where it says "illegible" with a little bracket

19  around it and then "55 Lyman".  So I notated as best I could

20  there where I couldn't read it.  I could make out some but not

21  others.  You know, numbers are a little easier than words on

22  some of these things.

23      Q.   But when you were examining the bank account

24  statements, if there was a check for which you could not

25  decipher the memo line, did you include it in this chart?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

KRISTINA BRUSENKOVA - Direct

1   A.    No.

2        Q.    Exhibits 3 and 4, I believe, demonstrate your

3   compilation of carrying costs that KDC paid on the project at

4   different points in time, correct?

5   A.    Deposits by KDC into the operating account.

6        Q.    Right.  Isn't it true that Kagan Development paid

7   some carrying costs directly without making deposits into the

8   operating account?

9   A.    I'm not familiar with that.  I know that there were

10  numerous payments from the operating account to the Town of

11  Brookline and other carrying costs.  But this was looking at

12  payments, deposits into the LLC account, not payments made by

13  KDC to other places.

14        MR. HARRIS:  All right.  Now, Exhibit 5 -- could you

15  bring up Exhibit 5, please, Mr. Perten?

16  BY MR. HARRIS:

17        Q.    This, I think you told us, was a compilation of

18  payments by ProExcavation for the project?

19  A.    As best we could identify from the handwritten checks.

20        Q.    And again, your analysis started with the checks as

21  opposed to the information that ProEx assembled as part of its

22  claim?

23  A.    Right.  We went to the bank statements that were produced

24  in discovery.  They were the most complete record available.

25        Q.    Okay.  And again, this turns on your ability to

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

KRISTINA BRUSENKOVA - Direct

1  interpret the memo line?

2  A.   Yes.

3      Q.   And as you testified, many of the ProEx checks, the

4  memo lines were blank, correct?

5  A.   Correct.

6      Q.   And in the instances in which you could not decipher

7  the memo line or when the memo line was blank, I assume

8  they're not on this chart?

9  A.   Correct.

10     Q.   Do you know, sir, how ProExcavation billed for its

11  work on this project?

12  A.   No.  I really don't.

13     Q.   So if I told you that it billed as a lump sum, you

14  wouldn't be able to confirm or disconfirm that?

15  A.   No.

16         MR. HARRIS:  Just one moment, please, Your Honor.

17         Nothing further, Your Honor.  Thank you.

18         THE COURT:  All right.  Anything else?

19         MR. CARNATHAN:  Yeah, I have nothing further for Mr.

20  Hartzell.

21         THE COURT:  Okay, great.

22         Thank you, Mr. Hartzell.

23         MR. CARNATHAN:  The plaintiffs call Kristina

24  Brusenkova.

25                 KRISTINA BRUSENKOVA SWORN

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

KRISTINA BRUSENKOVA - Direct

1            THE COURT:  All right.  Good morning.

2            THE WITNESS:  Good morning.

3            THE COURT:  Have you been in the courtroom?

4            THE WITNESS:  Yesterday.

5            THE COURT:  Yesterday?

6            THE WITNESS:  Yes.

7            THE COURT:  All right.  So you know that -- speak

8     into the microphone, and we'll record what you're saying,

9     okay?

10           THE WITNESS:  Okay.

11           THE COURT:  All right.  All right.

12           MR. CARNATHAN:  Thank you, Your Honor.

13                     DIRECT EXAMINATION

14    BY MR. CARNATHAN:

15       Q.   Would you state your name, please?

16    A.   Kristina Brusenkova.

17       Q.   What do you do for work?

18    A.   Accounting.

19       Q.   And would you briefly describe your education,

20    please?

21    A.   I have a master degree from Russia.

22       Q.   And when did you earn your master's degree?

23    A.   2011.

24       Q.   What was the major concentration for your master's

25    degree?

KRISTINA BRUSENKOVA - Direct

1    A.    Economics, accounting, analysist (sic), and auditing.

2         Q.    All right.  When did you come to this country?

3    A.    2011, I think.

4         Q.    Okay.  And where do you work right now?

5    A.    Glen's Properties (ph.).

6         Q.    Okay.  You at some point worked for Kagan

7    Development and KDC Corp.; is that right?

8    A.    Yes.

9         Q.    When did you work for -- if I may call it KDC --

10   when did you work for KDC?

11   A.    2013 to 2014.

12        Q.    Okay.  Approximately, when did you start at KDC?

13   A.    November 2013.

14        Q.    And approximately, when did you leave KDC?

15   A.    October 2014.

16        Q.    And how were you first introduced to KDC?

17   A.    Through my former employer.

18        Q.    Where were you working when you were introduced to

19   KDC?

20   A.    Agranovich Accounting.

21        Q.    Agranovich Accounting?

22   A.    Yes.

23        Q.    And so was Agranovich Accounting the accountant for

24   KDC at that time?

25   A.    Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

KRISTINA BRUSENKOVA - Direct

1    Q.   Were you doing any work for KDC before you went to

2    work for it?  That's -- let me clean that one up.  When you

3    were working for Agranovich, were you doing any work for KDC?

4    A.   I did.

5    Q.   And so if we think about your time working at

6    Agranovich, when did you first start doing any work for KDC?

7    A.   It was in June, July 2013.

8    Q.   Okay.  And how was it you came to be employed by

9    KDC?

10   A.   He offered me to start working for his company.

11   Q.   When you say "he", you mean Vadim Kagan?

12   A.   Yes.

13   Q.   And so when did you first meet Mr. Kagan?

14   A.   June or July 2013.

15   Q.   And you had a personal relationship with Mr. Kagan

16   beyond the professional; is that right?

17   A.   Yes.

18   Q.   In fact, a romantic relationship with Mr. Kagan?

19   A.   Yes.

20   Q.   And over what period of time did you have a romantic

21   relationship with Mr. Kagan?

22   A.   Almost a year.

23   Q.   And so about when did it start?

24   A.   December 1st, 2013.

25   Q.   And about when did it end?



KRISTINA BRUSENKOVA - Direct

1   A.   October 26th, 2014.

2      Q.   Let's think again about when you were working at

3   KDC.  What were your duties, if you will, when you were

4   working for KDC?

5   A.   Bookkeeping stuff.

6      Q.   And so were you keeping the books for KDC?

7   A.   Yes.

8      Q.   Were you keeping the books for any other companies

9   while you were working for KDC?

10  A.   For all companies.

11     Q.   All of Mr. Kagan's companies?

12  A.   Yes, and projects.

13     Q.   So you were keeping the books for ProExcavation as

14  well?

15  A.   Yes.

16     Q.   And you were keeping the books for all of the

17  project companies that he was working with?

18  A.   Yes.

19     Q.   Did that include Lyman-Cutler?

20  A.   Yes.

21     Q.   Was construction complete on the Lyman-Cutler

22  project by the time you left?

23  A.   I don't think so.  I don't remember.

24     Q.   Okay.  Had Mr. Kagan issued any final bills on

25  Lyman-Cutler by the time you left?



KRISTINA BRUSENKOVA - Direct

1   A.   No.

2        Q.   If we think in particular about your work keeping

3   the books for the projects that Mr. Kagan worked on, did you

4   observe any habit or routine practice that he engaged in with

5   regard to that billing?

6              MR. PERTEN:  Objection, Your Honor.

7              THE COURT:  Basis?

8              MR. PERTEN:  I don't believe habit or routine is an

9   issue in this lawsuit.  The question is what did he do in this

10  project.  I think it's inadmissible under the rules.

11             MR. CARNATHAN:  It's right out of Rule 406.  I mean,

12  I'm entitled to ask the witness if she observed any habit or

13  routine practice, and she's entitled to tell me.

14             THE COURT:  Overruled.

15             MR. PERTEN:  Okay.

16  BY MR. CARNATHAN:

17       Q.   So, Ms. Brusenkova, in your capacity keeping the

18  books for Mr. Kagan's projects, when he got to the end of his

19  projects, did you observe any habit or routine practice

20  concerning how Mr. Kagan would bill the projects?

21  A.   In the middle of 2013, he started billing them double.

22       Q.   And how is it you remember the middle of 2013 is

23  when that started?

24  A.   There was one project on Florence Street.  And one day he

25  came back from the site, and he said that there was found a

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

KRISTINA BRUSENKOVA - Direct

1  ladge (sic) on the project, and he has to bill the investors

2  more.  And I asked him how much he wanted bill them more.  He

3  said $200,000.  And the bill raised up to 400,000.  And then

4  in a couple of weeks, he said I think I have to bill them -- I

5  have to bill all investors same amount just to be consistent:

6  4,000 -- $400,000.

7      Q.  Do you remember who the investor was on Florence

8  Street?

9  A.  I believe Fuchs.  I'm not sure, but I think so.

10     Q.  Ilya [Fooks]; am I saying that right?

11 A.  Yes.

12     Q.  F-U-C-H-S; is that --

13 A.  Yes.

14     Q.  -- right?  Yeah.  Did Mr. Fuchs ever confront Mr.

15 Kagan about the, the billing on Florence Street?

16 A.  Yes.

17     Q.  Excuse me.  I guess without recounting what Mr.

18 Fuchs said, how did Mr. Kagan react after Mr. Fuchs confronted

19 him?

20 A.  He just -- laughing.

21     Q.  Do you recall anything in particular that Mr. Kagan

22 said after that incident?

23 A.  Yeah.  He was swearing.  And he said that I'm a powerful

24 man.  I can do whatever I want to do.  They cannot do anything

25 against me.  And if -- if they will not pay me money, I will



KRISTINA BRUSENKOVA - Direct

1    put lien and they will not get their contribution back for

2    another several years.

3           MR. CARNATHAN:  Mr. Hartzell, can I have Exhibit 37

4    in evidence, please?

5    BY MR. CARNATHAN:

6        Q.   Ms. Brusenkova, thinking back to when you were

7    working at KDC, did you ever see this document we've marked as

8    Exhibit 37 in evidence?

9    A.   No.

10       Q.   Did you ever see a document like it on any of the

11   projects that you were serving as the bookkeeper on?

12   A.   No.

13       Q.   At any time while you were working for Mr. Kagan,

14   either through Agranovich or once you went to work at KDC, did

15   he ever ask you to make any entries on the books for a general

16   contractor fee for KDC?

17   A.   No.

18       Q.   Did he ever ask you to make any entries on the books

19   for seventeen-and-a-half percent fee for advancing carrying

20   costs?

21   A.   No.

22           MR. CARNATHAN:  Can I have Exhibit 129 for

23   identification, please?

24   BY MR. CARNATHAN:

25       Q.   Ms. Brusenkova, I'm showing you a document that's

KRISTINA BRUSENKOVA - Direct

1    been marked Plaintiff's Trial Exhibit Number 129 for

2    identification.  It purports to be a proposal from

3    ProExcavation, first at 77 Lyman Road and then --

4            MR. CARNATHAN:  Mr. Hartzell, could I show her the

5    second page, please?

6    BY MR. CARNATHAN:

7        Q.   And then to 55 Lyman Road.  Again, thinking back to

8    when you were serving as the bookkeeper for KDC and

9    ProExcavation, did you ever see this proposal?

10   A.   No.

11       Q.   Did you ever see a proposal like it on any of Mr.

12   Kagan's projects?

13   A.        No.

14       Q.   If you look at the phone number in the upper left --

15   it's not the best copy, but I think it's 617-610-1276.  Does

16   that look right?

17   A.   Yes.

18       Q.   Yeah.  To your knowledge, did ProExcavation have

19   that phone number back in 2013?

20   A.   No.

21       Q.   When you were working for Mr. Kagan in 2013, what

22   phone number did you use on ProExcavation documents?

23   A.   Mr. Kagan's cell phone number.

24       Q.   And do you have any recollection of when Mr. Kagan

25   obtained that phone number that's on 129 for identification?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

KRISTINA BRUSENKOVA - Cross

1    A.    I believe it was in February 2014.

2         Q.    How is it you remember that so specifically?

3    A.    He asked me to buy a phone for the office.  And he asked

4    me to get a number -- phone number and fax number for the

5    office.

6         Q.    And is it your recollection that that was the number

7    that you got?

8    A.    No.  I don't remember.

9         MR. CARNATHAN:  Okay.  That's all I have for Ms.

10   Brusenkova, Your Honor.

11                       CROSS-EXAMINATION

12   BY MR. PERTEN:

13        Q.    Good morning, Ms. Brusenkova.

14   A.    Good morning.

15        Q.    Now, Ms. Brusenkova, your first job in the United

16   States was for an adult daycare center, correct?

17   A.    No.

18        Q.    Okay.  One of your first jobs?

19   A.    Yes.

20        Q.    And that had nothing to do with accounting, correct?

21   A.    Correct.

22        Q.    You were a transportation coordinator, correct?

23   A.    Yes.

24        Q.    And an office manager for a senior center, correct?

25   A.    Yes.



KRISTINA BRUSENKOVA - Cross

1     Q.   And you were fired from that position, weren't you?

2     A.   Yes.

3     Q.   Okay.  And so that would have been roughly 2011 to

4     2012 that you were there?

5     A.   I don't remember.

6     Q.   Okay.  And after you were fired from your position,

7     you went to work with Mr. Agranovich --

8     A.   Yeah.

9     Q.   -- the CPA?

10    A.   Yes.

11    Q.   You're not a CPA, correct?

12    A.   No.

13    Q.   And that was a full-time job for Mr. Agranovich,

14    correct?

15    A.   Yes.

16    Q.   And while you were at Mr. Agranovich, that's where

17    you learned to use QuickBooks, correct?

18    A.   Yes.

19    Q.   Prior to your work with Mr. Agranovich, you didn't

20    know how to use QuickBooks; isn't that correct?

21    A.   Russian QuickBooks.

22    Q.   Right.  But not the QuickBooks we have here,

23    correct?

24    A.   Yes.

25    Q.   And part of your duties was to go to various

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

KRISTINA BRUSENKOVA - Cross

1  clients' sites to enter data into the QuickBooks, correct?

2  A.   Yes.

3      Q.   And in fact, you did that for Mr. Kagan's company,

4  correct?

5  A.   Yes.

6      Q.   Now, your general job for Agranovich was answering

7  phones, greeting clients, and entering information from bank

8  statements, correct?

9  A.   To do tax returns as well.

10      Q.   Okay.  Now, you're not a CPA, though, correct?

11  A.   No.

12      Q.   Okay.  Now, you left Agranovich and went to work

13  directly full time with Mr. Kagan in about March of 2014;

14  isn't that correct?

15  A.   No.

16      Q.   In fact, isn't it correct that you worked for -- you

17  were sent by Mr. Agranovich for a period of several months to

18  KDC to do entries in their QuickBooks, but you weren't

19  directly employed by KDC until March of 2014?

20  A.   No.

21      Q.   Okay.  Now, Mr. Lipetsker, by the way, he's your

22  dentist, correct?

23  A.   No.

24      Q.   He was your dentist?

25  A.   No.  It was just one time.



KRISTINA BRUSENKOVA - Cross

1          Q.   I'm sorry?

2     A.   It was just one-time visit.

3          Q.   It was a one-time visit?

4     A.   Yes.

5          Q.   Now, in your duties for Mr. Kagan, at times,

6     investors would come into the office to review books and

7     records; isn't that correct?

8     A.   Just once or two times.

9          Q.   All right.  And one of the people who came in was

10    Mr. Zhukovskiy, correct?

11    A.   Yes.

12         Q.   To review the Hyde Avenue books and records,

13    correct?

14    A.   No.

15         Q.   It was another project?

16    A.   It was Hyde Avenue, yes.

17         Q.   It was Hyde Avenue?

18    A.   Yes.

19         Q.   Yes.  And when he was in the office, he didn't

20    accuse Mr. Kagan of any malfeasance, did he?

21    A.   I don't know.  They were upstairs.

22         Q.   Okay.  Now, prior to working at KDC, you had no

23    experience working for a construction company; isn't that

24    correct?

25    A.   I did, just a little bit.



KRISTINA BRUSENKOVA - Cross

1      Q.   What did you do?

2   A.   Just regular, small stuff, general stuff that I was asked

3   to do.

4           MR. PERTEN:  Your Honor, may I approach?

5           THE COURT:  Yes, you may.  Thank you.  Thank you.

6   It's okay.  Thank you.

7   BY MR. PERTEN:

8      Q.   Ms. Brusenkova, I've placed in front of you the

9   transcript of your deposition that we took on March 20th,

10   2018.  Do you recall being at my office to give a deposition?

11   A.   Yes.

12      Q.   Could I ask you, please, to turn to page 53.  And

13   starting on line 16, I said, "When you came to work for KDC,

14   had you worked for a construction company before?"  Your

15   answer was, "No."  Did I read that correctly?

16   A.   Yes.

17      Q.   And then I asked you, "Did you have any background

18   in construction?"

19           You said, "Only four months."

20           "So before you came?"

21           Your answer was, "Before I joined his company, I had

22   experience for four months working in construction company."

23           "What construction company did you work in for four

24   months?"

25           "A.  Kagan Development."



(973) 406-2250 | operations@escribers.net | www.escribers.net

KRISTINA BRUSENKOVA - Cross

1      So would you agree with me, ma'am, that prior to working

2   for Kagan Development you had not worked for a construction

3   company; isn't that correct?

4   A.   No.

5      Q.   So were you being untruthful when you testified at

6   the deposition?

7   A.   No.  I spoke with my lawyer.  And I asked him if

8   construction company is the same as a home-improvement

9   company.  He said yes.

10      Q.   Okay.

11   A.   And I work for another client who is a management --

12          MR. CARNATHAN:  If I may --

13          THE WITNESS:  -- construction company.

14          THE COURT:  All right.  Hold on, hold on, ma'am.

15          Go ahead.

16          MR. CARNATHAN:  I'm not really Ms. Brusenkova's

17   lawyer.  But I know she has a lawyer.  And I'm sure that she

18   would not want to waive the attorney-client privilege

19   that's --

20          THE COURT:  All right.

21          MR. CARNATHAN:  I'll offer that up.

22          THE COURT:  All right.  Okay.

23          You understand, Ms. Brusenkova, that communications

24   between you and your lawyer are confidential communications,

25   and if your answer includes revealing that information, that

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

KRISTINA BRUSENKOVA - Cross

1    you can tell me that it would require you to reveal

2    confidential communications from your lawyer.  And you're not

3    required to give that information.

4         You don't have a lawyer here in order to make that

5    objection, so you're going to have to tell me if you're aware

6    of it and you choose not to reveal those communications.  You

7    just need to tell me that, okay?

8         THE WITNESS:  Okay.

9         MR. PERTEN:  Thank you, Your Honor.

10   BY MR. PERTEN:

11        Q.   Now, Ms. Brusenkova, at no point did you submit any

12   kind of an errata sheet for your testimony; isn't that

13   correct?

14   A.   I don't understand you.

15        Q.   You didn't correct any of your testimony after you

16   reviewed your transcript; isn't that correct?

17   A.   No.

18        Q.   No, it's not correct, or yes, it is correct that you

19   did not do it?

20   A.   I did not do it.

21        Q.   Okay.  And continuing to read on page 54, starting

22   at line 12, you just told us about the work with Kagan

23   Development.

24        Then I said, "Other than that, did you have any

25   experience working with construction before you started

KRISTINA BRUSENKOVA - Cross

1   working directly for KDC?"

2       "A.  Yes.  I used to work for another construction

3   company for two months before I started to work for Kagan

4   Development.

5       "Q.  What construction company was that?

6       "Mere Realty Group (ph.).

7       "Q.  This was something that you worked for directly or

8   another client that Mr. Agranovich had?"

9       Your answer was:  "Another client."

10      "Any other experience working with construction prior to

11  your arrival at KDC?"

12      "A.  No."

13      Did I read that correctly?

14  A.   Yes.

15      Q.   And, in fact, not only had you not worked at

16  construction companies, you hadn't taken any type of

17  construction courses either at that point; isn't that correct?

18  A.   Repeat your question.

19      Q.   You had not taken any classes in construction prior

20  to working at KDC; isn't that correct?

21  A.   Correct.

22      Q.   And you certainly weren't in any position where you

23  were actually negotiating or handling subcontracts; isn't that

24  correct?

25  A.   Correct.

KRISTINA BRUSENKOVA - Cross

1      Q.   And at KDC, you described your job on the

2   bookkeeping side was just to enter payments and deposits into

3   QuickBooks based upon your review of bank statements, check

4   registers, credit card statements, and HUD statements,

5   correct?

6   A.   Yes.

7      Q.   And you were not involved in negotiating

8   subcontracts for any of the jobs that KDC worked, correct?

9   A.   Correct.

10     Q.   Okay.  And, in fact, when you arrived -- when you

11   started working at KDC, the Lyman-Cutler project was already

12   up and running, correct?

13   A.   I don't remember.

14     Q.   Okay.  Well, you understand, do you not, that the

15   operating agreement was signed in November 2012?  Do you

16   understand that?

17   A.   Maybe.  I don't know.

18     Q.   Okay.  Well, in November of 2012, you'll agree you

19   were not working at KDC, correct?

20   A.   Yes.

21     Q.   And, in fact, at the time you started at KDC, there

22   were already bills being paid and expenses being incurred on

23   the Lyman-Cutler account; isn't that correct?

24   A.   I don't remember.

25     Q.   Now, you understand also that the QuickBook (sic)

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

KRISTINA BRUSENKOVA - Cross

1    accounts at KDC was installed by Agranovich sometime in 2013;

2    isn't that correct?

3    A.    Yes.

4        Q.    And prior to the installation of the QuickBooks

5    accounts at KDC in 2013, he kept paper copies of invoices and

6    bank statements, correct?

7    A.    No.

8        Q.    He did not keep bank statements?

9    A.    He did not keep invoices.

10       Q.    So there were no invoices at all?

11   A.    Several.

12       Q.    I'm sorry?

13   A.    There's several.

14       Q.    There were several invoices?

15   A.    Yes.

16       Q.    Okay.  Now, during the time that you were at KDC,

17   you were the person in charge of QuickBook (sic) entries,

18   correct?

19   A.    Yes.

20       Q.    And so you'd agree with me that to the extent any of

21   the information that was entered during your time was

22   incorrect, that would be because you entered it incorrectly;

23   isn't that correct?

24   A.    Say it again.

25       Q.    Sure.  If there were any mistakes that were made

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

KRISTINA BRUSENKOVA - Cross

1   during the time that you kept the QuickBooks, those mistakes

2   would have been mistakes that you made; isn't that correct?

3   A.   No.

4        Q.   Well, did anybody else while you were there keep

5   QuickBooks at KDC?

6   A.   Yes.

7        Q.   Who?

8   A.   Her name was Marsha (ph.).  I don't remember her last

9   name.

10       Q.   And how long was she there for?

11  A.   Four -- I think four months.

12       Q.   Okay.  And other than the four-month period when she

13  was there, did anybody else do QuickBooks but you while you

14  were there?

15  A.   No.

16       Q.   Okay.  So you'd agree with me that you were the

17  primary person, during your tenure at KDC, keeping the

18  QuickBooks?

19  A.   Yes.

20       Q.   And if you didn't have information to enter into

21  QuickBooks, you certainly had access to Mr. Kagan to ask

22  questions; isn't that correct?

23  A.   Yes.

24       Q.   Now, you also would -- on the Lyman-Cutler project,

25  you would interact with Mr. Filippov's wife, Arina; isn't that

KRISTINA BRUSENKOVA - Cross

1    correct?

2    A.   Can you rephrase your question?

3         Q.   Yes.  You had communications with Mr. Filippov's

4    wife, Arina; isn't that correct?

5    A.   Yes.

6         Q.   And, in fact, you emailed her copies of checks;

7    isn't that correct?

8    A.   I'm not sure if I emailed her a copy of the checks.  But

9    I did email her some invoices per her request.

10        Q.   Okay.  So you emailed her invoices.

11             MR. PERTEN:  Mr. Harris, could you pull up Exhibit

12   315, please?

13             MR. HARRIS:  Excuse me, Liz (ph.).

14             MR. PERTEN:  Can you scroll down?  Keep going.  Next

15   one.

16   BY MR. PERTEN:

17        Q.   Now, would you agree that you used the Kagan

18   Development, the gmail.com account, while you were at Kagan

19   Development?

20   A.   Yes.

21        Q.   Okay.  Incidentally, this email June 26, 2013, would

22   this have been an email that you sent on or about June 26,

23   2013?

24   A.   I don't know.

25        Q.   Do you have any reason to think the date is

KRISTINA BRUSENKOVA - Cross

1    incorrect?

2    A.   I don't remember when I started working for Mr. Kagan.

3         Q.   I thought you told us you started working there in

4    early 2013 -- or in November 2013?

5    A.   No.  I said June, July 2013.

6         Q.   Okay.  Well, certainly in June, July of 2013, you

7    were using Kagan Development, the gmail.com, correct?

8    A.   No.

9         Q.   When did you --

10   A.   Only November 2013 when I started working for his company

11   full time.

12        Q.   Okay.  So is it your position that you didn't send

13   this email?

14   A.   I came to his office just to enter the transactions,

15   that's it.

16        Q.   And so --

17   A.   Maybe he asked me once, but I'm not sure if I did send

18   this email.

19        Q.   Okay.  But let's explore that for a moment, Ms.

20   Brusenkova.  Your job was you came to his office to enter

21   transactions in QuickBooks, correct?

22   A.   Yes.

23        Q.   And that's all you did, correct?

24   A.   Yes.

25             MR. PERTEN:  Okay.  Let's move down a little bit, Mr.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

KRISTINA BRUSENKOVA - Cross

1   Harris.

2   BY MR. PERTEN:

3       Q.   Now, again, here's an email dated August 26, 2013.

4   Were you using kagandevelopment@gmail.com in August of 2013?

5   A.   I don't think so.

6       Q.   Okay.  Would you agree with me that these were

7   copies of checks that were sent to Mr. Filippov?

8   A.   Yes.

9       Q.   Okay.  And, in fact, not only did checks get sent

10   and invoices -- you told us already -- did you also have

11   occasion to receive communications from Arina Rudyakova

12   seeking additional funds to be deposited into the Lyman-Cutler

13   account?

14   A.   I don't remember.

15       Q.   You don't remember ever getting requests to put more

16   money in the Lyman-Cutler account?

17   A.   We usually request investors to fund the account.

18       Q.   I'm sorry?

19   A.   We usually request -- send this kind of request to -- to

20   the investors to fund the account.

21       Q.   So it's your position that usually, the investors

22   funded the account?

23   A.   Yes.  This is what we usually did.  Yes.

24       Q.   Well, did that happen in the Lyman-Cutler?

25   A.   I don't remember.  Probably.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

KRISTINA BRUSENKOVA - Cross

1      Q.   You don't remember.  Now, you weren't involved in

2   negotiating the construction loan for Lyman-Cutler; isn't that

3   correct?

4   A.   Yes.

5      Q.   Now, also with respect to ProExcavation, you don't

6   understand in detail what ProExcavation did on the Lyman-

7   Cutler account, correct?

8   A.   I have only general ideas.

9      Q.   You only have general understanding, correct?

10  A.   Yes.

11     Q.   So you're certainly not in any position to determine

12  whether ProEx charged too much or too little because you don't

13  know exactly what they did; isn't that correct?

14  A.   Yes.

15     Q.   And, in fact, the final bill for ProEx didn't issue

16  until after you left -- after you were fired from KDC; isn't

17  that correct?

