UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS - EASTERN DIVISION

| | | |
|---|---|---|
| =============================== | . | |
| IN THE MATTER OF: | . | Case #16-01120 |
| | . | |
| LYMAN-CUTLER, LLC | . | |
| | . | Boston, Massachusetts |
| | . | **Wednesday, May 15, 2019** |
| Debtor. | . | 9:17 a.m. |
| =============================== | . | |
| LYMAN-CUTLER, LLC, et al. | . | Adv. Proc. 16-01120 |
| | . | |
| Plaintiffs, | . | |
| v. | . | |
| | . | |
| KAGAN, et al., | . | |
| | . | |
| Defendants. | . | |
| =============================== | . | |

TRANSCRIPT OF TRIAL, DAY 8 ON:
#167 OBJECTION TO CLAIM 9 OF CLAIMANT ALEX FILIPPOV
#1 COMPLAINT BY LYMAN-CUTLER, LLC AGAINST VADIM KAGAN, TATIANA
KAGAN, KAGAN DEVELOPMENT KCD, CORP., PROEXCAVATION CORP.

BEFORE THE HONORABLE FRANK J. BAILEY

APPEARANCES:

For the Debtor:                    PETER N. TAMPOSI, ESQ.
                                   The Tamposi Law Group, P.C.
                                   159 Main Street
                                   Nashua, NH 03060

For Alex Filippov and Nickolay    SEAN T. CARNATHAN, ESQ.
Lipetsker:                         O'Connor, Carnathan and Mack,
                                   LLC
                                   1 Van De Graaff Drive
                                   Suite 104
                                   Burlington, MA 01803

For the Defendants:                JOHN H. PERTEN, ESQ.
                                   Sheehan Phinney
                                   255 State Street
                                   5th Floor
                                   Boston, MA 02109



<u>For the Defendants:</u>        JAMES P. HARRIS, ESQ.
Sheehan Phinney
1000 Elm Street
17th Floor
Manchester, NH 03105


Electronic Sound Recording Operator:  YVONNE WOODBURY


Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service
eScribers, LLC
7227 N. 16th Street, Suite #207
Phoenix, AZ 85020
973-406-2250; operations@escribers.net

I N D E X

|                          | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|--------------------------|--------|-------|----------|---------|-----------|
| WITNESSES:               |        |       |          |         |           |
| For The Plaintiff:       |        |       |          |         |           |
| VADIM KAGAN              |        |       |          |         |           |
| (By Mr. Carnathan)       |        | 162   |          |         |           |
|                          |        |       |          |         |           |
| For The Defendants:      |        |       |          |         |           |
| VADIM KAGAN              |        |       |          |         |           |
| (By Mr. Perten)          | 8      |       |          |         |           |

| EXHIBITS: | DESCRIPTION | I.D. | EVID. |
|-----------|-------------|------|-------|
| For Defendants: |  |  |  |
| 326 | 9/1/2013 ProExcavation demolition proposal |  | 78 |
| 215 | 8/2013 email from KDC to Mr. O'Grady |  | 94 |
| 327 | 10/2013 ProExcavation proposal |  | 105 |
| 328 | 5/25/2015 ProExcavation proposal for winter damage |  | 111 |
| 329 | ProExcavation proposal for Lyman Road |  | 114 |
| 330 | ProExcavation proposal for after-winter work |  | 116 |

1    (At 9:17 a.m.)

2              THE BAILIFF:  All rise.  Court is in session.

3              THE COURT:  Good morning.

4              IN UNISON:  Good morning, Your Honor.

5              THE BAILIFF:  Now calling case number 15-13881, Lyman

6    Cutler LLC.  This is trial day 8 on docket number 167,

7    objection to claim 9 of claim on Alex Filippov, filed by

8    interested parties Tatiana Kagan, Vadim Kagan, Kagan

9    Development KDC, Corp., and ProExcavation Corp.  This is also

10   a trial on case number 16-1120, Lyman Cutler LLC v. Kagan, et

11   al.

12             May the parties please state their names for the

13   record?

14             MR. CARNATHAN:  Good morning, Your Honor.  Sean

15   Carnathan for Alex Filippov and Nickolay Lipetsker.

16             MR. TAMPOSI:  Good morning, Your Honor.  Peter

17   Tamposi for the Debtor.

18             THE COURT:  Good morning.

19             MR. PERTEN:  Good morning, Your Honor.  John Perten

20   for Vadim Kagan, Tatiana Kagan, ProExcavation Corp., and Kagan

21   Development KDC, Corp.

22             MR. HARRIS:  Good morning, Your Honor.  James Harris

23   for the same parties.

24             THE COURT:  Good morning.

25             Okay.  Any preliminaries?

1           MR. PERTEN:  No, Your Honor.  Just sort of a recap to

2    give you the --

3           THE COURT:  Yeah.

4           MR. PERTEN:  -- coming attractions, if you will.

5           THE COURT:  Thank you.

6           MR. PERTEN:  As I understand it, Mr. Carnathan's

7    client has more witness who -- Mr. Maiden, the attorney; he'll

8    be called in June -- the 17th -- the 18th -- the second day in

9    June.  So in a sense, we're going a little out of order

10   because he hasn't rested yet.

11          THE COURT:  Right.

12          MR. PERTEN:  We'll start today with Mr. Kagan.

13          THE COURT:  Right.

14          MR. PERTEN:  My expectation is we'll hopefully finish

15   him today, or at least come close.  I have Tatiana Kagan on

16   call if we are going faster than anticipated.

17          THE COURT:  Right.

18          MR. PERTEN:  And so that's where we are.  And then

19   the only other housekeeping in -- which I guess we can address

20   at the end -- I'm assuming, since we're going away for a

21   month, that we need to deal with all these boxes --

22          THE COURT:  Well --

23          MR. PERTEN:  -- and I have a messenger service that I

24   said I would call during the break if the Court could just

25   advise us by then what we need to do so I can line up people

1    to come with hand trucks or whatever.

2           THE COURT:  So -- yeah, I've done that.  So what

3    Elizabeth is suggesting is we can -- I'm sad to tell you that

4    that jury box never gets used for its intended purpose.  And

5    so we could -- I could let you store boxes behind there, and

6    then you could avoid the expense and the hassle.  I have no

7    problem with that.

8           There's one small -- and I don't think this will be

9    an issue -- I'm changing courtrooms, but probably not until

10   July.  So I'm going to be in courtroom 1 going forward, so two

11   courtrooms up the hall.  But it's not going to be until July,

12   so I'll just -- I'll leave you here.  Even if I move earlier,

13   there won't be another judge after Judge Feeney retires, so

14   there won't be anybody in this courtroom for a while.  Until

15   we get the new judge, I can come back down here and try the

16   case, so we don't have to disrupt that.  So that's kind of

17   more than you need to know.

18          The answer is you can store your boxes here.  If that

19   turns out to be a problem, we'll let you know and give you

20   access, but it can maybe avoid the trouble.

21          MR. PERTEN:  Thank you.  That will make it much

22   easier.  Thank you, Your Honor.

23          THE COURT:  Okay.  Yeah, nobody will touch them.  We

24   know who's here; that's for sure anyway.

25          Okay.  Anything else?



1           When you say thought that the plaintiffs have one

2    more witness, that's not entirely correct, right?  You have an

3    expert as well.

4           MR. CARNATHAN:  Well, potentially on rebuttal, Your

5    Honor, but --

6           THE COURT:  Is that how that works?  Okay.

7           MR. CARNATHAN:  Right, but he's not part of our case

8    in chief.

9           THE COURT:  Gotcha.  All right.  Okay, all right.  I

10   get it.

11          Okay.  Let's proceed.

12          MR. PERTEN:  Your Honor, we would call Vadim Kagan to

13   the stand, please.

14          THE BAILIFF:  Please raise your right hand.

15          THE COURT:  Mr. Kagan, could you just -- you didn't

16   say anything.

17          MR. KAGAN:  Yes.

18          THE COURT:  So you'll affirm the oath that was just

19   given to you, right?

20          MR. KAGAN:  Yes.

21                        VADIM KAGAN SWORN

22          THE COURT:  Thank you.  Okay.

23          MR. PERTEN:  May I proceed now?

24          THE COURT:  Yes.  Please do.

25          MR. PERTEN:  Thank you.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1                          DIRECT EXAMINATION

2     BY MR. PERTEN:

3          Q.   Good morning, Mr. Kagan.

4     A.   Good morning.

5          Q.   Could you state your full name?

6     A.   Vadim Kagan.

7          Q.   Where do you reside, Mr. Kagan?

8     A.   Newton.

9          Q.   Okay.

10    A.   2 --

11         Q.   Mr. Kagan, let me just remind you, especially

12    because your accent is a little bit heavy, to speak slowly and

13    close to the microphone, okay?  You understand that?

14    A.   Okay.  Yes.

15         Q.   Okay.  You reside in Newton?

16    A.   Yes.

17         Q.   When did you first come to the United States, sir?

18    A.   1995.

19         Q.   And are you a citizen of the United States?

20    A.   Yes.

21         Q.   Are you married?

22    A.   Yes.

23         Q.   What is the name of your spouse?

24    A.   Tatiana Kagan.

25         Q.   Do you have any children living with you at home?

VADIM KAGAN - Direct

1    A.    Yes.

2          Q.   How many children do you have at home?

3    A.    Three.

4          Q.   And what are their ages?

5    A.    Twenty-eight, twelve, and two-and-a-half.

6          Q.   I'm sorry -- two and a half?

7    A.    Yes.

8          Q.   Now, could you please, sir, give us a brief summary

9    of your educational background?

10   A.    In 1990 -- in 1987, I was graduate jewelry and firearms

11   engraving school.

12         Q.   Jewelry and firearms engraving?

13   A.    Firearms engraving, yes.

14         Q.   And was that in Russia?

15   A.    Yes.

16         Q.   And where in Russia did you grow up?

17   A.    Belarus, Minsk.

18         Q.   And I'm sorry, you said you first came to the United

19   States in 1995; is that correct?

20   A.    Yes.

21         Q.   When you came in 1995, did you speak English yet?

22   A.    No.

23         Q.   Okay.  Other than getting a degree in art and in

24   firearms engraving, do you have any college degrees?

25   A.    No.



VADIM KAGAN - Direct

1        Q.    Do you have any background in accounting?

2    A.    No.

3        Q.    Did you have any background in computers?

4    A.    No.

5        Q.    And how did you first get into the construction

6    industry?

7    A.    When we came in July of 1995, I needed some money, and I

8    found a job in the advertisement.  They need laborers.  And I

9    joined the construction crew.

10       Q.    So you first started as a laborer in the United

11   States?

12   A.    Yes.

13       Q.    Had you worked construction in Russia before you

14   immigrated to the United States?

15   A.    My grandfather, he was a builder, and I basically spent

16   all my weekends and after school helping him at the

17   construction site.

18       Q.    And how long did you work as a laborer for a

19   construction company?

20   A.    A week.

21       Q.    And what did you do after you --

22           MR. PERTEN:  Strike that.

23   BY MR. PERTEN:

24       Q.    Did you continue in the construction industry after

25   working as a laborer?



(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1   A.   Yes.

2         Q.   What did you do next?

3   A.   I became a company manager for back where I work at the

4   time.  I was subsequently promoted and continued to work with

5   this guy for another two months.

6         Q.   So you got promoted -- you worked for another two

7   months in that construction company?

8   A.   Yes.

9         Q.   And what did you do after that?

10  A.   I start my own business.

11        Q.   Okay.  And what was the nature of the business that

12  you started?

13  A.   Painting, tiling, hardwood-floor installation --

14  anything -- handyman services -- whatever I can do with my

15  hands.

16        Q.   Okay.  So was this mostly subcontracting work?

17  A.   Yes.

18        Q.   Now, do you hold any professional licenses from the

19  Commonwealth of Massachusetts?

20  A.   Yes.

21        Q.   What licenses do you hold?

22  A.   Construction supervisor unrestricted license.

23        Q.   And when did you first get that license?

24  A.   More than ten years ago.  I don't remember when.

25        Q.   And is that license -- do you currently hold that

VADIM KAGAN - Direct

1    license?

2    A.   Yes.

3         Q.   And you hold that license in good standing?

4    A.   Yes.

5         Q.   Now, at some point, did your business change from

6    subcontract work to general contracting?

7    A.   Yes.

8         Q.   When did that occur?

9    A.   Somewhere around '97 -- 1997.

10        Q.   Around 1997.  And in the general contracting world,

11   was that on the residential side or the commercial side?

12   A.   Residential.

13        Q.   Were you building spec homes or custom homes?

14   A.   We build both, spec and customs.

15        Q.   Okay.  Did you do any work in the commercial side?

16   A.   No.

17        Q.   So you were exclusively in the residential?

18   A.   Yes.

19        Q.   And was your building business geographically -- did

20   it focus in any part of the state?

21   A.   Three-mile radius between Newton and Brookline.

22        Q.   I'm sorry -- a three-mile radius between Newton and

23   Brookline?

24   A.   Three-mile radius -- yes.

25        Q.   Okay.  Now, are you familiar with a company called

VADIM KAGAN - Direct

1    Classic Homes Development & Construction I?

2    A.    Yes.

3         Q.    What was that company?

4    A.    This was a construction company, what I owned ten years

5    ago.

6         Q.    And at some point, did you shut that company down?

7    A.    Yes.

8         Q.    Is Classic Homes still operative?

9    A.    No.

10         Q.    And was Classic Homes operative at the time of the

11    Lyman Cutler project?

12    A.    No.

13         Q.    Once you --

14         MR. PERTEN:    Strike that.

15    BY MR. PERTEN:

16         Q.    Are you familiar with a company called Kagan

17    Development KDC?

18    A.    Yes.

19         Q.    And if I refer to it going forward as KDC, will you

20    understand that I mean Kagan Development KDC, Corp.?

21    A.    Yes.

22         Q.    Once you set up --

23         MR. PERTEN:    Strike that.

24    BY MR. PERTEN:

25         Q.    Was KDC set up after you shut down Classic Homes?

VADIM KAGAN - Direct

 1   A.    Basically, it was the same time.

 2        Q.   You shut down one and started the other?

 3   A.    And started -- yes.

 4        Q.   Okay.  Once you had KDC up and running, were you no

 5   longer using Classic Homes?

 6   A.    No -- not -- no longer using Classic Homes.

 7        Q.   Okay.  And what is the business of KDC?

 8   A.    General constructing custom homes and --

 9        Q.   Again, in the residential space?

10   A.    Residential, yes.

11        Q.   Okay.  When you were setting up KDC, did you work

12   with any attorneys?

13   A.    Yes.

14        Q.   Who?

15   A.    Boris Maiden.

16        Q.   Okay.  Did you also work with any accountants?

17   A.    Yes.

18        Q.   Who did you work with?

19   A.    Agranovich Accounting.

20        Q.   Okay.  And prior to Agranovich, was there another

21   accountant that you worked closely with?

22   A.    Yes.

23        Q.   Who was that?

24   A.    Julian Webb.

25        Q.   And generally speaking --




VADIM KAGAN - Direct

1           MR. PERTEN:  Strike that.

2   BY MR. PERTEN:

3       Q.   Do you know when you set up KDC?

4   A.   2011, I think.  Yeah.

5       Q.   Okay.  If I suggested it was more like 2012; does

6   that refresh your recollection?

7   A.   Yeah -- yeah.

8       Q.   Okay.  Now, you told us --

9           MR. PERTEN:  Strike that.

10  BY MR. PERTEN:

11      Q.   Generally, what did you rely on the accountants to

12  do for KDC?

13  A.   Make sure our numbers is correct, make sure everything

14  done properly, and make sure we filed the taxes properly.

15      Q.   Okay.  Now, given that you've told us earlier that

16  you don't have a background in accounting, did you rely in any

17  fashion upon the accountants to verify or make sure your books

18  and records were accurate?

19  A.   Absolutely.

20      Q.   And how did you go about having the accountants

21  verify your financial books and records?

22  A.   He has access to our checkbooks, bank statements,

23  invoices, proposals, deposit slips -- whatever he is -- need

24  to be -- prepare for taxes end of the year.

25      Q.   Okay.  And would you say that you worked closely

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1   with the accountant to make sure your books and records were

2   accurate?

3   A.   Yes.

4       Q.   Now, prior to sometime in 2013, did you utilize

5   QuickBooks?

6   A.   Yes.

7       Q.   Prior to 2013?

8   A.   No.

9       Q.   You did not utilize QuickBooks?

10  A.   No.

11      Q.   What did you -- how did you go about keeping your

12  books and records prior to QuickBooks?

13  A.   I have file cabinets.  We had folders -- pay our

14  subcontractors, and we keep all subcontractors separately, and

15  bank statements separate, deposit slips separate.

16      Q.   So you have files for subcontractors, bank

17  statements; is that correct?

18  A.   Yes.

19      Q.   And did you also keep any kind of accounting notes

20  of any type?

21  A.   Sometimes -- depends.

22      Q.   Okay.  Now, incidentally, Mr. Agranovich, I think

23  you said, was your CPA.

24  A.   Yes.

25      Q.   Correct?



(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1   A.   Yes.

2        Q.   Is he a native Russian speaker as well?

3   A.   Yes.

4        Q.   And how about Mr. Maiden?

5   A.   Also Russian speaking.

6        Q.   And did the fact that they were fluent in Russian

7   have anything to do with your decision to utilize them?

8   A.   Yes.

9        Q.   How so?

10  A.   Because I'm not understanding the taxes.  I'm not

11  understand legal stuff.  This is why I chose Russian-speaking

12  accountant.  He can explain for me if I have any question and

13  same as Boris Maiden.

14       Q.   So they could explain to you things that were in

15  English?

16  A.   Yes.

17       Q.   Now, at some point, did the company change the way

18  it kept its financial books and records and start using

19  QuickBooks?

20  A.   Yes.

21       Q.   How did that come about?

22  A.   It was my CPA idea -- it was Agranovich idea.  And he

23  said, we have to bring the company to the new standard.  And

24  right now, in his services -- the QuickBooks service, and I

25  ask him what's the QuickBook (sic) is, and he said, we

VADIM KAGAN - Direct

1   basically have to install software for you, and we're going to

2   scan copy of every bank statement, and invoices, and receipt

3   in the system -- in the hard drive.  And I will send you once

4   a week person from my office to your office and they going to

5   enter the numbers in the QuickBooks, and they will monitor --

6        Q.   So --

7   A.   -- all the sources.

8        Q.   I'm sorry, did you finish?

9   A.   Yes -- and he said I will monitor the sources -- he will

10   monitor all this.

11       Q.   He will monitor it?

12   A.   Yes.

13       Q.   Okay.  So this was Mr. Agranovich's suggestion?

14   A.   Yes.

15       Q.   And did Mr. Agranovich, your accountant, was he the

16   person or the accounting firm who actually did the

17   installation at your office?

18   A.   I think this is his partner, Elena Kladova, who did this.

19       Q.   All right.  So his partner --

20   A.   Yes.

21       Q.   -- is actually the one who physically installed it?

22   A.   Yes.

23       Q.   Were you trained on how to use the QuickBooks once

24   it was installed?

25   A.   No.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    Q.   If you didn't know how to use QuickBooks, who was it

2    that was entering data into QuickBooks when it was first

3    installed?

4    A.   Persons who worked for Agranovich Accounting.

5    Q.   So Mr. Agranovich would send somebody to your office

6    to enter the data?

7    A.   Yes.

8    Q.   And how often would somebody from Mr. Agranovich's

9    office come to your office to enter data into QuickBooks?

10   A.   One or twice a week.

11   Q.   And was it the same person every week, or did it

12   vary from week to week?

13   A.   Varied to week to week.

14   Q.   And did you in any manner monitor or verify the

15   information that the Agranovich people were entering into your

16   QuickBooks?

17   A.   No.

18   Q.   To this day, do you even know how to go into

19   QuickBooks?

20   A.   Absolutely not.

21   Q.   Okay.

22        THE COURT:   What -- I'm sorry -- what did you say?

23   Not?

24        THE WITNESS:   Absolutely not.

25        THE COURT:   Absolutely not.

VADIM KAGAN - Direct

1           THE WITNESS:  No.  I don't even know how to press the

2    button -- I don't know.

3    BY MR. PERTEN:

4        Q.   You don't know how to press the buttons and deal

5    with QuickBooks?

6    A.   No.

7        Q.   And in addition to the people who came every week,

8    did the accountants themselves come to your site at all to

9    deal with QuickBooks?

10   A.   I think it's once a month when they have to reconcile

11   something.  They go and checking what's the employee doing in

12   the QuickBooks.

13       Q.   So once a month they would come and reconcile the

14   books for you?

15   A.   Yes.

16       Q.   Okay.  And again, did you have the ability to

17   monitor the work, the reconciliation work, that your

18   accountants were doing?

19   A.   Absolutely not.

20       Q.   Did you rely on your accountants to make sure that

21   the QuickBooks was being done properly?

22   A.   Yes.

23       Q.   Now, for what period of time did this procedure that

24   you've just describe continue -- in other words, that the

25   Agranovich people would send somebody out to enter data, and

VADIM KAGAN - Direct

1    that the accountants, once a month or so, would come and

2    reconcile; how long did that process continue?

3    A.    Six months, probably.

4        Q.    Okay.  And after six months, did it change -- did

5    the process change in any fashion?

6    A.    I hired my own bookkeeper, and I want this done on

7    everyday basis, not once a week.

8        Q.    Okay.  And why did you want this done on an everyday

9    basis and not once or twice a week?

10    A.    Because I want more explanation, more control of this

11    process.  And we have a lot of work and it's require basically

12    a full-day job.

13        Q.    It was a full-time job?

14    A.    Yeah.

15        Q.    Okay.  Do you recall who you first hired into that

16    position of bookkeeper?

17    A.    Kristina Brusenkova.

18        Q.    Okay.  Did you hire somebody named Mr. O'Grady prior

19    to Kristine (sic)?

20    A.    Yes.  Mr. O'Grady was work before Kristina.  And he is

21    nothing to do with QuickBooks.

22        Q.    He has nothing to do with QuickBooks.  Okay.  When

23    did you hire Kristina Brusenkova?

24    A.    In March 2014.

25        Q.    Okay.  And prior to hiring her directly, was she one

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1   of the people who Mr. Agranovich was sending over?

2   A.   One of the people, yes.

3        Q.   Did you have any understanding of Kristina's

4   accounting background?

5   A.   No.

6        Q.   And what was your -- what were Kristina Brusenkova's

7   duties and responsibilities at KDC?

8   A.   Enter the checks, what was already paid to subcontractors

9   or --

10       Q.   I'm sorry, I didn't understand.  Enter the checks

11   and then --

12   A.   Enter the checkbooks in the QuickBooks.

13       Q.   Enter the checkbook into the QuickBooks?

14   A.   Check -- yes.

15       Q.   What else?

16   A.   Scan the invoices.

17       Q.   Scan the invoices.

18   A.   Yeah.

19       Q.   What else?

20   A.   And make sure invoices match to the checks.

21       Q.   Okay.

22   A.   And sometimes write emails.  That's it.

23       Q.   Okay.  So she entered the QuickBooks data and

24   sometimes responded to emails?

25   A.   Yes.

VADIM KAGAN - Direct

1    Q.   Okay.  Other than that, did she have any other

2    duties and responsibilities, or was that about it?

3    A.   That's it, nothing else.

4    Q.   Did Kristina Brusenkova -- as part of her

5    responsibilities, did she have anything to do with negotiating

6    subcontracts?

7    A.   No.

8    Q.   Did she have any day-to-day duties with respect to

9    the actual construction of a project?

10   A.   Absolutely not.

11   Q.   Now, was she also responsible, sir, for maintaining

12   QuickBooks for ProExcavation Corp.?

13   A.   Yes.

14   Q.   What is ProExcavation Corp.?

15   A.   ProExcavation -- it's a construction company owned by me.

16   And this is one of our subcontractor who does a lot of our

17   work.

18   Q.   It's a subcontractor that you own?

19   A.   Yes.

20   Q.   And how does the business of ProExcavation differ

21   from the business of KDC?

22   A.   ProExcavation is a subcontractor.  ProExcavation work for

23   us in every project and work for another people.

24   Q.   And why did you -- was there a business reason that

25   you decided to set up ProExcavation?

VADIM KAGAN - Direct

1    A.    Yes.

2         Q.    What was that?

3    A.    Because excavation process in the construction industry

4    is very important because I don't want to rely on my subs

5    anymore, what I used prior before I opened ProExcavation.

6         Q.    Let me interrupt you.  Why didn't you want to rely

7    on your subs that you were using before you opened

8    ProExcavation?

9    A.    Time-consuming issue and I don't want to chase excavation

10   people anymore.  I want to have my own company, and I can

11   control my construction process.

12        Q.    And how would having your own construction enable

13   you to control your own construction process?

14   A.    Because I know exactly when I get the permit for the job;

15   nobody can lie to me.  And I can send subcontractors when I

16   want.  And I want them to be on the site, not when they want.

17   This is their -- one of the reasons.

18        Q.    So it gives you better control of your scheduling?

19   A.    And it's going to give me -- yes.

20        Q.    Okay.  Does it impact the amount of money you can

21   charge -- or you have to -- excuse me -- does having your own

22   company impact the amount of money you could charge for

23   subcontracting work?

24   A.    Yes.

25        Q.    How so?



escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    A.    Because it's -- it's my company.  I can control process.

2    And usually, we go below the market price.

3        Q.    You go below the market price?

4    A.    Yes.

5        Q.    Okay.  And were those savings that you were able to

6    pass onto your clients?

7    A.    Yes.

8        Q.    Now, does ProEx maintain its own bank accounts?

9    A.    Yes.

10        Q.    Does ProEx have its own tax ID number?

11    A.    Yes.

12        Q.    Does ProEx file its own tax returns?

13    A.    Yes.

14        Q.    Does ProEx keep its own financial books and records?

15    A.    Yes.

16        Q.    And when I say its own, I'm distinguishing from KDC.

17    Does KDC have a complete separate set of financial books and

18    records for the KDC business?

19    A.    Yes.

20        Q.    Okay.  And did you also use Mr. Agranovich for ProEx

21    before Kristina Brusenkova came in?

22    A.    Yes.

23        Q.    And after Kristina Brusenkova came on as a direct

24    hire, did you continue to utilize the Agranovich Accounting

25    firm for any reason?



VADIM KAGAN - Direct

1   A.   Yes.

2        Q.   What ongoing responsibilities would the Agranovich

3   Accounting firm have for ProEx and KDC?

4   A.   They responsible for taxes.  They responsible for

5   QuickBooks.  And they responsible and they going to make sure

6   our numbers is correct.

7        Q.   Okay.  I'm sorry -- so responsible for tax returns?

8   A.   Yes.

9        Q.   Responsible for QuickBooks?

10  A.   Yes.

11       Q.   And responsible for making sure the numbers are

12  accurate?

13  A.   Yes.  And they also responsible if we have a IRS audit --

14  make sure everything brought up in standards, and they can

15  stood up and saying yes we did this tax return and everything

16  is correct.

17       Q.   Okay.  And let me ask you just, again, to speak a

18  little slower.  I'm accustomed to your accent --

19  A.   Okay.

20       Q.   -- but I'm not sure everybody else is.  So they were

21  responsible -- I think you said if there's an IRS audit, they

22  would be responsible for answering the questions and making

23  sure everything was accurate?

24  A.   Yes.  And part of my payments to Agranovich Accounting --

25  they have services as kind of insurance when you're buying

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1   with CPA.   If something happened -- if you have IRS audit, and

2   they did the tax return, for the same amount of what I'm

3   paying a year, they're going to go and stood up at IRS and

4   saying we did everything correctly.

5       Q.   Slow down just a little bit, okay?

6   A.   Yeah.

7       Q.   So part of your payment to the Agranovich firm was

8   that insurance --

9   A.   Yes.

10      Q.   -- if you will, if the IRS ever audits, they were --

11   they'd step up and make sure --

12   A.   Yes.

13      Q.   -- things were addressed?

14   A.   Yeah, because when the number -- what they entered in the

15   QuickBooks and the number what they put on tax return, it's --

16      Q.   Slow down.

17   A.   -- should be -- it should be correct.

18      Q.   All right.

19          MR. PERTEN:  Are you following?

20          THE COURT:  If you could slow down, it would be

21   helpful to me.

22          THE WITNESS:  Okay.

23   BY MR. PERTEN:

24      Q.   Now, for what period -- during the period of time

25   that Kristina Brusenkova was entering data into your



VADIM KAGAN - Direct

1    QuickBooks, was anybody else also entering data, or was that

2    her primary duty?

3    A.    That's when --

4         Q.    When Kristina --

5    A.    When she -- when she start working for us?

6         Q.    Yeah.

7    A.    It's only Kristina.

8         Q.    Okay.  And at some point, Kristina was fired,

9    correct?

10   A.    Yes.

11        Q.    And did you hire somebody to replace her?

12   A.    Yes.

13        Q.    Who did you hire to replace her?

14   A.    Dan Gersh.

15        Q.    Dan Gersh?

16   A.    Yes.

17        Q.    And does Dan Gersh have a title in your

18   organization?

19   A.    Yes.

20        Q.    What is it?

21   A.    He's the CFO.

22        Q.    CFO?

23   A.    Yeah.

24        Q.    Generally speaking, what are Dan Gersh's duties and

25   responsibilities as contrasted to what Kristina did?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1   A.    He is entering the number in QuickBooks.

2        Q.    Okay.

3   A.    Also, if he hired bookkeeper or person who entered the

4   QuickBooks, he is control this process a hundred percent

5   because what I'm understand -- he's understanding this.

6        Q.    When you say --

7   A.    Much -- much -- much better than Kristina and he is

8   responsible talking our CPA, make sure all the numbers is

9   correct, make sure everything entered properly.  And he's

10  doing the presentations for clients.  He doing the Excel

11  spreadsheets.  And he basically control all the numbers.

12       Q.    Okay.

13  A.    He knows how much money we have accounts in the beginning

14  of the day, how much money we have end of the day, and how

15  much money we need to purchase the property, how much we have

16  to pay for attorney.  He is in charge of the -- paying the

17  house statements before closing another closing.  He's

18  basically around all the financial for the company.

19       Q.    And do you recall when Mr. Gersh was first hired?

20  A.    Beginning of 2015.

21       Q.    If I suggest to you that Kristina Brusenkova was

22  fired in October of 2014, would that refresh your

23  recollection?

24  A.    Yes.  It's the beginning of 2015.

25       Q.    Okay.  Now, do you know Joseph Cohen?

VADIM KAGAN - Direct

1   A.   Yes.

2        Q.   How do you know him?

3   A.   My brother-in-law introduced me to this gentleman.

4        Q.   Okay.  So --

5        THE COURT:  I'm sorry -- would you say that again?

6   Your brother-in-law --

7        THE WITNESS:  My brother-in-law introduced me to

8   Joseph.

9        MR. PERTEN:  His brother-in-law introduced him to

10   Joseph.

11        THE COURT:  Thank you.

12   BY MR. PERTEN:

13        Q.   And was Mr. Cohen ever an employee of either KDC or

14   ProEx?

15   A.   No.

16        Q.   What role, if any, did he have with either KDC or

17   ProEx?

18   A.   He's the speaking-English person.  And I don't have

19   anybody in the capacity who can write the letter in the

20   company or speak with somebody who understand English, and

21   he's basically understand English better than me.  And if we

22   have to write a letter or talk to somebody, allows me --

23   Joseph to do so.

24        Q.   Okay.  So did Joseph have -- and you understand when

25   I say Joseph, I mean Joseph Cohen?



VADIM KAGAN - Direct

1   A.   Yes.

2        Q.   Did Joseph have any day-to-day responsibilities at

3   KDC?

4   A.   No.

5        Q.   Did Joseph have any day-to-day responsibilities with

6   ProExcavation?

7   A.   No.

8        Q.   Did you use him on an as-needed basis?

9   A.   Yes.

10       Q.   Did Joseph have a key to the office?

11  A.   No.

12       Q.   Did he maintain an office at the KDC business --

13  A.   No.

14       Q.   -- or ProEx for that matter?

15  A.   No.

16       Q.   Okay.  Did he have regular office hours?

17  A.   No.

18       Q.   How often would you speak with Joseph, generally

19  speaking, during the course of a year?

20  A.   Sometimes I speak with him once in three days, sometimes

21  twice a week; it depends, as needed.

22       Q.   Did Joseph have any responsibility as it related to

23  QuickBooks?

24  A.   No.

25       Q.   Did he have access to QuickBooks?

VADIM KAGAN - Direct

1    A.    No.

2        Q.    Did Joseph have any responsibility as it related to

3    subcontractor invoicing?

4    A.    Absolutely not.

5        Q.    Did he have any responsibility for any aspect of the

6    construction on any projects that you were working on?

7    A.    No.

8        Q.    Did he interact with subcontractors in any fashion?

9    A.    No.

10       Q.    In connection with the preparation of the -- I'm

11   going to call the binders for the proof of claim, which is

12   Exhibits 274 and 275 -- 174 and 175 -- excuse me -- did Joseph

13   have any role in pulling together that information, or did Mr.

14   Gersh do it?

15   A.    Mr. Gersh prepare the number.  And -- and Joseph just put

16   this together.

17       Q.    The invoice --

18   A.    Yes.

19       Q.    -- he put the invoice together?

20   A.    He put the invoice together -- yes.

21       Q.    But in terms of actually collecting all the invoices

22   and putting the binders together, did he have any role?

23   A.    No.

24       Q.    Now, when did you first start using Joseph Cohen as

25   a consultant?

VADIM KAGAN - Direct

1   A.   2012.

2        Q.   Okay.  And at the time you first starting utilizing

3   him as a consultant, did you know that --

4            THE COURT:  I'm sorry -- I'm sorry to interrupt you.

5            MR. PERTEN:  2012.

6            THE COURT:  That's what I thought he said.  All

7   right, go ahead.  Sorry to interrupt.

8   BY MR. PERTEN:

9        Q.   Mr. Kagan?

10  A.   Do you want me move my mouth from microphone a little

11  bit?

12       Q.   Lean a closer to the microphone and talk just a

13  little bit slower.  I'm very comfortable with your accent, but

14  clearly, it's -- you have to learn how --

15           THE COURT:  It's a combination of the microphone in

16  the courtroom, which makes things a little blurrier to hear,

17  and also with the speed with which you speak.  By the time you

18  leave that spot, I'll probably understand every word you say,

19  but I don't right now, so --

20           THE WITNESS:  Okay.

21           THE COURT:  Okay.  And I appreciate -- I think it

22  works if you repeat what he says --

23           MR. PERTEN:  I will.

24           THE COURT:  -- and he can hear you.

25           But you know to correct your lawyer if he repeats



VADIM KAGAN - Direct

 1  something incorrectly, right?

 2          THE WITNESS:  Thank you, Your Honor.

 3          THE COURT:  You'll do that -- you'll let us know?

 4          THE WITNESS:  Yes.

 5          THE COURT:  Okay.

 6          THE WITNESS:  Thank you.

 7          THE COURT:  All right.

 8  BY MR. PERTEN:

 9      Q.   Now, when you first engaged Mr. Gersh as a

10  consultant in 2012, did he disclose to you that he had served

11  time -- that he had been incarcerated?

12  A.   I think you said Gersh, not -- not Cohen.

13      Q.   Thank you.  When you first engaged Mr. Cohen --

14          THE COURT:  Like I said, correct him whenever you

15  need to.

16          THE WITNESS:  Yes.  What I'm going to do right now.

17          THE COURT:   Okay.

18          THE WITNESS:  I've got forty years of experience now.

19          MR. PERTEN:  Well -- thank you.  Now, you threw me

20  off my game.

21          THE WITNESS:  Do you need a few minutes?

22          MR. PERTEN:  I ask the questions.

23          THE COURT:  And I'll take care of the breaks, okay?

24          THE WITNESS:  Okay.  Thank you.

25          THE COURT:  Okay.  All right, let's go.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1   BY MR. PERTEN:

2        Q.   When you first started using Mr. Cohen as a

3   consultant, did he disclose to you that he had been

4   incarcerated -- that he had been in jail?

5   A.   No.

6        Q.   Did you know that he had been convicted of any

7   crimes?

8   A.   No.

9        Q.   When did you first learn that he had a background

10  where he had been incarcerated and convicted of crimes?

11  A.   I believe this is after deposition.

12       Q.   After Mr. Cohen's deposition?

13  A.   Mr. -- Mr. Cohen's deposition.

14       Q.   In 2018?

15  A.   Yes.

16       Q.   And prior to his deposition, did you have any

17  knowledge -- so prior to his deposition in 2018, did you have

18  any knowledge that Mr. Cohen had a criminal background?

19  A.   No.

20       Q.   And when you learned that Mr. Cohen had a criminal

21  background that he hadn't disclosed, did you confront him

22  about that?

23  A.   Yes.

24       Q.   Could you tell us what you recall about that

25  confrontation or discussion, if you will, with Mr. Cohen?

VADIM KAGAN - Direct

1           MR. CARNATHAN:  Objection.

2           THE COURT:  Objection to?

3           MR. CARNATHAN:  I think the question calls for a

4    hearsay or account of what Mr. Kagan's going to say he said to

5    Mr. Cohen.

6           THE COURT:  Well, what's your response, Mr. Perten?

7           MR. PERTEN:  It's going to the state of his

8    knowledge.  I'm not asking for the truth of the matter.

9           THE COURT:  It's overruled for that reason.  Go

10   ahead.

11   BY MR. PERTEN:

12      Q.   Could you recount what your conversation with Mr.

13   Cohen when you learned that he had a criminal background that

14   he hadn't told you about?

15   A.   First of all, it's blow my head off.  And I said, Joseph,

16   why didn't you tell us -- anybody?  And he said don't worry,

17   it's just the child support.  And this was ten or fifteen

18   years ago, so you don't have to worry about it.  He said I --

19   he said I go through a messy divorce, and I lost my house, I

20   lost my business.  And I said, okay fine.  If this is the

21   case, I --

22      Q.   Okay.  So he told you it was part of a messy

23   divorce?

24   A.   Yes.

25      Q.   And he lost his house and his business?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    A.    Yes.

2         Q.    And that it was it child-support related?

3    A.    It was child support, and he said his ex-wife throwed him

4    to jail and like --

5         Q.    I'm sorry -- his ex-wife --

6    A.    His ex-wife throwed him in jail.

7         Q.    His ex-wife threw him in jail?

8    A.    Yes.

9         Q.    As a result of learning this in 2018, did your

10   relationship with Mr. Cohen change in any manner?

11   A.    Yes.

12        Q.    How so?

13   A.    We basically not give them any business and we don't need

14   his help.

15        Q.    You basically didn't give him any business and --

16   A.    Any business and we don't need his help anymore.

17        Q.    You don't need his help anymore?

18   A.    Yeah.

19        Q.    And why did you make that decision?

20   A.    First of all, he is not honest.  And secondly --

21        Q.    I'm sorry -- first of all, he's not --

22   A.    First of all, he was not honest.  He --

23        Q.    You got to slow down.

24   A.    First --

25        Q.    Even I'm having trouble.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

 1    A.    First of all, he was not honest to us.

 2          Q.    He was not honest to you?

 3    A.    Yes, because he should -- at least, when they ask -- when

 4    we asked him, he should tell us the truth and he didn't.

 5          Q.    Okay.

 6    A.    And also, I have another attorney represent me since we

 7    are not doing business with Boris Maiden anymore.

 8          Q.    Let me stop you there --

 9    A.    Yeah.

10          Q.    -- because I don't want you to tell us what your

11    conversations were with the attorney.

12    A.    All right.

13          Q.    So I don't know if you can still proceed, or have

14    you now finished your answer short of whatever conversation

15    you had with your attorney?

16    A.    So basically, we don't have Joseph anymore.  And we don't

17    want to have anything with Joseph.

18          Q.    Okay.

19    A.    Simple answer.

20          Q.    Now, in or about 2015, did Joseph become a director

21    of KDC?

22    A.    Yes.

23          Q.    How did that come about?

24    A.    He suggest since she's -- he's doing filing on the states

25    on behalf of the company, like, any --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    Q.   Wait, slow down.  He suggested that because --

2  A.   He suggest because he's doing the annual reports --

3    Q.   He's doing --

4  A.   Annual reports --

5    Q.   Okay.

6  A.   -- on behalf of the company --

7    Q.   He's doing the annual reports on behalf of the

8  company?

9  A.   Yes and to the states.

10    Q.   He --

11  A.   Annual reports --

12    Q.   Yeah.

13  A.   -- when we have to pay for the LLC every year --

14    Q.   Um-hum.

15  A.   -- he does the annual reports.  He suggest he -- we have

16  to put him somewhere in the business.  And he suggests it's

17  the best way, he want to be director, and I said fine.

18    Q.   Okay.  So he suggested that because he was filing

19  the annual reports and was filing things, he should be a

20  director?

21  A.   Yes.

22    Q.   And you agreed?

23  A.   Yeah.

24    Q.   How did the title of strategic business manager come

25  to pass for Mr. Cohen?

VADIM KAGAN - Direct

1  A.    He -- I think he think he doing some kind of strategic

2  thing for the business and he titled himself as the strategic

3  business director.

4       Q.    So he titled himself?

5  A.    Yes.

6       Q.    And did you have any problem with that?

7  A.    No.

8       Q.    Okay.  As it relates to the Lyman Cutler project,

9  other than the assistance with preparing the final invoice,

10  did Mr. Cohen have anything substantive to do with Lyman

11  Cutler?

12  A.    No.

13       Q.    And that was true the entire -- from 2012 to the

14  date of the invoicing June of 2015; is that correct?

15  A.    Yeah.

16       Q.    Now, let's turn our attention a little bit to the

17  Lyman Cutler project.  At the time you first started thinking

18  about what became the Lyman Cutler project, how many homes had

19  you built in the Newton-Brookline area?

20  A.    Probably thirty/forty.

21       Q.    Thirty to forty?

22  A.    Yeah.

23       Q.    Okay.  And how did you first learn of the

24  possibility to do a project -- that being the project that

25  became Lyman Cutler; how did it first come to your attention?

VADIM KAGAN - Direct

1    A.   It was house on the market.  We building house next door.

2    And I thought it was going to be good opportunity to develop

3    this land.

4         Q.   Okay, so you were building a house next door?

5    A.   Yes.

6         Q.   Would that be 10 Lyman?

7    A.   Yes.

8         Q.   And you learned that this property was coming on the

9    market?

10   A.   It was on the market; I saw the sign there.

11        Q.   Okay.  And at that time you first learned that the

12   home, which I gather was at that point called 77 Lyman; is

13   that right?

14   A.   Yes.

15        Q.   At the time you first learned about 77 Lyman, was

16   there a home on the site?

17   A.   Yes.

18        Q.   And what were you thinking of in terms of what you

19   were going to do if you could purchase that property?

20   A.   Where we can build one house, or we can build two, or we

21   kill three -- or we'll build three.  We don't know what we're

22   going to do, but I thought it's a good opportunity and we can

23   do something there.

24        Q.   Okay.  So did you believe that the lot size was

25   large enough that you might be able to build two or three

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1  houses?

2  A.   Yes, because the different zoning on 10 Lyman.  And the

3  zoning, I know we can build two homes because we can

4  subdivide.

5      Q.   So you're understanding was that under the zoning,

6  you would be able to build two houses; is that your testimony?

7  A.   Yes.

8      Q.   And as you understood, in order to get permission to

9  build two houses on that property that just currently had the

10  77 Lyman house on it, what is your understanding of what would

11  have to happen?

12  A.   First of all, we have to survey the lot.

13      Q.   You have to subdivide the lot?

14  A.   No, survey the lot.

15      Q.   Survey the lot.

16  A.   You have to survey the lot first.  Based on the survey,

17  we have to present the plan to Town of Brookline, and that at

18  least give us initial thoughts what we can do there --

19      Q.   Okay.

20  A.   -- if we're eligible for subdivision.

21      Q.   Okay.  So there's a process by which you provide a

22  preliminary plan to divide the lots; is that correct?

23  A.   Yes.

24      Q.   And then you get feedback --

25  A.   Yes.



VADIM KAGAN - Direct

1     Q.    -- from the Town of Brookline as to whether they

2   might allow that?

3   A.    Yes.

4     Q.    And once that initial process occurs, what happens

5   next, as you understand the process?

6   A.    We have to cut this lot based on the zoning regulation

7   for Town of Brookline and feed the footprint of the future

8   project on those two lots or three lots.

9     Q.    Okay.  So you need to submit a plan which cuts it?

10  A.    Yes.

11    Q.    And get the Town of Brookline to approve it?

12  A.    Yes.

13    Q.    Does the house that you can build upon it, is that

14  contingent at all on the shape of the lot the town approves?

15  A.    Yes, only in the shape of the lot.

16    Q.    I'm sorry?

17  A.    Only in the shape of the lot.

18    Q.    Only on the shape of the lot?

19  A.    Because we -- because we have to be in setbacks.

20    Q.    Because you have to be within setbacks?

21  A.    In the setbacks, yes.

22    Q.    Okay.  And until the town tells you exactly where

23  the new lot lines will lie, is it possible to design a home on

24  the two lots?

25  A.    It's unrealistic.



(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    Q.   Why is it unrealistic?

2  A.   Because we not even know what does -- what does -- what

3  the Brookline allow us to do.  And also -- it's -- it's also

4  not only on the base of the shape of the lot.  Also depends on

5  the height.  Because this lot --

6    Q.   Okay.  Let me just interrupt for a moment.  It's not

7  only based on the shape of the lot, it's based on the height?

8  A.   It's based on the height --

9    Q.   Okay.

10  A.   -- because this lot, it's not a flat lot.  It was

11  basically a downhill ski from one side to another.

12    Q.   Okay.  So it was not a level lot; it was a sloping

13  lot?

14  A.   It's not -- it's slope, yeah.

15    Q.   And did how did the fact that it was a sloping lot

16  impact what you could build on it?

17  A.   Because we don't -- because based on the site plan

18  approvals, the Town of Brookline has to approve how we're

19  going to level the lot first because it's a special

20  requirements for all new construction.  We can't have runoff

21  water for new construction to the neighbor's yard.  And we

22  have to level them, and we have to create some kind of

23  drainage system and retaining walls first.

24    Q.   Okay.  So the Town of Brookline would require the

25  lot to be leveled in some fashion?



VADIM KAGAN - Direct

1    A.    Yes.

2        Q.    And as I understood your testimony, that's because

3    there's drainage concerns?

4    A.    Yes.

5        Q.    And so part of any plan that you would have would

6    have to take into account drainage, correct?

7    A.    Yes, drainage problem.

8        Q.    And the ability to build a home and site the home,

9    would that be impacted at all by how the drainage would work?

10    A.    Yes.

11        Q.    And could you plan a drainage system before you knew

12    what was actually going to be approved?

13    A.    Absolutely not.

14        Q.    Now, do you recall the price for the existing home

15    and lot?

16    A.    I think for 4.5 million.

17        Q.    Okay.  If I suggested $4 million, does that refresh

18    your recollection?

19    A.    That's what we purchased for four million, yeah.

20        Q.    You purchased it for four million?

21    A.    Yeah.

22        Q.    Was it listed for higher?

23    A.    It was listed higher, yeah.

24        Q.    So it was listed for four and a half?

25    A.    I think it was four and a half.




VADIM KAGAN - Direct

1    Q.   And you had an accepted offer for four million; is

2    that correct?

3    A.   Yes.

4    Q.   Now, where you planning on building and owning this

5    project yourself, or were you going to seek outside partners?

6    A.   I have to seek only outside partners.

7    Q.   And how did you go about finding outside partners?

8    A.   On this particular project?

9    Q.   I'm sorry?

10   A.   On this particular project?

11   Q.   On this particular project, yes.

12   A.   I spoke with Nick Lipetsker because he was my partner in

13   another few projects in the time.

14   Q.   Okay.  So Mr. Lipetsker had been a partner with you

15   on another three projects?

16   A.   Another four or five, yeah.

17   Q.   Four or five projects, and you spoke to Mr.

18   Lipetsker?

19   A.   Yes.

20   Q.   What did you say to Mr. Lipetsker?

21   A.   I said it's a lot next door for sale.  And it's a good

22   opportunity.

23   Q.   Slow down.

24   A.   It's a good opportunity.  We could build something there.

25   Q.   So you said, there's a lot next door for sale.  It's

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

 1  a good opportunity.  We can do something.

 2  A.   Yes.

 3       Q.   Did you say anything else?

 4  A.   No.

 5       Q.   And what did Mr. -- what was Mr. Lipetsker's

 6  response, if any?

 7  A.   He said I know a few people who can be very interesting

 8  in this project and let me talk to them, and that's it.

 9       Q.   Okay.  And after this initial conversation between

10  yourself and Mr. Lipetsker, what happened next with respect to

11  what ultimately became the Lyman Cutler project?

12  A.   He called me in a few days, and he said he spoke with the

13  people, and one of the person very interesting and would like

14  to talk to me.

15       Q.   Okay.  Did he tell you who that one person who was

16  interested was; did he tell you who it was?

17  A.   Yes.

18       Q.   Who was it?

19  A.   Alex Filippov.

20       Q.   Did you know Mr. Filippov at this point?

21  A.   No.

22       Q.   Okay.  So you clearly knew Mr. Lipetsker, correct?

23  A.   Yes.

24       Q.   And he introduced you to Mr. Filippov?

25  A.   Yes.



(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    Q.   And did you then have a conversation with Mr.

2    Filippov?

3    A.   Yes.

4    Q.   Was that a face-to-face or a phone conversation, how

5    did that --

6    A.   It was -- it was face-to-face.

7    Q.   Where did you meet?

8    A.   At the construction site.

9    Q.   Which construction site?

10   A.   I think it was at the 10 Lyman.

11   Q.   10 Lyman, around the corner?

12   A.   Yeah, yeah.

13   Q.   And who was present during that conversation?

14   A.   Lipetsker, and Filippov, and me.

15   Q.   The three of you?

16   A.   Yeah.

17   Q.   And what do you recall of your conversations at the

18   10 Lyman site when you first met Mr. Filippov?

19   A.   Filippov asked me what we can build there, and I said I

20   don't know.  We have to base on the town approval.  But I knew

21   definitely we can subdivide at least for two lots.

22   Q.   Okay.  So he asked you what you could build there --

23   A.   Yes.

24   Q.   -- and you said you don't know.

25   A.   Yeah.



VADIM KAGAN - Direct

1    Q.   Because it's based on the Town of Brookline, what

2  they'll allow?

3  A.   Based on the town's approval, yes.

4    Q.    And did you say words to the effect I think we can

5  probably build two houses?

6  A.   Yes.

7    Q.   All right.  Do you recall anything else about this

8  initial conversation with Mr. Filippov?

9  A.   And Filippov asked me why are not doing by yourself?  I

10  said I don't have so much money to -- because we're already in

11  a lot of projects right now.  And I can't do it myself because

12  very simply, bank's not going to finance me.

13    Q.   Okay.  So he wanted to know whether you could do

14  it -- why you weren't doing it yourself?

15  A.   Wanted -- yes.

16    Q.   And you told him you didn't have the financial

17  ability to do it yourself because you were doing other

18  projects?

19  A.   Yes.

20    Q.   I right.  Was there any further conversation that

21  you had during --

22  A.   It -- yes.

23    Q.   -- and again, I'm focusing you on this initial

24  conversation, sir.

25  A.   Yeah, yeah, he might be interesting.  And I said fine, if

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    you're interesting -- but it's only one week we can get on

2    this project.  You have to purchase it, you have to guarantee,

3    and you have to obtain the construction loans for this

4    purchase.

5        Q.   Okay.

6    A.   Yeah.

7        Q.   Again, you have to go a little slower.  He said he

8    might be interested?

9    A.   Yes.

10       Q.   Give it to me sentence by sentence.

11   A.   He might be interesting.

12       Q.   Yeah, he might be interested.

13   A.   And I said but it's only if you can purchase this on your

14   name and guarantee.  And depends on your financial status, I

15   don't know your financial status.  Also, your bank -- if you

16   present them all the financial documents, they can tell us you

17   can purchase this or not --

18       Q.   Okay.

19   A.   -- and work a deal with it or not.  And also based on the

20   bank approvals.

21       Q.   Okay.  So let's break that down a little bit.  You

22   said a lot.  You said you have to be able to purchase the

23   property, correct?

24   A.   Yes, yes.

25       Q.   And that he would have to have a strong enough

VADIM KAGAN - Direct

1  financial backing to go to the bank and get a loan?

2  A.   Yes.

3      Q.   And that based upon what the bank said, you would be

4  able to determine how much money you could borrow?

5  A.   Yes.

6      Q.   Did I miss anything, or is that what you said?

7  A.   No.   That's what I said, yeah.

8      Q.   Okay.   Did any other conversation occur during that

9  initial meeting with Mr. Filippov and Mr. Lipetsker?

10 A.   No.   They just walk on 10 Lyman -- said, you know, it's a

11 big site, it's a lot of work.   I said, yes, that's what we do

12 for a living.

13     Q.   Okay.   So they looked at 10 Lyman, which was then

14 under construction?

15 A.   Yes.

16     Q.   And noted it was a lot of work, and you said that's

17 what I do for a living?

18 A.   Yes.

19     Q.   What happened next with respect to what became the

20 Lyman Cutler project?

21     A.   I believe a few days after that, Filippov or

22 Lipetsker -- I don't know who was them, you know -- they call

23 me and said let's set up a meeting and talk about it.   And I

24 said when do you want to do the meeting.   He said let's set --

25     Q.   Let me stop you there.   So they called you -- one of

VADIM KAGAN - Direct

1    them called you a few days later --

2    A.    Yes.

3        Q.    -- and suggested that you set up a meeting?

4    A.    And -- and they suggest both of us set up the meeting.

5        Q.    What do you mean when you say they suggested that

6    both of us set up the meeting; what do you mean by that?

7    A.    The always act like Filippov and Lipetsker together and

8    me as the separate person.

9        Q.    Okay.  So by --

10   A.    When I said the both of them -- when I saying both of

11   them it's, like, Filippov and Lipetsker and me.

12       Q.    All right.  When you say "both of us", you meant you

13   on one side and Lipetsker and Filippov of the unit.

14   A.    I mean, on the other side -- yes --

15       Q.    On the other side, so --

16   A.    -- that's why I'm saying both -- yeah.

17       Q.    The two groups being you and Filippov/Lipetsker on

18   the other side --

19   A.    Yes.

20       Q.    -- suggested that the three of you get together?

21   A.    Yes.

22       Q.    And did you in fact get together?

23   A.    Yes.

24       Q.    Where did you meet?

25   A.    We met at the Boris Maiden office.



VADIM KAGAN - Direct

1        Q.    At Boris Maiden's office?

2    A.    Yes.

3        Q.    And do you recall when that was?

4    A.    I don't.

5        Q.    Okay.  Who was present at this meeting at Boris

6    Maiden's office?

7    A.    Lipetsker, Filippov, and me.

8        Q.    Okay.  Was Mr. Maiden present as well?

9    A.    No -- no, he was there next door.  He was doing his own

10    stuff, and we are talking in the conference room.

11        Q.    So you used his conference room, and he was present

12    in the office, but not present during the meeting?

13    A.    Yes.

14        Q.    Did he come in and out?

15    A.    Yeah.

16        Q.    Okay.  Incidentally, had Mr. Maiden represented you

17    on other projects?

18    A.    Yes.

19        Q.    Roughly, how many projects had you done with Mr.

20    Maiden?

21    A.    Probably twenty-five/thirty projects.

22        Q.    Okay.  And did Mr. Maiden -- to your understanding,

23    did Mr. Maiden sort of have a standard set of documents that

24    he used on the projects?

25    A.    Yes.



VADIM KAGAN - Direct

1      Q.   And were those -- as you understood it, were those

2   documents that he had developed?

3   A.   Yes.

4      Q.   And were those in English?

5   A.   Yes.

6      Q.   And when you had questions, would he translate

7   documents into Russian for you?

8   A.   Yes.

9      Q.   And did you rely on Mr. Maiden to make sure that you

10  understood the English documents?

11  A.   Yes.

12     Q.   Did you have the ability -- and granted, your

13  English in 2019 is better -- but did you have the ability back

14  in 2012 and 2013 to read and understand the intricacies of

15  legal documents?

16  A.   Absolutely not.

17     Q.   And did you rely on Mr. Maiden to tell you if there

18  was anything you needed to know about the documents he was

19  creating?

20  A.   Yes, only in Boris Maiden.

21     Q.   I'm sorry?

22  A.   Only in the Boris -- yeah.   Only on the Boris opinion.

23     Q.   Only on Boris' opinion?

24  A.   Yes, yes.

25     Q.   Okay.   At this meeting at Mr. Maiden's office, did

VADIM KAGAN - Direct

1    you bring any documents?

2    A.    No.

3        Q.    Was Mr. Zhukovskiy there at this meeting, or was

4    that another meeting, or was that another meeting?

5    A.    No.  It was another meeting.

6        Q.    Okay.  What do you recall happened at this initial

7    meeting at Boris Maiden's office?

8    A.    We talk about the project and my other projects, what I

9    do for a living.  Filippov said what he is doing for a living.

10   And we are agree we can do this project together.

11       Q.    Okay.  So you talked about the other kinds of

12   projects you developed?

13   A.    Yes.

14       Q.    Mr. Filippov told you what kind of business he was

15   in?

16   A.    Yeah.

17       Q.    And you reached agreement that you wanted to go

18   forward, if possible, on this project?

19   A.    Yeah.

20       Q.    Anything else substantive happen at this initial

21   meeting at Boris Maiden's office?

22   A.    No, nothing else.  We left and we said everybody do our

23   old -- our own due diligence about this project, what we can

24   do there.

25       Q.    Okay.  So you left and everybody was going to do his

VADIM KAGAN - Direct

1  own due diligence?

2  A.   Yes.

3       Q.   What happened next with what, again, became known as

4  the Lyman Cutler project?

5  A.   I believe Boris start doing the operating agreement.  And

6  Filippov supposed to contact the bank updating all the

7  financial information.  And I have to start work on the

8  subdivision of the land.

9       Q.   Okay.  Was there a second meeting when Mr.

10 Zhukovskiy was present in Mr. Maiden's office?

11 A.   Yes.

12      Q.   And approximately how long after that first meeting

13 at Boris Maiden's office was the second meeting where Mr.

14 Zhukovskiy was present?

15 A.   Probably a few months.  I don't -- don't remember.

16      Q.   Okay.  And let's focus on that second meeting; what

17 do you recall about that meeting?

18 A.   We talk about the numbers.

19      Q.   You talked about --

20 A.   About the numbers of the construction of the homes.

21      Q.   Okay.

22 A.   We talk --

23      Q.   Wait one second -- hold on.

24 A.   Yeah, yeah.

25      Q.   You talked about the numbers.

VADIM KAGAN - Direct

1    A.    Yes.

2         Q.    And what do you recall saying about the numbers for

3    this project?

4    A.    All the numbers based -- all the numbers of the whole

5    project based on the subdivision of the plan approvals --

6    based on the construction plans and --

7         Q.    Okay.  Hold on.  So all the numbers are based upon

8    the subdivision, the approvals, and what the Town of Brookline

9    permits?

10   A.    Yes.  And -- and based on the construction plan, when we

11   going to decide what are we going to build there.

12        Q.    So it would be based on the plan once you decide

13   what you were going to build?

14   A.    Yes.

15        Q.    Did you have any further discussion at that meeting

16   about the financial side of the possible arrangement?

17   A.    We look on a spreadsheet, which Mr. Zhukovskiy prepare.

18        Q.    Okay.  There was a spreadsheet --

19   A.    It was --

20        Q.    -- that Mr. Zhukovskiy prepared?

21   A.    Yes.

22        Q.    Let me stop you there for a moment.

23   A.    Yeah.

24        Q.    Is that a spreadsheet that you had reviewed prior to

25   attending to this meeting?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    A.    No.

2         Q.    Did you have any role in preparing that spreadsheet?

3    A.    Absolutely not.

4         Q.    Did you provide Mr. Zhukovskiy with some sort of a

5    template to use?

6    A.    Yes.

7         Q.    How did that come about?

8    A.    I provide a template to Mr. Zhukovskiy, I think -- he was

9    my partner on other project -- and I give him the template,

10   which is how we usually count the number, mortgages and

11   percentage and the carrying cost.

12        Q.    Okay.  Let me stop you there.  So you gave him a

13   template to utilize?

14   A.    Yes.

15        Q.    What is that template generally used for?

16   A.    It's generally when we enter into the project, and it was

17   basically a template created by my nephew fifteen years ago.

18   And it's three pages there.  You can have to just enter the

19   number for the purchase price, you enter the construction

20   cost, you enter the percentage, and the -- this Excel

21   spreadsheet will calculate everything by itself.

22        Q.    Okay.  So this spreadsheet that was -- I'm sorry --

23   you said it was prepared by your brother-in-law?

24   A.    By -- by my nephew.

25        Q.    By your nephew.



(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    A.    Yeah.

2         Q.    Sorry.

3    A.    Yeah.

4         Q.    Did you provide Mr. Zhukovskiy with the numbers to

5    enter into that spreadsheet?

6    A.    No.

7         Q.    Who put the numbers in that spreadsheet?

8    A.    I think Zhukovskiy.

9         Q.    Okay.  When you got to the meeting, was Mr.

10   Zhukovskiy there with the spreadsheet?

11   A.    Yes.

12        Q.    And did you have any discussion as to where he got

13   the numbers?

14   A.    First of all, I don't even know why Zhukovskiy was there.

15        Q.    Okay.

16   A.    It's my --

17        Q.    You didn't know why he was there?

18   A.    Yeah, it's my first impression because I don't know what

19   he's doing there.  And it was answered by Nick Lipetsker.  He

20   said, you know, to better understand the number and how deal

21   going to work, you know, we want Zhukovskiy to tell us about

22   it.

23        Q.    Okay.  Let me stop you there.  So again, as I

24   understood your testimony, you didn't know why Zhukovskiy was

25   there; is that correct?



(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    A.   Yes, absolutely.

2         Q.   And Mr. Lipetsker said that -- what did Mr.

3    Lipetsker say about that?

4    A.   It's going to be better for everybody when he want to

5    give us the presentation and tell us how this number going to

6    work.

7         Q.   Okay.  It was better for everybody that Zhukovskiy

8    explained the numbers?

9    A.   Yes.

10         Q.   Okay.  Did Mr. Lipetsker say anything else about how

11    Mr. Zhukovskiy came to be at this meeting?

12    A.   He said he ask him because he's his nephew and is good in

13    the numbers, and he only the one guy who can do all this --

14    who put this -- all this together.

15         Q.   Do you know to manipulate an Excel spreadsheet?

16    A.   No, no.

17         Q.   Are you --

18    A.   No.

19         Q.   You're not Excel savvy?

20    A.   I'm don't even know how to open, sir.

21         Q.   And so was there a discussion at the meeting about

22    the numbers on the spreadsheet?

23    A.   It's not really about the numbers.  And they start

24    showing me this -- they start showing to me all this Excel

25    spreadsheet, showing this number go there, this number go

VADIM KAGAN - Direct

1    there.  And it's -- that's about it.

2         Q.   So --

3    A.   And -- and -- and -- and they -- and they ask me a few

4    times, how much is going to be to cost to build two houses,

5    and I said I cannot tell you how much it's going to be to

6    build all those houses because we don't have the plans for the

7    house yet.

8         Q.   Okay.  So let me stop you there.  So you said that

9    there was some discussion about the numbers, and they kept

10   asking you how much the construction costs would be?

11   A.   Yes.

12        Q.   And what was your response to that question, slowly?

13   A.   I can't tell you how much it's going to build these

14   houses is because I don't know what we are building.

15        Q.   So you said you couldn't tell them because you

16   didn't know what was going to be built yet?

17   A.   Yes.

18        Q.   Okay.  At that point, had the property been

19   subdivided yet?

20   A.   No.

21        Q.   Had there been house plans prepared yet?

22   A.   No.

23        Q.   Did you know whether you could build one house or

24   two houses yet?

25   A.   I know -- I know -- I know we can build two houses.



VADIM KAGAN - Direct

1  And -- but nothing else.  And Filippov also asked maybe we can

2  build three.  I said maybe we could build three, but

3  everything depends on the -- our budget.

4      Q.   Did anybody at -- there's been testimony.  You've

5  been here for the entire trial, correct?

6  A.   Yeah.

7      Q.   There's been testimony to the effect that you

8  assured everybody that the construction costs would be $1.3

9  million.  At any point at that meeting, did you assure anybody

10  that the construction costs would not exceed $1.3 million?

11  A.   It's a very interesting testimony.  I never say this

12  because I cannot say how much it's going to be cost to build

13  the homes if I don't know what I'm doing.

14      Q.   So you did not say that?

15  A.   Absolutely, I didn't say that.

16      Q.   Because you didn't have house plans, you don't know

17  what you were going to be building?

18  A.   I don't -- I don't have anything.

19      Q.   Okay.

20  A.   It's just a hypothetic conversation of what we can do

21  with the project.

22      Q.   It was a hypothetical conversation --

23  A.   Yeah.

24      Q.   -- about what you might be able to do with the

25  project?

VADIM KAGAN - Direct

1    A.    Yes.

2         Q.    Okay.  How long did that meeting last?

3    A.    I don't remember.  Maybe forty minutes, maybe an hour.

4         Q.    Okay.  The spreadsheet that Mr. Zhukovskiy brought,

5    did anybody ask you to sign it and affirm that the numbers

6    were accurate and would not be exceeded?

7    A.    When we all opened the spreadsheet, and Filippov ask,

8    maybe you want to put the signature on the spreadsheet.  I

9    said, why do I have to put the signature?

10        Q.    Oh, so Mr. Filippov asked you to sign the Excel

11   spreadsheet?

12   A.    Yes.

13        Q.    And your response was why do you want me to sign it?

14   A.    Yeah.

15        Q.    And what did he say?

16   A.    We can add this number to the operating agreement in the

17   future.

18        Q.    He said we can add the number to the operating

19   agreement in the future?

20   A.    Yeah.

21        Q.    And what was your reaction?

22   A.    And I said what number?

23        Q.    You said what number --

24   A.    And I said what --

25        Q.    -- what did you mean by that?

VADIM KAGAN - Direct

1    A.    And I said what number what he said about some numbers.

2    And he said, no, we have this conversation today, and maybe

3    you're going to agree on the price and what you can build in

4    the future, and how much money we can spend, how much is

5    carrying cost going to be.  And I said, no, I cannot sign on

6    this piece of paper because I don't even know if you got the

7    loan and we don't have a plan.  And I cannot sign on some kind

8    of piece of paper for something what we don't know what's our

9    future plans.

10        Q.    So as I understood your testimony, sir, you told

11    them you couldn't sign it because you didn't have plans and

12    you didn't even know what you could build yet?

13    A.    Absolutely.

14        Q.    Okay.  And what was Mr. Filippov's response when you

15    told him you could not affirmatively assure him that the

16    numbers that were in that spreadsheet was the reality of what

17    the project would become?

18    A.    He didn't say anything.  But we probably all understand

19    from this meeting we have to complete the plans first.  We

20    have to complete the site plans.  We have to complete the

21    construction plans and get the approval from the bank if

22    Filippov really can get this loans himself.

23        Q.    Okay.  Let me stop there.  So as I understood it,

24    you all understood that before you could understand what the

25    cost would be, you'd have to complete plans?



VADIM KAGAN - Direct

1   A.   Yes.

2        Q.   And you would have to find out whether Mr.

3   Filippov's financial picture was strong enough to support a

4   loan; is that correct?

5   A.   Yes, absolutely, because if Filippov cannot purchase this

6   lot, and if he cannot get the construction loans, we can't

7   even enter in this project.

8        Q.   Okay.  Do you recall anything else that happened at

9   this meeting?

10  A.   No.

11       Q.   Okay.  At the end of the meeting, how were things

12  left?  Was anything agreed upon?

13  A.   No.

14       Q.   All right.  We were talking about the second

15  meeting; at the time you went into that meeting, were you

16  expecting to be an investor yourself, or were you expecting

17  just to be a builder?

18  A.   Both, or I can be partner, or I can be just a builder.

19       Q.   Okay.  So you knew it one or the other?

20  A.   Yeah.

21       Q.   Now, I understand there's been testimony that you've

22  yourself contributed $250,000, correct?

23  A.   Yes.

24       Q.   How did it come to pass that you agreed to invest

25  $250,000 of your own money into this project?



VADIM KAGAN - Direct

1   A.   Because Filippov wants me to have some skin in the game,

2   and he wants me to invest $250,000.

3       Q.   I'm sorry, he wants you to have skin in the game --

4   A.   Yeah.

5       Q.   And he wants you to --

6   A.   To invest 250,000.

7       Q.   And he wants you to invest $250,000?

8   A.   Yes, yeah.

9       Q.   And you agreed to do that?

10  A.   Yes.

11      Q.   Have you now exhausted your memory, sir, as to what

12  occurred at this meeting with Mr. Filippov, Mr. Lipetsker, and

13  Mr. Zhukovskiy?  Do you remember anything else, or is that it?

14  A.   I think that was it.

15      Q.   Okay.  What happened next with respect to what

16  ultimately became the Lyman Cutler project?

17  A.   Boris made and prepared the operating agreement.  Based

18  on my conversation with Filippov, he okay, and he get the

19  green light for the loans for the purchasing.  And he doesn't

20  have a green light at the time for the construction loans.

21      Q.   Okay.  So Boris Maiden started drafting the

22  operating agreement?

23  A.   Yes.

24      Q.   And Mr. Filippov went ahead to get the purchase-

25  money loan to buy the property?

VADIM KAGAN - Direct

1    A.    Yes.

2         Q.    And at that point, I think you said the construction

3    loans -- that hadn't been applied for yet, correct?

4    A.    I -- I think it's not.   Maybe he's applied, but it was

5    not --

6         Q.    It wasn't approved yet.

7    A.    It wasn't approved yet.

8         Q.    Okay.   Now, let's talk about the drafting of the

9    operating agreement.   Did you review any of the initial drafts

10   of the operating agreement that were circulated by email?

11   A.    No.

12        Q.    Okay.   Were you aware that Mr. Filippov was

13   negotiating privately with Mr. Maiden?

14   A.    Absolutely not.

15        Q.    Okay.   Prior to execution of the final version

16   of the operating agreement, which I believe is --

17        MR. PERTEN:   Exhibit 15, Mr. Harris?

18   BY MR. PERTEN:

19        Q.    -- Exhibit 15, had you reviewed earlier drafts of

20   that agreement?

21   A.    No.

22        Q.    Was there actually a closing -- where did you sign

23   that?

24   A.    At the Boris office.

25        Q.    At Boris Maiden's office?



VADIM KAGAN - Direct

1    A.    Yes.

2         Q.    Did you read it before you signed it?

3    A.    No.

4         Q.    Why not?

5    A.    Because I thought this was our standard operating

6    agreement, what we use in every house.  And Boris said, it's

7    all good just it.

8         Q.    So you didn't read it because you thought it was the

9    same as every other agreement?

10   A.    Yes.

11        Q.    And did Mr. Maiden highlight for you any ways in

12   which the agreement deviated from versions of that agreement

13   that had been used on other projects?

14   A.    No.

15        Q.    And you signed it?

16   A.    Yeah.

17        Q.    And sir, do you understand, sir, that even if you

18   didn't read it or discuss it, that you're bound by that

19   agreement?

20   A.    Yes.

21        Q.    And were you relying on Mr. Maiden to advise you if

22   there was anything you needed to know as it relates to the

23   operating agreement?

24   A.    I relied completely on Boris.

25        Q.    I'm sorry?



(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    A.    I completely -- I relied completely on Boris.

2         Q.    You were relying on --

3    A.    Completely on Boris.

4         Q.    I'm sorry -- one more time.

5    A.    I'm rely on Boris.

6         Q.    You're relying on Boris?

7    A.    Yes.

8         Q.    At any point prior to the execution, did Mr.

9    Filippov talk or speak directly to you about changes that he

10   was requesting to the operating agreement?

11   A.    No.

12        Q.    Now, you understood, did you not, that there would

13   be carrying costs during the duration of this project?

14   A.    Yes.

15        Q.    And did you have any understanding -- mindful of the

16   fact that you hadn't read the operating agreement, did you

17   have any understanding who would be responsible for paying

18   carrying costs as it related to the three of you?

19   A.    What I'm understand, I have to pay the carrying cost and

20   I'll be reimbursed at the closing when the house is going to

21   be sold.

22        Q.    Okay.  So you understood that you were going to be

23   paying carrying costs and you would be reimbursed once the

24   homes were sold?

25   A.    Yes.



VADIM KAGAN - Direct

1      Q.   Okay.  And you understand now that's not what the

2   operating agreement says, correct?

3   A.   Now, yes, I understand.

4      Q.   But at the time, you believed it was your

5   responsibility to pay the carrying costs?

6   A.   Yeah.

7      Q.   And did you in fact pay the carrying costs?

8   A.   Yes.  I did.

9      Q.   At any point until May of 2015, did Mr. Filippov or

10  Mr. Lipetsker say words to the effect why are you paying?

11  We're supposed to be paying for the first twenty-three months?

12  A.   No.

13     Q.   And you didn't ask that question?

14  A.   No.

15     Q.   Because you didn't know, correct?

16  A.   Yeah.  I know I have to pay it and I pay it because we

17  have -- we have our -- we have agreement.

18     Q.   It was your agreement -- your understanding was that

19  you would be paying them all along.

20  A.   Yes.

21     Q.   And then ultimately be reimbursed at the closing?

22  A.   Yes.

23     Q.   Now, once you purchased the property, was there in

24  fact a filing with the Town of Brookline to subdivide the

25  property?



VADIM KAGAN - Direct

1    A.    At the closing signing the operating agreement?

2        Q.    No.  You bought the property, correct?

3    A.    Yes.

4        Q.    Once the property was purchased, was there an

5    application filed with the Town of Brookline to subdivide the

6    property?

7    A.    Probably not.

8        Q.    Okay.  At some point, did you file an application to

9    subdivide so you knew you could divide the property?

10    A.    Yes.

11        Q.    Okay.  And was that something that, if you will, was

12    your responsibility to work through the town?

13    A.    Yes.

14        Q.    And how long did that process take?

15    A.    I think it -- we spent only few months for preparation

16    for the application because our surveyor and the site engineer

17    have to complete the onset of plans.

18        Q.    Okay.  So it took a few months because your surveyor

19    and onsite engineer had to complete their own plans?

20    A.    Yes.

21        Q.    Okay.  And once the surveyor and onsite engineer

22    completed their plans, would those plans have been

23    incorporated into some sort of a subdivision approval

24    application?

25    A.    Yes.



VADIM KAGAN - Direct

1    Q.   And did that process -- how long did that -- once

2    the application was actually filed, how long did that take

3    before you got approval?

4    A.   Probably another two months.

5    Q.   All right.  So the entire process was four to five

6    months?

7    A.   It's a few months to process, yeah.

8    Q.   Okay.  Now, sir, you told us earlier that the

9    existing property -- there was a home on that, correct?

10   A.   Yes.

11   Q.   Was there also a pool and a tennis court?

12   A.   Yes.

13   Q.   As part of the project, did you have to demolish the

14   house, the pool, and the tennis court?

15   A.   Yes.

16   Q.   And what happens when you demolish a site like that?

17   What happens to the debris, the concrete and all that stuff;

18   where does that go?

19   A.    It's go to different -- it's going to different sites.

20   Q.   Why does it go to different sites?

21   A.   Because it's different materials.

22   Q.   You say there's different materials; what are you

23   referring to?

24   A.   So when you demolishing home, first, we have to remove

25   the lead and asbest (sic) from the site.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1        Q.    You first remove the lead and asbestos?

2    A.    Lead and asbestos.

3        Q.    And does that have to go to a separate landfill

4    area?

5    A.    Yes.

6        Q.    Okay.

7    A.    And well, after, we have to separate wood from concrete

8    and brick.

9        Q.    So you have to separate wood, concrete, and brick?

10   A.    Yes.

11       Q.    And does that go to a different landfill?

12   A.    Yes.

13       Q.    And are there any other issues as it relates to

14   demolition?

15   A.    Also, sometimes we demolishing the old homes -- old

16   houses.  If they have rebar in the concrete, we have to also

17   go to another field.

18       Q.    So sometimes --

19   A.    And we -- and we --

20       Q.    I'm sorry -- let me interrupt.  Sometimes there's

21   rebar in the concrete?

22   A.    Yes.

23       Q.    Those are those big, fat, steel rods?

24   A.    Yes.

25       Q.    And was there rebar in any portion of the existing

#15-13881; #16-01120                                          5-15-2019

VADIM KAGAN - Direct

1   structures that you were demolishing?

2   A.   Yes.

3        Q.   Where was there rebar?

4   A.   On the foundation and the gunite pool.

5        Q.   In the gunite pool?

6   A.   Yes.

7        Q.   The foundation in the gunite pool?

8   A.   Yes.  The whole -- whole pool.

9        Q.   And does debris that have rebar in it, does that

10  also have to be disposed of differently than other types of

11  material?

12  A.   Yes.  We're paying the different price for that, and go

13  in different containers, go to the different sites.

14       Q.   And did ProExcavation do the demolition?

15  A.   Yes.

16       Q.   And did you do a proposal for the demolition, the

17  ProEx?

18  A.   Yes.

19       MR. PERTEN:  Mr. Harris, could you bring up the ProEx

20  proposal, which is part of the admitted proof-of-claim

21  binders, Your Honor?

22       MR. CARNATHAN:  I believe the ProEx proposal was part

23  of my objection.

24       MR. PERTEN:  I don't think so, Sean.

25                              (Pause)



VADIM KAGAN - Direct

1          MR. PERTEN:  It's part of Exhibit 174.

2          MR. CARNATHAN:  Yeah, "foundation hearsay best

3    evidence with regard to the components from ProExcavation, BST

4    Plumbing, Unicon", et cetera.

5          MR. PERTEN:  Okay.  In any event, I'm just showing,

6    I'm not offering this at this point.

7          THE COURT:  All right.

8    BY MR. PERTEN:

9       Q.   Mr. Kagan, I've put up on the screen the proposal

10   for the demolition of ProEx, correct?

11   A.   Yes.

12      Q.   Is that a document that you prepared?

13   A.   This is the document probably prepared by Ryan O'Grady, I

14   think.

15      Q.   Ryan O'Grady typed it, but did you give him the

16   information --

17   A.   Yes.

18      Q.   -- to prepare it?

19   A.   Yes.

20      Q.   And the phone number in the left-hand corner, 617-

21   610-1276, was that the phone number that that was being used

22   in 2013?

23   A.   I think so.

24      Q.   And was that the same number, actually, that KDC was

25   using as well?



VADIM KAGAN - Direct

1    A.    Yeah.

2        Q.    Sometime in 2014, when Kristina Brusenkova was

3    working there, did you request that she get a dedicated phone

4    number for ProExcavation?

5    A.    Yes.

6        Q.    But prior to asking her to do that, were you using

7    this 610-1276 number?

8    A.    Yeah.

9        Q.    And the dedicated number that she got, did you

10   actually end up using it for ProEx?

11   A.    I -- I don't think so.

12       Q.    You don't think so.  Okay.  So this proposal --

13           MR. PERTEN:  Mr. Harris, would you scroll down?

14   Thank you.  You can stop there.  I just wanted the whole

15   thing.

16   BY MR. PERTEN:

17       Q.    This proposal was for a total of $43,700 for ProEx,

18   correct?

19   A.    Yes.

20       Q.    And was this a -- is this a lump-sum proposal --

21   fixed price proposal?

22   A.    This was the fixed price -- this was the fixed-price

23   proposal, yes.

24       Q.    And how did you go about preparing this fixed-price

25   proposal?



VADIM KAGAN - Direct

1   A.   Actually, before we do the job, we call all the

2   subcontractors who should do certain work on the project, put

3   the numbers together, and finalize our proposal.

4        Q.   Okay.  So you called various subcontractors, got

5   their numbers, and put together the proposal?

6   A.   Yes.  And also, we have to include the town fees, all

7   these details fees, everything what going be -- should be

8   include to do the proper demolishment (sic) of the project.

9        Q.   Okay.  And was this proposal done under your -- the

10  proposal -- was this done at your direction and under your

11  supervision?

12  A.   Yes.

13       Q.   And to the best of your knowledge, is this a true

14  and accurate copy of the proposal that you maintained in the

15  ordinary course of business of ProExcavation?

16  A.   Yes.

17       Q.   Okay.

18            THE COURT:  Is that a one-page document?

19            MR. PERTEN:  Yes.  It is.

20            THE COURT:  Okay.

21            MR. PERTEN:  Your Honor, I would offer this one-page

22  document as our next exhibit.

23            MR. CARNATHAN:  And I apologize if I'm confused, but

24  I thought it was attached to the whole ProEx proposal.  Did

25  you separate them out?

VADIM KAGAN - Direct

1          MR. PERTEN:  There are three proposals, Sean.  I can

2    do it with one.

3          MR. CARNATHAN:  I guess I have no objection at this

4    point to that going into evidence.

5          THE COURT:  All right.  That's admitted then as --

6    are we going plaintiff's and defendants' on these?  We are

7    aren't we?  Are we?

8          DEFENDANTS' EXHIBIT 326 WAS ADMITTED INTO EVIDENCE

9          MR. PERTEN:  We were going just in order of --

10         THE COURT:  In order -- that's fine.  That's better.

11   Okay.  So it's Exhibit 48 now --

12         MR. PERTEN:  Yes.

13         THE COURT:  -- in evidence, right?

14         MR. PERTEN:  And you'll also find this already in tab

15   174, but we can mark it separately.

16         THE COURT:  Okay.

17         MR. PERTEN:  Okay.

18   BY MR. PERTEN:

19      Q.   Mr. Kagan, when you prepared this proposal, why

20   didn't you prepare it based on a cost basis -- or a cost-plus

21   basis; why did you use fixed price?

22   A.   Because our price for our own projects, it's much better

23   if we're going to use somebody else to do this job.  And this

24   is already below the market price.

25      Q.   So this is already below market?



(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1   A.   Yes.

2        Q.   Okay.  Now, sir, while you were preparing or getting

3   the permits ready, and the subdivision ready, and preparing

4   the demolition proposal, did you have any understand --

5            MR. PERTEN:  Strike that.

6   BY MR. PERTEN:

7        Q.   Did you have any role in applying for the

8   construction loans?

9   A.   No.

10       Q.   Who was handling the construction loans?

11  A.   Alex Filippov.

12       Q.   And did Mr. Filippov consult with you regarding the

13  construction loans?

14  A.   He did not.

15       Q.   Incidentally, this demolition proposal -- ProEx

16  demolition proposal, which is Exhibit --

17           MR. PERTEN:  I'm sorry, it was?

18           THE COURT:  48.

19           THE COURT:  I'm sorry?

20           THE COURT:  4-8.

21           MR. PERTEN:  4-8.

22           THE COURT:  48.

23           MR. PERTEN:  That doesn't sound right, Your Honor.

24           THE COURT:  I'm sorry.  We were at --

25           THE COURT:  I'm sorry.  I thought you were talking



VADIM KAGAN - Direct

1    about the ProEx proposal.

2           MR. PERTEN:  The one we just introduced into

3    evidence, the demolition proposal.

4           THE COURT:  Oh --

5           MR. HARRIS:  326.

6           MR. PERTEN:  326.

7           THE COURT:  All right, that's a little different.

8    Okay.

9           THE COURT:  Is this in evidence?

10          MR. PERTEN:  It is now.  Mr. Carnathan did not

11   object.

12          THE COURT:  All right.  It's in.

13          MR. PERTEN:  May I proceed?

14          THE COURT:  Yes, please.

15          MR. PERTEN:  Thank you.

16   BY MR. PERTEN:

17       Q.   When you prepared this proposal, did you provide a

18   copy of it to Mr. Filippov and Mr. Lipetsker?

19   A.   Yes.

20       Q.   Okay.  Now, with respect to the construction loan,

21   that was something --

22          THE COURT:  Can I just -- I just want to make sure

23   I'm not missing something.  The reason I was confused is I

24   still have 48 up on the screen.  Did you put 326 up?

25          MR. PERTEN:  I don't know -- what's 48?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1          MR. HARRIS:  This is the file you emailed me to make

2    sure --

3          MR. PERTEN:  Oh -- ignore that.  It's not 48.  I had

4    it -- I just used the PDF from my office which had that -- it

5    was previously an exhibit -- it's an old number that is

6    meaningless to this court.

7          THE COURT:  So what I'm looking at here is 326.

8          MR. PERTEN:  Yes.

9          THE COURT:  But --

10         MR. PERTEN:  The PDF name is not accurate.

11         THE COURT:  Fine.  All right.

12         MR. PERTEN:  My bad.

13         THE COURT:  I'm not missing the fact that it says 48

14   up on the top.

15         MR. PERTEN:  You're not missing that fact.

16         THE COURT:  That's what it says.  All right.  But it

17   is --

18         MR. PERTEN:  That's -- yeah.  I just downloaded a

19   copy last night that had been previously named, and I was

20   sloppy and didn't delete that number.

21         THE COURT:  All right.  So for appeals purposes, I

22   think the record's clear now that --

23         MR. PERTEN:  Yes.  This one-page proposal --

24         THE COURT:  Right.

25         MR. PERTEN:  -- dated September 1, 2013 for the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    demolition.

2         THE COURT:  Okay.

3         MR. PERTEN:  Thank you, Your Honor.

4         THE COURT:  Hold on one second.

5         MR. CARNATHAN:  Can you pause just long enough for me

6    to find the right binder?  I'm a little behind on trying to

7    find the binders.

8         THE COURT:  Yeah, that's fine.  And Elizabeth has a

9    question, too, for me.

10        That's -- I -- is -- okay.

11        MR. PERTEN:  You have copies in the binder, so I

12   can --

13        THE COURT:  That's what I thought.

14        MR. PERTEN:  -- find it for you at the break, if you

15   like.

16        THE CLERK:  Okay.

17        THE COURT:  It's marked -- it's under 326 though.

18        THE CLERK:  Yes.

19        MR. PERTEN:  Well, it will be.  I'll provide you with

20   a paper copy of this, which will be Exhibit 326.

21        THE COURT:  All right.  That answers it.  Okay.  All

22   right.  Well --

23        MR. CARNATHAN:  And just so I'm clear --

24        THE COURT:  On the record, though.

25        MR. CARNATHAN:  Right.  So Exhibit 48 says that we're

VADIM KAGAN - Direct

1  looking at page 2 of 6.  And I understand we've only admitted

2  one page, right?

3          MR. PERTEN:  That's right.

4          MR. CARNATHAN:  And I don't seem to have an

5  independent exhibit like that.  I just can't find it.  Where

6  should I look to find it?

7          MR. PERTEN:  You will find it, Sean --

8          Can we go off the record for a moment, Your Honor?

9          THE COURT:  Yeah -- no, we don't go off.

10          MR. PERTEN:  Okay.  I guess --

11          THE COURT:  You can go off the record by stepping

12  aside from the microphones and talk to Mr. Carnathan, if you

13  want, to straighten everything out.

14          MR. CARNATHAN:  I guess -- as long as we're clear

15  it's just the one page.  I mean, I know it's in the binder

16  somewhere, so I guess that's fine.

17          THE COURT:  Well, it sounds like it will be.  It

18  doesn't sound like it is.

19          MR. CARNATHAN:  Okay.  Thank you, Your Honor.

20          MR. PERTEN:  Thank you, Your Honor.

21  BY MR. PERTEN:

22      Q.   Now, with respect to the construction loan, at some

23  point, did you learn that Mr. Filippov had been successful in

24  getting approved for the construction loan?

25  A.   Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    Q.   And was there a closing -- or were there a bunch of

2    documents that you had to sign in connection with the

3    construction loan?

4    A.   Yes.

5    Q.   And the documents that you had to sign in connection

6    with the construction loan, did that occur in Mr. Maiden's

7    office?

8    A.   Yes.

9    Q.   And did you review each and every document that you

10   signed at Mr. Maiden's office in connection with the

11   construction loan?

12   A.   No.

13   Q.   How did you know where to sign?

14   A.   When I came to the office, it was stickers said sign, and

15   the Boris sitting next to me, and we have to sign wherever it

16   says sign and initial, and that's it.

17   Q.   Okay.  So there were -- there was a stack of

18   documents with little stickers on it that said sign here?

19   A.   Yes.

20   Q.   And you signed them?

21   A.   Yeah.

22   Q.   Did you review what you were signing?

23   A.   No.

24   Q.   Did you have any --

25   MR. PERTEN:  It's not a commentary.  I can't see

VADIM KAGAN - Direct

1    without these now.

2             THE COURT:  It happens to all of us.

3             MR. PERTEN:  It still irritates me.

4    BY MR. PERTEN:

5        Q.   Mr. Kagan, as part of the construction-loan

6    documents that you signed, did you have any idea you were

7    signing a construction contract under the name of Classic

8    Homes?

9    A.   No.

10            MR. PERTEN:  All right.  And that's been introduced

11   as Exhibit 36, Your Honor.

12            Can you bring up Exhibit 36, please?

13            THE COURT:  Was there an objection to this document?

14            MR. PERTEN:  It's in.

15            THE COURT:  It's in already.

16            MR. PERTEN:  Yeah.

17   BY MR. PERTEN:

18       Q.   Were you aware that you had signed this document;

19   did you know?

20   A.   No.

21       Q.   Okay.  Was this just one of the many documents that

22   you signed that day?

23   A.   Yes.

24       Q.   Okay.  And after the construction loan was approved,

25   and you knew how much money you would be able to get, were you

VADIM KAGAN - Direct

1  able to develop plans?

2  A.   Yes.

3      Q.   And once you developed plans, did you also, sir,

4  have a construction contract prepared for KDC?

5  A.   Yes.

6      MR. PERTEN:  Could you bring up Exhibit 37, please,

7  Mr. Harris?  And if you could scroll down to the signature

8  page, please.  Oops, you just passed it.  Okay.

9  BY MR. PERTEN:

10     Q.   Is this at least a copy of your signature on this?

11 A.   Yes.

12     Q.   And that's an agreement that you signed?

13 A.   Yes.

14     Q.   Why did you sign this if there was already a Classic

15 Homes contract?

16 A.   Because we're not operating under the Classic Homes

17 because we have no business with Classic Homes.  We operate

18 under Kagan Development.

19     Q.   And you didn't know you had signed Classic Homes?

20 A.   Yeah -- I didn't know I signed Classic Homes.

21     Q.   Okay.  And was this contract in fact signed in 2013?

22     A.   Yes.  Who prepared this --

23     THE COURT:  Did you say yes?

24     THE WITNESS:  Yes, yeah.

25     THE COURT:  Thank you.



VADIM KAGAN - Direct

1    BY MR. PERTEN:

2         Q.   Who prepared this form contract for you?

3    A.   Joseph Cohen.

4         Q.   Okay.

5              MR. PERTEN:  Just scroll up a bit.  Keep going to the

6    sevens.  Not page 7, section 7.

7              MR. HARRIS:  Oh, I'm sorry.

8              MR. PERTEN:  Okay.

9    BY MR. PERTEN:

10        Q.   Now, why -- this project is a so-called -- this

11   construction contract, you would agree with me is a cost-plus

12   contract?

13   A.   Yes.

14        Q.   What arrangement, if any, had you made with Filippov

15   and Lipetsker as to how construction costs would be handled

16   going forward?

17   A.   Can you repeat the question?

18        Q.   Sure.

19   A.   I don't understand.

20        Q.   How were you going to pay for the construction costs

21   as this project proceeded?

22   A.   We get the money from the bank, and we agreed on a

23   certain amount what we're going to get from the bank for the

24   construction loan -- each home, it was $1.6 million.

25        Q.   Okay.  So you received a construction loan for $1.6

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1   million; is that correct?

2   A.    I think so, yeah.

3        Q.    Okay, keep going.

4   A.    And we have to complete certain part of the project; for

5   example, I can do example as the foundation.  We getting the

6   foundation complete, and after the foundation's complete, we

7   getting the second payment from the bank, it's ninety percent.

8   And for us, to do so, we have to invest a lot of Kagan

9   Development money into the project to get the money back from

10  the bank because bank usually paying after job is complete.

11  And to complete the job, we have to invest our own money.

12       Q.    Okay.  Let me stop you there.  As I understand your

13  testimony, sir, KDC would front the money, and then it would

14  seek a reimbursement through the bank loan?

15  A.    Yes.

16       Q.    Okay.  Proceed.

17  A.    And we are paying carrying cost and all necessary

18  expenses what occurred during the project.  We should be

19  reimbursed in the end.

20       Q.    All this would be reimbursed?

21  A.    Reimbursed in the end when the houses is complete -- when

22  the houses sold.

23       Q.    Did you have any agreement to cap the construction

24  at the amount of the construction loan?

25  A.    No.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1      Q.   Well, what would happen if you exceeded the $1.6

2   million amount of the construction loan?

3   A.   We are have an obligation to complete the project and

4   when the house is sold, get the money back.

5      Q.   So KDC would front the money, and then when the

6   houses were sold, you would get reimbursed for the amount in

7   excess of the 1.6 million?

8   A.   Yes.

9      Q.   And was this a discussion that you had with Filippov

10   and Lipetsker?

11   A.   Yes.  This is why I paying carrying cost and can front

12   all this money --

13      Q.   That's --

14   A.   -- before we get the money from the bank, yes.

15      Q.   That's why you agreed to front the money before you

16   were able to get reimbursement?

17   A.   Yes.

18      Q.   So in addition to the $250,000 that you put up to

19   purchase the price, were you also advancing any monies in

20   excess of 1.6 million?

21   A.   Yes.

22      Q.   So fair to say that your stake in the venture was

23   more than $250,000?

24   A.   Much more.

25      Q.   Okay.  Now, I notice in this KDC contract that we

VADIM KAGAN - Direct

1  have, that there are certain percentage add-ons, the so-called

2  plus of a cost-plus contract; do you see that?

3  A.   Yes.

4       Q.   For example, in 7.1.2; do you see that?

5  A.   Yeah.

6       Q.   And there's another percentage add-on in 7.1.3 --

7  A.   Yeah.

8       Q.   -- and 7.1.4; do you see that?

9  A.   Yes.

10      Q.   Now, those -- I'm just going to call them add-ons or

11  soft costs -- let's call them soft costs for purposes of our

12  discussion, Mr. Kagan.  Are those fees that, when you private

13  clients, you charge?

14  A.   Yes.

15      Q.   Okay.  When you have a construction project where

16  you're an investor or you have investors, do you always charge

17  those fees?

18  A.   Not always.

19      Q.   Okay.  Do you sometimes waive them?

20  A.   Yes.

21      Q.   Okay.  And how do you decide, sir, whether you're

22  going to waive those soft-cost fees or impose them?

23  A.   At the end of the project and everything goes smooth, we

24  get paid, our money was reversed.  And I have ability to waive

25  my general contractor's fee.



VADIM KAGAN - Direct

1      Q.   Okay.  So at the end, if you've reimbursed and got

2    your money back, you have the ability to waive those fees?

3    A.   Absolutely.

4      Q.   And that's a determination that all your -- you have

5    the opportunity to charge them; that's a decision you

6    typically make at the end?

7    A.   Yes.

8      Q.   Okay.

9    A.   And this is also kind of my project, and I also partner

10   there, and I worry about every penny, and I don't want to

11   charge this fee during the project.

12     Q.   Okay.  It's because you're a partner, so this is a

13   fee that would also -- at least a portion of it would be your

14   responsibility as well, correct?

15   A.   Yes.

16     Q.   Okay.  Now, did you provide Mr. Filippov and Mr.

17   Lipetsker with a copy of this contract at or about the time it

18   was signed?

19   A.   Yes.

20     Q.   Did you also ask Mr. O'Grady to email this contract

21   to your partners?

22   A.   Yes.

23        MR. PERTEN:  Mr. Harris, can you pull up Exhibit 215,

24   please?

25   BY MR. PERTEN:

VADIM KAGAN - Direct

1    Q.   Now, sir, in August of 2013, was Mr. O'Grady -- Ryan

2  O'Grady, was he still working at your office?

3  A.   Yes.

4    Q.   And did you ask Mr. O'Grady to forward a copy of the

5  general contract --

6  A.   Yes.

7    Q.   -- to LymanCutlerLLC.com?

8  A.   Yes.

9    Q.   And do you recall whether he did that at your

10 expressed instructions?

11 A.   I don't -- I think yes -- I think he did.

12   Q.   Okay.  You believe he did?

13 A.   Yeah.

14   Q.   And did you go back into or have somebody on your

15 behalf go back into your email and find the email which you

16 remembered him sending in August 2013?

17 A.   Yes.

18   Q.   And is this the email that confirmed to you that

19 this had happened in fact sent in August of 2013?

20 A.   Yes.

21   Q.   And was that email kept in the ordinary course of

22 KDC's business?

23 A.   Yes.

24       MR. PERTEN:  Your Honor, I'd offer this as our next

25 exhibit.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1        MR. CARNATHAN:  We object, Your Honor; it's

2  incomplete.  There's no attachment to it.  We have no idea

3  what is being forwarded there.

4        THE COURT:  May I see the document?  So scroll down,

5  if you would.  It says it's a two-page document.  That's it.

6  Mr. Harris, could you go back up to the top to the first part

7  of that?  I could pull it up, but this is easier.

8        In these binders, is there a version of this with the

9  attachments that are mentioned in the document itself?

10       MR. PERTEN:  Well, the GC agreement is a standalone

11  document.

12       THE COURT:  No.  That's not my question.

13       MR. PERTEN:  No.  I did not -- I did not --

14       THE COURT:  There's not one that --

15       MR. PERTEN:  No.

16       THE COURT:  Well, in reality, it's not questioning

17  the authenticity of the -- I mean, he -- it is what it

18  proports to be.  He has said it's an email that he says he's

19  aware that was sent from his company.  Doesn't that

20  sufficiently authenticate these two pages?  You could

21  certainly cross-examine about whether or not anything's

22  attached, or whether he knows about that.

23       MR. CARNATHAN:  I'm happy to cross-examine him about

24  it, Your Honor, but I maintain that this document is not what

25  it proports to be, and in particular, it claims to forward a

VADIM KAGAN - Direct

1    GC agreement that's not attached.  So I don't think it's

2    authentic, but --

3          THE COURT:  Is there any other basis for an objection

4    to the admission of this document other than authenticity?

5          MR. CARNATHAN:  Well, I don't think I raised the best

6    evidence on my -- what do you -- the pre-trial --

7          THE COURT:  Yeah.

8          MR. CARNATHAN:  -- but we've never seen this other

9    than in a PDF form.  It was produced to us just as you see it

10   here.  We never got it out of the email.  This is how we got

11   it.  So I guess I would object on best evidence, too, but I

12   admit I didn't put that on the pre-trial.

13         THE COURT:  All right.  Well, best evidence in

14   federal court can be resolved easily by a copy.  And if it

15   wasn't raised earlier, we really don't want to get into

16   raising those issues late.

17         So I'll admit this document over the objection with

18   respect to authenticity.

19         DEFENDANTS' EXHIBIT 215 WAS ADMITTED INTO EVIDENCE

20         MR. PERTEN:  Thank you, Your Honor.

21         THE COURT:  So it's 215 now, right, in evidence?

22         MR. PERTEN:  Sorry, what number?

23         THE COURT:  Is that correct, Mr. Harris?

24         MR. HARRIS:  Yes, sir.

25         THE COURT:  215.



VADIM KAGAN - Direct

1   BY MR. PERTEN:

2        Q.   Mr. Kagan, this email references the GC agreement.

3   Is the GC agreement that is referenced there the KDC contract

4   which was admitted 36?

5   A.   Yes.

6        Q.   Thank you.  And did you understand, sir, that Lyman

7   Cutler LLC was the email address that was set up for Filippov

8   and Lipetsker?

9   A.   Yes.

10       Q.   After you provided --

11           MR. HARRIS:  Excuse me, Judge.

12           MR. PERTEN:  Excuse me.

13           THE COURT:  Yep.

14           MR. PERTEN:  Thank you.  My colleague corrects me,

15   Exhibit 37 is the KDC contract.

16   BY MR. PERTEN:

17       Q.   As I understand your testimony, sir, you handed a

18   hard copy of Exhibit 37, the KDC contract, to Mr. Filippov and

19   Mr. Lipetsker; is that correct?

20   A.   Yes.

21       Q.   And then you subsequently emailed a copy, which is

22   now Exhibit 215; is that correct?

23   A.   Yes.

24       Q.   Now, once you had your construction contract all

25   set, and you had gotten the subdivision -- not subdivision,

VADIM KAGAN - Direct

1    I'm sorry -- ANR -- the broke it into -- approval not

2    required -- broke it into two lots --

3    A.    Um-hum.

4        Q.    -- did you also prepare a proposal for ProExcavation

5    for the overall project cost?

6    A.    Yes.

7            MR. PERTEN:  Mr. Harris, can you bring that up again?

8    It was part of what I inadvertently marked as 48.  Can you go

9    to the second page, please?  And this is a four-page document,

10   I believe.

11           THE COURT:  It said six on the --

12           MR. PERTEN:  It's three pages -- the next three

13   pages.  And again, I'll break it out for the Court.  We

14   admitted page 1 already independently.  This is pages 2, 3,

15   and 4 of what I have on the screen.

16   BY MR. PERTEN:

17       Q.    Is this a proposal for ProExcavation that you

18   prepared on or about October 2013?

19   A.    Yes.

20       Q.    And again, did you follow the same procedure in

21   preparing this proposal for ProExcavation as you did for the

22   demolition portion of the proposal?

23   A.    Absolutely, yes.

24       Q.    Okay.  And again, can you explain to the Court how

25   you went about preparing this proposal?



VADIM KAGAN - Direct

1  A.   Based on our many year of experience work in the

2  construction field, and on the ProEx excavation company, and

3  based on the -- if I have a question on a certain amount of

4  work that needs to be done calling my subs who are going --

5  basically, it has to go through this project.

6       Q.   So you called your subs and solicited costs and

7  prices?

8  A.   Yes.

9       Q.   And you used your experience?

10 A.   Yes.  And we also have to call our vendors because in a

11 site plan and a house plan, they have a scope of work for the

12 certain items.

13      Q.   Okay.

14 A.   And we have to verify the price for the materials based

15 on the bids.

16      Q.   Sir, let me draw your attention to -- reading from

17 the top -- the first one, two, three, four -- we've got

18 "install hay bales and silt fence per the drawings", "clear an

19 exposed ledge", "ledge removal", and "excavation and earth

20 work for a proposed foundation system"; do you see those four

21 entries?

22 A.   Yes.

23      Q.   In gross terms, is that general site work --

24 reconstruction site work?

25 A.   Yes, except ledge removal.



VADIM KAGAN - Direct

1    Q.   Okay.  Did you know how much ledge you were going to

2    be needing to remove at that point?

3    A.   Approximately.

4    Q.   Okay.  And is that because you had done projects in

5    that area and knew there was ledge?

6    A.   Basically, all the sites in Brookline, in hill

7    neighborhood, basically of them ledge.

8    Q.   All of them have ledge in Brookline?

9    A.   All of them -- all of them mix ledge, clay, and the sand.

10   But definitely, if you have hill, you definitely have a ledge.

11   Q.   When you have a hill, you definitely have ledge?

12   A.   Absolutely.

13   Q.   And in fact, when you did excavate, did you

14   encounter ledge?

15   A.   We knew it's a ledge because when we did the test pit for

16   the site on engineer -- we have to do test pit of the Town of

17   Brookline.  And town of Brookline, part of our presentation is

18   require of the test pit.  They want to know what kind of soils

19   are there.  And this is basically to be determined what kind

20   of drainage system we have to do.  This is part of the scope

21   of work for Town of Brookline.

22   Q.   Okay.  Let me interrupt to just translate a little

23   bit.

24   A.   Okay.

25   Q.   You did test pits for the engineering and that's

VADIM KAGAN - Direct

1   when you learned there was ledge?

2   A.   Yes.

3        Q.   Okay.  And --

4   A.   We did multiple test pits.

5        Q.   You did multiple test pits.

6   A.   Because we have to do -- because we have to do in a few

7   different areas.  This is how to determine when the -- when

8   the ground was percolated, we have to do perc tests.  And this

9   is -- we have to -- by the town -- by the Town of Brookline,

10  specification of the lot is big, you have to do the perc test

11  in a few different areas because when --

12       Q.   Okay.

13  A.   -- when --

14       Q.   I'm sorry -- so you had to do a perc test in

15  multiple areas?

16  A.   In multiple areas, yes.

17       Q.   Okay.  That was a requirement of the Town of

18  Brookline?

19  A.   Yes.

20       Q.   And in the course of doing the perc test, did you

21  confirm, in fact, that there was ledge?

22  A.   Yes.

23       Q.   Okay.  Let's continue reading down items 6, "form

24  and pour proposed 24x12 footing", and then there's "9-foot

25  foundation walls, concrete pumps, concrete material,



VADIM KAGAN - Direct

1   structural steel footings, foundation, backfill" -- that's all

2   essentially concrete work, right?

3   A.   Yes.

4        Q.   Generally, in most projects, would your site

5   contractor and your concrete people who pour the foundation,

6   would that be separate subcontractors?

7   A.   Yes.

8        Q.   And was the fact that you were able to do those,

9   what are typically, separate subcontractor tasks under the

10  single umbrella of ProExcavation, did that translate into any

11  savings for this project?

12  A.   Yes.

13       Q.   Okay.  And then reading down, number 11, drain

14  installations and sump placements in the basement.

15  A.   "Sump pump in the basement", yes.

16       Q.   "Sump pump in the basement"?

17  A.   Yes.

18       Q.   Let's keep reading, next page, please.

19           MR. PERTEN:  If you could scroll down, Mr. Harris.

20  BY MR. PERTEN:

21       Q.   Again, "interior perimeter of foundation wall,

22  basement slabs, garage slab, concrete with hot water and two

23  percent accelerator foundation installation" -- again, is

24  foundation insulation and waterproofing, would that be another

25  trade typically that you would have a separate contractor for?

VADIM KAGAN - Direct

1    A.   Yes.

2        Q.   And was that something that, again, in addition to

3    doing the site work and the concrete work, were you able to do

4    the insulation and waterproofing under the umbrella of

5    ProExcavation?

6    A.   Yes.

7        Q.   Continuing to item 16 is "storm drainage".  Were you

8    able to do this -- did ProEx also do storm drainage?

9    A.   Yes.

10       Q.   Number 17, "new water and sewer service".  Again, is

11   that something that typically you would have a separate

12   subcontractor do in an ordinary course?

13   A.   Yes.  We have a separate subcontractor, but all the

14   subcontractors work our ProExcavation umbrella because we own

15   the bond and --

16       Q.   You own what?

17   A.   We own the bond to do the certain job because we have to

18   open the street and we are in the lease for the Town of

19   Brookline as the sewer and water installers.

20       Q.   All right, so again, if I could translate that a

21   little bit.  ProExcavation needed to get a bond in order to

22   open up the street, correct?

23   A.   Yes.

24       Q.   And that's in the ProExcavation name?

25   A.   Yes.

VADIM KAGAN - Direct

1        Q.    And so any subs that ProExcavation worked with would

2    be, if you will, going through the bond that you, as ProEx,

3    provided?

4    A.    Yes, absolutely.  I have to go fill -- I have to go get

5    the permit myself and hire necessary subs to do the job.

6        Q.    Okay.  And then we have rough grading, stone --

7    "building retaining walls".  Did that deal with the issue that

8    these weren't level lots?

9    A.    Oh yes.

10        MR. PERTEN:  Okay.  Let's continue to scroll down to

11    the next page.

12    BY MR. PERTEN:

13        Q.    There's VERSA-LOK retaining -- what are VERSA-LOK

14    retaining walls?

15    A.    VERSA-LOK, it's a -- it's a premade concrete block, and

16    we -- it's a self-drain block, and we use them on the border

17    of the properties.

18        Q.    I'm sorry -- on the border of properties?

19    A.    We use -- we -- we -- we use them on the border of the

20    property -- from one property to another property.  It's a

21    self-draining blocks.

22        Q.    Self-draining blocks?

23    A.    Yeah, concrete blocks.

24        Q.    Okay.  Let's continue to item number 21.  There's

25    "stonewall footings and footing installation, construct doing

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1   the natural stone wall" -- so were there natural walls put on

2   this property?

3   A.   Usually, when we have exposed wall and to have a curb

4   appeal to buyers or what the people are going to see every

5   day, we use the natural stonewall.

6      Q.   All right.  So you use natural stonewalls because it

7   gives the property a greater curb appeal?

8   A.   Yeah, this we usually do around the patio, in the middle

9   of the yard --

10      Q.   Okay.

11   A.   -- what people can see, actually.

12      Q.   All right.  22, "footings and slab for front steps

13   and landings"; 23, "outside front steps, front porch"; 24,

14   "back patio" and we have more footings, more backsteps, 26.

15   And then 27, 28, and 29, "trees, shrub planting, final

16   grading, sod installation"; is that the final landscaping

17   work?

18   A.   Yes.

19      Q.   And so in addition to doing the initial site work,

20   and then all the concrete work and the walls, are you also

21   doing landscaping under the ProExcavation umbrella?

22   A.   Yes.  And they also missing some items.  Also,

23   ProExcavation responsible if we have any masonry in the house

24   is as the brick work and the stonewall -- on the stonewall.

25   We also bring our own subcontractors who can do this job.



VADIM KAGAN - Direct

1      Q.   So if there's any stonework in the house or brick

2   work that needs to be done, that's also done under the --

3   A.   Yes.

4      Q.   -- ProExcavation umbrella?

5   A.   Yeah, yes.

6      Q.   And then do you also -- I see "prepare the asphalt

7   driveway"?

8   A.   Yes.  And we also do preparation for the asphalt because

9   they -- we're going to save this -- we're going to save a lot

10  on it because we're doing the preparation for people who does

11  the asphalt because they do preparation only four inches.  And

12  in a lot of case, especially this size is so big and dug

13  everywhere, we have to dug another foot and substitute the

14  soil for something more condense to be -- driveway will be

15  more stable.

16     Q.   Okay.  So you put in a more stable driveway than

17  most paving subcontractors?

18  A.   Yes.

19     Q.   Because you go deeper?

20  A.   Yes.  We go deeper.

21     Q.   Okay.  And with a house of the magnitude that you're

22  building, is this the kind of quality that you would

23  anticipate a homeowner would be looking for at that price

24  range?

25  A.   Yes.  And we do this in every basis.  It's what we have

VADIM KAGAN - Direct

1    to do.

2        Q.   And was the total price that you calculated for this

3    work set forth in those thirty-one items $418,150 per house?

4    A.   Yes.

5        Q.   And again, this proposal was prepared back in 2013,

6    correct?

7    A.   Yes.

8        Q.   And you maintained that in your ordinary course of

9    business in your company's records, correct?

10   A.   Yes.

11       Q.   Did you share this with Mr. Filippov and Mr.

12   Lipetsker?

13   A.   Absolutely.

14           MR. PERTEN:  Your Honor, I would offer these three

15   pages as the next exhibit.

16           MR. CARNATHAN:  No objection, Your Honor.

17           THE COURT:  All right.  They're admitted.  What's the

18   number on these now?

19         DEFENDANTS' EXHIBIT 327 WAS ADMITTED INTO EVIDENCE

20           MR. HARRIS:  327.

21           MR. PERTEN:  327 now, Your Honor, for those three

22   pages.

23           THE COURT:  Okay, all right.  It's a bit after

24   eleven.  So if we could take a break.

25           MR. PERTEN:  Sure.



VADIM KAGAN - Direct

1          THE COURT:  And I just want to also mention that I'm

2     having a lot better feel --

3          MR. PERTEN:  You got used to it.

4          THE COURT:  -- for his testimony -- for understanding

5     his testimony, which I think means maybe you don't need to

6     repeat --

7          MR. PERTEN:  Okay.

8          THE COURT:  -- and act as the --

9          MR. PERTEN:  If the Court will just let me know.

10    I'll be happy to -- I'll assume you're getting it, unless you

11    indicate otherwise.

12         THE COURT:  That's a good plan.  I think we can do

13    that.

14         MR. PERTEN:  Okay.  My --

15         THE COURT:  So otherwise it takes a lot longer,

16    but --

17         MR. PERTEN:  Yes.

18         THE COURT:  -- I am -- he's speaking slowly and I'm

19    getting it.  Maybe I've just gotten used to it now.

20         MR. PERTEN:  You do get accustomed to it.

21         THE COURT:  You do, right.

22         MR. PERTEN:  My only thought is I do worry about when

23    they do the transcript, so certainly that's why I'm trying to

24    repeat a little bit so that when whoever does the

25    transcription, it's an aide, but --

VADIM KAGAN - Direct

1          THE COURT:  I can't say it's going to be perfect --

2          MR. PERTEN:  Yeah.

3          THE COURT:  -- because it never is, but --

4          MR. PERTEN:  Right.

5          THE COURT:  -- it -- I think they're getting -- I

6     think they'll get it.

7          MR. PERTEN:  Okay.

8          THE COURT:  Unlike me, they can listen to it three

9     times, if they need to.

10          MR. PERTEN:  And Mr. Carnathan and I can also assist,

11     I'm sure.

12          THE COURT:  Right.  Okay.

13          MR. PERTEN:  Thank you, Your Honor.

14          THE COURT:  All right.  Fifteen minutes.  Thanks.

15          THE BAILIFF:  All rise, court's in recess.

16                  (Off the record at 11:12 a.m.)

17                  (On the record at 11:34 a.m.)

18          THE BAILIFF:  All rise.  Court is now in session.

19          THE COURT:  Thank you.  You can be seated.

20          How are we doing?  My sense is --

21          MR. PERTEN:  Forty-five minutes-ish is my bet.

22          THE COURT:  Okay.  All right.  Well, we'll just keep

23     going.  I do have an airplane this afternoon now because of

24     the trip that I had mentioned.

25          MR. PERTEN:  Okay.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1              THE COURT:  So --

2              MR. PERTEN:  Yeah, you just let us know, Your Honor,

3      and we'll --

4              THE COURT:  Yeah, close to -- really close to 1.

5              MR. PERTEN:  Okay.

6              THE COURT:  So anyway, let's just keep pushing.

7      Thank you.

8              MR. PERTEN:  And Your Honor, before I proceed, just

9      and to let the Court know, these ProEx proposals that we've

10     just admitted into evidence --

11             THE COURT:  Yeah.

12             MR. PERTEN:  -- they are also in the binders, and

13     when I'm done getting them in, I can direct the Court to the

14     actual tabs that have them.  I inadvertently included them in

15     17- -- as tabs in Exhibit 174, which is the list of agreed-

16     upon --

17             THE COURT:  I see.

18             MR. PERTEN:  -- the ProEx was not agreed-upon, as Mr.

19     Carnathan pointed out, so it should've actually been in 175.

20     But once they're all in --

21             THE COURT:  Right.

22             MR. PERTEN:  -- and if assuming, Your Honor, lets the

23     rest of them in, I will clarify which documents you're looking

24     at so that the record's clear.

25             THE COURT:  Yeah, I mean, the main -- we can sort out

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1  the paper and the tabs.  The main concern I have is that we,

2  during testimony, refer to them by numbers --

3          MR. PERTEN:  Yes.

4          THE COURT:  -- that when in appeals court -- or we

5  when ruling -- writing an opinion on the matter --

6          MR. PERTEN:  Right, absolutely.

7          THE COURT:  -- can go and reliably find them there,

8  so that's it.

9          MR. PERTEN:  Yes.  So at worst, it will be

10  duplicative.  You'll have them as standalone exhibits, and

11  I'll also, just for record, so that there's another copy at --

12  and I'll give you that number so you can --

13          THE COURT:  That's fine.  And when we finish, as I

14  mentioned earlier, it really is a great help to me if we can

15  have --

16          MR. PERTEN:  Electronic.

17          THE COURT:  -- these documents in a digital form, but

18  then, of course, they need to have the proper exhibit numbers

19  assigned to them --

20          MR. PERTEN:  Yes.

21          THE COURT:  -- in that form as well, so.

22          MR. PERTEN:  Okay.

23          THE COURT:  Okay.

24          MR. PERTEN:  May I proceed?

25          THE COURT:  You may.

VADIM KAGAN - Direct

1              MR. PERTEN:  Thank you, Your Honor.

2                        RESUMED DIRECT EXAMINATION

3    BY MR. PERTEN:

4         Q.   Mr. Kagan, we just looked at two proposals for

5    Cutler Lane.

6              MR. PERTEN:  While we have this up on the screen, Mr.

7    Harris, would you scroll to the third proposal, which is a

8    little out of order.

9    BY MR. PERTEN:

10        Q.   Is this another proposal that you did in May 25th of

11   2015, at the end of the project?

12   A.   Yes.

13        Q.   And did this proposal relate to damage after the

14   winter of 2015?

15   A.   Yes.

16        Q.   And that one's for $8,600?

17   A.   Yes.

18        Q.   And again, is that a proposal that you prepared or

19   it was prepared at your direction?

20   A.   Yes.

21        Q.   And did you maintain that proposal in the ordinary

22   course of ProExcavation's business?

23   A.   Yes.

24        Q.   And to the best of your knowledge, is this a true

25   and accurate copy of the proposal that you maintained in the

VADIM KAGAN - Direct

1  ordinary course of your business?

2  A.   Yes.

3           MR. PERTEN:  Your Honor, we'd offer that as the next

4  exhibit.

5           MR. CARNATHAN:  No objection, Your Honor.

6           THE COURT:  All right.  It's admitted then.

7        DEFENDANTS' EXHIBIT 328 WAS ADMITTED INTO EVIDENCE

8           MR. PERTEN:  Thank you.

9           THE COURT:  I don't know -- did you give me a number

10  on that one?

11          MR. HARRIS:  328.

12          THE COURT:  3-2-8.

13          MR. PERTEN:  328.

14          THE COURT:  Okay.  Thank you.

15  BY MR. PERTEN:

16     Q.   Okay.  Now, Mr. Kagan, did you also do the same

17  process of proposals as it related to the Lyman property?

18  A.   Yes.

19     Q.   Okay.  So at this point, if I could refer to Exhibit

20  174 at tab L-39.

21          MR. PERTEN:  May I approach?

22          THE COURT:  Yes.

23          Mr. Harris, was that 174 at tab 39?

24          MR. HARRIS:  L-39.

25          THE COURT:  L-39, thank you.

VADIM KAGAN - Direct

 1   BY MR. PERTEN:

 2        Q.   All right.  If you'll look at what's labeled the

 3   Defendants' Trial Exhibit 2 of 8.

 4             THE COURT:  Okay.

 5             MR. PERTEN:  With the Court's permission, can I

 6   hover?

 7             THE COURT:  It's your witness, yeah.  You can --

 8             MR. PERTEN:  Thank you, Your Honor.

 9             THE COURT:  You can hover.

10   BY MR. PERTEN:

11        Q.   Mr. Kagan, I'm referring you now to a proposal --

12   what was this -- at Exhibit 174, L-39.  I believe this the

13   demolition permit, again, correct?

14   A.   Yes.

15        Q.   And since that proposal, the demotion was of -- it

16   benefited both lots, correct?

17   A.   Yes.

18        Q.   So there's just a single proposal for the demolition

19   work, correct?

20   A.   Yes.

21             MR. PERTEN:  So this document is already in evidence

22   as -- Mr. Harris, what is the demolition?

23             MR. HARRIS:  327.

24             MR. PERTEN:  327.  Okay.

25             MR. HARRIS:  I'm sorry -- 326.



VADIM KAGAN - Direct

1          MR. PERTEN:  326, Your Honor -- our mistake.

2          Your Honor, if I could ask you to flip on Exhibit 174

3     to tab 47.  Are you there, Your Honor?

4          THE COURT:  I am.

5          MR. PERTEN:  Thank you.

6     BY MR. PERTEN:

7          Q.   Mr. Kagan, I'm showing you tab 47; is that the

8     proposal as it -- ProEx proposal as it relates to Lyman Road?

9     A.   Yes.

10         Q.   And is this, again, a document that was prepared in

11    the ordinary course of business?

12    A.   Yes.

13         Q.   This is the 43700, and behind it, on page 2 of that

14    same tab, we see another Lyman Road, three pages, correct --

15    four pages, bearing Bates numbers 1281 through 1284; do you

16    see that?

17         THE COURT:  What tab is that?

18         MR. PERTEN:  I'm sorry.  Your Honor, I'm at tab 47.

19         THE COURT:  Yes.

20         MR. PERTEN:  And if I could draw your attention to

21    Tab 1281, so about the third page -- second page and third

22    page in.

23         THE COURT:  Not tab -- so, I'm sorry --

24         MR. PERTEN:  Tab 47.

25         THE COURT:  Yes.

VADIM KAGAN - Direct

1          MR. PERTEN:  Bates number.

2          THE COURT:  Bates number.

3          MR. PERTEN:  The third number in is KDC-01281.

4          THE COURT:  I see that.

5          MR. PERTEN:  And it's 01281, 01282, and 01283 --

6    those three pages.

7    BY MR. PERTEN:

8          Q.   Mr. Kagan, are those three pages the ProEx proposal

9    for the work on Lyman Road?

10   A.   Yes.

11         Q.   And again, was the process by which you prepared it

12   the same as you described as it related to the proposal for

13   Cutler?

14   A.   Yes.

15         Q.   And is this document a document that you prepared in

16   the ordinary course of business for ProExcavation?

17   A.   Yes.

18         Q.   And did you maintain it in the ordinary course of

19   your business for ProExcavation?

20   A.   Yes.

21         MR. PERTEN:  So Your Honor, we would move those three

22   pages which we just referred to.

23         MR. CARNATHAN:  No objection, Your Honor.

24         THE COURT:  All right.  They're admitted.

25         DEFENDANTS' EXHIBIT 329 WAS ADMITTED INTO EVIDENCE

VADIM KAGAN - Direct

 1   BY MR. PERTEN:

 2        Q.   And then --

 3             THE COURT:  But I need a number again.  I'm really

 4   sorry.  Is that 327 now?

 5             THE CLERK:  329.

 6             THE COURT:  329.

 7             MR. HARRIS:  The next number is 329.

 8             THE COURT:  329.  Okay.  All right.  Go ahead.

 9   BY MR. PERTEN:

10        Q.   And then right behind that, still on Tab 40 -- 47,

11   we have bearing Bates number 1284, KDC-01284; is that another

12   proposal that you prepared -- either prepared by you or at

13   your direction for ProExcavation?

14   A.   Yes.

15        Q.   And that was prepared in the ordinary course of your

16   business?

17   A.   Yes.

18        Q.   And that relates to winter -- or after winter work?

19   A.   Yes.

20        Q.   And this was maintained by you in your corporate

21   records; is that correct?

22             MR. PERTEN:  Your Honor, we'd offer that, okay, as

23   the next exhibit.

24             MR. CARNATHAN:  No objection, Your Honor.

25             THE COURT:  All right.  What is that, 330?



VADIM KAGAN - Direct

1          THE CLERK:  Yes.

2          THE COURT:  All right.  That's 330 in evidence.

3       DEFENDANTS' EXHIBIT 330 WAS ADMITTED INTO EVIDENCE

4          MR. PERTEN:  And finally, Your Honor, if I could draw

5    the Court's attention to tab number 50 in the same book.

6          THE COURT:  All right, I'm there.

7          MR. PERTEN:  The first page, we already have, was the

8    43700; it's duplicative -- KDC-1301, 1302, and 1303 we have.

9    And then the last page, I don't believe we have.

10   BY MR. PERTEN:

11       Q.   So I would ask you, KDC-1304 Bates number, is that

12   an invoice or a proposal that you prepared for ProExcavation

13   in the ordinary course of your business?

14   A.   Yes.

15       Q.   And maintained in the ordinary course of your

16   business?

17   A.   Yes.

18          MR. PERTEN:  I'd offer this as the last exhibit.

19          MR. CARNATHAN:  I think we already put that one in as

20   328, but I could be confused.

21          THE COURT:  I thought so, too, actually.

22          MR. PERTEN:  Your Honor, if it's duplicative, we

23   don't need it.  I was unclear and --

24          THE COURT:  This is --

25          MR. PERTEN:  -- in an abundance of caution.



VADIM KAGAN - Direct

1          MR. CARNATHAN:  We should be sure, though, because

2     it's --

3          THE COURT:  This is the winter damage --

4          MR. PERTEN:  Yes.

5          THE COURT:  -- situation and it --

6          MR. CARNATHAN:  Yeah.

7          THE COURT:  -- but --

8          MR. PERTEN:  Mr. Carnathan is correct, Your Honor, so

9     I'll withdraw that.  We've already got this one.

10          THE COURT:  All right.  That's in evidence already.

11          MR. PERTEN:  Yes.  It is.

12     BY MR. PERTEN:

13     Q.   Mr. Kagan, with respect to the ProExcavation

14     proposals that have now been introduced into evidence, did you

15     provide copies of those in real time to Mr. Filippov and Mr.

16     Lipetsker?

17     A.   Absolutely, yes.

18     Q.   Now, when you were constructing these houses, did

19     you or someone at your direction prepare building plans?

20     A.   Yes.

21     Q.   And other than the actual building plans, were there

22     also formal specifications?

23     A.   Some sort of specifications.

24     Q.   Okay.  But was there actually a pamphlet or a

25     booklet of specifications?

VADIM KAGAN - Direct

1   A.   No.

2        Q.   Without formal specifications, how did your subs

3   know what to build?

4   A.   On the initial meetings, I told them what we are planning

5   to do.  And since we work with the same subs over probably the

6   last fifteen, seventeen years, they know what to do.

7        Q.   Okay.  So did you have meetings with each of the

8   subs and you would, for example, point and say I want this

9   kind of crown molding or this kind of wood or words to that

10  effect?

11  A.   Yeah.  If we talking about the crown molding, it's

12  required even more than meeting with the subs.  So we have to

13  meet with subs who actually going to do the work and meeting

14  the vendor who supplying the materials.  And between the three

15  of us, it depends on the price for certain items.  And if it's

16  expensive, we can do something less.  We, three of us,

17  determine what are we actually doing.  And based this initial

18  meeting with subs and the vendor, they doing the takeoffs and

19  prepare their proposal.

20       Q.   Okay.

21            MR. PERTEN:  Your Honor, do you need me to -- or did

22  you get that?

23            THE COURT:  I got it.

24            MR. PERTEN:  Okay.

25  BY MR. PERTEN:



VADIM KAGAN - Direct

1    Q.   So based upon your meeting with the subs when you

2  agreed on exactly what you would want, would you have a

3  conversation with either Filippov or Lipetsker about what

4  finish specifications or what finish materials you were going

5  to be using?

6  A.   Yes.

7    Q.   During the course of the project, how often would

8  you speak with Mr. Lipetsker?

9  A.   Every day.

10    Q.   Was he on site virtually every day?

11  A.   Sometimes even twice a day.

12    Q.   Okay.  What about Mr. Filippov; how often would you

13  speak with him during the life of the project?

14  A.   Once a week.

15    Q.   Okay.  Now, did you have a sign on the property

16  saying KDC?

17  A.   Yes.

18    Q.   On the construction fence?

19  A.   On the construction fence, yes.

20    Q.   Now, as the project developed, and as you decided on

21  finishes or any upgrades of any sort, would you discuss those

22  with Filippov and Lipetsker?

23  A.   Yes.

24    Q.   And would you discuss the costs that would be

25  associated with any upgrades?



VADIM KAGAN - Direct

1    A.    Yes.

2         Q.    And were you in fact fronting the cost for any

3    upgrades?

4    A.    Yes.

5         Q.    So for example, did you discuss with them

6    herringbone flooring?

7    A.    Yes.

8         Q.    And use of tile and types of tile?

9    A.    Yes.

10         Q.    And copper?

11    A.    Yeah.

12         Q.    Okay.  Did you provide copies of checks that you

13    were cutting to vendors to Lipetsker and Filippov?

14    A.    Yes.

15         Q.    And did you have any understanding, sir, whether

16    while she was there, Kristina, was interacting with Mr.

17    Filippov's wife with respect to questions that they might have

18    with respect to expenses?

19    A.    Yes.

20         Q.    Had Ms. Brusenkova been instructed to provide

21    whatever information they were looking for?

22    A.    Yes.  This is part of the agreement.

23         Q.    Okay.  At least from your perspective, was this what

24    you would call open book?

25    A.    Yes.  It's open book.



VADIM KAGAN - Direct

1      Q.   Now, the subcontractors that you used, are these

2    subcontractors for the most part who you've worked with

3    before?

4    A.   Yes.

5      Q.   Do you have longstanding relationships with them?

6    A.   Yeah.  Fifteen years, I think that's a long relationship.

7      Q.   Okay.  And for the most part, are you using large

8    sophisticated companies or smaller contractors?

9    A.   They all usually small.  The working owner and two, three

10   helpers.  And some of them even only one, two people.  Some of

11   the owners, they doing by themselves.

12     Q.   Did the fact that you were working with small

13   subcontractors who you had a relationship with impact the cost

14   of construction in any fashion?

15   A.   I think, yes.  It's -- we probably -- on some items, we

16   twenty, thirty percent below the market price.

17     Q.   Now, in connection with the subcontractors that

18   you've known for many years, did you require that every one of

19   them do a formal written contract?

20   A.   I think it's only fifteen, twenty percent of my subs can

21   actually do the written contract.

22     Q.   Why?

23   A.   Some of them because they don't speak English.

24     Q.   Okay.

25   A.   And some of them, when they need the check end of the

VADIM KAGAN - Direct

1   week, they do the formal invoice in the pickup truck in the

2   hood.

3        Q.   Okay.  So sometimes they would come on -- you would

4   pay them right on site?

5   A.   Yes.

6        Q.   Okay.  Would the paperwork sometimes follow after

7   the fact?

8   A.   Sometimes yes, and sometimes also based on the text

9   message.

10       Q.   Okay.

11   A.   If we can -- if they cannot provide for me the formal

12   proposal, they can send a text message and this text message

13   going to be agree on the price.  So for example, 30,000 to do

14   the plaster and blueboard; it's my Spanish crew -- for fifteen

15   years, they not speak any English.  And they usually -- all of

16   our conversation is with these guys going through the text

17   message.  And sometimes -- and right now we have Dan Gersh,

18   and actually, before he issued the payment of those guys, he

19   asked them to do some kind of formal email just stating, you

20   know, actually what's the full amount.

21       And we have agreement for the subcontractor.  So we

22   paying for the materials through our credit card because we're

23   not kind of relying on those people.  And we doing the

24   payments to the -- pay them directly.  And we deducting this

25   price from the total cost of job.



VADIM KAGAN - Direct

1      Q.   Did you keep a separate checkbook in your truck on

2   the site --

3   A.   Yes.

4      Q.   -- from what you had at the office?

5   A.   Yeah.

6      Q.   So did have two checkbooks going?

7   A.   Yes.

8      Q.   At any point during the life -- during the

9   construction of this project, did Mr. Filippov contact you and

10  say -- again, any time prior to May of 2015, did Mr. Filippov

11  contact you and say words to the effect I need more backup?

12  A.   He ask something at the end of the project.  He need

13  like -- no, no, no, he never did this.  He asked for the more

14  backup after he filed lawsuit.

15     Q.   After the end of the project?

16  A.   Yes.

17     Q.   But I'm focusing you on before the May 7th letter

18  from Attorney Pyle; before that, was Mr. Filippov asking for

19  additional backup for the check copies that you sent him?

20  A.   I don't think so.

21     Q.   Okay.  And did Mr. Lipetsker ask for additional

22  backup?

23  A.   No.

24     Q.   When you sent checks -- you sent copies of checks

25  for ProEx, correct?

VADIM KAGAN - Direct

1   A.   Yes.   We send basically a copy of every check what we do,

2   what carrying.

3        Q.   Okay.   And we looked at those checks -- or some of

4   those checks as Exhibit 315.

5             MR. PERTEN:   Is that correct, Mr. Harris?

6             MR. HARRIS:   Yes.

7             MR. PERTEN:   315.

8   BY MR. PERTEN:

9        Q.   And we looked at Exhibit 214, 217, and 240.   When

10  you sent those checks over, at any point, did somebody from

11  the Filippov-Lipetsker camp say hey, we got copies of these

12  checks.   We need the backup, or something doesn't look right,

13  or words to that effect?

14  A.   No.   There never was any questions about it.

15       Q.   We looked at a bunch of copies of ProEx payments

16  that were sent, which you will find at Exhibit 216, 231, 235,

17  238, 239, and 258, which are all in evidence.   At any point,

18  when you sent copies of the ProEx payments, did you receive

19  any communication from Lipetsker or Filippov asking for

20  additional information as to what those ProEx payments were

21  for?

22  A.   No.

23            MR. CARNATHAN:   Object to the form.

24            THE COURT:   Just hold one second -- yeah, go ahead.

25            MR. CARNATHAN:   I object to the form.   There were



VADIM KAGAN - Direct

1    just cited, I think, six exhibits that I tried to jot down

2    real fast.  I don't really know what's incorporated into the

3    question at this point.

4              THE COURT:  All right.  I'll sustain that.

5              MR. PERTEN:  Okay.

6              THE COURT:  Form of the question.

7              MR. PERTEN:  Mr. Harris, will you pull up Exhibit

8    216, please?

9              THE COURT:  And by the way, if he answered, I'll

10   strike his answer.

11             Okay.  Go ahead.

12             MR. PERTEN:  Would you scroll down?

13   BY MR. PERTEN:

14        Q.   Is Exhibit 2-1-6 a copy of a check that you sent to

15   the Filippov/Lipetsker camp?

16   A.   Yes.

17        Q.   And I note on the check, it says,

18   "Excavation/foundations", correct?

19   A.   Yes.

20        Q.   At any point, did either Filippov or Lipetsker, or

21   anybody on their behalf -- and again, I'm focusing you prior

22   to the lawyer letter, prior to May of 2015 -- at any point,

23   did they question this payment?

24   A.   No.

25        Q.   Can we look at, now, Exhibit number 231, please?  Is

VADIM KAGAN - Direct

1   this another email with a ProExcavation check that you sent to

2   the Filippov-Lipetsker camp?

3   A.   Yes.

4        Q.   For $40,000?

5   A.   Yes.

6        Q.   At any point, did anybody from either themselves or

7   on behalf of themselves, did Filippov or Lipetsker come back

8   to you and say what's this $40,000 for or ask for some sort of

9   backup?

10  A.   No.

11       Q.   Did they ask for backup?

12  A.   They didn't ask for backup, but since Lipetsker on site

13  every day, and sometimes he ask the verbal -- sometimes

14  verbally, he ask the question, what did you cut the check for.

15  I said we did this, this, and that.  This is basically in our

16  conversation.  And because, you know, he said, you know,

17  Filippov will worry about a little bit, I will go and explain

18  to him.  This is basically the initial conversation every day

19  on the site.

20       Q.   Okay.  And after you told Mr. Lipetsker, at times,

21  if he asked, what these payments were for, did you receive

22  subsequent communication saying that that explanation wasn't

23  sufficient and you needed to provide more information, or

24  words to that effect?

25  A.   No.



VADIM KAGAN - Direct

1    Q.   Okay.  Let's look at Exhibit 235.  Is this another

2  ProEx check that you sent?  Yes?

3  A.   Yes.

4    Q.   And again, do you recall, other than verbal

5  conversations you may have had with Lipetsker on the site, at

6  any point, did you receive any request for additional

7  information regarding the payments that were being made to

8  ProEx?

9  A.   No.

10       MR. PERTEN:  Mr. Harris, can you pull up 238,

11  please -- Exhibit 238?  I want you go back to the email.

12  BY MR. PERTEN:

13    Q.   Is this an email that was sent at your direction to

14  Arina and Alex?

15  A.   Yes.

16    Q.   And it references a check number 1014 in the amount

17  of $30,000 to ProExcavation; do you see that?

18  A.   Yes.

19    Q.   Do you recall ever having any request for additional

20  clarification as to what that $30,000 was for?

21  A.   Can I see the date on the check?

22    Q.   The check?

23  A.   Yeah.

24       MR. PERTEN:  Scroll down, Mr. Harris.  That's the

25  document.  I don't think we have a copy of the check with this

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    exhibit.

2    BY MR. PERTEN:

3        Q.   Do you recall getting a response to that email?

4    A.   I don't remember.

5        Q.   Okay.  Let's look at 239.  Is this consistent with

6    the way you let them know that you had -- in this particular

7    case, you had issued three checks to ProEx in the amount of

8    $45,000?

9    A.   That's mine.  Yeah, this is how we do our business,

10   perfect explanation how we provide all the copy to our

11   partners.  It's open book.

12       Q.   And again, we can keep going with all the

13   ProExcavation checks, but at any point, other than

14   conversations that you had with Mr. Lipetsker on the site

15   where he may have asked you about checks to ProEx, did you

16   receive any request from either Arina Rudyakova or Mr.

17   Filippov for additional information?

18   A.   I don't remember, but if maybe if they request some

19   additional information about this checks and we send them the

20   backup, I don't know; probably yes.

21       Q.   Okay.  And with respect to checks that were cut to

22   KDC, would you also provide copies of the KDC checks to the

23   Filippov-Lipetsker camp?

24   A.   Yes.

25           MR. PERTEN:  Mr. Harris, could you pull up Exhibit

VADIM KAGAN - Direct

1    229?

2    BY MR. PERTEN:

3        Q.   And would this be an example of the type of email

4    with a copy of the check that you spent relative to -- that

5    you sent relative to Kagan Development?

6    A.   Yes.

7        Q.   I see in the memo section on this one, it says,

8    "Partial payment to" excavate?

9    A.   Amex.

10       Q.   I'm sorry?

11   A.   I think it's called Amex.

12       Q.   To Amex.

13   A.   Yeah.

14       Q.   Okay.

15   A.   And something else.

16       Q.   When you paying things on Amex, did you tell them

17   what you were buying on Amex?

18   A.   Yes.  We usually provide them the copy of our American

19   Express statement, which is usually attached to all these

20   payments --

21       Q.   Okay.

22   A.   -- prices.

23           MR. PERTEN:  And again, this is -- let's just look at

24   another one.  Why don't you pull up exhibit --

25   A.   And also, it says right there, even the date on the

---



(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    statement.

2            MR. PERTEN:  I'm sorry -- wait, go back to that.

3    BY MR. PERTEN:

4        Q.   Say that again?

5    A.   Yeah.  It says, "Initial payment for American Express",

6    date 10 something '13, this is the date when our statement is

7    issued.  And we usually attach this statement date to this

8    day.

9            MR. PERTEN:  Okay.  Mr. Harris, would you pull up

10   Exhibit 230?

11   BY MR. PERTEN:

12       Q.   So this is an $80,000 KDC check, correct?  And can

13   you read the memo line there?

14   A.   Yes.  It's also, "Initial payment American Express,

15   10/29/2013".  If this is like initial payment for American

16   Express payment because they have a limit on our card.  And we

17   require initial payment sometimes even twice/three times a

18   week because we have a certain credit limit.  And this is why

19   we spending our money and when they can have a -- when we see

20   we have Lyman Cutler account has enough sufficient funds to

21   pay our American Express card, we issue the checks.

22       Q.   All right.  So you would use -- you would pay down

23   the balance?

24   A.   Yes.

25       Q.   Okay.  And how would you decide -- so again, this

VADIM KAGAN - Direct

1  particular check is $80,000; how would you decide how large a

2  check to issue?

3  A.   We usually check how much money we have on the Lyman

4  Cutler account.  We have to make sure what our outstanding

5  bill.  We have to make sure what's the due date on our

6  American Express account.  And based on all these factors, we

7  issue the checks.

8      Q.   But --

9  A.   Usually, this amount -- usually, this is a wrong number

10  probably -- not probably -- it's -- yes, probably the amount

11  was -- Lyman Cutler owed to Kagan Development even much

12  bigger.  This is why we have our own checks, and after end of

13  the month, we have a small check with the even numbers.

14     Q.   Okay.  So this was a partial payment, if you will,

15  for the amounts of money that had been fronted by Amex?

16  A.   Probably.

17     Q.   And at the end of the project, would you then

18  reconcile everything to make sure that either you hadn't

19  overpaid or underpaid yourself?

20  A.   Yes.

21     Q.   Did you actually issue invoices on either ProEx or

22  KDC?

23  A.   No.

24     Q.   No.  Okay.  In the proof of claim binders that Mr.

25  Gersh put together for you, Exhibits 174 and 175, do you have

VADIM KAGAN - Direct

1  any understanding whether the backup for all the payments was

2  located and placed there?

3  A.   Yeah.

4       Q.   Yes?

5  A.   Yes.

6       MR. CARNATHAN:  Objection.  Foundation.

7       THE COURT:  Sustained.

8       You need to lay a little more foundation on that.

9       MR. PERTEN:  Okay.  Yep.

10  BY MR. PERTEN:

11      Q.   Now, to the best of your knowledge, did Mr. Filippov

12  have access to the bank statements for the Lyman Cutler

13  account?

14  A.   Yes.

15      Q.   How do you know that?

16  A.   Because he opened the bank account and he provide us the

17  online access -- access his account.

18      Q.   And did you, based on -- did you make any

19  observations that led you to believe that he was reviewing

20  those?

21  A.   Yes, because -- yeah, we talk about it.

22      Q.   You had spoke about it?

23  A.   Yeah.

24      Q.   At any point, did you have trouble yourself getting

25  access to that account?



VADIM KAGAN - Direct

1    A.    No.

2         Q.    Okay.  Now, just very briefly, did Tatiana, your

3    wife, have any role in the day-to-day construction of this

4    project?

5    A.    No.

6         Q.    Did she negotiate with subcontractors?

7    A.    No.

8         Q.    Was she involved in the billing for subcontractors?

9    A.    No.

10         Q.    Or the billing for KDC or ProExcavation?

11    A.    No.

12         Q.    Now, once the homes are complete, do you need to get

13    a certificate of occupancy?

14    A.    Yes.

15         Q.    And when do you get the certificate of occupancy?

16    A.    Usually, a few days before the closing, or if we actually

17    need the money -- if we badly need the money in the accounts,

18    we ask them for certificate of occupancy.

19         Q.    And let's take those one at a time, if we could.

20    Why would you wait until generally just before the closing to

21    get the certificate of occupancy?

22    A.    Two reasons:  reason number one, if we're going to get

23    this last payment, usually five percent is from the total loan

24    proceeds for the construction, we have to pay percentage of

25    it.  And if we have money in our account, we don't have to do

VADIM KAGAN - Direct

1  it.  And the second reason, if we obtain the certificate of

2  occupancy, usually the town recalculate your annual taxes and

3  you can jump from 15- to $30,000 for the payments.

4      Q.  So once the certificate of occupancy issues, the

5  finished project is now in the tax rolls?

6  A.  Absolutely, only because of the part of the certificate

7  of occupancy inspection in Newton and Brookline, when the

8  inspector does the final, he will bring the assessors to the

9  site and do the pictures and basically next day, project

10  already is reassessed.

11      Q.  Okay.  So do you often delay so that the taxes don't

12  start accruing until right before the property is conveyed?

13  A.  Yes.

14      Q.  Okay.  This was at least to homes where what we call

15  spec homes, correct?

16  A.  Yes.

17      Q.  On a spec home, are there other reasons why you

18  might delay in requesting a certificate of occupancy?

19  A.  I don't know.

20      Q.  Okay.  Once a certificate of occupancy issues, if

21  you want to make additional changes to the home, do you need

22  to pull a new building permit?

23  A.  Oh, yes, absolutely.  And sometimes, if we have a buyer

24  and he want to change something, it's easy to not open the new

25  permit and we can work under the old permit.



VADIM KAGAN - Direct

1     Q.    Okay.  And you also mentioned that sometimes you may

2   get a certificate of occupancy just before the closing if you

3   need money; what's that all about?

4   A.    If we have not enough money to pay subcontractors, and we

5   have a five percent -- it's a big amount -- and we are

6   applying for certificate of occupancy getting back five

7   percent payment from the bank and paying our subs.

8     Q.    So the bank -- on the construction loan, the final

9   disbursement is not due until the CO issues; is that correct?

10  A.    Yes, five percent.

11    Q.    So if you need to pay subs, you may get the CO

12  earlier so that you can get that five percent released?

13  A.    Yes.  Sometimes subs can wait, sometimes not; depends on

14  the circumstances.

15    Q.    Now, so at some point, these homes were completed

16  and they were listed, correct?

17  A.    Yes.

18    Q.    Did you have discussions with Mr. Filippov about the

19  listing price?

20  A.    Yes.

21    Q.    Did you have any meetings with him to discuss the

22  listing price?

23  A.    Yes.

24    Q.    What do you recall about those meetings?

25  A.    We met -- Filippov, Tatiana, and me -- a couple of times.



VADIM KAGAN - Direct

1    And we agree on the price.  And Tatiana make the market

2    analysis.  And she has to give us the answer if the price was

3    Filippov suggests to be as the selling price can be real.

4        Q.   Can be?

5    A.    Real -- can be real.

6        Q.   Can it be a real price?

7    A.    Yes, if actually, you know, we can put the house on a

8    certain amount was Mr. Filippov's proposal.

9        Q.   Okay.  And did that occur in this case?

10   A.    Yes.

11       Q.   And did you agree with Mr. Filippov on a listing

12   price?

13   A.    Yes.

14       Q.   And was that $5,499,000 initially?

15   A.    Yes.

16       Q.   And did you tell Mr. Filippov that the properties

17   were going to be listed?

18   A.    Yes.

19       Q.   Did he authorize you to sign listing agreements?

20   A.    Yes.

21       Q.   There was some testimony earlier in this trial about

22   an April 2015 listing of a property; do you recall that

23   testimony?

24   A.    Yes.

25       Q.   And I think Mr. Filippov said he was down in Florida

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    at the time?

2    A.   Yes.  It's the second listing, yes.

3        Q.   The second listing.

4    A.   It's the second listing, yeah; it's for 55 Lyman.

5        Q.   Did you consult with Mr. Filippov in April of 2015

6    about the second listing of Cutler?

7    A.   Yes.

8        Q.   And did you send him a copy of the listing agreement

9    that you proposed to sign?

10   A.   Yes.

11       MR. PERTEN:  Mr. Harris, can you pull up Exhibit 266?

12   BY MR. PERTEN:

13       Q.   Is this an email that you sent -- or that was sent

14   at your request on April 25th at 9:53 a.m.?

15   A.   Yes.  Can you scroll it?

16       MR. PERTEN:  Can you scroll it down?

17   BY MR. PERTEN:

18       Q.   Subject:  "Agreement for exclusive right to sell"?

19   A.   Yes, I remember.

20       MR. PERTEN:  And if you scroll down further.  Keep

21   going.  Right there.

22   BY MR. PERTEN:

23       Q.   And is that the listing agreement that you forwarded

24   to Mr. Filippov for his review and consent to sign it?

25   A.   Yes.  Can I see this whole --



VADIM KAGAN - Direct

1     Q.   Sure.

2          MR. PERTEN:  You want to scroll down, Mr. Harris?

3     A.   -- all those pages?

4     BY MR. PERTEN:

5     Q.   It was the unsigned draft, correct?

6     A.   Yeah, the unsigned draft, it was, I think.

7     Q.   Okay.  And once it was signed, did you also send him

8     a copy of the signed listing agreement?

9     A.   Yes.

10          MR. PERTEN:  Mr. Harris, can you bring up Exhibit

11    263?

12    BY MR. PERTEN:

13    Q.   Is this the email you sent to Mr. Filippov enclosing

14    the signed agreement?

15    A.   I think Dan Gersh sent this email.

16    Q.   At your request?

17    A.   Yes, yeah.

18          MR. PERTEN:  Can you scroll down please, Mr. Harris,

19    to the last page.

20    BY MR. PERTEN:

21    Q.   And is that your signature on the bottom there?

22    A.   Yes.

23    Q.   Where it says, "seller"?

24    A.   Yes.

25    Q.   And when you sent that to Mr. Filippov, at any

VADIM KAGAN - Direct

1    point, did he contact you and say wait a minute, why are you

2    signing that, or words to that effect?

3    A.   No.  He didn't, but he asked me to sign this, so why do

4    we have to ask this question?

5        Q.   Okay.  Now, I want to draw your attention -- so this

6    is April 2015.  As of April 2015, you'll agree with me the

7    homes were complete, correct?

8    A.   Yes.

9        Q.   They had already been on the market for a while?

10   A.   Yeah.

11       Q.   Had you been paying the carrying cost through April

12   of 2015?

13   A.   Yes.

14       Q.   And did you have any concerns about the amount of

15   time it was taking to sell these homes?

16   A.   Yes.

17       Q.   And what were those concerns?

18   A.   My concerns is we have to lower the price, and I'm paying

19   carrying cost, and I don't know when it's going to be ended.

20       Q.   And I'm sorry -- you don't know when --

21   A.   When it's going to be ended.

22       Q.   When it's going to be ended, meaning when it's going

23   to get sold?

24   A.   When it's going to be sold, yes.

25       Q.   Did you have a conversation with Mr. Filippov about

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1  those concerns?

2  A.   Yes.

3       Q.   Can you tell us what you recall about that

4  conversation with Mr. Filippov?

5  A.   I asked him to lower the price because we are losing the

6  real estate season.

7       Q.   I'm sorry -- you are losing the --

8  A.   We are the losing the real estate season.

9       Q.   The real estate season.  Thank you.

10  A.   Yes.  So we have to lower the price, at least for 250,000

11  or something.  And he said why I should it because if you're

12  going to lower the price, he said, we're going to lose some

13  money.  But I said --

14       Q.   I'm sorry, could you slow down?  He said -- say it

15  again, please.

16  A.   Why do we have to lower the price because if they're

17  going to lower the price, we're going to lose some initial

18  profit.  But my reaction is I am paying the carrying cost.

19  And it can't be forever because I will drain all my money.

20  And Filippov said I don't care.  You're paying the carrying

21  cost and pay the carrying cost.  And I said no, if this is the

22  case, probably I'm going to stop paying the carrying cost if

23  this is the case.  And I said I have to go talk to Boris

24  Maiden.

25       Q.   Why did you have to go to Boris Maiden?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    A.    Because Boris Maiden was my attorney.

2         Q.    Okay.  And did you go to Boris Maiden?

3    A.    Yes.  I did.

4         Q.    And for what purpose did you go to Boris Maiden?

5    A.    I asked him to clarify what's the deal between me and Mr.

6    Filippov, actually.

7         Q.    And what did Mr. Maiden tell you?

8              MR. PERTEN:    Incidentally, Your Honor, I should

9    represent to the Court that that privilege was waived a long

10   time ago.

11             THE COURT:    Okay.

12   BY MR. PERTEN:

13        Q.    What did Mr. Maiden say to you?

14   A.    He said I can't do nothing about it.  You have go and

15   talk to Filippov.

16        Q.    Okay.  So did you have a follow up -- when he said

17   he can do nothing about it, you have to talk to Filippov, did

18   you have a follow up conversation with Mr. Filippov?

19   A.    Yes.

20        Q.    What do you recall about that conversation?

21   A.    I asked him to lower the price because I'm paying the

22   carrying cost, and he said I -- I don't care.  You're going to

23   pay the carrying cost until we agree you don't have to pay the

24   carrying cost.

25        Q.    And what was --



VADIM KAGAN - Direct

1   A.   And -- and I'm not going to lower the price.  I said if

2   you not lower the price, we all going to lose the money.

3   Somebody have to do something.  But I can't just lower the

4   price myself because this is your responsibility.

5        Q.   And what was his reaction to that statement by you?

6   A.   His reaction or my reaction?

7        Q.   I'm sorry?

8   A.   My reaction or his reaction?

9        Q.   His reaction.

10  A.   He just simply said I don't care.  Just go do your thing

11  and whatever.

12       Q.   So when he said that, what happened next with

13  respect to that topic of conversation?

14  A.   I call Lipetsker and we have a conversation with

15  Lipetsker about it.  And I got a lot of information after

16  talking to Lipetsker.

17       Q.   You got a lot of information?

18  A.   Yeah, interesting information.

19       Q.   What did Mr. Lipetsker tell you?

20  A.   Mr. Lipetsker said -- he offered me to walk away and pay

21  Lipetsker and Filippov $1 million and -- because they said

22  you're not going to get any more money.  And I said why are

23  you saying so because they said we spoke with your previous

24  bookkeeper and we got the information you stealing the money

25  from us.  I said guys, but I have open book.  We send you all

VADIM KAGAN - Direct

1    the copies of the receipt.  We send you all the invoices.  And

2    why you can't, you know, think about it.  And they said you

3    know what -- and he said doesn't matter what you think about

4    it.  You know, I can also ask my nephew, Mr. Zhukovskiy, to

5    testify against you if something happen.  He said in your best

6    interest, you have to walk away.

7        Q.    In your best interest what?

8    A.    You have to walk away.  And he said, you know, since we

9    are the major shareholders, me and Filippov, we going to

10   drive -- we going to drive -- we going to drive down your

11   shares to zero if you won't sell.

12       Q.    You're going to drive down your shares?

13   A.    The share of the business, yes.  And you're not going to

14   get anything.

15       Q.    And what was your reaction when that was said to you

16   by Mr. Lipetsker?

17   A.    I said let me think about it.

18       Q.    Okay.  And after you thought about it, what was your

19   next act on that topic?

20   A.    I spoke with Joseph -- and since I don't have attorney

21   yet -- and I spoke with Joseph and reviewed our operating

22   agreement.  And Joseph said since I'm not attorney, but what

23   I'm understands as an operating agreement, you should pay your

24   carrying cost after twenty-three months of the project, but

25   you're paying this all the time.  And he said, after the

VADIM KAGAN - Direct

1    twenty-three months, Filippov's responsibility to paying the

2    carrying cost.  But I said Filippov refusing to pay carrying

3    cost.  And he said --

4         Q.   And --

5    A.   -- let me sleep on it, Joseph said.  And he called me

6    probably the next day, and he said, let's go consult

7    attorneys.

8         Q.   Okay.  Now, when Mr. Cohen told you that under the

9    operating agreement, you shouldn't have been paying the

10   carrying cost for the first twenty-three months, was that the

11   first time you realized that the operating agreement didn't

12   provide what you thought it did?

13   A.   Yes.

14        Q.   Okay.  And at that point, did you consult with an

15   attorney?

16   A.   Yes.

17        Q.   And did you have the attorney write a letter?

18   A.   Yes.

19        Q.   And is that the May 7th, 2015 letter that we've

20   looked at?

21   A.   Yes.

22            MR. PERTEN:  Jim, can you pull up that letter? I'm

23   sorry.

24            MR. HARRIS:  50, I've got one.

25            MR. PERTEN:  It would be Exhibit 50, Your Honor.




VADIM KAGAN - Direct

1    BY MR. PERTEN:

2        Q.    Is this the letter you had your counsel send on your

3    behalf?

4    A.    Yes.

5        Q.    And this was after you learned that under the

6    operating agreement, you weren't supposed to be paying

7    carrying costs all along; is that correct?

8    A.    Yes.

9        Q.    At the time this letter was sent, had you done a

10   final reconciliation of all the costs yet?

11   A.    Absolutely not.

12       Q.    Okay.  What was your goal in sending this letter?

13   A.    First of all, we have to open the initial conversation

14   since we cannot talk anymore, me and Filippov.  I think if

15   they going to receive the letter from attorney, they going to

16   start thinking about it.  And also, I ask --

17            THE WITNESS:  Can you scroll the letter?  Can you

18   scroll more?

19   A.    Yes.  And we have some initial bookkeeping number; when I

20   ask, Dan give it to me.  And at least I want initial payment,

21   $758,000, to pay my subs and pay me for what I already spent.

22   BY MR. PERTEN:

23       Q.    Did that $758,000 include those soft costs that we

24   looked at in your construction contract -- the fifteen percent

25   general contractors' fee and all of those costs?



VADIM KAGAN - Direct

1    A.    No.

2         Q.   All right, so this was just hard construction?

3    A.    It just hard number before we reconciled a number.

4         Q.   And again, these were hard numbers, and at this

5    point, no reconciliation or verification had occurred, right?

6    A.    Yes.

7         Q.   And this was a number that was provided to you by

8    Mr. Gersh?

9    A.    Yes.

10        Q.   And did you have any understanding where he got that

11   number from?

12   A.    Probably from QuickBooks.

13        Q.   Okay.  All right.  And again, what did you need that

14   money for?

15   A.    We have to pay subcontractors and I want to reimburse

16   myself for the carrying cost already spent --

17        Q.   Okay.

18   A.    -- because the way I understand I shouldn't do it.

19        Q.   Okay.

20           MR. PERTEN:  Scroll down a little bit more.  Scroll

21   up just a little bit so I can see the full paragraph.

22   BY MR. PERTEN:

23        Q.   The top paragraph there, you request that members

24   agree to reduce the listing price to 5.199 --

25   A.    Yeah -- this --



VADIM KAGAN - Direct

1      Q.    -- or to 5.25 and then lower?

2    A.    Yeah, yes, yeah, it's --

3      Q.    Why was that?

4    A.    Because we losing the market again, and we have to reduce

5    the price, and we have to do at least some kind of quick sale.

6      Q.    What reaction, if any, did you get from Mr.

7    Filippov?

8    A.    I think he opened the lawsuit against us.

9      Q.    He opened the lawsuit against you?

10   A.    Yeah.  Filed a lawsuit.

11     Q.    After the lawsuit was filed, did you make a decision

12   to lien the property?

13   A.    Yes.

14     Q.    And did you do that or did Mr. Cohen do that?

15   A.    Mr. Cohen did the filing.

16     Q.    But you were aware that he was doing it?

17   A.    Yeah, we provide him all the information, yes.

18     Q.    Okay.  And the amount of the lien, did that include

19   those soft costs that you testified this morning you would

20   often waive?

21   A.    Yes.

22     Q.    Why did you decide in this case you would be

23   unwilling to waive those costs?

24   A.    Because I think my partners is unfair, and clearly, I'm

25   understand they're not planning to paid all the bills.  And I

Page 148

VADIM KAGAN - Direct

1  thought I have to finally pay my general contractor's fee and

2  pay all the percentage for the money what already advanced to

3  the Lyman Cutler LLC.

4      Q.   Prior to the filing of the lawsuit, was there any

5  kind of a members' meeting to discuss the concerns that you

6  had?

7  A.   No.

8      Q.   Was there any kind of a members' meeting to discuss

9  using company funds to start a lawsuit?

10 A.   No.

11     Q.   Now, let's jump ahead a little bit to the

12 following -- to the filing of the bankruptcy petition.  How

13 did you first learn that the bankruptcy petition had been

14 filed?

15 A.   From my attorney.

16     Q.   Okay.  Prior to learning that from your attorney,

17 had you had any discussion with either Mr. Filippov or Mr.

18 Lipetsker about whether or not filing a petition for

19 bankruptcy was in the best interest of Lyman Cutler?

20 A.   No.

21     Q.   Was it a surprise to you?

22 A.   Um-hum, yeah, it was a very big surprise.

23     Q.   Now, sir, you understand you've filed a proof of

24 claim in this document on behalf of KDC?

25 A.   Yes.



VADIM KAGAN - Direct

1      Q.   The numbers that are in the proof of claim, where

2   did they come from?

3   A.   From the QuickBooks.

4      Q.   And did you have somebody in your organization

5   prepare or evaluate and provide a number?

6   A.   Yes.

7      Q.   Who did that?

8   A.   Dan Gersh.

9      Q.   Mr. Kagan, I'm going to be showing you a page from

10   your proof of claim.

11         MR. PERTEN:  This is claim number 1, Your Honor, that

12   was filed on May 3rd, 2016 in these proceedings.  There are

13   forty-nine pages, and this page carries at the top of it page

14   5 of 49.

15         THE CLERK:  Just one second.

16         MR. PERTEN:  Okay.

17   BY MR. PERTEN:

18      Q.   Are these numbers that are based in the summary --

19   are these numbers that were provided to you at your direction

20   by Mr. Gersh?

21   A.   Yes.

22      Q.   Did Mr. Cohen have anything to do with coming up

23   with the cost for construction?

24   A.   No.

25      Q.   Okay.  And to the best of your knowledge, are the

VADIM KAGAN - Direct

1   numbers that are set forward for the hard costs for

2   construction still owed to KDC; is that the right number to

3   the best of your knowledge?

4   A.   Yes.

5        Q.   And then we see the add-ons of the general

6   contractor construction fee of fifteen percent; do you see

7   that?

8   A.   Yes.

9        Q.   As of the date that you filed this, May 3rd, 2016,

10  had you decided that you were not going to waive those fees in

11  this case?

12  A.   Absolutely not.

13       Q.   Why not?

14  A.   I believe we already lost a lot of money going through

15  this litigation for no reason for four years, and I'm not

16  going to waive this fee.

17       Q.   Okay.  Now, sir, if I could also show you page 4 of

18  49 from your proof of claim and draw your attention to

19  paragraph number 2.  After Mr. Gersh reviewed the records, did

20  you in fact reduce your claim by $74,000 for the hard

21  construction costs?

22  A.   Yes.

23       Q.   Okay.  And do you believe, as you sit here today,

24  sir, that the total amount of your claim of $2,396,914.66 is a

25  fair and accurate number of what you believe is owed to you?

VADIM KAGAN - Direct

1   A.   Yes.

2       Q.   Now, sir, at some point, did you instruct Mr. Gersh

3   to put together all the backup for the proof of claim?

4   A.   Yes.

5       Q.   What did you tell him to do?

6   A.   Get all the information what he can get -- whatever

7   requesting and whatever needs to be there because he's the

8   CFO, he's the number guy.  He can get all the information.

9       Q.   And when you told him to get all of the

10  information -- all of the backup, did you provide those

11  binders to Mr. Filippov and his counsel?

12  A.   Yes.

13      Q.   And if I represented to you that that was in

14  approximately June of 2016, is that consistent with your

15  memory?

16  A.   Probably.

17      Q.   Are there still some subcontractors who have not

18  been paid on this project?

19  A.   Yes.

20      Q.   Did you have conversations with those subcontractors

21  about the fact that they have not yet been paid?

22  A.   Yes.

23      Q.   Do you have any understanding why they haven't sued

24  you yet?

25  A.   Because they know I put the lien on the property and they

VADIM KAGAN - Direct

1  know, eventually, we both be paid.

2      Q.   Okay.  Are these subcontractors -- the few that

3  haven't been paid, are these subcontractors that you continue

4  to use on other projects?

5  A.   Yes.

6      Q.   And are these subcontractors that you've worked with

7  for many years?

8  A.   Yes.

9      Q.   Is DaCosta one of those contractors?

10  A.   Yes.

11      Q.   How about BST Plumbing; is that one of those

12  contractors?

13  A.   Yes.

14      Q.   V&D Plumbing?

15  A.   Yes.

16      Q.   V&D Plumbing and Heating?

17  A.   Yes -- V&D Heating, yes.

18      Q.   What about Dream Flooring?

19  A.   We -- we have two flooring contractors and he one of

20  those we used him on certain projects, too, yeah.

21      Q.   Okay.  And Unicon Electric; is that another

22  subcontractor who has agreed to wait?

23  A.   Yes.

24      Q.   Okay.  In addition, sir, are there outstanding

25  monies that haven't yet been paid to KDC and ProEx?



VADIM KAGAN - Direct

1    A.    Yes.

2          Q.   And is all the backup for those monies in those

3    binders that were provided?

4    A.    Yes.

5          Q.   Okay.  Now, sir, at some point, did you learn that

6    the two homes were sold?

7    A.    Yes.

8          Q.   You understood that the bankruptcy trustee was able

9    to sell them?

10   A.    Yes.

11         Q.   Did the bankruptcy trustee ask you to provide a new

12   home warranty for the construction work?

13   A.    Yes.

14         Q.   And although you still had monies outstanding to

15   KDC, did you agree to stand behind your work and do a new home

16   warranty?

17   A.    Yes.

18         Q.   Do you know, if one had to go out on the market and

19   purchase a new home warranty, how much would that cost?

20   A.    I don't know.

21         Q.   Were there any claims against --

22              THE COURT:  I'm sorry, did you answer that?

23              MR. PERTEN:  He said he didn't know.

24              THE WITNESS:  Yes, I said I --

25              THE COURT:  Did not know.



VADIM KAGAN - Direct

1          MR. PERTEN:  Did not know.

2          THE WITNESS:  I said I don't know.  I know it's going

3    to get -- and I know it should've been much more.  This is why

4    people choose -- this is why buyers choosing the builder's

5    warranty because it's like substantially less, but I don't

6    know the amount.

7    BY MR. PERTEN:

8          Q.   Well, you didn't charge any additional for the

9    builder's warranty, did you?

10   A.   No.

11         Q.   And during the pendency of the builder's warranty,

12   did anybody make any claims against the builder's warranty?

13   A.   No.

14         Q.   Now, I'd like to look at the charts that were in Mr.

15   Goldman's reports that he referred to.

16         MR. PERTEN:  You could bring up, Mr. Harris,

17   paragraph 50 of the Goldman report.

18         Okay.  Let's move down to the chart.  Thank you.

19   BY MR. PERTEN:

20         Q.   Mr. Kagan, this is a chart that Mr. Goldman had in

21   his report comparing project comparison based on selected

22   costs recorded in QuickBooks files.  Are you familiar with the

23   properties that are listed across the top:  55 Lyman, 88

24   Cutler, 10 Lyman, Yarmouth, Parker, Fredette, and Druid?

25   A.   Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    Q.    And is it a fact, sir, that 55 Lyman, 88 Cutler, 10

2    Lyman and Yarmouth were all built with investors?

3    A.    Yes.

4    Q.    Whereas Parker, Fredette, and Druid were only you?

5    A.    Yes.

6    Q.    Can you explain, sir, why the costs on the investor

7    side are the higher than the costs on the noninvestor side?

8    A.    Do you want only one house, or you want me to go through

9    every house?

10    Q.    Well, why don't --

11    A.    Only the --

12    Q.    -- we use -- just as an example, why don't you

13    compare 55 Lyman to Parker Street.

14    A.    Okay.  55 Lyman, it's almost acre of lot, almost 10,000

15    square feet house, compared to Fredette, it's a 7,000 square

16    feet lot and 2,500 square feet house.  This is the comparison.

17    And for example, affordable sprinklers, 8400, which is

18    probably forty heads.  And compared to Fredette, it's probably

19    three heads.

20    Q.    Three heads -- sprinkler heads?

21    A.    Sprinkler heads, yes.  This is why it's different 8400

22    compared to 1700.  Architectural, it's the same thing, 10,000

23    for plan for Lyman compared to basic small home, 5800, this is

24    basically our standard cost for the architects.

25    Q.    Was there anything about the shape of the 55 Lyman

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    property that made the architectural plans more costly?

2    A.    Yes, absolutely because it's more complex.  And even this

3    $10,000 for my architect charge, this is basically because

4    it's for me.  If anybody going to go and purchase this plan

5    from somebody else, it's going to be minimum thirty, forty

6    grand.

7        Q.    Okay.

8    A.    10,000 -- even 10,000, even twice more than Fredette, I

9    bill at this price, it's like -- it's my architect cost

10   because I work with my architect for twenty years.

11       Q.    Now, sir, let's look at the line item for electrical

12   services.  I'm seeing 65,000, 75,000 on the investor

13   properties and significantly less on the noninvestor

14   properties.  Why would the electrical service be different?

15   A.    It's the same thing because it's electrical service --

16   all these four houses Mr. Goldman brought up, it's a 10,000

17   square feet, basically, homes and --

18       Q.    That's including the garage, right?

19   A.    Including the garage.

20       Q.    And basement?

21   A.    Including the garage and including the basement, yes.

22   And an acre of land each.  And Brookline, they require

23   underground 400 amp service for each home, which is compared

24   to Fredette it's also probably like 100, 150 foot line under

25   the road to the house.  This is why this billed 6500 --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    65,000.

2         Q.   I'm sorry -- so 55 Lyman, it had to be underground

3    wiring and that wasn't true on the Parker side?

4    A.   Yes.  This is the underground 400 amp service.

5         Q.   Okay.

6    A.   We just usually go from another side of the road and

7    involve your other labor and materials to do certain work.

8    Plus, this house is much bigger and required much more wires,

9    much more laborers, much more of everything because it's

10   like -- compared to Fredette, it's like four times bigger.

11        Q.   Did the 55 Lyman also require potential wiring for

12   potential future roads or uses?

13   A.   Absolutely, yes.

14        Q.   Could you elaborate on that?

15   A.   Since this is more expensive home, we do a lot future

16   wiring for the future references because the sophisticated

17   buyers will know where they're going to put the TV, or don't

18   know where they're going to do anything.  We provide an extra

19   electrical -- extra power for the outside for the patio, for

20   the exterior lights, and this is also the lot is big and

21   require more wiring.

22        Q.   Okay.  Why would the difference in prices be so

23   dramatic with respect to framing?

24   A.   Framing -- same thing.  Framing, it's a 10,000 square

25   foot home, complex.  It's like don't have a straight line

VADIM KAGAN - Direct

1    basic to 7 Fredette.  7 Fredette is a basic square home, 2500

2    square feet.  It's like -- it's rectangle.  It's like 20x40.

3    And compared to Lyman Cutler, it's -- it's no straight lines.

4    It's rectangular, squares, heaves, gables, everything mixed

5    together.

6        Q.    When you split the Lyman Cutler lot into two lots --

7    A.    Yes.

8        Q.    -- was that split rectangular?

9    A.    No.  It is split uneven and usually, we put the

10   rectangular house, you know, we have rectangular lot -- when

11   we have a lot of frontage.  What's happened on Lyman Cutler,

12   when we split the lot, we have a long narrow lots and they

13   have this funky shape -- this is why we end up in the funky

14   shape of the house.

15       Q.    Right.  So it's not just a cookie-cutter, square

16   house, correct?

17   A.    Absolutely not.  It's like -- it's like more like serious

18   custom homes.

19       Q.    Okay.  What about -- let's drop down to, for

20   example, landscaping; why would 55 Lyman have been 45,000

21   while landscaping for Druid, for example, was 4500?

22   A.    Because different amount of plants required, different

23   square footage of sod -- it's just different size.

24       Q.    And did the fact that 55 Lyman was not a level lot,

25   did that have any impact on the price for landscaping?

VADIM KAGAN - Direct

1    A.    Yes.

2         Q.    Would that landscaping include, amongst other

3    things, the retaining walls and the leveling of the lots and

4    things of that nature?

5    A.    No.  I think this light on what you described, it's more

6    like close to maybe masonry or somewhere else because this

7    landscaping, I believe it's -- if you're talking about the

8    whole thing, the amount should be much bigger.

9         Q.    Okay.  What about the difference in the National

10   Lumber charges?

11   A.    So National Lumber provide us the framing and the

12   shingles and the roofing materials, which is 55 Lyman.  As

13   already said, it's 10,000 -- 10,000 square feet house, fully

14   shingled, with most expensive double prime shingles.  And

15   since the house shape, it's not basic rectangular, it's

16   involve a lot of special materials, like microlamp, microbeam,

17   sometimes steel materials.  And compared to Fredette -- where

18   is the Fredette lumber --

19        Q.    43,000.

20   A.    -- one second -- 43,000, which is the small home.  And

21   this home done by the stucco, which is not shingles included

22   in this price.

23        Q.    Now, when you say 10,000 square feet, you're

24   including the basement and the garage, correct?

25   A.    Yeah.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Direct

1    Q.    Okay.  So would you say that these houses -- when

2    you compare 55 Lyman to either Parker, Fredette, or Druid, are

3    they substantially different homes and different price points?

4    A.    Absolutely.  Fredette was a 1.3 price range, and 55 Lyman

5    5-1/2 million price range.

6    Q.    And what was the price range for Parker and Druid?

7    A.    Two million.  I think it was sold for two million on

8    Parker.

9    Q.    Okay.

10    MR. PERTEN:  Now, Mr. Harris, can you scroll to

11    paragraph 71?

12    BY MR. PERTEN:

13    Q.    Mr. Kagan, I'm showing you paragraph 71 from Mr.

14    Goldman's report, which he testified a bit about.  And it

15    deals with the electrical amperage and indicating that some of

16    the properties have 400 amps, some have 200 amps; why would

17    some have 400 and why would some have 200?

18    A.    Because after certain square footage of the house, the

19    amount of power is required.  Big houses require 400 amp and

20    smaller houses, 200 amp is more than enough.

21    Q.    So again, is the determination, sir, as to whether

22    to use 400 amps versus 200 amps of function largely of the

23    size of the house?

24    A.    Yes.

25    Q.    And are the costs that are shown, as you understand

VADIM KAGAN - Direct

1    it, are those largely below market costs that you got?

2    A.    Yes, much more.  I believe the electrical cost 55 and 88

3    is, like, forty percent below the market price.

4         Q.    Mr. Kagan, at any point, did you instruct anybody to

5    falsify the financial records of either KDC or ProEx?

6    A.    Absolutely not.

7         Q.    At any point, did you ever accept any kind of

8    kickbacks with respect to Lyman Cutler or any other project

9    for that matter?

10   A.    No.

11        Q.    At any point, sir, did you forge or alter invoices?

12   A.    No.

13        Q.    To your knowledge, did you ever request that anybody

14   else do that?

15   A.    No.

16        Q.    At any point, did you make up numbers and just

17   invent numbers out of thin air as it related to Lyman Cutler?

18   A.    Absolutely not.

19        Q.    Or any other project?

20   A.    No.

21             MR. PERTEN:  Your Honor, if I can have about a

22   minute, I think I may be done.

23             THE COURT:  Okay.

24                         (Pause)

25             MR. PERTEN:  Your Honor, I have no further questions



(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Cross

```
 1    for Mr. Kagan.

 2              THE COURT:  All right.

 3              MR. CARNATHAN:  Does the Court have a hard stop?

 4              THE COURT:  Yeah, pretty much at 1 o'clock, but you

 5    can go ahead and get started.

 6              MR. CARNATHAN:  Thank you, Your Honor.

 7              THE COURT:  Use the fifteen minutes.

 8                        CROSS-EXAMINATION

 9    BY MR. CARNATHAN:

10        Q.   Mr. Kagan, I thought I would start with your

11    testimony about these conversations you say you had with Mr.

12    Filippov.  I wasn't clear whether Mr. Lipetsker was involved,

13    too, but this was just before the May 7th file letter.  Do you

14    remember that testimony?

15    A.   Yeah.

16        Q.   Were those conversations with Filippov and Lipetsker

17    or one or the other?

18    A.   Yes.

19        Q.   I'm sorry -- both?

20    A.   Both.

21        Q.   Both.

22    A.   Both.

23        Q.   And if I got it right, you said something to the

24    effect of you wanted them -- or you wanted Filippov to agree

25    to lower the price of the property, right?
```



VADIM KAGAN - Cross

1  A.   Yes.

2       Q.   And you were concerned because you were losing the

3  selling season, right?

4  A.   Yes.

5       Q.   And you were concerned because you were paying the

6  carrying cost, right?

7  A.   Yes.

8       Q.   And Filippov said something to the effect of I don't

9  care, we're not lowering the price -- something like that?

10  A.   Yes.

11      Q.   So when exactly was that, sir?

12  A.   Somewhere of that time period.  I don't remember exactly

13  what's the -- Mom's Day?

14      Q.   Somewhere before the May 7th letter.

15  A.   Yes.

16      Q.   Was it before or after you sent the listing

17  agreement for 55 Lyman to Mr. Filippov?

18  A.   After I sent agreement.

19      Q.   It was after you sent it to him?

20  A.   Yes.

21          MR. CARNATHAN:  Can I have one of those on the

22  screen, Bill?  Was it 260 something?

23          How about 266, please?

24          MR. HARTZELL:  2-6-6?

25  BY MR. CARNATHAN:



(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Cross

1     Q.   So Mr. Kagan, we've got on screen now Defendants'

2   Exhibit 266, which one of the emails it looks like you or

3   someone on your behalf sent to Mr. Filippov, and that was sent

4   on April 25th, 2015; do you see that, sir?

5   A.   Yes.

6         MR. CARNATHAN:   And if we scroll down, I think this

7   is one of the ones that attached a listing agreement, right?

8   Okay.  If we can stop there.

9   BY MR. CARNATHAN:

10     Q.   So you see the listing price on that listing

11   agreement?

12   A.   Can I see this whole listing agreement?

13     Q.   Sure, absolutely.  Take your time.  I can either

14   have Mr. Hartzell scroll through for you, or it's in a binder

15   behind you in --

16   A.   I just want to see if this is my signature on this

17   listing agreement.

18         MR. CARNATHAN:   Certainly, Mr. Hartzell, would you

19   show Mr. Kagan the next page?  I guess one more, please.

20   BY MR. CARNATHAN:

21     Q.   Would you rather see one that you signed, sir?

22   A.   This is no signature on this listing.

23     Q.   No problem.  Give me one moment.

24         MR. CARNATHAN:   How about Exhibit 268, please?

25   BY MR. CARNATHAN:



VADIM KAGAN - Cross

1      Q.   Okay.  Exhibit 268 is the email from Dan -- I

2   believe that's Dan Gersh; am I right about that?

3   A.   Yes.

4      Q.   And so this on April 28th, 2015 at 10:02 a.m.; do

5   you see that?

6   A.   Yes.

7      Q.   And so this is the one where Dan says, "Per our

8   earlier conversations, we signed the agreement with C21 to put

9   55 Lyman on the market as agreed.  Please confirm receipt of

10  this email."  Have I read that correctly?

11  A.   Yes.

12         MR. CARNATHAN:  So if we scroll down through this one

13  to the signature page, please.

14         MR. HARTZELL:  This one isn't the exhibit.

15         MR. CARNATHAN:  So I guess -- I'm sorry.  We're going

16  to need ours, then.  Oh, he didn't attach it to that one.

17  Okay.  I'm farblonzet (sic) -- 44 would be great.  Okay.

18  BY MR. CARNATHAN:

19     Q.   We last have -- if we scroll down through this

20  one -- this is Exhibit 44 in evidence.  We have one that you

21  signed, right, sir?

22  A.   Yes.

23     Q.   Okay.  And if we go back to the first page, the

24  listing price on this is $5,499,000, right, sir?

25  A.   Yes.



VADIM KAGAN - Cross

1    Q.   So is your testimony that you became concerned about

2    the market price sometime between the time you signed this

3    listing agreement on April 24th, 2015 and May 7th, 2015?

4    A.   Yes.

5    Q.   Okay.  And you worried about losing the market in

6    that same time period in late April?

7    A.   Yes.

8    Q.   Okay.  How is it that you became so concerned with

9    getting Mr. Filippov to agree to sign this thing in late

10   April, sir?

11   A.   It was we have to put the house on the market.  We have

12   to sign it.

13   Q.   And so in fact, you never showed him the August 2014

14   agreement, did you, sir?

15   A.   What agreement are you referring?

16   Q.   The original listing agreement for 88 Cutler that

17   was signed August 2014.

18   A.   Can I see this agreement what are you talking about?  I

19   don't know.

20        MR. CARNATHAN:  Pull up Exhibit 45, I think, for that

21   one.

22   BY MR. CARNATHAN:

23   Q.   All right.  Do you remember signing this one?

24   A.   Can I see the signature page?  Yes, I remember that.

25   Q.   Okay.  And this one's handwritten, right?  This



VADIM KAGAN - Cross

1   one's -- somebody wrote it out in hand?

2   A.   Yes.

3        Q.   You know who's handwriting it is?

4   A.   I don't.

5        Q.   All right.  It's dated August 12th, 2014, right?

6   A.   Yeah.

7        Q.   And this one has a term through March of 2016,

8   right?

9   A.   Yes.

10       Q.   And you signed this one with Mr. Kiely, the follow

11  from Century 21, right?

12  A.   Yes, I think so.

13       Q.   All right.  And I mean, we've been doing this for

14  four years.  Would you agree with me, sir, that there's not a

15  single document in evidence or anywhere else that shows that

16  you ever gave this to Mr. Filippov?

17  A.   I gave this to Mr. Filippov.

18       Q.   Okay.  Let's go back to 44.

19            Okay.  So this one's typed, right?

20  A.   Yes.

21       Q.   And you reached out to Mr. Filippov on April 23rd,

22  2015 to try to get him to agree to sign this, right?

23  A.   Me and Tatiana, we both reached Mr. Filippov, yes.

24  Listing Broker Tatiana Kagan and Vadim Kagan, we both reached

25  Mr. Filippov.  He have to sign the listing agreement because



VADIM KAGAN - Cross

1    we have to put the house on the market, yes.

2        Q.    Okay.  And that's because he was the managing

3    member, right?

4    A.    Yes.

5        Q.    Okay.  And so April 23rd, 2015, suddenly you text

6    him looking for him to sign this, right?

7    A.    Yes.

8        Q.    That's Exhibit 261, I believe.  And Tatiana text him

9    too, right?

10   A.    Yes.

11       Q.    Exhibit 260.  And you sent him a copy you want him

12   to sign?

13   A.    Yes.

14       Q.    Right?  And that happened on April 25, 2015, right?

15   A.    I don't know.

16       Q.    Okay.  So you basically hound him through April

17   28th, 2015, right; you talked to him?

18   A.    Yes.

19       Q.    Tatiana talks to him?

20   A.    I don't know.

21       Q.    But he doesn't sign it, right?

22   A.    Because we never asked him to sign it.  And when we asked

23   him to sign it, he told me go and sign it.

24       Q.    So it's your testimony that he told you to go ahead

25   and sign it?



VADIM KAGAN - Cross

1   A.    Yes.

2        Q.    Okay.  So you signed it, and Mr. Gersh sent him a

3   note on April 28th, 2015 at around 10 a.m., telling him that

4   it had been signed, right?

5   A.    Yes.

6        MR. CARNATHAN:  All right.  Could we go back to that

7   175 for identification?

8   BY MR. CARNATHAN:

9        Q.    So Mr. Kagan, Exhibit 175 for identification is a

10  collection of the materials that I still have an objection to

11  as not authentic.

12       MR. CARNATHAN:  I'd like to look at page 17 of the

13  exhibit for a starter, please, Mr. Hartzell.

14       MR. HARTZELL:  Do you know what tab that is?

15       MR. CARNATHAN:  I don't.  I just look at page numbers

16  in my notebook.  I'm sorry.  Could we just blow up the

17  printout from the QuickBooks, please?

18  BY MR. CARNATHAN:

19       Q.    So based on the materials that you submitted, Mr.

20  Kagan, on April 28th, 2015, there was a bill inserted into the

21  55 Lyman QuickBooks for $30,000 on the same day that Dan Gersh

22  sent that email; do you see that?

23  A.    I see the check number and number -- yeah.

24       Q.    I'm looking in particular at the line that says,

25  "Bill, 42815 Unicon Electric, accounts payable 30,000" bucks,



VADIM KAGAN - Cross

1   right?

2   A.   Okay.  Now I see it, yes.

3       Q.   Right.  So Unicon's one of the ones that hasn't been

4   paid, right -- it still hasn't been paid?

5   A.   Yes.

6       Q.   And they're waiting because that's been your buddy

7   for fifteen or twenty years, and you're still working with

8   them?

9   A.   Yes.

10      Q.   Right.  Are they going to get paid if you win?

11  A.   We're going to pay it anyway.

12      Q.   Uh-huh.

13          MR. CARNATHAN:  Could we go next to page 40 of the

14  same exhibit?  And blow up the QuickBooks again, please.

15  BY MR. CARNATHAN:

16      Q.   Okay.  On April 28th, 2015, $14,500 was added to the

17  accounts payable for V&D Heating; isn't that right, sir?

18  A.   I see the number 14,500, yes; it's right here.

19      Q.   Okay.  And that's another one of your buddies,

20  right?  That's Viktor Sergeyev, right?

21  A.   He's my -- one of the older subcontractor, yes.

22      Q.   Right.  He's the fellow that was really intimidated

23  by Kristina Brusenkova that you had to go down to the Newton

24  Police Department about, right?

25  A.   I don't know what you're referring.



VADIM KAGAN - Cross

1      Q.   You don't remember going to the Newton Police

2   Department to swear out a complaint against Ms. Brusenkova on

3   behalf of Mr. Sergeyev?

4   A.   What are you -- what are you talking about?

5      Q.   I'll come back to that.

6   A.   Okay.

7           MR. CARNATHAN:  Why don't we go to page 44 of the

8   exhibit, please.  And blow up the QuickBooks again, please.

9   BY MR. CARNATHAN:

10      Q.   So on April 28th, 2015, $19,670 was added to the

11   accounts payable for BST Plumbing for 55 Lyman, right, sir?

12   A.   Yes.

13      Q.   And that's another one of your friends, right?

14   A.   He's my subcontractor, yes.

15      Q.   That's Boris Stanik, right?

16   A.   Yes.

17      Q.   Right.  And he hasn't been paid yet either, right?

18   A.   He doesn't -- yes, absolutely.

19           MR. CARNATHAN:  We're now going to move to the Cutler

20   materials, which are in the same binder.  Please take me to

21   page 47.  And please blow up the QuickBooks line items.

22   BY MR. CARNATHAN:

23      Q.   Okay.  So on this one, on Decor Art, $6,450 was

24   added to the accounts payable on April 28th, 2015; do you see

25   that, sir?

VADIM KAGAN - Cross

1   A.   Yes.

2        Q.   And in fact, it looks like you logged in another

3   4,250 on May 28th, 2015, right?

4   A.   Yes.

5        Q.   Okay.  But for the purposes of this little run, I'm

6   going to tally up just the April 28th at the end.

7   A.   Okay.

8        MR. CARNATHAN:  If we go now to page 59, please.  And

9   blow that one up.  Oh, wait a minute -- I'm sorry -- I missed

10  one, 57.  We don't want to leave out Dream Flooring.  Would

11  you blow up the accounts payable, please?

12  BY MR. CARNATHAN:

13       Q.   Okay.  Dream Flooring:  $11,410 was added on April

14  28th, 2015, right, sir?

15  A.   Yes.

16       Q.   Okay.

17       MR. CARNATHAN:  Now, let's go to 59, please.  And

18  please blow that one up.

19  BY MR. CARNATHAN:

20       Q.   Okay.  Unicon Electric got another 35,000 on Cutler

21  on April 28th, 2015, right, sir?

22  A.   Yes.

23       Q.   And just doing my simple lawyer math, the 30,000

24  plus the 35,000 on the two properties just happens to add up

25  to 65,000 bucks, which happens to be exactly what Unicon got

VADIM KAGAN - Cross

1   paid while it was doing the work, right?

2   A.   You are not correct, sir.

3           MR. CARNATHAN:   Let us go to 61, I believe, is the

4   next one.  And we could blow that one up, please.

5   BY MR. CARNATHAN:

6       Q.   Now, this one isn't actually April 28th, but this is

7   DaCosta, April 15, 2015, gets an extra 23,000 added, right?

8   A.   I see the number 23,000 entered by Dan Gersh.  He

9   probably explained to you what's this number entering for.

10   It's not questions to me.  I can't -- I can't explain

11   QuickBooks.  I'm not trying QuickBooks.  I don't know nothing

12   about the QuickBooks.

13       Q.   Okay.  But you'll agree with me that 23,000 was

14   added on April 15, 2015?

15   A.   I don't know is it add it or subtract.  I see the number

16   23,000.  That's what I can say about it.  I'm sorry.

17       Q.   Okay.

18           MR. CARNATHAN:   Let's go to page 80, please.  And

19   blow up QuickBooks again, please.

20   BY MR. CARNATHAN:

21       Q.   So Mr. Kagan, on April 28th, 2015, another 24,500

22   was added to the V&D Heating accounts payable for Cutler,

23   right?

24   A.   Yes.

25       Q.   Okay.  So I'll represent to you I've done the math.

VADIM KAGAN - Cross

1  On April 28th, 2015, just on the vendors that I'm challenging

2  in Exhibit 175, $141,530 was added to the accounts payable on

3  this project on April 28th, 2015, right?

4  A.   I don't know what you mean, added and own it.  I already

5  said, sir, I can't answer all these questions.  You have to

6  talk -- you have --

7       Q.   Well, I'm adding up the numbers.

8  A.   You can't --

9       Q.   I could put it up on the screen, but --

10 A.   I'm sorry -- we can add the numbers, but I can't -- you

11 can't rely on my testimony because I know nothing about

12 QuickBooks.

13      Q.   So we can't rely on your testimony?

14 A.   You can rely on my testimony.  You can't rely on my

15 testimony about the QuickBooks entering the numbers.

16      Q.   Okay.  Would you agree with me that a lot of money

17 was added to the accounts payable on this project on April

18 28th, 2015?

19 A.   A lot of money -- a lot of money for the project.  The

20 whole project is a lot of money.

21      Q.   All right.  Is it a coincidence that that all

22 happened on the same day that Mr. Gersh sent that email saying

23 we've signed the listing agreement for you?

24 A.   I don't know how Mr. Gersh reconciled our records.  You

25 have to refer this question to him.



VADIM KAGAN - Cross

1      Q.   I'm not interesting in the particular fact that it's

2  Mr. Gersh, but the fact that that's the day that you caused,

3  through Mr. Gersh, an email to be sent to Mr. Filippov saying

4  we've signed the listing agreement, please confirm.  And

5  that's the same day you added all of this money to the

6  accounts payable; isn't it, sir?

7  A.   I don't know.

8      Q.   Just is it a coincidence or not?

9  A.   I don't know.

10          MR. CARNATHAN:  I can go a long time, Your Honor.

11  Perhaps we --

12          THE COURT:  You're clearly going to go a long time,

13  and we're clearly not going to finish this, so let's resume at

14  the next date that we're scheduled.  Okay?

15          MR. CARNATHAN:  Thank you, Your Honor.

16          THE COURT:  I would like it if you could work out

17  with Elizabeth what the state of the exhibits is.

18          MR. PERTEN:  We will, Your Honor.

19          THE COURT:  And I just want to remind Mr. Kagan that

20  my direction -- and I know you've been in the courtroom, so

21  you've heard me make this direction -- now, it's especially

22  true where you're not going to be back for some several weeks.

23          THE WITNESS:  Um-hum.

24          THE COURT:  You should not talk with anyone

25  concerning the subject -- the substance of your testimony; do

VADIM KAGAN - Cross

1    you understand that?

2              THE WITNESS:  Absolutely, yes.

3              THE COURT:  All right.  If you have a question about

4    the law, if you have a question about -- and really, we

5    haven't had a whole lot of issues about privilege or those

6    kinds of things, you can always talk to your lawyers about

7    that.

8              THE WITNESS:  Thank you very much.

9              THE COURT:  And logistics, that's fine -- getting

10   here, you know what I mean.  But really, you're under

11   examination, you're under oath, and you should appear here

12   again just like you are today, same state of mind and same

13   state of knowledge, okay?

14             THE WITNESS:  Thank you, Your Honor.

15             THE COURT:  All right.  Anything else?

16             MR. PERTEN:  Yes, Your Honor.  I want to just follow

17   up on the colloquy that you just had.

18             THE COURT:  Yep.

19             MR. PERTEN:  Only because I don't want to run afoul

20   of your order.

21             THE COURT:  I hope not.

22             MR. PERTEN:  And this is what I alluded to when you

23   first discussed that with us.  I am perfectly comfortable --

24   and even if I wasn't, you ordered it -- but I'm perfectly

25   comfortable not discussing Mr. Kagan's testimony and how he's

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Cross

1  going to respond to questions and just all that stuff; I get

2  that.  The concern I have is certainly, over the next month, I

3  will be discussing the case with other witnesses as I prep

4  other witnesses who are not on the stand, which will include

5  Mr. Gersh, who is part of Mr. Kagan's organization.  He's the

6  CFO.  He's the one who can explain the QuickBooks, and the

7  backup, and answer these questions that Mr. Carnathan just

8  raised with Mr. Kagan.

9          In the ordinary course, because Mr. Kagan is my

10  client, I would be having conversations with Mr. Gersh

11  about -- as part of his prep about this, but now I kind of

12  feel uncomfortable because although I'm not actually asking

13  Mr. Kagan to say anything, clearly --

14          THE COURT:  You're making this harder than it is.

15          MR. PERTEN:  Okay.  Perhaps I am.

16          THE COURT:  I couldn't be -- I couldn't --

17          MR. PERTEN:  I just want to make sure -- I don't want

18  to run afoul.

19          THE COURT:  I can't be more clear about this.  If Mr.

20  Kagan were -- right now, if we were coming back at 2

21  o'clock --

22          MR. PERTEN:  Not a problem.

23          THE COURT:  -- no -- and you had prepared Mr. Gersh,

24  and you made a phone call to him, you shouldn't talk to Mr.

25  Kagan about Mr. Gersh --



VADIM KAGAN - Cross

1          MR. PERTEN:  Right.

2          THE COURT:  -- in that intervening period, right?

3   And by the way, I want him to understand -- I want his

4   acknowledgement of this -- he's not to talk to Mr. Gersh about

5   the substance of Mr. Kagan's testimony.  That would be an

6   unfair advantage.

7          THE WITNESS:  Okay.

8          THE COURT:  Okay?

9          THE WITNESS:  Yes.

10         THE COURT:  You're not going to do that, are you?

11         THE WITNESS:  I am not, absolutely not.  Thank you,

12  yes.

13         THE COURT:  All right.  That's as clear as I can be

14  about it.  In other states, including New Jersey, this is the

15  law.

16         MR. PERTEN:  No, Your Honor, I am not suggesting that

17  I'm going to be coaching or asking to color Mr. Kagan's

18  testimony.  I understand Your Honor's point.  I understand

19  Your Honor's --

20         THE COURT:  You're worried that -- and this is my

21  words, not yours, okay, and as a lawyer, I would have worried

22  and did worry, right.  You go and you sit down with Gersh, and

23  Gersh says X to you, and what he says to you is of concern to

24  you.  And you want to call Mr. Kagan, your client, and tell

25  him this is what Gersh said, and it's of concern to me and

VADIM KAGAN - Cross

1    here's why.  That's problematic to me.

2           MR. PERTEN:  It is problematic.

3           THE COURT:  And at this stage, it's problematic

4    because he's under examination.  And there are ways to have --

5    you could have had him on the stand, knowing what our schedule

6    is today, to try to get him on and off.  That wasn't even

7    close and so you're in this position during this interim

8    period.  So that's where we are.  It's just grossly unfair, in

9    my mind, and try as you might to not coach him on things that

10   he may face when he gets cross-examined, it would be grossly

11   unfair, in my view, to the plaintiffs to have him prepared;

12   they didn't have that opportunity.

13          MR. PERTEN:  Your Honor, this is why I'm raising it

14   with the Court --

15          THE COURT:  Okay.

16          MR. PERTEN:  -- because I don't want to run afoul of

17   the Court's order.

18          THE COURT:  I'm trying to be as --

19          MR. PERTEN:  It's precisely why I'm raising it, not

20   because this is my goal to do it, I just don't want to

21   inadvertently run afoul of the Court's order.

22          THE COURT:  It's not hard.  I mean, it's clear, as

23   far as I'm concerned.  I see no ambiguity in that order.  So

24   okay.  All right.  We'll see you all back here in a few weeks.

25          MR. PERTEN:  Have a safe trip, Your Honor.

1          THE COURT:  Thank you.  Thank you.

2          Thank you, sir.

3          THE BAILIFF:  All rise.  Court is in recess.

4  (End at 1:09 PM)

5                    * * * * * * * * * *

6          I certify that the foregoing is a true and accurate

7  transcript from the digitally sound recorded record of the

8  proceedings.

9

10  *Jennifer Ra Contat*

11

12  /s/ Jennifer Contat                    May 29, 2019

13  _____

    ESCRIBERS LLC
14                         eScribers
                  7227 N. 16th Street, Suite #207
15                     Phoenix, AZ 85020
                        973-406-2250
16                 e-mail operations@escribers.net

17

18

19

20

21

22

23

24

25



LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

May 15, 2019

## $

**$1 (1)**
142:21
**$1.3 (2)**
62:8,10
**$1.6 (3)**
87:24,25;89:1
**$10,000 (1)**
156:3
**$11,410 (1)**
172:13
**$14,500 (1)**
170:16
**$141,530 (1)**
174:2
**$19,670 (1)**
171:10
**$2,396,914.66 (1)**
150:24
**$250,000 (6)**
65:22,25;66:2,7;
89:18,23
**$30,000 (4)**
127:17,20;134:3;
169:21
**$4 (1)**
45:17
**$40,000 (2)**
126:4,8
**$418,150 (1)**
105:3
**$43,700 (1)**
76:17
**$45,000 (1)**
128:8
**$5,499,000 (2)**
136:14;165:24
**$6,450 (1)**
171:23
**$74,000 (1)**
150:20
**$758,000 (2)**
145:21,23
**$8,600 (1)**
110:16
**$80,000 (2)**
130:12;131:1

## A

**ability (7)**
20:16;45:8;49:17;
54:12,13;90:24;91:2
**able (13)**
25:5;41:25;42:6;
50:22;51:4;62:24;
85:25;86:1;89:16;
100:8;101:3,8;153:8
**Absolutely (36)**
15:19;19:20,24,25;
20:19;23:10;32:4;
45:13;54:16;58:3;60:1;
62:15;64:13;65:5;
67:14;91:3;96:23;
98:12;102:4;105:13;
109:6;117:17;134:6,
23;145:11;150:12;
156:2;157:13;158:17;
160:4;161:6,18;
164:13;171:18;176:2;
178:11
**abundance (1)**
116:25
**accelerator (1)**
100:23
**accent (3)**
8:12;26:18;33:13
**accept (1)**
161:7
**accepted (1)**
46:1
**access (7)**
6:20;15:22;31:25;
132:12,17,17,25
**account (10)**
36:4;45:6;130:20;
131:4,6;132:13,16,17,
25;133:25
**accountant (4)**
14:21;16:1;17:12;
18:15
**accountants (8)**
14:16;15:11,17,20;
20:8,18,20;21:1
**accounting (10)**
10:1;14:19;15:16;
16:19;18:16;19:4;22:4;
25:24;26:3,24
**accounts (12)**
25:8;29:13;133:17;
169:25;170:17;171:11,
24;172:11;173:22;
174:2,17;175:6
**accruing (1)**
134:12
**accurate (9)**
15:18;16:2;26:12,23;
63:6;77:14;81:10;
110:25;150:25
**accustomed (2)**
26:18;106:20
**acknowledgement (1)**
178:4
**acre (2)**
155:14;156:22
**across (1)**
154:23
**act (3)**
52:7;106:8;143:19
**actual (3)**
23:9;108:14;117:21
**actually (24)**
18:16,21;32:21;
45:12;67:22;72:2;
75:24;76:10;77:1;
103:11;108:19;116:21;
117:24;118:13,17;
121:21;122:18,20;
131:21;133:16;136:7;
141:6;173:6;177:12
**add (5)**
63:16,18;172:24;
173:15;174:10
**added (11)**
170:16;171:10,24;
172:13;173:7,14,22;
174:2,4,17;175:5
**adding (1)**
174:7
**addition (5)**
20:7;89:18;101:2;
103:19;152:24
**additional (9)**
123:19,21;124:20;
127:6,19;128:17,19;
134:21;154:8
**add-on (1)**
90:6
**add-ons (3)**
90:1,10;150:5
**address (2)**
5:19;95:7
**addressed (1)**
27:13
**admission (1)**
94:4
**admit (2)**
94:12,17
**admitted (15)**
74:20;78:5,8;83:1;
94:19;95:4;96:14;
105:17,19;108:10;
111:6,7;114:24,25;
116:3
**advanced (1)**
148:2
**advancing (1)**
89:19
**advantage (1)**
178:6
**advertisement (1)**
10:8
**advise (2)**
5:25;68:21
**affirm (2)**
7:18;63:5
**affirmatively (1)**
64:15
**affordable (1)**
155:17
**afoul (4)**
176:19;177:18;
179:16,21
**afternoon (1)**
107:23
**Again (39)**
14:9;20:16;26:17;
30:5;49:23;50:7;56:3;
59:23;96:7,13,20,24;
100:21,23;101:2,10,20;
105:5;110:18;112:13;
113:10;114:11;115:3;
123:10;125:21;127:4;
128:12;129:23;130:4,
25;140:15;146:4,13;
147:4;160:21;170:14;
171:8;173:19;176:12
**against (6)**
143:5;147:8,9;
153:21;154:12;171:2
**ages (1)**
9:4
**ago (5)**
11:24;13:5;36:18;
58:17;141:10
**Agranovich (15)**
14:19,20;16:22;
17:22;18:15;19:4,5,15;
20:25;22:1;25:20,24;
26:2,24;27:7
**Agranovich's (2)**
18:13;19:8
**agree (16)**
55:10;64:3;87:11;
122:13;136:1,11;
139:6;141:23;146:24;
153:15;162:24;166:9;
167:14,22;173:13;
174:16
**agreed (9)**
39:22;65:12,24;66:9;
87:22;89:15;119:2;
152:22;165:9
**agreed- (1)**
108:15
**agreed-upon (1)**
108:18
**agreement (55)**
55:17;56:5;63:16,19;
66:17,22;67:9,10,16,
20;68:6,9,12,12,19,23;
69:10,16;70:2,17,18;
71:1;86:12;88:23;
93:10;94:1;95:2,3;
120:22;122:21;137:8,
18,23;138:8,14;143:22,
23;144:9,11;145:6;
163:17,18;164:7,11,12,
17;165:8;166:3,14,15,
16,18;167:25;174:23;
175:4
**agreements (1)**
136:19
**ahead (9)**
33:7;36:10;66:24;
115:8;124:24;125:11;
148:11;162:5;168:24
**aide (1)**
106:25
**air (1)**
161:17
**airplane (1)**
107:23
**al (1)**
4:11
**Alex (5)**
4:7,15;47:19;79:11;
127:14
**allow (3)**
43:2;44:3;49:2
**allows (1)**
30:22
**alluded (1)**
176:22
**almost (2)**
155:14,14
**along (2)**
70:19;145:7
**alter (1)**
161:11
**although (2)**
153:14;177:12
**always (4)**
52:7;90:16,18;176:6
**ambiguity (1)**
179:23
**American (6)**
129:18;130:5,14,15,
21;131:6
**Amex (6)**
129:9,11,12,16,17;
131:15
**amongst (1)**
159:2
**amount (22)**
24:20,22;27:2;87:23;
88:24;89:2,6;97:3;
122:20;127:16;128:7;
131:9,10;135:5;136:8;
139:14;147:18;150:24;
154:6;158:22;159:8;
160:19
**amounts (1)**
131:15
**amp (4)**
156:23;157:4;
160:19,20
**amperage (1)**
160:15
**amps (4)**
160:16,16,22,22
**analysis (1)**
136:2
**annual (7)**
39:2,4,7,11,15,19;
134:2
**ANR (1)**
96:1
**answered (2)**
59:19;125:9
**anticipate (1)**
104:23
**anticipated (1)**

5:16

**anymore (7)**
24:5,10;37:16,17;
38:7,16;145:14

**anything's (1)**
93:21

**apologize (1)**
77:23

**appeal (2)**
103:4,7

**appeals (2)**
81:21;109:4

**appear (1)**
176:11

**application (5)**
71:5,8,16,24;72:2

**applied (2)**
67:3,4

**applying (2)**
79:7;135:6

**appreciate (1)**
33:21

**approach (1)**
111:21

**approval (6)**
48:20;49:3;64:21;
71:23;72:3;96:1

**approvals (4)**
44:18;50:20;57:5,8

**approve (2)**
43:11;44:18

**approved (5)**
45:12;67:6,7;83:24;
85:24

**approves (1)**
43:14

**approximately (3)**
56:12;98:3;151:14

**April (30)**
136:22;137:5,14;
139:6,6,11;164:4;
165:4;166:3,6,10;
167:21;168:5,14,16;
169:3,20;170:16;
171:10,24;172:6,13,21;
173:6,7,14,21;174:1,3,
17

**architect (3)**
156:3,9,10

**architects (1)**
155:24

**Architectural (2)**
155:22;156:1

**area (3)**
40:19;73:4;98:5

**areas (4)**
99:7,11,15,16

**Arina (2)**
127:14;128:16

**around (6)**
12:9,10;29:18;48:11;
103:8;169:3

**arrangement (2)**

57:16;87:14

**art (2)**
9:23;171:23

**asbest (1)**
72:25

**asbestos (2)**
73:1,2

**aside (1)**
83:12

**as-needed (1)**
31:8

**aspect (1)**
32:5

**asphalt (3)**
104:6,8,11

**assessors (1)**
134:8

**assigned (1)**
109:19

**assist (1)**
107:10

**assistance (1)**
40:9

**associated (1)**
119:25

**assume (1)**
106:10

**assuming (2)**
5:20;108:22

**assure (2)**
62:9;64:15

**assured (1)**
62:8

**attach (2)**
130:7;165:16

**attached (5)**
77:24;93:22;94:1;
129:19;164:7

**attachment (1)**
93:2

**attachments (1)**
93:9

**attending (1)**
57:25

**attention (7)**
40:16,25;97:16;
113:20;116:5;139:5;
150:18

**attorney (14)**
5:7;29:16;38:6,11,
15;123:18;141:1;
143:20,22;144:15,17;
145:15;148:15,16

**attorneys (2)**
14:12;144:7

**attractions (1)**
5:4

**audit (3)**
26:13,21;27:1

**audits (1)**
27:10

**August (6)**
92:1,16,19;166:13,

17;167:5

**authentic (2)**
94:2;169:11

**authenticate (1)**
93:20

**authenticity (3)**
93:17;94:4,18

**authorize (1)**
136:19

**avoid (2)**
6:6,20

**aware (4)**
67:12;85:18;93:19;
147:16

**away (4)**
5:20;142:20;143:6,8

**B**

**back (22)**
6:15;11:3;54:13;
88:9;89:4;91:2;92:14,
15;93:6;103:14;105:5;
126:7;127:11;130:2;
135:6;165:23;167:18;
169:6;171:5;175:22;
177:20;179:24

**backfill (1)**
100:1

**background (9)**
9:9;10:1,3;15:16;
22:4;35:9,18,21;36:13

**backing (1)**
51:1

**backsteps (1)**
103:14

**backup (14)**
123:11,14,19,22;
124:12;126:9,11,12;
128:20;132:1;151:3,
10;153:2;177:7

**bad (1)**
81:12

**badly (1)**
133:17

**BAILIFF (5)**
4:2,5;7:14;107:15,18

**balance (1)**
130:23

**bales (1)**
97:18

**bank (22)**
15:22;16:15,16;18:2;
25:8;50:15,20;51:1,3;
56:6;64:21;87:22,23;
88:7,10,10,14;89:14;
132:12,16;135:7,8

**bankruptcy (5)**
148:12,13,19;153:8,
11

**bank's (1)**
49:12

**base (2)**

44:4;48:20

**Based (29)**
42:16;43:6;44:7,7,8,
17;49:1,3;50:19;51:3;
57:4,5,6,7,10,12;66:17;
78:20;97:1,3,14;
118:17;119:1;122:8;
131:6;132:18;149:18;
154:21;169:19

**basement (7)**
100:14,15,16,22;
156:20,21;159:24

**basic (4)**
155:23;158:1,1;
159:15

**basically (24)**
10:15;14:1;18:1;
21:11;29:11,18;30:21;
37:13,15;38:16;44:11;
58:17;97:5;98:6,7,19;
124:1;126:15,18;
134:9;155:24;156:3,
17;168:16

**basis (7)**
21:7,9;31:8;78:20,
21;94:3;104:25

**Bates (5)**
113:15;114:1,2;
115:11;116:11

**bearing (2)**
113:15;115:11

**became (9)**
11:3;40:18,25;47:11;
51:19;56:3;66:16;
166:1,8

**become (2)**
38:20;64:17

**beginning (3)**
29:13,20,24

**behalf (10)**
38:25;39:6,7;92:15;
125:21;126:7;145:3;
148:24;164:3;171:3

**behind (6)**
6:5;82:6;113:13;
115:10;153:15;164:15

**Belarus (1)**
9:17

**below (7)**
25:2,3;78:24,25;
121:16;161:1,3

**benefited (1)**
112:16

**best (13)**
39:17;75:2;77:13;
94:5,11,13;110:24;
132:11;143:5,7;
148:19;149:25;150:3

**bet (1)**
107:21

**better (10)**
24:18;29:7;30:21;
54:13;59:20;60:4,7;

78:10,22;106:2

**bids (1)**
97:15

**big (8)**
51:11;73:23;99:10;
104:12;135:5;148:22;
157:20;160:19

**bigger (4)**
131:12;157:8,10;
159:8

**bill (5)**
131:5;156:9;163:22;
169:20,25

**billed (1)**
156:25

**billing (2)**
133:8,10

**bills (1)**
147:25

**binder (5)**
82:6,11;83:15;
164:14;171:20

**binders (9)**
32:11,22;74:21;82:7;
93:8;108:12;131:24;
151:11;153:3

**bit (16)**
8:12;27:5;33:11,13;
40:16;50:21;87:5;
98:23;101:21;105:23;
106:24;126:17;146:20,
21;148:11;160:14

**block (2)**
102:15,16

**blocks (3)**
102:21,22,23

**blow (10)**
36:15;169:16;
170:14;171:8,21;
172:9,11,18;173:4,19

**blueboard (1)**
122:14

**blurrier (1)**
33:16

**bond (4)**
101:15,17,21;102:2

**book (5)**
116:5;120:24,25;
128:11;142:25

**bookkeeper (4)**
21:6,16;29:3;142:24

**bookkeeping (1)**
145:19

**booklet (1)**
117:25

**books (8)**
15:17,21;16:1,12;
17:18;20:14;25:14,17

**border (3)**
102:16,18,19

**Boris (30)**
14:15;17:13;38:7;
52:25;53:1,5;54:20,22,

22;55:7,21;56:5,13;
66:17,21;67:24,25;
68:6,24;69:1,3,5,6;
84:15;140:23,25;
141:1,2,4;171:15

**Boris' (1)**
54:23

**borrow (1)**
51:4

**both (16)**
12:14;52:4,6,10,10,
12,16;65:18;112:16;
152:1;162:19,20,21,22;
167:23,24

**bottom (1)**
138:21

**bought (1)**
71:2

**bound (1)**
68:18

**box (1)**
6:4

**boxes (3)**
5:21;6:5,18

**break (5)**
5:24;50:21;82:14;
96:13;105:24

**breaks (1)**
34:23

**brick (4)**
73:8,9;103:24;104:1

**brief (1)**
9:8

**briefly (1)**
133:2

**bring (10)**
17:23;55:1;74:19;
85:12;86:6;96:7;
103:25;134:8;138:10;
154:16

**broke (2)**
96:1,2

**Broker (1)**
167:24

**Brookline (23)**
12:21,23;42:17;43:1,
7,11;44:3,18,24;49:1;
57:8;70:24;71:5;98:6,
8,17,17,21;99:9,18;
101:19;134:7;156:22

**brother-in-law (5)**
30:3,6,7,9;58:23

**brought (3)**
26:14;63:4;156:16

**Brusenkova (11)**
21:17,23;23:4;25:21,
23;27:25;29:21;76:2;
120:20;170:23;171:2

**Brusenkova's (1)**
22:6

**BST (3)**
75:3;152:11;171:11

**bucks (2)**
169:25;172:25

**buddies (1)**
170:19

**buddy (1)**
170:6

**budget (1)**
62:3

**build (28)**
12:14;41:20,20,21,
25;42:3,6,9;43:13;
44:16;45:8;46:24;
48:19,22;49:5;57:11,
13;61:4,6,13,23,25;
62:2,2,12;64:3,12;
118:3

**builder (3)**
10:15;65:17,18

**builder's (4)**
154:4,9,11,12

**building (12)**
12:13,19;41:1,4;
46:4;61:14;62:17;
102:7;104:22;117:19,
21;134:22

**built (3)**
40:19;61:16;155:2

**bunch (2)**
84:1;124:15

**business (35)**
11:10,11;12:5,19;
14:7;23:20,21,24;
25:18;31:12;36:20,25;
37:13,15,16;38:7;
39:16,24;40:2,3;55:14;
77:15;86:17;92:22;
105:9;110:22;111:1;
113:11;114:16,19;
115:16;116:13,16;
128:9;143:13

**button (1)**
20:2

**buttons (1)**
20:4

**buy (1)**
66:25

**buyer (1)**
134:23

**buyers (3)**
103:4;154:4;157:17

**buying (2)**
26:25;129:17

## C

**C21 (1)**
165:8

**cabinets (1)**
16:13

**calculate (1)**
58:21

**calculated (1)**
105:2

**call (14)**
5:16,24;7:12;32:11;
51:22;77:1;90:10,11;
97:10;120:24;134:14;
142:14;177:24;178:24

**called (11)**
5:8;12:25;13:16;
41:12;47:12;51:25;
52:1;77:4;97:6;129:11;
144:5

**calling (2)**
4:5;97:4

**calls (1)**
36:3

**came (8)**
9:18,21;10:7;20:7;
25:21,23;60:11;84:14

**camp (4)**
124:11;125:15;
126:2;128:23

**can (129)**
5:19,25;6:3,15,18,
20;11:14;17:12;24:10,
15,15,20;25:1;26:14;
30:19;33:24;38:13;
41:20,20,22;42:3,3,18;
43:13;47:1,7;48:19,21;
49:4;50:1,13,16,17;
55:10,23;58:18;60:13;
61:25;62:1,20;63:16,
18;64:3,4,22;65:18,18;
76:14;78:1,15;80:22;
82:5,12;83:8,11;85:12;
87:17;88:5;89:11;
91:23;94:14;96:7,8,24;
103:11,25;106:12;
107:8,10,19;108:13,25;
109:7,12,14;112:5,7,9;
118:16;121:20;122:11,
12;125:25;127:10,21;
128:12;130:12,19;
134:3,25;135:12,13;
136:3,4,5,6,7;137:11,
15,16,25;138:10,18;
140:3;141:17;143:4;
144:22;145:17,17;
146:21;151:6,8;155:6;
160:10;161:21;162:5;
163:21;164:8,12,13;
166:18,24;173:16;
174:10,14;175:10;
176:6;177:6;178:13

**cap (1)**
88:23

**capacity (1)**
30:19

**card (3)**
122:22;130:16,21

**care (5)**
34:23;140:20;
141:22;142:10;163:9

**CARNATHAN (73)**
4:14,15;7:4,7;36:1,3;
74:22;75:2;77:23;78:3;

5:16,24;7:12;32:11;
80:10;82:5,23,25;83:4,
12,14,19;93:1,23;94:5,
8;105:16;107:10;
108:19;111:5;114:23;
115:24;116:19;117:1,
6,8;124:23,25;132:6;
162:3,6,9;163:21,25;
164:6,9,18,20,24,25;
165:12,15,18;166:20,
22;169:6,8,12,15,18;
170:13,15;171:7,9,19,
22;172:8,12,17,19;
173:3,5,18,20;175:10,
15;177:7

**Carnathan's (1)**
5:6

**carries (1)**
149:13

**carrying (27)**
58:11;64:5;69:13,18,
19,23;70:5,7;88:17;
89:11;124:2;139:11,
19;140:18,20,21,22;
141:22,23,24;143:24;
144:2,2,10;145:7;
146:16;163:6

**case (13)**
4:5,10;6:16;7:7;
36:21;104:12;128:7;
136:9;140:22,23;
147:22;150:11;177:3

**caused (1)**
175:2

**caution (1)**
116:25

**Century (1)**
167:11

**certain (13)**
77:2;87:23;88:4;
90:1;97:3,12;101:17;
118:15;130:18;136:8;
152:20;157:7;160:18

**certainly (4)**
93:21;106:23;
164:18;177:2

**certificate (11)**
133:13,15,18,21;
134:1,4,6,18,20;135:2,
6

**cetera (1)**
75:4

**CFO (4)**
28:21,22;151:8;
177:6

**challenging (1)**
174:1

**change (6)**
12:5;17:17;21:4,5;
37:10;134:24

**changes (2)**
69:9;134:21

**changing (1)**
6:9

**charge (9)**
24:21,22;29:16;
90:13,16;91:5,11;
154:8;156:3

**charges (1)**
159:10

**chart (2)**
154:18,20

**charts (1)**
154:14

**chase (1)**
24:9

**Check (20)**
22:14;121:25;
123:19;124:1;125:14,
17;126:1,14;127:2,16,
21,22,25;129:4;
130:12;131:1,2,3,13;
169:23

**checkbook (2)**
22:13;123:1

**checkbooks (3)**
15:22;22:12;123:6

**checking (1)**
20:11

**checks (19)**
22:8,10,20;120:12;
123:24,24;124:3,4,10,
12;128:7,13,15,19,21,
22;130:21;131:7,12

**chief (1)**
7:8

**child (2)**
36:17;37:3

**children (2)**
8:25;9:2

**child-support (1)**
37:2

**choose (1)**
154:4

**choosing (1)**
154:4

**chose (1)**
17:11

**circulated (1)**
67:10

**circumstances (1)**
135:14

**cited (1)**
125:1

**citizen (1)**
8:19

**claim (12)**
4:7,7;32:11;131:24;
148:24;149:1,10,11;
150:18,20,24;151:3

**claims (3)**
93:25;153:21;154:12

**clarification (1)**
127:20

**clarify (2)**
108:23;141:5

**Classic (12)**

Case 16-01120    Doc 347    Filed 06/04/19    Entered 06/04/19 13:09:50    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 184 of 200

May 15, 2019

13:1,8,10,25;14:5,6;
85:7;86:14,16,17,19,20
**clay (1)**
98:9
**clear (9)**
81:22;82:23;83:14;
97:18;108:24;162:12;
177:19;178:13;179:22
**clearly (6)**
33:14;47:22;147:24;
175:12,13;177:13
**CLERK (5)**
82:16,18;115:5;
116:1;149:15
**client (3)**
5:7;177:10;178:24
**clients (3)**
25:6;29:10;90:13
**close (6)**
5:15;8:13;108:4,4;
159:6;179:7
**closely (2)**
14:21;15:25
**closer (1)**
33:12
**closing (10)**
29:17,17;67:22;
69:20;70:21;71:1;84:1;
133:16,20;135:2
**CO (2)**
135:9,11
**coach (1)**
179:9
**coaching (1)**
178:17
**Cohen (20)**
29:25;30:13,25;
32:24;34:12,13;35:2,
18,20,25;36:5,13;
37:10;39:25;40:10;
87:3;144:8;147:14,15;
149:22
**Cohen's (2)**
35:12,13
**coincidence (2)**
174:21;175:8
**colleague (1)**
95:14
**collecting (1)**
32:21
**collection (1)**
169:10
**college (1)**
9:24
**colloquy (1)**
176:17
**color (1)**
178:17
**combination (1)**
33:15
**comfortable (3)**
33:13;176:23,25
**coming (4)**

5:4;41:8;149:22;
177:20
**commentary (1)**
84:25
**commercial (2)**
12:11,15
**Commonwealth (1)**
11:19
**communication (2)**
124:19;126:22
**companies (1)**
121:8
**company (22)**
10:19;11:3,7;12:25;
13:3,4,6,16;17:17,23;
23:15;24:10,22;25:1;
29:18;30:20;38:25;
39:6,8;93:19;97:2;
148:9
**company's (1)**
105:9
**compare (2)**
155:13;160:2
**compared (8)**
155:15,18,22,23;
156:23;157:10;158:3;
159:17
**comparing (1)**
154:21
**comparison (2)**
154:21;155:16
**complaint (1)**
171:2
**complete (16)**
25:17;64:19,20,20,
25;71:17,19;88:4,6,6,
10,11,21;89:3;133:12;
139:7
**completed (2)**
71:22;135:15
**completely (4)**
68:24;69:1,1,3
**complex (2)**
156:2;157:25
**components (1)**
75:3
**computers (1)**
10:3
**concern (4)**
109:1;177:2;178:23,
25
**concerned (5)**
163:2,5;166:1,8;
179:23
**concerning (1)**
175:25
**concerns (6)**
45:3;139:14,17,18;
140:1;148:5
**concrete (14)**
72:17;73:7,9,16,21;
99:25,25;100:2,5,22;
101:3;102:15,23;

103:20
**condense (1)**
104:14
**conference (2)**
53:10,11
**confirm (3)**
99:21;165:9;175:4
**confirmed (1)**
92:18
**confront (1)**
35:21
**confrontation (1)**
35:25
**confused (3)**
77:23;80:23;116:20
**connection (5)**
32:10;84:2,5,10;
121:17
**consent (1)**
137:24
**consistent (2)**
128:5;151:14
**construct (1)**
102:25
**constructing (2)**
14:8;117:18
**construction (71)**
10:5,9,13,17,19,24;
11:7,22;13:1,4;23:9,
15;24:3,11,12,13;32:6,
44:20,21;48:8,9;50:3;
51:14;56:20;57:6,10;
58:19;61:10;62:8,10;
64:21;65:6;66:20;67:2;
79:8,10,13;80:20;
83:22,24;84:3,6,11;
85:7,24;86:4;87:11,15,
20,24,25;88:23,24;
89:2;90:15;95:24;97:2;
119:18,19;121:14;
123:9;133:3,24;135:8;
145:24;146:2;149:23;
150:2,6,21;153:12
**construction-loan (1)**
85:5
**consult (4)**
79:12;137:5;144:6,
14
**consultant (4)**
32:25;33:3;34:10;
35:3
**contact (4)**
56:6;123:9,11;139:1
**containers (1)**
74:13
**contingent (1)**
43:14
**continue (8)**
10:24;20:24;21:2;
25:24;99:23;102:10,
24;152:3
**continued (1)**
11:4

**Continuing (1)**
101:7
**contract (19)**
85:7;86:4,15,21;
87:2,11,12;89:25;90:2;
91:17,20;92:5;95:3,15,
18,24;121:19,21;
145:24
**contracting (2)**
12:6,10
**contractor (3)**
100:5,25;150:6
**contractors (4)**
121:8;152:9,12,19
**contractors' (1)**
145:25
**contractor's (2)**
90:25;148:1
**contrasted (1)**
28:25
**contributed (1)**
65:22
**control (7)**
21:10;24:11,13,18;
25:1;29:4,11
**conversation (25)**
36:12;38:14;47:9;
48:1,4,13;49:8,20,24;
51:8;62:20,22;64:2;
66:18;119:3;122:16;
126:16,18;139:25;
140:4;141:18,20;
142:13,14;145:13
**conversations (9)**
38:11;48:17;127:5;
128:14;151:20;162:11,
16;165:8;177:10
**conveyed (1)**
134:12
**convicted (2)**
35:6,10
**cookie-cutter (1)**
158:15
**copies (10)**
82:11;117:15;
120:12;123:19,24;
124:11,15,18;128:22;
143:1
**copper (1)**
120:10
**copy (22)**
18:2;77:14;80:18;
81:19;82:20;86:10;
91:17;92:4;94:14;
95:18,21;109:11;
110:25;124:1;125:14;
127:25;128:10;129:4,
18;137:8;138:8;168:11
**corner (2)**
48:11;75:20
**Corp (7)**
4:9,9,20,21;13:20;
23:12,14

**corporate (1)**
115:20
**correctly (2)**
27:4;165:10
**corrects (1)**
95:14
**cost (34)**
58:11,20;61:4;62:12;
64:5,25;69:19;78:20;
88:17;89:11;96:5;
120:2;121:13;122:25;
139:11,19;140:18,21,
21,22;141:22,23,24;
143:24;144:2,3,10;
146:16;149:23;153:19;
155:24;156:9;161:2;
163:6
**costly (1)**
156:1
**cost-plus (3)**
78:20;87:11;90:2
**costs (27)**
61:10;62:8,10;69:13,
18,23;70:5,7;87:15,20;
90:11,11;97:6;119:24;
145:7,10,23,25;147:19,
23;150:1,21;154:22;
155:6,7;160:25;161:1
**counsel (2)**
145:2;151:11
**count (1)**
58:10
**couple (1)**
135:25
**course (17)**
31:19;77:15;92:21;
99:20;101:12;105:8;
109:18;110:22;111:1;
113:11;114:16,18;
115:15;116:13,15;
119:7;177:9
**Court (201)**
4:2,3,18,24;5:3,5,11,
13,17,22,24;6:2,23;7:6,
9,15,18,22,24;19:22,
25;27:20;30:5,11;33:4,
6,15,21,24;34:3,5,7,14,
17,23,25;36:2,6,9;
72:11,14;75:7;77:18,
20;78:5,10,13,16;
79:18,19,20,22,24,25;
80:4,7,9,12,14,22;81:6,
7,9,11,13,16,21,24;
82:2,4,8,13,17,21,24;
83:9,11,17;85:2,13,15;
86:23,25;93:4,12,14,
16;94:3,7,13,14,21,23,
25;95:13;96:11,13,24;
105:17,23;106:1,4,8,9,
12,15,18,21;107:1,3,5,
8,12,14,18,19;
108:1,4,6,9,11,13,17,
21,25;109:4,4,7,13,17,

Case 16-01120   Doc 347   Filed 06/04/19   Entered 06/04/19 13:09:50   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 185 of 200

May 15, 2019

21,23,25;111:6,9,12,
14,22,25;112:4,7,9;
113:4,17,19,23,25;
114:2,4,24;115:3,6,8,
25;116:2,6,21,24;
117:3,5,7,10;118:23;
124:24;125:4,6,9;
132:7;141:9,11;
153:22,25;161:23;
162:2,3,4,7;175:12,16,
19,24;176:3,9,15,18,
21;177:14,16,19,23;
178:2,8,10,13,20;
179:3,14,15,18,22
**courtroom (4)**
6:10,14;33:16;
175:20
**courtrooms (2)**
6:9,11
**court's (5)**
107:15;112:5;116:5;
179:17,21
**CPA (3)**
16:23;17:22;27:1;
29:8
**create (1)**
44:22
**created (1)**
58:17
**creating (1)**
54:19
**credit (2)**
122:22;130:18
**crew (2)**
10:9;122:14
**crimes (2)**
35:7,10
**criminal (3)**
35:18,20;36:13
**CROSS-EXAMINATION (1)**
162:8
**cross-examine (2)**
93:21,23
**cross-examined (1)**
179:10
**crown (2)**
118:9,11
**curb (2)**
103:3,7
**currently (2)**
11:25;42:9
**custom (3)**
12:13;14:8;158:18
**customs (1)**
12:14
**cut (3)**
43:6;126:14;128:21
**Cutler (33)**
4:6,10;13:11;40:8,
11,17,18,25;47:11;
51:20;56:4;66:16;95:7;
110:5;114:13;130:20;
131:4,11;132:12;

137:6;148:3,19;
154:24;155:1;158:3,6,
11;161:8,17;166:16;
171:19;172:20;173:22
**cuts (1)**
43:9
**cutting (1)**
120:13

## D

**DaCosta (2)**
152:9;173:7
**damage (2)**
110:13;117:3
**Dan (13)**
28:14,15,17,24;
122:17;138:15;145:20;
149:8;165:1,2,7;
169:21;173:8
**data (7)**
19:2,6,9;20:25;
22:23;27:25;28:1
**date (9)**
40:14;127:21;
129:25;130:6,6,7;
131:5;150:9;175:14
**dated (2)**
81:25;167:5
**day (20)**
4:6;5:8;19:18;29:14,
14;85:22;103:5;119:9,
10,11;126:13,18;
130:8;134:9;144:6;
163:13;169:21;174:22;
175:2,5
**days (5)**
31:20;47:12;51:21;
52:1;133:16
**day-to-day (4)**
23:8;31:2,5;133:3
**deal (7)**
5:21;20:4,9;50:19;
59:20;102:7;141:5
**deals (1)**
160:15
**debris (2)**
72:17;74:9
**Debtor (1)**
4:17
**decide (6)**
57:11,12;90:21;
130:25;131:1;147:22
**decided (3)**
23:25;119:20;150:10
**decision (4)**
17:7;37:19;91:5;
147:11
**Decor (1)**
171:23
**dedicated (2)**
76:3,9
**deducting (1)**

122:24
**deeper (2)**
104:19,20
**defendants' (9)**
78:6,8;94:19;105:19;
111:7;112:3;114:25;
116:3;164:1
**definitely (4)**
48:21;98:10,10,11
**degree (1)**
9:23
**degrees (1)**
9:24
**delay (2)**
134:11,18
**delete (1)**
81:20
**demolish (2)**
72:13,16
**demolishing (3)**
72:24;73:15;74:1
**demolishment (1)**
77:8
**demolition (13)**
73:14;74:14,16;
75:10;79:4,15,16;80:3;
82:1;96:22;112:13,18,
22
**demotion (1)**
112:15
**Department (2)**
170:24;171:2
**depends (7)**
16:21;31:21;44:4;
50:14;62:3;118:15;
135:13
**deposit (2)**
15:23;16:15
**deposition (5)**
35:11,12,13,16,17
**describe (1)**
20:24
**described (2)**
114:12;159:5
**design (1)**
43:23
**details (1)**
77:7
**determination (2)**
91:4;160:21
**determine (3)**
51:4;99:7;118:17
**determined (1)**
98:19
**develop (2)**
41:2;86:1
**developed (4)**
54:2;55:12;86:3;
119:20
**Development (9)**
4:9,21;13:1,17,20;
86:18;88:9;129:5;
131:11

**deviated (1)**
68:12
**differ (1)**
23:20
**difference (2)**
157:22;159:9
**different (20)**
42:2;72:19,19,20,21,
22;73:11;74:12,13,13;
80:7;99:7,11;155:21;
156:14;158:22,22,23;
160:3,3
**differently (1)**
74:10
**digital (1)**
109:17
**diligence (2)**
55:23;56:1
**DIRECT (4)**
8:1;25:23;108:13;
110:2
**direction (8)**
77:10;110:19;
115:13;117:19;127:13;
149:19;175:20,21
**directly (3)**
21:25;69:9;122:24
**director (4)**
38:20;39:17,20;40:3
**disbursement (1)**
135:9
**disclose (2)**
34:10;35:3
**disclosed (1)**
35:21
**discuss (7)**
68:18;119:21,24;
120:5;135:21;148:5,8
**discussed (1)**
176:23
**discussing (2)**
176:25;177:3
**discussion (8)**
35:25;57:15;59:12;
60:21;61:9;89:9;90:12;
148:17
**discussions (1)**
135:18
**disposed (1)**
74:10
**disrupt (1)**
6:16
**distinguishing (1)**
25:16
**divide (2)**
42:22;71:9
**divorce (2)**
36:19,23
**docket (1)**
4:6
**document (22)**
75:12,13;77:18,22;
84:9;85:13,18;93:4,5,9,

11,24;94:4,17;96:9;
112:21;113:10;114:15,
15;127:25;148:24;
167:15
**documents (15)**
50:16;53:23;54:2,7,
10,15,18;55:1;84:2,5,
18;85:6,21;108:23;
109:17
**done (17)**
6:2;15:14;20:21;
21:6,8;53:19;77:9,10;
97:4;98:4;104:2,2;
108:13;145:9;159:21;
161:22;173:25
**door (5)**
41:1,4;46:21,25;53:9
**double (1)**
159:14
**down (38)**
6:15;13:6,25;14:2;
27:5,16,20;37:23;39:1;
46:23;50:21;76:13;
86:7;93:4;99:23;
100:13,19;102:10;
125:1,12;127:24;
130:22;136:25;137:16,
20;138:2,18;140:14;
143:10,12;146:20;
154:18;158:19;164:6;
165:12,19;170:23;
178:22
**downhill (1)**
44:11
**downloaded (1)**
81:18
**draft (2)**
138:5,6
**drafting (1)**
66:21;67:8
**drafts (2)**
67:9,19
**drain (2)**
100:13;140:19
**drainage (9)**
44:23;45:3,6,7,9,11;
98:20;101:7,8
**dramatic (1)**
157:23
**draw (5)**
97:16;113:20;116:4;
139:5;150:18
**drawings (1)**
97:18
**Dream (3)**
152:18;172:10,13
**drive (5)**
18:3;143:10,10,10,
12
**driveway (3)**
104:7,14,16
**drop (1)**
158:19

**Druid (5)**
154:24;155:4;
158:21;160:2,6
**due (4)**
55:23;56:1;131:5;
135:9
**dug (2)**
104:12,13
**duplicative (3)**
109:10;116:8,22
**duration (1)**
69:13
**during (17)**
5:24;27:24;31:19;
48:13;49:21;51:8;
53:12;69:13;88:18;
91:11;109:2;119:7,13;
123:8,8;154:11;179:7
**duties (4)**
22:7;23:2,8;28:24
**duty (1)**
28:2

**E**

**earlier (9)**
6:12;15:15;67:19;
72:8;94:15;109:14;
135:12;136:21;165:8
**earth (1)**
97:19
**easier (2)**
6:22;93:7
**easily (1)**
94:14
**easy (1)**
134:24
**educational (1)**
9:9
**effect (10)**
49:4;62:7;70:10;
118:10;123:11;124:13;
126:24;139:2;162:24;
163:8
**either (14)**
30:13,16;115:12;
119:3;125:20;126:6;
128:16;131:18,21;
148:17;160:2;161:5;
164:13;171:17
**elaborate (1)**
157:14
**Electric (3)**
152:21;169:25;
172:20
**electrical (6)**
156:11,14,15;
157:19;160:15;161:2
**Electronic (1)**
109:16
**Elena (1)**
18:18
**eleven (1)**

105:24
**eligible (1)**
42:20
**Elizabeth (3)**
6:3;82:8;175:17
**else (21)**
6:25;22:15,19;23:3;
26:20;28:1;47:3;49:7;
55:20,22;60:10;62:1;
65:8;66:13;78:23;
129:15;156:5;159:6;
161:14;167:15;176:15
**email (24)**
67:10;91:20;92:15,
15,18,21;93:18;94:10;
95:2,7;122:19;126:1;
127:11,13;128:3;
129:3;137:13;138:13,
15;165:1,10;169:22;
174:22;175:3
**emailed (1)**
81:1;95:21
**emails (3)**
22:22,24;164:2
**employee (2)**
20:11;30:13
**enable (1)**
24:12
**enclosing (1)**
138:13
**encounter (1)**
98:14
**end (18)**
5:20;15:24;29:14;
65:11;76:10;88:19,21;
90:23;91:1,6;110:11;
121:25;123:12,15;
131:12,17;158:13;
172:6
**ended (3)**
139:19,21,22
**engaged (2)**
34:9,13
**engineer (4)**
71:16,19,21;98:16
**engineering (1)**
98:25
**English (9)**
9:21;17:15;30:20,21;
54:4,10,13;121:23;
122:15
**engraving (4)**
9:11,12,13,24
**enough (7)**
41:25;50:25;65:3;
82:5;130:20;135:4;
160:20
**enter (14)**
18:5;19:6,9;20:25;
22:8,10,12,13;58:16,
18,19,20;59:5;65:7
**entered (5)**
22:23;27:14;29:3,9;

173:8
**entering (7)**
19:2,15;27:25;28:1;
29:1;173:9;174:15
**entire (3)**
40:13;62:5;72:5
**entirely (1)**
7:2
**entries (1)**
97:21
**especially (3)**
8:11;104:12;175:21
**essentially (1)**
100:2
**estate (3)**
140:6,8,9
**et (2)**
4:10;75:4
**evaluate (1)**
149:5
**Even (23)**
6:12;19:18;20:1;
37:25;44:2;59:14;
60:20;64:6,12;65:7;
68:17;118:12;119:11;
121:10;129:25;130:17;
131:11,13;156:2,8,8;
176:24;179:6
**event (1)**
75:5
**eventually (1)**
152:1
**everybody (6)**
26:20;55:22,25;60:4,
7;62:8
**everyday (2)**
21:7,8
**everywhere (1)**
104:13
**evidence (23)**
75:3;78:4,8,13;80:3,
9;94:6,11,13,19,21;
105:19;108:10;111:7;
112:21;114:25;116:2,
3;117:10,14;124:17;
165:20;167:15
**exactly (6)**
24:14;43:22;119:2;
163:11,12;172:25
**EXAMINATION (4)**
8:1;110:2;176:11;
179:4
**example (11)**
88:5,5;90:4;118:8;
120:5;122:13;129:3;
155:12,17;158:20,21
**excavate (2)**
98:13;129:8
**excavation (4)**
24:3,9;97:2,19
**Excavation/foundations (1)**
125:18
**exceed (1)**

62:10
**exceeded (2)**
63:6;89:1
**Excel (6)**
29:10;58:20;60:15,
19,24;63:10
**except (1)**
97:25
**excess (2)**
89:7,20
**exclusive (1)**
137:18
**exclusively (1)**
12:17
**excuse (4)**
24:21;32:12;95:11,
12
**execution (2)**
67:15;69:8
**exhausted (1)**
66:11
**Exhibit (62)**
67:17,19;75:1;77:22;
78:8,11;79:16;81:5;
82:20,25;83:5;85:11,
12;86:6;91:23;92:25;
94:19;95:15,18,22;
105:15,19;108:15;
109:18;111:4,7,19;
112:3,12;113:2;
114:25;115:23;116:3,
18;124:4,9,16;125:7,
14,25;127:1,11;128:1,
25;129:24;130:10;
137:11;138:10;144:25;
164:2,24;165:1,14,20;
166:20;168:8,11;
169:9,13;170:14;
171:8;174:2
**Exhibits (5)**
32:12;109:10;125:1;
131:25;175:17
**existing (3)**
45:14;72:9;73:25
**expectation (1)**
5:14
**expecting (2)**
65:16,16
**expense (1)**
6:6
**expenses (2)**
88:18;120:18
**expensive (3)**
118:16;157:15;
159:14
**experience (3)**
34:18;97:1,9
**expert (1)**
7:3
**explain (7)**
17:12,14;96:24;
126:17;155:6;173:10;
177:6

**explained (2)**
60:8;173:9
**explanation (3)**
21:10;126:22;128:10
**exposed (2)**
97:19;103:3
**Express (6)**
129:19;130:5,14,16,
21;131:6
**expressed (1)**
92:10
**exterior (1)**
157:20
**extra (3)**
157:18,19;173:7
**ex-wife (1)**
37:3,5,6,7

**F**

**face (1)**
179:10
**face-to-face (2)**
48:4,6
**fact (24)**
17:6;44:15;52:22;
69:16;70:7,24;81:13,
15;86:21;92:19;98:13;
99:21;100:8;120:2;
121:12;122:7;150:20;
151:21;155:1;158:24;
166:13;172:2;175:1,2
**factors (1)**
131:6
**fair (2)**
89:22;150:25
**falsify (1)**
161:5
**familiar (3)**
12:25;13:16;154:22
**far (1)**
179:23
**farblonzet (1)**
165:17
**fashion (5)**
15:17;21:5;32:8;
44:25;121:14
**fast (1)**
125:2
**faster (1)**
5:16
**fat (1)**
73:23
**federal (1)**
94:14
**fee (7)**
90:25;91:11,13;
145:25;148:1;150:6,16
**feed (1)**
43:7
**feedback (1)**
42:24
**feel (2)**

106:2;177:12
**Feeney (1)**
6:13
**fees (7)**
77:6,7;90:12,17,22;
91:2;150:10
**feet (7)**
155:15,16,16;
156:17;158:2;159:13,
23
**fellow (1)**
170:22
**fence (3)**
97:18;119:18,19
**few (16)**
34:21;46:13;47:7,12;
51:21;52:1;56:15;61:3;
71:15,18;72:7;99:6,11;
133:16;152:2;179:24
**field (2)**
73:17;97:2
**fifteen (11)**
36:17;58:17;107:14;
118:6;121:6,20;
122:14;145:24;150:6;
162:7;170:7
**file (5)**
16:13;25:12;71:8;
81:1;162:13
**filed (11)**
4:7;15:14;71:5;72:2;
123:14;147:10,11;
148:14,23;149:12;
150:9
**files (2)**
16:16;154:22
**filing (8)**
38:24;39:18,19;
70:24;147:15;148:4,
12,18
**Filippov (93)**
4:7,15;47:19,20,24;
48:2,14,18,19;49:8,9;
51:9,21;52:7,11,13;
53:7;55:9,14;56:6;
62:1;63:7,10;64:22;
65:5;66:1,12,18,24;
67:12;69:9;70:9;79:11,
12;80:18;83:23;87:14;
89:9;91:16;95:7,18;
105:11;117:15;119:3,
12,22;120:13;123:9,10,
18;124:19;125:20;
126:7,17;128:17;
132:11;135:18,25;
136:3,11,16,25;137:5,
24;138:13,25;139:25;
140:4,20;141:6,15,17,
18;142:21;143:9;
144:2;145:14;147:7;
148:17;151:11;162:12,
16,24;163:8,17;164:3;
166:9;167:16,17,21,23,

25;175:3
**Filippov/Lipetsker (2)**
52:17;125:15
**Filippov-Lipetsker (3)**
124:11;126:2;128:23
**Filippov's (5)**
64:14;65:3;120:17;
136:8;144:1
**fill (1)**
102:4
**final (7)**
40:9;67:15;103:15,
16;134:8;135:8;145:10
**finalize (1)**
77:3
**finally (2)**
116:4;148:1
**finance (1)**
49:12
**financial (14)**
15:21;17:18;25:14,
17;29:18;49:16;50:14,
15,16;51:1;56:7;57:16;
65:3;161:5
**find (11)**
65:2;78:14;82:6,7,
14;83:5,6,7;92:15;
109:7;124:16
**finding (1)**
46:7
**fine (9)**
36:20;39:17;49:25;
78:10;81:11;82:8;
83:16;109:13;176:9
**finish (6)**
5:14;18:8;109:13;
119:4,4;175:13
**finished (2)**
38:14;134:5
**finishes (1)**
119:21
**firearms (4)**
9:10,12,13,24
**fired (2)**
28:8;29:22
**firm (4)**
18:16;25:25;26:3;
27:7
**first (46)**
8:17;9:18;10:5,10;
11:23;19:2;21:15;
29:19;32:24;33:2;34:9,
13;35:2,9;36:15;37:20,
21,22,24;38:1;40:17,
23,25;41:11,15;42:12,
16;44:19,23;48:18;
56:12;59:14,18;64:19;
70:11;72:24;73:1;93:6;
97:17;116:7;144:10,
11;145:13;148:13;
165:23;176:23
**five (8)**
46:16,17;72:5;

133:23;135:5,6,10,12
**fixed (3)**
76:21,22;78:21
**fixed-price (2)**
76:22,24
**flat (1)**
44:10
**flip (1)**
113:2
**flooring (5)**
120:6;152:18,19;
172:10,13
**Florida (1)**
136:25
**fluent (1)**
17:6
**focus (2)**
12:20;56:16
**focusing (3)**
49:23;123:17;125:21
**folders (1)**
16:13
**follow (6)**
96:20;122:6;141:16,
18;167:10;176:16
**following (1)**
27:19;148:12
**foot (3)**
104:13;156:24;
157:25
**footage (2)**
158:23;160:18
**footing (2)**
99:24;102:25
**footings (4)**
100:1;102:25;
103:12,14
**footprint (1)**
43:7
**forever (1)**
140:19
**forge (1)**
161:11
**form (8)**
87:2;94:9;99:23;
109:17,21;124:23,25;
125:6
**formal (6)**
117:22;118:2;
121:19;122:1,11,19
**forth (1)**
105:3
**forty (6)**
34:18;40:21;63:3;
155:18;156:5;161:3
**Forty-five (1)**
107:21
**forty-nine (1)**
149:13
**forward (7)**
6:10,13;19:55:18;
87:16;92:4;93:25;
150:1

**forwarded (2)**
93:3;137:23
**found (1)**
10:8
**foundation (14)**
74:4,7;75:2;88:5,6;
97:20;99:25;100:1,5,
21,23,24;132:6,8
**foundation's (1)**
88:6
**four (16)**
45:19,20,24,25;46:1,
16,17;72:5;97:17,20;
104:11;113:15;150:15;
156:16;157:10;167:14
**four-page (1)**
96:9
**framing (4)**
157:23,24,24;159:11
**Fredette (13)**
154:24;155:4,15,18;
156:8,24;157:10;
158:1,1;159:17,18;
160:2,4
**friends (1)**
171:13
**front (7)**
88:13;89:5,11,15;
103:12,13,13
**frontage (1)**
158:11
**fronted (1)**
131:15
**fronting (1)**
120:2
**full (3)**
8:5;122:20;146:21
**full-day (1)**
21:12
**full-time (1)**
21:13
**fully (1)**
159:13
**function (1)**
160:22
**funds (2)**
130:20;148:9
**funky (2)**
158:13,13
**further (4)**
49:20;57:15;137:20;
161:25
**future (8)**
43:7;63:17,19;64:4,
9;157:12,15,16

**G**

**gables (1)**
158:4
**game (1)**
34:20;66:1,3
**garage (5)**

100:22;156:18,19,
21;159:24
**gather (1)**
41:12
**gave (3)**
58:12;167:16,17
**GC (4)**
93:10;94:1;95:2,3
**general (9)**
12:6,10;14:8;90:25;
92:5;97:23;145:25;
148:1;150:5
**generally (8)**
14:25;15:11;28:24;
31:18;58:15,16;100:4;
133:20
**gentleman (1)**
30:3
**geographically (1)**
12:19
**Gersh (32)**
28:14,15,17;29:19;
32:14,15;34:9,12;
122:17;131:25;138:15;
146:8;149:8,20;
150:19;151:2;165:2;
169:2,21;173:8;
174:22,24;175:2,3;
177:5,10,23,25;178:4,
22,23,25
**Gersh's (1)**
28:24
**gets (3)**
6:4;173:7;179:10
**given (2)**
7:19;15:15
**gives (2)**
24:18;103:7
**goal (2)**
145:12;179:20
**goes (1)**
90:23
**Goldman (3)**
154:17,20;156:16
**Goldman's (2)**
154:15;160:14
**Good (19)**
4:3,4,14,16,18,19,22,
24;8:3,4;12:3;41:2,22;
46:21,24;47:1;60:12;
68:7;106:12
**Gotcha (1)**
7:9
**grading (2)**
102:6;103:16
**graduate (1)**
9:10
**grand (1)**
156:6
**grandfather (1)**
10:15
**granted (1)**
54:12

Case 16-01120    Doc 347    Filed 06/04/19    Entered 06/04/19 13:09:50    Desc Main
Document    Page 188 of 200
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
May 15, 2019

**great (2)**
109:14;165:17
**greater (1)**
103:7
**green (2)**
66:19,20
**gross (1)**
97:23
**grossly (2)**
179:8,10
**ground (1)**
99:8
**groups (1)**
52:17
**grow (1)**
9:16
**guarantee (2)**
50:2,14
**guess (8)**
5:19;78:3;83:10,14,
16;94:11;164:19;
165:15
**gunite (2)**
74:4,5,7
**guy (3)**
11:5;60:13;151:8
**guys (3)**
122:16,18;142:25

**H**

**half (3)**
9:6;45:24,25
**hall (1)**
6:11
**hand (3)**
6:1;7:14;167:1
**handed (1)**
95:17
**handled (1)**
87:15
**handling (1)**
79:10
**hands (1)**
11:15
**handwriting (1)**
167:3
**handwritten (1)**
166:25
**handyman (1)**
11:14
**happen (4)**
42:11;55:20;89:1;
143:5
**happened (12)**
27:1;47:10;51:19;
55:6;56:3;65:8;66:15;
92:19;142:12;158:11;
168:14;174:22
**happens (6)**
43:4;72:16,17;85:2;
172:24,25
**happy (2)**

93:23;106:10
**hard (9)**
18:3;95:18;146:2,3,
4;150:1,20;162:3;
179:22
**harder (1)**
177:14
**hardwood-floor (1)**
11:13
**Harris (39)**
4:22,22;67:17;74:19;
76:13;80:5;81:1;86:7;
87:7;91:23;93:6;94:23,
24;95:11;96:7;100:19;
105:20;110:7;111:11,
23,24;112:22,23,25;
115:7;124:5,6;125:7;
127:10,24;128:25;
130:9;137:11;138:2,
10,18;144:24;154:16;
160:10
**HARTZELL (6)**
163:24;164:14,18;
165:14;169:13,14
**hassle (1)**
6:6
**hay (1)**
97:18
**head (1)**
36:15
**heads (5)**
155:18,19,20,20,21
**hear (2)**
33:16,24
**heard (1)**
175:21
**hearsay (2)**
36:4;75:2
**Heating (4)**
152:16,17;170:17;
173:22
**heaves (1)**
158:4
**heavy (1)**
8:12
**height (3)**
44:5,7,8
**help (4)**
37:14,16,17;109:14
**helpers (1)**
121:10
**helpful (1)**
27:21
**helping (1)**
10:16
**here's (1)**
179:1
**herringbone (1)**
120:6
**hey (1)**
124:11
**higher (3)**
45:22,23;155:7

**highlight (1)**
68:11
**hill (3)**
98:6,10,11
**himself (3)**
40:2,4;64:22
**hire (6)**
21:18,23;25:24;
28:11,13;102:5
**hired (4)**
21:6,15;29:3,19
**hiring (1)**
21:25
**hold (8)**
11:18,21,25;12:3;
56:23;57:7;82:4;
124:24
**home (23)**
8:25;9:2;41:12,16;
43:23;45:8,8,14;72:9,
24;87:24;134:17,21;
153:12,15,19;155:23;
156:23;157:15,25;
158:1;159:20,21
**homeowner (1)**
104:23
**homes (31)**
12:13,13;13:1,8,10,
25;14:5,6,8;40:18;
42:3;56:20;62:13;
69:24;73:15;85:8;
86:15,16,17,19,20;
133:12;134:14,15;
135:15;139:7,15;
153:6;156:17;158:18;
160:3
**honest (4)**
37:20,22;38:1,2
**Honor (59)**
4:4,14,16,19,22;5:1;
6:22;7:5,12;34:2;
74:21;77:21;79:23;
82:3;83:8,19,20;85:11;
92:24;93:1,24;94:20;
105:14,16,21;107:13;
108:2,8,22;110:1;
111:3,5;112:8;113:1,2,
3,18;114:21,23;115:22,
24;116:4,22;117:8;
118:21;141:8;144:25;
149:11;161:21,25;
162:6;175:10,15,18;
176:14,16;178:16;
179:13,25
**Honor's (2)**
178:18,19
**hood (1)**
122:2
**hope (1)**
176:21
**hopefully (1)**
5:14
**hot (1)**

100:22
**hound (1)**
168:16
**hour (1)**
63:3
**hours (1)**
31:16
**house (38)**
29:17;36:19,25;41:1,
1,4,20;42:10;43:13;
61:7,21,23;62:16;68:6;
69:20;72:14;89:4;
97:11;103:23;104:1,
21;105:3;136:7;155:8,
9,15,16;156:25;157:8;
158:10,14,16;159:13,
15;160:18,23;166:11;
168:1
**housekeeping (1)**
5:19
**houses (18)**
42:1,6,9;49:5;61:4,6,
14,24,25;73:16;88:21,
22;89:6;117:18;
156:16;160:1,19,20
**hover (2)**
112:6,9
**hundred (1)**
29:4
**hypothetic (1)**
62:20
**hypothetical (1)**
62:22

**I**

**ID (1)**
25:10
**idea (4)**
17:22,22;85:6;93:2
**identification (2)**
169:7,9
**ignore (1)**
81:3
**immigrated (1)**
10:14
**impact (5)**
24:20,22;44:16;
121:13;158:25
**impacted (1)**
45:9
**important (1)**
24:4
**impose (1)**
90:22
**impression (1)**
59:18
**inadvertently (3)**
96:8;108:14;179:21
**incarcerated (3)**
34:11;35:4,10
**inches (1)**
104:11

**incidentally (4)**
16:22;53:16;79:15;
141:8
**include (6)**
77:6,8;145:23;
147:18;159:2;177:4
**included (2)**
108:14;159:21
**including (6)**
156:18,19,21,21;
159:24;178:14
**incomplete (1)**
93:2
**incorporated (2)**
71:23;125:2
**incorrectly (1)**
34:1
**independent (1)**
83:5
**independently (1)**
96:14
**indicate (1)**
106:11
**indicating (1)**
160:15
**industry (3)**
10:6;24;24:3
**information (18)**
19:15;32:13;56:7;
75:16;120:21;124:20;
126:23;127:7;128:17,
19;142:15,17,18,24;
147:17;151:6,8,10
**initial (22)**
42:13;43:4;47:9;
49:8,23;51:9;55:6,20;
67:9;84:16;103:19;
118:4,17;126:18;
130:5,14,15,17;140:17;
145:13,19,20
**initially (1)**
136:14
**inserted (1)**
169:20
**inspection (1)**
134:7
**inspector (1)**
134:8
**install (2)**
18:1;97:18
**installation (5)**
11:13;18:17;100:23;
102:25;103:16
**installations (1)**
100:14
**installed (3)**
18:21,24;19:3
**installers (1)**
101:19
**instruct (2)**
151:2;161:4
**instructed (1)**
120:20

**instructions (1)**
92:10

**insulation (2)**
100:24;101:4

**insurance (2)**
26:25;27:8

**intended (1)**
6:4

**interact (1)**
32:8

**interacting (1)**
120:16

**interest (3)**
143:6;7;148:19

**interested (4)**
4:8;47:16;50:8,12

**interesting (8)**
47:7,13;49:25;50:1,
11;62:11;142:18;175:1

**interim (1)**
179:7

**interior (1)**
100:21

**interrupt (6)**
24:6;33:4;7;44:6;
73:20;98:22

**intervening (1)**
178:2

**intimidated (1)**
170:22

**into (35)**
10:5;19:2,9,15,18;
21:15;22:13;27:25;
45:6;54:7;58:16;59:5;
65:15,25;71:23;78:4,8;
80:2;88:9;92:14,15;
94:15,19;96:1,2;
100:10;105:19;108:10;
111:7;114:25;116:3;
117:14;125:2;158:6;
169:20

**intricacies (1)**
54:14

**introduced (7)**
30:3,7,9;47:24;80:2;
85:10;117:14

**invent (1)**
161:17

**invest (6)**
65:24;66:2,6,7;88:8,
11

**investor (4)**
65:16;90:16;155:6;
156:12

**investors (2)**
90:16;155:2

**invoice (6)**
32:17,19,20;40:9;
116:12;122:1

**invoices (9)**
15:23;18:2;22:16,17,
20;32:21;131:21;
143:1;161:11

**invoicing (2)**
32:3;40:14

**involve (2)**
157:7;159:16

**involved (2)**
133:8;162:12

**irritates (1)**
85:3

**IRS (5)**
26:13,21;27:1,3,10

**issue (7)**
6:9;24:9;102:7;
130:21;131:2,7,21

**issued (3)**
122:18;128:7;130:7

**issues (6)**
73:13;94:16;134:4,
20;135:9;176:5

**item (3)**
101:7;102:24;156:11

**items (7)**
97:12;99:23;103:22;
105:3;118:15;121:15;
171:21

## J

**jail (4)**
35:4;37:4,6,7

**James (1)**
4:22

**Jersey (1)**
178:14

**jewelry (2)**
9:10,12

**Jim (1)**
144:22

**job (12)**
10:8;21:12,13;24:14;
77:1;78:23;88:10,11;
101:17;102:5;103:25;
122:25

**John (1)**
4:19

**joined (1)**
10:9

**Joseph (25)**
29:25;30:8,10,23,24,
25,25;31:2,5,10,18,22;
32:2,12,15,24;36:15;
38:16,17,20;87:3;
143:20,21,22;144:5

**jot (1)**
125:1

**Judge (4)**
6:13,13,15;95:11

**Julian (1)**
14:24

**July (3)**
6:10,11;10:7

**jump (2)**
134:3;148:11

**June (4)**

5:8;9;40:14;151:14

**jury (1)**
6:4

## K

**Kagan (57)**
4:8;8,8,10,20,20,20;
5:12,15;7:12,15,17,20,
21;8:3,6,7,11,24;13:16,
20;33:9;75:9;78:19;
85:5;86:18;88:8;90:12;
95:2;110:4;111:16;
112:11;113:7;114:8;
117:13;129:5;131:11;
149:9;154:20;160:13;
161:4;162:1,10;164:1,
19;167:24,24;169:9,
20;173:21;175:19;
177:8,9,13,20,25;
178:24

**Kagan's (5)**
36:4;176:25;177:5;
178:5,17

**KDC (41)**
4:9,21;13:17,19,20,
25;14:4,7,11;15:3,12;
22:7;23:21;25:16,17,
18;26:3;30:13,16;31:3,
12;38:21;75:24;86:4;
88:13;89:5,25;95:3,15,
18;119:16;128:22,22;
130:12;131:22;133:10;
148:24;150:2;152:25;
153:15;161:5

**KDC-01281 (1)**
114:3

**KDC-01284 (1)**
115:11

**KDC-1301 (1)**
116:8

**KDC-1304 (1)**
116:11

**KDC's (1)**
92:22

**keep (11)**
16:14,19;25:14;87:5;
88:3;100:18;107:22;
108:6;123:1;128:12;
137:20

**keeping (1)**
16:11

**kept (3)**
17:18;61:9;92:21

**key (1)**
31:10

**kickbacks (1)**
161:8

**Kiely (1)**
167:10

**kill (1)**
41:21

**kind (20)**

6:16;16:19;26:25;
40:1;44:22;55:14;64:7;
91:9;98:18,19;104:22;
118:9,9;122:19,23;
147:5;148:5,8;161:7;
177:11

**kinds (2)**
55:11;176:6

**Kladova (1)**
18:18

**knew (8)**
45:11;47:22;48:20;
65:19;71:9;85:25;98:5,
15

**knowing (1)**
179:5

**knowledge (10)**
35:17,18;36:8;77:13;
110:24;132:11;149:25;
150:3;161:13;176:13

**known (2)**
56:3;121:18

**knows (2)**
29:13;93:22

**Kristina (17)**
21:17,20,23;22:6;
23:4;25:21,23;27:25;
28:4,7,8,25;29:7,21;
76:2;120:16;170:23

**Kristina's (1)**
22:3

**Kristine (1)**
21:19

## L

**L-39 (4)**
111:20,24,25;112:12

**labeled (1)**
112:2

**labor (1)**
157:7

**laborer (3)**
10:10,18,25

**laborers (2)**
10:8;157:9

**land (3)**
41:3;56:8;156:22

**landfill (2)**
73:3,11

**landings (1)**
103:13

**landscaping (7)**
103:16,21;158:20,
21,25;159:2,7

**Lane (1)**
110:5

**large (3)**
41:25;121:7;131:1

**largely (2)**
160:22;161:1

**last (8)**
63:2;81:19;116:9,18;

118:6;133:23;138:19;
165:19

**late (3)**
94:16;166:6,9

**later (1)**
52:1

**law (2)**
176:4;178:15

**lawsuit (7)**
123:14;147:8,9,10,
11;148:4,9

**lawyer (4)**
33:25;125:22;
172:23;178:21

**lawyers (1)**
176:6

**lay (1)**
132:8

**lead (3)**
72:25;73:1,2

**Lean (1)**
33:12

**learn (6)**
33:14;35:9;40:23;
83:23;148:13;153:5

**learned (7)**
35:20;36:13;41:8,11,
15;99:1;145:5

**learning (2)**
37:9;148:16

**lease (1)**
101:18

**least (11)**
5:15;38:3;42:18;
48:21;86:10;91:13;
120:23;134:14;140:10;
145:20;147:5

**leave (3)**
6:12;33:18;172:10

**led (1)**
132:19

**ledge (14)**
97:19,19,25;98:1,5,7,
8,9,10,11,14,15;99:1,
21

**left (3)**
55:22,25;65:12

**left-hand (1)**
75:20

**legal (2)**
17:11;54:15

**less (3)**
118:16;154:5;156:13

**lets (1)**
108:22

**letter (14)**
30:19,22;123:17;
125:22;144:17,19,22;
145:2,9,12,15,17;
162:13;163:14

**level (5)**
44:12,19,22;102:8;
158:24

Case 16-01120    Doc 347    Filed 06/04/19    Entered 06/04/19 13:09:50    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 190 of 200

May 15, 2019

**leveled (1)**
44:25
**leveling (1)**
159:3
**license (5)**
11:22,23,25;12:1,3
**licenses (2)**
11:18,21
**lie (2)**
24:15;43:23
**lien (3)**
147:12,18;151:25
**life (2)**
119:13;123:8
**light (3)**
66:19,20;159:5
**lights (1)**
157:20
**limit (2)**
130:16,18
**line (7)**
5:25;130:13;156:11,
24;157:25;169:24;
171:21
**lines (2)**
43:23;158:3
**Lipetsker (50)**
4:15;46:12,14,18,20;
47:10,22;48:14;51:9,
22;52:7,11,13;53:7;
59:19;60:2,3,10;66:12;
70:10;80:18;87:15;
89:10;91:17;95:8,19;
105:12;117:16;119:3,
8,22;120:13;123:21;
124:19;125:20;126:7,
12,20;127:5;128:14;
142:14,15,16,19,20,21;
143:16;148:18;162:12,
16
**Lipetsker's (1)**
47:5
**list (1)**
108:15
**listed (6)**
45:22,23,24;135:16;
136:17;154:23
**listen (1)**
107:8
**listing (27)**
135:19,22;136:11,
19,22;137:2,3,4,6,8,23;
138:8;146:24;163:16;
164:7,10,10,12,17,22;
165:24;166:3,16;
167:24,25;174:23;
175:4
**litigation (1)**
150:15
**little (23)**
5:9;8:12;26:18;27:5;
33:10,13,16;40:16;
50:7,21;80:7;82:6;

84:18;98:22;101:21;
106:24;110:8;126:17;
132:8;146:20,21;
148:11;172:5
**living (5)**
8:25;51:12,17;55:9,9
**LLC (5)**
4:6,10;39:13;95:7;
148:3
**loan (18)**
51:1;64:7;65:4;
66:25;80:20;83:22,24;
84:3,6,11;85:24;87:24,
25;88:14,24;89:2;
133:23;135:8
**loans (9)**
50:3;64:22;65:6;
66:19,20;67:3;79:8,10,
13
**located (1)**
132:2
**logged (1)**
172:2
**logistics (1)**
176:9
**long (14)**
10:18;21:2;56:12;
63:2;71:14;72:1,2;
82:5;83:14;121:6;
141:9;158:12;175:10,
12
**longer (3)**
14:5,6;106:15
**longstanding (1)**
121:5
**look (12)**
57:17;83:6;112:2;
124:12;125:25;127:1;
128:5;129:23;154:14;
156:11;169:12,15
**looked (7)**
51:13;110:4;124:3,9,
15;144:20;145:24
**looking (7)**
81:7;83:1;104:23;
108:23;120:21;168:6;
169:24
**looks (2)**
164:2;172:2
**lose (3)**
140:12,17;142:2
**losing (6)**
140:5,7,8;147:4;
163:2;166:5
**lost (4)**
36:19,20,25;150:14
**lot (56)**
21:11;23:16;41:24;
42:12,13,14,15,16;
43:6,14,15,17,18,23;
44:4,5,7,10,10,12,13,
15,19,25;45:15;46:21,
25;49:11;50:22;51:11,

16;65:6;88:8;99:10;
104:9,12;106:2,15;
142:15,17;150:14;
155:14,16;157:15,20;
158:6,10,11,12,24;
159:16;174:16,19,19,
20;176:5
**lots (11)**
42:22;43:8,8,24;
48:21;96:2;102:8;
112:16;158:6,12;159:3
**lower (12)**
139:18;140:5,10,12,
16,17;141:21;142:1,2,
3;147:1;162:25
**lowering (1)**
163:9
**Lumber (3)**
159:10,11,18
**lump-sum (1)**
76:20
**Lyman (58)**
4:5,10;13:11;40:8,
10,17,18,25;41:6,12,
15;42:2,10;47:11;
48:10,11,18;51:10,13,
20;56:4;66:16;95:6;
111:17;113:8,14;
114:9;130:20;131:3,
11;132:12;137:4;
148:3,19;154:23,24;
155:1,2,13,14,23,25;
157:2,11;158:3,6,11,
20,24;159:12;160:2,4;
161:8,17;163:17;
165:9;169:21;171:11
**LymanCutlerLLCcom (1)**
92:7

## M

**magnitude (1)**
104:21
**Maiden (25)**
5:7;14:15;17:4,13;
38:7;52:25;53:8,16,20,
22,23;54:9,17,20;
66:21;67:13;68:11,21;
140:24,25;141:1,2,4,7,
13
**Maiden's (10)**
53:1,6;54:25;55:7,
21;56:10,13;67:25;
84:6,10
**main (2)**
108:25;109:1
**maintain (5)**
25:8;31:12;93:24;
110:21;114:18
**maintained (5)**
77:14;105:8;110:25;
115:20;116:15
**maintaining (1)**

23:11
**major (1)**
143:9
**makes (1)**
33:16
**making (3)**
26:11,22;177:14
**manager (2)**
11:3;39:24
**managing (1)**
168:2
**manipulate (1)**
60:15
**manner (2)**
19:14;37:10
**many (7)**
9:2;40:18;53:19;
85:21;97:1;121:18;
152:7
**March (2)**
21:24;167:7
**mark (1)**
78:15
**marked (2)**
82:17;96:8
**market (19)**
25:2,3;41:1,9,10;
78:24,25;121:16;
136:1;139:9;147:4;
153:18;161:1,3;165:9;
166:2,5,11;168:1
**married (1)**
8:21
**masonry (2)**
103:23;159:6
**Massachusetts (1)**
11:19
**match (1)**
22:20
**material (2)**
74:11;99:25
**materials (13)**
72:21,22;97:14;
118:14;119:4;122:22;
157:7;159:12,16,17;
169:10,19;171:20
**math (2)**
172:23;173:25
**matter (5)**
31:14;36:8;109:5;
143:3;161:9
**May (25)**
4:12;7:23;70:9;
80:13;93:4;109:24,25;
110:10;111:21;123:10,
17;125:22;127:5;
128:15;135:1,11;
144:19;149:12;150:9;
161:22;162:13;163:14;
166:3;172:3;179:10
**maybe (12)**
6:20;62:1,2;63:3,3,8;
64:2;67:4;106:5,19;

128:18;159:6
**mean (13)**
13:20;30:25;52:5,6,
14;63:25;83:15;93:17;
108:25;167:13;174:4;
176:10;179:22
**meaning (1)**
139:22
**meaningless (1)**
81:6
**means (1)**
106:5
**meant (1)**
52:12
**meet (3)**
48:7;52:24;118:13
**meeting (39)**
51:9,23,24;52:3,4,6;
53:5,12;54:25;55:3,4,4,
5,7,21;56:9,12,13,16,
17;57:15,25;59:9;
60:11,21;62:9;63:2;
64:19;65:9,11,15,15;
66:12;118:12,13,18;
119:1;148:5,8
**meetings (4)**
118:4,7;135:21,24
**member (1)**
168:3
**members (1)**
146:23
**members' (2)**
148:5,8
**memo (2)**
129:7;130:13
**memory (2)**
66:11;151:15
**mention (1)**
106:1
**mentioned (4)**
93:9;107:24;109:14;
135:1
**message (4)**
122:9,12,12,17
**messenger (1)**
5:23
**messy (2)**
36:19,22
**met (3)**
48:18;52:25;135:25
**microbeam (1)**
159:16
**microlamp (1)**
159:16
**microphone (4)**
8:13;33:10,12,15
**microphones (1)**
83:12
**middle (1)**
103:8
**might (10)**
41:25;43:2;49:25;
50:8,11,12;62:24;

120:17;134:18;179:9

**million (16)**
45:16,17,19,20;46:1;
62:9,10;87:24;88:1;
89:2,7,20;142:21;
160:5,7,7

**mind (2)**
176:12;179:9

**mindful (1)**
69:15

**mine (1)**
128:9

**minimum (1)**
156:5

**Minsk (1)**
9:17

**minute (3)**
139:1;161:22;172:9

**minutes (4)**
34:21;63:3;107:14;
162:7

**minutes-ish (1)**
107:21

**miss (1)**
51:6

**missed (1)**
172:9

**missing (4)**
80:23;81:13,15;
103:22

**mistake (1)**
113:1

**mix (1)**
98:9

**mixed (1)**
158:4

**molding (2)**
118:9,11

**moment (4)**
44:6;57:22;83:8;
164:23

**Mom's (1)**
163:13

**money (45)**
10:7;24:20,22;29:13,
14,15;49:10;51:4;64:4;
65:25;66:25;85:25;
87:22;88:9,9,11,13;
89:4,5,12,14,15;90:24;
91:2;130:19;131:3,15;
133:17,17,25;135:3,4;
140:13,19;142:2,22,24;
146:14;148:2;150:14;
174:16,19,19,20;175:5

**monies (4)**
89:19;152:25;153:2,
14

**monitor (6)**
18:5,9,10,11;19:14;
20:17

**month (6)**
5:21;20:10,13;21:1;
131:13;177:2

**months (14)**
11:5,7;21:3,4;56:15;
70:11;71:15,18;72:4,6,
7;143:24;144:1,10

**more (38)**
5:7;6:17;7:2;11:24;
15:5;21:10,10;69:4;
89:23,24;103:14,14;
104:14,15,16;118:12;
123:11,13;126:23;
132:8;142:22;145:18;
146:20;154:3;156:1,2,
8;157:8,9,9,15,21;
158:17;159:5;160:20;
161:2;164:19;177:19

**morning (11)**
4:3,4,14,16,18,19,22,
24;8:3,4;147:19

**mortgages (1)**
58:10

**most (5)**
100:4;104:17;121:2,
7;159:14

**mostly (1)**
11:16

**mouth (1)**
33:10

**move (5)**
6:12;33:10;114:21;
154:18;171:19

**much (33)**
6:21;29:7,7,7,13,14,
15,15;49:10;51:4;61:4,
5,10,13;62:12;64:4,4;
78:22;85:25;89:24;
98:1;131:3,11;153:19;
154:3;157:8,8,9,9;
159:8;161:2;162:4;
176:8

**multiple (4)**
99:4,5,15,16

**myself (4)**
49:11;102:5;142:4;
146:16

---

**N**

**name (6)**
8:5,23;50:14;81:10;
85:7;101:24

**named (2)**
21:18;81:19

**names (1)**
4:12

**narrow (1)**
158:12

**National (2)**
159:9,11

**native (1)**
17:2

**natural (4)**
103:1,1,5,6

**nature (2)**

11:11;159:4

**necessary (2)**
88:17;102:5

**need (31)**
5:21,25;6:17;10:8;
15:23;29:15;34:15,21;
37:13,16,17;43:9;
106:5;107:9;109:18;
115:3;116:23;118:21;
121:25;123:11,12;
124:12;132:8;133:12,
17,17;134:21;135:3,
11;146:13;165:16

**needed (6)**
10:7;31:21;54:18;
68:22;101:21;126:23

**needing (1)**
98:2

**needs (3)**
97:4;104:2;151:7

**negotiate (1)**
133:6

**negotiating (2)**
23:5;67:13

**neighborhood (1)**
98:7

**neighbor's (1)**
44:21

**nephew (5)**
58:17,24,25;60:12;
143:4

**new (12)**
6:15;17:23;43:23;
44:20,21;101:10;
134:22,24;153:11,15,
19;178:14

**Newton (7)**
8:8,15;12:21,22;
134:7;170:23;171:1

**Newton-Brookline (1)**
40:19

**next (30)**
11:2;41:1,4;43:5;
46:21,25;47:10;51:19;
53:9;56:3;66:15;77:22;
84:15;92:24;96:12;
100:18;102:11;105:15;
111:3;115:7,23;134:9;
142:12;143:19;144:6;
164:19;170:13;173:4;
175:14;177:2

**Nick (2)**
46:12;59:19

**Nickolay (1)**
4:15

**night (1)**
81:19

**ninety (1)**
88:7

**nobody (2)**
6:23;24:15

**noninvestor (2)**
155:7;156:13

**note (2)**
125:17;169:3

**notebook (1)**
169:16

**noted (1)**
51:16

**notes (1)**
16:19

**notice (1)**
89:25

**number (63)**
4:5,6,10;25:10;
27:14,15;29:1;32:15;
58:10,19;59:20;60:5,
25,25;63:16,18,22,23;
64:1;75:20,21,24;76:4,
7,9;81:5,20;94:22;
100:13;101:10;102:24;
105:18;109:12;111:9;
114:1,2,3;115:3,7,11;
116:5,11;125:25;
127:16;131:9;133:22;
145:19;146:3,3,7,11;
149:5,11;150:2,19,25;
151:8;169:23,23;
170:18;173:8,9,15

**numbers (41)**
15:13;18:5;26:6,11;
29:8,11;56:18,20,25;
57:2,4,4,7;59:4,7,13;
60:8,13,22,23;61:9;
63:5;64:1,16;77:3,5;
109:2,18;113:15;
131:13;146:4;149:1,
18,19;150:1;161:16,
17;169:15;174:7,10,15

---

**O**

**oath (2)**
7:18;176:11

**object (5)**
80:11;93:1;94:11;
124:23,25

**objection (14)**
4:7;36:1,2;74:23;
78:3;85:13;94:3,17;
105:16;111:5;114:23;
115:24;132:6;169:10

**obligation (1)**
89:3

**observations (1)**
132:19

**obtain (2)**
50:3;134:1

**occupancy (11)**
133:13,15,18,21;
134:2,4,7,18,20;135:2,
6

**occur (4)**
12:8;51:8;84:6;
136:9

**occurred (3)**

66:12;88:18;146:5

**occurs (1)**
43:4

**o'clock (2)**
162:4;177:21

**October (2)**
29:22;96:18

**off (7)**
34:20;36:15;83:8,9,
11;107:16;179:6

**offer (7)**
46:1;77:21;92:24;
105:14;111:3;115:22;
116:18

**offered (1)**
142:20

**offering (1)**
75:6

**office (26)**
18:4,4,17;19:5,9,9;
31:10,12,16;52:25;
53:1,6,12;54:25;55:7,
21;56:10,13;67:24,25;
81:4;84:7,10,14;92:2;
123:4

**often (6)**
19:8;31:18;119:7,12;
134:11;147:20

**O'Grady (8)**
21:18,20;75:13,15;
91:20;92:1,2,4

**old (5)**
55:23;73:15,15;81:5;
134:25

**older (1)**
170:21

**Once (26)**
13:13,22;14:4;18:3,
23;20:10,13;21:1,7,9;
31:20;43:4;57:12;
69:23;70:23;71:4,21;
72:1;86:3;95:24;
108:20;119:14;133:12;
134:4,20;138:7

**one (77)**
6:8;7:1;14:2;18:21;
19:10;21:25;22:2;
23:16;24:17;41:20;
44:11;47:13,15;50:1;
51:25;52:13;56:23;
60:13;61:23;65:19;
69:4;78:2;80:2;82:4;
83:2,15;85:21;93:14;
97:17;102:20;111:10;
116:19;117:9;121:10,
18;124:24;129:7,24;
133:19,22;144:24;
149:15;152:9,11,19;
153:18;155:8;159:20;
162:17;163:21;164:2,
7,19,21,23;165:7,12,
14,16,20,20;166:21,23;
167:7,10;170:3,19,21;

Case 16-01120　Doc 347　Filed 06/04/19　Entered 06/04/19 13:09:50　Desc Main
Document　Page 192 of 200
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

May 15, 2019

171:13,23;172:9,10,18;
173:4,4,6;177:6
**one-page (1)**
77:18,21;81:23
**ones (2)**
164:7;170:3
**one's (4)**
110:16;166:25;
167:1,19
**ongoing (1)**
26:2
**online (1)**
132:17
**only (26)**
5:19;28:7;43:15,17,
18;44:4,7;46:6;50:1,
13;54:20,22,22,23;
60:13;71:15;83:1;
104:11;106:22;121:10,
20;134:6;155:4,8,11;
176:19
**onset (1)**
71:17
**onsite (2)**
71:19,21
**onto (1)**
25:6
**Oops (1)**
86:8
**open (9)**
60:20;101:18,22;
120:24,25;128:11;
134:24;142:25;145:13
**opened (6)**
24:5;7;63:7;132:16;
147:8,9
**operate (1)**
86:17
**operating (20)**
56:5;63:16,18;66:17,
22;67:9,10,16;68:5,23;
69:10,16;70:2;71:1;
86:16;143:21,23;
144:9,11;145:6
**operative (2)**
13:8,10
**opinion (3)**
54:22,23;109:5
**opportunity (4)**
41:2,22;46:22,24;
47:1;91:5;179:12
**order (10)**
5:9;42:8;78:9,10;
101:21;110:8;176:20;
179:17,21,23
**ordered (1)**
176:24
**ordinary (13)**
77:15;92:21;101:12;
105:8;110:21;111:1;
113:11;114:16,18;
115:15;116:13,15;
177:9

**organization (3)**
28:18;149:4;177:5
**original (1)**
166:16
**otherwise (2)**
106:11,15
**ours (1)**
165:16
**out (19)**
5:9;6:19;20:25;
53:14;65:2;77:25;
83:13;94:10;96:13;
108:19,25;110:8;
153:18;161:17;167:1,
21;171:2;172:10;
175:16
**outside (5)**
46:5,6,7;103:13;
157:19
**outstanding (3)**
131:4;152:24;153:14
**over (5)**
22:1;94:17;118:5;
124:10;177:2
**overall (1)**
96:5
**overpaid (1)**
131:19
**overruled (1)**
36:9
**owed (3)**
131:11;150:2,25
**own (25)**
11:10;21:6;23:18;
24:10,12,13,21;25:8,
10,12,14,16;53:9;
55:23;56:1;65:25;
71:19;78:22;88:11;
101:14,16,17;103:25;
131:12;174:4
**owned (2)**
13:4;23:15
**owner (1)**
121:9
**owners (1)**
121:11
**owning (1)**
46:4

## P

**page (31)**
83:1,2,15;86:8;87:6;
96:9,14;100:18;
102:11;113:13,21,21,
22;116:7,9;138:19;
149:9,13,13;150:17;
164:19;165:13,23;
166:24;169:12,15;
170:13;171:7,21;
172:8;173:18
**pages (14)**
58:18;93:20;96:12,

13,14;105:15,22;
113:14,15;114:6,8,22;
138:3;149:13
**paid (13)**
22:8;90:24;147:25;
151:18,21;152:1,3,25;
170:4,4,10;171:17;
173:1
**Painting (1)**
11:13
**pamphlet (1)**
117:24
**paper (4)**
64:6,8;82:20;109:1
**paperwork (1)**
122:6
**paragraph (6)**
146:21,23;150:19;
154:17;160:11,13
**Parker (7)**
154:24;155:4,13;
157:3;160:2,6,8
**part (23)**
7:7;12:20;23:4;
26:24;27:7;36:22;45:5;
72:13;74:20,22;75:1;
85:5;88:4;93:6;96:8;
98:17,20;120:22;
121:2,7;134:6;177:5,
11
**Partial (2)**
129:8;131:14
**particular (8)**
46:8,10,11;93:25;
128:6;131:1;169:24;
175:1
**parties (3)**
4:8,12,23
**partner (8)**
18:18,19;46:12,14;
58:9;65:18;91:9,12
**partners (6)**
46:5,6,7;91:21;
128:11;147:24
**pass (3)**
25:6;39:25;65:24
**passed (1)**
86:8
**patio (3)**
103:8,14;157:19
**Pause (3)**
74:25;82:5;161:24
**paving (1)**
104:17
**pay (28)**
16:13;29:16;39:13;
69:19;70:5,7,16,16;
87:20;122:4,24;
130:21,22;133:24;
135:4,11;140:21;
141:23,23;142:20;
143:23;144:2;145:21,
21;146:15;148:1,2;

170:11
**payable (9)**
169:25;170:17;
171:11,24;172:11;
173:22;174:2,17;175:6
**paying (25)**
27:3;29:16;69:17,23;
70:10,11,19;74:12;
88:10,17;89:11;
122:22;129:16;135:7;
139:11,18;140:18,20,
22;141:21;143:25;
144:1,9;145:6;163:5
**payment (14)**
27:7;88:7;122:18;
125:23;129:8;130:5,
14,15,16,17;131:14;
133:23;135:7;145:20
**payments (10)**
26:24;122:24;
124:15,18,20;126:21;
127:7;129:20;132:1;
134:3
**PDF (3)**
81:4,10;94:9
**pendency (1)**
154:11
**penny (1)**
91:10
**people (17)**
5:25;19:15;20:7,25;
22:1,2;23:23;24:10;
47:7,13;100:5;103:4,
11;104:10;121:10;
122:23;154:4
**per (3)**
97:18;105:3;165:7
**perc (4)**
99:8,10,14,20
**percent (13)**
29:4;88:7;100:23;
121:16,20;133:23;
135:5,7,10,12;145:24;
150:6;161:3
**percentage (6)**
58:11,20;90:1,6;
133:24;148:2
**percolated (1)**
99:8
**perfect (2)**
107:1;128:10
**perfectly (2)**
176:23,24
**Perhaps (2)**
175:11;177:15
**perimeter (1)**
100:21
**period (7)**
20:23;27:24,24;
163:12;166:6;178:2;
179:8
**permission (2)**
42:8;112:5

**permit (6)**
24:14;102:5;112:13;
134:22,25,25
**permits (2)**
57:9;79:3
**person (8)**
18:4;16;19:11;29:3;
30:18;47:13,15;52:8
**Persons (1)**
19:4
**perspective (1)**
120:23
**Perten (255)**
4:19,19;5:1,4,6,12,
14,18,23;6:21;7:12,23,
25;8:2;10:22,23;13:14,
15,23,24;15:1,2,9,10;
20:3;27:19,23;30:9,12;
33:5,8,23;34:8,19,22;
35:1;36:6,7,11;67:17,
18;74:19,24;75:1,5,8;
76:13,16;77:19,21;
78:1,9,12,14,17,18;
79:5,6,17,21,23;80:2,6,
10,13,15,16,25;81:3,8,
10,12,15,18,23,25;
82:3,11,14,19;83:3,7,
10,20,21;84:25;85:3,4,
10,14,16,17;86:6,9;
87:1,5,8,9;91:23,25;
92:24;93:10,13,15;
94:20,22;95:1,12,14,
16;96:7,12,16;100:19,
20;102:10,12;105:14,
21,25;106:3,7,9,14,17,
20,22;107:2,4,7,10,13,
21,25;108:2,5,8,12,18,
22;109:3,6,9,16,20,22,
24;110:1,3,6,9;111:3,8,
13,15,21;112:1,5,8,10,
21,24;113:1,5,6,18,20,
24;114:1,3,5,7,21;
115:1,9,22;116:4,7,10,
18,22,25;117:4,8,11,
12;118:21,24,25;124:5,
7,8;125:5,7,12,13;
127:10,12,24;128:2,25;
129:2,23;130:2,3,9,11;
132:9,10;137:11,12,16,
17,20,22;138:2,4,10,
12,18,20;141:8,12;
144:22,25;145:1,22;
146:20,22;149:11,16,
17;153:23;154:1,7,16,
19;160:10,12;161:21,
25;175:18;176:16,19,
22;177:15,17,22;178:1,
16;179:2,13,16,19,25
**Peter (1)**
4:16
**petition (3)**
148:12,13,18
**phone (5)**

48:4;75:20,21;76:3;
177:24
**physically (1)**
18:21
**pickup (1)**
122:1
**picture (1)**
65:3
**pictures (1)**
134:9
**piece (2)**
64:6,8
**pit (3)**
98:15,16,18
**pits (3)**
98:25;99:4,5
**placed (1)**
132:2
**placements (1)**
100:14
**plaintiffs (2)**
7:1;179:11
**plaintiff's (1)**
78:6
**plan (15)**
42:17,22;43:9;44:17;
45:5,11;57:5,10,12;
64:7;97:11,11;106:12;
155:23;156:4
**planning (3)**
46:4;118:4;147:25
**plans (19)**
57:6;61:6,21;62:16;
64:9,11,19,20,21,25;
71:17,19,22,22;86:1,3;
117:19,21;156:1
**planting (1)**
103:15
**plants (1)**
158:22
**plaster (1)**
122:14
**please (37)**
4:12;7:13,14,24;9:8;
80:14;85:12;86:6,8;
91:24;96:9;100:18;
125:8,25;127:11;
138:18;140:15;163:23;
164:19,24;165:9,13;
169:13,17;170:14;
171:8,8,20,21;172:8,
11,17,18;173:4,18,19;
175:4
**Plumbing (5)**
75:4;152:11,14,16;
171:11
**plus (3)**
90:2;157:8;172:24
**point (39)**
12:5;13:6;17:17;
28:8;41:12;47:20;
61:18;62:9;67:2;69:8;
70:9;71:8;75:6;78:4;

83:23;98:2;111:19;
118:8;123:8;124:10,
17;125:3,20,22;126:6;
127:6;128:13;132:24;
135:15;139:1;144:14;
146:5;151:2;153:5;
161:4,7,11,16;178:18
**pointed (1)**
108:19
**points (1)**
160:3
**Police (2)**
170:24;171:1
**pool (6)**
72:11,14;74:4,5,7,8
**porch (1)**
103:13
**portion (3)**
73:25;91:13;96:22
**position (2)**
21:16;179:7
**possibility (1)**
40:24
**possible (3)**
43:23;55:18;57:16
**potential (2)**
157:11,12
**potentially (1)**
7:4
**pour (2)**
99:24;100:5
**power (2)**
157:19;160:19
**precisely (1)**
179:19
**preliminaries (1)**
4:25
**preliminary (1)**
42:22
**premade (1)**
102:15
**prep (2)**
177:3,11
**preparation (5)**
32:10;71:15;104:8,
10,11
**prepare (10)**
15:24;32:15;57:17;
75:18;78:20;96:4;
104:6;117:19;118:19;
149:5
**prepared (24)**
57:20;58:23;61:21;
66:17;75:12,13;78:19;
80:17;86:4,22;87:2;
96:18;105:5;110:18,
19;113:10;114:11,15;
115:12,12,15;116:12;
177:23;179:11
**preparing (7)**
40:9;58:2;76:24;
79:2,3;96:21,25
**present (9)**

42:17;48:13;50:16;
53:5,8,11,12;56:10,14
**presentation (2)**
60:5;98:17
**presentations (1)**
29:10
**press (2)**
20:1,4
**pre-trial (2)**
94:6,12
**pretty (1)**
162:4
**previous (1)**
142:23
**previously (2)**
81:5,19
**price (51)**
25:2,3;45:14;58:19;
64:3;74:12;76:21,22;
78:21,22,24;89:19;
97:14;104:23;105:2;
118:15;121:16;122:13,
25;135:19,22;136:1,2,
3,6,12;139:18;140:5,
10,12,16,17;141:21;
142:1,2,4;146:24;
147:5;156:9;158:25;
159:22;160:3,4,5,6;
161:3;162:25;163:9;
164:10;165:24;166:2
**prices (3)**
97:7;129:22;157:22
**primary (1)**
28:2
**prime (1)**
159:14
**printout (1)**
169:17
**prior (18)**
14:20;16:4,7,12;
21:18,25;24:5;35:16,
17;57:24;67:15;69:8;
76:6;123:10;125:21,
22;148:4,16
**private (1)**
90:12
**privately (1)**
67:13
**privilege (2)**
141:9;176:5
**probably (26)**
6:9;21:3;33:18;
40:20;49:5;53:21;
56:15;64:18;71:7;72:4;
75:13;118:5;121:15;
128:20;131:10,10,10,
16;140:22;144:6;
146:12;151:16;155:18,
18;156:24;173:9
**problem (6)**
6:7,19;40:6;45:7;
164:23;177:22
**problematic (3)**

179:1,2,3
**procedure (2)**
20:23;96:20
**proceed (7)**
7:11,23;38:13;80:13;
88:16;108:8;109:24
**proceeded (1)**
87:21
**proceedings (1)**
149:12
**proceeds (1)**
133:24
**process (17)**
21:2,5,11;24:3,11,
13;25:1;29:4;42:21;
43:4,5;71:14;72:1,5,7;
111:17;114:11
**produced (1)**
94:9
**ProEx (36)**
25:8,10,12,14,20;
26:3;30:14,17;31:14;
74:17,19,22;75:10;
76:10,17;77:24;79:15;
80:1;97:2;101:8;102:2;
108:9,18;113:8;114:8;
123:25;124:15,18,20;
127:2,8;128:7,15;
131:21;152:25;161:5
**ProExcavation (37)**
4:9;20;23:12,14,15,
20,22,22,25;24:5,8;
31:6;74:14;75:3;76:4;
77:15;96:4,17,21;
100:10;101:5,14,21,24;
102:1;103:21,23;
104:4;114:16,19;
115:13;116:12;117:13;
126:1;127:17;128:13;
133:10
**ProExcavation's (1)**
110:22
**professional (1)**
11:18
**profit (1)**
140:18
**project (69)**
13:11;23:9,23;40:8,
17,18,24,24;43:8;46:5,
8,10,11;47:8,11;50:2;
51:20;55:8,10,18,23;
56:4;57:3,5;58:9,16;
62:21,25;64:17;65:7,
25;66:16;69:13;72:13;
77:2,8;87:10,21;88:4,9,
18;89:3;90:15,23;91:9,
11;96:5;97:5;100:11;
110:11;119:7,13,20;
123:9,12,15;131:17;
133:4;134:5,9;143:24;
151:18;154:21;161:8,
19;174:3,17,19,20
**projects (18)**

32:6;46:13,15,17;
49:11,18;53:17,19,21,
24;55:8,12;68:13;
78:22;98:4;100:4;
152:4,20
**promoted (2)**
11:4,6
**proof (7)**
32:11;131:24;
148:23;149:1,10;
150:18;151:3
**proof-of-claim (1)**
74:20
**proper (2)**
77:8;109:18
**properly (4)**
15:14,14;20:21;29:9
**properties (8)**
102:17,18;136:16;
154:23;156:13,14;
160:16;172:24
**property (27)**
29:15;41:8,19;42:9;
50:23;61:18;66:25;
70:23,25;71:2,4,6,9;
72:9;102:20,20,20;
103:2,7;111:17;
119:15;134:12;136:22;
147:12;151:25;156:1;
162:25
**proports (2)**
93:18,25
**proposal (48)**
74:16,20,22;75:9;
76:12,17,20,21,23,25;
77:3,5,9,10,14,24;
78:19;79:4,15,16;80:1,
3,17;81:23;96:4,17,21,
22,25;105:5;110:7,10,
13,18,21,25;112:11,15,
18;113:8,8;114:8,12;
115:12;116:12;118:19;
122:12;136:8
**proposals (6)**
15:23;78:1;108:9;
110:4;111:17;117:14
**proposed (3)**
97:20;99:24;137:9
**provide (5)**
42:21;58:4,8;59:4;
80:17;82:19;91:16;
117:15;120:12,20;
122:11;126:23;128:10,
14;129:18;132:16;
144:12;147:17;149:5;
151:10;153:11;157:18;
159:11
**provided (5)**
95:10;102:3;146:7;
149:19;153:3
**pull (17)**
91:23;93:7;125:7;
127:10;128:25;129:24;

Case 16-01120   Doc 347   Filed 06/04/19   Entered 06/04/19 13:09:50   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 194 of 200
May 15, 2019

130:9;134:22;137:11;
144:22;166:20

**pulling (1)**
32:13
**pump (2)**
100:15,16
**pumps (1)**
99:25
**purchase (12)**
29:15;41:19;50:2,4,
13,17,22;58:19;65:5;
89:19;153:19;156:4
**purchase- (1)**
66:24
**purchased (4)**
45:19;20;70:23;71:4
**purchasing (1)**
66:19
**purpose (2)**
6:4;141:4
**purposes (3)**
81:21;90:1;172:5
**pushing (1)**
108:6
**put (28)**
27:15;32:15,19,20;
39:16;59:7;60:14;63:8,
9;75:9;77:2,5;80:24;
89:18;94:12;103:1;
104:16;116:19;131:25;
136:7;151:3,25;
157:17;158:9;165:8;
166:11;168:1;174:9
**putting (1)**
32:22
**Pyle (1)**
123:18

## Q

**quality (1)**
104:22
**quick (1)**
147:5
**QuickBook (1)**
17:25
**QuickBooks (45)**
16:5,9,12;17:19,24;
18:5,23;19:1,2,9,16,19;
20:5,9,12,21;21:21,22;
22:12,13,23;23:12;
26:5,9;27:15;28:1;
29:1,4;31:23,25;
146:12;149:3;154:22;
169:17,21;170:14;
171:8,21;173:11,11,12,
19;174:12,15;177:6

## R

**radius (3)**
12:21,22,24
**raise (1)**

7:14
**raised (3)**
94:5,15;177:8
**raising (3)**
94:16;179:13,19
**range (4)**
104:24;160:4,5,6
**rather (1)**
164:21
**reached (4)**
55:17;167:21,23,24
**reaction (10)**
63:21;140:18;142:5,
6,6,8,8,9;143:15;147:6
**read (7)**
54:14;68:2,8,18;
69:16;130:13;165:10
**reading (4)**
97:16;99:23;100:13,
18
**ready (1)**
79:3,3
**real (9)**
117:15;125:2;136:3,
5,5,6;140:6,8,9
**reality (2)**
64:16;93:16
**realized (1)**
144:11
**really (10)**
60:23;64:22;94:15;
108:4;109:14;115:3;
125:2;170:22;176:4,10
**reason (7)**
23:24;25:25;36:9;
80:23;133:22;134:1;
150:15
**reasons (3)**
24:17;133:22;134:17
**reassessed (1)**
134:10
**rebar (5)**
73:16,21,25;74:3,9
**rebuttal (1)**
7:4
**recalculate (1)**
134:2
**recall (19)**
21:15;29:19;35:24;
45:14;48:17;49:7;53:3;
55:6;56:17;57:2;65:8;
92:9;127:4,19;128:3;
135:24;136:22;140:3;
141:20
**recap (1)**
5:1
**receipt (3)**
18:2;143:1;165:9
**receive (5)**
124:18;126:21;
127:6;128:16;145:15
**received (1)**
87:25

**recess (1)**
107:15
**recollection (3)**
15:6;29:23;45:18
**reconcile (4)**
20:10,13;21:2;
131:18
**reconciled (2)**
146:3;174:24
**reconciliation (3)**
20:17;145:10;146:5
**reconstruction (1)**
97:24
**record (7)**
4:13;82:24;83:8,11;
107:16,17;109:11
**recorded (1)**
154:22
**records (12)**
15:18,21;16:1,12;
17:18;25:14,18;105:9;
115:21;150:19;161:5;
174:24
**record's (2)**
81:22;108:24
**recount (1)**
36:12
**rectangle (1)**
158:2
**rectangular (5)**
158:4,8,10,10;
159:15
**reduce (3)**
146:24;147:4;150:20
**refer (4)**
13:19;109:2;111:19;
174:25
**referenced (1)**
95:3
**references (3)**
95:2;127:16;157:16
**referred (2)**
114:22;154:15
**referring (4)**
72:23;112:11;
166:15;170:25
**refresh (3)**
15:6;29:22;45:17
**refusing (1)**
144:2
**regard (1)**
75:3
**regarding (2)**
79:12;127:7
**regular (1)**
31:16
**regulation (1)**
43:6
**reimburse (1)**
146:15
**reimbursed (8)**
69:20,23;70:21;
88:19,20,21;89:6;91:1

**reimbursement (2)**
88:14;89:16
**relate (1)**
110:13
**related (7)**
31:22;32:2;37:2;
69:18;111:17;114:12;
161:17
**relates (5)**
40:8;68:22;73:13;
113:8;115:18
**relationship (3)**
37:10;121:6,13
**relationships (1)**
121:5
**relative (2)**
129:4,5
**released (1)**
135:12
**reliably (1)**
109:7
**relied (2)**
68:24;69:1
**rely (2)**
15:11,16;20:20;24:4,
6;54:9,17;69:5;174:11,
13,14,14
**relying (4)**
68:21;69:2,6;122:23
**remember (12)**
11:24;56:15;63:3;
66:13;128:4,18;
137:19;162:14;163:12;
166:23,24;171:1
**remembered (1)**
92:16
**remind (2)**
8:11;175:19
**removal (2)**
97:19,25
**remove (5)**
72:24;73:1;98:2
**repeat (4)**
33:22;87:17;106:6,
24
**repeats (1)**
33:25
**replace (2)**
28:11,13
**report (3)**
154:17,21;160:14
**reports (7)**
39:2,4,7,11,15,19;
154:15
**represent (3)**
38:6;141:9;173:25
**represented (2)**
53:16;151:13
**request (9)**
76:3;127:6,19;
128:16,18;137:14;
138:16;146:23;161:13
**requesting (3)**

69:10;134:18;151:7
**require (9)**
21:11;44:24;98:18;
121:18;130:17;156:22;
157:11,21;160:19
**required (5)**
96:2;118:12;157:8;
158:22;160:19
**requirement (1)**
99:17
**requirements (1)**
44:20
**reside (2)**
8:7,15
**residential (5)**
12:11,12,17;14:9,10
**resolved (1)**
94:14
**respect (14)**
23:8;47:10;51:19;
66:15;80:20;83:22;
94:18;117:13;120:17,
18;128:21;142:13;
157:23;161:8
**respond (1)**
177:1
**responded (1)**
22:24
**response (6)**
36:6;47:6;61:12;
63:13;64:14;128:3
**responsibilities (7)**
22:7;23:2,5;26:2;
28:25;31:2,5
**responsibility (8)**
31:22;32:2,5;70:5;
71:12;91:14;142:4;
144:1
**responsible (13)**
23:11;26:4,4,5,7,9,
11,13,21,22;29:8;
69:17;103:23
**rest (1)**
108:23
**rested (1)**
5:10
**result (1)**
37:9
**resume (1)**
175:13
**RESUMED (1)**
110:2
**retaining (5)**
44:23;102:7,13,14;
159:3
**retires (1)**
6:13
**return (3)**
26:15;27:2,15
**returns (2)**
25:12;26:7
**reversed (1)**
90:24

Case 16-01120    Doc 347    Filed 06/04/19    Entered 06/04/19 13:09:50    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 195 of 200
May 15, 2019

**review (4)**
67:9;84:9,22;137:24
**reviewed (4)**
57:24;67:19;143:21;
150:19
**reviewing (1)**
132:19
**Right (140)**
5:11,13,17;7:2,7,9,9,
14,19;17:24;18:19;
27:18;33:7,19;34:1,7,
16,25;38:12;41:13;
49:7,11,20;52:12;
65:14;72:5;75:7;78:5,
13;79:23;80:7,12;
81:11,16,21,24;82:6,
21,22,25;83:2,3;85:10;
94:13,21;100:2;
101:20;103:6,12;
105:17,23;106:21;
107:4,12,14,22;108:21;
109:6;111:6;112:2;
114:24;115:8,10,25;
116:2,6;117:10;122:4,
17;124:12;125:4;
129:25;130:22;134:12;
137:18,21;146:2,5,13;
150:2;156:18;158:15;
162:2,23,25;163:3,6;
164:7;165:2,21,24;
166:23,25;167:5,5,8,
11,13,19,22;168:3,6,9,
14,14,17,21;169:4,6;
170:1,3,4,10,17,18,20,
20,22,24;171:11,13,15,
17,17;172:3,14,21;
173:1,7,23;174:3,21;
176:3,15;177:20;
178:1,2,13,22;179:24
**rise (3)**
4:2;107:15,18
**Road (5)**
113:8,14;114:9;
156:25;157:6
**roads (1)**
157:12
**rods (1)**
73:23
**role (6)**
30:16;32:13,22;58:2;
79:7;133:3
**rolls (1)**
134:5
**roofing (1)**
159:12
**room (2)**
53:10,11
**rough (1)**
102:6
**Roughly (1)**
53:19
**Rudyakova (1)**
128:16

**ruling (1)**
109:5
**run (5)**
172:5;176:19;
177:18;179:16,21
**running (1)**
14:4
**runoff (1)**
44:20
**Russia (3)**
9:14,16;10:13
**Russian (4)**
17:2,5,6;54:7
**Russian-speaking (1)**
17:11
**Ryan (3)**
75:13,15;92:1

## S

**sad (1)**
6:3
**safe (1)**
179:25
**sale (3)**
46:21,25;147:5
**same (24)**
4:23;14:1;17:13;
19:11;27:2;68:9;75:24;
96:20;111:16;113:14;
114:12;116:5;118:5;
155:22;156:15;157:24;
166:6;169:21;170:14;
171:20;174:22;175:5;
176:12,12
**sand (1)**
98:9
**save (2)**
104:9,9
**savings (2)**
25:5;100:11
**savvy (1)**
60:19
**saw (1)**
41:10
**saying (10)**
26:15;27:4;52:10,16;
57:2;119:16;126:22;
142:23;174:22;175:3
**scan (3)**
18:2;22:16,17
**schedule (1)**
179:5
**scheduled (1)**
175:14
**scheduling (1)**
24:18
**school (2)**
9:11;10:16
**scope (2)**
97:11;98:20
**screen (7)**
75:9;80:24;96:15;

110:6;163:22;164:1;
174:9
**scroll (23)**
76:13;86:7;87:5;
93:4;100:19;102:10;
110:7;125:12;127:24;
137:15,16,20;138:2,18;
145:17,18;146:20,20;
160:10;164:6,14;
165:12,19
**Sean (4)**
4:14;74:24;78:1;
83:7
**season (4)**
140:6,8,9;163:3
**seated (1)**
107:19
**second (18)**
5:8;56:9,13,16,23;
65:14;82:4;88:7;96:9;
113:21;124:24;134:1;
137:2,3,4,6;149:15;
159:20
**secondly (1)**
37:20
**section (2)**
87:6;129:7
**seeing (1)**
156:12
**seek (3)**
46:5,6;88:14
**seem (1)**
83:4
**selected (1)**
154:21
**self-drain (1)**
102:16
**self-draining (2)**
102:21,22
**sell (4)**
137:18;139:15;
143:11;153:9
**seller (1)**
138:23
**selling (2)**
136:3;163:3
**send (12)**
18:3;19:5;20:25;
24:15;122:12;124:1;
128:19;137:8;138:7;
142:25;143:1;145:2
**sending (3)**
22:1;92:16;145:12
**sense (2)**
5:9;107:20
**sent (29)**
92:19;93:19;123:19,
24,24;124:10,16,18;
125:14;126:1;127:2,
13;129:5;137:13,13;
138:13,15,25;145:9;
163:16,18,19;164:3,3;
168:11;169:2,22;

174:22;175:3
**sentence (2)**
50:10,10
**separate (14)**
16:15,15;25:17;52:8;
73:3,7,9;77:25;100:6,9,
25;101:11,13;123:1
**separately (2)**
16:14;78:15
**September (1)**
81:25
**Sergeyev (2)**
170:20;171:3
**serious (1)**
158:17
**served (1)**
34:10
**service (7)**
5:23;17:24;101:10;
156:14,15,23;157:4
**services (2)**
11:14;17:24;26:25;
156:12
**session (2)**
4:2;107:18
**set (15)**
13:22,25;15:3;23:25;
25:17;51:23,24;52:3,4,
6;53:23;95:7,25;105:3;
150:1
**setbacks (3)**
43:19,20,21
**setting (1)**
14:11
**sevens (1)**
87:6
**seventeen (1)**
118:6
**several (1)**
175:22
**sewer (2)**
101:10,19
**shape (10)**
43:14,15,17,18;44:4,
7;155:25;158:13,14;
159:15
**share (2)**
105:11;143:13
**shareholders (1)**
143:9
**shares (2)**
143:11,12
**shingled (1)**
159:14
**shingles (3)**
159:12,14,21
**short (1)**
38:14
**show (2)**
150:17;164:19
**showed (1)**
166:13
**showing (7)**

174:22;175:3
**shown (1)**
160:25
**shows (1)**
167:15
**shrub (1)**
103:15
**shut (3)**
13:6;25;14:2
**sic (3)**
17:25;21:19;72:25;
77:8;165:17
**side (13)**
12:11,11,15;44:11;
52:13,14,15,18;57:16;
155:7,7;157:3,6
**sign (32)**
41:10;63:5,10,13;
64:5,7,11;67:22;84:2,5,
13,14,15,16,18;86:14;
119:15;136:19;137:9,
24;139:3;166:9,12;
167:22,25;168:6,12,21,
22,23,23,25
**signature (9)**
63:8,9;86:7,10;
138:21;164:16,22;
165:13;166:24
**signed (25)**
68:2,15;84:10,20;
85:6,18,22;86:12,19,
20,21;91:18;138:7,8,
14;164:21;165:8,21;
166:2,17;167:10;
169:2,4;174:23;175:4
**significantly (1)**
156:13
**signing (5)**
71:1;84:22;85:7;
139:2;166:23
**silt (1)**
97:18
**Simple (2)**
38:19;172:23
**simply (2)**
49:12;142:10
**single (3)**
100:10;112:18;
167:15
**sit (2)**
150:23;178:22
**site (29)**
10:17;20:8;24:16;
41:16;44:17;45:8;48:8,
9,18;51:11;64:20;
71:16;72:16,25;97:11,
23,24;98:16;100:4;
101:3;103:19;119:10;
122:4;123:2;126:12,
19;127:5;128:14;134:9
**sites (4)**
72:19,20;74:13;98:6

Case 16-01120    Doc 347    Filed 06/04/19    Entered 06/04/19 13:09:50    Desc Main
Document    Page 196 of 200
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

May 15, 2019

**sitting (1)**
84:15
**situation (1)**
117:5
**Six (4)**
21:3,4;96:11;125:1
**size (4)**
41:24;104:12;
158:23;160:23
**ski (1)**
44:11
**skin (2)**
66:1,3
**slab (2)**
100:22;103:12
**slabs (1)**
100:22
**sleep (1)**
144:5
**slips (2)**
15:23;16:15
**slope (1)**
44:14
**sloping (2)**
44:12,15
**sloppy (1)**
81:20
**Slow (5)**
27:5,16,20;37:23;
39:1;46:23;140:14
**slower (3)**
26:18;33:13;50:7
**slowly (3)**
8:12;61:12;106:18
**small (6)**
6:8;121:9,12;131:13;
155:23;159:20
**smaller (2)**
121:8;160:20
**smooth (1)**
90:23
**so-called (2)**
87:10;90:1
**sod (2)**
103:16;158:23
**soft (4)**
90:11,11;145:23;
147:19
**soft-cost (1)**
90:22
**software (1)**
18:1
**soil (1)**
104:14
**soils (1)**
98:18
**sold (9)**
69:21,24;88:22;89:4,
6;139:23,24;153:6;
160:7
**solicited (1)**
97:6
**somebody (14)**

19:5,8;20:25;21:18;
28:11;30:20,22;78:23;
92:14;124:10;142:3;
149:4;156:5;167:1
**someone (2)**
117:19;164:3
**sometime (3)**
16:4;76:2;166:2
**Sometimes (23)**
16:21;22:22,24;
31:20,20;73:15,18,20;
90:19;119:11;122:3,6,
8,8,17;126:13,13;
130:17;134:23;135:1,
13,13;159:17
**Somewhere (6)**
12:9;39:16;83:16;
159:6;163:12,14
**sophisticated (1)**
121:8;157:16
**sorry (5)**
9:6,18;12:22;18:8;
19:22;22:10;26:7;30:5;
33:4,4,7;37:5,21;
43:16;46:9;54:21;
58:22;59:2;66:3;68:25;
69:4;73:20;79:17,19,
24,25;87:7;94:22;96:1;
99:14;102:18;112:25;
113:18,23;115:4;
129:10;130:2;139:20;
140:7,14;142:7;
144:23;153:22;157:2;
162:19;165:15;169:16;
172:9;173:16;174:10
**sort (8)**
5:1;53:23;58:4;
71:23;108:25;117:23;
119:21;126:8
**sound (2)**
79:23;83:18
**sounds (1)**
83:17
**sources (2)**
18:7,9
**space (1)**
14:9
**Spanish (1)**
122:14
**speak (12)**
8:12;9:21;26:17;
30:20;31:18,20;33:17;
69:9;119:8,13;121:23;
122:15
**speaker (1)**
17:2
**speaking (5)**
14:25;17:5;28:24;
31:19;106:18
**speaking-English (1)**
30:18
**spec (4)**
12:13,14;134:15,17

**special (2)**
44:19;159:16
**specification (1)**
99:10
**specifications (5)**
117:22,23,25;118:2;
119:4
**speed (1)**
33:17
**spend (1)**
64:4
**spending (1)**
130:19
**spent (5)**
10:15;71:15;129:4;
145:21;146:16
**split (4)**
158:6,8,9,12
**spoke (7)**
46:12,17;47:12;
132:22;142:23;143:20,
21
**spot (1)**
33:18
**spouse (1)**
8:23
**spreadsheet (17)**
57:17,18,24;58:2,21,
22;59:5,7,10;60:15,22,
25;63:4,7,8,11;64:16
**spreadsheets (1)**
29:11
**sprinkler (2)**
155:20,21
**sprinklers (1)**
155:17
**square (12)**
155:15,15,16;
156:17;157:24;158:1,
2,15,23;159:13,23;
160:18
**squares (1)**
158:4
**stable (2)**
104:15,16
**stack (1)**
84:17
**stage (1)**
179:3
**stake (1)**
89:22
**stand (4)**
7:13;153:15;177:4;
179:5
**standalone (2)**
93:10;109:10
**standard (4)**
17:23;53:23;68:5;
155:24
**standards (1)**
26:14
**standing (1)**
12:3

**Stanik (1)**
171:15
**start (13)**
5:12;11:10;17:18;
28:5;32:24;56:5,7;
60:23,24;134:12;
145:16;148:9;162:10
**started (8)**
10:10;11:12;14:2,3;
35:2;40:17;66:21;
162:5
**starter (1)**
169:13
**starting (1)**
33:2
**state (7)**
4:12;8:5;12:20;36:7;
175:17;176:12,13
**statement (6)**
18:2;129:19;130:1,6,
7;142:5
**statements (5)**
15:22;16:15,17;
29:17;132:12
**States (8)**
8:17,19;9:19;10:11,
14;38:24;39:9;178:14
**stating (1)**
122:19
**status (2)**
50:14,15
**stealing (1)**
142:24
**steel (3)**
73:23;100:1;159:17
**step (1)**
27:11
**stepping (1)**
83:11
**steps (2)**
103:12,13
**stickers (2)**
84:14,18
**still (12)**
13:8;38:13;80:24;
85:3;92:2;115:10;
150:2;151:17;153:14;
169:10;170:4,7
**stone (1)**
102:6;103:1
**stonewall (4)**
102:25;103:5,24,24
**stonewalls (1)**
103:6
**stonework (1)**
104:1
**stood (2)**
26:15;27:3
**stop (12)**
38:8;51:25;57:22;
58:12;59:23;61:8;
64:23;76:14;88:12;
140:22;162:3;164:8

**store (2)**
6:5,18
**storm (2)**
101:7,8
**straight (2)**
157:25;158:3
**straighten (1)**
83:13
**strategic (1)**
39:24;40:1,2
**street (3)**
101:18,22;155:13
**Strike (7)**
10:22;13:14,23;15:1,
9;79:5;125:10
**strong (2)**
50:25;65:3
**structural (1)**
100:1
**structures (1)**
74:1
**stucco (1)**
159:21
**stuff (4)**
17:11;53:10;72:17;
177:1
**subcontract (1)**
12:6
**subcontracting (2)**
11:16;24:23
**subcontractor (11)**
23:16,18,22;32:3;
100:9;101:12,13;
122:21;152:22;170:21;
171:14
**subcontractors (25)**
16:14,14,16;22:8;
24:15;32:8;77:2,4;
100:6;101:14;103:25;
104:17;121:1,2,13,17;
133:6,8;135:4;146:15;
151:17,20;152:2,3,6
**subcontracts (1)**
23:6
**subdivide (6)**
42:4,13;48:21;70:24;
71:5,9
**subdivided (1)**
61:19
**subdivision (8)**
42:20;56:8;57:5,8;
71:23;79:3;95:25,25
**Subject (2)**
137:18;175:25
**submit (1)**
43:9
**submitted (1)**
169:19
**subs (18)**
24:4,7;97:4,6;102:1,
5;118:2,5,8,12,13,18;
119:1;121:20;135:7,
11,13;145:21

Case 16-01120    Doc 347    Filed 06/04/19    Entered 06/04/19 13:09:50    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 197 of 200

May 15, 2019

**subsequent (1)**
126:22
**subsequently (2)**
11:4;95:21
**substance (2)**
175:25;178:5
**substantially (2)**
154:5;160:3
**substantive (2)**
40:10;55:20
**substitute (1)**
104:13
**subtract (1)**
173:15
**successful (1)**
83:23
**suddenly (1)**
168:5
**sued (1)**
151:23
**sufficient (2)**
126:23;130:20
**sufficiently (1)**
93:20
**suggest (5)**
29:21;38:24;39:2,15;
52:4
**suggested (7)**
15:5;39:1,18;45:17;
52:3,5,20
**suggesting (2)**
6:3;178:16
**suggestion (1)**
18:13
**suggests (2)**
39:16;136:3
**summary (2)**
9:8;149:18
**sump (3)**
100:14,15,16
**supervision (1)**
77:11
**supervisor (1)**
11:22
**supplying (1)**
118:14
**support (3)**
36:17;37:3;65:3
**supposed (3)**
56:6;70:11;145:6
**sure (29)**
6:24;15:13,13,14,17;
16:1;20:20;22:20;26:5,
11,14,20,23;27:11;
29:8,9;54:9;80:22;
81:2;87:18;105:25;
107:11;117:1;131:4,5,
18;138:1;164:13;
177:17
**surprise (2)**
148:21,22
**survey (5)**
42:12,14,15,16,16

**surveyor (3)**
71:16,18,21
**sustain (1)**
125:4
**Sustained (1)**
132:7
**swear (1)**
171:2
**SWORN (1)**
7:21
**system (5)**
18:3;44:23;45:11;
97:20;98:20

**T**

**tab (14)**
78:14;111:20,23;
113:3,7,14,17,18,21,23,
24;115:10;116:5;
169:14
**tabs (3)**
108:14,15;109:1
**takeoffs (1)**
118:18
**talk (21)**
30:22;33:12;47:8,14;
51:23;55:8;56:18,22;
67:8;69:9;83:12;
132:21;140:23;141:15,
17;145:14;174:6;
175:24;176:6;177:24;
178:4
**talked (4)**
55:11;56:19,25;
168:17
**talking (9)**
29:8;53:10;65:14;
79:25;118:11;142:16;
159:7;166:18;171:4
**talks (1)**
168:19
**tally (1)**
172:6
**TAMPOSI (2)**
4:16,17
**tasks (1)**
100:9
**Tatiana (11)**
4:8,20;5:15;8:24;
133:2;135:25;136:1;
167:23,24;168:8,19
**tax (7)**
25:10,12;26:7,15;
27:2,15;134:5
**taxes (6)**
15:14,24;17:10;26:4;
134:2,11
**telling (1)**
169:3
**tells (1)**
43:22
**template (6)**

58:5,8,9,13,15,17
**ten (3)**
11:24;13:4;36:17
**tennis (2)**
72:11,14
**term (1)**
167:7
**terms (3)**
32:21;41:18;97:23
**test (9)**
98:15,16,18,25;99:4,
5,10,14,20
**testified (2)**
147:19;160:14
**testify (1)**
143:5
**testimony (27)**
42:6;45:2;59:24;
62:4,7,11;64:10;65:21;
88:13;95:17;106:4,5;
109:2;136:21,23;
162:11,14;166:1;
168:24;174:11,13,14,
15;175:25;176:25;
178:5,18
**tests (1)**
99:8
**Thanks (1)**
107:14
**thin (1)**
161:17
**thinking (3)**
40:17;41:18;145:16
**third (4)**
110:7;113:21,21;
114:3
**Thirty (3)**
40:21;121:16;156:5
**thirty/forty (1)**
40:20
**thirty-one (1)**
105:3
**though (3)**
82:17,24;117:1
**thought (15)**
7:1;33:6;41:2,22;
68:5,8;77:24;79:25;
82:13;106:22;116:21;
143:18;144:12;148:1;
162:10
**thoughts (1)**
42:18
**Three (30)**
9:3;31:20;41:21,21,
25;43:8;46:15;48:15;
52:20;58:18;62:2,2;
69:18;78:1;96:12,12;
97:17;105:14,21;
107:8;113:14;114:6,8,
21;118:14,16;121:9;
128:7;155:19,20
**Three-mile (3)**
12:21,22,24

**threw (2)**
34:19;37:7
**throwed (2)**
37:3,6
**tile (2)**
120:8,8
**tiling (1)**
11:13
**Time-consuming (1)**
24:9
**times (6)**
61:4;107:9;126:20;
130:17;135:25;157:10
**title (2)**
28:17;39:24
**titled (2)**
40:2,4
**today (6)**
5:12,15;64:2;150:23;
176:12;179:6
**together (15)**
32:13,16,19,20,22;
52:7,20,22;55:10;
60:14;77:3,5;131:25;
151:3;158:5
**told (15)**
15:8,15;36:14,22;
49:16;55:14;64:10,15;
72:8;118:4;126:20;
144:8;151:9;168:23,24
**took (1)**
71:18
**top (6)**
81:14;93:6;97:17;
146:23;149:13;154:23
**topic (2)**
142:13;143:19
**total (5)**
76:17;105:2;122:25;
133:23;150:24
**touch (1)**
6:23
**Town (23)**
42:17;43:1,7,11,14,
22;44:18,24;48:20;
49:1;57:8;70:24;71:5,
12;77:6;98:16,17,21;
99:9,9,17;101:18;
134:2
**town's (1)**
49:3
**trade (1)**
100:25
**trained (1)**
18:23
**transcript (1)**
106:23
**transcription (1)**
106:25
**translate (4)**
54:6;98:22;100:10;
101:20
**trees (1)**

103:15
**trial (5)**
4:6,10;62:5;112:3;
136:21
**tried (1)**
125:1
**trip (2)**
107:24;179:25
**trouble (3)**
6:20;37:25;132:24
**truck (2)**
122:1;123:1
**trucks (1)**
6:1
**true (5)**
40:13;77:13;110:24;
157:3;175:22
**trustee (2)**
153:8,11
**truth (2)**
36:8;38:4
**try (4)**
6:15;167:22;179:6,9
**trying (4)**
82:6;106:23;173:11;
179:18
**turn (1)**
40:16
**turns (1)**
6:19
**TV (1)**
157:17
**twelve (1)**
9:5
**twenty (4)**
121:16,20;156:10;
170:7
**Twenty-eight (1)**
9:5
**twenty-five/thirty (1)**
53:21
**twenty-three (4)**
70:11;143:24;144:1,
10
**twice (5)**
19:10;21:9;31:21;
119:11;156:8
**twice/three (1)**
130:17
**two (33)**
6:10;9:6;11:5,6;
41:20,25;42:3,6,9;43:8,
24;48:21;49:5;52:17;
61:4,24,25;72:4;93:20;
96:2;97:17;100:22;
110:4;121:9,10;123:6;
133:22;152:19;153:6;
158:6;160:7,7;172:24
**two-and-a-half (1)**
9:5
**two-page (1)**
93:5
**type (2)**

Case 16-01120    Doc 347    Filed 06/04/19    Entered 06/04/19 13:09:50    Desc Main
LYMAN-CUTLER, LLC, et al. v.                      Document    Page 198 of 200
KAGAN, et al.

May 15, 2019

16:20;129:3
**typed (2)**
    75:15;167:19
**types (2)**
    74:10;120:8
**typically (4)**
    91:6;100:9,25;
    101:11

## U

**ultimately (3)**
    47:11;66:16;70:21
**umbrella (5)**
    100:10;101:4,14;
    103:21;104:4
**Um-hum (4)**
    39:14;96:3;148:22;
    175:23
**unclear (1)**
    116:23
**uncomfortable (1)**
    177:12
**under (19)**
    42:5;51:14;77:9,10;
    82:17;85:7;86:16,18;
    100:9;101:4;103:21;
    104:2;134:25;144:8;
    145:5;156:24;176:10,
    11;179:4
**underground (3)**
    156:23;157:2,4
**underpaid (1)**
    131:19
**understands (1)**
    143:23
**understood (11)**
    42:8;45:2;54:1,10;
    59:24;64:10,23,24;
    69:12,22;153:8
**uneven (1)**
    158:9
**unfair (4)**
    147:24;178:6;179:8,
    11
**Unicon (5)**
    75:4;152:21;169:25;
    172:20,25
**Unicon's (1)**
    170:3
**UNISON (1)**
    4:4
**unit (1)**
    52:13
**United (5)**
    8:17,19;9:18;10:10,
    14
**unless (1)**
    106:10
**Unlike (1)**
    107:8
**unrealistic (2)**
    43:25;44:1

**unrestricted (1)**
    11:22
**unsigned (2)**
    138:5,6
**unwilling (1)**
    147:23
**up (65)**
    5:25;6:11;9:16;
    13:22,25;14:4,11;15:3;
    23:25;26:14,15;27:3,
    11;51:23;52:3,4,6;
    74:19;75:9;76:10;
    80:24,24;81:14;85:12;
    86:6;87:5;89:18;91:23;
    93:6,7;95:7;96:7;
    101:22;110:6;125:7;
    127:10;128:25;129:24;
    130:9;137:11;138:10;
    141:16,18;144:22;
    146:21;149:22;154:16;
    156:16;158:13;161:16;
    166:20;169:16;170:14;
    171:8,21;172:6,9,11,
    18,24;173:4,19;174:7,
    9;176:17
**updating (1)**
    56:6
**upgrades (3)**
    119:21,25;120:3
**upon (7)**
    15:17;43:13;51:3;
    57:7;65:12;108:16;
    119:1
**use (19)**
    18:23;19:1;25:20;
    31:8;58:5;68:6;78:21,
    23;102:16,19,19;103:5,
    6;120:8;130:22;152:4;
    155:12;160:22;162:7
**used (13)**
    6:4;24:5;53:11,24;
    58:15;68:13;75:21;
    81:4;97:9;106:3,19;
    121:1;152:20
**uses (1)**
    157:12
**using (12)**
    14:5,6;17:18;24:7;
    32:24;35:2;75:25;76:6,
    10;119:5;121:7;148:9
**usually (18)**
    25:2;58:10;88:10;
    103:3,8;121:9;122:15;
    129:18,19;130:7;
    131:3,9,9;133:16,23;
    134:2;157:6;158:9
**utilize (5)**
    16:4,9;17:7;25:24;
    58:13
**utilizing (1)**
    33:2

## V

**V&D (5)**
    152:14,16,17;
    170:17;173:22
**Vadim (6)**
    4:8,20;7:12,21;8:6;
    167:24
**Varied (1)**
    19:13
**various (1)**
    77:4
**vary (1)**
    19:12
**vendor (2)**
    118:14,18
**vendors (3)**
    97:10;120:13;174:1
**venture (1)**
    89:22
**verbal (2)**
    126:13;127:4
**verbally (1)**
    126:14
**verification (1)**
    146:5
**verify (4)**
    15:17,21;19:14;
    97:14
**VERSA-LOK (3)**
    102:13,13,15
**version (2)**
    67:15;93:8
**versions (1)**
    68:12
**versus (1)**
    160:22
**view (1)**
    179:11
**Viktor (1)**
    170:20
**virtually (1)**
    119:10

## W

**Wait (8)**
    39:1;56:23;130:2;
    133:20;135:13;139:1;
    152:22;172:9
**waiting (1)**
    170:6
**waive (8)**
    90:19,22,24;91:2;
    147:20,23;150:10,16
**waived (1)**
    141:9
**walk (4)**
    51:10;142:20;143:6,
    8
**wall (3)**
    100:21;103:1,3

**walls (7)**
    44:23;99:25;102:7,
    14;103:1,20;159:3
**wants (5)**
    66:1,2,3,5,7
**warranty (7)**
    153:12,16,19;154:5,
    9,11,12
**water (4)**
    44:21;100:22;
    101:10,19
**waterproofing (2)**
    100:24;101:4
**way (5)**
    17:17;39:17;125:9;
    128:6;146:18;178:3
**ways (2)**
    68:11;179:4
**Webb (1)**
    14:24
**week (16)**
    10:20;18:4;19:10,11,
    12,12,13,13;20:7;21:7,
    9;31:21;50:1;119:14;
    122:1;130:18
**weekends (1)**
    10:16
**weeks (2)**
    175:22;179:24
**weren't (3)**
    49:14;102:8;145:6
**what's (16)**
    17:25;20:11;36:6;
    64:8;80:25;105:17;
    112:2;122:20;125:2;
    126:8;131:5;135:3;
    141:5;158:11;163:13;
    173:9
**whenever (1)**
    34:14
**Whereas (1)**
    155:4
**wherever (1)**
    84:15
**whole (10)**
    57:4;74:8,8;76:14;
    77:24;137:25;159:8;
    164:12;174:20;176:5
**who's (2)**
    6:24;167:3
**wife (2)**
    120:17;133:3
**win (1)**
    170:10
**winter (4)**
    110:14;115:18,18;
    117:3
**wires (1)**
    157:8
**wiring (4)**
    157:3,11,16,21
**withdraw (1)**
    117:9

**within (1)**
    43:20
**without (2)**
    85:1;118:2
**witness (26)**
    5:7;7:2;19:24;20:1;
    27:22;30:7;33:20;34:2,
    4,6,16,18,21,24;86:24;
    112:7;145:17;153:24;
    154:2;175:23;176:2,8,
    14;178:7,9,11
**witnesses (1)**
    177:3,4
**wood (5)**
    73:7,9;118:9
**word (1)**
    33:18
**words (9)**
    20:24;49:4;70:10;
    118:9;123:11;124:13;
    126:24;139:2;178:21
**work (55)**
    10:18;11:3,4,16;
    12:6,15;14:11,16,18;
    20:17,17;21:11,20;
    23:17,22,23;24:23;
    45:9;50:19;51:11,16;
    56:7;59:21;60:6;71:12;
    77:2;97:1,4,11,20,23,
    24;98:21;100:2;101:3,
    3,14;103:17,19,20,24;
    104:2;105:3;112:19;
    114:9;115:18;118:5,
    13;134:25;153:12,15;
    156:10;157:7;173:1;
    175:16
**worked (8)**
    10:13;11:6;14:21;
    15:25;19:4;102:1;
    121:2;152:6
**working (8)**
    10:25;28:5;32:6;
    76:3;92:2;121:9,12;
    170:7
**works (2)**
    7:6;33:22
**world (1)**
    12:10
**worried (3)**
    166:5;178:20,21
**worry (5)**
    36:16,18;91:10;
    106:22;126:17;178:22
**worst (1)**
    109:9
**write (3)**
    22:22;30:19,22;
    144:17
**writing (1)**
    109:5
**written (2)**
    121:19,21
**wrong (1)**

eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net

Case 16-01120    Doc 347    Filed 06/04/19    Entered 06/04/19 13:09:50    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 199 of 200

May 15, 2019

131:9
**wrote (1)**
167:1

## Y

**yard (2)**
44:21;103:9
**Yarmouth (2)**
154:24;155:2
**year (5)**
15:24;27:3;31:19;
39:13;97:1
**years (14)**
11:24;13:4;34:18;
36:18;58:17;118:6;
121:6,18;122:15;
150:15;152:7;156:10;
167:14;170:7
**Yep (3)**
95:13;132:9;176:18

## Z

**zero (1)**
143:11
**Zhukovskiy (18)**
55:3;56:10,14;57:17,
20;58:4,8;59:4,8,10,14,
21,24;60:7,11;63:4;
66:13;143:4
**zoning (4)**
42:2,3,5;43:6

## 0

**01281 (1)**
114:5
**01282 (1)**
114:5
**01283 (1)**
114:5

## 1

**1 (6)**
6:10;81:25;96:14;
108:4;149:11;162:4
**1.3 (1)**
160:4
**1.6 (2)**
89:7,20
**10 (11)**
41:6;42:2;48:10,11,
18;51:10,13;130:6;
154:24;155:1;169:3
**10,000 (9)**
155:14,22;156:8,8,
16;157:24;159:13,13,
23
**10/29/2013 (1)**
130:15
**10:02 (1)**

165:4
**100 (1)**
156:24
**1014 (1)**
127:16
**11 (1)**
100:13
**11:12 (1)**
107:16
**11:34 (1)**
107:17
**1281 (2)**
113:15,21
**1284 (2)**
113:15;115:11
**12th (1)**
167:5
**13 (1)**
130:6
**1302 (1)**
116:8
**1303 (1)**
116:8
**14,500 (1)**
170:18
**15 (4)**
67:17,19;173:7,14
**15- (1)**
134:3
**150 (1)**
156:24
**15-13881 (1)**
4:5
**16 (1)**
101:7
**16-1120 (1)**
4:10
**167 (1)**
4:6
**17 (2)**
101:10;169:12
**17- (1)**
108:15
**1700 (1)**
155:22
**174 (9)**
32:12;75:1;78:15;
108:15;111:20,23;
112:12;113:2;131:25
**175 (6)**
32:12;108:19;
131:25;169:7,9;174:2
**17th (1)**
5:8
**18th (1)**
5:8
**1987 (1)**
9:10
**1990 (1)**
9:10
**1995 (4)**
8:18;9:19,21;10:7
**1997 (2)**

12:9,10

## 2

**2 (7)**
8:10;83:1;96:14;
112:3;113:13;150:19;
177:20
**2,500 (1)**
155:16
**200 (4)**
160:16,17,20,22
**2011 (1)**
15:4
**2012 (6)**
15:5;33:1,5;34:10;
40:13;54:14
**2013 (11)**
16:4,7;54:14;75:22;
81:25;86:21;92:1,16,
19;96:18;105:5
**2014 (6)**
21:24;29:22;76:2;
166:13,17;167:5
**2015 (37)**
29:20,24;38:20;
40:14;70:9;110:11,14;
123:10;125:22;136:22;
137:5;139:6,6,12;
144:19;164:4;165:4;
166:3,3;167:22;168:5,
14,17;169:3,20;
170:16;171:10,24;
172:3,14,21;173:7,14,
21;174:1,3,18
**2016 (4)**
149:12;150:9;
151:14;167:7
**2018 (1)**
35:14,17;37:9
**2019 (1)**
54:13
**20x40 (1)**
158:2
**21 (2)**
102:24;167:11
**214 (1)**
124:9
**215 (5)**
91:23;94:19,21,25;
95:22
**216 (2)**
124:16;125:8
**2-1-6 (1)**
125:14
**217 (1)**
124:9
**22 (1)**
103:12
**229 (1)**
129:1
**23 (1)**
103:13

**23,000 (4)**
173:7,8,13,16
**230 (1)**
130:10
**231 (2)**
124:16;125:25
**235 (2)**
124:16;127:1
**238 (2)**
124:17;127:10,11
**239 (2)**
124:17;128:5
**23rd (2)**
167:21;168:5
**24 (1)**
103:13
**24,500 (1)**
173:21
**240 (1)**
124:9
**24th (1)**
166:3
**24x12 (1)**
99:24
**25 (1)**
168:14
**250,000 (2)**
66:6;140:10
**2500 (1)**
158:1
**258 (1)**
124:17
**25th (3)**
110:10;137:14;164:4
**26 (1)**
103:14
**260 (2)**
163:22;168:11
**261 (1)**
168:8
**263 (1)**
138:11
**266 (3)**
137:11;163:23;164:2
**2-6-6 (1)**
163:24
**268 (2)**
164:24;165:1
**27 (1)**
103:15
**274 (1)**
32:12
**275 (1)**
32:12
**28 (1)**
103:15
**28th (16)**
165:4;168:17;169:3,
20;170:16;171:10,24;
172:3,6,14,21;173:6,
21;174:1,3,18
**29 (1)**
103:15

## 3

**3 (1)**
96:14
**30,000 (3)**
122:13;169:25;
172:23
**315 (2)**
124:4,7
**326 (9)**
78:8;80:5,6,24;81:7;
82:17,20;112:25;113:1
**327 (6)**
105:19,20,21;
112:23,24;115:4
**328 (4)**
111:7,11,13;116:20
**3-2-8 (1)**
111:12
**329 (5)**
114:25;115:5,6,7,8
**330 (3)**
115:25;116:2,3
**35,000 (2)**
172:20,24
**36 (3)**
85:11,12;95:4
**37 (3)**
86:6;95:15,18
**39 (1)**
111:23
**3rd (2)**
149:12;150:9

## 4

**4 (2)**
96:15;150:17
**4,250 (1)**
172:3
**4.5 (1)**
45:16
**40 (2)**
115:10;170:13
**400 (6)**
156:23;157:4;
160:16,17,19,22
**42815 (1)**
169:25
**43,000 (2)**
159:19,20
**43700 (2)**
113:13;116:8
**44 (4)**
165:17,20;167:18;
171:7
**45 (1)**
166:20
**45,000 (2)**
158:20
**4500 (1)**
158:21

**47 (6)**
113:3,7,18,24;
115:10;171:21
**48 (9)**
78:11;79:18,22;
80:24,25;81:3,13;
82:25;96:8
**4-8 (2)**
79:20,21
**49 (2)**
149:14;150:18

## 5

**5 (1)**
149:14
**5.199 (1)**
146:24
**5.25 (1)**
147:1
**50 (4)**
116:5;144:24,25;
154:17
**5-1/2 (1)**
160:5
**55 (18)**
137:4;154:23;155:1,
13,14,25;157:2,11;
158:20,24;159:12;
160:2,4;161:2;163:17;
165:9;169:21;171:11
**57 (1)**
172:10
**5800 (1)**
155:23
**59 (2)**
172:8,17

## 6

**6 (2)**
83:1;99:23
**61 (1)**
173:3
**610-1276 (2)**
75:21;76:7
**617- (1)**
75:20
**65,000 (3)**
156:12;157:1;172:25
**6500 (1)**
156:25

## 7

**7 (4)**
87:6,6;158:1,1
**7,000 (1)**
155:15
**7.1.2 (1)**
90:4
**7.1.3 (1)**
90:6

**7.1.4 (1)**
90:8
**71 (2)**
160:11,13
**75,000 (1)**
156:12
**77 (3)**
41:12,15;42:10
**7th (5)**
123:17;144:19;
162:13;163:14;166:3

## 8

**8 (2)**
4:6;112:3
**80 (1)**
173:18
**8400 (2)**
155:17,21
**88 (4)**
154:23;155:1;161:2;
166:16

## 9

**9 (1)**
4:7
**9:17 (1)**
4:1
**9:53 (1)**
137:14
**97 (1)**
12:9
**9-foot (1)**
99:24