## UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS - EASTERN DIVISION

```
============================= .
IN THE MATTER OF:            . Case #15-13881
                             .
LYMAN-CUTLER, LLC            .
                             . Boston, Massachusetts
                             . Monday, June 17, 2019
     Debtor.                 . 9:11 a.m.
============================= .
LYMAN-CUTLER, LLC, ALEX      . Adv. Proc. 16-01120
FILIPPOV and NICKOLAY        .
LIPETSKER,                   .
                             .
     Plaintiffs/Counterclaim .
Defendants,                  .
v.                           .
                             .
VADIM KAGAN, TATIANA KAGAN,  .
KAGAN DEVELOPMENT KDC, CORP. .
and PROEXCAVATION CORP.,     .
                             .
     Defendants/Counterclaim .
Plaintiffs.                  .
=============================
```

### TRANSCRIPT OF TRIAL, DAY 9, ON:
#### #167 OBJECTION TO CLAIM 9 OF CLAIMANT ALEX FILIPPOV FILED BY INTERESTED PARTIES TATIANA KAGAN, VADIM KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.
#### #1 COMPLAINT BY LYMAN-CUTLER, LLC AGAINST VADIM KAGAN, TATIANA KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.

### BEFORE THE HONORABLE FRANK J. BAILEY

APPEARANCES:

For the Debtor:
PETER N. TAMPOSI, ESQ.
The Tamposi Law Group, P.C.
159 Main Street
Nashua, NH 03060

For Alex Filippov and Nickolay Lipetsker:
SEAN T. CARNATHAN, ESQ.
O'Connor, Carnathan and Mack, LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01803



<u>For the Defendants:</u>                  JOHN H. PERTEN, ESQ.
                                           Sheehan Phinney
                                           255 State Street
                                           5th Floor
                                           Boston, MA 02109

                                           JAMES P. HARRIS, ESQ.
                                           Sheehan Phinney
                                           1000 Elm Street
                                           17th Floor
                                           Manchester, NH 03105


        Electronic Sound Recording Operator:   ELIZABETH LOMBARD


         Proceedings Recorded by Electronic Sound Recording
        Transcript Produced by Certified Transcription Service
                          eScribers, LLC
                 7227 N. 16th Street, Suite #207
                        Phoenix, AZ 85020
              973-406-2250; operations@escribers.net

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| **For the Defendants:** | | | | | |
| VADIM KAGAN | | | | | |
| (By Mr. Carnathan) | | 10 | | 117 | |
| (By Mr. Perten) | | | 112 | | |
| | | | | | |
| JASON GORDON | | | | | |
| (By Mr. Harris) | 119 | | 188 | | |
| (By Mr. Carnathan) | | 163 | | 191 | |
| | | | | | |
| DANIEL GERSH | | | | | |
| (By Mr. Perten) | 194 | | | | |

| EXHIBITS: | DESCRIPTION | I.D. | EVID. |
|---|---|---|---|
| **For Defendants:** | | | |
| 111 | 10 Lyman Road LLC Agreement | 29 | |
| 281 | Copy of lawsuit Mr. Kagan filed to enforce his mechanic's lien | | 116 |
| | | | |
| **For the Plaintiffs:** | | | |
| N | LLC agreement for 40 Druid | 35 | |
| O | LLC agreement for 73 Fuller | 35 | |
| P | LLC agreement for 80 Dorcar Road | 35 | |
| Q | LLC agreement for 104 Dorcar Road | 35 | |
| R | LLC agreement for 143 Florence | 35 | |
| 331 | 5 LLC agreements (previously marked as N-R) | | 40 |
| S | Permit application for demolition at 77 Lyman Road | 51 | |



| | | | |
|---|---|---|---|
| T | Building permit for 55 Lyman Road | 52 | |
| 332 | Building permit for 55 Lyman Road (was Exhibit T) | | 55 |
| U | 88 Cutler building permit packet | 56 | |
| 333 | 88 Cutler building permit packet (was Exhibit U) | | 87 |
| V | Packet of emails from Vadim Kagan's email account | 98 | |
| W | Packet of emails from Vadim Kagan's email account | 99 | |
| X | Emails from Vadim Kagan's Email account | 102 | |
| 334 | Packet of emails from Vadim Kagan's email account (was Exhibit V) | | 106 |
| 335 | Packet of emails from Vadim Kagan's email Account (was Exhibit W) | | 106 |
| 336 | Emails from Vadim Kagan's email account (was Exhibit X) | | 106 |
| 337 | 6/9/15 affidavit of Vadim Kagan | | 112 |
| 143 | General ledger for KDC for 2014 | | 128 |
| 148 | ProEx general ledger for 2014 | | 129 |
| 304 | Proposed adjusting entries provided to KDC at the end of the year | | 149 |
| 305 | Adjusted client trial balance | | 152 |
| 306 | Adjusted trial balance of KDC for year 2015 | | 154 |
| 149 | general ledger from ProExcavation as of June 30th, 2015 | | 176 |
| 85 | ProExcavation AR summary as of December 31, 2015 | | 177 |
| 86 | Gordon work papers | | 179 |



| 82 | KDC Corp. AR aging summary as of December 31, 2014 | 180 |
| 83 | AR aging summary for KDC as of December 31, 2015 | 181 |
| 137 | ProExcavation Corp. 2013 tax return | 183 |
| 131 | Various documents | 183 |
| Z | Email exchange | 184 |
| 136 | Amended 2016 tax return for KDC | 187 |

```
 1    (At 9:11 a.m.)

 2              THE CLERK:  Court is now in session.

 3              THE COURT:  Good morning.  Be seated, please.

 4              THE CLERK:  This is adversary proceeding 16-1120,

 5    Lyman-Cutler, LLC v. Kagan, et al.  This is trial day 9.  And

 6    also case 15-13881 Lyman-Cutler, LLC, trial day 9 regarding

 7    167 objection to claim 9.

 8              Will the parties please state their names for the

 9    record?

10              MR. CARNATHAN:  Good morning, Your Honor.  Sean

11    Carnathan for Alex Filippov and Nickolay Lipetsker.

12              MR. TAMPOSI:  Good morning, Your Honor.  Peter

13    Tamposi for the debtor.

14              MR. PERTEN:  Good morning, Your Honor.  John Perten

15    for Vadim Kagan, Tatiana Kagan, ProExcavation Corp. and Kagan

16    Development KDC, Corp.

17              MR. HARRIS:  Good morning, Your Honor.  James Harris

18    for the same parties.

19              THE COURT:  Okay.  Good morning, everyone.  Anything

20    by way of housekeeping?

21              MR. PERTEN:  Only to give the Court, sort of, a heads

22    up of coming attractions.  I thought that might --

23              THE COURT:  Thank you.

24              MR. PERTEN:  -- assist the Court in planning.  This

25    morning we have the resumption of the cross-examination of Mr.
```

1   Kagan by Mr. Carnathan.  Mr. Carnathan advised me that he'll

2   probably go a couple of hours at least.  So that'll probably

3   take us at least close to the morning break, if not, I

4   suspect, it'll flop into the early afternoon.

5        After that we have Jason Gordon, who is the outside

6   CPA, who will testify, and my best guesstimate is will go an

7   hour'ish, and I'm sure Mr. Carnathan -- so that'll take us

8   close to the end of the day.

9        THE COURT:  Right.

10        MR. PERTEN:  I also have Dan Gersh, who is Kagan's

11   CFO, on deck, although it may not make sense to start him,

12   depending on what time we are, because tomorrow we're, sort

13   of, fixed in terms of time.

14        Tomorrow we have six subcontractors coming through,

15   because, if you recall, there were objections to authenticity

16   on some of the invoices, so we've had to call these subs to

17   come in.  I suspect each of those subs will be fifteen, twenty

18   minutes to basically this is my invoice, and I did the work,

19   and I should get paid.  That's what I anticipate the summation

20   of their testimony will be.  But that'll essentially take the

21   morning.

22        And then we have Mr. Maiden, the outside attorney,

23   who was part of plaintiffs' case-in-chief, but he's taken out

24   of order.  So those are, sort of, fixed for tomorrow.  And

25   again, depending where we are, either we slot in Dan Gersh at

1    that point or not.

2              THE COURT:  Well, let me -- yes.

3              MR. PERTEN:  And then when we resume, depending on

4    where we are, we may have nobody for the Monday or very short.

5    Maybe that's when we put Gersh in, because on the Tuesday, as

6    we had advised the Court, the experts, Mr. Von Salmi will be

7    back from vacation, so Tuesday's lineup will be Von Salmi

8    followed by whatever cross-examination.  Then they will be

9    calling Mr. Doddridge as a rebuttal, and we'll be calling Mr.

10   Von Salmi back, if you will, to rebut Doddridge.

11             THE COURT:  Okay.

12             MR. PERTEN:  So I'm cautiously optimistic that we may

13   actually finish in the scheduled time, but in any event, that

14   is the coming attractions, if you will, of where we are.

15             THE COURT:  All right.  Anything on the schedule?

16             MR. CARNATHAN:  Not from me, Your Honor.

17             THE COURT:  All right.  Let me give you a heads up on

18   what today and tomorrow look like, maybe next week as well.

19   So hold on one second.

20             Today I have calls at 1, so we'll take the lunch

21   break at a little before 1.  That call will go an hour, but

22   I'm not going to stay on it for an hour.  It's a committee,

23   and I'll just need to go make my report, so we won't take --

24   we won't probably take an -- we won't take an hour for lunch.

25   But I also have a call at 4:30, so we will end at about 4:20

#15-13881; Adv. #16-01120          escribers          6-17-2019

1    today.

2           Tomorrow we'll go virtually all day, but I need to

3    leave here at -- I shouldn't say all day.  I need to leave

4    here tomorrow at, say, 3:30, all right?  So we'll finish

5    tomorrow at 3:30.

6           I don't know if that affects your thinking about who

7    you're going to call, but that's what I'm, sort of, locked

8    into.

9           It does seem a little wasteful to have all these

10   folks come in just for authentication purposes.  Is it more

11   than that, or is it just that?

12          MR. CARNATHAN:  Well, I certainly have some ideas for

13   things that I'd like to ask them about, Your Honor.

14          THE COURT:  Okay.  So it's more than that.  If it

15   were simply is this what it purports to be, but of course

16   that's contested, isn't it?  Okay.  All right.  Okay.  Your

17   case, so I understand the issues.

18          Okay.  Anything else?  All right.  Let's get back to

19   it.

20          Okay.  So it's been a long time since you were last

21   here.  You know what, Mary?  Why don't you administer the oath

22   again?  It's been long enough.

23                      VADIM KAGAN SWORN

24          THE COURT:  Okay.  All right.  Well, we'll get

25   started.

VADIM KAGAN - Cross

```
1                    RESUMED CROSS-EXAMINATION

2    BY MR. CARNATHAN:

3         Q.   Good morning, Mr. Kagan.

4    A.   Good morning.

5         Q.   Sir, is there anything from the last time that you

6    testified that you'd like to correct here now before we start?

7    A.   No.

8         Q.   Have you spoken to anybody about your testimony

9    since the last time you testified, sir?

10   A.   No.

11        Q.   All right.  I guess I'd like to rewind us to, sort

12   of, the beginning of the project, if you would.  You'll agree

13   with me, sir, that the Lyman-Cutler project was your idea?

14   A.   No.

15        Q.   You didn't identify the opportunity to build homes

16   at the lot at 77 Lyman?

17   A.   I said they had land available, and Mr. Lipetsker said

18   I -- we are interesting in it, and let me find somebody, and

19   I'll see what we can do about it.

20        Q.   Well, didn't you tell us last time, sir, that you

21   had identified the opportunity and were looking for partners

22   to do the project with you?

23   A.   I also said this.

24        Q.   I'm sorry.  I didn't understand your answer.

25   A.   I also say that.  It's always the opportunity, is what I
```

VADIM KAGAN - Cross

1    said.

2         Q.   And you approach Mr. Lipetsker because you needed an

3    investor in the project; isn't that right, sir?

4    A.   Mr. Lipetsker offer me this first, because I said to Mr.

5    Lipetsker, I cannot do this project.  It's too big for me.

6    And he said -- and he said he is very interesting, and let me

7    find somebody.

8         MR. CARNATHAN:  If I could just ask you to keep your

9    voice up?  I'm really struggling to follow your answers.

10        THE COURT:  Just pull the microphone closer to

11   yourself.  You can sit comfortably.  And if you're going to be

12   looking at counsel, which is normal, you can move that

13   microphone to your right a little bit, perhaps, so that it's

14   between you and counsel.  Okay?

15        THE WITNESS:  Okay.

16        THE COURT:  All right.  You'll hear it amplify the

17   way my voice is amplifying now.  That'll help everyone hear

18   you.  Because I agree.  I'm having a little difficulty.

19        THE WITNESS:  Okay.

20        MR. CARNATHAN:  Yes.  Thank you, sir.

21   BY MR. CARNATHAN:

22        Q.   And I apologize, because I really didn't understand

23   what you said.  Are we in agreement that you approached

24   Lipetsker looking for an investor in the Lyman-Cutler project?

25   A.   No.

VADIM KAGAN - Cross

1    Q.   Were not?

2    A.   Were not.

3    Q.   You didn't go to Mr. Lipetsker and say that you

4    needed an investor in the project?

5    A.   No.

6    Q.   So how did you first become involved with Mr.

7    Lipetsker and Mr. Filippov on the Lyman-Cutler project, sir?

8    A.   Mr. Lipetsker was in 10 Lyman.  That was the project we

9    doing at that time.  And he drove by on the street, and he

10   said there's a sign there.  You know, it's something for

11   sale.  I said, yes, it's a house for sale.

12   Q.   And so it was Mr. Lipetsker's idea to invest in 77

13   Lyman?

14   A.   Basically yes.

15   Q.   And then Mr. Lipetsker introduced you to Filippov,

16   right?

17   A.   Yes.

18   Q.   So it's your testimony that you were not looking for

19   an investor to do this Lyman-Cutler project; is that right,

20   sir?

21   A.   It's what I said to Mr. Lipetsker.  If you are

22   interesting, and if you can find somebody who can purchase

23   this project, I can build it for you guys.  This was the

24   conversation.

25        MR. CARNATHAN:  Can I have the transcript from the

VADIM KAGAN - Cross

1    last sentence?

2                              (Pause)

3              MR. CARNATHAN:  May I approach the witness, Your

4    Honor?

5              THE COURT:  Yes, you may.

6    BY MR. CARNATHAN:

7         Q.   So Mr. Kagan, I'd just like to direct your attention

8    to page 46 of the transcript of the first day that you

9    testified at trial.  And at the top of page 46 Mr. Perten

10   asked you:

11        "Q. And you had an accepted offer for four million; is

12   that correct?

13   "A.  Yes.

14        "Q. Now, where you planning on building and owning this

15   project yourself, or were you going to seek outside partners?

16   "A.  I have to seek only outside partners.

17        "Q.  And how did you go about finding outside partners?

18   "A.  On this particular project?"

19        And then you said -- I'm skipping down a couple of lines.

20   "A.  I spoke with Nick (ph.) Lipetsker because he was my

21   partner in another few projects in the time."

22        Have I read that correctly?

23   A.   Yes, I speak with Nick Lipetsker.

24        Q.   Okay.  But you're now saying that Mr. Lipetsker came

25   to you and proposed to do the project?



VADIM KAGAN - Cross

1   A.   Yes.

2        Q.   And so then you would agree that Mr. Lipetsker

3   introduced you to Mr. Filippov, right, sir?

4   A.   Yes.

5        Q.   Okay.  And that was in order to get money to invest

6   in the project, right?

7   A.   Yes.

8        Q.   And am I right that you initially had a meeting at

9   the site at 10 Lyman, right?

10  A.   With who?

11       Q.   The three of you.  Lipetsker, Filippov and you,

12  right?

13  A.   After this conversation, yes, we have a meeting.

14       Q.   Okay.  And then after that you had a couple of

15  meetings at Boris Maiden's office, right?

16  A.   Yes.

17       Q.   And at that point you told Filippov that you didn't

18  have any plans, right?

19  A.   I don't have any plans.

20       Q.   No plans for the house, no budget?

21  A.   No.

22       Q.   And yet Filippov was still willing to put $2 million

23  into the project; is that right, sir?

24  A.   Yes.

25       Q.   And we talked a little bit last time about that

VADIM KAGAN - Cross

1   presentation that was made, if you will, at the meeting at

2   Boris Maiden's office.

3           MR. CARNATHAN:  It's Trial Exhibit 9, Mr. Hartzell

4   BY MR. CARNATHAN:

5       Q.   Now, am I right, Mr. Kagan, that you deny that this

6   is your document, right, sir?

7   A.   It's not my document.

8       Q.   Okay.

9           MR. CARNATHAN:  And if we look at page 3?  And

10  perhaps blow up the left-hand column, the "Project Scenario

11  and Assumptions".

12  BY MR. CARNATHAN:

13      Q.   You see about halfway down there's a construction

14  budget there of $1.3 million.  You see that, sir?

15  A.   Yes.

16      Q.   Am I right that you also deny that that's your

17  number?

18  A.   It's not my number.

19      Q.   So you never provided a construction budget number

20  in October 2012; is that right, sir?

21  A.   I provide number 1.6.

22      Q.   I'm sorry.  I didn't understand.

23  A.   I provide number at this meeting, 1.550, I believe, or

24  1.6.  This is just the template.

25      Q.   Right.  Well, what I'm proposing to you, sir, is

VADIM KAGAN - Cross

1  that you were the contractor, right?

2  A.    Yes.

3       Q.    You're the builder?

4  A.    Yeah.

5       Q.    You had built, I think you said twenty-five or

6  thirty homes in the area at that point?

7  A.    Yes.

8       Q.    And you're meeting with two potential investors in

9  the project, right?

10  A.    Yes.

11       Q.    And Mr. Filippov's a telecom executive, right?  He

12  sells, like, SIM cards or something along those lines.

13  A.    I don't know what he sells.

14       Q.    You don't even know what business he's in?

15  A.    No.

16       Q.    He's certainly not a contractor, is he, sir?

17  A.    No.

18       Q.    And Mr. Lipetsker's a dentist, right?

19  A.    Yes.

20       Q.    And Mr. Zhukovskiy's an actuary, right?

21  A.    Yes.

22       Q.    And it's your testimony that they were presenting

23  the $1.3 million budget to you; is that right?

24  A.    It was Mr. Zhukovskiy presenting this to us.

25       Q.    And so they were suggesting to you that they could

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Cross

1    build the house, or you could build the house for 1.3 million.

2    Is that what you're saying?

3    A.    I said 1.6.

4        Q.    Well, eventually you got to 1.6.  I'm still in

5    October 2012, and this says 1.3, right, sir?

6    A.    This says 1.3.

7        Q.    And do I remember right, at your deposition you told

8    me that when they proposed that to you you said it was a

9    laughable number?  Do you remember that?

10   A.    Yes.

11       Q.    So 1.3 million was a laughable figure to build these

12   houses?

13   A.    Yes.

14       Q.    And you told them that at the October 25, 2012

15   meeting, right?

16   A.    Yes.

17       Q.    And so by the end of the meeting we had a number

18   that you had described as laughable for the construction

19   budget, right, sir?

20   A.    We didn't agree on any number at this meeting.

21       Q.    Right.  At the end of the meeting you had no

22   construction budget at all.  That was your previous testimony,

23   right, sir?

24   A.    We have approximately budget build each home for 1.6,

25   because we don't have a plans.  We don't have anything.  We

VADIM KAGAN - Cross

1    just talking.

2         Q.   Well, that was in 2013 you got to to 1.6, wasn't it,

3    sir?

4    A.   I think we have, like, 1.5, 1.550.

5                          (Pause)

6         Q.   So if we look back at your testimony from day one at

7    page 62.  It's on about a third of the way down the page.  And

8    Mr. Perten said:

9         "Q.   There's been testimony to the effect that you

10   assured everybody that the construction costs would be $1.3

11   million.  At any point at that meeting, did you assure anybody

12   that the construction costs would not exceed $1.3 million?

13   "A.   It's a very interesting testimony. I never say this

14   because I cannot say how much it's going to be cost to build

15   the homes if I don't know what I'm doing.

16        "Q. So you did not say that?

17   "A.   Absolutely, I didn't say that.

18        "Q. Because you didn't have house plans, you don't know

19   what you were going to be building?

20   "A.   I don't -- I don't have anything."

21        Have I read that correctly?

22   A.   Yes.

23        Q.   So if I understood you right on the first day that

24   you testified, your testimony was that at the October 2012

25   meeting you had no budget.  Did I get that wrong?



VADIM KAGAN - Cross

1    A.    We have no budget.

2         Q.    And you had no plans, right?

3    A.    We have no plans, no budget.

4         Q.    And yet when you left the meeting, Boris Maiden

5    started drafting the operating agreement, right?

6    A.    Yes.

7         Q.    And so Mr. Filippov was willing to sign an operating

8    agreement and put $2 million in the project with no plans and

9    no budget?

10   A.    Yes.

11        Q.    That was your testimony, right, sir?

12   A.    Yes.

13        Q.    Now, you did admit to having provided some kind of a

14   template to Mr. Zhukovskiy for the preparation of this

15   presentation, right?

16   A.    Yes.

17        Q.    And that's --

18             MR. CARNATHAN:   Could I have Exhibit 7?

19   BY MR. CARNATHAN:

20        Q.    And so it appears that on -- if we look at the

21   bottom of the first page -- on October 20, 2012 you forwarded

22   to Mr. Zhukovskiy a template with which to prepare the

23   document we looked at as Exhibit 9.   Do I have that right?

24   A.    Yes.

25        Q.    Okay.   And can you explain why you were doing that

VADIM KAGAN - Cross

 1    if the numbers were being presented to you by Filippov and

 2    Lipetsker?

 3    A.    Say again?

 4         Q.    Why are you sending a template to Mr. Zhukovskiy if

 5    the numbers are being presented to you by Filippov and

 6    Lipetsker?

 7    A.    I sent my template to Zhukovskiy to put the numbers in.

 8         Q.    Okay.

 9    A.    It's my template.  It's nothing to do what we just show

10    me before.

11         Q.    So it's just your template.  It's not your numbers.

12    A.    It's just my template.  I don't know what's this template

13    you talking about.  Can you open the template?

14              MR. CARNATHAN:  Could I have Exhibit 8 please?

15    BY MR. CARNATHAN:

16         Q.    Now, Exhibit 8 is Mr. Zhukovskiy, on October 23rd,

17    sending you a draft of the presentation to review before the

18    meeting; isn't that right, sir?

19    A.    He send this to everybody, and I didn't even open it.

20         Q.    Well, he sent it to you, right?

21    A.    Yeah.

22         Q.    And he sent it to Lipetsker?

23    A.    Yes.

24         Q.    And he sent it to Maiden?

25    A.    Yes.



VADIM KAGAN - Cross

1          Q.    But he didn't send it to Filippov, did he?

2     A.    He didn't.

3          Q.    Right.  And that's because you were making a

4     presentation to Mr. Filippov to get him to invest in your

5     project; isn't that right, sir?

6     A.    Absolutely not.

7          Q.    Okay.  So you leave the October meeting with no

8     budget and no plan, and Mr. Filippov's willing to put up $2

9     million and sign the operating agreement, right?

10    A.    We don't even know how much money we have to put in.

11         Q.    Right.  But we know that Filippov's going to put in

12    $2 million anyway, right?

13    A.    We don't know.

14         Q.    Did I understand you to testify, sir, that you

15    didn't know what you were going to build until you got the

16    bank loans?

17    A.    We know approximately what we going to build when we

18    purchase the property.

19         Q.    Well, if I understood your testimony before, you

20    claimed that you had no idea what you were going to build

21    until the town approved the subdivision of the lot, right?

22    A.    Yes.

23         Q.    And you had no idea what you were going to build

24    until you actually got the construction loan approved, right?

25    A.    Yes.

Page 22

VADIM KAGAN - Cross

1    Q.   And in fact, you claim that you developed the plans

2   after the construction loan was approved, right?

3   A.   No, before.

4    Q.   Before.  Right, because in order to get the

5   construction loan you had to submit plans to the bank, right?

6   A.   Yes.

7    Q.   And you had to submit a budget to the bank, right?

8   A.   Yes.

9    Q.   And so by the time you applied to the bank, you had

10   the $1.6 million budget for each home, right?

11   A.   Approximate, yeah.

12    Q.   Right.  And you actually had plans that you

13   submitted to the bank to get the loan, right?

14   A.   Yes.

15        MR. CARNATHAN:  Can I have Exhibit 27, please?

16   BY MR. CARNATHAN:

17    Q.   All right.  That's the budget you put together for

18   the bank, right, sir?

19   A.   Yes.

20                        (Pause)

21    Q.   Now, in fact, to get the 1.6 million construction

22   budget, there was quite a lot of analysis before that 1.6

23   million was agreed upon; isn't that right, sir?

24   A.   Yes.

25    Q.   And in fact, on April 13th Alex emailed you and said

VADIM KAGAN - Cross

1    let's stick to the original budget, right?

2         MR. CARNATHAN:   Can I have Exhibit 26?

3    BY MR. CARNATHAN:

4         Q.   Right.  And Exhibit 26 emails you -- Dima's you,

5    right?

6    A.   I think this is addressed to Zhukovskiy.

7         Q.   So you're saying that this email was not directed to

8    you, it was directed to Mr. Zhukovskiy?

9    A.   I think so.

10        Q.   Mr. Zhukovskiy wasn't part of the LLC, was he, sir?

11   A.   He is not.

12        Q.   He certainly wasn't the builder?

13   A.   He is not.

14        Q.   And Dima's a nickname that you go by, isn't it?

15   A.   Yeah, I am also Dima.

16        Q.   Right.  And so he says:

17   "Kolya, Borya and I discussed the issue of how much we

18   should loan from the bank.  All three of us agreed that we

19   should be going by the numbers we agreed when we formed the

20   LLC and apply for 1.5 million for each house:  1.3 million

21   construction and .2 million carrying costs.  We already

22   strayed away from the agreement when we took out $1.6 million

23   loan for the land instead of 1.5 million, as we originally

24   agreed to.  So let us try to stay the course of the original

25   deal."

VADIM KAGAN - Cross

1        Have I read that correctly?

2    A.   Yes, but I am not on this mail.

3        Q.   Well, the lymancutlerllc@gmail.com email includes

4    you as one of the recipients, right, sir?

5    A.   I am one of the recipients, but we always have a problem

6    with this email, because we cannot open the attachments.  This

7    is not my email address.  They not using this email address.

8        Q.   Are you saying you never got this email?

9    A.   No.

10       Q.   Never got an email like it?

11   A.   No.  Not this one.

12       Q.   No.  This is news to you?  You didn't know in April

13   2013 that Mr. Filippov thought the budget was 1.3 million for

14   construction and 200,000 for carrying costs?

15   A.   I just saying I was not on this email.

16       Q.   Well, would you agree that by April 2013 you knew

17   that the budget was 1.3 million for construction and 200,000

18   for carrying costs?

19   A.   We always talk about 1.5, 1.550.

20       Q.   Including the carrying costs, right?

21   A.   No.  1.5 is purely carrying costs.  Nothing to do with

22   carrying costs at all.

23       Q.   You actually knew that you were borrowing the

24   carrying costs as part of the construction loan, didn't you,

25   sir?

VADIM KAGAN - Cross

1    A.    No.

2         Q.    So you did testify the last time you testified that

3    you didn't know that you were borrowing the carrying costs.

4    You're sticking to that, right?

5    A.    Absolutely, yes.  We didn't borrow for anything for

6    carrying cost except 100,000 when Filippov asked in the bank

7    when we purchase the property.  100,000 was included in the

8    purchase price, but not in the construction loans.  Never was

9    the agreement.

10        Q.    All right.  So looking at this email, you actually

11   remember that the $1.6 million loan was taken out so you'd

12   have 100,000 for carrying costs, right, when you bought the

13   land.  Isn't that right, sir?

14   A.    When we bought the land, yes, 100,000 is included.

15        Q.    Okay.  But you're saying that didn't happen with the

16   construction loans?

17   A.    Absolutely not.

18        Q.    Okay.  And it was your testimony before that you

19   didn't read the operating agreement, right?

20   A.    Yes, I didn't read the --

21        Q.    Right.  And you didn't participate in the

22   negotiations about the operating agreement, right?

23   A.    No.

24        Q.    And you just relied totally on Boris and Maiden to

25   tell you what was in the operating agreement?

VADIM KAGAN - Cross

1    A.    Yes.

2         Q.    And Boris told you everything was good?

3    A.    Yup.

4         Q.    But he didn't tell you you were borrowing the

5    carrying costs?

6    A.    No.

7         Q.    Now, Mr. Maiden had formed quite a few other LLCs

8    for you over the years, hadn't he, sir?

9    A.    Yes.

10        Q.    I think you said something on the order of twenty or

11   thirty?

12   A.    Sounds about right.

13        Q.    And in fact, sir, you borrowed the carrying costs in

14   every deal you ever did with Mr. Maiden, didn't you, sir?

15   A.    No.

16            MR. CARNATHAN:   Can I have Exhibit 128, please?

17   BY MR. CARNATHAN:

18        Q.    Okay.  Do you remember doing the Deborah Road

19   project with Mark Kayserman, and you formed the LLC in May

20   2012.  You remember that, sir?

21   A.    Yes.

22        Q.    And this is a copy of the operating agreement from

23   that project, right, sir?

24   A.    Yes.

25            MR. CARNATHAN:   Could I have page 3, section 4.1,

VADIM KAGAN - Cross

1    please?

2    BY MR. CARNATHAN:

3         Q.   And section 4.1 says:

4         "Furthermore, a purchase money loan and construction loan

5    shall be taken from Rockland Trust to pay for construction and

6    carrying costs."

7         Have I read that correctly, sir?

8    A.   Yes.

9         Q.   So did you not understand you were borrowing the

10   carrying costs when you did the Deborah Road project, sir?

11   A.   What I am understand working with Rockland Trust for

12   fifteen years, because they financing a hundred percent of our

13   projects, before we get any loans we sign the commitment

14   letter for the bank saying money can use only for

15   construction.

16        Q.   Okay.

17   A.   This is what I am understand.

18        Q.   But what I'm asking you about is the LLC agreement,

19   whether you understood that you signed the LLC agreement

20   agreeing that you were borrowing the carrying costs?  Did you

21   know that when you signed this?

22   A.   When we signing the operating agreement it's very, very

23   far, usually before we start on any projects, before we start

24   building, and before we applying for the loan, and before we

25   getting the commitment letter.



VADIM KAGAN - Cross

1      Q.   So is it your testimony, sir, that you routinely

2   agreed to borrow the carrying costs with your investors but

3   then took out bank loans that didn't cover the carrying costs?

4   A.   Absolutely not.

5           MR. CARNATHAN:  Why don't we move onto Exhibit 111

6   for identification, please?

7   BY MR. CARNATHAN:

8      Q.   Now, in May 2012 you formed a project with Alexander

9   Fodymanow, correct, sir?

10  A.   Yes.

11     Q.   That's the 10 Lyman Road project, right, sir?

12  A.   Yes.

13     Q.   And that's a little -- that little VK in the bottom

14  left, that's your initials, right?

15  A.   Yes.

16          MR. CARNATHAN:  And if we go to the signature page?

17  BY MR. CARNATHAN:

18     Q.   That's your signature on that managing/manager line,

19  right, sir?

20  A.   Yes.

21          MR. CARNATHAN:  We would offer Plaintiffs' 111 for

22  identification into evidence, Your Honor.

23          MR. PERTEN:  Your Honor, we would object to this once

24  again, as this project has nothing to do with Lyman-Cutler.

25  It's another project.  It's another deal.  And we don't

VADIM KAGAN - Cross

1   believe it's admissible as no relevance to this case.

2           THE COURT:  All right.  And I've ruled on this issue

3   multiple times, have I not?  Have I not?

4           MR. PERTEN:  You have ruled --

5           MR. CARNATHAN:  You have.

6           MR. PERTEN:  -- on related issues, yes.

7           THE COURT:  No, no.  On this issues of other

8   projects, correct?

9           MR. PERTEN:  You have ruled that you will allow --

10  that you allowed him to discover other projects, and you have

11  ruled against us when we've raised similar objections in the

12  past.  And the Court instructed us that we should raise it

13  each time, and so I am doing that, Your Honor.

14          THE COURT:  Okay.  Overruled.

15     DEFENDANTS' EXHIBIT 111 WAS MARKED FOR IDENTIFICATION

16          MR. CARNATHAN:  Thank you, Your Honor.

17          Could I have again page 3 at section 4.1?  And if we

18  could blow that up so I can read it?

19  BY MR. CARNATHAN:

20      Q.   And again, in the 10 Lyman project it says:

21      "Furthermore, a purchase money loan and construction loan

22  shall be taken from Rockland Trust to pay for construction and

23  carrying costs and personally guaranteed only by Mr. Kagan."

24      Have I read that correctly?

25  A.   Yes.



Page 30

VADIM KAGAN - Cross

1    Q.   So again, in the 10 Lyman project you agree that you

2   were going to borrow the carrying costs, right?

3   A.   We are not.

4    Q.   You did not?

5   A.   No, we didn't borrow.

6    Q.   Okay.   Did you understand you were agreeing to do

7   that in the operating agreement?

8   A.   Yes, but we didn't borrow, because when the construction

9   budget what they prepared to bring, this soft cost was not

10  included there.   You allowed to do it, but we didn't use this

11  opportunity.

12   Q.   Okay.   So your testimony is now that you agreed to

13  borrow the carrying costs in the operating agreement, but you

14  didn't do it when you went to the bank; is that right?

15  A.   Well, we did -- we didn't.

16   Q.   All right.   Do you want to amend your testimony with

17  regard to the Lyman-Cutler project the same way?

18  A.   We didn't borrow carrying cost with any of our

19  construction loans, and we never did.

20   Q.   Did you understand that was the deal in the Lyman-

21  Cutler, LLC agreement, that you were going to borrow the

22  carrying costs?

23  A.   We didn't borrow the money for carrying costs when we

24  apply for the construction.

25   Q.   Well, I'm asking, sir, previously you testified you

VADIM KAGAN - Cross

1  didn't know that that was in the operating agreement.  I want

2  to know, are you now admitting that you did know it was in the

3  operating agreement?

4  A.   I didn't read that operating agreement.

5        MR. CARNATHAN:  Let's show him the next one then.

6  Could I have Exhibit 108?

7  BY MR. CARNATHAN:

8     Q.   Okay.  Exhibit 108 is the Cynthia Road operating

9  agreement, the deal that you did with Mr. Abramskiy and -- is

10 it Ms. (sic) Gassel -- I'm not sure -- in November 2012.  You

11 remember doing that project?

12 A.   Yes.

13        MR. CARNATHAN:  And if we look at page 3, paragraph

14 4.1?

15 BY MR. CARNATHAN:

16    Q.   It again says:

17    "Furthermore, a purchase money loan and construction loan

18 shall be taken from Rockland Trust to pay for construction and

19 carrying costs."

20    Do you see that, sir?

21 A.   Yes.

22    Q.   Did you read this one?

23 A.   I don't remember.

24    Q.   Did you know that you had agreed to borrow the

25 carrying costs of the Cynthia Road deal?



VADIM KAGAN - Cross

1   A.   We never agreeing.

2        Q.   I think you testified before that you knew that Mr.

3   Maiden had a standard form of documents that he used each

4   time, right, sir?

5   A.   Yes.

6        MR. CARNATHAN:   Can I have Exhibit 119, please?

7   BY MR. CARNATHAN:

8        Q.   You did a deal with Elena Lande and Yuriy Lande in

9   February '13 to develop 50 Yarmouth Road, right, sir?

10   A.   Yes.

11        MR. CARNATHAN:   And if we go to page 3, paragraph

12   4.1?

13   BY MR. CARNATHAN:

14        Q.   In this one it says:

15        "Furthermore, a purchase money loan and construction loan

16   shall be taken from Wellesley Bank to pay for construction and

17   carrying costs until the issuance of certificate of occupancy,

18   hereafter C.O., but in no event later than May 30, 2014."

19        Have I read that correctly?

20   A.   Yes.

21        Q.   Did you read this one when you did the deal with the

22   Landes?

23   A.   Actually, yes, I did.

24        Q.   Okay.   So you knew in this case that you were

25   borrowing the carrying costs?



VADIM KAGAN - Cross

1    A.    Yes, but we never did any deal with Wellesley Bank?  And

2    actually on Wellesley Bank, yes, you can't include your

3    carrying cost when you applying for the loan.  But we never

4    did.

5         Q.    So in this deal you knew you were borrowing the

6    carrying costs, and you did borrow them.  Is that what you're

7    saying?

8    A.    Yes, because you can't do this with Wellesley Bank, yes.

9              MR. CARNATHAN:  Can I have Exhibit A for

10   identification, please?  And if we go to page 3, section 4.1?

11             And I'm sorry.  I probably should have stopped at the

12   first page.  Let's go back to the first page.  I apologize.

13   BY MR. CARNATHAN:

14        Q.    In May 2012 you formed an LLC with Mr. Lipetsker,

15   your wife, and Mr. Zhukovskiy to do a project on Hyde Avenue,

16   right, sir?

17   A.    Yes.

18             MR. CARNATHAN:  And now if we go to page 3, section

19   4.1.

20   BY MR. CARNATHAN:

21        Q.    You also agreed in this one to take a purchase money

22   loan and construction loan from Rockland Trust to pay for

23   construction and carrying costs, right, sir?

24   A.    When they were a plan.

25        Q.    Did you read this one?



VADIM KAGAN - Cross

1    A.   No.

2         Q.   Those your initials on the bottom left corner, sir?

3    A.   Yes.

4         Q.   So you actually initialed this page without reading

5    it?

6    A.   Yes.

7                          (Pause)

8         MR. CARNATHAN:  May I approach?

9         THE COURT:  Just on the record go ahead and do that.

10        MR. CARNATHAN:  Yes.

11        THE COURT:  You've handed the clerk?

12        MR. CARNATHAN:  I've handed the clerk five LLC

13   agreements from other projects that I would like to ask be

14   marked for identification as N, O, P, Q, and R.

15        THE COURT:  All right.  Just so we're on the same

16   page here and we get them right, I'm going to hand them back

17   to Mary.  Just identify the document and what your proposed

18   exhibit letter for identification is for each, so that we

19   have --

20        MR. CARNATHAN:  Thank you, Your Honor.  So hopefully

21   I've got 40 Druid (sic) on the top.  Should be N.

22             And then 73 Fuller would be O.

23             80 Dorcar will be P.

24             104 Dorcar will be Q.

25             143 Florence should be R.



VADIM KAGAN - Cross

1           PLAINTIFFS' EXHIBIT N WAS MARKED FOR IDENTIFICATION

2           PLAINTIFFS' EXHIBIT O WAS MARKED FOR IDENTIFICATION

3           PLAINTIFFS' EXHIBIT P WAS MARKED FOR IDENTIFICATION

4           PLAINTIFFS' EXHIBIT Q WAS MARKED FOR IDENTIFICATION

5           PLAINTIFFS' EXHIBIT R WAS MARKED FOR IDENTIFICATION

6    BY MR. CARNATHAN:

7         Q.   Mr. Kagan, I'm showing you a document we have marked

8    as Plaintiffs' Exhibit N for identification.  Do you recognize

9    that as the operating agreement of Druid Hill, LLC, sir?

10   A.   Yes.

11        Q.   All right.  And that's an LLC you formed with

12   Nickolay Lipetsker in December 2011, right, sir?

13   A.   Yes.

14        Q.   And that's your little initial down there in the

15   bottom left?

16   A.   Yes.

17             MR. CARNATHAN:  I'd like to offer Plaintiffs' N for

18   identification into evidence.

19             MR. PERTEN:  Your Honor, we would object.  This is

20   not one of the five other projects that Your Honor --

21             THE COURT:  All right.  I understand.  What's the

22   purpose in offering this exhibit?

23             MR. CARNATHAN:  Well, this one -- all five of the

24   following exhibits --

25             THE COURT:  Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Cross

1          MR. CARNATHAN:  -- are all LLCs that Mr. Kagan did

2     with Mr. Maiden in which he has precisely the same paragraph

3     about borrowing the carrying costs that he claims not to have

4     understood when he signed the Lyman-Cutler agreement.  He did

5     it in every project, so we're showing that that is the case.

6          THE COURT:  All right.  And so it's for the purpose

7     of showing a common plan or knowledge or what?

8          MR. CARNATHAN:  It's going to show his knowledge and

9     showing, frankly, that he testified untruthfully that he

10    didn't know that --

11         THE COURT:  Oh.

12         MR. CARNATHAN:  -- he was borrowing the carrying

13    costs.

14         THE COURT:  Well, it's certainly -- if it is, in

15    fact, impeaching, you can certainly use it.  So I would -- I

16    have an objection.  These are not among those that were

17    initially gone into on discovery; is that right?

18         MR. CARNATHAN:  They were produced by Mr. Maiden in

19    response to the subpoena to Mr. Maiden.

20         THE COURT:  All right.  So I'm going to admit them

21    for a limited purpose, for the purposes that it's identified.

22    One is for impeachment.

23         Well, I'm putting you on notice, Mr. Perten.  You can

24    respond to this.

25         But I would allow them in for the limited purpose of

VADIM KAGAN - Cross

1    showing -- for impeachment, and secondly, in order to show a

2    common plan or knowledge on the part of the witness.

3          MR. PERTEN:  Your Honor, I would, again, repeat my

4    objection for additional reasons.  Not only were these not the

5    projects that you allowed that we discussed at length, you

6    also had a pretrial order where we scheduled and listed all

7    the documents that we were going to potentially introduce or

8    actually introduce.

9          Mr. Carnathan has a "might need" category.  These

10   aren't in there.  So we have no notice in advance that these

11   are even in play, number one.

12         Number two, the whole discussion about common plan

13   and common plea, as I've understood it throughout this

14   testimony, was the plaintiffs' theory is that you

15   underestimate, and then at the end of the job you come up with

16   additional costs.  And that's what you do in every case.

17   That's what has been articulated, as I've understood it, by

18   the plaintiffs.

19         Whether or not carrying costs are included or not

20   included really has nothing to do with that common plan.  This

21   is a new common plan that we're hearing about for the first

22   time.

23         Additionally, Your Honor, in the Lyman-Cutler project

24   Mr. Filippov has testified that he was the managing partner.

25   He was the one who got the construction loan.



escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Cross

1    So if there was an obligation to do, as Mr. Carnathan

2    is suggesting, get these, then it was his client who didn't do

3    it, not Mr. Kagan.  So it doesn't impeach.

4    THE COURT:  You're beyond.  Well --

5    MR. PERTEN:  But it doesn't impeach Mr. Kagan.  If

6    anything, he's impeaching his own client, Your Honor.

7    THE COURT:  Right.  You can point that out through

8    the witness when you have another opportunity.  You can show

9    him anything in order to impeach him, and that's what he's

10   doing here, the common plan issue.

11   But why were these not listed on either the I intend

12   to use or may use?

13   MR. CARNATHAN:  Well, these are impeachment exhibits,

14   Your Honor.  Your Honor's order specifically said that we

15   didn't have to list all of our impeachment exhibits.

16   THE COURT:  That's right.  But you're offering it for

17   yet another purpose, though; is that right?

18   MR. CARNATHAN:  Well, if allowed to.  I mean, I think

19   that they do go toward the common plan.  They tend to impeach

20   Mr. Cohen too, right, because what's really going on here is

21   Mr. Cohen cooked up this whole theory about how the

22   construction loan didn't cover the carrying costs in May or

23   June 2015 as they started to cook up their plan as to how they

24   were going to overcharge their investors.

25   THE COURT:  All right.  I'll admit them for



VADIM KAGAN - Cross

1   impeachment purposes only.

2          MR. CARNATHAN:  Okay.  If we go to page 3, paragraph

3   4.1.

4          THE COURT:  I need to get numbers on these now,

5   though.  What are we up to?

6          MR. CARNATHAN:  Oh, so we --

7          THE COURT:  Okay.  So N becomes 331, and then

8   seriatim from there, and at the end of the day make certain

9   that you -- what's the last number you're using then, Mary?

10         Do I have counsel's consent to mark these as a

11  composite?

12         MR. CARNATHAN:  Is it easier to mark them as one

13  Exhibit 331, or should we make them 331 through 335?

14         THE COURT:  It's probably easier to make it a

15  composite 331, but I would like to have Mr. Perten's agreement

16  to that, or I will mark them seriatim in those numbers.

17         MR. PERTEN:  However the Court wants to mark them.

18  It doesn't matter to me.  The admissibility is my issue, not

19  how to mark them.

20         THE COURT:  No, I understand, right.  But there's

21  nothing unique about each one.  Your objection goes to all of

22  them.  So let's --

23         MR. PERTEN:  Assuming they're offered for the same

24  purpose and it's the same drill, yes, my objection is the

25  same, right.

VADIM KAGAN - Cross

1        THE COURT:  And the same order applies in terms of
2   their admissibility.

3        MR. CARNATHAN:  Okay, so --

4        THE COURT:  Okay, Mary.  So 331 is a composite
5   exhibit.

6        MR. CARNATHAN:  Okay.  So we're aggregating N, O, P,
7   Q, and R for identification as Exhibit 331 in evidence.

8        THE COURT:  That's proper.  That's correct.

9        PLAINTIFFS' EXHIBIT 331 WAS ADMITTED INTO EVIDENCE

10        MR. CARNATHAN:  Thank you, Your Honor.

11        THE COURT:  Okay.

12        MR. CARNATHAN:  Okay.  So going to the third page,
13   paragraph 4.1.

14   BY MR. CARNATHAN:

15        Q.   You also agreed in the 40 Druid project to borrow
16   the carrying costs, right, Mr. Kagan?

17   A.   Yes.

18        Q.   Okay.  Did you read this one?

19   A.   I don't remember.

20        Q.   All right.  That's your initials on the bottom left
21   corner, right?

22   A.   Yes.

23        MR. CARNATHAN:  Can I have the next one, Mr.
24   Hartzell?

25   BY MR. CARNATHAN:



VADIM KAGAN - Cross

1     Q.   Okay.  So you formed the Fuller Street, LLC with Mr.

2  Lipetsker and Michael Ankin (ph.) in March, 2012, right, Mr.

3  Kagan?

4  A.   Yes.

5         MR. CARNATHAN:  And if we go to page 3, paragraph

6  4.1.

7  BY MR. CARNATHAN:

8     Q.   You also agreed with them to borrow the carrying

9  costs, right, sir?

10  A.   Yes.

11     Q.   And that's your initials on the bottom left corner?

12  A.   Yeah.

13     Q.   Did you read this one?

14  A.   No.

15     Q.   So it was, kind of, your habit and routine practice

16  not to read agreements that you sign?

17  A.   I usually come to Boris office, and he said put the

18  signature over here with stickers there.  I usually sign it

19  and that's it.

20         MR. CARNATHAN:  Can I have the next one, Mr.

21  Hartzell?

22  BY MR. CARNATHAN:

23     Q.   Okay.  So you formed Dorcar Road, LLC in May 2012

24  with your wife, Tatiana, Ilya Fuchs, and Igor -- I can't quite

25  make out the last name -- Shlayen?  Have I said that right?

VADIM KAGAN - Cross

1   A.   Yeah.

2        Q.   You remember forming that LLC, sir?

3   A.   Yes.

4        MR. CARNATHAN:   And if we go to the third page,

5   paragraph 4.1.

6   BY MR. CARNATHAN:

7        Q.   You again agreed to borrow the carrying costs,

8   right, sir?

9   A.   We all agree, but we never did.

10       Q.   Did you read this one?

11  A.   I remember we talk about it.

12       Q.   What'd you talk about?

13  A.   If we have to include our carrying -- if we have to

14  include carrying costs in the bank, and the bank didn't give

15  us enough money, so we were short on the construction and

16  carrying costs anyway.

17       Q.   So you knew in the 80 Dorcar project that you were

18  going to borrow the carrying costs; is that right?

19  A.   No, we have a conversation with partner, but I don't

20  remember if I read this, but I remember the conversation.

21       MR. CARNATHAN:   Could I have the next one, Mr.

22  Hartzell?

23  BY MR. CARNATHAN:

24       Q.   So in October 2012 you formed Dorcar Road II, LLC

25  with someone named Edward Shkolnikov (ph.), right, sir?



Page 43

VADIM KAGAN - Cross

1    A.    Yes.

2            MR. CARNATHAN:   And if we go to page 3, paragraph 4.1

3    again.

4    BY MR. CARNATHAN:

5        Q.   You again agreed to borrow the carrying costs in

6    that LLC agreement, right, sir?

7    A.    Yeah, but and we never did.

8        Q.   You never did?

9    A.    No, we never planned.

10       Q.   You're the common denominator in all these, right,

11   sir?  You're the guy who builds the houses, right?

12   A.    Yes, I'm the guy who build the houses.

13       Q.   And so in every LLC agreement you do you agree to

14   borrow the carrying costs, but then you go to the bank and you

15   don't borrow the carrying costs.  Is that what you're saying?

16   A.    I am not borrower the money in every project.

17       Q.   So you tell your investor to borrow the carrying

18   costs, but then you send them off to the bank and they don't

19   borrow the carrying costs.  That happens to you every time?

20   A.    It's not true.

21           MR. CARNATHAN:   Can I have the next one?

22   BY MR. CARNATHAN:

23       Q.   All right.  So in December 2012 you formed an LLC

24   called Classic Condominiums with Ilya Fuchs and Gizela

25   Rushansky (ph.).  Have I said that right?

VADIM KAGAN - Cross

1   A.   Yes.

2        Q.   Do you remember forming that LLC?

3   A.   Yes.

4        MR. CARNATHAN:   And if we go to page 3, paragraph

5   4.1.

6   BY MR. CARNATHAN:

7        Q.   You agreed to borrow the carrying costs in that LLC

8   too, right, sir?

9   A.   Yes, and we -- and we never did.

10       Q.   But you never did.

11  A.   We never applied.

12       Q.   So isn't it a fact, sir, that in precisely every one

13  of these LLCs you've ever done with Mr. Maiden, you agreed to

14  borrow the carrying costs?   Isn't that right, sir?

15  A.   We never agreed to borrow the carrying costs.   This is

16  the standard form which Boris create, but we never did.   When

17  applying for the loan we never include the carrying costs

18  there.   It was no line "carrying costs" there when we applying

19  for loan.   We never ask.

20       Q.   Now, sir, if we think again about the Lyman-Cutler

21  project in particular, I think it was your testimony last name

22  that you didn't understand that you were borrowing the

23  carrying costs, and so instead you paid them.   Did I get that

24  more or less right?

25  A.   Can you repeat the question?



VADIM KAGAN - Cross

1    Q.   If I understood your testimony from day one, you

2    claim that you didn't know that you weren't supposed to pay

3    the carrying costs, but you were paying them, right?

4    A.   Yes, I am paying carrying costs.

5    Q.   That's not true either, is it, sir?  You didn't pay

6    the carrying costs?

7    A.   Yes, I paid carrying cost.

8         MR. CARNATHAN:   Could I have Exhibit 43, please?

9    BY MR. CARNATHAN:

10   Q.   Okay.  So if we -- we can walk through Exhibit 43,

11   but the truth is, sir, that pretty much month in and month out

12   Mr. Filippov's wife Arina paid the carrying costs out of the

13   Rockland Bank account.  Isn't that right, sir?

14   A.   They did this couple of times.

15   Q.   Almost every month, right?  I mean, to be fair, you

16   did put some money in a few times, and we'll talk about that,

17   but almost every month Arina paid the carrying costs out of

18   the Rockland Bank account and then sent you an email saying I

19   just paid the carrying costs out of the Rockland Bank account.

20   Isn't that a fact, sir?

21        We can go page by page.  Would you like to see the

22   exhibit on paper?

23   A.   No, this is basically they showing us what they doing,

24   but we are paying carrying cost.

25        Q.   Right.  This --

VADIM KAGAN - Cross

1    A.    They just made the transfers.

2        Q.    She's paying these carrying costs out of the

3    Rockland Bank account, right?

4    A.    Yes.

5        Q.    And the Rockland Bank account is being funded by

6    draws from the construction loans, right?

7    A.    And also by us.

8        Q.    Right.  So occasionally KDC would put some money in.

9            MR. CARNATHAN:  Can I have Exhibit 3?

10   BY MR. CARNATHAN:

11       Q.    So Exhibit 3 in evidence, sir, is a chart of

12   payments from KDC into the Lyman-Cutler bank account.  See our

13   chart?

14   A.    Yes.

15       Q.    All right.  And behind it are the checks, and we can

16   scroll through a few if that's helpful.

17       All right.  So there were points where you put some money

18   into the Lyman-Cutler bank account.  That's true, right, sir?

19   A.    Yes.

20       Q.    But then you would take money back for KDC out of

21   the account right afterwards, right, sir?

22   A.    No.

23           MR. CARNATHAN:  Could I have Exhibit 3, please?

24   Excuse me, Exhibit 1.

25       Q.    So Exhibit 1 is a chart of the payments back to KDC

VADIM KAGAN - Cross

1  from Lyman-Cutler.  You see that?

2  A.    I think all this number, you have to talk to Dan Gersh,

3  because what I am understand, when the Kagan -- when the Kagan

4  Developing paid to subcontractors on behalf of Lyman-Cutler,

5  LLC when Lyman-Cutler, LLC has no money, the money was

6  reimbursed.  But that's nothing to do with carrying cost.

7      Q.    I'm sorry.  I couldn't quite follow that one.  Could

8  you repeat what you just told me?

9  A.    Actually, it says right here.  8/13, American Express,

10  37,000.  It's okay because we paid for the materials.  Also

11  building permit.  If he has to be reimbursed, then he has to

12  be reimbursed.  Water/sewer.  And all these numbers, they have

13  explanation for it and they have invoice number.

14      Q.    Right.  For instance, reimbursement, 28,697 on

15  10/1/2013, right, sir?

16  A.    Yes.

17      Q.    And while we're looking at it, why is KDC taking

18  payments for the foundation, right?  There's $90,000 there for

19  the 55 Lyman Foundation?  Do you see that?

20  A.    Yes.

21      Q.    All right.  And you've previously testified that

22  ProExcavation did that work, right?

23  A.    If the Kagan Development paid for the foundation, it

24  needs to be reverse.  Depends who makes the payment.  I don't

25  have invoices in front of me.  It's probably Dan Gersh will

VADIM KAGAN - Cross

1    explain this to you.

2        Q.   Okay.  And $30,000 to KDC for the water and sewer.

3    You see that?

4    A.   Yes.

5        Q.   That's also work that turns up on the ProExcavation

6    proposal, right, sir?

7    A.   This numbers doesn't mean for me anything.  I don't know.

8    We have to talk to Dan Gersh.  And probably verify with

9    invoice numbers right here.  You just show me the number

10   without the invoice.

11       Q.   Well, Dan Gersh didn't work for you in September

12   2013, did he, sir?

13   A.   But anyway, if you tell me something and ask me something

14   and it says invoice number, I have to see the invoice, and I

15   am sure you have these invoices.

16       Q.   Well, would you agree with me that KDC did not put

17   in the foundation?

18   A.   I have to see the invoice and who paid for foundation and

19   who has to be reimbursed.  I don't know.  I have to look at

20   the invoice and actual check number.

21       Q.   So KDC may have put in the foundation?

22   A.   KDC may paid for foundation people.

23       Q.   May have paid ProExcavation?

24   A.   Maybe pay.  I don't know.  We have to look at the

25   invoices.



VADIM KAGAN - Cross

1    Q.   I guess while we're thinking about, let's look at

2    some invoices.  If we think about the so-called proposals from

3    ProExcavation, you did one that was admitted into evidence as

4    Exhibit 326.

5    All right.  Do you remember testifying about this, sir?

6    A.   Yes.

7    Q.   And it was your testimony that Ryan O'Grady prepared

8    that proposal based on the numbers you gave him right?

9    A.   Yes.

10   Q.   And it was your testimony that you prepared this by

11   calling your subs and compiling their numbers; is that right?

12   A.   Yes.

13   Q.   And you claimed that you prepared this proposal

14   before you did the job, right, sir?

15   A.   Yes.

16   Q.   And this proposal is dated September 1, 2013, right,

17   sir?

18   A.   Yes.

19   Q.   So how is it --

20       MR. CARNATHAN:  If we look back at Exhibit 1.

21   BY MR. CARNATHAN:

22   Q.   How is it that you were already being paid for the

23   foundation in September if you were just doing a proposal to

24   demolish the house on September 1?

25   A.   What's the date on the ProExcavation proposal?  Can you

VADIM KAGAN - Cross

1    go back again?

2        MR. CARNATHAN:  Why don't we show Mr. Kagan Exhibit

3    329?

4    BY MR. CARNATHAN:

5        Q.   All right.  So the ProExcavation proposal purports

6    to be dated August 1.  Excuse me.  October 1, 2013, right,

7    sir?

8        MR. PERTEN:  Excuse me, Your Honor.  The witness --

9        THE WITNESS:  I think --

10       MR. PERTEN:  -- asked to see a different document.

11   He asked to see the document that you showed him, and you

12   pulled up a different document.

13       MR. CARNATHAN:  I misunderstood him.  Why don't we

14   show him 326?  Would you blow that up a little, Bill, and make

15   it more legible?

16   BY MR. CARNATHAN:

17       Q.   So 326 is the demolition proposal, right, sir?

18   A.   Yes.

19       Q.   And it purports to be dated September 1, right?

20   A.   Yes.

21       Q.   But by September 23, I think, you were already being

22   paid for the foundation and the water and sewer, right?

23   A.   It was down payment, because maybe we have to pay subs.

24   I don't remember.

25       Q.   Right.  But the fact is you had done the demolition

VADIM KAGAN - Cross

1    months before; isn't that right, sir?

2    A.   I don't remember when I done demolition.  I have to look

3    at permit.  It was five years ago.

4         Q.   All right.

5              MR. CARNATHAN:  Could we have Permits' Exhibit 1?

6              May we mark this as Plaintiffs' Exhibit S for

7    identification, please?

8              THE COURT:  Okay.  It's marked.

9         PLAINTIFFS' EXHIBIT S WAS MARKED FOR IDENTIFICATION

10   BY MR. CARNATHAN:

11        Q.   All right.  Sir, do you recognize this as the permit

12   application you submitted to the Town of Brookline for the

13   demolition at 77 Lyman?

14   A.   Yes.

15        Q.   And you'll see you submitted it on 4/26/13, right,

16   sir?

17   A.   Yes.

18        Q.   And so isn't it a fact, sir, that you had done the

19   demolition months before the proposal is dated September 1,

20   2013 in Exhibit 26?  Excuse me, 326.

21   A.   Actually, this is just the application.  Where is the

22   permit themselves?  Do you have a permit?

23             MR. CARNATHAN:  I believe it's the third page of the

24   Permits' Exhibit 1.

25             THE COURT:  That's the third page of Exhibit S for

VADIM KAGAN - Cross

1    ID?

2              MR. CARNATHAN:  That's right, Your Honor.

3    BY MR. CARNATHAN:

4         Q.   And so the permit was issued on May 2, 2013, right,

5    sir?

6    A.   Yes.

7         Q.   Are you now willing to agree with me that you did

8    the demolition months before the date on Exhibit 326?

9    A.   Do you have a signature on the back of the card of the

10   inspector when this actually job was complete?  There should

11   be signature there when inspector was onsite.  I usually go by

12   the inspection dates.  Application can be done six months

13   before the actually job is occurred.  And usually on the back

14   of the permit there's a bunch of signatures there.

15        Q.   Well, I'll tell you what.  Well, let me come at it

16   this way.

17             MR. CARNATHAN:  Could I have Permits' Exhibit 2, Mr.

18   Hartzell?

19             THE COURT:  So this is into evidence?

20             MR. CARNATHAN:  This one is Exhibit T for

21   identification, Your Honor.

22             THE COURT:  All right.

23        PLAINTIFFS' EXHIBIT T WAS MARKED FOR IDENTIFICATION

24             MR. CARNATHAN:  Why don't we show Mr. Kagan the

25   fourth page, please?  I think that's the fifth page.  Let's go

VADIM KAGAN - Cross

1    back one.

2    BY MR. CARNATHAN:

3        Q.   So Mr. Kagan, Exhibit T for identification is a

4    certified set of the records from the Brookline Building

5    Department.  Do you recognize this page as the building permit

6    for 55 Lyman?

7    A.   Yes.

8        Q.   And if we go to the next page, the fifth page, we

9    have the signoffs for the inspections; you see that?

10   A.   Um-hum.

11       Q.   And so I guess the hole was inspected on August 18,

12   2013, right, sir?

13   A.   Yes.

14       Q.   The footing was inspected on August 20, 2013?

15   A.   This was house 55 or 88?  Was this -- what this says on

16   the permit?  This is 55 Lyman or this is 88 Cutler.  We have

17   two permits.

18       Q.   This one's 55 Lyman.

19   A.   Okay.

20       Q.   Okay.  And the foundation was inspected on August

21   23, 2013, right, sir?

22   A.   Okay.

23       Q.   All right.  So if the foundation was in on August

24   23, 2013, then certainly you had done the demolition long

25   before September 1, 2013, right, sir?



VADIM KAGAN - Cross

1    A.    Yes.  Can I also see the 88 Cutler permit?

2        Q.    Certainly.  Before I move on, though, may I offer

3    Exhibit T for identification into evidence?

4            THE COURT:  Any objection?

5            MR. PERTEN:  Offer for identification, no.  Offer

6    into evidence, yes.

7            THE COURT:  All right.  Well, he's offered it into

8    evidence.  What's your objection?

9            MR. PERTEN:  To identification no objection.

10           THE COURT:  Did you offer it for identification?  I'm

11   sorry.  I missed that.

12           MR. CARNATHAN:  No, I'm offering it as the next

13   exhibit, Your Honor.

14           THE COURT:  In evidence?

15           MR. CARNATHAN:  Yes, Your Honor.

16           MR. PERTEN:  Yes, Your Honor.  Once again, these

17   permits were not on the list.  It's one thing to use a

18   document for impeachment purposes.  It's another to pull out

19   documents which should have been on a list and offer them into

20   evidence.

21           I feel like Your Honor made it clear.  If he wants to

22   show a document for impeachment purposes, that's his

23   prerogative, but once we move it into evidence, that should

24   have been on the list.  And this is happening now over and

25   over again.

VADIM KAGAN - Cross

1    MR. CARNATHAN:  Well, the difficulty and the reason,

2  I think, Your Honor, is order says you don't have to put

3  impeachment exhibits on the list, because you don't know what

4  you're going to have to impeach him about until he testifies.

5    THE COURT:  I'll admit it for impeachment purposes

6  only.

7    What number is it now, Mary?  332?

8    THE CLERK:  It's P-332.

9    THE COURT:  Plaintiffs' 332.

10    THE CLERK:  Yes.

11    PLAINTIFFS' EXHIBIT 332 WAS ADMITTED INTO EVIDENCE

12    MR. PERTEN:  Can I -- I'm sorry, Madame Clerk.  Is

13  it -- which one is -- there were two documents.  Is this what

14  we've marked as Exhibit S?

15    THE CLERK:  It was Exhibit T for identification is

16  now --

17    MR. CARNATHAN:  I didn't offer Exhibit S.  I just

18  offered Exhibit T.

19    THE CLERK:  Is now Plaintiff Exhibit 332.

20    MR. PERTEN:  Thank you.

21    MR. CARNATHAN:  We're up to Permits' 3.

22  BY MR. CARNATHAN:

23    Q.   So Mr. Kagan, you had asked to see the 88 Cutler

24  packet, and so we have now marked as U for identification the

25  certified packet of records from the Town of Brookline with

VADIM KAGAN - Cross

1    regard to 88 Cutler.

2        PLAINTIFFS' EXHIBIT U WAS MARKED FOR IDENTIFICATION

3            MR. CARNATHAN:  And if we go to the -- I think it's

4    the seventh page.

5    BY MR. CARNATHAN:

6        Q.   Well, do you recognize -- this page is the building

7    permit that was issued for 88 Cutler, sir?

8    A.   Yes.

9        Q.   If we go to the next page, the foundation for 88

10   Cutler was signed off on August 23, 2013 as well; isn't that

11   right, sir?

12   A.   Yes.

13       Q.   So the foundation for both properties was done

14   before the September 1, 2013 date on Exhibit 326, right, sir?

15   A.   Yes.

16           MR. CARNATHAN:  And if we show him briefly Exhibit

17   329?

18   BY MR. CARNATHAN:

19       Q.   The foundations were also in before the October 1,

20   2013 date on the ProEx proposal Exhibit 329, right, sir?

21   A.   Yes.

22       Q.   So you didn't get any bids to prepare those

23   proposals, did you, sir?

24   A.   I didn't get any bids.  I just call my subs and verified

25   the numbers.



VADIM KAGAN - Cross

1    Q.   Right.  In fact, you didn't get any bids on this job

2    at all, right, sir?

3    A.   Verbal phone conversations.  Yes, I don't get any bids.

4    Q.   All right.  So you used the same subcontractors you

5    always use, right?

6    A.   Yes.

7    Q.   Right.  These are guys that you've known for years?

8    A.   Yes.

9    Q.   Let's talk about the phone number, right.  So

10   keeping --

11        MR. CARNATHAN:  Could we just blow up that little

12   slug in the upper left?

13   BY MR. CARNATHAN:

14   Q.   Now, sir, you're aware that the phone number is an

15   issue here, right, sir?

16   A.   No.

17   Q.   No?

18   A.   What's the issue?

19   Q.   You know that Ms. Brusenkova testified that you

20   didn't have that phone number until sometime in early 2014.  I

21   think she said February 2014, right, sir?

22   A.   I don't remember what she said about it.

23   Q.   All right.  When you were asked about this phone

24   number by Mr. Perten, you told him that both KDC and ProEx

25   were using that phone number, right?



VADIM KAGAN - Cross

1   A.   Yes.

2        Q.   And when he asked you if you were using the phone

3   number in 2013, you said I think so.  Do you remember that?

4   A.   Yeah, I think so.

5        Q.   But that's not true, is it, sir?  You weren't using

6   that phone number in 2013.

7   A.   I think we use it.

8        Q.   All right.  Why don't we look at some of the emails

9   that Mr. Perten showed you during your direct?

10        MR. CARNATHAN:  If I could have Exhibit 216, please?

11   BY MR. CARNATHAN:

12        Q.   All right.  This is one of the emails that Mr.

13   Perten showed you where you emailed a check to Mr. Filippov in

14   August, 2013.  Do you see that?

15   A.   Yes.

16        Q.   Okay.  And you see the phone number there is 617-

17   828-2903, right, sir?

18   A.   Yeah, it's my cell phone.

19        Q.   Okay.

20        MR. CARNATHAN:  And if we look at Exhibit 231.

21   BY MR. CARNATHAN:

22        Q.   Now, we're in October, 2013.  Same phone number,

23   right?  617-828-2903, right?

24   A.   Yes.

25        MR. CARNATHAN:  If we look at Exhibit 235.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Cross

1   BY MR. CARNATHAN:

2      Q.   Okay.  This is November 2013.  Same phone number,

3   right, sir?

4   A.   Yes.

5      Q.   Okay.

6        MR. CARNATHAN:  How about 223?

7   BY MR. CARNATHAN:

8      Q.   September 30, 2013.  Same phone number, 617-828-

9   2903.  You see that?

10  A.   Yes.  It says sent from my cell phone.  Usually if I send

11  from cell phone, usually my cell phone number is there.

12     Q.   Okay.  Sir, if I were to suggest to you that there

13  is not a single other document dated in 2013 that bears that

14  phone number, the 617-610-1276, in the whole record except

15  one, could you contradict me?

16  A.   I don't know what you trying to say.  I'm not -- I don't

17  get it.  I see --

18     Q.   If I --

19  A.   I see clearly this is my cell phone number, and even if I

20  send email right now from my cell phone, it's going to be my

21  cell phone number.

22     Q.   Yes.  Sir, if I spend the rest of the day showing

23  you every document in the record, there's not going to be a

24  single other one in 2013 with that phone number on it except

25  one.  Do you know what that document is?

VADIM KAGAN - Cross

1    A.   I don't know.

2         Q.   It's Exhibit 215.

3              MR. CARNATHAN:   Could I have Exhibit 215, please?

4    BY MR. CARNATHAN:

5         Q.    Remember Exhibit 215?

6    A.   Yes.

7         Q.   Right.   This is the email that we say that you and

8    Mr. Cohen forged, right, sir?

9    A.   I didn't forge anything.

10        Q.   I apologize.   I didn't understand your answer.

11   A.   I'm not forging anything.

12        Q.   Okay.   Now, when we look at this document, even if

13   we look at the second page, this is where we find that phone

14   number popping up again.   Do you see it right down at the

15   bottom, there, the 610-1276?

16   A.   Yes.

17        Q.   So this is the only other document in the record

18   from 2013 that purports to have that phone number on it, sir?

19   A.   Yeah, but --

20        Q.   Can you disagree?

21   A.   -- but this does not come from my cell phone.

22        Q.   Okay.   The next one up actually has the cell phone

23   number, right, 617-828-2903, right?

24   A.   Yes.

25        Q.   And that's from your kagandevelopment@gmail.com

VADIM KAGAN - Cross

1   address, right?

2   A.   This was me -- this is two different versions.  The upper

3   version go from my cell phone, and the lower version with

4   email address and website come from stationary, probably,

5   computer.

6       Q.   All right.  Did you let Mr. O'Grady use your cell

7   phone, sir?

8   A.   Use the cell phone for what?  For talking or what?

9       Q.   For forwarding emails?

10  A.   If he has on my cell phone in the bottom of the page,

11  probably yes.

12      Q.   So if we go back to the first page, right, and we

13  look at the forwarded conversation --

14  A.   Yes.

15      Q.   -- you'll see that it's Mr. O'Grady forwarding an

16  email to this woman, Monique Plasse, at Rockland Trust, right?

17  A.   Maybe he forward this from the laptop or from the iPad,

18  and if this is the case, it can be my phone number going to be

19  there.  I don't know where they come from, stationary

20  computer, iPad, laptop, cell phone.  I don't know.  I'm not

21  the expert.

22      Q.   All right.  Well, are you testifying that Mr.

23  O'Grady may have used your cell phone, or you're not saying

24  that?

25  A.   If Mr. Kag -- Mr. O'Grady working for me and he used my

VADIM KAGAN - Cross

1   laptop or my iPad to forward something, yes.  And we used my

2   cell phone as the prime number at that time, so maybe in his

3   email setting says my cell phone number there.

4        Q.   Okay, sir.  You'll notice that the forwarded

5   conversation comes from kagandevelopment@gmail.com, right,

6   sir?

7   A.   Yes.

8        Q.   And then somehow when it gets forwarded, purportedly

9   on August 21, 2013, suddenly it's from

10  vadim@kagandevelopment.com; do you see that?  Can you explain

11  that one?

12  A.   I only can explain, it depends from what computer you

13  forwarding.  They have a different setting on the bottom.

14  This is what I can explain this.

15       Q.   What if I were to tell you, sir, that there is not a

16  single document anywhere in the record other than this one

17  that uses the email address of vadim@kagandevelopment.com;

18  could you disagree with me about that?

19  A.   Say again?  Say again, please?

20       Q.   If I were to tell you that this is the only document

21  anywhere in the record that uses the email address of

22  vadim@kagandevelopment.com, you can't disagree with me, can

23  you?

24  A.   If this is the only one documents, I don't know.

25       Q.   Right.  You had two email addresses, sir, right?

VADIM KAGAN - Cross

 1    You had the --

 2    A.    I have two.

 3         Q.    -- kagandevelopment@gmail.com address, right?

 4    A.    Yes.

 5         Q.    And you had vadim.kagan@yahoo.com, right?

 6    A.    Yes.

 7         Q.    And if I spend the rest of the day going through

 8    every other email in the record, those are the only two email

 9    addresses we're ever going to see you use; isn't that right,

10    sir?

11    A.    I don't remember.  I have another email address as well,

12    but I don't remember exact year they was created.

13         Q.    Well, in fact, the only person who ever used

14    kagandevelopment.com as the domain name for their emails was

15    Mr. Cohen, right?

16    A.    I don't remember what Mr. Cohen used.

17         Q.    And in fact, Mr. Cohen was using that in 2015; isn't

18    that right, sir?

19    A.    What exactly -- what email he exactly using, you saying?

20         Q.    I admit, I don't remember the intro to it, but

21    it's -- he's the only guy that ever used kagandevelopment.com

22    as the domain name for his email; isn't that right, sir?

23    A.    I not understand your question.

24         Q.    Would you also agree with me, sir, that this

25    document was produced a couple of weeks after Mr. Cohen's

VADIM KAGAN - Cross

1   deposition?

2   A.   No.

3        Q.   Yeah, the Cohen address was

4   J.Cohen@kagandevelopment.com.

5        MR. CARNATHAN:   Can I have Exhibit 68?

6   A.   At PolySavant, this is also Joseph's email.

7        Q.   Right, he's got the PolySavant email there, right?

8   A.   Yeah.

9        Q.   Right, because he didn't start using the

10  kagandevelopment.com address until 2015?

11  A.   Way before.   It should be way before.   Definitely before

12  '15.

13       MR. CARNATHAN:   Can I have the next page, Bill?

14  Maybe I've got the wrong exhibit.

15                          (Pause)

16       MR. CARNATHAN:   Try 67.

17  BY MR. CARNATHAN:

18       Q.   I wrote the wrong exhibit number in my outline.   To

19  return to the point, sir, 2015 -- exhibit 2015 (sic) is the

20  only email anywhere in which we see the address of

21  vadim@kagandevelopment.com; isn't that right, sir?

22  A.   You asking me if this is the only one email, or -- I'm

23  not understand what you're asking.

24       Q.   I'm back at 215.   That's the only one that we've

25  seen anywhere, ever, that has vadim@kagandevelopment.com;

VADIM KAGAN - Cross

1   isn't that right?

2   A.   I don't know.

3        Q.   Let's touch on the phone number again, and go to

4   Exhibit 239.

5   A.   Okay.

6        Q.   All right, so Exhibit 239 is an email exchange dated

7   in February 2014 in which we see the phone number 617-610-

8   1276, like Just Ms. Brusenkova said, right, sir?

9   A.   I don't know what she said, but I see the phone number is

10  here.

11       Q.   Right.  In February 2014, right?

12  A.   Yes.

13       Q.   Okay.  I've got myself a little out-of-order.  Let's

14  talk about the operating agreement again, Exhibit 15.

15       So to recap, it was your testimony that you didn't read

16  this, right?

17  A.   No, I didn't.

18       Q.   You just relied on Boris?

19  A.   Yes.

20       Q.   You didn't know that you were borrowing the carrying

21  costs?

22  A.   I know we're not borrowing carrying cost.

23       Q.   Okay.

24  A.   We never borrow carrying costs.

25       Q.   Did you understand it was your job to build the two

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Cross

1   houses?

2   A.   Yes.

3        Q.   And did you understand that your compensation for

4   that was going to be a fifty percent share of the net profits?

5   A.   Yes.

6        Q.   How did you know that?

7   A.   We talk about it.

8        Q.   Who's "we"?

9   A.   Me, Filippov.

10        Q.   What about --

11   A.   Bor --

12        Q.   -- Mr. Maiden?

13   A.   Boris, yes.

14        Q.   Did you understand Mr. Filippov was the managing

15   member?

16   A.   Yes.

17        Q.   Did you understand if you didn't finish the homes

18   within twenty-three months you were going to have to start

19   paying the carrying costs?

20   A.   Yes.

21        Q.   Did you understand that the operating agreement

22   obligated the managing member to initially retain your wife,

23   Tatiana, as the listing broker?

24   A.   Yes.

25        Q.   And did you understand that the managing member

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Cross

 1  would have a right to remove her after a certain time?

 2  A.   Yes, after certain times, yes.

 3       Q.   Did you know that was December 31, 2014?

 4  A.   No.

 5       Q.   Were you the guy who asked that that provision go

 6  into the operating agreement?

 7  A.   I don't think so.

 8       Q.   Somebody else wanted that in there?

 9  A.   I don't know.

10       Q.   So it --

11  A.   I don't remember --

12       Q.   -- why don't we --

13  A.   -- who asked put this provision.

14       MR. CARNATHAN:   Could I have 6.1(b)(6), Mr. Hartzell?

15  Maybe blow up that paragraph.

16  BY MR. CARNATHAN:

17       Q.   So when it says, "The managing member hereby agrees

18  to list the properties with Tatiana Kagan," surely you're the

19  guy who asked for that provision in the operating agreement,

20  aren't you, sir?

21  A.   To be her as the broker, yes.  By December 31st, I didn't

22  remember if I asked for this provision.  To be her broker,

23  yes.

24       Q.   Well, to be fair, the removal provision must have

25  been something Mr. Filippov asked for, right?

VADIM KAGAN - Cross

1     A.    I don't know.

2          Q.    Well, you wouldn't have asked for a provision to

3     remove her, would you, sir?

4     A.    I don't remember.  I didn't ask this.

5          Q.    Did you understand that Mr. Filippov had a right to

6     remove her?

7     A.    Yes.

8          Q.    I guess a couple of quick things.

9               MR. CARNATHAN:  Could I briefly have Exhibit 50?

10    BY MR. CARNATHAN:

11         Q.    So do you recognize Exhibit 50, Mr. Kagan?

12    A.    Yes.

13         Q.    That's the letter that Mr. Pyle sent on your behalf

14    on May 7th, 2015, right?

15    A.    Yes.

16              MR. CARNATHAN:  And then, could I have Exhibit 54,

17    please?

18    BY MR. CARNATHAN:

19         Q.    Do you recognize Exhibit 54, Mr. Kagan?

20    A.    Not really.

21         Q.    Well, that's the letter that my firm wrote back on

22    May 13th, right?

23    A.    Maybe.

24         Q.    You don't remember seeing that letter on or about

25    May 13th?



VADIM KAGAN - Cross

1   A.   I don't remember, no.  It's five years ago -- six years.

2        Q.   Okay.  Well, certainly you remember that Mr.

3   Filippov and Mr. Lipetsker rejected your claims in your May

4   7th letter, right?

5   A.   I remember they reject it.

6        Q.   Right.  And if you take a moment, please do, and

7   read this letter, you'll see that this is the letter rejecting

8   your claims; fair enough?

9   A.   I didn't remember if I make any claims and where.

10       Q.   Well, you claimed in the May 7th letter that you

11  were owed $758-odd-thousand for construction costs, right?

12  A.   Yes.  This I remember.

13       Q.   Right?  And you remember that you said there were

14  another 50,000 expected, right?

15  A.   Yes.

16       Q.   And you said that there was another 251,000 in

17  carrying costs that you wanted to be reimbursed for?

18  A.   Yes.

19       Q.   And I think you testified on day one that that was

20  the hard number that you wanted right away to pay your subs,

21  something to that effect, right?

22  A.   This is right away, absolutely, yes.

23       Q.   Okay.  And Filippov and Lipetsker wrote back and

24  said, in essence, no, right?

25  A.   Yes.

VADIM KAGAN - Cross

1      Q.   And in fact, in this letter, Mr. Filippov said he

2    was taking over control of the properties, right?

3    A.   He always was in control of the properties.

4      Q.   I'm sorry?

5    A.   He's always in the control of the properties.  Nothing to

6    taking over.

7      Q.   Okay.  So I guess the point I'm working up to is --

8          MR. CARNATHAN:  If I could have Exhibit 328?

9    BY MR. CARNATHAN:

10     Q.   This is another of the ProEx proposals, and this one

11   is dated May 25th, 2015, right, sir?

12   A.   Yes.

13     Q.   That's after the dispute commenced between the

14   parties, right, sir?

15   A.   I don't remember when the dispute commenced.

16     Q.   Well, certainly neither Mr. Filippov nor Mr.

17   Lipetsker ever approved this proposal; did they, sir?

18   A.   If you're looking by dates, yes.  It's May 25th.

19     Q.   So I'm sorry, are you agreeing with me that they

20   didn't -- excuse me -- that they never approved this proposal?

21   A.   They approved this proposal, because we have to clean up

22   the houses.  That's what we usually do.  They approve it.

23     Q.   All right, so you're saying that despite the dispute

24   having commenced some weeks earlier, they approved this one

25   anyway; that's your testimony?



VADIM KAGAN - Cross

1   A.   Yeah, they approved it.  They know we have to do the job.

2        MR. CARNATHAN:  All right, could I have Exhibit 30 --

3   excuse me -- 330?

4   BY MR. CARNATHAN:

5        Q.   All right, this is along the same lines, another

6   proposal dated May 25th, 2015, right, sir?

7   A.   This is proposal/invoice, already, yes.

8        Q.   Okay.  They never agreed to this one either; did

9   they, sir?

10  A.   They agree in it.

11       Q.   Okay, they agreed despite the dispute that had

12  commenced some weeks earlier?

13  A.   They agreed to do this particular work of the properties,

14  because it's necessary and needs to be done.

15       Q.   Let's talk a little bit more about ProEx.  During

16  your testimony on the 15th, we heard a number of times about

17  how ProEx had provided cost savings to the project, I think

18  the phrase was, under the umbrella of ProExcavation; do you

19  remember that, sir?

20  A.   They --

21       Q.   Right.  The fact is that ProEx doesn't actually do

22  any of the work; does it, sir?

23  A.   What do you mean "doesn't do any work"?

24       Q.   It does all of the excavation, masonry, landscaping,

25  it puts the foundation, it hires subcontractors to do that

VADIM KAGAN - Cross

1    part, right, sir?

2    A.   Yes.

3        Q.   Right.  You, in fact, are the only employee that

4    ProEx has, right?

5    A.   Yes, sir.

6        Q.   And I believe you're not being paid for your time,

7    right, sir?

8    A.   I am not.

9        Q.   Okay.  You and your wife Tatiana are the sole owners

10   of ProEx, right?

11   A.   Yes.

12       Q.   So any profit that ProEx makes goes straight into

13   your pockets, right?

14   A.   Yes.

15       Q.   And the same thing goes for KDC, right?  You and

16   your wife are the sole owners of KDC, right?

17   A.   Yes.

18       Q.   So any profits that KDC makes go straight into your

19   pocket, right?

20   A.   Yes.

21       Q.   If we think about the services that the -- that KDC

22   provided, KDC does all its work through subcontractors too,

23   right, sir?

24   A.   Yes.

25       Q.   All right.  So all it did -- all KDC ever did was

VADIM KAGAN - Cross

1   supervise the construction, right?

2   A.   Yes.

3        Q.   That's you; you supervised the construction?

4   A.   Yes.

5        Q.   And you're not being paid for your time, right?

6   A.   You're talking about Lyman-Cutler project or in general?

7        Q.   I'm talking about Lyman-Cutler?

8   A.   No, I was not paid on my time.

9        Q.   Now, you'd agree with me, sir, that by the time the

10  construction loans were taken, you did have a construction

11  budget of 1.6 million per house, right?

12  A.   Yes, sir.

13       Q.   And we have a disagreement about whether or not that

14  included the carrying costs, right, sir?

15  A.   It was never included, carrying cost.

16       Q.   And it's your testimony, I believe, that from that

17  starting point, you upgraded precisely every element of both

18  homes, right?

19  A.   Yes.

20       Q.   Just absolutely everything, from the retaining walls

21  to the floors to the trim, everything in the houses, you

22  upgraded -- absolutely everything.

23  A.   Yes.

24       Q.   And at each instance, Filippov or Lipetsker said

25  great, we'll pay for the upgrade, right?

VADIM KAGAN - Cross

1   A.   Yes.

2       Q.   But you didn't actually have any written

3   specifications, right, sir?

4   A.   No, we don't.

5       Q.   It was all oral.  It's not written down anywhere?

6   A.   No.

7       Q.   Right.  And you can't actually tell me how much each

8   of the upgrades costs.  We couldn't say, okay, the floor was

9   going to be X and then it became Y?

10  A.   If you can ask me per item, I can tell you exactly what's

11  happened.

12      Q.   Right.  There's nothing written down anywhere which

13  would show us that you started at -- and I'm going to just

14  make up a number -- 30,000 for the floors, and decided to

15  spend 50-; there's nothing like that anywhere; is there, sir?

16  A.   No.  We was original cost 1.5, and we end up 1.6, just

17  the construction costs.

18      Q.   Okay.  And so in the aggregate, Mr. Filippov agreed

19  that you could spend something like 2- to 300,000 more per

20  house; that's your testimony, right?

21  A.   Yes.

22      Q.   And that was just in a friendly conversation, as you

23  described it, right?

24  A.   It was his business decision.  It was the conversation

25  between three of us, which is they allowed me to spend this

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Cross

1  money.  It's come from my pocket, and it has to be reimbursed

2  at the closing.  This is what's the agreement, this is exactly

3  what I did.

4     Q.   But what I'm saying is that as you rolled through

5  the project, you would just say to Filippov I want to spend

6  more money on this, I want to spend more money on that, and he

7  would say sure, go for it?

8  A.   Yes.

9     Q.   All right.  This is the same guy that analyzed

10  whether to increase the original budget from 1.5 to 1.6

11  million at quite some length, isn't it?

12  A.   Because he want sell these houses for 5.6 not 5.1.  This

13  is why he want to increase their construction costs, because

14  he knows he going to get his money anyway.

15     Q.   So it was Filippov's idea to increase the

16  construction costs?

17  A.   Filippov idea increase the selling price.

18         MR. CARNATHAN:   Could I have Exhibit 31?

19         Maybe blow up the Filippov.  Okay.

20  BY MR. CARNATHAN:

21     Q.   Mr. Kagan, do you remember getting this email on May

22  4th, 2013, from Mr. Filippov?

23  A.   Yes.

24     Q.   All right.  And Mr. Filippov says the original

25  construction cost was estimated at 1.3 million; do you see

VADIM KAGAN - Cross

1    that?

2    A.   Yes.  This is his number in his head.  It's nothing to do

3    with me.  What he's plan and what he's doing, his plan to

4    invest some money in the project, he think he going to be 1.3

5    in the construction, 200 in carrying costs, and 4.9 sale.

6    This is his number.  It's nothing to do with what -- what I

7    present to the bank.

8         Q.   These are all --

9    A.   This is not --

10        Q.   -- his numbers, you --

11   A.   -- this is his number.  It's not my number.  My number

12   1.6, and I present this number to the bank attaching with the

13   plans as --

14        Q.   So your testimony is that Mr. Filippov came up with

15   these numbers on his own?

16   A.   Absolutely.

17        Q.   The telecom guy?

18   A.   Telecom guy, yes.  And Zhukovskiy together.

19        Q.   And he's telling the contractor with thirty years'

20   experience what the construction budget is going to be?

21   A.   I don't know.  We have agreement.  I prepare the

22   construction costs for the bank, 1.6, and we stick to that to

23   the end of the project.

24        Q.   Mr. Filippov's quite concerned, if you will, about

25   adding 100,000 to the project here; isn't he, sir?

VADIM KAGAN - Cross

1   A.   I don't know.

2           MR. CARNATHAN:   Isn't there another line over there?

3   A.   I don't know what's in his brain.  I have no idea.  I

4   just telling you what exactly happened.

5           MR. CARNATHAN:    Go on the second page.  Blow up the

6   top.

7   BY MR. CARNATHAN:

8       Q.   On the second page, Mr. Filippov says, "As you see,

9   1.6 million is not enough to carry us through the project.  We

10  are at least $16,000 short for each home.  This means we need

11  to borrow 1.65 million for the construction of each home, 3

12  million more than we originally planned.  As to the return,

13  there is hardly any gain for this."  Have I read that

14  correctly?

15  A.   He said this to who?  To Zhukovskiy, not to me.

16      Q.   No, he sent it to you.  Let's go back to the first

17  page.  See, it's Dima ZH --

18  A.   Yeah.

19      Q.   -- and he's forwarding that to you on the first

20  page.  Now, if we blow that up again, he's writing to Dima K.

21  A.   I didn't see -- no, it's absolutely separate email.  I

22  don't know.

23      Q.   So do you now say you don't remember this email?

24  A.   This one?  I don't remember.  No, this one -- can you

25  scroll it?  Can you open these two pages next to each other?



VADIM KAGAN - Cross

1      Q.   Do you recall Mr. Filippov being quite concerned

2    about $16,000 per home?

3    A.   I didn't remember if he concerned about 16,000.  I didn't

4    remember this email at all.

5            THE COURT:  You want to show him paper?

6            MR. CARNATHAN:  Certainly.  May I?

7            THE COURT:  Sure.

8                      (Pause)

9            THE COURT:  What exhibit number?

10           MR. CARNATHAN:  I'm on Exhibit 31, Your Honor.

11           THE COURT:  31.

12                     (Pause)

13           THE COURT:  I'm ready when you are.

14           MR. CARNATHAN:  Thank you, Your Honor.

15   BY MR. CARNATHAN:

16     Q.   So Mr. Kagan, I guess what I'm suggesting to you is

17   that a fellow who is this concerned about $16,000 certainly

18   did not agree orally to spend another 300,000 with you; isn't

19   that right, sir?

20   A.   Looking at this chain link of emails, what I'm seeing, it

21   was originally set between Zhukovskiy -- this conversation

22   between him and Zhukovskiy.  This was originally the plan,

23   1.3.  Now, after reviewing everything, it's going to be 1.6

24   and they have to add another 300,000 to construction, which it

25   exactly says right here.  This is why we end up at 1.6.  This

VADIM KAGAN - Cross

1   is why I submitted the 1.6 to the bank.  It's exactly says

2   right here.  It conversation between Filippov and Zhukovskiy,

3   1.6 to construction.

4        It says original 1.3, and they adding another 300,000 per

5   home.  It says right here, if I read this correctly.

6        Q.   You don't read it correctly, sir.

7   A.   Why not?

8        Q.   We're starting at the original construction loan was

9   planned to be 1.5 million.  Do you see that on the first page?

10  A.   It says 1.3.

11       Q.   Right.  1.3 for construction, 200- for carrying, and

12  construction loan 1.5 million.  Are you with me on line 4?

13  A.   Yes.

14       Q.   Okay, and the proposal --

15  A.   But this is not what we agreed.  This is what he think

16  about it.  We no agree on it.

17       Q.   He's analyzing your proposal to add $100,000 to each

18  home, isn't that right, sir?

19  A.   He's not analyzing my proposal.  He's analyzing

20  Zhukovskiy proposal, not my proposal.  He never analyzed my

21  proposal.  He never did.

22       Q.   So you're saying --

23  A.   I never did any proposals.  I'm never did any template.

24  I never did this.

25       Q.   So it was Zhukovskiy's idea to add 100,000 per home?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Cross

1    A.   It's Filippov idea.  Not 100,000, 300- per home, not

2    100-.  It says from the original 1.3, they have to add

3    300,000, per each home, if this is how we end up at 1.6.  And

4    this always 1.6.  This is why I present to the bank 1.6.  it

5    was never 1.3.  It says right here.

6         Q.   Respectfully, sir, what he says is that the proposal

7    is 1.6 million per home.

8    A.   Yeah.

9         Q.   That's together 200,000 more than the initial

10   proposal.  And what he's saying is that you'll be 16,000 short

11   per home, so you'll actually have to borrow 1.65 million per

12   home.

13   A.   Yes, yes.

14        Q.   And 1.65 plus 1.65 is 3.3 million, which is 300,000

15   more than 1.5 plus 1.5 for 3 million.  It's aggregate.

16   A.   It says of each home, 300,000 more.  This is why we

17   always did 1.6.  Where did you get 1.3?

18        Q.   I get 1.3 in line 1.  The original construction cost

19   was estimated at 1.3 million.

20   A.   This is his idea.  This is his guessing, when he talks to

21   Zhukovskiy.  When he talks to me and I explain to him how much

22   this actually is going to cost, and I prepare construction --

23   construction cost budget to the bank, 1.6 million dollars.

24        Q.   All right, we looked at that earlier?

25   A.   Yes, absolutely.

VADIM KAGAN - Cross

1   Q.   Exhibit 27.

2   A.   Yeah.  This is my document.  This is what I -- this is

3   what I sent to the bank.  And based on my number, the bank

4   give us the money.

5   Q.   Right.  Because if we look at Exhibit 32 --

6   A.   32; what page?

7   Q.   The very next one in your binder, sir.

8   A.   Just next page?

9   Q.   Excuse me?

10  A.   Okay.

11  Q.   All right.  So I'm now at Exhibit 32.

12  A.   Okay.

13  Q.   After two more days of emails back and forth, they

14  realized that they had miscalculated the tax liability and

15  that one 1.6 million per home would be enough; isn't that

16  right, sir?

17  A.   Exactly.  Conversation between who?

18  Q.   1.6 million including the carrying costs, right,

19  sir?

20  A.   It was never 1.6 including the carrying -- it was --

21  Q.   That's your --

22  A.   -- it can't be.

23  Q.   -- that's your email address up there, right,

24  vadimkagan@yahoo.com?

25  A.   Can I have this chain link of the email printed again?



VADIM KAGAN - Cross

1    Because you show me just, you know, parts of it, and I'm not

2    understand, because clearly when you show me two piece of

3    papers, it's absolutely different story.

4         Q.   Well, the binder in your lap should have this one.

5    This is Exhibit 32.  If you'd turn to the next tab, you'll

6    have the whole exhibit.

7    A.   32?

8         Q.   Yeah.

9    A.   Where's the number 32?

10        Q.   32.

11   A.   Okay.

12        Q.   Right, the whole basis of this conversation is

13   whether 1.6 million will be enough for the carrying costs on

14   top of the construction costs, right, sir?

15   A.   I don't know.  I have to look all these numbers.  And

16   where the attachment in this email.

17        Q.   Take your time.

18                            (Pause)

19   A.   Looks like they just add me at the end of the

20   conversation.  And what I'm seeing, they talking about the

21   carrying costs.  But I didn't see anywhere saying this

22   carrying cost included in 1.6.  I see the number of the

23   carrying cost.  But this is the number, should be on top of

24   1.6.

25        The carrying cost should be on the top of 1.6.  It's

VADIM KAGAN - Cross

1   nothing to do with 1.6.

2       Q.   Did you not read your email, sir?

3   A.   Some of them not.

4       Q.   Did you go back to them and say, hey, wait, it

5   should 1.6 plus carrying costs?

6   A.   I always said 1.6 plus carrying costs.  I always saying

7   this, from the day one.  It's going to be 1.5, after we went

8   up to 1.6; this is what we always agreed.  Now, after four

9   years of all this conversation, we just seeking the number

10  1.3, which is the template of the original template which

11  Zhukovskiy create with Filippov.  The original was 1.6.

12  Always 1.6.

13      Q.   Right, the bank loan was 1.6.

14  A.   Absolutely.  And I prepared this to the bank.  1.6

15  including the plans that are changed, and this is go to

16  appraiser and we spoke to the bank, and this is the new 1.6.

17      Q.   And --

18  A.   Because the bank was -- never would approve this with

19  this 1.3 building these houses, because they will never

20  finance this project because -- because it's not the real

21  number, because this go to the bank appraiser, and the bank

22  appraiser would never allow build these houses 1.3, because

23  it's unreal.  It's 8,000 square feet homes to 1.3, nobody can

24  build this 1.3.

25      Q.   So if we go back to the first page of Exhibit 32 --

VADIM KAGAN - Cross

1    A.   32?

2         Q.   Right.  This is -- again, this is the email

3    analyzing the carrying costs and whether the bank loan will be

4    sufficient to fund them.  Isn't that right, sir?

5    A.   No.

6         Q.   Do you agree this is an email among Mr. Zhukovskiy,

7    Alex, Nick, Boris Maiden, and you, right?

8    A.   Looks like they just add me in this email at the end of

9    the conversation.

10        Q.   But you were certainly in the conversation, right?

11   A.   Yeah.

12        Q.   Right?

13   A.   Yeah.

14        Q.   Right, and the title of the document is "Carrying

15   costs and the loan needed", right?

16   A.   Yes.

17        Q.   So precisely everyone involved in this project,

18   except you, apparently, understood that the bank loan was

19   going to cover the carrying costs, right, sir?

20   A.   The bank loan not cover the carrying costs.  And I will

21   continue saying this for another year.  It was never including

22   the carrying costs.

23             MR. CARNATHAN:  Let's shift to a different topic.

24             THE COURT:  Why don't we -- why don't we take a

25   break.  It's been -- it's 11 o'clock.  We'll take about a

VADIM KAGAN - Cross

1   fifteen-minute break, okay?

2          MR. CARNATHAN:  Yes, Your Honor.

3          THE COURT:  All right.  And again, don't talk about

4   your testimony with anyone -- the substance of your testimony,

5   okay?  All right?  Could you just acknowledge that --

6          THE WITNESS:  Yes, yes.

7          THE COURT:  -- in words.  Thank you.

8          THE WITNESS:  Yes.

9          THE CLERK:  All rise.

10                 (Off the record at 11:04 a.m.)

11                 (On the record at 11:25 a.m.)

12         THE CLERK:  All rise.  Court is now in session.

13         THE COURT:  Be seated.

14         Whenever you're ready.

15         MR. CARNATHAN:  Thank you, Your Honor.

16         Could I have Exhibit 332, in evidence, please?

17         THE COURT:  Oh, let me make a disclosure.  You just

18   never know, right?

19         But so you might have noticed that there was a young

20   woman sitting at the law clerk table this morning.  And her

21   name is Debra Kotkin.  Debra is a first -- just finished her

22   first year in law school and is here interning with me for the

23   summer.

24         And it turns out that her dentist is -- I think --

25   Mrs. Lipetsker -- I think that's what she's told me, or was.

Page 86

VADIM KAGAN - Cross

1  But recently.  For that reason -- she doesn't describe herself

2  or her family as friends of the Lipetskers, but there is some

3  involvement.

4       For that reason, I've asked her not to attend the

5  hearing, and she will not do any work for me in connection

6  with this matter during the remainder of the summer.  And she

7  hasn't worked on it before.  Okay?  So just by way of

8  disclosure.  Okay?

9       MR. CARNATHAN:  Thank you, Your Honor.

10 BY MR. CARNATHAN:

11      Q.   So Mr. Kagan, when you get the certificate of

12 occupancy, you have to file an affidavit of construction

13 costs, right, sir?

14 A.   Yes.

15      MR. CARNATHAN:  Can I have the page with the

16 affidavit, Bill?  That one, yeah.

17 BY MR. CARNATHAN:

18      Q.   So on 55 Lyman Road, on October 1st, 2014, you swore

19 under oath that the total construction costs were $910,000,

20 right, sir?

21 A.   Yes.

22      MR. CARNATHAN:  Can I have Exhibit U for

23 identification?

24 BY MR. CARNATHAN:

25      Q.   And with regard to Lyman-Cutler, in your affidavit

VADIM KAGAN - Cross

1   of final construction costs on October 1, 2014, you also swore

2   that the total construction costs were $910,000, right, sir?

3   A.  Yes.

4           MR. CARNATHAN:  I'd like to offer Exhibit U for

5   identification, into evidence.  I understand I forgot to do

6   that earlier.

7           THE COURT:  Okay.

8           MR. CARNATHAN:  That's the 88 Cutler building permit

9   packet.  And just for the record, they actually are on our

10  exhibit list, as -- I wrote it down somewhere -- I think 99,

11  100, and 101.  The difference is, the ones that we marked for

12  ID are the certified ones that we went and got from the Town.

13  But the building permit packets are on the exhibit list.

14          THE COURT:  All right, any objection?

15          MR. PERTEN:  No objection.

16          THE COURT:  All right.  It's admitted.

17          Mary, what is it?

18          THE CLERK:  333.

19          THE COURT:  333.

20     PLAINTIFFS' EXHIBIT 333 WAS ADMITTED INTO EVIDENCE

21  BY MR. CARNATHAN:

22     Q.  I guess just briefly, sir, you'll agree with me that

23  when Ms. Brusenkova was working for you, she didn't actually

24  do any of the construction work, right?

25  A.  No.

VADIM KAGAN - Cross

1      Q.   Right?  She didn't negotiate the deals with the

2   subcontractors?

3   A.    No.

4      Q.   Yeah.  And she didn't determine what materials

5   needed to be built on the projects?

6   A.    No.

7      Q.   So she relied on you for those figures when she put

8   them into the books, right?

9   A.    She relied on invoices and proposals.

10     Q.   But the invoices and proposals were something that

11   you negotiated, right?

12   A.    Yes.

13     Q.   And then she would put them into the books for you?

14   A.    Yes.

15     Q.   Right.  And the same goes for Mr. Gersh, right?

16   When he puts things in the books, he doesn't do construction

17   either, does he, sir?

18   A.    He doesn't do construction.

19     Q.   If we think about the May 7th letter, again, Exhibit

20   50, you testified that you went to the lawyers to have that

21   letter prepared after speaking to Mr. Cohen, right, sir?

22   A.    After speaking with -- not only Mr. Cohen.

23     Q.   And it was after Mr. Cohen told you that it was Mr.

24   Filippov's responsibility to pay the carrying costs, that's

25   when you went to the lawyers, right?



VADIM KAGAN - Cross

1    A.    We read the agreement together.

2        Q.    So let's just talk about Mr. Cohen for just a

3    moment.  At the time of your deposition on May 3rd, 2018, you

4    told me he'd been working a subcontractor for KDC for six or

5    seven years, right?

6    A.    Who, Mr. Cohen?

7        Q.    Yes.

8    A.    No, I did not -- I didn't say this.

9        Q.    You didn't?

10   A.    Six, seven years?

11       Q.    Correct.

12   A.    I met Joseph, I think, it's 2012.  I never say six or

13   seven years.

14           THE COURT:  Yes, of course.

15       Q.    So Mr. Kagan, I've just handed you a copy of your

16   deposition transcript from May 3rd, 2018, and I'm looking at

17   page 30.  Okay?  And I asked you, beginning at line 12, "For

18   how long has Mr. Cohen been a subcontractor for KDC?"

19   "A.  Six, seven years.

20       "Q.  So since somewhere in 2011 to 2012 range?

21   "A.  I think so."

22       Q.    I read that correctly?

23   A.    Yes.

24       Q.    So you did tell me at your deposition he had worked

25   for you for six or seven years as of May of 2018; isn't that

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VADIM KAGAN - Cross

1   right, sir?

2   A.   I said 2012, approximately, is what I said.

3        Q.   Okay.

4   A.   Exactly what you asked; it's exactly what I said, 2012.

5        Q.   And he used to work for your brother-in-law, right?

6   A.   Yes.

7        Q.   And you also told me at your deposition that you had

8   known him for approximately ten years, right?

9   A.   No, I never said -- who, Joseph?

10       Q.   Yes.

11  A.   No, I never say that.

12       Q.   Okay, let's look at page 35, please.  And that

13  starts at the bottom of page 34 at line 23.  I say:

14       "Q.  How long have you known Joseph Cohen?"

15       You say: "Me?"

16       I say, "Yes."

17       You say, "Maybe ten years."

18       Have I read that correctly?

19  A.   I just answered for you before, I know -- I know him

20  since 2012.

21       Q.   Well, you told me on pages 34 and 35, you'd known

22  him since approximately 2008, isn't that right?

23  A.   I told you I know him since 2012.  I didn't say 2008.

24       Q.   Okay.

25  A.   It's what I said, 2011/2012 is what I said.

VADIM KAGAN - Cross

1      Q.    All right.  It's also a fact, sir, you can't tell

2  me, within a $1 million how much you've paid Mr. Cohen; isn't

3  that right, sir?

4  A.    From 2012?

5      Q.    Actually for, let's say, the first five months of

6  2018, you couldn't say within $1 million how much you'd paid

7  Mr. Cohen in the first five months of 2018; isn't that right?

8  A.    First five months of -- no, I didn't remember.

9      Q.    Well, if we look at the deposition transcript at the

10  bottom of page 31, on May 3rd, 2018, I asked you, "How much

11  has KDC paid Mr. Cohen this year, in the year 2018?"

12      You said, "I don't know."

13      I said, "Can you say within $10,000?"

14      "No."

15      "Is it more than 100,000?

16      "I don't know.

17      "Is it more than 500,000?

18      "I don't know.

19      "Is it more than a million?

20      "I don't know."

21      "Q.  You don't have a clue whether you paid Mr. Cohen

22  over $1 million?

23  "A.  It was probably a lot of money.

24      "Q.  A lot of money?

25  "A.  A big number.



VADIM KAGAN - Cross

1    "Q.   Was it more than five million?  Can you tell me

2    whether you've paid Joseph Cohen more than five million?

3    "A.   I didn't pay him five million.

4    "Q.   We've narrowed it down to less than five million but

5    you don't know if it was more than a million?

6    "A.   I don't remember how much money I paid Mr. Cohen."

7    Q.   Have I read that correctly?

8    A.   Yes.

9    Q.   And you couldn't tell me for 2017 either, could you,

10   sir?  You couldn't tell me within a million bucks; isn't that

11   right?

12   A.   I don't remember how much I paid Joseph.  I just don't.

13   Q.   Just you paid him a lot, right?

14   A.   I have everything in the QuickBooks, and you have a

15   record how much we paid Joseph.  You have every canceled

16   check,  You know the number.  We're not hiding this number.

17   Q.   The --

18   A.   The number is there.

19   Q.   And at least at the time of your deposition, you

20   didn't know whether Mr. Cohen had any involvement in keeping

21   books for KDC, right, sir?

22   A.   He never had any involvement keeping any books of our

23   company.

24   Q.   I'm now looking at page 38.  And beginning at, I

25   guess, line 5, "Has Joseph Cohen had any involvement in

VADIM KAGAN - Cross

1   keeping the books and records for KDC?

2       "MR. PERTEN:  Objection."

3       Q.   And I say, "Let me try to do better.  Has Mr. Cohen

4   had any involvement in keeping the books for KDC?"

5       You say, "What kind of books, record books?"

6       I say, "The financial books, the bookkeeping for KDC; has

7   Mr. Cohen participated in KDC's bookkeeping?

8       "MR. PERTEN:  Objection.

9   "A.  I do not know.

10      "Q.  You don't know?

11  "A.  No.

12      "Q.  Who would know?

13  "A.  I don't know who knows.  I don't know who knows about our

14  books."

15      Q.   I've read that correctly, right, sir?

16  A.   Yes.

17      Q.   So somewhere between May 2018 and today, you figured

18  out that Mr. Cohen had nothing to do with your bookkeeping,

19  right?

20  A.   I always said he has nothing to do with our bookkeeping.

21  I always saying he never do anything -- he has nothing to do

22  with our bookkeeping.

23      Q.   Okay, well as --

24  A.   He's our sub -- he's our subcontractor, and his office is

25  Newburyport.  He has nothing to do with our books.



                              VADIM KAGAN - Cross

 1        Q.   Well, as of May 2018, you not only didn't know, you

 2   didn't know who would know, right?

 3   A.   Yes, I don't know who knows.  But I know he has nothing

 4   to do with our books.

 5        MR. CARNATHAN:  Can I have -- I think it's the last

 6   page of 50, the tally of receivables?

 7   BY MR. CARNATHAN:

 8        Q.   So Mr. Kagan, we've touched on this earlier, but the

 9   figure that you were looking for in the May 7th letter for the

10   unreimbursed construction costs was $758,025.56, right?

11   A.   Yes.

12        Q.   With 50,000 more anticipated, right?

13   A.   Yes.

14        Q.   And so that didn't include any of the fees that are

15   in that KDC contract that you signed for KDC and Lyman-Cutler,

16   right?

17   A.   In this letter, it is not.

18        Q.   Right.  And so if we look at Exhibit 67 --

19        MR. CARNATHAN:  And I think maybe go to the invoice

20   at the end.  Blow it up to try to make it somewhat reasonably

21   legible.

22   BY MR. CARNATHAN:

23        Q.   So the invoice includes a design fee of $25,000,

24   right, sir?

25   A.   Yes.



VADIM KAGAN - Cross

1        Q.    That's money that would go to KDC?

2   A.    Yes.

3        Q.    Right?  It includes office overhead of -- it's

4   difficult to read, but I think it's 59,000-two-something --

5   over $59,000, right?

6   A.    Yes.

7        Q.    That's another fee to KDC, right?

8   A.    Yes.

9        Q.    And if we look at the general construction fee of

10  fifteen percent, it's 560,838, I think.  It's not tremendously

11  legible, but over 560,000, right?

12  A.    Yes.

13       Q.    And then if we look down at the lower line, there's

14  a seventeen-and-a-half percent fee for advancing carrying

15  costs; do you see that?

16  A.    Yes.

17       Q.    Another 145,000 bucks, right?

18  A.    Yes.

19       Q.    So if we add those figures up, in round numbers, I

20  get about 790,000 bucks; does that sound right?

21  A.    Yes.

22       Q.    That's all money that would go straight to KDC,

23  right?

24  A.    Yes.

25       Q.    And we've already agreed that that's money that will

VADIM KAGAN - Cross

1    go straight to you and your wife, Tatiana, right?

2    A.   It will go straight to the company, because we have to

3    pay people.

4       Q.   Well, any fees into KDC, any profit in KDC goes to

5    you two.  It's a pass-through, right?

6    A.   Yes.

7       Q.   Now, I think you testified that the reason that

8    these didn't show up in the May 7th letter, is the May 7th was

9    some sort of a demand for the hard costs, right?

10   A.   Yes.

11      Q.   That was something you wanted to be paid right away

12   so you could pay the subs, right?

13   A.   Yes.

14      Q.   But you also testified that the deal was that you

15   were going to advance all the costs through KDC and get paid

16   when the houses sold, right?

17   A.   Yes, this is exactly what is shown in this invoice.

18      Q.   Right.  And the houses hadn't sold as of May 2015,

19   right?

20   A.   No, they not.

21      Q.   So you were basically demanding that Filippov and

22   Lipetsker pay you another $758,000, right?

23   A.   I demand an L/C, not take it from the business, and also

24   demand for myself.

25      Q.   Well, you knew perfectly well there wasn't any money

Page 97

VADIM KAGAN - Cross

1   in the bank account in May 2015, right?

2   A.   We can put the money in bank account and pay

3   subcontractors.  This is what I did.  I paid from my account

4   for the carrying costs and I paid from my accounts to

5   subcontractors, and I reimburse myself when they got the money

6   from the bank.  So we don't have money anymore, so we have to

7   put our -- we have to put more money in account to pay

8   subcontractors.  They have to be paid.

9        Q.   All right.  Isn't it a fact, sir, that you and Mr.

10  Cohen put together this June 1 invoice and the June 22

11  mechanic's lien to try to force Mr. Filippov and Mr. Lipetsker

12  to settle with you?

13  A.   No.

14       Q.   After you sent the May 7th, 2015 letter --

15       MR. CARNATHAN:  We briefly looked at Exhibit 54.  If

16  I could have it back?

17  BY MR. CARNATHAN:

18       Q.   -- on May 13th, 2015, my firm wrote back and

19  rejected your claims, right?

20  A.   Yes.

21       Q.   Okay.  And you see it went, by electronic mail and

22  U.S. mail, to Mr. Pyle, right?

23  A.   Yes.

24       Q.   And Mr. Pyle shared that with you pretty much right

25  away, right?



Page 98

VADIM KAGAN - Cross

1   A.   Yes.

2       Q.   Okay.  So on May 14th, you started forwarding

3   documents to Mr. Cohen, didn't you, sir?

4   A.   What documents?  This document?

5       MR. CARNATHAN:  Can I have Impeach 82?

6       PLAINTIFFS' EXHIBIT V WAS MARKED FOR IDENTIFICATION

7   BY MR. CARNATHAN:

8       Q.   Okay, sir.  I've asked the clerk to mark as Exhibit

9   V for identification, a packet of emails from the Kagan

10  Development at gmail.com Gmail account.  If we turn to the

11  fourth page in, Kagan 1213, you'll see that on May 14th, 2015,

12  at 1:58 p.m., you forwarded a bunch of materials to Mr. Cohen,

13  right, sir?

14  A.   I forward something, but I don't know what it is.  I have

15  to see the attachment.  Yeah, forward something to me, and I

16  forwarded it along, but I don't know what it is.

17      Q.   All right.  So you knew it was a copy of the

18  construction loan.

19  A.   Okay.

20      Q.   A copy of the manager certificate.

21  A.   Okay.

22      Q.   All right.  Materials from the closing of the loan

23  of the construction loan, right, sir?

24  A.   Okay.

25      Q.   Okay.  Now, interestingly enough, two pages later

VADIM KAGAN - Cross

1  on, you forwarded the same materials again on June 22nd, 2015;

2  do you see that?

3  A.   Okay.

4      Q.   That's the same day you recorded the mechanic's

5  lien, right, sir?

6  A.   Maybe.  Yeah, on June 22nd, yes.

7      Q.   And then you forwarded him the same stuff again on

8  September 22, 2015, on the next page.

9  A.   Okay.

10     Q.   What happened on September 22, 2015, sir?

11  A.   I don't remember exactly September -- September 2 --

12     Q.   You don't remember why you forwarded the stuff to

13  him a third time in September 2015?

14  A.   Maybe he said he doesn't have it, he asked me to forward

15  it, and I forwarded it.  Maybe he couldn't find it, so he

16  called me and said I couldn't find it, just mail it to me, and

17  I did.  I can't see another reason to send the same thing

18  twice.

19          THE COURT:  Okay.  What was the last one?

20          UNIDENTIFIED SPEAKER:  It was V for identification.

21          THE COURT:  It was V.  Okay.  This is W, right?

22          THE CLERK:  Um-hum.

23          MR. CARNATHAN:  This one's W.

24      PLAINTIFFS' EXHIBIT W WAS MARKED FOR IDENTIFICATION

25  BY MR. CARNATHAN:



VADIM KAGAN - Cross

1      Q.   So sir, I've now asked the court reporter to mark as

2  Exhibit W for identification another packet from your Gmail

3  account.

4          MR. CARNATHAN:  My apologies.

5  BY MR. CARNATHAN:

6      Q.   Okay.  We're back in business.  Looking again at

7  Exhibit W for identification, on June 3rd, sir, at -- June

8  3rd, 2015, at 10:17 a.m., you forwarded to Mr. Cohen this

9  packet of emails, right, sir?

10 A.   How many pages?

11     Q.   Fifteen, it looks like.

12 A.   I see only one page on the screen.

13     Q.   It's in the bottom right, it says 1 of 15.

14 A.   Okay.

15     Q.   Right?  You forwarded this to Mr. Cohen on June 3rd,

16 2015, didn't you, sir?

17 A.   What's the pages?  What's included?  I'm --

18          THE COURT:  Sorry, I didn't understand.

19 A.   I'm also not understanding.  You showed me the one page

20 of something --

21 BY MR. CARNATHAN:

22     Q.   Oh, I see.

23 A.   -- what I forwarded.

24     Q.   Okay.

25 A.   Because I don't know what.

VADIM KAGAN - Cross

1              MR. CARNATHAN:  May I approach, Your Honor?

2              THE COURT:  You may.

3    A.   Okay.

4    BY MR. CARNATHAN:

5         Q.   All right.  You forwarded these emails to Mr. Cohen

6    on June 3rd, 2015, right?

7    A.   Yes, I did.

8         Q.   And among the emails that are forwarded are Mr.

9    Filippov's comments about wanting to be the managing member.

10   A.   Okay.

11        Q.   It includes his comments about you having a penalty

12   if the project was not completed within twenty months.

13   A.   This is emails from who to who?  From Boris Maiden to

14   Filippov?

15        Q.   Among Filippov, you, Boris, Nick.  I mean, you

16   obviously had copies of these emails --

17   A.   No.

18        Q.   -- because you forwarded --

19   A.   No.

20        Q.   -- to Mr. Cohen, right, sir?

21   A.   No, no, no, no.  No.  No.  Based on these fourteen pages

22   of these emails, I was not even copied on it, what I'm seeing,

23   what you're showing to me right now.  And in the end what

24   somebody just forwarded to me when they have a conversation

25   for two weeks between each other.



VADIM KAGAN - Cross

1    Q.    Right, they forwarded it to you --

2  A.    Yeah.

3    Q.    -- back in 2012, and you forwarded them to Mr. Cohen

4  in June 2015, right?

5  A.    Yes.

6    Q.    So apparently you were aware of these emails?

7  A.    Yes, after I -- I did -- I start reading, you know, after

8  the lawsuit had started.  You know, they have a bunch of

9  conversations between -- Boris Maiden and Filippov were

10  negotiating something, and I was not involved in this

11  conversation.  But in the end there was somebody who just

12  forwarded it to me.  I was not on this email.  I think it's

13  only the last one when somebody just think he have to attach

14  Kagan.  Before that I was not on them.  This is strictly a

15  conversation between Filippov and Boris Maiden.  I am not on

16  it.

17    Q.    Well, you knew they were important enough to forward

18  to Mr. Cohen after the dispute began, right?

19  A.    I just forwarded him whatever we have.  He asked me to

20  forward what all we have regarding Lyman-Cutler; I just

21  forwarded him emails what I have.

22    Q.    Would you prefer this in paper?

23  A.    Yes, please.

24     PLAINTIFFS' EXHIBIT X WAS MARKED FOR IDENTIFICATION

25    Q.    So Mr. Kagan, I've asked the court reporter to mark,

VADIM KAGAN - Cross

1    as Plaintiffs' Exhibit X for identification, another email

2    from your Gmail account in which you forwarded to Mr. Cohen,

3    on May 14th, 2015, the email from Mr. Filippov, April 11th,

4    2013, in which he says:  "Here is the original proposal for

5    construction costs and carrying costs, 1.3 million and .2

6    million, a total of 1.5 million."

7    A.    This --

8         Q.    Right?

9    A.    This is what Filippov said; that's not me.  I didn't say

10   1.3 and --

11        Q.    Right.  And that scan of the relevant documents for

12   Lyman 77, that's that budget report that we looked at as

13   Exhibit 9, isn't it, sir?

14   A.    I don't know --

15        Q.    Okay.

16   A.    -- what's this.

17        Q.    You knew this one was important too, right?  You

18   forwarded it to Mr. Cohen on May 14th, 2015.

19   A.    I forwarded everything what I have regarding Lyman-

20   Cutler, any conversation, any emails what we have.  I just

21   forwarded it.

22        Q.    Okay.  I'm glad to hear you say that, sir, because

23   you know what we don't have?  There's no email from you to Mr.

24   Cohen forwarding that KDC contract that we've marked as

25   Exhibit 37.  That didn't happen, did it, sir?



VADIM KAGAN - Cross

1  A.   Because he -- he had -- because he has this agreement,

2  why do I have to forward it to him?

3       Q.   It's because it didn't exist, isn't it, sir?

4  A.   No, it was exist because Joseph made this agreement,

5  because he has this agreement, why I have to forward it to

6  him?  This all -- this is all the emails what I forwarded to

7  Joseph.  It's -- he was not even part of this conversation in

8  2013.

9            MR. CARNATHAN:  I'd like to offer Exhibits V, W, and

10  X into evidence, Your Honor.

11            MR. PERTEN:  Your Honor, we'd object on several

12  bases.  First off, as has been in so much of these, this was

13  not disclosed.  Secondly, many of these emails are hearsay.

14  Some of them are in evidence, some of them aren't.  Mr. Kagan

15  just said, you know, I just forwarded everything, I didn't see

16  these, I didn't read them, necessarily.  So he's in no

17  position to identify them.

18            To the extent there are emails within this that Mr.

19  Filippov authored, then they should have come in through Mr.

20  Filippov.  They can't come in through Kagan.  So again,

21  without going back document by document, to see which of these

22  are in and which of these aren't, presumably, the ones that

23  were important are in.  The ones that aren't, you don't get to

24  put them in through a witness who can't identify them.

25  It's -- it's rank hearsay, and it wasn't disclosed.  So we

VADIM KAGAN - Cross

1   would object.

2           MR. CARNATHAN:  Well, I'm trying to take the

3   objections in order.  I mean, they're offered for impeachment

4   because he's denied cooking up --

5           THE COURT:  You don't need to waste your --

6           MR. CARNATHAN:  Yeah.

7           THE COURT:  -- breath on this, right?  They're

8   obviously not offered for a hearsay purpose, obviously.

9   They're offered for impeachment.  The objections are

10  overruled.

11          MR. CARNATHAN:  Thank you, Your Honor.

12          THE COURT:  Do you want to make this a composite

13  exhibit again?

14          MR. CARNATHAN:  Whatever's most convenient for the

15  Court is fine by us, Your Honor.

16          THE COURT:  I guess I need to be mostly worried about

17  an appellate court, but --

18          MR. CARNATHAN:  I actually think in this case it

19  might make more sense to make them three because you noticed I

20  got a little confused at the beginning about the dates because

21  the Gmails are confusing.

22          THE COURT:  Let's make them three --

23          MR. CARNATHAN:  Yeah.

24          THE COURT:  -- Mary, just -- so go ahead and tell me

25  them.

VADIM KAGAN - Cross

1          THE CLERK:  So all right.  Exhibit identification --

2    hold on -- identification V would be Plaintiffs' Exhibit 334.

3    Document identification W will be 335.  And identification X

4    will be 336.

5          PLAINTIFFS' EXHIBIT 334 WAS ADMITTED INTO EVIDENCE

6          PLAINTIFFS' EXHIBIT 335 WAS ADMITTED INTO EVIDENCE

7          PLAINTIFFS' EXHIBIT 336 WAS ADMITTED INTO EVIDENCE

8          MR. CARNATHAN:  Could we return to Exhibit 67?

9          Maybe go back to the first page.

10   BY MR. CARNATHAN:

11        Q.   So Mr. Kagan, you'll see that this is an email dated

12   June 25, 2015 from Mr. Cohen to you and Mr. Filippov, Mr.

13   Pyle, and Mr. Perten; do you see that?

14   A.   Yes.

15        Q.   Okay.  And if we look at the last page, that's the

16   KDC invoice, right?

17   A.   Yes.

18        Q.   And that invoice purports to be dated June 1, 2015,

19   right, sir?

20   A.   Yes.

21        Q.   But in fact that invoice wasn't prepared by June 1,

22   2015, was it, sir?

23   A.   I don't know.

24        Q.   We talked a little bit about the KDC profits, but I

25   think you also agreed with me that the ProEx profits would go

VADIM KAGAN - Cross

1    to you and your wife too, right, sir?

2    A.    Yes.

3        Q.    And if we go back to Exhibits 326, 327, and 329,

4    I'll try to move things along.  The 326 was for 43,700

5    dollars, right?  I mean, I can show them to you, but without

6    belaboring it, the --

7    A.    What -- what -- you're talking about this invoice?

8        Q.    No, I'm talking about ProEx now.  I mean, we better

9    move on.

10   A.    Oh, okay.  All right.

11       Q.    Okay.  So 326, which is the demo proposal for 77

12   Lyman, is for 43,700, right, sir?

13   A.    Yes.

14       Q.    And if we go to 327 -- and I guess go to the end --

15   that one's for 418,150 dollars, right, sir?

16   A.    Yes.

17       Q.    And you did the same amount for the other property,

18   so it was times two, right, sir?

19   A.    Yes.

20       Q.    And we looked at a couple of other proposals for, I

21   want to say, like, 9,000 dollars each, right?  The May 2015

22   ones?

23   A.    Yes.

24       Q.    So when we add up the 418- times 2, the 43,7- and

25   the nines, in round numbers, it about 900,000 bucks, fair

VADIM KAGAN - Cross

1    enough?

2    A.   Yes.

3        Q.   And you can't tell me how much profits are built in

4    there for ProEx, can you, sir?

5    A.   They have some profit but it's very little because

6    basically it's a number what we have to pay to subcontractors,

7    pays for machinery, pays for insurance, pays for overhead.

8        Q.   At your deposition, you couldn't say, within 50,000

9    dollars, how much profit was built in there, could you, sir?

10   A.   I don't know.  I don't know in this invoice how much

11   profit is built.

12       Q.   But again, we certainly agree that whatever profits

13   in there would go to you and your wife?

14   A.   Yes.

15       Q.   Do you remember signing an affidavit in the state

16   court proceedings back in June 2015?  Do you remember that?

17   A.   We signed a lot of affidavits lately, so I don't know

18   which one.

19           MR. CARNATHAN:  I think we're at Y for

20   identification; is that right?

21           THE COURT:  Yes.

22           MR. CARNATHAN:  So may I approach the witness?

23           THE COURT:  Yes, you may.

24   BY MR. CARNATHAN:

25       Q.   Okay.  Mr. Kagan, on June 9th, 2015, you signed this

VADIM KAGAN - Cross

1   affidavit for presentation to the Middlesex Superior Court;

2   isn't that right, sir?

3   A.   Yes.

4        Q.   Okay.  And in the affidavit, you say that you agreed

5   "to oversee construction of the homes and to manage the

6   project at no cost to my partners beyond my percentage share

7   of the profits".  See that in paragraph 3?

8   A.   Yes.

9        Q.   And again, in paragraph 10, about the fifth line

10  down, you say:  "I paid myself nothing additional for my

11  services"; do you see that?

12  A.   Which paragraph?

13       Q.   I'm in paragraph 10 on the fourth page, five lines

14  down into the paragraph.  You say:  "I paid myself nothing

15  additional for my services", right?

16  A.   Yes.

17       Q.   So you swore under oath, on June 9th, 2015, that all

18  you were getting paid for overseeing the construction was your

19  percentage share of the profits, right, sir?

20  A.   But I -- that was not paid yet.

21       Q.   Well, we have that --

22  A.   The Lyman-Cutler, LLC didn't pay me yet.

23       Q.   -- the KDC contract that you claim to have signed on

24  June 24th, 2013, pays you a 560,000-dollar general contractor

25  fee, doesn't it, sir?



VADIM KAGAN - Cross

1    A.    Yes.  But that's not for my time; it's income and

2    constructions.

3         Q.    So you had studied the operating agreement

4    sufficiently to draft around it in the KDC contract by not

5    charging for your personal time; is that your testimony?

6    A.    I am not -- not charging for my personal time.  I'm not,

7    no.

8         Q.    Well, certainly your statement is also that you had

9    managed the project "at no cost to my partners beyond the

10   percentage share of profits", right, sir?

11   A.    Yes.

12        Q.    Right?  So the construction fee in the KDC contract

13   would be an additional cost to your partners, wouldn't it?

14   A.    It's an additional cost to everybody, to the whole

15   company.

16        Q.    All right.  And any --

17   A.    This is what's --

18        Q.    -- profit --

19   A.    This is what we agreed on.

20        Q.    Any profits to ProEx would be an additional cost to

21   your partners too, right?

22   A.    After we paid subcontractors, yes.  Maybe it's not going

23   to be profit left.

24        Q.    And the design fee would be an additional cost to

25   your partners, right?



VADIM KAGAN - Cross

 1   A.    Additional, yes, because I have to design this.  I'm am

 2   like as the subcontractor.

 3         Q.    And that overhead charge that you came up with, of

 4   59,000 bucks, that would be an additional cost, right?

 5   A.    It's going to be an additional cost.

 6         Q.    Right, and the 145,000 bucks to advance the carrying

 7   costs, that was another additional cost to your partners,

 8   right?

 9   A.    This is the additional cost what needs to be reimbursed.

10   It's based on the agreement.

11         Q.    So sir, is it that this affidavit's false, or is it

12   that the KDC contract didn't exist when you signed it?

13   A.    No, KDC contract was exist, and I didn't charge for my

14   time, but if the ProExcavation has a deal for 900 dollars to

15   basically hold the money what we owe subcontractors.

16         MR. CARNATHAN:  May I offer Exhibit Y for

17   identification into evidence?

18         THE COURT:  Any objection?

19         MR. PERTEN:  No, Your Honor.

20         THE COURT:  It's admitted.

21         What is it, Mary, 330-?

22         MR. CARNATHAN:  That's all I have form Mr. Kagan.

23         THE COURT:  Okay.  Thank you.

24         THE CLERK:  It will be Exhibit number 337.

25         THE COURT:  That's number 337.



VADIM KAGAN - Redirect

1          PLAINTIFFS' EXHIBIT 337 WAS ADMITTED INTO EVIDENCE

2              MR. PERTEN:  May I proceed, Your Honor?

3              THE COURT:  Yes, you may, please.

4                          REDIRECT EXAMINATION

5     BY MR. PERTEN:

6          Q.   Good morning, Mr. Kagan.

7     A.    Hi.

8          Q.   With respect to the operating agreement for Lyman-

9     Cutler, did Mr. Maiden review all the terms with you before

10    you signed it?

11    A.    No.

12         Q.   Who negotiated the construction loan for Lyman-

13    Cutler?

14    A.    Filippov.

15         Q.   Did you have any role in negotiating the

16    construction loans, or was that Mr. Filippov who did that?

17    A.    Filippov did that.

18         Q.   Did --

19             MR. PERTEN:  Strike that.

20    BY MR. PERTEN:

21         Q.   In 2012, were you able to read and understand

22    English in terms of legal documents?  Did you read legal

23    documents in English?

24    A.    2012, no.

25         Q.   Did you rely on Mr. Maiden to advise you on that?

VADIM KAGAN - Redirect

 1   A.    Only.

 2         Q.    In order --

 3              MR. PERTEN:   Strike that.

 4   BY MR. PERTEN:

 5         Q.    How was the Lyman-Cutler account funded in order to

 6   pay carrying costs?

 7   A.    We fund the account from Kagan Development.  We cut the

 8   checks and we deposit them.  And after it was paid from Lyman-

 9   Cutler account.

10         Q.    Now, sir, to the best of your knowledge, do the

11   Kagan Development computers have that feature where documents

12   auto-date, the date that's printed automatically appears at

13   the top?

14   A.    Yeah.

15         Q.    So when we looked at the proposal from

16   ProExcavation, which was dated September 2013, was that the

17   date that document was printed?

18   A.    Yes.

19         Q.    Mr. Carnathan showed you an affidavit of costs which

20   was submitted to the Town of Brookline; do you recall that?

21   A.    Yes.

22         Q.    Does the number that's provided to the Town of

23   Brookline contain all of the construction costs or just some

24   of them?

25   A.    Just some of them.

VADIM KAGAN - Redirect

1          Q.    What is not included?

2    A.    This is the -- my permit, and under the GC permit, it's

3    only the building costs, which is not including plumbing, not

4    including electrical, not including HVAC, any metal sheet

5    work, and not including a lot of landscaping.

6          Q.    Okay.  So that's not the total cost of construction;

7    that's just the total cost --

8    A.    Of my --

9          Q.    -- that you're required to report to the town?

10   A.    It's only cost of my permit.

11         Q.    Okay.

12   A.    Because all my subs, they have separate permits, they

13   have separate numbers.

14         Q.    I'm sorry; I didn't understand that.  Could you

15   elaborate?

16   A.    Because when the electrician filed getting the permit,

17   he's supposed to say how much electrical is going to be cost.

18   And he pay for his permit.  Plumber does the same thing in the

19   plumbing department.  And HVAC guy for the shipment of work,

20   they getting also the number.  And when the all numbers in,

21   that this was going to be -- plus we had the landscaping, it's

22   going to be total cost.  But 900- was only my cost.

23         Q.    Now, Mr. Carnathan asked you a little bit about the

24   mechanic's lien; do you recall that?

25   A.    Yes.



VADIM KAGAN - Redirect

1      Q.   Did you file suit to enforce the mechanic's lien?

2    A.   Yes.

3          MR. PERTEN:  All right.  Mr. Harris, could you pull

4    up Exhibit 281?

5          And I'd ask also if you could scroll up to the

6    signature block.  The verification, please.

7    BY MR. PERTEN:

8      Q.   Is that your signature, sir, on page 23 of this

9    document, on the verification?

10   A.   Yes.

11     Q.   And is that the lawsuit that you filed to enforce

12   your mechanic's lien?

13   A.   Yes.

14         MR. PERTEN:  Your Honor, I'd offer that as the next

15   exhibit that was objected to.

16         MR. CARNATHAN:  Objection.  I mean, it's -- this is

17   definitely hearsay in his hands.  I don't know what it's being

18   offered for.  It's after June 9th.

19         THE COURT:  What's the purpose?

20         MR. PERTEN:  Your Honor, in order -- under Chapter

21   254 of the General Laws, to perfect a mechanic's lien, you

22   file your notice of contract, statement account, and the third

23   step is to file the lawsuit, which is then recorded in the

24   registry of deeds.  So it's to complete.  To the extent that

25   they're challenging a lien, it's to show that we filed the

VADIM KAGAN - Redirect

1    suit and recorded it.

2           MR. CARNATHAN:  Well, I'd say it's beyond the scope

3    of my cross.

4           THE COURT:  All right.  If that's it, overruled.

5    It's admitted.

6           MR. PERTEN:  Thank you, Your Honor.

7           MR. CARNATHAN:  May I have a limiting objection that

8    it's not admitted for the truth of the contents of the

9    document?

10          THE COURT:  It's admitted -- my understanding, is to

11   show the fact that it was done is what you're seeking to --

12          MR. PERTEN:  That we complied with the lien law, yes,

13   Your Honor.

14          THE COURT:  And it's limited to that purpose.

15          MR. PERTEN:  That's fine.

16      DEFENDANTS' EXHIBIT 281 WAS ADMITTED INTO EVIDENCE

17          MR. PERTEN:  Now, Mr. Harris, could you pull up

18   Exhibit 31, please?

19          If you could scroll down, please.

20   BY MR. PERTEN:

21      Q.   Mr. Carnathan showed you this email, from me, of

22   2013.  At any point, did you respond to this email?

23   A.   No.

24          MR. PERTEN:  Okay.  Can we have Exhibit number 32,

25   please?  And if I could just ask you to scroll down just a

Page 117

VADIM KAGAN - Recross

1    little bit?

2    BY MR. PERTEN:

3        Q.   This email is addressed to Shura (ph.); who is

4    Shura?

5    A.    Filippov.

6        Q.   Okay.  And that's from Mr. Zhukovskiy?

7    A.    Yes.

8        Q.   Did you respond to this email?

9    A.    No.

10       Q.   So is this a conversation that you were involved in

11   or not?

12   A.    I was involved in this conversation.

13           MR. PERTEN:  Your Honor, I have nothing further.

14   Thank you.

15           THE COURT:  Whenever you're ready.

16                      RECROSS-EXAMINATION

17   BY MR. CARNATHAN:

18       Q.   Mr. Kagan, when you apply for the permit, you have

19   to file an affidavit of cost too; don't you, sir?

20   A.    Yes.

21           MR. CARNATHAN:  And so -- did we decide it's 333?

22   BY MR. CARNATHAN:

23       Q.   All right.  So we are now showing you the affidavit

24   that you signed -- or excuse me -- or the building permit

25   application that you signed, under penalties of perjury, on

VADIM KAGAN - Recross

1    July 22nd, 2013.  Do you see that, sir?

2    A.    Yes.

3        Q.    And in that one you estimated the total construction

4    would be 900,000, right?

5    A.    Yes.

6        Q.    And you arrived at that figure by adding 730- for

7    the structure, 40- for the plumbing, 50- for the wiring, and

8    80- for the HVAC, right, sir?

9    A.    Yes, this is the initial.

10        Q.    I'm sorry, I didn't --

11    A.    Yes, this is the initial thoughts when you apply -- yes,

12    when you're applying for the permit.

13        Q.    Okay.  But then if we go back to the final, it came

14

15    A.    Yeah, but this is different because the location of the

16    plumber they have their own number.  This is 900- my costs.

17            MR. CARNATHAN:  That's all I have, Your Honor.

18            THE COURT:  Anything further?

19            MR. PERTEN:  No, Your Honor.

20            THE COURT:  All right.  Thank you, sir.

21            MR. HARRIS:  Your Honor, we call Jason Gordon.

22            THE COURT:  Okay.

23                    JASON GORDON SWORN

24            THE CLERK:  Please be seated.

25            THE COURT:  Okay.



JASON GORDON - Direct

1                          DIRECT EXAMINATION

2    BY MR. HARRIS:

3         Q.   Okay.  Good afternoon, Mr. Gordon.  Could you please

4    state and spell your name for the record?

5    A.    Jason M. Gordon.  J-A-S-O-N, letter M., Gordon,

6    G-O-R-D-O-N.

7         Q.   Okay.  Where do you work, sir?

8    A.    S. Gordon Corporation.

9         Q.   Okay.  Could you please move the microphone a little

10   closer?  Thank you.

11             THE CLERK:  You can pull it --

12             THE WITNESS:  More?

13             MR. HARRIS:  Yeah.

14             THE WITNESS:  Like that?

15             MR. HARRIS:  Yes.

16             THE COURT:  Yeah, you can move that with you.  If you

17   want to sit back, feel free, but just keep that microphone in

18   front of you --

19             THE WITNESS:  Okay.

20             THE COURT:   -- and the counsel, okay?

21   BY MR. HARRIS:

22        Q.   Why don't you tell us again:  where do you work,

23   sir?

24   A.    S. Gordon Corporation.

25        Q.   What kind of company is that?

#15-13881; Adv. #16-01120                      6-17-2019



JASON GORDON - Direct

 1   A.    It's a public accounting firm.

 2         Q.    How long has it been in existence?

 3   A.    It was started by my father in the '70s.

 4         Q.    Okay.  How many employees does it have today?

 5   A.    Approximately eight.

 6         Q.    What types of services does the firm provide?

 7   A.    We provide -- we provide all the typical accounting

 8   services to our clients that you would expect from a CPA firm.

 9   We do tax preparation, tax planning, some reviews,

10   compilations, financial statements, and business advisory

11   services.

12         Q.    And what types of clients does your firm serve?

13   A.    We focus primarily on the business sector, typically

14   operating businesses between ten and eighty million dollars,

15   so small businesses, nothing public.  And we have a

16   concentration real estate where we spend probably fifty

17   percent of our time.

18         Q.    Okay.  What position do you hold?

19   A.    I'm the executive vice president.

20         Q.    And how long have you been with the firm?

21   A.    I've been with the firm about seventeen, eighteen years.

22         Q.    Can you just briefly describe for us what are your

23   duties in your current position?

24   of our clients as well as our staff.

25

JASON GORDON - Direct

1    Q.   Prior to joining your current firm, where did you

2    work?

3    A.   I had an internship as an auditor at Arthur Andersen.

4    Q.   Can you describe for us, briefly, your educational

5    background?

6    A.   Yes.  I have an undergraduate degree from Emory

7    University in Atlanta, Georgia.

8    Q.   Okay.  Have you had to pass any exams or similar

9    tests that are relevant to your occupation?

10   A.   Yes, I passed the CPA exam very early on in my career.

11   Q.   Okay.  Do you hold any certifications or

12   professional licenses?

13   A.   Certified Public Accountant in Massachusetts.

14   Q.   Okay.  Now, for how long have you held that license?

15   A.   Since somewhere around 2003.

16   Q.   Now, I want to ask you a few questions about Mr.

17   Kagan and his companies.  Has your firm provided services to

18   either Mr. Kagan or his companies?

19   A.   Yes, we have.

20   Q.   And on a high level, can you tell us what those

21   services have entailed?

22   A.   Yes, we have provided tax preparation services, some tax

23   planning type services, as well as what I would consider

24   assistance, oversight with some bookkeeping questions, as they

25   arrive, or what I call debit\credit type questions.



JASON GORDON - Direct

1      Q.   Okay.  Let me ask you a few questions first about

2    the tax returns.  Has your firm assisted in the preparation of

3    Mr. Kagan's personal tax returns?

4    A.   Yes.

5      Q.   And has it also provided services in connection with

6    KDC's tax returns?

7    A.   Yes, it has.

8      Q.   And how about for ProEx?

9    A.   Yes.

10      Q.   Okay.  We've been calling ProExcavation ProEx from

11   time to time.

12   A.   Got it.

13      Q.   Okay.  We've also heard some testimony that, from

14   time to time, Mr. Kagan sets up additional limited liability

15   companies in connection with development projects.  Has your

16   firm provided any tax preparation services in connection with

17   any of those companies?

18   A.   We have provided some tax preparation services in

19   connection with many of those.

20      Q.   And just while we're on this topic, did your firm

21   prepare the tax returns for the Lyman-Cutler, LLC?

22   A.   No.

23      Q.   Now, I want to ask you about the additional services

24   you described, the bookkeeping services.  Can you just give us

25   some examples of the types of services your firm has provided

JASON GORDON - Direct

1   to Mr. Kagan's companies in that regard?

2   A.   Yeah, we've provided, you know, we'll say on-call

3   assistance with bookkeeping type questions.  We didn't do the

4   bookkeeping, but as questions would arise throughout the year,

5   we'd answer questions on how things could be booked.  And then

6   at the end of the year, part of our tax preparation services

7   was looking over certain items.

8       Q.   How long has your firm had a relationship with Mr.

9   Kagan or his company?

10  A.   It was either the end of 2013 or beginning of 2014 that I

11  met them.

12      Q.   Do you have any reason to believe that either Mr.

13  Kagan or his companies have engaged in fraud?

14  A.   No.

15      Q.   Would you maintain a relationship with him if you

16  thought that he had engaged in fraud?

17  A.   Absolutely not.

18      Q.   Have you ever been an employee of any of Mr. Kagan's

19  companies?

20  A.   No.

21      Q.   Based on your dealings with Mr. Kagan's companies,

22  have you made any observations as to the level of Joseph

23  Cohen's involvement in the financial affairs?

24  A.   I haven't seen any of his involvement in, you know,

25  bookkeeping entries or anything like that.



JASON GORDON - Direct

1    Q.   Now, do you have experience working with either

2   general contractors or developers other than Mr. Kagan's

3   companies?

4   A.   Yes, I do.

5    Q.   Could you describe that for us, please?

6   A.   I represent other clients that are considered

7   developers/GCs, general contractors, where they've built homes

8   and developments or built buildings with condos and

9   subdivided.

10    Q.   Are the accounting issues that come up with respect

11   to Mr. Kagan's companies, are they similar to the account in

12   issues that the other general contracting companies tackle?

13   A.   Yes, there's a lot of similar -- similarity.

14    Q.   All right.  Now, let me ask you a few questions

15   about preparing the tax returns of Mr. Kagan and his

16   companies.  Am I correct that your firm's name appears on

17   those tax returns as the preparer?

18   A.   Yes, they do.

19    Q.   What level of review --

20        MR. HARRIS:  Strike that.

21   BY MR. HARRIS:

22    Q.   Am I also correct that the tax returns are based on

23   the financial information for those companies?

24   A.   Yes.

25    Q.   What level of review of that financial information

JASON GORDON - Direct

1  does your firm undertake in connection with the preparation of

2  the tax returns?

3  A.   We follow our -- we follow the standards by the AICPA

4  which basically says we're allowed to take the information

5  provided by our clients, and as long as nothing appears to be

6  incomplete, inconsistent, or inaccurate, we can prepare

7  without further inquiry.  If there are items that we need

8  further inquiry on, we'll do that.  So part of our -- part of

9  our firm's procedures is a little heightened on there where

10  we'll go through it and ask to see certain reconciliations,

11  bank reconciliations, loan reconciliations of intercompany

12  accounts, and ask a few questions to make sure we have some

13  level of comfort that at least all of the transactions are

14  being accounted for.

15      Q.   So if I have this correctly, you don't look at every

16  transaction; is that right?

17  A.   No, we don't look at every transaction.

18      Q.   But in the course of reviewing the financial data to

19  prepare tax returns, questions arise on your part; is that

20  right?

21  A.   Yes, they do.

22      Q.   And you pose those questions to the company, and you

23  seek out answers; is that correct?

24  A.   Correct.

25      Q.   And in the end you are -- are you sufficient --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JASON GORDON - Direct

1           MR. HARRIS:  Strike that.

2    BY MR. HARRIS:

3        Q.   By placing your name or your firm's name on the tax

4    returns, is that a signal that you are sufficiently

5    comfortable with the information?

6    A.   Yes, it is.

7        Q.   If you had reason to believe that his company is

8    engaged in fraud, would you put your firm's name on the tax

9    returns?

10   A.   Absolutely not.

11       Q.   Let me ask you some basic information about the

12   companies, and I'm asking just about KDC and ProEx for the

13   moment.  Do you the companies have the same tax identification

14   number?

15   A.   No, they do not.

16       Q.   So KDC and ProEx have separate tax ID numbers?

17   A.   Yes, they do.

18       Q.   Do they share a bank account?

19   A.   No, they do not.

20       Q.   They have separate bank accounts?

21   A.   Yes.

22       Q.   I think we've established they file -- each company

23   files its own tax returns; is that correct?

24   A.   Yes, that's correct.

25       Q.   Do the companies -- do KDC and ProEx, do they keep

JASON GORDON - Direct

1    separate sets of books?

2    A.    Yes, they each have separate sets of books.

3        Q.    And would that include separate general ledgers?

4    A.    Yes.

5        Q.    Could you describe for us the significance of

6    keeping separate general ledgers?

7    A.    Yes, absolutely.  So a general ledger is the primary

8    control of the accounting standards that allows you, when

9    people talk about debits and credits or balancing books, that

10   it allows you, if you follow certain procedures like bank

11   reconciliations or the like, you get assurance that you've at

12   least captured all of the transactions.  So it's really the

13   number one kind of internal control that you can first use for

14   accounting standards.

15       Q.    And so to close a loop on this, KDC has its own

16   general ledger where it keeps track of all of the items you've

17   just described, correct?

18   A.    Correct.

19       Q.    And ProEx has its own general ledger where it keeps

20   track of all of that information, correct?

21   A.    Correct.

22           MR. HARRIS:  Attorney Perten, could you bring up

23   Exhibit 143 for identification?  It's one of the Plaintiffs'

24   exhibits.

25           (Pause)



JASON GORDON - Direct

1    Q.   Mr. Gordon, we've put up on the screen what was

2    marked as Exhibit 143.  It's one of the plaintiff's exhibits.

3         MR. HARRIS:  Just for identification, this is not a

4    full exhibit yet, Your Honor.

5         If you can scroll up to the very top, Mr. Perten,

6    just so we can see the title at the top.  Okay.

7    BY MR. HARRIS:

8    Q.   First of all, do you -- as I show this to you on the

9    screen, do you recognize it; do you know what it is?

10   A.   Yes.

11   Q.   Can you tell us what it is?

12   A.   If I could see the title again.  But it's a general

13   ledger for KDC, and it looks like it's for the full year of

14   2014.

15   Q.   Okay.  Is this the type of information that your

16   firm receives in connection with its interactions with, in

17   this case, KDC?

18   A.   Yes.

19   Q.   Okay.

20        MR. HARRIS:  Your Honor, I'd like to admit this as

21   Exhibit 143.

22        MR. CARNATHAN:  No objection, Your Honor.

23        THE COURT:  All right, it's admitted, 143.

24       PLAINTIFFS' EXHIBIT 143 WAS ADMITTED INTO EVIDENCE

25   BY MR. HARRIS:

JASON GORDON - Direct

1     Q.    And why don't we do --

2          MR. HARRIS:  Attorney Perten, could you bring up

3    Exhibit 148, please?

4    BY MR. HARRIS:

5     Q.    All right.  We're going to put up on the screen for

6    you, Mr. Gordon, Exhibit 148 for identification.

7          MR. HARRIS:  If we could just see the very top, Mr.

8    Perten.

9    BY MR. HARRIS:

10    Q.    Okay.  And you see the title at the top.  Could you

11    tell us what this document is?

12    A.    Yeah.  It's the ProEx general ledger for -- it looks like

13    for the entirety of 2014.

14    Q.    Okay.  And again, is this the type of information

15    that your firm receives in connection with providing services

16    to, in this case, ProExcavation?

17    A.    Yes.

18    Q.    Okay.

19          MR. HARRIS:  We'd like to admit Exhibit 148.

20          MR. CARNATHAN:  No objection, Your Honor.

21          THE COURT:  All right, it's admitted.

22       PLAINTIFFS' EXHIBIT 148 WAS ADMITTED INTO EVIDENCE

23    BY MR. HARRIS:

24    Q.    Now, let's just deal with Exhibit 148 as an example.

25          MR. HARRIS:  And if we could scroll all the way over

JASON GORDON - Direct

1    to the left, Mr. Perten.

2    BY MR. HARRIS:

3        Q.   I just want you to identify for us the column, so we

4    get a sense of the type of information that each company

5    tracks.  So let's just talk about the column headers for a

6    moment.  Can you tell us what those are?

7    A.   Sure.  From left to right the column type means the type

8    of entry that went into the system.  Was it -- if it was a

9    deposit, if it was a check, if it was a ledger entry, or a

10   transfer.  Then you have the date, which is the date that

11   you're posting it as of.  So in this case, it would most

12   likely be the date of the bank transaction, since we're

13   looking at a bank account.  And then we skip over to name.

14   The name column is generally -- can be used for the name of

15   the bank, the customer, the vendor.  It depends the type of

16   transaction what pops up there.  Memo can be a reference.  And

17   where it says "split," that is the -- what we would call -- I

18   called before the double-entry bookkeeping, so where the

19   debits and the credits, that's telling you where the other

20   side of the entry is going to.  So in this example, there's a

21   debit to one cash account, and it's coming from the checking

22   account.  Though, it looks like that's more like a transfer

23   from one bank account to another, the first one.

24       Q.   Okay, thank you.  This particular general ledger for

25   ProEx is thirty-five pages long.  Do you see that?  Do you see

JASON GORDON - Direct

1    at the very top of the screen it says page 1 of 35?

2    A.    Yeah, I see the Adobe --

3        Q.    Okay.

4    A.    -- it says that.

5        Q.    On the representation that this is the thirty-five-

6    page PDF.  Is it fair to say that this document records the

7    financial activities, ins and outs, for ProEx for the calendar

8    year 2014?

9    A.    Yeah, that's what you would expect from a general ledger.

10       Q.    Okay.

11            MR. HARRIS:  And can you bring it back up, Exhibit

12    143, Mr. Perten?

13    BY MR. HARRIS:

14       Q.    We're returning now to the KDC general ledger for

15    2014.  This one I will represent to you is 103 pages long.  Do

16    you see that at the top of the screen?

17    A.    I see where it says that, yes.

18       Q.    Okay.  And were you expecting the same columns here?

19    I don't want to go through the columns again.

20    A.    Correct, I would expect the same columns.

21       Q.    All right.  In your dealings with Mr. Kagan's

22    companies, do you have any sense as to whether they use an

23    accounting software or similar software package?

24    A.    Yes, they use QuickBooks by Intuit.

25       Q.    And is this -- the general ledger's one of the

Page 132

JASON GORDON - Direct

1   outputs available from QuickBooks?

2   A.   Yes.

3        Q.   Okay.  Are you aware of any other practices with

4   respect to the financial recordkeeping that impact KDC and

5   ProExcavation keeping financial records separately?

6   A.   The biggest item is really entering the transactions into

7   a system like this to track it and then going through and

8   doing the bank reconciliations, you know, from time to time

9   and certainly at the end of the year, to ensure that

10  everything is captured and nothing is double-counted.

11       Q.   Okay.  Describe the is process of a bank

12  reconciliation.  We've heard that term a couple of times now,

13  but what does that mean?

14  A.   A bank reconciliation is where you go through and -- you

15  take what the software has in it, which is like your checkbook

16  per se, your sophisticated checkbook, and you see how that

17  correlates to the bank statement, which is actually what

18  happened.  And any discrepancies you look at, reconcile, and

19  figure out do they belong there or not.  One could be an

20  outstanding check, which would be acceptable, right.  If there

21  was a check that was outstanding, you might see it on your

22  QuickBooks but not in your bank yet.  But this is a spot that

23  you would typically catch if something was entered twice

24  inadvertently or something was forgotten at all.

25       Q.   Okay.  So when you're talking about reconciling bank

Page 133

JASON GORDON - Direct

1  statements, you're talking about tracking the movement of

2  dollars --

3  A.   Yes.

4      Q.   -- to make sure that it aligns with your -- with the

5  QuickBooks, which is a summary of those transactions?

6  A.   Correct.

7      Q.   All right.  And --

8          MR. HARRIS:  Strike that.

9  BY MR. HARRIS:

10     Q.   Can you also just describe -- you've used the term

11 "double-entry bookkeeping."  Can you describe that term so

12 we're speaking the same language?

13 A.   Yes.  So everything that comes in has to be classified

14 that goes into a general ledger system like this.  So on one

15 end, you see cash coming in, and you would have to identify

16 where that cash came from.  Did it come from revenue?  Did it

17 come from another entity as a loan?  Did it come from the

18 bank?  Did it come from a sale?  So every movement of cash has

19 a corresponding categorization of it.

20     Q.   Okay.  And based on your experience, does -- do KDC

21 and ProEx endeavor to provide these labels for the movement of

22 cash that you've just described?

23 A.   Yes, they do.

24     Q.   Now, there have been allegations in this case of

25 double-charging for work performed on the Lyman-Cutler

JASON GORDON - Direct

1    project.  Do any of the accounting practices that we've just

2    summarized on a high level affect whether there actually could

3    have been double-charging on the account?

4    A.    I would really need to know the specifics.  It would be

5    very difficult to see where KDC was seeking reimbursement for

6    something it didn't pay, because the way the general ledger

7    works, you know, that would probably come out.  It would be

8    very difficult to see double-counting.

9        Q.    Well, what is it about the general ledger that would

10   highlight that?

11   A.    The ledger, from the perspective that I've always seen

12   it, every time reimbursement was seeked -- the purpose of the

13   double-counting was when you said something is due from an

14   entity, you can trace that back to a credit card charge or to

15   a cash payment.  So if that cash payment was never made, it

16   would have to be reflected somewhere.  The books wouldn't

17   balance.

18       Q.    Okay.  So again, it comes back to finding the cash

19   transaction; is that right?

20   A.    Yes.

21       Q.    All right.  Now, what kind of accounting method does

22   KDC use?

23   A.    It's on the accrual-basis method of accounting.

24       Q.    All right.  And how about ProEx?

25   A.    Accrual basis as well.



JASON GORDON - Direct

1    Q.   Okay.  And am I correct that both companies' fiscal

2    years run on the calendar year?

3    A.   Correct.

4    Q.   I'd like to ask you a few questions about the KDC

5    business model and the ProEx business model, particularly how

6    it relates to how they account for expenses and revenue.  Can

7    you describe for us KDC's business model and how it relates to

8    it and how it accounts for that?

9    A.   Yes.  So primarily KDC's, you know, business transactions

10   and model was one where it would lay out expenses, certain

11   expenses, that it might pay on credit card or what not and

12   then seek reimbursement.  So it might pay somebody directly or

13   it might pay a bill on a credit card, and then it would

14   aggregate those charges and then seek reimbursement for those

15   charges.

16   Q.   Okay.  And now let me ask you about ProEx's business

17   model.  How does it compare and contrast?

18   A.   Okay.  So ProEx is totally different than KDC.  So KDC

19   was really just seeking reimbursement basically of the cost,

20   of a particular cost.  Where ProEx is totally different.

21   ProEx provides services either directly or through its subs

22   where it has a proposal and there's a fixed fee for a certain

23   scope.  And it doesn't bill back for -- it's not a cost-plus

24   arrangement.  For instance, if it has an excavator that it

25   paid for, it's not charging that ex -- you know, it's not

JASON GORDON - Direct

1  consuming that excavator on that project and charging it back.

2  So they come up with a particular cost what it, I guess, would

3  come up to do that job.  And it would bill against that

4  proposal.  So where it doesn't need to track particular costs,

5  how much time an excavator has spent there, or allocate

6  insurance dollars.  That's a lot of its business.  So, you

7  know, from my perspective, it's totally -- totally different.

8       Q.   Okay.  So let's return -- now that we've contrasted

9  them, let's return back to KDC's business model, for example.

10  You said that's a model based on reimbursement for expenses.

11  In that way of doing business, is it important to track which

12  expenses are incurred for which project?

13  A.   Yes, it's very important.

14       Q.   Okay.  And now if ProEx operates off a fixed

15  proposal, is it essential for ProEx to track expenses per

16  project in the same manner?

17  A.   It is not.  It's almost impossible because of the

18  equipment that's used in the insurances.

19       Q.   Okay.  Explain that.  Why is that the case?

20  A.   When you're buying heavy equipment or you own heavy

21  equipment for a project, you're not consuming it on that

22  project.  And when you buy this equipment in one year, you

23  know, you're not charging back your next five projects for

24  that generally.  I've never seen that.  So it's different than

25  the expense reimbursement model.  Or -- this is my

JASON GORDON - Direct

1   understanding, I've never seen it as a cost plus ProEx.  It

2   was a certain dollar amount for transaction, and that's when a

3   customer would get charged, that dollar amount, regardless of

4   how the work gets done.

5       Q.   Okay.  So if one were to look at ProEx's books,

6   financial records, for just the Lyman-Cutler project and

7   totaled up all of the transactions that happened to have been

8   labeled for the Lyman-Cutler project, would that necessarily

9   have captured all of the "expense" or the work that ProEx did

10  on that project?

11  A.   I think it would be totally irrelevant.

12      Q.   The model that ProEx uses, is that atypical or

13  unusual?

14  A.   No.

15      Q.   Now, from an accounting perspective, describe for us

16  how it is that ProEx's work on the Lyman-Cutler project is

17  actually reflected on its financials?

18  A.   From a revenue perspective?

19      Q.   Yes.

20  A.   So ProEx is on the accrual-basis method of accounting.

21  So just like any of its projects, it's called percentage of

22  completion generally that you would.  So as the project's

23  completed, you would recognize the revenue during that period

24  of time.  So if at the end of -- you know, at the end of the

25  year if forty percent of the project was done, you know, we

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JASON GORDON - Direct

1    would make sure that at least forty percent of that revenue

2    for that project gets booked.  That way you can max the

3    economics of -- you know, of what you paid out in expenses to

4    the revenue you earned.  Otherwise you end up with a lot of

5    expenses and revenue only on the last day, which could be a

6    different tax year, which is not acceptable to the IRS.

7        Q.   Okay.

8            MR. HARRIS:  Attorney Perten, could you bring back up

9    Exhibit 148?  I think it's the left tab that's already open.

10   Could you please scroll down to page 7 of this PDF?  All

11   right, can you keep scrolling down a bit?  All right.

12   BY MR. HARRIS:

13       Q.   You see we're now on page 7 of Exhibit 148.  This is

14   the ProEx general ledger for 2014.  Do you see there's an

15   account -- I'm not sure what number that is on the far left,

16   but it says, "accounts receivable"?

17   A.   Yes.

18       Q.   Do you see that?  Can you describe for us what

19   that -- what this block of the ProEx general ledger

20   represents?

21   A.   Yes.  is there any way I can see the whole page, left to

22   right, but --

23           MR. PERTEN:  We have a paper, if that would be

24   easier?

25           THE WITNESS:  I mean, I can describe it but --

JASON GORDON - Direct

1          MR. HARRIS:  Zoom a bit.

2          THE WITNESS:  Okay.

3   A.   So this accounts receivable ledger, starting in the

4   middle of the page there, shows you the balance of what is

5   owed.  It starts with that 281 or -- I don't know what the

6   number is -- on the right-hand corner in the middle.  And it

7   tracks as customers pay -- as customers pay ProEx here, you

8   see the money coming -- you see the money coming in on those

9   first several transactions are money coming in.

10  BY MR. HARRIS:

11         Q.   Where it says "payment" on the left side?

12  A.   Yes.

13         Q.   Okay.

14  A.   And it's in the right column, which is your credit

15  column.  And then as you go down, you then see where there's

16  invoices, which is then increasing your accounts receivable,

17  because that's when you're recognized revenue we're billing

18  for customers.

19         Q.   All right.  Let's focus in -- you see the line that

20  relates to Lyman-Cutler Road?  It has a little number 17, I

21  believe --

22  A.   Yes.

23         Q.   -- next to it.  Okay.  This is what's represented as

24  an invoice in the left-hand column, right?

25  A.   Correct.



JASON GORDON - Direct

1    Q.   Okay.  And then there's a date -- I believe it's

2    December 31st.  Is that --

3    A.   Yes.

4    Q.   Okay.  Then we have Lyman-Cutler Road.  Then in the

5    next column over it says "split."  What does that mean in this

6    context?

7    A.   Split means that it's actually going to multiple general

8    ledger accounts on the other side.

9    Q.   Other side -- what do you mean by "other side"?

10   A.   Other -- you know, on the credit side of the entry, it's

11   going multiple places on the revenue side somewhere.

12   Q.   Okay.  Give us examples.  Do you have any?

13   A.   You know, it might be representative of, if you billed

14   two projects on one invoice, you know, sometimes only the

15   first name shows up in this name column.  And you would see

16   that that $60,000 was billing 40,000 to one customer and 20 to

17   another, so you need to -- if you were in the system, you

18   could just live click into it, or scroll through other pages

19   to find it.

20   Q.   Okay.  Now, there appear to be a handful of ProEx

21   invoices all with December 31st, 2014.  Do you see that?

22   A.   Yes, correct.

23   Q.   Do you have any understanding as to why there are so

24   many invoices on the last day of the year?

25   A.   Yes, I do.

Page 141

JASON GORDON - Direct

1    Q.   Can you tell us why?

2    A.   Yes.  So at the end of the year, one of the questions we

3    ask, and KDC internally knows they need to do -- or ProEx

4    knows they need to do is, since it's an end-of-the-calendar

5    year, they need to true-up or book any revenue that was earned

6    throughout the year.  So even though they might not be billing

7    it per se at that moment, the economics need to be reflected

8    in the books.  So, you know, percentage of completion, there's

9    no reason to send a bill every week as you complete a project.

10   But, certainly, there are milestones.  You know, one of the

11   biggest ones being when you've completed a project you'll bill

12   it.  The other big one would be at the end of a calendar year

13   you're certainly going to want to book that so you can get the

14   revenue on the books in the year that it belongs, you know, to

15   show the economics of what happened during that year.

16   Q.   Okay.  So if we look at the Lyman-Cutler row line

17   again, you see there's an amount?  I think it's $325,000.

18   A.   Yes.

19   Q.   Do you see it?  How does that -- does that relate

20   this percentage completion concept you've been telling us

21   about?

22   A.   Um --

23   Q.   In other words, where does that number come from?

24   A.   That should be a billing against a proposal.

25   Q.   Okay.  Anything nefarious about the way in which

JASON GORDON - Direct

1   ProEx records this revenue as you've just described?

2   A.   No, I think it's pretty standard.

3        Q.   I want to shift topics a little bit.  Are you aware

4   of instances in which KDC and ProEx actually do -- enter into

5   business transactions with each other?

6   A.   They typically don't enter into what I'll say is

7   commercial transactions with each other.  But certainly like

8   most small businesses that require significant amounts of

9   capital, they may exchange money back and forth that is

10   notated in ledgers and tracked in order to use working capital

11   where it's needed.

12        Q.   Okay.  Are these referred to as intercompany

13   transfers?

14   A.   Yes.

15        Q.   All right.  Has your firm provided services to these

16   two companies in connection -- the accounting services -- in

17   connection with the intercompany transfers between them?

18   A.   Yes.  Part of our year-end inquiry is always to ask about

19   the intercompany transactions and to make sure that one set of

20   books -- full set -- each company set of books, if they have

21   an intercompany account, that they reconcile.  Just like you'd

22   make sure the bank statement and bank account reconcile, we'd

23   want to make sure that if one company says it's owed per se

24   $100,000 another company is showing that it owes it.

25        Q.   Okay.



JASON GORDON - Direct

1    A.    So that it balances.

2         Q.    All right.  And you may have touched on this a

3    little bit, but do the intercompany transfers between KDC and

4    ProEx, do they actually show up in the financial records of

5    those companies?

6    A.    Yes, they do.

7         Q.    How so?

8    A.    They'll show up in the general ledgers.

9         Q.    Okay.  And if I understand it, there's an effort to

10   make sure that the two companies' entries for each other

11   reconcile:  One is paying and one is receiving.  Is that

12   right?

13   A.    Absolutely.  So if money's transferred, it's reflected.

14        Q.    Okay.  By the way, would you expect an invoice

15   between ProEx and KDC for any of these intercompany transfers

16   you've just described?

17   A.    That wouldn't be typical, in my experience.

18        Q.    Okay.  Why not?

19   A.    When you're dealing with small businesses and similar

20   ownership and similar trades, quite often it's just the way to

21   manage working capital.

22        Q.    Now you've used that term a couple of times.  What

23   do you -- just so that I make sure we understand.  What do you

24   mean by managed working capital; what does that mean in this

25   context?

JASON GORDON - Direct

1  A.   Working capital, I mean, in this context it's really, you

2  know, cash-flow needs.  You know, oftentimes ProEx might need

3  money because its customers aren't paying it or haven't paid

4  an invoice yet.  And if KDC has the funds, it will lay out the

5  money to ProEx in order to keep that company floating.

6     Q.   Okay.  And, again, that transaction actually appears

7  on the financial records; am I correct about that?

8  A.   Yes.  Anything that goes through cash is reflected here.

9        MR. HARRIS:  Could you pull up Exhibit 288?  It's one

10  of the defendants' exhibits.

11        THE COURT:  I think we're going to take the lunch

12  break --

13        MR. HARRIS:  Okay.

14        THE COURT:  -- before we get to a new exhibit.

15        MR. HARRIS:  Yes.

16        THE COURT:  Let's try to be -- do you guys have

17  something up here that you're going to -- or do you have to go

18  out?

19        MR. CARNATHAN:  We're two blocks away, so we'll

20  probably go out, but --

21        THE COURT:  I see.

22        MR. CARNATHAN:  -- we can -- if you need us here,

23  we're here.

24        THE COURT:  No, no, no, I'm trying to figure out how

25  long -- I'm going to be on this call starting at 1.  I'll try

JASON GORDON - Direct

1    to come back up by 1:30, something like that, okay?

2              MR. CARNATHAN:   Sure.

3              THE COURT:   All right.   That should give you time.

4              MR. HARRIS:   Thank you, Your Honor.

5              THE COURT:   Okay.   We'll be in -- on break till then.

6              THE CLERK:   All rise.

7                      (Off the record at 12:51 p.m.)

8                       (On the record at 1:44 p.m.)

9              THE CLERK:   All rise.   Court is in session.

10             THE COURT:   Be seated.

11             Okay.   Whenever you're ready.

12             MR. HARRIS:   Thank you, Your Honor.

13             Mr. Perten, could you bring up Exhibit 288, please?

14   This is a full exhibit.

15                     RESUMED DIRECT EXAMINATION

16   BY MR. HARRIS:

17        Q.   Mr. Gordon, we've brought up on the screen Exhibit

18   288.   And let's first begin by identifying a couple of names.

19   So this Phillip Gordon on this email, who's Phillip Gordon?

20   A.   He's an employee of mine.

21        Q.   Okay.   And then you're cc'd on this particular

22   email; is that right?

23   A.   Correct.

24        Q.   Okay.

25             MR. HARRIS:   Attorney Perten, could you just scroll

JASON GORDON - Direct

1    down a bit to the --

2    BY MR. HARRIS:

3        Q.   And I want to ask you, Mr. Gordon, about the

4    paragraph -- the second substantive --

5            MR. HARRIS:  Well, strike that.

6    BY MR. HARRIS:

7        Q.   The paragraph that begins with the word "next," do

8    you see that?

9    A.   Yes.

10       Q.   Okay.  There's a reference there to reimbursement

11   accounts.  Do you have an understanding as to what's meant by

12   reimbursement accounts?

13   A.   Yes, I do.  Those are the accounts, once KDC pays for

14   money -- pays expenses with money, it is labeled into various

15   accounts that are identified for the specific projects.

16       Q.   Okay.  And there's a request here from Phillip

17   Gordon to either upload all the properties -- QB is

18   QuickBooks; is that right?

19   A.   Correct.

20       Q.   Or sending backup, do you see that?

21   A.   Yes.

22       Q.   And Mr. Phillip Gordon is asking -- he continues

23   "Showing me how these reimbursement balances on KDC tie to the

24   respective properties."  Do you see that?

25   A.   Correct.

JASON GORDON - Direct

1    Q.   And can you explain your understanding as to what

2    that request is?

3    A.   We're trying to make sure that the intercompanies agree

4    that the books balance per se, where if one entity shows that

5    it -- if KDC shows that it laid out money for a particular

6    project, I want to make sure that that project is recognizing

7    that as well.

8        Q.   Okay.   The paragraph below that, the one that begins

9    "loan accounts all tie out," do you see that?

10   A.   Correct.

11       Q.   What's your understanding of "loan accounts"?

12   A.   Loan -- loan accounts from this context is there are

13   certain -- there's certain ways that KDC track -- keeps track

14   of money it lays out or pays on behalf of its projects.   One

15   is if it pays an expense on behalf of a project directly and

16   it seeks reimbursement.   The second way would be if one of the

17   bank accounts for these project LLCs was running low and the

18   money needed to be paid directly out of that specific bank

19   account, KDC may, in fact, write a check and deposit it into

20   that project LLC's bank account, and that we would consider a

21   loan versus an expense reimbursement.

22       Q.   Okay.   Phillip Gordon writes "Except I do not have

23   the QuickBooks for Lyman-Cutler, so I cannot tie out the

24   $264,100 balance on KDC."   Do you see that?

25   A.   Yes.

JASON GORDON - Direct

1    Q.   Do you have an understanding as to what that

2  describes?

3  A.   There's some type of intercompany balance $264,100

4  showing on KDC, but we didn't have access to the Lyman-Cutler

5  QuickBooks.  We didn't prepare those tax returns either.  So

6  we were just asking to confirm that the balance is correct.

7  Or how do we ensure that this balance is correct as stated.

8    Q.   And we've had testimony before you've testified in

9  this case that there was another set of QuickBooks files not

10  maintained by Vadim or his companies that related to Lyman-

11  Cutler.  Is that what's being referenced here?

12  A.   It's another QuickBooks file that, you know, certainly

13  wasn't one that we -- wasn't one that I dealt with.

14    Q.   Okay.  Is this email exchange an example of the type

15  of back and forth where your firm is asking for information in

16  order to perform its accounting services on behalf of the

17  companies?

18  A.   Yes, this is, you know, certainly part of our process of

19  just trying to make sure that everything, to the best of our

20  ability, is captured in a complete manner.

21    Q.   We've talked a little bit about the circumstances

22  under which there might be loans between companies related to

23  these projects.  Anything about the amounts or frequency of

24  those loans that indicate financial mismanagement to you?

25  A.   No, everything -- you know, we saw there were separate

JASON GORDON - Direct

1    general ledgers kept, separate bank accounts, so there was a

2    trail on all these.

3            MR. HARRIS:  Mr. Perten, could you bring up Exhibit

4    304 for identification, please?  It's one of the defendants'

5    exhibits.  If we could see the top of the exhibit, please?

6    Thank you.

7    BY MR. HARRIS:

8        Q.   Mr. Gordon, could you tell us, first, do you

9    recognizes this document?

10   A.   Yes, I do.

11       Q.   Can you tell us what it is before we talk about the

12   actual substantive entries?

13   A.   Yes.  These are proposed adjusting entries that we

14   provided to KDC at the end of the year.  So as we go to look

15   at the books to prepare the tax returns, we propose entries to

16   reclass certain transactions generally for tax purposes but

17   could be for accounting purposes as well.

18       Q.   Okay.  Is this a document that your firm creates?

19   A.   Yes, it is.

20       Q.   All right.

21           MR. HARRIS:  I'd like to move this exhibit into

22   evidence, Your Honor.

23           MR. CARNATHAN:  No objection, Your Honor.

24           THE COURT:  All right, it's admitted.

25         PLAINTIFFS' EXHIBIT 304 WAS ADMITTED INTO EVIDENCE



JASON GORDON - Direct

1           MR. HARRIS:  Okay.

2    BY MR. HARRIS:

3       Q.   Now, let's talk a little bit --

4           THE COURT:  What's the next number?

5           MR. HARRIS:  This is 304.

6           THE COURT:  304 for ID --

7           MR. HARRIS:  It's already in --

8           THE COURT:  -- but it's also --

9           MR. HARRIS:  Yes, sir.

10          THE COURT:  304 into evidence.

11          MR. HARRIS:  Yes.

12   BY MR. HARRIS:

13      Q.   Now, explain to us -- you're saying that your firm

14   proposes adjustments.  What are the circumstances under which

15   your firm might propose adjustments?

16   A.   When we're reviewing the -- when we're looking at the

17   books to prepare the tax return, there's certain things for

18   tax purposes specifically that we will focus in on to propose

19   adjustments -- adjustments that need to be made for tax

20   purposes.  For instance, depreciation of equipment is

21   something that would be very typical and show up every year.

22   But it also could be, you know, just certain expense

23   classification.  Something was in, you know, one expense

24   account, and it should have included the bank charges as

25   another example on here.

JASON GORDON - Direct

1    Q.   Now, I want to ask you on this document, Exhibit

2    304, there's a column called "reference."  Do you see that?

3    A.   Yes.

4    Q.   What does that -- what does "reference" refer to?

5    A.   We label each of our adjustments when we provide them to

6    our clients, which is standard in the accounting industry.  So

7    when we send them these, they then post these in their books

8    and records.  And we have a reference as to -- you know, why

9    we came up with those.

10   Q.   Okay.  And am I correct that your firm maintains

11   work papers associated with these adjustments?

12   A.   Yes, we do.

13   Q.   Is this -- we're looking at one example.  This is

14   for the calendar year 2015.  Is this a process that happens

15   essentially every year?

16   A.   Yes, it happens every year on all of our clients pretty

17   much.

18   Q.   All right.

19        MR. HARRIS:  Mr. Perten, could you bring up Exhibit

20   305, please, for identification?

21   BY MR. HARRIS:

22   Q.   All right.  Again, sir, I'm going to ask you do you

23   recognize this document?

24   A.   Yes, I do.

25   Q.   Can you tell us what it is before we talk about the

JASON GORDON - Direct

1    substance of it?

2    A.   Yeah.  So this is what we call an adjusted client trial

3    balance.  It's a summary of all the transactions for the year.

4    And the first part of this is a summary of what you consider

5    the balance sheet items which is, like, your check book

6    accounts, checking accounts, receivable.  And then further

7    down it gets into your income statement accounts, revenues and

8    expenses.

9         Q.   Is this a document that your firm prepares?

10   A.   This is one we prepare, yes.

11        Q.   Okay.

12        MR. HARRIS:  Your Honor, I'd like to admit 305 as a

13   full exhibit.

14        MR. CARNATHAN:  No objection, Your Honor.

15        THE COURT:  All right.  It's admitted, 305.

16       PLAINTIFFS' EXHIBIT 305 WAS ADMITTED INTO EVIDENCE

17        MR. HARRIS:  Thank you.

18   BY MR. HARRIS:

19        Q.   Now, this one happens to be for ProExcavation; is

20   that right?

21   A.   Correct.

22        Q.   Would there be a similar one for KDC?

23   A.   Similar format, yes.

24        Q.   Okay.  If we scroll --

25        MR. HARRIS:  Can we scroll down a little bit, Mr.

JASON GORDON - Direct

1  Perten, just so we can see the bottom half.

2

3  BY MR. HARRIS:

4      Q.   You said the top half is essentially balance sheet

5  information; is that right?

6  A.   Yes.

7      Q.   And then the bottom half is what of the bottom

8  section?

9  A.   Income statement items.  So what you're looking at now is

10  pretty much all -- the summary of all expense accounts.

11     Q.   Okay.  And, again, this happens every year?

12  A.   Yes.

13         MR. HARRIS:  Mr. Perten, could you scroll back up

14  towards the top, please?

15  BY MR. HARRIS:

16     Q.   I want to ask you about the entry there that has the

17  box around it.  It's account number 2018.  Do you see that?

18  A.   Yes.

19     Q.   Do you have an understanding as to what that

20  description means?

21  A.   Yes.  So that's a note payable from KDC.  So it's showing

22  that $225,000 is owed from KDC.

23     Q.   To ProEx?

24  A.   To ProEx.

25     Q.   Okay.



JASON GORDON - Direct

1          MR. HARRIS:  And could you bring up, Mr. Perten,

2     Exhibit 306?

3     BY MR. HARRIS:

4          Q.   All right.  Now, again, I'm just going to ask you,

5     first, do you recognize this document?

6     A.   Yes.

7          Q.   Could you tell us what it is before I hand you the

8     substance of it?

9     A.   Yes.  This is the adjusted trial balance of KDC for year

10    2015.

11         Q.   Okay.  And is this a document your firm prepares?

12    A.   Correct.

13         MR. HARRIS:  I'd like to admit 306, Your Honor.

14         MR. CARNATHAN:  No objection, Your Honor.

15         THE COURT:  All right, it's admitted.

16      PLAINTIFFS' EXHIBIT 306 WAS ADMITTED INTO EVIDENCE

17         MR. HARRIS:  Thank you.

18    BY MR. HARRIS:

19         Q.   Again, is this essentially the same concept as what

20    we just looked at with respect to ProEx?

21    A.   Same concept, yes.

22         Q.   All right.  And if I could ask you to look at

23    account --

24         MR. HARRIS:  Can we scroll down just a little bit,

25    Mr. Perten?

JASON GORDON - Direct

1    BY MR. HARRIS:

2         Q.   -- to account 2021, do you see that?

3    A.   Yes.

4         Q.   And what does that description mean?

5    A.   Note receivable ProExcavation.

6         Q.   And, again, what does this signify?

7    A.   That's the other side of the entry we just looked at,

8    that 225 -- it says that this company, KDC, owes ProExcavation

9    $225,000.

10        Q.   Okay.  And is this an example of what you were

11   talking about before lunch of having the accounts -- various

12   accounts tie out to each other?

13   A.   Yes, it is.

14        Q.   Okay.  Now, in your dealings with KDC and ProEx,

15   have you seen any evidence of comingling of assets?

16   A.   No, I have not.  I've seen separate bank accounts and

17   separate ledgers tracking items.

18        Q.   Okay.  Now, as we've seen, there has been -- there

19   have been instances in which money has floated from one

20   company to the other; is that right?

21   A.   Correct.

22        Q.   And as we've covered now, those are reflected on the

23   company's financials; is that right?

24   A.   Correct.

25        Q.   Now, I want to ask you about the financial records

JASON GORDON - Direct

1   actually for the Lyman-Cutler, LLC.  You told us before lunch

2   your firm did not prepare the tax returns for that entity; is

3   that correct?

4   A.   That's correct.

5        Q.   And we saw in Exhibit 288 there was a reference to

6   not having access to the QuickBooks file maintained by that

7   entity; is that right?

8   A.   Correct.

9        Q.   All right.  Now, in connection with providing

10  services to Mr. Vadim -- Mr. Kagan's companies, did you firm

11  at any time get access to financial information maintained by

12  Lyman-Cutler, LLC?

13  A.   I don't believe we ever got access to their QuickBooks

14  files.

15       Q.   Okay.  Was there any level of financial information

16  utilized by your firm in connection with the services provided

17  to either Mr. Kagan or his companies?

18  A.   With respect to Lyman-Cutler?

19       Q.   Yes.

20  A.   You know, we may have seen some reports and asking for

21  title balances.  I don't -- I don't see any of that, and I

22  don't recall us ever getting access to their -- to those

23  books.

24       Q.   Okay.  Now, with respect to KDC's work on the Lyman-

25  Cutler project, you described for us before lunch a

JASON GORDON - Direct

1    circumstance where KDC would expend the funds on behalf of

2    that project and then seek reimbursement, correct?

3    A.    Correct.

4        Q.    All right.  And can you describe the mechanics of

5    how that process is actually reflected on KDC's books?

6    A.    Yes.  KDC would incur expenses on behalf of the projects,

7    say, Lyman-Cutler.  And it would go into a certain

8    reimbursement account that was due -- you know, that was

9    labeled Lyman-Cutler.  And as that account aggregated with

10   multiple charges in it, eventually, you know, some type of

11   invoice would be created moving it out of that reimbursement

12   expense account to an accounts receivable account on the

13   general ledger and eventually then get paid.  So it was a

14   multi-step process:  The expenses get aggregated in one

15   account, okay, basically your unbilled expenses, and then

16   eventually KDC would seek reimbursement, and it would go into

17   a receivable account labeled to a particular project, you know

18   Lyman-Cutler in this instance.  So if you were looking to see

19   how much was owed from a particular project, Lyman-Cutler, you

20   would have to be looking into both accounts:  the

21   reimbursement account, which is unbilled expenses, as well as

22   accounts receivable, which is billed.

23       Q.    Okay.  And, again, those expenses are tied back to

24   cash transactions; is that right?

25   A.    Yes.  All the ones that I've seen, they tied back to

JASON GORDON - Direct

1  either something that was paid out with a check or more likely

2  paid on credit card and you can tie it back to a credit card

3  statement.

4       Q.   Okay.  Now, if Lyman-Cutler, LLC, paid some expenses

5  for the project directly out of its own account, would any of

6  that transaction show up on KDC's books?

7  A.   No, it would not.  KDC was just basically a company that

8  was paying certain items and getting reimbursed.  It would be

9  missing a large scope of the transactions.

10      Q.   But in order to see a broader scope of what actually

11 was incurred for the Lyman-Cutler projects, you'd have to look

12 at Lyman-Cutler's transactions and KDC's transactions; is that

13 right?

14 A.   You should be able to look at Lyman-Cutler's

15 transact -- you know, Lyman-Cutler's QuickBooks.  And as long

16 as it's reconciled to KDC and ProEx, everything should be on

17 Lyman-Cutler, and that's what they should be using.

18      Q.   Okay.  Now, I want to ask you a few questions about

19 the tax returns that you prepared for KDC.  Do you recall,

20 sir, that there was -- that amendments were made to KDC's tax

21 returns in 2014 and 2015?

22 A.   Yes, I recall they were made for 2014 --

23      Q.   For 2014.

24 A.   -- and 2015, yes.

25      Q.   Okay.  Could you explain the circumstances; why were

JASON GORDON - Direct

1    amendments necessary?

2    A.    Yes.  So we had found out, subsequent to filing the

3    returns, that there were multiple projects, maybe three or

4    four, for which Vadim Kagan, person -- individually owned the

5    LLC interest.  And we were under the impression or under

6    the -- we had filed as if KDC had owned a hundred percent of

7    those transactions.  So they were consolid -- so originally

8    those three or four projects were consolidated under KDC.  So

9    when they sold, the revenue and expenses would be there, as

10   well as liabilities.  And, in fact, once we found out that

11   this was an error, that it really just was Vadim individually

12   owning those LLCs, we amended the returns to make sure they

13   were correct.

14        Q.    Any of those amendments change the overall

15   economics?

16   A.    No.  Being that Vadim's family owned a hundred percent of

17   the S-Corp of KDC, and he owned a hundred percent of the LLC,

18   all of the taxable income would end up on his personal return.

19   We just amended it.  Really, we wanted to get it populated

20   correctly, but it really had no economic -- very little

21   economic impact.

22        Q.    We've had a little bit of testimony -- we've covered

23   a little bit about adjustments to financials, as opposed to

24   tax returns, adjustments to KDC's or ProEx's financials.  I

25   think before lunch you mentioned there was a -- there were

JASON GORDON - Direct

1    mile -- certain milestones when this might occur.  Can you

2    tell us the circumstances under which either of those

3    companies might have adjustments to their financials?

4    A.   Yeah.  So if we were looking to see how an entity was

5    performing throughout the year, whether it be for tax-planning

6    strategies, whether it be for a conversation with the -- with

7    the banks, if they ask how things were going, we would want to

8    have some entries booked, for instance, on ProEx, the

9    percentage of completion.  You know quite often they'd wait a

10   significant amount of time to actually invoice or request the

11   money, ProEx would from one of its project LLCs, but all

12   along, it's incurring costs.  So if you were going to take a

13   snapshot of what's going on at any particular time, it would

14   like it's a big loss because there was no revenue going

15   against those expenses.  So, you know, certainly at the end of

16   the year on December 31st, but sometimes even a little bit

17   before then, for us to understand how the economics are

18   moving, we'd want to see what projects sold during the year,

19   and really the percentage of completion was done so we'd have

20   an idea of where things were from a planning perspective.

21        Q.   Okay.  And so those might be the circumstances under

22   which adjustments to the -- it might cause a review of the

23   financials and, therefore, adjustments to the financials; is

24   that right?

25   A.   Correct.



JASON GORDON - Direct

1      Q.   What's the goal of making those adjustments; why

2    make them?

3    A.   Depending upon what it is, it's usually to see the true

4    economics of how the company is performing.

5      Q.   So it would be more problematic not to make the

6    adjustments?

7    A.   You would have to make the adjustments in order to

8    understand what's really going on.  And then definitely at the

9    end of the year in order to accurately report for tax

10   purposes.

11     Q.   Okay.

12        MR. HARRIS:  Mr. Perten, could you bring Exhibit 305

13   back to the screen?  If you just click on the tab at the top

14   there, it should come up.

15   BY MR. HARRIS:

16     Q.   We're returning now to the adjusted client trial

17   balance for ProEx.  Do you see that?

18   A.   Yes, I do.

19     Q.   Okay.  If we scroll all the way down to the

20   bottom --

21        MR. HARRIS:  Strike that.

22   BY MR. HARRIS:

23     Q.   Before we do that, this is for 2015, correct?

24   A.   Yes.

25     Q.   Okay.  If we scroll all the way down to the bottom,

JASON GORDON - Direct

1    what is the net profit or loss shown?

2    A.    This is 150,592.55.

3        Q.    Okay.  Do you have a sense of the profits earned by

4    ProEx between 2014 and 2016?

5    A.    I believe in the aggregate it was a couple hundred

6    thousand dollars of profit between all three years.

7        Q.    Okay.  And in this particular 2015 year it's showing

8    a profit of $150,000; is that right?

9    A.    Correct.

10       Q.    Right.

11           MR. HARRIS:  And can we scroll to the top of the

12   page, please?

13   BY MR. HARRIS:

14       Q.    There's a line here that -- account 1004, accounts

15   receivable, do you see that?

16   A.    Yes.

17       Q.    Okay.  And what's the -- what's the amount there?

18   A.    The amount's 532,763.41.

19       Q.    Okay.  The profit shown at the bottom of page,

20   $150,000, does that take into account that ProEx would

21   actually collect $532,000?

22   A.    Yes, it does.  I mean, what this shows is more than the

23   company's entire profit is still being held in accounts

24   receivable.  So that's contemplated in the 150.  Without the

25   532 there, it would be the loss.



JASON GORDON - Cross

1      Q.   Okay.  So if ProEx never collects this $532,000,

2   it's not making $150,000 of profit, is it?

3   A.   No, it's not.

4      Q.   Is ProEx a viable vehicle to stash profits?

5   A.   I'm not sure what a viable vehicle to stash profits, but

6   clearly if it's made a couple of hundred thousand dollars over

7   a few years -- and this is a conversation I've had -- it made

8   a couple of hundred thousand dollars over a few years and it's

9   owed over $500,000, it looks like it's not potentially making

10   enough money and it's certainly not collecting enough money.

11           MR. HARRIS:  Could I just have one moment, Your

12   Honor, please?

13           THE COURT:  You may.

14           MR. HARRIS:  I have nothing further at this time.

15   Thank you.

16           THE COURT:  Okay.

17                       CROSS-EXAMINATION

18   BY MR. CARNATHAN:

19      Q.   Mr. Gordon, did I understand you right, that ProEx

20   actually doesn't track its expenses by project, right?

21   A.   It does track some expenses by project.

22      Q.   But overall ProEx actually can't tell -- you can't

23   match the expenses from project to project to the revenue, so

24   we can't tell if its got a profit on a particular project; is

25   that right?



JASON GORDON - Cross

1    A.    Correct, there's no tracking by project profitability.

2                MR. CARNATHAN:  This is still -- you follow this up

3    screen, right?

4                MR. PERTEN:  Yes, it is.

5                MR. CARNATHAN:  Maybe it makes sense to shift over to

6    Mr. Hartzell.

7                Would you highlight the loans two-thirds down?  I'm

8    interested in --

9                           (Pause)

10   BY MR. CARNATHAN:

11       Q.    So, Mr. Gordon, when I look at Exhibit 306 that you

12   were looking at a moment ago, and it says "Loan Kristina

13   Brusenkova 15,000," does that mean that she owes KDC 15,000

14   for a loan as of 12/31/2015?

15   A.    Yeah, that would show that she is -- it's on the debit

16   side.  Yes, that would show that she is -- she owes KDC

17   $15,000.

18       Q.    Okay.  And a couple of lines above that there's a

19   loan for $260,000, V&D loan four percent.  Do you see that?

20   A.    Yes.

21       Q.    And that's a loan from V&D Heating, right?

22   A.    I have no idea what V&D stands for?

23       Q.    Viktor Sergeyev?

24   A.    No, idea.

25       Q.    Do you know how long that 260,000's been carried on

JASON GORDON - Cross

1    KDC's books?

2    A.    No, I don't.

3         Q.    You mentioned, sir, that your work is governed by

4    the AICPA standards, if you will; have I got that right?

5    A.    Correct.

6         Q.    And so is the AICPA the American Institute of

7    Certified Public Accountants?

8    A.    Yes.

9         Q.    Okay.  And that's an authoritative source of rules

10   and standards for certified public accountants?

11   A.    Yes.

12        Q.    And if I understood things right, what you primarily

13   did for Mr. Kagan and his companies, which you did the tax

14   returns for KDC, right?

15   A.    Yes.

16        Q.    And you did them for ProEx?

17   A.    Yes.

18        Q.    And you did them for Mr. and Mrs. Kagan?

19   A.    Yes.

20        Q.    And you did them for some of the project LLCs?

21   A.    Correct.

22        Q.    And you would answer some bookkeeping questions when

23   they came up, right?

24   A.    Correct.

25        Q.    And, in fact, at times you did answer some tax

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

JASON GORDON - Cross

1    questions from Mr. Cohen; isn't that right, sir?

2    A.   I believe he asked me once about -- or I can recall once

3    where he asked me about the character of taxation.

4         Q.   Okay.  But you never did what's called an

5    attestation engagement for any of those people, right?

6    A.   Correct.

7         Q.   You never did one for KDC?

8    A.   No.

9         Q.   You never did one for ProEx?

10   A.   Not that I re -- no.

11        Q.   Never did one for Lyman-Cutler?

12   A.   No.

13        Q.   Never did one for the Kagans?

14   A.   Never.

15        Q.   And so when we talk about an attestation engagement,

16   that's an engagement where you as an accountant are asked to

17   express an opinion about the reliability of some financial

18   records; is that fair?

19   A.   Broadly, yes.

20        Q.   Okay.  And there are, as I understand it, three

21   different levels of attestation engagements?

22   A.   Three primary levels, yes.

23        Q.   Right.  There's the compilation, there's the review,

24   and then there's the audit; is that about right?

25   A.   Yes.

JASON GORDON - Cross

1        Q.   And so in a compilation, that's like the lowest

2    level of assurance, if you will, you just sort of compile the

3    financial statements and put them in an organized format; is

4    that about right?

5    A.   Correct.

6        Q.   And then in a review, it's kind of a mid-level.   You

7    do some analytical work, but you don't really dig into the

8    specific invoices and what not; is that fair?

9    A.   Correct.

10       Q.   And then an audit's the highest level, right, that

11   you start digging in and looking for -- for assurance that the

12   financials are free of material misstatement, right?

13   A.   Correct.

14       Q.   And you didn't do any one of those three levels of

15   attestation engagement for any of the parties that we're

16   talking about here today, right?

17   A.   Nope.

18       Q.   Okay.  so you've never reviewed the internal

19   controls at KDC?

20   A.   Never done a formal internal control review.

21       Q.   Right.  And you've never done a formal internal

22   control review for ProEx, right?

23   A.   Correct.

24       Q.   And you've never did a formal internal control

25   review for Lyman-Cutler, right?



JASON GORDON - Cross

1    A.    I never worked for Lyman-Cutler.

2         Q.    You're aware that Mr. Gersh was keeping a set of

3    QuickBooks for Lyman-Cutler, right, sir?

4    A.    Yes.

5         Q.    Okay.  And you never actually asked for any support

6    documents like invoices or contracts to confirm the

7    information you were getting from your clients, KDC or ProEx,

8    right?

9    A.    There may have been sometimes we asked for invoices, but

10   generally we did not.

11        Q.    Okay.  And you never did any third-party

12   confirmation.  You never reached out to a bank or something to

13   check on them, right?

14   A.    No, never reached out to a bank.

15        Q.    All right.  And you've never reviewed the American

16   Express statements for KDC, right, sir?

17   A.    I've seen them.

18        Q.    Okay.  Well, you remember at your deposition you

19   told me you never reviewed them, right?

20   A.    I never reviewed them in detail, but I had seen them.

21        Q.    Okay.  And you never reviewed the ProEx AmEx

22   statements either, right, sir?

23   A.    Never reviewed them in detail.

24        Q.    And so, in fact, in preparing the tax returns, you

25   largely relied on the information that you got from KDC,

JASON GORDON - Cross

1   ProEx, and Mr. Kagan, right?

2   A.    Correct.

3        Q.    And you're entitled to do that under the standards

4   from the AICPA, right?

5   A.    Correct.

6        Q.    So as you sit here today you actually cannot attest

7   to the accuracy of the recordkeeping for any of those

8   entities, right?

9   A.    No, I can only tell you what we did.

10       Q.    Okay.  Now, even if you had done an audit, sir,

11  isn't it a fact that you might not necessarily detect material

12  misstatements in the financials, right?

13  A.    Correct.

14       Q.    I mean, no matter how hard your worked, there's

15  always something called attestation risk, right?

16  A.    Yes.

17       Q.    And that's the risk that there are actually material

18  misstatements in the financials that you don't detect?

19  A.    There's always possibility.

20       Q.    Okay.  And a material misstatement is denied by the

21  AICPA as one that -- well, I guess I'll quote it:  "A

22  misstatement is material if individually or in the aggregate

23  it would reasonably be expected to influence the economic

24  decisions of the users of the financials."  Does that sound

25  right to you?

JASON GORDON - Cross

1    A.    That sounds right.

2         Q.    Okay.  And basically a misstatement can turn up in

3    the financials two ways, right?  It can either be a mistake or

4    it can be fraud?

5    A.    Those are two main ways, yes.

6         Q.    Are you aware of any others?

7    A.    No.

8         Q.    Okay.  And as a practical matter, the AICPA actually

9    warns you that the risk of your missing a material

10   misstatement is particularly high if management's engaged in

11   the fraud; isn't that right, sir?

12   A.    Yes.

13        Q.    Okay.  And what really distinguishes a fraudulent

14   material misstatement from an erroneous material misstatement

15   is the intent of the user, right, whether it's intentional or

16   unintentional?

17   A.    Correct.

18        Q.    And the reason that there's a higher risk of missing

19   a material misstatement by management is because they can

20   forge records, right?

21   A.    Yes.

22        Q.    And they can engage in a scheme to conceal their

23   forgeries?

24   A.    Yes, they could.  That's right.

25        Q.    They can deliberately fail to record transactions or

JASON GORDON - Cross

1    make conventional misrepresentations to you as the auditor,

2    right?

3    A.   Yes.

4         Q.   And if they're actually actively trying to conceal

5    their fraud, that makes it harder to detect the error than if

6    it's just a simple mistake, right?

7    A.   Correct.

8         Q.   Now this, in fact, becomes a particularly difficult

9    problem when there are related party relationships and

10   transactions involved, right?

11   A.   Correct.

12        Q.   And, in fact, the AICPA auditing standards recognize

13   related transaction -- excuse me, related-party transactions

14   as transactions that create an opportunity for fraud, right,

15   sir?

16   A.   I don't do audits anymore, so I'm not -- you know, you're

17   going into what the auditing -- it's out of the scope of my

18   engagement.

19        Q.   Well, would you agree with me that a related-party

20   transaction creates an opportunity to commit a fraud?

21   A.   No, everything's an -- I don't know how that it creates

22   necessarily a heightened opportunity.  It's certainly an

23   opportunity, but there's lots of opportunities.

24        Q.   I'm sorry?

25   A.   It creates an opportunity, but there's lots of

JASON GORDON - Cross

1  opportunities for it, so I mean, it's -- it's not uncommon in

2  a small business to have related-party activity.

3       Q.   In fact, if management is engaged in fraud, then

4  interviewing management to ask them if that's what they're

5  doing is not likely to  provide useful information, is it,

6  sir?

7  A.   Probably not.

8       Q.   Lack of good internal controls also create an

9  opportunity to commit fraud, right?

10 A.   Yes, it does.

11      Q.   And one of the hallmarks of fraud are fraudulent

12 journal entries, right?

13 A.   I don't -- I don't -- I don't -- I don't think so.

14      Q.   Okay.  Is it a hallmark of a fraudulent journal

15 entry to see entries at the end of a time period or post-

16 closing with little or no explanation?

17 A.   What do you mean by -- what's a "hallmark"?

18      Q.   Well, by a hallmark, I mean an indication that there

19 may be fraud going on.

20 A.   Most -- most journal entries and adjusting entries happen

21 after a periods over.  I don't know many situations where you

22 make them in advance.

23                         (Pause)

24      Q.   I'm showing you a printout of AUC Section 240?

25           THE COURT:  Oh, yeah, if you have -- if you could

JASON GORDON - Cross

1   bring that with you and start over.

2          MR. CARNATHAN:   Okay.

3          THE COURT:   That's good.

4   BY MR. CARNATHAN:

5      Q.   I'm showing you a printout of AUC Section 240,

6   consideration of fraud in a financial statement audit.   Are

7   you with me?

8   A.   Yes, I can see this.

9      Q.   All right.   And you can see I got highlighted down

10  there in Section 240.A49, "the characteristics of fraudulent

11  journal entries or other adjustments"; do you see that?

12  A.   Yes.

13     Q.   Okay.   And so would you agree with me that one of

14  the things the AICPA recognizes as a characteristic of a

15  fraudulent journal entry is where it's recorded at the end of

16  the period or as a post-closing entry with little or no

17  explanation or description?   Do you see that?

18  A.   Yes.

19     Q.   And it says also, "containing round numbers or

20  consistent-ending numbers"; do you see that?

21  A.   Yes.

22                        (Pause)

23     Q.   I'm going to come back to that concept.

24          We talked about, or you talked about during your

25  direct, how both KDC and ProEx are accrual taxpayers, right?

JASON GORDON - Cross

1    A.    Correct.

2         Q.    And would you agree with me that, before I took your

3    deposition last year, you had never laid eyes on that KDC

4    contract between KDC and Lyman-Cutler, right?

5    A.    Correct.

6         Q.    And you agreed with me at that time that, if there

7    had been a general contractor fee earned, that it should have

8    turned up on KDC's books, right?

9    A.    I think we discussed that it potentially would.

10        Q.    Well --

11   A.    But there were circumstances that it might not.

12        Q.    Well, just picking up on your testimony earlier

13   today, if the construction was complete and the fee was

14   earned, it should have shown up on the books, right?

15   A.    It -- it depends.  I never saw the operating agreement,

16   and sometimes, you know, when you have owners or -- owners and

17   operators in there, there's -- in an LLC it provides for a

18   certain way profits are allocated.  So oftentimes the person

19   working the LCL, they get a fee, but it doesn't come until the

20   end, and it's reported on a K-1 from the entity.  So not

21   knowing the structure of it, I -- you know, maybe it should be

22   on KDC, but maybe it should have came on a K-1.  I don't know.

23        Q.    Okay.  You can at least agree with me that you never

24   saw it on their ledger anywhere?

25   A.    I never saw it on a ledger, yeah.



JASON GORDON - Cross

1      Q.   Right.  And you never reported it on its tax

2   returns, right?

3   A.   Correct.

4      Q.   You never talked to anybody about it?

5   A.   Well, no, did not.

6      Q.   Okay.  And we talked a little bit about the ProEx

7   figures, but as of the time of your deposition, you had never

8   laid eyes on those ProEx proposals either, right, sir?

9   A.   Correct.

10        MR. CARNATHAN:  Could we go back to -- I think it was

11   304.  Is that the one with the -- no, that's wrong -- 148.

12                         (Pause)

13        MR. CARNATHAN:  I think we want to be at 1342.

14   BY MR. CARNATHAN:

15      Q.   Mr. Gordon, you testified a little bit about this

16   earlier.  You'll agree with me that these numbers are all

17   in -- all safe in round numbers, right?  The only one that

18   isn't a round number is Newton, Cynthia Road, right?

19   A.   I see everyone's in some type of round number.  There's

20   no pennies used.

21      Q.   Okay.  And just because this is as of 12/31/2014,

22   that's not when these numbers were put into the ledger, right,

23   sir?

24   A.   Correct.

25      Q.   In fact, these were put in, I believe, in July of

JASON GORDON - Cross

1    2015; weren't they, sir?

2    A.    I'm not sure when they were put in, but I would guess

3    they were put in after December 31st, though.

4                            (Pause)

5        Q.    Let me ask you this, sir:  If we go to Trial Exhibit

6    149, do you recognize that as the general ledger from

7    ProExcavation as of June 30th, 2015?

8    A.    Yes, I do.

9            MR. CARNATHAN:  All right.  We'd like to offer Trial

10   Exhibit 149 into evidence, Your Honor.

11           MR. PERTEN:  No objection, Your Honor.

12           THE COURT:  Okay, it's admitted.

13       PLAINTIFFS' EXHIBIT 149 WAS ADMITTED INTO EVIDENCE

14           MR. CARNATHAN:  And if we go to 1373, and I guess

15   blow up down in the bottom.

16   BY MR. CARNATHAN:

17       Q.    You see another 100,00 was added as of 1/1/2015; you

18   see that?

19   A.    Yes.

20       Q.    Can you explain why it was three-and-a-quarter as of

21   12/31/2014, another hundred as of 1/1/15?

22   A.    Yes.

23       Q.    Why is that?

24   A.    So as of the end of 2014, my understanding that was -- I

25   think it was -- was it 325?  Whatever it was, it was 325,000



JASON GORDON - Cross

1   as of 12/14.  In actuality, it was 425,000 that was owed as of

2   then.  However, in conversation -- I believe it was with Dan

3   Gersh -- we discussed that part of this might not get paid.

4   So we set up a reserve on the books for $100,000, saying that

5   we might only realize 325,000 instead of 425,000.  The

6   question got brought up because this receivable had been

7   sitting out there for so long, I asked them how realizable is

8   it, since, you know, the Kagans have to pay taxes on these

9   receivables.

10       Q.   Well, in fact, that conversation took place after

11  July 2015; didn't it, sir?

12  A.   I don't remember when it took place, but I know that.

13       MR. CARNATHAN:  Can I have Exhibit 85?

14  BY MR. CARNATHAN:

15       Q.   All right.  So this is one of your work papers;

16  isn't it, sir?

17  A.   Yes.

18       Q.   Okay.  And it's described as the ProExcavation AR

19  summary as of December 31, 2015, right?

20  A.   Yes.

21       MR. CARNATHAN:  I'd like to offer Exhibit 85 into

22  evidence?

23       MR. PERTEN:  No objection, Your Honor.

24       THE COURT:  All right, it's admitted.

25       PLAINTIFFS' EXHIBIT 85 WAS ADMITTED INTO EVIDENCE

JASON GORDON - Cross

1          MR. CARNATHAN:  Okay.

2    BY MR. CARNATHAN:

3          Q.   And that little date the 7/1 -- is that 15 or 16

4    there?

5    A.   15.

6          Q.   15, okay.  So 7/1/15 is when this was printed, is

7    it?

8    A.   Yeah, that's what it looks like.

9          Q.   All right.  So this is a printout from the

10   ProExcavation QuickBooks?

11   A.   Yes.

12         Q.   All right.  And that reflects the 325,000 number,

13   right, for Lyman-Cutler Road?

14   A.   Correct.

15         Q.   It shows that it's current, right?

16   A.   Everything's showing up as current.

17         Q.   Okay.  So that means it was entered into the books

18   within the last thirty days from July 1, 2015, right?

19   A.   No, it doesn't.  It's based -- this here is age based

20   upon -- you can put terms in as to when something's due:  is

21   it net 15, net 30, net 60.  And if you don't set up the terms

22   properly, potentially everything could sit here in current as

23   it is.

24         Q.   Okay.

25   A.   So --



JASON GORDON - Cross

1    MR. CARNATHAN:  Can I have Exhibit 86?  Are you able

2    to spin it and blow it up?

3    BY MR. CARNATHAN:

4    Q.   Is this another of your work papers, Mr. Gordon?

5    A.   It looks like it, yes.

6    Q.   Okay.  And so this one's dated September 15th, 2016,

7    right?

8    A.   Correct.

9    Q.   And this one says, "Missing a hundred K to ProEx

10   from LC that wasn't billed in 2014 but should have been,"

11   right?

12   A.   Correct.

13   Q.   And then in the little box it says, "Wanted to carry

14   the full amount of what should be due from Lyman-Cutler

15   because they are partners; however, this is set up as a

16   reserve because there are no funds to pay this, and it will

17   never be paid"; have I read that correctly?

18   A.   Correct.

19   MR. CARNATHAN:  I'd like to offer Exhibit 86 into

20   evidence.

21   MR. PERTEN:  We've read it into the record, so we

22   have no objection, however.

23   THE COURT:  All right, it's admitted.

24   PLAINTIFFS' EXHIBIT 86 WAS ADMITTED INTO EVIDENCE

25   MR. CARNATHAN:  Could I have Exhibit 82, please?

JASON GORDON - Cross

1   BY MR. CARNATHAN:

2        Q.   Is this another one of your work papers, Mr. Gordon?

3   A.   Yes.

4        Q.   So this one is the Kagan Development KDC Corp. AR

5   aging summary as of December 31, 2014, right?

6   A.   Correct.

7        Q.   And this one was also printed out on July 1, 2015,

8   right?

9   A.   Correct.

10        MR. CARNATHAN:  I'd like to offer Exhibit 82 into

11   evidence.

12        MR. PERTEN:  No objection, Your Honor.

13        THE COURT:  It's admitted.

14     PLAINTIFFS' EXHIBIT 82 WAS ADMITTED INTO EVIDENCE

15        MR. CARNATHAN:  Okay.

16   BY MR. CARNATHAN:

17        Q.   And so as of July 1, 2015 apparently KDC showed an

18   AR aging for Lyman-Cutler of 164,673.91, right?

19   A.   No.

20        Q.   How am I wrong?

21   A.   Although this was printed in July 1st, 2015, it looks

22   like, this was as of December 31st, 2014, the balances.  So

23   there could have been activity on any one of these that

24   changed from December 31st through July.  So this is a

25   snapshot as of December 31st, 2014, that -- that was printed

JASON GORDON - Cross

1    in July 1st, 2015.

2         Q.   Thank you.

3              MR. CARNATHAN:   Could I have Exhibit 83, please?

4    BY MR. CARNATHAN:

5         Q.   Is this another one of your work papers, Mr. Gordon?

6    A.   Yes.

7         Q.   Okay.  So this one's the AR aging summary for KDC as

8    of December 31, 2015, right?

9    A.   Correct.

10        Q.   Printed out on September 29th, 2016, right?

11   A.   Correct.

12             MR. CARNATHAN:   I'd like to offer Exhibit 83 into

13   evidence, please.

14             MR. PERTEN:   No objection, Your Honor.

15             THE COURT:   It's admitted.

16        PLAINTIFFS' EXHIBIT 83 WAS ADMITTED INTO EVIDENCE

17   BY MR. CARNATHAN:

18        Q.   Okay.  So if I'm reading this one right, it shows an

19   AR from Lyman-Cutler of $175,045.28.  Does that look right to

20   you?

21   A.   Let me see that.  Can you repeat the number again?  I

22   actually don't think I see the same number as you.

23        Q.   I'm following it all the way to the right.  It

24   starts out total one I think 78,045.14, and it says $3,000

25   variance.

JASON GORDON - Cross

1    A.   Okay, got it.  Yes.  Yes, sorry, I didn't see all the way

2    to the right.  Yeah.

3         Q.   Okay.  So 175 and change is about right, right?

4    A.   Correct.

5         Q.   Now, in 2014 Mr. Kagan decided to change the

6    ownership of his companies to ninety-five percent Tatiana and

7    five percent Mr. Kagan, right?

8    A.   I believe somewhere around there was -- there might have

9    been an ownership change, yeah.

10        Q.   Right.  In 2013 they owned ProEx fifty/fifty?

11   A.   I'd have to look back at the tax returns.  It sounds

12   right.

13             MR. CARNATHAN:  Can I have Exhibit 137 for

14   identification, please?  So if we go to SGC 1721.

15   BY MR. CARNATHAN:

16        Q.   You see there Mr. Kagan owned fifty percent in 2013,

17   right?

18   A.   Yes.

19        Q.   And he owned KDC a hundred percent before -- in

20   2013, right?

21   A.   I -- I don't remember.  I mean, if it's -- hang on, I

22   only have to show it to you.  If the tax return says, that

23   that's what I understood it to be.

24             MR. CARNATHAN:  I'd like to offer --

25        Q.   Well, can you identify Exhibit 137 as the

JASON GORDON - Cross

1    ProExcavation tax return for 2013, sir?

2    A.    Yes, I can.

3            MR. CARNATHAN:  I'd like to offer Exhibit 137 into

4    evidence.

5            MR. PERTEN:  No objection, Your Honor.

6            THE COURT:  All right.  It's admitted.

7        PLAINTIFFS' EXHIBIT 137 WAS ADMITTED INTO EVIDENCE

8            MR. CARNATHAN:  Could I have Exhibit 131, please?

9    BY MR. CARNATHAN:

10       Q.    And so if we go to SGC 844, see that Mr. Kagan owned

11   a hundred percent of Kagan Development in 2013, right?

12   A.    Yes.

13           MR. CARNATHAN:  I'd like to offer Exhibit 131 into

14   evidence, please.

15           MR. PERTEN:  No objection, Your Honor.

16           THE COURT:  All right.  It's admitted.

17       PLAINTIFFS' EXHIBIT 131 WAS ADMITTED INTO EVIDENCE

18   BY MR. CARNATHAN:

19       Q.    And so are you able to agree with me that you

20   changed it to ninety-five/five, Tatiana and Vadim, in 2014?

21   A.    I believe that's the year we changed it, yes.

22       Q.    Okay.  Did Mr. Kagan tell you why he wanted to do

23   that?

24   A.    I don't recall.  The IRS looks at husband and wife

25   together for income taxes purposes as one shareholder on an S

JASON GORDON - Cross

1    Corp, so I might not have questioned why.

2        Q.   So from your standpoint as a tax preparer, it didn't

3    make any difference?

4    A.   No, not between husband and wife in an S corp.

5        Q.   Is the same thing true, with regard to how Mr. Kagan

6    chooses to show income for, say, ProEx versus KDC, because it

7    all rolls up to them, eventually?

8    A.   They're all -- they're pass-through entities that the

9    taxable income passes through --

10       Q.   So in --

11   A.   -- to the personal to -- to their personal return.

12       Q.   So in fact, on May 26, 2015, Mr. Gersh emailed you

13   and said, well, how much income should we show in ProEx in

14   2014, right?

15   A.   I don't recall what he said when.  If you want to show me

16   something, happy to look at it.

17           MR. CARNATHAN:  Can I have page 80?

18           THE CLERK:  One of these.

19           MR. CARNATHAN:  May I approach the witness?

20           THE COURT:  You may.

21           THE WITNESS:  Okay, thanks.

22   BY MR. CARNATHAN:

23       Q.   So Mr. Gordon, I've asked the clerk to mark this

24   email exchange as Exhibit Z for identification.

25        PLAINTIFFS' EXHIBIT Z WAS MARKED FOR IDENTIFICATION

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

JASON GORDON - Cross

1        Q.   You recognize it?

2    A.   Yes, I do.

3        Q.   All right.  So this is an email exchange between or

4    among Susie (ph.) Steeves, Phil (ph.) Gordon, on the second

5    page, between the kagandevelopment@gmail.com address and you.

6    Do you see that?

7    A.   Correct.

8        Q.   Okay.  So on May 26, 2015, Mr. Gersh emails you, and

9    about two-thirds of the way down the page says, "ProEx, the

10   main thing left to determine is how much income we want to

11   show should've been earned in 2014."  Have I read that

12   correctly?

13   A.   Yes.

14       Q.   So from your standpoint as a tax practitioner, is

15   that acceptable to move income around among the related

16   entities?

17   A.   No.  I think it was a very poor choice of words here.

18            MR. CARNATHAN:  Could we go back to Exhibit 304 that

19   was admitted during direct -- or during Mr. Gordon's direct?

20                         (Pause)

21   BY MR. CARNATHAN:

22       Q.   Mr. Gordon, this is the adjusting journal entries

23   document that you identified during your direct?

24   A.   Correct.

25       Q.   All right.  If we go to the last page of the

JASON GORDON - Cross

1   document, should be SGC 679.  Oh, sorry.

2                        (Pause)

3        Q.   Perhaps I could just show you the paper --

4   A.   Right.

5             MR. CARNATHAN:  May I approach?

6             THE COURT:  That makes sense.

7   BY MR. CARNATHAN:

8        Q.   So Mr. Gordon, when we add up all the adjusting

9   entries, it's $3,171,514, right?

10  A.   Yes.

11            MR. HARRIS:  Could I make a request that we use the

12  over -- because I have no idea what you've just shown him.

13            MR. CARNATHAN:  Oh, my apologies.

14            MR. HARRIS:  Can we just -- can we just use the

15  projectors?

16            THE COURT:  Yeah, please do.  That would help me as

17  well.  304 is what we're talking about here.

18            MR. HARRIS:  Thank you.

19  BY MR. CARNATHAN:

20       Q.   Okay.  So I'm showing you the last page of Exhibit

21  304.  And the total adjusting journal entries that you

22  proposed for 2015 is $3,171,514, right?

23  A.   The -- the hash total, if you add up the number -- the

24  columns, I guess, comes out to that.

25       Q.   After you amended the return for KDC for 2015, it

JASON GORDON - Cross

1    had total income of about 680,000 bucks, right?

2    A.   I don't recall the amount, but if you're looking at

3    that --

4        Q.   Well, I guess for completeness, could I have Trial

5    136, Trial Exhibit 136?  Do you recognize this as the amended

6    tax return for KDC for the year 2015, sir?

7    A.   Can you just go through the few pages to the front page?

8        Q.   Sure.

9            MR. CARNATHAN:  Bill, could you go to the next page?

10           THE WITNESS:  The couple more pages in.  Another one.

11   One more.  Another one.  There.  Okay, hold on.

12   A.   Yes, this would be the amended one.

13       Q.   Okay.

14           MR. CARNATHAN:  So I'd like to offer Trial Exhibit

15   136 into evidence.

16           MR. PERTEN:  No objection, Your Honor.

17           THE COURT:  All right.  It's admitted.

18        PLAINTIFFS' EXHIBIT 136 WAS ADMITTED INTO EVIDENCE

19   BY MR. CARNATHAN:

20       Q.   So if we just stay with this page, the total income

21   line is $680,533, right?

22   A.   Yes, total gross income.

23       Q.   Okay.  The total deductions are $1,016,689, right?

24   A.   Correct.

25       Q.   Okay.  So on $680,000 of income, you had nearly 3.2

Page 188

JASON GORDON - Redirect

1    million dollars in adjusting journal entries, right?

2    A.    Yes.

3         Q.    Is that quite a lot for a company of this size?

4    A.    No, it's totally out of context, your questioning.

5              MR. CARNATHAN:    I have nothing further for Mr.

6    Gordon.

7              THE COURT:    Okay.

8                        REDIRECT EXAMINATION

9    BY MR. HARRIS:

10        Q.    Why is Mr. Carnathan so out of context?

11   A.    The adjusting journal entries you showed me, it was

12   totaling up numbers where -- an example, if you're just

13   reclassifying an expense from, you know, one expense line item

14   to another expense line item, it doesn't necessarily have that

15   large amount of impact on profit.

16        So it's just a recla -- you know, reclassifications can

17   be large if you are moving it from one type of bank debt to

18   another type of bank debt or one type of loan to another type

19   of loan, which could be huge numbers, if it's a capital-

20   intensive business, on a very small total-income number.    So

21   it's not really a -- a great way to -- to judge the impact of

22   the journal entries.

23        Q.    You were asked some questions and shown some

24   accounts-receivable summaries at different points in time --

25   2014, 2015, I believe -- for KDC.    Can you explain to us how

JASON GORDON - Redirect

1    accounts receivable work, when they have an entity like KDC

2    that works on an accrual basis?

3    A.    KDC?

4         Q.    Yes.

5    A.    So on KDC, as expenses are -- as expenses are incurred,

6    they are paid, and they're aggregated into a reimbursement

7    account, like I had talked about.  And at that point, they're

8    considered unbilled expenses relating to cash payments out.

9    And then, once they're aggregated to a certain amount, they

10   then get billed to the project LLC, Lyman-Cutler or whatever

11   it is.  And at that point, it goes into accounts receivable.

12   So you'd have to look in both accounts, at any one time, to

13   capture what's been paid on behalf of a particular entity.

14        Q.    Okay.  So if I'm following you, that AR summary just

15   looks at one of those two repositories?

16   A.    Correct.

17        Q.    You were asked a question or two about fees KDC

18   would charge, and I think you were asked whether they would

19   show up on KDC's tax return.  Those fees were not ever paid,

20   not ever received by KDC.  Would they show up on KDC's tax

21   return?

22   A.    If it's something that's not going to be realized, you

23   typically wouldn't see them because you'd be paying taxes on

24   something you're not getting.

25        Q.    You have been in a position to observe, to some

JASON GORDON - Redirect

1    degree, the internal controls of KDC and ProEx in operation;

2    is that right?

3    A.   Correct.

4        Q.   Okay.  And we've covered -- on somewhat of a summary

5    level, but we've covered the fact that your firm has

6    opportunities to ask questions of KDC and ProEx about their

7    respective finances, right?

8    A.   Correct.

9        Q.   Ask for backup, with respect to certain portions of

10   those financials, correct?

11   A.   Correct.

12       Q.   Has your firm, in fact, received bank statements

13   relating to KDC and/or ProEx?

14   A.   Yes, we've received bank state -- received bank

15   statements.

16       Q.   Okay.  And how about American Express account

17   statements?  Have you received those?

18   A.   We have received some at year end to verify, you know,

19   account balances.

20       Q.   You observed in operation the internal controls you

21   told about us (sic), I think, before lunch, the double entry,

22   correct?

23   A.   Yes.  I've seen the QuickBooks, yes.

24       Q.   And the general ledgers that we reviewed, is that

25   right?

JASON GORDON - Recross

1    A.    I've seen those, yes.

2         Q.    Okay.  And you have also participated in and

3    observed the company's tying transactions to the movement of

4    cash, correct?

5    A.    Correct.

6         Q.    Would you agree with me, sir, that it is difficult

7    to engage in fraud when the transactions of those companies

8    are tied back to the movement of dollars?

9    A.    I can tell you that, you know, reconciling everything and

10   tying back to dollars does really have a high probability that

11   we are capturing all the transactions and only capturing them

12   at once, not -- not double.

13        Q.    What do you mean double?  You mean that they're not

14   being double-billed or double-entered?

15   A.    You know, dou -- you know, double-billed or double-

16   entered on a -- you know, it -- it would -- it should come out

17   in one of those reconciliations that we do.

18        MR. HARRIS:  That's all I have, Your Honor.  Thank

19   you.

20                        RECROSS-EXAMINATION

21   BY MR. CARNATHAN:

22        Q.    So you've been talking a lot about the dollars,

23   like, tracking the dollars as a way to make sure that

24   nothing's wrong here, right, sir?

25   A.    That everything's captured.



JASON GORDON - Recross

1      Q.    Right.  So if we have things that remain unpaid,

2   say, subcontractors that are not paid, then we're not going to

3   be able to track those dollars through KDC, are we?

4   A.    Unless they're entered in payables.

5      Q.    But then we don't have any way to track dollars, do

6   we?

7   A.    If they're in payables, they do age out.  So one of the

8   questions we ask, just like on the accounts-receivable side,

9   is -- everything eventually should come through with cash.  So

10  if you see something that's been sitting there a long time,

11  you ask, does it belong -- is it realizable, on the payables

12  and the receivable side.

13     Q.    All right.  And so you were asked about the KDC

14  general-contractor fee during the redirect, but we agree that

15  KDC's an accrual taxpayer, right?

16  A.    Correct.

17     Q.    And so we agree that if that fee was earned -- and

18  you said something about a K-1 and whatnot, but if it was an

19  actual transaction where KDC was hired as a separate entity to

20  be paid a fee, then when the construction was complete,

21  theoretically, that should've appeared on the books somewhere,

22  right?

23  A.    If it was earned and there was no common ownership, I'd

24  be -- more likely expect to see that on the books.

25              MR. CARNATHAN:  That's all for me.



(973) 406-2250 | operations@escribers.net | www.escribers.net

1          MR. HARRIS:  Nothing further, Your Honor.  Thank you.

2          THE COURT:  Okay.  Thank you, sir.

3          MR. PERTEN:  Your Honor, if I could just scheduling-

4   wise --

5          THE COURT:  Yeah.

6          MR. PERTEN:  -- see how Your Honor wants to proceed.

7   I have Mr. Gersh here, who would be our next witness.  Looking

8   at the clock, I think it unlikely we will finish with cross-

9   examination today.  And then I know tomorrow we have a pretty

10  full lineup, with the six subcontractors and Mr. Maiden, who's

11  out of order, which would mean we wouldn't finish Mr. Gersh

12  until the following Monday, when he would be the only witness,

13  because the experts don't come back from vacation until the

14  Tuesday.

15         So my -- I don't know if you're tracking so far.  My

16  question --

17         THE COURT:  I'm completely tracking, so yes.

18         MR. PERTEN:  So my question is, as the Court wants,

19  we can put Gersh on Monday, a week from today, have all day

20  with him, and it won't be -- and be done with him, and then

21  finish up with the two experts on Tuesday.  I can put him on

22  now for an hour or until Your Honor breaks.  And then we

23  probably won't get him back until that Monday for like half an

24  hour or forty-five minutes, so whatever's left.  So I don't

25  know if that makes sense to --

Page 194

                        DANIEL GERSH - Direct

1            THE COURT:  My inclination is to use the trial

2    time --

3            MR. PERTEN:  That's fine.

4            THE COURT:  -- that we have available to us.  And so

5    why don't we go until 4 o'clock?

6            MR. PERTEN:  Okay.  That's what we'll do.

7            THE COURT:  Okay?

8            MR. PERTEN:  Very good.

9            THE COURT:  All right.

10           MR. PERTEN:  Call Mr. Gersh.

11           THE CLERK:  Please raise your right hand.

12                       DANIEL GERSH SWORN

13           THE CLERK:  Please be seated.

14                       DIRECT EXAMINATION

15   BY MR. PERTEN:

16        Q.  Afternoon, Mr. Gersh.

17   A.   Hi, there.

18        Q.  Would you state your full name, please?

19   A.   Daniel Gersh.

20        Q.  Are you married?

21   A.   I am.

22        Q.  Do you have any children?

23   A.   No.

24        Q.  How old are you, sir?

25   A.   Thirty-two.



DANIEL GERSH - Direct

1        Q.   Do you have a college degree?

2    A.   I do.

3        Q.   What is your degree in?

4    A.   Accounting.

5        Q.   And when did you get your degree in accounting and

6    from where?

7    A.   2008 from Bentley University.

8        Q.   And do you also hold a master's degree?

9    A.   I do.

10       Q.   From where?

11   A.   Also Bentley University.

12       Q.   And what do you have a master's in?

13   A.   Accountancy.

14       Q.   Okay.  Do you hold any professional licenses or

15   certifications?

16   A.   Not at this time.

17       Q.   Did you ever hold any professional licenses or

18   certifications?

19   A.   Yes.  I was a certified fraud examiner.

20       Q.   And when did you become a certified fraud examiner?

21   A.   Approximately 2012.

22       Q.   And what is that?  What is a certified fraud

23   examiner?  What does that certification mean?

24   A.   It's a certification, the Association of Certified Fraud

25   Examiners.  It's just a -- a form of -- a specific form of

DANIEL GERSH - Direct

1    auditing standards.  I was external at one point and then

2    internal.  And it's -- it covers -- it's a exam that covers

3    four different sections, including fraud prevention,

4    detection, financial transactions, interviewing skills, and

5    also legal elements of fraud.

6          Q.   And did you obtain that certification in connection

7    with prior jobs?

8    A.   Yes, when I was working at Iron Mountain.

9          Q.   Okay.  And you testified that you no longer hold

10   that certification.  How is it that you no longer hold that

11   certification?

12   A.   I held it during my time at Iron Mountain and then on an

13   annual or biannual basis.  I don't recall at this point, but

14   there's continuing education credits you have to fulfill to

15   keep your certification, like many others.  So I think a few

16   years later, when I was already working at Kagan Development,

17   I felt that my role or my career had kind of transitioned to

18   something different, where it was not necessary to put the --

19   the time and the funds necessary to continue those educational

20   credits to keep going.

21         Q.   So you allowed it to lapse?

22   A.   Correct.

23         Q.   But you weren't kicked off or disciplined or

24   anything?

25   A.   Correct, yeah.

DANIEL GERSH - Direct

1    Q.   Okay.  Now, are you a CPA?

2    A.   I'm not.

3    Q.   Okay.  Can you give us, sir, a brief summary of your

4    work history after you graduated with your master's in

5    accounting?

6    A.   Sure.  I actually interned at KPMG during junior year of

7    college; was offered a full-time position the following year,

8    post-graduation.  And back then, the big four firms had a

9    partnership or programming place at Bentley, where you could

10   fulfill your graduate degree while working full-time.  It was

11   called the summer-to-summer program.

12   Q.   And what were your duties and responsibilities at

13   KPMG?

14   A.   Standard first-year protocol.  You're put on a number of

15   clients from short-term, one week, two weeks to a few months

16   at a time, external auditing, going from site to site, from

17   company to company, testing, getting a feel for different

18   industries.  There was a rotation.

19   Q.   And when you say external auditing, what's that?

20   A.   KPMG was the external auditor.  So these are public

21   companies, and we were there to test and provide assurance on

22   their records.

23   Q.   Okay.  And at some point, did you leave KPMG?

24   A.   Yes, after the -- the market crashed that year, there was

25   a percentage of layoffs for everyone, including first-years.

DANIEL GERSH - Direct

1      Q.    Okay.  Where'd you go next?

2   A.    Iron Mountain.

3      Q.    What did you do at Iron Mountain?

4   A.    Iron Mountain, I worked in internal audit department.

5      Q.    And what did you do for the internal audit

6   department?

7   A.    I worked -- there were a few subdivisions, but I worked

8   within the North American operational internal audit team.

9   And on a monthly, if not more often, basis, we would do

10  surprise visits across the country to do surprise visits on-

11  site, and do testing over a week's time, and provide a report.

12  This included operational tactics, safety, security, financial

13  transactions, data protection.

14     Q.    So when you say testing, you were testing to see if

15  all the rules were complied with?

16  A.    Processes, procedures, yes.

17     Q.    Okay.  And to make sure there was no fraud?

18  A.    Yes, that was one of the ones, yeah.

19     Q.    Okay.  And when did you leave Iron Mountain?

20  A.    I was there for approximately three years, so 2012.

21     Q.    Okay.  And after leaving Iron Mountain, what did you

22  do next?

23  A.    I went back to the financial side of things.  I worked at

24  Blue Cross Blue Shield in their internal audit department.

25     Q.    And what does the internal audit department do?

DANIEL GERSH - Direct

1   A.   With a company the size -- in the industry of insurance

2   and the size of Blue Cross Blue Shield, there was a lot of

3   financial testing, computer programs, lots of money being --

4   exchanging hands.  And so there was a lot of proce --

5   procedural testing, sample testing.

6        Q.   Okay.  And at some point, did you leave Blue Cross

7   Blue Shield?

8   A.   Yes.

9        Q.   Where'd you go next?

10  A.   After about a year, I was recruited by another similar

11  company with CareGroup, which is the parent company of Blue

12  Cross Blue Shield.

13       Q.   And what did you do for CareGroup?

14  A.   CareGroup was more -- it was internal audit as well, and

15  it was operational and financial auditing.

16       Q.   And at some point, did you leave CareGroup?

17  A.   Yeah.  It -- there were only three of us.  It was co --

18  the entire department, there were only three of us, so we were

19  co-sourcing with Deloitte, and they decided to fully outsource

20  to Deloitte.

21       Q.   Okay.  And where did you go next?

22  A.   We were laid off in October of 2014.  My wife and I were

23  actually looking at potentially moving at the time.  And I got

24  a call about Mr. Kagan looking for potential help with his

25  company, for a bookkeeper.  And I had received a package, so I

DANIEL GERSH - Direct

1   had some time to think about what's next.  And I decided to

2   meet and look into it.

3          Q.   Are you currently employed by KDC?

4   A.   Yes, I am.

5          Q.   And what is your title at KDC?

6   A.   CFO.

7          Q.   And as the CFO at KDC, what are your duties and

8   responsibilities?

9   A.   For the most part, everything relating to the finances.

10  Considering how small of a company we are, we all wear a lot

11  of hats.  So I do everything that relates to the finances,

12  communications, the computers, phone calls.  We -- we do a lot

13  together, so pretty much everything.

14         Q.   Okay.  Now, when did you start at KDC?

15  A.   I met with Vadim at the very end of October of 2014.

16  Unofficially, started -- kind of come to the office in

17  November of 2014.

18         Q.   Okay.  At the time you started working for KDC, was

19  there another bookkeeper working there?

20  A.   No.

21         Q.   Do you know the name of the bookkeeper who was there

22  immediately prior to your starting at KDC?

23  A.   Yes.  Kris --

24         Q.   Who was that?

25  A.   Kristina Brusenkova.



Page 201

DANIEL GERSH - Direct

1      Q.   And did you have an opportunity to speak with Ms.

2   Brusenkova, as you were getting your feet wet, so to speak, to

3   learn how she kept the books and records?

4   A.   No, I did not.  We never crossed paths.

5      Q.   Okay.  Prior to your arrival at KDC, did you have

6   any experience in the construction industry?

7   A.   No, I did not.

8      Q.   Had you ever worked as the CFO of a small company?

9   A.   No, I had not.

10      Q.   Most of your work were for large megacompanies; is

11   that correct?

12   A.   Correct.

13      Q.   Okay.  And based upon the fact that you were coming

14   from a big corporate environment to a smaller type companies,

15   did you make any observations of the differences between

16   working for a small company, as opposed to the large

17   companies?

18   A.   Very much so, very different.  Large companies with

19   policies, and procedures, and hierarchies, and electronics,

20   and -- and documentation versus everything by paper, two or

21   three people that are just used to doing things how they do it

22   or -- it's just completely -- it was very different.

23      Q.   Okay.  And was there a learning curve for you, as

24   you got up to speed?

25   A.   Very much so.



(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 202

DANIEL GERSH - Direct

1    Q.   Now, when you first arrived at KDC, what was your

2    initial test?  What were you asked to do?

3    A.   The QuickBooks and the financial records and -- and

4    bookkeeping, and entries were definitely a big part of it.

5    But considering that I was brand new to the industry, and the

6    company, and Vadim, and subcontractors coming in and out, and

7    the life cycle of projects, it was really a comp -- the first

8    few months were, certainly, more getting a grasp of how the

9    business works on a day-to-day and on a month-to-month

10   process.

11       And bookkeeping and the entries in the QuickBooks was

12   definitely a main goal at the beginning, but it took a -- a

13   while to get comfortable with even how -- what things meant

14   that were already in the QuickBooks or that I would have to

15   put into the QuickBooks, by learning what happened day to day.

16       Q.   Okay.  Was the Lyman-Cutler project active at the

17   time you arrived?

18   A.   No.

19       Q.   Did you put any specific emphasis on the Lyman-

20   Cutler project when you arrived?

21   A.   No.  From -- from -- from what I know now, after five

22   years, almost, with the company, that time frame of 2014,

23   '15 -- 2013, '14, and '15 was, by far, the busiest.  And so

24   that project was, essentially, complete.  There were I don't

25   know how many projects -- active projects, at the time, but I

DANIEL GERSH - Direct

1  would say more than a handful, all at the same time.

2       Q.   So fair to say that, when you first arrived, most of

3  your efforts were working with projects that were active as

4  opposed to Lyman-Cutler, which was complete?

5  A.   Correct.  I mean, when you've got subcontractors going on

6  the site and coming and doing the work and asking for payments

7  and my boss is off -- my new boss is offsite most of the time

8  as well, getting a grasp of who to pay, how much, and

9  answering emails was a handful.

10      Q.   And did you have familiarity working with QuickBooks

11 before your arrival to KDC?

12 A.   Minimal.  I had some experience with it on one or two

13 clients at KPMG when we were traveling from business to

14 business.

15      Q.   Was there anybody else at KDC when you arrived who

16 was able to teach you how to use QuickBooks?

17 A.   Other than reaching out to the Gordons --

18      Q.   The CPAs?

19 A.   Correct.  No, there was not, other than the Gordons.

20      Q.   Okay.  Based upon your observations, does Mr. Kagan

21 know how to use QuickBooks?

22 A.   No, he does not.

23      Q.   Okay.  Now you say you reached out to the Gordons.

24 What kinds of things did you reach out for as you were

25 learning the ropes?

DANIEL GERSH - Direct

1    A.    You name it.  Part of the difficulty I had was different

2    people had been entering in to QuickBooks, and there was a gap

3    in time, obviously, as well, so my questions to them ranged

4    from coding, just from projects or relating to the companies.

5    And one of the first vivid memories I had of working with the

6    Gordons in the QuickBooks with setting up the three categories

7    of accounts and codings that was discussed earlier about

8    loans, reimbursements, and the third one is -- is equity,

9    which was a difficult concept for me to grasp at the time

10   because they were done inconsistently prior to me, so we

11   actually kind of stopped everything and re- -- started from

12   beginning and recategorized them all so that there was a rhyme

13   and reason and similar prefixes and -- and ending numbers on

14   the codes.

15       Q.    So was part of your task to clean up the QuickBooks?

16   A.    Yes.

17       Q.    Okay.  Was QuickBooks up to date at that point when

18   you arrived, generally speaking?

19   A.    Generally speaking, I probably couldn't answer that just

20   because it -- there were so many QuickBooks for each -- each

21   LLC and then the companies.  There were different ranges.

22   Maybe the companies were done altogether or some of the

23   projects, but within, I don't know -- when I first joined,

24   probably within a four- to six-month time range of being up to

25   date, yes.

DANIEL GERSH - Direct

1    Q.   Okay.  So in addition to QuickBooks, were there any

2  other methods of tracking the financial business of KDC at the

3  time you arrived?  What other documents or what other files

4  were there?

5  A.   Files, paper, files, file cabinets.

6    Q.   So in those paper files, did you have copies of

7  invoices?

8  A.   There was a -- a decent amount of them, yes.

9    Q.   And did you have copies of proposals or contracts?

10  A.   Yes.

11    Q.   Were there handwritten notes in the files?

12  A.   Yep.

13    Q.   Did you have bank statements?

14  A.   Yes, for the -- our LLCs and our companies, yes.

15    Q.   And did each LLC have a separate bank account?

16  A.   Yes.

17    Q.   And how about Amex statements?  Were there Amex

18  statements, American Express?

19  A.   Yes.  Um-hum.

20    Q.   Were there separate AMEX statements for each

21  project?

22  A.   To a degree.  There -- our company -- our companies each

23  had AMEX statements, and then our Kagan Development main

24  corporate account had separate cards, so you could see each

25  LLC's credit card separately within the large -- the full

DANIEL GERSH - Direct

1    statement.

2        Q.   Subfolders?

3    A.   Yes.

4        Q.   Okay.  Now with respect to the invoices that you had

5    and proposals you had, when you arrived, how were those

6    organized in the paper files?

7    A.   Not -- not to my liking.

8        Q.   I'm sorry, not to your liking?

9    A.   Not to my liking.

10       Q.   Why was that?

11   A.   The subcontractors and vendors across all the projects, a

12   lot of which were being used repeatedly, were kept

13   alphabetically by vendor and subcontractor.

14       Q.   So just wait for a moment.  So each vendor had a

15   separate file by vendor name?

16   A.   Correct.

17       Q.   But not by project name?

18   A.   No.  You'd have to look up a -- a subcontractor, find

19   their folder, and then within that folder, hopefully, they are

20   stapled or paper clipped together or in order by project.

21       Q.   Okay.

22   A.   That's the -- that was the hope.

23       Q.   Okay.  Was part of your job as you started to

24   reorganize it so that it'd be by project?

25   A.   Yeah.  That was one of the first things I did just

DANIEL GERSH - Direct

```
 1   because -- because they were all new to me, I had no idea -- I

 2   had no familiarity yet with the subcontractors, so the only

 3   way I -- my frame of reference was always, you know, which

 4   year or which project.

 5       Q.   So is it fair to say that the information was there;

 6   you just didn't -- it wasn't to your liking in the way it was

 7   organized?

 8   A.   Correct.

 9       Q.   Okay.

10   A.   And it was all paper.

11       Q.   I'm sorry?

12   A.   At that point, it was -- the far majority of it was by

13   paper, and so I attempted to bring everything electronic as

14   well.

15       Q.   And scanning them?

16   A.   Yeah.  There's -- everything that go -- comes into us,

17   whether it's an email or hard copy, first step is scanning it

18   in, and whether it's paid or not paid, it has to be left out

19   before anything gets filed away.

20       Q.   Now when you first started, what was the payment

21   process at KDC?  How were bills paid?

22   A.   At the very beginning, anytime anyone was looking for

23   payment, I'd have to run it by Vadim.

24       Q.   So you'd get an invoice and run it by Vadim?

25   A.   If they came to me first, yes.
```

DANIEL GERSH - Direct

1    Q.   Okay.  Has that changed?

2    A.   Yes.  It -- I asked for everyone to get proposals over to

3    us far before the project or before they start.  If they've

4    already started, we -- and we have the proposal or we know

5    what the full invoice amount, I always need some form of

6    documentation --

7    Q.   And again, so your reorganization has made that

8    process more streamlined?

9    A.   Correct.

10   Q.   Okay.

11   A.   Not efficient to call your boss to get that.

12   Q.   Were there also -- when you arrived, were emails

13   organized in any fashion?

14   A.   There were subfolders in our Gmail with project names in

15   there, but I would say they weren't consistently labeled,

16   saved, moved --

17   Q.   So again, fair to say the information was there, but

18   you just couldn't -- it wasn't organized your liking?

19   A.   Correct.

20   Q.   Okay.  Now, did you also -- do you also take care of

21   the financial records for ProExcavation?

22   A.   Yes.

23   Q.   Okay.  And are their books and records separate and

24   apart from KDC's?

25   A.   Yes, they are.

DANIEL GERSH - Direct

1      Q.   Now, as you got more familiar with the way the

2    financial records were kept and more familiar with QuickBooks,

3    did you make any observations as to how the QuickBooks were

4    maintained by Ms. Brusenkova prior to your arrival?

5    A.   Yes.  The -- my biggest issue with them was not even if

6    there was a backlog, because you can -- because we could do

7    our taxes on any old basis calendar year.  We can catch up

8    yearend or after, whatever it is.  My biggest issue was the

9    inconsistencies and primarily the lack of entering in a full

10   proposal or invoice or bill amount initially into the

11   QuickBooks and then billing against it.

12      Q.   Okay.  So let me see if I understand that.  So if

13   there was a contract or a proposal, the total amount would not

14   be entered into QuickBooks?

15   A.   Correct.  So the hardest part of seeing what was open

16   once I really took over and got comfortable with items was I

17   couldn't see if these two checks that were paid, because they

18   would only say check in the far left common column, if those

19   two payments, let's say, for example, $5000 each, if that's

20   it, that $10,000 was all that was due to that vendor or

21   subcontractor or if there was more.  So the main thing that

22   we've had to go back and do is -- well, going forwards but

23   also had gone back to do as much as possible to correct items

24   if necessary was to enter in a full bill.

25      Let's say a proposal comes in from a subcontractor to do

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DANIEL GERSH - Direct

1    the work, say, electrical for $50,000 on a project, the first

2    step should be entering in a bill for 50,000 from that

3    subcontractor.  And then if you make five payments of $10,000,

4    each one would go against that bill.  You'd make a bill

5    payment.  And so if we made two payments, at that point in

6    time you can see that there's $30,000 still remaining.  The

7    big issue prior to that was I would only see two check

8    payments for $10,000 each, and I would have no idea how much

9    more was left, when it was entered, when it's due, all that.

10   They were only entered into point in time, not useful.

11       Q.   And if you wanted to find out the total amount due,

12   you'd have to go back to the paper files and find the contract

13   to the proposal?

14   A.   Yes.

15       Q.   Okay.  Did you observe whether there were any either

16   incorrect or missing items in the QuickBooks that had been

17   entered prior to your arrival?

18   A.   Minimal missing or anything.  It was more so just having

19   the organized.  And that QuickBooks in particular is a little

20   bit more complicated.  So it was just -- it was extremely

21   difficult for me to follow and understand and feel comfortable

22   with how it was organized.

23       Q.   And when you made changes to QuickBooks -- you

24   mentioned coding or things of that nature -- would that also

25   generate what we call an audit report on QuickBooks showing

DANIEL GERSH - Direct

1    that there'd been a change?

2    A.    There is an audit report, but it would cau -- it would

3    create an audit trail, so you could run an audit report that

4    would show you the transactions when they made them first

5    entered and I think modifications each time as well.

6        Q.    And when you recoded or noted errors or anything of

7    that nature, would you fix them?

8    A.    Say it again.  I'm sorry.

9        Q.    Sure.  If you noted errors in coding, would you fix

10    that?

11    A.    Yes.

12        Q.    And similarly, if you had dates that were wrong or

13    anything like that, would you correct that?

14    A.    Correct.  And categories.  That was a big thing.

15        Q.    Okay.  Now fair to say, though, when you first

16    started, your focus in terms of reviewing QuickBooks and

17    updating things was not Lyman-Cutler, correct?

18    A.    Correct.

19        Q.    Okay.  Let's seg for just a moment.  Do you know

20    Joseph Cohen?

21    A.    I do.

22        Q.    What was his role at KDC?

23    A.    Advisory to Vadim.

24        Q.    Okay.  Did you work with him?

25    A.    Minimally.



DANIEL GERSH - Direct

1      Q.   Did he have any day-to-day responsibilities?

2   A.   No.

3      Q.   Did he have any responsibilities with QuickBooks?

4   A.   Never.

5      Q.   Did he have any access to QuickBooks?

6   A.   Nope.

7      Q.   Did he have any access to the financial records and

8   files of KDC?

9   A.   Absolutely not.

10      Q.   Did you enter -- as the CFO, did you interface with

11   him with any regularity?

12   A.   Certainly not.

13      Q.   Did he come to the office regularly?

14   A.   I think maybe twice over multiple years.

15      Q.   So would you speak to him by phone?

16   A.   By phone may -- at most, once a month on average, I'd

17   say.

18      Q.   Okay.  Fair to say that he had virtually nothing to

19   do with the finances of the company?

20   A.   For sure, yes.

21      Q.   Okay.  And the person who dealt with the finances

22   was you, correct?

23   A.   Correct.

24      Q.   Okay.  Now with respect to construction advances on

25   a project, did you make any observations as to how

DANIEL GERSH - Direct

1    frequently -- generally speaking, how frequently would KDC

2    seek a construction advance for a project?

3    A.    Pretty often when I first joined.  When I -- when I first

4    started, they were still being done with -- be a handwritten

5    requests by Vadim and I think faxed in.  I think that was

6    right when I started.  Shortly thereafter, they got with the

7    times and -- and started doing items electronically or at

8    least started using a spreadsheet that was easier to do, and

9    now it's -- it's very simple to -- to do them electronically

10   throughout the process.

11       Q.    Does the bank to charge a fee every time you seek a

12   construction advance?

13   A.    Correct.  There's a -- there's a small title fee and then

14   an inspection fee.

15       Q.    And does the presence of that fee or the requirement

16   of the fee impact how often you seek construction advances?

17   A.    It does.  It's when -- when cash flow is fine, we don't

18   do it.  And when you need funds, or when you're expec -- when

19   you're anticipating funds that week or the next week to start

20   to pick up, it would be a reason for it, yes.

21       Q.    If the construction advance, in other words, the

22   prior construction's advance were not sufficient enough to

23   cover an expense to, did KDC pay it out of its own pocket?

24   A.    Yes.

25       Q.    And was that the process that KDC generally

DANIEL GERSH - Direct

1    followed?

2    A.   Yes.

3         Q.   And would it then reimburse itself once the

4    construction loan or advances came in?

5    A.   Correct.

6         Q.   Okay.  Now let's talk about Lyman-Cutler project a

7    bit.  You when you arrived, did you contact the parties for

8    all the open projects that KDC is working on?

9    A.   Yes.

10        MR. PERTEN:  Mr. Harris, would you pull up Exhibit

11   253, please?

12   BY MR. PERTEN:

13        Q.   I'm showing you Exhibit 253.

14        MR. PERTEN:  Would you scroll down a little bit more?

15   Whoops.

16        MR. HARRIS:  Sorry.

17        MR. PERTEN:  Right.  That's good.

18   BY MR. PERTEN:

19        Q.   What is Exhibit 253?

20   A.   My introductory kind of email to the team, the Lyman-

21   Cutler group.

22        Q.   Okay.  Who is Arina?

23   A.   I believe, Mr. Filippov's wife.

24        Q.   Okay.  Now, when you sent this email to introduce

25   yourself and asked if -- "so please let me know if there any

DANIEL GERSH - Direct

1  issues or any questions," did you receive a response from

2  anybody from either Arina or Mr. Filippov?

3  A.   I don't believe so.

4       Q.   Okay.  In November of 2014, were you aware of any

5  issues on the Lyman-Cutler project?

6  A.   No.

7       Q.   Okay.  Did you have any understanding based upon

8  your review of the records who was paying the carrying costs

9  on the Lyman-Cutler project?

10 A.   From my understanding, it was a -- a joint effort.

11 Either we would all contribute fundings, or we would put

12 additional funds, low funds as we called it, into the account

13 when expenses were needed to be --

14      Q.   When you say "we," KDC would put funds into the

15 account to pay the carrying costs?

16 A.   Correct.  Yep.

17      Q.   Did you have any opportunity --

18           MR. PERTEN:  Strike that.

19 BY MR. PERTEN:

20      Q.   With respect to the Lyman-Cutler product, what

21 records were there when you first started looking into Lyman-

22 Cutler, when you first started with Lyman-Cutler?  Was there a

23 QuickBooks accounts?

24 A.   There were.  There was.

25      Q.   Were there paper invoices?



DANIEL GERSH - Direct

1   A.   Yes.

2        Q.   Were there proposals and contracts?

3   A.   Yep.

4        Q.   And these were also organized in a fashion that you

5   didn't like, correct?

6   A.   Correct.

7        Q.   Okay.  Did you have copies of the Lyman-Cutler bank

8   account?

9   A.   No.  That was one of the few accounts that was not mailed

10  to us, and I think the login information was different than

11  our online profile, which currently has, like, fifteen.  But

12  it was separate from it.  So I believe the previous bookkeeper

13  had only a short period of time of statements there that were

14  kept at our office.  I think it was less than a year or so,

15  and it was older.

16       Q.   Where the Lyman-Cutler bank statements sent directly

17  to Mr. Filippov?

18  A.   I -- I believe so.

19       Q.   So they weren't sent to KDC.  They were sent to

20  Filippov?

21  A.   Corr -- correct.  Yes.

22       Q.   Okay.  Did you have bank statements that wasn't

23  related to KDC's accounts?

24  A.   A full filing cabinet, yes.

25       Q.   And would that include summaries of payments KDC

DANIEL GERSH - Direct

1  made for the Lyman-Cutler account?

2  A.  Yeah.  They would be captured on the bank statements,

3  yes.

4      Q.  Okay.  And did you also have Amex, American Express,

5  statements which reflected expenses charged to the Lyman-

6  Cutler project?

7  A.  Yes.

8      Q.  Okay.  Now, did KDC maintain a Lyman-Cutler

9  QuickBooks, or did it maintain its own QuickBooks?

10  A.  We had our own QuickBooks, KDC, and ProEx and all our

11  companies and LLCs, and then for our own tracking records, we

12  had a QuickBooks file dedicated to Lyman-Cutler.

13      Q.  All right.  Who kept the formal QuickBooks for the

14  LLC?

15  A.  I believe it was the other partners.

16      Q.  Okay.  Now, when was the first time that you started

17  to get intimately involved with the Lyman-Cutler project?

18  A.  It was in the first quarter of 2015.

19      Q.  And how did it come about that you began to get

20  involved with Lyman-Cutler?

21  A.  I think I -- I think there were some more frequent

22  emails, but also Vadim had asked me to start ramping up the

23  kind of a tracking of the -- of our finances for Lyman-Cutler

24  ahead of a sale, you know, the completion of our properties.

25      Q.  Okay.  So in the final -- I'm sorry, in the first

DANIEL GERSH - Direct

1    quarter of 2015 when you first started looking at Lyman-

2    Cutler, had you done any kind of an in-depth review or

3    analysis of the Lyman-Cutler QuickBooks?

4    A.   I -- I would say I barely touched it the first two,

5    three, four months, maybe, of my time at Kagan Development.

6    Maybe in March was when I first started to look into it and

7    play around and -- with editing the numbers, the transactions

8    to reflect the right bills and bill payments and tracking

9    them.

10        Q.   Okay.  And so what did Mr. Kagan ask you to do in

11   the first quarter of 2015?

12   A.   We were -- the previous bookkeeper left in October of

13   2014.  I believe she was at least a few months behind in

14   Lyman-Cutler, which is not too drastic.  But that just meant

15   that by the time February, March came around when I started to

16   look at it in terms of the monthly reconciliations that we do

17   on a monthly basis -- and that means calendar year, for the

18   QuickBooks, so January, February.  You can do that in a day or

19   two, whatever it takes.  But there was a good amount to catch

20   up on, so it just meant start going on that priority-wise.

21        Q.   Okay.

22            MR. PERTEN:  And, Mr. Harris, would you pull up

23   Exhibit 50, please?  5-0, yeah.

24   BY MR. PERTEN:

25        Q.   Mr. Gersh, we've looked at this May 7th, 2015,

DANIEL GERSH - Direct

1   letter from Alexander Pyle several times during this trial.

2           MR. PERTEN:  Could you scroll down a bit?  Keep

3   going.

4   BY MR. PERTEN:

5       Q.   There's some numbers in this paragraph.  Talks about

6   as of May 7th, total of 758,025.56, exclusive of interest

7   charges.  You see that reference?

8   A.   Yes.

9       Q.   Did you provide that number to Mr. Kagan?

10  A.   Yes.

11      Q.   And what did that number represent?

12  A.   I believe that ties to the -- the outstanding accounts

13  payable at the time.

14      Q.   And how did you determine the outstanding accounts

15  payable at that time?

16  A.   After doing initial research and work on trying to

17  capture where the project stands financially at that point in

18  time, it was that exercise of instead of only seeing, you

19  know, that we had paid subcontractor 10,000, $20,000, let's

20  say, that there remains 30,000 still due.  So it was, you

21  know, either editing the transactions to, let's say, for

22  example, you could delete those two and put in a new bill for

23  50,000 and show the two bill payments that took place whenever

24  they took place, or at that point going forward, to create a

25  bill that says there's $30,000 left due, that's where you

DANIEL GERSH - Direct

1    stand.

2        Q.    Okay.  If I could interrupt you because, candidly,

3    you've lost me.  So let me try and break that down a little

4    bit.

5    A.    Sure.

6        Q.    Does that $758,000 figure, was that a snapshot of

7    what QuickBooks was showing at the time?

8    A.    Yes.

9        Q.    And at that time, in May of 2015, had you completed

10   your review of the QuickBooks as it relates to Lyman-Cutler?

11   A.    No.  That was my first stab at trying to get it up to

12   date.

13       Q.    And to what extent had you reviewed those numbers at

14   the time of this $758 figure was spit out?

15   A.    Compared to the rest of our time with this project in

16   this case, ten percent.

17       Q.    Okay.  So it was still roughly ninety percent of the

18   entries you hadn't verified yet?

19   A.    In -- in my level of comfort, correct, yeah.  There was

20   far more hours of supporting documentation, review, and

21   getting everything to feel confident after that time.

22       Q.    Okay.  Now, shortly after May 7th, 2015, were you

23   asked to provide a thumb drive containing the Lyman-Cutler

24   account QuickBooks?

25   A.    Yes.



DANIEL GERSH - Direct

1    Q.    And did you do so?

2    A.    Yes.

3    Q.    And that Lyman-Cutler thumb drive which was provided

4    to Mr. Filippov, was that in the same stage of review; in

5    other words, you'd looked at roughly ten percent of the

6    numbers?

7    A.    If it was right around the May 7 timeline, then, yes.

8    Most of the confidence in the detailed review came in the

9    following months.

10    Q.    Now you say a detailed review over the next several

11    months.  Did you undertake to do a detailed review of the

12    Lyman-Cutler QuickBooks accounts?

13    A.    I consider it almost an audit, yes.

14    Q.    I'm sorry?

15    A.    I consider it an audit, yes.

16    Q.    When you say you consider it an audit, so you did it

17    the way you did it when you were working at KPMG and Iron

18    Mountain, those companies?

19    A.    Considering how serious this had become and how

20    difficult -- different bookkeeping was, the supporting

21    documentation that was kept, it was too much to wrap my head

22    around without doing it my way and almost from the beginning

23    in terms of getting it all organized.

24    Q.    So when you say doing it my way, what did you do to

25    verify the numbers in the Lyman-Cutler QuickBooks?



(973) 406-2250 | operations@escribers.net | www.escribers.net

DANIEL GERSH - Direct

1   A.   Everything comes back to real caps, so everything ties

2   into the bank statements.  So money in, money out will always

3   be reconciled and -- and tested against on in the QuickBooks

4   software on a monthly basis with that bank reconciliation

5   report that you do every month.  You don't have to do it every

6   month, but the Gordons trained us to do it every month so that

7   you don't have to go back after eight months and find one

8   number that's wrong.

9       Q.   So if we could walk through the process.  Let's just

10  hypothetically say you had an entry on some date for a certain

11  amount of money --

12  A.   Um-hum.

13      Q.   -- how would you verify that that entry was

14  accurate?

15  A.   First, you look with the bank statement, and then you

16  make sure that that amount is in the right category if it's

17  split between two properties within the QuickBooks, and then

18  making sure balances do, either within that own QuickBooks

19  file, or if it's in an intercompan -- intercompany

20  transaction, whether it a reimbursement or a loan, to make

21  sure that they're balanced the other way.

22      Q.   Would you go back to see if there was an invoice

23  which corresponded to every entry in the QuickBooks?

24  A.   Yeah.  That was a significant portion of the time-

25  consuming process over that summer.

DANIEL GERSH - Direct

1  Q.  Did you also go back to confirm that there was a

2  check or an Amex receipt for every payment?

3  A.  As much as I could because after the -- the case became

4  official, we were cut off from the Lyman-Cutler checking

5  account.  So I think other than one vendor that I had tried to

6  research prior to then, I had no access to the Lyman-Cutler

7  checking account.

8  Q.  So that was the one that went to Mr. Filippov,

9  right?

10  A.  Correct.  The actuals.

11  Q.  But you certainly had in the KDC files --

12  A.  Correct.

13  Q.  -- you had copies of invoices and checks and Amex

14  statements.

15  A.  And all of our own bank accounts, yep.

16  Q.  Okay.  Now you'll agree with me, sir, that Lyman-

17  Cutler built two homes, correct?

18  A.  Correct.  Yep.

19  Q.  Did the fact that there were two homes being built

20  simultaneously cause any difficulties to you as you tried to

21  get your hands around the numbers?

22  A.  Yes, in that it wasn't handled consistently by the

23  previous bookkeeper or bookkeepers, whoever touched the -- the

24  QuickBooks file.

25  Q.  How so?



DANIEL GERSH - Direct

1  A.    In the QuickBooks file, I don't remember if it was pulled

2  up, but there's certain categories.  You start with your bank

3  accounts, you've got your operating expenses, and then you've

4  got your, either materials or outside services, whatever it

5  is, and then you have your equity accounts.  The Lyman-Cutler

6  QuickBooks file was actually -- had two categories of

7  operating expenses, materials, and services for each property,

8  55 and 88.

9       Q.    Okay.  So they were running two sets within the same

10  project, correct?

11  A.    They were.

12      Q.    And was it your understanding that -- the

13  construction of the two homes happened simultaneously, right?

14  A.    Yes.

15      Q.    You understood that right?  Did each of the

16  subcontractors who were working bill each of the two houses

17  separately, or did you observe situations where you had one

18  bill that covered both properties?

19  A.    The majority of them did two, but there were certainly

20  instances when there could be one that had both properties on

21  there or just said Lyman-Cutler or whatever it was.

22      Q.    And in those situations where you had invoice which

23  simply said Lyman-Cutler or one sum but it was clear that it

24  was for work done on both properties, how would you enter that

25  into QuickBooks?

DANIEL GERSH - Direct

1   A.   Part of the undertaking -- part of the way I decided to

2   do it was try to split the numbers and -- and even them out,

3   if they were equal, between the two properties.  So I'd run

4   into instances before where the previous bookkeeper had maybe

5   only put one of the subcontractors or vendors under 55 Lyman,

6   and you wouldn't see any amount under the same code in 88

7   Cutler.  So for me, in terms of wrapping my head around

8   everything and making sure that I could feel comfortable and

9   track it, if it was 50,000 total or 25 each, I wanted to see

10   25,000 on 55 and 25,000 on 88.

11       Q.   So the total project cost didn't change, you just

12   allocated half to one house and half to the other?

13   A.   Yes.

14       Q.   Okay.

15   A.   That was not every single instance, but in a very high

16   majority, correct.

17       Q.   Now, you mentioned that you started reviewing the

18   QuickBooks in the first quarter of 2015, correct?

19   A.   Late first quarter, yes.

20       Q.   Late first quarter.  Is it fair to say you were

21   making edits and making verification and changing codings and

22   all those kinds of things in April of 2015?

23   A.   Yes.

24       Q.   Earlier, there was testimony that you sent a

25   confirmatory email at the end of April confirming that Mr.

DANIEL GERSH - Direct

1    Filippov -- to Mr. Filippov that there had been a listing

2    agreement signed.  You're familiar with the email, right?

3    A.    Yes.

4         Q.    And Mr. Carnathan showed some entries in QuickBooks

5    that were made that same day.

6    A.    Okay.

7         Q.    Is there any connection between when you were making

8    entries in QuickBooks and that email about signing a listing

9    agreement?

10   A.    No.  In fact, I went back and reviewed that because it --

11   it popped out.  But I went back and reviewed that same audit

12   trail that was provided a long time ago.  And if you actually

13   look back, there are changes in categories and coding.  I

14   think dating back to late March it starts.  And then over the

15   course of April, there's a bunch of changes and edits, and

16   then, actually, I want to say it starts with that week,

17   whatever it is in April, 24 or 25th, is clearly going back.

18   You can tell that that's when the meat of that first set of a

19   lot of changes and edits were done.  It was not just the 28th.

20   There's the 24th, the -5th -- or -5th, -6th, -7th, 28th, 29th,

21   all that.

22        Q.    Okay.

23   A.    And -- and to be clear also, on that audit trail report,

24   whatever change was created is bolded and italicized, I

25   believe.  So again, going back to what I just said previously

Page 227

DANIEL GERSH - Direct

1    about splitting them between the two accounts or making sure

2    they were organized correctly, a high majority of that --

3    those changes were either dates to correct something or a

4    category change, completely unrelated to the invoice or the

5    bill.  A ton of those changes say, you know, a change in the

6    spelling of an account, whether it's a vendor or

7    subcontractor.  That's how small the changes were, literally,

8    a extra letter just to make it make it read normally, but back

9    then I had no idea all the stuff was show up on an audit trail

10   and make a report eighty times longer.

11       Q.   Okay.  Now, as you were going through and reviewing

12   all the backup at KDC to verify the input into the QuickBooks,

13   were there occasions when you found items that were missed?

14   A.   A few.

15       Q.   And when you observed that were there was an item

16   is, did you add it?

17   A.   Yes.

18       Q.   And it did you observe at times there were items

19   that were miscategorized, correct?

20   A.   Correct.

21       Q.   Okay.  So you may have edited from one property to

22   another property to the other property, correct?

23   A.   Yep.

24       Q.   Were there instances where you couldn't find backup

25   for a vendor cost that had been entered into QuickBooks?

DANIEL GERSH - Direct

1   A.   Sure.

2      Q.   And when you couldn't find backup, did you do any

3   further investigation?

4   A.   If it wasn't something that I felt comfortable with what

5   was in the files or the emails or something I could put

6   together in the bank statements, for example, a memo or

7   something like that, the next set of research really was

8   reaching out for invoices, proposals that I thought we needed

9   to see to provide for the documentation.

10     Q.   And when you say reaching out, would you contact the

11  contractors and ask for another copy of whatever it is you

12  couldn't find?

13  A.   Correct.

14     Q.   Okay.  And were you -- although, certainly, by the

15  first quarter of 2015, you said the project was done.  Were

16  you still receiving invoices even months after that?

17  A.   Yeah.  The bulk of our heavy lifting, I would say, was

18  end of May, June, July.  I -- I want to say August was still a

19  big month for us and September as well.  I think there were a

20  few -- after, you know, using all of our resources possible

21  from our end, I think the later parts of the summer was when

22  we actually reached out when we needed additional documents or

23  support because we had exhausted everything we could first.

24     Q.   And when you reached out, were you simply asking for

25  copies of whatever had been previously submitted that you

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

DANIEL GERSH - Direct

 1   couldn't put your fingers on?

 2   A.   Correct.

 3        Q.   Okay.  At any point, sir, did you alter or change

 4   documentation --

 5   A.   No.

 6        Q.   -- other than changing entries into QuickBooks?

 7   A.   Other than QuickBooks, no.

 8        Q.   Okay.  Now at some point, you're aware there was a

 9   decision to lien the properties, correct?

10   A.   Yes.

11        Q.   Were you involved at all in that decision?

12   A.   No.

13        Q.   Did you have any role in preparing the numbers that

14   were incorporated into the lien documents?

15   A.   Yes.  I was -- I was asked to calculate this -- these

16   costs or these totals to support the items that they were

17   looking to put into the lien.

18            THE COURT:  Before you go terribly into this topic --

19            MR. PERTEN:  I'm sorry?  Sure.

20            THE COURT:  Before you go too deeply into this topic,

21   this is a good time to break.  If it's okay with you.

22            MR. PERTEN:  Okay.  Certainly.

23            THE COURT:  You're just at a point I think where --

24   Okay.

25            MR. PERTEN:  Sure.  Fine.



DANIEL GERSH - Direct

1          THE COURT:  All right.  Yes.

2          MR. PERTEN:  If I might --

3          THE COURT:  Yes.

4          MR. PERTEN:  So I think tomorrow, we'll have to sort

5    of finish him whenever.

6          THE COURT:  Yeah.  I understand.

7          MR. PERTEN:  Because we have the subs coming in first

8    thing.

9          THE COURT:  That's fine.  No, I get it.  He'll be

10   back on, probably, not tomorrow at all, then, right?

11         MR. PERTEN:  I'll have him here or at least on call

12   for the late afternoon if we finish early with everybody else.

13         THE COURT:  Okay.  Just remember, yeah, tomorrow,

14   3:30-ish, yeah, is my time.

15         MR. PERTEN:  Yes.  Very good.

16         THE COURT:  Okay.  Anything else for today?

17         MR. PERTEN:  Not from me, Your Honor.

18         MR. CARNATHAN:  No, Your Honor.

19         THE COURT:  All right.  Okay.

20         So Mr. Gersh, I don't know if you've been around for

21   this admonition that I give every time, but please, don't

22   discuss your testimony with anyone --

23         THE WITNESS:  Sure.

24         THE COURT:  -- including counsel, the substance of

25   your testimony, okay --

DANIEL GERSH - Direct

1              THE WITNESS:  Sure.

2              THE COURT:  -- between now and the time that you

3       resume.

4              THE WITNESS:  Understood.

5              THE COURT:  Okay.  Either tomorrow or in a week or

6       so.

7              THE WITNESS:  Sure.

8              THE COURT:  Okay.  Thank you very much.

9              THE WITNESS:  Thank you.

10             MR. PERTEN:  Thank you, Your Honor.

11             THE COURT:  All right.  Thank you all.

12             MR. CARNATHAN: Thank you, Your Honor.

13      (End at 3:48 PM)

14                         *  *  *  *  *  *  *  *  *  *

15

16

17

18

19

20

21

22

23

24

25

I certify that the foregoing is a true and accurate transcript from the digitally sound recorded record of the proceedings.

*Hana Copperman*

/s/ Hana Copperman                              June 21, 2019

_____
AAERT Certified Electronic Transcriber        Date
(CET-487)
ESCRIBERS LLC

eScribers
7227 N. 16th Street, Suite #207
Phoenix, AZ 85020
973-406-2250
e-mail operations@escribers.net

**—**

**— (1)**
207:3

**$**

**$1 (3)**
91:2,6,22
**$1,016,689 (1)**
187:23
**$1.3 (4)**
15:14;16:23;18:10,
12
**$1.6 (3)**
22:10;23:22;25:11
**$10,000 (4)**
91:13;209:20;210:3,
8
**$100,000 (3)**
79:17;142:24;177:4
**$15,000 (1)**
164:17
**$150,000 (3)**
162:8,20;163:2
**$16,000 (3)**
77:10;78:2,17
**$175,045.28 (1)**
181:19
**$2 (4)**
14:22;19:8;21:8,12
**$20,000 (1)**
219:19
**$225,000 (2)**
153:22;155:9
**$25,000 (1)**
94:23
**$260,000 (1)**
164:19
**$264,100 (2)**
147:24;148:3
**$3,000 (1)**
181:24
**$3,171,514 (2)**
186:9,22
**$30,000 (3)**
48:2;210:6;219:25
**$325,000 (1)**
141:17
**$50,000 (1)**
210:1
**$500,000 (1)**
163:9
**$5000 (1)**
209:19
**$532,000 (2)**
162:21;163:1
**$59,000 (1)**
95:5
**$60,000 (1)**
140:16
**$680,000 (1)**

187:25
**$680,533 (1)**
187:21
**$758 (1)**
220:14
**$758,000 (2)**
96:22;220:6
**$758,025.56 (1)**
94:10
**$758-odd-thousand (1)**
69:11
**$90,000 (1)**
47:18
**$910,000 (2)**
86:19;87:2

**A**

**ability (1)**
148:20
**able (6)**
112:21;158:14;
179:1;183:19;192:3;
203:16
**above (1)**
164:18
**Abramskiy (1)**
31:9
**Absolutely (18)**
18:17;21:6;25:5,17;
28:4;69:22;73:20,22;
76:16;77:21;80:25;
82:3;83:14;123:17;
126:10;127:7;143:13;
212:9
**acceptable (3)**
132:20;138:6;185:15
**accepted (1)**
13:11
**access (8)**
148:4;156:6,11,13,
22;212:5,7;223:6
**account (59)**
45:13,18,19;46:3,5,
12,18,21;97:1,2,3,7;
98:10;100:3;103:2;
113:5,7,9;115:22;
124:11;126:18;130:13,
21,22,23;134:3;135:6;
138:15;142:21,22;
147:19,20;150:24;
153:17;154:23;155:2;
157:8,9,12,15,17,
21;158:5;162:14,20;
189:7;190:16,19;
205:15,24;215:12,15;
216:8;217:1;220:24;
223:5,7;227:6
**Accountancy (1)**
195:13
**Accountant (2)**
121:13;166:16
**Accountants (2)**

165:7,10
**accounted (1)**
125:14
**accounting (18)**
120:1,7;124:10;
127:8,14;131:23;
134:1,21,23;137:15,20;
142:16;148:16;149:17;
151:6;195:4,5;197:5
**accounts (43)**
97:4;125:12;126:20;
135:8;138:16;139:3,
16;140:8;146:11,12,13,
15;147:9,11,12,17;
149:1;152:6,6,7;
153:10;155:11,12,16;
157:12,20,22;162:14,
23;189:1,11,12;204:7;
215:23;216:9,23;
219:12,14;221:12;
223:15;224:3,5;227:1
**accounts-receivable (2)**
188:24;192:8
**Accrual (4)**
134:25;173:25;
189:2;192:15
**accrual-basis (2)**
134:23;137:20
**accuracy (1)**
169:7
**accurate (1)**
222:14
**accurately (1)**
161:9
**acknowledge (1)**
85:5
**across (2)**
198:10;206:11
**active (3)**
202:16,25;203:3
**actively (1)**
171:4
**activities (1)**
131:7
**activity (2)**
172:2;180:23
**actual (3)**
48:20;149:12;192:19
**actuality (1)**
177:1
**actually (50)**
8:13;21:24;22:12;
24:23;25:10;32:23;
33:2;34:4;37:8;47:9;
51:21;52:10,13;60:22;
71:21;74:2,7;80:11,22;
87:9,23;91:5;105:18;
132:17;134:2;137:17;
140:7;142:4;143:4;
144:6;156:1;157:5;
158:10;160:10;162:21;
163:20,22;168:5;
169:6,17;170:8;171:4;

181:22;197:6;199:23;
204:11;224:6;226:12,
16;228:22
**actuals (1)**
223:10
**actuary (1)**
16:20
**add (11)**
78:24;79:17,25;80:2;
82:19;84:8;95:19;
107:24;186:8,23;
227:16
**added (1)**
176:17
**adding (3)**
76:25;79:4;118:6
**addition (1)**
205:1
**additional (17)**
37:4,16;109:10,15;
110:13,14,20,24;111:1,
4,5,7,9;122:14,23;
215:12;228:22
**Additionally (1)**
37:23
**address (13)**
24:7,7;61:1,4;62:17,
21;63:3,11;64:3,10,20;
81:23;185:5
**addressed (2)**
23:6;117:3
**addresses (2)**
62:25;63:9
**adjusted (3)**
152:2;154:9;161:16
**adjusting (7)**
149:13;172:20;
185:22;186:8,21;
188:1,11
**adjustments (15)**
150:14,15,19,19;
151:5,11;159:23,24;
160:3,22,23;161:1,6,7;
173:11
**administer (1)**
9:21
**admissibility (2)**
39:18;40:2
**admissible (1)**
29:1
**admit (9)**
19:13;36:20;38:25;
55:5;63:20;128:20;
129:19;152:12;154:13
**ADMITTED (41)**
40:9;49:3;55:11;
87:16,20;106:5,6,7;
111:20;112:1;116:5,8,
10,16;128:23,24;
129:21,22;149:24,25;
152:15,16;154:15,16;
176:12,13;177:24,25;
179:23,24;180:13,14;

181:15,16;183:6,7,16,
17;185:19;187:17,18
**admitting (1)**
31:2
**admonition (1)**
230:21
**Adobe (1)**
131:2
**advance (8)**
37:10;96:15;111:6;
172:22;213:2,12,21,22
**advances (3)**
212:24;213:16;214:4
**advancing (1)**
95:14
**adversary (1)**
6:4
**advise (1)**
112:25
**advised (2)**
7:1;8:6
**advisory (2)**
120:10;211:23
**affairs (1)**
123:23
**affect (1)**
134:2
**affects (1)**
9:6
**affidavit (9)**
86:12,16,25;108:15;
109:1,4;113:19;
117:19,23
**affidavits (1)**
108:17
**affidavit's (1)**
111:11
**afternoon (4)**
7:4;119:3;194:16;
230:12
**afterwards (1)**
46:21
**again (51)**
7:25;9:22;20:3;
28:24;29:17,20;30:1;
31:16;37:3;42:7;43:3,
5;44:20;50:1;54:16,25;
60:14;62:19,19;65:3,
14;77:20;81:25;84:2;
85:3;88:19;99:1,7;
100:6;104:20;105:13;
108:12;109:9;119:22;
128:12;129:14;131:19;
134:18;141:17;144:6;
151:22;153:11;154:4,
19;155:6;157:23;
181:21;208:7,17;
211:8;226:25
**against (7)**
29:11;136:3;141:24;
160:15;209:11;210:4;
222:3
**age (2)**

Case 16-01120    Doc 354    Filed 06/21/19    Entered 06/21/19 17:57:25    Desc Main

LYMAN-CUTLER, LLC; Case #15-13881Document      Page 234 of 259
LYMAN-CUTLER, LLC v. KAGAN, et al.; Adv. Proc. 16-01120                                      June 17, 2019

178:19;192:7
**aggregate (5)**
74:18;80:15;135:14;
162:5;169:22
**aggregated (4)**
157:9,14;189:6,9
**aggregating (1)**
40:6
**aging (3)**
180:5,18;181:7
**ago (4)**
51:3;69:1;164:12;
226:12
**agree (29)**
10:12;11:18;14:2;
17:20;24:16;30:1;42:9;
43:13;48:16;52:7;
63:24;71:10;73:9;
78:18;79:16;84:6;
87:22;108:12;147:3;
171:19;173:13;174:2,
23;175:16;183:19;
191:6;192:14,17;
223:16
**agreed (26)**
22:23;23:18,19,24;
28:2;30:12;31:24;
33:21;40:15;41:8;42:7;
43:5;44:7,13,15;71:8,
11,13;74:18;79:15;
83:8;95:25;106:25;
109:4;110:19;174:6
**agreeing (4)**
27:20;30:6;32:1;
70:19
**agreement (41)**
11:23;19:5,8;21:9;
23:22;25:9,19,22,25;
26:22;27:18,19,22;
30:7,13,21;31:1,3,4,9;
35:9;36:4;39:15;43:6,
13;65:14;66:21;67:6,
19;75:2;76:21;89:1;
104:1,4,5;110:3;
111:10;112:8;174:15;
226:2,9
**agreements (2)**
34:13;41:16
**agrees (1)**
67:17
**ahead (3)**
34:9;105:24;217:24
**AICPA (8)**
125:3;165:4,6;169:4,
21;170:8;171:12;
173:14
**al (1)**
6:5
**Alex (3)**
6:11;22:25;84:7
**Alexander (2)**
28:8;219:1
**aligns (1)**

133:4
**allegations (1)**
133:24
**allocate (1)**
136:5
**allocated (2)**
174:18;225:12
**allow (3)**
29:9;36:25;83:22
**allowed (7)**
29:10;30:10;37:5;
38:18;74:25;125:4;
196:21
**allows (2)**
127:8,10
**Almost (6)**
45:15,17;136:17;
202:22;221:13,22
**along (5)**
16:12;71:5;98:16;
107:4;160:12
**alphabetically (1)**
206:13
**alter (1)**
229:3
**although (4)**
7:11;180:21;228:14
**altogether (1)**
204:22
**always (21)**
10:25;24:5,19;57:5;
70:3,5;80:4,17;83:6,6,
8,12;93:20,21;134:11;
142:18;169:15,19;
207:3;208:5;222:2
**amend (1)**
30:16
**amended (5)**
159:12,19;186:25;
187:5,12
**amendments (3)**
158:20;159:1,14
**American (7)**
47:9;165:6;168:15;
190:16;198:8;205:18;
217:4
**AmEx (8)**
168:21;205:17,17,
20,23;217:4;223:2,13
**among (6)**
36:16;84:6;101:8,15;
185:4,15
**amount (19)**
107:17;137:2,3;
141:17;160:10;162:17;
179:14;187:2;188:15;
189:9;205:8;208:5;
209:10,13;210:11;
218:19;222:11,16;
225:6
**amounts (2)**
142:8;148:23
**amount's (1)**

162:18
**amplify (1)**
11:16
**amplifying (1)**
11:17
**analysis (2)**
22:22;218:3
**analytical (1)**
167:7
**analyzed (2)**
75:9;79:20
**analyzing (4)**
79:17,19,19;84:3
**and/or (1)**
190:13
**Andersen (1)**
121:3
**Ankin (1)**
41:2
**annual (1)**
196:13
**answered (1)**
90:19
**anticipate (1)**
7:19
**anticipated (1)**
94:12
**anticipating (1)**
213:19
**anymore (2)**
97:6;171:16
**apart (1)**
208:24
**apologies (2)**
100:4;186:13
**apologize (3)**
11:22;33:12;60:10
**apparently (3)**
84:18;102:6;180:17
**appear (1)**
140:20
**appeared (1)**
192:21
**appears (5)**
19:20;113:12;
124:16;125:5;144:6
**appellate (1)**
105:17
**application (4)**
51:12,21;52:12;
117:25
**applied (2)**
22:9;44:11
**applies (1)**
40:1
**apply (4)**
23:20;30:24;117:18;
118:11
**applying (3)**
27:24;33:3;44:17,18;
118:12
**appraiser (3)**
83:16,21,22

**approach (7)**
11:2;13:3;34:8;
101:1;108:22;184:19;
186:5
**approached (1)**
11:23
**approve (2)**
70:22;83:18
**approved (8)**
21:21,24;22:2;70:17,
20,21,24;71:1
**Approximate (1)**
22:11
**approximately (8)**
17:24;21:17;90:2,8,
22;120:5;195:21;
198:20
**April (8)**
22:25;24:12,16;
103:3;225:22,25;
226:15,17
**AR (6)**
177:18;180:4,18;
181:7,19;189:14
**area (1)**
16:6
**Arina (1)**
45:12,17;214:22;
215:2
**arise (2)**
123:4;125:19
**around (12)**
110:4;121:15;
153:17;182:8;185:15;
218:7,15;221:7,22;
223:21;225:7;230:20
**arrangement (1)**
135:24
**arrival (4)**
201:5;203:11;209:4;
210:17
**arrive (1)**
121:25
**arrived (11)**
118:6;202:1,17,20;
203:2,15;204:18;
205:3;206:5;208:12;
214:7
**Arthur (1)**
121:3
**articulated (1)**
37:17
**assets (1)**
155:15
**assist (1)**
6:24
**assistance (2)**
121:24;123:3
**assisted (1)**
122:2
**associated (1)**
151:11
**Association (1)**

195:24
**Assuming (1)**
39:23
**Assumptions (1)**
15:11
**assurance (4)**
127:11;167:2,11;
197:21
**assure (1)**
18:11
**assured (1)**
18:10
**Atlanta (1)**
121:7
**attach (1)**
102:13
**attaching (1)**
76:12
**attachment (2)**
82:16;98:15
**attachments (1)**
24:6
**attempted (1)**
207:13
**attend (1)**
86:4
**attention (1)**
13:7
**attest (1)**
169:6
**attestation (5)**
166:5,15,21;167:15;
169:15
**attorney (5)**
7:22;127:22;129:2;
138:8;145:25
**attractions (2)**
6:22;8:14
**atypical (1)**
137:12
**AUC (2)**
172:24;173:5
**audit (19)**
166:24;169:10;
173:6;198:4,5,8,24,25;
199:14;210:25;211:2,
3,3;221:13,15,16;
226:11,23;227:9
**auditing (6)**
171:12,17;196:1;
197:16,19;199:15
**auditor (3)**
121:3;171:1;197:20
**audits (1)**
171:16
**audit's (1)**
167:10
**August (9)**
50:6;53:11,14,20,23;
56:10;58:14;62:9;
228:18
**authentication (1)**
9:10

**authenticity (1)**
7:15
**authored (1)**
104:19
**authoritative (1)**
165:9
**auto-date (1)**
113:12
**automatically (1)**
113:12
**available (3)**
10:17;132:1;194:4
**Avenue (1)**
33:15
**average (1)**
212:16
**aware (8)**
57:14;102:6;132:3;
142:3;168:2;170:6;
215:4;229:8
**away (7)**
23:22;69:20,22;
96:11;97:25;144:19;
207:19

**B**

**back (72)**
8:7,10;9:18;18:6;
33:12;34:16;46:20,25;
49:20;50:1;52:9,13;
53:1;61:12;64:24;
68:21;69:23;77:16;
81:13;83:4,25;97:16,
18;100:6;102:3;
104:21;106:9;107:3;
108:16;118:13;119:17;
131:11;134:14,18;
135:23;136:1,9,23;
138:8;142:9;145:1;
148:15;153:13;157:23,
25;158:2;161:13;
173:23;175:10;182:11;
185:18;191:8,10;
193:13,23;197:8;
198:23;209:22,23;
210:12;222:1,7,22;
223:1;226:10,11,13,14,
17,25;227:8;230:10
**background (1)**
121:5
**backlog (1)**
209:6
**backup (5)**
146:20;190:9;
227:12,24;228:2
**balance (12)**
134:17;139:4;147:4,
24;148:3,6,7;152:3,5;
153:4;154:9;161:17
**balanced (1)**
222:21
**balances (6)**

143:1;146:23;
156:21;180:22;190:19;
222:18
**balancing (1)**
127:9
**bank (89)**
21:16;22:5,7,9,13,
18;23:18;25:6;27:14;
28:3;30:14;32:16;33:1,
2,8;42:14,14;43:14,18;
45:13,18,19;46:3,5,12,
18;76:7,12,22;79:1;
80:4,23;81:3,3;83:13,
14,16,18,21,21;84:3,
18,20;97:1,2,6;125:11;
126:18,20;127:10;
130:12,13,15,23;132:8,
11,14,17,22,25;133:18;
142:22,22;147:17,18,
20;149:1;150:24;
155:16;168:12,14;
188:17,18;190:12,14,
14;205:13,15;213:11;
216:7,16,22;217:2;
222:2,4,15;223:15;
224:2;228:6
**banks (1)**
160:7
**barely (1)**
218:4
**based (13)**
49:8;81:3;101:21;
111:10;123:21;124:22;
133:20;136:10;178:19,
19;201:13;203:20;
215:7
**bases (1)**
104:12
**basic (1)**
126:11
**basically (11)**
7:18;12:14;45:23;
96:21;108:6;111:15;
125:4;135:19;157:15;
158:7;170:2
**basis (8)**
82:12;134:25;189:2;
196:13;198:9;209:7;
218:17;222:4
**bears (1)**
59:13
**became (2)**
74:9;223:3
**become (3)**
12:6;195:20;221:19
**becomes (2)**
39:7;171:8
**began (2)**
102:18;217:19
**begin (1)**
145:18
**beginning (9)**
10:12;89:17;92:24;

105:20;123:10;202:12;
204:12;207:22;221:22
**begins (2)**
146:7;147:8
**behalf (8)**
47:4;68:13;147:14,
15;148:16;157:1,6;
189:13
**behind (2)**
46:15;218:13
**belaboring (1)**
107:6
**belong (2)**
132:19;192:11
**belongs (1)**
141:14
**below (1)**
147:8
**Bentley (3)**
195:7,11;197:9
**best (3)**
7:6;113:10;148:19
**better (2)**
93:3;107:8
**beyond (4)**
38:4;109:6;110:9;
116:2
**biannual (1)**
196:13
**bids (4)**
56:22,24;57:1,3
**big (10)**
11:5;91:25;141:12;
160:14;197:8;201:14;
202:4;210:7;211:14;
228:19
**biggest (4)**
132:6;141:11;209:5,
8
**Bill (21)**
50:14;64:13;86:16;
135:13,23;136:3;
141:9,11;187:9;
209:10,24;210:2,4,4;
218:8;219:22,23,25;
224:16,18;227:5
**billed (4)**
140:13;157:22;
179:10;189:10
**billing (5)**
139:17;140:16;
141:6,24;209:11
**bills (2)**
207:21;218:8
**binder (2)**
81:7;82:4
**bit (25)**
11:13;14:25;71:15;
106:24;114:23;117:1;
138:11;139:1;142:3;
143:3;146:1;148:21;
150:3;152:25;154:24;
159:22,23;160:16;

175:6,15;210:20;
214:7,14;219:2;220:4
**block (2)**
115:6;138:19
**blocks (1)**
144:19
**blow (11)**
15:10;29:18;50:14;
57:11;67:15;75:19;
77:5,20;94:20;176:15;
179:2
**Blue (8)**
198:24,24;199:2,2,6,
7,11,12
**bolded (1)**
226:24
**book (3)**
141:5,13;152:5
**booked (3)**
123:5;138:2;160:8
**bookkeeper (7)**
199:25;200:19,21;
216:12;218:12;223:23;
225:4
**bookkeepers (1)**
223:23
**bookkeeping (16)**
93:6,7,18,20,22;
121:24;122:24;123:3,
4,25;130:18;133:11;
165:22;202:4,11;
221:20
**books (38)**
88:8,13,16;92:21,22;
93:1,4,5,5,6,14,25;
94:4;127:1,2,9;134:16;
137:5;141:8,14;
142:20,20;147:4;
149:15;150:17;151:7;
156:23;157:5;158:6;
165:1;174:8,14;177:4;
178:17;192:21,24;
201:3;208:23
**Bor (1)**
66:11
**Boris (7)**
14:15;15:2;19:4;
25:24;26:2;41:17;
44:16;65:18;66:13;
84:7;101:13,15;102:9,
15
**borrow (26)**
25:5;28:2;30:2,5,8,
13,18,21,23;31:24;
33:6;40:15;41:8;42:7,
18;43:5,14,15,17,19;
44:7,14,15;65:24;
77:11;80:11
**borrowed (1)**
26:13
**borrower (1)**
43:16
**borrowing (12)**

24:23;25:3;26:4;
27:9,20;32:25;33:5;
36:3,12;44:22;65:20,
22
**Borya (1)**
23:17
**boss (3)**
203:7,7;208:11
**both (10)**
56:13;57:24;73:17;
135:1;157:20;173:25;
189:12;224:18,20,24
**bottom (19)**
19:21;28:13;34:2;
35:15;40:20;41:11;
60:15;61:10;62:13;
90:13;91:10;100:13;
153:1,7,7;161:20,25;
162:19;176:15
**bought (2)**
25:12,14
**box (2)**
153:17;179:13
**brain (1)**
77:3
**brand (1)**
202:5
**break (8)**
7:3;8:21;84:25;85:1;
144:12;145:5;220:3;
229:21
**breaks (1)**
193:22
**breath (1)**
105:7
**brief (1)**
197:3
**briefly (6)**
56:16;68:9;87:22;
97:15;120:22;121:4
**bring (12)**
30:9;127:22;129:2;
131:11;138:8;145:13;
149:3;151:19;154:1;
161:12;173:1;207:13
**broader (1)**
158:10
**Broadly (1)**
166:19
**broker (3)**
66:23;67:21,22
**Brookline (5)**
51:12;53:4;55:25;
113:20,23
**brother-in-law (1)**
90:5
**brought (2)**
145:17;177:6
**Brusenkova (7)**
57:19;65:8;87:23;
164:13;200:25;201:2;
209:4
**bucks (7)**

92:10;95:17,20;
107:25;111:4,6;187:1
**budget (25)**
14:20;15:14,19;
16:23;17:19,22,24;
18:25;19:1,3,9;21:8;
22:7,10,17,22;23:1;
24:13,17;30:9;73:11;
75:10;76:20;80:23;
103:12
**build (15)**
10:15;12:23;17:1,1,
11,24;18:14;21:15,17,
20,23;43:12;65:25;
83:22,24
**builder (2)**
16:3;23:12
**building (12)**
13:14;18:19;27:24;
47:11;53:4,5;56:6;
83:19;87:8,13;114:3;
117:24
**buildings (1)**
124:8
**builds (1)**
43:11
**built (9)**
16:5;88:5;108:3,9,
11;124:7,8;223:17,19
**bulk (1)**
228:17
**bunch (4)**
52:14;98:12;102:8;
226:15
**busiest (1)**
202:23
**business (21)**
16:14;74:24;96:23;
100:6;120:10,13;
135:5,5,7,9,16;136:6,9,
11;142:5;172:2;
188:20;202:9;203:13,
14;205:2
**businesses (4)**
120:14,15;142:8;
143:19
**buy (1)**
136:22
**buying (1)**
136:20

**C**

**cabinet (1)**
216:24
**cabinets (1)**
205:5
**calculate (1)**
229:15
**calendar (6)**
131:7;135:2;141:12;
151:14;209:7;218:17
**call (15)**

7:16;8:21,25;9:7;
56:24;118:21;121:25;
130:17;144:25;152:2;
194:10;199:24;208:11;
210:25;230:11
**called (9)**
43:24;99:16;130:18;
137:21;151:2;166:4;
169:15;197:11;215:12
**calling (4)**
8:9,9;49:11;122:10
**calls (2)**
8:20;200:12
**came (12)**
13:24;76:14;111:3;
118:13;133:16;151:9;
165:23;174:22;207:25;
214:4;218:15;221:8
**can (127)**
10:19;11:11,12;
12:22,22,23,25;19:25;
20:13;22:15;23:2;
26:16;27:14;29:18;
32:6;33:9;36:15,23;
38:7,8;40:23;41:20;
43:21;44:25;45:10,21;
46:9,15;49:25;52:12;
54:1;55:12;60:20;
61:18;62:10,12,14,22;
64:5,13;74:10,10;
77:24,25;81:25;83:23;
86:15,22;91:13;92:1;
94:5;97:2;98:5;107:5;
108:4;116:24;119:11,
16;120:22;121:4,20;
122:24;125:6;127:13;
128:5,6,11;130:6,14,
16;131:11;133:10,11;
134:14;135:6;138:2,
11,18,21,25;141:1,13;
144:22;147:1;149:11;
151:25;152:25;153:1;
154:24;157:4;158:2;
160:1;162:11;166:2;
169:9;170:2,3,4,19,22,
25;173:8,9;174:23;
176:20;177:13;178:20;
179:1;181:21;182:13,
25;183:2;184:17;
186:14,14;187:7;
188:16,25;191:9;
193:19,21;197:3;
209:6,7;210:6;218:18;
226:18
**canceled (1)**
92:15
**candidly (1)**
220:2
**capital (5)**
142:9,10;143:21,24;
144:1
**capital- (1)**
188:19

**caps (1)**
222:1
**capture (2)**
189:13;219:17
**captured (6)**
127:12;132:10;
137:9;148:20;191:25;
217:2
**capturing (2)**
191:11,11
**card (7)**
52:9;134:14;135:11,
13;158:2,2;205:25
**cards (2)**
16:12;205:24
**care (1)**
208:20
**career (2)**
121:10;196:17
**CareGroup (4)**
199:11,13,14,16
**CARNATHAN (269)**
6:10,11;7:1,1,7;8:16;
9:12;10:2;11:8,20,21;
12:25;13:3,6;15:3,4,9,
12;19:18,19;20:14,15;
22:15,16;23:2,3;26:16,
17,25;27:2;28:5,7,16,
17,21;29:5,16,19;31:5,
7,13,15;32:6,7,11,13;
33:9,13,18,20;34:8,10,
12,20;35:6,17,23;36:1,
8,12,18;37:9;38:1,13,
18;39:2,6,12;40:3,6,10,
12,14,23,25;41:5,7,20,
22;42:4,6,21,23;43:2,4,
21,22;44:4,6;45:8,9;
46:9,10,23;49:20,21;
50:2,4,13,16;51:5,10,
23;52:2,3,17,20,24;
53:2;54:12,15;55:1,17,
21,22;56:3,5,16,18;
57:11,13;58:10,11,20,
21,25;59:1,6,7;60:3,4;
64:5,13,16,17;67:14,
16;68:9,10,16,18;70:8,
9;71:2,4;75:18,20;
77:2,5,7;78:6,10,14,15;
84:23;85:2,15;86:9,10,
15,17,22,24;87:4,8,21;
94:5,7,19,22;97:15,17;
98:5,7;99:23,25;100:4,
5,21;101:1,4;104:9;
105:2,6,11,14,18,23;
106:8,10;108:19,22,24;
111:16,22;113:19;
114:23;115:16;116:2,
7,21;117:17,21,22;
118:17;128:22;129:20;
144:19,22;145:2;
149:23;152:14;154:14;
163:18;164:2,5,10;
173:2,4;175:10,13,14;

176:9,14,16;177:13,14,
21;178:1,2;179:1,3,19,
25;180:1,10,15,16;
181:3,4,12,17;182:13,
15,24;183:3,8,9,13,18;
184:17,19,22;185:18,
21;186:5,7,13,19;
187:9,14,19;188:5,10;
191:21;192:25;226:4;
230:18;231:12
**carried (1)**
164:25
**carry (2)**
77:9;179:13
**carrying (93)**
23:21;24:14,18,20,
21,22,24;25:3,6,12;
26:5,13;27:6,10,20;
28:2,3;29:23;30:2,13,
18,22,23;31:19,25;
32:17,25;33:3,6,23;
36:3,12;37:19;38:22;
40:16;41:8;42:7,13,14,
16,18;43:5,14,15,17,
19;44:7,14,15,17,18,
23;45:3,4,6,7,12,17,19,
24;46:2;47:6;65:20,22,
24;66:19;69:17;73:14,
15;76:5;79:11;81:18,
20;82:13,21,22,23,25;
83:5,6;84:3,14,19,20,
22;88:24;95:14;97:4;
103:5;111:6;113:6;
215:8,15
**case (16)**
6:6;9:17;29:1;32:24;
36:5;37:16;61:18;
105:18;128:17;129:16;
130:11;133:24;136:19;
148:9;220:16;223:3
**case-in-chief (1)**
7:23
**cash (14)**
130:21;133:15,16,
18,22;134:15,15,18;
144:8;157:24;189:8;
191:4;192:9;213:17
**cash-flow (1)**
144:2
**catch (3)**
132:23;209:7;218:19
**categories (5)**
204:6;211:14;224:2,
6;226:13
**categorization (1)**
133:19
**category (3)**
37:9;222:16;227:4
**cau (1)**
211:2
**cause (2)**
160:22;223:20
**cautiously (1)**

8:12
**cc'd (1)**
145:21
**cell (17)**
58:18;59:10,11,11,
19,20,21;60:21,22;
61:3,6,8,10,20,23;62:2,
3
**certain (22)**
39:8;67:1,2;123:7;
125:10;127:10;135:10,
22;137:2;147:13,13;
149:16;150:17,22;
157:7;158:8;160:1;
174:18;189:9;190:9;
222:10;224:2
**certainly (29)**
9:12;16:16;23:12;
36:14,15;53:24;54:2;
69:2;70:16;78:6,17;
84:10;108:12;110:8;
132:9;141:10,13;
142:7;148:12,18;
160:15;163:10;171:22;
202:8;212:12;223:11;
224:19;228:14;229:22
**certificate (3)**
32:17;86:11;98:20
**certification (6)**
195:23,24;196:6,10,
11,15
**certifications (3)**
121:11;195:15,18
**certified (6)**
53:4;55:25;87:12;
121:13;165:7,10;
195:19,20,22,24
**CFO (5)**
7:11;200:6,7;201:8;
212:10
**chain (2)**
78:20;81:25
**challenging (1)**
115:25
**change (10)**
159:14;182:3,5,9;
211:1;225:11;226:24;
227:4,5;229:3
**changed (5)**
83:15;180:24;
183:20,21;208:1
**changes (7)**
210:23;226:13,15,
19;227:3,5,7
**changing (2)**
225:21;229:6
**Chapter (1)**
115:20
**character (1)**
166:3
**characteristic (1)**
173:14
**characteristics (1)**

Case 16-01120    Doc 354    Filed 06/21/19    Entered 06/21/19 17:57:25    Desc Main
LYMAN-CUTLER, LLC; Case #15-13881 Document    Page 237 of 259
LYMAN-CUTLER, LLC v. KAGAN, et al.; Adv. Proc. 16-01120

June 17, 2019

173:10
**charge (5)**
111:3,13;134:14;
189:18;213:11
**charged (2)**
137:3;217:5
**charges (5)**
135:14,15;150:24;
157:10;219:7
**charging (5)**
110:5,6;135:25;
136:1,23
**chart (3)**
46:11,13,25
**check (13)**
48:20;58:13;92:16;
130:9;132:20,21;
147:19;152:5;158:1;
168:13;209:18;210:7;
223:2
**checkbook (2)**
132:15,16
**checking (4)**
130:21;152:6;223:4,
7
**checks (4)**
46:15;113:8;209:17;
223:13
**children (1)**
194:22
**choice (1)**
185:17
**chooses (1)**
184:6
**circumstance (1)**
157:1
**circumstances (6)**
148:21;150:14;
158:25;160:2,21;
174:11
**claim (4)**
6:7;22:1;45:2;
109:23
**claimed (3)**
21:20;49:13;69:10
**claims (5)**
36:3;69:3,8,9;97:19
**Classic (1)**
43:24
**classification (1)**
150:23
**classified (1)**
133:13
**clean (2)**
70:21;204:15
**clear (3)**
54:21;224:23;226:23
**clearly (4)**
59:19;82:2;163:6;
226:17
**CLERK (25)**
6:2,4;34:11,12;55:8,
10,12,15,19;85:9,12,

20;87:18;98:8;99:22;
106:1;111:24;118:24;
119:11;145:6,9;
184:18,23;194:11,13
**click (2)**
140:18;161:13
**client (4)**
38:2,6;152:2;161:16
**clients (10)**
120:8,12,24;124:6;
125:5;151:6,16;168:7;
197:15;203:13
**clipped (1)**
206:20
**clock (1)**
193:8
**close (3)**
7:3,8;127:15
**closer (2)**
11:10;119:10
**closing (3)**
75:2;98:22;172:16
**clue (1)**
91:21
**CO (2)**
32:18;199:17
**code (1)**
225:6
**codes (1)**
204:14
**coding (4)**
204:4;210:24;211:9;
226:13
**codings (2)**
204:7;225:21
**Cohen (40)**
38:20,21;60:8;63:15,
16,17;64:3;88:21,22,
23;89:2,6,18;90:14;
91:2,7,11,21;92:2,6,20,
25;93:3,7,18;97:10;
98:3,12;100:8,15;
101:5,20;102:3,18;
103:2,18,24;106:12;
166:1;211:20
**Cohen's (2)**
63:25;123:23
**collect (1)**
162:21
**collecting (1)**
163:10
**collects (1)**
163:1
**college (2)**
195:1;197:7
**column (12)**
15:10;130:3,5,7,14;
139:14,15,24;140:5,15;
151:2;209:18
**columns (4)**
131:18,19,20;186:24
**comfort (2)**
125:13;220:19

**comfortable (6)**
126:5;202:13;
209:16;210:21;225:8;
228:4
**comfortably (1)**
11:11
**coming (12)**
6:22;7:14;8:14;
130:21;133:15;139:8,
8,9;201:13;202:6;
203:6;230:7
**comingling (1)**
155:15
**commenced (4)**
70:13,15,24;71:12
**comments (2)**
101:9,11
**commercial (1)**
142:7
**commit (2)**
171:20;172:9
**commitment (2)**
27:13,25
**committee (1)**
8:22
**common (11)**
36:7;37:2,12,13,20,
21;38:10,19;43:10;
192:23;209:18
**communications (1)**
200:12
**comp (1)**
202:7
**companies (39)**
121:17,18;122:15,
17;123:1,13,19,21;
124:3,11,12,16,23;
126:12,13,25;131:22;
142:16;143:5;148:10,
17,22;156:10,17;
160:3;165:13;182:6;
191:7;197:21;201:14,
17,18;204:4,21,22;
205:14,22;217:11;
221:18
**companies' (2)**
135:1;143:10
**company (31)**
92:23;96:2;110:15;
119:25;123:9;125:22;
126:7,22;130:4;
142:20,23,24;144:5;
155:8,20;158:7;161:4;
188:3;197:17,17;
199:1,11,11,25;200:10;
201:8,16;202:6,22;
205:22;212:19
**company's (3)**
155:23;162:23;191:3
**compare (1)**
135:17
**Compared (1)**
220:15

**compensation (1)**
66:3
**compilation (2)**
166:23;167:1
**compilations (1)**
120:10
**compile (1)**
167:2
**compiling (1)**
49:11
**complete (8)**
52:10;115:24;141:9;
148:20;174:13;192:20;
202:24;203:4
**completed (4)**
101:12;137:23;
141:11;220:9
**completely (3)**
193:17;201:22;227:4
**completeness (1)**
187:4
**completion (6)**
137:22;141:8,20;
160:9,19;217:24
**complicated (1)**
210:20
**complied (2)**
116:12;198:15
**composite (2)**
39:11,15;40:4;
105:12
**computer (4)**
61:5,20;62:12;199:3
**computers (2)**
113:11;200:12
**conceal (1)**
170:22;171:4
**concentration (1)**
120:16
**concept (5)**
141:20;154:19,21;
173:23;204:9
**concerned (4)**
76:24;78:1,3,17
**Condominiums (1)**
43:24
**condos (1)**
124:8
**confidence (1)**
221:8
**confident (1)**
220:21
**confirm (3)**
148:6;168:6;223:1
**confirmation (1)**
168:12
**confirmatory (1)**
225:25
**confirming (1)**
225:25
**confused (1)**
105:20
**confusing (1)**

**compensation → continued, right column:**
105:21
**connection (14)**
86:5;122:5,15,16,19;
125:1;128:16;129:15;
142:16,17;156:9,16;
196:6;226:7
**consent (1)**
39:10
**consider (6)**
121:23;147:20;
152:4;221:13,15,16
**consideration (1)**
173:6
**considered (2)**
124:6;189:8
**Considering (1)**
200:10;202:5;221:19
**consistent-ending (1)**
173:20
**consistently (2)**
208:15;223:22
**consolid (1)**
159:7
**consolidated (1)**
159:8
**construction (86)**
15:13,19;17:18,22;
18:10,12;21:24;22:2,5,
21;23:21;24:14,17,24;
25:8,16;27:4,5,15;
29:21,22;30:8,19,24;
31:17,18;32:15,16;
33:22,23;37:25;38:22;
42:15;46:6;69:11;73:1,
3,10,10;74:17;75:13,
16,25;76:5,20,22;
77:11;78:24;79:3,8,11,
12;80:18,22,23;82:14;
86:12,19;87:1,2,24;
88:16,18;94:10;95:9;
98:18,23;103:5;109:5,
18;110:12;112:12,16;
113:23;114:6;118:3;
174:13;192:20;201:6;
212:24;213:2,12,16,21;
214:4;224:13
**constructions (1)**
110:2
**construction's (1)**
213:22
**consuming (3)**
136:1,21;222:25
**contact (2)**
214:7;228:10
**contain (1)**
113:23
**containing (2)**
173:19;220:23
**contemplated (1)**
162:24
**contents (1)**
116:8
**contested (1)**

Case 16-01120    Doc 354    Filed 06/21/19    Entered 06/21/19 17:57:25    Desc Main
LYMAN-CUTLER, LLC; Case #15-13881 Document    Page 238 of 259
LYMAN-CUTLER, LLC v. KAGAN, et al.; Adv. Proc. 16-01120

June 17, 2019

9:16

**context (6)**
140:6;143:25;144:1;
147:12;188:4,10

**continue (2)**
84:21;196:19

**continues (1)**
146:22

**continuing (1)**
196:14

**contract (11)**
94:15;103:24;
109:23;110:4,12;
111:12,13;115:22;
174:4;209:13;210:12

**contracting (1)**
124:12

**contractor (5)**
16:1,16;76:19;
109:24;174:7

**contractors (3)**
124:2,7;228:11

**contracts (3)**
168:6;205:9;216:2

**contradict (1)**
59:15

**contrast (1)**
135:17

**contrasted (1)**
136:8

**contribute (1)**
215:11

**control (8)**
70:2,3,5;127:8,13;
167:20,22,24

**controls (4)**
167:19;172:8;190:1,
20

**convenient (1)**
105:14

**conventional (1)**
171:1

**conversation (27)**
12:24;14:13;42:19,
20;61:13;62:5;74:22,
24;78:21;79:2;81:17;
82:12,20;83:9;84:9,10;
101:24;102:11,15;
103:20;104:7;117:10,
12;160:6;163:7;177:2,
10

**conversations (2)**
57:3;102:9

**cook (1)**
38:23

**cooked (1)**
38:21

**cooking (1)**
105:4

**copied (1)**
101:22

**copies (6)**
101:16;205:6,9;

216:7;223:13;228:25

**copy (6)**
26:22;89:15;98:17,
20;207:17;228:11

**corner (4)**
34:2;40:21;41:11;
139:6

**Corp (5)**
6:15,16;180:4;184:1,
4

**corporate (2)**
201:14;205:24

**Corporation (2)**
119:8,24

**Corr (1)**
216:21

**correctly (18)**
13:22;18:21;24:1;
27:7;29:24;32:19;
77:14;79:5,6;89:22;
90:18;92:7;93:15;
125:15;159:20;179:17;
185:12;227:2

**correlates (1)**
132:17

**corresponded (1)**
222:23

**corresponding (1)**
133:19

**co-sourcing (1)**
199:19

**cost (42)**
18:14;25:6;30:9,18;
33:3;45:7,24;47:6;
65:22;71:17;73:15;
74:16;75:25;80:18,22,
23;82:22,23,25;109:6;
110:9,13,14,20,24;
111:4,5,7,9;114:6,7,10,
17,22,22;117:19;
135:19,20;136:2;
137:1;225:11;227:25

**cost-plus (1)**
135:23

**costs (104)**
18:10,12;23:21;
24:14,18,20,21,22,24;
25:3,12;26:5,13;27:6,
10,20;28:2,3;29:23;
30:2,13,22,23;31:19,
25;32:17,25;33:6,23;
36:3,13;37:16,19;
38:22;40:16;41:9;42:7,
14,16,18;43:5,14,15,
18,19;44:7,14,15,17,
18,23;45:3,4,6,12,17,
19;46:2;65:21,24;
66:19;69:11,17;73:14;
74:8,17;75:13,16;76:5,
22;81:18;82:13,14,21;
83:5,6;84:3,15,19,20,
22;86:13,19;87:1,2;
88:24;94:10;95:15;

96:9,15;97:4;103:5,5;
111:7;113:6,19,23;
114:3;118:16;136:4;
160:12;215:8,15;
229:16

**counsel (4)**
11:12,14;119:20;
230:24

**counsel's (1)**
39:10

**country (1)**
198:10

**couple (15)**
7:2;13:19;14:14;
45:14;63:25;68:8;
107:20;132:12;143:22;
145:18;162:5;163:6,8;
164:18;187:10

**course (5)**
9:15;23:24;89:14;
125:18;226:15

**Court (160)**
6:2,3,19,21,23,24;
7:9;8:2,6,11,15,17;
9:14,24;11:10,16;13:5;
29:2,7,12,14;34:9,11,
15;35:21,25;36:6,11,
14,20;38:4,7,16,25;
39:4,7,14,17,20;40:1,4,
8,11;51:8,25;52:19,22;
54:4,7,10,14;55:5,9;
78:5,7,9,11,13;84:24;
85:3,7,12,13,17;87:7,
14,16,19;89:14;99:19,
21;100:1,18;101:2;
102:25;105:5,7,12,15,
16,17,22,24;108:16,21,
23;109:1;111:18,20,23,
25;112:3;115:19;
116:4,10,14;117:15;
118:18,20,22,25;
119:16,20;128:23;
129:21;144:11,14,16,
21,24;145:3,5,9,10;
149:24;150:4,6,8,10;
152:15;154:15;163:13,
16;172:25;173:3;
176:12;177:24;179:23;
180:13;181:15;183:6,
16;184:20;186:6,16;
187:17;188:7;193:2,5,
17,18;194:1,4,7,9;
229:18,20,23;230:1,3,
6,9,13,16,19,24;231:2,
5,8,11

**cover (3)**
28:3;38:22;84:19,20;
213:23

**covered (5)**
155:22;159:22;
190:4,5;224:18

**covers (2)**
196:2,2

**CPA (4)**
7:6;120:8;121:10;
197:1

**CPAs (1)**
203:18

**crashed (1)**
197:24

**create (6)**
44:16;83:11;171:14;
172:8;211:3;219:24

**created (3)**
63:12;157:11;226:24

**creates (3)**
149:18;171:20,21,25

**credit (8)**
134:14;135:11,13;
139:14;140:10;158:2,
2;205:25

**credits (4)**
127:9;130:19;
196:14,20

**cross (5)**
116:3;198:24;199:2,
6,12

**cross- (1)**
193:8

**crossed (1)**
201:4

**cross-examination (4)**
6:25;8:8;10:1;
163:17

**current (5)**
120:23;121:1;
178:15,16,22

**currently (2)**
200:3;216:11

**curve (1)**
201:23

**customer (3)**
130:15;137:3;140:16

**customers (4)**
139:7,7,18;144:3

**cut (2)**
113:7;223:4

**Cutler (21)**
30:21;53:16;54:1;
55:23;56:1,7,10;87:8;
103:20;112:9,13;
113:9;148:11;156:25;
202:20;214:21;215:22;
217:6;218:2;223:17;
225:7

**cycle (1)**
202:7

**Cynthia (3)**
31:8,25;175:18

## D

**Dan (7)**
7:10,25;47:2,25;
48:8,11;177:2

**DANIEL (2)**

194:12,19

**data (2)**
125:18;198:13

**date (15)**
49:25;52:8;56:14,20;
113:12,17;130:10,10,
12;140:1;178:3;
204:17,25;220:12;
222:10

**dated (12)**
49:16;50:6,19;51:19;
59:13;65:6;70:11;71:6;
106:11,18;113:16;
179:6

**dates (5)**
52:12;70:18;105:20;
211:12;227:3

**dating (1)**
226:14

**day (22)**
6:5,6;7:8;9:2,3;13:8;
18:6,23;39:8;45:1;
59:22;63:7;69:19;83:7;
99:4;138:5;140:24;
193:19;202:15,15;
218:18;226:5

**days (2)**
81:13;178:18

**day-to-day (2)**
202:9;212:1

**deal (13)**
23:25;26:14;28:25;
30:20;31:9,25;32:8,21;
33:1,5;96:14;111:14;
129:24

**dealing (1)**
143:19

**dealings (3)**
123:21;131:21;
155:14

**deals (1)**
88:1

**dealt (2)**
148:13;212:21

**debit (2)**
130:21;164:15

**debit\credit (1)**
121:25

**debits (2)**
127:9;130:19

**Deborah (2)**
26:18;27:10

**Debra (2)**
85:21,21

**debt (2)**
188:17,18

**debtor (1)**
6:13

**December (14)**
35:12;43:23;67:3,21;
140:2,21;160:16;
176:3;177:19;180:5,
22,24,25;181:8

**decent (1)**
205:8
**decide (1)**
117:21
**decided (5)**
74:14;182:5;199:19;
200:1;225:1
**decision (3)**
74:24;229:9,11
**decisions (1)**
169:24
**deck (1)**
7:11
**dedicated (1)**
217:12
**deductions (1)**
187:23
**deeds (1)**
115:24
**deeply (1)**
229:20
**DEFENDANTS' (4)**
29:15;116:16;
144:10;149:4
**Definitely (5)**
64:11;115:17;161:8;
202:4,12
**degree (8)**
121:6;190:1;195:1,3,
5,8;197:10;205:22
**delete (1)**
219:22
**deliberately (1)**
170:25
**Deloitte (2)**
199:19,20
**demand (3)**
96:9,23,24
**demanding (1)**
96:21
**demo (1)**
107:11
**demolish (1)**
49:24
**demolition (7)**
50:17,25;51:2,13,19;
52:8;53:24
**denied (2)**
105:4;169:20
**denominator (1)**
43:10
**dentist (2)**
16:18;85:24
**deny (2)**
15:5,16
**Department (7)**
53:5;114:19;198:4,6,
24,25;199:18
**depending (4)**
7:12,25;8:3;161:3
**Depends (4)**
47:24;62:12;130:15;
174:15

**deposit (3)**
113:8;130:9;147:19
**deposition (12)**
17:7;64:1;89:3,16,
24;90:7;91:9;92:19;
108:8;168:18;174:3;
175:7
**depreciation (1)**
150:20
**describe (13)**
86:1;120:22;121:4;
124:5;127:5;132:11;
133:10,11;135:7;
137:15;138:18,25;
157:4
**described (9)**
17:18;74:23;122:24;
127:17;133:22;142:1;
143:16;156:25;177:18
**describes (1)**
148:2
**description (3)**
153:20;155:4;173:17
**design (3)**
94:23;110:24;111:1
**despite (2)**
70:23;71:11
**detail (2)**
168:20,23
**detailed (3)**
221:8,10,11
**detect (3)**
169:11,18;171:5
**detection (1)**
196:4
**determine (3)**
88:4;185:10;219:14
**develop (1)**
32:9
**developed (1)**
22:1
**developers (1)**
124:2
**developers/GCs (1)**
124:7
**Developing (1)**
47:4
**Development (11)**
6:16;47:23;98:10;
113:7,11;122:15;
180:4;183:11;196:16;
205:23;218:5
**developments (1)**
124:8
**difference (2)**
87:11;184:3
**differences (1)**
201:15
**different (23)**
50:10,12;61:2;62:13;
82:3;84:23;118:15;
135:18,20;136:7,24;
138:6;166:21;188:24;

**difficult (8)**
95:4;134:5,8;171:8;
191:6;204:9;210:21;
221:20
**difficulties (1)**
223:20
**difficulty (3)**
11:18;55:1;204:1
**dig (1)**
167:7
**digging (1)**
167:11
**Dima (3)**
23:15;77:17,20
**Dima's (2)**
23:4,14
**direct (9)**
13:7;58:9;119:1;
145:15;173:25;185:19,
19,23;194:14
**directed (2)**
23:7,8
**directly (6)**
135:12,21;147:15,
18;158:5;216:16
**disagree (3)**
60:20;62:18,22
**disagreement (1)**
73:13
**disciplined (1)**
196:23
**disclosed (2)**
104:13,25
**disclosure (2)**
85:17;86:8
**discover (1)**
29:10
**discovery (1)**
36:17
**discrepancies (1)**
132:18
**discuss (1)**
230:22
**discussed (5)**
23:17;37:5;174:9;
177:3;204:7
**discussion (1)**
37:12
**dispute (5)**
70:13,15,23;71:11;
102:18
**distinguishes (1)**
170:13
**document (38)**
15:6,7;19:23;34:17;
35:7;50:10,11,12;
54:18,22;59:13,23,25;
60:12,17;62:16,20;
63:25;81:2;84:14;98:4;
104:21,21;106:3;

113:17;115:9;116:9;
129:11;131:6;149:9,
18;151:1,23;152:9;
154:5,11;185:23;186:1
**documentation (6)**
201:20;208:6;
220:20;221:21;228:9;
229:4
**documents (15)**
32:3;37:7;54:19;
55:13;62:24;98:3,4;
103:11;112:22,23;
113:11;168:6;205:3;
228:22;229:14
**Doddridge (2)**
8:9,10
**dollar (2)**
137:2,3
**dollars (19)**
80:23;107:5,15,21;
108:9;111:14;120:14;
133:2;136:6;162:6;
163:6,8;188:1;191:8,
10,22,23;192:3,5
**domain (2)**
63:14,22
**done (23)**
44:13;50:25;51:2,18;
52:12;53:24;56:13;
71:14;116:11;137:4,
25;160:19;167:20,21;
169:10;193:20;204:10,
22;213:4;218:2;
224:24;226:19;228:15
**Dorcar (5)**
34:23,24;41:23;
42:17,24
**dou (1)**
191:15
**double (3)**
190:21;191:12,13
**double- (1)**
191:15
**double-billed (2)**
191:14,15
**double-charging (2)**
133:25;134:3
**double-counted (1)**
132:10
**double-counting (2)**
134:8,13
**double-entered (1)**
191:14
**double-entry (2)**
130:18;133:11
**down (31)**
13:19;15:13;18:7;
35:14;50:23;60:14;
74:5,12;87:10;92:4;
95:13;109:10,14;
116:19,25;138:10,11;
139:15;146:1;152:7,
25;154:24;161:19,25;

164:7;173:9;176:15;
185:9;214:14;219:2;
220:3
**draft (2)**
20:17;110:4
**drafting (1)**
19:5
**drastic (1)**
218:14
**draws (1)**
46:6
**drill (1)**
39:24
**drive (2)**
220:23;221:3
**drove (1)**
12:9
**Druid (3)**
34:21;35:9;40:15
**due (9)**
134:13;157:8;
178:20;179:14;209:20;
210:9,11;219:20,25
**during (14)**
58:9;71:15;86:6;
137:23;141:15;160:18;
173:24;185:19,19,23;
192:14;196:12;197:6;
219:1
**duties (3)**
120:23;197:12;200:7

**E**

**earlier (9)**
70:24;71:12;80:24;
87:6;94:8;174:12;
175:16;204:7;225:24
**early (4)**
7:4;57:20;121:10;
230:12
**earned (8)**
138:4;141:5;162:3;
174:7,14;185:11;
192:17,23
**easier (4)**
39:12,14;138:24;
213:8
**economic (3)**
159:20,21;169:23
**economics (6)**
138:3;141:7,15;
159:15;160:17;161:4
**edited (1)**
227:21
**editing (2)**
218:7;219:21
**edits (3)**
225:21;226:15,19
**education (1)**
196:14
**educational (2)**
121:4;196:19

Case 16-01120    Doc 354    Filed 06/21/19    Entered 06/21/19 17:57:25    Desc Main
Document    Page 240 of 259
LYMAN-CUTLER, LLC; Case #15-13881
LYMAN-CUTLER, LLC v. KAGAN, et al.; Adv. Proc. 16-01120

June 17, 2019

**Edward (1)**
42:25

**effect (2)**
18:9;69:21

**efficient (1)**
208:11

**effort (2)**
143:9;215:10

**efforts (1)**
203:3

**eight (2)**
120:5;222:7

**eighteen (1)**
120:21

**eighty (2)**
120:14;227:10

**either (27)**
7:25;38:11;45:5;
71:8;88:17;92:9;
121:18;123:10,12;
124:1;135:21;146:17;
148:5;156:17;158:1;
160:2;168:22;170:3;
175:8;210:15;215:2,
11;219:21;222:18;
224:4;227:3;231:5

**elaborate (1)**
114:15

**electrical (3)**
114:4,17;210:1

**electrician (1)**
114:16

**electronic (2)**
97:21;207:13

**electronically (2)**
213:7,9

**electronics (1)**
201:19

**element (1)**
73:17

**elements (1)**
196:5

**Elena (1)**
32:8

**else (5)**
9:18;67:8;203:15;
230:12,16

**email (59)**
23:7;24:3,6,7,7,8,10,
15;25:10;45:18;59:20;
60:7;61:4,16;62:3,17,
21,25;63:8,8,11,19,22;
64:6,7,20,22;65:6;
75:21;77:21,23;78:4;
81:23,25;82:16;83:2;
84:2,6,8;102:12;103:1,
3,23;106:11;116:21,
22;117:3,8;145:19,22;
148:14;184:24;185:3;
207:17;214:20,24;
225:25;226:2,8

**emailed (3)**
22:25;58:13;184:12

**emails (25)**
23:4;58:8,12;61:9;
63:14;78:20;81:13;
98:9;100:9;101:5,8,13,
16,22;102:6,21;
103:20;104:6,13,18;
185:8;203:9;208:12;
217:22;228:5

**Emory (1)**
121:6

**emphasis (1)**
202:19

**employed (1)**
200:3

**employee (3)**
72:3;123:18;145:20

**employees (1)**
120:4

**end (40)**
7:8;8:25;17:17,21;
37:15;39:8;74:16;
76:23;78:25;80:3;
82:19;84:8;94:20;
101:23;102:11;107:14;
123:6,10;125:25;
132:9;133:15;137:24,
24;138:4;141:2,12;
149:14;159:18;160:15;
161:9;172:15;173:15;
174:20;176:24;190:18;
200:15;225:25;228:18,
21;231:13

**endeavor (1)**
133:21

**ending (1)**
204:13

**end-of-the-calendar (1)**
141:4

**enforce (2)**
115:1,11

**engage (2)**
170:22;191:7

**engaged (5)**
123:13,16;126:8;
170:10;172:3

**engagement (5)**
166:5,15,16;167:15;
171:18

**engagements (1)**
166:21

**English (2)**
112:22,23

**enough (12)**
9:22;42:15;69:8;
77:9;81:15;82:13;
98:25;102:17;108:1;
163:10,10;213:22

**ensure (2)**
132:9;148:7

**entailed (1)**
121:21

**enter (5)**
142:4,6;209:24;

212:10;224:24

**entered (10)**
132:23;178:17;
191:16;192:4;209:14;
210:9,10,17;211:5;
227:25

**entering (4)**
132:6;204:2;209:9;
210:2

**entire (2)**
162:23;199:18

**entirety (1)**
129:13

**entities (3)**
169:8;184:8;185:16

**entitled (1)**
169:3

**entity (10)**
133:17;134:14;
147:4;156:2,7;160:4;
174:20;189:1,13;
192:19

**entries (23)**
123:25;143:10;
149:12,13,15;160:8;
172:12,15,20,20;
173:11;185:22;186:9,
21;188:1,11,22;202:4,
11;220:18;226:4,8;
229:6

**entry (13)**
130:8,9,20;140:10;
153:16;155:7;172:15;
173:15,16;190:21;
222:10,13,23

**environment (1)**
201:14

**equal (1)**
225:3

**equipment (5)**
136:18,20,21,22;
150:20

**equity (2)**
204:8;224:5

**erroneous (1)**
170:14

**error (2)**
159:11;171:5

**errors (2)**
211:6,9

**essence (1)**
69:24

**essential (1)**
136:15

**essentially (5)**
7:20;115:15;153:4;
154:19;202:24

**established (1)**
126:22

**estate (1)**
120:16

**estimated (3)**
75:25;80:19;118:3

**et (1)**
6:5

**even (15)**
16:14;20:19;21:10;
37:11;59:19;60:12;
101:22;104:7;141:6;
160:16;169:10;202:13;
209:5;225:2;228:16

**event (2)**
8:13;32:18

**eventually (6)**
17:4;157:10,13,16;
184:7;192:9

**everybody (4)**
18:10;20:19;110:14;
230:12

**everyone (5)**
6:19;11:17;84:17;
197:25;208:2

**everyone's (1)**
175:19

**everything's (3)**
171:21;178:16;
191:25

**evidence (49)**
28:22;35:18;40:7,9;
46:11;49:3;52:19;54:3,
6,8,14,20,23;55:11;
85:16;87:5,20;104:10,
14;106:5,6,7;111:17;
112:1;116:16;128:24;
129:22;149:22,25;
150:10;152:16;154:16;
155:15;176:10,13;
177:22,25;179:20,24;
180:11,14;181:13,16;
183:4,7,14,17;187:15,
18

**ex (1)**
135:25

**exact (1)**
63:12

**exactly (12)**
63:19,19;74:10;75:2;
77:4;78:25;79:1;81:17;
90:4,4;96:17;99:11

**exam (1)**
121:10;196:2

**EXAMINATION (6)**
112:4;119:1;145:15;
188:8;193:9;194:14

**examiner (3)**
195:19,20,23

**Examiners (1)**
195:25

**example (11)**
129:24;130:20;
136:9;148:14;150:25;
151:13;155:10;188:12;
209:19;219:22;228:6

**examples (2)**
122:25;140:12

**exams (1)**

121:8

**excavation (1)**
71:24

**excavator (3)**
135:24;136:1,5

**exceed (1)**
18:12

**except (5)**
25:6;59:14,24;84:18;
147:22

**exchange (3)**
65:6;142:9;148:14;
184:24;185:3

**exchanging (1)**
199:4

**exclusive (1)**
219:6

**Excuse (9)**
46:24;50:6,8;51:20;
70:20;71:3;81:9;
117:24;171:13

**executive (2)**
16:11;120:19

**exercise (1)**
219:18

**exhausted (1)**
228:23

**Exhibit (186)**
15:3;19:18,23;20:14,
16;22:15;23:2,4;26:16;
28:5;29:15;31:6,8;
32:6;33:9;34:18;35:1,
2,3,4,5,8,22;39:13;
40:5,7,9;45:8,10,22;
46:9,11,23,24,25;49:4,
20;50:2;51:5,6,9,20,24,
25;52:8,17,20,23;53:3;
54:3,13;55:11,14,15,
17,18,19;56:2,14,16,
20;58:10,20,25;60:2,3,
5;64:5,14,18,19;65:4,6,
14;68:9,11,16,19;70:8;
71:2;75:18;78:9,10;
81:1,5,11;82:5,6;
83:25;85:16;86:22;
87:4,10,13,20;88:19;
94:18;97:15;98:6,8;
99:24;100:2,7;102:24;
103:1,13,25;105:13;
106:1,2,5,6,7,8;111:16,
24;112:1;115:4,15;
116:16,18,24;127:23;
128:2,4,21,24;129:3,6,
19,22,24;131:11;138:9,
13;144:9,14;145:13,14,
17;149:3,5,21,25;
151:1,19;152:13,16;
154:2,16;156:5;
161:12;164:11;176:5,
10,13;177:13,21,25;
179:1,19,24,25;180:10,
14;181:3,12,16;182:13,
25;183:3,7,8,13,17;

Case 16-01120    Doc 354    Filed 06/21/19    Entered 06/21/19 17:57:25    Desc Main
LYMAN-CUTLER, LLC; Case #15-13881 Document    Page 241 of 259
LYMAN-CUTLER, LLC v. KAGAN, et al.; Adv. Proc. 16-01120

June 17, 2019

184:24,25;185:18;
186:20;187:5,14,18;
214:10,13,19;218:23
**exhibits (10)**
35:24;38:13,15;55:3;
104:9;107:3;127:24;
128:2;144:10;149:5
**exist (4)**
104:3,4;111:12,13
**existence (1)**
120:2
**expec (1)**
213:18
**expect (5)**
120:8;131:9,20;
143:14;192:24
**expected (2)**
69:14;169:23
**expecting (1)**
131:18
**expend (1)**
157:1
**expense (12)**
136:25;137:9;
147:15,21;150:22,23;
153:10;157:12;188:13,
13,14;213:23
**expenses (28)**
135:6,10,11;136:10,
12,15;138:3,5;146:14;
152:8;157:6,14,15,21,
23;158:4;159:9;
160:15;163:20,21,23;
189:5,5,8;215:13;
217:5;224:3,7
**experience (6)**
76:20;124:1;133:20;
143:17;201:6;203:12
**expert (1)**
61:21
**experts (3)**
8:6;193:13,21
**explain (12)**
19:25;48:1;62:10,12,
14;80:21;136:19;
147:1;150:13;158:25;
176:20;188:25
**explanation (3)**
47:13;172:16;173:17
**Express (6)**
47:9;166:17;168:16;
190:16;205:18;217:4
**extent (3)**
104:18;115:24;
220:13
**external (4)**
196:1;197:16,19,20
**extra (1)**
227:8
**extremely (1)**
210:20
**eyes (2)**
174:3;175:8

## F

**fact (35)**
22:1,21,25;26:13;
36:15;44:12;45:20;
50:25;51:18;57:1;
63:13,17;70:1;71:21;
72:3;91:1;97:9;106:21;
116:11;147:19;159:10;
165:25;168:24;169:11;
171:8,12;172:3;
175:25;177:10;184:12;
190:5,12;201:13;
223:19;226:10
**fail (1)**
170:25
**fair (13)**
45:15;67:24;69:8;
107:25;131:6;166:18;
167:8;203:2;207:5;
208:17;211:15;212:18;
225:20
**false (1)**
111:11
**familiar (3)**
209:1,2;226:2
**familiarity (2)**
203:10;207:2
**family (2)**
86:2;159:16
**far (8)**
27:23;138:15;
193:15;202:23;207:12;
208:3;209:18;220:20
**fashion (2)**
208:13;216:4
**father (1)**
120:3
**faxed (1)**
213:5
**feature (1)**
113:11
**February (6)**
32:9;57:21;65:7,11;
218:15,18
**fee (19)**
94:23;95:7,9,14;
109:25;110:12,24;
135:22;174:7,13,19;
192:14,17,20;213:11,
13,14,15,16
**feel (6)**
54:21;119:17;
197:17;210:21;220:21;
225:8
**fees (4)**
94:14;96:4;189:17,
19
**feet (2)**
83:23;201:2
**fellow (1)**
78:17

**felt (2)**
196:17;228:4
**few (21)**
13:21;26:7;45:16;
46:16;121:16;122:1;
124:14;125:12;135:4;
158:18;163:7,8;187:7;
196:15;197:15;198:7;
202:8;216:9;218:13;
227:14;228:20
**fifteen (5)**
7:17;27:12;95:10;
100:11;216:11
**fifteen-minute (1)**
85:1
**fifth (3)**
52:25;53:8;109:9
**fifty (3)**
66:4;120:16;182:16
**fifty/fifty (1)**
182:10
**figure (7)**
17:11;94:9;118:6;
132:19;144:24;220:6,
14
**figured (1)**
93:17
**figures (3)**
88:7;95:19;175:7
**file (15)**
86:12;115:1,22,23;
117:19;126:22;148:12;
156:6;205:5;206:15;
217:12;222:19;223:24;
224:1,6
**filed (5)**
114:16;115:11,25;
159:6;207:19
**files (3)**
126:23;148:9;
156:14;205:3,5,5,6,11;
206:6;210:12;212:8;
223:11;228:5
**filing (2)**
159:2;216:24
**Filippov (59)**
6:11;12:7,15;14:3,
11,17,22;19:7;20:1,5;
21:1,4;24:13;25:6;
37:24;58:13;66:9,14;
67:25;68:5;69:3,23;
70:1,16;73:24;74:18;
75:5,17,19,22,24;
76:14;77:8;78:1;79:2;
80:1;83:11;96:21;
97:11;101:14,15;
102:9,15;103:3,9;
104:19,20;106:12;
112:14,16,17;117:5;
215:2;216:17,20;
221:4;223:8;226:1,1
**Filippov's (3)**
16:11;21:8,11;45:12;

75:15;76:24;88:24;
101:9;214:23
**final (3)**
87:1;118:13;217:25
**finance (1)**
83:20
**finances (6)**
190:7;200:9,11;
212:19,21;217:23
**financial (29)**
93:6;120:10;123:23;
124:23,25;125:18;
131:7;132:4,5;137:6;
143:4;144:7;148:24;
155:25;156:11,15;
166:17;167:3;173:6;
196:4;198:12,23;
199:3,15;202:3;205:2;
208:21;209:2;212:7
**financially (1)**
219:17
**financials (13)**
137:17;155:23;
159:23,24;160:3,23,23;
167:12;169:12,18,24;
170:3;190:10
**financing (1)**
27:12
**find (14)**
10:18;11:7;12:22;
60:13;99:15,16;
140:19;206:18;210:11,
12;222:7;227:24;
228:2,12
**finding (2)**
13:17;134:18
**fine (6)**
105:15;116:15;
194:3;213:17;229:25;
230:9
**fingers (1)**
229:1
**finish (8)**
8:13;9:4;66:17;
193:8,11,21;230:5,12
**finished (1)**
85:21
**firm (31)**
68:21;97:18;120:1,6,
8,12,20,21;121:1,17;
122:2,16,20,25;123:8;
125:1;128:16;129:15;
142:15;148:15;149:18;
150:13,15;151:10;
152:9;154:11;156:2,
10,16;190:5,12
**firms (1)**
197:8
**firm's (4)**
124:16;125:9;126:3,
8
**first (62)**
11:4;12:6;13:8;

18:23;19:21;33:12,12;
37:21;61:12;77:16,19;
79:9;83:25;85:21,22;
91:5,7,8;104:12;106:9;
122:1;127:13;128:8;
130:23;139:9;140:15;
145:18;149:8;152:4;
154:5;202:1,7;203:2;
204:5,23;206:25;
207:17,20,25;210:1;
211:4,15;213:3,3;
215:21,22;217:16,18,
25;218:1,4,6,11;
220:11;222:15;225:18,
19,20;226:18;228:15,
23;230:7
**first-year (1)**
197:14
**first-years (1)**
197:25
**fiscal (1)**
135:1
**five (17)**
34:12;35:20,23;51:3;
69:1;91:5,7,8;92:1,2,3,
4;109:13;136:23;
182:7;202:21;210:3
**fix (2)**
211:7,9
**fixed (4)**
7:13,24;135:22;
136:14
**floated (1)**
155:19
**floating (1)**
144:5
**floor (1)**
74:8
**floors (2)**
73:21;74:14
**flop (1)**
7:4
**Florence (1)**
34:25
**flow (1)**
213:17
**focus (4)**
120:13;139:19;
150:18;211:16
**Fodymanow (1)**
28:9
**folder (2)**
206:19,19
**folks (1)**
9:10
**follow (7)**
11:9;47:7;125:3,3;
127:10;164:2;210:21
**followed (2)**
8:8;214:1
**following (6)**
35:24;181:23;
189:14;193:12;197:7;

221:9

**footing (1)**
53:14

**force (1)**
97:11

**forge (2)**
60:9;170:20

**forged (1)**
60:8

**forgeries (1)**
170:23

**forging (1)**
60:11

**forgot (1)**
87:5

**forgotten (1)**
132:24

**form (6)**
32:3;44:16;111:22;
195:25,25;208:5

**formal (4)**
167:20,21,24;217:13

**format (2)**
152:23;167:3

**formed (10)**
23:19;26:7,19;28:8;
33:14;35:11;41:1,23;
42:24;43:23

**forming (2)**
42:2;44:2

**forth (3)**
81:13;142:9;148:15

**forty (2)**
137:25;138:1

**forty-five (1)**
193:24

**forward (10)**
61:17;62:1;98:14,15;
99:14;102:17,20;
104:2,5;219:24

**forwarded (28)**
19:21;61:13;62:4,8;
98:12,16;99:1,7,12,15;
100:8,15,23;101:5,8,
18,24;102:1,3,12,19,
21;103:2,18,19,21;
104:6,15

**forwarding (6)**
61:9,15;62:13;77:19;
98:2;103:24

**forwards (1)**
209:22

**found (3)**
159:2,10;227:13

**foundation (14)**
47:18,19,23;48:17,
18,21,22;49:23;50:22;
53:20,23;56:9,13;
71:25

**foundations (1)**
56:19

**four (8)**
13:11;83:8;159:4,8;

164:19;196:3;197:8;
218:5

**four- (1)**
204:24

**fourteen (1)**
101:21

**fourth (3)**
52:25;98:11;109:13

**frame (2)**
202:22;207:3

**frankly (1)**
36:9

**fraud (21)**
123:13,16;126:8;
170:4,11;171:5,14,20;
172:3,9,11,19;173:6;
191:7;195:19,20,22,24;
196:3,5;198:17

**fraudulent (5)**
170:13;172:11,14;
173:10,15

**free (2)**
119:17;167:12

**frequency (1)**
148:23

**frequent (1)**
217:21

**frequently (2)**
213:1,1

**friendly (1)**
74:22

**friends (1)**
86:2

**front (3)**
47:25;119:18;187:7

**Fuchs (2)**
41:24;43:24

**fulfill (2)**
196:14;197:10

**full (13)**
128:4,13;142:20;
145:14;152:13;179:14;
193:10;194:18;205:25;
208:5;209:9,24;216:24

**Fuller (2)**
34:22;41:1

**full-time (2)**
197:7,10

**fully (1)**
199:19

**fund (2)**
84:4;113:7

**funded (2)**
46:5;113:5

**fundings (1)**
215:11

**funds (9)**
144:4;157:1;179:16;
196:19;213:18,19;
215:12,12,14

**further (9)**
117:13;118:18;
125:7,8;152:6;163:14;

188:5;193:1;228:3

**Furthermore (4)**
27:4;29:21;31:17;
32:15

## G

**gain (1)**
77:13

**gap (1)**
204:2

**Gassel (1)**
31:10

**gave (1)**
49:8

**GC (1)**
114:2

**general (30)**
73:6;95:9;109:24;
115:21;124:2,7,12;
127:3,6,7,16,19;
128:12;129:12;130:24;
131:9,14,25;133:14;
134:6,9;138:14,19;
140:7;143:8;149:1;
157:13;174:7;176:6;
190:24

**general-contractor (1)**
192:14

**generally (9)**
130:14;136:24;
137:22;149:16;168:10;
204:18,19;213:1,25

**generate (1)**
210:25

**Georgia (1)**
121:7

**Gersh (21)**
7:10,25;8:5;47:2,25;
48:8,11;88:15;168:2;
177:3;184:12;185:8;
193:7,11,19;194:10,12,
16,19;218:25;230:20

**gets (5)**
62:8;137:4;138:2;
152:7;207:19

**Gizela (1)**
43:24

**glad (1)**
103:22

**Gmail (4)**
98:10;100:2;103:2;
208:14

**gmailcom (1)**
98:10

**Gmails (1)**
105:21

**goal (2)**
161:1;202:12

**goes (8)**
39:21;72:12,15;
88:15;96:4;133:14;
144:8;189:11

**Good (18)**
6:3,10,12,14,17,19;
10:3,4;26:2;112:6;
119:3;172:8;173:3;
194:8;214:17;218:19;
229:21;230:15

**Gordon (29)**
7:5;118:21,23;119:3,
5,5,8,24;128:1;129:6;
145:17,19,19;146:3,17,
22;147:22;149:8;
163:19;164:11;175:15;
179:4;180:2;181:5;
184:23;185:4,22;
186:8;188:6

**G-O-R-D-O-N (1)**
119:6

**Gordons (3)**
203:17,19,23;204:6;
222:6

**Gordon's (1)**
185:19

**governed (1)**
165:3

**graduate (1)**
197:10

**graduated (1)**
197:4

**grasp (3)**
202:8;203:8;204:9

**great (2)**
73:25;188:21

**gross (1)**
187:22

**group (1)**
214:21

**guaranteed (1)**
29:23

**guess (16)**
10:11;49:1;53:11;
68:8;70:7;78:16;87:22;
92:25;105:16;107:14;
136:2;169:21;176:2,
14;186:24;187:4

**guessing (1)**
80:20

**guesstimate (1)**
7:6

**guy (9)**
43:11,12;63:21;67:5,
19;75:9;76:17,18;
114:19

**guys (3)**
12:23;57:7;144:16

## H

**habit (1)**
41:15

**half (6)**
153:1,4,7;193:23;
225:12,12

**halfway (1)**

15:13

**hallmark (3)**
172:14,17,18

**hallmarks (1)**
172:11

**hand (3)**
34:16;154:7;194:11

**handed (3)**
34:11,12;89:15

**handful (3)**
140:20;203:1,9

**handled (1)**
223:22

**hands (3)**
115:17;199:4;223:21

**handwritten (1)**
205:11;213:4

**hang (1)**
182:21

**happen (3)**
25:15;103:25;172:20

**happened (8)**
74:11;77:4;99:10;
132:18;137:7;141:15;
202:15;224:13

**happening (1)**
54:24

**happens (3)**
43:19;151:14,16;
152:19;153:11

**happy (1)**
184:16

**hard (4)**
69:20;96:9;169:14;
207:17

**harder (1)**
171:5

**hardest (1)**
209:15

**hardly (1)**
77:13

**Harris (87)**
6:17,17;115:3;
116:17;118:21;119:2,
13,15,21;124:20,21;
126:1,2;127:22;128:3,
7,20,25;129:2,4,7,9,19,
23,25;130:2;131:11,
13;133:8,9;138:8,12;
139:1,10;144:9,13,15;
145:4,12,16,25;146:2,
5,6;149:3,7,21;150:1,2,
5,7,9,11,12;151:19,21;
152:12,17,18,25;153:3,
13,15;154:1,3,13,17,
18,24;155:1;161:12,15,
21,22;162:11,13;
163:11,14;186:11,14,
18;188:9;191:18;
193:1;214:10,16;
218:22

**Hartzell (7)**
15:3;40:24;41:21;

42:22;52:18;67:14;
164:6
**hash (1)**
186:23
**hats (1)**
200:11
**head (3)**
76:2;221:21;225:7
**headers (1)**
130:5
**heads (2)**
6:21;8:17
**hear (3)**
11:16,17;103:22
**heard (3)**
71:16;122:13;132:12
**hearing (2)**
37:21;86:5
**hearsay (4)**
104:13,23;105:8;
115:17
**Heating (1)**
164:21
**heavy (3)**
136:20,20;228:17
**heightened (2)**
125:9;171:22
**held (3)**
121:14;162:23;
196:12
**help (3)**
11:17;186:16;199:24
**helpful (1)**
46:16
**hereafter (1)**
32:18
**hereby (1)**
67:17
**herself (1)**
86:1
**hey (1)**
83:4
**Hi (2)**
112:7;194:17
**hiding (1)**
92:16
**hierarchies (1)**
201:19
**high (6)**
121:20;134:2;
170:10;191:10;225:15;
227:2
**higher (1)**
170:18
**highest (1)**
167:10
**highlight (2)**
134:10;164:7
**highlighted (1)**
173:9
**Hill (1)**
35:9
**hired (1)**

192:19
**hires (1)**
71:25
**history (1)**
197:4
**hold (11)**
8:19;106:2;111:15;
120:18;121:11;187:11;
195:8,14,17;196:9,10
**hole (1)**
53:11
**home (15)**
17:24;22:10;77:10,
11;78:2;79:5,18,25;
80:1,3,7,11,12,16;
81:15
**homes (11)**
10:15;16:6;18:15;
66:17;73:18;83:23;
109:5;124:7;223:17,
19;224:13
**Honor (77)**
6:10,12,14,17;8:16;
9:13;13:4;28:22,23;
29:13,16;34:20;35:19,
20;37:3,23;38:6,14;
40:10;50:8;52:2,21;
54:13,15,16,21;55:2;
78:10,14;85:2,15;86:9;
101:1;104:10,11;
105:11,15;111:19;
112:2;115:14,20;
116:6,13;117:13;
118:17,19,21;128:4,20,
22;129:20;145:4,12;
149:22,23;152:12,14;
154:13,14;163:12;
176:10,11;177:23;
180:12;181:14;183:5,
15;187:16;191:18;
193:1,3,6,22;230:17,
18;231:10,12
**Honor's (1)**
38:14
**hope (1)**
206:22
**hopefully (2)**
34:20;206:19
**hour (5)**
8:21,22,24;193:22,
24
**hour'ish (1)**
7:7
**hours (2)**
7:2;220:20
**house (11)**
12:11;14:20;17:1,1;
18:18;23:20;49:24;
53:15;73:11;74:20;
225:12
**housekeeping (1)**
6:20
**houses (12)**

17:12;43:11,12;66:1;
70:22;73:21;75:12;
83:19,22;96:16,18;
224:16
**huge (1)**
188:19
**hundred (11)**
27:12;159:6,16,17;
162:5;163:6,8;176:21;
179:9;182:19;183:11
**husband (2)**
183:24;184:4
**HVAC (3)**
114:4,19;118:8
**Hyde (1)**
33:15
**hypothetically (1)**
222:10

**I**

**ID (4)**
52:1;87:12;126:16;
150:6
**idea (17)**
10:13;12:12;21:20,
23;75:15,17;77:3;
79:25;80:1,20;160:20;
164:22,24;186:12;
207:1;210:8;227:9
**ideas (1)**
9:12
**identification (51)**
28:6,22;29:15;33:10;
34:14,18;35:1,2,3,4,5,
8,18;40:7;51:7,9;
52:21,23;53:3;54:3,5,9,
10;55:15,24;56:2;
86:23;87:5;98:6,9;
99:20,24;100:2,7;
102:24;103:1;106:1,2,
3,3;108:20;111:17;
126:13;127:23;128:3;
129:6;149:4;151:20;
182:14;184:24,25
**identified (4)**
10:21;36:21;146:15;
185:23
**identify (7)**
10:15;34:17;104:17,
24;130:3;133:15;
182:25
**identifying (1)**
145:18
**Igor (1)**
41:24
**II (1)**
42:24
**Ilya (2)**
41:24;43:24
**immediately (1)**
200:22
**impact (5)**

132:4;159:21;
188:15,21;213:16
**impeach (6)**
38:3,5,9,19;55:4;
98:5
**impeaching (2)**
36:15;38:6
**impeachment (11)**
36:22;37:1;38:13,15;
39:1;54:18,22;55:3,5;
105:3,9
**important (5)**
102:17;103:17;
104:23;136:11,13
**impossible (1)**
136:17
**impression (1)**
159:5
**inaccurate (1)**
125:6
**inadvertently (1)**
132:24
**inclination (1)**
194:1
**include (7)**
33:2;42:13,14;44:17;
94:14;127:3;216:25
**included (12)**
25:7,14;30:10;37:19,
20;73:14,15;82:22;
100:17;114:1;150:24;
198:12
**includes (3)**
24:3;94:23;95:3;
101:11
**Including (12)**
24:20;81:18,20;
83:15;84:21;114:3,4,4,
5;196:3;197:25;230:24
**income (14)**
110:1;152:7;153:9;
159:18;183:25;184:6,
9,13;185:10,15;187:1,
20,22,25
**incomplete (1)**
125:6
**inconsistencies (1)**
209:9
**inconsistent (1)**
125:6
**inconsistently (1)**
204:10
**incorporated (1)**
229:14
**incorrect (1)**
210:16
**increase (4)**
75:10,13,15,17
**increasing (1)**
139:16
**incur (1)**
157:6
**incurred (3)**

136:12;158:11;189:5
**incurring (1)**
160:12
**in-depth (1)**
218:2
**indicate (1)**
148:24
**indication (1)**
172:18
**individually (3)**
159:4,11;169:22
**industries (1)**
197:18
**industry (4)**
151:6;199:1;201:6;
202:5
**influence (1)**
169:23
**information (19)**
124:23,25;125:4;
126:5,11;127:20;
128:15;129:14;130:4;
148:15;153:5;156:11,
15;168:7,25;172:5;
207:5;208:17;216:10
**initial (6)**
35:14;80:9;118:9,11;
202:2;219:16
**initialed (1)**
34:4
**initially (4)**
14:8;36:17;66:22;
209:10
**initials (4)**
28:14;34:2;40:20;
41:11
**input (1)**
227:12
**inquiry (3)**
125:7,8;142:18
**ins (1)**
131:7
**inspected (3)**
53:11,14,20
**inspection (2)**
52:12;213:14
**inspections (1)**
53:9
**inspector (2)**
52:10,11
**instance (7)**
47:14;73:24;135:24;
150:20;157:18;160:8;
225:15
**instances (5)**
142:4;155:19;
224:20;225:4;227:24
**instead (4)**
23:23;44:23;177:5;
219:18
**Institute (1)**
165:6
**instructed (1)**

29:12

**insurance (3)**
108:7;136:6;199:1

**insurances (1)**
136:18

**intend (1)**
38:11

**intensive (1)**
188:20

**intent (1)**
170:15

**intentional (1)**
170:15

**interactions (1)**
128:16

**intercompan (1)**
222:19

**intercompanies (1)**
147:3

**intercompany (9)**
125:11;142:12,17,
19,21;143:3,15;148:3;
222:19

**interest (2)**
159:5;219:6

**interested (1)**
164:8

**interesting (4)**
10:18;11:6;12:22;
18:13

**interestingly (1)**
98:25

**interface (1)**
212:10

**internal (15)**
127:13;167:18,20,
21,24;172:8;190:1,20;
196:2;198:4,5,8,24,25;
199:14

**internally (1)**
141:3

**interned (1)**
197:6

**interning (1)**
85:22

**internship (1)**
121:3

**interrupt (1)**
220:2

**interviewing (2)**
172:4;196:4

**intimately (1)**
217:17

**into (96)**
7:4;9:8;14:23;28:22;
35:18;36:17;40:9;
46:12,18;49:3;52:19;
54:3,6,7,19,23;55:11;
67:6;72:12,18;87:5,20;
88:8,13;96:4;104:10;
106:5,6,7;109:14;
111:17;112:1;116:16;
128:24;129:22;130:8;

132:6;133:14;140:18;
142:4,6;146:14;
147:19;149:21,25;
150:10;152:7,16;
154:16;157:7,16,20;
162:20;167:7;171:17;
175:22;176:10,13;
177:21,25;178:17;
179:19,21,24;180:10,
14;181:12,16;183:3,7,
13,17;187:15,18;189:6,
11;200:2;202:15;
207:16;209:10,14;
210:10;215:12,14,21;
218:6;222:2;224:25;
225:4;227:12,25;
229:6,14,17,18,20

**intro (1)**
63:20

**introduce (3)**
37:7,8;214:24

**introduced (2)**
12:15;14:3

**introductory (1)**
214:20

**Intuit (1)**
131:24

**invest (4)**
12:12;14:5;21:4;
76:4

**investigation (1)**
228:3

**investor (5)**
11:3,24;12:4,19;
43:17

**investors (3)**
16:8;28:2;38:24

**invoice (29)**
7:18;47:13;48:9,10,
14,14,18,20;94:19,23;
96:17;97:10;106:16,
18,21;107:7;108:10;
139:24;140:14;143:14;
144:4;157:11;160:10;
207:24;208:5;209:10;
222:22;224:22;227:4

**invoices (19)**
7:16;47:25;48:15,25;
49:2;88:9,10;139:16;
140:21,24;167:8;
168:6,9;205:7;206:4;
215:25;223:13;228:8,
16

**involved (9)**
12:6;84:17;102:10;
117:10,12;171:10;
217:17,20;229:11

**involvement (7)**
86:3;92:20,22,25;
93:4;123:23,24

**iPad (3)**
61:17,20;62:1

**Iron (8)**

196:8,12;198:2,3,4,
19,21;221:17

**irrelevant (1)**
137:11

**IRS (2)**
138:6;183:24

**issuance (1)**
32:17

**issue (9)**
23:17;29:2;38:10;
39:18;57:15,18;209:5,
8;210:7

**issued (2)**
52:4;56:7

**issues (7)**
9:17;29:6,7;124:10,
12;215:1,5

**italicized (1)**
226:24

**item (5)**
74:10;132:6;188:13,
14;227:15

**items (14)**
123:7;125:7;127:16;
152:5;153:9;155:17;
158:8;209:16,23;
210:16;213:7;227:13,
18;229:16

---

**J**

**James (1)**
6:17

**January (1)**
218:18

**Jason (4)**
7:5;118:21,23;119:5

**J-A-S-O-N (1)**
119:5

JCohen@kagandevelopmentcom (1)
64:4

**job (9)**
37:15;49:14;52:10,
13;57:1;65:25;71:1;
136:3;206:23

**jobs (1)**
196:7

**John (1)**
6:14

**joined (2)**
204:23;213:3

**joining (1)**
121:1

**joint (1)**
215:10

**Joseph (11)**
89:12;90:9,14;92:2,
12,15,25;104:4,7;
123:22;211:20

**Joseph's (1)**
64:6

**journal (10)**
172:12,14,20;

173:11,15;185:22;
186:21;188:1,11,22

**judge (1)**
188:21

**July (10)**
118:1;175:25;
177:11;178:18;180:7,
17,21,24;181:1;228:18

**June (20)**
38:23;97:10,10;99:1,
6;100:7,7,15;101:6;
102:4;106:12,18,21;
108:16,25;109:17,24;
115:18;176:7;228:18

**junior (1)**
197:6

---

**K**

**K-1 (3)**
174:20,22;192:18

**Kag (1)**
61:25

**Kagan (70)**
6:5,15,15,15;7:1;
9:23;10:3;13:7;15:5;
29:23;35:7;36:1;38:3,
5;40:16;41:3;47:3,3,
23;50:2;52:24;53:3;
55:23;67:18;68:11,19;
75:21;78:16;86:11;
89:15;94:8;98:9,11;
102:14,25;104:14,20;
106:11;108:25;111:22;
112:6;113:7,11;
117:18;121:17,18;
122:14;123:9,13;
124:15;156:17;159:4;
163:5,13,18;169:1;
180:4;182:5,7,16;
183:10,11,22;184:5;
196:16;199:24;203:20;
205:23;218:5,10;219:9
kagandevelopment@gmailcom (4)
60:25;62:5;63:3;
185:5
kagandevelopmentcom (3)
63:14,21;64:10

**Kagans (2)**
166:13;177:8

**Kagan's (9)**
7:10;122:3;123:1,18,
21;124:2,11;131:21;
156:10

**Kayserman (1)**
26:19

**KDC (138)**
6:16;46:8,12,20,25;
47:17;48:1,6,12,22;
57:24;72:15,16,18,21,
22,25;89:4,18;91:11;
92:21;93:1,4,6;94:15,
15;95:1,7,22;96:4,4,15;

103:24;106:16,24;
109:23;110:4,12;
111:12,13;126:12,16,
25;127:15;128:13,17;
131:14;132:4;133:20;
134:5,22;135:4,18,18;
141:3;142:4;143:3,15;
144:4;146:13,23;
147:5,13,19,24;148:4;
149:14;152:22;153:21,
22;154:9;155:8,14;
157:1,6,16;158:7,16,
19;159:6,8,17;164:13,
16;165:14;166:7;
167:19;168:7;16,25;
173:25;174:3,4,22;
180:4,17;181:7;
182:19;184:6;186:25;
187:6;188:25;189:1,3,
5,17,20;190:1,6,13;
192:3,13,19;200:3,5,7,
14,18,22;201:5;202:1;
203:11,15;205:2;
207:21;211:22;212:8;
213:1,23,25;214:8;
215:14;216:19,25;
217:8,10;223:11;
227:12

**KDC's (18)**
93:7;122:6;135:7,9;
136:9;156:24;157:5;
158:6,12,20;159:24;
165:1;174:8;189:19,
20;192:15;208:24;
216:23

**keep (8)**
11:8;119:17;126:25;
138:11;144:5;196:15,
20;219:2

**keeping (8)**
57:10;92:20,22;93:1,
4;127:6;132:5;168:2

**keeps (3)**
57:16,19;147:13

**kept (7)**
149:1;201:3;206:12;
209:2;216:14;217:13;
221:21

**kicked (1)**
196:23

**kind (3)**
19:13;41:15;93:5;
119:25;127:13;134:21;
167:6;196:17;200:16;
204:11;214:20;217:23;
218:2

**kinds (2)**
203:24;225:22

**knew (10)**
24:16,23;32:2,24;
33:5;42:17;96:25;
98:17;102:17;103:17

**knowing (1)**

174:21

**knowledge (4)**
36:7,8;37:2;113:10

**known (6)**
57:7;90:8,14,21

**knows (6)**
75:14;93:13,13;94:3;
141:3,4

**Kolya (1)**
23:17

**Kotkin (1)**
85:21

**KPMG (6)**
197:6,13,20,23;
203:13;221:17

**Kris (1)**
200:23

**Kristina (2)**
164:12;200:25

## L

**L/C (1)**
96:23

**label (1)**
151:5

**labeled (5)**
137:8;146:14;157:9,
17;208:15

**labels (1)**
133:21

**Lack (2)**
172:8;209:9

**laid (4)**
147:5;174:3;175:8;
199:22

**land (4)**
10:17;23:23;25:13,
14

**Lande (2)**
32:8,8

**Landes (1)**
32:22

**landscaping (3)**
71:24;114:5,21

**language (1)**
133:12

**lap (1)**
82:4

**lapse (1)**
196:21

**laptop (3)**
61:17,20;62:1

**large (3)**
158:9;188:15,17;
201:10,16,18;205:25

**largely (1)**
168:25

**last (20)**
9:20;10:5,9,20;13:1;
14:25;25:2;39:9;41:25;
44:21;94:5;99:19;
102:13;106:15;138:5;

140:24;174:3;178:18;
185:25;186:20

**Late (4)**
225:19,20;226:14;
230:12

**lately (1)**
108:17

**later (4)**
32:18;98:25;196:16;
228:21

**laughable (3)**
17:9,11,18

**law (3)**
85:20,22;116:12

**Laws (1)**
115:21

**lawsuit (3)**
102:8;115:11,23

**lawyers (2)**
88:20,25

**lay (2)**
135:10;144:4

**layoffs (1)**
197:25

**lays (1)**
147:14

**LC (1)**
179:10

**LCL (1)**
174:19

**learn (1)**
201:3

**learning (3)**
201:23;202:15;
203:25

**least (11)**
7:2,3;77:10;92:19;
125:13;127:12;138:1;
174:23;213:8;218:13;
230:11

**leave (7)**
9:3,3;21:7;197:23;
198:19;199:6,16

**leaving (1)**
198:21

**ledger (22)**
127:7,16,19;128:13;
129:12;130:9,24;
131:9,14;133:14;
134:6,9,11;138:14,19;
139:3;140:8;157:13;
174:24,25;175:22;
176:6

**ledgers (7)**
127:3,6;142:10;
143:8;149:1;155:17;
190:24

**ledger's (1)**
131:25

**left (21)**
19:4;28:14;34:2;
35:15;40:20;41:11;
57:12;110:23;130:1,7;

138:9,15,21;139:11;
185:10;193:24;207:18;
209:18;210:9;218:12;
219:25

**left-hand (2)**
15:10;139:24

**legal (3)**
112:22,22;196:5

**legible (5)**
50:15;94:21;95:11

**length (2)**
37:5;75:11

**less (3)**
44:24;92:4;216:14

**letter (20)**
27:14,25;34:18;
68:13,21,24;69:4,7,7,
10;70:1;88:19,21;94:9,
17;96:8;97:14;119:5;
219:1;227:8

**level (11)**
121:20;123:22;
124:19,25;125:13;
134:2;156:15;167:2,
10;190:5;220:19

**levels (3)**
166:21,22;167:14

**liabilities (1)**
159:10

**liability (2)**
81:14;122:14

**license (1)**
121:14

**licenses (3)**
121:12;195:14,17

**lien (1)**
97:11;99:5;114:24;
115:1,12,21,25;116:12;
229:9,14,17

**life (1)**
202:7

**lifting (1)**
228:17

**likely (4)**
130:12;158:1;172:5;
192:24

**liking (5)**
206:7,8,9;207:6;
208:18

**limited (4)**
36:21,25;116:14;
122:14

**limiting (1)**
116:7

**line (16)**
28:18;44:18;77:2;
79:12;80:18;89:17;
90:13;92:25;95:13;
109:9;139:19;141:16;
162:14;187:21;188:13,
14

**lines (5)**
13:19;16:12;71:5;

109:13;164:18

**lineup (2)**
8:7;193:10

**link (2)**
78:20;81:25

**Lipetsker (29)**
6:11;10:17;11:2,4,5,
24;12:3,7,8,15,21;
13:20,23,24;14:2,11;
20:2,6,22;33:14;35:12;
41:2;69:3,23;70:17;
73:24;85:25;96:22;
97:11

**Lipetskers (1)**
86:2

**Lipetsker's (2)**
12:12;16:18

**list (8)**
38:15;54:17,19,24;
55:3;67:18;87:10,13

**listed (2)**
37:6;38:11

**listing (3)**
66:23;226:1,8

**literally (1)**
227:7

**little (39)**
8:21;9:9;11:13,18;
14:25;28:13,13;35:14;
50:14;57:11;65:13;
71:15;105:20;106:24;
108:5;114:23;117:1;
119:9;125:9;139:20;
142:3;143:3;148:21;
150:3;152:25;154:24;
159:20,22,23;160:16;
172:16;173:16;175:6,
15;178:3;179:13;
210:19;214:14;220:3

**live (1)**
140:18

**LLC (35)**
6:5,6;23:10,20;
26:19;27:18,19;30:21;
33:14;34:12;35:9,11;
41:1,23;42:2,24;43:6,
13,23;44:2,7;47:5,5;
109:22;122:21;156:1,
12;158:4;159:5,17;
174:17;189:10;204:21;
205:15;217:14

**LLCs (9)**
26:7;36:1;44:13;
147:17;159:12;160:11;
165:20;205:14;217:11

**LLC's (2)**
147:20;205:25

**loan (51)**
21:24;22:2,5,13;
23:18,23,24;24:25;11;
27:4,4,24;29:21,21;
31:17,17;32:15,15;
33:3,22,22;37:25;

38:22;44:17,19;79:8,
12;83:13;84:3,15,18,
20;98:18,22,23;
112:12;125:11;133:17;
147:9,11,12,12,21;
164:12,14,19,19,21;
188:18,19;214:4;
222:20

**loans (13)**
21:16;25:8,16;27:13;
28:3;30:19;46:6;73:10;
112:16;148:22,24;
164:7;204:8

**location (1)**
118:15

**locked (1)**
9:7

**login (1)**
216:10

**long (18)**
9:20,22;53:24;89:18;
90:14;120:2,20;
121:14;123:8;125:5;
130:25;131:15;144:25;
158:15;164:25;177:7;
192:10;226:12

**longer (3)**
196:9,10;227:10

**look (44)**
8:18;15:9;18:6;
19:20;31:13;48:19,24;
49:1,20;51:2;58:8,20,
25;60:12,13;61:13;
81:5;82:15;90:12;91:9;
94:18;95:9,13;106:15;
125:15,17;132:18;
137:5;141:16;149:14;
154:22;158:11,14;
164:11;181:19;182:11;
184:16;189:12;200:2;
206:18;218:6,16;
222:15;226:13

**looked (10)**
19:23;80:24;97:15;
103:12;107:20;113:15;
154:20;155:7;218:25;
221:5

**looking (30)**
10:21;11:12,24;
12:18;25:10;47:17;
70:18;78:20;89:16;
92:24;94:9;100:6;
123:7;130:13;150:16;
151:13;153:9;157:18,
20;160:4;164:12;
167:11;187:2;193:7;
199:23,24;207:22;
215:21;218:1;229:17

**Looks (2)**
82:19;84:8;100:11;
128:13;129:12;130:22;
163:9;178:8;179:5;
180:21;183:24;189:15

**loop (1)**
127:15
**loss (3)**
160:14;162:1,25
**lost (1)**
220:3
**lot (19)**
10:16;21:21;22:22;
91:23,24;92:13;
108:17;114:5;124:13;
136:6;138:4;188:3;
191:22;199:2,4;
200:10,12;206:12;
226:19
**lots (3)**
171:23,25;199:3
**low (2)**
147:17;215:12
**lower (2)**
61:3;95:13
**lowest (1)**
167:1
**lunch (8)**
8:20,24;144:11;
155:11;156:1,25;
159:25;190:21
**Lyman (16)**
10:16;12:8,13;14:9;
28:11;29:20;30:1;
47:19;51:13;53:6,16,
18;86:18;103:12;
107:12;225:5
**Lyman- (13)**
30:20;103:19;112:8,
12;113:8;148:10;
156:24;202:19;214:20;
215:21;217:5;218:1;
223:16
**Lyman-Cutler (81)**
6:5,6;10:13;11:24;
12:7,19;28:24;30:17;
36:4;37:23;44:20;
46:12,18;47:1,4,5;73:6,
7;86:25;94:15;102:20;
109:22;113:5;122:21;
133:25;137:6,8,16;
139:20;140:4;141:16;
147:23;148:4;156:1,
12,18;157:7,9,18,19;
158:4,11,17;166:11;
167:25;168:1,3;174:4;
178:13;179:14;180:18;
181:19;189:10;202:16;
203:4;211:17;214:6;
215:5,9,20,22;216:7,
16;217:1,8,12,17,20,
23;218:3,14;220:10,
23;221:3,12,25;223:4,
6;224:5,21,23
lymancutlerllc@gmailcom (1)
24:3
**Lyman-Cutler's (3)**
158:12,14,15

# M

**machinery (1)**
108:7
**Madame (1)**
55:12
**Maiden (19)**
7:22;19:4;20:24;
25:24;26:7,14;32:3;
36:2,18,19;44:13;
66:12;84:7;101:13;
102:9,15;112:9,25;
193:10
**Maiden's (2)**
14:15;15:2
**mail (4)**
24:2;97:21,22;99:16
**mailed (1)**
216:9
**main (5)**
170:5;185:10;
202:12;205:23;209:21
**maintain (1)**
123:15;217:8,9
**maintained (4)**
148:10;156:6,11;
209:4
**maintains (1)**
151:10
**majority (4)**
207:12;224:19;
225:16;227:2
**makes (7)**
47:24;72:12,18;
164:5;171:5;186:6;
193:25
**making (10)**
21:3;161:1;163:2,9;
222:18;225:8,21,21;
226:7;227:1
**manage (2)**
109:5;143:21
**managed (2)**
110:9;143:24
**management (3)**
170:19;172:3,4
**management's (1)**
170:10
**manager (1)**
98:20
**managing (6)**
37:24;66:14,22,25;
67:17;101:9
**managing/manager (1)**
28:18
**manner (2)**
136:16;148:20
**many (9)**
100:10;104:13;
120:4;122:19;140:24;
172:21;196:15;202:25;
204:20

**March (4)**
41:2;218:6,15;
226:14
**Mark (11)**
26:19;39:10,12,16,
17,19;51:6;98:8;100:1;
102:25;184:23
**MARKED (21)**
29:15;34:14;35:1,2,
3,4,5,7;51:8,9;52:23;
55:14,24;56:2;87:11;
98:6;99:24;102:24;
103:24;128:2;184:25
**market (1)**
197:24
**married (1)**
194:20
**Mary (8)**
9:21;34:17;39:9;
40:4;55:7;87:17;
105:24;111:21
**masonry (1)**
71:24
**Massachusetts (1)**
121:13
**master's (3)**
195:8,12;197:4
**match (1)**
163:23
**material (9)**
167:12;169:11,17,
20,22;170:9,14,14,19
**materials (7)**
47:10;88:4;98:12,22;
99:1;224:4,7
**matter (4)**
39:18;86:6;169:14;
170:8
**max (1)**
138:2
**may (77)**
7:11;8:4,12;13:3,5;
26:19;28:8;32:18;
33:14;34:8;38:12,22;
41:23;48:21,22,23;
51:6;52:4;54:2;61:23;
68:14,22,25;69:3,10;
70:11,18;71:6;75:21;
78:6;88:19;89:3,16,25;
91:10;93:17;94:1,9;
96:8,8,18;97:1,14,18;
98:2,11;101:1,2;103:3,
18;107:21;108:22,23;
111:16;112:2,3;116:7;
142:9;143:2;147:19;
156:20;163:13;168:9;
172:19;184:12,19,20;
185:8;186:5;212:16;
218:25;219:6;220:9,
22;221:7;227:21;
228:18
**Maybe (26)**
8:5,18;48:24;50:23;

61:17;62:2;64:14;
67:15;68:23;75:19;
90:17;94:19;99:6,14,
15;106:9;110:22;
159:3;164:5;174:21,
22;204:22;212:14;
218:5,6;225:4
**mean (24)**
38:18;45:15;48:7;
71:23;101:15;105:3;
107:5,8;115:16;
132:13;138:25;140:5,
9;143:24,24;144:1;
155:4;162:22;164:13;
169:14;172:1,17,18;
182:21;191:13,13;
193:11;195:23;203:5
**means (4)**
77:10;130:7;140:7;
153:20;178:17;218:17
**meant (4)**
146:11;202:13;
218:14,20
**meat (1)**
226:18
**mechanics (1)**
157:4
**mechanic's (6)**
97:11;99:4;114:24;
115:1,12,21
**meet (1)**
200:2
**meeting (14)**
14:8,13;15:1,23;
16:8;17:15,17,20,21;
18:11,25;19:4;20:18;
21:7
**meetings (1)**
14:15
**megacompanies (1)**
201:10
**member (5)**
66:15,22,25;67:17;
101:9
**Memo (2)**
130:16;228:6
**memories (1)**
204:5
**mentioned (4)**
159:25;165:3;
210:24;225:17
**met (3)**
89:12;123:11;200:15
**metal (1)**
114:4
**method (3)**
134:21,23;137:20
**methods (1)**
205:2
**Michael (1)**
41:2
**microphone (4)**
11:10,13;119:9,17

**middle (2)**
139:4,6
**Middlesex (1)**
109:1
**mid-level (1)**
167:6
**might (24)**
6:22;37:9;85:19;
105:19;132:21;135:11,
12,13;140:13;141:6;
144:2;148:22;150:15;
160:1,3,21,22;169:11;
174:11;177:3,5;182:8;
184:1;230:2
**mile (1)**
160:1
**milestones (2)**
141:10;160:1
**million (54)**
13:11;14:22;15:14;
16:23;17:1,11;18:11,
12;19:8;21:9,12;22:10,
21,23;23:20,20,21,22,
23;24:13,17;25:11;
73:11;75:11,25;77:9,
11,12;79:9,12;80:7,11,
14,15,19,23;81:15,18;
82:13;91:2,6,19,22;
92:1,2,3,4,5,10;103:5,
6,6;120:14;188:1
**mine (1)**
145:20
**Minimal (2)**
203:12;210:18
**Minimally (1)**
211:25
**minutes (2)**
7:18;193:24
**miscalculated (1)**
81:14
**miscategorized (1)**
227:19
**mismanagement (1)**
148:24
**misrepresentations (1)**
171:1
**missed (2)**
54:11;227:13
**missing (6)**
158:9;170:9,18;
179:9;210:16,18
**misstatement (8)**
167:12;169:20,22;
170:2,10,14,14,19
**misstatements (2)**
169:12,18
**mistake (2)**
170:3;171:6
**misunderstood (1)**
50:13
**model (9)**
135:5,5,7,10,17;
136:9,10,25;137:12

**modifications (1)**
211:5

**moment (9)**
69:6;89:3;126:13;
130:6;141:7;163:11;
164:12;206:14;211:19

**Monday (4)**
8:4;193:12,19,23

**money (54)**
14:5;21:10;27:4,14;
29:21;30:23;31:17;
32:15;33:21;42:15;
43:16;45:16;46:8,17,
20;47:5,5;75:1,6,6,14;
76:4;81:4;91:23,24;
92:6;95:1,22,25;96:25;
97:2,5,6,7;111:15;
139:8,8,9;142:9;144:3,
5;146:14,14;147:5,14,
18;155:19;160:11;
163:10,10;199:3;
222:2,2,11

**money's (1)**
143:13

**Monique (1)**
61:16

**month (9)**
45:11,11,15,17;
212:16;222:5,6,6;
228:19

**monthly (4)**
198:9;218:16,17;
222:4

**months (17)**
51:1,19;52:8,12;
66:18;91:5,7,8;101:12;
197:15;202:8;218:5,
13;221:9,11;222:7;
228:16

**month-to-month (1)**
202:9

**more (44)**
9:10,14;44:24;50:15;
71:15;74:19;75:6,6;
77:12;80:9,15,16;
81:13;91:15,17,19;
92:1,2,5;94:12;97:7;
105:19;119:12;130:22;
158:1;161:5;162:22;
187:10,11;192:24;
198:9;199:14;202:8;
203:1;208:8;209:1,2,
21;210:9,18,20;
214:14;217:21;220:20

**morning (13)**
6:3,10,12,14,17,19,
25;7:3,21;10:3,4;
85:20;112:6

**most (11)**
105:14;130:11;
142:8;172:20,20;
200:9;201:10;203:2,7;
212:16;221:8

**mostly (1)**
105:16

**Mountain (8)**
196:8,12;198:2,3,4,
19,21;221:18

**move (10)**
11:12;28:5;54:2,23;
107:4,9;119:9,16;
149:21;185:15

**moved (1)**
208:16

**movement (5)**
133:1,18,21;191:3,8

**moving (4)**
157:11;160:18;
188:17;199:23

**Mrs (2)**
85:25;165:18

**much (33)**
18:14;21:10;23:17;
45:11;74:7;80:21;91:2,
6,10;92:6,12,15;97:24;
104:12;108:3,9,10;
114:17;136:5;151:17;
153:10;157:19;184:13;
185:10;200:13;201:18,
25;203:8;209:23;
210:8;221:21;223:3;
231:8

**multiple (6)**
29:3;140:7,11;
157:10;159:3;212:14

**multi-step (1)**
157:14

**must (1)**
67:24

**myself (5)**
65:13;96:24;97:5;
109:10,14

## N

**name (20)**
41:25;44:21;63:14,
22;85:21;119:4;
124:16;126:3,3,8;
130:13,14,14;140:15,
15;194:18;200:21;
204:1;206:15,17

**named (1)**
42:25

**names (3)**
6:8;145:18;208:14

**narrowed (1)**
92:4

**nature (1)**
210:24;211:7

**nearly (1)**
187:25

**necessarily (5)**
104:16;137:8;
169:11;171:22;188:14

**necessary (5)**

**71:14;159:1;196:18,**
19;209:24

**need (21)**
8:23;9:2,3;37:9;
39:4;77:10;105:5,16;
125:7;134:4;136:4;
140:17;141:3,4,5,7;
144:2,22;150:19;
208:5;213:18

**needed (9)**
11:2;12:4;84:15;
88:5;142:11;147:18;
215:13;228:8,22

**needs (4)**
47:24;71:14;111:9;
144:2

**nefarious (1)**
141:25

**negotiate (1)**
88:1

**negotiated (2)**
88:11;112:12

**negotiating (2)**
102:10;112:15

**negotiations (1)**
25:22

**neither (1)**
70:16

**net (5)**
66:4;162:1;178:21,
21,21

**new (7)**
37:21;83:16;144:14;
202:5;203:7;207:1;
219:22

**Newburyport (1)**
93:25

**news (1)**
24:12

**Newton (1)**
175:18

**next (32)**
8:18;31:5;40:23;
41:20;42:21;43:21;
53:8;54:12;56:9;60:22;
64:13;77:25;81:7,8;
82:5;99:8;115:14;
136:23;139:23;140:5;
146:7;150:4;187:9;
193:7;198:1,22;199:9,
21;200:1;213:19;
221:10;228:7

**Nick (4)**
13:20,23;84:7;
101:15

**nickname (1)**
23:14

**Nickolay (2)**
6:11;35:12

**nines (1)**
107:25

**ninety (1)**
220:17

**ninety-five (1)**
182:6

**ninety-five/five (1)**
183:20

**nobody (2)**
8:4;83:23

**Nope (2)**
167:17;212:6

**nor (1)**
70:16

**normal (1)**
11:12

**normally (1)**
227:8

**North (1)**
198:8

**notated (1)**
142:10

**note (2)**
153:21;155:5

**noted (2)**
211:6,9

**notes (1)**
205:11

**nothing's (1)**
191:24

**notice (4)**
36:23;37:10;62:4;
115:22

**noticed (2)**
85:19;105:19

**November (4)**
31:10;59:2;200:17;
215:4

**number (89)**
15:17,18,19,21,23;
17:9,17,20;37:11,12;
39:9;47:2,13;48:9,14,
20;55:7;57:9,14,20,24,
25;58:3,6,16,22;59:2,8,
11,14,19,21,24;60:14,
18,23;61:18;62:2,3;
64:18;65:3,7,9;69:20;
71:16;74:14;76:2,6,11,
11,11,12;78:9;81:3;
82:9,22,23;83:9,21;
91:25;92:16,16,18;
108:6;111:24,25;
113:22;114:20;116:24;
118:16;126:14;127:13;
138:15;139:6,20;
141:23;150:4;153:17;
175:18,19;178:12;
181:21,22;186:23;
188:20;197:14;219:9,
11;222:8

**numbers (37)**
20:1,5,7,11;23:19;
39:4,16;47:12;48:7,9;
49:8,11;56:25;76:10,
15;82:15;95:19;
107:25;114:13,20;
126:16;173:19,20;

**ninety-five (1)**
175:16,17,22;188:12,
19;204:13;218:7;
219:5;220:13;221:6,
25;223:21;225:2;
229:13

## O

**oath (3)**
9:21;86:19;109:17

**object (4)**
28:23;35:19;104:11;
105:1

**objected (1)**
115:15

**objection (28)**
6:7;36:16;37:4;
39:21,24;54:4,8,9;
87:14,15;93:2,8;
111:18;115:16;116:7;
128:22;129:20;149:23;
152:14;154:14;176:11;
177:23;179:22;180:12;
181:14;183:5,15;
187:16

**objections (4)**
7:15;29:11;105:3,9

**obligated (1)**
66:22

**obligation (1)**
38:1

**observations (5)**
123:22;201:15;
203:20;209:3;212:25

**observe (4)**
189:25;210:15;
224:17;227:18

**observed (3)**
190:20;191:3;227:15

**obtain (1)**
196:6

**obviously (4)**
101:16;105:8,8;
204:3

**occasionally (1)**
46:8

**occasions (1)**
227:13

**occupancy (2)**
32:17;86:12

**occupation (1)**
121:9

**occur (1)**
160:1

**occurred (1)**
52:13

**o'clock (2)**
84:25;194:5

**October (16)**
15:20;17:5,14;18:24;
19:21;20:16;21:7;
42:24;50:6;56:19;
58:22;86:18;87:1;

Case 16-01120   Doc 354   Filed 06/21/19   Entered 06/21/19 17:57:25   Desc Main
Document   Page 248 of 259
LYMAN-CUTLER, LLC; Case #15-13881
LYMAN-CUTLER, LLC v. KAGAN, et al.; Adv. Proc. 16-01120

June 17, 2019

19:22;200:15;218:12
**off (10)**
43:18;56:10;85:10;
104:12;136:14;145:7;
196:23;199:22;203:7;
223:4
**offer (23)**
11:4;13:11;28:21;
35:17;54:2,5,5,10,19;
55:17;87:4;104:9;
111:16;115:14;176:9;
177:21;179:19;180:10;
181:12;182:24;183:3,
13;187:14
**offered (8)**
39:23;54:7;55:18;
105:3,8,9;115:18;
197:7
**offering (3)**
35:22;38:16;54:12
**office (8)**
14:15;15:2;41:17;
93:24;95:3;200:16;
212:13;216:14
**official (1)**
223:4
**offsite (1)**
203:7
**often (5)**
143:20;160:9;198:9;
213:3,16
**oftentimes (2)**
144:2;174:18
**O'Grady (5)**
49:7;61:6,15,23,25
**old (2)**
194:24;209:7
**older (1)**
216:15
**on- (1)**
198:10
**on-call (1)**
123:2
**once (12)**
28:23;54:16,23;
146:13;159:10;166:2,
2;189:9;191:12;
209:16;212:16;214:3
**one (150)**
8:19;18:6;24:4,5,11;
31:5,22;32:14,21;
33:21,25;35:20,23;
36:22;37:11,25;39:12,
21;40:18,23;41:13,20;
42:10,21;43:21;44:12;
45:1;47:7;49:3;52:20;
53:1;54:17;55:13;
58:12;59:15,24,25;
60:22;62:11,16,24;
64:22,24;69:19;70:10,
24;71:8;77:24,24;81:7,
15;82:4;83:7;86:16;
99:19;100:12,19;

102:13;103:17;108:18;
118:3;127:13,23;
128:2;130:21,23,23;
131:15,25;132:19;
133:14;135:10;136:22;
137:5;140:14,16;
141:2,10,12;142:19,23;
143:11,11;144:9;
147:4,8,14,16;148:13,
13;149:4;150:23;
151:13;152:10,19,22;
155:19;157:14;160:11;
163:11;166:7,9,11,13;
167:14;169:21;172:11;
173:13;175:11,17;
177:15;179:9;180:2,4,
7,23;181:5,18,24;
183:25;184:18;187:10,
11,11,12;188:13,17,18;
189:12,15;191:17;
192:7;196:1;197:15;
198:18;203:12;204:5,
8;206:25;210:4;216:9;
222:7;223:5,8;224:17,
20,23;225:5,12;227:21
**ones (8)**
87:11,12;104:22,23;
107:22;141:11;157:25;
198:18
**one's (5)**
53:18;99:23;107:15;
179:6;181:7
**online (1)**
216:11
**Only (43)**
6:21;13:16;27:14;
29:23;37:4;39:1;55:6;
60:17;62:12,20,24;
63:8,13,21;64:20,22,
24;72:3;88:22;94:1;
100:12;102:13;113:1;
114:3,10,22;138:5;
140:14;169:9;175:17;
177:5;182:22;191:11;
193:12;199:17,18;
207:2;209:18;210:7,
10;216:13;219:18;
225:5
**onsite (1)**
52:11
**onto (1)**
28:5
**open (7)**
20:13,19;24:6;77:25;
138:9;209:15;214:8
**operates (1)**
136:14
**operating (25)**
19:5,7;21:9;25:19,
22,25;26:22;27:22;
30:7,13;31:1,3,4,8;
35:9;65:14;66:21;67:6,
19;110:3;112:8;

120:14;174:15;224:3,7
**operation (2)**
190:1,20
**operational (3)**
198:8,12;199:15
**operators (1)**
174:17
**opinion (1)**
166:17
**opportunities (3)**
171:23;172:1;190:6
**opportunity (13)**
10:15,21,25;30:11;
38:8;171:14,20,22,23,
25;172:9;201:1;215:17
**opposed (3)**
159:23;201:16;203:4
**optimistic (1)**
8:12
**oral (1)**
74:5
**orally (1)**
78:18
**order (22)**
7:24;14:5;22:4;
26:10;37:1,6;38:9,14;
40:1;55:2;105:3;113:2,
5;115:20;142:10;
144:5;148:16;158:10;
161:7,9;193:11;206:20
**organized (10)**
167:3;206:6;207:7;
208:13,18;210:19,22;
216:4;221:23;227:2
**original (12)**
23:1,24;74:16;75:10,
24;79:4,8;80:2,18;
83:10,11;103:4
**originally (5)**
23:23;77:12;78:21,
22;159:7
**others (2)**
170:6;196:15
**Otherwise (1)**
138:4
**out (64)**
7:23;23:22;25:11;
28:3;38:7;41:25;45:11,
12,17,19;46:2,20;
54:18;85:24;93:18;
125:23;132:19;134:7;
135:10;138:3;144:4,
18,20,24;147:5,9,14,
18,23;155:12;157:11;
158:1,5;159:2,10;
168:12,14;171:17;
177:7;180:7;181:10,
24;186:24;188:4,10;
189:8;191:16;192:7;
193:11;202:6;203:17,
23,24;207:18;210:11;
213:23;220:14;222:2;
225:2;226:11;228:8,

10,22,24
**outline (1)**
64:18
**out-of-order (1)**
65:13
**outputs (1)**
132:1
**outs (1)**
131:7
**outside (6)**
7:5,22;13:15,16,17;
224:4
**outsource (1)**
199:19
**outstanding (4)**
132:20,21;219:12,14
**over (28)**
26:8;41:18;54:24,25;
70:2,6;77:2;91:22;
95:5,11;123:7;129:25;
130:13;140:5;163:6,8,
9;164:5;172:21;173:1;
186:12;198:11;208:2;
209:16;212:14;221:10;
222:25;226:14
**overall (2)**
159:14;163:22
**overcharge (1)**
38:24
**overhead (3)**
95:3;108:7;111:3
**Overruled (3)**
29:14;105:10;116:4
**oversee (1)**
109:5
**overseeing (1)**
109:18
**oversight (1)**
121:24
**owe (1)**
111:15
**owed (7)**
69:11;139:5;142:23;
153:22;157:19;163:9;
177:1
**owes (4)**
142:24;155:8;
164:13,16
**own (14)**
38:6;76:15;118:16;
126:23;127:15,19;
136:20;158:5;213:23;
217:9,10,11;222:18;
223:15
**owned (8)**
159:4,6,16,17;
182:10,16,19;183:10
**owners (4)**
72:9,16;174:16,16
**ownership (4)**
143:20;182:6,9;
192:23
**owning (2)**

10,22,24

13:14;159:12

## P

**P-332 (1)**
55:8
**package (2)**
131:23;199:25
**packet (6)**
55:24,25;87:9;98:9;
100:2,9
**packets (1)**
87:13
**page (78)**
13:8,9;15:9;18:7,7;
19:21;26:25;28:16;
29:17;31:13;32:11;
33:10,12,13,18;34:4,
16;39:2;40:12;41:5;
42:4;43:2;44:4;45:21,
21;51:23,25;52:25,25;
53:5,8,8;56:4,6,9;
60:13;61:10,12;64:13;
77:5,8,17,20;79:9;81:6,
8;83:25;86:15;89:17;
90:12,13;91:10;92:24;
94:6;98:11;99:8;
100:12,19;106:9,15;
109:13;115:8;131:1,6;
138:10,13,21;139:4;
162:12,19;184:17;
185:5,9,25;186:20;
187:7,9,20
**pages (14)**
77:25;90:21;98:25;
100:10,17;101:21;
130:25;131:15;140:18;
187:7,10
**paid (57)**
7:19;44:23;45:7,12,
17,19;47:4,10,23;
48:18,22,23;49:22;
50:22;72:6;73:5,8;
91:2,6,11,21;92:2,6,12,
13,15;96:11,15;97:3,4,
8;109:10,14,18,20;
110:22;113:8;135:25;
138:3;144:3;147:18;
157:13;158:1,2,4;
177:3;179:17;189:6,
13,19;192:2,20;207:18,
18,21;209:17;219:19
**paper (14)**
45:22;78:5;102:22;
138:23;186:3;201:20;
205:5,6;206:6,20;
207:10,13;210:12;
215:25
**papers (6)**
82:3;151:11;177:15;
179:4;180:2;181:5
**paragraph (19)**
31:13;32:11;36:2;

Case 16-01120   Doc 354   Filed 06/21/19   Entered 06/21/19 17:57:25   Desc Main
LYMAN-CUTLER, LLC; Case #15-13881 Document   Page 249 of 259
LYMAN-CUTLER, LLC v. KAGAN, et al.; Adv. Proc. 16-01120

June 17, 2019

39:2;40:13;41:5;42:5;
43:2;44:4;67:15;109:7,
9,12,13,14;146:4,7;
147:8;219:5
**parent (1)**
199:11
**part (22)**
7:23;23:10;24:24;
37:2;72:1;104:7;123:6;
125:8,8,19;142:18;
148:18;152:4;177:3;
200:9;202:4;204:1,15;
206:23;209:15;225:1,1
**participate (1)**
25:21
**participated (2)**
93:7;191:2
**particular (16)**
13:18;44:21;71:13;
130:24;135:20;136:2,
4;145:21;147:5;
157:17,19;160:13;
162:7;163:24;189:13;
210:19
**particularly (3)**
135:5;170:10;171:8
**parties (5)**
6:8,18;70:14;167:15;
214:7
**partner (3)**
13:21;37:24;42:19
**partners (12)**
10:21;13:15,16,17;
109:6;110:9,13,21,25;
111:7;179:15;217:15
**partnership (1)**
197:9
**parts (2)**
82:1;228:21
**party (1)**
171:9
**pass (1)**
121:8
**passed (1)**
121:10
**passes (1)**
184:9
**pass-through (2)**
96:5;184:8
**past (1)**
29:12
**paths (1)**
201:4
**Pause (16)**
13:2;18:5;22:20;
34:7;64:15;78:8,12;
82:18;127:25;164:9;
172:23;173:22;175:12;
176:4;185:20;186:2
**pay (33)**
27:5;29:22;31:18;
32:16;33:22;45:2,5;
48:24;50:23;69:20;

73:25;88:24;92:3;96:3,
12,22;97:2,7;108:6;
109:22;113:6;114:18;
134:6;135:11,12,13;
139:7,7;177:8;179:16;
203:8;213:23;215:15
**payable (3)**
153:21;219:13,15
**payables (3)**
192:4,7,11
**paying (10)**
45:3,4,24;46:2;
66:19;143:11;144:3;
158:8;189:23;215:8
**payment (9)**
47:24;50:23;134:15,
15;139:11;207:20,23;
210:5;223:2
**payments (12)**
46:12,25;47:18;
189:8;203:6;209:19;
210:3,5,8;216:25;
218:8;219:23
**pays (8)**
108:7,7,7;109:24;
146:13,14;147:14,15
**PDF (2)**
131:6;138:10
**penalties (1)**
117:25
**penalty (1)**
101:11
**pennies (1)**
175:20
**people (6)**
48:22;96:3;127:9;
166:5;201:21;204:2
**per (17)**
73:11;74:10,19;78:2;
79:4,25;80:1,3,7,11,11;
81:15;132:16;136:15;
141:7;142:23;147:4
**percent (19)**
27:12;66:4;95:10,14;
120:17;137:25;138:1;
159:6,16,17;164:19;
182:6,7,16,19;183:11;
220:16,17;221:5
**percentage (9)**
109:6,19;110:10;
137:21;141:8,20;
160:9,19;197:25
**perfect (1)**
115:21
**perfectly (1)**
96:25
**perform (1)**
148:16
**performed (1)**
133:25
**performing (2)**
160:5;161:4
**perhaps (3)**

11:13;15:10;186:3
**period (4)**
137:23;172:15;
173:16;216:13
**periods (1)**
172:21
**perjury (1)**
117:25
**permit (21)**
47:11;51:3,11,22,22;
52:4,14;53:5,16;54:1;
56:7;87:8,13;114:2,2,
10,16,18;117:18,24;
118:12
**permits (3)**
53:17;54:17;114:12
**Permits' (4)**
51:5,24;52:17;55:21
**person (4)**
63:13;159:4;174:18;
212:21
**personal (6)**
110:5,6;122:3;
159:18;184:11,11
**personally (1)**
29:23
**perspective (5)**
134:11;136:7;
137:15,18;160:20
**Perten (109)**
6:14,14,21,24;7:10;
8:3,12;13:9;18:8;
28:23;29:4,6,9;35:19;
36:23;37:3;38:5;39:17,
23;50:8,10;54:5,9,16;
55:12,20;57:24;58:9,
13;87:15;93:2,8;
104:11;106:13;111:19;
112:2,5,19,20;113:3,4;
115:3,7,14,20;116:6,
12,15,17,20,24;117:2,
13;118:19;127:22;
128:5;129:2,8;130:1;
131:12;138:8,23;
145:13,25;149:3;
151:19;153:1,13;
154:1,25;161:12;
164:4;176:11;177:23;
179:21;180:12;181:14;
183:5,15;187:16;
193:3,6,18;194:3,6,8,
10,15;214:10,12,14,17,
18;215:18,19;218:22,
24;219:2,4;229:19,22,
25;230:2,4,7,11,15,17;
231:10
**Perten's (1)**
39:15
**Peter (1)**
6:12
**ph (7)**
13:20;41:2;42:25;
43:25;117:3;185:4,4

**Phil (1)**
185:4
**Phillip (5)**
145:19,19;146:16,
22;147:22
**phone (40)**
57:3,9,14,20,23,25;
58:2,6,16,18,22;59:2,8,
10,11,11,14,19,20,21,
24;60:13,18,21,22;
61:3,7,8,10,18,20,23;
62:2,3;65:3,7,9;
200:12;212:15,16
**phrase (1)**
71:18
**pick (1)**
213:20
**picking (1)**
174:12
**piece (1)**
82:2
**place (5)**
177:10,12;197:9;
219:23,24
**places (1)**
140:11
**placing (1)**
126:3
**Plaintiff (1)**
55:19
**plaintiffs (1)**
37:18
**plaintiffs' (42)**
7:23;28:21;35:1,2,3,
4,5,8,17;37:14;40:9;
51:6,9;52:23;55:9,11;
56:2;87:20;98:6;99:24;
102:24;103:1;106:2,5,
6,7;112:1;127:23;
128:24;129:22;149:25;
152:16;154:16;176:13;
177:25;179:24;180:14;
181:16;183:7,17;
184:25;187:18
**plaintiff's (1)**
128:2
**plan (13)**
21:8;33:24;36:7;
37:2,12,20,21;38:10,
19,23;76:3,3;78:22
**planned (3)**
43:9;77:12;79:9
**planning (5)**
6:24;13:14;120:9;
121:23;160:20
**plans (13)**
14:18,19,20;17:25;
18:18;19:2,3,8;22:1,5,
21;76:13;83:15
**Plasse (1)**
61:16
**play (2)**
37:11;218:7

**plea (1)**
37:13
**please (53)**
6:3,8;20:14;22:15;
26:16;27:1;28:6;32:6;
33:10;45:8;46:23;51:7;
52:25;58:10;60:3;
62:19;68:17;69:6;
85:16;90:12;102:23;
112:3;115:6;116:18,
19,25;118:24;119:3,9;
124:5;129:3;138:10;
145:13;149:4,5;
151:20;153:14;162:12;
163:12;179:25;181:3,
13;182:14;183:8,14;
186:16;194:11,13,18;
214:11,25;218:23;
230:21
**Plumber (2)**
114:18;118:16
**plumbing (3)**
114:3,19;118:7
**plus (6)**
80:14,15;83:5,6;
114:21;137:1
**pm (4)**
98:12;145:7,8;
231:13
**pocket (3)**
72:19;75:1;213:23
**pockets (1)**
72:13
**point (25)**
8:1;14:17;16:6;
18:11;38:7;64:19;70:7;
73:17;116:22;189:7,
11;196:1,13;197:23;
199:6,16;204:17;
207:12;210:5,10;
219:17,24;229:3,8,23
**points (2)**
46:17;188:24
**policies (1)**
201:19
**PolySavant (2)**
64:6,7
**poor (1)**
185:17
**popped (1)**
226:11
**popping (1)**
60:14
**pops (1)**
130:16
**populated (1)**
159:19
**portion (1)**
222:24
**portions (1)**
190:9
**pose (1)**
125:22

Case 16-01120   Doc 354   Filed 06/21/19   Entered 06/21/19 17:57:25   Desc Main
LYMAN-CUTLER, LLC; Case #15-13881 Document   Page 250 of 259
LYMAN-CUTLER, LLC v. KAGAN, et al.; Adv. Proc. 16-01120

June 17, 2019

position (5)
    104:17;120:18,23;
    189:25;197:7
possibility (1)
    169:19
possible (5)
    209:23;228:20
post (1)
    151:7
post- (1)
    172:15
post-closing (1)
    173:16
post-graduation (1)
    197:8
posting (1)
    130:11
potential (2)
    16:8;199:24
potentially (5)
    37:7;163:9;174:9;
    178:22;199:23
practical (1)
    170:8
practice (1)
    41:15
practices (2)
    132:3;134:1
practitioner (1)
    185:14
precisely (4)
    36:2;44:12;73:17;
    84:17
prefer (1)
    102:22
prefixes (1)
    204:13
preparation (8)
    19:14;120:9;121:22;
    122:2,16,18;123:6;
    125:1
prepare (12)
    19:22;56:22;76:21;
    80:22;122:21;125:6,
    19;148:5;149:15;
    150:17;152:10;156:2
prepared (8)
    30:9;49:7,10,13;
    83:14;88:21;106:21;
    158:19
preparer (2)
    124:17;184:2
prepares (2)
    152:9;154:11
preparing (3)
    124:15;168:24;
    229:13
prerogative (1)
    54:23
presence (1)
    213:15
present (3)
    76:7,12;80:4

presentation (5)
    15:1;19:15;20:17;
    21:4;109:1
presented (2)
    20:1,5
presenting (2)
    16:22,24
president (1)
    120:19
presumably (1)
    104:22
pretrial (1)
    37:6
pretty (8)
    45:11;97:24;142:2;
    151:16;153:10;193:9;
    200:13;213:3
prevention (1)
    196:3
previous (5)
    17:22;216:12;
    218:12;223:23;225:4
previously (4)
    30:25;47:21;226:25;
    228:25
price (1)
    25:8;75:17
primarily (2)
    120:13;135:9;
    165:12;209:9
primary (2)
    127:7;166:22
prime (1)
    62:2
printed (8)
    81:25;113:12,17;
    178:6;180:7,21,25;
    181:10
printout (3)
    172:24;173:5;178:9
Prior (10)
    121:1;196:7;200:22;
    201:5;204:10;209:4;
    210:7,17;213:22;223:6
priority-wise (1)
    218:20
probability (1)
    191:10
probably (18)
    7:2,2;8:24;33:11;
    39:14;47:25;48:8;61:4,
    11;91:23;120:16;
    134:7;144:20;172:7;
    193:23;204:19,24;
    230:10
problem (2)
    24:5;171:9
problematic (1)
    161:5
proce (1)
    199:4
procedural (1)
    199:5

procedures (4)
    125:9;127:10;
    198:16;201:19
proceed (2)
    112:2;193:6
proceeding (1)
    6:4
proceedings (1)
    108:16
process (12)
    132:11;148:18;
    151:14;157:5,14;
    202:10;207:21;208:8;
    213:10,25;222:9,25
Processes (1)
    198:16
produced (2)
    36:18;63:25
product (1)
    215:20
ProEx (77)
    56:20;57:24;70:10;
    71:15,17,21;72:4,10,
    12;106:25;107:8;
    108:4;110:20;122:8,
    10;126:12,16,25;
    127:19;129:12;130:25;
    131:7;133:21;134:24;
    135:5,18,20,21;136:14,
    15;137:1,9,12,20;
    138:14,19;139:7;
    140:20;141:3;142:1,4;
    143:4,15;144:2,5;
    153:23,24;154:20;
    155:14;158:16;160:8,
    11;161:17;162:4,20;
    163:1,4,19,22;165:16;
    166:9;167:22;168:7,
    21;169:1;173:25;
    175:6,8;179:9;182:10;
    184:6,13;185:9;190:1,
    6,13;217:10
ProExcavation (21)
    6:15;47:22;48:5,23;
    49:3,25;50:5;71:18;
    111:14;113:16;122:10;
    129:16;132:5;152:19;
    155:5,8;176:7;177:18;
    178:10;183:1;208:21
ProEx's (4)
    135:16;137:5,16;
    159:24
professional (3)
    121:12;195:14,17
profile (1)
    216:11
profit (15)
    72:12;96:4;108:5,9,
    11;110:18,23;162:1,6,
    8,19,23;163:2,24;
    188:15
profitability (1)
    164:1

profits (14)
    66:4;72:18;106:24,
    25;108:3,12;109:7,19;
    110:10,20;162:3;
    163:4,5;174:18
program (1)
    197:11
programming (1)
    197:9
programs (1)
    199:3
project (106)
    10:12,13,22;11:3,5,
    24;12:4,7,8,19,23;
    13:15,18,25;14:6,23;
    15:10;16:9;19:8;21:5;
    26:19,23;27:10;28:8,
    11,24,25;29:20;30:1,
    17;31:11;33:15;36:5;
    37:23;40:15;42:17;
    43:16;44:21;71:17;
    73:6;75:5;76:4,23,25;
    77:9;83:20;84:17;
    101:12;109:6;110:9;
    134:1;136:1,12,16,21,
    22;137:6,8,10,16,25;
    138:2;141:9,11;147:6,
    6,15,17,20;156:25;
    157:2,17,19;158:5;
    160:11;163:20,21,23,
    23,24;164:1;165:20;
    189:10;202:16,20,24;
    205:21;206:17,20,24;
    207:4;208:3,14;210:1;
    212:25;213:2;214:6;
    215:5,9;217:6,17;
    219:17;220:15;224:10;
    225:11;228:15
projectors (1)
    186:15
projects (29)
    13:21;27:13,23;29:8,
    10;34:13;35:20;37:5;
    88:5;122:15;136:23;
    137:21;140:14;146:15;
    147:14;148:23;157:6;
    158:11;159:3,8;
    160:18;202:7,25,25;
    203:3;204:4,23;
    206:11;214:8
project's (1)
    137:22
proper (1)
    40:8
properly (1)
    178:22
properties (15)
    56:13;67:18;70:2,3,
    5;71:13;146:17,24;
    217:24;222:17;224:18,
    20,24;225:3;229:9
property (7)
    21:18;25:7;107:17;

224:7;227:21,22,22
proposal (34)
    48:6;49:8,13,16,23,
    25;50:5,17;51:19;
    56:20;70:17,20,21;
    71:6;79:14,17,19,20,
    20,21;80:6,10;103:4;
    107:11;113:15;135:22;
    136:4,15;141:24;
    208:4;209:10,13,25;
    210:13
proposal/invoice (1)
    71:7
proposals (13)
    49:2;56:23;70:10;
    79:23;88:9,10;107:20;
    175:8;205:9;206:5;
    208:2;216:2;228:8
propose (3)
    149:15;150:15,18
proposed (5)
    13:25;17:8;34:17;
    149:13;186:22
proposes (1)
    150:14
proposing (1)
    15:25
protection (1)
    198:13
protocol (1)
    197:14
provide (13)
    15:21,23;120:6,7,7;
    133:21;151:5;172:5;
    197:21;198:11;219:9;
    220:23;228:9
provided (18)
    15:19;19:13;71:17;
    72:22;113:22;121:17,
    22;122:5,16,18,25;
    123:2;125:5;142:15;
    149:14;156:16;221:3;
    226:12
provides (2)
    135:21;174:17
providing (2)
    129:15;156:9
provision (6)
    67:5,13,19,22,24;
    68:2
public (6)
    120:1,15;121:13;
    165:7,10;197:20
pull (8)
    11:10;54:18;115:3;
    116:17;119:11;144:9;
    214:10;218:22
pulled (2)
    50:12;224:1
purchase (9)
    12:22;21:18;25:7,8;
    27:4;29:21;31:17;
    32:15;33:21

Case 16-01120    Doc 354    Filed 06/21/19    Entered 06/21/19 17:57:25    Desc Main
LYMAN-CUTLER, LLC; Case #15-13881 Document    Page 251 of 259
LYMAN-CUTLER, LLC v. KAGAN, et al.; Adv. Proc. 16-01120        June 17, 2019

**purely (1)**
24:21
**purportedly (1)**
62:8
**purports (5)**
9:15;50:5,19;60:18;
106:18
**purpose (10)**
35:22;36:6,21,25;
38:17;39:24;105:8;
115:19;116:14;134:12
**purposes (12)**
9:10;36:21;39:1;
54:18,22;55:5;149:16,
17;150:18,20;161:10;
183:25
**put (45)**
8:5;14:22;19:8;20:7;
21:8,10,11;22:17;
41:17;45:16;46:8,17;
48:16,21;55:2;67:13;
88:7,13;97:2,7,7,10;
104:24;126:8;128:1;
129:5;167:3;175:22,
25;176:2,3;178:20;
193:19,21;196:18;
197:14;202:15,19;
215:11,14;219:22;
225:5;228:5;229:1,17
**puts (2)**
71:25;88:16
**putting (1)**
36:23
**Pyle (5)**
68:13;97:22,24;
106:13;219:1

**Q**

**QB (1)**
146:17
**quarter (7)**
217:18;218:1,11;
225:18,19,20;228:15
**quick (1)**
68:8
**QuickBooks (68)**
92:14;131:24;132:1,
22;133:5;146:18;
147:23;148:5,9,12;
156:6,13;158:15;
168:3;178:10;190:23;
202:3,11,14,15;203:10,
16,21;204:2,6,15,17,
20;205:1;209:2,3,11,
14;210:16,19,23,25;
211:16;212:3,5;
215:23;217:9,9,10,12,
13;218:3,18;220:7,10,
24;221:12,25;222:3,17,
18,23;223:24;224:1,6,
25;225:18;226:4,8;
227:12,25;229:6,7

**quite (10)**
22:22;26:7;41:24;
47:7;75:11;76:24;78:1;
143:20;160:9;188:3
**quote (1)**
169:21

**R**

**raise (2)**
29:12;194:11
**raised (1)**
29:11
**ramping (1)**
217:22
**range (2)**
89:20;204:24
**ranged (1)**
204:3
**ranges (1)**
204:21
**rank (1)**
104:25
**re (1)**
166:10
**re- (1)**
204:11
**reach (1)**
203:24
**reached (5)**
168:12,14;203:23;
228:22,24
**reaching (3)**
203:17;228:8,10
**read (37)**
13:22;18:21;24:1;
25:19,20;27:7;29:18,
24;31:4,22;32:19,21;
33:25;40:18;41:13,16;
42:10,20;65:15;69:7;
77:13;79:5,6;83:2;
89:1,22;90:18;92:7;
93:15;95:4;104:16;
112:21,22;179:17,21;
185:11;227:8
**reading (3)**
34:4;102:7;181:18
**ready (4)**
78:13;85:14;117:15;
145:11
**real (3)**
83:20;120:16;222:1
**realizable (2)**
177:7;192:11
**realize (1)**
177:5
**realized (2)**
81:14;189:22
**really (22)**
11:9,22;37:20;38:20;
68:20;127:12;132:6;
134:4;135:19;144:1;
159:11,19,20;160:19;

161:8;167:7;170:13;
188:21;191:10;202:7;
209:16;228:7
**reason (11)**
55:1;86:1,4;96:7;
99:17;123:12;126:7;
141:9;170:18;204:13;
213:20
**reasonably (2)**
94:20;169:23
**reasons (1)**
37:4
**rebut (1)**
8:10
**rebuttal (1)**
8:9
**recall (12)**
7:15;78:1;113:20;
114:24;156:22;158:19,
22;166:2;183:24;
184:15;187:2;196:13
**recap (1)**
65:15
**recategorized (1)**
204:12
**receipt (1)**
223:2
**receivable (14)**
138:16;139:3,16;
152:6;155:5;157:12,
17,22;162:15,24;
177:6;189:1,11;192:12
**receivables (2)**
94:6;177:9
**receive (1)**
215:1
**received (7)**
189:20;190:12,14,
14,17,18;199:25
**receives (2)**
128:16;129:15
**receiving (2)**
143:11;228:16
**recently (1)**
86:1
**recipients (2)**
24:4,5
**recla (1)**
188:16
**reclass (1)**
149:16
**reclassifications (1)**
188:16
**reclassifying (1)**
188:13
**recoded (1)**
211:6
**recognize (14)**
35:8;51:11;53:5;
56:6;68:11,19;128:9;
137:23;151:23;154:5;
171:12;176:6;185:1;
187:5

**recognized (1)**
139:17
**recognizes (2)**
149:9;173:14
**recognizing (1)**
147:6
**reconcile (4)**
132:18;142:21,22;
143:11
**reconciled (2)**
158:16;222:3
**reconciliation (3)**
132:12,14;222:4
**reconciliations (7)**
125:10,11,11;
127:11;132:8;191:17;
218:16
**reconciling (2)**
132:25;191:9
**record (18)**
6:9;34:9;59:14,23;
60:17;62:16,21;63:8;
85:10,11;87:9;92:15;
93:5;119:4;145:7,8;
170:25;179:21
**recorded (4)**
99:4;115:23;116:1;
173:15
**recordkeeping (2)**
132:4;169:7
**records (23)**
53:4;55:25;93:1;
131:6;132:5;137:6;
142:1;143:4;144:7;
151:8;155:25;166:18;
170:20;197:22;201:3;
202:3;208:21,23;
209:2;212:7;215:8,21;
217:11
**RECROSS-EXAMINATION (2)**
117:16;191:20
**recruited (1)**
199:10
**REDIRECT (3)**
112:4;188:8;192:14
**refer (1)**
151:4
**reference (8)**
130:16;146:10;
151:2,4,8;156:5;207:3;
219:7
**referenced (1)**
148:11
**referred (1)**
142:12
**reflect (1)**
218:8
**reflected (8)**
134:16;137:17;
141:7;143:13;144:8;
155:22;157:5;217:5
**reflects (1)**
178:12

**regard (5)**
30:17;56:1;86:25;
123:1;184:5
**regarding (3)**
6:6;102:20;103:19
**regardless (1)**
137:3
**registry (1)**
115:24
**regularity (1)**
212:11
**regularly (1)**
212:13
**reimburse (1)**
97:5;214:3
**reimbursed (8)**
47:6,11,12;48:19;
69:17;75:1;111:9;
158:8
**reimbursement (20)**
47:14;134:5,12;
135:12,14,19;136:10,
25;146:10,12,23;
147:16,21;157:2,8,11,
16,21;189:6;222:20
**reimbursements (1)**
204:8
**reject (1)**
69:5
**rejected (2)**
69:3;97:19
**rejecting (1)**
69:7
**relate (1)**
141:19
**related (7)**
29:6;148:10,22;
171:9,13;185:15;
216:23
**related-party (3)**
171:13,19;172:2
**relates (5)**
135:6,7;139:20;
200:11;220:10
**relating (4)**
189:8;190:13;200:9;
204:4
**relationship (2)**
123:8,15
**relationships (1)**
171:9
**relevance (1)**
29:1
**relevant (2)**
103:11;121:9
**reliability (1)**
166:17
**relied (5)**
25:24;65:18;88:7,9;
168:25
**rely (1)**
112:25
**remain (1)**

192:1

**remainder (1)**
86:6

**remaining (1)**
210:6

**remains (1)**
219:20

**remember (52)**
17:7,9;25:11;26:18,
20;31:11,23;40:19;
42:2,11,20,20;44:2;
49:5;50:24;51:2;57:22;
58:3;60:5;63:11,12,16,
20;67:11,22;68:4,24;
69:1,2,5,9,12,13;70:15;
71:19;75:21;77:23,24;
78:3,4;91:8;92:6,12;
99:11,12;108:15,16;
168:18;177:12;182:21;
224:1;230:13

**removal (1)**
67:24

**remove (3)**
67:1;68:3,6

**reorganization (1)**
208:7

**reorganize (1)**
206:24

**repeat (4)**
37:3;44:25;47:8;
181:21

**repeatedly (1)**
206:12

**report (11)**
8:23;103:12;114:9;
161:9;198:11;210:25;
211:2,3;222:5;226:23;
227:10

**reported (2)**
174:20;175:1

**reporter (2)**
100:1;102:25

**reports (1)**
156:20

**repositories (1)**
189:15

**represent (3)**
124:6;131:15;219:11

**representation (1)**
131:5

**representative (1)**
140:13

**represented (1)**
139:23

**represents (1)**
138:20

**request (4)**
146:16;147:2;
160:10;186:11

**requests (1)**
213:5

**require (1)**
142:8

**required (1)**
114:9

**requirement (1)**
213:15

**research (3)**
219:16;223:6;228:7

**reserve (2)**
177:4;179:16

**resources (1)**
228:20

**respect (10)**
112:8;124:10;132:4;
154:20;156:18,24;
190:9;206:4;212:24;
215:20

**Respectfully (1)**
80:6

**respective (2)**
146:24;190:7

**respond (3)**
36:24;116:22;117:8

**response (2)**
36:19;215:1

**responsibilities (4)**
197:12;200:8;212:1,
3

**responsibility (1)**
88:24

**rest (3)**
59:22;63:7;220:15

**resume (2)**
8:3;231:3

**RESUMED (2)**
10:1;145:15

**resumption (1)**
6:25

**retain (1)**
66:22

**retaining (1)**
73:20

**return (14)**
64:19;77:12;106:8;
136:8,9;150:17;
159:18;182:22;183:1;
184:11;186:25;187:6;
189:19,21

**returning (2)**
131:14;161:16

**returns (24)**
122:2,3,6,21;124:15,
17,22;125:2,19;126:4,
9,23;148:5;149:15;
156:2;158:19,21;
159:3,12,24;165:14;
168:24;175:2;182:11

**revenue (15)**
133:16;135:6;
137:18,23;138:1,4,5;
139:17;140:11;141:5,
14;142:1;159:9;
160:14;163:23

**revenues (1)**
152:7

**reverse (1)**
47:24

**review (18)**
20:17;112:9;124:19,
25;160:22;166:23;
167:6,20,22,25;215:8;
218:2;220:10,20;
221:4,8,10,11

**reviewed (10)**
167:18;168:15,19,
20,21,23;190:24;
220:13;226:10,11

**reviewing (6)**
78:23;125:18;
150:16;211:16;225:17;
227:11

**reviews (1)**
120:9

**rewind (1)**
10:11

**rhyme (1)**
204:12

**Right (555)**
7:9;8:15,17;9:4,16,
18,24;10:11;11:3,13,
16;12:16,19;14:3,6,8,9,
12,15,18,23;15:5,6,16,
20,25;16:1,9,11,18,20,
23;17:5,7,15,19,21,23;
18:23;19:2,5,11,15,23;
20:18,20;21:3,5,9,11,
12,21,24;22:2,4,5,7,10,
12,13,17,18,23;23:1,4,
5,16;24:4,20;25:4,10,
12,13,19,21,22;26:12,
23;28:11,14,19;29:2;
30:2,14,16;32:4,9;
33:16,23;34:15,16;
35:11,12,21;36:6,17,
20;38:7,16,17,20,25;
39:20,25;40:16,20,21;
41:2,9,25;42:8,18,25;
43:6,10,11,23,25;44:8,
14,24;45:3,13,15,25;
46:3,6,8,15,17,18,21,
21;47:9,14,15,18,21,
22;48:6,9;49:5,8,11,14,
16;50:5,6,17,19,22,25;
51:1,4,11,15;52:2,4,22;
53:12,21,23,25;54:7;
56:11,14,20;57:1,2,4,5,
7,9,15,21,23,25;58:8,
12,17,23,23;59:3,20;
60:7,8,14,23,25;61:1,6,
12,16,22;62:5,25,25;
63:3,5,9,15,18,22;64:7,
7,9,21;65:1,6,8,11,11,
16;67:1,25;68:5,14,22;
69:4,6,11,13,14,20,21,
22,24;70:2,11,14,23;
71:2,5,6,21;72:1,3,4,7,
10,13,15,16,19,23,25;
73:1,5,11,14,18,25;

74:3,7,12,20,23;75:9,
24;78:19,25;79:2,5,11,
18;80:5,24;81:5,11,16,
18,23;82:12,14;83:13;
84:2,4,7,10,12,14,15,
19;85:3,5,18;86:13,20;
87:2,14,16,24;88:1,8,
11,15,15,21,25;89:5;
90:1,5,8,22;91:1,3,7;
92:11,13,21;93:15,19;
94:2,10,12,16,18,24;
95:3,5,7,11,17,20,23;
96:1,5,9,11,12,16,18,
19,22;97:1,9,19,22,24,
25;98:13,17,22,23;
99:5,21;100:9,13,15;
101:5,6,20,23;102:1,4,
18;103:8,11,17;105:7;
106:1,16,19;107:1,5,
10,12,15,18,21;108:20;
109:2,15,19;110:10,12,
16,21,25;111:4,6,8;
115:3;116:4;117:23;
118:4,8,20;124:14;
125:16,20;128:23;
129:5,21;130:7;
131:21;132:20;133:7;
134:19,21,24;138:11,
11,22;139:14,19,24;
142:15;143:2,12;
145:3,22;146:18;
149:20,24;151:18,22;
152:15,20;153:5;
154:4,15,22;155:20,23;
156:7,9;157:4,24;
158:13;160:24;162:8,
10;163:19,20,25;164:3,
21;165:4,12,14,23;
166:1,5,23,24;167:4,
10,12,16,21,22,25;
168:3,8,13,15,16,19,
22;169:1,4,8,12,15,25;
170:1,3,11,15,20,24;
171:2,6,10,14;172:9,
12;173:9,25;174:4,8,
14;175:1,2,8,17,18,22;
176:9;177:15,19,24;
178:9,12,13,15,18;
179:7,11,23;180:5,8,
18;181:8,10,18,19,23;
182:2,3,3,7,10,12,17,
20;183:6,11,16;
184:14;185:3,25;
186:4,9,22;187:1,17,
21,23;188:1;190:2,7,
25;191:24;192:1,13,15,
22;194:9,11;213:6;
214:17;217:13;218:8;
221:7;222:16;223:9;
224:13,15;226:2;
230:1,10,19;231:11

**right-hand (1)**
139:6

**rise (4)**
85:9,12;145:6,9

**risk (4)**
169:15,17;170:9,18

**Road (13)**
26:18;27:10;28:11;
31:8,25;32:9;41:23;
42:24;86:18;139:20;
140:4;175:18;178:13

**Rockland (11)**
27:5,11;29:22;31:18;
33:22;45:13,18,19;
46:3,5;61:16

**role (4)**
112:15;196:17;
211:22;229:13

**rolled (1)**
75:4

**rolls (1)**
184:7

**ropes (1)**
203:25

**rotation (1)**
197:18

**roughly (2)**
220:17;221:5

**round (6)**
95:19;107:25;
173:19;175:17,18,19

**routine (1)**
41:15

**routinely (1)**
28:1

**row (1)**
141:16

**ruled (4)**
29:2,4,9,11

**rules (2)**
165:9;198:15

**run (5)**
135:2;207:23,24;
211:3;225:3

**running (2)**
147:17;224:9

**Rushansky (1)**
43:25

**Ryan (1)**
49:7

---

**S**

**safe (1)**
175:17

**safety (1)**
198:12

**sale (3)**
12:11,11;76:5;
133:18;217:24

**Salmi (3)**
8:6,7,10

**same (37)**
6:18;30:17;34:15;
36:2;39:23,24,25;40:1;

LYMAN-CUTLER, LLC; Case #15-13881
LYMAN-CUTLER, LLC v. KAGAN, et al.; Adv. Proc. 16-01120

June 17, 2019

57:4;58:22;59:2,8;
71:5;72:15;75:9;88:15;
99:1,4,7,17;107:17;
114:18;126:13;131:18,
20;133:12;136:16;
154:19,21;181:22;
184:5;203:1;221:4;
224:9;225:6;226:5,11
**sample (1)**
199:5
**saved (1)**
208:16
**savings (1)**
71:17
**saw (5)**
148:25;156:5;
174:15,24,25
**saying (22)**
13:24;17:2;23:7;
24:8,15;25:15;27:14;
33:7;43:15;45:18;
61:23;63:19;70:23;
75:4;79:22;80:10;
82:21;83:6;84:21;
93:21;150:13;177:4
**scan (1)**
103:11
**scanning (2)**
207:15,17
**Scenario (1)**
15:10
**schedule (1)**
8:15
**scheduled (2)**
8:13;37:6
**scheduling- (1)**
193:3
**scheme (1)**
170:22
**school (1)**
85:22
**scope (5)**
116:2;135:23;158:9,
10;171:17
**S-Corp (1)**
159:17
**screen (9)**
100:12;128:1,9;
129:5;131:1,16;
145:17;161:13;164:3
**scroll (19)**
46:16;77:25;115:5;
116:19,25;128:5;
129:25;138:10;140:18;
145:25;152:24,25;
153:13;154:24;161:19,
25;162:11;214:14;
219:2
**scrolling (1)**
138:11
**se (4)**
132:16;141:7;
142:23;147:4

**Sean (1)**
6:10
**seated (5)**
6:3;85:13;118:24;
145:10;194:13
**second (7)**
8:19;60:13;77:5,8;
146:4;147:16;185:4
**secondly (1)**
37:1;104:13
**section (9)**
26:25;27:3;29:17;
33:10,18;153:8;
172:24;173:5,10
**sections (1)**
196:3
**sector (1)**
120:13
**security (1)**
198:12
**seeing (6)**
68:24;78:20;82:20;
101:22;209:15;219:18
**seek (10)**
13:15,16;125:23;
135:12,14;157:2,16;
213:2,11,16
**seeked (1)**
134:12
**seeking (4)**
83:9;116:11;134:5;
135:19
**seeks (1)**
147:16
**seem (1)**
9:9
**seg (1)**
211:19
**sell (1)**
75:12
**selling (1)**
75:17
**sells (2)**
16:12,13
**send (8)**
20:19;21:1;43:18;
59:10,20;99:17;141:9;
151:7
**sending (3)**
20:4,17;146:20
**sense (8)**
7:11;105:19;130:4;
131:22;162:3;164:5;
186:6;193:25
**sent (15)**
20:7,20,22,24;45:18;
59:10;68:13;77:16;
81:3;97:14;214:24;
216:16,19,19;225:24
**sentence (1)**
13:1
**separate (20)**
77:21;114:12,13;

126:16,20;127:1,2,3,6;
148:25;149:1;155:16,
17;192:19;205:15,20,
24;206:15;208:23;
216:12
**separately (3)**
132:5;205:25;224:17
**September (19)**
48:11;49:16,23,24;
50:19,21;51:19;53:25;
56:14;59:8;99:8,10,11,
11,13;113:16;179:6;
181:10;228:19
**Sergeyev (1)**
164:23
**seriatim (2)**
39:8,16
**serious (1)**
221:19
**serve (1)**
120:12
**services (26)**
72:21;109:11,15;
120:6,8,11;121:17,21,
22,23;122:5,16,18,23,
24,25;123:6;129:15;
135:21;142:15,16;
148:16;156:10,16;
224:4,7
**session (3)**
6:2;85:12;145:9
**set (12)**
53:4;78:21;142:19,
20,20;148:9;168:2;
177:4;178:21;179:15;
226:18;228:7
**sets (4)**
122:14;127:1,2;
224:9
**setting (3)**
62:3,13;204:6
**settle (1)**
97:12
**seven (5)**
89:5,10,13,19,25
**seventeen (1)**
120:21
**seventeen-and-a-half (1)**
95:14
**seventh (1)**
56:4
**several (4)**
104:11;139:9;219:1;
221:10
**sewer (2)**
48:2;50:22
**SGC (3)**
182:14;183:10;186:1
**shall (4)**
27:5;29:22;31:18;
32:16
**share (5)**
66:4;109:6,19;

110:10;126:18
**shared (1)**
97:24
**shareholder (1)**
183:25
**sheet (3)**
114:4;152:5;153:4
**Shield (1)**
198:24;199:2,7,12
**shift (3)**
84:23;142:3;164:5
**shipment (1)**
114:19
**Shkolnikov (1)**
42:25
**Shlayen (1)**
41:25
**short (5)**
8:4;42:15;77:10;
80:10;216:13
**Shortly (1)**
213:6;220:22
**short-term (1)**
197:15
**show (38)**
20:9;31:5;36:8;37:1;
38:8;48:9;50:2,14;
52:24;54:22;56:16;
74:13;78:5;82:1,2;
96:8;107:5;115:25;
116:11;128:8;141:15;
143:4,8;150:21;158:6;
164:5,16;182:22;
184:6,13,15;185:11;
186:3;189:19,20;
211:4;219:23;227:9
**showed (9)**
50:11;58:9,13;
100:19;113:19;116:21;
180:17;188:11;226:4
**showing (21)**
35:7;36:5,7,9;37:1;
45:23;59:22;101:23;
117:23;142:24;146:23;
148:4;153:21;162:7;
172:24;173:5;178:16;
186:20;210:25;214:13;
220:7
**shown (6)**
96:17;162:1,19;
174:14;186:12;188:23
**shows (7)**
139:4;140:15;147:4,
5;162:22;178:15;
181:18
**Shura (2)**
117:3,4
**sic (4)**
31:10;34:21;64:19;
190:21
**side (12)**
130:20;139:11;
140:8,9,9,10,11;155:7;

164:16;192:8,12;
198:23
**sign (6)**
12:10;19:7;21:9;
27:13;41:16,18
**signal (1)**
126:4
**signature (7)**
28:16,18;41:18;52:9,
11;115:6,8
**signatures (1)**
52:14
**signed (13)**
27:19,21;36:4;56:10;
94:15;108:17,25;
109:23;111:12;112:10;
117:24,25;226:2
**significance (1)**
127:5
**significant (3)**
142:8;160:10;222:24
**signify (1)**
155:6
**signing (3)**
27:22;108:15;226:8
**signoffs (1)**
53:9
**SIM (1)**
16:12
**similar (11)**
29:11;121:8;124:11,
13;131:23;143:19,20;
152:22,23;199:10;
204:13
**similarity (1)**
124:13
**similarly (1)**
211:12
**simple (2)**
171:6;213:9
**simply (3)**
9:15;224:23;228:24
**simultaneously (2)**
223:20;224:13
**single (4)**
59:13,24;62:16;
225:15
**sit (4)**
11:11;119:17;169:6;
178:22
**site (5)**
14:9;197:16,16;
198:11;203:6
**sitting (3)**
85:20;177:7;192:10
**situations (3)**
172:21;224:17,22
**six (9)**
7:14;52:12;69:1;
89:4,10,12,19,25;
193:10
**six-month (1)**
204:24

LYMAN-CUTLER, LLC; Case #15-13881
LYMAN-CUTLER, LLC v. KAGAN, et al.; Adv. Proc. 16-01120

June 17, 2019

**size (3)**
188:3;199:1,2
**skills (1)**
196:4
**skip (1)**
130:13
**skipping (1)**
13:19
**slot (1)**
7:25
**slug (1)**
57:12
**small (10)**
120:15;142:8;
143:19;172:2;188:20;
200:10;201:8,16;
213:13;227:7
**smaller (1)**
201:14
**snapshot (3)**
160:13;180:25;220:6
**so-called (1)**
49:2
**soft (1)**
30:9
**software (4)**
131:23,23;132:15;
222:4
**sold (4)**
96:16,18;159:9;
160:18
**sole (2)**
72:9,16
**somebody (8)**
10:18;11:7;12:22;
67:8;101:24;102:11,
13;135:12
**somehow (1)**
62:8
**someone (1)**
42:25
**something's (1)**
178:20
**sometime (1)**
57:20
**sometimes (4)**
140:14;160:16;
168:9;174:16
**somewhat (2)**
94:20;190:4
**somewhere (8)**
87:10;89:20;93:17;
121:15;134:16;140:11;
182:8;192:21
**sophisticated (1)**
132:16
**sorry (21)**
10:24;15:22;33:11;
47:7;54:11;55:12;70:4,
19;100:18;114:14;
118:10;171:24;182:1;
186:1;206:8;207:11;
211:8;214:16;217:25;

221:14;229:19
**sort (8)**
6:21;7:12,24;9:7;
10:11;96:9;167:2;
230:4
**sound (2)**
95:20;169:24
**Sounds (1)**
26:12;170:1;182:11
**source (1)**
165:9
**speak (4)**
13:23;201:1,2;
212:15
**SPEAKER (1)**
99:20
**speaking (6)**
88:21,22;133:12;
204:18,19;213:1
**specific (5)**
146:15;147:18;
167:8;195:25;202:19
**specifically (2)**
38:14;150:18
**specifications (1)**
74:3
**specifics (1)**
134:4
**speed (1)**
201:24
**spell (1)**
119:4
**spelling (1)**
227:6
**spend (9)**
59:22;63:7;74:15,19,
25;75:5,6;78:18;
120:16
**spent (1)**
136:5
**spin (1)**
179:2
**spit (1)**
220:14
**split (5)**
130:17;140:5,7;
222:17;225:2
**splitting (1)**
227:1
**spoke (2)**
13:20;83:16
**spoken (1)**
10:8
**spot (1)**
132:22
**spreadsheet (1)**
213:8
**square (1)**
83:23
**stab (1)**
220:11
**staff (1)**
120:24

**stage (1)**
221:4
**stand (1)**
220:1
**standard (5)**
32:3;44:16;142:2;
151:6;197:14
**standards (8)**
125:3;127:8,14;
165:4,10;169:3;
171:12;196:1
**standpoint (2)**
184:2;185:14
**stands (2)**
164:22;219:17
**stapled (1)**
206:20
**start (15)**
7:11;10:6;27:23,23;
64:9;66:18;102:7;
167:11;173:1;200:14;
208:3;213:19;217:22;
218:20;224:2
**started (25)**
9:25;19:5;38:23;
74:13;98:2;102:8;
120:3;200:16,18;
204:11;206:23;207:20;
208:4;211:16;213:4,6,
7,8;215:21,22;217:16;
218:1,6,15;225:17
**starting (5)**
73:17;79:8;139:3;
144:25;200:22
**starts (5)**
90:13;139:5;181:24;
226:14,16
**stash (2)**
163:4,5
**state (5)**
6:8;108:15;119:4;
190:14;194:18
**stated (1)**
148:7
**statement (10)**
110:8;115:22;
132:17;142:22;152:7;
153:9;158:3;173:6;
206:1;222:15
**statements (21)**
120:10;133:1;167:3;
168:16,22;190:12,15,
17;205:13,17,18,20,23;
216:13,16,22;217:2,5;
222:2;223:14;228:6
**stationary (2)**
61:4,19
**stay (3)**
8:22;23:24;187:20
**Steeves (1)**
185:4
**step (3)**
115:23;207:17;210:2

**stick (2)**
23:1;76:22
**stickers (1)**
41:18
**sticking (1)**
25:4
**still (10)**
14:22;17:4;162:23;
164:2;210:6;213:4;
219:20;220:17;228:16,
18
**stopped (2)**
33:11;204:11
**story (1)**
82:3
**straight (5)**
72:12,18;95:22;96:1,
2
**strategies (1)**
160:6
**strayed (1)**
23:22
**streamlined (1)**
208:8
**street (2)**
12:9;41:1
**strictly (1)**
102:14
**Strike (8)**
112:19;113:3;
124:20;126:1;133:8;
146:5;161:21;215:18
**structure (2)**
118:7;174:21
**struggling (1)**
11:9
**studied (1)**
110:3
**stuff (3)**
99:7,12;227:9
**sub (1)**
93:24
**subcontractor (11)**
89:4,18;93:24;111:2;
206:13,18;209:21,25;
210:3;219:19;227:7
**subcontractors (20)**
7:14;47:4;57:4;
71:25;72:22;88:9;97:3,
5,8;108:6;110:22;
111:15;192:2;193:10;
202:6;203:5;206:11;
207:2;224:16;225:5
**subdivided (1)**
124:9
**subdivision (1)**
21:21
**subdivisions (1)**
198:7
**Subfolders (2)**
206:2;208:14
**submit (2)**
22:5,7

**submitted (6)**
22:13;51:12,15;79:1;
113:20;228:25
**subpoena (1)**
36:19
**subs (10)**
7:16,17;49:11;50:23;
56:24;69:20;96:12;
114:12;135:21;230:7
**subsequent (1)**
159:2
**substance (4)**
85:4;152:1;154:8;
230:24
**substantive (2)**
146:4;149:12
**suddenly (1)**
62:9
**sufficient (3)**
84:4;125:25;213:22
**sufficiently (2)**
110:4;126:4
**suggest (1)**
59:12
**suggesting (3)**
16:25;38:2;78:16
**suit (2)**
115:1;116:1
**sum (1)**
224:23
**summaries (2)**
188:24;216:25
**summarized (1)**
134:2
**summary (10)**
133:5;152:3,4;
153:10;177:19;180:5;
181:7;189:14;190:4;
197:3
**summation (1)**
7:19
**summer (4)**
85:23;86:6;222:25;
228:21
**summer-to-summer (1)**
197:11
**Superior (1)**
109:1
**supervise (1)**
73:1
**supervised (1)**
73:3
**support (3)**
168:5;228:23;229:16
**supporting (2)**
220:20;221:20
**supposed (2)**
45:2;114:17
**sure (40)**
7:7;31:10;48:15;
75:7;78:7;125:12;
130:7;133:4;138:1,15;
142:19,22,23;143:10,

Case 16-01120   Doc 354   Filed 06/21/19   Entered 06/21/19 17:57:25   Desc Main
LYMAN-CUTLER, LLC; Case #15-13881 Document    Page 255 of 259
LYMAN-CUTLER, LLC v. KAGAN, et al.; Adv. Proc. 16-01120

June 17, 2019

23;145:2;147:3,6;
148:19;159:12;163:5;
176:2;187:8;191:23;
197:6;198:17;211:9;
212:20;220:5;222:16,
18,21;225:8;227:1;
228:1;229:19,25;
230:23;231:1,7

**surely (1)**
67:18

**surprise (2)**
198:10,10

**Susie (1)**
185:4

**suspect (2)**
7:4,17

**swore (3)**
86:18;87:1;109:17

**SWORN (3)**
9:23;118:23;194:12

**system (4)**
130:8;132:7;133:14;
140:17

---

## T

**tab (3)**
82:5;138:9;161:13

**table (1)**
85:20

**tackle (1)**
124:12

**tactics (1)**
198:12

**talk (19)**
24:19;42:11,12;
45:16;47:2;48:8;57:9;
65:14;66:7;71:15;85:3;
89:2;127:9;130:5;
149:11;150:3;151:25;
166:15;214:6

**talked (8)**
14:25;106:24;
148:21;173:24,24;
175:4,6;189:7

**talking (14)**
18:1;20:13;61:8;
73:6,7;82:20;107:7,8;
132:25;133:1;155:11;
167:16;186:17;191:22

**talks (3)**
80:20,21;219:5

**tally (1)**
94:6

**TAMPOSI (2)**
6:12,13

**task (1)**
204:15

**Tatiana (8)**
6:15;41:24;66:23;
67:18;72:9;96:1;182:6;
183:20

**tax (46)**

81:14;120:9,9;
121:22,22;122:2,3,6,
16,18,21;123:6;124:15,
17,22;125:2,19;126:3,
8,13,16,23;138:6;
148:5;149:15,16;
150:17,18,19;156:2;
158:19,20;159:24;
161:9;165:13,25;
168:24;175:1;182:11,
22;183:1;184:2;
185:14;187:6;189:19,
20

**taxable (2)**
159:18;184:9

**taxation (1)**
166:3

**taxes (4)**
177:8;183:25;
189:23;209:7

**taxpayer (1)**
192:15

**taxpayers (1)**
173:25

**tax-planning (1)**
160:5

**teach (1)**
203:16

**team (2)**
198:8;214:20

**telecom (3)**
16:11;76:17,18

**telling (4)**
76:19;77:4;130:19;
141:20

**template (13)**
15:24;19:14,22;20:4,
7,9,11,12,12,13;79:23;
83:10,10

**ten (5)**
90:8,17;120:14;
220:16;221:5

**tend (1)**
38:19

**term (4)**
132:12;133:10,11;
143:22

**terms (10)**
7:13;40:1;112:9,22;
178:20,21;211:16;
218:16;221:23;225:7

**terribly (1)**
229:18

**test (2)**
197:21;202:2

**tested (1)**
222:3

**testified (18)**
10:6,9;13:9;18:24;
25:2;30:25;32:2;36:9;
37:24;47:21;57:19;
69:19;88:20;96:7,14;
148:8;175:15;196:9

**testifies (1)**
55:4

**testify (3)**
7:6;21:14;25:2

**testifying (2)**
49:5;61:22

**testimony (36)**
7:20;10:8;12:18;
16:22;17:22;18:6,9,13,
24;19:11;21:19;25:18;
28:1;30:12,16;37:14;
44:21;45:1;49:7,10;
65:15;70:25;71:16;
73:16;74:20;76:14;
85:4,4;110:5;122:13;
148:8;159:22;174:12;
225:24;230:22,25

**testing (7)**
197:1;198:11,14,
14;199:3,5,5

**tests (1)**
121:9

**thanks (1)**
184:21

**that'll (4)**
7:2,7,20;11:17

**theoretically (1)**
192:21

**theory (2)**
37:14;38:21

**thereafter (1)**
213:6

**there'd (1)**
211:1

**therefore (1)**
160:23

**thinking (2)**
9:6;49:1

**third (8)**
18:7;40:12;42:4;
51:23,25;99:13;
115:22;204:8

**third-party (1)**
168:11

**thirty (4)**
16:6;26:11;76:19;
178:18

**thirty-five (1)**
130:25

**thirty-five- (1)**
131:5

**Thirty-two (1)**
194:25

**though (7)**
38:17;39:5;54:2;
130:22;141:6;176:3;
211:15

**thought (4)**
6:22;24:13;123:16;
228:8

**thoughts (1)**
118:11

**thousand (3)**

162:6;163:6,8

**three (17)**
14:11;23:18;74:25;
105:19,22;159:3,8;
162:6;166:20,22;
167:14;198:20;199:17,
18;201:21;204:6;218:5

**three-and-a-quarter (1)**
176:20

**throughout (5)**
37:13;123:4;141:6;
160:5;213:10

**thumb (2)**
220:23;221:3

**tie (5)**
146:23;147:9,23;
155:12;158:2

**tied (3)**
157:23,25;191:8

**ties (2)**
219:12;222:1

**till (1)**
145:5

**time- (1)**
222:24

**timeline (1)**
221:7

**times (14)**
29:3;45:14,16;67:2;
71:16;107:18,24;
132:12;143:22;165:25;
213:7;219:1;227:10,18

**title (7)**
84:14;128:6,12;
129:10;156:21;200:5;
213:13

**today (11)**
8:18,20;9:1;93:17;
120:4;167:16;169:6;
174:13;193:9,19;
230:16

**together (9)**
22:17;76:18;80:9;
89:1;97:10;183:25;
200:13;206:20;228:6

**told (15)**
14:17;17:7,14;26:2;
47:8;57:24;85:25;
88:23;89:4;90:7,21,23;
156:1;168:19;190:21

**tomorrow (12)**
7:12,14,24;8:18;9:2,
4,5;193:9;230:4,10,13;
231:5

**ton (1)**
227:5

**took (9)**
23:22;28:3;174:2;
177:10,12;202:12;
209:16;219:23,24

**top (18)**
13:9;34:21;77:6;
82:14,23,25;113:13;

128:5,6;129:7,10;
131:1,16;149:5;153:4,
14;161:13;162:11

**topic (4)**
84:23;122:20;
229:18,20

**topics (1)**
142:3

**total (19)**
86:19;87:2;103:6;
114:6,7,22;118:3;
181:24;186:21,23;
187:1,20,22,23;209:13;
210:11;219:6;225:9,11

**totaled (1)**
137:7

**total-income (1)**
188:20

**totaling (1)**
188:12

**totally (7)**
25:24;135:18,20;
136:7,7;137:11;188:4

**totals (1)**
229:16

**touch (1)**
65:3

**touched (4)**
94:8;143:2;218:4;
223:23

**toward (1)**
38:19

**towards (1)**
153:14

**town (7)**
21:21;51:12;55:25;
87:12;113:20,22;114:9

**trace (1)**
134:14

**track (13)**
127:16,20;132:7;
136:4,11,15;147:13,13;
163:20,21;192:3,5;
225:9

**tracked (1)**
142:10

**tracking (10)**
133:1;155:17;164:1;
191:23;193:15,17;
205:2;217:11,23;218:8

**tracks (2)**
130:5;139:7

**trades (1)**
143:20

**trail (5)**
149:2;211:3;226:12,
23;227:9

**trained (1)**
222:6

**transact (1)**
158:15

**transaction (12)**
125:16,17;130:12,

16;134:19;137:2;
144:6;158:6;171:13,
20;192:19;222:20
**transactions (29)**
125:13;127:12;
132:6;133:5;135:9;
137:7;139:9;142:5,7,
19;149:16;152:3;
157:24;158:9,12,12;
159:7;170:25;171:10,
13,14;191:3,7,11;
196:4;198:13;211:4;
218:7;219:21
**transcript (4)**
12:25;13:8;89:16;
91:9
**transfer (2)**
130:10,22
**transferred (1)**
143:13
**transfers (5)**
46:1;142:13,17;
143:3,15
**transitioned (1)**
196:17
**traveling (1)**
203:13
**tremendously (1)**
95:10
**trial (14)**
6:5,6;13:9;15:3;
152:2;154:9;161:16;
176:5,9;187:4,5,14;
194:1;219:1
**tried (2)**
223:5,20
**trim (1)**
73:21
**true (6)**
43:20;45:5;46:18;
58:5;161:3;184:5
**true-up (1)**
141:5
**Trust (6)**
27:5,11;29:22;31:18;
33:22;61:16
**truth (2)**
45:11;116:8
**try (10)**
23:24;64:16;93:3;
94:20;97:11;107:4;
144:16,25;220:3;225:2
**trying (8)**
59:16;105:2;144:24;
147:3;148:19;171:4;
219:16;220:11
**Tuesday (3)**
8:5;193:14,21
**Tuesday's (1)**
8:7
**turn (3)**
82:5;98:10;170:2
**turned (1)**

174:8
**turns (2)**
48:5;85:24
**twenty (3)**
7:17;26:10;101:12
**twenty-five (1)**
16:5
**twenty-three (1)**
66:18
**twice (3)**
99:18;132:23;212:14
**two (46)**
16:8;37:12;53:17;
55:13;61:2;62:25;63:2,
8;65:25;77:25;81:13;
82:2;96:5;98:25;
101:25;107:18;140:14;
142:16;143:10;144:19;
170:3,5;189:15,17;
193:21;197:15;201:20;
203:12;209:17,19;
210:5,7;218:4,19;
219:22,23;222:17;
223:17,19;224:6,9,13,
16,19;225:3;227:1
**two-thirds (2)**
164:7;185:9
**tying (2)**
191:3,10
**type (18)**
121:23,25;123:3;
128:15;129:14;130:4,
7,7,15;148:3,14;
157:10;175:19;188:17,
18,18,18;201:14
**types (3)**
120:6,12;122:25
**typical (3)**
120:7;143:17;150:21
**typically (4)**
120:13;132:23;
142:6;189:23

---

## U

**Um (1)**
141:22
**umbrella (1)**
71:18
**Um-hum (4)**
53:10;99:22;205:19;
222:12
**unbilled (3)**
157:15,21;189:8
**uncommon (1)**
172:1
**under (16)**
71:18;86:19;109:17;
114:2;115:20;117:25;
148:22;150:14;159:5,
5,8;160:2,21;169:3;
225:5,6
**underestimate (1)**

37:15
**undergraduate (1)**
121:6
**understood (12)**
18:23;21:19;27:19;
36:4;37:13,17;45:1;
84:18;165:12;182:23;
224:15;231:4
**undertake (1)**
125:1;221:11
**undertaking (1)**
225:1
**UNIDENTIFIED (1)**
99:20
**unintentional (1)**
170:16
**unique (1)**
39:21
**University (3)**
121:7;195:7,11
**Unless (1)**
192:4
**unlikely (1)**
193:8
**Unofficially (1)**
200:16
**unpaid (1)**
192:1
**unreal (1)**
83:23
**unreimbursed (1)**
94:10
**unrelated (1)**
227:4
**untruthfully (1)**
36:9
**unusual (1)**
137:13
**up (105)**
6:22;8:17;11:9;
15:10;21:8;29:18;
37:15;38:21,23;39:5;
48:5;50:12,14;55:21;
57:11;60:14,22;67:15;
70:7,21;74:14,16;
75:19;76:14;77:5,20;
78:25;80:3;81:23;83:8;
94:20;95:19;96:8;
105:4;107:24;111:3;
115:4,5;116:17;
122:14;124:10;127:22;
128:1,5;129:2,5;
130:16;131:11;136:2,
3;137:7;138:4,8;
140:15;143:4,8;144:9,
17;145:1,13,17;149:3;
150:21;151:9,19;
153:13;154:1;158:6;
159:18;161:14;164:2;
165:23;170:2;174:8,
12,14;176:15;177:4,6;
178:16,21;179:2,15;
184:7;186:8,23;

188:12;189:19,20;
193:21;201:24;204:6,
15,17,24;206:18;
209:7;213:20;214:10;
217:22;218:20,22;
220:11;224:2;227:9
**updating (1)**
211:17
**upgrade (1)**
73:25
**upgraded (2)**
73:17,22
**upgrades (1)**
74:8
**upload (1)**
146:17
**upon (6)**
22:23;161:3;178:20;
201:13;203:20;215:7
**upper (2)**
57:12;61:2
**use (21)**
27:14;30:10;36:15;
38:12,12;54:17;57:5;
58:7;61:6,8;63:9;
127:13;131:22,24;
134:22;142:10;186:11,
14;194:1;203:16,21
**used (16)**
32:3;57:4;61:23,25;
62:1;63:13,16,21;90:5;
130:14;133:10;136:18;
143:22;175:20;201:21;
206:12
**useful (2)**
172:5;210:10
**user (1)**
170:15
**users (1)**
169:24
**uses (3)**
62:17,21;137:12
**using (11)**
24:7;39:9;57:25;
58:2,5;63:17,19;64:9;
158:17;213:8;228:20
**usually (9)**
27:23;41:17,18;
52:11,13;59:10,11;
70:22;161:3
**utilized (1)**
156:16

---

## V

**V&D (3)**
164:19,21,22
**vacation (2)**
8:7;193:13
**Vadim (14)**
6:15;9:23;148:10;
156:10;159:4,11;
183:20;200:15;202:6;

207:23,24;211:23;
213:5;217:22
vadim@kagandevelopmentcom (5)
62:10,17,22;64:21,
25
vadimkagan@yahoocom (2)
63:5;81:24
**Vadim's (1)**
159:16
**variance (1)**
181:25
**various (2)**
146:14;155:11
**vehicle (2)**
163:4,5
**vendor (8)**
130:15;206:13,14,
15;209:20;223:5;
227:6,25
**vendors (2)**
206:11;225:5
**Verbal (1)**
57:3
**verification (3)**
115:6,9;225:21
**verified (2)**
56:24;220:18
**verify (5)**
48:8;190:18;221:25;
222:13;227:12
**version (2)**
61:3,3
**versions (1)**
61:2
**versus (3)**
147:21;184:6;201:20
**viable (2)**
163:4,5
**vice (1)**
120:19
**Viktor (1)**
164:23
**virtually (2)**
9:2;212:18
**visits (2)**
198:10,10
**vivid (1)**
204:5
**VK (1)**
28:13
**voice (2)**
11:9,17
**Von (3)**
8:6,7,10

---

## W

**wait (3)**
83:4;160:9;206:14
**walk (2)**
45:10;222:9
**walls (1)**
73:20

**wants (4)**
39:17;54:21;193:6,
18
**warns (1)**
170:9
**waste (1)**
105:5
**wasteful (1)**
9:9
**water (2)**
48:2;50:22
**Water/sewer (1)**
47:12
**way (34)**
6:20;11:17;18:7;
30:17;52:16;64:11,11;
86:7;129:25;134:6;
136:11;138:2,21;
141:25;143:14,20;
147:16;161:19,25;
174:18;181:23;182:1;
185:9;188:21;191:23;
192:5;207:3,6;209:1;
221:17,22,24;222:21;
225:1
**ways (3)**
147:13;170:3,5
**wear (1)**
200:10
**website (1)**
61:4
**week (8)**
8:18;141:9;193:19;
197:15;213:19,19;
226:16;231:5
**weeks (5)**
63:25;70:24;71:12;
101:25;197:15
**week's (1)**
198:11
**Wellesley (4)**
32:16;33:1,2,8
**weren't (6)**
45:2;58:5;176:1;
196:23;208:15;216:19
**wet (1)**
201:2
**What'd (1)**
42:12
**Whatever's (2)**
105:14;193:24
**whatnot (1)**
192:18
**what's (30)**
20:12;35:21;38:20;
39:9;49:25;54:8;57:18;
74:10;75:2;77:3;
100:17,17;103:16;
110:17;115:19;139:23;
146:11;147:11;148:11;
150:4;160:13;161:1,8;
162:17,17;166:4;
172:17;189:13;197:19;

200:1
**Whenever (5)**
85:14;117:15;
145:11;219:23;230:5
**Where'd (2)**
198:1;199:9
**Where's (1)**
82:9
**whole (7)**
37:12;38:21;59:14;
82:6,12;110:14;138:21
**Whoops (1)**
214:15
**Who's (3)**
66:8;145:19;193:10
**wife (13)**
33:15;41:24;45:12;
66:22;72:9,16;96:1;
107:1;108:13;183:24;
184:4;199:22;214:23
**willing (4)**
14:22;19:7;21:8;
52:7
**wiring (1)**
118:7
**wise (1)**
193:4
**within (17)**
66:18;91:2,6,13;
92:10;101:12;104:18;
108:8;178:18;198:8;
204:23,24;205:25;
206:19;222:17,18;
224:9
**without (7)**
34:4;48:10;104:21;
107:5;125:7;162:24;
221:22
**WITNESS (26)**
11:15,19;13:3;37:2;
38:8;50:8,9;85:6,8;
104:24;108:22;119:12,
14,19;138:25;139:2;
184:19,21;187:10;
193:7,12;230:23;
231:1,4,7,9
**woman (2)**
61:16;85:20
**word (1)**
146:7
**words (5)**
85:7;141:23;185:17;
213:21;221:5
**work (36)**
7:18;47:22;48:5,11;
71:13,22,23;72:22;
86:5;87:24;90:5;114:5,
19;119:7,22;121:2;
133:25;137:4,9,16;
151:11;156:24;165:3;
167:7;177:15;179:4;
180:2;181:5;189:1;
197:4;201:10;203:6;

210:1;211:24;219:16;
224:24
**worked (9)**
86:7;89:24;168:1;
169:14;198:4,7,7,23;
201:8
**working (23)**
27:11;61:25;70:7;
87:23;89:4;124:1;
142:10;143:21,24;
144:1;174:19;196:8,
16;197:10;200:18,19;
201:16;203:3,10;
204:5;214:8;221:17;
224:16
**works (3)**
134:7;189:2;202:9
**worried (1)**
105:16
**wrap (1)**
221:21
**wrapping (1)**
225:7
**write (1)**
147:19
**writes (1)**
147:22
**writing (1)**
77:20
**written (3)**
74:2,5,12
**wrong (8)**
18:25;64:14,18;
175:11;180:20;191:24;
211:12;222:8
**wrote (5)**
64:18;68:21;69:23;
87:10;97:18

---

## Y

**Yarmouth (1)**
32:9
**year (46)**
63:12;84:21;85:22;
91:11,11;123:4,6;
128:13;131:8;132:9;
135:2;136:22;137:25;
138:6;140:24;141:2,5,
6,12,14,15;149:14;
150:21;151:14,15,16;
152:3;153:11;154:9;
160:5,16,18;161:9;
162:7;174:3;183:21;
187:6;190:18;197:6,7,
24;199:10;207:4;
209:7;216:14;218:17
**yearend (1)**
209:8
**year-end (1)**
142:18
**years (23)**
26:8;27:12;51:3;

57:7;69:1,1;83:9;89:5,
10,13,19,25;90:8,17;
120:21;135:2;162:6;
163:7,8;196:16;
198:20;202:22;212:14
**years' (1)**
76:19
**Yep (6)**
205:12;215:16;
216:3;223:15,18;
227:23
**young (1)**
85:19
**Yup (1)**
26:3
**Yuriy (1)**
32:8

---

## Z

**ZH (1)**
77:17
**Zhukovskiy (20)**
16:24;19:14,22;20:4,
7,16;23:6,8,10;33:15;
76:18;77:15;78:21,22;
79:2,20;80:21;83:11;
84:6;117:6
**Zhukovskiy's (2)**
16:20;79:25
**Zoom (1)**
139:1

---

## 1

**1 (27)**
8:20;21;46:24,25;
49:16,20,24;50:6,6,19;
51:5,19,24;53:25;
56:14,19;80:18;87:1;
97:10;100:13;106:18,
21;131:1;144:25;
178:18;180:7,17
**1.3 (25)**
17:1,5,6,11;23:20;
24:13,17;75:25;76:4;
78:23;79:4,10,11;80:2,
5,17,18,19;83:10,19,
22,23,24;103:5,10
**1.5 (13)**
18:4;23:20,23;24:19,
21;74:16;75:10;79:9,
12;80:15,15;83:7;
103:6
**1.550 (3)**
15:23;18:4;24:19
**1.6 (40)**
15:21,24;17:3,4,24;
18:2;22:21,22;73:11;
74:16;75:10;76:12,22;
77:9;78:23,25;79:1,3;
80:3,4,4,7,17,23;81:15,
18,20;82:13,22,24,25;

83:1,5,6,8,11,12,13,14,
16
**1.65 (4)**
77:11;80:11,14,14
**1/1/15 (1)**
176:21
**1/1/2015 (1)**
176:17
**1:30 (1)**
145:1
**1:44 (1)**
145:8
**1:58 (1)**
98:12
**10 (7)**
12:8;14:9;28:11;
29:20;30:1;109:9,13
**10,000 (1)**
219:19
**10/1/2013 (1)**
47:15
**10:17 (1)**
100:8
**100 (1)**
87:11
**100- (1)**
80:2
**100,00 (1)**
176:17
**100,000 (8)**
25:6,7,12,14;76:25;
79:25;80:1;91:15
**1004 (1)**
162:14
**101 (1)**
87:11
**103 (1)**
131:15
**104 (1)**
34:24
**108 (2)**
31:6,8
**11 (1)**
84:25
**11:04 (1)**
85:10
**11:25 (1)**
85:11
**111 (3)**
28:5,21;29:15
**119 (1)**
32:6
**11th (1)**
103:3
**12 (1)**
89:17
**12/14 (1)**
177:1
**12/31/2014 (2)**
175:21;176:21
**12/31/2015 (1)**
164:14
**12:51 (1)**

Case 16-01120    Doc 354    Filed 06/21/19    Entered 06/21/19 17:57:25    Desc Main
Document      Page 258 of 259
LYMAN-CUTLER, LLC; Case #15-13881
LYMAN-CUTLER, LLC v. KAGAN, et al.; Adv. Proc. 16-01120

June 17, 2019

145:7
**1213 (1)**
98:11
**1276 (1)**
65:8
**128 (1)**
26:16
**13 (1)**
32:9
**131 (3)**
183:8,13,17
**1342 (1)**
175:13
**136 (4)**
187:5,5,15,18
**137 (4)**
182:13,25;183:3,7
**1373 (1)**
176:14
**13th (4)**
22:25;68:22,25;
97:18
**14 (1)**
202:23
**143 (7)**
34:25;127:23;128:2,
21,23,24;131:12
**145,000 (2)**
95:17;111:6
**148 (8)**
129:3,6,19,22,24;
138:9,13;175:11
**149 (3)**
176:6,10,13
**14th (4)**
98:2,11;103:3,18
**15 (9)**
64:12;65:14;100:13;
178:3,5,6,21;202:23,23
**15,000 (2)**
164:13,13
**150 (1)**
162:24
**150,592.55 (1)**
162:2
**15-13881 (1)**
6:6
**15th (2)**
71:16;179:6
**16 (1)**
178:3
**16,000 (2)**
78:3;80:10
**16-1120 (1)**
6:4
**164,673.91 (1)**
180:18
**167 (1)**
6:7
**17 (1)**
139:20
**1721 (1)**
182:14

**175 (1)**
182:3
**18 (1)**
53:11
**1st (3)**
86:18;180:21;181:1

─────────

**2**

─────────

**2 (6)**
23:21;52:4,17;99:11;
103:5;107:24
**2- (1)**
74:19
**20 (3)**
19:21;53:14;140:16
**200 (1)**
76:5
**200- (1)**
79:11
**200,000 (3)**
24:14,17;80:9
**2003 (1)**
121:15
**2008 (3)**
90:22,23;195:7
**2011 (2)**
35:12;89:20
**2011/2012 (1)**
90:25
**2012 (25)**
15:20;17:5,14;18:24;
19:21;26:20;28:8;
31:10;33:14;41:2,23;
42:24;43:23;89:12,20;
90:2,4,20,23;91:4;
102:3;112:21,24;
195:21;198:20
**2013 (40)**
18:2;24:13,16;48:12;
49:16;50:6;51:20;52:4;
53:12,14,21,24,25;
56:10,14,20;58:3,6,14,
22;59:2,8,13,24;60:18;
62:9;75:22;103:4;
104:8;109:24;113:16;
116:22;118:1;123:10;
182:10,16,20;183:1,11;
202:23
**2014 (35)**
32:18;57:20,21;65:7,
11;67:3;86:18;87:1;
123:10;128:14;129:13;
131:8,15;138:14;
140:21;158:21,22,23;
162:4;176:24;179:10;
180:5,22,25;182:5;
183:20;184:14;185:11;
188:25;199:22;200:15,
17;202:22;215:4;
218:13
**2015 (61)**
38:23;63:17;64:10,

19,19;68:14;70:11;
71:6;96:18;97:1,14,18;
98:11;99:1,8,10,13;
100:8,16;101:6;102:4;
103:3,18;106:12,18,22;
107:21;108:16,25;
109:17;151:14;154:10;
158:21,24;161:23;
162:7;176:1,7;177:11,
19;178:18;180:7,17,
21;181:1,8;184:12;
185:8;186:22,25;
187:6;188:25;217:18;
218:1,11,25;220:9,22;
225:18,22;228:15
**2016 (3)**
162:4;179:6;181:10
**2017 (1)**
92:9
**2018 (10)**
89:3,16,25;91:6,7,10,
11;93:17;94:1;153:17
**2021 (1)**
155:2
**21 (1)**
62:9
**215 (4)**
60:2,3,5;64:24
**216 (1)**
58:10
**22 (3)**
97:10;99:8,10
**223 (1)**
59:6
**225 (1)**
155:8
**22nd (3)**
99:1,6;118:1
**23 (6)**
50:21;53:21,24;
56:10;90:13;115:8
**231 (1)**
58:20
**235 (1)**
58:25
**239 (2)**
65:4,6
**23rd (1)**
20:16
**24 (1)**
226:17
**240 (2)**
172:24;173:5
**240A49 (1)**
173:10
**24th (2)**
109:24;226:20
**25 (3)**
17:14;106:12;225:9
**25,000 (2)**
225:10,10
**251,000 (1)**
69:16

**253 (3)**
214:11,13,19
**254 (1)**
115:21
**25th (4)**
70:11,18;71:6;
226:17
**26 (5)**
23:2,4;51:20;184:12;
185:8
**260,000's (1)**
164:25
**27 (2)**
22:15;81:1
**28,697 (1)**
47:14
**281 (3)**
115:4;116:16;139:5
**288 (4)**
144:9;145:13,18;
156:5
**28th (2)**
226:19,20
**2903 (1)**
59:9
**29th (2)**
181:10;226:20

─────────

**3**

─────────

**3 (18)**
15:9;26:25;29:17;
31:13;32:11;33:10,18;
39:2;41:5;43:2;44:4;
46:9,11,23;55:21;
77:11;80:15;109:7
**3.2 (1)**
187:25
**3.3 (1)**
80:14
**3:30 (2)**
9:4,5
**3:30-ish (1)**
230:14
**3:48 (1)**
231:13
**30 (5)**
32:18;59:8;71:2;
89:17;178:21
**30,000 (2)**
74:14;219:20
**300- (1)**
80:1
**300,000 (7)**
74:19;78:18,24;79:4;
80:3,14,16
**304 (10)**
149:4,25;150:5,6,10;
151:2;175:11;185:18;
186:17,21
**305 (5)**
151:20;152:12,15,
16;161:12

**306 (4)**
154:2,13,16;164:11
**30th (1)**
176:7
**31 (9)**
67:3;75:18;78:10,11;
91:10;116:18;177:19;
180:5;181:8
**31st (8)**
67:21;140:2,21;
160:16;176:3;180:22,
24,25
**32 (10)**
81:5,6,11;82:5,7,9,
10;83:25;84:1;116:24
**325 (1)**
176:25
**325,000 (3)**
176:25;177:5;178:12
**326 (9)**
49:4;50:14,17;51:20;
52:8;56:14;107:3,4,11
**327 (2)**
107:3,14
**328 (1)**
70:8
**329 (7)**
50:3;56:17,20;107:3
**330 (1)**
71:3
**330- (1)**
111:21
**331 (7)**
39:7,13,13,15;40:4,7,
9
**332 (5)**
55:7,9,11,19;85:16
**333 (4)**
87:18,19,20;117:21
**334 (2)**
106:2,5
**335 (3)**
39:13;106:3,6
**336 (2)**
106:4,7
**337 (3)**
111:24,25;112:1
**34 (2)**
90:13,21
**35 (3)**
90:12,21;131:1
**37 (1)**
103:25
**37,000 (1)**
47:10
**38 (1)**
92:24
**3rd (7)**
89:3,16;91:10;100:7,
8,15;101:6

─────────

**4**

─────────

Case 16-01120   Doc 354   Filed 06/21/19   Entered 06/21/19 17:57:25   Desc Main
LYMAN-CUTLER, LLC; Case #15-13881 Document   Page 259 of 259
LYMAN-CUTLER, LLC v. KAGAN, et al.; Adv. Proc. 16-01120

June 17, 2019

**4 (2)**
 79:12;194:5
**4.1 (13)**
 26:25;27:3;29:17;
 31:14;32:12;33:10,19;
 39:3;40:13;41:6;42:5;
 43:2;44:5
**4.9 (1)**
 76:5
**4/26/13 (1)**
 51:15
**4:20 (1)**
 8:25
**4:30 (1)**
 8:25
**40 (2)**
 34:21;40:15
**40- (1)**
 118:7
**40,000 (1)**
 140:16
**418- (1)**
 107:24
**418,150 (1)**
 107:15
**425,000 (2)**
 177:1,5
**43 (2)**
 45:8,10
**43,7- (1)**
 107:24
**43,700 (2)**
 107:4,12
**46 (2)**
 13:8,9
**4th (1)**
 75:22

---

**5**

**5 (1)**
 92:25
**5.1 (1)**
 75:12
**5.6 (1)**
 75:12
**50 (6)**
 32:9;68:9,11;88:20;
 94:6;218:23
**50- (2)**
 74:15;118:7
**5–0 (1)**
 218:23
**50,000 (6)**
 69:14;94:12;108:8;
 210:2;219:23;225:9
**500,000 (1)**
 91:17
**532 (1)**
 162:25
**532,763.41 (1)**
 162:18
**54 (3)**

 68:16,19;97:15
**55 (9)**
 47:19;53:6,15,16,18;
 86:18;224:8;225:5,10
**560,000 (1)**
 95:11
**560,000-dollar (1)**
 109:24
**560,838 (1)**
 95:10
**59,000 (1)**
 111:4
**59,000-two-something (1)**
 95:4
**5th (2)**
 226:20,20

---

**6**

**6.1b6 (1)**
 67:14
**60 (1)**
 178:21
**610-1276 (1)**
 60:15
**617- (1)**
 58:16
**617-610- (1)**
 65:7
**617-610-1276 (1)**
 59:14
**617-828- (1)**
 59:8
**617-828-2903 (2)**
 58:23;60:23
**62 (1)**
 18:7
**67 (3)**
 64:16;94:18;106:8
**679 (1)**
 186:1
**68 (1)**
 64:5
**680,000 (1)**
 187:1
**6th (1)**
 226:20

---

**7**

**7 (4)**
 19:18;138:10,13;
 221:7
**7/1 (1)**
 178:3
**7/1/15 (1)**
 178:6
**70s (1)**
 120:3
**73 (1)**
 34:22
**730- (1)**
 118:6

**758,025.56 (1)**
 219:6
**77 (5)**
 10:16;12:12;51:13;
 103:12;107:11
**78,045.14 (1)**
 181:24
**790,000 (1)**
 95:20
**7th (12)**
 68:14;69:4,10;88:19;
 94:9;96:8,8;97:14;
 218:25;219:6;220:22;
 226:20

---

**8**

**8 (2)**
 20:14,16
**8,000 (1)**
 83:23
**8/13 (1)**
 47:9
**80 (3)**
 34:23;42:17;184:17
**80- (1)**
 118:8
**82 (4)**
 98:5;179:25;180:10,
 14
**828-2903 (1)**
 58:17
**83 (3)**
 181:3,12,16
**844 (1)**
 183:10
**85 (3)**
 177:13,21,25
**86 (3)**
 179:1,19,24
**88 (11)**
 53:15,16;54:1;55:23;
 56:1,7,9;87:8;224:8;
 225:6,10

---

**9**

**9 (6)**
 6:5,6,7;15:3;19:23;
 103:13
**9,000 (1)**
 107:21
**9:11 (1)**
 6:1
**900 (1)**
 111:14
**900- (2)**
 114:22;118:16
**900,000 (2)**
 107:25;118:4
**99 (1)**
 87:10
**9th (3)**

108:25;109:17;
115:18