**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS - EASTERN DIVISION**

```
==============================  .
IN THE MATTER OF:              . Case #15-13881
                              .
LYMAN-CUTLER, LLC             .
                              . Boston, Massachusetts
                              . Tuesday, June 18, 2019
     Debtor.                  . 9:08 a.m.
==============================  .
LYMAN-CUTLER, LLC,            . Adv. Proc. 16-01120
                              .
     Plaintiff,              .
v.                            .
                              .
KAGAN ET AL,                  .
                              .
     Defendants.             .
==============================  .
```

**TRANSCRIPT OF TRIAL DAY 10 ON:**
**#167 OBJECTION TO CLAIM 9 OF CLAIMANT ALEX FILIPPOV FILED BY**
**INTERESTED PARTIES TATIANA KAGAN, VADIM KAGAN, KAGAN**
**DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.**
**#1 COMPLAINT BY LYMAN-CUTLER, LLC AGAINST VADIM KAGAN, TATIANA**
**KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.**

**BEFORE THE HONORABLE FRANK J. BAILEY**

APPEARANCES:

<u>For the Debtor:</u>                PETER N. TAMPOSI, ESQ.
                                The Tamposi Law Group, P.C.
                                159 Main Street
                                Nashua, NH 03060

<u>For Alex Filippov and Nickolay</u>  SEAN T. CARNATHAN, ESQ.
<u>Lipetsker:</u>                     O'Connor, Carnathan, and Mack,
                                LLC
                                1 Van De Graaff Drive
                                Suite 104
                                Burlington, MA 01803

<u>For the Defendants:</u>            JOHN H. PERTEN, ESQ.
                                Sheehan Phinney
                                255 State Street
                                5th Floor
                                Boston, MA 02109



For the Defendants:                    JAMES P. HARRIS, ESQ.
                                       Sheehan Phinney
                                       1000- Elm Street
                                       17th Floor
                                       Manchester, NH 03105


        Electronic Sound Recording Operator:   ELIZABETH LOMBARD

        Proceedings Recorded by Electronic Sound Recording
      Transcript Produced by Certified Transcription Service
                            eScribers, LLC
               7227 N. 16th Street, Suite #207
                      Phoenix, AZ 85020
              973-406-2250; operations@escribers.net

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| **For Defendants:** | | | | | |
| ERIK BABAYAN | | | | | |
| (By Mr. Harris) | 10 | | 41 | | |
| (By Mr. Carnathan) | | 24 | | | |
| | | | | | |
| PEDRO PORTO | | | | | |
| (By Mr. Harris) | 43 | | | | |
| (By Mr. Carnathan) | | 54 | | | |
| | | | | | |
| VICTOR SERGEEV | | | | | |
| (By Mr. Harris) | 60,89 | | | | |
| (By Mr. Carnathan) | | 95 | | | 68 |
| | | | | | |
| BORIS STANIK | | | | | |
| (By Mr. Harris) | 99 | | | | |
| (By Mr. Carnathan) | | 107 | | | |
| | | | | | |
| VICTOR ISPIRAVNIKOV | | | | | |
| (By Mr. Harris) | 123,133,144 | | | | |
| (By Mr. Carnathan) | | 146 | | | 129,139 |
| | | | | | |
| PAULO CORDEIRO | | | | | |
| (By Mr. Harris) | 150 | | | | |
| (By Mr. Carnathan) | | 164 | | | |
| | | | | | |
| BORIS MAIDEN | | | | | |
| (By Mr. Carnathan) | 173 | | | | |
| (By Mr. Perten) | | 195 | | | |
| | | | | | |
| **For The Plaintiff:** | | | | | |
| BORIS MAIDEN | | | | | |
| (By Mr. Carnathan) | 173 | | | | |

| EXHIBITS: | DESCRIPTION | I.D. | EVID. |
|---|---|---|---|
| For Defendants: | | | |
| 175, Tab L-36 | Invoice for 55 Lyman | | 17 |
| 175, Tab C-32 | Invoice for 88 Cutler | | 20 |
| 175, Tab L-35 | Documents from Decor Art | | 49 |

I N D E X

| EXHIBITS: | DESCRIPTION | I.D. | EVID. |
|---|---|---|---|
| **For Defendants:** | | | |
| 175, Tab C-31 | Decor Art documents for 88 Cutler | | 51 |
| 175, Tab L-43 | V and D invoices and documents | | 87 |
| 175, Tab C-41 | V and D documents relating to Cutler | | 92 |
| 175, Tab C-41 | V&D Heating documents | | 94 |
| 175, Tab L-53 | Stanik invoice for 55 Lyman | | 104 |
| 175, Tab C-51 | Stanik invoice for 88 Cutler | | 105 |
| 339 | Originals of V and D documents | | 145 |
| 175, Tab L-40 | Documents and invoices for 55 Lyman | | 159 |
| 175, Tab C-38 | Documents for 88 Cutler | | 161 |
| **For the Plaintiff:** | | | |
| 155 | Invoice marked as paid in full | | 31 |
| 156 | Invoice dated 7/3/14 for 55 Cutler marked as paid in full | | 31 |
| 157 | Invoice dated 3/23/15 marked as paid in full | | 32 |
| 117 | | | 143 |

1    (At 9:08 a.m.)

2            THE CLERK:  Adversary proceeding 16-1120,

3    Lyman-Cutler, LLC, versus Kagan, et al.  This is day 10 of

4    trial.

5            And 15-13881, Lyman-Cutler, LLC, number 167,

6    objection to claim 9.  This is day 10 of trial.

7            Will the parties please state their names for the

8    record?

9            MR. CARNATHAN:  Good morning, Your Honor.  Sean

10   Carnathan for Alex Filippov and Nickolay Lipetsker.

11           MR. TAMPOSI:  Good morning, Your Honor.  Peter

12   Tamposi for the debtor.

13           MR. PERTEN:  Good morning, Your Honor.  John Perten

14   for Vadim Kagan, Tatiana Kagan, ProExcavation Corp, and Kagan

15   Development KDC, Corp.

16           MR. HARRIS:  Good morning, Your Honor.  James Harris

17   for the same parties.

18           THE COURT:  All right.  Good morning, everyone.

19           Any preliminaries, housekeeping, anything today?

20           MR. CARNATHAN:  A couple of items, Your Honor.

21           THE COURT:  Sure.

22           MR. CARNATHAN:  Yesterday we had some difficulty with

23   Defense Exhibit 304.  We might have to go over it with a paper

24   because we couldn't find the last page.

25           THE COURT:  Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1           MR. CARNATHAN:  We've now figured out that the

2     exhibit that was offered is only the first page of a six-page

3     document.  So we'd like to offer the full exhibit in its

4     place.  It should be SGC 674, that's the Bates number, through

5     679.  And I've given Mr. Harris a copy.

6           THE COURT:  And, Mr. Harris, any objection?

7           MR. HARRIS:  No, Your Honor.

8           THE COURT:  All right.  So we'll be replacing 304 --

9           MR. CARNATHAN:  Correct.

10          THE COURT:  -- with the document you're handing up.

11    Okay.  Very good.

12          MR. CARNATHAN:  May I bring it up?

13          THE COURT:  Yes, please do.

14          Anything else this morning?

15          MR. CARNATHAN:  One other thing, Your Honor.  I

16    noticed that Mr. Gersh is in the courtroom.  And he's already

17    been sworn in and isn't supposed to be discussing his

18    testimony with anyone.  We don't think it's appropriate for

19    him to be in the courtroom this morning while the

20    subcontractors are testifying.

21          THE COURT:  Okay.

22          MR. PERTEN:  Your Honor, we think Mr. Gersh is

23    entitled to be in the courtroom.  Not only have we not

24    excluded any witnesses throughout this trial, but, Your Honor,

25    if I could draw your attention to Rule 615 --

1          THE COURT:  Right.

2          MR. PERTEN:  -- which says that a party -- the rule

3    does not allow excluding of an officer or employee of a party

4    that is not a natural person, as in KDC and ProEx, after being

5    designated as the parties' representative by its attorney.

6          He is an officer.  He's testified that he's the CFO.

7    He also testified as a rule 30(b)(6) deponent at the

8    deposition of the corporation.  So we think under Rule 615(b)

9    as in boy, he's entitled to stay in the courtroom.

10         THE COURT:  Are you designated him as the parties'

11   representative?

12         MR. PERTEN:  Well, he's testifying on behalf -- he is

13   the CFO of the party.  He was also designated as the Rule

14   30 -- as one of the Rule 30(b)(6) designees testifying on

15   behalf of the parties.  So to the extent he's here in that

16   capacity, I'm not sure what is meant by designating -- I mean,

17   he's clearly here as -- in his capacity as an officer of the

18   company.

19         THE COURT:  No.  I think the cases say that a party

20   is required to designate that person.  And if you're

21   designating him -- and the cases also say you're only entitled

22   to have one person designated.  So you've got to pick.  If

23   he's the one, then he's here.  Then that means Mr. Kagan is

24   not here.

25         MR. PERTEN:  Well, obviously, Mr. Kagan has to stay.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    So I guess I am not designating him as that person as you've

2    described it.

3            THE COURT:  That's my understanding of the way it's

4    bene briefed to me in the past.  So look, the presumption, as

5    you know, is to -- if you notice, the prefatory language to

6    that rule is at a party's request, the Court must order

7    witnesses not to be here.

8            I always say this about this point, right?  It

9    affects my -- as the trier of fact -- and when I'm making a

10   determination as to credibility, if someone stays here when

11   they've been asked to leave because the party thinks -- and in

12   this case, obviously, the plaintiffs think that his testimony

13   will be affected by hearing the testimony of other witnesses,

14   that it will in fact affect my view -- my assessment of his

15   credibility when he takes the stand again because the whole

16   point of Rule 615 is people ought not to be exposed to other

17   witnesses.  We want to hear from them without the color of

18   having heard other witnesses.

19           So I don't particularly think it's a great idea to

20   keep people here.

21           MR. PERTEN:  Your Honor --

22           THE COURT:  It's up to you.  It is up to you.

23           MR. PERTEN:  No.  With that -- I mean, I would be

24   foolish to say otherwise.  With that indication from the

25   Court, I'm okay with him leaving the courtroom.

1        THE COURT:  I think it's smarter.  I think it's

2   smarter for everyone.  I also think the rule allows -- Mr.

3   Kagan has been here all along.  That makes perfect sense to

4   me.  And you certainly ought to have the right to have Mr.

5   Kagan here.  But to have another witness here, a second

6   designee as a party representative --

7        MR. PERTEN:  I guess I was responding more to the

8   fact that none of the other witnesses were ever challenged on

9   that basis.  It's curious that now that this one is.  But I

10   understand your --

11        THE COURT:  That may be.  That may be true.

12        MR. HARRIS:  Yeah.

13        THE COURT:  That may be true.  But I take the rule --

14   I've said it.  I don't need to repeat it.

15        So I think you should not be here then under those

16   circumstances, okay?

17        So we'll ask him to wait outside.

18        You can get coffee across the street.  You can have a

19   pleasant time in our --

20        MR. GERSCH:  I'll find something.

21        THE COURT:  Okay.

22        Yeah.  Could you make sure he knows that he's welcome

23   to put himself in a conference room?  He can have that so he

24   can work or whatever he wants to do, make phone calls.

25        Okay.  Any other preliminaries?  If not, let's get

ERIK BABAYAN - Direct

1    going, get these guys back to work wherever they're supposed

2    to be.

3            MR. HARRIS:  Your Honor, we call Mr. Babayan, please,

4    of Dream Flooring.

5            THE COURT:  Okay.  Just come right up here if you

6    would.  Thank you.

7                    ERIK BABAYAN SWORN

8            THE CLERK:  Please be seated.

9            MR. HARRIS:  Your Honor, just before we get started,

10   today I'm largely going to work from one particular binder.  I

11   think it'll be easier to use paper.

12           THE COURT:  Got it.

13           MR. HARRIS:  I just provided it with you.  It's

14   Exhibit 175 for identification.

15           THE COURT:  That's fine.

16           MR. HARRIS:  Okay.

17           THE COURT:  This whole binder is one exhibit?

18           MR. HARRIS:  It's 175 for identification with several

19   tabs.  And what we'll do today is march through the tabs.

20           THE COURT:  Got you.  Okay. All right.  Thank you.

21                   DIRECT EXAMINATION

22   BY MR. HARRIS:

23       Q.   Good morning, sir.  Could you please state and spell

24   your name for the record?

25   A.   My name is Erik Babayan, E-R-I-K B-A-B-A-Y-A-N.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ERIK BABAYAN - Direct

1    Q.    Okay.  What do you do for work, sir?

2    A.    Hardwood floors.

3    Q.    What's the name of your company?

4    A.    Dream Flooring.

5    Q.    And where is it located?

6    A.    Waltham, Mass.

7    Q.    How long have you been in business, sir?

8    A.    About fifteen years in October.

9    Q.    How many employees do you have?

10    A.    Six employees for full time, two part time.

11    Q.    Do you have a book keeper?

12    A.    No, I don't.

13    Q.    Do you have an accountant?

14    A.    No.

15    Q.    Do you use any bookkeeping or accounting software as

16    part of your business?

17    A.    Mostly using Pages for creating invoices and stuff.

18    Q.    Okay.  Pages, is that a program, an Apple program?

19    A.    Apple program.

20    Q.    And is it a -- basically a Word --

21    A.    Yeah, basically like Word.

22    Q.    Okay.  Did your company, Dream Flooring, perform any

23    work on the Lyman-Cutler project, that's the two houses at 88

24    Cutler and 55 Lyman?

25    A.    Yes.

ERIK BABAYAN - Direct

1   Q.   What kind of work did your company perform?

2   A.   Supplied, installed, and finished the floors.

3   Q.   Did your company do the work?

4   A.   Yes, they did.

5   Q.   Did you falsify any invoices?

6   A.   No.

7   Q.   Did you bill for work that you did not do?

8   A.   No.

9   Q.   Now, parties in this case have raised questions

10  about your work and your paperwork.  Have you ever had any

11  communications with Mr. Filippov?

12  A.   No.

13  Q.   Mr. Lipetsker?

14  A.   No.

15  Q.   Did they ever ask you any questions about your

16  paperwork?

17  A.   No.

18  Q.   Am I correct, sir, that you did sit for a deposition

19  in this case?

20  A.   Yes, sir.

21  Q.   Did you sit for a -- did you show up at a law firm

22  and answer questions under oath?

23  A.   No.

24  Q.   Okay.  Have you had any contact by an expert by the

25  name of Michael Goldman?  Did he ever contact you?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ERIK BABAYAN - Direct

 1   A.   No expert in -- I don't remember.

 2        Q.   He didn't ask you any --

 3   A.   I have no idea.

 4        Q.   Didn't ask you any questions about your invoices?

 5   A.   No, no.

 6        Q.   Okay.

 7   A.   Never been asked about it.

 8        Q.   Now, in front of you, sir, is a binder.  And if you

 9   could please turn to the tab that says L-36.  Do you have

10   that?

11   A.   Yes, I do.

12        Q.   Okay.  And if you turn to the second page, sir.

13   A.   Okay.

14        Q.   Can you tell us what this document is?

15   A.   That's my invoice.

16        Q.   Okay.  And it has a little number 338 at the very

17   bottom, at the very bottom right hand corner?

18   A.   Yeah.

19        Q.   Okay.  Who prepared this invoice, sir?

20   A.   I did.

21        Q.   And how did you prepare it?

22   A.   Usually, if I have invoice from previous, I just open a

23   new one, duplicate it, and then just give him the different

24   numbers and send it.

25        Q.   Okay.  Does this document relate to your work on one

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ERIK BABAYAN - Direct

1   of the homes in the Lyman-Cutler project?

2   A.   Yes, it does.

3        Q.   Would you turn to the next page, please?

4   A.   Uh-huh.

5        Q.   And tell us what this is.  This is -- does it have a

6   little number 339 at the bottom?

7   A.   Yes, it is.

8        Q.   And would you please tell us what this is?

9   A.   That's invoice for repairs being done on the work.

10       Q.   This relates to 55 Lyman Road?

11  A.   Yes, it does.

12       Q.   Who prepared this invoice?

13  A.   I did.

14       Q.   In the same manner that you described earlier?

15  A.   I mean, more here, it basically cleared the whole thing

16  up and just ended out.

17       Q.   Okay.

18  A.   But they knew --

19       THE COURT:  Mr. Harris, I don't know if this is just

20  my version, but the copy that I have that's document number in

21  the binder L-36 for identification starts with Bates number

22  KDC00337.

23       MR. HARRIS:  Yes.

24       THE COURT:  Okay.  So the second page is the --

25       MR. HARRIS:  Yes, sir.

Page  15

ERIK BABAYAN - Direct

1    THE COURT:  -- invoice; the first page is something

2    else?

3    MR. HARRIS:  Yes, sir.

4    THE COURT:  Is that part of this exhibit?

5    MR. HARRIS:  It is part of the exhibit.  You will

6    hear from Mr. Gersh -- I expect the very first cover page is

7    the summary, a vendor summary, printed from within the

8    QuickBooks file that tallies up everything that follows.  So

9    the -- I asked him about the second page which is a document

10   that he prepared and so forth.

11   THE COURT:  Right.

12   MR. HARRIS:  That'll be a recurring theme.

13   THE COURT:  Thank you.  All right.  I understand.

14   MR. HARRIS:  Yeah.

15   THE COURT:  I need to step off for just one moment --

16   MR. HARRIS:  Yes.

17   THE COURT:  -- to answer a question --

18   MR. HARRIS:  Yes.

19   THE COURT:  -- from chambers.  So I'm going to step

20   off.  Don't anybody move.  Don't even stand up.  Everybody sit

21   down.  I'm going to step off.  And I'll come right back.

22   MR. HARRIS:  Yes, sir.

23              (Off the record at 9:22 a.m.)

24              (On the record at 9:23 a.m.)

25   THE COURT:  Okay.  We can resume.

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

ERIK BABAYAN - Direct

1          MR. HARRIS:  Okay.  Thank you.

2    BY MR. HARRIS:

3          Q.   So we reviewed the second page of tab L-36.  You

4    told us that was an invoice that you prepared; is that right?

5    A.   Yes.

6          Q.   And then the third page is another invoice that you

7    prepared for 55 Lyman Road, correct?

8    A.   I don't have invoice here.

9          Q.   Page with number 339 at the bottom.

10   A.   I think I'm -- oh, 339?  Yeah.  Yeah.

11         Q.   Okay.  Are these true and accurate copies of the

12   invoices that you prepared relating to 55 Lyman Road?

13   A.   Yes, they are.

14         Q.   Okay.  Were they created around the time that you

15   did the work on the project?

16   A.   Yes.

17         Q.   Okay.  Are these records that your company keeps in

18   the regular course of its business?

19   A.   Yes.

20         MR. HARRIS:  Okay.  Your Honor, I would move into

21   evidence the two invoices that are part of 175, tab L-36, for

22   identification.

23         THE COURT:  Those are Bates stamped 38 (sic)?

24         MR. HARRIS:  338 and 339.

25         THE COURT:  Okay.  Any objection?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ERIK BABAYAN - Direct

1              MR. CARNATHAN:  No objection, Your Honor.

2              THE COURT:  All right.  They're admitted.  What are

3      they called now?

4              MR. HARRIS:  I'm sorry?

5              THE COURT:  What are they going to be called in

6      evidence?

7              MR. HARRIS:  These are within 175.

8              THE COURT:  So 175 is going to be a composite

9      exhibit?

10             MR. HARRIS:  Yes.

11             THE COURT:  Hopefully, that's your hope.

12             MR. HARRIS:  That's the hope through this morning.

13             THE COURT:  Got you.  Okay.  So this is going to

14     be -- we'll keep the designation L-36, but the overall exhibit

15     will be -- what did you say?  What --

16             MR. HARRIS:  175.

17             THE COURT:  175.

18             MR. HARRIS:  Yes, sir.

19             THE COURT:  Defendant's 175.  Okay.

20        DEFENDANTS' EXHIBIT 175, L-36 WAS ADMITTED INTO EVIDENCE

21             MR. HARRIS:  Just for clarification, I intend to move

22     that into evidence as a full exhibit.  I'm told I might have

23     been unclear.  But so the record -- is the Court clear my

24     intention was to move those documents into evidence as a full

25     exhibit?

ERIK BABAYAN - Direct

1           THE COURT:  Those two?

2           MR. HARRIS:  Those two pages.

3           THE COURT:  Okay.  So we'll call them 175.  And the

4    next one will be 176.  Is that how you want to do it?

5           MR. HARRIS:  No.  I think that the plan that you had

6    just described with 175 being essentially a composite --

7           THE COURT:  Okay.

8           MR. HARRIS:  -- of these different tabs is the plan

9    we propose for today.  And it mirrors what we've done with

10   175, the other proof of claim binders.  There's essentially a

11   tab for the Lyman house and a tab for the Cutler house within

12   this binder, as you'll see today.  So we'd like to keep 175 as

13   a composite.  And hopefully each tab will come into evidence.

14          THE COURT:  All right.  Mr. Carnathan?

15          MR. CARNATHAN:  If it diminishes the pain of it -- at

16   this point, I actually don't mind if the four pages in L-36 go

17   in together.  It's got the tab from the Lyman-Cutler

18   QuickBooks.  And it's go the check from KDC for 5,000 bucks to

19   Dream Flooring.  If you want to just put those in, that's

20   fine.

21          MR. HARRIS:  That is fine with us.

22          THE COURT:  That's KDC337 through --

23          MR. HARRIS:  Through 340.

24          THE COURT:  -- 340?

25          MR. HARRIS:  Yes, sir.

ERIK BABAYAN - Direct

1          THE COURT:  All right.  All right.  So that's the

2    exhibit, the L-36 portion of Defendant's 175.

3          MR. HARRIS:  Okay.  Thank you.

4          THE COURT:  Now that the appeals court is completely

5    confused about what I'm doing here anyway.  But all right.

6    BY MR. HARRIS:

7      Q.   Sir, with that same binder in front of you, could

8    you please turn to tab C as in Charlie, 32?  And I'd ask you

9    to turn to the second page in that tab.  It has the number 975

10   at the bottom.  Do you see that?

11   A.   Uh-huh, yes.

12     Q.   Okay.  Can you tell us what this is, please?

13   A.   That's another invoice that says job was completed.  So

14   when I get paid, I just -- I mean, it's not really an invoice

15   at this point.  The job is completed.  That's for myself.  So

16   I know it's paid off.

17     Q.   Okay.  Let me ask you, sir.  Which home does this

18   invoice relate to?

19   A.   88 Cutler.

20     Q.   Okay.  Is this a document that you prepared, sir?

21   A.   Yes, I did.

22     Q.   Okay.  And is it a true and accurate copy of the

23   invoice you prepared?

24   A.   Yes.

25     Q.   Is this an invoice that you prepared around the time

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ERIK BABAYAN - Direct

1   that you did the work at 88 Cutler?

2   A.   Yes, I did.

3        Q.   Okay.  Is this a document that your company keeps in

4   the regular course of its business?

5   A.   Yes.

6        MR. HARRIS:  Your Honor, as we did before, I'd like

7   to introduce into evidence as a full exhibit this tab C-32 in

8   Exhibit 175.

9        MR. CARNATHAN:  No objection, Your Honor.

10       MR. HARRIS:  And, Attorney Carnathan, do we agree

11  that the cover page also comes in?

12       MR. CARNATHAN:  Yes.

13       MR. HARRIS:  Okay.  So with that, Your Honor, the

14  entire tab C-32 we would like as a full exhibit.

15       THE COURT:  All right.  It's admitted.

16   DEFENDANTS' EXHIBIT 175, TAB C-32 WAS ADMITTED INTO EVIDENCE

17       THE COURT:  And just for the record, it includes one,

18  two -- it's just two pages, right?

19       MR. HARRIS:  Yes, sir.

20       THE COURT:  All right.  Very good.

21       MR. HARRIS:  Thank you.

22  BY MR. HARRIS:

23       Q.   Sir, how many -- how long have you worked with Vadim

24  Kagan and his companies?

25  A.   About five years, four to five years.

ERIK BABAYAN - Direct

1      Q.   Sorry.  Say that again, sir.

2   A.   About four or five years.

3      Q.   Four or five years.  I assume you worked for other

4   contractors and developers as well?

5   A.   Yes, I do.

6      Q.   Can you describe for us the --

7   A.   I'm sorry.  This one is -- this one is an invoice.  I

8   didn't read it right.  It says -- this is an invoice.

9      Q.   Which document are you looking at, sir?

10  A.   The document that -- 975.

11     Q.   975.  Okay.

12  A.   I missed that.

13     Q.   Can you describe for me, sir, the practice your

14  company followed with respect to requesting payment of, in

15  this instance, KDC for the Lyman-Cutler project?

16  A.   The --

17     Q.   How did you ask to get paid?

18  A.   I -- I would send invoices.  And I was getting checks, I

19  don't know, like sometimes two weeks, sometimes one week,

20  sometimes --

21     Q.   Okay.  And how did you keep track of payments?

22  A.   Usually when I get the check, I put them -- that amount

23  paid, a certain amount -- just separate, you know.  I have a

24  separate file for it.

25     Q.   Okay.  Describe for me the file.  What -- is it a

ERIK BABAYAN - Direct

1    piece of paper?

2    A.   It was.  It -- yes.  No, it's not piece of -- I -- I

3    usually -- if I know -- I -- I go through the checks, and I

4    see the total balance that I got paid for this job.  And then

5    I calculate what the total balance was for the job, deduct the

6    amount that was paid.  And then I send the amount that I need

7    to get to be paid.

8         Q.   Now, could you turn back, sir, to the tab -- oh, I'm

9    sorry.  Let's just stay with this page you're looking at, the

10   one that has 975 at the bottom.  Do you have that?

11   A.   Yes.

12        Q.   Okay.  I noticed that there's no invoice number on

13   your invoice.

14   A.   I --

15        Q.   Do you use invoice numbers?

16   A.   No.  I never use invoice numbers.

17        Q.   I'm sorry.  Say that again, sir.

18   A.   No, I don't.

19        MR. HARRIS:  Attorney Perten, could you bring up the

20   PDF that -- or the slides from Michael Goldman?

21        So, Your Honor, what's on the screen right now, if

22   you recall, when Michael Goldman testified, they had a

23   demonstrative exhibit.  This is the same.

24        THE COURT:  Thank you.  I do recall.

25        MR. HARRIS:  Okay.  And could you bring us to page

ERIK BABAYAN - Direct

1    12, please, of the PDF?

2            THE COURT:  You want to go help him?

3    BY MR. HARRIS:

4        Q.   Okay.  Let me just explain for one moment, sir.  A

5    witness earlier in the case put these two pieces of this image

6    up on the screen for us, okay?  He told us that the one on the

7    left is one that you provided --

8    A.   Uh-huh.

9        Q.   -- in response to a subpoena.  Do you remember that,

10   providing documents in response to a subpoena?

11   A.   Yes.

12       Q.   Okay.  And the one on the right he explained came

13   from Mr. Kagan's files, okay?

14   A.   Okay.

15       Q.   All right.  Now, the one on the left, the one that

16   came from your file that says at the very bottom job is

17   completed, paid in full --

18   A.   Yes.

19       Q.   -- can you describe for us how that notation came to

20   be on this invoice?

21   A.   So when I got it, I opened that file from this job.  And

22   when I get paid in full, I usually just make a new file that

23   says job is completed, paid in full, so I know this job is

24   done, I got paid in full for this job.

25       Q.   Okay.  When you provided the invoice to Mr. Kagan's

ERIK BABAYAN - Cross

1    company, KDC, did it have job as completed, paid in full on

2    it?

3    A.    No.

4          MR. HARRIS:   That's all I have, Your Honor.   Thank

5    you.

6                      CROSS-EXAMINATION

7    BY MR. CARNATHAN:

8          Q.   Good morning, sir.

9    A.    Hey.

10         Q.   Good morning, Mr. Babayan.   Am I saying that right?

11   A.    Good morning.   Yes.

12         Q.   Yes.   It sounds like perhaps you are a Russian-

13   speaking person?

14   A.    Yes, I am.

15         Q.    Yes.   Is Russian your first language?

16   A.    Yes, correct.

17         Q.    During Mr. Harris' questions, you said that you had

18   not appeared for deposition.   Do you know what a deposition

19   is, sir?

20   A.    I guess it's preparation before the court.

21         Q.    It's actually a testimony under oath in a lawyer's

22   office.   Do you remember getting a subpoena from my office, a

23   fellow named Joe Calandrelli?

24   A.    I don't --

25          MR. CARNATHAN:   May I hand up a --

ERIK BABAYAN - Cross

1           THE COURT:  You may.

2           MR. CARNATHAN:  May I approach the witness?

3           THE COURT:  Yes, of course.

4    BY MR. CARNATHAN:

5       Q.   So, sir, I'm just showing you what we call a

6    transcript.  That's -- we actually sent you a subpoena and had

7    you come to my office and answer questions.  And there was a

8    court reporter there, and she typed up the answers.  Do you

9    remember being there?

10   A.   Oh, I thought it was --

11      Q.   It was like four years ago, to be fair.  I mean, it

12   was in I think September of 2015.

13   A.   I don't remember.

14      Q.   Okay.

15   A.   I'm sorry.

16      Q.   Okay.  Do you recall responding to our subpoena?  Do

17   you recall producing documents to my office, giving --

18   A.   I thought it was their office.  I messed up.  I provided

19   documents.  I remember I provided documents to someone, but I

20   didn't know it was your office.  I thought it was for --

21      Q.   Okay.

22   A.   -- Vadim's lawyers.

23           MR. CARNATHAN:  Could I just have --

24   BY MR. CARNATHAN:

25      Q.   So, sir, I'm showing you a document --



ERIK BABAYAN - Cross

1          MR. CARNATHAN:  Oh, we should probably mark it.

2     BY MR. CARNATHAN:

3          Q.   So, Mr. Babayan, I'm showing you a document that

4     I've asked the clerk to mark as Exhibit AA for identification.

5     I'm really showing you this just to try to orient you.  Do you

6     remember getting a subpoena from my office addressed to Dream

7     Flooring?

8     A.   I don't -- I don't remember to tell you the truth.

9          Q.   And if we show you the next page --

10    A.   Now I start to -- to get -- it comes back to me.  I -- I

11    thought it was from Vadim's lawyers.

12         Q.   Uh-huh.

13    A.   That's why I missed the -- I thought that --

14         Q.   I mean, when you got the subpoena, Mr. Kagan called

15    you, right?

16    A.   I mean, I don't even remember I had a subpoena.  I don't

17    remember the call.

18         Q.   Well --

19    A.   I'm sorry.

20         MR. CARNATHAN:  if we go to the second page of

21    Exhibit AA for identification, please.

22    BY MR. CARNATHAN:

23         Q.   We sent you this in August of 2015.  Do you see

24    that, sir?

25    A.   Yes.

ERIK BABAYAN - Cross

1    Q.   And if you look at the front page of your deposition

2    transcript that I handed you, that stick stack of papers, you

3    actually testified on September 29th, 2015.  Do you remember

4    that now?

5    A.   Yeah.  Now it starts coming back to me.

6    Q.   Okay.  And yet you told us that day that when you

7    got the subpoena, Mr. Kagan called you.  Fair enough?

8    A.   Maybe, yeah.

9    Q.   And he actually -- he called you the day of your

10   deposition too, right, sir?

11   A.   I don't remember.

12   Q.   Well, just by way of refreshing your recollection,

13   if you would -- would you look at page 78 of your transcript

14   for me?  You can see that thick packet.

15   A.   78?  Yeah.

16   Q.   So on page 78, this is Mr. Calandrelli asking

17   questions, he says, "When was the last time you spoke with Mr.

18   Kagan?"

19        And you said, "This morning."

20        And then Mr. Calandrelli said, "Did you call him or did

21   he call you?"

22        And you said, "He called me."

23        Do you see that?  I'm kind of two-thirds of the way down,

24   page 78, beginning at line 13.

25   A.   Okay.

ERIK BABAYAN - Cross

1      Q.   Okay.  have I read that correctly?

2   A.   Yes.

3      Q.   Okay.  And then if we go to 79 --

4         MR. HARRIS:  Your Honor, for completeness, I think we

5   ought to read the next answer, the question and answer.

6         THE COURT:  That's permitted.  You can do it.  I'll

7   let you do it now.  You can either read it or have him read

8   it, however you want to handle it.  But under Rule 103 --

9         MR. CARNATHAN:  I'll read it in or --

10         THE COURT:  -- it's appropriate.

11         MR. CARNATHAN:  -- Mr. Harris can do it.  Yeah.

12         THE COURT:  However you want to do it.

13         MR. CARNATHAN:  So you want me to read in the part,

14   what did you discuss?

15         MR. HARRIS:  Yes.

16         MR. CARNATHAN:  Okay.

17   BY MR. CARNATHAN:

18      Q.   "I wasn't going to come to the meeting and basically

19   told me that I have to.  Otherwise, next time, they -- I mean,

20   he asked me to come.  He wanted to make sure that I am coming

21   to the meeting today because I had a meeting in Boston.  So I

22   had to cancel that to make it here.  I forgot about this

23   meeting.  I was notified, and I didn't put it in my book.  So

24   I forgot about it.  I scheduled another meeting in Boston.

25         "When I told them I'm not going to come, I'm not going to

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ERIK BABAYAN - Cross

1   make it, he basically asked me to make sure that I'm here."

2        I have I read that correctly?

3   A.   Yes.

4        Q.   And I'm now skipping down a couple lines --

5             MR. HARRIS:   Unless Mr. Harris wants me to keep

6   reading.

7   BY MR. HARRIS:

8        Q.   So now I'm on page 79, line 12.  And Mr. Calandrelli

9   asks you, "Prior to this morning, when was the last time you

10  had spoken to Mr. Kagan?"

11       And your answer is, "Right before the meeting with Dan."

12       Q.   And then he says, "Was this after you had received

13  my subpoena?"

14       And you said, "Yes."

15       Have I read that correctly?

16  A.   Yes.

17       Q.   Okay.  In that one, it says, "Did you call him or

18  did he call you?"

19       And you say, "I called him to find out what was this

20  about, and he explained it to me."

21       Have I read that correctly?

22  A.   Yes.

23       Q.   Okay.  So after you got the subpoena, you met with

24  Mr. Gersh, right?

25  A.   Mr. --

ERIK BABAYAN - Cross

1          Q.   Dan Gersh, the bookkeeper for Mr. Kagan?

2     A.   Oh, Dan, yeah.

3          Q.   Right.  And you figured out that you had actually

4     been paid in full for the work that you did on Lyman-Cutler,

5     right?

6     A.   Yes.

7          Q.   And at that point, you changed the invoices you had

8     sent to all say completed in full, right, sir?

9     A.   Yes.

10         Q.   Okay.  And as you sit here today, you have been paid

11    in full, right, sir?

12    A.   Yes, I did.

13         MR. CARNATHAN:  All right.  So if I could have

14    Exhibit 155, please.

15    BY MR. CARNATHAN:

16         Q.   So Exhibit 155, this is for identification, this is

17    another version, if you will, of one of the invoices that you

18    identified earlier.  And this one says completed, paid in full

19    on it, right, sir?

20    A.   Yes.

21         Q.   And this is the one that says 88 Cutler, June 21,

22    2014, right, sir?

23    A.   Correct.

24         MR. CARNATHAN:  I'd like to offer 155 for

25    identification into evidence, please.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ERIK BABAYAN - Cross

1          MR. HARRIS:  No objection, Your Honor.

2          THE COURT:  All right.  It's admitted.

3       PLAINTIFF'S EXHIBIT 155 WAS ADMITTED INTO EVIDENCE

4   BY MR. CARNATHAN:

5       Q.   All right.  And we agree, sir, that you did the work

6   back in June of 2014; is that right?

7   A.   Yes.  But the problem is sometimes when I duplicate and I

8   gave a new invoice, I forget to change the dates or possible

9   the date is different.  But yes, somewhere around this time.

10          MR. CARNATHAN:  Okay.  Could I have Exhibit 156,

11   please?

12   BY MR. CARNATHAN:

13       Q.   So, again, 156 is another version of one of the

14   invoices you looked at earlier.  This one says 55 Cutler on

15   it, July 3rd, 2014.  But this one says paid in full or

16   completed, paid in full, right, sir?

17   A.   Yes.

18          MR. CARNATHAN:  I'd like to offer 156 into evidence,

19   please.

20          MR. HARRIS:  No objection, Your Honor.

21          THE COURT:  All right.  It's admitted.

22       PLAINTIFF'S EXHIBIT 156 WAS ADMITTED INTO EVIDENCE

23          MR. CARNATHAN:  And may I have 157?

24   BY MR. CARNATHAN:

25       Q.   So again, the same concept here, right, Mr. Babayan?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ERIK BABAYAN - Cross

1  This is another version of the March 23, 2015 invoice which

2  also now says paid in full, right, sir?

3  A.   Yes, sir.

4       MR. CARNATHAN:  I'd like to offer 158 into

5  evidence -- well, excuse me, 157 into evidence, please.

6       MR. HARRIS:  No objection, Your Honor.

7       THE COURT:  It's admitted.

8      PLAINTIFF'S EXHIBIT 157 WAS ADMITTED INTO EVIDENCE

9  BY MR. CARNATHAN:

10      Q.   Now, sir, back when Ms. Brusenkova worked for Mr.

11  Kagan, you had a meeting with her, didn't you, sir?

12  A.   Yeah, I guess.  I mean, I have twenty-eight builders.  I

13  don't remember all the meetings I've had.  I think I did,

14  yeah.

15      Q.   Well, was your memory about this better in 2015 than

16  it is here today, sir?

17  A.   It was.

18      Q.   All right.  So --

19  A.   And, of course, I use a lot of polyurethane.  So my

20  memory is getting worse every year.  Sorry.

21      Q.   I'm with you.

22       So, sir, is it true that back when Ms. Brusenkova

23  was working as Mr. Kagan's bookkeeper, you met with her to

24  talk about whether you had been paid in full for all of your

25  projects?  Do you remember that?

ERIK BABAYAN - Cross

1   A.   I'm sorry?

2        Q.   You actually had a meeting with Ms. Brusenkova to

3   talk about whether you had been paid in full for all of your

4   projects.  Do you remember that?

5   A.   Yes.

6        Q.   And you discovered that her bookkeeping was kind of

7   a mess, right, sir?

8   A.   I don't remember that.

9        Q.   Well, again, just by way of refreshing your

10  memory -- I'll come back to that.

11       When you met with her, it was confusing, right, sir?

12  A.   Yeah, it was a little bit.

13       Q.   And the difficulty was that your records didn't

14  necessarily match hers, right?

15  A.   It was just a little complicated because they do the

16  bookkeeping their way.  I get -- so it was a little

17  complicated.  But then we came to the conclusion that it was

18  paid for.

19       Q.   Right.  And the difficulty, sir, was that they were

20  paying for one project with money from another project, right,

21  sir?

22  A.   It was sometimes, yeah -- the project -- I don't know if

23  the projects were on the same --

24       Q.   And, in fact, you determined on this job that they

25  had given you a check from what you called at the time 10

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ERIK BABAYAN - Cross

 1  Cutler, right, sir?

 2  A.   I don't know.

 3       Q.   Would you look at page 47 of your deposition for me,

 4  please, the transcript?

 5  A.   On this page?

 6       Q.   Yeah, the tick packet I gave you of the transcript

 7  of your deposition.

 8  A.   Which page?

 9       Q.   It actually begins on 46.  If you could start with

10  me on 46, that would be great.

11            Okay.  Are you there, sir?

12  A.   Yes.

13       Q.   So I guess to make it make sense, I'm going to have

14  to start up at the top of 46.  And Mr. Calandrelli says, "And

15  do you have some sort of recordkeeping software that you use

16  that will show the payments that you received on a project?"

17            And you say, "No."

18            Question, "How do you keep track of that?"

19            Answer, "I usually send the invoice.  And when I get the

20  check, it's complicated.  It all depends on the project on the

21  job.  Sometimes I just send the check.  When I receive the

22  check, I make a copy of it, I print out the copy from me.  But

23  on this job, I didn't do it.  I didn't make copies of the

24  checks."

25            Question, "Why not?"

ERIK BABAYAN - Cross

1       Answer, "I don't know.  But I was going through with

2   what's-her-name, Vadim's bookkeeper, and I pulled out all the

3   records.  I made actually the copies of the checks back then

4   to make sure because my numbers didn't -- didn't -- I'm

5   sorry."

6       And he says, "It's okay.  Take your time."

7       And you say, "At some point when I was checking all the

8   payments and invoices, my numbers were a little bit higher

9   than their numbers.  And I met with -- I forgot the name of

10  that bookkeeper."

11      Question, "Is her name Christina?"

12      Answer, "Christina.  I met with Christina.  And they were

13  going back and forth.  She was showing me all the checks.  I

14  printed out my checks.  And they came to the conclusion that

15  that's right.  It was just a little bit messed up because they

16  would pay me sometimes upfront.  Like for example, they'll pay

17  a check from 10 Cutler for this job.  It was a little bit of a

18  mess.  They were paying from one project for another.  So

19  that's how it got complicated.  And they went through all the

20  checks.  And then they came to the conclusion that it's all

21  correct, that it was paid in full."

22      Have I read that correctly, sir?

23  A.   Yes.

24      Q.   Now, you later clarified that you sort of came to a

25  realization after the meeting with Christina that you thought

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ERIK BABAYAN - Cross

 1  that they still owed you some money; isn't that right, sir?

 2  A.   They owe me some money?  I don't remember.

 3       Q.   Yeah.  I think later in your deposition, you say

 4  that you thought they might still owe you some money even

 5  after the meeting with Christina.

 6  A.   No, I don't think so.  When -- when we calculated all the

 7  invoices that I sent and all the checks that I got, the total

 8  amount then was paid in full.

 9       Q.   Right.  No.  I'm with you.  So you've been paid in

10  full?

11  A.   The balance was -- yeah.

12       Q.   I'm just interested at this point in the process by

13  which you got paid in full.

14       Let's talk for a moment about the meeting with Mr.

15  Gersh.  When you met with Mr. Gersh after you received our

16  subpoena, you went over the numbers with him again, right,

17  sir?

18  A.   I don't know.  I don't know.

19       Q.   Would you turn with me to page 53, please?

20  A.   I am there.

21       Q.   Okay.  And so I guess I actually have to pick up on

22  52 to make it make sense.  I'm sorry.  At the very bottom of

23  52, Mr. Calandrelli says, "How would you determine whether

24  that did, in fact, happen on this project?"

25       And you say, "I just don't recall if it's happened on

ERIK BABAYAN - Cross

1  this project or not."

2      He says, "Okay."

3      And then you say, "For this project, I had a meeting with

4  Dan and another bookkeeper.  And we went through all the

5  numbers again, copies of the checks.  And when I found out

6  it's all good -- I mean, I knew it's fine.  So that's why I

7  made the change, to make it clear the job is completed and

8  paid in full."

9      And then Mr. Calandrelli says, "When did you have this

10  meeting with Dan?"

11      And you say, "I don't remember, just about a month ago.

12  I don't remember for sure."

13      Have I read that correctly?

14  A.   Yes.

15      Q.   Okay.  And one of the things that Mr. Gersh told you

16  during this meeting was that you had, in fact, been paid in

17  full because they overpaid you with funds from another

18  project; isn't that right, sir?

19  A.   I don't know.  I don't remember.

20      Q.   Would you look with me at page 56, please?  So on

21  page 56, I'm on line 12, about halfway down.

22  A.   Okay.

23      Q.   Mr. Calandrelli says, "Before that meeting,"

24  referring to the meeting with Mr. Gersh, "Did you believe that

25  there was still an outstanding balance due on your account?"

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ERIK BABAYAN - Cross

1        And you said, "Yes, but I explained why.  I forgot about

2    that 7,000 before that they had overpaid me.  I forgot about

3    it because the meeting with Christina was like seven or eight

4    months before the meeting with Dan.  So I forgot about the

5    7,000 dollars.  And when I put the numbers together, again, it

6    was wrong.  When I met with Dan, he reminded me of the 7,000

7    they overpaid for this job."

8        Have I read that correctly?

9    A.   Yes.

10       Q.   I guess I'll continue.  So then Mr. Calandrelli

11   says, "I'm a little confused about your testimony.  There was

12   a 7- or 8,000-dollar difference in what you had on your books

13   for payments received on this project, correct?"

14       You say, "It's not on this project.  It's all over the

15   projects together."  Excuse me.  "It's over all the projects

16   together."

17       And then he says, "Right.  But you keep saying that you

18   were overpaid on this project.  That's what I'm trying to

19   clarify."

20       And you answer, "Not on this project.  It was Deborah or

21   Cynthia, one of those houses before."

22       Have I read that correctly?

23   A.   Yes.

24       Q.   So what Mr. Gersh reminded you was that they used

25   money from either the Cynthia or the Deborah Road to pay you

ERIK BABAYAN - Cross

1  on this project; isn't that right, sir?

2  A.   No.   That is not it.   You are twisting my words.   It's --

3  when the total was -- they were showing me that they overpaid,

4  but it's not paid from Cutler and Lyman for this project.

5  It's just the balances didn't come together.   And then he was

6  showing me that they -- I did about seventeen or eighteen

7  projects.   It's not just Cutler and Lyman.

8       So they overpaid -- so some projects, previous projects,

9  were the same things like Lyman-Cutler, it's one -- basically

10 one package, one investor or whatever it's -- what is -- so

11 they overpaid me for those projects from one to another, but

12 not from Lyman-Cutler.   I never said that they paid me from

13 Lyman-Cutler for the --

14      Q.   Well, you testified in two different places, both at

15 a meeting with Christina and a meeting with Mr. Gersh, that

16 they had paid you with funds from other projects?

17 A.   Yes, but not necessarily -- you're saying that from

18 Lyman-Cutler they paid for the -- what was the street name

19 over there?   The last one you said.

20      Q.   Well, if we look back at page 47 --

21 A.   Okay.

22      Q.   You say there, "It was just a little bit messed up

23 because they would pay me sometimes upfront.   Like, for

24 example, they'll pay me a check from 10 Cutler for this job.

25 It was a little bit of a mess.   They were paying from one

ERIK BABAYAN - Cross

1    project for another, so that's how it got complicated."

2    A.   Yeah.  But they're only paying from one project to

3    another if they're from the same investor or some projects are

4    connected.  It's one investor is building three or four

5    projects.  They're not paid for one project that is not

6    connected to another.

7        Q.   So are you under the impression that the same

8    investor was doing Deborah Road or Cynthia Road as was doing

9    Lyman-Cutler?

10   A.   No.  But yeah.  I knew actually at least some projects

11   who is investor there and who is investor on the other

12   project.

13       Q.   All right.  Are you under the impression the same

14   investor was doing 10 Lyman as was doing 55 Lyman?

15   A.   No.  But what I'm saying is the -- you said particularly

16   that 55 Lyman, 7,000, was paid over to Cynthia.  But that was

17   not the case.

18       Q.   I'm just reading your words to you, sir, right?  Do

19   you know who the investors were on each of Mr. Kagan's

20   projects?

21   A.   Some of them, not -- I don't know the investors, but I

22   knew that some projects are connected to.

23       Q.   All right.  Do you know wo the investor was on

24   Deborah Road?

25   A.   No.

ERIK BABAYAN - Redirect

1    Q.   Do you know who the investor was on Cynthia Road?

2    A.   Cynthia, I don't think so.

3    Q.   Yeah.  Do you know who the investor was on 10 Lyman

4    Road?

5    A.   I mean, I saw some of them, yeah.

6         MR. CARNATHAN:  I have nothing more for Mr. Babayan.

7                    REDIRECT EXAMINATION

8    BY MR. HARRIS:

9    Q.   Sir, did you get paid more than once for work that

10   you performed on Lyman-Cutler?

11   A.   I don't remember.  I'm pretty sure it was more than once,

12   yeah.  Usually I bill for the work.

13   Q.   Yeah.  That wasn't a very good question.  Did you

14   get paid more than you were supposed to for your work on

15   Lyman-Cutler?

16   A.   Oh, no.  No.

17   Q.   You were asked some questions about meetings you had

18   with bookkeepers at Mr. Kagan's companies.  What was the

19   purpose of those meetings?

20   A.   Just to -- I thought that I was underpaid.  That was the

21   purpose of the meetings, to figure out if they owe me money or

22   not.

23   Q.   And in the end of those meetings, were you satisfied

24   that the records were then accurate?

25   A.   Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

ERIK BABAYAN - Redirect

1    Q.   And it sounded like from your testimony that you

2    were a little uncertain about your own recordkeeping; is that

3    correct?

4    A.   Yes.  Sometimes it's a little bit of a mess.

5        Q.   Okay.  So you had your recordkeeping and you were

6    trying to make it match up with --

7    A.   Yes, correct.

8        Q.   -- the other records; is that right?

9    A.   Yeah.

10       Q.   Okay.  In the end, sir, were you satisfied that you

11   were paid only what you were supposed to be paid for the

12   Lyman-Cutler project?

13   A.   Yes.

14       MR. HARRIS:  I have no further questions, Your Honor.

15   Thank you.

16       MR. CARNATHAN:  I have nothing more for Mr. Babayan,

17   sir.

18       THE COURT:  Okay.  Thank you, Mr. Babayan.

19       So is he free to leave?

20       MR. HARRIS:  Yes, from our perspective.

21       MR. PERTHEN:  Yes, Your Honor.

22       MR. HARRIS:  Yes, please.

23       THE COURT:  Okay.

24       MR. HARRIS:  Your Honor, we call Mr. Porto of Decor

25   Art.



PEDRO PORTO - Direct

1              PEDRO PORTO SWORN

2              DIRECT EXAMINATION

3    BY MR. HARRIS:

4        Q.   Okay.  Good morning, sir.  Please pull yourself

5    closet to the microphone.

6    A.   Good morning.

7        Q.   And could you please state and then spell your name

8    for the record?

9    A.   My name is Pedro Porto.

10       Q.   Okay.  Could you please spell those?

11   A.   Yes.  P-E-D-R-O P-O-R-T-O.

12       Q.   Okay.  What do you do for work, sir?

13   A.   Construction, painting, and stock ordering.

14       Q.   Do you work for a company?

15   A.   No.  This is my own company.

16       Q.   Okay.  And what's the name of your company?

17   A.   Decor Art.

18       Q.   Decor Art.  How long have you been in business, sir?

19   A.   From 2011.

20       Q.   How many employees do you have?

21   A.   Now we have around sixteen.

22       Q.   Okay.  Do you have a bookkeeper?

23   A.   No.

24       Q.   Do you have an accountant?

25   A.   No.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PEDRO PORTO - Direct

1 Q. Do you use any bookkeeping or accounting software

2 for your business?

3 A. No.

4 Q. Did Decor Art perform work on the -- we call the

5 Lyman-Cutler project, it's the two homes at 88 Cutler and 55

6 Lyman.  Did your company provide services there?

7 A. Yes.

8 Q. On a high level, what did your company do?

9 A. We did painting there.  We did cleaning.  We did hardware

10 installation.  And I don't believe we did -- I don't think

11 there's a stock order.

12 Q. What do you mean by hardware installation?

13 A. We install hardwares for doors, bathrooms, stuff like

14 this we do, like handles, those parts, stuff like this.

15 Q. Did your company do the work?

16 A. Yes.

17 Q. Did you falsify any invoices?

18 A. No.

19 Q. Did you bill for work you did not perform?

20 A. No.

21 Q. The parties in this case have raised questions about

22 your work on that project and the paperwork.  Have you had any

23 communications with Mr. Lipetsker?

24 A. No.

25 Q. Or Mr. Filippov?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PEDRO PORTO - Direct

1    A.    No.

2        Q.    Please keep your hands away so that we can pick up

3    your voice on the microphone.    Thank you.

4        Am I correct that you did sit for a deposition in

5    this case?

6    A.    Yeah.    I went to a building I believe like a couple years

7    ago.    I think it's the deposition there.

8        Q.    Okay.    And you sat for several hours and answered

9    questions?

10   A.    Yeah.    We stayed for about, I don't know, and hour and a

11   half there.

12       Q.    All right.    Have you ever been contacted by a man by

13   the name of Michael Goldman to ask you questions about your

14   paperwork?

15   A.    No.

16       Q.    Now, in front of you, sir, there should be a binder

17   that's Exhibit 175.    And I'd like you to turn to the tab that

18   is L-35.    Do you have that?

19   A.    Yes.

20       Q.    Okay.    The second page, sir, has a little number at

21   the bottom.    It should say 328.

22   A.    Yes.

23       Q.    At the bottom, right?    Okay.    Could you tell us,

24   sir, what this is?

25   A.    That's a proposal for 55 Lyman.

PEDRO PORTO - Direct

1    Q.   Who prepared this proposal?

2    A.   I don't remember, myself or my wife.

3    Q.   And does this relate to work on the Lyman-Cutler

4    project?

5    A.   Yes.

6    Q.   And this one appears to relate to 55 Lyman Road; is

7    that right?

8    A.   Yes.

9    Q.   Could you tell us how proposals like this are

10   prepared by your company?

11   A.   Well, I look around the houses.  And I -- I know how much

12   it's going to cost to -- to do the work.

13   Q.   But mechanically, how do you generate this actual

14   document?

15   A.   Well, we -- I put it -- I create it in Pages.

16   Q.   What is Pages?

17   A.   It's an Apple -- an app from Apple.

18   Q.   It's an Apple software?

19   A.   Yeah, kind of software.

20   Q.   Okay.  And is this a true and accurate copy of the

21   proposal your company provided for 55 Lyman Road?

22   A.   Yes.

23   Q.   Could you turn to the next page in this packet?  It

24   has number 329 at the bottom.

25   A.   Yes.

PEDRO PORTO - Direct

1      Q.   Could you tell us what this is?

2   A.   Yeah.  When we -- we did some (indiscernible)

3   installation in the basement for a whole insulation and

4   invoiced for that.

5      Q.   Okay.  This is an invoice that your company

6   prepared?

7   A.   Yes.

8      Q.   Do you know who prepared this invoice?

9   A.   Me or my wife.  That's the only two persons creating

10  invoices.

11     Q.   And the process to prepare this invoice, was it the

12  same that you just described, you used Pages?

13  A.   Yeah.  It was Pages.  And I duplicate invoices.  And

14  we -- I go from there.

15     Q.   All right.  Would you turn to the next page, please?

16  It has number 330 at the bottom.

17  A.   Yes.

18     Q.   Tell us what this is, please.

19  A.   That's for a house -- I believe the second one.

20     Q.   All right.  Is this another invoice your company

21  prepared?

22  A.   Yes.  And this one I believe my wife did.

23     Q.   All right.  The next page, please, that has 331 at

24  the bottom.

25  A.   Yes.

PEDRO PORTO - Direct

1        Q.    Could you tell us what that is?

2    A.    That's hydrofluoric painting.  And we did some stock on

3    the foundation inside the garage.

4        Q.    Is this another invoice your company prepared?

5    A.    Yes.

6        Q.    The next page, please, has number 332 at the bottom.

7    A.    Yes.

8        Q.    Tell us what this is.

9    A.    That's -- the house have some cracks after the work is

10   done.  And we went back there to fix it.

11       Q.    And so is this an invoice reflecting that work?

12   A.    Yes.

13       Q.    All right.  It's an invoice your company prepared in

14   the same manner?

15   A.    Yes.

16       Q.    The next page, please, Exhibit 333.  Could you tell

17   us what this is?

18   A.    That's invoice for payment for exterior.

19       Q.    All right.  Same thing.  An invoice your company

20   prepared?

21   A.    Yes.

22       Q.    The next page, sir, 334, what is this?

23   A.    Invoice for interior paint.

24       Q.    And is this also an invoice your company prepared?

25   A.    Yes.

PEDRO PORTO - Direct

1      Q.   The next page, sir, 335.  Is this an invoice your

2   company prepared relating to its work on 55 Lyman Road?

3   A.   Yeah.  Interior painting, yes.

4      Q.   The next page, 336, same question.  Is this an

5   invoice your company prepared?

6   A.   Yes.

7      Q.   All right.  Now, of these, the proposal and then

8   these subsequent invoices that we looked at, are these true

9   and accurate copies of your company's documents?

10  A.   Yes.

11     Q.   Were they prepared around the time that you did the

12  work?

13  A.   Yes.

14     Q.   Are these documents kept in the ordinary course of

15  your company's business?

16  A.   Yes.

17          MR. HARRIS:  So, Your Honor, I'd like to admit into

18  evidence the documents that are tab L-35 in Exhibit 175.

19          MR. CARNATHAN:  No objection, Your Honor.

20          THE COURT:  Okay.  They're admitted.

21   DEFENDANTS' EXHIBIT 175, TAB L-35 WAS ADMITTED INTO EVIDENCE

22          MR. HARRIS:  And do we agree with the summary page as

23  well?

24          MR. CARNATHAN:  We do.

25          MR. HARRIS:  Okay.  So for the record, that will also

PEDRO PORTO - Direct

1    include page 327 which is the summary page.

2             THE COURT:  Okay.

3             MR. HARRIS:  All right.  Thank you.

4    BY MR. HARRIS:

5        Q.   Sir, in that same binder, could you turn to the tab

6    that is C as in Charlie 31?

7    A.   Yes.

8        Q.   Do you have it?  All right.  And I want to turn your

9    attention to the second page in that tab.  It has the number

10   1541 at the bottom.  Do you see that?

11   A.   1541?

12       Q.   Yes.

13   A.   Yes.

14       Q.   Okay.  Could you tell us what this is, please?

15   A.   That's a proposal for 88 Cutler.

16       Q.   All right.  The other home, correct?

17   A.   Yes.

18       Q.   All right.  Same series of questions.  This is a

19   proposal your company prepared?

20   A.   Yes.

21       Q.   And perhaps I can shortcut this.  If you look at the

22   remaining pages in that tab, will you agree with me, sir, that

23   those are invoices that your company prepared with respect to

24   its work on 88 Cutler?

25   A.   Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PEDRO PORTO - Direct

1          Q.    Okay.  Are they true and accurate copies --

2     A.    Yes.

3          Q.    -- of your company's documents?  Were they prepared

4     by either you or your wife?

5     A.    Yes.

6          Q.    Were they kept in the ordinary course of your

7     company's business?

8     A.    Yep.

9          Q.    Were they made around the time that you did the

10    work?

11    A.    Yes.

12              MR. HARRIS:  Your Honor, I'd like to admit into

13    evidence the tab C-31 in Exhibit 175.

14              MR. CARNATHAN:  No objection, Your Honor.

15              MR. HARRIS:  And we can include the cover page?

16              MR. CARNATHAN:  Yes.

17              MR. HARRIS:  Including the cover page which is 1540.

18              THE COURT:  All right.  That's admitted.

19     DEFENDANTS' EXHIBIT 175, TAB C-31 WAS ADMITTED INTO EVIDENCE

20              MR. HARRIS:  Thank you.

21    BY MR. HARRIS:

22         Q.    How long has you company worked with Mr. Kagan or

23    his company?

24    A.    I used to work for another company.  I worked for Kagan

25    basically back from 2006, 2007.  I used to work for another

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PEDRO PORTO - Direct

1    company that did work for Kagan.  Then in 2011, I opened my

2    own company.  But basically from 2006, 2007.

3         Q.   And am I correct in assuming that you work for other

4    contractors as well?

5    A.   Yes.

6         Q.   Okay.  What's your company's practice for tracking

7    payments?

8    A.   I use my head.

9         Q.   Okay.  When you point to your head, it doesn't show

10   up on the record.  So tell us how you keep track.

11   A.   Well, I use -- I have everything in my head, but I --

12   sometimes I wrote -- I have a folder.  I print like a copy of

13   the checks paid and stuff like this.  And I wrote on the left

14   top side check number, date, and --

15             MR. HARRIS:  Could you please, Madam Clerk, switch

16   the screen back to Mr. Perten?

17   BY MR. HARRIS:

18        Q.   Mr. Porto, we're showing you on the screen -- there

19   was a witness that testified earlier.  He generated these

20   slides, okay?

21   A.   Uh-huh.

22        Q.   On the first -- this first slide that I'm showing

23   you on the screen, there are two copies of different invoices

24   from your company.  On the one on the left, you see the line

25   where it says where quality comes first?

PEDRO PORTO - Direct

1   A.   Yes.

2        Q.   And then on the right, this other person has

3   underlined that same sentence and pointed out that the

4   capitalization is different.   Is there any significance in the

5   way your company does business to the capitalization?

6   A.   Well, it's like a -- probably like a mistake.   But we

7   duplicate the invoice.   Sometimes we create one.   And probably

8   that's what happened.   We have like a small error.

9        Q.   Okay.   He pointed out on the one on the right there

10  that painting is misspelled.   Any significance to you?

11  A.   No.   That's my fault.

12        MR. HARRIS:   Okay.   Could you go to the next page on

13  the slides, please?

14  BY MR. HARRIS:

15        Q.   All right.   On this one, he's pointed out -- it's a

16  little hard to see on the screen, but he's pointed out that

17  you've used the same invoice number twice.

18  A.   Yes.

19        Q.   Tell us how the invoice numbers are generated for

20  these documents.

21  A.   Yeah.   That's the one we duplicated.   And the invoice

22  numbers stayed the same.

23        Q.   Did you actually do the work reflected on these two

24  invoices?

25  A.   Yes.

PEDRO PORTO - Cross

1          MR. HARRIS:  Okay.  I have no further questions at

2    this time, Your Honor.  Thank you.

3                        CROSS-EXAMINATION

4    BY MR. CARNATHAN:

5          Q.   Good morning, Mr. Porto.

6    A.    Good morning.

7          Q.   Am I right, sir, you've actually done quite a lot of

8    work for Mr. Kagan?

9    A.    Yes.

10          Q.   At least as of the time of your deposition back in

11   2015, he accounted for about half of your work at that time,

12   right, sir?

13   A.    Say it again.

14          Q.   Back in 2015 at least, Mr. Kagan accounted for about

15   half of the work your company did; is that right?

16   A.    What do you mean half of the -- half --

17          Q.   I think you testified that almost half of you work

18   was from Mr. Kagan's company at your deposition; is that

19   right, sir?

20   A.    I don't understand the question for half.

21          Q.   Well, at your deposition, you testified that about

22   eighty percent of your work is for contractors, right, sir?

23   A.    Oh, yes.

24          Q.   And at that time, you estimated that you had done

25   maybe thirty or so jobs for contractors, right?

PEDRO PORTO - Cross

1    A.    Okay, yes.

2          Q.    And you testified about that about fifteen of them

3    were from Mr. Kagan's companies, right, sir?

4    A.    Yes.

5          Q.    Are you still doing a lot of work for Mr. Kagan now?

6    A.    Yes.

7          Q.    Sir, if I understood things right, you also

8    testified that your standard process, if you will, on a job is

9    that you insist on being paid in about a week, right?

10   A.    Yeah.  Like a week, two weeks sometimes.

11         Q.    Right.  And if you're not paid in about a week, you

12   walk off the job, right?

13   A.    Well, normally, yes, but sometimes I wait a little bit

14   longer to get the payment for delays they have.

15         Q.    All right.  But on the Lyman-Cutler projects, you

16   got paid as agreed, right?

17   A.    Well, we get -- yeah.  I got paid for those two jobs.

18   Yes.

19         Q.    If we could take a look at -- and just to clarify,

20   you actually did get paid within a week on the Lyman-Cutler

21   jobs, right?

22   A.    I don't remember.

23         Q.    Would you agree with me your memory about it was

24   better back in 2015?

25   A.    The deposition?

PEDRO PORTO - Cross

1      Q.   Yeah.

2   A.   Yeah.

3      Q.   Yeah.  That was closer in time, right?

4   A.   Yeah.

5      Q.   And at that time, you were asked, "Did Mr. Kagan

6   always pay you within a week of you requesting payment?"

7      And you said, "Yes."

8   A.   Yes.

9      Q.   Now, you -- I think you also just testified that you

10  used a computer to prepare your invoices, sir?

11  A.   Yes, Pages.

12     Q.   Pages, like on a -- I think a Mac; is that right?

13  A.   It's a Mac, exactly.

14     Q.   All right.  And do you use -- do you have it set up

15  at a template?  Do you use more or less the same template each

16  time?

17  A.   Well, at that time, we started doing the local -- the

18  Decor Art local.  And we have one template we changed for

19  another one.

20     Q.   So if we just -- if we go into the tabs that you've

21  just identified for Mr. Harris, so if we look as Exhibit 175,

22  tab L-35 -- you with me so far?

23  A.   Where is that?  That's the Lyman or Cutler?

24     Q.   I guess it's Lyman.  It's right in the front of the

25  book.  It's the L-35 tab.

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

PEDRO PORTO - Cross

1   A.    Yes.

2       Q.    Okay.  And so we've got the Decor Art logo.  It's a

3   little bit obscured by the --

4   A.    Yes.

5       Q.    -- this accounting info.  But -- and then you've got

6   the where quality comes first.  And then you've got the

7   painting, plastering, stucco, EIFS.  What's EIFS?

8   A.    Exterior insulation finish system.

9       Q.    Okay.  And then you've got your website address,

10  right, sir?

11  A.    Yes.

12      Q.    Decorart.com?

13  A.    Yes.

14      Q.    And then you've got your email address.  And below

15  that you've got the phone number and a cell with the little

16  phone logos, right, sir?

17  A.    Yes.

18      Q.    And so if we turn the page, the next one has the

19  same logo, if you will, at the top right?  The logo is the

20  same; the where quality comes first.

21  A.    Yep.

22      Q.    All the same at the top, right, sir?

23          And that happens again.  If we turn the page to KDC

24  330, exactly the same, right?

25  A.    Yes.

PEDRO PORTO - Cross

1    Q.   Okay.  And if we continue through this exhibit, 331

2    is exactly the same?  332 is exactly the same?  And by all

3    means, pause to check me.  333 is exactly the same?

4    A.   You're talking about just the logo, right?

5    Q.   I'm just looking at the top.

6    A.   Just the top, okay.

7    Q.   Yeah.  I'm just looking --

8    A.   Yes.

9    Q.   -- at the --

10   A.   The top is the same.

11   Q.   -- that sort of slug where we've got the logo and

12   the slogan, if you will, and then your contact information.

13   It's all the same each time, right?

14   A.   Yes.

15   Q.   And if we go through this whole exhibit, they are

16   all exactly the same?  Take a moment.

17   A.   Yes.

18   Q.   All right.  Now, if we go to C-31 in Exhibit 175,

19   and if we just follow the same process, the first one, page

20   1541, the top is the same, right?  It's got the same logo,

21   same slogan, same information, right, sir?

22   A.   Yes.

23   Q.   And if we turn the page to 1542, exactly the same?

24   1543 is exactly the same?  1544 is exactly the same?  1545 is

25   exactly the same?

PEDRO PORTO - Cross

1              Now, I thought I noticed your face scrunch up a bit

2      when you were identifying the docs for Mr. Harris when we get

3      to 1546, right?

4      A.    1546, okay.

5          Q.    That's different, isn't it, sir?

6      A.    Yes.

7          Q.    All right.  It's got an underlining on the website

8      address?

9      A.    Yes.

10         Q.    Right?  It's in upper and lowercase.  It's no longer

11     in capitals.  And we look at the email, it's all in lowercase.

12     It's in italics.  It's been underlined.  That's different,

13     right, sir?

14     A.    Yes.

15         Q.    This isn't your form, is it, sir?

16     A.    Well, I -- again, me or my wife would create this

17     invoice, probably change something.  We changed the logo or

18     whatever is there, but exactly --

19         Q.    So you still say this is your form?

20     A.    Yes.

21         Q.    Okay.  And when we turn the page, we're back to the

22     original -- right, this one matches all the other documents

23     except 1546?

24     A.    Yes.

25         Q.    We turn the page again.  Now we're at 1548.  Matches

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VIKTOR SERGEEV - Direct

1  all the other documents except 1546?

2  A.   Yes.

3      Q.   And 1549 matches all the other documents except

4  1546, right, sir?

5  A.   Yes.

6         MR. CARNATHAN:  That's all I have for Mr. Porto.

7         MR. HARRIS:  Nothing for me, Your Honor.  Thank you.

8         THE COURT:  Thank you, Mr. Porto.

9         THE WITNESS:  I'm all set?

10        THE COURT:  Yep.  You're all set.

11        THE WITNESS:  Thank you.

12        THE COURT:  Thanks for coming in.

13        MR. HARRIS:  Thank you.

14        THE COURT:  All right.  He's free to leave the

15  courtroom, right?

16        MR. HARRIS:  Yes.

17        THE COURT:  Okay.

18        MR. CARNATHAN:  Yes, Your Honor.

19        MR. HARRIS:  Your Honor, we call Viktor Sergeev of V

20  AND D Heating.

21                  VIKTOR SERGEEV SWORN

22                  DIRECT EXAMINATION

23  BY MR. HARRIS:

24      Q.   Good morning, sir.

25  A.   Good morning.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VIKTOR SERGEEV - Direct

1      Q.   Please pull that microphone close to you.   Pull

2    it -- you can --

3           THE COURT:   You can pull it.

4           THE WITNESS:   Oh.

5           THE COURT:   It moves.   Be comfortable in the seat,

6    okay?

7    BY MR. HARRIS:

8      Q.   All right.   Could you please state and then spell

9    your name for the record?

10   A.   Viktor, V-I-K-T-O-R.   And last name Sergeev, S-E-R-G-E-V.

11     Q.   Thank you.   What do you do for work, sir?

12   A.   HVAC, heating, vent, air conditioning.

13     Q.   Okay.   Do you own a company or work for a company?

14   A.   I own a company.

15     Q.   What's the name of your company?

16   A.   V AND D HVAC.

17     Q.   All right.   How long have you been in business, sir?

18   A.   From 1999.   I'm working for myself.   Before, I worked for

19   somebody's company.

20     Q.   All right.   How many employees does V AND D Heating

21   have?

22   A.   Sometimes between two and four people.

23     Q.   Do you have a bookkeeper?

24   A.   Actually, I do it by myself.   I got an accounter (sic) on

25   the end of the year.

VIKTOR SERGEEV - Direct

1      Q.   Okay.  You do bookkeeping yourself, but you also

2   use --

3   A.   Yes.

4      Q.   -- use an accountant; is that right?

5   A.   Yes.

6      Q.   All right.  Did V AND D Heating perform work on what

7   we call the Lyman-Cutler project?  It's the two home at 88

8   Cutler and 55 Lyman.

9   A.   Yes, we did.

10      Q.   All right.  What kind of work does your company

11   perform?

12   A.   Air conditioning and heating.

13      Q.   Does your company do the work?

14   A.   Yes.

15      Q.   Does your company falsify any invoices?

16   A.   No.

17      Q.   Does your company bill for work that it did not do?

18   A.   No.

19      Q.   Now, some of the parties in this case have raised

20   questions about your work and your paperwork.  Have you ever

21   had any contact with Alex Filippov?

22   A.   No.

23      Q.   How about Nick Lipetsker?

24   A.   I saw him just a few times on job site, but -- I dojn't

25   even speak with him about --

Page 63

VIKTOR SERGEEV - Direct

1    Q.   Okay.  Did he ask you any questions about your

2  paperwork?

3  A.   No.

4    Q.   All right.  Have you had any contact with the

5  lawyers that represent Mr. Filippov and Mr. Lipetsker?

6  A.   I don't remember, no.  I think no.

7    Q.   Okay.  How about a gentleman by the name of Michael

8  Goldman?  Did he contact you and ask you questions about your

9  paperwork?

10  A.   Michael Goldman.  I don't remember his name.

11    Q.   All right.  Now, in front of you, sir, you should

12  have a binder.  And can you turn to the tab that is L-43?

13  A.   You mean this one here?

14    MR. HARRIS:  May I approach the witness, Your Honor?

15    THE COURT:  You may.

16  BY MR. HARRIS:

17    Q.   Okay.  Do you have the tab L-43 in front of you,

18  sir?

19  A.   Yes.

20    Q.   All right.  Could you turn to the second page?  And

21  at the very bottom, you should see the number 381.  Do you see

22  that?

23  A.   Yes.

24    Q.   Okay.  Tell us what this is, sir.

25  A.   This is my proposal for 55 Lyman Road.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VIKTOR SERGEEV - Direct

1    Q.    Whose handwriting is on this?

2    A.    Me.

3    Q.    I'm sorry?

4    A.    My hand.

5    Q.    It's your handwriting?

6    A.    Yes.

7    Q.    And is that your signature?

8    A.    Yes.

9    Q.    Could you tell us how you created this document?

10   A.    Usually it got created by capacity of system and quality

11   of equipment.

12   Q.    Okay.  It looks like, sir, that there's a form that

13   you fill in with your handwriting.  Do you agree with that?

14   A.    Yeah.

15   Q.    Okay.  So tell us about the form.  Where do you have

16   this form kept in your business?

17   A.    What do you mean form kept in --

18   Q.    Well, how did you create the -- leave your

19   handwriting out if it for a moment.

20   A.    Uh-huh.

21   Q.    Just the form part of it, how did you create that?

22   A.    I told them -- capacity of equipment and brands and just

23   put it together.

24   Q.    I'm asking about -- let's say the top part.  See

25   it's just a couple of boxes that has your company's name at

VIKTOR SERGEEV - Direct

1    the top?

2    A.    Yeah.

3         Q.    And there are a couple of boxes.  The form that you

4    actually filled out with your handwriting --

5    A.    Yes.

6         Q.    -- where did you get that form?

7    A.    Oh, just from Staples.

8         Q.    Staples, the store?

9    A.    The store, yeah.

10        Q.    Okay.  But this is -- we've established it's your

11   handwriting on this --

12   A.    Yes.

13        Q.    -- document, correct?  Now, turn to the next page,

14   the one that has 382 at the bottom.

15   A.    Yes.

16        Q.    And for right now, I'm just asking you about the

17   bottom half of this document.

18   A.    Uh-huh.

19        Q.    Okay.  Tell us what the bottom half is.

20   A.    This is an extra payment for heating for basement.

21        Q.    Okay.  It has -- on the top left, it says invoice.

22   Do you agree that this is an invoice?

23   A.    Yes.

24        Q.    All right.

25   A.    Yes.  It's an invoice.

VIKTOR SERGEEV - Direct

1      Q.   And, again, tell me about the form.

2   A.   The form is from the Staples.

3      Q.   From the store?

4   A.   Yeah, from the store.

5      Q.   Okay.  And there's a little number -- I think it's

6   607 -- I think it's 086 on the right.

7   A.   Yes.

8      Q.   Okay.  Where does that number come from?

9   A.   It's coming from store.  I mean it's invoices, numbered.

10      Q.   So these forms are like in a book?

11   A.   Yes.  It's a book.

12      Q.   All right.

13   A.   These numbers of pages.

14      Q.   All right.  Turn to the next page, please, the one

15   with 383 at the bottom.

16   A.   Yes.

17      Q.   Can you tell us what this is?

18   A.   Yeah.  This is for -- make repair for kitchen hood.

19   Sometimes it's for big kitchen hood, we need to make repair.

20      Q.   Okay.  And at the top where it says address, it

21   looks to me like this relates to both houses; is that --

22   A.   Yes.

23      Q.   Okay.

24   A.   Yes, because it's same houses.  And it's this price just

25   for two houses, because it's same job.

VIKTOR SERGEEV - Direct

1    Q.   All right.  And would you agree with me, sir, this

2    is also an invoice?

3    A.   Yes.

4    Q.   All right.  Is this your handwriting?

5    A.   Yes.

6    Q.   Okay.  The proposal and the invoices that we looked

7    at, are they true and accurate copies of those documents?

8    A.   Yes.

9    Q.   Were they made around the time that you did the

10   work?

11   A.   Yes, when we finished.

12   Q.   Okay.  Are these documents that your company keeps

13   in the regular course of its business?

14   A.   Yes.

15       MR. HARRIS:  Okay.  Your Honor, I'd like to move into

16   evidence as a full exhibit tab L-43 in Exhibit 175.

17       MR. CARNATHAN:  Your Honor, we object to the

18   authenticity of these.  I believe we have an agreement that

19   they would bring the originals with them here today.

20       MR. HARRIS:  We'll let the record reflect Mr. Perten

21   has handed Mr. Carnathan originals.

22       MR. CARNATHAN:  If I could --

23       THE COURT:  On the -- just on the microphone.

24       MR. CARNATHAN:  I'd actually like to have the

25   purported originals marked and perhaps just show them to the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VIKTOR SERGEEV - Voir Dire

1    Court.  If can hand them up or I can put them on the overhead.

2              THE COURT:  Oh, whatever you --

3              MR. CARNATHAN:  Or I would --

4              THE COURT:  I would allow it.  What do you want to

5    do?

6              MR. CARNATHAN:  Well, I'd either like to voir dire

7    the witness or have Your Honor reserve ruling until you hear

8    my cross.  But I'd like to have the originals marked as

9    opposed to the copies.

10             THE COURT:  Well, let's -- I think we should voir

11   dire the witness first.  Let's deal with the objection.

12                              VOIR DIRE

13   BY MR. CARNATHAN:

14        Q.   Mr. Sergeev --

15   A.   Yes.

16        Q.   I think you testified that this is a form from

17   Staples with your handwriting on it, right, sir?

18   A.   Yes.

19        Q.   Okay.

20        Q.   But in fact, when we look at this, you see at the

21   top -- see how the word proposal is sort of cut off at the

22   top?

23   A.   Yes.

24        Q.   And you see down at the bottom how the proposal

25   piece is cut off down at the bottom?

VIKTOR SERGEEV - Voir Dire

1    A.    Yes.

2         Q.    All right.  And if I come over and I --

3              MR. CARNATHAN:  May I approach the witness?

4              THE COURT:  You may.

5              THE WITNESS:  Uh-huh.

6    BY MR. CARNATHAN:

7         Q.    Having handed you that to hold, sir, would you agree

8    with me that's just regular paper, that's not some form paper

9    out of a Staples book, right, sir?

10   A.    Yeah.  It's Staples form, but I make sometimes, you know,

11   some copy of this report.

12        Q.    I guess what I'm proposing, sir, is that this isn't

13   actually the form, is it, sir?  This is a color photocopy?

14   A.    Yeah.  Would be.

15        Q.    Yeah.  And, in fact, if we look at the other

16   components of the proposed exhibit L-43, we've got --

17             THE COURT:  Do you know the Bates number of the first

18   page you showed him?

19             MR. CARNATHAN:  Yeah.  It's 381, Your Honor, in KVC

20   381.

21             THE COURT:  All right.  So if you could refer to what

22   you've shown him by his counterpart that was Bates stamped at

23   some point.  It is now proposed -- the proposed exhibit.

24             MR. CARNATHAN:  Thank you, Your Honor.

25             THE COURT:  That would help on appeal.  Thank you.

VIKTOR SERGEEV - Voir Dire

1   BY MR. CARNATHAN:

2       Q.   Okay.  I am now on to KVC 382, the next page in the

3   tab.  Okay.  And so I'm putting on the invoice that has

4   607086.  I've got that on the screen.  Do you see that, sir?

5   A.   Yes.

6       Q.   Okay.  And now I'm going to show you the other piece

7   of that particular page, 607088.

8   A.   Yes.

9       Q.   With me so far?

10          Now I'm going to turn the page.  And I'm going to

11  show you 603215.  Okay?  Are you with me?

12  A.   Yes.

13          MR. CARNATHAN:  If I -- may I approach the witness

14  again, Your Honor?

15          THE COURT:  You may.

16          THE WITNESS:  Uh-huh.

17          THE COURT:  Okay.  I think in this instance, I'll let

18  you inquire -- you want to inquire from here?

19          MR. CARNATHAN:  I don't want to be in his space.

20          THE COURT:  No, I don't like that.  But hold on one

21  second.  Just bear with me for one second.

22          All right.  I'm going to hand you another microphone

23  so you can be over there but not -- each of you will have a

24  microphone.  No singing allowed.

25  BY MR. CARNATHAN:

VIKTOR SERGEEV - Voir Dire

1    Q.   Okay, sir.  So I'm initially handing you 603215.

2  A.   Yes.

3    Q.   Would you agree with me, sir, that that's

4  actually -- I don't know if the right word is -- the scanning

5  kind of paper you get from --

6  A.   Yes, yes.

7         THE COURT:  Hold on.  Hold on.  Everyone hold.

8         COURT REPORTER:  I'm not picking his question up.

9         THE COURT:  You're not?

10         THE CLERK:  Okay.  Hang on.

11         COURT REPORT:  I did at first.  It's not --

12         THE COURT:  I wonder what happened.

13         Hold on.  I have another alternative.  Let's see if

14  this works.  That's good, yeah.

15         This is a lapel.  You can hold it or use it on the

16  lapel.

17         MR. CARNATHAN:  Are you picking it up now?

18         COURT REPORTER:  Barely.

19         THE COURT:  Just turn it a bit -- yeah.

20         MR. CARNATHAN:  How about now?

21         COURT REPORTER:  I'm not --

22         MR. CARNATHAN:  All right.  How about if I do this?

23         COURT REPORTER:  Better.

24         MR. CARNATHAN:  Better?  Okay.

25

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VIKTOR SERGEEV - Voir Dire

 1  BY MR. CARNATHAN:

 2      Q.   So, sir, when you look at 603215, that invoice,

 3  would you agree with me that that is actually pulled out of a

 4  Staples --

 5  A.   Yes.

 6      Q.   -- invoice book?

 7  A.   Yes.

 8      Q.   That's the actual paper?

 9  A.   Yes.

10      Q.   All right.  But when I hand you the other two --

11  A.   Yeah, this is --

12      Q.   -- 607086 and 607088, you'll agree with me those are

13  color photo copies?

14  A.   Yes.  It's color photo, yeah.  Okay.

15          MR. CARNATHAN:  Could I have the original of Cutler?

16          THE WITNESS:  No problem.

17          MR. CARNATHAN:  Cutler?

18          MR. HARRIS:  I haven't done Cutler.

19          MR. CARNATHAN:  Well, but it goes to the same point.

20  BY MR. CARNATHAN:

21      Q.   All right, sir.  I'm next going to put up -- I'm now

22  in tab C-41 which has a Bates number of KAG 2033 at the bottom

23  right corner.  And I'm going to put the purported original up

24  on the screen.  All right.  Are you with me, sir?

25  A.   Yes.  Yes.

VIKTOR SERGEEV - Voir Dire

1      Q.   You'll notice that, again, the word proposal is cut

2   off at the bottom, right, sir?

3   A.   Yeah.  It's photocopy.

4      Q.   And if I walk over and let you hold it for a moment,

5   that's just regular paper, right, sir?

6   A.   Yes.

7      Q.   All right.  So that's just a color photocopy too,

8   right?

9   A.   Yes.

10        MR. CARNATHAN:  Now, perhaps, Mr. Hartzell, can you

11   get the two up on the screen, side-by-side?  Is that the

12   easiest way to do that?

13                          (Pause)

14   BY MR. CARNATHAN:

15      Q.   Mr. Sergeev?

16   A.   Yes.

17      Q.   I now have the two documents up on screen.  Mr.

18   Hartzell has up them on the screen, side-by-side.  So on the

19   left side, we have KAG 2033 which is the 88 Cutler invoice.

20   And on the right side is KVC 00381 which is the Lyman invoice.

21   You with me?

22   A.   Yes.

23      Q.   Okay.  And the addresses are obviously different in

24   the proposal submitted to, right, sir?

25   A.   Yes.

VIKTOR SERGEEV - Voir Dire

1    Q.    But when we look at the text in the box, it's

2    exactly the same, right?

3    A.    Yes.

4    Q.    I mean, exactly.

5    A.    So what?  It's two exactly the same houses.

6    Q.    All right.

7    A.    One --

8    Q.    One was photocopied from the other and changed the

9    address, right, sir?

10   A.    I don't know.  I don't remember right now.

11   Q.    I mean, it's the same right down to the stroke

12   marks.  I mean, there's no differential whatsoever?

13   A.    Could be.  I don't remember right now if I write down new

14   one or just copy.

15                        (Pause)

16   Q.    Okay.  Mr. Sergeev, on the right-hand side of the

17   screen is now Plaintiff's Trial Exhibit 118 for

18   identification.

19           MR. HARRIS:  Your Honor, I object.  We're now

20   bringing in a document unrelated to Lyman-Cutler.  And it also

21   goes well beyond the voir dire that should be focused on in

22   the admissibility of these particular exhibits.

23           THE COURT:  Where are you going with this?  Mr.

24   Carnathan, where are you going with this?

25           MR. CARNATHAN:  Actually, I apologize.  I picked the

VIKTOR SERGEEV - Voir Dire

1  wrong exhibit for this point.  So let's -- I'll withdraw that

2  question.

3          THE COURT:  All right.

4          MR. CARNATHAN:  Yeah.

5  BY MR. CARNATHAN:

6      Q.   Sir, we sent you a subpoena too, right?

7  A.   Subpoena?

8      Q.   Do you remember getting a subpoena from my office?

9  A.   I don't remember a subpoena.

10     Q.   All right.  You produced documents to us?

11 A.   I produced documents.

12         MR. CARNATHAN:  Yeah.  May I approach again, Your

13 Honor?

14         THE COURT:  You may.

15 BY MR. CARNATHAN:

16     Q.   Okay, sir.  So I'm now showing you a subpoena that

17 we sent to V and D Heating and Cooling.

18 A.   Yes.

19     Q.   Do you remember receiving that?

20 A.   Yes.

21     Q.   And you produced documents to us in response to it?

22 A.   Yes.

23     Q.   All right.  You produced a copy of this check?

24 A.   Yes.

25     Q.   Produced a copy of that check?

VIKTOR SERGEEV - Voir Dire

1    A.    Yes.

2         Q.    Produced a copy of another check?

3    A.    Yes.

4         Q.    And yet another check?  Okay.

5              You also produced a copy of the 55 Lyman Road

6    proposal, right?

7    A.    Yes.

8         Q.    And you notice, excuse me, that it's got a little

9    kind of paperclip mark in the upper left?

10   A.    Uh-huh.

11        Q.    See that little paperclip mark?

12   A.    Yes.

13        Q.    You see how V and D Heating and Cooling is sort of

14   cut off at the top?

15   A.    Yes.

16        Q.    And the number there is cut off at the top?

17   A.    Uh-huh.

18        Q.    And at the bottom, the proposal piece is cut off at

19   the bottom?

20   A.    Yes.

21        Q.    Now, if I put L-43, page 331, the proposed exhibit

22   up on the screen --

23   A.    Yes.

24        Q.    It's -- I'm trying to do it on the overhead -- it's

25   got exactly the same paperclip mark.  Right, sir?

VIKTOR SERGEEV - Voir Dire

1   A.   Yes.

2       Q.   It's cut off at the top in exactly the same way,

3   right?

4   A.   Yeah.  I see this.

5       Q.   It's cut off.  The number in the upper right corner

6   is cut off in exactly the same way?

7   A.   yes, I see this.

8       Q.   Yes.  And down at the bottom, the proposal is cut

9   off, right?

10  A.   Yes.

11      Q.   All right.  So let's look at the other one.  Okay.

12  So now I've got the subpoena response back up on screen.

13  A.   Uh-huh.

14      Q.   This one has got a little paperclip in the upper

15  left corner, right?

16  A.   Yes.

17      Q.   And this one down at the bottom, you can see the

18  first signature line.  The second one is cut off, right?

19  A.   Yes.

20      Q.   All right.  Now, I'm putting on screen the component

21  of C-41 which is KAG 2033.  It's got exactly the same

22  paperclip in the upper left corner, right, sir?

23  A.   Uh-huh.

24      Q.   And down on the bottom, the signature line is cut

25  off in exactly the same way, right, sir?

VIKTOR SERGEEV - Voir Dire

1   A.   Yes.

2        Q.   So did you send these documents to Mr. Kagan or did

3   he send them to you?

4   A.   I think I sent it to them.  I'm sorry, but my brain --

5   sometimes there's not enough space.  I wasn't prepared to

6   recall this proposal correct.

7        MR. CARNATHAN:  That concludes my voir dire for the

8   moment, Your Honor.  But I would like the originals to be

9   marked if anything I going to come in.

10       THE COURT:  All right.  So I have a -- I have an

11  objection.  I have a proposal to admit these documents, the

12  ones that are in the binder.  I have your objection on the

13  basis of that they're not authentic.  Is that your --

14       MR. CARNATHAN:  That's correct, Your Honor.  It's a

15  best evidence thing.  We don't think these are actual

16  originals.  We don't think they're authentic.  I would think

17  the evidence shows that they're unreliable.

18       THE COURT:  Go ahead, Mr. Harris.

19       MR. HARRIS:  I wasn't sure if you were waiting for me

20  or not.

21       THE COURT:  No.  I wasn't sure either.  I'm thinking

22  at the moment.  But go ahead.

23       MR. HARRIS:  All right.  I think I just heard two

24  possible objections, best evidence and authentication.

25       THE COURT:  Right.

1           MR. HARRIS:  Two separate rules.

2           The best-evidence rule requires a genuine question

3    about whether these are accurate copies or not.  And all we've

4    heard about is photocopiers cutting off the tops and bottoms.

5    There's not a single word of complaint by the plaintiffs about

6    any of the actual substance of these documents, the numbers,

7    what was charged, what was proposed.

8           With respect to authenticity, not a high bar.  We

9    have a witness who testified from personal knowledge.  It's

10   his handwriting all over these documents.  So again, we think

11   these should be admitted.

12          As a side note, we don't have any objection to

13   marking these originals as additional exhibits.  But the

14   documents in the binder should be admitted.

15          THE COURT:  Okay.  Do you want to argue to me, Mr.

16   Carnathan, about what you think the voir dire demonstrated in

17   support of your objection?

18          MR. CARNATHAN:  Well, I think that we've demonstrated

19   that these are definitely not original documents.  And the

20   best evidence rule is designed to apply when there's a

21   question about authenticity.  If there's a question about

22   authenticity, they're supposed to produce the originals.  And

23   these are handwritten documents that are obvious mirror images

24   of one another that obviously have been photocopied.

25          We have the same document being produced by the

1 | vendor as by the payee.  Like KDC has the exact same document

2 | right down to the staple mark and the paperclip mark and the

3 | cutoffs in his files as in the other guy's files.  So

4 | obviously they swapped somewhere along the line.

5 | So where there's a question about whether these

6 | things are real, they were obligated to come forward with

7 | these actual Staples forms, right?  I mean, he said they were

8 | said Staples forms and that he wrote on them in hand.  Clearly

9 | there was a Staples form at some point in the process, but

10 | it's been copied, copied, copied.  And the address keeps

11 | getting changed; perhaps photo shop, perhaps something else.

12 | I don't know how they're doing it.

13 | But there's no reason to believe that these invoices

14 | reliably reflect what was billed here and what is owed here.

15 | THE COURT:  Well, that's not what we're looking at

16 | though.  The only issue on authenticity under the rules is are

17 | they what they purport to be.

18 | May see the originals that were tendered this

19 | morning?  Thank you.

20 | I see what you're saying.

21 | So the -- I've got three half-page documents that

22 | appear to have original handwriting in pen on them.  They

23 | appear to be originals.  They have I assume invoice numbers in

24 | red on each of them in red color on each of them, 603215,

25 | 607088, and 607086.

1        Then I have two full -- I have three full page

2   documents that were handed to me.  Two of them have V and D

3   Heating and Cooling as a heading.

4        And the third one has a -- has some handwriting on

5   the top called tile installation.  It's a printed job invoice

6   both on top and on the bottom and has some handwriting on it.

7        Mr. Harris, could you hand these two documents that

8   I'm going to hand you, it's V and D Heating and Cooling, the

9   two that full pages and have -- are imprinted with the words V

10  and D Heating and Cooling.  One is proposal number 2231.  One

11  is -- 2230 is dated 12/6/13.  And 2231 is dated 12/5/13.

12  Could you hand those to the witness for me?

13        MR. HARRIS:  Yes, sir.

14        THE COURT:  Thank you.

15        THE WITNESS:  Uh-huh.

16        THE COURT:  Okay.  So you have those.  It's -- I'm

17  sorry.  It's Mr. --

18        THE WITNESS:  Sergeev.

19        THE COURT:  Sergeev?

20        THE WITNESS:  Yeah.

21        THE COURT:  Okay.  Mr. Sergeev, those two documents

22  that you're looking at, are they copies or is that an

23  actual -- is that the actual document on which you wrote with

24  pen?

25        THE WITNESS:  This one is actual -- I think it's -- I

1    wrote by pen and maybe I copied for Cutler or Lyman which is

2    later because it's identical.

3             THE COURT:  I understand that.  But my question is,

4    on each of those two documents, are either of them here in

5    this -- any these to --

6             THE WITNESS:  Yeah.  This is one original and one --

7    I think if I make a copy, just change headers.

8             THE COURT:  So one of those two documents and I'll

9    get --

10            THE WITNESS:  Yes.

11            THE COURT:  Hold on.  One of those two documents --

12            THE WITNESS:  Yes.

13            THE COURT:  -- has your actual pen writing on it?

14            THE WITNESS:  Yes, yes.

15            THE COURT:  Which one?  Identify it.

16            THE WITNESS:  88 Cutler Lane.

17            THE COURT:  Okay.  And the other one is a photo copy?

18            THE WITNESS:  Yes.

19            THE COURT:  But did you ever handwrite a second one,

20   do you see what I mean, or did you just copy --

21            THE WITNESS:  Yes, I write -- because it's different

22   addresses and different date.

23            THE COURT:  But the date and the address, is that

24   your handwriting on --

25            THE WITNESS:  Yes.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1          THE COURT:  -- that document?

2          THE WITNESS:  Yes.

3          THE COURT:  Your actual pen handwriting?

4          THE WITNESS:  Yes, yes.

5          THE COURT:  Okay.  All right.  That's his testimony.

6      Here's what I'm going to do.  I'm going to take

7  everything -- it's almost a minute.  I'm going to take a

8  minute, okay?  I'm going to go into chambers.  I'm going to

9  give you -- we'll take our morning break right now. Okay?

10         MR. HARRIS:  Could I just be heard for five seconds?

11         THE COURT:  Absolutely.  You can be heard for as long

12  as you want.

13         MR. HARRIS:  Okay.  No.  I only need five seconds.

14         THE COURT:  Yep.

15         MR. HARRIS:  As he just testified, these are two

16  identical houses.  And as you can see, he wrote these -- one

17  of them out by hand.  So logically, after I'm done writing out

18  one, I'm going to feed it through the copy machine, change the

19  address, and make it for the other one.

20         THE COURT:  So he's -- what you have tendered today

21  as originals on those two documents, one of them, the body in

22  each of them, is identical.  One has his actual pen marks on

23  it, handwriting on it in pen.  The other one is a copy, at

24  least the body of it.

25         MR. HARRIS:  It is the original proposal number --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    the second -- whatever one in the chain in that it's what he

2    created.  The manner in which he created it was by writing out

3    one, sticking it through the copy machine, and changing the

4    address.  I mean, it's an original in the sense that that's

5    what we have.

6              THE COURT:  All right.

7              MR. CARNATHAN:  If I can just briefly reiterate --

8              THE COURT:  Yeah, yeah, by all means.  I'm not sure

9    I'm fully appreciating it, but go ahead.

10             MR. CARNATHAN:  It's apparent to me at least that

11   neither of them is an original.  Neither one is an actual

12   Staples form.  He testified that he wrote these things out on

13   Staples forms.  These are photocopies of some other thing.  As

14   you can see how it's shifted a little bit, like the word

15   proposal is cut off at the bottom, cut off at the top, the

16   signature thing is cut off, this is not the form from Staples.

17   This is some kind of weird color photocopy.

18             THE COURT:  Is it -- your contention is that neither

19   of the documents, the full-page documents that were tendered

20   as originals that I identified earlier, neither of them have

21   original pen handwriting on them?

22             MR. CARNATHAN:  That's our contention, yeah.  We

23   think they're just well-done color photocopies.

24             THE COURT:  And what's the significance of all that?

25             MR. CARNATHAN:  Well, it's very significant when you

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    look at what we're talking about here which is that they made

2    up paperwork to kind of fill in what they wanted to charge us.

3            So very seriously, what we think here is that Mr.

4    Cohen fired up his photo shop or something and created these

5    color photocopies and got Mr. Sergeev to go along with it.

6    And when you look at these particular documents when you've

7    got these staple -- the paperclip, the way they're cut off in

8    the same in both people's files, right, it's telling.  You've

9    got precise photocopies in both people's files.  So somebody

10   sent one to the other.

11           And so I suppose one could disagree with us and

12   conclude that Mr. Sergeev made photocopies and sent them along

13   after the fact and this is less sinister than it seems.  But

14   in context, certainly the evidence seems to suggest that these

15   things were ginned up after the fact.  And they're not

16   originals.  They shouldn't be originals.

17           MR. HARRIS:  I would like to -- I had not addressed

18   the production of documents and the staple and paperclip

19   thing.  I mean, that is a completely separate issue than the

20   one you've been grappling with it seems to me.  How documents

21   got produced in response to a subpoena or a deposition is

22   completely than the task I think I had.

23           THE COURT:  Yeah.  I think I agree.  I do agree with

24   that.  That's a different issue.

25           MR. HARRIS:  Yeah.  And again, I'm just -- so we have

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    to -- before we even get to the question of whether we need

2    originals or copies or any of that, you've got to find that

3    there was a genuine issue raised --

4            THE COURT:  Yeah.

5            MR. HARRIS:  -- with respect to whether the numbers

6    on these documents are wrong.  And that has never come up.

7            THE COURT:  Okay.  I think I've heard enough to say

8    that I'll admit them over the objection.  But these originals

9    should be marked and remain in the trial record.

10           This is the kind of thing, frankly, that under Rule

11   702, I could -- it might be a little beyond the ability of the

12   trier of the facts to determine -- it requires a certain level

13   of expertise that a general trier of fact like myself doesn't

14   possess to look at those documents and say that's not original

15   handwriting it or is.  But I have that from the witness that

16   says it is.  So if in rebuttal, if there were additional

17   testimony, I'd certainly hear it on that point.

18           But so I'm going to overrule the objection as to

19   authenticity and best evidence.  And I -- but I'll direct that

20   these documents be marked as something.  We'll put a number on

21   this.

22           MR. HARRIS:  Yes.

23           THE COURT:  And they'll stay in the record, okay?

24           MR. HARRIS:  Yes, sir.

25           THE COURT:  Is that all I -- that's all I have

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

1    pending, correct?

2            MR. HARRIS:  Yes.  So at the moment, all I've

3    tendered for you is tab L-43.

4            THE COURT:  Right, okay.  So that's admitted with

5    that proviso, with that ruling.  Okay?

6     DEFENDANTS' EXHIBIT 175, TAB L-43 WAS ADMITTED INTO EVIDENCE

7            MR. HARRIS:  Yes, sir.

8            THE COURT:  I'll hand these back to --

9            MR. HARRIS:  I want to collect the other --

10           THE COURT:  Yeah.  You collect them.  You take

11   control of them, put them in some form.  I guess you can hand

12   them to me right now.  But when you do that, I don't know that

13   they've really been fully described on the record.  So I'd

14   like you to do that, what it is you're handing me.  And we'll

15   mark it -- we're going to give them another number.

16           So we're going to admit what's in the binder, but Mr.

17   Harris is going to -- and this will -- I don't know what that

18   number is.

19           MR. HARRIS:  Okay.  The documents in the binder are

20   in 175.  And it's tab L-43 you have now --

21           THE COURT:  All right.

22           MR. HARRIS:  -- admitted into evidence.

23           THE COURT:  So just for clarity, is there a 176 yet?

24           MR. HARRIS:  We're going to be on the 300s, Your

25   Honor, with these new ones.

1        THE COURT:  That's all fine.  So you call this a new

2    number?

3        MR. HARRIS:  Yes, sir.

4        THE COURT:  All right.  So that -- and go ahead and

5    connect the dots for us on the record.

6        MR. HARRIS:  All right.  So -- excuse me, Madam

7    Clerk.  Do you know what the next number will be?

8        THE CLERK:  338.

9        MR. HARRIS:  338.  Okay.

10       THE CLERK:  38.

11       MR. HARRIS:  338.  So for the record, we are going to

12   mark as a composite exhibit, as Exhibit 338 three full-page

13   documents that we've been speaking as originals.  One is a --

14   actually, Your Honor, now that I'm looking at this, this job

15   invoice for tile installation does not related to V and D

16   Heating.  The one that said tile installation, that's a

17   different --

18       THE COURT:  Different vendor?

19       MR. HARRIS:  Different person.

20       THE COURT:  Different vendor?

21       MR. HARRIS:  Yes.

22       THE COURT:  Okay.  Well, that's irrelevant to this

23   then.  That shouldn't be there at all.

24       So describe the composite exhibit on the record then.

25       MR. HARRIS:  So Exhibit -- Composite Exhibit 338 will

VIKTOR SERGEEV - Direct

1   be two full-page eight-and-a-half-by-eleven sheets, V and D

2   Heating and Cooling proposal number 2230 and 2231.  And then

3   we will also include in Exhibit 338 three half-page sheets

4   also with V and D Heating and Cooling on top.  And they are

5   invoice number 603215, 607088, and 607086.

6           THE COURT:  Okay.  All right.  I'm still going to

7   take a break I think unless -- how much more do you have with

8   this witness?

9           MR. HARRIS:  I have another ten minutes or so.

10          THE COURT:  Well, do your ten minutes so we can get

11  back to work.

12          MR. HARRIS:  All right.

13                  RESUMED DIRECT EXAMINATION

14  BY MR. HARRIS:

15      Q.   Okay.  Sir, could you turn back to the binder that

16  is in front of you?  And turn to tab C-41.  Do you have that,

17  sir?

18          MR. HARRIS:  May I approach --

19          THE WITNESS:  Yes.

20          MR. HARRIS:  -- the witness?

21          THE WITNESS:  You may.

22  BY MR. HARRIS:

23      Q.   Okay.  Sir, I want to turn you to the second page.

24  It has the number 2033 at the bottom.

25  A.   Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VIKTOR SERGEEV - Direct

1     Q.   Okay.  Would you move the microphone a little

2     closer?

3     A.   Yes.

4     Q.   Thank you.  Tell us what this is, please.

5     A.   This is proposal for 88 Cutler Lane.

6     Q.   Okay.  Is it your handwriting?

7     A.   Yes.

8     Q.   Is it a document that you prepared?

9     A.   Yes.

10    Q.   Is it made around the time that you did the work at

11    88 Cutler?

12    A.   Yes.

13    Q.   Is it a true and accurate copy of your proposal?

14    A.   Yes.

15    Q.   Would you turn to the next page that has 20134 at

16    the bottom?

17    A.   Yes.

18    Q.   And I want to direct your attention to the top half

19    of that document.  Tell us what that is.

20    A.   It's a payment for basement heating zone.

21    Q.   Sorry.  Say that again, please.

22    A.   It's for heating zone in the basement.

23    Q.   Okay.  And is this an invoice related to 88 Cutler?

24    A.   Yes.

25    Q.   Is it a true and accurate copy?

VIKTOR SERGEEV - Direct

1   A.   Yes.

2       Q.   Is it a document that you created around the time of

3   the work?

4   A.   Yes, I did.

5       Q.   Is it something that you keep in the regular course

6   of your business?

7   A.   Yes.

8       Q.   And the next page, please, has number 2035 at the

9   bottom?

10  A.   Yes.

11      Q.   Will you tell us what this is, please?

12  A.   This is extra payment for two houses, main cafe or for

13  kitchen food.

14      Q.   Okay.  And this one relates to both 88 Cutler and 55

15  Lyman?

16  A.   Yes, that's right.

17      Q.   It's a document that you prepared?

18  A.   Yes.

19      Q.   Is it a true and accurate copy?

20  A.   Yes.

21      Q.   Is it a document your company keeps in the regular

22  course of its business?

23  A.   Yes.

24          MR. HARRIS:  Your Honor, I'd like to admit as a full

25  exhibit tab C-41 in the binder on 175.

VIKTOR SERGEEV - Direct

1          MR. CARNATHAN:  We have the same objection, Your

2     Honor.

3          THE COURT:  Okay.  In order to avoid going through

4     all of that again, it's the same objection based on the

5     same -- is there a factual difference between this current

6     group of documents and the ones that we talked about earlier?

7          MR. CARNATHAN:  No, Your Honor.  It has the same

8     predicate as I've already done.

9          THE COURT:  Fine.  So I'll overrule the objection.

10    And the same ruling.  And they'll be admitted then.

11     DEFENDANTS' EXHIBIT 175, TAB C-41 WAS ADMITTED INTO EVIDENCE

12         THE COURT:  But will ask that -- are the -- have the

13    originals been produced?

14         MR. HARRIS:  They are within the same composite that

15    will be 338.

16         THE COURT:  Okay.

17         MR. HARRIS:  Attorney Carnathan voir dired on both

18    homes.  So they're --

19         THE COURT:  Oh, that's right.  Okay.  All right.  So

20    they're in 338.

21         Hold one second.

22         I think there's a problem with the proposed exhibit

23    C-41.  In my book, it includes that tile installation --

24         MR. HARRIS:  Yes, I see that.

25         THE COURT:  -- document and some checks.

VIKTOR SERGEEV - Direct

1       MR. HARRIS:  Yes.

2       THE COURT:  Go ahead.

3       MR. HARRIS:  What I propose, Your Honor, why don't I

4   limit what I'm offering, just the particular ones but -- and

5   then during the break, I'd like to just confer with Mr. Kagan

6   to make sure my belief is correct that the tile installation

7   documents don't relate to V and D Heating.

8       THE COURT:  All right.  Well, we'll reserve on that.

9       Are the checks part of what are being offered, the

10  copies of checks?  They're in my --

11      MR. HARRIS:  My belief, subject to confirming with

12  Mr. Kagan, the checks relate to vendors other than V and D

13  Heating.

14      THE COURT:  All right.  So that needs to be -- you're

15  going to want to adjust this.

16      MR. HARRIS:  Yes.

17      THE COURT:  But you want to confer with your client

18  first.

19      MR. HARRIS:  I would.

20      THE COURT:  All right.

21      MR. HARRIS:  Yes.

22      THE COURT:  As much as I wanted to get you back to

23  doing what you do, I'm going to take the break now so that

24  they can get this document straightened out.  And then we'll

25  come back and finish your testimony, okay?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VIKTOR SERGEEV - Direct

1           THE WITNESS:  Okay.

2           THE COURT:  All right.

3           THE WITNESS:  Yes.

4           THE COURT:  Thank you.  All right.  We'll take a

5    short break.

6                    (Off the record at 11:05 a.m.)

7                     (On the record at 11:35 a.m.)

8           THE CLERK:  The Court is in session.

9           THE COURT:  Be seated.

10          All right.  Whenever you're ready.

11          MR. HARRIS:  Yes.  Just a tie-up with respect to tab

12   C-41.  We've discussed -- and there are pages that relate to a

13   different vendor in there, so I discussed it with Attorney

14   Carnathan.  We will remove those pages from that tab so that

15   that tab will relate just to V&D Heating.

16          THE COURT:  That's fine.

17          MR. HARRIS:  Okay.

18          THE COURT:  Okay.

19          MR. HARRIS:  So with that, I think I'm still awaiting

20   a ruling from Your Honor to admit C-41.

21          THE COURT:  I'll admit it on the same -- with the

22   same ruling as I did with respect to the just prior exhibit.

23      DEFENDANTS' EXHIBIT C-41 WAS ADMITTED INTO EVIDENCE

24          MR. HARRIS:  Okay.  Thank you.

25                   RESUMED DIRECT EXAMINATION

VIKTOR SERGEEV - Direct

1  BY MR. HARRIS:

2      Q.   Sir, let me ask you -- you gave us a little bit of

3  testimony -- how did you -- how'd you come up with the number

4  to charge on the Lyman-Cutler project?

5  A.   As I told you, it depends the capacity of units and brand

6  and quality of equipment.

7      Q.   How do you keep track of payments that you receive?

8  A.   Under a book in the house, and I write down payments, you

9  know, all amount for my proposal and payments.

10     Q.   Are you owed any money on the Lyman-Cutler project?

11 A.   Yes.

12     Q.   How much?

13 A.   Oh, if I remember, 39,000-something.

14     Q.   39,000?  Is that for --

15 A.   Both.

16     Q.   Both homes?  Okay.

17     MR. HARRIS:  I have nothing further, Your Honor.

18 Thank you.

19     THE COURT:  Okay.

20                    CROSS-EXAMINATION

21 BY MR. CARNATHAN:

22     Q.   So Mr. Sergeev, the proposals were dated in December

23 of '13, right, sir?

24 A.   Which one?

25     Q.   Both.  If we look at tab --

Page 96

VIKTOR SERGEEV - Cross

1   A.   No, it's --

2        Q.   -- L-43, KDC 381, the proposal's dated December 6th,

3   2013, right, sir?

4   A.   I have just one proposal in book.  It's 88 Cutler.  I

5   don't remember second one.  I can see this one is December

6   6th, 2013.

7        Q.   2013, right?

8   A.   Yes.

9        Q.   All right.

10  A.   88.  Another one, I don't know.  I don't have copy in my

11  book.

12       Q.   All right.  Did you need to get a permit before you

13  did the work, sir?

14  A.   Yes.

15       Q.   And did you get a permit before you started the

16  work?

17  A.   Yes.

18            MR. CARNATHAN:  Could I have, I guess, Impeach 50,

19  please?  Oh, sorry.

20            THE CLERK:  There we go.

21  BY MR. CARNATHAN:

22       Q.   Okay.  Do you recognize this as your application for

23  a permit for 88 Cutler, sir?

24  A.   Yes.

25       Q.   Okay.  And that's dated December 26th, 2013, right?

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VIKTOR SERGEEV - Cross

1    A.    Yes.

2        Q.    And at that time, you estimated the job cost to be

3    $18,500, right, sir?

4    A.    No, I estimated before.  First of all, I sign it

5    proposal.  And after that, I pull out for permit.  It takes

6    sometimes one, two, three weeks between proposal and permit.

7        Q.    Okay.  So you did your proposal, but when you went

8    to the town, you put the estimated job cost as 18,500, right,

9    sir?

10   A.    Yes, but actually, they ask me for duct work, sheet metal

11   permit.  It's not includes equipment.  For example, heating

12   system and equipment for air conditioning, it's not includes.

13   It includes only duct work.  If you see, it says sheet metal

14   permit.  It's nothing to do with equipment.

15       Q.    Okay.  So on 88 Cutler, if we look at C-41, KAG

16   2032, would you agree with me, sir, that you've been paid

17   $45,000 for your work on 88 Cutler?

18   A.    You wants to me say, yes, by heart after five years?

19   Maybe.  I don't remember numbers right now, by heart.

20       Q.    Okay.  And did you actually do the work at the end

21   of 2013, beginning of 2014, sir?

22   A.    Yes.  Actually, I did some work after bankruptcy

23   (indiscernible) because we going to finish house.  And I think

24   Kagan asked me to finish everything, you know.  Even after we

25   were sold houses -- they sold houses; I did some job for them.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VIKTOR SERGEEV - Cross

1   I didn't charge this.

2        Q.   Okay.  And if we go to Impeach 47 you also needed

3   to get a permit for 55 Lyman, right, sir?

4   A.   47?

5        Q.   I'm going to have Mr. Hartzell put it up on the

6   screen for you.  This won't be in your book.

7   A.   Um-hum.  Um-hum.

8        Q.   Yeah.  Yeah.

9   A.   Okay.

10        Q.   So you applied for a permit for 55 Lyman on February

11   11th, 2014, right, sir?

12   A.   Yes.

13        Q.   And that one also estimates the job cost at 18,500,

14   right?

15   A.   Yes.

16        Q.   Okay.  And if I look at L-43, KDC 00380, you've been

17   paid $45,550 on that job, right, sir?

18   A.   I can't say numbers because I don't remember.  I don't

19   remember.  Yeah, there was some payments.

20        Q.   Okay.  And as you sit here today, you still haven't

21   been paid the other $39,000 you say --

22   A.   Yes.

23        Q.   -- you're owed?

24   A.   For both houses.

25        Q.   Okay.

VIKTOR SERGEEV - Cross

1          MR. CARNATHAN:  That's all I have for Mr. Sergeev.

2          THE COURT:  Okay.  Thank you.

3          MR. HARRIS:  Nothing from me, Your Honor.  Thank you.

4          THE COURT:  All right.  Thank you very much for

5     coming in today.

6          THE WITNESS:  Thank you.

7          THE COURT:  He's free to leave, correct?

8          MR. HARRIS:  Yes.

9          THE COURT:  All right.

10          MR. HARRIS:  Thank you.

11          Your Honor, I call Boris Stanik of BST Plumbing.

12          THE COURT:  Okay.

13          THE CLERK:  Please raise your right hand.

14                         BORIS STANIK SWORN

15          THE CLERK:  Please be seated.

16                         DIRECT EXAMINATION

17     BY MR. HARRIS:

18          Q.   Good morning, sir.

19     A.   Good morning.

20          Q.   Good morning.  Could you please state and then spell

21     your name into the record, please?  You can say --

22          THE COURT:  No, no.  And Mr. Stanik, you can move

23     that microphone -- move it right toward yourself and speak

24     into it so that we -- because we record -- we record here.  Be

25     comfortable, but keep that between you and counsel, and it'll

BORIS STANIK - Direct

1    work fine for us, okay?

2           THE WITNESS:  Thank you.  I'll try.

3           THE COURT:  All right.  He wanted you to identify

4    yourself and spell your name.

5           THE WITNESS:  My name is Boris Stanik.

6    BY MR. HARRIS:

7       Q.   Could you spell your last name, please?

8    A.   S-T-A-N-I-K.

9       Q.   Okay.  Thank you.  What do you do for work, sir?

10   A.   Plumbing.

11      Q.   All right.  Do you work for a company?

12   A.   I own a company, which is BST Plumbing.

13      Q.   All right.  Thank you.  How long have you been in

14   business, sir?

15   A.   Twenty years.

16      Q.   Okay.  How many employees do you have?

17   A.   I have three employees.

18      Q.   Do you have a bookkeeper?

19   A.   No, my wife help me with that.

20      Q.   Your wife?

21   A.   Yes.

22      Q.   Okay.  Do you have an accountant?

23   A.   Yes, I do.

24      Q.   All right.  Do you use any bookkeeping or accounting

25   software for your business?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS STANIK - Direct

1   A.   Yes, my wife does.  It's probably Microsoft Word.

2        Q.   Word?

3   A.   Word.

4        Q.   Word?  Okay.

5   A.   Yes.

6        Q.   Okay.  Microsoft Word.  Did your company BST

7   Plumbing do any work on what we call the Lyman-Cutler project?

8   That's the two houses at 88 Cutler and 55 Lyman.

9   A.   Yes.

10       Q.   Could you describe for us what work your company

11  did?

12  A.   We did plumbing for a new house on both project, all

13  plumbing complete.

14       Q.   Okay.  Did you do the work?

15  A.   Yes.

16       Q.   Did you falsify any invoices?

17  A.   No.

18       Q.   Did you bill for work that you did not do?

19  A.   No.

20       Q.   Some parties in this case have raised questions

21  about your work and your paperwork.  Have you ever had any

22  communications with Mr. Filippov?

23  A.   No.

24       Q.   Or Mr. Lipetsker?

25  A.   No.



(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS STANIK - Direct

1     Q.   Have you had any communications with their lawyers?

2   A.   No.

3     Q.   Have you ever had any discussions with a man named

4   Michael Goldman about your paperwork?

5   A.   No.

6     Q.   All right.  In front of you, sir, you should have a

7   binder, and I'd like you to turn to tab L-53.

8   A.   Which binder?  It's --

9     Q.   It --

10        MR. HARRIS:  May I approach, Your Honor?

11        THE COURT:  Yes, you may.

12        THE WITNESS:  Okay.

13   BY MR. HARRIS:

14     Q.   Okay.  I'd like you to turn to the second page in

15   tab L-53.  It has the little number KDC 500 at the bottom.  Do

16   you see that, the bottom right?

17   A.   Yes.

18     Q.   Okay.  Could you tell us what this is, please?

19   A.   This is my invoice for 55 Lyman Road in Brookline.

20     Q.   Okay.  Who created this document?

21   A.   Me and my wife.  Basically, me.

22     Q.   All right.  And how was it created?

23   A.   I looked at the plans, then I remember everything what we

24   did and put it in writing.

25     Q.   Okay.  But I'm asking, did you use -- this looks

BORIS STANIK - Direct

1    like it was created on a computer.  Did you --

2    A.   Yes, it was created on a computer.

3         Q.   All right.  Do you know what program was used to

4    create it?

5    A.   Probably Microsoft Word.

6         Q.   Word?  Okay.

7    A.   Probably.  Yeah, I think so.

8         Q.   All right.  Is this document a true and accurate

9    copy of your invoice for the work performed at 55 Lyman?

10   A.   Yes.

11        Q.   Was it created around the time that you did the

12   work?

13   A.   No, it was created after we did the work.

14        Q.   All right.  You said that you and your wife created

15   this; is that right?

16   A.   I wrote it down on a paper, and my wife helped me to put

17   it on a computer and print it.

18        Q.   All right.  Is this a document that your company

19   keeps as a regular part of its business?

20   A.   Yes.

21             MR. HARRIS:  Your Honor, I would like to move into

22   evidence as a full exhibit this document which is found in tab

23   L-53, in the binder 175, and Bates stamped KDC 500.

24             THE COURT:  Any objection?

25             MR. CARNATHAN:  Are we just -- are we just talking

BORIS STANIK - Direct

1    about the one page?  Because the next one is not a Stanik

2    document.

3              MR. HARRIS:  Yes.

4              MR. CARNATHAN:  Yeah.  No objection to that page,

5    Your Honor.

6              THE COURT:  And that page has Bates stamp number?

7              MR. HARRIS:  500.

8              THE COURT:  500.  Okay.  It's admitted.  No

9    objection.

10         DEFENDANTS' EXHIBIT L-53 WAS ADMITTED INTO EVIDENCE

11             MR. HARRIS:  All right.

12   BY MR. HARRIS:

13        Q.   Would you turn, in the same binder, sir, to tab C-

14   51?

15   A.   Yes.

16        Q.   Okay.  This has a little number at the bottom right,

17   KDC 1103, correct?

18   A.   Yes.

19        Q.   Okay.  Tell us what this is.

20   A.   It's final invoice for 88 Cutler.

21        Q.   All right.  Is this -- did you prepare it?

22   A.   Yes.

23        Q.   All right.  Is it a true and accurate copy of the

24   invoice for your work at 88 Cutler?

25   A.   Yes.

BORIS STANIK - Direct

1        Q.   All right.  Was it created around the time that you

2    did the work?

3    A.   It was created after we did the work.

4        Q.   Is this a document that your company keeps as a

5    regular part of its business?

6    A.   Yes.

7            MR. HARRIS:  Your Honor, I'd like to admit as a full

8    exhibit tab C-51, page KDC 1103.

9            MR. CARNATHAN:  No objection, Your Honor.

10           THE COURT:  All right.  It's admitted.

11        DEFENDANTS' EXHIBIT C-51 WAS ADMITTED INTO EVIDENCE

12   BY MR. HARRIS:

13       Q.   How long have you worked with Mr. Kagan or his

14   companies?

15   A.   I started to work for him probably like sixteen, eighteen

16   years ago.

17       Q.   And I assume you worked for other contractors as

18   well?

19   A.   Yes.

20       Q.   Now, could you tell us, how did you come up with the

21   number to charge -- the amount to charge?

22   A.   It depends how we -- how many plumbing fixtures in the

23   house, how fancy house is, how big the house is.  That's how

24   we come up with -- that's how I come with this numbers.

25       Q.   All right.  Could you tell us, sir, how do you keep

BORIS STANIK - Direct

1    track of payments?

2    A.    I wrote down what I got for a payment -- actually, I make

3    copy of the checks, and then I look at the final invoice, and

4    that's how I try to get my money.

5        Q.    Okay.  Now, I'd like to ask you, sir, to look at the

6    screen in front of you.

7            MR. HARRIS:  And Mr. Perten, can you go to slide 7,

8    page 7 of that?

9    BY MR. HARRIS:

10       Q.    Okay.  So sir, another witness testified in this

11   case, and he created this -- these slides.  And I will tell

12   you that this one that he created appears to be portions of

13   different documents from BST Plumbing.  There's actually three

14   different documents there.  Are you following me so far?

15   A.    Yeah.

16       Q.    Okay.  Now, you see at the top, there's an invoice

17   number that has four digits.  It's 1165, correct?

18   A.    Yeah.

19       Q.    All right.  And then the two invoices that follow on

20   this page are only three digits:  216 and 217.  Do you see

21   that?

22   A.    Yeah.

23       Q.    Okay.  Can you tell us why we have one invoice with

24   four digits and we have two invoices with just three digits?

25   A.    The four-digit invoice, this is for work what we perform.

BORIS STANIK - Direct

1    And the three-digit invoice, it was for materials, what I

2    order it for Kagan Development, which was even paid directly

3    to plumbing supplier.

4          Q.   All right.  So --

5    A.   I -- yeah.

6          Q.   -- if I have it right, the four-digit invoices

7    includes your labor, and the --

8    A.   Yes.

9          Q.   -- three-digit invoices is your system for charging

10   for materials?

11   A.   It's materials what we usually not buy, like the plumbing

12   fixtures, actually.

13         Q.   Oh, right.

14   A.   It's the plumbing fixtures.

15         Q.   Are you owed any money on the Lyman-Cutler project?

16   A.   Yes.

17         Q.   How much?

18   A.   About $40,000.

19         Q.   All right.

20            MR. HARRIS:  I have nothing further for Mr. Stanik at

21   this time.  Thank you, Your Honor.

22                          CROSS-EXAMINATION

23   BY MR. CARNATHAN:

24         Q.   Good morning, sir.

25   A.   Good morning.  Good afternoon -- yeah, morning.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS STANIK - Cross

1      Q.   Could we look back at that L-53, please?

2    A.   It's in a binder or in a -- on a screen?

3      Q.   Yeah, I'm sorry, it's in the binder you just looked

4    at with Mr. Harris.  It's --

5    A.   L-53.  Okay.

6      Q.   So this is -- I'm looking at the document with the

7    KDC 500 in the bottom right corner.

8    A.   Yes.

9      Q.   Invoice 1165.  You with me?

10    A.   Yeah.

11      Q.   And so you just testified that you did not make this

12    invoice around the time you did the work, right, sir?

13    A.   Yes.

14      Q.   In fact, it's got a little date up in the upper

15    right corner of February 14, 2015, right?

16    A.   Yes.

17      Q.   And that's the better part of a year after you did

18    most of the work, isn't it, sir?

19    A.   Possible.  I don't remember when we got the final

20    inspection.

21      Q.   Okay.  So if I heard you right, the way you prepared

22    this invoice was you tried to remember what you had done by

23    looking at the plans, and then you put the invoice together.

24    Was that about right?

25    A.   Yes, sir.



escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS STANIK - Cross

1     Q.   Okay.  Did you do that at Mr. Kagan's request?

2   A.   No, I -- I always do it.  I need to get some numbers to

3   get some money.

4     Q.   So you -- but you waited a year to submit your

5   invoice?

6   A.   Yeah, sometimes I got some money during construction, and

7   sometimes I'm late with final invoice.

8         MR. CARNATHAN:  Could I have Impeach 48, please?

9         THE WITNESS:  Wait, excuse me?

10   BY MR. CARNATHAN:

11     Q.   I was just asking Mr. --

12   A.   Oh.

13     Q.   -- Hartzell, my assistant to put another document up

14   on the screen for you to look at, sir.

15     So when you do plumbing work, do you have to get a permit

16   before you do the work, right, sir?

17   A.   Yes.

18     Q.   And do you recognize this as the application for a

19   permit that you submitted in connection with 55 Lyman Road?

20   A.   Yes.

21     Q.   Okay.  And it appears to be dated September 25th,

22   2013, right, sir?

23   A.   Yes.

24     Q.   And at the top, you estimate the cost of the work at

25   $20,000, right, sir?

BORIS STANIK - Cross

1    A.    Yes.

2         Q.    Okay.  And in fact, you've been paid $20,000 for

3    this job, haven't you, sir?

4    A.    Yeah, a -- yeah, sounds right.

5         Q.    Okay.

6         MR. CARNATHAN:  And if I could have 332 in evidence,

7    please?  And then, I guess, let's go to the -- yeah, the

8    second page just to show him what we're looking at.

9    BY MR. CARNATHAN:

10        Q.    We're looking at a packet of materials from the

11   Brookline Building Department.

12        MR. CARNATHAN:  And if we could go to the sign-off

13   page; thank you.

14   BY MR. CARNATHAN:

15        Q.    So if I'm reading this right, the electrical sign-

16   off on 55 Lyman took place for the rough on March 18th, 2014,

17   right, sir?

18   A.    One second.  Can you repeat, please?

19        Q.    I'm looking at the electrical sign-off for the rough

20   March 18, 2014, right?

21   A.    Yeah.

22        Q.    And the final sign-off was 9/23/2014, right?

23   A.    You said electrical.  You're looking at plumbing, right?

24        Q.    Oh, I'm sorry, are we on the wrong one?

25        MR. CARNATHAN:  Can we get to the electrical one?

BORIS STANIK - Cross

1              THE WITNESS:  Actually, we need plumbing.

2              THE COURT:  Plumbing.

3              THE WITNESS:  Plumbing.

4              MR. CARNATHAN:  Oh, my apologies.  That's -- it's --

5              THE WITNESS:  Okay.

6              MR. CARNATHAN:  -- my glitch.  Okay.

7              THE WITNESS:  Plumbing.

8    BY MR. CARNATHAN:

9         Q.   So it's actually March 6th, 2014 is the rough sign-

10   off, right?

11   A.   March 6 -- hold on.  March -- what is it?  Hold on.  You

12   can --

13        Q.   Yeah, it's not tremendously clear.  It's on the

14   left-hand side --

15   A.   We have --

16        Q.   -- 3/6/14 rough.

17   A.   Okay.  And the final?

18        Q.   9/24/14, right, sir?

19   A.   9/24/14.  Okay, yes.

20        Q.   Okay.

21             MR. CARNATHAN:  Could I have Exhibit 174.2, page 228?

22             THE WITNESS:  I need to find it?

23             MR. CARNATHAN:  I'm asking Mr. Hartzell --

24             THE WITNESS:  Oh.

25             MR. CARNATHAN:  -- to put something else up on screen

BORIS STANIK - Cross

1   for you.

2        MR. HARTZELL:  Sorry, what page do you want?

3        MR. CARNATHAN:   228.

4   BY MR. CARNATHAN:

5        Q.   Right.  Do you recognize the -- this invoice, sir?

6   A.   Yes.

7        Q.   All right.  And this is one for rough plumbing

8   materials and finished plumbing materials, right, sir?

9   A.   This is actually for rough plumbing fixtures and finished

10  plumbing fixtures.  This is not for -- not for pipe and

11  other --

12       Q.   Okay.

13  A.   -- and other stuff.  This only for appliances.

14       Q.   Okay.  And this one is dated August 18th, 2015; do

15  you see that?

16  A.   Yeah.

17       Q.   How is it you happened to be submitting another

18  invoice in the middle of August 2015, sir?

19  A.   This probably was a final invoice.  During construction,

20  I probably bought some rough materials from Ferguson, and

21  Kagan Development paid this money.  And final, sometimes we

22  change, sometimes we missing, and it's very complicated to get

23  all this numbers together.  It's kind of a lot of work to do

24  that.

25       Q.   All right.  So am I understanding you right, this

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS STANIK - Cross

 1   invoice, you're asserting that you bought plumbing fixtures

 2   and that you want to be paid back for them; is that right?

 3   A.   Yes.

 4        Q.   And so if we go to the next page of the exhibit.

 5   All right.   This is attached to the invoice, right?   It's a

 6   price quotation from Ferguson dated August 19th, 2015, I

 7   guess.   Do you see that?

 8   A.   Yeah.

 9        Q.   And so I think we just agreed that you had completed

10   back in the first part of 2014, didn't we, sir?

11   A.   Yeah.

12        Q.   And yet you're getting a quote from Ferguson in

13   August of 2015, sir, right?

14   A.   Yes.

15        Q.   Can you just explain how that came to pass?

16   A.   Because when I get a final bills, I need to get exact

17   numbers, what I paid for this mat -- how much it cost me, how

18   much Ferguson charged me for that to get exact number.   During

19   construction, I might get approximate amount, but when the job

20   is done, I'm trying to get exact number and show Kagan

21   Development how much money each item cost.   And this is the

22   stuff what was bought for this job, and this is -- all these

23   appliances were installed at this job, and it should be very

24   reasonable prices.   I have a good discount.

25        Q.   I'm sorry, I still don't understand why it was a

BORIS STANIK - Cross

1    year and a half after you did the work that you're getting a

2    proposal for the fixtures that you said you bought?

3    A.    Because I got paid some money during construction.

4    Just -- this is a final invoice, and it's very hard to go

5    through all paperwork and to find every little thing, like --

6        Q.    Did Mr. Kagan ask you for this in August 2015?

7    A.    It's not ask me; he paid for it.  I need to do it for --

8    to tell him how much money I spent.

9        MR. CARNATHAN:  Can we move back through the tab to

10    the cover page?  All right.  And spin it around.

11    BY MR. CARNATHAN:

12        Q.    So Mr. Stanik, is it your testimony that you've been

13    paid for these materials or that you are owed for these

14    materials?

15    A.    I've been pay for the materials, but they owe me money

16    for plumbing work.

17        Q.    Okay.  We sent you a subpoena, too, sir; do you

18    remember that?

19    A.    No.  I probably misplace it.  I missed it; I know.

20        Q.    Okay.

21        MR. CARNATHAN:  Is that it?  Sorry.

22    BY MR. CARNATHAN:

23        Q.    So sir, up on the screen now, I'm showing you the

24    subpoena we sent you back in 2015.  Does that refresh your

25    memory?

BORIS STANIK - Cross

1  A.   Not really.

2       Q.   All right.  If it turn to the next page, do you

3  recognize your handwriting on this invoice?

4  A.   Yes.

5       Q.   Okay.  And so that's the "20,000, please pay

6  19,670", right?  That's your handwriting, right?

7  A.   Yes.

8       Q.   Did you ever send this to Mr. Kagan, saying please

9  pay?

10  A.   Yes.

11       Q.   And if we get to the materials, it says, "3,500

12  paid.  Please pay $9,130.94", right, sir?

13  A.   Yes.

14       Q.   Did you send that to Mr. Kagan, too?

15  A.   Yes.

16       Q.   So your testimony you've been paid the $9,130.94?

17  A.   I'm not sure.  I need to check.

18       Q.   Is that your handwriting as well, sir?

19  A.   No.

20       Q.   Do you know whose handwriting it is?

21  A.   No.

22       Q.   Do you know how it happened to come into your

23  documents that were produced to us?

24  A.   It's not on my document.  It's a copy of a document which

25  I sent to Mr. Kagan, and I have -- I have no idea who did

BORIS STANIK - Cross

1   that.

2        Q.   But you'll agree that this -- the handwriting on the

3   next page is yours?

4   A.   Yes, that's mine.

5        Q.   And the next page, "3,500 paid; please pay", that's

6   your handwriting?

7   A.   Yes.

8        Q.   And so I'm now at the last page of my packet.

9   That's not your handwriting?

10  A.   No.

11       Q.   No?  All right.

12  A.   Because that's money -- I never saw this money.  This is

13  only invoice, which is the three-digit numbers.  They were

14  paid directly to Ferguson.

15       Q.   Okay.  Did you ever receive $3,500 from KDC for any

16  of these materials?

17  A.   No, he directly paid to Ferguson with a credit card.

18       Q.   He paid for the materials directly?

19  A.   Yes.

20       Q.   Then why do they appear on an invoice from you, sir?

21  A.   I bought this materials, but he paid directly to Ferguson

22  for this materials.

23       Q.   Then why did you write on the invoice, please pay

24  9,130- -- whatever it was?

25  A.   Yeah, that's what he's supposed to pay to Ferguson with

BORIS STANIK - Cross

1   his credit card.

2        Q.   So it -- it's -- if I follow your testimony, you

3   didn't pay for any of these materials, right, sir?

4   A.   I order these materials.  I have account with Ferguson

5   Plumbing Supply.  I order this materials; I receive this

6   materials for his job, and he pays for the -- he paid for this

7   materials with a credit card directly to Ferguson.  I never

8   saw a check or this money.

9        Q.   Okay.

10  A.   It goes directly -- he paid it directly on my account at

11  Ferguson.

12       Q.   So he doesn't owe you any money for these materials

13  then, sir?

14  A.   As far as I know, he paid it.

15       Q.   Okay.  And if we have the exact same invoices for

16  the other property, but your testimony is the same?  He

17  doesn't owe you any money for that -- those materials, either,

18  right?

19  A.   Yes.  I don't know.  Yes, yes.

20           MR. CARNATHAN:  So just to make the record clean, I

21  think I need 174.4, page 45, please.

22                          (Pause)

23           MR. CARNATHAN:  There we go.

24  BY MR. CARNATHAN:

25       Q.   So I'm now looking at, basically, the same bill on

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS STANIK - Cross

1    the 55 Lyman job, also dated 8/18/2015.  That's your invoice,

2    too, sir; is that correct?

3    A.   Yes.

4        Q.   But Mr. Kagan paid for those materials directly; is

5    that right?

6    A.   He paid to Ferguson.  I never see this money, and I don't

7    have any record of them.  He paid this bills to Ferguson --

8        Q.   Okay.

9    A.   -- but with his credit card.

10                        (Pause)

11           MR. CARNATHAN:  Could I have Impeach 51, please?

12           THE WITNESS:  Excuse me.

13   BY MR. CARNATHAN:

14       Q.   So sir, now I'm showing you the application for a

15   permit to perform plumbing work at 88 Cutler; do you recognize

16   that?

17   A.   Yes.

18       Q.   And is that the application for a permit that you

19   submitted in connection with the 88 Cutler project?

20   A.   Yes.

21       Q.   And again, you estimated that the cost of the work

22   was going to be $20,000, right, sir?

23   A.   Yes.

24       Q.   And you were in fact paid $20,000, right?

25   A.   Yes.



(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS STANIK - Cross

1          MR. CARNATHAN:  That's all I have for Mr. Stanik.

2          THE COURT:  Anything else?

3          MR. CARNATHAN:  Oh, wait, no.  My apologies.  I do --

4    I should hit one more point.

5          THE COURT:  Okay.  Go ahead.

6    BY MR. CARNATHAN:

7       Q.   So I understood you to say that you wrote about

8    $40,000 on this job, right, sir?

9    A.   Yes.

10      Q.   And the same thing has happened to you on a couple

11   of other projects, right, sir, with Mr. Kagan?

12   A.   I didn't say that.

13         MR. CARNATHAN:  Could I have Exhibit 106, please?

14         Spin around 106, and get rid of -- yeah.

15   BY MR. CARNATHAN:

16      Q.   So sir, I'm showing you a document that purports to

17   show accounts payable on a project at 10 Lyman Road.  Did you

18   work on the 10 Lyman Road project?

19   A.   Yes.

20      Q.   And did you also find yourself owed over $40,000 at

21   the end of the 10 Lyman Road project?

22   A.   Yeah, probably.

23      Q.   You don't recall?

24   A.   I don't remember.  I don't have that record with me.

25      Q.   Well --

BORIS STANIK - Cross

1    A.    But --

2         Q.    -- you see the date there is 5/12/15, right, sir?

3    A.    Date --

4         Q.    And --

5    A.    -- total account, yes.

6         Q.    And by April 15, you were also owed $40,000 on this

7    project, on the Lyman-Cutler project, right?

8    A.    Yeah, it's pretty same size house.  It's very possible.

9         Q.    Well, what I'm getting at is, combined, you were

10   owed over $80,000 by Mr. Kagan on these two projects, right?

11   A.    One more time, can you repeat, please?

12        Q.    Well, combined, in May 2015, you were owed

13   $80,000 -- over $80,000 by Mr. Kagan for projects you'd worked

14   on for him?

15   A.    I don't understand.  What do you mean?

16        Q.    Well, you said you were owed 40,000 on the Lyman-

17   Cutler project, right?

18   A.    Rode?  What does that mean, rode?  You said I rode.

19        Q.    You're owed, right, Mr. --

20   A.    Oh, I owed?  Yes.

21        Q.    Yes.

22   A.    No, for 10 Lyman, I think we got all money.

23        Q.    You got your -- you got paid?

24   A.    Yes.

25        Q.    But in May 2015, were you still owed $40,000?

BORIS STANIK - Cross

1    A.    I don't know.  I got paid-in-full for 10 Lyman.

2          Q.    Did --

3    A.    I --

4          Q.    -- you get paid on time in 10 Lyman?

5    A.    Yes.  I pro -- I might didn't ask money on time, but I

6    don't remember any problem with 10 Lyman.

7          Q.    Okay.

8          MR. CARNATHAN:  Could I have Exhibit 95?  Three pages

9    in, LCBK 3936, and kind of blow up the box.

10          MR. HARRIS:  Excuse me, Your Honor?

11          THE COURT:  Yes.

12          MR. HARRIS:  I believe this is an exhibit that's not

13    in evidence.

14                          (Counsel confer)

15          MR. HARRIS:  All right.  My apologies.

16          THE COURT:  That's fine.

17    BY MR. CARNATHAN:

18          Q.    Okay.  So back to the point, at the end of the

19    Yarmouth Road (sic) project, did you find yourself out nearly

20    $10,000 -- excuse -- Mr. Stanik?

21    A.    Yarmouth Road?

22          Q.    Yeah, did you work on the 50 Yarmouth Road project

23    for Mr. Kagan?

24    A.    The Yarmouth -- I don't remember.  We did one house at

25    Yarmouth.  Yeah, probably.  I don't remember.

BORIS STANIK - Cross

1      Q.   Did you work on most of Mr. Kagan's projects?

2   A.   Not on all of them.

3      Q.   Do you remember being owed nearly $10,000 at the end

4   of the Yarmouth Road project?

5   A.   This is normal if you need to wait for money a little

6   bit, even month or two.  That happens very often.

7      Q.   Well, all three of those projects --

8   A.   I don't remember.

9      Q.   All three of those projects were ones you worked on

10  in 2014, weren't they, sir?

11  A.   I don't remember.

12     Q.   Well, do you remember being --

13  A.   It was approximately same time, but I think Lyman and

14  Cutler were our last houses what we did.

15     Q.   All right.  I think that's right.  Do you remember

16  being owed $90,000 all at once by Mr. Kagan on these three

17  projects?

18  A.   I don't remember.  As I remember, I -- for Yarmouth and

19  Lyman, I got paid-in-full.  And for these two last houses,

20  Lyman and Cutler, he still owed me money.

21     Q.   Okay.  Did you get paid on time on Yarmouth Road?

22  A.   Yeah.

23     Q.   All right.

24          MR. CARNATHAN:  That's all I have for Mr. Stanik.

25          THE COURT:  Okay.  Anything else?

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS STANIK - Cross

1          MR. HARRIS:  Nothing further.  Thank you.

2          THE COURT:  All right.  Thank you, Mr. Stanik.

3     You're finished.

4          He's going to leave the courtroom, okay?

5          MR. HARRIS:  Yes.

6          THE COURT:  All right.  Thank you.

7          MR. HARRIS:  Thank you, sir.

8          Your Honor, we call Victor Ispiravnikov of Unicon

9     Electric.

10          THE CLERK:  Please raise your right hand.

11               VICTOR ISPIRAVNIKOV SWORN

12          THE CLERK:  Please be seated.

13          THE WITNESS:  Okay.  Okay.

14                 DIRECT EXAMINATION

15     BY MR. HARRIS:

16     Q.   Good afternoon, sir.

17     A.   Good afternoon.

18     Q.   Okay.  Please pull that microphone close.

19     A.   Like that?

20     Q.   Thank you.

21     A.   Yeah.

22     Q.   Could you please tell us your name and then spell

23     your name?

24     A.   My -- my name is Victor Ispiravnikov.  I'm going to spell

25     second name:  I-S, like Stampede, R-A-V-N-I-K-O-V.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VICTOR ISPIRAVNIKOV - Direct

1       Q.   Thank you.  What do you do for work, sir?

2    A.   I'm electrician.

3       Q.   All right.  And --

4    A.   I'm do electrical work, yeah.

5       Q.   Okay.  Keep your voice -- speak clearly into the

6    microphone, please.

7    A.   Okay.

8       Q.   Do you work for a company, sir?

9    A.   I own the company, and I'm working for the company, yeah.

10      Q.   Okay.  What's the name of your company?

11   A.   Unicon Electric.

12      Q.   Unicon?

13   A.   Yes.

14      Q.   All right.  How long have you been in business, sir?

15   A.   Seventeen years in here and all my life before.

16      Q.   How many employees does Unicon have?

17   A.   Sometimes two, three, four, something like that.

18      Q.   Two, three, or four?

19   A.   Yeah.

20      Q.   Do you have a bookkeeper?

21   A.   No, I don't.

22      Q.   Do you have an accountant?

23   A.   Yeah.

24      Q.   Okay.  Do you use any bookkeeping or accounting

25   software?

VICTOR ISPIRAVNIKOV - Direct

1   A.   No, I don't.

2        Q.   Okay.  Did -- we're here today to talk about what we

3   call the Lyman-Cutler project, the two homes at 88 Cutler and

4   55 Lyman.  Did Unicon provide work at those homes?

5   A.   Yes.

6        Q.   Could you tell us what you did?

7   A.   Yes, I did.

8        Q.   What did you do, sir?

9   A.   I did some electrical work for this houses.

10       Q.   All right.  Did you do the work?

11  A.   Yes, I did.  I did.  I did.

12       Q.   Did you bill for work that you did not do?

13  A.   No.

14       Q.   Okay.  Did you get paid for work that you did not

15  do?

16  A.   No.  No.

17       Q.   Have you had any communications with Alex Filippov?

18  A.   I don't remember, no.

19       Q.   No?  How about Nick Lipetsker?

20  A.   Sometimes for something.

21       Q.   Okay.  Did he ask you any questions about your work

22  or your paperwork?

23  A.   No, he did not.

24       Q.   Okay.  How about -- have you had any communications

25  with Mr. Filippov or Mr. Lipetsker's lawyers?

VICTOR ISPIRAVNIKOV - Direct

1   A.   No, never.

2        Q.   Now, in front of you, sir, you should have a binder.

3   Could you please turn to tab L-37?

4            MR. HARRIS:  May I approach the witness, Your Honor?

5            THE COURT:  You may?

6            THE WITNESS:  L-37?

7   BY MR. HARRIS:

8        Q.   Before we get to the binder, sir, have you ever been

9   contacted by a man -- by a man by the name of Michael Goldman?

10  A.   Michael Goldman?

11       Q.   Yes.

12  A.   I --

13       Q.   Did he ever contact you and ask you questions about

14  your paperwork?

15  A.   No, I don't know Michael Goldman.

16       Q.   Okay.  Do you have tab L-37 in front of you in the

17  binder, sir?

18  A.   Yes.

19       Q.   Would you turn to the second page?  And at the very

20  bottom, you'll see the numbers 342 at the very bottom.  Do you

21  have that?

22  A.   Say it again, please.

23       Q.   Do you have page -- the page at the very bottom,

24  it's numbered KDC 00342?

25  A.   Yes, I see, yeah.

VICTOR ISPIRAVNIKOV - Direct

1      Q.   All right.  Could you tell us what this document is,

2    sir?

3    A.   This is proposal for 55 Lyman.

4      Q.   Okay.  And whose handwriting is that?

5    A.   I wrote it.

6      Q.   It's your handwriting?

7    A.   Yeah.

8      Q.   And is that your signature?

9    A.   That's my signature.

10     Q.   All right.  Is this a true and accurate copy of your

11   proposal for 55 Lyman Road?

12   A.   Yes.

13     Q.   Was this proposal made around the time that you did

14   the work?

15   A.   I didn't -- say it again.

16     Q.   Was this -- did you write out this proposal around

17   the time that you were doing the work on 55 Lyman?

18   A.   Probably, yes.  Yeah.

19     Q.   Is this a document that you keep as part of your

20   company's records?

21   A.   Maybe.  I don't know.  I don't remember.

22     Q.   Okay.  Well, do you have a practice of keeping

23   proposals?

24   A.   It could be, but I have to check.  I don't --

25     Q.   All right.  Do you have a recollection, sir, of

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VICTOR ISPIRAVNIKOV - Direct

1    providing this proposal to Mr. Kagan?

2    A.    Yeah.

3         Q.    Yes?

4    A.    Say it --

5         Q.    Did you give this to Mr. Kagan?

6    A.    Yes, I did.

7         Q.    All right.  And am I correct that this proposal

8    relates to your work at 55 Lyman?

9    A.    Yes, it's 55 Lyman.

10         MR. HARRIS:  Your Honor, we'd like to admit as a full

11   exhibit tab L-37 in binder 175.

12         THE COURT:  So that consists of one page?

13         MR. HARRIS:  Well, there's one page.  It has the

14   cover sheet that, in other instances, has also been admitted.

15   But I'll -- it's up to Mr. Carnathan on that.

16         THE COURT:  Okay.

17         MR. CARNATHAN:  We have the same difficulty -- we

18   have the same difficulty with the Unicon proposals as we had

19   with the V&D.  I guess I'd like to show you the originals.

20   They're photocopies, again, of handwritten documents.

21         THE COURT:  Well, if you're objecting, then we'll

22   have to go through that.  And that's fine.  We'll go through

23   it.  It -- do you have the originals here -- the original of

24   one page here?  Yes?

25                        (Counsel confer)

Page 129

VICTOR ISPIRAVNIKOV - Voir Dire

1          THE COURT:  All right.  Yeah, go ahead.  Inspect it,

2     and then you can inquire.

3                              VOIR DIRE

4     BY MR. CARNATHAN:

5          Q.   Good afternoon, sir.

6     A.   Good afternoon.

7          Q.   I think we were just now testifying about Exhibit L-

8     37, right?  That's the 55 Lyman Road proposal?

9     A.   Yeah.

10         Q.   That's right?

11    A.   Yeah.

12         Q.   And so I put up on screen what purports to be the

13    original of that document.  You see that, sir?

14    A.   Um-hum.

15         Q.   Hang on.  I'm now going to put up C-33.  Would you

16    agree with me that C-33 is exactly the same except for the

17    address?

18    A.   Yeah, absolutely, yeah.

19         Q.   I mean, right down to the handwriting, right?

20    It's -- the handwriting here is exactly the same as what shows

21    up?

22    A.   Right.  Yeah.

23         Q.   Right?

24    A.   I --

25         Q.   In fact, this -- one is just a copy of the other?

VICTOR ISPIRAVNIKOV - Voir Dire

1    A.   Yeah, I did the copies, and I change this on there.

2         Q.   Okay.

3    A.   This is just another houses, and I did -- yeah.

4         MR. CARNATHAN:  And if I could get Exhibit 117,

5    please, Mr. Hartzell?  Sorry.

6         THE CLERK:  No, hang on.  Okay.

7    BY MR. CARNATHAN:

8         Q.   Do you recognize Exhibit 117 as your invoice on the

9    10 Lyman Road -- or your proposal, I should say, on the 10

10   Lyman Road project, sir?

11   A.   This is the same, right.

12        Q.   It's a different project, right?

13   A.   Yeah, different project, but --

14        Q.   Right.  But this is your proposal on that project?

15   A.   Yeah, it's the same, yeah.

16        Q.   Yeah, that's your handwriting?

17   A.   Yeah.

18        Q.   And that's your signature down there?

19   A.   Absolutely.

20        Q.   And would you agree with me that that's an exact

21   photocopy of L-37 and C-33, except the address has been

22   changed?

23   A.   Right.

24        Q.   All right.

25        MR. CARNATHAN:  May I approach the witness, Your

VICTOR ISPIRAVNIKOV - Voir Dire

1    Honor?

2              THE COURT:  You may.

3              MR. CARNATHAN:  Am I coming through?

4              THE COURT:  It's not on.

5              THE CLERK:  It should be on.  I think you turned it

6    off, and I turned it on.  Oh.  Guess what?

7              THE COURT:  Did it run out?

8              THE CLERK:  A battery issue.

9              THE COURT:  Yeah.

10             MR. CARNATHAN:  I can (indiscernible) this one.

11             THE COURT:  That's fine.

12             THE CLERK:  Actually, it should be okay now for a few

13   minutes.

14             THE COURT:  It sounds like it's on.

15             MR. CARNATHAN:  All right.  So I'm coming through?

16   BY MR. CARNATHAN:

17        Q.   So sir, I've given you the two documents that

18   purport to be originals, and they've got little stickers on

19   them identifying them as C-33 and L-37.  Are you able to say

20   whether either of those is an actual original with your actual

21   handwriting?

22   A.   This is mine, yeah.

23        Q.   You're pointing at L-37?

24   A.   Yeah, this is mine.  This is the same, yeah.  This for 55

25   Lyman.  This is for 88 Cutler.

VICTOR ISPIRAVNIKOV - Voir Dire

1      Q.   Well, you agree with me that at least one of them is

2   a photocopy of the other?

3   A.   I mean, maybe both of them were photocopy.  I just made

4   it without address.  I just put address, and that's it.

5      Q.   So it could be that both are photocopies?

6   A.   Yeah.  I don't remember.  I did it by my box or copy

7   machine.

8      Q.   Okay.  Why don't I take those back?

9   A.   Yeah.

10      Q.   So sir, am I right that you are -- as you sit here

11   today, you assert that you're owed $65,000 on the Lyman-Cutler

12   project?

13   A.   Yeah.  10 Lyman or 55 Lyman?

14      Q.   Combined -- 65- combined?

15   A.   Yeah.  Yeah, yeah.

16      Q.   All right.  And am I right that you were paid

17   exactly $65,000 on the project, combined, right?

18   A.   Pro -- yeah.

19      Q.   Okay.

20         MR. CARNATHAN:  That's all I have on this issue, Your

21   Honor.

22         THE COURT:  All right.  And so -- and you've made an

23   objection to the admissibility of this exhibit based on a

24   question as to its authenticity, right?

25         MR. CARNATHAN:  Right, we object on authenticity and

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 133

VICTOR ISPIRAVNIKOV - Direct

1   best evidence grounds.  And I think he just told me they might

2   both be photocopies.  He's not even sure.

3            THE COURT:  Okay.  All right.  Mr. Harris.  Argument,

4   questions, whatever you'd like to do before I rule on this

5   objection.

6            MR. HARRIS:  Well, I'd like to ask a few questions

7   first.

8            THE COURT:  You may.

9                      RESUMED DIRECT EXAMINATION

10  BY MR. HARRIS:

11       Q.   Sir, you were just shown proposals for three

12  different homes?

13  A.   Yes.

14       Q.   55 Lyman, 88 Cutler, 10 Lyman, correct?

15  A.   Yes, yes.

16       Q.   Was your -- the work that you performed in each

17  home, was it the same for each?

18  A.   Yes, it is.

19       Q.   So --

20  A.   It's the same work -- I mean electrical work, yeah.

21       Q.   All right.  But I mean, the proposal, what you

22  were -- what you actually did in each home, was it essentially

23  the same?

24  A.   Yes.

25       Q.   Okay.  And did you work on those three homes around

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VICTOR ISPIRAVNIKOV - Direct

1  the same time?

2  A.    Yeah, very close, because we -- this house is exactly

3  next door -- I mean, 55 Lyman and 88 Cutler.  And we just from

4  house-to-house, we work at the same time, yeah.

5        Q.    Do you remember which one you worked on first?

6  A.    I'm not sure, but probably 88.

7        Q.    All right.  Now, how did you actually create the

8  proposal?  For whatever the first one was, how did you

9  actually make the proposal out?

10  A.    It depends on material, on square footage, usually.

11        Q.    But I mean, if you're just looking at the

12  document --

13  A.    It's --

14        Q.    -- how did you make the document, for whatever the

15  first proposal was?

16  A.    I did -- I created that -- what kind of service, what

17  kind of lighting, and how many square foot was the house.

18  That's basically -- yeah.

19        Q.    I'm asking you about the physical piece of paper

20  that had your proposal on it.  How did you actually -- we've

21  established already it's your handwriting on these proposals;

22  is that right?

23  A.    Say it again.

24        Q.    The -- these documents have your handwriting on

25  them, sir?

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

VICTOR ISPIRAVNIKOV - Direct

1   A.   Yeah.

2        Q.   You wrote them out?

3   A.   Yes.

4        Q.   In your own hand?

5   A.   Yes, yes.

6        Q.   Okay.

7   A.   I did, yes.

8        Q.   All right.  Now, given that you were working on

9   three homes that were very similar, how did you make the

10  next -- after you did the first proposal, how did you make the

11  next proposal, the actual document?

12  A.   By copy.

13       Q.   All right.  So when you -- how did you do it?  Tell

14  us.  How did you make the copy?

15  A.   In (indiscernible) machine.

16       Q.   I'm sorry?

17  A.   In the (indiscernible) machine -- in the copy machine.

18       Q.   You have a copy machine?

19  A.   Yes.

20       Q.   Okay.  When you made the copy, did it have the

21  address filled in for the second home you worked on?

22  A.   Yes.  I -- yes, I wrote the address.

23       Q.   You had to write the --

24  A.   No.

25       Q.   -- address?



(973) 406-2250 | operations@escribers.net | www.escribers.net

VICTOR ISPIRAVNIKOV - Direct

1    A.    I have everything without address.

2         Q.    Yes?

3    A.    I just put the address, that's it.   Yeah.

4         Q.    Okay.   So the bottom part, where you describe your

5    work, was copied, and then you wrote in the address; is that

6    right?

7    A.    Yeah, this is the same.   It's typical houses for me.   For

8    me, yeah.

9         Q.    Okay.   And then the third proposal, how did you make

10   the third proposal?

11   A.    Like second, the same.

12        Q.    Same?

13   A.    Yeah.

14        Q.    You copied the description --

15   A.    Right, yeah.

16        Q.    -- of your work?

17   A.    Yes.

18        Q.    And then you wrote in the address?

19   A.    Yeah, absolutely right.

20        Q.    Is that right?

21   A.    Yeah.

22        Q.    Okay.

23             MR. HARRIS:   With that, Your Honor, here's my

24   argument as to the objection that's been raised.   The

25   testimony is he worked on three very similar homes, at least

VICTOR ISPIRAVNIKOV - Direct

1   with respect to his work, generated the first proposal, ran

2   that through the photocopy machine, and then inserted the

3   address for the second home.  So if we're asking for what the

4   original is, yes, the scope of work that this man wrote out by

5   hand on his first proposal gets fed through the copy machine.

6   And the new part of it, if you will, is the address.  That now

7   becomes an original to the second home, and the same process

8   is followed for the third.

9         Again, as we've discussed with the prior exhibits, we

10   have to have a genuine issue in order to even get to whether

11   we -- the photocopies are accurate or not.  There's not any

12   evidence in the case questioning any of the numbers or any of

13   the actual work that BST Plumbing (sic) performed.  So with

14   respect to best evidence, I think we've certainly cleared that

15   hurdle.  I'm sorry, did I say -- Unicon, I apologize.

16         THE COURT:  Yeah.

17         MR. HARRIS:  There hasn't been any question about

18   whether there's wiring in these homes or how many switches or

19   any of that.

20         Finally, with respect to authenticity, we have the

21   gentleman here who has now testified that's his handwriting,

22   including the handwriting that generates the address for the

23   new proposal for each one.  So our position is we've more than

24   satisfied our burden.

25         THE COURT:  Yeah.  Can I inspect the originals?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VICTOR ISPIRAVNIKOV - Direct

1          MR. HARRIS:  Yes.

2          THE COURT:  So I've only got two, and that's because

3   you're only offering two?

4          MR. HARRIS:  So at the moment, I have only moved with

5   respect to the Lyman project.  Attorney Carnathan voir dired

6   with respect to both.

7          THE COURT:  Yeah, I understand.

8          MR. HARRIS:  So that's why you have two in your

9   hands.

10          THE COURT:  All right.  And you're about to move for

11   both?

12          MR. HARRIS:  I would like to, yes.

13          THE COURT:  But not 10 Lyman?

14          MR. HARRIS:  Correct.

15          THE COURT:  All right.

16                          (Pause)

17          THE COURT:  All right.  Mr. Carnathan, I'll -- do you

18   wish to be heard?

19          MR. CARNATHAN:  I do.  Thank you, Your Honor.  I

20   guess I would like to ask Mr. Ispiravnikov a follow-up

21   question, but I'd also like to point out that it's one thing

22   to have one subcontractor who just happens to make photocopies

23   of his handwritten documents.  It's quite another matter once

24   you have two.  That starts to get pretty questionable.

25          THE COURT:  Well, that's argument that --

                              VICTOR SERGEEV - Voir Dire

1              MR. CARNATHAN:  Sure, yeah.

2              THE COURT:  -- that's not for this moment.

3              MR. CARNATHAN:  Yes, Your Honor.

4              THE COURT:  But --

5              MR. CARNATHAN:  Maybe I could ask him the follow-up

6    question?

7              THE COURT:  You may.

8                         (Counsel confer)

9              THE COURT:  Whenever you're ready.  Oh, you're

10   waiting for the --

11             MR. CARNATHAN:  Yeah, I'm sorry.  I'm trying to get

12   Mr. Hartsell to put them up side by side.  I hope that will be

13   the most efficient.

14                         (Pause)

15             MR. CARNATHAN:  Okay, all right, we're there.

16                         VOIR DIRE

17   BY MR. CARNATHAN:

18        Q.   We now have up on screen the two proposals.  On the

19   left-hand side is the 88 Cutler Road proposal, which is KDC

20   00978, and on the right-hand side is the 55 Lyman Road, KDC

21   00342.  Do you see that, sir?

22   A.   Yes.

23        Q.   Okay.  And you agree with me that one is just a

24   photocopy of the other right down to -- you can see the little

25   punches --



VICTOR SERGEEV - Voir Dire

1    A.   Maybe those (indiscernible).

2         Q.   -- on the left?  Other than the address, right?  The

3    address is different.  Everything else is exactly the same?

4    A.   I know.  I -- I -- I told -- maybe both is photocopy of

5    them.  I don't know.

6         Q.   They might both be photocopies?

7    A.   Yeah.

8         Q.   Right.  But everything is exactly the same except

9    for the address, right, sir?

10   A.   That's -- yeah.

11        Q.   And you just talked a little bit about how you would

12   make a photocopy -- photocopies because the jobs were the same

13   and the houses were pretty much the same?  That was the gist

14   of what you said?

15   A.   I did it.  I did it sometimes, yeah, if it's similar.

16   Yeah.

17        Q.   Could you just explain a little bit about how you

18   got the address blocks so perfect so that it looks like it was

19   a new thing when everything else is an exact photocopy?

20   A.   What do you mean?

21        Q.   Well, everything is an exact photocopy, right,

22   except for the box that says proposal submitted to --

23   A.   No.  I --

24        Q.   -- and on the left-hand one, it says 88 Cutler Road,

25   and on the right-hand one, it says 55 Lyman Road.  Do you see

VICTOR SERGEEV - Voir Dire

1    that?

2    A.    Yes.

3         Q.    And the rest of the document is perfectly identical.

4    A.    Absolutely --

5         Q.    How did you manage to get the addresses so perfect,

6    too, sir?

7    A.    Just wrote it.  I don't mean -- I don't understand.  What

8    do you mean, perfect?  This is one for Lyman Road and other

9    one, Fredette -- I wrote it both.

10        Q.    Well, unless you put it side by side, those

11   addresses look like they fit right in that box, right?

12   A.    Sorry, I don't understand.

13        Q.    Have you ever used Photoshop in your life, sir?

14   A.    No.

15        Q.    No?

16   A.    I'm not -- I'm not (indiscernible) computer.

17            MR. CARNATHAN:  That's all I have for this moment,

18   Your Honor.

19            THE COURT:  All right.  So I have authenticity as an

20   objection under Rule 901, and then, I have best evidence, so

21   to speak, under 1001, 1002.  1002 requires the original, but

22   1003 allows the admission of duplicates.  So even if they are

23   both photocopies, and I've inspected them, for the life of me,

24   I cannot tell whether there is any original handwriting on

25   either of these.

VICTOR SERGEEV - Voir Dire

1      But the witness has testified that perhaps -- it's

2  not necessary to ask him because he's already testified that

3  perhaps they're both copies.  He has identified them.  He has

4  said they are his bills.  I think he meets the -- they meet

5  the authenticity requirements.  Whether it's an original or a

6  duplicate of the original, I think it meets the requirements

7  of so-called best evidence, words that are not used in the

8  code.

9      And so I'll overrule the objections, as I did before,

10 and I'll -- but I would ask that these two documents that have

11 been produced today by the defendant -- the defendants, that

12 they be marked as an exhibit for any appellate review and for

13 my further review in deciding the case.

14      I'm making no determination, with respect to any of

15 this, as to whether or not inferences may be drawn concerning

16 the testimony that's been given.  And it's all testimony

17 that's been subject to cross-examination.  And there's some

18 contested testimony concerning this.  So I don't want anyone

19 to think that a determination of authenticity that's just it

20 is what it purports to be, and best evidence, again, these are

21 not high hurdles.  So that's by way of explanation.

22      Go ahead.

23      MR. CARNATHAN:  In light of your ruling, Your Honor,

24 may I offer trial Exhibit 117, the 10 Lyman version of the

25 same document, into evidence?

VICTOR SERGEEV - Voir Dire

1          THE COURT:  Objection?

2          MR. HARRIS:  As we have done at the Court's

3    instruction, we have consistently objected to evidence

4    relating to other projects so I will --

5          THE COURT:  It's a little different here, too.  I

6    mean, I understand that.  I've overruled that objection

7    consistently, but I think here there's even more of a reason

8    to do that, to overrule the objection.  It makes perfect sense

9    to include this given its similarity to what are contested

10   documents.  So I'll allow that to be marked.

11         How do you want to handle that?  Should that be part

12   of the --

13         MR. CARNATHAN:  It's on our list as Exhibit 117.  It

14   might be cleanest just to leave it where it is.

15         THE COURT:  That's fine.  I think you're right.

16         MR. CARNATHAN:  Yeah.

17         THE COURT:  Okay.  So I'll admit that as 117.

18       PLAINTIFF'S EXHIBIT 117 WAS ADMITTED INTO EVIDENCE

19         THE COURT:  Okay.  And what are these?

20         THE CLERK:  They're going to be Exhibit 339.

21         THE COURT:  Okay.  And the two documents that we've

22   referred to at this hearing as produced today will be marked

23   separately as Defendant's 339.  Right, Mary?  Okay.

24         THE CLERK:  Correct.

25         THE COURT:  All right.

VICTOR SPIRANIKOV - Direct

1              MR. HARRIS:  Yes.  Okay.  Thank you, sir.

2                      RESUMED DIRECT EXAMINATION

3      BY MR. HARRIS:

4          Q.   Could I ask you to turn back to the binder, please,

5      and turn to Tab C-33?

6      A.   C-33?

7              MR. HARRIS:  May I approach the witness, Your Honor?

8              THE COURT:  You may.

9      BY MR. HARRIS:

10         Q.   So you've already testified, at some degree, about

11     this, so I'm going to try to be brief.  I've asked you to look

12     at the second page, which has the number 978 at the bottom.

13     Do you have that?

14     A.   978?  Yeah.

15         Q.   Okay.  Is this your proposal for 88 Cutler?

16     A.   Yes.

17         Q.   Is this your handwriting?

18     A.   Yeah.

19         Q.   All right.  This is a document that you prepared?

20     A.   Yeah.

21         Q.   Is it a true and accurate copy of your proposal?

22     A.   Yes.

23         Q.   Is it a record that you sent to Mr. Kagan's company?

24     A.   Yes, yes.

25         Q.   Okay.

VICTOR SPIRANIKOV - Direct

1          MR. HARRIS:  So, Your Honor, I'd like to move into

2     evidence Tab C-33 of the binder that is 175.

3          MR. CARNATHAN:  I guess my understanding is it's

4     already in evidence, Your Honor, but I would have the same

5     objection.  I assume I'll get the same ruling.

6          THE COURT:  Correct.  We'll treat it in the same way

7     that I did with the prior exhibit.

8          MR. HARRIS:  Yes.

9          THE COURT:  And it's also now been marked, the

10    original of that document, or what's been produced as an

11    original, has now been marked as Defendant's 339.  Okay?

12         MR. HARRIS:  Thank you, sir.

13         DEFENDANT'S EXHIBIT 339 WAS ADMITTED INTO EVIDENCE

14    BY MR. HARRIS:

15    Q.   How do you keep track of whether you've been paid?

16    A.   Sometimes I'm -- put it in -- actually, say it again.

17    Q.   How do you keep track of whether you've been paid

18    for a project?

19    A.   I put it -- I -- I had some -- every -- I make -- I had

20    like a book, my job book, and then when somebody paid for me,

21    I put it -- I wrote it in the book.

22    Q.   Okay.  Attorney Carnathan asked you this question.

23    I'm going to ask it as part.  Are you owed any money on

24    Lyman-Cutler?

25    A.   I owe?

VICTOR SPIRANIKOV - Direct

1      Q.   Have you been paid in full?

2   A.   No.  They paid for me but not -- not -- not amount.

3      Q.   How much are you owed?

4   A.   Thirty and thirty-five.

5      Q.   30- and 35,000?

6   A.   Yeah.

7          MR. HARRIS:  Okay.  Nothing further, Your Honor.

8   Thank you.

9          THE COURT:  Okay.

10                    CROSS-EXAMINATION

11  BY MR. CARNATHAN:

12      Q.   Sir, for electrical work, you also need to get a

13  permit, right?

14  A.   Yes, sir.

15      Q.   And you got a permit in this case, correct?

16  A.   Should -- should have got.

17          MR. CARNATHAN:  Could I have impeach 49, please?

18  BY MR. CARNATHAN:

19      Q.   And in order to get your permit, you had to swear

20  under the penalties of perjury how much the job was going to

21  cost, right?

22  A.   Yeah.

23      Q.   Right.  And you put down $18,000 --

24  A.   Right.

25      Q.   -- for 88 Cutler Lane, right?



VICTOR SPIRANIKOV - Cross

1    A.    Yeah, yeah.

2        Q.    All right.  Did you estimate the same on 55 Lyman?

3    A.    Probably, yes.  Yeah.

4        Q.    Now, you've had a similar problem on the 10 Lyman

5    Road project, right, sir?

6    A.    Usually, yes, because --

7        Q.    Yeah.  Were you owed a lot of money at the end of

8    the 10 Lyman Road project?

9    A.    No.  We don't.

10        MR. CARNATHAN:  Could I have Exhibit 106 again?  Spin

11    it around and blow up the box on the right.  This one is not

12    in evidence.  So it's 106 for identification, I should say, to

13    be clear.

14    BY MR. CARNATHAN:

15        Q.    So, sir, I'm showing you an exhibit that relates to

16    the 10 Lyman Road project that purports to show you being owed

17    $40,000 as of May 12th, 2015.  Were you owed $40,000 as of

18    May 12th, 2015?

19    A    Yeah.  Yeah, yeah, because he -- he's buy some material,

20    not me.  I mean, usually I'm buying -- buying wires, panels,

21    switches, and sometimes the owner -- usually he buy

22    (indiscernible) because (indiscernible).  In this first case,

23    he -- he bought some stuff.  That's why it's a difference.

24    Next -- next house, he said buy everything, I'm -- I'm going

25    to pay.  And also, the question is -- okay, okay, that's -- I

VICTOR SPIRANIKOV - Cross

1    think --

2         Q.   I admit I struggled to understand your answer, but

3    in a simple phrase, were you owed 40,000 bucks on the Lyman

4    Road project --

5    A.   Yeah.

6         Q.   -- in May 2015?

7    A.   Say it -- say it again.

8         Q.   I'm just trying to get to whether you, in fact, were

9    owed $40,000 on the Lyman Road project, the 10 Lyman Road

10   project?

11   A.   Yes, yes.

12        Q.   You were?

13   A.   Yes.

14        Q.   Okay.  And you were owed $65,000 on the Lyman-Cutler

15   project?

16   A.   Right.  I told you -- 10 Lyman, we're talking 10 Lyman,

17   right?

18        Q.   So just on these two projects that you worked on

19   in 2014, Mr. Kagan owed you $105,000 in May 2015?  Is that

20   right, sir?

21   A.   Say it again.

22        Q.   I'm just adding up the numbers.  You worked on

23   Lyman-Cutler in 2014, right, sir?

24   A.   Yeah.  Yeah.  I've been work --

25        Q.   And he, still to this day, owes you $65,000, right,

VICTOR SPIRANIKOV - Cross

1    sir?

2    A.   On the --

3        Q.   For Lyman-Cutler.

4    A.   Yeah.

5        Q.   Yeah.  And you worked on the 10 Lyman --

6    A.   Yes.

7        Q.   -- Road project in 2014 --

8    A.   Yes.

9        Q.   -- too, right, sir?

10   A.   Yes.

11       Q.   And you say he owed you 40,000 bucks in May 2015,

12   right?

13   A.   Yes, yeah.

14       Q.   So together, he owed you $105,000 in May 2015.  Is

15   that right?

16   A.   (indiscernible)?  100,000?

17       Q.   I'm just adding the 40,000 and the 65,000.  Is it

18   right that he owed you $105,000 in May 2015?

19   A.   I don't remember.  Sorry, I just -- honestly, I don't

20   remember.

21       Q.   You don't remember?

22   A.   Yeah.

23           MR. CARNATHAN:  That's all I have for Mr. Spiranikov.

24           THE COURT:  Okay.  Anything else?

25           MR. HARRIS:  Nothing further, Your Honor.  Thank you.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PAULO CORDEIRO - Direct

1          THE COURT:  All right.  Thank you, sir.  Thank you,

2     Mr. Spiranikov.

3          THE WITNESS:  Oh, thank you.

4          THE COURT:  All right.  You're all set.  You can

5     leave the courtroom.

6          MR. HARRIS:  Your Honor, we have one subcontractor

7     left.

8          THE COURT:  Okay.

9          MR. HARRIS:  Would you like us to proceed now?

10         THE COURT:  Yeah, go ahead.

11         MR. HARRIS:  Okay.  So we call Paulo Cordeiro of

12    DaCosta.

13                    PAULO CORDEIRO SWORN

14                    DIRECT EXAMINATION

15    BY MR. HARRIS:

16        Q.   Good afternoon, sir.

17    A.   Good afternoon.

18        Q.   Okay.  Please pull the microphone a little closer so

19    we hear you.  Thank you.

20        Please state your name and spell your last name for the

21    record?

22    A.   My name is Paulo Cordeiro, C-O-R-D-E-I-R-O.

23        Q.   What do you do for work, sir?

24    A.   Framing job.

25        Q.   Do you work for any company?

PAULO CORDEIRO - Direct

1  A.   I work for myself.

2       Q.   What's the name of your business?

3  A.   DaCosta Construction.

4       Q.   How long have you been in business, sir?

5  A.   About fifteen years.

6       Q.   How many employees do you have?

7  A.   Depends which -- how big the project.  From eight to

8  twelve.  And we have part-time workers.

9       Q.   Do you have a bookkeeper?

10  A.   No.

11       Q.   All right.  Do you have an accountant?

12  A.   Yes.

13       Q.   All right.  What kind of services does the

14  accountant provide for you?

15  A.   He just -- we just provide the -- he does all -- all

16  accounting for the whole taxes for the year.

17       Q.   Do you use any bookkeeping or accounting software as

18  part of your business?

19  A.   I do it myself.

20       Q.   Do you use any software to help you?

21  A.   Microsoft Words.

22       Q.   Microsoft Word?

23  A.   Yeah.

24       Q.   Okay.  I'm going to ask you some questions about the

25  Lyman-Cutler project.  It's the homes at 88 Cutler and 55

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PAULO CORDEIRO - Direct

1    Lyman.  Did your company do work at those houses?

2    A.    Yes.

3        Q.    Tell us what you did.

4    A.    We did all the framing, siding, roof, windows, doors, and

5    trim.

6        Q.    Okay.  Did you do the work?

7    A.    Yes.

8        Q.    Did you falsify any invoices?

9    A.    No.

10       Q.    Did you bill for work that you did not do?

11   A.    No.

12       Q.    Did you get paid for work you did not do?

13   A.    I still some money owe.

14       Q.    I'm sorry?

15   A.    Can you repeat the question?

16       Q.    Did you get paid for work that you did not?

17   A.    No.

18       Q.    All right.  Some other parties in this case have

19   raised some questions about your work and the paperwork.  Have

20   you ever been contacted by Alex Filippov?

21   A.    No.

22       Q.    Or Nick Lipetsker?

23   A.    Never met him, no.

24       Q.    Ever been contacted by their lawyers to ask you

25   questions about your paperwork?

Page 153

PAULO CORDEIRO - Direct

1    A.    No.

2         Q.    Did a man named Michael Goldman call you or contact

3    you and ask you questions about your paperwork?

4    A.    Never.

5         Q.    You have a binder in front of you, sir.  I'd like

6    for you to turn to Tab L-40, 4-0.  Do you have that?

7    A.    Yeah.

8         Q.    Okay.  And the second page in that tab should be an

9    email with a little number 354 at the bottom.  Do you have

10   that?

11   A.    354?  Yes.  I do --

12        Q.    Okay.  We're going to come back to the substance of

13   the email in a bit, so right now I just want to ask you some

14   questions about the email itself.  Is that -- there's an email

15   address that says Paulo Cordeiro.  Is that you at the top?

16   A.    Yes.

17        Q.    Okay.  That's your email address?

18   A.    Yes.

19        Q.    And this appears to have been sent on September 2nd,

20   2015.  Do you agree with me on that?

21   A.    Yes.

22        Q.    Okay.  And it appears to be addressed to the email

23   address KaganDevelopment@gmail.com.  Do you see that?

24   A.    Uh-huh.

25        Q.    You have to say yes, sir.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PAULO CORDEIRO - Direct

1  A.   Yes.

2       Q.   Okay.

3  A.   Yes.

4       Q.   Do you agree with me, sir, this is an email you sent

5  to Kagan Development on September 2nd, 2015?

6  A.   Yes.

7       Q.   All right.  Now, on the first page, at the very

8  bottom of this email, it seems to reference three attachments.

9  Do you see that?

10  A.   Yes.

11       Q.   Okay.  Do you have a recollection as to whether,

12  when you sent this email, you also attached three documents?

13  A.   Yeah.  One is my invoices.

14       Q.   All right.  Let's turn to the next page in the

15  packet, please.  And this one has the little numbers at the

16  bottom, 355.  Do you see that?

17  A.   Yes.

18       Q.   Okay.  Can you tell us what this is?

19  A.   My invoices.

20       Q.   Who prepared this invoice?

21  A.   Myself.

22       Q.   How did you -- I'm just asking how did you actually

23  generate this piece of paper with this invoice?

24  A.   Usually, we put the name of the company, the client, on

25  the top, on the left side, and date it, and scope of work on

PAULO CORDEIRO - Direct

1    the bottom and total.

2        Q.   Okay.  And that's a task that you performed.  Is

3    that right?

4    A.   Yes.

5        Q.   This proposal appears to go on to the next page

6    that's numbered 356.  Do you agree with that?

7    A.   Yes.

8        Q.   All right.  We turn to the next page that's numbered

9    357.  Do you have that in front of you?

10   A.   Yes.

11       Q.   Can you tell us what this is?

12   A.   My invoice.

13       Q.   Is this something that you prepared?

14   A.   Yes.

15       Q.   Now, this one appears to have work related to three

16   different homes on it.  Am I reading that correctly?

17   A.   Yes.

18       Q.   All right.  And if we turn to the next page, sir,

19   the one that's marked 358 at the bottom --

20   A.   Okay.

21       Q.   -- can you tell us what this is?

22   A.   Invoice.  It's a change order.

23       Q.   Change order.  Okay.  Is this something that you

24   prepared?

25   A.   Yes.



PAULO CORDEIRO - Direct

1       Q.   And can we turn to the next page, please?  This one

2    is numbered 359 at the bottom.  Do you have that?

3    A.   Yes.

4       Q.   Please tell us what this is?

5    A.   Invoice.

6       Q.   This relates to -- you have 55 Cutler Road on this.

7    Can you tell us whether this relates to 55 Lyman or 88 Cutler?

8    A.   55 Cutler.  That's what the invoice say.

9       Q.   Okay.  Well, there was a home at 55 Lyman, and there

10   was one at 88 Cutler.

11   A.   Yeah.  It was mistyping.

12      Q.   Okay.  So can you tell us, do you know which home

13   this related to?

14   A.   I think 55 Lyman.

15      Q.   Lyman?  Okay.  And again, this is a document that

16   you created?

17   A.   Yes.

18      Q.   All right.  Now, the invoices and change orders that

19   we just now looked at, are they true and accurate copies of

20   documents that your company created?

21   A.   Yes.

22      Q.   Were they created around the time that you did the

23   work?

24   A.   Yes.

25      Q.   Are they documents that you kept in the course of

PAULO CORDEIRO - Direct

1   your business?

2   A.    Yeah, they created in between finish and ending the --

3   the job.

4        Q.    But are these documents that you keep as part of

5   your records?

6   A.    Yes.

7            MR. HARRIS:  So Your Honor, I would -- sorry, strike

8   that.

9   BY MR. HARRIS:

10       Q.    Could you turn two more pages in the binder there's

11  a copy of a -- there's a document that's numbered 361.

12  A.    Okay.

13       Q.    Okay.  Do you recognize this document?

14  A.    Yeah.  This is a check from -- made out to my company.

15       Q.    Right.  And the next page, numbered 362, do you

16  recognize these?

17  A.    Yes.

18       Q.    What are they?

19  A.    This is a check I can -- made out to my company.

20       Q.    The next page, 363, can you tell us what these are?

21  A.    Another check made to my company.

22       Q.    And 364?

23  A.    Same thing.

24       Q.    Check -- okay.

25  A.    Another check.  Yeah.

PAULO CORDEIRO - Direct

1    Q.   On 365, can you tell us what this is?

2    A.   Another check made to my company.

3    Q.   And 366?

4    A.   Another check made to my company.

5    Q.   On 367, can you tell us what that is, please?

6    A.   Two checks made to my company.

7    Q.   If you turn to 368, and I want to draw your

8    attention to the lower right-hand portion of this page.  Can

9    you tell us, what do we see at the bottom, there?

10   A.   The bottom of the check?

11   Q.   Yes, the one at the bottom right.

12   A.   Is a check 1057.

13   Q.   Yes.

14   A.   30,000 made to my company.

15   Q.   Okay.

16   A.   55 -- I cannot read it right.  I don't know if it's

17   Lyman.  I think it's 55 Lyman Road, on the bottom.

18   Q.   On page 369, can you tell us what these are?

19   A.   Two checks made to the company.

20   Q.   On page 370, I want to direct your attention to the

21   bottom left portion of this page.  Can you tell us what that

22   is?

23   A.   Very -- very hard to read, but it looks like a check made

24   out to my company.

25   Q.   On page 371, can you tell us what this is?

PAULO CORDEIRO - Direct

1  A.   Another check made to my company.

2       Q.   And on 372, just directing your attention to the top

3  portion of this document?

4  A.   Okay.

5       Q.   What is it?

6  A.   The top portion is a check made to my company.

7       Q.   And page 373?

8  A.   Another check made out to my company.

9            MR. HARRIS:  Okay.  Your Honor, I would like to move

10 into evidence as a full exhibit Tab L-40 in the binder that is

11 175.

12           MR. CARNATHAN:  No objection, Your Honor.

13           THE COURT:  All right.  It's admitted.

14      DEFENDANT'S EXHIBIT 175 WAS ADMITTED INTO EVIDENCE

15 BY MR. HARRIS:

16      Q.   Can you turn in the binder, sir, to the tab that is

17 C-38?  Do you have that?

18 A.   Yes.

19      Q.   Okay.  If you turn to the second page in this tab,

20 I'm hoping you'll agree with me this is another company of the

21 same email we looked at earlier?

22 A.   Yes, it's the same one.

23      Q.   All right.  The next page, the one that's numbered

24 2077, do you have that?

25 A.   Yes.

PAULO CORDEIRO - Direct

1    Q.   Tell us what this is, please?

2    A.   Invoice from my company.

3    Q.   All right.  And who created this invoice?

4    A.   Myself.

5    Q.   Is it a true and accurate copy of your invoice?

6    A.   Yes.

7    Q.   Is this a record that you created around the time

8    that you did the work?

9    A.   Yes.

10    Q.   And is it a record that you keep as a regular part

11    of your business?

12    A.   Yes.

13    Q.   Could you turn to page 2079?

14    A.   Yeah.

15    Q.   Please tell us what this is?

16    A.   An invoice.

17    Q.   Okay.  Who created it?

18    A.   Myself.

19    Q.   Is it a true and accurate copy of your invoice?

20    A.   Yes.

21    Q    Is it a record your company keeps as part of its

22    business?

23    A.   Yes.

24    Q.   Page 2080, tell us what this is, please?

25    A.   My invoice from the company.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PAULO CORDEIRO - Direct

1    Q.   Did you create it?

2  A.   Yes.

3    Q.   Is it a record you keep as a part of your business?

4  A.   Yes.

5    Q.   The next page, sir, 2081, could you tell us what

6  this is?

7  A.   Same thing.  It's an invoice created for myself, and I

8  keep it.

9    Q.   Okay.  2082, can you tell us what this is, please?

10 A.   It's an invoice from my company.

11   Q.   You created it?

12 A.   Yes.

13   Q.   All right.  And not to belabor the point, if you

14 flip through the next several pages, will you agree with me,

15 sir, that there are copies of checks made out to your company?

16 A.   Yes.  All of these checks were being made to my company.

17        MR. HARRIS:  Your Honor, I'd like to move, as a full

18 exhibit, Tab C-38 in binder number 175.

19        MR. CARNATHAN:  No objection, Your Honor.

20        THE COURT:  All right.  It's admitted.

21     DEFENDANTS' EXHIBIT X WAS ADMITTED INTO EVIDENCE

22        MR. HARRIS:  And Attorney Carnathan, can we agree

23 that the cover pages also come in on these two tabs?

24        MR. CARNATHAN:  Yes.

25        THE COURT:  Okay.

PAULO CORDEIRO - Direct

1           MR. HARRIS:  All right.  Thank you.

2    BY MR. HARRIS:

3       Q.   How do you keep track of whether you've been paid?

4    A.   I have a photocopy of the checks and write it down.

5       Q.   How long have you worked with Mr. Kagan or his

6    companies?

7    A.   I started back in 2012.

8       Q.   And I assume you work for other contractors as well?

9    A.   Oh, yeah.

10      Q.   How did you come up with the amount to charge on

11   Lyman-Cutler?

12   A.   Mr. Kagan sent me a plan by pdf email, and we discussed

13   on site and come to a number, and then --

14          MR. HARRIS:  Mr. Perten, can you bring up page 8 on

15   the top of this slide?

16   BY MR. HARRIS:

17      Q.   So let me explain, sir, that another witness

18   testified earlier in this case, and he created these slides.

19   Okay?  So I'm going to ask you about one page that relates to

20   you.

21   A.   Uh-huh.

22      Q.   What he -- I think what he explained to us was he

23   took all of the instances in which you had invoice numbers on

24   various invoices for this project and others, and he put them

25   all on one page.  Okay?

PAULO CORDEIRO - Direct

1    A.   Okay.

2         Q.   And the -- I should just note the red handwriting is

3    his.  It's not mine.  Let me ask you, when you generate

4    invoices, how do you -- how are the invoice numbers prepared?

5    A.   The invoice numbers are prepared by myself.  It's not a

6    software, not creating by them.  There's not a system to -- to

7    track the -- the numbers.

8         Q.   So you have to manually enter that every time you

9    create an invoice?

10   A.   Correct.

11        Q.   And what about the dates?

12   A.   Same thing.

13        Q.   You have to manually type that in each time?

14   A.   Yes.

15        Q.   Is there any significance as to whether the date is

16   01 March 2015 or March 1st, 2015?

17   A.   No.

18        Q.   Now, I'd like to ask you -- if you turn back to the

19   binder, and if you're in tab C-38, I want to ask you about the

20   email.  Do you have that in front of you, sir?

21   A.   Yes.

22        Q.   Okay.  Can you tell us why you sent this email?

23   A.   Because there was an error by me on the invoice, and then

24   I reviewed the invoice and I correct it.

25        Q.   Okay.  And can you describe -- what was the error?

PAULO CORDERIO - Cross

1    A.    I think the total amount on the change order.

2         Q.    Now, you say here that "we have revised all our

3    records as you request.  All our files we find some mistake on

4    invoice."  Did I read that correctly?

5    A.    I think the -- the "revised" word means review.  I review

6    and correct the -- the invoice.

7         Q.    All right.  And you go on to explain, do you not,

8    sir, in the substance of this email, the correction that you

9    made?

10   A.    Correct.

11        Q.    All right.  And then, am I correct that invoice

12   number 1405 is the corrected invoice?

13   A.    From the 35 dol -- yes.

14        MR. HARRIS:  Okay.  I have nothing further for Mr.

15   Cordiero.  Thank you.

16                      CROSS-EXAMINATION

17   BY MR. CARNATHAN:

18        Q.    Good afternoon, sir.

19   A.    Good afternoon.

20        Q.    If we could stay with that email for a moment that

21   you were just looking at?

22   A.    Sure.

23        Q.    Tab C-38, KAG-2076.  And I'm also interested in that

24   first line.  "We have revised all our records as you request".

25   Have a read that correctly?

PAULO CORDIERO - Cross

1   A.   Yes.

2        Q.   So did Mr. Kagan ask you to submit these materials

3   to him?

4   A.   What do you mean materials?

5        Q.   Well, you sent him this email on September 2nd,

6   2015, right, sir?

7   A.   Yes.

8        Q.   And attached to that, there were three items, right?

9   There was "Vadim Kagan 2033 change order".  That's the first

10  one, right?

11  A.   Yes.

12       Q.   And the second one is "Vadim Kagan 2032 change

13  order", right?

14  A.   Yes.

15       Q.   And the third one is "Vadim Kagan 1405 88 Cutler

16  New" -- I think that's probably supposed to say "Invoice

17  Changes", just a typo?

18  A.   Yeah.

19       Q.   All right.  And so you sent those materials to him

20  on September 2nd, 2015, right?

21  A.   Yes.

22       Q.   Was that the first time you sent him those

23  particular three materials?

24  A.   No, it was -- no.

25       Q.   No.



PAULO CORDIERO - Cross

1    A.    No.

2          Q.    So why were you resending them to him in September?

3    A.    Oh, you talk about this -- this revising -- I mean,

4    review invoices?

5          Q.    Yeah.  Is this the first time you sent him change

6    order 2033?

7    A.    Yes.

8          Q.    Yeah.  And is the first time you sent him change

9    order 2032?

10   A.    I don't remember, but I think so.

11         Q.    Okay.  It's the first time you sent him this 1405

12   new invoice?

13   A.    Yes.

14         Q.    Okay.  And were you doing that because he asked you

15   to?

16   A.    We -- I don't remember.

17         Q.    If we -- let's -- I guess let's stay in tab C-38 for

18   the moment to make things easier.  If we turn the page, the

19   next document behind the invoice -- excuse me -- behind the

20   email, that's invoice 1405, right?

21   A.    Yes.

22         Q.    And this is the new invoice?  This is the one that

23   you corrected?

24   A.    Yes.

25         Q.    And if we look at the top in the box, it says

PAULO CORDIERO - Cross

1  "DaCosta Construction"; do you see that?

2  A.   Yes.

3       Q.   And if we turn the page, we're still in invoice

4  1405, but now it just says DaCosta; do you see that?

5  A.   Yes.

6       Q.   Okay.  Can you explain how that came to pass?

7  A.   Well, you use the soft -- the Micro software, when you

8  start -- start typing, the blocks move around.  So sometime,

9  minimize or maximize the words, and that's why maybe it's

10  missing some word there.

11      Q.   Would it be fair to conclude that the first page,

12  where it just says DaCosta Construction --

13  A.   Uh-huh.

14      Q.   -- is original material, and the followup pages are

15  the changed material?  Or the other way around or -- can I

16  draw any conclusion like that?

17  A.   I don't remember.

18      Q.   If we turn one, two, three, four -- about four pages

19  further on in the exhibit, I'm now at KAG-2081 in the bottom

20  right corner.  This is the change order 2032.  Have I got you

21  to the right place?

22  A.   Yes.

23      Q.   Yeah.  Okay.  So that's one of the attachments that

24  went with the September 2 email, right?

25  A.   Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

PAULO CORDIERO - Cross

1     Q.   So that's a change order dated March 1, 2015, right,

2     sir?

3     A.   Yes.

4     Q.   Okay.  And if we look back, now at -- I'm now going

5     back to tab L-40, and I'm looking for the same -- I guess,

6     more or less the same change order.  It's invoice number 2033.

7     It's got a little KDC-358 in the bottom right corner.  Are you

8     with me, now?

9     A.   Uh-huh.  Yes.

10    Q.   Okay.  And that's one of the documents that was

11    attached to this email, right?  That's "Vadim Kagan 2033

12    change order"?

13    A.   Can you repeat the page for me again?

14    Q.   I'm in tab L-40 at KDC-358.  And it should be the

15    change order invoice 2033.

16    A.   Okay.  I got it.

17    Q.   Okay.  So that one's dated March 1, 2015, too,

18    right, sir?

19    A.   Yes.

20    Q.   You remember when you actually did the work?

21    A.   I did in between '14 -- the whole year.

22    Q.   If we look at some of the other invoices in that

23    same packet, the earliest one is dated October 10th, 2013.

24    That's -- I'm now -- I'm still in tab L-40.  I'm at KDC-359.

25    Did you start in the fall of 2013?

PAULO CORDIERO - Cross

1   A.   Yes.

2        Q.   Okay.  And when I look at your other invoices, the

3   big ones, if you will, are dated April 25, 2014, and there's

4   another one from August 2014.  Is it fair to conclude you'd

5   done most of the work by April 2014 and then did some more

6   before August?

7   A.   No, those are two big projects, so it -- it would have

8   taken a long time.

9        Q.   All right.  Is it fair to conclude you were done by

10  late August 2014?

11  A.   With Mr. Kagan, was always a lot of changes.  I don't

12  remember.

13       Q.   Okay.  Can you explain to me why it was that you

14  were sending him a change order dated March 1, 2015, with an

15  email in September 2015?

16  A.   Maybe when it's -- oh.  We did the siding on the job over

17  the wintertime in 2015.  And then we -- we complete, we're in

18  between complete start and finish; that's the time we sent it.

19  That's right.

20       Q.   Okay.  Why September 2015, sir?

21  A.   You asked me about March 2015.

22       Q.   Right.  The change orders were dated March 1, 2015,

23  but you sent them to him September 2nd, 2015, right, sir?

24  A.   Yeah, because then we had decided to go on siding.

25       Q.   I'm not sure I understood your answer.  Wasn't all

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 170

PAULO CORDIERO - Cross

1    the work all done by September 2015?  It had been done months

2    ago.

3    A.    Framing job.  Framing job was all done, probably.  Not

4    siding job.

5        Q.    You're saying you're still working on the siding in

6    September '15?

7    A.    No, September '14.

8        Q.    Right, but that would match my understanding.  You

9    might have been doing siding in September '14.  But the

10   email's September '15, right, sir?

11   A.    Me -- I -- the email was a revising because Kagan would

12   owe me money and the recognize the invoice was incorrectly.

13       Q.    All right.  And how is it you came to recognize the

14   invoice was incorrect a year after you'd finished the work?

15   A.    Go to the books.

16       Q.    As you sit here today, how much are you owed?

17   A.    23,000.

18           MR. CARNATHAN:  That's all I have for Mr. Cordiero.

19           THE COURT:  Okay.

20           MR. HARRIS:  Nothing further.  Thank you, Your Honor.

21           THE COURT:  All right.  Thank you, sir.  You're --

22           THE WITNESS:  You're welcome.

23           THE COURT:  -- finished here.  Thank you.

24           THE WITNESS:  Thank you.  Thank you.

25           THE COURT:  Is that the last of this group?



```
 1                  MR. HARRIS:  It is.

 2                  THE COURT:  Okay.  What's next?

 3                  MR. HARRIS:  I think we might be doing Attorney

 4      Maiden.

 5                  THE COURT:  Oh, yes.

 6                  MR. CARNATHAN:  We expect to call Mr. Maiden, Your

 7      Honor.

 8                  THE COURT:  Okay.  How's everybody doing?  Do we need

 9      a break?  It's going to go until 3.

10                  MR. CARNATHAN:  I could certainly use a few minutes,

11      but --

12                  THE COURT:  Yeah.

13                  MR. CARNATHAN:  -- if the Court would like to soldier

14      on and do a late lunch, that's okay from my standpoint.

15                  THE COURT:  Okay.  Let me check with my crew.  Let's

16      go fifteen minutes, okay?  And so we'll just -- we'll go to

17      about 1:30 and come back, and we'll go an hour and a half,

18      okay?  All right.  Thank you, all.

19                          (Off the record at 1:18:35 p.m.)

20                          (On the record at 1:39:11 p.m.)

21                  THE CLERK:  All rise.  Court is in session.

22                  THE COURT:  Be seated.  Okay.  Whenever you're ready.

23                  MR. CARNATHAN:  Thank you, Your Honor.

24                  MR. PERTEN:  Your Honor, one minor housekeeping --

25                  THE COURT:  Sure.  Sure.
```

1          MR. PERTEN:  -- matter.  Mr. Gersh has been sitting

2     in the little conference room.  Mr. Carnathan and I consulted,

3     and we both are of the opinion we won't be getting to him.  So

4     I'd like to send him home, but I didn't want to do that

5     without clearing it with you first.

6          THE COURT:  By all means.  That's fine.

7          MR. PERTEN:  Okay.  Thank you.

8          THE COURT:  Okay.

9          MR. CARNATHAN:  The plaintiffs call Boris Maiden,

10    Your Honor.

11         THE COURT:  Okay.

12         MR. CARNATHAN:  And so the Court knows, this is

13    Attorney Val Gurvits.  He's here on behalf of Mr. Maiden to

14    the extent that any privilege issues come up or as Mr. Gurvits

15    sees fit, frankly.  But that's his role.

16         THE COURT:  Okay.  And I'm sorry, your name is?

17         MR. GURVITS:  Valentin Gurvits.  I'm on record.

18         THE COURT:  Gurvits.  Okay.

19         MR. GURVITS:  Gurvits.

20         THE COURT:  All right.  You've made your appearance.

21    Thank you.

22         MR. GURVITS:  Thank you.

23         THE COURT:  All right.

24         THE CLERK:  Please raise your right hand.

25                         BORIS MAIDEN SWORN

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Direct

1          THE COURT:  Good afternoon --

2          THE WITNESS:  Afternoon.

3          THE COURT:  -- Mr. Maiden.  I -- you've been here for

4     some of this, I think, but just we record in this courtroom,

5     so you need to speak into the microphone --

6          THE WITNESS:  All right.

7          THE COURT:  -- and if you hear it amplifying your

8     voice, you'll know that we're getting you, okay?

9          THE WITNESS:  I understand.  Thank you.

10          THE COURT:  Thank you very much.  All right.

11                    DIRECT EXAMINATION

12     BY MR. CARNATHAN:

13          Q.   Good afternoon, sir.

14     A.   Good afternoon.

15          Q.   Would you state your name, please?

16     A.   Boris B. Maiden.

17          Q.   What do you do for a living, sir?

18     A.   I'm an attorney.

19          Q.   For how long have you been an attorney?

20     A.   Twenty-four years.

21          Q.   Would you briefly describe your educational

22     background, please?

23     A.   High school, Providence College undergraduate, Suffolk

24     Law.

25          Q.   And do I understand you're a native Russian speaker?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Direct

1    A.   That's correct.

2         Q.   When did you come to this country?

3    A.   1980.

4         Q.   Let's talk about your legal practice for just a

5    moment.  In what jurisdictions are you admitted, sir?

6    A.   In Massachusetts and New York.

7         Q.   And do you focus your practice in any particular

8    area or areas?

9    A.   Yes, I do.

10        Q.   And where do you focus?

11   A.   Mostly conveyancing, real estate, residential and

12   commercial closings.

13        Q.   Let's just speak briefly about your acquaintance

14   with the various parties here.  Do you know Vadim Kagan?

15   A.   Yes, I do.

16        Q.   For how long have you known Mr. Kagan?

17   A.   Anywhere between fifteen to eighteen years.

18        Q.   Have you provided any legal services to Mr. Kagan

19   over the years?

20   A.   Yes.

21        Q.   What legal services, in general terms, have you

22   provided to him?

23   A.   Well, he purchased properties in his name.  I did the

24   work for the bank and for representing him on the purchase and

25   sales agreement.

BORIS MAIDEN - Direct

1    Q.   Have you also formed any limited liability companies

2    for projects that Mr. Kagan undertook?

3    A.   That Mr. Kagan was involved, that's correct, yes.

4    Q.   Yeah.  About how many times have you formed a

5    limited liability company for a project in which Mr. Kagan was

6    involved?

7    A.   Between ten and fifteen or more.

8    Q.   And how about Alex Filippov?  Are you acquainted

9    with Alex Filippov?

10   A.   Yes, I am.

11   Q.   For how long have you known Mr. Filippov?

12   A.   Probably fifteen years or so.

13   Q.   And have you done any legal work for Mr. Filippov?

14   A.   During his purchase when he purchased the -- or

15   refinanced some of his properties, yes.

16   Q.   About how many times would you say you've done legal

17   work for Mr. Filippov?

18   A.   Between five and ten.

19   Q.   And how about Nikolay Lipetsker?  Are you acquainted

20   with Mr. Lipetsker?

21   A.   Yes, I am.

22   Q.   And for how long have you known Mr. Lipetsker?

23   A.   About twenty years.

24   Q.   And have you done any legal work for Mr. Lipetsker?

25   A.   Maybe some tickets or personal injury cases, but no,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Direct

1   other than that, nothing.

2       Q.   What about Dmitriy Zhukovskiy?  Are you acquainted

3   with Dmitriy?

4   A.   Yes.

5       Q.   Yeah.  And for how long have you known him?

6   A.   About fifteen to twenty years.

7       Q.   Am I right, his wife works for you, or at least did

8   at one time?

9   A.   That's correct.  She does work for me.

10      Q.   She still does?

11  A.   Yes.

12      Q.   Yeah.  And have you done any legal work for Mr.

13  Zhukovskiy?

14  A.   In a similar capacity as I did for -- I described for --

15  his refinancing when he purchased the property and the

16  purchase money.

17      Q.   Would you describe yourself as friends with Mr.

18  Kagan?

19  A.   We used to be.

20      Q.   But not anymore?

21  A.   Not anymore.

22      Q.   What happened?

23  A.   We just stopped communicating after -- after the lawsuit

24  was filed.

25      Q.   What about Mr. Filippov?  Would you characterize

BORIS MAIDEN - Direct

1    yourself as friends with Mr. Filippov?

2    A.    Social acquaintance.  No.

3         Q.    How about Mr. Lipetsker?

4    A.    Mr. Lipetsker is a friend of mine, yes.

5         Q.    Yeah.  Am I right, his office is near yours?

6    A.    That's correct.

7         Q.    Why don't we think a little bit about the Lyman-

8    Cutler project?  How did you first become aware of the Lyman-

9    Cutler project?

10   A.    Vadim -- Mr. Kagan -- stopped by my office, and he

11   indicated that he found and made an offer on the property in

12   Brookline.  The offer was accepted.  He put down $1,000, and

13   the property was $4 million.  And he was asking me if he -- if

14   I knew anybody who would be interested in participating with

15   him on this project.

16        Q.    And did you suggest that he speak to anyone in

17   particular?

18   A.    I suggested for him to speak to Mr. Lipetsker, whom he

19   knew well by then.  And my understanding that after he spoke

20   to Mr. Lipetsker, Mr. Lipetsker introduced Mr. Filippov.

21        Q.    So after that initial meeting where Mr. Kagan asked

22   you for suggestions about who to approach to invest in his

23   project, what was your next involvement with the Lyman-Cutler

24   project?

25   A.    My next involvement in terms of actually being there is

BORIS MAIDEN - Direct

1    after Mr. Kagan, Mr. Lipetsker, and Mr. Filippov after they

2    have met, and I was told that Mr. Kagan took and showed him

3    his prior projects, that they spent some time together, maybe

4    with Mr. Lipetsker was also there.  They wanted to reconvene

5    in my office to discuss it further.

6         Q.    Okay.  And did they meet at your office?

7    A.    Yes, they did.

8         Q.    Were you present during the meeting?

9    A.    My conference room is connected to -- to my actual

10   office, so I was in and out, but mostly for the things that I

11   needed to hear or they wanted me to hear, I was there.

12        Q.    All right.  And about when did that meeting take

13   place?

14   A.    I really can't remember.

15        Q.    Let me --

16          MR. CARNATHAN:  Mr. Hartzell, could I have Exhibit 15

17   in evidence?  Actually, you know what, Exhibit 9 might be

18   preferable.

19   BY MR. CARNATHAN:

20        Q.    Do you recognize Exhibit 9 in evidence, Mr. Maiden?

21   A.    This is Exhibit 6.

22        Q.    And we can show you more pages, yeah.  Yeah.  I'm

23   sorry.  It's -- it was marked as 6 at Mr. Kagan's deposition.

24   It's 9 in the trial.  If Mr. Hartzell just scrolls through --

25   A.    I recognize that at the -- at the meeting, there was a

BORIS MAIDEN - Direct

1   spreadsheet.  Whether it is exactly -- it looks the same way,

2   but I can't tell you the -- the -- the -- exactly what was

3   shown there.

4        Q.   Okay.

5             MR. CARNATHAN:  Can we go back to the first page?

6   BY MR. CARNATHAN:

7        Q.   So I guess, at this point, I'm mostly showing it to

8   you because it's got a date on the cover.

9   A.   October 25th.

10       Q.   And that one says October -- does that sound about

11  right?

12  A.   Yes.

13            MR. CARNATHAN:  And then maybe we could have 15?

14  BY MR. CARNATHAN:

15       Q.   I'm really just showing you these to orient you in

16  time.  All right.  Do you recognize that as the operating

17  agreement of Lyman-Cutler, Mr. Maiden?

18  A.   Yes, I do.

19       Q.   All right.  And that's dated November 14th, 2012.

20  See that?

21  A.   Yes.

22       Q.   Okay.  So with those reference points, are you able

23  to say when the meeting took place that you're thinking of?

24  A.   Before October 25th or at October 25th, 2012.

25       Q.   Okay.  Right around there somewhere?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Direct

1    A.    Yes.

2         Q.    Who was at the meeting?

3    A.    Mr. Kagan, Mr. Filippov, Mr. Lipetsker, and I'm not sure

4    whether Mr. Zhukovskiy was present at the first or at the

5    second meeting.

6         Q.    So you actually remember two meetings at your

7    office?

8    A.    Yes.

9         Q.    And were they both before the signing of the

10   operating agreement?

11   A.    I would say yes.

12        Q.    So what do you recall as the substance of what was

13   discussed during the first meeting that you're thinking of?

14   A.    The financial terms of who's going to be the

15   responsibilities, who's going to be providing the investments,

16   who is going to be building, what is going to be built, some

17   potential profit analysis based on prior projects.

18        Q.    So if we break that down and try to take it piece by

19   piece, thinking first about the financial terms, as best you

20   can recall, would you recount who said what to whom during

21   this meeting about the financial terms of the arrangement for

22   the Lyman-Cutler project?

23   A.    It was understood -- and I don't know who exactly said,

24   but it was understood that the reason Vadim needed investment

25   is because on a project of this magnitude where the purchase

BORIS MAIDEN - Direct

1    price is $4 million, you would require anywhere between $2.2

2    to $2.5 million of total investment.  And that's why Mr.

3    Filippov was brought in, that he was going to be supplying

4    with the majority of capital of the investment into company.

5        Q.    And I think you also said that the response -- the

6    various parties' responsibilities were discussed, too.  Did I

7    get that right?

8    A.    Yes.

9        Q.    What -- who said what to whom about the

10   responsibilities that each party would have in connection with

11   the project?

12   A.    Well, Mr. Kagan is a well-known builder, and that's what

13   he does for a living.  He was building houses.  So his

14   responsibility would be -- he already found the project that

15   he was very excited about, that it can be subdivided into two

16   houses in a very good location in Brookline, desirable

17   location in Brookline.  So his responsibility would be to

18   build the house.  And from -- that -- that's -- Nickolay's

19   responsibility was to come in with a small amount of money and

20   basically do nothing.

21       Q.    And what was Mr. Filippov's responsibility?

22   A.    Mr. Filippov wanted -- because he was investing a

23   substantial sum of money into the project, his responsibility

24   was that he wanted to make sure that the -- he makes money,

25   and that he has control over the company.

BORIS MAIDEN - Direct

1    Q.   What do you recall was discussed at this meeting

2    about what would be built?

3    A.   The -- the analysis was -- at that point, Mr. Kagan had

4    already two similar projects -- one was on the Yarmouth Road

5    and the other on 10 Cutler -- that are similar in size,

6    similar in pricing.  So the understanding that -- and those

7    are the projects that he showed to Filippov.  So the idea was

8    that there would be two houses built similar to the one on 10

9    Lyman, at least.  Because that's next door to where they

10   building -- were going to be building Lyman-Cutler.

11   Q.   To what extent was there any discussion of what the

12   construction would cost during this meeting?

13   A.   The projects that were given were, if I remember

14   correctly, were based on what the 10 Lyman was costing and

15   what was -- what 10 Lyman was anticipating to be sold.  So

16   they -- if I remember, it was anywhere between $1.3 to $1.6

17   million per house.

18   Q.   Who was it that came up with those numbers?

19   A.   The first initial spreadsheet that you showed me -- or at

20   some point, the spreadsheet that showed it, I -- I think took

21   the analysis of prior projects and given what was worth --

22   what -- what it did cost to build 10 Lyman, the anticipation

23   was that the same costs would be associated with this project.

24   And the spreadsheet gave the analysis of -- based on prior

25   projects, on what can happen with this project.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Direct

1  Q. Did Mr. Kagan say anything in particular about the

2 construction costs during this meeting?

3 A. I don't remember.

4  Q. What about Mr. Filippov?

5 A. There was a discussion at the -- at the conference table

6 between all three of them what is going to be costing, but

7 people were looking at the numbers and investigating that.  So

8 I don't remember who said to who what; it was a group

9 discussion.

10  Q. So thinking still about this first meeting, was

11 there any discussion of the carrying cost during the first

12 meeting?

13 A. It was definitely discussed that carrying costs will be

14 paid, if I remember correctly, and the project was split in

15 two in terms of purchase money.  In order to go purchase for

16 $4 million, you needed some money from the bank.  And then, it

17 would be another financing arranged for construction loans.

18 And so the first -- and I don't remember whether it was the

19 first meeting, second, but it definitely was.  The first loan

20 from Rockland Trust was for $1.6 million.  And only -- and the

21 total investment from all the players were $2.5 million -- $2

22 million, Mr. Filippov; 250, Lipetsker; and 250, Kagan.

23  Q. So with the 1.6, they had $4.1 million, is that

24 right?

25 A. So they needed out 1.6, they only needed 1.5.  So there

BORIS MAIDEN - Direct

1   was a discussion that the extra 100,000 that they're getting

2   would be used for the carrying costs, to pay on the purchase

3   money mortgage.

4        Q.   Was there any discussion about the carrying costs

5   once construction started?

6   A.   The carrying costs, there was discussion, and that's what

7   I wrote based on the agreement that the carrying costs will be

8   paid out of loan proceeds.

9        Q.   So that's what you wrote?  You drafted the operating

10  agreement, right, sir?

11  A.   That's correct.

12       Q.   And so you captured their discussion about the

13  carrying costs in the operating agreement; is that right?

14  A.   That is correct.

15       Q.   If we expand the question now to encompass the

16  second meeting, because I know you said there were two, what

17  further discussion took place at the second meeting about the

18  project, to the best of your recollection?

19  A.   I remember that Mr. Filippov wanted to nail the financing

20  and the numbers because he was putting $200,000 for the

21  signing of a purchase and sales agreement.  And I remember he

22  was saying to everyone, I'm not going to put $200,000 down

23  without knowing exactly what I'm signing on for.

24       Q.   So the 200,000, where's that number from?

25  A.   That's five percent on the purchase and sales agreement.

BORIS MAIDEN - Direct

1    Q.    So at this point in the discussion, Mr. Kagan had

2    put $1,000 down to hold the offer, is that right?

3    A.    That is correct.

4    Q.    And in order to sign the P&S, you needed to bring it

5    up to five percent, right?

6    A.    Another 199.

7    Q.    Okay.  And so Mr. Filippov was saying before he

8    would put down the five percent, he wanted the financial

9    numbers nailed down, is that right?

10   A.    That is correct.

11   Q.    What, if anything, did Mr. Kagan say?

12   A.    He agreed.

13   Q.    And so before they signed the P&S, did they nail

14   down the financial numbers?

15   A.    I think so.

16   Q.    Yeah.  What's your best recollection of how they

17   nailed them down?

18   A.    Well there was discussion about how are they going to be

19   splitting the money and what -- what way.  In me -- in the --

20   I mean in the interest of profit.  Who's possible for what,

21   how much is going to approximately cost with plus or minus

22   some deviation.  But they have basically the most important

23   terms of who invests how much money?  Who gets what?  Where

24   are the carrying costs was -- was resolved within a couple of

25   weeks.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Direct

1        Q.   Within a couple of weeks?

2    A.   I -- or within a short period of time.

3        Q.   In connection with drafting the operating agreement,

4    sir, who did you understand yourself to be representing?

5    A.   The LLC.

6        Q.   So were you trying to act on behalf of any

7    particular party during the drafting?

8    A.   No, I did not.

9        Q.   So where did the -- the terms, if you will, in the

10   operating agreement come from?

11   A.   The terms -- as I was sitting in their meeting, they have

12   nailed down the terms.  And basically as a group, they said,

13   Boris, write it down now for us.  That constitutes our

14   agreement.  And I downlo -- used the same template on -- on

15   all the prior projects that Mr. Kagan was involved.  The only

16   thing that would change is what's the profit split?  What's --

17   and -- and that's basically an -- or how much money each one

18   will invest.  That's basically what -- the only thing that

19   changed from time to time on this template.

20       Q.   Would you agree with me that you went through a

21   series of drafts before you go to the final version?

22   A.   Yes.

23       Q.   Yeah, and there was some email back and forth

24   between you and Mr. Filippov, and I think at times with Mr.

25   Lipetsker and Mr. Kagan; is that right?

BORIS MAIDEN - Direct

1   A.    That's correct.

2        Q.    To what extent did you keep Mr. Kagan informed about

3   changes to the drafts of the operating agreement?

4   A.   Mr. Kagan very rarely, if any, replied to emails in terms

5   of -- so, however, as you indicated, you asked me before and I

6   answered that Mr. Kagan would stop by my office almost on a

7   daily basis.  And anytime a change would be propagated or

8   asked by Mr. Filippov, whether they want a change X to Y,

9   let's say, I would run it by Mr. Kagan and say this is what he

10  wants, is that okay with you?  Then I will change the

11  operating agreement.  If it's not okay, then do -- I go back

12  and negotiate more.

13        Q.    Are there any terms in the final version of the

14  operating agreement for Lyman-Cutler that you did not go over

15  with Mr. Kagan?

16  A.    No.

17        Q.    Could we go to section 4.1?  So Mr. Maiden, I'll

18  just tell you there's been a lot of hubbub about section 4.1.

19  Did you go over section 4.1 with Mr. Kagan before you signed

20  it -- before you signed the operating agreement?

21  A.    Yes.

22        Q.    Yeah.  As best you can recall, what was the

23  substance of your discussion with Mr. Kagan about section 4.1?

24  A.    That the carrying costs will be paid out over all

25  Rockland Trust proceeds.

BORIS MAIDEN - Direct

1    Q.   Were they, in fact, borrowed from Rockland Trust --

2    the carrying costs?

3    A.   As a -- let me explain a little bit on this.  When a

4    builder submits a budget -- and this is the common practice

5    in -- submits budget to a bank, there is no line item which

6    indicates in this budget as a carrying cost.  What the bank --

7    what the banks know and basically wink, wink at it and what

8    all the builders know that they going to increase a little bit

9    to ten percent -- fifteen percent the total budget.  And the

10   banks go with that and use that incremental out of paying the

11   carrying costs.

12        Q.   Is that what happened in this case, sir?

13   A.   Yes.

14        Q.   Yeah.

15   A.   And this is what happens on each and every project.

16        Q.   Each and every project that you worked with Mr.

17   Kagan?

18   A.   That I was aware of, yes.

19        Q.   And you -- I think for the loan to acquire the land,

20   you served as the closing attorney, right sir?

21   A.   Correct.

22        Q.   And you also served as the closing attorney for the

23   construction loans?

24   A.   Correct.

25        Q.   All right.  And so you knew that the carrying costs

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Direct

1    were included in the budget?

2    A.    Not only the -- well, they -- they were included without

3    being said so.  And the bank was in possession of this

4    operating agreement.  So not only I knew but the bank knew.

5        Q.    You see in section 4.1 it says that you're going to

6    "Borrow the accounting costs until the issuance of the

7    certificates of occupancy but in no event for more than

8    twenty-three months from the date of acquisition".  Have I

9    read that correctly?

10   A.    Yes.

11       Q.    Do you recall how that term came to be in the

12   agreement?

13   A.    It was negotiated between them.

14       Q.    Right.  And what was to happen after twenty-three

15   months?

16   A.    If I remember correctly -- and -- and that is again it

17   was negotiated between them that after twenty-three months if

18   the certificate of occupancy is not issued, then Mr. Kagan

19   will be responsible for payment of the carrying costs.  And if

20   he's unable to pay, then his capital contribution -- so for

21   example, if Mr. Filippov stepped in and started paying the

22   carrying costs, then capital contribution that Mr. Kagan has

23   invested in it would be reduced by that amount.

24       Q.    What about if Mr. -- when Mr. Kagan paid the

25   carrying costs, did that reduce anyone's capital account?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Direct

1    A.    No.

2         Q.    Why was that different?

3    A.    Because if I remember, that was a point that Mr. Filippov

4    negotiated with Mr. Kagan basically stating that it is his

5    responsibility to build on time -- to build the property and

6    get the certificate of occupancy so the property can be sold.

7    And since Filippov could not affect it one way or another, the

8    construction, he wanted to put some sort of a limitation on

9    how long it's going to take.

10        MR. CARNATHAN:   Can I have section 8.1, Mr. Hartsell?

11   Maybe blow up the bold italics.   Okay.

12   BY MR. CARNATHAN:

13        Q.    So that's -- is that the provision you were

14   just talking about?

15   A.    Yes.

16        Q.    Why is it in bold and italics?

17   A.    I -- it is my way of showing the significance -- the

18   importance of that section to everyone.

19        Q.    Did you ever talk to Mr. Kagan about this particular

20   term?

21   A.    On numerous occasions.

22        Q.    And what's the substance of your discussion with Mr.

23   Kagan about this provision?

24   A.    I was cautioning him against -- because the other

25   projects that he was involved, it was -- did not have the same

BORIS MAIDEN - Direct

1    terms -- the same -- or type of limitation.  And I explained

2    to him again.  And his response was, fine by me.  It's all

3    acceptable.  Let's go with it.

4         MR. CARNATHAN:  Could I also have section 6.1 B-6,

5    Mr. Hartsell?

6    BY MR. CARNATHAN:

7         Q.   Mr. Maiden, do you recall having a provision in the

8    agreement about the managing member agreeing to list the

9    properties with Tatiana Kagan?

10   A.   Yes.

11        Q.   And what's your recollection of how that provision

12   came to be in the operating agreement?

13   A.   Historically from -- on all the projects that or on -- on

14   almost all of them that I remember, Mr. -- Mrs. Kagan was the

15   one who was selling the property.  And it -- it went without

16   saying that it will be listed by Mrs. Kagan and she's going to

17   be selling the property.

18   However, Mr. Filippov thought that it's important if -- to be

19   able to change real estate broker if the current real estate

20   broker is not successful or -- or is not getting -- sometimes

21   happens one can do miracles that the other one cannot at this

22   point.  So that is the limitation that he was going to put in.

23   And I remember there was a discussion also that he could not

24   eliminate Mrs. Kagan unilaterally.  Even though he had eighty

25   percent, he needed, as it says here, eighty-one percent.  That

BORIS MAIDEN - Direct

1    means either Mr. Lipetsker could consent or Mr. Kagan could

2    consent.

3            MR. CARNATHAN:  Okay.  If we could have the rest of

4    the paragraph, Mr. Hartsell.  Yes.  I guess we have to go onto

5    the next page.

6    BY MR. CARNATHAN:

7        Q.   Did that change at some point through the December

8    31 date?

9    A.   Was it September before?

10       Q.   Well, the final agreement says after December 31,

11   2014 no such consent shall be required.  Have I read that

12   correctly?

13   A.   Yes.

14       Q.   Are you saying that the date after which no such

15   consent shall be required was also a negotiated term?

16   A.   Correct.

17       Q.   Yeah.  What do you recall about those negotiations?

18   A.   Basically either emails from Filippov or phone calls and

19   I would communicate Filippov's request to Mr. Kagan and that's

20   how it would appear --

21       Q.   All right.  So --

22   A.   -- after his blessing.

23       Q.    -- did you actually discuss this term with Mr.

24   Kagan?

25   A.   All terms were discussed with Mr. Kagan.

BORIS MAIDEN - Direct

1      Q.    Okay.  And did he agree with it?

2   A.    Yes.

3      Q.    What about -- who was the managing member of Lyman-

4   Cutler?

5   A.    The managing member was Mr. Filippov.

6      Q.    And was that a negotiated term as well?

7   A.    There was actually one of the conditions for him getting

8   into this -- the -- this transaction is that -- I remember his

9   words.  He says I am the guy who puts $2 million.  I want to

10   be able to be in charge of this or what happens to my money.

11         MR. CARNATHAN:  So if we go, Mr. Hartsell, to page

12   13, the signature block.

13   BY MR. CARNATHAN:

14      Q.    You see on the signature block it says managing

15   manager, Mr. Maiden?

16   A.    Yeah.

17      Q.    Yeah.  Could you explain how it came to say managing

18   manager?

19   A.    When you file documents with the Secretary of State, they

20   don't have a managing -- the -- they have a manager.  But in

21   this particular template, which was should of -- modify it --

22   that Alex Filippov was supposed to be a manager.  It -- it --

23   the guy who can do things with -- decide for the company.

24         MR. CARNATHAN:  Could I have section 5.2, Mr.

25   Hartsell?



BORIS MAIDEN - Direct

1  BY MR. CARNATHAN:

2      Q.   So section 5.2, Mr. Maiden, states, "It shall be Mr.

3  Kagan's duty and obligation to construct two homes at the

4  location currently known as 77 Lyman Road in Brookline

5  Massachusetts in according with the plans including drawings

6  supplied by Mr. Kagan and approved by the managing member".

7  Have I read that correctly?

8  A.   Correct.

9      Q.   And who is the managing member in that sentence to

10  your understanding?

11  A.   Mr. Filippov.

12      Q.   Yeah.  And do you have an understanding of what was

13  meant by the term plans in that sentence?

14  A.   Yeah.  The actual floor plans and the site plan.

15      Q.   And it says, "The construction shall be

16  substantially completed no later than March 30th, 2014".  Was

17  there any particular discussion about that date?

18  A.   Between them, yes.

19      Q.   Yeah.  In your presence?

20  A.   I can't recall.

21      Q.   Did you go over this paragraph with Mr. Kagan too?

22  A.   Yes.

23      Q.   Yeah.  And it says, "It is specifically understood

24  by all members that Mr. Kagan's compensation for this duty is

25  outlined in section 8.1 below".  Have I read that correctly?

BORIS MAIDEN - Cross

1   A.   Correct.

2        MR. CARNATHAN:  And so if we go to section 8.1, Mr.

3   Hartsell.

4   BY MR. CARNATHAN:

5        Q.   What was Mr. Kagan's compensation supposed to be for

6   building the two homes?

7   A.   Fifty percent of profit.

8        Q.   If we think again about before the operating

9   agreement is signed, who was it that developed the budget that

10  was submitted to the bank for the construction costs?

11  A.   Mr. Kagan.

12                          (Pause)

13       MR. CARNATHAN:  That's all I had for Mr. Maiden.

14       THE COURT:  Okay.

15       MR. PERTEN:  May I proceed, Your Honor.

16       THE COURT:  You may.

17                   CROSS-EXAMINATION

18  BY MR. PERTEN:

19       Q.   Good afternoon, Mr. Maiden.

20  A.   Good afternoon.

21       Q.   Now, Mr. Maiden, you mentioned that you also know

22  Mr. Zhukovskiy, correct?

23  A.   Correct.

24       Q.   In fact, his wife is an associate in your office or

25  was?

BORIS MAIDEN - Cross

1   A.   She is.

2        Q.   Okay.  You've also represented Kristina Brusenkova,

3   correct?

4   A.   I represented her on a purchase and sales once.

5        Q.   Okay.  And you've represented Lev Agranovich, the

6   CPA that Kagan used, correct?

7   A.   That is correct.

8        Q.   And you told us already you represented Lipetsker

9   and Filippov as well as Kagan?

10  A.   That is correct.

11       Q.   Okay.  And you represented Mr. Kagan on multiple

12  deals, correct?

13  A.   On the ones that he formed LLCs, my duty was to the LLC.

14       Q.   Correct.

15  A.   So I was not representing him individually.

16       Q.   Okay.  Now, the projects that you worked on with Mr.

17  Kagan, they all basically followed the same formula, correct?

18  He builds the houses and then they sell and everybody gets a

19  profit, correct?  Hopefully a profit.

20  A.   Yes, but not from the beginning it was the same way.

21       Q.   Okay.  And in terms of the Kagan related projects,

22  you had forms that you had developed over the many

23  transactions you did with him, correct?

24  A.   Yes.

25       Q.   So you didn't have to reinvent the wheel; you had an

BORIS MAIDEN - Cross

1    LLC agreement that you could change the names and whatever

2    terms you had to change, correct?

3    A.    Correct.

4        Q.    And similarly, when buying the property, you had a

5    standard purchase and sale agreement, which would get tweaked

6    for every deal, correct?

7    A.    That is correct.

8        Q.    And when representing the bank, you have bank loan

9    documents that you had already developed that you could use,

10   correct?

11   A.    Correct.

12       Q.    And certainly many of the transactions that were

13   Kagan related, the lender was Rockland Trust Company, correct?

14   A.    Yes.

15       Q.    And so you had a set of forms that had been

16   developed for use in Rockland Trust Company transactions,

17   correct?

18   A.    Yes.

19       Q.    And you were certainly familiar with what Rockland

20   Trust Company required, correct?

21   A.    Yes.

22       Q.    Okay.  Now you told us that you suggested that Mr.

23   Kagan speak to Mr. Lipetsker, and your understanding is

24   Lipetsker introduced him to Filippov, correct?

25   A.    Correct.

BORIS MAIDEN - Cross

1    Q.   At any point sir, did you tell Mr. Kagan that you

2  had previously represented Mr. Filippov?

3  A.   No, I did not.

4    Q.   Okay.  So when you had the initial -- you said there

5  was an initial meeting in your office, correct?

6  A.   Yes.

7    Q.   And you said at that initial office, there was some

8  discussion of prior projects, correct?

9  A.   Correct.

10    Q.   At that initial meeting, nothing was agreed; isn't

11  that correct?

12  A.   They agreed that -- that there was enough interest from

13  all of them to meet again and finalize whatever the terms that

14  they were going to go with.

15    Q.   Okay.  And with respect to the spreadsheets that

16  were of prior projects, there were no discussions in your

17  presence about the financials in those spreadsheets; isn't

18  that correct?

19  A.   I do not remember whether it is -- it was the first

20  meeting or the second, but there was a discussion.

21    Q.   Okay.  Do you recall when you had your deposition

22  taken in September of 2015, we discussed the first meeting,

23  and you said there was no discussion of the financial aspects

24  of the spreadsheet at that first meeting; do you recall that?

25  A.   I don't recall specifically that.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

 1             MR. PERTEN:  Your Honor, may I?

 2             THE COURT:  Yes, of course.  Thank you.

 3    BY MR. PERTEN:

 4        Q.   If I could draw your attention sir, to page 39 of

 5    your transcript?

 6    A.   Okay.

 7        Q.   At the bottom of page 39 at line 24, the question

 8    starts, "And was there any discussion in your presence about

 9    those spreadsheets, about the finances that are shown in those

10    spreadsheets?"  And your answer was no.  Did I read that

11    correctly?

12    A.   Can you tell me which line is it?

13        Q.   We start at 39, line 24.  The last line of page 39,

14    and it flops over to page 40, line 3.

15    A.   Correct.  My answer was no.

16        Q.   Okay.  And then there was a second meeting that you

17    recall in your office, correct?

18    A.   Yes.

19        Q.   And there was some spreadsheets prepared by Mr.

20    Zhukovskiy; isn't that correct?

21    A.   That is correct.

22        Q.   And you knew that those spreadsheets hadn't been

23    prepared by Mr. Kagan because he doesn't know how to do

24    spreadsheets, correct?

25    A.   Correct.

BORIS MAIDEN - Cross

1    Q.   And at that second meeting, as you recalled, the

2    parties discussed profit, the amount of the investment, and

3    the dates of completion, correct?

4    A.   Correct.  Are you asking me whether that says that here,

5    or of my --

6        Q.   No.  I'm asking --

7    A.   -- or my current recollection?

8        Q.   -- for your best recollection.

9    A.   Yes.

10       Q.   And yes, you did say that as well at your

11   deposition; you're consistent.

12       And other than discussions about profit allocation,

13   initial contribution, and dates of completion, you don't

14   recall any other discussion that occurred at that second

15   meeting; isn't that correct?

16   A.   The terms of -- I don't -- I cannot tell you for sure

17   whether any -- whether the additional terms were discussed at

18   that time.  So my recollection, yes, for some reason, but I

19   cannot be sure.

20       Q.   Okay.  So you're not sure what was discussed in that

21   meeting; is that your testimony?

22   A.   No.  I'm -- I definitely, as you indicated in your

23   question, of the profits, the amount of investment was

24   discussed, and responsibilities of who is going to be doing

25   what -- things more or less were getting to a point of total

BORIS MAIDEN - Cross

1    agreement between the parties.

2        Q.   Okay.  And when I asked you at your deposition if

3    there was anything else discussed, do you recall saying you

4    don't remember any other specifics?  Do you recall that?  The

5    majority --

6    A.   Not that I remember, but --

7        Q.   Sure.  Let me draw your attention to page 56.

8    A.   Yep.  Line?

9        Q.   We had just finished discussing the profits, amount

10   of investment, dates of -- and the last thing we're talking

11   about at the top of page 56, "If we could just focus in on the

12   second meeting.  If I could just take you back.  You said one

13   of the things that were discussed were dates of completion."

14   And, "Do you recall anything about the dates of completion?"

15   Your answer was "not other than they were discussed".

16       Then my question is "You don't remember the specifics as

17   you sit here?" "No."

18       "Anything else you recall being discussed at that second

19   meeting in your office?"  And your answer was, "I think that's

20   about it."  Correct?

21   A.   Yes.

22       Q.   So in 2015, the only things -- you did not recall a

23   specific discussion regarding the costs of construction?

24   A.   At the second meeting?

25       Q.   Correct.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1    A.    Yes.

2         Q.    Okay.  Now you told us that at one of the meetings,

3    maybe it was the first, there was a discussion that the cost

4    could be somewhere in the $1.3 to $1.6 million range, correct?

5    A.    Yes.

6         Q.    And certainly there was no assurance at that meeting

7    that it was either going to be 1.3 or 1.6, correct?

8    A.    There were no assurances given by anybody.

9         Q.    There was no assurances given by anybody as to the

10   construction costs, correct?

11   A.    As to the -- to those no, as a guarantee to any numbers

12   that were -- were given.

13        Q.    Okay.  Now, when you -- once the parties had decided

14   on the business terms, it fell upon you to draft the operative

15   documents, correct?

16   A.    Yes.

17        Q.    Now, you said that the -- at your deposition -- that

18   the three of them asked you to put it down in writing,

19   correct?

20   A.    Correct.

21        Q.    And you didn't get an engagement letter from

22   anybody, did you?

23   A.    No.

24        Q.    And you told us already you didn't tell Mr. Kagan

25   that you had previously represented Mr. Filippov, correct?

BORIS MAIDEN - Cross

1    A.    That's correct.

2         Q.    And you didn't get any conflict waiver, did you?

3    A.    No.

4         Q.    And the reason that you didn't get a conflict waiver

5    is because you viewed yourself as what you'd said, was a

6    glamorized scribe; do you recall that testimony?

7    A.    Yes, I do.

8         Q.    So from your perspective, all you were -- you were a

9    scribe, you were just writing things down, and you weren't

10   really representing anybody at that point, correct?

11   A.    I was describing their agreement for the LLC, and I was

12   representing the LLC once it's formed.

13        Q.    Well, once it was formed, you were representing the

14   LLC.  But prior to the formation, when you were negotiating

15   the deal, there was no LLC to represent; isn't that correct?

16   A.    I'm sorry.  I was not negotiating the deal.

17        Q.    Well, you told us, Mr. Maiden, a moment ago when Mr.

18   Carnathan discussed with you that there were negotiations back

19   and forth between the parties about various terms that were

20   ultimately included in the operating agreement; you recall

21   that testimony?

22   A.    Negotiations were between the parties, correct.

23        Q.    And you were acting as the intermediary; isn't that

24   correct?

25   A.    As a telephone.

BORIS MAIDEN - Cross

1    Q.    I'm sorry?

2  A.    As a telephone -- as a --

3    Q.    You were --

4  A.    -- telephone was also, it acts as an intermediary.

5    Q.    Okay.  So you were talking to Mr. Filippov, and he

6  would raise concerns or questions that he had with your

7  drafting, correct?

8  A.    Correct.

9    Q.    And he would have private conversations with you;

10  isn't that correct?

11  A.    Over the phone, yes.

12    Q.    Yes?  Or he might send you emails privately,

13  correct?

14  A.    Possibly.

15    Q.    All right.  And then you would talk to Mr. Kagan

16  privately; is that correct?

17  A.    Or email him.

18    Q.    All right.  But you told us that Mr. Kagan didn't

19  respond to emails typically, correct?

20  A.    No.  He did not.

21    Q.    Okay.  So certainly sir, before the LLC was formed,

22  you understood that you were providing legal services to Mr.

23  Kagan, Mr. Filippov, and Mr. Lipetsker; isn't that correct?

24  A.    No.

25    Q.    No?  So when you were having this negotiation sir,

BORIS MAIDEN - Cross

1    who were you representing?

2    A.    I was not having negotiations.

3         Q.    When you were passing --

4    A.    There was no representation on my part of any of the

5    terms or anything that they had discussed.  The parties have

6    agreed, they told me to write it down, I did.

7         Q.    Okay.  And when they told you to write it down, and

8    I'm talking about the period before the certificate of

9    organization was actually filed, so there was no entity

10   legally called Lyman-Cutler LLC, who were you representing?

11   A.    Nobody.

12        Q.    Nobody?  Okay.  Now the form sir, that you used for

13   the Lyman-Cutler operating agreement, that was a template that

14   you'd used on many transactions, correct?

15   A.    Correct.

16        Q.    Okay.  And that form went through many iterations

17   before it became finalized, correct?

18   A.    Are you talking about this particular --

19        Q.    Yes, sir.

20   A.    -- on the Lyman-Cutler?

21        Q.    Yes.

22   A.    Yes, it went through --

23        Q.    There was eight or nine drafts?

24   A.    Correct.

25        Q.    Okay.  And you heard back from Mr. Filippov with his

BORIS MAIDEN - Cross

1   comments to the drafts; isn't that correct?

2   A.   Yes.

3       Q.   And incidentally, when you communicated with Mr.

4   Kagan, you'd spoke Russian to him; isn't that correct?

5   A.   Correct.

6       Q.   And Mr. Kagan certainly back in 2012, he spoke

7   English, but it wasn't that strong; would you agree with that?

8   A.   He maybe speaks with an accent, but he doesn't think with

9   an accent, so yes.

10      Q.   All right.

11  A.   I communicated with him in Russian.

12      Q.   Okay.  And given that these forms were forms that

13  you had used on multiple transactions, there was no need for

14  you to go line by line or paragraph by paragraph for things

15  that weren't being changed; isn't that correct?

16  A.   If the terms changed significantly from -- such as time

17  of the construction, allocation of profit, when or who is

18  paying what -- I did go detailed explanation with Mr. Kagan,

19  on each and every variance.  I did not go over all the

20  headings because they're the same.

21      Q.   Right.

22  A.   But --

23      Q.   And --

24  A.   -- on most -- on the crucial terms, I did.

25      Q.   Okay.  So you made a judgment call as to which terms

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

```
 1   were significant, and those terms that were changing or that
 2   were different than prior deals, you made sure you went
 3   through them with Mr. Kagan, correct?
 4   A.    Any variation, whatever in their negotiations between
 5   them that I thought called for a change, was run by Mr. Kagan.
 6       Q.    And sir, you didn't -- these conversations that you
 7   had with Mr. Kagan, they were oral, they weren't emails,
 8   correct?
 9   A.    There were some emails, but most of the -- of the
10   conversation was oral, correct.
11       Q.    Okay.  And other than your memory sir, you didn't --
12   when we subpoenaed your records -- you didn't have any notes
13   of conversations with Mr. Kagan, did you?
14   A.    I never had any notes.
15       Q.    Okay.  So you would have a conversation with him
16   about a significant change in the operating agreement, he
17   would say fine, and you wouldn't jot a memo to the file, or a
18   note, or a confirmatory email, or anything in writing, to
19   confirm that your understanding was accurate; isn't that
20   correct?
21   A.    No, because that was -- that was how -- that's how it was
22   done all the time.
23       Q.    Okay.  Now you also understood that not only were
24   the numbers not fixed, if you will, you told us at the earlier
25   meeting that there was no guaranteed rate of return; isn't
```

BORIS MAIDEN - Cross

1    that correct?

2    A.    There was no such thing.

3        Q.    Correct.  Nobody knew how much money they were going

4    to make; isn't that correct?

5    A.    Well -- that is correct.

6        Q.    In fact, it's possible they could make no money,

7    that's a risk?

8    A.    Yes.

9        Q.    And everybody understood, to the best of your

10   knowledge, going in that there is a risk that this project may

11   go belly up?

12   A.    Yeah, like anything in life.

13       Q.    Correct.

14           MR. PERTEN:  Mr. Harris, can you bring up Exhibit 14,

15   please?

16   BY MR. PERTEN:

17       Q.    Now Exhibit --

18           MR. PERTEN:  Scroll down to the -- this is a chain.

19   Go down to the bottom.

20           MR. HARRIS:  All the way to the end?

21           MR. PERTEN:  Yeah, please.  To the first email.

22   Thank you.

23   BY MR. PERTEN:

24       Q.    You'll agree with me sir, that this is an email

25   exchange in which you are a part of from October 29th, 2012 at

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1    9:54 p.m., correct?

2    A.   Yes.

3         Q.   Okay.  And this was an email from Mr. Filippov to

4    Kagandevelopment@gmail.com, Boris Maiden, Nick Lipetsker,

5    correct?

6    A.   Correct.

7         Q.   And incidentally, Kagandevelopment@gmail.com, you

8    understood that that was Mr. Kagan's email, correct?

9    A.   Yes.

10        Q.   And that was the email that he was using in 2012 --

11   October 2012, isn't it?

12   A.   A few others, but the -- one of them, yes.

13        Q.   Okay.  And in this email --

14        MR. PERTEN:  If you could scroll down just a little

15   bit, Mr. Harris?

16   BY MR. PERTEN:

17        Q.   Mr. Filippov is raising some questions about the

18   schedule and about how profits and delay -- profit-sharing and

19   the like, correct?

20   A.   Yes.

21        Q.   Okay.  And you understood sir, that these were

22   substantive business issues, correct?

23   A.   Yes.

24        Q.   And if we could scroll up -- you responded, on

25   October 30th at 12:42 with changes, and you sent it to Mr.

BORIS MAIDEN - Cross

1    Filippov, Mr. Kagan, Mr. Lipetsker, please review and let me

2    know your comments, correct?

3    A.    Um-hum.

4         Q.    So you understood --

5    A.    Yes.

6         Q.    -- did you not, that at this time you are drafting

7    documents and circulating them to the partners for their

8    review, correct?

9    A.    Correct.

10        Q.    All right.  Now you did not get a response from Mr.

11   Kagan to this email, did you?

12   A.    I don't remember.

13        Q.    Okay.

14            MR. PERTEN:  Let's scroll up if we could, Mr. Harris?

15   BY MR. PERTEN:

16        Q.    Okay.  October 30th at 3:30 p.m., you get a response

17   from Mr. Filippov to the edits that you had made, correct?

18   And there is nothing in that email that's from Mr. Kagan,

19   correct?

20   A.    That is correct --

21        Q.    Okay.

22   A.    -- but it's also addressed to Mr. Kagan.

23        Q.    Right.  And you understand again, that Mr. Kagan

24   doesn't do email very often, correct?  So that was not a

25   surprise to you?

BORIS MAIDEN - Cross

1    A.   That is correct.

2        Q.   Okay.  And again, so when you did that round of

3    changes, you actually don't have any memory, do you, of

4    actually discussing that round of changes with Mr. Kagan?

5    A.   Other than that I do that all the time before making a

6    change, I would either call or see him and ask him whether

7    he's okay with that change.

8        Q.   Now sir, if I could draw your attention to page 111

9    of your deposition?  And at that time, we were looking at the

10   October 30th version of the operating agreement, which is

11   referenced in your email.

12       And you can see starting page 111, line 16, we're talking

13   about that email of October 30th at 3:30 which we just looked

14   at, and the question, "What did you understand the concern

15   that Mr. Filippov was communicating to you in his email of

16   October 30th at 3:30, relative to paragraph 8.2?"  Answer:

17   "He wanted a certain return on investment that over a certain

18   period of time that will be subtracted from profit first, and

19   then the profit being divided."

20       Question:  "Was that a change that would benefit" -- "If

21   everybody was in agreement with it, was that a change that

22   would benefit Mr. Filippov, or the other members?"  Answer:

23   "Mr. Filippov."

24       Question:  "And conversely, it would not be something

25   that would necessarily benefit Mr. Kagan, correct?"  Answer:

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1    "Correct."

2        "After receiving the email of October 30th at 3:30, what

3    did you do, if anything?"  Answer:  "Most likely, I

4    communicated the requested changed to Vadim, again, explaining

5    he was copied, but as I indicated before, the changes were

6    requested by Filippov, got his approval on that, and

7    incorporated those changes."

8        Question:  "And do you have an actual memory, or is this

9    your assumption based on your course of conduct with Mr.

10   Kagan?"  The answer to that is, "Correct."

11       Question:  "That is your assumption?"  Answer:

12   "Correct."

13       "But you don't have an actual memory of having that

14   discussion?"  And your answer is, "No."  Correct?

15   A.   That's still correct.

16       Q.   So in 2015, roughly three years after this -- a

17   little less than three years, this was in September -- you

18   didn't remember whether you'd actually discussed that change

19   with Mr. Kagan.  You made an assumption you did because you

20   usually did, but you didn't have any real recollection; isn't

21   that correct?

22   A.   I did not have actual recollection of each and every

23   conversation that I had with Mr. Kagan.

24       Q.   And you also testified that you didn't discuss it at

25   all with Mr. Lipetsker because it didn't concern him; isn't

BORIS MAIDEN - Cross

1    that correct?

2    A.    That is correct.

3         Q.    Okay.  So you were making judgment calls as to which

4    of the partners needed to be spoken to and which didn't,

5    correct?

6    A.    That is not correct.  Mr. Lipetsker told me specifically

7    he -- his ten percent of profit is in -- it doesn't change

8    anything, and the rest he doesn't want to hear or know about

9    it.

10         MR. PERTEN:  Okay.  And let's continue to scroll up,

11   Mr. Harris.

12   BY MR. PERTEN:

13        Q.    You gave some answers to Mr. Filippov --

14         MR. PERTEN:  Keep going up.

15   BY MR. PERTEN:

16        Q.    -- and at 5:21, you provided Mr. Filippov with

17   another round.  And Mr. Filippov says, "Can you please send an

18   updated" operating agreement, "OA" -- operating agreement --

19   "so I can run it against my attorney and an accountant?"  Do

20   you see that?

21   A.    Yes.

22        Q.    And when Mr. Filippov told you that he had an

23   attorney, you didn't stop speaking with him, did you?

24   A.    No.

25        Q.    And the reason you didn't stop speaking with him is

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1   because since you never heard from the attorney, you figured

2   it was still fine to be having private conversations with him,

3   correct?

4   A.   He did not indicate that, Mr. Maiden, I'm now represented

5   by X, Y, and Z, please send him a -- he cannot -- he could

6   have showed to it anybody.  He didn't -- there was nowhere --

7   to my understanding, there was no representation that he was

8   seeking or getting.

9        Q.   Okay.  So when he told you I can -- I want to run it

10  against my attorney, your assumption is the attorney could

11  have just been a friend or a neighbor who happened to be an

12  attorney?

13  A.   Absolutely.

14       Q.   All right.

15            MR. PERTEN:  Let's continue to scroll up if we could?

16  BY MR. PERTEN:

17       Q.   At 5:42 p.m., you emailed to Mr. Filippov, asking

18  him if he wants to be the manager, correct?

19  A.   Yes.

20       Q.   And in this email, you cut off Mr. Kagan, and you

21  cut off Mr. Lipetsker from that email.  So this is a private

22  communication between yourself and Mr. Filippov, correct?

23  A.   If it was, it was unintentional.  Instead of reply to

24  all, I could have replied just to Mr. Filippov.

25       Q.   All right.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1              MR. PERTEN:  And let's keep going up.

2      BY MR. PERTEN:

3          Q.   At 5:53, Mr. Filippov replies privately to you,

4      basically saying, I want to be in control but whatever you

5      call it, it's up to you, correct?

6      A.   That's what the email says, yes.

7          Q.   All right.  And then you made the decision that he

8      would then be the manager, correct?

9      A.   They made the decision.  I don't make decisions.  They

10     made the decisions.

11         Q.   Okay.

12             MR. PERTEN:  Let's keep scrolling up.

13     BY MR. PERTEN:

14         Q.   9:44, you write privately to Mr. Filippov, "Does

15     that mean you want total control?  Example, you can sell

16     without consent of the other members?"  And he responds

17     November 2nd, "I think I should have this right, but I don't

18     think it's ever going to be used".

19             And again, these are private emails between yourself and

20     Mr. Filippov, correct?

21     A.   Again, not by intention.

22         Q.   Okay.  Now when you change -- the original drafts of

23     the operating agreement have Mr. Kagan as the managing

24     partner; isn't that correct?

25     A.   In some of them.

BORIS MAIDEN - Cross

1     Q.   Yeah.  And you told us that you had bolded the

2     sections to draw attention to substantive changes, correct?

3     A.   In some of them, yes.

4     Q.   Yes, but you didn't bold the fact that you were

5     changing the managing partner designation to Mr. Filippov from

6     Mr. Kagan, did you?

7     A.   No.

8     Q.   Okay.

9           MR. PERTEN:  Now Mr. Harris, could you bring up

10    Exhibit 183, please?  If you could scroll down, 2:07 p.m.

11    on -- okay.  We just -- I'm sorry.  Here's that same email,

12    this is part of the same email string, so if you could scroll

13    up?  Keep going.

14    BY MR. PERTEN:

15    Q.   At 2:07 p.m., that same day, you now add back in

16    everybody --

17          MR. PERTEN:  Strike that.

18    BY MR. PERTEN:

19    Q.   You don't add Mr. Kagan, you add Mr. Lipetsker to

20    this email, saying I'm going to -- making changes and this one

21    gives you ninety percent, so at this point sir, would you

22    agree with me you recognize that your previous emails had not

23    been going to Mr. Kagan, and you made a decision to add Mr.

24    Lipetsker but not Mr. Kagan; isn't that correct?

25    A.   No conscientiously (sic).  It was not a decision.  It --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1      Q.   Well, certainly to repopulate the names, you had to

2  fill them in.  That was an affirmative act by you, wasn't it?

3  A.   Yes, but the -- the fact that I omitted Mr. Kagan was not

4  with intention of I'm not going to send this email to Kagan,

5  or for some reason -- that they -- I want -- want to hide

6  something from him, which is what you are trying to imply.

7      Q.   Okay.

8         MR. PERTEN:  Now Mr. Harris, would you just scroll

9  down just a little bit?  Okay.  And if you have number 14 open

10  still?  Scroll up, please.  All right.

11  BY MR. PERTEN:

12      Q.   This email sir, 11:23 --

13         MR. PERTEN:  Scroll just down a little bit.

14  BY MR. PERTEN:

15      Q.   Mr. Filippov asks you in this email whether the

16  Excel file should be part of this agreement as an addendum,

17  right there at the bottom; you see that?

18  A.   Please repeat again?

19      Q.   Sure.  Part of this email from Mr. Filippov to you

20  on November 3rd at 11:23 a.m., the bottom of the email, he

21  says, "Also the calculations and stages prepared by Dima

22  (Excel files) should be part of this agreement as an addendum.

23  These docs might need to be tweaked to reflect changes in

24  numbers."  Do you see that language?

25  A.   Yes, I do.

BORIS MAIDEN - Cross

1    Q.    So you understood there that Mr. Filippov was asking

2    that the spreadsheets be actually incorporated into the

3    operating agreement, correct?

4    A.    Correct.

5    Q.    And that didn't happen, correct?  Because that was

6    never agreed to; isn't that correct?

7    A.    Correct.

8    Q.    All right.  So you would have had a conversation

9    when that request was made, with Mr. Kagan and said words to

10   the effect, he wants those spreadsheets made as part of the

11   deal.  And Mr. Kagan must have told you, absolutely not.

12   Would you agree with that?

13   A.    Or something -- that he didn't want them.

14   Q.    Okay.  And the reason you understood was because

15   those spreadsheets and those -- those Excel spreadsheets that

16   had been circulated were just estimates; isn't that correct?

17   A.    I think that -- again, I don't remember a specific

18   recollection for the reasoning why Mr. Kagan didn't want to,

19   but that was never ever included before in any of the prior

20   deals, and that could have been why Mr. Kagan said, I don't

21   want it.  I -- I never had that before; I don't want it now.

22   Q.    And in fact, you'd agree with me sir, that nowhere

23   in the operating agreement that you drafted is there anything

24   that specifies that this project will be done on a -- the

25   construction cost will be at fixed cost; isn't that correct?

BORIS MAIDEN - Cross

1    A.    That is correct.

2         Q.    Because to the best of your knowledge, there never

3    was any assurance that this was a fixed-price construction

4    cost; isn't that correct?

5    A.    From my experience, there never is.

6         Q.    Okay.  Now eventually you got to -- you got to yes,

7    and everybody signed the operating agreement, correct?

8    A.    Correct.

9         Q.    And once the operating agreement was signed, the

10   next task that you did was to prepare the certificate of

11   organization and file it with the Secretary of State, correct?

12   A.    I usually do that before the actual closing.  So I am not

13   sure whether it -- it was done right after operating agreement

14   was signed, or I usually wait at what, two, three days before

15   closing, or a week before closing.

16        Q.    All right.

17             MR. PERTEN:  Mr. Harris, would you pull up Exhibit

18   16, please?

19   BY MR. PERTEN:

20        Q.    Now Exhibit 16 sir, is the Lyman-Cutler certificate

21   of organization.  That's a document that you prepared; isn't

22   that correct?

23   A.    Correct.  Yes.

24             MR. PERTEN:  And would you scroll down a little bit?

25   Keep going.  Keep going.

BORIS MAIDEN - Cross

1    BY MR. PERTEN:

2        Q.   Paragraph number 5 says, "The date of dissolution.

3    The LLC shall have no fixed date on which it shall dissolve."

4    That's language that you drafted in, correct?

5    A.   Correct.

6        Q.   In fact sir, you'd agree with me that the operating

7    agreement does state a date of dissolution of November 30th,

8    2015; isn't that correct?

9    A.   And -- it does.

10       Q.   Okay.  So you made a mistake when you did the

11   certificate of organization; isn't that correct?

12   A.   No.  I made a mistake in the operating agreement.

13       Q.   Well, certainly everybody reviewed the operating

14   agreement and you went through it with everybody so that

15   everybody was aware of the terms, and everybody signed it;

16   isn't that correct?

17   A.   As I indicated before --

18       Q.   I'm sorry?

19   A.   -- as I indicated to you before, the most important

20   terms, the dissolution is one of the things that probably got

21   in from the prior agreement that was never discussed.  The --

22   that dissolution date, I don't remember ever having

23   discussions from anybody about the dissolution date.

24       Q.   Okay.  Is it your testimony sir, that when you have

25   people sign an agreement setting forth their terms and

BORIS MAIDEN - Cross

1    conditions of their deal, you made a mistake because you put a

2    clause in there that was never supposed to be there; is that

3    correct?

4    A.    I made a typo, yes.

5         Q.    Well, it's more than a typo.  You filled in a date,

6    didn't you?

7    A.    Or it stayed there before.

8         Q.    Yeah.  And Mr. Filippov had reviewed that agreement

9    at length.  You made seven or eight operating agreement

10   amendments, correct?

11   A.    Yes.

12        Q.    And he didn't have a problem with that date,

13   correct?

14   A.    Not as far as I know.

15        Q.    And you told us you went through every line or that

16   entire agreement with Mr. Kagan.  He didn't have a problem

17   with that date, correct?

18   A.    I did not say I every line.  I said every important term.

19        Q.    Okay.  So nobody, even thought this was read

20   extensively, nobody voiced any objection; isn't that correct?

21   A.    Correct.

22        Q.    And when you realized that error, you didn't suggest

23   that they file articles of amendment, or amend the operating

24   agreement to reflect what you now say was their intent, did

25   you?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1    A.    I never realized that I made a mistake.  It's not like I

2    caught it at some point in time, and said, oh.

3          Q.    Now once the LLC was formed, the next job was to

4    close on the property, correct?

5    A.    Yeah -- yes.

6          Q.    And there was a loan taken out, the purchase money

7    loan was taken out from the Rockland Trust Company, correct?

8    A.    Correct.

9          Q.    And in that transaction, you represented the bank;

10   isn't that correct?

11   A.    Correct.

12         Q.    And you also represented Lyman-Cutler; isn't that

13   correct?

14   A.    Lyman-Cutler LLC.

15         Q.    So you were representing both sides of the

16   transaction, correct?

17   A.    Those are not both sides of the transaction.

18         Q.    Well --

19   A.    Because the bank and Lyman-Cutler were on the same side,

20   so it's the --

21         Q.    Okay.  Well, you'll agree with me that the bank was

22   the lender, correct?

23   A.    Correct.

24         Q.    And the Lyman-Cutler was the borrower, correct?

25   A.    Correct.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1    Q.   And you were representing both the lender and the

2    borrower, correct?

3    A.   Correct.

4    Q.   And once again, you didn't get an engagement letter,

5    and you didn't get a conflict waiver; isn't that correct?

6    A.   Correct.

7    Q.   And you took a fee for your services, correct?

8    A.   Correct.

9    Q.   And you drafted the documents for the bank -- the

10   bank documents -- and you reviewed them with the borrower, and

11   you had Mr. Filippov sign them, correct?

12   A.   Correct.

13   Q.   And after that happened, the next activity you

14   undertook was to help to subdivide the property, correct?

15   A.   Correct.

16   Q.   And in doing the subdivision, certainly you were not

17   representing the bank at that point, so now you were wearing

18   your borrower hat, correct?

19   A.   I was helping LLC, correct.

20   Q.   Okay.  And again, no engagement letter, no conflict

21   letter with respect to that task, correct?

22   A.   Nobody every required it.

23   Q.   And then the next -- once you got the subdivision

24   sir, we get to the construction loans, and you were involved

25   in that as well; isn't that correct?

BORIS MAIDEN - Cross

1   A.   Correct.

2        Q.   And in fact, you were the one who contacted Mr.

3   Filippov, and said hey, it's time to start thinking about

4   getting the construction loan; do you recall that?

5   A.   I don't remember that.

6        MR. PERTEN:   Mr. Harris, bring up Exhibit 21, please?

7   Scroll down, please.   Keep going.   Here you go.

8   BY MR. PERTEN:

9        Q.   So on February 15th, 2013, from you to Alex Filippov

10  and their other partners, "March is around the corner, I think

11  it's time to apply for the construction loan," correct?

12  A.   Um-hum.

13       Q.   So you were monitoring this and keeping tabs on

14  where things were, correct?   And -- correct?

15  A.   I monitored to the extent that -- I'm not on a daily

16  basis, but it wasn't --

17       Q.   Sure.

18  A.   -- but it somehow it came out to be that through my

19  conversation with --

20       Q.   Okay.

21  A.   -- Mr. Kagan or somebody, well, look, it's time, send a

22  reminder.

23       Q.   Very good.   And certainly sir, you prepared all the

24  loan documents for the construction loan, correct?

25  A.   Correct.

BORIS MAIDEN - Cross

1      Q.    Included in that -- or you either prepared, or you

2   got whatever you needed.  You knew what you needed to close

3   the loan, correct?

4   A.    Correct.

5      Q.    So you got that construction budget you told us

6   about, correct?

7   A.    I did -- I do not give construction budgets.

8      Q.    Well, Mr. Kagan provided a construction budget;

9   isn't that correct?

10  A.    The way the process works, a builder provides the

11  construction to the bank.

12     Q.    Okay.

13  A.    Bank, based on the plans provided by the builder and the

14  budget, approves the loan, and then they give me green light

15  saying it's approved in such and such amount, go ahead.

16     Q.    Okay.  Now you understood though --

17  A.    I never saw the budget.

18     Q.    -- the -- you never saw the budget.  So when you

19  testified that the budget was intentionally inflated, you

20  never saw the budget so you don't know that one way or the

21  other, do you?

22  A.    No.

23     Q.    And in fact sir, representing the bank, you

24  certainly wouldn't counsel your clients to provide false

25  documents to the bank, would you?

BORIS MAIDEN - Cross

1  A.   The inflated budget?

2       Q.   Yes, sir.

3  A.   It is done all the time.

4       Q.   And does that make it right, it's done all the time,

5  so you don't have a problem with it --

6  A.   The bank --

7       Q.   -- is that your testimony, sir?

8  A.   -- the banks are aware of it.

9       Q.   And sir, you were representing the bank, you're

10 aware that there are inflated budgets, and you didn't worry

11 about that?

12 A.   There was nothing hiding from them.

13      Q.   Okay.

14 A.   They saw the operating agreement, they've done it a

15 million times, they know exactly what's going on.  I did not

16 hide the carrying costs was going to be paid out of that; it

17 was right in operating agreement submitted to the bank.

18      Q.   Okay.  And sir, you also understood that it was

19 necessary in order to get a loan to have a construction

20 contract, correct?

21 A.   I'm not sure.

22      Q.   All right.  And in fact, you had a template of a

23 construction contract on your system, correct?

24 A.   Correct.

25      Q.   And you drafted a construction contract to use in

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1    the loan; isn't that correct?

2    A.   I don't remember specifically, but sometimes the bank

3    required it.  I don't, for example, the difference is if

4    Vadim -- Mr. Kagan was applying for a construction loan, then

5    the bank would not require anything from him because they know

6    he's a builder, and they don't need the -- him to provide

7    construction.

8    When the investor applies, they do want to see that -- that

9    type -- some sort of a pro forma construction contract.

10        Q.   Okay.  And you prepared that pro forma construction

11   contract?

12   A.   Yeah.  Yes.

13            MR. PERTEN:  And let's bring up Exhibit 209.

14   BY MR. PERTEN:

15        Q.   And this is the construction contract for Classic

16   Homes Development & Construction, LLC.  That's the pro forma

17   construction contract that you provided; isn't that correct?

18   A.   Would you kind of scroll down a little bit?

19        Q.   Sure.  Tell him when you want -- if you want him to

20   stop, just say so.

21   A.   Yes.  Looks it --

22        Q.   Okay.

23   A.   -- we did.

24        Q.   You did, correct?  And this was signed by Mr.

25   Filippov on June 18th, and Mr. Kagan on June 18th of 2013,

BORIS MAIDEN - Cross

1    correct?

2    A.    Yes.

3         Q.    Which was the date the loan was closed, correct?

4    A.    Correct.

5         Q.    And it was your understanding sir, that this

6    construction contract reflected what the parties deal was with

7    respect to how the project was going to be constructed,

8    correct?

9    A.    No.

10        Q.    Okay.  So you prepared a contract, and you had it

11   signed with the understanding that it was meaningless; is that

12   your testimony?

13   A.    My testimony is that the contract was prepared as a

14   requirement for the bank which does -- did not outline any

15   type of agreement.  They knew the contract from a builder, a

16   licensed builder, to let the construction -- it did not

17   outline any of the terms between the parties.

18        Q.    Okay.  So why did you have the parties sign it?

19   A.    Because the bank required it.

20        Q.    So as the bank's attorney, you understood they

21   required a signed construction contract.  You prepared this

22   agreement, and you had Mr. Filippov and Mr. Kagan sign it,

23   correct?

24   A.    Correct.

25        Q.    And this agreement, you'll agree with me, is not a

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1    lump-sum contract, it's a cost contract, right?

2    A.    I believe it --

3          MR. PERTEN:  J.P., would you scroll up?

4    BY MR. PERTEN:

5          Q.    "The contract price.  The builder agrees to

6    construct the house according to the plans.  As consideration

7    for the builder constructing the house, the owner agrees to

8    pay the builder's contractors' and trades' full costs and

9    expenses on a weekly basis."  Correct?

10   A.    Yes.

11         Q.    So you understood that the transaction contemplated

12   by the agreement you provided was that as expenses were

13   incurred, they'd be paid, correct?

14   A.    That there were -- Mr. Kagan would pay his

15   subcontractors, yes.

16         Q.    Okay.

17         MR. PERTEN:  Your Honor, I want to be sensitive to

18   your schedule.  I am about fifteen minutes, max.  Do you want

19   me to keep going, or you want me to --

20         THE COURT:  No.  No.  I've got to break at --

21         MR. PERTEN:  Okay.

22         THE COURT:  -- now.  So I'm sure there's some

23   redirect.  I'm sorry to force you to come back -- but when

24   would you like him back?

25         MR. PERTEN:  We can do him first thing Monday morning

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    so he doesn't have to sit around, if that's acceptable?

2              THE WITNESS:  I will need to check my schedule for

3    Monday morning.

4              THE COURT:  Yeah.  That's fine.  Okay.

5              MR. PERTEN:  Your Honor, I have -- either Mr. Gersh

6    can be first in the morning, or Mr. Maiden; it doesn't matter

7    to me.

8              THE COURT:  All right.  You work it out.

9              MR. PERTEN:  Okay. Thank you, Your Honor.

10             THE COURT:  Do you think for his calendar purposes,

11   you've got about fifteen minutes?

12             MR. PERTEN:  Fifteen-ish, yeah.  Fifteen, twenty

13   minutes, but no more than that.

14             THE COURT:  Okay.  All right.  I won't ask you what

15   you have yet, because you haven't heard it all, but probably

16   not.  So I don't --

17             MR. CARNATHAN:  It'll be brief.

18             THE COURT:  -- you won't need -- yeah, brief.  Okay.

19   All right.

20             I've got to dash, so thank you, sir.

21             As I've told all witnesses, you're under examination.

22   I prefer that you not speak about the substance of your

23   testimony with anyone between now and the time that you

24   resume.

25             THE WITNESS:  Understood.

1           THE COURT:  Your counsel, of course, you can

2   certainly talk to your counsel.  He doesn't know a lot about

3   the facts anyway, I suspect, but you could talk to him about

4   privilege, that kind of thing as always, but not substance.

5   Okay?

6           THE WITNESS:  Understood.

7           THE COURT:  Very good.  Thank you.

8           THE WITNESS:  Thank you.

9           MR. PERTEN:  Your Honor, just to help you plan, I'm

10  envisioning that Monday will actually be a fairly short day

11  because other than Mr. Gersh and Mr. Maiden, that's all we

12  have for Monday, because the experts come on Tuesday, so --

13          THE COURT:  That's fine.  Thank you for that.

14          MR. PERTEN:  -- hopefully we'll be done early.

15          THE COURT:  All right.  That's fine.  Okay.

16          MR. PERTEN:  Thank you.

17          THE COURT:  All right.  Thanks very much.

18  (End at 3:02 PM)

19                  * * * * * * * * * *

20

21

22

23

24

25

1          I certify that the foregoing is a true and accurate

2    transcript from the digitally sound recorded record of the

3    proceedings.

4

5

6

7    /s/ Michael Drake                              June 21, 2019

_____

8    AAERT Certified Electronic Transcriber        Date
     (CER-513, CET-513)

9    ESCRIBERS LLC

                                eScribers
10                    7227 N. 16th Street, Suite #207
                           Phoenix, AZ 85020
11                            973-406-2250
                      e-mail operations@escribers.net

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1,000 (2)**
177:12;185:2
**1.3 (2)**
182:16;202:4
**$1.6 (3)**
182:16;183:20;202:4
**$10,000 (2)**
121:20;122:3
**$105,000 (3)**
148:19;149:14,18
**$18,000 (1)**
146:23
**$18,500 (1)**
97:3
**$2 (2)**
183:21;193:9
**$2.2 (1)**
181:1
**$2.5 (2)**
181:2;183:21
**$20,000 (4)**
109:25;110:2;
118:22,24
**$200,000 (2)**
184:20,22
**$3,500 (1)**
116:15
**$39,000 (1)**
98:21
**$4 (3)**
177:13;181:1;183:16
**$4.1 (1)**
183:23
**$40,000 (8)**
107:18;119:8,20;
120:6,25;147:17,17;
148:9
**$45,000 (1)**
97:17
**$45,550 (1)**
98:17
**$65,000 (4)**
132:11,17;148:14,25
**$80,000 (3)**
120:10,13,13
**9,130.94 (2)**
115:12,16
**$90,000 (1)**
122:16

**A**

**AA (2)**
26:4,21
**ability (1)**
86:11
**able (4)**
131:19;179:22;
191:19;193:10
**Absolutely (7)**
83:11;129:18;
130:19;136:19;141:4;
214:13;218:11
**accent (2)**
206:8,9
**acceptable (2)**
191:3;230:1
**accepted (1)**
177:12
**according (2)**
194:5;229:6
**account (5)**
37:25;117:4,10;
120:5;189:25
**accountant (8)**
11:13;43:24;62:4;
100:22;124:22;151:11,
14;213:19
**accounted (2)**
54:11,14
**accounter (1)**
61:24
**accounting (8)**
11:15;44:1;57:5;
100:24;124:24;151:16,
17;189:6
**accounts (1)**
119:17
**accurate (20)**
16:11;19:22;41:24;
46:20;49:9;51:1;67:7;
79:3;90:13,25;91:19;
103:8;104:23;127:10;
137:11;144:21;156:19;
160:5,19;207:19
**acquaintance (2)**
174:13;177:2
**acquainted (3)**
175:8,19;176:2
**acquire (1)**
188:19
**acquisition (1)**
189:8
**across (1)**
9:18
**act (2)**
186:6;217:2
**acting (1)**
203:23
**activity (1)**
223:13
**acts (1)**
204:4
**actual (22)**
46:13;72:8;78:15;
79:6;80:7;81:23,23,25;
82:13;83:3,22;84:11;
131:20,20;135:11;
137:13;178:9;194:14;
212:8,13,22;219:12
**actually (25)**
18:16;24:21;25:6;
27:3,9;30:3;33:2;34:9;
35:3;36:21;40:10;
53:23;54:7;55:20;
61:24;65:4;67:24;
69:13;71:4;72:3;74:25;
88:14;97:10,20,22;
106:2,13;107:12;
111:1,9;112:9;131:12;
133:22;134:7,9,20;
145:16;154:22;168:20;
177:25;178:17;180:6;
192:23;193:7;205:9;
211:3,4;212:18;218:2;
231:10
**add (4)**
216:15,19,19,23
**addendum (2)**
217:16,22
**adding (2)**
148:22;149:17
**additional (3)**
79:13;86:16;200:17
**address (30)**
57:9,14;59:8;66:20;
74:9;80:10;82:23;
83:19;84:4;129:17;
130:21;132:4,4;
135:21,22,25;136:1,3,
5,18;137:3,6,22;140:2,
3,9,18;153:15,17,23
**addressed (4)**
26:6;85:17;153:22;
210:22
**addresses (4)**
73:23;82:22;141:5,
11
**adjust (1)**
93:15
**admissibility (2)**
74:22;132:23
**admission (1)**
141:22
**admit (12)**
49:17;51:12;78:11;
86:8;87:16;91:24;
94:20,21;105:7;
128:10;143:17;148:2
**admitted (34)**
17:2,20;20:15,16;
31:2,3,21,22;32:7,8;
49:20,21;51:18,19;
79:11,14;87:4,6,22;
92:10,11;94:23;104:8,
10;105:10,11;128:14;
143:18;145:13;159:13,
14;161:20,21;174:5
**Adversary (1)**
5:2
**affect (2)**
8:14;190:7
**affected (1)**
8:13
**affects (1)**
8:9
**affirmative (1)**
217:2
**afternoon (15)**
107:25;123:16,17;
129:5,6;150:16,17;
164:18,19;173:1,2,13,
14;195:19,20
**again (47)**
8:15;21:1;22:17;
31:13,25;33:9;36:16;
37:5;38:5;54:13;57:23;
59:16,25;66:1;70:14;
73:1;75:12;79:10;
85:25;90:21;92:4;
118:21;126:22;127:15;
128:20;134:23;137:9;
142:20;145:16;147:10;
148:7,21;156:15;
168:13;189:16;191:2;
195:8;198:13;210:23;
211:2;212:4;215:19,
21;217:18;218:17;
223:4,20
**against (3)**
190:24;213:19;
214:10
**ago (6)**
25:11;37:11;45:7;
105:16;170:2;203:17
**Agranovich (1)**
196:5
**agree (36)**
20:10;31:5;49:22;
50:22;55:23;64:13;
65:22;67:1;69:7;71:3;
72:3,12;85:23,23;
97:16;116:2;129:16;
130:20;132:1;139:23;
153:20;154:4;155:6;
159:20;161:14,22;
186:20;193:1;206:7;
208:24;216:22;218:12,
22;220:6;222:21;
228:25
**agreed (7)**
55:16;113:9;185:12;
198:10,12;205:6;218:6
**agreeing (1)**
191:8
**agreement (56)**
67:18;174:25;
179:17;180:10;184:7,
10,13,21,25;186:3,10,
14;187:3,11,14,20;
189:4,12;191:8,12;
192:10;195:9;197:1,5;
201:1;203:11,20;
205:13;207:16;211:10,
21;213:18,18;215:23;
217:16,22;218:3,23;
219:7,9,13;220:7,12,
14,21,25;221:8,9,16,
24;226:14,17;228:15,
**affirmative (1)**
22,25;229:12
**agrees (2)**
229:5,7
**ahead (10)**
78:18,22;84:9;88:4;
93:2;119:5;129:1;
142:22;150:10;225:15
**air (3)**
61:12;62:12;97:12
**al (1)**
5:3
**Alex (8)**
5:10;62:21;125:17;
152:20;175:8,9;
193:22;224:9
**allocation (2)**
200:12;206:17
**allow (1)**
7:3;68:4;143:10
**allowed (1)**
70:24
**allows (2)**
9:2;141:22
**almost (4)**
54:17;83:7;187:6;
191:14
**along (4)**
9:3;80:4;85:5,12
**alternative (1)**
71:13
**always (5)**
8:8;56:6;109:2;
169:11;231:4
**amend (1)**
221:23
**amendment (1)**
221:23
**amendments (1)**
221:10
**amount (17)**
21:22,23;22:6,6;
36:8;95:9;105:21;
113:19;146:2;162:10;
164:1;181:19;189:23;
200:2,23;201:9;225:15
**amplifying (1)**
173:7
**analysis (4)**
180:17;182:3,21,24
**answered (2)**
45:8;187:6
**anticipating (1)**
182:15
**anticipation (1)**
182:22
**anymore (2)**
176:20,21
**apologies (3)**
111:4;119:3;121:15
**apologize (2)**
74:25;137:15
**app (1)**
46:17

Case 16-01120    Doc 356    Filed 06/24/19    Entered 06/24/19 09:21:27    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 234 of 256
June 18, 2019

**apparent (1)**
84:10

**appeal (1)**
69:25

**appeals (1)**
19:4

**appear (4)**
80:22,23;116:20;
192:20

**appearance (1)**
172:20

**appeared (1)**
24:18

**appears (7)**
46:6;106:12;109:21;
153:19,22;155:5,15

**appellate (1)**
142:12

**Apple (5)**
11:18,19;46:17,17,
18

**appliances (2)**
112:13;113:23

**application (4)**
96:22;109:18;
118:14,18

**applied (1)**
98:10

**applies (1)**
227:8

**apply (2)**
79:20;224:11

**applying (1)**
227:4

**appreciating (1)**
84:9

**approach (11)**
25:2;63:14;69:3;
70:13;75:12;89:18;
102:10;126:4;130:25;
144:7;177:22

**appropriate (2)**
6:18;28:10

**approval (1)**
212:6

**approved (2)**
194:6;225:15

**approves (1)**
225:14

**approximate (1)**
113:19

**approximately (2)**
122:13;185:21

**April (3)**
120:6;169:3,5

**area (1)**
174:8

**areas (1)**
174:8

**argue (1)**
79:15

**Argument (3)**
133:3;136:24;138:25

**around (26)**
16:14;19:25;31:9;
43:21;46:11;49:11;
51:9;67:9;90:10;91:2;
103:11;105:1;108:12;
114:10;119:14;127:13,
16;133:25;147:11;
156:22;160:7;167:8,
15;179:25;224:10;
230:1

**arranged (1)**
183:17

**arrangement (1)**
180:21

**Art (6)**
42:25;43:17,18;44:4;
56:18;57:2

**articles (1)**
221:23

**aspects (1)**
198:23

**assert (1)**
132:11

**asserting (1)**
113:1

**assessment (1)**
8:14

**assistant (1)**
109:13

**associate (1)**
195:24

**associated (1)**
182:23

**assume (5)**
21:3;80:23;105:17;
145:5;162:8

**assuming (1)**
52:3

**assumption (4)**
212:9,11,19;214:10

**assurance (1)**
202:6;219:3

**assurances (2)**
202:8,9

**attached (4)**
113:5;154:12;165:8;
168:11

**attachments (2)**
154:8;167:23

**attention (10)**
6:25;50:9;90:18;
158:8,20;159:2;199:4;
201:7;211:8;216:2

**attorney (21)**
7:5;20:10;22:19;
92:17;94:13;138:5;
145:22;161:22;171:3;
172:13;173:18,19;
188:20,22;213:19,23;
214:1,10,10,12;228:20

**August (9)**
26:23;112:14,18;
113:6,13;114:6;169:4,

**6,10**

**authentic (2)**
78:13,16

**authentication (1)**
78:24

**authenticity (12)**
67:18;79:8,21,22;
80:16;86:19;132:24,
25;137:20;141:19;
142:5,19

**avoid (1)**
92:3

**awaiting (1)**
94:19

**aware (5)**
177:8;188:18;
220:15;226:8,10

**away (1)**
45:2

**B**

**B-6 (1)**
191:4

**Babayan (9)**
10:3,7,25;24:10;
26:3;31:25;41:6;42:16,
18

**B-A-B-A-Y-A-N (1)**
10:25

**back (49)**
10:1;15:21;22:8;
26:10;27:5;31:6;32:10,
22;33:10;35:3,13;
39:20;48:10;51:25;
52:16;54:10,14;55:24;
59:21;77:12;87:8;
89:11,15;93:22,25;
108:1;113:2,10;114:9,
24;121:18;132:8;
144:4;153:12;162:7;
163:18;168:4,5;
171:17;179:5;186:23;
187:11;201:12;203:18;
205:25;206:6;216:15;
229:23,24

**background (1)**
173:22

**balance (4)**
22:4,5;36:11;37:25

**balances (1)**
39:5

**bank (26)**
174:24;183:16;
188:5,6;189:3,4;
195:10;197:8,8;222:9,
19,21;223:9,10,17;
225:11,13,23,25;226:6,
9,17;227:2,5;228:14,19

**bankruptcy (1)**
97:22

**banks (3)**
188:7,10;226:8

**bank's (1)**
228:20

**bar (1)**
79:8

**Barely (1)**
71:18

**based (8)**
92:4;132:23;180:17;
182:14,24;184:7;
212:9;225:13

**basement (4)**
47:3;65:20;90:20,22

**basically (21)**
11:20,21;14:15;
28:18;29:1;39:9;51:25;
52:2;102:21;117:25;
134:18;181:20;185:22;
186:12,17,18;188:7;
190:4;192:18;196:17;
215:4

**basis (5)**
9:9;78:13;187:7;
224:16;229:9

**Bates (7)**
6:4;14:21;16:23;
69:17,22;72:22;
103:23;104:6

**bathrooms (1)**
44:13

**battery (1)**
131:8

**bear (1)**
70:21

**became (1)**
205:17

**become (1)**
177:8

**becomes (1)**
137:7

**beginning (3)**
27:24;97:21;196:20

**begins (1)**
34:9

**behalf (4)**
7:12,15;172:13;
186:6

**behind (2)**
166:19,19

**belabor (1)**
161:13

**belief (2)**
93:6,11

**belly (1)**
208:11

**below (2)**
57:14;194:25

**bene (1)**
8:4

**benefit (3)**
211:20,22,25

**best (16)**
78:15,24;79:20;
86:19;133:1;137:14;

**bank's (1)**
141:20;142:7,20;
180:19;184:18;185:16;
187:22;200:8;208:9;
219:2

**best-evidence (1)**
79:2

**better (5)**
32:15;55:24;71:23,
24;108:17

**beyond (2)**
74:21;86:11

**big (5)**
66:19;105:23;151:7;
169:3,7

**bill (8)**
12:7;41:12;44:19;
62:17;101:18;117:25;
125:12;152:10

**billed (1)**
80:14

**bills (3)**
113:16;118:7;142:4

**binder (33)**
10:10,17;13:8;14:21;
18:12;19:7;45:16;50:5;
63:12;78:12;79:14;
87:16,19;89:15;91:25;
102:7,8;103:23;
104:13;108:2,3;126:2,
8,17;128:11;144:4;
145:2;153:5;157:10;
159:10,16;161:18;
163:19

**binders (1)**
18:10

**bit (25)**
33:12;35:8,15,17;
39:22,25;42:4;55:13;
57:3;59:17;71:19;84:14;
95:2;122:6;140:11,17;
153:13;177:7;188:3,8;
209:15;217:9,13;
219:24;227:18

**blessing (1)**
192:22

**block (2)**
193:12,14

**blocks (2)**
140:18;167:8

**blow (3)**
121:9;147:11;190:11

**body (2)**
83:21,24

**bold (3)**
190:11,16;216:4

**bolded (1)**
216:1

**book (15)**
11:11;28:23;56:25;
66:10,11;69:9;72:6;
92:23;95:8;96:4,11;
98:6;145:20,20,21

**bookkeeper (10)**

Case 16-01120    Doc 356    Filed 06/24/19    Entered 06/24/19 09:21:27    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 235 of 256
June 18, 2019

30:1;32:23;35:2,10;
37:4;43:22;61:23;
100:18;124:20;151:9
**bookkeepers (1)**
41:18
**bookkeeping (8)**
11:15;33:6,16;44:1;
62:1;100:24;124:24;
151:17
**books (2)**
38:12;170:15
**Boris (8)**
99:11,14;100:5;
172:9,25;173:16;
186:13;209:4
**Borrow (1)**
189:6
**borrowed (1)**
188:1
**borrower (4)**
222:24;223:2,10,18
**Boston (2)**
28:21,24
**both (27)**
39:14;66:21;81:6;
85:8,9;91:14;92:17;
95:15,16,25;98:24;
101:12;132:3,5;133:2;
138:6,11;140:4,6;
141:9,23;142:3;172:3;
180:9;222:15,17;223:1
**bottom (60)**
13:17,17;14:6;16:9;
19:10;22:10;23:16;
36:22;45:21,23;46:24;
47:16,24;48:6;50:10;
63:21;65:14,17,19;
66:15;68:24,25;72:22;
73:2;76:18,19;77:8,17,
24;81:6;84:15;89:24;
90:16;91:9;102:15,16;
104:16;108:7;126:20,
20,23;136:4;144:12;
153:9;154:8,16;155:1,
19;156:2;158:9,10,11,
17,21;167:19;168:7;
199:7;208:19;217:17,
20
**bottoms (1)**
79:4
**bought (6)**
112:20;113:1,22;
114:2;116:21;147:23
**box (7)**
74:1;121:9;132:6;
140:22;141:11;147:11;
166:25
**boxes (2)**
64:25;65:3
**boy (1)**
7:9
**brain (1)**
78:4

**brand (1)**
95:5
**brands (1)**
64:22
**break (8)**
83:9;89:7;93:5,23;
94:5;171:9;180:18;
229:20
**brief (3)**
144:11;230:17,18
**briefed (1)**
8:4
**briefly (3)**
84:7;173:21;174:13
**bring (10)**
6:12;22:19,25;67:19;
162:14;185:4;208:14;
216:9;224:6;227:13
**bringing (1)**
74:20
**broker (2)**
191:19,20
**Brookline (6)**
102:19;110:11;
177:12;181:16,17;
194:4
**brought (1)**
181:3
**Brusenkova (4)**
32:10,22;33:2;196:2
**BST (5)**
99:11;100:12;101:6;
106:13;137:13
**bucks (3)**
18:18;148:3;149:11
**budget (14)**
188:4,5,6,9;189:1;
195:9;225:5,8,14,17,
18,19,20;226:1
**budgets (2)**
225:7;226:10
**build (4)**
181:18;182:22;
190:5,5
**builder (9)**
181:12;188:4;
225:10,13;227:6;
228:15,16;229:5,7
**builders (2)**
32:12;188:8
**builder's (1)**
229:8
**building (8)**
40:4;45:6;110:11;
180:16;181:13;182:10,
10;195:6
**builds (1)**
196:18
**built (3)**
180:16;182:2,8
**burden (1)**
137:24
**business (28)**

11:7,16;16:18;20:4;
43:18;44:2;49:15;51:7;
53:5;61:17;64:16;
67:13;91:6,22;100:14,
25;103:19;105:5;
124:14;151:2,4,18;
157:1;160:11,22;
161:3;202:14;209:22
**buy (4)**
107:11;147:19,21,24
**buying (3)**
147:20,20;197:4

## C

**C- (1)**
104:13
**C-31 (3)**
51:13,19;58:18
**C-32 (3)**
20:7,14,16
**C-33 (7)**
129:15,16;130:21;
131:19;144:5,6;145:2
**C-38 (5)**
159:17;161:18;
163:19;164:23;166:17
**C-41 (10)**
72:22;77:21;89:16;
91:25;92:11,23;94:12,
20,23;97:15
**C-51 (2)**
105:8,11
**cafe (1)**
91:12
**Calandrelli (9)**
24:23;27:16,20;29:8;
34:14;36:23;37:9,23;
38:10
**calculate (1)**
22:5
**calculated (1)**
36:6
**calculations (1)**
217:21
**calendar (1)**
230:10
**call (24)**
10:3;18:3;25:5;
26:17;27:20,21;29:17,
18;42:24;44:4;60:19;
62:7;88:1;99:11;101:7;
123:8;125:3;150:11;
153:2;171:6;172:9;
206:25;211:6;215:5
**called (11)**
17:3,5;26:14;27:7,9,
22;29:19;33:25;81:5;
205:10;207:5
**calls (3)**
9:24;192:18;213:3
**came (15)**
23:12,16,19;33:17;

35:14,20,24;113:15;
167:6;170:13;182:18;
189:11;191:12;193:17;
224:18
**can (95)**
9:18,18,23,24;13:14;
15:25;19:12;21:6,13;
23:19;27:14;28:6,7,11;
45:2;50:21;51:15;61:2,
3;63:12;66:17;68:1,1;
70:23;71:15;73:10;
77:17;83:11,16;84:7,
14;87:11;89:10;93:24;
96:5;99:21,22;106:7,
23;110:18,25;111:12;
113:15;114:9;120:11;
129:2;131:10;137:25;
139:24;150:4;152:15;
154:18;155:11,21;
156:1,7,12;157:19,20;
158:1,5,8,18,21,25;
159:16;161:9,22;
162:14;163:22,25;
167:6,15;168:13;
169:13;178:22;179:5;
180:20;181:15;182:25;
187:22;190:6,10;
191:21;193:23;199:12;
208:14;211:12;213:17,
19;214:9;215:15;
229:25;230:6;231:1
**cancel (1)**
28:22
**capacity (6)**
7:16,17;64:10,22;
95:5;176:14
**capital (4)**
181:4;189:20,22,25
**capitalization (2)**
53:4,5
**capitals (1)**
59:11
**captured (1)**
184:12
**card (4)**
116:17;117:1,7;
118:9
**CARNATHAN (201)**
5:9,10,20,22;6:1,9,
12,15;17:1;18:14,15;
20:9,10,12;24:7,25;
25:2,4,23,24;26:1,2,20,
22;28:9,11,13,16,17;
30:13,15,24;31:4,10,
12,18,23,24;32:4,9;
41:6;42:16;49:19,24;
51:14,16;54:4;60:6,18;
67:17,21,22,24;68:3,6,
13;69:3,6,19,24;70:1,
13,19,25;71:17,20,22,
24;72:1,15,17,19,20;
73:10,14;74:24,25;
75:4,5,12,15;78:7,14;

79:16,18;84:7,10,22,
25;92:1,7,17;94:14;
95:21;96:18,21;99:1;
103:25;104:4;105:9;
107:23;109:8,10;
110:6,9,12,14,25;
111:4,6,8,21,23,25;
112:3,4;114:9,11,21,
22;117:20,23,24;
118:11,13;119:1,3,6,
13,15;121:8,17;
122:24;128:15,17;
129:4;130:4,7,25;
131:3,10,15,16;132:20,
25;138:5,17,19;139:1,
3,5,11,15,17;141:17;
142:23;143:13,16;
145:3,22;146:11,17,18;
147:10,14;149:23;
159:12;161:19,22,24;
164:17;170:18;171:6,
10,13,23;172:2,9,12;
173:12;178:16,19;
179:5,6,13,14;190:10,
12;191:4,6;192:3,6;
193:11,13,24;194:1;
195:2,4,13;203:18;
230:17
**carrying (17)**
183:11,13;184:2,4,6,
7,13;185:24;187:24;
188:2,6,11,25;189:19,
22,25;226:16
**case (17)**
8:12;12:9,19;23:5;
40:17;44:21;45:5;
62:19;101:20;106:11;
137:12;142:13;146:15;
147:22;152:18;162:18;
188:12
**cases (3)**
7:19,21;175:25
**caught (1)**
222:2
**cautioning (1)**
190:24
**cell (1)**
57:15
**certain (4)**
21:23;86:12;211:17,
17
**certainly (16)**
9:4;85:14;86:17;
137:14;171:10;197:12,
19;202:6;204:21;
206:6;217:1;220:13;
223:16;224:23;225:24;
231:2
**certificate (6)**
189:18;190:6;205:8;
219:10,20;220:11
**certificates (1)**
189:7

**CFO (2)**
7:6,13
**chain (2)**
84:1;208:18
**challenged (1)**
9:8
**chambers (2)**
15:19;83:8
**change (39)**
31:8;37:7;59:17;
82:7;83:18;112:22;
130:1;155:22,23;
156:18;164:1;165:9,
12;166:5,8;167:20;
168:1,6,12,15;169:14,
22;186:16;187:7,8,10;
191:19;192:7;197:1,2;
207:5,16;211:6,7,20,
21;212:18;213:7;
215:22
**changed (11)**
30:7;56:18;59:17;
74:8;80:11;130:22;
167:15;186:19;206:15,
16;212:4
**Changes (11)**
165:17;169:11;
187:3;209:25;211:3,4;
212:5,7;216:2,20;
217:23
**changing (3)**
84:3;207:1;216:5
**characterize (1)**
176:25
**charge (7)**
85:2;95:4;98:1;
105:21,21;162:10;
193:10
**charged (2)**
79:7;113:18
**charging (1)**
107:9
**Charlie (2)**
19:8;50:6
**check (32)**
18:18;21:22;33:25;
34:20,21,22;35:17;
39:24;52:14;58:3;
75:23,25;76:2,4;
115:17;117:8;127:24;
157:14,19,21,24,25;
158:2,4,10,12,23;
159:1,6,8;171:15;
230:2
**checking (1)**
35:7
**checks (20)**
21:18;22:3;34:24;
35:3,13,14,20;36:7;
37:5;52:13;92:25;93:9,
10,12;106:3;158:6,19;
161:15,16;162:4
**Christina (7)**

35:11,12,12,25;36:5;
38:3;39:15
**circulated (1)**
218:16
**circulating (1)**
210:7
**circumstances (1)**
9:16
**claim (2)**
5:6;18:10
**clarification (1)**
17:21
**clarified (1)**
35:24
**clarify (2)**
38:19;55:19
**clarity (1)**
87:23
**Classic (1)**
227:15
**clause (1)**
221:2
**clean (1)**
117:20
**cleanest (1)**
143:14
**cleaning (1)**
44:9
**clear (4)**
17:23;37:7;111:13;
147:13
**cleared (2)**
14:15;137:14
**clearing (1)**
172:5
**clearly (3)**
7:17;80:8;124:5
**CLERK (22)**
5:2;10:8;26:4;52:15;
71:10;88:7,8,10;94:8;
96:20;99:13,15;
123:10,12;130:6;
131:5,8,12;143:20,24;
171:21;172:24
**client (2)**
93:17;154:24
**clients (1)**
225:24
**close (5)**
61:1;123:18;134:2;
222:4;225:2
**closed (1)**
228:3
**closer (3)**
56:3;90:2;150:18
**closet (1)**
43:5
**closing (5)**
188:20,22;219:12,
15,15
**closings (1)**
174:12
**code (1)**

142:8
**coffee (1)**
9:18
**Cohen (1)**
85:4
**collect (2)**
87:9,10
**College (1)**
173:23
**color (9)**
8:17;69:13;72:13,14;
73:7;80:24;84:17,23;
85:5
**combined (5)**
120:9,12;132:14,14,
17
**comfortable (2)**
61:5;99:25
**coming (7)**
27:5;28:20;60:12;
66:9;99:5;131:3,15
**comments (2)**
206:1;210:2
**commercial (1)**
174:12
**common (1)**
188:4
**communicate (1)**
192:19
**communicated (3)**
206:3,11;212:4
**communicating (2)**
176:23;211:15
**communication (1)**
214:22
**communications (6)**
12:11;44:23;101:22;
102:1;125:17,24
**companies (6)**
20:24;41:18;55:3;
105:14;162:6;175:1
**company (89)**
7:18;11:3,22;12:1,3;
16:17;20:3;21:14;24:1;
43:14,15,16;44:6,8,15;
46:10,21;47:5,20;48:4,
13,19,24;49:2,5;50:19,
23;51:22,23,24;52:1,2,
24;53:5;54:15,18;
61:13,13,14,15,19;
62:10,13,15,17;67:12;
91:21;100:11,12;
101:6,10;103:18;
105:4;124:8,9,9,10;
144:23;150:25;152:1;
154:24;156:20;157:14,
19,21;158:2,4,6,14,19,
24;159:1,6,8,20;160:2,
21,25;161:10,15,16;
175:5;181:4,25;
193:23;197:13,16,20;
222:7
**company's (7)**

49:9,15;51:3;7;52:6;
64:25;127:20
**compensation (2)**
194:24;195:5
**complaint (1)**
79:5
**complete (3)**
101:13;169:17,18
**completed (11)**
19:13,15;23:17,23;
24:1;30:8,18;31:16;
37:7;113:9;194:16
**completely (3)**
19:4;85:19,22
**completeness (1)**
28:4
**completion (4)**
200:3,13;201:13,14
**complicated (6)**
33:15,17;34:20;
35:19;40:1;112:22
**component (1)**
77:20
**components (1)**
69:16
**composite (7)**
17:8;18:6,13;88:12,
24,25;92:14
**computer (3)**
56:10;103:1,2,17;
141:16
**concept (1)**
31:25
**concern (2)**
211:14;212:25
**concerning (2)**
142:15,18
**concerns (1)**
204:6
**conclude (4)**
85:12;167:11;169:4,
9
**concludes (1)**
78:7
**conclusion (4)**
33:17;35:14,20;
167:16
**conditioning (3)**
61:12;62:12;97:12
**conditions (2)**
193:7;221:1
**conduct (1)**
212:9
**confer (5)**
93:5,17;121:14;
128:25;139:8
**conference (4)**
9:23;172:2;178:9;
183:5
**confirm (1)**
207:19
**confirmatory (1)**
207:18

**confirming (1)**
93:11
**conflict (4)**
203:2,4;223:5,20
**confused (2)**
19:5;38:11
**confusing (1)**
33:11
**connect (1)**
88:5
**connected (4)**
40:4,6,22;178:9
**connection (4)**
109:19;118:19;
181:10;186:3
**conscientiously (1)**
216:25
**consent (5)**
192:1,2,11,15;
215:16
**consideration (1)**
229:6
**consistent (1)**
200:11
**consistently (2)**
143:3,7
**consists (1)**
128:12
**constitutes (1)**
186:13
**construct (2)**
194:3;229:6
**constructed (1)**
228:7
**constructing (1)**
229:7
**Construction (42)**
43:13;109:6;112:19;
113:19;114:3;151:3;
167:1,12;182:12;
183:2,17;184:5;
188:23;190:8;194:15;
195:10;201:23;202:10;
206:17;218:25;219:3;
223:24;224:4,11,24;
225:5,7,8,11;226:19,
23,25;227:4,7,9,10,15,
16,17;228:6,16,21
**consulted (1)**
172:2
**contact (8)**
12:24,25;58:12;
62:21;63:4,8;126:13;
153:2
**contacted (5)**
45:12;126:9;152:20,
24;224:2
**contemplated (1)**
229:11
**contention (2)**
84:18,22
**contested (2)**
142:18;143:9

**context (1)**
85:14
**continue (4)**
38:10;58:1;213:10;
214:15
**contract (15)**
226:20,23,25;227:9,
11,15,17;228:6,10,13,
15,21;229:1,1,5
**contractors (6)**
21:4;52:4;54:22,25;
105:17;162:8
**contractors' (1)**
229:8
**contribution (3)**
189:20,22;200:13
**control (4)**
87:11;181:25;215:4,
15
**conversation (5)**
207:10,15;212:23;
218:8;224:19
**conversations (4)**
204:9;207:6,13;
214:2
**conversely (1)**
211:24
**conveyancing (1)**
174:11
**Cooling (7)**
75:17;76:13;81:3,8,
10;89:2,4
**copied (7)**
80:10,10,10;82:1;
136:5,14;212:5
**copies (18)**
16:11;34:23;35:3;
37:5;49:9;51:1;52:23;
67:7;68:9;72:13;79:3;
81:22;86:2;93:10;
130:1;142:3;156:19;
161:15
**copy (40)**
6:5;14:20;19:22;
34:22,22;46:20;52:12;
69:11;74:14;75:23,25;
76:2,5;82:7,17,20;
83:18,23;84:3;90:13,
25;91:19;96:10;103:9;
104:23;106:3;115:24;
127:10;129:25;132:6;
135:12,14,17,18,20;
137:5;144:21;157:11;
160:5,19
**Cordeiro (4)**
150:11,13,22;153:15
**C-O-R-D-E-I-R-O (1)**
150:22
**Cordiero (2)**
164:15;170:18
**corner (10)**
13:17;72:23;77:5,15,
22;108:7,15;167:20;

168:7;224:10
**Corp (2)**
5:14,15
**corporation (1)**
7:8
**corrected (2)**
164:12;166:23
**correction (1)**
164:8
**correctly (19)**
28:1;29:2,15,21;
35:22;37:13;38:8,22;
155:16;164:4,25;
182:14;183:14;189:9,
16;192:12;194:7,25;
199:11
**cost (19)**
46:12;97:2,8;98:13;
109:24;113:17,21;
118:21;146:21;182:12,
22;183:11;185:21;
188:6;202:3;218:25,
25;219:4;229:1
**costing (2)**
182:14;183:6
**costs (22)**
182:23;183:2,13;
184:2,4,6,7,13;185:24;
187:24;188:2,11,25;
189:6,19,22,25;195:10;
201:23;202:10;226:16;
229:8
**counsel (7)**
99:25;121:14;
128:25;139:8;225:24;
231:1,2
**counterpart (1)**
69:22
**country (1)**
174:2
**couple (8)**
5:20;29:4;45:6;
64:25;65:3;119:10;
185:24;186:1
**course (13)**
16:18;20:4;25:3;
32:19;49:14;51:6;
67:13;91:5,22;156:25;
199:2;212:9;231:1
**COURT (277)**
5:18,21,25;6:6,8,10,
13,21;7:1,10,19;8:3,6,
22,25;9:1,11,13,21;
10:5,12,15,17,20;
14:19,24;15:1,4,11,13,
15,17,19,25;16:23,25;
17:2,5,8,11,13,17,19,
23;18:1,3,7,14,22,24;
19:1,4,4;20:15,17,20;
22:24;23:2;24:20;25:1,
3,8;28:6,10,12;31:2,21;
32:7;42:18,23;49:20;
50:2;51:18;60:8,10,12,

14,17;61:3,5;63:15;
67:23;68:1,2,4,10;69:4,
17,21,25;70:15,17,20;
71:7,8,9,11,12,18,19,
21,23;74:23;75:3,14;
78:10,18,21,25;79:15;
80:15;81:14,16,19,21;
82:3,8,11,13,15,17,19,
23;83:1,3,5,11,14,20;
84:6,8,18,24;85:23;
86:4,7,23,25;87:4,8,10,
21,23;88:1,4,18,20,22;
89:6,10;92:3,9,12,16,
19,25;93:2,8,14,17,20,
22;94:2,4,8,9,16,18,21;
95:19;99:2,4,7,9,12,22;
100:3;102:11;103:24;
104:6,8;105:10;111:2;
119:2,5;121:11,16;
122:25;123:2,6;126:5;
128:12,16,21;129:1;
131:2,4,7,9,11,14;
132:22;133:3,8;
137:16,25;138:2,7,10,
13,15,17,25;139:2,4,7,
9;141:19;143:1,5,15,
17,19,21,25;144:8;
145:6,9;146:9;149:24;
150:1,4,8,10;159:13;
161:20,25;170:19,21,
23,25;171:2,5,8,12,13,
15,21,22,25;172:6,8,
11,12,16,18,20,23;
173:1,3,7,10;195:14,
16;199:2;229:20,22;
230:4,8,10,14,18;
231:1,7,13,15,17
**courtroom (9)**
6:16,19,23;7:9;8:25;
60:15;123:4;150:5;
173:4
**Court's (1)**
143:2
**cover (8)**
15:6;20:11;51:15,17;
114:10;128:14;161:23;
179:8
**CPA (1)**
196:6
**cracks (1)**
48:9
**create (9)**
46:15;53:7;59:16;
64:18,21;103:4;134:7;
161:1;163:9
**created (29)**
16:14;64:9,10;84:2,
2;85:4;91:2;102:20,22;
103:1,2,11,13,14;
105:1,3;106:11,12;
134:16;156:16,20,22;
157:2;160:3,7,17;
161:7,11;162:18

**creating (3)**
11:17;47:9;163:6
**credibility (2)**
8:10,15
**credit (4)**
116:17;117:1,7;
118:9
**crew (1)**
171:15
**cross (1)**
68:8
**CROSS-EXAMINATION (8)**
24:6;54:3;95:20;
107:22;142:17;146:10;
164:16;195:17
**crucial (1)**
206:24
**curious (1)**
9:9
**current (3)**
92:5;191:19;200:7
**currently (1)**
194:4
**cut (18)**
68:21,25;73:1;76:14,
16,18;77:2,5,6,8,18,24;
84:15,15,16;85:7;
214:20,21
**Cutler (56)**
11:24;18:11;19:19;
20:1;30:21;31:14;34:1;
35:17;39:4,7,24;44:5;
50:15,24;56:23;62:8;
72:15,17,18;73:19;
82:1,16;90:5,11,23;
91:14;96:4,23;97:15,
17;101:8;104:20,24;
118:15,19;120:17;
122:14,20;125:3;
131:25;133:14;134:3;
139:19;140:24;144:15;
146:25;151:25;156:6,
7,8,10;165:15;177:8,9;
182:5;193:4
**cutoffs (1)**
80:3
**cutting (1)**
79:4
**Cynthia (6)**
38:21,25;40:8,16;
41:1,2

**D**

**DaCosta (5)**
150:12;151:3;167:1,
4,12
**daily (2)**
187:7;224:15
**Dan (7)**
29:11;30:1,2;37:4,
10;38:4,6
**dash (1)**

230:20
**date (23)**
31:9;52:14;82:22,23;
108:14;120:2,3;
154:25;163:15;179:8;
189:8;192:8,14;
194:17;220:2,3,7,22,
23;221:5,12,17;228:3
**dated (16)**
81:11,11;95:22;96:2,
25;109:21;112:14;
113:6;118:1;168:1,17,
23;169:3,14,22;179:19
**dates (7)**
31:8;163:11;200:3,
13;201:10,13,14
**day (7)**
5:3,6;27:6,9;148:25;
216:15;231:10
**days (1)**
219:14
**deal (7)**
68:11;197:6;203:15,
16;218:11;221:1;228:6
**deals (3)**
196:12;207:2;218:20
**Deborah (4)**
38:20,25;40:8,24
**debtor (1)**
5:12
**December (6)**
95:22;96:2,5,25;
192:7,10
**decide (1)**
193:23
**decided (2)**
169:24;202:13
**deciding (1)**
142:13
**decision (4)**
215:7,9;216:23,25
**decisions (2)**
215:9,10
**Decor (6)**
42:24;43:17,18;44:4;
56:18;57:2
**Decorartcom (1)**
57:12
**deduct (1)**
22:5
**defendant (1)**
142:11
**defendants (1)**
142:11
**DEFENDANTS' (10)**
17:20;20:16;49:21;
51:19;87:6;92:11;
94:23;104:10;105:11;
161:21
**Defendant's (6)**
17:19;19:2;143:23;
145:11,13;159:14
**Defense (1)**

Case 16-01120    Doc 356    Filed 06/24/19    Entered 06/24/19 09:21:27    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 238 of 256

June 18, 2019

5:23

**definitely (4)**
79:19;183:13,19;
200:22

**degree (1)**
144:10

**delay (1)**
209:18

**delays (1)**
55:14

**demonstrated (2)**
79:16,18

**demonstrative (1)**
22:23

**Department (1)**
110:11

**depends (5)**
34:20;95:5;105:22;
134:10;151:7

**deponent (1)**
7:7

**deposition (22)**
7:8;12:18;24:18,18;
27:1,10;34:3,7;36:3;
45:4,7;54:10,18,21;
55:25;85:21;178:23;
198:21;200:11;201:2;
202:17;211:9

**describe (10)**
21:6,13,25;23:19;
88:24;101:10;136:4;
163:25;173:21;176:17

**described (6)**
8:2;14:14;18:6;
47:12;87:13;176:14

**describing (1)**
203:11

**description (1)**
136:14

**designate (1)**
7:20

**designated (4)**
7:5,10,13,22

**designating (3)**
7:16,21;8:1

**designation (2)**
17:14;216:5

**designed (1)**
79:20

**designee (1)**
9:6

**designees (1)**
7:14

**desirable (1)**
181:16

**detailed (1)**
206:18

**determination (3)**
8:10;142:14,19

**determine (2)**
36:23;86:12

**determined (1)**
33:24

**developed (4)**
195:9;196:22;197:9,
16

**developers (1)**
21:4

**Development (6)**
5:15;107:2;112:21;
113:21;154:5;227:16

**deviation (1)**
185:22

**difference (4)**
38:12;92:5;147:23;
227:3

**different (27)**
13:23;18:8;31:9;
39:14;52:23;53:4;59:5,
12;73:23;82:21,22;
85:24;88:17,18,19,20;
94:13;106:13,14;
130:12,13;133:12;
140:3;143:5;155:16;
190:2;207:2

**differential (1)**
74:12

**difficulty (5)**
5:22;33:13,19;
128:17,18

**digits (4)**
106:17,20,24,24

**Dima (1)**
217:21

**diminishes (1)**
18:15

**dire (8)**
68:6,11,12;74:21;
78:7;79:16;129:3;
139:16

**DIRECT (14)**
10:21;43:2;60:22;
86:19;89:13;90:18;
94:25;99:16;123:14;
133:9;144:2;150:14;
158:20;173:11

**directing (1)**
159:2

**directly (9)**
107:2;116:14,17,18,
21;117:7,10,10;118:4

**dired (2)**
92:17;138:5

**disagree (1)**
85:11

**discount (1)**
113:24

**discovered (1)**
33:6

**discuss (4)**
28:14;178:5;192:23;
212:24

**discussed (22)**
94:12,13;137:9;
162:12;180:13;181:6;
182:1;183:13;192:25;

198:22;200:2,17,20,24;
201:3,13,15,18;203:18;
205:5;212:18;220:21

**discussing (3)**
6:17;201:9;211:4

**discussion (23)**
182:11;183:5,9,11;
184:1,4,6,12,17;185:1,
18;187:23;190:22;
191:23;194:17;198:8,
20,23;199:8;200:14;
201:23;202:3;212:14

**discussions (4)**
102:3;198:16;
200:12;220:23

**dissolution (5)**
220:2,7,20,22,23

**dissolve (1)**
220:3

**divided (1)**
211:19

**Dmitriy (2)**
176:2,3

**docs (2)**
59:2;217:23

**document (55)**
6:3,10;13:14,25;
14:20;15:9;19:20;20:3;
21:9,10;25:25;26:3;
46:14;64:9;65:13,17;
74:20;79:25;80:1;
81:23;83:1;90:8,19;
91:2,17,21;92:25;
93:24;102:20;103:8,
18,22;104:2;105:4;
108:6;109:13;115:24,
24;119:16;127:1,19;
129:13;134:12,14;
135:11;141:3;142:25;
144:19;145:10;156:15;
157:11,13;159:3;
166:19;219:21

**documents (69)**
17:24;23:10;25:17,
19,19;49:9,14,18;51:3;
53:20;59:22;60:1,3;
67:7,12;73:17;75:10,
11,21;78:2,11;79:6,10,
14,19,23;80:21;81:2,7,
21;82:4,8,11;83:21;
84:19,19;85:6,14,20;
86:6,14,20;87:19;
88:13;92:6;93:7;
106:13,14;115:23;
128:20;131:17;134:24;
138:23;142:10;143:10,
21;154:12;156:20,25;
157:4;168:10;193:19;
197:9;202:15;210:7;
223:9,10;224:24;
225:25

**dojn't (1)**
62:24

**dol (1)**
164:13

**dollars (1)**
38:5

**done (28)**
14:9;18:9;23:24;
48:10;54:7,24;72:18;
83:17;92:8;108:22;
113:20;143:2;169:5,9;
170:1,1,3;175:13,16,
24;176:12;207:22;
218:24;219:13;226:3,
4,14;231:14

**door (2)**
134:3;182:9

**doors (2)**
44:13;152:4

**dots (1)**
88:5

**down (43)**
15:21;27:23;29:4;
37:21;68:24,25;74:11,
13;77:8,17,24;80:2;
95:8;103:16;106:2;
129:19;130:18;139:24;
146:23;162:4;177:12;
180:18;184:22;185:2,
8,9,14,17;186:12,13;
202:18;203:9;205:6,7;
208:18,19;209:14;
216:10;217:9,13;
219:24;224:7;227:18

**downlo (1)**
186:14

**draft (1)**
202:14

**drafted (5)**
184:9;218:23;220:4;
223:9;226:25

**drafting (4)**
186:3,7;204:7;210:6

**drafts (5)**
186:21;187:3;
205:23;206:1;215:22

**draw (7)**
6:25;158:7;167:16;
199:4;201:7;211:8;
216:2

**drawings (1)**
194:5

**drawn (1)**
142:15

**Dream (5)**
10:4;11:4,22;18:19;
26:6

**duct (2)**
97:10,13

**due (1)**
37:25

**duplicate (5)**
13:23;31:7;47:13;
53:7;142:6

**duplicated (1)**

53:21

**duplicates (1)**
141:22

**During (15)**
24:17;37:16;93:5;
109:6;112:19;113:18;
114:3;175:14;178:8;
180:13,20;182:12;
183:2,11;186:7

**duty (3)**
194:3,24;196:13

## E

**earlier (10)**
14:14;23:5;30:18;
31:14;52:19;84:20;
92:6;159:21;162:18;
207:24

**earliest (1)**
168:23

**early (1)**
231:14

**easier (2)**
10:11;166:18

**easiest (1)**
73:12

**edits (1)**
210:17

**educational (1)**
173:21

**effect (1)**
218:10

**efficient (1)**
139:13

**EIFS (2)**
57:7,7

**eight (4)**
38:3;151:7;205:23;
221:9

**eight-and-a-half-by-eleven (1)**
89:1

**eighteen (3)**
39:6;105:15;174:17

**eighty (2)**
54:22;191:24

**eighty-one (1)**
191:25

**either (15)**
28:7;38:25;51:4;
68:6;78:21;82:4;
117:17;131:20;141:25;
192:1,18;202:7;211:6;
221:5;230:5

**Electric (2)**
123:9;124:11

**electrical (8)**
110:15,19,23,25;
124:4;125:9;133:20;
146:12

**electrician (1)**
124:2

**eliminate (1)**

Case 16-01120    Doc 356    Filed 06/24/19    Entered 06/24/19 09:21:27    Desc Main
LYMAN-CUTLER, LLC, et al. v.    Document    Page 239 of 256
KAGAN, et al.                                                      June 18, 2019

191:24

**else (11)**
6:14;15:2;80:11;
111:25;119:2;122:25;
140:3,19;149:24;
201:3,18

**email (50)**
57:14;59:11;153:9,
13,14,14,17,22;154:4,
8,12;159:21;162:12;
163:20,22;164:8,20;
165:5;166:20;167:24;
168:11;169:15;170:11;
186:23;204:17;207:18;
208:21,24;209:3,8,10,
13;210:11,18,24;
211:11,13,15;212:2;
214:20,21;215:6;
216:11,12,20;217:4,12,
15,19,20

**emailed (1)**
214:17

**emails (8)**
187:4;192:18;
204:12,19;207:7,9;
215:19;216:22

**email's (1)**
170:10

**employee (1)**
7:3

**employees (8)**
11:9,10;43:20;61:20;
100:16,17;124:16;
151:6

**encompass (1)**
184:15

**end (10)**
41:23;42:10;61:25;
97:20;119:21;121:18;
122:3;147:7;208:20;
231:18

**ended (1)**
14:16

**ending (1)**
157:2

**engagement (3)**
202:21;223:4,20

**English (1)**
206:7

**enough (4)**
27:7;78:5;86:7;
198:12

**enter (1)**
163:8

**entire (2)**
20:14;221:16

**entitled (3)**
6:23;7:9,21

**entity (1)**
205:9

**envisioning (1)**
231:10

**equipment (6)**

64:11,22;95:6;97:11,
12,14

**ERIK (2)**
10:7,25

**E-R-I-K (1)**
10:25

**error (4)**
53:8;163:23,25;
221:22

**essentially (3)**
18:6,10;133:22

**established (2)**
65:10;134:21

**estate (3)**
174:11;191:19,19

**estimate (2)**
109:24;147:2

**estimated (5)**
54:24;97:2,4,8;
118:21

**estimates (2)**
98:13;218:16

**et (1)**
5:3

**even (14)**
15:20;26:16;36:4;
62:25;86:1;97:24;
107:2;122:6;133:2;
137:10;141:22;143:7;
191:24;221:19

**event (1)**
189:7

**eventually (1)**
219:6

**Everybody (11)**
15:20;171:8;196:18;
208:9;211:21;216:16;
219:7;220:13,14,15,15

**everyone (5)**
5:18;9:2;71:7;
184:22;190:18

**evidence (53)**
16:21;17:6,20,22,24;
18:13;20:7,16,30:25;
31:3,18,22;32:5,5,8;
49:18,21;51:13,19;
67:16;78:15,17,24;
79:20;85:14;86:19;
87:6,22;92:11;94:23;
103:22;104:10;105:11;
110:6;121:13;133:1;
137:12,14;141:20;
142:7,20,25;143:3,18;
145:2,4,13;147:12;
159:10,14;161:21;
178:17,20

**exact (8)**
80:1;113:16,18,20;
117:15;130:20;140:19,
21

**exactly (30)**
56:13;57:24;58:2,2,
3,16,23,24,24,25;

59:18;74:2,4,5;76:25;
77:2,6,21,25;129:16,
20;132:17;134:2;
140:3,8;179:1,2;
180:23;184:23;226:15

**EXAMINATION (13)**
10:21;41:7;43:2;
60:22;89:13;94:25;
99:16;123:14;133:9;
144:2;150:14;173:11;
230:21

**example (6)**
35:16;39:24;97:11;
189:21;215:15;227:3

**Excel (3)**
217:16,22;218:15

**except (7)**
59:23;60:1,3;129:16;
130:21;140:8,22

**exchange (1)**
208:25

**excited (1)**
181:15

**excluded (1)**
6:24

**excluding (1)**
7:3

**excuse (9)**
32:5;38:15;76:8;
88:6;109:9;118:12;
121:10,20;166:19

**Exhibit (94)**
5:23;6:2,3;10:14,17;
15:4,5;17:9,14,20,22,
25;19:2;20:7,8,14,16;
22:23;26:4,21;30:14,
16;31:3,10,22;32:8;
45:17;48:16;49:18,21;
51:13,19;56:21;58:1,
15,18;67:16,16;69:16,
23;74:17;75:1;76:21;
87:6;88:12,12,24,25,
25;89:3;91:25;92:11,
22;94:22,23;103:22;
104:10;105:8,11;
111:21;113:4;119:13;
121:8,12;128:11;
129:7;130:4,8;132:23;
142:12,24;143:13,18,
20;145:7,13;147:10,
15;159:10,14;161:18,
21;167:19;178:16,17,
20,21;208:14,17;
216:10;219:17,20;
224:6;227:13

**exhibits (3)**
74:22;79:13;137:9

**expand (1)**
184:15

**expect (2)**
15:6;171:6

**expenses (2)**
229:9,12

**experience (1)**
219:5

**expert (2)**
12:24;13:1

**expertise (1)**
86:13

**experts (1)**
231:12

**explain (9)**
23:4;113:15;140:17;
162:17;164:7;167:6;
169:13;188:3;193:17

**explained (5)**
23:12;29:20;38:1;
162:22;191:1

**explaining (1)**
212:4

**explanation (2)**
142:21;206:18

**exposed (1)**
8:16

**extensively (1)**
221:20

**extent (5)**
7:15;172:14;182:11;
187:2;224:15

**exterior (2)**
48:18;57:8

**extra (5)**
65:20;91:12;184:1

**F**

**face (1)**
59:1

**fact (26)**
8:9,14;9:8;33:24;
36:24;37:16;68:20;
69:15;85:13,15;86:13;
108:14;110:2;118:24;
129:25;148:8;188:1;
195:24;208:6;216:4;
217:3;218:22;220:6;
224:2;225:23;226:22

**facts (2)**
86:12;231:3

**factual (1)**
92:5

**fair (5)**
25:11;27:7;167:11;
169:4,9

**fairly (1)**
231:10

**fall (1)**
168:25

**false (1)**
225:24

**falsify (5)**
12:5;44:17;62:15;
101:16;152:8

**familiar (1)**
197:19

**fancy (1)**

105:23

**far (5)**
56:22;70:9;106:14;
117:14;221:14

**fault (1)**
53:11

**February (3)**
98:10;108:15;224:9

**fed (1)**
137:5

**fee (1)**
223:7

**feed (1)**
83:18

**fell (1)**
202:14

**fellow (1)**
24:23

**Ferguson (13)**
112:20;113:6,12,18;
116:14,17,21,25;117:4,
7,11;118:6,7

**few (5)**
62:24;131:12;133:6;
171:10;209:12

**fifteen (5)**
11:8;55:2;151:5;
171:16;174:17;175:7,
12;176:6;188:9;
229:18;230:11,12

**Fifteen-ish (1)**
230:12

**Fifty (1)**
195:7

**figure (1)**
41:21

**figured (3)**
6:1;30:3;214:1

**file (11)**
15:8;21:24,25;23:16,
21,22;193:19;207:17;
217:16;219:11;221:23

**filed (2)**
176:24;205:9

**files (7)**
23:13;80:3,3;85:8,9;
164:3;217:22

**Filippov (71)**
5:10;12:11;44:25;
62:21;63:5;101:22;
125:17,25;152:20;
175:8,9,11,13,17;
176:25;177:1,20;
178:1;180:3;181:3,22;
182:7;183:4,22;
184:19;185:7;186:24;
187:8;189:21;190:3,7;
191:18;192:18;193:5,
22;194:11;196:9;
197:24;198:2;202:25;
204:5,23;205:25;
209:3,17;210:1,17;
211:15,22,23;212:6;

Case 16-01120 Doc 356 Filed 06/24/19 Entered 06/24/19 09:21:27 Desc Main
Document Page 240 of 256
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

June 18, 2019

213:13,16,17,22;
214:17,22,24;215:3,14,
20;216:5;217:15,19;
218:1;221:8;223:11;
224:3,9;227:25;228:22

**Filippov's (2)**
181:21;192:19

**fill (3)**
64:13;85:2;217:2

**filled (3)**
65:4;135:21;221:5

**final (13)**
104:20;106:3;
108:19;109:7;110:22;
111:17;112:19,21;
113:16;114:4;186:21;
187:13;192:10

**finalize (1)**
198:13

**finalized (1)**
205:17

**Finally (1)**
137:20

**finances (1)**
199:9

**financial (6)**
180:14,19,21;185:8,
14;198:23

**financials (1)**
198:17

**financing (2)**
183:17;184:19

**find (9)**
5:24;9:20;29:19;
86:2;111:22;114:5;
119:20;121:19;164:3

**fine (19)**
10:15;18:20,21;37:6;
88:1;92:9;94:16;100:1;
121:16;128:22;131:11;
143:15;172:6;191:2;
207:17;214:2;230:4;
231:13,15

**finish (6)**
57:8;93:25;97:23,24;
157:2;169:18

**finished (8)**
12:2;67:11;112:8,9;
123:3;170:14,23;201:9

**fired (1)**
85:4

**firm (1)**
12:21

**first (53)**
6:2;15:1,6;24:15;
52:22,22,25;57:6,20;
58:19;68:11;69:17;
71:11;77:18;93:18;
97:4;113:10;133:7;
134:5,8,15;135:10;
137:1,5;147:22;154:7;
164:24;165:9,22;
166:5,8,11;167:11;

172:5;177:8;179:5;
180:4,13,19;182:19;
183:10,11,18,19,19;
198:19,22,24;202:3;
208:21;211:18;229:25;
230:6

**fit (2)**
141:11;172:15

**five (11)**
20:25,25;21:2,3;
83:10,13;97:18;
175:18;184:25;185:5,8

**fix (1)**
48:10

**fixed (3)**
207:24;218:25;220:3

**fixed-price (1)**
219:3

**fixtures (7)**
105:22;107:12,14;
112:9,10;113:1;114:2

**flip (1)**
161:14

**floor (1)**
194:14

**Flooring (5)**
10:4;11:4,22;18:19;
26:7

**floors (2)**
11:2;12:2

**flops (1)**
199:14

**focus (3)**
174:7,10;201:11

**focused (1)**
74:21

**folder (1)**
52:12

**follow (3)**
58:19;106:19;117:2

**followed (3)**
21:14;137:8;196:17

**following (1)**
106:14

**follows (1)**
15:8

**followup (1)**
167:14

**follow-up (2)**
138:20;139:5

**food (1)**
91:13

**foolish (1)**
8:24

**foot (1)**
134:17

**footage (1)**
134:10

**force (1)**
229:23

**forget (1)**
31:8

**forgot (6)**

28:22,24;35:9;38:1,
2,4

**form (21)**
59:15,19;64:12,15,
16,17,21;65:3,6;66:1,2;
68:16;69:8,10,13;80:9;
84:12,16;87:11;
205:12,16

**forma (3)**
227:9,10,16

**formation (1)**
203:14

**formed (7)**
175:1,4;196:13;
203:12,13;204:21;
222:3

**forms (8)**
66:10;80:7,8;84:13;
196:22;197:15;206:12,
12

**formula (1)**
196:17

**forth (5)**
15:10;35:13;186:23;
203:19;220:25

**forward (1)**
80:6

**found (4)**
37:5;103:22;177:11;
181:14

**foundation (1)**
48:3

**four (13)**
18:16;20:25;21:2,3;
25:11;40:4;61:22;
106:17,24;124:17,18;
167:18,18

**four-digit (2)**
106:25;107:6

**Framing (4)**
150:24;152:4;170:3,
3

**frankly (2)**
86:10;172:15

**Fredette (1)**
141:9

**free (3)**
42:19;60:14;99:7

**friend (1)**
177:4;214:11

**friends (2)**
176:17;177:1

**front (15)**
13:8;19:7;27:1;
45:16;56:24;63:11,17;
89:16;102:6;106:6;
126:2,16;153:5;155:9;
163:20

**full (38)**
6:3;11:10;17:22,24;
20:7,14;23:17,22,23,
24;24:1;30:4,8,11,18;
31:15,16;32:2,24;33:3;

35:21;36:8,10,13;37:8,
17;67:16;81:1,1,9;
91:24;103:22;105:7;
128:10;146:1;159:10;
161:17;229:8

**full-page (3)**
84:19;88:12;89:1

**fully (2)**
84:9;87:13

**funds (2)**
37:17;39:16

**further (13)**
42:14;54:1;95:17;
107:20;123:1;142:13;
146:7;149:25;164:14;
167:19;170:20;178:5;
184:17

## G

**garage (1)**
48:3

**gave (5)**
31:8;34:6;95:2;
182:24;213:13

**general (2)**
86:13;174:21

**generate (3)**
46:13;154:23;163:3

**generated (3)**
52:19;53:19;137:1

**generates (1)**
137:22

**gentleman (2)**
63:7;137:21

**genuine (3)**
79:2;86:3;137:10

**GERSCH (1)**
9:20

**Gersh (14)**
6:16,22;15:6;29:24;
30:1;36:15,15;37:15,
24;38:24;39:15;172:1;
230:5;231:11

**gets (3)**
137:5;185:23;196:18

**ginned (1)**
85:15

**gist (1)**
140:13

**given (12)**
6:5;33:25;131:17;
135:8;142:16;143:9;
182:13,21;202:8,9,12;
206:12

**gives (1)**
216:21

**giving (1)**
25:17

**glamorized (1)**
203:6

**glitch (1)**
111:6

**goes (3)**
72:19;74:21;117:10

**Goldman (11)**
12:25;22:20,22;
45:13;63:8,10;102:4;
126:9,10,15;153:2

**Good (43)**
5:9,11,13,16,18;
6:11;10:23;20:20;24:8,
10,11;37:6;41:13;43:4,
6;54:5,6;60:24,25;
71:14;99:18,19,20;
107:24,25,25;113:24;
123:16,17;129:5,6;
150:16,17;164:18,19;
173:1,13,14;181:16;
195:19,20;224:23;
231:7

**grappling (1)**
85:20

**great (2)**
8:19;34:10

**green (1)**
225:14

**grounds (1)**
133:1

**group (4)**
92:6;170:25;183:8;
186:12

**guarantee (1)**
202:11

**guaranteed (1)**
207:25

**guess (21)**
8:1;9:7;24:20;32:12;
34:13;36:21;38:10;
56:24;69:12;87:11;
96:18;110:7;113:7;
128:19;131:6;138:20;
145:3;166:17;168:5;
179:7;192:4

**Gurvits (8)**
172:13,14,17,17,18,
19,19,22

**guy (2)**
193:9,23

**guys (1)**
10:1

**guy's (1)**
80:3

## H

**half (12)**
45:11;54:11,15,16,
16,17,20;65:17,19;
90:18;114:1;171:17

**half-page (2)**
80:21;89:3

**halfway (1)**
37:21

**hand (18)**
13:17;24:25;64:4;

Case 16-01120    Doc 356    Filed 06/24/19    Entered 06/24/19 09:21:27    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 241 of 256

June 18, 2019

68:1;70:22;72:10;80:8;
81:7,8,12;83:17;87:8,
11;99:13;123:10;
135:4;137:5;172:24
**handed (4)**
27:2;67:21;69:7;
81:2
**handing (3)**
6:10;71:1;87:14
**handle (2)**
28:8;143:11
**handles (1)**
44:14
**hands (2)**
45:2;138:9
**handwrite (1)**
82:19
**handwriting (38)**
64:1,5,13,19;65:4,
11;67:4;68:17;79:10;
80:22;81:4,6;82:24;
83:3,23;84:21;86:15;
90:6;115:3,6,18,20;
116:2,6,9;127:4,6;
129:19,20;130:16;
131:21;134:21,24;
137:21,22;141:24;
144:17;163:2
**handwritten (3)**
79:23;128:20;138:23
**Hang (3)**
71:10;129:15;130:6
**happen (4)**
36:24;182:25;
189:14;218:5
**happened (10)**
36:25;53:8;71:12;
112:17;115:22;119:10;
176:22;188:12;214:11;
223:13
**happens (6)**
57:23;122:6;138:22;
188:15;191:21;193:10
**hard (3)**
53:16;114:4;158:23
**hardware (2)**
44:9,12
**hardwares (1)**
44:13
**Hardwood (1)**
11:2
**Harris (223)**
5:16,16;6:5,6,7;9:12;
10:3,9,13,16,18,22;
14:19,23,25;15:3,5,12,
14,16,18,22;16:1,2,20,
24;17:4,7,10,12,16,18,
21;18:2,5,8,21,23,25;
19:3,6;20:6,10,13,19,
21,22;22:19,25;23:3;
24:4;28:4,11,15;29:5,5,
7;31:1,20;32:6;41:8;
42:14,20,22,24;43:3;

49:17,22,25;50:3,4;
51:12,15,17,20,21;
52:15,17;53:12,14;
54:1;56:21;59:2;60:7,
13,16,19,23;61:7;
63:14,16;67:15,20;
72:18;74:19;78:18,19,
23;79:1;81:7,13;83:10,
13,15,25;85:17,25;
86:5,22,24;87:2,7,9,17,
19,22,24;88:3,6,9,11,
19,21,25;89:9,12,14,
18,20,22;91:24;92:14,
17,24;93:1,3,11,16,19,
21;94:11,17,19,24;
95:1,17;99:3,8,10,17;
100:6;102:10,13;
103:21;104:3,7,11,12;
105:7,12;106:7,9;
107:20;108:4;121:10,
12,15;123:1,5,7,15;
126:4,7;128:10,13;
133:3,6,10;136:23;
137:17;138:1,4,8,12,
14;143:2;144:1,3,7,9;
145:1,8,12,14;146:7;
149:25;150:6,9,11,15;
157:7,9;159:9,15;
161:17,22;162:1,2,14,
16;164:14;170:20;
171:1,3;208:14,20;
209:15;210:14;213:11;
216:9;217:8;219:17;
224:6
**Harris' (1)**
24:17
**Hartsell (7)**
139:12;190:10;
191:5;192:4;193:11,
25;195:3
**Hartzell (9)**
73:10,18;98:5;
109:13;111:23;112:2;
130:5;178:16,24
**hat (1)**
223:18
**head (3)**
52:8,9,11
**headers (1)**
82:7
**heading (1)**
81:3
**headings (1)**
206:20
**hear (9)**
8:17;15:6;68:7;
86:17;150:19;173:7;
178:11,11;213:8
**heard (11)**
8:18;78:23;79:4;
83:10,11;86:7;108:21;
138:18;205:25;214:1;
230:15

**hearing (2)**
8:13;143:22
**heart (2)**
97:18,19
**Heating (20)**
60:20;61:12,20;62:6,
12;65:20;75:17;76:13;
81:3,8,10;88:16;89:2,
4;90:20,22;93:7,13;
94:15;97:11
**help (6)**
23:2;69:25;100:19;
151:20;223:14;231:9
**helped (1)**
103:16
**helping (1)**
223:19
**Here's (3)**
83:6;136:23;216:11
**Hey (2)**
24:9;224:3
**hide (2)**
217:5;226:16
**hiding (1)**
226:12
**high (4)**
44:8;79:8;142:21;
173:23
**higher (1)**
35:8
**himself (1)**
9:23
**Historically (1)**
191:13
**hit (1)**
119:4
**hold (13)**
69:7;70:20;71:7,7,7,
13,15;73:4;82:11;
92:21;111:11,11;185:2
**home (11)**
19:17;50:16;62:7;
133:17,22;135:21;
137:3,7;156:9,12;
172:4
**homes (16)**
14:1;44:5;92:18;
95:16;125:3,4;133:12,
25;135:9;136:25;
137:18;151:25;155:16;
194:3;195:6;227:16
**honestly (1)**
149:19
**Honor (94)**
5:9,11,13,16,20;6:7,
15,22,24;8:21;10:3,9;
16:20;17:1;20:6,9,13;
22:21;24:4;28:4;31:1,
20;32:6;42:14,21,24;
49:17,19;51:12,14;
54:2;60:7,18,19;63:14;
67:15,17;68:7;69:19,
24;70:14;74:19;75:13;

78:8,14;87:25;88:14;
91:24;92:2,7;93:3;
94:20;95:17;99:3,11;
102:10;103:21;104:5;
105:7,9;107:21;
121:10;123:8;126:4;
128:10;131:1;132:21;
136:23;138:19;139:3;
141:18;142:23;144:7;
145:1,4;146:7;149:25;
150:6;157:7;159:9,12;
161:17,19;170:20;
171:7,23,24;172:10;
195:15;199:1;229:17;
230:5,9;231:9
**hood (2)**
66:18,19
**hope (3)**
17:11,12;139:12
**Hopefully (4)**
17:11;18:13;196:19;
231:14
**hoping (1)**
159:20
**hour (2)**
45:10;171:17
**hours (1)**
45:8
**house (19)**
18:11,11;47:19;48:9;
95:8;97:23;101:12;
105:23,23,23;120:8;
121:24;134:2,17;
147:24;181:18;182:17;
229:6,7
**housekeeping (2)**
5:19;171:24
**houses (24)**
11:23;38:21;46:11;
66:21,24,25;74:5;
83:16;91:12;97:25,25;
98:24;101:8;122:14,
19;125:9;130:3;136:7;
140:13;152:1;181:13,
16;182:8;196:18
**house-to-house (1)**
134:4
**how'd (1)**
95:3
**How's (1)**
171:8
**hubbub (1)**
187:18
**hurdle (1)**
137:15
**hurdles (1)**
142:21
**HVAC (2)**
61:12,16
**hydrofluoric (1)**
48:2

**idea (4)**
8:19;13:3;115:25;
182:7
**identical (4)**
82:2;83:16,22;141:3
**identification (10)**
10:14,18;14:21;
16:22;26:4,21;30:16,
25;74:18;147:12
**identified (4)**
30:18;56:21;84:20;
142:3
**Identify (2)**
82:15;100:3
**identifying (2)**
59:2;131:19
**image (1)**
23:5
**images (1)**
79:23
**Impeach (5)**
96:18;98:2;109:8;
118:11;146:17
**imply (1)**
217:6
**importance (1)**
190:18
**important (4)**
185:22;191:18;
220:19;221:18
**impression (2)**
40:7,13
**imprinted (1)**
81:9
**incidentally (2)**
206:3;209:7
**include (4)**
50:1;51:15;89:3;
143:9
**included (5)**
189:1,2;203:20;
218:19;225:1
**includes (5)**
20:17;92:23;97:11,
12,13;107:7
**Including (3)**
51:17;137:22;194:5
**incorporated (2)**
212:7;218:2
**incorrect (1)**
170:14
**incorrectly (1)**
170:12
**increase (1)**
188:8
**incremental (1)**
188:10
**incurred (1)**
229:13
**indicate (1)**

214:4

**indicated (6)**
177:11;187:5;
200:22;212:5;220:17,
19

**indicates (1)**
188:6

**indication (1)**
8:24

**indiscernible (10)**
47:2;97:23;131:10;
135:15,17;140:1;
141:16;147:22,22;
149:16

**individually (1)**
196:15

**inferences (1)**
142:15

**inflated (3)**
225:19;226:1,10

**info (1)**
57:5

**information (2)**
58:12,21

**informed (1)**
187:2

**initial (7)**
177:21;182:19;
198:4,5,7,10;200:13

**initially (1)**
71:1

**injury (1)**
175:25

**inquire (3)**
70:18,18;129:2

**inserted (1)**
137:2

**inside (1)**
48:3

**insist (1)**
55:9

**Inspect (2)**
129:1;137:25

**inspected (1)**
141:23

**inspection (1)**
108:20

**install (1)**
44:13

**installation (8)**
44:10,12;47:3;81:5;
88:15,16;92:23;93:6

**installed (2)**
12:2;113:23

**instance (2)**
21:15;70:17

**instances (2)**
128:14;162:23

**Instead (1)**
214:23

**instruction (1)**
143:3

**insulation (2)**

47:3;57:8

**intend (1)**
17:21

**intent (1)**
221:24

**intention (3)**
17:24;215:21;217:4

**intentionally (1)**
225:19

**interest (2)**
185:20;198:12

**interested (3)**
36:12;164:23;177:14

**interior (2)**
48:23;49:3

**intermediary (2)**
203:23;204:4

**into (45)**
16:20;17:20,22,24;
18:13;20:7,16;30:25;
31:3,18,22;32:4,5,8;
49:17,21;51:12,19;
56:20;67:15;83:8;87:6,
22;92:11;94:23;99:21,
24;103:21;104:10;
105:11;115:22;124:5;
142:25;143:18;145:1,
13;159:10,14;161:21;
173:5;181:4,15,23;
193:8;218:2

**introduce (1)**
20:7

**introduced (2)**
177:20;197:24

**invest (2)**
177:22;186:18

**invested (1)**
189:23

**investigating (1)**
183:7

**investing (1)**
181:22

**investment (8)**
180:24;181:2,4;
183:21;200:2,23;
201:10;211:17

**investments (1)**
180:15

**investor (11)**
39:10;40:3,4,8,11,11,
14,23;41:1,3;227:8

**investors (2)**
40:19,21

**invests (1)**
185:23

**invoice (118)**
13:15,19,22;14:9,12;
15:1;16:4,6,8;19:13,14,
18,23,25;21:7,8;22:12,
13,15,16;23:20,25;
31:8;32:1;34:19;47:5,
8,11,20;48:4,11,13,18,
19,23,24;49:1,5;53:7,

17,19,21;59:17;65:21,
22,25;67:2;70:3;72:2,
6;73:19,20;80:23;81:5;
88:15;89:5;90:23;
102:19;103:9;104:20,
24;106:3,16,23,25;
107:1;108:9,12,22,23;
109:5,7;112:5,18,19;
113:1,5;114:4;115:3;
116:13,20,23;118:1;
130:8;154:20,23;
155:12,22;156:5,8;
160:2,3,5,16,19,25;
161:7,10;162:23;
163:4,5,9,23,24;164:4,
6,11,12;165:16;166:12,
19,20,22;167:3;168:6,
15;170:12,14

**invoiced (1)**
47:4

**invoices (38)**
11:17;12:5;13:4;
16:12,21;21:18;30:7,
17;31:14;35:8;36:7;
44:17;47:10,13;49:8;
50:23;52:23;53:24;
56:10;62:15;66:9;67:6;
80:13;101:16;106:19,
24;107:6,9;117:15;
152:8;154:13,19;
156:18;162:24;163:4;
166:4;168:22;169:2

**involved (5)**
175:3,6;186:15;
190:25;223:24

**involvement (2)**
177:23,25

**irrelevant (1)**
88:22

**I-S (1)**
123:25

**Ispiravnikov (4)**
123:8,11,24;138:20

**issuance (1)**
189:6

**issue (7)**
80:16;85:19,24;86:3;
131:8;132:20;137:10

**issued (1)**
189:18

**issues (2)**
172:14;209:22

**italics (3)**
59:12;190:11,16

**item (2)**
113:21;188:5

**items (2)**
5:20;165:8

**iterations (1)**
205:16

**James (1)**
5:16

**job (44)**
19:13,15;22:4,5;
23:16,21,23,23,24;
24:1;33:24;34:21,23;
35:17;37:7;38:7;39:24;
55:8,12;62:24;66:25;
81:5;88:14;97:2,8,25;
98:13,17;110:3;
113:19,22,23;117:6;
118:1;119:8;145:20;
146:20;150:24;157:3;
169:16;170:3,3,4;
222:3

**jobs (4)**
54:25;55:17,21;
140:12

**Joe (1)**
24:23

**John (1)**
5:13

**jot (1)**
207:17

**JP (1)**
229:3

**judgment (2)**
206:25;213:3

**July (1)**
31:15

**June (4)**
30:21;31:6;227:25,
25

**jurisdictions (1)**
174:5

---

**K**

**KAG (4)**
72:22;73:19;77:21;
97:15

**KAG-2076 (1)**
164:23

**KAG-2081 (1)**
167:19

**Kagan (147)**
5:3,14,14,14;7:23,
25;9:3,5;20:24;26:14;
27:7,18;29:10;30:1;
32:11;51:22,24;52:1;
54:8,14;55:5;56:5;
78:2;93:5,12;97:24;
105:13;107:2;112:21;
113:20;114:6;115:8,
14,25;118:4;119:11;
120:10,13;121:23;
122:16;128:1,5;
148:19;154:5;162:5,
12;165:2,9,12,15;
168:11;169:11;170:11;
174:14,16,18;175:2,3,
5;176:18;177:10,21;
178:1,2;180:3;181:12;

182:3;183:1,22;185:1,
11;186:15,25;187:2,4,
6,9,15,19,23;188:17;
189:18,22,24;190:4,19,
23;191:9,14,16,24;
192:1,19,24,25;194:6,
21;195:11;196:6,9,11,
17,21;197:13,23;
198:1;199:23;202:24;
204:15,18,23;206:4,6,
18;207:3,5,7,13;210:1,
11,18,22,23;211:4,25;
212:10,19,23;214:20;
215:23;216:6,19,23,24;
217:3,4;218:9,11,18,
20;221:16;224:21;
225:8;227:4,25;
228:22;229:14

KaganDevelopment@gmailcom (3)
153:23;209:4,7

**Kagan's (15)**
23:13,25;32:23;
40:19;41:18;54:18;
55:3;109:1;122:1;
144:23;178:23;194:3,
24;195:5;209:8

**KDC (18)**
5:15;7:4;18:18;
21:15;24:1;57:23;80:1;
96:2;98:16;102:15;
103:23;104:17;105:8;
108:7;116:15;126:24;
139:19,20

**KDC00337 (1)**
14:22

**KDC337 (1)**
18:22

**KDC-358 (2)**
168:7,14

**KDC-359 (1)**
168:24

**keep (31)**
8:20;17:14;18:12;
21:21;29:5;34:18;
38:17;45:2;52:10;91:5;
95:7;99:25;105:25;
124:5;127:19;145:15,
17;157:4;160:10;
161:3,8;162:3;187:2;
213:14;215:1,12;
216:13;219:25,25;
224:7;229:19

**keeper (1)**
11:11

**keeping (2)**
127:22;224:13

**keeps (8)**
16:17;20:3;67:12;
80:10;91:21;103:19;
105:4;160:21

**kept (8)**
49:14;51:6;64:16,17;
156:25

Case 16-01120    Doc 356    Filed 06/24/19    Entered 06/24/19 09:21:27    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 243 of 256

June 18, 2019

**kind (17)**
12:1;27:23;33:6;
46:19;62:10;71:5;76:9;
84:17;85:2;86:10;
112:23;121:9;134:16,
17;151:13;227:18;
231:4

**kitchen (3)**
66:18,19;91:13

**knew (13)**
14:18;37:6;40:10,22;
177:14,19;188:25;
189:4,4;199:22;208:3;
225:2;228:15

**knowing (1)**
184:23

**knowledge (3)**
79:9;208:10;219:2

**known (5)**
174:16;175:11,22;
176:5;194:4

**knows (2)**
9:22;172:12

**Kristina (1)**
196:2

**KVC (3)**
69:19;70:2;73:20

---

**L**

**L- (1)**
129:7

**L-35 (5)**
45:18;49:18,21;
56:22,25

**L-36 (8)**
13:9;14:21;16:3,21;
17:14,20;18:16;19:2

**L-37 (7)**
126:3,6,16;128:11;
130:21;131:19,23

**L-40 (5)**
153:6;159:10;168:5,
14,24

**L-43 (10)**
63:12,17;67:16;
69:16;76:21;87:3,6,20;
96:2;98:16

**L-53 (9)**
102:7,15;103:23;
104:10;108:1,5

**labor (1)**
107:7

**land (1)**
188:19

**Lane (3)**
82:16;90:5;146:25

**language (4)**
8:5;24:15;217:24;
220:4

**lapel (2)**
71:15,16

**largely (1)**

**10:10**

**last (13)**
5:24;27:17;29:9;
39:19;61:10;100:7;
116:8;122:14,19;
150:20;170:25;199:13;
201:10

**late (3)**
109:7;169:10;171:14

**later (4)**
35:24;36:3;82:2;
194:16

**law (2)**
12:21;173:24

**lawsuit (1)**
176:23

**lawyers (6)**
25:22;26:11;63:5;
102:1;125:25;152:24

**lawyer's (1)**
24:21

**LCBK (1)**
121:9

**least (9)**
40:10;54:10,14;
83:24;84:10;132:1;
136:25;176:7;182:9

**leave (8)**
8:11;42:19;60:14;
64:18;99:7;123:4;
143:14;150:5

**leaving (1)**
8:25

**left (13)**
23:7,15;52:13,24;
65:21;73:19;76:9;
77:15,22;140:2;150:7;
154:25;158:21

**left-hand (3)**
111:14;139:19;
140:24

**legal (8)**
174:4,18,21;175:13,
16,24;176:12;204:22

**legally (1)**
205:10

**lender (3)**
197:13;222:22;223:1

**length (1)**
221:9

**less (5)**
56:15;85:13;168:6;
200:25;212:17

**letter (4)**
202:21;223:4,20,21

**Lev (1)**
196:5

**level (2)**
44:8;86:12

**liability (2)**
175:1,5

**licensed (1)**
228:16

**life (4)**
124:15;141:13,23;
208:12

**light (2)**
142:23;225:14

**lighting (1)**
134:17

**likely (1)**
212:3

**limit (1)**
93:4

**limitation (3)**
190:8;191:1,22

**limited (1)**
175:1,5

**line (20)**
27:24;29:8;37:21;
52:24;77:18,24;80:4;
164:24;188:5;199:7,
12,13,13,14;201:8;
206:14,14;211:12;
221:15,18

**lines (1)**
29:4

**Lipetsker (34)**
5:10;12:13;44:23;
62:23;63:5;101:24;
125:19;152:22;175:19,
20,22,24;177:3,4,18,
20,20;178:1,4;180:3;
183:22;186:25;192:1;
196:8;197:23,24;
204:23;209:4;210:1;
212:25;213:6;214:21;
216:19,24

**Lipetsker's (1)**
125:25

**list (2)**
143:13;191:8

**listed (1)**
191:16

**little (50)**
13:16;14:6;33:12,15,
16;35:8,15,17;38:11;
39:22,25;42:2,4;45:20;
53:16;55:13;57:3,15;
66:5;76:8,11;77:14;
84:14;86:11;90:1;95:2;
102:15;104:16;108:14;
114:5;122:5;131:18;
139:24;140:11,17;
143:5;150:18;153:9;
154:15;168:7;172:2;
177:7;188:3,8;209:14;
212:17;217:9,13;
219:24;227:18

**living (2)**
173:17;181:13

**LLC (16)**
5:3,5;186:5;196:13;
197:1;203:11,12,14,15;
204:21;205:10;220:3;
222:3,14;223:19;

**227:16**

**LLCs (1)**
196:13

**loan (16)**
183:19;184:8;
188:19;197:8;222:6,7;
224:4,11,24,24;225:3,
14;226:19;227:1,4;
228:3

**loans (3)**
183:17;188:23;
223:24

**local (2)**
56:17,18

**located (1)**
11:5

**location (3)**
181:16,17;194:4

**logically (1)**
83:17

**logo (7)**
57:2,19,19;58:4,11,
20;59:17

**logos (1)**
57:16

**long (18)**
11:7;20:23;43:18;
51:22;61:17;83:11;
100:13;105:13;124:14;
151:4;162:5;169:8;
173:19;174:16;175:11,
22;176:5;190:9

**longer (2)**
55:14;59:10

**look (33)**
8:4;27:1,13;34:3;
37:20;39:20;46:11;
50:21;55:19;56:21;
59:11;68:20;69:15;
72:2;74:1;77:11;85:1,
6;86:14;95:25;97:15;
98:16;106:3,5;108:1;
109:14;141:11;144:11;
166:25;168:4,22;
169:2;224:21

**looked (8)**
31:14;49:8;67:6;
102:23;108:3;156:19;
159:21;211:13

**looking (19)**
21:9;22:9;58:5,7;
80:15;81:22;88:14;
108:6,23;110:8,10,19,
23;117:25;134:11;
164:21;168:5;183:7;
211:9

**looks (7)**
64:12;66:21;102:25;
140:18;158:23;179:1;
227:21

**lot (8)**
32:19;54:7;55:5;
112:23;147:7;169:11;

**187:18;231:2**

**lower (1)**
158:8

**lowercase (2)**
59:10,11

**lump-sum (1)**
229:1

**lunch (1)**
171:14

**Lyman (85)**
11:24;14:10;16:7,12;
18:11;39:4,7;40:14,14,
16;41:3;44:6;45:25;
46:6,21;49:2;56:23,24;
62:8;63:25;73:20;76:5;
82:1;91:15;98:3,10;
101:8;102:19;103:9;
109:19;110:16;118:1;
119:17,18,21;120:22;
121:1,4,6;122:13,19,
20;125:4;127:3,11,17;
128:8,9;129:8;130:9,
10;131:25;132:13,13;
133:14,14;134:3;
138:5,13;139:20;
140:25;141:8;142:24;
147:2,4,8,16;148:3,9,9,
16,16;149:5;152:1;
156:7,9,14,15;158:17,
17;182:9,14,15,22;
194:4

**Lyman- (4)**
120:16;177:7,8;
193:3

**Lyman-Cutler (47)**
5:3,5;11:23;14:1;
18:17;21:15;30:4;39:9,
12,13,18;40:9;41:10,
15;42:12;44:5;46:3;
55:15,20;62:7;74:20;
95:4,10;101:7;107:15;
120:7;125:3;132:11;
145:24;148:14,23;
149:3;151:25;162:11;
177:23;179:17;180:22;
182:10;187:14;205:10,
13,20;219:20;222:12,
14,19,24

---

**M**

**Mac (2)**
56:12,13

**machine (9)**
83:18;84:3;132:7;
135:15,17,18;137:2,
5

**Madam (2)**
52:15;88:6

**magnitude (1)**
180:25

**Maiden (21)**
171:4,6;172:9,13,25;

Case 16-01120    Doc 356    Filed 06/24/19    Entered 06/24/19 09:21:27    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 244 of 256
June 18, 2019

173:3,16;178:20;
179:17;187:17;191:7;
193:15;194:2;195:13,
19,21;203:17;209:4;
214:4;230:6;231:11
**main (1)**
91:12
**majority (2)**
181:4;201:5
**makes (3)**
9:3;143:8;181:24
**making (5)**
8:9;142:14;211:5;
213:3;216:20
**man (6)**
45:12;102:3;126:9,9;
137:4;153:2
**manage (1)**
141:5
**manager (6)**
193:15,18,20,22;
214:18;215:8
**managing (10)**
191:8;193:3,5,14,17,
20;194:6,9;215:23;
216:5
**manner (3)**
14:14;48:14;84:2
**manually (2)**
163:8,13
**many (16)**
11:9;20:23;43:20;
61:20;100:16;105:22;
124:16;134:17;137:18;
151:6;175:4,16;
196:22;197:12;205:14,
16
**march (16)**
10:19;32:1;110:16,
20;111:9,11,11;163:16,
16;168:1,17;169:14,21,
22;194:16;224:10
**mark (9)**
26:1,4;76:9,11,25;
80:2,2;87:15;88:12
**marked (12)**
67:25;68:8;78:9;
86:9,20;142:12;
143:10,22;145:9,11;
155:19;178:23
**marking (1)**
79:13
**marks (2)**
74:12;83:22
**Mary (1)**
143:23
**Mass (1)**
11:6
**Massachusetts (2)**
174:6;194:5
**mat (1)**
113:17
**match (3)**

33:14;42:6;170:8
**matches (3)**
59:22,25;60:3
**material (4)**
134:10;147:19;
167:14,15
**materials (27)**
107:1,10,11;110:10;
112:8,8,20;114:13,14,
15;115:11;116:16,18,
21,22;117:3,4,5,6,7,12,
17;118:4;165:2,4,19,23
**matter (3)**
138:23;172:1;230:6
**max (1)**
229:18
**maximize (1)**
167:9
**May (44)**
6:12;9:11,11,13;
24:25;25:1,2;31:23;
63:14,15;69:3,4;70:13,
15;75:12,14;80:18;
89:18,21;102:10,11;
120:12,25;126:4,5;
130:25;131:2;133:8;
139:7;142:15,24;
144:7,8;147:17,18;
148:6,19;149:11,14,18;
195:15,16;199:1;
208:10
**Maybe (17)**
27:8;54:25;82:1;
97:19;127:21;132:3;
139:5;140:1,4;167:9;
169:16;175:25;178:3;
179:13;190:11;202:3;
206:8
**mean (40)**
7:16;8:23;14:15;
19:14;25:11;26:14,16;
28:19;32:12;37:6;41:5;
44:12;54:16;63:13;
64:17;66:9;74:4,11,12;
80:7;82:20;84:4;85:19;
120:15,18;129:19;
132:3;133:20,21;
134:3,11;140:20;
141:7,8;143:6;147:20;
165:4;166:3;185:20;
215:15
**meaningless (1)**
228:11
**means (6)**
7:23;58:3;84:8;
164:5;172:6;192:1
**meant (2)**
7:16;194:13
**mechanically (1)**
46:13
**meet (3)**
142:4;178:6;198:13
**meeting (52)**

28:18,21,21,23,24;
29:11;32:11;33:2;
35:25;36:5,14;37:3,10,
16,23,24;38:3,4;39:15,
15;177:21;178:8,12,
25;179:23;180:2,5,13,
21;182:1,12;183:2,10,
12,19;184:16,17;
186:11;198:5,10,20,22,
24;199:16;200:1,15,
21;201:12,19,24;
202:6;207:25
**meetings (7)**
32:13;41:17,19,21,
23;180:6;202:2
**meets (2)**
142:4,6
**member (5)**
191:8;193:3,5;194:6,
9
**members (3)**
194:24;211:22;
215:16
**memo (1)**
207:17
**memory (9)**
32:15,20;33:10;
55:23;114:25;207:11;
211:3;212:8,13
**mentioned (1)**
195:21
**mess (4)**
33:7;35:18;39:25;
42:4
**messed (3)**
25:18;35:15;39:22
**met (9)**
29:23;32:23;33:11;
35:9,12;36:15;38:6;
152:23;178:2
**metal (2)**
97:10,13
**Michael (11)**
12:25;22:20,22;
45:13;63:7,10;102:4;
126:9,10,15;153:2
**Micro (1)**
167:7
**microphone (12)**
43:5;45:3;61:1;
67:23;70:22,24;90:1;
99:23;123:18;124:6;
150:18;173:5
**Microsoft (5)**
101:1,6;103:5;
151:21,22
**middle (1)**
112:18
**might (14)**
5:23;17:22;36:4;
86:11;113:19;121:5;
133:1;140:6;143:14;
170:9;171:3;178:17;

204:12;217:23
**million (12)**
177:13;181:1,2;
182:17;183:16,20,21,
22,23;193:9;202:4;
226:15
**mind (1)**
18:16
**mine (5)**
116:4;131:22,24;
163:3;177:4
**minimize (1)**
167:9
**minor (1)**
171:24
**minus (1)**
185:21
**minute (2)**
83:7,8
**minutes (8)**
89:9,10;131:13;
171:10,16;229:18;
230:11,13
**miracles (1)**
191:21
**mirror (1)**
79:23
**mirrors (1)**
18:9
**misplace (1)**
114:19
**missed (3)**
21:12;26:13;114:19
**missing (2)**
112:22;167:10
**misspelled (1)**
53:10
**mistake (6)**
53:6;164:3;220:10,
12;221:1;222:1
**mistyping (1)**
156:11
**modify (1)**
193:21
**moment (16)**
15:15;23:4;36:14;
58:16;64:19;73:4;78:8,
22;87:2;138:4;139:2;
141:17;164:20;166:18;
174:5;203:17
**Monday (4)**
229:25;230:3;
231:10,12
**money (44)**
33:20;36:1,2,4;
38:25;41:21;95:10;
106:4;107:15;109:3,6;
112:21;113:21;114:3,
8,15;116:12,12;117:8,
12,17;118:6;120:22;
121:5;122:5,20;
145:23;147:7;152:13;
170:12;176:16;181:19,

23,24;183:15,16;
184:3;185:19,23;
186:17;193:10;208:3,
6;222:6
**monitored (1)**
224:15
**monitoring (1)**
224:13
**month (2)**
37:11;122:6
**months (5)**
38:4;170:1;189:8,15,
17
**more (23)**
9:7;14:15;41:6,9,11,
14;42:16;56:15;89:7;
119:4;120:11;137:23;
143:7;157:10;168:6;
169:5;175:7;178:22;
187:12;189:7;200:25;
221:5;230:13
**morning (31)**
5:9,11,13,16,18;6:14,
19;10:23;17:12;24:8,
10,11;27:19;29:9;43:4,
6;54:5,6;60:24,25;
80:19;83:9;99:18,19,
20;107:24,25,25;
229:25;230:3,6
**mortgage (1)**
184:3
**most (9)**
108:18;122:1;
139:13;169:5;185:22;
206:24;207:9;212:3;
220:19
**Mostly (4)**
11:17;174:11;
178:10;179:7
**move (15)**
15:20;16:20;17:21,
24;67:15;90:1;99:22,
23;103:21;114:9;
138:10;145:1;159:9;
161:17;167:8
**moved (1)**
138:4
**moves (1)**
61:5
**Mrs (3)**
191:14,16,24
**much (20)**
46:11;89:7;93:22;
95:12;99:4;107:17;
113:17,18,21;114:8;
140:13;146:3,20;
170:16;173:10;185:21,
23;186:17;208:3;
231:17
**multiple (2)**
196:11;206:13
**must (2)**
8:6;218:11

Case 16-01120    Doc 356    Filed 06/24/19    Entered 06/24/19 09:21:27    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 245 of 256
June 18, 2019

**myself (12)**
19:15;46:2;61:18,24;
86:13;151:1,19;
154:21;160:4,18;
161:7;163:5

## N

**nail (2)**
184:19;185:13
**nailed (1)**
185:9,17;186:12
**name (35)**
10:24,25;11:3;12:25;
35:9,11;39:18;43:7,9,
16;45:13;61:9,10,15;
63:7,10;64:25;99:21;
100:4,5,7;123:22,23,
24,25;124:10;126:9;
150:20,20,22;151:2;
154:24;172:16;173:15;
174:23
**named (1)**
24:23;102:3;153:2
**names (3)**
5:7;197:1;217:1
**native (1)**
173:25
**natural (1)**
7:4
**near (1)**
177:5
**nearly (2)**
121:19;122:3
**necessarily (3)**
33:14;39:17;211:25
**necessary (2)**
142:2;226:19
**need (23)**
9:14;15:15;22:6;
66:19;83:13;86:1;
96:12;109:2;111:1,22;
113:16;114:7;115:17;
117:21;122:5;146:12;
171:8;173:5;206:13;
217:23;227:6;230:2,18
**needed (11)**
98:2;178:11;180:24;
183:16,25,25;185:4;
191:25;213:4;225:2,2
**needs (1)**
93:14
**negotiate (1)**
187:12
**negotiated (5)**
189:13,17;190:4;
192:15;193:6
**negotiating (2)**
203:14,16
**negotiation (1)**
204:25
**negotiations (5)**
192:17;203:18,22;

205:2;207:4
**neighbor (1)**
214:11
**Neither (4)**
84:11,11,18,20
**new (14)**
13:23;23:22;31:8;
74:13;87:25;88:1;
101:12;137:6,23;
140:19;165:16;166:12,
22;174:6
**next (52)**
14:3;18:4;26:9;28:5,
19;46:23;47:15,23;
48:6,16,22;49:1,4;
53:12;57:18;65:13;
66:14;70:2;72:21;88:7;
90:15;91:8;104:1;
113:4;115:2;116:3,5;
134:3;135:10,11;
147:24,24;154:14;
155:5,8,18;156:1;
157:15,20;159:23;
161:5,14;166:19;
171:2;177:23,25;
182:9;192:5;219:10;
222:3;223:13,23
**Nick (4)**
62:23;125:19;
152:22;209:4
**Nickolay (1)**
5:10
**Nickolay's (1)**
181:18
**Nikolay (1)**
175:19
**nine (1)**
205:23
**ninety (1)**
216:21
**Nobody (6)**
205:11,12;208:3;
221:19,20;223:22
**none (1)**
9:8
**normal (1)**
122:5
**normally (1)**
55:13
**notation (1)**
23:19
**note (3)**
79:12;163:2;207:18
**notes (2)**
207:12,14
**notice (3)**
8:5;73:1;76:8
**noticed (3)**
6:16;22:12;59:1
**notified (1)**
28:23
**November (4)**
179:19;215:17;

217:20;220:7
**nowhere (2)**
214:6;218:22
**number (52)**
5:5;6:4;13:16;14:6,
20,21;16:9;19:9;22:12;
45:20;46:24;47:16;
48:6;50:9;52:14;53:17;
57:15;63:21;66:5,8;
69:17;72:22;76:16;
77:5;81:10;83:25;
86:20;87:15,18;88:2,7;
89:2,5,24;91:8;95:3;
102:15;104:6,16;
105:21;106:17;113:18,
20;144:12;153:9;
161:18;162:13;164:12;
168:6;184:24;217:9;
220:2
**numbered (8)**
66:9;126:24;155:6,8;
156:2;157:11,15;
159:23
**numbers (38)**
13:24;22:15,16;35:4,
8,9;36:16;37:5;38:5;
53:19,22;66:13;79:6;
80:23;86:5;97:19;
98:18;105:24;109:2;
112:23;113:17;116:13;
126:20;137:12;148:22;
154:15;162:23;163:4,
5,7;182:18;183:7;
184:20;185:9,14;
202:11;207:24;217:24
**numerous (1)**
190:21

## O

**OA (1)**
213:18
**oath (2)**
12:22;24:21
**object (3)**
67:17;74:19;132:25
**objected (1)**
143:3
**objecting (1)**
128:21
**objection (35)**
5:6;6:6;16:25;17:1;
20:9;31:1,20;32:6;
49:19;51:14;68:11;
78:11,12;79:12,17;
86:8,18;92:1,4,9;
103:24;104:4,9;105:9;
132:23;133:5;136:24;
141:20;143:1,6,8;
145:5;159:12;161:19;
221:20
**objections (2)**
78:24;142:9

**obligated (1)**
80:6
**obligation (1)**
194:3
**obscured (1)**
57:3
**obvious (1)**
79:23
**obviously (5)**
7:25;8:12;73:23;
79:24;80:4
**occasions (1)**
190:21
**occupancy (3)**
189:7,18;190:6
**occurred (1)**
200:14
**October (14)**
11:8;168:23;179:9,
10,24,24;208:25;
209:11,25;210:16;
211:10,13,16;212:2
**off (30)**
15:15,20,21,23;
19:16;55:12;68:21,25;
73:2;76:14,16,18;77:2,
5,6,9,18,25;79:4;84:15,
15,16;85:7;94:6;
110:16;111:10;131:6;
171:19;214:20,21
**offer (8)**
6:3;30:24;31:18;
32:4;142:24;177:11,
12;185:2
**offered (2)**
6:2;93:9
**offering (2)**
93:4;138:3
**office (20)**
24:22,22;25:7,17,18,
20;26:6;75:8;177:5,10;
178:5,6,10;180:7;
187:6;195:24;198:5,7;
199:17;201:19
**officer (3)**
7:3,6,17
**often (2)**
122:6;210:24
**omitted (1)**
217:3
**once (13)**
41:9,11;122:16;
138:23;184:5;196:4;
202:13;203:12,13;
219:9;222:3;223:4,23
**One (170)**
6:15;7:14,22,23;9:9;
10:10,17;13:23,25;
15:15;18:4;20:17;21:7,
7,19;22:10;23:4,6,7,12,
15,15;29:17;30:17,18,
21;31:13,14,15;33:20;
35:18;37:15;38:21;

39:9,10,10,11,19,25;
40:2,4,5;46:6;47:19,
22;52:24;53:7,9,15,21;
56:18,19;57:18;58:19;
59:22;63:13;65:14;
66:14;70:20,21;74:7,8,
14;77:11,14,17,18;
79:24;81:4,10,10,25;
82:6,6,8,11,15,17,19;
83:16,18,19,21,22,23;
84:1,3,11;85:10,11,20;
88:13,16;91:14;92:21;
95:24;96:4,5,5,10;
97:6;98:13;104:1,1;
106:12,23;110:18,24,
25;112:7,14;119:4;
120:11;121:24;128:12,
13,24;129:25;131:10;
132:1;134:5,8;137:23;
138:21,22;139:23;
140:24,25;141:8,9;
147:11;150:6;154:13,
15;155:15,19;156:1,
10;158:11;159:22,23;
162:19,25;165:10,12,
15;166:22;167:18,23;
168:10,23;169:4;
171:24;176:8;179:10;
182:4,8;186:17;190:7;
191:15,21,21;193:7;
201:12;202:2;209:12;
216:20;220:20;224:2;
225:20
**ones (7)**
78:12;87:25;92:6;
93:4;122:9;169:3;
196:13
**one's (1)**
168:17
**only (23)**
6:2,23;7:21;40:2;
42:11;47:9;80:16;
83:13;97:13;106:20;
112:13;116:13;138:2,
3,4;183:20,25;186:15,
18;189:2,4;201:22;
207:23
**onto (1)**
192:4
**open (2)**
13:22;217:9
**opened (2)**
23:21;52:1
**operating (32)**
179:16;180:10;
184:9,13;186:3,10;
187:3,11,14,20;189:4;
191:12;195:8;203:20;
205:13;207:16;211:10;
213:18,18;215:23;
218:3,23;219:7,9,13;
220:6,12,13;221:9,23;
226:14,17

**operative (1)**
    202:14
**opinion (1)**
    172:3
**opposed (1)**
    68:9
**oral (2)**
    207:7,10
**order (24)**
    8:6;44:11;92:3;
    107:2;117:4,5;137:10;
    146:19;155:22,23;
    164:1;165:9,13;166:6,
    9;167:20;168:1,6,12,
    15;169:14;183:15;
    185:4;226:19
**ordering (1)**
    43:13
**orders (2)**
    156:18;169:22
**ordinary (2)**
    49:14;51:6
**organization (4)**
    205:9;219:11,21;
    220:11
**orient (2)**
    26:5;179:15
**original (24)**
    59:22;72:15,23;
    79:19;80:22;82:6;
    83:25;84:4,11,21;
    86:14;128:23;129:13;
    131:20;137:4,7;
    141:21,24;142:5,6;
    145:10,11;167:14;
    215:22
**originals (22)**
    67:19,21,25;68:8;
    78:8,16;79:13,22;
    80:18,23;83:21;84:20;
    85:16,16;86:2,8;88:13;
    92:13;128:19,23;
    131:18;137:25
**others (2)**
    162:24;209:12
**otherwise (2)**
    8:24;28:19
**ought (3)**
    8:16;9:4;28:5
**out (45)**
    6:1;14:16;29:19;
    30:3;34:22;35:2,14;
    37:5;41:21;53:3,9,15,
    16;64:19;65:4;69:9;
    72:3;83:17,17;84:2,12;
    93:24;97:5;121:19;
    127:16;131:7;134:9;
    135:2;137:4;138:21;
    157:14,19;158:24;
    159:8;161:15;178:10;
    183:25;184:8;187:24;
    188:10;222:6,7;
    224:18;226:16;230:8

**outline (2)**
    228:14,17
**outlined (1)**
    194:25
**outside (1)**
    9:17
**outstanding (1)**
    37:25
**over (26)**
    5:23;36:16;38:14,15;
    39:19;40:16;69:2;
    70:23;73:4;79:10;86:8;
    119:20;120:10,13;
    169:16;174:19;181:25;
    187:14,19,24;194:21;
    196:22;199:14;204:11;
    206:19;211:17
**overall (1)**
    17:14
**overhead (2)**
    68:1;76:24
**overpaid (7)**
    37:17;38:2,7,18;
    39:3,8,11
**overrule (4)**
    86:18;92:9;142:9;
    143:8
**overruled (1)**
    143:6
**owe (9)**
    36:2,4;41:21;114:15;
    117:12,17;145:25;
    152:13;170:12
**owed (31)**
    36:1;80:14;95:10;
    98:23;107:15;114:13;
    119:20;120:6,10,12,16,
    19,20,25;122:3,16,20;
    132:11;145:23;146:3;
    147:7,16,17;148:3,9,
    14,19;149:11,14,18;
    170:16
**owes (1)**
    148:25
**own (8)**
    42:2;43:15;52:2;
    61:13,14;100:12;
    124:9;135:4
**owner (2)**
    147:21;229:7

**P**

**P&S (2)**
    185:4,13
**package (1)**
    39:10
**packet (7)**
    27:14;34:6;46:23;
    110:10;116:8;154:15;
    168:23
**page (126)**
    5:24;6:2;13:12;14:3,

24;15:1,6,9;16:3,6,9;
    19:9;20:11;22:9,25;
    26:9,20;27:1,13,16,24;
    29:8;34:3,5,8;36:19;
    37:20,21;39:20;45:20;
    46:23;47:15,23;48:6,
    16,22;49:1,4,22;50:1,1,
    9;51:15,17;53:12;
    57:18,23;58:19,23;
    59:21,25;63:20;65:13;
    66:14;69:18;70:2,7,10;
    76:21;81:1;89:23;
    90:15;91:8;102:14;
    104:1,4,6;105:8;106:8,
    20;110:8,13;111:21;
    112:2;113:4;114:10;
    115:2;116:3,5,8;
    117:21;126:19,23,23;
    128:12,13,24;144:12;
    153:8;154:7,14;155:5,
    8,18;156:1;157:15,20;
    158:8,18,20,21,25;
    159:7,19,23;160:13,24;
    161:5;162:14,19,25;
    166:18;167:3,11;
    168:13;179:5;192:5;
    193:11;199:4,7,13,14;
    201:7,11;211:8,12
**Pages (23)**
    11:17,18;18:2,16;
    20:18;46:15,16;47:12,
    13;50:22;56:11,12;
    66:13;81:9;94:12,14;
    121:8;157:10;161:14,
    23;167:14,18;178:22
**paid (87)**
    19:14,16;21:17,23;
    22:4,6,7;23:17,22,23,
    24;24:1;30:4,10,18;
    31:15,16;32:2,24;33:3,
    18;35:21;36:8,9,13;
    37:8,16;39:4,12,16,18;
    40:5,16;41:9,14;42:11,
    11;52:13;55:9,11,16,
    17,20;97:16;98:17,21;
    107:2;110:2;112:21;
    113:2,17;114:3,7,13;
    115:12,16;116:5,14,17,
    18,21;117:6,10,14;
    118:4,6,7,24;120:23;
    121:4;122:21;125:14;
    132:16;145:15,17,20;
    146:1,2;152:12,16;
    162:3;183:14;184:8;
    187:24;189:24;226:16;
    229:13
**paid-in-full (2)**
    121:1;122:19
**pain (1)**
    18:15
**paint (1)**
    48:23
**painting (6)**

43:13;44:9;48:2;
    49:3;53:10;57:7
**panels (1)**
    147:20
**paper (11)**
    5:23;10:11;22:1;
    69:8,8;71:5;72:8;73:5;
    103:16;134:19;154:23
**paperclip (8)**
    76:9,11,25;77:14,22;
    80:2;85:7,18
**papers (1)**
    27:2
**paperwork (16)**
    12:10,16;44:22;
    45:14;62:20;63:2,9;
    85:2;101:21;102:4;
    114:5;125:22;126:14;
    152:19,25;153:3
**paragraph (6)**
    192:4;194:21;
    206:14,14;211:16;
    220:2
**part (30)**
    11:10,16;15:4,5;
    16:21;28:13;64:21,24;
    93:9;103:19;105:5;
    108:17;113:10;127:19;
    136:4;137:6;143:11;
    145:23;151:18;157:4;
    160:10,21;161:3;
    205:4;208:25;216:12;
    217:16,19,22;218:10
**participating (1)**
    177:14
**particular (14)**
    10:10;70:7;74:22;
    85:6;93:4;165:23;
    174:7;177:17;183:1;
    186:7;190:19;193:21;
    194:17;205:18
**particularly (2)**
    8:19;40:15
**parties (18)**
    5:7,17;7:15;12:9;
    44:21;62:19;101:20;
    152:18;174:14;200:2;
    201:1;202:13;203:19,
    22;205:5;228:6,17,18
**parties' (3)**
    7:5,10;181:6
**partner (2)**
    215:24;216:5
**partners (3)**
    210:7;213:4;224:10
**parts (1)**
    44:14
**part-time (1)**
    151:8
**party (8)**
    7:2,3,13,19;8:11;9:6;
    181:10;186:7
**party's (1)**

8:6
**pass (2)**
    113:15;167:6
**passing (1)**
    205:3
**past (1)**
    8:4
**Paulo (4)**
    150:11,13,22;153:15
**pause (8)**
    58:3;73:13;74:15;
    117:22;118:10;138:16;
    139:14;195:12
**pay (19)**
    35:16,16;38:25;
    39:23,24;56:6;114:15;
    115:5,9,12;116:5,23,
    25;117:3;147:25;
    184:2;189:20;229:8,14
**payable (1)**
    119:17
**payee (1)**
    80:1
**paying (7)**
    33:20;35:18;39:25;
    40:2;188:10;189:21;
    206:18
**payment (9)**
    21:14;48:18;55:14;
    56:6;65:20;90:20;
    91:12;106:2;189:19
**payments (10)**
    21:21;34:16;35:8;
    38:13;52:7;95:7,8,9;
    98:19;106:1
**pays (1)**
    117:6
**PDF (3)**
    22:20;23:1;162:12
**PEDRO (2)**
    43:1,9
**P-E-D-R-O (1)**
    43:11
**pen (8)**
    80:22;81:24;82:1,13;
    83:3,22,23;84:21
**penalties (1)**
    146:20
**pending (1)**
    87:1
**people (5)**
    8:16,20;61:22;183:7;
    220:25
**people's (2)**
    85:8,9
**per (1)**
    182:17
**percent (11)**
    54:22;184:25;185:5,
    8;188:9,9;191:25,25;
    195:7;213:7;216:21
**perfect (5)**
    9:3;140:18;141:5,8;

Case 16-01120   Doc 356   Filed 06/24/19   Entered 06/24/19 09:21:27   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 247 of 256
June 18, 2019

143:8

**perfectly (1)**
141:3

**perform (8)**
11:22;12:1;44:4,19;
62:6,11;106:25;118:15

**performed (5)**
41:10;103:9;133:16;
137:13;155:2

**perhaps (8)**
24:12;50:21;67:25;
73:10;80:11,11;142:1,
3

**period (3)**
186:2;205:8;211:18

**perjury (1)**
146:20

**permit (16)**
96:12,15,23;97:5,6,
11,14;98:3,10;109:15,
19;118:15,18;146:13,
15,19

**permitted (1)**
28:6

**person (7)**
7:4,20,22;8:1;24:13;
53:2;88:19

**personal (2)**
79:9;175:25

**persons (1)**
47:9

**perspective (2)**
42:20;203:8

**Perten (67)**
5:13,13;6:22;7:2,12,
25;8:21,23;9:7;22:19;
52:16;67:20;106:7;
162:14;171:24;172:1,
7;195:15,18;199:1,3;
208:14,16,18,21,23;
209:14,16;210:14,15;
213:10,12,14,15;
214:15,16;215:1,2,12,
13;216:9,14,17,18;
217:8,11,13,14;219:17,
19,24;220:1;224:6,8;
227:13,14;229:3,4,17,
21,25;230:5,9,12;
231:9,14,16

**PERTHEN (1)**
42:21

**Peter (1)**
5:11

**phone (5)**
9:24;57:15,16;
192:18;204:11

**photo (5)**
72:13,14;80:11;
82:17;85:4

**photocopied (2)**
74:8;79:24

**photocopiers (1)**
79:4

**photocopies (13)**
84:13,23;85:5,9,12;
128:20;132:5;133:2;
137:11;138:22;140:6,
12;141:23

**photocopy (14)**
69:13;73:3,7;84:17;
130:21;132:2,3;137:2;
139:24;140:4,12,19,21;
162:4

**Photoshop (1)**
141:13

**phrase (1)**
148:3

**physical (1)**
134:19

**pick (3)**
7:22;36:21;45:2

**picked (1)**
74:25

**picking (2)**
71:8,17

**piece (9)**
22:1,2;68:25;70:6;
76:18;134:19;154:23;
180:18,19

**pieces (1)**
23:5

**pipe (1)**
112:10

**place (6)**
6:4;110:16;167:21;
178:13;179:23;184:17

**places (1)**
39:14

**plaintiffs (3)**
8:12;79:5;172:9

**PLAINTIFF'S (5)**
31:3,22;32:8;74:17;
143:18

**plan (5)**
18:5,8;162:12;
194:14;231:9

**plans (7)**
102:23;108:23;
194:5,13,14;225:13;
229:6

**plastering (1)**
57:7

**players (1)**
183:21

**pleasant (1)**
9:19

**please (94)**
5:7;6:13;10:3,8,23;
13:9;14:3,8;19:8,12;
23:1;26:21;30:14,25;
31:11,19;32:5;34:4;
36:19;37:20;42:22;
43:4,7,10;45:2;47:15,
18,23;48:6,16;50:14;
52:15;53:13;61:1,8;
66:14;90:4,21;91:8,11;

**pointing (1)**
131:23

**points (1)**
179:22

**polyurethane (1)**
32:19

**portion (5)**
19:2;158:8,21;159:3,
6

**portions (1)**
106:12

**Porto (7)**
42:24;43:1,9;52:18;
54:5;60:6,8

**P-O-R-T-O (1)**
43:11

**position (1)**
137:23

**possess (1)**
86:14

**possession (1)**
189:3

96:19;99:13,15,20,21;
100:7;102:18;108:1;
109:8;110:7,18;115:5,
8,12;116:5,23;117:21;
118:11;119:13;120:11;
123:10,12,18,22;124:6;
126:3,22;130:5;144:4;
146:17;150:18,20;
154:15;156:1,4;158:5;
160:1,15,24;161:9;
172:24;173:15,22;
208:15,21;210:1;
213:17;214:5;216:10;
217:10,18;219:18;
224:6,7

**Plumbing (26)**
99:11;100:10,12;
101:7,12,13;105:22;
106:13;107:3,11,14;
109:15;110:23;111:1,
2,3,7;112:7,8,9,10;
113:1;114:16;117:5;
118:15;137:13

**plus (1)**
185:21

**pm (8)**
171:19,20;209:1;
210:16;214:17;216:10,
15;231:18

**point (30)**
8:8,16;18:16;19:15;
30:7;35:7;36:12;52:9;
69:23;72:19;75:1;80:9;
86:17;119:4;121:18;
138:21;161:13;179:7;
182:3,20;185:1;190:3;
191:22;192:7;198:1;
200:25;203:10;216:21;
222:2;223:17

**pointed (4)**
53:3,9,15,16

**pointing (1)**
131:23

**possible (6)**
31:8;78:24;108:19;
120:8;185:20;208:6

**Possibly (1)**
204:14

**potential (1)**
180:17

**practice (6)**
21:13;52:6;127:22;
174:4;7;188:4

**precise (1)**
85:9

**predicate (1)**
92:8

**prefatory (1)**
8:5

**prefer (1)**
230:22

**preferable (1)**
178:18

**preliminaries (2)**
5:19;9:25

**preparation (1)**
24:20

**prepare (5)**
13:21;47:11;56:10;
104:21;219:10

**prepared (44)**
13:19;14:12;15:10;
16:4,7,12;19:20,23,25;
46:1,10;47:6,8,21;48:4,
13,20,24;49:2,5,11;
50:19,23;51:3;78:5;
90:8;91:17;108:21;
144:19;154:20;155:13,
24;163:4,5;199:19,23;
217:21;219:21;224:23;
225:1;227:10;228:10,
13,21

**presence (3)**
194:19;198:17;199:8

**present (2)**
178:8;180:4

**presumption (1)**
8:4

**pretty (4)**
41:11;120:8;138:24;
140:13

**previous (3)**
13:22;39:8;216:22

**previously (2)**
198:2;202:25

**price (4)**
66:24;113:6;181:1;
229:5

**prices (1)**
113:24

**pricing (1)**
182:6

**print (3)**
34:22;52:12;103:17

**printed (3)**
15:7;35:14;81:5

**Prior (15)**
29:9;94:22;137:9;
145:7;178:3;180:17;
182:21,24;186:15;
198:8,16;203:14;
207:2;218:19;220:21

**private (4)**
204:9;214:2,21;
215:19

**privately (4)**
204:12,16;215:3,14

**privilege (2)**
172:14;231:4

**pro (5)**
121:5;132:18;227:9,
10,16

**probably (21)**
26:1;53:6,7;59:17;
101:1;103:5,7;105:15;
112:19,20;114:19;
119:22;121:25;127:18;
134:6;147:3;165:16;
170:3;175:12;220:20;
230:15

**problem (8)**
31:7;72:16;92:22;
121:6;147:4;221:12,
16;226:5

**proceed (2)**
150:9;195:15

**proceeding (1)**
5:2

**proceeds (2)**
184:8;187:25

**process (7)**
36:12;47:11;55:8;
58:19;80:9;137:7;
225:10

**produce (1)**
79:22

**produced (14)**
75:10,11,21,23,25;
76:2,5;79:25;85:21;
92:13;115:23;142:11;
143:22;145:10

**producing (1)**
25:17

**production (1)**
85:18

**ProEx (1)**
7:4

**ProExcavation (1)**
5:14

**profit (12)**
180:17;185:20;
186:16;195:7;196:19,
19;200:2,12;206:17;
211:18,19;213:7

**profits (3)**
200:23;201:9;209:18

**profit-sharing (1)**
209:18

**program (4)**

Case 16-01120    Doc 356    Filed 06/24/19    Entered 06/24/19 09:21:27    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 248 of 256
June 18, 2019

11:18,18,19;103:3

**project (84)**
11:23;14:1;16:15;
21:15;33:20,20,22;
34:16,20;35:18;36:24;
37:1,3,18;38:13,14,18,
20;39:1,4;40:1,2,5,12;
42:12;44:5,22;46:4;
62:7;95:4,10;101:7,12;
107:15;118:19;119:17,
18,21;120:7,7,17;
121:19,22;122:4;
125:3;130:10,12,13,14;
132:12,17;138:5;
145:18;147:5,8,16;
148:4,9,10,15;149:7;
151:7,25;162:24;
175:5;177:8,9,15,23,
24;180:22,25;181:11,
14,23;182:23,25;
183:14;184:18;188:15,
16;208:10;218:24;
228:7

**projects (41)**
32:25;33:4,23;38:15,
15;39:7,8,8,11,16;40:3,
5,10,20,22;55:15;
119:11;120:10,13;
122:1,7,9,17;143:4;
148:18;169:7;175:2;
178:3;180:17;182:4,7,
13,21,25;186:15;
190:25;191:13;196:16,
21;198:8,16

**proof (1)**
18:10

**propagated (1)**
187:7

**properties (3)**
174:23;175:15;191:9

**property (11)**
117:16;176:15;
177:11,13;190:5,6;
191:15,17;197:4;
222:4;223:14

**proposal (55)**
45:25;46:1,21;49:7;
50:15,19;63:25;67:6;
68:21,24;73:1,24;76:6,
18;77:8;78:6,11;81:10;
83:25;84:15;89:2;90:5,
13;95:9;96:4;97:5,6,7;
114:2;127:3,11,13,16;
128:1,7;129:8;130:9,
14;133:21;134:8,9,15,
20;135:10,11;136:9,
10;137:1,5,23;139:19;
140:22;144:15,21;
155:5

**proposals (7)**
46:9;95:22;127:23;
128:18;133:11;134:21;
139:18

**proposal's (1)**
96:2

**propose (2)**
18:9;93:3

**proposed (6)**
69:16,23,23;76:21;
79:7;92:22

**proposing (1)**
69:12

**provide (6)**
44:6;125:4;151:14,
15;225:24;227:6

**provided (13)**
10:13;23:7,25;25:18,
19;46:21;174:18,22;
213:16;225:8,13;
227:17;229:12

**Providence (1)**
173:23

**provides (1)**
225:10

**providing (4)**
23:10;128:1;180:15;
204:22

**provision (4)**
190:13,23;191:7,11

**proviso (1)**
87:5

**pull (8)**
43:4;61:1,1,3;97:5;
123:18;150:18;219:17

**pulled (2)**
35:2;72:3

**punches (1)**
139:25

**purchase (12)**
174:24;175:14;
176:16;180:25;183:15,
15;184:2,21,25;196:4;
197:5;222:6

**purchased (3)**
174:23;175:14;
176:15

**purport (2)**
80:17;131:18

**purported (2)**
67:25;72:23

**purports (4)**
119:16;129:12;
142:20;147:16

**purpose (2)**
41:19,21

**purposes (1)**
230:10

**put (41)**
9:23;18:19;21:22;
23:5;28:23;38:5;46:15;
64:23;68:1;72:21,23;
76:21;86:20;87:11;
97:8;98:5;102:24;
103:16;108:23;109:13;
111:25;129:12,15;
132:4;136:3;139:12;

141:10;145:16,19,21;
146:23;154:24;162:24;
177:12;184:22;185:2,
8;190:8;191:22;
202:18;221:1

**puts (1)**
193:9

**putting (3)**
70:3;77:20;184:20

---

## Q

**quality (5)**
52:25;57:6,20;64:10;
95:6

**questionable (1)**
138:24

**QuickBooks (2)**
15:8;18:18

**quite (2)**
54:7;138:23

**quotation (1)**
113:6

**quote (1)**
113:12

---

## R

**raise (4)**
99:13;123:10;
172:24;204:6

**raised (7)**
12:9;44:21;62:19;
86:3;101:20;136:24;
152:19

**raising (1)**
209:17

**ran (1)**
137:1

**range (1)**
202:4

**rarely (1)**
187:4

**rate (1)**
207:25

**R-A-V-N-I-K-O-V (1)**
123:25

**read (24)**
21:8;28:1,5,7,7,9,13;
29:2,15,21;35:22;
37:13;38:8,22;158:16,
23;164:4,25;189:9;
192:11;194:7,25;
199:10;221:19

**reading (4)**
29:6;40:18;110:15;
155:16

**ready (3)**
94:10;139:9;171:22

**real (5)**
80:6;174:11;191:19,
19;212:20

**realization (1)**

35:25

**realized (2)**
221:22;222:1

**really (7)**
19:14;26:5;87:13;
115:1;178:14;179:15;
203:10

**reason (8)**
80:13;143:7;180:24;
200:18;203:4;213:25;
217:5;218:14

**reasonable (1)**
113:24

**reasoning (1)**
218:18

**rebuttal (1)**
86:16

**recall (28)**
22:22,24;25:16,17;
36:25;78:6;119:23;
180:12,20;182:1;
187:22;189:11;191:7;
192:17;194:20;198:21,
24,25;199:17;200:14;
201:3,4,14,18,22;
203:6,20;224:4

**recalled (1)**
200:1

**receive (4)**
34:21;95:7;116:15;
117:5

**received (4)**
29:12;34:16;36:15;
38:13

**receiving (2)**
75:19;212:2

**recognize (14)**
96:22;109:18;112:5;
115:3;118:15;130:8;
157:13,16;170:12,13;
178:20,25;179:16;
216:22

**recollection (12)**
27:12;127:25;
154:11;184:18;185:16;
191:11;200:7,8,18;
212:20,22;218:18

**reconvene (1)**
178:4

**record (35)**
5:8;10:24;15:23,24;
17:23;20:17;43:8;
49:25;52:10;61:9;
67:20;86:9,23;87:13;
88:5,11,24;94:6,7;
99:21,24,24;117:20;
118:7;119:24;144:23;
150:21;160:7,10,21;
161:3;171:19,20;
172:17;173:4

**recordkeeping (3)**
34:15;42:2,5

**records (10)**

16:17;33:13;35:3;
41:24;42:8;127:20;
157:5;164:3,24;207:12

**recount (1)**
180:20

**recurring (1)**
15:12

**red (3)**
80:24,24;163:2

**REDIRECT (2)**
41:7;229:23

**reduce (1)**
189:25

**reduced (1)**
189:23

**refer (1)**
69:21

**reference (2)**
154:8;179:22

**referenced (1)**
211:11

**referred (1)**
143:22

**referring (1)**
37:24

**refinanced (1)**
175:15

**refinancing (1)**
176:15

**reflect (4)**
67:20;80:14;217:23;
221:24

**reflected (2)**
53:23;228:6

**reflecting (1)**
48:11

**refresh (1)**
114:24

**refreshing (2)**
27:12;33:9

**regarding (1)**
201:23

**regular (10)**
16:18;20:4;67:13;
69:8;73:5;91:5,21;
103:19;105:5;160:10

**reinvent (1)**
196:25

**reiterate (1)**
84:7

**relate (3)**
13:25;19:18;46:3,6;
93:7,12;94:12,15

**related (6)**
88:15;90:23;155:15;
156:13;196:21;197:13

**relates (8)**
14:10;66:21;91:14;
128:8;147:15;156:6,7;
162:19

**relating (3)**
16:12;49:2;143:4

**relative (1)**

Case 16-01120    Doc 356    Filed 06/24/19    Entered 06/24/19 09:21:27    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 249 of 256

June 18, 2019

211:16
**reliably (1)**
80:14
**remain (1)**
86:9
**remaining (1)**
50:22
**remember (87)**
13:1;23:9;24:22;
25:9,13,19;26:6,8,16,
17;27:3,11;32:13,25;
33:4,8;36:2;37:11,12,
19;41:11;46:2;55:22;
63:6,10;74:10,13;75:8,
9,19;95:13;96:5;97:19;
98:18,19;102:23;
108:19,22;114:18;
119:24;121:6,24,25;
122:3,8,11,12,15,18,
18;125:18;127:21;
132:6;134:5;149:19,
20,21;166:10,16;
167:17;168:20;169:12;
178:14;180:6;182:13,
16;183:3,8,14,18;
184:19,21;189:16;
190:3;191:14,23;
193:8;198:19;201:4,6,
16;210:12;212:18;
218:17;220:22;224:5;
227:2
**reminded (2)**
38:6,24
**reminder (1)**
224:22
**remove (1)**
94:14
**repair (2)**
66:18,19
**repairs (1)**
14:9
**repeat (6)**
9:14;110:18;120:11;
152:15;168:13;217:18
**replacing (1)**
6:8
**replied (2)**
187:4;214:24
**replies (1)**
215:3
**reply (1)**
214:23
**repopulate (1)**
217:1
**report (2)**
69:11;71:11
**reporter (5)**
25:8;71:8,18,21,23
**represent (2)**
63:5;203:15
**representation (2)**
205:4;214:7
**representative (3)**

7:5,11;9:6
**represented (10)**
196:2,4,5,8,11;
198:2;202:25;214:4;
222:9,12
**representing (14)**
174:24;186:4;
196:15;197:8;203:10,
12,13;205:1,10;
222:15;223:1,17;
225:23;226:9
**request (6)**
8:6;109:1;164:3,24;
192:19;218:9
**requested (2)**
212:4,6
**requesting (2)**
21:14;56:6
**require (2)**
181:1;227:5
**required (8)**
7:20;192:11,15;
197:20;223:22;227:3;
228:19,21
**requirement (1)**
228:14
**requirements (2)**
142:5,6
**requires (3)**
79:2;86:12;141:21
**resending (1)**
166:2
**reserve (2)**
68:7;93:8
**residential (1)**
174:11
**resolved (1)**
185:24
**respect (15)**
21:14;50:23;79:8;
86:5;94:11,22;137:1,
14,20;138:5,6;142:14;
198:15;223:21;228:7
**respond (1)**
204:19
**responded (1)**
209:24
**responding (2)**
9:7;25:16
**responds (1)**
215:16
**response (9)**
23:9,10;75:21;77:12;
85:21;181:5;191:2;
210:10,16
**responsibilities (4)**
180:15;181:6,10;
200:24
**responsibility (6)**
181:14,17,19,21,23;
190:5
**responsible (1)**
189:19

**rest (3)**
141:3;192:3;213:8
**resume (2)**
15:25;230:24
**RESUMED (4)**
89:13;94:25;133:9;
144:2
**return (2)**
207:25;211:17
**review (7)**
142:12,13;164:5,5;
166:4;210:1,8
**reviewed (5)**
16:3;163:24;220:13;
221:8;223:10
**revised (3)**
164:2,5,24
**revising (2)**
166:3;170:11
**rid (1)**
119:14
**right (449)**
5:18;6:8;7:1;8:8;9:4;
10:5,20;13:17;15:11,
13,21;16:4;17:2;18:14;
19:1,1,5;20:15,18,20;
21:8;22:21;23:12,15;
24:10;26:15;27:10;
29:11,24;30:3,5,8,11,
13,19,22;31:2,5,6,16,
21,25;32:2,18;33:7,11,
14,19,20;34:1;35:15;
36:1,9,16;37:18;38:17;
39:1;40:13,18,23;42:8;
45:12,23;46:7;47:15,
20,23;48:13,19;49:7;
50:3,8,16,18;51:18;
53:2,9,15;54:7,12,15,
19,22,25;55:3,7,9,11,
12,15,16,21;56:3,12,
14,24;57:10,16,19,22,
24;58:4,13,18,20,21;
59:3,7,10,13,22;60:4,
14,15;61:8,17,20;62:4,
6,10;63:4,11,20;65:16,
24;66:6,12,14;67:1,4;
68:17;69:2,9,21;70:22;
71:4,22;72:10,21,23,
24;73:2,5,7,8,20,24;
74:2,6,9,10,11,13;75:3,
6,10,23;76:6,25;77:3,5,
9,11,15,18,20,22,25;
78:10,23,25;80:2,7;
83:5,9;84:6;85:8;87:4,
12,21;88:4,6;89:6,12;
91:16;92:19,19;93:8,
14,20;94:2,4,10;95:23;
96:3,7,9,12,25;97:3,8,
19;98:3,11,14,17;99:4,
9,13,23;100:3,11,13,
24;102:6,16,22;103:3,
8,14,15,18;104:11,16,
21,23;105:1,10,25;

106:19;107:4,6,13,19;
108:7,12,15,15,21,24;
109:16,22,25;110:4,15,
17,20,22,23;111:10,18;
112:5,7,8,25,25;113:2,
5,5,13;114:10;115:2,6,
6,12;116:11;117:3,18;
118:5,22,24;119:8,11;
120:2,7,10,17,19;
121:15;122:15,15,23;
123:2,6,10;124:3,14;
125:10;127:1,10,25;
128:7;129:1,8,10,19,
19,22,23;130:11,12,14,
23,24;131:15;132:10,
16,16,17,22,24,25;
133:3,21;134:7,22;
135:8,13;136:6,15,19,
20;138:10,15,17;
139:15,24;140:2,8,9,
21;141:11,11,19;
143:15,23,25;144:19;
146:13,21,23,24,25;
147:2,5,11;148:16,17,
20,23,25;149:9,12,15,
18;150:1,4;151:11,13;
152:18;153:13;154:7,
14;155:3,8,18;156:18;
157:15;158:11,16;
159:13,23;160:3;
161:13,20;162:1;
164:7,11;165:6,8,10,
13,19,20;166:20;
167:20,21,24;168:1,7,
11,18;169:9,19,22,23;
170:8,10,13,21;171:18;
172:20,23,24;173:6,10;
176:7;177:5;178:12;
179:11,16,19,25;181:7;
183:24;184:10,13;
185:2,5,9;186:25;
188:20,25;189:14;
192:21;204:15,18;
214:14,25;215:7,17;
217:10,17;218:8;
219:13,16;226:4,17,22;
229:1;230:8,14,19;
231:15,17
**right-hand (4)**
74:16;139:20;
140:25;158:8
**rise (1)**
171:21
**risk (2)**
208:7,10
**Road (44)**
14:10;16:7,12;38:25;
40:8,8,24;41:1,4;46:6,
21;49:2;63:25;76:5;
102:19;109:19;119:17,
18,21;121:19,21,22;
122:4,21;127:11;

129:8;130:9,10;
139:19,20;140:24,25;
141:8;147:5,8,16;
148:4,9,9;149:7;156:6;
158:17;182:4;194:4
**Rockland (7)**
183:20;187:25;
188:1;197:13,16,19;
222:7
**rode (3)**
120:18,18,18
**role (1)**
172:15
**roof (1)**
152:4
**room (3)**
9:23;172:2;178:9
**rough (7)**
110:16,19;111:9,16;
112:7,9,20
**roughly (1)**
212:16
**round (3)**
211:2,4;213:17
**Rule (16)**
6:25;7:2,7,8,13,14;
8:6,16;9:2,13;28:8;
79:2,20;86:10;133:4;
141:20
**rules (2)**
79:1;80:16
**ruling (7)**
68:7;87:5;92:10;
94:20,22;142:23;145:5
**run (5)**
131:7;187:9;207:5;
213:19;214:9
**Russian (4)**
24:15;173:25;206:4,
11
**Russian- (1)**
24:12

---

## S

**sale (1)**
197:5
**sales (4)**
174:25;184:21,25;
196:4
**same (113)**
5:17;14:14;19:7;
22:23;31:25;33:23;
39:9;40:3,7,13;47:12;
48:14,19;49:4;50:5,18;
53:3,17,22;56:15;
57:19,20,22,24;58:2,2,
3,10,13,16,19,20,20,21,
21,23,24,24,25;66:24,
25;72:19;74:2,5,11;
76:25;77:2,6,21,25;
79:25;80:1;85:8;92:1,
4,5,7,10,14;94:21,22;

Case 16-01120    Doc 356    Filed 06/24/19    Entered 06/24/19 09:21:27    Desc Main
Document    Page 250 of 256
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

June 18, 2019

104:13;117:15,16,25;
119:10;120:8;122:13;
128:17,18;129:16,20;
130:11,15;131:24;
133:17,20,23;134:1,4;
136:7,11,12;137:7;
140:3,8,12,13;142:25;
145:4,5,6;147:2;
157:23;159:21,22;
161:7;163:12;168:5,6,
23;179:1;182:23;
186:14;190:25;191:1;
196:17,20;206:20;
216:11,12,15;222:19
**sat (1)**
45:8
**satisfied (3)**
41:23;42:10;137:24
**saw (8)**
41:5;62:24;116:12;
117:8;225:17,18,20;
226:14
**saying (15)**
24:10;38:17;39:17;
40:15;80:20;115:8;
170:5;184:22;185:7;
191:16;192:14;201:3;
215:4;216:20;225:15
**scanning (1)**
71:4
**schedule (3)**
209:18;229:18;230:2
**scheduled (1)**
28:24
**school (1)**
173:23
**scope (2)**
137:4;154:25
**screen (23)**
22:21;23:6;52:16,18,
23;53:16;70:4;72:24;
73:11,17,18;74:17;
76:22;77:12,20;98:6;
106:6;108:2;109:14;
111:25;114:23;129:12;
139:18
**scribe (2)**
203:6,9
**Scroll (15)**
208:18;209:14,24;
210:14;213:10;214:15;
216:10,12;217:8,10,13;
219:24;224:7;227:18;
229:3
**scrolling (1)**
215:12
**scrolls (1)**
178:24
**scrunch (1)**
59:1
**Sean (1)**
5:9
**seat (1)**

61:5
**seated (5)**
10:8;94:9;99:15;
123:12;171:22
**second (43)**
9:5;13:12;14:24;
15:9;16:3;19:9;26:20;
45:20;47:19;50:9;
63:20;70:21,21;77:18;
82:19;84:1;89:23;
92:21;96:5;102:14;
110:8,18;123:25;
126:19;135:21;136:11;
137:3,7;144:12;153:8;
159:19;165:12;180:5;
183:19;184:16,17;
198:20;199:16;200:1,
14;201:12,18,24
**seconds (2)**
83:10,13
**Secretary (2)**
193:19;219:11
**section (12)**
187:17,18,19,23;
189:5;190:10,18;
191:4;193:24;194:2,
25;195:2
**sections (1)**
216:2
**seeking (1)**
214:8
**seems (4)**
85:13,14,20;154:8
**sees (1)**
172:15
**sell (2)**
196:18;215:15
**selling (2)**
191:15,17
**send (15)**
13:24;21:18;22:6;
34:19,21;78:2,3;115:8,
14;172:4;204:12;
213:17;214:5;217:4;
224:21
**sending (1)**
169:14
**sense (5)**
9:3;34:13;36:22;
84:4;143:8
**sensitive (1)**
229:17
**sent (27)**
25:6;26:23;30:8;
36:7;75:6,17;78:4;
85:10,12;114:17,24;
115:25;144:23;153:19;
154:4,12;162:12;
163:22;165:5,19,22;
166:5,8,11;169:18,23;
209:25
**sentence (3)**
53:3;194:9,13

**separate (4)**
21:23,24;79:1;85:19
**separately (1)**
143:23
**September (20)**
25:12;27:3;109:21;
153:19;154:5;165:5,
20;166:2;167:24;
169:15,20,23;170:1,6,
7,9,10;192:9;198:22;
212:17
**Sergeev (13)**
60:19,21;61:10;
68:14;73:15;74:16;
81:18,19,21;85:5,12;
95:22;99:1
**S-E-R-G-E-V (1)**
61:10
**series (2)**
50:18;186:21
**seriously (1)**
85:3
**served (2)**
188:20,22
**service (1)**
134:16
**services (6)**
44:6;151:13;174:18,
21;204:22;223:7
**session (2)**
94:8;171:21
**set (5)**
56:14;60:9,10;150:4;
197:15
**setting (1)**
220:25
**seven (2)**
38:3;221:9
**seventeen (2)**
39:6;124:15
**several (3)**
10:18;45:8;161:14
**SGC (1)**
6:4
**shall (6)**
192:11,15;194:2,15;
220:3,3
**sheet (3)**
97:10,13;128:14
**sheets (2)**
89:1,3
**shifted (1)**
84:14
**shop (2)**
80:11;85:4
**short (3)**
94:5;186:2;231:10
**shortcut (1)**
50:21
**show (13)**
12:21;26:9;34:16;
52:9;67:25;70:6,11;
110:8;113:20;119:17;

128:19;147:16;178:22
**showed (6)**
69:18;178:2;182:7,
19,20;214:6
**showing (17)**
25:5,25;26:3,5;
35:13;39:3,6;52:18,22;
75:16;114:23;118:14;
119:16;147:15;179:7,
15;190:17
**shown (4)**
69:22;133:11;179:3;
199:9
**shows (2)**
78:17;129:20
**sic (5)**
16:23;61:24;121:19;
137:13;216:25
**side (14)**
52:14;73:19,20;
74:16;79:12;111:14;
139:12,12,19,20;
141:10,10;154:25;
222:19
**side-by-side (2)**
73:11,18
**sides (2)**
222:15,17
**siding (6)**
152:4;169:16,24;
170:4,5,9
**sign (6)**
97:4;185:4;220:25;
223:11;228:18,22
**sign- (2)**
110:15;111:9
**signature (9)**
64:7;77:18,24;84:16;
127:8,9;130:18;
193:12,14
**signed (11)**
185:13;187:19,20;
195:9;219:7,9,14;
220:15;227:24;228:11,
21
**significance (5)**
53:4,10;84:24;
163:15;190:17
**significant (3)**
84:25;207:1,16
**significantly (1)**
206:16
**signing (3)**
180:9;184:21,23
**sign-off (3)**
110:12,19,22
**similar (9)**
135:9;136:25;
140:15;147:4;176:14;
182:4,5,6,8
**similarity (1)**
143:9
**similarly (1)**

197:4
**simple (1)**
148:3
**singing (1)**
70:24
**single (1)**
79:5
**sinister (1)**
85:13
**sit (10)**
12:18,21;15:20;
30:10;45:4;98:20;
132:10;170:16;201:17;
230:1
**site (3)**
62:24;162:13;194:14
**sitting (2)**
172:1;186:11
**Six (1)**
11:10
**six-page (1)**
6:2
**sixteen (2)**
43:21;105:15
**size (2)**
120:8;182:5
**skipping (1)**
29:4
**slide (3)**
52:22;106:7;162:15
**slides (5)**
22:20;52:20;53:13;
106:11;162:18
**slogan (2)**
58:12,21
**slug (1)**
58:11
**small (2)**
53:8;181:19
**smarter (2)**
9:1,2
**so-called (1)**
142:7
**Social (1)**
177:2
**soft (1)**
167:7
**software (11)**
11:15;34:15;44:1;
46:18,19;100:25;
124:25;151:17,20;
163:6;167:7
**sold (4)**
97:25,25;182:15;
190:6
**soldier (1)**
171:13
**somebody (3)**
85:9;145:20;224:21
**somebody's (1)**
61:19
**somehow (1)**
224:18

Case 16-01120    Doc 356    Filed 06/24/19    Entered 06/24/19 09:21:27    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 251 of 256

June 18, 2019

**someone (2)**
8:10;25:19
**sometime (1)**
167:8
**sometimes (29)**
21:19,19,20;31:7;
33:22;34:21;35:16;
39:23;42:4;52:12;53:7;
55:10,13;61:22;66:19;
69:10;78:5;97:6;109:6,
7;112:21,22;124:17;
125:20;140:15;145:16;
147:21;191:20;227:2
**somewhere (4)**
31:9;80:4;179:25;
202:4
**sorry (36)**
17:4;21:1,7;22:9,17;
25:15;26:19;32:20;
33:1;35:5;36:22;64:3;
78:4;81:17;90:21;
96:19;108:3;110:24;
112:2;113:25;114:21;
130:5;135:16;137:15;
139:11;141:12;149:19;
152:14;157:7;172:16;
178:23;203:16;204:1;
216:11;220:18;229:23
**sort (7)**
34:15;35:24;58:11;
68:21;76:13;190:8;
227:9
**sound (1)**
179:10
**sounded (1)**
42:1
**sounds (3)**
24:12;110:4;131:14
**space (2)**
70:19;78:5
**speak (10)**
62:25;99:23;124:5;
141:21;173:5;174:13;
177:16,18;197:23;
230:22
**speaker (1)**
173:25
**speaking (4)**
24:13;88:13;213:23,
25
**speaks (1)**
206:8
**specific (2)**
201:23;218:17
**specifically (4)**
194:23;198:25;
213:6;227:2
**specifics (2)**
201:4,16
**specifies (1)**
218:24
**spell (10)**
10:23;43:7,10;61:8;

99:20;100:4,7;123:22,
24;150:20
**spent (2)**
114:8;178:3
**spin (3)**
114:10;119:14;
147:10
**Spiranikov (2)**
149:23;150:2
**split (2)**
183:14;186:16
**splitting (1)**
185:19
**spoke (4)**
27:17;177:19;206:4,
6
**spoken (2)**
29:10;213:4
**spreadsheet (5)**
179:1;182:19,20,24;
198:24
**spreadsheets (11)**
198:15,17;199:9,10,
19,22,24;218:2,10,15,
15
**square (2)**
134:10,17
**stack (1)**
27:2
**stages (1)**
217:21
**stamp (1)**
104:6
**stamped (3)**
16:23;69:22;103:23
**Stampede (1)**
123:25
**stand (2)**
8:15;15:20
**standard (2)**
55:8;197:5
**standpoint (1)**
171:14
**Stanik (11)**
99:11,14,22;100:5;
104:1;107:20;114:12;
119:1;121:20;122:24;
123:2
**S-T-A-N-I-K (1)**
100:8
**staple (3)**
80:2;85:7,18
**Staples (13)**
65:7,8;66:2;68:17;
69:9,10;72:4;80:7,8,9;
84:12,13,16
**start (9)**
26:10;34:9,14;167:8,
8;168:25;169:18;
199:13;224:3
**started (7)**
10:9;56:17;96:15;
105:15;162:7;184:5;

189:21
**starting (1)**
211:12
**starts (4)**
14:21;27:5;138:24;
199:8
**state (10)**
5:7;10:23;43:7;61:8;
99:20;150:20;173:15;
193:19;219:11;220:7
**states (1)**
194:2
**stating (1)**
190:4
**stay (6)**
7:9,25;22:9;86:23;
164:20;166:17
**stayed (3)**
45:10;53:22;221:7
**stays (1)**
8:10
**step (3)**
15:15,19,21
**stepped (1)**
189:21
**stick (1)**
27:2
**stickers (1)**
131:18
**sticking (1)**
84:3
**still (21)**
36:1,4;37:25;55:5;
59:19;89:6;94:19;
98:20;113:25;120:25;
122:20;148:25;152:13;
167:3;168:24;170:5;
176:10;183:10;212:15;
214:2;217:10
**stock (3)**
43:13;44:11;48:2
**stop (4)**
187:6;213:23,25;
227:20
**stopped (2)**
176:23;177:10
**store (5)**
65:8,9;66:3,4,9
**straightened (1)**
93:24
**street (2)**
9:18;39:18
**strike (2)**
157:7;216:17
**string (1)**
216:12
**stroke (1)**
74:11
**strong (1)**
206:7
**struggled (1)**
148:2
**stucco (1)**

57:7
**stuff (7)**
11:17;44:13,14;
52:13;112:13;113:22;
147:23
**subcontractor (2)**
138:22;150:6
**subcontractors (2)**
6:20;229:15
**subdivide (1)**
223:14
**subdivided (1)**
181:15
**subdivision (2)**
223:16,23
**subject (2)**
93:11;142:17
**submit (2)**
109:4;165:2
**submits (2)**
188:4,5
**submitted (6)**
73:24;109:19;
118:19;140:22;195:10;
226:17
**submitting (1)**
112:17
**subpoena (21)**
23:9,10;24:22;25:6,
16;26:6,14,16;27:7;
29:13,23;36:16;75:6,7,
8,9,16;77:12;85:21;
114:17,24
**subpoenaed (1)**
207:12
**subsequent (1)**
49:8
**substance (8)**
79:6;153:12;164:8;
180:12;187:23;190:22;
230:22;231:4
**substantial (1)**
181:23
**substantially (1)**
194:16
**substantive (2)**
209:22;216:2
**subtracted (1)**
211:18
**successful (1)**
191:20
**Suffolk (1)**
173:23
**suggest (3)**
85:14;177:16;221:22
**suggested (2)**
177:18;197:22
**suggestions (1)**
177:22
**sum (1)**
181:23
**summary (4)**
15:7,7;49:22;50:1

**Supplied (2)**
12:2;194:6
**supplier (1)**
107:3
**Supply (1)**
117:5
**supplying (1)**
181:3
**support (1)**
79:17
**suppose (1)**
85:11
**supposed (10)**
6:17;10:1;41:14;
42:11;79:22;116:25;
165:16;193:22;195:5;
221:2
**Sure (33)**
5:21;7:16;9:22;
28:20;29:1;35:4;37:12;
41:11;78:19,21;84:8;
93:6;115:17;133:2;
134:6;139:1;164:22;
169:25;171:25,25;
180:3;181:24;200:16,
19,20;201:7;207:2;
217:19;219:13;224:17;
226:21;227:19;229:22
**surprise (1)**
210:25
**suspect (1)**
231:3
**swapped (1)**
80:4
**swear (1)**
146:19
**switch (1)**
52:15
**switches (2)**
137:18;147:21
**sworn (8)**
6:17;10:7;43:1;
60:21;99:14;123:11;
150:13;172:25
**system (6)**
57:8;64:10;97:12;
107:9;163:6;226:23

**T**

**tab (61)**
13:9;16:3,21;18:11,
11,13,17;19:8,9;20:7,
14,16;22:8;45:17;
49:18,21;50:5,9,22;
51:13,19;56:22,25;
63:12,17;67:16;70:3;
72:22;87:3,6,20;89:16;
91:25;92:11;94:11,14,
15;95:25;102:7,15;
103:22;104:13;105:8;
114:9;126:3,16;
128:11;144:5;145:2;

Case 16-01120    Doc 356    Filed 06/24/19    Entered 06/24/19 09:21:27    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 252 of 256

June 18, 2019

153:6,8;159:10,16,19;
161:18;163:19;164:23;
166:17;168:5,14,24
**table (1)**
183:5
**tabs (6)**
10:19,19;18:8;56:20;
161:23;224:13
**talk (10)**
32:24;33:3;36:14;
125:2;166:3;174:4;
190:19;204:15;231:2,3
**talked (2)**
92:6;140:11
**talking (10)**
58:4;85:1;103:25;
148:16;190:14;201:10;
204:5;205:8,18;211:12
**tallies (1)**
15:8
**TAMPOSI (2)**
5:11,12
**task (4)**
85:22;155:2;219:10;
223:21
**Tatiana (2)**
5:14;191:9
**taxes (1)**
151:16
**telephone (3)**
203:25;204:2,4
**telling (1)**
85:8
**template (8)**
56:15,15,18;186:14,
19;193:21;205:13;
226:22
**ten (6)**
89:9,10;175:7,18;
188:9;213:7
**tendered (4)**
80:18;83:20;84:19;
87:3
**term (7)**
189:11;190:20;
192:15,23;193:6;
194:13;221:18
**terms (30)**
174:21;177:25;
180:14,19,21;183:15;
185:23;186:9,11,12;
187:4,13;191:1;
192:25;196:21;197:2;
198:13;200:16,17;
202:14;203:19;205:5;
206:16,24,25;207:1;
220:15,20,25;228:17
**testified (24)**
7:6,7;22:22;27:3;
39:14;52:19;54:17,21;
55:2,8;56:9;68:16;
79:9;83:15;84:12;
106:10;108:11;137:21;

142:1,2;144:10;
162:18;212:24;225:19
**testifying (4)**
6:20;7:12,14;129:7
**testimony (26)**
6:18;8:12,13;24:21;
38:11;42:1;83:5;86:17;
93:25;95:3;114:12;
115:16;117:2,16;
136:25;142:16,16,18;
200:21;203:6,21;
220:24;226:7;228:12,
13;230:23
**Thanks (2)**
60:12;231:17
**That'll (1)**
15:12
**theme (1)**
15:12
**thick (1)**
27:14
**thinking (6)**
78:21;179:23;
180:13,19;183:10;
224:3
**third (6)**
16:6;81:4;136:9,10;
137:8;165:15
**thirty (2)**
54:25;146:4
**thirty-five (1)**
146:4
**though (3)**
80:16;191:24;225:16
**thought (12)**
25:10,18,20;26:11,
13;35:25;36:4;41:20;
59:1;191:18;207:5;
221:19
**three (31)**
40:4;80:21;81:1;
88:12;89:3;97:6;
100:17;106:13,20,24;
121:8;122:7,9,16;
124:17,18;133:11,25;
135:9;136:25;154:8,
12;155:15;165:8,23;
167:18;183:6;202:18;
212:16,17;219:14
**three-digit (3)**
107:1,9;116:13
**throughout (1)**
6:24
**tick (1)**
34:6
**tickets (1)**
175:25
**tie-up (1)**
94:11
**tile (5)**
81:5;88:15,16;92:23;
93:6
**times (5)**

62:24;175:4,16;
186:24;226:15
**today (17)**
5:19;10:10,19;18:9,
12;28:21;30:10;32:16;
67:19;83:20;98:20;
99:5;125:2;132:11;
142:11;143:22;170:16
**together (10)**
18:17;38:5,15,16;
39:5;64:23;108:23;
112:23;149:14;178:3
**told (30)**
16:4;17:22;23:6;
27:6;28:19,25;37:15;
64:22;95:5;133:1;
140:4;148:16;178:2;
196:8;197:22;202:2,
24;203:17;204:18;
205:6,7;207:24;213:6,
22;214:9;216:1;
218:11;221:15;225:5;
230:21
**took (7)**
110:16;162:23;
178:2;179:23;182:20;
184:17;223:7
**top (31)**
34:14;52:14;57:19,
22;58:5,6,10,20;64:24;
65:1,21;66:20;68:21,
22;76:14,16;77:2;81:5,
6;84:15;89:4;90:18;
106:16;109:24;153:15;
154:25;159:2,6;
162:15;166:25;201:11
**tops (1)**
79:4
**total (12)**
22:4,5;36:7;39:3;
120:5;155:1;164:1;
181:2;183:21;188:9;
200:25;215:15
**toward (1)**
99:23
**town (1)**
97:8
**track (9)**
21:21;34:18;52:10;
95:7;106:1;145:15,17;
162:3;163:7
**tracking (1)**
52:6
**trades' (1)**
229:8
**transaction (5)**
193:8;222:9,16,17;
229:11
**transactions (5)**
196:23;197:12,16;
205:14;206:13
**transcript (6)**
25:6;27:2,13;34:4,6,

199:5
**treat (1)**
145:6
**tremendously (1)**
111:13
**trial (7)**
5:4,6;6:24;74:17;
86:9;142:24;178:24
**tried (1)**
108:22
**trier (3)**
8:9;86:12,13
**trim (1)**
152:5
**true (19)**
9:11,13;16:11;19:22;
32:22;46:20;49:8;51:1;
67:7;90:13,25;91:19;
103:8;104:23;127:10;
144:21;156:19;160:5,
19
**Trust (7)**
183:20;187:25;
188:1;197:13,16,20;
222:7
**truth (1)**
26:8
**try (5)**
26:5;100:2;106:4;
144:11;180:18
**trying (8)**
38:18;42:6;76:24;
113:20;139:11;148:8;
186:6;217:6
**Tuesday (1)**
231:12
**turn (49)**
13:9,12;14:3;19:8,9;
22:8;36:19;45:17;
46:23;47:15;50:5,8;
57:18,23;58:23;59:21,
25;63:12,20;65:13;
66:14;70:10;71:19;
89:15,16,23;90:15;
102:7,14;104:13;
115:2;126:3,19;144:4,
5;153:6;154:14;155:8,
18;156:1;157:10;
158:7;159:16,19;
160:13;163:18;166:18;
167:3,18
**turned (2)**
131:5,6
**tweaked (2)**
197:5;217:23
**twelve (1)**
151:8
**Twenty (4)**
100:15;175:23;
176:6;230:12
**twenty-eight (1)**
32:12
**Twenty-four (1)**

173:20
**twenty-three (3)**
189:8,14,17
**twice (1)**
53:17
**twisting (1)**
39:2
**two (71)**
11:10,23;16:21;18:1,
2;20:18,18;21:19;23:5;
39:14;44:5;47:9;52:23;
53:23;55:10,17;61:22;
62:7;66:25;72:10;
73:11,17;74:5;78:23;
79:1;81:1,2,7,9,21;
82:4,8,11;83:15,21;
89:1;91:12;97:6;101:8;
106:19,24;120:10;
122:6,19;124:17,18;
125:3;131:17;138:2,3,
8,24;139:18;142:10;
143:21;148:18;157:10;
158:6,19;161:23;
167:18;169:7;180:6;
181:15;182:4,8;
183:15;184:16;194:3;
195:6;219:14
**two-thirds (1)**
27:23
**type (4)**
163:13;191:1;227:9;
228:15
**typed (1)**
25:8
**typical (1)**
136:7
**typically (1)**
204:19
**typing (1)**
167:8
**typo (3)**
165:17;221:4,5

---

**U**

**ultimately (1)**
203:20
**Um-hum (5)**
98:7,7;129:14;210:3;
224:12
**unable (1)**
189:20
**uncertain (1)**
42:2
**unclear (1)**
17:23
**under (14)**
7:8;9:15;12:22;
24:21;28:8;40:7,13;
80:16;86:10;95:8;
141:20,21;146:20;
230:21
**undergraduate (1)**

Case 16-01120    Doc 356    Filed 06/24/19    Entered 06/24/19 09:21:27    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 253 of 256
June 18, 2019

173:23

**underlined (2)**
53:3;59:12

**underlining (1)**
59:7

**underpaid (1)**
41:20

**understood (20)**
55:7;119:7;169:25;
180:23,24;194:23;
204:22;207:23;208:9;
209:8,21;210:4;218:1,
14;225:16;226:18;
228:20;229:11;230:25;
231:6

**undertook (2)**
175:2;223:14

**Unicon (7)**
123:8;124:11,12,16;
125:4;128:18;137:15

**unilaterally (1)**
191:24

**unintentional (1)**
214:23

**units (1)**
95:5

**Unless (3)**
29:5;89:7;141:10

**unrelated (1)**
74:20

**unreliable (1)**
78:17

**up (77)**
6:10,12;8:22,22;
10:5;12:21;14:16,15:8,
20;22:19;23:6;24:25;
25:8,18;34:14;35:15;
36:21;39:22;42:6;45:2;
52:10;56:14;59:1;68:1;
71:8,17;72:21,23;
73:11,17,18;76:22;
77:12;85:2,4,15;86:6;
95:3;98:5;105:20,24;
108:14;109:13;111:25;
114:23;121:9;128:15;
129:12,15,21;139:12,
18;147:11;148:22;
162:10,14;172:14;
182:18;185:5;190:11;
208:11,14;209:24;
210:14;213:10,14;
214:15;215:1,5,12;
216:9,13;217:10;
219:17;224:6;227:13;
229:3

**updated (1)**
213:18

**upfront (2)**
35:16;39:23

**upon (1)**
202:14

**upper (6)**
59:10;76:9;77:5,14,

22;108:14

**use (25)**
10:11;11:15;22:15,
16;32:19;34:15;44:1;
52:8,11;56:14,15;62:2,
4;71:15;100:24;
102:25;124:24;151:17,
20;167:7;171:10;
188:10;197:9,16;
226:25

**used (17)**
38:24;47:12;51:24,
25;53:17;56:10;103:3;
141:13;142:7;176:19;
184:2;186:14;196:6;
205:12,14;206:13;
215:18

**using (2)**
11:17;209:10

**Usually (16)**
13:22;21:22;22:3;
23:22;34:19;41:12;
64:10;107:11;134:10;
147:6,20,21;154:24;
212:20;219:12,14

## V

**V&D (2)**
94:15;128:19

**Vadim (11)**
5:14;20:23;165:9,12,
15;168:11;174:14;
177:10;180:24;212:4;
227:4

**Vadim's (3)**
25:22;26:11;35:2

**Val (1)**
172:13

**Valentin (1)**
172:17

**variance (1)**
206:19

**variation (1)**
207:4

**various (4)**
162:24;174:14;
181:6;203:19

**vendor (5)**
15:7;80:1;88:18,20;
94:13

**vendors (1)**
93:12

**vent (1)**
61:12

**version (8)**
14:20;30:17;31:13;
32:1;142:24;186:21;
187:13;211:10

**versus (1)**
5:3

**Victor (3)**
123:8,11,24

**view (1)**
8:14

**viewed (1)**
203:5

**Viktor (3)**
60:19,21;61:10

**V-I-K-T-O-R (1)**
61:10

**voice (3)**
45:3;124:5;173:8

**voiced (1)**
221:20

**voir (10)**
68:6,10,12;74:21;
78:7;79:16;92:17;
129:3;138:5;139:16

## W

**wait (6)**
9:17;55:13;109:9;
119:3;122:5;219:14

**waited (1)**
109:4

**waiting (2)**
78:19;139:10

**waiver (3)**
203:2,4;223:5

**walk (2)**
55:12;73:4

**Waltham (1)**
11:6

**wants (6)**
9:24;29:5;97:18;
187:10;214:18;218:10

**way (23)**
8:3;27:12,23;33:9,
16;53:5;73:12;77:2,6,
25;85:7;108:21;
142:21;145:6;167:15;
179:1;185:19;190:7,
17;196:20;208:20;
225:10,20

**wearing (1)**
223:17

**website (2)**
57:9;59:7

**week (7)**
21:19;55:9,10,11,20;
56:6;219:15

**weekly (1)**
229:9

**weeks (5)**
21:19;55:10;97:6;
185:25;186:1

**weird (1)**
84:17

**welcome (2)**
9:22;170:22

**well-done (1)**
84:23

**well-known (1)**
181:12

**weren't (4)**
122:10;203:9;
206:15;207:7

**What's (18)**
11:3;22:21;43:16;
52:6;57:7;61:15;84:24;
87:16;124:10;145:10;
151:2;171:2;185:16;
186:16,16;190:22;
191:11;226:15

**what's-her-name (1)**
35:2

**whatsoever (1)**
74:12

**wheel (1)**
196:25

**Whenever (3)**
94:10;139:9;171:22

**where's (1)**
184:24

**wherever (1)**
10:1

**whole (7)**
8:15;10:17;14:15;
47:3;58:15;151:16;
168:21

**who's (3)**
180:14,15;185:20

**Whose (3)**
64:1;115:20;127:4

**wife (13)**
46:2;47:9,22;51:4;
59:16;100:19,20;
101:1;102:21;103:14,
16;176:7;195:24

**windows (1)**
152:4

**wink (2)**
188:7,7

**wintertime (1)**
169:17

**wires (1)**
147:20

**wiring (1)**
137:18

**wish (1)**
138:18

**withdraw (1)**
75:1

**within (9)**
15:7;17:7;18:11;
55:20;56:6;92:14;
185:24;186:1,2

**without (8)**
8:17;132:4;136:1;
172:5;184:23;189:2;
191:15;215:16

**witness (68)**
9:5;23:5;25:2;52:19;
60:9,11;61:4;63:14;
68:7,11;69:3,5;70:13,
16;72:16;79:9;81:12,
15,18,20,25;82:6,10,

12,14,16,18,21,25;
83:2,4;86:15;89:8,19,
20,21;94:1,3;99:6;
100:2,5;102:12;
106:10;109:9;111:1,3,
5,7,22,24;118:12;
123:13;126:4,6;
130:25;142:1;144:7;
150:3;162:17;170:22,
24;173:2,6,9;230:2,25;
231:6,8

**witnesses (7)**
6:24;8:7,13,17,18;
9:8;230:21

**wo (1)**
40:23

**wonder (1)**
71:12

**Word (17)**
11:20,21;68:21;71:4;
73:1;79:5;84:14;101:1,
2,3,4,6;103:5,6;151:22;
164:5;167:10

**words (8)**
39:2;40:18;81:9;
142:7;151:21;167:9;
193:9;218:9

**work (139)**
9:24;10:1,10;11:1,
23;12:1,3,7,10;13:25;
14:9;16:15;20:1;30:4;
31:5;41:9,12,14;43:12,
14;44:4,15,19,22;46:3,
12;48:9,11;49:2,12;
50:24;51:10,24,25;
52:1,3;53:23;54:8,11,
15,17,22;55:5;61:11,
13;62:6,10,13,17,20;
67:10;89:11;90:10;
91:3;96:13,16;97:10,
13,17,20,22;100:14,
11;101:7,10,14,18,21;
103:9,12,13;104:24;
105:2,3,15;106:25;
108:12,18;109:15,16,
24;112:23;114:1,16;
118:15,21;119:18;
121:22;122:1;124:1,4,
8;125:4,9,10,12,14,21;
127:14,17;128:8;
133:16,20,20,25;134:4;
136:5,16;137:1,4,13;
146:12;148:24;150:23,
25;151:1;152:1,6,10,
12,16,19;154:25;
155:15;156:23;160:8;
162:8;168:20;169:5;
170:1,14;174:24;
175:13,17,24;176:9,12;
230:8

**worked (19)**
20:23;21:3;32:10;
51:22,24;61:18;

105:13,17;120:13;
122:9;134:5;135:21;
136:25;148:18,22;
149:5;162:5;188:16;
196:16
**workers (1)**
151:8
**working (5)**
32:23;61:18;124:9;
135:8;170:5
**works (3)**
71:14;176:7;225:10
**worry (1)**
226:10
**worse (1)**
32:20
**worth (1)**
182:21
**write (11)**
74:13;82:21;95:8;
116:23;127:16;135:23;
162:4;186:13;205:6,7;
215:14
**writing (7)**
82:13;83:17;84:2;
102:24;202:18;203:9;
207:18
**wrong (4)**
38:6;75:1;86:6;
110:24
**wrote (21)**
52:12,13;80:8;81:23;
82:1;83:16;84:12;
103:16;106:2;119:7;
127:5;135:2,22;136:5,
18;137:4;141:7,9;
145:21;184:7,9

## Y

**Yarmouth (9)**
121:19,21,22,24,25;
122:4,18,21;182:4
**year (8)**
32:20;61:25;108:17;
109:4;114:1;151:16;
168:21;170:14
**years (20)**
11:8;20:25,25;21:2,
3;25:11;45:6;97:18;
100:15;105:16;124:15;
151:5;173:20;174:17,
19;175:12,23;176:6;
212:16,17
**Yep (5)**
51:8;57:21;60:10;
83:14;201:8
**Yesterday (1)**
5:22
**York (1)**
174:6

## Z

**Zhukovskiy (5)**
176:2,13;180:4;
195:22;199:20
**zone (2)**
90:20,22

## 0

**00342 (2)**
126:24;139:21
**00380 (1)**
98:16
**00381 (1)**
73:20
**00978 (1)**
139:20
**01 (1)**
163:16
**086 (1)**
66:6

## 1

**1 (4)**
168:1,17;169:14,22
**1.3 (1)**
202:7
**1.5 (1)**
183:25
**1.6 (3)**
183:23,25;202:7
**1:18:35 (1)**
171:19
**1:30 (1)**
171:17
**1:39:11 (1)**
171:20
**10 (32)**
5:3,6;33:25;35:17;
39:24;40:14;41:3;
119:17,18,21;120:22;
121:1,4,6;130:9,9;
132:13;133:14;138:13;
142:24;147:4,8,16;
148:9,16,16;149:5;
182:5,8,14,15,22
**100,000 (2)**
149:16;184:1
**1001 (1)**
141:21
**1002 (2)**
141:21,21
**1003 (1)**
141:22
**103 (1)**
28:8
**1057 (1)**
158:12
**106 (4)**
119:13,14;147:10,12

**10th (1)**
168:23
**11:05 (1)**
94:6
**11:23 (2)**
217:12,20
**11:35 (1)**
94:7
**1103 (2)**
104:17;105:8
**111 (2)**
211:8,12
**1165 (2)**
106:17;108:9
**117 (6)**
130:4,8;142:24;
143:13,17,18
**118 (1)**
74:17
**11th (1)**
98:11
**12 (3)**
23:1;29:8;37:21
**12/5/13 (1)**
81:11
**12/6/13 (1)**
81:11
**12:42 (1)**
209:25
**12th (2)**
147:17,18
**13 (3)**
27:24;95:23;193:12
**14 (6)**
108:15;168:21;
170:7,9;208:14;217:9
**1405 (5)**
164:12;165:15;
166:11,20;167:4
**14th (1)**
179:19
**15 (5)**
120:6;170:6,10;
178:16;179:13
**15-13881 (1)**
5:5
**1540 (1)**
51:17
**1541 (3)**
50:10,11;58:20
**1542 (1)**
58:23
**1543 (1)**
58:24
**1544 (1)**
58:24
**1545 (1)**
58:24
**1546 (5)**
59:3,4,23;60:1,4
**1548 (1)**
59:25
**1549 (1)**

60:3
**155 (4)**
30:14,16,24;31:3
**156 (1)**
31:10,13,18,22
**157 (3)**
31:23;32:5,8
**158 (1)**
32:4
**15th (1)**
224:9
**16 (3)**
211:12;219:18,20
**16-1120 (1)**
5:2
**167 (1)**
5:5
**174.2 (1)**
111:21
**174.4 (1)**
117:21
**175 (34)**
10:14,18;16:21;17:7,
8,16,17,19,20;18:3,6,
10,12;19:2;20:8,16;
45:17;49:18,21;51:13,
19;56:21;58:18;67:16;
87:6,20;91:25;92:11;
103:23;128:11;145:2;
159:11,14;161:18
**176 (2)**
18:4;87:23
**18 (1)**
110:20
**18,500 (2)**
97:8;98:13
**183 (1)**
216:10
**18th (4)**
110:16;112:14;
227:25,25
**19,670 (1)**
115:6
**1980 (1)**
174:3
**199 (1)**
185:6
**1999 (1)**
61:18
**19th (1)**
113:6
**1st (1)**
163:16

## 2

**2 (1)**
167:24
**2:07 (2)**
216:10,15
**20,000 (1)**
115:5
**200,000 (1)**

184:24
**2006 (2)**
51:25;52:2
**2007 (2)**
51:25;52:2
**2011 (2)**
43:19;52:1
**2012 (7)**
162:7;179:19,24;
206:6;208:25;209:10,
11
**2013 (10)**
96:3,6,7,25;97:21;
109:22;168:23,25;
224:9;227:25
**20134 (1)**
90:15
**2014 (19)**
30:22;31:6,15;97:21;
98:11;110:16,20;
111:9;113:10;122:10;
148:19,23;149:7;
169:3,4,5,10;192:11;
194:16
**2015 (44)**
25:12;26:23;27:3;
32:1,15;54:11,14;
55:24;108:15;112:14,
18;113:6,13;114:6,24;
120:12,25;147:17,18;
148:6,19;149:11,14,18;
153:20;154:5;163:16,
16;165:6,20;168:1,17;
169:14,15,17,20,21,22,
23;170:1;198:22;
201:22;212:16;220:8
**2032 (4)**
97:16;165:12;166:9;
167:20
**2033 (9)**
72:22;73:19;77:21;
89:24;165:9;166:6;
168:6,11,15
**2035 (1)**
91:8
**2077 (1)**
159:24
**2079 (1)**
160:13
**2080 (1)**
160:24
**2081 (1)**
161:5
**2082 (1)**
161:9
**209 (1)**
227:13
**21 (2)**
30:21;224:6
**216 (1)**
106:20
**217 (1)**
106:20

LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

June 18, 2019

**2230 (2)**
81:11;89:2
**2231 (3)**
81:10,11;89:2
**228 (2)**
111:21;112:3
**23 (1)**
32:1
**23,000 (1)**
170:17
**24 (2)**
199:7,13
**25 (1)**
169:3
**250 (2)**
183:22,22
**25th (4)**
109:21;179:9,24,24
**26th (1)**
96:25
**29th (2)**
27:3;208:25
**2nd (6)**
153:19;154:5;165:5,
20;169:23;215:17

**3**

**3 (2)**
171:9;199:14
**3,500 (2)**
115:11;116:5
**3/6/14 (1)**
111:16
**3:02 (1)**
231:18
**3:30 (4)**
210:16;211:13,16;
212:2
**30 (1)**
7:14
**30- (1)**
146:5
**30,000 (1)**
158:14
**300s (1)**
87:24
**304 (2)**
5:23;6:8
**30b6 (2)**
7:7,14
**30th (8)**
194:16;209:25;
210:16;211:10,13,16;
212:2;220:7
**31 (3)**
50:6;192:8,10
**32 (1)**
19:8
**327 (1)**
50:1
**328 (1)**
45:21

**329 (1)**
46:24
**330 (2)**
47:16;57:24
**331 (3)**
47:23;58:1;76:21
**332 (3)**
48:6;58:2;110:6
**333 (2)**
48:16;58:3
**334 (1)**
48:22
**335 (1)**
49:1
**336 (1)**
49:4
**338 (10)**
13:16;16:24;88:8,9,
11,12,25;89:3;92:15,20
**339 (8)**
14:6;16:9,10,24;
143:20,23;145:11,13
**340 (2)**
18:23,24
**342 (1)**
126:20
**35 (1)**
164:13
**35,000 (1)**
146:5
**354 (2)**
153:9,11
**355 (1)**
154:16
**356 (1)**
155:6
**357 (1)**
155:9
**358 (1)**
155:19
**359 (1)**
156:2
**361 (1)**
157:11
**362 (1)**
157:15
**363 (1)**
157:20
**364 (1)**
157:22
**365 (1)**
158:1
**366 (1)**
158:3
**367 (1)**
158:5
**368 (1)**
158:7
**369 (1)**
158:18
**37 (1)**
129:8
**370 (1)**

**158:20**
**371 (1)**
158:25
**372 (1)**
159:2
**373 (1)**
159:7
**38 (2)**
16:23;88:10
**381 (4)**
63:21;69:19,20;96:2
**382 (2)**
65:14;70:2
**383 (1)**
66:15
**39 (4)**
199:4,7,13,13
**39,000 (1)**
95:14
**39,000-something (1)**
95:13
**3936 (1)**
121:9
**3rd (2)**
31:15;217:20

**4**

**4.1 (5)**
187:17,18,19,23;
189:5
**40 (1)**
199:14
**4-0 (1)**
153:6
**40,000 (4)**
120:16;148:3;
149:11,17
**45 (1)**
117:21
**46 (3)**
34:9,10,14
**47 (4)**
34:3;39:20;98:2,4
**48 (1)**
109:8
**49 (1)**
146:17

**5**

**5 (1)**
220:2
**5,000 (1)**
18:18
**5.2 (2)**
193:24;194:2
**5/12/15 (1)**
120:2
**5:21 (1)**
213:16
**5:42 (1)**
214:17

**5:53 (1)**
215:3
**50 (2)**
96:18;121:22
**500 (5)**
102:15;103:23;
104:7,8;108:7
**51 (2)**
104:14;118:11
**52 (2)**
36:22,23
**53 (1)**
36:19
**55 (46)**
11:24;14:10;16:7,12;
31:14;40:14,16;44:5;
45:25;46:6,21;49:2;
62:8;63:25;76:5;91:14;
98:3,10;101:8;102:19;
103:9;109:19;110:16;
118:1;125:4;127:3,11,
17;128:8,9;129:8;
131:24;132:13;133:14;
134:3;139:20;140:25;
147:2;151:25;156:6,7,
8,9,14;158:16,17
**56 (4)**
37:20,21;201:7,11

**6**

**6 (3)**
111:11;178:21,23
**6.1 (1)**
191:4
**603215 (5)**
70:11;71:1;72:2;
80:24;89:5
**607 (1)**
66:6
**607086 (4)**
70:4;72:12;80:25;
89:5
**607088 (4)**
70:7;72:12;80:25;
89:5
**615 (2)**
6:25;8:16
**615b (1)**
7:8
**65- (1)**
132:14
**65,000 (1)**
149:17
**674 (1)**
6:4
**679 (1)**
6:5
**6th (3)**
96:2,6;111:9

**7**

**7 (2)**
106:7,8
**7- (1)**
38:12
**7,000 (4)**
38:2,5,6;40:16
**702 (1)**
86:11
**77 (1)**
194:4
**78 (4)**
27:13,15,16,24
**79 (2)**
28:3;29:8

**8**

**8 (1)**
162:14
**8,000-dollar (1)**
38:12
**8.1 (3)**
190:10;194:25;195:2
**8.2 (1)**
211:16
**8/18/2015 (1)**
118:1
**88 (37)**
11:23;19:19;20:1;
30:21;44:5;50:15,24;
62:7;73:19;82:16;90:5,
11,23;91:14;96:4,10,
23;97:15,17;101:8;
104:20,24;118:15,19;
125:3;131:25;133:14;
134:3,6;139:19;
140:24;144:15;146:25;
151:25;156:7,10;
165:15

**9**

**9 (4)**
5:6;178:17,20,24
**9,130- (1)**
116:24
**9/23/2014 (1)**
110:22
**9/24/14 (2)**
111:18,19
**9:08 (1)**
5:1
**9:22 (1)**
15:23
**9:23 (1)**
15:24
**9:44 (1)**
215:14
**9:54 (1)**
209:1
**901 (1)**
141:20
**95 (1)**

**LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.**

*June 18, 2019*

121:8
**975 (4)**
  19:9;21:10,11;22:10
**978 (2)**
  144:12,14