**UNITED STATES BANKRUPTCY COURT**
**DISTRICT OF MASSACHUSETTS - EASTERN DIVISION**

| | |
|---|---|
| =============================== . | |
| IN THE MATTER OF: . | Case #15-13881-FJB |
| . | |
| LYMAN-CUTLER, LLC, . | Boston, Massachusetts |
| . | **Monday, June 24, 2019** |
| Debtor. . | 9:04 a.m. |
| =============================== . | |
| LYMAN-CUTLER, LLC, ALEX . | Adv. Proc. 16-01120-FJB |
| FILIPPOV and NICKOLAY . | |
| LIPETSKER, . | |
| . | |
| Plaintiffs/Counterclaim . | |
| Defendants, . | |
| v. . | |
| . | |
| VADIM KAGAN, TATIANA KAGAN, . | |
| KAGAN DEVELOPMENT KDC, CORP., . | |
| and PROEXCAVATION CORP., . | |
| . | |
| Defendants/Counterclaim . | |
| Plaintiffs. . | |
| =============================== . | |

**TRANSCRIPT OF TRIAL DAY 11 ON:**
**RE: CASE NO. 15-13881-FJB:**
**[#167] OBJECTION TO CLAIM 9 OF CLAIMANT ALEX FILIPPOV, FILED**
**BY INTERESTED PARTIES TATIANA KAGAN, VADIM KAGAN, KAGAN**
**DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.**

**RE: ADV. PROC. NO. 16-01120-FJB:**
**[#1] COMPLAINT BY LYMAN-CUTLER, LLC AGAINST VADIM KAGAN,**
**TATIANA KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION**
**CORP.**

**BEFORE THE HONORABLE FRANK J. BAILEY**

APPEARANCES:

For the Debtor-Plaintiff:      PETER N. TAMPOSI, ESQ.
     The Tamposi Law Group, P.C.
     159 Main Street
     Nashua, NH 03060

For Plaintiffs Alex Filippov    SEAN T. CARNATHAN, ESQ.
and Nickolay Lipetsker:      O'Connor, Carnathan, and Mack,
     LLC
     1 Van de Graaff Drive
     Burlington, MA 01803



For Defendants Tatiana Kagan,   JOHN H. PERTEN, ESQ.
Vadim Kagan, Kagan Development   MICHAEL R. STANLEY, ESQ.
KDC, Corp., and ProExcavation   Sheehan Phinney
Corp.:   28 State Street
  22nd Floor
  Boston, MA 02109

Electronic Sound Recording Operator:  ELIZABETH LOMBARD

Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service
eScribers, LLC
7227 N. 16th Street, Suite #207
Phoenix, AZ 85020
973-406-2250; operations@escribers.net



(973) 406-2250 | operations@escribers.net | www.escribers.net

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|
| For the Defendants: | | | | | |
| DAN GERSH | | | | | |
| (By Mr. Perten) | 8 | | 102 | | |
| (By Mr. Carnathan) | | 42 | | 110 | |

| EXHIBITS: | DESCRIPTION | I.D. | EVID. |
|---|---|---|---|
| For Defendants: | | | |
| 175 | Copy of check 289 to Dream Flooring, as part of tab L-36 | | 36 |
| For the Plaintiffs: | | | |
| BB | Audit-trail report | 69 | |
| 340 | Audit-trail report | | 76 |
| 84 | Lyman-Cutler accounts-payable-aging summary as of 12/31/15 | | 84 |
| CC | Impeach-86 | 92 | |
| 341 | Impeach-86 | | 92 |
| DD | Impeach-87 | 94 | |

escribers

(973) 406-2250 | operations@escribers.net | www.escribers.net

1    (At 9:04 a.m.)

2            THE CLERK:  All rise.  Court is now in session.

3            THE COURT:  Good morning.  Be seated.

4            THE CLERK:  Adversary proceeding 16-1120, Lyman-

5    Cutler, LLC v. Kagan, et al.; this is the day 11 of trial.

6    And case 15-13881, Lyman-Cutler, LLC; number 167, objection to

7    claim 9; trial day 11.

8            Will the parties please state their names for the

9    record?

10           MR. CARNATHAN:  Good morning, Your Honor.  Sean

11   Carnathan for Alex Filippov and Nickolay Lipetsker.

12           MR. TAMPOSI:  Good morning, Your Honor.  Peter

13   Tamposi for the debtor.

14           MR. PERTEN:  Good morning, Your Honor.  John Perten

15   for Vadim Kagan, Tatiana Kagan, ProExcavation Corp., and Kagan

16   Development KDC, Corp.  Mr. Harris is out of town, so my

17   colleague --

18           THE COURT:  Oh.

19           MR. PERTEN:  -- Michael Stanley will be pinch-hitting

20   today and tomorrow.

21           THE COURT:  Okay.

22           MR. STANLEY:  Good morning, Your Honor.

23           THE COURT:  Good morning.  I'm sorry; it's Michael?

24           MR. STANLEY:  Stanley, Your Honor.

25           THE COURT:  Stanley.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1          MR. STANLEY:  Yes.

2          THE COURT:  Okay.  Welcome to this little village.

3          MR. STANLEY:  Happy to join.

4          THE COURT:  Okay.  So any, sort of, housekeeping

5    matters before we get started today?

6          MR. PERTEN:  I don't think so, Your Honor.  We have

7    finishing-up Mr. Gersh and then we'll be done for the day.

8    Tomorrow should be --

9          THE COURT:  Oh, is it -- what about Mr. Gerten -- or,

10   I'm sorry -- "Mr. Gerten"; Mr. Perten and Gerten (sic) and

11   Gersh all together.  Mr. Maiden?

12         MR. PERTEN:  He was -- he had a court appearance

13   apparently this morning.

14         THE COURT:  Oh.

15         MR. PERTEN:  So he will start first thing off

16   tomorrow morning at 9 a.m.; we told him to be here.  And

17   that'll be followed by Von Salmi, our expert, and then Mr.

18   Doddridge --

19         THE COURT:  Got you.

20         MR. PERTEN:  -- Plaintiffs' expert.  And we're hoping

21   we'll be done tomorrow.

22         THE COURT:  Okay.  All right.  Thank you.

23         MR. CARNATHAN:  And you have some housekeeping, on

24   the summaries, that we talked about?

25         MR. PERTEN:  Yes.  Thank you, Sean.  Thank you.

1          This is on the line of housekeeping.  We were looking

2    last week at Exhibit 175 with all the subcontractors.  Exhibit

3    175 were the ones for which there had been an objection.

4          THE COURT:  I remember.

5          MR. PERTEN:  And on C-51, which was the Cutler tab

6    for BST Plumbing, we were missing the QuickBooks summary

7    sheet.  And Mr. Carnathan has stipulated that that can be part

8    of that exhibit.  So if I can hand that up.

9          THE COURT:  All right, so what you're -- you're

10   supplementing C- --

11         MR. PERTEN:  51.

12         THE COURT:  Of 1 -- of Exhibit --

13         MR. PERTEN:  175.  And then there were two more, if

14   you will, with respect -- also in Exhibit 175, Your Honor,

15   with respect to L-43 and C-41, which were both for V&D

16   Heating.  The summary sheets are in the binders but they were

17   never offered as part of the full exhibit.  Mr. Carnathan

18   stipulated that they may come in.  And the same goes -- I just

19   gave you BST.  The summary sheets for Unicon Electric, which

20   are at tab L-37 and C-33, again, they are in the binders.  So

21   those will come in.

22         And then the final piece of that, Your Honor; there

23   was an invoice, which was in the -- bear with me just one

24   moment.  Here it is.  On BST Plumbing, which is L-53, there

25   was an invoice, as part of L-53, from an entity called East

1    Coast Pipelines.  And that was the only remaining document

2    there that Mr. Carnathan has agreed can be part of that

3    original exhibit.

4            THE COURT:  Okay.

5            MR. CARNATHAN:  And just to clarify, Your Honor; with

6    regard to the summaries, the supporting materials were

7    admitted over my objection.  And so I'm not intending to

8    withdraw the objections.  What I'm saying is that those

9    materials haven't come in.  The summaries are properly part of

10   the exhibit too.  And so I'm agreeing that the summaries come

11   in too.

12           THE COURT:  All right, I understand.  You're

13   maintaining your objection to it overall but, to the extent

14   that I've overruled that objection, it's in evidence; these

15   supplements are with your -- that's with your agreement?

16           MR. TAMPOSI:  That's correct, Your Honor.

17           THE COURT:  Okay.  All right.  The record's clear.

18           Then -- and has -- just provide Mary, if you have

19   not, with --

20           MR. PERTEN:  Yes.  The only new document is the

21   document we've just handed up to the clerk.  Everything

22   else --

23           THE COURT:  Perfect.

24           MR. PERTEN:  -- is already in the binders.

25           THE COURT:  Very good.  Okay.

Page 8

DAN GERSH - Direct (Resumed)

1        MR. PERTEN:  So if we may resume with Mr. Gersh --

2        THE COURT:  Please do.

3        MR. PERTEN:  -- at this point, Your Honor?

4        THE COURT:  Please do.

5        Why don't we -- it's been long enough.  Why don't you

6    administer the oath again, Mary.  Thank you.

7                        DAN GERSH SWORN

8        THE CLERK:  Please be seated.

9        MR. PERTEN:  May I proceed, Your Honor?

10       THE COURT:  Yes.  Please do.

11       MR. PERTEN:  Thank you.

12                   RESUMED DIRECT EXAMINATION

13   BY MR. PERTEN:

14       Q.   Good morning, Mr. Gersh.

15   A.   Good morning.

16       Q.   Mr. Gersh, just to sort of orient you to where we

17   were; you testified briefly about a construction budget which

18   was utilized to build construction advances.  Do you recall

19   that testimony?

20   A.   Yes.

21       MR. PERTEN:  Mr. Stanley, could you pull up Exhibit

22   27, please?

23   BY MR. PERTEN:

24       Q.   Is this the construction budget against which the

25   construction loan was billed for advances?

DAN GERSH - Direct (Resumed)

1            MR. PERTEN:  You can -- just go down a little bit so

2    I can see the full --

3    A.   Yes.

4    BY MR. PERTEN:

5        Q.   And is there any line item for carrying costs in the

6    construction budget?

7    A.   No, there's not.

8        Q.   Okay.  Now, just about when we break (sic), we were

9    turning to the subject of the mechanic's lien.  We had looked

10   at, right before that, the May 7th letter, which was Exhibit

11   50, and there was a QuickBooks snapshot showing hard costs of

12   758,000 outstanding; do you recall that?

13   A.   Yes, I do.

14       Q.   And again, on -- just to get you back

15   chronologically to where we were; on June -- that was May 7th.

16   On June 5th, KDC was sued, which is Exhibit 64.  And then on

17   June 22nd is when the lien happened.  Do you understand that

18   chronology?

19   A.   I do.

20       Q.   So let's focus on the lien.  Did you have any role

21   in the decision to lien the properties?

22   A.   Absolutely not.

23       Q.   Okay.  Did you provide the hard construction costs

24   that were included in the lien documents?

25   A.   Yes, I did.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Direct (Resumed)

1      Q.   Okay.  And would you agree with me, sir, that the

2   hard construction costs in the lien were approximately

3   $200,000 less than the amount that was set forth in the May

4   7th letter, which was Exhibit 50?

5           MR. CARNATHAN:  Objection.

6           THE COURT:  Basis?

7           MR. CARNATHAN:  Can I have the question again?

8           MR. PERTEN:  Sure.

9           THE COURT:  You'll have to restate it, so --

10           MR. PERTEN:  I will, Your Honor.  Thank you.

11           THE COURT:  Yeah.  Okay.

12   BY MR. PERTEN:

13      Q.   The hard-construction-costs number in the lien

14   documents, was that about $200,000 less than the amount stated

15   in the May 7th letter?

16           MR. CARNATHAN:  Objection.

17           THE COURT:  Basis?

18           MR. CARNATHAN:  The amount stated in the lien was,

19   like, $3.7 million.  The amount stated in the May 7 letter's

20   758-.  I just -- I don't understand the question, truthfully.

21           MR. PERTEN:  My focus, Your Honor, in the question

22   was the hard construction costs, not the add-ons, which

23   brought it to the 2.-whatever.

24           THE COURT:  Oh.

25           MR. PERTEN:  Just the hard construction costs is all

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Direct (Resumed)

1    I'm talking about.

2            THE COURT:  Does that clarify it sufficiently for

3    you?

4            MR. CARNATHAN:  Then I'd say it's leading.

5            THE COURT:  Well, are we going to start that now?

6    It's been leading since the beginning.  Anyway, yeah, if you

7    could, I'd prefer to hear from the witness today.

8            MR. PERTEN:  Okay.

9            THE COURT:  I really would prefer to hear from the

10   witness.

11           MR. PERTEN:  Okay.

12           THE COURT:  But I'll overrule that, as he's

13   redirecting (sic) the witness at this point.

14   BY MR. PERTEN:

15       Q.  So the answer?

16   A.  Yes, it is.

17       Q.  Okay, thank you.

18           MR. PERTEN:  Now, could you bring up Exhibit 67,

19   please, Mr. Stanley?  And if you could stroll down -- scroll

20   down, sir, to the invoice, which is part of that.  Here we go.

21   BY MR. PERTEN:

22       Q.  In order to determine --

23           MR. PERTEN:  Strike that.

24   BY MR. PERTEN:

25       Q.  How would you go about determining the hard

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Direct (Resumed)

1    construction costs -- again, exclusive of the percentage add-

2    ons; how would you go about determining the hard construction

3    costs as set forth in that invoice?

4    A.    It's fairly simple, looking at this here.  The carrying

5    costs had been separated out already, which is several lines

6    down, the one that says, "Total carrying costs".

7         Q.    Okay, but I'm not talking about carrying costs.

8    A.    Right.

9         Q.    I just want hard construction costs.

10   A.    So, because carrying costs were separated out from the

11   project, the total construction costs there at the beginning

12   of this invoice, 3.738 in this version, those are the hard

13   construction costs.

14        Q.    Okay.  And then to get to the amount outstanding

15   just of hard construction costs, what would you subtract?

16   A.    It's the total cost for the project -- well, you couldn't

17   see it from this invoice; you'd have to see the accounts-

18   payable report on the Lyman-Cutler QuickBooks.

19        Q.    What is the line item that's titled "Total

20   construction payments through June 10th, 2015"?

21   A.    Those are the construction funds advanced --

22        Q.    Okay.

23   A.    -- to the project --

24        Q.    So if I --

25   A.    -- by the bank.

DAN GERSH - Direct (Resumed)

1    Q.   -- took the total construction cost and subtracted

2    the total construction payments, would that delta be the

3    outstanding amount --

4    A.   At this --

5    Q.   -- due?

6    A.   At this point in time, yes.

7    Q.   Okay.  And that's around $200,000 less than May 7;

8    correct?

9    A.   I believe so.

10    Q.   Okay.  Now, this invoice is dated June 1, 2015.  And

11    I'll represent to you that the proof of claim was filed in May

12    of 2016, roughly a year later.  As of June 1, 2015, had you

13    completed your review of the financial books and records and

14    backup for the Lyman-Cutler project?

15    A.   Definitely not.

16    Q.   Okay.  How much in the roughly six weeks between May

17    7th -- the May 7th letter and this June 1st -- how much still

18    remained to be completed in terms of your review?

19    A.   Oh, a high percentage.  I mean, I -- there was certainly

20    a lot of review and -- and research done during the month of

21    May, since I really started to get into it in April.  But I

22    vividly remember the amount of hours in June, July, August,

23    September were extremely high.  I would say percentage of

24    completion of the review, and even not adjusting many numbers

25    within the QuickBooks, because I wouldn't want to do that

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Direct (Resumed)

1  until I had done more research and was certain of stuff,

2  twenty percent maybe, total, twenty-five percent, at the time.

3      Q.   So there was roughly eighty percent that you had not

4  yet reviewed?

5  A.   Correct.  And specially made corrections, adjustments,

6  whatever it was, based on that research and review, yes.

7      Q.   Now, a moment ago I mentioned to you the proof of

8  claim that was filed in May 2016.

9  A.   Um-hum.  Yes.

10     Q.   Did you have any role in preparing the numbers that

11  were included in that proof of claim?

12  A.   Just the final numbers that -- based on all my research

13  and review and -- and updates.  Those were the numbers I

14  provided.

15         MR. PERTEN:  Your Honor, may I approach the witness?

16         THE COURT:  You may.

17         MR. PERTEN:  I'm going to hand the witness a copy of

18  the proof-of-claim document.  I have one for the Court too, if

19  you -- it's not an --

20         THE COURT:  I'll --

21         MR. PERTEN:  -- exhibit, but --

22         THE COURT:  I'll be happy to take it.  It's -- okay.

23         Thank you.

24  BY MR. PERTEN:

25     Q.   Mr. Gersh, I've placed in front of you claim number

DAN GERSH - Direct (Resumed)

1    1, which is a forty-nine-page document, which is the proof of

2    claim that has been filed by KDC.  And the first thing I'd

3    like to ask you, sir:  as of May of 2016 when this document

4    was filed with the Court, had you at that point completed your

5    review?

6    A.    Yes.

7        Q.    Okay.  And if I could ask you to flip to the

8    invoice, which is about six or seven pages in.  It's an

9    invoice dated March 17, 2016.

10        THE COURT:  It's page 7 of 49, on the top line.

11        MR. PERTEN:  Yeah, it does say at the top.  Thank

12    you, Your Honor.

13    BY MR. PERTEN:

14        Q.    Page 7 of 49.  You have that in front of you?

15    A.    Yes, I do.

16        Q.    Which numbers on that invoice were you responsible

17    for providing?

18    A.    Total construction costs and, I guess, total construction

19    payments and total carrying costs.

20        Q.    Okay.  Now, with respect to the total construction

21    costs, would you explain to the Court the process by which you

22    arrived at that number?

23    A.    The total construction costs, you said?

24        Q.    Yes, sir.

25    A.    That's literally all -- every dollar spent on the Lyman-

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Direct (Resumed)

1  Cutler project, separate from carrying costs spent on the

2  Lyman-Cutler project.

3        Q.   Okay.  In --

4  A.   Or -- I'm sorry.  To clarify:  or still due.  Or still

5  due.

6        Q.   Okay.  Did you -- in order to come up with that

7  number, did you review the invoices for each supplier,

8  laborer, that --

9  A.   Every single one.

10       Q.   -- billed on the Lyman-Cutler project?

11  A.   Yes.

12       Q.   Did you review Amex statements for the Lyman-Cutler

13  project?

14  A.   Yes.

15       Q.   Did you review the KDC bank statements and cancelled

16  checks?

17  A.   Yes, I did.

18       Q.   Were you able to review the Lyman-Cutler bank

19  statements?

20  A.   I was not, other than the several, maybe ten, that we had

21  on file still at the office. --

22       Q.   And I believe you told us that those were sent to

23  Filippov; correct?

24  A.   The bank statements were; therefore, I didn't have access

25  to them --

DAN GERSH - Direct (Resumed)

1      Q.   Okay.

2   A.   -- anymore.  Yeah.

3      Q.   So in terms of the payments directly from Lyman-

4   Cutler, those were based on the data that, as you understood

5   it -- in the QuickBooks, that you had; correct?

6   A.   Correct.  There were no -- there was no check, from my

7   end, of providing a Lyman-Cutler check or proof of payment

8   behind those.

9      Q.   Okay.  And when you added up all those numbers, is

10  that how you came up with 3,773,143.49?

11  A.   Correct.

12     Q.   Now, you also said that total construction payments

13  through June 10th, 2015 -- there's a line item.  Did you come

14  up with that number?

15  A.   Yes, sir.

16     Q.   What does that number represent?

17  A.   It is the construction -- the construction funds advanced

18  to us from the bank, for construction of the two properties.

19  And subtracted from that, 3.2 million were all the fees:

20  inspection fees and --

21     Q.   Okay, so --

22  A.   -- title fees.

23     Q.   -- does that 3-million-194 figure reflect the

24  proceeds of the construction loan after deduction for

25  inspection fees and administrative fees?

DAN GERSH - Direct (Resumed)

1    A.    Correct.  Yes.

2         Q.    So that was the financing from the bank; correct?

3    A.    Yes.

4         Q.    And if I do the math and I subtract 3-million-77- --

5    from 3-million-773 the 3-million-194 figure, would that give

6    me the total amount above and beyond the construction loan

7    that was expended for this project -- or should be expended

8    for this project?

9    A.    Yes.  Correct.

10        Q.    Okay.  And again, would you agree with me that's

11   roughly $500,000?

12   A.    Yes.  Correct.  And just to clarify because, the first

13   time, I hadn't thought of it; but yes, it's what has been paid

14   and what remains to.  Everything is from the QuickBooks.

15        Q.    Okay.  Now, you also said that you calculated the

16   total carrying costs from July 2013 through June 10th, 2015,

17   which is listed as 665,545.49; do you see that?

18   A.    Yes.

19        Q.    And if I could ask you to flip the page to page 8 of

20   49.  We have Exhibit B.

21   A.    Um-hum.

22        Q.    And then the next page, it's a chart entitled

23   "Carrying Costs".

24   A.    Yes.

25        Q.    Did you prepare that chart?

DAN GERSH - Direct (Resumed)

1    A.    Yes, for --

2        Q.    And is that the breakdown of all the numbers that

3    went into that $665,000 figure for carrying costs?

4    A.    Correct.  We considered these soft costs carrying costs,

5    compared to the construction costs.

6        Q.    And if I -- one of the columns we have, 55 -- first

7    column is carrying costs.  Is that the description?

8    A.    Yes, it is.

9        Q.    Then we have 55 Lyman and 88 Cutler.  Would that be

10   the allocation as between the two?

11   A.    Correct.  And the carrying-cost column is the description

12   of the QuickBooks category.

13       Q.    Okay.  And then it says, "Binder tab".  For example,

14   first one for Vis-home photography's L-18.  That would be

15   Lyman-18, which is part of Exhibit 174; correct?

16   A.    Correct.

17       Q.    Okay.  And so the L prefix is Lyman and a C prefix

18   is Cutler; correct?

19   A.    Yes.

20       Q.    And are all those documents that are referenced in

21   "Binder tab" part of the proof-of-claim binders?

22   A.    Yes.

23       Q.    And would you agree, sir, in terms of the large

24   numbers, we've got interest expense, 186,199; another interest

25   expense, 99,903; and another interest expense, of 94,905?  Do

DAN GERSH - Direct (Resumed)

1   you see those three entries?

2   A.   Yes, I do.

3        Q.   Would those reflect the debt service for the two

4   construction loans and the purchase-money loan?

5   A.   Correct.

6        Q.   And were there any markups or anything, or is that

7   just whatever the bank billed?

8   A.   The monthly bill from the bank and auto payments -- auto

9   debits.

10       Q.   And similarly, there's $17,000 for insurance

11   expense.  Again, is that just whatever the -- that was the

12   insurance for the property; is that correct?

13   A.   Over the course of that time, yes.

14       Q.   Okay.  And then the last one I want to ask you

15   about, sir:  taxes, property, of $132,00 and change; you see

16   that entry?

17   A.   Yes, sir.

18       Q.   Were those the real-estate taxes?

19   A.   Yes.

20       Q.   Okay, and again, those are what they are; that's not

21   markup or anything; correct?

22   A.   Correct.  Yeah.

23       Q.   And again, the backup for the real-estate taxes we

24   would find in Exhibit 174, at L-23 and C-20; is that correct?

25   A.   Correct.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Direct (Resumed)

1    Q.   And does this chart set forth a true and accurate

2    summary of how you came up with that 665- number?

3    A.   Yes, it does.

4    Q.   Now, sir, if I could ask you to flip back now to

5    page 4 of 49.  Do you have that in front of you --

6    A.   I do.

7    Q.   -- the attachment to amended claim of Kagan

8    Development?

9    A.   Yes.

10   Q.   Do you see that?  And that is a summary, if you

11   will.  And on the second page, so page 5 of 49, the top bullet

12   point says, "Cost for construction still owed to KDC".  You

13   have -- and it's 578,528, and there's an explanation as to how

14   you got to that number; do you see that?

15   A.   Yes, I do.

16   Q.   To the best of your knowledge based upon your

17   analysis, is that an accurate number, exclusive of the

18   percentage add-ons?

19   A.   Yes, it is.

20   Q.   Okay.  And similarly, the fourth bullet point talks

21   about the carrying costs broken out in Exhibit C.  Is that an

22   explanation as to how those numbers were arrived (sic)?

23   A.   Correct.

24   Q.   How confident are you in these numbers?

25   A.   One hundred percent.

DAN GERSH - Direct (Resumed)

1      Q.    And why do you say that with such surety?

2   A.    The amount of hours, the amount of double checks, triple

3   checks, invoices, proposals that we went through, copies and

4   scans we made to put in and -- and support every single

5   number, and number of times that we went through it.  I'm one-

6   hundred-percent confident in these.

7      Q.    And how many hours would you estimate you spent

8   going through the backup, going through the numbers, to ensure

9   that you had an accurate accounting?

10  A.    With the help of our part-time bookkeeper at the time, we

11  spent almost every single hour of her twenty to thirty hours a

12  week, and then I'd say a solid thirty of mine, times at least

13  six months.  Six months times sixty, so -- whatever that is.

14  Sixty hours a week, roughly, for -- for six months.

15     Q.    Okay.  And this was in addition, sir, to your normal

16  duties?

17  A.    Yes.

18     Q.    Okay.  Now, with respect to the percentage add-ons

19  to the invoice on 7 -- page 7 of 49 of the proof of claim,

20  that's a strict multiplication off of the hard construction

21  cost that you found; is that correct?

22  A.    Could you repeat that one more time?  Sorry.

23     Q.    Sure.  Do you know how those were calculated?  Are

24  those just a percentage of the total construction costs?

25  A.    I missed the beginning of the question, I'm sorry.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Direct (Resumed)

1    Q.   The percentages, which you said you weren't the one

2  who actually --

3  A.   Oh.

4    Q.   -- calculated --

5  A.   Okay.

6    Q.   -- what's your understanding as to what that is?

7  A.   Yeah.  That -- I wasn't a part of those conversations

8  but, from my understanding, a percentage of the contract, off

9  these numbers.

10    Q.   Now, do you have page 7 of 49 in front of you, sir?

11  A.   Yes.

12    Q.   Based upon your review, do you believe that the

13  numbers set forth in the construction -- in the invoice there

14  are accurate?

15  A.   All the numbers?

16    Q.   Yeah.

17  A.   I think we did not adjust our office overhead after that

18  first calculation, but at that point it really doesn't matter.

19  But yes, the carrying cost, the construction cost, the fees

20  and the percentages applied, yes, there; correct.

21    Q.   And when you say you didn't adjust it, what are you

22  referring to?  Is it -- this is dated March of 2016 and you

23  haven't carried it forward beyond that; correct?

24  A.   Yes.

25    Q.   Okay.

DAN GERSH - Direct (Resumed)

1   A.   I also believe, if you look back at our -- I don't know

2   what -- oh, actually; yeah.  Yeah, if you actually look at the

3   previous one that's still up on the screen, dated June 1st,

4   2015 --

5        Q.   Yep.

6   A.   -- you'll notice KDC office overhead.  That's only

7   talking about Vadim but, you know, that number didn't change

8   compared to March 2016.

9        Q.   Okay.

10  A.   Obviously, all those hours -- the majority of the hours I

11  just mentioned were added after, so that number isn't even

12  adjusted for that.

13       Q.   And as you sit here today, is exclusive of interest

14  and these -- whatever's happened since then is the amount due

15  to KDC, 2,021,858.39?

16  A.   Absolutely.

17       Q.   Now, to the extent, sir, that the amount of

18  indebtedness incurred on this project exceeded the 3.2 that

19  you had available from the construction loan, who paid those

20  numbers?

21  A.   We put in additional funding when -- when money was

22  necessary.

23       Q.   When you say "we", is that KDC?

24  A.   Correct.  Yes.

25       Q.   Now, sir, I'd like to talk to you very briefly about

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Direct (Resumed)

1    the proof-of-claim binders themself (sic).

2          MR. PERTEN: And, Your Honor, there -- these would be

3    Exhibit 174 and 175. And again, just to orient the Court, 174

4    has four binders; the first two are Lyman Road; the second two

5    are Cutler. And then 175 was the ones that were objected.

6    But those five binders make up the backup, if you will, for

7    the proof of claim that has been presented.

8    BY MR. PERTEN:

9          Q.   Did you prepare those proof-of-claim binders?

10   A.   Yes, I did.

11         Q.   And again, could you briefly explain how you went

12   about preparing those proof-of-claim binders?

13   A.   The process was really to make QuickBooks, as much as

14   possible, the documentation point for verifying the total

15   numbers for the project.

16         Q.   Now --

17   A.   So --

18         Q.   Let me stop you there for a moment. When you refer

19   to "QuickBooks", is the QuickBook (sic) summaries that are

20   part of the proof-of-claim binders -- are those the same

21   summaries that were provided to the Filippov people roughly a

22   year prior, or had they been altered in any fashion?

23   A.   They -- yeah, that was at the very beginning of the

24   research, so the -- they -- many changes were accounted for,

25   after that.

DAN GERSH - Direct (Resumed)

1    Q.   Okay, so those QuickBook summary sheets, if you

2    will, those are after your audit; correct?

3    A.   Correct.  Yes, the ones in the -- in the binders are

4    final; yes.

5    Q.   Okay.  So if you could continue.  So what else did

6    you do to prepare those proof-of-claim binders?

7    A.   The -- on the front end of it, there was a lot of

8    organization to make sure that, because there were two

9    properties within the QuickBooks -- I believe we discussed

10   this previously, yes --

11   Q.   Yeah.

12   A.   -- my main goal was to organize it so it'd be simpler and

13   easier for me to go through the entire process.  So categories

14   were -- if they were only on one house, made sure that they

15   were in both places.  For the most part, tried to also equal

16   them, if -- if simple enough, for a lot of the subcontractors,

17   per house, that they were the same amount for each, to make

18   sure that they ended up having the same numbers and the same

19   bills on both sides.

20       And the summary pages were really the documentation, the

21   summary, per each subcontractor or category.  And, yeah, all

22   the support behind it had to confirm what were on those

23   summary pages.

24   Q.   And were you able to essentially confirm to the

25   penny the number of dollars that were spent or which are to be

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Direct (Resumed)

1  spent on this project?

