### UNITED STATES BANKRUPTCY COURT
### DISTRICT OF MASSACHUSETTS - EASTERN DIVISION

| | |
|---|---|
| =============================== | . |
| IN THE MATTER OF: | . Case #15-13881 |
| | . |
| LYMAN-CUTLER, LLC | . |
| | . Boston, Massachusetts |
| | . **Tuesday, June 25, 2019** |
| Debtor. | . 9:06 a.m. |
| =============================== | . |
| LYMAN-CUTLER, LLC, | . Adv. Proc. 16-01120 |
| | . |
| Plaintiff, | . |
| v. | . |
| | . |
| KAGAN, ET AL, | . |
| | . |
| Defendants. | . |
| =============================== | . |

### TRANSCRIPT OF TRIAL DAY 12 ON:
### #167 OBJECTION TO CLAIM 9 OF CLAIMANT ALEX FILIPPOV FILED BY INTERESTED PARTIES TATIANA KAGAN, VADIM KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.
### #1 COMPLAINT BY LYMAN-CUTIER, LLC AGAINST VADIM KAGAN, TATIANA KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.

### BEFORE THE HONORABLE FRANK J. BAILEY

APPEARANCES:

| | |
|---|---|
| For the Debtor: | PETER N. TAMPOSI, ESQ.<br>The Tamposi Law Group, P.C.<br>159 Main Street<br>Nashua, NH 03060 |
| For Alex Filippov and Nickolay Lipetsker: | SEAN T. CARNATHAN, ESQ.<br>O'Connor, Carnathan, and Mack, LLC<br>1 Van De Graaff Drive<br>Suite 104<br>Burlington, MA 01803 |
| For the Defendants: | JOHN H. PERTEN, ESQ.<br>MICHAEL R. STANLEY, ESQ.<br>Sheehan Phinney<br>255 State Street<br>5th Floor<br>Boston, MA 02109 |



Electronic Sound Recording Operator:   ELIZABETH LOMBARD


Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service
eScribers, LLC
7227 N. 16th Street, Suite #207
Phoenix, AZ 85020
973-406-2250; operations@escribers.net

I N D E X

|                           | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---------------------------|--------|-------|----------|---------|-----------|
| WITNESSES:                |        |       |          |         |           |
| For The Debtor:           |        |       |          |         |           |
| BORIS MAIDEN              |        |       |          |         |           |
| (By Mr. Carnathan)        |        |       | 39       |         |           |
|                           |        |       |          |         |           |
| For The Plaintiff:        |        |       |          |         |           |
| BORIS MAIDEN              |        |       |          |         |           |
| (By Mr. Perten)           |        | 6     |          | 56      |           |
| (By Mr. Carnathan)        |        |       | 61       |         |           |

| EXHIBITS:         | DESCRIPTION                          | I.D. | EVID. |
|-------------------|--------------------------------------|------|-------|
| For the Debtor:   |                                      |      |       |
| EE                | Loan agreement                       | 22   |       |
|                   |                                      |      |       |
| For Defendants:   |                                      |      |       |
| 208               | Email Mr. Filippov to Mr. Maiden May 25. |   | 14    |
| 342               | Loan agreement                       |      | 35    |

1    (At 9:06 a.m.)

2              THE CLERK:  All rise.  Court is now in session.

3              THE COURT:  Good morning.  Be seated.

4              MR. CARNATHAN:  Good morning, Your Honor.

5              THE COURT:  All right.  Let's see what happens.

6                            (Pause)

7              THE COURT:  It's password changing day.

8              MR. CARNATHAN:  Have to write it on the back of your

9    hand now.

10             THE COURT:  No, I remember the password; it's -- at

11   least I thought I did.  You know what I'm saying here.  I

12   don't know what else to do.  It's -- it's not the one I

13   thought.  No, it's not working.  Okay.  Then it was changed.

14   Okay, Mary.  All set.

15             THE CLERK:  Adversary proceeding 16-1120, Lyman-

16   Cutler, LLC v. Kagan, et al.  This is day twelve of trial in

17   case 15-13881, Lyman-Cutler, LLC, number 167 objection to

18   claim 9, day twelve of trial.

19             Will the parties please state their names for the

20   record?

21             MR. CARNATHAN:  Good morning, Your Honor.  Sean

22   Carnathan for Alex Filippov and Nickolay Lipestker.

23             MR. TAMPOSI:  Good morning, Your Honor.  Pete Tamposi

24   for the debtor.

25             MR. PERTEN:  Good morning, Your Honor.  John Perten

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    for Vadim Kagan, Tatiana Kagan, ProExcavation Corp., and Kagan

2    Development KDC, Corp.

3         MR. STANLEY:  Good morning, Your Honor.  Michael

4    Stanley on behalf of (indiscernible) defendants.

5         THE COURT:  Okay.  Good morning everyone.  Any -- I

6    know we have some housekeeping.  Should we do that now or at

7    the end?  Is there anything else?

8         MR. PERTEN:  No, there's nothing else.  We've

9    actually had conversations with Mary about rescheduling, and I

10   appreciate the Court's indulgence.  Mr. Von Salmi sounded like

11   death warmed over yesterday --

12        THE COURT:  Okay.

13        MR. PERTEN:  -- so I appreciate that.  I was --

14        THE COURT:  All right.

15        MR. PERTEN:  -- frustrated, but it happens.

16        THE COURT:  No, it happens.  It's life, but we're --

17   should we put that date on the record?  Why don't we go ahead

18   and do that now so that -- my understanding is the arrangement

19   is that the next -- we'll need one more trial day is the

20   expectation.  That'll be the day for the experts, Mr. Von

21   Salmi and Mr. Doddridge, and that will be July 29 starting

22   at -- is that going to be a pretty full day?  Should we start

23   at 9 or 9:30?

24        MR. PERTEN:  I think my preference would be to start

25   at 9 just in case we need that time as opposed to assuming we

 1  don't, and hopefully we'll finish early.  That would be my

 2  preference.

 3          MR. CARNATHAN:  I think that's wise, Your Honor.

 4          THE COURT:  All right.  So we'll start at 9 that day.

 5  Okay.  All right.  That's in the books.

 6          Okay.  Well, then why don't we get Mr. Maiden back up

 7  and resume with him?  Come right up.

 8          Good morning, Mr. Maiden.

 9          MR. MAIDEN:  Your Honor.

10          THE COURT:  I'll just remind you, and if you could

11  just affirm that you understand you're still under oath from

12  the first round of this testimony.

13          MR. MAIDEN:  I do.

14          THE COURT:  Very good, thank you.  Okay.

15              BORIS MAIDEN PREVIOUSLY SWORN

16          MR. PERTEN:  Good?

17          THE COURT:  Whenever -- oh, yes, whenever you're

18  ready, from my standpoint.

19          MR. PERTEN:  Okay.  Thank you.  Can I start now?

20          THE COURT:  Yes, please do.

21                  CROSS-EXAMINATION

22  BY MR. PERTEN:

23      Q.   Good morning, Mr. Maiden.

24  A.   Good morning.

25      Q.   Mr. Maiden, when we broke last time, we were talking

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1  about the construction loans.  Do you recall that?

2  A.   Yes.

3       Q.   And you told us that in that transaction you

4  represented both the borrower and the lender with respect to

5  the construction loan, correct?

6  A.   Correct.

7       Q.   And as part of your representation, you drafted the

8  loan documents, correct?

9  A.   Correct.

10       Q.   And you understood that the loan documents needed to

11  reflect the underlying transaction, correct?

12  A.   From the bank perspective?

13       Q.   From both sides' perspective.

14  A.   Yeah, the -- yes.

15       Q.   Okay.  And it was Mr. Filippov that you were

16  primarily communicating with with regard to the construction

17  loans because he was the one who was going to be signing all

18  the documents; isn't that correct?

19  A.   As a manager of the LLC, yes.

20       Q.   Yes.  And it's also true, is it not, that originally

21  Mr. Filippov's, his relationship was with Belmont Savings

22  Bank, but since Mr. Kagan had a relationship with Rockland

23  Trust company and Rockland Trust company required a more

24  limited guarantee, that the decision was made to go with

25  Rockland Trust company; is that correct?

BORIS MAIDEN - Cross

1    A.    Decision by whom?

2         Q.   I'm sorry?

3    A.    Decision by whom?

4         Q.   The decision --

5    A.    Who made the --

6         Q.   -- by the borrower was to go to the Rockland Trust

7    company because they had a more limited guarantee, if you

8    will?

9    A.    That is correct.

10        Q.   Okay.  Now, Mr. Filippov, prior to the closing for

11   the construction loan, reviewed with you the various drafts of

12   the loan documents, did he not?

13   A.    I don't think so.

14        Q.   Okay.

15        MR. PERTEN:  Mr. Stanley, would you pull up Exhibit

16   308?  That's not the right exhibit.

17        MR. STANLEY:  Excuse me, Your Honor.

18        THE COURT:  Yes.

19        MR. PERTEN:  Try 309.  Nope.  It's 208.  Is that what

20   I said?  Not 308, 208.  There we go.

21        Could you scroll, Mr. Stanley, down to the end, so

22   reverse chronological order to the top of that first email?

23   All right.  That's good.

24   BY MR. PERTEN:

25        Q.   You'll agree with me, sir, that we have an email

BORIS MAIDEN - Cross

1    here on Saturday May 25th to you from Mr. Filippov, correct?

2    A.    Yes.

3            MR. PERTEN:  And if you could just scroll down --

4            THE WITNESS:  I can't actually see that it's --

5            MR. PERTEN:  Yeah.

6            THE WITNESS:  I assume it's from Mr. Filippov.

7            MR. PERTEN:  If you could just scroll down?  Stop

8    there.

9    BY MR. PERTEN:

10       Q.   So you'll agree with me that, in this email,

11   generally, what's happening is Mr. Filippov has various

12   questions about the loan agreement, about the guarantees,

13   which he's raising with you, correct?

14   A.    Yes.

15       Q.   Okay.  And certainly, you understood, based on the

16   questions that he was posing in Exhibit 208, that he was

17   carefully reviewing the documents, correct?

18   A.    He was reviewing the documents.

19       Q.   Okay.  And you responded to the questions that he

20   posed.

21           MR. PERTEN:  If you could scroll up, Mr. Stanley?

22   BY MR. PERTEN:

23       Q.   On May 27th, you had forwarded him a review, and he

24   reviewed it, and you made corrections and the like.

25           MR. PERTEN:  Can you scroll down a little bit so Mr.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1    Maiden can see that?

2            Would it be easier for you to see the paper?

3            THE WITNESS:  No, no, I'm good.

4            MR. PERTEN:  Yes?

5            THE WITNESS:  Yeah, I'm good.

6            MR. PERTEN:  Okay.

7    BY MR. PERTEN:

8        Q.   And one of the questions raised by Mr. Filippov, he

9    had questions about the guarantee, correct?

10   A.   Yes.

11       Q.   Okay.  And --

12           MR. PERTEN:  Scroll up a little bit.

13   BY MR. PERTEN:

14       Q.   Again, this is part of that same conversation on May

15   27th, Mr. Filippov again is talking to you about the guarantee

16   and whether or not Mr. Kagan and Mr. Lipetsker would have a

17   guarantee and what the terms of that guarantee would be,

18   correct?

19   A.   Correct.

20       Q.   And again, this was all part of a dialogue, over

21   several days, between yourself and Mr. Filippov, correct?

22   A.   Correct.

23           MR. PERTEN:  Could you scroll up a little bit more,

24   Mr. Stanley?

25   BY MR. PERTEN:

BORIS MAIDEN - Cross

1      Q.   And then we go to May 28th; you send an email to Mr.

2  Filippov, "Look at the proposed guarantee.  Neither Nick nor

3  Vadim have approved it, but if this is acceptable to you, then

4  I'll talk with both of them.  Thanks.  Boris."

5      Did I read that correctly?

6  A.   Yes.

7      Q.   So you were having communications with Filippov.

8  You were making changes to documents with Filippov, and once

9  Filippov was okay with it, your goal was, then, to run it by

10 Mr. Kagan and Mr. Lipetsker, correct?

11 A.   On the personal guarantees, yes.

12     Q.   Okay.  And the rest of the loan documents, other

13 than the personal guarantee, since Filippov and Lipetsker were

14 not -- excuse me -- since Mr. Kagan and Mr. Lipetsker were not

15 the ones who were actually signing them, you dealt exclusively

16 with Mr. Filippov on those since he's the one who signed it,

17 correct?

18 A.   That is correct.

19     Q.   Okay.

20         MR. PERTEN:  Could you scroll up, Mr. Stanley?

21 BY MR. PERTEN:

22     Q.   And then -- so you forwarded a guarantee, Mr.

23 Filippov says, "If it works for Nick, it works for me",

24 correct?

25 A.   Yes.



(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1      Q.   And then, ultimately, Mr. Filippov was comfortable

2   with the loan documents, and those were finalized; isn't that

3   correct?

4   A.   It's correct.

5      Q.   And the guarantees were finalized, as well, correct?

6   A.   Correct.

7      Q.   And when we spoke about the fact that Rockland Trust

8   company offered a more limited guarantee, Mr. Filippov was

9   only obligated to guarantee up to 600,000 of the 3.2 that was

10   being borrowed; isn't that correct?

11   A.   I don't remember exactly the amount, but there was a

12   limitation to the guarantee.

13      Q.   Okay.  That's fine.

14      Now -- so this is all happening in the end of May.

15   During this time, I think you told us when we were speaking

16   last week, you also were handling the subdivision of the

17   property; do you recall that?

18   A.   That's from a -- a legal point of view.

19      Q.   From a what point of view?

20   A.   From a legal point of view.

21      Q.   From a legal point of view, correct.

22   A.   Yes.

23      Q.   You were the one who filed whatever had to be filed

24   with the Town of Brookline and appeared at whatever hearings

25   there were and the like?

BORIS MAIDEN - Cross

1    A.    No.  Mr. Kagan did that.

2         Q.    Mr. Kagan did what?

3    A.    He made -- he actually -- all -- did all the work with

4    the Town of Brookline either for him (indiscernible) advice,

5    he worked with the surveyors, he divided the actual site plan

6    into -- the actual location into two.

7         Once it was approved by Brookline, he brought it to me,

8    and I have recorded it at the registry.

9         Q.    Okay.  And the process with Brookline took several

10   weeks.  You're at the mercy of the town schedule, correct?

11   A.    Yes.

12        Q.    And there were some problems with the town during

13   this period, correct?

14   A.    I think they were switching -- if I remember correctly --

15   they were switching inspectors from -- it's usual saga with

16   almost every town.

17        Q.    Okay.

18             MR. PERTEN:  Your Honor, with respect to Exhibit 208,

19   which we were just looking at and which is still up on the

20   screen, I'd like to offer that as full exhibit.  There wasn't

21   objection to it.

22             MR. CARNATHAN:  No objection, Your Honor.

23             THE COURT:  All right.  It's admitted.

24             Mary, what is it now?

25             MR. PERTEN:  It's 208.

BORIS MAIDEN - Cross

1            THE COURT:  Oh, it is --

2            MR. PERTEN:  It's in the book.

3            THE COURT:  -- it is 208.

4            MR. PERTEN:  Yeah.

5            THE COURT:  All right.  So it's, right, Defendant's

6    208.

7        DEFENDANTS' EXHIBIT 208 WAS ADMITTED INTO EVIDENCE

8    BY MR. PERTEN:

9        Q.   Now, on June 18th, sir, was the date the loan

10   closed, correct, June 18th, 2013?

11   A.   I assume you're -- I don't have a --

12       Q.   Okay.  And in connection with that closing, you had

13   Mr. Filippov sign the various loan documents that you had

14   drafted, correct?

15   A.   That's correct.

16           MR. PERTEN:  Now, Mr. Stanley, would you pull up

17   Exhibit 33, please?

18   BY MR. PERTEN:

19       Q.   Now, at the time you were closing the loan, at that

20   point, the operating agreement had all been signed and sealed

21   and finalized, correct?

22   A.   Yes.  It was signed, yes.

23       Q.   Several months earlier --

24   A.   Yes.

25       Q.   -- actually; isn't that correct -- which was another

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1   document that you had drafted on behalf of the LLC, correct?

2   A.   Correct.

3        Q.   And you understood, did you not, that the actual

4   construction was going to be done by Mr. Kagan's company, KDC?

5   A.   Yes.

6        Q.   Okay.  And sir, I put up on Exhibit 33 --

7        MR. PERTEN:  Mr. Stanley, would you please scroll the

8   second page of that?

9   BY MR. PERTEN:

10       Q.   You would agree with me, sir, that this May 7th,

11  2013 is the commitment letter that the bank provided for the

12  construction loans, correct?

13  A.   That is correct.

14       Q.   And it's the commitment letter that served the

15  basis, if you will, of drafting of all the loan documents?

16  A.   That is exactly correct.

17       Q.   So this certainly was the document that you had and

18  you relied upon in order to draft the final loan

19  documentation; isn't that correct?

20  A.   Yes.  The bank sends it to me and to the borrower.

21       Q.   Okay.  And in fact, if we --

22       MR. PERTEN:  Mr. Stanley, if you could just skip to

23  page 7?

24  BY MR. PERTEN:

25       Q.   There, on page 7, we see the signature of Mr.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1    Filippov and the signature of somebody from Rockland Trust

2    company, correct?

3    A.   Yes.  That's the John McGregor signature.

4        Q.   John McGregor who's the bank officer, and then Alex

5    Filippov signed both as a guarantor and as the manager,

6    correct?

