UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
*In re:*                                )
                                        )
LYMAN-CUTLER, LLC,                      )          Chapter 7
            Debtor                      )          Case No. 15-13881 FJB
_____)

_____
                                        )
LYMAN-CUTLER, LLC, ALEX FILIPPOV,       )
and NICKOLAY LIPETSKER,                 )
                                        )
            Plaintiffs,                 )
                                        )          Adv. Case No. 1:16-ap-01120
      v.                                )
                                        )
VADIM KAGAN, TATIANA KAGAN,             )
KAGAN DEVELOPMENT KDC, CORP. and        )
PROEXCAVATION CORP.                     )
                                        )
            Defendants.                 )
_____)

**PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON
PARTIAL FINDINGS AS TO COUNTS IV, V, VI, VII, VIII, IX AND X OF
PLAINTIFFS' AFFIRMATIVE CLAIMS AND PLAINTIFFS' PROOFS OF CLAIM**

The evidence at trial proves that Defendants Vadim Kagan ("Mr. Kagan"), Tatiana Kagan

("Tatiana"), Kagan Development KDC, Corp. ("KDC") and ProExcavation ("ProEx") have done

exactly what the Plaintiffs have always said they did – conspired to perpetrate a fraud on the

Plaintiffs.  Indeed, the evidence shows that KDC's Proof of Claim is an attempted fraud on the

Court.  In or about October 2012, Mr. Kagan induced Alex Filippov ("Filippov") and Nickolay

Lipetsker ("Lipetsker") to invest in his project by committing to deliver the construction of two

homes on a lot at 77 Lyman Road, Brookline, Massachusetts for a deliberately low price - $1.3

million plus $200,000 in carrying costs each, which sum the parties later agreed to increase to

$1.4 million each – and to pay the carrying costs out of his own pocket if he did not deliver the sales of the homes as promised.  When construction was over, Mr. Kagan decided how much money he really wanted to put in his own pocket and created out of whole cloth "proposals" from ProEx, a knowingly false assertion about the payment of the carrying costs, and a purported contract with KDC through which he added over $1 million more to the purported construction costs.  He was aided in this fraudulent scheme by not only his companies, KDC and ProEx, and his wife, Tatiana, but also by career criminal and convicted forger, Joseph Cohen.  The evidence at trial shows that Mr. Kagan used this same method of operation to perpetrate similar fraud on at least four other parties in unrelated construction projects.  The Court should deny the Defendants' Motion.[1]

## **FACTS**[2]

In light of the tremendous amount of evidence to marshal and the Court's familiarity with prior briefing and the evidence at trial, Plaintiffs will discuss the facts in connection with each of the Defendants' challenges in turn.

---

[1]     Plaintiffs previously withdrew Count X (breach of contract v. KDC for shoddy construction) and assented to its dismissal.

[2]     As a procedural matter, this Opposition focuses on the state of the evidence at the close of the Plaintiffs' case in chief (taking Boris Maiden out of order) without specifically analyzing the evidence presented during the Defendants' case, which Plaintiffs will do in detail at the close of the case.  Plaintiffs note briefly, however, that the Defendants' evidence hurt them rather than helped them.  Mr. Kagan was not remotely credible about any material issue.  Daniel Gersh was not credible about key issues but also made key admissions.  KDC's accountant, Jason Gordon, admitted that he relied on Mr. Kagan and Mr. Gersh for the numbers in the tax returns and that even if he had performed an audit, which he did not, he would not necessarily have detected fraud by management.  Mr. Kagan failed to present testimony from a single satisfied investor.  Finally, the subcontractors' testimony actually proved rather than refuted the Plaintiffs' contention that the KDC Proof of Claim contains false billing.

# ARGUMENT

## I.     Standard of Review

A motion seeking partial findings under Fed. R. Civ. P. 52(c) must demonstrate that the plaintiff's evidence has failed to make out a prima facie case or that, if a prima facie case has been established, that the preponderance of evidence weighs against the plaintiff's claim.  Bellas Pavers, LLC v. Stewart (In re Stewart), 2012 Bankr. LEXIS 4943 (B.A.P. 1st Cir. Oct. 8, 2012). It is a procedure designed to avoid wasting time, such that a Court "may call a halt to the proceedings and enter judgment accordingly" following one party's conclusion of its evidentiary presentation.  Feliciano v. Rullan, 378 F.3d 42, 59 (1st Cir. 2004).  The Court, in the exercise of its discretion, may decline to entertain the motion until the close of all the evidence.  See Fed. R. Civ. P. 52(c); see also McDermott v. Marcus, Errico, Emmer & Brooks, P.C., 911 F. Supp. 2d 1, 17-18 (D. Mass. 2012) (collecting cases where courts declined to entertain motion during trial).

## II.     The Kagan Defendants' Challenge to the Fraud Claims is Meritless

The evidence of the Kagan Defendants' fraud is overwhelming.  Plaintiffs have proved exactly what they said they would.  Kagan induced Filippov and Lipetsker to invest in his Project by assuring them that:  (1) he would build the houses for $1.3 million each (later increased by agreement to $1.4 million); (2) they would borrow the carrying costs from the bank; and (3) he would underwrite the risk that the construction and sale process would take longer than expected by agreeing to pay the carrying costs out of his own pocket if the houses were not built and sold within 23 months from the date of acquiring the lot (i.e.,  by November 30, 2014).  Filippov, May 6 Tr. at 32-33, 38 ("this is the maximum budget") & Trial Ex. 9; Lipetsker, May 9 Tr. at 18; Zhukovskiy, May 8 at 44 (Kagan confirmed before the meeting that the numbers in the presentation were correct), 54-55 (Kagan said "I know exactly how much it is going to cost" at

the meeting), 60; Maiden, June 18 at 183-84, 187-89 (borrowed carrying costs and specifically went over provisions with Kagan.  See also Filippov, May 6 Tr. at 79 (increase to $1.4 million); Trial Exs. 31, 32 (reviewing original plan of $1.3 million and proposed increase to $1.4 million and financial effects thereof).

