UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| In re:<br><br>LYMAN-CUTLER, LLC,<br><br>  Debtor. | )<br>)<br>)<br>)<br>)<br>)<br>) | Chapter 7<br>No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, et al.,<br>  Plaintiffs,<br>  Defendants in Counterclaim,<br><br>v.<br><br>VADIM KAGAN, et al.<br>  Defendants,<br>  Plaintiffs in Counterclaim. | )<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>)<br>) | Adv. Proc. No. 16-01120 |

**DEFENDANTS' REPLY TO PLAINTIFFS' OPPOSITION TO DEFENDANTS' MOTION FOR JUDGMENT ON PARTIAL FINDINGS AS TO COUNTS IV, V, VI, VII, VIII, IX AND X OF PLAINTIFFS' AFFIRMATIVE CLAIMS AND PLAINTIFFS' PROOFS OF CLAIM**

Plaintiffs intentionally conflate KDC's Proof of Claim with Plaintiffs' independent claims seeking affirmative recovery for fraud. The subject of the instant motion is Plaintiffs' affirmative claims only. Clearly recognizing that they have failed to meet their burden of proof on each of the elements necessary for an affirmative recovery under the Adversary Complaint, Plaintiffs' Opposition primarily focuses on their challenge to KDC's Proof of Claim. For example, in the introductory paragraph to the Opposition which sets the stage for the arguments which follow, Plaintiffs state that "the evidence shows that **KDC's Proof of Claim** is an attempted fraud…" (Opposition at 1, emphasis added). This is followed by their opening argument which Plaintiffs caption as Defendants "knowingly misrepresented the Agreement

{S1416540.4}

about the carrying costs and fabricated documentation to support parts of the vendor and subcontractor components of the **KDC Proof of Claim**." *Id.* at 5)(emphasis added). Plaintiffs do the same on pages 12-13 of their Opposition: "**The Carrying Cost Component of the KDC Claims is Fraudulent.**" *Id*. at 12 (emphasis added); "**The KDC Proof of Claim Documentation is Riddled with Fraud.**" *Id*. at 13. While interesting reading, albeit flawed, this Court should not be taken in by Plaintiffs' attempt to obfuscate their failure to establish that they are entitled to affirmative relief. KDC's right to payment under its Proof of Claim is an argument for a later date.

Plaintiffs affirmative claims are predicated on the alleged falsification of KDC's books and its attempt to claim more money than Plaintiffs believe is properly due. As this Court well knows, claims of improper charges and doctored documents permeated these proceedings. Once again, however, Plaintiffs fail to deliver on their promise of proving fraud as they point to no evidence of an improper or duplicate charge and no evidence of compensable damages as Defendants' fictional nefarious scheme failed miserably when Plaintiffs failed to reimburse them for any additional monies. Had Plaintiffs paid more money in reliance on Defendants' alleged fraud, this might be a different case. The evidence is clear, however, that they did not.

Plaintiffs' Opposition merely summarizes the deficient testimony of their expert, Mr. Goldman, who admitted he found no actual evidence of fraud. In repackaging Mr. Goldman's hollow criticisms, Plaintiffs hope this Court will refrain from peering beneath the surface and rubber stamp what are in truth empty allegations. Plaintiffs' fraud claims also defy common sense such that no reasonable inferences from the evidence can resuscitate them. Plaintiffs failed to link the actual evidence in the case to any of their many damage theories. Therefore, judgment for Defendant is warranted. Finally, Plaintiffs failed to point to evidence in the record

establishing that Tatiana Kagan was a knowing, active participant in any of the alleged wrongdoing and the evidence they presented demonstrates that the process Plaintiffs followed with respect to Mr. Filippov's mortgage and the engagement of OCM as counsel was so fundamentally unfair that Plaintiffs cannot possibly carry their burden.

