Page 1

UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS - EASTERN DIVISION

```
==============================  .
IN THE MATTER OF:               . Case #15-13881
                                .
LYMAN-CUTLER, LLC               .
                                . Boston, Massachusetts
                                . Monday, July 29, 2019
     Debtor.                    . 9:15 a.m.
==============================  .
LYMAN-CUTLER, LLC,              . Adv. Proc. 16-01120
                                .
     Plaintiff,                 .
v.                              .
                                .
KAGAN, et al.,                  .
                                .
     Defendants.                .
==============================  .
```

TRANSCRIPT OF TRIAL DAY 13 ON:
#167 OBJECTION TO CLAIM 9 OF CLAIMANT ALEX FILIPPOV FILED BY
INTERESTED PARTIES TATIANA KAGAN, VADIM KAGAN, KAGAN
DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.
#1 COMPLAINT BY LYMAN-CUTLER, LLC AGAINST VADIM KAGAN, TATIANA
KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.

BEFORE THE HONORABLE FRANK J. BAILEY

APPEARANCES:

For the Debtor:                 PETER N. TAMPOSI, ESQ.
                                The Tamposi Law Group, P.C.
                                159 Main Street
                                Nashua, NH 03060


For Alex Filippov and Nickolay  SEAN T. CARNATHAN, ESQ.
Lipetsker:                      O'Connor, Carnathan, and Mack,
                                LLC
                                1 Van De Graaff Drive
                                Suite 104
                                Burlington, MA 01803


For the Defendants:             JOHN H. PERTEN, ESQ.
                                JAMES HARRIS, ESQ.
                                Sheehan Phinney
                                255 State Street
                                5th Floor
                                Boston, MA 02109



Electronic Sound Recording Operator:   ELIZABETH LOMBARD


Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service
eScribers, LLC
7227 N. 16th Street, Suite #207
Phoenix, AZ 85020
973-406-2250; operations@escribers.net

I N D E X

| WITNESSES: | DIRECT | CROSS | REDIRECT | RECROSS | VOIR DIRE |
|---|---|---|---|---|---|

For the Defendants:
VON SALMI

| | DIRECT | CROSS | REDIRECT | RECROSS |
|---|---|---|---|---|
| (By Mr. Perten) | 6 | | 132 | |
| (By Mr. Carnathan) | | 71 | | 15 |

DAVID DODDRIDGE

| | DIRECT | CROSS |
|---|---|---|
| (By Mr. Perten) | | 187 |

For Alex Filippov and Nickolay Lipetsker:
DAVID DODDRIDGE

| | DIRECT |
|---|---|
| (By Mr. Carnathan) | 159 |

For The Plaintiff:
DAVID DODDRIDGE

| | REDIRECT |
|---|---|
| (By Mr. Carnathan) | 259 |

| EXHIBITS: | DESCRIPTION | I.D. | EVID. |
|---|---|---|---|
| For the Defendants: | | | |
| GG | RSMeans residential cost data, 2014 | 34 | |
| 174 and 175 | Proof-of-claim binders | 37 | |
| FF | Backup with page references to the RSMeans for first report 7/30/2018 | 212 | |
| 343 | | | 256 |
| 344 | | | 256 |

1   (At 9:15 a.m.)

2          THE CLERK:  All rise.  Court is now in session.

3          THE COURT:  Good morning.

4          IN UNISON:  Good morning.

5          THE COURT:  Be seated.

6          THE CLERK:  This is adversary proceeding 16-1120,

7   Lyman-Cutler, LLC v. Kagan, et al.  This is day thirteen of

8   trial.  And it's case number 15-13881, Lyman-Cutler, LLC.

9   It's trial day thirteen of document number 167, objection to

10  claim 9.

11         Will the parties please state their names for the

12  record?

13         MR. CARNATHAN:  Good morning, Your Honor.  Sean

14  Carnathan for Alex Filippov and Nickolay Lipetsker.

15         MR. TAMPOSI:  Good morning, Your Honor.  Peter

16  Tamposi for the debtor.

17         MR. PERTEN:  Good morning, Your Honor.  John Perten

18  for Vadim Kagan, Tatiana Kagan, ProExcavation Corp., and KDC

19  Development Corp.

20         MR. HARRIS:  Good morning, Your Honor.  James Harris

21  for the same parties.

22         THE COURT:  All right.  All right.  Good morning,

23  everyone.  Welcome back.  Here we go.

24         Anything that we should talk about before we get

25  started?  All right.

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1              Mr. Perten, you go first today, right?

2              MR. PERTEN:  Yes, Your Honor.  And the preview is,

3      it's just the parties' experts today --

4              THE COURT:  That's where we are.

5              MR. PERTEN:  -- so the two witnesses today.

6              THE COURT:  Great.

7              MR. PERTEN:  And so I think we're both cautiously

8      optimistic we finish the evidence today.

9              THE COURT:  Okay.  All right.

10             MR. PERTEN:  That's our hope.

11             THE COURT:  Let's get started.

12             MR. PERTEN:  Very good.  All right.  Your Honor, we

13     could call Von Salmi to the stand, please.

14             THE COURT:  Okay.

15                        VON SALMI SWORN

16             THE COURT:  Good morning.

17             THE WITNESS:  Good morning, Your Honor.

18             THE COURT:  Is it Mr. Von Salmi, or is it Salmi?

19             THE WITNESS:  It's Mr. Salmi.  Von is --

20             THE COURT:  Mr. Salmi.

21             THE WITNESS:  -- my first name.

22             THE COURT:  Von is your first name.  Okay.

23             THE WITNESS:  Yes, sir.

24             THE COURT:  All right.  Well, welcome to the

25     courtroom.

VON SALMI - Direct

1              THE WITNESS:  Thank you, sir.

2              THE COURT:  I don't believe you've been around for

3     any of the trial yet; is that right?

4              THE WITNESS:  No, I have not.

5              THE COURT:  Okay.  So we record in the courtroom and

6     Elizabeth does QC on that, so she's not making a record in the

7     way that you might have seen before.  So you just need to talk

8     into the microphone.

9              THE WITNESS:  Okay.

10             THE COURT:  You can move that microphone back and

11    forth, no problem there.  You want to sit back, be more

12    comfortable, feel free to do that.  But just, if you hear it

13    amplifying, you know we're getting it, okay?

14             THE WITNESS:  Okay.

15             THE COURT:  All right.  Thank you.

16             THE WITNESS:  Okay, thank you, sir.

17             MR. PERTEN:  May I proceed --

18             THE COURT:  All right, Mr. Perten?

19             MR. PERTEN:  -- Your Honor?  Thank you.

20                        DIRECT EXAMINATION

21    BY MR. PERTEN:

22        Q.   Good morning, Mr. Salmi.

23    A.   Good morning, sir.

24        Q.   Could you state your full name, please?

25    A.   Von A. Salmi.



(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1    Q.   And where do you reside, Mr. Salmi?

2  A.   41B Bacon Street, Westminster, Mass.

3    Q.   And do you own a business, sir?

4  A.   Yes, sir, I do.

5    Q.   What is the name of your business?

6  A.   It is Von Salmi and Associates, Incorporated.

7    Q.   And what is the nature of the business of Von Salmi

8  and Associates?

9  A.   We primarily do expert witness, construction forensic,

10  and owner's representation work.

11    Q.   Okay.  Now sir, can you give us a brief rundown of

12  your educational background starting at college, please?

13  A.   Yes, I can.  I obtained a five-year professional degree,

14  a bachelor's of landscape architecture from Kansas State

15  University in 1974.

16    Q.   Now, sir, what fields of study does landscape

17  architect include?

18  A.   It includes the fields of architecture, civil

19  engineering, botany, civil engineering, biology.

20    Q.   Okay.  And prior to attending Kansas State

21  University, were you employed in the -- or did you work in the

22  construction field?

23  A.   Yes, I had, for quite a few years.

24    Q.   In what capacities?

25  A.   I've worked as an apprentice electrician, an apprentice

Page  8

VON SALMI - Direct

1    plumber, apprentice carpenter, carpentry foreman, heavy

2    equipment operator, laborer, nurseryman, nurseryman laborer,

3    pretty much most entities that'd be involved in the field of

4    residential construction.

5         Q.   Okay.  Was part of your course of studies site

6    development?

7    A.   Yes, sir, it was.

8         Q.   Okay.  Did you study hardscaping and softscaping?

9    A.   Yes.

10        Q.   Okay.  After you left Kansas -- after you got your

11   degree from Kansas State, sir, did you become employed?

12   A.   Yes, I did.

13        Q.   What was your first employment after college?

14   A.   My first employment was with Dean Johnson and Associates,

15   landscape architects located in Barnstable, Mass.

16        Q.   And what did you do for Dean Johnson?

17   A.   I worked as a landscape designer in the capacity of a

18   landscape architect working on my apprenticeship.

19        Q.   And could you tell us, what does a landscape

20   designer do?  What does that encompass?

21   A.   For that particular office, and what we were engaged in,

22   was we would do feasibility studies, land-use studies of

23   various properties.  We would also do land development

24   studies, and specific site development, the site elements for

25   various sites, ranging from commercial, institutional, and

VON SALMI - Direct

1   residential properties.

2        Q.   Did you get involved in learning how to build stone

3   walls?

4   A.   Yes, I did.

5        Q.   Did you get involved with grading of sites?

6   A.   Yes, I did.

7        Q.   And drainage issues?

8   A.   Yes, I did.

9        Q.   Okay.   At -- how long were you there with Dean

10   Johnson?

11   A.   Probably a year, year and a half.

12        Q.   And after you left Dean Johnson, where did you go

13   next?

14   A.   I migrated to Buckeye State Landscapes in Toledo, Ohio.

15        Q.   What was your position at Buckeye State Landscapes?

16   A.   I was the general manager and chief designer for that

17   entity.

18        Q.   And as the general manager and chief designer, what

19   were your duties and responsibilities?

20   A.   The overall day-to-day operations.   We specialized in

21   large commercial, institutional-type projects, and residential

22   projects, grading, landscaping, selling plant materials,

23   various landscaping material, and then overseeing designs for

24   those various entities.

25        Q.   And when did you leave Buckeye?

VON SALMI - Direct

1   A.    Sometime around 1976, I believe.

2        Q.    What did you do next, sir?

3   A.    Then I migrated to Minnesota, to Chanhassen, to work for

4   Halla Nursery.

5        Q.    Okay.  In your work with Halla Nursery, did you

6   interact with builders?

7   A.    Yes, I did.

8        Q.    In what capacity?

9   A.    I was general manager of the 800-acre nursery.  I had

10   seven design personnel on board.  We had eight or nine

11   landscape crews.  So I oversaw the sales and operations, and

12   integration of those entities and larger residential projects,

13   and oversaw the design, estimating, and successful execution

14   of projects for those various entities.

15        Q.    Okay.  And at some point, did you leave Halla?

16   A.    Yes, I did.

17        Q.    When was that?

18   A.    That would be about 1978.

19        Q.    Okay.  And after leaving Halla, did you migrate away

20   from the landscape industry?

21   A.    Yes, I did.  I kind of felt as though I had reached a

22   pinnacle as far as my earning capacity goes, and looked to

23   take a move into other entities.

24        Q.    Where did you go next?

25   A.    I was employed as a -- as an outside contractor salesman

VON SALMI - Direct

1   for Webber Lumber.

2        Q.   Is that a lumber company?

3   A.   Yes, it was.

4        Q.   And what did you do while working at the lumber

5   company?

6   A.   As an outside salesman, I sold lumber primarily to

7   contractors, homeowners, did specific take-offs, quantities to

8   supply materials -- specific materials -- for the execution of

9   their projects.

10       Q.   And did you provide cost estimates for materials

11  to -- to contractors?

12  A.   Yes.

13       Q.   And did that involve doing take-offs from plans?

14  A.   Yes, it did.

15       Q.   Did you consult generally with builders about

16  different methods and methodologies?

17  A.   Extensively.

18       Q.   Okay.  How long were you at Webber Lumber?

19  A.   For approximately two years.

20       Q.   Specifically, where is Webber?

21  A.   They were located in central Massachusetts.  The main

22  office was Fitchburg, Mass., and they had fifteen retail

23  locations throughout central Mass.

24       Q.   Okay.  And when did you leave Webber?

25  A.   About 1980.



VON SALMI - Direct

1    Q.   And after leaving Webber, what did you do next?

2    A.   I had the opportunity to purchase a business in my

3    hometown community, and I started a company known as Yankee

4    Lumber & Specialty Products.

5    Q.   And what did Yankee Lumber & Specialty Products do?

6    A.   We had a retail lumberyard selling to contractors,

7    homeowners.  We also did special shipping containers designed

8    for pieces.  We had entities that were making parts for the

9    space program, so we had the capacity to design and build

10   those.  We also had a construction division, where we did

11   residential building, and we also had a millwork entity.

12   Q.   And in terms of the residential building, did you

13   oversee that division as part of your duties and

14   responsibilities?

15   A.   Yes, I did.

16   Q.   And was that in the commercial or residential side

17   that you were building?

18   A.   It was in the residential side.

19   Q.   Okay.  How long were you with Yankee Lumber?

20   A.   For eleven years.

21   Q.   And after leaving Yankee Lumber -- and I think that

22   brings us to about 1991; is that correct?

23   A.   Correct.

24   Q.   After leaving Yankee Lumber in 1991, what did you do

25   next?

VON SALMI - Direct

1  A.   I went back to the owners of Webber Lumber -- they had

2  changed the entity to Cherry Valley Lumber -- became the VP of

3  operations.

4       Q.   And as a VP of operations for the Cherry Lumber

5  company, what were your duties and responsibilities?

6  A.   I was overseeing the function and operation of thirteen

7  retail outlets.  And I had probably ten or twelve contractor

8  salesmen that I would oversee.  And I was there as a resource

9  for them.  I also took on many of the larger projects that we

10  had oversaw the successful sale of materials to those

11  entities.

12      Q.   And as your prior lumberyard experience, did that

13  include estimating jobs?

14  A.   Yes, it did.

15      Q.   And did that include reading plans?

16  A.   Yes, it did.

17      Q.   And did that include interfacing with contractors?

18  A.   Yes, it did.

19      Q.   And how long were you at Cherry Valley?

20  A.   That was for about two years, I'd say.

21      Q.   And at some point after leaving Cherry Valley, did

22  you move into yet another segment of the construction

23  industry?

24  A.   Yes, I did.

25      Q.   What did you do next?

A. I went to work for an entity known as Kepa Homes Corporation in Southborough, Mass.

Q. Okay. And before going to Kepa Homes, did you work for Von Salmi Masonry?

A. Yes, I did. I had a two-year period there.

Q. What was the business of Von Salmi Masonry?

A. We did high-end vertical and horizontal masonry installations, until my shoulders gave out.

Q. So that would be building walls, and the like?

A. Walls, veneers, flatwork, patios, steps, anything, again, with vertical and horizontal masonry applications.

Q. And when you talk about masonry, that includes concrete and natural stone?

A. Concrete, natural stone, manmade products.

Q. Okay. Now, after the two-year stint with Von Salmi Masonry, you started to say something about a company called Kepa Homes?

A. Yes.

Q. What is Kepa Homes?

A. Kepa Homes was a spec and custom-home builder located in Southborough. They also did some development.

Q. Okay. What was your role with Kepa Homes?

A. I was a general manager of operations.

Q. As general manager of operations, did you oversee construction of residential homes?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1  A.   Yes, I did -- construction and design.

2       Q.   And as part of your duties and responsibilities, did

3  you bid jobs?

4  A.   Yes, I did.

5       Q.   Did you supervise subcontractors?

6  A.   Yes, I did.

7       Q.   Was Kepa Homes exclusively in the residential side?

8  A.   Yes, it was.

9       Q.   And was there -- in terms of the market, was it

10  mostly high-end homes, average homes?  What -- where was it?

11  A.   Well, at that time, those were all high-end homes in the

12  range of 500 -- or 350- to 950,000 in the mid-'90s.

13       Q.   And while at Kepa Homes, how many homes were you

14  personally responsible for overseeing those projects?

15  A.   About 60.

16       Q.   About 60 homes that --

17  A.   Yes.

18       Q.   -- you directly participated in overseeing?

19  A.   Yes, I did.

20       Q.   Okay.  Now, how long were you at Kepa Homes?

21  A.   That was a period of, oh, four years, I believe.

22       Q.   And after leaving Kepa Homes, did you continue in

23  the construction industry?

24  A.   Yes, I did.

25       Q.   Where did you go next?

                              VON SALMI - Direct

1    A.    I went to work for Thoughtforms, Corporation, out of

2    Acton, Mass.

3         Q.    What is the business of Thoughtforms, Corporation?

4    A.    Building high-end residential properties in the eastern

5    New England area.

6         Q.    And what were your duties and responsibilities for

7    Thoughtforms?

8    A.    I worked as a site superintendent, and also as a project

9    manager.

10        Q.    In terms of building homes?

11   A.    Yes.

12        Q.    Were these spec homes?

13   A.    No, they were customs.

14        Q.    Custom homes?

15   A.    Yes.

16        Q.    Okay.  Again, which segment of the industries?  Were

17   these luxury homes or slab ranches?  What were they?

18   A.    No, these were the ultra-high.  These went to probably

19   the top one percent of income earners.

20        Q.    All right.  The -- to -- I'm sorry.  I didn't hear.

21   A.    They probably went to the top one percent of income

22   earners.  They were extremely high-end homes.

23        Q.    Okay.  And how long were you at Thoughtforms?

24   A.    For a period of about four years.

25        Q.    And after leaving Thoughtforms, where did you go

VON SALMI - Direct

1    next?

2    A.    I went to work for The Classic Group, out of Lexington,

3    Mass.

4         Q.    And what is the business of Classic Group?

5    A.    They were a design builder organization of architects,

6    and builders, project managers.  And I went to work for them

7    as a senior project manager.

8         Q.    And as a senior project manager for The Classic

9    Group, what were your duties and responsibilities?

10   A.    I oversaw the development of programs for cost-tracking;

11   bidding; oversaw bidding on projects that would come in;

12   oversaw the function of a staff of about six to seven project

13   managers, and four or five assistant project managers; and

14   interfaced with the architectural staff in the development of

15   design-build projects.

16        Q.    And again, was this design-build in the residential

17   or commercial?

18   A.    Residential.

19        Q.    Okay.  Over the course of your roughly fifty-year

20   career, how many homes have you personally been involved in

21   building?

22   A.    Hundreds and hundreds.

23        Q.    Okay.  Now how long were you at The Classic Group?

24   A.    It was a period of about four years.

25        Q.    And after leaving Classic Group, what did you do

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1    next?

2    A.    Looking in terms of recession in 2008, I looked to apply

3    some of my background into something that would take and

4    succeed.   And I decided to pursue, full time, the entity of

5    Von Salmi & Associates, consulting and doing owner's

6    representation, construction forensics, and expert witness.

7    And then we took on some selected construction projects --

8    things that would interest us.

9         Q.   Okay.  Do you also act as owner's reps?

10   A.   Yes, we do.

11        Q.   So are you still involved in the building

12   profession?

13   A.   Yes, I am.

14        Q.   Or directly, in addition to consulting to it?

15   A.   Yes, I am.

16        Q.   Okay.  And how long have you been with Von Salmi &

17   Associates?

18   A.   Well, since 2008 to present.

19        Q.   Okay.  Now, you told us that you had personally been

20   involved in building several hundred residential homes,

21   correct?

22   A.   Correct.

23        Q.   At any point, did you become familiar with the

24   neighborhood in which the Lyman-Cutler project was located?

25   A.   Yes, I did.

VON SALMI - Direct

1      Q.    How did that come to pass?

2    A.    I had done quite a number of projects in the Newton-

3    Brookline area.  And I had a project that we had executed

4    about the same time frame that the Lyman-Cutler homes were

5    being built.

6      Q.    Where was that project?

7    A.    That was on Countryside Lane in Newton.

8      Q.    And how far is Countryside Lane from the Lyman-

9    Cutler project?

10   A.    I would say probably a mile, little over a mile, maybe.

11     Q.    And in what period of time were you working on that

12   project?

13   A.    That was about 2014 and 2015.

14     Q.    So roughly the same time as Lyman-Cutler?

15   A.    Correct.

16     Q.    Was that a luxury home as well?

17   A.    Yes, it was.

18     Q.    Okay.  Now, sir, do you have any memberships in any

19   professional organizations?

20   A.    Yes, sir, I do.

21     Q.    What organizations do you have memberships in?

22   A.    Well, I belong to the ASLA, the American Society of

23   Landscape Architects, the Boston chapter -- the Boston Society

24   of Landscape Architects.  I belong to the American Institute

25   of Architects.  I belong to the Builders and Remodelers

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1    Association of Greater Boston, which I currently am serving on

2    the board of directors there.  I'm also involved with the

3    Eastern Mass. National Association of the Remodeling Industry,

4    and currently serve on their board of directors also.  I'm

5    also a member of the -- they call it the Homebuilders and

6    Rebuilders Association of Massachusetts, which is a

7    homebuilders' association; The National Association of Home

8    Builders; the International Code Council; the International

9    Furnishings and Design Industry; also the National Wood

10   Flooring Association; and the NFPA, the National Fire

11   Protection Association.

12        Q.   Now, you mentioned you were --

13             MR. CARNATHAN:  Excuse me.  Your Honor, I think Mr.

14   Von Salmi --

15             Mr. Salmi, you're reading from your CV; aren't you,

16   sir?

17             THE WITNESS:  Excuse me?

18             MR. CARNATHAN:  I think he's reading from his CV.

19             THE COURT:  Are you reading from something?

20             THE WITNESS:  No, I'm referring to it from time to

21   time, yes.

22             MR. CARNATHAN:  So shouldn't one not be referring to

23   written proffers during your testimony, unless you're --

24             THE COURT:  It should be --

25             MR. CARNATHAN:  -- remembering --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1          THE COURT:  I -- well, do you have a copy of it?

2          MR. CARNATHAN:  I don't know that I do --

3          THE COURT:  Yeah, yes --

4          MR. CARNATHAN:  -- unless it's attached to his

5    report.

6          THE COURT:  -- the answer is yes.

7          MR. CARNATHAN:  Yeah.

8          THE COURT:  He -- you -- he should not be reading

9    from something without --

10          MR. PERTEN:  Okay.

11          THE COURT:  -- counsel establishing under the

12   appropriate rule that his memory is insufficient, and then he

13   can refresh his memory with that document.  But he should not

14   be sitting there referring to it to refresh his recollection,

15   or we can't tell that his memory was insufficient on its own.

16   But that -- that's denied to the -- to Mr. Carnathan's side.

17   So -- okay?

18          MR. PERTEN:  Thank you.

19          THE COURT:  You put the -- can you confirm you've put

20   away the document you were looking at?

21          THE WITNESS:  Yes, sir, I have.

22          THE COURT:  Okay.  All right.

23   BY MR. PERTEN:

24     Q.   Your CV and your report is closed now, correct?

25   A.   Yes, it is.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1    Q.   Okay.  Incidentally, were you referring to the same

2    CV that was provided as part of your expert report?

3    A.   Yes, I was.

4    Q.   Okay.  Now, Mr. Salmi, you mentioned your

5    involvement with the International Code Council; what is that

6    organization?

7    A.   That is an organization responsible for the promulgation

8    of the current building codes, which are used internationally

9    by most of the United States and most foreign countries.

10    Q.   And in connection with that organization, and in

11    connection with your fifty years of construction work, are you

12    familiar with the Massachusetts State Building Code?

13    A.   Yes, I am.

14    Q.   How often do you need to refer to the building code?

15    A.   Almost daily.

16    Q.   Okay.  Now, sir, do you hold any professional

17    licenses?

18    A.   Yes, I do.

19    Q.   What professional licenses do you hold?

20    A.   I hold a Massachusetts construction supervisor's license,

21    the home improvement contractor's license, I have a commercial

22    driver's license, and I'm also a certified nurseryman in the

23    State of Minnesota.

24    Q.   Okay.  Now with respect to the construction

25    supervisor's license, which I think goes by the acronym CSL,

VON SALMI - Direct

1   correct?

2   A.   Correct.

3       Q.   In order to obtain a CSL, how does one get that

4   licensure?

5   A.   You have to have a period of time that you have operated,

6   in a supervisory capacity, on construction of residential

7   homes.  You also have to pass a test to demonstrate your

8   proficiency in the code -- the current codes.

9       Q.   And when did you first get your license -- excuse

10   me -- your licensure as a CSL?

11   A.   I believe the first-year licensure was required.  My

12   license number is 14,251 and we're in the hundred-some-odd

13   thousands now.

14       Q.   And as a CSL, are you able to pull building permits?

15   A.   Yes, on residential structures, up to 35,000 cubic feet.

16       Q.   And are you able to prepare house plans?

17   A.   Yes.

18       Q.   Okay.  And approximately how many houses have you

19   pulled permits on, yourself?

20   A.   Again, you know, the number of houses I've built runs in

21   the high hundreds, and I've probably pulled permits on two or

22   three hundred homes.

23       Q.   Okay.  Now, you also mentioned that you have a home

24   improvement contractor's license.  What is that?

25   A.   That is the license required by the State of

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 24

VON SALMI - Direct

1   Massachusetts in order to perform work on any home over -- or

2   any work over $1,000.

3       Q.    Residential --

4   A.    Residential --

5       Q.    -- renovations?

6   A.    -- renovations, correct.

7       Q.    Okay.  Do you hold what we call an RRP license?

8   A.    I do.  That's the Mass. waiver for the execution of lead-

9   safe practices.

10      Q.    And in order to deal with potential lead-

11  contaminated material, do you need an RRP license?

12  A.    Yes, you do.  Any home built prior to 1978 is assumed to

13  have lead.  And you're required to have that license in order

14  to be able to do any work on that.

15      Q.    Okay.  Now, have you ever been engaged as an expert

16  witness in the field of construction?

17  A.    Yes, I have.

18      Q.    About how many times?

19  A.    Probably forty, fifty times.

20      Q.    Okay.  And you've also gave a deposition in this

21  case, correct?

22  A.    Yes, I did.

23      Q.    All right.  Now, sir, were you engaged to perform

24  expert services for the defendants in this Lyman-Cutler case?

25  A.    Yes, I was.

Page 25

VON SALMI - Direct

1    Q.   And what was the nature of your engagement?  What

2    were you asked to do?

3    A.   I was asked to opine on three things:  the first of those

4    elements was the fair and reasonable cost of construction for

5    the homes at 88 Cutler and 55 Lyman, to opine on the fair and

6    reasonable value or cost of the work performed by ProEx, and

7    also opine on the fair and reasonable value of the materials

8    that were provided through Home Depot and National Lumber.

9    Q.   Okay.  Now, let's focus first on your work in

10   determining the fair and reasonable value of the demolition

11   and construction for 88 Cutler and 55 Lyman, okay?

12   A.   Okay.

13   Q.   In order to do your analysis, what methodology did

14   you decide to employ?

15   A.   I -- it's the same methodology that I was taught when I

16   first entered into this field.  And it's a methodology which

17   we employ today, which is basically to acquire the information

18   the construction documents provided for a project, and then

19   take and generate a list of bidders, and a scope of work to be

20   issued to those bidders, elicit bids from them, and then tally

21   those bids to come up with a cost for a specific project.

22   Q.   And in essence, you bid this out as a project?

23   A.   That is correct.

24   Q.   Okay.  And is that where you got the numbers that

25   you ultimately relied upon?

VON SALMI - Direct

1    A.    That is correct.

2         Q.    Are you familiar with the RSMeans methodology of

3    estimating jobs?

4    A.    I am.

5         Q.    Can you explain to us what RSMeans is?

6              MR. CARNATHAN:   Objection, Your Honor.  Mr. Salmi

7    doesn't discuss RSMeans in his opening report.  He's trying to

8    move it into sort of, like, a pre-rebuttal, that isn't even in

9    the report.  So if he wants to --

10             THE COURT:   The question is whether it was -- whether

11   this was disclosed, or whether --

12             MR. CARNATHAN:   Well, it wasn't disclosed in --

13             THE COURT:   -- it needed to be.

14             MR. CARNATHAN:   -- the opening report.  He's supposed

15   to be doing his opening -- his opinion at this point, right?

16   Now he's trying to front run Mr. Doddridge's testimony, which

17   hasn't come in yet.  So he's doing his rebuttal before Mr.

18   Doddridge testifies.

19             THE COURT:   I understand.

20             MR. CARNATHAN:   Okay.

21             MR. PERTEN:   Your Honor, I think it's appropriate.

22   First of all, it was disclosed in the rebuttal report, so

23   certainly --

24             THE COURT:   Then show me.

25             MR. PERTEN:   I'm sorry?



VON SALMI - Direct

1          THE COURT:  Oh, in the rebuttal report?

2          MR. PERTEN:  In the rebuttal report, because

3     Mister --

4          THE COURT:  All right, well, that proves the point,

5     but go ahead.

6          MR. PERTEN:  Except it doesn't, Your Honor, with

7     respect.  I think Mr. Von Salmi is entitled to testify as to

8     what other ways there are of doing what he did, and why he

9     chose to do it the way he did.  And so to ask him if he

10    considered other methodology before deciding on this

11    methodology, I would say, is appropriate, Your Honor.

12         THE COURT:  Are you going to recall him? Is that your

13    intention -- after --

14         MR. PERTEN:  That --

15         THE COURT:  -- Mr. Doddridge?

16         MR. PERTEN:  I don't know.  It depends on how Mr.

17    Doddridge does.  I may not.  It may not be necessary.  I can't

18    call that now.

19         MR. CARNATHAN:  Well, there's no discussion of

20    consideration of other methodologies in the opening report.

21    He doesn't talk about RSMeans and why he didn't use it.  He

22    only talked about that in the rebuttal report after seeing Mr.

23    Doddridge's, so he's --

24         THE COURT:  You may have to recall him then, because

25    I'm going to take a -- I'm going to take a fairly narrow view

VON SALMI - Direct

1    of disclosure at this -- if this wasn't discussed in his

2    initial report, then it wasn't fairly disclosed.  If it's

3    discussed in his rebuttal report, he may have to talk about it

4    on rebuttal.

5            MR. PERTEN:  Well --

6            THE COURT:  The objection's sustained.  Go ahead.

7            MR. PERTEN:  Thank you.

8    BY MR. PERTEN:

9        Q.   Now, why did you decide, sir, to bid and perform

10   your analysis -- to bid it as if it were a real project?

11   A.   Well, first of all, we're dealing in the realm of high-

12   end homes, okay?  In dealing with high-end homes, there is a

13   huge number of items that will be custom.  In order to take

14   and acquire the cost of those custom items, and the

15   application of those custom items, you need to take and be

16   able to acquire costs that come from entities that have had

17   experience with generating and installing those items.

18           In our opinion, we felt it was appropriate to develop a

19   list of bidders that we had familiarity with, that we had

20   worked with in the past, that knew how to perform and execute

21   this work, that had successfully executed this work for us and

22   others in previous applications.  So it -- it seemed to be a

23   natural segue for us to acquire the costs, based upon the fact

24   that these are high-end homes.

25           And high -- when -- and let me clarify that, when I say

VON SALMI - Direct

1   "high-end homes", because if one takes a look, you know, of

2   the various entities that we look at from time to time, one of

3   those -- Boston Magazine -- provided a statistic showing what

4   the average value in 2015 of a home in Boston -- saying all

5   cities in Boston -- at that time, it was about 453,000.

6       You go into Brookline, the average home was 1.6, okay?

7   Here we have homes, at my understanding, sold for about 4.4

8   million.  These are high-end homes.  They're not your

9   standard, average homes.  So we wanted to have a methodology

10  that would directly and accurately reflect the work that was

11  being conducted in these structures.

12      Q.   Now, in order to prepare a bid, or to obtain bids,

13  how did you go about doing that?

14  A.   We looked at the plans.  We looked at -- looked for

15  specifications.  The plans had architectural and structural

16  information on them.  There was information that could be

17  garnered through some of the exterior finishes.  There was

18  information on windows, some limited information on doors.

19  And we needed to further expand that to understand the

20  elements that were contained on the inside of the house.

21  While --

22      Q.   If I could interrupt you for a moment, sir --

23  A.   Yes.

24      Q.   -- let's just focus on the plans that you reviewed.

25  A.   Yes.

VON SALMI - Direct

1    Q.   You said there were architectural and structural

2    plans?

3    A.   Correct.

4    Q.   Are these the plans that would support the building

5    permit?

6    A.   Yes, they are.

7    Q.   And were these the plans upon which the building

8    permit was issued?

9    A.   That is correct.

10   Q.   Now, just generally speaking, can you explain to the

11   Court the architectural plans?  Generally, what is contained

12   in the architectural plans?

13   A.   Okay.  The architectural plans will take and show four

14   layouts.  They will show the foundation, and the composition

15   and dimensions of the foundation, the supporting footings,

16   columns --

17   Q.   It's -- Mr. Salmi, I -- I'm trying to distinguish

18   between the architectural versus --

19   A.   Okay.

20   Q.   -- the structural plans.  First, let's focus --

21   A.   Okay.

22   Q.   -- what's showing on the architectural plans?

23   A.   Okay.  In the architectural plans, you basically will

24   have dimensions.  You'll have rooms.  You'll have floor

25   layouts.  You will have elevations that show the width,

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1  heights of the buildings, and the light vertical dimensions,

2  illustrating some finishes, illustrating door and window

3  patterns, and again, you know, entities in terms of layouts

4  and rooms, bathrooms, kitchens, so on, so forth --

5       Q.   Okay.

6  A.   -- would be contained in the architecturals.

7       Q.   And are there also structural drawings that are part

8  of what you need for a building permit?

9  A.   Yes, there are.

10      Q.   And what is shown on the structural drawings?

11 A.   That would be the nature of the frame construction, how

12 it is to be constructed, and the size of various lumbers

13 included in the supporting loads, point -- supporting points

14 for transferring those loads into a structural-carrying

15 capability for the structure, basically the foundation and

16 footings.

17      Q.   Thank you.

18           MR. PERTEN:  Mr. Harris, could you pull up Exhibit

19 210, please?

20           MR. HARRIS:  Sorry.

21           MR. PERTEN:  You do have the plans, right?  No --

22 well, one exhibit.  I'm sorry, Mr. Harris -- 310.  Can you

23 rotate that?

24 BY MR. PERTEN:

25      Q.   Mr. Salmi, I'm showing you agreed-upon Exhibit 310.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1    Would that be part -- are -- these are the architectural

2    plans, correct?

3    A.   It appears as though they are, yeah.

4         Q.   Okay.

5              MR. PERTEN:  And if you could scroll down, Mr.

6    Harris?

7    BY MR. PERTEN:

8         Q.   So this is -- again, this would be sheet A-1.  What

9    does sheet A-1 show?

10   A.   That shows the first-floor plan.

11        Q.   The floor plan.

12             MR. PERTEN:  Okay.  Could you scroll down to A-2,

13   please, Mr. Harris?

14   BY MR. PERTEN:

15        Q.   What does that show?

16   A.   It shows the second-floor plan.

17             MR. PERTEN:  Scroll down, please.

18   BY MR. PERTEN:

19        Q.   And the next few sheets are the elevations; is that

20   correct?

21   A.   Correct.

22        Q.   So that's what the exterior of the house will look

23   like?

24   A.   Correct.

25        Q.   And I notice, although it's small, a little box.  Is

VON SALMI - Direct

1   that the door and window specifications?

2   A.    It is.

3        Q.    Okay.

4            MR. PERTEN:  Scroll down, please.

5   BY MR. PERTEN:

6        Q.    Is that the rear elevation?

7   A.    Yes, it is.

8            MR. PERTEN:  Keep going.

9   BY MR. PERTEN:

10       Q.    Another elevation?

11  A.    Yes, it is.

12       Q.    Another elevation?

13  A.    Correct.

14       Q.    Okay.  I'm now showing you what's labeled S-1 of

15  S-8.  So are we now moving into the structural plans, correct?

16  A.    Yes, we are.

17       Q.    And is -- are these the plans that show the columns,

18  and the foundations, and things of that like?

19  A.    Yes, it is.

20       Q.    All right.

21           MR. PERTEN:  And there are eight pages of those.  If

22  you just scroll down, Mr. Harris.

23  BY MR. PERTEN:

24       Q.    Structural details, correct?

25  A.    Yes.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1      Q.   Framing details, joists, and the like?

2   A.   Yes.

3      Q.   All right.  Sheet S-4, more framing detail?

4   A.   Correct.

5      Q.   Same with S-5?

6   A.   Correct.

7      Q.   More framing detail?  Same with S-6?

8   A.   Correct.

9      Q.   More framing detail?  We've got details of certain

10  structural numbers in the project, correct?

11  A.   Correct.

12     Q.   Okay.  And again, more details in the next drawing,

13  sheet 8?

14  A.   Correct.

15     Q.   Okay.  And are these the plans -- the permit plans

16  that you relied upon?

17  A.   Yes, they are.

18     Q.   Okay.  Now, did these plans provide you with all the

19  detail that was necessary in order to prepare a bid package?

20  A.   No, they did not.

21     Q.   Were they typical for what plans show to support a

22  building permit?

23  A.   Very much so.

24     Q.   So do they have all the finish specifications?

25  A.   No, they do not.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

Page 35

VON SALMI - Direct

1       Q.    And do the plans that are needed to support a

2   building permit have to have all the finish specifications?

3   A.    Not unless they concern health and safety.

4       Q.    Okay.  Given that you didn't have all the finish

5   specifications, did you take any steps to ascertain what

6   finishes were actually used in this house?

7   A.    Yes, we did.

8       Q.    What did you do?

9   A.    Well, first of all, we did a drive-by.  We did not have

10  access to the homes, because these are presently privately-

11  owned homes.  We did not want to intrude upon the homeowners.

12  But we did a drive-by of both sites to view the exteriors and

13  understand the nature of the site, the topography, the site

14  elements that were included, understand the finishes on the

15  exterior of the building, to confirm that the buildings were

16  constructed as per the plans.

17      Q.    Okay.  If I could interrupt you there for a moment.

18  During your site visit, were you able to observe the type of

19  siding on this house?

20  A.    Yes, we were.

21      Q.    Were you able to observe the topography?

22  A.    Yes, we were.

23      Q.    Were you able to observe the landscape's features?

24  A.    Yes, we were.

25      Q.    Were you able to observe the doors --

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1    A.    Yes, we were.

2          Q.    -- exterior doors?

3    A.    Yes.

4          Q.    What about retaining walls?

5    A.    Yes.

6          Q.    Fair to say that you were able to see first-hand

7    anything on the exterior of the house, correct?

8    A.    That would be correct.

9          Q.    You could see the roof --

10   A.    Yes.

11         Q.    -- shingling --

12   A.    Yes.

13         Q.    -- things of that nature?

14   A.    Yes.

15         Q.    Okay.  After doing your site visit, did you take any

16   other steps to learn what else went into this house that was

17   actually built?

18   A.    Yes, we did.

19         Q.    What did you do?

20   A.    We requested the proof-of-claim binders with redacted

21   costs.  We wanted to understand the nature of materials that

22   would be on the interior.  We reviewed those invoices to

23   take --

24         Q.    Okay.  I'm sorry, if I can interrupt.

25               MR. PERTEN:  So this is -- Your Honor, this is

VON SALMI - Direct

1    Exhibits 174 and 175, the proof-of-claim binders.

2     DEFENDANTS' EXHIBIT 174 AND 175 WAS MARKED FOR IDENTIFICATION

3            THE COURT:  Okay.

4    BY MR. PERTEN:

5        Q.   Mr. Salmi, when you first reviewed the invoices that

6    supported the proof of claim, did you look at the numbers that

7    were on them?

8    A.   Yes, we did -- or no, we did not have any numbers on

9    them, because we asked for redacted invoices with no pricing

10   on those, because we wanted to take and understand only the

11   nature of the materials that were utilized in there.  And we

12   want to also look in terms of the appropriateness of those

13   materials to see if it looked like those were materials that

14   would be used in a home like this.

15       Q.   So all the numbers were blacked out?

16   A.   Yes, they were.

17       Q.   Okay.  Did you do anything else besides a site visit

18   and looking at the invoices that supported the construction --

19   the redacted invoices?

20   A.   Yes, we did.

21       Q.   What else did you do?

22   A.   We reviewed photographs that were provided from the

23   realtors for the sale of the home, which showed extensive

24   interior photographs.

25       Q.   And looking --

VON SALMI - Direct

1          MR. PERTEN:  Mr. Harris, could you pull up Exhibit

2     46?

3          MR. HARRIS:  Yes.

4     BY MR. PERTEN:

5          Q.   Is this one of the MLS listings that you reviewed?

6     A.   Yes, it is.

7          MR. PERTEN:  Mr. Harris, could you scroll down to the

8     photos?

9     BY MR. PERTEN:

10         Q.   So are these the photos that you are referencing?

11    A.   Yes, they are.

12         Q.   And these photos enabled you to see certain aspects

13    of the interior of the home that you couldn't get physical

14    access to?

15    A.   Yes, they did.

16         Q.   And what kinds of things were you able to glean from

17    looking at the photos?

18    A.   We were able to take and understand the finishes -- types

19    of finishes.  For instance, if we start, first of all, with

20    the floors:  understand what type of floors, and the

21    dimensions and materials used on the floors; whether they were

22    clear-finished, or whether they were stained floors; the

23    baseboards, whether they were single-piece or multiple-stage

24    baseboards; the types of casings; the trim included on those.

25    The ceilings, as far as mouldings go, for instance, there were

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1   rooms that had multiple layers of crown mouldings -- sometimes

2   two, three, four layers of crown mouldings -- built up on

3   them.  There were coffered ceilings.  There were splay

4   ceilings.

5   There was paneling going up the stairways.  We understood the

6   nature of the composition of the stairs themselves.  We were

7   able to take and understand the cabinetry, the doors, where

8   there were stained finishes, where there were painted

9   finishes.  We under --

10          Q.   Excuse me.

11               MR. PERTEN:  Mr. Harris, could you scroll down,

12   please?  Keep going.  Stop there for a minute.

13   BY MR. PERTEN:

14          Q.   You mentioned you could understand cabinetry.  Did

15   these photographs -- are these the photographs that you're

16   referring to, where you could see cabinetry?

17   A.   That is correct.

18          Q.   Okay.  So top right there, is that part of the

19   kitchen?

20   A.   Yes, it is.

21          Q.   All right.

22               MR. PERTEN:  And then scroll down a bit.

23   BY MR. PERTEN:

24          Q.   Top right of what we're showing on the screen now,

25   would that be -- and top left, for that matter -- more

1    pictures of the kitchen?

2    A.    Yes.

3        Q.    And did that enable you to see, again, flooring,

4    trims, and the like?

5    A.    Countertops; appliances; lighting; ceiling conditions;

6    treatment of ceilings; enabled us also to take and understand

7    the amount of recessed lighting that was included and give us

8    some idea of the size, whether they were four-inch cans or

9    six-inch cans utilized in the ceiling; the types of hanging

10   fixtures, surface fixtures that would be included;

11   countertops, you know, whether they were laminate, whether

12   they were solid surface, or whether they were stone.  We

13   couldn't tell the exact species of the stone, but we knew that

14   there were stone countertops, the types of edges, so on, so

15   forth.

16        MR. PERTEN:  Okay, Mr. Harris, would you continue to

17   scroll, please?

18   BY MR. PERTEN:

19       Q.    We have -- that upper left, is that the kitchen

20   again?

21   A.    Yes.

22       Q.    All right.  Are there anything else in the four

23   pictures that we have up now on page 6 of Exhibit 46, sir,

24   features that you observed?

25   A.    Again, you know, when you get into a level of cabinetry,

VON SALMI - Direct

1    you'll see there are some glass doors with divided lights on

2    them, customized.  You get to see the nature of the

3    backsplash.  You see some of the fireplaces.  A fireplace was

4    installed there.

5        You get to understand and confirm the layouts in the

6    glazing, the windows and doors, what those layouts would be.

7    There were coffered ceilings in there, trims around the

8    fireplaces.  You know, it pretty much divulged what the

9    interior schedule was.

10        MR. PERTEN:  Mr. Harris, would you continue to

11   scroll, please?  Okay.

12   BY MR. PERTEN:

13       Q.   This next group of pictures on page 7 of this

14   Exhibit 46, what did you glean from those?

15   A.   Again, on the second-floor level, it looks like this was

16   probably the master bedroom.  It included a fireplace.  You

17   could see the master closet that was built out with custom

18   fitting.  You also see the extensive nature of the cabinetry

19   included in the master bath.  It's -- it's a pretty well-

20   appointed master bath.  And the lower right shows the shower.

21   It -- it appears to be a custom shower that was off to the

22   left, and the built-in for a custom soaking tub, it looks

23   like.

24       Q.   Okay.

25        MR. PERTEN:  Keep going, Mr. Harris.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1   BY MR. PERTEN:

2        Q.   Are those more pictures showing the fixtures and the

3   layout of the master bathroom?

4   A.   Yes, they are.

5        Q.   Okay, what does that picture in the lower right

6   show?

7   A.   That shows the inset of a mosaic pattern in the stone,

8   shows the shower fit-out, shower seat, shows extensive

9   plumbing in there with valves and multiple heads, and the

10  shower steam unit, and the like; typical amenities that you

11  would in, again, a very high-end home.

12        MR. PERTEN:  Mr. Harris, could you scroll?

13  BY MR. PERTEN:

14        Q.   Top left, is that the rotunda?

15  A.   Yes, it is.

16        Q.   Okay.  Were you able to correlate your observations

17  here of the exterior of the home, with what you saw for --

18  when you did your site visit?

19  A.   Yes, I was.

20        Q.   Okay.  Incidentally, the exterior, what is the

21  material used for the exterior?

22  A.   Okay, so you have wood shingles extensively used in -- on

23  this -- I believe this is Lyman -- with the brick exterior,

24  brick chimneys.  There's brick veneers to the exterior.  You

25  can also see there's a brick veneer on the foundation.  You

VON SALMI - Direct

1   see there's a blue stone patio, extensive patio.  You can see

2   blue stone treads, brick rises from the stoops coming out of

3   the house, and the extensive nature of the exterior lighting

4   package, also.  Plus you also see the extensive amount of

5   landscaping, and relatively mature material that was installed

6   with the landscaping.

7       Q.   Okay.  Now, the picture in the lower right, which

8   shows the house with lights on, do you see that?

9   A.   Yes.

10      Q.   I see a wall there.  Is that one of the retaining

11  walls?

12  A.   That is one of the number of retaining walls on the

13  property.

14      Q.   Now, based on these pictures, and based upon what

15  you actually saw, is this a level lot, or is it a sloped lot?

16  A.   No, it isn't.  The -- the lot -- I believe, when I

17  calculated -- showed probably about a thirty-some-odd-foot

18  differential from the high end to the low end of the property.

19      Q.   Okay.

20          MR. PERTEN:  Mr. Harris, could you scroll?

21          MR. HARRIS:  Up?

22          MR. PERTEN:  Yeah, are we at the end?

23          MR. HARRIS:  Yes, we are.

24          MR. PERTEN:  Okay.

25  BY MR. PERTEN:



VON SALMI - Direct

1    Q.   Now, in addition, sir, to doing your site visit,

2    reviewing the photographs, and reviewing the redacted

3    invoices, did you do anything else to ascertain exactly what

4    went into the construction of this building?

5    A.   Yes, we did.

6    Q.   What else did you do?

7    A.   We also reviewed inspection reports.

8    Q.   Would these be the inspection reports from the

9    purchasers of the property?

10   A.   Yes.

11   Q.   And what information, generally, did that give you?

12   A.   Again, I confirmed finishes, things that we saw within

13   the photographs of the interior, confirmed things that we saw

14   on the outside -- again, another set of checks and balances

15   that confirm that the assumptions that we were utilizing in

16   costing were accurate.

17   Q.   Did you also go back and confirm that the invoices

18   that you reviewed correlated to what you were seeing in other

19   sources?

20   A.   Yes, we did.

21   Q.   And did it?

22   A.   Accurately -- quite accurately.

23   Q.   Did you review anything else to ascertain exactly

24   what had been built?

25   A.   Yes, I believe there were some depositions that were

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1   conducted from Kagan Development, Mr. Kagan, and, I believe,

2   Tatiana Kagan, also several subcontractors.

3       Q.   Okay.  Okay.

4   A.   Yes, sir.

5       Q.   Any other documents that you reviewed in order to

6   ascertain exactly what went into the building of these

7   projects, in order to prepare your bid packages?

8   A.   There were additional documents.  For the moment, I

9   cannot recall those.  I believe that's listed in the list of

10  documents that was included in our report.

11      Q.   Sir, are you referencing Exhibit C to your report?

12  A.   Yes.

13      Q.   Would that refresh your memory to look at Exhibit C

14  and see what else you looked at?

15  A.   Yes, it would.

16          MR. PERTEN:  Your Honor, may I have him look at

17  Exhibit C to refresh his memory?

18          THE COURT:  Any objection?

19          MR. CARNATHAN:  No objection, Your Honor.

20          THE COURT:  All right.  Go ahead.

21          THE WITNESS:  Okay.

22  BY MR. PERTEN:

23      Q.   Having looked at Exhibit C, sir, are there other

24  documents that you reviewed that you haven't already told us

25  about, that you reviewed in order to ascertain exactly what

VON SALMI - Direct

1  went into the building of this project?

2  A.   Yes, we did.

3      Q.   What else?

4  A.   There was a construction budget that was submitted to

5  Rockland Trust, the certificate of occupancy, again,

6  appraisals --

7      Q.   And with respect to the appraisals, what information

8  did you glean from the appraisals?

9  A.   Descriptions of materials.

10     Q.   Okay.

11 A.   Final plans, both lots.  Again, we mentioned inspection

12 reports.

13     Q.   I'm sorry.  Which plans did you just say a moment

14 ago?

15 A.   Okay, the final as-built plans.

16     Q.   Okay.  What are the final as-built plans?

17 A.   Those are required by the engineering departments for

18 final sign-off on an occupancy permit that show the final

19 dispensation of site elements; verifying the position of the

20 house, that it was located with the proper setbacks, and the

21 like; also, compliance for any engineering features, such as

22 retention areas; capturing run-off on sit; placement of site

23 walls; showing grades, and the like; in compliance with town

24 requirements.

25         MR. PERTEN:  Mr. Harris, would you pull up Exhibit

eScribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1  311, please?

2  BY MR. PERTEN:

3      Q.   Is Exhibit 311 one of the final as-built plans?

4          MR. PERTEN:  Yeah, can you rotate that?

5  A.   Yes, sir, it looks -- it appears to be so, yes.

6  BY MR. PERTEN:

7      Q.   Okay, that's for one of the houses, correct?

8  A.   Correct.

9          MR. PERTEN:  And Mr. Harris, would you pull up

10  Exhibit 312?  And if you could rotate that, please.

11  BY MR. PERTEN:

12      Q.   Is this the as-built plan for the other property?

13  A.   Yes, it is.

14      Q.   All right.  Did you also look at as-builts for the

15  foundation?

16  A.   Yes, we did.

17          MR. PERTEN:  Mr. Harris, would you pull up 313?  You

18  got it upside-down there.

19          MR. HARRIS:  Sorry.

20  BY MR. PERTEN:

21      Q.   Is that  the final as-built for the foundation?

22  A.   That is.

23      Q.   Was that also a document you reviewed?

24  A.   Yes, I did.

25      Q.   Incidentally, when we looked at 311 and 312, which

VON SALMI - Direct

1   was the as-built site plans a moment ago, did they depict the

2   as-built driveways?

3   A.   Yes, they did.

4        Q.   Did you make any observation as to whether the

5   driveways on the two properties were identical?

6   A.   Yes, I did.

7        Q.   Were they identical?

8   A.   No, they were not.

9        Q.   And did you scale them and determine whether one

10  was -- what the difference was between the two of them?

11  A.   Yes, I did.

12       Q.   What was the difference between the two of them?

13  A.   It was about 13- or 1400 square feet more on one over the

14  other one.

15       Q.   Okay, so they weren't identical?

16  A.   Yes, that's true.

17       Q.   Okay.  And was the shape of the lots identical?

18  A.   No, it was not.

19       Q.   Okay.  Now, after you had reviewed the permit plans,

20  site plans, the as-builts, the invoices, the photos, and all

21  the documents we've just referenced, what did you do next in

22  order to come up with a bid that you could submit to trades?

23  A.   Well, we also took a look at the contract to build the

24  houses between Classic Homes and Lyman-Cutler, just to see if

25  there was any information that would give us an -- a

VON SALMI - Direct

1    direction, as far as the scope of work goes, and what

2    materials might be included.  Same thing with the management

3    contract, in those various transcripts that we looked at.

4         Q.   Okay.  And once you had gathered all this

5    information, what did you do next?

6    A.   So we began to assemble that into an order utilizing

7    what's widely used in the construction industry, using the CSI

8    MasterFormat, which breaks down, by category, the various

9    elements that are utilized in construction.

10        Q.   Okay.  So when we talk about CSI format and various

11   elements, in other words, you broke it down into electrical,

12   plumbing -- sitework in various gross categories?

13   A.   Yes.

14        Q.   Okay.  And each of those are assigned a number; is

15   that correct?

16   A.   Yes.

17        Q.   So like Division 1 would be general requirements,

18   Division 2 would be some other trade, and so on?

19   A.   Yes.

20        Q.   And what are there, like, about thirty-some-odd

21   different --

22   A.   There's thirty-six, thirty-eight.  I think maybe it

23   expanded to even forty now.

24        Q.   Okay.  And did you prepare a set of specifications

25   based upon all this information that you had reviewed?

Page 50

VON SALMI - Direct

1   A.   Yes, we did.

2        Q.   Now in preparing the specifications, sir, did you

3   just make that up randomly, or was that based on facts that

4   you had gleaned?

5   A.   We only deal in facts, okay?  So again, we tried to

6   garner as much information as we could, to be as accurate as

7   possible, and take that information, then, and translate that

8   into a set of specifications to be bid, along with the plans

9   by the various subcontracting entities.

10       Q.   Okay.  Now once you had developed, sir, a set of

11  specifications reflecting what was actually bid -- built,

12  excuse me -- how did you go about figuring out who to send the

13  bids to?

14  A.   Well, once we had identified the various categories of

15  subcontractors that were needed, we went through the list of

16  subcontractors that we maintain -- that we've utilized over

17  the years, and that we've had relationships with.  And because

18  this was a project that we wanted to have a bid for, we

19  selected individuals that we knew, first of all, had done

20  similar types of work, had executed the work, and provided

21  good value in their bids for the work.

22       Q.   And did choosing bidders that you knew of, or had

23  some relationship with, would that impact the value of the

24  bids in any fashion?

25  A.   We felt it would, yes.

VON SALMI - Direct

1      Q.    How so?

2   A.    In providing an accurate price that would not be overly

3   inflated, because again, we had a relationship.  And these

4   contractors, many of which we've worked with twenty-plus

5   years, we've had a very good relationship with them, a very

6   honest relationship.  And wanting to take and keep that

7   relationship open going forward, they wanted to make sure that

8   they would provide, again, good value in the quotes that they

9   were providing us with.

10      Q.    If you had just bid out cold, were you, did you have

11   concerns?

12   A.    If I had bid out -- I'm sorry?

13      Q.    Just to people you didn't know, were you -- did you

14   have concerns about doing that?

15   A.    Yes, the -- the nature in doing that is you've -- people

16   don't understand the requirements of the job, okay?  They're

17   coming in.  You don't understand them.  You don't know what

18   their pricing regime is.  You don't know what their crews are.

19   You -- again, it's like dating.  You know, again, you know,

20   you -- it takes a period of time to understand.

21      We did not feel as though we had a year or two to take

22   and understand the relationships with outside contractors.  We

23   wanted to be able to get someone who gets right to the point

24   as quickly as possible, and as accurately as possible.

25      Q.    And based upon your experience, you're able to get

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1   better prices from people you know?

2   A.   Yes, we were.

3        Q.   And by better, lower?

4   A.   Yes.

5        Q.   Now, when you sent the bids out to the various

6   contractors, did you advise them that this was going to be

7   used for a lawsuit?

8   A.   No.

9        Q.   Why not?

10  A.   Well, we told a little, white lie here.  What we told

11  them was, we wanted them to take and -- if they were

12  interested in bidding, we wanted a bid for a home that we were

13  pricing out for a customer, who had seen a similar home to

14  these, and would like to take and have us price that home out

15  for them.  And everyone consented.

16       Q.   And why did you decide not to tell them that this

17  was for use in a lawsuit?

18  A.   In the past, when we have done that, we've found that

19  we've gotten over-inflated prices.  Individuals were concerned

20  about being brought into court, having to testify to the end

21  numbers, and the like.  It just -- it's not a field that they

22  deal with.  They're contractors.  They're subcontractors.

23  That's what they know.  So again, if they hear the word

24  "legal" in anything, sometimes we can't even get them to bid

25  it.

VON SALMI - Direct

1    Q.    And are the prices inflated?

2    A.    If -- absolutely.

3    Q.    Now, after you sent out the bids, presumably, you

4    got a bid back, correct?

5    A.    Yes.

6    Q.    Did you validate those bids in any fashion?

7    A.    Yes, we did.

8    Q.    What did you do?

9    A.    Well, for instance, based upon my experience, I know that

10   electrical for these homes can run anywhere between ten to

11   fourteen dollars a square foot.  The bid that came in was

12   about eleven dollars and twenty-some-odd cents a square foot.

13   It fell within the range, and it was in the lower end of the

14   range, so we felt that was a valid bid.  And we did similar

15   calculations with any of the other bids that we had any

16   questions over.

17   Q.    And did you find any bids that you were not

18   comfortable with?

19   A.    Yes, we did.

20   Q.    And what areas did you find a bid that you felt was

21   not reflective of an actual cost?

22   A.    The windows, in particular.

23   Q.    Okay.  And when you looked at the window bid that

24   you'd received, and you had concerns, what did you do?

25   A.    We sent that out for a comparable bid, possibly even

VON SALMI - Direct

1    another product that was comparable to the Andersen window

2    package that was asked for.  Marvin makes a line of windows

3    called Integrity, which is almost, you know, spec to spec

4    matches that.  And we had solicited a bid based upon the

5    Integrity line.

6         Q.   And so you had two bids for windows?

7    A.   Yes.

8         Q.   And in your final analysis, did you use the higher

9    or the lower number?

10   A.   No, we used the lower.

11        Q.   Now, after you received all the bids back, did you

12   tally the numbers?

13   A.   Yes, we did.

14        Q.   And did you come up with an analysis of the cost to

15   build these structures?

16   A.   Yes, we did.

17        Q.   And after you had developed your numbers, did you do

18   anything else to validate the facts in the bids that you had

19   sent out?

20   A.   Yes, we did.

21        Q.   What did you do?

22   A.   We asked for the unredacted copies of the invoices and

23   contracts that were provided in the first proof of claim

24   binders with the redacted costs.  We asked for those costs to

25   come back to us, so we could take and review those compared to

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1   the costs in the quote that we had previously generated.

2       Q.   And based upon that check that you did once you --

3   after you had developed your pricing, did you find anything

4   out of whack?

5   A.   No, not really, other than the fact that the prices were

6   better than what we were able to achieve.

7       Q.   Okay.  The Kagan prices?

8   A.   Yes.

9       Q.   Did you speak with Mr. Kagan?

10  A.   Yes, I did.

11      Q.   Did you speak to Mr. Kagan before or after you had

12  done your analysis?

13  A.   It was probably a month to almost two months afterwards.

14      Q.   And at the time you spoke with Mr. Kagan, had you

15  provided him with a copy of your analysis?

16  A.   No, I had not.

17      Q.   And what was the purpose for speaking with Mr.

18  Kagan?

19  A.   Just to verify that the assumptions on materials that we

20  made were accurate.  A for-instance would be on -- because

21  again, we were not there, but we saw that there was an invoice

22  for plastering.  Well, I asked him, what was the finish on the

23  interior walls?  He said half-inch wood and plaster.

24      Q.   All right.

25  A.   So it was that type of verification we looked for.

VON SALMI - Direct

1    Q.   Okay.  And again, this occurred after you had done

2    your analysis?

3    A.   Yes, it did.

4    Q.   And based upon the information that you received

5    directly from Mr. Kagan, did you change your analysis in any

6    fashion?

7    A.   No, we did not.

8    Q.   Okay.  Now Mr. Salmi, let's talk about how you

9    tabulated your results.  How many different analyses did you

10   do?

11   A.   I -- I don't --

12   Q.   Let me try the question again.

13   A.   -- understand your question.  Please.

14   Q.   You priced this -- you came up with three different

15   prices, correct?

16   A.   Yes, we did.

17   Q.   Let's talk, if we could, about the first price that

18   you came up with, which you called the Von Salmi Associate

19   cost.  What was that?

20   A.   Yes.  Okay, that was a cost that we wanted to establish

21   as a benchmark.  Okay, that benchmark would be if we were a

22   general contractor, we were hired to build one of those homes,

23   that is the cost that we would want to have to build that home

24   the way that Von Salmi & Associates would build.

25   Q.   And in addition to the bids that you had received

VON SALMI - Direct

1   from the various trades, would there have been additional add-

2   ons, if you will, that a general contractor, such as Von Salmi

3   & Associates, would do to the project?

4   A.    Yes.

5       Q.    What kinds of things did you add on to that number?

6   A.    Well, for instance, we would normally staff the job with

7   a dedicated project manager.  We staff the job with a

8   dedicated site superintendent who would be in charge of the

9   site and site operations.  We also included our customary

10  overhead numbers in there.

11      Q.    What is overhead?  What do you mean by that?

12  A.    Well, overhead costs that are incurred by the contractor,

13  such as insurances, office cleaning, a lot of -- some of those

14  general categories that are not carried specifically on the

15  bid, those are the office -- office help, things like that --

16  that all goes under that overhead number.

17      Q.    And did you ascribe a percentage of the construction

18  costs for overhead?

19  A.    Yes, we did.

20      Q.    What number did you utilize?

21  A.    We use ten percent.

22      Q.    Of the total construction cost?

23  A.    Correct.

24      Q.    And why did you select ten percent?

25  A.    Well, the range, customarily is five to fifteen percent,

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1  for most companies.  Most companies use that ten percent.  We

2  have used ten percent for -- I've used it for probably the

3  last thirty, forty years.  It works for us in terms of being

4  able to cover us for our overhead numbers.

5       Q.   And now you said you did this first analysis of the

6  Von Salmi Associates cost as a benchmark.  What did that mean?

7  What do you mean by that?

8  A.   Okay.

9            MR. CARNATHAN:  Objection.  Basically renewing my

10 motion in limine objection with Mr. Salmi's testimony about

11 the --

12           THE COURT:  Just -- the microphone --

13           MR. CARNATHAN:  Oh, excuse me.

14           THE COURT:  -- I'm a little worried about.

15           MR. CARNATHAN:  Effectively renewing my objection to

16 the motion from the motion in limine, Your Honor, that Mr.

17 Salmi's testimony is irrelevant.  His testimony about what he

18 determined based on a single bid for each trade in 2018

19 informs us nothing about what the fair costs were in 2013,

20 2014, and his methodology is flawed.

21           MR. PERTEN:  I think his methodology is sound, and

22 you certainly can cross-exam on that.  And we can certainly --

23           THE COURT:  Overruled.

24           MR. PERTEN:  -- address --

25           THE COURT:  Overruled.

VON SALMI - Direct

1          MR. PERTEN:  Thank you.

2          THE COURT:  The objection's overruled.  Go ahead.

3      BY MR. PERTEN:

4          Q.   Were you -- before the objection, I asked you what

5      you meant by benchmark.

6      A.   Okay.  We wanted to have a cost for that house if VSA

7      were to build that.

8          Q.   So an outside GC?

9      A.   That's correct.

10         Q.   Okay.  Did you adjust your numbers at all to reflect

11     the fact that this construction was 2014 and you're now

12     getting bids in 2018?

13     A.   What we did was we looked at several sources of

14     information to take and determine what the variance may be.

15     One of those was the design cost data publication, which

16     showed in 19- -- in 2014, if you had a price index of 100,

17     that price index would've increased to 107,000, roughly a

18     seven percent increase in materials over that time.

19         Labor had been relatively stable, even going back to

20     2015.  Roughly, they're paying anywhere from -- seventy to

21     seventy-five dollars an hour is what carpenters are charging.

22     That's currently, to this day, what carpenters are charging.

23     Massachusetts was a very unique market.  Even in the

24     recession, we did not take a decrease.  You did not see a lot

25     of reduction as far as the cost of labor goes, because we have

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1   a very tight labor market in the industry, and particularly

2   here in the Boston area.  So labor being a factor, and labor

3   generally may be fifty percent, sixty percent of the costs in

4   a building -- so with the seven percent cost increase in

5   materials, we did not think that was appreciable enough to

6   modify our numbers.

7        Q.   Okay.  And sir, just for the benchmark, what was the

8   ultimate price you came up with?

9   A.   If I could take and refer back to my report in my binder.

10  I believe it was 3.9 or somewhere thereabout.  But if you'd

11  like to me to quote you the exact --

12       Q.   Sure.  Would you look at your --

13  A.   -- number, I'd have to go to my binder.

14       Q.   -- exhibit and refresh your memory as to what your

15  number was when you tabulated for if there was an outside GC

16  engaged?

17            MR. CARNATHAN:  No objection, Your Honor.

18            THE COURT:  Okay.  Go ahead.

19            And remind me while he's looking, are the expert

20  reports being offered in evidence?

21            MR. PERTEN:  No.

22            THE COURT:  Okay.

23  A.   Okay.  So that total number on the VSA column was

24  $3,689,730.57.

25  BY MR. PERTEN:

VON SALMI - Direct

1    Q.   So 3-million-689 would be the cost to build one

2    house if there was an outside general account?

3    A.   Correct.

4    Q.   And that was the benchmark only, correct?

5    A.   That's correct.

6    Q.   So you're not testifying that that's what it would

7    have cost for this project, correct?

8    A.   No, I am not.

9    Q.   Once you established the benchmark, did you do

10   further analysis to determine what the cost would be to build

11   the Lyman-Cutler project in the manner that it was actually

12   built?

13   A.   Yes, we did.

14   Q.   How did you go about doing that?

15   A.   Again, in reviewing the invoices that we were presented

16   with, looking at some of those costs versus what we had, we

17   noticed there were reductions in certain categories.  So in

18   the project cost summary, you'll notice in that middle column

19   under developer costs, there --

20   Q.   Now again, you're referring, sir, to your Exhibit A

21   to your opening report?

22   A.   Yes, sir.

23   Q.   Okay.  Were there expenses, sir, that you listed

24   when you did the benchmark, that you did not need to list, or

25   which did not need to be incurred on the Lyman-Cutler project?

VON SALMI - Direct

1    A.    Yes, there were.

2         Q.    And what kind of expenses, if you will, did you not

3    include for the Lyman-Cutler analysis, as opposed to the

4    benchmark analysis?

5    A.    We removed the site supervisor, because we assumed then

6    that the GC, Kagan, would be performing those -- self-

7    performing those services.

8         Q.    So how much did you carry, sir, for site supervisor

9    in the VSA benchmark number?

10   A.    It was 130,000.

11        Q.    And did you charge that 130,000 in the Lyman-Cutler

12   project as well?

13   A.    No, we did not.

14        Q.    All right, so that was $130,000 savings, if you

15   will?

16   A.    Yes.

17        Q.    All right.  Were there any other significant deducts

18   from the benchmark which you used to develop the Lyman-Cutler

19   number?

20   A.    Yes, if we go back to Exhibit A, and if we take a look

21   and --

22        Q.    And Mr. Salmi, let me interrupt you.  I'm assuming

23   you haven't memorized these numbers, correct?

24   A.    I -- there's a lot in my head.

25        Q.    All right, so you need to --

VON SALMI - Direct

1  A.    Yes.

2       Q.   -- refer to your Exhibit A?

3  A.    I -- I am.

4       Q.   Okay.  Thank you.

5  A.    Okay.

6       Q.   You can please proceed.

7  A.    So if you take and look at the developer costs again

8  there, we originally had the general site conditions, a

9  trailer at 1,500.  We reduced that to 1,000, because the

10 contractor may have his own site trailer, or he may not even

11 have a site trailer.

12      Looking at cleaning for instance, you know, weekly

13 cleaning of the site -- in the VSA costs, we don't have

14 laborers.  We would have to hire an outside entity to do that.

15 Assuming that the developer had someone on staff to go in and

16 do that cleaning and the like, we reduced that cost.

17      And if you go down to the -- the second category there,

18 we took a look in terms of the landscaping.  We had an

19 allowance of 75,000.  We reduced that to 55,000.  The

20 developer may have a relationship with a nursery, or a

21 landscaper, and he's able to take and buy in because he's

22 doing multiple projects and have that relationship over time

23 where he could take and acquire further savings.

24      Same thing with the fencing, temporary security.  He may

25 already own that.  He may move that from site to site.  So

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1   that we attributed as a reduction in cost.

2        Q.   And after you tallied the sub-bids -- and certainly

3   the sub-bids, that's a constant, right?  You didn't change

4   those?

5   A.   Correct.

6        Q.   After you deducted those things, what you didn't

7   feel were necessary because it wasn't an outside contractor,

8   per se, were you able to come up with a number as to what it

9   would cost to build the first house for Lyman-Cutler?

10  A.   Yes, we did.

11       Q.   And sir, based upon the analysis that you performed,

12  your experience, your education, your fifty years in the

13  industry, were you able to form an opinion, sir, as to the

14  cost to build the first house on the Lyman-Cutler project?

15  A.   Yes, we did.

16       Q.   And what is that number?

17  A.   It was $3,098,160.80.

18       Q.   3,098,160?

19  A.   Yes.

20       Q.   And that value, sir, in order to figure out what

21  the -- there were two houses; you understand that, correct?

22  A.   Correct.

23       Q.   In order to figure out the value of building the

24  second house, did you just double that?

25  A.   No, we did not.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1      Q.   Why not?

2   A.   Well, for instance, if we go back to page 1 on Exhibit A

3   and you look at the off-site transport disposal demolition,

4   you couldn't build the first house without demolishing the

5   existing house on the site.  So we attributed that cost

6   directly to the first house, did not carry any of that cost

7   into the second house.  So that was removed.

8        Earthwork, ledge, we made the assumption, and accurately

9   so, that there was ledge found on only one home, not both

10  homes.  There was also a reduction there in -- we had removed

11  in both columns, also, electric backup generator, which we

12  would normally have, but was not included in the cost here.

13       And then in this second home there, also, a project

14  manager number would come out, because you have two houses,

15  but this is one project.  So you're building two houses with

16  one project, and assuming there's one project manager that's

17  managing both houses at the same time.  So that cost, instead

18  of dividing it over both houses, we carried it only on the

19  first.

20       So you would have to take the first house and the second

21  house, and combine those to get the total cost.  You couldn't

22  take and double either one.

23       Q.   So in other words, there were some economies of

24  scale?

25  A.   That is correct.

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1    Q.   And based upon the economy of scale deduction, did

2    you come up with a lower price for building the second home?

3    A.   Yes, we did.

4    Q.   And sir, based upon your experience, and your

5    methodology that you employed, and your fifty years in the

6    industry, were you able to form an opinion as to the cost to

7    construct the second home on the Lyman-Cutler project?

8    A.   Yes, we did.

9    Q.   And what was that cost?

10   A.   It was 2,771,667.94.

11   Q.   2,771,667, sir?

12   A.   Correct.

13   Q.   So if I wanted to ascertain the total cost for the

14   two houses, would I add the 3,098,160 for the first house and

15   the 2,771,667 for the second house?

16   A.   That would be correct.

17   Q.   And therefore, the total cost would be 5,869,828; is

18   that correct?

19   A.   As our estimate, yes.

20   Q.   Okay.  Now, when you made your opinions of cost as

21   to each of the homes, did you tack overhead on each?

22   A.   Yes, we did.

23   Q.   And again, how much was the overhead?

24   A.   The overhead, again, being a function of the total cost

25   there, on the first home was 281,650.  And the second home was

VON SALMI - Direct

1   251,969.

2        Q.   So it's ten percent?

3   A.   Correct.

4        Q.   Okay.  Now, were you also asked, sir, to determine

5   the fair and reasonable value of the work that was performed

6   by ProExcavation Corp.?

7   A.   Yes.

8        Q.   And how did you go about doing that analysis?

9   A.   Quite simply, we took the ProEx estimate that was

10  included in the proof-of-claim binders, because we discovered

11  later that that was also the invoice that ProEx used.  So we

12  took the description of the work in the ProEx estimate and we

13  went back to the subcontractors, which were in categories 2,

14  3, 4, and 7100, in our estimate.

15       Q.   Let me interrupt.  When you say categories, these

16  are those various divisions, if you will?

17  A.   The CSI divisions, yes.

18       Q.   So you determined which subcontractor numbers

19  related to work that was performed by ProExcavation Corp.?

20  A.   That is correct.

21       Q.   And what did you do once you made the determination

22  as to which numbers reflected work that was performed by

23  ProEx?

24  A.   So we tallied those numbers for column "Developer Costs",

25  and then the third column, in the economy of scale house,

VON SALMI - Direct

1    because those numbers come in differently.  So we tallied the

2    numbers for each house for that particular category of work.

3        Q.   And so once you tallied the information that related

4    solely to the ProEx work, were you able to form an opinion, to

5    a reasonable degree of certainty in your profession, as to the

6    fair and reasonable value of the ProEx work?

7    A.   Yes, we did.

8        Q.   What was that number?

9    A.   That number came in, I believe, on a per-house basis.  It

10   was 489,550.  I will have to point out, it was a math error in

11   our report on page 11.  We, at that time, had pointed out that

12   the cost was 447,040.  We incorrectly doubled the number,

13   which was incorrect.  You would have to take the cost in the

14   first column, and the cost and the second column.  The first

15   column was equal to 556,700.  The second column being the

16   447-4.  You combine those, and then split those, which gave us

17   a number of 489,550.  So there was an error of about

18   $42,000 --

19       Q.   Okay.

20   A.   -- in our statement.

21       Q.   Whether you use the originally underestimated

22   number, which was lower than -- by approximately 40,000, or

23   the revised number, which is slightly 40,000 more, regardless

24   of which number you use, did you come to an opinion as to

25   whether the prices charged by ProEx were fair and reasonable?

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Direct

1   A.   Yes, we did.

2        Q.   And what was your opinion?

3   A.   They were very good.  We -- in the original analysis, we

4   thought we were only off by two-tenths of a difference.  It

5   was a little bit higher, but it was very, very close.  So we

6   felt --

7        Q.   Okay.

8   A.   -- as though those costs were fair and reasonable.

9        Q.   So before you increased the number to account for

10  the error, your number was within a couple hundred bucks?

11  A.   That's correct.

12       Q.   Okay.  And again, sir, so the number for the ProEx

13  work is what?

14  A.   It averages to 489,550 for each house, or doubling that

15  number -- what did they have -- well, we'd double the 489,550.

16       Q.   Okay.  Now, sir, when you were preparing your

17  analysis and obtaining costs for the full project, what was

18  the amount of money that you attributed to the electrical

19  work?

20  A.   The electrical end of the VSA column was 278 --

21       Q.   Per house?

22  A.   -- 278,000.  No, that was a VSA estimate.  Then when you

23  go into developer column, it was 205,000.  And then the

24  economies of scale was at 194,750.

25       Q.   Okay.  So there's been testimony in this court case

VON SALMI - Direct

1  that the entire electrical for both houses combined would only

2  be 65,000.  Would that be consistent with your report?

3  A.   No.

4      Q.   Could the electrical work have been done for 65,000,

5  combined, the two houses?

6  A.   In my -- in my opinion, not as I've seen, and what I

7  understand of finishing these homes.

8          MR. PERTEN:  All right, may I just have a minute?  I

9  think I may be done.

10         THE COURT:  Yes.

11                     (Pause)

12         MR. PERTEN:  Thank you, Your Honor.  May I proceed?

13         THE COURT:  Yes.

14 BY MR. PERTEN:

15     Q.   Mr. Salmi, as part of your analysis when you were

16 preparing the bid specifications for the total project cost,

17 did you have to calculate the total exterior area of this

18 house?

19 A.   By exterior, what are you referring to?

20     Q.   The areas that had to be sided.

21 A.   Yes.

22     Q.   And how large an area was that?

23 A.   I think we estimated the area covered by the cedar siding

24 would be approximately 6,395 square feet.

25     Q.   And in order to do that calculation, how do you go

VON SALMI - Direct

1    about doing that?

2    A.   Well, the methodology I employed is I would take and go

3    through the plans to get the horizontal dimension, and then

4    scale off the vertical dimension off of the plans.  Then what

5    I did was I deducted areas for trim-to-trim dimensions.  In

6    other words, where there's a window casing, you go from the

7    left side of that casing to the right side of that casing, and

8    then you go from the head casing down to the bottom of the

9    sill, because that area is not being covered.

10   So there's a certain amount of area attributable in the total

11   sidewall to doors and windows.  But the siding actual area

12   being covered by the siding was 6,395.

13        MR. PERTEN:  Your Honor, I have nothing further at

14   this time.

15        THE COURT:  Okay.

16        MR. CARNATHAN:  Thank you, Your Honor.

17        THE COURT:  Okay.

18                    CROSS-EXAMINATION

19   BY MR. CARNATHAN:

20        Q.   Good morning, Mr. Salmi.

21   A.   Good morning, Mr. Carnathan.

22        Q.   Just picking up quickly on that last point, that

23   6,395-square-foot figure you just testified to, that -- that's

24   nowhere in the specs you provided; is it, sir?

25   A.   No, it is not.

     Q.   In fact, it's not in your report either; is it, sir?

A.   It -- it -- that number would be part of the bid that was

contained from Crimson King, because they would have done that

calculation.  I did that calculation as a check for myself to

check the quantities that were billed on the unredacted

invoice.

     Q.   So you'll agree with me that that figure's not found

in your report then, sir, right?

A.   No, it is not.

          MR. CARNATHAN:  All right, so I would move to strike

that testimony, Your Honor.

          THE COURT:  Any response?

          MR. PERTEN:  Your Honor, I think the report discloses

what he did.  To the extent that that was a number that he

received and that he verified, I think that's certainly within

the scope of disclosure.  We've provided the bids.  He

testified that he --

          THE COURT:  Well, where --

          MR. PERTEN:  -- reviewed the bids.

          THE COURT:  -- is it in the disclosure?  Where?

Where --

          MR. PERTEN:  The --

          THE COURT:  When you say it's in the disclosure --

          MR. PERTEN:  The --

          THE COURT:  -- in the report?

MR. PERTEN:  The disclosure broke it out by trade and gave a number as to what each trade would cost.  We also provided the backup bid specifications to Mr. Carnathan, as well as the bids themselves.  That was all part of what was provided with the initial disclosure.

THE COURT:  Yeah, but the -- okay.  It --

MR. CARNATHAN:  If --

THE COURT:  The question is what he told these guys he was going to testify about.  That's the issue.

MR. PERTEN:  Well --

MR. CARNATHAN:  Well, the number's also not found in his specs, as he just testified.  It's not in his report.  And I can put the Crimson King proposal up on the screen, and it's not on the Crimson King proposal, either.  So this is --

THE COURT:  What I'm trying to figure out is whether it's calculable from what was in the report.

MR. PERTEN:  Yes, Your Honor.

THE COURT:  How so?

MR. PERTEN:  Because what Mr. Salmi testified today, and what he said in his report, is that he relied on the plans and spec -- the plans, which we have, the building plans, the elevations -- the structural, and he just said he scaled off those plans, which are in evidence, and did the math.

THE COURT:  The question remains -- I understand how he did it, the question is, did they have fair notice that he

was going to testify about this?

MR. PERTEN:  Well, they had fair notice that he was going to testify as to the value of the total project.  They had fair notice that he reviewed everything, that he checked everything.  They deposed him.  If they failed to ask him how he came up with a number, this is not my issue; that's a failure on behalf of the plaintiffs.

THE COURT:  Well, they might not --

MR. PERTEN:  They --

THE COURT:  -- think of that.  And the question pertained -- I'm not at the deposition.  They might not ask him about something that isn't fairly disclosed in his report. Why would they --

MR. PERTEN:  Your --

THE COURT:  -- think of it?  So --

MR. PERTEN:  Your Honor, we disclosed his methodology, everything he did, and the calculations to come up with his number, and provided all the backup.  The manner in which he utilized the backup is all contained within that description.  The disclosure doesn't have, well, I looked at this paper and added one and one equals two.  No, it doesn't say that, nor do I think it needs to say that.

THE COURT:  All right.

MR. PERTEN:  What --

THE COURT:  All right. I'm going to -- I'm going

to -- I'm going to sustain the objection and strike the --

I'll note for any reviewing court that the witness testified

that it's not in his report, that he had an opportunity to

say, but it's calculable from my report.  He didn't say that.

All right, if you want to ask him questions later, that's my

ruling.  You don't need to argue it.

       Go ahead.

       MR. CARNATHAN:  Thank you, Your Honor.

BY MR. CARNATHAN:

    Q.   Mr. Salmi, you've actually been working as an expert

witness since 1994, right, sir?

A.   That's correct.

    Q.   All right, so about twenty-five years of experience?

A.   In that field, yes.

    Q.   All right.  And I think you said you'd done

something in those -- the range of fifty to sixty prior expert

witness engagements in the construction industry, right, sir?

A.   Yeah, well, fifty to sixty where I have -- I have

attended arbitrations, court hearings, appearances.  That

total has probably been 2- to 300 cases.

    Q.   Okay.  So quite a lot of engagements then, right,

sir?

A.   I would say yes.

    Q.   All right.  And you knew that you had been retained

by the builder in this case, right?

A.   I was retained by Sheehan, Phinney, and Bass.

Q.   Right, who were representing the builder.  You understood that when you were --

A.   Yes, I did.

Q.   -- retained, right?  So you knew it was your job to come in with as high a number as you could support, right, sir?

A.   No, sir.  That was not my understanding.

Q.   All right.  And you came into the final number of $5,869,828.74 to build the two houses, right, sir?

A.   Yes, sir.

Q.   And that's just for the construction costs, right?

A.   That's correct.

Q.   That's not accounting for any carrying costs, right?

A.   The soft costs are not included.

Q.   Okay.  I think we also agreed that you ended up having to make up your own specifications, right, sir?

A.   I -- what do you mean by the nature of make up my own specifications, sir?  I don't understand that.

Q.   You personally prepared the specifications, right?

A.   We did.

Q.   Right, because Mr. Kagan didn't have any?

A.   Mr. Kagan did not supply us with a list of the specifications.  What they -- what they supplied us with was the proof-of-claim binders of those invoices, which appeared

to be in alignment with the photos, everything that we were

able to garner as far as evidence goes to take and show what

types of mouldings, sides to mouldings, and all the various

entities that we discussed earlier.  So yes, we -- we

accumulated that -- those facts into a set of specification,

but we did not fabricate those.  We just accumulated the facts

as we discovered them through proof-of-claim binders and the

other items that we reviewed.

    Q.   Well, let's break that down and try to get back to

what I was asking you.  You didn't get any written

specifications from Mr. Kagan, right?

A.   No, I did not.

    Q.   Right.  And yet, you asked for them, right?

A.   Yes, we did.

    Q.   But he didn't have any?

A.   That's correct.

    Q.   And so all these invoices that he gave you, that's

out of the proof-of-claim binder, right?

A.   Correct.

    Q.   And so you based the specifications that you

prepared on the materials that Mr. Kagan gave you, right, sir?

A.   I don't know as though Mr. Kagan gave me that.  That

information came to me through counsel, through Mr. Perten.

So again, there was various --

    Q.   Well, that's not really the distinction that I'm

making.

A.   Okay.

     Q.   Okay?  But you --

A.   Okay.  I'm sorry.

     Q.   Do you understand that these are the invoices that
Mr. Kagan provided to his counsel, that eventually found their
way to you, fair enough?

A.   Fair enough.

     Q.   Okay.  And so your specifications are based on the
assumption that those materials were actually used in the
project, right, sir?

A.   That's correct.

     Q.   Right.  And you would normally have expected to see
specifications in a project like this, right?

A.   Well, not always so, with my experience with spec
building.

     Q.   But you told me at your deposition you normally
would've expected to see them, didn't you, sir?

A.   For any project, you would, but with spec building, it's
a different animal.

     Q.   Right.  And you did also eventually interview Mr.
Kagan, too, right?

A.   I did.

     Q.   And so to some extent, you're relying on Mr. Kagan
as the source of the characterization of the materials used in

the project, right, sir?

A.   Not so.  It was just a verification of the information we had already garnered through the pictures, through the appraisals, through the inspection reports, through the proof-of-claim binders.  There was a series of varying elements that we did.  And all the interview with Mr. Kagan did was confirm what we had already uncovered.

Q.   Well, I think you told me you took his characterizations at face value, right, sir?

A.   I did.

Q.   Right?  And you never interviewed the subcontractors, right?

A.   I did not.

Q.   All right.  And the plans that you used were dated May 23rd, 2013, right?  That's the permits that we looked at, Exhibit 310?

A.   I believe so.

Q.   And you're aware, sir -- I think you looked at some other materials -- you're aware that the Lyman-Cutler project actually formed in October 2012, right?

A.   Correct.

Q.   And I think you've said you also looked at the construction budget that Mr. Kagan gave to the bank, right, sir?

A.   I did.

Q.   And so you must be aware that that construction
budget was provided to the bank somewhere in the March or
April of 2013 time frame?

A.   I believe so --

Q.   Okay.

A.   -- if that's the dates.

Q.   So a couple of months before the plans that you
based your opinion on, right, sir?

A.   Correct.

Q.   All right.  And would you agree with me that Mr.
Kagan had a duty to Lyman-Cutler to try to be accurate in
submitting the construction budget to the bank?

MR. PERTEN:  Objection, Your Honor.  This would also
go A, well beyond the scope of direct, and B, in their
rebuttal, he certainly didn't go down this path.

THE COURT:  He never what?  He --

MR. PERTEN:  This goes beyond the scope of --

THE COURT:  Yes, I got that.

MR. PERTEN:  -- direct.  And in his rebuttal report,
he certainly didn't go down this path.

THE COURT:  And his rebuttal report didn't go down
this path.

MR. CARNATHAN:  Well, I mean, Mr. Salmi's come up
with a number of the better part of 5.9 million bucks to build
these two houses.  Mr. Kagan told the bank it was going to

cost 1.4 million per house.  Seems to me there's a huge

disconnect.  So it goes to the credibility of Mr. Salmi's

opinion.  Mr. Kagan is less than half of what Mr. Salmi says

the two houses would've cost to build.

        THE COURT:  Overruled.

BY MR. CARNATHAN:

    Q.   So to return to the question, Mr. Salmi, would you

agree that Mr. Kagan had a duty to the company, to Lyman-

Cutler, to try to be accurate when he submitted his budget to

the bank to get the construction loans?

        MR. PERTEN:  Objection, Your Honor.

        THE COURT:  Didn't we just do this?

        MR. PERTEN:  Your Honor, I think, if he's going to go

down this road, this expert -- he's being asked whether Mr.

Kagan had a duty to the bank.  That's what he's asking.

There's been no foundation.  There's no nothing that Mr. Salmi

is here to testify as to a duty owed to a bank.  He can

certainly testify as to his analysis of the costs, but as to

duties owed to banks, that is -- there's been no testimony on

direct, and there is no foundation that he's qualified to talk

about duties owed to banks.

        MR. CARNATHAN:  Well, if I may, my next question was

going to be duty to the bank.  But this question was duty to

the owner, to Lyman-Cutler.

        THE COURT:  Right.

Page 82

          MR. PERTEN:  Or to the owner.

          MR. CARNATHAN:  And he says he's got fifty years of
experience building spec homes, building custom homes,
submitting budgets, bidding projects.  I --

          THE COURT:  But isn't that a legal conclusion you're
asking him about?

          MR. CARNATHAN:  Well, I mean, I think it's -- I'm
asking him for his expert opinion as a contractor with fifty
years' experience about what one does.  I mean, if Mr. Kagan
is lobbing in some crazy number that is half of what he says
it would've cost to build the homes, I think that goes to the
credibility of both of them.  I think it's a fair-game
question.

          THE COURT:  Sustained.
BY MR. CARNATHAN:

     Q.   During your fifty years in the industry, sir, have
you ever submitted a construction bank -- a construction
budget to a bank to get a loan, without first making a good-
faith effort to estimate the cost of construction?

          MR. PERTEN:  Your Honor, same objection.

          THE COURT:  No, no, no -- that objection -- if it's
the same objection, it's overruled.  It doesn't apply to this
question.

          Go ahead.

          MR. CARNATHAN:  Thank you.

THE COURT:  You can answer that.  Have you ever supplied a --

MR. CARNATHAN:  I can repeat it.

THE COURT:  Please do.

BY MR. CARNATHAN:

Q.   During your fifty years in the industry, sir, have you ever submitted a construction budget to a bank to get a loan, without first making a good-faith effort to estimate the cost of construction?

A.   Okay.  I see that as a two-part question.  I will answer the first part of the question.  Yes, I have submitted construction budgets to the bank to establish a disbursal mechanism, and for the various breaking out -- those categories up to set up a disbursement schedule with a bank. That's commonly done where there's a bank loan.

Sometimes, when we're doing a speculative home, there's a high degree of variability in the final dispensation, or the finishes, and the final layouts on those homes, because sometimes when we get input that comes prospective buyers, it may change what they might see.  They back out.  We got a house that has changes.

So those construction budgets are commonly, in my experience, known to change.  And we apprise the bank of those changes, because sometimes we have go to back for additional funding, that they can accommodate those changes that we made.

And that's part of the nature in speculative building.

Q.   Okay.  That was a long answer that didn't really answer the question.  So we've agreed that you have previously submitted construction budgets to banks in order to get a construction loan, right, sir?

A.   Yes.

Q.   And at any time, have you ever submitted a budget to a bank without first making a good-faith effort to estimate the cost of construction?

A.   No.

Q.   Thank you.  Now, based on the plans that you were supplied by Mr. Kagan's counsel, there wasn't enough information there to do a bid package, right?

A.   Correct.

Q.   Right.  And in fact, pricing from only that set of plans, without a tremendous amount of more information, would provide inaccurate figures as to the impacts of the cost of the level of finishes and items provided, because they have such a large variation and range in cost, right, sir?

A.   Correct.

Q.   Now, in particular, you based the excavation specification on the ProEx proposals, right, sir?

A.   Correct.

Q.   And in fact, your specifications instruct the excavator to assume that there's three feet of ledge, right?

A.   Correct.

     Q.   And you accepted that there was ledge in this project, based on the ProEx proposal, right, sir?

A.   Well, there were several things we looked at, okay?  When we looked at the site, we noticed there was a lot of, what looked like, excavated ledge utilized in a lot of the stone walls on site, which seemed to be congruent with the claim that they had encountered ledge.  And it seemed to make sense that, you know, assuming that there was only an eight-foot basement on the earlier home that was there, and we have nine-foot basement walls going in here, that there had to be an additional depth going down.

     So that assumption seemed to be logical and seemed to follow with the claim that there was ledge in there.  So we did make an assumption that there was ledge encountered.

          MR. CARNATHAN:  Grab those.

          May I hand out the --

          THE COURT:  Yes.

          MR. CARNATHAN:  -- deposition transcript?

          THE WITNESS:  Thank you, sir.

          THE COURT:  Thank you.

BY MR. CARNATHAN:

     Q.   Mr. Salmi, would you look at page 145 with me?

          THE COURT:  Did you say 145?

          MR. CARNATHAN:  145, yes, Your Honor.

THE COURT:  Thank you.

BY MR. CARNATHAN:

Q.   Are you with --

A.   Yes, sir.

Q.   -- me, sir?  So toward the bottom of 145, beginning at line 18, I asked you, "On what records did you rely to determine what work ProEx had done?"

And your answer was, "The ProEx scope of work that we were given with redacted prices that delineated the scope of work that ProEx had taken and provided."

Then my question was, "Anything else?"

And your answer is, "No."

Have I read that correctly?

A.   That is correct.

MR. PERTEN:  Your Honor, for completeness, I think that's the second half of the question.  We needed the first question before that as well.  If I may read it, Your Honor?

THE COURT:  Yes, you may.

MR. PERTEN:  The question, I guess we would start at page 145, line 3.

"Q.  How did you calculate the 556,700?

"A.  556,700 is based upon the costs that we have and the VSA cost in Exhibit A.  So if you take the various components in there that match up to the scope of work that was done by ProEx, that number was -- that's how that number was derived.

"Q.   I guess I'm asking more specifically, which lines in
Exhibit A do you say match what was done by ProEx?

 "A.                                              I do not
 have those specifically, because I don't have any records in
  front of me.  But there are things like the framing, labor,
the masonry, the foundation, earthwork, landscaping.  You have
   the demolition, off-site transport disposal, waterproofing,
                              stone."

        And then we go on to Mr. Carnathan's question, Your
Honor.

BY MR. CARNATHAN:

     Q.   Okay.  Mr. Salmi, you'll agree with me, too, that
the subcontractors that you're relying on to get to your
number to compare to ProEx are Glenn Hines and Bennett
Masonry, right, sir?

A.   There was four categories.  So we had category 2, which
was site work, category 3, which was framing, category 4, and
7100.  So there was several subcontractors involved in there.
I think that also included a portion of the roofing estimate.

     Q.   You may have misspoken.  I don't think ProEx did the
framing; did it, sir?

A.   May I --

     Q.   Please.

A.   -- refer back to estimate?  Yeah.

     So it's category 2, which included the demolition,

landscaping, earthwork.  Let's see.  Category 3, concrete

foundations.  Category 4, masonry.  And category 7100,

waterproofing.  Those were the categories that were -- we

included to take and encompass the work, as we understood it,

that ProEx had done.

    Q.  Okay.  And at least at your deposition, you agreed

with me that those numbers also came out of Glenn Hines and

Bennett Masonry; isn't that right, sir?

A.  Well, Glenn Hines, Bennett Masonry, and that would be

part of Newton Roofing, I believe, who did the waterproofing.

    Q.  Newton Roofing?

A.  Or water -- oh, waterproofing and the foundation were

the -- I believe that was included in the foundation cost,

correct.

    Q.  Right, on Glenn Hines, right?  I'm --

A.  Yes.

      MR. CARNATHAN:  So, Mr. Hartzell, why don't we put up

Salmi-4, the first page?  It's VSOO7.

      MR. HARTZELL:  What number, Sean?

      MR. CARNATHAN:  VSOO7.  It's the first page of Salmi-

4.  It's, I guess, encompassed in Defendant's 302.

BY MR. CARNATHAN:

    Q.  Okay.  So now we have a blow-up of the numbers from

the Glenn Hines proposal.  Do you see that, Mr. Salmi?

A.  Yes, I do.

Q.   All right, and that's the bid that you got from Glenn Hines, if you will -- the proposal, right?

A.   Right.

Q.   And the way that's laid out, those categories are right out of your specs, right?  That's what you told Mr. Hines to give you, right?

A.   That's correct.

Q.   And so when we look, for instance, at that $220,000 number, there's no breakdown here in the proposal, right?

A.   Okay.  $220,000 number --

Q.   For earthwork --

A.   -- under earthwork?

Q.   -- utilities and --

A.   No.

Q.   Right.  And so there's no way to tell from the Glenn Hines proposal what's encompassed in that, right?

A.   Okay, so there are several things that we do.  Okay? With --

Q.   Well, I'm asking specifically about the proposal, sir.  I'm not asking about what you do.

A.   Mr. Hines has included, based upon his experience with us, everything that would be included within the sitework category to execute the construction of these homes.

Q.   Okay.  But when we look at this, we just see 220,000 bucks, right?

A.    That's correct.

     Q.    Right.  And you've known Mr. Hines for about twenty years, right?

A.    Correct.

     Q.    And you'll agree with me that the sitework category is the one that has the widest swings and costs, because there are so many unknowns, right?

A.    Correct.

     Q.    And in fact, the swings and costs in the sitework can be as much as thirty to forty percent, right?

A.    Could be.

     Q.    Why don't we go ahead to Bennett Masonry, which I think is the very next page, VS008.

          THE COURT:  Just hold one second.  All right.  You know, it's -- you don't have a question pending, I think; is that right?

          MR. CARNATHAN:  No, Your Honor.

          THE COURT:  All right.  It's 11 a.m.  We've been at it for a while.  I'm sure the witness could use a break.  I can use a break.  So let's take about a fifteen-minute break, okay?

          MR. CARNATHAN:  Yeah.

          THE COURT:  Great.

          MR. CARNATHAN:  Thank you, Your Honor.

          MR. PERTEN:  Thank you.

THE CLERK:  All rise.

            (Off the record at 11:01 a.m.)

             (On the record at 11:15 a.m.)

THE CLERK:  Court is now in session.

THE COURT:  Be seated.

All right.  Proceed whenever you're ready.

MR. CARNATHAN:  Thank you, Your Honor.

Mr. Hartzell, could I have VS008?  Which is the --
like the second page of Salmi-4?

                RESUMED CROSS-EXAMINATION

BY MR. CARNATHAN:

    Q.   So, Mr. Salmi, when we left off, I was just about to
ask you about Bennett Masonry, sir.

A.   Yes, sir.

    Q.   Right.  So Mike Bennett's a guy you knew for six or
seven years when you got the bid from him, right?

A.   Yes.

    Q.   And you actually picked him because he's the only
mason who returned your call, right?

A.   Correct.

    Q.   And so this bid isn't on letterhead?

A.   No, because he was quite delayed in getting it to us and
we had to take his bid over the phone in order to compile it
on time and get our report in.

    Q.   So you typed this up yourself based on a phone

conversation?

A.    That's correct.

    Q.    And this bid is based on your specs, right?

A.    That's correct.

    Q.    All right.  And all your specs say is see the plans and pictures, right?

A.    Correct.

    Q.    You're familiar from your years in the trade, sir, in the construction industry, with the concept of competitive bidding, aren't you, sir?

A.    Yes, I am.

    Q.    The concept is you get more than one bid per trade, right?

A.    On a competitive bidding situation, yes.

    Q.    But you didn't do that here, right?

A.    No, we did not.

    Q.    You got one bid per trade; except for the windows, you got two, right?

A.    Correct.

    Q.    And are you familiar with a term, leveling sheet?

A.    I'm -- I'm not familiar with your terms.  The term in particular.  What application are you talking about, sir?

    Q.    In connection with getting your bids, do you know what a leveling sheet is?

A.    Where you take and do a -- you do a bid review.  You take

and write all the bids.  And you take and look between those

to make comparative costing.

    Q.   Right.  Make sure everybody's on the same page, that

they're bidding the same things, right?

A.   Correct.

    Q.   Right.  You didn't that here, either, right sir?

A.   We chose not to.

    Q.   No.  And in fact, all the bids are from old friends,

right?

A.   From friends, from people who we've done business with.

    Q.   Right.  In fact, even one of the bids is from your

own son, right?

A.   Worked for North Shore Windows; he's an outside salesman,

yes.

    Q.   So right.  So the Marvin bid was prepared by your

son Erik, right?

A.   That's correct.

    Q.   Right.  And you told everybody that bid on this job

that they had a shot at getting the business, right?

A.   That is correct.

    Q.   Right.  So you lied to your own son?

A.   Correct.

    Q.   And it didn't bother you to mislead the subs, right

sir?

A.   No, sir, it did not.

Q.   Now, I thought you said on direct something about having had experiences before telling subs that they were bidding for a lawsuit, right?

A.   Yes.

Q.   Right.  But at your deposition, you couldn't recall ever having done the same thing in another case, could you, sir?

A.   I could not recall at the time of my deposition.  No, I could not.

Q.   All right.  In fact, you couldn't recall any other engagement in which you'd used the same methodology that you used here, could you, sir?

A.   Could you point out to where that is in my deposition, please?

Q.   I could.  Would you turn to page 112 with me?  I'm toward the bottom, line 20.  And I say, "Is this the first engagement in which you have built an opinion of the cost of construction by soliciting bids from subcontractors?"

And you say, "No."

And then I say, "On what other engagements have you approached the development of reopinion in that method?"

And you answer, "I have had other cases.  I'd be glad if you needed to --"

Mr. Perten says, "No, you won't."

Answer, "I'd be glad to take the time to recall, but

right now, I can't recall the specific cases to name them for

you.  But I know we've done that in the past."

Have I read that correctly?

A.   Correct.

Q.   Why don't we look next at the Crimson King bid which

came up earlier.  That's the next page, VS009.  So Crimson

King, you worked with a fellow named Dave Dunham, right?

A.   Correct.

Q.   And you'd known Dave for ` years?

A.   Yes.

Q.   Right.  And so we've got 283,050 dollars for the

framing, right?

A.   No, it's not for framing.

Q.   Well, that's where it's plugged into your opinion in

Exhibit A, right?

A.   So if one looks, that is the carpentry area.  So there

are nine elements in there that go to framing, window

installs, exterior trim, porch and balcony decks, column

install, and porches, curved stair-framing, siding, shingles,

and clapboards -- or clapboards or cornerboards, exterior

window casings, if needed, and a low allowance, comprise that

283,050 number.

Q.   Okay.  And that all plugs into your CSI division

0605 framing labor in your Exhibit A, right sir?

A.   Let's see.  Allow me just get to that.  That would be

under the framing labor, correct.

Q.   Right.  And then the framing materials, another 212,360 bucks, right?

A.   That is the building materials, yes.

Q.   All right.  And that's the quote you got from Brad Cutter at Concord Lumber?

A.   Correct.

Q.   And Brad's another guy you've known for twenty years, right?

A.   I've done quite a bit of business with them.

Q.   Right.  So we're looking at a cool half-million bucks for the labor and materials in those categories, right?

A.   Correct.

Q.   That's per house, right?

A.   Correct.

Q.   So just quickly, the insulation contractor was March & Martin, right?

A.   Correct.

Q.   And that's another guy, Ray March; you've known him for over twenty years, right?

A.   Yes, I have.

Q.   All right.  I think you said you used the lower quote for the windows, didn't you, sir?

A.   Correct.

Q.   And that is line item 8500 on Exhibit A, right?

A.   That would be 8500, that's windows and doors.

Q.   Okay.  So we got 91,867.58, right?

A.   Yes.

Q.   Okay, and in fact, when we look at the window bids, one of them was 81,131.59, right?

A.   But that doesn't include the exterior front doors and the side door which are included in the $91,000 number.

Q.   Right.  The doors are also in the Herrick & White bid, though, aren't they, sir?

A.   Not the exterior doors.  The interior doors are.

Q.   So we don't have a separate bid for the exterior doors, then; is that what you're telling me?

A.   We accounted for that cost somewhere.  I do not or cannot recall at the moment where that came from, but that's why there's differential in this number and the window number.

Q.   I'd be happy to have you look through Exhibit 4. There's no additional bid for $10,200 for exterior doors, sir. I invite you to correct me.

A.   We did not.  I just remember that VSA brought into the number to take in account for a custom front door and the side entry door.  They're custom-sized doors because they were eight-foot doors.

Q.   All right.  So you agree with me, you're the source of the other 10,000-odd dollars in the window and doors line, right?

A.   Correct.

Q.   And then you added another $10,000 for door and window hardware, right, sir?

A.   Correct.

Q.   Isn't it a fact, sir, that the window hardware is included in the Marvin quote and the Anderson quote?

A.   Door window hardware meaning that they may have added various changes, for instance, if they wanted.

That's basically a category.  Door and window hardware, because there's really no hardware that we were aware of that we accumulated for the windows.  There's basically the door hardware, meaning knobs, latches, locks, hinges, any types of closers, door stops.  That hardware.  That's a category heading, door and window hardware.

Q.   Well, at least the interior doors all came from Herrick & White, right?

A.   Correct.

Q.   And in fact, those included up to $2,410 per double-hung door and, I want to say, 16- or $1,700 for the single-hung doors, right?

A.   Let me take and refer to that bid, please.

Q.   I believe that's going to be page VS11.  Let me blow that up a little bit.  So we're in the middle of the page.

MR. CARNATHAN:  Mr. Hartzell, you see the doors down there?

BY MR. CARNATHAN:

    Q.   2,410 and looks like 1,868 for single doors.  Right?
You see those, sir?

A.   Which line are we on, sir?

    Q.   I'm on lines 9 and 10, the pre-hung double interior
doors for 2,410 a door.  And the single doors for 1,868 a
door.

A.   Yes, sir.

    Q.   Do you see that?  All right, so pre-hung, so that's
including a bunch of the hardware, isn't it, sir?

A.   That would include paint hinges.  What we call paint
hinges are a basic brass hinge that are included with the door
but not necessarily the knobs and the like because we did not
provide them with a spec.  We include that in the allowance
that we used.

    Q.   So you're paying 2,410 bucks for doors with no
handles?

A.   Custom doors.

    Q.   Do know what Mr. Kagan actually paid for his doors?

A.   I do not recall the exact number.

    Q.   He didn't pay remotely that much, did you, sir?

A.   I do not recall that number, sir.

    Q.   All right.  Well, you did go back and look at his
invoices with the numbers toward the end, right?

A.   I -- I did.  And as I opined, I thought his numbers were

much better than what we were able to come up with.

Q.   Right.  In fact, he was buying doors for as little as 600 bucks, wasn't he, sir?

A.   If that's what his invoice says, that's what his invoice says.  I can't verify that at this moment.

Q.   Yeah.  Would you agree with me that that number for door and window hardware, that's another Von Salmi number, right?  We don't have a bid for that in Exhibit 4?

A.   No.

Q.   And in fact, there's a number of numbers in here that you just inserted that we don't have bids for, right, sir?

A.   Not a huge number.  Well, for instance, when you go in the CSI divisions, those categories in the first area are general electric, gas bills, temporary facilities, controls, water, cleaning.  Those are numbers which we inserted, certainly.

Most of the numbers in there contained in the accumulation of the bid sheets are numbers that were bid.  You know, we did not have the -- we did not use the exact fireplaces.  We go by the -- our experience.  We've installed probably fifty, sixty of these fireplaces, and we have an idea that they run anywhere from roughly 3,000 to 5,000 each.  So we carry an allowance based upon those types of numbers.

Q.   So you anticipate me a bit, but the overhead doors,

that's a number that you came up with on your own, right?

About 6,000 dollars?

A.   Yes.

      Q.   And the fireplace specialties and accessories,

10,000, that's a number you came up with on your own, right?

A.   Correct.

      Q.   The vacuum system at 2,500, that's just you?

A.   Correct.

      Q.   The water filtration at 800, that's just you?

A.   Correct.

      Q.   The sump pump for 2,000, that's just you?

A.   Correct.

      Q.   And the allowance for civil engineer of 3,500,

that's just you?

A.   That's correct.

      Q.   And the tiles, you actually, you talked to your

friend at Tiles Plus, but there's no actual tile estimate,

right?

A.   Allow me to look.  I believe there was an estimate for

tile in here -- tile materials.

      Q.   We are at VS61 in Salmi-4.

A.   So we had a tile cost summary --

      Q.   Right, that's something that you created?

A.   -- with cost per square foot.  Yes, it was.

      Q.   Right.  And so there's no back up to that, that's

all we got?

A.   That's correct.

     Q.   Right, and you created that yourself by talking to
your friend at Tile Plus, right?

A.   Correct.

     Q.   And so when we look at the 14,901 number, that
includes your Von Salmi profit, if you will?

A.   Correct.

     Q.   Right.  And the 11,150 takes out your Von Salmi
profit, right?

A.   Correct.

     Q.   So sir, would you look with me at the line item on
your report on page 2 for mechanical systems?

A.   Yes, sir.

     Q.   That line item is 140,000 dollars, right?

A.   Correct.

     Q.   And there's no bid for that in your materials,
either, is there, sir?

A.   That's correct.

     Q.   Right, so that's 140,000 of pure Von Salmi, right?

A.   Based upon our experience, and building homes of similar
size, yes.

     Q.   Okay.  And just sort of buzzing through quickly.
The guy at C&R Flooring who gave you his estimate, you've
known him for 15 years?

A.    Yes.

Q.    And Bill Larkin, you've known him for eight?

A.    Yes.

Q.    Jaime Candita, the plumbing guy, was about four, five years?

A.    Yes.

Q.    Keyes North Atlantic, fourteen or fifteen years?

A.    Yes.

Q.    The audio-video guy, twenty years, right?

A.    Yes.

Q.    And I think the tile guy was thirty?

A.    Yes.

Q.    When we look at the appliance figure on page 65 of Salmi-4 -- are you with me?

A.    Yes.

Q.    That doesn't actually reflect who it comes from at all, does it, sir?

A.    That comes from Yale.

Q.    All right.  But there's no way to tell that from this document, right, sir?

A.    No, it is not.

Q.    And I think you valued the project manager work at eighty-five bucks an hour, right, sir?

A.    Yes.

Q.    Do you know Mr. Kagan valued his time at 200 dollars

an hour?

A.   No, I did not.

Q.   Let's look again at the Herrick & White -- I don't know if it was a proposal, or -- but the Herrick & White materials.  And I'm now on the second page of the Herrick & White materials, VS12.

A.   Okay.

Q.   Let's start by kind of --

A.   Yes.

Q.   Are you with me, Mr. Salmi?

A.   Yes, I am.

MR. CARNATHAN:  Okay.  Kind of blow up the top line to start with then, Mr. Hartzell.

BY MR. CARNATHAN:

Q.   So you'll agree with me, sir, that the Herrick & White number is $735,754 at the bottom line, right, sir?

A.   Correct.

Q.   And that includes $150,000 for the stairs, right?

A.   Assuming that they were doing a pre-built staircase, it would be installed for a curved staircase of the type that was installed there, yes.

Q.   Right.  A big, old, custom staircase that they built and just plugged into the home, right?

A.   Correct.

Q.   And that's not how Mr. Kagan did it, is it, sir?

A.   I'm not sure exactly how he did his.

Q.   Well, you looked at the Horner Millwork materials, right?

A.   Well, we took and had all the materials in there and then we had an allowance in there for -- from Crimson King, part of that framing a custom stairway.

Q.   Okay.  Well, you looked at the Horner Millwork materials that Mr. Kagan gave you in the proof of claim binders, right?

A.   Yes, we did.

Q.   And you looked at them at the start with the numbers redacted, right?

A.   Correct.

Q.   And you looked at them at the end with the financial numbers put back in, right?

A.   Correct.

Q.   And so you might well know that he spent 48,000 dollars on the parts of the stairs.  Does that sound familiar, sir?

A.   That may be correct.

Q.   But you're carrying 150,000?

A.   Correct, because we have the front staircase and the back stairs.  The back stairs go from the basement up to the second floor.  So you have three flights of stairs there and then you have the front stairs, also.

Q.   I'm talking total stair numbers, you're --

A.   Um-hum.

Q.   When I look at these columns here, am I right that LF means linear foot?

A.   Correct.

Q.   And so the quote here is 1,216 per linear foot for the bathroom vanities, right, sir?

A.   Yes, sir.

Q.   Right.  That's a lot of money for a bathroom vanity for a spec house, isn't it, sir?

A.   Not when you look at the pictures of the master bath vanity that was installed.

Q.   Yeah, okay.  Second-floor closets, we've got $297 a linear foot, right?  And that's for the poles and shelves in the closet, right?

A.   No, that was custom-built cabinetry in there.

Q.   Well, that's the next line item down, sir.  I'm still looking at line 18,:  linear foot pole and shelves, stained, $297 a square foot, right?  So $35,640 for the poles and shelves in the closet.  Isn't that right, sir?

A.   All the second-floor closets that were not the master that was built out specifically.

Q.   All right.  My point being that $297 a linear foot is a lot for a pole that you're going to hang your suit on and a shelf, right?

A.    Not when you look at what was finally installed there and

again, the spec of what they got here.  If it were a closet

pull that one was pulling off the shelf from a lumber yard and

putting a piece of pine off, sure.

But these are custom-built shelves.  They're probably

inch and a quarter thick that they can span six feet and carry

whatever kind of load you'd place against them.  Special

brackets.  It's probably an inch-and-a-quarter chrome pole all

the way though with a bracket for that.  There's quite a bit

to it.  It's not just a pole -- a wooden pole and a wooden

shelf.

Q.   And then right below that line item is the -- sorry, I'm

at the wrong line item.  No, I'm right.  Number 19, second-

floor closets, you're carrying $1,593 a square foot for the

cabinets and the closets; aren't you, sir?

A.   They're custom built, yes --

Q.   So 16- --

A.   -- and designed.

Q.   -- 1,600 bucks a linear square foot, 95,580 bucks

for the cabinets and the closets, right?

A.   Um-hum.

Q.   Okay.  And again, the total down on the bottom right

was 735,754, right?

A.   Correct.

Q.   Okay.  Just briefly so I don't forget the point.

You testified that you looked at the deposition transcripts, too, or a number of deposition transcripts, right?

A.   Correct.  I briefly went through them.

    Q.   All right.  And in fact, Exhibit C to your report lists the deposition transcripts you looked at, right?

A.   Yes.

    Q.   And among those deposition transcripts was Kirill Kagan, right?

A.   I believe so.

    Q.   Right.  And so he's -- I believe he's Kagan's brother, right?  Mr. Vadim Kagan's brother?

A.   I don't know what the relationship is, but if you say so.

    Q.   Right.  And he was sort of the point man for the work that ProExcavation did out in the field, right, sir?

A.   I don't know that for a fact.  Yeah.

    Q.   Right.  Do you know --

A.   But -- but again, you know, I briefly looked through those depositions, looking at material content.  That was the nature of my review in those, to see if there was any information that described the material in there so that I could take and develop it for the specifications. Other than that, I didn't pay any particular attention to anything else in there.

    Q.   So you were indifferent in forming in your opinion as to what Mr. Kagan actually spent on anything, right, sir?

A.   There was specific items that we relied upon, after we took and did our estimate, to verify that what we did in the specifications and the costs were aligned with those.  We found that Mr. Kagan's cost was significantly less than the costs that we were utilizing.

Q.   Right.  And in fact, you might know from reviewing Kirill Kagan's deposition that Kagan used day labor for the excavation that he would find at Dunkin' Donuts and pay them $100 a day.  Do you remember reading that testimony?

A.   I did not pay attention to that, no.  It -- it may be in there, but it was not a material interest to me.

Q.   So that wouldn't affect your figure as to how much it cost to do the excavation?

A.   Well, again, did he use day labor for labor, or were they digging holes with a shovel and a pick, or did they use equipment?  I can't imagine day labor, you know, operating a piece of equipment and the like.  Again, you know, I don't know the context.  That's an open -- to me, that's an open comment, open hypothetical.

Q.   Okay.  Let's return to Herrick & White.  So we're at that 735,754 number.  I think you agreed during direct that you did not adjust any of your 2018 bids and estimates to reduce them for the fact that the project was done in 2013 and 2014, right, sir?

A.   Correct.

Q.   And you asserted that the labor costs have been flat since 2013, right?

A.   In our experience, yes.

Q.   Right.  Are you familiar with a company called Turner Construction?

A.   Yes.

Q.   Right.  They --

A.   Well, I know of Turner.  I'm not familiar with them.

Q.   Right.  And you're familiar with their quarterly building cost index?

A.   No, I'm not.

Q.   Oh.  Are you aware that Turner Construction estimates that overall construction costs are up at least twenty-five percent since 2014?

A.   No, I'm not.

Q.   About five percent a year.

A.   I'm not aware of that publication or that opinion.

Q.   But you do agree in your report that, at least, the material costs have gone up 7.6 percent since 2013, right, sir?

A.   Correct.

Q.   But you didn't reduce any of the materials bids, right?

A.   No, we did not.

Q.   Right.  And I think you said during your testimony

on direct that as a rule of thumb, the overall construction

costs reflect fifty to sixty percent of that as labor, right?

A.   Correct.

     Q.   So that means that forty to fifty percent are

materials?

A.   Correct.

     Q.   So if your number is, call it, 3 million bucks in

round numbers, half of that's 1.5 million, then 7.6 percent's

real money; isn't it, sir?

A.   Could be.

     Q.   Just --

A.   Could be, yeah.

     Q.   -- of the top of my --

A.   Again --

     Q.   -- head, about a hundred grand?

A.   -- because we discounted the further columns, okay?  We

took into account some of that.  We didn't know exactly how

much.  We gave some weight to the developer costs by

discounting some of that to allow for that.

     The VSA cost was based upon the estimates that we had in

2018.  The developer costs were reflecting the costs that it

would have cost to build those two houses at that point in

time.

     Q.   Well, I think you explained both during your direct

and at your deposition that if we look at Exhibit A, to your

report, the difference between the VSA cost and the developer

cost is basically the Salmi profit, right?  You took out the

Salmi profit to get to the developer costs.

A.   Well, there were also developer -- the ability of the

developer to acquire better prices based upon his

relationships -- his ten, twenty, thirty-year relationships

with someone that he may have experience with.

So again, we widely leveraged those to take and get the

best prices.  We try not to get the most expensive prices

because that converts back against the profit margin at the

end.

Q.   All right.  Well, in your deposition, you told me

precisely that the difference between the VSA costs and the

developer costs was taken out your markup.  Do you remember

that, sir?

A.   Could you point that out, please, in the deposition --

Q.   Yeah.

A.   -- where I --

Q.   Page --

A.   -- can see that in context?

Q.   Page 123.

A.   I'm sorry, 123?

Q.   Under page 123.

A.   Okay.

Q.   Are you with me?

A.   Yes, I am.

Q.   And maybe I'll pick it up on 122 just for
completeness.  Line 11.

"Q.  Which of these columns, VSA costs or developer
costs did you use in forming your opinion?

"A.  In our estimate, there are three columns.  There's
VSA cost.  If we were to build a house for someone, and they
asked us to build the house, what would we charge?  That's the
first column.

"Then there was the secondary column in there that
reflects the developer costs if the developer were doing one
house.  But then when you kick in economy of scale for the
second house, that's where the developer costs comes down.

"Q.  You're looking at Exhibit A and Exhibit 1.  So
Exhibit A to your opinion?

"A.  Yes.

"Q.  I think your telling me that the first column,
the one that's headed "VSA Costs", is a calculation of what
you would expect to charge if you had been hired to build this
house?

"A.  Correct.

"Q.  I'm sorry.  Can you explain to me what the
difference is between column 1 and column 2?

"A.  Column 2 is, again, the developer's costs, what the
tile would cost without the -- would cost the developer

without any markup.

      "Q.  So column 2 eliminates the markup that's found in column 1; is that correct?

    "A.  Correct."

      Have I read that correctly?

A.    Yes.  And I think at this point, too, I thought we had some confusion about the tile in that discussion there.

    Q.    Well, you told me that the difference between the tile number of, I think it was 14-9 and 11-something was, again, the Von Salmi markup, right?

A.    Correct.

    Q.    So we actually talked about this in a couple of contexts at your deposition, right?

A.    Okay.  That sounds correct.

    Q.    And over the course of a couple of pages of testimony here, you agreed with me that the difference between the VSA cost column and the developer cost column is you took out your profit, right, sir?

A.    Correct.

    Q.    All right.  So the economy-of-scale category was reflecting that he was building two houses at once, right?

A.    For the discount that occurred with the second house coming on board, correct.

    Q.    All right. And would you expect additional economies of scale if there were more than two projects going on

contemporaneously?

A.    In the same location, yes.

Q.    Yeah.  What if he had ten contemporaneous projects?
Would that generate further economies of scale?

A.    Certainly would.

Q.    Yeah.  What if he had twenty?  Would that generate
further economies of scale?

A.    It may.

Q.    What if he was effectively keeping the subs working
full-time on his projects all year long?  Would that generate
further economies of scale?

A.    It could.

Q.    So when I look at the second page of your Exhibit A
to your report, the tally -- all right.  The difference
between the Von Salmi costs and the developer costs is the
better part of $600,000, right, 3-689 versus 3-098, right?

A.    Yes.

Q.    And 100- -- actually, it looks like 135- -- or no,
excuse me, 130,000 of that is taking out the site manager,
right?

A.    Correct.

Q.    And so the other 470 or so is Von Salmi profit that
you've backed out of the second number, right, sir?

A.    No.  Well, some of it is, but some of it is also in a
refinement of his costs and his ability to take -- and be able

to take and acquire better costs.

For instance, you know, going in the electrical.  When we looked at the electrical bid, my vendor, Keyes, carried in a design cost.  Design cost meaning that there would be some costs in lighting control.  We realized there was not a lighting-control system in there, so that came out of part of the electrical.

So no, it was not all profit.  There was some refinement based upon the way that Mr. Kagan built the homes.

Q.   All right.  So that's different than what you told me at your deposition, right?  We've just been over that at some length.

A.   That -- that would be correct.

Q.   That's new here today.  Right?  This is --

A.   Well, it's --

Q.   -- the first time --

A.   -- it's probably --

Q.   -- you've told me this.

A.   It's probably the rest of the story, sir.

Q.   Right.

A.   That's what I'm telling you, so I'm clarifying what my statements were.

Q.   All right.  So my question is, did you ask the subs who bid for you, in forming your opinion, to inflate their bids to include Von Salmi profit?

A.   No, I did not.

    Q.   All right.  So why don't we look at the Herrick &
White line item on the first page of Exhibit A?  That's
finished material and install, right?  06410, right?

      MR. CARNATHAN:  Can you blow that up so we can see it
better, Bill?  That sort of middle of the page?

A.   I'm sorry, sir, which line item are we at?

BY MR. CARNATHAN:

    Q.   06410, finished material and install.  It's that
735,754; you with me?

A.   Yes.

    Q.   That's exactly the number that Herrick & White bid,
right?

A.   Correct.

    Q.   And so then that's the Von Salmi cost column, right,
sir?

A.   That's correct.

    Q.   And then in the developer costs, somehow, you've
gotten that down to 550,000 bucks, right?

A.   That's correct.

    Q.   All right.  So did you ask Herrick & White to build
$85,000 in profit for you on that bid?

A.   No, we did not.

    Q.   And you already front ran the Keyes electrical a
little bit, but if we go to the second page, Keyes Electrical.

That one comes in at 278,000 bucks for electrical, right, sir?

A.   Correct.

Q.   And so did you ask them to build in 73,000 bucks in profit for you when they gave you their bid?

A.   Okay.  So what I would like to clarify, sir, and you're certainly welcome to ask whatever you want, but we asked no one to build any profit in anything.  They had their own profit.  They had their own overhead as a subcontractor built in, but they did nothing to benefit the VSA.

Q.   So in each instance, you're assuming that somehow, you're going to beat these costs down by about a half a million bucks?  I mean, in the aggregate, 470,000 bucks in the aggregate from what their bids were; is that right, sir?

A.   So for instance, we took -- and if we go to our end -- let me take and go back to Exhibit A.  So on Exhibit A, we have the cost to build, okay?  We do not have a profit margin added in there.  That is the cost to build, okay?  Those are the costs that would be directly attributable.  There are -- okay.

When we say profit, it's not profit.  So I mischaracterized that.  I would say there's some overhead and some management fees, for instance, with the tile at 14,000.  We call that profit because it's marking that up, but that's actually the management fee in there that goes along with having to take and do the take offs, the purchasing, the

acquiring of the tile, getting that delivered, all -- all the
things that go along with producing the final product.

So maybe profit is not the correct terminology.  It
should probably be overhead for some of the management numbers
that go in there, not directly tied to the normal overhead
numbers, but overhead for handling materials and the like.

Q.   Well, you've got a separate overhead number of
335,000 bucks in the Salmi category, don't you, sir?

A.   Which I just mentioned, okay, does not include those
types of overheads, for instance, in handling the material.
We might have to go after it.  The normal -- the overhead
categories, I think, are probably well-defined by insurances,
office costs, you know, builder's insurance, builder's risk
insurance, the expense of disposable materials in there and
the like.

But then there is also a cost -- a time element that gets
added in for having to handle and discern the various elements
involved in ordering the tile, going there, taking a look,
choosing the right tile, selecting that, handling it, getting
it delivered.  Sometimes you might have to pick it up.
Sometimes you might have to return a box that's damaged.  So
that's all part of executing the work.  So those numbers are
in selected categories, but not all the way across on all
categories.

Q.   You've confused me a bit.  So are you saying that

the, call it, 470,000 bucks we were talking about in the VSA

column?  You're now saying that's additional overhead for

having to choose the materials that went into the project?  Is

that what you're telling me?

A.    So where is the $470,000 number which you refer to?

      Q.    We did the math about three minutes ago, sir.  We

compared the 3-689 million to 3-098 million and we agreed that

was --

A.    Okay.  That --

      Q.    -- the better part of 600,000.

A.    That difference there, okay.

      Q.    Right?  And we deducted 130 because you took out the

site supervisor, and I'm rounding off because my math isn't

that sharp, but it was the better part of 470 grand, right?

A.    Right.

      Q.    And I thought we agreed that at your deposition, you

told me that Von Salmi profit.  And now I think you're telling

me that's additional overhead?

A.    Okay.  So I mischaracterized that, and that's what I'm

doing, is I'm trying to clarify that statement.

      Q.    So you're clarifying now that the actual overhead

and the Von Salmi number would've been more like $800,000 --

470 plus 330; is that right?

A.    No, because I said it does not -- it's not built into all

those numbers.  Okay?  If you notice, those numbers come from

subcontractors.  Those are subcontractor numbers.  There is no
profit built in there, okay, for VSA.  What they're doing is
they're providing a quote to perform the work based upon the
specifications and the documents, which we provided them, and
providing that work, the scope of that work that was described
there.  That's what those numbers reflect.  For instance --

    Q.   So you're claiming --

A.   -- only in those --

    Q.   -- that's overhead --

A.   -- numbers --

    Q.   -- for the subs?

A.   Excuse me, sir?

    Q.   So you're saying that 470 is overhead from the subs
that they put in their initial bids?

A.   Okay.  Let's back up, sir, so I can understand the nature
of your question, okay?

    Q.   Well, I --

A.   I'm getting --

    Q.   -- I'm trying to establish --

A.   -- somewhat confused here.

    Q.   Oh, you've got company.  Well, I'm trying to
establish how you got from -- let's go back to Herrick &
White -- 735,000 bucks to 550,000 bucks.  And you told me at
your deposition the difference between the first column and
the second column is Von Salmi profit.

Now, you've -- I don't know what you've told me.

A.    Okay.

Q.    So how do we get from 735 to 550?

A.    Okay.  If I could take and be allowed to refer to my

report?

(Pause)

A.    Okay.  So if we go to page 9 in my report, please.

BY MR. CARNATHAN:

Q.    Okay.

A.    Okay.  So if I could be allowed to read from that, okay?

That last paragraph:  "Twelve divisions that we utilize are

reflected in the project cost summary.  Initially, we created

bid packages based on the CSI divisions.  The bid packages

included the specifications as created by VSA and the RAB

(ph.) construction plans.

"Our bid package results are found in the VSA column.

Reduced these costs to reflect the variations to what is more

standard in the industry for developer savings buying for KDC.

This is provided in the developer" -- "in the developer

column, developer costs, one house.

"Finally, when building two homes in close proximity and

also similar in size, materials, finishes, and expectation of

the subcontractors, both houses, when combined, can be

reduced" and further -- "in price further due to the economy

of scale.  This is provided in the economy of scale second

house column in our project summary costs.

"Reducing these costs further would result in producing a product that would not make the real estate values of this area, would compromise the integrity of the building.  It is a breaking point we would be able to produce a marketable product to recover costs."

That is what I stand by.

Q.   Okay.  So you do not stand by your testimony at your deposition when you spent two pages telling me that the difference was the Von Salmi markup?  You disavow that now, sir?

A.   I do.

Q.   And so the difference between that first column and the second column, that's basically Von Salmi fiat, right? you just decided, I'm going to cut it by X -- 470,000 bucks. That's just your number, right?

A.   No, that's based upon my fifty years of experience and having done a large number of spec homes, knowing what I could take and reduce the costs by, because I had experience in only doing one of and then doing multiple homes and understanding the reductions that I could get by having the economies of scale kicking in and having relationships with subcontractors. And I think that's further verified by the costs that Kagan was able to get, which were even -- cost far below what we were able to take a acquire.

Q.   Right.  Far below, right?  Your number was $5.8-odd-
million for the two homes, right?

A.   Correct.

Q.   And in fact, it was your opinion -- you just read
it -- reducing these costs further would result in producing a
product that would not meet the real estate values of this
area or would compromise the integrity of the building; have I
read that correctly?

A.   In our experience.

Q.   All right.  So if we think about Mr. Kagan
submitting a budget to the bank of $1.4 million for the
construction, is there any way that an honest and competent
builder could've thought that that would be sufficient to
build the home?

        MR. PERTEN:  Objection, Your Honor.  The question was
submitting a $1.4 million budget to the bank.  In fact, it was
a $1.6 million budget.  And again, and he didn't testify
about -- other than he's done bank things, we're beyond that.

        MR. CARNATHAN:  Well, I mean, he just read to us
about how reducing the costs further would compromise the
integrity.  His number is close to 3 million bucks a home --
$2.9 million a home.

        THE COURT:  Overruled, it's cross.

        THE WITNESS:  Okay.  Sir, please ask the question
again.

BY MR. CARNATHAN:

Q.   So in light of your opinion that reducing the costs
further would not produce a product to meet the real estate
values in the area or would compromise the integrity of the
building, if you accept with me for the moment that Mr. Kagan
submitted a budget for $1.4 million for construction costs to
build the homes, plus 200,000 for carrying costs, is there any
way that an honest and competent builder could've believed
that $1.4 million would've been sufficient to build one of
these homes?

MR. PERTEN:  Objection, Your Honor.  There is no
evidence that there was a budget from what --

THE COURT:  Are you repeating your earlier objection
or did he --

MR. PERTEN:  If he's going to --

THE COURT:  -- misstate it?  Just answer my question
first.  You're objecting a second time to this question?

MR. PERTEN:  Yes, Your Honor.  It doesn't --

THE COURT:  Overruled.

MR. PERTEN:  -- accurately state the evidence.

THE COURT:  Overruled.

THE WITNESS:  Okay.  Question again, please, sir.

MR. CARNATHAN:  Can I have it read back this time?  I
mean, I'm --

THE COURT:  We don't read back.

MR. CARNATHAN:  Sorry.  All right.  Thank you.

THE COURT:  It's just impossible, but we --

MR. CARNATHAN:  All right.

THE COURT:  It's not a record in the same way.

MR. CARNATHAN:  All right.

BY MR. CARNATHAN:

Q.   In light of your opinion, sir, that we've just gone over three times that reducing the costs further would result in a product that did not meet the real estate values or would compromise the integrity of the value, if you assume with me for the purpose of my question that Mr. Kagan submitted a budget to the bank of 1.4 million for the construction costs and 200,000 carrying costs, is there any way that an honest and competent builder could've believed he could build one of these homes for $1.4 million in your professional experience and opinion?

MR. PERTEN:  Objection, Your Honor.

MR. CARNATHAN:  We're --

THE COURT:  Basis?

MR. PERTEN:  He's asking him now to opine what an honest and competent builder would do.  He can testify what his opinion is as to cost.  He's not here to testify about other builders.  It's his opinion as to what this cost could be.  That's pure argument, which he can make in closing argument.  That's not a proper question for this expert.

THE COURT:  Overruled.

BY MR. CARNATHAN:

Q.   Surely you have the question by now, sir.

A.   I do.  Thank you.  First thing I will say is I can't opine as to what honesty or integrity of some other builder would do.  I can only go by the limits of my experience. In my experience, when I do these bank schedules, the bank schedule is based upon my guess estimate of the cost of a home.

And we -- in my experience, I've gone back through the bank several times to revise that because the ultimate product -- end product would be more than what our initial schedule was.  So I can take -- and I've done the initial schedules for building homes maybe 500,000. I've had to go bank through the bid because we made modifications where we might have to get, you know, another 50,000, 100,000, 150,000 to take and cover the cost of construction because of all the revisions that we did to the original home.  That's a spec house.  So that's my experience.

Q.   Well, let me tidy up the question.  Is there any way an honest and competent builder in the Boston area could've believed he could build these homes for $181 a square foot?

MR. PERTEN:  Objection, Your Honor.

THE COURT:  Overruled.

A.   Again, I can't comment on someone else's intentions,

their honesty, or integrity.  I can only answer it in the

context of my experience.  In the context --

BY MR. CARNATHAN:

    Q.   All right.  Well, in your experience, sir, the range

of building costs in the greater Boston area is between 350

and $650 per square foot, right, sir?

A.   Correct.

    Q.   And in your opinion, it comes out to about $476 a

square foot in the VSA column, right?

A.   Correct.

    Q.   And your very best case comes out to $400 a square

foot, right?

A.   Correct.

    Q.   And your best case on the economy of scale comes out

to $357 a square foot, right?

A.   Correct.

    Q.   So just doing some rudimentary math to build the two

homes together, about $385 a square foot?

A.   Correct.

    Q.   Mr. Salmi, you mentioned a project you did on

Countryside Road in Newton during your direct, right, sir?

A.   Yes.

    Q.   And you also referenced that in your report?

A.   Briefly, yes.

    Q.   And so that's a project that, to some extent,

informed your opinion, right?  Your experience in building

that house informed your opinion, right?

A.   Only to an institutional knowledge basis because I'm

under an NDA with the client, so I can't disclose material

facts of that project.

    Q.   Yes.  Well, you did say in your report that it was

about the same-sized project, right?

A.   That's correct.

    Q.   About 7,700 square feet, right?

A.   That's correct.

    Q.   And you did say in your report that you used

materials and finishes comparable to those in the Lyman-Cutler

project, right?

A.   Correct.

    Q.   And in fact, you wrote in your report that that

experience was taken into account in forming your opinion,

right?

A.   That's correct.

    Q.   Right.  But not a single one of the subs that you

used on Countryside Road actually gave you a bid or an

estimate in connection with forming your opinion here, right?

A.   That's correct.

    Q.   Okay.  And the address for that property was 150

Countryside Road in Newton, right?

A.   Correct.

Q.   All right.  And you built that project from the
ground up, right?

A.   Correct.

Q.   And I think you said during your direct that you
built it in 2014 and '15; is that right?

A.   Correct.

Q.   But as of your deposition in October of 2018, you
still couldn't tell me the total construction costs, right?

A.   That's correct.

Q.   Right.  And in fact, you couldn't tell me within a
million bucks, right, sir?

A.   I could not.

Q.   All right.  You told me it was somewhere between 1.8
and $3 million to build that house, right?

A.   That's correct.  Because the client took over the cost
tracking in the last third of the project and did not divulge
those numbers to us.  They took care of all the payments.
They took care of the subcontractor arrangements.  We just
oversaw the final execution at work.  So I did not have that
final number.

Q.   Right.  Well, you were responsible for building the
house, right?

A.   Correct.

Q.   All right.  And you're the guy who pulled the
building permit, right?

A.   Correct.

     Q.   And you pulled that permit -- so you applied for it in April 2013 and you received it on May 10th, 2013, right, sir?

A.   If that's what it said, sure.

        MR. CARNATHAN:  Can I have Salmi-002 on the screen, please?  Maybe blow up the sort of the center there under job weather card and -- yeah, perfect.

BY MR. CARNATHAN:

     Q.   And in fact, you told the Town of Newton that the estimated construction cost was going to be $950,000, right, sir?

A.   At the time we started the project, yes.

     Q.   Right.  And the permit fee that was paid was $17,670, right, sir?

A.   I believe so.

     Q.   Okay.  And the final inspections on that home weren't done until November of 2018, right?

A.   Correct.

     Q.   And the certificate of occupancy, I think, issued December 4th, right?

A.   I -- somewhere around that time frame sounds about right.

     Q.   Okay.  And when the city closed out the project --

        MR. CARNATHAN:  If I can have Salmi -- the fee screen.  Yeah, I think we have to blow up the applied value.

BY MR. CARNATHAN:

    Q.   Well, you can see it's closed now, right, sir?

A.   Yes.

    Q.   Yeah.   That project's done.   And the final construction cost was still $950,000 for a fee of 17,670, right, sir?

A.   I don't know because I didn't sign the final affidavit. The owner provided that affidavit to the Town of Newton.

    Q.   Right.   Comparable house, right?   Same size or similar size, similar finishes, similar materials?

A.   Um-hum.

    Q.   Right?   And that was your project?

A.   Correct.

        MR. CARNATHAN:   That's all I have for Mr. Salmi.

        THE COURT:   Okay.

        MR. PERTEN:   May I proceed, Your Honor?

        THE COURT:   Yes, of course.

                REDIRECT EXAMINATION

BY MR. PERTEN:

    Q.   Mr. Salmi, Mr. Carnathan showed you some bids that you had received and challenged that they didn't have sufficient specificity.   Do you recall that?

A.   Yes.

    Q.   We looked at the Bennett, for example?

A.   Yes.

VON SALMI - Redirect

1    Q.   When you bid the projects, did you provide

2    specifications?

3    A.   Yes.

4    Q.   And did you provide plans?

5    A.   Yes.

6    Q.   And when you received the bids, were those bids

7    based on the plans and specifications that you provided?

8    A.   Yes.

9    Q.   Was the level of detail that was contained in the

10   bid responses consistent with what a normal subcontractor

11   would do on every job?

12   A.   In some instances, yes.

13   Q.   And in fact, sir, were the prices that you were

14   given the prices with which those subs would be willing to be

15   bound?

16   A.   Yes.

17   Q.   In other words, you gave them specifications.  They

18   looked at the specifications.  They looked at the plans, and

19   they gave you a price, correct?

20   A.   That's correct.  Because they understand that when we go

21   to contract, our contracts -- subcontractor contracts are

22   probably ten, twelve pages long, but they own everything in

23   that scope of work --

24   Q.   So --

25   A.   -- that goes on that job.

Page 134

VON SALMI - Redirect

1    Q.   So they own what was contained in the specifications

2    and what was contained in the plans and all the description

3    that you sent as part of the bid package, correct?

4    A.   That's correct.

5    Q.   So Mr. Carnathan showed you the Glenn E. Hines

6    proposal?

7         MR. PERTEN:  Let's put that up for a moment, if we

8    could.

9    BY MR. PERTEN:

10   Q.   Okay.  And specifically, we have the Glenn E. Hines

11   proposal up, and he was questioning you about earthwork

12   utilities and engineering for --

13        THE COURT:  Is there an exhibit number on this one --

14        MR. PERTEN:  No --

15        THE COURT:  -- Mr. Perten?  There isn't?

16        MR. PERTEN:  -- there is not.

17        THE COURT:  Okay.

18   BY MR. PERTEN:

19   Q.   He pointed you to the $220,000 figure.  Do you

20   recall that?

21   A.   Yes, I do.

22        MR. PERTEN:  That's just me.  I'm just pulling it

23   closer.

24        THE COURT:  That's fine.

25   BY MR. PERTEN:

VON SALMI - Redirect

1    Q.   Now, when you sent the bid to Glenn E. Hines, would

2    you have a breakdown as to what was included in his earthwork

3    utilities and engineering?

4    A.   So in the bid package, the specifications list, okay?  On

5    the first page, I have a list of specifications, lists all the

6    items that were included in there.

7    Q.   Okay.

8    A.   And that was the site, the concrete, and the

9    waterproofing categories.

10   Q.   Okay.  Let me show you the first page of your

11   specification, sir.  Do you recognize that as the first page

12   of your specifications?

13   A.   Yes, I do.

14   Q.   And in fact, that would've been provided to Mr.

15   Hines -- Glenn E. Hines, correct?

16   A.   It was provided to him.

17   Q.   And does that, in fact, provide the detail in items

18   A through K, L, somewhere in that range, correct?

19   A.   Well, the entire scope goes all the way through S.

20   Q.   Okay.  So Mr. Hines was bidding 220 for this detail

21   that's provided in the specifications, correct?

22   A.   Correct.

23   Q.   And you had no expectation that he was going to

24   break it down by how much for each item; isn't that correct?

25   A.   As a matter of fact, on the second page of the

VON SALMI - Redirect

1    specifications, we provided a breakdown of how we wanted that

2    information from him, totals for all labor, materials, and

3    taxes in the following breakdown that goes from offsite

4    transport disposal down to the waterproofing.

5         Q.   So in fact, the form of his bid response was exactly

6    the form that you prescribed that he used; isn't that correct?

7    A.   That is correct.

8         Q.   Okay.  And is it typical for contractors, when you

9    get bids, to tell you what their actual costs are?

10   A.   No.

11        Q.   Or what their profit margin is?

12   A.   No.

13        Q.   You get a number, correct?

14   A.   That's correct.

15        Q.   And you hold them to their number and their

16   specifications and the plans that accompany that, correct?

17   A.   That is correct.

18        Q.   And so when you look at a bid, you're not looking at

19   the bid in a vacuum.  You're looking at a bid as responsive to

20   the specifications and plans that were provided; isn't that

21   correct?

22   A.   That's the purpose of having the bid process.

23        Q.   And when you contract, if that bid is acceptable,

24   you would incorporate the specifications and plans to which

25   they're obligated to build, correct?

VON SALMI - Redirect

1   A.   We reference all of that.

2        Q.   Okay.  Now, Mr. Carnathan spent some time discussing

3   this creation of the specifications and the fact that there

4   were no formal written specifications, correct?

5   A.   Correct.

6        Q.   In creating the specifications, you relied on

7   extrinsic data, didn't you?

8   A.   Yes.

9        Q.   You relied on the appraisals, you told us?

10  A.   Correct.

11       Q.   The inspections?

12  A.   Correct.

13       Q.   The photos?

14  A.   Correct.

15       Q.   Invoices?

16  A.   Correct.

17       Q.   Site plans?

18  A.   Correct.

19       Q.   Your visuals?  You went into the site visit?

20  A.   Correct.

21       Q.   And that's all of the information that one would

22  need to create specifications; isn't that correct?

23  A.   That's correct.

24       Q.   So it's not like you randomly, just willy nilly,

25  created specifications.  They are based on the facts as you

VON SALMI - Redirect

1    developed them in your investigation, correct?

2    A.    That's correct.  And as I mentioned, all we did was

3    collate those facts into a set of specifications.  We didn't

4    invent them.  We just collated the information from those

5    various sources.

6         Q.    Okay.  So again, so all the material, all the

7    information that was contained in the specifications, was

8    contained in the material that you reviewed?

9    A.    That's correct.

10        Q.    Okay.  And you also told us, I believe, in -- or

11   told Mr. Carnathan, that when doing a spec house, it is

12   typical that there is not a standalone set of specs; is that

13   correct?

14   A.    That's correct.

15        Q.    Why is that?

16   A.    Well, because you're responding to whatever the market

17   may take, market desires what and may be in vogue at a given

18   point in time.  For instance, when we're building a Keeper, we

19   had two realtors that we worked extensively with.

20        And as we're building the home, we would talk about

21   colors.  We would talk about what the hot buttons that

22   customers would be.  There might be a particular fixture

23   that's in vogue in the kitchen, something that might be in

24   vogue as far as the toilet style goes, tiles versus stone.

25   All of those types of things.

VON SALMI - Redirect

1      So it's kind of an evolving process when we're doing a

2   spec home as to where we start and where we end up with a

3   final product that goes to market.

4      Q.   Okay.  And the fact, sir, in your experience, that

5   you don't have standalone specifications, does that prevent

6   you from bidding out a project?

7   A.   No, it doesn't.

8      Q.   And do you undertake, essentially, the same exercise

9   that you've just described to us in terms of developing

10  specifications for bidders?

11  A.   That would be correct.

12     Q.   Okay.  Now, Mr. Carnathan appeared to find fault

13  with you for using contractors that you had a pre-existing

14  relationship with.  Do you recall that testimony?

15  A.   I did get that feeling, yes.

16     Q.   Why did you elect to go with contractors you knew as

17  opposed to contractors you didn't know?

18  A.   Well, maybe as the saying goes, you're better off with

19  the devil you know than the devil you don't.  Okay.

20  So we had experience these contractors.  They knew how we

21  expected them to take and execute the work, the level of work,

22  the kind of work that we expected out of them.  We knew that

23  they could perform.  We knew that they could take and complete

24  the job within a given schedule.

25     There are so many variables that go into the selection

VON SALMI - Redirect

1   process of the subcontractor, plus what I mentioned was good

2   value.  They provide good value.  I'm not necessarily saying

3   the cheapest.  When you go out to get three bids, that's what

4   you do for a home advisor, you know, you're a homeowner and

5   you want to price a new roof and you don't know a roofer.

6        So you go out and you get three bids, and you determine

7   which one you want.  And sometimes homeowners don't even

8   always choose the lowest bid.  Maybe they didn't like the guy.

9   Maybe the guy's pickup truck looked horrible, and they didn't

10  trust them.

11       So there are a series of factors that go into making a

12  selection for a particular sub to execute the work on a

13  particular project.  We take that institutional knowledge, and

14  we utilize that to select the subcontractors to bid this

15  project.  That surpasses -- that's how we did it.  You can't

16  mischaracterize it any other way.  That's what we did.

17       Q.   Is it fair to say that because you had worked with

18  each of these subcontractors for years, they were thoroughly

19  vetted?

20  A.   Absolutely.

21       Q.   And did the fact that you knew the quality of the

22  work, did that factor into your decision to use those as

23  opposed to an unknown?

24  A.   Absolutely.  Again, this is not an average home.  We were

25  not working off of average contractors.  We wanted people that

VON SALMI - Redirect

1   could that execute a home that's going to be sold for $4-some-

2   odd million.

3       Q.   Okay.  And is the quality of workmanship that one

4   would expect in a home that's going to sell for $4-some-odd

5   million higher than the quality of workmanship you'd expect in

6   a home that costs $500,000?

7   A.   Absolutely.

8       Q.   And is the universe of builders who can work in that

9   high-end environment, is it smaller than those who work in the

10  basic $500,000 home?

11  A.   It's very small.

12      Q.   Okay.  And again, did you consider those factors

13  when you vetted these contractors?

14  A.   Absolutely.

15      Q.   And when you received the bids, did you take their

16  number as gospel or did you further evaluate whether the bids

17  were reasonable?

18  A.   No, we did not take it as gospel.  We relied upon our

19  institutional knowledge, looked backed, historically, what we

20  knew, for instance, with Keeper homes.  I had developed the

21  matrix for three different levels of home -- homes.  There

22  might be an A, B, and C.  On an A home, electrical might be

23  $10 a square foot.  On a C home, electrical might be $14 a

24  square foot because there's different types of materials and

25  different levels of those finishes.  Whether it has lighting

VON SALMI - Redirect

1    control or it doesn't have lighting control.

2        So we have some institutional knowledge based upon our

3    fifty years of experience of where we think these costs should

4    go.  That's -- I don't know how else to express that.  But

5    that is contained within the criteria that I utilize when I'm

6    looking at reviewing those bids to see if it sounds like a

7    duck, walks like a duck, quacks like a duck; it's a duck.

8        Q.   Okay.  Now, Mr. Carnathan spent some time on the

9    fact that you received a bid for finished materials at

10   $735,000, which is what you carried in the VSA column,

11   correct?  The benchmark column?

12   A.   That's correct.

13       Q.   And in fact, you then took it upon yourself to

14   reduce that by 170,000 bucks down to 550 or whatever the math

15   is -- 650, 750, about 170 -- $180,000, correct?

16   A.   Yes, we did.

17       Q.   And just so that we're clear, so he's complaining

18   that you reduced the number; you understood that?

19   A.   That's what I understood.

20       Q.    Now, why didn't you just carry the bid as it was

21   presented to you, consistent?  Why did you reduce it when you

22   were putting together the Lyman-Cutler numbers?

23   A.   Again, we bid this as if VSA was a general contractor.

24   If we go in, we know we have a given methodology that we've

25   executed hundreds of homes on, that -- that I've executed

VON SALMI - Redirect

1    hundreds of homes using this methodology, and they've been

2    successful homes.  We've gotten paid for them.  We've had

3    successful clients.  There was no reason for me to change

4    that.

5        So when I looked at -- again, what Herrick & White was

6    doing, they were taking and projecting a standard VSA-type

7    home that we would that we have and projecting all the

8    elements that would be contained in that.  We knew that Mr.

9    Kagan did not take and have, at least from the evidence that I

10   got from the invoices, I saw nothing there that he did any

11   work with Herrick & White.  I don't even know if he knew

12   Herrick & White.  I didn't ask him if he knew Herrick & White.

13   Herrick & White is one of the top millwork houses.  There are

14   probably three or four in the Boston area that do high-end

15   work.

16       So knowing that, and knowing that they could provide me

17   with thorough bid, but knowing that it was a top of the line

18   and knowing that Kagan could probably get better prices, based

19   upon what we saw, we knew that we should discount from there.

20   We did not use those prices as per se.  And it was not profit.

21   There is no profit in those numbers for VSA.

22       Q.   So Mr. Salmi, picking up on that question earlier

23   about whether or not you accepted bids as gospel or whether or

24   not you reviewed them to evaluate them, that would be an

25   example of one bid where you felt that he could get a better

VON SALMI - Redirect

1  price, so you reduced it, correct?

2  A.   That's correct.

3      Q.   As opposed to simply carrying the number and

4  standing by the number because that's what they gave you,

5  correct?

6  A.   That's correct.

7      Q.   Now, there was a question about mechanical systems.

8  And Mr. Carnathan found fault for it being carried at

9  $140,000.  In fact, that was a VSA cost, not the Lyman-Cutler

10  cost, correct?

11  A.   That's correct.

12      Q.   So in fact, you didn't carry it at 140.  You carried

13  it at some lesser number, correct?

14  A.   That's correct.

15      Q.   Now, there was also testimony and a sense

16  incredulity regarding the cost of closet poles and shelves; do

17  you recall that?

18  A.   Yes, I do.

19      Q.   Now, there was more than one closet.  There were

20  many closets, correct?

21  A.   That's correct.

22      Q.   And these were custom, correct?

23  A.   That's correct.

24      Q.   And this wasn't pine, correct?

25  A.   That's correct.

Page 145

VON SALMI - Redirect

1    Q.   This was cherry and mahogany and various rare woods,

2    correct?

3    A.   That's correct.

4    Q.   That would be expensive, correct?

5    A.   That's correct.

6    Q.   Did you have any understanding whether this is off-

7    the-shelf, kind of, shelving?  Can I go to Home Depot and just

8    buy those?

9    A.   No.

10    Q.   Okay.  This all had to be custom milled?

11    A.   That's correct.

12    Q.   Custom beveled?

13    A.   That's correct.

14    Q.   Custom measured?  Custom installed?

15    A.   That's correct?

16    Q.   Custom hardware?

17    A.   Correct.

18    Q.   Did the price that was for this specialty, custom

19    millwork, was that inconsistent with the price that you would

20    expect, based upon your fifty years of experience in the

21    industry building high-end homes?

22    A.   I never questioned it.  It was consistent with all of my

23    knowledge.

24    Q.   Now, when you did your analysis, this is the price

25    that you came up with as to what the fair and reasonable value

VON SALMI - Redirect

```
 1   was, in your opinion, for constructing these homes, correct?
 2   A.   Correct.
 3        Q.   And you will agree that you came up with a cost that
 4   was larger than what Mr. Kagan actually spent, correct?
 5   A.   That's correct.
 6        Q.   And so you'd agree with me that if he beat your
 7   prices, he did a heck of a job, correct?
 8   A.   Absolutely.
 9        Q.   And certainly, sir, if there was an attempt to be
10   disingenuous you would expect his cost to be even higher than
11   yours; isn't that correct?
12   A.   I would assume so.
13        Q.   Now, there was some question about the value or the
14   changes as a result of the passage of time between 2014 and
15   2018 when you got the bids; do you recall that?
16   A.   Yes.
17        Q.   And I think Mr. Carnathan's math, if we assume it
18   was right, was maybe materials would have been at roughly
19   $200,000 less.  That's the number he threw out, roughly.
20   A.   Okay.
21        Q.   Okay.  If the number was $200,000 less on materials
22   than what you put there, your numbers still would be
23   significantly higher than what Mr. Kagan actually spent; isn't
24   that correct?
25   A.   Absolutely.
```

VON SALMI - Redirect

1    Q.   And in fact, the other thing, we looked at several

2    numbers in the developer costs, where you said these were Von

3    Salmi numbers; do you recall --

4    A.   Correct.

5        Q.   -- testimony?

6            Now, those were numbers that you didn't just make

7    up, correct?  These were based on your experience?

8    A.   That's correct.

9        Q.   Okay.  And you said that the bulk of the information

10   in your Exhibit A, in your analysis, was based on the

11   subcontracts, the bids, that you received, correct?

12   A.   That is correct.

13       Q.   Is it fair to say that of the total that you came up

14   with, the Von Salmi numbers, if you will, was probably less

15   than 200,000?

16   A.   Absolutely.

17       Q.   Now, you said that the property you did on

18   Countryside was similar size, correct?

19   A.   Correct.

20       Q.   All right.  And it was about a mile away, correct?

21   A.   Correct.

22       Q.   The cost of Countryside and the cost of Lyman-

23   Cutler, there's a lot of variables; isn't that correct?

24   A.   Correct.

25       Q.   Would it be a fair analysis to say if you could

VON SALMI - Redirect

1    build that house, which we don't know anything about, for $4

2    million, but Lyman-Cutler was $5 million, can you draw any

3    conclusions from that?

4    A.   That they're similar in the nature of their construction.

5         Q.   All right.  But they're not the same?

6    A.   Correct.

7         Q.   And what was spent there doesn't necessarily

8    indicate what was spent on Lyman-Cutler, correct?

9    A.   That's correct.

10        Q.   Now, you also spoke, sir, about overhead; do you

11   recall that testimony?

12   A.   Yes.

13        Q.   Now, would you agree with me, sir, that overhead is

14   a direct cost to the contractor, correct?

15   A.   That's correct.

16        Q.   That's money out of his pocket or her pocket or its

17   pocket, correct?

18   A.   That is correct.

19        Q.   And in your experience, do subcontractors charge for

20   their overhead?

21   A.   Yes, they do.

22        Q.   Do general contractors charge for their overhead?

23   A.   Yes, they do.

24        Q.   Is that an actual cost of doing business?

25   A.   Yes, it is.

VON SALMI - Redirect

1    Q.   Now, you told us that overhead generally runs five

2    to fifteen percent of the total construction cost, correct?

3    A.   Correct.

4    Q.   Why didn't you use fifteen percent instead of ten?

5    Why didn't you go with the higher number?

6    A.   We -- I don't need to.  Historically, we have used ten

7    percent.  I've used ten percent in the companies I've worked

8    for in the past.  Ten percent is the number used for our

9    overhead because it seems to cover the amount of overhead for

10   those particular categories that we have.  So ten percent

11   seemed to be a logical and fair number.

12       If it was seven percent, we'd have used seven percent.  I

13   know the only variability is that contractors aren't currently

14   coding -- currently costing work who use ten percent for

15   overhead and they set out a ten percent for profit.  They

16   don't vary the overhead number.  They vary the profit number.

17   Q.   Okay.  So the overhead of ten percent is the

18   standard across the board?

19   A.   That's correct.

20   Q.   And the variable, if you will, is the profit number?

21   A.   That's correct.

22   Q.   And there's a difference between overhead and

23   profit, correct?

24   A.   That's correct.

25   Q.   They're not the same number?

VON SALMI - Redirect

1    A.    That is correct.

2         Q.    Two different concepts, correct?

3    A.    Absolutely.

4         Q.    We often talk about overhead and profit, but that's

5    really two different concepts, correct?

6    A.    That's correct.

7         Q.    And again, overhead is a fixed cost?

8    A.    That's correct.

9         Q.    Okay.  Now, Mr. Carnathan asked you if you

10   intentionally got the highest number that you possibly get; do

11   you recall that question?

12   A.    I do.

13        Q.    Sir, if you wanted the highest number, why didn't

14   you use fifteen percent overhead?

15   A.    Exactly.

16        Q.    And sir, if you wanted the highest number, would

17   that have been good practice on your behalf to reduce the cost

18   of tiles from what was bid?

19   A.    No, it would not.

20        Q.    And to reduce the various subcontractors and reduce

21   for economies of scale, is that how you come up with highest

22   number possible?

23   A.    No.

24        Q.    And the actual cost that Kagan spent for materials,

25   was that pertinent at all for you to make an independent

VON SALMI - Redirect

1  evaluation as to what the fair and reasonable cost should be?

2  A.   It was completely after the fact because we didn't know

3  those costs.  Going into this, we had generated our report.

4  We had generated these costs before we even knew what Kagan's

5  costs were.

6      Q.   Okay.  So when you prepared your report, prepared

7  your costs, whether Kagan spent $1 million or $50 million had

8  no factor in your determination, independently, as to what a

9  fair and reasonable cost for this project would be; is that

10  right?

11  A.   Again, it was not in the scope of our engagement.

12      Q.   There was questions about Mike Bennett's bid.  And

13  you said you took it over the phone --

14  A.   Correct.

15      Q.   -- do you recall that?

16      That is certainly done in your industry, isn't it?

17  A.   Absolutely.

18      Q.   And with the phone bid that you got, did you

19  undertake the same process to vet that bid?  In other words,

20  to make sure that it was in line with what you would expect?

21  A.   What I did was I looked at the approximate scope of work

22  that was being undertaken.  And having experience with masonry

23  in my own business, I looked at what I would be charging to do

24  that amount of work.  I thought it was reasonable for the

25  amount of work.  I think he misquoted his square footages, but

Page 152

VON SALMI - Redirect

1   I think his total number was quite accurate.

2        Q.   And in fact, the square footages was less than you

3   thought it was, correct?

4   A.   Correct.

5        Q.   Okay.  So in fact, that number, if anything, was on

6   the low side; is that correct?

7   A.   That's correct.

8        Q.   And that's based not only on your general experience

9   in the construction industry, but on the fact that you

10  personally owned a masonry company at one point, correct?

11  A.   That's correct.

12       Q.   Now, Mr. Bennett, who gave you the phone invoice --

13  excuse me, phone proposal, he was provided with the

14  specifications and plans as well, correct?

15  A.   That is correct.

16       Q.   So when he was phoning you he had that and your

17  contract with him would have reflected that, correct?

18  A.   That is correct.

19       Q.   And would you tell us, sir, you said in response to

20  Mr. Carnathan, that you told a white lie, I think was the

21  phrase you used, to your contractors because you didn't tell

22  them this was for a lawsuit, but for potential home; do you

23  recall that?

24  A.   And even to my son, yes.

25       Q.   And even to your son, you did that?

VON SALMI - Redirect

1    A.    Correct.

2         Q.    Why did you do that?  Why did you lie to them?

3    A.    Because I wanted an unbiased, unprejudiced opinion.  As I

4    had mention, you know, contractors go in as soon as they hear

5    anything is legal.  First of all, it's trying to get them to

6    bid anything because they don't want to be involved.

7    Secondly, there's a constant fear that they're going to

8    inflate those prices because they may take and get drug into

9    court to have to take and testify to those values.  So they're

10   trades people.  They don't do this by way of their everyday

11   work.  So there's an inherent reluctance on their part to

12   participate in something like this.  That's why we didn't want

13   to take and divulge to them that it was going to take and be

14   involved in a legal endeavor.

15        Q.    Okay.  And in so doing, potentially you jeopardized

16   some of your relationships with your subs?

17   A.    Absolutely.

18             MR. PERTEN:  Okay.  Nothing further, Your Honor.

19             THE COURT:  How much do you think you have?

20             MR. CARNATHAN:  Oh, just a couple of minutes, Your

21   Honor.

22             THE COURT:  Okay.  Go ahead.

23                         RECROSS EXAMINATION

24   BY MR. CARNATHAN:

25        Q.    Mr. Salmi, just now you mentioned that you used to

VON SALMI - Recross

1    own a masonry company, right?

2    A.    Yes.

3         Q.    That was about twenty-five years ago?

4    A.    Correct.

5         Q.    So sir, I think you also mentioned during the

6    redirect that you knew these were spec homes, right?

7    A.    Correct.

8         Q.    All right.  And you knew that they sold for $4-odd

9    million each?

10   A.    Right.

11        Q.    Right.  And when you build a spec home, the whole

12   point is to earn a profit, right?

13   A.    Correct.

14        Q.    And you've built spec homes yourself?

15   A.    That's correct.

16        Q.    About fifteen of them, I think you told me, right?

17   A.    Correct.

18        Q.    And when you were building --

19   A.    Well, fifteen at Keeper, yes.

20        Q.    Excuse me?

21   A.    Fifteen at Keeper.

22        Q.    But when you were building spec homes, you would

23   work backwards from the selling price, right?  You'd figure

24   out your profit and then figure out what you could spend on

25   the construction, right?

Page 155

VON SALMI - Recross

1    A.    Right.

2        Q.    And so did you know that they spent $4 million for

3    the lot in this case, sir?

4    A.    I did not have the lot cost, no.

5        Q.    All right.  And your number for the construction was

6    5.869 million, right, sir?

7    A.    Right.

8        Q.    All right.  So if they paid 5.869 million for the

9    homes --

10    A.    Um-hum.

11        Q.    -- and 4 million for the lot and then sold them for

12    $4-odd million each, that would be pretty awful outcome,

13    right, sir?

14    A.    I've experienced that.

15        MR. CARNATHAN:  That's all I have.

16        MR. PERTEN:  Nothing further, Your Honor.

17        THE COURT:  All done?  Okay.

18        Thank you, Mr. Salmi.

19        All right.  I think we'll take a break.  Based on

20    what you've heard, if we took an hour break, not that I could

21    cut it a whole lot from that, come back at 1:30, do you think

22    that we're still in the range of finishing this?

23        MR. CARNATHAN:  From my standpoint.  I mean, I'll be

24    fairly brisk with Mr. Doddridge.

25        MR. PERTEN:  Your Honor, I'm cautiously optimistic as

VON SALMI - Recross

1    well that we'll get done, but I do have procedural question

2    that may impact that optimism.

3            As Mr. Carnathan has just indicated.  He's going to

4    be -- brisk was his word, as brisk as possible with his

5    expert.  And I anticipate, Your Honor, that my cross-

6    examination of Mr. Doddridge will require me to go through

7    some of the numbers and some of the math and some of things

8    which I further anticipate he wouldn't go through on direct.

9    So it's entirely likely that my cross, if that's the way we

10   go, would be longer than the direct.  I know Your Honor has

11   previously advised to, sort of, the equal rules in terms of

12   timing.  I would be prepared, because I don't want to cut

13   short, I would be prepared to call Mr. Doddridge on direct and

14   walk him through or --

15           THE COURT:  What would that do for anybody?

16           MR. PERTEN:  Well, then again, then I would suggest

17   then if went first it would take as long as it takes and I

18   don't -- if he does twenty minutes, I'm not capped at twenty

19   minutes.  Because I don't think I can adequately cross this

20   witness in the twenty minutes or half hour or forty-five

21   minutes, especially based on what we've just seen with Mr.

22   Salmi.  So I don't want to be capped, if you will, or cut

23   short by the briskness --

24           THE COURT:  Yeah, I'm not going to commit now to

25   any -- well, he's here in the courtroom, right?

VON SALMI - Recross

1          MR. PERTEN:  Yep.  I can call him as the next

2    witness --

3          THE COURT:  No, no.

4          MR. PERTEN:  -- on direct.

5          THE COURT:  Hold on.  I understand.  But he's here in

6    the courtroom?

7          MR. PERTEN:  Yes.

8          THE COURT:  You could call him, right --

9          MR. PERTEN:  Yes.

10         THE COURT:  -- I suppose?  I'm not going to allow

11   that if that's not what was discussed.

12         MR. PERTEN:  I mentioned to Mr. Carnathan that I

13   might call him on direct.

14         MR. CARNATHAN:  He mentioned that, I think, Friday.

15   But I had always understood I was going to call Doddridge in

16   rebuttal and then he'd cross him and --

17         THE COURT:  Yeah, that's what we're going to do.  And

18   I'll take as it comes.  Okay.

19         MR. PERTEN:  Thank you, Your honor.

20         THE COURT:  I'll let you know --

21         MR. PERTEN:  I just wanted to sort of give the heads

22   up.

23         THE COURT:  -- as we move forward.

24         MR. PERTEN:  Thank you.

25         THE COURT:  Okay.  Just be proportional.

VON SALMI - Recross

1              MR. PERTEN:  I will do my best.

2              THE CLERK:  All rise.

3                     (Off the record at 12:35 p.m.)

4                      (On the record at 1:46 p.m.)

5              THE CLERK:  The court is now in session.

6              THE COURT OFFICER:  Be seated.

7              THE COURT:  Okay.  Well, just the -- has the, at this

8    point then, the defendants have rested; is that correct?

9              MR. PERTEN:  Yes, Your Honor.

10             THE COURT:  Okay.  All right.

11             Go ahead.

12             MR. CARNATHAN:  Thank you, Your Honor.

13             The plaintiff calls David Doddridge in rebuttal to

14   Mr. Salmi.

15                     DAVID DODDRIDGE SWORN

16             THE COURT:  Okay.  Good afternoon, Mr. Dodderidge

17   (sic).

18             THE WITNESS:  Good afternoon, Judge.

19             THE COURT:  Is that right, ['Dod-er-rij]?

20             THE WITNESS:  ['Dod-rij].

21             THE COURT:  ['Dod-rij]?

22             THE WITNESS:  Yeah.

23             THE COURT:  Okay.

24             You've been here in the courtroom this morning?

25             THE WITNESS:  I have.

1          THE COURT:  All right.  So you know my rules about

2    speaking into the microphone, et cetera, right?

3          THE WITNESS:  Yes, sir.

4          THE COURT:  Okay.  Very well.

5          Go ahead.

6          MR. CARNATHAN:  Thank you, Your Honor.

7                      DIRECT EXAMINATION

8    BY MR. CARNATHAN:

9      Q.   Would you state your name, please, sir?

10   A.   David A. Doddridge.

11     Q.   Where do you live?

12   A.   I live at -- in Worcester, Massachusetts.

13     Q.   And what's your understanding of your purpose for

14   testifying here today?

15   A.   To rebut the opinion of Mr. Salmi.

16     Q.   Let's just speak briefly about your credentials.

17   Could you just briefly describe your training and experience

18   in the construction industry, please?

19   A.   I started working with my dad in the late '70s.  We

20   started a construction company in 1983.  We were partners

21   through 1996.  At which point, I took the company over and

22   continued to build primarily residential projects through

23   about 2012/2013.

24     Q.   So I have it right that you were operating your own

25   construction company between, approximately, 1983 and 2012; is



1    that right?

2    A.    Yes.

3         Q.    And during that time, you were building homes, fair

4    enough?

5    A.    Yes, correct.

6         Q.    Primarily residential homes?

7    A.    Primarily residential, some -- some light commercial.

8         Q.    Over the approximately thirty years that you were

9    operating your own construction company, approximately, how

10   many projects did you work on?

11   A.    Oh, 2- to 300.

12        Q.    And approximately, how many of those projects were

13   you responsible for building a home, soup to nuts?

14   A.    About fifty percent.

15        Q.    And how many of those projects were you responsible

16   for estimating the costs of construction at the outset of the

17   project?

18   A.    About a hundred percent, really.  My dad would sometimes

19   do an estimate, but I would always certainly be part of it,

20   so.

21        Q.    Do you hold any professional licenses in the

22   construction industry, sir?

23   A.    I do.  I have a unrestricted commercial -- unrestricted

24   construction supervisor's license.

25        Q.    Okay.  And do you also have a one- and two-family



1    construction supervisor's license?

2    A.    Right.   So the -- the unrestricted allows me to build a

3    one and two family and commercial up to 35,000 cubic feet --

4         Q.    Okay.

5    A.    -- without an architect or engineer involved.

6         Q.    Do you hold any professional certifications in the

7    construction industry, sir?

8    A.    I do.   I have a ICC certification, and I have OSHA

9    certification.   I've got my OSHA 30.

10        Q.    What's an ICC certification?

11   A.    International Code Council.

12        Q.    What does that mean?

13   A.    The ICC is the entity that authors model-building codes

14   that are adopted, at this point, really coast to coast.

15        Q.    All right.   What did you have to do to earn that

16   certification?

17   A.    Take an examination.

18        Q.    And what about the OSHA certification?   What's the

19   OSHA certification?

20   A.    The OSHA 30 is thirty hours of classroom -- thirty --

21   thirty hours of training in -- in construction site safety.   I

22   also have a building envelope inspector certification from the

23   Building Envelope Science Institute.

24        Q.    And what does that certification represent?

25   A.    That was a solid week of training with -- with an



1    examination at the end.  And that's all about building

2    envelopes, the exterior cladding, if you will, of a building.

3        Q.    And so during that thirty years that you're running

4    your own construction company, how much experience do you have

5    actually doing construction work with your own hands?

6    A.    About thirty years.

7        Q.    And so what sorts or work have you done, just with

8    your own hands, in the construction industry?

9    A.    Years ago, I even built my own forms so I could I could

10   my own foundations.  So I used to pour to my own foundations,

11   framing, lots and lots of framing, roofing, siding.  I've

12   built lots of stairways, interior carpentry, flooring,

13   stairways, trim, cabinets, basically everything.  I've even

14   done a fair amount of painting.

15       Q.    Have you previously been qualified to testify in

16   court?

17   A.    Yes.

18       Q.    About how many times have you previously been

19   qualified to testify in court?

20   A.    About twelve to fifteen.

21       Q.    Let's talk about this engagement in particular.

22   What methodology did you follow?  What process did you follow

23   in order to estimate the cost of construction in this case?

24   A.    I received the plans, the permanent set of plans.  And

25   then, I used a program called Bluebeam to quantify the various



Page 163

1    units of measure within those plans.  And by that, I mean

2    square foot of flooring, for example, lineal foot of -- of

3    cabinetry, that kind of thing.  So I quantified the various

4    units of measure using Bluebeam.  And then, I referenced the

5    RSMeans Construction Cost Guide for the year 2014.  And I

6    identified certain line items within that construction costs

7    guide.  And I assigned that cost to the appropriate unit of

8    measure.

9         Q.   In connection with forming your opinion, sir, were

10   you able to tour the interior of the two houses at issue?

11   A.   No, I was not.

12        Q.   Why not?

13   A.   They were sold.

14        Q.   What were you able to do with regard to the interior

15   of the properties?

16   A.   With respect to the interior, I was able to just use some

17   photographs from, I believe, what was a listing sheet.

18        Q.   What about the exterior?

19   A.   I just -- all I could was a quick drive by.

20        Q.   Okay.  And was the inability to tour the interior of

21   the homes a problem for you in estimating the costs of

22   construction in this case?

23   A.   No, I could tell what was in there by the photographs,

24   pretty -- pretty much.

25        Q.   To what extent, if at all, did you rely on the



1    proof-of-claim documentation by Mr. Kagan?

2    A.    On forming my opinion, I did not.

3         Q.    Why not?

4    A.    Because I wanted to go in -- every construction estimate

5    that I do for the purposes of -- of litigation support, I like

6    to go in blind.  I don't want to know what the actual costs

7    were because I -- because I don't want my opinions to be

8    skewed in any way.  So I just like to form my own opinion,

9    right from the very beginning, as if I had only the

10   information that's contained within the plans and

11   specifications, photographs.

12        Q.    Okay.  Let's talk a little bit about the Bluebeam

13   software you mentioned earlier.  What's the Bluebeam software?

14   A.    So Bluebeam is basically an electronic version of the

15   old-school method of doing quantity takeoffs.  So for example,

16   the old-school method, you would use an architect scale, a

17   construction master calculator, right, and a rolling measure,

18   which, basically, you roll across the paper plans and you set

19   it to a certain scale.  So it tells you how many lineal feet,

20   so you can do various calculations that way.  So Bluebeam is

21   basically the electronic -- electronic version of -- of that

22   same methodology.

23        Q.    So what's the output that you get out of Bluebeam?

24   What does it provide to you?

25   A.    Quantities, quantity takeoffs, lineal footage, square



Page 165

1   footage, cubic yards, that kind of thing.

2       Q.   In your experience, is Bluebeam widely used in the

3   construction industry?

4   A.   In my experience, yes, yes.  According to Bluebeam, they

5   have 1.4 million users or something like that.

6       Q.   Okay.  So after you got the quantities out of

7   Bluebeam, what did you do with quantities?

8   A.   So then what I did was I put those into a spreadsheet and

9   I assigned a cost per unit, based in part out of the RSMeans

10  Construction Cost Guides.

11      Q.   Okay.  Could you explain a little bit about what the

12  RSMeans Construction Cost Guide is?

13  A.   Basically, the RSMeans Construction Cost Guide is a -- is

14  a recognized, reliable, published construction cost guide,

15  published by the RSMeans company, which was actually purchased

16  by a company called Gordian, within, like, the last ten years.

17  But the RSMeans Construction Cost Guides are widely used by

18  architects, engineers, contractors, specialty tradespeople,

19  even the government uses them.

20      They've been in business for almost eighty years.  And

21  it's based upon a, they have a call center where they're

22  constantly, constantly gathering data from contractors and

23  construction professionals across the country and analyzing

24  that data.  So the people who edit these books and publish

25  these books are, if you look at the -- the inside cover, are

1    engineers, architects, engineer, engineer, architects, you

2    know.  They're construction professionals that basically study

3    construction costs as -- for a living, full time.

4         Q.   Right.  And where is RSMeans based?

5    A.   It's a local company.  Actually, it was founded in

6    Norwood, Massachusetts.

7         Q.   And so how long have you, personally, been using

8    RSMeans to estimate construction costs?

9    A.   Almost my entire career.

10         Q.   So did you ever use RSMeans when you were building

11   houses?

12   A.   Yes.

13         Q.   And so what's your experience been in building

14   houses with the reliability and accuracy of the RSMeans data?

15   A.   I've always found them -- found it to be very accurate,

16   if you know how to use it.  You have to know how to use the

17   book.  You have to know what you're looking at.

18         Q.   And how often is the book updated?

19   A.   If you have the -- if you have an online subscription

20   it's quarterly, but they're published annually.

21         Q.   Okay.  Which guide did you use?

22   A.   The 2014.

23         Q.   And why did you use the 2014 guide?

24   A.   That's the year that these houses were built in.

25         Q.   Is there any cap on the size home that RSMeans can



1    be used to estimate costs for?

2    A.    No, their book is divided into three sections, the

3    square-foot section, the assembly section, and the per-unit-

4    cost section.  So in the square-foot section, they take the

5    number of, so for example, a single-story house, they only go

6    up to a certain square footage in the -- in the table that's

7    in the book on the one page that that information is -- is --

8    can be found on.  So in the two-story luxury, they go up to

9    4,400 square feet in that section.  I didn't use that section.

10   I used the assembly section and the -- the unit-cost section.

11   So I could estimate a 20,000-square-foot house that way.

12       Q.    Have you used RSMeans in other engagements as an

13   expert witness?

14   A.    I have.

15       Q.    And about how many times have you used RSMeans in an

16   expert-witness engagement?

17   A.    Oh, forty or fifty.

18       Q.    And have you previously been qualified to testify in

19   court based the RSMeans data?

20   A.    Yes, I have.

21       Q.    And I don't think I asked in any clear way, but back

22   when you were building houses, in connection with about how

23   many construction projects did you use RSMeans?

24   A.      Probably a couple of hundred.

25       Q.    Am I right that the selection of the finishes can



1    have a big impact on the costs of construction?

2    A.    Yes.

3        Q.    So what did you do to take into account the costs of

4    the finishes in connection with your estimate here?

5    A.    Well, if you can't find something that's straight out of

6    the book that the book calls for that matches exactly what

7    you're looking for, then you just make adjustments,

8    internally.

9        Q.    All right.

10   A.    So --

11       Q.    You did that based on your experience as a

12   contractor?

13   A.    Right.  So for example, on the -- the -- the wainscoting,

14   I -- the book says $14.30 per square foot.  I -- I put it at

15   $25.  So I added $9 a square foot for that.  The stairway, I

16   doubled the cost of the stairway, so from 17-5 to 35,000, just

17   based on my own experience.

18       Q.    And am I right that the baseline cost data in

19   RSMeans is a national average, right?

20   A.    It's a national average, correct.

21       Q.    All right.  Is there a way to adjust that figure for

22   regional costs?

23   A.    Right.  So they have a location factor table in the book.

24   So for Boston, Massachusetts, that was 1.21, so a twenty --

25   twenty-one percent increase.



```
 1          Q.   And did you adjust your numbers for the Boston --
 2     A.   I --
 3          Q.   -- cost difference?
 4     A.   Yes, I did.
 5          Q.   So in your report, you put together a chart that
 6     summarized all the numbers, right, sir?
 7     A.   Yes.
 8          Q.   Yeah.  Would showing you that chart help you explain
 9     your testimony to the Court?
10     A.   Sure, yeah.
11               MR. CARNATHAN:  Yeah, yeah.  Bill, could we put up
12     the chart, beginning at page 3?
13     BY MR. CARNATHAN:
14          Q.   So sir, the chart begins on page 3 of your report.
15     It spans all to the way to page 10, I think.  Can you just
16     explain to the Court what the chart represents?
17     A.   Right.  So under "Description", that's the item
18     description; under "Unit", that is the unit of measure; under
19     "Quantity", that is the however many units of measure that it
20     is that you're including in the estimate; "Price per unit",
21     obviously is the price that -- per unit; and then, the total
22     is the quantity times the price per unit.
23          Q.   All right.  And how many different components did
24     you break the job down into about, sir?
25     A.   A couple of hundred.
```

1        Q.    Why so many different components?

2    A.    Because the -- the more you break it down, the more

3    accurate you're going to be.  If you -- if you aim small,

4    you're going miss small.

5        Q.    And how did you determine what the components would

6    be?

7    A.    Based upon my own experience, based in part upon the

8    specifications that were drafted by Mr. Salmi, in part by the

9    plans that were submitted to me, and in part by the

10   photographs that I viewed and the drive by that I did.

11       Q.    So when we look at the chart, if I'm looking at the

12   "Unit of measure" column, what does EA mean?

13   A.    That's each.

14       Q.    Okay.  And then, CY is what?

15   A.    Cubic yards.

16       Q.    How about LF?

17   A.    Lineal feet.

18       Q.    And SF is what?

19   A.    Square feet.

20       Q.    And so then, the next column is, for instance, just

21   pick one -- how about full basement foundation, 262 linear

22   feet?  Do you see that, kind of --

23   A.    Yes.

24       Q.    -- partway down?

25   A.    Yep.



1      Q.   So where's the 262 come from?

2   A.   From the quantity takeoff that I used Bluebeam for.

3      Q.   All right.  And where does 3,492 come from?

4   A.   The 3,492 would come from the book, unless I adjusted it

5   on my own, based on my own expertise.  I'm not sure if that

6   40- -- 3,492 is directly out of the book or if I adjusted it.

7      Q.   Right.  I'm just using this by way of an example.

8   So that's RSMeans, potentially adjusted by your experience as

9   a contractor, right?

10  A.   Correct.

11     Q.   And so then last column is a multiple of the unit of

12  measure times the --

13  A.   Times the quantity.

14     Q.   -- the price?

15  A.   Or times the price per unit, right.

16     Q.   Right.  Okay.  And so you did that for all of the

17  hundreds of different components and arrived at a final

18  figure, right?

19  A.   I -- I did.  Occasionally, I -- I put in something as an

20  allowance.

21     Q.   Okay.  And when we look at one of those cost

22  figures, what's included in that figure?

23  A.   Overhead and profit for the installing contractors.  So

24  for the subcontractor, there's overhead and profit.

25     Q.   Does it include materials?



1    A.    Yes, and equipment, labor.  Labor, equipment, materials,

2    overhead, and profit.

3         Q.    Okay.  Are there some exceptions to the idea that

4    the overhead and profit is included in each of those numbers?

5    A.    Within my estimate?

6         Q.    Within your estimate, yes.

7    A.    Yes.  So as I -- as I understood it, a company called

8    ProEx -- ProExcavation was to perform certain work without a

9    markup for overhead and profit.

10        Q.    Okay.  What was the basis for that understanding?

11   A.    I was -- I was led to believe that the basis for that

12   understanding was because that was part of the agreement.

13        Q.    All right.

14   A.    That -- that it would --

15        Q.    We told you to assume that for the purpose of your

16   --

17   A.    Right.  So that was -- that was to be done at cost, so it

18   wasn't cost-plus.  It was at cost in order to reduce the

19   overall cost of construction in exchange for, apparently,

20   equity in the project.

21        Q.    Right.  And what about the general contractor; did

22   you include overhead and profit for a general contractor?

23   A.    I did not.

24        Q.    All right.  Why not?

25   A.    For the same reason.



Page 173

1    Q.   After going through all this process, how accurate

2  do you believe your estimate of the total cost of construction

3  is?

4  A.   This particular estimate that we're looking for -- that

5  we're looking at, I believe, is accurate to within about three

6  to five percent.

7    Q.   Are there any assumptions baked into the numbers

8  about the nature of the subcontractors used or baked into the

9  prices?

10  A.   Yes, the -- I mean, the -- the RSMeans book assumes that

11  the contractors are licensed, where necessary, insured

12  properly, that they're professionals and that there is no

13  interpersonal relationship between whoever it is that's

14  performing the estimate and the subcontractor themselves.  So

15  this is basically an arm's-length, sort of, assumption.

16    Q.   Okay.  Now, since submitting the report, you've

17  reviewed it and discovered there's some mistakes in the chart,

18  right, sir?

19  A.   Yeah, I'm not sure how that happened.  But -- but there

20  are some redundancies, yes.  When I did this, basically, what

21  I did was I went into the spreadsheet and I highlighted an

22  area, right-clicked copy, and then went into the Word document

23  and left-clicked paste and just left it at that.  I checked my

24  estimate, you know, quadruple checked the spreadsheet, so I

25  didn't think that there would be any sort of a glitch in the

1    copy and paste, but there was.  However, I'm not --

2        Q.    So for instance, if we go to page 7 of the report,

3    just to show the Court what we're talking about.

4    A.    Okay.

5        Q.    And so if you look on the chart, it's got kitchen

6    cabinets, upper/lower; library casework.  And then, down a

7    little below that it's got kitchen cabinets, upper/lower;

8    library casework.  So it incorporates that figure more than

9    once, right?

10   A.    Right.  It incorporates those three times actually.  And

11   I'm well aware of the fact there are not three kitchens in

12   this house.  But what I did was I took a calculator and

13   manually checked my numbers not to include the redundancies.

14   So the bottom-line figure is absolutely correct.  I checked it

15   three times.

16       Q.    So if we go to page 10 and, I guess, look at the

17   subtotal construction costs, $1,365,089; have you checked that

18   figure?

19   A.    Yes.

20       Q.    And did the mistake in the copying of the chart

21   affect that number?

22   A.    No, not at all.

23       Q.    So is that still your subtotal as to what the

24   construction costs were?

25   A.    Yes.



```
 1              Q.    And that's for just one house, right?

 2    A.    Correct.

 3              Q.    Okay.  And then, in the next item, you add $286,669

 4    to that figure, right, sir?

 5    A.    I did, yes.

 6              Q.    Can you just briefly explain what that figure is?

 7    A.    That is twenty-one percent of the above costs, twenty-one

 8    percent of $1,365,089.  That's -- so that's the location

 9    factor that I was speaking of a minute ago.

10              Q.    Right.  So that's taking into account that the costs

11    in Boston are higher than the national average?

12    A.    Yes.

13              Q.    And then, you added in a sum for permit fee at $20

14    for a 1,000; is that right?

15    A.    Yes.

16              Q.    And where's that figure from?

17    A.    That figure is from the Town of Brookline, I believe.

18              Q.    All right.  And how about the --

19    A.    I know that it -- it comports with Mr. Salmi's estimate.

20              Q.    All right.  And then, you also added in $34,067 for

21    sales tax?

22    A.    Correct.

23              Q.    And where does that come from?

24    A.    Well, just -- basically, just as a rule of thumb, you

25    take one-third of the total and assume that to be materials.
```

1    And then, I just multiplied by six-and-a-quarter percent.

2         Q.   And so after going through that process, what was

3    your opinion as to the direct cost of construction per home?

4    A.   $1,718,000 and -- $718,860.

5         Q.   All right.  Then that figure assumes arm's-length

6    engagements with reputable subcontractors, right?

7    A.   Absolutely, yes.

8         Q.   Did you also, if we can go back to the chart, but

9    did you tally up what your estimate was for the total of the

10   work that ProEx did?

11   A.   Yes.

12        Q.   And what figure did you arrive at for the total cost

13   of construction for what ProEx did?

14   A.   I -- I have a -- there's a separate sheet that is my -- a

15   printout of my actual estimate spreadsheet, and I have a

16   column that's not in here that is marked with an X.  So each

17   one of those items, the overhead and profit was not included.

18        Q.   Right.  And do recall what your tally was, though,

19   about how much it all added up to?

20   A.   It's around 900,000 -- or I'm sorry, 450,000 per --

21        Q.   Well, I'm asking what your estimate was of the cost

22   for ProEx for the work that ProEx did.

23   A.   Oh.  So if I were to match ProEx's work, item by item, I

24   was at $321,000.  And their -- I -- I did see a quote from

25   ProEx that the same work totaled 418,000.

1          Q.    Right.   What about for the foundation and slabs?

2     Did you add up what you estimated the cost of construction

3     would be for the foundation and slabs?

4     A.    It's around 45,000.

5          Q.    Okay.   And how about the earthwork?

6     A.    The earth -- earthwork was around 65,000.

7          Q.    So you're aware that Mr. Salmi came in at 5.8-odd-

8     thousand for the two houses combined, right, sir?

9     A.    Yes.

10         Q.    So that, just splitting it in half, it's a little

11    over 2.9 million per home, according to Mr. Salmi, right?

12    A.    Correct.

13         Q.    And what's your opinion about that figure?

14    A.    It's exorbitantly high.

15         Q.    Do you know what it works out to per square foot?

16    A.    I calculated it at around $433 per square foot, based on

17    6,771 square feet, not -- not to include the garage.

18         Q.    So you excluded the garage and you got into the 433

19    figure?

20    A.    Right.   So what, theoretically, what you'd have to do

21    is -- is take out the value of the garage from that 2.9

22    million, and then divide it by 6,771.

23         Q.    Right.

24    A.    So --

25         Q.    Why do you do that?   Why do you do that?



1   A.    Calculate the square-foot costs or --

2       Q.    No, take out the garage before it calculates.

3   A.    Well, because, generally speaking, when you -- when you

4   speak about square-foot costs of a house you're -- you're

5   about the living space of the house.  You're not talking about

6   the basement.  You're not talking about the garage.

7       Q.    So is that amount of money a reasonable amount for

8   the cost of construction for a high-end home in Brookline?

9   A.    It's way too high.

10      Q.    And when we think about Mr. Salmi's methodology, in

11  your opinion, what's wrong with his methodology --

12  A.    Well --

13      Q.    -- if anything?

14  A.    It's not objective.  And it's -- it's -- it's basically,

15  what Mr. Salmi did was went out and got quotations from select

16  vendors for labor and materials and didn't get more than one

17  bid.  Didn't -- and therefore, didn't do a bid-levelling

18  sheet.  And some of those, some of the -- of the bids that Mr.

19  Salmi got from select vendors were just astronomically high.

20      Q.    Were there any estimates in particular that you

21  thought were astronomically high?

22  A.    The one that sticks out in my mind is the Herrick & White

23  estimate.

24      Q.    And what was it about the Herrick & White bid that

25  you thought made it astronomically high?



1   A.    Well, if you look at the lineal-footage charges or

2   estimates for cabinets or closet systems, for the stairway, a

3   $150,000 for the stairways.  My estimate includes $76,000 for

4   the stairways.  And I had the opportunity to add up what Mr.

5   Kagan claimed the stair parts cost by adding up all the

6   invoices relating to the stairs.  And that added up to

7   $48,000, which leaves $28,000 for labor, which translates into

8   two men, about 4.7 weeks.  Two -- two good stairway carpenters

9   about 65 to $75 per hour, translates into about four-and-a-

10  half weeks' worth of work, which is certainly enough time.

11  It's not an exorbitant amount of time, but it, you know -- I

12  mean, I've built those stairways as a stairway carpenter.

13  I've actually constructed those with my own two hands.

14       You have to understand that those -- those stairways that

15  exist in those houses are all made out of stock parts.

16  They're not stock like you can just simply go down to Home

17  Depot and buy a curved handrail, right.  But they come out of

18  a catalog, which is the Horner Millwork catalog.  They weren't

19  built in a millwork shop just for that job.  And that

20  certainly happens.  I've had those stairways built myself,

21  that's only built for that house and that's it.  You can't use

22  it anywhere else because it's not going to fit, right.  So

23  these stair parts are cataloged, if you will, stair parts.  So

24  just because it's not stocked at the lumber yard doesn't mean

25  that it's not stocked at the -- at the wholesaler/distributor.

1    So they just ship it to the lumber yard.  So it's a custom

2    order.  It's not a custom part.

3         Q.   You were here this morning when I was asking Mr.

4    Salmi about the closets, right?

5    A.   Yes.

6         Q.   And so he was saying that the $297 for poles and

7    shelves was reasonable for linear foot, and I forget the

8    number, 1,500 and change per linear foot, I think, for the

9    cabinets and the closets; do you remember that testimony?

10   A.   I do.

11        Q.   And he was testifying something to the effect about

12   how these were really high-end, custom closets.  Have you seen

13   pictures of the closets?

14   A.   I have.

15        MR. PERTEN:  None of this discussion was disclosed

16   anywhere in their report.  So I would object to the line of

17   questioning.

18        MR. CARNATHAN:  Well, Mr. Salmi went on a frolic this

19   morning about how the closets were custom, high-end mahogany.

20   I can't even remember all his testimony.  But it was kind of

21   new material about why his numbers were so darn high on the

22   closets.  And so I'm just going to ask Mr. Doddridge about the

23   pictures that they both looked at that allegedly support this

24   $1,500 a linear foot cabinets and the closets.

25        THE COURT:  So you're saying that Mr. Salmi didn't

1   have the same information in his report?

2            MR. CARNATHAN:  Right.  That the stuff about how the

3   closets were super high-end and how that justified his big

4   numbers per linear foot in the closets was also new material.

5   And so I'm just asking Mr. Doddridge to rebut what he heard

6   this morning.

7            MR. PERTEN:  Your Honor, on direct, he didn't touch

8   that.  That was in response to a question on cross.  In this

9   rebuttal report that was prepared there is zero discussion

10  about that.

11           THE COURT:  Well, he couldn't -- obviously, in his

12  report, he couldn't rebut what hadn't been said yet and so it

13  was said only --

14           MR. PERTEN:  Your Honor --

15           THE COURT:  -- it was only said today.

16           MR. PERTEN:  Your Honor, yes.  But Your Honor

17  indicated this morning when we had a similar argument that

18  we're going to be held to the content of our report when we

19  wanted to talk about certain calculations that could be

20  gleaned and you said no.  This is the same thing.  This is --

21           THE COURT:  No.  No --

22           MR. PERTEN:  -- something --

23           THE COURT:  -- it isn't.

24           MR. PERTEN:  -- that can be --

25           THE COURT:  It isn't, though.



1        MR. PERTEN:  -- gleaned?

2        THE COURT:  I don't want to argue about it.  It isn't

3   though because this is now responding to testimony.

4        You say it was elicited on cross, well, so what.

5   It's still testimony and in rebuttal, it's certainly

6   appropriate for this witness -- he couldn't have known before

7   he got here.  That objection's overruled.  You can recall Mr.

8   Saleni (sic).

9        MR. PERTEN:  Salmi.

10        THE COURT:  Sorry?

11        MR. PERTEN:  Salmi, Your Honor

12        THE COURT:  I'm really sorry about that.  Salmi.  I

13   bet he gets that all the time, though.  He's smiling.  In

14   fact, he's laughing.  He does get it all the time.  All right.

15   All right.  You can call him again.

16        MR. PERTEN:  I understand that --

17        THE COURT:  I'll allow that.

18        MR. PERTEN:  -- Your Honor, and I'll sit down, but

19   one last comment if I might, which is I don't believe the

20   scope of expert testimony gets expanded from disclosure

21   because of information they bring up on cross.  So I'm --

22        THE COURT:  I also think that the rule allows me the

23   discretion to allow that testimony.  The rule is very clear on

24   that.

25        So go ahead.



1           MR. CARNATHAN:  Thank you, Your Honor.  So, actually,

2    Mr. Hartzell, do you have Exhibit 46?

3    BY MR. CARNATHAN

4        Q.   So just to complete the question, Mr. Doddridge,

5    based on the pictures you reviewed, were these high-end

6    mahogany custom closets that would cost $1,500-odd a square

7    foot -- I mean linear foot?

8    A.   That's a good question.  Stop right there, please.

9           MR. CARNATHAN:  Yea, there's a, maybe -- Mr.

10   Hartzell, can you expand the picture of the closets?

11          THE WITNESS:  The upper right.

12          MR. CARNATHAN:  Yeah.

13   A.   Yes, I heard testimony where Mr. Salmi was being asked if

14   those were custom cherry.  He said yes.  Custom mahogany, he

15   said yes.  Custom beveled, he said yes.  They're not.  Those

16   are -- those are melamine.  Okay, those are a laminated

17   shelving system that -- you've seen the California closets

18   commercials?  It's the same thing.

19   BY MR. CARNATHAN:

20       Q.   And so would these closets go for over $1,500 a

21   linear foot?

22   A.   No.  No.

23       Q.   What about the Crimson King proposal.  Remember the

24   Crimson King proposal?  Did you have any reaction to that

25   proposal?


(973) 406-2250 | operations@escribers.net | www.escribers.net

1    A.    I do.

2         Q.    And could you tell me what your reaction is to the

3    Crimson King proposal, please?

4    A.    It was $283,000 --

5         MR. CARNATHAN:    Maybe -- Mr. Hartzell, can we have

6    Salmi-4 VS008, I think, second page -- or no, third page in,

7    probably VS009.

8                          (Pause)

9         Q.    Okay, so we have the Crimson King Proposal up on

10   screen.   What comments do you have about the Crimson King

11   proposal, Mr. Doddridge?

12   A.    It says $283,000 with a $16,000 allowance for a LULL,

13   which is an all-terrain forklift.  Which would leave $267,000

14   just for bare labor alone, which, with a six-man crew,

15   translates into about 4.8 months with six men working five

16   days a week.  So that's an entire football season.  I mean

17   that's just way too much time.

18        Q.    In your opinion, how much too long is that?

19   A.    In my, what I did in my estimate is I broke out what the

20   labor-only cost would be from my own numbers and I came up

21   with 162,000.  Which translates into the same crew about 2.8

22   months.  Which is just about right.

23        Q.    Okay.

24   A.    That's without a LULL.  I don't use a LULL.  To me

25   they're not necessary.  I've been a framer for many, many



1    years.  I've never used a LULL.

2         Q.   All right.  And so just to tie things up, what's

3    your overall opinion of Mr. Salmi's estimate of the costs of

4    construction in this case?

5    A.   Mr. Salmi is -- it's $1.2 million too high.  That's my

6    opinion.

7         Q.   Okay.  Let's just talk briefly about how, in your

8    experience, an experienced builder would go about estimating

9    the cost of construction at the beginning of a project.  How

10   should an experienced builder go about estimating costs of

11   construction at the outset of a project?

12   A.   At the beginning of a project?

13        Q.   Yes.

14   A.   Yeah, I would do this all the time.  I take -- generally

15   at the beginning of the project, you've only got a preliminary

16   set of plans, okay?  So -- but if you're experienced and you

17   know what you're doing, then you should be able to extract

18   from that preliminary set of plans enough data to be able to

19   apply -- to be able to break the costs down division by

20   division and assign a reasonable cost to each of those

21   divisions, using your experience, using available construction

22   costs resources.  And then what you do is you, you establish a

23   baseline cost per-square-foot for, for what that specific

24   house in that specific location would be.

25             And then as the client refines the plans, they add



1   this, they add that, then you can, you can apply that baseline

2   per-square-foot cost to, to the final design.  That doesn't

3   mean you're going to sign a contract based on that.  That just

4   means that you're advising your client as to how much this

5   house is going to cost while they're in the -- in the

6   preliminary stages before you've broke ground, right?  Before

7   they've spent, spent all this money on an architect.  You're

8   advising your client this is how, how much this should cost.

9   It's something that architects do also, but not nearly as

10  accurately as I do.

11       Q.   So let me ask you, if an experienced builder goes

12  through that process and does it correctly, how accurate would

13  you expect that estimate to be?

14  A.   Not quite as accurate as the final broken-down estimate

15  at the three to five percent, but certainly within the five-

16  to-seven-percent range.  You, you know, you should be able to

17  get it pretty darn close.  I mean I'm not talking about

18  something that's, you know, scribbled on the back of a

19  cocktail napkin.  I'm talking about a, you know, a dimension

20  set of preliminary plans that you -- and -- and you should be

21  able to come up with a reasonably accurate cost figure based

22  on that.  And then you'd refine it as you go.

23       Q.   All right.  But so your opinion is that at the

24  outset, an experienced builder should be able to come within

25  five to seven percent of the cost of construction in his



DAVID DODDRIDGE - Cross

1    initial estimate?

2    A.    Approximately, yeah.  Yep.

3            MR. CARNATHAN:  That's all I have for Mr. Doddridge.

4            THE COURT:  Okay.

5                        (Pause)

6                   CROSS-EXAMINATION

7    BY MR. PERTEN:

8        Q.    Good afternoon, Mr. Doddridge.

9    A.    Good afternoon.

10       Q.    Now, Mr. Doddridge, before we get into some of the

11   nuts and bolts about what you did, a moment ago, you testified

12   that that shelving was all laminate.  Do you recall that?

13   A.    It looks to me to be a melamine-type shelving, yeah.

14       Q.    Okay, so in a 4 to $5 million home, you're expecting

15   laminate shelves?  Is that your testimony?

16   A.    In a closet?  There's nothing wrong with that.

17       Q.    I didn't ask you --

18   A.    This is a spec home.

19       Q.    I didn't ask you if there was anything wrong with

20   it.  Is it your experience that in a $5 million home, people

21   put laminate shelves?

22   A.    In -- in that kind of a system, sure --

23       Q.    And --

24   A.    -- of course.

25       Q.    -- sir, did you go back and look at the invoices for



DAVID DODDRIDGE - Cross

1   the actual materials that were purchased to confirm your

2   assumption that it was just laminate?

3   A.   No.

4        Q.   So that was just a guess you made; isn't that

5   correct?

6   A.   By looking at the photograph, it's pretty obvious.

7        Q.   So you saw one photograph?  Were there other

8   closets?

9   A.   I'm assuming.

10       Q.   And you didn't see photographs of any of the other

11   closets, did you?

12   A.   No.

13       Q.   So on the basis of one photograph, you were able to

14   make the determination what kind of wood it was and whether it

15   was composite material or real wood; is that correct?

16   A.   That's what it looked like to me.

17       Q.   Okay.  And you took no steps, sir, by going back to

18   look at the invoices to see what was actually purchased for

19   the wood; isn't that correct?

20   A.   That is correct.

21       Q.   And point of fact, sir, you never even looked at the

22   invoices that were provided to determine what went into this

23   structure; isn't that correct?

24   A.   I added up the invoices that were related to the

25   stairway.  That's it.



DAVID DODDRIDGE - Cross

1      Q.   Sir, you did not look at the proof-of-claim binders?

2   You didn't look at the backup for the actual construction;

3   isn't that correct?

4   A.   I did not rely on that in the formation of my opinion,

5   no.

6      Q.   Okay.  Now, sir, you'll agree with me that you

7   actually did two reports in this case, didn't you?

8   A.   I did.

9      Q.   And your first report was just the ProEx work; isn't

10  that correct?

11  A.   Yes.

12     Q.   Now, when you did that ProEx report, you didn't even

13  look at the ProEx proposals to determine what they had done,

14  did you?

15  A.   No.

16     Q.   So somehow, you were able to determine what ProEx

17  did without even looking at the proposals to see what they

18  said they did; is that correct?

19  A.   I already know what they did.

20     Q.   I'm sorry?

21  A.   I knew what they did.

22     Q.   I'm sorry?

23  A.   I knew what they did.

24     Q.   You really didn't?

25  A.   I said I knew --



DAVID DODDRIDGE - Cross

1           THE CLERK:  Excuse me, Your Honor.

2    A.   -- what they did.

3           THE CLERK:  The attorney (indiscernible).

4           MR. PERTEN:  I'm sorry.  Yes, thank you.

5    BY MR. PERTEN:

6       Q.   I'm sorry.  Did you say you really didn't?

7    A.   I said I know what they did.

8       Q.   Sir, you know what they did, but you didn't look at

9    any of their invoices; is that your testimony?

10   A.   The scope of my engagement related to that report was to

11   estimate what a fair and reasonable cost would be for the site

12   work, and that's what I did.

13      Q.   And, sir, in order to do a fair and reasonable

14   estimate of the site work, as well as the entire project cost,

15   you'd agree with me it's important that you know exactly what

16   was done; isn't that correct?

17   A.   I would need to know what the scope of the work being

18   proposed was, yes.

19      Q.   Okay.  And in order to know what the scope of the

20   work being proposed by ProEx, you'd have to look at the ProEx

21   proposal; isn't that correct?

22   A.   No.  I know what needs to be done.  You've got an

23   existing house that needs to be torn down.  And you need to do

24   the site work in order to build two more -- two houses in its

25   place.

DAVID DODDRIDGE - Cross

1    Q.   All right.  What else did ProEx do besides site

2    work?

3    A.   I would have to look at my first report in order to

4    refresh my memory.

5    Q.   So, sir, you're here today as the expert testifying

6    about ProEx and presumably prepped and you can't tell me what

7    ProEx did without looking at your report?

8    A.   They demo'd the house, cut and capped the utilities,

9    demo'd and removed the -- the pool.

10   Q.   Now --

11   A.   I'm not done yet.  A tennis court, a driveway, an old

12   stone wall, and then they dug the hole and, I'm sorry, but I

13   can't recall, in my first report, whether I included the

14   foundation or not.

15   Q.   And that information as to what ProEx did, did you

16   make any independent determination as to what ProEx did, or

17   did you just simply rely on what counsel told you?

18   A.   I confirmed what I just said by looking at the ProEx

19   proposal.

20   Q.   Oh, so now you remember looking at the ProEx

21   proposal?

22   A.   Not as part of that first report, though.

23   Q.   So in your first report, sir, when you gave an

24   opinion of value as to ProEx, you didn't feel it necessary to

25   look at the ProEx proposal, correct?



DAVID DODDRIDGE - Cross

1   A.   I didn't even know it existed.

2        Q.   You didn't even know it existed?  So you were asked

3   to opine on the value of the ProEx work and you didn't even

4   know there was a proposal out there --

5   A.   I had a site plan.

6        Q.   -- is that your testimony?

7   A.   I had a foundation plan.

8        Q.   Now, sir --

9   A.   I did, I did a drive-by.  I know what -- I know what was

10  there.  I've done this a thousand times, I mean.  You know, I

11  know -- I know what's required.

12       Q.   And in fact, sir, when you did your initial report

13  as to ProEx, you didn't do a drive-by either, did you?

14  A.   Not that at time, correct.

15       Q.   Okay.

16  A.   Correct.  That's correct.

17       Q.   So you didn't do a drive-by, and a drive-by

18  certainly would've told you about the topography, wouldn't it?

19  A.   I had -- I had a site plan.

20  Q.   Okay, and it would've told you about landscaping, right?

21  A.   The as-built plan would.

22       Q.   All right.  So you saw no reason to go and actually

23  see with your own eyes what was actually built when you were

24  first engaged; is that correct?

25  A.   I would want to look at my initial report in order to



Page 193

DAVID DODDRIDGE - Cross

1    verify.  I don't have it memorized.

2         Q.   Well, sir, why don't you look at your initial report

3    and tell me if you've looked at the ProEx proposal and did a

4    site visit?  You can look.

5    A.   Could you put it in front of me, please.

6         Q.   Your report?  You gave us a report dated July 30th,

7    2018.

8    A.   Right.

9         Q.   Did you not bring your report with you, sir?

10   A.   No.

11              MR. CARNATHAN:  Just for clarity, that's not the

12   report he testified to.  That's the --

13              THE COURT:  I understand.

14              Mr. Perten, do you have a copy of the report?

15              MR. PERTEN:  I have my annotated copy of the report.

16        But there's nothing that unique on it.

17              THE COURT:  Why don't you let him see it then if

18        he's --

19              MR. PERTEN:  Sure.

20              THE COURT:  -- asking for it.

21              MR. PERTEN:  May I?

22              THE COURT:  Yes, of course.

23              MR. PERTEN:  May I use this?

24              THE COURT:  No.  I don't want you hovering there.

25   Oh, now you only have one copy.  Oh, he's an expert.  I'll let



DAVID DODDRIDGE - Cross

1    you do it.  Go ahead.

2           MR. PERTEN:  Thank you.

3           THE COURT:  Inquire from there.

4    BY MR. PERTEN:

5      Q.   Mr. Doddridge, in your --

6    A.   I'm going to read this, starting on page 1.

7      Q.   All right.  I just want to draw your attention, sir,

8    to "Documents reviewed, data and information considered".  Do

9    you see that?

10   A.   Yes, sir.

11     Q.   And that's a list, if you will, of what you reviewed

12   in order to do this report, correct?  Nine items?

13   A.   Yes.

14     Q.   And will you agree with me, sir, that in the list of

15   data and information considered when you did this report for

16   ProExcavation, you didn't look at the proposal and you didn't

17   do a site visit?

18   A.   I, I did a drive-by when I did that report.  Yes, I did.

19     Q.   You just forgot to put that in your report; is that

20   it?

21   A.   I suppose.

22          THE COURT:  Just pull the microphone down a bit more

23   now.

24          MR. DODDRIDGE:  Yep.

25          THE COURT:  Yeah.  Okay.



DAVID DODDRIDGE - Cross

1          MR. DODDRIDGE:  Is that better?

2          THE COURT:  That'll be better.

3          MR. DODDRIDGE:  Okay.

4          THE COURT:  Go ahead.

5          MR. PERTEN:  Thank you.

6   BY MR. PERTEN:

7      Q.   Now let's talk a little bit, sir, about RSMeans.

8   You agree with me, sir, that when one typically bids a

9   construction project, the way it's done is you solicit bids

10  from subcontractors; isn't that correct?

11  A.   Sometimes.

12     Q.   Sometimes?  So that certainly is a methodology that

13  you've employed when hired to build a house, correct?

14  A.   There have been times when I've solicited bids, yeah.

15     Q.   Okay.  Now, you elected, sir, to rely on the RSMeans

16  book, correct?

17  A.   Yes.

18     Q.   And that's this book that we have in front of us,

19  right?

20  A.   Correct.

21     Q.   And you understand, sir, that RSMeans provides

22  average costs nationally, correct?

23  A.   They do.

24     Q.   And so when you rely on RSMeans, what you're ending

25  up with is an average, correct?



Page 196

DAVID DODDRIDGE - Cross

1    A.    I'm -- I'm ending up with a national average and then a

2    location factor adjustment of twenty-one percent.

3         Q.    And the location factor is for labor costs, correct?

4    A.    It's for everything.

5         Q.    Okay.  So you end up with an -- you'll agree with me

6    that that number that you generated from RSMeans is an

7    average?

8    A.    An average for around here, yes.

9         Q.    Correct.  And because it's an average, you

10   understand, sir, that the actual costs might be higher or they

11   might be lower than the average; isn't that correct?

12   A.    It could be, slightly.

13        Q.    Okay.  Well, in fact, sir, just as way of an

14   example, if you have two contractors, one does it for --

15   whatever it is -- for $75, and one does it for $25, you'll

16   agree the average is 50, correct?

17   A.    The average of those two numbers is 50, but you're not --

18             Q.    It's 50.

19   A.    -- going to get that -- you're not going to get that wide

20   of a variation from one contractor to the other unless you're

21   picking them up at Dunkin' Donuts and -- you know, as day

22   laborers and paying them a fraction of what they should

23   otherwise pay.  So you might get a $75-an-hour guy for $25 if

24   you want to use that example.  I don't do that.  I use legit

25   subs.

DAVID DODDRIDGE - Cross

1      Q.   Okay, sir.  Any you would agree with me, would you

2  not, that on high-end construction, you tend to have high-end

3  contractors; isn't that correct?

4  A.   I use the same framing contractor for a 6,000-square-foot

5  house as I do for a garage addition.

6      Q.   And --

7  A.   So no, that is absolutely not correct.

8      Q.   Okay.  So the same guy, guy with pickup truck and

9  two laborers you're going to use on a $500,000 house, on a

10  custom $5-million-dollar house.  Is that your testimony?

11  A.   My guys don't have that --

12     Q.   Okay.

13  A.   -- kind of crew.

14     Q.   And because it's --

15  A.   I never had that kind of a crew.

16     Q.   Because it's an average, sir, you would expect that

17  the actual cost could deviate from the average?

18  A.   Slightly.

19     Q.   Okay.  And in fact, you already told us that you

20  would expect five percent certainly is not out of the realm of

21  possibility, correct?

22  A.   If you do a breakdown of, a line-by-line breakdown, then

23  you're going to be within three to five percent.

24     Q.   Okay.  So that the number that you determined right

25  off the bat, the actual construction cost could be five


(973) 406-2250 | operations@escribers.net | www.escribers.net

DAVID DODDRIDGE - Cross

1    percent higher than what you came up with; isn't that correct?

2    A.    No.  Because if you look at the book, if I didn't use a

3    number that's straight out of the book, then the number is

4    going to be higher.  I erred on the side of caution throughout

5    this entire estimate.

6          Q.    Well, sir --

7    A.    I always err on the side of caution.  I err on the side

8    of caution out of respect for the scope of the project.  I err

9    on the side of caution in Mr. Kagan's favor.  Just to make

10   sure that I wasn't on the low side.  I'd rather be on the high

11   side.  So if this -- if I were to build this house today, or

12   if I were to have built this house in 2014, with my own crew,

13   my own company, I'll tell you right now.  I -- with everything

14   that's been presented to me, the costs would have come in at

15   1.65, 1.68.  I'm slightly high.

16         Q.    Sir, RSMeans specifically tells you that it's based

17   on average cost; is that not correct?

18   A.    That's what RSMeans says.  That doesn't mean that I'm not

19   a thirty-year experienced professional who's capable of taking

20   that data and adjusting it based on my own expertise.  Which

21   is exactly --

22         Q.    Okay, so --

23   A.    -- what I do.  Which is exactly what I've done as the

24   owner of a construction company.  That's what I've done.

25         Q.    All right.  So when you told us you relied on



DAVID DODDRIDGE - Cross

1   RSMeans, you took RSMeans numbers and then you altered all the

2   numbers; isn't that correct?

3   A.   Not all of them.

4        Q.   You altered most of them, correct?

5   A.   I altered -- I altered them on the high side.  Just to be

6   safe.

7        Q.   Now, RSMeans, sir, because it's an average, doesn't

8   give you prices for specific brands of things; isn't that

9   correct?

10  A.   Yeah, that's true.

11       Q.   So, for example, if you were required to get a

12  specific brand of window, you'd get an average cost out of the

13  RSMeans; isn't that correct?

14  A.   Right.  It doesn't say how much an Anderson or a Marvin

15  window is.

16       Q.   That's right.

17  A.   That's correct, right.

18       Q.   And the only way to know what an Anderson or a

19  Marvin window would be, would be to get a quote for Anderson

20  and Marvin windows; isn't that correct?

21  A.   That's true.

22       Q.   And you didn't do that in this case, did you?

23  A.   No.

24       Q.   And, in fact, you understood, sir, speaking of

25  windows, that this project used Anderson window, Anderson



DAVID DODDRIDGE - Cross

1   series 400.  You knew that, didn't you?

2   A.   If it's in the window schedule, then yeah.

3        Q.   Well, then if you knew exactly what brand and what

4   model was being spec'd for this project, why didn't you get

5   actual prices?

6   A.   Because I wanted to remain within the scope of the book.

7        Q.   So you didn't want to leave the book?  And the book

8   specifically tells you that if there are specific

9   specifications, you have to take those into account; don't

10  you?

11  A.   Right.  My experience has been that if you apply the

12  window -- the windows that I got out of this book were from

13  the assemblies section of the book.  Not the unit-cost section

14  of the book.  So when you look at that assembly, it's the

15  window, the trim, the painting, the labor all in one per-unit

16  cost.  And that's -- you know, with doors it includes the

17  hardware, the frame, the sill, the interior trim, the painting

18  of that trim.  And it's -- it's a way of accurately estimating

19  things without having to say okay, there's -- you know,

20  counting two-by-fours and counting, you know --

21       Q.   Well, wouldn't you agree with me, sir, that getting

22  the actual cost of the windows would give you a more accurate

23  cost than taking the average costs and tweaking that number?

24  A.   If it's off, it's not off by much.  I --

25       Q.   Well you're an expert, sir.



DAVID DODDRIDGE - Cross

1    A.    -- my -- my windows came in at $70,000.

2         Q.    Sir, you'd agree with me, sir, that if you know the

3    brand numbers and we know the models, it's much more accurate

4    to get actual quotes than to use average costs?  You'd agree

5    with that, wouldn't you?

6    A.    I would agree with that, yes.

7         Q.    All right.  And yet you didn't do that?

8    A.    Correct.

9         Q.    Now, you said that there is a multiplier to take

10   into account this region.  Do you recall that testimony?

11   A.    Yes.

12        Q.    And that's a multiplier they give for Boston,

13   correct?

14   A.    Yes.

15        Q.    And they give multipliers for Springfield and other

16   large metropolitan areas, correct?

17   A.    Yes.

18        Q.    And, sir, there is no multiplier for Brookline, is

19   there?

20   A.    Specifically, no.

21        Q.    So you're assuming the cost to construct in

22   Brookline is similar to the cost to construct in Boston,

23   correct?

24        A.    Yes.

25        Q.    How many 6,000-square-foot, single-family houses



DAVID DODDRIDGE - Cross

1    have you built in Boston?

2    A.   In Boston, none.

3         Q.   None.  How many have been built in the last ten

4    years in Boston?

5    A.   I don't know.

6         Q.   Isn't it a fact, sir, that building in Brookline is

7    a completely different ballgame than building in Boston?

8    A.   No.  And I don't know where you get that notion.  It's --

9    it's almost like you're saying that Brookline is the Land of

10   Oz and you have to be a wizard in order to build there.

11   That's ridiculous.

12        Q.   Now --

13   A.   I could build a house in Brookline starting tomorrow.

14   I've got a license.  I could build that house tomorrow.

15        Q.   Sir, you'll --

16   A.   No problem.

17        Q.   -- agree with me that the costs to construct vary

18   based on geographic location; isn't that correct?

19   A.   Yes.

20        Q.   Okay.  You'd also agree with me that different towns

21   have different rules and regulations?  Local regulations,

22   correct?

23   A.   Exactly, as per the towns that I've built in myself, yes.

24        Q.   Okay.  Now, RSMeans also doesn't account for weather

25   conditions; isn't that correct?



DAVID DODDRIDGE - Cross

1   A.   Not necessarily, correct.

2       Q.   And you didn't account for the weather conditions;

3   isn't that correct?

4   A.   I put snow removal in there.

5       Q.   Now, sir, you told us you did take-offs to get the

6   specific quantities.  Do you recall that testimony?

7   A.   Yes.

8       Q.   And point of fact, sir, when you did your initial

9   report, you were not working from the final plans; isn't that

10  correct?

11  A.   I was not given the final plans.  That is correct, yes.

12      Q.   So you issued a report based upon a set of plans

13  which was not the permit set; isn't that correct?

14  A.   My initial report, yes.

15      Q.   Okay.  And certainly, as an expert, you know that

16  it's important to use the actual plans, not an earlier

17  iteration; isn't that correct?

18  A.   I used the permit set of plans in my second report.

19      Q.   Okay.  But certainly, your first report, which you

20  haven't retracted, sir, you were -- you issued an expert

21  report evaluating ProEx based on a set of plans that was not

22  the final set of plans; isn't that correct?

23  A.   There's a very clear qualification in my report --

24      Q.   Isn't that correct, sir?

25  A.   There's a qualification in my report that --



DAVID DODDRIDGE - Cross

1    Q.   Sir --

2    A.   -- says that if new information becomes available, that I

3    reserve the right to supplement this report.

4    Q.   And you understood, sir, because you told us this

5    this morning that, or this afternoon, that you did take-offs

6    to determine the actual footage and so on and so forth,

7    correct?

8    A.   Yes.

9    Q.   And in point of fact, one of the reasons you had to

10   do takeoffs is you didn't have the structural plans that were

11   issued for this house which shows you -- the structural nature

12   of this project; isn't that correct?

13   A.   Yes, I do.

14   Q.   Sir, when you issued your initial report, you did

15   not have the structural plans; isn't that correct?

16   A.   If you're referencing my initial report, then that would

17   be correct.

18   Q.   I am -- and you understood, sir, that for the

19   initial report, which dealt with ProExcavation, much of the

20   work that ProExcavation did, for example, all the concrete

21   work, that would be on the structural plans.  Wouldn't that be

22   true?

23   A.   Yes.

24   Q.   Okay, so you were missing the structural plans, yet

25   you didn't think it was important before issuing a report and



DAVID DODDRIDGE - Cross

1  opining on the value of ProEx to get the actual structural

2  plans, did you?

3  A.   I enumerated what that report was based upon.  I

4  enumerated the documents that --

5       Q.   And it --

6  A.   -- that report was based upon.  That's why I do that.

7       Q.   And you enumerated that report was based on the

8  architectural plans only and you didn't mention the structural

9  plans; isn't that correct?

10  A.   Whatever it says.  Whatever it says in the report --

11       Q.   Well, it certainly --

12  A.   -- is what I relied upon.

13       Q.   It certainly doesn't mention the structural report,

14  the structural plans, does it?

15  A.   Okay.

16       Q.   Now, sir, when you were asked to form an expert

17  opinion on the structural value of this project for ProEx, did

18  you ask for the structural plans?

19  A.   Absolutely.

20       Q.   Then why didn't you get them?

21  A.   I got what was given to me.

22       Q.   Well, sir, you understand that in order to get a

23  building permit, there has to be architectural plans and

24  structural plans.  You understand that, correct?

25  A.   Of course.



DAVID DODDRIDGE - Cross

1    Q.    Did anything prevent you from walking yourself down

2    to the Brookline Town Hall and getting a copy of what was in

3    file?

4    A.    I believe that's what was done after my first report was

5    issued.

6        Q.    Well, after --

7    A.    And that's what my -- and so my second report was based

8    on the full permit set of plans.

9        Q.    Okay.  So let's get this straight, sir.  So you

10   issued a report as an expert opining on the value of ProEx

11   work.  You had plans that weren't up to date and you were

12   missing half the set of plans.  Is that correct?

13   A.    There's a lot of sets of those plans -- pages of those

14   plans that would not be required in order to estimate that

15   portion of the work.  You don't need elevation details.

16       Q.    Which are --

17   A.    You don't need roof framing.  Roof framing --

18       Q.    Which --

19   A.    Roof framing was not in there.  You don't need floor

20   framing details.  You don't need any framing details at all.

21       Q.    But you said --

22   A.    The only thing that I estimated was the foundation --

23       Q.    And --

24   A.    Okay?  And I probably wasn't that far off, either.

25       Q.    And the foundation, sir, would be in the structural



DAVID DODDRIDGE - Cross

1    plans --

2    A.    In the structural plans.

3         Q.    -- isn't that correct?

4    A.    That is correct, yes.  That is correct.

5         Q.    And as an expert, isn't your job to make sure you

6    have the actual plans so that you know what you're talking

7    about?

8    A.    It's my --

9         Q.    As opposed to making assumptions?

10   A.    It's my job to ask for what I know that I need, which is

11   exactly what I did.

12        Q.    And when counsel didn't provide you with the

13   structural plans, you didn't take it upon yourself to get them

14   from town hall, did you?

15   A.    No.

16        Q.    And, in fact, it was only when we pointed out that

17   you weren't relying on the permit plans and you were missing

18   the structural plans that you then went back to revise your

19   report; isn't that correct?

20   A.    No, I -- I knew what I needed.

21        Q.    So it was perfectly fine to do an estimate which

22   involves all the structural work without the structural plan?

23   A.    That's why I put the qualification in there and that's

24   why I enumerate the documents that I rely upon.

25        Q.    Now, sir --



(973) 406-2250 | operations@escribers.net | www.escribers.net

DAVID DODDRIDGE - Cross

1   A.   What part of that don't you understand?

2        Q.   Sir, the qualification -- are you referring to the

3   language that says, "If further evidence becomes available in

4   this the case, my opinions may change as a result of my review

5   of such evidence"?

6   A.   Yes.

7        Q.   Is that the qualification?

8   A.   Yeah.

9        Q.   So that was sort of a catch-all if something else

10  comes to my attention, I can revise, correct?

11  A.   Yeah.

12       Q.   Well, you certainly knew there were structural plans

13  out there, didn't you?  It's not like it was a secret, is it?

14  A.   I asked for what I knew that I needed.  I got what I got.

15  I wrote the report.  And then I wrote another one that was

16  based on a full, complete set of plans.

17       Q.   And in fact, sir, when you went and revised your

18  report, you revised the numbers significantly; isn't that

19  correct?

20  A.   I'd have to check each one against it --

21       Q.   Well, we can --

22  A.   -- against the other.

23       Q.   -- do that, sir.  Isn't it a fact, sir, that after

24  we pointed out errors, you revised quantities, you revised

25  unit prices, you revised totals in many instances?



DAVID DODDRIDGE - Cross

1    A.    After you pointed them out to whom?

2        Q.    After you reviewed Mr. Salmi's report and you issued

3    a rebuttal report incorporating all the errors that you had

4    made that he pointed out, you changed many of your numbers;

5    isn't that correct?

6    A.    I didn't rely on Mr. Salmi for that.  I don't need Mr.

7    Salmi for that.

8        Q.    So it's just pure coincidence when he pointed out

9    that your unit numbers were wrong, that you fixed it?

10   A.    He didn't point any -- point out any unit numbers that

11   were wrong.

12       Q.    Well, sir, you recall that --

13   A.    In my first report, perhaps.  Lowry (ph.) columns, big

14   deal.  It's not that big of a deal.

15       Q.    So it's not that big of a deal, so who cares?  Is

16   that your testimony?

17   A.    No, no, no.  No.

18       Q.    Well, sir, you understand, sir, that you were -- you

19   provided the backup for your two reports, correct?

20   A.    I provided the backup?  What do you mean?

21       Q.    Page numbers in the RSMeans?

22   A.    Oh, yeah.  Yep.

23       Q.    Right?

24   A.    Yep.

25       Q.    And you made sure that was all accurate, didn't you?



DAVID DODDRIDGE - Cross

1    A.    Yes.

2         Q.    And given that the work of ProEx didn't change

3    between the time of your first report and your second report,

4    would you agree with me that the numbers that you used for

5    ProEx should have been constant?

6    A.    Not sure if I understand what you're saying.

7         Q.    Well, let me try again then, sir.  Just

8    hypothetically, if you estimated $50,000 for foundations in

9    your first report, your second report, which was total project

10   costs, which included ProEx, the line item for foundations

11   should still be $50,000 because that hasn't changed, correct?

12   A.    They only changed because then I got the correct set of

13   plans.  For my second report, I have the correct set of plans.

14   So whatever is in my second report is absolutely accurate.

15        Q.    So as an expert, sir, you have no problem issuing a

16   report with incorrect numbers and submitting that for this

17   litigation; is that correct?

18   A.    The numbers in my second report are absolutely accurate.

19        Q.    And the numbers in your first report are absolutely

20   inaccurate; is that your testimony?

21   A.    No.  The numbers in my first report are absolutely

22   accurate based upon the documents that are enumerated in that

23   report.  That's --

24        Q.    Mr. Doddridge, you haven't brought your files with

25   you today; is that correct?

DAVID DODDRIDGE - Cross

1    A.    I brought the book.  That's it.

2        Q.    Okay.  Well let me hand you your backup papers,

3    which gives us the page numbers so you have them.

4    A.    Thank you.

5            MR. PERTEN:  Your Honor, may I hand up to the

6    Court --

7            THE COURT:  Yes.

8            MR. PERTEN:  -- so you can read along?

9            THE COURT:  What is it, for the record, that you're

10   handing out?

11           MR. PERTEN:  These are the -- well, let me lay the

12   foundation so he can explain what these are.

13           THE COURT:  That's fine.  That's fine.

14   BY MR. PERTEN:

15       Q.    Mr. Doddridge, I've handed you two documents,

16   correct?

17   A.    Correct.

18       Q.    And the first document purports to be the backup

19   with page references to the RSMeans for your July 30th, 2018

20   report, correct?

21   A.    I'm sorry, which one?

22       Q.    The little two-page one.

23   A.    Yes.

24       Q.    All right.  And the second document is the backup

25   with the RSMeans page numbers for your second report; isn't



Page 212

DAVID DODDRIDGE - Cross

1   that correct?

2   A.   Correct.

3        Q.   All right.

4        MR. PERTEN:  Your Honor, may I hand these up to you?

5        THE COURT:  Yes.  Should we mark these for

6   identification?

7        MR. PERTEN:  Yes, we should, Your Honor.  I'd like to

8   suggest that the two-page one, which in the upper right-hand

9   corner has the date 7/30/2018 --

10        THE COURT:  Fine.

11        MR. PERTEN:  I think we're up to FF, I believe.

12        DEFENDANTS' EXHIBIT FF WAS MARKED FOR IDENTIFICATION

13        MR. PERTEN:  FF?

14        THE CLERK: Yeah.

15        THE COURT:  Let's work with --

16        MR. PERTEN:  Do you need --

17        THE COURT:  Is that -- what's your recollection?  We

18   don't seem to have the --

19        MR. PERTEN:  Yeah, I think it's FF.

20        THE CLERK:  FF would be the --

21        MR. CARNATHAN:  It's FF.

22        MR. PERTEN:  It's FF.

23        THE COURT:  Everyone agrees.

24        MR. PERTEN:  I thought you were saying you needed

25   stickers.  I have stickers.

DAVID DODDRIDGE - Cross

1          THE COURT:  It's FF.  We don't have stickers.

2          MR. PERTEN:  Do you need stickers?

3          THE COURT:  But we would appreciate your stickers.

4   Thank you.

5          MR. PERTEN:  You have them?

6          THE CLERK:  Yeah.

7          THE COURT:  We changed courtrooms.

8          MS. MARY:  I'll take one after.

9          MR. PERTEN:  I know, I changed offices since last

10  time, so I know what you're going through, Your Honor.

11         THE COURT:  Yeah.  Everything's in two places or in

12  neither.

13         Okay, I'm going to -- Mary, I'm going write FF on

14  this one, so.

15         THE CLERK:  Yes, that's fine.

16         THE COURT:  And then the other we're going to call

17  GG, and that's the one with the upper right corner, it says

18  "REF: RSMeans residential cost data 2014", right?

19         MR. PERTEN:  Correct, Your Honor.

20         THE COURT:  All right.  That's GG.

21     DEFENDANTS' EXHIBIT GG WAS MARKED FOR IDENTIFICATION

22         THE COURT:  All right.  Go ahead, whenever you're

23  ready.

24         MR. PERTEN:  Thank you.

25  BY MR. PEREN:



DAVID DODDRIDGE - Cross

1    Q.   Incidentally, before we turn to what we've now

2    marked as FF and GG for identification, you told us, sir, that

3    you did not include any overhead in your calculations,

4    correct?

5    A.   I did not --

6    Q.   Isn't that --

7    A.   -- include any overhead in my calculations, right.

8    Q.   Now, overhead, you'll agree with me, is different

9    than profit, correct?

10   A.   Yes.

11   Q.   And overhead is a direct cost that is actually

12   incurred by a contractor, correct?

13   A.   Right.

14   Q.   Okay.  And you didn't include that because counsel

15   told you not to include overhead; isn't that correct?

16   A.   Yes.

17   Q.   Sir, did you make any independent investigation as

18   to whether overhead should be included in this case?

19   A.   No.

20   Q.   Now you would agree with me, would you not, that

21   your estimates are supposed to be a delineation of the direct

22   costs incurred by the contractors, correct?

23   A.   Yes.

24   Q.   And that would include overhead, would it not?

25   A.   That would include overhead on the installing contractors



DAVID DODDRIDGE - Cross

1  except for ProEx.

2       Q.   Well --

3  A.   And, and no overhead for the -- for the general

4  contractor, as I was instructed.

5       Q.   Well, you certainly understand, sir, that a lot of

6  the work that ProEx billed for was done by subs.  You

7  understand that, correct?

8  A.   Some of it.

9       Q.   Well --

10 A.   Sure.

11      Q.   In order to decide what overhead you didn't want to

12 charge, didn't you have to know who did the work?

13 A.   No.

14      Q.   Well, so you made a decision, sir, not to give the

15 direct cost to ProEx for overhead.  You made that decision,

16 correct?

17 A.   Based on what I was asked as part of the scope of my --

18      Q.   And you --

19 A.   -- engagement, yep.

20      Q.   -- you understood, sir, that overhead is a direct

21 cost, correct?

22 A.   Yes.

23      Q.   And you understood that ProEx's subcontractors, or

24 sub-subcontractors, would be charging overhead as part of

25 their cost, correct?



DAVID DODDRIDGE - Cross

 1   A.    From my perspective, that's -- that's not my problem.

 2        Q.    Well, sir, you were asked to give an opinion of the

 3   reasonable cost of construction.  You were not asked to give a

 4   reasonable cost of construction after you deleted overhead,

 5   profit, and some other numbers, correct?

 6   A.    No.  I was asked to give a reasonable cost of

 7   construction, to exclude overhead and profit for ProEx, and

 8   exclude overhead and profit for the general contractor, based

 9   upon arm's-length deals with legitimate subcontractors.

10        Q.    So --

11   A.    That's what I was asked to do.

12        Q.    So is it your --

13   A.    That's what I did.

14        Q.    -- understanding, sir, that ProExcavation and KDC

15   had a deal that they wouldn't charge for the direct costs they

16   incurred for overhead; is that you're understanding?

17   A.    That they would not charge for any overhead related to

18   their work.

19        Q.    Okay.  And what's the -- other than what counsel

20   told you, did you review any documentation to verify what you

21   were being told?

22   A.    No.

23        Q.    In fact, sir, in your July 30th report, you recite,

24   "According to the agreement between Mr. Kagan and Lyman-

25   Cutler, Mr. Kagan was to perform the above work at his direct

DAVID DODDRIDGE - Cross

1    cost in exchange for Kagan's equity in the construction

2    project."  Do you recall writing that language?

3    A.    Yep.

4         Q.   Sir, you would agree with me that you're

5    understanding was his direct cost, which would include

6    overhead, was recoverable; isn't that correct?

7    A.    I'm sorry.  Rephrase that question.

8         Q.   Sure.  I'm reading from your report, sir, on page

9    28.

10   A.    I'd like to have that report in front of me.

11        Q.   Well, if you had brought your files --

12   A.    I'm not going to opine --

13        Q.    -- sir.

14   A.    -- on something unless I have it in front of me.

15        Q.    Sure.

16            MR. PERTEN:  May I approach, Your Honor?

17            THE COURT:  Yes, you may.  Well, hold on.  Is this

18   his -- which report are we talking about now?

19            MR. PERTEN:  This is now his July 30th report, Your

20   Honor.

21            THE COURT:  This is the second report?

22            MR. PERTEN:  The second report.

23            THE COURT:  Does anybody have a copy of that

24   available for this witness?

25            MR. HARRIS:  It's 167.



DAVID DODDRIDGE - Cross

1          MR. PERTEN:  I'm sorry?

2          MR. HARRIS:  It's 167.

3          MR. PERTEN:  167, please.

4          THE COURT:  It's -- somebody give him --

5          MR. HARRIS:  167 is the second report, right, on --

6          MR. PERTEN:  Right.  Why don't you pull up the second

7    report, 167.

8          THE COURT:  167.

9          MR. PERTEN:  Which is not in evidence, Your Honor.

10   That's --

11         THE COURT:  Which is not in evidence.  Well, rather

12   than have you bouncing back and forth, if someone has a copy

13   of 167, you're certainly permitted to use it to refresh his

14   memory.

15         MR. CARNATHAN:  Why don't you just --

16         MR. PERTEN:  Well he's going to have it in the

17   binder --

18         MR. CARNATHAN:  In the binder, John?

19         MR. PERTEN:  -- if I can walk over there.

20         THE COURT:  That's what I'm confused about.  If

21   somebody's saying that its next to him, help him get it.

22         MR. PERTEN:  Sean, do you have both reports for him?

23         UNIDENTIFIED SPEAKER:  It's right behind him.

24         MR. CARNATHAN:  I brought a copy of the July 30th

25   report, but I didn't bring --



DAVID DODDRIDGE - Cross

 1          THE COURT:  Yeah.  We're not getting this on the

 2    record.  I'm not concerned about that particularly.

 3          MR. CARNATHAN:  Okay, so I just gave Mr. Doddridge

 4    Exhibit 167 for identification which is his, the report that

 5    he testified about today.

 6          THE COURT:  Okay.

 7          MR. PERTEN:  Okay.  Thank you.

 8          THE COURT:  Thank you.

 9    BY MR. PERTEN

10      Q.   Would you scroll, please, to page 13 -- I'm sorry,

11    page 28?

12    A.   Are you talking about my September 13th report?

13      Q.   Yes, sir.

14    A.   Or my July --

15      Q.   Page 28, Exhibit 167, down at the bottom.

16          THE COURT:  Look, as the witness, take your time.

17    Figure out what you're being shown.  It's okay.

18          THE WITNESS:  Yes.

19          THE COURT:  Look at the first page.  It's --

20          THE WITNESS:  I did, thank you, Judge.

21          THE COURT:  All right.  Go ahead then.  He knows what

22    you're --

23    BY MR. PERTEN

24      Q.   Sir --

25          THE COURT:  -- talking about.



DAVID DODDRIDGE - Cross

1  BY MR. PERTEN

2       Q.   -- are you on page 28?

3  A.    I am.

4       Q.   At the bottom of the page, it says, "According to

5  the agreement between Mr. Kagan and Lyman-Cutler, Mr. Kagan

6  was to have performed the above work at his direct cost in

7  exchange for Mr. Kagan's equity in the construction project."

8  Do you see that language?

9  A.    I do.

10      Q.   So you'd agree with me, sir, that you're under --

11 that overhead is a direct cost that was not excluded from any

12 agreement as you understood it; isn't that correct?

13 A.    That's an opinion.  That would be -- that would mean that

14 I would be opining on an agreement on a legal contract and I'm

15 not -- that's beyond my area of expertise.

16      Q.   Well, sir, you put that in your report.  You made a

17 decision to exclude it, so it's certainly within your

18 expertise.  You didn't say this was based on something that

19 counsel told you.  You put in your report that he's entitled

20 to his direct cost; isn't that correct?

21 A.    It's really more of an explanation of how I arrived at my

22 figure.  It's an explanation --

23      Q.   Yes or no, sir?  He's entitled to his direct cost,

24 which would include overhead; isn't that correct?

25 A.    Define direct cost.  What are you talking about?



DAVID DODDRIDGE - Cross

1       Q.   Well, sir, you --

2   A.   Define -- define direct.

3       Q.   Sir, you testified a few moments ago that overhead

4   is a direct cost to the contractor.  Do you recall that

5   testimony?

6   A.   Yes.

7       Q.   Okay.  And your report makes it clear that direct

8   costs are recoverable as you understand the deal?

9   A.   I didn't say recoverable.

10      Q.   You left it out?

11  A.   I left it out, right.

12      Q.   You left it out notwithstanding that your own report

13  says he's entitled to his direct cost.

14  A.   I left it out.  That's what I was asked.  That was the

15  scope of my engagement.

16      Q.   So you'd agree with me, sir, that your report is

17  inaccurate?

18  A.   No.

19      Q.   Well, either it's a direct cost or it's not a direct

20  cost.  Which is it?

21  A.   It's a legal opinion that I'm not qualified to answer.

22      Q.   All right.  Now --

23  A.   I'm not a legal expert, sir.

24      Q.   Well, sir --

25  A.   The scope of my engagement did not include the analysis



Page 222

DAVID DODDRIDGE - Cross

1    of a legal agreement.  I would never take an engagement that

2    included that because I'm not a legal expert.

3        Q.   But in fact, sir, you put this right in your report.

4    A.   It's in there, yeah.  I'm not going to argue with that.

5        Q.   But did you verify it?  Did you ask to see anything

6    before you incorporated stuff into your report?

7    A.   No.  I was based --

8        Q.   Okay, thank you.

9    A.   -- I was basing upon what counsel --

10       Q.   Okay.

11   A.   -- asked me to do.

12       Q.   All right.  Now, sir, in the industry, you'll agree

13   with me, that ten percent overhead of cost to work is pretty

14   average?

15   A.   Yep.

16       Q.   Okay.  Now, let's look at your exhibits for

17   identification FF and GG.  Do you have those in front of you

18   now?

19   A.   FF and GG.  All I have are numbered pads.

20           THE COURT:  No, he --

21           MR. PERTEN:  Okay.  The backup, sir --

22           THE COURT:  Yeah.

23   BY MR. PERTEN

24       Q.   -- there's the 7/30/2018 backup, right?  You have

25   that in front of you, which has the page numbers?  It's a two-



DAVID DODDRIDGE - Cross

1  page document.

2  A.   I'm sorry, what, which one?

3       Q.   The two-page document which we've marked for

4  identification as FF.  It's the one with -- in the upper

5  right-hand corner, it says July 30th, 2018.

6  A.   Yeah, this is not marked.  There's no FF anywhere.

7       Q.   All right.  Well are you looking at the one which

8  has July 30th, 2018 in the upper --

9  A.   Yes.

10      Q.   -- right-hand corner?

11 A.   Yep.

12      Q.   And you would agree with me, sir, that is your

13 breakdown as to where you got the numbers that were in your

14 first report, correct?

15 A.   Yes.

16      Q.   And these were the backup for the ProEx numbers,

17 correct?

18 A.   For the -- yes.

19      Q.   Okay.  Now, let's look at that for a moment.  And

20 then the other document we have, which we've marked as GG, is

21 your backup, if you will, for the entire project; isn't that

22 correct?

23 A.   Again, this is not marked GG, but I have a six-page

24 spreadsheet --

25      Q.   All right.  And you'll agree with me that that six-



DAVID DODDRIDGE - Cross

1    page spreadsheet is --

2    A.    Five pages.

3         Q.    -- the backup for your second report; isn't that

4    correct?

5    A.    Yes.

6         Q.    Now, the first one, the two-page one, again, that's

7    just ProEx, correct?

8    A.    Correct.

9         Q.    And then the six-page one is ProEx plus everybody

10   else, correct?

11   A.    Right.

12        Q.    All right.  So let's look, sir, at division 1, which

13   has general requirements and equipment mobilization, correct?

14   A.    Yes.

15        Q.    And you have "unit each, quantity three"?

16   A.    Right.

17        Q.    And you had a price of $955 for that item?

18   A.    Yes.

19            MR. CARNATHAN:  Can I just ask, John, do you have one

20   of the July 30th backups for me that --

21            Could I also point out that I went about thirty,

22   forty minutes on the direct.  We're now at north of forty

23   minutes.  I know we've talked about the -- what's the word I'm

24   looking for -- parity or proportionality.  We spent a lot of

25   time on the July 30th report.  He didn't testify about the

DAVID DODDRIDGE - Cross

1    July 30th report.

2            THE COURT:  I understand.  All right, I thank you for

3    your observations.

4            MR. PERTEN:  May I proceed, Your Honor?

5            THE COURT:  You may.

6            MR. PERTEN:  Thank you.

7    BY MR. PERTEN

8        Q.   Sir, so you agree with me, division 1, equipment

9    mobilization, you have three, correct?

10   A.   Yes.

11       Q.   And then if you look at the six-page report for that

12   same division 1, equipment mobilization, suddenly it's five?

13   A.   Okay.

14       Q.   So in fact, sir, you're either wrong on your first

15   report or wrong on your second report; isn't that correct?

16   A.   No.

17       Q.   Well, is it three or is it five?

18           MR. CARNATHAN:  So John, with apologies, I was asking

19   for the July 30th one.  You gave me the September one.

20   Thanks.

21           THE COURT:  I think there's a question pending,

22   right?  Do you need to hear the question again?

23           MR. DODDRIDGE:  Yes.  Please ask that question again,

24   please.

25   BY MR. PERTEN



DAVID DODDRIDGE - Cross

1      Q.   Sir, originally, in your initial report you had

2   three equipment mobilizations for ProEx, correct?

3   A.   Yes.

4      Q.   And in your second report, you had five equipment

5   mobilizations for ProEx; isn't that correct?

6   A.   Okay.

7      Q.   So one of your reports was wrong; isn't that

8   correct?

9   A.   The -- the -- the one, the backup for my September 13th

10  is correct.  The backup for the -- for my July 30th report has

11  three mobilizations missing from division 32 under exterior

12  improvements.  In July 30th is spreading the topsoil.  This --

13  the July 30th is not -- does not represent a completed

14  project.  You understand that, right?

15     Q.   I do, sir.

16  A.   Okay, good.

17     Q.   Now, sir, so you'd agree with me that either you

18  were wrong in your first report or you were wrong in your

19  second report.  It can't be both, right?

20  A.   Yes, it can.  The first one is for a foundation.  It's

21  for the demolition of a house, site work, and a foundation

22  with nothing built on top of it.  Of course it's different.

23  How could it not be different?

24     Q.   Sir --

25  A.   The second one includes all sorts of landscaping,



DAVID DODDRIDGE - Cross

1   irrigation.  There's --

2       Q.   Sir --

3   A.   -- different equipment that is required in order to build

4   a completed house.

5       Q.   Sir, I'm simply looking at equipment mobilization.

6   A.   You're mischaracterizing what's in front of you --

7       Q.   I'm simply --

8   A.   -- is what you're doing.

9       Q.   -- looking at equipment mobilization.  That's ProEx

10  mobilization.

11  A.   I just answered the question.  There's more equipment

12  mobilization as you continue to build a house.

13      Q.   Okay.  So then, sir, let's move on.  You have

14  demolition prices as well in exhibition 2, right?

15  A.   Yes.

16      Q.   You have --

17  A.   Yep, yes.

18      Q.   -- in the initial report, "Demolition excavation

19  off-site disposal of existing single-family home within twenty

20  miles", right?

21  A.   Yeah.

22      Q.   And you have a price for $9,975?

23  A.   Okay.

24      Q.   Do you see that?

25  A.   Yep.



DAVID DODDRIDGE - Cross

1      Q.   Now, let's look at the other one.  Somehow, that

2  number just reduced on the second one, the same description,

3  to $7,725?

4  A.   I'll say it one more time.  I --

5      Q.   Sir --

6  A.   -- removed the overhead and profit for ProEx.

7      Q.   Sir, will you agree with me you did a report for

8  ProEx, you decided in your initial report that demolition was

9  $9,975.  In your second report, you did the same analysis for

10  ProEx and all of a sudden, the demotion went down?

11  A.   Because I --

12      Q.   How can that be, sir?

13  A.   -- I removed the overhead and profit for ProEx in my

14  second report.

15          THE COURT:  All right, let's move on to another --

16          MR. PERTEN:  All right.

17          THE COURT:  -- topic.

18  BY MR. PERTEN

19      Q.   Sir, and for that ninth -- for that demolition, you

20  told us to look at page 301 of RSMeans, correct?

21  A.   Okay.

22      Q.   Do you have your book there?

23  A.   I do.

24      Q.   Let's turn to page 301.

25          MR. PERTEN:  Your Honor, may I hand you a book so you



DAVID DODDRIDGE - Cross

 1   can read along?

 2          THE COURT:  Yes.  Thank you.

 3   BY MR. PERTEN

 4      Q.   Do you have page 300 and 301 there?

 5   A.   I do.

 6      Q.   Now, in your first analysis, you did the pricing off

 7   of page 300, correct?

 8   A.   Page 300?

 9      Q.    In FF, the two-page one, you told us to look at page

10   300, correct?

11   A.   Must be a typo.

12      Q.   That was a typo?  So then we get to page 301 and the

13   price you had is, "Demolition, single-family house, one-story,

14   wood, 1,600 square foot or 3,200 square feet", correct?

15   A.   Yes.

16      Q.   The house that was demolished was significantly

17   larger than 3,200 square feet, wasn't it?

18   A.   I can't say for sure.

19      Q.   Well, sir, how did you make the determination to

20   only demolish -- to price out a demolition for a 3,200-square-

21   foot house?

22   A.   A 3,200-square-foot house is a pretty, pretty average

23   size house.

24      Q.   Well, sir, wouldn't, as an expert, you want to know

25   what was actually demolished?



DAVID DODDRIDGE - Cross

1          Sir?

2    A.   I suppose that would make sense, yep.

3          Q.   All right.  And in fact, sir, according to the

4    appraisal that the bank did of the existing house, it was

5    5,899 square feet.

6    A.   Okay.

7          Q.   So certainly, demolishing a 5,899-square-foot house

8    would cost more than demolishing a 3,200 square foot house;

9    wouldn't you agree with that?

10   A.   Yes.

11         Q.   And in fact, if you scroll down, there is no price

12   given in RSMeans for a 32 -- for a 5,889.  You used the price

13   for a 3,200-square-foot house.  Correct?

14   A.   Right.  You would extrapolate it.

15         Q.   But you didn't do that?

16   A.   No.

17         Q.   And in fact, sir, we know that demolishing a three-

18   family, 5,400 square foot house, would've been 16,600, and the

19   house was even bigger than that, correct?

20   A.   I don't know where it says that.

21         Q.   And, sir, this number --

22   A.   Oh, it's the same --

23         Q.   -- that you got also assumes that the haul for the

24   demolition is within twenty miles, correct?

25   A.   Correct, yes.



DAVID DODDRIDGE - Cross

1        Q.   And in fact, you cannot dispose of construction

2   debris within twenty miles of Brookline; isn't that correct?

3   A.   I -- no, I haven't measured it.  I haven't measured the

4   distance.

5        Q.   Well, sir, if you're providing an expert report,

6   don't you think it's important that you know where the

7   disposal's happening?

8   A.   To travel an extra few miles, you know, would not --

9        Q.   And point of fact --

10  A.   -- make a huge difference, but.

11       Q.   And point of fact, sir, you have to travel to New

12  Hampshire to dispose of this; isn't that correct?

13  A.   No.

14       Q.   And in point of fact, under 310 CMR 014, you can't

15  dispose of construction debris in Massachusetts; isn't that

16  correct?  I'm sorry, 017.  19.017.  310 CMR 19.017.

17  A.   You have to put that document in front of me.

18            MR. PERTEN:  May I, Your Honor?

19            THE COURT:  You may.

20                         (Pause)

21  A.   This is going to take me awhile to read this entire

22  thing --

23  BY MR. PERTEN:

24       Q.   Well, sir --

25  A.   -- word for word.



DAVID DODDRIDGE - Cross

1      Q.   -- as an expert --

2   A.   I mean I'm --

3      Q.   -- in construction, aren't you --

4   A.   -- actually going to start on the first page and --

5      Q.   As an --

6   A.   -- I'm going to have to sit here for half an hour and

7   read this.

8      Q.   As an expert in construction, aren't you familiar

9   with the regulations that govern your profession in terms of

10   demolition?

11   A.   When you demolish a house, okay, you -- you have to

12   comply with regulations that say you -- that the house has to

13   be "clean" before you tear it down and haul it away.  Which

14   means that you have to have a professional come in and do a

15   report on any hazardous materials that exist in the house,

16   like asbestos, for example, lead paint.  You have the take the

17   old mercury-switched thermostats and you have to dispose of

18   them correctly.  There's a Board of Health checkmark on a box

19   that says okay, the thermostats do not exist in this house.

20   You have to have a -- then have a report submitted with a

21   demolition permit that says this house is clean, okay?  This

22   house is clean, there's nothing hazardous in it.  Then you can

23   demolish the house.

24      Q.   Well, sir --

25   A.   You demolish the house, you put those materials on a



DAVID DODDRIDGE - Cross

1    truck, and those are trucked to a site that's regulated by the

2    DEP.  I'm not in the -- the transportation of -- or the

3    storage of scrap building materials business.  So what I know

4    is what I've done in the past.  And I've demo'd lots of houses

5    and I've complied with everything that I just said in my

6    experience.  And that's where my knowledge ends.

7         Q.   Well --

8    A.   I don't run a DEP-regulated dump site.

9         Q.   Well, sir, before determining that this hauling was

10   only twenty miles and it was only a 3,200 square foot, did you

11   make any determination whether there was lead paint in what

12   was demolished?

13   A.   Did I make any determination --

14        Q.   Sure.

15   A.   -- if there was lead paint in what I demolished?  I

16   didn't demolish anything.

17        Q.   Sir --

18   A.   What are you talking about?

19        Q.   -- did you make any determination whether the house

20   that was at 77 Lyman that was demolished, for which you gave

21   us a price, had hazardous materials in it?

22   A.   Assuming that the contractor abided --

23        Q.   Sir --

24   A.   -- by --

25        Q.   Sir, yes or no?  Did you make that determination?



DAVID DODDRIDGE - Cross

1    A.    No.

2         Q.    Okay.  Now, sir, you'll agree with me on page 617 of

3    the RSMeans book, it has cost for hauling greater distances.

4    Do you see that on page 617?

5    A.    Okay.

6         Q.    You see that?  There's a whole section on hauling

7    and the prices vary depending on how far you have to haul and

8    what volume of debris you're hauling, correct?

9    A.    Okay.

10        Q.    Do you agree with that?

11   A.    Yes.

12        Q.    Okay.  And, sir, in order to determine the

13   demolition cost and the hauling cost, you'd have to know the

14   cubic yardage of what was being demolished; isn't that

15   correct?

16   A.    Correct.

17        Q.    And in fact, sir, in terms of landfills, you know

18   that, for example, asphalt, pavement, and brick go in one type

19   of landfill.  Metal goes in another one.  Wood goes in another

20   one, correct?  It's multiple landfills; isn't that correct?

21   A.    I'm not in the landfill business.

22        Q.    Well, sir, you're here as an expert and you were

23   able to quote the demolition costs, but you don't know whether

24   you have to use multiple, different landfills?

25   A.    The scrap from a demolished house goes to a -- I don't



DAVID DODDRIDGE - Cross

1   know what you call it officially -- a recycling type facility

2   that separates all that out.  And then it is hauled away.

3        Q.   Okay.

4   A.   And that's, and I --

5        Q.   And the price --

6   A.   -- do not,  I am not in that business.

7        Q.   No, I know.

8   A.   I am not in the business of storing --

9        Q.   All right.

10  A.   -- temporarily storing scrap building materials,

11  separating them, and then hauling them to where they're going

12  to end up forever.  That's not the business that I'm in.

13       Q.   Right.  But you somehow can price it, correct?

14            Now, sir, let's look at division 3.  Basement

15  foundation footing systems.  You have 272 linear feet at

16  $20.40.  Do you see that?

17  A.   Yeah.

18       Q.   And you refer us to page 118 --

19  A.   Okay.

20       Q.   -- of the book.

21  A.   Yep.

22       Q.   Correct?

23  A.   Yep.

24       Q.   So let's look at page 118, sir.  Do you have that?

25  A.   Yep.



DAVID DODDRIDGE - Cross

1    Q.   And that is the pricing, sir, for a twelve-inch-

2    thick by twenty-four-inch-wide footing, correct?

3    A.   Yes.

4    Q.   $20.40?

5    A.   Yep.

6    Q.   And then when you look at the basement foundation

7    footing system on your revised report, all of a sudden, the

8    unit price is $17 a square foot.  Somehow, it went down $3 and

9    change.  Do you see that?

10   A.   Okay.

11   Q.   But the size of the foundation certainly didn't

12   change between the first report and the second report, did it?

13   A.   Right.

14   Q.   And in fact, that $17 figure that you're now

15   carrying is nowhere on page 118; isn't that correct?

16   A.   I do not see 17 on that page.

17   Q.   All right.  Another mistake, sir?

18   A.   I adjusted it downward to remove the overhead and profit

19   for ProEx.

20   Q.   Well, did ProEx do the actual pouring or did a

21   subcontractor do the actual --

22   A.   I don't know.

23   Q.   -- pouring?

24   A.   I don't know.

25   Q.   Well, if it's subcontracted, wouldn't the



DAVID DODDRIDGE - Cross

 1   subcontractor charge overhead and profit?

 2        Sir, let's --

 3   A.   If, if you look at -- at Mr. Kagan's brother's deposition

 4   testimony, you would understand that the guys working on this

 5   site were picked up at Dunkin' Donuts at day-labor rates and

 6   paid $100 a day, so I don't -- I doubt that they had

 7   insurance.  I doubt that there's a whole heck of a lot of

 8   overhead involved in a subcontractor like that.  And it

 9   doesn't take very skilled labor to pour a footing.  Trust me.

10        Q.   Now, Mr. Doddridge, nowhere in your report did you

11   say you reviewed any depositions; isn't that correct?

12   A.   That's correct.  That does not say that in my report, but

13   I --

14        Q.   All right.  So you didn't read Kirill Kagan's

15   deposition, did you?

16   A.   I read enough pages to know that he would pick up guys at

17   Dunkin' Donuts and pay them a $100 bucks a day --

18        Q.   Uh-huh.

19   A.   -- for day labor.

20        Q.   And you just forgot to mention that in your report,

21   huh?

22        Sir, let's --

23   A.   No.  I did, I read that the other day.

24        Q.   Oh, you read that the other day?

25   A.   Yeah.



DAVID DODDRIDGE - Cross

1        Q.   Let's look at -- let's continue, sir.

2             THE COURT:  Yes, Counsel.

3             MR. CARNATHAN:  Can, I ask for a short break before

4    we --

5             THE COURT:  Yeah, I'm going to --

6             MR. CARNATHAN:  -- move this --

7             THE COURT:  -- we're going to take a break.

8             How much more do you have?

9             MR. PERTEN:  Half hour-ish.

10            THE COURT:  Yeah.  And that's going to be it, a half

11   hour, okay?

12            MR. PERTEN:  Okay.  Yes.

13            THE COURT:  All right.  So we'll, we'll be done at

14   about -- we'll take a break 'til 3:30 and you'll finish by 4,

15   okay?

16                    (Off the record at 3:23 p.m.)

17                    (On the record at 3:32 p.m.)

18            THE CLERK:  The court is in session.

19            MR. PERTEN:  May I proceed, Your Honor?

20            THE COURT:  Please do.

21            MR. PERTEN:  Just a few more of these and then we'll

22   move on, Your Honor.

23                    RESUMED CROSS EXAMINATION

24   BY MR. PERTEN:

25       Q.   Still looking at division two, sir.  There's an



DAVID DODDRIDGE - Cross

1  entry for full basement foundation.  You see that?

2  A.  Yes.

3      Q.  And initially, your full basement foundation here,

4  you had 2720 square feet; do you see that?  In the first back-

5  up report, FF?

6  A.  Yes.

7      Q.  And the way you got that 2720 was that the perimeter

8  is 272, but it's 10 feet high, so you multiply by ten.  That's

9  how you got to 2720, correct?

10 A.  Most likely, yeah.

11     Q.  And now that same --

12 A.  Actually, the height is 9 feet.

13     Q.  Okay.

14 A.  The height of this particular foundation is 9 feet.

15     Q.  Okay.  And now sir, when we look at that same entry

16 in the later one, full basement, all of a sudden it dropped

17 from 2720 to 262.  Do you see that?

18 A.  Yes.

19     Q.  And that's an error, isn't it?

20 A.  It was 262 lineal feet.

21     Q.  And in fact, RSMeans doesn't priced this out by

22 lineal feet, does it?

23                     (Pause)

24 BY MR. PERTEN:

25 A.  Correct.



DAVID DODDRIDGE - Cross

1      Q.   All right.  And in fact, sir, if the basement

2   foundation is 272, then the full basement foundation should

3   also have been 272; isn't that correct?  Not 262.

4   A.   No, because there's a -- the footings continue on the

5   righthand side of the foundation.  The footings continue in a

6   little bit to accommodate a couple of those lally column pads.

7      Q.   And that 272 is the correct square foot number,

8   correct?  Which is the way it's priced in RSMeans; isn't that

9   correct?

10  A.   I'm sorry, can you ask that question again?

11     Q.   Sure.  In your first report, when you had 2,720

12  square feet, you checked that number so that is the right

13  quantity; isn't that correct?

14  A.   That would actually be high.

15     Q.   Okay.  And you originally carried this at $16.90 a

16  square foot, correct?

17  A.   Yeah.

18     Q.   And now, suddenly, the number went to $34.92 a

19  square foot, correct?

20  A.   Right.

21     Q.   So if, in fact, we were doing 2,720 times 34.92, you

22  shorted us by about $85,000.

23          Isn't that correct?

24  A.   No.  The 262 is lineal feet.  Lineal feet.

25     Q.   Well, there is no price for lineal feet you told us,



DAVID DODDRIDGE - Cross

1  correct?  We'll try it this way, Mr. Doddridge.  Let me help

2  you out a little bit.  You originally carried that line item

3  at 45,968.  You see that?

4  A.   Right.

5       Q.   When you redid it, suddenly that number dropped to

6  9,149.

7  A.   Right.

8       Q.   Nothing changed.  The foundation didn't get any

9  smaller, did it?

10 A.   No.

11      Q.   Were you wrong in the first one or wrong in the

12 second one?  Or don't you know?

13 A.   I'm not sure.

14      Q.   All right.  Let's drop down, sir.  Footings for

15 interior columns.  It's the second to the last item in

16 division three on Exhibit FF.

17 A.   Yeah.

18      Q.   You have ten columns.  Do you see that?

19 A.   I do.

20      Q.   At $285 a column.  Correct?

21 A.   Yes.

22      Q.   And when you redid your calculations, apparently you

23 realized that there are actually sixteen columns for that same

24 entry.  Correct?

25 A.   That's because it was based on the newer --



DAVID DODDRIDGE - Cross

 1      Q.   So you misread --

 2   A.   -- the permanent set of plans.

 3      Q.   You misread the plans; isn't that correct?

 4   A.   No, I did not misread the plans.

 5      Q.   Or was the incomplete plans that you were relying

 6   on?

 7   A.   That's correct, yes.

 8      Q.   All right.  And suddenly, once you counted right,

 9   the unit price went from $285 down to $235.  Correct?

10   A.   Yes.

11      Q.   And the last entry there, footings for front

12   porch -- footings for porch.  You carried 10 at $285

13   initially.  Correct?

14   A.   Right.

15      Q.   And you told us to look at page 314, correct?

16   A.   Yeah.

17      Q.   Let's turn to page 314.

18   A.   Yep.

19      Q.   And in fact, sir, the price you took was the price

20   without overhead and profit, correct?

21   A.   Correct.

22      Q.   The overhead and profit that they're suggesting goes

23   on there as a hundred bucks, correct?  With overhead and

24   profit, it's 385; without, it's 285, correct?

25   A.   Correct.


(973) 406-2250 | operations@escribers.net | www.escribers.net

DAVID DODDRIDGE - Cross

1    Q.   Okay.  Who was the subcontractor, sir, who poured

2    the footing systems for the porch?

3    A.   I don't know.

4    Q.   Did ProEx do that?

5    A.   As I understand it, they were supposed to have done that.

6    Q.   Well, sir, did you look to see who did that?

7    A.   No.

8    Q.   All right.  Let's move on.  Let's skip all the way

9    to division five.  Steel columns.

10   A.   Yes?

11   Q.   Yes.  Steel columns, initially in Exhibit FF.  You

12   carried only ten.  You see that?

13   A.   Yeah.

14   Q.   And suddenly, in Exhibit GG, you realize that it

15   should have been thirty-one.

16   A.   Right.

17   Q.   So that's another error, isn't it?  You undercounted

18   by thirty-one when you first did your analysis.

19   A.   No, there were ten shown on the plans that I referenced

20   in my initial report.  That's the difference from -- that's

21   the difference between one plan and another plan that I had.

22   Q.   Now, let's skip all the way down to division 31,

23   sir.  Driveway excavation.

24   A.   Yes.

25   Q.   You carried one number.  Same number for each



DAVID DODDRIDGE - Cross

1    property.  Isn't that correct?

2    A.    I assumed each property to be the same, yes.

3        Q.    Well, you had the site plans.  Did you scale and

4    note that one of the driveways was 1,300 square feet larger

5    than the other one?

6    A.    I only estimated this based on --

7        Q.    Well, as an expert --

8    A.    -- one house.

9        Q.    As an expert estimating cost, isn't it important for

10   you to know the actual dimensions instead of just guessing?

11   A.    I used a cubic yard unit of measure in my second report,

12   80 cubic yards.  Not a square foot.

13       Q.    And in fact, cubic yards isn't even the type of --

14   RSMeans carries, not in cubic yards, but in square feet; isn't

15   that correct?

16   A.    For excavation, no.

17       Q.    Sir, let's just skip to the bottom line there.  You

18   didn't scale the as-builts that you had to determine the

19   actual dimensions of the driveway.  Isn't that correct?

20   A.    Correct.

21       Q.    All right.  Well, sir, let's look at catch basins.

22   We're in division 31, originally in FF.  You said there were

23   two catch basins.

24   A.    Okay.

25       Q.    And in your revised report, suddenly, sir, you



DAVID DODDRIDGE - Cross

 1  realized that there were significantly more.  Isn't that

 2  correct?

 3  A.    Okay.

 4      Q.    Were you wrong the first time or wrong the second

 5  time?

 6  A.    Neither.

 7      Q.    All right.  Now, sir, let's move to division --

 8      MR. PERTEN:  Strike that.

 9  BY MR. PERTEN:

10      Q.    Sir, how much was the -- how much did you determine

11  that the electrical work would be on this site?

12  A.    I don't have that division totaled here.

13      Q.    Could the electrical work that was required for this

14  house have been done for $37,500 per?

15  A.    I'm sorry -- 37 what?

16      Q.    37,500.  Half of 65,000.  Could you have done all of

17  the electrical work, based upon your numbers, for that price?

18  A.    $37,500 for one house?

19      Q.    Yeah.

20  A.    I'm not an electrician, so I wouldn't do that work.

21      Q.    Well, sir, you carried electrical service in

22  division 28 -- 26, I'm sorry.  Isn't that correct?

23  A.    Electrical service, okay.

24      Q.    And if you add up all your numbers, it's about

25  $102,000 per house.  Isn't that correct?



(973) 406-2250 | operations@escribers.net | www.escribers.net

DAVID DODDRIDGE - Cross

1    A.    I would have to use a calculator.

2         Q.    Or you could even eyeball it.  You can certainly see

3    it's certainly more than 37,500, correct?

4    A.    It's definitely over $100,000.

5         Q.    I'm sorry?

6    A.    It's definitely over $100,000.

7         Q.    Okay.  So if there's any suggestion that the total

8    electrical for both houses combined could've been $65,000, you

9    wouldn't agree with that, would you?

10   A.    Where are you getting $65,000 from?

11        Q.    Would you agree with that or no?

12   A.    Yeah, you were correct, yes.

13        Q.    Yeah, you're right what?  Would you agree with it or

14   not?

15   A.    Repeat the question one more time.

16        Q.    Would you agree that it would be impossible to do

17   the electrical work for these houses for a combined total of

18   $65,000?

19   A.    Nothing's impossible, but yes, generally speaking, I

20   would agree with that.

21        Q.    And the number that you came up per house was in

22   excess of 100,000.  Isn't that correct?

23   A.    Yes.

24        Q.    Did you look at the Unicon Electric invoices?

25   A.    No.



DAVID DODDRIDGE - Cross

1      Q.   Okay.  Now, sir, in your second report, there were a

2   bunch of allowances that you made, correct?

3   A.   Yes.

4      Q.   And those were things that you couldn't find a price

5   in RSMeans, correct?

6   A.   Right.  Oftentimes, allowances are referencing a portion

7   of the job that are not scoped out or drawn.  There's no scope

8   of work so we carry a number.  It's industry standard to carry

9   a reasonable number based on your expertise and experience to

10   allow for something.

11      Q.   Sure.  And you also made some assumptions, correct?

12   A.   Some assumptions, yeah.

13      Q.   And in division seven, one of the assumptions had to

14   do with the pricing of the roofing system; isn't that correct?

15   A.   I'm sorry, which division?

16      Q.   Seven.

17   A.   Right.  That was an assumption/allowance.  Sort of

18   interchangeable.

19      Q.   Did you look --

20   A.   Best to carry the number for sheet metal.

21      Q.   And did you look and price out exactly what kind of

22   a roof there was so you didn't have to make an assumption?

23   A.   That's sheet metal allowance.

24      Q.   Well, did you calculate how much sheet metal there

25   was so you could get an actual price instead of just making an



DAVID DODDRIDGE - Cross

1    assumption?

2    A.    No.  No, but it's enough.

3         Q.    Now, sir, in division number 11,  that's where you

4    have the appliances priced out, correct?

5    A.    Yes, sir.

6         Q.    And you looked at the pictures in the multiple

7    listings service -- Exhibit 46 that we looked at -- and that

8    showed you in those pictures the refrigerators and the stove.

9    You recall that?

10   A.    Vaguely.

11        Q.    And you priced the refrigerator at $2,303.  Correct?

12   A.    Okay.

13        Q.    You'd agree with me that's a Sub-Zero refrigerator

14   being shown in that picture, correct?

15   A.    I don't know.

16        Q.    Well, you would also --

17   A.    Unless you can zoom in on the little label that says

18   "Sub-Zero."  There's lots of different appliances that are

19   being made now that look like Sub-Zeros.

20        Q.    Well, certainly, sir, you'd agree with me these were

21   high-end appliances, not average appliances, correct?

22   A.    I didn't actually walk through and view each appliance.

23   All I had was a picture.

24        Q.    Well, sir, did you look and see the invoice for the

25   actual refrigerator that went into that house?

DAVID DODDRIDGE - Cross

1    A.    No.

2         Q.    Sir, in Exhibit 174, tab L-2, Yale Appliance,

3    $10,199 for that refrigerator.

4    A.    Wow.

5         Q.    Did you look to confirm what was actually there, or

6    did you make another assumption?

7    A.    I just -- I went by the prices in the book.

8         Q.    You went by the prices in the book.

9    A.    Yeah, obviously.

10        Q.    What about the range top?  You recognized that as a

11   Wolf, didn't you?  With red handles?

12   A.    I didn't see any red handles.

13        Q.    Well, certainly, sir, did you go back in the

14   invoices so you could see exactly what was there and compare

15   it to the pictures to see if the invoice reflected what was

16   actually there?

17   A.    I did not check the invoices, no.

18        Q.    And in fact, sir, if you had looked at Exhibit 174,

19   tab L-2, the Yale Appliance invoice, it would've told you that

20   that range top was upwards of $5,000.

21   A.    Oh?  Okay.

22        Q.    You didn't look, did you?

23   A.    Nope.

24        Q.    All right.  Let's look at division seven, sir.  You

25   carrying a line item for vinyl siding.  Do you see that?



DAVID DODDRIDGE - Cross

1    A.    Yeah.

2         Q.    Did this house have vinyl siding?

3    A.    It was hard to tell.

4         Q.    Well, sir, you did a site visit.  You did a site

5    visit.  You couldn't tell?

6    A.    I did a drive-by.  There were people outside, so I drove

7    by the house.  It was hard to tell.  And if you look at Mr.

8    Salmi's specifications, it says "see plans."  And if you look

9    at the plans, the plans don't show.  And the number that I

10   carried for vinyl siding is higher than wood shingles.  So I

11   erred on the side of caution, just like I did throughout my

12   entire estimate.

13        Q.    Sir.

14   A.    I use higher numbers, always.

15        Q.    Is it your testimony that a $5 million house would

16   typically have vinyl siding?

17   A.    I've seen multimillion-dollar houses with vinyl siding,

18   yeah.

19        Q.    So let me --

20   A.    And PVC trim, maintenance-free exterior.

21        Q.    Sir.

22   A.    And my vinyl number's higher than the wood shingle

23   number.  $610 a square is what I've got.

24        Q.    Sir, isn't it a fact, sir, that vinyl siding is less

25   expensive than cedar clapboard?



DAVID DODDRIDGE - Cross

1    A.    No.

2         Q.    Sir, look at page 426 of the book.

3    A.    Okay.

4         Q.    You see the pricing for a cedar?  It ranges from $5,

5    6 a square foot.

6    A.    Okay.

7         Q.    And the number you're carrying for vinyl siding --

8    you've got trim at $1.95; you've got vinyl siding at 6.10.

9    You see that?

10   A.    Yes.

11        Q.    Isn't it important that you know exactly what you're

12   pricing?  That's a yes/no, sir.

13   A.    I'm answering --

14        Q.    Isn't it important --

15   A.    I'm prepping to answer your question --

16        Q.    Isn't it important, sir --

17   A.    -- so I'm going to take whatever time is necessary.

18        Q.    Isn't it important that in order to price something

19   you know what was used?

20   A.    I carried a number that I knew would cover it.  If you

21   look at page 166 --

22        Q.    Sir.

23   A.    My vinyl siding number $6.10 --

24        Q.    Sir.

25   A.    -- per square foot.



DAVID DODDRIDGE - Cross

1      Q.   Sir, please try my question.

2    A.   And then you look at the shingle number on the page

3    before that.

4    MR. PERTEN:  Your Honor, could you instruct the witness,

5    please?

6    THE WITNESS:  I'm just trying to answer the question, Judge.

7            THE COURT:  Right.  I think you asked him.  I'll let

8    him answer.  Go ahead.

9            THE WITNESS:  Thank you, Judge.

10   BY MR. PERTEN:

11   A.   If you look on page 164, white cedar shingles, five-inch

12   exposure, $5.37 per square foot.  My vinyl siding number's

13   $6.10 per square foot, okay?  That's $0.73 per square foot

14   higher.

15      Q.   Sir.

16   A.   The next one up, the next quality grade up, is only $6.21

17   per square foot for wood.  So that means I'm $0.11 per square

18   foot shy.  I could sidewall that house for $610 per square.  I

19   carried a number that erred on the side of caution.

20      Q.   Now, sir, let's skip to your bottom line.  You said,

21   your opinion was 1,718,000.  Correct?

22   A.   Correct.

23      Q.   1,718,000.  And you told us that the actual price

24   could be five percent above that, right?

25   A.   No.  I said I erred on the side of caution throughout my



Page 253

DAVID DODDRIDGE - Cross

1    entire estimate and that 1,718,000's probably three to five

2    percent on the high side.  That's what I said.

3        Q.    Okay.  Do you know how much Kagan actually charged

4    for the hard construction in this case?

5    A.    I do not.

6        Q.    Would it surprise you, sir, if his hard construction

7    costs were only $167,000 from what you estimated?

8    A.    Would it surprise me if he was $167,000 off from what I

9    estimated?

10        Q.    Correct.

11    A.    As long as he matched up with the same specifications

12    that I came up with -- or the same --

13        Q.    Okay, so on Mr. Kagan's proof of claim, he outlines

14    hard costs for the two homes at 3,773,143 for the total.

15    A.    Okay.

16        Q.    And divide that by two equals 1,886,000.  And you're

17    at 1,718,000.  Okay?  You with me?

18    A.    Yeah.  So he's 100 and -- okay.  The difference between

19    1718 and 1886 is more than 136, isn't it?

20        Q.    Okay, let's see what it is.  168,571.

21    A.    Okay.

22        Q.    Okay?

23    A.    Yeah.

24        Q.    And certainly, sir, you would agree with me that if

25    you estimated an average -- and even if we overlook all the



Page 254

DAVID DODDRIDGE - Cross

1    errors -- you'd certainly agree with me that if his actual

2    hard prices were $168,000 from what you estimated, that

3    wouldn't raise any eyebrows to you, would it?

4    A.    Times two, that's $340,000.  It's a lot of money.

5        Q.    I'm talking per house, sir.

6    A.    Yeah, I know.

7        Q.    I'm asking you per house.  If his per house cost was

8    $168,000 more than your per house cost.  That wouldn't raise

9    any great eyebrows for you, would it?

10   A.    Given the fact that I erred on the side of caution, used

11   high numbers throughout my entire estimate, and I also

12   included $8,000 for cleaning, $5,000 for temporary utilities,

13   $2,000 for a field office that was most likely never even

14   there, temporary fencing and site security, $5,000.  I've got

15   numbers peppered throughout my estimate.  Combined with the

16   fact that I estimated out of the book on the high side, I

17   would think that my number would be lower in the end.

18       Q.    Okay.

19   A.    At the end of the day, my number's going to be lower than

20   1.718.

21       Q.    Sir, you issued an opinion in this court.

22   $1,718,000, that was your opinion, correct?

23   A.    Right, and then I --

24       Q.    On a house.  Yes or no?

25   A.    Yes.  Correct.



DAVID DODDRIDGE - Cross

1    Q.   And you also told us that you didn't add the

2    overhead, which you ran about ten percent, correct?

3    A.   Correct.

4    Q.   And if I told you that the delta between what Mr.

5    Kagan charged and what you charged for the hard construction

6    only, not any add-ons, for the hard construction, was as less

7    than ten percent -- 167 and change -- was less than ten

8    percent, that wouldn't surprise you, would it?

9    A.   Yeah, it would surprise me a little bit since my number

10   is already a little high.

11   Q.   But your number, sir, didn't include that ten

12   percent overhead, did it?

13   A.   Right.

14   Q.   So if we tack on that ten percent overhead, we're at

15   the same number, aren't we, more or less?

16   A.   That's not what I understood the agreement to be, but

17   okay.  Okay.

18   Q.   I didn't ask you what the agreement was.

19   A.   No, I get it.  Okay.

20   Q.   And certainly if there was massive overbilling and

21   massive fraud, you'd expect the per house hard cost delta to

22   be more than $168,000, wouldn't you?

23   A.   Depends on what your definition of the word massive is.

24   Q.   And sir, you did no analysis whatsoever of Mr.

25   Kagan's actual costs to see how they compared to what you



DAVID DODDRIDGE - Cross

1    thought it should cost; isn't that correct?

2    A.    I did not review his invoices.  I did not analyze his

3    invoices, that's correct.

4         MR. PERTEN:  Your Honor, at this point, I'd like to

5    move into evidence what we've marked as Exhibits FF and GG.

6         THE COURT:  Any objection?

7         MR. CARNATHAN:  No objection, Your Honor.

8         THE COURT:  All right.  Mary, what are the next two

9    numbers?

10         THE CLERK:  Okay so, Exhibit FF for identification

11    will now become Defendant's Exhibit 343.  And Defendant's

12    Exhibit GG identification will become Defendant's Exhibit 344.

13         THE COURT:  Okay.

14         MR. PERTEN:  Thank you.

15         THE COURT:  FF is 343, and GG is 344.

16    DEFENDANTS' EXHIBIT 343 AND 344 WAS ADMITTED INTO EVIDENCE

17    BY MR. PERTEN:

18         Q.    And sir, one final question for you.  If I wanted to

19    ascertain based upon --

20         MR. PERTEN:  I'm sorry, 344 was the last one?

21         THE COURT:  343 and 344.

22    BY MR. PERTEN:

23         Q.    Okay.  Based on 344, which was the back-up for the

24    latter report, the one you corrected.

25    A.    Yeah.

escribers

DAVID DODDRIDGE - Cross

1      Q.   If I wanted to add up and determine what you

2   determined ProEx was, what divisions would I add up?

3   A.   Anything with an X in that one column that says

4   ProExcavation, no overhead in profit.

5      Q.   So there's no Xs on this.  It would be division two,

6   correct?

7   A.   Which spreadsheet are you talking about?

8      Q.   The six-page.

9   A.   It's right here.  X -- you gave this to me.

10         THE COURT:  Go ahead, (indiscernible).

11   A.   You gave it to me.

12      Q.   Those Xs?

13   A.   Yeah.

14      Q.   So it's divisions 2, divisions 3, division 31, 32,

15   and portions of 33?  Correct?

16   A.   Portions of 32, portions of 33.

17      Q.   Okay.  It's the ones with the little Xs?

18   A.   I did a direct comparison with the $418,000 ProEx quote

19   with my numbers, and I was $97,000 lower.

20      Q.   When you first did this analysis, sir, you had

21   division one.  You had some money allocated from division one.

22   Why is there no money allocated for division one in the -- why

23   doesn't it have an X for ProEx in your second analysis?

24   A.   I didn't consider that as work that ProEx would be doing

25   themselves.  For example, a field office, you're going to rent

DAVID DODDRIDGE - Cross

1   that.  Temporary utilities, like toilets, you're going to rent

2   those.  So I didn't think that ProEx actually owned a field

3   office or owned temporary toilets, so therefore I did not put

4   an X in that column because I did not --

5       Q.   And did ProEx not have any general requirements in

6   equipment mobilization?

7   A.   I suppose you could remove the overhead and profit from

8   equipment mobilization.

9       Q.   So there should've been an add-on that you just

10  forgot to do?

11  A.   That number should be less, then.

12      Q.   The number should be less than?

13  A.   Less.

14      Q.   Than what?

15  A.   Less -- not -- less then, T-H-E-N.  That number should

16  therefore be less.

17      Q.   ProEx should get some credit for equipment

18  mobilizations and general requirements, correct?

19  A.   For whatever their cost is.

20      Q.   Correct, they should get some credit.

21  A.   Some credit, some credit, yes.

22      Q.   And you didn't do that, did you?

23  A.   Yes, I did.  5 times 9, 55.  4775.

24      Q.   Sir, there's no Xs on division one, is there?

25  A.   The X reduces the amount.  You understand that, right?



DAVID DODDRIDGE - Cross

1    The X removes the overhead and profit, therefore reduces that

2    number.

3              THE WITNESS:  All right.  We're at 4 o'clock.  It's

4    enough.

5              MR. PERTEN:  Okay.  We're fine.  Thank you, Your

6    Honor.

7              THE COURT:  Those are the exhibits.

8              Okay, Mr. Carnathan?  Redirect.

9              MR. CARNATHAN:  Just very briefly.

10                         REDIRECT EXAMINATION

11   BY MR. CARNATHAN:

12        Q.   So Mr. Doddridge, during your direct here today when

13   you were describing your opinion, which report was that based

14   on?

15   A.   The latter of the two.

16        Q.   All right.  The September report, right?

17   A.   September 13th.  Yeah.

18        Q.   All right.  So none of your direct testimony was

19   based on that July 30th report that we heard so much about?

20   A.   Right.

21        Q.   Right.  And during your direct, I think you told me

22   that you calculated that your number for what ProEx did was

23   321,000.  Right, sir?

24   A.   Yes.

25        Q.   And if we look at that -- I guess it's been admitted



DAVID DODDRIDGE - Redirect

1    now -- but we were calling it FF all the way through.

2              THE COURT:  343.

3    BY MR. CARNATHAN:

4         Q.   343.  At that time, when you had the different

5    plans, your number per property was 260,612, right?

6    A.   Which one are you talking about?

7         Q.   I'm looking at Exhibit 343.  We were calling it FF.

8    It's the two-page one from your July 30th.

9    A.   Okay.  All right, yeah.

10        Q.   Right.  So if you look at the second page --

11   A.   Okay.

12        Q.   It was 260,612 per property, right?

13   A.   Yes.

14        Q.   So Mr. Perten went through a bunch of line items

15   with you, but ultimately, you increased that number by $61,000

16   after you had the permit plans, right?

17   A.   Right.

18        Q.   And your opinion here today was based on the permit

19   plans, right?

20   A.   It was.

21        Q.   All right.  And so has your opinion changed as a

22   result of the questions you've been asked on cross-

23   examination?

24   A.   No.

25        Q.   So you're still confident that the right number was



DAVID DODDRIDGE - Redirect

1    $1.718 million?

2    A.    Yes.

3        Q.    And that's erring on the high side?

4    A.    Yes.

5        Q.    And that's assuming that Mr. Kagan was using

6    reputable subcontractors in arm's length arrangements, right?

7    A.    Correct.

8        MR. CARNATHAN:  All right.  That's all I have for Mr.

9    Doddridge.

10        THE COURT:  Anything else?  All right.  Thank you,

11    Mr. Doddridge.

12        THE WITNESS:  Thank you, Judge.

13        THE COURT:  Does that end the evidence in the case?

14    Both sides?

15        MR. PERTEN:  Yes, Your Honor.

16        THE COURT:  It does?

17        MR. CARNATHAN:  Yes, Your Honor.

18        THE COURT:  Okay.  We talked about closings and did

19    we set dates?

20        MR. PERTEN:  We did not, Your Honor.

21        MR. CARNATHAN:  We did not.

22        MR. PERTEN:  Mr. Carnathan and I spoke.  You had

23    discussed earlier that you were thinking about thirty days,

24    which works except for the fact that brings us into Labor Day

25    and brings us into my vacation.  So if we could do it forty-

VON SALMI - Cross

```
 1   five days right into mid-September.

 2             THE COURT:  You guys tell me.  You tell me.

 3             MR. PERTEN:  I think you're leaving the third week

 4   for vacation, so right before you leave?

 5             MR. CARNATHAN:  We talked about September 15 as the

 6   date for the --

 7             MR. PERTEN:  I don't know what day of the week that

 8   is.

 9             MR. CARNATHAN:  I'm out the week of August 19th.

10             THE COURT:  All right.  So we're talking about

11   proposed findings and rulings, right?  Is that what we're

12   talking about?

13             MR. PERTEN:  Yes, Your Honor.

14             THE COURT:  Proposed findings and rulings.

15             MR. PERTEN:  15th is a Sunday, so it can't be that

16   day.

17             THE COURT:  How about Monday the 16th?

18             MR. PERTEN:  Monday the 16th is -- September 16th is

19   fine with the defendant.

20             MR. CARNATHAN:  It's fine on my end, too, Your Honor.

21             THE COURT:  Okay.  So we'll have proposed findings

22   and rulings then, and Mary --

23                          (Pause)

24             THE COURT:  What do you think you'd need?  It's been

25   a long trial, so an hour a piece?
```


(973) 406-2250 | operations@escribers.net | www.escribers.net

VON SALMI - Cross

1          MR. CARNATHAN:  I'd like two if I could have them.

2          THE COURT:  Two.

3          MR. PERTEN:  I'm good with an hour.  I don't think

4   it'll take two, but whatever the Court wants.  An hour's a

5   long time.

6          THE COURT:  All right.  You get two, you get one.  I

7   knew you wouldn't go with that.  Hold on.

8          MR. PERTEN:  We could compromise at an hour and half.

9          MR. CARNATHAN:  I mean, I'll try to be faster than

10  that, but I've got a lot to cover so.

11         THE COURT:  It's okay.  It really is.  It's a long

12  trial.  There's a lot to cover.  Hold on one second.  You have

13  the burden.  Hold on.  Monday the 30th.

14         What about Monday the 30th?  I'm here that day?

15         MR. PERTEN:  Yeah, no, that's Rosh Hashanah.

16         THE COURT:  Okay, yeah.  Bad idea.  That's why it's

17  open.

18         MR. PERTEN:  I'm sorry?

19         THE COURT:  That's why it's available.

20         MR. PERTEN:  How about the Friday of the 4th?

21         THE COURT:  Hold on.  Mary's looking.  Right.  Mary's

22  going to be traveling.  That's her -- she hates to have us do

23  anything without her here, but I'm going to do it anyway.

24  Friday, October 4.  Let's say, why don't we start at 9:30,

25  Courtroom Number 1.  All right.  You're going to remove all

VON SALMI - Cross

1    these boxes.  All right.

2           And so, we'll go back to where I belong.  And it may

3    be that this courtroom will be occupied by then.  In fact, I

4    should hope it's occupied by then.  Just coordinate with Mary

5    on two things.  And you don't have to do this today.  You can

6    schedule a time with her.  Well, you have to remove the boxes

7    pretty soon.

8           MR. PERTEN:  Yeah, no, we'll have them gone by

9    tomorrow at least.

10          THE COURT:  Tomorrow is fine.  Make sure that you

11   coordinate with each other on exhibits that you agree are in

12   evidence and then coordinate with Mary that you're in

13   agreement on that, and we agree with what her notes are as to

14   what's in evidence.  Okay?

15          MR. PERTEN:  Two housekeeping questions, if I might.

16          THE COURT:  Yes.

17          MR. PERTEN:  I just want to confirm the Court had

18   indicated previously that you want electronic versions of the

19   agreed exhibits.

20          THE COURT:  Boy, it makes life a lot better for me.

21          MR. PERTEN:  That's fine.  I just -- so we'll

22   coordinate with that.  And do you want -- when do you want

23   that?  Do you want that with the submissions?

24          THE COURT:  Tell me when it's comfortable doing it.

25   I really don't technically need them until after closing

VON SALMI - Cross

1   arguments because then that's when the writing could begin.

2          MR. PERTEN:  So we'll get them to you in due course.

3          THE COURT:  How about by the time of the closings?

4          MR. PERTEN:  That's fine.  And then the next

5   question, Your Honor had mentioned some sort of a post-trial

6   brief.

7          THE COURT:  I'll leave that to you entirely.

8          MR. PERTEN:  Okay.

9          THE COURT:  If you want to submit a brief in support

10  of your proposed rulings, essentially, is what that comes down

11  to, you may.

12         MR. PERTEN:  And would that be due at the same day, I

13  assume?

14         THE COURT:  That should be filed on September 16.

15  It's best if it comes in at that point so I can take all of

16  this together.  Okay.

17         Anything else?  All right.  Very well.

18         MR. PERTEN:  Thank you, Your Honor.

19         THE COURT:  Thanks very much.

20         MR. CARNATHAN:  Thank you, Your Honor.

21         MR. PERTEN:  May I steal back that RSMeans book from

22  you, Your Honor?

23         THE COURT:  Yeah, absolutely.  That's a scary book.

24         MR. PERTEN:  It is.

25         THE COURT:  I'm going to return all of these depo



1   transcripts to you as well.  Everything else is available to

2   us.

3   (End at 4:11 PM)

4                       * * * * * * * * * *

5          I certify that the foregoing is a true and accurate

6   transcript from the digitally sound recorded record of the

7   proceedings.

8

9   *Heather Richards*

10

11  /s/ Heather Richards                        August 21, 2019

12  _____

13  ESCRIBERS LLC
                              eScribers
                    7227 N. 16th Street, Suite #207
14                        Phoenix, AZ 85020
                            973-406-2250
15                  e-mail operations@escribers.net

16

17

18

19

20

21

22

23

24

25


(973) 406-2250 | operations@escribers.net | www.escribers.net

Case 16-01120    Doc 382    Filed 08/22/19    Entered 08/22/19 10:11:12    Desc Main
Document    Page 267 of 292
LYMAN-CUTLER, LLC v.
KAGAN, et al.

July 29, 2019

**$**

**$0.11 (1)**
252:17
**$0.73 (1)**
252:13
**$1 (1)**
151:7
**$1,000 (1)**
24:2
**$1,365,089 (2)**
174:17;175:8
**$1,500 (2)**
180:24;183:20
**$1,500-odd (1)**
183:6
**$1,718,000 (2)**
176:4;254:22
**$1.2 (1)**
185:5
**$1.718 (1)**
261:1
**$1.95 (1)**
251:8
**$10 (1)**
141:23
**$10,199 (1)**
249:3
**$100 (2)**
237:6,17
**$100,000 (2)**
246:4,6
**$102,000 (1)**
245:25
**$130,000 (1)**
62:14
**$14 (1)**
141:23
**$14.30 (1)**
168:14
**$140,000 (1)**
144:9
**$150,000 (1)**
179:3
**$16,000 (1)**
184:12
**$16.90 (1)**
240:15
**$167,000 (2)**
253:7,8
**$168,000 (3)**
254:2,8;255:22
**$17 (2)**
236:8,14
**$180,000 (1)**
142:15
**$2,000 (1)**
254:13
**$2,303 (1)**
248:11
**$20 (1)**
175:13

**$20.40 (2)**
235:16;236:4
**$200,000 (2)**
146:19,21
**$220,000 (1)**
134:19
**$235 (1)**
242:9
**$25 (3)**
168:15;196:15,23
**$267,000 (1)**
184:13
**$28,000 (1)**
179:7
**$283,000 (2)**
184:4,12
**$285 (3)**
241:20;242:9,12
**$286,669 (1)**
175:3
**$297 (1)**
180:6
**$3 (1)**
236:8
**$3,098,160.80 (1)**
64:17
**$3,689,730.57 (1)**
60:24
**$321,000 (1)**
176:24
**$34,067 (1)**
175:20
**$34.92 (1)**
240:18
**$340,000 (1)**
254:4
**$37,500 (2)**
245:14,18
**$4 (2)**
148:1;155:2
**$418,000 (1)**
257:18
**$42,000 (1)**
68:18
**$433 (1)**
177:16
**$48,000 (1)**
179:7
**$4-odd (2)**
154:8;155:12
**$4-some- (1)**
141:1
**$4-some-odd (1)**
141:4
**$5 (5)**
148:2;187:14,20;
250:15;251:4
**$5,000 (3)**
249:20;254:12,14
**$5.37 (1)**
252:12
**$50 (1)**
151:7

**$50,000 (2)**
210:8,11
**$500,000 (3)**
141:6,10;197:9
**$5-million-dollar (1)**
197:10
**$6.10 (2)**
251:23;252:13
**$6.21 (1)**
252:16
**$61,000 (1)**
260:15
**$610 (2)**
250:23;252:18
**$65,000 (3)**
246:8,10,18
**$7,725 (1)**
228:3
**$70,000 (1)**
201:1
**$718,860 (1)**
176:4
**$735,000 (1)**
142:10
**$75 (2)**
179:9;196:15
**$75-an-hour (1)**
196:23
**$76,000 (1)**
179:3
**$8,000 (1)**
254:12
**$85,000 (1)**
240:22
**$9 (1)**
168:15
**$9,975 (2)**
227:22;228:9
**$955 (1)**
224:17
**$97,000 (1)**
257:19

**[**

**['Dod-er-rij] (1)**
158:19
**['Dod-rij] (2)**
158:20,21

**A**

**A-1 (2)**
32:8,9
**A-2 (1)**
32:12
**abided (1)**
233:22
**able (34)**
23:14,16;24:14;
28:16;35:18,21,23,25;
36:6;38:16,18;39:7;
42:16;51:23,25;55:6;

58:4;63:21;64:8,13;
66:6;68:4;163:10,14,
16;185:17,18,19;
186:16,21,24;188:13;
189:16;234:23
**above (4)**
175:7;216:25;220:6;
252:24
**absolutely (20)**
53:2;140:20,24;
141:7,14;146:8,25;
147:16;150:3;151:17;
153:17;174:14;176:7;
197:7;205:19;210:14,
18,19,21;265:23
**acceptable (1)**
136:23
**accepted (1)**
143:23
**access (2)**
35:10;38:14
**accommodate (1)**
240:6
**accompany (1)**
136:16
**According (5)**
165:4;177:11;
216:24;220:4;230:3
**account (8)**
61:2;69:9;168:3;
175:10;200:9;201:10;
202:24;203:2
**accuracy (1)**
166:14
**accurate (18)**
44:16;50:6;51:2;
55:20;152:1;166:15;
170:3;173:1,5;186:12,
14,21;200:22;201:3;
209:25;210:14,18,22
**accurately (7)**
29:10;44:22,22;
51:24;65:8;186:10;
200:18
**achieve (1)**
55:6
**acquire (5)**
25:17;28:14,16,23;
63:23
**acronym (1)**
22:25
**across (3)**
149:18;164:18;
165:23
**act (1)**
18:9
**Acton (1)**
16:2
**actual (28)**
53:21;71:11;136:9;
148:24;150:24;164:6;
176:15;188:1;189:2;
196:10;197:17,25;

200:5,22;201:4;
203:16;204:6;205:1;
207:6;236:20,21;
244:10,19;247:25;
248:25;252:23;254:1;
255:25
**actually (28)**
35:6;36:17;43:15;
50:11;61:11;146:4,23;
162:5;165:15;166:5;
174:10;179:13;183:1;
188:18;189:7;192:22,
23;214:11;229:25;
232:4;239:12;240:14;
241:23;248:22;249:5,
16;253:3;258:2
**add (11)**
57:5;66:14;175:3;
177:2;179:4;185:25;
186:1;245:24;255:1;
257:1,2
**add- (1)**
57:1
**added (6)**
168:15;175:13,20;
176:19;179:6;188:24
**adding (1)**
179:5
**addition (4)**
18:14;44:1;56:25;
197:5
**additional (2)**
45:8;57:1
**add-on (1)**
258:9
**add-ons (1)**
255:6
**address (1)**
58:24
**adequately (1)**
156:19
**adjust (3)**
59:10;168:21;169:1
**adjusted (4)**
171:4,6,8;236:18
**adjusting (1)**
198:20
**adjustment (1)**
196:2
**adjustments (1)**
168:7
**ADMITTED (2)**
256:16;259:25
**adopted (1)**
161:14
**adversary (1)**
4:6
**advise (1)**
52:6
**advised (1)**
156:11
**advising (2)**
186:4,8

**advisor (1)**
140:4
**affect (1)**
174:21
**afternoon (5)**
158:16,18;187:8,9;
204:5
**afterwards (1)**
55:13
**again (46)**
14:10;16:16;17:16;
23:20;31:3;32:8;34:12;
40:3,20,25;41:15;
42:11;44:12,14;46:5,
11;50:5;51:3,8,19,19;
52:23;55:21;56:1,12;
61:15,20;63:7;66:23,
24;69:12;138:6;
140:24;141:12;142:23;
143:5;150:7;151:11;
156:16;182:15;210:7;
223:23;224:6;225:22,
23;240:10
**against (2)**
208:20,22
**ago (7)**
46:14;48:1;154:3;
162:9;175:9;187:11;
221:3
**agree (42)**
146:3,6;148:13;
189:6;190:15;194:14;
195:8;196:5,16;197:1;
200:21;201:2,4,6;
202:17,20;210:4;
214:8,20;217:4;
220:10;221:16;222:12;
223:12,25;225:8;
226:17;228:7;230:9;
234:2,10;246:9,11,13,
16,20;248:13,20;
253:24;254:1;264:11,
13
**agreed (1)**
264:19
**agreed-upon (1)**
31:25
**agreement (9)**
172:12;216:24;
220:5,12,14;222:1;
255:16,18;264:13
**agrees (1)**
212:23
**ahead (15)**
27:5;28:6;45:20;
59:2;60:18;153:22;
158:11;159:5;182:25;
194:1;195:4;213:22;
219:21;252:8;257:10
**aim (1)**
170:3
**al (1)**
4:7

**Alex (1)**
4:14
**allegedly (1)**
180:23
**allocated (2)**
257:21,22
**allow (4)**
157:10;182:17,23;
247:10
**allowance (4)**
63:19;171:20;
184:12;247:23
**allowances (2)**
247:2,6
**allows (2)**
161:2;182:22
**all-terrain (1)**
184:13
**Almost (6)**
22:15;54:3;55:13;
165:20;166:9;202:9
**alone (1)**
184:14
**along (3)**
50:8;211:8;229:1
**altered (4)**
199:1,4,5,5
**although (1)**
32:25
**always (6)**
140:8;157:15;
160:19;166:15;198:7;
250:14
**amenities (1)**
42:10
**American (2)**
19:22,24
**amount (12)**
40:7;43:4;69:18;
71:10;149:9;151:24,
25;162:14;178:7,7;
179:11;258:25
**amplifying (1)**
6:13
**analyses (1)**
56:9
**analysis (27)**
25:13;28:10;54:8,14;
55:12,15;56:2,5;58:5;
61:10;62:3,4;64:11;
67:8;69:3,17;70:15;
145:24;147:10,25;
221:25;228:9;229:6;
243:18;255:24;257:20,
23
**analyze (1)**
256:2
**analyzing (1)**
165:23
**Andersen (1)**
54:1
**Anderson (5)**
199:14,18,19,25,25

**annotated (1)**
193:15
**annually (1)**
166:20
**answered (1)**
227:11
**anticipate (2)**
156:5,8
**apologies (1)**
225:18
**apparently (2)**
172:19;241:22
**appeared (1)**
139:12
**appears (3)**
32:3;41:21;47:5
**appliance (3)**
248:22;249:2,19
**appliances (5)**
40:5;248:4,18,21,21
**application (1)**
28:15
**applications (2)**
14:11;28:22
**apply (4)**
18:2;185:19;186:1;
200:11
**appointed (1)**
41:20
**appraisal (1)**
230:4
**appraisals (4)**
46:6,7,8;137:9
**appreciable (1)**
60:5
**appreciate (1)**
213:3
**apprentice (3)**
7:25,25;8:1
**apprenticeship (1)**
8:18
**approach (1)**
217:16
**appropriate (6)**
21:12;26:21;27:11;
28:18;163:7;182:6
**appropriateness (1)**
37:12
**approximate (1)**
151:21
**approximately (9)**
11:19;23:18;68:22;
70:24;159:25;160:8,9,
12;187:2
**architect (5)**
7:17;8:18;161:5;
164:16;186:7
**architects (9)**
8:15;17:5;19:23,24,
25;165:18;166:1,1;
186:9
**architectural (12)**
17:14;29:15;30:1,11,

12,13,18,22,23;32:1;
205:8,23
**architecturals (1)**
31:6
**architecture (2)**
7:14,18
**area (12)**
16:5;19:3;60:2;
70:17,22,23;71:9,10,
11;143:14;173:22;
220:15
**areas (5)**
46:22;53:20;70:20;
71:5;201:16
**argue (2)**
182:2;222:4
**argument (1)**
181:17
**arguments (1)**
265:1
**arm's (1)**
261:6
**arm's-length (3)**
173:15;176:5;216:9
**around (8)**
6:2;10:1;41:7;
176:20;177:4,6,16;
196:8
**arrangements (1)**
261:6
**arrive (1)**
176:12
**arrived (2)**
171:17;220:21
**asbestos (1)**
232:16
**as-built (8)**
46:15,16;47:3,12,21;
48:1,2;192:21
**as-builts (3)**
47:14;48:20;244:18
**ascertain (7)**
35:5;44:3,23;45:6,
25;66:13;256:19
**ascribe (1)**
57:17
**ASLA (1)**
19:22
**aspects (1)**
38:12
**asphalt (1)**
234:18
**assemble (1)**
49:6
**assemblies (1)**
200:13
**assembly (3)**
167:3,10;200:14
**assign (1)**
185:20
**assigned (3)**
49:14;163:7;165:9
**assistant (1)**

17:13
**Associate (1)**
56:18
**Associates (8)**
7:6,8;8:14;18:5,17;
56:24;57:3;58:6
**Association (7)**
20:1,3,6,7,7,10,11
**assume (3)**
146:12,17;172:15;
175:25;265:13
**assumed (3)**
24:12;62:5;244:2
**assumes (3)**
173:10;176:5;230:23
**assuming (7)**
62:22;63:15;65:16;
188:9;201:21;233:22;
261:5
**assumption (6)**
65:8;173:15;188:2;
247:22;248:1;249:6
**assumption/allowance (1)**
247:17
**assumptions (7)**
44:15;55:19;173:7;
207:9;247:11,12,13
**astronomically (3)**
178:19,21,25
**attached (1)**
21:4
**attempt (1)**
146:9
**attending (1)**
7:20
**attention (2)**
194:7;208:10
**attorney (1)**
190:3
**attributable (1)**
71:10
**attributed (3)**
64:1;65:5;69:18
**August (1)**
262:9
**authors (1)**
161:13
**available (5)**
185:21;204:2;208:3;
217:24;263:19
**average (29)**
15:10;29:4,6,9;
140:24,25;168:19,20;
175:11;195:22,25;
196:1,7,8,9,11,16,17;
197:16,17;198:17;
199:7,12;200:23;
201:4;222:14;229:22;
248:21;253:25
**averages (1)**
69:14
**aware (2)**
174:11;177:7

Case 16-01120    Doc 382    Filed 08/22/19    Entered 08/22/19 10:11:12    Desc Main
LYMAN-CUTLER, LLC v.                    Document      Page 269 of 292
KAGAN, et al.                                                                    July 29, 2019

**away (5)**
  10:19;21:20;147:20;
  232:13;235:2
**awful (1)**
  155:12
**awhile (1)**
  231:21

# B

**bachelor's (1)**
  7:14
**back (24)**
  4:23;6:10,11;13:1;
  44:17;53:4;54:11,25;
  59:19;60:9;62:20;65:2;
  67:13;155:21;167:21;
  176:8;186:18;187:25;
  188:17;207:18;218:12;
  249:13;264:2;265:21
**back- (1)**
  239:4
**backed (1)**
  141:19
**background (2)**
  7:12;18:3
**backsplash (1)**
  41:3
**backup (14)**
  65:11;189:2;209:19,
  20;211:2,18,24;222:21,
  24;223:16,21;224:3;
  226:9,10
**back-up (1)**
  256:23
**backups (1)**
  224:20
**backwards (1)**
  154:23
**Bacon (1)**
  7:2
**Bad (1)**
  263:16
**baked (2)**
  173:7,8
**balances (1)**
  44:14
**ballgame (1)**
  202:7
**bank (1)**
  230:4
**bare (1)**
  184:14
**Barnstable (1)**
  8:15
**baseboards (2)**
  38:23,24
**based (61)**
  28:23;43:14,14;
  49:25;50:3;51:25;53:9;
  54:4;55:2;56:4;58:18;
  64:11;66:1,4;133:7;
  137:25;142:2;143:18;

  145:20;147:7,10;
  152:8;155:19;156:21;
  165:9,21;166:4;
  167:19;168:11,17;
  170:7,7;171:5;177:16;
  183:5;186:3,21;
  198:16,20;202:18;
  203:12,21;205:3,6,7;
  206:7;208:16;210:22;
  215:17;216:8;220:18;
  222:7;241:25;244:6;
  245:17;247:9;256:19,
  23;259:13,19;260:18
**baseline (1)**
  168:18;185:23;186:1
**basement (9)**
  170:21;178:6;
  235:14;236:6;239:1,3,
  16;240:1,2
**basic (1)**
  141:10
**basically (14)**
  25:17;30:23;31:15;
  58:9;162:13;164:14,
  18,21;165:13;166:2;
  173:15,20;175:24;
  178:14
**basing (1)**
  222:9
**basins (2)**
  244:21,23
**basis (4)**
  68:9;172:10,11;
  188:13
**bat (1)**
  197:25
**bath (2)**
  41:19,20
**bathroom (1)**
  42:3
**bathrooms (1)**
  31:4
**beat (1)**
  146:6
**became (1)**
  13:2
**become (4)**
  8:11;18:23;256:11,
  12
**becomes (2)**
  204:2;208:3
**bedroom (1)**
  41:16
**began (1)**
  49:6
**begin (1)**
  265:1
**beginning (5)**
  164:9;169:12;185:9,
  12,15
**begins (1)**
  169:14
**behalf (1)**

  150:17
**behind (1)**
  218:23
**belong (4)**
  19:22,24,25;264:2
**below (1)**
  174:7
**benchmark (12)**
  56:21,21;58:6;59:5;
  60:7;61:4,9,24;62:4,9,
  18;142:11
**Bennett (1)**
  152:12
**Bennett's (1)**
  151:12
**besides (2)**
  37:17;191:1
**best (3)**
  158:1;247:20;265:15
**bet (1)**
  182:13
**better (9)**
  52:1,3;55:6;139:18;
  143:18,25;195:1,2;
  264:20
**beveled (2)**
  145:12;183:15
**beyond (1)**
  220:15
**bid (50)**
  15:3;25:22;28:9,10;
  29:12;34:19;45:7;
  48:22;50:8,11,18;
  51:10,12;52:12,24;
  53:4,11,14,20,23,25;
  54:4;57:15;58:18;
  70:16;133:1,10;134:3;
  135:1,4;136:5,18,19,
  19,22,23;140:8,14;
  142:9,20,23;143:17,25;
  150:18;151:12,18,19;
  153:6;178:17,24
**bidders (5)**
  25:19,20;28:19;
  50:22;139:10
**bidding (5)**
  17:11,11;52:12;
  135:20;139:6
**bid-levelling (1)**
  178:17
**bids (31)**
  25:20,21;29:12;
  50:13,21,24;52:5;53:3,
  6,15,17;54:6,11,18;
  56:25;59:12;133:6,6;
  136:9;140:3,6;141:15,
  16;142:6;143:23;
  146:15;147:11;178:18;
  195:8,9,14
**big (5)**
  168:1;181:3;209:13,
  14,15
**bigger (1)**

  230:19
**Bill (1)**
  169:11
**billed (1)**
  215:6
**binder (4)**
  60:9;13;218:17,18
**binders (5)**
  36:20;37:1;54:24;
  67:10;189:1
**biology (1)**
  7:19
**bit (9)**
  39:22;69:5;164:12;
  165:11;194:22;195:7;
  240:6;241:2;255:9
**blacked (1)**
  37:15
**blind (1)**
  164:6
**blue (2)**
  43:1,2
**Bluebeam (11)**
  162:25;163:4;
  164:12,13,14,20,23;
  165:2,4,7;171:2
**board (5)**
  10:10;20:2,4;149:18;
  232:18
**bolts (1)**
  187:11
**book (32)**
  166:17,18;167:2,7;
  168:6,6,14,23;171:4,6;
  173:10;195:16,18;
  198:2,3;200:6,7,7,12,
  13,14;211:1;228:22,
  25;234:3;235:20;
  249:7,8;251:2;254:16;
  265:21,23
**books (2)**
  165:24,25
**Boston (17)**
  19:23,23;20:1;29:3,
  4,5;60:2;143:14;
  168:24;169:1;175:11;
  201:12,22;202:1,2,4,7
**botany (1)**
  7:19
**both (13)**
  5:7;35:12;46:11;
  65:9,11,17,18;70:1;
  180:23;218:22;226:19;
  246:8;261:14
**bottom (5)**
  71:8;219:15;220:4;
  244:17;252:20
**bottom-line (1)**
  174:14
**bouncing (1)**
  218:12
**bound (1)**
  133:15

**box (2)**
  32:25;232:18
**boxes (2)**
  264:1,6
**Boy (1)**
  264:20
**brand (3)**
  199:12;200:3;201:3
**brands (1)**
  199:8
**break (9)**
  135:24;155:19,20;
  169:24;170:2;185:19;
  238:3,7,14
**breakdown (6)**
  135:2;136:1,3;
  197:22,22;223:13
**breaks (1)**
  49:8
**brick (6)**
  42:23,24,24,25;43:2;
  234:18
**brief (3)**
  7:11;265:6,9
**briefly (5)**
  159:16,17;175:6;
  185:7;259:9
**bring (3)**
  182:21;193:9;218:25
**brings (3)**
  12:22;261:24,25
**brisk (3)**
  155:24;156:4,4
**briskness (1)**
  156:23
**broke (3)**
  49:11;184:19;186:6
**broken-down (1)**
  186:14
**Brookline (11)**
  19:3;29:6;175:17;
  178:8;201:18,22;
  202:6,9,13;206:2;
  231:2
**brother's (1)**
  237:3
**brought (5)**
  52:20;210:24;211:1;
  217:11;218:24
**Buckeye (3)**
  9:14,15,25
**bucks (4)**
  69:10;142:14;
  237:17;242:23
**budget (1)**
  46:4
**build (26)**
  9:2;12:9;48:23;
  54:15;56:2,22,23,24;
  59:7;61:1,10;64:9,14;
  65:4;136:25;148:1;
  154:11;159:22;161:2;
  190:24;195:13;198:11;

Case 16-01120    Doc 382    Filed 08/22/19    Entered 08/22/19 10:11:12    Desc Main
LYMAN-CUTLER, LLC v.
KAGAN, et al.
Document    Page 270 of 292

July 29, 2019

202:10,13,14;227:3,12
**builder (6)**
14:20;17:5;185:8,10;
186:11,24
**builders (6)**
10:6;11:15;17:6;
19:25;20:8;141:8
**building (45)**
12:11,12,17;14:9;
16:4,10;17:21;18:11,
20;22:8,12,14;23:14;
30:4,7;31:8;34:22;
35:2,15;44:4;45:6;
46:1;60:4;64:23;65:15;
66:2;138:18,20;
145:21;154:18,22;
160:3,13;161:22,23;
162:1,2;166:10,13;
167:22;202:6,7;
205:23;233:3;235:10
**buildings (2)**
31:1;35:15
**built (23)**
19:5;23:20;24:12;
36:17;39:2;41:17;
44:24;50:11;61:12;
154:14;162:9,12;
166:24;179:12,19,20,
21;192:23;198:12;
202:1,3,23;226:22
**built-in (1)**
41:22
**bulk (1)**
147:9
**bunch (2)**
247:2;260:14
**burden (1)**
263:13
**business (15)**
7:3,5,7;12:2;14:6;
16:3;17:4;148:24;
151:23;165:20;233:3;
234:21;235:6,8,12
**buttons (1)**
138:21
**buy (3)**
63:21;145:8;179:17

**C**

**cabinetry (6)**
39:7,14,16;40:25;
41:18;163:3
**cabinets (6)**
162:13;174:6,7;
179:2;180:9,24
**calculate (3)**
70:17;178:1;247:24
**calculated (3)**
43:17;177:16;259:22
**calculates (1)**
178:2
**calculation (1)**

70:25
**calculations (6)**
53:15;164:20;
181:19;214:3,7;241:22
**calculator (3)**
164:17;174:12;246:1
**California (1)**
183:17
**call (13)**
5:13;20:5;24:7;
27:18;156:13;157:1,8,
13,15;165:21;182:15;
213:16;235:1
**called (6)**
14:16;54:3;56:18;
162:25;165:16;172:7
**calling (2)**
260:1,7
**calls (2)**
158:13;168:6
**came (14)**
53:11;56:14,18;60:8;
68:9;145:25;146:3;
147:13;177:7;184:20;
198:1;201:1;246:21;
253:12
**can (54)**
6:10;7:11,13;21:13,
19;26:5;30:10;31:22;
36:24;42:25;43:1;47:4;
53:10;58:22,22;63:6;
141:8;145:7;148:2;
156:19;157:1;164:20;
166:25;167:8,25;
169:15;175:6;176:8;
179:16;181:24;182:7,
15;183:10;184:5;
186:1,1;193:4;208:10,
21;211:8,12;218:19;
224:19;226:20;228:12;
229:1;232:22;235:13;
238:3;240:10;246:2;
248:17;264:5;265:15
**cans (2)**
40:8,9
**cap (1)**
166:25
**capability (1)**
31:15
**capable (1)**
198:19
**capacities (1)**
7:24
**capacity (5)**
8:17;10:8,22;12:9;
23:6
**capped (3)**
156:18,22;191:8
**capturing (1)**
46:22
**career (2)**
17:20;166:9
**cares (1)**

209:15
**CARNATHAN (76)**
4:13,14;20:13,18,22,
25;21:2,4,7;26:6,12,14,
20;27:19;45:19;58:9,
13,15;60:17;71:16,19,
21;134:5;137:2;
138:11;139:12;142:8;
144:8;150:9;152:20;
153:20,24;155:15,23;
156:3;157:12,14;
158:12;159:6,8;
169:11,13;180:18;
181:2;183:1,3,9,12,19;
184:5;187:3;193:11;
212:21;218:15,18,24;
219:3;224:19;225:18;
238:3,6;256:7;259:8,9,
11;260:3;261:8,17,21,
22;262:5,9,20;263:1,9;
265:20
**Carnathan's (2)**
21:16;146:17
**carpenter (2)**
8:1;179:12
**carpenters (3)**
59:21,22;179:8
**carpentry (2)**
8:1;162:12
**carried (14)**
57:14;65:18;142:10;
144:8,12;240:15;
241:2;242:12;243:12,
25;245:21;250:10;
251:20;252:19
**carries (1)**
244:14
**carry (7)**
62:8;65:6;142:20;
144:12;247:8,8,20
**carrying (4)**
144:3;236:15;
249:25;251:7
**case (14)**
4:8;24:21,24;69:25;
155:3;162:23;163:22;
185:4;189:7;199:22;
208:4;214:18;253:4;
261:13
**casework (2)**
174:6,8
**casing (4)**
71:6,7,7,8
**casings (1)**
38:24
**catalog (2)**
179:18,18
**cataloged (1)**
179:23
**catch (2)**
244:21,23
**catch-all (1)**
208:9

**categories (8)**
49:12;50:14;57:14;
61:17;67:13,15;135:9;
149:10
**category (3)**
49:8;63:17;68:2
**caution (8)**
198:4,7,8,9;250:11;
252:19,25;254:10
**cautiously (2)**
5:7;155:25
**cedar (4)**
70:23;250:25;251:4;
252:11
**ceiling (2)**
40:5,9
**ceilings (5)**
38:25;39:3,4;40:6;
41:7
**center (1)**
165:21
**central (2)**
11:21,23
**cents (1)**
53:12
**certain (9)**
34:9;38:12;61:17;
71:10;163:6;164:19;
167:6;172:8;181:19
**certainly (31)**
26:23;58:22,22;64:2;
146:9;151:16;160:19;
179:10,20;182:5;
186:15;192:18;195:12;
197:20;203:15,19;
205:11,13;208:12;
215:5;218:13;220:17;
230:7;236:11;246:2,3;
248:20;249:13;253:24;
254:1;255:20
**certainty (1)**
68:5
**certificate (1)**
46:5
**certification (8)**
161:8,9,10,16,18,19,
22,24
**certifications (1)**
161:6
**certified (1)**
22:22
**cetera (1)**
159:2
**change (9)**
56:5;64:3;143:3;
180:8;208:4;210:2;
236:9,12;255:7
**changed (8)**
13:2;209:4;210:11,
12;213:7,9;241:8;
260:21
**changes (1)**
146:14

**Chanhassen (1)**
10:3
**chapter (1)**
19:23
**charge (8)**
57:8;62:11;148:19,
22;215:12;216:15,17;
237:1
**charged (4)**
68:25;253:3;255:5,5
**charges (1)**
179:1
**charging (4)**
59:21,22;151:23;
215:24
**chart (10)**
169:5,8,12,14,16;
170:11;173:17;174:5,
20;176:8
**cheapest (1)**
140:3
**check (3)**
55:2;208:20;249:17
**checked (6)**
173:23,24;174:13,
14,17;240:12
**checkmark (1)**
232:18
**checks (1)**
44:14
**Cherry (6)**
13:2,4,19,21;145:1;
183:14
**chief (2)**
9:16,18
**chimneys (1)**
42:24
**choose (1)**
140:8
**choosing (1)**
50:22
**chose (1)**
27:9
**cities (1)**
29:5
**civil (2)**
7:18,19
**cladding (1)**
162:2
**claim (4)**
4:10;37:6;54:23;
253:13
**claimed (1)**
179:5
**clapboard (1)**
250:25
**clarify (1)**
28:25
**clarity (1)**
193:11
**Classic (6)**
17:2,4,8,23,25;48:24
**classroom (1)**

Case 16-01120    Doc 382    Filed 08/22/19    Entered 08/22/19 10:11:12    Desc Main
LYMAN-CUTLER, LLC v.                                Document    Page 271 of 292
KAGAN, et al.                                                                          July 29, 2019

161:20
**clean (3)**
232:13,21,22
**cleaning (5)**
57:13;63:12,13,16;
254:12
**clear (5)**
142:17;167:21;
182:23;203:23;221:7
**clear-finished (1)**
38:22
**CLERK (12)**
4:2,6;158:2,5;190:1,
3;212:14,20;213:6,15;
238:18;256:10
**client (2)**
185:25;186:4,8
**clients (1)**
143:3
**close (2)**
69:5;186:17
**closed (1)**
21:24
**closer (1)**
134:23
**closet (5)**
41:17;144:16,19;
179:2;187:16
**closets (16)**
144:20;180:4,9,12,
13,19,22,24;181:3,4;
183:6,10,17,20;188:8,
11
**closing (1)**
264:25
**closings (2)**
261:18;265:3
**CMR (2)**
231:14,16
**coast (2)**
161:14,14
**cocktail (1)**
186:19
**Code (6)**
20:8;22:5,12,14;
23:8;161:11
**codes (3)**
22:8;23:8;161:13
**coding (1)**
149:14
**coffered (2)**
39:3;41:7
**coincidence (1)**
209:8
**cold (1)**
51:10
**collate (1)**
138:3
**collated (1)**
138:4
**college (2)**
7:12;8:13
**colors (1)**

138:21
**column (20)**
60:23;61:18;67:24,
25;68:14,14,15,15;
69:20,23;142:10,11;
170:12,20;171:11;
176:16;240:6;241:20;
257:3;258:4
**columns (9)**
30:16;33:17;65:11;
209:13;241:15,18,23;
243:9,11
**combine (2)**
65:21;68:16
**combined (6)**
70:1,5;177:8;246:8,
17;254:15
**comfortable (3)**
6:12;53:18;264:24
**coming (2)**
43:2;51:17
**comment (1)**
182:19
**comments (1)**
184:10
**commercial (8)**
8:25;9:21;12:16;
17:17;22:21;160:7,23;
161:3
**commercials (1)**
183:18
**commit (1)**
156:24
**community (1)**
12:3
**companies (3)**
58:1,1;149:7
**company (18)**
11:2,5;12:3,13:5;
14:16;152:10;154:1;
159:20,21,25;160:9;
162:4;165:15,16;
166:5;172:7;198:13,24
**comparable (2)**
53:25;54:1
**compare (1)**
249:14
**compared (2)**
54:25;255:25
**comparison (1)**
257:18
**complaining (1)**
142:17
**complete (3)**
139:23;183:4;208:16
**completed (2)**
226:13;227:4
**completely (2)**
151:2;202:7
**compliance (2)**
46:21,23
**complied (1)**
233:5

**comply (1)**
232:12
**components (4)**
169:23;170:1,5;
171:17
**comports (1)**
175:19
**composite (1)**
188:15
**composition (2)**
30:14;39:6
**compromise (1)**
263:8
**concepts (2)**
150:2,5
**concern (1)**
35:3
**concerned (2)**
52:19;219:2
**concerns (3)**
51:11,14;53:24
**conclusions (1)**
148:3
**concrete (4)**
14:13,14;135:8;
204:20
**conditions (4)**
40:5;63:8;202:25;
203:2
**conducted (2)**
29:11;45:1
**confident (1)**
260:25
**confirm (8)**
21:19;35:15;41:5;
44:15,17;188:1;249:5;
264:17
**confirmed (3)**
44:12,13;191:18
**confused (1)**
218:20
**connection (5)**
22:10,11;163:9;
167:22;168:4
**consented (1)**
52:15
**consider (2)**
141:12;257:24
**consideration (1)**
27:20
**considered (3)**
27:10;194:8,15
**consistent (4)**
70:2;133:10;142:21;
145:22
**constant (3)**
64:3;153:7;210:5
**constantly (2)**
165:22,22
**construct (4)**
66:7;201:21,22;
202:17
**constructed (3)**

31:12;35:16;179:13
**constructing (1)**
146:1
**construction (94)**
7:9,22;8:4;12:10;
13:22;14:25;15:1,23;
18:6,7;22:11,20,24;
23:6;24:16;25:4,11,18;
31:11;37:18;44:4;46:4;
49:7,9;57:17,22;59:11;
148:4;149:2;152:9;
154:25;155:5;159:18,
20,25;160:9,16,22,24;
161:1,7,21;162:4,5,8,
23;163:5,6,22;164:4,
17;165:3,10,12,13,14,
17,23;166:2,3,8;
167:23;168:1;172:19;
173:2;174:17,24;
176:3,13;177:2;178:8;
185:4,9,11,21;186:25;
189:2;195:9;197:2,25;
198:24;216:3,4,7;
217:1;220:7;231:1,15;
232:3,8;253:4,6;255:5,
6
**consult (1)**
11:15
**consulting (2)**
18:5,14
**contained (11)**
29:20;30:11;31:6;
133:9;134:1,2;138:7,8;
142:5;143:8;164:10
**containers (1)**
12:7
**contaminated (1)**
24:11
**content (1)**
181:18
**continue (7)**
15:22;40:16;41:10;
227:12;238:1;240:4,5
**continued (1)**
159:22
**contract (7)**
48:23;49:3;133:21;
136:23;152:17;186:3;
220:14
**contractor (20)**
10:25;13:7;56:22;
57:2,12;63:10;64:7;
142:23;148:14;168:12;
171:9;172:21,22;
196:20;197:4;214:12;
215:4;216:8;221:4;
233:22
**contractors (27)**
11:7,11;12:6;13:17;
51:4,22;52:6,22;136:8;
139:13,16,17,20;
140:25;141:13;148:22;
149:13;152:21;153:4;

165:18,22;171:23;
173:11;196:14;197:3;
214:22,25
**contractor's (2)**
22:21;23:24
**contracts (3)**
54:23;133:21,21
**control (2)**
142:1,1
**coordinate (4)**
264:4,11,12,22
**copies (1)**
54:22
**copy (11)**
21:1;55:15;173:22;
174:1;193:14,15,25;
206:2;217:23;218:12,
24
**copying (1)**
174:20
**corner (4)**
212:9;213:17;223:5,
10
**Corp (4)**
4:18,19;67:6,19
**Corporation (3)**
14:2;16:1,3
**corrected (1)**
256:24
**correctly (2)**
186:12;232:18
**correlate (1)**
42:16
**correlated (1)**
44:18
**cost (130)**
11:10;25:4,6,21;
28:14;53:21;54:14;
56:19,20,23;57:22;
58:6;59:6,15,25;60:4;
61:1,7,10,18;63:16;
64:1,9,14;65:5,6,12,17,
21;66:6,9,13,17,20,24;
68:12,13,14;70:16;
144:9,10,16;146:3,10;
147:22,22;148:14,24;
149:2;150:7,17,24;
151:1,9;155:4;162:23;
163:5,7;165:9,10,12,
13,14,17;167:4;168:16,
18;169:3;171:21;
172:17,18,19;173:2;
176:3,12,21;177:2;
178:8;179:5;183:6;
184:20;185:9,20,23;
186:2,5,8,21,25;
190:11,14;197:17,25;
198:17;199:12;200:16,
22,23;201:21,22;
213:18;214:11;215:15,
21,25;216:3,4,6;217:1,
5;220:6,11,20,23,25;
221:4,13,19,20;222:13;

Case 16-01120    Doc 382    Filed 08/22/19    Entered 08/22/19 10:11:12    Desc Main
Document    Page 272 of 292
LYMAN-CUTLER, LLC v.
KAGAN, et al.

July 29, 2019

230:8;234:3,13,13;
244:9;254:7,8;255:21;
256:1;258:19
**costing (2)**
44:16;149:14
**cost-plus (1)**
172:18
**costs (60)**
28:16,23;36:21;
54:24,24;55:1;57:12,
18;58:19;60:3;61:16,
19;63:7,13;67:24;69:8,
17;136:9;141:6;142:3;
147:2;151:3,4,5,7;
160:16;163:6,21;
164:6;166:3,8;167:1;
168:1,3,22;174:17,24;
175:7,10;178:1,4;
185:3,10,19,22;195:22;
196:3,10;198:14;
200:23;201:4;202:17;
210:10;214:22;216:15;
221:8;234:23;253:7,
14;255:25
**cost-tracking (1)**
17:10
**Council (3)**
20:8;22:5;161:11
**counsel (8)**
21:11;191:17;
207:12;214:14;216:19;
220:19;222:9;238:2
**counted (1)**
242:8
**Countertops (3)**
40:5,11,14
**counting (2)**
200:20,20
**countries (1)**
22:9
**country (1)**
165:23
**Countryside (4)**
19:7,8;147:18,22
**couple (5)**
69:10;153:20;
167:24;169:25;240:6
**course (7)**
8:5;17:19;187:24;
193:22;205:25;226:22;
265:2
**Court (197)**
4:2,3,5,22;5:4,6,9,11,
14,16,18,20,22,24;6:2,
5,10,15,18;20:19,24;
21:1,3,6,8,11,19,22;
26:10,13,19,24;27:1,4,
12,15,24;28:6;30:11;
37:3;45:18,20;52:20;
58:12,14,23,25;59:2;
60:18,22;69:25;70:10,
13;71:15,17;134:13,15,
17,24;153:9,19,22;

155:17;156:15,24;
157:3,5,8,10,17,20,23,
25;158:5,6,7,10,16,19,
21,23;159:1,4;162:16,
19;167:19;169:9,16;
174:3;180:25;181:11,
15,21,23,25;182:2,10,
12,17,22;187:4;
191:11;193:13,17,20,
22,24;194:3,22,25;
195:2,4;211:6,7,9,13;
212:5,10,15,17,23;
213:1,3,7,11,16,20,22;
217:17,21,23;218:4,8,
11,20;219:1,6,8,16,19,
21,25;222:20,22;225:2,
5,21;228:15,17;229:2;
231:19;238:2,5,7,10,
13,18,20;252:7;
254:21;256:6,8,13,15,
21;257:10;259:7;
260:2;261:10,13,16,18;
262:2,10,14,17,21,24;
263:2,4,6,11,16,18,21;
264:10,16,17,20,24;
265:3,7,9,14,19,23,25
**courtroom (7)**
5:25;6:5;156:25;
157:6;158:24;263:25;
264:3
**courtrooms (1)**
213:7
**cover (6)**
58:4;149:9;165:25;
251:20;263:10,12
**covered (3)**
70:23;71:9,12
**create (1)**
137:22
**created (1)**
137:25
**creating (1)**
137:6
**creation (1)**
137:3
**credentials (1)**
159:16
**credit (4)**
258:17,20,21,21
**crew (5)**
184:14,21;197:13,
15;198:12
**crews (2)**
10:11;51:18
**Crimson (5)**
183:23,24;184:3,9,
10
**criteria (1)**
142:5
**cross (7)**
156:9,19;157:16;
181:8;182:4,21;238:23
**cross- (2)**

156:5;260:22
**cross-exam (1)**
58:22
**CROSS-EXAMINATION (2)**
71:18;187:6
**crown (2)**
39:1,2
**CSI (3)**
49:7,10;67:17
**CSL (4)**
22:25;23:3,10,14
**cubic (9)**
23:15;161:3;165:1;
170:15;234:14;244:11,
12,13,14
**current (2)**
22:8;23:8
**currently (5)**
20:1,4;59:22;149:13,
14
**curved (1)**
179:17
**Custom (23)**
16:14;28:13,14,15;
41:17,21,22;144:22;
145:10,12,14,14,16,18;
180:1,2,12,19;183:6,
14,14,15;197:10
**customarily (1)**
57:25
**customary (1)**
57:9
**customer (1)**
52:13
**customers (1)**
138:22
**custom-home (1)**
14:20
**customized (1)**
41:2
**customs (1)**
16:13
**cut (4)**
155:21;156:12,22;
191:8
**Cutler (5)**
19:9;25:5,11;147:23;
216:25
**CV (4)**
20:15,18;21:24;22:2
**CY (1)**
170:14

---

**D**

**dad (2)**
159:19;160:18
**daily (1)**
22:15
**darn (2)**
180:21;186:17
**data (12)**
59:15;137:7;165:22,

24;166:14;167:19;
168:18;185:18;194:8,
15;198:20;213:18
**date (3)**
206:11;212:9;262:6
**dated (1)**
193:6
**dates (1)**
261:19
**dating (1)**
51:19
**David (3)**
158:13,15;159:10
**day (15)**
4:7,9;59:22;196:21;
237:6,17,19,23,24;
254:19;261:24;262:7,
16;263:14;265:12
**day-labor (1)**
237:5
**days (3)**
184:16;261:23;262:1
**day-to-day (1)**
9:20
**deal (8)**
24:10;50:5;52:22;
209:14,14,15;216:15;
221:8
**dealing (2)**
28:11,12
**deals (1)**
216:9
**dealt (1)**
204:19
**Dean (4)**
8:14,16;9:9,12
**debris (3)**
231:2,15;234:8
**debtor (1)**
4:16
**decide (4)**
25:14;28:9;52:16;
215:11
**decided (2)**
18:4;228:8
**deciding (1)**
27:10
**decision (4)**
140:22;215:14,15;
220:17
**decrease (1)**
59:24
**dedicated (2)**
57:7,8
**deducted (2)**
64:6;71:5
**deduction (1)**
66:1
**deducts (1)**
62:17
**defendant (1)**
262:19
**defendants (2)**

24:24;158:8
**DEFENDANTS' (4)**
37:2;212:12;213:21;
256:16
**Defendant's (3)**
256:11,11,12
**Define (3)**
220:25;221:2,2
**definitely (1)**
246:4,6
**definition (1)**
255:23
**degree (3)**
7:13;8:11;68:5
**deleted (1)**
216:4
**delineation (1)**
214:21
**delta (2)**
255:4,21
**demo'd (3)**
191:8,9;233:4
**demolish (1)**
229:20;232:11,23,
25;233:16
**demolished (7)**
229:16,25;233:12,
15,20;234:14,25
**demolishing (1)**
65:4;230:7,8,17
**demolition (14)**
25:10;65:3;226:21;
227:14,18;228:8,19;
229:13,20;230:24;
232:10,21;234:13,23
**demonstrate (1)**
23:7
**demotion (1)**
228:10
**denied (1)**
21:16
**DEP (1)**
233:2
**departments (1)**
46:17
**depending (1)**
234:7
**depends (2)**
27:16;255:23
**depict (1)**
48:1
**depo (1)**
265:25
**deposition (3)**
24:20;237:3,15
**depositions (2)**
44:25;237:11
**Depot (3)**
25:8;145:7;179:17
**DEP-regulated (1)**
233:8
**describe (1)**
159:17

Case 16-01120   Doc 382   Filed 08/22/19   Entered 08/22/19 10:11:12   Desc Main
Document   Page 273 of 292
LYMAN-CUTLER, LLC v.
KAGAN, et al.

July 29, 2019

**described (1)**
139:9
**describing (1)**
259:13
**description (5)**
67:12;134:2;169:17,
18;228:2
**Descriptions (1)**
46:9
**design (8)**
10:10,13;12:9;15:1;
17:5;20:9;59:15;186:2
**design-build (2)**
17:15,16
**designed (1)**
12:7
**designer (4)**
8:17,20;9:16,18
**designs (1)**
9:23
**desires (1)**
138:17
**detail (7)**
34:3,7,9,19;133:9;
135:17,20
**details (7)**
33:24;34:1,9,12;
206:15,20,20
**determination (9)**
67:21;151:8;188:14;
191:16;229:19;233:11,
13,19,25
**determine (14)**
48:9;59:14;61:10;
67:4;140:6;170:5;
188:22;189:13,16;
204:6;234:12;244:18;
245:10;257:1
**determined (4)**
58:18;67:18;197:24;
257:2
**determining (2)**
25:10;233:9
**develop (2)**
28:18;62:18
**developed (5)**
50:10;54:17;55:3;
138:1;141:20
**developer (7)**
61:19;63:7,15,20;
67:24;69:23;147:2
**developing (1)**
139:9
**Development (8)**
4:19;8:6,23,24;
14:21;17:10,14;45:1
**deviate (1)**
197:17
**devil (2)**
139:19,19
**didn't (1)**
200:7
**difference (9)**

48:10,12;69:4;
149:22;169:3;231:10;
243:20,21;253:18
**different (22)**
11:16;49:21;56:9,14;
141:21,24,25;150:2,5;
169:23;170:1;171:17;
202:7,20,21;214:8;
226:22,23;227:3;
234:24;248:18;260:4
**differential (1)**
43:18
**differently (1)**
68:1
**dimension (3)**
71:3,4;186:19
**dimensions (7)**
30:15,24;31:1;38:21;
71:5;244:10,19
**DIRECT (33)**
6:20;148:14;156:8,
10,13;157:4,13;159:7;
176:3;181:7;214:11,
21;215:15,20;216:15,
25;217:5;220:6,11,20,
23,25;221:2,4,7,13,19,
19;224:22;257:18;
259:12,18,21
**direction (1)**
49:1
**directly (6)**
15:18;18:14;29:10;
56:5;65:6;171:6
**directors (2)**
20:2,4
**disclosed (5)**
26:11,12,22;28:2;
180:15
**disclosure (2)**
28:1;182:20
**discount (1)**
143:19
**discovered (2)**
67:10;173:17
**discretion (1)**
182:23
**discuss (1)**
26:7
**discussed (4)**
28:1,3;157:11;
261:23
**discussing (1)**
137:2
**discussion (3)**
27:19;180:15;181:9
**disingenuous (1)**
146:10
**dispensation (1)**
46:19
**disposal (3)**
65:3;136:4;227:19
**disposal's (1)**
231:7

**dispose (4)**
231:1,12,15;232:17
**distance (1)**
231:4
**distances (1)**
234:3
**distinguish (1)**
30:17
**divide (2)**
177:22;253:16
**divided (2)**
41:1;167:2
**dividing (1)**
65:18
**division (29)**
12:10,13;49:17,18;
185:19,20;224:12;
225:8,12;226:11;
235:14;238:25;241:16;
243:9,22;244:22;
245:7,12,22;247:13,15;
248:3;249:24;257:5,
14,21,21,22;258:24
**divisions (6)**
67:16,17;185:21;
257:2,14,14
**divulge (1)**
153:13
**divulged (1)**
41:8
**document (11)**
4:9;21:13,20;47:23;
173:22;211:18,24;
223:1,3,20;231:17
**documentation (2)**
164:1;216:20
**documents (11)**
25:18;45:5,8,10,24;
48:21;194:8;205:4;
207:24;210:22;211:15
**Dodderidge (1)**
158:16
**Doddridge (30)**
26:18;27:15,17;
155:24;156:6,13;
157:15;158:13,15;
159:10;180:22;181:5;
183:4;184:11;187:3,8,
10;194:5,24;195:1,3;
210:24;211:15;219:3;
225:23;237:10;241:1;
259:12;261:9,11
**Doddridge's (2)**
26:16;27:23
**dollars (3)**
53:11,12;59:21
**done (28)**
19:2;50:19;52:18;
55:12;56:1;70:4,9;
151:16;155:17;156:1;
162:7,14;172:17;
189:13;190:16,22;
191:11;192:10;195:9;

198:23,24;206:4;
215:6;233:4;238:13;
243:5;245:14,16
**Donuts (3)**
196:21;237:5,17
**door (2)**
31:2;33:1
**doors (8)**
29:18;35:25;36:2;
39:7;41:1,6;71:11;
200:16
**double (3)**
64:24;65:22;69:15
**doubled (2)**
68:12;168:16
**doubling (1)**
69:14
**doubt (2)**
237:6,7
**down (34)**
32:5,12,17;33:4,22;
38:7;39:11,22;49:8,11;
63:17;71:8;135:24;
136:4;142:14;169:24;
170:2,24;174:6;
179:16;182:18;185:19;
190:23;194:22;206:1;
219:15;228:10;230:11;
232:13;236:8;241:14;
242:9;243:22;265:10
**downward (1)**
236:18
**drafted (1)**
170:8
**drainage (1)**
9:7
**draw (2)**
148:2;194:7
**drawing (1)**
34:12
**drawings (2)**
31:7,10
**drawn (1)**
247:7
**drive (2)**
163:19;170:10
**drive-by (8)**
35:9,12;192:9,13,17,
17;194:18;250:6
**driver's (1)**
22:22
**driveway (3)**
191:11;243:23;
244:19
**driveways (3)**
48:2,5;244:4
**drop (1)**
241:14
**dropped (2)**
239:16;241:5
**drove (1)**
250:6
**drug (1)**

153:8
**duck (4)**
142:7,7,7,7
**due (2)**
265:2,12
**dug (1)**
191:12
**dump (1)**
233:8
**Dunkin' (3)**
196:21;237:5,17
**during (7)**
20:23;35:18;154:5;
160:3;162:3;259:12,21
**duties (6)**
9:19;12:13;13:5;
15:2;16:6;17:9

## E

**EA (1)**
170:12
**earlier (2)**
143:22;164:13;
203:16;261:23
**earn (2)**
154:12;161:15
**earners (2)**
16:19,22
**earning (1)**
10:22
**earth (1)**
177:6
**Earthwork (5)**
65:8;134:11;135:2;
177:5,6
**eastern (2)**
16:4;20:3
**economies (3)**
65:23;69:24;150:21
**economy (2)**
66:1;67:25
**edges (1)**
40:14
**edit (1)**
165:24
**education (1)**
64:12
**educational (1)**
7:12
**effect (1)**
180:11
**Effectively (1)**
58:15
**eight (2)**
10:10;33:21
**eighty (1)**
165:20
**either (6)**
65:22;192:13;
206:24;221:19;225:14;
226:17
**elect (1)**

Case 16-01120    Doc 382    Filed 08/22/19    Entered 08/22/19 10:11:12    Desc Main
LYMAN-CUTLER, LLC v.
KAGAN, et al.
Document    Page 274 of 292

July 29, 2019

139:16
**elected (1)**
 195:15
**electric (2)**
 65:11;246:24
**electrical (15)**
 49:11;53:10;69:18,
 20;70:1,4;141:22,23;
 245:11,13,17,21,23;
 246:8,17
**electrician (2)**
 7:25;245:20
**electronic (2)**
 164:14,21,21;264:18
**elements (8)**
 8:24;25:4;29:20;
 35:14;46:19;49:9,11;
 143:8
**elevation (4)**
 33:6,10,12;206:15
**elevations (2)**
 30:25;32:19
**eleven (2)**
 12:20;53:12
**elicit (1)**
 25:20
**elicited (1)**
 182:4
**Elizabeth (1)**
 6:6
**else (17)**
 36:16;37:17,21;
 40:22;44:3,6,23;45:14;
 46:3;54:18;142:4;
 179:22;191:1;208:9;
 224:10;261:10;265:17
**employ (2)**
 25:14,17
**employed (6)**
 7:21;8:11;10:25;
 66:5;71:2;195:13
**employment (2)**
 8:13,14
**enable (1)**
 40:3
**enabled (2)**
 38:12;40:6
**encompass (1)**
 8:20
**end (15)**
 28:12;43:18,18,22;
 52:20;53:13;69:20;
 139:2;162:1;196:5;
 235:12;254:17,19;
 261:13;262:20
**endeavor (1)**
 153:14
**ending (2)**
 195:24;196:1
**ends (1)**
 233:6
**engaged (5)**
 8:21;24:15,23;60:16;

192:24
**engagement (9)**
 25:1;151:11;162:21;
 167:16;190:10;215:19;
 221:15,25;222:1
**engagements (2)**
 167:12;176:6
**engineer (3)**
 161:5;166:1,1
**engineering (6)**
 7:19,19;46:17,21;
 134:12;135:3
**engineers (2)**
 165:18;166:1
**England (1)**
 16:5
**enough (7)**
 60:5;160:4;179:10;
 185:18;237:16;248:2;
 259:4
**entered (1)**
 25:16
**entire (11)**
 70:1;135:19;166:9;
 184:16;190:14;198:5;
 223:21;231:21;250:12;
 253:1;254:11
**entirely (2)**
 156:9;265:7
**entities (11)**
 8:3;9:24;10:12,14,
 23;12:8;13:11;28:16;
 29:2;31:3;50:9
**entitled (4)**
 27:7;220:19,23;
 221:13
**entity (7)**
 9:17;12:11;13:2;
 14:1;18:4;63:14;
 161:13
**entry (4)**
 239:1,15;241:24;
 242:11
**enumerate (1)**
 207:24
**enumerated (4)**
 205:3,4,7;210:22
**envelope (2)**
 161:22,23
**envelopes (1)**
 162:2
**environment (1)**
 141:9
**equal (2)**
 68:15;156:11
**equals (1)**
 253:16
**equipment (15)**
 8:2;172:1,1;224:13;
 225:8,12;226:2,4;
 227:3,5,9,11;258:6,8,
 17
**equity (3)**

172:20;217:1;220:7
**err (3)**
 198:7,7,8
**erred (5)**
 198:4;250:11;
 252:19,25;254:10
**erring (1)**
 261:3
**error (5)**
 68:10,17;69:10;
 239:19;243:17
**errors (3)**
 208:24;209:3;254:1
**especially (1)**
 156:21
**essence (1)**
 25:22
**essentially (2)**
 139:8;265:10
**establish (2)**
 56:20;185:22
**established (1)**
 61:9
**establishing (1)**
 21:11
**estimate (39)**
 66:19;67:9,12,14;
 69:22;160:19;162:23;
 164:4;166:8;167:1,11;
 168:4;169:20;172:5,6;
 173:2,4,14,24;175:19;
 176:9,15,21;178:23;
 179:3;184:19;185:3;
 186:13,14;187:1;
 190:11,14;198:5;
 206:14;207:21;250:12;
 253:1;254:11,15
**estimated (10)**
 70:23;177:2;206:22;
 210:8;244:6;253:7,9,
 25;254:2,16
**estimates (4)**
 11:10;178:20;179:2;
 214:21
**estimating (9)**
 10:13;13:13;26:3;
 160:16;163:21;185:8,
 10;200:18;244:9
**et (2)**
 4:7;159:2
**evaluate (2)**
 141:16;143:24
**evaluating (1)**
 203:21
**evaluation (1)**
 151:1
**even (28)**
 26:8;49:23;52:24;
 53:25;59:19,23;63:10;
 140:7;143:11;146:10;
 151:4;152:24,25;
 162:9,13;165:19;
 180:20;188:21;189:12,

17;192:1,2,3;230:19;
 244:13;246:2;253:25;
 254:13
**everybody (1)**
 224:9
**everyday (1)**
 153:10
**everyone (3)**
 4:23;52:15;212:23
**Everything's (1)**
 213:11
**evidence (12)**
 5:8;60:20;143:9;
 208:3,5;218:9,11;
 256:5,16;261:13;
 264:12,14
**evolving (1)**
 139:1
**exact (2)**
 40:13;60:11
**exactly (16)**
 44:3,23;45:6,25;
 136:5;150:15;168:6;
 190:15;198:21,23;
 200:3;202:23;207:11;
 247:21;249:14;251:11
**EXAMINATION (9)**
 6:20;153:23;156:6;
 159:7;161:17;162:1;
 238:23;259:10;260:23
**example (13)**
 143:25;163:2;
 164:15;167:5;168:13;
 171:7;196:14,24;
 199:11;204:20;232:16;
 234:18;257:25
**excavation (3)**
 227:18;243:23;
 244:16
**Except (3)**
 27:6;215:1;261:24
**exceptions (1)**
 172:3
**excess (1)**
 246:22
**exchange (3)**
 172:19;217:1;220:7
**exclude (3)**
 216:7,8;220:17
**excluded (2)**
 177:18;220:11
**exclusively (1)**
 15:7
**Excuse (9)**
 20:13,17;23:9;39:10;
 50:12;58:13;152:13;
 154:20;190:1
**execute (4)**
 28:20;139:21;
 140:12;141:1
**executed (5)**
 19:3;28:21;50:20;
 142:25,25

**execution (3)**
 10:13;11:8;24:8
**exercise (1)**
 139:8
**Exhibit (38)**
 31:18,22,25;37:2;
 38:1;40:23;41:14;
 45:11,13,17,23;46:25;
 47:3,10;60:14;61:20;
 62:20;63:2;65:2;
 134:13;147:10;183:2;
 212:12;213:21;219:4,
 15;241:16;243:11,14;
 248:7;249:2,18;
 256:10,11,12,12,16;
 260:7
**exhibition (1)**
 227:14
**Exhibits (6)**
 37:1;222:16;256:5;
 259:7;264:11,19
**exist (3)**
 179:15;232:15,19
**existed (2)**
 192:1,2
**existing (4)**
 65:5;190:23;227:19;
 230:4
**exorbitant (1)**
 179:11
**exorbitantly (1)**
 177:14
**expand (2)**
 29:19;183:10
**expanded (2)**
 49:23;182:20
**expect (9)**
 141:4,5;145:20;
 146:10;151:20;186:13;
 197:16,20;255:21
**expectation (1)**
 135:23
**expected (2)**
 139:21,22
**expecting (1)**
 187:14
**expenses (2)**
 61:23;62:2
**expensive (2)**
 145:4;250:25
**experience (29)**
 13:12;28:17;51:25;
 53:9;64:12;66:4;139:4,
 20;142:3;145:20;
 147:7;148:19;151:22;
 152:8;159:17;162:4;
 165:2,4;166:13;
 168:11,17;170:7;
 171:8;185:8,21;
 187:20;200:11;233:6;
 247:9
**experienced (7)**
 155:14;185:8,10,16;

Case 16-01120    Doc 382    Filed 08/22/19    Entered 08/22/19 10:11:12    Desc Main
LYMAN-CUTLER, LLC v.
KAGAN, et al.
Document    Page 275 of 292

July 29, 2019

186:11,24;198:19

**expert (27)**
7:9;18:6;22:2;24:15,
24;60:19;156:5;
167:13;182:20;191:5;
193:25;200:25;203:15,
20;205:16;206:10;
207:5;210:15;221:23;
222:2;229:24;231:5;
232:1,8;234:22;244:7,
9

**expertise (5)**
171:5;198:20;
220:15,18;247:9

**experts (1)**
5:3

**expert-witness (1)**
167:16

**explain (7)**
26:5;30:10;165:11;
169:8,16;175:6;211:12

**explanation (2)**
220:21,22

**exposure (1)**
252:12

**express (1)**
142:4

**extensive (6)**
37:23;41:18;42:8;
43:1,3,4

**Extensively (3)**
11:17;42:22;138:19

**extent (1)**
163:25

**exterior (17)**
29:17;32:22;35:15;
36:2,7;42:17,20,21,23,
24;43:3;70:17,19;
162:2;163:18;226:11;
250:20

**exteriors (1)**
35:12

**extra (1)**
231:8

**extract (1)**
185:17

**extrapolate (1)**
230:14

**extremely (1)**
16:22

**extrinsic (1)**
137:7

**eyeball (1)**
246:2

**eyebrows (2)**
254:3,9

**eyes (1)**
192:23

**F**

**facility (1)**
235:1

**fact (56)**
28:23;55:5;59:11;
133:13;135:14,17,25;
136:5;137:3;139:4;
140:21;142:9,13;
144:9,12;147:1;151:2;
152:2,5,9;174:11;
182:14;188:21;192:12;
196:13;197:19;199:24;
202:6;203:8;204:9;
207:16;208:17,23;
216:23;222:3;225:14;
230:3,11,17;231:1,9,
11,14;234:17;236:14;
239:21;240:1,21;
242:19;244:13;249:18;
250:24;254:10,16;
261:24;264:3

**factor (7)**
60:2;140:22;151:8;
168:23;175:9;196:2,3

**factors (2)**
140:11;141:12

**facts (5)**
50:3,5;54:18;137:25;
138:3

**fair (21)**
25:4,5,7,10;36:6;
58:19;67:5;68:6,25;
69:8;140:17;145:25;
147:13,25;149:11;
151:1,9;160:3;162:14;
190:11,13

**fairly (3)**
27:25;28:2;155:24

**familiar (4)**
18:23;22:12;26:2;
232:8

**familiarity (1)**
28:19

**family (2)**
161:3;230:18

**far (8)**
10:22;19:8;38:25;
49:1;59:25;138:24;
206:24;234:7

**fashion (3)**
50:24;53:6;56:6

**faster (1)**
263:9

**fault (2)**
139:12;144:8

**favor (1)**
198:9

**fear (1)**
153:7

**feasibility (1)**
8:22

**features (3)**
35:23;40:24;46:21

**fee (1)**
175:13

**feel (4)**

6:12;51:21;64:7;
191:24

**feeling (1)**
139:15

**feet (26)**
23:15;48:13;70:24;
161:3;164:19;167:9;
170:17,19,22;177:17;
229:14,17;230:5;
235:15;239:4,8,12,14,
20,22;240:12,24,24,25;
244:4,14

**fell (1)**
53:13

**felt (7)**
10:21;28:18;50:25;
53:14,20;69:6;143:25

**fencing (2)**
63:24;254:14

**few (5)**
7:23;32:19;221:3;
231:8;238:21

**FF (24)**
212:11,12,13,19,20,
21,22;213:1,13;214:2;
222:17,19;223:4,6;
229:9;239:5;241:16;
243:11;244:22;256:5,
10,15;260:1,7

**field (8)**
7:22;8:3;24:16;
25:16;52:21;254:13;
257:25;258:2

**fields (2)**
7:16,18

**fifteen (9)**
11:22;57:25;149:2,4;
150:14;154:16,19,21;
162:20

**fifty (9)**
22:11;24:19;60:3;
64:12;66:5;142:3;
145:20;160:14;167:17

**fifty-year (1)**
17:19

**figure (24)**
64:20,23;71:23;
134:19;154:23,24;
168:21;171:18,22;
174:8,14,18;175:4,6,
16,17;176:5,12;177:13,
19;186:21;219:17;
220:22;236:14

**figures (1)**
171:22

**figuring (1)**
50:12

**file (1)**
206:3

**filed (1)**
265:14

**files (2)**
210:24;217:11

**Filippov (1)**
4:14

**Final (16)**
46:11,15,16,18,18;
47:3,21;54:8;139:3;
171:17;186:2,14;
203:9,11,22;256:18

**find (6)**
53:17,20;55:3;
139:12;168:5;247:4

**findings (3)**
262:11,14,21

**fine (12)**
134:24;207:21;
211:13,13;212:10;
213:15;259:5;262:19,
20;264:10,21;265:4

**finish (6)**
5:8;34:24;35:2,4;
55:22;238:14

**finished (1)**
142:9

**finishes (12)**
29:17;31:2;35:6,14;
38:18,19;39:8,9;44:12;
141:25;167:25;168:4

**finishing (2)**
70:7;155:22

**Fire (1)**
20:10

**fireplace (2)**
41:3,16

**fireplaces (2)**
41:3,8

**first (63)**
5:1,21,22;8:13,14;
23:9;25:3,9,16;26:22;
28:11;30:20;35:9;37:5;
38:19;50:19;54:23;
56:17;58:5;64:9,14;
65:4,6,19,20;66:14,25;
68:14,14;135:5,10,11;
153:5;156:17;189:9;
191:3,13,22,23;192:24;
203:19;206:4;209:13;
210:3,9,19,21;211:18;
219:19;223:14;224:6;
225:14;226:18,20;
229:6;232:4;236:12;
239:4;240:11;241:11;
243:18;245:4;257:20

**first-floor (1)**
32:10

**first-hand (1)**
36:6

**first-year (1)**
23:11

**fit (1)**
179:22

**Fitchburg (1)**
11:22

**fit-out (1)**
42:8

**fitting (1)**
41:18

**five (34)**
17:13;57:25;149:1;
173:6;184:15;186:15,
25;197:20,23,25;
224:2;225:12,17;
226:4;243:9;252:24;
253:1;262:1

**five- (1)**
186:15

**five-inch (1)**
252:11

**five-year (1)**
7:13

**fixed (2)**
150:7;209:9

**fixture (1)**
138:22

**fixtures (3)**
40:10,10;42:2

**flatwork (1)**
14:10

**flawed (1)**
58:20

**floor (3)**
30:24;32:11;206:19

**Flooring (4)**
20:10;40:3;162:12;
163:2

**floors (4)**
38:20,20,21,22

**focus (3)**
25:9;29:24;30:20

**follow (2)**
162:22,22

**following (1)**
136:3

**foot (34)**
53:11,12;141:23,24;
163:2,2;168:14,15;
177:15,16;180:7,8,24;
181:4;183:7,7,21;
229:14,21;230:8,18;
16,19;244:12;251:5,
25;252:12,13,13,17,18

**footage (4)**
164:25;165:1;167:6;
204:6

**footages (2)**
151:25;152:2

**football (1)**
184:16

**footing (5)**
235:15;236:2,7;
237:9;243:2

**footings (7)**
30:15;31:16;240:4,5;
241:14;242:11,12

**foreign (1)**
22:9

**foreman (1)**

8:1

**forensic (1)**
7:9

**forensics (1)**
18:6

**forever (1)**
235:12

**forget (1)**
180:7

**forgot (3)**
194:19;237:20;
258:10

**for-instance (1)**
55:20

**forklift (1)**
184:13

**form (7)**
64:13;66:6;68:4;
136:5,6;164:8;205:16

**formal (1)**
137:4

**format (1)**
49:10

**formation (1)**
189:4

**forming (2)**
163:9;164:2

**forms (1)**
162:9

**forth (5)**
6:11;31:4;40:15;
204:6;218:12

**forty (6)**
24:19;49:23;58:3;
167:17;224:22,22

**forty- (1)**
261:25

**forty-five (1)**
156:20

**forward (2)**
51:7;157:23

**found (6)**
52:18;65:9;144:8;
166:15,15;167:8

**foundation (26)**
30:14,15;31:15;
42:25;47:15,21;
170:21;177:1,3;
191:14;192:7;206:22,
25;211:12;226:20,21;
235:15;236:6,11;
239:1,3,14;240:2,2,5;
241:8

**foundations (5)**
33:18;162:10,10;
210:8,10

**founded (1)**
166:5

**four (8)**
15:21;16:24;17:13,
24;30:13;39:2;40:22;
143:14

**four-and-a- (1)**

179:9

**four-inch (1)**
40:8

**fourteen (1)**
53:11

**fraction (1)**
196:22

**frame (3)**
19:4;31:11;200:17

**framer (1)**
184:25

**Framing (12)**
34:1,3,7,9;162:11,
11;197:4;206:17,17,19,
20,20

**fraud (1)**
255:21

**free (1)**
6:12

**Friday (3)**
157:14;263:20,24

**frolic (1)**
180:18

**front (10)**
26:16;193:5;195:18;
217:10,14;222:17,25;
227:6;231:17;242:11

**full (11)**
6:24;18:4;69:17;
166:3;170:21;206:8;
208:16;239:1,3,16;
240:2

**function (2)**
13:6;17:12;66:24

**Furnishings (1)**
20:9

**further (9)**
29:19;61:10;63:23;
71:13;141:16;153:18;
155:16;156:8;208:3

**G**

**garage (6)**
177:17,18,21;178:2,
6;197:5

**garner (1)**
50:6

**garnered (1)**
29:17

**gathered (1)**
49:4

**gathering (1)**
165:22

**gave (14)**
14:8;24:20;68:16;
133:17,19;144:4;
152:12;191:23;193:6;
219:3;225:19;233:20;
257:9,11

**GC (3)**
59:8;60:15;62:6

**general (21)**

9:16,18;10:9;14:23,
24;49:17;56:22;57:2,
14;61:2;63:8;142:23;
148:22;152:8;172:21,
22;215:3;216:8;
224:13;258:5,18

**generally (9)**
11:15;30:10,11;
44:11;60:3;149:1;
178:3;185:14;246:19

**generate (1)**
25:19

**generated (4)**
55:1;151:3,4;196:6

**generating (1)**
28:17

**generator (1)**
65:11

**geographic (1)**
202:18

**gets (3)**
51:23;182:13,20

**GG (12)**
213:17,20,21;214:2;
222:17,19;223:20,23;
243:14;256:5,12,15

**Given (10)**
35:4;133:14;138:17;
139:24;142:24;203:11;
205:21;210:2;230:12;
254:10

**gives (1)**
211:3

**glass (1)**
41:1

**glazing (1)**
41:6

**glean (3)**
38:16;41:14;46:8

**gleaned (3)**
50:4;181:20;182:1

**Glenn (4)**
134:5,10;135:1,15

**glitch (1)**
173:25

**goes (5)**
10:22;22:25;49:1;
57:16;59:25;133:25;
135:19;136:3;138:24;
139:3,18;186:11;
234:19,19,25;242:22

**Good (29)**
4:3,4,13,15,17,20,22;
5:12,16,17;6:22,23;
50:21;51:5,8;69:3;
71:20,21;140:1,2;
150:17;158:16,18;
179:8;183:8;187:8,9;
226:16;263:3

**Gordian (1)**
165:16

**gospel (3)**
141:16,18;143:23

**govern (1)**
232:9

**government (1)**
165:19

**grade (1)**
252:16

**grades (1)**
46:23

**grading (2)**
9:5,22

**Great (2)**
5:6;254:9

**Greater (2)**
20:1;234:3

**gross (1)**
49:12

**ground (1)**
186:6

**Group (6)**
17:2,4,9,23,25;41:13

**guess (3)**
174:16;188:4;259:25

**guessing (1)**
244:10

**Guide (7)**
163:5,7;165:12,13,
14;166:21,23

**Guides (1)**
165:10,17

**guy (4)**
140:8;196:23;197:8,
8

**guys (4)**
197:11;237:4,16;
262:2

**guy's (1)**
140:9

**H**

**half (10)**
9:11;156:20;177:10;
179:10;206:12;232:6;
238:9,10;245:16;263:8

**half-inch (1)**
55:23

**Hall (2)**
206:2;207:14

**Halla (4)**
10:4,5,15,19

**Hampshire (1)**
231:12

**hand (4)**
211:2,5;212:4;
228:25

**handed (1)**
211:15

**handing (1)**
211:10

**handles (2)**
249:11,12

**handrail (1)**
179:17

**hands (3)**
162:5,8;179:13

**hanging (1)**
40:9

**happened (1)**
173:19

**happening (1)**
231:7

**happens (1)**
179:20

**hard (4)**
250:3,7;253:4,6,14;
254:2;255:5,6,21

**hardscaping (1)**
8:8

**hardware (2)**
145:16;200:17

**Harris (7)**
4:20,20;31:18,20,22;
32:6,13;33:22;38:1,3,
7;39:11;40:16;41:10,
25;42:12;43:20,21,23;
46:25;47:9,17,19;
217:25;218:2,5

**Hartzell (3)**
183:2,10;184:5

**Hashanah (1)**
263:15

**hates (1)**
263:22

**haul (3)**
230:23;232:13;234:7

**hauled (1)**
235:2

**hauling (6)**
233:9;234:3,6,8,13;
235:11

**hazardous (3)**
232:15,22;233:21

**head (2)**
62:24;71:8

**heads (2)**
42:9;157:21

**health (2)**
35:3;232:18

**hear (5)**
6:12;16:20;52:23;
153:4;225:22

**heard (4)**
155:20;181:5;
183:13;259:19

**heavy (1)**
8:1

**heck (2)**
146:7;237:7

**height (2)**
239:12,14

**heights (1)**
31:1

**held (1)**
181:18

**help (4)**
57:15;169:8;218:21;

241:1

**Herrick (7)**
143:5,11,12,12,13;
178:22,24

**high (20)**
23:21;28:25;43:18;
177:14;178:9,19,21,25;
180:21;185:5;198:10,
15;199:5;239:8;
240:14;253:2;254:11,
16;255:10;261:3

**high- (1)**
28:11

**high-end (21)**
14:7;15:10,11;16:4,
22;28:12,24;29:1,8;
42:11;141:9;143:14;
145:21;178:8;180:12,
19;181:3;183:5;197:2,
2;248:21

**higher (14)**
54:8;69:5;141:5;
146:10,23;149:5;
175:11;196:10;198:1,
4;250:10,14,22;252:14

**highest (4)**
150:10,13,16,21

**highlighted (1)**
173:21

**Hines (6)**
134:5,10;135:1,15,
15,20

**hire (1)**
63:14

**hired (2)**
56:22;195:13

**historically (2)**
141:19;149:6

**hold (13)**
22:16,19,20;24:7;
136:15;157:5;160:21;
161:6;217:17;263:7,
12,13,21

**hole (1)**
191:12

**home (49)**
19:16;20:7;22:21;
23:23;24:1,12;25:8;
29:4,6;37:14,23;38:13;
42:11,17;52:12,13,14;
56:23;65:9,13;66:2,7,
25,25;138:20;139:2;
140:4,24;141:1,4,6,10,
21,22,23;143:7;145:7;
152:22;154:11;160:13;
166:25;176:3;177:11;
178:8;179:16;187:14,
18,20;227:19

**Homebuilders (1)**
20:5

**homebuilders' (1)**
20:7

**homeowner (1)**

140:4

**homeowners (4)**
11:7;12:7;35:11;
140:7

**Homes (57)**
14:1,3,17,19,20,22,
25;15:7,10,10,11,13,
13,16,20,22;16:10,12,
14,17,22;17:20;18:20;
19:4;23:7,22;25:5;
28:12,12,24;29:1,7,8,9;
35:10,11;48:24;53:10;
56:22;65:10;66:21;
70:7;141:20,21;
142:25;143:1,2;
145:21;146:1;154:6,
14,22;155:9;160:3,6;
163:21;253:14

**hometown (1)**
12:3

**honest (1)**
51:6

**Honor (65)**
4:13,15,17,20;5:2,12,
17;6:19;20:13;26:6,21;
27:6,11;36:25;45:16,
19;58:16;60:17;70:12;
71:13,16;153:18,21;
155:16,25;156:5,10;
157:19;158:9,12;
159:6;181:7,14,16,16;
182:11,18;183:1;
190:1;211:5;212:4,7;
213:10,19;217:16,20;
218:9;225:4;228:25;
231:18;238:19,22;
252:4;256:4,7;259:6;
261:15,17,20;262:13,
20;265:5,18,20,22

**hope (2)**
5:10;264:4

**horizontal (3)**
14:7,11;71:3

**Horner (1)**
179:18

**horrible (1)**
140:9

**hot (1)**
138:21

**hour (9)**
59:21;155:20;
156:20;179:9;232:6;
238:11;262:25;263:3,8

**hour-ish (1)**
238:9

**hours (2)**
161:20,21

**hour's (1)**
263:4

**house (90)**
23:16;29:20;32:22;
35:6,19;36:7,16;43:3,
8;46:20;59:6;61:2;

64:9,14,24;65:4,5,6,7,
20,21;66:14,15;67:25;
68:2;69:14,21;70:18;
138:11;148:1;167:5,
11;174:12;175:1;
178:4,5;179:21;
185:24;186:5;190:23;
191:8;195:13;197:5,9,
10;198:11,12;202:13,
14;204:11;226:21;
227:4,12;229:13,16,21,
22,23;230:4,7,8,13,18,
19;232:11,12,15,19,21,
22,23,25;233:19;
234:25;244:8;245:14,
18,25;246:21;248:25;
250:2,7,15;252:18;
254:5,7,7,8,24;255:21

**housekeeping (1)**
264:15

**houses (26)**
23:18,20;47:7;48:24;
64:21;65:14,15,17,18;
66:14;70:1,5;143:13;
163:10;166:11,14,24;
167:22;177:8;179:15;
190:24;201:25;233:4;
246:8,17;250:17

**hovering (1)**
193:24

**huge (2)**
28:13;231:10

**huh (1)**
237:21

**hundred (7)**
18:20;23:22;69:10;
160:18;167:24;169:25;
242:23

**hundreds (6)**
17:22,22;23:21;
142:25;143:1;171:17

**hundred-some-odd (1)**
23:12

**hypothetically (1)**
210:8

## I

**ICC (3)**
161:8,10,13

**idea (3)**
40:8;172:3;263:16

**identical (4)**
4:5,7,15,17

**IDENTIFICATION (10)**
37:2;212:6,12;
213:21;214:2;219:4;
222:17;223:4;256:10,
12

**identified (2)**
50:14;163:6

**illustrating (1)**
31:2,2

**impact (3)**
50:23;156:2;168:1

**important (3)**
190:15;203:16;
204:25;231:6;244:9;
251:11,14,16,18

**impossible (2)**
246:16,19

**improvement (1)**
22:21;23:24

**improvements (1)**
226:12

**inability (1)**
163:20

**inaccurate (1)**
210:20;221:17

**Incidentally (4)**
22:1;42:20;47:25;
214:1

**include (19)**
7:17;13:13,15,17;
62:3;171:25;172:22;
174:13;177:17;214:3,
7,14,15,24,25;217:5;
220:24;221:25;255:11

**included (22)**
31:13;35:14;38:24;
40:7,10;41:16,19;
45:10;49:2;57:9;65:12;
67:10;135:2,6;171:22;
172:4;176:17;191:13;
210:10;214:18;222:2;
254:12

**includes (5)**
7:18;14:12;179:3;
200:16;226:25

**including (1)**
169:20

**income (2)**
16:19,21

**incomplete (1)**
242:5

**inconsistent (1)**
145:19

**incorporate (1)**
136:24

**Incorporated (2)**
7:6;222:6

**incorporates (2)**
174:8,10

**incorporating (1)**
209:3

**incorrect (2)**
68:13;210:16

**incorrectly (1)**
68:12

**increase (3)**
59:18;60:4;168:25

**increased (3)**
59:17;69:9;260:15

**incredulity (1)**
144:16

**incurred (5)**

57:12;61:25;214:12,
22;216:16

**independent (3)**
150:25;191:16;
214:17

**independently (1)**
151:8

**index (2)**
59:16,17

**indicate (1)**
148:8

**indicated (3)**
156:3;181:17;264:18

**indiscernible (1)**
190:3;257:10

**individuals (2)**
50:19;52:19

**industries (1)**
16:16

**industry (19)**
10:20;13:23;15:23;
20:3,9;49:7;60:1;
64:13;66:6;145:21;
151:16;152:9;159:18;
160:22;161:7;162:8;
165:3;222:12;247:8

**inflate (1)**
153:8

**inflated (2)**
51:3;53:1

**information (28)**
25:17;29:16,16,18,
18;44:11;46:7;48:25;
49:5,25;50:6,7;56:4;
59:14;68:3;136:2;
137:21;138:4,7;147:9;
164:10;167:7;181:1;
182:21;191:15;194:8,
15;204:2

**informs (1)**
58:19

**inherent (1)**
153:11

**initial (14)**
28:2;187:1;192:12,
25;193:2;203:8,14;
204:14,16,19;226:1;
227:18;228:8;243:20

**initially (1)**
239:3;242:13;243:11

**Inquire (1)**
194:3

**inset (1)**
42:7

**inside (2)**
29:20;165:25

**inspection (3)**
44:7,8;46:11

**inspections (1)**
137:11

**inspector (1)**
161:22

**installations (1)**

14:8
**installed (3)**
41:4;43:5;145:14
**installing (3)**
28:17;171:23;214:25
**instance (10)**
38:19,25;53:9;57:6;
63:12;65:2;138:18;
141:20;170:20;174:2
**instances (2)**
133:12;208:25
**instead (4)**
65:17;149:4;244:10;
247:25
**Institute (2)**
19:24;161:23
**institutional (4)**
8:25;140:13;141:19;
142:2
**institutional-type (1)**
9:21
**instruct (1)**
252:4
**instructed (1)**
215:4
**insufficient (2)**
21:12,15
**insurance (1)**
237:7
**insurances (1)**
57:13
**insured (1)**
173:11
**integration (1)**
10:12
**Integrity (2)**
54:3,5
**intention (1)**
27:13
**intentionally (1)**
150:10
**interact (1)**
10:6
**interchangeable (1)**
247:18
**interest (1)**
18:8
**interested (1)**
52:12
**interfaced (1)**
17:14
**interfacing (1)**
13:17
**interior (13)**
36:22;37:24;38:13;
41:9;44:13;55:23;
162:12;163:10,14,16,
20;200:17;241:15
**internally (1)**
168:8
**International (4)**
20:8,8;22:5;161:11
**internationally (1)**

22:8
**interpersonal (1)**
173:13
**interrupt (5)**
29:22;35:17;36:24;
62:22;67:15
**into (53)**
6:8;10:23;13:22;
18:3;25:16;26:8;29:6;
31:14;33:15;36:16;
40:25;44:4;45:6;46:1;
49:6,11;50:8;52:20;
65:7;69:23;137:19;
138:3;139:25;140:11,
22;151:3;153:8;159:2;
165:8;167:2;168:3;
169:24;173:7,8,21,22;
175:10;177:18;179:7,
9;184:15,21;187:10;
188:22;200:9;201:10;
222:6;248:25;256:5,
16;261:24,25;262:1
**intrude (1)**
35:11
**invent (1)**
138:4
**investigation (2)**
138:1;214:17
**invoice (6)**
55:21;67:11;152:12;
248:24;249:15,19
**invoices (23)**
36:22;37:5,9,18,19;
44:3,17;48:20;54:22;
61:15;137:15;143:10;
179:6;187:25;188:18,
22,24;190:9;246:24;
249:14,17;256:2,3
**involve (1)**
11:13
**involved (11)**
8:3;9:2,5;17:20;
18:11,20;20:2;153:6,
14;161:5;237:8
**involvement (1)**
22:5
**involves (1)**
207:22
**irrelevant (1)**
58:17
**irrigation (1)**
227:1
**issue (1)**
163:10
**issued (10)**
25:20;30:8;203:12,
20;204:11,14;206:5,
10;209:2;254:21
**issues (1)**
9:7
**issuing (2)**
204:25;210:15
**item (10)**

135:24;169:17;
175:3;176:23,23;
210:10;224:17;241:2,
15;249:25
**items (10)**
28:13,14,15,17;
135:6,17;163:6;
176:17;194:12;260:14
**iteration (1)**
203:17

## J

**James (1)**
4:20
**jeopardized (1)**
153:15
**job (12)**
51:16;57:6,7;133:11,
25;139:24;146:7;
169:24;179:19;207:5,
10;247:7
**jobs (3)**
13:13;15:3;26:3
**John (4)**
4:17;218:18;224:19;
225:18
**Johnson (4)**
8:14,16;9:10,12
**joists (1)**
34:1
**Judge (5)**
158:18;219:20;
252:6,9;261:12
**July (17)**
193:6;211:19;
216:23;217:19;218:24;
219:14;223:5,8;
224:20,25;225:1,19;
226:10,12,13;259:19;
260:8
**justified (1)**
181:3

## K

**Kagan (28)**
4:7,18,18;45:1,1,2;
55:7,9,11,14,18;56:5;
62:6;143:9,18;146:4,
23;150:24;151:7;
164:1;179:5;216:24,
25;220:5,5;253:3;
255:5;261:5
**Kagan's (8)**
151:4;198:9;217:1;
220:7;237:3,14;
253:13;255:25
**Kansas (4)**
7:14,20;8:10,11
**KDC (2)**
4:18;216:14
**Keep (4)**

33:8;39:12;41:25;
51:6
**Keeper (4)**
138:18;141:20;
154:19,21
**Kepa (10)**
14:1,3,17,19,20,22;
15:7,13,20,22
**kind (14)**
10:21;62:2;139:1,22;
145:7;163:3;165:1;
170:22;180:20;187:22;
188:14;197:13,15;
247:21
**kinds (2)**
38:16;57:5
**King (5)**
183:23,24;184:3,9,
10
**Kirill (1)**
237:14
**kitchen (6)**
39:19;40:1,19;
138:23;174:5,7
**kitchens (2)**
31:4;174:11
**knew (27)**
28:20;40:13;50:19,
22;139:16,20,22,23;
140:21;141:20;143:8,
11,12,19;151:4;154:6,
8;189:21,23,25;200:1,
3;207:20;208:12,14;
251:20;263:7
**knowing (4)**
143:16,16,17,18
**knowledge (5)**
140:13;141:19;
142:2;145:23;233:6
**known (5)**
12:3;14:1;182:6
**knows (1)**
219:21

## L

**L-2 (2)**
249:2,19
**label (1)**
248:17
**labeled (1)**
33:14
**Labor (16)**
59:19,25;60:1,2,2;
136:2;172:1,1;178:16;
179:7;184:14;196:3;
200:15;237:9,19;
261:24
**laborer (2)**
8:2,2
**laborers (3)**
63:14;196:22;197:9
**labor-only (1)**

184:20
**lally (1)**
240:6
**laminate (5)**
40:11;187:12,15,21;
188:2
**laminated (1)**
183:16
**land (2)**
8:23;202:9
**landfill (2)**
234:19,21
**landfills (3)**
234:17,20,24
**landscape (10)**
7:14,16;8:15,17,18,
19;10:11,20;19:23,24
**landscaper (1)**
63:21
**Landscapes (2)**
9:14,15
**landscape's (1)**
35:23
**landscaping (7)**
9:22,23;43:5,6;
63:18;192:20;226:25
**land-use (1)**
8:22
**Lane (2)**
19:7,8
**language (3)**
208:3;217:2;220:8
**large (3)**
9:21;70:22;201:16
**larger (5)**
10:12;13:9;146:4;
229:17;244:4
**last (10)**
58:3;71:22;165:16;
171:11;182:19;202:3;
213:9;241:15;242:11;
256:20
**late (1)**
159:19
**later (2)**
67:11;239:16
**latter (2)**
256:24;259:15
**laughing (1)**
182:14
**lawsuit (3)**
52:7,17;152:22
**lay (1)**
211:11
**layers (2)**
39:1,2
**layout (1)**
42:3
**layouts (5)**
30:14,25;31:3;41:5,6
**lead (2)**
24:13;232:16;
233:11,15

Case 16-01120    Doc 382    Filed 08/22/19    Entered 08/22/19 10:11:12    Desc Main
LYMAN-CUTLER, LLC v.                        Document      Page 279 of 292
KAGAN, et al.                                                                    July 29, 2019

**lead-** (2)
    24:8,10
**learn** (1)
    36:16
**learning** (1)
    9:2
**least** (2)
    143:9;264:9
**leave** (7)
    9:25;10:15;11:24;
    184:13;200:7;262:4;
    265:7
**leaves** (1)
    179:7
**leaving** (9)
    10:19;12:1,21,24;
    13:21;15:22;16:25;
    17:25;262:3
**led** (1)
    172:11
**ledge** (2)
    65:8,9
**left** (12)
    8:10;9:12;39:25;
    40:19;41:22;42:14;
    71:7;173:23;221:10,
    11,12,14
**left-clicked** (1)
    173:23
**legal** (8)
    52:24;153:5,14;
    220:14;221:21,23;
    222:1,2
**legit** (1)
    196:24
**legitimate** (1)
    216:9
**length** (1)
    261:6
**less** (14)
    146:19,21;147:14;
    152:2;250:24;255:6,7,
    15;258:11,12,13,15,15,
    16
**lesser** (1)
    144:13
**level** (5)
    40:25;41:15;43:15;
    133:9;139:21
**levels** (2)
    141:21,25
**Lexington** (1)
    17:2
**LF** (1)
    170:16
**library** (2)
    174:6,8
**license** (14)
    22:20,21,22,25;23:9,
    12,24,25;24:7,11,13;
    160:24;161:1;202:14
**licensed** (1)
    173:11

**licenses** (3)
    22:17,19;160:21
**licensure** (3)
    23:4,10,11
**lie** (3)
    52:10;152:20;153:2
**life** (1)
    264:20
**light** (2)
    31:1;160:7
**lighting** (3)
    40:5,7;43:3;141:25;
    142:1
**lights** (2)
    41:1;43:8
**likely** (3)
    156:9;239:10;254:13
**limine** (2)
    58:10,16
**limited** (1)
    29:18
**line** (12)
    54:2,5;143:17;
    151:20;163:6;180:16;
    210:10;241:2;244:17;
    249:25;252:20;260:14
**lineal** (9)
    163:2;164:19,25;
    170:17;239:20,22;
    240:24,24,25
**lineal-footage** (1)
    179:1
**linear** (8)
    170:21;180:7,8,24;
    181:4;183:7,21;235:15
**line-by-line** (1)
    197:22
**Lipetsker** (1)
    4:14
**list** (9)
    25:19;28:19;45:9;
    50:15;61:24;135:4,5;
    194:11,14
**listed** (2)
    45:9;61:23
**listing** (1)
    163:17
**listings** (2)
    38:5;248:7
**lists** (1)
    135:5
**litigation** (2)
    164:5;210:17
**little** (17)
    19:10;32:25;52:10;
    58:14;69:5;164:12;
    165:11;174:7;177:10;
    195:7;211:22;240:6;
    241:2;248:17;255:9,
    10;257:17
**live** (2)
    159:11,12
**living** (2)

166:3;178:5
**LLC** (2)
    4:7,8
**loads** (2)
    31:13,14
**local** (2)
    166:5;202:21
**located** (5)
    8:15;11:21;14:20;
    18:24;46:20
**location** (6)
    168:23;175:8;
    185:24;196:2,3;202:18
**locations** (1)
    11:23
**logical** (1)
    149:11
**long** (16)
    9:9;11:18;12:19;
    13:19;15:20;16:23;
    17:23;18:16;133:22;
    156:17;166:7;184:18;
    253:11;262:25;263:5,
    11
**longer** (1)
    156:10
**look** (70)
    29:1,2;32:22;37:6,
    12;45:13,16;47:14;
    48:23;60:12;62:20;
    63:7,18;65:3;136:18;
    165:25;170:11;171:21;
    174:5,16;179:1;
    187:25;188:18;189:1,
    2,13;190:8,20;191:3,
    25;192:25;193:2,4;
    194:16;198:2;200:14;
    219:16,19;222:16;
    223:19;224:12;225:11;
    228:1,20;229:9;
    235:14,24;236:6;
    237:3;238:1;239:15;
    242:15;243:6;244:21;
    246:24;247:19,21;
    248:19,24;249:5,22,24;
    250:7,8;251:2,21;
    252:2,11;259:25;
    260:10
**looked** (28)
    10:22;18:2;29:14,14,
    14;37:13;45:14,23;
    47:25;49:3;53:23;
    55:25;59:13;133:18,
    18;140:9;141:19;
    143:5;147:1;151:21,
    23;180:23;188:16,21;
    193:3;248:6,7;249:18
**Looking** (28)
    18:2;21:20;37:18,25;
    38:17;60:19;61:16;
    63:12;136:18,19;
    142:6;166:17;168:7;
    170:11;173:4,5;188:6;

189:17;191:7,18,20;
    223:7;224:24;227:5,9;
    238:25;260:7;263:21
**looks** (4)
    41:15,22;47:5;
    187:13
**lot** (19)
    43:15,15,16;57:13;
    59:24;62:24;147:23;
    155:3,4,11,21;206:13;
    215:5;224:24;237:7;
    254:4;263:10,12;
    264:20
**lots** (7)
    46:11;48:17;162:11,
    11,12;233:4;248:18
**low** (3)
    43:18;152:6;198:10
**lower** (13)
    41:20;42:5;43:7;
    52:3;53:13;54:9,10;
    66:2;68:22;196:11;
    254:17,19;257:19
**lowest** (1)
    140:8
**Lowry** (1)
    209:13
**LULL** (4)
    184:12,24,24;185:1
**Lumber** (16)
    11:1,2,4,6,18;12:4,5,
    19,21,24;13:1,2,4;25:8;
    179:24;180:1
**lumbers** (1)
    31:12
**lumberyard** (2)
    12:6;13:12
**luxury** (3)
    16:17;19:16;167:8
**Lyman** (4)
    25:5,11;42:23;
    233:20
**Lyman-** (3)
    19:8;147:22;216:24
**Lyman-Cutler** (20)
    4:7,8;18:24;19:4,14;
    24:24;48:24;61:11,25;
    62:3,11,18;64:9,14;
    66:7;142:22;144:9;
    148:2,8;220:5

**M**

**Magazine** (1)
    29:3
**mahogany** (4)
    145:1;180:19;183:6,
    14
**main** (1)
    11:21
**maintain** (1)
    50:16
**maintenance-free** (1)

250:20
**makes** (3)
    54:2;221:7;264:20
**making** (5)
    6:6;12:8;140:11;
    207:9;247:25
**management** (1)
    49:2
**manager** (11)
    9:16,18;10:9;14:23,
    24;16:9;17:7,8;57:7;
    65:14,16
**managers** (3)
    17:6,13,13
**managing** (1)
    65:17
**manmade** (1)
    14:14
**manner** (1)
    61:11
**manually** (1)
    174:13
**many** (25)
    13:9;15:13;17:20;
    23:18;24:18;51:4;56:9;
    139:25;144:20;160:10,
    12,15;162:18;164:19;
    167:15,23;169:19,23;
    170:1;184:25,25;
    201:25;202:3;208:25;
    209:4
**margin** (1)
    136:11
**mark** (1)
    212:5
**MARKED** (10)
    37:2;176:16;212:12;
    213:21;214:2;223:3,6,
    20,23;256:5
**market** (6)
    15:9;59:23;60:1;
    138:16,17;139:3
**markup** (1)
    172:9
**Marvin** (4)
    54:2;199:14,19,20
**MARY** (6)
    213:8,13;256:8;
    262:22;264:4,12
**Mary's** (2)
    263:21,21
**Masonry** (9)
    14:4,6,7,11,12,16;
    151:22;152:10;154:1
**Mass** (9)
    7:2;8:15;11:22,23;
    14:2;16:2;17:3;20:3;
    24:8
**Massachusetts** (10)
    11:21;20:6;22:12,20;
    24:1;59:23;159:12;
    166:6;168:24;231:15
**massive** (3)

Case 16-01120    Doc 382    Filed 08/22/19    Entered 08/22/19 10:11:12    Desc Main
LYMAN-CUTLER, LLC v.
KAGAN, et al.
Document    Page 280 of 292

July 29, 2019

255:20,21,23
**master (6)**
41:16,17,19,20;42:3;
164:17
**MasterFormat (1)**
49:8
**match (1)**
176:23
**matched (1)**
253:11
**matches (2)**
54:4;168:6
**material (9)**
9:23;24:11;42:21;
43:5;138:6,8;180:21;
181:4;188:15
**materials (32)**
9:22;11:8,8,10;
13:10;25:7;36:21;
37:11,13,13;38:21;
46:9;49:2;55:19;59:18;
60:5;136:2;141:24;
142:9;146:18,21;
150:24;171:25;172:1;
175:25;178:16;188:1;
232:15,25;233:3,21;
235:10
**math (4)**
68:10;142:14;
146:17;156:7
**matrix (1)**
141:21
**matter (2)**
39:25;135:25
**mature (1)**
43:5
**May (36)**
6:17;27:17,17,24;
28:3;45:16;59:14;60:3;
63:10,10,20,24,25;
70:8,9,12;138:17,17;
153:8;156:2;193:21,
23;208:4;211:5;212:4;
217:16,17;225:4,5;
228:25;231:18,19;
238:19;264:2;265:11,
21
**maybe (8)**
19:10;49:22;139:18;
140:8,9;146:18;183:9;
184:5
**mean (20)**
57:11;58:6,7;155:23;
161:12;163:1;170:12;
173:10;179:12,24;
183:7;184:16;186:3,
17;192:10;198:18;
209:20;220:13;232:2;
263:9
**means (3)**
186:4;232:14;252:17
**meant (1)**
59:5

**measure (9)**
163:1,4,8;164:17;
169:18,19;170:12;
171:12;244:11
**measured (3)**
145:14;231:3,3
**mechanical (1)**
144:7
**melamine (1)**
183:16
**melamine-type (1)**
187:13
**member (1)**
20:5
**memberships (2)**
19:18,21
**memorized (2)**
62:23;193:1
**memory (8)**
21:12,13,15;45:13,
17;60:14;191:4;218:14
**men (2)**
179:8;184:15
**mention (1)**
153:4;205:8,13;
237:20
**mentioned (13)**
20:12;22:4;23:23;
39:14;46:11;138:2;
140:1;153:25;154:5;
157:12,14;164:13;
265:5
**mercury-switched (1)**
232:17
**Metal (4)**
234:19;247:20,23,24
**method (2)**
164:15,16
**methodologies (2)**
11:16;27:20
**methodology (18)**
25:13,15,16;26:2;
27:10,11;29:9;58:20,
21;66:5;71:2;142:24;
143:1;162:22;164:22;
178:10,11;195:12
**methods (1)**
11:16
**metropolitan (1)**
201:16
**microphone (5)**
6:8,10;58:12;159:2;
194:22
**mid-'90s (1)**
15:12
**middle (1)**
61:18
**mid-September (1)**
262:1
**might (13)**
6:7;49:2;138:22,23;
141:22,22,23;157:13;
182:19;196:10,11,23;

264:15
**migrate (1)**
10:19
**migrated (2)**
9:14;10:3
**Mike (1)**
151:12
**mile (3)**
19:10,10;147:20
**miles (5)**
227:20;230:24;
231:2,8;233:10
**milled (1)**
145:10
**million (21)**
29:8;141:2,5;148:2,
2;151:7,7;154:9;155:2,
6,8,11,12;165:5;
177:11,22;185:5;
187:14,20;250:15;
261:1
**millwork (5)**
12:11;143:13;
145:19;179:18,19
**mind (1)**
178:22
**Minnesota (2)**
10:3;22:23
**minute (3)**
39:12;70:8;175:9
**minutes (7)**
153:20;156:18,19,
20,21;224:22,23
**mischaracterize (1)**
140:16
**mischaracterizing (1)**
227:6
**misquoted (1)**
151:25
**misread (3)**
242:1,3,4
**miss (1)**
170:4
**missing (4)**
204:24;206:12;
207:17;226:11
**mistake (2)**
174:20;236:17
**mistakes (1)**
173:17
**Mister (1)**
27:3
**MLS (1)**
38:5
**mobilization (9)**
224:13;225:9,12;
227:5,9,10,12;258:6,8
**mobilizations (4)**
226:2,5,11;258:18
**model (1)**
200:4
**model-building (1)**
161:13

**models (1)**
201:3
**modify (1)**
60:6
**moment (8)**
29:22;35:17;45:8;
46:13;48:1;134:7;
187:11;223:19
**moments (1)**
221:3
**Monday (4)**
262:17,18;263:13,14
**money (7)**
69:18;148:16;178:7;
186:7;254:4;257:21,22
**month (1)**
55:13
**months (3)**
55:13;184:15,22
**more (31)**
6:11;34:3,7,9,12;
39:25;42:2;48:13;
68:23;144:19;170:2,2;
174:8;178:16;190:24;
194:22;200:22;201:3;
220:21;227:11;228:4;
230:8;238:8,21;245:1;
246:3,15;253:19;
254:8;255:15,22
**morning (19)**
4:3,4,13,15,17,20,22;
5:16,17;6:22,23;71:20,
21;158:24;180:3,19;
181:6,17;204:5
**mosaic (1)**
42:7
**most (8)**
8:3;22:9,9;58:1,1;
199:4;239:10;254:13
**mostly (1)**
15:10
**motion (3)**
58:10,16,16
**mouldings (3)**
38:25;39:1,2
**move (13)**
6:10;10:23;13:22;
26:8;63:25;157:23;
227:13;228:15;238:6,
22;243:8;245:7;256:5
**moving (1)**
33:15
**much (26)**
8:3;34:23;41:8;50:6;
62:8;66:23;135:24;
153:19;162:4;163:24;
176:19;184:17,18;
186:4,8;199:14;
200:24;201:3;204:19;
238:8;245:10,10;
247:24;253:3;259:19;
265:19
**multimillion-dollar (1)**

250:17
**multiple (7)**
39:1;42:9;63:22;
171:11;234:20,24;
248:6
**multiple-stage (1)**
38:23
**multiplied (1)**
176:1
**multiplier (3)**
201:9,12,18
**multipliers (1)**
201:15
**multiply (1)**
239:8
**Must (1)**
229:11
**myself (2)**
179:20;202:23

---

**N**

**name (5)**
5:21,22;6:24;7:5;
159:9
**names (1)**
4:11
**napkin (1)**
186:19
**narrow (1)**
27:25
**National (9)**
20:3;7,9,10;25:8;
168:19,20;175:11;
196:1
**nationally (1)**
195:22
**natural (3)**
14:13,14;28:23
**nature (15)**
7:7;25:1;31:11;
35:13;36:13,21;37:11;
39:6;41:2,18;43:3;
51:15;148:4;173:8;
204:11
**nearly (1)**
186:9
**necessarily (3)**
140:2;148:7;203:1
**necessary (7)**
27:17;34:19;64:7;
173:11;184:25;191:24;
251:17
**need (23)**
6:7;22:14;24:11;
28:15;31:8;61:24,25;
62:25;137:22;149:6;
190:17,23;206:15,17,
19,20;207:10;209:6;
212:16;213:2;225:22;
262:24;264:25
**needed (7)**
26:13;29:19;35:1;

50:15;207:20;208:14;
212:24
**needs (2)**
190:22,23
**neighborhood (1)**
18:24
**neither (2)**
213:12;245:6
**New (6)**
16:5;140:5;180:21;
181:4;204:2;231:11
**newer (1)**
241:25
**Newton (1)**
19:7
**Newton- (1)**
19:2
**next (22)**
9:13;10:2,24;12:1,
25;13:25;15:25;17:1;
18:1;32:19;34:12;
41:13;48:21;49:5;
157:1;170:20;175:3;
218:21;252:16,16;
256:8;265:4
**NFPA (1)**
20:10
**Nickolay (1)**
4:14
**nilly (1)**
137:24
**nine (2)**
10:10;194:12
**ninth (1)**
228:19
**None (4)**
180:15;202:2,3;
259:18
**Nope (1)**
249:23
**normal (1)**
133:10
**normally (2)**
57:6;65:12
**north (1)**
224:22
**Norwood (1)**
166:6
**note (1)**
244:4
**notes (1)**
264:13
**Nothing's (1)**
246:19
**notice (2)**
32:25;61:18
**noticed (1)**
61:17
**notion (1)**
202:8
**notwithstanding (1)**
221:12
**nowhere (3)**

71:24;236:15;237:10
**number (96)**
4:8,9;19:2;23:12,20;
28:13;43:12;49:14;
54:9;57:5,16,20;60:13,
15,23;62:9,19;64:8,16;
65:14;68:8,9,12,17,22,
23,24;69:9,10,12,15;
134:13;136:13,15;
141:16;142:18;144:3,
4,13;146:19,21;149:5,
8,11,16,16,20,25;
150:10,13,16,22;152:1,
5;155:5;167:5;174:21;
180:8;196:6;197:24;
198:3,3;200:23;228:2;
230:21;240:7,12,18;
241:5;243:25,25;
246:21;247:8,9,20;
248:3;250:9,23;251:7,
20,23;252:2,19;
254:17;255:9,11,15;
258:11,12,15;259:2,22;
260:5,15,25;263:25
**numbered (1)**
222:19
**numbers (61)**
25:24;34:10;37:6,8,
15;52:21;54:12,17;
57:10;58:4;59:10;60:6;
62:23;67:18,22,24;
68:1,2;142:22;143:21;
146:22;147:2,3,6,14;
156:7;169:1,6;172:4;
173:7;174:13;180:21;
181:4;184:20;196:17;
199:1,2;201:3;208:18;
209:4,9,10,21;210:4,
16,18,19,21;211:3,25;
216:5;222:25;223:13,
16;245:17,24;250:14;
254:11,15;256:9;
257:19
**number's (3)**
250:22;252:12;
254:19
**Nursery (4)**
10:4,5,9;63:20
**nurseryman (3)**
8:2,2,22;22
**nuts (2)**
160:13;187:11

---

**O**

**object (1)**
180:16
**objection (11)**
4:9;26:6;45:18,19;
58:9,10,15;59:4;60:17;
256:6,7
**objection's (3)**
28:6;59:2;182:7

**objective (1)**
178:14
**obligated (1)**
136:25
**observation (1)**
48:4
**observations (2)**
42:16;225:3
**observe (4)**
35:18,21,23,25
**observed (1)**
40:24
**obtain (2)**
23:3;29:12
**obtained (1)**
7:13
**obtaining (1)**
69:17
**obvious (1)**
188:6
**obviously (3)**
169:21;181:11;249:9
**Occasionally (1)**
171:19
**occupancy (2)**
46:5,18
**occupied (2)**
264:3,4
**occurred (1)**
56:1
**o'clock (1)**
259:3
**October (1)**
263:24
**odd (1)**
141:2
**off (14)**
41:21;69:4;71:4,4;
139:18;140:25;158:3;
197:25;200:24,24;
206:24;229:6;238:16;
253:8
**off- (1)**
145:6
**offered (1)**
60:20
**office (8)**
8:21;11:22;57:13,15,
15;254:13;257:25;
258:3
**OFFICER (1)**
158:6
**offices (1)**
213:9
**officially (1)**
235:1
**offsite (1)**
136:3
**off-site (2)**
65:3;227:19
**often (3)**
22:14;150:4;166:18
**Oftentimes (1)**

247:6
**Ohio (1)**
9:14
**old (2)**
191:11;232:17
**old-school (2)**
164:15,16
**once (9)**
49:4;50:10,14;55:2;
61:9;67:21;68:3;174:9;
242:8
**one (101)**
16:19,21;20:22;23:3;
29:1,2;31:22;38:5;
43:10,12;47:3,7;48:9,
13,14;56:22;59:15;
61:1;65:9,15,16,16,22;
134:13;137:21;140:7;
141:3;143:13,25;
144:19;152:10;161:3;
167:7;170:21;171:21;
175:1;176:17;178:16,
22;182:19;188:7,13;
193:25;195:8;196:14,
15,20;200:15;204:9;
208:15,20;211:21,22;
212:8;213:8,14,17;
223:2,4,7;224:6,6,9,19;
225:19,19;226:7,9,20,
25;228:1,2,4;229:9;
234:18,19,20;239:16;
241:11,12;243:21,25;
244:4,5,8;245:18;
246:15;247:13;252:16;
256:18,20,24;257:3,21,
21,22;258:24;260:6,8;
263:6,12
**one- (1)**
160:25
**ones (1)**
257:17
**one-story (1)**
229:13
**one-third (1)**
175:25
**online (1)**
166:19
**only (30)**
27:22;37:10;50:5;
61:4;65:9,18;69:4;
70:1;149:13;152:8;
164:9;167:5;179:21;
181:13,15;185:15;
193:25;199:18;205:8;
206:22;207:16;210:12;
229:20;233:10,10;
243:12;244:6;252:16;
253:7;255:6
**ons (1)**
57:2
**open (2)**
51:7;263:17
**opening (5)**

26:7,14,15;27:20;
61:21
**operated (1)**
23:5
**operating (2)**
159:24;160:9
**operation (1)**
13:6
**operations (7)**
9:20;10:11;13:3,4;
14:23,24;57:9
**operator (1)**
8:2
**opine (5)**
25:3,5,7;192:3;
217:12
**opining (3)**
205:1;206:10;220:14
**opinion (33)**
26:15;28:18;64:13;
66:6;68:4,24;69:2;
70:6;146:1;153:3;
159:15;163:9;164:2,8;
176:3;177:13;178:11;
184:18;185:3,6;
186:23;189:4;191:24;
205:17;216:2;220:13;
221:21;252:21;254:21,
22;259:13;260:18,21
**opinions (3)**
66:20;164:7;208:4
**opportunity (2)**
12:2;179:4
**opposed (5)**
62:3;139:17;140:23;
144:3;207:9
**optimism (1)**
156:2
**optimistic (2)**
5:8;155:25
**order (32)**
23:3;24:1,10,13;
25:13;28:13;29:12;
34:19;45:5,7,25;48:22;
49:6;64:20,23;70:25;
162:23;172:18;180:2;
190:13,19,24;191:3;
192:25;194:12;202:10;
205:22;206:14;215:11;
227:3;234:12;251:18
**organization (4)**
17:5;22:6,7,10
**organizations (2)**
19:19,21
**original (1)**
69:3
**originally (6)**
63:8;68:21;226:1;
240:15;241:2;244:22
**OSHA (5)**
161:8,9,18,19,20
**others (1)**
28:22

Case 16-01120    Doc 382    Filed 08/22/19    Entered 08/22/19 10:11:12    Desc Main
LYMAN-CUTLER, LLC v.
KAGAN, et al.
Document    Page 282 of 292

July 29, 2019

otherwise (1)
196:23
out (73)
14:8;16:1;17:2;
25:22;37:15;41:17;
43:2;50:12;51:10,12;
52:5,13,14;53:3,25;
54:19;55:4;64:20,23;
65:14;68:10,11;139:6,
22;140:3,6;146:19;
148:16;149:15;154:24,
24;164:23;165:6,9;
168:5;171:6;177:15,
21;178:2,15,22;179:15,
17;184:19;192:4;
197:20;198:3,8;
199:12;200:12;207:16;
208:13,24;209:1,4,8,
10;211:10;219:17;
221:10,11,12,14;
224:21;229:20;235:2;
239:21;241:2;247:7,
21;248:4;254:16;262:9
outcome (1)
155:12
outlets (1)
13:7
outlines (1)
253:13
output (1)
164:23
outset (3)
160:16;185:11;
186:24
outside (10)
10:25;11:6;44:14;
51:22;59:8;60:15;61:2;
63:14;64:7;250:6
Over (18)
17:19;19:10;24:1,2;
48:13;50:16;53:16;
59:18;63:22;65:18;
151:13;159:21;160:8;
177:11;183:20;218:19;
246:4,6
overall (3)
9:20;172:19;185:3
overbilling (1)
255:20
overhead (67)
57:10,11,12,16,18;
58:4;66:21,23,24;
148:10,13,20,22;149:1,
9,9,15,16,17,22;150:4,
7,14;171:23,24;172:2,
4,9,22;176:17;214:3,7,
8,11,15,18,24,25;
215:3,11,15,20,24;
216:4,7,8,16,17;217:6;
220:11,24;221:3;
222:13;228:6,13;
236:18;237:1,8;
242:20,22,23;255:2,12,

14;257:4;258:7;259:1
over-inflated (1)
52:19
overlook (1)
253:25
overly (1)
51:2
Overruled (4)
58:23,25;59:2;182:7
oversaw (6)
10:11,13;13:10;
17:10,11,12
oversee (3)
12:13;13:8;14:24
overseeing (4)
9:23;13:6;15:14,18
own (28)
7:3;21:15;63:10,25;
133:22;134:1;151:23;
154:1;159:24;160:9;
162:4,5,8,9,10,10;
164:8;168:17;170:7;
171:5,5;179:13;
184:20;192:23;198:12,
13,20;221:12
owned (4)
35:11;152:10;258:2,
3
owner (1)
198:24
owners (1)
13:1
owner's (3)
7:10;18:5,9
Oz (1)
202:10

**P**

package (5)
34:19;43:4;54:2;
134:3;135:4
packages (1)
45:7
pads (2)
222:19;240:6
page (52)
40:23;41:13;65:2;
68:11;135:5,10,11,25;
167:7;169:12,14,15;
174:2,16;184:6,6;
194:6;209:21;211:3,
19,25;217:8;219:10,11,
15,19;220:2,4;222:25;
223:1;224:1;228:20,
24;229:4,7,8,9,12;
232:4;234:2,4;235:18,
24;236:15,16;242:15,
17;251:2,21;252:2,11;
260:10
pages (5)
33:21;133:22;
206:13;224:2;237:16

paid (3)
143:2;155:8;237:6
paint (3)
232:16;233:11,15
painted (1)
39:8
painting (3)
162:14;200:15,17
paneling (1)
39:5
paper (1)
164:18
papers (1)
211:2
parity (1)
224:24
part (21)
8:5;12:13;15:2;22:2;
31:7;32:1;39:18;70:15;
134:3;153:11;160:19;
165:9;170:7,8,9;
172:12;180:2;191:22;
208:1;215:17,24
participate (1)
153:12
participated (1)
15:18
particular (11)
8:21;53:22;68:2;
138:22;140:12,13;
149:10;162:21;173:4;
178:20;239:14
particularly (2)
60:1;219:2
parties (2)
4:11,21
parties' (1)
5:3
partners (1)
159:20
parts (5)
12:8;179:5,15,23,23
partway (1)
170:24
pass (2)
19:1;23:7
passage (1)
146:14
past (4)
28:20;52:18;149:8;
233:4
paste (2)
173:23;174:1
patio (2)
43:1,1
patios (1)
14:10
pattern (1)
42:7
patterns (1)
31:3
Pause (6)
70:11;184:8;187:5;

231:20;239:23;262:23
pavement (1)
234:18
pay (2)
196:23;237:17
paying (2)
59:20;196:22
pending (1)
225:21
people (8)
51:13,15;52:1;
140:25;153:10;165:24;
187:20;250:6
peppered (1)
254:15
per (36)
35:16;64:8;69:21;
143:20;165:9;168:14;
169:20,21,22;171:15;
176:3,20;177:11,15,16;
179:9;180:8;181:4;
202:23;245:14,25;
246:21;251:25;252:12,
13,13,17,17,18;254:5,
7,7,8;255:21;260:5,12
percent (45)
16:19,21;57:21,24,
25;58:1,2;59:18;60:3,
3,4;67:2;149:2,4,7,7,8,
10,12,12,14,15,17;
150:14;160:14,18;
168:25;173:6;175:7,8;
176:1;186:15,25;
196:2;197:20,23;
198:1;222:13;252:24;
253:2;255:2,7,8,12,14
percentage (1)
57:17
PEREN (1)
213:25
perfectly (1)
207:21
perform (7)
24:1,23;28:9,20;
139:23;172:8;216:25
performed (6)
25:6;64:11;67:5,19,
22;220:6
performing (3)
62:6,7;173:14
perhaps (1)
209:13
per-house (1)
68:9
perimeter (1)
239:7
period (7)
14:5;15:21;16:24;
17:24;19:11;23:5;
51:20
permanent (2)
162:24;242:2
permit (17)

30:5,8;31:8;34:15,
22;35:2;46:18;48:19;
175:13;203:13,18;
205:23;206:8;207:17;
232:21;260:16,18
permits (3)
23:14,19,21
permitted (1)
218:13
personally (5)
15:14;17:20;18:19;
152:10;166:7
personnel (1)
10:10
perspective (1)
216:1
per-square-foot (2)
185:23;186:2
PERTEN (210)
4:17,17;5:1,2,5,7,10,
12;6:17,18,19,21;
21:10,18,23;26:21,25;
27:2,6,14,16;28:5,7,8;
31:18,21,24;32:5,7,12,
14,17,18;33:4,5,8,9,21,
23;36:25;37:4;38:1,4,
7,9;39:11,13,22,23;
40:16,18;41:10,12,25;
42:1,12,13;43:20,22,
24,25;45:16,22;46:25;
47:2,4,6,9,11,17,20;
58:21,24;59:1,3;60:21,
25;70:8,12,14;71:13;
134:7,9,14,15,16,18,22,
25;153:18;155:16,25;
156:16;157:1,4,7,9,12,
19,21,24;158:1,9;
180:15;181:7,14,16,22,
24;182:1,9,11,16,18;
187:7;190:4,5;193:14,
15,19,21,23;194:2,4;
195:5,6;211:5,8,11,14;
212:4,7,11,13,16,19,22,
24;213:2,5,9,19,24;
217:16,19,22;218:1,3,
6,9,16,19,22;219:7,9,
23;220:1;222:21,23;
225:4,6,7,25;228:16,
18,25;229:3;231:18,
23;238:9,12,19,21,24;
239:24;245:8,9;252:4,
10;256:4,14,17,20,22;
259:5;260:14;261:15,
20,22;262:3,7,13,15,
18;263:3,8,15,18,20;
264:8,15,17,21;265:2,
4,8,12,18,21,24
pertinent (1)
150:25
per-unit (1)
200:15
per-unit- (1)
167:3

Case 16-01120    Doc 382    Filed 08/22/19    Entered 08/22/19 10:11:12    Desc Main
LYMAN-CUTLER, LLC v.                Document      Page 283 of 292
KAGAN, et al.                                                                            July 29, 2019

Peter (1)
  4:15
ph (1)
  209:13
phone (4)
  151:13,18;152:12,13
phoning (1)
  152:16
photograph (3)
  188:6,7,13
photographs (11)
  37:22,24;39:15,15;
  44:2,13;163:17,23;
  164:11;170:10;188:10
photos (6)
  38:8,10,12,17;48:20;
  137:13
phrase (1)
  152:21
physical (1)
  38:13
pick (2)
  170:21;237:16
picked (1)
  237:5
picking (3)
  71:22;143:22;196:21
pickup (2)
  140:9;197:8
picture (5)
  42:5;43:7;183:10;
  248:14,23
pictures (1)
  40:1,23;41:13;42:2;
  43:14;180:13,23;
  183:5;248:6,8;249:15
piece (1)
  262:25
pieces (1)
  12:8
pine (1)
  144:24
pinnacle (1)
  10:22
place (1)
  190:25
placement (1)
  46:22
places (1)
  213:11
plaintiff (1)
  158:13
plan (11)
  32:10,11,16;47:12;
  192:5,7,19,21;207:22;
  243:21,21
plans (100)
  11:13;13:15;23:16;
  29:14,15,24;30:2,4,7,
  11,12,13,20,22,23;
  31:21;32:2;33:15,17;
  34:15,15,18,21;35:1,
  16;46:11,13,15,16;

47:3;48:1,19,20;50:8;
71:3,4;133:4,7,18;
134:2;136:16,20,24;
137:17;152:14;162:24,
24;163:1;164:10,18;
170:9;185:16,18,25;
186:20;203:9,11,12,16,
18,21,22;204:10,15,21,
24;205:2,8,9,14,18,23,
24;206:8,11,11,12,13,14;
207:1,2,6,13,17,18;
208:12,16;210:13,13;
242:2,3,4,5;243:19;
244:3;250:8,9,9;260:5,
16,19
plant (1)
  9:22
plaster (1)
  55:23
plastering (1)
  55:22
please (27)
  4:11;5:13:6:24;7:12;
  31:19;32:13,17;33:4;
  39:12;40:17;41:11;
  47:1;10;56:13;63:6;
  159:9,18;183:8;184:3;
  193:5;218:3;219:10;
  225:23,24;238:20;
  252:1,5
plumber (1)
  8:1
plumbing (2)
  42:9;49:12
Plus (3)
  43:4;140:1;224:9
pm (4)
  158:3,4;238:16,17
pocket (3)
  148:16,16,17
point (26)
  10:15;13:21;18:23;
  26:15;27:4;31:13;
  51:23;68:10;71:22;
  138:18;152:10;154:12;
  158:8;159:21;161:14;
  188:21;203:8;204:9;
  209:10,10;224:21;
  231:9,11,14;256:4;
  265:15
pointed (7)
  68:11;134:19;
  207:16;208:24;209:1,
  4,8
points (1)
  31:13
poles (2)
  144:16;180:6
pool (1)
  191:9
porch (3)
  242:12,12;243:2
portion (2)

206:15;247:6
portions (3)
  257:15,16,16
position (2)
  9:15;46:19
possibility (1)
  197:21
possible (5)
  50:7;51:24,24;
  150:22;156:4
possibly (2)
  53:25;150:10
post-trial (1)
  265:5
potential (2)
  24:10;152:22
potentially (2)
  153:15;171:8
pour (2)
  162:10;237:9
poured (1)
  243:1
pouring (2)
  236:20,23
practice (1)
  150:17
practices (1)
  24:9
pre-existing (1)
  139:13
preliminary (4)
  185:15,18;186:6,20
prepare (5)
  23:16;29:12;34:19;
  45:7;49:24
prepared (5)
  151:6,6;156:12,13;
  181:9
preparing (3)
  50:2;69:16;70:16
prepped (1)
  191:6
prepping (1)
  251:15
pre-rebuttal (1)
  26:8
prescribed (1)
  136:6
present (1)
  18:18
presented (3)
  61:15;142:21;198:14
presently (1)
  35:10
presumably (2)
  53:3;191:6
pretty (12)
  8:3;41:8,19;155:12;
  163:24,24;186:17;
  188:6;222:13;229:22,
  22;264:7
prevent (2)
  139:5;206:1

preview (1)
  5:2
previous (1)
  28:22
previously (6)
  55:1;156:11;162:15,
  18;167:18;264:18
price (39)
  51:22;52:14;56:17;
  59:16,17;60:8;66:2;
  133:19;140:5;144:1;
  145:18,19,24;154:23;
  169:20,21,22;171:14,
  15;224:17;227:22;
  229:13,20;230:11,12;
  233:21;235:5,13;
  236:8;240:25;242:9,
  19,19;245:17;247:4,21,
  25;251:18;252:23
priced (5)
  56:14;239:21;240:8;
  248:4,11
prices (22)
  52:1,19;53:1;55:5,7;
  56:15;68:25;133:13,
  14;143:18,20;146:7;
  153:8;173:9;199:8;
  200:5;208:25;227:14;
  234:7;249:7,8;254:2
pricing (9)
  37:9;51:18;52:13;
  55:3;229:6;236:1;
  247:14;251:4,12
primarily (5)
  7:9;11:6;159:22;
  160:6,7
printout (1)
  176:15
prior (3)
  7:20;13:12;24:12
privately- (1)
  35:10
Probably (19)
  9:11;13:7;16:18,21;
  19:10;23:21;24:19;
  41:16;43:17;55:13;
  58:2;133:22;143:14,
  18;147:14;167:24;
  184:7;206:24;253:1
problem (5)
  6:11;163:21;202:16;
  210:15;216:1
procedural (1)
  156:1
proceed (5)
  6:17;63:6;70:12;
  225:4;238:19
proceeding (1)
  4:6
process (8)
  136:22;139:1;140:1;
  151:19;162:22;173:1;
  176:2;186:12

product (2)
  54:1;139:3
Products (3)
  12:4,5;14:14
ProEx (65)
  25:6;67:9,11,12,23;
  68:4,6,25;69:12;172:8;
  176:10,13,22,22,25;
  189:9,12,13,16;190:20,
  20,21;191:1,6,7,15,16,18,
  20,24,25;192:3,13;
  193:3;203:21;205:1,
  17;206:10;210:2,5,10;
  215:1,6,15;216:7;
  223:16;224:7,9;226:2,
  5;227:9;228:6,8,10,13;
  236:19,20;243:4;
  257:2,18,23,24;258:2,
  5,17;259:22
ProExcavation (9)
  4:18;67:6,19;172:8;
  194:16;204:19,20;
  216:14;257:4
ProEx's (2)
  176:23;215:23
profession (2)
  18:12;68:5;232:9
professional (8)
  7:13;19:19;22:16,19;
  160:21;161:6;198:19;
  232:14
professionals (3)
  165:23;166:2;173:12
proffers (1)
  20:23
proficiency (1)
  23:8
profit (31)
  136:11;143:20,21;
  149:15,16,20,23;150:4;
  154:12,24;171:23,24;
  172:2,4,9,22;176:17;
  214:9;216:5,7,8;228:6,
  13;236:18;237:1;
  242:20,22,24;257:4;
  258:7;259:1
program (2)
  12:9;162:25
programs (1)
  17:10
project (55)
  16:8;17:6,7,8,12,13;
  18:24;19:3,6,9,12;
  25:18,21,22;28:10;
  34:10;46:1;50:18;57:3,
  7;61:7,11,18,25;62:12;
  64:14;65:13,15,16,16;
  66:7;69:17;70:16;
  139:6;140:13,15;
  151:9;160:17;172:20;
  185:9,11,12,15;190:14;
  195:9;198:8;199:25;
  200:4;204:12;205:17;

210:9;217:2;220:7;
223:21;226:14
**projecting (2)**
143:6,7
**projects (19)**
9:21,22;10:12,14;
11:9;13:9;15:14;17:11,
15;18:7;19:2;45:7;
63:22;133:1;159:22;
160:10,12,15;167:23
**promulgation (1)**
22:7
**proof (3)**
37:6;54:23;253:13
**proof-of-claim (5)**
36:20;37:1;67:10;
164:1;189:1
**proper (1)**
46:20
**properly (1)**
173:12
**properties (5)**
8:23;9:1;16:4;48:5;
163:15
**property (9)**
43:13,18;44:9;47:12;
147:17;244:1,2;260:5,
12
**proportional (1)**
157:25
**proportionality (1)**
224:24
**proposal (16)**
134:6,11;152:13;
183:23,24,25;184:3,9,
11;190:21;191:19,21,
25;192:4;193:1;194:16
**proposals (2)**
189:13,17
**proposed (6)**
190:18,20;262:11,
14,21;265:10
**Protection (1)**
20:11
**proves (1)**
27:4
**provide (10)**
11:10;34:18;51:8;
133:1,4;135:17;140:2;
143:16;164:24;207:12
**provided (19)**
22:2;25:8,18;29:3;
37:22;50:20;54:23;
55:15;71:24;133:7;
135:14,16,21;136:1,20;
152:13;188:22;209:19,
20
**provides (1)**
195:21
**providing (3)**
51:2,9;231:5
**publication (1)**
59:15

**publish (1)**
165:24
**published (3)**
165:14,15;166:20
**pull (8)**
23:14;31:18;38:1;
46:25;47:9,17;194:22;
218:6
**pulled (2)**
23:19,21
**pulling (1)**
134:22
**purchase (1)**
12:2
**purchased (3)**
165:15;188:1,18
**purchasers (1)**
44:9
**pure (1)**
209:8
**purports (1)**
211:18
**purpose (4)**
55:17;136:22;
159:13;172:15
**purposes (1)**
164:5
**pursue (1)**
18:4
**put (20)**
21:19,19;134:7;
146:22;165:8;168:14;
169:5,11;171:19;
187:21;193:5;194:19;
203:4;207:23;220:16,
19;222:3;231:17;
232:25;258:3
**putting (1)**
142:22
**PVC (1)**
250:20

**Q**

**QC (1)**
6:6
**quacks (1)**
142:7
**quadruple (1)**
173:24
**qualification (5)**
203:23,25;207:23;
208:2,7
**qualified (4)**
162:15,19;167:18;
221:21
**quality (4)**
140:21;141:3,5;
252:16
**quantified (1)**
163:3
**quantify (1)**
162:25

**quantities (6)**
11:7;164:25;165:6,7;
203:6;208:24
**quantity (8)**
164:15,25;169:19,
22;171:2,13;224:15;
240:13
**quarterly (1)**
166:20
**quick (1)**
163:19
**quickly (2)**
51:24;71:22
**quite (6)**
7:23;19:2;44:22;
67:9;152:1;186:14
**quotations (1)**
178:15
**quote (6)**
55:1;60:11;176:24;
199:19;234:23;257:18
**quotes (2)**
51:8;201:4

**R**

**raise (2)**
254:3,8
**ran (1)**
255:2
**ranches (1)**
16:17
**randomly (2)**
50:3;137:24
**range (9)**
15:12;53:13,14;
57:25;135:18;155:22;
186:16;249:10,20
**ranges (1)**
251:4
**ranging (1)**
8:25
**rare (1)**
145:1
**rates (1)**
237:5
**rather (2)**
198:10;218:11
**reached (1)**
10:21
**reaction (2)**
183:24;184:2
**read (9)**
194:6;211:8;229:1;
231:21;232:7;237:14,
16,23,24
**reading (6)**
13:15;20:15,18,19;
21:8;217:8
**ready (1)**
213:23
**real (2)**
28:10;188:15

**realize (1)**
243:14
**realized (2)**
241:23;245:1
**really (11)**
55:5;150:5;160:18;
161:14;180:12;182:12;
189:24;190:6;220:21;
263:11;264:25
**realm (2)**
28:11;197:20
**realtors (2)**
37:23;138:19
**rear (1)**
33:6
**reason (3)**
143:3;172:25;192:22
**reasonable (23)**
25:4,6,7,10;67:5;
68:5,6,25;69:8;141:17;
145:25;151:1,9,24;
178:7;180:7;185:20;
190:11,13;216:3,4,6;
247:9
**reasonably (1)**
186:21
**reasons (1)**
204:9
**Rebuilders (1)**
20:6
**rebut (3)**
159:15;181:5,12
**rebuttal (12)**
26:17,22;27:1,2,22;
28:3,4;157:16;158:13;
181:9;182:5;209:3
**recall (22)**
27:12,24;45:9;
134:20;139:14;144:17;
146:15;147:3;148:11;
150:11;151:15;152:23;
176:18;182:7;187:12;
191:13;201:10;203:6;
209:12;217:2;221:4;
248:9
**received (9)**
53:24;54:11;56:4,25;
133:6;141:15;142:9;
147:11;162:24
**recessed (1)**
40:7
**recession (2)**
18:2;59:24
**recite (1)**
216:23
**recognize (1)**
135:11
**recognized (2)**
165:14;249:10
**recollection (2)**
21:14;212:17
**record (9)**
4:12;6:5,6;158:3,4;

211:9;219:2;238:16,17
**recoverable (3)**
217:6;221:8,9
**RECROSS (1)**
153:23
**recycling (1)**
235:1
**red (2)**
249:11,12
**redacted (5)**
36:20;37:9,19;44:2;
54:24
**redid (2)**
241:5,22
**redirect (3)**
154:6;259:8,10
**reduce (6)**
142:14,21;150:17,
20,20;172:18
**reduced (6)**
63:9,16,19;142:18;
144:1;228:2
**reduces (2)**
258:25;259:1
**reduction (3)**
59:25;64:1;65:10
**reductions (1)**
61:17
**redundancies (2)**
173:20;174:13
**REF (1)**
213:18
**refer (4)**
22:14;60:9;63:2;
235:18
**reference (1)**
137:1
**referenced (3)**
48:21;163:4;243:19
**references (1)**
211:19
**referencing (4)**
38:10;45:11;204:16;
247:6
**referring (8)**
20:20,22;21:14;22:1;
39:16;61:20;70:19;
208:2
**refine (1)**
186:22
**refines (1)**
185:25
**reflect (2)**
29:10;59:10
**reflected (3)**
67:22;152:17;249:15
**reflecting (1)**
50:11
**reflective (1)**
53:21
**refresh (7)**
21:13,14;45:13,17;
60:14;191:4;218:13

**refrigerator (4)**
248:11,13,25;249:3
**refrigerators (1)**
248:8
**regard (1)**
163:14
**regarding (1)**
144:16
**regardless (1)**
68:23
**regime (1)**
51:18
**region (1)**
201:10
**regional (1)**
168:22
**regulated (1)**
233:1
**regulations (4)**
202:21,21;232:9,12
**related (5)**
67:19;68:3;188:24;
190:10;216:17
**relating (1)**
179:6
**relationship (9)**
50:23;51:3,5,6,7;
63:20,22;139:14;
173:13
**relationships (3)**
50:17;51:22;153:16
**relatively (2)**
43:5;59:19
**reliability (1)**
166:14
**reliable (1)**
165:14
**relied (7)**
25:25;34:16;137:6,9;
141:18;198:25;205:12
**reluctance (1)**
153:11
**rely (7)**
163:25;189:4;
191:17;195:15,24;
207:24;209:6
**remain (1)**
200:6
**remember (4)**
180:9,20;183:23;
191:20
**remembering (1)**
20:25
**remind (1)**
60:19
**Remodelers (1)**
19:25
**Remodeling (1)**
20:3
**removal (1)**
203:4

**remove (4)**
236:18;258:7;
263:25;264:6
**removed (6)**
62:5;65:7,10;191:9;
228:6,13
**removes (1)**
259:1
**renewing (2)**
58:9,15
**renovations (1)**
24:5,6
**rent (2)**
257:25;258:1
**Repeat (1)**
246:15
**Rephrase (1)**
217:7
**report (146)**
21:5,24;22:2;26:7,9,
14,22;27:1,2,20,22;
28:2,3;45:10,11;60:9;
61:21;68:11;70:2;
151:3,6;169:5,14;
173:16;174:2;180:16;
181:1,9,12,18;189:9,
12;190:10;191:3,7,13,
22,23;192:12,25;193:2,
6,6,9,12,14,15;194:12,
15,18,19;203:9,12,14,
18,19,21,23,25;204:3,
14,16,19,25;205:3,6,7,
10,13;206:4,7,10;
207:19;208:15,18;
209:2,3,13;210:3,3,9,9,
13,14,16,18,19,21,23;
211:20,25;216:23;
217:8,10,18,19,21,22;
218:5,7,25;219:4,12;
220:16,19;221:7,12,16;
222:3,6;223:14;224:3,
25;225:1,11,15,15;
226:1,4,10,18,19;
227:18;228:7,8,9,14;
231:5;232:15,20;
236:7,12,12;237:10,12,
20;239:5;240:11;
243:20;244:11,25;
247:1;256:24;259:13,
16,19
**reports (8)**
44:7,8;46:12;60:20;
189:7;209:19;218:22;
226:7
**represent (2)**
161:24;226:13
**representation (2)**
7:10;18:6
**represents (1)**
169:16
**reps (1)**
18:9
**reputable (2)**

**176:6;261:6**
**requested (1)**
36:20
**require (1)**
156:6
**required (9)**
23:11,25;24:13;
46:17;192:11;199:11;
206:14;227:3;245:13
**requirements (6)**
46:24;49:17;51:16;
224:13;258:5,18
**reserve (1)**
204:3
**reside (1)**
7:1
**residential (22)**
8:4;9:1,21;10:12;
12:11,12,16,18;14:25;
15:7;16:4;17:16,18;
18:20;23:6,15;24:3,4;
159:22;160:6,7;213:18
**resource (1)**
13:8
**resources (1)**
185:22
**respect (5)**
22:24;27:7;46:7;
163:16;198:8
**responding (2)**
138:16;182:3
**response (3)**
136:5;152:19;181:8
**responses (1)**
133:10
**responsibilities (6)**
9:19;12:14;13:5;
15:2;16:6;17:9
**responsible (4)**
15:14;22:7;160:13,
15
**responsive (1)**
136:19
**rested (1)**
158:8
**result (3)**
146:14;208:4;260:22
**results (1)**
56:9
**RESUMED (1)**
238:23
**retail (3)**
11:22;12:6;13:7
**retaining (3)**
36:4;43:10,12
**retention (1)**
46:22
**retracted (1)**
203:20
**return (1)**
265:25
**review (5)**
44:23;54:25;208:4;

**216:20;256:2**
**reviewed (21)**
29:24;36:22;37:5,22;
38:5;44:7,18;45:5,24,
25;47:23;48:19;49:25;
138:8;143:24;173:17;
183:5;194:8,11;209:2;
237:11
**reviewing (4)**
44:2,2;61:15;142:6
**revise (2)**
207:18;208:10
**revised (8)**
68:23;208:17,18,24,
24,25;236:7;244:25
**ridiculous (1)**
202:11
**right (223)**
4:22,22,25;5:1,9,12,
24;6:3,15,18;16:20;
21:22;24:23;26:15;
27:4;31:21;33:20;34:3;
39:18,21,24;40:22;
41:20;42:5;43:7;45:20;
47:14;51:23;55:24;
62:14,17,25;64:3;70:8;
71:7;146:18;147:20;
148:5;151:10;154:1,6,
8,10,11,12,16,23,25;
155:1,5,6,7,8,13,19;
156:25;157:8;158:10,
19;159:1,2,24;160:1;
161:2,15;164:9,17;
166:4;167:25;168:9,
13,18,19,21,23;169:6,
17,23;171:3,7,9,15,16,
18;172:13,17,21,24;
173:18;174:9,10;
175:1,4,10,14,18,20;
176:5,6,18;177:1,8,11,
20,23;179:17,22;
180:4;181:2;182:14,
15;183:8,11;184:22;
185:2;186:6,23;191:1;
192:20,22;193:8;
194:7;195:19;197:24;
198:13,25;199:14,16,
17;200:11;201:7;
204:3;209:23;211:24;
212:3;213:17,18,20,22;
214:7,13;218:5,6,23;
219:21;221:11,22;
222:3,12,24;223:7,25;
224:11,12,16;225:2,22;
226:14,19;227:14,20;
228:15,16;230:3,14;
235:9,13;236:13,17;
237:14;238:13;240:1,
12,20;241:4,7,14;
242:8,8,14;243:8,16;
244:21;245:7;246:13;
247:6,17;249:24;
252:7,24;254:23;

**255:13;256:8;257:9;**
258:25;259:3,16,16,18,
20,21,23;260:5,9,10,
12,16,17,19,21,25;
261:6,8,10;262:1,4,10,
11;263:6,21,25;264:1;
265:17
**right-clicked (1)**
173:22
**righthand (1)**
240:5
**right-hand (3)**
212:8;223:5,10
**rise (2)**
4:2;158:2
**rises (1)**
43:2
**Rockland (1)**
46:5
**role (1)**
14:22
**roll (1)**
164:18
**rolling (1)**
164:17
**roof (6)**
36:9;140:5;206:17,
17,19;247:22
**roofer (1)**
140:5
**roofing (2)**
162:11;247:14
**rooms (3)**
30:24;31:4;39:1
**Rosh (1)**
263:15
**rotate (3)**
31:23;47:4,10
**rotunda (1)**
42:14
**roughly (6)**
17:19;19:14;59:17,
20;146:18,19
**RRP (2)**
24:7,11
**RSMeans (46)**
26:2,5,7;27:21;
163:5;165:9,12,13,15,
17;166:4,8,10,14,25;
167:12,15,19,23;
168:19;171:8;173:10;
195:7,15,21,24;196:6;
198:16,18;199:1,1,7,
13;202:24;209:21;
211:19,25;213:18;
228:20;230:12;234:3;
239:21;240:8;244:14;
247:5;265:21
**rule (4)**
21:12;175:24;
182:22,23
**rules (3)**
156:11;159:1;202:21

Case 16-01120    Doc 382    Filed 08/22/19    Entered 08/22/19 10:11:12    Desc Main
LYMAN-CUTLER, LLC v.
KAGAN, et al.
Document    Page 286 of 292

July 29, 2019

**rulings (4)**
262:11,14,22;265:10
**run (3)**
26:16;53:10;233:8
**rundown (1)**
7:11
**running (1)**
162:3
**run-off (1)**
46:22
**runs (2)**
23:20;149:1

## S

**S-1 (1)**
33:14
**S-4 (1)**
34:3
**S-5 (1)**
34:5
**S-6 (1)**
34:7
**S-8 (1)**
33:15
**safe (2)**
24:9;199:6
**safety (2)**
35:3;161:21
**sale (2)**
13:10;37:23
**Saleni (1)**
182:8
**sales (2)**
10:11;175:21
**salesman (2)**
10:25;11:6
**salesmen (1)**
13:8
**Salmi (55)**
5:13,15,18,18,19,20;
6:22,25;7:1,6,7;14:4,6,
15;18:5,16;20:14,15;
22:4;26:6;27:7;30:17;
31:25;37:5;56:8,18,24;
57:2;58:6;62:22;70:15;
71:20;143:22;147:3,
14;153:25;155:18;
156:22;158:14;159:15;
170:8;177:7,11;
178:15,19;180:4,18,25;
182:9,11,12;183:13;
185:5;209:6,7
**Salmi-4 (1)**
184:6
**Salmi's (7)**
58:10,17;175:19;
178:10;185:3;209:2;
250:8
**same (36)**
4:21;19:4,14;22:1;
25:15;34:5,7;49:2;
63:24;65:17;139:8;

148:5;149:25;151:19;
164:22;172:25;176:25;
181:1,20;183:18;
184:21;197:4,8;
225:12;228:2,9;
230:22;239:11,15;
241:23;243:25;244:2;
253:11,12;255:15;
265:12
**savings (2)**
62:14;63:23
**saw (9)**
42:17;43:15;44:12,
13;55:21;143:10,19;
188:7;192:22
**saying (9)**
29:4;139:18;140:2;
180:6,25;202:9;210:6;
212:24;218:21
**scale (11)**
48:9;65:24;66:1;
67:25;69:24;71:4;
150:21;164:16,19;
244:3,18
**scary (1)**
265:23
**schedule (4)**
41:9;139:24;200:2;
264:6
**Science (1)**
161:23
**scope (16)**
25:19;49:1;133:23;
135:19;151:11,21;
182:20;190:10,17,19;
198:8;200:6;215:17;
221:15,25;247:7
**scoped (1)**
247:7
**scrap (3)**
233:3;234:25;235:10
**screen (2)**
39:24;184:10
**scribbled (1)**
186:18
**scroll (14)**
32:5,12,17;33:4,22;
38:7;39:11,22;40:17;
41:11;42:12;43:20;
219:10;230:11
**se (2)**
64:8;143:20
**Sean (2)**
4:13;218:22
**season (1)**
184:16
**seat (1)**
42:8
**seated (2)**
4:5;158:6
**second (43)**
63:17;64:24;65:7,13,
20;66:2,7,15,25;68:14,

15;135:25;184:6;
203:18;206:7;210:3,9,
13,14,18;211:24,25;
217:21,22;218:5,6;
224:3;225:15;226:4,
19,25;228:2,9,14;
236:12;241:12,15;
244:11;245:4;247:1;
257:23;260:10;263:12
**second-floor (2)**
12:16;41:15
**Secondly (1)**
153:7
**secret (1)**
208:13
**section (11)**
167:3,3,4,4,9,9,10,
10;200:13,13;234:6
**sections (1)**
167:2
**security (2)**
63:24;254:14
**seeing (2)**
27:22;44:18
**seem (1)**
212:18
**seemed (2)**
28:22;149:11
**seems (1)**
149:9
**segment (2)**
13:22;16:16
**segue (1)**
28:23
**select (4)**
57:24;140:14;
178:15,19
**selected (2)**
18:7;50:19
**selection (3)**
139:25;140:12;
167:25
**self- (1)**
62:6
**sell (1)**
141:4
**selling (3)**
9:22;12:6;154:23
**send (1)**
50:12
**senior (2)**
17:7,8
**sense (2)**
144:15;230:2
**sent (6)**
52:5;53:3,25;54:19;
134:3;135:1
**separate (1)**
176:14
**separates (1)**
235:2
**separating (1)**
235:11

**September (8)**
219:12;225:19;
226:9;259:16,17;
262:5,18;265:14
**series (2)**
140:11;200:1
**serve (1)**
20:4
**service (3)**
245:21,23;248:7
**services (2)**
24:24;62:7
**serving (1)**
20:1
**session (3)**
4:2;158:5;238:18
**set (24)**
44:14;49:24;50:8,10;
138:3,12;149:15;
162:24;164:18;185:16,
18;186:20;203:12,13,
18,21,22;206:8,12;
208:16;210:12,13;
242:2;261:19
**setbacks (1)**
46:20
**sets (1)**
206:13
**seven (10)**
10:10;17:12;59:18;
60:4;149:12,12;
186:25;247:13,16;
249:24
**seventy (1)**
59:20
**seventy-five (1)**
59:21
**several (4)**
18:20;45:2;59:13;
147:1
**SF (1)**
170:18
**shape (1)**
48:17
**sheet (10)**
32:8,9;34:3,13;
163:17;176:14;178:18;
247:20,23,24
**sheets (1)**
32:19
**shelves (4)**
144:16;180:7;
187:15,21
**shelving (4)**
145:7;183:17;
187:12,13
**shingle (2)**
250:22;252:2
**shingles (3)**
42:22;250:10;252:11
**shingling (1)**
36:11
**ship (1)**

180:1
**shipping (1)**
12:7
**shop (1)**
179:19
**short (3)**
156:13,23;238:3
**shorted (1)**
240:22
**shoulders (1)**
14:8
**show (13)**
26:24;30:13,14,25;
32:9,15;33:17;34:21;
42:6;46:18;135:10;
174:3;250:9
**showed (5)**
37:23;43:17;59:16;
134:5;248:8
**shower (5)**
41:20,21;42:8,8,10
**showing (8)**
29:3;30:22;31:25;
33:14;39:24;42:2;
46:23;169:8
**shown (4)**
31:10;219:17;
243:19;248:14
**shows (8)**
32:10,16;41:20;42:7,
8,8;43:8;204:11
**shy (1)**
252:18
**sic (2)**
158:17;182:8
**side (22)**
12:16,18;15:7;21:16;
71:7,7;152:6;198:4,7,7,
9,10,11;199:5;240:5;
250:11;252:19,25;
253:2;254:10,16;261:3
**sided (1)**
70:20
**sides (1)**
261:14
**sidewall (2)**
71:11;252:18
**siding (15)**
35:19;70:23;71:11,
12;162:11;249:25;
250:2,10,16,17,24;
251:7,8,23;252:12
**sign (1)**
186:3
**significant (1)**
62:17
**significantly (4)**
146:23;208:18;
229:16;245:1
**sign-off (1)**
46:18
**sill (2)**
71:9;200:17

**similar (7)**
50:20;52:13;53:14;
147:18;148:4;181:17;
201:22

**simply (6)**
67:9;144:3;179:16;
191:17;227:5,7

**single (1)**
58:18

**single-family (3)**
201:25;227:19;
229:13

**single-piece (1)**
38:23

**single-story (1)**
167:5

**sit (4)**
6:11;46:22;182:18;
232:6

**site (48)**
8:5,24,24;16:8;
35:13,13,18;36:15;
37:17;42:18;44:1;
46:19,22;48:1,20;57:8,
9,9;62:5,8;63:8,10,11,
13,25,25;65:5;135:8;
137:17,19;161:21;
190:11,14,24;191:1;
192:5,19;193:4;
194:17;226:21;233:1,
8;237:5;244:3;245:11;
250:4,4;254:14

**sites (3)**
8:25;9:5;35:12

**sitework (1)**
49:12

**sitting (1)**
21:14

**six (2)**
17:12;184:15

**six- (1)**
223:25

**six-and-a-quarter (1)**
176:1

**six-inch (1)**
40:9

**six-man (1)**
184:14

**six-page (4)**
223:23;224:9;
225:11;257:8

**sixteen (1)**
241:23

**sixty (1)**
60:3

**size (6)**
31:12;40:8;147:18;
166:25;229:23;236:11

**skewed (1)**
164:8

**skilled (1)**
237:9

**skip (4)**

**243:8,22;244:17;**
252:20

**slab (1)**
16:17

**slabs (2)**
177:1,3

**slightly (4)**
68:23;196:12;
197:18;198:15

**sloped (1)**
43:15

**small (4)**
32:25;141:11;170:3,
4

**smaller (2)**
141:9;241:9

**smiling (1)**
182:13

**snow (1)**
203:4

**soaking (1)**
41:22

**Society (2)**
19:22,23

**softscaping (1)**
8:8

**software (2)**
164:13,13

**sold (6)**
11:6;29:7;141:1;
154:8;155:11;163:13

**solely (1)**
68:4

**solicit (1)**
195:9

**solicited (2)**
54:4;195:14

**solid (2)**
40:12;161:25

**somebody (1)**
218:4

**somebody's (1)**
218:21

**somehow (4)**
189:16;228:1;
235:13;236:8

**someone (3)**
51:23;63:15;218:12

**Sometime (1)**
10:1

**sometimes (6)**
39:1;52:24;140:7;
160:18;195:11,12

**somewhere (2)**
60:10;135:18

**son (2)**
152:24,25

**soon (2)**
153:4;264:7

**sorry (29)**
16:20;26:25;31:20,
22;36:24;46:13;47:19;
51:12;176:20;182:10,

**12;189:20,22;190:4,6;**
191:12;211:21;217:7;
218:1;219:10;223:2;
231:16;240:10;245:15,
22;246:5;247:15;
256:20;263:18

**sort (8)**
26:8;156:11;157:21;
173:15,25;208:9;
247:17;265:5

**sorts (2)**
162:7;226:25

**sound (1)**
58:21

**sounds (1)**
142:6

**soup (1)**
160:13

**sources (3)**
44:19;59:13;138:5

**Southborough (2)**
14:2,21

**space (2)**
12:9;178:5

**spans (1)**
169:15

**speak (4)**
55:9,11;159:16;
178:4

**SPEAKER (1)**
218:23

**speaking (7)**
30:10;55:17;159:2;
175:9;178:3;199:24;
246:19

**spec (11)**
14:20;16:12;54:3,3;
138:11;139:2;154:6,
11,14,22;187:18

**spec'd (1)**
200:4

**special (1)**
12:7

**specialized (1)**
9:20

**Specialty (4)**
12:4,5;145:18;
165:18

**species (1)**
40:13

**specific (10)**
8:24;11:7,8;25:21;
185:23,24;199:8,12;
200:8;203:6

**Specifically (6)**
11:20;57:14;134:10;
198:16;200:8;201:20

**specification (1)**
135:11

**specifications (38)**
29:15;33:1;134:24;
35:2,5;49:24;50:2,8,
11;70:16;133:2,7,17,

**18;134:1;135:4,5,12,**
21;136:1,16,20,24;
137:3,4,6,22,25;138:3,
7;139:5,10;152:14;
164:11;170:8;200:9;
250:8;253:11

**specs (2)**
71:24;138:12

**spend (1)**
154:24

**spent (12)**
137:2;142:8;146:4,
23;148:7,8;150:24;
151:7;155:2;186:7,7;
224:24

**splay (1)**
39:3

**split (1)**
68:16

**splitting (1)**
177:10

**spoke (3)**
55:14;148:10;261:22

**spreading (1)**
226:12

**spreadsheet (7)**
165:8;173:21,24;
176:15;223:24;224:1;
257:7

**Springfield (1)**
201:15

**square (44)**
48:13;53:11,12;
70:24;141:23,24;
151:25;152:2;163:2;
164:25;167:6,9;
168:14,15;170:19;
177:15,16,17;183:6;
229:14,14,17;230:5,8,
18;233:10;236:8;
239:4;240:7,12,16,19;
244:4,12,14;250:23;
251:5,25;252:12,13,13,
17,17,18

**square-foot (4)**
167:3,4;178:1,4

**stable (1)**
59:19

**staff (5)**
17:12,14;57:6,7;
63:15

**stages (1)**
186:6

**stained (2)**
38:22;39:8

**stair (3)**
179:5,23,23

**stairs (2)**
39:6;179:6

**stairway (6)**
168:15,16;179:2,8,
12;188:25

**stairways (8)**

**39:5;162:12,13;**
179:3,4,12,14,20

**stand (1)**
5:13

**standalone (2)**
138:12;139:5

**standard (4)**
29:9;143:6;149:18;
247:8

**standing (1)**
144:4

**standpoint (1)**
155:23

**start (4)**
38:19;139:2;232:4;
263:24

**started (6)**
4:25;5:11;12:3;
14:16;159:19,20

**starting (3)**
7:12;194:6;202:13

**state (11)**
4:11;6:24;7:14,20;
8:11;9:14,15;22:12,23;
23:25;159:9

**statement (1)**
68:20

**States (1)**
22:9

**statistic (1)**
29:3

**steal (1)**
265:21

**steam (1)**
42:10

**Steel (2)**
243:9,11

**steps (4)**
14:10;35:5;36:16;
188:17

**stickers (5)**
212:25,25;213:1,2,3

**sticks (1)**
178:22

**still (8)**
18:11;146:22;
155:22;174:23;182:5;
210:11;238:25;260:25

**stint (1)**
14:15

**stock (2)**
179:15,16

**stocked (2)**
179:24,25

**stone (11)**
9:2;14:13,14;40:12,
13,14;42:7;43:1,2;
138:24;191:12

**stoops (1)**
43:2

**Stop (2)**
39:12;183:8

**storage (1)**

233:3
**storing (2)**
  235:8,10
**stove (1)**
  248:8
**straight (3)**
  168:5;198:3;206:9
**Street (1)**
  7:2
**Strike (1)**
  245:8
**structural (27)**
  29:15;30:1,20;31:7,
  10;33:15,24;34:10;
  204:10,11,15,21,24;
  205:1,8,13,14,17,18,
  24;206:25;207:2,13,18,
  22,22;208:12
**structural-carrying (1)**
  31:14
**structure (2)**
  31:15;188:23
**structures (3)**
  23:15;29:11;54:15
**studies (4)**
  8:5,22,22,24
**study (3)**
  7:16;8:8;166:2
**stuff (2)**
  181:2;222:6
**style (1)**
  138:24
**sub (1)**
  140:12
**sub-bids (2)**
  64:2,3
**subcontracted (1)**
  236:25
**subcontracting (1)**
  50:9
**subcontractor (10)**
  67:18;133:10,21;
  140:1;171:24;173:14;
  236:21;237:1,8;243:1
**subcontractors (16)**
  15:5;45:2;50:15,16;
  52:22;67:13;140:14,
  18;148:19;150:20;
  173:8;176:6;195:10;
  215:23;216:9;261:6
**subcontracts (1)**
  147:11
**submissions (1)**
  264:23
**submit (2)**
  48:22;265:9
**submitted (3)**
  46:4;170:9;232:20
**submitting (2)**
  173:16;210:16
**subs (4)**
  133:14;153:16;
  196:25;215:6

**subscription (1)**
  166:19
**sub-subcontractors (1)**
  215:24
**subtotal (2)**
  174:17,23
**Sub-Zero (3)**
  248:13,18
**Sub-Zeros (1)**
  248:19
**succeed (1)**
  18:4
**successful (4)**
  10:13;13:10;143:2,3
**successfully (1)**
  28:21
**sudden (3)**
  228:10;236:7;239:16
**suddenly (6)**
  225:12;240:18;
  241:5;242:8;243:14;
  244:25
**suggest (2)**
  156:16;212:8
**suggesting (1)**
  242:22
**suggestion (1)**
  246:7
**sum (1)**
  175:13
**summarized (1)**
  169:6
**summary (1)**
  61:18
**Sunday (1)**
  262:15
**super (1)**
  181:3
**superintendent (2)**
  16:8;57:8
**supervise (1)**
  15:5
**supervisor (2)**
  62:5,8
**supervisor's (4)**
  22:20,25;160:24;
  161:1
**supervisory (1)**
  23:6
**supplement (1)**
  204:3
**supply (1)**
  11:8
**support (6)**
  30:4;34:21;35:1;
  164:5;180:23;265:9
**supported (2)**
  37:6,18
**supporting (3)**
  30:15;31:13,13
**suppose (4)**
  157:10;194:21;
  230:2;258:7

**supposed (3)**
  26:14;214:21;243:5
**sure (21)**
  51:7;60:12;151:20;
  169:10;171:5;173:19;
  187:22;193:19;198:10;
  207:5;209:25;210:6;
  215:10;217:8,15;
  229:18;233:14;240:11;
  241:13;247:11;264:10
**surface (2)**
  40:10,12
**surpasses (1)**
  140:15
**surprise (4)**
  253:6,8;255:8,9
**sustained (1)**
  28:6
**SWORN (2)**
  5:15;158:15
**system (4)**
  183:17;187:22;
  236:7;247:14
**systems (4)**
  144:7;179:2;235:15;
  243:2

**T**

**tab (2)**
  249:2,19
**table (2)**
  167:6;168:23
**tabulated (2)**
  56:9;60:15
**tack (2)**
  66:21;255:14
**takeoff (1)**
  171:2
**takeoffs (3)**
  164:15,25;204:10
**take-offs (4)**
  11:7,13;203:5;204:5
**talk (16)**
  4:24;6:7;14:12;
  27:21;28:3;49:10;56:8,
  17;138:20,21;150:4;
  162:21;164:12;181:19;
  185:7;195:7
**talked (4)**
  27:22;224:23;
  261:18;262:5
**talking (16)**
  174:3;178:5,6;
  186:17,19;207:6;
  217:18;219:12,25;
  220:25;233:18;254:5;
  257:7;260:6;262:10,12
**tallied (4)**
  64:2;67:24;68:1,3
**tally (4)**
  25:20;54:12;176:9,
  18

**TAMPOSI (2)**
  4:15,16
**Tatiana (2)**
  4:18;45:2
**taught (1)**
  25:15
**tax (1)**
  175:21
**taxes (1)**
  136:3
**tear (1)**
  232:13
**technically (1)**
  264:25
**tells (3)**
  164:19;198:16;200:8
**temporarily (1)**
  235:10
**temporary (5)**
  63:24;254:12,14;
  258:1,3
**ten (28)**
  13:7;53:10;57:21,24;
  58:1,2;67:2;133:22;
  149:4,6,7,8,10,14,15,
  17;165:16;202:3;
  222:13;239:8;241:18;
  243:12,19;255:2,7,7,
  11,14
**tend (1)**
  197:2
**tennis (1)**
  191:11
**terms (12)**
  12:12;15:9;16:10;
  18:2;31:3;37:12;58:3;
  63:18;139:9;156:11;
  232:9;234:17
**test (1)**
  23:7
**testified (5)**
  71:23;187:11;
  193:12;219:5;221:3
**testifies (1)**
  26:18
**testify (7)**
  27:7;52:20;153:9;
  162:15,19;167:18;
  224:25
**testifying (4)**
  61:6;159:14;180:11;
  191:5
**testimony (30)**
  20:23;26:16;58:10,
  17,17;69:25;139:14;
  144:15;147:5;148:11;
  169:9;180:9,20;182:3,
  5,20,23;183:13;
  187:15;190:9;192:6;
  197:10;201:10;203:6;
  209:16;210:20;221:5;
  237:4;250:15;259:18
**Thanks (2)**

225:20;265:19
**that'd (1)**
  8:3
**That'll (1)**
  195:2
**T-H-E-N (1)**
  258:15
**theoretically (1)**
  177:20
**thereabout (1)**
  60:10
**therefore (5)**
  66:17;178:17;258:3,
  16;259:1
**thermostats (2)**
  232:17,19
**the-shelf (1)**
  145:7
**thick (1)**
  236:2
**thinking (1)**
  261:23
**third (3)**
  67:25;184:6;262:3
**thirteen (3)**
  4:7,9;13:6
**thirty (9)**
  58:3;160:8;161:20,
  20,21;162:3,6;224:21;
  261:23
**thirty-eight (1)**
  49:22
**thirty-one (2)**
  243:15,18
**thirty-six (1)**
  49:22
**thirty-some-odd (1)**
  49:20
**thirty-some-odd-foot (1)**
  43:17
**thirty-year (1)**
  198:19
**thorough (1)**
  143:17
**thoroughly (1)**
  140:18
**though (9)**
  10:21;32:3;51:21;
  69:8;176:18;181:25;
  182:3,13;191:22
**thought (7)**
  69:4;151:24;152:3;
  178:21,25;212:24;
  256:1
**Thoughtforms (5)**
  16:1,3,7,23,25
**thousand (2)**
  177:8;192:10
**thousands (1)**
  23:13
**three (22)**
  23:22;25:3;39:2;
  56:14;140:3,6;141:21;

Case 16-01120    Doc 382    Filed 08/22/19    Entered 08/22/19 10:11:12    Desc Main
LYMAN-CUTLER, LLC v.
KAGAN, et al.
Document    Page 289 of 292

July 29, 2019

143:14;167:2;173:5;
174:10,11,15;186:15;
197:23;224:15;225:9,
17;226:2,11;241:16;
253:1
**three- (1)**
230:17
**threw (1)**
146:19
**throughout (6)**
11:23;198:4;250:11;
252:25;254:11,15
**thumb (1)**
175:24
**tie (1)**
185:2
**tight (1)**
60:1
**til (1)**
238:14
**tiles (2)**
138:24;150:18
**times (15)**
24:18,19;162:18;
167:15;169:22;171:12,
13,15;174:10,15;
192:10;195:14;240:21;
254:4;258:23
**timing (1)**
156:12
**today (14)**
5:1,3,5,8;25:17;
159:14;181:15;191:5;
198:11;210:25;219:5;
259:12;260:18;264:5
**together (3)**
142:22;169:5;265:16
**toilet (1)**
138:24
**toilets (2)**
258:1,3
**told (32)**
18:19;45:24;52:10,
10;137:9;138:10,11;
149:1;152:20;154:16;
172:15;191:17;192:18,
20;197:19;198:25;
203:5;204:4;214:2,15;
216:20,21;220:19;
228:20;229:9;240:25;
242:15;249:19;252:23;
255:1,4;259:21
**Toledo (1)**
9:14
**tomorrow (4)**
202:13,14;264:9,10
**took (14)**
13:9;18:7;48:23;
63:18;67:9,12;142:13;
151:13;155:20;159:21;
174:12;188:17;199:1;
242:19
**top (11)**

16:19,21;39:18,24,
25;42:14;143:13,17;
226:22;249:10,20
**topic (1)**
228:17
**topography (3)**
35:13,21;192:18
**topsoil (1)**
226:12
**torn (1)**
190:23
**to-seven-percent (1)**
186:16
**total (21)**
57:22;60:23;65:21;
66:13,17,24;70:16,17;
71:10;147:13;149:2;
152:1;169:21;173:2;
175:25;176:9,12;
210:9;246:7,17;253:14
**totaled (2)**
176:25;245:12
**totals (2)**
136:2;208:25
**touch (1)**
181:7
**tour (2)**
163:10,20
**town (4)**
46:23;175:17;206:2;
207:14
**towns (2)**
202:20,23
**trade (2)**
49:18;58:18
**trades (3)**
48:22;57:1;153:10
**tradespeople (1)**
165:18
**trailer (3)**
63:9,10,11
**training (3)**
159:17;161:21,25
**transcripts (1)**
49:3
**transferring (1)**
31:14
**translate (1)**
50:7
**translates (4)**
179:7,9;184:15,21
**transport (2)**
65:3;136:4
**transportation (1)**
233:2
**travel (2)**
231:8,11
**traveling (1)**
263:22
**treads (1)**
43:2
**treatment (1)**
40:6

**trial (5)**
4:8,9;6:3;262:25;
263:12
**tried (1)**
50:5
**trim (7)**
38:24;162:13;
200:15,17,18;250:20;
251:8
**trims (2)**
40:4;41:7
**trim-to-trim (1)**
71:5
**truck (3)**
140:9;197:8;233:1
**trucked (1)**
233:1
**true (4)**
48:16;199:10,21;
204:22
**Trust (3)**
46:5;140:10;237:9
**try (5)**
56:12;210:7;241:1;
252:1;263:9
**trying (5)**
26:7,16;30:17;153:5;
252:6
**tub (1)**
41:22
**turn (3)**
214:1;228:24;242:17
**tweaking (1)**
200:23
**twelve (3)**
13:7;133:22;162:20
**twelve-inch- (1)**
236:1
**twenty (8)**
156:18,18,20;
168:24;227:19;230:24;
231:2;233:10
**twenty-five (1)**
154:3
**twenty-four-inch-wide (1)**
236:2
**twenty-one (4)**
168:25;175:7,7;
196:2
**twenty-plus (1)**
51:4
**twenty-some-odd (1)**
53:12
**two (49)**
5:5;11:19;13:20;
23:21;39:2;48:5,10,12;
51:21;54:6;55:13;
64:21;65:14,15;66:14;
70:5;138:19;150:2,5;
161:3;163:10;177:8;
179:8,8,8,13;189:7;
190:24,24;196:14,17;
197:9;209:19;211:15;

213:11;238:25;244:23;
253:14,16;254:4;
256:8;257:5;259:15;
263:1,2,4,6;264:5,15
**two- (1)**
222:25
**two-by-fours (1)**
200:20
**two-family (1)**
160:25
**two-page (6)**
211:22;212:8;223:3;
224:6;229:9;260:8
**two-story (1)**
167:8
**two-tenths (1)**
69:4
**two-year (2)**
14:5,15
**type (6)**
35:18;38:20;55:25;
234:18;235:1;244:13
**types (7)**
38:18,24;40:9,14;
50:20;138:25;141:24
**typical (4)**
34:21;42:10;136:8;
138:12
**typically (2)**
195:8;250:16
**typo (2)**
229:11,12

---

# U

**ultimate (1)**
60:8
**ultimately (2)**
25:25;260:15
**ultra-high (1)**
16:18
**Um-hum (1)**
155:10
**unbiased (1)**
153:3
**under (10)**
21:11;39:9;57:16;
61:19;169:17,18,18;
220:10;226:11;231:14
**undercounted (1)**
243:17
**underestimated (1)**
68:21
**understood (12)**
39:5;142:18,19;
157:15;172:7;199:24;
204:4,18;215:20,23;
220:12;255:16
**undertake (2)**
139:8;151:19
**undertaken (1)**
151:22
**Unicon (1)**

246:24
**UNIDENTIFIED (1)**
218:23
**unique (2)**
59:23;193:16
**UNISON (1)**
4:4
**unit (18)**
42:10;163:7;165:9;
169:18,18,20,21,22;
170:12;171:11,15;
208:25;209:9,10;
224:15;236:8;242:9;
244:11
**unit-cost (2)**
167:10;200:13
**United (1)**
22:9
**units (3)**
163:1,4;169:19
**universe (1)**
141:8
**University (2)**
7:15,21
**unknown (1)**
140:23
**unless (7)**
20:23;21:4;35:3;
171:4;196:20;217:14;
248:17
**unprejudiced (1)**
153:3
**unredacted (1)**
54:22
**unrestricted (3)**
160:23,23;161:2
**up (68)**
23:15;25:21;31:18;
38:1;39:2,5;40:23;
43:21;46:25;47:9,17;
48:22;50:3;54:14;
56:14,18;60:8;64:8;
66:2;71:22;134:7,11;
139:2;143:22;145:25;
146:3;147:7,13;
150:21;157:22;161:3;
167:6,8;169:11;176:9,
19;177:2;179:4,5,6;
182:21;184:9,20;
185:2;186:21;188:24;
195:25;196:1,5,21;
198:1;206:11;211:5;
212:4,11;218:6;
235:12;237:5,16;
239:5;245:24;246:21;
252:16,16;253:11,12;
257:1,2
**updated (1)**
166:18
**upon (34)**
25:25;28:23;30:7;
34:16;35:11;43:14;
49:25;51:25;53:9;54:4;

LYMAN-CUTLER, LLC v.
KAGAN, et al.

July 29, 2019

55:2;56:4;64:11;66:1,
4;141:18;142:2,13;
143:19;145:20;165:21;
170:7,7;203:12;205:3,
6,12;207:13,24;
210:22;216:9;222:9;
245:17;256:19

**upper (6)**
40:19;183:11;212:8;
213:17;223:4,8

**upper/lower (2)**
174:6,7

**upside-down (1)**
47:18

**upwards (1)**
249:20

**use (35)**
27:21;52:17;54:8;
57:21;58:1;68:21,24;
140:22;143:20;149:4,
14;150:14;163:16;
164:16;166:10,16,16,
21,23;167:9,23;
179:21;184:24;193:23;
196:24,24;197:4,9;
198:2;201:4;203:16;
218:13;234:24;246:1;
250:14

**used (38)**
22:8;35:6;37:14;
38:21;42:21,22;49:7;
52:7;54:10;58:2,2;
62:18;67:11;136:6;
149:6,7,8,12;152:21;
153:25;162:10,25;
165:2,17;167:1,10,12,
15;171:2;173:8;185:1;
199:25;203:18;210:4;
230:12;244:11;251:19;
254:10

**users (1)**
165:5

**uses (1)**
165:19

**using (9)**
49:7;139:13;143:1;
163:4;166:7;171:7;
185:21,21;261:5

**utilities (5)**
134:12;135:3;191:8;
254:12;258:1

**utilize (3)**
57:20;140:14;142:5

**utilized (4)**
37:11;40:9;49:9;
50:16

**utilizing (2)**
44:15;49:6

---

## V

**vacation (2)**
261:25;262:4

**vacuum (1)**
136:19

**Vadim (1)**
4:18

**Vaguely (1)**
248:10

**valid (1)**
53:14

**validate (2)**
53:6;54:18

**Valley (3)**
13:2,19,21

**value (21)**
25:6,7,10;29:4;
50:21,23;51:8;64:20,
23;67:5;68:6;140:2,2;
145:25;146:13;177:21;
191:24;192:3;205:1,
17;206:10

**values (1)**
153:9

**valves (1)**
42:9

**variability (1)**
149:13

**variable (1)**
149:20

**variables (2)**
139:25;147:23

**variance (1)**
59:14

**variation (1)**
196:20

**various (22)**
8:23,25;9:23,24;
10:14;29:2;31:12;49:3,
8,10,12;50:9,14;52:5;
57:1;67:16;138:5;
145:1;150:20;162:25;
163:3;164:20

**vary (4)**
149:16,16;202:17;
234:7

**vendors (2)**
178:16,19

**veneer (1)**
42:25

**veneers (2)**
14:10;42:24

**verification (1)**
55:25

**verify (4)**
55:19;193:1;216:20;
222:5

**verifying (1)**
46:19

**version (2)**
164:14,21

**versions (1)**
264:18

**versus (3)**
30:18;61:16;138:24

**vertical (4)**

14:7,11;31:1;71:4

**vet (1)**
151:19

**vetted (2)**
140:19;141:13

**view (1)**
27:25;35:12;248:22

**viewed (1)**
170:10

**vinyl (11)**
249:25;250:2,10,16,
17,22,24;251:7,8,23;
252:12

**visit (10)**
35:18;36:15;37:17;
42:18;44:1;137:19;
193:4;194:17;250:4,5

**visuals (1)**
137:19

**vogue (3)**
138:17,23,24

**volume (1)**
234:8

**Von (21)**
5:13,15,18,19,22;
6:25;7:6,7;14:4,6,15;
18:5,16;20:14;27:7;
56:18,24;57:2;58:6;
147:2,14

**VP (2)**
13:2,4

**VS008 (1)**
184:6

**VS009 (1)**
184:7

**VSA (10)**
59:6;60:23;62:9;
63:13;69:20,22;
142:10,23;143:21;
144:9

**VSA-type (1)**
143:6

---

## W

**wainscoting (1)**
168:13

**waiver (1)**
24:8

**walk (3)**
156:14;218:19;
248:22

**walking (1)**
206:1

**walks (1)**
142:7

**wall (2)**
43:10;191:12

**walls (8)**
9:3;14:9,10;36:4;
43:11,12;46:23;55:23

**wants (2)**
26:9;263:4

**waterproofing (2)**
135:9;136:4

**way (26)**
6:7;27:9;56:24;
135:19;140:16;153:10;
156:9;164:8,20;
167:11,21;168:21;
169:15;171:7;178:9;
184:17;195:9;196:13;
199:18;200:18;239:7;
240:8;241:1;243:8,22;
260:1

**ways (1)**
27:8

**weather (2)**
202:24;203:2

**Webber (6)**
11:1,18,20,24;12:1;
13:1

**week (5)**
161:25;184:16;
262:3,7,9

**weekly (1)**
63:12

**weeks (1)**
179:8

**weeks' (1)**
179:10

**Welcome (2)**
4:23;5:24

**well- (1)**
41:19

**weren't (4)**
48:15;179:18;
206:11;207:17

**Westminster (1)**
7:2

**whack (1)**
55:4

**what's (19)**
30:22;33:14;49:7;
159:13;161:10,18;
164:13,23;166:13;
171:22;177:13;178:11;
185:2;192:11;212:17;
216:19;224:23;227:6;
264:14

**whatsoever (1)**
255:24

**whenever (1)**
213:22

**where's (2)**
171:1;175:16

**white (10)**
52:10;143:5,11,12,
12,13;152:20;178:22,
24;252:11

**whole (4)**
154:11;155:21;
234:6;237:7

**wholesaler/distributor (1)**
179:25

**who's (1)**

198:19

**wide (1)**
196:19

**widely (3)**
49:7;165:2,17

**width (1)**
30:25

**willing (1)**
133:14

**willy (1)**
137:24

**window (12)**
31:2;33:1;53:23;
54:1;71:6;199:12,15,
19,25;200:2,12,15

**windows (11)**
29:18;41:6;53:22;
54:2,6;71:11;199:20,
25;200:12,22;201:1

**within (20)**
44:12;53:13;69:10;
139:24;142:5;163:1,6;
164:10;165:16;172:5,
6;173:5;186:15,24;
197:23;200:6;220:17;
227:19;230:24;231:2

**without (12)**
21:9;65:4;161:5;
172:8;184:24;189:17;
191:7;200:19;207:22;
242:20,24;263:23

**WITNESS (35)**
5:17,19,21,23;6:1,4,
9,14,16;7:9;18:6;
20:17,20;21:21;24:16;
45:21;156:20;157:2;
158:18,20,22,25;159:3;
167:13;182:6;183:11;
217:24;219:16,18,20;
252:4,6,9;259:3;
261:12

**witnesses (1)**
5:5

**wizard (1)**
202:10

**Wolf (1)**
249:11

**Wood (11)**
20:9;42:22;55:23;
188:14,15,19;229:14;
234:19;250:10,22;
252:17

**woods (1)**
145:1

**Worcester (1)**
159:12

**word (7)**
52:23;156:4;173:22;
224:23;231:25,25;
255:23

**words (5)**
49:11;65:23;71:6;
133:17;151:19

**work (87)**
7:10,21;10:3,5;14:1,
3;16:1;17:2,6;22:11;
24:1,2,14;25:6,9,19;
28:21,21;29:10;49:1;
50:20,20,21;67:5,12,
19,22;68:2,4,6;69:13,
19;70:4;133:23;
139:21,21,22;140:12,
22;141:8,9;143:11,15;
149:14;151:21,24,25;
153:11;154:23;160:10;
162:5,7;172:8;176:10,
22,23,25;179:10;
189:9;190:12,14,17,20,
24;191:2;192:3;
204:20,21;206:11,15;
207:22;210:2;212:15;
215:6,12;216:18,25;
220:6;222:13;226:21;
245:11,13,17,20;
246:17;247:8;257:24
**worked (8)**
7:25;8:17;16:8;
28:20;51:4;138:19;
140:17;149:7
**working (8)**
8:18;11:4;19:11;
140:25;159:19;184:15;
203:9;237:4
**workmanship (2)**
141:3,5
**works (3)**
58:3;177:15;261:24
**worried (1)**
58:14
**worth (1)**
179:10
**Wow (1)**
249:4
**write (1)**
213:13
**writing (2)**
217:2;265:1
**written (2)**
20:23;137:4
**wrong (14)**
178:11;187:16,19;
209:9,11;225:14,15;
226:7,18,18;241:11,11;
245:4,4
**wrote (2)**
208:15,15

**X**

**Xs (4)**
257:5,12,17;258:24

**Y**

**Yale (2)**
249:2,19

**Yankee (5)**
12:3,5,19,21,24
**yard (3)**
179:24;180:1;244:11
**yardage (1)**
234:14
**yards (5)**
165:1;170:15;
244:12,13,14
**Yea (1)**
183:9
**year (5)**
9:11,11;51:21;163:5;
166:24
**years (25)**
7:23;11:19;12:20;
13:20;15:21;16:24;
17:24;22:11;50:17;
51:5;58:3;64:12;66:5;
140:18;142:3;145:20;
154:3;160:8;162:3,6,9;
165:16,20;185:1;202:4
**Yep (18)**
157:1;170:25;187:2;
194:24;209:22,24;
215:19;217:3;222:15;
223:11;227:17,25;
230:2;235:21,23,25;
236:5;242:18
**yes/no (1)**
251:12

**Z**

**zero (1)**
181:9
**zoom (1)**
248:17

**0**

**014 (1)**
231:14
**017 (1)**
231:16

**1**

**1 (7)**
49:17;65:2;194:6;
224:12;225:8,12;
263:25
**1,000 (2)**
63:9;175:14
**1,300 (1)**
244:4
**1,500 (2)**
63:9;180:8
**1,600 (1)**
229:14
**1,718,000 (3)**
252:21,23;253:17
**1,718,000's (1)**

253:1
**1,886,000 (1)**
253:16
**1.21 (1)**
168:24
**1.4 (1)**
165:5
**1.6 (1)**
29:6
**1.65 (1)**
198:15
**1.68 (1)**
198:15
**1.718 (1)**
254:20
**1:30 (1)**
155:21
**1:46 (1)**
158:4
**10 (4)**
169:15;174:16;
239:8;242:12
**100 (2)**
59:16;253:18
**100,000 (1)**
246:22
**107,000 (1)**
59:17
**11 (2)**
68:11;248:3
**118 (3)**
235:18,24;236:15
**12:35 (1)**
158:3
**13 (1)**
219:10
**13- (1)**
48:13
**130,000 (2)**
62:10,11
**136 (1)**
253:19
**13th (3)**
219:12;226:9;259:17
**14,251 (1)**
23:12
**140 (1)**
144:12
**1400 (1)**
48:13
**15 (1)**
262:5
**15-13881 (1)**
4:8
**15th (1)**
262:15
**16 (1)**
265:14
**16,600 (1)**
230:18
**16-1120 (1)**
4:6
**162,000 (1)**

184:21
**164 (1)**
252:11
**166 (1)**
251:21
**167 (11)**
4:9;217:25;218:2,3,
5,7,8,13;219:4,15;
255:7
**168,571 (1)**
253:20
**16th (3)**
262:17,18,18
**17 (1)**
236:16
**170 (1)**
142:15
**170,000 (1)**
142:14
**1718 (1)**
253:19
**174 (4)**
37:1,2;249:2,18
**175 (2)**
37:1,2
**17-5 (1)**
168:16
**1886 (1)**
253:19
**19- (1)**
59:16
**19.017 (2)**
231:16,16
**194,750 (1)**
69:24
**1974 (1)**
7:15
**1976 (1)**
10:1
**1978 (2)**
10:18;24:12
**1980 (1)**
11:25
**1983 (2)**
159:20,25
**1991 (2)**
12:22,24
**1996 (1)**
159:21
**19th (1)**
262:9

**2**

**2 (4)**
49:18;67:13;227:14;
257:14
**2- (1)**
160:11
**2,720 (2)**
240:11,21
**2,771,667 (2)**
66:11,15

**2,771,667.94 (1)**
66:10
**2.8 (1)**
184:21
**2.9 (2)**
177:11,21
**20,000-square-foot (1)**
167:11
**200,000 (1)**
147:15
**2008 (2)**
18:2,18
**2012 (1)**
159:25
**2012/2013 (1)**
159:23
**2013 (1)**
58:19
**2014 (10)**
19:13;58:20;59:11,
16;146:14;163:5;
166:22,23;198:12;
213:18
**2015 (3)**
19:13;29:4;59:20
**2018 (7)**
58:18;59:12;146:15;
193:7;211:19;223:5,8
**205,000 (1)**
69:23
**210 (1)**
31:19
**220 (1)**
135:20
**251,969 (1)**
67:1
**26 (1)**
245:22
**260,612 (2)**
260:5,12
**262 (6)**
170:21;171:1;
239:17,20;240:3,24
**272 (5)**
235:15;239:8;240:2,
3,7
**2720 (4)**
239:4,7,9,17
**278 (1)**
69:20
**278,000 (1)**
69:22
**28 (5)**
217:9;219:11,15;
220:2;245:22
**281,650 (1)**
66:25
**285 (1)**
242:24

**3**

**3 (5)**

67:14;169:12,14;
235:14;257:14
**3,098,160 (2)**
64:18;66:14
**3,200 (4)**
229:14,17;230:8;
233:10
**3,200-square- (1)**
229:20
**3,200-square-foot (2)**
229:22;230:13
**3,492 (3)**
171:3,4,6
**3,773,143 (1)**
253:14
**3.9 (1)**
60:10
**3:23 (1)**
238:16
**3:30 (1)**
238:14
**3:32 (1)**
238:17
**30 (2)**
161:9,20
**300 (5)**
160:11;229:4,7,8,10
**301 (4)**
228:20,24;229:4,12
**30th (18)**
193:6;211:19;
216:23;217:19;218:24;
223:5,8;224:20,25;
225:1,19;226:10,12,13;
259:19;260:8;263:13,
14
**31 (3)**
243:22;244:22;
257:14
**310 (4)**
31:22,25;231:14,16
**311 (3)**
47:1,3,25
**312 (2)**
47:10,25
**313 (1)**
47:17
**314 (2)**
242:15,17
**32 (4)**
226:11;230:12;
257:14,16
**321,000 (1)**
259:23
**33 (2)**
257:15,16
**34.92 (1)**
240:21
**343 (7)**
256:11,15,16,21;
260:2,4,7
**344 (6)**
256:12,15,16,20,21,

23
**35,000 (3)**
23:15;161:3;168:16
**350- (1)**
15:12
**37 (1)**
245:15
**37,500 (2)**
245:16;246:3
**385 (1)**
242:24
**3-million-689 (1)**
61:1

### 4

**4 (6)**
67:14;155:11;
187:14;238:14;259:3;
263:24
**4,400 (1)**
167:9
**4.4 (1)**
29:7
**4.7 (1)**
179:8
**4.8 (1)**
184:15
**40- (1)**
171:6
**40,000 (2)**
68:22,23
**400 (1)**
200:1
**418,000 (1)**
176:25
**41B (1)**
7:2
**426 (1)**
251:2
**433 (1)**
177:18
**447,040 (1)**
68:12
**447-4 (1)**
68:16
**45,000 (1)**
177:4
**45,968 (1)**
241:3
**450,000 (1)**
176:20
**453,000 (1)**
29:5
**46 (5)**
38:2;40:23;41:14;
183:2;248:7
**4775 (1)**
258:23
**489,550 (4)**
68:10,17;69:14,15
**4th (1)**
263:20

### 5

**5 (1)**
258:23
**5,400 (1)**
230:18
**5,869,828 (1)**
66:17
**5,889 (1)**
230:12
**5,899 (1)**
230:5
**5,899-square-foot (1)**
230:7
**5.869 (2)**
155:6,8
**5.8-odd- (1)**
177:7
**50 (3)**
196:16,17,18
**500 (1)**
15:12
**55 (3)**
25:5,11;258:23
**55,000 (1)**
63:19
**550 (1)**
142:14
**556,700 (1)**
68:15

### 6

**6 (2)**
40:23;251:5
**6,000-square-foot (2)**
197:4;201:25
**6,395 (2)**
70:24;71:12
**6,395-square-foot (1)**
71:23
**6,771 (2)**
177:17,22
**6.10 (1)**
251:8
**60 (2)**
15:15,16
**617 (2)**
234:2,4
**65 (1)**
179:9
**65,000 (4)**
70:2,4;177:6;245:16
**650 (1)**
142:15

### 7

**7 (2)**
41:13;174:2
**7/30/2018 (2)**
212:9;222:24

**70s (1)**
159:19
**7100 (1)**
67:14
**75,000 (1)**
63:19
**750 (1)**
142:15
**77 (1)**
233:20

### 8

**8 (1)**
34:13
**80 (1)**
244:12
**800-acre (1)**
10:9
**88 (2)**
25:5,11

### 9

**9 (4)**
4:10;239:12,14;
258:23
**9,149 (1)**
241:6
**9:15 (1)**
4:1
**9:30 (1)**
263:24
**900,000 (1)**
176:20
**950,000 (1)**
15:12