UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| In re: | ) | Chapter 7 |
|  | ) | No. 15-13881-FJB |
| LYMAN-CUTLER, LLC, | ) |  |
|  | ) |  |
| Debtor. | ) |  |
|  | ) |  |

|  |  |  |
|---|---|---|
| LYMAN-CUTLER, LLC, et al., | ) |  |
| Plaintiffs, | ) |  |
| Defendants in Counterclaim, | ) |  |
|  | ) | Adv. Proc. No. 16-01120 |
| v. | ) |  |
|  | ) |  |
| VADIM KAGAN, et al. | ) |  |
| Defendants, | ) |  |
| Plaintiffs in Counterclaim. | ) |  |

## DEFENDANTS' REQUESTS FOR FINDINGS OF FACT

Vadim Kagan, Tatiana Kagan, Kagan Development KDC, Corp. and

ProExcavation Corp. submit these requests for findings of fact for consideration by this

Court.

## INDEX

Background and Overview – Request Nos. 1 to 8

KDC's Books and Records/Migration to QuickBooks – Request Nos. 9 to 20

The Parties' Relationship with Attorney Boris Maiden – Request Nos. 21 to 25

First Discussions About Lyman-Cutler – Request Nos. 26 to 30

October 25, 2012 Meeting – Request Nos. 31 to 40

The Zhukovskiy Spreadsheets – Request Nos. 41 to 61

Post-Meeting Due Diligence – Request Nos. 62 to 65

Filippov Decides to Invest – Request Nos. 66 to 70

Drafting of the Operating Agreement– Request Nos. 71 to 86

Execution of the Operating Agreement– Request Nos. 87 to 94

Pertinent Terms of the Operating Agreement– Request Nos. 95 to 116

Certificate of Organization– Request No. 117

Purchase of the Property– Request Nos. 118 to 126

Construction Loans/Confirmation that No Fixed Cost– Request Nos. 127 to 157

Pertinent Terms of Construction Loan Agreement– Request Nos. 158 to 166

Classic Homes Construction Contract– Request Nos. 167 to 173

KDC Construction Contract– Request Nos. 174 to 183

Joseph Cohen– Request Nos. 184 to 196

Payment of Carrying Costs– Request Nos. 197 to 211

Monitoring Construction Expenses– Request Nos. 212 to 240

Interactions with Tatiana Kagan During Construction – Request Nos. 241 to 246

Maintaining the Project Books and Records– Request Nos. 247 to 252

Kristina Brusenkova– Request Nos. 253 to 266

Dan Gersh– Request Nos. 267 to 275

Substantial Completion– Request Nos. 276 to 281

Execution of the Listing Agreement for Cutler Lane– Request Nos. 282 to 292

Execution of the Listing Agreement for Lyman Road– Request Nos. 293 to 301

May 7, 2015 Letter and Conduct Leading to Initiation of Litigation– Request Nos. 302 to 324

Plaintiffs' Initiation of State Court Litigation– Request Nos. 325 to 339

KDC Asserts the Mechanics Lien– Request Nos. 340 to 346

Members' Meeting– Request Nos. 347 to 349

Plaintiffs' Decision to File Bankruptcy– Request Nos. 350 to 360

Sale of Properties and Net Proceeds Held By Trustee– Request Nos. 3610 to 362

Filippov's $200,000 Note and Mortgage– Request Nos. 363 to 382 (Claim No. 9)

Absence of Evidence of Fraud– Request Nos. 384 to 469

    a) Testimony by Filippov, Lipetsker and Brusenkova– Request Nos. 384 to 396
    b) Forensic Accounting – Goldman's Failure to Identify Any Fraud– Request Nos. 397 to 417
    c) Gordon, KDC's Outside Accountant, Found No Evidence of Fraud– Request Nos. 418 to 435
    d) The Project Subcontractors Undercut Plaintiffs' Claims– Request Nos. 436 to 469

        a. Dream Flooring– Request Nos. 437 to 442
        b. Décor Art– Request Nos. 443 to 447
        c. V&D Plumbing and Heating– Request Nos. 448 to 451
        d. BST Plumbing– Request Nos. 452 to 458
        e. Unicon Electric– Request Nos. 459 to 464
        f. DaCosta– Request Nos. 465 to 469

Other Projects– Request Nos. 470 to 483

The KDC Contract and ProEx Contract Are Fair and Reasonable– Request Nos. 484 to 551

    a) Salmi/Doddridge– Request Nos. 484 to 510

    b) Plaintiffs' Construction Expert, David Doddridge, Validates KDC's Numbers– Request Nos. 511 to 551

Testimony by Morgan Fennell, Plaintiffs' Real Estate Valuation Expert– Request Nos. 551 to 560

KDC's Proof of Claim No. 1 (5/3/16) – Request Nos. 562 to 479

Indemnity Proofs of Claim (Claim Nos. 4, 5, 6 and 7) – Request Nos. 580 to 587

O'Connor Carnathan & Mack Proof of Claim No. 2– Request Nos. 588 to 591

Plaintiffs' Failure to Prove Damages– Request Nos. 592 to 595

Defendants' Damages– Request Nos. 596 to 602

## BACKGROUND AND OVERVIEW

1. Alex Filippov ("Filippov") and Nickolay Lipetsker ("Lipetsker") are close friends. They met in Italy while waiting to emigrate to the United States from Russia in 1989. [Filippov, Day 2,10:2-6]

2. Filippov is a successful businessman. He owns and operates a telecommunications company. [Filippov, Day 1, 29:12-17] He has negotiated multiple contracts over his career. [Filippov, Day 2, 8:18-20; 40:5-10] He had also previously formed LLCs. [Filippov, Day 1, 62:1-4]

3. Lipetsker is a dentist. [Lipetsker, Day 4, 9:17-18] Prior to Lyman-Cutler, he had been involved in multiple other real estate ventures. [Lipetsker, Day 4, 35:22-24]. Some of those real estate ventures were with Vadim Kagan ("Kagan"). His experiences with Kagan were all positive. [Lipetsker, Day 4, 35:25-36:13]

4. Kagan is a residential builder and real estate developer. He emigrated to the United States from Russia in 1995. [Kagan, Day 8, 9:18-20]

5. Kagan owns and operates a construction company known as Kagan Development KDC, Corp. ("KDC"). KDC is a Massachusetts corporation, has its own bank accounts, tax ID number and employees. [Kagan, Day 8, 25:16-19] It files its own tax returns and keeps its records on an accrual basis. [Gersh, Day 11: 36:24-37:3; Gordon, Day 9, 126:16-25, 127: 1-4]

6. Kagan also owns and operates ProExcavation Corp. ("ProEx"). ProEx is a Massachusetts corporation. It has its own bank accounts, tax ID number, and files its own tax returns. [Kagan, Day 8, 25:8-15; Gersh, Day 9, 208:23-25] ProEx keeps its own books and records, also on an accrual basis. [Gordon, Day 9, 126:16-25, 127: 1-4]

4

7. ProEx provides subcontracting services primarily in the area of excavation, hardscape, softscape, and landscaping. Kagan formed ProEx because this allowed him better control over scheduling and costs. By using ProEx, KDC could charge less and work more efficiently than if that work was subcontracted to outside subcontractors at market rates. [Kagan, Day 8, 23:20-25:7]

8. Tatiana Kagan ("Tatiana") is Kagan's wife. She is a real estate agent affiliated with Century 21. Although she is listed as an officer and director of KDC and ProEx, she has no day-to-day responsibilities for either company. [Tatiana, Day 7, 128:17-25, 129:1-13, 129:14-25, 130:1-10]

### KDC'S BOOKS AND RECORDS/MIGRATION TO QUICKBOOKS

9. Kagan is not skilled in computers and is not trained in accounting. [Kagan, Day 8, 10:1-4]. He does not know how to prepare Excel spreadsheets or use Quickbooks. [Kagan, Day 8, 19:18-20; 60:15-20; Gersh, Day 9, 203:20-22]

10. Filippov and Lipetsker understood that Kagan does not do a lot of e-mailing. [Filippov, Day 2, 44:23-25; Lipetsker, Day 4, 72:3-5]. Kagan prefers to communicate in person or by phone. [Filippov, Day 2, 45:1-4; Maiden, Day 10, 187:4]

11. Because he did not have an accounting background, Kagan utilized and relied on outside accountants to ensure that his companies' financial records were accurate. [Kagan, Day 8, 15:11-16:3]

12. KDC maintained paper files containing receipts, proposals, and invoices, as well as bank statements and credit card statements, together with handwritten notes. [Kagan, Day 8, 16:4-21; Gersh, Day 9, 205:1- 207:19, 208:12-19]

13. Prior to 2013, Kagan used his outside accountant, Lev Agranovich, CPA ("Aganovich"), to keep his financial books and records. [Kagan, Day 8, 16:22-24]   Each month, Agranovich would review Kagan's paper documentation and reconcile KDC's and ProEx's books.  Agranovich also prepared the tax returns for ProEx and KDC. [Kagan, Day 8, 26:7-8]

14. Kagan relied upon Agranovich to ensure that his records were accurate and would withstand audit if one was ever requested by the IRS. [Kagan, Day 8, 26:13-27:17]

15. In or about late 2013, Agranovich suggested that Kagan migrate his paper accounting system to QuickBooks.  Agranovich set up the QuickBooks program for Kagan and his companies.  Kagan himself was never trained on QuickBooks and does not know how to use QuickBooks.  Weekly, Agranovich would send one of his employees to Kagan's office to enter financial data into QuickBooks.  It was not always the same Agranovich employee who entered the data.  Agranovich or his partner would also come on site at least monthly to review the QuickBooks entries.  [Kagan, Day 8,17:17-20:22; Gersh, Day 9, 203:20-22]

16. Concerned that there were so many different people from Agranovich's office entering data and the potential for inconsistent entries, in or about early 2014, Kagan hired a bookkeeper directly, Kristina Brusenkova ("Brusenkova").  Her primary job was to enter data from the bank statements into QuickBooks and cut checks authorized by Kagan. [Kagan, Day 8, 21:4-14; Brusenkova, Day 7, 41:6-20]

17. Even after Brusenkova was hired, Kagan still relied upon his accountants to review his financial records and confirm that they were accurate.  [Kagan, Day 8, 25:23-26:16]

18. Prior to Lyman-Cutler, Kagan had worked on at least approximately 25-30 other projects. [Kagan, Day 8, 53:19-21]

19. For each project on which KDC worked, a separate QuickBooks account was set up.

20. KDC also had designated American Express accounts for each project so that project expenses could be more easily tracked. [Gersh, Day 9, 205:20-206:1]

### THE PARTIES' RELATIONSHIP WITH ATTORNEY BORIS MAIDEN

21. Boris Maiden is a real estate attorney. He too is a Russian emigre, and works closely with the Russian immigrant community. [Maiden, Day 10, 173:17-174:12] Kagan used Attorney Maiden on many real estate purchases. Attorney Maiden drafted the operative documents for Kagan projects such as forming LLC's, drafting operating agreements, as well as loan documents for the lenders on Kagan projects. Attorney Maiden developed templates for the standard documentation utilized on Kagan projects which he tweaked as necessary. [Maiden, Day 10, 186:9-19, 205:12-15, 226:22-24; Day 12, 21:15-17, 29:12-23; Kagan, Day 8, 53:22-25]

22. Kagan trusted Attorney Maiden implicitly. He relied upon Attorney Maiden to explain, in Russian, the terms of legal documents which Attorney Maiden drafted. [Kagan, Day 8, 17:6-16, 54:9-20]

23. Although Attorney Maiden considered Kagan a friend, by the time of his testimony at trial, he no longer considered him one. [Maiden, Day 10, 176:17-24]

24. Prior to Lyman-Cutler, Attorney Maiden also represented Lipetsker, or entities in which he was a member, in connection with several other real estate projects. [Lipetsker, Day 4, 17:21] Maiden considers Lipetsker a friend. [Maiden, Day 10, 177:3-4]

25. Attorney Maiden also had a pre-existing relationship with Filippov, though Kagan was not aware of this. [Filippov, Day 2, 10:17-23; Maiden, Day 10, 175:8-18]

## FIRST DISCUSSIONS ABOUT LYMAN-CUTLER

26. In or about October 2012, Kagan identified a property for sale located at 77 Lyman Road, Brookline, MA. Kagan believed that the existing home on the property could be demolished, and the property could be subdivided into two or more buildable lots. [Kagan, Day 7, 41:1-23].

27. In order to purchase and develop the 77 Lyman Road property, Kagan needed to find investors. He asked Lipetsker if he wanted to invest in the project. He described the project in general terms as the potential construction of two luxury homes in Brookline, MA. [Lipetsker, Day 4, 15:13-21; Kagan, Day 8, 46:20-47:4]

28. Kagan asked Lipetsker if knew anyone else who might be interested in investing. [Lipetsker, Day 4, 16:5-7; Kagan, Day 8, 46:4-47:8]

29. Lipetsker spoke to his old friend, Filippov, to see if he would be interested in the project. [Lipetsker, Day 4, 17:1-5; Kagan, Day 8, 47:9-19; Filippov, Day 1, 31:8-23]

30. Kagan met with Filippov and Lipetsker on the site of another ongoing project, 10 Lyman Road. He explained in general terms what he was thinking. He explained that he needed an investor and unless Filippov could convince a bank to lend sufficient money based on the strength of his financial picture, they would not be able to go forward. [Kagan, Day 8, 48:1-51:18]

## OCTOBER 25, 2012 MEETING

31. The parties met at Attorney Maiden's office in October 2012. [Filippov, Day 1, 32:3-14]

32. Filippov did not disclose to Kagan that he had a pre-existing relationship with Attorney Maiden. [Filippov, Day 2, 44:1-4]. Maiden did not disclose the relationship to Kagan either. [Maiden, Day 10, 198:1-3]

33. The purpose of this initial meeting was simply to determine whether there was any interest in going forward with the project at all. [Lipetsker, Day 4, 37:7-10]

34. Present at the meeting were Attorney Maiden, Lipetsker, Filippov, Kagan and Dmitriy Zhukovskiy ("Zhukovskiy"). [Filippov, Day 1, 32:15-17]

35. Zhukovskiy is Lipetsker's nephew. They are very close. Lipetsker and Zhukovskiy had partnered together on approximately five other real estate projects. [Lipetsker, Day 4, 13:10-18] Zhukovskiy is an actuary. [Zhukovskiy, Day 3, 36:1-11]

36. Zhukovskiy, together with Lipetsker, had invested in a project with Kagan which was ongoing at this time. In that project, Hyde Ave., LLC, Zhukovskiy was the managing member. [Zhukovskiy, Day 3, 38:22-39:3]

37. Filippov had also known Zhukovskiy for many years. [Filippov, Day 2, 10:11-16]

38. Attorney Maiden had also known Zhukovskiy for many years. In fact, Zhukovskiy's wife is an associate attorney in Attorney Maiden's office. [Maiden, Day 10, 176:2-16; 195:21-196:1]

39. The meeting at Attorney Maiden's office lasted about an hour and a half. [Filippov, Day 1, 33:4-6]

40. At the time of the meeting, the property (77 Lyman Road) had not yet been purchased, no LLC had been created, no construction plans had been drawn and it was unknown whether the property could be subdivided. [Filippov, Day 1, 65:25-66:3; Day 2, 19:1-7; Kagan, Day 8, 57:4-14; Lipetsker, Day 4, 42:20-43:1] Until the subdivision was

approved, it was unknown where on the lots houses could be sited or even the size and

shape of the houses that could be built. [Kagan, Day 8, 42:8-45:12]

## THE ZHUKOVSKIY SPREADSHEETS

41. Using a template provided to him by Kagan, Zhukovskiy prepared a financial risk

analysis spreadsheet to use at the meeting. [Lipetsker, Day 4, 37:21-25] The spreadsheet

is titled "**Estimated** Financials and Risk Analysis. Investment and Profit Allocation

Alternatives." [Exh. 9] (Emphasis added).

42. Kagan did not prepare the spreadsheets and does not know how to utilize Excel.

[Kagan, Day 8, 58:2-59:6; 60:15-20; Maiden, Day 10, 199:19-25; Day 12, 55:10-17]

43. Zhukovskiy explained the numbers on the spreadsheet. [Filippov, Day 1, 35:6-7;

Filippov, Day 2, 15:23-16:7; Lipetsker, Day 4, 19:16-20:5]

44. Kagan's part of the presentation was limited to the lots and the subdivision. [Filippov,

Day 1, 36:9-17]

45. Lipetsker understood that the financial aspects of the spreadsheet were only estimates.

In his own words he described the spreadsheets as an "estimated financial plan."

[Lipetsker, Day 4, 18:6-19]

46. Filippov too understood that the presentation contained only an "**estimated** financial and

risk analysis." [Filippov, Day 2, 23:3-13]

47. Page 3 of Exh. 9 is captioned "**Estimated** Project Financials and Risk Analysis"

(emphasis added). The left-most column is entitled "Project Scenarios and

Assumptions." One of the rows in that column is entitled "Construction Budget" and

carries a sum of $1.3 million. [Exh. 9] At trial, Filippov admitted that the entire column

entitled "Project Scenarios and Assumptions," which included the $1.3 million figure for

the construction budget, were all estimates. [Filippov, Day 2, 24:17-25:2]

48. At deposition, Zhukovskiy too admitted that all the numbers in the column entitled

"Project Scenarios and Assumptions" were estimates. [Zhukovskiy, Day 3, 95:20-24]

49. Attorney Maiden too understood that the numbers in the spreadsheets were only

estimates. [Maiden, Day 12, 57:22-24]

50. Attorney Maiden recalls that based upon the cost of the project at 10 Lyman Road, the

parties discussed that the cost for the Lyman-Cutler project could be anywhere between

$1.3 million and $1.6 million. [Maiden, Day 10, 182:11-17]  Attorney Maiden does not

recall Kagan saying anything specifically about the construction costs at the meeting.

[Maiden, Day 10, 183:1-3].  He is clear, however, that there were no assurances given

by anybody as to the construction costs:

> Q: Now you told us that at one of the meetings, maybe it was the first, there was a discussion that the cost could be somewhere in the $1.3 to $1.6 million range, correct?
>
> A: Yes.
>
> **Q: And certainly there were no assurances given by anybody that it was either going to be 1.3 or 1.6, correct?**
>
> **A: There were no assurances given by anybody.**
>
> **Q: There were no assurances given by anybody as to the construction costs, correct?**
>
> **A: As to the –those no, as a guarantee to any numbers that were—given.**

[Maiden, Day 10, 202:2-12]

51. Filippov too candidly admitted that he had no memory of Kagan specifically telling him

that construction costs of $1.3 million were guaranteed. [Filippov, Day 2, 16:14-21].  In

fact, Filippov could not remember exactly what Kagan said because it was six years ago. [Filippov, Day 1, 36:9-17; Day 2, 15:11-14]  Filippov testified that he could not remember who said what at the meeting. [Filippov, Day 2, 15:1-13]

52. The Estimated Project Financials and Risk Analysis also carried $200,000 for anticipated carrying costs.  This number was calculated by the Excel formula entered by Zhukovskiy based on several factors. [Zhukovskiy, Day 3, 46:21-47:2, 102:22-103:3]

53. Filippov testified that he understood the carrying costs were also an estimate because it was impossible to predict how quickly the properties would sell. [Filippov, Day 2, 28:20-29:12]

54. There was no guarantee as to when the properties would sell.  [Filippov, Day 2, 27:7-14] The parties discussed that there was a risk that if the properties did not sell as quickly as anticipated, there would be more carrying costs incurred than shown on the estimated financials.  [Filippov, Day 1, 41:2-6]

55. The spreadsheet also anticipated only two investors when, in fact, the ultimate deal included three investors. [Filippov, Day 2, 22:1-8]

56. Filippov asked Kagan if he would guarantee that construction costs would not exceed $1.3 million and asked him to sign the Excel spreadsheet to signify his guarantee. Kagan refused to sign the Excel spreadsheet, noting that it was a template only and until the property was purchased and subdivided, plans drawn, and bank financing lined up, he did not even know what they'd be building or how much money they had to spend. [Kagan, Day 8, 60:21-61:22, 62:7-23, 63:4-65:7]

57. The proposed construction loan distribution schedule in Exhibit 9, which assumed two loans of $750,000 each for an aggregate of $1.5 million [ultimately each loan amount

was $1.6 million for an aggregate of $3.2 million], does not list any disbursement for carrying costs. [Filippov, Day 2, 25:24-26:15; 71:12-20; Exh. 9, p. 5]

58. The Project Scenarios and Assumptions in Exhibit 9 assume a property sale price of $4.9 million. [Exh. 9, p.3] Filippov and Lipetsker both agreed that there never was an agreement to sell the properties for $4.9 million each. [Filippov, Day 2, 27:15-19, 31:4-18; Lipetsker, Day 4, 57:6-58:13]

59. In their adversary complaint, the Plaintiffs claim that the plan was to sell the properties by November 2014 for a price of $4.9 million. [Adv. Cmp.,¶30] Despite this pleading, Filippov agrees that there never was any agreement to sell the properties for $4.9 million each and he has no recollection of ever agreeing to a "plan" to sell the properties by November 2014. [Filippov, Day 2, 61:25-62:13]

60. The allegation in the adversary complaint that the properties were listed for "nearly $600,000 higher than the [$4.9 million] budgeted selling price" [Amd. Adv. Cmp., ¶30] is false insofar as plaintiffs agree that the target sale price was $5-5.25 million and the properties were listed at $5.5 million. [Filippov, Day 2, 31:20-34:2] Filippov admits his allegation "could not be exactly accurate." [Filippov, Day 2, 32:8-13]

61. No agreements were reached at the October 25th meeting. [Filippov, Day 1, 42:25-43:2] Filippov wanted to do more due diligence before he agreed to invest in the project. [Lipetsker, Day 4, 20:16-19; Maiden, Day 10, 198:10-14]

<u>POST MEETING DUE DILIGENCE</u>

62. After the meeting, Kagan drove Filippov and his wife to see the other homes he had built in Newton and Brookline. [Filippov, Day 1, 43:3-19]

63. Kagan told Filippov during their driving tour of prior projects that he typically sets up an LLC for each project and then dissolves them in about a year or so. [Rudyakova, Day 7, 12:2-12]

64. Following the driving tour, Filippov "Googled" Kagan and asked Attorney Maiden to forward a draft of his standard operating agreement so that he could see it before he decided to invest. [Filippov, Day 1, 44:4-13]

65. Tatiana had no role in the negotiations between Filippov, Lipetsker and Kagan. Her only role was that the parties agreed that she would act as the real estate agent for the sale of the finished homes. [Filippov, Day 2, 42:16-23; Tatiana, Day 7, 127:13-25, 128: 1-17] To this day, Filippov has no idea if she had anything to do with the project other than acting as the real estate agent. [Filippov, Day 2, 73:8-24]

<u>FILIPPOV DECIDES TO INVEST</u>

66. Lipetsker had no further communications with Kagan after the October 25th meeting and prior to signing the Operating Agreement. [Lipetsker, Day 4, 21:12-16]

67. Filippov understood that this was a risky investment. [Day 1, 46, 9:15; Day 2, 41:22-42:10] He understood that there was a possibility that that he could lose his entire investment. [Filippov, Day 2, 42:11-15] He understood that there was no guaranteed rate of return. [Filippov, Day 2, 14:21-24]

68. Lipetsker too understood that there was no guaranteed rate of return. Although he hoped to make some return, he did not give it much thought. [Lipetsker, Day 4, 38:11-13] At his deposition, when reviewing the estimated financials, Lipetsker testified that "... the possible outcomes, how long it will take to sell, I didn't care too much if construction

cost was fixed.  It didn't matter how long it would take to sell.  My profit may vary

between five and twenty percent.  I didn't care much."  [Lipetsker, Day 4, 39:25-40:5]

69. It was understood by everyone that there was no guaranty that there would ever be any

return.  [Maiden, Day 10, 207:23-208:12]

70. Filippov knew that under the deal they were discussing Kagan stood to make a

"fortune," but he was fine with that.  [Filippov, Day 2, 14:5-15]  Lipetsker assured

Filippov that the arrangement made sense.  [Filippov, Day 2, 12:22-13:14]  Filippov

relied heavily on Lipetsker's recommendations.  [Filippov, Day 2, 11:3-10]

## DRAFTING OF THE OPERATING AGREEMENT

71. Attorney Maiden drafted the operating agreement to set up Lyman-Cutler, LLC

("LLC").  Attorney Maiden requested no engagement letter and no conflict waiver.

