UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

_____
                                        )
In re:                                  )        Chapter 7
                                        )        No. 15-13881-FJB
LYMAN-CUTLER, LLC,                      )
                                        )
        Debtor.                         )
_____)

_____
                                        )
LYMAN-CUTLER, LLC,  et al.,             )
        Plaintiffs,                     )
        Defendants in Counterclaim,     )
                                        )        Adv. Proc. No. 16-01120
        v.                              )
                                        )
VADIM KAGAN, et al.                     )
        Defendants,                     )
        Plaintiffs in Counterclaim.     )
_____)

**DEFENDANTS' POST-TRIAL MEMORANDUM**

Vadim Kagan, Tatiana Kagan, Kagan Development KDC, Corp. and ProExcavation

Corp. submit this Post-Trial Memorandum for consideration by this Court.

**TABLE OF CONTENTS**

I.      INTRODUCTION ...................................................................... 4-6

II.     SUMMARY OF EVIDENCE PRESENTED AT TRIAL ......................... 6-31
        a.  The Parties and their Respective Skills ................................. 6-7
        b.  The October 25, 2012 Meeting ........................................... 7-9
        c.  Plaintiffs Knew There Were Risks, As There Were No Guarantees .......... 9
        d.  Plaintiffs Changed the Operating Agreement to Protect
            Themselves, But They Did Not Secure a Promise as to Fixed
            Construction Costs ....................................................... 9-10
        e.  There Is No Cap On Construction Costs in the Operating
            Agreement ................................................................ 10-11
        f.  Payment of Carrying Costs ............................................... 11-12
        g.  Allocation of Monies from Sale of the Properties ..................... 12
        h.  The Agreed-Upon Dissolution of the LLC ............................... 13

i.   Fillipov Negotiates the Construction Loan, Affirming His
Understanding that there Was No Fixed Price for Construction  ........ 13-14
j.   Filippov Takes Out a Loan Which Prohibits the Use of the Loan
Proceeds for Payment of Carrying Costs, Contrary to the Express
Requirement of the Operating Agreement  .......................................... 14-15
k.   Filippov Commits Bank Fraud  ......................................................... 16-17
l.   The Two Construction Contracts  ...................................................... 17-19
m.   The ProEx Proposals Detail Its Work and the Cost for It.
Plaintiffs' Construction Expert Validates the Charges  ...................... 19-21
n.   Filippov Demands Kagan Pay Carrying Costs  .........................................21
o.   Plaintiffs Were Kept Apprised of Construction Costs and
Expressed No Concerns  .................................................................... 21-22
p.   Substantial Completion and Quality of Construction  .......................... 22-23
q.   Tatiana's Limited Role and Filippov's Approval of the Listing
Agreements  ..................................................................................... 23-26
r.   Kagan Asks Filippov to Contribute to Carrying Costs and to
Reduce the Selling Price.  Plaintiffs Overreact and Allege Fraud
Without a Basis  ................................................................................ 26-27
s.   Plaintiffs Commence Litigation  .............................................................28
t.   KDC Records its Mechanic's Lien  ..........................................................28
u.   Plaintiffs Unilaterally Decide to File Bankruptcy Even Though the
Company was not Insolvent  .............................................................. 29-30
v.   Filippov's Self-Dealing Mortgage  .................................................... 30-31

III.   PLAINTIFFS FAILED TO PROVE ANY OF THEIR CLAIMS  ........... 31-59
a.   The Prices Charged by KDC and ProEx Were Fair  ........................... 31-39
i.   Plaintiffs' Own Expert Says the Prices Were Fair  ................. 31-33
ii.   Salmi Opined the Prices Were Fair  ........................................ 33-34
iii.   There Is No Evidence of a Fixed Price Contract  ................... 34-37
iv.   There Is No Credible Evidence that Carrying Costs Were
Included in the Construction Loan Amount  ........................... 37-39
b.   Despite Their Bold Accusations, Plaintiffs Failed to Prove
Any Fraud, Violation of c.93A, or Breach of Contract  ......................40-49
i.   There Is No Evidence of Fraudulent Billing  ........................... 40-43
ii.   Plaintiffs Failed to Prove Gersh and the Subcontractors
Committed Fraud  .................................................................. 43-45
iii.   Kagan's Outside Accountant, Jason Gordon, Dismantled
Goldman's Criticisms  ........................................................... 45-48
iv.   Joseph Cohen is a Red Herring  .............................................. 48-49
v.   The Other Projects are Irrelevant  .............................................49
c.   Plaintiffs Failed to Prove Kagan Breached a Fiduciary Duty  ........... 49-55
i.   Plaintiffs Failed to Raise a Genuine Question of Fairness
Regarding the KDC, ProEx and Century21 Contracts to
Actually Shift the Burden to Kagan  ....................................... 49-51
ii.   The KDC and ProEx Transactions Were Fair  ......................... 51-55
iii.   The Listing Agreements Were Fair  ...............................................55

  d. Plaintiffs Offered No Evidence to Support their Claims Against
    Tatiana Kagan ........................................................................ 56-57
  e. Plaintiffs Suffered No Damage ............................................... 58-59

IV. DEFENDANTS PREVAIL ON THEIR CLAIMS ................................. 59-68
  a. KDC's Proof of Claim .......................................................... 59-62
    i. KDC's Proof of Claim Carries of Presumption of Validity .... 59-60
    ii. KDC Proved the Amounts Owed ........................................ 60-62
  b. Plaintiffs' Breach of Contract and the Covenant of Good Faith and
    Fair Dealing ............................................................................62
    i. The Debtor's Breach of the KDC Contract ...................................62
    ii. Filippov's and Lipetsker's Breach of the Operating
      Agreement ....................................................................................63
  c. In the Alternative, KDC Prevails on its Equitable Claims of Unjust
    Enrichment and Quantum Meruit ...................................... 63-64
  d. Defendants Prevail on their Indemnity Claims ................................. 64-65
  e. Plaintiffs Froze out Kagan, Depriving Him of the Benefits of
    Ownership ......................................................................... 65-67
  f. Filippov and Lipetsker Breached their Fiduciary Duties to Kagan .... 67-68
  g. Filippov and Lipetsker Engaged in a Conspiracy .....................................68

V. DAMAGES ............................................................................ 68-71

# I.
## <u>INTRODUCTION</u>

For four years, this Court has heard plaintiffs assure it that there will be irrefutable evidence of fraud, including overcharging, double billing, kickbacks, billing items from other projects to the Lyman-Cutler project, and fraudulent invoices. Plaintiffs claimed to have suffered millions of dollars of damage. They claimed to have a "smoking gun" in that KDC's own former bookkeeper, Ms. Brusenkova, would confirm the fraudulent bookkeeping on the Lyman-Cutler project. There were promises that plaintiffs' forensic accountant expert, construction expert and real estate expert would all provide damning testimony. Given the gravity of the allegations and the representations as to the extensive "evidence," this Court allowed plaintiffs broad discovery into five other projects ostensibly to prove that defendants were charging the Lyman-Cutler project for goods and materials properly attributable to other projects.

After thirteen days of trial, as predicted, plaintiffs have failed to deliver on their promises. Despite testifying that they understood that this was a risky venture, with no guaranteed rate of return, plaintiffs seek a windfall by claiming entitlement to all of the sales proceeds from the homes plus additional damages, without reimbursing KDC for the proven and unreimbursed construction and carrying costs it advanced. They also seek to ignore the express terms of the Operating Agreement which grants Kagan 50% of the net proceeds from the sale of the properties and requires Lyman-Cutler to indemnify defendants for the hundreds of thousands of dollars spent defending these claims. Plaintiffs have tied up over three million dollars in escrow and have forced defendants to spend countless hours responding to the baseless allegations against them.

4

Mr. Doddridge, plaintiffs' own construction expert, unwittingly validated KDC's accounting.  He testified that the value of the work performed by KDC was, almost to the penny, exactly what KDC charged!  How could there have been falsified invoices and gross overbilling where plaintiffs' own expert testified that the amounts KDC charged for construction were reasonable?  Despite their assurance that they had expert testimony of fraud, Mr. Goldman, plaintiffs' forensic accountant, testified that he could not opine that fraud occurred on this project.  The best he could offer was that KDC's records are "unreliable," while candidly conceding that he made no inquiry whatsoever to determine whether the questions he raised had any merit.  Mr. Fennell, plaintiffs' real estate expert, failed to draw any causal connection between the amount that the properties sold and anything the defendants did or did not do.  All he could say was that "something must have happened."  This hardly qualifies as substantial evidence of fraud.

And what about plaintiffs' star witness, Ms. Brusenkova?  She testified that she was not working at KDC when the project started or when it ended.  She never even saw the final invoices.  More importantly, she testified that she had no evidence whatsoever of any false billings on the Lyman-Cutler project.  In short, none of the promised evidence has materialized. It was "smoke and mirrors" from the outset, and now that the smoke has dissipated, it is apparent that there is nothing there.

At the end of the day, KDC is entitled to recover the roughly $2.3 million set forth in its proof of claim, as documented in its proof of claim binders. Each of the defendants is entitled to indemnity based upon express terms of the Operating Agreement. Even if all of the defendants' claims are denied, an unlikely scenario, Kagan is still entitled to 50% of the net proceeds from

the sale of the properties under Section 8.1 of the Operating Agreement, which equates to approximately $1.7 million.

## II.
## SUMMARY OF EVIDENCE PRESENTED AT TRIAL[1]

### A. The Parties and their Respective Skills.

Alex Filippov ("Filippov") and Nickolay Lipetsker ("Lipetsker") are close friends, having emigrated together to the United States from Russia. Each is sophisticated and highly educated. Lipetsker is a dentist and Filippov is a successful business owner. Prior to Lyman-Cutler, Lipetsker had been involved in multiple real estate ventures, including several with Vadim Kagan ("Kagan"), each of which has turned out well. [SOF 1-3][2]

Kagan is an experienced "old school" real estate developer. [SOF 4] He is not technologically savvy – he does not use e-mail often, does not know how to use Excel spreadsheets, and is not trained in the use of QuickBooks. He builds houses. Prior to 2013, he relied upon paper financial records, i.e. invoices, checks, bank statements, credit card statements and written notes. He had his outside accountant, Lev Agranovich ("Agranovich"), send personnel to his office weekly to review his records, verify the accounts and maintain his financial records. Sometime in 2013, Agranovich suggested that Kagan implement QuickBooks, which caused Kagan to start the process of converting from a paper-based system to a more electronic one. Agranovich installed QuickBooks at KDC and sent his own personnel to KDC's office to enter data into QuickBooks. Kagan himself was not trained on Quickbooks. In 2014, Kagan hired an in-house bookkeeper, Kristina Brusenkova ("Brusenkova"), to maintain QuickBooks, and he relied on her expertise. [SOF 9-20]

---

[1] Defendants refer the Court to their Requests for Findings of Fact and Rulings of Law, which provides a comprehensive list of facts established at trial. Defendants merely summarize some of the key evidence here.
[2] "SOF" refers to Defendants' requests for findings of fact.

Kagan's companies, Kagan Development KDC, Corp. ("KDC") and ProExcavation Corp. ("ProEx") are truly separate.  Each has its own tax identification number, each files its own tax return, each maintains its own bank account, each keeps its own set of financial records, and each maintains its own general ledger.  KDC is a general contractor, while ProEx is a subcontractor that provides, *inter alia,* excavation, concrete work, masonry, and landscaping.  By using ProEx, KDC is able to keep costs down as Kagan has better control over scheduling and pricing.  [SOF 5-7]

### B.  The October 25, 2012 Meeting.

On October 25, 2012, the parties met to discuss whether to proceed with what ultimately became the Lyman-Cutler project (the "Project").  The meeting lasted only an hour to an hour and a half.  At the time of the meeting, the property had not yet been purchased, no construction plans had been drawn and it was unknown whether the property could be subdivided.  Until the subdivision was approved, it was unknown where on the lots houses could be sited or even the size and shape of the houses that could be built. No funding had yet been committed, nor was it clear how much funding could be obtained, if any. All present at that meeting agree that no deal was struck at that meeting. Filippov wanted to perform more due diligence and there were still several unknowns.  [SOF 31-40]

Lipetsker's nephew, Dmitriy Zhukovskiy ("Zhukovskiy"), prepared an Excel spreadsheet to use at the meeting entitled "**Estimated** Financials and Risk Analysis.  Investment and Profit Allocation Alternatives."  [Exh. 9] [Emphasis added]  Everyone agrees that the spreadsheets contained estimates as it would have been impossible at that time for anyone to predict the future, and many of the numbers, were patent speculation.  For example, the eventual loan amounts, carrying costs, closing costs and land costs were all different than the numbers carried

in the estimated financials.  Plaintiffs now claim that only the $1.3 million entry for the estimated

construction budget was a "fixed cost."  In other words, of the hundreds of numbers presented in

the Estimated Financials and Risk Analysis which were estimates, somehow that one number

represented a fixed cost. [SOF 41-61]

Filippov himself, unwittingly perhaps as it does not fit his narrative, exposed this fiction

for what it is.  When testifying as to the content of the column in the spreadsheet entitled

"Project Scenarios and Assumptions," which included the $1.3 million construction budget, he

testified as follows:

> Q: Now, you understood, sir, that **the project scenario and
> assumptions was all estimates**; isn't that correct?
>
> A: **Yes**.
>
> Q: And sir, you also understood that – it says, "Project scenarios and
> assumptions".  You understood that there were certain assumptions
> built into this model, correct?
>
> A: Yes.
>
> Q: And you understand, sir, that **an assumption is something that's
> being accepted for purposes of the analysis, but it may or may
> not be true** –
>
> A: **Yes**.

[Filippov, Day 2, 24:17-25:2] [Emphasis added]

Attorney Maiden, a non-party who was present at the meeting, was equally clear that

there were no assurances as to the construction cost:

> Q: Now you told us that at one of the meetings, maybe it was the
> first, there was a discussion that the cost could be somewhere in the
> $1.3 to $1.6 million range, correct?
>
> A: Yes.

Q: **And certainly there were no assurances given by anybody that it was either going to be 1.3 or 1.6, correct?**

A: **There were no assurances given by anybody.**

[Maiden, Day 10, 202:2-12] [Emphasis added]

### C.  *Plaintiffs Knew There Were Risks, As There Were No Guarantees.*

After conducting his own additional due diligence, Filippov made the decision to invest notwithstanding that he was well aware that any real estate venture carries significant risk. Filippov and Lipetsker both conceded that there was no guaranteed return and they understood that their money was at risk.  [SOF 66-70]  Kagan too took an immense risk.  In addition to his own $250,000 capital investment, he agreed to manage the Project without taking any compensation up front. This meant that for almost two years he worked for "free."  If, and only if, the Project turned a profit, would Kagan be paid, and the parties agreed to pay him 50% of the net proceeds from any sale.  Filippov openly questioned the allocation of 50% to Kagan as he recognized this was a higher return than a developer would normally garner.  Ultimately, he decided he was fine with it notwithstanding that he knew that Kagan stood to make a "fortune." [SOF 70]

### D.  *Plaintiffs Changed the Operating Agreement to Protect Themselves, But They Did Not Secure a Promise as to Fixed Construction Costs.  [SOF 71-86]*

The parties charged Attorney Maiden with preparing the organizational documents.  He had prepared documents for several of Kagan's prior projects and he used those forms as the starting point.  Kagan, who is not a native English speaker, relied exclusively on Attorney Maiden to advise him as to the import of the documents and whether there were terms that differed materially from the "usual" terms on prior deals.

