UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| *In re:* | ) | |
| | ) | |
| LYMAN-CUTLER, LLC, | ) | Chapter 7 |
| Debtor | ) | Case No. 15-13881 FJB |
| | ) | |

| | | |
|---|---|---|
| LYMAN-CUTLER, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adv. Case No. 1:16-ap-01120 |
| | ) | |
| VADIM KAGAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

## PLAINTIFFS' POST-TRIAL BRIEF

Plaintiffs Lyman-Cutler, LLC (the "LLC"), Alex Filippov ("Filippov"), and Nickolay

Lipetsker ("Lipetsker") (collectively, "Plaintiffs") respectfully submit this Post-Trial Brief in

support of their Proofs of Claims and in opposition to the Proofs of Claim by Kagan

Development KDC Corp. ("KDC"), ProExcavation ("ProEx"), Vadim Kagan and Tatiana Kagan,

as well as in support of judgment in Plaintiffs' favor on all Claims and Counterclaims asserted in

the Adversary Proceeding.

1

## **Table of Contents**

The Evidence at Trial ...................................................................................................... 4

I.     The Inception of the Venture and Agreement Among the Parties ......................... 4

II.    The Course of Construction .................................................................................... 8

III.   The Post Construction False Claims ....................................................................... 9

   A.    The KDC Contract ............................................................................................. 9

      1.    Evidence that the KDC Contract is a Fraud ................................................. 9

      2.    Evidence that Exhibit 215 is a Fraud ......................................................... 14

      3.    Entire (Un)Fairness .................................................................................... 16

   B.    The ProEx "Proposals" .................................................................................... 18

      1.    Evidence of Fraud ...................................................................................... 18

      2.    Entire (Un)Fairness .................................................................................... 20

   C.    The Claim for Carrying Costs .......................................................................... 21

   D.    The Subcontractor Claims ................................................................................ 22

      1.    Dream Flooring ........................................................................................... 22

      2.    Décor Art .................................................................................................... 24

      3.    V&D Heating & Unicon .............................................................................. 25

      4.    Boris Stanik – BST Plumbing ..................................................................... 25

      5.    DaCosta ....................................................................................................... 26

      6.    The April 28, 2015 Flurry of Entries on the Lyman-Cutler Payables ........ 27

IV.    The Unreliability of the Documentation in General ............................................. 28

V.     What Was Really Going On .................................................................................. 29

VI.    Substantial Completion ........................................................................................ 30

Resolution of the Proofs of Claim and Adversary Proceeding at Trial ........................ 31

I.     Kagan's Self-Dealing, Fraud and Bad Faith Must be Remedied. ........................ 31

II.    The Court Must Disallow the Kagan Parties' Proofs of Claim. ........................... 33

   A.    KDC's Proof of Claim is Predicated on a Fraudulent Contract
         Asserting Knowingly False Charges. ............................................................... 33

   B.    The Court Must Disallow the Indemnification Proofs of Claim
         by the Kagan Parties. ....................................................................................... 36

      1.    ProEx, KDC and Tatiana are not Indemnified Parties
            under the Operating Agreement. ................................................................. 36

      2.    None of the Kagan Parties Have Acted in Good Faith. .............................. 37

3.   None of the Kagan Parties Offered Evidence of Having Paid
Any Legal Fees or Incurred Any Costs.................................................. 37

III.   The Court Should Allow the Proofs of Claim by Filippov and OCM. ............................ 38

IV.   The Court Should Enter Judgment in Favor of Plaintiffs
on All Claims of the Adversary Complaint. ..................................................... 38

V.   The Court should Enter Judgment in Favor of Plaintiffs
on all Counterclaims Asserted by the Kagan Parties. ...................................... 39

VI.   The Damage Done ........................................................................................... 40

CONCLUSION.................................................................................................................. 41

**The Evidence at Trial**

Plaintiffs have contemporaneously submitted Proposed Findings of Fact and Conclusions of Law, which present specific facts with record support point by point and are incorporated by reference. In this Post-Trial Brief, Plaintiffs present the overarching narrative with commentary on the evidence that proves that their account of what happened is correct and that the Kagan Parties' narrative is false. Plaintiffs respectfully incorporate by reference their Opposition to Defendants' Motion for Judgment on Partial Findings (Adv. Doc. No. 374; Bankr. Doc. No. 465). Not one of the trio of Vadim Kagan, Joseph Cohen or Dan Gersh was a credible witness. In particular, Kagan's at times bizarrely false testimony is compelling evidence against him.

## I.    The Inception of the Venture and Agreement Among the Parties

The evidence proves that when the Parties agreed to enter into a joint venture and form Lyman-Cutler, LLC in late October/early November 2012, the agreement was that Kagan would build the homes for $1.3 million <u>maximum</u> in construction costs, and the carrying costs would run approximately $200,000. Kagan stood behind his representations by agreeing that he would personally fund the carrying costs if the homes were not built and sold on schedule. Trial Exhibit 9; Trial Exhibit 15; T. Tr. May 6, 2019 at 32-33, 38 (Filippov) ("this is the maximum budget"); T. Tr.May 9, 2019 at 18 (Lipetsker); T. Tr. May 8, 2019 at 44 (Zhukovskiy) (Kagan confirmed before the meeting that the numbers in the presentation were correct), 54-55 (Kagan said "I know exactly how much it is going to cost" at the meeting), 60; T. Tr. June 18, 2019 at 183-84, 187-89 (Maiden) (borrowed carrying costs and specifically went over provisions with Kagan). <u>See</u> <u>also</u> T. Tr. May 6, 2019 at 79 (Filippov) (increase to $1.4 million); Trial Exs. 31, 32 (reviewing original plan of $1.3 million and proposed increase to $1.4 million and financial effects thereof).

There is no other reasonable way to make sense of what happened.  Indeed, Kagan's testimony about what the deal was and how it came together is, in a word, ridiculous.  According to Kagan, Filippov and Lipetsker (respectively, a telecom executive and a dentist) presented a construction budget to him, he told them it was laughable and that he did not know what the construction would cost, and yet they nevertheless gave him $2.25 million, knowing that they had no construction plans or budget whatsoever.  T. Tr. May 15, 2019 at 59, 62 (claiming he told them he did not know what construction would cost); T. Tr. June 17, 2019 at 17 (told Filippov $1.3 million construction budget was "laughable"), 18-19, 21 (Filippov agreed to invest $2 million with no plan and no budget).

Kagan actually claimed at trial that he could not develop plans until he knew how much Filippov could borrow.  T. Tr. May 15, 2019 at 85-86.  Not only does this make no sense at all because Kagan had to submit the plans to the bank in order to support an appraisal and get the loan, Trial Exhibits 27, 28, 29, but it makes no sense that Filippov and Lipetsker would just give Kagan money with no plans of any kind.

Kagan makes much of the absence of any construction plans when the deal formed, but that makes Plaintiffs' point.  The only plans they had were the financial plans that Kagan presented to them and upon which they relied in agreeing to invest so much money.  Trial Exhibit 9.  Kagan presented to them a chart of hundreds of profit scenarios based on time to sale and selling price in which the cost of construction was a constant.  Id.  Kagan's denial that he had any involvement in creation of the presentation from the October 25, 2012 meeting is also ridiculous.  See T. Tr. May 15, 2019 at 57-59 (denying seeing or providing numbers to plug into spreadsheet); compare Trial Exhibits 7, 8 (pre-meeting correspondence among Kagan, Zhukovskiy, Lipetsker and Maiden concerning the presentation).

As a direct result of being told the selling price and time to sale were the primary risks, Filippov focused on negotiating protection in the Operating Agreement from the risk that the time to sale would be longer than Kagan projected.  Trial Exhibit 13 at 3 (Filippov email pointing out that Kagan has control over construction schedule and sale and asking for provisions in operating agreement); Trial Exhibit 15, §§ 4.2, 5.2, 8.1 (provisions providing that Kagan must complete construction by March 30, 2014 and pay carrying costs himself if properties not sold in 23 months).  Filippov specifically negotiated that Kagan would be responsible for carrying costs if the homes were not built and sold within the projected time line because Kagan should bear the risk associated with time delays.  Id.

Kagan emphasized at trial that Filippov also asked that the October 25, 2012 presentation be attached to the Operating Agreement as an exhibit, and that Kagan would not agree to that. But in response to Filippov's concern, a term was added to the Operating Agreement stating that:

> It shall be Mr. Kagan's duty and obligation to construct two (2) homes at the location currently known as 77 Lyman Road, in Brookline, Massachusetts <u>in accordance with the plans, including drawings, supplied by Mr. Kagan and approved by the Managing Member.</u>

Trial Ex. 15, § 5.2 (emphasis added).   Again, the only "plans" they had, and the only plans Filippov approved, were the financial plans.

Kagan was not remotely credible when he testified that he never read the Operating Agreement and that he had no idea what it said about carrying costs.  See T. Tr. May 15, 2019 at 144 (did not know what Operating Agreement said about carrying costs until Cohen explained it to him in 2015); T. Tr. June 17, 2019 at 25-26 (did not read Operating Agreement or participate in its negotiation).  Kagan's own attorney, Boris Maiden, contradicted Kagan's testimony clearly and repeatedly.  T. Tr. June 25, 2019 at 44; T. Tr. June 18, 2019 at 187-89.

The Operating Agreement itself belies Kagan's claim. Filippov originally asked that Kagan be responsible for the carrying costs after 20 months. Trial Exhibit 13 at 3. The final provision is 23 months. Trial Exhibit 15, § 8.1. The earlier drafts of the Operating Agreement do not contain a provision about retaining Tatiana as the listing broker. Trial Exhibit 11 at 6. The final version contains a provision (with a right to remove her). Trial Exhibit 15, § 6.1(b)(6). These provisions reflect Kagan's input. Moreover, on cross examination, Kagan admitted to understanding the other material terms of the Agreement. T. Tr. June 17, 2019 at 66-68. His testimony was contradictory and not at all credible.

To make matters worse, Kagan testified that, not only did the parties not borrow the carrying costs in Lyman-Cutler, but that he never borrowed carrying costs on any project. T. Tr. June 17, 2019 at 30 ("never"), 65 ("never"), 84 ("never"). But his own attorney, Boris Maiden, testified that Kagan always borrowed the carrying costs in every deal. T. Tr. June 18, 2019 ("this is what happens on each and every project"). The Lyman-Cutler Operating Agreement clearly states the parties will borrow the carrying costs, as does every other operating agreement for the Kagan projects. Trial Exhibits 15, 108, 111, 119-20, 128, 331; see T. Tr. June 17, 2018 at 26-45 (confronting Kagan with a total of ten operating agreements, in all of which the project borrowed the carrying costs). The evidence also shows that Lyman-Cutler paid the carrying costs out of the construction loans, with occasional cash flow advances from KDC, which were reimbursed. Trial Exhibits 1-6, 43. The evidence further shows that after Kagan failed to complete and sell the homes on schedule, he covered the carrying costs as agreed for several months before cooking up his false claims in May 2015. Trial Exhibit 43.