18  A.   Yes.

19     Q.   And, in fact, you didn't leave voluntarily.  You

20  were fired; isn't that correct?

21  A.   Yes.

22     Q.   Now, at the time you worked at KDC, you were

23  married, correct?

24  A.   Yes.

25     Q.   And you mentioned in response to Mr. Carnathan that

KRISTINA BRUSENKOVA - Cross

1    you also had a romantic relationship with Mr. Kagan; isn't

2    that correct?

3    A.    Yes.

4        Q.    And that relationship started prior to the time that

5    you came to KDC; isn't that correct?

6    A.    No.

7        Q.    Now, the relationship with Mr. Kagan didn't end

8    amicably; isn't that correct?

9    A.    I don't understand you.

10        Q.    Okay.   Let me -- it wasn't a happy ending; would you

11    agree with that?

12    A.    Yes.

13        Q.    And, in fact, you were very angry; isn't that

14    correct?

15    A.    No.

16        Q.    Isn't it a fact that Mr. Kagan obtained a

17    restraining order against you?

18    A.    Yes.

19        Q.    And isn't it a fact that there were various criminal

20    actions that were initiated against you?

21    A.    Yes

22        Q.    And, in fact, there was a conviction in one them;

23    isn't that correct?

24    A.    Yes.

25        Q.    Now, after you were terminated from Kagan

KRISTINA BRUSENKOVA - Cross

1    Development you brought a discrimination lawsuit against Mr.

2    Kagan and KDC; isn't that correct?

3    A.    Yes.

4         Q.    With the Mass. Commission Against Discrimination,

5    correct, MCAD?

6    A.    Yes.

7         Q.    And that lawsuit was dismissed by the MCAD, wasn't

8    it?  It was thrown out?

9    A.    I think it was transferred to superior court.

10        Q.    Okay.  I'd represent to you that it was thrown out.

11   You have a separate action pending in the superior court,

12   correct?

13   A.    I don't know.

14        Q.    Well, certainly you understand that you -- there is

15   a civil lawsuit pending in the Middlesex Superior Court as we

16   speak; isn't that correct?

17   A.    Right now?

18        Q.    Yeah.

19   A.    Between me and Mr. Kagan?

20        Q.    Yes.

21   A.    Yes.

22        Q.    And, in fact, Mr. Kagan has alleged that you

23   embezzled money; isn't that what his allegation is?

24   A.    Yes.

25        Q.    And you have countersued against Mr. Kagan, correct?

KRISTINA BRUSENKOVA - Cross

1    A.    Rephrase the question.

2         Q.    You've brought claims against Mr. Kagan yourself;

3    isn't that correct?

4    A.    Yes.

5         Q.    So there is a pending lawsuit where both of you are

6    suing each other; isn't that correct?

7    A.    Yes.

8         Q.    And that hasn't been tried yet.  That's still

9    ongoing; isn't that correct?

10   A.    Yes.

11        Q.    Now, a few months after you were fired at KDC, you

12   received a call from Mr. Filippov; isn't that correct?

13   A.    I think it was in eight months.

14        Q.    About eight months?

15   A.    Yes.

16        Q.    Okay.  And he asked you if you knew anything about

17   any kind of a dispute with numbers as it related to the Lyman-

18   Cutler project, correct?

19   A.    Yes.

20        Q.    And you told him you didn't know anything about

21   disputes with numbers at it related to the Lyman-Cutler

22   project; isn't that correct?

23   A.    No.  I said -- actually, he asked me if I -- I'm aware

24   what's going on between him and Mr. Kagan.  I said no.

25        Q.    Okay.  And you --

KRISTINA BRUSENKOVA - Cross

1  A.   And he just explained to me.

2       Q.   And you told him you knew nothing about a conflict

3  regarding the numbers in Lyman-Cutler; isn't that correct?

4  A.   I don't remember.

5       Q.   Why don't you turn to page 89 of your deposition.

6  On the bottom of the page at line 19:  "Give me your best

7  recollection what you can recall about the telephone

8  conversation with Mr. Filippov.

9       "A.   He asked me if I heard anything about what happened

10 between him and Mr. Kagan and the conflict they now had on the

11 numbers.

12      "And when he asked you if you knew anything about the

13 conflict on the numbers, what did you say?"

14      You said, "I said no," correct?

15 A.   What do you mean by conflict on the numbers?

16      Q.   Dispute regarding the numbers.  You said no,

17 correct?  I read that correctly, correct?

18 A.   I don't quite think I understood your question.

19      Q.   Okay.  Now, this was followed up by a meeting at a

20 Starbucks with Mr. Filippov, correct?

21 A.   Yes.

22      Q.   Okay.  So you had a phone -- you had no interactions

23 with Mr. Filippov prior to his phone call; isn't that correct?

24 A.   No.

25      Q.   You had been fired from KDC.  You had a relationship

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

KRISTINA BRUSENKOVA - Cross

1    that didn't end well.  You're involved in litigation with Mr.

2    Kagan.  And then Mr. Filippov calls you and asks to meet with

3    him; isn't that correct?

4    A.    No.

5        Q.    He didn't call you and ask to meet with you?

6    A.    He did call me.

7        Q.    And --

8    A.    But --

9        Q.    -- in time --

10   A.    -- litigation started after.

11       Q.    Okay.  And you agreed to meet with Mr. Filippov,

12   correct?

13   A.    Yes.

14       Q.    Now, you told Mr. Filippov that Kagan had several

15   American Express cards, and you said he wasn't good about

16   separating by projects.  Do you recall that?

17   A.    ProExcavation credit card, yes.

18       Q.    However, you don't know whether that happened with

19   Lyman-Cutler; isn't that correct?

20   A.    I do know.

21       Q.    Let's look at your deposition.  On page 92, I asked

22   you, starting at line 10:  "What about American Express

23   cards?"

24       You said, "He had several American Express cards, one for

25   KDC and under this KDC and ProExcavation.  ProExcavation, when

KRISTINA BRUSENKOVA - Cross

1    you went to buy something on the credit card, he never

2    separate between the projects.  We didn't know the exact

3    amount that was spent for the particular house when he billed

4    at the end of the construction of the house.  I'm not talking

5    about Lyman-Cutler here -- or right now.  I'm talking in

6    general", correct?

7    A.    Yes.

8        Q.    And you have no specifics of anything that he billed

9    on an Amex card to Lyman-Cutler that was not proper, no

10   specifics; isn't that correct?

11   A.    He billed Lyman-Cutler what he thinks is will be cover

12   the expenses.

13       Q.    You were unable to identify a single, specific

14   expense --

15   A.    No.

16       Q.    -- on Lyman-Cutler --

17   A.    No.

18       Q.    -- isn't that correct?  It's correct, right?

19   A.    Yes.

20       Q.    Okay.  Now, you also told us at your deposition that

21   when you first got to KDC, you observed that there were some

22   invoices which had inadvertently not been added to QuickBooks;

23   do you recall that testimony?

24   A.    At the beginning, yes.

25       Q.    And so that would be documentation that you added

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

KRISTINA BRUSENKOVA - Cross

1    after the fact, correct?

2    A.    Yes.

3        Q.    So with respect to invoices that had been

4    inadvertently not included in QuickBooks, you would agree that

5    as of that moment, if anything, he would have been

6    undercharging for his projects, correct?

7    A.    Rephrase the question.

8        Q.    Sure.  Certainly, if he didn't add an invoice that

9    was outstanding for a project to QuickBooks, he would not be

10   billing for that amount because it wasn't in the QuickBooks,

11   correct?

12   A.    At that time, yes.

13       Q.    Right.  And you went back and you fixed that to make

14   sure that anything that was missing was brought up to date,

15   correct?

16   A.    Yes.

17       Q.    Okay.  Now, you've testified that you believe that

18   ProEx was double billing, correct?

19   A.    Yes.

20       Q.    But you don't know that that happened in the Lyman-

21   Cutler project; isn't that correct?

22   A.    No.

23       Q.    No, it's not correct, or no, you don't know --

24   A.    I don't --

25       Q.    -- what happened?



KRISTINA BRUSENKOVA - Cross

1   A.   -- know.

2        Q.   You don't know.  Okay.

3             Now, additionally, you were unable to identify any

4   contractors who overcharged on the Lyman-Cutler project; isn't

5   that correct?

6   A.   I don't know.

7        Q.   You don't know of any; isn't that correct?

8   A.   That's correct.

9        Q.   And you don't know of any contractors on the Lyman-

10  Cutler charge who were paid more than they were supposed to

11  get; isn't that correct?

12  A.   No.

13       Q.   No, it's not correct, or --

14  A.   It's not correct.

15       Q.   It's not correct.  So let's look at page 133 of your

16  deposition testimony.  My question was:  "What subcontractors

17  did Mr. Kagan pay more than the job was worth?

18       You told me:  "I can't recall the names."  Is that true?

19  A.   Where is it?

20       Q.   Top of page 133.

21  A.   I'm sorry.  Page --

22            MR. PERTEN:  May I approach, Your Honor?

23            THE COURT:  Yes, you may.

24            THE WITNESS:  This one?

25            MR. PERTEN:  Right here.




KRISTINA BRUSENKOVA - Cross

1  BY MR. PERTEN:

2      Q.   So at your deposition would you agree you couldn't

3  identify a single subcontractor that you believed had been

4  overpaid on the Lyman-Cutler project; isn't that correct?

5  A.   No.  I think I put in my affidavit the name of Peter

6  Nolan (ph.).

7      Q.   Well, at your deposition, I said, "What

8  subcontractors did Mr. Kagan pay more than the job was worth?"

9  Your answer was, "I can't recall the names", correct?

10  A.   Yes.

11     Q.   And then we went on.  I said, "How did you make a

12  determination that there were payments in excess of what the

13  job was worth?"

14         And you answered, "When the work was done, he

15  usually came to my desk, and he asked me to pull all the

16  numbers that were paid to this particular person.  So when he

17  saw this number, he said, you know, it's a little low.  Can

18  we -- can we had (sic) an additional 2,000."

19     And I went back at you with a question:  "So try my

20  question.  First of all, did that happen in Lyman-Cutler?

21     "A.  I can't recall.

22     "Q.  Do you have any basis for knowing what the proper

23  charge from a subcontractor would be?"

24     And your answer was, "No."

25     Did I read that correctly?



KRISTINA BRUSENKOVA - Cross

1   A.   Yes.

2        Q.   Now, you also had no information about any double

3   billing on the Lyman-Cutler project; isn't that correct?

4   A.   If can pay with his personal companies, yes.

5        Q.   Well, let's look at page 125 of your deposition in

6   the middle of the page, starting at line 11.  We were looking

7   at an affidavit you had provided.  It says, "Now, you say in

8   paragraph number 7 that he regularly double billed projects.

9   Do you see that?"

10  A.   Yes.

11       Q.   "A.   Yes.

12       "On the Lyman-Cutler project specifically, when did he

13  overbill?

14       "I can't recall.

15       "Did he ever?

16       "A.   Based on the invention that I saw -- the information

17  that Filippov provided me, yes, for landscaping.

18       "So you believe he double billed for landscaping?

19       "A.   I believe yes.

20       "Anything else?

21       "A.   I can't recall now.

22       "Do you believe there was other things?

23       "I don't know."

24       Did I read that correctly?

25  A.   Yes.



KRISTINA BRUSENKOVA - Cross

1    Q.    And the landscaping charge that you were referring

2    to was about a $400 charge, correct?

3    A.    I don't remember.

4    Q.    Now, we also discussed at your deposition whether

5    there were any charges that were improperly attributed to

6    Lyman-Cutler which shouldn't have.  Do you recall that?

7    A.    No.

8    Q.    Okay.  Let's look at page 135 of your deposition, on

9    line 7.  I asked you,  "Do you know if any of the expenses

10   before were improperly charged to the Lyman-Cutler account?"

11   And you said, "I can't recall it."  Did I read that correctly?

12   A.    Yes.

13                         (Pause)

14   Q.    Now, we also discussed whether there were any

15   refunds, things that had been returned to the vendor that

16   weren't then credited back to the Lyman-Cutler account.  Do

17   you recall that discussion?

18   A.    Yes.

19   Q.    And you were unable to identify any refunds that

20   were not credited to the Lyman-Cutler account; isn't that

21   correct?

22   A.    Yes.

23   Q.    In fact, on page 94 of your deposition, I asked you

24   on line 9:  "What did he return and not apply the credit?

25        "A.  I cannot -- I can't recall.



Page  72

KRISTINA BRUSENKOVA - Cross

1    "Q.  Do you have any specific details about what he

2  returned back and did not credit to Lyman-Cutler?

3    "A.  I cannot recall."

4    Read that correctly?

5  A.   Yes.

6    Q.   Now, since you left Lyman -- excuse me -- KDC's

7  employment, you've gotten yourself licensed as a construction

8  supervisor, correct?

9  A.   Yes.

10    Q.   And you're involved in the building trades, right?

11  A.   I'm sorry.  What?

12    Q.   And as a result, you can be a builder, correct?

13  A.   Yes.

14    Q.   And you obtained what we call a construction

15  supervisor's license?

16  A.   Yes.

17    Q.   Let me show you a document.

18    MR. PERTEN:  You Honor, may I?

19    THE COURT:  Yes, you may.

20    MR. CARNATHAN:  I object to this line, Your Honor.  I

21  think it's irrelevant.  I don't know where he's going with it.

22  But it looks like he's trying to set up some kind of extrinsic

23  matter to impeach her on that is not relevant to the case.  I

24  don't know why we're talking about this.

25    THE COURT:  It's relevant maybe to her -- go ahead.

KRISTINA BRUSENKOVA - Cross

1           MR. PERTEN:  Okay.

2           THE COURT:  No, no, no.  What is it we're dealing

3    with here?

4           MR. PERTEN:  This is her CSL license, and it's being

5    offered as -- it will become apparent to impeach her.

6           THE COURT:  To impeach her --

7           MR. PERTEN:  Yes.

8           THE COURT:  -- credibility.

9           MR. PERTEN:  Yes.

10          MR. CARNATHAN:  Well, to impeach her credibility for

11   what, for her CSL license?  I mean, if her CSL license is

12   not --

13          THE COURT:  Her truthfulness.

14          MR. CARNATHAN:  -- an issue in this case --

15          MR. PERTEN:  Right.

16          THE COURT:  I suspect for her truthfulness.

17          MR. CARNATHAN:  Right.  But we're talking about a

18   collateral matter.  You can't impeach a witness about a

19   collateral matter with extrinsic evidence.  You end up with

20   mini trials within trials about things that are not relevant

21   to this case.  So he's going to try to show that she was

22   untruthful on some -- I don't even quite know what this is, a

23   construction supervisor license application --

24          THE COURT:  Overruled.

25          MR. PERTEN:  Thank you, Your Honor.



KRISTINA BRUSENKOVA - Cross

1   BY MR. PERTEN:

2       Q.   Ms. Brusenkova, I've placed in front of you the

3   construction supervisor's license application that I obtained

4   through a Freedom of Information Act request, public-records

5   request.  Do you recognize on the first page -- that's your

6   picture, correct?

7   A.   Yes.

8           THE COURT:  Do you have a copy of that?

9           MR. PERTEN:  I'm sorry?

10          THE COURT:  May --

11          MR. PERTEN:  Do you want a copy?

12          THE COURT:  May I see your copy?

13          MR. PERTEN:  Yes.

14          THE COURT:  Thank you.  Thank you.

15          MR. PERTEN:  May I proceed, Your Honor?

16          THE COURT:  Yes, you may.

17  BY MR. PERTEN:

18      Q.   So the first page, that's your picture.  And

19  although it's partly obscured, that would have been your

20  signature there, correct?

21  A.   Yes.

22      Q.   Okay.  And then on the second page is the actual

23  application that you filled out by hand, correct?

24  A.   Yes.

25      Q.   Has your name and your background, correct?



KRISTINA BRUSENKOVA - Cross

1   A.   Yes.

2        Q.   And then on the third page, if you will, that's your

3   signature there where it says, "Applicant signature"; isn't

4   that correct?

5   A.   Yes.

6        Q.   And you signed that on March 6th, 2015?

7   A.   Yes.

8        Q.   And, in fact, it was notarized by an Anna Duzenko,

9   correct?

10  A.   Yes.

11       Q.   Anna Duzenko is a friend of yours, isn't she?

12  A.   Yes.

13       Q.   She's somebody you knew from the Agranovich

14  accounting firm, correct?

15  A.   Yes.

16       Q.   Now, looking at that third page right above your

17  signature, item number 2 says, "I solemnly swear that the

18  information provided on this application is true and complete

19  to the best of my knowledge", correct?  That's what is says,

20  doesn't it?

21  A.   I'm sorry.  Where?

22       Q.   Right above your signature, there's items 1, 2, and

23  3.  Number 2 is you swearing that everything in the

24  application is true and accurate, correct?

25  A.   Yes.



KRISTINA BRUSENKOVA - Cross

1      Q.   Now, if you could flip back to the first page of

2    your application, the middle of the page, there's an area that

3    says, "Proof of Experience, Option A".  Do you see that?

4    A.   No.  Where?

5           THE COURT:  Is this the first page of the exhibit?

6           MR. PERTEN:  It's the second page of the exhibit.

7           THE COURT:  All right.  Go ahead.

8    BY MR. PERTEN:

9      Q.   Right in the middle, it says, "Proof of Experience,

10   Option A."  Do you see that?

11          MR. PERTEN:  May I, Your Honor?

12   A.   Yes.

13          THE COURT:  You may approach.

14          MR. PERTEN:  Have you found it?

15          THE WITNESS:  Yes.

16          MR. PERTEN:  You have it now?

17          THE WITNESS:  Yes.

18   BY MR. PERTEN:

19     Q.   And it says, "Enter below the name and address of

20   the employer and/or military branch from which you've received

21   three years of construction experience.  If you've worked for

22   multiple employers, please copy the sheet as needed and submit

23   all sheets from your registration form.  Provide copies of W-2

24   from the employer and/or copies of military discharge

25   documents.  If self employed, then submit either IRS schedule

KRISTINA BRUSENKOVA - Cross

1    C or 1099.  Copies must be on 8-1/2 by 11 paper neatly

2    attached."

3         Then it says, "If you do not possess your tax form, you

4    may request copies from the Internal Revenue Service."  Did I

5    read that correctly?

6    A.   Yes.

7         Q.   So you understood that what they were asking you was

8    to provide evidence that you had three years of construction

9    experience, correct?

10   A.   Yes.

11        Q.   And, in fact, you listed down below that you had --

12   where it says, "Proof of Experience, Option B," it says, "If

13   tax records of employment are not available, you may submit a

14   notarized letter of attestation in verification of work

15   experience", correct?

16   A.   Yes.

17        Q.   And, in fact, you submitted a letter in support of

18   your application, which is the fourth page of this document;

19   isn't that correct?

20   A.   Yes.

21        Q.   And there's a letter dated February 27th, 2015,

22   which would have been roughly three months after you left KDC,

23   where Mr. Crowley (ph.) apparently is attesting that "Kristina

24   Brusenkova has worked for me full time from November 23rd,

25   2011 to February 8th, 2015, as my helper.  Her duties included

KRISTINA BRUSENKOVA - Cross

1   drawing plans, tiling, painting, and help with installing

2   windows and hardwood flooring."  Did I read that correctly?

3   A.   Yes.

4        Q.   In fact, you had not worked full time from 2011 to

5   2015 because you had told us this morning you were working for

6   Mr. Kagan full time and you were working for Agranovich full

7   time; isn't that correct?

8   A.   Yes.

9        Q.   And, in fact, Mr. Crowley didn't even sign this

10  letter.  That's not his signature, is it?

11  A.   This is his signature.

12       Q.   Mr. Crowley was at the time the boyfriend of Anna

13  Duzenko; isn't that correct?

14  A.   No.

15       Q.   And Ms. Duzenko, by the way, is in jail now, isn't

16  she?

17  A.   No.

18       Q.   So you signed on the pains and penalties of perjury

19  to the Commonwealth of Massachusetts that you worked full time

20  in the construction industry when you knew that wasn't true;

21  isn't that correct?

22  A.   No.

23       Q.   Well, did you work full time in the construction

24  industry from 2011 to 2015?

25  A.   Yes.

KRISTINA BRUSENKOVA - Cross

1      Q.   So you worked full time; while you were at Berembaum

2   (ph.) you were also working full time in a construction

3   company?

4   A.   Yes.

5      Q.   So your testimony this morning was untruthful; is

6   that your testimony?

7   A.   No.

8   Q.   Your testimony has changed now.  You remember that you

9   were working full time in a construction company; whereas, you

10   forgot early?

11   A.   Full time is from thirty hours to forty hours, right?  I

12   worked on the weekend.  Right now, I have three jobs.  I'm

13   working eighty hours a week.

14      Q.   So when I asked you at your deposition if you had

15   any experience working construction and you told us no, were

16   you being untruthful then, or are you being untruthful now?

17   A.   I just explained to you that construction and home

18   improvement are two different things for me.

19          MR. PERTEN:  Your Honor, I have nothing further from

20   Ms. --

21          THE COURT:  Okay.

22          MR. PERTEN:  -- Brusenkova.

23          THE COURT:  Anything else?

24          MR. CARNATHAN:  Just a couple of quick ones, Your

25   Honor.



KRISTINA BRUSENKOVA - Redirect

1          THE COURT:  Sure.  This is not in evidence.  I'm

2   going to hand this back to Mr. Perten unless -- are you going

3   to inquire about this?

4          MR. CARNATHAN:  No.  Thank you --

5          THE COURT:  No.

6          MR. CARNATHAN:  -- Your Honor.

7          THE COURT:  All right.  You can do it later.

8          MR. PERTEN:  Yeah.

9          MR. CARNATHAN:  Right.

10                    REDIRECT EXAMINATION

11  BY MR. CARNATHAN:

12     Q.   So, Ms. Brusenkova, just to review when did your

13  employment for KDC end?

14  A.   October 25th or 26th, 2014.

15     Q.   Okay.  And Mr. Perten asked you about some criminal

16  charges that were brought against you.  Do you remember that?

17  A.   Yes.

18     Q.   And you acknowledged that you were convicted once,

19  right?

20  A.   Yes.

21     Q.   What were you convicted for?

22  A.   Breaking and entering during the nighttime, I guess.

23     Q.   Right.  And that was the weekend of October 26th,

24  2014, right?

25  A.   Yes.



Page 81

KRISTINA BRUSENKOVA - Redirect

1    Q.   And so if we think about all the other criminal

2    charges that Mr. Kagan and Mr. Cohen have sworn out against

3    you since then, what happened to those?

4    A.   They were dismissed.

5    Q.   The other thing -- at one point -- if you look at

6    page 135 in your deposition again, please.  Can you find that?

7         MR. PERTEN:  Did I leave my copy?

8         MR. CARNATHAN:  I don't think so.

9         MR. PERTEN:  No, I'm sorry.  I have it right here.

10   BY MR. CARNATHAN:

11   Q.   I'd just like to refer you to the rest of your

12   answer.  Mr. Perten asked you about lines, I think it was, 7

13   through 10.  And he read to you, "Do you know if any of the

14   expenses from before were improperly charged to the Lyman-

15   Cutler account?"  And your answer was, "I can't recall it."

16        Do you remember when he read you that?

17   A.   Yes.

18   Q.   If we go down to line 13, he then asked you, "Do you

19   know if it ever happened?"

20        And your answer was, "I just know it happened

21   usually when billed from ProExcavation it is the amount.  He

22   just create the amount and put it on the invoice and asked me

23   to prepare this invoice."

24        Have I read that correctly?

25   A.   Yes.

1           MR. CARNATHAN:  That's all I have for Ms. Brusenkova,

2     Your Honor.

3           THE COURT:  Okay.  Anything else?

4           MR. PERTEN:  All right.  If you could give me just

5     thirty seconds, Your Honor.

6           THE COURT:  No, no, absolutely.  You can.

7           Well, let's just hold on a second.  What's next?

8           MR. CARNATHAN:  I have Mr. Fennell, my real estate

9     expert, and then Mrs. Kagan.

10          THE COURT:  Let's take our 11 o'clock break now,

11     okay?

12          MR. PERTEN:  That would be good.

13          THE COURT:  And --

14          MR. PERTEN:  Thank you.

15          THE COURT:  -- we'll let you have a chance, and we'll

16     finish with this witness at that time, okay?  All right.

17          THE BAILIFF:  All rise.  Court is in recess.

18                (Off the record at 10:52 a.m.)

19                (On the record at 11:11 a.m.)

20          THE BAILIFF:  All rise.  Court is now in session.

21          THE COURT:  Be seated.

22                     (Pause)

23          THE COURT:  All right.  Are we ready to proceed?

24          MR. PERTEN:  Your Honor, we have no further questions

25     of this witness.

MORGAN FENNELL - Direct

1        THE COURT:  Okay.  That's fine.  All right.  Anything

2    further?

3        MR. CARNATHAN:  Nothing --

4        THE COURT:  No, you don't get a right to.  Okay.

5    Thank you so much for your --

6        THE WITNESS:  Thank you.

7        THE COURT:  -- being here.  All right.

8        MR. CARNATHAN:  Thank you, Your Honor.  The

9    plaintiffs call Morgan Fennell.

10                    MORGAN FENNELL SWORN

11       THE COURT:  Good morning.

12       THE WITNESS:  Good morning.

13       THE COURT:  It's me.

14       THE WITNESS:  Who's saying that?

15       THE COURT:  I know.  You hear this --

16       THE WITNESS:  Good morning, Your Honor.

17       THE COURT:  -- voice.  I didn't hear you orally

18    affirm the --

19       THE WITNESS:  Oh, I'm sorry.

20       THE COURT:  -- the oath, but --

21       THE WITNESS:  I do.

22       THE COURT:  -- you do.  And just speak into the

23    microphone.

24       THE WITNESS:  Sure.

25       THE COURT:  And you can be comfortable in the chair.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MORGAN FENNELL - Direct

1   Bring the microphone with you if you need to --

2           THE WITNESS:  Okay.

3           THE COURT:  -- move away from it, okay?

4           THE WITNESS:  Great.

5           THE COURT:  All right.  Mr. Harris?

6           MR. HARRIS:  Your Honor, you may recall, before

7   trial, we filed a motion in limine with respect to Mr.

8   Fennell's expert report --

9           THE COURT:  I do recall.

10          MR. HARRIS:  -- particularly on the causation

11  analysis, so we renew that objection before he commences.

12          THE COURT:  All right.  That's considered renewed.

13  I'll take it as a motion to reconsider, and the motion is

14  denied.  Okay?

15          All right.  Go ahead.

16          MR. CARNATHAN:  Okay.

17                       DIRECT EXAMINATION

18  BY MR. CARNATHAN:

19      Q.   Would you state your name, sir?

20  A.   Morgan Fennell.

21      Q.   What do you do for work?

22  A.   A real estate appraiser.

23      Q.   On what subject have you been asked to testify here

24  today?

25  A.   To provide an opinion of value on two homes in Brookline,

MORGAN FENNELL - Direct

1   Massachusetts.

2          MR. CARNATHAN:  So I am going to give Mr. Fennell

3   copies of his report to refer to as needed during the

4   testimony.