2  A.   Yes, especially for the big subcontractors, the big

3  bills.  There's a lot of tiny bills -- electricity and, you

4  know, the -- the small refuse bills for the Town of

5  Brookline -- that are all through the Lyman-Cutler checkbooks.

6  So, obviously those checks weren't provided, but --

7      Q.   Obviously.

8  A.   -- everything else is in there.

9      Q.   Now, you mentioned briefly last week that there was

10  a small percentage of QuickBook entries where you didn't

11  initially have the backup; do you recall that?

12  A.   Yes.

13     Q.   How did you go about getting the backup?

14  A.   Searched high and far within our office, in our filing

15  cabinets.  If there was nothing there, checked email, looked

16  on the shared drive that we had at the office.  But most

17  documents weren't kept electronically at that point, but

18  certainly tried to save them all, going forwards (sic).  And

19  our final attempt was to directly reach out to vendors and/or

20  subcontractors, through email or -- or, if they were by --

21     Q.   Okay.  At any point did you ask subcontractors to

22  make fictitious documents?

23  A.   Never.

24     Q.   At any point did you dictate to them the numbers in

25  their invoices?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Direct (Resumed)

1   A.   Not once.

2      Q.   At any point did you alter any of the backup?

3   A.   No.

4      Q.   At any point did you ask any of the subcontractors

5   to alter any of the backup?

6   A.   No.  I made notes if we paid a bill or something,

7   sometimes, on it.  You may see some notes, but --

8      Q.   Handwritten notes?

9   A.   Handwritten, but nothing altered; just notes on top.

10     Q.   Okay.  Now, it's been pointed out that some of the

11  invoices have dates on it that are perhaps months after the

12  project was completed.

13  A.   Yes.

14     Q.   Do you have any explanation as to how that would

15  have occurred?

16  A.   Yes.  The several vendors that we did in fact need to

17  reach out to in the end had auto reports or whatever they

18  generated, whatever they used in -- in their system or at

19  their home; would put a date on there.  Off -- I think there's

20  maybe only a handful of them; three or four.  I know off the

21  top of my head a few of them; yeah.

22     Q.   Regardless of the dates of the invoice, did you

23  confirm that there was actually a payment that corresponded to

24  the invoices that were provided?

25  A.   Yes.  If -- if -- if there were payments made, whether it

DAN GERSH - Direct (Resumed)

1    be to an invoice or to -- you know, off of a proposal,

2    separate from these invoices or proposals that were sent in

3    later, that's real money.  So if it was paid by Kagan

4    Development, you will see a check or an Amex charge.  If it

5    was paid by Lyman-Cutler, it's in the Lyman-Cutler bank

6    statements two years earlier or whatever it is.

7        Q.   And with respect to the Lyman-Cutler checks, did you

8    provide at least the check number and amount so that it could

9    track that?

10   A.   If it was in the -- in -- if it was in the QuickBooks

11   file, yes, it was.  But again --

12       Q.   Okay.  Now, you've been at KDC now roughly five

13   years?

14   A.   Yes; almost five.

15       Q.   Have you -- as you've become more familiar with the

16   KDC business, is it typical to get invoices months after work

17   is completed, from the subcontractors?

18   A.   There's certainly a lot less of it, but back then it

19   was -- it was often.  And there're -- there're definitely

20   subcontracts -- subcontractors in particular that would take a

21   very long time.  But these days, I ask for proposals ahead of

22   any kind of down payment or deposit that anyone's asking for,

23   for invoice backup.  If -- if somebody says they need to get

24   this for us or get this item for a project, I make sure

25   that -- we need receipts right then and there.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Direct (Resumed)

1      Q.   Now, in preparing the proof-of-claim binders which

2   are Exhibits 174 and 175, did Joseph Cohen have any role

3   whatsoever in preparing those documents?

4   A.   Absolutely not.

5      Q.   And in calculating the total construction cost, did

6   Mr. Cohen have any part in it?

7   A.   Nope.

8      Q.   That was the number you provided to him?

9   A.   Correct.

10      Q.   Now, sir, if I could ask you to pull out Exhibit

11   175, which is 8 of 8 in the skinny binder, which you should

12   have in front --

13   A.   Oh.  Yes.

14      Q.   -- of you, right in the right --

15   A.   Um-hum.  5 of 8, or --

16      Q.   5 of 8.  I'm sorry.  Binder 5 of 8, which is Exhibit

17   175.

18          MR. PERTEN:  Your Honor, it's the skinny one at the

19   back, I believe, of your --

20   BY MR. PERTEN:

21      Q.   And if I could ask you to turn to tab L-37, which is

22   one of the Unicon Electric --

23   A.   Yes.

24      Q.   -- binder -- invoices.

25   A.   Yep.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Direct (Resumed)

1    Q.   And I would like you to just look at the QuickBooks

2    summary.

3    A.   Yes.

4    Q.   Based upon -- could you sort of walk us through how

5    to read that summary?

6    A.   Sure.  So this is a perfect example of the difference

7    between my preferred bookkeeping practices and the previous

8    bookkeeper's ways.  This summary page shows this category,

9    this account.  So Unicon Electric's work for 55 Lyman shows

10   that he was paid initially $10,000, in that first line in

11   September of 2013; another $10,000 through this account, in

12   February; another 10- in March -- sorry, another 5- in March;

13   another 10- in April.

14       As you can tell, that left -- left column just shows

15   "check" and the date and the number.  So if we are -- if we

16   had only seen those first four lines, we would have only seen

17   that there was 35,000 paid to this subcontractor for 55 Lyman.

18       The last line there, bill of April 28th, 2015 for 30,000

19   is what I was speaking to previously about how it should be

20   put in is, whatever bill is outstanding or bill from the first

21   place should be put in as a bill, and then any payments

22   applied -- or made to that subcontractor should be applied to

23   that bill.  So if, for example, another $10,000 check was paid

24   out after that, the next line would say, "bill payment",

25   whatever date it was, and then you would see -- the balance on

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Direct (Resumed)

1   the right would drop down 10,000.

2       Q.   So is it fair to say, using this as an example, that

3   the change -- or one of the changes on April 28th was adding

4   the total amount due so that you could then see what was

5   outstanding?

6   A.   Yes.  In -- not in every single instance did I want to

7   just delete the first four check payments and do it properly.

8   There was not enough time to do that.  So as part of all of

9   the review in the audit that I did for especially

10  subcontractors like this, where they were -- where we were

11  talking round numbers, large amounts, we just put in what was

12  due, since that was reality.

13      Q.   So when you say "to ... do it properly", your

14  preference would be to put the total indebtedness first and

15  then subtract from it, as opposed to the payments first and

16  then adding to it?

17  A.   If I had more time and if I started from the beginning,

18  the first line would be a bill, from whenever we got it,

19  preferably before the project, that said 65,000.  And then

20  you'd see however many lines of bill payments --

21      Q.   Okay, and that --

22  A.   -- going against that.

23      Q.   -- 65,000 would be reflected on the proposal that's

24  behind the QuickBooks?

25  A.   Correct.  Yes.

DAN GERSH - Direct (Resumed)

1    Q.   And in general, is that how these QuickBook proof-

2  of-claim -- excuse me -- the proof-of-claim binders, Exhibits

3  174 and 175 --

4  A.   Yes.

5    Q.   -- in general, is that how they're laid out:  we

6  have a summary and then the backup behind it?

7  A.   Correct.  And if payments were made by Kagan Development

8  checks, they are provided every time.  The Amex statements

9  were provided in general, so we didn't show the Amex line in

10  every one, but they were provided during the court case.  And

11  then if we had a check documented from Lyman-Cutler, or

12  something along those lines, we would have added it; but

13  again, we did not, for the most part; one tender (ph.), I

14  think.

15    So this one, as you can -- the -- the four checks that

16  were paid out to Unicon here -- 1070, 1030, 1041, 1058 -- I

17  believe those are all Lyman checks and that's why you won't

18  see a Kagan Development check behind it.

19    Q.   Because those were Lyman-Cutler checks?

20  A.   Correct.

21    Q.   Okay.  Could I ask you for a moment, sir, to turn to

22  tab L-36 of Exhibit 175, which is the Dream Flooring invoices?

23  Tab L- --

24  A.   Yep.

25    Q.   -- 36.

DAN GERSH - Direct (Resumed)

1    A.    Yes.

2        Q.    And I'd like you to flip to the third page of that

3    exhibit; there's a copy of a check.

4    A.    Yes.

5        Q.    Do you see that?

6    A.    Um-hum.

7        Q.    Can you tell us what that check is?

8    A.    Post-work, we -- Dream Flooring -- he needed some funds,

9    unlike the -- the several other vendors or subcontractors that

10   have amounts due to them.  He requested payment, said he

11   really needed it.  So we paid him a --

12       Q.    So was that a --

13   A.    -- portion.

14       Q.    -- partial payment to Dream --

15   A.    Correct, partial payment to Dream Flooring.  And this is

16   an example of kind of that reshuffle of trying to keep

17   balances equal on both sides, at times.  I don't -- I don't

18   believe Dream Flooring is, because we had to do repairs on one

19   of them post-sale -- or maybe it was before the sale.

20       But this payment here on check number 289 for $5,000, if

21   you go back to the summary page, is in here as a bill entered

22   in on July 2nd.  It says the number, 289, under the fourth

23   column, it says, name:  KDC.  And memo says "Payment of

24   partial balance relating" -- "remaining".  And as you can

25   tell, the amount applied to this category is 2,500 because

DAN GERSH - Direct (Resumed)

1    that 5,000 was split between this one and then 88 Cutler's

2    category of Dream Flooring as well.

3        The reason why it say -- still says "bill" instead of

4    "bill payment" like I previously explained is because this is

5    showing that it is now a bill that is due to Kagan Development

6    because we covered it by paying him for $5,000.

7        Q.   Okay.  And is that check a document that you keep in

8    the ordinary course of your business?

9    A.   Our check?

10       Q.   Yeah.

11   A.   And our bank statements, yes.

12       Q.   And the originals you keep in the ordinary course of

13   your business?

14   A.   Correct.

15           MR. PERTEN:  Your Honor, I believe that was the only

16   document in that tab that we hadn't offered into evidence, so

17   I offer it at this point, to complete that tab.

18           MR. CARNATHAN:  No objection, Your Honor.

19           THE COURT:  All right, it's admitted.  It's admitted

20   as --

21           MR. PERTEN:  Part of --

22           THE COURT:  -- part of that exhibit --

23           MR. PERTEN:  Correct.

24           THE COURT:  -- which is L-36, which is --

25           MR. PERTEN:  Yes.

DAN GERSH - Direct (Resumed)

1        THE COURT:  -- part of 175.

2      REMAINDER OF DEFENDANTS' EXHIBIT 175 WAS ADMITTED INTO

3                            EVIDENCE

4        MR. PERTEN:  Yes.  And my records at this point

5    reflect, Your Honor, that the entirety of --

6            (To Mr. Carnathan) Subject to your confirmation.

7            (To the Court) But I believe the entirety of Exhibit

8    175 has now been in, over whatever objections Mr. Carnathan

9    had.

10           THE COURT:  Okay.

11           MR. CARNATHAN:  I don't know if that's right or

12   wrong, off the top of my head, but --

13           THE COURT:  All right.  That's fine.

14   BY MR. PERTEN:

15     Q.   Now, Mr. Gersh, in the course of your

16   responsibilities as the CFO for KDC, do you work at all with

17   the outside accountants, the Gordons?

18   A.   Yes, I do.

19     Q.   And what kind of services or what kind of

20   interactions do you have with the Gordon accounting people?

21   A.   Periodically, questions and for help, but certainly on an

22   annual basis we ramp up after we -- as we prepare for tax

23   filings for the companies.

24     Q.   Now, Mr. Gordon testified that you're on an accrual

25   basis; correct?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Direct (Resumed)

1   A.   Yes.

2        Q.   KDC?

3   A.   Yep.

4        Q.   Do you have conversations with Mr. Gordon at the

5   year end, as to how much income to realize for purposes of

6   paying taxes on the accrual basis?

7   A.   Yes.  And we've, since I've been here, filed tax -- tax

8   extensions, the filing extensions, each year, so that those

9   conversations usually are mid calendar year.

10        Q.   And --

11   A.   So --

12        Q.   -- given your experience, are those typical

13   conversations that you'd be having with your accountant?

14   A.   Yes.

15        Q.   Now, did you have the opportunity to review the

16   expert report that was prepared by Michael Goldman?

17   A.   Yes.

18        Q.   After receiving the Goldman report, did you go back

19   and review each of the entries that Mr. Goldman had mentioned?

20   A.   Oh, yes.

21        Q.   Were you able to identify any errors or problems

22   with the observations that Mr. Goldman had made?

23   A.   Not a single error (sic).

24        Q.   Okay, so is it your testimony, sir, that you stand

25   by the numbers in the proof-of-claim binders?

DAN GERSH - Direct (Resumed)

1  A.   Absolutely.

2      Q.   Did you find any instances where Mr. Goldman was

3  just plain wrong?

4  A.   Almost every single one, yes.

5      Q.   Now, Mr. Goldman testified about some emails that

6  you had sent.  Let me ask you a couple of questions.  There

7  was an email where there's a reference to you making up

8  numbers.  At any point did you ever make up numbers for the

9  Lyman-Cutler project?

10  A.   No.

11      Q.   Okay, there was an email where you referenced to

12  "playing with numbers".  What did you mean by "playing with

13  numbers"?

14  A.   It was poor choice of words, but it's really just a

15  realization of when revenue was to be realized, in which

16  calendar year, for our own projects, our own --

17      Q.   And --

18  A.   -- noninvestment projects.

19      Q.   And why is it important to determine when income is

20  to be realized, when you're on the accrual basis?

21  A.   Well, for ProExcavation, because that's what -- what

22  the -- that was in reference to, those were to -- realizing

23  the revenue that was earned and then versus what was actually

24  paid out from those projects over the course of that year.

25  So, percentage of completion -- if we had just done, you know,

DAN GERSH - Direct (Resumed)

1    a quarter of the -- let's -- let's say fifty percent of the

2    work on one of our projects, it should be around that number.

3    If ProEx was only paid a quarter of the amount that it was

4    due, then we should be entering a bill at year end that says

5    this much was paid but this much remains due for that calendar

6    year.

7        Q.   Because you pay taxes not on when it's received but

8    when it's realized, is that correct --

9    A.   Correct.

10       Q.   -- on the accrual basis?

11   A.   Correct.

12       Q.   And is that part of your annual dialogue with Jason

13   Gordon and the Gordon accounting firm?

14   A.   Yes, it is.

15       Q.   Now, Mr. Goldman testified about what I'm going to

16   call some recurrent themes that he observed.  We've already

17   spoken about dates, which were sometimes months later.  He

18   suggested there may have been credits taken on the Lyman-

19   Cutler project that were not accounted for.  In your review of

20   the Lyman-Cutler books and records, were you able to identify

21   any credits for which they had been improperly accounted or

22   not accounted for, in the Lyman-Cutler project?

23   A.   Only the few that we put in.

24       Q.   So that was part -- if you noticed, when that was

25   part of the correction?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Direct (Resumed)

1  A.   That was a part of my review, yeah.

2       Q.   Okay.  And --

3  A.   Those came up during my review, I should say.

4       Q.   Okay.  And as part of your review, as we -- the

5  proof of claim and the binders -- are there any credits, to

6  your knowledge, that have not been properly allocated?

7  A.   No.

8       Q.   Did you identify any labor or materials charged to

9  Lyman-Cutler which were actually incurred for another project?

10  A.   No.

11      Q.   Did you see or identify any commingling of funds

12  between projects or even between companies?

13  A.   No.  In fact, the two or three credits that were put in

14  were from ProExcavation back, because they were charges that

15  were -- should have been captured by the ProExcavation

16  proposal.

17      Q.   Now, when we started your testimony, you talked

18  about the fact that you had a license as a certified fraud

19  examiner, which you've allowed to lapse; correct?

20  A.   Correct.

21      Q.   And that you had worked in internal and external

22  auditing for a number of years, before coming to KDC?

23  A.   Correct.

24      Q.   Given your training as a fraud examiner and your

25  experience in the other auditing capacities that you had, when

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 41

DAN GERSH - Direct (Resumed)

1    you were reviewing the books did anything jump out to you as

2    reflecting fraud?

3    A.   No, did not.

4         MR. PERTEN:  Your Honor, if I can have thirty

5    seconds.  I think --

6         THE COURT:  Sure.

7         MR. PERTEN:  -- I'll be done.

8                        (Pause)

9    BY MR. PERTEN:

10        Q.   Mr. Gersh, just very quickly.  If I could ask you to

11   look at the proof of claim again, the invoice, page 7 of 49.

12   A.   Um-hum.  Yes.

13        Q.   If I wanted to -- we're looking at the total

14   construction cost of 3.773.

15   A.   Yes.

16        Q.   You see that?

17   A.   Um-hum.

18        Q.   If I wanted to know the cost per house, would I

19   simply divide that by 2?

20   A.   In general, yes.  It's -- it's not exact --

21        Q.   Okay, so --

22   A.   -- that way, but it's --

23        Q.   -- if I divided by 2, would you agree that the cost

24   per house was roughly 1.886?

25   A.   Correct.  Yep.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1          MR. PERTEN:  Your Honor, I have nothing further for

2     Mr. Gersh.

3               THE COURT:  Okay.

4                         CROSS-EXAMINATION

5     BY MR. CARNATHAN:

6          Q.   Good morning, Mr. Gersh.

7     A.   Morning.

8          Q.   So you at this point are a hundred-percent confident

9     in your numbers; right, sir?

10    A.   Yes, sir.

11         Q.   And you put a lot of time into working them out;

12    right?

13    A.   Yes.

14         Q.   So there are no mistakes in those numbers; right,

15    sir?

16    A.   Nope.

17         Q.   So you started at KDC in November 2014; right?

18    A.   Yes.

19         Q.   And you're the chief financial officer for KDC;

20    right?

21    A.   Yes.

22         Q.   And you took over the bookkeeping for KDC and ProEx

23    when you started in 2014; right?

24    A.   Yes.

25         Q.   And when you arrived, each of the projects had its

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1    own QuickBooks; right?

2    A.    Correct.

3        Q.    And you agree with me, sir, that by the time you got

4    there, Lyman-Cutler was largely over; right?

5    A.    Correct.

6        Q.    Right.  It wasn't active; that's why you didn't do

7    anything on it until sometime in Q1 2015; right?

8    A.    Yes, sir.

9        Q.    Construction had been done for a while?

10   A.    From my understanding, yes, sir.

11       Q.    All right.  But when you got there, the books

12   overall were a mess; right?

13   A.    Not organized my way; yes.

14       Q.    I think you called them a mishmash, in fact, right?

15   A.    Mostly.

16       Q.    And basically what Mr. Kagan had were some manila

17   folders with pencil notations, containing invoices and

18   proposals from subs; right?

19   A.    There were files, yes.

20       Q.    Right?  And I think you said they were organized

21   alphabetically but not by project; right?

22   A.    Yes, the subcontractor files; yeah.

23       Q.    And KDC had no bookkeeping systems or procedures, to

24   the fullest, I think were your words; right?

25   A.    I don't believe so.  What is -- what's that in reference

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1   to?

2        Q.   That's what you told me at your deposition last

3   year, sir:  it had no systems or procedures, to the fullest.

4   A.   I don't quite know what that means.

5              MR. CARNATHAN:  Could I have the transcripts?

6                    (Pause)

7   BY MR. CARNATHAN:

8        Q.   So, Mr. Gersh, I've just handed you a copy of your

9   deposition transcript from May 17th, 2018.  Are you with me?

10  A.   Yes.

11       Q.   And I'm on page 27, sir.

12  A.   Okay.

13       Q.   And I'm down starting at line 15 and I asked you,

14  "When you arrived at KDC, were there any bookkeeping systems

15  or procedures in place that they asked you to follow?"  Your

16  answer was, "No, to the fullest," right, sir?

17  A.   Yes.

18       Q.   So in fact, sir, at that time, the only system that

19  they had for tracking invoices in connection with which

20  project those invoices went with was what the subcontractor

21  wrote for an address on that invoice; right, sir?

22  A.   Not necessarily.  I think my answer, "No, to the

23  fullest," I'm guessing, probably was in reference to

24  procedures.  We obviously had QuickBook files there as well,

25  and had filing cabinets, and some -- some files were kept

DAN GERSH - Cross

1   electronically already.

2      Q.   So you're actually looking at your answer at the

3   bottom of page 27 and at the top of 28 as you're responding to

4   me; right, sir?

5   A.   I'm -- absolutely, yes.

6      Q.   Right.  And so what I said to you was, "So when you

7   arrived, did they have any system of tracking which invoices

8   applied to which project?"  Mr. Perten objected.  And you

9   answered, "Just whatever was written on the invoices, whether

10  a subcontractor wrote an address or wrote the wrong address or

11  provided detail or not.  Literally, you never knew with

12  subcontractors back then."  Have I read that correctly?

13  A.   Some of them, yes.

14     Q.   So in fact, at times they wrote the wrong address on

15  the invoice; right?

16  A.   Misspellings.  Yes.

17     Q.   Right.  And you just literally didn't know back then

18  whether it had the right address on the invoice; right, sir?

19  A.   Other than asking my boss, yes.

20     Q.   Right.  And so they didn't have any Lyman-Cutler

21  file you could pull out and just see what went with the Lyman-

22  Cutler project; right, sir?

23  A.   Correct.  The previous filing system was not that way.

24     Q.   And in fact, your experience was that the ProEx

25  tracking of expenses was particularly bad; right?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1  A.   Not by project.  Yes.

2       Q.   But just in general, you had a real difficulty

3  tracking what expenses it had incurred; right?

4  A.   No.  Not applying it to a project.

5       Q.   So you couldn't track the ProEx expenses and connect

6  them to a project, is what you're saying?

7  A.   Correct.

8       Q.   Right.  And in fact, you do less work now with ProEx

9  because it was so hard to track those expenses; right?

10 A.   Correct.

11      Q.   So if I understood you right last time you

12 testified, you said that all the information was in the KDC

13 books, it just wasn't organized the way you liked it.  Did I

14 get that right?

15 A.   In our office?

16      Q.   Yeah.

17 A.   Yes.

18      Q.   Yeah.  And I think you also said that, when you went

19 back to the subs to get documentation, you were just getting

20 copies of invoices that I think you had implied had been lost.

21 Did I follow that right?

22 A.   Probably, but if -- if they were there or not there.  I

23 don't know if they were.

24      Q.   Right.  But the fact is that a lot of those invoices

25 were missing; weren't they, sir?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1    A.    No.

2         Q.    No?  And the fact is that, in a number of instances,

3    you had to go back to the sub to get an invoice and they did

4    it for the first time in 2015; right, sir?

5    A.    Not necessarily.

6         Q.    All right.  In fact, you had told me specifically

7    that you had to go back to subcontractors and vendors to get

8    documentation, when I deposed you back in May 2018; right?

9    A.    Some; yes.

10        Q.    And you actually can't recall which ones you went

11   back to, to get documentation; right, sir?

12   A.    No.  Some of them I can.

13        Q.    Well, you told me back at your deposition, you

14   couldn't recall; do you remember that?

15   A.    Sure.

16        Q.    Yeah, but it's changed now you've done some more

17   work and you figured out which ones you went back to?

18   A.    No, I researched what we have gone over and gone through

19   ahead of the trial, so -- I don't know right now.  I certainly

20   knew a couple back then.

21        Q.    Certainly if we go back to page 54 of your

22   deposition, I asked you that; right?

23             So I'm now at line 13 on page 54, and I said, "Do

24   you remember in particular any vendors or subs that you had to

25   ask for documentation of their invoices after you arrived?"

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1   And you said, "I could not recall specifically which ones,

2   when, no."  I've read that correctly?

3   A.   Sure.

4                         (Pause)

5   BY MR. CARNATHAN:

6       Q.   And in some instances, Mr. Kagan went back to the

7   subcontractors and vendors to get the documentation; didn't

8   he, sir?

9   A.   It's possible.

10      Q.   Right?  And you in fact can't remember which ones he

11  went back to and which ones you went back to; right?

12  A.   Possible.

13      Q.   And we know in particular that a number of these

14  invoices were created, if you will, in 2015; right?

15  A.   How many?

16      Q.   I've got several to show you, but I don't actually

17  know entirely how many.  But a number of them were; right?

18  A.   It's possible.

19      Q.   Right?  For instance, the BST Plumbing invoices?

20  A.   Definitely.

21          MR. CARNATHAN:  Mr. Harzl (ph.), could I have Exhibit

22  175, page 45?

23  BY MR. CARNATHAN:

24      Q.   So, sir, I'm showing you one of the BST invoices;

25  this one, on 55 Lyman.  You'll see it's dated February 14th,

DAN GERSH - Cross

1    2015 in the upper right corner; right?

2    A.   Yes.

3         Q.   So that certainly wasn't in the files at KDC when

4    you arrived in November 2014; right, sir?

5    A.   Correct.

6         Q.   Right?  And this can't possibly be a copy of some

7    prior invoice; it's got a date in 2015; right?

8    A.   Correct.

9         Q.   And so if we look at Exhibit 175, page 88, this is

10   another BST invoice.  This one's dated March 1st, 2015.  You

11   see that, sir?

12   A.   Yes.

13        Q.   So this one certainly wasn't in the files at KDC

14   when you arrived, either; right, sir?

15   A.   BST Plumbing, definitely not.

16        Q.   All right, so somebody had to go back to BST and get

17   an invoice; right?

18   A.   Nope, not this one.  BST Plumbing, of all of our

19   subcontractors -- most renowned for sending invoices,

20   proposals, longest after work.  So this was not asked for,

21   again, because these are dated March -- February and March of

22   2015.  I did not go back to reach out to any subcontractors

23   for any requests, until the summer; I think, June, July,

24   August.

25        Q.   Okay.  I actually asked you specifically about BST

DAN GERSH - Cross

1  at your deposition; you remember that, sir?

2  A.   I do not remember anything from the deposition.

3       Q.   Yeah.  You in fact have a terrible memory; right,

4  sir?

5  A.   I do.

6       Q.   If you look at the bottom of page 65 with me.  I

7  guess I'll pick up at line 16 to give it context.  So I say to

8  you, "So when I look at the vendor-transaction report that

9  we've marked as Exhibit 30, am I able to at least conclude

10 that, where we have dates in April or May 2015, those are

11 entries that you made after you started at KDC?"

12           "MR. PERTEN:  Objection.

13 "A.  I can't say that with entire certainty.  I can't confirm

14 that a hundred percent.  I think so."

15           And then I say, "You think so."

16           So when I look at BST -- I may have asked you this --

17 on page 2, "Is BST one of the subcontractors with regard to

18 which you had to request invoicing?"

19           "MR. PERTEN:  Objection.

20 "A.  I could not tell you off the top of my head.  Sometimes

21 they had it.  I don't remember which ones we had to go back

22 and request something when I was there."

23           Have I read that correctly?

24 A.   Correct.

25       Q.   But you remember today that BST did you -- send you

DAN GERSH - Cross

1    this invoice unprompted; is that your testimony, sir?

2    A.    Correct, because what you're showing me is the BST

3    Plumbing & Heating proposal, and the invoice that you're

4    referring to here -- or what you're getting to in this

5    deposition is actually the materials -- the support for the

6    materials that he provides that are further in his tab, from

7    Ferguson Plumbing, which, if you go back and look, provided

8    bids or quotes on August 2- -- in August of 2015, because that

9    is when we went back to ask him for support, and he reached

10   out to Ferguson Plumbing.  They got a new billing system.  The

11   only way that they could recreate a number that was used for

12   the materials used in Lyman-Cutler was to create a new bid.

13   And it showed those numbers.  But that was the only way.

14        So his proposal -- that was not requested, this one in

15   March and the previous one in February, but that Ferguson one

16   in August was.

17        Q.   So you did go back to get more support for the --

18   excuse me -- for the plumbing materials?

19   A.    Correct.

20        Q.   All right, I'm glad you bring that up.  And just

21   before I move on; when I look at this -- I think you said

22   something about confirming these things with payments.  But

23   with regard to BST, the only payment made was for $20,000;

24   right?

25   A.    Correct.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1      Q.   And so on this particular invoice, as you sit here

2   now, the assertion is that there's $19,670 still outstanding

3   to BST; right, sir?

4   A.   Correct.

5      Q.   On this -- just on this invoice?

6   A.   Yes.

7      Q.   Right.  To this very day, as you sit here right now?

8   A.   Correct.  For this property, for BST Plumbing.

9          MR. CARNATHAN:  So could I have 174.4, at page 45,

10   please?

11   BY MR. CARNATHAN:

12      Q.   So that's one of the ones you were just referring

13   to, right?  This is the support for the plumbing materials

14   that you went back to Mr. Stanik to get in August 2015; right,

15   sir?

16   A.   Yep.  Correct.

17      Q.   So that certainly wasn't in the files when you

18   arrived in November 2014?

19   A.   Correct.

20      Q.   And I believe on this invoice there's something like

21   $8,900 still outstanding, according to your records?

22   A.   I can't remember that.  Can't remember the --

23      Q.   And we have another one, on the project, that's

24   basically the same.

25          MR. CARNATHAN:  Exhibit 174.2, at page 228.

DAN GERSH - Cross

1    BY MR. CARNATHAN:

2        Q.   Also in August 2015, this is one that you went back

3    to BST to get documentation for in August 2015; right, sir?

4    A.   Correct.

5            MR. CARNATHAN:  Could I have Exhibit 175, at page 20?

6    BY MR. CARNATHAN:

7        Q.   Do you recognize this email, sir?

8    A.   Yes, I do.

9        Q.   All right.  And so this is September 2nd, 2015?

10   Right?

11   A.   Yes.

12       Q.   And Mr. Cordeiro says, "We have revised all of our

13   records as you request."  Have I read that correctly?

14   A.   Yes.

15       Q.   All right.  So you went back to Mr. Cordeiro in

16   September 2015 and asked him for a bill for 23,000 bucks?

17   A.   No.  Not correct.

18       Q.   You asked him to revise his records to support your

19   bill for 23,000 bucks?

20   A.   Not correct either.

21       Q.   Oh.  Mr. Cordeiro's just confused?

22   A.   Eh, as you can tell by all of his wording, English is not

23   his first language.

24           MR. CARNATHAN:  Can I have Exhibit 175, at 15,

25   please?

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1   BY MR. CARNATHAN:

2       Q.   So now I'm showing one of the Dream Flooring

3   invoices, and this one is dated March 23rd, 2015; right, sir?

4   A.   Yes.

5       Q.   So this is another one that wasn't in the files when

6   you got there in November 2014; right?

7   A.   Correct.   Real-time.   The line that says "repairs" --

8   because there were repairs made around this time, I want to

9   say.