7    A.   Sign -- yep, individually and as a manager.

8        Q.   Great.

9            MR. PERTEN:  Would you go back to page 2, please?

10   BY MR. PERTEN:

11       Q.   Now, you understood, sir, that this document, the

12   commitment letter, sets forth the terms and conditions under

13   which the loan will be issued by the bank, correct?

14   A.   Correct.

15       Q.   And the column marked "Use of loan" says, "The

16   proceeds of the loan will be used solely for the purposes set

17   forth in the attached construction supplement, correct?

18   A.   Correct.

19       Q.   So you understood that this loan couldn't be used

20   for anything?  It had to be used strictly within the

21   guidelines of whatever the construction loan supplement said;

22   isn't that correct?

23   A.   That was the -- was what the commitment said, yes.

24       Q.   Yes.  And if we scroll --

25           MR. PERTEN:  Mr. Stanley, if you could skip ahead to

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1  page 8?

2  BY MR. PERTEN:

3      Q.   That is the construction loan supplement that's

4  referenced in the commitment letter, correct?

5  A.   Yes.

6      Q.   And if we look --

7          MR. PERTEN:  Scroll to the next page, down at the

8  bottom.

9  BY MR. PERTEN:

10      Q.   That, too, is signed, is it not, by Mr. Filippov on

11  behalf of Lyman-Cutler, correct?

12  A.   Correct.

13          MR. PERTEN:  Mr. Stanley, go back to the previous

14  page.

15  BY MR. PERTEN:

16      Q.   And this one provides at the top where it's first

17  paragraph after the introductory paragraph, "Use of loan

18  proceeds.  The proceeds of the loan shall be used solely for

19  costs incurred in connection with construction of the

20  project."

21      Did I read that correctly?

22  A.   Yes.

23      Q.   So again, the limitation that was imposed by the

24  bank in the commitment letter and in the construction loan

25  supplement was that this -- these proceeds could only be used

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1    in connection with construction, correct?

2    A.    For all the costs associated with the construction.

3        Q.    And the --

4            MR. PERTEN:  Scroll down a little bit.

5    BY MR. PERTEN:

6        Q.    You also understood there's a section called

7    "Agreements with general contractor and architect" that the

8    actual contract between the general contractor and the owner,

9    in this case Lyman-Cutler, needed to be submitted to the bank

10   as part of the loan closing, correct?

11   A.    Correct.

12       Q.    So it wasn't just a form contract; they needed the

13   actual contract, correct?

14   A.    Well, they were -- (indiscernible) them was satisfactory

15   to the bank.

16       Q.    Okay.

17           MR. PERTEN:  Mr. Stanley -- I keep wanting to say Mr.

18   Harris -- Mr. Stanley, would you go to page 3 please?

19   BY MR. PERTEN:

20       Q.    We're back in the commitment letter.  We spoke

21   briefly about the guarantee, and does that refresh your memory

22   that there was a $600,000 guarantee that Mr. Filippov was

23   going to be guaranteeing?  That's bad grammar.

24   A.    Yes, I see it now.

25       Q.    Right.  His guarantee was limited to 600,000,

BORIS MAIDEN - Cross

1    correct?

2    A.   I see it now, yes.

3        Q.   Okay.

4            MR. PERTEN:   Now, would you forward to page 5,

5    please?

6    BY MR. PERTEN:

7        Q.   And you understood, sir, that the bank was

8    appointing you as the attorney for the lender, correct?

9    A.   Correct.

10       Q.   And in fact, that's confirmed there, middle of the

11   page, attorney for the bank.

12       "The following attorney will prepare all necessary and

13   appropriate papers and instruments for the closing of the

14   loan.  The attorney will represent the bank's interest only

15   and will not be providing any services to the borrower", and

16   then your name is listed, correct?

17   A.   Correct.

18       Q.   So when you also represented the borrower at the

19   time, you understood that was not consistent with what the

20   commitment letter required, correct?

21   A.   I misspoke on that point.  On the refinances -- on the

22   refinances, there is, specifically at the point in time, I --

23   there was no representation of the borrower in terms of

24   representation.  I explained the documents to the borrower; it

25   doesn't mean that I was representing them.  It's done all the

BORIS MAIDEN - Cross

1    time at closings where people come in; you explain the

2    promissory note to them; you explain all the other documents;

3    there is no representation as to the borrower in terms of my

4    meaning or representation.

5         Q.   Understood, but this was not a refinance.  This was

6    an initial --

7    A.   That was a constru --

8         Q.   -- initial borrowing.  I was not June of 2013 --

9    A.   It doesn't make any difference.

10        Q.   -- was not a refinance, correct?

11   A.   On the June it was the --

12        Q.   June 18th, 2013 was the initial closing for the

13   construction loan.

14   A.   And even at that point in time, there is no

15   representation of the borrower in terms of representing.

16        There's -- the bank issues the commitment, and the

17   borrower either takes it, or they don't take it, and the

18   documents are being drafted.  Opening negotiations are done

19   between the bank -- my job is put whatever they agreed in

20   together.

21        Q.   Okay.  And sir, when we looked a moment ago at

22   Exhibit 208, when you were communicating back-and-forth and

23   making edits in response to questions raised by Mr.

24   Filippov --

25   A.   Um-hum.



BORIS MAIDEN - Cross

1    Q.   -- is it your testimony now, that you are not --

2    that you were just reviewing documents with him, or were you

3    going beyond that?

4    A.   No, I was reviewing documents, and if he had any changes,

5    he would talk to the bank.

6    Q.   Okay.

7    A.   But the same thing goes on in your closing.  If you have

8    questions, you come for a refinance, you have question on a

9    promissory note, you can go talk to the bank, and then if

10   there is a change, it will be changed.

11   Q.   But you'll agree with me, sir, that you did more

12   than simply discuss the terms.  You responded to questions and

13   made edits to the documents at the request of Mr. Filippov?

14   A.   I do it part of every closing.

15   Q.   Okay.  Now, you also had to draft a loan agreement;

16   isn't that correct?

17   A.   It's a template.

18   Q.   Okay.

19   MR. PERTEN:  Your Honor, may I approach the witness?

20   THE COURT:  You may.  Thank you.

21   MR. PERTEN:  Your Honor, I have handed a loan

22   agreement to the witness, and I'd ask if that could be marked

23   for identification.  I think we're up to EE.

24   THE COURT:  Okay.  It's marked as EE for

25   identification.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1          DEBTOR'S EXHIBIT EE WAS MARKED FOR IDENTIFICATION

2     BY MR. PERTEN:

3          Q.   Now, Mr. Maiden, the document I've placed in front

4     of you, would you agree with me that that is the loan

5     agreement -- the final version of the loan agreement that was

6     signed on the last page by Mr. Filippov and by the Rockland

7     Trust company?

8     A.   Yes.

9          Q.   And in fact, Mr. Filippov's signature was witnessed

10    by you, correct?

11    A.   Correct.

12         Q.   And this is a document that you drafted, correct?

13    A.   Based on the commitment letter, yes.

14         Q.   Based on the commitment letter.  This is, if you

15    will, the final product of --

16    A.   Incorporated in the final commitment letter, correct.

17         Q.   Okay.  And you will recall, sir, that there were

18    actually two loans -- identical loans, each for $1.6 million,

19    correct?

20    A.   Yes.

21         Q.   And if we --

22              MR. PERTEN:  Strike that.

23    BY MR. PERTEN:

24         Q.   And this document, you reviewed this with Mr.

25    Filippov as well, correct?

BORIS MAIDEN - Cross

1    A.    Correct.

2         Q.    So there are certainly -- Mr. Filippov had an

3    opportunity to ask questions or raise concerns, correct?

4    A.    Correct.

5         Q.    And as we know from the previous emails, he did have

6    questions and concerns that you responded to, correct?

7    A.    That were addressed by the bank or me, yes.

8         Q.    Yes.  Okay.  If I could ask you to turn to the

9    second page, sir, of this document that you drafted, paragraph

10   2.3 states, "The loan proceeds shall be used for construction

11   of the project."  You see that?

12   A.    Yes.

13        Q.    So again, you understood that the proceeds could

14   only be used for the construction; isn't that correct?

15   A.    Correct.

16        Q.    Okay.  And if we continue on, on page 3, at the top

17   of the page, you've identified a general contractors Classic

18   Homes Development and Construction, LLC, correct?

19   A.    Yes.

20        Q.    And you understood that wasn't the case as KDC was

21   the one whose actually doing the construction?

22   A.    At that time, I think, the name of the company was

23   Classic Homes that Mr. Kagan used.

24        Q.    All right.

25   A.    So that was his company that he used for construction.

BORIS MAIDEN - Cross

1    Q.   Right.  And we looked at the contract that you had

2    drafted last time, correct?

3    A.   Yes.

4    Q.   Okay.  And then, if we go down to 3.2, which talks

5    about advances, "Except as specifically" -- I'm reading,

6    starting at the second sentence -- "Except as specifically

7    provided to the contrary herein, all advances under this

8    agreement shall be made solely for the payment of a portion of

9    the expenses properly incurred in connection with the project,

10   all in accordance with the budget and as set forth in the loan

11   disbursement schedule."  Did I read that correctly?

12   A.   Yes.

13   Q.   And the budget, if you will --

14        MR. PERTEN:  Mr. Stanley, can you bring up Exhibit

15   27?

16   BY MR. PERTEN:

17   Q.   And this document, which we've introduced as Exhibit

18   27, that is -- that's the budget, correct?

19        MR. PERTEN:  You can scroll down just so he could see

20   the whole document.

21   A.   I -- was it attached to the loan documents or not --

22   Q.   I believe --

23   A.   -- because I usually don't see budgets.

24   Q.   Okay.  Well, are you aware of a different budget?

25   A.   I'm not -- I was -- I was aware that there must be

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1    budget, but I don't remember doing it as part of paperwork.

2         Q.   Okay.

3              MR. PERTEN:  Mr. Stanley, would you just scroll down

4    to the end of this document?  Whoops, you went too far.  I

5    just want to --

6    BY MR. PERTEN:

7         Q.   So we can see the total is $1.6 million, correct?

8    A.   Yes.

9         Q.   And you'll agree with me, sir, that nowhere in this

10   budget does it talk about carrying cost, correct?

11   A.   Correct.

12        Q.   And as counsel for the bank, you certainly wouldn't

13   sanction the submission of any documents that you knew were

14   false to the bank in support of a loan, correct?

15   A.   I am not aware, nor do I have any idea whether, for

16   example, exterior fixtures cost $7,000, or in reality, they

17   are $5,000.  So I don't know whether this is the correct

18   numbers or not, whether they were exaggerated or not.

19        Q.   Let's go -- understood.

20        So your position, sir, is that you can't vouch for any of

21   these numbers at all, because you're not the contractor --

22   A.   The bank does it.

23        Q.   -- you're a lawyer, and you're not a contractor?

24   A.   The bank does it, right.

25        Q.   Sure.  Sure.  But you'll also agree with me that the

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1  budget did not list carrying costs as a category for

2  disbursement?

3  A.   Yeah.

4       Q.   And you've also told us earlier that you understood

5  that, under the loan documents that you drafted, carrying

6  costs could not be paid by the construction loan, under the

7  documents you drafted?

8  A.   Correct.

9       Q.   Okay.  So certainly, sir, if the borrower intended

10 to use the proceeds of the -- and you knew it -- the proceeds

11 of the loan documents to pay carrying costs, as the lawyer for

12 the bank, that's not something that you would approve?

13 A.   The bank actually gets to see all the documents,

14 including the operating agreement, which specifically

15 contradicts that, which specifically says carrying costs will

16 be paid.

17      If the bank would have rejected -- and they have their

18 own underwriting department; they review it; they value it;

19 they actually make sure that, if there is any violation,

20 that's -- I'm not there to oversee whether the budget is

21 correct, whether -- how will the -- whether kitchen appliances

22 cost 32-; maybe they cost 25- and the 7- is used to pay

23 carrying costs, which is what I know from my experience with

24 all the build -- builders that's what they do, but I have no

25 knowledge of that.

BORIS MAIDEN - Cross

1      Q.   Understood.  But certainly, sir, you'll agree with

2   me that, to the extent that you testified last time that the

3   parties were going to use the loan proceeds to pay carrying

4   costs, you understood that was not in compliance with the

5   operating agreement that you drafted, not in compliance with

6   the loan commitment letter that we looked at, and not in

7   compliance with the loan agreement; you'd agree with that,

8   correct?

9           MR. CARNATHAN:  Objection.

10  A.   It was --

11          THE COURT:  Hold on.  Hold on.

12          MR. CARNATHAN:  There's three questions in there, and

13  I'm not sure --

14          MR. PERTEN:  I can break them --

15          MR. CARNATHAN:  -- which one was asked.

16          THE COURT:  Sustained as compound.

17          MR. PERTEN:  Okay.

18  BY MR. PERTEN:

19      Q.   Well, you'll agree with me, sir, that you

20  understood that the commitment letter was at odds with the

21  operating agreement in that it prohibited the use of anything

22  other than for construction costs, correct?

23  A.   On it -- on its face, yes.

24      Q.   Yes, sir.  And you also understood that the terms of

25  the operating agreement that you drafted did not comply with

BORIS MAIDEN - Cross

1   the terms of the loan agreement that you drafted, which we're

2   looking at, correct?

3   A.   Those -- those are -- it was not my job to ensure --

4        Q.   I'm not asking if it was your job, but you

5   understood, sir, that the documents that you drafted were

6   contradicted, if you will, the terms of the operating

7   agreement?

8   A.   Every closing I did for Rockland Trust contained that --

9   that's -- that term, and every operating agreement I did

10  contained that.

11       Q.   And in fact, sir, you understood that the parties

12  had decided to waive that requirement of the operating

13  agreement and that Mr. Kagan would front the carrying costs

14  and then get reimbursed at the end.  You understood that,

15  didn't you?

16  A.   No, I did not.

17       Q.   Now, will you look back at the loan agreement, sir,

18  which you have in front of you?

19  A.   Yes.

20       Q.   On page 5, Section 3.4.2 there's a requirement that,

21  in connection with a construction advance, the borrower has to

22  state, among other things, that the requested amount does not

23  exceed the project costs incurred to the then current state of

24  construction.  Did I read that correctly?

25  A.   You said 3.42?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1      Q.   3.4.2, "That the requested" in the middle of the

2   paragraph, "That the requested amount (together with previous

3   amounts requested and disbursed by the bank, if any) does not

4   exceed the project costs incurred to the then state of

5   construction".  Do you see that language?

6   A.   I didn't bring my glasses.  Which paragraph?

7      Q.   Okay.  I'm sorry.  3.4.2 at the top of the page.

8   A.   3.4.2.  Yes, I see it.

9      Q.   Okay.  So again, that's another term of the loan

10   agreement that you drafted which makes it very clear that the

11   advance is tied to the state of construction?

12   A.   When you say "you drafted", those paragraphs come out of

13   the template.  I didn't even change anything on them, right.

14      Q.   Okay.

15   A.   Incorporated.

16      Q.   Well, this is a bank template that you used and that

17   you had used for other Rockland Trust --

18   A.   Correct.

19      Q.   -- loans, but you were the bank's attorney, and it

20   was your job to tweak those documents to reflect anything that

21   deviated from the standard terms of your template, correct?

22   A.   Based on the template; that's correct.

23      Q.   That's right.

24   A.   I mean, based on the commitment.

25      Q.   That's right.  And you didn't make any change to

BORIS MAIDEN - Cross

1    this 3.4.2 because you understood that was the requirement of

2    the loan and that wasn't being changed, correct?

3    A.    It was never brought up.

4        Q.    Okay.  And then, if we drop to paragraph 3.4.6 on

5    the same page, it says, "Each advance requested shall be for

6    works performed substantially in accordance with the plans and

7    specifications and shall be consistent with the loan

8    disbursement schedule, the budget, and the construction

9    contract, as approved by the bank", correct?

10   A.    Yes.

11       Q.    And it doesn't say consistent with the operating

12   agreement; this is consistent with the loan disbursement

13   schedule, the budget, and the construction contract, correct?

14   A.    Yes.

15       Q.    If you could flip the page to page 6, paragraph

16   3.4.11, it says, "Subject to the terms and conditions of this

17   agreement and upon the borrower's compliance with all the

18   conditions contained in the agreement, the bank shall advance

19   up to ninety percent of the applicable approved project

20   costs", correct?

21   A.    Yes.

22       Q.    Now, certainly to the extent that you represented a

23   lender like Lyman-Cutler, you would not counsel them to breach

24   the terms and conditions of their loan agreement, correct?

25   A.    In terms of counseling and on what terms of happen in the

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1    reality, those are two different things.

2        Q.   Understood.

3    A.   I knew that -- the -- the money is going to be used for

4    paying construction.  Loan officer knew; everybody, probably,

5    at the bank knew that.  So at that point, I don't need --

6    didn't need to be counseling anybody.

7        Q.   And you understood, sir, that certainly Rockland

8    Trust company is a federally insured bank, correct?

9    A.   Yes.

10       Q.   And that they're subject to various banking

11   regulations?

12   A.   Yes.

13       Q.   And you understood that it's certainly not uncommon

14   that banks sell the mortgages and loans on the market?

15   A.   Not commercial ones.

16       Q.   Okay.  And certainly, whatever the loan officer may

17   know, you would agree, is not consistent with the documents

18   that you drafted; isn't that correct?

19   A.   That is correct.

20       Q.   Okay.  And finally, if I could ask you to turn to

21   page 9, Section 5.1, it says, "Payments.  Borrower will pay

22   principal, interest, fees, and all other amounts payable under

23   the note and of this agreement when and as due".