The Parties negotiated an Operating Agreement over approximately 3 weeks between October 25, 2012 and November 14, 2012.  Filippov, May 6 Tr. 43-51; Maiden, June 18 Tr. at 186-91; Trial Ex. 9; Trial Ex. 15.  Mr. Kagan came by Attorney Maiden's office daily, and Attorney Maiden went over each and every material term of the agreement with him, and Mr. Kagan agreed to all of the terms.  Maiden, June 18 Tr. at 187.  In particular, the Agreement provided that Mr. Kagan's compensation for building the two houses would be his 50% share of the net profits.  Filippov, May 6 Tr. at 57; Trial Ex. 15, § 5.2.  The LLC would borrow the carrying costs from Rockland Trust and in particular, Attorney Maiden went over with Mr. Kagan the term that provided that he would be responsible for paying the carrying costs after 23 months.  Maiden June 18 Tr. at 189-91; Trial Ex. 15, § 4.1.  Attorney Maiden, who was the closing attorney for all the loans, testified repeatedly that Rockland Trust knew that Lyman Cutler was borrowing the carrying costs.  Maiden, June 18 Tr. at 188-89.[3]

Then abruptly on May 7, 2015, Mr. Kagan sent a lawyer letter to Filippov and Lipetsker demanding $1,059,025.56 in alleged cost overruns, which sum included $758,025.56 in unpaid alleged construction costs, $50,000 in additional costs "expected" and $251,000 in carrying

---

[3]     In any event, Filippov had no way or reason to know differently when the builder who was soliciting his investment and the closing attorney were telling him that is how things were done and how they were doing it here.

costs.[4]  Trial Ex. 50.  This letter arrived nearly 9 months after construction was completed and 88

Cutler was listed in August 2014.  Filippov May 6 Tr. at 101; Trial Ex. 45.  When Filippov and

Lipetsker rejected Kagan's demands and filed suit, he doubled them to $2,095, 985.23 and filed a

Mechanic's Lien against the Project properties.  Trial Ex. 66.  The evidence proves that Mr.

Kagan made up the alleged cost overruns whole cloth.

    **A.**   **The Evidence Proves that Mr. Kagan Fabricated the Charges by ProEx and KDC, Knowingly Misrepresented the Agreement about the Carrying Costs and Fabricated Documentation to Support Parts of the Vendor and Subcontractor Components of the KDC Proof of Claim.**

Each component of the KDC Proof of Claim is riddled with fraud.  Proof of fraud does

not depend on an expert telling the court what to find.  It depends on the Court's assessment of

the weight of the evidence, which is almost always circumstantial.  Rarely do fraud perpetrators

simply throw up their hands and come clean.  United States v. Goodchild, 25 F.3d 55, 60 (1st Cir.

1994) ("Fraud is usually proven by circumstantial evidence.  Direct proof of a knowing intent to

defraud is rare. . . ."); see also ABCD Holdings, LLC v. Hannon (In re Hannon), 512 B.R. 1, 16-

17 (Bankr. D. Mass. 2014) (court must exercise caution when ruling on evidence in fraud case);

Beal Bank, SSB v. Pittorino, 177 F.3d 65, 69 (1st Cir. 1999) ("confluence of several badges of

fraud may be conclusive evidence of fraudulent intent"); Xerox Fin. Servs. Life Ins. Co. v.

Sterman (In re Sterman), 244 B.R. 499, 504 (D. Mass. 1999) (family relationship may be a badge

of fraud).  As of the close of the Plaintiffs' case in chief, at least the following evidence proves

the Kagan Defendants' fraud.

---

[4]     The evidence further showed that Kagan falsely asserted in the May 7, 2015 letter that Filippov had refused to reduce the selling price of the Properties, which is another Kagan fabrication.  Filipov May 6 Tr. at 108-09.

### 1. **The ProEx Proposals are Fraudulent.**

The May 7, 2015 Demand Letter (Trial Ex. 50) includes $325,000 in the alleged unpaid payables to ProEx as part of the $758,025.56 in allegedly unpaid vendor claims.[5]  The evidence, however, of actual payments into and out of ProEx shows that ProEx booked only $204,000 in expenses on its general ledgers on the Lyman Cutler Project, Goldman, May 10 Tr. at 25. Examining the actual checks produced in discovery, even giving full credit to ProEx for every check produced that so much as mentions Lyman, Cutler, 55 or 88, even where other properties are also noted on the check, ProEx spent only $225,958.05 on the Lyman-Cutler Project.  Trial Ex. 5.  In contrast, Lyman-Cutler paid ProEx $335,000.  Trial Ex. 6.  That means that rather than being owed $325,000, ProEx had already been overpaid by over $109,000.

One must bear in mind that the deal among the Parties was for Kagan to handle the construction for a 50% share of the net profits, and deliver the construction for $1.4 million per home, and that he was the only employee of ProEx.  Trial Ex. 145, Response No. 10.  He was not entitled to pay himself fees or profits on top of his net profit share (unless, one supposes, he could do so and still deliver the homes for $1.4 million each).  Kagan was not entitled to arbitrarily allocate to himself hundreds of thousands of dollars by issuing a "lump sum" invoice from ProEx and he knows that perfectly well.

Kagan's former bookkeeper, Kristina Brusenkova, who kept the books for KDC, ProEx and all of Mr. Kagan's Projects, including Lyman-Cutler, told the Court exactly what happened. In 2013, Mr. Kagan adopted a habit or routine practice of double billing his investor projects. Brusenkova, May 14 Tr. at 42.  Mr. Kagan decided that he was a "powerful man" and that "I can

---

[5]    The Defendants would later arbitrarily increase the alleged ProEx receivable to $439,136.69 and the total of the ProEx proposals was over $900,000 but that evidence came in during the Defendants' case.  <u>See</u> Trial Ex. 88 (Lyman Cutler AP aging as of 9/15/16).

do whatever I want to do" and the investors "cannot do anything against me." Id. at 43. He said

that if any investor refused to pay him what he demanded then he would "put lien and they will

not get their contribution back for another several years." Id. at 43-44. Mr. Kagan would add

additional sums to various bills "when the work was done." May 14 Tr. at 69. That is exactly

what the evidence shows Kagan did to Filippov and Lipetsker in the Lyman-Cutler Project.

When the Project was over, Mr. Kagan decided how much money to put in his own pocket and

created supporting documentation to bolster his demands.[6]

    Ms. Brusenkova's account is supported not only by the documentation itself, which is

riddled with indicia of fraud, but also by the testimony of the four other project investors, who

were all subjected to large cost overruns at the 11th hour, involving previously undisclosed

charges by ProEx.

    Elena Lande testified that Kagan hit her with approximately $300,000 in alleged overruns

after the house was under agreement and just before the closing. Lande, May 8 Tr. at 144; Trial

Ex. 169. The charges included $440,000 by ProEx. Trial Ex. 247. A number of the other large

alleged payables were due to the same subs as in this case – BST Plumbing, Dream Flooring,

Sergei Nikolaev and V&D Heating. Lande, May 8 Tr. at 146-47. Lande was also threatened by

Mr. Cohen. Lande, May 8 Tr. at 148; Trial Ex. 95.