## I.
## Plaintiffs Still Fail to Point Any Evidence of Fraud.

*A. Plaintiffs Still Fail to Identify a Single Fraudulent Charge.*

At trial, neither Plaintiff could point to any specific fraudulent charges. Instead, they left that determination to their expert, Michael Goldman, who purported to have conducted a forensic accounting of the Lyman-Cutler project, which included a review of five other projects. Mr. Goldman's testimony makes it incontestable that Plaintiffs failed to meet their burden of proving fraud. On direct examination, where one would assume Mr. Goldman's testimony would be strongest, he made it clear that he could not support the allegations of fraud. All he could say was that he suspected the records were not reliable. That is a far cry from establishing affirmative fraud and relevant, if at all, to KDC's Proof of Claim which is not an issue in this Motion. On direct examination, Goldman testified:

> …My conclusion would be, again, that internal control was weak. There's not a lot of reliability to these numbers when – when its been testified that nobody knows what's in some of them and you can see it happening in the accounting records. I – I'd say that the -- the information generated from that system is not reliable.
>
> Q: So, I guess what I'm looking to elicit is, what's the alternative? If it's not fraud, then what is it?
>
> **A: I – I see similar things that turn out to be just incompetence.**

(Tr. Day 5, 82:11-20) (emphasis added).

On cross-examination, Mr. Goldman reiterated that he had no evidence of fraud. He testified:

> Q: Mr. Goldman, before we go any further, let's just cut to the end. You haven't formed any opinion, have you, as to whether there was fraud on this project; isn't that correct?
>
> A: That's correct.
>
>     \*\*\*
>
> Q: You haven't formed any opinion as to the value of the work that was performed; isn't that correct?
>
> A: Correct.
>
> Q: And, in fact, your opinion, ultimately, was that this may be a product of gross incompetency, or it may be fraud; isn't that correct?
>
> A: Yes.
>
> Q: And you are unable to say which one was more likely than not. You don't know; isn't that correct?
>
> A: No, I – I think they both lead to the same unreliability, but I can't say between the two.

(*Id*. 91:17- 92:11)

> Q: Okay, so in other words, your ultimate conclusion is you don't trust the records, but you don't know whether that's innocent, uninnocent, or – if that's a word – you just don't know.
>
> A: Correct. I have no opinion.

(*Id*. 92:12-17)

Despite 27 pages of Opposition, Plaintiffs still have not pointed the Court to a single fraudulent charge on the project. Pages 13-15 of the Opposition merely restate Mr. Goldman's testimony, which he repeatedly couched as either fraud or incompetence, though he could not say which was more likely. Plaintiffs hope this Court fails to exert the effort required to see how

{S1416540.4}      4

meaningless their pages of bullet points really are, and the lack of any relevance to the affirmative claims that Plaintiffs have lodged. Moreover, even if relevant, the bullet points can be dispatched with little effort.

| **Plaintiffs' Bullet Points** | **Actual Evidence Presented by Plaintiffs** |
|---|---|
| The absence of support for the KDC Proof of Claim in the KDC or ProEx general ledgers. | Plaintiffs provide no specifics whatsoever to this assertion. |
| Only $204,000 of expenses booked by ProEx on the Project in its general ledgers. | Plaintiffs offered no evidence as to what ProEx should have charged/what it should have cost to complete the same scope of work. Mr. Goldman had no understanding that ProEx billed by lump sum and therefore imposed a business rule on ProEx that is not reality. |
| BST Plumbing entries changed from $11,360 to $19,670.27 minutes apart on April 29, 2015. | Plaintiffs never demonstrated what the plumbing charges should have been and therefore never explained why the timing of the change to KDC's internal accounting records is relevant. |
| The suspicious pattern of every investor project paying double what Kagan paid for electrical work on his solo projects. | Plaintiffs failed to present evidence that the other investors' projects were the same such that the electrical charges should have been identical and never explained why the other investors' projects prove fraud in this instance. Goldman admitted he was not a construction expert and had no basis, beyond what he "Googled" to opine as to what electrical service should cost. |
| Both KDC and V&D Heating produced in discovery exactly the same photocopies of the proffered invoices, right down to the paper clip and staple marks. | Plaintiffs never demonstrated why the manner in which documents were produced in discovery show that the amount charged by the heating subcontractor was improper. Plaintiffs never even questioned the amount charged for the work. |
| KDC's unpaid debt of $260,000 to V&D Heating, which has been outstanding for several years. | Plaintiffs never connected this with anything relating to the amount charged on this project. Plaintiffs never offered proof of what the heating charges should have been. |
| The change from $8,982 to $14,130 on the Construction Specialties claim for both properties, which did not tie out to the American Express statements. | Mr. Goldman admitted he failed to account for the fact that American Express reported this vendor's name differently and therefore failed to recognize that the amounts in fact "tied out". |