[Filippov, Day 2, 43:14-25]  He did not think a conflict waiver or engagement letter was

necessary because there was no conflict between the parties and because he was only

acting as a "glamorized scribe."  [Maiden, Day 10, 202:21-203:7]

72. Attorney Maiden used a template from an operating agreement that he had previously

used on a Kagan project.  The only terms he remembers putting in which deviated from

the template dealt with profit allocation.  [Maiden, Day 10, 186:9-18]

73. Kagan was using the e-mail kagandevelopment@gmail.com in October 2012.  [Exh. 14,

178]  Attorney Maiden copied Kagan on some e-mails, but, not surprisingly since Kagan

does not often communicate by e-mail, did not receive responses.  [Maiden, Day 10,

208:14-211:1]  This was also not a surprise to either Filippov or Attorney Maiden as

they knew that Kagan did not read e-mails and preferred to have conversations in

person. [Maiden, Day 10, 204:18-20]

74. Lipetsker did not see any of the prior drafts of the operating agreement prepared by Attorney Maiden.  [Lipetsker, Day 4, 46:2-8]

75. Filippov carefully reviewed all the drafts of the operating agreement and made comments and edits.  In addition, he had his own attorney, Attorney Mark Watson, review the draft agreement to ensure that it adequately protected him.  Attorney Watson redlined the agreement for Filippov, who provided that redline to Attorney Maiden so that he could incorporate his requested changes into the next draft of the agreement.  [Filippov, Day 1, 53:10-20; Exh.182]

76. Filippov discussed his concerns regarding the draft operating agreement directly with Attorney Maiden.  [Filippov, Day 2, 45:9-12]  At no time did Filippov speak directly with Kagan during the negotiation of the operating agreement.  [Filippov, Day 2, 45:13-18]

77. In fact, for some of his negotiations with Attorney Maiden, Filippov did not include Kagan in the e-mail distribution list. [Filippov, Day 2, 48:1-4; Exhs. 180, 182, 183, 185]  Attorney Maiden too deleted Kagan from the distribution list on several e-mails about the draft operating agreement.  [Maiden, Day 10, 204:5-14; Exh. 183]

78. Kagan had no idea that Filippov and Maiden were communicating privately about changes in the form operating agreement.  [Kagan, Day 8, 67:12-15]

79. Initially, it was contemplated that Kagan would be the managing partner.  [Filippov, Day 1, 45:7-10; Exh. 11 at p. 12].  However, Filippov had private communications with Attorney Maiden about the fact that he, Filippov, wanted to be in total control because he was putting up the most money and therefore had the most to lose.  In response, Attorney Maiden suggested that he could make Filippov the managing member instead.

These communications were not copied to Kagan. [Filippov, Day 2, 49:18-51:25; Exhs. 182, 183, 184, 185, 186; Filippov, Day 1, 54:9-12; 45:19-24]

80. Filippov left it to Attorney Maiden to decide whether he should be designated as the managing member. Ultimately, Attorney Maiden changed the signature block on the draft operating agreement to reflect his decision to change the designation of "managing manager" from Kagan to Filippov. [Maiden, Day 10, 214:17-215:11; Exh. 14; *Compare*, Exh. 179 signature block to Exh. 15 signature block]

81. Attorney Maiden testified that substantive changes to the draft operating agreement were inserted in bold typeface in order to draw attention to them. The change of managing member from Kagan to Filippov is not bolded. [Exh. 15, signature page; Maiden, Day 10, 216:1-7]

82. Nowhere in the final version of the operating agreement or any of the drafts was there any cap on the cost of construction. Filippov asked if the Excel spreadsheet [Exh. 9] could be attached to the operating agreement as an addendum. [Exh. 14] When making this request, Filippov acknowledged his understanding that the spreadsheet numbers were not finalized noting that the numbers may need to be "tweaked" before being attached to the operating agreement. [Exh. 14; Maiden, Day 10, 217:15-218:4]

83. The Excel spreadsheet was never attached as an addendum to the operating agreement. [Maiden, Day 10, 218:1-7; Exh. 15] Attorney Maiden testified that he would have discussed Filippov's request with Kagan, and the fact that it was never incorporated into the operating agreement means that Kagan did not agree. [Maiden, Day 10, 218:8-13]

84. In fact, the operating agreement [Exh. 15] is silent on the amount of the construction

costs. Attorney Maiden, who drafted the operating agreement, agrees that the operating

agreement is silent on the issue of construction costs:

> Q: And in fact, you'd agree with me sir, that nowhere in the operating agreement
> that you drafted is there anything that specifies that the project will be done on a –
> the construction cost will be at fixed cost, isn't that correct?
>
> A: That is correct.

[Maiden, Day 10, 218:22-219:1]

85. Attorney Maiden did not go through every line of the final version of the operating

agreement with Kagan, and he has no notes of any conversations with Kagan. [Maiden,

Day 10, 206:12-207:22]  In fact, although Attorney Maiden "assumes" he discussed

changes with Kagan, he has no actual memory of these conversations. [Maiden, Day 10,

212:2-23]

86. Filippov never confirmed that Kagan approved the changes to the standard template

operating agreement that he had discussed privately with Maiden. [Filippov, Day 2,

55:22-56:7; Kagan, Day 8, 69:8-11]

<u>EXECUTION OF THE OPERATING AGREEMENT</u>

87. The operating agreement (the "Operating Agreement") went through several iterations

before it was finalized. [Maiden, Day 10, 205:12-24]

88. Before executing the Operating Agreement, Filippov reviewed it carefully to ensure that

it accurately reflected the parties' agreement. [Filippov, Day 2, 9:23-10:1]

89. Both Filippov and Lipetsker agree that they are bound by all the terms of the Operating

Agreement and cannot simply ignore sections even if, with hindsight, they do not like

the terms. [Filippov, Day 2, 9:13-22; Lipetsker, Day 4, 46:20-47:2]

90. After completing his review, Filippov signed and e-mailed the executed copy back to

    Maiden. There was no formal closing. [Filippov, Day 2, 55:19-21; Exh 180]

91. The Operating Agreement was signed on or about November 12, 2012. [Exh. 15]

92. Tatiana is not a signatory to the Operating Agreement and there is no evidence that she

    was ever provided with a copy thereof. [Exh. 15]

93. Kagan did not read the Operating Agreement before he signed it, especially as it was a

    legal document written in English. He relied upon Attorney Maiden to alert him to any

    issues. [Kagan, Day 8, 53:22-54:24; 68:21-69:7]

94. Although there are terms in the Operating Agreement that Kagan did not understand or

    even know existed until after commencement of the litigation, Kagan too agrees that he

    is bound by its terms. [Kagan, Day 8, 67:15-68:20]

## PERTINENT TERMS OF THE OPERATING AGREEMENT

95. The Operating Agreement provides that the LLC will terminate on November 30, 2015.

    [Exh. 15, §2.3]

96. For the first 23 months following acquisition of the property, the obligation to pay

    carrying costs belonged to the LLC. [Exh.15, §4.1]. To finance construction and

    carrying costs, the Operating Agreement provided that the Company would take out a

    purchase money loan and construction loans from the Rockland Trust Company. [Id.]

    Filippov understood that the construction loans were to cover the carrying costs for the

    first 23 months. [Filippov, Day 1, 53:1-6]

97. "Carrying costs" are defined in the Operating Agreement "to include but not be limited

    to mortgage payments, taxes and insurance for the subject property 77 Lyman Road,

    Brookline, Massachusetts." [Exh. 15, § 4.3] They are not just debt service.

98. The underlying property was purchased on or about December 31, 2012. [Exh. 19]
Therefore, the 23 months period in which the LLC exclusively bore the obligation to pay
carrying costs would not expire until November 30, 2015.

99. In the event that the properties were not sold within 23 months, the obligation to pay
carrying costs would shift from the LLC to Kagan. [Exh. 15, §8.1] The parties
contemplated that Kagan might not be willing or able to pay the carrying costs and
expressly provided that if he did not do so, the obligation to pay those costs would then
shift to Filippov. [Id.; Filippov, Day 2, 63:5-64:4] In that event, Filippov's "capital
contribution and percentage interest in the Company shall increase by the same amount
and percentage and at the same time shall trigger reduction of Mr. Kagan's share of
capital contribution by the same amount and subsequently his/her percentage interest in
the Company." [Id.] In other words, Kagan's $250,000 capital contribution was at risk.

100.     Filippov has invoked the penalty provisions of Section 8.1 in this lawsuit,
claiming that his equity has increased due to his payment of additional carrying costs.
[Exh. 72; Proof of Interest Claim No. 11]

101.     It was Kagan's "duty and obligation" to construct two homes on the 77 Lyman
Road property. The only construction detail reserved back to the managing member was
to approve "the plans, including drawings" to be supplied by Kagan. [Exh. 15, § 5.2]
All other aspects of the construction process were delegated to Kagan.

102.     The Operating Agreement does not dictate the means and methods of construction
nor require that selection of contractors or subcontractors be approved by the managing
member.

103.     Nowhere in the Operating Agreement are construction costs fixed at $1.3 million or any other amount. [Lipetsker, Day 4, 48:3-12; Maiden, Day 12, 58:7-15]

104.     Filippov alone claims that "plans, including drawings" was meant to include the financial plans contained in the October 2012 presentation. Not only is this contrary to the plain language of the document, Attorney Maiden, who drafted the document, was very clear that the reference to "plans" in this section meant "the actual floor plans and site plan." [Maiden, Day 10, 194:2-14]

105.     For his services overseeing the construction of the homes, Kagan agreed that he would not charge for his personal time. Instead he agreed that he would be compensated per the formula set forth in Section 8.1 of the Operating Agreement. [Exh. 15, §5.2]

106.     Section 8.1 of the Operating Agreement provides that the "net profits, net cash flow and **net proceeds of any sale** or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows: Mr. Alex Fillipov (40%), Mr. Nickolay Lipetsker (10%) and **Mr. Kagan (50%).**" [Exh. 15, § 8.1] (Emphasis added). Thus, the allocation does not track the parties' equity interests.

107.     The houses were to be "substantially completed" by March 30, 2014. [Exh. 15, § 5.2] The Operating Agreement does not define what is meant by "substantially completed" though, logically, it must mean something less than fully completed. [Filippov, Day 2, 57:7-12] The Operating Agreement does not provide that "time is of the essence." It also does not set a date for final completion.

108.     There was no expert testimony as to the meaning of "substantial completion" or any evidence as to the actual date on which "substantial completion" occurred.

21

109.    The parties agreed that Tatiana would be the listing broker for the sale of the

homes.  The Operating Agreement does not provide a termination date for the listing by

Tatiana, though it does give the managing member the unilateral right to terminate the

listing after December 31, 2014.  [Exh. 15, § 6.1(b)] The ability to terminate the listing

agreement with Tatiana is not self-effectuating, however.  It requires an affirmative act

by the managing member. [Id.]

110.    Filippov did not attempt to remove Tatiana until after receiving the May 7, 2015

[Exh. 50] letter.  [Filippov, Day 2, 120:15-121:12].  Plaintiff's allegation that Tatiana's

right to act as real estate agent automatically expired on December 31, 2014 is contrary

to the express terms of the Operating Agreement. [Filippov, Day 2: 122:11-17; Amd.

Adv. Cmp., ¶ 29]

111.    The books and records of the LLC were to be kept at the company's principal

office and comply with "good record keeping practices." [Exh. 15, § 6.1 b] The LLC's

principal office is designated as Filippov's residence, 130 Trapelo Road, Belmont.

[Exh.15, §2.2]

112.    As the managing member of the LLC, it was Filippov's responsibility to maintain

the LLC's books and records.  Filippov delegated the obligation to maintain the LLC's

books and records to his wife, Arina. [Filippov, Day 2, 59:2-60:5]

113.    The LLC was to dissolve upon the expiration of the term set forth in Section 2.3

(November 30, 2015). [Exh. 15, § 9.1 (c)]

114.    Upon dissolution, the LLC, was to wind up.  Assets were to be distributed in the

following order: 1) liabilities of Company and expenses of liquidation, exclusive of

member loans; 2) repayment of member loans; and 3) anything remaining to the

members in accordance with their capital contributions "after giving effect to all contribution, distributions, and **allocations**..." [Exh. 15, §9.2](Emphasis added). As previously noted, under Section 8.1, Kagan is "allocated" 50% of the net proceeds from any sale of the properties. [Exh. 15, § 8.1]

115.    The LLC agreed to provide indemnification for members and their employees and authorized agents for losses incurred due to acts or omissions undertaken in good faith and in reasonable belief that such acts were within the scope of authority under the Operating Agreement. Excluded from the indemnity are acts undertaken through gross negligence or willful misconduct. [Exh. 15, § 10.2]

116.    Filippov's capital contribution was $2,000,000 in exchange for an 80% interest in the LLC; Lipetsker and Kagan each contributed $250,000 in exchange for a 10% interest each in the Company. [Exh. 15, Schedule A]

<u>CERTIFICATE OF ORGANIZATION</u>

117.    On December 26, 2012, Filippov executed a Certificate of Organization to create Lyman-Cutler, LLC. The Certificate of Organization, signed under pains and penalties of perjury, falsely recited that the LLC did not have a set termination date. This is directly contrary to Section 2.3 of the Operating Agreement which set the termination date as November 30, 2015. Filippov conceded that the Certificate of Organization was inaccurate. [Filippov, Day 2, 67:17-69:6; Exhs. 16 and 17, 190]

<u>PURCHASE OF THE PROPERTY</u>

118.    Following the execution of the Operating Agreement and filing of the Certificate of Organization, Filippov arranged for a purchase money loan from Rockland Trust

23

Company ("RTC").  Attorney Maiden acted as the closing attorney for the bank while
simultaneously representing the LLC as borrower. [Filippov, Day 1, 62:15-24]

119.     Filippov opened up an RTC bank account for the LLC.  Bank statements and
copies of all checks written on the account were sent directly to him at his home address.
Filippov also had online access to the bank accounts.  [Rudyakova, Day 7, 19:13-21:6;
Exh. 289]

120.     The deed was recorded on 12/31/2012. [Filippov, Day 1, 63:20-25; Exh 19]

121.     The purchase price for the property was $4 million. [Exh. 19] The purchase
money loan was for $1.6 million.  With the initial capitalization of $2.5 million, this left
an additional $100,000 to cover closing costs and some of the initial project expenses.
[Kagan, Day 9, 25:2-14]

122.     After deducting the closing costs, the parties had only $58,022.18 on hand for
initial project costs, including carrying costs, out of the purchase money loan.  [Exh.
291, opening balance dated 1/11/13]

123.     At the time the property was purchased, there still were no final construction
plans. [Filippov, Day 1, 65:19-66:3]

124.     While Filippov arranged for the construction financing, Kagan, with the
assistance of Attorney Maiden, filed an application to subdivide the property into two
buildable lots.  The approval of the subdivision application was delayed several months
due to scheduling issues with the Town of Brookline.  [Filippov, Day 1, 64:1-10; Kagan,
Day 8, 71:8-72:7; Maiden, Day 12, 13:9-16]

125.     Filippov knew before a shovel was even in the ground that the project schedule
had slipped five months due to the delays in the permitting process.  [Filippov, Day 2,

72:11-17; Exh. 208]  Thus, if the original "substantial completion" date in the Operating

Agreement was March 30, 2014, Filippov reasonably could anticipate that the new

substantial completion date would be around August 30, 2014.   As time was not "of the

essence" and all parties were aware of the delays, nobody complained about the slippage

of the commencement date.

126.    Once the subdivision was approved and Kagan knew the shape of the new

building lots, he was able to complete the building plans. [Exh. 310]

CONSTRUCTION LOANS/CONFIRMATION THAT NO FIXED COST CONTRACT

127.    On February 19, 2013, John MacGregor, the loan officer at RTC, e-mailed

Filippov that the bank would need two sets of construction plans and budgets for the

construction loans.  [Filippov, Day 1, 65:7-12]  That same day, Filippov asked Kagan to

prepare the plans and budgets for submission to the bank.  [Filippov, Day 1, 65:19-

66:3][Exh. 21]  Filippov admitted that plans had not been prepared prior to this date.

[Filippov, Day 1, 65:21-24]

128.    At this point, the parties still did not know how much the bank would lend for

construction.  The building plans could not be finalized until the bank advised how

much it would lend.

129.    As the managing member and the one putting up the largest share of capital,

Filippov negotiated the construction loans directly with RTC.  [Kagan, Day 8, 79:7-14]

It was up to Filippov, as the managing member and one negotiating the construction

loans, to ensure that the proceeds of the construction loans could be utilized to pay

carrying costs as provided in the Operating Agreement.  [Exh. 15, §4.1] It was not up to

Kagan.

130.    Filippov, Lipetsker and Kagan discussed the construction plans.  Kagan explained

that he would be able to construct larger homes than originally anticipated, which would

mean that construction costs would also be higher.  [Filippov, Day 1, 68:4-9; Day 2,

83:14-17; 84:13-85:12]  See Exh. 197 (Kagan requesting meeting to discuss site plans).

131.    Filippov does not remember the details of the project expansion, but he

remembers Kagan proposing a "fancier" home, which Filippov authorized.  [Filippov,

Day 2, 85;4-12]

132.    As part of the loan application process, RTC commissioned an appraisal of the

property and proposed homes.  [Exhs. 28, 29, 196]  Filippov received a copy of the

appraisal and reviewed it.  [Exhs. 30, 198]  The appraisal anticipates a sale price of $5.3

million which is consistent with the target sale price that the parties had discussed.

[Filippov, Day 2, 74:7-75:22, Day 1, 75:10-18]  The appraisal valued the estimated

construction cost at $4,354,275.  [Exh. 196, at p. 3]

133.    In or about April 2013, Kagan prepared a construction budget for the bank's use

based on the $1.6 million loan application.  [Exhs. 25, 27]  The budget shows how the

proposed construction loan proceeds will be allocated.  [Exh. 27; Filippov, Day 1, 69:1-

4, 71:6-10]  At the time the budget was prepared, the properties still had not yet been

subdivided. [Filippov, Day 1, 71:3-10]

134.    It is typical in the industry that the construction budget submitted to the bank is

based on preliminary estimates.  This is especially true with a spec house where finishes

are not yet selected and actual construction costs are often higher than reflected in the

preliminary budget.  [Salmi, Day 13, 83:6-84:1]  The budget submitted to RTC was

prepared before the plans were even finalized.  [Exh. 21]  See Final Plans, Exh. 310

dated 5/23/13]

135.     The construction budget does not carry a line item for payment of carrying costs.

If the loan proceeds were to be used to cover carrying costs, there should have been a

line item in the budget for "carrying costs."  [Maiden, Day 12, 59:20-25]

136.     Over a period of several days commencing on May 1, 2013, Filippov had an

extensive e-mail exchange with Zhukovskiy regarding the original financial estimates

contained in the October 2012 Excel spreadsheets.  [Exh. 199, 202]  He asked

Zhukovskiy to forward an electronic copy of the Excel spreadsheets because **"I need to**

**update this excel with real numbers which differ from the original estimates."**

[Exh. 199, p. 4, 5/28/13 at 4:27 p.m.](Emphasis added)  Clearly, Filippov knew he had

been working with estimates.

137.     Filippov did not consult with Kagan regarding his manipulation of the Excel

spreadsheet estimates. Instead, he consulted with Zhukovskiy because Zhukovskiy knew

financial details better than anyone.  [Filippov, Day 1, 77:15-21]

138.     In his e-mail communications with Zhukovskiy, Filippov referred to the original

numbers being discussed at the October 25th meeting, as "estimates." [Exh. 31, p.1]

Zhukovskiy confirmed back to Filippov that all the numbers in the original presentation

were "estimates." [Filippov, Day 2, 85:20-25]  For example, Zhukovskiy stated,  "It was

an estimate based on assumptions…" [Exh. 32, p.3]

139.     As of May 4, 2013, Filippov already knew that the cost of construction would be

at least $1.4 million (up from the $1.3 million amount he claims was agreed to), carrying

costs would be at least $275,000 (up from the $200,000 figure in the spreadsheet), and

sale price would be $5.25 million (up from the $4.9 million in the spreadsheet).

[Filippov, Day 1, 78:7-12; Exh. 32, p. 4-5; Exhs. 31, p. 1, 203, p. 1]

140.    In his May 4, 2013 e-mail, Filippov confirmed his understanding that the original

numbers were all estimates and that they were no longer accurate. [Exh. 203; Filippov,

Day 2, 80:3-13] He confirmed that the project was already at least "$300K more than we

originally planned." [Exh. 203, p.2]

141.    On May 5, 2013 at 3:14 a.m., in his "executive summary," Zhukovskiy

underscored that the spreadsheet numbers were all estimates. [Exh. 32, p.3] He

concluded: "On a personal note, (Really, really personal note) **I think the important

takeaway is to understand that these calculations are based on estimates…**" [Exh.

32, p.4](emphasis added)

142.    On May 5, 2013, Filippov stated that "my calculations for carrying costs is

$252K.  This will leave us without at least $100K in funds at the end." [Exh.  205]

143.    After all of this analysis, Filippov decided to borrow $1.6 million to cover the

construction costs for each of the two houses to be built. [Filippov, Day 1, 75:22-76:3,

79:19-22; Exhs. 30, 342]

144.    The construction loan commitment letter dated May 7, 2013 states: "USE OF

LOAN.  The proceeds of the loan will be used solely for the purposes set forth in the

attached Construction Loan Supplement." [Maiden, Day 12, 15:10-16:23]  The

Construction Loan Supplement, which is also incorporated into the final Loan

Agreement, states: "USE OF LOAN PROCEEDS:  The proceeds of the loan shall be

used solely for costs incurred in connection with construction of the Project." [Exh.

207]

145.     Attorney Maiden confirmed that per the verbiage of the loan documents, the loan

proceeds could not be used for paying carrying costs. [Maiden, Day 12, 16:19-23]

146.     The express terms of the construction loan agreement to make it clear that

construction loans can only be utilized to pay construction costs.  They cannot be used to

pay carrying costs.  [see e.g. Exh. 342, §§ 2.3, 2.4, 3.1, 3.2, 3.3.1, 3.4.2, 3.4.6, 3.4.7,

3.4.11, 3.5.1, 5.1, 5.8, 6.1]

147.     Filippov understood that Section 4.1 of the Operating Agreement obligated him to

take out a loan that would cover carrying costs. He admits, however, that the loan he

negotiated, did not allow the use of the loan proceeds for that purpose. [Filippov, Day 2,

98:23-99:8]

148.     As the managing member and signatory, Filippov had a fiduciary duty to honor

the terms of the Operating Agreement and to ensure that the loan that he personally

negotiated as the LLC's managing member enabled the LLC to pay the carrying costs.

149.     To justify his failure to obtain a construction loan that complied with the mandate

of Section 4.1, Filippov now claims that he knowingly perpetrated bank fraud on RTC.

He claims that notwithstanding the express prohibitions in the loan documents and the

lack of a line item in the construction budget for carrying costs, the allocations in the

construction budget were intentionally inflated so that the funds borrowed would be

enough to cover carrying costs.  [Filippov, Day 2, 97:15, 98:4, 101:2-13]

150.     Filippov testified as follows:

          Q: So you're submitting what you claim are false documents to Rockland
Trust Company to support the construction loan; is that your testimony?

          A: Yes.

Q: Okay. Now, you also understand, sir, that the construction loan says that the money needs to be used for construction costs, correct?