Filippov carefully reviewed several drafts of the operating agreement before signing.  He and Attorney Maiden had multiple communications regarding terms that Filippov wanted edited. Unbeknownst to Kagan, Attorney Maiden and Filippov had private communications and changed material terms in the standard documents. Filippov also had his own attorney review the draft document. Not once during the entire negotiation of the operating agreement did Filippov consult with Kagan or make sure that the changes that he requested privately from Attorney Maiden met with Kagan's approval.  Both Filippov and Attorney Maiden testified that they did not disclose that Attorney Maiden had previously represented Filippov.

Once the operating agreement had been finalized, Kagan signed it (the "Operating Agreement").  [Exh. 15]  Although he did not read the Operating Agreement before he signed it, Kagan agrees that he is bound to abide by it even though some of the terms were not consistent with his understanding of the parties' agreement.  This stands in stark contrast to plaintiffs who seek to ignore those terms that, with hindsight, they no longer view as favorable or consistent with the false narrative they have crafted.

### E.  There Is No Cap On Construction Costs in the Operating Agreement.

Nowhere in the Operating Agreement are construction costs capped at $1.3 million, or any other number.  When reviewing earlier drafts, Filippov requested that a "tweaked" version of the spreadsheet which the parties reviewed on October 25, 2012 be attached as an addendum, but this request was rejected.[3]  [Exh. 14].  Desperate to shoehorn the Excel spreadsheets into the Operating Agreement so as to buttress his claim of a fixed price, Filippov incredibly contended at trial that where the Operating Agreement placed the obligation on Kagan to construct the homes "in accordance with the plans, including drawings, supplied by Mr. Kagan" [Exh. 15,

---

[3] If the spreadsheet really contained fixed prices, one cannot help but wonder why it needed to be "tweaked."

§5.2], the word "plans" was meant to incorporate the financial spreadsheet. Attorney Maiden, who drafted the agreement, made short shrift of Filippov's creative reading:

> Q: Do you have an understanding of what was meant by the term "plans" in that sentence?
>
> A: Yeah. The actual floor plans and the site plan.

[Maiden, Day 10, 194:2-14]  See John Hancock Life Ins. Co. v. Abbott Labs., No. 03-12501-DPW, 2005 U.S. Dist. LEXIS 20563, at *42 (D. Mass. Sep. 16, 2005) (contract to be interpreted in a manner that is not contrary to the "plain and obvious meaning of its terms.").

### F. Payment of Carrying Costs.

The Operating Agreement obligated the LLC to pay carrying costs for the first 23 months of the Project. "Carrying costs" is much more than debt service. It is defined in the Operating Agreement "to include but not be limited to mortgage payments, taxes and insurance." [Exh. 15, §§ 4.2, 4.1][4]  In the event that the properties were not sold within 23 months, the obligation to pay carrying costs shifted from the LLC to Kagan. [Id. §8.1].  The parties contemplated that Kagan might not be willing or able to pay the carrying costs and expressly provided that if he did not do so, the obligation would then shift to Filippov. [Id.]   In that event, Filippov's "capital contribution and percentage interest in the Company shall increase by the same amount and percentage and at the same time shall trigger reduction of Mr. Kagan's share of capital contribution by the same amount and subsequently his/her percentage interest in the Company." [Id.]

Not having read the agreement, Kagan thought that he was responsible for paying the carrying costs from the outset, which he did through KDC. In fact, Filippov's own e-mail sent

---

[4] The line item for carrying costs in the Excel spreadsheet calculated debt service only, yet another indication that the numbers in that analysis were not reflective of the parties' ultimate agreement.

during the negotiation of the Operating Agreement confirmed this. On October 30, 2012, he confirmed, "Mr. Kagan is taking care of all the carrying costs till properties are sold." [Exh. 12] Although the Operating Agreement changed this, Filippov was content to allow Kagan to labor under this misconception until Filippov's obligation to pay those costs were triggered in May 2015 when Kagan advised that he no longer wished to pay them alone.  Only then, when Filippov recognized that he was going to have to put in additional personal monies, did he start his campaign to discredit Kagan so as to avoid his contractual undertaking and increase his potential return on investment.

### G.  *Allocation of Monies from Sale of the Properties.*

The allocation of a return on the Project did not track the parties' equity interests. Although Kagan only had a 10% interest in the company, because he found the Project and was working without compensation, the Operating Agreement provides that the "net profits, net cash flow and **net proceeds of any sale** or refinancing of any property of the Company or upon liquidation of the Company shall be allocated among the Members as follows: Mr. Alex Fillipov (40%), Mr. Nickolay Lipetsker (10%) and **Mr. Kagan (50%).**" [Exh. 15, § 8.1] [Emphasis added].   This allocation was mirrored in the provisions for the distribution of assets upon dissolution.  Following wind up, assets were to be distributed in the following order: 1) liabilities of Company and expenses of liquidation, exclusive of member loans; 2) repayment of member loans; and 3) anything remaining to the members in accordance with their capital contributions "**after** giving effect to all contribution, distributions, and **allocations**…" [Id., §9.2] [Emphasis added].  As noted, under Section 8.1, Kagan is "allocated" **50% of the net proceeds from any sale of the properties.** [Id., § 8.1]

12

### H.  The Agreed-Upon Dissolution of the LLC.

Following the execution of the Operating Agreement, Filippov signed a certificate of organization, under pains and penalties of perjury, to form Lyman-Cutler, LLC ("LLC").  [Exhs. 16, 17]  The certificate of organization falsely stated that the LLC had no stated termination date despite the fact that the Operating Agreement provided that it was to terminate on November 30, 2015. [Exh. 15, § 2.3] This date becomes critical as, ultimately, plaintiffs did not want to terminate the LLC, which played a critical role in their decision to place the LLC into bankruptcy.

### I.  Filippov Negotiates the Construction Loans, Affirming His Understanding that there Was No Fixed Price for Construction.  [SOF 127-157]

The deed for the property was recorded on December 31, 2012.  The purchase price was $4 million. The purchase money loan was for $1.6 million.  With the members' initial capitalization of $2.5 million, this left an additional $100,000 for paying closing costs and some initial Project expenses.  According to plaintiffs' own accounting, after paying closing costs, there was $58,022 left in the account.  [Exh. 291]  Neither Filippov nor Lipetsker put any additional monies into the Project until after Kagan refused to continue paying carrying costs in May 2015.  At the time of the closing, there were still no construction plans.  The subdivision application was delayed several months due to Town scheduling issues.  While Kagan worked on the building plans, Filippov, as managing member, negotiated the construction loans with Rockland Trust Company ("RTC")

The parties all agree that Kagan told them that he could build a larger and fancier project than originally contemplated.  Commencing on May 1, 2013 and over the next several days, there was an extensive e-mail exchange between Zhukovskiy and Filippov.  [Exhs. 31, 32] Filippov requested that Zhukovskiy send him an electronic copy of the original Excel

spreadsheet so that he could run some new calculations.  [Exh. 31]  Filippov consulted with

Zhukovskiy rather than Kagan because Zhukovskiy created the spreadsheet and knew financial

details better than anyone.   Completely undermining the fiction that the spreadsheet reflected a

fixed construction cost, in those candid e-mails Filippov and Zhukovskiy both refer to the

numbers therein as "estimates."  [See e.g. Exhs. 31, 32]   Zhukovskiy confirmed to Filippov that

the numbers "was an estimate based on assumptions…" [Exh. 32, p.3]   In his "Executive

Summary," Zhukovskiy underscored: "On a personal note, (Really, really personal note) **I think

the important takeaway is to understand that these calculations are based on estimates…**"

[Exh. 32, p.4][Emphasis added]

> **J.    *Filippov Takes Out a Loan Which Prohibits the Use of the Loan Proceeds for
> Payment of Carrying Costs Contrary to the Express Requirement of the Operating
> Agreement. [SOF 144-166]***

On May 7, 2013, RTC issued commitment letters for the construction loans.  As

managing member, Filippov signed the commitment letters.  Despite the fact that the Operating

Agreement provided that the construction loans were supposed to be available to pay the first 23

months of carrying costs, the commitment letter prohibited use of the bank's funds for those

purposes.  It states: "USE OF LOAN.  The proceeds of the loan will be used solely for the

purposes set forth in the attached Construction Loan Supplement." The Construction Loan

Supplement, which was ultimately incorporated into the final Loan Agreement, similarly states:

"USE OF LOAN PROCEEDS:  The proceeds of the loan shall be used solely for costs incurred

in connection with construction of the Project."  [Exhs. 207, 342]  Attorney Maiden, who drafted

the loan closing documents, confirmed that per the verbiage of the loan documents, the loan

proceeds could not be used for payment of carrying costs.

As part of the loan application process, RTC commissioned an appraisal of the property and proposed homes.  [Exh. 196]  Filippov received a copy of the appraisal and reviewed it.  [Exh. 30, 198]  The appraisal anticipated a sale price of $5.3 million which is consistent with the target sale price that the parties had discussed.  The appraisal also valued the estimated construction cost at $4,354,275 per home, well above the $1.3 million assurance Filippov now claims Kagan gave him.  [Exh. 196, at p. 3]

The Loan Agreement which Filippov signed on June 18, 2013 makes it clear that the loan amount **represents only 90% of the anticipated construction costs**.  [Exh. 342, ¶3.4.11][Emphasis added]  Thus, even prior to commencement of construction, Filippov must be deemed to have understood that actual construction could be at least 10% higher than the $1.6 million loan amount ($160,000) for a total anticipated per home construction budget of **$1,760,000**.  At a minimum, this meant that someone would have to front an additional $320,000 for construction (2 x $160,000), and in Filippov's mind that someone was Kagan.[5]  Kagan prepared a construction budget for the bank's use showing how the $1.6 million loan proceeds would be allocated.  [Exh. 27]  It is typical in the industry that the construction budget submitted to the bank is based on preliminary estimates, especially where the project is for a spec house where finishes are not yet selected and actual construction costs are often higher than reflected in the preliminary budget.  In fact, Mr. Doddridge, plaintiffs' construction expert, testified that estimates based on preliminary plans can be off by as much as 7%.  Thus, it was certainly in the realm of reasonable possibility that the construction costs would be 7% higher, $1,883,200.  This is almost to the penny, what KDC actually spent to construct.

---

[5] Lipetsker and Filippov both testified that they did not put any more money into the Project construction.  Kagan testified that he covered the shortfall.

### K.  Fillipov Commits Bank Fraud. [SOF 149-153, 173]

Consistent with the prohibitions in the Loan Agreement, the construction budget does not carry a line item allocating <u>any</u> portion of the loan proceeds to carrying costs.  [Exh. 27] Notwithstanding that Filippov knew that he was supposed to take out a loan that would cover carrying costs, he failed to do so, secure in his knowledge that Kagan, ignorant of the terms in the Operating Agreement that he had not read, would continue fronting those costs.  In an effort to explain away the express prohibitions against using the construction loan proceeds to pay carrying costs and the lack of a line item for carrying costs in the construction budget, Filippov now claims that although he knew that the loan documents prohibited using the loan proceeds to pay carrying costs, the numbers submitted to RTC were inflated so that there would be extra money to use for that purpose. In other words, he admitted to bank fraud. To justify this action, he claimed he was just doing what Kagan told him and that nobody, including RTC, cared. Notably, plaintiffs did not call anyone from RTC or introduce any documents to confirm this position.  In his own words, Filippov testified that he is quite willing to violate the law if it fulfills his objectives:

> Q: And do you know as you sit here today whether the construction loan that you signed permitted the proceeds to be used for carrying costs?
>
> A: I read it doesn't.  But at that point, again, Kagan said its common practice.  So, if there are things that you sign, even if its common practice – you know that is how the business is done—its okay with me, actually.  **Even though I would be told you cannot do this, I would probably say, look there is no way to obey every law.**

[Filippov, Day 2, 100:9-101:1; emphasis added] [6] No matter how he tries to spin it, Filippov, the LLC's managing member, knowingly and intentionally perpetrated a fraud on RTC, thereby

---

[6] There is a certain irony to the fact that plaintiffs gleefully pounced upon the fact that Kagan's consultant, Joseph Cohen, who had nothing to do with negotiating the construction loans, was convicted of bank fraud for falsifying

exposing the LLC (and possibly its members) to civil and criminal liability.  If, in fact, Kagan

had inflated the numbers (which is denied) and told Filippov that he had done so, Filippov had a

legal and fiduciary obligation to refuse to be a party to bank fraud.  Instead, he perpetrated it.

Such egregious conduct cannot be sanctioned by this Court

### L.   *The Two Construction Contracts.  [SOF 167-183]*

RTC required a fully executed construction contract to support the construction loan

application.  Attorney Maiden had a form construction contract on his computer that he had

utilized for other Kagan projects.  Attorney Maiden utilized that form contract as part of the loan

documentation that he prepared.  That form contract was for a company that Kagan no longer

utilized, Classic Homes & Development & Construction, Inc. ("Classic Homes").  Filippov

executed the Classic Homes contract on behalf of the LLC. [Exh. 36]  Before executing it,

Filippov testified that he read the contract to ensure that it accurately reflected the parties'

agreement.  Kagan too signed the contract where Attorney Maiden told him to sign, but did not

read it.  Consistent with the parties' agreement, the Classic Homes contract is an open-ended cost

contract; it is not capped at $1.3 million.  If Kagan had agreed to construct the Project at a fixed

cost, why was Filippov knowingly signing an open-ended contract?  His story simply does not

hang together.

Recognizing again that he acted inconsistently with the fiction he concocted, Filippov

seeks to excuse his signature by claiming that he perpetrated an additional fraud on RTC.

According to Filippov, the Classic Homes contract was a sham contract which everybody,

including RTC, knew about, so it is no "big deal."  In other words, somehow he concludes that

admitting to bank fraud absolves him of his patent breach of fiduciary duty which exposed the

---

loan documents, yet when Filippov himself commits bank fraud, it is "no big deal" because everyone does it.

LLC and its members to potential civil or criminal liability. Even if it is true that "everyone knew," which Kagan vociferously denies, this does not give Filippov a free pass. This Court should not allow itself to become complicit in suborning Filippov's bank fraud. Filippov, as managing member, had a fiduciary responsibility to take no actions that could jeopardize the LLC (and its members). He smugly concedes that he was knowingly complicit in fraud, while at the same time crying foul against Kagan. Filippov clearly has a double standard.

Unaware that he had already signed a construction contract for Classic Homes, Kagan asked Joseph Cohen ("Cohen"), a consultant and native English speaker, to draw up a standard KDC construction contract. [Exh. 37] Cohen utilized the standard form KDC construction contract which he tailored to the terms of the parties' agreement. The KDC construction contract, as was the Classic Homes' contract, is also open-ended. [Exh. 37] As the Operating Agreement delegated full authority to Kagan to construct the homes, reserving back to the managing member only the right to approve the final construction plans, Kagan reasonably believed he was authorized to execute the KDC construction contract, and did so. Prior to executing the KDC contract, Kagan discussed it with Filippov and provided him with a copy. On August 21, 2013, Kagan had his office manager, Ryan O'Grady, e-mail another copy of the executed KDC construction contract to Filippov and Lipetsker so that they would have a copy for their records.[7] [8] [Exh. 215]

---

[7] Filippov complains that Kagan signed the KDC contract both on behalf of KDC and the LLC. Filippov ignores the fact that he signed a mortgage and note from the LLC to himself, both as lender and borrower on the same day as he filed the bankruptcy petition. Somehow, when Filippov signs both sides of a contract it is business as usual. When Kagan does it, under the express delegation of authority under the Operating Agreement, it is fraud.

[8] Filippov claims, without facts, that the August 21, 2013 e-mail is a fraud because the e-mail address from which it was sent, according to Filippov, was not owned by KDC at that time. In fact, KDC obtained that e-mail address six months earlier. (Exh. 324). No computer expert backed up Filippov's bald allegation that the e-mail was some sort of after the fact fiction.