The truth of the Plaintiffs' account and the lack of credibility of Kagan's account is further confirmed by the April/May 2013 correspondence and analysis concerning whether to

increase the maximum construction budget by $100,000 and also increase the selling price of the

homes.  Trial Exhibits 26, 30, 31, 32.  Filippov's focus on the possibility that the project would

be $16,000 per home short based on increased carrying costs confirms the agreement among the

parties regarding the construction costs.  Trial Exhibit 32 at 5.  Only when Zhukovskiy realized

they had double counted the tax liability and that the carrying costs were lower than Filippov had

previously thought did Filippov agree to increase the construction loan by $100,000.  Trial

Exhibit 32.  Again, the "plans" Filippov is approving are the financial plans – he necessarily

relied on Kagan for the construction plans.

Kagan's testimony concerning the carrying costs is knowingly false.  It is a creation

concocted by his career criminal advisor, Joseph Cohen, based on the provision in the mortgage

that bars use of the mortgage proceeds for carrying costs.  See T. Tr. May 15, 2019 at 143-44

(Kagan talked to Cohen about the carrying costs); Trial Exhibits 334, 335, 336 (Kagan

forwarding documents, including the construction loan documents to Cohen in mid May 2015).

Filippov had no idea that the mortgage contained such a provision until the litigation commenced

and Kagan took this position.  T. Tr. May 6, 2019 at 38-39 (Filippov).  He had no reason to think

there was any issue with borrowing the carrying costs where both the closing attorney (Maiden)

and the professional builder he had partnered with (Kagan) told him that was how it was done.

Id.; T. Tr. June 25, 2019 at 43 (Maiden).

## II.    <u>The Course of Construction</u>

The evidence further confirms Plaintiffs' account that Kagan <u>never</u> mentioned any cost

overruns and none were ever approved during the construction and that the <u>first</u> time Kagan ever

claimed any such thing was in the May 7, 2015 lawyer demand letter.  Trial Ex. 54; T. Tr. May

6, 2019 at 94 (Filippov); T. Tr. May 9, 2019 at 27 (Lipetsker).   Again, Kagan's testimony is not

at all credible.  According to Kagan, Filippov and Lipetsker cavalierly approved hundreds of thousands of dollars of cost increases, without anything in writing, with no bids, no estimates – nothing.  T. Tr. May 15, 2019 at 119-20; T. Tr. June 17, 2019 at 73-75.  It is impossible to square this testimony with the writings in the record, in particular, Trial Exhibit 32, where Filippov objects to going $16,000 per home over budget.   A man who worries about the potential for being $16,000 short does not glibly agree to hundreds of thousands of dollars in cost overruns.  It also makes no sense that Kagan would present his demands in the form of a lawyer demand letter if the parties had previously agreed on them.  Furthermore, where it is indisputable that Kagan did not track the construction costs by Project, he had no basis to know what the costs were and so he had no basis to ask Filippov to approve higher costs.

### III.    The Post Construction False Claims

### A.  The KDC Contract

#### 1.  Evidence that the KDC Contract is a Fraud

The evidence strongly supports the conclusion that Kagan and Cohen created the purported KDC Contract in June 2015 in order to support their false and fraudulent mechanic's lien against Lyman-Cutler's properties.

The purported KDC Contract and consequent Mechanic's Lien are the work of career criminal Joseph Cohen.  T. Tr. May 9. 2019 at 94, 107 (Cohen).[1]  Neither Filippov, Lipetsker,

---

[1]    The evidence showed that Cohen was an officer and director of KDC and its "Strategic Business Manager," who helped it manage litigation matters.  T. Tr. May 9, 2019 at 86-87 (Cohen).  As a general proposition, Plaintiffs submit that Cohen was singularly not credible about any issue unless confronted with a document or deposition testimony that forced him to admit the truth.  See, e.g. T. Tr. May 9, 2019 at 101-03 (Cohen) & Trial Ex. 63 (denying writing June 26 email from Kagan and claiming never to have written emails for him and then being forced to admit he wrote another email for Kagan, but trying to distinguish writing the words in the email from sending it for Kagan).

nor Brusenkova ever laid eyes upon the supposed contract between KDC and Lyman-Cutler,

which Kagan signed for both parties ("KDC Contract"), before it was produced in the litigation

among the Parties.  T. Tr. May 6, 2019 at 87 (Filippov); T. Tr. May 9, 2019 at 23-24 (Lipetsker);

T. Tr. May 14, 2019 at 44 (Brusenkova); see also Trial Exhibit 68 (asking for copy in June

2015).  Brusenkova never made any entry on the KDC books for general contractor fee for KDC.

Id.  There is no line item for any general contractor fee in the budget Kagan presented to

Rockland Trust and no mention of any such thing anywhere in any of the other contemporaneous

documents.  Trial Ex. 27.  Filippov specifically requested that Section 5.2 be added to the

Operating Agreement to make sure nothing like this ever happened.  Trial Ex. 14 (Filippov

email); Trial Ex. 15, § 5.2 (Kagan responsible for building homes for share of net profits).

　　　　During the Kagan Parties' case in chief, both KDC's accountant Jason Gordon and

KDC's CFO Dan Gersh also admitted that they had never seen the KDC Contract before the

litigation.  T. Tr. June 24, 2019 at 99-100 (Gersh); T. Tr. June 17, 2019 at 174 (Gordon).  Gersh

did not know what the basis was for the alleged $560,838.87 general contractor fee.  T. Tr. June

24, 2019 at 99-100 (Gersh).  He considered it "above his pay grade" as KDC's CFO.  Id.  He

never entered any such fee on KDC's books or Lyman Cutler's books because he was never

asked to do so.  Id.  He admitted that KDC had never charged a 15% general contractor fee on

any other project of which he was aware, and that he had never booked any such payable on any

other project or any such receivable for KDC.  Id. at 101-02.[2]

---

[2]      In another instance of total lack of credibility, Kagan testified that he always charged the
15% general contractor fee, but would waive it if he was happy with the results of the project.  T.
Tr. May 15, 2019 at 90-91 (Kagan).  That testimony is manifestly false based on the
contradicting testimony of his own accountant and CFO.

Joseph Cohen drafted the KDC Contract.  T. Tr. May 9, 2019 at 107 (Cohen).  Cohen also drafted the Mechanic's Lien.  Id. at 94; Trial Ex. 66.  Cohen also drafted the invoice that allegedly supports the Mechanic's Lien.  T. Tr. May 9, 2019 at 105-06; T. Tr. May 13, 2019 at 15 (Cohen).  Substantial circumstantial evidence proves that Cohen drafted the KDC Contract contemporaneously with drafting the Mechanic's Lien in June 2015:

Kagan was forced to admit on cross examination that immediately after receiving Filippov's and Lipetsker's response to his May 7, 2015 Demand, he began emailing documents relating to the agreement among the Parties to Cohen.  Those documents included emails concerning the terms of the deal and the closing documents from the Rockland Trust construction loans.  Trial Exhibits 334, 335, 336; T. Tr. June 17, 2019 at 98-105.  The purported KDC Contract was not among the documents forwarded.[3]

The invoice Cohen drafted bears a date of June 1, 2015.  Trial Exhibit 63.  But the email in which it was conveyed to Filippov and Lipetsker is dated June 25, 2015.  Id.  But on June 4, 2015, Cohen ghost wrote an email for Kagan titled "forward proposed response to be sent via Vadim's non-Kagan Development account."  T. Tr. May 9, 2019 at 103; Trial Ex. 63.  This June 4, 2015 email shows that the invoice had not yet been drafted.  In addition, Gersh was on his honeymoon in early June 2015 and could not have provided any support to Cohen for the construction or carrying costs until he returned.  T. Tr. June. 24, 2019 at 67-68.  He tellingly could not remember when he first saw the purported KDC Invoice, but acknowledged it could have been as late as 2017.  Id. at 100-101.

---

[3]    Kagan also testified he could not say within $1 million how much he had paid to Cohen for his work as a "consultant."  T. Tr. June 17, 2019 at 91-92.  Kagan was not credible about anything material in this case.

Kagan was also forced to acknowledge on cross examination that he had submitted an affidavit to the Massachusetts Superior Court on June 9, 2015 in which he represented to the Court that: "I . . . agreed to oversee construction of the homes and manage the project at no cost to my partners, beyond my percentage share of the profits," and that "I paid myself nothing additional for my services." Trial Exhibit 337, ¶¶ 3, 10. These statements, in an affidavit that was plainly prepared with assistance of counsel, cannot be reconciled with the KDC Contract (or the ProEx Proposals) or the KDC invoice. They again support the conclusion that neither the KDC Contract nor the KDC invoice existed as of June 9, 2015.

This conclusion is further cemented by Cohen's admission that legal counsel played no role in preparing the Mechanic's Lien – even though by that time litigation had commenced and KDC was represented by counsel. Id. at 94-95; Trial Ex. 50 (May 7, 2015 Sheehan Phinney letter); Trial Ex. 64 (Middlesex Superior Court Complaint). Instead of involving their legal counsel, Cohen did his own legal research. Id. at 98.[4]

Also telling is Cohen's admission that when he prepared the Mechanic's Lien, Cohen talked to Kagan about it and specifically discussed with him Paragraph 5.2 of the Lyman-Cutler Operating Agreement. Id. at 96-97. Section 5.2 is the provision that obligates Kagan to build the homes in return for a 50% share of the net profits (and specifically limits his compensation to that amount). Trial Ex. 15, § 5.2. See also Trial Ex. 14 at 3 (Filippov asking for specific provision stating Kagan must build the homes to earn his profit share).

---

[4]     Based on Cohen's legal research, he was aware that work had to be done at the property within 90 days of recording the lien. Id. at 98. Workers turned up at the properties without any request or authorization by Filippov on June 22, 2015, the day the Mechanic's Lien was recorded. T. Tr. May 6, 2019 at 121 (Filippov). Cohen "did not recall" if he and Kagan decided to send the workers over so they could file the Mechanic's Lien. T. Tr. May 9, 2019 at 99 (Cohen).

Cohen plainly did not understand the import of this admission.  He drafted the Mechanic's Lien in June 2015, shortly before recording it on June 22, 2015.  He also testified that when he drafted the KDC Contract, his solution to the provision in the Lyman-Cutler Operating Agreement obligating Kagan to build the homes was not to charge for Kagan's personal time.  Id. at 109-10.   If he had really drafted the KDC Contract back in 2013, and at that time drafted around Section 5.2 by not charging for Kagan's time, then he would have no reason to discuss Section 5.2 with Kagan in June 2015.  The fact that Cohen and Kagan discussed Section 5.2 suggests it was very much a provision they had not yet figured out how to avoid.  Again, the evidence supports the conclusion that Kagan and Cohen fabricated the KDC Contract in June 2015 in an effort to support both their fraudulent Mechanic's Lien and, later, KDC's fraudulent Proof of Claim.

Also damning is the print-out of the "properties" page from the electronic copy of the KDC Contract, which shows that it was printed out on June 17, 2015, just five days before the Defendants recorded the Mechanic's Lien.  Trial Ex. 65.  This was 13 days after Cohen wrote to Filippov that a "detailed invoice" was being prepared.  Trial Ex. 63.  This fact is particularly important where Cohen admitted that he had disposed of the computer on which he drafted the KDC Contract and his legal research.  Id. at 108-09, 113.