5          THE COURT:  It's [Fren-'el], right?

6          THE WITNESS:  F, [Fen-'el].

7          THE COURT:  [Fen-'el], okay.

8          MR. CARNATHAN:  Thank you.

9          THE COURT:  And what have you just handed him, a

10   report?

11          MR. CARNATHAN:  I just handed him a copy of each of

12   his reports, the one for 88 Cutler as of January 29, 2016, and

13   the one for 55 Lyman as of March 11th, 2016.

14          THE COURT:  Are they in evidence?

15          MR. CARNATHAN:  They are not.  They're strictly to be

16   at his fingertips to refresh his recollection if he's unable

17   to recall the details of his report.

18          THE COURT:  Okay.  All right.  You okay with him, Mr.

19   Harris, having that?

20          MR. HARRIS:  Yes.  We would object to them being

21   entered into evidence, however.

22          THE COURT:  But you have no objection to him

23   referring to them during his examination?

24          MR. HARRIS:  No, we do not.

25          THE COURT:  Okay.  All right.  Go ahead.

MORGAN FENNELL - Direct

1   BY MR. CARNATHAN:

2        Q.   Mr. Fennell, let's just briefly talk about your

3   qualifications.  Where are you employed, sir?

4   A.   The Appraiser's Group.

5        Q.   And what's your position there?

6   A.   I'm vice president.

7        Q.   And for how long have you been with the Appraiser's

8   Group?

9   A.   Nineteen years.

10        Q.   Are you licensed as a real estate appraiser in the

11   Commonwealth of Massachusetts?

12   A.   Yes.

13        Q.   For how long have you been licensed?

14   A.   Nineteen years.

15        Q.   And what level of license do you hold?

16   A.   Certified general appraiser.

17        Q.   Are there different levels of appraiser in

18   Massachusetts?

19   A.   There are.  There's four levels.  There's the trainee,

20   the state residential license, the state-certified

21   residential, and the certified general.

22        Q.   And so if we think of those as a hierarchy, where do

23   you -- where's your license stand in the hierarchy?

24   A.   Certified general is the highest.  It allows you to

25   perform both residential and commercial appraisals.



MORGAN FENNELL - Direct

1    Q.    Over the years, can you say about how many

2    residential appraisals you've performed?

3    A.    It'd have to be over 1,000.

4    Q.    Have you performed any in particular in Brookline

5    before this engagement?

6    A.    Yes, I have.

7    Q.    About how many have you done in Brookline; do you

8    know?

9    A.    At least fifteen and actually two on this street.

10    Q.    On Lyman Road?

11    A.    On -- I'm sorry.  On Lyman Road.

12    Q.    Have you previously been qualified to testify as an

13    expert in court?

14    A.    I have.

15    Q.    In what courts have you previously been qualified as

16    an expert to testify?

17    A.    In U.S. Bankruptcy Court and Middlesex Probate and

18    Family, Suffolk Probate and Family, and Northfolk Probate and

19    Family Court.

20    Q.    Have you also been qualified in the United States

21    Bankruptcy Court?

22    A.    Yes.

23    Q.    For the District of Massachusetts, right?

24    A.    Correct.

25    Q.    Let's start by talking about your -- let's focus on

MORGAN FENNELL - Direct

1    the appraisal for 55 Lyman.

2    A.    Okay.

3         Q.    And so what specifically were you asked to do with

4    regard to the appraisal of 55 Lyman?

5    A.    To provide an opinion of value as of March 11th, 2016.

6         Q.    And what's your understanding of why in particular

7    March 11th, 2016, was selected as the date for your appraisal?

8    A.    It was -- it was understood that that was the date that

9    that property sold.

10        Q.    Okay.  Are there any particular standards that guide

11   your appraisal work?

12   A.    We have to follow what's called uniform standards of

13   professional appraisal practice, or USPAP for abbreviation.

14        Q.    And did you follow those standards in this case?

15   A.    I did.

16        Q.    When you are determining market value, what

17   definition do you use for what market value is?

18   A.    It's a definition through the federal registry.  It's

19   contained in the report.

20        Q.    So --

21   A.    It's on page 4 of 4.  It's "the most probable price that

22   a property would bring in an open and competitive market with

23   conditions requisite to a fair sale, the buyers and sellers

24   acting knowledgably and prudently, and assuming that the price

25   is not affected by undue stimulus."



MORGAN FENNELL - Direct

1      Q.   And just to complete that, it further says,

2  "Implicit in this definition is the consummation of a sale as

3  of a specified date and the passing of title from seller to

4  buyer under conditions whereby buyer and seller are typically

5  motivated.  Both parties are well informed or well advised and

6  acting in what they consider their own best interests.  A

7  reasonable time is allowed for exposure on the open market.

8  And payment is made in terms of cash and U.S. dollars or in

9  terms of financial arrangements comparable thereto.  And the

10  price represents the normal consideration for the property

11  sold unaffected by special or creative financing or sales

12  concessions granted by anyone associated with the sale."

13      Have I read that correctly?

14  A.   Yes.

15      Q.   And is that the definition of market value you

16  applied in this case?

17  A.   I did.

18      Q.   So would you describe the process that you went

19  through in appraising 55 Lyman, please?

20  A.   I was out to the property in February of 2017.  I took

21  exterior photographs and notes of the property and went to

22  research assessor's records and Brookline Building Department

23  records.

24      Q.   Is that the typical process that an appraiser

25  follows when appraising residential real estate?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MORGAN FENNELL - Direct

1    A.    Everything except we usually go on the interior of a

2    property as well.

3        Q.    All right.  Were you able to inspect the interior of

4    the properties at issue in this case?

5    A.    I was not.

6        Q.    Why not?

7    A.    At that point they were owned by a third party that's

8    unrelated to this process.

9        Q.    Did you do anything instead to try to assess the

10   interior of the properties?

11   A.    I did.  I relied on multiple listing-service sheets that

12   were marketing the properties that included interior

13   photographs, floor plans, descriptions.  In addition to that,

14   I went to the Building Department, analyzed the -- the file,

15   as well as the assessor's records.

16       Q.    Okay.  So based on the inspection you were able to

17   conduct, what did you conclude about the property's overall

18   condition?

19   A.    That well, it was essentially new construction, so it was

20   good -- very good.

21       Q.    So after you inspected the property, what additional

22   steps did you take to complete your assignment?

23   A.    Well, we analyzed the markets, the -- the Brookline

24   market for comparable sales, ideally in the neighborhood, and

25   go through the same process with those sales as we did with

MORGAN FENNELL - Direct

1    the -- as I did with the subject property in terms of

2    verifying them, driving by them, researching them through

3    the -- the Building Department and the assessor's records.

4        Q.   Did you consider whether the properties were the

5    highest and best use for the sites?

6    A.   I did.  Typically, in residential real estate the highest

7    and best use of a site is almost always the current use.

8    There are cases such as the subject where prior to

9    development, the builder and investor must have got together

10   and determined that the highest and best use of -- of what

11   existed there was not indeed the highest and best use.  So

12   they, I believe, subdivided the lot and razed the existing

13   property to build two new homes.

14         And that's what we have to kind of look at through

15   each and every appraisal we do.  There's criteria in the

16   highest and best use:  physically possible, legally

17   permissible, financially feasible, and maximally productive.

18   So those are the steps you have to -- to look at as an

19   appraiser.  And -- and market participants will do that as

20   well.

21       Q.   And I'm sorry.  Did you conclude that the homes were

22   the highest and best use for the sites here?

23   A.   Yes.  I did.

24       Q.   Did you also evaluate the exposure time for the

25   properties?

MORGAN FENNELL - Direct

1   A.   I did.

2        Q.   And could you just explain what that means?  What

3   are you working on there?

4   A.   We typically analyze the market, analyze the property

5   within the market to see how long it would take the market --

6   for a property to sell and meeting the market definition in an

7   open and transparent market.  The approximate amount of time,

8   given all that, of exposure time that it would take to sell a

9   particular property.

10       Q.   And so what work do you do to determine what the

11  expected exposure time would be?

12  A.   You look at properties in the -- in the neighborhood, in

13  the town, in the price range, through multiple listing

14  service, and see -- and each property has a -- has a -- a

15  detailed property history of price changes and -- and days on

16  the market.  And you can analyze on average or on median what

17  the days on market of a property in that community is.  And

18  you can drill down sometimes to price range and style of

19  properties to determine a -- a reasonable exposure time.

20       Q.   And what did you determine in this case was the

21  reasonable exposure time?

22  A.   I believe it was about ninety days.  Three months would

23  be a reasonable exposure time.

24       Q.   And is the evaluating the exposure time just a

25  standard part of a residential appraisal, or was that

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MORGAN FENNELL - Direct

1    something you did particularly for this engagement?

2    A.    It's -- it's standard.  It should be standard for

3    everybody to analyze the -- the -- the exposure or marketing

4    periods.

5         Q.    Did you also look at the neighborhood market

6    conditions?

7    A.    I did, yes.

8         Q.    And what did you do to evaluate the neighborhood

9    market conditions?

10   A.    We typically compare year-over-year analysis of

11   properties, ideally in the subject price range.  And we

12   compare them on a -- both the listings on -- as of the date,

13   effective date of analysis, and compare the list prices, the

14   days on market, and the number of listings on the market at

15   that day.

16        And we also compare sales, closed sales year over year to

17   compare trends, again, average or median sale price, the days

18   on market, and the number of sales that are currently on -- or

19   that are closed from year to year.

20        Q.    And so in this case, how did you define the

21   neighborhood market?  What market were you looking at?

22   A.    In this case, the criteria I believe was properties over

23   $2 million.  And so I have a section under neighborhood market

24   conditions that has as of my effective date, March 16th,

25   compared to March 15th, the year prior.



Page 94

MORGAN FENNELL - Direct

1       The number of listings in this case had gone up

2   significantly, the days on market had come down significantly,

3   and the median asking price had come down significantly.  We

4   have --

5       Q.   What conclusion, if any, did you reach about the

6   neighborhood market conditions based on your analysis?

7   A.   Well, that was the -- that was the listings and the

8   sales.  The number of sales were -- were relatively stable.

9   The average days on market had come down, and the median sale

10  price had remained stable.  So I essentially concluded that

11  the -- the overall market for properties in this price range

12  was relatively stable.

13      Q.   What methodology did you use to actually arrive at a

14  market value opinion about the property?

15  A.   The sales comparison approach.

16      Q.   Did you consider using other methodologies?

17  A.   I did.  We have two others, the cost approach and the

18  income approach.

19      Q.   And why did you select the comparable sales

20  approach?

21  A.   It's the most accepted method in residential real estate

22  appraisal.  The income approach really analyzes a -- a

23  property's income capabilities.  It's more applicable to

24  commercial real estate.  And the cost approach potentially

25  could be developed on the subject property, but it requires a

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MORGAN FENNELL - Direct

1    land analysis and then estimating contributory value of the

2    improvements and factor it in depreciation.  In this case,

3    there was very little depreciation because the property's

4    essentially new.  But the most credible opinion of value that

5    I could arrive at is based on the sales comparison approach.

6        Q.   So once you selected the sales approach, what did

7    you do?

8    A.   I researched the market in -- starting within the subject

9    neighborhood and expanded the search to find the most

10   comparable sales I could, which were location, age of the --

11   of the comparable, quality of the comparable, size of the

12   comparable, and tried to locate comparable sales in that

13   manner and then go about confirming those sales, finding out

14   as much information as I could about them, and applying

15   adjustments to those sales based on differences between them

16   and the -- and the subject.  After that process is done, you

17   come to a reconciled range and you -- and you select a value

18   based on the strengths and weaknesses of the comparable sales.

19       Q.   All right.  Would showing you a chart of the

20   comparable sales you selected help you explain your testimony

21   to the Court?

22   A.   Yes.

23            MR. CARNATHAN:  Mr. Hartzell, could you put up the

24   first page of comps from the 55 Lyman report.  It should be

25   the third page in.



MORGAN FENNELL - Direct

1  BY MR. CARNATHAN:

2      Q.   Okay, Mr. Fennell, the first comparable sale is 50

3  Lyman Road.  Why did you pick that one?

4  A.   Well, because it's directly across the street from the

5  subject property.  In addition, it's similar in age, similar

6  in size, similar in quality, similar in lot size.  It's about

7  as ideal a comparable sale as an appraiser can hope for.

8      Q.   Okay.  And so that one sold for $5,641,047, right?

9  A.   Correct.

10     Q.   And then you made some adjustments to that.  Could

11 you explain the adjustments?

12 A.   In -- in comparable 1, I made adjustments for -- the --

13 the first adjustment down would be the difference in bathroom

14 count.  The subject has -- according to the records, I had

15 six-and-a-half bathrooms.  This property had seven.  So you

16 have to account for that minor difference.

17     The next adjustment would be for the actual gross living

18 area above grade of the subject versus that comparable.

19 That -- that comparable was essentially the same size.  So

20 there's a very minor adjustment there.

21     Again, another minor adjustment for amenities, exterior

22 amenities, and then at the bottom as with all of my

23 comparables I -- I made a --  a minor appeal adjustment.

24     Q.   So the appeal adjustment is the largest, right,

25 $141,026.  Do I have that right?



MORGAN FENNELL - Direct

1   A.   Yes, for comparable 1, correct.

2        Q.   Can you explain what the appeal adjustment

3   represents?

4   A.   Well, after analyzing the subject as well as the -- the

5   second property at 88 Cutler, they're virtually identical

6   homes in terms of size and -- and -- and look from the

7   outside.  And based on discussion with several brokers, as

8   well as appraisers, in discussing this -- this property, it

9   was brought to my attention that many -- not many -- some

10  buyers may find it -- they may not like having a property that

11  looks identical to theirs, especially in this price range.

12  They want something unique, different that -- that really

13  showcases what -- what their house is.  So there may be some

14  minor buyer resistance to having -- to having a -- to having a

15  property that looks identical to yours next door.  This is,

16  again, a minor adjustment because it's really outweighed by

17  the fact that the property is located where it is and is -- is

18  in the quality and condition that it is.

19       Q.   If we look at the second comparable at 10 Lyman

20  Road, how did you select that one?

21  A.   Again, you know, in -- in all reports that I do I try to

22  find properties that are within the subject neighborhood.  And

23  typically, the -- the higher priced homes that you get, the

24  fewer comparable sales you're going to be able to find.

25       In this case, I -- I found two that were on the subject

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MORGAN FENNELL - Direct

1    street that had closed within seven or eight months of my

2    effective date.  So they -- they couldn't not be used.

3        In this case the subject -- comparable 2 is the same age,

4    a slightly smaller home and similar in room count, bedrooms,

5    and overall quality.  It was my understanding that this

6    property was built by the same builder as the subject property

7    at 55 Lyman Road.  So again, I -- I can't ask for really a

8    better comparable sale than to have something that was built

9    by the same builder as something that I'm appraising.  And I

10   made some adjustments to this sale for differences versus the

11   Lyman Road proper -- the -- the subject property.

12       Q.   Okay.  And how about the third comparable sale, for

13   407 Warren Street.  How did you pick that one?

14   A.   Again, that's within half a mile of the subject property,

15   closed within six months of the effective date, and is -- is

16   essentially new construction like the subject, very high-end

17   quality, in -- in this case, slightly larger than the subject

18   but is -- is really another quality comparable sale that I

19   couldn't omit from my report.

20       Q.   All right.  And so just -- I think I missed the

21   point that comparable sale number 2 sold for $5 million; do I

22   have that right?

23   A.   Yes.

24       Q.   And after you applied your various adjustments you

25   came to an adjusted sale price of $5,091,100, right?

MORGAN FENNELL - Direct

1   A.   Correct.

2        Q.   And on the first comparable sale, after you applied

3   your adjustments, you arrived at a comparable sale price of

4   $5,500,321, right?

5   A.   Correct.

6        Q.   So when we look at comparable sale 3, that one sold

7   for $5,686,100, correct?

8   A.   Yes.

9        Q.   And you arrived at a net adjusted comparable sale

10  price after applying your adjustments of $5,305,547, right?

11  A.   Yes.

12       Q.   So that one had the most adjustments.  Can you

13  explain why that is?

14  A.   That one, A, is a larger home, which required a downward

15  adjustment.  In addition, it had a larger lot.  That's --

16  that -- the market's preference is for -- for larger lots with

17  privacy.  So that required a downward adjustment.  It's not

18  significantly larger, but just enough so that a typical buyer

19  in this price range would notice a difference.  And it had a

20  finished basement, and that required some adjustment.  So

21  overall, that gross adjustment was -- well, it was similar to

22  sale 2, but it had -- the number of adjustments was -- was the

23  most.

24       Q.   Okay.  Then you had one more comparable sale on the

25  next page, I think, right?



MORGAN FENNELL - Direct

1  A.    Correct.

2        MR. CARNATHAN:   Can I have that one, Mr. Hartzell?

3  Maybe blow it up so we can see it.

4  BY MR. CARNATHAN:

5        Q.    How did you select the comparable from 48 Laurel

6  Road in Chestnut Hill?

7  A.    It was -- well, again, it was in the subject

8  neighborhood.  It's -- it's just over a mile away, but similar

9  in age, again, similar in size, slightly smaller, overall

10  quality, a large lot size.  So it was -- if I had not had two

11  on the subject street or that comparable 3, this would still

12  be considered a good comparable.  And I used it as -- as my

13  fourth comparable sale.  I made adjustments for -- for

14  differences.

15        Q.    All right.  So this one sold for $5.2 million,

16  right?

17  A.    Yes.

18        Q.    And after your adjustments, you got to an adjusted

19  sale price of comparables of $5,139,500, right?

20  A.    Correct.

21        Q.    What other analysis, if any, did do before you

22  arrived at your opinion about the market value of 55 Lyman

23  Road?

24  A.    I verified these sales as much as -- as possible.  I

25  confirmed data on them as much as possible and drove by each

Page 101

MORGAN FENNELL - Direct

1    one of them.  In the case of comparable 3, I could not get a

2    photograph of that because it's set back significantly from

3    the street on a long, windy road, so I did not want to

4    trespass.  Utilized the multiple listing service photo for

5    that comparable.

6        Q.   So based on all that work, what was your opinion of

7    the market value of 55 Lyman Road as of March 11th, 2016?

8    A.   $5,100,000.

9        Q.   Having arrived at the opinion that it was $5.1

10   million, did you also do a test of reasonableness?

11   A.   I did, yes.

12       MR. CARNATHAN:  Could I have that chart up on screen,

13   Mr. Hartzell?

14   BY MR. CARNATHAN:

15       Q.   Could you explain to the Court what the test of

16   reasonableness is?

17   A.   Well, I just -- given the value -- my value opinion and

18   the delta between that and the sale price, I wanted to provide

19   the reader of this report another analysis, another

20   methodology in which you can look at single family homes in

21   the market.

22       And in this case, I selected nine homes.  My -- my

23   criteria was essentially from selling prices of over four

24   million that have sold from 2012 until the current date of

25   when I was doing this report.  That criteria yielded nine

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MORGAN FENNELL - Direct

1    sales.  And I compared them on -- four of which I used in --

2    in the report itself that we just discussed.  But an

3    additional five were selected.

4        And I compared them on a price per square foot, which is

5    essentially saying how much is the gross living area above

6    grade and dividing the sale price by that to provide you a

7    price per square foot.  And it provides you a -- I provided a

8    high, low, and median range for the -- those findings.

9        Q.   So if I'm reading the chart right, you have nine

10   properties, and you're checking with the -- the price per

11   square foot is based on the size of the home and the selling

12   price; do I have right?

13   A.   Correct.

14       Q.   And having done those nine, you found that the high

15   was $915.75 per square foot; is that right?

16   A.   Yes.

17       Q.   And the median was $837.07, right?

18   A.   Correct.

19       Q.   And the low was $733.94, right?

20   A.   Yes.

21       Q.   And so the line below about 55 Lyman Road, when you

22   look at its selling price, it only sold for $647.92 per square

23   foot, right?

24   A.   Correct.

25       Q.   And so what did this analysis tell you about whether

MORGAN FENNELL - Direct

1   your appraisal of 5.1 million was reasonable or not?

2   A.   Well, it showed me that -- that 55 Lyman Road sold

3   significantly below what -- what I would consider a comparable

4   sales in the market to have sold for; in fact, almost thirty

5   percent below the -- the median sale price.

6       Q.   And so we're obviously aware that the house actually

7   sold for 4.4 million, and your appraisal's 5.1 million.  Why

8   isn't the actual selling price of the home, the 4.4 million,

9   presumptively the market value on the date itself?

10  A.   Well, it has to meet -- again, going back to the

11  definition of market value, it has to meet those criteria.

12  And in my opinion, that $4.4 million sale price did not meet

13  that.

14      In over twenty years of appraising, I've -- I've been off

15  on -- on sale prices, but not this significantly.  So there

16  has to be something else going on here.  And this was a sort

17  of a test to confirm my data of the four sales that I used

18  that I wasn't way off base with my analysis.

19      Q.   So if we think about 88 Cutler, did your process

20  vary in any way with regard to 88 Cutler?

21  A.   It was virtually the same as -- because the house was --

22  as far as the -- the information I had was identical to --

23  virtually identical to the 55 Lyman Road.

24      Q.   The homes were essentially identical, correct?

25  A.   Same size, same finishes, the same room count, based on

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

MORGAN FENNELL - Direct

1    the information that I had available to me.

2        Q.   Right.  And you used the same comps when you looked

3    at Cutler?

4    A.   I did.

5        Q.   And did you arrive at the same opinion of market

6    value, $5.1 million?

7    A.   I did.

8        Q.   And that one was as of --

9    A.   Of January 29th, 2016.

10       Q.   Okay.  And that was -- that's also the date that it

11   actually sold, right?

12   A.   Yes.

13       Q.   And how much did 88 Cutler sell for?

14   A.   I -- I believe it sold for 4.4 million as well.

15       Q.   All right.  So based on your twenty-two years of --

16   is it twenty-two; is that right?

17   A.   Yes.

18       Q.   Your over twenty years of real estate appraising

19   experience, what conclusion do you draw from the fact that

20   the -- your appraisal comes in at 5.1 million and the home

21   sold for 4.4 million?

22   A.   That -- that both of those homes didn't meet the

23   definition of market value, and there has to be something else

24   going on that -- that would affect the -- the selling price

25   that significantly.



(973) 406-2250 | operations@escribers.net | www.escribers.net

MORGAN FENNELL - Cross

1    Q.   So did either of these homes actually sell for their

2  market value on the date they sold?

3  A.   In my opinion, no, they did not.

4         MR. CARNATHAN:   That's all I have for Mr. Fennell.

5                        CROSS-EXAMINATION

6  BY MR. HARRIS:

7    Q.   Hello, sir.

8  A.   Hello.

9    Q.   Hi.  Now, you've testified that you attempted to

10 determine fair market value on the dates that these two

11 properties sold; is that right?

12 A.   Yes.

13   Q.   And the amounts that you've identified, the $5.1

14 million amounts, those are gross amounts, correct, to the

15 seller?

16 A.   Gross -- I'm not -- I'm confused as to your question.

17   Q.   If the properties actually sold at that amount, the

18 seller would also be responsible for closing costs and

19 commissions?

20 A.   Yes.

21   Q.   Okay.  So that's not the net to the seller, correct?

22 A.   Correct.

23   Q.   Now, I want to -- you explained a little bit about

24 the concept of exposure time.  Am I correct that the price

25 that the seller chooses to list a given property can impact

MORGAN FENNELL - Cross

1    the exposure time?

2    A.    It can, yes.

3        Q.    All right.  So if the seller decides to list a

4    property for too high, it will stay on the market for

5    longer --

6    A.    Yes.

7        Q.    -- correct?

8    A.    Correct.

9        Q.    Now, I want to ask you a little bit about the test

10   of reasonableness, the check that you did.  You told us that

11   you used nine properties for that test, correct?

12   A.    Yes.

13       Q.    And four of them were the comps that you used to do

14   the first part of your analysis; is that right?

15   A.    Yes.

16       Q.    All right.  So you were checking your first analysis

17   with this test of reasonableness, right?

18   A.    Correct.

19       Q.    But using four of the nine properties that you used

20   for the test of reasonableness, you used the first time

21   around; is that right?

22   A.    Yes.

23       Q.    And you used those four properties to calculate your

24   high, low, and median points, correct?

25   A.    In addition to the five others, yes.



1    Q.   Yes.  All right.  You testified a few times that you

2    used the multiple listing service to get information for the

3    comps that you use; is that right?

4    A.   Yes.

5    Q.   You studied the information available to you in the

6    multiple listing service as carefully as you could?

7    A.   Yes.

8    Q.   And, in fact, your report is populated with data

9    that you received in part from the multiple listing service;

10   is that right?

11   A.   Yes.

12   Q.   Do you consider the multiple listing source to be an

13   authoritative source for information about real estate?

14   A.   It's one source.  We try to verify that with other

15   sources --

16   Q.   Right.

17   A.   -- to confirm it.

18   Q.   In your efforts to verify information for the work

19   that you did in this case, did you -- from the other, non-MLS

20   sources, did you find any information in the MLS that was

21   inaccurate?

22   A.   I don't believe so, but I'd have to look more thoroughly.

23   Q.   All right.  Now, you testified a little bit about an

24   adjustment you made in the comp process for the fact that they

25   were two homes next to each other that were identical.  Do you

Page 108

MORGAN FENNELL - Cross

1    recall that testimony?

2    A.    Yes.

3         Q.    And I believe your report indicates that you used an

4    adjustment of 2.5 percent?

5    A.    Correct.

6         Q.    Is that right?

7    A.    Yes.

8         Q.    Where does the 2.5 percent come from?

9    A.    It comes from testing adjustments continuously for years

10   over thousands of sales that meet the market -- the definition

11   of market value, using those as a test for our adjustments,

12   for my adjustments to see if they're reasonable or not.

13        So typically, almost all adjustments if they are fairly

14   minimal, are going to fall between zero -- or one percent and

15   five percent.  Sometimes larger adjustments will be ten

16   percent, but anything above that, you really have to question

17   whether or not the comparable sale you're using is really

18   comparable.

19        Q.    But is there a treatise that you look to define 2.5

20   percent for this adjustment?

21   A.    No, there is not.

22        Q.    You testified a little bit about the analysis you

23   did of the neighborhood.  And I want to ask you specifically

24   about -- this appears in your report with respect to 55 Lyman.

25   You reviewed sales in Brookline from -- you compared 2014/2015

MORGAN FENNELL - Cross

1    versus 2015/2016; is that right?

2    A.   Correct.

3         Q.   Okay.  And, in fact, your report indicates that the

4    median sale price decline year over year by .6 percent; is

5    that right?

6    A.   Yes.

7         Q.   Now, if you could please look at page 2 of the

8    addendum to your report for 55 Lyman.  And if I've picked the

9    right page, I want to ask you about the subject market history

10   section.  Do you see that?

11   A.   Yes.

12        Q.   All right.  So we're talking about the subject

13   market history.  This is data you collected with respect to

14   the subject property, 55 Lyman, in this instance, correct?

15   A.   Yes.

16        Q.   And your report indicates that the home was

17   initially listed for sale on April 30th of 2015 for 5.5 -- I'm

18   sorry, $5,499,999, correct?