10      Q.   Right.   And your records still show a balance due to

11  Dream Flooring; right, sir?

12  A.   I believe so.

13      Q.   We'll circle back to the balance.

14          MR. CARNATHAN:   Could I have Exhibit 175, at 13?

15          MR. HARZL:   13?

16          MR. CARNATHAN:   13, yeah.   Thanks.   Maybe just blow

17  up the line items in the summary.

18  BY MR. CARNATHAN:

19      Q.   And so we see another 2,500 bucks added to the Dream

20  Flooring account, July 2nd, 2015; right, sir?

21  A.   Correct.

22      Q.   And the check that we looked at was July 24th, 2015;

23  right?

24  A.   Sure.

25      Q.   And that check showed a balance due of $1,550;

DAN GERSH - Cross

1   right?

2   A.   I believe that's what the memo said.

3        MR. CARNATHAN:   Could I have 174.1, at 29?

4        Yeah, that's the one.

5   BY MR. CARNATHAN:

6        Q.   So Mr. DiGiacomo also provided you with an invoice,

7   August 6, 2015, for $35,805; right, sir?

8   A.   Yes.

9        Q.   But if we were to look at the subsequent invoices in

10  this packet from 2014, they add up to a much smaller number;

11  right, sir?  The --

12       MR. CARNATHAN:   Can you scroll through the next few

13  pages, Bill?

14  BY MR. CARNATHAN:

15       Q.   All right, so we've got one for 3,000 bucks in April

16  2014.  Think it's a little fuzzy.  2,000 bucks, I think, in

17  June.

18  A.   Yes.  These are the ones we had in our -- in our files.

19       Q.   Right.  And you couldn't explain that to me at your

20  deposition; could you, sir?

21  A.   It's possible, yes.

22       Q.   And if we look at 174.3, at 26, we've got another

23  invoice, this one on Cutler, for 35,805.  It's the same

24  invoice, with the address changed; right, sir?

25  A.   I bel -- I believe so.  I don't know.

DAN GERSH - Cross

1    Q.   We sort of touched upon it earlier, but isn't it a

2   fact, sir, that in large part you have to rely on Mr. Kagan

3   for whether the construction costs are real; right, sir?

4   A.   I'm sorry.  Could you repeat that?

5    Q.   Well, in a significant way, you're relying on Mr.

6   Kagan for whether the materials used in the project were

7   actually used; right?

8   A.   Yes.

9    Q.   Right?  And you're relying on him to tell you

10   whether the vendors did the work that's reflected on the

11   invoices; right?

12   A.   Yes.  He's the GC --

13    Q.   Right.  I mean, you weren't --

14   A.   -- the builder.

15    Q.   -- you weren't there when the project was done;

16   right, sir?

17   A.   Correct.

18    Q.   And you never did any construction?

19   A.   Other than driving by and seeing the homes, I wouldn't

20   know if any of these were even -- the houses were even

21   standing there.

22    Q.   And so, in fact, when you prepare a construction

23   budget, you sit with Mr. Kagan and you put into the budget

24   what he tells you to do; right?

25   A.   Correct.  We -- we provide a budget for the bank when we

DAN GERSH - Cross

1    do our -- when we apply for the construction loan.

2         Q.   Right.  And so you don't actually know how Mr. Kagan

3    decides how much profit KDC's going to make on a given

4    project; right?

5    A.   Three years before completion, no.  No.

6         Q.   Right.  And you don't know how Mr. Kagan decides how

7    much profit ProEx would make on a given project; right, sir?

8    A.   Correct.

9         Q.   And in this particular case, you don't actually know

10   whether Mr. Kagan challenged any of the invoices that the subs

11   submitted; right, sir?

12   A.   I know that my boss negotiates every bid that we get from

13   vendors, subcontractors, whether it's the first time or if

14   he's worked with them before.  But I'm not part of those

15   conversations, no.

16        Q.   Would you turn with me to page 139 of your

17   deposition, sir?

18             So I'm at line 13.  Are you with me?

19   A.   Yes.

20        Q.   And I asked you, "On this project, did Vadim

21   challenge any of the bills that came in from any of the subs?"

22   And your response was, "I definitely can't speak to that.  I

23   have no idea."  Have I read that correctly, sir?

24   A.   Yes, sir.

25             THE COURT:  Mr. Carnathan, I need to take about a

DAN GERSH - Cross

1  five-minute break.  Is this a good moment for that?

2          MR. CARNATHAN:  This is fine, Your Honor.  I was

3  going to shift to something a little different.

4          THE COURT:  Sounded like it.  Okay, let me just --

5  five to ten.  Okay?  I'll be right back.

6                  (Off the record at 10:16 a.m.)

7                  (On the record at 10:41 a.m.)

8          THE CLERK:  Court's in session.

9          THE COURT:  Be seated.

10         All right.  Sorry for the interruption.  Let's --

11 we'll get going again.  Whenever you're ready.

12         MR. CARNATHAN:  Thank you, Your Honor.

13         So, Mr. Harzl, could I have Exhibit 174.2?  That's

14 the second binder of 174, in the paper -- at page 144.

15 BY MR. CARNATHAN:

16    Q.   So, Mr. Gersh, you recognize this as one of the

17 ProExcavation proposals?

18 A.   Yes.

19    Q.   All right.  And we talked a little bit earlier about

20 your reliance on Mr. Kagan for certain information but, in

21 particular, the only thing in the proof-of-claim binders to

22 support the ProEx component of the KDC proof of claim are

23 these proposals; right?

24 A.   Yes.

25    Q.   And Mr. Kagan gave those to you; right, sir?

DAN GERSH - Cross

1    A.    These were before my time.

2         Q.    Right.  So you weren't there when the work was done?

3    A.    Correct.

4         Q.    Right, you don't know how much -- or how he decided

5    how much to charge for the work that ProEx says it did?

6    A.    Correct.

7         Q.    Right, so you just took the proposals and you used

8    them to create the ProExcavation component of the KDC proof of

9    claim; right, sir?

10   A.    The -- the support in the binder --

11        Q.    Right.

12   A.    -- you mean?  Yes.

13        Q.    Right.  This is the proposals?

14   A.    Yes.

15        Q.    Right.  And they get allocated into three different

16   categories:  landscaping, excavation, and masonry; right, sir?

17   A.    Correct.

18        Q.    But there's no actual way to map the landscaping,

19   the excavation, and the masonry, to the proposals; right?

20   A.    Correct.

21        Q.    Right.  Nobody can do that?

22   A.    Not for a company of two people, no.

23        Q.    Right.  So the way that you did that for this

24   purpose is you sat down with Mr. Kagan and you decided how to

25   allocate it; right, sir?

DAN GERSH - Cross

1    A.    Estimates, yes.

2         Q.    Right.  And if we look at Trial Exhibit 174.4, at

3    203 --

4                          (Pause)

5              MR. CARNATHAN:  Ah, there we go.

6    BY MR. CARNATHAN:

7         Q.    This is the March 25, 2015 proposal from

8    ProExcavation, for snow removal; right, sir?

9    A.    Yes.

10        Q.    This is actually after the fact; right?  This is

11   after the winter's over; right?

12   A.    Correct.

13        Q.    And this is one that you prepared; right?

14   A.    Correct.

15        Q.    Right.  And you did that by sitting down with Mr.

16   Kagan, and he told you how much to charge; right?

17   A.    Yep.

18        Q.    Do you know how long the driveway is?

19   A.    I do not.

20        Q.    And if we look at 174.2, at 175 --

21             I guess, just to move it along; you did the same

22   thing for the $9,500 snow-removal proposal for Lyman; right?

23   A.    Correct.

24        Q.    So we, during your direct, looked at Exhibit 67;

25   that's the -- the fifth page of which is that June -- or

DAN GERSH - Cross

1   purportedly June 1, 2015 invoice.

2           MR. CARNATHAN:  Could I have that up on screen,

3   please?

4   BY MR. CARNATHAN:

5       Q.   Now, you and Mr. Cohen put this together; right,

6   sir?

7   A.   I provided the numbers related to the construction for

8   this, for -- for Mr. Cohen.

9       Q.   Right, the construction and the carrying costs, I

10  think you testified; right, sir?

11  A.   Correct.

12      Q.   You also provided the overhead number; right?

13  A.   I was asked roughly how many hours, but I didn't do the

14  final number or the wording or anything like that.

15      Q.   Right.  Well, KDC didn't keep any time records;

16  right?

17  A.   Correct.  Two people -- two-and-a-half.  Didn't have time

18  for that.

19      Q.   Right, so in fact, you just sort of estimated how

20  many hours you thought would be about right and plugged it in;

21  right?

22  A.   I -- I didn't.  I don't even know if my numbers were used

23  in that number.  When I read it now, when it says, "net of

24  Kagan" -- "of Vadim Kagan", I don't know if that means

25  including his, not including his.  But if so, those are just

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1  estimates, yes.

2  Q.   So you don't actually know where that number came

3  from?  You can't tell us?

4  A.   I remember a conversation with -- with Mr. Cohen, asking

5  roughly how many hours were spent; yes.  That I remember.

6  Q.   All right.  And KDC was working on something like

7  twenty other projects during the same time it was doing Lyman-

8  Cutler; right, sir?

9  A.   No, I don't believe so.  And I think these -- I don't

10  know exactly what those hours -- what time frame that is and

11  how many projects were during Lyman-Cutler.  I came on at the

12  end of 2014.

13  Q.   Do you know how many projects you assumed for the

14  purposes of estimating your 790 hours there?

15  A.   I don't.  I don't recall.

16  Q.   So if I followed you right during your direct, you

17  testified that the construction costs here were down to

18  560,000 by June 1, 2015.  Did I get that right?  The

19  unreimbursed construction costs, if you will.

20  A.   No.  Well, it -- based on this invoice, it -- it would be

21  the total construction costs minus the construction payments

22  through June 10th.

23  Q.   Right.  So all you're doing to get to that 560-

24  number is you're tallying up the 3.7-odd million of

25  construction costs and deducting the 3.194-odd from the bank

DAN GERSH - Cross

1   account and coming to the 560-; right?

2   A.   Are you referring to the 560- in -- on the third number

3   here?  The third number in this invoice?  That number is just

4   fifteen percent of general construction.  So I believe that's

5   fifteen percent of the number above it.

6        Q.   I'm sorry; I'm trying to map to your testimony.

7   So --

8   A.   Sure.

9        Q.   So if I understood you during direct, you basically

10  took the 3.7-odd million, deducted the 3.194-odd million and

11  said that that was the outstanding construction costs at the

12  time of the June 1 invoice; right?

13  A.   No.  The -- that number is captured in the proof-of-

14  claims exhibit; if I can point to it.

15       Q.   We talking proof-of-claim page 7?

16  A.   Yes.

17            MR. CARNATHAN:  Can I have that one, Mr. Harzl?

18  A.   Actually, page 4 of -- or 5 of 49.  That's what it is.

19            THE WITNESS:  One -- one more.

20  A.   So this number that -- even though they look similar,

21  they are not the same thing.  It's the first bullet:  cost for

22  construction, still owed to KDC:  578,528.49.  So that's the

23  total -- final, total, hard construction cost, the 3.773 that

24  in that old invoice was 3.78, I think, subtracted from the --

25  or the funds advanced by the bank are subtracted from that.

DAN GERSH - Cross

1       So even though that number right below it is very

2   similar, it's a different number.  That's just fifteen

3   percent, I believe, of the number above it.

4   BY MR. CARNATHAN:

5       Q.   Perfect, perfect.  But -- so that actually is my

6   point; right?  The way that you're getting to that 578-odd

7   thousand is you're taking what you've tallied up as the total

8   cost of construction and deducting the 3.194 --

9   A.   Correct.

10      Q.   -- from the bank?

11  A.   Yes.  Yes.

12      Q.   We're getting to 578K?

13  A.   Correct.

14      Q.   But in fact, that's a little different than the

15  accounts payable from Lyman-Cutler that we looked at, attached

16  to Exhibit 50; right, sir?

17  A.   Correct.

18      Q.   And in fact, between May 7th, 2015 when Exhibit 50

19  was issued --

20          MR. CARNATHAN:  Can I have that page, Mr. Harzl?

21  BY MR. CARNATHAN:

22      Q.   Right, so when Exhibit 50 was issued, it was $758-

23  odd thousand in accounts payable; right?

24  A.   Correct.

25      Q.   And that number hardly moved at all between May 7th

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1   and June 1st; right, sir?

2   A.   Of 2015?

3        Q.   Right.

4   A.   It's possible.  Don't recall.

5        MR. CARNATHAN:  Can I have Exhibit 90?

6   BY MR. CARNATHAN:

7        Q.   So Exhibit 90 is an A/P aging detail as of June 2nd,

8   2015.  You with me, sir?

9   A.   Yes.

10        MR. CARNATHAN:  And if we go to the second page, down

11   at the very bottom.  Kind of blow up the total.

12   BY MR. CARNATHAN:

13        Q.   Right, it's gone to 758,783 as of June 2nd, 2015;

14   you see that, sir?

15   A.   Yes.

16        Q.   So it had changed, I don't know, 760 bucks, call it?

17   A.   Sure.

18        Q.   Right; same?  And in fact, the 758- number was baked

19   in, if you will, to that June 1 invoice; right, sir?

20   A.   The invoice --

21        Q.   The --

22   A.   -- June 1st of 2015, which was not final, included

23   amounts due.

24        Q.   Right, and some of that 758- got allocated to

25   carrying costs and some of that 758- got allocated to

DAN GERSH - Cross

1   construction costs; right?

2   A.   Correct.

3       Q.   And the way you figured that out was to talk to Mr.

4   Cohen; right?

5   A.   No.   I was just told to separate out hard construction

6   costs and then what was deemed carrying-costs categories,

7   which we went over in a previous exhibit.

8       Q.   Right.   You went over it with Mr. Cohen; right?

9   A.   I don't recall, but probably.

10  BY MR. CARNATHAN:

11      Q.   Can I have you take a peek at your deposition, at

12  page 80?

13  A.   Sure.

14          MR. PERTEN:   Sorry; what page?   8 or 80?

15          MR. CARNATHAN:   Page 80.

16  A.   Okay.

17  BY MR. CARNATHAN:

18      Q.   I'm down at line 21 and I ask you, "Who participated

19  in the discussion of what was construction and what was

20  carrying costs?"   And your answer is, "I don't remember

21  specifically.   To be honest, that's going to be my response

22  every question.   I don't remember my conversations from three

23  years ago, whether it was just Joseph, just Vadim, John, both.

24  I have a terrible memory.   I won't be able to answer those

25  questions.   I do not know who I discussed it with.   It was a

DAN GERSH - Cross

1    group."  Have I read that correctly?

2    A.    Absolutely, yes.

3         Q.    Right?  So would you agree that Mr. Cohen --

4    A.    May have.

5         Q.    -- helped you decide?

6    A.    May have helped, yes.  Conversations I don't recall.

7    Numbers I'm pretty good at.

8         Q.    Okay, and I think you said you had done quite a lot

9    of work in May and June, working on the aging A/P; right?

10   A.    Started work on it, yeah, in depth.

11        Q.    In fact, you were out of the office for quite a lot

12   of May and June; weren't you, sir?

13   A.    I don't recall back then.

14        Q.    Do you remember getting married?

15   A.    Oh, yeah.  Yeah.

16        Q.    Yeah?  And I think you got married -- was it on

17   Saturday, May 23rd, 2015?

18   A.    24th.

19        Q.    24th.  Okay.

20   A.    Good try.

21        Q.    I was close.

22            All right, and so you went out of town for your

23   bachelor party, for a week, between April 29th, 2015 and May

24   6, 2015; right, sir?

25   A.    Four, five days; sure.  Over a weekend.

DAN GERSH - Cross

1              MR. CARNATHAN:  Well, if I can have Exhibit 49.

2      BY MR. CARNATHAN:

3          Q.   Right, so this is on April 29th and you are telling

4      Mr. Filippov here, "Unfortunately, I'm already on my way out

5      of town, my bachelor party, and won't be back until Wednesday

6      of next week."  Have I read that correctly?

7      A.   Yes.

8          Q.   And so Wednesday of the following week was May 6th;

9      right?

10     A.   Sure.

11         Q.   Thirty days has September, April, June; right?

12     A.   Yes.

13         Q.   Yeah.  And then you were back in the office for, oh,

14     a little over a week after that -- I'm sorry, probably two

15     weeks.  And then you went out for three weeks for your

16     honeymoon; right, sir?

17     A.   Yes.  I don't recall when.  In June, end of -- yeah.

18         Q.   Yeah, so you were --

19     A.   Yeah, a week after the wedding.  Sure.

20         Q.   Yeah.  So you were out till the middle of June

21     sometime?

22     A.   Yes.

23         Q.   Right.  So you weren't in the office on June 1,

24     2015; were you, sir?

25     A.   June 1st?  I don't remember.  I'd have to look at my

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1  airfare.

2       Q.   Let's talk about -- you testified, last time you

3  were on the stand, that -- we were a bit confused about the

4  April 28th entries, that you looked back at the audit trail

5  and that most of those were minor changes, little spelling

6  changes, things unrelated to the bills; just --

7  A.   The numbers.

8       Q.   -- little things; right?

9  A.   Yeah.

10      Q.   Right.  You're also the guy who gave us the thumb

11 drive of the QuickBooks from Lyman-Cutler, back in June 2015;

12 right, sir?

13 A.   I believe so.

14      Q.   Right.

15          MR. CARNATHAN:  Can I have the audit-trail report,

16 Mr. Harzl?  Maybe blow up the top so we can read it.

17          Oh, I probably should mark this thing.  Excuse me.

18      PLAINTIFFS' EXHIBIT BB WAS MARKED FOR IDENTIFICATION

19 BY MR. CARNATHAN:

20      Q.   Okay, sir, I've asked the clerk to mark this as

21 Exhibit BB for identification.

22 A.   Um-hum.

23      Q.   So this is an audit-trail report printed out from

24 the QuickBooks that you gave us; do you see that?

25 A.   Um-hum.  Yes.

Page  70

DAN GERSH - Cross

1     Q.   Yeah?  And so this first page is the Decor Art audit

2    trail, back when you gave it to us in June 2015; right?

3    A.   Sure.

4     Q.   And so that in fact shows 5,250 being added to the

5    Lyman-Cutler accounts payable.  It was entered on June --

6    excuse me, April 29th, 2015, as of April 28th, 2015; right,

7    sir?

8    A.   Yes.

9     Q.   And for Cutler, 6,000 was added on April 29th, 2015,

10   as of April 28th, 2015; right, sir?

11   A.   Yes.

12       MR. CARNATHAN:  And if we go to the second page.  And

13   blow it up so we can see it.

14   BY MR. CARNATHAN:

15    Q.   For Dream Flooring, we have two entries being made

16   on April 29th, 2015.  Actually, maybe I'm misinterpreting.

17   We've got -- "prior" means that's when it was entered; right?

18   So April 29th, 2015, we've got an entry made as of 2- -- April

19   28th, 2015, adding 8,910 to the accounts payable for 55 Lyman.

20   Am I interpreting that correctly?

21   A.   The third line of that first bill was entered on the

22   29th, yes, correct, yeah --

23    Q.   Right.

24   A.   -- for 8,910.

25    Q.   Right.  And then the fourth line down, we're adding

DAN GERSH - Cross

1    6,550 to Cutler on April 29th, 2015, as of April 28th, 2015;

2    right, sir?

3    A.    Correct.

4         Q.    And then some further adjustments are made --

5    A.    Right.

6         Q.    -- in May; right?

7    A.    The top two lines are -- oh, sorry.  Those, as you could

8    see in bold, were the changes of the name.

9         Q.    Right.  Those were made on May 13th; right, sir?

10   A.    Yes.

11        Q.    Okay.  But the actual entries of the numbers was on

12   April 29th?

13   A.    Entered in; correct.

14        Q.    Right.  Okay.

15            MR. CARNATHAN:  So if we go to the next page now,

16   please.  And blow it up so we can see it.

17   BY MR. CARNATHAN:

18        Q.    The Unicon Electric entries for 30,000 on 55 Lyman

19   and 35,000 for 88 Cutler were both made on April 29th, 2015,

20   as of April 28th, 2015; right, sir?

21   A.    Correct.  Just like the other ones, these are outstanding

22   bills being entered in.

23        Q.    Right.

24            MR. CARNATHAN:  All right, could I have the next

25   page, please?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1   BY MR. CARNATHAN:

2       Q.   And the same is true for V&D Heating; right?   On

3   April 29th, 2015, you put in $13,955 on 55 Lyman and $23,955

4   on 88 Cutler, as of April 28th; right, sir?

5   A.   Correct.   Kristina hadn't put in the full proposals,

6   because her -- part of that exercise is mine.

7       Q.   Okay.

8           MR. CARNATHAN:   And if we go to page 5 of the

9   exhibit.   And blow her up.

10  BY MR. CARNATHAN:

11      Q.   We also had entries made on BST Plumbing, on April

12  29, 2015, as of April 28th, 2015; right, sir?

13  A.   Yes.

14      Q.   And so you added $19,670 to 55 Lyman, an additional

15  $11,360 to 55 Lyman, and did the same for 88 Cutler, that day;

16  right, sir?

17  A.   Initially, yes.

18      Q.   Okay.   The 1960 (sic) is the services invoices and

19  the 11,360 is the materials; right?

20  A.   I don't recall.   I -- if I'm -- if I had to guess

21  based -- looking on this, these were adjusted to show -- at

22  first when I was entering it, I thought it was 11,360, and

23  then I probably realized the mistake and entered in, thirty,

24  twenty-five minutes later, 19,670 number instead.

25      Q.   Okay, I'll return to that topic again.

DAN GERSH - Cross

1          MR. CARNATHAN:  Could I have the next page?

2     BY MR. CARNATHAN:

3          Q.   Then we see the same thing -- well, more or less,

4     with DaCosta.  Right?  We see some entries entered on April

5     28th and apparently deleted on April 29th; right, sir?

6     A.   Yep.

7          MR. CARNATHAN:  I'd like to offer BB for

8     identification into evidence, Your Honor.

9          MR. PERTEN:  Your Honor, I'd object to that.  I don't

10    think there's a proper foundation.  He didn't prepare this.

11    This is not -- he can testify, as he had, to his

12    interpretation, but it's not his document.

13         THE COURT:  Well, what's your --

14         MR. CARNATHAN:  Well, it's printed out of the

15    QuickBooks he gave us.  He identified it at the start of his

16    testimony.  He's identified at this point, I think, every line

17    item in it.  I think he's laid a sufficient foundation to

18    establish it is what it purports to be.  And he's admitted it

19    is what it --

20         THE COURT:  Yeah, I think --

21         MR. CARNATHAN:  -- purports to be.

22         MR. PERTEN:  Your Honor --

23         THE COURT:  -- if it's authentication --

24         MR. PERTEN:  Your Honor, as Mr. Carnathan has just

25    represented to the Court, they got a thumb drive, they ran

DAN GERSH - Cross

1    some report on it.  I don't know if this is the whole report,

2    a selective report.  I don't know who put in the parameters to

3    tell -- excuse me -- to tell it what to spit out.  He

4    certainly has testified as to the numbers that he was shown,

5    but this is not his report and there's nobody here who can

6    tell us how this report was generated, whether it's complete,

7    whether it's partial.  It's not a document that was on the

8    exhibit list to enable us to look at it and ask those

9    questions.  So I -- again, I don't -- he's gotten his oral

10    testimony; he's entitled to that.  But I don't think the

11    document comes in, Your Honor.

12         THE COURT:  Can you lay some more foundation?

13    BY MR. CARNATHAN:

14         Q.   Mr. Gersh, you would agree me that you can run

15    audit-trail reports out of QuickBooks; right, sir?

16    A.    Correct.

17         Q.   Right?  And you can put in certain parameters about

18    what you want those reports to produce; right?

19    A.    You can.

20         Q.   And one of the parameters you can run is to ask it

21    to produce an audit-trail report for certain vendors; right?

22    A.    That I don't know.  I don't know which parameters you can

23    put in.  I know you can put in parameters; I do not know which

24    parameters you can put in.  If -- if these are the only two,

25    maybe.  I -- I don't know.

DAN GERSH - Cross

1    Q.   Well, you were certainly able to identify the

2    entries that we made or that we've shown you as entries that

3    you had made in the books, with regard to these vendors back

4    in April 2015; right, sir?

5    A.   Are these from the QuickBooks file given to you on the

6    thumb drive?

7    Q.   Yes.

8    A.   Given in April of 2015?

9    Q.   No, I think you gave it to us in June, sir.  You

10   gave us the thumb drive in June; right?

11   A.   Before my audit was complete.  I believe I gave a

12   percentage of roughly twenty percent of my review was

13   complete, in June.  That was not the finished product at all.

14   Q.   Right, but the point here is that you made entries

15   of actual financial numbers, on April 29th, 2015; right?

16   A.   Correct.

17   Q.   And so although there may have been a number of

18   entries of changing names or making minor corrections, some of

19   them were hard numbers that you put into the books that very

20   day; right?

21   A.   They were put in as of that day, at a point in time on

22   June 2nd.  Whether these numbers were changed or not changed

23   or adjusted or recategorized after June 2nd to the final

24   numbers that were put into the proof of claims -- it could be

25   any of them.

DAN GERSH - Cross

1     Q.   Sure.  We'll review that --

2  A.   Okay.

3     Q.   -- I promise.

4  A.   Okay.

5     Q.   But on April 29th at least, you put in numbers for

6  BST; right?

7  A.   Um-hum.

8     Q.   You put in a number for V&D?

9  A.   Yeah.

10     Q.   You put in numbers for Unicon?

11  A.   Yeah.

12     Q.   Put in numbers for DaCosta?

13  A.   Yeah.

14     Q.   You have Decor Art?

15  A.   Yes.

16     Q.   And I'm forgetting one.  Dream Flooring.  And one

17  for --

18  A.   Sure.

19     Q.   And for Dream Flooring

20  A.   Um-hum.

21     THE COURT:  That's all right.  He's authenticated

22  these numbers.  He's the CFO of sorts.  He's the numbers guy;

23  he's told us that multiple times.  Objection's overruled.

24  It's admitted.

25     PLAINTIFFS' EXHIBIT 340 WAS ADMITTED INTO EVIDENCE

DAN GERSH - Cross

1          MR. CARNATHAN:  Thank you, Your Honor.

2     BY MR. CARNATHAN:

3          Q.   Now, to the point on --

4          MR. PERTEN:  Excuse me; what number is this?

5          MR. CARNATHAN:  Oh.  Excuse me.

6          THE COURT:  Yeah, what's our -- or Plaintiffs' next

7     number?

8          THE CLERK:  It is Plaintiffs' Exhibit number 340.

9          THE COURT:  3-4-0.

10         MR. CARNATHAN:  We good to go, or --

11         THE WITNESS:  I have a question.  I don't know if I'm

12    allowed to ask.  If I'm being asked about these questions but

13    I don't know if anything else was adjusted to them after, if

14    this, for example, shows two transactions that were adjusted

15    but maybe there was an additional transaction added after the

16    fact, or one of the previous ones was adjusted more so

17    after --

18         THE COURT:  Are you uncertain about some testimony

19    you've given?

20         THE WITNESS:  No.  This -- these reports that are

21    being put in front of me.  So if there was more transactions

22    that were adjusted or added or deleted with this vendor or

23    subcontractor, after --

24         THE COURT:  So --

25         THE WITNESS:  -- this file was given to them --

DAN GERSH - Cross

1             THE COURT:  Just so that -- I mean, the way this

2    works is that, after you're finished with Mr. Carnathan, then

3    Mr. Perten will have a chance --

4             THE WITNESS:  Okay.

5             THE COURT:  -- to examine you again --

6             THE WITNESS:  So, speak to only what I see --

7             THE COURT:  Yeah.  And --

8             THE WITNESS:  -- in front of me?

9             THE COURT:  -- he'll give you a chance to -- whatever

10   he thinks is the appropriate --

11            THE WITNESS:  Okay.

12            THE COURT:  -- follow-up.  Believe me, he's making

13   notes.  So --

14            THE WITNESS:  Okay.

15            THE COURT:  And your commentary, no doubt, informs

16   his thinking about it.  But -- it's a little bit stilted, but

17   that's the way -- that's the way the process works.  So he'll

18   have a chance --

19            THE WITNESS:  Okay.

20            THE COURT:  -- to ask you --

21            THE WITNESS:  Okay.

22            THE COURT:  -- to give you a chance --

23            THE WITNESS:  Okay.

24            THE COURT:  -- to expand your testimony.  Okay?

25            THE WITNESS:  Thank you.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

 1          THE COURT:  All right.

 2          MR. CARNATHAN:  And ironically, so will I.

 3          THE COURT:  That's right.  We keep going until we run

 4   out of energy or time.

 5   BY MR. CARNATHAN:

 6      Q.   So, thinking more about the -- your work on the

 7   books and records after -- excuse me -- after May 2015, right,

 8   you would agree with me that, to the extent that the proof of

 9   claim, as you sit here today, reflects an outstanding balance

10   to a subcontractor, that balance is still outstanding, it's

11   still unpaid; right, sir?

12   A.   For the most part.  Some of them we had paid off; we had

13   paid some of their balances or the -- their remaining balances

14   at the time.  But there is an amount open for several

15   subcontractors; correct.

16      Q.   Right.  Well, certainly at this point we've been

17   doing this for several years.  You've produced all the

18   materials you have to support the claim; right?

19   A.   Yes.

20      Q.   Right.  In discovery, KDC has been ordered, if you

21   will, to produce all of its invoices; right?

22   A.   For -- within -- we did as much as we could; yes.

23      Q.   Right.  We've got all of its proposals?

24   A.   Yes.

25      Q.   Right?  We got all the checks?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1   A.    All of the Kagan Development checks.

2         Q.    Right?

3   A.    Right.

4         Q.    And I -- you testified that you didn't have the bank

5   statements to confirm the Lyman-Cutler checks; right, sir?

6   A.    Correct.

7         Q.    But somehow on that June 1 invoice, you were able to

8   calculate the 3,194 number; right?

9   A.    Yes.

10        Q.    That was payments out of the Lyman-Cutler account;

11  right?

12  A.    Yes.

13        Q.    Right?  And you -- certainly you had electronic

14  access to the account, right up until some point after the

15  lawsuit started; right?

16  A.    Correct.

17        Q.    And Mr. Kagan had the checkbook; right?  I mean, he

18  wrote three million out of those checks; didn't he?