24       So the term of this agreement was that the borrower pays

25   the principal and the interest, correct?

BORIS MAIDEN - Cross

1    A.   Mr. Perten, could you tell me which --

2         Q.   Sure.  5.1 on the bottom of the page.

3    A.   Yes.

4         Q.   Okay.  And then I'm going to ask you to flip all the

5    way towards the end.

6    A.   What page?

7         Q.   Page 13.  Are you there?

8    A.   Yes.

9         Q.   Paragraph 6.4, which is part of the events of

10   default.

11   A.   Um-hum.

12        Q.   "One of the events of the default is if any

13   representation or warranty made in this agreement or if any

14   representation or warranty contained in any of the other loan

15   documents or hereinafter made by borrower or guarantor to bank

16   shall be breached or shall be false, inaccurate, or incomplete

17   in any material respect" -- you understood, sir, that that

18   would be an event of default if something that the borrower

19   was signing onto was not accurate?

20   A.   If the bank wanted to do --

21        Q.   If the bank wanted to.

22   A.   Yes.

23        Q.   Sure.  And you also understood, if I could ask you

24   to flip the page, that another event of default set forth in

25   page -- paragraph 6.1 2, which is titled "Dispute".

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1    A.    Um-hum.

2         Q.    Says, "Any material dispute between the developer

3    and the builder, as determined by the bank", correct?

4    A.    Yes.

5         Q.    And so you understood, sir, or you'd agree with me

6    that when Mr. Filippov filed suit in June of 2015 against Mr.

7    Kagan, one of the potential ramifications was that was a

8    default of the note?

9    A.    The bank could have.

10        Q.    Could have.

11   A.    Yes.

12        Q.    Sure.    And that was a risk that he was taking by

13   filing that suit; you'd agree with that, wouldn't you?

14   A.    The banks --

15        Q.    All right.

16   A.    -- don't foreclose unless they get -- don't get paid.

17        Q.    And you also understood that the bank was relying on

18   the representations and warranties in this document?

19   A.    The bank was relying on the underlying project for its

20   security and relying on the mortgage that was recorded, on the

21   financial strengths of the borrower.    These are basically --

22   these documents were not -- oh, where the bank relies,

23   therefore, we'll lend.

24        Q.    Okay.

25   A.    No, the lending already was done in the commitment level.

BORIS MAIDEN - Cross

1      Q.   Got it.

2   A.   This is just -- they're not relying on my document here.

3      Q.   Okay.  Now, sir, last clause I'd like to draw to

4   your attention, then, is if you could just look at on page 15,

5   Section 8.2, it says, "All representations, warranties,

6   covenants, and agreements set forth in this agreement and in

7   the other loan documents are material and shall be deemed to

8   have been relied upon by the bank in making the loan

9   notwithstanding any investigation heretofore or hereafter made

10   by the bank".  Did I read that correctly?

11   A.   Yes.

12      Q.   So you understood, regardless of what the bank knew

13   or didn't know, they were making it very clear, because you

14   drafted this document, that they were relying upon the

15   statements made in this document, correct?

16   A.   They would rely on that document if the case came to

17   default or that they needed to foreclose, they will use every

18   possible sentence in this agreement to foreclose.

19      Q.   Okay.  And this document, certainly, before Mr.

20   Filippov signed it, you read it, and you reviewed it with him,

21   correct?

22   A.   As you indicated in your email, he did go over the

23   changes, so I assume he -- I -- I personally don't remember

24   going line-by-line with him on this document.

25      MR. PERTEN:  Your Honor, at this point, I'd like to

BORIS MAIDEN - Cross

1   offer this as a full exhibit into evidence, the loan

2   agreement.

3            MR. CARNATHAN:  No objection, Your Honor.

4            THE COURT:  All right.

5            MR. PERTEN:  I think 342.

6            THE CLERK:  The exhibit Defendant's Exhibit 342.

7            MR. PERTEN:  Is that right?

8            THE COURT:  Okay.  So that's in evidence, 342.  Yes.

9            MR. PERTEN:  Thank you, Your Honor.

10          DEFENDANT'S EXHIBIT 342 WAS ADMITTED INTO EVIDENCE

11   BY MR. PERTEN:

12       Q.   Now --

13            MR. PERTEN:  Do you need another one here?

14            THE COURT:  No, she's got it.

15            MR. PERTEN:  Thank you, Your Honor.

16            THE COURT:  Um-hum.

17   BY MR. PERTEN:

18       Q.   Now, once the construction loan is closed, your

19   involvement with the Lyman-Cutler project essentially ended,

20   correct?

21   A.   Yes.

22       Q.   The only other activities that you were involved in

23   were the loans needed to be extended, and you orchestrated the

24   extension of the loan so that they wouldn't mature before the

25   property sold, correct?

BORIS MAIDEN - Cross

1  A.   I think it was done -- there was no actual paperwork that

2  was done for that.  I think Mr. Filippov called the bank, and

3  the bank says don't worry about it, just keep paying what

4  you're paying.

5       Q.   Okay.  And during the pendency of this project, at

6  no point did either Mr. --

7            MR. PERTEN:  Strike that.

8  BY MR. PERTEN:

9       Q.   At no point did Mr. Filippov come to you and say

10  words to the effect of, hey, we're having problems on this

11  project; something's wrong, or words to that effect, correct?

12  A.   Correct.

13       Q.   And at no point did he come to you and say, hey, the

14  terms of the loan documents that I signed don't reflect our

15  agreement, or words to that effect, correct?

16  A.   Our agreement between Mr. Kagan?

17       Q.   Sure.

18  A.   No.

19       Q.   No, he didn't?

20  A.   He did not.

21       Q.   Okay.  And in fact, the next involvement that you

22  had was roughly April of 2015 -- April/May of 2015, when Mr.

23  Kagan approached you to tell you that his partners, Mr.

24  Filippov and Mr. Kagan, were refusing to pay for costs that he

25  had advanced; isn't that correct?

BORIS MAIDEN - Cross

1   A.    He came over indicating that, basically, that the money

2   is being -- the project is writing out money, and something

3   needs to be done about it.

4        Q.    Okay.  And part of what he said to you was that Mr.

5   Filippov and Mr. Lipetsker were refusing to put more money in;

6   isn't that correct?

7   A.    He did not say that, no.

8        Q.    Okay.  Well, you understood that he had been

9   fronting money; you understood that, didn't you?

10  A.    At some point -- I understood, based on the operating

11  agreement, that after some period of time, the carrying costs

12  needs to be paid by Mr. Kagan individually, and whether he was

13  already paying it at that point in time, I'm not sure, or he

14  was going -- I think he already was paying some out of his

15  pocket at that point in time.

16       Q.    And Mr. Kagan asked you to intercede on his behalf,

17  didn't he?

18  A.    I don't remember that he did.  I think he met with -- at

19  some point, with Mr. Lipetsker to discuss the same issue, but

20  I don't remember that he asked me can you call Filippov, can

21  call somebody regard let's have a meeting or any -- that was

22  not the case.

23       Q.    All right.  It's fair to say, sir, though, that

24  despite the fact that you had a relationship with Mr. Kagan

25  and Mr. Lipetsker and Mr. Filippov, when Mr. Kagan came to you

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Cross

1    to raise the concerns that he was having, you didn't take any

2    steps to get involved with that dispute; isn't that correct?

3    A.    Correct.

4         Q.   And the reason you didn't do that is you felt it

5    would be a conflict of interest; isn't that correct?

6    A.    I -- it is not uncommon for Mr. Kagan to have disputes

7    with his investors which he was able to settle.

8         So I would hear, sometimes, complaints about X, Y, or Z,

9    so I didn't even think it as a -- as an issue.

10        Q.   Okay.  And you certainly, also, would agree with me

11   that. in connection with the relationships between the

12   parties, that the parties were certainly free to waive

13   whatever requirements of the operating agreement they wanted

14   to; isn't that correct?

15   A.    That's why the agreements are made.  They could --

16        Q.   Okay.

17   A.    -- they can be modified.

18        Q.   So certainly, there was nothing wrong, in your mind,

19   if the operating agreement says carrying costs are to be paid

20   by the LLC with the parties agreeing that, in fact, we're

21   going to take out a loan that doesn't allow carrying costs to

22   be paid and Mr. Kagan will pay them, that certainly wouldn't

23   be shocking to you, correct?

24   A.    That was not -- not my understanding, but parties can

25   agree to what -- whatever they want to agree, I guess.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Redirect

1     Q.   Right.  And you wouldn't have been privy to those

2   communications, correct?

3   A.   No.

4     Q.   Okay.

5         MR. PERTEN:  Your Honor, I have nothing further.

6   Thank you.

7         THE COURT:  Okay.

8                   REDIRECT EXAMINATION

9   BY MR. CARNATHAN:

10    Q.   Good morning, Mr. Maiden.

11  A.   Good morning.

12    Q.   So sir, I'd like to start by just going back over a

13  couple of the documents that Mr. Perten just showed you.

14        MR. CARNATHAN:  So Mr. Hartzell, can I have Exhibit

15  33 back up, please?  And I think I'm on the eighth page.

16  That's that construction loan supplement that Mr. Perten was

17  showing you.  Would you just blow up the paragraph that says

18  "Overall project budget" please?

19  BY MR. CARNATHAN:

20    Q.   So Mr. Maiden, I'm back on that loan commitment

21  letter and the construction loan supplement, and the paragraph

22  that's titled "Overall project budget" reads, "Prior to the

23  loan closing, borrower must submit to the bank for bank's

24  approval a complete itemized budget for the project ("The

25  Budget").  The budget must include not only the direct hard

BORIS MAIDEN - Redirect

1  construction costs, but also interest expense to completion of

2  the projection and all related project development costs,

3  including nonconstruction, indirect soft costs, and also show

4  sources of the funding for the costs."

5      Have I read that correctly?

6  A.   Yes.

7      Q.   So in fact, the obligation was for the borrower to

8  submit a budget that included the carrying costs; right, sir?

9  A.   Yes.

10     Q.   And I believe it was your testimony that Mr. Kagan

11  prepared the project, right?

12  A.   He's the only one who could.

13     Q.   And in fact, I think you said you didn't recall

14  seeing that budget; right, sir?

15  A.   I might have; I might have not.  Maybe I'm confusing with

16  some other projects where I saw the budget.  I don't -- cannot

17  specifically recall that they include that part of the budget.

18     Q.   But certainly, I think, over the course of many

19  questions, you were clear that they were borrowing the

20  carrying costs in this project; right, sir?

21  A.   That was my understanding, yes.

22     Q.   If we go back to Exhibit 342 that you looked at with

23  Mr. Perten, that's the loan agreement; I don't think I can put

24  that one up on the screen or --

25         MR. CARNATHAN:  Can you get it up, Bill, now?

BORIS MAIDEN - Redirect

1           MR. HARTZELL:  No.

2           MR. CARNATHAN:  No, because it's a new one.

3    BY MR. CARNATHAN:

4       Q.   I guess we'll have to look at the paper.  Do you

5    have the paper?

6    A.   Yes.

7       Q.   All right.  I'm back to paragraph 2.3, the use of

8    proceeds paragraph.

9    A.   Yep.

10      Q.   And what it says is, "The loan proceeds shall be

11   used for construction of the project".  Have I read that

12   correctly?

13   A.   Yes.

14      Q.   "Borrower shall not directly or indirectly use all,

15   or any part, of the proceeds of the loans for the purpose of

16   purchasing or carrying any margin stock within the meaning of

17   Regulation U of the Board of Governors of the Federal Reserve

18   System ("Board of Governors") or to extend credit to any

19   person for the purpose of purchasing or carrying any such

20   margin stock or for any purpose which violates or is

21   inconsistent with Regulation X of the Board of Governors."

22   Have I read that correctly?

23   A.   Exactly.

24      Q.   So I don't see anything in here that says you can't

25   borrow the carrying costs here; am I missing something?

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Redirect

1   A.   No.

2        Q.   And in fact, none of the paragraphs that Mr. Perten

3   read to you said you can't borrow carrying costs; am I missing

4   something?

5   A.   No.

6        Q.   When we looked at Exhibit 208 --

7             MR. CARNATHAN:  Can I -- can we get 208 back up?  I

8   think Mr. Perten might have been on page 5, if I remember

9   right.  Must have the page wrong.  Can you scroll back up?

10  BY MR. CARNATHAN:

11       Q.   I'm sorry; I should have written the page number,

12  but my point was none of the questions that Mr. Filippov

13  raised in Exhibit 208 dealt with carrying costs; did they,

14  sir?

15  A.   No.

16       Q.   In fact, the paragraph that he wanted changed, I

17  think, was, like, 3.9.  It had to do with putting up $75,000

18  in a bank account, right?

19  A.   Yes, right.

20       Q.   And his question was something to the effect of who

21  is going to put -- where's the 75,000 going to come from,

22  right, sir?

23  A.   Yes.

24       Q.   The tenor being that he wasn't going to put it up,

25  right?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Redirect

1    A.    Correct.

2          Q.    Did you ever actually talk to Mr. Filippov about

3    whether borrowing -- whether or not borrowing the carrying

4    costs was acceptable in connection with the construction

5    loans?

6    A.    It was part of the deal.  It -- it -- that was totally --

7    I just thought that was part of the -- their projections, part

8    of everything that they talked about.

9          Q.    So is it fair to conclude that you never told him

10   that he couldn't borrow the carrying costs?

11   A.    I did not.

12         Q.    Did you tell him he could?

13   A.    I told him.  The discussions between Kagan, Lipetsker,

14   and Filippov, once -- the ones of the -- of that sort -- was

15   included in the budget.  In the budget, I'm including the

16   extra ten percent or so, and out of that, the carrying costs

17   will be paid, and that's exactly what happened.

18         The bank funds the money; then, they take out the money

19   for a payment every time, and that was done every time.

20         Q.    So Mr. Perten read you some paragraphs about

21   representations to the bank and whatnot; were you aware of any

22   misrepresentations to the bank in connection with this loan?

23   A.    It depends on the reading.  Mr. Perten reads it

24   literally, and I did not.  From my experience doing that for

25   Rockland Trust in almost fifteen years, that that was enforced

BORIS MAIDEN - Redirect

1    or agreed or prohibited, specifically, in terms of -- for the

2    builders, that is exactly what is done every construction loan

3    on all the projects.

4         Q.   And in fact, you had done this a number of times for

5    Mr. Kagan on his other projects, right?

6    A.   That is correct.

7         Q.   Right, with other investors involved, right?

8    A.   Correct.

9         Q.   If we think, again, about the last time you were

10   here and you were testifying, Mr. Perten showed you a number

11   of emails, I think he called them the "private emails" where

12   you were emailing with Mr. Filippov; do you remember that?

13   A.   Yes.

14        Q.   But I think you also testified that, at that time,

15   you and Mr. Kagan were friends, right?

16   A.   Yes.

17        Q.   And I think you said you weren't social acquaintance

18   with Mr. Filippov, right?

19   A.   Correct.

20        Q.   He showed you one email in particular that I'd just

21   like to look at briefly.

22             MR. CARNATHAN:   Exhibit 183, please.   If we just kind

23   of blow up the top so it's easier to read.

24   BY MR. CARNATHAN:

25        Q.   This is the one with the so-called decision to add

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Redirect

1   Mr. Lipetsker; do you remember that?

2   A.   I don't know what I meant by that.

3        Q.   Well, is Coli (ph.), Mr. Lipetsker in that --

4   A.   Yes.

5        Q.   -- in that email?

6   A.   Yes.

7        Q.   So what you're saying is, "Coli was going into the

8   deal on borrowed money.  If it is all the same to you, then he

9   would rather not borrow the money".

10       Have I read that correctly?

11  A.   Yeah.

12       Q.   Is this a moment where Mr. Lipetsker is thinking

13  about not investing in the project?

14  A.   The implication of this email that that is the case, but

15  I don't remember it.

16       Q.   Okay.  Well, let me ask you this; I think Mr. Perten

17  also established that you were aware that Mr. Kagan frequently

18  didn't even respond to his emails, right, sir?

19  A.   Very seldom.

20       Q.   But Mr. Filippov generally would respond to his

21  emails, right?

22  A.   That is correct.

23       Q.   So how did you communicate, again, with Mr. Kagan

24  about changes to the operating agreement?

25  A.   The fact that Mr. Kagan did not reply to emails does not

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Redirect

1   mean that he did not read them, and if he didn't, we -- we

2   would go over it because I would pick up the phone, and I will

3   call and tell him, well, here is what is going on, did you

4   have a chance to see it?  And he will say either yes or no.

5   If he said no, I would go over it with him.

6        Q.   In fact, Mr. Perten showed you some of your

7   deposition testimony on day one.  Do you remember going over

8   that with him?

9   A.    Yeah.

10       Q.   Yeah.  I'd just like to show you some of your other

11  testimony on the same topic.  Do you still have the transcript

12  up there, sir?

13  A.    Yes.

14       Q.   I am at page 70.

15  A.    Got it.

16  Q.    All right, so I'm picking up at line 12, and the

17  question, I believe, from Mr. Perten was, "Did you also have

18  phone conversations with Filippov about the changes that he

19  wanted?"  Answer, "No.  Filippov was good at communicating via

20  emails.  Most of my conversations were with Vadim.  Vadim used

21  to stop by my office almost on a daily basis, and I would go

22  and say, okay, Filippov changed things, what do you think?  Is

23  it acceptable?"