    Dimitriy Zhukovskiy testified that Kagan hit him with approximately $510,000 in alleged

overruns just before and even after the closing of the Hyde Avenue sale in April 2014, when

construction was completed in August or September 2013. Zhukovskiy, May 8 Tr. 85-86. A

---

[6]    It is not surprising that Ms. Brusenkova could not identify specific fraudulent charges
where she left Kagan's companies in October 2014 and Kagan made up the fraudulent charges in
2015. She did, however, testify that from reviewing the KDC submissions the landscaping
charges looked like double billing to her. Brusenkova, May 14 at 70.

large amount of these alleged overruns were charges by KDC and ProEx.  Id. at 87, 90 ($170,000 was from ProEx).

Kagan also asserted a surge in the allegedly unpaid project payables against Vladisav Abramskiy, going from $141,900 before the property went under agreement to $408,172.77 after it went under agreement.  Abramskiy, May 13 Tr. at 98-100; Trial Exs. 92, 94, 273.  Abramskiy also received the Cohen treatment of having the demand multiply after rejecting the first demand.  Compare Trial Ex. 92 and 94.  The May 2015 demand included a general contractor fee of 15% of which Abramskiy had never heard before and an "accrual fee" of 18% of which he had never heard before.  Abramskiy, May 13 Tr. at 100-101.  The supposed back up provided to Abramskiy consisted of a mish mash including numerous one line KDC "invoices" referring to several of the same subs involved in Lyman Cutler.  Trial Ex. 271.

Mark Kaiserman had been "very close friends" with Kagan for years before Kagan betrayed him; they no longer speak.  Kaiserman, May 13 Tr. at 120-21, 128.  Construction was complete in the summer of 2013.  Id. at 126.  A few days prior to the closing of the sale of the property, Kagan sent him an invoice for $111,000 for work done a year earlier.  Id. at 126-27.  The invoice was primarily for work done by Kagan's excavation company.  Id. at 127.

Critically, neither Filippov, Lipetsker nor Brusenkova ever saw the alleged ProEx "proposals" before the litigation among the parties.  Brusenkova, May 14 Tr. at 45; Filippov, May 6 Tr. at 90; Lipetsker, May 9 Tr. at 25.[7]  Kagan never discussed any charges by ProEx with Filippov or Lipetsker.  Filippov, May 6 Tr. at 90; Lipetsker, May 9, Tr. at 26.  Indeed, Ms. Brusenkova testified that Kagan did not even have the phone number on the Proposals in 2013,

---

[7]     Indeed, neither did Accountant Jason Gordon or KDC CFO Daniel Gersh, but again, that evidence came in during the Defendants' case.

when they purport to be dated.  Brusenkova, May 14, Tr. at 45-46. [8]   There is ample evidence

that Kagan fabricated the ProEx charges and supporting proposals in 2015 in order to line his

own pockets.

### 2.  The KDC Contract and Mechanic's Lien are Fraudulent.

The purported KDC Contract and consequent Mechanic's Lien are together the single

most glaring act of fraud, and they are the work of career criminal Joseph Cohen.  Cohen, May 9

Tr. at 94, 107. [9]  Neither Filippov, Lipetsker, nor Brusenkova ever laid eyes upon the supposed

contract between KDC and Lyman Cutler, which Kagan signed for both parties ("KDC

Contract"), before it was produced in the litigation among the Parties.  Filippov, May 6 Tr. at 87;

Lipetsker, May 9 Tr. at 23-24; Brusenkova, May 14 Tr. at 44.  Ms. Brusenkova never made any

entry on the KDC books for general contractor fee for KDC.  Id.  There is no line item for any

general contractor fee in the budget Kagan presented to Rockland Trust and no mention of any

such thing anywhere in any of the other contemporaneous documents.  Trial Ex. 27.  Filippov

specifically requested that Section 5.2 be added to the Operating Agreement to make sure

---

[8]     Other than the ProEx Proposals, there is not a single other document in the record from 2013 that bears this phone number, save one – Ex. 215, the email that Plaintiffs believe was forged by Mr. Cohen as Plaintiffs will explain in greater detail at closing (Exhibit 215 was not in evidence during Plaintiffs' case in chief).

[9]     The evidence showed that Cohen was an officer and director of KDC and its "Strategic Business Manager," who helped it manage litigation matters.  Cohen, May 9 Tr. at 86-87.  As a general proposition, Plaintiffs submit that Mr. Cohen was singularly not credible about any issue unless confronted with a document or deposition testimony that forced him to admit the truth. See, e.g. Cohen May 9 Tr. at 101-03 & Trial Ex. 63 (denying writing June 26 email from Mr. Kagan and claiming never to have written emails for him and then being forced to admit he wrote another email for Kagan, but trying to distinguish writing the words in the email from sending it for Kagan).

nothing like this ever happened.  Trial Ex. 14 (Filippov email); Trial Ex. 15, § 5.2 (Kagan responsible for building homes for share of net profits).

Joseph Cohen drafted the KDC Contract. Cohen, May 9 Tr. at 107.  His bad faith "solution" to the provision in the Lyman-Cutler Operating Agreement obligating Kagan to build the homes was not to charge for Kagan's personal time.  Id. at 109-10.  Cohen disposed of the computer on which he drafted the KDC Contract and his legal research.  Id. at 108-09, 113.  The print out of the "properties" page from the electronic copy of the KDC Contract produced by the Defendants in discovery shows that it was printed out on June 17, 2015, just five days before the Defendants recorded the Mechanic's Lien.  Trial Ex. 65.  This was 13 days after Cohen wrote to Filippov that a "detailed invoice" was being prepared.  Trial Ex. 63.[10]  Where:  (1) there is precisely no evidence of any mention of the KDC Contract or any of the fees it asserts before June 2015, including as recently as the May 7, 2015 Demand Letter; (2) the evidence shows it was printed June 17, 2015; and (3) the author is a known criminal, it is fair to conclude that the KDC Contract was forged whole cloth by Cohen and Kagan in June 2015 in order to extort a settlement from Filippov and Lipetsker.[11]  See Trial Exs. 317-321.