{S1416540.4}  5

| **Plaintiffs' Bullet Points** | **Actual Evidence Presented by Plaintiffs** |
|---|---|
| The electronic Quickbooks files produced by the Defendants in discovery is [sic] not the same file that was used to generate the printouts included in the KDC Proof of Claim. | This appears to be an attempt to provide cover for Mr. Goldman, who consistently failed to review or rely upon up-to-date information. Plaintiffs never identified why this purported discovery issue has any bearing on the merits of the case, including, but not limited to, the actual amount charged by KDC for the project. |
| The electronic Quickbooks file for Construction Specialties adds up to only $27,280 for the two properties combined by the Proof of Claim Printouts for Construction Specialties add up to $36,530. | Again, Plaintiffs are drawing conclusions on the pre-audited Quickbooks which have not been presented as support for the Proof of Claim. |
| The Huntington TV invoices contain discrepancies that make some of them appear fabricated. | Plaintiffs never specified this allegation and presented no information as to the types of TVs installed so they could not demonstrate the amount charged is improper. |
| The Quickbooks files produced electronically compared to the ones used in the Proof of Claim contain a KDC invoice 316 which is listed as $29,936 in the electronic files but as $35,060 in the Proof of Claim, and the lower figure is the one supported by the Amex statements. | KDC is not relying upon the audited Quickbooks files. The comparison of the audited and unaudited Quickbooks is meaningless. |
| The PaveTech invoices and related Quickbook files contain highly unusual discrepancies. | Plaintiffs do not identify the alleged discrepancies with any specificity and never presented evidence as to what the paving should have cost. |
| The DiGiacomo invoices include a misspelling of the man's own name and appear fabricated. | Plaintiffs offered no evidence as to what the work should have cost. They presented no evidence that the work performed by Mr. DiGiacomo had not been done. |
| The suspicious pattern or dramatically higher per square foot construction costs on the investor projects comparted to the Kagan solo projects. | Plaintiffs failed to show that the investor homes were identical to the non-investor homes such that this comparison would be meaningful. Even with such a comparison, such information would be irrelevant to whether a fraud was perpetrated on this project. |
| J.W. Campbell was paid $171,919, but the cancelled checks KDC produced do not support this substantial component of the Proof of Claim. | Plaintiffs cite to page 171 of the transcript for this assertion. In fact, none of this testimony appears on page 171. Contrary to this bald assertion, the backup is contained in Exhibit 174, Tabs L46 and C44 which lists the check numbers, amounts and provides copies of the |

{S1416540.4} 6

| **Plaintiffs' Bullet Points** | **Actual Evidence Presented by Plaintiffs** |
|---|---|
| | KDC checks. The Lyman-Cutler checks are identified by check number and were retained by Mr. Filippov. |

Plaintiffs' bullet points, based on Mr. Goldman's testimony, are merely smoke and mirrors. Plaintiffs never connected the necessary dots and never demonstrated that the charges were inflated compared to what should have been charged. More importantly, even if any of this evidence was true, which is denied, that would not entitle Plaintiffs to an affirmative recovery. At best, it might reduce the value of KDC's Proof of Claim, but it cannot also result in an additional award of tort damages. Given that Plaintiffs testified that they did not spend a penny more than their initial capital investments, the alleged discrepancies in the billing does not entitle them to an affirmative recovery. Merely labelling things as "fraud" without proving the necessary elements to establish the tort of fraud, does not entitle Plaintiffs to recover.

  B. *Plaintiffs Failed to Prove the KDC Contract is a Fraud.*

Plaintiffs never explain why the date on which the KDC Contract was last printed, around the time of the mechanics lien, proves it is fraudulent or entitles them to damages. Nor do Plaintiffs explain why a discussion between Mr. Cohen and Mr. Kagan about a particular paragraph in the contract, paragraph 5.2, proves the contract is a fraud. Without such an explanation, Plaintiffs insist that the Court make inferences without tethering them to any actual evidence. Moreover, given that Plaintiffs claim to have never seen the KDC contract and therefore never relied upon it, and never put in any additional money, means that there were no damages that flowed from the execution of that contract. No claim for fraud can exist on these facts. At best, if their incredible story is believed, it may go to KDC's affirmative recovery but

that is not the subject of the instant Motion. Plaintiffs have failed to articulate how the allegedly fraudulent KDC contract entitles them to damages.