A: Yes.

Q: And it does not say it can be used for carrying costs, correct?

A: Yes.

[Filippov, Day 2, 97:19 – 98:4]

151.    Filippov further claims, though there was no supporting testimony or documentary evidence from RTC to support his contention, that RTC was aware that the construction budget was false and inflated and had no problem accepting a falsified document. [Filippov, Day 2, 102:4-9] It is not credible that RTC would knowingly acquiesce to the filing of false financial documents as part of a loan application.

152.    Filippov admitted that he has no qualms about ignoring the law if ignoring it allows him to further his business interests:

Q: "And do you know as you sit here today whether the construction loan that you signed permitted the proceeds to be used for carrying costs?"

A: "I read it doesn't.  But at that point, again, Kagan said its common practice. **So, if there are things that you sign, even if its common practice – you know that is how the business is done—its okay with me, actually.  Even though I would be told you cannot do this, I would probably say, look there is no way to obey every law.**"

[Filippov, Day 2, 100:9-101:1] (emphasis added)

153.    Filippov attempts to defend his fraud by claiming that Kagan told him that this was commonplace and acceptable. [Filippov, Day 1, 38:20-39:3] If there was any truth to this assertion, Filippov should have refused to be a party to a fraud and, as managing partner, should have refused to submit knowingly false documents.

154.    Attorney Maiden did not see the Lyman-Cutler budget and has no idea if it was inflated or not. [Maiden, Day 10, 225:8-22]

155.    Perhaps recognizing how hollow this story reads, Filippov also posed a different explanation. He testified that he did not realize that the loan documents prohibited the use of the funds for carrying costs because they were simply "too voluminous" to read. [Filippov, Day 2, 99:9-17] Whichever of his two stories is accurate, if either, Filippov admits that he knowingly put the LLC's assets at risk and subjected the LLC to liability by committing bank fraud. [Filippov, Day 2, 102:10-17]

156.    Attorney Maiden closed construction loans on June 18, 2013. [Filippov, Day 1, 85:20-22]

157.    Filippov reviewed the draft loan documents before he executed them. [Maiden, Day 12, 8:19-12:4; Exh. 208] As the managing member, Filippov signed the loan agreement and loan commitment letter on behalf of the LLC, knowing that his signature on the fraudulent loan documents exposed the LLC to liability. [Filippov, Day 2, 102:4-12; Exhs. 33, 342; Maiden, Day 12, 32:9-22]

PERTINENT TERMS OF THE CONSTRUCTION LOAN AGREEMENT

158.    As noted above, under the loan agreement, the proceeds could only be used for construction costs. [Exh. 342, ¶ 2.3, Maiden, Day 12, 23:8-15] [See SOF Nos. 144-46]

159.    The loan agreement restricts use of the proceeds to the items set forth in the construction budget. [Exh. 342, ¶3.2; Maiden, Day 12, 24:4-12] Consistent with the restrictions in the loan agreement, the construction budget does not allocate any disbursement to payment of carrying costs. [Exh. 27; Maiden, Day 12, 25:9-11; 30:4-14]

160.     The loan agreement states that the amount of the loan, $1.6 million, represented

only 90% of the anticipated construction costs.  [Exh. 342, ¶3.4.11]  Thus, the total

anticipated construction costs would be at least 10% higher than the loan amount

($160,000) for a total of **$1,760,000**.  KDC brought the homes in for $1,886,571.74

each, approximately $125,000 (~7%) higher than the originally estimated cost

notwithstanding that the homes constructed were larger and "fancier" than originally

anticipated. [See SOF Nos. 500. 565-66 for calculation of actual construction costs]

161.     Insofar as by signing the loan agreement Filippov attested to the fact that $1.6

million represented only 90% of the anticipated construction costs, Filippov must be

deemed to have known that the parties would have to come up with at least an additional

$320,000 (the aggregate 10% unfunded construction costs for the two homes) to

complete the construction.   Kagan was the person who funded the shortfall.

162.     In the loan agreement, Filippov covenanted that if the Borrower (the LLC)

transacted any business with any officer, director, or affiliated person or entity (i.e.

Kagan, ProEx, KDC, or Classic Homes) it will be on "fair and reasonable terms and

conditions substantially as favorable to the Borrower as would be obtainable by

Borrower in a comparable arm's length transaction with an unaffiliated third party."

[Exh. 342, § 5.17] Thus, Filippov not only knew about the KDC contract but also

determined that it was "fair and reasonable."

163.     The failure to comply with any representation or warranty in the loan agreement

is an event of default.  [Exh. 342, ¶6.4].  Thus, paying carrying costs with the

construction loan proceeds, which is expressly prohibited by the loan documents, is an

event of default.  [Maiden, Day 12, 32:9-22]  See also Exh. 342, ¶8.2 (bank relying on

the "representations, warranties, covenants and agreements" set forth in the loan

agreement).

164.    A dispute between the builder and the borrower is also an event of default under

the loan agreement.  [Exh. 342, ¶6.1.2; Maiden, Day 12: 32:23-33:11]  By precipitously

filing suit due to their own personal concerns, plaintiffs risked having the loans declared

in default.

165.    Perpetrating a fraud on the bank is an event of default under the loan agreements

which put the LLC's assets at risk.  [Exh. 342, §6.4]

166.    The Construction Loan Supplement, which is incorporated into the loan

agreement, states: "USE OF LOAN PROCEEDS:  The proceeds of the loan shall be

used solely for costs incurred in connection with construction of the Project."  [Exh.

207]

CLASSIC HOMES CONSTRUCTION CONTRACT

167.    RTC required a fully executed construction contract to support the construction

loan application.  Attorney Maiden had a form construction contract on his computer

which he had utilized for other Kagan projects.  [Filippov, Day 2, 88:13-16; Maiden,

Day 10, 226:18-228:4]  Attorney Maiden utilized that form contract as part of the loan

application that he prepared for the Lyman-Cutler project.

168.    The form contract that Attorney Maiden utilized was for a company that Kagan

no longer operated, Classic Homes & Development & Construction, Inc. ("Classic

Homes").  [Kagan, Day 8, 12:25-13:12; Exhs. 36, 209]

169.    The Classic Homes contract is a cost contract and not a fixed price contract.  It is

not capped at $1.3 million. [Exhs. 36, 209, §V, p.2] This is consistent with the parties'

33

understanding that the total construction costs were still unknown. [Filippov, Day 2, 88:24-89:9; Maiden, Day 10, 228:25-229:15]

170.     The Classic Homes' contract also left blank the space where the approved plans should have been listed as the parties' knew that the plans might still change. [Exhs. 36, 209, §II, p.1]

171.     Filippov executed the Classic Homes contract on behalf of the LLC. Before executing the Classic Homes contract, Filippov read it to ensure that it accurately reflected the parties' agreement. [Filippov, Day 2, 89:21-90:3; Exhs. 36, 209]

172.     Prior to the construction loan closing, Kagan went to Attorney Maiden's office. Attorney Maiden had a stack of documents and pointed out to Kagan those documents that needed his signature and where he should sign. Attorney Maiden did not review any of the documents with Kagan and, as they were in English, Kagan relied totally on Attorney Maiden to advise him if there was anything noteworthy. Kagan did not review any of the documents himself. He did not know that one of the documents he signed was the Classic Homes contract. [Kagan, Day 8, 84:5-85:23]

173.     In an effort to get out from under the fact that he knowingly signed an open-ended cost contract, which is wholly inconsistent with his claim that Kagan agreed to construct on a fixed cost basis, Filippov now claims that when he signed the Classic Homes agreement as managing member of the LLC, he knew it was a sham and another fraud he knowingly perpetrated on the bank. [Filippov, Day 2, 86:7 – 88:4]

## KDC CONSTRUCTION CONTRACT

174.     The parties understood from the outset that KDC would be doing the construction. [Maiden, Day 13, 3-5] In November 2012, before the Operating Agreement had even

34

been signed, Attorney Maiden told Filippov that the bank would require a signed

contract with Kagan Development. [Filippov, Day 2, 52:10-19, Exh. 187]

175.     Lipetsker submitted an affidavit attesting to the fact that "Mr. Kagan, through his

company Kagan Development, was to serve as the general contractor for the project. "

[Lipetsker, Day 4, 54:12-19]

176.     Unaware that he had already signed a construction contract for Classic Homes,

Kagan asked Joseph Cohen ("Cohen"), a consultant, to draw up a standard KDC

construction contract which reflected the agreement set forth in the Operating

Agreement. [Kagan, Day 8, 86:6-87:4; Exhs. 37, 211]

177.     Cohen utilized the standard form KDC construction contract which he tailored to

the terms of the parties' agreement. [Cohen, Day 4, 107:17-20, 109:15-21]  He e-mailed

the execution copy of the KDC contract to Kagan on 6/24/13.  [Exh. 65]  The metadata

from that document confirms that it was last edited on that same day.  [Exh. 65, last

page]

178.     The KDC construction contract, just like the Classic Homes' contract, is also

open-ended.  [Exhs. 37, 211] The primary difference between the two is that the KDC

contract permitted certain percentage add-ons which were not part of the Classic Homes

contract.  The KDC contract is a "cost-plus" contract, while the Classic Homes' contract

is a "cost only" contract.  Neither is a fixed price contract capped at $1.3 million,

however.

179.     Although the KDC contract authorized KDC to add certain percentage multipliers

based on the cost of work, for projects in which he is an investor, Kagan typically does

not invoke these percentage multipliers. [Kagan, Day 8, 89:25-90:15]  In that regard,

those terms are much like the standard contract terms which permit charging interest, late fees or recovering attorney fees, though those clauses are rarely invoked absent litigation.

180.    As the Operating Agreement delegated full authority to Kagan to construct the homes, reserving back to the managing member only the right to approve the final plans, Kagan reasonably believed he was authorized to execute the KDC construction contract (and any subcontracts) on behalf of the LLC, and did so. [Exh. 15, § 5.2]

181.    Prior to executing the KDC contract, Kagan discussed it with Filippov and provided him with a copy.  On August 21, 2013, Kagan had his office manager, Ryan O'Grady, e-mail another copy of the executed construction contract to Filippov and Lipetsker so that they would have a copy for their records. [Kagan, Day 8, 91:16-92:23; 95:2-23; Exh. 215]

182.    The August 21, 2013 e-mail [Exh. 215] was sent from the domain name "kagandevelopment.com" KDC reserved that domain name on 3/20/13, five months before it e-mailed the KDC contract to Filippov and Lipetsker.  [Exh. 324]

183.    Although plaintiffs now seek to disavow the KDC contract and deny that they knew anything about KDC doing the construction, in the Adversary Complaint, plaintiffs alleges that the LLC entered into a contract with KDC (Amd. Adv. Cmp., ¶78) and even brought a count for a breach of that contract (Count VII).  Filippov reviewed the allegations in the adversary complaint before filing it and confirmed that the factual allegations therein were accurate.  [Filippov, Day 2, 33:9-21]

## JOSEPH COHEN

184.     Cohen is an independent consultant that Kagan occasionally used for "legal" assistance as he is a native English speaker and seemed to have experience.  Kagan also relied upon Cohen to advise him regarding strategy in litigation matters. [Cohen, Day 4, 87:12-15; Kagan, Day 8, 30;13-23]

185.     Cohen did not have an office at KDC and had no ongoing role in the Project construction.  He had no day-to-day responsibilities. [Cohen, Day 6, 66:12 – 67:16] He was rarely, if ever, on site at the KDC offices and did not have a key to the office. Kagan used him on an as-needed basis. [Kagan, Day 8, 31:5-21]

186.     Cohen did not have any responsibility for or access to QuickBooks.  [Kagan, Day 8, 31:22-32:1; Cohen, Day 6, 71:15 – 72:3]

187.     Cohen had no responsibility for anything dealing with construction.  He did not interact with subcontractors nor have any responsibility for determining who was a subcontractor nor how much each would be paid. [Kagan, Day 8, 32:2-9; Cohen, Day 6, 67:17 – 68:6]

188.     He had no role whatsoever in preparing KDC's proof of claim binders. [Exhs. 174 and 175] Gersh prepared those binders. [Kagan, Day 8, 32:10-23; Gersh, Day 11, 25:9-10, 30:1-4]

189.     Gersh had minimal involvement with Cohen, and Cohen had nothing to do with the financial records of the Kagan companies.  [Gersh, Day 9, 211:19-212:23; Gordon, Day 9, 123, 21-25]

190.     Filippov had no dealings with Cohen during the construction of the Project. His first interaction with Cohen was when he received an email from him on May 12, 2015.

[Filippov, Day 1, 113:23-114:5] He first met Cohen on site on May 16, 2015 when Cohen turned over the keys. [Filippov, Day 1, 115:3-7]

191.    Cohen was not involved with the Lyman-Cutler project after drafting the form KDC construction project in June 2013. His next involvement was not until May 2015 after the Project was complete and the payment dispute which forms the basis for this complaint arose. [Kagan, Day 8, 40:8-12]

192.    Cohen is a convicted felon. He never disclosed his criminal background to Kagan. Kagan did not learn that he had a criminal background until reviewing Cohen's deposition testimony in 2018. [Kagan, Day 8, 35:2-19]

193.    Cohen was convicted of bank fraud for submitting false statements in loan applications. [Cohen, Day 6, 20:2-9] This is exactly what Filippov did when applying for the construction loans. Filippov, however, did not get caught.

194.    When Kagan learned that Cohen was a convicted felon, he confronted Cohen with this fact. Cohen told him that his conviction had to do with a messy divorce and non-payment of child support that occurred 15 years previously. [Kagan, Day 8, 35:16-37:8]

195.    Although Kagan felt sorry for Cohen, he believed that Cohen should have disclosed his criminal background to him. Kagan felt that the failure to have disclosed his background was a betrayal of trust. As a result, after he learned about Cohen's testimony at deposition, Kagan stopped using Cohen for anything. [Kagan, Day 8, 37:9-38:19]

196.    Cohen billed for his services through a company known as "Sarc". Cohen did minimal, if any, work for KDC after calendar year 2015 as evidenced by the fact that KDC has not paid Cohen for any services after calendar year 2015. [Gersh, Day 11,

98:1-99:9]  The proof of claim and supporting binders were prepared in May 2016,

months after Kagan stopped using Cohen.

## PAYMENT OF CARRYING COSTS

197.   The final version of the Operating Agreement required the LLC, not Kagan, to

pay carrying costs for the first 23 months. [Exh. 15, § 4.1, § 8.1] Kagan, however, did

not read the Operating Agreement before he signed it and was unaware that it did not

reflect his initial understanding. [Kagan, Day 8, 69:15 – 70:8]

198.   The parties originally agreed that Kagan would front all carrying costs until the

properties sold. [See Exh. 12 "Mr. Kagan is taking care of the carrying cost till

properties are sold"].

199.   Exhibit  291 is an accounting prepared by Filippov which shows all account

activity through April 23, 2018. [Filippov, Day 2, 156:18-157:5]

200.   The opening balance of the LLC account, funded by the remaining balance of the

purchase money loan after the closing on the property purchase, according to Filippov's

own records, was only $58,022.18. [Exh. 291, opening balance dated 1/11/13]

201.   As of April 2013, there were insufficient monies left over from the purchase

money loan to pay for carrying costs.  [Exh. 22]

202.   Filippov advised Kagan [Exhs. 22 ,23, 194, 195] that he would not be putting any

further money into the account.  [Filippov, Day 1, 66:11-67:3, Filippov, Day 2, 35;13-

16]  This meant that he knew Kagan was starting to pay carrying costs as early as April

2013.

203.   In Filippov's own words from April 6, 2013, "There is $20K left in the bank and

we have new payments due coming shortly [carrying costs].  Under no circumstances

will I be adding any new investment money to the project." [Exh. 194; See also Exh.

22] Clearly, Filippov understood that Kagan would be fronting the money for carrying

costs.

204.     Filippov knew that if only $200,000 was earmarked for carrying costs, the LLC

was going to be short. [Filippov, Day 3, 27:8-13] This is especially so as the $200,000

of carrying costs calculated in the original spreadsheet assumed a loan of $1.5 million,

not a loan of $1.6 million. In fact, as of May 4, 2013, Filippov had already determined

that carrying costs would be at least $275,000 for each of the two loans, i.e. $150,000

higher (because there are two loans) than estimated at the October 2012 meeting. [Exh.

32, p. 4-5, Exh. 31, p.1]

205.     Filippov understood that any shortfall on the ability to pay carrying costs would

be paid for by Kagan. [Filippov, Day 2, 36:9-13]

206.     Filippov "assumed" that Kagan was putting money in for carrying costs and then

pulling that same money out. Filippov has no evidence to confirm his assumption and

even his expert forensic accountant provided no testimony to this effect. [ Filippov Day

3, 27:16-24]

207.     Every time the LLC bank account balance was too low to cover debt service

payments, Filippov or his wife, Arina, would contact Kagan and have him deposit

additional funds to cover the debt service. [Filippov, Day 2, 104:24-106:25; Exh. 316;

See e.g. Exh. 256 (requesting that KDC deposit monies to cover debt service)

208.     Kagan would then transfer money to the LLC operating account so that Filippov's

wife, Arina, could make payments to the bank for debt service. [Kagan, Day 9, 46:2-7;

113:5-9]

209.    Notwithstanding that he knew that Kagan had no obligation to pay carrying costs

for the first 23 months yet was doing so, Filippov never pointed out that the obligation to

pay belonged to the LLC. [Kagan, Day 8, 70:9-22]  Filippov is trying to reap a windfall

out of his silence and Kagan's ignorance.

210.    Filippov knew that Kagan was making deposits to cover carrying costs.  In the

books and records maintained by Filippov for the LLC, there are multiple entries

indicating deposits that are identified as "Kagan Carrying Costs."  [Filippov, Day 2,

107:17-109:10; Exh. 291, entries dated 7/23/13, 9/19/13, 11/29/13, 1/08/14, 1/15/14,

5/01/14, 5/02/14, 6/18/14, 7/03/14, 9/29/14, 10/9/14, 11/18/14, 11/25/14, 12/17/14,

1/8/15, 1/14/15, 1/26/15, 1/29/15, 2/10/15, 2/18/15, 2/25/15, 2/27/15, 3/13/15, 3/27/15,

4/17/15, 4/22/15, 4/27/15, 5/18/15]  Assuming, *arguendo*, that Fillipov's entries are

accurate, even by Filippov's own calculations Kagan fronted at least $301,615.26 (the

total of the entries) for carrying costs starting all the way back to July 2013.  [Id.]

211.    In fact, the actual amount of carrying costs advanced, which includes much more

than just debt service, was $665,545.49.  [Gersh, Day 11, 18:15-21:3, Proof of Claim

No. 1, p. 5/9]

### MONITORING CONSTRUCTION EXPENSES

212.    The final building plans are dated May 23, 2013.  [Exh. 310]  These plans,

submitted as part of the building permit application, included a set of architectural plans

(Sheets A1-A6) which showed floor plans and elevations, and a set of structural plans

(Sheets S1-S8). The building permits issued on July 23, 2013.  [Exhs. 100, 101]

213.    In order to receive a construction loan disbursement from RTC, the LLC needed

to pay a fee of $125 and RTC would send an inspector to ensure that the work for which

payment was sought had been completed. [Exh. 342, §3.5] Therefore, KDC waited until

the LLC was low on funds before requesting a disbursement, thereby saving on

inspection fees. [Gersh, Day 9, 213:11-20]

214.     If the costs of construction were truly inflated in the construction budget to cover

carrying costs, as Filippov contends, the inspector would have approved a lower amount

when valuing construction. [See RTC Credit File Comment at 2 ("Every construction

invoice paid (advanced) is monitored by RTC inspectors."); Exh. 234]

215.     ProEx prepared proposals for the work it performed on the project.  The proposals

are below market rates. [Kagan, Day 8,75:9-19, 76:17-79:1; Exh. 326, 327, 328, 329,

330 and 174]  Kagan gave a copy of the proposals to Lipetsker and Filippov.  [Kagan,

Day 8, 80:17-19]

216.     ProEx was responsible for the demolition of the existing house, as set forth in its

proposal.  [Exh. 326, 329]  ProEx also did extensive additional work on the project as

set forth in a second proposal.   [Kagan, Day 8, 96:17-105:13; Exh. 327] There are also

two additional proposals for remedial work performed by ProEx to address damage after

the winter of 2015.  [Kagan, Day 8, 110:10-111:6; Exh. 328, 330]

217.     ProEx's base work is described in three proposals:  Exh. 326 ($43,700), Exh. 327

($418,150) and Exh. 329 ($418,700).  Thus the total of ProEx's proposals is $880,000.

218.     The ProEx proposals are all for lump sum amounts.  ProEx does not bill based on

its actual expenses and does not track its expenses by project.  It bills on percent

completed. [Gersh, Day 11, 103:6-14; Gordon, Day 9, 134:18-25, 135: 1-7]

219.     Construction started in July 2013. [Filippov, Day 1, 92:20-21]

220.    In an effort to control costs, Kagan would meet with his subcontractors to discuss

finish specifications and costs. [Kagan, Day 8, 118:2-20]  Finish specifications and costs

were also discussed with Filippov and Lipetsker.  [Kagan, Day 8, 119:1-15; 119:20-

120:1]

221.    Nothing in the Operating Agreement prevented Filippov from inserting himself

into the construction process should he wish to do so.  [Filippov, Day 2, 58:20-59:19]

222.    Despite being managing member, Filippov made a conscious decision not to be

involved in the day-to-day construction activities.  He was not onsite every day, never

asked to see subcontracts, and never asked for subcontractor bids or lien waivers.

[Filippov, Day 2, 57:13-58:19; Kagan, Day 8, 119:12-14]  Not until after the payment

dispute arose in May 2015, did Filippov ask for any back-up or question any payments.

223.    Lipetsker was on site more frequently than Filippov.  [Kagan, Day 8, 119:7-11]

He was there to observe the construction progress and observed that the houses that

KDC was building had changed from the original plans.  In fact, he recalls discussing

the changes with Kagan.  [Lipetsker, Day 4, 45:6-14]

224.    Lipetsker understood that Kagan was going to be hiring contractors to do the

work and agrees that the contractors who did the work are entitled to be paid.

[Lipetsker, Day 4, 52:4-11]  He did not expect Kagan to seek approval before engaging

subcontractors.  [Lipetsker, Day 4, 53:6-9] Lipetsker understood that under Section 5.2

of the Operating Agreement, the members delegated the obligation to build to Kagan,

reserving back to Filippov, as managing member, only the ability to approve the plans.

[Lipetsker, Day 4, 52:20-53:5; Exh. 15, §5.2]

225.     The understanding from the beginning was that KDC would be acting as the

general contractor.  [Lipetsker, Day 4, 53:15-25]  Lipetsker filed a sworn affidavit in the

state court litigation where he averred: "we planned to purchase of land in Brookline,

Massachusetts, subdivide into two parcels, and then construct on each separate parcel a

high-end, single-family home.  **Mr. Kagan, through his company Kagan**

**Development, was to serve as the general contractor for the project.**"  [Lipetsker,

Day 4, 54-8-19; 55:10-13] (Emphasis added)  Any suggestion that plaintiffs did not

know that Kagan was contracting with KDC is simply not credible given Lipetsker's

affidavit and the pleading in the Adversary Complaint that "the parties entered into a

contract with KDC". [Amd. Adv. Comp. ¶ 78]

226.     Filippov understood that KDC was doing the construction.  He saw bills from

KDC, saw checks cut to it, saw e-mails to it, saw the KDC sign on the construction site,

and knew KDC was a Kagan company.  He never asked any questions.  [Filippov, Day

2, 90:25-91:18; Kagan, Day 8, 119:15-18]

227.     As previously noted, in November 2012, Maiden advised Filippov that RTC

would require a contract with KDC to support the construction loans. [Exh. 187]

228.     Kagan sent Filippov copies of checks as they were written. [Filippov, Day 1,

92:6-9; Exhs. 193, 174, 175, 217, 219, 240, 315]; [Filippov, Day 2, 109:19-112:3]

229.     Kagan sent copies of checks payable to KDC as they were being paid.  [Filippov,

Day 2, 112:25-113:3; Kagan, Day 8, 120:12-14; Exhs. 223, 224, 225, 229, 230, 236,

237, 238, 241, 258, 315] Filippov admits that he received copies of checks cut to KDC.