Although plaintiffs now claim they knew nothing about the KDC contract, in November 2012, Attorney Maiden told Filippov that he would have to enter into a contract with KDC. [Exh. 187] Moreover, Lipetsker filed an affidavit in the state court proceedings admitting that the agreed upon plan was that "Mr. Kagan, through his company Kagan Development, was to serve as the general contractor for the project." [Lipetsker, Day 4, 54:12-19] Either Lipetsker perjured himself in the affidavit or he perjured himself at trial. Additionally, in the Adversary Complaint, which Filippov affirmed was accurate, plaintiffs plead that "The Company entered into a contract with KDC that required, among other things, that KDC perform its work in a good and workmanlike manner." [Amd. Adv. Cmp., ¶78]. If they knew nothing of this contract until receiving a copy through discovery, how could they make these factual averments prior to discovery? Did Filippov perjure himself in his pleading or during his testimony at trial? The e-mail forwarding the KDC contract, Lipetsker affidavit, Maiden e-mail, and the Adversary Complaint all belie plaintiffs' revisionist testimony. The LLC and its members went into the Project with eyes wide open, fully cognizant of KDC's role as general contractor.

### M. The ProEx Proposals Detail Its Work and the Cost for It. Plaintiffs' Construction Expert Validates the Charges. [SOF 215-218, 527, 531-539]

ProEx prepared proposals for the work it performed on the Project, which proposals doubled as its invoices. The proposals were all below market rates. Kagan gave a copy of the proposals to Lipetsker and Filippov. The ProEx proposals are all for lump sum amounts. Unlike KDC, ProEx does not bill based on its actual expenses; it bills against its lump sum proposal based on percentage of the project completed. There were three proposals for the properties, one for $43,700 and two for $418,150, for a total of $440,000 per house. [Exhs. 326, 327, 329][9]

---

[9] There were another two small invoices for repairs.

Although plaintiffs plead that the amount billed by ProEx was "double what any conceivably legitimate charges for the work it performed on the project would be" [Amd. Adv. Cmp. ¶47], plaintiffs' own expert, Mr. Doddridge, failed to support this allegation.  Though it did not stop him from opining as to the value of ProEx's work, Mr. Doddridge conceded that he was not sure exactly what ProEx did.  He relied upon the average unit costs set forth in the RS Means reference book to calculate the value of ProEx's work.  He testified that the work corresponding to ProEx's $418,150 proposal was valued, in his estimation, at $321,000. ("So if I were to match ProEx's work, item by item, I was at $321,000. And their –I—I did see a quote from ProEx that the same work totaled $418,000.") [Doddridge, Day 13, 176:23-25] Significantly, Mr. Doddridge provided <u>no</u> testimony whatsoever as to the value of the work outlined in ProEx's $43,700 proposal.  He simply ignored it.  Thus, his analysis is significantly incomplete and understated!  Mr. Doddridge further testified that he did not add on any overhead, which he conceded was a direct recoverable cost.  He agreed that overhead is typically 10% of the cost of work.  He also conceded that because RS Means numbers are based on averages, his estimate might be off by as much as 5%.  Thus, even without the work he omitted, when adding the 15% to Mr. Doddridge's estimate ($321,000 x 1.15), his actual number is $369,150 per house.  Given that ProEx's proposal was $440,000, this is hardly "double what any conceivably legitimate charges for the work it performed on the project would be."

Perhaps seeking to overcome this substantial omission, Mr. Doddridge testified that there was an additional $45,000 for slabs and foundation and $65,000 for earthwork. When adding this additional $126,500 to his initial estimate ($110,000 x 1.5), his total estimate is even higher than ProEx's proposals.  Thus, Doddridge's testimony either materially understated the value of ProEx's work, or actually validated ProEx's charges.  It is also right in line with Mr. Salmi's

opinion that the value of ProEx's work was $979,100, higher than the $880,000 it actually

charged. [SOF 505-508]

### N. Filippov Demands Kagan Pay Carrying Costs. [SOF 197-211]

As of April 2013, even before construction started, there was insufficient money left over

from the purchase money loan to pay for carrying costs.  Filippov advised Kagan that he would

not be putting any further money into the account.  [Exhs. 22, 23]  This meant that he knew

Kagan was starting to pay carrying costs as early as April 2013.  If there was sufficient money,

why would Filippov feel compelled to tell Kagan that he would not put in any more money?

Filippov's story makes no sense.  Every time the LLC account balance was too low, Filippov or

his wife, Arina, contracted Kagan and had him deposit additional funds to cover the debt service,

and he did so.  [Exh. 316] Notwithstanding that he knew that Kagan had no obligation to pay

carrying costs for the first 23 months, Filippov was content to sit back and have Kagan (through

KDC) front all those costs.  In an unbelievable display of "chutzpah," Filippov now does not

want to credit KDC for any of those payments and seeks a windfall.

### O. Plaintiffs Were Kept Apprised of Construction Costs and Expressed No Concerns. [SOF 212-240]

As construction proceeded, Kagan sent Filippov copies of all checks as they were written.

Filippov also received copies of the LLC's bank statements which included copies of all checks

and all deposits into the LLC account. He also received copies of pertinent AMEX statements.

Filippov delegated responsibility for keeping the LLC's books to his wife, Arina.  She interfaced

with KDC's bookkeeping staff regularly where she had questions about payments.  Despite

seeing regular checks cut to KDC and to ProEx.  Filippov asked no questions.  In fact, he

testified that he "didn't care."  He did not ask to see the KDC contract [presumably because he

already had it] or seek any explanation as to what KDC or ProEx were doing on the site and why

they were being paid so frequently.  Despite now claiming not to know what the checks were

actually for, Filippov did not ask for any explanation.  This is hardly surprising as he made it

clear from the outset that he would not be contributing a dime more to the Project and knew that

Kagan was fronting all necessary additional monies.  Filippov was content to have Kagan bear

the financial burden as the Project proceeded, until Filippov was called upon to honor his

agreement to start paying carrying costs.  Then, suddenly, Filippov was no longer content.

### P.  Substantial Completion and Quality of Construction. [SOF 276-281]

Although plaintiffs claimed that defendants failed to achieve timely "substantial

completion," they introduced no evidence as to when substantial completion actually occurred.

The Operating Agreement does not provide a deadline for final completion nor provide that

"time is of the essence." Thus, Kagan had a reasonable amount of time to complete the Projects

Thermo Electron Corp. v. Schiavone Constr. Co., 958 F.2d 1158, 1164 (1st Cir. 1992);

LimoLiner, Inc. v. Dattco, Inc., 809 F.3d 33, 39 (1st Cir. 2015) ("Under Massachusetts law, if a

contract is silent as to the term for performance, then 'the term shall be a reasonable time based

on all the relevant evidence.'"), *quoting*, Bushkin Assocs. v. Raytheon Co., 815 F.2d 142, 146

(1st Cir. 1987)); SAA Grp., LLC v. Old Republic Nat'l Title Ins. Co., 28 Mass. L. Rep. 304, *9

(2011) ("In situations where parties do not indicate that time is of the essence, parties must

perform within a reasonable amount of time.").  Plaintiffs also introduced no evidence of any

damages that flowed from the alleged failure to timely complete the Project.  Plaintiffs plead that

substantial completion did not occur until October 2014, but they offered no testimony to that

effect.  Despite insisting that the date and definition of substantial completion would be

established by their construction expert, Mr. Doddridge, and negotiated leave to have Mr.

Doddridge testify to that effect as part of their direct case, Doddridge offered no testimony on

that issue.  See Order No. 211 dated 10/02/18 ("in [plaintiffs] case in chief, Mr. Doddridge's

testimony is limited to the issue of substantial completion").  The only thing clear is that

substantial completion had to have occurred *sometime* prior to August, as that was when the first

of the two homes was listed for sale.  Beyond that, the Court is left to speculate.  Even had there

been some claim of damages caused by late completion (there was not), it would have been left

to speculation as to when those damages started to accrue.  Further still, as Filippov agreed to the

marketing strategy of not having both houses listed simultaneously, even if the second house was

finished timely it would not have been placed on the market until the first home either sold or

was removed from the market. [SOF 288] The whole issue regarding substantial completion is a

red herring.

Plaintiffs also claimed in the adversary complaint (Count VII) that KDC failed to

complete the construction in a good and workmanlike manner.  Despite forcing defendants to

spend money discovering on this issue, plaintiffs did not offer a shred of evidence regarding the

quality of the construction.  Rather, having caused defendants to waste time and money

addressing this claim, they magnanimously agreed to dismiss that count, prior to trial.  Shame.

### Q. Tatiana's Limited Role and Filippov's Approval of the Listing Agreements. [SOF 282-300]

Plaintiffs claimed that they had hard evidence that Tatiana Kagan ("Tatiana") was an

integral player in the fraud allegedly perpetrated on them.  Like so much of their case, they failed

to deliver on their promise.  They put on no evidence that Tatiana had anything to do with the

construction.  [SOF 8, 243-47]  The only evidence connecting Tatiana to this Project was that she

was married to Kagan and acted as the real estate agent for the sale of the properties.  Neither

Lipetsker nor Filippov testified about any interactions with Tatiana whatsoever regarding

construction or billing.  There are no e-mails with Tatiana, nor was she even copied on Project e-

23

mails.  She was not part of the original Project negotiations and there is no evidence that she ever

even saw the Operating Agreement.  Although on paper she was an officer of KDC and ProEx,

she testified that she had no day-to-day role in the companies.  Her mere status as an officer and

the spouse of Kagan is not enough to confer liability on her.  <u>Refrigeration Disc. Corp. v. Catino</u>,

330 Mass. 230, 235 (1953) ("An officer of a corporation does not incur personal liability for a

tort committed by a corporation or by one of its officers merely by virtue of the office which he

holds in the corporation."); <u>O'Leary v. N.H. Boring, Inc.</u>, 176 F. Supp. 3d 4, 12 n.5 (D. Mass.

2016) ("As a general rule, a corporate officer does not incur personal liability for activities of the

corporation merely by virtue of the office which he holds in the corporation."); <u>Tomei v. Corix</u>

<u>Utils. (U.S.), Inc.</u>, No. 07-cv-11928-DPW, 2009 U.S. Dist. LEXIS 83416, at *49 (D. Mass. Sept.

10, 2009) (same).

    With respect to her role as the listing agent, Plaintiffs alleged three transgressions: (1)

failure to communicate an offer to purchase that had been received in March 2015; (2) failure to

properly market the properties; and (3) listing the properties without authorization and at a price

that had not been approved.  Not one of these allegations has any support.

    There was virtually no evidence of any offer that had not been communicated – because

there was none!  Plaintiffs used that allegation to convince this Court to prohibit Tatiana from

getting a commission at the outset of these proceedings and to force defendants to waste time and

money conducting discovery on this issue, including deposing the broker who supposedly

represented the potential buyer.  Plaintiffs opposed Tatiana's summary judgment motion

claiming they had evidence of malfeasance.  This allegation was just another baseless allegation

created to trump up plaintiffs' narrative and to force defendants to spend more money.

Similarly, there was no evidence that Tatiana's marketing efforts were substandard. The mere fact that the properties did not sell during her time as listing agent, without more, does not permit the conclusion that she, somehow, was to blame. Despite arguing in opposition to defendants' motion in limine that plaintiffs' real estate expert, Mr. Fennell, should be allowed to testify as to Tatiana's allegedly substandard marketing efforts, at trial Mr. Fennell offered <u>no</u> testimony or opinion on this subject. He also did not tie the failure of the properties to have sold earlier to any issues relating to Tatiana's marketing efforts, or for that matter to any acts by any of the defendants. [SOF 552-561] This whole topic was yet another baseless allegation that plaintiffs abandoned once it had served its purpose of forcing defendants to waste time and money going down this path.

The allegations against Tatiana as to the unauthorized listing agreements are even more outrageous. There was extensive evidence, through plaintiffs' own mouths, that they both knew about and approved of the listing agreements. Cutler Lane was first listed in August 2014. Both Filippov and Lipetsker testified that they were aware that the property had been listed and the price at which it was listed. Neither objected. [SOF 282-292] They both testified that they reviewed the listings on Zillow and, in fact, Filippov contacted Tatiana to have her correct an error on the property description. [Exh. 250] How they can now, with a straight face, claim they knew nothing about the listing agreement? Did Filippov really think that C21 would list a property on the Multiple Listing Service without having a listing agreement? This defies logic.

Filippov was also actively involved in approving the execution of the listing agreement for Lyman Road. Tatiana called Filippov at the end of April 2015 and said she needed him to sign a listing agreement for Lyman Road. Kagan also contacted Filippov to discuss that listing. [Exhs. 260, 261] Both Tatiana and Kagan sent Filippov a copy of the listing agreement to

review.   [Exh. 266]  The only concern Filippov raised related to the rate of Tatiana's

commission, which concern was addressed to Filippov's satisfaction. [Exh. 267]  After

reviewing the listing agreement, Filippov authorized Kagan to sign it.  Kagan signed the listing

agreement on behalf of the LLC, and sent a signed copy of the listing agreement to Filippov.

Filippov admitted he received that copy.  Dan Gersh e-mailed confirmation of the listing and

signing to Filippov and asked him to confirm that he received the e-mail. [Exh. 268]  Filippov

replied in the affirmative.  Later that same afternoon, Tatiana texted Filippov to confirm that he

knew the agreement had been signed. Filippov replied that he had already sent confirmation to

Gersh.  [Exh. 270, 269]  [SOF 293-301] Despite this overwhelming evidence, plaintiffs have

pressed forward with this ridiculous claim.

### R.   Kagan Asks Filippov to Contribute to Carrying Costs and to Reduce the Selling Price. Plaintiffs Overreact and Allege Fraud without a Basis.  [SOF  302-324]

Though under no obligation to do so (but unaware of this fact) through KDC, Kagan had

been paying carrying costs since the beginning of the Project.  By May 2015, he had concerns

because the homes were not selling as quickly as hoped and he had already laid out significant

money.  He approached Filippov to suggest that they lower the asking price in an attempt to

move the properties.  Filippov refused, stating that he did not want to lower the price because

that would cut into his profit.

On May 7, 2015, KDC had its counsel send a letter to Lipetsker, Filippov and Kagan.

[Exh. 50]  In that letter, Kagan suggested again that they lower the asking price for the

properties, agree to extend the time for the termination of the LLC so that they would not have to

sell at liquidation, and indicated that he was no longer willing to be solely responsible for paying

carrying costs.  He offered to share that responsibility going forward with Filippov.  He also

26

indicated that, in addition to carrying costs, KDC had already fronted approximately $758,000 of additional construction costs.

Dan Gersh, the CFO for KDC, testified that he provided the numbers that were incorporated into the May 7th letter. He testified that he had not yet "audited" the QuickBooks files to ensure that everything had been captured accurately. Upon receiving the letter, Filippov demanded a copy of KDC's Quickbooks, and KDC turned them over, with the caveat from Gersh that they had not yet been reviewed. Over the next several months, Gersh reviewed each and every QuickBooks entry, corrected those which were mistaken or omitted, and provided plaintiffs with a copy of the "audited" QuickBooks. [SOF 267-275, 312-314, 417] Mr. Goldman, plaintiffs' forensic accounting expert, testified that it would have been irresponsible not to review the QuickBooks entries and correct errors or omissions that had been identified.

Filippov and Lipetsker claim that until they received the May 7th letter, they were unaware that there were increased construction costs and that KDC was fronting carrying costs, a somewhat dubious position given the overwhelming evidence and real time financial disclosures that had been made. They instantly assumed that KDC's numbers must be the product of fraud. They admitted that, other than their professed disbelief of the numbers, they had no actual evidence of fraud. Moreover, despite the fact that he had agreed in the Operating Agreement to pay carrying costs if Kagan would not, Filippov became concerned that now he was going to have to put more money into the Project. To avoid his contractual obligations, Filippov masterminded the witch hunt which is the instant litigation.