Where:  (1) there is precisely no evidence of any mention of the KDC Contract or any of the fees it asserts before June 2015, including as recently as the May 7, 2015 Demand Letter; (2) the evidence shows it was printed June 17, 2015 after Kagan emailed Cohen myriad documents relating to the terms of the deal; and (3) the author is a known criminal, it is fair to conclude that the KDC Contract was forged from whole cloth by Cohen and Kagan in June 2015 as part of an intentional plan to extort a settlement from Filippov and Lipetsker.  See Trial Exs. 317-321.

### 2.   Evidence that Exhibit 215 is a Fraud

There is no credible evidence that the KDC Contract was prepared or shared with

Filippov and Lipetsker around the time it purports to be dated, June 24, 2013.   Neither Cohen's

nor Kagan's testimony is worthy of credit on any material issue.   The only document the Kagan

Parties offered into evidence to support their claim that Kagan sent the KDC Contract to Filippov

in 2013 is an email that purports to be dated August 21, 2013.   Trial Exhibit 215.   Filippov

testified that this email is a "complete fraud" and the evidence supports his assertion.   See T. Tr.

May 7, 2019 at 92-93; T. Tr. May 8, 2019 at 23-25.   Rather than supporting his claim, Exhibit

215 is evidence of intentional forgery.

Starting from the top of the purported email, it comes from

Vadim@kagandevelopment.com.   Trial Ex. 215.   Nowhere in the hundreds of exhibits submitted

to this court does this email address appear on any other exhibit.   Kagan never used that email

address.   He used kagandevelopment@gmail.com as his business email, see Trial Exhibit 231,

and on occasion, Vadim.Kagan@yahoo.com, as his personal email, see Trial Ex. 89.   There is

not a single legitimate email in the record where Kagan uses Vadim@kagandevelopment.com.

Indeed, no one ever used the kagandevelopment.com domain for the purpose of email until 2015

when Cohen started using j.cohen@kagandevelopment.com.   See Trial Exhibit 53.

There is no attachment to the purported email and it was offered only in paper format

over Plaintiff's objection to the failure to produce it in electronic format.   T. Tr. May 15, 2019 at

94.   Although Lymancutlerllc@gmail.com was an address set up to send emails to four different

people (Filippov, Lipetsker, Kagan and Filippov's wife, Arina), none of them ever received this

email.   T. Tr. May 6, 2019 at 65-66 (group email distribution list); T. Tr. May 8, 2019 at 24 (none

of them received it).

Kagan claimed that Ryan O'Grady sent the email for him, but then testified he sent it using his cell phone.  Compare T. Tr. May 15, 2019 at 92 (instructed O'Grady to send it) with T. Tr. June 17, 2019 at 61 ("The upper version go from my cellphone, and the lower version with email address and website come from stationary, probably computer.").  Kagan was forced to concoct this testimony because of the phone number issue.  As Brusenkova testified, Kagan did not have the phone number 617-610-1276 in 2013; she obtained that phone number for him in February 2014.  T. Tr. May 14, 2019 at 45-46.  In 2013, Kagan used his cell phone number, 617-828-2903.  Id.  Kagan's cell phone number is on all of the intervening emails on Trial Exhibit 215 and the number he did not obtain until February 2014 appears only at the end of Trial Exhibit 215.  Nowhere on any other email in the record does that phone number, 617-610-1276, appear on an email dated in 2013.[5]  Emails actually sent from Kagan's cell phone bear the statement "send from cell phone" on them.  Trial Exhibits 216, 223, 226, 227, 228, 229, 230, 231.

The person who allegedly sent the email on Kagan's behalf, Ryan O'Grady, did not testify at trial.  See T. Tr. May 15, 2019 at 92 (Kagan being led to testify that he instructed Ryan O'Grady to forward a copy of "the general contract" to "LymanCutlerLLC.com").  Given the import of the issue, one would expect the Kagan Parties to have called him as a witness and the Court should draw an adverse inference against them based on his absence.  Irish Bank Resolution Corp. (In re Special Liquidation) v. Drumm (In re Drumm), 524 B.R. 329, 373 (D.

---

[5]     The only other documents purportedly dated in 2013 upon which that phone number appears are the ProEx Proposals, which Plaintiffs submit Kagan also prepared long after the fact in order to "document" his fraudulent claims.  See Trial Exhibit 174.2, Tab L40.  Compare Trial Exhibits 43, 216, 223, 226, 227, 228, 229, 230, 231 (all emails from 2013 with the cell phone number, 617-828-2903).

Mass. Bankr. 2015) (drawing negative inference from failing to call particular witness). Without O'Grady's testimony, the only testimony to "authenticate" the forged email is Kagan's, and he is not credible on any material issue.

The email itself purports to be a forwarding of another chain of emails from August 2013, with the subject "88 Cutler Advance." Trial Exhibit 215. These emails were sent and received by the kagandevelopment@gmail.com address, but somehow the email which allegedly forwarded the "GC agreement" bears the subject "88 Cutler Advance and GC agreement" and comes from the purported e-mail address of vadim@kagandevelopment.com and adds Cohen as a recipient. Id. Filippov also testified that he had never heard of Cohen until 2015. T. Tr. May 6, 2019 at 114 (Filippov). Elena Lande and Vladimir Abramskiy similarly testified that they had never heard of Cohen until the surprise demands for more money began at the end of their projects. T. Tr. May 8, 2019 at 147 (Lande); T. Tr. May 13, 2019 at 96 (Abramskiy).

Plaintiffs respectfully submit that all of this evidence taken together proves by a preponderance that Trial Exhibit 215 is a forgery, most likely created by Cohen in order to "document" the transmittal of the KDC Contract to Filippov and Lipetsker. At minimum, even if the Court does not conclude that the evidence proves that Exhibit 215 is a forgery and an intentional fraud, it is not credible evidence of having shared the purported KDC Contract with Filippov and Lipetsker.

### 3.  Entire (Un)Fairness

In sum, the evidence squarely dictates the conclusion that the KDC Contract, the Mechanic's Lien and the charges asserted through them are bad faith, after-the-fact, fraudulent fabrications. Even if the Court for some reason disagrees, there is no evidence to support the conclusion that Kagan complied with the dictates of entire fairness in connection with the KDC

16

Contract.   Kagan admitted on cross examination that KDC's profits flow into his own pockets.

T. Tr. June 17, 2019 at 72.   The KDC Contract lards $777,784.41 in charges that would flow

into Kagan's own pocket.[6]

All of these charges conflict with the terms of the deal among the parties:

- The 15% general contractor fee conflicts with Section 5.2 of the Operating

  Agreement, which obligates Kagan to build the homes for his share of the profits.

  Compare Trial Exhibit 37, § 7 (outlining charges) and Trial Exhibit 67 at 5 (giving

  numerical line items) with Trial Exhibit 15, § 5.2 (Kagan's obligation to build

  homes).

- The "Design Fee" and charge for "Office Overhead" also conflict with Section 5.2 of

  the Operating Agreement.

- With regard to the "Office Overhead," that is just a charge of $75 per hour for time

  allegedly spent on the project by KDC employees, excluding Kagan.  Trial Exhibit

  67.  Gersh admitted they did not track anyone's hours working on the project and he

  just "estimated" the number in 2015.  T. Tr. June 24, 2019 at 61-62.  Gersh's number

  – 790 hours over approximately a 15-month span by "two and a half people" is

  outrageous in light of the 20 projects Kagan was working on contemporaneously,

  particularly bearing in mind that one of those people was Kagan, whose time they

  purported to exclude from the calculation.  If the other person and "a half" spent

  similar time on the other 19 projects, then they worked 15,800 hours in 15 months –

---

[6]    $777,784.41 is the total of fees and overhead in the KDC Proof of Claim.  Claims
Register No. 1-2.  In the June 2015 invoice, the total is $790,903.33.  Trial Exhibit 67.  The fact
that Kagan was still changing his numbers through March 2016 confirms that he never presented
any of these fees and charges to Filippov for approval.

17

or approximately 243 hours a week. Given that there are 168 hours in a week, a person and a "half" would have to work 24 hours per day to work 243 hours per week.

■ The charge for carrying costs conflicts with Section 4.2 and Section 8.1 of the LLC Operating Agreement. Trial Exhibit 15.

Even if he were credible, which he is not, Kagan cannot carry his burden of proving entire fairness by claiming he gave a copy of the KDC Contract to Filippov and Lipetsker in August 2013 (2 months after the date of the alleged contract). See T. Tr. May 15, 2019 at 91 (claiming he gave them a copy without elaboration). To submit $777,784.41 in charges ($790,903.33 as of June 2015) that squarely conflict with the terms of the Operating Agreement, Kagan was obligated to prove by clear and convincing evidence that he gave clear explanations to Filippov and Lipetsker as to the basis for these charges and clear and convincing evidence of their knowing and informed consent to these charges. See infra at 29 (citing cases). The record is devoid of any such evidence.[7]

### B. The ProEx "Proposals"

#### 1. Evidence of Fraud

The Proof of Claim also includes self-dealing charges through Kagan's excavation company, ProEx. Neither Filippov, Lipetsker nor Brusenkova ever saw the alleged ProEx "proposals" before the litigation among the parties. T. Tr. May 14, 2019 at 45 (Brusenkova); T. Tr. May 6, 2019 at 90 (Filippov); T. Tr. May 9, 2019 at 25 (Lipetsker). Brusnekova testified Kagan never used such a proposal on any project. T. Tr. May 14, 2019 at 45. Kagan never

---

[7]    The KDC Proof of Claim adds $141,191.25 in "administrative fees and expenses," for which no evidence was offered in support whatsoever. Claim 1-2. The Proof of Claim also adds $233,865.39 in interest, for which no explanation or evidence was offered at trial. Id.

discussed any charges by ProEx with Filippov or Lipetsker.  T. Tr. May 6, 2019 at 90 (Filippov);

T. Tr. May 9, 2019 at 26 (Lipetsker).  Indeed, Brusenkova testified that Kagan did not even have

the phone number on the Proposals in 2013, when they purport to be dated.  T. Tr. May 14, 2019

at 45-46 (Brusenkova).[8]

 During the Kagan Parties' case in chief, both KDC's accountant Jason Gordon and

KDC's CFO Dan Gersh admitted they too had never seen the ProEx Proposals prior to the

litigation.  T. Tr. June 17, 2019 at 175 (Gordon); T. Tr. June 24, 2019 at 58-59 (Gersh).

Although Kagan claimed to have solicited input from his subcontractors to prepare the proposals,

and to have presented them to Filippov and Lipetsker before the work was done, T. Tr. May 15,

2019 at 77, he was forced to admit on cross that the foundations were in before the dates on the

"Proposals."  T. Tr. June 17, 2019 at 49-50.  See Trial Exhibits 332 and 333 (foundations

inspected August 23, 2013); compare Trial Exhibit 326 (Sept. 1, 2013 demolition "proposal"),

Trial Exhibit 327 (Oct 1, 2013 "proposal" including excavation and foundation).   In addition,

the "Proposals" include a line item for ledge removal.  Trial Exhibit 174.2 at Tab 39, KDC

01276; Trial Exhibit 174.4 at Tab 36, KAG 2058.[9]  Plaintiffs frankly do not believe there was

any ledge, but if there were, Kagan could not have known that before starting the excavation.

Kagan was also forced to admit having taken money for KDC for work on the ProEx proposals.

T. Tr. June 17, 2019 at 47-48.

---

[8]  When Kagan was asked if he had the phone number in 2013, all he could manage to say
was "I think so" while looking at the ProEx demolition proposal.  T. Tr. May 14, 2019 at 75.