19   A.   Yes.

20        Q.   Okay.  And then about forty days later, on June

21   11th, 2015, the price dropped to 5.1 million, correct?

22   A.   Yes.

23        Q.   And if I'm interpreting this correctly, the home

24   didn't sell for 5.1, correct?

25   A.   Correct.



MORGAN FENNELL - Cross

1      Q.   But it was exposed to the market at that price?

2   A.   Correct.

3      Q.   And then the property dropped again to 4,699,000 on

4   August 20th, 2015, correct?

5   A.   Yes.

6      Q.   And it was exposed to the market at that price and

7   did not sell, correct?

8   A.   Correct.

9      Q.   Now, let's perform a similar review with respect to

10  88 Cutler.  If you look at page 2 of the addendum for your

11  report on 88 Cutler, this time, you report that the property

12  was initially listed for sale on August 20th, 2014 for

13  $5,499,999, correct?

14  A.   Correct.

15     Q.   And then on May 21st, 2015, it was again listed at

16  the same price, correct?

17  A.   Correct.

18     Q.   Then on June 11th, 2015 the price was reduced to

19  4,999,000, correct?

20  A.   Correct.

21     Q.   And it was exposed at the market for that price?

22  A.   Correct.

23     Q.   And did not sell?

24  A.   Correct.

25     Q.   By the way, your report indicates that 88 Cutler

MORGAN FENNELL - Cross

1  Lane was assessed at $4.8 million in 2016, correct?  It's on

2  page 1 of your report.

3  A.   Correct.

4       Q.   It's $300,000 less than the value you ascribed to

5  it?

6  A.   Yes.

7       Q.   Do you have any information, sir, about any offers

8  that were made to purchase either of these properties?

9  A.   I don't believe so, no.

10      Q.   That's not information that was accessible to you

11 through the multiple listing service, right?

12 A.   Right.

13      Q.   Did you know, sir, that there was an offer made for

14 88 Cutler Lane in July of 2015 for $4.1 million?

15 A.   I did not.

16      Q.   No.  You didn't take that into account with respect

17 to your analysis, did you?

18 A.   No.

19      Q.   I noticed when we were looking at the chart of the

20 comps -- you can take either report.  It doesn't really

21 matter.  Comp number 2, the 10 Lyman Road property, you see

22 the row that says, "Data sources".  Then if you move over to

23 comp number 2, you have "MLS pin".  That's the MLS service,

24 correct?

25 A.   Um-hum.



MORGAN FENNELL - Cross

1      Q.   Yes?

2  A.   Yes.  Correct.

3      Q.   Okay.  And then "DOM 289".  That's days on market,

4  289 days, correct?

5  A.   Yes.

6      Q.   And that depicts for us how long that particular

7  property was on the market before it eventually sold, right?

8  A.   Yes.

9      Q.   And the next one over, 407 Warren Street, that was

10 on the market for 408 days before it sold, correct?

11 A.   Yes.

12     Q.   You were retained by the plaintiffs in the case; is

13 that right?

14 A.   Yes.

15     Q.   Retained through the law firm or Mr. Filippov and

16 Lipetsker individually?

17 A.   For the law firm.

18     Q.   All right.  Did they tell you what Mr. Filippov told

19 all of us at the beginning of this trial, that he decided to

20 list these properties for $4.5 million in an effort to try to

21 sell them in two weeks' time?

22         MR. CARNATHAN:  Objection.  I think what he learns

23 from us is only admissible if it was something he relied on in

24 forming his opinion, which we have not established.

25         THE COURT:  Overruled.



MORGAN FENNELL - Cross

1           Go ahead.

2    BY MR. HARRIS:

3        Q.   Did you know that Mr. Filippov decided to list these

4    properties for $4.5 million in an effort to try to sell them

5    in two weeks' time?

6    A.   I did not.

7        Q.   Did you take that into account as part of your

8    analysis?

9    A.   No, I did not.

10       Q.   You would agree with me that that would impact the

11   fair market value of these homes?

12   A.   No, not necessarily.

13       Q.   Well, I think part of the definition you recited to

14   us with respect to fair market value was that a seller was

15   trying to actually maximize the value.  Is that part of the

16   analysis?

17   A.   And part of it's that it's not affected by undue

18   stimulus.

19       Q.   Okay.  Well, would you -- your opinion is that that

20   home was worth -- the homes were worth $5.1 million on the

21   dates that they sold, correct?

22   A.   Yes.

23       Q.   Okay.  And if the seller decided not to seek the

24   full maximum price, that would impact whether it was, in fact,

25   ever had a chance of achieving that price, correct?

MORGAN FENNELL - Cross

1  A.    If they decided not to list it for the opinion of value

2  that I came in at?

3       Q.    Yes.

4  A.    Sure.

5       Q.    All right.  Do you have any information regarding

6  the fact that Mr. Filippov consulted with real estate brokers

7  in August 2015 about the value of the homes?

8  A.    I assume that any time he would -- or the property was

9  listed for sale regardless, of who it was listed for, there

10  would be some sort of consultation.

11       Q.    Okay.  And following along with that assumption,

12  that led to the homes being listed for sale at $4.5 million,

13  correct?

14  A.    I don't know if they were listed at $4.5 million.

15       Q.    Okay.  Well, let's go back to your report.  Take

16  either one, the 88 Cutler --

17  A.    Okay.

18       Q.    -- the same subject market history paragraph we

19  looked at previously.  Actually, your particular report

20  doesn't indicate that.  So in the course of your analysis, you

21  did not take into account the fact that they were listed for

22  $4.5 million at the time they were sold?

23  A.    I knew that they were eventually listed at that price.

24       Q.    All right.  And based on your earlier testimony,

25  your assumption is that was with the consultation of at least

MORGAN FENNELL - Cross

1    one real estate agent?

2    A.    I would assume so.  I don't know.

3         Q.    Are you aware, sir, that real estate agents

4    frequently perform what are called CMAs?

5    A.    Yes.

6         Q.    What's CMA?  Tell us that.

7    A.    I believe it's a comparative market analysis.  An agent

8    who has an interest in listing that property will provide the

9    homeowner an overview of the property and where it fits into

10   the market.

11        Q.    Okay.  How it compares to other recent sales,

12   correct?

13   A.    Yes.

14        Q.    Okay.  And that's similar to the work you did that

15   generated your reports; is that right?

16   A.    Part of it is, yes.

17        Q.    Okay.  Do you have any knowledge of the

18   representation that Mr. Filippov made when he filed his proof

19   of claim in this case as to the value of these homes?

20   A.    No.

21        Q.    You have been clear, sir, that you identified the

22   fair market value of these homes at very specific points in

23   time.  88 Cutler was January 29th of 2016, and 55 Lyman was

24   March 11th, 2016, correct?

25   A.    Yes.

MORGAN FENNELL - Cross

1      Q.   And those you -- those dates you -- sorry.  Those

2  dates correspond with the dates on which the properties sold,

3  correct?

4  A.   Yes.

5      Q.   And am I correct that your report is good only as to

6  those dates?

7  A.   Yes.

8      Q.   We cannot extrapolate what the value of these homes

9  were at any other time beyond the dates you've identified in

10  your report; is that right?

11  A.   Well, you could extrapolate.  Short of there being a -- a

12  market crash, I could extrapolate that my value would be --

13  two weeks later, a month later, or two months later would be

14  fairly similar to what I provided as of that date.

15      Q.   Okay.  But is that the window of time that your

16  reports --

17  A.   It depends on --

18      Q.   -- are good for?

19  A.   It depends on the market conditions that affect that

20  property.

21      Q.   All right.  But that would require some further

22  analysis on your part to confirm or disconfirm whether these

23  values would change?

24  A.   Correct.

25      Q.   You did not, for example, attempt to determine the

MORGAN FENNELL - Redirect

1    fair market value of the homes as of March 30th, 2014?

2    A.   No.

3        Q.   All right.  And you did not determine the market

4    value as of November of 2014, did you?

5    A.   No, I did not.

6            MR. HARRIS:  If I could have a moment, Your Honor, to

7    confer --

8            THE COURT:  Yes.

9            MR. HARRIS:  -- with Mr. Perten?

10           THE COURT:  Sure.

11           MR. HARRIS:  Thank you.

12                        (Pause)

13           MR. HARRIS:  I have nothing further, Your Honor.

14   Thank you.

15                   REDIRECT EXAMINATION

16   BY MR. CARNATHAN:

17       Q.   Mr. Fennell, during Mr. Harris' cross-examination,

18   he asked you whether you were aware of an offer for $4.1

19   million for one of the houses in July of 2015.  Do you

20   remember that?

21   A.   Yes.

22       Q.   If you would accept that premise as true for the

23   moment and assume that there was an offer for 4.1 million for

24   one of the houses back in July of 2015, does that have any

25   impact on your opinion of the market value?



MORGAN FENNELL - Redirect

1  A.   No.

2       Q.   Why not?

3  A.   Well, people are free to offer whatever they want on a

4  property.  It doesn't make it market value.

5       Q.   Let's then think for a moment about the, the

6  lowering of the prices.  There was some questions about the

7  price being lowered, and we know that that happened.  Does the

8  fact that the price was lowered over time impact your opinion

9  of the market value of either of the houses?

10  A.   In this case, no.

11      Q.   Why not?

12      A.   I believe that -- again, the market -- the

13  definition of market value was not being met on these for

14  whatever reasons, outside reasons, there -- they were not --

15  they were not at market value based on the strength of my

16  comparable sales, two on the subject street, four in the

17  immediate neighborhood, all new construction, all similar in

18  size, all similar in quality, telling me that the market value

19  at a minimum was $5.1 million.  When it sells at $4.4 million,

20  there is something wrong.

21           MR. CARNATHAN:  That's all I have, Your Honor.

22           MR. HARRIS:  Nothing from me, Your Honor.  Thank you.

23           THE COURT:  All right.  Thank you, Mr. Fennell.

24           THE WITNESS:  Sure.

25                        (Pause)



TATIANA KAGAN - Direct

1          MR. CARNATHAN:  Sorry for the delay.  We actually

2     have a day going as planned.  The plaintiffs call Tatiana

3     Kagan.

4          THE COURT:  Okay.

5                    TATIANA KAGAN SWORN

6          THE COURT:  Whenever you're ready.

7                    DIRECT EXAMINATION

8     BY MR. CARNATHAN:

9          Q.   Would you state your name, please?

10    A.   Tatiana Kagan.

11         Q.   What do you do for work?

12    A.   I sell real estate.

13         Q.   For how long have you sold real estate?

14    A.   Since 2003.

15         Q.   Are you married?

16    A.   Yes, I am.

17         Q.   To whom are you married?

18    A.   Vadim Kagan.

19         Q.   And for how long have you been married to Mr. Kagan?

20    A.   Since 2003.

21         Q.   And you are a shareholder in Kagan Development and

22    KDC Corp., right, ma'am?

23    A.   I think so.

24         Q.   And you're also a director of KDC, right?

25    A.   I'm not a hundred percent sure.

TATIANA KAGAN - Direct

1          MR. CARNATHAN:  Can I get the --

2          THE COURT:  Yes, sure.

3          MR. CARNATHAN:  Thank you.

4     BY MR. CARNATHAN:

5       Q.   So, Mrs. Kagan, I'm just showing you briefly Kagan

6     Development, KDC Corp.'s responses to Alex Filippov's first

7     set of interrogatories.  And I'm showing you response number

8     7, in which KDC states that you were a director of KDC during

9     the pertinent time period.  Does that refresh your

10    recollection that you at least were a director of KDC during

11    the time period we care about for this case?

12    A.   I guess I am.

13      Q.   So you don't really know either way.  Would you

14    agree with me that you're an officer of KDC?

15    A.   I don't know.  Maybe.

16          MR. CARNATHAN:  May I approach for a moment, Your

17    Honor?

18          THE COURT:  You may.  Okay, thank you.

19          MR. CARNATHAN:  Can I give her this, Your Honor?

20          THE COURT:  Sorry?

21          MR. CARNATHAN:  Can I approach the witness?

22          THE COURT:  Yes, of course.  Yes.

23    BY MR. CARNATHAN:

24      Q.   So if you look at page 19, Ms. Kagan.  Are you

25    there, ma'am?

TATIANA KAGAN - Direct

1   A.   I am there.

2        Q.   Okay.  Do you remember I took your deposition on May

3   18th, 2018?

4   A.   I do.

5        Q.   And I asked you that day if you were an officer of

6   KDC.  Do you see that?  It's at line 13?

7   A.   I do.

8        Q.   And at least at that time, you seemed to believe you

9   were an officer, fair enough?

10  A.   Fair enough.

11       Q.   Okay.  You're also a shareholder of the company,

12  ProExcavation Corp., ma'am?

13  A.   I think so.

14       Q.   You're not really sure?

15  A.   No.

16       Q.   You're also a director of ProExcavation?

17  A.   I'm not sure.

18       Q.   All right.  I'm just going to briefly show you

19  ProExcavation's responses to Alex Filippov's first set of

20  interrogatories.  And so I'm looking at response number 6, and

21  ProExcavation states that you were and remain a director.  Do

22  you see that?

23  A.   I do see that.

24       Q.   So the company's at least under the impression that

25  you're a director?



TATIANA KAGAN - Direct

 1   A.   Is that a question?

 2        Q.   It is.  Would you agree that's true?

 3   A.   If it says somewhere and my -- has my signature, it must

 4   be true.

 5        Q.   Okay.  But you leave all the financial stuff to your

 6   husband, right, ma'am?

 7   A.   I'm not involved in the financials or any kind of work

 8   with --

 9        Q.   Yeah.

10   A.   -- with those companies.

11        Q.   But you have an understanding with your husband that

12   you're going to be the listing agent for every property he

13   builds, right?

14   A.   That, yes.

15        Q.   Okay.  And that's always been your understanding

16   with him, right?

17   A.   Yes.

18        Q.   And that's, in fact, why you got your real estate

19   license, correct?

20   A.   Correct.

21        Q.   Okay.  But you sometimes waive your commission for

22   your husband, right?

23   A.   Yes.

24        Q.   And you basically just do what he tells you to do.

25   If he asks you to waive the commission, then you waive it,

TATIANA KAGAN - Direct

1    right?

2    A.    If it's our own property, we don't have any investors,

3    what's the reason for commission.  It all goes to the same

4    bank account.  I don't have separate accounts.

5        Q.    Well, you don't actually know what your husband does

6    about commissions if there are investments involved, do you,

7    ma'am?

8    A.    I can guess that he deposits it to our joint account.

9        Q.    Well, I mean about in terms of when he asks you to

10   waive, you don't know whether or not he does that on projects

11   when he has investors, do you?

12   A.    I don't know.

13       Q.    Right.  Because you leave all the financial stuff to

14   him, right?

15   A.    Yes.

16       Q.    And Century 21 never objects when you waive a

17   commission, right?

18   A.    Century 21 has agreement with me that houses that are

19   built by my husband, they do not charge commission.  It means

20   if they don't charge commission, I don't get paid.  All the

21   amount goes to proceeds.

22       Q.    Okay.  And when you do get a commission, you give it

23   to Mr. Gersh, right?

24   A.    That's right.

25       Q.    Right.  And he's the CFO of KDC, right?




TATIANA KAGAN - Direct

1    A.    Right.

2              MR. CARNATHAN:  That's all I have for Mrs. Kagan.

3              MR. HARRIS:  Your Honor, one housekeeping issue just

4    related to the time.  We have sort of two options here.  And

5    I'm a bit betwixt in between.  I can focus my inquiry now just

6    on what Mr. Carnathan asked, and we'd be done with Mrs. Kagan.

7    We would recall her, likely, later.

8              The issue with going through our full testimony with

9    Mrs. Kagan now is I don't believe we'd finish my direct and

10   any further questions from Mr. Carnathan on that topic before

11   1 o'clock.  I'm happy to do whatever the Court would like us

12   to do.

13             I would obviously prefer not to have Mrs. Kagan come

14   back tomorrow.  If we had to come back in June, that's sort of

15   another story logistically from a childcare perspective and

16   all that.  But --

17             THE COURT:  Well, you can certainly recall her in

18   your own case.  And I think as far as time's concerned, I

19   mean, if you examined her with essentially all the questions

20   that you have in the nature of a direct, how long do you

21   suppose that's going to take you?

22             MR. HARRIS:  My portion would be forty minutes, in

23   that range.

24             THE COURT:  All right.  And there'd be some --

25   there'd be some redirect in the nature of --



(973) 406-2250 | operations@escribers.net | www.escribers.net

TATIANA KAGAN - Direct

1          MR. HARRIS:  Yes.

2          THE COURT:  -- recross at that point.  So we wouldn't

3    finish today.  So she'd have to come back tomorrow.

4          MR. HARRIS:  Yeah, but --

5          THE COURT:  It's sort of up to you and her.  I mean,

6    does she want to come back tomorrow, or does she want to come

7    in, get it all done in June in one fell swoop?

8          MR. HARRIS:  May I confer with Mrs. Kagan for just

9    one --

10          THE COURT:  Yes.

11          MR. HARRIS:  -- minute?

12          THE COURT:  You may.

13          MR. HARRIS:  I'm told, Your Honor, that Mrs. Kagan

14    can come back tomorrow, but it might not be right at 9

15    o'clock.  So with that, I think I'll just start -- well, just

16    one moment.  Let me confer with Mr. Perten --

17          THE COURT:  Yeah.  Go right --

18          MR. HARRIS:  -- for one second.

19          THE COURT:  -- ahead.  Yeah.

20                              (Pause)

21          MR. HARRIS:  Your Honor, if we chose just to limit

22    ourselves to the scope, would we be done for today?  We may be

23    ending shortly.  The difficulty then is starting another

24    witness in the time that's remaining.

25          THE COURT:  Yeah.  I'm not going to -- I'm not going

TATIANA KAGAN - Direct

```
 1    to have a lot of heartburn if you end up finishing early

 2    today.

 3            MR. HARRIS:  All right.

 4            THE COURT:  If that's your question --

 5            MR. HARRIS:  Yeah.

 6            THE COURT:  -- and I think it is.

 7            MR. HARRIS:  I think it is.

 8            MR. PERTEN:  Your Honor, if I might, I don't mean to

 9    double team --

10            THE COURT:  No.  It's --

11            MR. PERTEN:  -- on this.

12            THE COURT:  -- not double teaming.

13            MR. PERTEN:  Based on how we've been going when we

14    heard that Mr. Carnathan had five witnesses, we thought the

15    likelihood of starting ours was de minimis.

16            THE COURT:  Don't worry about it.

17            MR. PERTEN:  So --

18            THE COURT:  I --

19            MR. PERTEN:  -- we would essentially be taking her

20    out of order.  And I'd prefer not to, so.

21            THE COURT:  I'm fine with that.  And I really do -- I

22    really do have a 1 o'clock, a hard stop.  We'd probably ought

23    to be ten of 1, really, for me to go down and get on the phone

24    for a meeting that I have.  So I'm more than happy if I'm out

25    of here in time to get on that call without as much concern.
```

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

                        TATIANA KAGAN - Direct

 1    So --

 2              MR. HARRIS:  Thank you, Your Honor.

 3              THE COURT:  It's fine.

 4              MR. HARRIS:  So what I'll do then, Your Honor, is

 5    essentially focus my few questions on the scope that Mr.

 6    Carnathan just asked, and then we will recall Mrs. Kagan --

 7              THE COURT:  That's fine.

 8              MR. HARRIS:  -- later.  Okay.

 9              THE COURT:  That's fine.

10              MR. HARRIS:  All right.  Thank you, Your Honor.

11                         CROSS-EXAMINATION

12    BY MR. HARRIS:

13         Q.   Mrs. Kagan, you were asked several questions about

14    your involvement in and role with KDC and ProExcavation.  Do

15    you recall those questions?

16    A.   Yes.

17         Q.   Okay.  Aside from listing the homes for sale, did

18    you have any involvement in the development or construction of

19    the two Lyman-Cutler homes?

20    A.   The only involvement that I had is I helped my husband

21    choose the colors and finishes for the homes, stage them, and

22    take pictures of them because I do have background.

23         Q.   And that is the entire extent of your involvement in

24    the Lyman-Cutler project?

25    A.   Pretty much, and then selling it.


(973) 406-2250 | operations@escribers.net | www.escribers.net

1          Q.    Right.  Have you ever read the Lyman-Cutler

2     operating agreement?

3     A.    Never.

4          Q.    Have you ever been provided a copy?

5     A.    No.

6          Q.    Were you involved in its negotiation?

7     A.    No.

8          Q.    Did you attend any of the meetings regarding the

9     development of the project?

10    A.    No.

11         Q.    Did you have any involvement regarding the budget to

12    construct those homes?

13    A.    No.

14         Q.    Did you have any knowledge during the project

15    regarding the finances of that --

16    A.    No.

17         Q.    -- construction project?  Have you ever done any

18    work for ProExcavation?

19    A.    No.

20         Q.    Do you have any involvement in its financial

21    affairs?

22    A.    None.

23         Q.    Do you direct any of its work?

24    A.    No.

25         Q.    Do you supervise any of its employees?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

```
 1    A.    No.

 2         Q.    Do you help decide what projects it takes on or

 3    turns down?

 4    A.    No.

 5         Q.    Do you provide any assistance in how it performs its

 6    work?

 7    A.    No.

 8         Q.    Do you help it obtain materials?

 9    A.    No.

10         Q.    Do you help it find subcontractors?

11    A.    No.

12         Q.    Do you help it obtain equipment?

13    A.    No.

14         Q.    All right.  Now I want to ask you similar questions

15    with respect to KDC.  Have you had any involvement in the

16    financial affairs of KDC?

17    A.    No.

18         Q.    Do you direct any of its work?

19    A.    No.

20         Q.    Do you supervise any of its employees?

21    A.    No.

22         Q.    Do you help it decide what projects to take on or

23    turn down?

24    A.    No.

25         Q.    Do you provide any guidance as to how it should
```

Page 130

```
 1    complete its work?

 2    A.    No.

 3         Q.    Did you provide any assistance to KDC in connection

 4    with obtaining loans from a bank?

 5    A.    No.

 6         Q.    Do you help it obtain materials to perform

 7    construction?

 8    A.    No.

 9         Q.    Do you help it obtain and use any equipment?

10    A.    No.

11         Q.    You were asked a question or two about the

12    circumstances under which you waive your real estate

13    commission.  Could you, please, elaborate on when it is you

14    waive commission and when it is you don't?

15    A.    When I work for other developers or just independent

16    buyers or sellers that have nothing to do with my husband's

17    company, I do get paid commission.  And Century 21 gets paid

18    as well.

19         But when I work for selling my husband's properties,

20    there is no need to have commission because all the amount can

21    go to proceeds.  The only commission that's paid is to buyer's

22    agent and agency.

23              MR. HARRIS:  Okay.  That's all I have for Mrs. Kagan

24    at this time, Your Honor, subject to our recalling her later.

25              THE COURT:  Yes.
```

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

```
1              MR. HARRIS:  Thank you.

2              THE COURT:  Anything else?

3              MR. PERTEN:  That's all I have on these topics, Your

4    Honor.  I'd be happy to wait until she's recalled.

5              THE COURT:  That's fine.

6              Okay, thank you.

7              THE WITNESS:  Thank you.

8              MR. CARNATHAN:  So with that, subject to we're going

9    to call Mr. Maiden on June 18th out of order, the plaintiffs

10   would rest their case-in-chief.

11             THE COURT:  Okay, all right.

12             Anything else for today?

13             MR. HARRIS:  We'll start fresh in the morning, Your

14   Honor.

15             THE COURT:  Very well.  Oh, thanks very much.

16             MR. HARRIS:  Thank you, Your Honor.

17             MR. CARNATHAN:  Thank you, Your Honor.

18   (End at 12:14 PM)

19                    * * * * * * * * * *

20

21

22

23

24

25
```

1          I certify that the foregoing is a true and accurate

2    transcript from the digitally sound recorded record of the

3    proceedings.