19  A.    Yes.  Not in -- not all by check, but yes.

20        Q.    Right.  And then the one thing that I think that we

21  agree on is that Ms. Brusenkova put the payments into the

22  Lyman-Cutler QuickBooks; right?

23  A.    For the most part, yes.

24        Q.    And way back on June 2nd, 2015, Mr. Filippov sent

25  you our QuickBooks that had all the checks listed in it;

DAN GERSH - Cross

1    right, sir?

2    A.    I --

3              MR. CARNATHAN:   Can I have Exhibit 62, Mr. Harzl?

4    A.   I've never looked at another QuickBooks file.  If he sent

5    it -- maybe he sent it.  I never looked at another QuickBooks

6    file, I believe.

7    BY MR. CARNATHAN:

8         Q.   So even if we sent it to you --

9    A.    Doesn't sound right.

10        Q.   -- you never looked at it?

11   A.    Don't believe so.

12        Q.   So it's -- I'm sorry, I missed the date by one.  It

13   was actually June 1st.  This is an email from Mr. Filippov to

14   Mr. Kagan, and he says, "Attached are the QuickBook records we

15   kept.  These records do not have much meaning.  There's no

16   invoices or sales receipts were (sic) ever produced by you.

17   These records are merely a copy of entries of deposits and

18   withdrawals from the Lyman-Cutler, LLD", I think you meant

19   "LLC", "Rockland Trust bank account."  Have I read that

20   correctly?

21   A.    Yes.

22        Q.   And we produced all the bank statements to you in

23   discovery back to you; right, sir?

24   A.   I don't know when they were produced.  Even if they were

25   produced, I did not feel the need to tie in every single

DAN GERSH - Cross

1   Lyman-Cutler check to some payment, when everyone had access

2   to it.  But obviously for the trial, the -- you -- the non-

3   Kagan Development side did not have access to Kagan

4   Development Amex and -- and checkbooks.  So that's every time

5   we had a payment; I provided that.

6       Q.   All right.  So you didn't feel the need to tie it

7   back to the Lyman-Cutler bank statements anyway?

8   A.   No.

9       Q.   Let's think again about your efforts to nail down

10  the numbers, if you will, after May 7.  So if we look at the

11  May 7th accounts receivable again, attached to Exhibit 50 --

12          MR. CARNATHAN:   Please.

13  BY MR. CARNATHAN:

14      Q.   So as I understand, this is just -- this is a

15  printout of the accounts payable in the Lyman-Cutler books, as

16  of May 7th, 2015; right, sir?

17  A.   Yes.

18      Q.   And I think you testified that you gave it to Mr.

19  Kagan; right?

20  A.   Yes.

21      Q.   Right.  And in fact, you printed it out at Mr.

22  Cohen's request, after the legal folks got involved; right?

23  A.   It's possible, yes.

24      Q.   Well, if we look at the bottom of page 161 of your

25  deposition transcript, and I'm all the way down at line 22, I

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1    say, "How did Lyman-Cutler come to be a priority for you?"

2    And your answer is, "When legal folks got involved and I was

3    asked to -- when Joseph asked me to pull all those numbers

4    together."  I'm into the top of 162.  Have I read that

5    correctly?

6    A.    Yes.

7         Q.    And Joseph's Mr. Cohen; right?

8    A.    Correct.

9         Q.    Okay.  So I think you said that you had done the --

10   excuse me -- the heavy lifting of your work in confirming the

11   books in May, June, and July, and into August and September,

12   of 2015; right?

13   A.    I believe so, yes.

14        Q.    And you had it all nailed down by the time the proof

15   of claim was filed in May 2016; right, sir?

16   A.    Um-hum.  Yes.

17        Q.    So certainly by the time October 6, 2016 rolled

18   around, you had done all the work you were going to do to make

19   sure these numbers are right; right?

20   A.    I believe so.

21        MR. CARNATHAN:  Can I have Exhibit 84, please?

22   BY MR. CARNATHAN:

23        Q.    Okay, sir, so I'm showing you the Lyman-Cutler

24   accounts-payable-aging summary as of December 31, 2015.  You

25   see that?

DAN GERSH - Cross

1    A.   Yes.

2         Q.   And the little date in the upper left corner,

3    October 6, 2016, means this was printed on October 6, 2016;

4    right, sir?

5    A.   Correct.

6         MR. CARNATHAN:  I'd like to offer Exhibit 84 into

7    evidence.

8         MR. PERTEN:  No objection.

9         THE COURT:  All right, it's admitted.

10        PLAINTIFFS' EXHIBIT 84 WAS ADMITTED INTO EVIDENCE

11   BY MR. CARNATHAN:

12        Q.   So if we look at the particular line items on here,

13   as of October 6, 2016 you're carrying a payable to BST

14   Plumbing of $57,601.88; right?

15   A.   Yes.

16        Q.   And that consists of the balance due on the two

17   service invoices, plus the balance due on the two materials

18   invoices; right, sir?

19   A.   I believe so.

20        Q.   So in fact, if we look at 174.4, page 45 --

21        MR. CARNATHAN:  Maybe we have to go to the summary

22   page to -- go back a page in the exhibit.  Kind of spin it

23   around.  Yeah.  And blow it up a little bit.

24   BY MR. CARNATHAN:

25        Q.   Okay, sir.  So try to map this together quickly.

DAN GERSH - Cross

1    But you remember on the May 7th, 2015 accounts payable, the

2    amount outstanding to BST was $39,340; right?

3    A.    Sure.  Yes.

4        Q.    And so by October 6th, it's out to $57,601.88;

5    right?

6    A.    I believe that report is dated December 31st, 2015.

7        Q.    It's as of.  But it was printed on October 6, 2016;

8    right?

9    A.    Yes.

10       Q.    Right.  And so as of December 31, 2015, you're

11    carrying $57,601.88; right?

12    A.    Yes.

13       Q.    And so what's changed between May 7th, 2015 and

14    December 31, 2015 is you've added the outstanding payable for

15    the materials, $9,130.94, times 2, because it's on both

16    properties; right?

17    A.    Yes, under BST Plumbing.

18       Q.    Okay.  And that still remains outstanding to this

19    day; right, sir?

20    A.    I believe so.

21       Q.    Now, if we go back to Exhibit 84 --

22           MR. CARNATHAN:  And actually, Mr. Harzl, could we do

23    the Exhibit 50 page on the left-hand side and the Exhibit 84

24    on the right-hand side?

25           MR. HARZL:  I'm bringing back 84.

DAN GERSH - Cross

1            MR. CARNATHAN:  Yeah, I guess left and right --

2    doesn't matter that much, but --

3    BY MR. CARNATHAN:

4        Q.   Okay, so I'm now looking at Decor Art.  So as of May

5    7th, 2015, Decor Art had an outstanding payable of $11,250;

6    right, sir?

7    A.   Yes.

8        Q.   And as of 12/31/2015, that payable was up to 23,000;

9    right?

10   A.   Yes.  And this document is from?  This one we're looking

11   at here.

12       Q.   The -- which one?  The --

13   A.   This one.

14       Q.   The A/P summary, 12/31/15?

15   A.   Yes.

16       Q.   That was produced by the Gordon firm, I believe.

17   A.   Okay.

18       Q.   Okay?

19   A.   So it's his workpaper?  Oh, yeah, the B-10.  Okay.

20       Q.   Okay.

21   A.   Yeah, it's --

22       Q.   And if we look at Dream Flooring -- well, as long as

23   this one's on screen -- it's 13,910 as of 12/31/2015; right?

24   A.   Yes.

25       Q.   And that's down slightly from May 7th where it was

DAN GERSH - Cross

1    15,460; right, sir?

2    A.   Yes.  But -- yes.

3        Q.   Well, you had given them a $5,000 check in July;

4    right?

5    A.   Dream Flooring?  Yes.  Um-hum.

6        Q.   Okay, and if we look at ProExcavation, ProExcavation

7    is carried at 325,000 as of May 7th; do you see that?

8    A.   Yes.

9        Q.   And if we look back at as of 12/31, it had gone up

10   to 439,000 and change.  You with me?

11   A.   Yes.

12       Q.   Did you make up journal entries for ProExcavation in

13   2014 and 2015, Mr. Gersh?

14   A.   Did I enter?

15       Q.   Did you make up journal entries?  Did you --

16   A.   Did I make up --

17       Q.    -- make them up?

18   A.    -- journal entries?  No, I did not.

19       Q.    All right.

20           MR. CARNATHAN:  Can I have Exhibit 148, at 1342?

21           MR. PERTEN:  I'm sorry, what exhibit, Sean?

22           MR. CARNATHAN:  I'm on 148 --

23           MR. PERTEN:  Thank you.

24           MR. CARNATHAN:  -- at page 1342, which should be the

25   seventh page of the exhibit.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1          And maybe blow up the -- yeah, the accounts

2     receivable.  Thanks.  Yeah.

3     BY MR. CARNATHAN:

4          Q.   So, sir, I'm showing you a page from the ProEx

5     general ledger.  Are you with me?

6     A.   Yes.

7          Q.   And we've blown up the accounts-receivable portion

8     of it.  You see there's a number of entries on the various

9     projects, all as of 12/31/2014?  You see that?

10    A.   Yes.

11         Q.   And mostly in round numbers; right?

12    A.   Yes.

13         Q.   And that was the product of a group effort to

14    determine what was most likely due to ProEx; right?

15    A.   Yes.

16         Q.   Yeah.  And in fact, you can't recall whether you had

17    a copy of the ProEx proposals when you put in the 325- into

18    the receivables there; can you, sir?

19    A.   Could you say that one more time?

20         Q.   You can't recall if -- when you put the 325- into

21    the books here, whether you had a copy of the ProEx proposals?

22    A.   I don't know if I even entered that in.

23         Q.   Well, isn't it true, sir, that in fact these entries

24    were made sometime on or after June 30th, 2015?

25    A.   I have no way of answering that question for you.

DAN GERSH - Cross

1        Q.   Right.  I'll help --

2   A.   It could have been before.  It could have been on 12/31.

3   It could have been in 12 -- in 2015.

4        Q.   Well, in the middle of 2015 when you were working on

5   the ProEx tax returns for 2014, the main thing you had to

6   figure out was how much income you wanted to show for ProEx;

7   right?

8   A.   For all of our projects, yeah, in reference to all the

9   revenue.  Sure.

10       Q.   Right?  And that was the moment on or after June

11  30th, 2015 when you opened up the ProEx accounts receivable

12  and started playing around with it; right?

13  A.   I don't know.  That's usually in reference to our own

14  projects where we don't have any partners.

15       Q.   Right, because playing around with the accounts

16  receivable on projects with your partners would be wrong;

17  right, sir?

18  A.   No.  Playing around with it means playing around, looking

19  within the QuickBooks, is what that meant:  looking.

20       Q.   Well, do you remember sending an email to your

21  accountants on June 30th, 2015, saying you were going to play

22  around with the ProEx accounts receivable?

23  A.   Yes.  If that's the exact wording of the email, then

24  sure.

25       Q.   Happy to show it to you.

DAN GERSH - Cross

1  A.   Please.

2       MR. CARNATHAN:  Can I have Impeach-86, please?  It's

3  on the third page.

4  BY MR. CARNATHAN:

5       Q.   Okay, so I'm looking in the middle of the page.  On

6  June 30th, 2015, you wrote, "I just opened up ProEx for the

7  first time since coming back ... and noticed that the 12/31/14

8  balances might not match up with what we discussed or should

9  have as A/P for 2014.  I think it's undervalued.  Let me play

10  around with it for a little and get back to you on that."

11  Have I read that correctly?

12  A.   Correct.  "I just opened up ProEx for the first time

13  since coming back," period, period, period.  "Let me play

14  around with it for a while and let me back to you."  Not play

15  around with A/P -- or A/R.  Play around with the QuickBooks

16  file is what I meant.

17       Q.   Well, if we go to the fourth page, you're at this

18  point talking about creating invoices for Classic Interiors,

19  dated 12/31/14; right, sir?

20  A.   Phil Gordon is, yes.

21       Q.   Right.  And those are on some of the same projects

22  that we just saw on the ProEx A/P, right:  the Fredette Road,

23  Wallace Street, Parker Terrace, Cynthia Road, Centre Street?

24  A.   I believe so, yes.

25       Q.   Right.  On some of those, Mr. Kagan had investors;

DAN GERSH - Cross

1    right?

2    A.    On one of them, yes.

3         Q.    Cynthia Road; right?

4    A.    Yep.

5         Q.    Yeah.  They certainly had investors on Lyman-Cutler?

6    A.    Sure.

7         Q.    And if we go back to the second page --

8    A.    That 15,000 to Cynthia Road was not in Cynthia Road's

9    QuickBooks.

10        Q.    If we go to the second page and we look toward the

11   top, you refer to "potential adjustments, 10K Wallace, 60K" --

12   "65K Yarmouth, and 100K-plus from Centre.  We could have an

13   additional 150- to 200K in revenue due to ProEx for 2014."

14   Have I read that correctly?

15   A.    Correct.

16        Q.    Right.  And you had investors in Yarmouth Road;

17   right, sir?

18   A.    Correct.

19        Q.    Right?  Elaina Landau (ph.); right?

20   A.    That's summarizing the math.  Yes.

21        Q.    Right.  And if we go to the first page, on July 1

22   you say that you've confirmed all of the ProEx A/R amounts

23   with the properties, good to go; right, sir?

24   A.    Yes.

25             MR. CARNATHAN:  Can I mark this as C -- what are

DAN GERSH - Cross

1   we -- we're up to CC, right -- CC for identification?

2          PLAINTIFFS' EXHIBIT CC WAS MARKED FOR IDENTIFICATION

3                MR. CARNATHAN:  I'd like to offer CC for

4   identification into evidence, please.

5                MR. PERTEN:  No objection.

6                THE COURT:  Okay, it's admitted.

7                THE CLERK:  It will be Plaintiffs' Exhibit 341.

8          PLAINTIFFS' EXHIBIT 341 WAS ADMITTED INTO EVIDENCE

9   BY MR. CARNATHAN:

10        Q.   Now, in fact, Mr. Gersh, when you were working on

11  the returns for KDC and ProEx for 2015 in September of 2016,

12  you actually flat-out said that you had made up journal

13  entries for 2014; isn't that right, sir?

14  A.   Could not tell you.

15               MR. CARNATHAN:  Can I have Trial Exhibit 77, which is

16  already in evidence, I believe?

17               Yes.

18  BY MR. CARNATHAN:

19        Q.   Okay.  So we're now looking at Exhibit 77 in

20  evidence.

21               MR. CARNATHAN:  And I need the third page, please.

22  Actually, perhaps starting on the second, in order to give us

23  the right context.

24  BY MR. CARNATHAN:

25        Q.   So I'm looking down at the bottom of page 2 of

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

```
 1    Exhibit 77 and just showing you that this is an email from you

 2    to the Gordons on September 19th, 2016; right?

 3    A.   Yes.

 4         MR. CARNATHAN:  Okay, and if we jump to the next

 5    page, please.

 6    BY MR. CARNATHAN:

 7         Q.   This is a continuation of your email, and in the

 8    second full paragraph down, you say, "This might be a repeat

 9    of last year when we simply make up some journal entries to

10    get things closed out, instead of wasting time trying to

11    figure it out.  Sucks that it's like this again."  Have I read

12    that correctly?

13    A.   Yes, yes, yes.  Yeah.

14         Q.   So you did make up journal entries to close out

15    2014 --

16    A.   No.

17         Q.   -- right?

18    A.   What that term -- what that's in reference to are the

19    adjustable journal entries that the Gordons make at year end.

20    That's what that's in reference to.  Poor choice of words, but

21    definitely not that.  And no mention of Lyman-Cutler in this

22    email -- or this -- yeah, that email, from me.

23         Q.   Okay, so you made up some journal entries but they

24    were kind of harmless little journal entries that were okay to

25    do?
```

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

```
 1    A.   I didn't make up any journal entries.  The Gordons make

 2    year-end adjusting journal entries, AGEs (sic), that they do

 3    at 12/31/14 -- or 12/31; a bunch.

 4         Q.   Okay.  Did you also, at the end of 2015, do some

 5    reshuffling and make some transactions in order to show some

 6    more income in KDC for 2015?

 7    A.   You'd have to show me; I'm sorry.

 8         Q.   Yeah.  Mr. Kagan was looking for a loan and didn't

 9    have enough income in KDC for 2015, so you shuffled things

10    around?

11    A.   I don't know what you're referring to, off the top of my

12    head.

13              MR. TAMPOSI:  Can I have Impeach-87, please?

14                        (Pause)

15        PLAINTIFFS' EXHIBIT DD WAS MARKED FOR IDENTIFICATION

16    BY MR. CARNATHAN:

17         Q.   Okay.  We have up on screen what has been marked by

18    the clerk Exhibit DD for identification.  Do you recognize

19    this as a series of emails back and forth between you and the

20    Gordons, sir?

21    A.   Yes.

22         Q.   Okay, and if we look to the -- one, two, three,

23    four -- I guess the fourth page in, to give context, right,

24    there's an email there, down toward the bottom, and you're

25    talking about getting an email from Doug.  Doug is the
```

DAN GERSH - Cross

1 underwriter on a loan that KDC was looking for?

2 A. I'm not sure.  I think it's just a personal loan to Vadim

3 on a personal home or property, unrelated to Lym -- I -- I

4 don't remember; personal, I think.

5  Q. All right.  Well, if we go to the next page of the

6 exhibit, this is an email from Douglas McGregor (ph.), the

7 loan officer at Tidewater Mortgage, and he is telling actually

8 you, because the -- looks like the email starts, "Hi, Dan";

9 "I'm reviewing the P&Ls and it appears Kagan Development had a

10 major decline in 2015?  If that's the case, we may have a

11 problem.  They may want to review the P&L and see if it is

12 correct.  That is where the bulk of the income came from in

13 2014, after a low 2013.  They may not qualify if Kagan

14 Development ends here with only 68K in net profit."  Have I

15 read that correctly?

16 A. Yes.

17  Q. All right, now, if we return to the fourth page --

18 A. Before we turn away from that, that said, "steep decline

19 in 2015".  Is that right?

20  Q. That's what he said, yeah.

21 A. Okay.

22  Q. Yeah.

23 A. Yeah.

24  Q. So on the fourth page in, on December 30th, 2015,

25 you say to Mr. Gordon, "Got this email from Doug last night

DAN GERSH - Cross

1  and we have a call scheduled for 4 o'clock today.  Can you

2  take a peek at the items his underwriter listed as issues and

3  let me know if there's anything I/we should be concerned about

4  right away that requires us reshuffling or making any

5  transactions before year end?  Maybe we need to advance some

6  services to KDC from certain properties.  Or maybe KDC's books

7  simply need to be reviewed for year end.  Now we can make sure

8  we actually accounted for all the sales properly, which I

9  don't think we've done yet."  Have I read that correctly?

10  A.   Yes.

11      Q.   So did you reshuffle and make transactions for KDC

12  at the end of 2015?

13  A.   Don't believe so.  Don't know what we could reshuffle.

14      Q.   Let's think about Lyman-Cutler again in particular.

15  And as of May 7th, 2015, that Trial Exhibit 50 that we've

16  looked at a bunch of times, you had about 758,000 bucks in

17  outstanding payables; right, sir?

18  A.   Correct.

19      Q.   And right around that same time, you ran into pretty

20  much the same problem with a couple of other properties at

21  least; right, sir?

22  A.   I don't recall which ones.  Only one other one.

23          MR. CARNATHAN:  Can I have Trial Exhibit 107, please?

24  Maybe blow up that upper right box.

25  BY MR. CARNATHAN:

DAN GERSH - Cross

1    Q.   Right, so Trial Exhibit 107 reflects that there were

2    accounts payable of $385,483.33 on the 10 Lyman Road project,

3    as of May 18th, 2015; right, sir?

4    A.   Yes.

5         MR. CARNATHAN:   Okay, and then if I could have

6    Exhibit 94, please?   And maybe blow up that fourth paragraph

7    down.   But you -- actually, before we do that --

8    BY MR. CARNATHAN:

9    Q.   You can see this is a letter dated June 15th, 2015,

10   from Joseph Cohen, strategic business manager, to a Bromsky

11   (ph.) Kagan and Zena Gassle (ph.); right, sir?

12   A.   Correct.

13   Q.   And so according to this letter as of June 15th,

14   there were $408,172 in payables on Cynthia Road; right?

15   A.   This is the one other project that I didn't remember we

16   had an issue with the partners; yes.

17   Q.   Right.   So we've got three projects, at least, in

18   the May-June time frame, that have hundreds of thousands of

19   dollars in payables; right?

20   A.   Yeah.   Bills were -- were due, correct.

21   Q.   Right.   And so if we add that up, 408- plus 385-

22   plus 758- means that there was $1,551,000 in outstanding

23   payables on just these three projects, for KDC, in that May-

24   June time frame in 2015; right, sir?

25   A.   Not just KDC.   Either KDC or vendors; correct.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1    Q.   All right, let's talk about Mr. Cohen for a moment.

2    You testified he was just an adviser to Mr. Kagan; right?

3    A.   Yes.

4    Q.   And you actually did minimal work with him; right?

5    A.   Correct.

6    Q.   In fact, he only came to the office maybe twice over

7    multiple years; right?

8    A.   Roughly, yes.

9    Q.   And you, at one time at least, spoke to him on the

10   phone about monthly; right?

11   A.   Yes.

12   Q.   In fact, Mr. Cohen has his own company; it's called

13   Sarc; right?

14   A.   Believe so.

15   Q.   Right.

16   A.   Sarc, Inc.

17   Q.   Right.  Sarc, Inc., right.  That's where you pay --

18   like, when Mr. Cohen sends you a bill, it's from Sarc and

19   that's who you pay; right?

20   A.   Believe so.

21   Q.   Right.

22        MR. CARNATHAN:  Can I have Exhibit 304, at page 4,

23   please?  And blow up that second-to-the bottom -- the reclass.

24   BY MR. CARNATHAN:

25   Q.   So, sir, this is the adjusting journal entries from

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

1   2015 by the Gordons.  You see that KDC paid Sarc 70,000 bucks

2   just in 2015 for his -- for Cohen's work on Lyman-Cutler;

3   right, sir?

4   A.   Correct.

5        Q.   That's about what they were paying you for a year's

6   work in 2015; right, sir?

7   A.   Correct.

8        Q.   When was the last time you wrote a check to Sarc?

9   A.   Can't recall.  It's been a while.

10        MR. CARNATHAN:  Could I have Exhibit 37?

11   BY MR. CARNATHAN:

12        Q.   So, Mr. Gersh, I'm showing you Exhibit 37, which is

13   the contract allegedly between Lyman-Cutler and KDC.  And you

14   don't remember ever laying eyes on that before your deposition

15   in May 2018; do you, sir?

16   A.   Correct.

17        Q.   And you don't really know what the basis is for the

18   $580-odd-thousand general-contractor fee; do you, sir?

19   A.   Correct.

20        Q.   That -- you describe that as above your pay grade;

21   right?

22   A.   Sure.

23        Q.   Above your pay grade as the CFO of KDC; right?

24   A.   Yes.

25        Q.   And you never put a general-contractor fee into the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

DAN GERSH - Cross

```
 1   Lyman-Cutler QuickBooks; did you, sir?

 2   A.   Correct.

 3        Q.   Because you were never asked to?

 4   A.   Correct.

 5        Q.   And you never put a general-contractor fee in KDC's

 6   books either; right?

 7   A.   Correct.

 8        Q.   Because you were never asked to?

 9   A.   Correct.

10        Q.   Right?  You've actually got nothing to do with the

11   contracts or fees to KDC; right?

12   A.   Correct.

13        Q.   And in fact, if we were to put Exhibit 67 back up on

14   screen, that KDC invoice, you don't actually even remember

15   when you first saw that invoice; do you, sir?

16   A.   Is that that proof-of-claims invoice?

17        Q.   Yeah, that June 1, 2015 invoice.  You don't actually

18   remember when you first saw that; right?

19   A.   Around that time, I'm guessing; yes.

20        Q.   Well, you told me at your deposition, it could have

21   been as late as 2017; right?

22   A.   That I saw it?

23        Q.   That you for the very first time saw that invoice

24   that we've got up on screen right now.

25   A.   I probably saw it before.
```

DAN GERSH - Cross

1    Q.    Okay, so I'm at page 112 of your deposition.

2    A.    Yep.

3         MR. CARNATHAN:  Maybe it's helpful to go to the first

4    page of 67, Bill.

5         MR. HARZL:  Pardon?

6         MR. CARNATHAN:  Would you put up the first page of

7    67?

8    BY MR. CARNATHAN:

9    Q.    Okay.  You see I've just put on screen -- Exhibit 67

10   has that little sticker in the upper right corner that

11   identifies this as Exhibit 28 back when we were doing

12   depositions; right, sir?

13   A.    Yes.

14   Q.    Okay, and then if we go to the last page again,

15   Exhibit 28 has that invoice attached to it; right?  You with

16   me?

17   A.    Yes.

18   Q.    So now if we go back to your deposition transcript, at

19   line 18 I say, "Was the first time that you saw that invoice

20   that's attached to Exhibit 28 -- was that more than a year

21   ago?"  And your answer's, "Approximately.  Maybe, yeah."  And

22   I say, "So are we talking 2017 sometime?"  And you say, "I

23   don't remember when the first time I saw that document was."

24   Have I read that correctly?

25   A.    Yes.



Page 102

DAN GERSH - Redirect

1      Q.  And you were never shown any documentation to

2  support putting a general-contractor fee into the Lyman-Cutler

3  books as an obligation; right, sir?

4  A.  Correct.

5      Q.  And you're unaware of Mr. Kagan ever charging a

6  fifteen-percent general-contractor fee on any project for

7  which you've kept the books; right?

8  A.  He had never gone in -- to suit on another project.  I've

9  never been a part of any of these other projects.

10      Q.  Right.  And you've never booked a payable for a

11  general-contractor fee on any of the project books you've ever

12  done; right, sir?

13  A.  Correct.

14      Q.  And you've never booked a receivable on KDC books,

15  for a general-contractor fee, ever; right, sir?

16  A.  Correct.

17         MR. CARNATHAN:  That's all I have for Mr. Gersh.

18         MR. PERTEN:  May I proceed?

19         THE COURT:  Whenever you're ready.

20               REDIRECT EXAMINATION

21  BY MR. PERTEN:

22      Q.  Mr. Gersh, when you went back to subs for whom you

23  were missing invoices, approximately how many did you have to

24  go back to?

25  A.  A handful.  Several, tops.



DAN GERSH - Redirect

1      Q.    Okay.  Fair to say that you had the majority of the

2   backup --

3   A.    Yes.

4      Q.    -- without going back?

5   A.    Yes.

6      Q.    Now, Mr. Carnathan asked you some questions about

7   ProEx and tracking expenses for ProEx.  Do you recall that

8   testimony?

9   A.    Yes.

10     Q.    For purposes of billing on ProEx, do you bill based

11   on expenses?

12   A.    No.

13     Q.    Do you bill against a lump sum?

14   A.    Correct.

15     Q.    Now, we looked at this audit trail, which has now

16   been admitted into evidence as Exhibit 340.  Do you still have

17   that document in front of you?

18   A.    It was --

19     Q.    Exhibit 340 was the audit trail that Mr. Carnathan

20   gave you.

21   A.    I don't believe I got it --

22     Q.    May I hand you --

23   A.    -- physically.

24        MR. PERTEN:  Your Honor, may I hand him my copy?

25        THE COURT:  You may, of course.

DAN GERSH - Redirect

1  A.   Or I can take this.

2        MR. CARNATHAN:  Do you want us to put it up on

3  screen?  I know that it's tiny.

4        MR. PERTEN:  No, I'll just hand him my copy.

5  BY MR. PERTEN:

6     Q.   Did you prepare that audit trail?

7  A.   I did not.  I don't believe so.

8     Q.   Okay.  Did you ever review that audit trail prior to

9  today?

10 A.   No.

11    Q.   Do you know what parameters were tied into that

12 audit trail to make that report spit out?

13 A.   I do not.

14    Q.   Is that something that was prepared by the

15 plaintiffs, as far as you know?

16 A.   Yes.

17    Q.   Do you know whether that reflects all the changes

18 that you made to the account?

19 A.   It certainly does not.

20    Q.   Okay, so it's a very early report; is that correct?

21 A.   Correct.

22    Q.   Do you know whether that audit report relates at all

23 to the QuickBooks that were used to support your proof of

24 claim?

25 A.   No.



DAN GERSH - Redirect

1    Q.   Okay.  Now, with respect to the Lyman-Cutler bank

2    accounts and checks, we had some discussion about that; do you

3    recall?

4    A.   Yes.

5    Q.   In your QuickBooks summaries, did you list the check

6    numbers and amounts for all checks that were written on the

7    Lyman-Cutler account?

8    A.   I did not go back to change or enter all of the previous

9    bookkeeper's items, unless there was something that I found to

10   be an error or misguided --

11   Q.   Has --

12   A.   -- in my review.

13   Q.   Has anybody, to date, pointed to any Lyman-Cutler

14   check which was entered incorrectly into QuickBooks?

15   A.   No.  It's -- well, they have it.

16   Q.   And to the extent that items were paid by Lyman-

17   Cutler checks, although you didn't look at the checks

18   themselves, did you confirm that the money was -- that there

19   was an invoice supporting that check?

20   A.   Yes.

21   MR. PERTEN:  Could you pull up Exhibit 84, please?

22   84.  Could you scroll down just a little bit?  The

23   other way, to the top.  Thank you.

24   BY MR. PERTEN:

25   Q.   Now, we looked at Exhibit 84.



DAN GERSH - Redirect

1          MR. PERTEN:  And if you could scroll down just a

2     little bit more, to the bottom, for a second.

3     BY MR. PERTEN:

4          Q.   I notice in the lower right-hand corner it says,

5     "SGC000700".  Do you see that?

6     A.   Yes.

7          Q.   And I'll represent to you that that's a document --

8     that's a Bates number from the Gordon document production.  So

9     my question for you is, do you know how this document was

10    created?

11    A.   This is most likely a report that they ran using the

12    Lyman-Cutler QuickBooks file that I sent them -- I don't know

13    when I would have sent them, but obviously they ran it as of

14    12/31/15.  I don't know if I sent it to them January 1st or

15    whatnot.  But the purpose of them having this document and

16    creating this document goes back to that annual tie-out of

17    intercompany and interproject balances.

18         So that's why they have a number next to KDC and probably

19    why they would have had something next to ProEx, because they

20    couldn't care at all about what makes up the 888,729.94.  The

21    exercise we went through with them, with every single project,

22    was tying out KDC and then also, on ProEx's books, ProEx

23    balances between each one.  Whether it's 175,000 or whether

24    it's $0, as of year end, all intercompany balances need to be

25    the same number --

DAN GERSH - Redirect

1    Q.   Okay.

2    A.   -- on both sides.

3    Q.   So you'd agree with me, sir, this is a worksheet

4    that the Gordons created?