24  A.    Excuse me, what -- is that page 70?

25       Q.   70, yes.

BORIS MAIDEN - Redirect

1    A.   Line 12?

2         Q.   Line 12.

3    A.   Oh.   I am looking at Mr. Gersh testimony.

4              MR. GERSH:   You owe me.

5              THE WITNESS:   I saw the heading the same.

6                        (Pause)

7              THE COURT:   What page were you on?

8              MR. CARNATHAN:   I'm at page 70, Your Honor.

9              THE COURT:   70, okay.

10             MR. CARNATHAN:   And I'm picking up at line 12.

11   BY MR. CARNATHAN:

12        Q.   And so the question by Mr. Perten is, "Did you also

13   have phone conversations with Filippov about the changes that

14   he wanted?"  Answer, "No.  Filippov was good at communicating

15   via emails.  Most of my conversations were with Vadim.  Vadim

16   used to stop by my office almost on a daily basis, and I would

17   go and say, okay, Filippov changed things; what do you think;

18   is it acceptable to you?  And Vadim would either say yes or

19   no, and that's how we would get by.  I would also email to

20   Vadim, but Vadim would not comment via emails.  I don't ever

21   remember him doing that."

22        Question, " He's not a big emailer?"  Answer, "No."

23        Question, "Now, I take it by your testimony that in terms

24   of how you're dealing with Vadim, this is -- what's the word

25   I'm looking for -- a manner, a means of communication that's

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Redirect

1   evolved over the years?"  Answer, "Yes."

2        Question, "That he stops by regularly?"  Answer, "Yes."

3        Question, "Do you remember specifically discussing the

4   operating for Lyman-Cutler, or are you just assuming, because

5   that's the way it always goes, that that happened on this

6   deal?"  Answer, "I remember specifically on Lyman-Cutler,

7   because some of the terms that were agreed, that were proposed

8   by Filippov and agreed to by Vadim, I considered a bit too

9   harsh, and I specifically went over them with Vadim."

10       Have I read that correctly?

11  A.   Yes.

12            MR. PERTEN:  Your Honor, for completion -- for

13  completeness, I think the next couple of questions would be

14  appropriate as to what he recalls.

15            THE COURT:  You may -- you can read whatever you'd

16  like for completion.

17            MR. PERTEN:  Sure.  It continues, "What terms do you

18  recall that they" --

19            THE COURT:  Just --

20            MR. PERTEN:  -- "that you felt were too harsh?"

21            THE COURT:  -- identify page numbers and line.

22            MR. PERTEN:  I'm sorry; I'm continuing on page 71

23  starting at line 20.

24       "Q.  What terms do you recall that you felt were too

25  harsh?  "A.  The dates of completion were very -- what if

BORIS MAIDEN - Redirect

1  there was a delay, what if we get a snowstorm like we did last

2  year, all kinds of things.  There were penalties that were

3  triggered by the delay, time to market, time to get a

4  certificate of occupancy, those were all terms proposed by

5  Filippov and that Vadim accepted, but I just think that was

6  not something that we had before."

7       "Q.  Now, other than those things that you just

8  mentioned, were there any other terms that you can recall that

9  you felt harsh -- were harsh?  A.  The dates obtaining the

10  certificate of occupancy and when the property is sold.  I

11  think those -- those were unusual from other deals that I

12  drafted."

13          MR. PERTEN:  Thank you.

14          THE COURT:  Okay.  That ended, for the record, on

15  page 72; it ended on line 13.

16          MR. CARNATHAN:  But as long as we're reading, I'd

17  like to pick up at 72, line 19, and complete the run.

18          THE COURT:  You may.

19  BY MR. CARNATHAN:

20     Q.  Mr. Perten then asks, "And do you specifically

21  recall speaking with Vadim about those things?"  Answer,

22  "Yes."

23      Question.  "Was this one conversation, multiple

24  conversations?"  Answer, "Multiple."

25      Question, "And these would be when he stopped by your

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Redirect

1   office?"  Answer, "Yes."

2       Q.   Have I read that correctly?

3   A.   Yes.

4           THE COURT:  All right.  And you ended on 73?

5           MR. CARNATHAN:  Oh, I'm sorry.  I ended on 73 at line

6   3, Your Honor.

7           THE COURT:  Very good.

8   BY MR. CARNATHAN:

9       Q.   Also, during your last day on the stand, sir, I

10  think you said that you never heard Mr. Kagan give Filippov or

11  Lipetsker any assurance about what the cost of construction

12  would be, right, sir?

13  A.   Mr. Perten asked me about the guarantees, and I did not

14  hear -- I interpret the guarantee and assurance as two

15  different things.

16      A guarantee, in my mind, is something -- my advice in

17  terms of if I don't perform, if I don't do something, here's a

18  guarantee that it will be either done, or I will pay the

19  money.

20      Assurances is a different thing.  Assurances is when

21  people negotiate, and they assure based on their costs that --

22  based on their experience, that this is going to cost

23  something.  Somebody asked for my flat legal fee, and I say, I

24  approximately will charge $3,000 for it, that is an assurance

25  the same way.

BORIS MAIDEN - Redirect

1    Q.   So I'm not sure I understand your testimony at this

2    point, sir.  What are you saying about what --

3    A.   I'm saying that whatever numbers were given from Vadim to

4    Filippov and Lipetsker were based on his experience in

5    building the property, how much it's going to cost, what it's

6    going to take.  Those are more assurances.

7    Q.   Did you actually hear him give them a number on how

8    much the construction would cost?

9    A.   They were part -- the numbers were very intrinsic to the

10   whole negotiations from whether Filippov is going to go into

11   it or not to go into it.  That was what they were deciding.

12   I -- I do remember, specific, that were initial

13   construction cost was 1.5.  And then Mr. Kagan calls -- calls,

14   says, look, I'm modifying the plans, and I think I'm going to

15   build more bigger houses, so we really need to apply for 1.6.

16   Mr. Filippov was there; Lipetsker was there.  Mr. Kagan

17   was there; they reviewed the plans.  And I remember Mr.

18   Filippov answer.  He was like, well, if it's going to be more

19   expensive, we're going to make more money, yeah, let's borrow

20   1.6.

21   Q.   And was it your understanding, sir, that those

22   figures, 1.5 and 1.6, included carrying costs or not?

23   A.   Yes.

24   Q.   It did include the carrying costs?

25   A.   Up to a certain amount, yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Redirect

1    Q.   We also had some testimony last time about Mr. Kagan

2    declining to have the spreadsheets attached to the operating

3    agreement; do you remember that, sir?

4    A.   Yes.

5         MR. CARNATHAN:   Could I have Exhibit 14 back up,

6    please?  I need the third page, please.  And maybe highlight

7    the lower half, where he starts, "Borya(ph.)".

8    BY MR. CARNATHAN:

9    Q.   So we looked at Exhibit 14 last time, and this is an

10   email from Mr. Filippov on November 3rd, and he says, "Borya,

11   I just realized that the agreement is missing a very important

12   piece.  The piece missing is the role of investor Kagan.  We

13   have described his investor part and his profit; what is not

14   described here at all is the reason why his profit part is

15   fifty percent at all.  While I understand this is not going to

16   happen, technically, based on the language of this agreement,

17   Dima can say, I'm going to have nothing to do with the

18   development, find a developer who will do the whole thing, and

19   when it is all done my share is fifty percent.

20        "The reason Coli and I agreed to the deal is that Dima is

21   going to take care of all parts of the process; buying lots,

22   creating project dots, building the property.  None of it is

23   mentioned in the agreement.  This needs to be corrected.

24        "Also, the calculations and stages aired by Dima Excel

25   files should be part of this agreement as an addendum.  These

BORIS MAIDEN - Redirect

1   dots might need to be tweaked to reflect changes in the

2   numbers.  Let me know if this makes sense to you."

3         Have I read that correctly?

4   A.   Yes.

5         Q.   So I see that as Mr. Filippov asking for two things,

6   right?  He wants something in the agreement that is going to

7   show that Mr. Kagan's responsible for forming the project, and

8   he wants the spreadsheets attached, right, sir?

9   A.   Correct.

10        Q.   And at the time that he sent this email on November

11   3rd, the draft of the operating agreement didn't have any such

12   provision in it, right?

13         MR. CARNATHAN:  If I can have Exhibit 11.  I'm on --

14   BY MR. CARNATHAN:

15        Q.   So Exhibit 11 is an earlier draft of the operating

16   agreement.  It's got the little 10/30/12 at 12:30 p.m. which I

17   now understand is actually Mr. Perten's handwriting from your

18   deposition.  Do you remember that?

19   A.   No, but I assume so.

20        Q.   Okay.  If we go into the -- one, two, three, four,

21   fifth page, at this point in the drafting process, paragraph

22   5.2 is just something about admission of members.  Do you see

23   that, sir?

24   A.   Yes.

25        Q.   And if we go now to the final version of the

BORIS MAIDEN - Redirect

1   agreement, which is Exhibit 15 -- now, I'm on the fourth page

2   of Exhibit 15.  We now have a new 5.2, duties of members.  Do

3   you see that, sir?

4   A.   Yes.

5        Q.   And it says, "It shall be Mr. Kagan's duty and

6   obligation to construct two homes at the location currently

7   known as 77 Lyman Road in Brookline, Massachusetts in

8   accordance with the plans including drawings supplied by Mr.

9   Kagan and approved by the managing member".  Have I read that

10  correctly?

11  A.   Yes.

12       Q.   So it, now, does provide that Mr. Kagan has the duty

13  to build the homes?

14  A.   Correct.

15       Q.   And that he has to do so in accordance with the

16  plans approved by the managing member, right?

17  A.   Correct.

18       Q.   The managing member being Filippov; right, sir?

19  A.   Correct.

20       Q.   At the time that the operating agreement was signed,

21  they didn't have the construction plans yet; did they, sir?

22  A.   I don't think so.

23       Q.   All right.  But I think you testified last time,

24  they did have the financial details nailed down, right?

25  A.   Yes.

BORIS MAIDEN - Redirect

1      Q.   All right.  Because Mr. Filippov wasn't going to put

2  up 200,000 bucks to secure the P&S until the financial details

3  were done, right?

4  A.   Correct.

5      Q.   I guess the last thing is --

6          MR. CARNATHAN:  If I could have just Exhibit 9 back

7  up, briefly, please.  Maybe just skip to the second page,

8  probably.  No, third, I guess.

9  BY MR. CARNATHAN:

10     Q.   Last time you agreed with Mr. Perten that Mr. Kagan

11  didn't prepare the spreadsheets in Exhibit 9, right, sir?

12  A.   That's correct.

13     Q.   Right.  Mr. Zhukovskiy did that.

14  A.   Correct.

15     Q.   Because Mr. Kagan didn't know how to use Excel to

16  prepare a spreadsheet like this, right?

17  A.   That is correct.

18     Q.   Do you know who asked Mr. Zhukovskiy to prepare the

19  spreadsheets?

20  A.   My understanding was Mr. Kagan.

21     Q.   Do you know why he asked Mr. Zhukovskiy to prepare

22  them?

23  A.   In order to have a presentation to give to Filippov and

24  Lipetsker on what will be the numbers, possible profit --

25  outlining the -- here's the cost of the project, here is how

BORIS MAIDEN - Recross

1   much money we need to put down, here is a potential number for

2   the sale of the property, and there were -- I think there were

3   three different variations on what will to be the profits if

4   it sells for 4 million, what it will be the profits if it sold

5   for 4.5, showing deviation in profit based on the -- on the --

6   all the other things were -- the investments were the same;

7   nothing changed, and the other costs associated with it were

8   also the same.

9           MR. CARNATHAN:  That's all I have for Mr. Maiden,

10  Your Honor.

11          THE COURT:  Okay.  Anything else?

12                      RECROSS-EXAMINATION

13  BY MR. PERTEN:

14      Q.   Mr. Maiden, last week when you testified, you

15  testified that you don't recall any discussions about

16  financials relating to the spreadsheets.  Do you recall that

17  testimony?

18  A.   No.

19      Q.   Do you still have your deposition?  If I could have

20  you --

21  A.   Is that the deposition or last time -- last Tuesday?

22      Q.   Well, it was both, but let's look at your deposition

23  at page 39.  At the bottom of page -- I'm sorry; do you have

24  that?

25  A.   No.

BORIS MAIDEN - Recross

1      Q.    You there?

2   A.    What line?

3      Q.    Page 39 at the very bottom starting at line 24.

4   Question, "And was there any discussion in your presence about

5   those spreadsheets, about the finances that are shown in those

6   spreadsheets?"  Answer, "No."

7      Correct?

8   A.    Yes.

9      Q.    Did I read that correctly?

10  A.    Yes.

11     Q.    And in fact, you also testified that you were in and

12  out of the meeting; you weren't there all the time, correct?

13  A.    Yes.

14     Q.    And you also told us last week that the construction

15  costs that were discussed were arranged between 1.3 and 1.6;

16  you recall that, don't you?

17  A.    Yes.

18     Q.    Okay.  So there certainly was never an assurance

19  that it was going to be 1.3.  It was a range; isn't that

20  correct?

21  A.    Correct.

22     Q.    And you also understood that those spreadsheets, as

23  they're titled, were estimates, correct?

24  A.    Yes.

25     Q.    Okay.  And there were no plans; you've told us that.

BORIS MAIDEN - Recross

1    Isn't that correct?

2    A.    No plans?

3         Q.    Construction plans haven't even been drawn yet,

4    correct?  You hadn't subdivided the property yet; isn't that

5    correct?

6    A.    No.

7         Q.    Okay.  Now, you would agree with me, and I think you

8    agreed with me last time, that in the operating agreement

9    there is nowhere that in that document that you drafted that

10   caps construction costs at any number; isn't that correct?

11   A.    Correct.

12        Q.    Okay.  In fact, there's nothing in the operating

13   agreement that speaks to the cost of construction; isn't that

14   correct?

15   A.    As far as I'm aware, yes.

16        Q.    And you also told us that that addendum, the reason

17   it wasn't added it was because Mr. Kagan would not allow that.

18   He wasn't in agreement; isn't that correct?

19   A.    We arrived to that answer a little bit differently, but

20   through your logic, that I reviewed it, everything else that

21   proposed by Filippov went in, and obviously, this it did not

22   go in.  So therefore, Mr. Kagan does not agree to it.  And

23   logically, I agree with you.

24        Q.    Okay.  And you'll also agree with me that after Mr.

25   Filippov asked for that and didn't get it, the subject was

BORIS MAIDEN - Recross

1    dropped?

2    A.    I don't remember it.

3         Q.    Okay.  Now, Section 5.2 of the operating agreement,

4    which was the section that says Mr. Kagan will be responsible

5    for building and selling, in fact, he did all that, didn't he?

6    A.    Yeah.  As far as I know, yes.

7         Q.    All right.  Now, in terms of the loan commitment

8    letter that we looked at and in terms of the language that --

9    Mr. Carnathan pointed to you about the use and the language

10   about the fact that your budget needs to show all the sources

11   of income -- excuse me; of funding and all the hard costs and

12   the soft costs, you recall that line of questioning, correct?

13   A.    Yes.

14        Q.    You'll agree with me, sir, that the budget for this

15   project did not include, as a separate category, any of the

16   soft costs; did it?

17   A.    I -- I didn't look at the budget that closely, but --

18        Q.    Okay.

19   A.    -- yeah, I -- I don't remember.

20        Q.    Well, certainly you would agree with me in

21   accordance with the requirements of the loan commitment

22   letter, if in fact proceeds of the loan were going to be used

23   for carrying costs, they should have been spelled out in that

24   budget; isn't that correct?

25   A.    As a line item?  Literally, yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Recross

1    Q.   Okay.  And certainly, looking at the budget, in

2    fact, looking at any of the loan documents, there is no way

3    that you could back into how much of that was hard

4    construction and how much of that was carrying costs if

5    carrying costs were, in fact, part of that budget; isn't that

6    correct?

7    A.   The only thing I can tell you is from my understanding is

8    that approximately ten percent of the total amount borrowed

9    goes toward construction costs -- (indiscernible) carrying

10   costs.  That was numbers that I've heard from Mr. Kagan and

11   from other builders that that's what they were doing.

12   Q.   Okay.  But you would agree with me, sir, that

13   looking at the loan documents, if anybody was reading those

14   loan documents, nowhere does it break out that $200,000

15   carrying costs and 1.4 is construction or anything of that

16   nature, correct?

17   A.   Correct.

18   Q.   So no -- there's no way of telling -- it's your

19   testimony that the bank would accept documents knowing that a

20   portion was for carrying costs without having any way of

21   knowing how much or what percentage would be carrying costs;

22   is that your testimony?

23   A.   The bank would accept a slightly exaggerated budget, and

24   it always does.

25   Q.   And in order to determine what "slightly

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Further Redirect

1   exaggerated" meant, they would have to know what the

2   allocation was so they could make that determination; isn't

3   that correct?

4   A.   And they -- they -- that's -- they do.

5        Q.   Okay.

6                          (Pause)

7          MR. PERTEN:  I have nothing further.

8          THE COURT:  Okay.  A bit more?

9          MR. CARNATHAN:  Two.

10                 FURTHER REDIRECT EXAMINATION

11   BY MR. CARNATHAN:

12       Q.   Mr. Maiden, when the bank does the loan, it also

13   does appraisals of the properties as built; right, sir?

14   A.   Correct.

15       Q.   Do you remember about what these appraised for at

16   the time?

17   A.   Anywhere between 4.5 to 5.3, something of that sort.

18       Q.   Yeah, I mean, just to move it along, if I told you

19   it was 5.3 million per house, as built, at the time of the

20   loans, does that sound about right?