---

[10]   Mr. Cohen also drafted the "Invoice" that allegedly supports the Mechanic's Lien. Cohen, May 9 Tr. at; 105-06; Cohen May13 Tr. at 15; Trial Ex. 67.  The supposed Invoice bears the date June 1, 2015, but was first presented to Filippov and Lipetsker on June 26, 2015.  Trial Ex. 63.  Cohen lied about this too, claiming to have sent it earlier (because without an unpaid invoice there can be no mechanic's lien).  Cohen, May 9 Tr. at 106 (claiming to have sent it earlier even though there is no document to support this claim).  On June 4, 2015, Cohen ghost wrote an email for Kagan titled "forward proposed response to be sent via Vadim's non-Kagan Development account."  Id. at 102, Trial Ex. 63.  The June 4, 2015 email asserted "Kagan Development Corp. is preparing a detailed invoice for submission."  Cohen, May 9 Tr. at 103; Trial Ex. 63.  The only documentary evidence of providing any invoice to Filippov and Lipetsker is the email and letter Cohen also wrote, dated June 25, 2015, three days after the Defendants recorded the Mechanic's Lien.  Cohen, May 9 Tr. at 104-05; Trial Ex. 67.

[11]   This is another instance where the evidence got even worse for the Defendants during their case in chief as both Gordon and Gersh denied ever having seen the KDC Contract or made any record of it in any of the books and records.

Mr. Cohen also drafted the Mechanic's Lien, Trial Ex. 66. Id. at 94. Although by the time Mr. Cohen drafted the Mechanic's Lien, litigation had commenced and KDC had counsel, legal counsel played no role in preparing it. Id. at 94-95; Trial Ex. 50 (May 7, 2015 Sheehan Phinney letter); Trial Ex. 64 (Middlesex Superior Court Complaint). At the time he prepared the Mechanic's Lien, Mr. Cohen talked to Mr. Kagan about it, and specifically discussed with him Paragraph 5.2 of the Lyman-Cutler Operating Agreement. Id. at 96-97. Section 5.2 is the provision that obligates Kagan to build the homes in return for a 50% share of the net profits (and specifically limits his compensation to that amount). Trial Ex. 15, § 5.2. See also Trial Ex. 14 at 3 (Filippov asking for specific provision stating Kagan must build the homes to earn his profit share). This is a telling admission, the import of which Cohen plainly did not understand. He drafted the Mechanic's Lien in June 2015, shortly before recording it June 22, 2015. If he had really drafted the KDC Contract back in 2013, and at that time drafted around Section 5.2 by not charging for Kagan's time, then he would have no reason to discuss Section 5.2 with Kagan in June 2015. The fact Cohen and Kagan discussed Section 5.2 suggests it was very much a provision they had not yet figured out how to avoid. Again, the evidence supports the conclusion that Kagan and Cohen fabricated the KDC Contract in June 2015 in an effort to support both their fraudulent Mechanic's Lien and, later, KDC's fraudulent Proof of Claim.

Mr. Cohen also testified that he did legal research in connection with drafting the Mechanic's Lien and was aware that work had to be done at the property within 90 days of recording the lien. Id. at 98. Workers turned up at the properties without any request or authorization by Filippov on June 22, 2015, the day the Mechanic's Lien was recorded. Filippov, May 6 Tr. at 121. Cohen "did not recall" if he and Kagan decided to send the workers over so they could file the Mechanic's Lien. Cohen, May 9 at 99. These facts further support

the conclusion that the KDC Contract, the Mechanic's Lien and the charges asserted through

them are bad faith, fraudulent fabrications.

### 3.  The Carrying Costs Component of the KDC Claims is Fraudulent.

Kagan's circumlocutions regarding the carrying costs are also courtesy of Joseph Cohen,

who testified that he had reviewed the Lyman-Cutler Operating Agreement some 50-100 times

and that he had advised Mr. Kagan concerning his obligation to pay carrying costs.  Cohen May

9 Tr. at 88-89 ("More now").[12]  The evidence emphatically established that:  (1) the Parties

agreed to borrow the carrying costs and did so based upon a budget prepared by Kagan and

submitted to Rockland Trust to get the construction loans; (2) Kagan agreed to pay the carrying

costs out of his own pocket if the homes were not sold by November 30, 2014; and (3) Kagan

knew this perfectly well.  The testimony from third-party witness, Boris Maiden, established

these facts beyond purview.  Maiden is an attorney and long-time friend of Kagan's who had

done 10-15 or more prior deals with Kagan, in every one of which the parties borrowed the

carrying costs See Maiden, June 18 Tr. at 174-76 (friends and attorney), 183-84 (borrowed extra

$100,000 for carrying costs when they took out the loan to buy the lot), 187-88 (went over all

terms including carrying costs with Kagan), 188-89 (borrowed carrying costs on every project),

189-90 (Kagan bore carrying costs after 23 months because he was responsible to deliver the

project on time).  See also Filippov May 6 Tr. at 51-53, 60-61, 79, 85; Zhukovskiy, May 8 Tr. at

55-56 (carrying costs loaded in budget).

Accordingly, Kagan's assertion that he was entitled to recover carrying costs is just plain

false.  Trial Ex. 50.  Moreover, when the payments in and out of KDC and ProEx are tallied up,

---

[12]     Cohen is also the architect of the contention that Filippov is not the managing member, a preposterous contention that the Defendants appear to have abandoned at trial.  See Cohen May 9 Tr. at 89-92.

excluding the payments for carrying costs after November 30, 2014, they were together paid $1,707,442.83 and had laid out only $1,690,977.28. Trial Exs. 1-6. Therefore, if the Court looks at the actual cash, KDC and ProEx were paid in full, just as the actual deal among the Parties provided.[13]

### 4.   **The KDC Proof of Claim Documentation is Riddled with Fraud.**

In addition to the evidence of fraudulent ProEx Proposals, the fraudulent KDC Contract and Mechanic's Lien, and the fraudulent assertions regarding the carrying costs, Plaintiffs presented expert testimony from Certified Fraud Examiner Michael Goldman, who identified numerous specific inconsistencies in the documentation submitted by KDC, including:

- The absence of support for the KDC Proof of Claim in the KDC or ProEx general ledgers, Goldman, May 10 Tr. at 25;

- Only $204,000 of expenses booked by ProEx on the Project in its general ledgers, Id.;

- BST Plumbing entries changed from $11,360 to $19,670 27 minutes apart on April 29, 2015, Id. at 37;

- The suspicious pattern of every investor project paying double what Kagan paid for electrical work on his solo projects, Id. at 51-54;

- Both KDC and V&D Heating produced in discovery exactly the same photocopies of the proffered invoices, right down to the paper clip and staple marks, Id. at 58;

- KDC's unpaid debt of $260,000 to V&D Heating, which has been outstanding for several years, Id. at 59;

---

[13]    This is yet another issue with regard to which the evidence in the Defendants' case hurt them rather than helped them. Kagan's account of his purported lack of understanding of the carrying costs was nothing short of ridiculous. His total lack of credibility on any material issue is in fact devastating evidence that he has committed fraud.