    *C. Plaintiffs Resort to Manufacturing a Claim Based on Fixed Construction Costs.*

Plaintiffs now contend that Mr. Kagan should be liable for affirmative damages because he was "reckless" in telling them the homes would cost $1.3 million each to build. Leaving aside the fact that this is not the theory advanced by the Adversary Complaint, Plaintiffs cannot base their claim on forward-looking, statements of optimism because no reasonable person would rely on them. *Pacheco v. Cambridge Tech. Partners (Massachusetts), Inc.*, 85 F. Supp. 2d 69, 80 (D. Mass. 2000) (finding the statements in that case to be nonactionable puffery). Mr. Filippov testified he thought of Mr. Kagan as a salesman, which demonstrates that he did not actually rely on whatever statements Plaintiffs ascribe to Mr. Kagan. Plaintiffs chastise Mr. Kagan for not obtaining bids before committing to such a price, yet they have presented no evidence that the price charged was unreasonable or that had bids been solicited a lower price would have resulted. No reasonable fact-finder would make the inference Plaintiffs ask this Court to make. Rather, the position Plaintiffs articulate supports only a conclusion that undercuts their claim - that the project was so immature in October 2012 that Mr. Kagan did not, in fact, assure anyone that the homes could be built for any fixed price. In fact, neither the Operating Agreement (Ex. 15) nor the construction contract signed by Mr. Filippov (Ex. 36) make any mention of capping the construction costs at $1.3 million. No reasonable fact-finder could conclude there was a firm representation to fix the construction costs where Messrs. Filippov and Lipetsker both testified that when they first discussed the project with Mr. Kagan

there were no plans developed and the property had not yet even been subdivided. They failed to explain why the spreadsheet discussed is clearly labelled "Estimated." (Ex. 9). Without a sufficiently firm representation, Plaintiffs cannot recover on their affirmative claim for damages. *Sumner v. Richmond*, Opinion No.: 89311, Docket No: 05-00221B, 2005 Mass. Super. LEXIS 311, at *3 (June 13, 2005) ("The most basic element of fraud is the knowing representation. In this case it has not been pleaded, nor cannot be inferred.").

To the extent that Plaintiffs have shifted course to contend they were fraudulently induced into investing in the project, such a claim is directly contrary to their position that the Operating Agreement and KDC construction contract are enforceable contracts. Plaintiffs cannot have it both ways. Having taken the position that the terms of the deal are enforceable, they cannot seek to secure the benefits of the deal while simultaneously seeking to repudiate it. *McCartin v. Westlake*, 36 Mass. App. Ct. 221, 234 (1994) ("Having decided that the plaintiffs were fraudulently induced to enter into the franchise agreement as well as the related guaranty and noncompetition agreements, the jury should not have proceeded to assess damages for breach of the franchise agreement they found unenforceable by reason of fraud." *See also Forman v. Hamilburg*, 300 Mass. 138, 142 (1938) ("Upon discovery of the fraud the plaintiff could have repudiated the contract or could affirm it and bring an action for damages").

D. *There is No Evidence that the ProExcavation Proposals are Fraudulent.*

When challenging the ProExcavation proposals, Plaintiffs once again confuse their objection to KDC's proof of claim with their own claim for affirmative recovery. The sum total of the contention that ProExcavation's proposals are fraudulent is that Plaintiffs claim that they did not see them prior to discovery and were surprised by the amount paid to ProExcavation. That is not enough. To establish fraud, they must prove reliance and damages, neither of which

has been proven. Having never seen the proposals and claiming not to know what ProExcavation did, Plaintiffs certainly cannot have relied upon those proposals for anything. Moreover, Plaintiffs testified that they put in no additional money to pay for construction costs beyond the construction loan which was earmarked for those purposes. Thus, they have suffered no damage either. While Plaintiffs claim that ProExcavation overcharged, there is no evidence of any overcharges. No qualified witness testified that ProExcavation's charges were excessive. Thus, there is no basis for an affirmative recovery to Plaintiffs based on their claim that ProExcavation's charges, which they did not pay, were excessive.