(Filippov, Day 2, 118:1-3)

230.     Filippov also received copies of the LLC bank statements which showed all checks being cut. [Filippov, Day 2, 114:21-23] He was aware of every deposit, debit and check. [Filippov, Day 2, 115:3-8; Exh. 289]

231.     Filippov also received copies of the construction disbursement requests. [Exhs. 221, 222, 226, 227, 228, 232, 233, 294, 295]

232.     Lipetsker made no attempt to monitor expenses. Filippov let him know, however, that he was receiving copies of checks. [Lipetsker, Day 4, 49:4-18]

233.     Despite seeing multiple checks being paid to KDC, and despite being the managing member of the LLC, Filippov asked no questions. He did not ask to see the KDC contract (because he already had it) or ask what KDC was doing on the site and why it was receiving so many large payments. [Filippov, Day 2, 91:19-92:4]

234.     Despite being the managing partner and now claiming not to know what the checks were actually for, Filippov did not ask for copies of invoices. In fact, he testified that he "didn't care." [Filippov, Day 2, 112:1-10] His first requests for additional back-up only came after the Project was complete and the payment dispute commenced in May 2015. [Kagan, Day 8, 123:8-16]

235.     Filippov also knew that ProEx was working on the Project. [Filippov, Day 1, 91:8-10]

236.     Kagan ensured that Filippov received copies of checks cut to ProEx. [Filippov, Day 2, 115:12- 116:16, 118:4-6; 125:14-131:20; Exhs. 216, 230, 231, 235, 238, 239, 258]

237.     If the account balance in the LLC operating account was too low, KDC would

front the costs of construction or other costs and then reimburse itself from the next loan

disbursement. [Gersh; Day 9, 213:21-214:5]  Any excess expenses, including KDC's

fronting of the carrying costs, were to be reimbursed at the closing on the sale of the

properties. [Kagan, Day 8, 88:12-89-24]

238.     Filippov's wife, Arina, interfaced regularly with KDC's booking staff: first Ryan

O'Grady, then Brusenkova, and finally Dan Gersh. [Rudyakova, Day 7,  18:12-25;

Kagan, Day 8, 120:15-25]

239.     When the LLC account balances got too low, Filippov's wife, Arina, would

contact Kagan and ask him to deposit more money, and he did so. [Rudyakova, Day 7,

17:16-18:11; Exh. 316]

240.     Lipetsker too put in no additional monies beyond his initial capital contribution.
[Lipetsker, Day 4, 51:25-52:3; 91:10-12]

## INTERACTIONS WITH TATIANA DURING CONSTRUCTION

241.     Filippov recalls meeting with Kagan and Tatiana at the site in July 2014 just

before the first property was listed.  They showed him the inside of the house.  This is

the only time he ever saw Tatiana outside of a social engagement. [Filippov, Day 1,

95:18-20]

242.     Tatiana had no role whatsoever with respect to the construction.  She had nothing

to do with the project billings. [Lipetsker, Day 4, 50:16-51:21; Kagan, Day 8, 133:2-11;

Tatiana, Day 7, 127:13-25]

243.     Tatiana had nothing to do with the deal other than she acted as real estate broker.

[Filippov, Day 2, 47:16-23]

244.     Other than as it related to her attempts to sell the properties, Lipetsker had no

interaction with Tatiana.  [Lipetsker, Day 4, 41:18-21]

245.     Lipetsker testified that he has no evidence at all that Tatiana committed any

malfeasance in connection with construction of the Lyman-Cutler project.

> Q: And certainly with respect to any aspect of the construction of
> the project, you have no facts that Tatiana did anything wrong,
> isn't that correct?
>
> A:  It's correct.

[Lipetsker, Day 4, 62:15-18]

246.     There is no evidence of any malfeasance by Tatiana.

### MAINTAINING THE PROJECT BOOKS AND RECORDS

247.     Filippov conceded that he was responsible for maintaining the books and records

of the LLC.  He delegated that responsibility to his wife, Arina.  She interacted with

Kagan's personnel to the extent that she needed any information.  [Filippov, Day 2,

59:24-60:12]

248.     The LLC's bank statements were sent directly to Filippov. Kagan did not have

access. [Gersh, Day 9, 216:16-21; Day 11, 16:18-25].

249.     In order to help KDC maintain its own books, Kagan asked Filippov to send him

copies of the LLC's bank statements and copies of checks. [Exh. 218]  Kagan's on-line

access to the LLC's RTC account did not function.  [Exh. 220]

250.     Filippov understood that if he was not getting requested information or if he was

unhappy with the way things were going, he could have called a members' meeting to

demand answers under Section 7.4 of the Operating Agreement.  He never invoked that

clause until after the litigation was filed.  [Filippov, Day 2, 61:2-14]

251.    Filippov did not ask for any back-up until receiving the May 7, 2015 letter:

> Q: And in fact, it wasn't until after you got counsel involved, after the May 7th letter, when it's the first time that, all of a sudden, you're starting to ask for invoices---
>
> A: Correct.
>
> Q: --isn't that correct.
> A: Yes.

[Filippov, Day 2. 118:17-22]

252.    Filippov was also responsible for doing the tax returns for the LLC. [Day 1, 93:24-25] He did so, and admits that in order to do so he had to have sufficient information and confidence in the accuracy of the numbers that he reported. [Filippov, Day 2, 119:12-19]

### KRISTINA BRUSENKOVA

253.    In late 2013, Kagan hired Kristina Brusenkova ("Brusenkova") as an in-house bookkeeper. [Brusenkova, Day 7, 39:12-13] He initially met Brusenkova when she worked for KDC's accountant, Lev Agranovich. Brusenkova was one of the many persons who Agranovich sent to KDC's office to input data into the new QuickBooks system that he installed. [Brusenkova, Day 7, 39:16-22]

254.    At the time of her hire, the Lyman-Cutler project was well underway.

255.    Kagan had a romantic relationship with Brusenkova which ended badly in October 2014. [Brusenkova, Day 7, 40:15-41:1]

256.    Brusenkova was responsible for bookkeeping necessary for the Kagan companies and projects, including, for the short time she was there, Lyman-Cutler. [Brusenkova, Day 7, 41:2-42:20]

48

257.     Plaintiffs suggest that the ProEx proposals were backdated because ProEx was not
using the phone number on those proposals at that time. When questioned, Brusenkova
could not remember if that phone number was new or not. [Brusenkova, Day 7, 45:24-
46:8]

258.     Kagan relied upon Brusenkova to accurately enter data into the QuickBooks
accounts. Her job was to enter checks, scan invoices and occasionally respond to e-
mails. [Kagan, Day 8, 22:6-23:3]

259.     When she first arrived at KDC, Brusenkova identified certain invoices which
inadvertently had not been entered into QuickBooks. Appropriately, she went back and
inserted the missing information. [Brusenkova, Day 7, 66:20-67:16]

260.     Brusenkova e-mailed copies of checks and invoices to Filippov's wife, Arina.
[Brusenkova, Day 7, 57:3-9]

261.     The romantic relationship between Brusenkova and Kagan soured. [Brusenkova,
Day 7, 61:7-12] KDC fired her and Kagan accused her of embezzling money.
[Brusenkova, Day 7, 60:19-21]

262.     Kagan obtained a restraining order against Brusenkova, and she was convicted on
criminal charges brought against her for breaking and entering in the nighttime.
[Brusenkova, Day 7, 61:16-21; 80:15-25]

263.     Brusenkova brought a discrimination case against Kagan, which action was
thrown out. [Brusenkova, Day 7, 61:25-62:10] At the time of her testimony at this trial,
Brusenkova and Kagan were also adversaries in a civil lawsuit between them based on
Kagan's claim that she embezzled monies. [Brusenkova, Day 7, 62:14-24]

264.     Only after she was fired and her relationship with Kagan soured, did Brusenkova

meet with Filippov. [Brusenkova, Day 7, 63:11-64:21]

265.     Brusenkova had no experience working with a construction company prior to

KDC. [Brusenkova, Day 7, 50:8-25] She had not taken any construction classes either.

[Brusenkova, Day 7, 53:19-21]. She was not involved in the negotiation or

administration of any subcontracts. [Brusenkova, Day 7, 53:22-25, 54:7-9; Kagan, Day

8, 234-10; Kagan, Day 9, 87:22-88:14]

266.     Notwithstanding that Brusenkova had no construction experience and was

working full time for KDC, she filed an application to obtain a Construction

Supervisors' License with an false attesting certification that she had at least three years

of full time construction experience. [Brusenkova, Day 7, 76:1-79:18]

DAN GERSH

267.     After Brusenkova was fired, Kagan hired Dan Gersh ("Gersh") to replace her.

His duties were more expansive than Brusenkova's. He is the CFO. [Kagan, Day 8,

28:8-29:24; Gersh, Day, Day 9, 200:3-13]

268.     It took Gersh months to painstakingly review and verify the information that

Brusenkova maintained, which was made even more difficult as he did not have the

ability to call her to ask questions. [Gersh, Day 9,201:1-4] Gersh did not have a

background in construction or working with small companies like KDC. There was a

large learning curve. [Gersh, Day 9, 202:1-15]

269.     At the time he started at KDC, the Lyman-Cutler project was essentially complete

and inactive. It was not the focus of his efforts. [Gersh, Day 9, 202:16-203:9] Part of

his initial efforts were to clean up the QuickBooks files and to bring the system up to

50

date.  Because multiple persons had been entering data into QuickBooks, the manner in

which data was entered was inconsistent.  [Gersh, Day 9, 203:23-204:25]

270.    As to the records maintained by Brusenkova prior to his arrival, Gersh found the

manner in which she kept them to be inconsistent and incomplete. [Gersh, Day 9, 209:1-

210:22]  He spent a lot of time correcting and completing entries, all of which would

show in the QuickBooks "audit trail."  [Gersh, Day 9, 210:23-211:24]

271.    Upon his arrival at KDC, Gersh reached out to Filippov and Lipetsker to

introduce himself and to ask if they had any questions.  He received no reply.  [Gersh,

Day 9, 214:215:6; Exhs. 48, 253]

272.    As it related to Lyman-Cutler, Gersh observed when he arrived that there were

paper records and also QuickBooks records, though they were not organized in the

manner that Gersh preferred.  [Gersh, Day 9, 215:20-217:7]

273.    Gersh first started reviewing the Lyman-Cutler records in earnest during the first

quarter of 2015.  [Gersh, Day 9, 217:7-218:20]

274.    At each year end, Gersh meets with the company accountants to finalize the books

and determine, as the companies are on an accrual basis, how much income to realize in

accordance with applicable tax laws.  [Gersh, Day 11: 38:5-39:14; Gordon, Day 9, 132,

3-24, 137:15-25, 138:1-6, 140:20-25, 141:1-15]  This is typical conversation with the

accountant.  [Gersh, Day 11, 107:13-109:1; Gordon, Day 9, 141:25, 142:1-2]

275.    When Gersh says he "plays around" with numbers, [Exh. 341], he means he is

going into QuickBooks, running reports, researching and looking for answers.  [Gersh,

Day 11, 89:15-19, 109:2-11]

## SUBSTANTIAL COMPLETION

276.    Plaintiffs allege in their complaint that Kagan failed to achieve substantial

completion timely. [Amd. Adv. Cmp. ¶. 26, 54(a)]

277.    Plaintiff offered no expert testimony as to the date of substantial completion or

final completion. Nowhere in the Operating Agreement does it state that "time is of the

essence."

278.    In response to a question from Filippov, Brusenkova [not Kagan] confirmed that

at least by August 2014, both homes were substantially complete, though she does not

state when they achieved that status. [Exh. 249]

279.    Although the certificates of occupancy ("CO") are dated October 2, 2014 [Exhs.

102, 103], Kagan testified that he intentionally delays in getting a CO on a spec home

because the prospective buyer may want custom changes. Once one gets a CO, one

would have to apply for a new building permit instead of simply continuing under the

existing one if the buyer wanted changes. Moreover, once the CO is issued, for tax

purposes the property is assessed at its improved value as opposed to its pre-

improvement value. By delaying the issuance of a CO, the developer (Lyman-Culter,

LLC in this instance) saves on real estate taxes. [Kagan, Day 8, 133:12-135:14]

280.    Filippov agrees that 88 Cutler Lane was completed no later than the end of July or

early August. [Filippov, Day 2,127:18-128:4] Filippov is unsure when the Lyman Road

property was finished. Plaintiffs have failed to establish the exact dates of substantial

completion or final completion.

281.    The allegation in the Adversary Complaint that **neither** property was finished by

October 2014 is patently false.  [Filippov, Day 2, 128:5-19] [Amd. Adv. Cmp., ¶ - 26,

54(a)]

<u>EXECUTION OF THE LISTING AGREEMENT FOR CUTLER LANE</u>

282.    Kagan discussed listing of the properties and the listing prices with Filippov.

[Kagan, Day 8, 135:15-136:15]  Filippov authorized Kagan to sign the listing

agreements.  [Kagan, Day 8, 136:19-20]

283.    Cutler Lane was first listed in August 2014 for $5.499 million.  [Exh. 45, 248;

Filippov, Day 1, 100:17-24]  The listing agreement was signed by Greg Keily of

Century 21 and Kagan. [Filippov, Day 1, 101:3-25; Kagan, Day 8, 167:10-12]  Tatiana

is not a signatory or a party to the listing agreement.

284.    Kagan sent Filippov a text message when the first property was listed in August

2014.  He also told Filippov that the listing price was $5.5 million.  [Filippov, Day 2,

123:1-14; Exh. 45]  Filippov did not object to listing the properties at $5.5 million.

[Filippov,  Day 2, 123:15-21, 124:3-11]

285.    As the parties hoped to sell the properties for between $5 million and $5.25

million, a listing price of $5,499,000, less than 5% higher than the target selling price,

left some room for negotiation.

286.    On or about September 4, 2014, Filippov went on-line and reviewed the listing

information as reported on Zillow. [Exh. 250] He noted an inaccuracy as to the size of

the property, which he brought to Tatiana's attention, but had no other complaints about

the listing itself and no complaint about the listing price.  [Filippov, Day 2, 124:15-

125:19, 126:3-127:10]

287.     Lipetsker also went on line to review the listing on Zillow.  He too voiced no

objections about the fact of the listing or the listing price.  [Lipetsker, Day 4, 58:14-

59:8]

288.     Filippov understood that the marketing strategy was to only have one house listed

at a time. [Filippov, Day 2, 127:7-13]  There is no evidence that Filippov disagreed with

this marketing strategy.

289.     Filippov knew that in the months following August 2014, Tatiana was trying to

sell the properties. [Filippov, Day 1, 102:13-23]

290.     Filippov agrees that Tatiana's only role in this project was to list the properties

and try to sell them.  [Day 2, 120:15-21]

291.     Filippov now claims that Tatiana did not keep him informed as to her marketing

efforts. [Filippov, Day 1, 102:24-103:18] Despite his alleged concerns, Filippov took no

steps to contact her until after the litigation commenced.  [Filippov, Day 2, 134:1-24]

292.     Filippov admits that on or about May 14, 2015, prior to the commencement of any

litigation, Century 21 provided him with a detailed description of its marketing efforts.

[Filippov, Day 2, 134:14-17]

### EXECUTION OF THE LISTING AGREEMENT FOR LYMAN ROAD

293.     Tatiana called Filippov at the end of April 2015 while he was in Florida and said

she needed him to sign a listing agreement for Lyman Road.  [Filippov, Day 1, 103:19-

23] Kagan also contacted Filippov to discuss listing Lyman Road. [Filippov, Day 2,

128:20-129:12; Exh. 259, 260, 261]

294.     Kagan also sent a copy of the proposed listing agreement to Filippov for his

review.  [Kagan, Day 8, 137:5-138:6; Exh. 266]

295.     Tatiana also sent Filippov a copy of the listing agreement she wanted him to sign.

At trial, Filippov claimed he was away on business at the time and too busy to deal with

this issue. [Filippov, Day 1, 104:8-13, 105:18-24, Day 2, 129:17-24; Exhs. 263, 266]

296.     The only concern Filippov raised regarding the proposed listing agreement related

to the rate of Tatiana's commission, which concern was addressed to Filippov's

satisfaction. [Filippov, Day 2, 129:25-130:9; Exh. 267]

297.     After reviewing the listing agreement, Filippov authorized Kagan to sign the it.

[Kagan, Day 8, 138:21-139:4].

298.     Kagan signed the listing agreement on behalf of the LLC and sent a signed copy

to Filippov. [Filippov, Day 2, 130:13-22; Kagan, Day 8, 138:7-139:4; Exh. 263, 264,

293]

299.     Dan Gersh e-mailed confirmation of the signing to Filippov and asked Filippov to

confirm that he received the e-mail: "Mr. Filippov, Per earlier conversations, we signed

the agreement with C21 to put 55 Lyman on the market, as agreed.  Please confirm

receipt of this e-mail." [Exh. 268] Filippov replied, "I confirm.  Thank you." [Id.]

[Filippov, Day 2, 13:11-18]

300.     Tatiana also texted Filippov to confirm that he knew the agreement had been

signed, and he indicated that he had already sent confirmation to Gersh. [Exh. 270;

Filippov,  Day 2, 132:3-22]

301.     Filippov did not object or indicate that he had any concerns about the fact that

listing agreement had been signed. [Filippov, Day 2, 132:23-133:1] To the contrary, he

confirmed the execution. He claimed that although he knew it had been signed, he was

too busy to deal with it and did not want to start a fight. [Filippov, Day 1, 106:24-107:5]

## MAY 7, 2015 LETTER AND CONDUCT LEADING TO INITIATION OF LITIGATION

302.     Kagan had concerns because the homes were not selling as quickly as hoped and

he alone had been paying carrying costs since the beginning of the Project.  He

approached Filippov to suggest that they lower the asking price in an attempt to move

the properties.  Filippov refused, stating that he did not want to lower the price because

that would cut into his profit. [Kagan, Day 8, 140:3-142:11]

303.     On or about May 7, 2015, KDC had its counsel send a letter to Lipetsker, Filippov

and Kagan (the "May 7th Letter") [Exh. 50, 272]  At the time of this letter, KDC had not

yet done a final reconciliation of the costs for the Project.  [Kagan, Day 8, 145:9-146:12]

304.     Gersh provided the numbers utilized in the May 7th Letter.  They had not been

verified or reviewed.  [Gersh, Day 9, 218:25-220:21]

305.     In the May 7th Letter, KDC solicited a dialogue regarding several items of

concern:  (1) the properties had still not sold, and there needed to be a reduction in the

asking price; (2) under Section 2.3 of the Operating Agreement, the LLC was to

terminate by November 30, 2015 and forcing the properties to be liquidated would

benefit no one; (3) based upon KDC's preliminary accounting, it had already laid out

approximately $1 million for construction costs and carrying costs beyond the amounts

of the loans; and (4) Kagan was no longer willing to pay the carrying costs by himself as

he had done for the duration of the project [despite the fact that the first 23 months

should have been the LLC's responsibility].  The letter asked for a dialogue to address

these issues.  [Exh. 50; Kagan, Day 8, 145:12-16]

306.     Filippov and Lipetsker both professed to be shocked by the receipt of this letter as

they claim this was the first time they heard about additional outstanding costs.

[Lipetsker, Day 4, 28:22-29:12; Filippov, Day 1, 107:23-108:9] They immediately concluded, that the "overcharges" must be the product of fraud and that Kagan must have falsified his records.

307.    Under Section 8.1 of the Operating Agreement, if Kagan refused to be responsible for the ongoing payment of carrying costs, the obligation to pay carrying costs shifted to Filippov. [Exh. 15, §8.1]

308.    Upon receiving the May 7th Letter, Filippov realized that Project was not going to be profitable and that he was going to have to pay carrying costs.  [Filippov, Day 1, 111, 12-16; Exh. 15, §8.1]  Despite his contractual undertaking to do so, Filippov did not want to pay carrying costs if he could help it.

309.    Instead of working with Kagan after receiving the May 7th Letter, Filippov immediately accused him of fraud. [Filippov, Day 2, 140:5-7]

310.    Although KDC had been paying carrying costs since the beginning of the Project, despite the fact that it was not obligated to do so, Filippov sought to obtain a windfall by refusing to give any credit for KDC's payments.

311.    Filippov made it crystal clear that he was not going to authorize the payment of any further monies to KDC. He recognized that the Project was not going to be profitable and did not want to put any more money into it. [Filippov, Day 1, 111:12-16]

312.    Filippov demanded a copy of KDC's QuickBooks files for the Project.  At this point, Gersh had not yet completed his review of the QuickBooks files for this Project, as KDC usually does not do so until just before a closing.  [Gersh, Day 9, 220:22-221:9]

313.     Gersh advised Filippov that "we have not 'self-audited' our books, so we would

need to spend some time finalizing and double-checking certain things." [Exh. 49]

Filippov was unwilling to wait.

314.     Filippov received KDC's "unaudited" QuickBooks files in or about mid-May, and

observed that they were not complete, which is consistent with what Gersh told him.

[Filippov, Day 1, 112:9-14; Gersh, Day 11, 75:1-13]

315.     Gersh did not prepare the QuickBooks audit report which plaintiffs offered into

evidence [Exh. 340] and does not know what parameters were used to prepare it.  He

does know that it does not reflect all the changes that he made after the "unaudited" file

was provided.  [Gersh, Day 11: 103:19-104:25]

316.     Exhibit 84, an accounts payable aging summary as of December 31, 2015 offered

into evidence by plaintiffs [Gersh, Day 11, 83:21-84:5], is a worksheet prepared by the

Gordon accounting firm.  Gersh does not know if this is the final version of that work

sheet, and no evidence has been adduced to answer that question. [Gersh, Day 11,

105:24-107:12]  As such, it is not reliable for the proposition plaintiffs suggested.

317.     Filippov understands that KDC did not keep the LLC's records but its own

records.  Plaintiffs are not alleging that defendants fraudulently kept the LLC's books

and records.  Rather they allege that defendants fraudulently kept KDC's and

ProExcavation's records, though Filippov concedes that because he had no role in those

companies, there was no duty owed to him to keep accurate books and records.

[Filippov, Day 2, 119:20-120:7]

318.     As managing member, Filippov took over control of the Project, removed Kagan

as a signatory on the LLC bank account, and barred him from entering the property.  He

demanded the keys to the properties.  [Filippov, Day 1, 113:13-16]

319.     On or about May 12, 2015, Cohen met Filippov at the properties to turn over the

keys.  This was first communication that Filippov ever had with Cohen. [Filippov, Day

1, 114:2-5]

320.     Filippov cannot remember the details of his conversation with Cohen on site.  He

does remember, generally, that Cohen promised to get him the KDC financials and told

him that KDC should be paid in accordance with the May 7th Letter.  [Filippov, Day 1,

115:6-25]

321.     Cohen claims that he tried to initiate a conversation leading towards resolution but

Filippov was too angry. [Cohen, Day 6, 80:16 – 81:10]. Filippov disputes that he was

angry.  Regardless of whose perception is accurate, there is no dispute that the meeting

between Cohen and Filippov did not result in a resolution.

322.     On May 13, 2015, Filippov, through counsel sent a written response to the May

7th Letter, accusing Kagan of malfeasance and demanding copies of KDC's project

QuickBooks.  He also threatened that because he and Lipetsker collectively held the

majority interest in the LLC, they would not hesitate to vote to reduce Kagan's right to

profit from the sale of the property if he did not accede to their demands.  [Exhs. 54,

275] He stated, "I assure you that Mr. Lipetsker is in full agreement with Mr. Filippov's

position and plan and that together they have the 81% of the vote required under Section

8.2 to make changes in the allocations of the profits and losses from the Project if Mr.