### S. *Plaintiffs Commence Litigation.* *[SOF 325-339]*

Within four weeks of their receipt of May 7th letter and two weeks after receiving the "unaudited" KDC QuickBooks files, Filippov caused the LLC to file suit in state court accusing

Kagan of "cooking the books" and committing massive fraud.  Although Kagan was a member

of the LLC, Filippov did not consult with him or call for a vote before filing suit.  He used

corporate funds to finance the lawsuit, though his overarching motivation was to ensure that he

would not have to use personal funds to pay carrying costs or additional construction costs. His

goal was to maximize his potential return at Kagan's expense.   Plaintiffs also threatened, as the

majority equity holders, that if Kagan did not capitulate to their demands, they would vote to

amend the Operating Agreement to cut his profits.  [Exh. 54, p. 3] This is classic minority

oppression.

### T.  KDC Records its Mechanics Lien. [SOF 340-346]

Recognizing that KDC was not going to be paid, it was unsecured, owed money to

subcontractors, and had just been sued, Kagan asked Joseph Cohen to prepare a mechanics lien.

Cohen prepared the mechanics liens, which were recorded on June 22, 2015. The numbers in the

mechanics lien are supported by the proof of claim binders. KDC did not rely upon the previous,

unaudited, QuickBooks.  By the time KDC filed its proof of claim months later, Gersh had spent

months going through each of the entries in the QuickBooks accounts to ensure that everything

was accurate.  Filippov took no steps to dissolve or bond off the lien, despite the fact that he

already had a state court lawsuit pending which had the jurisdiction to make such adjudications.

M.G.L. c. 254, § 14, 15A. Even if the amount of the lien was intentionally overstated, and the

evidence does not support this, the remedy is to invalidate the lien. See M.G.L. c. 254, § 11. It

does not invalidate the underlying debt.

### U.  Plaintiffs Unilaterally Decide to File Bankruptcy. [SOF 350-360]

On October 7, 2015, Filippov caused the LLC to file a Chapter 11 petition for

bankruptcy.  Filippov filed the petition as a means to gain control over the properties, which was

unnecessary given his status as managing member.  He was concerned that if the LLC dissolved

on November 30, 2015 as required under the Operating Agreement, it would constitute an event

of default under the loans which could result in a foreclosure and trigger his personal guaranty.

At the time he filed the petition, the LLC's only ongoing fiscal responsibility was to pay carrying

costs.  Under the Operating Agreement, because Kagan had decided he was unwilling to

continue paying the carrying costs alone, payment of carrying costs was now Filippov's

obligation.  Far from filing to protect the LLC's interests, in violation of their fiduciary duty,

plaintiffs put their own interests ahead of the LLC. Filippov did not want to plough any further

monies into the Project and saw bankruptcy as a vehicle to avoid his personal obligations.

Lipetsker too explained that the bankruptcy filing was motivated by personal concerns.  He

explained that the filing was to protect his personal investment because the loans were about to

mature.

　　　The LLC was not insolvent at the time the petition was filed. It had $107,000 in its bank

account and no business to reorganize as its only remaining corporate activity was to liquidate

the two properties.  Filippov and Lipetsker determined that, as the majority equity holders, they

could unilaterally decide what was best for the company irrespective of what was required by the

Operating Agreement.  Neither Filippov nor Lipetsker discussed filing for bankruptcy with

Kagan because they assumed he'd say "no." "It was just a waste of time to do this."  [Filippov,

Day 1, 139:22-140:6]

　　　The Trustee listed the properties for sale with Deborah Gordon, who was recommended

to him by Filippov.  The Trustee's listing price was $4.5 million.  Although Filippov now claims

this was a low listing price, in a surprising moment of testimonial candor, he admitted that

because he wanted the property to move quickly so that he would not have to pay any more

carrying costs, he did not object. The Trustee, with the approval of this Court, sold each of the properties for $4.4 million. [SOF 361-362] The net proceeds from the sale of the properties, approximately $3.4 million, are currently being held by the Trustee. The Operating Agreement provides that 50% of the net proceeds from the sale of the properties are to go to Kagan. Therefore, he is entitled to approximately $1.7 million regardless of how this Court rules on KDC's proof of claim. [Exh. 15, §8.1] Plaintiffs simply do not want to honor the agreement that they struck.

### V. *Filippov's Self-Dealing Mortgage. [SOF 363-383]*

After Kagan refused to pay additional carrying costs by himself, Filippov claims that he took on that obligation. Although he has filed a proof of interest invoking Section 8.1 of the Operating Agreement to reduce Kagan's capital account and equity interest to reflect the carrying costs he claims to have paid [Claim No. 11], Filippov now claims that the monies he deposited into the LLC's account to pay for carrying costs was, in part, a $200,000 loan. He was unable to identify which deposits comprised his loans, leaving this Court to speculate on that issue. According to plaintiffs own accounting, at least $67,211.06 was utilized, without authorization, to pay legal fees for the lawsuit against Kagan. There was no vote to accept a loan from Filippov, and Kagan was never consulted. The loan was not contemporaneously papered. Filippov made no showing whatsoever that the company needed a loan or that the loan was on terms that were fair and reasonable. Filippov never introduced into evidence the promissory note which he claims is due and payable and its terms remain unknown.

On the day Filippov filed the Debtor's bankruptcy petition, in a self-dealing attempt to place himself ahead of KDC's unsecured claim and to secure his personal investment to the potential detriment of the LLC, Filippov signed and recorded a mortgage to himself. [Exh. 75]

Filippov used LLC monies to pay for the cost of preparing this personal mortgage.  Filippov and

Lipetsker did not discuss the loan or the mortgage with Kagan because they knew he would not

approve of it.  As candidly conceded by Filippov: "As a –manager, I can do whatever I want,

basically." [Filippov, Day 2 153:16-154:1]  There is no evidence that the grant of a mortgage to

Filippov, after the loan was already made, was necessary, reasonable, or provided any benefit to

the LLC.

### III.
### PLAINTIFFS FAILED TO PROVE ANY OF THEIR CLAIMS

###### A. *The Prices Charged by KDC and ProEx Were Fair.*

###### i. *Plaintiffs' Own Expert Says the Prices Were Fair.  [SOF  511-551]*

Despite alleging significant overbilling, plaintiffs' own expert that opined that the prices

charged by KDC (and ProEx) were fair and reasonable.  Without any adjustments whatsoever,

Doddridge's number is only $167,711 less than the hard cost number KDC seeks in its proof of

claim, $3,773,143, or $1,886,571 per house.  Doddridge testified that he valued the total hard

construction costs at $1,718,860 per house.  If one looked no further, Doddridge's opinion of

value is only 8.9% lower than KDC's actual charges.  The fact that plaintiffs perpetuated this

dispute through four years of litigation, thirteen trial days, and hundreds of thousands of dollars

in legal fees to dispute $167,000 is outrageous!  In fact, the numbers are even closer

Doddridge testified that although contractors are entitled to recover 10% overhead as a

direct cost, he did not add this on to his opinion of the value.  No matter how one reads the

Operating Agreement, nowhere is there any agreement to waive direct costs, other than for

Kagan's personal time.  If one tacks on the missing 10% for overhead, Doddridge's new number

is $1,890,746. This represents a delta of **$4,175** between what KDC charged and what Doddridge

claims its services should have been valued.  If one further tacks on the 5% margin of error

Doddridge testified was appropriate given that he was working with average costs, Doddridge's

new number becomes $1,985,283, translating to a number ***higher*** ($98,712) than KDC's actual

costs. Thus, plaintiffs' own expert validates the amount charged by KDC and undermines any

claim of inflated billings!

Doddridge believes a builder should be able estimate construction costs within 7% based

on preliminary plans. The construction budget submitted to RTC based on the preliminary plans

was $1.6 million, which represented 90% of the total anticipated construction costs. [Exh. 342,

§3.4.11] Thus, the preliminary budget was $1,760,000. Seven percent higher than that would be

$1,883,200. Kagan brought in each house at $1,886,571.50, only **$3,371.50** higher than the

number Doddridge finds acceptable. The only conclusion that can be drawn is that plaintiffs

wasted everyone's time (and defendants' money) with their allegations of fraudulent billing.

Plaintiffs have claimed that Kagan used ProEx to inflate the costs and line his own

pockets, but again Doddridge undercuts this theory. First, the total Project costs as determined by

Doddridge do not support the claim that ProEx overcharged by 2X. If one looks at ProEx's work

in a vacuum, Doddridge opined that it would be $321,000 per house, or $642,000. If one adds

on the 5% margin of error because Doddridge used averages and the 10% omitted overhead, his

number is actually $738,300. This is only a $141,700 difference from the $880,000 that ProEx

actually charged.

Doddridge made several key errors that explain why he came up a little short of ProEx's

actual charges. Doddridge assumed that all ProEx did was site work. Doddridge conceded, as

he must, there was also other work, but he could not remember everything that ProEx did.

Doddridge also failed to value the work in all of ProEx's proposals. He focused on ProEx's

proposals for $418,150, but he failed to consider ProEx's other proposal for $43,700. [Exhs.

326, 327, 329]  As the $43,700 proposal was not even considered, it is unrebutted and should be

added to his opinion of value.  Doddridge also testified that there was another $45,000 for

foundation and slabs, and $65,000 for earthwork.  When this $110,000 is added, his opinion of

value is actually ***higher*** than the $880,000 ($440,000 per house) that ProEx charged, even

without taking into account the missing $43,700 proposal.

> ## ii.   *Salmi Too Opined the Prices Were Fair. [SOF 484-510]*

The other expert that testified in this case, Von Salmi ("Salmi"), also validated KDC's

Proof of Claim, destroyed plaintiffs' claims, and established that the KDC charges (including

ProEx's work) were fair to the Debtor.  Salmi's number, based on actual bids from

subcontractors and not averages taken out of a book, was ***higher*** than KDC's number for both

hard construction costs and soft costs combined.  After deducting all the savings that Salmi

determined would inure to a contractor such as KDC, Salmi opined that the fair and reasonable

cost to build the first home in the Lyman-Cutler project would be **$3,098,160.80**.  This is about

$600,000 lower than the VSA benchmark, and significantly lower than the estimate of

$4,354,275 which the appraiser engaged by RTC in connection with the original loan application

anticipated.  [Exh. 196 at p. 3]  After applying further discounts for the economy of scale, Salmi

opined that the fair and reasonable cost for building the second house would be **$2,771,667.94**.

Thus the combined cost to build the two homes would be **$5,869,828**.   The actual amount

charged by KDC for the hard costs of construction was $3,773,143.49, significantly less than

Salmi determined would be the cost on the open market.[10]  Even if one discounts Salmi's opinion

by $1 million, which is not justified given his sound methodology and plaintiffs' failure to even

---

[10] Overhead is a direct cost incurred by a contractor and is charged by subcontractors and contractors.  In each of his calculations, Salmi added 10% of the cost of work for overhead, notwithstanding that some contractors charge as much as 15%.  Plaintiffs' own expert, Mr. Doddridge, agreed that 10% for overhead was a reasonable figure.   Mr. Doddridge also agreed that overhead is a direct cost borne by a contractor.

challenge that amount, his number proves that KDC (and therefore Kagan) acted reasonably toward the LLC (and therefore Filippov and Lipetsker).

Salmi also provided an opinion as to the fair and reasonable value of the work provided by ProEx. In order to do this analysis, he reviewed all of the ProEx proposals. He then correlated that work with the subcontractor bids and other items that went into his analysis as to the total project cost. After tallying the numbers attributable to work performed by ProEx, Salmi opined that the fair and reasonable value of the ProEx work was $489,550 per house, for a project total of **$979,100.** Salmi's opinion of the value of ProEx's work is, therefore, approximately $100,000 more than what ProEx actually charged and further validates its reasonableness.

The evidence by both sides' experts, established that the KDC (and ProEx) charges are fair and reasonable. The fairness of KDC's numbers cascades through the claims in this case. Plaintiffs' claims of fraud, breach of contract, violation of c. 93A, breach of fiduciary duty, aiding and abetting, and others all evaporate. On the other hand, defendants' claims solidify and mandate findings for defendants.

<ol type="iii">
<li style="list-style-type:none"><em>iii.     There is no Evidence of a Fixed Price Contract.</em></li>
</ol>

1.      With the numbers charged validated, plaintiffs stretch out of necessity to try to manufacture a promise to construct for something less than the reasonable charges. The record is devoid of such a promise. The Operating Agreement [Exh. 15] does not fix the cost of the Project and undercuts plaintiffs' claim. It does not purport to cap construction or even address construction costs. [SOF 103] If this was such an important term, given Filippov's extensive review and negotiation of the document, clearly the fixed price would have been expressly stated therein. Filippov's personal lawyer reviewed a draft of the Operating Agreement and he too provided no

34

verbiage to make clear that construction costs were capped at $1.3 million. Surely, any competent attorney would have insisted on making that number express if, in fact, there was such an agreement. Filippov's request to attach the spreadsheets as an addendum to the Operating Agreement, which was rejected, clearly shows that he understood that if the costs were fixed, he would need some express representation in the agreement as to cost. It also shows Kagan did not agree to be bound to a fixed number. Filippov tried to resuscitate the claim by contending that when Kagan agreed to build per the "plans and specifications" this was meant to broadly include the financial plans. This defies logic. Worcester Mut. Ins. Co. v. Marnell, 398 Mass. 240, 245 (1986) (contract not to be read to render terms superfluous). See also Jasty v. Wright Med. Tech., Inc., 528 F.3d 28, 36 (1st Cir. 2008) ("'[C]onstructions that render contract terms meaningless should be avoided.'") (quoting Summit Packaging Sys., Inc. v. Kenyon & Kenyon, 273 F.3d 9, 12-13 (1st Cir. 2001)). Attorney Maiden, the lawyer who drafted the Operating Agreement, directly contradicted Filippov's fabrication. [SOF 104]

Plaintiffs resort to trying to make the spreadsheet considered by the parties in October 2012, weeks before the Operating Agreement was signed, into a firm commitment by Kagan. Plaintiffs insist that that Kagan represented that he could complete the construction at a fixed price of $1.3 million, and claim that the $1.3 million figure in the Estimated Financials and Risk Analysis spreadsheet that was handed out at the October 2012 meeting [Exh. 9] confirm a fixed price. This claim barely passes the laugh test. The Excel spreadsheet is entitled "**Estimated** Financials and Risk Analysis." If this was not an "estimate", why is it so titled? Plaintiffs would have this Court rule that of the hundreds of numbers in that estimate which they concede are estimates, only the construction cost was fixed. At the time of the October 2012 meeting the parties did not even know what they were planning to build. It would have been virtually

impossible to estimate construction costs before the property was subdivided and the bank had

committed to any amount of funding such that Kagan could make any guess at what he could

build. [SOF 41-61] Other than Filippov's, Lipetsker's and Lipetsker's nephew's, Zhukovskiy,

self-serving testimony, there is absolutely no support for plaintiffs' incredible claim.[11]

Boris Maiden, an attorney and admitted friend of Lipetsker (though not of Kagan),

testified that there was never a guaranty to construct at a fixed price. [SOF 50] He certainly has

no incentive to lie – if anything, one would expect him to be adverse to Kagan. Attorney Maiden

was clear, though, that no guarantees were made to fix construction costs. Plaintiffs simply

cannot demonstrate a meeting of the minds sufficient to manufacture an agreement by Kagan to

construct the homes for $1.3 million each.

There is additional evidence that plaintiffs did not consider Kagan to be bound to a fixed

price. Some of this evidence can be found in the construction contracts. Filippov testified that

he signed the Classic Homes construction contract, after reading it to ensure it reflected the

parties' agreement. It is a "cost" contract, not a fixed price contract. [SOF 167-173] His claim

that this was a "sham" contract which he knowingly submitted to the bank is unavailing.