[9]  The Court will also find if it compares the Lyman Proposal to the Cutler Proposal, Trial
Exhibit 174.2, Tab 39 with Trial Exhibit 174.4, Tab 36, Kagan changes the charges for various
line items apparently at random but arrives at precisely the same total charge for each property,
$418,150.  He was "backing into" the number he needed to support his alleged payables from
Lyman-Cutler.

The ProEx Proposals, which purport to be dated in 2013, also bear the phone number that Brusenkova testified she secured for KDC and ProEx in February 2014.  The only other document in the record from 2013 that bears this phone number is Exhibit 215 which, as Plaintiffs have explained at some length, is a forged document.  Kagan created the ProEx Proposals after the fact, likely in 2015, and certainly never showed them to Filippov or Lipetsker and never obtained Filippov's approval of them.

### 2.  Entire (Un)Fairness

Even if the Court does not conclude that the ProEx proposals were made up after the fact to support Kagan's claims, there is no evidence to carry Kagan's burden of entire fairness. Kagan testified that the ProEx charges were "flat fees" and that he started ProEx to avoid having to use subcontractors, and to "pass the savings" to his investors.  T. Tr. May 15, 2019 at 24-25. But on cross examination, he admitted that ProEx had no employees other than Kagan, and that all of its work was done by subcontractors.  T. Tr. June 17, 2019 at 71-72.  Kagan admitted that ProEx profits flow straight into his own pockets.  Id. at 72.  The only evidence in the record of what ProEx actually spent on the Lyman-Cutler Project was submitted by the Plaintiffs.  The checks traceable to the Project add up to $225,958.05.  Trial Exhibit 5.  The expenses carried in ProEx's general ledger add up to $204,000.  T. Tr. May 10, 2019 at 26.  Based on these expenditures, Kagan proposes to have ProEx charge Lyman Cutler "flat fees" adding up to $916,800, thus putting no less than $690,841.95 into his own pockets, if this Court were to accept ProEx's "flat fees" as valid, which they are not.

Again, Kagan is not credible and the evidence is that he forged these proposals after the fact, but even if he had given copies to Filippov and Lipetsker in 2013, that would not satisfy his burden of entire fairness.  To put $690,841.95 in his pockets on top of the 50% share of net profits allocated to him in the Operating Agreement, Kagan was obligated to prove by clear and

convincing evidence that he gave clear explanations to Filippov and Lipetsker as to the basis for

these charges and clear and convincing evidence of their knowing and informed consent to these

charges.  See infra at 29 (citing cases).  The record is devoid of any such evidence.

### C.  The Claim for Carrying Costs

Kagan's circumlocutions regarding the carrying costs are also the work of Joseph Cohen,

who testified that he had reviewed the Lyman-Cutler Operating Agreement some 50-100 times

and that he had advised Kagan concerning his obligation to pay carrying costs.  T. Tr. May 9,

2019 at 88-89 (Cohen) ("More now").[10]  The evidence emphatically established that:  (1) the

Parties agreed to borrow the carrying costs and did so based upon a budget prepared by Kagan

and submitted to Rockland Trust to get the construction loans; (2) Kagan agreed to pay the

carrying costs out of his own pocket if the homes were not sold by November 30, 2014; and (3)

Kagan knew this perfectly well.  The testimony from third-party witness, Boris Maiden,

established these facts beyond purview.  Maiden is an attorney and long-time friend of Kagan's

who had done 10-15 or more prior deals with Kagan, in every one of which the parties borrowed

the carrying costs  See T. Tr. June 18, 2019 at 174-76 (Maiden) (friends and attorney), 183-84

(borrowed extra $100,000 for carrying costs when they took out the loan to buy the lot), 187-88

(went over all terms including carrying costs with Kagan), 188-89 (borrowed carrying costs on

every project), 189-90 (Kagan bore carrying costs after 23 months because he was responsible

for delivering the project on time).  See also T. Tr. May 6, 2019 at 51-53, 60-61, 79, 85

(Filippov); T. Tr. May 8, 2019 at 55-56 (Zhukovskiy) (carrying costs loaded in budget).

---

[10]     Cohen is also the architect of the contention that Filippov is not the managing member, a
preposterous contention that the Defendants appear to have abandoned at trial.  See T. Tr. May 9,
2019 at 89-92 (Cohen).

Accordingly, Kagan's assertion that he believes he is entitled to recover carrying costs is just plain false. Trial Ex. 50. Moreover, when the payments in and out of KDC and ProEx are tallied up, excluding the payments for carrying costs after November 30, 2014, they were together paid $1,707,442.83 and had laid out only $1,690,977.28. Trial Exs. 1-6. Therefore, if the Court looks at the actual cash, KDC and ProEx were paid in full, just as the actual deal among the Parties provided.[11]

### D. The Subcontractor Claims

Gersh testified to the hundreds of hours he purportedly spent going over the books and records to prepare the Proof of Claim. T. Tr. June 24, 2019 at 14-22, 37-38, 42 (Gersh). He claimed to be 100% confident in his numbers and testified that there were "no mistakes" in the Proof of Claim. T. Tr. June 24, 2019 at 42. Based on this testimony, the Court should conclude that all of the misstatements are not mistakes; they are intentional. The testimony of the subcontractors who testified in person establish beyond dispute that there are serious misstatements in the figures presented in the KDC Proof of Claim. Kagan's and Gersh's lack of credibility means that none of the KDC records can be trusted. See also T. Tr. May 10, 2019 at 92, 126-127, 177 (Goldman).

### 1. Dream Flooring

Erik Babayan, the principal of Dream Flooring, specifically and repeatedly testified that he had been paid in full. T. Tr. June 18, 2019 at 10-11, 19, 23-24 (explaining discrepancy in invoices saying "Amount deu"[sic] and "Paid in Full"), 30, 32. To make matters worse, Babayan testified that he met with Brusenkova to discuss payment on the project. Id. at 33-35.

---

[11] This is yet another issue with regard to which the evidence in the Defendants' case hurt them rather than helped them. Kagan's account of his purported lack of understanding of the carrying costs was nothing short of ridiculous. His total lack of credibility on any material issue is in fact devastating evidence that he has committed fraud.

Because Brusenkova left KDC in October 2014, this meeting had to have occurred before then.

See T. Tr. May 14, 2019 at 39, 80 (Brusenkova left in October 2014).  At the meeting, Babayan

and Brusenkova figured out that he had been paid in full and the confusion stemmed from the

fact that "[t]hey were paying from one project for another."  T. Tr. June 18, 2019 at 35.

Babayan repeated the process with Gersh at some point prior to Babayan's deposition on

September 29, 2015.  Id. at 27 (deposition was Sept. 29, 2015), 29-30 (met with Gersh after

getting the subpoena for the deposition).  At the meeting with Gersh, he again confirmed that he

had been paid in full, and changed his invoices to say "Paid in Full."  Id. at 29-30.  Gersh was

also aware, and reminded Babayan, that Kagan had overpaid him $7,000 from another project.

Id. at 38.  Babayan explained that:

> "I did about seventeen or eighteen projects.  It's not just Cutler and Lyman.  So
> they overpaid – so some projects, previous projects, were the same things like
> Lyman-Cutler, it's one – basically one package, one investor or whatever . . . so
> they overpaid me for those projects from one another, but not from Lyman-
> Cutler."

Id. at 39 (emphasis added).  In other words, Kagan treated all of the jobs Babayan did for

him as one big job and just wrote him checks from whatever project had money at a

given time.

Despite the fact that Babayan had met with both Brusenkova and Gersh, and

determined that he had been paid in full, the May 7, 2015 Demand Letter included a

purported outstanding payable to Dream Flooring of $15,460.  Trial Ex. 50.  The Lyman-

Cutler AP Aging as of October 2016 carries a payable to Dream Flooring of $13,910.

Trial Ex. 84.  The Proof of Claim submitted to this Court in March 2016 includes a

significant purported payable to Dream Flooring of $26,120.  Trial Ex. 175 at 13

(showing total billings of $52,210 with payments of $35,000); id. at 57 (showing total

billings of $48,910 with payments of $35,000).[12]  These purported payables cannot be

squared with Babayan's testimony that he had long since been paid in full.  Gersh

specifically testified that there was a balance due to Dream Flooring.  T. Tr. June 24,

2019 at 54, 86.[13]  Neither KDC's documentation nor Gersh is credible.[14]

### 2. Décor Art

Jose Porto, the principal of Décor Art, also made clear that he had been paid in full.  T.

Tr. June 18, 2019 at 43, 55 (insists on being paid within a week or walks off job), 56 (Kagan

always pays him within a week).  The May 7, 2015 Demand Letter nevertheless carries a

purported payable to Décor Art of $11,250.  Trial Ex. 50.  The October 2016 Lyman Cutler AP

Aging increases the payable to Décor Art to $20,870.  Trial Ex. 84.  The Proof of Claim

submitted to this Court in March 2016 includes a payable to Décor Art of $20,870.  Trial Ex. 175

at 3 (showing total billings of $73,520 and payments of $63,350); id. at 47 (showing total

billings of $68,750 and payments of $62,300 – crediting "Deposits" as payments).  These

purported payables cannot be squared with Porto's testimony that he was paid "within a week."

Gersh specifically acknowledged the increase of the payable to Décor Art from $11,250 as of

---

[12]    The back up included in Exhibit 175 shows that two of the line items in the Dream
Flooring itemization listed as just a "bill" have a $5,000 payment behind them, so that the total
payments to Dream Flooring add up to $75,000.  The total billing, however, adds up to $101,120
for an outstanding receivable of $26,120 – despite Babayan's testimony that he had been paid in
full.

[13]    The Court may recall that Gersh was sequestered during the testimony of the
subcontractors at the request of Plaintiffs' counsel.  T. Tr. June 18, 2018 at 6-9.  Gersh's
testimony that there is a balance outstanding to Dream Flooring is particularly telling where
Babayan testified he met with Gersh and determined together that KDC did not owe Dream
Flooring anything.

[14]    Kagan also claimed that Dream Flooring and Décor Art were owed money, when that is
plainly not true.  See T. Tr. May 15, 2019 at 152.

May 7, 2015 to $23,000 as of December 31, 2015.  T. Tr. June 24, 2019 at 86.  Again, neither

KDC's documentation nor Gersh is credible.

### 3.  V&D Heating & Unicon

Viktor Sergeev, the principal of V&D Heating, admitted to sending photocopies of the

same "invoice" for both 55 Lyman and 88 Cutler.  T. Tr. June 18, 2019 at 73.  Sergeev claims to

still be owed $39,000 for jobs he did in late 2013 and early 2014.  Id. at 95, 97.  On his

application for a permit to do the work, he represented the cost of the job as $18,500.  Id. at 96,

98.

Victor Ispranikov, the principal of Unicon Electric, also admitted that his "proposals" for

Lyman Cutler were photocopies of the same invoice.  Id. at 129-131, 136.  One might believe

that one subcontractor used photocopied invoices, but two doing so on the same job is highly

suspicious.  This is particularly true where the amount allegedly outstanding is exactly equal to

the amount previously paid.  Trial Exhibit 175, Tabs L37 & C33.  Ispranikov also represented to

the Town in his permit application that the cost of the work was only $18,000.  Id. at 146.