4

5

6

7

8

9    /s/ Julie Chandler                          May 28, 2019
     _____

10   ESCRIBERS LLC
                              eScribers
11                   7227 N. 16th Street, Suite #207
                           Phoenix, AZ 85020
12                           973-406-2250
                     e-mail operations@escribers.net
13

14

15

16

17

18

19

20

21

22

23

24

25

(973) 406-2250 | operations@escribers.net | www.escribers.net

**$**

**$141,026 (1)**
96:25
**$19,000 (1)**
13:25
**$2 (1)**
93:23
**$200,000 (1)**
43:3
**$3,500 (2)**
27:22,23
**$300,000 (1)**
111:4
**$4.1 (2)**
111:14;117:18
**$4.4 (2)**
103:12;118:19
**$4.5 (5)**
112:20;113:4;
114:12,14,22
**$4.8 (1)**
111:1
**$400 (1)**
71:2
**$400,000 (1)**
43:6
**$5 (1)**
98:21
**$5,091,100 (1)**
98:25
**$5,100,000 (1)**
101:8
**$5,139,500 (1)**
100:19
**$5,305,547 (1)**
99:10
**$5,499,999 (2)**
109:18;110:13
**$5,500,321 (1)**
99:4
**$5,641,047 (1)**
96:8
**$5,686,100 (1)**
99:7
**$5.1 (5)**
101:9;104:6;105:13;
113:20;118:19
**$5.2 (1)**
100:15
**$647.92 (1)**
102:22
**$733.94 (1)**
102:19
**$837.07 (1)**
102:17
**$915.75 (1)**
102:15

**[**

**[Fen-'el] (2)**

85:6,7
**[Fooks] (1)**
43:10
**[Fren-'el] (1)**
85:5

**A**

**abbreviation (1)**
88:13
**ability (8)**
23:24;26:16;28:1;
29:11;30:16;31:14;
35:11;36:25
**able (7)**
15:10;19:23;25:23;
37:14;90:3,16;97:24
**above (5)**
75:16,22;96:18;
102:5;108:16
**absolutely (1)**
82:6
**accept (1)**
117:22
**acceptable (2)**
6:8;7:2
**accepted (1)**
94:21
**access (3)**
19:19;29:6;56:21
**accessible (1)**
111:10
**according (2)**
13:19;96:14
**account (53)**
13:25;17:18;18:5,8;
19:17,19,24;21:2;
23:13,14,21;24:24;
25:10,11,13;26:10;
27:9,14,19,21,24;
28:17,23,24;29:3,6,7;
30:10;31:8;33:20;
35:23;36:5,8,10,12;
54:23;57:18;59:13,16,
17,20,22;60:7;71:10,
16,20;81:15;96:16;
111:16;113:7;114:21;
123:4,8
**accountant (2)**
33:1;39:23
**accounting (9)**
32:9,12;38:18;39:1,
20,21,23;46:20;75:14
**accounts (5)**
13:8;33:25;55:1,5;
123:4
**accurate (1)**
75:24
**accurately (6)**
23:25;26:16;28:2;
29:12;30:17;31:15
**accuse (1)**
49:20

**achieving (1)**
113:25
**acknowledged (1)**
80:18
**across (1)**
96:4
**Act (1)**
74:4
**acting (2)**
88:24;89:6
**action (1)**
62:11
**actions (1)**
61:20
**active (1)**
26:7
**actual (3)**
74:22;96:17;103:8
**actually (20)**
10:17;12:9;14:11;
15:10;16:4;27:18;35:8,
9;53:23;63:23;87:9;
94:13;103:6;104:11;
105:1,17;113:15;
114:19;119:1;123:5
**add (1)**
67:8
**added (2)**
66:22,25
**addendum (2)**
109:8;110:10
**addition (4)**
90:13;96:5;99:15;
106:25
**additional (8)**
15:15;17:22;20:11,
13;59:12;69:18;90:21;
102:3
**additionally (1)**
68:3
**address (8)**
13:14,24;19:17,17;
20:20;25:22,24;76:19
**adjusted (3)**
98:25;99:9;100:18
**adjustment (15)**
96:13,17,20,21,23,
24;97:2,16;99:15,17,
20,21;107:24;108:4,20
**adjustments (17)**
95:15;96:10,11,12;
98:10,24;99:3,10,12,
22;100:13,18;108:9,11,
12,13,15
**admissible (1)**
112:23
**ADMITTED (13)**
7:8;24:7,8;26:23,24;
28:8,9;29:18,19;30:23,
24;31:21,22
**adult (1)**
46:16
**advancing (1)**

44:19
**Adversarial (1)**
5:4
**advised (1)**
89:5
**affairs (2)**
128:21;129:16
**affect (2)**
104:24;116:19
**affected (2)**
88:25;113:17
**affidavit (2)**
69:5;70:7
**affirm (1)**
83:18
**again (31)**
9:5,6,16;11:1;12:18;
14:7;25:18;27:14;
28:21;29:3;30:10,11;
36:20,25;41:2;45:7;
55:24;59:3;81:6;93:17;
96:21;97:16,21;98:7,
14;100:7,9;103:10;
110:3,15;118:12
**against (9)**
43:25;61:17,20;62:1,
4,25;63:2;80:16;81:2
**age (4)**
95:10;96:5;98:3;
100:9
**agency (1)**
130:22
**agent (2)**
115:1,7;122:12;
130:22
**agents (1)**
115:3
**ago (2)**
16:23;17:17
**Agranovich (17)**
39:20,21,23;40:3,6;
44:14;47:7,13,16,19;
48:6,12,17;53:8;55:1;
75:13;78:6
**agree (15)**
15:14;32:21;33:6;
51:1;54:18;55:20;
56:16;57:17;59:6;
61:11;67:4;69:2;
113:10;120:14;122:2
**agreed (2)**
6:25;65:11
**agreement (12)**
6:16;13:19;16:1,3,7,
22;17:9;20:18;27:11;
54:15;123:18;128:2
**agreements (2)**
16:11,15
**ahead (8)**
9:6;51:15;72:25;
76:7;84:15;85:25;
113:1;125:19
**al (1)**

5:5
**Alex (6)**
5:7,10;11:11;14:18;
120:6;121:19
**allegation (1)**
62:23
**alleged (1)**
62:22
**allowed (1)**
89:7
**allows (1)**
86:24
**almost (5)**
16:4;40:22;91:7;
103:4;108:13
**along (1)**
114:11
**although (1)**
74:19
**always (3)**
12:10;91:7;122:15
**amenities (2)**
96:21,22
**American (7)**
25:2,7;26:10;33:19;
65:15,22,24
**Amex (5)**
26:2,3,4,13;66:9
**amicably (1)**
61:8
**amount (13)**
15:14;23:21;30:9,14;
43:5;66:3;67:10;81:21,
22;92:7;105:17;
123:21;130:20
**amounts (3)**
105:13,14,14
**amplified (2)**
10:14,16
**analysis (21)**
34:10;35:10;36:20;
84:11;93:10,13;94:6;
95:1;100:21;101:19;
102:25;103:18;106:14,
16;108:22;111:17;
113:8,16;114:20;
115:7;116:22
**analysist (1)**
39:1
**analyze (4)**
92:4,4,16;93:3
**analyzed (4)**
33:18,19;90:14,23
**analyzes (1)**
94:22
**analyzing (1)**
97:4
**and/or (2)**
76:20,24
**angry (1)**
61:13
**Anna (3)**
75:8,11;78:12

**answered (1)**
69:14
**anticipating (1)**
7:25
**apparent (1)**
73:5
**apparently (1)**
77:23
**appeal (3)**
96:23,24;97:2
**appear (1)**
8:1
**appeared (1)**
16:4
**appears (1)**
108:24
**applicable (1)**
94:23
**Applicant (1)**
75:3
**application (7)**
73:23;74:3,23;75:18,
24;76:2;77:18
**applied (4)**
11:17;89:16;98:24;
99:2
**apply (1)**
71:24
**applying (2)**
95:14;99:10
**appraisal (10)**
88:1,4,7,11,13;
91:15;92:25;94:22;
103:1;104:20
**appraisals (2)**
86:25;87:2
**appraisal's (1)**
103:7
**appraiser (7)**
84:22;86:10,16,17;
89:24;91:19;96:7
**appraisers (1)**
97:8
**Appraiser's (2)**
86:4,7
**appraising (5)**
89:19,25;98:9;
103:14;104:18
**approach (14)**
6:20;50:4;68:22;
76:13;94:15,17,18,20,
22,24;95:5,6;120:16,21
**approximate (1)**
92:7
**Approximately (3)**
14:3;39:12,14
**April (5)**
14:9;15:9;22:6;29:8;
109:17
**area (3)**
76:2;96:18;102:5
**Arina (7)**
8:2;10:6,8;29:10;

56:25;57:4;59:11
**around (2)**
35:19;106:21
**arrangements (1)**
89:9
**arrival (1)**
53:11
**arrive (3)**
94:13;95:5;104:5
**arrived (5)**
54:10;99:3,9;100:22;
101:9
**ascribed (1)**
111:4
**Aside (1)**
127:17
**assembled (1)**
36:21
**assess (1)**
90:9
**assessed (1)**
111:1
**assessor's (3)**
89:22;90:15;91:3
**assignment (1)**
90:22
**assistance (2)**
129:5;130:3
**associated (2)**
34:8;89:12
**assume (5)**
32:7;37:7;114:8;
115:2;117:23
**assumed (1)**
35:14
**assuming (1)**
88:24
**assumption (2)**
114:11,25
**attached (1)**
77:2
**attempt (2)**
22:19;116:25
**attempted (1)**
105:9
**attend (1)**
128:8
**attention (1)**
97:9
**attestation (1)**
77:14
**attesting (1)**
77:23
**attorney-client (1)**
51:18
**attributed (1)**
71:5
**attributing (1)**
29:9
**auditing (1)**
39:1
**August (5)**
59:3,4;110:4,12;

114:7
**authoritative (1)**
107:13
**available (5)**
25:19;36:24;77:13;
104:1;107:5
**Avenue (3)**
49:12,16,17
**average (3)**
92:16;93:17;94:9
**avoid (1)**
7:3
**aware (5)**
52:5;63:23;103:6;
115:3;117:18
**away (3)**
7:17;84:3;100:8

**B**

**back (26)**
12:3;15:17;21:13;
28:22;34:3;35:1;42:25;
44:1,6;45:7,19;67:13;
69:19;71:16;72:2;76:1;
80:2;101:2;103:10;
114:15;117:24;124:14,
14;125:3,6,14
**background (4)**
32:10;50:17;74:25;
127:22
**backup (1)**
20:11
**backwards (1)**
34:7
**BAILIFF (5)**
5:2,4;10:25;82:17,20
**balance (3)**
13:8;18:8;21:3
**balances (1)**
18:5
**bank (30)**
19:13;23:16,18,20;
25:1,6,18;28:21;30:11;
31:11;33:25,25;34:5,9,
10,12,15,19,23,25;
35:1,6,23;36:23;48:7;
54:3;55:6,8;123:4;
130:4
**Bankruptcy (2)**
87:17,21
**bar (1)**
22:22
**Barry (1)**
22:13
**base (1)**
103:18
**based (15)**
54:3;70:16;90:16;
94:6;95:5,15,18;97:7;
101:6;102:11;103:25;
104:15;114:24;118:15;
126:13

**basement (1)**
99:20
**basically (1)**
122:24
**Basis (2)**
42:7;69:22
**Bates (3)**
27:17;34:13,15
**bathroom (1)**
96:13
**bathrooms (1)**
96:15
**BDM (1)**
11:20
**became (1)**
35:4
**become (1)**
73:5
**bedrooms (1)**
98:4
**began (2)**
34:10,12
**beginning (9)**
11:25;12:21;19:15,
21;21:5;22:11;24:15;
66:24;112:19
**below (5)**
76:19;77:11;102:21;
103:3,5
**Berembaum (1)**
79:1
**best (20)**
14:19;23:24;24:25;
26:15;28:1;29:11;
30:16;31:14;35:19;
36:19;45:15;64:6;
75:19;89:6;91:5,7,10,
11,16,22
**bet (1)**
8:25
**better (1)**
98:8
**betwixt (1)**
124:5
**beyond (3)**
25:25;40:16;116:9
**big (1)**
11:19
**bill (7)**
42:20;43:1,2,3,4,5;
60:15
**billed (8)**
37:10,13;66:3,8,11;
70:8,18;81:21
**billing (6)**
42:5,21;43:15;67:10,
18;70:3
**bills (2)**
41:24;54:22
**binder (2)**
35:2,5
**binders (1)**
33:24

**bit (8)**
22:12;49:25;58:25;
105:23;106:9;107:23;
108:22;124:5
**blank (2)**
37:4,7
**blood (2)**
15:4,5
**blow (1)**
100:3
**bookkeeper (5)**
18:13;20:14;32:19;
44:11;45:8
**Bookkeeping (2)**
41:5;54:2
**books (14)**
13:1,3;20:19,24;
41:6,8,13,16;42:3,18;
44:15,18;49:6,12
**both (5)**
63:5;86:25;89:5;
93:12;104:22
**bottom (3)**
26:6;64:6;96:22
**boyfriend (1)**
78:12
**bracket (1)**
35:18
**branch (1)**
76:20
**break (1)**
82:10
**Breaking (1)**
80:22
**briefly (6)**
11:16;22:7;38:19;
86:2;120:5;121:18
**bring (4)**
33:10;36:15;84:1;
88:22
**brokers (2)**
97:7;114:6
**Brookline (7)**
36:11;84:25;87:4,7;
89:22;90:23;108:25
**brought (5)**
62:1;63:2;67:14;
80:16;97:9
**Brusenkova (21)**
7:25;18:14,23;37:24,
25;38:16;42:17;44:6,
25;46:10,13,15;50:8;
51:23;52:11;58:20;
74:2;77:24;79:22;
80:12;82:1
**Brusenkova's (1)**
51:16
**budget (1)**
128:11
**build (1)**
91:13
**builder (4)**
72:12;91:9;98:6,9

Case 16-01120    Doc 346    Filed 06/04/19    Entered 06/04/19 13:08:47    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 135 of 149

May 14, 2019

building (5)
11:25;72:10;89:22;
90:14;91:3
builds (1)
122:13
built (3)
98:6,8;123:19
businesses (1)
11:15
buy (2)
46:3;66:1
buyer (4)
89:4,4;97:14;99:18
buyers (3)
88:23;97:10;130:16
buyer's (1)
130:21

**C**

calculate (1)
106:23
call (20)
7:5,13,24;8:2,16,21;
9:15;10:6;21:16;37:23;
39:9;63:12;64:23;65:5,
6;72:14;83:9;119:2;
126:25;131:9
called (2)
88:12;115:4
calling (1)
7:11
calls (1)
65:2
came (12)
6:2;40:8;42:25;49:9;
50:13,20;58:14,20;
61:5;69:15;98:25;
114:2
can (47)
9:19;13:9;14:19;
21:12;22:23;23:3;25:9,
21;28:25;30:3;34:17;
35:16;43:24;44:3,22;
52:1;57:2,14;64:7;
69:17,18;70:4;72:12;
80:7;81:6;82:6;83:25;
87:1;92:16,18;96:7;
97:2;99:12;100:2,3;
101:20;105:25;106:2;
111:20;120:1,19,21;
123:8;124:5,17;
125:14;130:20
capabilities (1)
94:23
capacity (1)
42:17
card (4)
54:4;65:17;66:1,9
cards (3)
65:15,23,24
care (1)
120:11

carefully (1)
107:6
CARNATHAN (120)
5:9,10,20,22;6:12,15,
20,22;7:9,21,24;8:4,7,
10,12,23;9:10;10:2,6,
21;11:3,5;12:14;13:9,
12;15:18;17:16;21:11,
16,22;22:3,5,14,18,23;
23:2,4,5;24:3,9,11,14,
17;26:19,25;27:2;28:5,
10,12;29:15,20;30:20,
25;31:18,23;37:19,23;
38:12,14;42:11,16;
44:3,5,22,24;45:4,6;
46:9;51:12,16,21;
60:25;72:20;73:10,14,
17;79:24;80:4,6,9,11;
81:8,10;82:1,8;83:3,8;
84:16,18;85:2,8,11,15;
86:1;95:23;96:1;100:2,
4;101:12,14;105:4;
112:22;117:16;118:21;
119:1,8;120:1,3,4,16,
19,21,23;124:2,6,10;
126:14;127:6;131:8,17
Carnathan's (1)
9:19
carrying (6)
17:2,10;36:3,7,11;
44:19
case (26)
5:6;7:15,17,18;
72:23;73:14,21;88:14;
89:16;90:4;92:20;
93:20,22;94:1;95:2;
97:25;98:3,17;101:1,
22;107:19;112:12;
115:19;118:10;120:11;
124:18
case-in-chief (3)
7:11;8:19;131:10
cases (2)
32:15;91:8
cash (3)
6:24;28:25;89:8
causation (1)
84:10
celebrate (1)
12:21
cell (1)
45:23
center (2)
46:16,24
Century (3)
123:16,18;130:17
Certainly (11)
10:21;16:14,24;
19:16;53:22;56:21;
58:6;60:11;62:14;67:8;
124:17
certificate (1)
22:9

certified (4)
6:3;86:16,21,24
CFO (1)
123:25
chair (1)
83:25
chance (2)
82:15;113:25
change (1)
116:23
changed (1)
79:8
changes (1)
92:15
charge (7)
55:17;68:10;69:23;
71:1,2;123:19,20
charged (3)
60:12;71:10;81:14
charges (3)
71:5;80:16;81:2
chart (34)
23:6,11,15,25;24:19,
22;25:5,9;26:11,15;
27:4,7,13,25;28:14,16,
20,23;29:5,22;30:1,8,
17;31:10,13,15;33:19;
34:13;35:25;37:8;
95:19;101:12;102:9;
111:19
check (14)
19:23;23:20,21,22;
27:16,22;28:22;29:1;
30:9;34:17,22;35:24;
54:3;106:10
checking (2)
102:10;106:16
checks (27)
19:10,14;20:12;
23:13,19;25:12,15,17;
26:1;27:20;30:4,12;
31:8,11;33:19,23,23;
34:3;35:7,14;36:19,20;
37:3;57:6,8;59:7,9
Chestnut (1)
100:6
childcare (1)
124:15
choose (2)
52:6;127:21
chooses (1)
105:25
chose (3)
19:24;20:3;125:21
circumstances (1)
130:12
civil (1)
62:15
claim (8)
5:7;25:3,8;34:18,19;
35:5;36:22;115:19
claimant (1)
5:7

claims (1)
63:2
classes (1)
53:19
clean (1)
40:2
clear (1)
115:21
clerical (1)
22:11
clerk (2)
5:25;6:19
client (3)
51:11;53:8,9
clients (2)
32:8;48:7
clients' (1)
48:1
closed (4)
93:16,19;98:1,15
closer (1)
35:7
closing (1)
105:18
CMA (1)
115:6
CMAs (1)
115:4
Cohen (7)
14:8,14,20,25;15:1,
8;81:2
collateral (2)
73:18,19
collected (1)
109:13
colors (1)
127:21
column (2)
34:16,21
comfortable (1)
83:25
coming (1)
27:8
commences (1)
84:11
commercial (2)
86:25;94:24
Commission (13)
62:4;122:21,25;
123:3,17,19,20,22;
130:13,14,17,20,21
commissions (2)
105:19;123:6
Commonwealth (2)
78:19;86:11
communications (6)
51:23,24;52:2,6;
57:3;59:11
community (1)
92:17
comp (3)
107:24;111:21,23
companies (10)

11:20;12:10;33:2;
41:8,10,11,17;53:16;
70:4;122:10
company (18)
40:10;48:3;49:23;
50:14,21,22,23;51:3,8,
9,13;53:3,5;58:10;
79:3;9;121:11;130:17
company's (2)
33:7;121:24
comparable (38)
89:9;90:24;94:19;
95:10,11,11,12,12,18,
20;96:2,7,12,18,19;
97:1,19,24;98:3,8,12,
18,21;99:2,3,6,9,24;
100:5,11,12,13;101:1,
5;103:3;108:17,18;
118:16
comparables (2)
96:23;100:19
comparative (1)
115:7
compare (5)
93:10,12,13,16,17
compared (4)
93:25;102:1,4;
108:25
compares (1)
115:11
comparison (2)
94:15;95:5
competitive (1)
88:22
compilation (3)
33:15;36:3,17
complete (8)
7:10;34:25;36:24;
41:21;75:18;89:1;
90:22;130:1
comps (5)
95:24;104:2;106:13;
107:3;111:20
computer (1)
11:17
concentration (1)
38:24
concept (1)
105:24
concern (1)
126:25
concerned (1)
124:18
concerning (1)
42:20
concessions (1)
89:12
conclude (2)
90:17;91:21
concluded (1)
94:10
conclusion (2)
94:5;104:19

Case 16-01120   Doc 346   Filed 06/04/19   Entered 06/04/19 13:08:47   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 136 of 149

May 14, 2019

**condition (2)**
90:18;97:18
**conditions (7)**
88:23;89:4;93:6,9,
24;94:6;116:19
**conduct (1)**
90:17
**confer (3)**
117:7;125:8,16
**confidential (2)**
51:24;52:2
**confirm (4)**
37:14;103:17;
107:17;116:22
**confirmed (1)**
100:25
**confirming (1)**
95:13
**conflict (4)**
64:2,10,13,15
**confront (1)**
43:14
**confronted (1)**
43:18
**confused (1)**
105:16
**connection (1)**
130:3
**consider (5)**
89:6;91:4;94:16;
103:3;107:12
**consideration (1)**
89:10
**considered (2)**
84:12;100:12
**consistent (1)**
43:5
**construct (1)**
128:12
**construction (41)**
11:25;12:1,13,15;
13:16;41:21;49:23;
50:14,18,22,23;51:2,8,
13;52:25;53:2,5,10,16,
17,19;60:2;66:4;72:7,
14;73:23;74:3;76:21;
77:8;78:20,23;79:2,9,
15,17;90:19;98:16;
118:17;127:18;128:17;
130:7
**consultation (2)**
114:10,25
**consulted (1)**
114:6
**consummation (1)**
89:2
**contact (1)**
18:9
**contained (1)**
88:19
**content (6)**
23:25;26:17;28:2;
29:12;30:17;31:15

**continue (1)**
14:2
**continued (1)**
13:18
**continuing (1)**
52:21
**continuously (1)**
108:9
**contractor (1)**
44:16
**contractors (2)**
68:4,9
**contribution (1)**
44:1
**contributory (1)**
95:1
**conversation (1)**
64:8
**convey (1)**
30:1
**conveyed (1)**
31:5
**convicted (1)**
80:18,21
**conviction (2)**
5:24;61:22
**coordinator (1)**
46:22
**copies (11)**
19:9,13;20:12;55:5;
57:6;59:7;76:23,24;
77:1,4;85:3
**copy (9)**
45:15;57:8;74:8,11,
12;76:22;81:7;85:11;
128:4
**Corp (7)**
5:14,15;20:8;30:2;
39:7;119:22;121:12
**Corp's (1)**
120:6
**correctly (12)**
50:15;53:13;64:17;
69:25;70:24;71:11;
72:4;77:5;78:2;81:24;
89:13;109:23
**correspond (2)**
27:18;116:2
**corresponded (1)**
34:4
**cost (3)**
15:15;94:17,24
**costs (8)**
12:15;17:2,10;36:3,
7,11;44:20;105:18
**count (3)**
96:14;98:4;103:25
**countersued (1)**
62:25
**country (1)**
39:2
**couple (4)**
5:20;25:12;43:4;

79:24
**course (5)**
23:1;25:7;27:18;
114:20;120:22
**courses (1)**
53:17
**COURT (168)**
5:3,18,21;6:2,4,6,8,
10,13,18,21;7:2,6,19,
22;8:3,5,8,11,13,18,20;
9:1,3,5,8,12,13,17,21,
23,25;10:4,9,11,19,22;
11:1;12:5,7;15:19;
21:10,12,15,18,20;
22:25;23:3;24:5,7,13,
16;26:21,23;28:8;
29:18;30:23;31:21,24;
37:18,21;38:1,3,5,7,11;
42:7,14;50:5;51:14,20,
22;62:9,11,15;68:23;
72:19,25;73:2,6,8,13,
16,24;74:8,10,12,14,
16;76:5,7,13;79:21,23;
80:1,5,7;82:3,6,10,13,
15,17,20,21,23;83:1,4,
7,11,13,15,17,20,22,25;
84:3,5,9,12;85:5,7,9,
14,18,22,25;87:13,17,
19,21;95:21;101:15;
112:25;117:8,10;
118:23;119:4,6;120:2,
18,20,22;124:11,17,24;
125:2,5,10,12,17,19,
25;126:4,6,10,12,16,
18,21;127:3,7,9;
130:25;131:2,5,11,15
**courtroom (3)**
10:12,12;38:3
**courts (1)**
87:15
**court's (1)**
5:2
**cover (3)**
6:2;17:18;66:11
**CPA (3)**
47:9,11;48:10
**crash (1)**
116:12
**crawl (1)**
22:23
**create (1)**
33:18;81:22
**creates (1)**
12:10
**creative (1)**
89:11
**credibility (2)**
73:8,10
**credible (1)**
95:4
**credit (8)**
26:12;30:4,8;54:4;
65:17;66:1;71:24;72:2

**credited (2)**
71:16,20
**criminal (3)**
61:19;80:15;81:1
**criteria (5)**
91:15;93:22;101:23,
25;103:11
**cross (1)**
9:19
**CROSS-EXAMINATION (6)**
15:21;31:25;46:11;
105:5;117:17;127:11
**Crowley (3)**
77:23;78:9,12
**CSL (3)**
73:4,11,11
**current (3)**
35:17;91:7;101:24
**currently (1)**
93:18
**cut (1)**
6:1
**Cutler (18)**
5:5;60:7;63:18;
67:21;68:10;81:15;
85:12;97:5;103:19,20;
104:3,13;110:10,11,25;
111:14;114:16;115:23
**cutoff (2)**
27:10;28:19

## D

**damage (2)**
14:12;15:11
**Dan (3)**
18:18,24;32:16
**data (6)**
48:1;100:25;103:17;
107:8;109:13;111:22
**date (19)**
16:16;23:20,20;
27:10;57:25;67:14;
88:7,8;89:3;93:12,13,
24;98:2,15;101:24;
103:9;104:10;105:2;
116:14
**dated (2)**
59:3;77:21
**dates (7)**
105:10;113:21;
116:1,2,2,6,9
**day (11)**
5:5,6;8:25;9:10,19;
32:13,14;42:24;93:15;
119:2;121:5
**daycare (1)**
46:16
**days (11)**
92:15,17,22;93:14,
17;94:2,9;109:20;
112:3,4,10
**de (1)**

126:15
**dealing (1)**
73:2
**Debtor (1)**
5:12
**December (3)**
13:14;17:17;40:24
**decide (2)**
129:2,22
**decided (4)**
112:19;113:3,23;
114:1
**decides (1)**
106:3
**decipher (3)**
35:15,25;37:6
**decline (1)**
109:4
**defendants (1)**
7:2
**define (2)**
93:20;108:19
**definition (10)**
88:17,18;89:2,15;
92:6;103:11;104:23;
108:10;113:13;118:13
**degree (4)**
11:17;38:21,22,25
**delay (1)**
119:1
**delta (1)**
101:18
**demonstrate (1)**
36:2
**denied (1)**
84:14
**dentist (2)**
48:22,24
**Department (3)**
89:22;90:14;91:3
**depending (1)**
19:6
**depends (2)**
116:17,19
**depicts (1)**
112:6
**deposit (5)**
27:23;28:23,24,25;
29:7
**deposited (4)**
13:25;17:18,22;
59:12
**deposition (16)**
50:9,10;51:6;64:5;
65:21;66:20;68:16;
69:2,7;70:5;71:4,8,23;
79:14;81:6;121:2
**deposits (8)**
27:18,21;29:8;36:5,
7,12;54:2;123:8
**depreciation (2)**
95:2,3
**describe (4)**

11:16;22:7;38:19;
89:18
**described (1)**
54:1
**descriptions (1)**
90:13
**desk (1)**
69:15
**detail (1)**
60:6
**detailed (1)**
92:15
**details (2)**
72:1;85:17
**determination (1)**
69:12
**determine (8)**
25:17;60:11;92:10,
19,20;105:10;116:25;
117:3
**determined (1)**
91:10
**determining (1)**
88:16
**developed (1)**
94:25
**developers (1)**
130:15
**Development (27)**
5:15;13:24;18:14;
19:3,9;23:13,23;24:25;
25:6;27:8;28:18;29:3;
36:6;39:7;50:25;51:2;
52:23;53:4;57:18,19;
58:7;62:1;91:9;119:21;
120:6;127:18;128:9
**difference (3)**
96:13,16;99:19
**differences (3)**
95:15;98:10;100:14
**different (6)**
8:16;22:12;36:4;
79:18;86:17;97:12
**difficulty (1)**
125:23
**DIRECT (10)**
11:4;21:21;29:4;
38:13;84:17;119:7;
124:9,20;128:23;
129:18
**directly (6)**
36:7;48:13,19;53:1,
7;96:4
**director (6)**
119:24;120:8,10;
121:16,21,25
**disbursements (1)**
6:24
**discharge (1)**
76:24
**disconfirm (2)**
37:14;116:22
**discovery (10)**

23:17;25:1,7,19;
27:15;28:22;30:11;
34:1,15;36:24
**discrimination (2)**
62:1,4
**discussed (5)**
21:2;29:10;71:4,14;
102:2
**discussing (2)**
12:15;97:8
**discussion (3)**
21:4;71:17;97:7
**dismissed (2)**
62:7;81:4
**dispute (2)**
63:17;64:16
**disputes (1)**
63:21
**dissolved (1)**
16:12
**dissolves (1)**
12:11
**District (1)**
87:23
**dividing (1)**
102:6
**docket (1)**
5:24
**document (8)**
5:6;28:2;29:12;44:7,
10,25;72:17;77:18
**documentation (1)**
66:25
**documents (10)**
24:1;25:14;26:6,17;
28:3;29:13;30:18;
31:16;45:22;76:25
**dollars (1)**
89:8
**DOM (1)**
112:3
**done (10)**
9:20;16:5;69:14;
87:7;95:16;102:14;
124:6;125:7,22;128:17
**door (2)**
15:5;97:15
**double (7)**
42:21;67:18;70:2,8,
18;126:9,12
**double-check (2)**
34:24;35:4
**double-checked (1)**
27:24
**down (18)**
5:23;6:1;13:17;
23:18;30:7;35:17;
57:14;58:25;77:11;
81:18;92:18;94:2,3,9;
96:13;126:23;129:3,23
**downward (2)**
99:14,17
**drag (1)**