5    A.   Yes.  And --

6    Q.   And do you know, sir, as a worksheet, whether there

7    were other versions of this document; other worksheets?

8    A.   There may have been, yes.

9    Q.   Okay, so do you know whether this is the final

10   report of something that the Gordons were doing?

11   A.   No.  And the variance shows the thing that they were

12   trying to find or look at.

13   Q.   Okay.  And again, let's focus on your relationship

14   with the Gordons, because we've looked at a lot of emails back

15   and forth with the Gordons -- being your CPAs, correct?

16   A.   Correct.

17   Q.   And again, let's just review here.  At the year end,

18   on an accrual basis, how much do you pay -- what do you pay

19   taxes on?  Not a number, but generically.

20   A.   On -- on income.

21   Q.   Okay.  And is that income reflected as to dollars

22   actually in, or dollars that are accrued --

23   A.   Accrued.

24   Q.   -- in that period?  So is this --

25   A.   Outstanding or not.

DAN GERSH - Redirect

1    Q.   -- process of adjusting the numbers and looking at

2    how much is accrued in a year a standard dialogue that you

3    have with the Gordons every year?

4    A.   Every year; month at a time.

5        Q.   And is the danger --

6            MR. PERTEN:  Strike that.

7    BY MR. PERTEN:

8        Q.   Is there a danger that if you accrue a hundred

9    percent of the dollars in a single year, even if you haven't

10   received the money, that you would be taxed on that money

11   before you even got it?  Correct?

12   A.   Correct.

13       Q.   And is part of the discussion as to how much should

14   be recognized within the requirements of the law for tax

15   purposes?

16   A.   Yes.

17       Q.   Okay.  So at any point, to the best of your

18   knowledge, were you just making up numbers?

19   A.   No.

20       Q.   And again, was this part of an ongoing dialogue as

21   to how accountants deal with accrual companies?

22   A.   Correct.

23       Q.   And in deciding what gets accrued and what gets

24   realized when, are you in essence relying on the Gordons to

25   explain tax laws to you?

DAN GERSH - Redirect

1   A.   Absolutely.

2        Q.   Now, we looked at an email where they talked --

3   where you used the words "play around" with numbers.

4   A.   Yes.

5        Q.   What did you mean by that?

6   A.   I meant going in the QuickBooks and playing around, going

7   in between all the accounts, running reports.  Researching.

8   Looking.

9        Q.   Okay.  So that was a colloquial way of saying

10  "researching"?

11  A.   Sure.

12                        (Pause)

13  BY MR. PERTEN:

14       Q.   Now, sir, we looked at what has now been marked as

15  Exhibit 341.  And there was an email that Mr. Carnathan read

16  to you, which has that "play around" -- it says, "About to

17  upload Classic Int. (ph.) and KDC to file exchange.  Just

18  opened up ProEx for the first time since coming back, and

19  noticed that the balances might not match up with what was

20  discussed or should have had as A/P for 2014.  I think it's

21  undervalued.  Let me play around for a little and get back to

22  you on that."  Recall that email?

23  A.   Yes.

24       Q.   And again, was this a conversation regarding what to

25  realize for purposes of accrual?

DAN GERSH - Recross

1   A.   Yes.  Terrible wording.  Sorry.

2        Q.   And incidentally, would you have also had

3   conversation -- telephone conversations with Gordon?

4   A.   Certainly.

5        Q.   So is this the entire discussion with Gordon on that

6   topic, or is this merely a part of a conversation?

7   A.   A small percentage.  We had a lot of screen-sharing

8   conference calls to discuss -- so that they could see what was

9   in the QuickBooks; like, they got control of my computer, that

10  type of thing, so they could see.

11       Q.   And based on your training, sir, when you were an

12  auditor for some of the big -- KPMG and Iron Mountain and all

13  those, as well as you training as a certified fraud examiner,

14  is this kind of conversations that you're having with an

15  accountant typical for what you'd expect to see?

16  A.   Yes.

17           MR. PERTEN:  No further questions, Your Honor.

18                     RECROSS-EXAMINATION

19  BY MR. CARNATHAN:

20       Q.   Just briefly, sir.  Did I understand; you testified

21  that that audit trail -- I think it was Exhibit 340 that we

22  looked at.  You're saying that you don't know whether that

23  relates at all to the QuickBooks that were used to prepare the

24  proof of claim?  Did I hear that right?

25  A.   Correct, timing-wise.

DAN GERSH - Recross

1      Q.   Okay.  Are you saying you created a separate set of

2  QuickBooks to do the proof of claim?

3  A.   No.

4      Q.   No.  So just timewise?  Like, there may have been

5  entries after what I showed you?

6  A.   Incomplete -- correct.  Yes.

7      Q.   All right.

8  A.   But again, I didn't run that out at trail, so I don't

9  know --

10      Q.   Right.  But --

11  A.   -- who -- who ran that.

12      Q.   Right.  But you're not challenging that those

13  particular entries were made; just that there may have been

14  entries after that?

15  A.   Certainly.

16      Q.   Right.

17  A.   Sure.

18          MR. CARNATHAN:  That's all I have.

19          THE COURT:  Okay.  Anything else?  No?

20          All right.  Thank you, Mr. Gersh.

21          THE WITNESS:  Thank you.

22          THE COURT:  So is that it for today, or do you

23  have --

24          MR. PERTEN:  Yes, that's it for today, Your Honor.

25          THE COURT:  All right.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1      MR. PERTEN:  There are a couple of housekeeping

2   questions, if I might?

3      THE COURT:  Sure.

4      MR. PERTEN:  Really two.  One is that tomorrow, Von

5   Salmi, our expert, will testify, followed by Mr. Doddridge,

6   the plaintiffs' expert.  My preference would be not to have

7   Mr. Doddridge in the courtroom while Mr. (sic) Von Salmi is

8   testifying.  And I -- Mr. Carnathan views it differently, so

9   we wanted to address that --

10      MR. CARNATHAN:  Right.

11      MR. PERTEN:  -- to you.

12      MR. CARNATHAN:  Well, I mean, the problematic thing

13   is that Mr. Doddridge is being called to rebut Mr. Salmi.  So

14   if he doesn't hear what Mr. Salmi says, then how does he rebut

15   what Mr. Salmi says?

16      THE COURT:  Right.

17      MR. PERTEN:  Your Honor, with respect to Mr.

18   Carnathan, Mr. Salmi will --

19      Thank you.

20      -- will be testifying on direct, in accordance with

21   his report, which was provided, that Mr. Doddridge had a

22   chance to review.  What he doesn't have -- if you recall, Your

23   Honor issued sanctions.  There was, like -- and there's an

24   order that said we did not have to produce our rebuttal to his

25   expert report.

1          So as to what he's going to testify to on direct,

2     there's -- he has all the information that he needs.  But

3     similarly to as Your Honor has ruled before, I don't think

4     it's appropriate for the expert to hear my expert.

5          THE COURT:  Yeah, but the rule is quite different as

6     it relates to experts, of course, because experts aren't

7     testifying to facts.  Right?  And it's important for me as a

8     trier of fact, if I'm going to be helped by an expert, to have

9     that expert know what the expert said --

10          MR. PERTEN:  Right, and you will have that.

11          THE COURT:  -- to which he's being responsive.

12          MR. PERTEN:  And you will have that.  And there's

13     certainly no surprise, to the extent that we've made our full

14     expert disclosure.  It's not like there should be any

15     surprise.  What I don't think, though, he's entitled to is

16     hear -- is basically augmenting or getting an advance read of

17     how we're going to phrase things or do things.  I don't think

18     he's entitled to be in the courtroom for that.

19          MR. CARNATHAN:  I guess I'm slightly confused,

20     because I think Mr. Doddri -- excuse me, Mr. Salmi testifies

21     to his opening report, however he does that, and then Mr.

22     Doddridge will rebut it.  And then as I understand the Court's

23     order, Mr. Salmi will get a last chance to rebut Mr.

24     Doddridge.  But I don't think Mr. Salmi gets to anticipate

25     rebuttal to Mr. Doddridge --

```
 1                THE COURT:  That's right.

 2                MR. CARNATHAN:  -- before he even testifies.

 3     That's --

 4                THE COURT:  That's right.  So you can --

 5                MR. CARNATHAN:  -- weird.

 6                THE COURT:  -- you can call him again; you can call

 7     him back.

 8                MR. PERTEN:  That's correct.

 9                THE COURT:  That's right.  That's -- I think that's

10     enough to level the field here.  And again, the rule is

11     addressed to facts; that's the concern that the rule is

12     intended to deal with.  So --

13                MR. PERTEN:  Okay.

14                THE COURT:  Okay?  So he can be here.

15                MR. PERTEN:  All right.  The second issue, Your

16     Honor, which is really administrative -- the hope, the goal,

17     is to finish tomorrow with the evidence.  How does Your Honor

18     want to handle -- I'm assuming we don't have closings

19     tomorrow; you'll do that at a later date.

20                THE COURT:  Right.

21                MR. PERTEN:  But if you could give us some guidance

22     as to what your --

23                THE COURT:  Yes.

24                MR. PERTEN:  -- expectations are.

25                THE COURT:  So what I'd like to do is -- I'm going to
```

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1   ask for proposed findings and rulings.  And you've probably

2   been getting the transcripts as we go, I think; right?  So --

3   sometimes it's a wait.  And there might be a little wait for

4   tomorrow's and today's.  But what I find useful is that, if

5   you were to file your proposed findings and rulings, give me a

6   little time with them, and then come in and do closings, then

7   I could actually ask questions that I have as a result of your

8   proposed findings and rulings.  And if you want to file a

9   short memo of law in support, I'm happy to have you do that

10  too, if you want to.  But the findings and rulings I do need.

11          So does that sound like a procedure that is --

12          MR. PERTEN:  It does.  There is a little -- just so

13  Your Honor's aware; we do get the audio files daily.

14          THE COURT:  Yeah.

15          MR. PERTEN:  The transcription takes several days

16  more after you've ordered it, unless you order it expedited,

17  which -- we haven't ordered expedited copies.  But it's

18  anywhere, as I understand it, from two weeks to thirty days,

19  depending on --

20          So, speaking for myself, I've got --

21          THE COURT:  Well, you tell me.

22          MR. PERTEN:  I've got the transcripts from the first

23  half of the trial.  I don't have the transcripts yet from

24  today and -- obvious -- or Monday, Tuesday, of last week.

25          THE COURT:  So I leave it to you, in a way.  I mean,



 1   what would be a reasonable time?  So, first of all, are we

 2   talking about simultaneous --

 3             MR. PERTEN:  Right.

 4             THE COURT:  -- filing?  I think.  Okay.  And you want

 5   to make that forty-five days out?

 6             MR. PERTEN:  After receipt of the transcript?

 7             THE COURT:  Well, I don't know about that.  No, I

 8   wouldn't -- I wasn't thinking that far out.  You tell me.

 9             MR. PERTEN:  I guess I would want to contact the

10   transcriber and see how -- on the ordinary course, how quickly

11   I can get the transcript, because I don't want to be pinched

12   until I know that.

13             THE COURT:  Yeah.

14             MR. CARNATHAN:  I don't think we've waited --

15             THE COURT:  Do you have a sense, Elizabeth?

16             MR. CARNATHAN:  -- more than a week or so.  Have we?

17   I --

18             MR. PERTEN:  Well, I know you can pay an expedited

19   fee and get it in a week.  I --

20             THE COURT:  Oh, I'm sure you can pay something and

21   get it in a day, but --

22             MR. PERTEN:  Right.  But my preference -- my client's

23   preference is to --

24             THE COURT:  Yeah.

25             MR. PERTEN:  -- not to be paying those expedited fees

1   unless it's absolutely necessary.

2          THE COURT:  I understand.

3          Elizabeth, do you have a sense of how long?  What do

4   you think?

5          THE CLERK:  Well, the transcript (indiscernible).

6          MR. PERTEN:  The audio or the written --

7          THE COURT:  No; transcript.

8          THE CLERK:  Transcript.

9          THE COURT:  So that's a week.  I mean --

10         MR. PERTEN:  May I make a suggestion, Your Honor?

11         THE COURT:  Yeah, go ahead.

12         MR. PERTEN:  When I get back to the office, we'll

13   call the -- my assistant is on top of this.  We'll call the --

14   and report back to the Court tomorrow.

15         THE COURT:  That's fine.

16         They can talk to them, right?

17         Yeah.  Okay.  So go ahead.  We'll inform --

18         MR. PERTEN:  Yeah.

19         THE COURT:  -- ourselves.  And I'm not trying to

20   squeeze you.  I'm also trying not to have this go into the --

21         MR. PERTEN:  Right.  Right, right.  Forty-five days

22   may be perfect; I just want to --

23         THE COURT:  Yeah.  Yeah.  Right.  I think that's a

24   lot of time --

25         MR. PERTEN:  Yeah.

```
 1              THE COURT:  -- from when you get the transcripts.  I
 2    think thirty is more than enough from when --
 3              MR. PERTEN:  That's fine.
 4              THE COURT:  -- you get the transcripts.  But -- and I
 5    don't anticipate it's going to be thirty to get the
 6    transcripts.  But inform yourselves and then -- and talk to
 7    each other and let me know tomorrow what your preference is.
 8    And we can --
 9              MR. PERTEN:  Very good.
10              THE COURT:  -- even give you a date for those
11    closings, assuming that -- some date, assuming that the time
12    that we have for you to receive those transcripts turns out to
13    be right --
14              MR. PERTEN:  Very good.
15              THE COURT:  -- and how much time you'll need for that
16    day.  My inclination would be to put it on for a morning or an
17    afternoon when there's nothing else on.  Okay?
18              MR. PERTEN:  Great.  Thank you, Your Honor.
19              THE COURT:  All right, anything else?
20              Thanks a lot.  I'll see you at 9 tomorrow.
21              MR. PERTEN:  Very good.  Thank you.
22              THE COURT:  Okay.  You know, I have generated a pile
23    of paper; it's all -- I'm going to have Mary give it back to
24    you.  It's all transcripts of depositions and things.  I just
25    don't want it to get -- ended up in my materials --
```

1          MR. CARNATHAN:  Right.

2          THE COURT:  -- and then confused by things that

3     aren't in evidence.  So I'll -- we'll hand those back.  You

4     can leave them here for today and we'll do it at the end of

5     tomorrow.  Okay?

6          MR. CARNATHAN:  Thank you.

7          MR. PERTEN:  Very good.

8          THE COURT:  All right.

9     (End at 12:02 PM)

10                    * * * * * * * * * *

11         I certify that the foregoing is a true and accurate

12    transcript from the digitally sound-recorded record of the

13    proceedings.

14

15

16

17

18

19

20    /s/ Clara Rubin                          July 1, 2019
_____

21
ESCRIBERS LLC
22                           eScribers
                   7227 N. 16th Street, Suite #207
23                      Phoenix, AZ 85020
                         973-406-2250
24               e-mail operations@escribers.net

25

## $

**$0 (1)**
106:24
**$1,550 (1)**
54:25
**$1,551,000 (1)**
97:22
**$10,000 (3)**
31:10,11,23
**$11,250 (1)**
86:5
**$11,360 (1)**
72:15
**$13,955 (1)**
72:3
**$132,00 (1)**
20:15
**$17,000 (1)**
20:10
**$19,670 (2)**
52:2;72:14
**$20,000 (1)**
51:23
**$200,000 (3)**
10:3,14;13:7
**$23,955 (1)**
72:3
**$3.7 (1)**
10:19
**$35,805 (1)**
55:7
**$385,483.33 (1)**
97:2
**$39,340 (1)**
85:2
**$408,172 (1)**
97:14
**$5,000 (3)**
34:20;35:6;87:3
**$500,000 (1)**
18:11
**$57,601.88 (3)**
84:14;85:4,11
**$580-odd-thousand (1)**
99:18
**$665,000 (1)**
19:3
**$758- (1)**
64:22
**$8,900 (1)**
52:21
**$9,130.94 (1)**
85:15
**$9,500 (1)**
60:22

## A

**A/P (7)**
65:7;67:9;86:14;
90:9,15,22;109:20

**A/R (2)**
90:15;91:22
**able (8)**
16:18;26:24;37:21;
39:20;50:9;66:24;75:1;
80:7
**above (5)**
18:6;63:5;64:3;
99:20,23
**Absolutely (8)**
9:22;24:16;30:4;
38:1;45:5;67:2;109:1;
117:1
**access (4)**
16:24;80:14;82:1,3
**accordance (1)**
112:20
**according (2)**
52:21;97:13
**account (9)**
31:9,11;54:20;63:1;
80:10,14;81:19;
104:18;105:7
**accountant (2)**
37:13;110:15
**accountants (3)**
36:17;89:21;108:21
**accounted (5)**
25:24;39:19,21,22;
96:8
**accounting (3)**
22:9;36:20;39:13
**accounts (14)**
64:15,23;70:5,19;
82:11,15;85:1;88:1;
89:11,15,22;97:2;
105:2;109:7
**accounts- (1)**
12:17
**accounts-payable-aging (1)**
83:24
**accounts-receivable (1)**
88:7
**accrual (7)**
36:24;37:6;38:20;
39:10;107:18;108:21;
109:25
**accrue (1)**
108:8
**accrued (4)**
107:22,23;108:2,23
**accurate (4)**
21:1,17;22:9;23:14
**active (1)**
43:6
**actual (3)**
59:18;71:11;75:15
**actually (32)**
23:2;24:2,2;28:23;
38:23;40:9;45:2;47:10;
48:16;49:25;51:5;56:7;
57:2,9;60:10;62:2;
63:18;64:5;70:16;

81:13;85:22;92:12,22;
95:7;96:8;97:7;98:4;
100:10,14,17;107:22;
115:7
**add (2)**
55:10;97:21
**add- (1)**
12:1
**added (10)**
17:9;24:11;33:12;
54:19;70:4,9;72:14;
77:15,22;85:14
**adding (4)**
32:3,16;70:19,25
**addition (1)**
22:15
**additional (4)**
24:21;72:14;77:15;
91:13
**add-ons (3)**
10:22;21:18;22:18
**address (7)**
44:21;45:10,10,14,
18;55:24;112:9
**addressed (1)**
114:11
**adjust (2)**
23:17,21
**adjustable (1)**
93:19
**adjusted (7)**
24:12;72:21;75:23;
77:13,14,16,22
**adjusting (4)**
13:24;94:2;98:25;
108:1
**adjustments (3)**
14:5;71:4;91:11
**administer (1)**
8:6
**administrative (2)**
17:25;114:16
**admitted (12)**
7:7;35:19,19;36:2;
73:18;76:24,25;84:9,
10;92:6,8;103:16
**advance (2)**
96:5;113:16
**advanced (3)**
12:21;17:17;63:25
**advances (2)**
8:18,25
**Adversary (1)**
4:4
**adviser (1)**
98:2
**afternoon (1)**
118:17
**again (31)**
6:20;8:6;9:14;10:7;
12:1;18:10;20:11,20,
23;25:3,11;29:11;
33:13;41:11;49:21;

58:11;72:25;74:9;78:5;
82:9,11;93:11;96:14;
101:14;107:13,17;
108:20;109:24;111:8;
114:6,10
**against (3)**
8:24;32:22;103:13
**AGEs (1)**
94:2
**aging (2)**
65:7;67:9
**ago (3)**
14:7;66:23;101:21
**agree (10)**
10:1;18:10;19:23;
41:23;43:3;67:3;74:14;
79:8;80:21;107:3
**agreed (1)**
7:2
**agreeing (1)**
7:10
**agreement (1)**
7:15
**Ah (1)**
60:5
**ahead (4)**
29:21;47:19;117:11,
17
**airfare (1)**
69:1
**al (1)**
4:5
**Alex (1)**
4:11
**allegedly (1)**
99:13
**allocate (1)**
59:25
**allocated (4)**
40:6;59:15;65:24,25
**allocation (1)**
19:10
**allowed (2)**
40:19;77:12
**almost (3)**
22:11;29:14;38:4
**along (2)**
33:12;60:21
**alphabetically (1)**
43:21
**alter (2)**
28:2,5
**altered (2)**
25:22;28:9
**although (2)**
75:17;105:17
**amended (1)**
21:7
**Amex (5)**
16:12;29:4;33:8,9;
82:4
**amount (19)**
10:3,14,18,19;12:14;

13:3,22;18:6;22:2,2;
24:14,17;26:17;29:8;
32:4;34:25;39:3;79:14;
85:2
**amounts (5)**
32:11;34:10;65:23;
91:22;105:6
**analysis (1)**
21:17
**and/or (1)**
27:19
**annual (3)**
36:22;39:12;106:16
**answered (1)**
45:9
**answer's (1)**
101:21
**anticipate (2)**
113:24;118:5
**anymore (1)**
17:2
**apparently (2)**
5:13;73:5
**appearance (1)**
5:12
**appears (1)**
95:9
**applied (5)**
23:20;31:22,22;
34:25;45:8
**apply (1)**
57:1
**applying (1)**
46:4
**approach (1)**
14:15
**appropriate (2)**
78:10;113:4
**approximately (3)**
10:2;101:21;102:23
**April (32)**
13:21;31:13,18;32:3;
50:10;55:15;67:23;
68:3,11;69:4;70:6,6,9,
10,16,18,18;71:1,1,12,
19,20;72:3,4,11,12;
73:4,5;75:4,8,15;76:5
**around (21)**
13:7;39:2;54:8;
83:18;84:23;89:12,15,
18,18,22;90:10,14,15,
15;94:10;96:19;
100:19;109:3,6,16,21
**arrived (9)**
15:22;21:22;42:25;
44:14;45:7;47:25;49:4,
14;52:18
**Art (4)**
70:1;76:14;86:4,5
**assertion (1)**
52:2
**assistant (1)**
117:13

**assumed (1)**
62:13
**assuming (3)**
114:18;118:11,11
**attached (5)**
64:15;81:14;82:11;
101:15,20
**attachment (1)**
21:7
**attempt (1)**
27:19
**audio (2)**
115:13;117:6
**audit (12)**
26:2;32:9;69:4;70:1;
75:11;103:15,19;
104:6,8,12,22;110:21
**auditing (2)**
40:22,25
**auditor (1)**
110:12
**audit-trail (4)**
69:15,23;74:15,21
**augmenting (1)**
113:16
**August (10)**
13:22;49:24;51:8,8,
16;52:14;53:2,3;55:7;
83:11
**authenticated (1)**
76:21
**authentication (1)**
73:23
**auto (3)**
20:8,8;28:17
**available (1)**
24:19
**aware (1)**
115:13
**away (2)**
95:18;96:4

**B**

**B-10 (1)**
86:19
**bachelor (2)**
67:23;68:5
**back (68)**
9:14;21:4;24:1;
29:18;30:19;34:21;
37:18;40:14;45:12,17;
46:19;47:3,7,8,11,13,
17,20,21;48:6,11,11;
49:16,22;50:21;51:7,9,
17;52:14;53:2,5;
54:13;58:5;67:13;68:5,
13;69:4,11;70:2;75:3;
80:24;81:23;82:7;
84:22;85:21,25;87:9;
90:7,10,13,14;91:7;
94:19;100:13;101:11,
18;102:22,24;103:4;

105:8;106:16;107:14;
109:18,21;114:7;
117:12,14;118:23
**backup (11)**
13:14;20:23;22:8;
25:6;27:11,13;28:2,5;
29:23;33:6;103:2
**bad (1)**
45:25
**baked (1)**
65:18
**balance (9)**
31:25;34:24;54:10,
13,25;79:9,10;84:16,17
**balances (8)**
34:17;79:13,13;90:8;
106:17,23,24;109:19
**bank (19)**
12:25;16:15,18,24;
17:18;18:2;20:7,8;
29:5;35:11;56:25;
62:25;63:25;64:10;
80:4;81:19,22;82:7;
105:1
**based (10)**
14:6,12;17:4;21:16;
23:12;31:4;62:20;
72:21;103:10;110:11
**basically (4)**
43:16;52:24;63:9;
113:16
**Basis (9)**
10:6,17;36:22,25;
37:6;38:20;39:10;
99:17;107:18
**Bates (1)**
106:8
**BB (3)**
69:18,21;73:7
**bear (1)**
6:23
**become (1)**
29:15
**beginning (5)**
11:6;12:11;22:25;
25:23;32:17
**behind (5)**
17:8;26:22;32:24;
33:6,18
**bel (1)**
55:25
**below (1)**
64:1
**best (2)**
21:16;108:17
**beyond (2)**
18:6;23:23
**bid (2)**
51:12;57:12
**bids (1)**
51:8
**big (3)**
27:2,2;110:12

**bill (23)**
20:8;28:6;31:18,20,
20,21,23,24;32:18,20;
34:21;35:3,4,5;39:4;
53:16,19;55:13;70:21;
98:18;101:4;103:10,13
**billed (3)**
8:25;16:10;20:7
**billing (2)**
51:10;103:10
**bills (8)**
26:19;27:3,3,4;
57:21;69:6;71:22;
97:20
**Binder (7)**
19:13,21;30:11,16,
24;58:14;59:10
**binders (17)**
6:16,20;7:24;19:21;
25:1,4,6,9,12,20;26:3,
6;30:1;33:2;37:25;
40:5;58:21
**bit (7)**
9:1;58:19;69:3;
78:16;84:23;105:22;
106:2
**blow (11)**
54:16;65:11;69:16;
70:13;71:16;72:9;
84:23;88:1;96:24;97:6;
98:23
**blown (1)**
88:7
**bold (1)**
71:8
**booked (2)**
102:10,14
**bookkeeper (1)**
22:10
**bookkeeper's (2)**
31:8;105:9
**bookkeeping (4)**
31:7;42:22;43:23;
44:14
**books (18)**
13:13;39:20;41:1;
43:11;46:13;75:3,19;
79:7;82:15;83:11;
88:21;96:6;100:6;
102:3,7,11,14;106:22
**boss (2)**
45:19;57:12
**both (8)**
6:15;26:15,19;34:17;
66:23;71:19;85:15;
107:2
**bottom (8)**
45:3;50:6;65:11;
82:24;92:25;94:24;
98:23;106:2
**box (1)**
96:24
**break (2)**

9:8;58:1
**breakdown (1)**
19:2
**briefly (5)**
8:17;24:25;25:11;
27:9;110:20
**bring (2)**
11:18;51:20
**bringing (1)**
85:25
**broken (1)**
21:21
**Bromsky (1)**
97:10
**Brookline (1)**
27:5
**brought (1)**
10:23
**Brusenkova (1)**
80:21
**BST (23)**
6:6,19,24;48:19,24;
49:10,15,16,18,25;
50:16,17,25;51:2,23;
52:3,8;53:3;72:11;
76:6;84:13;85:2,17
**bucks (8)**
53:16,19;54:19;
55:15,16;65:16;96:16;
99:1
**budget (6)**
8:17,24;9:6;56:23,
23,25
**build (1)**
8:18
**builder (1)**
56:14
**bulk (1)**
95:12
**bullet (3)**
21:11,20;63:21
**bunch (2)**
94:3;96:16
**business (4)**
29:16;35:8,13;97:10

**C**

**C- (1)**
6:10
**C-20 (1)**
20:24
**C-33 (1)**
6:20
**C-41 (1)**
6:15
**C-51 (1)**
6:5
**cabinets (2)**
27:15;44:25
**calculate (1)**
80:8
**calculated (3)**

18:15;22:23;23:4
**calculating (1)**
30:5
**calculation (1)**
23:18
**calendar (3)**
37:9;38:16;39:5
**call (7)**
39:16;65:16;96:1;
114:6,6;117:13,13
**called (4)**
6:25;43:14;98:12;
112:13
**calls (1)**
110:8
**came (4)**
17:10;21:2;40:3;
57:21;62:2,11;95:12;
98:6
**can (59)**
6:7,8;7:2;9:1,2;10:7;
31:14;33:15;34:7,24;
41:4;47:12;53:22,24;
55:12;59:21;63:14,17;
64:20;65:5;66:11;68:1;
69:15,16;70:13;71:16;
73:11;74:5,12,14,17,
19,20,22,23,24;81:3;
83:21;87:20;88:18;
90:2;91:25;92:15;
94:13;96:1,7,23;97:9;
98:22;104:1;114:4,6,6,
14;116:11,18,20;
117:16;118:8
**cancelled (1)**
16:15
**capacities (1)**
40:25
**captured (2)**
40:15;63:13
**care (1)**
106:20
**CARNATHAN (138)**
4:10,11;5:23;6:7,17;
7:2,5;10:5,7,16,18;
11:4;35:18;36:6,8,11;
42:5;44:5,7;48:5,21,
23;52:9,11,25;53:1,5,6,
24;54:1,14,16,18;55:3,
5,12,14;57:25;58:2,12,
15;60:5,6;61:2,4;
63:17;64:4,20,21;65:5,
6,10,12;66:10,15,17;
68:1,2;69:15,19;70:12,
14;71:15,17,24;72:1,8,
10;73:1,2,7,14,21,24;
74:13;77:1,2,5,10;
78:2;79:2;79:2,5;81:3,7;
82:12,13;83:21,22;
84:6,11,21,24;85:22;
86:1,3;87:20,22,24;
88:3;90:2,4;91:25;
92:3,9,15,18,21,24;

Case 16-01120    Doc 368    Filed 07/01/19    Entered 07/01/19 15:41:09    Desc Main
Document    Page 122 of 135
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

June 24, 2019

93:4,6;94:16;96:23,25;
97:5,8;98:22,24;99:10,
11;101:3,6,8;102:17;
103:6,19;104:2;
109:15;110:19;111:18;
112:8,10,12,18;113:19;
114:2,5;116:14,16
**carried (2)**
23:23;87:7
**carrying (19)**
9:5;12:4,6,7,10;
15:19;16:1;18:16,23;
19:3,4,7;21:21;23:19;
61:9;65:25;66:20;
84:13;85:11
**carrying-cost (1)**
19:11
**carrying-costs (1)**
66:6
**case (4)**
4:6;33:10;57:9;
95:10
**categories (3)**
26:13;59:16;66:6
**category (5)**
19:12;26:21;31:8;
34:25;35:2
**CC (4)**
92:1,1,2,3
**Centre (2)**
90:23;91:12
**certain (5)**
14:1;58:20;74:17,21;
96:6
**certainly (19)**
13:19;27:18;29:18;
36:21;47:19,21;49:3,
13;52:17;74:4;75:1;
79:16;80:13;83:17;
91:5;104:19;110:4;
111:15;113:13
**certainty (1)**
50:13
**certified (2)**
40:18;110:13
**CFO (3)**
36:16;76:22;99:23
**challenge (1)**
57:21
**challenged (1)**
57:10
**challenging (1)**
111:12
**chance (6)**
78:3,9,18,22;112:22;
113:23
**change (5)**
20:15;24:7;32:3;
87:10;105:8
**changed (6)**
47:16;55:24;65:16;
75:22,22;85:13
**changes (6)**