21   A.   Yes.

22       Q.   And so the banks extending 1.6 million for

23   construction costs against $5.3 million houses, right?

24   A.   Yes.

25       Q.   Mr. Perten read you some deposition testimony again.

BORIS MAIDEN - Further Redirect

1    I'd just like to direct your attention to some more of your

2    deposition testimony on the same topic.

3    A.    Um-hum.

4        Q.    I'm now at the bottom of page 37 of your transcript.

5    A.    Yep.

6        Q.    So I'm picking up at line 22, question from Mr.

7    Perten is, "When was the first time you were present when the

8    three of them discussed the venture?  Answer, "It was at the

9    initial stages where Vadim did an introduction, showed

10   Filippov his prior projects.  If I remember, he had some Excel

11   spreadsheets showing profit-and-loss ratio on the prior

12   projects.  I know that Vadim took Filippov -- well, that's

13   hearsay -- but took and showed him all of his prior projects,

14   actually, that were in progress or that he had already built,

15   and that there was, actually, after that, there was another

16   meeting where there were projections of what is going to be

17   involved and how much capital needs to be put into it and how

18   much the development costs and what will be the expected

19   profit."

20       Have I read that correctly?

21   A.    Yes.

22            MR. CARNATHAN:  That's all I have, Your Honor.

23            MR. PERTEN:  Nothing further, Your Honor.

24            THE COURT:  All right.  Thank you, Mr. Maiden.  Thank

25   you.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

BORIS MAIDEN - Further Redirect

1              THE WITNESS:  Thank you.

2              THE COURT:  Just to iron out a few details.

3              I have Exhibit, I think, the original of 342,

4    Defendant's 342; okay, that goes to you.

5              I still have a copy of the proof of claim.  Was that

6    marked and entered in evidence?

7              MR. PERTEN:  What document?

8              THE COURT:  I don't have a number on it.  It's the

9    official, in our records, proof of claim of Kagan Development.

10             MR. PERTEN:  No, that's -- that is not an exhibit,

11   per se.

12             THE COURT:  It's not an exhibit.  Okay.

13             MR. PERTEN:  No.  You had indicated earlier that

14   that's part of the court record.

15             THE COURT:  Okay.  All right.

16             I have quite a pile of deposition transcripts, and

17   I'll return those to you.  I just want to keep them out of my

18   hands unless they're in evidence.  I don't think any of them

19   were introduced.  They were read.  Okay.

20             All right.  Anything else?

21             MR. PERTEN:  I guess I have one thing.

22             My understanding is Mr. Maiden was the last witness

23   that Mr. Carnathan will be calling for his case-in-chief, so I

24   think it would be appropriate for him to rest if he's --

25   that's where he's at.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1          MR. CARNATHAN:  That is where I'm at, Your Honor.

2          THE COURT:  Okay.

3          MR. PERTEN:  And to the extent that Mr. Carnathan had

4    rested, I think it appropriate, Your Honor, that I present the

5    Court with a motion for judgment on partial findings, which,

6    under the Rules, happens in a jury-waived case.  So if I could

7    hand that up to the Court.

8          THE COURT:  You can.  Thank you.

9          All right.  So given where we are, we're going to

10   break now until we resume on -- what did we say -- July 29?

11         MR. PERTEN:  29 --

12         THE COURT:  Okay.  Mr. Carnathan, have you seen this

13   motion for judgment on partial findings?

14         MR. CARNATHAN:  I have not until this moment, Your

15   Honor.

16         THE COURT:  Okay.  All right.  So I deal with this

17   many different ways, but under these circumstances, why don't

18   we say, since we have time, if I could receive an opposition

19   to this in ten days, fourteen days?

20         MR. CARNATHAN:  Yeah, I'm hesitating only because

21   next week's the 4th, and I was going to be away, Your Honor,

22   so that effectively is, like, three days.

23         THE COURT:  No, let's -- we'll do something that

24   works, okay.

25         MR. CARNATHAN:  Maybe till the following Friday after

1  that?

2           THE COURT:  Let's just get it -- let's just get a

3  deadline.

4           So the 4th, the 12th, the 19th?

5           MR. CARNATHAN:  I'm sorry; I hate to drag it out.

6  I'm also in New York for hearings right after I'm away.

7           May I have until the 17th?  Is that acceptable?  July

8  17th?

9           THE COURT:  Yes.

10          MR. CARNATHAN:  Okay.  Thank you, Your Honor.

11          THE COURT:  And if there is going to be -- I won't do

12  anything with it, but I'll await -- if you want to file a

13  reply, you may do so, and that should be in on the -- by 4:30

14  p.m. on the 24th.

15          MR. PERTEN:  Your Honor, can I do --

16          THE COURT:  Maybe --

17          MR. PERTEN:  -- the week of the 15th, I'm on

18  vacation.  So that --

19          THE COURT:  The week of the 15th?

20          MR. PERTEN:  That whole week.

21          THE COURT:  Well, why don't we say -- see then,

22  the -- when would you like to file it?  It should be in

23  advance of the 29th.

24          MR. PERTEN:  Yeah.  Let me just pull out my calendar,

25  Your Honor.  I am back the week -- I'm sorry.  What was the

1   date that Your Honor just proposed?

2          THE COURT:  I proposed the Wednesday the 24th as

3   your --

4          MR. PERTEN:  Okay.  My bad.  I'm back that week.  So

5   that is fine, Your Honor.

6          THE COURT:  So let's -- all right.  We'll go with

7   that, and that gives me a couple of days --

8          MR. PERTEN:  Sure.

9          THE COURT:  -- to see that.  So I don't know what

10  I'll do with it and when, but that's -- we'll go with that,

11  okay?

12         Oh, yeah.  Okay.  So I'm going to hand the motion to

13  Mary.  She's going to docket it, okay?

14         MR. PERTEN:  Does the Court need another copy,

15  because I have an extra?

16         THE COURT:  No.  No.  It's fine.  I'll find it on the

17  docket.

18         Anything else?  Okay.  Have nice vacations.  We'll

19  see you back here on the 29th, okay.

20         MR. PERTEN:  Thank you, Your Honor.

21         MR. CARNATHAN:  Thank you, Your Honor.

22         MR. TAMPOSI:  Thank you, Judge.

23  (End at 10:32 AM)

24                    * * * * * * * * * *

25

1        I certify that the foregoing is a true and accurate

2    transcript from the digitally sound recorded record of the

3    proceedings.

4

5    *Ellen S. Kolman*

6

7    /s/ Ellen S. Kolman                              July 4, 2019
     _____
8    AAERT Certified Electronic Transcriber       Date
     (CET-568)
9    ESCRIBERS LLC
                              eScribers
10                 7227 N. 16th Street, Suite #207
                         Phoenix, AZ 85020
11                         973-406-2250
                   e-mail operations@escribers.net

12

13

14

15

16

17

18

19

20

21

22

23

24

25

**$**

**$1.6 (2)**
22:18;25:7
**$200,000 (1)**
60:14
**$3,000 (1)**
50:24
**$5,000 (1)**
25:17
**$5.3 (1)**
61:23
**$600,000 (1)**
18:22
**$7,000 (1)**
25:16
**$75,000 (1)**
42:17

**A**

**able (1)**
38:7
**accept (2)**
60:19,23
**acceptable (5)**
11:3;43:4;46:23;
47:18;65:7
**accepted (1)**
49:5
**accordance (5)**
24:10;30:6;54:8,15;
59:21
**account (1)**
42:18
**accurate (1)**
32:19
**acquaintance (1)**
44:17
**activities (1)**
35:22
**actual (6)**
13:5,6;15:3;18:8,13;
36:1
**actually (14)**
5:9;9:4;11:15;13:3;
14:25;22:18;23:21;
26:13,19;43:2;51:7;
53:17;62:14,15
**add (1)**
44:25
**added (1)**
58:17
**addendum (2)**
52:25;58:16
**addressed (1)**
23:7
**admission (1)**
53:22
**admitted (3)**
13:23;14:7;35:10
**advance (5)**

28:21;29:11;30:5,18;
65:23
**advanced (1)**
36:25
**advances (2)**
24:5,7
**Adversary (1)**
4:15
**advice (2)**
13:4;50:16
**affirm (1)**
6:11
**Again (9)**
10:14,15,20;17:23;
23:13;29:9;44:9;45:23;
61:25
**against (2)**
33:6;61:23
**ago (1)**
20:21
**agree (23)**
8:25;9:10;15:10;
21:11;22:4;25:9,25;
27:1,7,19;31:17;33:5,
13;38:10,25,25;58:7,
22,23,24;59:14,20;
60:12
**agreed (7)**
20:19;44:1;48:7,8;
52:20;55:10;58:8
**agreeing (1)**
38:20
**agreement (49)**
9:12;14:20;21:15,22;
22:5,5;24:8;26:14;
27:5,7,21,25;28:1,7,9,
13,17;29:10;30:12,17,
18,24;31:23,24;32:13;
34:6,18;35:2;36:15,16;
37:11;38:13,19;40:23;
45:24;52:3,11,16,23;
25;53:6,11,16;54:1,20;
58:8,13,18;59:3
**Agreements (3)**
18:7;34:6;38:15
**ahead (2)**
5:17;16:25
**aired (1)**
52:24
**al (1)**
4:16
**Alex (2)**
4:22;16:4
**allocation (1)**
61:2
**allow (2)**
38:21;58:17
**almost (4)**
13:16;43:25;46:21;
47:16
**along (1)**
61:18
**always (2)**

48:5;60:24
**among (1)**
28:22
**amount (5)**
12:11;28:22;29:2;
51:25;60:8
**amounts (2)**
29:3;31:22
**appeared (1)**
12:24
**appliances (1)**
26:21
**applicable (1)**
30:19
**apply (1)**
51:15
**appointing (1)**
19:8
**appraisals (1)**
61:13
**appraised (1)**
61:15
**appreciate (2)**
5:10,13
**approach (1)**
21:19
**approached (1)**
36:23
**appropriate (4)**
19:13;48:14;63:24;
64:4
**approval (1)**
39:24
**approve (1)**
26:12
**approved (6)**
11:3;13:7;30:9,19;
54:9,16
**approximately (2)**
50:24;60:8
**April (1)**
36:22
**April/May (1)**
36:22
**architect (1)**
18:7
**arranged (1)**
57:15
**arrangement (1)**
5:18
**arrived (1)**
58:19
**associated (2)**
18:2;56:7
**assume (4)**
9:6;14:11;34:23;
53:19
**assuming (2)**
5:25;48:4
**assurance (4)**
50:11,14,24;57:18
**Assurances (3)**
50:20,20;51:6

**assure (1)**
50:21
**attached (4)**
16:17;24:21;52:2;
53:8
**attention (2)**
34:4;62:1
**attorney (5)**
19:8,11,12,14;29:19
**await (1)**
65:12
**aware (6)**
24:24,25;25:15;
43:21;45:17;58:15
**away (2)**
64:21;65:6

**B**

**back (19)**
4:8;6:6;16:9;17:13;
18:20;28:17;39:12,15,
20;40:22;41:7;42:7,9;
52:5;55:6;60:3;65:25;
66:4,19
**back-and-forth (1)**
20:22
**bad (2)**
18:23;66:4
**bank (50)**
7:12,22;15:11,20;
16:4,13;17:24;18:9,15;
19:7,11;20:16,19;21:5,
9;23:7;25:12,14,22,24;
26:12,13,17;29:3,16;
30:9,18;31:5,8;32:15,
20,21;33:3,9,17,19,22;
34:8,10,12;36:2,3;
39:23;42:18;43:8,21,
22;60:19,23;61:12
**banking (1)**
31:10
**banks (3)**
31:14;33:14;61:22
**bank's (3)**
19:14;29:19;39:23
**based (11)**
9:15;22:13,14;29:22,
24;37:10;50:21,22;
51:4;52:16;56:5
**basically (2)**
33:21;37:1
**basis (3)**
15:15;46:21;47:16
**behalf (4)**
5:4;15:1;17:11;
37:16
**Belmont (1)**
7:21
**beyond (1)**
21:3
**big (1)**
47:22

**bigger (1)**
51:15
**Bill (1)**
40:25
**bit (7)**
9:25;10:12,23;18:4;
48:8;58:19;61:8
**blow (2)**
39:17;44:23
**Board (3)**
41:17,18,21
**book (1)**
14:2
**books (1)**
6:5
**BORIS (2)**
6:15;11:4
**borrow (5)**
41:25;42:3;43:10;
45:9;51:19
**borrowed (5)**
12:10;45:8;60:8
**borrower (20)**
7:4;8:6;15:20;19:15,
18,23,24;20:3,15,17;
26:9;28:21;31:21,24;
32:15,18;33:21;39:23;
40:7;41:14
**borrower's (1)**
30:17
**borrowing (4)**
20:8;40:19;43:3,3
**Borya (1)**
52:10
**Boryaph (1)**
52:7
**both (5)**
7:4,13;11:4;16:5;
56:22
**bottom (5)**
17:8;32:2;56:23;
57:3;62:4
**breach (1)**
30:23
**breached (1)**
32:16
**break (3)**
27:14;60:14;64:10
**briefly (3)**
18:21;44:21;55:7
**bring (2)**
24:14;29:6
**broke (1)**
6:25
**Brookline (5)**
12:24;13:4,7,9;54:7
**brought (1)**
13:7;30:3
**bucks (1)**
55:2
**budget (28)**
24:10,13,18,24;25:1,
10;26:1,20;30:8,13;

Case 16-01120    Doc 371    Filed 07/05/19    Entered 07/05/19 12:05:06    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document        Page 69 of 77
June 25, 2019

39:18,22,24,25,25;
40:8,14,16,17;43:15,
15;59:10,14,17,24;
60:1,5,23
**budgets (1)**
24:23
**build (3)**
26:24;51:15;54:13
**builder (1)**
33:3
**builders (3)**
26:24;44:2;60:11
**building (3)**
51:5;52:22;59:5
**built (3)**
61:13,19;62:14
**buying (1)**
52:21

## C

**calculations (1)**
52:24
**calendar (1)**
65:24
**call (3)**
37:20,21;46:3
**called (3)**
18:6;36:2;44:11
**calling (1)**
63:23
**calls (2)**
51:13,13
**came (3)**
34:16;37:1,25
**Can (25)**
6:19;9:25;10:1;21:9;
24:14,19;25:7;27:14;
37:20,20;38:17,24;
39:14;40:23,25;42:7,7,
9;48:15;49:8;52:17;
53:13;60:7;64:8;65:15
**capital (1)**
62:17
**caps (1)**
58:10
**care (1)**
52:21
**carefully (1)**
9:17
**CARNATHAN (48)**
4:4,8,21,22;6:3;
13:22;27:9,12,15;35:3;
39:9,14,19;40:25;41:2,
3;42:7,10;44:22,24;
47:8,10,11;49:16,19;
50:5,8;52:5,8;53:13,
14;55:6,9;56:9;59:9;
61:9,11;62:22;63:23;
64:1,3,12,14,20,25;
65:5,10;66:21
**carrying (30)**
25:10;26:1,5,11,15,

23;27:3;28:13;37:11;
38:19,21;40:8,20;
41:16,19,25;42:3,13;
43:3,10,16;51:22,24;
59:23;60:4,5,9,15,20,
21
**case (8)**
4:17;5:25;18:9;
23:20;34:16;37:22;
45:14;64:6
**case-in-chief (1)**
63:23
**category (2)**
26:1;59:15
**certain (1)**
51:25
**certainly (19)**
9:15;15:17;23:2;
25:12;26:9;27:1;30:22;
31:7,13,16;34:19;
38:10,12,18,22;40:18;
57:18;59:20;60:1
**certificate (2)**
49:4,10
**chance (1)**
46:4
**change (3)**
21:10;29:13,25
**changed (7)**
4:13;21:10;30:2;
42:16;46:22;47:17;
56:7
**changes (7)**
11:8;21:4;34:23;
45:24;46:18;47:13;
53:1
**changing (1)**
4:7
**charge (1)**
50:24
**chronological (1)**
8:22
**circumstances (1)**
64:17
**claim (3)**
4:18;63:5,9
**Classic (2)**
23:17,23
**clause (1)**
34:3
**clear (3)**
29:10;34:13;40:19
**CLERK (3)**
4:2,15;35:6
**closed (2)**
14:10;35:18
**closely (1)**
59:17
**closing (10)**
8:10;14:12,19;18:10;
19:13;20:12;21:7,14;
28:8;39:23
**closings (1)**

20:1
**Coli (3)**
45:3,7;52:20
**column (1)**
16:15
**comfortable (1)**
12:1
**comment (1)**
47:20
**commercial (1)**
31:15
**commitment (19)**
15:11,14;16:12,23;
17:4,24;18:20;19:20;
20:16;22:13,14,16;
27:6,20;29:24;33:25;
39:20;59:7,21
**communicate (1)**
45:23
**communicating (4)**
7:16;20:22;46:19;
47:14
**communication (1)**
47:25
**communications (2)**
11:7;39:2
**company (11)**
7:23,23,25;8:7;12:8;
15:4;16:2;22:7;23:22,
25;31:8
**complaints (1)**
38:8
**complete (2)**
39:24;49:17
**completeness (1)**
48:13
**completion (4)**
40:1;48:12,16,25
**compliance (4)**
27:4,5,7;30:17
**comply (1)**
27:25
**compound (1)**
27:16
**concerns (3)**
23:3,6;38:1
**conclude (1)**
43:9
**conditions (4)**
16:12;30:16,18,24
**confirmed (1)**
19:10
**conflict (1)**
38:5
**confusing (1)**
40:15
**connection (8)**
14:12;17:19;18:1;
24:9;28:21;38:11;43:4,
22
**considered (1)**
48:8
**consistent (5)**