- The change from $8,982 to $14,130 on the Construction Specialties claim for both Properties, which did not tie out to the American Express statements, Id. at 59;[14]

- **The electronic Quickbooks files produced by the Defendants in discovery is not the same file that was used to generate the printouts included in the KDC Proof of Claim,** Id. at 61-62, 101;

- The electronic Quickbooks file for Construction Specialties adds up to only $27,280 for the two Properties combined but the Proof of Claim Printouts for Construction Specialties add up to $36,530, Id. at 63-64;

- The Huntington TV invoices contain discrepancies that make some of them appear fabricated, Id. at 66;

- The Quickbooks files produced electronically compared to the ones used in the Proof of Claim contain a KDC invoice 316 which is listed as $26,936 in the electronic files but as $35,060 in the Proof of Claim, and the lower figure is the one supported by the Amex Statements, Id. at 66-68;[15]

- The PaveTech invoices and related Quickbook files contain highly unusual discrepancies, Id.at 68-70;

- The DiGiacomo invoices include a misspelling of the man's own name and appear fabricated, Id. at 71.

- The suspicious pattern of the dramatically higher per square foot construction costs on the investor projects compared to the Kagan solo projects, Id. at 84-85;

---

[14]    On cross examination, Defendants attempted to tie this discrepancy out to a charge by another vendor, but it is not at all clear that this is a valid explanation and is not double counted elsewhere.  See Goldman, May 10, at 138.

[15]    Defendants also challenged this discrepancy during cross examination but again it is not at all clear that there is no double counting going on.  See Goldman, May 10 at 140.

■ J.W. Campbell was paid $171,919, but the cancelled checks KDC produced do not
support this substantial component of the Proof of Claim, <u>Id.</u> at 171.

Defendants make much of Mr. Goldman's refusal to conclude that they engaged in fraud,
but as he explained, a Certified Fraud Examiner is precluded by his code of conduct from issuing
such a conclusion. <u>Id.</u> at 79. That conclusion is for the Court as the trier of fact. <u>Id.</u> Mr.
Goldman did, however, powerfully testify that the pervasiveness of the discrepancies in the
documentation submitted by KDC made the documentation unreliable, and that it could <u>only</u> be
the product of either gross incompetence or knowing fraud. <u>Id.</u> at 92, 177. Mr. Goldman also
testified that the prevalence of problems in this case is "extreme" and that he had only seen one
other case this bad in 22 years of work as a Certified Fraud Examiner (and in that case there was
fraud). <u>Id.</u> at 126-27. No one discrepancy in the financials is proof of fraud; any isolated
incident may be innocuous. But the pervasive pattern suggests fraud. <u>Id.</u> at 155, 169-70.
Particularly in this case, the vast weight of the other evidence points squarely to knowing fraud.
<u>Cf</u>. <u>Robin Singh Educ. Servs. v. McCarthy (In re McCarthy)</u>, 488 B.R. 814, 826 (BAP 1st Cir.
2013) ("Even though courts will not construe an ignorant or inadvertent omission as evidence of
fraudulent intent, reckless disregard may nonetheless be found based on the 'cumulative effect of
a series of innocent mistakes.'"). Plaintiffs submit that the production of different versions of the
Quickbooks alone is damning evidence of fraud.

**5.  <u>The Concerted Legal Process Assault on Brusenkova is Evidence of Fraud.</u>**

Mr. Cohen also led a legal campaign against Brusenkova of dubious criminal charges –
almost all of which failed to survive a magistrate's probable cause hearing – and a pending civil
action for "embezzlement." He wrote to the Middlesex District Attorney's Office on November
20, 2015 and claimed that she had paid her husband to marry her and proposed that she be

15

indicted.  Cohen May 13 Tr. at 54-59, Trial Ex. 322.  On November 30, 2015, Cohen went to the

Newton Police to report an alleged crime by Brusenkova of embezzlement.  Cohen May 13 Tr. at

60-62, Trial Ex. 323.  The charge did not survive the magistrate's hearing.  Cohen May 13 Tr. at

63.  He again went to the police department on February 1, 2016 and swore out a complaint

against her for "witness intimidation" of Viktor Sergeev (who happens to be the principal of

V&D Heating, one of the unpaid subs in this case).  Cohen May 13 Tr. at 63-65.  Sergeev did not

attend; rather, Cohen brought along an affidavit that he had drafted.  Id.  Cohen does not recall

whether this charge ever even went to a clerk magistrate's hearing.  Id.  Next, KDC, Kagan and

Tatiana sued Ms. Brusenkova in April 2016.  Id. at 65.  Although Cohen was the "Strategic

Business Manager" who assisted Kagan with litigation matters in 2016, he denies that this suit

was his idea.  Ms. Brusenkova left KDC in October 2014.  Brusenkova, May 14 Tr. at 80.  The

evidence of serial, dismissed criminal charges and a civil lawsuit against her after the Defendants

learned that she would testify against them is witness intimidation and evidence of fraud.

 **B.  <u>The Plaintiffs Relied on the Defendants' Fraud.</u>**

  There are at least two junctures where fraud occurred in this case.  First, Kagan

personally committed fraud when he induced Filippov and Lipetsker to invest in the project by

assuring them that he would build each home for a construction budget of $1.3 million.  Ms.

Brusenkova testified that Kagan first conceived of the intentional overcharge plan in 2013 after

realizing in connection with the Florence Street project that his investor, Ilya Fuchs, was

powerless to contest his made up charges by ProEx.  Brusenkova, May 14 Tr. at 42-43.  This

evidence, which was wholly credible, supports the conclusion that Kagan was not consciously

planning to cheat Filippov and Lipetsker in October 2012.

BUT – fraud encompasses reckless disregard for the truth.  Robin Singh, 488 B.R. at 826; Lassman v. Spalt (In re Spalt), 593 B.R. 69, 88 (D. Mass. Bankr. 2018); Geresy v. Dommert, 2004 Mich. App. LEXIS 1397, at *24 (June 3, 2004) (affirming verdict that contractor who under estimated construction costs without supporting bids was liable for fraud based on reckless disregard for the truth).  Kagan committed to the construction budget in October 2012, and to the increased $1.4 million budget in April 2013 before he had the house plans, without getting any bids and without any basis whatsoever other than his own estimate.  Filippov and Lipetsker – a telecom executive and a dentist – had no reason or basis to doubt Kagan's confident assertions when the project began.  They relied on him.  Filippov May 6 Tr. at 38-39; Lipetsker May 9 Tr. at 18.