### E. *Plaintiffs' Theory of Knowingly Mispresenting the Source of Funds to Pay the Carrying Costs Makes No Sense.*

Plaintiffs claim Mr. Kagan duped them regarding paying for carrying costs, but this assertion is illogical given that Mr. Kagan paid them out of his own pocket for months without insisting that Messrs. Filippov and Lipetsker contribute. After the balance remaining from the purchase money mortgage was expended, Mr. Kagan or KDC paid all carrying costs while Mr. Filippov repeatedly expressed his refusal to contribute any more money and persistently directed Mr. Kagan to put in more of his own money. Both Mr. Filippov and Mr. Lipetsker affirmed that they had put in no additional monies to cover carrying costs during the project construction. There is no upside to Mr. Kagan's duping the other investors on this point as the carrying costs are actual charges that needed to be paid to the bank and others, and there can be no dispute that those costs were paid. Paying carrying costs provided no benefit whatsoever to Mr. Kagan. If Plaintiffs really thought the loan proceeds were to be used to pay the carrying costs, they never inquired when the records in their possession failed to show loan disbursements followed by checks paid to the bank. Their utter silence proves that Plaintiffs concocted this part of the story

after the fact to attempt to manufacture sufficiently definite deal terms on which to base a claim of fraud.

Mr. Filippov's admission that he knew that the construction loan documentation **he** submitted to the bank was false and contrary to the express restrictions in the loan documents, is nothing short of remarkable. Mr. Filippov is happy to enjoy the benefit of the fact that Mr. Kagan/KDC, not he, paid the carrying costs. To then find fault with Mr. Kagan for refusing to go along with the fraud on the bank being perpetrated by Mr. Filippov by (Mr. Kagan) using his own money to pay the carrying costs, is the height of "chutzpah." To double down and seek damages on top of the benefit he received through Mr. Kagan's voluntary payment of the carrying costs is unprecedented and not supportable. The evidence presented simply does not hold together and neither does Plaintiffs' claim.

The only aspect of Plaintiffs' claim that is tethered to actual evidence is the objection that Mr. Kagan did not continue to pay carrying costs indefinitely, after the twenty-third month as stated in the Operating Agreement. But, even if one never affords Mr. Kagan a credit for the carrying costs he covered when it was really the LLC's obligation to pay them, the Operating Agreement describes the remedy to which the parties agreed – an adjustment of capital accounts, not an additional award of money damages. (Ex. 15, Operating Agreement, ¶8.1). Plaintiffs' tort theory is therefore subsumed by the parties' contract and an award of money damages on top of an adjustment of capital accounts would be contrary to the parties' agreement and unlawfully duplicative.

## II.
## Plaintiffs Failed to Offer Any Evidence of Actual Damages.

Plaintiffs offer a scattershot of arguments on damages for the fraud they failed to prove, none of which are tied to evidence they presented. On the one hand, Plaintiffs seek the "benefit

of the bargain", but, as stated above, Plaintiffs failed to prove the essential elements of the bargain itself.  There was no agreement as to a fixed price, among other things.  "Benefit of the bargain" damages are only available where the plaintiff is able to establish damages with reasonable certainty, which Plaintiffs have not done.  *Hurwitz v. Prime Communs.*, 2 Mass. L. Rep. 74 (1994).  Plaintiffs remarkably suggest that this Court pick one of the 600 scenarios on the estimate spreadsheet (Ex. 9) and award damages based on one of those 600 scenarios. Opposition at 19.   While it is true that mathematical certainty is not required, asking this Court to throw a dart at one of 600 scenarios is unacceptable as a matter of law.  *Damon v. Sun Co.*, 87 F.3d 1467, 1472 (1st Cir. 1996) (requiring a "fair degree of certainty") (citing *Pearl* v. *William Filene's Sons Co.*, 317 Mass. 529, 532 (1945); and *Squeri* v. *McCarrick*, 32 Mass. App. Ct. 203, 209 (1992) ("While proof of damages does not require mathematical precision, it must be based on more than mere speculation.")).