Kagan impedes its successful completion." This is a classic threat of a minority freeze out.

323.     On May 15, 2015, Gersh wrote to explain that he had not yet finished auditing the account which had some errors and that it would take a bit of time to complete his review. [Exh. 276]

324.     On May 25, 2015, Filippov contacted Zhukovskiy to see if he could remember why the construction budget that had been part of the October 2012 presentation did not have a line item for carrying costs. [Exh. 277]

PLAINTIFFS' INITIATION OF THE STATE COURT LITIGATION

325.     On June 5, 2015, less than 4 weeks after receiving the May 7th Letter, Filippov caused the LLC to file suit against Kagan, Tatiana and Century 21. [Filippov, Day 1, 131:16-19; Exh. 64]

326.     Before hiring Attorney Carnathan to file suit, neither Filippov nor Lipetsker spoke to Kagan. They did not call a members meeting. [Filippov, Day 1, 116;12-21; [Filippov, Day 2, 147:12-2; Lipetsker, Day 4, 72:6-9; 73:15-24]

327.     Attorney Carnathan's firm represented both the LLC and Filippov/Lipetsker, individually. [Filippov, Day 2, 159:13-16]

328.     Plaintiffs attempted to justify their failure to speak with Kagan before filing suit by claiming that because he did not return phone calls and because the relationship was already adversarial, there was no reason to speak with him. [Filippov, Day 1, 131:11-132:6; [Lipetsker, Day 4, 71:13-72:9]

329.     Lipetsker explained that the reason for hiring counsel was because they were no longer hearing directly from Kagan "and the letter that we received from his attorney

[the May 7th Letter] showed that there is no other way to do that than go through the –
and – and the – have – have this lawsuit also." [Lipetsker, Day 4, 30:2-8]  He further
admitted that the only "facts" he had to support the initiation of the lawsuit were that he
did not believe the allegations in the May 7th Letter.  [Lipetsker, Day 4, 71:5-8]

330.      The decision to file suit was made unilaterally by Filippov and Lipetsker.
[Filippov, Day 2, 147:24-148:4]  As majority shareholders, they determined that there
was no need to speak with Kagan because he would not have agreed anyway.  [Filippov,
Day 2, 148:18-149:3]

331.      The decision to file suit was also motivated by the fact that the LLC still had to
pay carrying costs, though Lipetsker understood that the obligation to pay those costs,
under the Operating Agreement, now lay with Filippov.  [Lipetsker, Day 4, 72:10-73:8]
Thus, it was personal concerns, not corporate concerns, which motivated the filing of the
state court litigation.

332.      Although the motivation to initiate litigation was to prevent Filippov from having
to use his personal monies to pay carrying costs, by filing suit in the name of the LLC,
Filippov claimed to be able to use LLC monies to pay for the lawsuit, and did so, all
without consulting with Kagan.  [Filippov, Day 2, 156:12-17; Lipetsker, Day 4,73:9-13]

333.      In the state court complaint, which Filippov verified under pains and penalties of
perjury, Filippov claimed that Kagan had wrongfully drawn down the entirety of the
construction loan without providing any information regarding expenses.  [Exh. 64,
¶2.0]  Filippov neglected to mention that Kagan provided copies of all checks in real
time, that Filippov received the bank statements and copies of checks, and that

Filippov's wife communicated regularly with KDC's bookkeeper if she had any questions.

334.     Filippov alleged that Kagan was responsible for "completing" the homes no later than March 30, 2014, despite the fact that the Operating Agreement expressly states that the March 30th date is the substantial completion date, not the final completion date, and does not provide that "time is of the essence." [Exh. 64, ¶21] There is no evidence as to the actual date of substantial completion.

335.     Filippov alleged that the plan was to sell the properties no later than November 30, 2014 at a price of $4.9 million, despite the fact that he admitted at trial that there never was an agreement to sell for $4.9 million or a deadline for completing the sale. [Exh. 64, ¶25]

336.     Filippov falsely alleged that the properties were listed at $5.499 million without his authorization, and that that asking price was $600,000 higher than the approved price of $4.9 million, notwithstanding his testimony that there never was an agreement to sell at $4.9 million (the hope was for a sale between $5 and $5.25 million).  Lipetsker admitted this was a false allegation.  [Lipetsker, Day 4, 59:9-24]

337.     Filippov falsely alleged that Tatiana failed to convey a bona fide offer, knowing full well that there was none.   In fact, despite repeating this allegation in the Adversary Complaint, Filippov offer no evidence whatsoever in support of this allegation.  [Amd. Adv. Cmp., ¶31, 32]

338.     In the Adversary Complaint, Filippov repeated many of these same false allegations.  In fact, large portions of the Adversary Complaint are simply a cut and paste job of the state court action. *Compare* Exh. 64 with Amd. Adv. Cmp.

339.    Despite Kagan's request in the May 7th Letter that they reduce the listing price to

try to move the properties, it was not until June 11, 2015, after losing an injunction in

the state court, that Filippov finally agreed to reduce the price.  [Exh. 278]  Thus,

Filippov caused a five week delay while he sought court intervention.

<u>KDC ASSERTS THE MECHANICS LIENS</u>

340.    Recognizing that KDC was not going to be paid, it was unsecured, still owed

money to subcontractors and had just been sued, Kagan asked Cohen to prepare a

mechanics lien to secure KDC's claim.  Cohen prepared the mechanics liens, which

were recorded on June 22, 2015. [Cohen, Day 4, 93:25-94:7; Exhs. 66, 281]

341.    Before preparing the lien documents, Cohen printed off a copy of the KDC

construction contract which he drafted in 2013 and was still on his computer.  [Exh. 65,

last page, showing last date of printing was 6/17/15]

342.    In addition to the hard costs outstanding for construction, KDC elected to charge

the LLC for the percentage add-ons to which it was entitled under the KDC construction

contract.  Were it not for the precipitous lawsuit, Kagan likely would have waived the

contractual add-ons.  [Kagan, Day 8, 147:18-148:3]

343.    The construction costs specified in the mechanics lien are supported by the proof

of claim binders. [Exh. 174, 175]  Gersh spent months going through each of the entries

in the QuickBooks accounts to ensure that everything was accurate.  [Gersh, Day 9,

222:22-223:15; 227:11-229:7]

344.    When he received a copy of the mechanics liens, Filippov claimed to be shocked

because the amount of the lien increased from the preliminary number referenced in the

May 7th Letter.  [Filippov, Day 1,121:21-25].  The reason the numbers increased was the

decision to add on the percentages allowed under the KDC contract. In actuality, the hard construction costs **decreased**.

345.     The mechanics lien recorded by KDC on June 22, 2015 [Exhs. 66, 281] occurred only <u>after</u> the suit was filed by Filippov. The LLC took no steps to dissolve or bond off the lien, notwithstanding that there was already a pending lawsuit in which he could have demanded dissolution. [Filippov, Day 2, 145:20-146:24]

346.     As required by M.G.L. c. 254, §5 and §11, KDC filed suit on or about July 2, 2015 to preserve its lien. [Exh. 281]

<u>MEMBERS' MEETING</u>

347.     On July 16, 2015, Filippov belatedly initiated a members meeting ostensibly to ratify his previously unauthorized conduct. [Exh. 282] Kagan provided his own list of questions for discussion at the meeting. [Exh. 283] As is evident from the minutes of the meeting, Filippov and Lipetsker voted as a block and voted against Kagan on everything substantive. [Exh. 70; Filippov, Day 1, 134:9-135:6]

348.     At the members' meeting, Lipetsker and Filippov, over the objection of Kagan, purported to ratify Filippov's actions as managing member. [Day 1, 135:15 – 137:2 ] On multiple issues, they refused to engage in a discussion about the issues. [Exh. 70]

349.     On August 19, 2015, Filippov lowered the asking price of the Lyman Road property to $4,699,000. He explained that "my consultations with two prominent brokers and a developer in this are established that the fair value of these houses [sic] is at $4.5M." [Exh. 287, 303] None of those "prominent brokers" or the developer testified at trial.

## PLAINTIFFS' DECISION TO FILE FOR BANKRUPTCY

350.     Despite the fact that in the May 7th Letter, Kagan had suggested that they amend

the Operating Agreement to extend the specified date of termination for the LLC,

plaintiffs refused to discuss that offer.

351.     Therefore, on September 11, 2015, through counsel, Kagan demanded that the

LLC be dissolved on November 30, 2015 as required under Section 2.3 of the Operating

Agreement. [Exh. 71]   Filippov was afraid that if he dissolved the LLC as he was

contractually obligated to do, RTC would likely call the LLC's loans which, in turn,

would implicate his personal guaranty. [Filippov, Day 1, 137:14-138:6]  For this reason,

he started to consider bankruptcy as a means to protect his investment. [Id.]

352.     On October 7, 2015, Filippov caused the LLC to file a Chapter 11 bankruptcy

petition for bankruptcy.  Filippov filed for Chapter 11 as a means to gain control over

the properties.  He did not anticipate the conversion to Chapter 7 or the appointment of a

trustee (and did not object to either action), notwithstanding his belief that the goal of a

trustee was simply to unload the property at a loss.  [Filippov, Day 2, 163:5-19]

353.     According to Lipetsker, the reason for filing the bankruptcy was that the loans

were about to mature and it was not clear whether they would be extended.  If they were

not, he feared RTC would foreclose on the properties, sell them at auction, and his

**personal** investment would be lost.  [Lipetsker, Day 4, 33:13-24]  In other words, for

him too, the decision to petition for bankruptcy was motivated by personal concerns

rather than needs of the Debtor.

354.    At his deposition, Lipetsker further explained that the reason for filing the bankruptcy was that "We had absolutely no money left in the Lyman-Cutler account" [Lipetsker, Day 4, 77:22-78:13] At trial he admitted, however, that at the time of the petition there was approximately $106,000 in the LLC account. [Lipetsker, Day 4, 76:11-14]

355.    Filippov hired Attorney Peter Tamposi as the LLC's counsel. In addition to his concerns about having to dissolve the company, Filippov thought that filing for bankruptcy would remove KDC's lien. [Filippov, Day 1, 139:4-16]

356.    Neither Filippov nor Lipetsker discussed filing the bankruptcy petition with Kagan because they assumed he'd say "no". "It was just a waste of time to do this. Exactly like at this meeting, everything we vote yes for, they voted no." [Filippov, Day 1, 139:22-140:6]  [See Filippov, Day 2, 149:11-21; Lipetsker, Day 4, 75:7-17; Kagan, Day 8, 148:11-22]  As majority shareholders, Filippov and Lipetsker believed they were entitled to make that decision without consulting Kagan.  Id.

357.    The LLC was not insolvent at the time the Chapter 11 petition was filed. [Filippov, Day 2, 150:1-5]  It also had no business to reorganize as the LLC had no employees and its only remaining corporate activity was to liquidate the two completed properties.

358.    The LLC's only remaining ongoing fiscal responsibility was to pay carrying costs. Filippov understood that payment of carrying cost was his obligation under the Operating Agreement once Kagan refused to pay further. [Filippov, Day 2, 150:6-19] Despite the fact that he had contractually agreed to be responsible for payment of carrying costs, Filippov did not want to do so.

359.     Filippov was also concerned that if the company dissolved as required under the Operating Agreement, it would be an event of default which would trigger his personal guaranty. [Filippov, Day 2, 151:7-152:7]   Filippov and Lipetsker decided not to dissolve the company because as the holders of a majority of interests they believed they could unilaterally make the determination of what was best for the LLC irrespective of what was required by the Operating Agreement. [Filippov, Day 3, 29:5-30:11]

360.     In the bankruptcy petition, Filippov failed to disclose approximately $50,000 of payments to his lawyers made within 90 days of filing the petition despite attesting to the truth of the petition under pains and penalties of perjury. [Filippov, Day 2, 157:9-159:6]

## SALE OF THE PROPERTIES AND NET PROCEEDS HELD BY TRUSTEE

361.     On November 30, 2015, the Trustee listed the properties with Deborah Gordon, who was recommended to him by Filippov and was Filippov's preferred broker. [Exh. 292] The term of the listing was one year, and the Trustee's listing price was $4.5 million which was the same price that Filippov's broker recommended in order to sell the property within a two-week period. [Exhs. 287, 303] Although Filippov believed this was a low listing price, he voiced no objection because he wanted the property to move quickly so that he would not have to pay any more carrying costs. [Filippov, Day 2, 163:20-164:22]

362.     The Trustee, with the approval of this Court, sold each of the properties for $4.4 million, without objection by Filippov or the Debtor.  The net proceeds from the sale of the properties, together with monies that were in the Debtor's account when the Trustee was appointed, are currently being held by the Trustee. [Exh. 325]

FILIPPOV'S $200,000 NOTE AND MORTGAGE (PROOF OF CLAIM NO. 9)

363.    After receipt of the May 7th Letter wherein Kagan advised that he was no longer

willing to be responsible for carrying costs alone, Filippov claims that he took on the

obligation to pay carrying costs.

364.    Although he has filed a proof of claim invoking Section 8.1 of the Operating

Agreement to reduce Kagan's capital account by the amount of carrying costs he paid

[Claim No. 11], Filippov now claims that the same monies he deposited into the LLC's

account to pay for operating expenses were, in part, a $200,000 loan.

365.    The "loan" was an aggregate sum paid over a period of weeks.  Filippov was

unable to identify which deposits comprised his loans and which were carrying rests.

[Filippov, Day 2, 168, 22-170:16]

366.    Lipetsker explained that the reason for the loan was that "we needed the money to

continue the – op – operation – operation."  [Lipetsker, Day 4, 34:9-12]  Other than

paying carrying costs, there were no ongoing operations for Lyman-Cutler. There was

absolutely no need for the loan.

367.    Lipetsker had no idea how the loan was "allocated" and "when".  [Lipetsker, Day

4, 79:7-11]

368.    Filippov testified that Exhibit 291 was an accounting that he maintained which

listed all financial transactions through April 23, 2018.  [Filippov, Day 2, 168;12-21] It

is virtually impossible to back into the numbers and identify which deposits were loans.

When reviewing his own accounting Filippov too could not identify which deposits were

loans.  [Filippov, Day 2, 168:22-169:8; 170:7-9]

369.    There are no entries in the ledger that identify any of Filippov's deposits as loans.

None of the deposits add up cleanly to $200,000. [Exh. 291]

370.    As to Filippov's entries listed as "Alex Filippov Investments," even Filippov had

no idea what those were. [Filippov, Day 2, 170:10-16]

371.    At best, Filippov fronted carrying costs totaling $51,933.33.  [Exh. 291, entries

showing payments to Rockland Trust Company on 5/18/15, 5/18/15, 6/18/15, 6/18/15,

6/28/15, 11/5/15, 11/5/15, 11/5/15]

372.    At least $67,211.06 of the money deposited by Filippov was utilized, without

authorization, to pay legal fees for the lawsuit against Kagan.  [Exh. 291, entries on

7/28/15, 8/25/15, 9/22/15]

373.    There was no vote to accept a loan from Filippov, and Kagan was never consulted

regarding any loans.  The loan was not papered contemporaneously with the alleged

decision to loan.  It is unclear whether Filippov used company monies, $699.14, to pay

for preparation of the note and mortgage or personal monies.  [Exh. 72, entry on

11/4/15]  Either way, he is not entitled to credit or reimbursement of that amount.

374.    Filippov's Claim No. 9 is, allegedly, based on a written promissory note dated

September 30, 2015 which was annexed to his proof of claim form.  Filippov failed to

introduce the promissory note into evidence.  There was no evidence as to the terms of

the supposed loan such as its repayment terms or interest rate, or that it is even in

default.  Therefore, there is no evidence to support his claim that he is entitled to recover

based on a written promissory note.

375.     On the day Filippov filed the bankruptcy petition, October 7, 2015, he executed a

mortgage to himself to secure his personal "loan." [Exh. 75; Filippov, Day 2, 152:12-

153:15] Filippov used LLC monies to pay for the cost of preparing this personal

mortgage. [Filippov, Day 2, 156:9-11]

376.     Filippov and Lipetsker did not discuss the loan or the mortgage with Kagan

because they assumed he would not approve of it. [Filippov, Day 1, 140;10-23]. As

candidly explained by Filippov: "As a –manager, I can do whatever I want, basically."

[Filippov, Day 2 153:16-154:1]

377.     As the mortgage was made after the loan had been made and mere hours before

the bankruptcy petition was filed, if there truly was a loan, the granting of a security

interest to Filippov benefitted no one other than himself.

378.     In deciding to make a loan and grant himself a mortgage, Filippov put his own

personal concerns ahead of the LLC's.

379.     The grant of the mortgage was an improper attempt to ensure that Filippov would

be deemed a secured creditor and therefore get paid before any unsecured creditors, i.e.

KDC, got paid.

380.     As of 12/31/15, Filippov claims to have put in $2,435,533.95, including his initial

investment of $2 million. [Exh. 72] This includes his supposed $200,000 loan.

According to Filippov, the balance of $235,533.95 would be for carrying costs and legal

fees but he provided no clear breakdown of what were carrying costs and what were not.

[Filippov, Day 1, 145:21-146:18]

381.     Although he failed to disclose this on the Statement of Affairs in the bankruptcy petition, Filippov paid his counsel $67,211.01 using the LLC's money in the 90 days preceding the petition.  Legal fees are not carrying costs.

382.     Filippov claims the full $235,000 goes to reduce Kagan's interest.  [Filippov, Day 1, 148:4-6] notwithstanding that, at best, he only fronted $51,933.33 in carrying costs. [Exh. 291]

383.     Filippov admits that he made no payments for carrying costs after November 2015. [Filippov, Day 2, 168:8-21]

<u>ABSENCE OF EVIDENCE OF FRAUD</u>

**a) Testimony by Filippov, Lipetsker and Brusenkova**

384.     Lipetsker admits that he has no evidence of any improper payments on the Lyman-Cutler project. [Lipetsker, Day 4, 63:9-12]  He admits that he has no evidence of any improper payments to ProEx.  [Lipetsker, Day 4, 63:18-64:7]

385.     Lipetsker merely "assumed" that because the cost to construct was higher than anticipated, there must have been double-billing but admits that he has no hard evidence. [Lipetsker, Day 4, 65:18-66:6]

386.     Despite Plaintiffs' allegations, Lipetsker has no evidence that Kagan failed to credit the project for returned items.  [Lipetsker, Day 4, 68:20-23]

387.     Despite Plaintiffs' allegations, Lipetsker has no evidence of any credits that were not properly applied to this project.  [Lipetsker, Day 4, 68:24-70:5]

388.     Despite Plaintiffs' allegations, Lipetsker has no evidence of materials from another Kagan project being wrongfully charged to the Lyman-Cutler project. [Lipetsker, Day 4, 70:6-10]

389.     Filippov too had no evidence of fraud. He too simply assumed that because he received a letter claiming cost overruns, there must have been fraud. [Filippov, Day 2, 143:3-144:22]

390.     Brusenkova, KDC's former bookkeeper who only worked at KDC for a short time and was not employed by KDC when the Project started or when it ended, testified on behalf of the plaintiffs. Plaintiffs' had maintained throughout these proceedings that she had an insider's knowledge of fraud on the Lyman-Cutler project.

391.     At the time Brusenkova was fired from KDC, final bills had not yet issued in the Lyman-Cutler matter. She does not recall if the Project was even finished. [Brusenkova, Day 7, 41:21-42:1]

392.     Brusenkova has no idea whether the amounts charged by ProEx on the Project were improper because she does not know what ProEx did on the Project. The final ProEx bill issued after she left. [Brusenkova, Day 7, 60:5-18]

393.     Brusenkova could not identify any instances of double-billing by ProEx on the Project. [Brusenkova, Day 7, 67:17-22]

394.     Brusenkova could not identify any contractors who overcharged on the Project. [Brusenkova, Day 7, 68:3-8] She could not recall any expenses that were improperly charged to the Lyman-Cutler account. [Brusenkova, Day 7, 71:8-12] She could not recall any credits that were not properly given. [Brusenkova, Day 7, 71:19-22]

395.     Brusenkova could not identify a single expense improperly charged to Lyman-Cutler on the Project AMEX card. [Brusenkova, Day 7, 66:8-19]

396.     Kagan enjoyed long relationships with many of his subcontractors. Many of them were small, unsophisticated, businesses with informal bookkeeping practices. Some of

them did work on a handshake; some demanded payment on site with formal invoices to

follow; some texted their proposals and payment requests.  Many of them do not speak

English or English is not their first language.  [Kagan, Day 8, 121:1-122:10]

**b) Forensic Accounting - Goldman's Failure to Identify Any Fraud**

397.      Plaintiffs retained Michael Goldman ("Goldman") "to review documents in this

case" and render an opinion "on the veracity of the claim that the Kagan companies

made…" [Goldman, Day 5, 13:16-18, 18:20-25]

398.      Goldman did not opine that he found any fraud.  In fact, he admitted that the

concerns he raised could simply be sloppy bookkeeping. On direct examination,

Goldman testified:

> …My conclusion would be, again, that internal control was weak.
> There's not a lot of reliability to these numbers when – when its
> been testified that nobody knows what's in some of them and you
> can see it happening in the accounting records.  I – I'd say that the -
> - the information generated from that system is not reliable.
>
> Q: So, I guess what I'm looking to elicit is, what's the alternative?
> If it's not fraud, then what is it?
>
> **A:  I – I see similar things that turn out to be just incompetence.**

(Goldman, Day 5, 82:11-20) (emphasis added).

399.      On cross-examination, Goldman reiterated that he had no evidence of

fraud.  He testified as follows:

> Q: Mr. Goldman, before we go any further, let's just cut to the end.
> You haven't formed any opinion, have you, as to whether there
> was fraud on this project; isn't that correct?
>
> A:  That's correct.

\*\*\*

73

Q: You haven't formed any opinion as to the value of the work that was performed; isn't that correct?

A: Correct.

Q: And, in fact, your opinion, ultimately, was that this may be a product of gross incompetency, or it may be fraud; isn't that correct?

A: Yes.

Q: And you are unable to say which one was more likely than not. You don't know; isn't that correct?

A: No, I – I think they both lead to the same unreliability, but I can't say between the two.

Q: Okay, so in other words, your ultimate conclusion is you don't trust the records, but you don't know whether that's innocent, uninnocent, or – if that's a word – you just don't know.

A: Correct. I have no opinion.

[Goldman, Day 5, 91:17-92:12-17]

400.     Goldman refused to opine as to whether there was fraud. [Goldman, Day 5, 74:18-22, 75:22-76:4]

401.     He was unable to opine on whether materials had been commingled between projects. [Goldman, Day 5, 86:11-14, 99:19-23]

402.     Goldman made no determination that there was any commingling of funds between the various Kagan entities. [Goldman, Day 5, 123;24-124:1]

403.     KDC had a dedicated AMEX card to use on the Lyman-Cutler account in order to better track charges. [Goldman, Day 5, 167:20 – 168:19]

404.     Goldman found no evidence of kickbacks. [Goldman, Day 5, 99:12-14]

405.     Goldman was unable to identify any credits that had not been properly given.

[Goldman, Day 5, 99:15-18]

406.     Goldman reviewed no evidence as to how subcontractors keep their books and

records.  [Goldman, Day 5, 94:22-95:3]

407.     Goldman recognizes that QuickBooks is just a tool that is as reliable as the data

entered.  [Goldman, Day 5, 95:19-24]

408.     Goldman agrees that as part of internal controls, a company should go back into

its QuickBooks, review the entries for accuracy, and if errors are found, correct them.

He agrees that the failure to correct errors would be irresponsible.  [Goldman, Day 5,

96:15-23; 113:11-14].

409.     The QuickBooks supporting KDC's proof of claim was the version prepared after

Gersh went back to "audit" it and correct any errors.  [Goldman, Day 5, 100:20-23].

This is different than the "unaudited" version that KDC produced to Filippov in or about

June 2015.