Committing bank fraud does not undo his testimony that he reviewed the Classic Homes contract

before execution to ensure that it was accurate. The KDC contract too, which was emailed to

Filippov, is also open ended. [SOF 174-183] Thus, neither sides' proffered contracts support

the contention that there was a fixed price agreement. One can argue about whether there was

agreement about the "plus" in the KDC contract, but there should be no question about the fact

that there was no cap on construction costs.

---

[11] Months after the Operating Agreement was signed, Filippov continued to refer to the spreadsheets as "estimates,"
which belies the characterization plaintiffs make now. [Exh. 31, 32] Filippov and Lipetsker both testified that they
understood everything in the column that included the construction budget was an estimate, yet, here we are.

When Filippov obtained the construction loans, he again represented, in writing, that the cost to construct was not fixed. The construction loan agreement signed by Filippov makes it clear that the loan amount, $1.6 million, is only 90% of the estimated construction costs. [Exh. 342] Filippov must be bound by the contracts that he signed. While he cavalierly admits to bank fraud in an attempt to explain away his signature, this does not excuse his transgressions. This Court should not suborn a crime to allow Filippov to get out from under the loan agreement he signed. If the deal was $1.3 million fixed price, why was Filippov representing to the bank in the loan documentation that the actual anticipated construction for each home amount was $1.760 million? (90% of the construction costs = $1.6 million). Filippov also reviewed the bank appraisal used to support the construction loan. It too had a construction estimate far greater than $1.3 million. The evidence is overwhelming that Filippov knew construction was not fixed at $1.3 million and, in fact, would be significantly more.

There is simply no contractual bar to KDC's being paid for its out-of-pocket costs to complete the Project. As set forth in KDC's proof of claim, as affirmed by Kagan, Gersh and documented in the proof of claim binders, the additional unreimbursed hard construction costs advanced by KDC were **$578,528.49**. [SOF 562-579] The LLC is responsible to pay KDC this sum.

> iv.    *There is no Credible Evidence that Carrying Costs Were Included in the Construction Loan Amount.*

Just as the construction costs were just estimates, so too were the carrying costs reflected in the spreadsheets the parties considered in October 2012. [Exh. 9] This is logical as carrying costs would be a function of how much was borrowed, how long the property remained unsold, the interest rate of the yet to be obtained loan, and all the other unknown costs beyond debt service, such as utilities, taxes, insurance and maintenance. Whatever the parties estimated them

37

to be, the Operating Agreement required Filippov to ensure that the construction loans that he

negotiated could be used to pay them. [Exh. 15, §4.1] This he failed to do, as Filippov admitted

that the loan documents prohibit using the loan proceeds to pay carrying costs. The loan

agreement itself, in multiple places, prohibited the use of the loan proceeds to pay carrying costs.

[Exh. 342] The loan commitment letter is also clear that the proceeds can only be used for

construction (not carrying) costs. The budget prepared by Kagan to support the allocation of the

$1.6 million loan proceeds, consistent with the prohibition in the commitment letter, has no line

item for carrying costs. [Exhs. 25, 27]

Plaintiffs claim that the LLC should not have any responsibility to pay things like

insurance, taxes, and debt service to the extent they exceed the construction loan proceeds; they

want Kagan alone to bear that responsibility, even though it was Filippov's duty to obtain loans

sufficient to pay them. Under both Massachusetts and federal law, "the in pari delicto doctrine

[applies] to those situations in which (i) the plaintiff, as compared to the defendant, bears at least

substantially equal responsibility for the wrong he seeks to redress and (ii) preclusion of the suit

would not interfere with the purposes of the underlying law or otherwise contravene the public

interest." Nisselson v. Lernout, 469 F.3d 143, 152 (1st Cir. 2006); Gray v. Evercore

Restructuring L.L.C., 544 F.3d 320, 324 (1st Cir. 2008) (same). Filippov's failure to secure a

loan covering the carrying costs make him at least equally responsible for the harm he alleges

(having to pay carrying costs) and denying Plaintiffs recovery against Kagan on these facts

would not offend the public interest to any degree.

Filippov relies on the bank fraud that he perpetrated to excuse his failure to comply with

his obligations under the Operating Agreement. That is not a proper defense and certainly not a

proper basis on which to award any affirmative relief. If, as Filippov claims, he was told by

Kagan that this was "normal," as the managing member and one with a fiduciary duty to the LLC and its members, Filippov should have refused to be party to the proposed fraud.  Instead, with open eyes (if one believes his story), he signed the loan documents and implemented the fraud. He can gain no benefit from his illegal activity.

The evidence shows that as early as April 2013, the LLC had insufficient money in its account to even cover debt service, let alone the other carrying costs required for the Project. Filippov made it clear that he would put in no additional money, and that unless Kagan put in the money, the Project would grind to a halt.  There are multiple texts and e-mails demanding that Kagan put in money. Even in plaintiffs' own QuickBooks accounting [Exh. 291], plaintiffs note multiple deposits totaling hundreds of thousands of dollars, which they described as "Kagan Carrying Costs".  [SOF 570] Plaintiffs never countered the evidence from Kagan and Gersh, consistent with the emails demanding deposits to pay carrying costs.  There were no other sources of funds after the construction loans were fully disbursed to pay carrying costs except for deposits from KDC.  The reality is that Kagan (through KDC) paid the carrying costs throughout the Project, ignorant of the fact that this was actually not his responsibility.  Filippov simply is trying gain a windfall.  As set forth in KDC's proof of claim, as affirmed by Gersh, the total unreimbursed carrying costs advanced were **$665,545.49**.  [SOF  562-579] The LLC should pay this amount.

**B.  *Despite their Bold Accusations, Plaintiffs Failed to Prove Any Fraud, Violation of c.93A, or Breach of Contract.***

i.  *There Is No Evidence of Fraudulent Billing.*

The predominant theme of plaintiffs' claims is that KDC and ProEx "cooked the books" and overcharged for their services.  The evidence simply is not there because there was no fraud. The opinions by both sides' experts validates the expenses charged and undermines any

suggestion of false billing.  Neither Filippov nor Lipetsker had any evidence, beyond their

unsubstantiated suspicions, that any of the charges contained in the proof of claim binders were

inflated or not actually incurred.  All they had was their self-professed outrage that they did not

know about "cost overruns" until after the Project had been complete.[12]  [SOF  384-396]

Contrary to their representation, plaintiffs' star witness, Brusenkova, had no knowledge

of malfeasance on the Lyman-Cutler project. She testified as follows:

> Q: So, you're certainly not in any position to determine whether
> ProEx charged too much or too little because you don't know
> exactly what they did; isn't that correct?
>
> A.  Yes. [p. 60:11-14]
>
>    ***
> Q: But you don't know that that [ProEx double billing] happened in
> the Lyman-Cutler project; isn't that correct?
>
> A: No … I don't know. [67:17-68:1]
>
> Q: Now, additionally, you were unable to identify any contractors
> who overcharged on the Lyman-Cutler project; isn't that correct?
>
> A: I don't know. [68:3-8]

[Brusenkova, Day 7]  At her deposition, which was read into the record, she could not recall any

specifics regarding financial malfeasance on the Project.

Most importantly, plaintiffs' own forensic accountant, Mr. Goldman, testified that despite

unfettered access to all of KDC's and ProEx's records, as well as the records for five other

projects, he could not opine that there was any fraud. [SOF 397-417]  He made it clear that the

supposed discrepancies he observed could just as easily be the product of incompetence.  If that

---

[12] Assuming, *arguendo*, that there is any truth to this surprise disclosure (which is also not supported by the
evidence), Filippov and Lipetsker did not pay the amounts invoiced over and above the construction loans and,
therefore, they have suffered no damage and cannot prevail on their affirmative claims.  This Court need look no
further in denying plaintiffs' claims.

were true, incompetence is not fraud or a violation of any duty.  See Leifker v. Leifker Grain,

LLC, No. 15-cv-37-jdp, 2017 U.S. Dist. LEXIS 46993, at *16 (W.D. Wis. Mar. 28, 2017)

("sloppy bookkeeping does not equate to … fraud and deception"); Ladd v. Equicredit Corp. of

Am., CIVIL ACTION NO. 00-2688 SECTION "N", 2001 U.S. Dist. LEXIS 14422, at *5 (E.D.

La. Sep. 6, 2001) (denying summary judgment where the court refused to equate sloppy

bookkeeping with fraud); B.T. Lazarus & Co. v. Alma Mktg., Inc., No. 89AP-1350, 1991 Ohio

App. LEXIS 2911, at *32 (Ct. App. June 13, 1991) (affirming trial court's ruling that "there was

no evidence of fraud" where "at best [the evidence] shows poor bookkeeping"); Scott v.

Anderson Newspapers, Inc., 477 N.E.2d 553, 563 (Ind. Ct. App. 1985) (noting that in case the

court "found no fraudulent acts, only sloppy bookkeeping.").

Defendants threw Mr. Goldman a softball when they asked if he could testify that, more

likely than not, there was fraud in the records.  Even with that relatively low bar, he declined to

take the bait.  All he offered were that the records were, in his opinion, unreliable.  While this

may be pertinent to plaintiffs' objection to KDC's proof of claim, it does nothing to advance

plaintiffs' affirmative claims.

On direct examination, Goldman testified:

> …My conclusion would be, again, that internal control was weak.
> There's not a lot of reliability to these numbers when – when its been
> testified that nobody knows what's in some of them and you can see
> it happening in the accounting records.  I – I'd say that the  -- the
> information generated from that system is not reliable.
>
> Q: So, I guess what I'm looking to elicit is, what's the alternative?
> If it's not fraud, then what is it?
>
> A:  **I – I see similar things that turn out to be just incompetence**.

[Goldman, Day 5, 82:11-20] [Emphasis added]

On cross-examination, Goldman reiterated that he had no evidence of fraud.  He testified:

Q: Mr. Goldman, before we go any further, let's just cut to the end. You haven't formed any opinion, have you, as to whether there was fraud on this project; isn't that correct?

A:  That's correct.

   ***

Q: You haven't formed any opinion as to the value of the work that was performed; isn't that correct?

A: Correct.

Q: And, in fact, your opinion, ultimately, was that this may be a product of gross incompetency, or it may be fraud; isn't that correct?

A: Yes.

Q:  And you are unable to say which one was more likely than not. You don't know; isn't that correct?

A:  No, I – I think they both lead to the same unreliability, but I can't say between the two.

Q: Okay, so in other words, your ultimate conclusion is you don't trust the records, but you don't know whether that's innocent, uninnocent, or – if that's a word – you just don't know.

A: Correct.  I have no opinion.

[Goldman, Day 5, 91:17-92:12-17]

Not only did Goldman refuse to opine as to whether there was fraud, he was unable to opine on whether materials had been commingled between projects.  He made no determination that there was any commingling of funds between the various Kagan entities.  He found no evidence of kickbacks.  Goldman was unable to identify any credits that had not been properly applied. He did no substantive investigation other than to note that he had questions about some of the QuickBooks entries and some of the invoices he reviewed.  His conclusions regarding the unreliability of the KDC documents was based not on any express finding of malfeasance, but

rather on the number of unanswered questions he had, yet he did not verify any of his concerns by consulting with plaintiffs' construction expert or contacting the subcontractors themselves. With respect to invoices about which he had questions, Goldman admitted that he did not conduct any analysis to determine whether the underlying charges on the invoice were proper or improper.

Having failed to establish a single fraudulent entry or any damage flowing therefrom, judgment must enter for the defendants on all claims based on fraudulent invoicing and record keeping. This finding permeates plaintiffs' claims of fraud, violation of c.93A, breach of contract, breach of fiduciary duty, aiding and abetting, conspiracy, and others.

### ii. Plaintiffs Failed to Prove Gersh and the Subcontractors Committed Fraud.

Plaintiffs were unable to support their bold claims of fraud because, simply put, there was no fraud. This Court heard from Dan Gersh, who assembled the proof of claim binders and testified regarding the efforts to substantiate every penny of construction costs. This Court would have to find Gersh to be a liar in order to find for plaintiffs, and there simply is no basis on which this Court to do so. Indeed, the overwhelming majority of the invoices, proposals, checks and payments were admitted into evidence without objection by plaintiffs. [Exh. 174] Plaintiffs made half-hearted objections to the records of two subcontractors, Unicon Electric and V&D Heating, but in the end, those objections were overruled and emphasized how weak Plaintiffs' contentions have been. [Exh. 175, 388, 389]

This Court met the six subcontractors who submitted invoices which Goldman chose to contest. Each testified without hesitation that their companies did the work, did not falsify any invoices, and did not receive any improper payments. None of the questions plaintiffs posed to the subcontractors had anything to do with their actual work or the amounts they charged.

43

Rather, plaintiffs focused their efforts on trying to establish that the subcontractor invoices were

inaccurate or altered, implicitly accepting that the work itself was done and the charge proper.

Even had there been no invoices, i.e. if all the work had been done on a handshake or if the

invoices had been created after the fact, defendants would still be entitled to recover the

reasonable cost of the work actually performed.  In addition to Kagan and Gersh, this Court

would have to find that all of the subcontractors were liars and in on the conspiracy in order of

find for plaintiffs.  There is nothing in the record to support such a conclusion.

Goldman's challenge was to the form of the subcontractors' invoices, not the underlying

charges. Plaintiffs forced defendants to parade each of the subcontractors into Court to explain

why Goldman's observations about the fonts, numbering, form or spelling on the invoices were

irrelevant.  Each subcontractor dismantled Goldman's criticism. For example, BST Plumbing

(Mr. Stanik) credibly explained why he sometimes use three-digit invoice numbers and

sometimes use four-digit ones, depending on whether the invoice was for service or material.

Décor Art (Mr. Porto), explained that differences in capitalization from one invoice to another

and misspellings mean nothing as the invoices are created manually using a word processing

program.  DaCosta Construction (Mr. Cordiero) explained that dates on invoices are filled in

manually and there is no significance in the format of his dates.  Much of Goldman's opinion

consisted of his faulting subcontractors, with whom he never communicated, for not following

textbook accounting procedures used by larger companies.  As the Court saw and heard, the

subcontractors are not sophisticated and own small companies without bookkeepers. None of

them were native English speakers. They prepare invoices and proposals by hand or on word

processing programs; they do not benefit from QuickBooks or other sophisticated tools or the

kinds of controls Goldman believes are essential.  The standard Goldman applied is simply from

a world these small subcontractors do not inhabit.  [SOF  437-469]

> iii.  *Kagan's Outside Accountant, Jason Gordon, Dismantled Goldman's Criticisms.*
>       *[SOF  418-435]*

KDC's and ProEx's outside accountant, Jason Gordon ("Gordon"), testified that, contrary

to Goldman's cursory allegations, KDC and ProEx follow reasonable bookkeeping and

accounting practices.   Gordon has no reason to believe that Kagan or his companies has engaged

in fraud. Gordon has extensive experience working with contractors and developers like KDC.

Based on Gordon's experience, the accounting issues that arise with respect to KDC and ProEx

are similar to the accounting issues that arise with the other contractors Gordon represents.  KDC

and ProEx each maintain completely separate general ledgers, which, as Gordon explained, are

the primary control recognized by accounting standards that allow companies like KDC and

ProEx to have assurance that all transactions are captured.  KDC and ProEx also reconcile their

records against their respective bank account statements and review the records from time to

time and at year end to ensure that everything is captured and nothing is double-counted.  KDC

and ProEx utilize double-entry bookkeeping, which means that everything entered into the

general ledger is classified so one can see the cash coming in and where it came from.  Every

movement of cash has a corresponding categorization.

As Gordon explained (and Goldman overlooked), KDC's and ProEx's business models

are not the same, which impacts how the two companies account for their financial activities.