If Sergeev and Ispranikov are held to their representations to the Town of Brookline,

which they should be, they have been more than paid in full.  The documentation of their

purported payables is not credible.

### 4.  Boris Stanik – BST Plumbing

Boris Stanik of BST Plumbing specifically testified that he created his invoices in

February and March 2015 by "looking at the plans" and "remembering what he had done."  T.

Tr. June 18, 2019 at 102 ("I looked at the plans, then I remember everything we did and put it in

writing"), 108 (same point on cross examination).  But Stanik submitted precisely identical

invoices with just the addresses changed, dated over a month apart.  Trial Exhibit 175 at L53 and

C51.  These invoices are not credible evidence of charges by Stanik.  Stanik's permit

applications attested under oath that the charge for the plumbing would be $20,000 per house, and that is how much he has been paid.  T. Tr. June 18, 2019 at 110-11, 118-19.  The city inspector's sign off on the rough plumbing for the houses was in March 2014 and the final inspection was in September 2014.  Id. at 111.  Stanik should also be held to his representation to the Town of Brookline.

Most damning, however, was Stanik's testimony about the purported invoices for plumbing fixtures and materials, which are dated August 2015.  Id. at 116-18.  Stanik testified that he was not owed any money for these "invoices" and that as far as he knew, Kagan had paid them directly on his credit card:

> Q:  So . . . if I follow your testimony, you didn't pay for any of these materials, right, sir?
> A:  I order these materials.  I have account with Ferguson Plumbing Supply.  I order this materials; I receive this materials for his job, and he pays for the – he paid for this materials with a credit card directly to Ferguson.  I never saw a check or money . . .  It goes directly – he paid it directly on my account at Ferguson.
> Q:  He doesn't owe you any money for these materials then, sir?
> A:  As far as I know, he paid it.

Id. at 117-18.

Gersh, who was sequestered during Stanik's testimony, specifically testified that he went back to BST to get back up for these charges in August 2015.  T. Tr. June 24, 2019 at 52-53 (Gersh).  In light of Stanik's testimony, Gersh is yet again not credible and these alleged KDC payables are patently false.

### 5.  DaCosta

The DaCosta evidence is illuminating.  If the Court examines a time line of the payments to DaCosta and the invoices from DaCosta, it will find that as of the close of construction, Lyman-Cutler had paid DaCosta **$37,000 more** than DaCosta had invoiced the Project.  See Chart attached hereto as Appendix A; Trial Exhibit 175, Tabs L40 & C38.  Indeed, DaCosta had

been paid $230,000 before it ever submitted an invoice.  Id.  Gersh apparently recognized that

the payments exceeded the billing.  And so on September 2, 2015, DaCosta "revise[d] our

records as [Kagan or Gersh] request[ed]" and submitted "change orders" of $18,500 per house in

order to make its billing add up to the payments it had received.  It also provided a revised

invoice adding another $23,000 based upon a purported mistake in its prior invoices.  Trial

Exhibit 175, Tab L40, KDC 00354 (Sept. 2, 2015 DaCosta email), Tab C38, KAG 02076 (same).

Babayan (Dream Flooring) testified that he was not owed any money in part because

Kagan had paid him more than he was owed on another project.  Here, DaCosta was paid

significantly more than he was owed on Lyman-Cutler.  Taken together with the other related

evidence of how Brusenkova kept the books alphabetically by subcontractor and the round

number payments to the subcontractors unrelated in time to the work done, the fair inference is

that Kagan was not tracking expenses on any project, but was simply using whatever funds he

had available to pay his subcontractors without regard for whether they were working on the

project that was paying them.

### 6. The April 28, 2015 Flurry of Entries on the Lyman-Cutler Payables

The evidence showed that Kagan and his wife, Tatiana, suddenly and for the very first

time began hounding Filippov to sign a listing agreement with Tatiana in late April 2015, just

before a large number of entries were made in the Lyman-Cutler accounts payable.  T. Tr. May

6, 2019 at 100-07(Filippov); T. Tr. May 15, 2019 at 163-75 (Kagan); T. Tr. June 24, 2019 at 69-

76 (Gersh); Trial Exhibits 175, 340.  In one of Gersh's most significant losses of credibility, he

testified on direct examination that the changes in the books in late April 2015 were mostly

trivial matters – "small changes."  T. Tr. June 17, 2019 at 226-27.  Then on cross examination he

was forced to acknowledge he made large additions to the alleged payables due to the challenged

subcontractors on the very same day he emailed Filippov the listing agreement Kagan had signed

with Tatiana.  T. Tr. June 24, 2019 at 69-76; Trial Ex. 340.  The timing of Kagan's and Tatiana's

sudden urgency to get Filippov's signature on a listing agreement is no coincidence.  They were

acting in concert, preparing to make their demands for more money and setting Filippov up to

thwart his rights under the Operating Agreement.  See Trial Exhibit 50 (May 7, 2015 demand).

### IV.    The Unreliability of the Documentation in General

Plaintiff's Expert, Michael Goldman, recounted at some length the many inconsistencies

in the documentation presented by KDC in support of its Proof of Claim and in its internal

controls and books and records.  T. Tr. May 10, 2019, at 13-86.  Highlights of Goldman's

specific findings are recounted in Plaintiffs' Opposition to Defendants' Motion for Judgment on

Partial Findings (Doc. 374) ("Plaintiffs' Opposition") at 13-15, which is incorporated by

reference.  Goldman's ultimate conclusion was that the KDC documentation is unreliable and

can only be the product of gross incompetence or fraud.  T. Tr. May 10, 2019 at 92, 177.  The

Kagan Parties offered little by way of rebuttal to Goldman's findings during their case in chief.

Kagan offered some perplexing testimony that per square foot costs could be higher for larger

homes in response to Goldman's finding that the costs of construction were routinely double on

homes where Kagan had an investor compared to homes he did alone.  T. Tr. May 15, 2019 at

154-56.  Gersh testified in a sentence or two that Mr. Goldman was "wrong."  T. Tr. June 24,

2019 at 37-38.  Tellingly, they could not rebut Goldman's testimony that the **electronic**

**Quickbooks files produced by the Defendants in discovery is not the same file that was used**

**to generate the printouts included in the KDC Proof of Claim.**  T. Tr. May 10, 2019 at 61-62,

101 (Goldman).

The pervasive problems and lack of credibility by the principal participants – Kagan,

Cohen and Gersh – all point to fraud.  In particular, Cohen's extensive criminal history may be

considered by the Court in evaluating whether the Defendants acted with "intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident." Fed. R. Evid. 404(b)(2).[15]

The conclusion that the Kagan Parties acted intentionally and with bad intent is further bolstered by the testimony by other investors in Kagan projects who were victims of the same type of eleventh-hour cost overruns and threats. See Plaintiff's Opposition at 7-8 (summarizing testimony of other victims). The Court should again draw an adverse inference against the Kagan Parties because they did not present a single satisfied investor witness, despite demanding and being given the opportunity to do so. Irish Bank Resolution Corp., 524 B.R. at 373.

## V.   **What Was Really Going On**

When the strands of evidence are woven together, it becomes clear what Kagan was really doing. Brusenkova kept Kagan's books alphabetically – by vendor or subcontractor without making any effort to keep track of expenditures on each project. T. Tr. June 17, 2019 at 206 (Gersh). Babayan (Dream Flooring) specifically testified that he had been overpaid on another project, which meant he had been paid in full with regard to Lyman-Cutler. According to Babayan, he worked on 17 or 18 projects and "it's one – basically one package." T. Tr. June

---

[15]      Mr. Kagan tried to cover for his dreadful bookkeeping by testifying that he relied on his bookkeepers and accountants to maintain his books and records. T. Tr. May 15, 2019 at 15, 19, 28. But his accountant, Jason Gordon, testified that he relies on Gersh and Kagan for the numbers he puts into the tax returns, and Gersh testified he relies on Kagan! T. Tr. June 17, 2019 at 168-69 (Gordon); T. Tr. June 24, 2019 at 56 (Gersh testimony that he has to rely on Kagan to tell him what the construction costs are). Gordon had never done an attestation engagement and could not attest to the accuracy of KDC or ProEx's books and records. T. Tr. June 17, 2019 at 166-69. He acknowledged that even if he had done a full blown audit, it would be hard to detect fraud by management. T. Tr. June 17, 2019 at 169-72. At bottom, Gordon relied on Gersh, who relied on Kagan. Where Kagan was not credible (and frankly neither was Gersh), Kagan's testimony that he relied on Gersh and Gordon to keep his books does not help him.

18, 2019 at 39. The payments were all in round numbers and at least $40,000 of it predated the

work he did – the floors were not installed until July 2014. See Trial Exhibit 39 (Kagan email

July 25, 2014 saying "Right now we are doing Hardwood Floor."); Appendix B hereto (round

number payments). DaCosta was overpaid by $37,000 – $339,700 in payments compared to

$302,700 in invoices (before he submitted his "change orders" and the "amended" invoice in

September 2015). Compare Charts attached hereto as Appendix A (time line of payments to and

invoices from DaCosta); Appendix B (time line of payments and invoices to/from BST, Unicon,

V&D, Dream Flooring, also almost entirely in round numbers). There is no dispute that Kagan

had 20 projects going contemporaneously with Lyman-Cutler. Trial Exhibit 141, Supp.

Response No. 3.

The only reasonable conclusion is that Brusenkova kept the books by subcontractor not

because she was a bad bookkeeper but because that is how Kagan operated his business. These

subcontractors were, as a practical matter, on KDC's payroll. He would send them $10,000 here

and $20,000 there without regard for what project was making the payment or on what project

they were doing the work. Then, at the end of the project, Kagan would decide what he wanted

to charge a particular investor and put together a demand. Just like Brusenkova said he did. T.

Tr. May 14, 2019 at 42-44.

### VI.    Substantial Completion

Kagan offered no evidence that he substantially completed the homes by the contractual

deadline – March 30, 2014. See Trial Exhibit 15, § 5.2. The only evidence in the record is that

they were not finished until months later. T. Tr. May 6, 2019 at 95-96; Trial Exhibits 38 & 39.

The first house was not listed until August 2014. Trial Exhibit 45. It makes no sense to sit out

the selling season if the house was substantially complete in March 2014. Kagan breached

Section 5.2 of the Operating Agreement by failing to substantially complete the homes by March 30, 2014.

### <u>Resolution of the Proofs of Claim and Adversary Proceeding at Trial</u>

Plaintiffs incorporate their contemporaneous proposed findings and conclusions by reference, and offer the following additional comments on the claims, counterclaims and proofs of claim.

### I.    <u>Kagan's Self-Dealing, Fraud and Bad Faith Must be Remedied.</u>

At its core, this case is governed by two simple legal principles:  (1) Kagan is a fiduciary and owes duties of loyalty, care and full disclosure not only to Lyman-Cutler, but also to Filippov and Lipetsker; and (2) where Kagan has breached those duties, this Court has broad discretion to fashion a remedy to put the Plaintiffs in as good a position as if there had been no wrongdoing.  <u>Zimmerman v. Bogoff</u>, 402 Mass. 650, 657 (1988).  As the Court ruled in connection with the pretrial Motions in Limine, Kagan must prove that "whether acting on his own or through entities that he controls . . . his actions were entirely fair to the LLC and its members." (Doc. 409).  He has abjectly failed to do so at trial.