7:4
**draw (1)**
104:19
**drawing (1)**
78:1
**drawn (2)**
13:17;19:24
**drill (1)**
92:18
**driving (1)**
91:2
**dropped (2)**
109:21;110:3
**drove (1)**
100:25
**duration (2)**
16:15;25:19
**during (19)**
12:16;14:20,25;15:8;
17:4;18:12,13;34:1;
55:16,21;56:1,17;
80:22;85:3,23;117:17;
120:8,10;128:14
**duties (4)**
41:3;47:25;49:5;
77:25
**Duzenko (4)**
75:8,11;78:13,15

**E**

**earlier (1)**
114:24
**early (3)**
58:4;79:10;126:1
**earn (1)**
38:22
**easier (1)**
35:21
**Economics (1)**
39:1
**edge (1)**
34:13
**education (3)**
11:16;22:7;38:19
**effective (4)**
93:13,24;98:2,15
**effort (3)**
13:1;112:20;113:4
**efforts (1)**
107:18
**eight (4)**
26:8;63:13,14;98:1
**eighty (1)**
79:13
**either (5)**
11:22,25;14:9;44:14;
53:17;76:25;105:1;
111:8,20;114:16;
118:9;120:13
**elaborate (1)**
130:13
**electronic (1)**

29:1
**eliminate (1)**
5:23
**else (12)**
10:1;14:17;37:18;
56:4,13;70:20;79:23;
82:3;103:16;104:23;
131:2,12
**email (14)**
13:13,23;17:16;
18:15,21;19:3,4;20:10;
57:9,21,22;58:13,18;
59:3
**emailed (3)**
57:6,8,10
**emails (4)**
17:21;19:2,5;29:10
**embezzled (1)**
62:23
**employed (5)**
22:10;40:8;48:19;
76:25;86:3
**employees (2)**
128:25;129:20
**employer (3)**
39:17;76:20,24
**employers (1)**
76:22
**employment (3)**
72:7;77:13;80:13
**end (11)**
9:20;26:6;40:25;
42:18;61:7;65:1;66:4;
73:19;80:13;126:1;
131:18
**ended (2)**
16:15;34:10
**ending (2)**
61:10;125:23
**endpoint (1)**
12:1
**engaged (1)**
42:4
**engagement (2)**
87:5;93:1
**enough (3)**
99:18;121:9,10
**enter (6)**
48:1;54:2;56:20;
58:14,20;76:19
**entered (3)**
55:21,22;85:21
**entering (2)**
48:7;80:22
**entire (1)**
127:23
**entitled (2)**
42:12,13
**entries (5)**
29:5;44:15,18;48:18;
55:17
**envisioned (1)**
7:10

**equipment (1)**
129:12;130:9
**errata (1)**
52:12
**especially (1)**
97:11
**essentially (11)**
90:19;94:10;95:4;
96:19;98:16;101:23;
102:5;103:24;124:19;
126:19;127:5
**established (1)**
112:24
**estate (16)**
82:8;84:22;86:10;
89:25;91:6;94:21,24;
104:18;107:13;114:6;
115:1,3;119:12,13;
122:18;130:12
**estimating (1)**
95:1
**et (1)**
5:5
**evaluate (2)**
91:24;93:8
**evaluating (1)**
92:24
**even (5)**
9:12;19:4;26:8;30:6;
73:22;78:9
**eventually (2)**
112:7;114:23
**everybody (1)**
93:3
**everyone (1)**
5:18
**evidence (24)**
5:23;6:12,25;7:8;
13:9;24:4,8;26:20,24;
28:6,9;29:16,19;30:21,
24;31:19,22;44:4,8;
73:19;77:8;80:1;85:14,
21
**exact (2)**
13:21;66:2
**exactly (1)**
14:9;23:4;60:13
**EXAMINATION (8)**
11:4;21:21;38:13;
80:10;84:17;85:23;
117:15;119:7
**examined (1)**
124:19
**examining (1)**
35:23
**example (1)**
116:25
**except (2)**
14:21;90:1
**excess (1)**
69:12
**excuse (4)**
16:25;43:17;57:13;

72:6

**Exhibit (36)**
5:23;6:11,15,22;7:1,
6,8;13:9;22:20;23:1,7,
17;24:3,8,19;25:16;
26:19,24;28:9;29:19,
23;30:1,24;31:3,22;
33:9,14;36:14,15;44:3,
8,22;45:1;57:11;76:5,6

**Exhibits (1)**
36:2

**existed (1)**
91:11

**existing (1)**
91:12

**expanded (1)**
95:9

**expect (1)**
27:23

**expectation (2)**
9:11,16

**expected (1)**
92:11

**expense (1)**
66:14

**expenses (6)**
21:5;34:4;54:22;
66:12;71:9;81:14

**experience (12)**
49:23;50:22;52:25;
53:10;76:3,9,21;77:9,
12,15;79:15;104:19

**expert (5)**
7:23;82:9;84:8;
87:13,16

**experts (1)**
7:22

**explain (3)**
92:2;95:20;96:11;
97:2;99:13;101:15

**explained (3)**
64:1;79:17;105:23

**explore (1)**
58:19

**exposed (3)**
110:1,6,21

**exposure (11)**
89:7;91:24;92:8,11,
19,21,23,24;93:3;
105:24;106:1

**Express (7)**
25:2,7;26:10;33:19;
65:15,22,24

**extent (2)**
55:20;127:23

**exterior (2)**
89:21;96:21

**extrapolate (3)**
116:8,11,12

**extrinsic (2)**
72:22;73:19

---

# F

**fact (34)**
18:4;40:18;48:3,16;
53:15;54:10,21;57:6;
59:9;60:15,19;61:13,
16,19,22;62:22;67:1;
71:23;75:8;77:11,17;
78:4,9;97:17;103:4;
104:19;107:8,24;
109:3;113:24;114:6,
21;118:8;122:18

**factor (1)**
95:2

**fair (8)**
88:23;105:10;
113:11,14;115:22;
117:1;121:9,10

**fairly (8)**
23:25;26:16;28:2;
29:12;30:17;31:15;
108:13;116:14

**fall (1)**
108:14

**familiar (1)**
36:9

**Family (4)**
87:18,18,19;101:20

**far (4)**
32:21;33:6;103:22;
124:18

**fax (1)**
46:4

**feasible (1)**
91:17

**February (4)**
46:1;77:21,25;89:20

**federal (1)**
88:18

**fee (2)**
44:16,19

**feel (1)**
24:15

**fell (1)**
125:7

**felt (1)**
15:12

**Fennell (10)**
82:8;83:9,10;84:20;
85:2;86:2;96:2;105:4;
117:17;118:23

**Fennell's (1)**
84:8

**few (5)**
25:23;29:5;63:11;
107:1;127:5

**fewer (1)**
97:24

**fifteen (1)**
87:9

**figuring (1)**
32:14

**file (1)**
90:14

**filed (2)**
84:7;115:18

**Filippov (19)**
5:7,10;11:11;14:18;
29:8;59:7;63:12;64:8,
20,23;65:2,11,14;
70:17;112:15,18;
113:3;114:6;115:18

**Filippov's (4)**
56:25;57:3;120:6;
121:19

**fill (6)**
8:23,25;9:10,11,16,
18

**filled (1)**
74:23

**final (2)**
41:24;60:15

**finance (2)**
32:9,12

**finances (1)**
32:22;33:7;128:15

**financial (6)**
6:23;89:9;122:5;
123:13;128:20;129:16

**financially (1)**
91:17

**financials (1)**
122:7

**financing (1)**
89:11

**find (10)**
34:3,7;35:5;81:6;
95:9;97:10,22,24;
107:20;129:10

**finding (1)**
95:13

**findings (1)**
102:8

**fine (12)**
6:5;8:18,20;9:25;
12:5,7;83:1;126:21;
127:3,7,9;131:5

**fingertips (1)**
85:16

**finish (3)**
82:16;124:9;125:3

**finished (2)**
16:13;99:20

**finishes (2)**
103:25;127:21

**finishing (1)**
126:1

**fired (6)**
47:1,6;60:16,20;
63:11;64:25

**firm (3)**
22:10,13;32:5,7,13;
75:14;112:15,17

**first (35)**
8:4,16;9:15;11:21,

22;14:8;15:10;17:4,21,
25;18:3;22:24;27:23;
34:25;39:16;40:6,13;
45:3;46:15,18;66:21;
69:20;74:5,18;76:1,5;
95:24;96:2,13;99:2;
106:14,16,20;120:6;
121:19

**fits (1)**
115:9

**five (6)**
6:1;9:11;102:3;
106:25;108:15;126:14

**fixed (2)**
16:16;67:13

**flip (1)**
76:1

**floor (2)**
15:4;90:13

**flooring (1)**
78:2

**Florence (3)**
42:24;43:7,15

**focus (3)**
33:22;87:25;124:5;
127:5

**follow (3)**
8:14;88:12,14

**followed (1)**
64:19

**following (1)**
114:11

**follows (1)**
89:25

**follow-up (1)**
12:13

**foot (5)**
102:4,7,11,15,23

**forgot (1)**
79:10

**form (3)**
6:10;76:23;77:3

**formed (1)**
16:1

**former (1)**
39:17

**forming (1)**
112:24

**forms (1)**
6:23

**forty (3)**
79:11;109:20;124:22

**found (4)**
42:25;76:14;97:25;
102:14

**four (13)**
50:19,22,23;56:11,
11;86:19;101:23;
102:1;103:17;106:13,
19,23;118:16

**four-month (1)**
56:12

**fourth (2)**

77:18;100:13

**frame (2)**
14:8;19:6

**free (1)**
118:3

**Freedom (1)**
74:4

**frequently (1)**
115:4

**fresh (1)**
131:13

**friend (1)**
75:11

**frightened (1)**
15:13

**front (2)**
50:8;74:2

**Fuchs (4)**
43:9,14,18,18

**F-U-C-H-S (1)**
43:12

**full (15)**
33:25;48:13;58:11;
77:24;78:4,6,6,19,23;
79:1,2,9,11;113:24;
124:8

**full-time (1)**
47:13

**fully (1)**
13:17

**fund (3)**
29:2;59:17,20

**funded (1)**
59:22

**funds (3)**
17:18,22;59:12

**further (11)**
21:9,11;37:17,19;
79:19;82:24;83:2;89:1;
116:21;117:13;124:10

---

# G

**gallery (1)**
21:13

**gathered (1)**
12:20

**gave (2)**
26:12;30:8

**general (9)**
44:15;48:6;50:2;
60:8,9;66:6;86:16,21,
24

**generated (1)**
115:15

**Gersh (4)**
18:24;32:16,21;
123:23

**gets (1)**
130:17

**given (3)**
92:8;101:17;105:25

**Glen's (1)**

Case 16-01120    Doc 346    Filed 06/04/19    Entered 06/04/19 13:08:47    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 139 of 149
May 14, 2019

39:5
**gmailcom (3)**
13:24;57:18;58:7
**goal (1)**
9:24
**goes (4)**
7:10;22:24;123:3,21
**Good (28)**
5:3,9,11,13,16,18;
10:9,10;15:23,24;
22:21,25;32:2,4;38:1,
2;46:13,14;65:15;
82:12;83:11,12,16;
90:20,20;100:12;
116:5,18
**Gordon (1)**
32:24
**grade (2)**
96:18;102:6
**granted (1)**
89:12
**great (2)**
37:21;84:4
**greeting (1)**
48:7
**gross (5)**
96:17;99:21;102:5;
105:14,16
**Group (3)**
53:6;86:4,8
**GTE (1)**
11:20
**guess (6)**
7:9;25:11;43:17;
80:22;120:12;123:8
**guessing (1)**
9:10
**guidance (1)**
129:25
**guide (1)**
88:10

**H**

**habit (4)**
42:4,8,12,19
**half (2)**
11:15;98:14
**hand (2)**
74:23;80:2
**handed (2)**
85:9,11
**handful (2)**
7:14;28:23
**handling (1)**
53:23
**handwriting (1)**
35:11
**handwritten (4)**
26:1;30:12;35:7;
36:19
**happen (2)**
59:24;69:20

**happened (8)**
64:9;65:18;67:20,25;
81:3,19,20;118:7
**happy (4)**
61:10;124:11;
126:24;131:4
**hard (3)**
9:12;35:7;126:22
**harder (1)**
10:16
**hardwood (1)**
78:2
**Harris (51)**
5:16,16;26:21,22;
28:7;29:17;30:22;
31:20;32:1;33:10,13;
36:14,16;37:16;57:11,
13;59:1;84:5,6,10;
85:19,20,24;105:6;
113:2;117:6,9,11,13;
118:22;124:3,22;
125:1,4,8,11,13,18,21;
126:3,5,7;127:2,4,8,10,
12;130:23;131:1,13,16
**Harris' (1)**
117:17
**Hartzell (17)**
21:16,19,24;23:6;
24:18;27:3;28:13;
29:22;31:2,23;37:20,
22;44:3;45:4;95:23;
100:2;101:13
**hear (4)**
10:14,15;83:15,17
**heard (5)**
15:6;32:17,25;64:9;
126:14
**heartburn (1)**
126:1
**Hello (3)**
32:3;105:7,8
**help (9)**
78:1;95:20;129:2,8,
10,12,22;130:6,9
**helped (1)**
127:20
**helper (1)**
77:25
**Here's (2)**
24:14;59:3
**Hi (1)**
105:9
**hierarchy (2)**
86:22,23
**high (4)**
102:8,14;106:4,24
**high-end (1)**
98:16
**higher (1)**
97:23
**highest (7)**
86:24;91:5,6,10,11,
16,22

**Hill (1)**
100:6
**history (4)**
92:15;109:9,13;
114:18
**hit (1)**
35:9
**hold (5)**
10:20;51:14,14;82:7;
86:15
**home (11)**
19:17;20:19;79:17;
98:4;99:14;102:11;
103:8;104:20;109:16,
23;113:20
**home-improvement (1)**
51:8
**homeowner (1)**
115:9
**homes (23)**
84:25;91:13,21;97:6,
23;101:20,22;103:24;
104:22;105:1;107:25;
113:11,20;114:7,12;
115:19,22;116:8;
117:1;127:17,19,21;
128:12
**Honor (71)**
5:9,11,13,16,20;6:7,
9,12;7:3,21;8:12,14;
9:9;10:3;11:3;21:9,11,
17;22:21;23:2;24:4,6;
26:20,22;28:6,7;29:16,
17;30:21,22;31:20;
37:16,17;38:12;42:6;
46:10;50:4;52:9;68:22;
72:18,20;73:25;74:15;
76:11;79:19,25;80:6;
82:2,5,24;83:8,16;
84:6;117:6,13;118:21,
22;120:17,19;124:3;
125:13,21;126:8;
127:2,4,10;130:24;
131:4,14,16,17
**hope (2)**
9:19;96:7
**hopefully (1)**
7:5
**hoping (1)**
22:23
**hours (3)**
79:11,11,13
**house (6)**
15:16;66:3,4;97:13;
103:6,21
**housekeeping (1)**
124:3
**houses (12)**
11:24;12:3;13:20;
14:10,13,15,22;15:9;
117:19,24;118:9;
123:18
**HUD (1)**

54:4
**hundred (4)**
26:12;30:4,8;119:25
**husband (16)**
11:15,23;14:18,19,
24;15:6;16:7;17:11;
20:15;21:4;122:6,11,
22;123:5,19;127:20
**husband's (3)**
20:23;130:16,19
**Hyde (3)**
49:12,16,17

**I**

**idea (1)**
18:20
**ideal (1)**
96:7
**ideally (2)**
90:24;93:11
**ideas (1)**
60:8
**identical (7)**
97:5,11,15;103:22,
23,24;107:25
**identification (14)**
22:20;23:8;24:12,20,
23;25:16;29:23;30:1;
31:1,3,6;44:23;45:2,25
**identified (5)**
26:4;34:23;105:13;
115:21;116:9
**identify (6)**
25:24;36:19;66:13;
68:3;69:3;71:19
**identifying (2)**
23:19;25:20
**illegible (1)**
35:18
**Ilya (1)**
43:10
**images (1)**
27:16
**imagine (5)**
9:2;18:10:16;32:23;
33:8
**immediate (1)**
118:17
**impact (5)**
105:25;113:10,24;
117:25;118:8
**impeach (5)**
72:23;73:5,6,10,18
**Implicit (1)**
89:2
**important (1)**
10:13
**impression (1)**
121:24
**improperly (3)**
71:5,10;81:14
**improvement (1)**

79:18
**improvements (1)**
95:2
**inaccurate (1)**
107:21
**inadmissible (1)**
42:10
**inadvertently (2)**
66:22;67:4
**incident (1)**
43:22
**Incidentally (1)**
57:21
**include (3)**
25:17;35:25;41:19
**included (3)**
67:4;77:25;90:12
**includes (2)**
25:2;51:25
**inclusive (2)**
26:14;30:3
**income (3)**
94:18,22,23
**incorrect (2)**
55:22;58:1
**incorrectly (1)**
55:22
**incurred (1)**
54:22
**indeed (1)**
91:11
**independent (1)**
130:15
**indicate (1)**
114:20
**indicated (1)**
30:13
**indicates (4)**
108:3;109:3,16;
110:25
**indicating (1)**
30:5
**indictment (1)**
5:23
**individually (1)**
112:16
**industry (2)**
78:20,24
**information (31)**
10:4;20:13;23:10;
24:22;27:6;29:25,25;
31:5;33:24;34:3;36:21;
48:7;51:25;52:3;55:21;
56:20;70:2,16;74:4;
75:18;95:14;103:22;
104:1;107:2,5,13,18,
20;111:7,10;114:5
**informed (1)**
89:5
**initially (2)**
109:17;110:12
**initiated (1)**
61:20

inquire (1)
80:3
inquiry (1)
124:5
inspect (1)
90:3
inspected (1)
90:21
inspection (1)
90:16
installation (1)
55:4
installed (1)
55:1
installing (1)
78:1
instance (3)
30:7;35:17;109:14
instances (1)
37:6
instead (1)
90:9
interact (1)
56:25
interactions (1)
64:22
interest (1)
115:8
interested (2)
13:10,16
interests (1)
89:6
interior (4)
90:1,3,10,12
Internal (1)
77:4
interpret (2)
35:11;37:1
interpreting (1)
109:23
interrogatories (2)
120:7;121:20
intimate (2)
32:22;33:6
into (38)
6:25;7:8,17;8:15;
10:13;17:18;24:4,8;
26:20,24;27:8;28:5,9,
17,23;29:2,15,19;30:2,
20,24;31:19,22;36:5,7,
12;38:8;48:1;49:6;
54:2;56:20;59:12;
83:22;85:21;111:16;
113:7;114:21;115:9
introduced (2)
39:16,18
invention (1)
70:16
invest (1)
11:24
invested (1)
13:5
investments (1)

123:6
investor (2)
43:7;91:9
investors (8)
43:1,5;49:6;59:17,
20,21;123:2,11
invoice (3)
67:8;81:22,23
invoices (9)
55:5,9,10,14;57:9,
10;59:10;66:22;67:3
involved (7)
54:7;60:1;65:1;
72:10;122:7;123:6;
128:6
involvement (7)
127:14,18,20,23;
128:11,20;129:15
Irina (1)
11:7
irrelevant (1)
72:21
IRS (1)
76:25
issue (6)
42:9;60:15;73:14;
90:4;124:3,8
issued (1)
41:24
item (1)
75:17
items (1)
75:22

J

jail (1)
78:15
James (1)
5:16
January (3)
85:12;104:9;115:23
Jason (1)
32:24
job (8)
46:15;47:13;48:6;
54:1;58:20;68:17;69:8,
13
jobs (3)
46:18;54:8;79:12
John (1)
5:13
joined (1)
50:21
joint (1)
123:8
Joseph (1)
14:8
judgment (1)
5:24
July (7)
40:7,14;58:5,6;
111:14;117:19,24
kept (3)

June (12)
7:12;40:7,14;57:21,
22;58:5,6;109:20;
110:18;124:14;125:7;
131:9

K

Kagan (101)
5:5,14,14,14;7:13,18,
19;8:8,15,24;9:15,15;
11:21;12:2,10,16,18,
23;13:21,23;16:7,10;
17:1,10;18:9,14;19:3,
9;20:11;23:13,23;
24:24;25:6;27:8;28:18;
29:3;34:14;36:6;39:6;
40:11,13,15,18,21;
41:24;42:3,20;43:15,
18,21;44:13;45:21,24;
48:13;49:5,20;50:25;
51:2;52:22;53:3;56:21;
57:17,18;58:2,7;61:1,7,
16,25;62:2,19,22,25;
63:2,24;64:10;65:2,14;
68:17;69:8;78:6;81:2;
82:9;119:3,5,10,18,19,
21;120:5,5,24;124:2,6,
9,13;125:8,13;127:6,
13;130:23

kagandevelopment@gmailcom (2)
13:14;59:4
Kagan's (6)
33:2;41:11;42:18;
45:12,23;48:3
KDC (83)
5:15;20:5;23:19,23;
24:25;25:3,6,10,11;
26:12;27:8,14,20;29:6,
9;32:19;33:15;34:7;
35:1;36:3,5,13;39:7,9,
10,12,14,16,19,24;
44:7,14,16;45:8;48:18,
19;49:22;50:13;53:1,
11,20;54:1,8,11,19,21;
55:1,5,16;56:5,17;
60:16,22;61:5;62:2;
63:11;64:25;65:25,25;
66:21;77:22;80:13;
119:22,24;120:6,8,8,
10,14;121:6;123:25;
127:14;129:15,16;
130:3
KDC's (2)
32:22;72:6
keep (9)
13:1,4;20:23;21:2,5;
55:8,9;56:4;57:14
keeping (8)
6:17;41:6,8,13,16;
42:2,17;56:17
kept (3)

20:19;55:5;56:1
keys (1)
14:22
kind (6)
52:12;59:19;63:17;
72:22;91:14;122:7
knew (6)
63:16;64:2,12;75:13;
78:20;114:23
knowing (1)
69:22
knowledgably (1)
88:24
knowledge (6)
32:22;33:7;45:18;
75:19;115:17;128:14
Kristina (6)
18:16,23;37:23,25;
38:16;77:23

L

ladge (1)
43:1
land (1)
95:1
landscaping (3)
70:17,18;71:1
Lane (2)
111:1,14
Lang (1)
22:13
large (1)
100:10
larger (6)
98:17;99:14,15,16,
18;108:15
largest (1)
96:24
last (7)
7:9,14,19;8:9;16:11;
29:5;56:8
later (9)
25:13;80:7;109:20;
116:13,13,13;124:7;
127:8;130:24
laughing (1)
43:20
Laurel (1)
100:5
law (1)
22:10,12;112:15,17
lawsuit (5)
42:9;62:1,7,15;63:5
lawyer (7)
16:21;51:7,17,17,24;
52:2,4
learned (1)
47:17
learns (1)
112:22
least (7)
7:23;13:7;87:9;

114:25;120:10;121:8,
24
leave (1)
5:24;39:14;60:19;
81:7;122:5;123:13
leaving (1)
9:6
led (1)
114:12
left (8)
18:23;41:22,25;
45:14;48:12;60:16;
72:6;77:22
legally (1)
91:16
Leningrad (1)
11:18
less (1)
111:4
letter (4)
77:14,17,21;78:10
level (1)
86:15
levels (2)
86:17,19
license (10)
72:15;73:4,11,11,23;
74:3;86:15,20,23;
122:19
licensed (3)
72:7;86:10,13
lien (2)
15:15;44:1
life (2)
18:5,13
likelihood (1)
126:15
likely (1)
124:7
likes (1)
7:16
limine (1)
84:7
limit (1)
125:21
line (2)
25:25;27:23;30:6,13;
35:12,15,25;37:1,7,7;
50:13;52:22;64:6;
65:22;70:6;71:9,24;
72:20;81:18;102:21;
121:6
lines (3)
25:20;37:4;81:12
lineup (1)
8:22
Lipetsker (5)
5:10;16:7;48:21;
112:16
list (6)
93:13;105:25;106:3;
112:20;113:3;114:1
listed (10)

77:11;109:17;
110:12,15;114:9,9,12,
14,21,23
**listing (11)**
31:7;92:13;101:4;
107:2,6,9,12;111:11;
115:8;122:12;127:17
**listings (4)**
93:12,14;94:1,7
**listing-service (1)**
90:11
**litigation (2)**
65:1,10
**little (13)**
22:12;34:16;35:18,
21;49:25;58:25;60:12;
69:17;95:3;105:23;
106:9;107:23;108:22
**living (2)**
96:17;102:5
**Liz (1)**
57:13
**LLC (27)**
5:5,6;12:10,20;
13:19;16:1,3,6,11,15;
17:6;20:14;21:3;23:12;
27:9,11,17,19,20,24;
28:17,23,24;29:2;31:7,
11;36:12
**LLC's (1)**
20:23
**loan (1)**
60:2
**loans (4)**
13:5,17,18;130:4
**locate (1)**
95:12
**located (1)**
97:17
**location (1)**
95:10
**logical (1)**
9:23
**logistically (1)**
124:15
**long (13)**
11:12;14:2;22:4,15;
56:10;86:7,13;92:5;
101:3;112:6;119:13,
19;124:20
**longer (2)**
26:8;106:5
**look (23)**
34:12;35:7;45:14,16;
65:21;68:15;70:5;71:8;
81:5;91:14,18;92:12;
93:5;97:6,19;99:6;
101:20;102:22;107:22;
108:19;109:7;110:10;
120:24
**looked (5)**
29:10;34:24;35:1;
104:2;114:19

**looking (12)**
23:22;25:20;27:15;
31:11;33:24;34:23;
36:11;70:6;75:16;
93:21;111:19;121:20
**Looks (4)**
24:16;72:22;97:11,
15
**lot (6)**
32:14;91:12;96:6;
99:15;100:10;126:1
**lots (1)**
99:16
**low (6)**
18:8;22:22;69:17;
102:8,19;106:24
**lower (1)**
25:9
**lowered (2)**
118:7,8
**lowering (1)**
118:6
**lump (1)**
37:13
**Lyman (26)**
25:22;35:19;45:3,7;
72:6;85:13;87:10,11;
88:1,4;89:19;95:24;
96:3;97:19;98:7,11;
100:22;101:7;102:21;
103:2,23;108:24;
109:8,14;111:21;
115:23
**Lyman- (6)**
5:4;60:6;63:17;
67:20;68:9;81:14
**Lyman-Cutler (42)**
5:6;13:1;17:5;23:12;
25:21;26:5,9;27:9,16;
29:7;30:14;31:8;41:19,
21,25;54:11,23;56:24;
59:12,16,24;60:2;
63:21;64:3;65:19;66:5,
9,11,16;68:4;69:4,20;
70:3,12;71:6,10,16,20;
72:2;127:19,24;128:1

## M

**ma'am (8)**
21:12;51:1,14;
119:22;120:25;121:12;
122:6;123:7
**Mack (3)**
22:3,5,14
**Madoff (1)**
7:4
**Maiden (2)**
7:11;131:9
**major (1)**
38:24
**making (2)**
14:24;36:7