25:24;32:3;69:5,6;
71:8;104:17
**changing (1)**
75:18
**charge (3)**
29:4;59:5;60:16
**charged (1)**
40:8
**charges (1)**
40:14
**charging (1)**
102:5
**chart (3)**
18:22,25;21:1
**check (23)**
17:6,7;29:4,8;31:15,
23;32:7;33:11,18;34:3,
7,20;35:7,9;54:22,25;
80:19;82:1;87:3;99:8;
105:5,14,19
**checkbook (1)**
80:17
**checkbooks (2)**
27:5;82:4
**checked (1)**
27:15
**checks (18)**
16:16;22:2,3;27:6;
29:7;33:8,15,17,19;
79:25;80:1,5,18,25;
105:2,6,17,17
**chief (1)**
42:19
**choice (2)**
38:14;93:20
**chronologically (1)**
9:15
**chronology (1)**
9:18
**circle (1)**
54:13
**claim (19)**
4:7;13:11;14:8,11,
25;15:2;21:7;22:19;
25:7;40:5;41:11;58:22;
59:9;79:9,18;83:15;
104:24;110:24;111:2
**claims (2)**
63:14;75:24
**clarify (4)**
7:5;11:2;16:4;18:12
**Classic (2)**
90:18;109:17
**clear (1)**
7:17
**CLERK (11)**
4:2,4;7:21;8:8;58:8;
69:20;77:8;92:7;94:18;
117:5,8
**client's (1)**
116:22
**close (2)**
67:21;93:14

**closed (1)**
93:10
**closings (3)**
114:18;115:6;118:11
**Coast (1)**
7:1
**Cohen (13)**
30:2,6;61:5,8;62:4;
66:4,8;67:3;83:7;
97:10;98:1,12,18
**Cohen's (2)**
82:22;99:2
**colleague (1)**
4:17
**colloquial (1)**
109:9
**column (4)**
19:7,11;31:14;34:23
**columns (1)**
19:6
**coming (5)**
40:22;63:1;90:7,13;
109:18
**commentary (1)**
78:15
**commingling (1)**
40:11
**companies (3)**
36:23;40:12;108:21
**company (2)**
59:22;98:12
**compared (2)**
19:5;24:8
**complete (4)**
35:17;74:6;75:11,13
**completed (5)**
13:13,18;15:4;28:12;
29:17
**completion (3)**
13:24;38:25;57:5
**component (2)**
58:22;59:8
**computer (1)**
110:9
**concern (1)**
114:11
**concerned (1)**
96:3
**conclude (1)**
50:9
**conference (1)**
110:8
**confident (3)**
21:24;22:6;42:8
**confirm (6)**
26:22,24;28:23;
50:13;80:5;105:18
**confirmation (1)**
36:6
**confirmed (1)**
91:22
**confirming (2)**
51:22;83:10

**confused (3)**
53:21;69:3;113:19
**connect (1)**
46:5
**connection (1)**
44:19
**considered (1)**
19:4
**consists (1)**
84:16
**construction (59)**
8:17,18,24,25;9:6,
23;10:2,22,25;12:1,2,9,
11,13,15,20,21;13:1,2;
15:18,18,20,23;17:12,
17,17,18,24;18:6;19:5;
20:4;21:12;22:20,24;
23:13,19;24:19;30:5;
41:14;43:9;56:3,18,22;
57:1;61:7,9,6;62:17,19,
21,21,25;63:4,11,22,
23;64:8;66:1,5,19
**contact (1)**
116:9
**containing (1)**
43:17
**context (3)**
50:7;92:23;94:23
**continuation (1)**
93:7
**continue (1)**
26:5
**contract (2)**
23:8;99:13
**contracts (1)**
100:11
**control (1)**
110:9
**conversation (4)**
62:4;109:24;110:3,6
**conversations (9)**
23:7;37:4,9,13;
57:15;66:22;67:6;
110:3,14
**copies (3)**
22:3;46:20;115:17
**copy (9)**
14:17;34:3;44:8;
49:6;81:17;88:17,21;
103:24;104:4
**Cordeiro (2)**
53:12,15
**Cordeiro's (1)**
53:21
**corner (4)**
49:1;84:2;101:10;
106:4
**Corp (2)**
4:15,16
**correction (1)**
39:25
**corrections (2)**
14:5;75:18

**correctly (16)**
45:12;48:2;50:23;
53:13;57:23;67:1;68:6;
70:20;81:20;83:5;
90:11;91:14;93:12;
95:15;96:9;101:24
**corresponded (1)**
28:23
**cost (13)**
12:16;13:1;21:12;
22:21;23:19,19;30:5;
41:14,18,23;63:21,23;
64:8
**costs (41)**
9:5,11,23;10:2,22,
25;12:1,3,5,6,7,9,10,11,
13,15;15:18,19,21,23;
16:1;18:16,23;19:3,4,4,
5,7;21:21;22:24;56:3;
61:9;62:17,19,21,25;
63:11;65:25;66:1,6,20
**couple (4)**
38:6;47:20;96:20;
112:1
**course (8)**
20:13;35:8,12;36:15;
38:24;103:25;113:6;
116:10
**Court (117)**
4:2,3,18,21,23,25;
5:2,4,9,12,14,19,22;
6:4,9,12;7:4,12,17,23,
25;8:2,4,10;10:6,9,11,
17,24;11:2,5,9,12;
14:16,18,20,22;15:4,
10,21;25:3;33:10;
35:19,22,24;36:1,7,10,
13;41:6;42:3;57:25;
58:4,9;73:13,20,23,25;
74:12;76:21;77:6,9,18,
24;78:1,5,7,9,12,15,20,
22,24;79:1,3;84:9;
92:6;102:19;103:25;
111:19,22,25;112:3,16;
113:5,11;114:1,4,6,9,
14,20,23,25;115:14,21,
25;116:4,7,13,15,20,
24;117:2,7,9,11,14,15,
19,23;118:1,4,10,15,
19,22
**courtroom (2)**
112:7;113:18
**Court's (2)**
58:8;113:22
**covered (1)**
35:6
**CPAs (1)**
107:15
**create (2)**
51:12;59:8
**created (2)**
48:14;106:10;107:4;
111:1

creating (2)
90:18;106:16
credits (4)
39:18,21;40:5,13
CROSS-EXAMINATION (1)
42:4
Cutler (17)
4:5;6:5;16:1;17:4;
19:9,18;25:5;39:19;
45:22;55:23;62:8;70:9;
71:1,19;72:4,15;
105:17
Cutler's (1)
35:1
Cynthia (5)
90:23;91:3,8,8;97:14

**D**

DaCosta (2)
73:4;76:12
daily (1)
115:13
DAN (2)
8:7;95:8
danger (2)
108:5,8
data (1)
17:4
date (10)
28:19;31:15,25;49:7;
81:12;84:2;105:13;
114:19;118:10,11
dated (11)
13:10;15:9;23:22;
24:3;48:25;49:10,21;
54:3;85:6;90:19;97:9
dates (4)
28:11,22;39:17;
50:10
day (10)
4:5,7;5:7;52:7;
72:15;75:20,21;85:19;
116:21;118:16
days (7)
29:21;67:25;68:11;
115:15,18;116:5;
117:21
DD (2)
94:15,18
deal (2)
108:21;114:12
debits (1)
20:9
debt (1)
20:3
debtor (1)
4:13
December (5)
83:24;85:6,10,14;
95:24
decide (1)
67:5

decided (2)
59:4,24
decides (2)
57:3,6
deciding (1)
108:23
decision (1)
9:21
decline (2)
95:10,18
Decor (4)
70:1;76:14;86:4,5
deducted (1)
63:10
deducting (2)
62:25;64:8
deduction (1)
17:24
deemed (1)
66:6
DEFENDANTS' (1)
36:2
Definitely (6)
13:15;29:19;48:20;
49:15;57:22;93:21
delete (1)
32:7
deleted (2)
73:5;77:22
delta (1)
13:2
depending (1)
115:19
deposed (1)
47:8
deposit (1)
29:22
deposition (15)
44:2,9;47:13,22;
50:1,2;51:5;55:20;
57:17;66:11;82:25;
99:14;100:20;101:1,18
depositions (2)
101:12;118:24
deposits (1)
81:17
depth (1)
67:10
describe (1)
99:20
description (2)
19:7,11
detail (2)
45:11;65:7
determine (3)
11:22;38:19;88:14
determining (2)
11:25;12:2
Development (11)
4:16;21:8;29:4;33:7,
18;35:5;80:1;82:3,4;
95:9,14
dialogue (3)

39:12;108:2,20
dictate (1)
27:24
difference (1)
31:6
different (5)
58:3;59:15;64:2,14;
113:5
differently (1)
112:8
difficulty (1)
46:2
DiGiacomo (1)
55:6
DIRECT (6)
8:12;60:24;62:16;
63:9;112:20;113:1
directly (2)
17:3;27:19
disclosure (1)
113:14
discovery (2)
79:20;81:23
discuss (1)
110:8
discussed (4)
26:9;66:25;90:8;
109:20
discussion (4)
66:19;105:2;108:13;
110:5
divide (1)
41:19
divided (1)
41:23
document (20)
7:1,20,21;14:18;
15:1,3;35:7,16;73:12;
74:7,11;86:10;101:23;
103:17;106:7,8,9,15,
16;107:7
documentation (9)
25:14;26:20;46:19;
47:8,11,25;48:7;53:3;
102:1
documented (1)
33:11
documents (6)
9:24;10:14;19:20;
27:17,22;30:3
Doddri (1)
113:20
Doddridge (8)
5:18;112:5,7,13,21;
113:22,24,25
dollar (1)
15:25
dollars (5)
26:25;97:19;107:21,
22;108:9
done (15)
5:7,21;13:20;14:1;
38:25;41:7;43:9;47:16;

56:15;59:2;67:8;83:9,
18;96:9;102:12
double (1)
22:2
doubt (1)
78:15
Doug (3)
94:25,25;95:25
Douglas (1)
95:6
down (23)
9:1;11:19,20;12:6;
29:22;32:1;44:13;
59:24;60:15;62:17;
65:10;66:18;70:25;
82:9,25;83:14;86:25;
92:25;93:8;94:24;97:7;
105:22;106:1
Dream (7)
33:22;34:8,14,15,18;
35:2;54:2,11,19;70:15;
76:16,19;86:22;87:5
drive (5)
27:16;69:11;73:25;
75:6,10
driveway (1)
60:18
driving (1)
56:19
drop (1)
32:1
due (18)
13:5;16:4,5;24:14;
32:4,12;34:10;35:5;
39:4,5;54:10,25;65:23;
84:16,17;88:14;91:13;
97:20
during (8)
13:20;33:10;40:3;
60:24;62:7,11,16;63:9
duties (1)
22:16

**E**

earlier (3)
29:6;56:1;58:19
early (1)
104:20
earned (1)
38:23
easier (1)
26:13
East (1)
6:25
effort (1)
88:13
efforts (1)
82:9
Eh (1)
53:22
eighty (1)
14:3

either (4)
49:14;53:20;97:25;
100:6
Elaina (1)
91:19
Electric (3)
6:19;30:22;71:18
electricity (1)
27:3
Electric's (1)
31:9
electronic (1)
80:13
electronically (2)
27:17;45:1
Elizabeth (2)
116:15;117:3
else (7)
7:22;26:5;27:8;
77:13;111:19;118:17,
19
email (20)
27:15,20;38:7,11;
53:7;81:13;89:20,23;
93:1,7,22,22;94:24,25;
95:6,8,25;109:2,15,22
emails (4)
38:5;94:19;107:14
enable (1)
74:8
end (14)
17:7;26:7;28:17;
37:5;39:4;62:12;68:17;
93:19;94:4;96:5,7,12;
106:24;107:17
ended (2)
26:18;118:25
ends (1)
95:14
energy (1)
79:4
English (1)
53:22
enough (6)
8:5;26:16;32:8;94:9;
114:10;118:2
ensure (1)
22:8
enter (2)
87:14;105:8
entered (10)
34:21;70:5,17,21;
71:13,22;72:23;73:4;
88:22;105:14
entering (2)
39:4;72:22
entire (3)
26:13;50:13;110:5
entirely (1)
48:17
entirety (2)
36:5,7
entitled (4)

Case 16-01120    Doc 368    Filed 07/01/19    Entered 07/01/19 15:41:09    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 124 of 135
June 24, 2019

18:22;74:10;113:15,
18
**entity (1)**
6:25
**entries (32)**
20:1;27:10;37:19;
50:11;69:4;70:15;
71:11,18;72:11;73:4;
75:2,2,14,18;81:17;
87:12,15,18;88:8,23;
92:13;93:9,14,19,23,
24;94:1,2;98:25;111:5,
13,14
**entry (2)**
20:16;70:18
**equal (2)**
26:15;34:17
**error (2)**
37:23;105:10
**errors (1)**
37:21
**especially (2)**
27:2;32:9
**essence (1)**
108:24
**essentially (1)**
26:24
**establish (1)**
73:18
**estimate (1)**
22:7
**estimated (1)**
61:19
**Estimates (2)**
60:1;62:1
**estimating (1)**
62:14
**et (1)**
4:5
**even (16)**
13:24;24:11;40:12;
56:20,20;61:22;63:20;
64:1;81:8,24;88:22;
100:14;108:9,11;
114:2;118:10
**everyone (1)**
82:1
**evidence (13)**
7:14;35:16;36:3;
73:8;76:25;84:7,10;
92:4,8,16,20;103:16;
114:17
**exact (2)**
41:20;89:23
**exactly (1)**
62:10
**EXAMINATION (2)**
8:12;102:20
**examine (1)**
78:5
**examiner (3)**
40:19,24;110:13
**example (6)**

19:13;31:6,23;32:2;
34:16;77:14
**excavation (2)**
59:16,19
**exceeded (1)**
24:18
**exchange (1)**
109:17
**exclusive (3)**
12:1;21:17;24:13
**excuse (10)**
33:2;51:18;69:17;
70:6;74:3;77:4,5;79:7;
83:10;113:20
**exercise (2)**
72:6;106:21
**Exhibit (89)**
6:2,2,8,12,14,17;7:3,
10;8:21;9:10,16;10:4;
11:18;14:21;18:20;
19:15;20:24;21:21;
25:3;30:10,16;33:22;
34:3;35:22;36:2,7;
48:21;49:9;50:9;52:25;
53:5,24;54:14;58:13;
60:2,24;63:14;64:16,
18,22;65:5,7;66:7;
68:1;69:18,21;72:9;
74:8;76:25;77:8;81:3;
82:11;83:21;84:6,10,
22;85:21,23,23;87:20,
21,25;92:2,7,8,15,19;
93:1;94:15,18;95:6;
96:15,23;97:1,6;98:22;
99:10,12;100:13;
101:9,11,15,20;103:16,
19;105:21,25;109:15;
110:21
**Exhibits (2)**
30:2;33:2
**expand (1)**
78:24
**expect (1)**
110:15
**expectations (1)**
114:24
**expedited (4)**
115:16,17;116:18,25
**expended (2)**
18:7,7
**expense (1)**
19:24,25,25;20:11
**expenses (6)**
45:25;46:3,5,9;
103:7,11
**experience (1)**
37:12;40:25;45:24
**expert (12)**
5:17,20;37:16;112:5,
6,25;113:4,4,8,9,9,14
**experts (2)**
113:6,6
**explain (4)**

15:21;25:11;55:19;
108:25
**explained (1)**
35:4
**explanation (3)**
21:13,22;28:14
**extensions (2)**
37:8,8
**extent (5)**
7:13;24:17;79:8;
105:16;113:13
**external (1)**
40:21
**extremely (1)**
13:23
**eyes (1)**
99:14

# F

**fact (32)**
28:16;40:13,18;
43:14;44:18;45:14,24;
46:8,24;47:2,6;48:10;
50:3;56:2,22;60:10;
61:19;64:14,18;65:18;
67:11;70:4;77:16;
82:21;84:20;88:16,23;
92:10;98:6,12;100:13;
113:8
**facts (2)**
113:7;114:11
**fair (2)**
32:2;103:1
**fairly (1)**
12:4
**familiar (1)**
29:15
**far (3)**
27:14;104:15;116:8
**fashion (1)**
25:22
**February (4)**
31:12;48:25;49:21;
51:15
**fee (8)**
99:18,25;100:5;
102:2,6,11,15;116:19
**feel (2)**
81:25;82:6
**fees (8)**
17:19,20,22,25,25;
23:19;100:11;116:25
**Ferguson (3)**
51:7,10,15
**few (3)**
28:21;39:23;55:12
**fictitious (1)**
27:22
**field (1)**
114:10
**fifteen (3)**
63:4,5;64:2

**fifteen-percent (1)**
102:6
**fifth (1)**
60:25
**fifty (1)**
39:1
**figure (5)**
17:23;18:5;19:3;
89:6;93:11
**figured (2)**
47:17;66:3
**file (12)**
16:21;29:11;45:21;
75:5;77:25;81:4,6;
90:16;106:12;109:17;
115:5,8
**filed (6)**
13:11;14:8;15:2,4;
37:7;83:15
**files (10)**
43:19,22;44:24,25;
49:3,13;52:17;54:5;
55:18;115:13
**filing (5)**
27:14;37:8;44:25;
45:23;116:4
**filings (1)**
36:23
**Filippov (6)**
4:11;16:23;25:21;
68:4;80:24;81:13
**final (9)**
6:22;14:12;26:4;
27:19;61:14;63:23;
65:22;75:23;107:9
**financial (3)**
13:13;42:19;75:15
**financing (1)**
18:2
**find (4)**
20:24;38:2;107:12;
115:4
**findings (4)**
115:1,5,8,10
**fine (4)**
36:13;58:2;117:15;
118:3
**finish (1)**
114:17
**finished (2)**
75:13;78:2
**finishing-up (1)**
5:7
**firm (2)**
39:13;86:16
**first (34)**
5:15;15:2;18:12;
19:6,14;23:18;25:4;
31:10,16,20;32:7,14,
15,18;47:4;53:23;
57:13;63:21;70:1,21;
72:22;90:7,12;91:21;
100:15,18,23;101:3,6,

19,23;109:18;115:22;
116:1
**five (3)**
25:6;29:12,14;58:5;
67:25
**five-minute (1)**
58:1
**flat-out (1)**
92:12
**flip (4)**
15:7;18:19;21:4;
34:2
**Flooring (13)**
33:22;34:8,15,18;
35:2;54:2,11,20;70:15;
76:16,19;86:22;87:5
**focus (3)**
9:20;10:21;107:13
**folders (1)**
43:17
**folks (2)**
82:22;83:2
**follow (2)**
44:15;46:21
**followed (3)**
5:17;62:16;112:5
**following (1)**
68:8
**follow-up (1)**
78:12
**forgetting (1)**
76:16
**forth (6)**
10:3;12:3;21:1;
23:13;94:19;107:15
**forty-five (2)**
116:5;117:21
**forty-nine-page (1)**
15:1
**forward (1)**
23:23
**forwards (1)**
27:18
**found (2)**
22:21;105:9
**foundation (3)**
73:10,17;74:12
**four (7)**
25:4;28:20;31:16;
32:7;33:15;67:25;
94:23
**fourth (8)**
21:20;34:22;70:25;
90:17;94:23;95:17,24;
97:6
**frame (3)**
62:10;97:18,24
**fraud (4)**
40:18,24;41:2;
110:13
**Fredette (1)**
90:22
**front (9)**

14:25;15:14;21:5;
23:10;26:7;30:12;
77:21;78:8;103:17
**full (5)**
6:17;9:2;72:5;93:8;
113:13
**fullest (4)**
43:24;44:3,16,23
**funding (1)**
24:21
**funds (5)**
12:21;17:17;34:8;
40:11;63:25
**further (4)**
42:1;51:6;71:4;
110:17
**fuzzy (1)**
55:16

**G**

**Gassle (1)**
97:11
**gave (11)**
6:19;58:25;69:10,24;
70:2;73:15;75:9,10,11;
82:18;103:20
**GC (1)**
56:12
**general (7)**
33:1,5,9;41:20;46:2;
63:4;88:5
**general-contractor (7)**
99:18,25;100:5;
102:2,6,11,15
**generated (3)**
28:18;74:6;118:22
**generically (1)**
107:19
**Gersh (20)**
5:7,11;8:1,7,14,16;
14:25;36:15;41:10;
42:2,6;44:8;58:16;
74:14;87:13;92:10;
99:12;102:17,22;
111:20
**Gerten (3)**
5:9,10,10
**gets (3)**
108:23,23;113:24
**given (9)**
37:12;40:24;57:3,7;
75:5,8;77:19,25;87:3
**glad (1)**
51:20
**goal (2)**
26:12;114:16
**goes (2)**
6:18;106:16
**Goldman (7)**
37:16,18,19,22;38:2,
5;39:15
**Good (18)**

4:3,10,12,14,22,23;
7:25;8:14,15;42:6;
58:1;67:7,20;77:10;
91:23;118:9,14,21
**Gordon (11)**
36:20,24;37:4;39:13,
13;86:16;90:20;95:25;
106:8;110:3,5
**Gordons (12)**
36:17;93:2,19;94:1,
20;99:1;107:4,10,14,
15;108:3,24
**grade (2)**
99:20,23
**Great (1)**
118:18
**group (2)**
67:1;88:13
**guess (8)**
15:18;50:7;60:21;
72:20;86:1;94:23;
113:19;116:9
**guessing (2)**
44:23;100:19
**guidance (1)**
114:21
**guy (2)**
69:10;76:22

**H**

**half (1)**
115:23
**hand (5)**
6:8;14:17;103:22,24;
104:4
**handed (2)**
7:21;44:8
**handful (1)**
28:20;102:25
**handle (1)**
114:18
**Handwritten (2)**
28:8,9
**happened (2)**
9:17;24:14
**Happy (4)**
5:3;14:22;89:25;
115:9
**hard (15)**
9:11,23;10:2,22,25;
11:25;12:2,9,12,15;
22:20;46:9;63:23;66:5;
75:19
**hard-construction-costs (1)**
10:13
**hardly (1)**
64:25
**harmless (1)**
93:24
**Harris (1)**
4:16
**Harzl (10)**

48:21;54:15;58:13;
63:17;64:20;69:16;
81:3;85:22,25;101:5
**head (4)**
28:21;36:12;50:20;
94:12
**hear (6)**
11:7;9:110:24;
112:14;113:4,16
**Heating (3)**
6:16;51:3;72:2
**heavy (1)**
83:10
**help (3)**
22:10;36:21;89:1
**helped (3)**
67:5,6;113:8
**helpful (1)**
101:3
**Hi (1)**
95:8
**high (3)**
13:19,23;27:14
**home (1)**
28:19;95:3
**homes (1)**
56:19
**honest (1)**
66:21
**honeymoon (1)**
68:16
**Honor (41)**
4:10,12,14,22,24;
5:6;6:14,22;7:5,16;8:3,
9;10:10,21;14:15;
15:12;25:2;30:18;
35:15,18;36:5;41:4;
42:1;58:2,12;73:8,9,22,
24;74:11;77:1;103:24;
110:17;111:24;112:17,
23;113:3;114:16,17;
117:10;118:18
**Honor's (1)**
115:13
**hope (1)**
114:16
**hoping (1)**
5:20
**hour (1)**
22:11
**hours (12)**
13:22;22:2,7,11,14;
24:10,10;61:13,20;
62:5,10,14
**house (4)**
26:14,17;41:18,24
**housekeeping (4)**
5:4,23;6:1;112:1
**houses (1)**
56:20
**hundred (3)**
21:25;50:14;108:8
**hundred-percent (2)**

22:6;42:8
**hundreds (1)**
97:18

**I**

**I/we (1)**
96:3
**idea (1)**
57:23
**IDENTIFICATION (8)**
69:18,21;73:8;92:1,
2,4;94:15,18
**identified (2)**
73:15,16
**identifies (1)**
101:11
**identify (5)**
37:21;39:20;40:8,11;
75:1
**Impeach-86 (1)**
90:2
**Impeach-87 (1)**
94:13
**implied (1)**
46:20
**important (2)**
38:19;113:7
**improperly (1)**
39:21
**Inc (2)**
98:16,17
**incidentally (1)**
110:2
**inclination (1)**
118:16
**included (3)**
9:24;14:11;65:22
**including (2)**
61:25,25
**income (8)**
37:5;38:19;89:6;
94:6,9;95:12;107:20,
21
**Incomplete (1)**
111:6
**incorrectly (1)**
105:14
**incurred (3)**
24:18;40:9;46:3
**indebtedness (2)**
24:18;32:14
**indiscernible (1)**
117:5
**inform (2)**
117:17;118:6
**information (3)**
46:12;58:20;113:2
**informs (1)**
78:15
**initially (3)**
27:11;31:10;72:17
**inspection (2)**

17:20,25
**instance (2)**
32:6;48:19
**instances (3)**
38:2;47:2;48:6
**instead (3)**
35:3;72:24;93:10
**insurance (2)**
20:10,12
**Int (1)**
109:17
**intended (1)**
114:12
**intending (1)**
7:7
**interactions (1)**
36:20
**intercompany (2)**
106:17,24
**interest (4)**
19:24,24,25;24:13
**Interiors (1)**
90:18
**internal (1)**
40:21
**interpretation (1)**
73:12
**interpreting (1)**
70:20
**interproject (1)**
106:17
**interruption (1)**
58:10
**into (27)**
13:21;19:3;35:16;
36:2;42:11;56:23;
59:15;73:8;75:19,24;
76:25;80:21;83:4,11;
84:6,10;88:17,20;92:4,
8;96:19;99:25;102:2;
103:16;104:11;105:14;
117:20
**investors (3)**
90:25;91:5,16
**invoice (47)**
6:23,25;11:20;12:3,
12,17;13:10;15:8,9,16;
22:19;23:13;28:22;
29:1,2,3;41:11;44:21;
45:15,18;47:3;49:7,10,
17;51:1,3;52:1,5,20;
55:6,23,24;61:1;62:20;
63:3,12,24;65:19,20;
80:7;100:14,15,16,17,
23;101:15,19;105:19
**invoices (32)**
16:7;22:3;27:25;
28:11,24;29:2,16;
30:24;33:22;43:17;
44:19,20;45:7,9;46:20,
24;47:25;48:14,19,24;
49:19;54:3;55:9;56:11;
57:10;72:18;79:21;

Case 16-01120  Doc 368  Filed 07/01/19  Entered 07/01/19 15:41:09  Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document  Page 126 of 135
June 24, 2019

81:16;84:17,18;90:18;
102:23
**invoicing (1)**
50:18
**involved (2)**
82:22;83:2
**Iron (1)**
110:12
**ironically (1)**
79:2
**issue (2)**
97:16;114:15
**issued (3)**
64:19,22;112:23
**issues (1)**
96:2
**item (5)**
9:5;12:19;17:13;
29:24;73:17
**items (5)**
54:17;84:12;96:2;
105:9,16

## J

**January (1)**
106:14
**Jason (1)**
39:12
**John (2)**
4:14;66:23
**join (1)**
5:3
**Joseph (4)**
30:2;66:23;83:3;
97:10
**Joseph's (1)**
83:7
**journal (12)**
87:12,15,18;92:12;
93:9,14,19,23,24;94:1,
2;98:25
**July (9)**
13:22;18:16;34:22;
49:23;54:20,22;83:11;
87:3;91:21
**jump (2)**
41:1;93:4
**June (50)**
9:15,16,17;12:20;
13:10,12,17,22;17:13;
18:16;24:3;49:23;
55:17;60:25;61:1;
62:18,22;63:12;65:1,7,
13,19,22;67:9,12;
68:11,17,20,23,25;
69:11;70:2,5;75:9,10,
13,22,23;80:7,24;
81:13;83:11;88:24;
89:10,21;90:6;97:9,13,
24;100:17

## K

**Kagan (36)**
4:5,15,15,15;21:7;
29:3;33:7,18;35:5;
43:16;48:6;56:2,6,23;
57:2,6,10;58:20,25;
59:24;60:16;61:24,24;
80:1,17;81:14;82:3,3,
19;90:25;94:8;95:9,13;
97:11;98:2;102:5
**KDC (47)**
4:16;9:16;15:2;
16:15;21:12;24:6,15,
23;29:12,16;34:23;
36:16;37:2;40:22;
42:17,19,22;43:23;
44:14;46:12;49:3,13;
50:11;58:22;59:8;
61:15;62:6;63:22;
79:20;92:11;94:6,9;
95:1;96:6,11;97:23,25,
25;99:1,13,23;100:11,
14;102:14;106:18,22;
109:17
**KDC's (3)**
57:3;96:6;100:5
**keep (5)**
34:16;35:7,12;61:15;
79:3
**kept (4)**
27:17;44:25;81:15;
102:7
**kind (8)**
29:22;34:16;36:19,
19;65:11;84:22;93:24;
110:14
**knew (2)**
45:11;47:20
**knowledge (1)**
21:16;40:6;108:18
**KPMG (1)**
110:12
**Kristina (1)**
72:5

## L

**L- (1)**
33:23
**L-18 (1)**
19:14
**L-23 (1)**
20:24
**L-36 (2)**
33:22;35:24
**L-37 (2)**
6:20;30:21
**L-43 (1)**
6:15
**L-53 (2)**
6:24,25

**labor (1)**
40:8
**laborer (1)**
16:8
**laid (2)**
33:5;73:17
**Landau (1)**
91:19
**landscaping (2)**
59:16,18
**language (1)**
53:23
**lapse (1)**
40:19
**large (3)**
19:23;32:11;56:2
**largely (1)**
43:4
**last (13)**
6:2;20:14;27:9;
31:18;44:2;46:11;69:2;
93:9;95:25;99:8;
101:14;113:23;115:24
**late (1)**
100:21
**later (5)**
13:12;29:3;39:17;
72:24;114:19
**law (2)**
108:14;115:9
**laws (1)**
108:25
**lawsuit (1)**
80:15
**lay (1)**
74:12
**laying (1)**
99:14
**leading (2)**
11:4,6
**least (7)**
22:12;29:8;50:9;
76:5;96:21;97:17;98:9
**leave (1)**
115:25
**ledger (1)**
88:5
**left (4)**
31:14,14;84:2;86:1
**left-hand (1)**
85:23
**legal (2)**
82:22;83:2
**less (6)**
10:3,14;13:7;29:18;
46:8;73:3
**letter (6)**
9:10;10:4,15;13:17;
97:9,13
**letter's (1)**
10:19
**level (1)**
114:10