19:19;30:7,11,12;
31:17
**constru (1)**
20:7
**construct (1)**
54:6
**construction (47)**
7:1,5,16;8:11;15:4,
12;16:17,21;17:3,19,
24;18:1,2;20:13;23:10,
14,18,21,25;26:6;
27:22;28:21,24;29:5,
11;30:8,13;31:4;35:18;
39:16,21;40:11;41:11;
43:4;44:2;50:11;51:8,
13;54:21;57:14;58:3,
10,13;60:4,9,15;61:23
**contained (4)**
28:8,10;30:18;32:14
**continue (1)**
23:16
**continues (1)**
48:17
**continuing (1)**
48:22
**contract (6)**
18:8,12,13;24:1;
30:9,13
**contractor (4)**
18:7,8;25:21,23
**contractors (1)**
23:17
**contradicted (1)**
28:6
**contradicts (1)**
26:15
**contrary (1)**
24:7
**conversation (2)**
10:14;49:23
**conversations (5)**
5:9;46:18,20;47:13,
15;49:24
**copy (2)**
63:5;66:14
**Corp (2)**
5:1,2
**corrected (1)**
52:23
**corrections (1)**
9:24
**correctly (16)**
11:5;13:14;17:21;
24:11;28:24;34:10;
40:5;41:12,22;45:10;
48:10;50:2;53:3;54:10;
57:9;62:20
**cost (11)**
25:10,16;26:22,22;
50:11,22;51:5,8,13;
55:25;58:13
**costs (48)**
17:19;18:2;26:1,6,

11,15,23;27:4,22;
28:13,23;29:4;30:20;
36:24;37:11;38:19,21;
40:1,2,3,4,8,20;41:25;
42:3,13;43:4,10,16;
50:21;51:22,24;56:7;
57:15;58:10;59:11,12,
16,23;60:4,5,9,10,15,
20,21;61:23;62:18
**counsel (2)**
25:12;30:23
**counseling (2)**
30:25;31:6
**couple (3)**
39:13;48:13;66:7
**course (1)**
40:18
**Court (63)**
4:2,3,5,7,10;5:5,12,
14,16;6:4,10,14,17,20;
8:18;13:23;14:1,3,5;
21:20,24;27:11,16;
35:4,8,14,16;39:7;47:7,
9;48:15,19,21;49:14,
18;50:4,7;56:11;61:8;
62:24;63:2,8,12,14,15;
64:2,5,7,8,12,16,23;
65:2,9,11,16,19,21;
66:2,6,9,14,16
**Court's (1)**
5:10
**covenants (1)**
34:6
**creating (1)**
52:22
**credit (1)**
41:18
**CROSS-EXAMINATION (1)**
6:21
**current (1)**
28:23
**currently (1)**
54:6
**Cutler (1)**
4:16

## D

**daily (2)**
46:21;47:16
**date (3)**
5:17;14:9;66:1
**dates (2)**
48:25;49:9
**day (9)**
4:7,16,18;5:19,20,
22;6:4;46:7;50:9
**days (5)**
10:21;64:19,19,22;
66:7
**deadline (1)**
65:3
**deal (5)**

43:6;45:8;48:6;
52:20;64:16
**dealing (1)**
47:24
**deals (1)**
49:11
**dealt (2)**
11:15;42:13
**death (1)**
5:11
**debtor (1)**
4:24
**DEBTOR'S (1)**
22:1
**decided (1)**
28:12
**deciding (1)**
51:11
**decision (5)**
7:24;8:1,3,4;44:25
**declining (1)**
52:2
**deemed (1)**
34:7
**default (6)**
32:10,12,18,24;33:8;
34:17
**defendants (1)**
5:4
**DEFENDANTS' (1)**
14:7
**Defendant's (4)**
14:5;35:6,10;63:4
**delay (2)**
49:1,3
**department (1)**
26:18
**depends (1)**
43:23
**deposition (8)**
46:7;53:18;56:19,21,
22;61:25;62:2;63:16
**described (2)**
52:13,14
**despite (1)**
37:24
**details (3)**
54:24;55:2;63:2
**determination (1)**
61:2
**determine (1)**
60:25
**determined (1)**
33:3
**developer (2)**
33:2;52:18
**Development (6)**
5:2;23:18;40:2;
52:18;62:18;63:9
**deviated (1)**
29:21
**deviation (1)**
56:5

**dialogue (1)**
10:20
**difference (1)**
20:9
**different (6)**
24:24;31:1;50:15,20;
56:3;64:17
**differently (1)**
58:19
**Dima (3)**
52:17,20,24
**direct (2)**
39:25;62:1
**directly (1)**
41:14
**disbursed (1)**
29:3
**disbursement (4)**
24:11;26:2;30:8,12
**discuss (2)**
21:12;37:19
**discussed (2)**
57:15;62:8
**discussing (1)**
48:3
**discussion (1)**
57:4
**discussions (2)**
43:13;56:15
**Dispute (3)**
32:25;33:2;38:2
**disputes (1)**
38:6
**divided (1)**
13:5
**docket (2)**
66:13,17
**document (19)**
15:1,17;16:11;22:3,
12,24;23:9;24:17,20;
25:4;33:18;34:2,14,15,
16,19,24;58:9;63:7
**documentation (1)**
15:19
**documents (35)**
7:8,10,18;8:12;9:17,
18;11:8,12;12:2;14:13;
15:15;19:24;20:2,18;
21:2,4,13;24:21;25:13;
26:5,7,11,13;28:5;
29:20;31:17;32:15;
33:22;34:7;36:14;
39:13;60:2,13,14,19
**Doddridge (1)**
5:21
**done (13)**
15:4;19:25;20:18;
33:25;36:1,2;37:3;
43:19;44:2,4;50:18;
52:19;55:3
**dots (2)**
52:22;53:1
**down (11)**

8:21;9:3,7,25;17:7;
18:4;24:4,19;25:3;
54:24;56:1
**draft (4)**
15:18;21:15;53:11,
15
**drafted (19)**
7:7;14:14;15:1;
20:18;22:12;23:9;24:2;
26:5,7;27:5,25;28:1,5;
29:10,12;31:18;34:14;
49:12;58:9
**drafting (2)**
15:15;53:21
**drafts (1)**
8:11
**drag (1)**
65:5
**draw (1)**
34:3
**drawings (1)**
54:8
**drawn (1)**
58:3
**drop (1)**
30:4
**dropped (1)**
59:1
**due (1)**
31:23
**During (4)**
12:15;13:12;36:5;
50:9
**duties (1)**
54:2
**duty (2)**
54:5,12

**E**

**earlier (4)**
14:23;26:4;53:15;
63:13
**early (1)**
6:1
**easier (2)**
10:2;44:23
**edits (2)**
20:23;21:13
**EE (3)**
21:23,24;22:1
**effect (4)**
36:10,11,15;42:20
**effectively (1)**
64:22
**eighth (1)**
39:15
**either (6)**
13:4;20:17;36:6;
46:4;47:18;50:18
**else (7)**
4:12;5:7,8;56:11;
58:20;63:20;66:18

**email (11)**
8:22,25;9:10;11:1;
34:22;44:20;45:5,14;
47:19;52:10;53:10
**emailer (1)**
47:22
**emailing (1)**
44:12
**emails (9)**
23:5;44:11,11;45:18,
21,25;46:20;47:15,20
**end (7)**
5:7;8:21;12:14;25:4;
28:14;32:5;66:23
**ended (5)**
35:19;49:14,15;50:4,
5
**enforced (1)**
43:25
**ensure (1)**
28:3
**entered (1)**
63:6
**essentially (1)**
35:19
**established (1)**
45:17
**estimates (1)**
57:23
**et (1)**
4:16
**even (5)**
20:14;29:13;38:9;
45:18;58:3
**event (2)**
32:18,24
**events (2)**
32:9,12
**everybody (1)**
31:4
**everyone (1)**
5:5
**EVIDENCE (6)**
14:7;35:1,8,10;63:6,
18
**evolved (1)**
48:1
**exactly (5)**
12:11;15:16;41:23;
43:17;44:2
**exaggerated (3)**
25:18;60:23;61:1
**EXAMINATION (2)**
39:8;61:10
**example (1)**
25:16
**exceed (2)**
28:23;29:4
**Excel (3)**
52:24;55:15;62:10
**Except (2)**
24:5,6
**exclusively (1)**

11:15
**Excuse (4)**
8:17;11:14;46:24;
59:11
**Exhibit (32)**
8:15,16;9:16;13:18,
20;14:7,17;15:6;20:22;
22:1;24:14,17;35:1,6,6,
10;39:14;40:22;42:6,
13;44:22;52:5,9;53:13,
15;54:1,2;55:6,11;
63:3,10,12
**expectation (1)**
5:20
**expected (1)**
62:18
**expense (1)**
40:1
**expenses (1)**
24:9
**expensive (1)**
51:19
**experience (3)**
26:23;43:24;50:22;
51:4
**experts (1)**
5:20
**explain (2)**
20:1,2
**explained (1)**
19:24
**extend (1)**
41:18
**extended (1)**
35:23
**extending (1)**
61:22
**extension (1)**
35:24
**extent (3)**
27:2;30:22;64:3
**exterior (1)**
25:16
**extra (2)**
43:16;66:15

**F**

**face (1)**
27:23
**fact (22)**
12:7;15:21;19:10;
22:9;28:11;36:21;
37:24;38:20;40:7,13;
42:2,16;44:4;45:25;
46:6;57:11;58:12;59:5,
10,22;60:2,5
**fair (2)**
37:23;43:9
**false (2)**
25:14;32:16
**far (3)**
25:4;58:15;59:6

Case 16-01120    Doc 371    Filed 07/05/19    Entered 07/05/19 12:05:06    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document        Page 71 of 77
June 25, 2019

**Federal (1)**
41:17
**federally (1)**
31:8
**fee (1)**
50:23
**fees (1)**
31:22
**felt (4)**
38:4;48:20,24;49:9
**few (1)**
63:2
**fifteen (1)**
43:25
**fifth (1)**
53:21
**fifty (2)**
52:15,19
**figures (1)**
51:22
**file (1)**
65:12,22
**filed (3)**
12:23,23;33:6
**files (1)**
52:25
**filing (1)**
33:13
**Filippov (64)**
4:22;7:15;8:10;9:1,6,
11;10:8,15,21;11:2,7,8,
9,13,16,23;12:1,8;
14:13;16:1,5;17:10;
18:22;20:24;21:13;
22:6,25;23:2;33:6;
34:20;36:2,9,24;37:5,
20,25;42:12;43:2,14;
44:12,18;45:20;46:18,
19,22;47:13,14,17;
48:8;49:5;50:10;51:4,
10,16,18;52:10;53:5;
54:18;55:1,23;58:21,
25;62:10,12
**Filippov's (2)**
7:21;22:9
**final (5)**
15:18;22:5,15,16;
53:25
**finalized (3)**
12:2,5;14:21
**finally (1)**
31:20
**finances (1)**
57:5
**financial (3)**
33:21;54:24;55:2
**financials (1)**
56:16
**find (2)**
52:18;66:16
**findings (2)**
64:5,13
**fine (3)**

12:13;66:5,16
**finish (1)**
6:1
**first (4)**
6:12;8:22;17:16;
62:7
**fixtures (1)**
25:16
**flat (1)**
50:23
**flip (3)**
30:15;32:4,24
**following (2)**
19:12;64:25
**foreclose (3)**
33:16;34:17,18
**form (1)**
18:12
**forming (1)**
53:7
**forth (5)**
16:12,17;24:10;
32:24;34:6
**forward (1)**
19:4
**forwarded (2)**
9:23;11:22
**four (1)**
53:20
**fourteen (1)**
64:19
**fourth (1)**
54:1
**free (1)**
38:12
**frequently (1)**
45:17
**Friday (1)**
64:25
**friends (1)**
44:15
**front (3)**
22:3;28:13,18
**fronting (1)**
37:9
**frustrated (1)**
5:15
**full (3)**
5:22;13:20;35:1
**funding (2)**
40:4;59:11
**funds (1)**
43:18
**further (4)**
39:5;61:7,10;62:23

**G**

**general (3)**
18:7,8;23:17
**generally (2)**
9:11;45:20
**Gersh (2)**

47:3,4
**gets (1)**
26:13
**given (2)**
51:3;64:9
**gives (1)**
66:7
**glasses (1)**
29:6
**goal (1)**
11:9
**goes (4)**
21:7;48:5;60:9;63:4
**Good (20)**
4:3,4,21,23,25;5:3,5;
6:8,14,16,23,24;8:23;
10:3,5;39:10,11;46:19;
47:14;50:7
**Governors (3)**
41:17,18,21
**grammar (1)**
18:23
**Great (1)**
16:8
**guarantee (18)**
7:24;8:7;10:9,15,17,
17;11:2,13,22;12:8,9,
12;18:21,22,25;50:14,
16,18
**guaranteeing (1)**
18:23
**guarantees (4)**
9:12;11:11;12:5;
50:13
**guarantor (2)**
16:5;32:15
**guess (5)**
38:25;41:4;55:5,8;
63:21
**guidelines (1)**
16:21

**H**

**half (1)**
52:7
**hand (3)**
4:9;64:7;66:12
**handed (1)**
21:21
**handling (1)**
12:16
**hands (1)**
63:18
**handwriting (1)**
53:17
**happen (2)**
30:25;52:16
**happened (2)**
43:17;48:5
**happening (2)**
9:11;12:14
**happens (4)**

4:5;5:15,16;64:6
**hard (3)**
39:25;59:11;60:3
**Harris (1)**
18:18
**harsh (5)**
48:9,20,25;49:9,9
**Hartzell (2)**
39:14;41:1
**hate (1)**
65:5
**heading (1)**
47:5
**hear (3)**
38:8;50:14;51:7
**heard (2)**
50:10;60:10
**hearings (1)**
12:24;65:6
**hearsay (1)**
62:13
**hereafter (1)**
34:9
**herein (1)**
24:7
**hereinafter (1)**
32:15
**here's (2)**
50:17;55:25
**heretofore (1)**
34:9
**hesitating (1)**
64:20
**hey (2)**
36:10,13
**highlight (1)**
52:6
**Hold (2)**
27:11,11
**Homes (4)**
23:18,23;54:6,13
**Honor (34)**
4:4,21,23,25;5:3;6:3,
9;8:17;13:18,22;22:19,
21;34:25;35:3,9,15;
39:5;47:8;48:12;50:6;
56:10;62:22,23;64:1,4,
15,21;65:10,15,25;
66:1,5,20,21
**hopefully (1)**
6:1
**house (1)**
61:19
**housekeeping (1)**
5:6
**houses (2)**
51:15;61:23

**I**

**idea (1)**
25:15
**identical (1)**

22:18
**identification (3)**
21:23,25;22:1
**identified (1)**
23:17
**identify (1)**
48:21
**implication (1)**
45:14
**important (1)**
52:11
**imposed (1)**
17:23
**inaccurate (1)**
32:16
**include (4)**
39:25;40:17;51:24;
59:15
**included (3)**
40:8;43:15;51:22
**including (4)**
26:14;40:3;43:15;
54:8
**income (1)**
59:11
**incomplete (1)**
32:16
**inconsistent (1)**
41:21
**Incorporated (2)**
22:16;29:15
**incurred (4)**
17:19;24:9;28:23;
29:4
**indicated (2)**
34:22;63:13
**indicating (1)**
37:1
**indirect (1)**
40:3
**indirectly (1)**
41:14
**indiscernible (4)**
5:4;13:4;18:14;60:9
**individually (2)**
16:7;37:12
**indulgence (1)**
5:10
**initial (5)**
20:6,8,12;51:12;62:9
**inspectors (1)**
13:15
**instruments (1)**
19:13
**insured (1)**
31:8
**intended (1)**
26:9
**intercede (1)**
37:16
**interest (5)**
19:14;31:22,25;38:5;
40:1

Case 16-01120    Doc 371    Filed 07/05/19    Entered 07/05/19 12:05:06    Desc Main
LYMAN-CUTLER, LLC, et al. v.                    Document        Page 72 of 77
KAGAN, et al.                                                                        June 25, 2019

**interpret (1)**
50:14
**into (11)**
13:6,6;14:7;35:1,10;
45:7;51:10,11;53:20;
60:3;62:17
**intrinsic (1)**
51:9
**introduced (2)**
24:17;63:19
**introduction (1)**
62:9
**introductory (1)**
17:17
**investigation (1)**
34:9
**investing (1)**
45:13
**investments (1)**
56:6
**investor (2)**
52:12,13
**investors (2)**
38:7;44:7
**involved (4)**
35:22;38:2;44:7;
62:17
**involvement (2)**
35:19;36:21
**iron (1)**
63:2
**issue (2)**
37:19;38:9
**issued (1)**
16:13
**issues (1)**
20:16
**item (1)**
59:25
**itemized (1)**
39:24

### J

**job (4)**
20:19;28:3,4;29:20
**John (3)**
4:25;16:3,4
**Judge (1)**
66:22
**judgment (2)**
64:5,13
**July (3)**
5:21;64:10;65:7
**June (6)**
14:9,10;20:8,11,12;
33:6
**jury-waived (1)**
64:6