Second, Kagan, KDC and ProEx worked together to assert the fraudulent claims embodied in the May 7, 2015 Demand Letter, the June 1, 2015 Invoice (presented June 25, 2015), the June 22, 2015 Mechanic's Lien and the KDC Proof of Claim submitted to this Court – all engineered by Joseph Cohen.  Although Plaintiffs did not "rely" on these fraudulent claims in the traditional sense, they had a form of "reliance" inflicted upon them because they have been forced to battle and refute them for over four years, including in connection with the Mechanic's Lien and the Defendants' Proofs of Claim in this Court.

As explained by Judge Posner of the 7th Circuit, actual fraud is

> **any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another**. . . No learned inquiry into the history of fraud is necessary to establish that it is not limited to misrepresentations and misleading omissions.  Fraud is a generic term, which **embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth**.  No definite and invariable rule can be laid down as a general proposition defining fraud, and it includes all surprise, trick, cunning, dissembling, and any unfair way by which another is cheated.

McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000) (emphasis added); see In re: Lawson, 791 F.3d 214, 220 (1st Cir. 2015) (actual fraud "is not limited to fraud effected by misrepresentation"); Bailey v. Community Bank of Homewood-Flossmoor, 145 B.R. 919, 927 (Bankr. N.D. Ill. 1992) (debtor denied discharge for fabricating fraudulent mechanics' lien).

By making claims for charges to which they know they are not entitled, and encumbering the properties with a false Mechanic's Lien, the Defendants unilaterally transferred to themselves an interest in the properties commensurate with their false claim, which the Plaintiffs have battled ever since at great cost. In re Maher, 144 F. 503 (D. Mass. 1906) ("In a fraudulent transfer the fraud is actual, the bankrupt has secured an advantage for himself out of what in law should belong to his creditors, and not to him"); Cordeck Sales, Inc. v. Construction Sys., Inc., 382 Ill. App. 3d 334, 399 (Ill. App. Ct. 2008) ("[w]hen there is evidence that a lien claimant knowingly recorded a claim that contained a substantial overcharge, the claim will be defeated on the basis of constructive fraud the effect of his actions is to give an appearance of a greater encumbrance on the property than that to which he is entitled"). The Defendants cannot escape liability for this wrongdoing by asserting that the Plaintiffs did not rely on their falsehoods.

**C.  The Plaintiffs are Entitled to Substantial Damages and Other Relief.**

The well-settled measure of damages for fraud (as well as breach of contract and breach of fiduciary duty) is the benefit of the Plaintiffs' bargain. Spagnuolo v. Spagnuolo, 2014 Bankr. LEXIS 4752, at *27-29 (D. Mass. Bankr. 2014). The bargain was that Kagan would build the homes by March 2014, sell them by November 2014, pay the carrying costs out of his own pocket if the homes were not sold by November 2014, and would deliver those homes for a total construction cost of $1.4 million per home, taking no fees or profits for himself beyond his 50% share of the net profits. That is obviously not what happened.

### 1.   <u>The Plaintiffs are entitled to lost profits.</u>

There is no dispute that the ultimate profit was not "guaranteed," but it is indisputably subject to reasonable estimation for the purpose of a damages calculation. Absolute certainty is <u>not</u> required to award lost profits damages.  <u>VCA Cenvet, Inc. v. Winchester Veterinary Grp</u>., Inc., 2015 U.S. Dist. LEXIS 192507, at * 31 (D. Mass. Aug. 31, 2015) ("Antech's individualized lost profit analysis provides a basis to establish lost profits with reasonable certainty. Calculating future lost profits necessarily involves estimates and assumptions").  A plaintiff need not, and indeed generally cannot, prove damages with mathematical certainty.  The requirement is simply that the proof remove the calculation from the realm of speculation and achieve "reasonable certainty."  <u>Vale v. Valchuis</u>, 2019 Mass. App. Unpub. LEXIS 306, at *16 (Apr. 24, 2019) (affirming lost profits damages award).

The evidence at trial is more than sufficient to establish Filippov and Lipetsker's reasonably certain lost profits in the absence of the Defendants' wrongdoing.  First, Mr. Kagan's presentation on October 25, 2012, which was part of the inducement to Filippov and Lipetsker to invest, presented over 600 different profit scenarios from which one can reasonably select a measure for benefit of the bargain damages.   Trial Ex. 9.

Furthermore, Plaintiff's expert real estate appraiser, Morgan Fennell, testified to the market value of the properties on their dates of sale -- $5.1 million compared to the selling price of $4.4 million.  Fennell, May 14 Tr. at 101, 104.  Mr. Fennell's conclusion is also supported by the other appraisals in the record, which showed that Rockland Trust appraised the properties for:  (1) $5.3 million each as of April 17, 2013, Trial Ex. 28 at 3; Trial Ex. 29 at 3; and (2) $5.2 million as of May 25, 2015, Trial Ex. 57 at 3; Trial Ex. 58 at 3.  Mr. Fennell also testified that based upon the definition of market value in the Uniform Standards of Professional Appraisal,

the dramatic difference between the selling prices and the market values indicated that there had

to be "something wrong" some sort of "undue stimulus" that led to the substantially diminished

selling prices.  Id. at 88, 113, 118.  The <u>only</u> evidence of what was wrong and the "undue

stimulus" is the extensive evidence of the Defendants' wrongdoing – the Mechanic's Lien, the

threats of dissolution, the refusal to honor Filippov's right to retain a new and more qualified real

estate broker.  The evidence supports not only the measure of damages for the diminished selling

price of the properties and lost profits, but also causation.

**2.  <u>Plaintiffs are entitled to damages for the lost use of money.</u>**

Plaintiffs are also entitled to recover for the lost use of their money.  <u>See</u>, <u>e.g.</u>, <u>Arthur D.</u>

<u>Little, Inc. v. Dooyang Corp</u>., 147 F.3d 47, 56 (1st Cir. 1998) ("the loss of the use of money 'is

precisely the type of damage we have described as appropriately being subject to multiplication .