Plaintiffs' expert, Mr. Fennell, who sheepishly testified that "something must have happened" never connected his opinions of value to any conduct by Defendants.  Plaintiffs now speculate that the mechanics lien, impending dissolution and refusal to change real estate brokers must be the "something" Mr. Fennell hand in mind but, conspicuously, they never asked him this question when he was on the stand and he did not volunteer it either.  Of course, Plaintiffs never introduced any evidence that any potential buyers knew there was a mechanics lien, knew the LLC would dissolve, or knew about the refusal to change real estate brokers.  Indeed, the MLS printouts for the two homes includes none of that information.  *See* Exhibits 46 and 47.  Plaintiffs did not introduce any potential buyers or real estate professionals to testify that but for the mechanics lien, for example, they would have made an offer on the homes.  Further, the evidence shows that Plaintiffs failed to challenge the mechanics lien even though they filed suit and could

have demanded an expedited hearing under M.G.L. c. 254, §15A; Mr. Kagan offered to extend the dissolution deadline, but Mr. Filippov refused; and Century21 eventually relinquished the listings.

Plaintiffs shift again to claim they are entitled to damages for the "loss of use" of the money they invested. First, Plaintiffs presented no actual evidence of what return Plaintiffs would have received had they invested elsewhere and they did not identify any such investment vehicle. They also conceded that there was no guaranteed return. No expert testified as to what return they could have reasonably expected had the money been invested otherwise. Plaintiffs ask this Court to simply make up a rate of return. Second, Plaintiffs have failed to make any comparison between the return they will actually receive on the Lyman-Cutler project versus another investment they forewent. Without this comparison, there is no delta for this Court to rely upon to affix a damage award. *Sigma Sys. v. Rasamsetti*, No. 01-1435A, 2003 Mass. Super. LEXIS 357, at *6-7 (Oct. 25, 2003) ("To recover on a fraud claim, the plaintiff must prove actual losses suffered as a consequence of reliance on the misrepresentation."). Plaintiffs offer no guidance to the Court as to what should be awarded for the "loss of use of money," so such an award would be wholly inappropriate. There is approximately $3.5 million sitting in an escrow account, $1 million more than the parties' capital investment, tied up solely because Plaintiffs prefer to litigate.

Plaintiffs seek "mitigation" damages for the costs of the bankruptcy but concede that they never consulted with Mr. Kagan about filing the bankruptcy and unilaterally made the decision to invoke this Court's jurisdiction. Contrary to the assertion, these are not "consequential" damages caused by Defendants, but rather damages voluntarily incurred by Plaintiffs. There is

no support for shifting the burden of bankruptcy costs, i.e. trustee fees and expenses, onto Defendants.

Plaintiffs also seek damages under M.G.L. c.93A. As explained above, Plaintiffs have failed to demonstrate any deceptive conduct on which such a claim could be based. While they attempt to avoid having to prove reliance, they overlook that the law requires they prove a causal connection between the alleged misrepresentation and the loss, something they have failed to prove. *International Fidelity Ins. Co. v. Wilson*, 387 Mass. 841, 850 (1983). Their Opposition also demonstrates that the c.93A claim is duplicative of their fraud claim and breach of contract claim, as the allegations are identical. They have failed to articulate any conduct separate from the alleged fraud on which an additional recovery could be based. Even if they had proven such a case, they failed to offer any evidence of recoverable damages. They have not established an amount of actual damages on which this Court could base an award of multiple damages. *Tech Plus, Inc. v. Ansel*, 59 Mass. App. Ct. 12, 14 (2003) (affirming a JNOV where the plaintiffs failed to prove they suffered any actual harm). At most, Plaintiffs assert a claim for equitable subordination, but the manner in which profits are to be distributed are governed by the Operating Agreement, a contract Plaintiffs concede is valid and enforceable.