410.     Goldman admits that his analysis is incomplete because he was relying upon the

"wrong material."  [Goldman, Day 5, 102:5-11]

411.     Although Goldman had questions about invoices, he did not do any investigation

to determine whether the work done or supplies ordered were actually utilized on the

Project or whether the amounts charged were reasonable.  He did no substantive

investigation other than to note that he had questions.  [Goldman, Day 5,102:12-108:11]

412.     Goldman's conclusions regarding the unreliability of the KDC documents was

based not on any express display of malfeasance, but on the number of unanswered

questions he had. [Goldman, Day 5, 82:4-17]

413.    With respect to invoices about which he had questions, Goldman admitted that he did not conduct any analysis to determine whether the underlying charges on the invoice were proper or improper.  [Goldman, Day 5, 106:4-108:11]

414.    As Goldman explained, "whether that makes sense or not, -- I'm just – I'm raising questions."  [Goldman, Day 5, 86:20-21]

415.    Goldman agrees that the fact that KDC may be behind in conducting its account reconciliations does not mean there is any fraud, though he felt it could raise questions as to the accuracy of the reconciliation.  [Goldman, Day 5, 111:6-22]

416.    KDC and ProEx keep their books and records on an accrual basis.  At year end, after discussion with their accountants, it is not atypical for entries to be adjusted or reclassified.  [Goldman, Day 5, 117:19-118:5; Gordon, Day 9, 124:10-13, 150:13-25, 161:1-10]

417.    After receiving the Goldman report and reviewing the irregularities he claimed to be present, Gersh went back and verified that his numbers were accurate.  He found no errors whatsoever.  [Gersh, Day 11, 37:15-38:4]

**c) Gordon, KDC's Outside Accountant, Found No Evidence of Fraud**

418.    KDC's and ProEx's outside accountant, Jason Gordon, testified that, contrary to Goldman's cursory allegations, KDC and ProEx follow reasonable bookkeeping and accounting practices.  Jason Gordon is the Executive Vice President of S. Gordon Corporation, a public accounting firm that has been in business since the 1970's. [Gordon, Day 9, 119:22-25, 120:1-3, 18-19]  Mr. Gordon has been with the firm for approximately 18 years.  [Gordon, Day 9, 120:20-21]  Prior to joining the firm, Mr. Gordon interned as an auditor for Arthur Anderson.  [Gordon, Day 9, 121:1-3]  Mr.

Gordon has been a Certified Public Accountant licensed in the Commonwealth of

Massachusetts since approximately 2003.  [Gordon, Day 9, 121:11-15]

419.    For Kagan and his companies, S. Gordon Corporation has provided tax

preparation services, some tax planning services as well as assistance and oversight of

bookkeeping issues as they arise.  [Gordon, Day 9, 121: 16-25]  S. Gordon Corporation

has provided these services to Kagan and his companies since the end of 2013 or

beginning of 2014.  [Gordon, Day 9, 123:8-11]

420.    Mr. Gordon has no reason to believe that Kagan or his companies has engaged in

fraud.  [Gordon, Day 9, 123 12-14]

421.    S. Gordon Corporation's name appears on the tax returns, which are based on the

companies' financial records, the firm prepares for Kagan, KDC and ProEx.  [Gordon,

Day 9, 124: 14-18, 22-24]  Even though the firm does not review each and every

transaction, if questions arise as S. Gordon Corporation prepares the tax returns, the firm

seeks out answers to those questions and puts its name on the tax returns only if/when

comfortable with the responses to the questions it raises.  The firm would not put its

name on any tax returns if it had reason to believe Kagan or his companies engaged in

fraud.  [Gordon, Day 9, 125:18-24, 126:3-10]

422.    Mr. Gordon has extensive experience working with contractors and developers

like KDC.  [Gordon, Day 9, 124:1-9]  Based on Mr. Gordon's experience, the

accounting issues that arise with respect to KDC and ProEx are similar to the accounting

issues that arise with the other contractors Mr. Gordon represents.  [Gordon, Day 9,

124:10-13]

423.    KDC and ProEx each maintain complete, separate general ledgers, which, as Mr.

Gordon explained, are the primary control recognized by accounting standards that

allow companies like KDC and ProEx to have assurance that all transactions are

captured.  Mr. Gordon described it as the number one type of control companies can use.

[Gordon, Day 9, 127:5-14; Exhs. 143, 148]  The general ledgers record the companies'

financial activities – the ins and outs of the accounts- for a year.  [Gordon, Day 9, 131:6-

8]

424.    KDC and ProEx also reconcile their records against their respective bank account

statements and review the records from time to time and at year end to ensure that

everything is captured and nothing is double-counted.  [Gordon, Day 9, 132, 3-24]

425.    KDC and ProEx utilize double-entry bookkeeping, which means that everything

entered into the general ledger is classified so one can see the cash coming in and where

it came from.  Every movement of cash has a corresponding categorization.  [Gordon,

Day 9, 133:10-19]  Double counting in a general ledger allows the companies to trace

back amounts owed to a credit card charge or cash payment; otherwise the books would

not balance.  [Gordon, Day 9, 134:11-17]

426.    As Mr. Gordon explained (and Goldman overlooked), KDC's and ProEx's

business models are not the same, which impacts how the two companies account for

their financial activities.  KDC pays expenses for projects and then seeks reimbursement

from the project owner.  [Gordon, Day 9, 134:9-15]  KDC typically pays expenses or

bills with its credit card or by cash, aggregates those small charges, and then invoices

the project owner for reimbursement.  *Id.* [*see also* Gordon, Day 9, 157:4-22]

427.     Because KDC pays expenses and seeks reimbursement, it is more important for

KDC to track which expenses are incurred for a given project. [Gordon, Day 9, 136:8-

13] Because ProEx, on the other hand, bills based on a fixed price proposal, it is not

essential for ProEx to track costs by project in the same way. [Gordon, Day 9, 136:14-

25, 137: 1-4] Indeed, it would be impossible for ProEx to track costs by project because

of the way its equipment is used. *Id.* As such, if one were to look at ProEx's financial

records and total up all of those items that happened to have been labeled for the Lyman-

Cutler project, one would not capture all of the expense or work actually performed. *Id.*

428.     The business model used by ProEx and the fact that it does not track all expenses

by project is not atypical or unusual. [Gordon, Day 9, 137:12-14] When Goldman, or

plaintiffs, total up only those expenses ProEx happened to label as relating to the

Lyman-Cutler project, they completely miss the fact that ProEx billed from a lump-sum

proposal and had no reason to track each expense on a per project basis. [See Exh. 5]

429.     Goldman also misapprehended the adjustments made by ProEx to reflect the

percentage of each project it has completed at certain points in time such as year end.

Because ProEx utilizes an accrual accounting method, ProEx recognizes revenue on its

books based on the percentage of the project that is completed through a point in time.

[Gordon, Day 9, 137:15-138:6] As an example, if ProEx completed 40% of a project by

the end of a year, ProEx and S. Gordon Corporation make sure that at least 40% of the

revenue is booked. Id. This matches the economics of the situation – matching the

revenue earned with the expenses paid in that year. Id. This also makes sure that

revenue and expenses are reflected in the proper year, as the IRS mandates. Id. This is

reflected in ProEx's general ledger. [Gordon, Day 9, 138:8-25, 139:1-18] [Exh. 148, pg.

7] ProEx commonly enters invoices on the last day of each calendar year in an effort to true-up its accounting records to reflect the percentage of each project that was completed in that calendar year. [Gordon, Day 9, 140:20-25, 141:1-15]

430.    Goldman also improperly suggested that intercompany transfers between ProEx and KDC evidences a lack of proper internal controls. Mr. Gordon explained them as properly documented transfers of capital. As Mr. Gordon explained, ProEx and KDC sometimes engage in intercompany transfers, which, like most small businesses, involve the exchange of money back and forth to address one company's working capital needs. [Gordon, Day 9, 142:3-11] At year end, S. Gordon Corporation inquires about intercompany transfers between ProEx and KDC to help the two companies reconcile their respective accounts. [Gordon, Day 9, 142:15-24] These intercompany transfers appear on each company's general ledger, so there is a complete record of each transaction. [Gordon, Day 9, 143:2-8] It would be atypical for one company (KDC, for example) to generate an invoice to the other (ProEx, for example) where, as here, you have two small businesses with similar ownership and the goal is to manage working capital. [Gordon, Day 9, 143:14-21]

431.    Contrary to Goldman's view that KDC and ProEx lack internal controls, the two companies confer with their outside accountant regularly to try to be as accurate as possible. Exhibit 288 is an example of the interaction between S. Gordon Corporation and KDC/ProEx to receive information to confirm balances. [Gordon, Day 9, 145:17-25, 146:1-147: 21, 148:14-20] In Mr. Gordon's experience, there is nothing unusual about the amount or frequency of intercompany transfers between and among KDC and ProEx. [Gordon, Day 9, 148:21-149: 2] All of the transfers are documented on the

80

companies' respective general ledgers and cash is moved from the separate bank accounts. Id.

432.    S. Gordon Corporation also assists KDC and ProEx prepare other financial documents that help the two companies track their financial affairs. For example, S. Gordon Corporation prepares documents called adjusted client trial balance for ProEx and KDC, which summarize all of the transactions for a year. [Gordon, Day 9, 152:2-10] Exhibit 305 is an example. Id. The top half depicts balance sheet items (check book accounts, checking accounts, receivables) and the bottom half depicts income statement items (revenues, expenses) Id. Exhibits 305 and 306, adjusted trial balances for ProEx and KDC, each reflect payables and receivables between the two companies. [Gordon, Day 9, 153:16-24, 154:22-155:13] In other words, as opposed to trying to hide transactions between the two companies, they are fully documented and reconciled on their respective financial documents, with the help of S. Gordon Corporation.

433.    Contrary to Goldman's vague and unsupported statements, Mr. Gordon has not seen any evidence of comingling of assets between KDC and ProEx. [Gordon, Day 9, 155:14-17]

434.    While plaintiffs and Goldman contend that Kagan "stashed profits" in ProEx, the accounting records confirm this assertion is untrue. As Mr. Gordon explained, between 2014 and 2016, ProEx earned aggregate profits of about a couple hundred thousand dollars. [Gordon, Day 9, 162:3-6] For 2015, ProEx is showing a profit of approximately $150,000, which assumes it is actually paid the receivable of $532,763.41 from Lyman-Cutler. [Gordon, Day 9, 162:7-25] If ProEx does is not paid the

receivable, it will post a loss for 2015. *Id.* ProEx therefore is not a viable vehicle for

Mr. Kagan to "stash profits." [Gordon, Day 9, 163:4-10] [Exh. 305]

435.    Mr. Gordon also identified another fault in Goldman's analysis. As Mr. Gordon

explained, if one just looks at the accounts receivable account on KDC's records and did

not also include the unbilled expenses account, one would not be able to calculate all

that is owed to KDC on a project. [Gordon, Day 9, 188:23-189: 16] If one looks simply

at KDC's A/R summaries as specific points in time, without including the expense

reimbursement account, one would not see all that is owed to KDC. *Id.*

### d) The Project Subcontractors Undercut Plaintiffs' Claims

436.    Goldman and plaintiffs raised questions about the paperwork and work performed

by six of the subcontractors that worked on the project. Neither Goldman nor plaintiffs

presented any actual evidence that the subcontractors failed to perform the work

reflected in their invoices or proposals. They nevertheless contend that each of the

subcontractors is complicit in a fraudulent scheme.

## A. Dream Flooring

437.    Dream Flooring and has been in business for 15 years. [Babayan, Day 10, 11:7-8]

Dream Flooring has six full time employees and two part time employees. [Babayan,

Day 10, 11:9-10] It does not have a bookkeeper or accountant. [Babayan, Day 10,

11:11-14] Dream Flooring's principal, Mr. Babayan, uses a word processing program,

Pages, to create invoices, but does not use any bookkeeping or accounting software for

his business. [Babayan, Day 10, 11:15-21]

438.    Dream Flooring supplied, installed and finished the floors in the two homes of the

Lyman-Cutler project. [Babayan, Day 10, 12:1-2]

439.     As Mr. Babayan testified, which was uncontroverted at trial, Dream Flooring

actually performed the work, did not falsify invoices, and did not bill for work that was

not actually performed.  [Babayan, Day 10, 12:3-8] [Exh. 175, Tab L-26, Tab-32]

Dream Flooring did not get paid more than it was supposed to on the Lyman-Cutler

project.  [Babayan, Day 10, 41:13-16]

440.     Although plaintiffs questioned Dream Flooring's paperwork, Goldman never

contracted Mr. Babayan to pose questions to him.  [Babayan, Day 10, 12:9-17, 24-25,

13:1-7]

441.     Goldman suggested that the Dream Flooring invoice relied upon by KDC was

altered because the KDC version and the Dream Flooring version differed in that the

Dream Flooring version stated it had been paid in full while the KDC version did not

have that indication.  [Goldman, Day 5, 43:20-44:5] Mr. Babayan addressed this issue

by explaining that when Dream Flooring is "paid in full" on a project, for internal

tracking purposes he makes a new version of the word processing file that was the

invoice with a notation to indicate that Dream Flooring has been paid in full.  [Babayan,

Day 10, 23:15-24]  When Dream Flooring provided the invoice to KDC prior to

receiving payment, it was not marked "paid in full" and was therefore produced by KDC

without that notation.  [Babayan, Day 10, 23:25, 24:1-3] Thereafter, when Dream

Flooring responded to the subpoena served on it, it produced its own version of the

invoice that had, in the interim since the completion of the project, been marked as "paid

in full."

442.     Goldman also raised questions about dates on Dream Flooring invoices. Mr.

Babayan explained that sometimes when he creates invoices, he forgets to change the

dates. [Babayan, Day 10, 31:7-9]


**B. Décor Art**

443.     Décor Art has been in business since 2011 and has approximately sixteen

employees. [Porto, Day 10, 43:18-21] Décor Art does not have a bookkeeper or

accountant and it does not use any bookkeeping or accounting software. [Porto, Day 10,

43:22-25, 44:1-3] Décor Art's principal, Mr. Porto and his wife use a word processing

program, Pages, to create proposals and invoices. [Porto, Day 10, 46:13-19]

444.     On the Lyman-Cutler project, Décor Art painted, cleaned and installed hardware.

[Porto, Day 10, 44:4-11]

445.     Décor Art actually did the work; it did not falsify invoices; it did not bill for work

it did not perform. [Porto, Day 10, 44:15-20] [Exh. 175, Tab L-35, Tab C-31]

446.     Mr. Porto sat for a deposition in this matter and answered questions posed by

plaintiffs' counsel, but was never contacted by Goldman to address any issues Goldman

raised. [Porto, Day 10, 45:4-15]

447.     Mr. Porto addressed Goldman's criticisms of Décor Art's paperwork. Goldman

raised concerns about differing fonts, misspellings, and duplicate invoice numbers.

[Goldman, Day 5, 27:6 – 32:10] Mr. Porto explained that the difference in capitalization

has no meaning at all, that he and his wife sometimes copy prior invoices or create new

ones and the difference in capitalization was just a mistake. [Porto, Day 10, 52:22-25,

53:1-8] Mr. Porto is not a native English speaker. He explained that misspellings are

merely mistakes. [Porto, Day 10, 53:9-11] Mr. Porto explained that the duplicated

invoice numbers was the result of copying one invoice to use again while failing to

manually enter a new invoice number. [Porto, Day 10, 53:15-22] Mr. Porto confirmed

that Décor Art did the work reflected in both invoices, even though the invoice numbers

were the same. [Porto, Day 10, 53:23-25] When questioned about one particular

invoice, Mr. Porto again confirmed that even though it appears slightly different from

the others, it is a valid invoice from Décor Art. [Porto, Day 10, 59:15-20]

### C. V&D Plumbing and Heating

448.    Mr. Sergeev has been in business for himself since 1999. [Sergeev, Day 10,

61:17-19] His company, V&D Heating, employ between two and four people.

[Sergeev, Day 10, 61:20-22] Mr. Sergeev does his own bookkeeping; he does not have

a separate bookkeeper for the company. [Sergeev, Day 10, 61:23-62:4]

449.    V&D Heating did the work on the Lyman-Cutler project; it did not falsify

invoices; it did not bill for work that it did not perform. [Sergeev, Day 10, 62:13-18]

[Exh. 175, Tab L-43, Tab C-41]

450.    Although plaintiffs and their expert, Goldman, had questions about V&D

Heating's paperwork, none of them reached out to Mr. Sergeev to ask him those

questions before accusing V&D Heating of participating in a fraudulent campaign.

[Sergeev, Day 10, 62:19-63:10]

451.    Mr. Goldman raised concerns because V&D Heating's proposals for each of the

two homes was identical other than for the property address. [Goldman, Day 5, 56:6-25]

Mr. Sergeev explained that because V&D Heating's scope of work was the same for the

two homes, he wrote out one proposal by hand for one home and, instead of writing out

a second identical proposal for the second house, he simply photocopied the original

proposal to use for the second home.  [Sergeev, Day 10, 82:6-7; [Exhs. 175, Tabs L43,

C41, Exh. 338]

452.     V&D Heating still has not been paid in full for its work on the Lyman-Cutler

project.  [Sergeev, Day 10, 95:10-16]

**D. BST Plumbing**

453.     Mr. Stanik has been in the plumbing business for twenty years.  [Stanik, Day 10,

100:13-15]  His company, BST Plumbing, has three employees, but it does not have a

bookkeeper.  [Stanik, Day 10, 100:16-21]  Mr. Stanik's wife helps with the bookkeeping

duties.  *Id.*  BST does not use bookkeeping or accounting software; it uses Microsoft

Word.  [Stanik, Day 10, 100:24-101:5]

454.     BST Plumbing did the plumbing work on the Lyman-Cutler project without

falsifying invoices or billing for work it did not perform.  [Stanik, Day 10, 101:14-19]

[Exh. 175, Tab L-53, Tab C-51]

455.     Although plaintiffs accuse BST Plumbing of participating in a fraud, neither they

nor Goldman reached out to BST Plumbing to ask questions about its paperwork or

work.  [Stanik, Day 10, 101:20-102:5]

456.     Mr. Goldman was concerned because some of the BST invoices carried a three

digit number and others carried a four digit number.  Mr. Goldman suggested that this

was indicative of potential fraud.  [Goldman, Day 5, 35:15-25]  Mr. Stanik explained

that when he invoices for materials and labor, BST Plumbing invoice numbers are four

digits long.  However, when he invoices for just materials, the invoice numbers are just

three digits long.  [Stanik, Day 10, 106:10-107:14]

457.    He also explained that he prepared his invoices after BST Plumbing completed its

work.  Doing so required contacting the materials supplier, Ferguson, to get quantities

and prices for the materials that were purchased, which Mr. Stanik obtained from

Ferguson.  [Stanik, Day 10, 113:15-24]  He further explained that KDC paid Ferguson

directly for materials BST Plumbing ordered for the project.  [Stanik, Day 10, 116:15-

19, 118:4-7]

458.    BST Plumbing still has not been paid in full for its work on the Lyman-Cutler

project.  [Stanik, Day 10, 107:15-19]

**E. Unicon Electric**

459.    Mr. Ispiranikov has worked as an electrician his entire life and for the last

seventeen years in the United States.  [Ispiranikov, Day 10, 124:14-15]  His company,

Unicon Electric, has between two and four employees but it does not have an

accountant.  [Ispiranikov, Day 10, 124:16-21]  Unicon does not use any bookkeeping or

accounting software.  [Ispiranikov, Day 10, 124:24-125:1]

460.    Unicon did the electrical work on the Lyman-Cutler project without falsifying

invoices or being paid for work it did not perform.  [Ispiranikov, Day 10, 125:12-16]

[Exhs 117, 339]

461.    Although Plaintiffs allege that Unicon participated in fraud, neither they nor their

lawyers nor their expert, Goldman, ever reached out to Mr. Ispiranikov to pose questions

about Unicon's paperwork or work.  [Ispiranikov, Day 10, 125:17-126:15]

462.    Mr. Ispiranikov testified that because the work Unicon performed on each home

was the same, he wrote out one proposal, copied it, and inserted the address for each

home in the Lyman-Cutler project. [Ispiranikov, Day 10, 132:3-4, 133:16-18, 135:18-136:8] Each of the invoices is for $65,000, for a total of $130,000. [Exhs 117, 339].

463.     Plaintiff's own construction expert, Mr. Doddridge, testified that the electrical work for each house should have cost in excess of $100,000 each. [Doddridge, Day 13, 245:10-246:23] Therefore, Unicorn's total price of $130,000 is well below market as determined by plaintiffs' own expert.

464.     Unicorn has not been paid in full for its work on the Lyman-Cutler project; it is owed between $30,000-$35,000 [Ispiranikov, Day 10, 146:1-6]

**F.  DaCosta**

465.     Mr. Cordeiro has been in business for about fifteen years. [Cordeiro, Day 10, 151:4-5] His company, DaCosta Construction, employs between eight and twelve full-time employees and additional part-time employees. [Cordeiro, Day 10, 151:6-8] DaCosta does not have a bookkeeper. [Cordeiro, Day 10, 151:9-10] DaCosta does not use any bookkeeping or accounting software. [Cordeiro, Day 10, 151:17-21]

466.     DaCosta completed the framing, siding, and roofing; installed the windows, doors and trim without falsifying invoices, billing for work it did not perform, or being paid for work that it did not perform. [Cordeiro, Day 10, 152:6-17; Exh. 175, Tab L-40, Tab C-38]

467.     Although Plaintiffs raise questions about DaCosta's work and paperwork, neither Plaintiffs nor their lawyers nor their expert reached out to Mr. Cordeiro to pose those questions to him before alleging DaCosta engaged in fraud. [Cordeiro, Day 10, 152:18-153:4]

468.    Mr. Cordeiro addressed the issues raised by Goldman.  He explained that dates on his invoices are entered manually for each invoice and there is no significance to the differing formats of the dates he types.  [Cordeiro, Day 10, 163:5-17]  He also explained why which the words "DaCosta Construction" appear in different sizes and fonts on invoices – when blocks are moved around in the Microsoft Word document he uses to generate invoices, the computer expands or minimizes the words to fit the title block. [Cordeiro, Day 10, 167:7-10]

469.    DaCosta is still owed $23,000. [Cordeiro, Day 10, 170:16-17]

### OTHER PROJECTS

470.    KDC was involved in approximately 25-30 projects prior to working on the Lyman-Cutler project.  [Kagan, Day 8, 53:19-21]  Each of the other projects is unique. They are different sizes and different types of projects. [Zhukovskiy, Day 3, 115:21-116:9]

471.    Plaintiffs cherry-picked four projects on which they contend there were problems similar to those alleged in this action.

472.    Four projects out of thirty is not a representative sample.

473.    Each of the investors in the other projects plaintiffs presented to the Court were well-educated, sophisticated people with real-estate investment experience.  [Lande, Day 3, 132:1-4, 149:13-150:5, 150:13 – 151:1; Abramskiy, Day 6, 102:16-25, 103:1-5, 103:8-23; Kaiserman, Day 6, 120:11-12, 128:16-17, 121:12-17, 129:1-8, 128:19-23, 129:9-11]

474.    Kagan did not guarantee any return on the investors' investments and each

investor understood there were risks. [Lande, Day 3, 152:8-15; Abramskiy, Day 6,

118:12-18; Kaiserman, Day 6, 131:4:18]

475.    Each of the investors on the other projects were the LLCs' managing members,

with rights to exert control over the project. [Lande, Day 3, 139: 17-23, 165: 18-21;

Exhs. 119, 120; Abramskiy, Day 6, 90:5-7; Exh. 108; Exh. 128; Zhukovskiy, Day 3,

109:1-3]

476.    Each investor received a full return on their investment and the investors on two

of the three projects received substantial profits. [Lande, Day 3, 152:18-22, 178:18-19,

179:3-7, 153:4-5] [Ambramskiy, Day 6, 102:10-12, 111:5-6; Kaiserman, Day 6, 126:1-

2, 136:10-17; Zhukovskiy, Day 3, 117:22-24]

477.    The Landes, for example, received a 50% return on top of their initial investment.

[Lande, Day 3, 153:4-5]

478.    There were losses on the project involving Mr. Abramskiy but Kagan covered

them, even though the losses were incurred by the LLC and could have been allocated

among the members. [Kasierman, Day 6, 109:21-110:2, 114:13-16, 115:16-21, 116:7-

10]

479.    When the appraisal came in lower than expected on the project involving Mr.

Abramskiy, Kagan made up the shortfall, rather than insisting that Mr. Abramskiy invest

more of his money. [Abramskiy, Day 6, 91:21-25, 92:3-17, 106:14-17, 107:11-16]

480.    When ledge was encountered on the project involving Mr. Abramskiy, Kagan

covered the extra costs, rather than insist that Mr. Abramskiy invest more of his money.