KDC pays expenses for projects and then seeks reimbursement from the project owner.  KDC

typically pays expenses or bills with its credit card or by cash, aggregates those small charges,

and then invoices the project owner to be reimbursed for those expenses.  Thus, it is important

for KDC to track expenses through project specific bank accounts and AMEX cards.

ProEx, on the other hand, bills against a fixed price proposal, so it is not essential for ProEx to track costs by project in the same way as KDC does. Indeed, it would be impossible for ProEx to track costs by project because of the way its equipment is used. When Goldman, or plaintiffs, total up only those expenses ProEx happened to label as relating to the Lyman-Cutler project, they completely miss the fact that ProEx billed from a lump-sum proposal and had no reason to track each expense on a per project basis.

Goldman also misapprehended the adjustments made by ProEx to reflect the percentage of each project it has completed at certain points in time such as year-end. Because ProEx utilizes an accrual accounting method, ProEx recognizes revenue on its books based on the percentage of the project that is completed through a point in time. As an example, if ProEx completed 40% of a project by the end of a year, ProEx and S. Gordon Corporation make sure that at least 40% of the revenue is booked. This matches the economics of the situation – matching the revenue earned with the expenses paid in that year. This also makes sure that revenue and expenses are reflected in the proper year, as the IRS mandates. This is reflected in ProEx's general ledger. [Exh. 148, pg. 7] ProEx commonly enters invoices on the last day of each calendar year in an effort to true-up its accounting records to reflect the percentage of each project that was completed in that calendar year. Gordon testified there is nothing nefarious about this process and Goldman never connected this factoid with any actual fraud.

Goldman also improperly suggested that intercompany transfers between ProEx and KDC evidence a lack of proper internal controls. Gordon explained them as properly documented transfers of capital. As Gordon explained, ProEx and KDC sometimes engage in intercompany transfers, which, like most small businesses, involve the exchange of money back and forth to address one company's working capital needs. At year end, S. Gordon Corporation

inquires about intercompany transfers between ProEx and KDC to help the two companies

reconcile their respective accounts.  These intercompany transfers appear on each company's

general ledger, so there is a complete, transparent record of each transaction.  It would be

atypical for one company (KDC, for example) to generate an invoice to the other (ProEx, for

example) where, as here, you have two small businesses with similar ownership and the goal is

to manage working capital.  If one were trying to hide these transactions, one would not go to

such lengths to document and reconcile them.  Goldman simply blew this out of proportion in the

hopes the Court would confuse this with actual fraud.

While Plaintiffs and Goldman contend that Kagan "stashed profits" in ProEx, the

accounting records confirm this assertion is untrue.  As Gordon explained, between 2014 and

2016, ProEx earned aggregate profits of about a couple hundred thousand dollars.  For 2015,

ProEx is showing a profit of approximately $150,000, which assumes it is actually paid the

receivable of $532,763.41 for the Lyman Cutler Project.  If ProEx is not paid the receivable

owed for the Lyman-Cutler project, it will post a loss for 2015.  ProEx therefore is not a viable

vehicle for Kagan to "stash profits."  [Exh. 305]  Like plaintiffs' other claims, contending Kagan

committed fraud by hiring a subcontracting company he owns sounds good in theory, but there is

no substance to the theory.

### iv.  Joseph Cohen is a Red Herring.  [SOF 184-196]

Plaintiffs' theory of the case centers on Joseph Cohen ("Cohen"), but they never

connected him to any of the financial aspects of the Project. Cohen is a convicted felon. Neither

Kagan nor the plaintiffs knew this until Cohen gave his deposition in 2018. Kagan stopped using

Cohen when he learned that Cohen failed to disclose his criminal background.  No evidence

indicates that Cohen had any role whatsoever regarding the construction of the Project or the

prices charged by KDC or its subcontractors. There was no evidence that he was responsible for any of KDC's or ProEx's financial affairs, and each witness testified very clearly that Cohen had no involvement in them. Kagan and Gersh each testified that Cohen does not deal with the companies' QuickBooks files or reports, invoices, proposals, payments, or other financial documents. The companies' outside accountant, Gordon, confirmed that, based on his observation, Cohen had no involvement in the companies' finances. Cohen had no role creating the proof of claim binders.

When plaintiffs learned of Cohen's criminal background, they stood up and cheered. But, nothing ties Cohen to the issues in this case. Their attempt to ignore Filippov's own bank fraud is troublesome, the primary difference being that Fillipov did not get caught and the bank suffered no loss. Plaintiffs attempt to exaggerate Cohen's role, but Kagan and Gersh explained that Cohen does not have an office at KDC's office, does not have a key to the office, does not have access to QuickBooks or the financial records, and does not come into the office with any real frequency. Despite the role plaintiffs attempted to paint, Cohen is really a minor figure in this dispute. Plaintiffs' theme seems to be that Cohen was a bad guy and therefore Kagan is a bad guy too, as is Gersh and all the subcontractors who plaintiffs forced defendants to parade into Court. Cohen is simply a distraction and an attempt to infer bad acts where plaintiffs have utterly failed to find any.

    *v. The Other Projects are Irrelevant.  [SOF  470-483]*

Plaintiffs also diverted the Court's attention to four other projects, out of the thirty that KDC worked on, that they cherry picked and which had nothing at all to do with the Lyman-Cutler dispute. Not only is this not a representative sample, but several common themes emerged from these investors' testimony. First, each was a sophisticated person, many of whom

48

hold graduate degrees, with significant experience investing in real estate.  Not one of these

investors identified any fraud that occurred on their projects, even though they were each

provided with sufficient financial information to examine.  When costs were incurred above the

construction loans, Kagan and/or his company covered them in the first instance and took the

risk that the sale of the homes would be insufficient to reimburse for those additional expenses.

In other words, far from defrauding the investors, Kagan did not insist that they pony up

additional investment to cover expenses.  In one instance, Kagan actually covered the investor's

loss, and each of the other investors received a handsome return on investment.  There was no

connection between these other projects and this case before trial and Plaintiffs failed to make

any connection during trial.  The Court should disregard these other projects entirely.

### C.  *Plaintiffs Failed to Prove Kagan Breached a Fiduciary Duty*

> i.  *Plaintiffs Failed to Raise a Genuine Question of Fairness Regarding the KDC, ProEx and Century21 Contracts to Actually Shift the Burden to Kagan.*

Unable to carry their burden to prove fraud and deceptive conduct, plaintiffs resort to

trying to flip the burden of persuasion on to Kagan by repackaging the same fraud, breach of

contract, and c.93A claims as claims that he breached his fiduciary duties.  In order to shift the

burden of persuasion to Kagan, plaintiffs had to first raise a genuine of question of fairness,

which they did not do at trial.  Weinberger v. UOP, Inc., 457 A.2d 707, 711 (Del. 1983) ("The

Chancellor also held that even though the **ultimate** burden of proof is on the majority

shareholder to show by a preponderance of the evidence that the transaction is fair, **it is first the**

**burden of the plaintiff attacking the merger to demonstrate some basis for invoking the**

**fairness obligation**.") (emphasis added).  Other than their own unsubstantiated suspicions,

plaintiffs have nothing.  Plaintiffs own expert, Doddridge, opined that the price charged by KDC

was ultimately fair, so there is no basis on which to shift the ultimate burden of persuasion to

Kagan as to the KDC contract.[13]  In fact, Doddridge's opinion as to the cost of the construction is, almost to the penny, the same price as KDC actually charged.  Defendants' expert Salmi, testified that the costs incurred by KDC were even lower than he would have believed possible.  Given that there is virtually no evidence, from either side, that KDC has charged an unreasonable amount, the burden should not shift at all.

In the Loan Agreement, Filippov covenanted that the contract with the general contractor (KDC) was on "fair and reasonable terms and conditions substantially as favorable to the Borrower as would be obtainable by Borrower in a comparable arm's length transaction with an unaffiliated third party."  [Exh. 342, §5.17]  Unless Filippov wants to admit to bank fraud yet again, he should be estopped from even questioning the fairness of the underlying.

It would be illogical to require Kagan to prove the fairness of the two listing agreements because he was not on both sides of those transactions.  The other party to the listing agreements was Century21, an entity over which he exerted no control.  Kagan, therefore, should never have to bear the burden of proving the entire fairness of the listing agreements.  Jernberg v. Mann, 358 F.3d 131, 138 (1st Cir. 2004).  See also Bergeron v. Ridgewood Sec. Corp., 610 F. Supp. 2d 113, 136 n.10 (D. Mass. 2009) ("The plaintiff has the burden [to] … demonstrate that the Defendants "appeared on both sides of [a] transaction or derived a personal benefit from a transaction in the sense of self-dealing. If the plaintiff fails to meet this burden, the business judgment rule attaches to protect [the fiduciaries] and the decisions they make, and [the] courts will not second-guess these business judgments.").  The listing agreements are also not part of defendants' claim for

---

[13] As explained above, in addition to Doddridge's concessions, other evidence establishes that the price charged was fair, including Salmi's expert opinion, the subcontractors' testimony confirming the validity of their invoices/proposals, and the documentary evidence of hard costs incurred.

damages. They are not looking to enforce the listing agreements in this litigation.  The burden of persuasion simply can never shift to Kagan as to the listing agreement.[14]

As to the Century21 contracts, although claiming in their pleading that it too was not fair and reasonable, plaintiffs made no attempt to demonstrate that the listing agreements with Century21 were unfair to the LLC.  They offered no evidence at all to compare the signed listing agreements with terms the LLC would have garnered elsewhere.  Having failed to make the necessary threshold showing, the burden of persuasion should never shift to Kagan on plaintiffs' claims that he breached fiduciary duties and, to the extent that KDC needed to prove that the contracts were fair, it has done so.

### ii.  The KDC and ProEx Transactions Were Fair.

Even if Kagan is required to prove the entire fairness of the transaction between KDC and the LLC, Kagan has cleared that hurdle because the evidence clearly demonstrates that the amount KDC charged for its work was not only reasonable, but it was below market rate.  Courts take a holistic view of the fairness of a transaction and apply a flexible standard based on the particular facts at hand.  Demoulas v. Demoulas Super Markets, 424 Mass. 501, 529 (1997). See also Finnegan v. Baker, Nos. 121567, SUCV2009-03772-BLS1, 2012 Mass. Super. LEXIS 306, at *82-83 (Oct. 18, 2012) (applying Delaware law) ("Entire fairness is a flexible standard, 'requiring an examination of all aspects of the transaction to gain a sense of whether the deal in its entirety is fair.'"), (quoting, Kahn v. Lynch Commc'n Sys., Inc., 669 A.2d 79, 84 (Del. 1995)).  Courts consider both the procedural aspects of the transaction and whether the price was fair, but these two components are not viewed in isolation.  In other words, the fairness test "is not a bifurcated one as between fair dealing [ ] and price. All aspects of the issue must be

---

[14] Notably, Tatiana has not asserted a claim for the commission she would have earned, despite the fact that the fraud perpetrated on this Court by Plaintiffs led it to bar Century21 from sharing the commission with Tatiana.

examined as a whole since the question is one of entire fairness."). Weinberger v. Uop, 457 A.2d

701, 711 (Del. 1981); see also MAZ Partners LP v. Shear, 265 F. Supp. 3d 109, 114 (D. Mass.

2017).

Delaware courts (and Massachusetts courts) emphasize that a fair price "may be the

preponderant consideration outweighing all other features of the transaction." Finnegan, 2012

Mass. Super. LEXIS 306, at *83 (quoting Weinberger, 457 A.2d at 711); see also Ams. Mining

Corp. v. Theriault, 51 A.3d 1213, 1244 (Del. 2012) ("In a non-fraudulent transaction, price may

be the preponderant consideration outweighing other features of the merger. Evidence of fair

dealing has significant probative value to demonstrate the fairness of the price obtained. The

paramount consideration, however, is whether the price was a fair one."); Encite LLC v. Soni,

Civil Action No. 2476-VCG, 2011 Del. Ch. LEXIS 177, at *65 (Ch. Nov. 28, 2011) ("[W]hat

ultimately matters most is that the price was a fair one.").

As described above, the only reasonable conclusion that can be drawn from the evidence

is that the price KDC charged was fair.  The so-called predominate factor therefore goes to

Kagan.  The evidence is indisputable that there was never an agreement to undertake the Project

at a fixed price. The fact that both the Classic Homes contract and the KDC contract are open-

ended further confirms the parties' agreement. All parties went into this deal with their eyes wide

open.  At the time of contract execution, the parties knew that the construction would cost at

least $1.6 million plus an additional 10% since the RTC financing was only 90% of the total

cost. This means that Filippov knew that construction was likely to be, for each home, at least

$1.760 million. The parties also knew that there were no finish specs and discussed expansion of

the Project. KDC's final hard costs of $1,886,571 is only $126,571.50 (or 7%) higher than

originally anticipated. **Bringing in a multi-million-dollar project within 7% is undoubtedly reasonable**, as Doddridge himself confirmed.

Although ProEx has not asserted a direct claim as its claim is incorporated into KDC's, there can be no dispute that the amount ProEx charged for its services was also fair and reasonable.  As set forth above, Doddridge himself valued ProEx's work at more than ProEx actually charged.  Salmi too came up with a number slightly higher than ProEx's actual charge. If ProEx's number was truly "twice any conceivable charge" as alleged by plaintiffs, Doddridge would have had to have found that ProEx's number should have been no higher than $220,000 per home.  He also would have had to find that the total Project cost was significantly higher than he did, as a significantly inflated ProEx number would have increased the cost as a whole. He made neither finding.

If nothing else, the evidence presented supports only one conclusion – the price charged by KDC (and ProEx) was fair and reasonable.  This conclusion cascades throughout plaintiffs' claims, KDC's proof of claim, and defendants' claims.  In addition to undercutting plaintiffs' ability to prove essential elements of their claims, that KDC charged a fair price means plaintiffs have suffered no damages (except for the self-inflicted ones).  For this additional reason, it would be unjustified to award plaintiffs any monetary relief on the affirmative claims in their Adversary Complaint.  But, even if the Kagan failed to formally present the KDC contract to the other members, which is denied, he prevails because the price set in the KDC contract was fair to the LLC at the time the contract was signed.  Genesis Tech. & Fin., Inc. v. Cast Navigation, LLC, 74 Mass. App. Ct. 203, 211 n.15 (2009).  In other words, a deficiency of procedural fairness is not in itself fatal.  Therefore Kagan has carried his burden to prove the fairness of the transaction and that he did not breach his fiduciary duty.

The evidence nevertheless shows that the KDC contract was procedurally fair to the LLC because the disinterested members had actual knowledge of the KDC contract and never complained about it.  Filippov's claim that he was unaware of the KDC contract does not pass muster.  The evidence is clear that Filippov was given a copy of that agreement. [Exh. 215]  He received copies of the ProEx proposals.  Lipetsker submitted an affidavit attesting to the fact that the parties contracted with KDC, and plaintiffs pled in their adversary complaint that they had a contract with KDC and even recited some of its terms.  This Court also saw an e-mail from Attorney Maiden [Exh. 187], before the Operating Agreement was even signed, advising Filippov that the LLC needed to have a signed contract with KDC.  Thereafter, Filippov received copies of multiple checks written to KDC and testified that he saw the KDC construction sign on the construction fence.  Against this background, Filippov's self-serving testimony that he knew nothing about the KDC contract is simply not credible.  He knew all about it, or intentionally buried his head in the sand, so he could profess ignorance in an attempt to get the LLC out from under its financial obligations so as to increase his own personal profit.[15]

Because Filippov and Lipetsker were aware of both the KDC contract and did not complain about it until the conclusion of the Project, they cannot recover on their claim for breach of fiduciary duty.  Liston v. Gottsegen, 348 F.3d 294, 305 (1st Cir. 2003) (in small LLCs, less likely that there are "disinterested shareholders" so members' actual knowledge precludes claim against acting member); ADA Sols., Inc. v. Meadors, 98 F. Supp. 3d 240, 265 (D. Mass. 2015) (there can be no breach of fiduciary duty if "the principal … authorize[d] or acquiesce in the arrangement.") rev'd in part on other grounds by 665 Fed. Appx. 3 (1st Cir. 2016).