Plaintiffs respectfully submit that the evidence at trial has proven that the disputed charges are the product of "corruption and dishonesty," but also emphasize that a finding by the Court that the disputed charges are <u>not</u> entirely fair does not require such a finding.  <u>Coggins v. New England Patriots Football Club</u>, 397 Mass. 525, 533 (1986); <u>Lazenby v. Henderson,</u> 241 Mass. 177, 180 (1922).   To support his self-dealing contracts, Kagan was obligated, and failed, to prove <u>by clear and convincing</u> evidence that he made <u>full disclosure</u> of all material facts to Filippov and Lipetsker.  <u>See</u> <u>Estate of Carpenter v. Dineen</u>, 2008 Del. Ch. LEXIS 40, at *50 (Del. Ch. Ct. Mar. 26, 2008); <u>Ramsey v. Toelle</u>, 2008 Del. Ch. LEXIS 283, at *22 (Del. Ch. Ct. Sept. 30, 2008) (voiding a self-dealing transaction on the part of a fiduciary "is the proper

remedy"); <u>Sizemore v. I-R Maple Corp.</u>, 2003 Mass. Super. LEXIS 133, at *17-18 (Mass. Super.
Ct. Apr. 25, 2003) ("[a] self-dealing transaction is presumed invalid and is voidable unless the
fiduciary can prove fair dealing by clear and convincing evidence"); <u>Geller v. Allied-Lyons PLC</u>,
42 Mass. App. Ct. 120, 125-28 (1997) (full disclosure of all material facts regarding agreement
whereby fiduciary would receive a personal profit in connection with corporate transaction was
prerequisite for enforcement); <u>see</u> <u>also</u> <u>Demoulas v. Demoulas Super Mkts., Inc.</u>, 1995 Mass.
Super. LEXIS 870, at *204 (Mass. Super. Ct. Aug. 2, 1995) (fiduciary contract is voidable unless
it is on fair terms and all the parties manifest assent with full understanding of all relevant facts
that the fiduciary knows or should know).

The Court has broad discretion to fashion a remedy designed to put Filippov and
Lipetsker in as good a position as if there had been no wrongdoing. <u>Zimmerman v. Bogoff</u>, 402
Mass. at 661 ("innocent partner is to be put as nearly as possible in the same position which he
would have occupied if there had been no wrongdoing"); <u>see</u> <u>also</u> <u>Brodie v. Jordan</u>, 447 Mass.
866, 871 (2006) ("Courts have broad equitable powers to fashion remedies for breaches of
fiduciary duty in a close corporation"); <u>Demoulas v. Demoulas</u>, 428 Mass. 555, 581 (1998)
(recognizing that "a court may . . . reform an agreement to correct wrongdoing"); <u>Julian v.
Eastern States Constr. Serv.</u>, 2008 Del. Ch. LEXIS 86, at *63 (Del. Ch. Ct. July 8, 2008) (court
free to fashion appropriate remedy); <u>see</u> <u>also</u> <u>In re Cumberland Farms, Inc.</u>, 249 B.R. 341, 354
(D. Mass. Bankr. 2000) ("An insider's wrongful profit in matters such as dealing in the
corporation's securities does not cause the corporation damage. Yet, to deter such conduct, the
corporation is permitted to recover the ill-gotten gain.").

In order to put Filippov and Lipetsker in as good a position as if there had been no
wrongdoing, the Court must:

(1) disallow KDC's, Kagan's, ProEx's and Tatiana's Proofs of Claim and Interest in their

   entirety;

(2) allow Filippov and Lipetsker's Proofs of Claim and Interest;

(3) enter judgment for the Plaintiffs on the Claims and Counterclaims in the Adversary

   Proceeding; and

(4) award Filippov and Lipetsker benefit of the bargain damages.

Because the Kagan Parties' conduct was knowing and intentional, the Court should also

award treble damages and attorneys' fees against KDC, ProEx and Tatiana. M.G.L. ch. 93A, §

11 (up to treble damages for willful and knowing violation).

## II.   **The Court Must Disallow the Kagan Parties' Proofs of Claim.**

### A.  **KDC's Proof of Claim is Predicated on a Fraudulent Contract Asserting Knowingly False Charges.**

The Court must disallow the KDC Proof of Claim. Kagan made up his charges in May

2015 without any good faith basis, and then blatantly doubled the alleged charges in an unlawful

attempt to force the Plaintiffs to settle with him. His alleged claims went from $1,059,025.56 on

May 7, 2015 to $2,095,985.23 on June 22, 2015. Of this sum, **$918,975.66** allegedly consists of

fees, charges and reimbursements to KDC, and **$916,800** consists of charges by ProEx.

**$777,784.41** consists of charges specifically by KDC under the KDC Contract, which had never

been asserted before and appear nowhere in KDC's books. The ProEx charges include at least

**$690,841.95** in pure profit. All of these sums would flow straight into Kagan's pockets. They

are directly contrary to the Operating Agreement and the deal the Parties made. These charges

are all knowingly false. Indeed, by Plaintiffs' calculation, no less than **$2,299,178.26** of the

KDC Proof of Claim consists of false or unsubstantiated charges, which violate Kagan's

fiduciary duty, entire fairness and the Operating Agreement.  Proposed Findings ¶¶ 241-255

(submitted contemporaneously herewith).

Kagan knows quite well the deal was for him to build the two houses for a 50% share of

the profits from the venture.   At minimum, KDC has offered no evidence to satisfy its burden of

proving entire fairness with regard to these charges, which blatantly contradict the term of the

Operating Agreement obligating Kagan to build the homes for a 50% share of the profits.  Trial

Exhibit 15, § 5.2.

Tellingly, when Plaintiffs tally up all of the KDC and ProEx checks on the Project and all

of the Amex Summaries, even giving KDC the benefit of the doubt and crediting it 100% for

these sums, its expenditures on the Project add up to less than what the two entities collected

from Lyman-Cutler:

| Lyman-Cutler Payments to Kagan Entities vs. Kagan Entities Expenditures | | |
|---|---|---|
| Source | Lyman-Cutler LLC Payments | Kagan Entity Payments |
| Lyman-Cutler LLC to KDC | $         1,372,442.83 | |
| Lyman-Cutler LLC to ProExcavation | $           335,000.00 | |
| KDC Payments on Project | | $         1,338,919.23 |
| KDC Payments to LLC, first 23 months | | $           126,100.00 |
| ProEx Payments on Project | | $           225,958.05 |
| **Totals** | $         **1,707,442.83** | $         **1,690,977.28** |

Trial Exhibits 1-6.

The evidence of actual cash payments thus proves that Kagan had been reimbursed in full

for his actual expenditures at the conclusion of construction in October 2014.  Accordingly, the

purported cost overruns Kagan asserted in the May 7, 2015 Demand Letter are false and

fraudulent.  Even if some of the cost overruns were real, Kagan's documentation is wholly
unreliable and in a number of instances fabricated.

By falsely doubling the KDC charges to try and force a settlement, Kagan egregiously
breached the Operating Agreement, his fiduciary duty and the covenant of good faith, and
thereby sacrificed any recovery at all.  See Anthony's Pier Four, Inc. v. HSBC Assocs., 411
Mass. 451, 471-472 (1991) ("neither party shall do anything that will have the effect of
destroying or injuring the right of the other party to receive the fruits of the contract"); Ahern v.
Scholz, 85 F.3d 774, 798 (1st Cir. 1996) (conduct in disregard of known contractual
arrangements is a violation of Chapter 93A); cf. In re Cumberland Farms, Inc., 249 B.R. at 354,
360 (disallowing self-dealing proof of claim in its entirety and finding debtor had right of
recovery against the self-dealing fiduciary).

Entire fairness encompasses the entire course of dealing between the Parties.  Kagan
cannot assert false and overstated charges in order to force a settlement, and then claim
entitlement to recover in a judgment by this Court a portion of what he claimed.  If any part of
his claim is false (and all or nearly all of it is), then he cannot recover any of it.  See, e.g., Owen
v. Cannon, 2015 Del. Ch. LEXIS 165, at *90 (Del. Ch. Ct. June 17, 2015) (holding that
defendants failed to prove fair dealing "under the totality of the circumstances"); Cox v. Smith
(In re Cent. Ill. Energy Coop.), 2012 Bankr. LEXIS 3848, at *8-9 (Bankr. C.D. Ill. Aug. 22,
2012) (entire fairness "contemplates a totality of the circumstances inquiry"); Auburn Chevrolet-
Oldsmobile-Cadillac, Inc. v. Branch, 2009 U.S. Dist. LEXIS 18222, at *31-32 (N.D.N.Y. Mar.
10, 2009) (entire fairness requires the fact finder "to evaluate the circumstances giving rise to,
and constituting, the transaction in question"); In re Emerging Communs., Inc. S'holders Litig.,
2004 Del. Ch. LEXIS 70, at *136-37 (Del. Ch. Ct. May 3, 2004) (finding that transaction was

product of unfair dealing and was not entirely fair in context of false disclosures); In re Signature

Apparel Grp., 577 B.R. 54, 102 (S.D.N.Y. Bankr. 2017) (finding breach of duty of care under

entire fairness standard in context of false representations).

      **B.  The Court Must Disallow the Indemnification Proofs of Claim by the
Kagan Parties.**

        **1.  ProEx, KDC and Tatiana are not Indemnified Parties under the
Operating Agreement.**

    Tatiana, ProEx and KDC have no claim for indemnification whatsoever because they are

not agents of the LLC or its members under the Operating Agreement.

> The Operating Agreement provides for the LLC to "indemnify and hold harmless
> the Members and their respective employees and authorized agents from and
> against any loss, damage or claim incurred by reason of any act or omission
> performed or omitted by such Member, employee or agent in good faith and on
> behalf of the Company and reasonably believed to be within the scope of
> authority conferred by this Agreement, except that no Member, employee or
> authorized agent shall be entitled to be indemnified or held harmless from or
> against any loss, damage or claim incurred by reason of such Member's,
> employee's or authorized agent's gross negligence or willful misconduct;
> provided, however that any indemnity under this Section 10.2 shall be provided
> out of and to the extent of Company assets only, and no Member shall have any
> personal liability on account thereof.

Trial Exhibit 15, § 10.2 (emphasis added).

    "Agency is the fiduciary relationship that arises when one person (a 'principal') manifests

assent to another person (an 'agent') that the agent shall act on the principal's behalf and subject

to the principal's control, and the agent manifests assent or otherwise consents so to act."

Restatement (Third) of Agency § 1.01.  An agent owes its principal a fiduciary duty, "a duty to

his principal to act solely for the benefit of the principal in all matters connected with his

agency."  Mackey v. Rootes Motors, Inc., 348 Mass. 464, 467-68 (1965); see also Hollingsworth

v. Perry, 570 U.S. 693, 713-14 (2013) (if there is an agent relationship, the principal controls the

agent, the agent owes the principal a fiduciary duty); CNE Direct, Inc. v. Blackberry Corp., 821

F.3d 146, 150 (1st Cir. 2016) (one of the "essential ingredients" of a principal-agent relationship

under Massachusetts law is "a fiduciary relationship toward the principal regarding matters

within the scope of the agency"); Carreras v. PMG Collins, LLC, 660 F.3d 549, 556 (1st Cir.