**malfeasance (1)**
49:20
**man (1)**
43:24
**management (1)**
51:11
**manager (3)**
20:16,22;46:24
**managing (2)**
20:16,22
**manner (1)**
95:13
**Many (7)**
16:23;30:12;37:3;
87:1,7;97:9,9
**map (1)**
28:22
**mapped (1)**
27:20
**March (12)**
48:13,19;50:9;75:6;
85:13;88:5,7;93:24,25;
101:7;115:24;117:1
**marked (5)**
24:19,23;29:22;44:7;
45:1
**market (66)**
88:16,17,22;89:7,15;
90:24;91:19;92:4,5,5,6,
7,16,17;93:5,9,14,14,
18,21,21,23;94:2,6,9,
11,14;95:8;100:22;
101:7,21;103:4,9,11;
104:5,23;105:2,10;
106:4;108:10,11;
109:9,13;110:1,6,21;
112:3,7,10;113:11,14;
114:18;115:7,10,22;
118:4,9,12,13,15,18
**marketing (2)**
90:12;93:3
**markets (1)**
90:23
**market's (1)**
99:16
**marking (2)**
6:22;31:12
**married (7)**
11:8,10,12;60:23;
119:15,17,19
**Marsha (1)**
56:8
**Mary (2)**
6:18;9:6
**Mass (1)**
62:4
**Massachusetts (5)**
78:19;85:1;86:11,18;
87:23
**master (2)**
11:17;38:21
**master's (2)**

38:22,24
**match (1)**
35:3
**materials (2)**
129:8;130:6
**mathematics (1)**
11:18
**matter (5)**
32:5;72:23;73:18,19;
111:21
**maximally (1)**
91:17
**maximize (1)**
113:15
**maximum (1)**
113:24
**May (39)**
6:20,21,25;8:16;
14:3,4,7,10;15:9;
24:11;26:25;28:10;
39:9;50:4,5;51:12;
68:22,23;72:18,19;
74:10,12,15,16;76:11,
13;77:4,13;84:6;97:10,
10,13;110:15;120:16,
18;121:2;125:8,12,22
**Maybe (6)**
16:17;54:17;58:17;
72:25;100:3;120:15
**MCAD (2)**
62:5,7
**mean (8)**
40:11;42:11;64:15;
73:11;123:9;124:19;
125:5;126:8
**means (2)**
92:2;123:19
**median (9)**
92:16;93:17;94:3,9;
102:8,17;103:5;
106:24;109:4
**meet (11)**
11:21;12:18;40:13;
65:2,5,11;103:10,11,
12;104:22;108:10
**meeting (6)**
14:20,25;15:9;64:19;
92:6;126:24
**meetings (1)**
128:8
**members (1)**
12:20
**memo (15)**
23:21;25:20,25;
27:17;29:1;30:6,12;
35:11,15,16,25;37:1,4,
7,7
**memos (2)**
30:5,13
**mentioned (5)**
12:10;14:11;16:3;
35:10;60:25
**Mere (1)**

53:6
**merely (1)**
34:22
**met (4)**
11:22;12:19;14:8;
118:13
**method (1)**
94:21
**methodologies (1)**
94:16
**methodology (2)**
94:13;101:20
**microphone (4)**
10:13;38:8;83:23;
84:1
**middle (5)**
42:21,22;70:6;76:2,9
**Middlesex (2)**
62:15;87:17
**might (2)**
125:14;126:8
**mile (2)**
98:14;100:8
**military (2)**
76:20,24
**million (25)**
93:23;98:21;100:15;
101:10,24;103:1,7,7,8,
12;104:6,14,20,21;
105:14;109:21;111:1,
14;112:20;113:4,20;
114:12,14,22;117:19,
23;118:19,19
**mini (1)**
73:20
**minimal (1)**
108:14
**minimis (1)**
126:15
**minimum (1)**
118:19
**minor (6)**
96:16,20,21,23;
97:14,16
**minute (1)**
125:11
**minutes (1)**
124:22
**missed (1)**
98:20
**missing (1)**
67:14
**mistakes (3)**
55:25;56:1,2
**MLS (3)**
107:20;111:23,23
**moment (11)**
8:1;17:17;33:23;
37:16;58:19;67:5;
117:6,23;118:5;
120:16;125:16
**monetary (1)**
13:22

**money (9)**
11:24;13:4,25;15:16;
18:9;32:15;43:25;
59:16;62:23
**monitoring (1)**
18:4
**month (4)**
19:14;23:19,19;
116:13
**months (18)**
13:20;17:1,5,11;
48:17;50:19,22,24;
53:3;56:11;63:11,13,
14;77:22;92:22;98:1,
15;116:13
**more (16)**
9:12;17:18;18:9;
22:11;32:21;33:6;43:2,
2;59:15;68:10,17;69:8;
94:23;99:24;107:22;
126:24
**Morgan (3)**
83:9,10;84:20
**morning (24)**
5:3,9,11,13,16,18,25;
9:14;10:9,10;15:23,24;
32:2,4;38:1,2;46:13,
14;78:5;79:5;83:11,12,
16;131:13
**mortgage (1)**
17:19
**most (8)**
26:7;36:24;88:21;
94:21;95:4,9;99:12,23
**mostly (1)**
23:22
**motion (3)**
84:7,13,13
**motivated (1)**
89:5
**move (3)**
58:25;84:3;111:22
**moved (3)**
22:11,12,13
**Mrs (14)**
7:19;8:8,15;82:9;
120:5;124:2,6,9,13;
125:8,13;127:6,13;
130:23
**much (11)**
43:2;60:12;83:5;
95:14;100:24,25;
102:5;104:13;126:25;
127:25;131:15
**multiple (9)**
76:22;90:11;92:13;
101:4;107:2,6,9,12;
111:11
**must (3)**
77:1;91:9;122:3
**myself (1)**
13:6

## N

**name (15)**
11:6,7;13:5;21:3,23;
32:17,25;35:16;56:8,9;
69:5;74:25;76:19;
84:19;119:9
**names (3)**
5:8;68:18;69:9
**nature (1)**
124:20,25
**neatly (1)**
77:1
**necessarily (2)**
8:15;113:12
**need (5)**
14:22;17:22;52:7;
84:1;130:20
**needed (4)**
13:24;21:5;76:22;
85:3
**negotiating (3)**
53:23;54:7;60:2
**negotiation (1)**
128:6
**neighborhood (12)**
90:24;92:12;93:5,8,
21,23;94:6;95:9;97:22;
100:8;108:23;118:17
**net (2)**
99:9;105:21
**new (5)**
90:19;91:13;95:4;
98:16;118:17
**news (1)**
22:21
**next (9)**
8:9;34:16;57:14;
82:7;96:17;97:15;
99:25;107:25;112:9
**Nickolay (1)**
5:10
**nighttime (1)**
80:22
**nine (6)**
101:22,25;102:9,14;
106:11,19
**Nineteen (1)**
86:9,14
**ninety (1)**
92:22
**Nolan (1)**
69:6
**None (1)**
128:22
**non-MLS (1)**
107:19
**normal (1)**
89:10
**Northeastern (1)**
22:9
**Northfolk (1)**

87:18
**notarized (2)**
75:8;77:14
**notated (1)**
35:19
**notation (1)**
35:16
**notes (1)**
89:21
**notice (1)**
99:19
**noticed (1)**
111:19
**noting (3)**
23:20;27:17,17
**November (10)**
16:8;27:9;28:18;
39:13;54:15,18;58:4,
10;77:24;117:4
**number (33)**
6:11;13:21;23:7,21;
24:4;25:16;27:17;
34:14,15;45:1,14,19,
22,23,25;46:4,4,4,6;
69:17;70:8;75:17,23;
93:14,18;94:1,8;98:21;
99:22;111:21,23;
120:7;121:20
**numbers (9)**
35:21;63:17,21;64:3,
11,13,15,16;69:16
**numerous (1)**
36:10

## O

**oath (1)**
83:20
**object (2)**
72:20;85:20
**objection (12)**
5:7;24:5;26:22;28:7;
29:17;30:22;31:20;
42:6;52:5;84:11;85:22;
112:22
**objects (1)**
123:16
**obligation (3)**
17:5,11;20:23
**obscured (2)**
34:16;74:19
**observe (2)**
42:4,19
**observed (2)**
42:12;66:21
**obtain (1)**
129:8,12;130:6,9
**obtained (4)**
45:25;61:16;72:14;
74:3
**obtaining (1)**
130:4
**obviously (2)**

103:6;124:13
**occasion (1)**
59:11
**occasions (1)**
12:22
**o'clock (5)**
8:24;82:10;124:11;
125:15;126:22
**O'Connor (3)**
22:3,4,13
**October (5)**
11:22;39:15;41:1;
80:14,23
**of-claim (1)**
25:14
**off (8)**
9:20;10:23;14:12;
22:25;31:12;82:18;
103:14,18
**offer (11)**
24:3;26:19;28:5;
29:15;30:20;31:18;
51:21;111:13;117:18,
23;118:3
**offered (2)**
40:10;73:5
**offers (1)**
111:7
**office (8)**
46:3,5,24;49:6,19;
50:10;58:14,20
**officer (3)**
120:14;121:5,9
**often (1)**
19:12
**O'Grady (1)**
18:22
**omit (1)**
98:19
**once (6)**
20:11;44:14;49:8;
58:17;80:18;95:6
**one (47)**
7:23;10:20;12:4,4,9;
14:14;19:5;22:24;30:4;
37:16;40:2;42:24,24;
46:18;48:25;49:9;
57:15;61:22;65:24;
68:24;81:5;85:12,13;
96:3,8;97:20;98:13;
99:6,12,14,24;100:2,
15;101:1;104:8;
107:14;108:14;112:9;
114:16;115:1;117:19,
24;124:3;125:7,9,16,18
**ones (1)**
79:24
**one-time (2)**
49:2,3
**ongoing (1)**
63:9
**online (1)**
19:19

**only (14)**
14:16;16:11;28:24;
50:19;53:15;58:10;
59:9;60:8,9;102:22;
112:23;116:5;127:20;
130:21
**open (4)**
16:15;88:22;89:7;
92:7
**opened (2)**
25:11;29:3
**operating (18)**
16:22;17:9;20:18;
23:13,14;24:24;25:11;
27:9,14,24;28:17,24;
31:8;36:5,8,10;54:15;
128:2
**opinion (16)**
84:25;88:5;94:14;
95:4;100:22;101:6,9,
17;103:12;104:5;
105:3;112:24;113:19;
114:1;117:25;118:8
**opposed (2)**
33:23;36:21
**optimistic (1)**
24:15
**Option (3)**
76:3,10;77:12
**options (1)**
124:4
**orally (1)**
83:17
**order (13)**
7:11;8:17;12:12;
13:17;25:4;27:12;
28:20;31:10;33:18;
52:4;61:17;126:20;
131:9
**original (1)**
25:22
**others (4)**
28:25;35:21;94:17;
106:25
**ought (1)**
126:22
**ours (1)**
126:15
**ourselves (1)**
125:22
**out (13)**
7:11;32:14;35:20;
42:11;62:8,10;74:23;
81:2;89:20;95:13;
126:20,24;131:9
**outset (1)**
16:11
**outside (3)**
33:1;97:7;118:14
**outstanding (1)**
67:9
**outweighed (1)**
97:16

**over (19)**
5:25;7:15;22:19,23;
34:16;40:20;87:1,3;
93:16,22;100:8;
101:23;103:14;104:18;
108:10;109:4;111:22;
112:9;118:8
**overall (5)**
90:17;94:11;98:5;
99:21;100:9
**overbill (1)**
70:13
**overcharged (1)**
68:4
**overpaid (1)**
69:4
**Overruled (3)**
42:14;73:24;112:25
**overview (1)**
115:9
**owe (1)**
15:15
**own (5)**
11:15,15;89:6;123:2;
124:18
**owned (1)**
90:7

## P

**packet (1)**
6:23
**Page (36)**
13:11;34:5,5;45:5;
50:12;52:21;64:5,6;
65:21;68:15,20,21;
70:5,6;71:8,23;74:5,18,
22;75:2,16;76:1,2,5,6;
77:18;81:6;88:21;
95:24,25;99:25;109:7,
9;110:10;111:2;120:24
**pages (3)**
6:1;26:6,8
**paging (1)**
27:15
**paid (10)**
13:18;36:3,6;54:22;
68:10;69:16;123:20;
130:17,17,21
**pains (1)**
78:18
**painting (1)**
78:1
**paper (2)**
55:5;77:1
**paragraph (2)**
70:8;114:18
**paralegal (4)**
22:1,9,16;32:4
**paring (1)**
5:22
**part (14)**
25:2,8;27:10;36:21;

47:25;92:25;106:14;
107:9;113:7,13,15,17;
115:16;116:22
**participants (1)**
91:19
**particular (13)**
12:11;13:10;14:21;
42:2;43:21;66:3;69:16;
87:4;88:6,10;92:9;
112:6;114:19
**particularly (2)**
84:10;93:1
**particulars (1)**
31:12
**parties (3)**
5:8,17;89:5
**parties' (1)**
7:18
**partly (1)**
74:19
**party (1)**
90:7
**passing (1)**
89:3
**past (1)**
22:6
**Pause (5)**
71:13;82:22;117:12;
118:25;125:20
**pay (6)**
15:14;17:10;43:25;
68:17;69:8;70:4
**payee (2)**
23:22;28:22
**paying (2)**
13:22;19:10
**payment (2)**
17:19;89:8
**payments (16)**
20:5,7;23:12;24:24;
27:8;28:17;30:2;31:7;
33:15;34:8;36:10,12,
12,18;54:2;69:12
**penalties (1)**
78:18
**pending (3)**
62:11,15;63:5
**people (2)**
49:9;118:3
**per (6)**
57:9;102:4,7,10,15,
22
**percent (13)**
26:12;30:4,8;44:19;
103:5;108:4,8,14,15,
16,20;109:4;119:25
**perform (4)**
86:25;110:9;115:4;
130:6
**performed (2)**
87:2,4
**performs (1)**
129:5

**perhaps (1)**
8:1
**period (5)**
40:20;48:17;56:12;
120:9,11
**periods (1)**
93:4
**perjury (1)**
78:18
**permissible (1)**
91:17
**person (8)**
12:23;24:18;27:3;
28:13;31:2;55:17;
56:17;69:16
**personal (2)**
40:15;70:4
**perspective (1)**
124:15
**persuade (1)**
11:23
**Perten (80)**
5:13,13;6:5,7,9;7:3,
15;8:14,19,22;9:2,4,7,
8,9,14,18,22,24;15:22;
21:8;24:6;33:10,12;
36:15;42:6,8,15;46:12;
50:4,7;52:9,10;57:11,
14,16;58:25;59:2;
68:22,25;69:1;72:18;
73:1,4,7,9,15,25;74:1,
9,11,13,15,17;76:6,8,
11,14,16,18;79:19,22;
80:2,8,15;81:7,9,12;
82:4,12,14,24;117:9;
125:16;126:8,11,13,17,
19;131:3
**Perten's (1)**
6:4
**pertinent (1)**
120:9
**Peter (2)**
5:11;69:5
**ph (7)**
39:5;53:6;56:8;
57:13;69:6;77:23;79:2
**phone (10)**
45:14,19,22,23,25;
46:3,4;64:22,23;
126:23
**phones (1)**
48:7
**photo (1)**
101:4
**photograph (1)**
101:2
**photographs (2)**
89:21;90:13
**physically (1)**
91:16
**pick (3)**
26:3;96:3;98:13
**picked (1)**

109:8
**picture (3)**
30:15;74:6,18
**pictures (1)**
127:22
**pin (1)**
111:23
**placed (3)**
25:16;50:8;74:2
**places (1)**
36:13
**plaintiffs (8)**
10:6;21:16;32:5;
37:23;83:9;112:12;
119:2;131:9
**PLAINTIFF'S (28)**
7:8,17;22:20;23:7;
24:3,8,11,19,23;26:19,
24,25;28:5,9,10;29:15,
19,21,23;30:1,20,24;
31:1,3,5,19,22;45:1
**plan (5)**
7:13,21;8:11;9:9,14
**planned (1)**
119:2
**plans (2)**
78:1;90:13
**please (26)**
5:8;10:25;11:6,16;
21:23;22:8,20;24:12;
27:1;28:10;33:11;
36:15;37:16;38:15,20;
44:4,23;45:5;50:12;
57:12;76:22;81:6;
89:19;109:7;119:9;
130:13
**plus (1)**
6:1
**PM (1)**
131:18
**point (12)**
7:9,16;11:25;20:10;
35:13;39:6;52:11;
53:17;81:5;90:7;98:21;
125:2
**points (3)**
36:4;106:24;115:22
**populated (1)**
107:8
**portion (1)**
124:22
**position (8)**
22:11;47:1,6;53:22;
58:12;59:21;60:11;
86:5
**possess (1)**
77:3
**possible (3)**
91:16;100:24,25
**posting (1)**
23:20
**potentially (1)**
94:24

**powerful (1)**
43:23
**practice (4)**
42:4,13,19;88:13
**prefer (2)**
124:13;126:20
**preference (1)**
99:16
**preliminaries (2)**
5:19;10:1
**premise (1)**
117:22
**prepare (5)**
25:5;27:12;28:20;
29:22;31:10;81:23
**prepared (5)**
23:6;24:19;27:3;
28:14;31:2
**preparing (1)**
23:15
**present (1)**
32:18
**presented (1)**
15:14
**president (1)**
86:6
**presumptively (1)**
103:9
**pretty (2)**
22:22;127:25
**previously (3)**
87:12,15;114:19
**price (41)**
88:21,24;89:10;
92:13,15,18;93:11,17;
94:3,10,11;97:11;
98:25;99:3,10,19;
100:19;101:18;102:4,
6,7,10,12,22;103:5,8,
12;104:24;105:24;
109:4,21;110:1,6,16,
18,21;113:24,25;
114:23;118:7,8
**priced (1)**
97:23
**prices (4)**
93:13;101:23;
103:15;118:6
**primary (1)**
56:17
**Prior (10)**
47:19;49:22;51:1;
53:10,19;55:4;61:4;
64:23;91:8;93:25
**privacy (1)**
99:17
**privilege (1)**
51:18
**probable (1)**
88:21
**probably (3)**
9:16;59:25;126:22
**Probate (3)**

Case 16-01120    Doc 346    Filed 06/04/19    Entered 06/04/19 13:08:47    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 144 of 149
May 14, 2019

87:17,18,18
**problems (1)**
12:12
**proceed (2)**
74:15;82:23
**proceeding (1)**
5:4
**proceeds (2)**
123:21;130:21
**process (7)**
89:18,24;90:8,25;
95:16;103:19;107:24
**produced (8)**
23:16;25:1,7;27:15;
28:22;30:11;34:1;
36:23
**product (1)**
12:11
**productive (1)**
91:17
**ProEx (6)**
30:10;36:21;37:3;
60:12,15;67:18
**ProExcavation (24)**
5:14;20:8;30:2,15;
31:9,12;36:18;37:10;
41:13;45:3,9,18,22;
60:5,6;65:17,25,25;
81:21;121:12,16,21;
127:14;128:18
**ProExcavation's (1)**
121:19
**professional (2)**
40:16;88:13
**programmer (1)**
11:19
**project (38)**
12:11,21;13:2;16:2,
4,13;18:5,13,13;24:25;
25:20,21;30:3,7;33:16;
36:3,18;37:11;41:17,
22;42:10,24;43:1;
49:15;54:11;56:24;
63:18,22;67:9,21;68:4;
69:4;70:3,12;127:24;
128:9,14,17
**projects (15)**
30:5;41:12;42:3,18,
19,20;44:11;45:12;
65:16;66:2;67:6;70:8;
123:10;129:2,22
**proof (9)**
25:3,8;34:18,19;
35:5;76:3,9;77:12;
115:18
**proof- (1)**
25:13
**proof-of-claim (3)**
33:24;34:2;35:2
**proper (3)**
66:9;69:22;98:11
**properly (2)**
6:17

**properties (24)**
17:1;39:5;90:4,10,
12;91:4,25;92:12,19;
93:11,22;94:11;97:22;
102:10;105:11,17;
106:11,19,23;111:8;
112:20;113:4;116:2;
130:19
**property (44)**
6:23;25:22;88:9,22;
89:10,20,21;90:2,21;
91:1,13;92:4,6,9,14,15,
17;94:14,25;96:5,15;
97:5,8,10,15,17;98:6,6,
11,14;105:25;106:4;
109:14;110:3,11;
111:21;112:7;114:8;
115:8,9;116:20;118:4;
122:12;123:2
**property's (3)**
90:17;94:23;95:3
**proposal (3)**
45:2,9,11
**Provide (10)**
76:23;77:8;84:25;
88:5;101:18;102:6;
115:8;129:5,25;130:3
**provided (8)**
20:11;34:7;70:7,17;
75:18;102:7;116:14;
128:4
**provides (4)**
17:9;20:19;33:1;
102:7
**prudently (1)**
88:24
**public-records (1)**
74:4
**pull (2)**
57:11;69:15
**purchase (1)**
111:8
**purports (1)**
45:2
**purpose (1)**
7:15
**purposes (1)**
26:11
**put (10)**
6:16;13:25;15:15;
18:9;26:3;44:1;59:15;
69:5;81:22;95:23

**Q**

**qualifications (1)**
86:3
**qualified (3)**
87:12,15,20
**quality (8)**
95:11;96:6;97:18;
98:5,17,18;100:10;
118:18

**quarter (1)**
25:9
**quick (1)**
79:24
**QuickBook (2)**
54:25;55:17
**QuickBooks (19)**
34:6;47:17,20,21,22;
48:1,18;54:3;55:4;
56:1,5,13,18,21;58:21;
66:22;67:4,9,10
**quite (2)**
64:18;73:22

**R**

**raised (1)**
43:3
**range (9)**
92:13,18;93:11;
94:11;95:17;97:11;
99:19;102:8;124:23
**rather (1)**
15:12
**razed (1)**
91:12
**reach (1)**
94:5
**react (1)**
43:18
**read (20)**
16:22,24;25:24;35:8,
20;50:15;52:21;53:13;
64:17;69:25;70:24;
71:11;72:4;77:5;78:2;
81:13,16,24;89:13;
128:1
**reader (1)**
101:19
**reading (1)**
102:9
**ready (6)**
8:20,24;11:2;15:20;
82:23;119:6
**real (17)**
19:24;82:8;84:22;
86:10;89:25;91:6;
94:21,24;104:18;
107:13;114:6;115:1,3;
119:12,13;122:18;
130:12
**really (18)**
13:3;24:13;25:24;
37:12;51:16;94:22;
97:12,16;98:7,18;
108:16,17;111:20;
120:13;121:14;126:21,
22,23
**Realty (1)**
53:6
**reason (2)**
57:25;123:3
**reasonable (6)**

89:7;92:19,21,23;
103:1;108:12
**reasonableness (5)**
101:10,16;106:10,
17,20
**reasons (2)**
118:14,14
**recall (31)**
12:2,15;14:19,24;
15:8;17:19;35:8;43:21;
50:10;64:7;65:16;
66:23;68:18;69:9,21;
70:14,21;71:6,11,17,
25;72:3;81:15;84:6,9;
85:17;108:1;124:7,17;
127:6,15
**recalled (1)**
131:4
**recalling (1)**
130:24
**receipts (1)**
6:24
**receive (1)**
59:11
**received (5)**
19:9,13;63:12;76:20;
107:9
**recent (1)**
115:11
**recess (1)**
82:17
**recited (1)**
113:13
**recognize (1)**
74:5
**recollection (5)**
45:24;46:6;64:7;
85:16;120:10
**reconciled (1)**
95:17
**reconsider (1)**
84:13
**record (11)**
5:8;6:24,25;10:12,
23,24;34:25;36:24;
38:8;82:18,19
**records (12)**
13:4;20:19,24;25:4;
49:7,12;77:13;89:22,
23;90:15;91:3;96:14
**recounted (1)**
24:22
**recounting (3)**
23:10;27:6;43:17
**recross (1)**
125:2
**REDIRECT (3)**
80:10;117:15;124:25
**reduced (1)**
110:18
**refer (2)**
81:11;85:3
**reference (3)**

34:14,21,22
**referenced (1)**
30:6
**referring (2)**
71:1;85:23
**reflect (7)**
23:25;26:16;28:2,16;
29:12;30:17;31:15
**refresh (2)**
85:16;120:9
**refunds (2)**
71:15,19
**regard (6)**
25:15;26:2,15;42:5;
88:4;103:20
**regarding (7)**
17:22;64:3,16;114:5;
128:8,11,15
**regardless (1)**
114:9
**registers (1)**
54:4
**registration (1)**
76:23
**registry (1)**
88:18
**regular (1)**
50:2
**regularly (1)**
70:8
**related (4)**
25:21;63:17,21;
124:4
**relating (1)**
30:13
**relationship (7)**
40:15,18,21;61:1,4,
7;64:25
**relatively (1)**
94:8,12
**relevant (3)**
72:23,25;73:20
**relied (2)**
90:11;112:23
**remain (1)**
121:21
**remained (1)**
94:10
**remaining (1)**
125:24
**remember (28)**
12:9;13:21;14:9,16,
21;15:10,12;41:23;
42:22;43:7;46:2,8;
47:5;54:13,24;56:8;
58:2;59:14,15,25;60:1;
64:4;71:3;79:8;80:16;
81:16;117:20;121:2
**renew (1)**
84:11
**renewed (1)**
84:12
**Repeat (1)**

Case 16-01120    Doc 346    Filed 06/04/19    Entered 06/04/19 13:08:47    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 145 of 149

May 14, 2019

53:18

**rephrase (3)**
57:2;63:1;67:7

**report (27)**
6:24;34:6;84:8;85:3,
10,17;88:19;95:24;
98:19;101:19,25;
102:2;107:8;108:3,24;
109:3,8,16;110:11,11,
25;111:2,20;114:15,
19;116:5,10