**license (1)**
40:18
**lien (8)**
9:9,17,20,21,24;10:2,
13,18
**lifting (1)**
83:10
**liked (1)**
46:13
**likely (2)**
88:14;106:11
**line (23)**
6:1;9:5;12:19;15:10;
17:13;31:10,18,24;
32:18;33:9;44:13;
47:23;50:7;54:7,17;
57:18;66:18;70:21,25;
73:16;82:25;84:12;
101:19
**lines (5)**
12:5;31:16;32:20;
33:12;71:7
**Lipetsker (1)**
4:11
**list (2)**
74:8;105:5
**listed (3)**
18:17;80:25;96:2
**literally (3)**
15:25;45:11,17
**little (21)**
5:2;9:1;55:16;58:3,
19;64:14;68:14;69:5,8;
78:16;84:2,23;90:10;
93:24;101:10;105:22;
106:2;109:21;115:3,6,
12
**LLC (3)**
4:5,6;81:19
**LLD (1)**
81:18
**loan (10)**
8:25;17:24;18:6;
20:4;24:19;57:1;94:8;
95:1,2,7
**loans (1)**
20:4
**long (5)**
8:5;29:21;60:18;
86:22;117:3
**longest (1)**
49:20
**look (28)**
24:1,2;31:1;41:11;
49:9;50:6,8,16;51:7,
21;55:9,22;60:2,20;
63:20;68:25;74:8;
82:10,24;84:12,20;
86:22;87:6,9;91:10;
94:22;105:17;107:12
**looked (16)**
9:9;27:15;54:22;
60:24;64:15;69:4;81:4,

5,10;96:16;103:15;
105:25;107:14;109:2,
14;110:22
**looking (16)**
6:1;12:4;41:13;45:2;
72:21;86:4,10;89:18,
19;90:5;92:19,25;94:8;
95:1;108:1;109:8
**looks (1)**
95:8
**lost (1)**
46:20
**lot (13)**
13:20;26:7,16;27:3;
29:18;42:11;46:24;
67:8,11;107:14;110:7;
117:24;118:20
**low (1)**
95:13
**lower (1)**
106:4
**lump (1)**
103:13
**Lym (1)**
95:3
**Lyman (14)**
19:9,17;25:4;31:9,
17;33:17;48:25;60:22;
70:19;71:18;72:3,14,
15;97:2
**Lyman- (7)**
4:4;15:25;17:3;
39:18;45:21;62:7;
105:16
**Lyman-18 (1)**
19:15
**Lyman-Cutler (45)**
4:6;12:18;13:14;
16:2,10,12,18;17:7;
27:5;29:5,5,7;33:11,
19;38:9;39:20,22;40:9;
43:4;45:20;51:12;
62:11;64:15;69:11;
70:5;80:5,10,22;81:18;
82:1,7,15;83:1,23;
91:5;93:21;96:14;99:2,
13;100:1;102:2;105:1,
7,13;106:12

## M

**Maiden (1)**
5:11
**main (2)**
26:12;89:5
**maintaining (1)**
7:13
**major (1)**
95:10
**majority (2)**
24:10;103:1
**makes (1)**
106:20

Case 16-01120    Doc 368    Filed 07/01/19    Entered 07/01/19 15:41:09    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 127 of 135
June 24, 2019

**making (5)**
  38:7;75:18;78:12;
  96:4;108:18
**manager (1)**
  97:10
**manila (1)**
  43:16
**many (12)**
  13:24;22:7;25:24;
  32:20;48:15,17;61:13,
  20;62:5,11,13;102:23
**map (3)**
  59:18;63:6;84:25
**March (11)**
  15:9;23:22;24:8;
  31:12,12;49:10,21,21;
  51:15;54:3;60:7
**mark (3)**
  69:17,20;91:25
**marked (6)**
  50:9;69:18;92:2;
  94:15,17;109:14
**markup (1)**
  20:21
**markups (1)**
  20:6
**married (2)**
  67:14,16
**Mary (3)**
  7:18;8:6;118:23
**masonry (2)**
  59:16,19
**match (2)**
  90:8;109:19
**materials (14)**
  7:6,9;40:8;51:5,6,12,
  18;52:13;56:6;72:19;
  79:18;84:17;85:15;
  118:25
**math (2)**
  18:4;91:20
**matter (2)**
  23:18;86:2
**matters (1)**
  5:5
**may (61)**
  6:18;8:1,9:9:10,15;
  10:3,15,19;13:7,11,16,
  17,21;14:8,15,16;15:3;
  28:7;39:18;44:9;47:8;
  50:10,16;64:18,25;
  67:4,6,9,12,17,23;68:8;
  71:6,9;75:17;79:7;
  82:10,11,16;83:11,15;
  85:1,13;86:4,25;87:7;
  95:10,11,13;96:15;
  97:3;99:15;102:18;
  103:22,24,25;107:8;
  111:4,13;117:10,22
**May- (1)**
  97:23
**maybe (19)**
  14:2;16:20;28:20;

**34:19;54:16;69:16;**
  70:16;74:25;77:15;
  81:5;84:21;88:1;96:5,
  6,24;97:6;98:6;101:3,
  21
**May-June (1)**
  97:18
**McGregor (1)**
  95:6
**mean (10)**
  13:19;38:12;56:13;
  59:12;78:1;80:17;
  109:5;112:12;115:25;
  117:9
**meaning (1)**
  81:15
**means (6)**
  44:4;61:24;70:17;
  84:3;89:18;97:22
**meant (4)**
  81:18;89:19;90:16;
  109:6
**mechanic's (1)**
  9:9
**memo (3)**
  34:23;55:2;115:9
**memory (2)**
  50:3;66:24
**mention (1)**
  93:21
**mentioned (4)**
  14:7;24:11;27:9;
  37:19
**merely (2)**
  81:17;110:6
**mess (1)**
  43:12
**Michael (3)**
  4:19,23;37:16
**mid (1)**
  37:9
**middle (3)**
  68:20;89:4;90:5
**might (5)**
  90:8;93:8;109:19;
  112:2;115:3
**million (6)**
  10:19;17:19;62:24;
  63:10,10;80:18
**mine (2)**
  22:12;72:6
**minimal (1)**
  98:4
**minor (2)**
  69:5;75:18
**minus (1)**
  62:21
**minutes (1)**
  72:24
**misguided (1)**
  105:10
**mishmash (1)**
  43:14

**misinterpreting (1)**
  70:16
**missed (2)**
  22:25;81:12
**missing (3)**
  6:6;46:25;102:23
**Misspellings (1)**
  45:16
**mistake (1)**
  72:23
**mistakes (1)**
  42:14
**moment (7)**
  6:24;14:7;25:18;
  33:21;58:1;89:10;98:1
**Monday (1)**
  115:24
**money (5)**
  24:21;29:3;105:18;
  108:10,10
**month (2)**
  13:20;108:4
**monthly (2)**
  20:8;98:10
**months (6)**
  22:13,13,14;28:11;
  29:16;39:17
**more (20)**
  6:13;14:1;22:22;
  29:15;32:17;47:16;
  51:17;63:19;73:3;
  74:12;77:16,21;79:6;
  88:19;94:6;101:20;
  106:2;115:16;116:16;
  118:2
**morning (13)**
  4:3,10,12,14,22,23;
  5:13,16;8:14,15;42:6,
  7;118:16
**Mortgage (1)**
  95:7
**most (9)**
  26:15;27:16;33:13;
  49:19;69:5;79:12;
  80:23;88:14;106:11
**Mostly (2)**
  43:15;88:11
**Mountain (1)**
  110:12
**move (2)**
  51:21;60:21
**moved (1)**
  64:25
**much (21)**
  13:16,17;25:13;37:5;
  39:5,5;55:10;57:3,7;
  59:4,5;60:16;79:22;
  81:15;86:2;89:6;96:20;
  107:18;108:2,13;
  118:15
**multiple (2)**
  76:23;98:7
**multiplication (1)**

  22:20
**myself (1)**
  115:20

## N

**nail (1)**
  82:9
**nailed (1)**
  83:14
**name (2)**
  34:23;71:8
**names (2)**
  4:8;75:18
**necessarily (2)**
  44:22;47:5
**necessary (2)**
  24:22;117:1
**need (12)**
  28:16;29:23,25;
  57:25;81:25;82:6;
  92:21;96:5,7;106:24;
  115:10;118:15
**needed (2)**
  34:8,11
**needs (1)**
  113:2
**negotiates (1)**
  57:12
**net (2)**
  61:23;95:14
**new (3)**
  7:20;51:10,12
**next (12)**
  18:22;31:24;55:12;
  68:6;71:15,24;73:1;
  77:6;93:4;95:5;106:18,
  19
**Nickolay (1)**
  4:11
**night (1)**
  95:25
**Nobody (2)**
  59:21;74:5
**non- (1)**
  82:2
**noninvestment (1)**
  38:18
**Nope (3)**
  30:7;42:16;49:18
**normal (1)**
  22:15
**notations (1)**
  43:17
**notes (5)**
  28:6,7,8,9;78:13
**notice (2)**
  24:6;106:4
**noticed (3)**
  39:24;90:7;109:19
**November (4)**
  42:17;49:4;52:18;
  54:6

**number (55)**
  4:6;10:13;14:25;
  15:22;16:7;17:14,16;
  21:2,14,17;22:5,5;24:7,
  11;26:25;29:8;30:8;
  31:15;34:20,22;39:2;
  40:22;47:2;48:13,17;
  51:11;55:10;61:12,14,
  23;62:2,24;63:2,3,3,5,
  13,20;64:1,2,3,25;
  65:18;72:24;75:17;
  76:8;77:4,7,8;80:8;
  88:8;106:8,18,25;
  107:19
**numbers (50)**
  13:24;14:10,12,13;
  15:16;17:9;19:2,24;
  21:22,24;22:8;23:9,13,
  15;24:20;25:15;26:18;
  27:24;32:11;37:25;
  38:8,8,12,13;42:9,14;
  51:13;61:7,22;67:7;
  69:7;71:11;74:4;75:15,
  19,22,24;76:5,10,12,
  22,22;82:10;83:3,19;
  88:11;105:6;108:1,18;
  109:3

## O

**oath (1)**
  8:6
**object (1)**
  73:9
**objected (2)**
  25:5;45:8
**objection (12)**
  4:6;6:3;7:7,13,14;
  10:5,16;35:18;50:12,
  19;84:8;92:5
**objections (2)**
  7:8;36:8
**Objection's (1)**
  76:23
**obligation (1)**
  102:3
**observations (1)**
  37:22
**observed (1)**
  39:16
**obvious (1)**
  115:24
**Obviously (6)**
  24:10;27:6,7;44:24;
  82:2;106:13
**occurred (1)**
  28:15
**o'clock (1)**
  96:1
**October (6)**
  83:17;84:3,3,13;
  85:4,7
**odd (1)**

Case 16-01120    Doc 368    Filed 07/01/19    Entered 07/01/19 15:41:09    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 128 of 135

June 24, 2019

64:23

**of-claim (1)**
33:2

**off (11)**
5:15;22:20;23:8;
28:19,20;29:1;36:12;
50:20;58:6;79:12;
94:11

**offer (4)**
35:17;73:7;84:6;
92:3

**offered (2)**
6:17;35:16

**office (11)**
16:21;23:17;24:6;
27:14,16;46:15;67:11;
68:13,23;98:6;117:12

**officer (1)**
42:19;95:7

**often (1)**
29:19

**old (1)**
63:24

**once (1)**
28:1

**one (62)**
6:23;12:6;14:18;
16:9;19:6,14;20:14;
21:25;22:22;23:1;24:3;
26:14;30:18,22;32:3;
33:10,13,15;34:18;
35:1;38:4;39:2;48:24,
25;49:13,18;50:17;
51:14,15,15;52:12,13;
53:2;54:2,3,5;55:4,15,
23;58:16;60:13;63:17,
19,19;74:20;76:16,16;
77:16;80:20;81:12;
86:10,12,13;88:19;
91:2;94:22;96:22,22;
97:15;98:9;106:23;
112:4

**one- (1)**
22:5

**ones (14)**
6:3;25:5;26:3;47:10,
17;48:1,10,11;50:21;
52:12;55:18;71:21;
77:16;96:22

**one's (2)**
49:10;86:23

**ongoing (1)**
108:20

**only (20)**
7:1,20;24:6;26:14;
28:20;31:16,16;35:15;
39:3,23;44:18;51:11,
13,23;58:21;74:24;
78:6;95:14;96:22;98:6

**ons (1)**
12:2

**open (1)**
79:14

**opened (4)**
89:11;90:6,12;
109:18

**opening (1)**
113:21

**opportunity (1)**
37:15

**opposed (1)**
32:15

**oral (1)**
74:9

**order (7)**
11:22;16:6;92:22;
94:5;112:24;113:23;
115:16

**ordered (3)**
79:20;115:16,17

**ordinary (3)**
35:8,12;116:10

**organization (1)**
26:8

**organize (1)**
26:12

**organized (3)**
43:13,20;46:13

**orient (2)**
8:16;25:3

**original (1)**
7:3

**originals (1)**
35:12

**ourselves (1)**
117:19

**out (44)**
4:16;12:5,10;21:21;
27:19;28:10,17;30:10;
31:24;33:5,16;38:24;
41:1;42:11;45:21;
47:17;49:22;51:10;
66:3,5;67:11,22;68:4,
15,20;69:23;73:14;
74:3,15;79:4;80:10,18;
82:21;85:4;89:6;93:10,
11,14;104:12;106:22;
111:8;116:5,8;118:12

**outside (1)**
36:17

**outstanding (18)**
9:12;12:14;13:3;
31:20;32:5;52:2,21;
63:11;71:21;79:9,10;
85:2,14,18;86:5;96:17;
97:22;107:25

**over (13)**
7:7;20:13;36:8;
38:24;42:22;43:4;
47:18;60:11;66:7,8;
67:25;68:14;98:6

**overall (2)**
7:13;43:12

**overhead (3)**
23:17;24:6;61:12

**overrule (1)**

**11:12**

**overruled (2)**
7:14;76:23

**owed (2)**
21:12;63:22

**own (5)**
38:16,16;43:1;89:13;
98:12

**P**

**P&L (1)**
95:11

**P&Ls (1)**
95:9

**packet (1)**
55:10

**page (67)**
15:10,14;18:19,19,
22;21:5,11,11;22:19;
23:10;31:8;34:2,21;
41:11;44:11;45:3;
47:21,23;48:22;49:9;
50:6,17;52:9,25;53:5;
57:16;58:14;60:25;
63:15,18;64:20;65:10;
66:12,14,15;70:1,12;
71:15,25;72:8;73:1;
82:24;84:20,22,22;
85:23;87:24,25;88:4;
90:3,5,17;91:7,10,21;
92:21,25;93:5;94:23;
95:5,17,24;98:22;
101:1,4,6,14

**pages (4)**
15:8;26:20,23;55:13

**paid (17)**
18:13;24:19;28:6;
29:3,5;31:10,17,23;
33:16;34:11;38:24;
39:3,5;79:12,13;99:1;
105:16

**paper (2)**
58:14;118:23

**paragraph (2)**
93:8;97:6

**parameters (7)**
74:2,17,20,22,23,24;
104:11

**Pardon (1)**
101:5

**Parker (1)**
90:23

**part (31)**
6:7,17,25;7:2,9;
11:20;19:15,21;23:7;
25:20;26:15;30:6;32:8;
33:13;35:21,22;36:1;
39:12,24,25;40:1,4;
56:2;57:14;72:6;79:12;
80:23;102:9;108:13,
20;110:6

**partial (4)**

**34:14,15,24;74:7**

**participated (1)**
66:18

**particular (9)**
29:20;47:24;48:13;
52:1;57:9;58:21;84:12;
96:14;111:13

**particularly (1)**
45:25

**parties (1)**
4:8

**partners (3)**
89:14,16;97:16

**part-time (1)**
22:10

**party (2)**
67:23;68:5

**Pause (6)**
41:8;44:6;48:4;60:4;
94:14;109:12

**pay (9)**
39:7;98:17,19;99:20,
23;107:18,18;116:18,
20

**payable (13)**
12:18;64:15,23;70:5,
19;82:15;84:13;85:1,
14;86:5,8;97:2;102:10

**payables (4)**
96:17;97:14,19,23

**paying (4)**
35:6;37:6;99:5;
116:25

**payment (13)**
17:7;28:23;29:22;
31:24;34:10,14,16,20,
23;35:4;51:23;82:1,5

**payments (16)**
12:20;13:2;15:19;
17:3,12;20:8;28:25;
31:21;32:7,15,20;33:7;
51:22;62:21;80:10,21

**peek (2)**
66:11;96:2

**pencil (1)**
43:17

**penny (1)**
26:25

**people (4)**
25:21;36:20;59:22;
61:17

**per (4)**
26:17,21;41:18,24

**percent (11)**
14:2,2,3;21:25;39:1;
50:14;63:4,5;64:3;
75:12;108:9

**percentage (11)**
12:1;13:19,23;21:18;
22:18,24;23:8;27:10;
38:25;75:12;110:7

**percentages (2)**
23:1,20

**Perfect (5)**
7:23;31:6;64:5,5;
117:22

**perhaps (2)**
28:11;92:22

**period (4)**
90:13,13,13;107:24

**Periodically (1)**
36:21

**personal (3)**
95:2,3,4

**Perten (113)**
4:14,14,19;5:6,10,12,
15,20,25;6:5,11,13;
7:20,24;8:1,3,9,11,13,
21,23;9:1,4;10:8,10,12,
21,25;11:8,11,14,18,
21,23,24;14:15,17,21,
24;15:11,13;25:2,8;
30:18,20;35:15,21,23,
25;36:4,14;41:4,7,9;
42:1;45:8;50:12,19;
66:14;73:9,22,24;77:4;
78:3;84:8;87:21,23;
92:5;102:18,21;
103:24;104:4,5;
105:21,24;106:1,3;
108:6,7;109:13;
110:17;111:24;112:1,
4,11,17;113:10,12;
114:8,13,15,21,24;
115:12,15,22;116:3,6,
9,18,22,25;117:6,10,
12,18,21,25;118:3,9,
14,18,21

**Peter (1)**
4:12

**ph (7)**
33:13;48:21;91:19;
95:6;97:11,11;109:17

**Phil (1)**
90:20

**phone (1)**
98:10

**photography's (1)**
19:14

**phrase (1)**
113:17

**physically (1)**
103:23

**pick (1)**
50:7

**piece (1)**
6:22

**pile (1)**
118:22

**pinched (1)**
116:11

**pinch-hitting (1)**
4:19

**Pipelines (1)**
7:1

**place (2)**

31:21;44:15

**placed (1)**
14:25
**places (1)**
26:15
**plain (1)**
38:3
**plaintiffs (1)**
104:15
**Plaintiffs' (11)**
5:20;69:18;76:25;
77:6,8;84:10;92:2,7,8;
94:15;112:6
**play (8)**
89:21;90:9,13,14,15;
109:3,16,21
**playing (7)**
38:12,12;89:12,15,
18,18;109:6
**please (24)**
4:8;8:2,4,8,10,22;
11:19;52:10;53:25;
61:3;71:16,25;82:12;
83:21;90:1,2;92:4,21;
93:5;94:13;96:23;97:6;
98:23;105:21
**plugged (1)**
61:20
**Plumbing (14)**
6:6,24;48:19;49:15,
18;51:3,7,10,18;52:8,
13;72:11;84:14;85:17
**plus (3)**
84:17;97:21,22
**point (27)**
8:3;11:13;13:6;15:4;
21:12,20;23:18;25:14;
27:17,21,24;28:2,4;
35:17;36:4;38:8;42:8;
63:14;64:6;73:16;
75:14,21;77:3;79:16;
80:14;90:18;108:17
**pointed (2)**
28:10;105:13
**poor (2)**
38:14;93:20
**portion (2)**
34:13;88:7
**possible (7)**
25:14;48:9,12,18;
55:21;65:4;82:23
**possibly (1)**
49:6
**post-sale (1)**
34:19
**Post-work (1)**
34:8
**potential (1)**
91:11
**practices (1)**
31:7
**prefer (2)**
11:7,9

**preferably (1)**
32:19
**preference (5)**
32:14;112:6;116:22,
23;118:7
**preferred (1)**
31:7
**prefix (2)**
19:17,17
**prepare (8)**
18:25;25:9;26:6;
36:22;56:22;73:10;
104:6;110:23
**prepared (3)**
37:16;60:13;104:14
**preparing (4)**
14:10;25:12;30:1,3
**presented (1)**
25:7
**pretty (2)**
67:7;96:19
**previous (7)**
24:3;31:7;45:23;
51:15;66:7;77:16;
105:8
**previously (1)**
26:10;31:19;35:4
**printed (5)**
69:23;73:14;82:21;
84:3;85:7
**printout (1)**
82:15
**prior (4)**
25:22;49:7;70:17;
104:8
**priority (1)**
83:1
**probably (9)**
44:23;46:22;66:9;
68:14;69:17;72:23;
100:25;106:18;115:1
**problem (1)**
95:11;96:20
**problematic (1)**
112:12
**problems (1)**
37:21
**procedure (1)**
115:11
**procedures (4)**
43:23;44:3,15,24
**proceed (2)**
8:9;102:18
**proceeding (1)**
4:4
**proceeds (1)**
17:24
**process (5)**
15:21;25:13;26:13;
78:17;108:1
**produce (2)**
74:18,21;79:21;
112:24

**produced (6)**
79:17;81:16,22,24,
25;86:16
**product (2)**
75:13;88:13
**production (1)**
106:8
**ProEx (28)**
39:3;42:22;45:24;
46:5,8;57:7;58:22;
59:5;88:4,14,17,21;
89:5,6,11,22;90:6,12,
22;91:13,22;92:11;
103:7,7,10;106:19,22;
109:18
**ProExcavation (10)**
4:15;38:21;40:14,15;
58:17;59:8;60:8;87:6,
6,12
**ProEx's (1)**
106:22
**profit (3)**
57:3,7;95:14
**project (39)**
12:11,16,23;13:14;
16:1,2,10,13;18:7,8;
24:18;25:15;27:1;
28:12;29:24;32:19;
38:9;39:19,22;40:9;
43:21;44:20;45:8,22;
46:1,4,6;52:23;56:6,
15;57:4,7,20;97:2,15;
102:6,8,11;106:21
**projects (17)**
38:16,18,24;39:2;
40:12;42:25;62:7,11,
13;88:9;89:8,14,16;
90:21;97:17,23;102:9
**promise (1)**
76:3
**proof (17)**
13:11;14:7,11;15:1;
17:7;22:19;25:7;40:5;
41:11;58:22;59:8;
75:24;79:8;83:14;
104:23;110:24;111:2
**proof- (1)**
33:1
**proof-of- (1)**
63:13
**proof-of-claim (12)**
14:18;19:21;25:1,9,
12,20;26:6;30:1;33:2;
37:25;58:21;63:15
**proof-of-claims (1)**
100:16
**proper (1)**
73:10
**properly (5)**
7:9;32:7,13;40:6;
96:8
**properties (7)**
9:21;17:18;26:9;

85:16;91:23;96:6,20
**property (4)**
20:12,15;52:8;95:3
**proposal (7)**
29:1;32:23;40:16;
51:3,14;60:7,22
**proposals (14)**
22:3;29:2,21;43:18;
49:20;58:17,23;59:7,
13,19;72:5;79:23;
88:17,21
**proposed (3)**
115:1,5,8
**provide (4)**
7:18;9:23;29:8;
56:25
**provided (15)**
14:14;25:21;27:6;
28:24;30:8;33:8,9,10;
45:11;51:7;55:6;61:7,
12;82:5;112:21
**provides (1)**
51:6
**providing (2)**
15:17;17:7
**pull (5)**
8:21;30:10;45:21;
83:3;105:21
**purchase-money (1)**
20:4
**purportedly (1)**
61:1
**purports (2)**
73:18,21
**purpose (2)**
59:24;106:15
**purposes (5)**
37:5;62:14;103:10;
108:15;109:25
**put (37)**
22:4;24:21;28:19;
31:20,21;32:11,14;
39:23;40:13;42:11;
56:23;61:5;72:3,5;
74:2,17,23,23,24;
75:19,21,24;76:5,8,10,
12;77:21;80:21;88:17,
20;99:25;100:5,13;
101:6,9;104:2;118:16
**putting (1)**
102:2

**Q**

**Q1 (1)**
43:7
**qualify (1)**
95:13
**quarter (2)**
39:1,3
**QuickBook (6)**
25:19;26:1;27:10;
33:1;44:24;81:14

**QuickBooks (35)**
6:6;9:11;12:18;
13:25;17:5;18:14;
19:12;25:13;19;26:9;
29:10;31:1;32:24;43:1;
69:11,24;73:15;74:15;
75:5;80:22,25;81:4,5;
89:19;90:15;91:9;
100:1;104:23;105:5,
14;106:12;109:6;
110:9,23;111:2
**quickly (3)**
41:10;84:25;116:10
**quite (2)**
44:4;67:8,11;113:5
**quotes (1)**
51:8

**R**

**ramp (1)**
36:22
**ran (2)**
73:25;96:19;106:11,
13;111:11
**reach (3)**
27:19;28:17;49:22
**reached (1)**
51:9
**read (20)**
31:5;45:12;48:2;
50:23;53:13;57:23;
61:23;67:1;68:6;69:16;
81:19;83:4;90:11;
91:14;93:11;95:15;
96:9;101:24;109:15;
113:16
**ready (2)**
58:11;102:19
**real (3)**
29:3;46:2;56:3
**real-estate (2)**
20:18,23
**reality (1)**
32:12
**realization (1)**
38:15
**realize (2)**
37:5;109:25
**realized (5)**
38:15,20;39:8;72:23;
108:24
**realizing (1)**
38:22
**really (10)**
11:9;13:21;23:18;
25:13;26:20;34:11;
38:14;99:17;112:4;
14:16
**Real-time (1)**
54:7
**reason (1)**
35:3

Case 16-01120    Doc 368    Filed 07/01/19    Entered 07/01/19 15:41:09    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 130 of 135
June 24, 2019

**reasonable (1)**
116:1
**rebut (4)**
112:13,14;113:22,23
**rebuttal (2)**
112:24;113:25
**recall (21)**
8:18;9:12;27:11;
47:10,14;48:1;62:15;
65:4;66:9;67:6,13;
68:17;72:20;88:16,20;
96:22;99:9;103:7;
105:3;109:22;112:22
**recategorized (1)**
75:23
**receipt (1)**
116:6
**receipts (2)**
29:25;81:16
**receivable (6)**
82:11;88:2;89:11,16,
22;102:14
**receivables (1)**
88:18
**receive (1)**
118:12
**received (2)**
39:7;108:10
**receiving (1)**
37:18
**reclass (1)**
98:23
**recognize (3)**
53:7;58:16;94:18
**recognized (1)**
108:14
**record (3)**
4:9;58:6,7
**records (12)**
13:13;36:4;39:20;
52:21;53:13,18;54:10;
61:15;79:7;81:14,15,
17
**record's (1)**
7:17
**recreate (1)**
51:11
RECROSS-EXAMINATION (1)
110:18
**recurrent (1)**
39:16
**REDIRECT (1)**
102:20
**redirecting (1)**
11:13
**refer (2)**
25:18;91:11
**reference (8)**
38:7,22;43:25;44:23;
89:8,13;93:18,20
**referenced (2)**
19:20;38:11
**referring (5)**

23:22;51:4;52:12;
63:2;94:11
**reflect (3)**
17:23;20:3;36:5
**reflected (3)**
32:23;56:10;107:21
**reflecting (1)**
41:2
**reflects (3)**
79:9;97:1;104:17
**refuse (1)**
27:4
**regard (4)**
7:6;50:17;51:23;
75:3
**regarding (1)**
109:24
**Regardless (1)**
28:22
**related (1)**
61:7
**relates (3)**
104:22;110:23;113:6
**relating (1)**
34:24
**relationship (1)**
107:13
**reliance (1)**
58:20
**rely (1)**
56:2
**relying (3)**
56:5,9;108:24
**REMAINDER (1)**
36:2
**remained (1)**
13:18
**remaining (3)**
7:1;34:24;79:13
**remains (3)**
18:14;39:5;85:18
**remember (25)**
6:4;13:22;47:14,24;
48:10;50:1,2,21,25;
52:22,22;62:4,5;66:20,
22;67:14;68:25;85:1;
89:20;95:4;97:15;
99:14;100:14,18;
101:23
**removal (1)**
60:8
**renowned (1)**
49:19
**repairs (3)**
34:18;54:7,8
**repeat (3)**
22:22;56:4;93:8
**report (22)**
12:18;37:16,18;50:8;
69:15,23;74:1,1,2,5,6,
21;85:6;104:12,20,22;
106:11;107:10;112:21,
25;113:21;117:14

**reports (5)**
28:17;74:15,18;
77:20;109:7
**represent (3)**
13:11;17:16;106:7
**represented (1)**
73:25
**request (4)**
50:18,22;53:13;
82:22
**requested (2)**
34:10;51:14
**requests (1)**
49:23
**requirements (1)**
108:14
**requires (1)**
96:4
**research (5)**
13:20;14:1,6,12;
25:24
**researched (1)**
47:18
**Researching (2)**
109:7,10
**reshuffle (3)**
34:16;96:11,13
**reshuffling (2)**
94:5;96:4
**respect (7)**
6:14,15;15:20;22:18;
29:7;105:1;112:17
**responding (1)**
45:3
**response (2)**
57:22;66:21
**responsibilities (1)**
36:16
**responsible (1)**
15:16
**responsive (1)**
113:11
**restate (1)**
10:9
**result (1)**
115:7
**resume (1)**
8:1
**RESUMED (1)**
8:12
**return (2)**
72:25;95:17
**returns (2)**
89:5;92:11
**revenue (4)**
38:15,23;89:9;91:13
**review (26)**
13:13,18,20,24;14:6,
13;15:5;16:7,12,15,18;
23:12;32:9;37:15,19;
39:19;40:1,3,4;75:12;
76:1;95:11;104:8;
105:12;107:17;112:22