### K

**Kagan (44)**

4:16;5:1,1,1;7:22;
10:16;11:10,14;13:1,2;
23:23;28:13;33:7;
36:16,23,24;37:12,16,
24,25;38:6,22;40:10;
43:13;44:5,15;45:17,
23,25;50:10;51:13,16;
52:1,12;54:9,12;55:10,
15,20;58:17,22;59:4;
60:10;63:9
**Kagan's (3)**
15:4;53:7;54:5
**KDC (3)**
5:2;15:4;23:20
**keep (3)**
18:17;36:3;63:17
**kind (1)**
44:22
**kinds (1)**
49:2
**kitchen (1)**
26:21
**knew (6)**
25:13;26:10;31:3,4,
5;34:12
**knowing (2)**
60:19,21
**knowledge (1)**
26:25
**known (1)**
54:7

### L

**language (4)**
29:5;52:16;59:8,9
**last (20)**
6:25;12:16;22:6;
24:2;27:2;34:3;44:9;
49:1;50:9;52:1,9;
54:23;55:5,10;56:14,
21,21;57:14;58:8;
63:22
**lawyer (2)**
25:23;26:11
**least (1)**
4:11
**legal (4)**
12:18,20,21;50:23
**lend (1)**
33:23
**lender (3)**
7:4;19:8;30:23
**lending (1)**
33:25
**letter (15)**
15:11,14;16:12;17:4,
24;18:20;19:20;22:13,
14,16;27:6,20;39:21;
59:8,22
**level (1)**
33:25
**life (1)**

5:16
**limitation (2)**
12:12;17:23
**limited (4)**
7:24;8:7;12:8;18:25
**line (14)**
46:16;47:1,2,10;
48:21,23;49:15,17;
50:5;57:2,3;59:12,25;
62:6
**line-by-line (1)**
34:24
**Lipestker (1)**
4:22
**Lipetsker (15)**
10:16;11:10,13,14;
37:5,19,25;43:13;45:1,
3,12;50:11;51:4,16;
55:24
**list (1)**
26:1
**listed (1)**
19:16
**literally (2)**
43:24;59:25
**little (6)**
9:25;10:12,23;18:4;
53:16;58:19
**LLC (6)**
4:16,17;7:19;15:1;
23:18;38:20
**loan (71)**
7:5,8,10;8:11,12;
9:12;11:12;12:2;14:9,
13,19;15:15,18;16:13,
15,16,19,21;17:3,17,
18,24;18:10;19:14;
20:13;21:15,21;22:4,5;
23:10;24:10,21;25:14;
26:5,6,11;27:3,6,7;
28:1,17;29:9;30:2,7,12,
24;31:4,16;32:14;34:7,
8;35:1,18,24;36:14;
38:21;39:16,20,21,23;
40:23;41:10;43:22;
44:2;59:7,21,22;60:2,
13,14;61:12
**loans (11)**
7:1,17;15:12;22:18,
18;29:19;31:14;35:23;
41:15;43:5;61:20
**location (2)**
13:6;54:6
**logic (1)**
58:20
**logically (1)**
58:23
**long (1)**
49:16
**Look (9)**
11:2;17:6;28:17;
34:4;41:4;44:21;51:14;
56:22;59:17

**looked (7)**
20:21;24:1;27:6;
40:22;42:6;52:9;59:8
**looking (7)**
13:19;28:2;47:3,25;
60:1,2,13
**lots (1)**
52:21
**lower (1)**
52:7
**Lyman (1)**
54:7
**Lyman- (1)**
4:15
**Lyman-Cutler (7)**
4:17;17:11;18:9;
30:23;35:19;48:4,6

### M

**Maiden (16)**
6:6,8,9,13,15,23,25;
10:1;22:3;39:10,20;
56:9,14;61:12;62:24;
63:22
**makes (2)**
29:10;53:2
**making (4)**
11:8;20:23;34:8,13
**manager (3)**
7:19;16:5,7
**managing (3)**
54:9,16,18
**manner (1)**
47:25
**many (2)**
40:18;64:17
**margin (2)**
41:16,20
**marked (5)**
16:15;21:22,24;22:1;
63:6
**market (2)**
31:14;49:3
**Mary (4)**
4:14;5:9;13:24;
66:13
**Massachusetts (1)**
54:7
**material (3)**
32:17;33:2;34:7
**mature (1)**
35:24
**May (13)**
9:1,23;10:14;11:1;
12:14;15:10;21:19,20;
31:16;48:15;49:18;
65:7,13
**maybe (3)**
26:22;40:15;52:6;
55:7;64:25;65:16
**McGregor (2)**
16:3,4

**mean (4)**
19:25;29:24;46:1;
61:18
**meaning (2)**
20:4;41:16
**means (1)**
47:25
**meant (2)**
45:2;61:1
**meeting (3)**
37:21;57:12;62:16
**member (3)**
54:9,16,18
**members (2)**
53:22;54:2
**memory (1)**
18:21
**mentioned (2)**
49:8;52:23
**mercy (1)**
13:10
**met (1)**
37:18
**Michael (1)**
5:3
**middle (2)**
19:10;29:1
**might (4)**
40:15,15;42:8;53:1
**million (6)**
22:18;25:7;56:4;
61:19,22,23
**mind (2)**
38:18;50:16
**misrepresentations (1)**
43:22
**missing (4)**
41:25;42:3;52:11,12
**misspoke (1)**
19:21
**modified (1)**
38:17
**modifying (1)**
51:14
**moment (3)**
20:21;45:12;64:14
**money (12)**
31:3;37:1,2,5,9;
43:18,18;45:8,9;50:19;
51:19;56:1
**months (1)**
14:23
**more (13)**
5:19;7:23;8:7;10:23;
12:8;21:11;37:5;51:6,
15,18,19;61:8;62:1
**morning (12)**
4:3,4,21,23,25;5:3,5;
6:8,23,24;39:10,11
**mortgage (1)**
33:20
**mortgages (1)**
31:14

**Most (2)**
46:20;47:15
**motion (1)**
64:5,13;66:12
**move (1)**
61:18
**much (8)**
51:5,8;56:1;60:3,4,
21;62:17,18
**multiple (2)**
49:23,24
**must (4)**
24:25;39:23,25;42:9

**N**

**nailed (1)**
54:24
**name (2)**
19:16;23:22
**names (1)**
4:19
**nature (1)**
60:16
**necessary (1)**
19:12
**need (10)**
5:19,25;31:5,6;
35:13;51:15;52:6;53:1;
56:1;66:14
**needed (5)**
7:10;18:9,12;34:17;
35:23
**needs (5)**
37:3,12;52:23;59:10;
62:17
**negotiate (1)**
50:21
**negotiations (2)**
20:18;51:10
**Neither (1)**
11:2
**new (3)**
41:2;54:2;65:6
**next (5)**
5:19;17:7;36:21;
48:13;64:21
**nice (1)**
66:18
**Nick (2)**
11:2,23
**Nickolay (1)**
4:22
**ninety (1)**
30:19
**nonconstruction (1)**
40:3
**none (3)**
42:2,12;52:22
**Nope (1)**
8:19
**nor (2)**
11:2;25:15

**note (4)**
20:2;21:9;31:23;
33:8
**notwithstanding (1)**
34:9
**November (2)**
52:10;53:10
**nowhere (1)**
25:9;58:9;60:14
**number (8)**
4:17;42:11;44:4,10;
51:7;56:1;58:10;63:8
**numbers (8)**
25:18,21;48:21;51:3,
9;53:2;55:24;60:10

**O**

**oath (1)**
6:11
**objection (5)**
4:17;13:21,22;27:9;
35:3
**obligated (1)**
12:9
**obligation (2)**
40:7;54:6
**obtaining (1)**
49:9
**obviously (1)**
58:21
**occupancy (2)**
49:4,10
**odds (1)**
27:20
**offer (2)**
13:20;35:1
**offered (1)**
12:8
**office (3)**
46:21;47:16;50:1
**officer (3)**
16:4;31:4,16
**official (1)**
63:9
**once (4)**
11:8;13:7;35:18;
43:14
**one (21)**
4:12;5:19;7:17;10:8;
11:16;12:23;17:16;
23:21;27:15;32:12;
33:7;35:13;40:12,24;
41:2;44:20,25;46:7;
49:23;53:20;63:21
**ones (3)**
11:15;31:15;43:14
**only (9)**
12:9;17:25;19:14;
23:14;35:22;39:25;
40:12;60:7;64:20
**onto (1)**
32:19

**Opening (1)**
20:18
**operating (21)**
14:20;26:14;27:5,21,
25;28:6,9,12;30:11;
37:10;38:13,19;45:24;
48:4;52:2;53:11,15;
54:20;58:8,12;59:3
**opportunity (1)**
23:3
**opposed (1)**
5:25
**opposition (1)**
64:18
**orchestrated (1)**
35:23
**order (4)**
8:22;15:18;55:23;
60:25
**original (1)**
63:3
**originally (1)**
7:20
**out (13)**
29:12;37:2,14;38:21;
43:16,18;57:12;59:23;
60:14;63:2,17;65:5,24
**outlining (1)**
55:25
**over (11)**
5:11;10:20;34:22;
37:1;39:12;40:18;46:2,
5,7;48:1;9
**Overall (2)**
39:18,22
**oversee (1)**
26:20
**owe (1)**
47:4
**own (1)**
26:18
**owner (1)**
18:8

**P**

**P&S (1)**
55:2
**page (45)**
15:8,23,25;16:9;
17:1,7,14;18:18;19:4,
11;22:6;23:9,16,17;
28:20;29:7;30:5,15,15;
31:21;32:2,6,7,24,25;
34:4;39:15;42:8,9,11;
46:14,24;47:7,8;48:21,
22;49:15;52:6;53:21;
54:1;55:7;56:23,23;
57:3;62:4
**paid (7)**
26:6,16;33:16;37:12;
38:19,22;43:17
**paper (3)**

10:2;41:4,5
**papers (1)**
19:13
**paperwork (2)**
25:1;36:1
**paragraph (15)**
17:17,17;23:9;29:2,
6;30:4,15;32:9,25;
39:17,21;41:7,8;42:16;
53:21
**paragraphs (3)**
29:12;42:2;43:20
**part (19)**
7:7;10:14,20;18:10;
21:14;25:1;32:9;37:4;
40:17;41:15;43:6,7,7;
51:9;52:13,14,25;60:5;
63:14
**partial (2)**
64:5,13
**particular (1)**
44:20
**parties (7)**
4:19;27:3;28:11;
38:12,12,20,24
**partners (1)**
36:23
**parts (1)**
52:21
**password (2)**
4:7,10
**Pause (3)**
4:6;47:6;61:6
**pay (7)**
26:11,22;27:3;31:21;
36:24;38:22;50:18
**payable (1)**
31:22
**paying (5)**
31:4;36:3,4;37:13,14
**payment (2)**
24:8;43:19
**Payments (1)**
31:21
**pays (1)**
31:24
**penalties (1)**
49:2
**pendency (1)**
36:5
**people (2)**
20:1;50:21
**per (2)**
61:19;63:11
**percent (5)**
30:19;43:16;52:15,
19;60:8
**percentage (1)**
60:21
**perform (1)**
50:17
**performed (1)**
30:6

10:2;41:4,5
**period (2)**
13:13;37:11
**person (1)**
41:19
**personal (2)**
11:11,13
**personally (1)**
34:23
**perspective (1)**
7:12,13
**Perten (117)**
4:25,25;5:8,13,15,
24;6:16,19,22;8:15,19,
24;9:3,5,7,9,21,22,25;
10:4,6,7,12,13,23,25;
11:20,21;13:18,25;
14:2,4,8,16,18;15:7,9,
22,24;16:9,10,25;17:2,
7,9,13,15;18:4,5,17,19;
19:4,6;21:19,21;22:2,
22,23;24:14,16,19;
25:3,6;27:14,17,18;
32:1;34:25;35:5,7,9,11,
13,15,17;36:7,8;39:5,
13,16;40:23;42:2,8;
43:20,23;44:10;45:16;
46:6,17;47:12;48:12,
17,20,22;49:13,20;
50:13;55:10;56:13;
61:7,25;62:7,23;63:7,
10,13,21;64:3,11;
65:15,17,20,24;66:4,8,
14,20
**Perten's (1)**
53:17
**Pete (1)**
4:23
**ph (1)**
45:3
**phone (3)**
46:2,18;47:13
**pick (2)**
46:2;49:17
**picking (3)**
46:16;47:10;62:6
**piece (2)**
52:12,12
**pile (1)**
63:16
**placed (1)**
22:3
**plan (1)**
13:5
**plans (9)**
30:6;51:14,17;54:8,
16,21;57:25;58:2,3
**please (13)**
4:19;6:20;14:17;
15:7;16:9;18:18;19:5;
39:15,18;44:22;52:6,6;
55:7
**pm (2)**
53:16;65:14

**pocket (1)**
37:15
**point (20)**
12:18,19,20,21;
14:20;19:21,22;20:14;
31:5;34:25;36:6,9,13;
37:10,13,15,19;42:12;
51:2;53:21
**pointed (1)**
59:9
**portion (2)**
24:8;60:20
**posed (1)**
9:20
**posing (1)**
9:16
**position (1)**
25:20
**possible (2)**
34:18;55:24
**potential (2)**
33:7;56:1
**preference (2)**
5:24;6:2
**prepare (5)**
19:12;55:11,16,18,
21
**prepared (1)**
40:11
**presence (1)**
57:4
**present (2)**
62:7;64:4
**presentation (1)**
55:23
**pretty (1)**
5:22
**previous (3)**
17:13;23:5;29:2
**PREVIOUSLY (1)**
6:15
**primarily (1)**
7:16
**principal (2)**
31:22,25
**prior (5)**
8:10;39:22;62:10,11,
13
**private (1)**
44:11
**privy (1)**
39:1
**probably (2)**
31:4;55:8
**problems (2)**
13:12;36:10
**proceeding (1)**
4:15
**proceeds (13)**
16:16;17:18,18,25;
23:10,13;26:10,10;
27:3;41:8,10,15;59:22
**process (3)**

13:9;52:21;53:21
**product (1)**
22:15
**ProExcavation (1)**
5:1
**profit (5)**
52:13,14;55:24;56:5;
62:19
**profit-and-loss (1)**
62:11
**profits (2)**
56:3,4
**progress (1)**
62:14
**prohibited (2)**
27:21;44:1
**project (23)**
17:20;23:11;24:9;
28:23;29:4;30:19;
33:19;35:19;36:5,11;
37:2;39:18,22,24;40:2,
11,20;41:11;45:13;
52:22;53:7;55:25;
59:15
**projection (1)**
40:2
**projections (2)**
43:7;62:16
**projects (6)**
40:16;44:3,5;62:10,
12,13
**promissory (2)**
20:2;21:9
**proof (1)**
63:5,9
**properly (1)**
24:9
**properties (1)**
61:13
**property (7)**
12:17;35:25;49:10;
51:5;52:22;56:2;58:4
**proposed (6)**
11:2;48:7;49:4;
58:21;66:1,2
**provide (1)**
54:12
**provided (2)**
15:11;24:7
**provides (1)**
17:16
**providing (1)**
19:15
**provision (1)**
53:12
**pull (3)**
8:15;14:16;65:24
**purchasing (2)**
41:16,19
**purpose (3)**
41:15,19,20
**purposes (1)**
16:16

**put (10)**
5:17;15:6;20:19;
37:5;40:23;42:21,24;
55:1;56:1;62:17
**putting (1)**
42:17

**Q**

**quite (1)**
63:16

**R**

**raise (2)**
23:3;38:1
**raised (3)**
10:8;20:23;42:13
**raising (1)**
9:13
**ramifications (1)**
33:7
**range (1)**
57:19
**rather (1)**
45:9
**ratio (1)**
62:11
**read (23)**
11:5;17:21;24:11;
28:24;34:10,20;40:5;
41:11,22;42:3;43:20;
44:23;45:10;46:1;
48:10,15;50:2;53:3;
54:9;57:9;61:25;62:20;
63:19
**reading (4)**
24:5;43:23;49:16;
60:13
**reads (2)**
39:22;43:23
**ready (1)**
6:18
**reality (2)**
25:16;31:1
**realized (1)**
52:11
**really (1)**
51:15
**reason (4)**
38:4;52:14,20;58:16
**recall (13)**
7:1;12:17;22:17;
40:13,17;48:18,24;
49:8,21;56:15,16;
57:16;59:12
**recalls (1)**
48:14
**receive (1)**
64:18
**record (2)**
4:20;5:17;49:14;
63:14

**recorded (2)**
13:8;33:20
**records (1)**
63:9
**RECROSS-EXAMINATION (1)**
56:12
**REDIRECT (2)**
39:8;61:10
**referenced (1)**
17:4
**refinance (3)**
20:5;10;21:8
**refinances (2)**
19:21,22
**reflect (4)**
7:11;29:20;36:14;
53:1
**refresh (1)**
18:21
**refusing (2)**
36:24;37:5
**regard (2)**
7:16;37:21
**regardless (1)**
34:12
**registry (1)**
13:8
**regularly (1)**
48:2
**Regulation (2)**
41:17,21
**regulations (1)**
31:11
**reimbursed (1)**
28:14
**rejected (1)**
26:17
**related (1)**
40:2
**relating (1)**
56:16
**relationship (3)**
7:21,22;37:24
**relationships (1)**
38:11
**relied (2)**
15:18;34:8
**relies (1)**
33:22
**rely (1)**
34:16
**relying (5)**
33:17,19,20;34:2,14
**remember (23)**
4:10;12:11;13:14;
25:1;34:23;37:18,20;
42:8;44:12;45:1,15;
46:7;47:21;48:3,6;
51:12,17;52:3;53:18;
59:2,19;61:15;62:10
**remind (1)**
6:10
**reply (2)**