. . under c. 93A'"); <u>Auto Flat Car Crushers, Inc. v. Hanover Insurance Company</u>, 469 Mass. 813,

827  (2014) (damages for insurer's failure to settle include loss of use of funds); <u>Chestnut Hill</u>

<u>Dev. Corp. v. Otis Elevator Co</u>., 739 F. Supp. 692, 702 (D. Mass. 1990) ("Customarily,

construction contracts, particularly large contracts, require third-party financing. Ordinarily,

delay in completion requires an extension of the term of construction financing. The interest

costs incurred and the interest revenue lost during such an extended term are predictable results

of the delay and are, therefore, compensable direct damages.").  As a result of the Defendants'

fraudulent scheme, Filippov's and Lipetsker's capital has been tied up for years.  They are

entitled to recover for the lost use of their money and the evidence provides the components to

calculate this loss.  Trial Exs. 15, 72, 91.

### 3. **Plaintiffs are entitled to damages for the expenses of mitigation.**

Plaintiffs are also entitled to recover other lost monies resulting from the Defendants' wrongdoing, including costs incurred in connection with the bankruptcy proceedings. Selmark Assocs. v. Erlich, 467 Mass. 525, 545 (2014) ("Expectation damages for breach of contract includes consequential damages, *i.e.*, "those that cannot be reasonably prevented and arise naturally from the breach, or which are reasonably contemplated by the parties"). Costs incurred attempting to mitigate the harm caused by a defendant's wrongdoing, including the costs of a bankruptcy proceeding, are recoverable as consequential damages. Primavera Familienstiftung v. Askin, 130 F. Supp. 2d 450, 534-35 (S.D.N.Y. 2001) (denying summary judgment and holding that plaintiffs could recover damages for liquidation and bankruptcy-related expenses); Lambert, 324 B.R. at 911("the bankruptcy costs Paragon incurred to rehabilitate itself from Weyerhaeuser's breach are recoverable as consequential damages"). Having engaged in egregious fraudulent and extortionate conduct, Defendants should not be heard to criticize the decisions Plaintiffs made under pressure from that wrongdoing to mitigate its impact by relief in this Court. Those costs are in evidence. Trial Ex. 325. The evidence also includes Filippov's additional out of pocket expenses incurred since May 2015 (carefully delineated among the claims). Trial Exs. 72, 91.

### 4. **Plaintiffs are entitled to equitable relief.**

In addition, Plaintiffs are entitled to equitable relief. This Court has broad equitable powers to make things right. M.G.L. ch. 93A, § 11 (equitable relief for violation); Brodie v. Jordan, 447 Mass. 866, 871 (2006) (broad discretion to fashion a remedy for the breach of fiduciary duty); see also Maz Partners LP v. Shear, 265 F. Supp. 3d 109, 116 (D. Mass. 2017) (equitable remedies may be awarded for breach of fiduciary duty without showing of damages or

causation); Amended Complaint, Count VIII (Equitable Subordination).  Any claim by any of

the Defendants should be subordinated to a full recovery by Filippov and Lipetsker, including

their capital contributions.  The Court may also order restitution, disgorgement, impose a

constructive trust on monies taken by the Defendants or otherwise enter equitable orders to

achieve a just result.

### 5.  Plaintiffs are entitled to treble damages and attorneys' fees.

Plaintiffs are entitled to an award of attorneys' fees under M.G.L. ch. 93A, § 11.  In

addition because the Defendants' wrongdoing is willful and knowing, they are entitled to treble

damages.  Id

## III.   The Defendants' Challenge to the Chapter 93A Claims is Meritless.

The fraudulent and extortionate conduct by KDC and ProEx is plainly sufficient to

support a judgment against them under Chapter 93A.  See Datacomm Interface, Inc. v.

Computerworld, Inc., 396 Mass. 760, 779 (1986) ("it is clear that common law actions for fraud

and deceit are within the contemplation of an 'unfair act' under [G.L. c. 93A]"); Kraft Power

Corp. v. Merrill, 464 Mass. 145, 156 n.16 (2013) ("tort actions for fraud and deceit are within the

contemplation of an unfair act").  Indeed, reliance is not an element of a claim for Chapter 93A,

so this aspect of the analysis of the fraud claims does not apply.  New Faith Missionary Baptist

Church v. Pizziferri, 2012 Mass. App. Unpub. LEXIS 207, at *8 (Feb. 23, 2012) ("reasonable

reliance is not a necessary element of a c. 93A claim").

Making up false claims to force a settlement is an unfair trade practice in violation of

Chapter 93A.  Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 474 (1991); Certified

Power Sys. v. Dominion Energy Brayton Point, LLC, 2011 Mass. Super. LEXIS 317, at *167

(Dec. 30, 2011); see also Hannon v. Original Gunite Aquatech Pools, Inc., 385 Mass. 813, 825

(1982) ("low-balling" or bidding less than job requires and then demanding more money violates

Chapter 93A).   The evidence, discussed above, is that KDC and ProEx made up false claims.

As recounted above, the original May 7, 2015 demand includes, at minimum, demands for

payment of large sums to KDC and ProEx that Kagan knew were false and a demand for

payment of carrying costs that he knew were his responsibility.   The evidence is also clear that

they presented dramatically inflated additional claims, and inflicted a false Mechanic's Lien on

the properties, as pure extortion to force Filippov and Lipetsker to settle with them.   Trial Exs.

66, 67.   On June 25, 2015, 3 days after recording the Mechanic's Lien, Mr. Cohen first

presented the "Invoice" purportedly dated June 1, 2015 and demanded immediate payment of $1

million, followed by additional payments upon the earlier of the sale of the properties or

November 30, 2015.   Trial Ex. 67 at 4; Cohen May 9 Tr. at 106 ("workout proposal" was

Cohen's work).   When Cohen met with Filippov and his wife at the properties in May 2015, he

specifically threatened them with a lien. Rudyakova May 14 Tr. at 15 (he threatened them that if

they did not pay what Kagan demanded, "they're going to put the lien on the house and they're

going to take all our money.  We'll never get anything back"); compare Lande, May 8 Tr. at 148

(Cohen knew she was pregnant and had lost a child the year before and told her "you don't want

anything like that happening again").   At the time of this demand, Lyman Cutler had a few

thousand dollars in its bank account as Kagan and Cohen knew perfectly well.   Trial Ex. 74

(bank statements); Trial Ex. 50 (May 7, 2015 demand letter).   This extortionate conduct is a

Chapter 93A violation in which both KDC and ProEx participated.