### III.
### Plaintiffs Failed to Articulate Viable Claims Against Tatiana Kagan.

Despite sweeping allegations that Mrs. Kagan was intimately involved the fraudulent scheme, in their Opposition Plaintiffs were able to articulate only two "facts" linking her to their theories of the case: (1) that Mrs. Kagan pressured Mr. Filippov to sign a listing agreement around the same time Mr. Kagan was computing the total project costs; and (2) Mrs. Kagan would have waived her commission, but did not because Mr. Kagan told her to refuse. Neither of these "facts" prove Mrs. Kagan engaged in any wrongdoing. No evidence was presented that

{S1416540.4}    14

Mrs. Kagan knew anything at all about the finances of the project or had any role in the project construction, and so Plaintiffs suggest this Court should link events that are not actually connected.  Plaintiffs presented no evidence to show that Mr. Filippov was under any duress with respect to the listing agreement.  He was away on business and testified that he unilaterally decided he was too busy to be bothered and he did not tell Defendants to wait until he returned from his trip.  None of the communications from Mrs. Kagan express any pressure or force on Mr. Filippov whatsoever.  Indeed, if Defendants did not communicate with Mr. Filippov about the listing agreement, he would complain about his lack of involvement.  Plaintiffs' presentation is insufficient, as a matter of law, to possibly impose financial liability on Mrs. Kagan.

      Plaintiffs also failed to account for the full testimony as to the circumstances under which commissions are waived.  First, Plaintiffs ignore the reality that the listing agreement in this instance is between Lyman-Cutler and Century21, not with Mrs. Kagan individually.  The right or ability to waive the selling side of the commission belongs to Century21 alone.  Plaintiffs presented no evidence as to the decisions made by Century21.  Second, Plaintiffs successfully removed Mrs. Kagan from the listing, so Plaintiffs present no evidence of harm, even if Mrs. Kagan "fraudulently" refused to relinquish its right to a commission.  Plaintiffs also ignore that even if Century21 waived its portion of the commission, Lyman-Cutler, LLC still would have been required to pay the buyer's side of the commission.  They therefore never quantified the amount of harm that allegedly flowed from the commission dispute.  In any event, Plaintiffs highlight that Mrs. Kagan followed Mr. Kagan's requests as to waiving or not waiving the commission.  Rather than proving that Mrs. Kagan was therefore instrumental in effectuating a fraud, the evidence on which Plaintiffs focus demonstrates the opposite – that Mrs. Kagan exerted no control whatsoever.  Without proof of her knowledge of and active involvement in the

claims, Plaintiffs cannot possibly recover against Mrs. Kagan. *Kurker v. Hill*, 44 Mass. App. Ct. 184, 187 (1998) (This type conspiracy is derived from concerted action and is limited to cases which "manifest a common plan to commit a tortious act where the participants know of the plan and its purpose and take affirmative steps to encourage the achievement of the result.").

## IV.
## Plaintiffs Failed to Prove that the Process Followed for Mr. Filippov's Mortgage was Fair.

Mr. Filippov testified very clearly that he decided ***not*** to include Mr. Kagan on the discussions that lead to his making a supposed loan and recording a mortgage to secure his interests **on the same day** as he filed the Debtor's bankruptcy petition. He also testified, and conceded in his Opposition, that he (and Mr. Lipetsker) concluded there was no point in including their partner, Mr. Kagan, in those discussions because they knew he would vote against the mortgage. This is the hallmark of a breach of the fiduciary duties owed to Mr. Kagan and fatal to their claim. Beyond that, Mr. Filippov's own words undercut his ability to prove that this self-dealing transaction, the encumbering of company assets for his own personal protection, was entirely fair. *Weinburger v. UOP, Inc.*, 457 A.2d 701, 711 (Del. 1983) ("An inquiry into fair dealing 'embraces questions of when the transaction was timed, how it was initiated, structured, negotiated, disclosed to the [decision-maker], and how the approvals . . . were obtained.'"). Providing no notice to Mr. Kagan and no opportunity for him to be heard renders the mortgage invalid as a matter of law.