[Abramskiy, Day 6, 93:5-19]

481.    When construction costs exceeded $1.7 million on the Lande project, Kagan paid

them and took the risk there would be insufficient proceeds from the sale to be

reimbursed.  He did not insist that the Landes invest more money.  [Lande, Day 3,

166:8-167:6, 166:20-23]

482.    The investors on the other projects received financial information about their

projects from Kagan and had real-time access to the pertinent banking information.

[Lande, Day 3, 159:5-7, 161: 10-12, 165:6-8, 173:6-14, 173:25-174: 1; Exhs. 243, 247,

255; Ambramskiy, Day 6, 112:3-25; Exh. 271; Kaiserman, Day 6, 124:9-11, 134:13-

135:1-3, 135:7-18; Exhs. 191, 296; Zhukovskiy, Day 3, 117:25-118:12, 119:21-23]

483.    None of the investors in the other projects came forward with any actual proof

Kagan engaged in fraud on those projects or proof that subcontractors were paid despite

not actually performing work.  [Lande, Day 3, 163:7-18, 168:2-8, 174:17-25, 175:1-3,

175:13-15; Exh. 243; Ambramskiy, Day 6, 114:2-9; Kaiserman, Day 6, 136:24-25,

137:1-5, 137:11-17; Zhukovskiy, Day 3, 118:17-20]

### The KDC Contract and ProEx Contract are Fair and Reasonable.

a)    <u>VON SALMI/DODDRIDGE</u>

484.    In 2008, Von Salmi ("Salmi") started Von Salmi Associates ("VSA").  He acts as

a consultant and expert witness, does construction forensics, and acts as an owner's

representative for construction projects.  [Salmi, Day 13, 18:4-15]  He still builds homes

(has built hundreds of homes) and, in fact, completed a high end residential home in the

same general area as the Lyman-Cutler project and in the same time period.  [Salmi, Day

13, 18:23-19:17]

485.    In the Loan Agreement, Filippov covenanted that any contract with an affiliate would be "fair and reasonable." [Exh. 342, §5.17] Despite signing this covenant, he now seeks to reverse course and challenge whether they were "fair and reasonable."

486.    Salmi was engaged to opine on the fair and reasonable value of the cost of work to build the homes at 88 Cutler Lane and 55 Lyman Road.  He was also asked to opine as to the fair and reasonable value of the work performed by ProEx.  [Salmi, Day 13, 25:3-8]

487.    In order to perform his valuation, Salmi essentially re-bid the Project and obtained actual pricing from pre-vetted, competent, bidders.  He reviewed all the documentation from the Project, including building plans, redacted invoices, contracts, and photographs.  He also did a site visit.  [Salmi, Day 13, 25:15-26:1, 28:9-49:3; Exhs. 310, 174, 175, 46, 311, 312, 313]

488.    Once Salmi had determined, based on the documents reviewed and his own construction experience exactly what had been built, he organized all the information into a comprehensive set of specifications using the standard CSI format utilized for bidding projects.  [Salmi, Day 13, 49:4-50]  These specifications were based entirely on the facts developed during his review – he did not "invent" or "make up" specifications. [Salmi, Day 13, 50:2-9, 137:2-138:9]

489.    It is typical when building a spec house not to have a standalone "specifications" document. [Salmi, Day 13, 138:10-139:11]

490.    Once he had compiled a comprehensive set of specifications, Salmi identified prospective bidders to send the pertinent plans and specifications to in order to solicit a bid.  In identifying potential bidders, Salmi only considered contractors that he had

worked with or knew of, as he already had vetted these and knew the quality of their

work. He also knew that he could get a lower bid from someone he knew instead of

simply randomly soliciting an unknown contractor. [Salmi, Day 13, 50:14-52:4, 139:16-

141:14]

491.    Salmi did not tell the bidders that their bid was for use in litigation. Rather, he led

them to believe that he was soliciting bids for an actual project. His experience was that

if contractors know they are being solicited to price a job for the purposes of litigation,

they will artificially inflate their price to account for the fact that they might be called

into court. [Salmi, Day 13, 52:5-53:2, 152:19-153:17] Salmi provided the bidders with

a bid response form. [Salmi, Day 13, 135:25-136:7]

492.    Salmi also developed his own prices for some few items. The total of items

which VSA calculated (bid) on his own was less than $200,000. [Salmi, Day 13, 147:1-

16]

493.    Once VSA received back the bids, Salmi validated them based on his experience

and understanding of the range in which one would expect the bids to fall. [Salmi, Day

13, 141:15-142:7] For bids that seemed out of whack, he rebid them for a basis of

comparison and then used the lower bid. [Salmi, Day 13, 53:6-54:10] For some bids

that he felt were too high, Salmi voluntarily reduced them. [Salmi, Day 13, 142:8-

144:6]

494.    All numbers were reviewed to account for any increases between 2014 when the

Lyman-Cutler job was built and 2018 when the VSA bids were solicited. [Salmi, Day

13, 59:10-60:6] At worst, the total cost increase between 2014 and 2018 would be about

$200,000. [Salmi, Day 13, 146:13-25]

495.    Once VSA had received and validated the bids, Salmi tallied them. [Salmi, Day 13, 54:11-13]  Thereafter, he also reviewed unredacted copies of the invoices  as a double check to ensure that nothing appeared out of line.  [Salmi, Day 13, 54:17- 55:1] Salmi did not observe any anomalies, though he did observe that the KDC prices were even better than the bids he was able to solicit.  [Salmi, Day 13, 55:2-8] He also spoke to Kagan to verify that certain construction details that he assumed were, in fact, consistent with what had been done.  [Salmi, Day 13, 55:11-56:7, 78:24-79:7]

496.    Once he had validated all the numbers, Salmi did three separate analyses.  First he determined, as a benchmark, what it would cost if his company, VSA, itself acted as the general contractor for this Project.  [Salmi, Day 13, 56:14-59:9]  That number was $3,689,730.57 per home.  [Salmi, Day 13, 60:23-24]

497.    Next, Salmi calculated the cost to build a single house when using a contractor such as KDC where Kagan essentially was self-performing the construction.  In that scenario, there would be significant savings from what VSA would have charged.  For example, there would be no need for a dedicated site supervisor, a $130,000 savings, no need for a site trailer, no need to hire outside cleaners, savings due to relationships with contractors such as landscapers due the fact that KDC had multiple projects and relationships which lead to greater "buying power," and no need to rent fencing.  [Salmi, Day 13,62:2-64:1]

498.    After deducting all the savings that Salmi determined would inure to a contractor such as KDC building one home, Salmi opined that the fair and reasonable cost to build the first home in the Lyman-Cutler project would be **$3,098,160.80**.  [Salmi, Day 13,64:6-19]  This is about $600,000 lower than the VSA benchmark, and significantly

lower than the estimate of $4,354,275 which the appraiser engaged for RTC in connection with the original loan application anticipated. [Exh. 196 at p. 3]

499.     In order to determine the cost to build the second of the two homes, Salmi did not believe it was proper to simply double the cost of the first home. He explained that there are additional savings due to economies of scale. For example, there was only one existing house to demolish, site clearing could be done simultaneously, only one back-up electric generator was needed for the two homes, and only one project manager is needed. [Salmi, Day 13,64:23-65:25]

500.     After applying discounts for the economy of scale, Salmi opined that the fair and reasonable cost for building the second house would be **$2,771,667.94**. Thus the combined cost to build the two homes would be **$5,869,828**. [Salmi, Day 13:76:9-15]

501.     The actual amount charged by KDC for the hard costs of construction was $3,773,143.49, significantly less than the amount that Salmi determined would be the cost on the open market. [Gersh, Day , POC, P.5/9]

502.     KDC's contract is fair and reasonable. [Salmi, Day 13, 145:24-146:12]

503.     Overhead is a direct cost incurred by a contractor and is charged by subcontractors and contractors. [Salmi, Day 13, 148:13-25] In each of his calculations, Salmi added 10% of the cost of work for overhead, notwithstanding that some contractors charge as much as 15%. [Salmi, Day 13, 57:9-58:4; 66:20-67:3, 149:1-19] Plaintiffs' own expert, Mr. Doddridge, agreed that 10% for overhead was a reasonable figure. [Doddridge, Day 13, 222:12-15] Mr. Doddridge also agreed that overhead is a direct cost borne by a contractor. [Doddridge, Day 13, 214:1-13]

504.    "Overhead" and "profit" are two different concepts. [Salmi, Day 13, 149:22-150:8] Salmi did not add anything for profit.

505.    Salmi also provided an opinion as to the fair and reasonable value of the work provided by ProEx. In order to do this analysis, he reviewed the ProEx proposals which set forth their scope of work and correlated that work with the subcontractor bids and other items VSA had valued for its opinion as to the total project cost. Salmi then tallied those numbers. [Salmi, Day 13, 67:4-68:2]

506.    After tallying the numbers attributable to work performed by ProEx, Salmi opined that the fair and reasonable value of the ProEx work was $489,550 per house, for a project total of **$979,100.** [Salmi, Day 13, 68:3-69:15]

507.    The total amount charged for the base work performed by ProEx as set forth in its proposals was $880,000.

508.    ProEx's charges of $880,000 were fair and reasonable. [Salmi, Day 13, 68:21-69:15]

509.    Unicon Electric charged $65,000 for the electrical work on each home, for a total of $130,000. [Exhs 117, 339]. Plaintiffs have suggested that one of Unicon Electric's proposal, which is a copy of the other, is a fraud and that the charge for completing the electrical work, combined, should only have been $65,000. Salmi opined that the electrical work could not have been done for a total cost of $65,000 and that this would be inconsistent with the estimate he provided. [Salmi, Day 13, 69:16-70:7] In fact the bid for the same electrical work which Salmi solicited was $278,000. [Salmi, Day 13, 117:24-118:2]

510.     Doddridge agrees that the electrical work for one house, by his own calculations, was over $100,000.  He agrees that there is no way that the total cost for installing the electrical for both houses could have been $65,000 as suggested by plaintiffs.

[Doddridge, Day 13, 245:10-246:25]

### b) PLAINTIFFS' CONSTRUCTION EXPERT, DAVID DODDRIDGE VALIDATES KDC'S NUMBERS

511.     Doddridge was engaged solely to rebut Salmi.  [Doddridge, Day 13, 159:13-15].  He as not engaged to provide any affirmative testimony in plaintiffs' case in chief, and testified only in rebuttal.

512.     Despite being a testifying expert, he did not bring a copy of his expert reports to the trial and was not conversant with them.  [Doddridge, Day 13, 193:6-10]

513.     To render his own opinion as to the cost to construct the Lyman-Cutler project, Doddridge relied on a book, RS Means Construction Cost Guide ("RSM").  [Doddridge, Day 13, 163:4-5]  RSM gathers average cost data nationally from various persons in the construction industry.  [Doddridge, Day 13, 165:13-166:3]

514.     Doddridge recognizes that another acceptable methodology to price out a project is by soliciting bids.  [Doddridge, Day 13, 195:7-14]  This is how Salmi priced the project.

515.     The cost data in RSM reflects national averages [Doddridge, Day 13, 168:18-20].  The numbers in RSM are all averages.  [Doddridge, Day 13, 196:5-8]  Because they are averages, Doddridge concedes that the numbers could be off by as much as 5%.

[Doddridge, Day 13, 173:1-6, 197:1-23]

516.     RSM assigns a multiplier to account for regional differences in price.  There is no multiplier for Brookline. [Doddridge, Day 13, 201:9-24]  Doddridge assumes that the

Boston prices for this kind of a home are the same as Boston, although he concedes that

different towns have different local rules and regulations which could affect cost.

[Doddridge, Day 13, 202:15-23]

517.    If RSM does not cover an item that is used in a construction project, "then you

just make adjustments, internally." [Doddridge, Day 13, 168:5-8] Doddridge did not

explain how he made his "adjustments.

518.    RSM does not price specific brands or models of items. [Doddridge, Day 13,

199:7-10] For example, even though the plans specify Anderson windows [Exh. 310,

Sheet A-3], Doddridge elected to price using an average price window "because I

wanted to remain within the scope of the book." [Doddridge, Day 13, 199:24-200:6]

Doddridge concedes that the only way to know the actual cost of an Anderson window

would be to get a quote, which he did not do. [Doddridge, Day 13, 199;18-23] He

further conceded that that methodology would be much more accurate. [Doddridge, Day

13, 201;2-6] In fact, the pricing for the windows that Doddridge used was just for the

window assembly. [Doddridge, Day 13, 200:6-20]

519.    In preparing his analysis, Doddridge relied upon the specifications collated by

Salmi instead of preparing his own. [Doddridge, Day 13, 170:5-8] By relying on

Salmi's specifications, Doddridge is adopting them as his own.

520.    Doddridge's final report states that "Mr. Kagan was to have performed the above

work at his direct cost…" [Doddridge, Day 13, 220:4-9] He agrees that overhead is a

direct cost that is actually incurred by a contractor. [Doddridge, Day 13, 214:1-13]

521.    Doddridge did not include overhead and profit in his calculations for work that he

believed ProEx or KDC did because he understood they had agreed to do its work

without charging overhead and profit based on what the lawyers told him. [Doddridge, Day 13, 172:3-23]

522.    At no time did ProEx, KDC or Kagan agree not to charge overhead. In the Operating Agreement, Kagan agreed that his compensation would be in accordance with the formula set forth in Section 8.1 (50% of the net proceeds of sale) – it says nothing about "eating" direct costs such as overhead. [Exh. 15, §8.1]

523.    Even though he recognized that ProEx's subcontractors charge overhead, and that is a recoverable cost, Doddridge did not account for any subcontractor overhead. [Doddridge, Day 13, 215:14- 216:1] His explanation for this omission was "that's not my problem." [Doddridge, Day 13, 216:1]

524.    Doddridge agrees that regardless of what profit might be, 10% is an industry standard for overhead. [Doddridge, Day 13, 222:12-15]

525.    Without any adjustments whatsoever, Doddridge's number is only $167,711 less than Kagan's hard cost number.

526.    Doddridge agrees that his estimates could be off by as much as 5%. [Doddridge, Day 13, 173:1-6] If one increased Doddridge's number by 5%, the delta between KDC's number and Doddridge's number is only $81,768. [1,886,571 – ($1,718,860 x 1.05)] If you add on the omitted 10% figure for overhead, KDC's actual hard cost numbers are almost $100,000 less than Doddridge's.

527.    As to the value of ProEx's work, Doddridge opined that it would be $321,000 per house, or $642,000 [Doddridge, Day 13, 176:21-25] If one adds on the 5% possible error for using averages, and the 10% omitted overhead, that number is actually $738,300.

528.    Doddridge believes a builder should be able estimate construction costs within 7% based on preliminary plans. [Doddridge, Day 13, 186:14-22] The construction budget submitted to RTC based on the preliminary plans was $1.6 million, which represented 90% of the total anticipated construction costs. [Exh. 342, §3.4.11] Thus, the preliminary budget was $1,760,000. 7% higher than that would be $1,883,200. Kagan brought in each house at $1,886,571.50, only $3,371.50 higher than the number Doddridge finds acceptable.

529.    Doddridge assumed based on his viewing of a single photograph in the MLS listing, that the closet shelving for these $5 million homes would be some sort of laminate. He did not look at the actual invoices to confirm his assumption. [Doddridge, Day 13, 187:10-188:20]

530.    Doddridge did not look at any of the back-up invoices when doing his analysis. [Doddridge, Day 13, 189:1-4]

531.    Doddridge prepared two reports. The first dealt only with the cost for the work performed by ProEx. To determine what ProEx did, he did not even look at ProEx's proposals. [Doddridge, Day 13, 189:6-15] In fact, he did not even know that ProEx had submitted a proposal. [Doddridge, Day 13, 191:23-192:1]

532.    Doddridge assumed that all ProEx did was site work. [Doddridge, Day 13, 190:10-12] There was also other work, but Doddridge, a testifying expert, could not remember everything that they did. [Doddridge, Day 13, 190:19-191:14]

533.    To prepare his initial report as to the value of ProEx's work, Doddridge saw no need to do a site investigation. [Doddridge, Day 13, 192:12-16]

534.     In preparing his initial report, Doddridge relied upon an incomplete set of plans
which was not from the permit set. [Doddridge, Day 13, 203:8-14]

535.     In preparing his initial report, Doddridge did not have the structural plans which
would have covered work performed by ProEx. [Doddridge, Day 13, 204:4-22] He
understood that in order to get a building permit there had to be structural plans but he
did not bother to go to Town Hall to get copies. [Doddridge, Day 13, 205:16-207:15]
As Doddridge explained "I got what I got.  I wrote the report.  And then I wrote another
one that was based on a full set of plans." [Doddridge, Day 13, 208:14-16]

536.     Doddridge admits that the numbers in his first report differ in many instances
from the numbers for those same items in the second report.  [Doddridge, Day 13,
210:7-12

537.     The back-up for the first and second report have different valuations for the same
tasks. [Exh. 343 and 344] The chart attached hereto as <u>Exhibit A</u>, compares the two
exhibits side by side, highlighting the numbers that changed.

538.     Doddridge opined that the fair and reasonable value of the work contained in
ProEx's proposals for $418,150 (Exhs. 327, 329) was $321,000.  [Doddridge, Day 12,
176:21-25].  He did not testify at all as to the value of the work contained in ProEx's
other proposal for $43,700 (Exh. 326).  He also did not include the 10% overhead or the
5% adjustment to account for the use of average prices instead of actual prices.  Adding
this 15% onto his opinion would bring the number to $369,150, though this still does not
include the extensive work delineated in the $43,700 proposal.

539.     Doddridge also testified that there was another $45,000 for foundation and slabs,
and $65,000 for earthwork.  [Doddridge, Day 13, 177:1-6]  When this $110,000 is added

onto his $369,150 number, his opinion of value is actually higher than the $880,000

($440,000 per house) that ProEx charged.  This still does not take into account the

missing $43,700 proposal.

540.    Doddridge's estimate of the cost for the demolition of the existing house went

from $9,975 in the first report to $7,725 in the second report.  [Doddridge, Day 13,

228:1-14]  Doddridge used the RSM unit price for demolishing an average 3,200 SF

house, notwithstanding that the actual house was 5,899 SF.  He agrees that demolishing

a larger house would cost more.  [Doddridge, Day 13, 229:12-230:10]

541.    Demolition debris needs to be sorted and disposed of in multiple locations

depending on the type of debris it is.  This increases construction costs.  [Kagan, Day 8,

72:13-74:13]

542.    Doddridge assumes that the construction debris could be disposed of within 20

miles.  He does not know if there is an appropriate disposal site within 20 miles.

[Doddridge, Day 13, 231:1-4]  Doddridge recognizes that different types of debris must

be disposed of in different sites, but is not familiar with the MA regulations governing

disposal of construction debris and made no determination what type of debris was

generated, i.e. lead.  [Doddridge, Day 13, 232:8-234:1]

543.    Doddridge admits that RSM has unit prices for additional debris hauling but has

no idea if any additional hauling was needed.  [Doddridge, Day 13, 234:2-235:12] He

did not calculate any additional figures in hauling.

544.    Doddridge priced out the unit costs for the basement foundation at two different

rates when comparing his first report to the second report.  His final report prices by

"lineal feet".  RSM does not price by lineal feet.  [Doddridge, Day 13, 238:25-239:25]

545.     The original line item for the basement foundation was $45,968.  When

Doddridge did his second, updated report, the cost for that line item suddenly dropped to

$9,149.  Doddridge admits that nothing changed about the size of the foundation

between the time of the first and the second report.  He agrees that one of the reports

must be wrong, but he cannot say which one.  [Doddridge, Day 13, 241:1-13]

546.     Doddridge admits that the unit price for columns dropped from $285 to $235

between his first and second report.  He also decided not to add subcontractor overhead

for the columns, which RSM carried at an additional $100 per unit.  He has no idea

whether ProEx or another sub poured the columns.  [Doddridge, Day 13,  242:8-243:7]

547.     Doddridge assumed that the dimensions of the driveways were identical in both

properties, but he did not scale them. [Doddridge, Day 13,  243:22-244:8]

548.     Doddridge carried an allowance for the roofing system, even though he could

have determined exactly what roofing system was used and could have priced it.

[Doddridge, Day 13, 247:1-248:2]

549.     Doddridge made no attempt to determine what appliances were actually installed

in the houses.  Instead, he simply accepted the RSM average cost of appliances.

[Doddridge, Day 13, 248:3-249:23]

550.     Doddridge priced these $5 million homes for vinyl siding without knowing

whether vinyl siding was even used.  [Doddridge, Day 13, 250:2-5]

551.     Doddridge did no comparison of the costs he determined with the actual costs that

KDC incurred.  In fact, the delta is miniscule.  If you ignore all of Doddridge's

omissions, tack on the 10% overhead that Doddridge did not include, plus the 5% error

factor Doddridge testified to, KDC's number, in fact, is almost exactly the same as

Doddridge's number.  In fact, KDC's number is slightly lower than Doddridge.

[Doddridge, Day 13, 253:3-256:3]

### TESTIMONY BY MORGAN FENNELL,
### PLAINTIFFS' REAL ESTATE VALUATION EXPERT

552.    Morgan Fennell provided an opinion of value of the real estate at the time they

were sold in February and March 2016. He failed to tie his opinion to any issues in this

case and therefore his opinion is nothing other than an interesting, but irrelevant,

observation.

553.    Plaintiffs failed to connect the opinion testimony they solicited from Morgan

Fennell to any of the issues in this case.  Instead, Fennell provided an opinion as to the

value of the homes on the dates they were sold.  [Fennell, Day 7, 105:9-12]

554.    Fennell did not offer an opinion as to why 55 Lyman Road sold for less than what

he determined the home to be worth at the time of the sale.  [Fennell, Day 7, 103:10-18]

All Fennell could offer was "There has to be something else going on here." [Id.].  He

similarly offered no opinion as to why 88 Cutler Lane sold for less than what he

determined to be fair market value, and testified merely "there has to be something else

going on – that would affect the – the selling price that significantly." [Fennell, Day 7,

104:22-25] He failed to offer any opinion as to what that "something" was.

555.    In any event, the values Fennell offered are not reliable.  The fact that each home

had been actually previously listed for the values Fennell determined and did not sell at

those prices, severely undercuts his opinions as to value.  For example, 55 Lyman was

initially listed for sale at $5,499,999.  [Fennell, Day 7, 109:16-19]  Forty days later, the

price was lowered to the value Fennell determined, $5.1 million, and was exposed to the

market at that price.  [Fennell, Day 7, 109:20-110:1-2]  The home was later listed for

sale at $4,699,000 and did not sell at that price either. [Fennell, Day 7, 110:3-8] The

same is true for 88 Cutler Lane, which was initially listed for sale at $5,499,999.

[Fennell, Day 7, 110:9-17] The price was then reduced to below the value Mr. Fennell

determined, $4,999,000, was exposed to the market and again did not sell at that time.

[Fennell, Day 7, 110:18-24] The market itself indicates that Fennell's opinion of fair

market value is too high.