[15] Similarly, Defendants have established that the ProEx contract was fair and reasonable.  Kagan testified that he gave copies of the proposals to Filippov and Lipetsker.  The evidence showed that as he made payments to ProEx, Kagan made sure that copies of the checks were sent to Filippov.  If Filippov knew nothing about the ProEx contract, why did he not question the payments to ProEx?

54

### iii.  The Listing Agreements Were Fair.  [SOF  282-301]

If Kagan is required to demonstrate the fairness of the listing agreements between the

Debtor and Century21, the evidence supports such a conclusion.  The record shows that when the

Trustee sold the two properties, he paid the same commission rate as the Debtor would have paid

under the Century21 listing agreements.  As such, the "price" in the Century21 listing

agreements were unquestionably fair.

Although plaintiffs pled that they were in the dark as to the listing agreements, the

evidence shows they had actual knowledge of the terms.  In other words, the process under

which the listing agreements were signed was fundamentally fair to the Debtor because the

disinterested members (Filippov, principally), had actual knowledge and voiced no objection

whatsoever.  Filippov eventually exercised his right to terminate the listing agreements, took

control of the listings, and the properties were sold.  There is no path on which plaintiffs can

recover for breach of fiduciary duty against Kagan for the Century21 listing agreements.

The Operating Agreement expressly authorized signing of the listing agreements with

Tatiana's firm, so there can be no viable claim for breach of fiduciary duty.  Homeowner's

Rehab, Inc. v. Related Corp. V SLP, L.P., 479 Mass. 741, 763, (2018) (Where "the contours of

fiduciary duties are defined with reference to the terms of the contract, there can be no claim for

a breach of fiduciary duty where a partner's 'contested action falls entirely within the scope of a

contract' between the partners." (quoting Fronk v. Fowler, 456 Mass. 317, 331-332 (2010)).

Thus, even if Kagan is required to prove the fairness of the listing agreements, he has done so.

### D.  Plaintiffs Offer No Evidence to Support their Claims Against Tatiana Kagan.

 Plaintiffs asserted four claims against Tatiana, but carried their burden as to none.  They

allege that Tatiana aided and abetted Kagan's breaches of fiduciary duty (Count III), committed

fraud (Count V), engaged in a conspiracy (Count VIII), and violated M.G.L. c. 93A (Count IX).

Plaintiffs have failed to prove that Kagan breached a fiduciary duty, so it follows that Tatiana

cannot be liable for aiding and abetting a breach that did not happen. Gatof v. Northland Inv.

Corp., 32 Mass. L. Rep. 468, *8 (2014) (where agreement precluded "claim for breach of

fiduciary duty [defendants were] "entitled to judgment as a matter of law on the aiding and

abetting breach of fiduciary duty claim … because [plaintiff] will be unable to prove a breach of

fiduciary duty occurred.").

Even if Kagan breached a fiduciary duty, plaintiffs presented no evidence that Tatiana

assisted him in any fashion, and so she cannot possibly be liable to plaintiffs. Spinner v. Nutt,

417 Mass. 549, 556 (1994) (claim for aiding and abetting breach of fiduciary duty fails if the

plaintiffs cannot "show that the defendant knew of the breach and actively participated in it such

that he or she could not reasonably be held to have acted in good faith."). She was not involved

in the Operating Agreement, the pre-project meetings, the construction, or the finances of the

Project. Tatiana's only role was to list the properties for sale. Filippov testified, and the records

establish, that he knew of the listing agreements and their details but did not object. Filippov

admitted that he never inquired as to Tatiana's marketing efforts and there was no evidence that

her efforts were substandard or caused the properties not to sell. Contrary to plaintiffs' bold

pronouncements, the Operating Agreement did not prohibit a listing extending beyond December

31, 2014; it merely allowed Filippov to terminate it after that date, a right he exercised.

Plaintiffs have offered no evidence to warrant piercing any corporate veil or to otherwise

making Tatiana individually responsible for the corporations' actions. The evidence in the

record shows that Tatiana did not exert control or direct any company to defraud plaintiffs.

Indeed, there is no evidence she was an active participant in any of the alleged corporate torts, so

she cannot be individually liable. Cash Energy, Inc. v. Weiner, 768 F. Supp. 892, 895 (D. Mass.

1991) ("Traditional principles of corporate law preclude individual liability unless grounds are

shown either for piercing the corporate veil or finding active personal involvement in a tortious

act."). And, as stated above, plaintiffs have not offered any evidence of damages suffered as

result of a fraudulent act, let alone one perpetrated by Tatiana.

The same dearth of evidence mandates a judgment for Tatiana with respect to Counts VIII

(for conspiracy) and IX (for violation of M.G.L. c. 93A). Plaintiffs have failed to connect

Tatiana to any plan or scheme to harm them, that she was an active participant in any wrongful

conduct, and she cannot be found personally liable for the claims asserted in this case. Aetna

Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546, 1564 (1st Cir. 1994) (To prove a civil

conspiracy, plaintiffs must prove "a common design or an agreement, although not necessarily

express, between two or more persons to do a wrongful act and, second, proof of some tortious

act in furtherance of the agreement."). Similarly, plaintiffs have not identified any unfair or

deceptive act undertaken by Tatiana herself and prohibited by c. 93A, so that claim should be

denied. See S. Shore Hellenic Church, Inc. v. Artech Church Interiors, Inc., 183 F. Supp. 3d 197,

222 (D. Mass. 2016) (An individual's status as a corporate officer is not in itself enough to create

personal liability under c. 93A when the corporation may be liable.). Judgment should enter for

Tatiana on all claims against her.

### E. Plaintiffs Suffered No Damages. [SOF 592-595]

Even if plaintiffs carried their burden on the essential elements of the claims, they failed

to introduce any evidence from which this Court could ascertain specific damages. Shaulis v.

Nordstrom, Inc., 865 F.3d 1, 15 (1st Cir. 2017) ("[U]nder Massachusetts law, a claim for

fraudulent misrepresentation requires a pecuniary loss."); Productora Importadora de Papel, S.A.

de C.V. v. Fleming, 376 Mass. 826, 838 (1978) (stating that, in deceit action, benefit of bargain damages could be awarded "if such damages are reasonably proved,") (quoting Goldman v. Mahony, 354 Mass. 705, 709, 242 N.E.2d 405 (1968))); Bruno v. Restuccia, No. 01-4906-C, 2005 Mass. Super. LEXIS 93, at *32-33 (Feb. 28, 2005).

Plaintiffs also never presented any evidence to support Filippov's theory that his money was worth a return of 5%; they testified that there was no guaranteed rate of return, they never introduced documents or testimony to show that if they invested his money in a project other than Lyman-Cutler, that they would have received such a return.  There was no expert testimony as to how much Plaintiffs could have made had they invested their money differently.  There is absolutely no basis upon which such a recovery can be made.

The only evidence presented by plaintiffs even remotely related to damages was from their real estate expert, Hugh Morgan Fennell ("Fennell").  [SOF 552-561]  But, even Fennell offered no opinion linking what he perceived to be a loss of value to any conduct by defendants. All he could say was "something must have happened."  The fact is that the homes were previously marketed for $5.1 million, the amount Fennell claimed they were worth, and did not sell.  This renders unreliable Fennell's academic, predictive exercise.  Filippov represented to the Court that after he consulted with two real estate agents, and a developer, he determined that each of the homes was worth $4.5 million [Exh. 287], and he did not object when the Trustee listed the properties for $4.5 million and agreed to sell them for $4.4 million because he wanted the properties to sell quickly so he no longer would have to pay carrying costs.  Moreover, even had there been a loss chargeable to defendants, which is not the case, only a portion of the loss would inure to plaintiffs, notwithstanding that they seek to recover the whole, because Kagan is entitled to 50% of the net proceeds for the sale. So, if there was a loss of value somehow

chargeable to defendants, plaintiffs only get 50% of that loss as damages. The fact that the loss, if any, was never attributed to defendants means there can be no recovery.

## IV.
## DEFENDANTS PREVAIL ON THEIR CLAIMS

### A. *KDC's Proof of Claim.*

### i. *KDC's Proof of Claim Carries a Presumption of Validity.*

Plaintiffs never carried their burden of coming forward with substantial evidence to overcome the presumption that KDC's proof of claim is valid. Bankruptcy Rule 3001(f) states: "A proof of claim executed and filed in accordance with these rules shall constitute prima facie evidence of the validity and the amount of the claim." Fed. R. Bankr. P. 3001(f). If a party-in-interest objects to a proof of claim, that party bears "the initial burden of producing **substantial evidence**" to overcome the presumption of validity to which a properly executed proof of claim is otherwise entitled. Juniper Dev. Group v. Kahn (In re Hemingway Transp. Inc.), 993 F.2d 915, 925 (1st Cir. 1993) (emphasis added). Only if the objector meets its burden of providing **substantial** evidence, does the burden shift back to the claim-filing creditor. Id. As explained throughout this brief, plaintiffs themselves introduced expert testimony corroborating the amount KDC charged. They otherwise mounted no credible challenge to the charges incurred.

When the claim involves a fiduciary, the presumed validity of KDC's proof of claim does not change. The court in In re Americana Apparel, Inc., 55 B.R. 160 (E.D. Pa. 1985) stated:

> … requiring a claimant who is a fiduciary to a corporation, to prove the good faith and inherent fairness of his transactions with the corporation, does not apply until the objecting party overcomes the prima facie effect of the claim. Absent such a requirement, an intolerable burden would be placed on corporate fiduciaries, requiring them to prove the good faith and fairness of each of their dealings with the corporation.

59

Id. at 162 (citing, In re Mobil Steel Co., 563 F.2d 692, 701 (5th Cir. 1977)).  See Matter of

Multiponics, 622 F.2d 709, 714 (5th Cir. 1980)("This proof allocation provides a proper balance

of burdens, assuring that the trustee does not underprove his objections while, at the same time,

assuring that the fiduciary need not overprove his good faith and fairness at the mere cry of

inequity by the trustee."); In the Matter of Lemco Gypsum, Inc., 108 B.R. 831, 834 (S.D. Ga.

1988)("Where the claimant is an insider or fiduciary, the [objecting party] bear the burden of

presenting material evidence of unfair conduct"), citing, In re N&D Properties, Inc., 799 F.2d

726, 731 (11th Cir. 1986); In re Missionary Baptist Foundation of America, Inc., 48 B.R. 885,

887 (N.D. Tex. 1985)("While a claim arising out of dealings between the debtor and its fiduciary

must be rigorously scrutinized by the courts, the claim still enjoys *prima facie* validity.").

Because plaintiffs ultimately failed to come forward with "substantial evidence" KDC's proof of

claim is entitled to a presumption of validity, which also supports the conclusion that KDC's

proof of claim for $2,396,914.66 (plus interest) should be approved.

>        ii.     *KDC Proved the Amounts Owed.*

In contrast to plaintiffs and their failing to substantiate their affirmative claims, KDC has

demonstrated its right to recover against the Debtor for the amount incurred by KDC to complete

this project, as summarized in its Proof of Claim.  Exhibits 174 and 175 and the remaining

invoices introduced at trial establish the hard construction costs incurred on the Project.  Gersh

affirmed the total amount owed after checking and rechecking the back-up invoices and

QuickBooks entries.  Plaintiffs mounted no serious challenge to any of these costs and their own

expert, Doddridge, affirmed that they are reasonable.  The summary of payments to KDC offered

through Mr. Hartzell, plaintiffs' counsel's paralegal, representing his analysis of the handwriting

on checks, as memorialized in the summary Exhibits 1-6, is inherently unreliable.  Rather than

work backwards from the proof of claim binders to see if all of the charges were incurred, Mr.

Hartzell worked from the bank statements and checks, attempting to discern from handwriting

which expenses related to the Lyman-Cutler project. [SOF 580-584] As explained above, doing

so for ProEx's work is pointless. Gersh's testimony and the documents themselves are far more

reliable proof of the cost of the project.

Then proof of claim binders which include Exhibits 174, 175, 326, 327, 328, 329, and 330

detail the hard construction costs. Plaintiffs never mounted a serious challenge to the invoices,

proposals and receipts reflecting the hard construction costs. Nor did plaintiffs successfully

challenge the carrying costs KDC paid. All they did was raise unsubstantiated (but answerable)

questions about a small universe of subcontractor invoices which led Goldman to conclude that

the support for KDC's proof of claim was "unreliable." Goldman's few specific questions were

answered at trial, frequently by the subcontractors themselves who Goldman indirectly claimed

were in on the fraudulent scheme.

Salmi testified that, based on actual bids, the total hard construction costs for the two

homes should have been $5,869,828, or an average of $2,934,914 per home. The fact that KDC

brought the Project in considerably lower underscores the reasonableness of the KDC agreement.

Plaintiffs focused a considerable amount of its cross-examination of Salmi and direct

examination of Doddridge unsuccessfully trying to discredit Salmi's numbers and methodology.

They spent no time, and there is no evidence, undercutting KDC's actual numbers. Salmi's

opinion of value still is greater than KDC's construction charges even with soft costs included.

This too leads to the only conclusion that there was nothing unfair about KDC's contract.

Moreover, as to the soft costs that KDC was permitted to charge under its construction

contract, Kagan testified that although KDC's standard contract contains these charges, KDC

typically waives them.  Only after he was sued did he decide not to waive these soft costs.  Even

with all these soft costs added in, Salmi's number still came in higher than KDC's.  Doddridge

provided no testimony whatsoever that giving a contractor the option to add on soft costs was

improper or even atypical.  His entire focus was aimed at rebutting Salmi's calculation of hard

costs rather than any challenge to KDC's soft costs.  This leaves the record devoid of anything to

rebut Salmi's opinion that the total amount charged by KDC was fair and reasonable.

### B.  Plaintiffs' Breach of Contract and the Covenant of Good Faith and Fair Dealing.

#### i.    The Debtor's Breach of the KDC Contract.

The evidence reveals that Kagan and KDC have also prevailed on their other affirmative

claims. KDC prevails on its claim that the Debtor breached the parties' contract, for the same

reasons described with respect to why it is entitled to recover under KDC's proof of claim.  KDC

did the work and deserves to be paid. It fronted carrying costs for which it deserves

reimbursement. KDC also prevails on its accompanying claim that the Debtor violated the

covenant of good faith and fair dealing implied in that contract.  The Debtor has abused its

discretion to avoid paying what is otherwise due under the contract and acted to deprive KDC of

the benefits of that agreement.  This conduct constitutes a violation of the covenant.  See Liss v.

Studney, 450 Mass. 473 (2008) (the purpose of the implied covenant of good faith and fair

dealing is to ensure that neither party deprives the other of the fruits of the contract.).

#### ii.   Filippov's and Lipetsker's Breach of the Operating Agreement.

Filippov and Lipetsker also breached express promises contained in the Operating

Agreement and their implied duties imposed on them as a result of the implied covenant of good

faith and fair dealing.  Filippov promised in §8.1 of the Operating Agreement [Exh. 15] to pay

carrying costs, if Kagan did not do so.  Filippov took drastic measures to avoid this obligation,

62

including needlessly throwing the company into bankruptcy when it was not insolvent.  Filippov

also promised to obtain construction loans that covered the carrying costs, which he admits he

failed to do.  KDC was then forced to pay them for many months.  The remedy for this is clearly

to reimburse KDC for these amounts with interest at the statutory rate.  Any administrative costs

incurred due to the improper bankruptcy should be charged to Filippov and Lipetsker.  Filippov

and Lipetsker breached their promises to pay Kagan the net proceeds from the sale of the homes

and caused the LLC to refuse its obligation to indemnify those entitled to indemnification under

the Operating Agreement, which will be remedied through other parts of this matter.