2011) ("[a]n agency relationship would exist only if [the principal] had manifested its assent to

have [the agent] act on its behalf and subject to its control").

To the extent KDC provided any services, the services were to Lyman Cutler, not Kagan.

KDC was not Kagan's "agent" within the meaning of the Operating Agreement. The same

reasoning applies to Tatiana. She was retained as a listing broker by Lyman Cutler, not Kagan.

ProEx is an additional step removed and was hired by KDC, not the LLC. The indemnification

provision applies to Members and their agents, not to vendors (allegedly) hired by the LLC.

## 2. None of the Kagan Parties Have Acted in Good Faith.

Section 10.2 specifically requires that to be indemnified, a party must act in good faith

and be acting on behalf of the Company and within the scope of the party's authority under the

operating agreement. None of the Kagan Parties' conduct qualifies in any way whatsoever.

Section 10.2 further precludes indemnification for gross negligence or willful misconduct. The

Kagan Parties undoubtedly fit that description. None of them can recover indemnification.

## 3. None of the Kagan Parties Offered Evidence of Having Paid Any Legal Fees or Incurred Any Costs.

The record is devoid of any evidence of who paid what to whom to support any claim for

indemnification by any of the Kagan Parties. Having failed to prove they incurred any

indemnifiable costs, they cannot recover anything.

### III.    <u>The Court Should Allow the Proofs of Claim by Filippov and OCM.</u>

The evidence supports the conclusion that the Filippov and OCM Proofs of Claim are

predicated on entirely fair transactions.

Filippov undisputedly put over $435,000 into the Debtor to support its payment

obligations, only $200,000 of which is covered by the mortgage.  The 5% interest rate is the

same as the rate to which he is entitled under the Operating Agreement.  Trial Exhibit 15, § 8.1

Lipetsker approved the mortgage.  The <u>only</u> impact of the mortgage is to put repayment of the

mortgage ahead of other claims.  It was entirely fair.

OCM undisputedly provided services to the Debtor, opposing Kagan's bad faith claims

and filing the state court action against him and the other Kagan Defendants.  Both Filippov and

Lipetsker approved the retention.  There was no point in consulting Kagan to see if he would

agree that the Debtor should retain counsel to sue him.

### IV.    <u>The Court Should Enter Judgment in Favor of Plaintiffs on All Claims of the Adversary Complaint.</u>

The evidence at trial establishes that Kagan breached the Operating Agreement and his

fiduciary duties by:

(1) failing to substantially complete the two homes by March 30, 2014 as required by

Section 5.2;

(2) signing exclusive listing agreements with his wife, Tatiana, that he knew he lacked

authority to sign under Section 6.1(b)(6);

(3) signing a contract with KDC that purports to pay Kagan hundreds of thousands of

dollars in contradiction of Section 5.2;

(4) asserting claims for unsubstantiated and false cost overruns that Filippov as Managing

Member never approved in violation of Section 5.2; and

(5) refusing to honor his obligation to pay the carrying costs after May 7, 2015 in

violation of Section 8.1.

<u>See</u> Trial Exhibit 15 (operating agreement); Trial Exhibit 44 (exclusive listing agreement signed

April 2015); Trial Exhibit 45 (exclusive listing agreement for 18 month term, allegedly signed

August 2014); Trial Exhibit 50 (May 7, 2015 letter refusing to pay further carrying costs); Trial

Exhibit 72 (summary of costs paid by Filippov, including carrying costs after May 7, 2015).

As more specifically set forth in the contemporaneously submitted Proposed Findings,

the conduct of the Kagan Defendants is outright fraud.  Kagan quoted the construction costs to

induce Filippov and Lipetsker to invest with reckless disregard for the truth.  Months after

construction was complete, he decided how much he wanted to overcharge Filippov and

Lipetsker, and invented KDC Contract, the ProEx Proposals and the other alleged Lyman-Cutler

payables without any genuine basis whatsoever.  He had (and has) no reliable records or indeed

any genuine idea at all what the construction really cost, <u>because he never made any effort to

track costs per project</u>.

### V.     The Court should Enter Judgment in Favor of Plaintiffs on all Counterclaims Asserted by the Kagan Parties.

The evidence does not support any of the claims asserted by the Kagan Parties.  Indeed,

they merit little discussion.  Kagan's false claims against the Company forced the Company into

a bankruptcy filing.  Kagan is the one who breached his fiduciary duties, not the other way

around.  The assertion that Filippov was not the Managing Member (see Counterclaim, Adv.

Doc. 106, ¶ 70(d), and Count XV (interference with contract)) is absolutely false and Kagan

knows it.  Counts I through IV are entirely meritless and there is no evidence to support them.

Counts V through VIII are indemnification claims that add nothing to the corresponding Proofs

of Claim.  They are also meritless.  Count IX asserts breach of the KDC Contract, which as

already discussed at length is fraudulent and entirely unfair. Where the KDC Contract is void, KDC cannot maintain a claim for breach of the covenant of good faith and fair dealing (Count X) or for a Mechanic's Lien (Count XII). KDC cannot recover anything in equity under Count XI (Unjust Enrichment), Count XIII (Promissory Estoppel) or Count XIV (Quantum Meruit). KDC's bad faith and unfair dealing has impoverished the Company, not enriched it, and having failed to prove entire fairness, it cannot recover anything at all. Kagan has not proved any "conspiracy" among the Plaintiffs (Count XVII). Neither has he proved any Tortious Interference (Count XVIII). His counterclaims are frivolous.

## VI.   **The Damage Done**

Rather than receive the benefit of the bargain they made with Kagan, the Plaintiffs were forced to seek bankruptcy protection, sell the properties under distress, and see their investment tied up in a bankruptcy trustee escrow account for a period of years. The Court should award Plaintiffs the following:

(1)   Allowance of their Proofs of Claim and Interest;

(2)   Disallowance of the Kagan Parties' Proofs of Claim and Interest;

(3)   Return of their full capital contributions;

(4)   Lost Profits Damages;

(5)   Consequential Damages;

(6)   Lost Use of Money Damages;

(7)   Prejudgment Interest;

(8)   Equitable Subordination of the Kagan Parties' Claims and Interests;

(9)   Treble Damages and Attorneys' Fees against KDC, ProEx and Tatiana; and

(10)   Judgment in their favor and against the Kagan Parties on all claims and counterclaims in the Adversary Proceeding.

Plaintiffs provide their specific calculations of the proper damages and their proposed

additional and further relief in the accompanying Proposed Findings.  Because each of the

Defendants contributed substantially to the overall scheme, they are jointly and severally liable

for the Plaintiffs' damages.  <u>Nelson v. Nason</u>, 343 Mass. 220, 222 (1961)

## <u>CONCLUSION</u>

The Court should disallow all of the Kagan Parties' Proofs of Claim and Interest, allow

the Plaintiffs' Proofs of Claim and Interest and grant Plaintiffs judgment on all counts of their

Complaint and all counts of the Counterclaims, and award them damages, treble damages,

equitable relief, attorneys' fees and such other and further relief as the court deems just.

| | |
|---|---|
| LYMAN-CUTLER, LLC,<br>By its attorney, | ALEX FILIPPOV and<br>NICKOLAY LIPETSKER,<br>By their attorneys, |
| */s/ Peter Tamposi* | */s/ Sean T. Carnathan* |
| Peter N. Tamposi, BBO No. 639497<br>The Tamposi Law Group, P.C.<br>159 Main Street<br>Nashua, NH 03060<br>T: (603) 204-5513 | Sean T. Carnathan, BBO No. 636889<br>scarnathan@ocmlaw.net<br>Joseph P. Calandrelli, BBO No. 666128<br>jcalandrelli@ocmlaw.net<br>O'Connor, Carnathan and Mack, LLC<br>1 Van de Graaff Dr. Suite 104<br>Burlington, MA 01803<br>T:  781-359-9000 |

Dated:  September 20, 2019

## <u>Certificate of Service</u>

I hereby certify that this document filed through the ECF system will be sent
electronically to the registered participants as identified on the Notice of Electronic Filing and
paper copies will be sent to those indicated as non-registered participants on September 20, 2019.

*/s/ Sean T. Carnathan*
Sean T. Carnathan

| DA COSTA CONSTRUCTION | | | | |
|---|---|---|---|---|
| Date | Type | Amount | Property | Cite |
| 9/19/2013 | LLC Check | $ 10,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 29 |
| 9/19/2013 | LLC Check | $ 10,000.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 30 |
| 10/5/2013 | LLC Check | $ 10,000.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 35 |
| 10/5/2013 | LLC Check | $ 10,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 35 |
| 11/1/2013 | LLC Check | $ 10,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 42 |
| 11/1/2013 | LLC Check | $ 10,000.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 43 |
| 11/18/2013 | LLC Check | $ 20,000.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 41 |
| 11/18/2013 | LLC Check | $ 20,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 41 |
| 12/24/2013 | LLC Check | $ 20,000.00 | both | Plaintiff's Exhibit 74, p. 48 |
| 1/17/2014 | LLC Check | $ 40,000.00 | both | Plaintiff's Exhibit 74, p. 53 |
| 2/14/2014 | LLC Check | $ 20,000.00 | blank | Plaintiff's Exhibit 74, p. 57 |
| 3/6/2014 | LLC Check | $ 30,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 62 |
| 3/6/2014 | LLC Check | $ 20,000.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 62 |
| 4/15/2014 | DaCosta Invoice #1405 | $ 97,500.00 | 88 Cutler | Defendant's Exhibit 175, Tab C38 |
| 4/15/2014 | Change Order | $ 6,800.00 | 88 Cutler | Defendant's Exhibit 175, Tab C38 |
| 4/15/2014 | Change Order | $ 10,200.00 | 88 Cutler | Defendant's Exhibit 175, Tab C38 |
| 4/15/2014 | Change Order | $ 12,500.00 | 88 Cutler | Defendant's Exhibit 175, Tab C38 |
| 4/15/2014 | Extra Trim | $ 6,800.00 | 88 Cutler | Defendant's Exhibit 175, Tab C38 |
| 4/15/2014 | Extra Siding | $ 4,550.00 | 88 Cutler | Defendant's Exhibit 175, Tab C38 |
| 4/22/2014 | LLC Check | $ 30,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 67 |
| 4/25/2014 | DaCosta Invoice #1406 | $ 97,500.00 | 55 Lyman | Defendant's Exhibit 175, Tab L40 |
| 4/25/2014 | Change Order | $ 6,800.00 | 55 Lyman | Defendant's Exhibit 175, Tab L40 |
| 4/25/2014 | Change Order | $ 10,200.00 | 55 Lyman | Defendant's Exhibit 175, Tab L40 |
| 4/25/2014 | Change Order | $ 35,500.00 | 55 Lyman | Defendant's Exhibit 175, Tab L40 |
| 4/25/2014 | Extra Trim | $ 6,800.00 | 55 Lyman | Defendant's Exhibit 175, Tab L40 |
| 4/25/2014 | Extra Siding | $ 4,550.00 | 55 Lyman | Defendant's Exhibit 175, Tab L40 |
| 5/1/2014 | LLC Check | $ 28,350.00 | unknown | Plaintiff's Exhibit 74, p. 70 |
| 5/5/2014 | LLC Check | $ 4,350.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 72 |
| 5/19/2014 | LLC Check | $ 7,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 74 |
| 6/3/2014 | KDC Check | $ 5,000.00 | 55 Lyman | Defendant's Exhibit 175, Tab L40 |
| 7/3/2014 | KDC Check | $ 10,000.00 | 55 Lyman | Defendant's Exhibit 175, Tab L40 |
| 7/24/2014 | LLC Check | $ 10,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 85 |
| 8/22/2014 | LLC Check | $ 15,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 91 |
| 8/29/2014 | DaCosta Invoice #1407 | $ 1,500.00 | 55 Lyman | Defendant's Exhibit 175, Tab L40 |
| 8/29/2014 | DaCosta Invoice #1407 | $ 1,500.00 | 88 Cutler | Defendant's Exhibit 175, Tab C38 |
| 9/2/2015 | DaCosta Change Order 2033 dated 3/1/15 | $ 18,500.00 | 55 Lyman | Defendant's Exhibit 175, Tab L40 |
| 9/2/2015 | DaCosta Change Order 2032 dated 3/1/15 | $ 18,500.00 | 88 Cutler | Defendant's Exhibit 175, Tab C38 |
| 9/2/2015 | Correction to Invoice #1405 | $ 23,000.00 | 88 Cutler | Defendant's Exhibit 175, Tab C38 |
|  | Total Payments | $ 339,700.00 |  |  |
|  | Total Invoices after adjustment | $ 362,700.00 |  |  |
|  | Claimed Outstanding Balance | $ 23,000.00 |  |  |