**reports (4)**
85:12;97:21;115:15;
116:16

**represent (2)**
32:8;62:10

**representation (1)**
115:18

**represents (3)**
32:5;89:10;97:3

**request (7)**
57:9;59:17,19,19;
74:4,5;77:4

**requests (1)**
59:15

**require (2)**
52:1;116:21

**required (4)**
52:3;99:14,17,20

**requires (1)**
94:25

**requisite (1)**
88:23

**research (1)**
89:22

**researched (1)**
95:8

**researching (1)**
91:2

**residential (8)**
86:20,21,25;87:2;
89:25;91:6;92:25;
94:21

**resistance (1)**
97:14

**respect (9)**
60:5;67:3;84:7;
108:24;109:13;110:9;
111:16;113:14;129:15

**respond (2)**
14:4;19:7

**response (4)**
19:5;60:25;120:7;
121:20

**responses (2)**
120:6;121:19

**responsibilities (2)**
13:22;14:22

**responsible (3)**
13:21;17:2;105:18

**rest (2)**
81:11;131:10

**restaurant (1)**

12:20

**restraining (1)**
61:17

**result (1)**
72:12

**retained (2)**
112:12,15

**return (1)**
71:24

**returned (2)**
71:15;72:2

**returns (1)**
48:9

**reveal (2)**
52:1,6

**revealing (1)**
51:25

**Revenue (1)**
77:4

**review (7)**
25:4;27:14;49:6,12;
54:3;80:12;110:9

**reviewed (2)**
52:16;108:25

**right (176)**
5:18;6:6,13;7:19,22;
8:6,15;9:1,9;10:1,1,4,
13,19,25;12:25;14:24;
15:2;20:2;21:12;22:15,
18,25;23:2;24:7;26:11,
13,23;27:22;28:8,14;
29:18;30:8,9,23;31:14,
18,21,24;33:1,18,21;
34:6,16,24;35:15;36:6,
14,23;37:18;38:1,7,11,
11;39:2,4,7;40:16;
42:11;43:10,14;45:16;
47:22;49:9;51:14,20,
22;62:17;66:5,18;
67:13;68:25;72:10;
73:15,17;75:16,22;
76:7,9;79:11,12;80:7,9,
19,23,24;81:9;82:4,16,
23;83:1,4,7;84:5,12,15;
85:5,18,25;87:23;90:3;
95:19;96:8,24,25;
98:20,22,25;99:4,10,
25;100:15,16,19;102:9,
12,15,17,19,23;104:2,
11,15,16;105:11;106:3,
14,16,17,21;107:1,3,
10,16,23;108:6;109:1,
5,9,12;111:11,12;
112:7,13,18;114:5,24;
115:15;116:10,21;
117:3;118:23;119:22,
24;121:18;122:6,13,16,
22;123:1,13,14,17,23,
24,25,25;124:1,24;
125:14,17;126:3;
127:10;128:1;129:14;
131:11

**right-hand (2)**

34:13,21

**rise (2)**
82:17,20

**Road (17)**
30:7;45:3,7;87:10,
11;96:3;97:20;98:7,11;
100:6,23;101:3,7;
102:21;103:2,23;
111:21

**Rockland (5)**
13:6;25:10,11;29:4,6

**role (1)**
127:14

**rolling (1)**
8:15

**romantic (3)**
40:18,20;61:1

**room (3)**
9:6;98:4;103:25

**roughly (2)**
47:3;77:22

**routine (4)**
42:4,8,13,19

**row (1)**
111:22

**Rudyakova (9)**
8:2;10:7,8;11:7;
12:25;13:13;15:18,23;
59:11

**Rule (1)**
42:11

**rules (1)**
42:10

**running (1)**
54:12

**Russia (1)**
38:21

**Russian (1)**
47:21

**Ryan (2)**
18:15,22

# S

**sale (33)**
88:23;89:2,12;93:17;
94:9;96:2,7;98:8,10,12,
18,21,25;99:2,3,6,9,22,
24;100:13,19;101:18;
102:6;103:5,12,15;
108:17;109:4,17;
110:12;114:9,12;
127:17

**sales (27)**
89:11;90:24,25;
93:16,16,18;94:8,8,15,
19;95:5,6,10,12,13,15,
18,20;97:24;100:24;
102:1;103:4,17;
108:10,25;115:11;
118:16

**same (17)**
5:17;43:5;51:8;

90:25;96:19;98:3,6,9;
103:21,25,25,25;104:2,
5;110:16;114:18;123:3

**Santander (2)**
30:11;33:25

**saw (3)**
34:25;69:17;70:16

**saying (4)**
38:8;43:10;83:14;
102:5

**schedule (1)**
76:25

**science (1)**
11:17

**scope (2)**
125:22;127:5

**screen (5)**
23:7;29:21;31:2;
33:14;101:12

**scroll (1)**
57:14

**Sean (1)**
5:9

**search (1)**
95:9

**seated (3)**
5:3;10:25;82:21

**second (9)**
10:20;12:19;45:5;
74:22;76:6;82:7;97:5,
19;125:18

**secondary (2)**
34:17,21

**seconds (1)**
82:5

**section (2)**
93:23;109:10

**seeing (1)**
27:16

**seek (1)**
113:23

**seeking (1)**
59:12

**seemed (1)**
121:8

**select (4)**
94:19;95:17;97:20;
100:5

**selected (6)**
25:15;88:7;95:6,20;
101:22;102:3

**self (1)**
76:25

**sell (10)**
92:6,8;104:13;105:1;
109:24;110:7,23;
112:21;113:4;119:12

**seller (9)**
89:3,4;105:15,18,21,
25;106:3;113:14,23

**sellers (2)**
88:23;130:16

**selling (7)**

101:23;102:11,22;
103:8;104:24;127:25;
130:19

**sells (1)**
118:19

**send (4)**
20:10;58:12,17;
59:19

**sending (2)**
19:2,3

**senior (1)**
46:24

**sent (7)**
13:13,23;17:21;
48:17;57:22;59:7,9

**separate (5)**
16:1,3;62:11;66:2;
123:4

**separating (1)**
65:16

**September (1)**
11:22

**Service (8)**
77:4;92:14;101:4;
107:2,6,9;111:11,23

**services (1)**
33:2

**serving (2)**
44:11;45:8

**session (2)**
5:2;82:20

**set (5)**
22:22;72:22;101:2;
120:7;121:19

**seven (6)**
5:5,6;22:6;26:8;
96:15;98:1

**seventeen-and-a-half (1)**
44:19

**several (10)**
11:24;44:2;48:17;
55:11,13,14;65:14,24;
97:7;127:13

**severe (1)**
14:12

**shared (1)**
8:23

**shareholder (2)**
119:21;121:11

**sheet (3)**
6:2;52:12;76:22

**sheets (3)**
5:24;76:23;90:11

**Short (1)**
116:11

**shortly (1)**
125:23

**show (6)**
15:10;25:13;45:4;
72:17;73:21;121:18

**showcases (1)**
97:13

**showed (2)**

17:16;103:2

**showing (8)**
11:24;12:3;14:10,12;
44:25;95:19;120:5,7
**shown (1)**
27:25
**shows (1)**
6:2
**sic (5)**
39:1;43:1;54:25;
55:17;69:18
**side (1)**
54:2
**sign (1)**
78:9
**signature (8)**
74:20;75:3,3,17,22;
78:10,11;122:3
**signed (4)**
16:7;54:15;75:6;
78:18
**significantly (8)**
94:2,2,3;99:18;
101:2;103:3,15;104:25
**similar (14)**
96:5,5,6,6;98:4;
99:21;100:8,9;110:9;
115:14;116:14;118:17,
18;129:14
**single (3)**
66:13;69:3;101:20
**site (2)**
42:25;91:7
**sites (3)**
48:1;91:5,22
**sitting (1)**
23:18
**six (2)**
30:7;98:15
**six-and-a-half (1)**
96:15
**size (10)**
95:11;96:6,6,19;
97:6;100:9,10;102:11;
103:25;118:18
**slightly (3)**
98:4,17;100:9
**small (1)**
50:2
**smaller (2)**
98:4;100:9
**socially (1)**
12:19
**sold (25)**
13:20;17:1;88:9;
89:11;96:8;98:21;99:6;
100:15;101:24;102:22;
103:2,4,7;104:11,14,
21;105:2,11,17;112:7,
10;113:21;114:22;
116:2;119:13
**solemnly (1)**
75:17

**somebody (1)**
75:13
**sometime (2)**
29:4;55:1
**sometimes (6)**
18:20,21;19:12;
92:18;108:15;122:21
**somewhere (1)**
122:3
**sorry (18)**
9:3;16:18;17:14;
49:1;55:12;59:18;
68:21;72:11;74:9;
75:21;81:9;83:19;
87:11;91:21;109:18;
116:1;119:1;120:20
**sort (11)**
7:17;12:21;13:1;
14:7;25:9;34:24;
103:16;114:10;124:4,
14;125:5
**sounded (1)**
8:22
**sounds (2)**
9:21,23
**source (3)**
107:12,13,14
**sources (3)**
107:15,20;111:22
**speak (4)**
10:13;38:7;62:16;
83:22
**special (1)**
89:11
**specific (4)**
26:5;66:13;72:1;
115:22
**specifically (5)**
17:9;46:2;70:12;
88:3;108:23
**specifics (2)**
66:8,10
**specified (1)**
89:3
**spend (1)**
32:14
**spent (2)**
30:15;66:3
**spoke (1)**
51:7
**square (5)**
102:4,7,11,15,22
**stable (3)**
94:8,10,12
**stage (2)**
14:13;127:21
**stand (3)**
8:16;10:5;86:23
**standard (3)**
92:25;93:2,2
**standards (3)**
88:10,12,14
**Starbucks (1)**

64:20
**start (12)**
8:19,24;22:25;34:2,
6;39:12;40:6,10,23;
87:25;125:15;131:13
**started (15)**
29:4;33:22,23;36:20;
42:21,23;52:25;53:3;
54:11,21;58:2,3,10;
61:4;65:10
**starting (7)**
50:13;52:21;65:22;
70:6;95:8;125:23;
126:15
**state (7)**
5:8;11:6;21:23;
38:15;84:19;86:20;
119:9
**state-certified (1)**
86:20
**stated (1)**
32:4
**statement (6)**
19:16;34:20,23,25;
35:1,6
**statements (25)**
19:13;23:16,18;25:1,
6,18;27:14;28:21;
30:10;31:11;33:20;
34:1,5,9,11,12,15;
35:24;36:23;48:8;54:3,
4,4;55:6,8
**States (4)**
46:16;87:20;120:8;
121:21
**stay (1)**
106:4
**steps (2)**
90:22;91:18
**still (2)**
63:8;100:11
**stimulus (2)**
88:25;113:18
**stipulation (1)**
7:4
**stop (2)**
9:12;126:22
**storm (1)**
15:11
**story (1)**
124:15
**Street (11)**
42:24;43:8,15;87:9;
96:4;98:1,13;100:11;
101:3;112:9;118:16
**strength (1)**
118:15
**strengths (1)**
95:18
**strictly (1)**
85:15
**struck (1)**
12:9

**studied (1)**
107:5
**stuff (5)**
41:5;50:2,2;122:5;
123:13
**style (1)**
92:18
**subcontractor (2)**
69:3,23
**subcontractors (4)**
19:10;68:16;69:8;
129:10
**subcontracts (2)**
53:23;54:8
**subdivided (1)**
91:12
**subject (29)**
7:11;84:23;91:1,8;
93:11;94:25;95:8,16;
96:5,14,18;97:4,22,25;
98:3,6,11,14,16,17;
100:7,11;109:9,12,14;
114:18;118:16;130:24;
131:8
**submit (4)**
52:11;76:22,25;
77:13
**submitted (1)**
77:17
**sufficiently (1)**
16:24
**Suffolk (1)**
87:18
**suing (1)**
63:6
**sum (1)**
37:13
**summaries (7)**
25:2,8;26:2,3,4,7,13
**superior (3)**
62:9,11,15
**supervise (2)**
128:25;129:20
**supervisor (2)**
72:8;73:23
**supervisor's (2)**
72:15;74:3
**support (1)**
77:17
**suppose (1)**
124:21
**supposed (1)**
68:10
**Sure (19)**
5:21;13:7;20:25;
43:9;51:17;55:25;57:8;
58:17;67:8,14;80:1;
83:24;114:4;117:10;
118:24;119:25;120:2;
121:14,17
**suspect (1)**
73:16
**swear (1)**

75:17
**swearing (2)**
43:23;75:23
**swoop (1)**
125:7
**SWORN (6)**
10:8;21:19;37:25;
81:2;83:10;119:5

**T**

**talk (1)**
86:2
**talked (2)**
5:22;6:1
**talking (6)**
66:4,5;72:24;73:17;
87:25;109:12
**tallying (1)**
31:13
**TAMPOSI (6)**
5:11,12;22:19,21;
24:15;28:11
**Tatiana (5)**
5:14;7:13;119:2,5,10
**tax (3)**
48:9;77:3,13
**taxes (1)**
13:18
**team (1)**
126:9
**teaming (1)**
126:12
**technical (2)**
11:19,20
**telephone (1)**
64:7
**telling (3)**
8:5;12:2;118:18
**tells (1)**
122:24
**ten (2)**
108:15;126:23
**tenure (1)**
56:17
**terminated (1)**
61:25
**termination (1)**
16:16
**terms (5)**
89:8;9:1;91:1;97:6;
123:9
**test (9)**
24:14;101:10,15;
103:17;106:9,11,17,20;
108:11
**testified (7)**
37:3;51:5;67:17;
105:9;107:1,23;108:22
**testify (3)**
84:23;87:12,16
**testimony (12)**
52:12,15;66:23;

LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

May 14, 2019

68:16;79:5,6,8;85:4;
95:20;108:1;114:24;
124:8
**testing (1)**
108:9
**Thanks (2)**
10:4;131:15
**theirs (1)**
97:11
**there'd (2)**
124:24,25
**thereto (1)**
89:9
**thinking (4)**
9:5;14:7;44:6;45:7
**third (5)**
75:2,16;90:7;95:25;
98:12
**Thirty (4)**
11:13;79:11;82:5;
103:4
**thoroughly (1)**
107:22
**though (1)**
48:10
**thought (2)**
58:3;126:14
**thousands (1)**
108:10
**threatened (1)**
15:13
**threats (1)**
14:25
**three (9)**
12:19;17:11;19:5;
22:17;76:21;77:8,22;
79:12;92:22
**three-month (1)**
28:19
**three-quarters (1)**
35:17
**throughout (1)**
18:5
**thrown (2)**
62:8,10
**tiling (1)**
78:1
**times (3)**
49:5,8;107:1
**time's (1)**
124:18
**timing (1)**
14:9
**title (2)**
30:4;89:3
**today (9)**
5:19;7:11;8:23;9:11;
84:24;125:3,22;126:2;
131:12
**together (2)**
27:20;91:9
**told (18)**
16:10,10;33:15;

36:17;37:13;52:22;
58:3;59:10;63:20;64:2;
65:14;66:20;68:18;
78:5;79:15;106:10;
112:18;125:13
**tomorrow (7)**
8:21;9:14,20;124:14;
125:3,6,14
**took (3)**
50:9;89:20;121:2
**Top (1)**
68:20
**topic (1)**
124:10
**topics (1)**
131:3
**total (5)**
22:15;26:5,9;30:9,14
**touch (6)**
18:12,15,22,23,24;
19:1
**tour (1)**
12:16
**touring (1)**
14:10
**Town (2)**
36:10;92:13
**track (2)**
6:17;21:5
**trades (1)**
72:10
**trainee (1)**
86:19
**training (1)**
22:8
**transactions (2)**
58:14,21
**transcript (2)**
50:9;52:16
**transferred (1)**
62:9
**transfers (2)**
29:2,5
**transitioning (1)**
7:17
**transparent (1)**
92:7
**transportation (1)**
46:22
**treatise (1)**
108:19
**trends (1)**
93:17
**trespass (1)**
101:4
**trial (7)**
5:5;23:7,17;25:16;
45:1;84:7;112:19
**trials (2)**
73:20,20
**tried (2)**
63:8;95:12
**true (9)**

18:4;36:6;68:18;
75:18,24;78:20;
117:22;122:2,4
**Trust (5)**
13:6;25:10,11;29:4,6
**trustee (1)**
6:23
**truthfulness (2)**
73:13,16
**try (10)**
11:1;34:3,7;69:19;
73:21;90:9;97:21;
107:14;112:20;113:4
**trying (7)**
7:3;11:23;13:4,6;
18:7;72:22;113:15
**turn (4)**
7:15;50:12;64:5;
129:23
**turns (3)**
35:11;36:25;129:3
**Twenty (3)**
22:17;103:14;104:18
**twenty- (2)**
17:10;28:18
**twenty-something (1)**
13:20
**twenty-three (2)**
16:25;17:5
**twenty-three-month (1)**
27:10
**twenty-two (3)**
22:17;104:15,16
**two (20)**
12:22;49:8;53:3;
79:18;84:25;87:9;
91:13;94:17;97:25;
100:10;105:10;107:25;
112:21;113:5;116:13,
13;118:16;124:4;
127:19;130:11
**two-and-a-half-year (1)**
25:19
**type (1)**
53:16
**typical (2)**
89:24;99:18
**typically (6)**
89:4;91:6;92:4;
93:10;97:23;108:13

**U**

**ultimately (1)**
20:23
**Um-hum (4)**
9:13;17:13;33:3;
111:25
**unable (4)**
66:13;68:3;71:19;
85:16
**unaffected (1)**
89:11

**under (6)**
42:10;65:25;89:4;
93:23;121:24;130:12
**undercharging (1)**
67:6
**underlying (6)**
24:1;26:17;28:3;
29:13;30:18;31:16
**understood (10)**
16:14;17:4,8,12;
20:4,7,22;64:18;77:7;
88:8
**undue (2)**
88:25;113:17
**uniform (1)**
88:12
**unique (1)**
97:12
**United (2)**
46:15;87:20
**University (2)**
11:18;22:10
**unless (1)**
80:2
**unrelated (1)**
90:8
**untruthful (5)**
51:5;73:22;79:5,16,
16
**up (26)**
8:14;22:12,24;23:6;
25:13;29:21;31:1,13;
33:10,14;36:15;40:2;
43:3;51:21;54:12;
57:11;64:19;67:14;
72:22;73:19;94:1;
95:23;100:3;101:12;
125:5;126:1
**upon (1)**
54:3
**upper (1)**
45:14
**upstairs (1)**
49:21
**use (14)**
45:22;47:17,20;
88:17;91:5,7,7,10,11,
16,22;94:13;107:3;
130:9
**used (19)**
26:5,9;30:9,14;34:9;
53:2;57:17;98:2;
100:12;102:1;103:17;
104:2;106:11,13,19,20,
23;107:2;108:3
**using (7)**
30:10;58:7;59:4;
94:16;106:19;108:11,
17
**USPAP (1)**
88:13
**usually (8)**
16:11;59:17,19,21,

23;69:15;81:21;90:1
**Utilized (1)**
101:4

**V**

**Vadim (6)**
5:14;9:15;11:21;
18:20;40:11;119:18
**value (38)**
84:25;88:5,16,17;
89:15;94:14;95:1,4,17;
100:22;101:7,17,17;
103:9,11;104:6,23;
105:2,10;108:11;
111:4;113:11,14,15;
114:1,7;115:19,22;
116:8,12;117:1,4,25;
118:4,9,13,15,18
**values (1)**
116:23
**various (4)**
19:10;47:25;61:19;
98:24
**vary (1)**
103:20
**vendor (1)**
71:15
**verification (1)**
77:14
**verified (3)**
34:18,19;100:24
**verify (2)**
107:14,18
**verifying (1)**
91:2
**versus (3)**
96:18;98:10;109:1
**vice (1)**
86:6
**view (1)**
35:18
**virtually (3)**
97:5;103:21,23
**visit (1)**
49:2,3
**vividly (1)**
15:12
**voice (3)**
10:14,15;83:17
**voluntarily (1)**
60:19

**W**

**W-2 (1)**
76:23
**wait (1)**
131:4
**waive (8)**
51:18;122:21,25,25;
123:10,16;130:12,14
**wants (1)**

32:7
**Warren (2)**
98:13;112:9
**way (8)**
27:25;35:17;48:21;
78:15;103:18,20;
110:25;120:13
**weaknesses (1)**
95:18
**week (1)**
79:13
**weekend (2)**
79:12;80:23
**weeks (2)**
43:4;116:13
**weeks' (2)**
112:21;113:5
**weren't (5)**
47:1;48:18;53:22;
60:1;71:16
**What's (8)**
6:11;63:24;82:7;
86:5;88:6,12;115:6;
123:3
**Whenever (3)**
11:1;15:20;119:6
**whereas (1)**
79:9
**whereby (1)**
89:4
**where's (1)**
86:23
**whole (1)**
9:18
**Who's (1)**
83:14
**wife (2)**
56:25;57:4
**William (3)**
21:16,19,24
**win (1)**
32:7
**window (1)**
116:15
**windows (1)**
78:2
**windy (1)**
101:3
**winter (3)**
14:12,12;15:11
**within (7)**
73:20;92:5;95:8;
97:22;98:1,14,15
**without (3)**
36:7;43:17;126:25
**witness (41)**
7:14,20;8:4,9,9,16,
21;9:15;10:10,18;12:6,
8;21:14;24:10;38:2,4,
6,10;42:12;51:13;52:8;
68:24;73:18;76:15,17;
82:16,25;83:6,12,14,
16,19,21,24;84:2,4;

85:6;118:24;120:21;
125:24;131:7
**witnesses (3)**
7:24;9:11;126:14
**wives (1)**
12:20
**words (1)**
35:21
**work (42)**
11:14;21:25;22:2;
34:7;37:11;38:17;39:4,
9,10;40:1,2,3,6;42:2;
44:14;47:7,19;48:12;
50:13,23;51:11;52:22;
53:2,3;69:14;77:14;
78:23;84:21;88:11;
92:10;101:6;107:18;
115:14;119:11;122:7;
128:18,23;129:6,18;
130:1,15,19
**worked (19)**
11:18,19;28:21;34:5;
39:6;42:3;48:16;50:14;
51:2;53:7,15;54:8;
60:22;76:21;77:24;
78:4,19;79:1,12
**working (33)**
22:4;25:18;39:18;
40:3,5,10;41:2,4,9,17;
44:7,13;45:21;49:22,
23;50:22;51:1;52:25;
53:1,10,20;54:11,19;
58:2,3,10;78:5,6;79:2,
9,13,15;92:3
**worry (1)**
126:16
**worth (5)**
68:17;69:8,13;
113:20,20
**writer (1)**
11:19
**written (6)**
23:13,19;25:13;
27:16;31:8,12
**wrong (1)**
118:20

**Y**

**Yarmouth (1)**
30:7
**year (11)**
12:12;16:12,13;
40:22;93:16,16,19,19,
25;109:4,4
**year-over-year (1)**
93:10
**years (15)**
11:13;16:23;22:6,17;
26:7;44:2;76:21;77:8;
86:9,14;87:1;103:14;
104:15,18;108:9
**Yesterday (4)**

5:22;6:1;38:4,5
**yielded (1)**
101:25

**Z**

**zero (2)**
13:7;108:14
**Zhukovskiy (1)**
49:10

**0**

**001 (1)**
23:1

**1**

**1 (12)**
9:13;22:20;23:7;
24:4,8;75:22;96:12;
97:1;111:2;124:11;
126:22,23
**1,000 (1)**
87:3
**10 (4)**
65:22;81:13;97:19;
111:21
**10:52 (1)**
82:18
**1099 (1)**
77:1
**11 (3)**
70:6;77:1;82:10
**11:11 (1)**
82:19
**11th (7)**
85:13;88:5,7;101:7;
109:21;110:18;115:24
**12 (1)**
52:22
**12:14 (1)**
131:18
**125 (1)**
70:5
**129 (3)**
44:22;45:1,25
**12th (1)**
11:23
**13 (2)**
81:18;121:6
**133 (2)**
68:15,20
**135 (2)**
71:8;81:6
**14 (1)**
26:8
**15-13881 (1)**
5:6
**15th (2)**
13:14;93:25
**16 (1)**
50:13

**16-1120 (1)**
5:4
**167 (1)**
5:6
**16th (1)**
93:24
**18th (3)**
7:12;121:3;131:9
**19 (2)**
64:6;120:24
**1994 (1)**
22:11
**1996 (1)**
22:10
**1st (1)**
40:24

**2**

**2 (21)**
23:3;24:11,13,20,23;
25:16;26:19,23,24;
33:9,14;75:17,22,23;
98:3,21;99:22;109:7;
110:10;111:21,23
**2,000 (1)**
69:18
**2.5 (3)**
108:4,8,19
**2000 (1)**
22:12
**2003 (2)**
119:14,20
**2011 (6)**
38:23;39:3;47:3;
77:25;78:4,24
**2012 (7)**
12:3;16:8;22:13;
47:4;54:15,18;101:24
**2013 (21)**
26:7;39:11,13;40:7,
14,24;42:21,22;45:19,
21;55:1,5;57:21,23;
58:4,4,5,6,10;59:3,4
**2014 (14)**
13:14;17:17;27:10;
39:11,15;41:1;46:1;
48:13,19;80:14,24;
110:12;117:1,4
**2014/2015 (1)**
108:25
**2015 (22)**
14:3,4,7;15:9;16:4;
25:12;29:4,8;75:6;
77:21,25;78:5,24;
109:17,21;110:4,15,18;
111:14;114:7;117:19,
24
**2015/2016 (1)**
109:1
**2016 (9)**
85:12,13;88:5,7;
101:7;104:9;111:1;

115:23,24
**2017 (1)**
89:20
**2018 (2)**
50:10;121:3
**20th (3)**
50:9;110:4,12
**21 (3)**
123:16,18;130:17
**21st (1)**
110:15
**22 (1)**
6:19
**23 (1)**
6:19
**23rd (1)**
77:24
**25 (1)**
13:11
**25th (1)**
80:14
**26 (3)**
57:21,22;59:3
**26th (3)**
41:1;80:14,23
**27th (1)**
77:21
**289 (2)**
112:3,4
**29 (1)**
85:12
**29th (2)**
104:9;115:23

**3**

**3 (9)**
26:25;28:5,8,9;36:2;
75:23;99:6;100:11;
101:1
**30th (4)**
27:9;28:18;109:17;
117:1
**315 (1)**
57:12
**318 (3)**
5:23;6:12,13
**325 (6)**
6:17,19,22;7:1,7,8
**37 (2)**
44:3,8

**4**

**4 (7)**
28:10;29:15,18,19;
36:2;88:21,21
**4,000 (1)**
43:6
**4,699,000 (1)**
110:3
**4,999,000 (1)**
110:19

Case 16-01120    Doc 346    Filed 06/04/19    Entered 06/04/19 13:08:47    Desc Main
Document    Page 149 of 149
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

May 14, 2019

**4.1 (1)**
    117:23
**4.4 (4)**
    103:7,8;104:14,21
**400,000 (1)**
    43:3
**406 (1)**
    42:11
**407 (2)**
    98:13;112:9
**408 (1)**
    112:10
**43 (1)**
    13:9
**48 (1)**
    100:5

## 5

**5 (8)**
    23:17;29:21,23;30:1,
    20,24;36:14,15
**5.1 (5)**
    103:1,7;104:20;
    109:21,24
**5.5 (1)**
    109:17
**50 (1)**
    96:2
**53 (1)**
    50:12
**54 (1)**
    52:21
**55 (18)**
    25:25;35:19;45:7;
    85:13;88:1,4;89:19;
    95:24;98:7;100:22;
    101:7;102:21;103:2,
    23;108:24;109:8,14;
    115:23
**5588 (1)**
    25:23

## 6

**6 (7)**
    31:1,3,5,19,22;
    109:4;121:20
**617-610-1276 (1)**
    45:15
**65 (1)**
    6:10
**6th (1)**
    75:6

## 7

**7 (4)**
    70:8;71:9;81:12;
    120:8
**74 (1)**
    23:17
**77 (2)**
    25:22;45:3

## 8

**8-1/2 (1)**
    77:1
**88 (12)**
    25:25;85:12;97:5;
    103:19,20;104:13;
    110:10,11,25;111:14;
    114:16;115:23
**89 (1)**
    64:5
**8th (1)**
    77:25

## 9

**9 (4)**
    5:7;8:24;71:24;
    125:14
**9:07 (1)**
    5:1
**9:14 (1)**
    10:23
**9:23 (1)**
    10:24
**92 (1)**
    65:21
**94 (1)**
    71:23