**reviewed (2)**
14:4;96:7
**reviewing (2)**
41:1;95:9
**revise (1)**
53:18
**revised (1)**
53:12
**right (354)**
5:22;6:9;7:12,17;
9:10;12:8;29:25;30:14,
14;32:1;35:19;36:11,
13;42:9,12,14,17,20,
23;43:1,4,6,7,11,12,14,
18,20,21,24;44:16,21;
45:4,45,15,17,18,18,20,
22,25;46:3,8,9,11,14,
21,24;47:4,6,8,11,19,
22;48:10,11,14,17,19;
49:1,1,4,6,7,14,16,17;
50:3;51:20,24;52:3,7,7,
13,14;53:3,9,10,15;
54:3,6,10,11,20,23;
55:1,7,11,15,19,24;
56:3,7,9,11,13,16,24;
57:2,4,6,7,11;58:5,10,
19,23,25;59:2,4,7,9,11,
13,15,16,19,21,23,25;
60:2,8,10,11,13,15,16,
22;61:5,9,10,12,15,16,
19,20,21;62:6,8,16,18,
23;63:1,12;64:1,6,16,
22,23;65:1,3,13,18,19,
24;66:1,4,8,8;67:3,9,
22,24;68:3,9,11,16,23;
69:8,10,12,14;70:2,6,
10,17,23,25;71:2,5,6,9,
9,14,20,23,24;72:2,4,
12,16,19;73:4,5;74:15,
17,18,21;75:4,10,14,
15,20;76:6,21;79:1,3,7,
11,16,18,20,21,23,25;
80:2,3,5,8,11,13,14,15,
17,20,22;81:1,9,23;
82:6,16,19,21,22;83:7,
12,15,19,19;84:4,9,14,
18;85:2,5,8,10,11,16,
19;86:1,6,9,23;87:1,4,
19;88:11,14;89:1,7,10,
12,15,17;90:19,21,22,
25;91:1,3,16,17,19,19,
21,23;92:1,13,23;93:2,
17;94:23;95:5,17,19;
96:4,17,19,21,24;97:1,
3,11,14,17,19,21,24;
98:1,2,4,7,10,13,15,17,
17,19,21;99:3,6,21,23;
100:6,10,11,18,21,24;
101:10,12,15;102:3,7,
10,12,15;110:24;111:7,
10,12,16,20,25;112:10,
16;113:7,10;114:1,4,9,
15,20;115:2;116:3,22;

117:16,21,21,21,23;
118:13,19
**right-hand (2)**
85:24;106:4
**rise (1)**
4:2
**Road (8)**
25:4;90:22,23;91:3,
8,16;97:2,14
**Road's (1)**
91:8
**Rockland (1)**
81:19
**role (3)**
9:20;14:10;30:2
**rolled (1)**
83:17
**roughly (12)**
13:12,16;14:3;18:11;
22:14;25:21;29:12;
41:24;61:13;62:5;
75:12;98:8
**round (2)**
32:11;88:11
**rule (3)**
113:5;114:10,11
**ruled (1)**
113:3
**rulings (4)**
115:1,5,8,10
**run (4)**
74:14,20;79:3;111:8
**running (1)**
109:7

---

**S**

**sale (1)**
34:19
**sales (2)**
81:16;96:8
**Salmi (10)**
5:17;112:5,7,13,14,
15,18;113:20,23,24
**same (18)**
6:18;25:20;26:17,18,
18;52:24;55:23;60:21;
62:7;63:21;65:18;72:2,
5;73:3;90:21;96:19,
20;106:25
**sanctions (1)**
112:23
**Sarc (6)**
98:13,16,17,18;99:1,
8
**sat (1)**
59:24
**Saturday (1)**
67:17
**save (1)**
27:18
**saw (8)**
90:22;100:15,18,22,

Case 16-01120    Doc 368    Filed 07/01/19    Entered 07/01/19 15:41:09    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 131 of 135

June 24, 2019

23,25;101:19,23

**saying (6)**
7:8;46:6;89:21;
109:9;110:22;111:1
**scans (1)**
22:4
**scheduled (1)**
96:1
**screen (8)**
24:3;61:2;86:23;
94:17;100:14,24;
101:9;104:3
**screen-sharing (1)**
110:7
**scroll (4)**
11:19;55:12;105:22;
106:1
**Sean (3)**
4:10;5:25;87:21
**Searched (1)**
27:14
**seated (3)**
4:3;8:8;58:9
**second (11)**
21:11;25:4;58:14;
65:10;70:12;91:7,10;
92:22;93:8;106:2;
114:15
**seconds (1)**
41:5
**second-to-the (1)**
98:23
**seeing (1)**
56:19
**selective (1)**
74:2
**send (1)**
50:25
**sending (2)**
49:19;89:20
**sends (1)**
98:18
**sense (2)**
116:15;117:3
**sent (10)**
16:22;29:2;38:6;
80:24;81:4,5,8;106:12,
13,14
**separate (4)**
16:1;29:2;66:5;
111:1
**separated (2)**
12:5,10
**September (8)**
13:23;31:11;53:9,16;
68:11;83:11;92:11;
93:2
**series (1)**
94:19
**service (2)**
20:3;84:17
**services (3)**
36:19;72:18;96:6

**session (2)**
4:2;58:8
**set (5)**
10:3;12:3;21:1;
23:13;111:1
**seven (1)**
15:8
**seventh (1)**
87:25
**several (9)**
12:5;16:20;28:16;
34:9;48:16;79:14,17;
102:25;115:15
**SGC000700 (1)**
106:5
**shared (1)**
27:16
**sheet (1)**
6:7
**sheets (3)**
6:16;19;26:1
**shift (1)**
58:3
**short (1)**
115:9
**show (8)**
33:9;48:16;54:10;
72:21;89:6,25;94:5,7
**showed (3)**
51:13;54:25;111:5
**showing (9)**
9:11;35:5;48:24;
51:2;54:2;83:23;88:4;
93:1;99:12
**shown (3)**
74:4;75:2;102:1
**shows (6)**
31:8,9,14;70:4;
77:14;107:11
**shuffled (1)**
94:9
**sic (12)**
5:10;9:8;11:13;
21:22;25:1,19;27:18;
37:23;72:18;81:16;
94:2;112:7
**side (3)**
82:3;85:23,24
**sides (3)**
26:19;34:17;107:2
**significant (1)**
56:5
**similar (2)**
63:20;64:2
**similarly (3)**
20:10;21:20;113:3
**simple (2)**
12:4;26:16
**simpler (1)**
26:12
**simply (3)**
41:19;93:9;96:7
**simultaneous (1)**

116:2
**single (9)**
16:9;22:4,11;32:6;
37:23;38:4;81:25;
106:21;108:9
**sit (5)**
24:13;52:1,7;56:23;
79:9
**sitting (1)**
60:15
**six (5)**
13:16;15:8;22:13,13,
14
**sixty (2)**
22:13,14
**skinny (2)**
30:11,18
**slightly (2)**
86:25;113:19
**small (3)**
27:4,10;110:7
**smaller (1)**
55:10
**snapshot (1)**
9:11
**snow (1)**
60:8
**snow-removal (1)**
60:22
**soft (1)**
19:4
**solid (1)**
22:12
**somebody (2)**
29:23;49:16
**somehow (1)**
80:7
**sometime (4)**
43:7;68:21;88:24;
101:22
**sometimes (4)**
28:7;39:17;50:20;
115:3
**sorry (17)**
4:23;5:10;16:4;
22:22,25;30:16;31:12;
56:4;58:10;63:6;66:14;
68:14;71:7;81:12;
87:21;94:7;110:1
**sort (5)**
5:4;8:16;31:4;56:1;
61:19
**sorts (1)**
76:22
**sound (2)**
81:9;115:11
**Sounded (1)**
58:4
**speak (2)**
57:22;78:6
**speaking (2)**
31:19;115:20
**specially (1)**

14:5
**specifically (4)**
47:6;48:1;49:25;
66:21
**spelling (1)**
69:5
**spent (7)**
15:25;16:1;22:7,11;
26:25;27:1;62:5
**spin (1)**
84:22
**spit (2)**
74:3;104:12
**split (1)**
35:1
**spoke (1)**
98:9
**spoken (1)**
39:17
**squeeze (1)**
117:20
**stand (2)**
37:24;69:3
**standard (1)**
108:2
**standing (1)**
56:21
**Stanik (1)**
52:14
**Stanley (9)**
4:19,22,24,24,25;5:1,
3;8:21;11:19
**start (3)**
5:15;11:5;73:15
**started (10)**
5:5;13:21;32:17;
40:17;42:17,23;50:11;
67:10;80:15;89:12
**starting (2)**
44:13;92:22
**starts (1)**
95:8
**state (1)**
4:8
**stated (3)**
10:14,18,19
**statements (10)**
16:12,15,19,24;29:6;
33:8;35:11;80:5;81:22;
82:7
**steep (1)**
95:18
**sticker (1)**
101:10
**still (15)**
13:17;16:4,4,21;
21:12;24:3;35:3;52:2,
21;54:10;63:22;79:10,
11;85:18;103:16
**stilted (1)**
78:16
**stipulated (2)**
6:7,18

**stop (1)**
25:18
**strategic (1)**
97:10
**Street (2)**
90:23,23
**strict (1)**
22:20
**Strike (2)**
11:23;108:6
**stroll (1)**
11:19
**stuff (1)**
14:1
**sub (1)**
47:3
**subcontractor (8)**
26:21;31:17,22;
43:22;44:20;45:10;
77:23;79:10
**subcontractors (18)**
6:2;26:16;27:2,20,
21;28:4;29:17,20;
32:10;34:9;45:12;47:7;
48:7;49:19,22;50:17;
57:13;79:15
**subcontracts (1)**
29:20
**subject (2)**
9:9;36:6
**submitted (1)**
57:11
**subs (6)**
43:18;46:19;47:24;
57:10,21;102:22
**subsequent (1)**
55:9
**subtract (3)**
12:15;18:4;32:15
**subtracted (4)**
13:1;17:19;63:24,25
**Sucks (1)**
93:11
**sued (1)**
9:16
**sufficient (1)**
73:17
**sufficiently (1)**
11:2
**suggested (1)**
39:18
**suggestion (1)**
117:10
**suit (1)**
102:8
**sum (1)**
103:13
**summaries (7)**
5:24;7:6,9,10;25:19,
21;105:5
**summarizing (1)**
91:20
**summary (18)**

6:6,16,19;21:2,10;
26:1,20,21,23;31:2,5,8;
33:6;34:21;54:17;
83:24;84:21;86:14
**summer (1)**
49:23
**supplementing (1)**
6:10
**supplements (1)**
7:15
**supplier (1)**
16:7
**support (13)**
22:4;26:22;51:5,9,
17;52:13;53:18;58:22;
59:10;79:18;102:2;
104:23;115:9
**supporting (2)**
7:6;105:19
**Sure (32)**
10:8;22:23;26:8,14,
18;29:24;31:6;41:6;
47:15;48:3;54:24;63:8;
65:17;66:13;67:25;
68:10,19;70:3;76:1,18;
83:19;85:3;89:9,24;
91:6;95:2;96:7;99:22;
109:11;111:17;112:3;
116:20
**surety (1)**
22:1
**surprise (2)**
113:13,15
**SWORN (1)**
8:7
**system (5)**
28:18;44:18;45:7,23;
51:10
**systems (3)**
43:23;44:3,14

**T**

**tab (10)**
6:5,20;19:13,21;
30:21;33:22,23;35:16,
17;51:6
**talk (6)**
24:25;66:3;69:2;
98:1;117:16;118:6
**talked (4)**
5:24;40:17;58:19;
109:2
**talking (9)**
11:1;12:7;24:7;
32:11;63:15;90:18;
94:25;101:22;116:2
**talks (1)**
21:20
**tallied (1)**
64:7
**tallying (1)**
62:24

**TAMPOSI (4)**
4:12,13;7:16;94:13
**Tatiana (1)**
4:15
**tax (6)**
36:22;37:7,7;89:5;
108:14,25
**taxed (1)**
108:10
**taxes (6)**
20:15,18,23;37:6;
39:7;107:19
**telephone (1)**
110:3
**telling (2)**
68:3;95:7
**tells (1)**
56:24
**ten (2)**
16:20;58:5
**tender (1)**
33:13
**term (1)**
93:18
**terms (3)**
13:18;17:3;19:23
**Terrace (1)**
90:23
**terrible (3)**
50:3;66:24;110:1
**testified (13)**
8:17;36:24;38:5;
39:15;46:12;61:10;
62:17;69:2;74:4;80:4;
82:18;98:2;110:20
**testifies (2)**
113:20;114:2
**testify (3)**
73:11;112:5;113:1
**testifying (3)**
112:8,20;113:7
**testimony (10)**
8:19;37:24;40:17;
51:1;63:6;73:16;74:10;
77:18;78:24;103:8
**Thanks (1)**
54:16;88:2;118:20
**that'll (1)**
5:17
**themes (1)**
39:16
**therefore (1)**
16:24
**there're (2)**
29:19,19
**thinking (3)**
78:16;79:6;116:8
**third (6)**
34:2;63:2,3;70:21;
90:3;92:21
**thirty (8)**
22:11,12;41:4;68:11;
72:23;115:18;118:2,5

**though (3)**
63:20;64:1;113:15
**thought (3)**
18:13;61:20;72:22
**thousand (2)**
64:7,23
**thousands (1)**
97:18
**three (11)**
20:1;28:20;40:13;
57:5;59:15;66:22;
68:15;80:18;94:22;
97:17,23
**thumb (4)**
69:10;73:25;75:6,10
**Tidewater (1)**
95:7
**tie (2)**
81:25;82:6
**tied (1)**
104:11
**tie-out (1)**
106:16
**till (1)**
68:20
**times (8)**
22:5,12,13;34:17;
45:14;76:23;85:15;
96:16
**timewise (1)**
111:4
**timing-wise (1)**
110:25
**tiny (2)**
27:3;104:3
**title (1)**
17:22
**titled (1)**
12:19
**today (11)**
4:20;5:5;11:7;24:13;
50:25;79:9;96:1;104:9;
111:22,24;115:24
**today's (1)**
115:4
**together (4)**
5:11;61:5;83:4;
84:25
**told (9)**
5:16;16:22;44:2;
47:6,13;60:16;66:5;
76:23;100:20
**tomorrow (10)**
4:20;5:8,16,21;
112:4;114:17,19;
117:14;118:7,20
**tomorrow's (1)**
115:4
**took (4)**
13:1;42:22;59:7;
63:10
**top (15)**
15:10,11;21:11;28:9,

21;36:12;45:3;50:20;
69:16;71:7;83:4;91:11;
94:11;105:23;117:13
**topic (2)**
72:25;110:6
**tops (1)**
102:25
**Total (26)**
12:6,11,16,19;13:1,
2;14:2;15:18,18,19,20,
23;17:12;18:6,16;
22:24;25:14;30:5;32:4,
14;41:13;62:21;63:23,
23;64:7;65:11
**touched (1)**
56:1
**toward (2)**
91:10;94:24
**town (4)**
4:16;27:4;67:22;
68:5
**track (3)**
29:9;46:5,9
**tracking (5)**
44:19;45:7,25;46:3;
103:7
**trail (9)**
69:4;70:2;103:15,19;
104:6,8,12;110:21;
111:8
**training (3)**
40:24;110:11,13
**transaction (1)**
77:15
**transactions (5)**
77:14,21;94:5;96:5,
11
**transcriber (1)**
116:10
**transcript (8)**
44:9;82:25;101:18;
116:6,11;117:5,7,8
**transcription (1)**
115:15
**transcripts (9)**
44:5;115:2,22,23;
118:1,4,6,12,24
**trial (10)**
4:5,7;47:19;60:2;
82:2;92:15;96:15,23;
97:1;115:23
**tried (2)**
26:15;27:18
**trier (1)**
113:8
**triple (1)**
22:2
**true (3)**
21:1;72:2;88:23
**Trust (1)**
81:19
**truthfully (1)**
10:20

**try (2)**
67:20;84:25
**trying (5)**
34:16;63:6;93:10;
107:12;117:19,20
**Tuesday (1)**
115:24
**turn (4)**
30:21;33:21;57:16;
95:18
**turning (1)**
9:9
**turns (1)**
118:12
**twenty (4)**
14:2;22:11;62:7;
75:12
**twenty-five (2)**
14:2;72:24
**twice (1)**
98:6
**two (21)**
6:13;17:18;19:10;
20:3;25:4,4;26:8;29:6;
40:13;59:22;61:17;
68:14;70:15;71:7;
74:24;77:14;84:16,17;
94:22;112:4;115:18
**two-and-a-half (1)**
61:17
**tying (1)**
106:22
**type (1)**
110:10
**typical (3)**
29:16;37:12;110:15

**U**

**Um-hum (12)**
14:9;18:21;30:15;
34:6;41:12,17;69:22,
25;76:7,20;83:16;87:5
**unaware (1)**
102:5
**uncertain (1)**
77:18
**under (2)**
34:22;85:17
**understood (3)**
17:4;46:11;63:9
**undervalued (2)**
90:9;109:21
**underwriter (2)**
95:1;96:2
**Unfortunately (1)**
68:4
**Unicon (6)**
6:19;30:22;31:9;
33:16;71:18;76:10
**unless (3)**
105:9;115:16;117:1
**unlike (1)**

Case 16-01120    Doc 368    Filed 07/01/19    Entered 07/01/19 15:41:09    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 133 of 135
June 24, 2019

34:9

**unpaid (1)**
79:11

**unprompted (1)**
51:1

**unreimbursed (1)**
62:19

**unrelated (2)**
69:6;95:3

**up (63)**
6:8;7:21;8:21;11:18;
16:6;17:9,10,14;21:2;
24:3;25:6;26:18;36:22;
38:7,8;40:3;50:7;
51:20;54:17;55:10;
61:2;62:24;64:7;65:11;
69:16;70:13;71:16;
72:9;80:14;84:23;86:8;
87:9,12,15,16,17;88:1,
7;89:11;90:6,8,12;
92:1,12;93:9,14,23;
94:1,17;96:24;97:6,21;
98:23;100:13,24;
101:6;104:2;105:21;
106:20;108:18;109:18,
19;118:25

**updates (1)**
14:13

**upload (1)**
109:17

**upon (4)**
21:16;23:12;31:4;
56:1

**upper (4)**
49:1;84:2;96:24;
101:10

**used (10)**
28:18;51:11,12;56:6,
7;59:7;61:22;104:23;
109:3;110:23

**useful (1)**
115:4

**using (2)**
32:2;106:11

**usually (2)**
37:9;89:13

**utilized (1)**
8:18

**V**

**V&D (3)**
6:15;72:2;76:8

**Vadim (6)**
4:15;24:7;57:20;
61:24;66:23;95:2

**variance (1)**
107:11

**various (1)**
88:8

**vendor (1)**
77:22

**vendors (11)**

27:19;28:16;34:9;
47:7,24;48:7;56:10;
57:13;74:21;75:3;
97:25

**vendor-transaction (1)**
50:8

**verifying (1)**
25:14

**version (1)**
12:12

**versions (1)**
107:7

**versus (1)**
38:23

**views (1)**
112:8

**village (1)**
5:2

**Vis-home (1)**
19:14

**vividly (1)**
13:22

**Von (3)**
5:17;112:4,7

**W**

**wait (2)**
115:3,3

**waited (1)**
116:14

**walk (1)**
31:4

**Wallace (2)**
90:23;91:11

**wasting (1)**
93:10

**way (21)**
41:22;43:13;45:23;
46:13;51:11,13;56:5;
59:18,23;64:6;66:3;
68:4;78:1,17,17;80:24;
82:25;88:25;105:23;
109:9;115:25

**ways (1)**
31:8

**wedding (1)**
68:19

**Wednesday (2)**
68:5,8

**week (13)**
6:2;22:12,14;27:9;
67:23;68:6,8,14,19;
115:24;116:16,19;
117:9

**weekend (1)**
67:25

**weeks (4)**
13:16;68:15,15;
115:18

**weird (1)**
114:5

**Welcome (1)**

5:2

**weren't (9)**
23:1;27:6,17;46:25;
56:13,15;59:2;67:12;
68:23

**whatever's (1)**
24:14

**whatnot (1)**
106:15

**what's (5)**
23:6;43:25;73:13;
77:6;85:13

**whatsoever (1)**
30:3

**whenever (3)**
32:18;58:11;102:19

**whole (1)**
74:1

**winter's (1)**
60:11

**withdraw (1)**
7:8

**withdrawals (1)**
81:18

**within (6)**
13:25;26:9;27:14;
79:22;89:19;108:14

**without (1)**
103:4

**witness (19)**
11:7,10,13;14:15,17;
63:19;77:11,20,25;
78:4,6,8,11,14,19,21,
23,25;111:21

**wording (4)**
53:22;61:14;89:23;
110:1

**words (4)**
38:14;43:24;93:20;
109:3

**work (18)**
29:16;31:9;36:16;
39:2;46:8;47:17;49:20;
56:10;59:2,5;67:9,10;
79:6;83:10,18;98:4;
99:2,6

**worked (2)**
40:21;57:14

**working (5)**
42:11;62:6;67:9;
89:4;92:10

**workpaper (1)**
86:19

**works (2)**
78:2,17

**worksheet (2)**
107:3,6

**worksheets (1)**
107:7

**written (3)**
45:9;105:6;117:6

**wrong (5)**
36:12;38:3;45:10,14;

89:16

**wrote (7)**
44:21;45:10,10,14;
80:18;90:6;99:8

**Y**

**Yarmouth (2)**
91:12,16

**year (21)**
13:12;25:22;37:5,8,
9;38:16,24;39:4,6;
44:3;93:9,19;96:5,7;
101:20;106:24;107:17;
108:2,3,4,9

**year-end (1)**
94:2

**years (7)**
29:6,13;40:22;57:5;
66:23;79:17;98:7

**year's (1)**
99:5

**Yep (10)**
24:5;30:25;33:24;
37:3;41:25;52:16;
60:17;73:6;91:4;101:2

**Z**

**Zena (1)**
97:11

**1**

**1 (12)**
6:12;13:10,12;15:1;
61:1;62:18;63:12;
65:19;68:23;80:7;
79:21;100:17

**1.886 (1)**
41:24

**10 (1)**
97:2

**10- (2)**
31:12,13

**10,000 (1)**
32:1

**10:16 (1)**
58:6

**10:41 (1)**
58:7

**100K-plus (1)**
91:12

**1030 (1)**
33:16

**1041 (1)**
33:16

**1058 (1)**
33:16

**107 (2)**
96:23;97:1

**1070 (1)**
33:16

**10K (1)**
91:11

**10th (4)**
12:20;17:13;18:16;
62:22

**11 (2)**
4:5,7

**11,360 (2)**
72:19,22

**112 (1)**
101:1

**12 (1)**
89:3

**12/31 (3)**
87:9;89:2;94:3

**12/31/14 (3)**
90:7,19;94:3

**12/31/15 (2)**
86:14;106:14

**12/31/2014 (1)**
88:9

**12/31/2015 (2)**
86:8,23

**13 (5)**
47:23;54:14,15,16;
57:18

**13,910 (1)**
86:23

**1342 (2)**
87:20,24

**139 (1)**
57:16

**13th (1)**
71:9

**144 (1)**
58:14

**148 (2)**
87:20,22

**14th (1)**
48:25

**15 (2)**
44:13;53:24

**15,000 (1)**
91:8

**15,460 (1)**
87:1

**150- (1)**
91:13

**15-13881 (1)**
4:6

**15th (2)**
97:9,13

**16 (1)**
50:7

**161 (1)**
82:24

**16-1120 (1)**
4:4

**162 (1)**
83:4

**167 (1)**
4:6

**17 (1)**

15:9
**174 (7)**
19:15;20:24;25:3,3;
30:2;33:3;58:14
**174.1 (1)**
55:3
**174.2 (3)**
52:25;58:13;60:20
**174.3 (1)**
55:22
**174.4 (3)**
52:9;60:2;84:20
**175 (20)**
6:2,3,13,14;25:3,5;
30:2,11,17;33:3,22;
36:1,2,8;48:22;49:9;
53:5,24;54:14;60:20
**175,000 (1)**
106:23
**17th (1)**
44:9
**18 (1)**
101:19
**186,199 (1)**
19:24
**18th (1)**
97:3
**19,670 (1)**
72:24
**1960 (1)**
72:18
**19th (1)**
93:2
**1st (8)**
13:17;24:3;49:10;
65:1,22;68:25;81:13;
106:14

## 2

**2 (5)**
41:19,23;50:17;
85:15;92:25
**2- (2)**
51:8;70:18
**2,000 (1)**
55:16
**2,021,858.39 (1)**
24:15
**2,500 (2)**
34:25;54:19
**20 (1)**
53:5
**200K (1)**
91:13
**2013 (3)**
18:16;31:11;95:13
**2014 (16)**
42:17,23;49:4;52:18;
54:6;55:10,16;62:12;
87:13;89:5;90:9;91:13;
92:13;93:15;95:13;
109:20

**2015 (90)**
12:20;13:10,12;
17:13;18:16;24:4;
31:18;43:7;47:4;48:14;
49:1,7,10,22;50:10;
51:8;52:14;53:2,3,9,
16;54:3,20,22;55:7;
60:7;61:1;62:18;64:18;
65:2,8,13,22;67:17,23,
24;68:24;69:11;70:2,6,
6,9,10,16,18,19;71:1,1,
19,20;72:3,12,12;75:4,
8,15;79:7;80:24;82:16;
83:12,24;85:1,6,10,13,
14;86:5;87:13;88:24;
89:3,4,11,21;90:6;
92:11;94:4,6,9;95:10,
19,24;96:12,15;97:3,9,
24;99:1,2,6;100:17
**2016 (14)**
13:12;14:8;15:3,9;
23:22;24:8;83:15,17;
84:3,3,13;85:7;92:11;
93:2
**2017 (2)**
100:21;101:22
**2018 (3)**
44:9;47:8;99:15
**203 (1)**
60:3
**21 (1)**
66:18
**22 (1)**
82:25
**228 (1)**
52:25
**22nd (1)**
9:17
**23,000 (3)**
53:16,19;86:8
**23rd (2)**
54:3;67:17
**24th (3)**
54:22;67:18,19
**25 (1)**
60:7
**26 (1)**
55:22
**27 (3)**
8:22;44:11;45:3
**28 (4)**
45:3;101:11,15,20
**289 (2)**
34:20,22
**28th (11)**
31:18;32:3;69:4;
70:6,10,19;71:1,20;
72:4,12;73:5
**29 (2)**
55:3;72:12
**29th (14)**
67:23;68:3;70:6,9,
16,18,22;71:1,12,19;

72:3;73:5;75:15;76:5
**2nd (8)**
34:22;53:9;54:20;
65:7,13;75:22,23;
80:24
**2-whatever (1)**
10:23

## 3

**3,000 (1)**
55:15
**3,194 (1)**
80:8
**3,773,143.49 (1)**
17:10
**3.194 (1)**
64:8
**3.194-odd (2)**
62:25;63:10
**3.2 (2)**
17:19;24:18
**3.738 (1)**
12:12
**3.773 (2)**
41:14;63:23
**3.78 (1)**
63:24
**3.7-odd (2)**
62:24;63:10
**30 (1)**
50:9
**30,000 (2)**
31:18;71:18
**304 (1)**
98:22
**30th (5)**
88:24;89:11,21;90:6;
95:24
**31 (3)**
83:24;85:10,14
**31st (1)**
85:6
**325- (2)**
88:17,20
**325,000 (1)**
87:7
**340 (5)**
76:25;77:8;103:16,
19;110:21
**3-4-0 (1)**
77:9
**341 (3)**
92:7,8;109:15
**35,000 (2)**
31:17;71:19
**35,805 (1)**
55:23
**36 (1)**
33:25
**37 (2)**
99:10,12
**385- (1)**

72:3;73:5;75:15;76:5
**97:21**
**3-million-194 (2)**
17:23;18:5
**3-million-77- (1)**
18:4
**3-million-773 (1)**
18:5

## 4

**4 (4)**
21:5;63:18;96:1;
98:22
**408- (1)**
97:21
**439,000 (1)**
87:10
**45 (3)**
48:22;52:9;84:20
**49 (10)**
15:10,14;18:20;21:5,
11;22:19;23:10;41:11;
63:18;68:1

## 5

**5 (6)**
21:11;30:15,16,16;
63:18;72:8
**5- (1)**
31:12
**5,000 (1)**
35:1
**5,250 (1)**
70:4
**50 (8)**
9:11;10:4;64:16,18,
22;82:11;85:23;96:15
**51 (1)**
6:11
**54 (2)**
47:21,23
**55 (10)**
19:6,9;31:9,17;
48:25;70:19;71:18;
72:3,14,15
**560- (3)**
62:23;63:1,2
**560,000 (1)**
62:18
**578,528 (1)**
21:13
**578,528.49 (1)**
63:22
**578K (1)**
64:12
**578-odd (1)**
64:6
**5th (1)**
9:16

## 6

**6 (7)**
55:7;67:24;83:17;
84:3,3,13;85:7
**6,000 (1)**
70:9
**6,550 (1)**
71:1
**60K (1)**
91:11
**62 (1)**
81:3
**64 (1)**
9:16
**65 (1)**
50:6
**65,000 (2)**
32:19,23
**65K (1)**
91:12
**665- (1)**
21:2
**665,545.49 (1)**
18:17
**67 (6)**
11:18;60:24;100:13;
101:4,7,9
**68K (1)**
95:14
**6th (2)**
68:8;85:4

## 7

**7 (10)**
10:19;13:7;15:10,14;
22:19,19;23:10;41:11;
63:15;82:10
**70,000 (1)**
99:1
**758- (5)**
10:20;65:18,24,25;
97:22
**758,000 (2)**
9:12;96:16
**758,783 (1)**
65:13
**760 (1)**
65:16
**77 (3)**
92:15,19;93:1
**790 (1)**
62:14
**7th (16)**
9:10,15;10:4,15;
13:17,17;64:18,25;
82:11,16;85:1,13;86:5,
25;87:7;96:15

## 8

**8 (7)**
18:19;30:11,11,15,
16,16;66:14

**8,910 (2)**
  70:19,24
**80 (3)**
  66:12,14,15
**84 (9)**
  83:21;84:6,10;85:21,
  23,25;105:21,22,25
**88 (6)**
  19:9;35:1;49:9;
  71:19;72:4,15
**888,729.94 (1)**
  106:20

## 9

**9 (3)**
  4:7;5:16;118:20
**9:04 (1)**
  4:1
**90 (2)**
  65:5,7
**94 (1)**
  97:6
**94,905 (1)**
  19:25
**99,903 (1)**
  19:25