**recorded (2)**
13:8;33:20
**records (1)**
63:9
**45:25;65:13**
**represent (1)**
19:14
**representation (8)**
7:7;19:23,24;20:3,4,
15;32:13,14
**representations (3)**
33:18;34:5;43:21
**represented (3)**
7:4;19:18;30:22
**representing (1)**
19:25;20:15
**request (1)**
21:13
**requested (5)**
28:22;29:1,2,3;30:5
**required (1)**
7:23;19:20
**requirement (3)**
28:12,20;30:1
**requirements (2)**
38:13;59:21
**rescheduling (1)**
5:9
**Reserve (1)**
41:17
**respect (3)**
7:4;13:18;32:17
**respond (2)**
45:18,20
**responded (3)**
9:19;21:12;23:6
**response (1)**
20:23
**responsible (2)**
53:7;59:4
**rest (2)**
11:12;63:24
**rested (1)**
64:4
**resume (2)**
6:7;64:10
**return (1)**
63:17
**reverse (1)**
8:22
**review (2)**
9:23;26:18
**reviewed (6)**
8:11;9:24;22:24;
34:20;51:17;58:20
**reviewing (4)**
9:17,18;21:2,4
**right (65)**
4:5;5:14;6:4,5,7;
8:16,23;13:23;14:5,5;
18:25;23:24;24:1;
25:24;29:13,23,25;
33:15;35:4,7;37:23;
39:1;40:8,11,14,20;
41:7;42:9,18,19,22,25;
44:5,7,7,15,18;45:18,
21;46:16;50:4,12;53:6,

8,12;54:16,18,23,24;
55:1,3,11,13,16;59:7;
61:13,20,23;62:24;
63:15,20;64:9,16;65:6;
66:6
**rise (1)**
4:2
**risk (1)**
33:12
**Road (1)**
54:7
**Rockland (11)**
7:22,23,25;8:6;12:7;
16:1;22:6;28:8;29:17;
31:7;43:25
**role (1)**
52:12
**roughly (1)**
36:22
**round (1)**
6:12
**Rules (1)**
64:6
**run (2)**
11:9;49:17

**S**

**saga (1)**
13:15
**sale (1)**
56:2
**Salmi (2)**
5:10,21
**same (11)**
10:14;21:7;30:5;
37:19;45:8;46:11;47:5;
50:25;56:6,8;62:2
**sanction (1)**
25:13
**satisfactory (1)**
18:14
**Saturday (1)**
9:1
**Savings (1)**
7:21
**saw (2)**
40:16;47:5
**saying (4)**
4:11;45:7;51:2,3
**schedule (4)**
13:10;24:11;30:8,13
**screen (2)**
13:20;40:24
**scroll (15)**
8:21;9:3,7,21,25;
10:12,23;11:20;15:7;
16:24;17:7;18:4;24:19;
25:3;42:9
**se (1)**
63:11
**sealed (1)**
14:20

**Sean (1)**
4:21
**seated (1)**
4:3
**second (1)**
15:8;23:9;24:6;55:7
**section (6)**
18:6;28:20;31:21;
34:5;59:3,4
**secure (1)**
55:2
**security (1)**
33:20
**seeing (1)**
40:14
**seldom (1)**
45:19
**sell (1)**
31:14
**selling (1)**
59:5
**sells (1)**
56:4
**send (1)**
11:1
**sends (1)**
15:20
**sense (1)**
53:2
**sent (1)**
53:10
**sentence (2)**
24:6;34:18
**separate (1)**
59:15
**served (1)**
15:14
**services (1)**
19:15
**session (1)**
4:2
**set (5)**
4:14;16:16;24:10;
32:24;34:6
**sets (1)**
16:12
**settle (1)**
38:7
**several (3)**
10:21;13:9;14:23
**shall (12)**
17:18;23:10;24:8;
30:5,7,18;32:16,16;
34:7;41:10,14;54:5
**share (1)**
52:19
**shocking (1)**
38:23
**show (4)**
40:3;46:10;53:7;
59:10
**showed (6)**
39:13;44:10,20;46:6;

62:9,13
**showing (3)**
39:17;56:5;62:11
**shown (1)**
57:5
**sides' (1)**
7:13
**sign (2)**
14:13;16:7
**signature (4)**
15:25;16:1,3;22:9
**signed (9)**
11:16;14:20,22;16:5;
17:10;22:6;34:20;
36:14;54:20
**signing (3)**
7:17;11:15;32:19
**simply (1)**
21:12
**site (1)**
13:5
**skip (3)**
15:22;16:25;55:7
**slightly (2)**
60:23,25
**snowstorm (1)**
49:1
**so-called (1)**
44:25
**social (1)**
44:17
**soft (3)**
40:3;59:12,16
**sold (3)**
35:25;49:10;56:4
**solely (3)**
16:16;17:18;24:8
**somebody (3)**
16:1;37:21;50:23
**something's (1)**
36:11
**sometimes (1)**
38:8
**sorry (8)**
8:2;29:7;42:11;
48:22;50:5;56:23;65:5,
25
**sort (2)**
43:14;61:17
**sound (1)**
61:20
**sounded (1)**
5:10
**sources (2)**
40:4;59:10
**speaking (2)**
12:15;49:21
**speaks (1)**
58:13
**specific (1)**
51:12
**specifically (11)**
19:22;24:5,6;26:14,

15;40:17;44:1;48:3,6,
9;49:20
**specifications (1)**
30:7
**spelled (1)**
59:23
**spoke (2)**
12:7;18:20
**spreadsheet (1)**
55:16
**spreadsheets (9)**
52:2;53:8;55:11,19;
56:16;57:5,6,22;62:11
**stages (2)**
52:24;62:9
**stand (1)**
50:9
**standard (1)**
29:21
**standpoint (1)**
6:18
**STANLEY (17)**
5:3,4;8:15,17,21;
9:21;10:24;11:20;
14:16;15:7,22;16:25;
17:13;18:17,18;24:14;
25:3
**start (5)**
5:22,24;6:4,19;39:12
**starting (4)**
5:21;24:6;48:23;
57:3
**starts (1)**
52:7
**state (5)**
4:19;28:22,23;29:4,
11
**statements (1)**
34:15
**states (1)**
23:10
**steps (1)**
38:2
**still (5)**
6:11;13:19;46:11;
56:19;63:5
**stock (2)**
41:16,20
**Stop (3)**
9:7;46:21;47:16
**stopped (1)**
49:25
**stops (1)**
48:2
**strengths (1)**
33:21
**strictly (1)**
16:20
**Strike (2)**
22:22;36:7
**subdivided (1)**
58:4
**subdivision (1)**

12:16
**Subject (3)**
30:16;31:10;58:25
**submission (1)**
25:13
**submit (2)**
39:23;40:8
**submitted (1)**
18:9
**substantially (1)**
30:6
**suit (2)**
33:6,13
**supplement (6)**
16:17,21;17:3,25;
39:16,21
**supplied (1)**
54:8
**support (1)**
25:14
**Sure (12)**
25:25,25;26:19;
27:13;32:2,23;33:12;
36:17;37:13;48:17;
51:1;66:8
**surveyors (1)**
13:5
**Sustained (1)**
27:16
**switching (2)**
13:14,15
**SWORN (1)**
6:15
**System (1)**
41:18

**T**

**talk (5)**
11:4;21:5,9;25:10;
43:2
**talked (1)**
43:8
**talking (2)**
6:25;10:15
**talks (1)**
24:4
**Tamposi (3)**
4:23,23;66:22
**Tatiana (1)**
5:1
**technically (1)**
52:16
**telling (1)**
60:18
**template (5)**
21:17;29:13,16,21,
22
**ten (3)**
43:16;60:8;64:19
**tenor (1)**
42:24
**term (3)**

Case 16-01120 Doc 371 Filed 07/05/19 Entered 07/05/19 12:05:06 Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document Page 76 of 77
June 25, 2019

28:9;29:9;31:24
**terms (25)**
  10:17;16:12;19:23;
  20:3,15;21:12;27:24;
  28:1,6;29:21;30:16,24,
  25,25;36:14;44:1;
  47:23;48:7,17,24;49:4,
  8;50:17;59:7,8
**testified (6)**
  27:2;44:14;54:23;
  56:14,15;57:11
**testifying (1)**
  44:10
**testimony (14)**
  6:12;21:1;40:10;
  46:7,11;47:3,23;51:1;
  52:1;56:17;60:19,22;
  61:25;62:2
**Thanks (1)**
  11:4
**That'll (1)**
  5:20
**therefore (2)**
  33:23;58:22
**thinking (1)**
  45:12
**third (2)**
  52:6;55:8
**though (1)**
  37:23
**thought (3)**
  4:11,13;43:7
**three (5)**
  27:12;53:20;56:3;
  62:8;64:22
**tied (1)**
  29:11
**till (1)**
  64:25
**times (1)**
  44:4
**titled (3)**
  32:25;39:22;57:23
**together (2)**
  20:20;29:2
**told (9)**
  7:3;12:15;26:4;43:9,
  13;57:14,25;58:16;
  61:18
**took (3)**
  13:9;62:12,13
**top (5)**
  8:22;17:16;23:16;
  29:7;44:23
**topic (2)**
  46:11;62:2
**total (2)**
  25:7;60:8
**totally (1)**
  43:6
**toward (1)**
  60:9
**towards (1)**

32:5
**Town (5)**
  12:24;13:4,10,12,16
**transaction (2)**
  7:3,11
**transcript (2)**
  46:11;62:4
**transcripts (1)**
  63:16
**trial (3)**
  4:16,18;5:19
**triggered (1)**
  49:3
**true (1)**
  7:20
**Trust (11)**
  7:23,23,25;8:6;12:7;
  16:1;22:7;28:8;29:17;
  31:8;43:25
**Try (1)**
  8:19
**Tuesday (1)**
  56:21
**turn (2)**
  23:8;31:20
**tweak (1)**
  29:20
**tweaked (1)**
  53:1
**twelve (2)**
  4:16,18
**two (8)**
  13:6;22:18;31:1;
  50:14;53:5,20;54:6;
  61:9

**U**

**ultimately (1)**
  12:1
**Um-hum (5)**
  20:25;32:11;33:1;
  35:16;62:3
**uncommon (1)**
  31:13;38:6
**under (8)**
  6:11;16:12;24:7;
  26:5,6;31:22;64:6,17
**underlying (2)**
  7:11;33:19
**understood (33)**
  7:10;9:15;15:3;
  16:11,19;18:6;19:7,19;
  20:5;23:13,20;25:19;
  26:4;27:1,4,20,24;28:5,
  11,14;30:1;31:2,7,13;
  32:17,23;33:5,17;
  34:12;37:8,9,10;57:22
**underwriting (1)**
  26:18
**unless (2)**
  33:16;63:18
**unusual (1)**

49:11
**up (35)**
  6:6,7;8:15;9:21;
  10:12,23;11:20;12:9;
  13:19;14:16;15:6;
  21:23;24:14;30:3,19;
  39:15,17;40:24,25;
  42:7,9,17,24;44:23;
  46:2,12,16;47:10;
  49:17;51:25;52:5;55:2,
  7;62:6;64:7
**upon (4)**
  15:18;30:17;34:8,14
**Use (10)**
  16:15;17:17;26:10;
  27:3,21;34:17;41:7,14;
  55:15;59:9
**used (17)**
  16:16,19,20;17:18,
  25;23:10,14,23,25;
  26:22;29:16,17;31:3;
  41:11;46:20;47:16;
  59:22
**usual (1)**
  13:15
**usually (1)**
  24:23

**V**

**vacation (1)**
  65:18
**vacations (1)**
  66:18
**Vadim (17)**
  5:1;11:3;46:20,20;
  47:15,15,18,20,20,24;
  48:8,9;49:5,21;51:3;
  62:9,12
**value (1)**
  26:18
**variations (1)**
  56:3
**various (4)**
  8:11;9:11;14:13;
  31:10
**venture (1)**
  62:8
**version (2)**
  22:5;53:25
**via (3)**
  46:19;47:15,20
**view (4)**
  12:18,19,20,21
**violates (1)**
  41:20
**violation (1)**
  26:19
**Von (2)**
  5:10,20
**vouch (1)**
  25:20

**W**

**waive (2)**
  28:12;38:12
**wants (2)**
  53:6,8
**warmed (1)**
  5:11
**warranties (2)**
  33:18;34:5
**warranty (2)**
  32:13,14
**way (6)**
  32:5;48:5;50:25;
  60:2,18,20
**ways (1)**
  64:17
**Wednesday (1)**
  66:2
**week (8)**
  12:16;56:14;57:14;
  65:17,19,20,25;66:4
**weeks (1)**
  13:10
**week's (1)**
  64:21
**weren't (2)**
  44:17;57:12
**whatnot (1)**
  43:21
**what's (2)**
  9:11;47:24
**whenever (1)**
  6:17,17
**where's (1)**
  42:21
**whole (4)**
  24:20;51:10;52:18;
  65:20
**Whoops (1)**
  25:4
**who's (1)**
  16:4
**whose (1)**
  23:21
**wise (1)**
  6:3
**within (2)**
  16:20;41:16
**without (1)**
  60:20
**WITNESS (9)**
  9:4,6;10:3,5;21:19,
  22;47:5;63:1,22
**witnessed (1)**
  22:9
**word (1)**
  47:24
**words (3)**
  36:10,11,15
**work (1)**
  13:3

**worked (1)**
  13:5
**working (1)**
  4:13
**works (4)**
  11:23,23;30:6;64:24
**worry (1)**
  36:3
**write (1)**
  4:8
**writing (1)**
  37:2
**written (1)**
  42:11
**wrong (3)**
  36:11;38:18;42:9

**Y**

**year (1)**
  49:2
**years (2)**
  43:25;48:1
**yep (3)**
  16:7;41:9;62:5
**yesterday (1)**
  5:11
**York (1)**
  65:6

**Z**

**Zhukovskiy (3)**
  55:13,18,21

**1**

**1.3 (2)**
  57:15,19
**1.4 (1)**
  60:15
**1.5 (2)**
  51:13,22
**1.6 (5)**
  51:15,20,22;57:15;
  61:22
**10/30/12 (1)**
  53:16
**10:32 (1)**
  66:23
**11 (2)**
  53:13,15
**12 (4)**
  46:16;47:1,2,10
**12:30 (1)**
  53:16
**12th (1)**
  65:4
**13 (2)**
  32:7;49:15
**14 (2)**
  52:5,9
**15 (3)**

Case 16-01120    Doc 371    Filed 07/05/19    Entered 07/05/19 12:05:06    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 77 of 77

June 25, 2019

34:4;54:1,2
**15-13881 (1)**
    4:17
**15th (2)**
    65:17,19
**16-1120 (1)**
    4:15
**167 (1)**
    4:17
**17th (2)**
    65:7,8
**183 (1)**
    44:22
**18th (3)**
    14:9,10;20:12
**19 (1)**
    49:17
**19th (1)**
    65:4

---

**2**

**2 (2)**
    16:9;32:25
**2.3 (2)**
    23:10;41:7
**20 (1)**
    48:23
**200,000 (1)**
    55:2
**2013 (4)**
    14:10;15:11;20:8,12
**2015 (3)**
    33:6;36:22,22
**208 (12)**
    8:19,20;9:16;13:18,
    25;14:3,6,7;20:22;
    42:6,7,13
**22 (1)**
    62:6
**24 (1)**
    57:3
**24th (2)**
    65:14;66:2
**25- (1)**
    26:22
**25th (1)**
    9:1
**27 (2)**
    24:15,18
**27th (2)**
    9:23;10:15
**28th (1)**
    11:1
**29 (3)**
    5:21;64:10,11
**29th (2)**
    65:23;66:19

---

**3**

**3 (3)**
    18:18;23:16;50:6

**3.2 (2)**
    12:9;24:4
**3.4.11 (1)**
    30:16
**3.4.2 (5)**
    28:20;29:1,7,8;30:1
**3.4.6 (1)**
    30:4
**3.42 (1)**
    28:25
**3.9 (1)**
    42:17
**308 (2)**
    8:16,20
**309 (1)**
    8:19
**32- (1)**
    26:22
**33 (3)**
    14:17;15:6;39:15
**342 (7)**
    35:5,6,8,10;40:22;
    63:3,4
**37 (1)**
    62:4
**39 (2)**
    56:23;57:3
**3rd (2)**
    52:10;53:11

---

**4**

**4 (1)**
    56:4
**4.5 (2)**
    56:5;61:17
**4:30 (1)**
    65:13
**4th (2)**
    64:21;65:4

---

**5**

**5 (3)**
    19:4;28:20;42:8
**5.1 (2)**
    31:21;32:2
**5.2 (3)**
    53:22;54:2;59:3
**5.3 (2)**
    61:17,19

---

**6**

**6 (1)**
    30:15
**6.1 (1)**
    32:25
**6.4 (1)**
    32:9
**600,000 (2)**
    12:9;18:25

---

**7**

**7 (2)**
    15:23,25
**7- (1)**
    26:22
**70 (5)**
    46:14,24,25;47:8,9
**71 (1)**
    48:22
**72 (2)**
    49:15,17
**73 (2)**
    50:4,5
**75,000 (1)**
    42:21
**77 (1)**
    54:7
**7th (1)**
    15:10

---

**8**

**8 (1)**
    17:1
**8.2 (1)**
    34:5

---

**9**

**9 (7)**
    4:18;5:23,25;6:4;
    31:21;55:6,11
**9:06 (1)**
    4:1
**9:30 (1)**
    5:23