**IV.    Tatiana's Challenge to the Claims Against Her is Meritless.**

Again, with regard to Tatiana, the evidence proves exactly what the Plaintiffs have

always said it would.   Tatiana is an officer, director and shareholder in ProEx and KDC, who

"leaves all the financial matters" to her husband, and turns over her commissions to KDC.
Tatiana, May 14 Tr. at 119-23.  Immediately before presenting their first extortionate demand on
May 7, 2015, Tatiana and Kagan suddenly started hounding Filippov – for the very first time – to
sign a listing agreement with Tatiana.  Filippov May 6 Tr. at 103-04.  Even though Filippov did
not sign the agreement and did not tell Kagan he could do so, Kagan signed the listing agreement
with Tatiana for 55 Lyman and then sent Filippov an email "confirming" that he had done so.  Id.
at 105-06.  Filippov admittedly did not object at the time, but at that point in time the parties
were not otherwise at odds and Filippov believed he could remove Tatiana at any time under the
terms of the Operating Agreement.  Id. at 106-07; Trial Ex. 15, § 6.1(b)(6).  The timing of this
sudden bum's rush to get Filippov to sign a listing agreement shows that Tatiana knew about the
imminent extortionate demand and was working with her husband to get an advantage over
Filippov before presenting it.

    After Kagan demanded payment of over $1 million just two weeks later, and falsely
claimed that Filippov had refused to lower the selling price, Filippov for good reason wanted to
replace Tatiana as the listing broker.  She had done nothing to sell the properties for some eight
months and Filippov was frankly panicked that his $2 million investment was at serious risk.
Filippov, May 6 Tr. at 102-03, 108.  When he tried to exercise his right to replace her, he was
informed that she had exclusive listing agreements and that Century 21 was enforcing them.
Filippov never saw the listing agreement for 88 Cutler – which Kagan also signed without ever
mentioning it to Filippov – until it was presented in the litigation.  Filippov May 6 Tr. at 101.  It
was for an 18 month term, even though it was signed (allegedly) in August 2014 and Filippov
had a unilateral right to remove Tatiana as of December 31, 2014.

The infliction of these exclusive listing agreements was a bald breach of the Operating

Agreement and Kagan's fiduciary duty, and was another fraudulent, extortionate tactic in

violation of Chapter 93A, **which Kagan could not have accomplished without Tatiana's**

**knowing assistance**.  By her own testimony:

> Q:    Okay.  But you sometimes waive your commission for your husband,
>        right?
> A:    Yes.
> Q:    And you basically just do what he tells you to do if he asks you to waive
>        the commission, then you waive it, right?
> A:    If it's our own property, we don't have any investors, that's the reason for
>        the commission.  It all goes into the same bank account.  I don't have
>        separate accounts.
> Q:    Well, I mean about in terms of when he asks you to waive, you don't
>        know whether or not he does that on projects when he has investors, do
>        you?
> A:    I don't know.
> .Q:    Right.  Because you leave all the financial stuff to him, right?
> A:    Yes.
> Q:    And Century 21 never objects when you waive a commission, right?
> A:    Century 21 has agreement with me that houses that are built by my
>        husband, they do not charge commission. It means if they don't charge
>        commission, I don't get paid.  All the amount goes to proceeds.
> Q:    Okay.  And when you do get a commission, you give it to Mr. Gersh,
>        right?
> A:    That's right.

Tatiana, May 14 Tr. at 122-23; see also id. at 130 ("when I work for selling my husband's

properties, there is no need to have commission because all the amounts can go to proceeds").

Tatiana's testimony is a flat out admission that she and Century 21 could have and would

have honored Filippov's right to remove her as the listing agent.  She could have stepped aside at

any time and Century 21 would not have objected.  Instead, Tatiana and Kagan worked together

to make sure that Century 21 refused.  Tatiana personally participated in the fraudulent,

extortionate scheme and is subject to liability as a result.

**V.**   **Filippov is Entitled to Allowance of his Proof of Claim (No. 9).**

Plaintiffs agree that Filippov's mortgage is subject to entire fairness review, but submit that the evidence supports the conclusion that it was entirely fair.  The Debtor unquestionably needed funds when the mortgage was executed September 30, 2015. Trial Ex. 75.  There is no dispute that Filippov put in $200,000 and indeed much more in support of the Debtor.  The interest rate of 5% matches what Filippov was entitled to on his capital under the Operating Agreement Trial Ex. 15, § 8.2.  Lipetsker approved the mortgage.  Lipetsker, May 9 Tr. at 33-34; Filippov May 6 Tr. at 140.  There was no point in discussing it with Mr. Kagan in September 2015.  The parties were in litigation and Kagan was the prime mover driving the LLC into bankruptcy.  He was presumed to object.  See Filippov May 6 Tr. at 140.  Kagan's objection does not make the mortgage unfair.

**VI.**   **OCM is Entitled to Allowance of its Proof of Claim.**

The evidence at trial proves that OCM represented the Debtor, and to this day advances the Debtor's best interests in tandem with those of Filippov and Lipetsker in opposing KDC's fraudulent proof of claim.  Trial Ex. 64 (Middlesex Superior Court Complaint filed for Lyman Cutler).  Both Filippov and Lipetsker approved OCM's retention and the litigation against the Defendants.  Filippov, May 6 Tr. at 116; Lipetsker May 9 Tr. at 28-30.  It makes no sense to consult Kagan as to whether to retain counsel to pursue claims against him and his companies (and in any event Kagan was unresponsive to Filippov's calls and emails prior to the litigation).  See Filippov, May 6 Tr. at 116.

**CONCLUSION**

The Court should deny Defendants' Motion.


LYMAN-CUTLER, LLC,                           ALEX FILIPPOV and
By its attorney,                             NICKOLAY LIPETSKER,
                                             By their attorneys,


/s/ Peter Tamposi_____           /s/ Sean T. Carnathan_____
Peter N. Tamposi, BBO No. 639497             Sean T. Carnathan, BBO No. 636889
The Tamposi Law Group, P.C.                  scarnathan@ocmlaw.net
159 Main Street                              Joseph P. Calandrelli, BBO No. 666128
Nashua, NH 03060                             jcalandrelli@ocmlaw.net
T: (603) 204-5513                            O'Connor, Carnathan and Mack, LLC
                                             1 Van de Graaff Dr. Suite 104
                                             Burlington, MA 01803
                                             T:  781-359-9000


Dated:  July 17, 2019


Certificate of Service

I hereby certify that a copy of the foregoing document was served by ECF on counsel of record for all of the parties on July 17, 2019.


                                             /s/ Sean T. Carnathan_____
                                             Sean T. Carnathan