Mr. Filippov's attempt to prove fairness by claiming that the "Debtor unquestionably needed funds when the mortgage was executed…" is nonsensical. Opposition at 26. The only financial obligation that the Debtor had at the time of the loan and mortgage was to pay carrying

costs.[1]  Under the Operating Agreement, if Mr. Kagan refused to pay carrying costs, that responsibility expressly fell upon Mr. Filippov.  (Ex. 15, Operating Agreement, ¶8.1).  Despite the fact that he was contractually obligated to pay those costs personally and has invoked the remedy he bargained for by claiming a reduction in Mr. Kagan's equity interest and capital account, he then purports to recharacterize this obligation as a loan, with interest, secured by a mortgage granted the same day that Mr. Filippov filed the Debtor's petition.  In so doing, he not only breached his fiduciary duty as the manager of the LLC, he also violated the Operating Agreement.  The loan and mortgage imposed additional financial obligations onto the Debtor and encumbered its assets.  This benefitted no-one but Mr. Filippov.   Under these circumstances, it is hard to imagine how the transaction could be construed as fair and Mr. Filippov's attempt to do so should be rejected out of hand.

## V.
## Plaintiffs Failed to Prove that the Fees Charged by OCM were Fair or Benefitted the Debtor.

Messrs. Filippov and Lipetsker, again without consulting Mr. Kagan, made the unilateral decision to hire OCM.  The Debtor has its own counsel, Mr. Tamposi.  The fees generated by OCM clearly were for the primary, if not sole, benefit of Messrs. Filippov and Lipetsker.  No evidence was adduced to establish that the fees charged were fair and reasonable or for the benefit of the Debtor.  Moreover, Mr. Filippov conceded that there were significant payments to OCM within the 90 days preceding the filing of the bankruptcy petition which he concealed from this Court.  Even if the fees did benefit the Debtor in some nominal way, there is no evidence as to how those fees should be allocated as between the individuals and the Debtor or that proper

---

[1] The Debtor also owed construction costs but KDC either covered those or was able to convince subcontractors to await payment once the litigation was resolved.  In any event, Plaintiffs certainly were not "loaning" the Debtor money to pay subcontractors.

{S1416540.4}  17

credit for the fees omitted from the Statement of Financial Affairs was made. Accordingly, the OCM claim should be denied.

WHEREFORE, Defendants respectfully request that this honorable Court:

A. Grant Defendants judgment on partial findings as to Plaintiffs' affirmative counts IV, V, VI, VII, VIII, IX and X;

B. Grant Defendants judgment on partial findings as to Mr. Filippov's proof of claim for the purported loan of $200,000 to the Debtor;

C. Grant Defendants judgment on partial findings as to the proof of claim filed by O'Connor Carnathan and Mack LLC; and

D. Grant such additional and further relief as the Court deems necessary.

Dated: July 24, 2019                VADIM KAGAN, ET AL.

By their attorneys,

/s/ John H. Perten, Esq.
John H. Perten (BBO# 548728)
James P. Harris (BBO # 678283)
SHEEHAN PHINNEY BASS & GREEN, P.A.
28 State Street, 22nd Floor
Boston, MA 02109
(617) 897-5600
jperten@sheehan.com
jharris@sheehan.com

## CERTIFICATE OF SERVICE

I, John H. Perten, hereby certify that on July 24, 2019, copies of the foregoing was served on Plaintiffs in-hand and subsequently by the Court's ECF system or by first class U.S. mail on those parties listed on the attached service list:

Dated: July 24, 2019                /s/ John H. Perten
John H. Perten

{S1416540.4}                18

**SERVICE LIST**

Eric K. Bradford
Office of the US Trustee
J.W. McCormack Post Office & Courthouse
5 Post Office Sq., 10th Fl, Suite 1000
Boston, MA 02109

Sean T. Carnathan
O'Connor, Carnathan and Mack, LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

David B. Madoff
Madoff & Khoury LLP
124 Washington Street - Suite 202
Foxborough, MA 02035

Steffani Pelton Nicholson
Madoff & Khoury LLP
124 Washington Street
Foxborough, MA 02035

Sarah A Smegal
Hackett Feinberg P.C.
155 Federal Street
9th Floor
Boston, MA 02110

Joseph P. Calandrelli
O'Connor Carnathan and Mack LLC
1 Van De Graaff Drive
Suite 104
Burlington, MA 01772

Stephen G. DeLisle
Rubin and Rudman LLP
50 Rowes Wharf
3rd Floor
Boston, MA 02110

Peter N. Tamposi
The Tamposi Law Group
159 Main Street
Nashua, NH 03060

David C. Phalen
Hackett Feinberg P.C.
155 Federal Street, 9th Floor
Boston, MA 02110

/s/ John H. Perten
John H. Perten