556.    In fact, on or about August 19, 2015, Filippov himself had solicited three other

opinions of value, and reported that each of them determined that the market value at

that time was $4.5 million. [Exh. 287, 303]

557.    Fennell did not know that Filippov decided to list the homes for $4,500,000 each

in an effort to try to sell them in two weeks' time. [Fennell, Day 7, 113:3-9] According

to Fennell, a reasonable exposure time for these homes was 90 days, not two weeks.

[Fennell, Day 7, 92: 22-23] Fennell agreed, however, that if a seller, such as Filippov,

decides not to list the home for full fair market value, that would impact whether it had a

chance of ever achieving that price. [Fennell, Day 7, 113:23-114:4]

558.    Filippov testified that he decided to list the homes for $4,500,000 after consulting

with local real estate agents. Fennell assumed this was the case, and explained that real

estate agents perform CMA's, or comparative market analyses, which are similar to the

valuation methods Mr. Fennell used, in order to determine a recommended list price.

[Fennell, Day 7, 114:24-115:16] The fact that the real estate agents with whom Mr.

Filippov conferred performed CMA's and recommended listing prices at $4,500,000

indicates that Fennell's opinions as to fair market value are too high.

559.    Fennel did not take into account that his client, Filippov, represented to this Court

that the homes were worth $4,500,000 when he filed the bankruptcy petition. [Fennell,

Day 7, 115:17-20]

560.    When checking his opinions of fair market value, Fennell purported to use the

"test of reasonableness" in which he used the same comparable properties to check his

opinion of fair market value. [Fennell, Day 7, 106:9-22] Fennell's check for

reasonableness is therefore unreliable.

561.    Fennell's report is only good as to the dates he selected, the dates the properties

were sold and not for any other dates. [Fennell, Day 7, 116:5-7] Fennell did not attempt

to determine the values of the homes as of March 30, 2014 or November 2014.

[Fennell, Day 7, 116:25, 117:1-5]

### KDC'S PROOF OF CLAIM (CLAIM NO. 1, 5/3/16)

562.    KDC's proof of claim is based on the audited numbers in the KDC QuickBooks

files provided by Gersh. [Kagan, Day 8, 149:1-21; Gersh, Day 11, 14:25-15:19].

563.    To develop the numbers in the proof of claim, Gersh reviewed invoices, AMEX

statements, bank statements, and checks. Gersh verified everything over a period of

several months. He did not forge, alter or otherwise improperly change any numbers.

[Gersh, Day 11, 15:20-16:17; 25:11-28:9]

564.    A few of the invoices in the binders have dates that are months after the project

was completed. For vendors where Gersh could not find an invoice, he reached out to

them and asked if they could send a replacement copy of their invoice. The

bookkeeping system of many subcontractors have an "autodate" feature. Gersh did not

change the date.  Regardless of the date, Gersh double checked to ensure that the amount

of the invoice tracked the payment history.  [Gersh, Day 11, 28:10-29:11]

565.    It is not atypical for KDC subcontractors to send invoices months after the work is

complete.  [Gersh, Day 11, 29:15-25]  Regardless of the dates on the invoices, plaintiffs

adduced no evidence that the work described in the invoices had not been performed or

the charges presented were not reasonable.

566.    KDC's hard cost for construction ($3,773,149.49) is the total amount of hard

construction costs incurred to build the two homes. [Gersh, Day 11, 15:20-17:11; Claim

No. 1, p. 5/49; Kagan, Day 8, 149:25-150:4] Allocated between the two homes, this

means that hard construction cost for each house was $3,773,149.49 ÷ 2 =

**$1,886,574.75** per home.  [Gersh, Day 11, 42:10-25]

567.    After deducting the net amount of the construction loans, the excess construction

costs advanced by KDC which remain unreimbursed are **$578,528.49** ($3,773,143.49 -

$2,194,615). [Gersh, Day 11, 17:12-18:14]  Claim No. 1, p. 5/49.  This number is

approximately $200,000 less than the number reflected in the unaudited QuickBooks

which had been incorporated into the May 7th Letter.

568.    The total carrying costs advanced by KDC was **$665,545.49**.  [Gersh, Day 11,

18:15-21:3; Claim No. 1, p. 5/49, Exh. B to Claim No.1 and binders referenced therein;

Exhs. 174, 175].

569.    Because Kagan's actual obligation to pay carrying costs did not mature until after

23 months, he should get full credit for these advances.

570.    Although plaintiffs claim that KDC did not advance carrying costs, in the books

and records maintained by Filippov for the LLC, there are multiple entries which

plaintiffs themselves listed as "Kagan Carrying Costs." [Filippov, Day 2, 107:17-

109:10; Exh. 291, entries 7/23/13, 9/19/13, 11/29/13, 1/08/14, 1/15/14, 5/01/14, 5/02/14,

6/18/14, 7/03/14, 9/29/14, 10/9/14, 11/18/14, 11/25/14, 12/17/14, 1/8/15, 1/14/15,

1/26/15, 1/29/15, 2/10/15, 2/18/15, 2/25/15, 2/27/15, 3/13/15, 3/27/15, 4/17/15, 4/22/15,

4/27/15, 5/18/15]

571.    **The total of unreimbursed hard construction costs and carrying costs,**

**advanced by KDC, therefor, is $578,528.49 + $665,545.49 = $1,244,073.98.**

572.    KDC's also includes the percentage add-ons permitted under the KDC

construction contract. [Exh. 37]  After plaintiffs initiated litigation against KDC and

refused to pay it, KDC made the decision not to waive these charges.  [Kagan, Day 8,

150:5-16].  The percentage add-ons are summarized in the POC and are accurate.

[Gersh, Day 11, 21:16-19; 22:18-23:24].  These are:

- Design Fee per Section 7.1.1 of the KDC contract [Exh. 37] of **$25,000**

- General Contractor Fee of **$565,971.52**

- KDC overhead per Section 7.3.2.5 of the KDC Contract of **$59,250.00** (which

  is approximately 1.5% of the cost of work, in contrast to the normal 10%

  which both Salmi and Doddridge agreed was the norm)

- Carrying costs advance fee per Section 7.1.3 of the KDC contract,

  **$127,562.89**;

- Interest accruing since June 1, 2015; and

- Administrative fees and expenses **$141,191.25**

573.    The total due to KDC, as set forth in its proof of claim and supported by the proof

of claim binders [Exh. 174, 175, Tabs C-31, L-43, C-41, L-53, C-41, l-53, C-51, L-40,

C-38; Exh. 339] is **$2,396,914.66** with interest through June 1, 2015. [Kagan, Day 8, 150:23-151:1] Additional interest has accrued.

574.    The amount of Claim No. 1 includes some amounts still owing to subcontractors that have not been paid. These few subcontractors have agreed to await the outcome of the litigation for payment. [Kagan, Day 8, 151:17-153:4].

575.    The summary exhibits prepared by Mr. Hartzell, a paralegal in the office of plaintiffs' counsel, do not undercut KDC's proof of claim. [Exhs. 1, 2, 3, 4, 5, 6] Mr. Hartzel lacks a background in accounting or finance. [Hartzell, Day 7, 32:9-11] He defers to Gersh and Gordon, who he admitted have far more intimate knowledge of KDC's finances than he. [Hartzell, Day 7, 32:21-23, 33:6-8]

576.    Hartzell's analysis of payments depends upon his interpretation of the handwritten memo lines on checks, which, he admits, was difficult to read at times. [Hartzell, Day 7, 35:10-22, 36:19, 36:25- 37:2] When he could not decipher the handwritten memo or if the handwritten memo line was left blank, Hartzell chose not to include that particular check into his compilation of payments. [Hartzell, Day 7, 35:23-36:1, 37:3-9; Exhs. 2, 5] Hartzell chose to compile payments based on the bank account statements and cancelled checks, rather than start with the proof of claim binders or QuickBooks reports and confirm if all of the claimed payments were reflected in the account statements and checks. [Hartzell, Day 7, 33:22-34:9, 36:20-24]

577.    In connection with Exhibits 3 and 4, Hartzell did not account for KDC's paying carrying costs directly, as opposed to depositing money into the LLC's bank account and then the LLC paying the carrying cost. [Hartzell, Day 7, 36:2-13] Carrying costs

include more than just debt service that was paid out of the LLC account once KDC

replenished the low balance. [Exh. 15, §4.2]

578.     Hartzell did not know how ProEx billed for its work on the Lyman-Cutler project.

He did not know that it billed based on a lump sum proposal so that it was unnecessary

for ProEx to track expenses by project. [Hartzell, Day 7, 37:10-15]

579.     Hartzell did not identify any costs contained in the proof of claim binders [Exhs.

174, 175] that were not reflected on bank account statements, checks or American

Express statements. He did not identify any double or fraudulent charges.


INDEMNITY PROOFS OF CLAIM (CLAIM NOS. 4, 5, 6 and 7)

580.     Under the Operating Agreement, "Members and their respective employees and

authorized agents" are entitled to indemnity where they acted in good faith and

reasonably believed to be acting within the scope of authority conferred under the

Operating Agreement. [Exh. 15, §10.2]

581.     Kagan is a member of the LLC. The Operating Agreement delegated full

authority to construct the homes to him. [Exh. 15, §5.2]

582.     All actions that he took were within the scope of his authority.

583.     At all times, Kagan acted in good faith.

584.     Plaintiffs have alleged that Kagan, KDC and ProEx should be treated as one and

the same. As such, KDC and ProEx are also entitled to indemnity.

585.     At all times, KDC and ProEx acted in good faith belief that they were authorized

to perform construction services under the authority delegated to Kagan under the

Operating Agreement.

586.     At all times, Tatiana acted as an agent of the members of the LLC and in good

faith. Tatiana is specifically identified in the Operating Agreement as having authority to

act as the real estate agent for the sale of the properties. [Exh. 15, §6.1(b).]

587.     Each of the defendants is entitled to full indemnity.

### O'CONNOR CARNATHAN & MACK CLAIM (PROOF OF CLAIM NO. 2)

588.     Filippov and Lipetsker engaged the O'Connor Carnathan & Mack law firm, to

represent themselves and the LLC.  Prior to engaging the law firm, they did not take a

vote or consult with Kagan as to whether engaging counsel was even necessary.

589.     The LLC is not responsible for payment of legal fees for services rendered for

Filippov and Lipetsker, individually.

590.     There was no evidence to allow this Court to allocate counsel's time between

services provided to the LLC and to the individual defendants.

591.     The Debtor failed to disclose on its Statement of Affairs that it paid counsel a

total of at least $ 67,211.07 in the 90 days prior to filing of the bankruptcy petition, with

the last payment occurring on 9/22/15 shortly before the filing of the petition.  There is

no showing that any additional fees were incurred for the LLC in the short remaining

time before its unilateral decision to file for bankruptcy. [Filippov, Day 2, 157:9-159:6;

Exh. 291 entries on 7/28/15, 8/25/15, 9/22/15]

### PLAINTIFFS' FAILURE TO PROVE DAMAGES

592.     Plaintiffs admit that they never paid the monies that KDC sought.  At worst, there

was an attempt to get more money, but none of the plaintiffs ever paid it. [Filippov, Day

2, 140:9-16; Lipetsker, Day 4, 51:25-52:3]  Therefore, even had there been an improper

demand for additional monies, which I do not find, plaintiffs suffered no damages from that request.

593.     Plaintiffs never presented any evidence that they would have actually earned 5% (or any return for that matter) had they invested their money in something other than the Lyman-Cutler project. They did not present any expert testimony as to what gain, if any, they may have anticipated. Therefore, I do not find that they are entitled to any damages attributable to a return on their investment. Kagan too is not entitled to any return on his investment beyond what was agreed to in the Operating Agreement. [Exh. 15, §8.1 (entitling Kagan to recover 50% of the net proceeds from the sale of the properties)]

594.     Plaintiffs unilaterally elected to invoke the jurisdiction of this Court and selected the forum in which to prosecute their claims. Administrative costs, i.e. the Trustee's commissions and bank charges are not a proper element of damages recoverable by plaintiffs.

595.     Plaintiffs have failed to establish that the loss of any value in the real estate, if any, was caused by defendants. Therefore, they are not entitled to recover any damages for that loss, if any.

DEFENDANTS' DAMAGES

596.     KDC has submitted construction invoices totaling $3,773,143.49. After deducting the amount covered by the construction loans, the outstanding balance due for hard construction costs is $578, 528.49. KDC is entitled to an award of **$578, 528.49** for unreimbursed hard construction costs. [Gersh, Day 11, 17:12-18:14, 21:10-19; Proof of Claim No. 1, p. 5/9]

112

597.     KDC has also advanced $665,545.49 to cover carrying costs on behalf of the

LLC. [Gersh, Day 11, 18:15-21:3, Proof of Claim No. 1, p. 5/9]. KDC is entitled to an

award of **$665,528.49** to reimburse it for the carrying costs that it advanced.

598.     Under KDC's construction contract [Exh. 37] it is also entitled to recover "soft

costs". These are a percentage of the total cost of work. The total of these "soft costs"

properly claimed is **$918,975.66**. [Design Fee per Section 7.1.1 of the KDC Contract of

$25,000, General Contractor Construction Fee, 15% per §7.1.2 of the KDC Contract

($565,971.52), KDC Office Overhead per §7.3.2.5 of the KDC Contract ($59,250),

Carrying Cost Advance Fee per §7.1.3 of the KDC Contract ($127,562.89 for the first 23

months only), Administrative Fees through May 1, 2016 ($141,191.25)] KDC is entitled

to an award of **$918,975.66** for the "soft costs" permissible under the KDC Contract.

[Gersh, Day 11, 22:18-23:20; Cohen, Day 6, 79:15-22; Proof of Claim No. 1, p. 5/9]

599.     KDC, Kagan, ProEx and Tatiana are each entitled to be indemnified and are

awarded a sum to be determined after an assessment of damages hearing. [Exh. 15,

§10.2]

600.     The Operating Agreement provides that Kagan is entitled to 50% of the "net

proceeds of any sale ... of any property". [Exh. 15, §8.1]

601.     Filippov agrees that the money that is being held in escrow by the Trustee came

from two sources. The first was money in the LLC's account at the time the Trustee

took possession of it. The remaining money was the "net proceeds" from the sale of the

properties. [Filippov, Day 2, 164:23-165:17]

602.     As of 11/30/15, when the Trustee took possession of the LLC's bank account,

there was $107,492.32 in it. That is the first pot of money. [Exh. 325, p. 3 opening

113

balance form] All of the deposits and disbursements that follow constitute the "net proceeds" from the sale of the properties, or $3,421,231.11 (the ending balance of $3,528,723.43 - $107,492.32). [Exh. 325] Subject to potential offsets, i.e. the Trustee's commission, Kagan is entitled to 50% of the net sale proceeds. If there are no offsets, 50% would be **$1,710,615.55**. [Exh. 15, §8.1]

Dated: September 20, 2019          VADIM KAGAN, TATIANA KAGAN, KAGAN
                                   DEVELOPMENT KDC, CORP., AND
                                   PROEXCAVATION CORP.

                                   By their attorneys,

                                   /s/ John H. Perten, Esq.

                                   John H. Perten (BBO# 548728)
                                   James P. Harris (BBO # 678283)
                                   SHEEHAN PHINNEY BASS & GREEN, P.A.
                                   255 State Street, Fifth Floor
                                   Boston, MA 02109
                                   (617) 897-5600
                                   jperten@sheehan.com
                                   jharris@sheehan.com

## CERTIFICATE OF SERVICE

I, John H. Perten, hereby certify that on September 20, 2019, a copy of the foregoing was

served via the Court's ECF system.

Dated:  September 20, 2019                    /s/ John H. Perten
                                             John H. Perten

# EXHIBIT A

## EXHIBIT A

### Division 1 - General Requirements

**Equipment Mobilization**

| Original Report (Exh. 343) | Rebuttal Report (Exh. 344) | Comment |
|---|---|---|
| Quantity: 3 (EA) | Quantity: 5 (EA) | Quantity change |
| Price/Unit: 955.00 | Price/Unit: 955.00 | |

### Division 2 - Existing Conditions

**Demolition/Excavation/Off Site Disposal of Existing Single Family Home**

| Original Report (Exh. 343) | Rebuttal Report (Exh. 344) | Comment |
|---|---|---|
| Quantity: 1 (EA) | Quantity: 1 (EA) | |
| Privce/Unit: 9975.00 | Price/Unit: 7725.00 | Unit price decreased |

**Demolition/Excavation/Off Site Disposal of Existing Pool and Patio**

| Original Report (Exh. 343) | Rebuttal Report (Exh. 344) | Comment |
|---|---|---|
| Quantity: 120 (CY) | Quantity: 120 | No change |
| Price/Unit: 55.00 | Price/Unit: 55.00 | |

**Tree & Stump Removal**

| Original Report (Exh. 343) | Rebuttal Report (Exh. 344) | Comment |
|---|---|---|
| Quantity: 1 (EA) | Quantity: 1 (EA) | |
| Price/Unit: 5600.00 | Price/Unit: 4175.00 | Unit price decreased |

**Strip & Stockpile Loam on Site**

| Original Report (Exh. 343) | Rebuttal Report (Exh. 344) | Comment |
|---|---|---|
| Quantity: 500 (CY) | Quantity: 500 (CY) | |
| Price/Unit: 1.79 | Price/Unit: 1.12 | Unit price decreased |

### Division 3 - Concrete

**Basement Foundation - Footing System**

| Original Report (Exh. 343) | Rebuttal Report (Exh. 344) | Comment |
|---|---|---|
| Quantity: 272 (L.F) | Quantity: 272 (L.F) | |
| Price/Unit: 20.40 | Price/Unit: 17.00 | Unit price decreased |

**Perimeter Drain System**

| Original Report (Exh. 343) | Rebuttal Report (Exh. 344) | Comment |
|---|---|---|
| Quantity: 272 (L.F) | Quantity: 272 (L.F) | |
| Price/Unit: 6.25 | Price/Unit: 4.97 | Unit price decreased |

**Full Basement Foundation - Wall System (10'H x 12'' Thick)**

| Original Report (Exh. 343) | Rebuttal Report (Exh. 344) | Comment |
|---|---|---|
| Quantity: 2720 (S.F) | Quantity: 262 (L.F) | Quantity changed |
| Price/Unit: 16.9 | Price/Unit: 34.92 | Unit price decrease |

**Concrete Stairs (Cast on Ground)**

| Original Report (Exh. 343) | Rebuttal Report (Exh. 344) | Comment |
|---|---|---|
| Quantity: 48 (L.F) | Quantity: 48 (L.F) | |
| Price/Unit: 25.00 | Price/Unit: 20.66 | Unit price decrease |

**6'' Floor Slab (Basement Slab)**

| Original Report (Exh. 343) | Rebuttal Report (Exh. 344) | Comment |
|---|---|---|
| Quantity: 3248 (S.F) | Quantity: 3248 (S.F) | |
| Price/Unit: 4.48 | Price/Unit: 3.70 | Unit price decrease |

**6'' Floor Slab (Slab on Grade - Garage)**

| Original Report (Exh. 343) | Rebuttal Report (Exh. 344) | Comment |
|---|---|---|
| Quantity: 718 (S.F) | Quantity: 718 (S.F) | |
| Price/Unit: 4.48 | Price/Unit: 3.70 | Unit price decrease |

**Footings for interior columns (under 1 CY)**

| Original Report (Exh. 343) | Rebuttal Report (Exh. 344) | Comment |
|---|---|---|

| Quantity: 10 (EA) | Quantity: 16 (EA) | Quantity increase |
|---|---|---|
| Price/Unit: 285.16 | Price/Unit: 235.67 | Unit price decrease |
| | Footings for Exterior Porch and Stairs (Under 1 CY) | |
| **Original Report (Exh. 343)** | **Rebuttal Report (Exh. 344)** | **Comment** |
| Quantity: 10 (EA) | Quantity: | Not found in rebuttal report in Division 3 |
| Price/Unit: 285.16 | Price/Unit: | |
| | | |

## Division 4 - Masonry

| | Fireplace System | |
|---|---|---|
| **Original Report (Exh. 343)** | **Rebuttal Report (Exh. 344)** | **Comment** |
| Quantity: 4 (EA) | Quantity: 3 (EA) | Found in rebuttal report at Division 23 |
| Price/Unit: 5746.80 | Price/Unit: 7028.30 | Quantity change, unit price increase |
| | | |

## Division 5 - Metals

| | Steel Beams WBx31 | |
|---|---|---|
| **Original Report (Exh. 343)** | **Rebuttal Report (Exh. 344)** | **Comment** |
| Quantity: 60 (L.F) | Quantity: 60 (L.F) | |
| Price/Unit: 59.41 | Price/Unit: 65.35 | Unit price increase |
| | Steel Columns 4" Dla. | |
| **Original Report (Exh. 343)** | **Rebuttal Report (Exh. 344)** | **Comment** |
| Quantity: 10 (EA) | Quantity: 31 (EA) | Quantity increase |
| Price/Unit: 52.59 | Price/Unit: 52.59 | |
| | | |

## Division 31 - Earthwork

| | Excavation for New Foundation | |
|---|---|---|
| **Original Report (Exh. 343)** | **Rebuttal Report (Exh. 344)** | **Comment** |
| Quantity: 3 (EA) | Quantity: 1850 (CY) | Quantity change |
| Price/Unit: 4711.70 | Price/Unit: 1.73 | Unit price change |
| | Driveway Excavation and Crushed Stone | |
| **Original Report (Exh. 343)** | **Rebuttal Report (Exh. 344)** | **Comment** |
| Quantity: 4000 (S.F) | Quantity: 80 (CY) | Quantity change |
| Price/Unit: 1.40 | Price/Unit: 37.19 | Unit price change |
| | Catch Basins | |
| **Original Report (Exh. 343)** | **Rebuttal Report (Exh. 344)** | **Comment** |
| Quantity: 2 (EA) | Quantity: 6 (EA) | Found in rebuttal report Division 33 |
| Price/Unit: 625.00 | Price/Unit: 516.53 | Quantity change, unit price decreased |
| | | |

## Division 32 - Exterior Improvments

| | Sodding Systems | |
|---|---|---|
| **Original Report (Exh. 343)** | **Rebuttal Report (Exh. 344)** | **Comment** |
| Quantity: 1400 (S.F) | Quantity: 18 (M.S.F) | Quantity change |
| Price/Unit: 4.65 | Price/Unit: 326.45 | Unit price change |
| | Stone Walls per Site Plans | |
| **Original Report (Exh. 343)** | **Rebuttal Report (Exh. 344)** | **Comment** |
| Quantity: 300 (S.F) | Quantity: | Not found in rebuttal report in Division 32 |
| Price/Unit: 62.00 | Price/Unit: | |
| | Patios, Walkways, & Steps | |
| **Original Report (Exh. 343)** | **Rebuttal Report (Exh. 344)** | **Comment** |
| Quantity: 600 (S.F) | Quantity: 1800 (S.F) | Quantity increase |
| Price/Unit: 14.20 | Price/Unit: 14.45 | Unit price increase |
| | | |

## Division 33 - Utilities

| Water Service (40' to Existing Utility + 5' Building Connection) | | |
|---|---|---|
| **Original Report (Exh. 343)** | **Rebuttal Report (Exh. 344)** | **Comment** |
| Quantity: 45 (L.F) | Quantity: **120 (L.F)** | Quantity increase |
| Price/Unit: 85.00 | Price/Unit: **24.79** | Unit price decrease |
| Septic System - Polyethylene Utility Septic Tanks (1500 ga) | | |
| **Original Report (Exh. 343)** | **Rebuttal Report (Exh. 344)** | **Comment** |
| Quantity: 4 (EA) | Quantity: | Not found in rebuttal report in Division 33 |
| Price/Unit: 3624.00 | Price/Unit: | |
| Underground Electrical Service | | |
| **Original Report (Exh. 343)** | **Rebuttal Report (Exh. 344)** | **Comment** |
| Quantity: 1 (EA) | Quantity: **125 (L.F)** | Quantity changed |
| Price/Unit: 8258.00 | Price/Unit: **34.00** | Unit price decrease |
| | | |