### C. In the Alternative, KDC Prevails on its Equitable Claims of Unjust Enrichment and Quantum Meruit.

Even if the KDC contract was somehow deemed invalid, equity demands that KDC be

paid for the fair value of the services it provided as KDC easily carried its burden on its claims

for unjust enrichment and quantum meruit.  Dialogo, LLC v. Bauza, 456 F. Supp. 2d 219, 227

(D. Mass. 2006) ("To satisfy the elements of unjust enrichment, a plaintiff must show: (1) an

enrichment; (2) an impoverishment; (3) a relation between the enrichment and the

impoverishment; (4) an absence of justification and (5) the absence of a remedy provided by

law."), citing, Massachusetts v. Mylan Labs., 357 F. Supp. 2d 314, 324 (D. Mass. 2005)); Patel

v. Emerald P'ship, Ltd., Nos. 106604, 00-1033-H, 2009 Mass. Super. LEXIS 94, at *68-69 (Apr.

9, 2009); Broderick v. Lynch, 87 Mass. App. Ct. 1137 (2015) ("In order to recover on a theory of

quantum meruit, the plaintiff must prove the following three elements: "(1) that [she] conferred a

measurable benefit upon the defendant[]; (2) that the claimant reasonably expected compensation

from the defendant[]; and (3) that the defendant[] accepted the benefit with the knowledge,

actual or chargeable, of the claimant's reasonable expectation.").  Although Salmi's opinion

establishes that the value of KDC's work is actually higher than the amount invoiced in the first

instance, KDC seeks as compensation only the amount it invoiced, which Doddridge too found

were reasonable.

The soft costs owed to KDC above its hard construction costs are determined by

multiplying the percentages set forth in the KDC contract against the hard costs to construct.

Filippov had the KDC contract in his possession long before the construction even started.  [SOF

181] Plaintiffs neither disproved the numbers on which the percentages were based nor

challenged the mathematical operation required to apply those percentages.

### D.  Defendants Prevail on their Indemnity Claims.  [SOF  580-587]

Kagan, Tatiana, KDC and ProEx are each entitled to indemnification from the Debtor as

to the claims asserted against them pursuant to the plain language of the Operating Agreement.

Section 10.2 of the Operating Agreement [Exh. 15] provides:

> The Company shall indemnity…the Members and their respective
> employees and authorized agents from and against any loss, damage
> or claim by incurred by reason of any act or omission performed or
> omitted…in good faith on behalf of the Company and reasonable,
> believed to be within the scope of authority conferred by this
> Agreement.

The only carve out is for losses suffered as a result of the indemnitee's "gross negligence or

willful misconduct."  As written, the indemnity provision covers losses suffered by members and

their agents even if the indemnitees are themselves negligent.  Shea v. Bay State Gas Co., 418

N.E.2d 597, 600 (Mass. 1981) (contracts of indemnity are not strictly construed but are to be

fairly and reasonably construed in order to ascertain the intention of the parties and to effectuate

the purpose sought to be accomplished.) (quotation omitted).

Kagan is a member and acted within the authority of the agreement to build the Project,

sign the listing agreements, and work to further the Project. There has been absolutely no

showing that he did anything wrong. At worst, his record keeping was not what larger, more

sophisticated companies do, but that does not preclude him from claiming indemnity as he clearly acted in good faith and there is no showing of gross negligence or willful misconduct which are the only carve-outs from Section 10.2.

Plaintiffs' whole case is premised on the allegation that ProEx and KDC are agents of a member, Kagan, so they too are entitled to indemnity. No evidence has been presented to support a finding of malfeasance by KDC or ProEx. As to Tatiana, as the broker and authorized agent of the LLC, she too is covered. Plaintiffs never mounted any serious claims that she did anything wrong, so she suffered losses through no fault of her own. Accordingly, this Court should set a hearing to assess damages under indemnity provisions of the Operating Agreement.

### E. Plaintiffs Froze out Kagan, Depriving Him of the Benefits of Ownership. [SOF 322, 326-332, 347-348, 350-360]

Feeling unconstrained to follow rules, Filippov, with the assistance or acquiescence of Lipetsker, made self-serving decisions to the detriment of the LLC and Kagan. Filippov and Lipetsker owed fiduciary duties to both and they breached them out of their own self-interest. They commenced the state court litigation without consulting Kagan and utilized company funds to pay for it. Filippov and Lipetsker placed the LLC into bankruptcy to avoid the dissolution date set in the Operating Agreement and to protect Filippov from having his personal guaranty called and from having to dip into his personal funds to pay carrying costs. The decision to place the LLC into bankruptcy benefitted Filippov alone and oppressed the minority member, Kagan. In the sham members' meeting, they voted as a block against Kagan and refused to discuss many of his concerns. [Exhs. 282, 283] Butler, 2015 U.S. Dist. LEXIS 39416, at *174 ("Majority shareholders are forbidden from taking actions that oppress or disadvantage minority stockholders, often called 'freeze-outs.'"); see also Pavlidis v. New England Patriots Football Club, Inc., 675 F. Supp. 688, 695 (D. Mass. 1986) ("The Supreme Judicial Court [in Coggins]

held that where a corporate freeze-out is carried out for no legitimate corporate purpose and

solely for the selfish interest of the directors and majority stockholders at the expense of the

minority, there is an actionable breach of fiduciary duty.").

Plaintiffs had a legal obligation to confer with Kagan, even if they predicted he would

vote contrary to the result they preferred. Brodie v. Jordan, 447 Mass. 866 (2006) (defendants

interfered with the plaintiff's reasonable expectations by excluding her from corporate decision-

making and denying her access to company information); see also Bair v. Purcell, 500 F. Supp.

2d 468, 484 (M.D. Pa. 2007) (A majority shareholder may not use the corporate process to deny

minority shareholders the right to participate in the corporation.); Orchard v. Covelli, 590 F.

Supp. 1548, 1557 (W.D. Pa. 1984) (failure to hold meetings and excluding the minority from a

meaningful role in the corporate decision-making are some of the recognized freeze out tactics).

If they called a meeting and allowed Kagan to participate in decision-making, Kagan might have

been able to demonstrate to Plaintiffs why initiating litigation or filing for bankruptcy was so

unwise. Filippov's and Lipetsker's failure to confer with Kagan is itself actionable.

Filippov and Lipetsker made a host of other decisions without consulting their partner,

Kagan, including granting Filippov a mortgage to secure his interests, hiring legal counsel, and

using company funds to pay legal counsel. As Filippov aptly states, he could do whatever he

wants as manager of the company: "As a –manager, I can do whatever I want, basically."

[Filippov, Day 2 153:16-154:1]  This is the epitome of a freeze out, having successfully deprived

Kagan of the benefits of ownership and participation in the company.

### F. *Filippov and Lipetsker Breached their Fiduciary Duties to Kagan.*

As members in the LLC, Filippov and Lipetsker owed fiduciary duties to their partner,

Kagan, such as the duty of loyalty. Allison v. Eriksson, 479 Mass. 626, 635 (2018).  Filippov

was also the managing member and owes fiduciary duties from this position. The evidence

shows that Filippov and Lipetsker breached those duties to Kagan by, among other things, falsely

accusing Kagan of fraud when they had no basis at all to do so, refusing to lower the sale prices

for the homes when Kagan requested, refusing to pay carrying costs (even though the Operating

Agreement expressly obligated Filippov to do so), directing the LLC to neglect its payment

obligations to KDC refusing to indemnify, and avoiding the dissolution date set in the Operating

Agreement.

Filippov also engaged in a series of self-dealing transactions, so he bears the ultimate

burden of proving they were entirely fair to the LLC.  Filippov was on both sides of the

transaction that resulted in the mortgage from the LLC to Filippov, created the same day

Filippov placed the company into bankruptcy, that provided him with personal security in the

LLC's assets.  Patel v. Emerald P'ship, Ltd., Nos. 106604, 00-1033-H, 2009 Mass. Super.

LEXIS 94, at *60 (Apr. 9, 2009) (If a fiduciary does engage in self-dealing, then the fiduciary

bears to burden to show that "the consideration [paid] … was fair…").  Filippov made no effort

to attempt to carry this burden.  The mortgage was fundamentally unfair because it encumbered

the LLC's properties for no reason, thereby damaging Kagan's interests in the remaining assets.

A breach of fiduciary duty by a self-dealing actor is, at its base, an equitable claim

empowering this Court to fashion appropriate equitable relief, even if a remedy at law is

available.  MAZ Partners LP v. Shear (In re PHC, Inc. S'holder Litig.), 894 F.3d 419, 435 (1st

Cir. 2018).  Within this remedial realm, it is standard fare for a court to fashion remedies that

deny a breaching fiduciary undue gain or advantage received by virtue of his position. Id. (citing

Chelsea Indus., Inc. v. Gaffney, 389 Mass. 1 (1983); Sagalyn, 195 N.E. at 771; Geller, 674

N.E.2d at 1337; see also Haseotes v. Cumberland Farms, Inc. (In re Cumberland Farms, Inc.), 284 F.3d 216, 229 (1st Cir. 2002) (applying Massachusetts law)).

###### G. *Filippov and Lipetsker Engaged in a Conspiracy.*

Finally, the evidence shows that Filippov and Lipetsker acted in close unison to cause harm to defendants.  They plotted together and helped each other commit their wrongdoings.  They used their collective membership interests to oppress Kagan and therefore engaged in what the First Circuit referred to as the "coercive type" of conspiracy.  Cruickshank v. Dixon (In re Blast Fitness Grp., LLC), 602 B.R. 208, 228 (Bankr. D. Mass. 2019) ("'[i]n order to state a claim of [this type of] civil conspiracy, plaintiff must allege that defendants, acting in unison, had some peculiar power of coercion over plaintiff that they would not have had if they had been acting independently.'") (quoting Aetna Cas. Sur. Co. v. P & B Autobody, 43 F.3d 1546 (1st Cir. 1994)).  They also engaged in the more common form of civil conspiracy, which involves a common design or agreement between two or more people to commit a wrongful act.  Cruickshank, 602 B.R. at 228.  As Filippov and Lipetsker acted in concert to harm defendants, they are each jointly and severally liable for any damages awarded.  Id., *citing*, Kadar Corp. v. Milbury, 549 F.2d 230, 234 (1st Cir. 1977)).

### V.
### DAMAGES

The monies held by the Trustee comes from two sources: $3,421,231.11 are the proceeds from the sale of the properties, and $107,492.32 was the money that was in the account when the Trustee was appointed.   With respect to the disbursement of the proceeds of the sale of the properties, defendants ask this Court to disburse those funds as follows:

#### A.  Plaintiffs' Affirmative Claims for Damages

Plaintiffs are not entitled to any recovery on their claims for damages from defendants as they have not proven that they suffered any damages or any cognizable injury.

**B.  Defendants' Affirmative Claims for Damages**

As co-conspirators, Filippov and Lipetsker are jointly and severally liable for any damages awarded to defendants.  To the extent any portion of the net proceeds of the sale of the properties may be allocated to Filippov and Lipetsker, as discussed below, those sums shall be used to pay the sums owed to defendants.  To the extent there is a shortfall after using the net proceeds of the sale of the properties, Filippov and Lipetsker are ordered, jointly and severally, to pay those sums.

**C.  KDC is Entitled to Recover for the Cost of Construction, Carrying Costs, and Other Damages.**

KDC's claims are stated in Claim Nos. 1 and 4, and largely restated in its counterclaims. The Court should award KDC: (a) **$578,528.49** for unreimbursed construction costs; and (b) **$665,545.49** for unreimbursed carrying costs.  This is a total award to KDC of **$1,244,073.98**.

KDC should also be awarded the additional costs due to it under the KDC contract. [Exh. 37].  These costs are: (a) **$25,000.00** for Design Fee per Section 7.1.1of the KDC contract; (b) General Contractor Fee of 15% per §7.1.2 of the KDC contract of **$565,971.52**; (c) **$59,250.00** as overhead per Section 7.3.2.5 of the KDC Contract; (d) **$127,562.89** in fees for advancing carrying costs per Section 7.1.3 of the KDC contract; (d) **$141,191.25** as administrative fees and expenses. This adds up to an additional **$918,975.66**, bringing the total damage award to **$2,163,049.64**, to which interest must be applied by this Court from the date suit was first filed in June 2015 plus costs.

### D.  Indemnity

Each of the defendants have established their entitlement to indemnity under Section 10.2 of the Operating Agreement.  A hearing is to be scheduled to determine the amount of attorneys' fees and costs to be recovered.  This corresponds to Claims 4, 5, 6 and 7 and are also restated in defendants' counterclaims.

### E.  Distribution of the Net Proceeds from the Sale of the Properties

After the amounts due to the LLC's creditors is established, the remaining assets are to be distributed in accordance with Sections 8.1 and 9.2 of the Operating Agreement.  Section 8.1 allocates 50% of the net proceeds from the sale of the properties to Kagan.  If none of the creditors made any recovery and there are no other deductions from the bankruptcy estate, Kagan's allocation under Section 8.1 would be 50% of $3,421,231.11, or **$1,710,615.55**. Filippov would be allocated 40% of the net proceeds, or $1,368,492.44, and Lipetsker would be awarded 10% of the net proceeds, or $342,123.11.  As to the monies in the account which were not part of the net proceeds from the sale, $107,492.32 [SOF 602], Kagan would get 10%, Filippov 80% and Lipetsker 10%.

### F.  Plaintiffs' Proofs of Claim

1.    <u>Filippov's Mortgage (Claim 9)</u>.  Filippov's mortgage should be voided because it was a self-dealing transaction and he failed to prove it was fair to the Debtor.  As such, he enjoys no priority with respect to the remaining assets of the Debtor.  As he has failed to prove his entitlement to any affirmative recovery on his alleged loan, no award is entered.  Defendants objection to Claim No. 9 is sustained, and Filippov is to refund the LLC for the $699.14 spent to prepare the mortgage and note.

70

2.      <u>O'Connor Carnathan & Mack Claim (Claim No. 2)</u>.  Defendants' objection is

sustained.  Claimant is order to return the sum of $67,211.06 paid to it within 90 days prior to the filing

of the petition, which sum was not disclosed on the LLC's Statement of Financial Affairs.

### G.  Additional Equitable Relief

The filing of the bankruptcy petition was breach of fiduciary duty by Filippov and

Lipetsker.  As damages, they are personally liable to pay the costs of administration of the

bankruptcy estate.

WHEREFORE, Defendants respectfully request that this honorable Court:

A.  Find in favor of the defendants on each of plaintiffs' claims;

B.  Find in favor of the defendants on each of their counterclaims;

C.  Award KDC the full amount of its proof of claim

D.  Award KDC, Tatiana, Kagan and ProEx attorneys' fees and cost pursuant to the express

indemnity provisions of Section 10.2 of the Operating Agreement;

E.  Award Kagan 50% of the net proceeds from the sales of the Properties; and

F.  Grant such additional and further relief as the Court deems necessary.


Dated:  September 20, 2019          VADIM KAGAN, ET AL.

By their attorneys,

/s/ John H. Perten, Esq.
John H. Perten (BBO# 548728)
James P. Harris (BBO # 678283)
SHEEHAN PHINNEY BASS & GREEN, P.A.
28 State Street, 22nd Floor
Boston, MA 02109
(617) 897-5600
jperten@sheehan.com
jharris@sheehan.com

## <u>CERTIFICATE OF SERVICE</u>

I, John H. Perten, hereby certify that on September 20, 2019, a copy of the foregoing was

served via the Court's ECF system.


Dated:  September 20, 2019 /s/ John H. Perten
John H. Perten