| 8/29/2014 | Total Invoiced as of 8/29/14 | $ 302,700.00 |
|---|---|---|
| 8/29/2014 | Total Payments as of 8/29/14 | $ 339,700.00 |
|  | Overpayment as of 8/29/14 | $ (37,000.00) |
| 9/2/2015 | Late Correction & Change Orders | $ 60,000.00 |

| DÉCOR ART | | | | |
|---|---|---|---|---|
| Date | Type | Amount | Property | Cite |
| undated | Proposal | $ 61,100.00 | 55 Lyman | Defendant's Exhibit 175, Tab L35 |
| undated | Proposal | $ 61,100.00 | 88 Cutler | Defendant's Exhibit 175, Tab C31 |
| 11/1/2013 | LLC Check | $ 10,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 43 |
| 11/1/2013 | LLC Check | $ 10,000.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 43 |
| 1/17/2014 | LLC Check | $ 15,000.00 | blank | Plaintiff's Exhibit 74, p. 53 |
| 4/17/2014 | LLC Check | $ 5,000.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 67 |
| 4/17/2014 | Invoice 1015 | $ 5,000.00 | 88 Cutler | Defendant's Exhibit 175, Tab C31 |
| 5/30/2014 | LLC Check | $ 5,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 78 |
| 7/1/2014 | LLC Check | $ 16,000.00 | both | Plaintiff's Exhibit 74, p. 83 |
| 7/25/2014 | LLC Check | $ 8,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 86 |
| 7/25/2014 | LLC Check | $ 8,000.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 86 |
| 8/22/2014 | LLC Check | $ 28,450.00 | both | Plaintiff's Exhibit 74, p. 91 |
| 1/23/2015 | LLC Check | $ 3,350.00 | blank | Plaintiff's Exhibit 74, p. 112 |
| 2/12/2015 | Invoice 1057 | $ 8,750.00 | 55 Lyman | Defendant's Exhibit 175, Tab L35 |
| 2/18/2015 | LLC Check | $ 6,000.00 | Inv. 1057 | Plaintiff's Exhibit 74, p. 117 |
| 3/19/2015 | LLC Check | $ 3,600.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 121 |
| 4/19/2015 | LLC Check | $ 3,000.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 125 |
| 4/23/2015 | Invoice 1067 | $ 420.00 | 55 Lyman | Defendant's Exhibit 175, Tab L35 |
| 5/27/2015 | Invoice 1076 | $ 4,250.00 | 88 Cutler | Defendant's Exhibit 175, Tab C31 |
| undated | Invoice 1054 | $ 1,550.00 | 88 Cutler | Defendant's Exhibit 175, Tab C31 |
| undated | Invoice 1052 | $ 1,850.00 | 55 Lyman | Defendant's Exhibit 175, Tab L35 |
| undated | Invoice 1048 | $ 1,400.00 | 55 Lyman | Defendant's Exhibit 175, Tab L35 |
| undated | Invoice 1047 | $ 1,400.00 | 88 Cutler | Defendant's Exhibit 175, Tab C31 |
| undated | Invoice 1041 | $ 10,000.00 | 88 Cutler | Defendant's Exhibit 175, Tab C31 |
| undated | Invoice 1040 | $ 450.00 | 88 Cutler | Defendant's Exhibit 175, Tab C31 |
| undated | Invoice 1039 | $ 18,000.00 | 88 Cutler | Defendant's Exhibit 175, Tab C31 |
| undated | Invoice 1034 | $ 10,000.00 | 55 Lyman | Defendant's Exhibit 175, Tab L35 |
| undated | Invoice 1031 | $ 8,000.00 | 55 Lyman | Defendant's Exhibit 175, Tab L35 |
| undated | Invoice 1027 | $ 6,000.00 | 55 Lyman | Defendant's Exhibit 175, Tab L35 |
| undated | Invoice 1020 | $ 5,000.00 | 55 Lyman | Defendant's Exhibit 175, Tab L35 |
| undated | Invoice 1020 | $ 10,000.00 | 88 Cutler | Defendant's Exhibit 175, Tab C31 |
|  | Total Proposals | $ 122,200.00 | | |
|  | Total Invoices | $ 92,070.00 | | |
|  | Total Payments | $ 121,400.00 | | |

| BST PLUMBING | | | | |
|---|---|---|---|---|
| Date | Type | Amount | Property | Cite |
| 1/29/2014 | Rough Inspection | | 88 Cutler | Exhibit 333, p. 8 |
| 2/4/2014 | LLC Check | $ 20,000.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 57 |
| 3/6/2014 | Rough Inspection | | 55 Lyman | Exhibit 332, p. 5 |
| 3/10/2014 | LLC Check | $ 20,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 62 |
| 9/24/2014 | Final Inspection | | 55 Lyman | Exhibit 332, p. 5 |
| 9/26/2014 | Final Inspection | | 88 Cutler | Exhibit 333, p. 8 |
| 2/14/2015 | Invoice #1165 | $ 39,670.00 | 55 Lyman | Defendant's Exhibit 175, Tab L53 |
| 3/1/2015 | Invoice #1166 | $ 39,670.00 | 88 Cutler | Defendant's Exhibit 175, Tab C51 |

| UNICON ELECTRIC | | | | |
|---|---|---|---|---|
| Date | Type | Amount | Property | Cite |
| 9/19/2013 | LLC Check | $ 10,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 30 |
| 9/19/2013 | LLC Check | $ 10,000.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 30 |
| 1/7/2014 | LLC Check | $ 10,000.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 52 |
| 2/6/2014 | Rough Inspection | | 88 Cutler | Exhibit 333, p. 8 |
| 2/18/2014 | LLC Check | $ 15,000.00 | Both | Plaintiff's Exhibit 74, p. 58 |
| 3/6/2014 | LLC Check | $ 10,000.00 | Both | Plaintiff's Exhibit 74, p. 62 |
| 3/18/2014 | Rough Inspection | | 55 Lyman | Exhibit 332, p. 5 |
| 4/24/2014 | LLC Check | $ 10,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 68 |
| 9/3/2014 | Final Inspection | | 88 Cutler | Exhibit 333, p. 8 |
| 9/23/2014 | Final Inspection | | 55 Lyman | Exhibit 332, p. 5 |
| Undated | Proposal | $ 65,000.00 | 55 Lyman | Defendant's Exhibit 175, Tab L37 |
| Undated | Proposal | $ 65,000.00 | 88 Cutler | Defendant's Exhibit 175, Tab C33 |

| V&D HEATING & COOLING | | | | |
|---|---|---|---|---|
| Date | Type | Amount | Property | Cite |
| 10/26/2013 | LLC Check | $ 10,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 37 |
| 10/26/2013 | LLC Check | $ 10,000.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 37 |
| 12/5/2013 | Proposal | $ 57,000.00 | 88 Cutler | Defendant's Exhibit 175, Tab C41 |
| 12/6/2013 | Proposal | $ 57,000.00 | 55 Lyman | Defendant's Exhibit 175, Tab L43 |
| 12/26/2013 | Permit Application | | 88 Cutler | Sergeev Testimony |
| 1/5/2014 | LLC Check | $ 25,000.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 52 |
| 1/29/2014 | Rough Inspection | | 88 Cutler | Exhibit 333, p. 8 |
| 2/28/2014 | LLC Check | $ 25,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 61 |
| 3/6/2014 | Rough Inspection | | 55 Lyman | Exhibit 332, p. 5 |
| 4/17/2014 | LLC Check | $ 10,000.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 67 |
| 7/8/2014 | Invoice | $ 1,100.00 | Both | Defendant's Exhibit 175, Tab L43 |
| 7/8/2014 | LLC Check | $ 1,100.00 | Both | Plaintiff's Exhibit 74, p. 84 |
| 9/25/2014 | Final Inspection | | 55 Lyman | Exhibit 332, p. 5 |
| 9/25/2014 | Final Inspection | | 88 Cutler | Exhibit 333, p. 8 |
| 11/25/2014 | Invoice | $ 2,500.00 | 55 Lyman | Defendant's Exhibit 175, Tab L43 |
| 11/25/2014 | Invoice | $ 2,500.00 | 88 Cutler | Defendant's Exhibit 175, Tab C41 |

| DREAM FLOORING | | | | |
|---|---|---|---|---|
| Date | Type | Amount | Property | Cite |
| 11/20/2013 | LLC Check | $ 10,000.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 42 |
| 11/20/2013 | LLC Check | $ 10,000.00 | 88 Cutler | Plaintiff's Exhibit 74, p. 42 |
| 2/4/2014 | LLC Check | $ 10,000.00 | Both | Plaintiff's Exhibit 74, p. 57 |
| 2/17/2014 | LLC Check | $ 10,000.00 | Both | Plaintiff's Exhibit 74, p. 58 |
| 6/21/2014 | Invoice | $ 48,910.00 | 88 Cutler | Defendant's Exhibit 175, Tab C32 |
| 7/3/2014 | Invoice | $ 48,910.00 | 55 Lyman | Defendant's Exhibit 175, Tab L36 |
| 7/21/2014 | Loan Advance Request | $ 16,000.00 | 88 Cutler | Exhibit 42, p. 26 |
| 7/25/2014 | Floor installation | | 55 Lyman | Exhibit 39 |
| 7/28/2014 | Loan Advance Request | $ 16,000.00 | 55 Lyman | Exhibit 41, p. 26 |
| 8/25/2014 | LLC Check | $ 30,000.00 | Both | Plaintiff's Exhibit 74, p. 96 |
| 3/23/2015 | Invoice | $ 3,300.00 | 55 Lyman | Defendant's Exhibit 175, Tab L36 |
| 4/22/2015 | LLC Check | $ 12,210.00 | 55 Lyman | Plaintiff's Exhibit 74, p. 125 |
| 7/24/2015 | KDC Check | $ 5,000.00 | Both | Defendant's Exhibit 175, Tab L36 |