UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS

|  |  |  |
|---|---|---|
| *In re:* | ) | |
| | ) | |
| LYMAN-CUTLER, LLC, | ) | Chapter 7 |
| Debtor | ) | Case No. 15-13881 FJB |
| | ) | |

|  |  |  |
|---|---|---|
| LYMAN-CUTLER, LLC, et al., | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | Adv. Case No. 1:16-ap-01120 |
| | ) | |
| | ) | |
| VADIM KAGAN, et al., | ) | |
| | ) | |
| Defendants. | ) | |

**PLAINTIFFS' PROPOSED FINDINGS OF FACT AND CONCLUSIONS OF LAW**

Pursuant to the Pretrial Order (Doc. No. 155), August 3, 2016, ¶ 20, Plaintiffs Lyman-Cutler, LLC ("Lyman-Cutler"), Alex Filippov ("Filippov") and Nickolay Lipetsker ("Lipetsker") hereby submit their Post-Trial Proposed Findings of Fact and Conclusions of Law.  Citations to the Trial Transcript are given in the format "T. Tr. May __, 2019 at __."

# **Table of Contents**

Findings of Fact ........................................................................................................... 4

    I.     The Inception of the Project .......................................................................... 4

    II.    Payment of Construction Costs During the Project. .................................... 13

    III.   The Listing Agreements with Tatiana.......................................................... 14

    IV.   The Construction of the Two Homes and Substantial Completion ............. 19

    V.    The Purported Contract between Lyman-Cutler and KDC ......................... 20

    VI.   Trial Exhibit 215 ......................................................................................... 27

    VII.  The Purported Charges By ProEx ............................................................... 30

    VIII. General Evidence of the Unreliability of KDC's
           Documentation of its Proof of Claim.......................................................... 34

    IX.   The Alleged Payables to the Subcontractors .............................................. 39

    X.    Total False and Unsubstantiated Claims in the Proof of Claim................... 50

    XI.   The Financial Distress of the Debtor .......................................................... 52

    XII.  The Construction Expert Testimony............................................................ 53

Conclusions of Law and Mixed Findings ..................................................................... 59

    I.     Overarching Principles................................................................................. 59

    II.    The Proofs of Claim and Interests .............................................................. 68

           Proof of Claim 1-2 Kagan Development KDC Corp............................... 68

           Proof of Claim 2-1 O'Connor, Carnathan and Mack, LLC .................... 68

           Proof of Claim 3-1 U.S. Trustee ............................................................ 69

           Proof of Claim 4-1 Kagan Development, KDC Corp. (Indemnification)............ 69

           Proof of Claim 5-1 Tatiana Kagan.......................................................... 69

           Proof of Claim 6-1 Vadim Kagan ........................................................... 70

           Proof of Claim 7-1 ProExcavation Corp................................................. 70

           Proof of Claim 8-1 Cortez Landscaping ................................................ 70

           Proof of Claim 9-1 Alex Filippov........................................................... 70

           Proof of Interest 10-1 Nickolay Lipetsker ............................................. 71

           Proof of Interest 11-1 Alex Filippov....................................................... 71

           Proof of Interest 12-1 Vadim Kagan....................................................... 71

    III.   The Counts in the Amended Adversary Complaint...................................... 72

           Count I – Breach of Contract, Asserted by All Plaintiffs
                   against Vadim Kagan ................................................................ 72

Count II – Breach of Fiduciary Duty, Asserted by All Plaintiffs
against Vadim Kagan ................................................................. 72

Count III – Aiding and Abetting Breach of Fiduciary Duty, All Plaintiffs
against Tatiana, KDC and ProEx .................................................. 73

Count IV – Fraud, All Plaintiffs Against All Defendants...................................... 73

Count V – Conspiracy, All Plaintiffs against All Defendants ............................. 75

Count VI – Violation of Chapter 93A by the Company against
Tatiana, KDC and ProEx ............................................................. 75

Count VIII – Equitable Subordination ................................................................. 76

Damages and Other Relief ........................................................................................... 77

Kagan Parties' Counterclaims (Adv. Doc. 106) .......................................................... 85

Counts I and II – Breach of Fiduciary Duty and Freezeout,
by Kagan against Filippov and Lipetsker ..................................... 85

Count III – Breach of Contract, Kagan v. Filippov and Lipetsker ...................... 85

Count IV – Breach of Implied Covenant of Good Faith and Fair Dealing,
Kagan v. Filippov and Lipetsker................................................... 85

Counts V, VI, VII, VIII – Indemnification by All Kagan Defendants
against the Debtor ....................................................................... 86

Count IX – Breach of Contract, by KDC against the Debtor ............................. 86

Count X – Breach of the Implied Covenant of Good Faith and Fair Dealing,
KDC v. the Debtor ...................................................................... 86

Count XI – Unjust Enrichment, KDC v. the Debtor........................................... 87

Count XII – Mechanic's Lien by KDC against the Debtor ................................. 87

Count XIII – Promissory Estoppel, KDC against the Debtor .............................. 88

Count XIV – Quantum Meruit, KDC against the Debtor .................................... 88

Count XV – Interference with Contract, Kagan against the Debtor .................... 89

Count XVI – Promissory Estoppel, Kagan against the Debtor,
Filippov and Lipetsker ................................................................. 90

Count XVII – Conspiracy, Kagan against the Debtor, Filippov and Lipetsker.... 90

Count XVIII – Tortious Interference with Advantageous Business Relations,
Kagan against Filippov and Lipetsker .......................................... 90

## Findings of Fact

I.     **The Inception of the Project**

1.     Filippov is a telecom executive and Lipetsker is a dentist.  Neither man has significant experience with home construction.  T. Tr. May 6, 2019 at 29 (Filippov);  T. Tr. May 9, 2019 at 9 (Lipetsker).

2.     In October 2012, Vadim Kagan ("Kagan") approached Lipetsker to solicit investment in a development project he had planned.  T. Tr. May 15, 2019 at 46-47 (Kagan); T. Tr. May 9, 2019 at 13, 15 (Lipetsker).

3.     Lipetsker introduced Kagan to Filippov as a potential investor.  T. Tr. May 6, 2019 at 31 (Filippov).

4.     Kagan planned to purchase a property at 77 Lyman Road, Brookline, Massachusetts, tear down the existing home, split the lot in two and build two new homes on the property (the "Project").  T. Tr. May 6, 2019 at 36 (Filippov).

5.     With the assistance of Dimitriy Zhukovskiy, Kagan prepared a presentation to Filippov and Lipetsker, outlining the costs of construction and carrying costs and presenting to them projected profits from the proposed project.  Trial Exhibits 7, 8 and 9; T. Tr. May 8, 2019 at 38, 40-43 (Zhukovskiy); T. Tr. May 6, 2019 at 35, 38-42 (Filippov); T. Tr. May 9, 2019 at 17-20 (Lipetsker); see also Trial Exhibit 89 (May 5, 2013 Filippov email asking who is paying Zhukovskiy); T. Tr. May 6, 2019 at 80 (translating Russian).

6.     The Court discredits Kagan's testimony denying that he worked with Zhukovskiy to create the presentation, Trial Exhibit 9, and denying that he provided the construction cost numbers for the presentation.  See T. Tr. May 15, 2019 at 57-59; June 17, 2019 at 14-16 (Kagan).  The documentary evidence and three credible witnesses contradict him.

7.       On October 25, 2012, Kagan, Filippov, and Lipetsker met at the office of

Attorney Boris Maiden ("Maiden") to discuss the potential project.  Maiden was also present for

the meeting.  T. Tr. May 6, 2019 at 32-35 (Filippov); T. Tr. May 9, 2019 at 17-20 (Lipetsker); T.

Tr. May 8, 2019 at 58 (Zhukovskiy); T. Tr. June 18, 2019 at 178-179 (Maiden); Trial Ex. 9.

8.       Maiden had worked with Kagan on many prior projects and drafted many

operating agreements for his projects.  T. Tr. June 18, 2019 at 174-175 (Maiden); T. Tr. May 15,

2019 at 53-54; June 17, 2019 at 26 (Kagan).

9.       Kagan understood that Maiden was his attorney for the purpose of forming

Lyman-Cutler and negotiating the operating agreement.  T. Tr. May 15, 2019 at 66, 68-69, 140-

141; June 17, 2019 at 25-26, 65 (Kagan).

10.      At the meeting, Kagan presented to Filippov and Lipetsker the presentation he

and Zhukovskiy had created.  The presentation projected total construction and carrying costs of

$1.5 million per home (the "Construction Budget"), comprised of $1.3 million in construction

costs and $200,000 in carrying costs.  Kagan  presented 663 different profit scenarios, varying

based upon the time to sell the property and the selling price.  Every one of the 663 scenarios

used the same costs of construction, $1.3 million per home.  T. Tr. May 8, 2019 at 59-60

(Zhukovskiy); T. Tr. May 6, 2019 at 38-42 (Filippov); T. Tr. May 9, 2019 at 17-20 (Lipetsker).

11.      Kagan assured Filippov and Lipetsker at the October 25, 2012 meeting that he

knew exactly how much it would cost to build each home and that they could rely on his

estimated costs of construction.  T. Tr. May 8, at 46-47, 54-55, 60 (Zhukovskiy); T. Tr. May 6,

2019 at 32-33, 38 (Filippov); T. Tr. May 9, 2019 at 18, 20 (Lipetsker).

12.      The Court discredits Kagan's testimony denying that he assured Filippov and

Lipetsker that he could build each home for $1.3 million plus $200,000 in carrying costs through

the sale of the homes.  T. Tr. May 15, 2019 at 62-63; June 17, 2019 at 18-19 (Kagan).  The

documentary evidence and three credible witnesses contradict him.  See Trial Exhibits 26, 30,

31, and 32 (referring to the $1.3 million construction budget per home and analyzing whether to

agree to extend it to $1.4 million per home).

13.     Filippov and Lipetsker specifically and reasonably relied upon Kagan's assurance

that he would complete construction of two homes at a fixed maximum cost of $1.3 million per

home when they agreed to invest in the Project.  T. Tr. May 6, 2019 at 44-45 (Filippov); T. Tr.

May 9, 2019 at 18-20 (Lipetsker).

14.     When Kagan told Filippov and Lipetsker that he could build each home for $1.3

million in maximum construction costs, he had not generated any construction plans, or site

plans and had not solicited any bids or estimates from his subcontractors.  T. Tr. June 17, 2019 at

14, 17-19, 56-57 (Kagan).  Kagan acted with reckless disregard for whether he could in fact

build the homes for the amount he promised to Filippov and Lipetsker.

15.     Between October 25, 2012 and November 12, 2012, Maiden worked on drafting

the Operating Agreement for Lyman-Cutler LLC (the "Operating Agreement"), and the Parties

negotiated certain terms material to this dispute.  T. Tr. June 18, 2019 at 186-187 (Maiden); T.

Tr. May 6, 2019 at 46-47, 48-61 (Filippov); Trial Exhibits 10, 11, 12, 13, 14, 15.

16.     At Filippov's insistence, he was made the Managing Member of Lyman-Cutler.

Trial Exhibits 14, 15; T. Tr. June 18, 2019 at 193 (Maiden); T. Tr. May 6, 2019 at 53-54

(Filippov).

17.     Maiden credibly testified that he went over each and every material provision of

the Operating Agreement with Kagan before the Parties signed it.  T. Tr. June 18, 2019 at 187

(Maiden).  Compare Trial Exhibit 11 with Trial Exhibit 15 (changes from draft operating

agreement to final reflect Kagan input).

18.    The Court discredits Kagan's testimony that he did not read or understand the

Operating Agreement.  T. Tr. May 15, 2019 at 67-69; June 17, 2019 at 25, 30-31 (Kagan).  His

own attorney, the documents, other credible witnesses and at times his own testimony all

contradict his account.

19.    The Operating Agreement identifies Filippov as the "Managing Manager," but

that was a typographical error.  In multiple other documents, Filippov is identified as the

Managing Member.  Trial Exhibit 15; Trial Exhibits 16, 17, 20, 53.

20.    Kagan had actual knowledge from the outset of the Project that Filippov was the

Managing Member.  Kagan's arguments in this case that Filippov was not the Managing

Member are not credible.  T. Tr. June 18, 2019 at 193 (Maiden).   Compare Amended

Counterclaim (Adv. Doc. No. 106) ¶¶ 70(d), 156.

21.    Kagan informed Filippov and Lipetsker that the carrying costs would be paid with

proceeds from the construction loans.  T. Tr. May 6, 2019 at 38 (Filippov).   Kagan had done this

in multiple prior projects.  T. Tr. June 18, 2019 at 188; T. Tr. June 25, 2019 at 44 (Maiden); Trial

Exhibits 108, 111, 119, 120, 128, 331 (composite exhibit of 5 operating agreements from other

projects in which Kagan borrowed the carrying costs).  Kagan was forced on cross examination

to acknowledge a total of ten operating agreements providing that the company would borrow

the carrying costs.  There was no evidence of any operating agreement in which the company did

not borrow the carrying costs.

22.    The Operating Agreement specifically provides that Lyman-Cutler would borrow

the carrying costs.  Trial Exhibit 15.

23.     The Court discredits Kagan's testimony that he did not know that Lyman-Cutler was borrowing the carrying costs.  T. Tr. June 17, 2019 at 24-25, 30, 65 (Kagan).

24.     Kagan admitted to understanding the other material terms of the Operating Agreement, including that he was responsible for building the two houses, that his compensation was 50% of the net profits, that Filippov was the managing member, that Tatiana would be retained as the listing broker, that Filippov had the right to remove her after a certain time, and that he had to pay the carrying costs after 23 months.  T Tr. June 17, 2019 at 65-67. Accordingly, by his own admission, Kagan had <u>actual</u> knowledge of the terms of the Operating Agreement that he breached through his conduct described in this Decision.

25.     Based on Kagan's October 25, 2012 presentation, which identified the time to sale and selling price as the two primary risk factors in the deal, Filippov was acutely aware of the potential for the carrying costs to be higher than projected if the two new homes were not completed and sold in the time frame projected in Kagan's presentation.  Trial Exhibits 9, 10, 12.

26.     Accordingly, at Filippov's insistence, Kagan agreed to be responsible for paying the carrying costs if the homes were not completed and sold within 23 months from the "Date of Acquisition," which is a defined term in the Operating Agreement.  Trial Exhibits 9, 10, 15.  T. Tr. June 18, 2019 at 189 (Maiden).

27.     The Operating Agreement defined the "Date of Acquisition" as the date the deed for the Lyman Road property was recorded.  Trial Exhibit 15 at 2.

28.     The Lyman Road deed was recorded on December 31, 2012, making that the Date of Acquisition.  Trial Exhibit 19.

29.     Accordingly, under Section 8.1 of the Operating Agreement, Kagan was responsible for payment of all carrying costs incurred on or after **November 30, 2014**, 23 months from the Date of Acquisition.  Trial Exhibit 15.

30.     Section 5.2 of the Operating Agreement also expressly states that Kagan is responsible for building the two homes "in accordance with the plans, including drawings, supplied by Mr. Kagan and approved by Managing Member."  Trial Exhibit 15.

31.     Section 5.2 further expressly states that Kagan's compensation for building the homes is his profit share set forth in Section 8.1 of the Agreement.  Although Kagan was investing only $250,000 compared to Filippov's $2 million and Lipetsker's $250,000 (for which Lipetsker was to receive 10% of the profits), Kagan was to receive 50% of the profits, subject to certain potential adjustments.  Id.

32.     Filippov was the Managing Member.  T. Tr. June 18, 2019 at 193 (Maiden); T. Tr. May 6, 2019 at 53-54 (Filippov); T. Tr. June 17, 2019 at 66 (Kagan); Trial Exhibit 15; Trial Exhibit 20.

33.     The only "plans" approved by Filippov were the financial plans consisting of the maximum construction budget of $1.3 million per home plus $200,000 in carrying costs per home, as adjusted to $1.4 million for maximum construction costs per home in May 2013.  Trial Exhibits 9, 26, 30, 31, 32; T. Tr. May 6, 2019 at 58 (Filippov); T. Tr. May 9, 2019 at 18, 42-44 (Lipetsker).

34.      The Court credits the testimony of Filippov and Lipetsker regarding the terms of the deal among the parties and the "plans" approved by Filippov.  The Court discredits Kagan's contrary testimony on this issue.  See T. Tr. June 17, 2019 at 17-19 (Kagan).  Kagan's testimony is contradicted by the documentary evidence and the credible witnesses.

35.    In particular, the Court discredits Kagan's testimony that he told Filippov and Lipetsker that he had no plans and did not know what it would cost to build the homes, and that the $1.3 million budget in the October 25, 2012 presentation that Kagan prepared with Zhukovskiy was "laughable," but that Filippov and Lipetsker nevertheless agreed to invest $2.25 million combined with Kagan. See T. Tr. June 17, 2019 at 17-19 (Kagan's testimony, which the Court finds is not credible).

36.    In connection with applying to Rockland Trust for the construction loans, the Parties reviewed the construction and carrying costs carefully and agreed to increase the construction loans and the Construction Budget for each home to $1.6 million, comprised of $1.4 million for the costs of construction and $200,000 for carrying costs. The related correspondence again shows that Filippov was acutely aware of the impact of the carrying costs on the Project's profit and was concerned about relatively modest amounts of money compared to the current stakes of the litigation. Trial Exhibits 26, 30, 31, 32; T. Tr. May 6, 2019 at 68, 75, 77-79 (Filippov); T. Tr. May 9, 2019 at 20-22 (Lipetsker): T. Tr. May 8, 2019 at 68-69 (Zhukovskiy).

37.    Kagan is the one who asked Filippov to approve an increase to $1.4 million per home. T. Tr. May 6, 2019 at 78 (Filippov). There is no credible reason to believe Filippov would have asked Kagan to increase the construction budget. See also Trial Exhibits 22, 23.

38.    Specifically, Filippov was concerned about increasing the maximum construction budget and corresponding bank loan to $1.4 million per home because he believed they would be $16,000 per home short to cover the carrying costs. Trial Ex. 32 at 3. Only when Zhukovskiy pointed out an error in the math where they double counted taxes did Filippov agree to increase the maximum construction budget to $1.4 million per home. Id.

10

39.     Filippov arranged to borrow $1.6 million for the Construction Budget for each home from Rockland Bank, and the Parties all understood and agreed that this sum included $200,000 per home for carrying costs.  Trial Ex. 32; T. Tr. May 6, 2019 at 85 (Filippov); T. Tr. June 18, 2019 at 188 (Maiden).

40.     The parties also borrowed an extra $100,000 when they took out the loan to buy the land in order to cover carrying costs.  Trial Exhibit 18; T. Tr. June 17, 2019 at 25 (Kagan admitting they borrowed $100,000 for carrying costs when they took out the loan for the land); T. Tr. June 18, 2019 at 183-84 (Maiden).

41.     The Rockland Bank mortgage documents contain a term prohibiting the borrowing of carrying costs but Filippov was unaware of it and had no reason to believe Lyman Cutler could not borrow the carrying costs.  To the contrary, both Kagan and Maiden told him that this was standard practice.  T. Tr. June 25, 2019 at 43 (Maiden); T. Tr. May 6, 2019 at 38-39.  Where Maiden was the closing attorney and told Filippov that he could borrow the carrying costs and they were included in the loan, Filippov had no reason to believe there was anything wrong with doing so.

42.     The Court discredits Kagan's testimony regarding the borrowing of the carrying costs as knowingly false.  The Court finds that Kagan developed this false testimony with the assistance of Joseph Cohen, who studied the documents and developed this theory in bad faith in order to extort money from Filippov and Lipetsker.  T. Tr. May 9, 2019 at 89 (Cohen); T. Tr. June 17, 2019 at 24-26, 30, 44, 65, 73, 82-84 (Kagan).

43.     When the Parties formed Lyman-Cutler, the agreement among them included the following material terms:

      a.   Filippov was the Managing Member;

b.  Kagan was responsible for building the two homes in accordance with plans approved by Filippov as Managing Member;

c.  Kagan's compensation for building the two homes was his 50% share of the net profits from the venture;

d.  Kagan was responsible for substantially completing the homes by no later than March 30, 2014;

e.  The construction budget, approved by Filippov, was $1.3 million per home;

f.  The LLC would borrow $200,000 per home from Rockland Trust for the carrying costs;

g.  If Kagan did not build and sell the homes within 23 months (by November 30, 2014) he was responsible for payment of all carrying costs until the homes were sold, without reimbursement at closing;

h.  If Kagan failed to honor his obligation to pay the carrying costs after 23 months, then Filippov would pay them, but as a result Kagan's share of the proceeds of any sale would go down commensurately and Filippov's would go up commensurately;

i.  Filippov and Lipetsker were entitled to an extra 5% per annum return on any capital not returned to them by November 30, 2014.

Trial Exhibit 15.

44.    In May 2013, in connection with the construction loans from Rockland Trust, Filippov, as Managing Member, approved an adjustment to the financial plans to borrow an additional $100,000 per home for construction costs and increase the selling prices to $5.25 million.  Trial Exhibits 26, 30, 31, 32.

45. Kagan had actual knowledge of the terms of the Parties' agreement from the outset of the venture. T. Tr. June 17, 2019 at 65-67 (Kagan).

46. The Court further discredit's Kagan's testimony that he could not develop construction plans until he knew how much Filippov could borrow. T. Tr. May 15, 2019 at 85-86. Not only does this make no sense at all because Kagan had to submit the plans to the bank in order to support an appraisal and get the loan, Trial Exhibit 21, 24, 27, 28, 29, but it makes no sense that Filippov and Lipetsker would just give Kagan money with no plans of any kind. Filippov and Lipetsker agreed to invest in the project based on the financial plans that Kagan presented to them and that Filippov approved as Managing Member.

**II.   Payment of Construction Costs During the Project.**

47. The bank statements and related correspondence among the Parties demonstrate that each month until November 2014, Lyman-Cutler used advances from the loans to pay the carrying costs without protest from Kagan. Trial Exhibit 43 (related correspondence); Trial Exhibit 74 (Bank Statements); T. Tr. May 6, 2019 at 93 (Filippov).

48. From time to time KDC made advances of cash to the Lyman Cutler bank account when the account was low on funds to meet the carrying costs, but the payments back to KDC from Lyman Cutler reimbursed KDC for all such carrying costs prior to November 30, 2014. Trial Exhibits 1-6.

49. Indeed, the only evidence in the record of actual payments to and from KDC and ProExcavation Corp. ("ProEx") show that, excluding payments of carrying costs after November 30, 2014, KDC and ProEx together received more money from Lyman-Cutler than they paid out on its behalf. KDC and ProEx paid out a total of $1,690,977.28 and were paid a total of $1,707,442.83. Trial Exhibits 1-6.

50.     The Court discredits Kagan's testimony that he was paying the carrying costs out of his own pocket during construction as contrary to the documentary evidence and the testimony of the credible witnesses.  See T. Tr. May 15, 2019 at 70, 139, 163; June 17, 2019 at 45, 97 (Kagan); compare Trial Exhibits 1-6, 43.

51.     After 23 months from the Date of Acquisition, and after Kagan drew down all of the funds from the construction loans, Kagan paid the carrying costs as agreed for the months of December 2014, January 2015, February 2015, March 2015 and April 2015.  Trial Exhibit 43.

52.     One of the requirements by Rockland Trust to close the construction loans was to have a signed agreement with a construction company.  To satisfy this requirement, on June 18, 2013, Filippov and Kagan signed a construction contract with one of Kagan's companies, Classic Homes Development & Construction, LLC. ("Classic Homes")  Classic Homes did not provide any construction services and did not file a proof of claim in this bankruptcy.  T. Tr. May 15, 2019 at 13-14, 85-86.  Kagan testified that it no longer existed at the time of the Rockland Trust closing.  Id.  The parties agree on this point – that the Classic Homes contract was "pro forma" and signed to meet a closing requirement by Rockland Trust. T. Tr. May 6, 2019 at 86 (Filippov); T. Tr. May 15, 2019 at 85 (Kagan); T. Tr. June 18, 2019 at 228 (Maiden); see Trial Exhibit 36.

### III.     The Listing Agreements with Tatiana

53.     The Operating Agreement provided for the initial retention of Kagan's wife, Tatiana Kagan ("Tatiana"), as the broker to market and sell the properties, but provided she could be removed at any time by an 81% vote of the members and could be removed by the Managing Member unilaterally after December 31, 2014.  Trial Exhibit 15.

54.     The provisions concerning the retention and removal of Tatiana were explicitly negotiated among the Parties.  T. Tr. June 18, 2019 at 191-193 (Maiden); T. Tr. May 6, 2019 at

58-60 (Filippov).  Compare Trial Exhibit 11 with Trial Exhibit 15 (earlier draft with no provision

concerning Tatiana compared to final operating agreement).

55.     The Court finds that at all relevant times, Kagan had actual knowledge of the

terms concerning not only Tatiana's retention by Lyman-Cutler but also her removal by Filippov.

56.     Accordingly, when Kagan signed an exclusive listing agreement with Tatiana on

August 12, 2014 for a term of 18 months, he had actual knowledge that enforcement of an

exclusive 18-month listing agreement violated the Operating Agreement.  Compare Trial Exhibit

15, § 6.1(b)(6) with Trial Exhibit 45 (18-month exclusive listing agreement).

57.     The Court finds that Kagan signed the August 2014 Listing Agreement knowingly

and intentionally and in bad faith to thwart Filippov's right to remove Tatiana as the Listing

Broker.

58.     Tatiana explicitly admitted that she had an arrangement with Century 21 that

allowed her to waive any commission on any home sold by her husband at any time.  T. Tr. May

14, 2019 at 122-23, 130.

59.     Accordingly, Tatiana and Kagan could have honored Filippov's right to remove

and replace her as the Listing Broker despite the exclusive listing agreements signed by Kagan

with her.

60.     Kagan could only thwart Filippov's right to remove Tatiana as the Listing Broker

with Tatiana's active cooperation and participation.

61.     In April 2015, just two weeks before presenting the May 7, 2015 Demand Letter,

both Tatiana and Kagan began, for the very first time, to insist that Filippov sign a listing

agreement with Tatiana.  T. Tr. May 6, 2019 at 103-04 (Filippov).

62.     Filippov was in Florida at the time and did not understand why they were suddenly pushing him to sign a listing agreement.  T. Tr. May 6, 2019 at 103-04 (Filippov).

63.     The Court credits Filippov's testimony that he never told Tatiana or Kagan that they were authorized to sign a listing agreement in April 2015.  T. Tr. May 6, 2019 at 105-06 (Filippov).  The Court discredits Kagan's contrary testimony that he did.  See T. Tr. May 15, 2019 at 136-139, 167-169 (Kagan).

64.     Filippov admits that Dan Gersh ("Gersh") sent him a copy of the signed listing agreement on April 28, 2015.  Trial Exhibit 268; T. Tr. May 6, 2019 at 106 (Filippov).

65.     Filippov credibly explains that he did not object at the time because he did not want to start a quarrel with the Kagans and he believed he had the right to remove Tatiana at any time under the Lyman Cutler Operating Agreement.  T. Tr. May 6, 2019 at 106-107 (Filippov); Trial Exhibit 15, § 6.1(b)(6).

66.     The listing agreement Kagan signed with Tatiana on April 24, 2015 is also an exclusive listing agreement, the enforcement of which violates the Operating Agreement.  Trial Exhibit 44.

67.     On April 28, 2015, the very same day that Gersh sent Filippov the signed listing agreement, Gersh made a series of large entries into the Lyman Cutler books and records, adding sums allegedly due and payable to certain subcontractors, the validity of which the Plaintiffs have long challenged.  T. Tr. May 15, 2019 at 169-175 (Kagan); T. Tr. June 24, 2019 at 69-76 (Gersh); Trial Exhibits 175, 340.

68.     These entries included:

       a.     Décor Art: $5,250 for 55 Lyman, $6,000 for 88 Cutler;

       b.     Dream Flooring: $8,910 for 55 Lyman, $6,550 for 88 Cutler;

c.      Unicon Electric: $30,000 for 55 Lyman, $35,000 for 88 Cutler;

d.      V&D Heating & Cooling: $13,955 for 55 Lyman, $23,955 for 88

Cutler; and

e.      BST Plumbing: $19,670 for 55 Lyman, $11,360 for 88 Cutler.

T. Tr. June 24, 2019 at 69-73 (Gersh); Trial Exhibits 175, 340.

69.     Gersh testified that the changes to the Lyman Cutler books on April 28, 2015 were just a "bunch of changes and edits," and a "high majority of . . . those changes were either dates to correct something or a category change, completely unrelated to the invoice or bill.  A ton of those changes, say, you know, a change in the spelling of an account, whether it's a vendor or subcontractor.  That's how small the changes were, literally . . ."  T. Tr. June 17, 2019 at 226-27 (Gersh).  But on cross examination, confronted by an audit trail report, Gersh was forced to admit to the addition of large sums to the Lyman Cutler payables to subcontractors on April 28, 2015.  T. Tr. June 24, 2019 at 69-76; Trial Exhibit 340.  The Court discredits Gersh's testimony concerning his activities on April 28, 2015 and finds that Gersh added large sums to the Lyman Cutler payables the same day that he sent the email to Filippov informing him that Kagan had signed a new listing agreement with Tatiana.

70.     Kagan could not explain the April 28, 2015 Quickbook entries. "You can't rely on my testimony because I know nothing about Quickbooks."  T. Tr. May 15, 2019 at 174.  Kagan did concede that the entries represented a lot of money, but claimed he did not know if it was a coincidence that the entries were made the same day the listing agreement was sent to Filippov.  Id. at 174-175.  The Court discredits Kagan's testimony and finds it was not a coincidence that so many entries were added to the Lyman-Cutler payables the same day Gersh e-mailed Filippov

about the listing agreement. Rather, this is additional evidence of the concerted scheme by the Kagan Defendants.

71.     By this point, career criminal Joseph Cohen ("Cohen") was involved in Kagan's business as his "Strategic Business Manager" and was advising Kagan concerning litigation matters.  T. Tr. May 9, 2019 at 86-87 (Cohen); T. Tr. May 15, 2019 at 32-33, 39-40; see Trial Exhibit 53.

72.     Cohen has an extensive criminal history dating back to the 1990s and involving fraud and forgery.  Trial Exhibits 317, 318, 319, 320, 321; T. Tr. May 13, 2019 at 16-53 (Cohen).

73.     The Court accepted evidence of Cohen's criminal history both to impeach his credibility and pursuant to Fed. R. Evid. 404(b)(2) to prove "motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake, or lack of accident."

74.     The Court finds that it was no accident that Tatiana and Kagan began hounding Filippov to sign a listing agreement with Tatiana just before presenting their demands in the May 7, 2015 letter and that it was no accident that Gersh put so much money into the Lyman Cutler payables the same day he sent Filippov a copy of the signed listing agreement.  The Court infers from the evidence that Cohen coached Kagan, Tatiana and Gersh to do this and they did so with the express, bad faith intent to thwart Filippov's right to remove Tatiana as the Listing Broker after they presented him with their demand.  The Court finds that this bad faith conduct was part of their plan.

75.     After Kagan sent the May 7, 2015 Demand Letter, Trial Exhibit 50, Filippov attempted to exercise his right to remove and replace Tatiana under the Operating Agreement.  T. Tr. May 6, 2019 at 116-117 (Filippov).

76.     Filippov had good reason to replace Tatiana.  She had failed to keep him informed about any efforts to sell the properties and, as far as Filippov knew, she was doing nothing to market them.  The sale of the homes was months past the deadline in the Operating Agreement. T. Tr. May 6, 2019 at 102; Trial Exhibit 15.

77.     Tatiana and Kagan refused to honor Filippov's right to replace Tatiana.  Kagan could not have thwarted Filippov's contractual right to replace Tatiana without Tatiana's knowing and intentional participation.  Exhibit 54; T. Tr. May 6, 2019 at 117 (Filippov); see also Trial Exhibit 64.

78.     By knowingly and intentionally thwarting Filippov's right to replace Tatiana, Kagan breached the Operating Agreement and his fiduciary duty to the Plaintiffs.

79.     By knowingly and intentionally aiding and abetting Kagan's breach of the Operating Agreement and his fiduciary duty, Tatiana engaged in a conspiracy with her husband, ProEx and KDC and aided and abetted Kagan's breach of fiduciary duty to the Plaintiffs.

**IV.     The Construction of the Two Homes and Substantial Completion**

80.     Kagan commenced construction in or about June 2013.  T. Tr. June 17, 2019 at 51-55; Trial Exhibit 332.  Kagan applied for a demolition permit on April 26, 2013.  Id.

81.     At no time after Filippov approved the increase in the maximum construction budget to $1.4 million did Kagan ever again ask Filippov to approve any construction cost increase until Kagan caused his lawyer to send the May 7, 2015 Demand Letter.  T. Tr. May 6, 2019 at 94-95 (Filippov); T. Tr. May 9, 2019 at 23 (Lipetsker); Trial Exhibit 50.  The Court credits the testimony by Filippov and Lipetsker.  The Court discredits Kagan's contrary testimony.  See T. Tr. May 15, 2019 at 119-120; June 17, 2019 at 73-75 (Kagan).

82.     The homes were not substantially completed until August 2014.  T. Tr. May 6, 2019 at 96 (Filippov); Trial Exhibit 39 (email exchange in July and August 2014 regarding

completion of homes); Trial Ex. 45 (listing first home on August 12, 2014). Kagan presented no

evidence to support his contention that he substantially completed the homes by the contractual

deadline of March 30, 2014. By failing to substantially complete the homes by March 30, 2014,

Kagan breached the Operating Agreement. As a result of his failure to complete the homes as

agreed, the Parties missed the bulk of the 2014 selling season.

### V.     The Purported Contract between Lyman-Cutler and KDC

83.     Kagan ran expenses through Kagan Development KDC, Corp. ("KDC"), of which

he and Tatiana are the 100% owners. T. Tr. June 17, 2019 at 72. Kagan admitted that all profits

from KDC flow directly to him. Id. ("straight into [his] pocket").

84.     Kagan admitted that the only service KDC provided to Lyman Cutler was to

supervise construction. Id. at 72-73. All other work was done by subcontractors. Id.

Accordingly, the Court finds that KDC did not provide any services to Lyman Cutler beyond

supervision of construction, which Kagan was contractually obligated to provide without charge

pursuant to the Operating Agreement. Trial Exhibit 15, § 5.2.

85.     Kagan nevertheless claims to have entered into a contract between Lyman-Cutler

and KDC for the purpose of building the two homes. T. Tr. May 15, 2019 at 86-87 (Kagan);

Trial Exhibit 37.

86.     Kagan signed the proffered contract between Lyman-Cutler and KDC (the "KDC

Contract") for both sides of the transaction. Id. The Contract purports to be dated June 24, 2013,

just six days after the date of the Classic Homes contract Filippov and Kagan signed to satisfy

Rockland Trust. Trial Exhibit 37; Trial Exhibit 36.

87.     The evidence strongly supports the conclusion that Kagan and Cohen prepared

and executed the KDC Contract on or about June 17, 2015 in order to support an inflated

Mechanic's Lien against Lyman Cutler for the bad faith purpose of forcing Filippov and

Lipetsker to settle with Kagan and pay him money to which he was not entitled, and the Court

finds that this is what Kagan and Cohen did, based upon the following facts:

88.     On May 7, 2015, Kagan caused his lawyer to send Filippov and Lipetsker a

Demand Letter, in which he asserted that KDC had incurred unreimbursed construction costs of

$758,025.56, that it expected another $50,000 and that Kagan was owed $251,000 for carrying

costs.  Prior to this Demand Letter, Kagan had never mentioned unreimbursed construction costs.

T. Tr. May 6, 2019 at 108-09 (Filippov); T. Tr. May 9, 2019 at 27 (Lipetsker); Trial Exhibit 50.

89.     In the May 7, 2015 Demand Letter, Kagan asserted that Filippov had refused to

reduce the selling price, but the Court discredits this assertion.  Kagan signed the listing

agreement with his wife, Tatiana, on April 24, 2015, which reflects a listing price of $5,499,000.

Trial Exhibit 45.  Gersh sent the listing agreement to Filippov on April 28, 2015.  Trial Exhibit

268.  Kagan claimed during his testimony that he became concerned about losing the selling

season between the time he signed the listing agreement on April 24, 2015 and when he sent the

Demand Letter, May 7, 2015.  T. Tr. May 15, 2019 at 163-64.  The Court again finds Kagan is

not credible and credits the testimony by Filippov that the assertion that he refused to reduce the

selling price is false.  T. Tr. May 6, 2019 at 108-09 (Filippov).

90.     On May 13, 2015, Filippov and Lipetsker, through counsel, responded to Kagan's

May 7, 2015 Demand Letter.  Trial Exhibit 54.  In the May 13, 2015 Response, among other

things, Filippov and Lipetsker state that Kagan is responsible for the carrying costs under the

Operating Agreement and that Filippov never approved any additional costs beyond the budget

he had approved ($1.3 million per home in October 2012, plus an additional $100,000 per home

in May 2013).  Id.

91.     The very next day, on May 14, 2015, Kagan forwarded a number of documents to Cohen.  T. Tr. June 17, 2019 at 98-105; Trial Exhibit 334, 335, 336.  The documents Kagan forwarded included documents from the closing of the construction loans, including the mortgages, Trial Exhibit 334, and April 11, 2013 correspondence from Filippov to Kagan concerning the terms of their deal, expressly stating the $1.3 million for construction costs and $200,000 for carrying costs.  Trial Exhibit 336.  The fact that Kagan forwarded this email to Mr. Cohen shows he was well aware of the terms of his deal with Filippov and Lipetsker concerning the maximum construction budget and carrying costs and discredits his contrary testimony.

92.     Kagan re-forwarded the closing documents, Exhibit 334, to Cohen again on June 22, 2015 (the day they recorded the Mechanic's Lien) and again on September 22, 2015. T. Tr. June 17, 2019 at 98-99 (Kagan).

93.     Kagan also forwarded to Cohen on June 3, 2015 an email chain with Filippov that includes emails about Filippov being made Managing Member, adding a provision to make clear that Kagan is responsible for building the homes in return for his share of the profits, and that Kagan is responsible for paying the carrying costs if the homes are not completed and sold within the projected time period (20 months at the point in the negotiations that Kagan forwarded).  T. Tr. June 17, 2019 at 100-102 (Kagan). Trial Exhibit 335.

94.     There is notably no evidence at all that Kagan forwarded to Cohen a copy of the purported KDC Contract entered into evidence as Trial Exhibit 37.  T. Tr. June 17, 2019 at 103-104 (Kagan).

95.     Cohen testified that he drafted the KDC Contract, and that he addressed Section 5.2 of the Operating Agreement when he did so by not charging for Kagan's personal time. Cohen, T. Tr. May 9, 2019 at 94, 107, 109-10.  The fact that Kagan forwarded him documents

concerning the deal terms in May and June 2015 supports the conclusion that Cohen drafted the

KDC Contract after receiving these documents.  There is no documentary evidence to show that

he ever received them before this time period.

96.     Not only Filippov and Lipetsker, but also Kagan's own chief financial officer,

Dan Gersh, his former bookkeeper Kristina Brusenkova, and his accountant, Jason Gordon, all

testified that they had never seen the KDC Contract before this litigation.  T. Tr. May 6, 2019 at

87 (Filippov), T. Tr. May 9, 2019 at 23-24 (Lipetsker); T. Tr. May 14, 2019 at 44 (Brusenkova);

see also Trial Exhibit 68 (asking for copy in June 2015); T. Tr. June 24, 2019 at 99-100 (Gersh);

T. Tr. June 17, 2019 at 174 (Gordon).

97.     Gersh further admitted that he did not know what the basis was for the

$560,838.87 general contractor fee.  T. Tr. June 24, 2019 at 99-100 (Gersh).  He considered it

"above his pay grade" as KDC's CFO.  Id. at 99.  He never entered any such fee on KDC's

books or Lyman Cutler's books because he was never asked to do so.  Id. at 99-100.  He could

not remember when he first saw the purported KDC Invoice, but acknowledged it could have

been as late as 2017.  Id. at 100-101.  He admitted that KDC had never charged a 15% general

contractor fee on any other project of which he was aware, and that he had never booked any

such payable on any other project or any such receivable for KDC.  Id. at 102.

98.     KDC is an accrual basis tax payer.  Trial Exhibits 131, 136.  It never recognized

any income from any purported general contractor fee on its tax returns.  T. Tr. June 17, 2019 at

173-174 (Gordon).  Gordon admitted that if KDC had earned such a fee, it should have

recognized the income.  Id.

99.     Brusenkova also never made any entry on the KDC books for general contractor

fee for KDC.  T. Tr. May 14, 2019 at 44 (Brusenkova).

100.     There is no line item for any general contractor fee in the budget Kagan presented to Rockland Trust and no mention of any such thing anywhere in any of the other contemporaneous documents.  Trial Ex. 27.

101.     Filippov specifically requested that Section 5.2 be added to the Operating Agreement to make sure nothing like this ever happened.  Trial Ex. 14 (Filippov email); Trial Ex. 15, § 5.2 (Kagan responsible for building homes for share of net profits).

102.     Cohen disposed of the computer on which he drafted the KDC Contract and his legal research.  T. Tr. May 9, 2019 at 108-09, 113.

103.     On May 16, 2015, Filippov and his wife Arina Rudyakova ("Arina") met with Cohen at the properties in order to obtain the keys to them.  T. Tr. May 6, 2019 at 115 (Filippov); T. Tr. May 14, 2019 at 14-15 (Arina).

104.     During the meeting, Cohen threatened them financially and told them that unless they met KDC's demands, he and Kagan would put a lien on the properties and "they would never get their money back."  T. Tr. May 6, 2019 at 115-116 (Filippov); T. Tr. May 14, 2019 at 15 (Arina).

105.     The Court discredits Cohen's account of the meeting at the property.  The court notes that in general Cohen was not truthful unless confronted with a document he could not deny.  The Court also notes that Elena Lande also testified that Cohen threatened her and suggested the stress could cause her to lose the child with whom she was pregnant at the time.  T. Tr. May 8, 2019 at 148 (Lande).

106.     The print-out of the "properties" page from the electronic copy of the KDC Contract produced by the Defendants in discovery shows that it was printed out on June 17,

2015, just five days before the Defendants recorded the Mechanic's Lien.  Trial Ex. 65, last page

(properties); Trial Exhibit 66 (June 22, 2015 Mechanic's Lien).

107.    This was 13 days after Cohen wrote to Filippov on June 4, 2015 that a "detailed

invoice" was being prepared.  Trial Ex. 63.

108.    No such "invoice" was ever presented until June 25, 2015.  Trial Exhibit 67.

109.    The purported invoice is dated June 1, 2015.  Trial Exhibit 67 at page 5.

110.    Gersh admitted he was away on his honeymoon between late May and mid-June,

2015.  T. Tr. June 24, 2019 at 67-68 (Gersh).  Kagan and Cohen claimed Gersh helped prepare

the invoice.  T. Tr. May 15, 2019 at 32 (Kagan); T. Tr. May 9, 2019 at 94 ("the numbers didn't

come from me") (Cohen).

111.    The May 7, 2015 Demand Letter tallies up to $1,059,025.56 in total claims.  Trial

Exhibit 50.  It does not mention any claims by KDC for a general contractor fee, a design fee,

overhead, or a carrying costs advance fee.

112.    The Court discredits Kagan's explanation that the May 7, 2015 Demand Letter

did not include "soft costs," and was just an "initial payment…to pay my subs and pay me for

what I already spent."  T. Tr. May 15, 2019 at 145-146.  This testimony is contrary to the content

of the May 7, 2015 Demand Letter, Trial Exhibit 50, and contrary to Kagan's own testimony that

he was supposed to advance costs and be repaid when the properties sold.  T. Tr. May 15, 2019

at 69-70, 88-89 (Kagan).  There is also no dispute that Lyman Cutler was out of money by May

2015 and that Kagan had been paying the carrying costs, as agreed in the Operating Agreement,

since November 2014.  Trial Exhibit 43; Trial Exhibit 69; Trial Exhibit 74 at 123, 126.  This

Demand Letter was intended to extract money from Filippov.

113.    In the June 22, 2015 Mechanic's Lien, the alleged debt to KDC approximately doubled to $2,095,985.23.  Trial Exhibit 66.

114.    The June 25, 2015 email from Cohen outlines the revised components of the alleged claim, which include $560,838.87 as a "General Contractor Construction Fee," $25,000 "Design Fee," $145,814.46 for a "Carrying Costs Advance Fee," and Office Overhead of "$59,250."   Trial Exhibit 67.

115.    These purported fees and the office overhead charge, which add up to $790,903.33, would all flow "straight into [Kagan's] pocket," T. Tr. June 17, 2019 at 72 (Kagan), and violate Section 5.2 of the Operating Agreement and Kagan's fiduciary duty.  Trial Exhibit 15.

116.    Based on these facts, the Court finds that Kagan and Cohen conspired in June 2015 to forge the KDC Contract and use it as a basis to assert knowingly and intentionally falsely inflated, doubled charges against Lyman Cutler in the June 22, 2015 Mechanic's Lien <u>and in the Proof of Claim KDC has submitted to this Court.</u>

117.    KDC, as an independent entity, aided and abetted Kagan's breach of fiduciary duty and violated Chapter 93A.

118.    Because Kagan's knowledge is charged to KDC, KDC's conduct is knowing, willful and intentional within the meaning of Chapter 93A.

## VI.    Trial Exhibit 215

119.    Kagan offered into evidence an email which purports to convey a "GC agreement" to Filippov and Lipetsker on August 21, 2013.  Trial Exhibit 215.

120.    Not only does the Court find that this is not credible evidence, and that Kagan was not credible when he testified that he gave Filippov a copy of the KDC Contract in 2013, T. Tr. May 15, 2019 at 91 (Kagan), but the Court also finds that Exhibit 215 is a knowing and intentional forgery.  The Court bases this finding on the following evidence:

121.    Filippov credibly testified that he never received this email and that it is a "complete fraud" and the evidence supports his assertion.  See T. Tr. May 7, 2019 at 92-93; T. Tr. May 8, 2019 at 23-25.

122.    The email comes from the email address, Vadim@kagandevelopment.com.  Trial Ex. 215.  Nowhere in the hundreds of exhibits submitted to this Court does this email address appear on any other exhibit.  The Court finds that Kagan never used that email address.  He used kagandevelopment@gmail.com as his business email, see Trial Exhibit 231, and on occasion, Vadim.Kagan@yahoo.com, as his personal email, see Trial Ex. 89.  T. Trial June 17, 2019 at 62-63 (Kagan).

123.    There are no other emails in the record from any party using the kagandevelopment.com domain for the purpose of email until 2015 when Cohen started using j.cohen@kagandevelopment.com.  See Trial Exhibit 53.

124.    The person who allegedly sent the email on Kagan's behalf, Ryan O'Grady, did not testify at trial.  See T. Tr. May 15, 2019 at 92 (Kagan being led to testify that he instructed Ryan O'Grady to forward a copy of "the GC contract" to "LymanCutlerLLC.com").  Given the import of the issue, one would expect the Kagan Parties to have called him as a witness and the Court therefore draws an adverse inference against them based on his absence.  Irish Bank

Resolution Corp. (In re Special Liquidation) v. Drumm (In re Drumm), 524 B.R. 329, 373 (D.

Mass. Bankr. 2015) (drawing negative inference from failing to call particular witness).  Without

O'Grady's testimony, the only testimony to "authenticate" the forged email is Kagan's, and he is

not credible on any material issue.

125.    There is no attachment to the purported email and it was offered only in paper

format.

126.    Although Lymancutlerllc@gmail.com was an address set up to send emails to

four different people (Filippov, Lipetsker, Kagan and Filippov's wife, Arina), none of them ever

received this email.  T. Tr. May 6, 2019 at 64-65 (group email distribution list); T. Tr. May 8,

2019 at 24 (none of them received it).

127.    Kagan claimed that Ryan O'Grady sent the email for him, but then testified he

sent it using his cell phone.  Compare T. Tr. May 15, 2019 at 92 (instructed O'Grady to send it)

with T. Tr. June 17, 2019 at 61 ("The upper version go from my cell phone, and the lower

version with email address and website come from stationary, probably computer.").

128.    Other emails in the record sent from Kagan's cell phone bear the statement, "send

from cell phone" on them.  See, e.g. Trial Exhibits 227, 228, 229, 230, 231.

129.    As Brusenkova credibly testified, Kagan did not have the phone number 617-610-

1276 in 2013; she obtained that phone number for him in February 2014.  T. Tr. May 14, 2019 at

45-46.  In 2013, Kagan used his cell phone number, 617-828-2903.  Id.  Kagan's cell phone

number is on all of the intervening emails on Trial Exhibit 215 and the number he did not obtain

until February 2014 appears only at the end of Trial Exhibit 215.  Nowhere on any other email in

the record does that phone number, 617-610-1276, appear on an email dated in 2013.[1]  On the

last page of Exhibit 215, the phone number Kagan actually had in 2013 – 617-828-2903 –

appears immediately above the phone number he did not obtain until 2014 – 617-610-1276.

130.    The email itself purports to be a forwarding of another chain of emails from

August 2013, with the subject "88 Cutler Advance."  Trial Exhibit 215.  These emails were sent

and received by the kagandevelopment@gmail.com address, but somehow the email which

allegedly forwarded the "GC agreement" bears the subject "88 Cutler Advance and GC

Agreement" and comes from the purported e-mail address of vadim@kagandevelopment.com

and adds Cohen as a recipient.  Id.

131.    Filippov also credibly testified that he had never heard of Cohen until 2015.  T.

Tr. May 6, 2019 at 114 (Filippov).   Elena Lande and Vladimir Abramskiy similarly testified that

they had never heard of Cohen until the surprise demands for more money began at the end of

their projects.  T. Tr. May 8, 2019 at 147 (Lande); T. Tr. May 13, 2019 at 96 (Abramskiy).

132.    The Court credits the testimony of Filippov and Lipetsker as credible and rejects

the testimony of Kagan and Cohen as not credible.

133.    The Court finds that Filippov and Lipetsker never authorized or approved the

KDC Contract and, to the contrary, never saw it.  They never saw or approved any of the fees

and charges by KDC listed in the KDC Contract.

---

[1]      The only other documents from 2013 upon which that phone number appears are the
ProEx Proposals, which Plaintiffs submit Kagan also prepared long after the fact in order to
"document" his fraudulent claims.  See Trial Exhibits 326, 327, 328, 329, 330.  Compare Trial
Exhibits 43, 216, 231, 235, 223 (emails from 2013 with the cell phone number 617-828-2903).

134.     Based on the facts set forth in paragraphs 118-130 above, the Court concludes that Exhibit 215 is the work of Cohen, forged to support the assertion that Kagan gave a copy of the KDC Contract to Filippov and Lipetsker.

135.     The Court finds that the KDC Contract and Exhibit 215 are knowing and intentionally fraudulent documents and that their submission in evidence by Kagan is an attempted fraud on the Court.

**VII.    The Purported Charges By ProEx**

136.     Kagan testified he used ProEx to perform the excavation, landscaping and masonry on the Lyman Cutler Project.  T. Tr. May 15, 2019 at 96 (Kagan).  He claimed he did so in order to avoid having to rely on subcontractors and to "pass the savings" to his investors.  T. Tr. May 15, 2019 at 24-25 (Kagan).  Gersh testified that ProEx operates on a "flat fee" basis and does not track its costs.  T. Tr. June 24, 2019 at 45-46, 103 (Gersh).

137.     On cross examination, Kagan admitted that he and Tatiana own ProEx 100% and that ProEx's profits go "straight into [his] pockets."  T. Tr. June 17, 2019 at 72 (Kagan).

138.     Kagan also admitted that he is the only employee of ProEx and that all of the excavation, masonry and landscaping was done by subcontractors.  Id. at 71-72.

139.     Accordingly, the Court finds that ProEx did not provide any services to Lyman Cutler, beyond supervision of construction, which Kagan was contractually obligated to provide without charge pursuant to the Operating Agreement.  Trial Exhibit 15, § 5.2.

140.     The Court discredits Kagan's testimony that he prepared the ProEx Proposals before construction started by consulting his subcontractors.  T. Tr. May 15, 2019 at 77.  Kagan was forced to admit on cross examination that the foundations were in before the dates on the "Proposals."  T. Tr. June 17, 2019 at 49-50.  See Trial Exhibits 99, 100, 101, 332 and 333 (foundations inspected August 23, 2013); compare Trial Exhibit 326 (Sept. 1, 2013 demolition

30

"proposal"), Trial Exhibit 327 ("Oct 1, 2013 "proposal" including excavation and foundation).

In addition, the "Proposals" include a line item for ledge removal.  Trial Exhibit 174.2 at Tab 39,

KDC 01276; Trial Exhibit 174.4 at Tab 36, KAG 2058.  There is no credible evidence that there

was any ledge on the property, but if there were, Kagan could not have known that before

starting the excavation.  Kagan was also forced to admit having taken money for KDC for work

on the ProEx proposals.  T. Tr. June 17, 2019 at 47-48.

141.   Kagan admitted he did not know how much profit was built into the charges he

has submitted from ProEx.  Id. at 108; see also  T.Tr. June 17, 2019 at 164 (ProEx does not track

its profits per project) (Gordon).

142.   The actual checks in the record only support a total of $225,958.05 in out of

pocket costs paid by ProEx in connection with Lyman Cutler.  Trial Exhibit 5.  In addition,

Expert Witness and Certified Fraud Examiner Michael Goldman ("Goldman") testified that its

general ledger only reflects $204,000 in out of pocket costs on Lyman Cutler.  T. Tr. May 10,

2019 at 26.  ProEx presented no evidence to support any additional expenditures on the Lyman

Cutler Project.

143.   Indeed, the evidence showed that Gersh would "play around with" the numbers to

move profits and losses around among Kagan's companies.  Trial Exhibit 341; T. Tr. June 24,

2019 at 89-91 (Gersh).

144.   With regard to ProEx in particular, large receivables from Lyman Cutler were

recorded in ProEx's general ledger as of December 31, 2014 and January 1, 2015, when

construction had been completed months earlier.  Trial Exhibit 148 at page 7; Trial Exhibit 149

at page 3; T. Tr. June 17, 2019 at 175-76 (Gordon); T. Tr. June 24, 2019 at 87-90 (Gersh).  See

also Trial Exhibit 86 ("The $100,000 will never be paid").

145.    ProEx is an accrual basis tax payer.  Trial Exhibit 137.  ProEx never recognized any income on its taxes from these purported charges.

146.    There was never any contract signed between ProEx and Lyman-Cutler or between ProEx and KDC.

147.    The only documentation of ProEx's charges during construction that are produced in the binders KDC proffers as support for the KDC Proof of Claim are "Proposals" purportedly dated September 1, 2013 and October 1, 2013 (which is approximately three months after Kagan began the construction, which included much of the work ProEx charges for under its "Proposal").  See Trial Exhibits 332 and 333 (foundations inspected August 23, 2013); compare Trial Exhibit 326 (Sept. 1, 2013 demolition "proposal"), Trial Exhibit 327 ("Oct 1, 2013 "proposal" including excavation and foundation).

148.    The ProEx "proposals" from May 25, 2015 were issued after this dispute commenced and were not approved by the Managing Member.  Trial Exhibits 328 and 330.

149.    The ProEx "proposals" for the snow removal are dated March 25, 2015, after the winter season, and total $19,000 (on top of $2,000 for each house paid to Paul DiGiacomo to "clean off roof").  Trial Exhibit 174, Tabs L58, C57.  There is no evidence that Filippov ever approved these exorbitant sums to plow the driveways.

150.    Filippov and Lipetsker testified that they never saw the ProEx Proposals prior to the litigation. T. Tr. May 6, 2019 at 90 (Filippov); T. Tr. May 9, 2019 at 25-26 (Lipetsker).  I credit their testimony in this regard and reject Kagan's.  KDC's accountant, Jason Gordon, and its CFO Dan Gersh, also had not seen the ProEx Proposals prior to the litigation.  T. Tr. June 17, 2019 at 175 (Gordon); T. Tr. June 24, 2019 at 58-59 (Gersh).  Brusenkova also had never seen

the ProEx Proposals prior to the litigation.  T. Tr. May 14, 2019 at 45 (Brusenkova).  Indeed,

Brusenkova testified that she had never seen a proposal like this on any of Kagan's projects.  Id.

151.    The Proposal also bears a phone number, 617-610-1276, which Brusenkova

testified ProEx did not have in 2013.  T. Tr. May 14, 2019 at 45 (Brusenkova).  A number of

other contemporaneous documents from 2013 bear a different phone number, and Kagan did not

identify a single other contemporaneous document from 2013 that reflects the same phone

number for ProEx as appears on the ProEx Proposal.  See, e.g., Trial Exhibits 227, 228, 229, 230,

231.

152.    From these facts, it is fair to infer that Kagan created the Proposal some time later

and back dated it to 2013, which makes his testimony that he showed it to Filippov and Lipetsker

and obtained their approval in 2013 knowingly false.

153.    The total charges by ProEx included in the KDC Proof of Claim equal

$916,800.00. Trial Exhibits 326, 327, 328, 329, 330, 174 at Tabs L58 and C57.

154.    The Court finds that the purported charges by ProEx include no less than

$690,841.95 in profits for ProEx, and therefore for Kagan.  By asserting a claim for $690,841.95

in profits against Lyman Cutler, Kagan violated Section 5.2 of the Operating Agreement and his

fiduciary duty to the Plaintiffs.

155.    ProEx, as an independent entity, aided and abetted Kagan in violating his

fiduciary duty and violated Chapter 93A.

156.    Because ProEx is charged with Kagan's knowledge and intent, ProEx's conduct is

knowing, willful and intentional within the meaning of Chapter 93A.

### VIII.    General Evidence of the Unreliability of KDC's Documentation of its Proof of Claim

157.    Filippov and Lipetsker were aware that Kagan was using KDC and ProExcavation as vehicles to satisfy his obligations under the Operating Agreement, but at no time did Kagan discuss with them any fees or charges for his companies in addition to his profit share under the Operating Agreement.  T. Tr. May 6, 2019 at 90-91 (Filippov); T. Tr. May 9, 2019 at 24-26, 53, 84 (Lipetsker).

158.    Kagan did not solicit any competitive bids for any of the subcontractors who worked on the Project or any of the materials vendors.  The subcontractors he used were ones he knew well and had used on many other projects.  T. Tr. May 15, 2019 at 121; June 17, 2019 at 57 (Kagan).

159.    Kagan had check writing authority on the Lyman-Cutler bank account and had complete control over the construction and construction costs.  T. Tr. May 6, 2019 at 93, 131 (Filippov).  Kagan paid construction expenses out of the Lyman-Cutler account, on his American Express cards, through the KDC bank account and through the ProEx bank account without any particular discernible pattern or plan.  See T. Tr. May 10, 2019 at 119-122 (Goldman); Trial Exhibit 174.

160.    Kagan failed to keep contemporaneous records of his construction costs.  After his current bookkeeper, Dan Gersh, started work for KDC in November 2014, Gersh recreated books and records for the various projects.  T. Tr. June 17, 2019 at 200, 203-204, 206-210, 218 (Gersh).

161.    During the Lyman-Cutler Project, the books and records Kagan maintained for KDC and for ProEx were so disorganized that he cannot have known whether or not he was delivering the Lyman-Cutler homes for the approved Construction Budget.  Kagan's complete

failure to maintain contemporaneous books and records for the Project discredits his account of the Project expenses and constitutes gross negligence and reckless disregard for his fiduciary duties to the Plaintiffs.

162.   At no time during the Project after Filippov approved the $100,000 increase in the maximum budget in May 2013 did Kagan ever discuss upgrades to the homes or any cost overruns with Filippov or Lipetsker.   At no time did Filippov approve any cost overruns.   T. Tr. May 6, 2019 at 94-95 (Filippov); T. Tr. May 9, 2019 at 23, 27 (Lipetsker).   In this regard, I credit the testimony of Filippov and Lipetsker and reject the testimony of Kagan.   Kagan's account makes no sense in light of Kagan's complete failure to maintain any records, the unreliability of the documentation Kagan created after construction was complete, the obvious concern of Filippov for the impact of much more modest sums of money on the success of the Project, and the fact that the very first document in the record referring to construction cost overruns was a letter from Attorney Alexander Pyle dated May 7, 2015.   There are also contemporaneous emails from Filippov asking for information during the Project that contradict Kagan's account.   See Trial Exhibits 38, 39.

163.   Kagan could not have asked Filippov to approve cost overruns if Kagan did not know what the costs were in the first place.

164.   The evidence shows that Filippov and his wife, Arina Rudyakova, made good faith efforts to keep track of the construction costs and ensure that the Project was on track by creating contemporaneous Quickbooks based upon the bank statements, to which they had access and check writing authority.   T. Tr. May 14, 2019 at 13 (Arina).   But Kagan provided almost no records of construction costs to support the payments from the bank account.   T. Tr. May 6, 2019 at 92 (Filippov).

165.   The documentation proffered by KDC in support of its Proof of Claim is riddled with inconsistencies, inaccuracies and indicia of unreliability and fraud.  The Court credits the testimony of Expert Witness and Certified Fraud Examiner Michael Goldman that the KDC documentation is wholly unreliable and that the inconsistencies in it are so pervasive as to indicate either gross incompetence or intentional fraud.

166.   Goldman identified numerous specific inconsistencies in the documentation submitted by KDC, including:

a.   The absence of support for the KDC Proof of Claim in the KDC or ProEx general ledgers, Goldman, T. Tr. May 10 2019 at 25;

b.   Only $204,000 of expenses booked by ProEx on the Project in its general ledgers, Id.;

c.   BST Plumbing entries changed from $11,360 to $19,670 27 minutes apart on April 29, 2015, Id. at 37;

d.   The suspicious pattern of every investor project paying double what Kagan paid for electrical work on his solo projects, Id. at 51-54;

e.   Both KDC and V&D Heating produced in discovery exactly the same photocopies of the proffered invoices, right down to the paper clip and staple marks, Id. at 58;

f.   KDC's unpaid debt of $260,000 to V&D Heating, which has been outstanding for several years, Id. at 59;

g.   The change from $8,982 to $14,130 on the Construction Specialties claim for both Properties, which did not tie out to the American Express statements, Id. at 59;

h.   **The electronic Quickbooks files produced by the Defendants in discovery is not the same file that was used to generate the printouts included in the KDC Proof of Claim,** Id. at 61-62, 101;

i.  The electronic Quickbooks file for Construction Specialties adds up to only $27,280 for the two Properties combined but the Proof of Claim Printouts for Construction Specialties add up to $36,530, <u>Id.</u> at 63-64;

j.  The Huntington TV invoices contain discrepancies that make some of them appear fabricated, <u>Id.</u> at 66;

k.  The Quickbooks files produced electronically compared to the ones used in the Proof of Claim contain a KDC invoice 316 which is listed as $26,936 in the electronic files but as $35,060 in the Proof of Claim, and the lower figure is the one supported by the Amex Statements, <u>Id.</u> at 66-68;

l.  The PaveTech invoices and related Quickbooks files contain highly unusual discrepancies, <u>Id.</u>at 68-70;

m.  The DiGiacomo invoices include a misspelling of the man's own name and appear fabricated, <u>Id.</u> at 71.

n.  The suspicious pattern of the dramatically higher per square foot construction costs on the investor projects compared to the Kagan solo projects, <u>Id.</u> at 84-85;

o.  J.W. Campbell was paid $171,919, but the cancelled checks KDC produced do not support this substantial component of the Proof of Claim, <u>Id.</u> at 171.

167.    The Kagan Parties did not effectively rebut Goldman's testimony.  The Court does not find Gersh's statement that Goldman was wrong persuasive.  <u>See</u> T. Tr. June 24, 2019 at 37-38. (Gersh).  The Court did not find Gersh credible.  Gersh did not even try to rebut the fact that the Quickbooks file used to create the Proof of Claim was not the same Quickbooks file produced in discovery.  <u>Compare</u>, <u>e.g.</u>, Trial Exhibit 50 (May 7, 2015 Demand letter asserting Lyman-Cutler AP aging of $758,025.56 including $244,276.56 to KDC) <u>with</u> Trial Exhibit 82

37

(KDC A/R aging as of December 31, 2014, printed July 1, 2015, showing $164,673.91 allegedly

due from Lyman-Cutler); and Trial Exhibits 83 and 84 (more inconsistent KDC payables

reports).  See also Trial Exhibit 86 (adding $100,000 to the ProEx receivables from Lyman-

Cutler in September 2016, as of January 1, 2015).

168.    The Court credits Goldman's testimony that the pervasiveness of the

discrepancies in the documentation submitted by KDC made the documentation unreliable, and

that it could only be the product of either gross incompetence or knowing fraud.  T. Tr. May 10,

2019 at 92, 177.

169.    The Court further credits Goldman's testimony that the prevalence of problems in

this case is "extreme" and that Goldman had only seen one other case this bad in 22 years of

work as a Certified Fraud Examiner (and in that case there was fraud).  Id. at 126-27.

170.    The Court finds that although no one discrepancy in the financial records is proof

of fraud and any isolated incident may be innocuous, the pervasive pattern in this case dictates a

finding of  knowing and intentional fraud.  Id. at 155, 169-70.  Cf. Robin Singh Educ. Servs. v.

McCarthy (In re McCarthy), 488 B.R. 814, 826 (BAP 1st Cir. 2013) ("Even though courts will

not construe an ignorant or inadvertent omission as evidence of fraudulent intent, reckless

disregard may nonetheless be found based on the 'cumulative effect of a series of innocent

mistakes.'").

171.    KDC's accountant Jason Gordon, testified that he relies on Gersh and Kagan for

the numbers he puts into the tax returns, and Gersh testified he relies on Kagan.   T. Tr. June 17,

2019 at 168-69 (Gordon); T. Tr. June 24, 2019 at 56(Gersh).  Gordon had never done an

attestation engagement and so could not attest to the accuracy of KDC or ProEx's books and

records.  T. Tr. June 17, 2019 at 166-69. He acknowledged that even if he had done a full blown

audit, it would be hard to detect fraud by management. T. Tr. June 17, 2019 at 169-72.

### IX.    The Alleged Payables to the Subcontractors

172.    The KDC Proof of Claim includes hundreds of thousands of dollars in alleged

payables to subcontractors.

173.    There is no evidence that any of the subcontractors, including ProEx, had any

contract with Lyman-Cutler.

174.    In the absence of a written contract with Lyman-Cutler, it is not liable to any of

the subcontractors.

175.    KDC has failed to provide reliable documentation of any of these alleged

payables.

176.    According to the May 7, 2015 Demand Letter, the outstanding payables included:

          a.  $39,340 to BST Plumbing;

          b.  $11,250 to Décor Art;

          c.  $15,460 to Dream Flooring;

          d.  $244,276.56 to KDC;

          e.  $325,000 to ProEx;

          f.  $19,320 to Sergey Nikolaev;

          g.  $65,000 to Unicon Electric; and

          h.  $37,900 to V&D Heating.

Trial Exhibit 50.

177.    These payables largely carried over into the Proof of Claim.  Trial Exhibit 175;

see also Trial Exhibit 84 (October 2016 payables report).

178.     KDC offered no evidence to support a payable to it of $244,276.56.  Kagan

admitted KDC did no work other than construction supervision, which he was obligated to do

without charge under the Operating Agreement.  The checks in the record add up to full

reimbursement of the out of pockets of KDC and ProEx, eliminating payment of carrying costs

after November 30, 2014, which were Kagan's responsibility under the Operating Agreement.

Trial Exhibits 1-6, 15.

179.     KDC did not admit into evidence any invoice by Sergey Nikolaev, with regard to

which KDC seeks $24,660 per home.  The Nikolaev charges are unsupported by any

documentation admitted into evidence at trial.

180.     Defendants' Trial Exhibit 174 included Tabs L4 and C3 asserting charges by

Nikolaev as part of KDC's Proof of Claim.  Plaintiffs objected to the Nikolaev materials on

several grounds.  Nikolaev did not testify at the trial and those materials were never offered in

evidence.  The Court draws an adverse inference against KDC based on Nikolaev's absence.

181.     Erik Babayan, the principal of Dream Flooring, specifically and repeatedly

testified that he had been paid in full.  T. Tr. June 18, 2019 at 10-11, 19, 23-24 (explaining

discrepancy in invoices saying "Balance deu"[sic] and "Paid in Full"), 30, 32.  See Trial Exhibit

175, Tab L36; compare Trial Exhibits 155, 156, 157 ("Paid in Full").

182.     To make matters worse, Babayan testified that he met with Brusenkova to discuss

payment on the project.  Id. at 33-35.  Because Brusenkova left KDC in October 2014, this

meeting had to have occurred before then.  See T. Tr. May 14, 2019 at 39, 80 (Brusenkova left in

October 2014).  At the meeting, Babayan and Brusenkova figured out that he had been paid in

full and the confusion stemmed from the fact that "[t]hey were paying from one project for

another."  T. Tr. June 18, 2019 at 35.

183.    Babayan also testified that he repeated the process with Gersh at some point prior

to Babayan's deposition on September 29, 2015.  Id. at 27 (deposition was Sept. 29, 2015), 29-30

(met with Mr. Gersh after getting the subpoena for the deposition).  At the meeting with Gersh,

he again confirmed that he had been paid in full, and changed his invoices to say "Paid in Full."

Id. at 29-30.  Gersh was also aware, and reminded Babayan, that Kagan had overpaid him $7,000

from another project.  Id. at 38.  Babayan explained that:

> "I did about seventeen or eighteen projects.  It's not just Cutler and Lyman.  So
> they overpaid – so some projects, previous projects, were the same things like
> Lyman-Cutler, it's <u>one – basically one package, one investor or whatever . . . so
> they overpaid me for those projects from one another, but not from Lyman-
> Cutler."</u>

Id. at 39 (emphasis added).  In other words, Kagan treated all of the jobs Babayan did for

him – essentially all of his concurrent projects -- as one big Kagan project.

184.    Despite the fact that Babayan had met with both Brusenkova and Gersh, and

determined that he had been paid in full, the May 7, 2015 Demand letter included a purported

outstanding payable to Dream Flooring of $15,460.  Trial Ex. 50.

185.    The Lyman Cutler AP Aging as of October 2016 carries a payable to Dream

Flooring of $13,910.  Trial Ex. 84.

186.    The Proof of Claim submitted to this Court in March 2016 includes a significant

purported payable to Dream Flooring of $26,120.  Trial Ex. 175 at 13 (showing total billings of

$52,210 with payments of $35,000); id. at 57 (showing total billings of $48,910 with payments

of $35,000).[2]

---

[2]    The back up included in Exhibit 175 shows that two of the line items in the Dream
Flooring itemization listed as just a "bill" have a $5,000 payment behind it, so that the total
payments to Dream Flooring add up to $75,000.  The total billing, however, adds up to $101,120
for an outstanding receivable of $26,120 – despite Babayan's testimony that he had been paid in
full.

187.     These purported payables cannot be squared with Babayan's testimony that he

had long since been paid in full.

188.     Gersh, who was sequestered during Babayan's testimony, specifically testified

that there was a balance due to Dream Flooring.  T. Tr. June 24, 2019 at 54, 86 (Gersh).

189.     The documentation submitted by KDC in connection with the Dream Flooring

payable is not credible.

190.     Jose Porto, the principal of Décor Art, also made clear that he had been paid in

full.  T. Tr. June 18, 2019 at 43, 55 (insists on being paid within a week or walks off job), 56

(Kagan always pays him within a week).

191.     The May 7, 2015 Demand Letter nevertheless carries a purported payable to

Décor Art of $11,250.  Trial Ex. 50.

192.     The October 2016 Lyman Cutler AP Aging increases the payable to Décor Art to

$20,870.  Trial Ex. 84.

193.     The Proof of Claim submitted to this Court in March 2016 includes a payable to

Décor Art of $20,870.  Trial Ex. 175 at L35 (showing total billings of $73,520 and payments of

$63,350); id. at C31 (showing total billings of $68,750 and payments of $58,050 – crediting

"Deposits" as payments).

194.     These purported payables cannot be squared with Porto's testimony that he was

paid "within a week."  Gersh, who was sequestered during Porto's testimony, specifically

acknowledged the increase of the payable to Décor Art from $11,250 as of May 7, 2015 to

$23,000 as of December 31, 2015.  T. Tr. June 24, 2019 at 86 (Gersh).  Gersh is, again, not

credible.

195.    The documentation submitted by KDC of the alleged payable to Décor Art is false.

196.    Viktor Sergeev, the principal of V&D Heating, admits to sending photocopies of the same "invoice" for both 55 Lyman and 88 Cutler.  T. Tr. June 18, 2019 at 73.  Sergeev claims to still be owed $39,000 for jobs he did in late 2013 and early 2014.  Id. at 95, 97.

197.    On his application for a permit to do the work, he represented the cost of the job as $18,500.  Id. at 96, 98.  If that representation by Sergeev is true, then he has been more than paid in full.

198.    Victor Ispravnikov, the principal of Unicon Electric, also admitted that his "proposals" on Lyman Cutler were photocopies of the same invoice.  T. Tr. June 18, 2019 at 129-131, 136.  One might believe that one subcontractor used photocopied invoices in connection with this business, but two is highly suspicious.  This is particularly the case where the amount allegedly outstanding is exactly equal to the amount previously paid -- $65,000.

199.    Ispravnikov also acknowledged that he represented on his permit application that the cost of the work was to be $18,000.  Id. at 146.  If that representation by Mr. Ispravnikov is true, then he has been more than paid in full.

200.    Ispravnikov was also listed as being owed $40,000 at approximately the same time in connection with the 10 Lyman Road Project, but testified he did not remember being owed $105,000 by Kagan in May 2015.  Id. at 148.  It is not credible that a small subcontractor would not remember such a large debt.

201.    The documentation KDC submitted to support the charges from V&D Heating and Unicon Electric is not credible.

202.    Boris Stanik of BST Plumbing specifically testified that he created his invoices in February and March 2015 by "looking at the plans" and "remembering what he had done." T. Tr. June 18, 2019 at 102 ("I looked at the plans, then I remember everything we did and put it in writing."), 108 (same point on cross examination). But Stanik submitted precisely identical invoices with just the addresses changed, dated over a month apart. Trial Exhibit 175 at L53 and C51. These invoices are not credible evidence of charges by Stanik.

203.    Stanik's permit applications attested under oath that the charge for the plumbing would be $20,000 per house, and that is how much he has been paid. T. Tr., June 18, 2019 at 110-11, 118-19.

204.    The city inspector's sign off on the rough plumbing for the houses was in March 2014 and the final inspection was in September 2014. Id. at 111.

205.    Stanik also testified that he was not owed any money for the purported invoices for plumbing fixtures and materials, which are dated August 2015. Id. at 116-18.

206.    Stanik testified that Kagan had paid them directly on his credit card:

Q: So . . . if I follow your testimony, you didn't pay for any of these materials, right, sir?
A: I order these materials. I have account with Ferguson Plumbing Supply. I order this materials; I receive this materials for his job, and he pays for the – he paid for this materials with a credit card directly to Ferguson. I never saw a check or money . . . It goes directly – he paid it directly on my account at Ferguson.
Q: He doesn't owe you any money for these materials then, sir?
A: As far as I know, he paid it.

Id. at 117-18.

207.    The KDC Proof of Claim asserts an outstanding balance to BST of $19,670 based upon these invoices for materials. Trial Exhibit 174.4 at C37; Trial Exhibit 174.2 at L60. Gersh, who was sequestered during Stanik's testimony, specifically testified that he went back to BST

to get back up for these charges in August 2015. T. Tr. June 24, 2019 at 52-53. In light of

Stanik's testimony, Gersh is not credible and these alleged KDC payables are false.

208.    The Court notes that Gersh testified to having spent hundreds of hours going over

the Lyman Cutler books and records and that the Proof of Claim contained no mistakes. T. Tr.

June 24, 2019 at 14-22, 37-38, 42 (Gersh). Yet the evidence repeatedly shows payables on these

books and records where the subcontractor (Babayan, Porto and Stanik) testified nothing is owed

to them. Neither the proffered documentation in support of KDC's Proof of Claim nor Gersh's

testimony is credible.

209.    With regard to DaCosta, the evidence actually shows that during the Lyman-

Cutler Project, DaCosta was paid $37,000 <u>more</u> than he billed on the Project. Trial Exhibit 175

at L40, C38.

210.    The evidence further showed that DaCosta was paid $230,000 before he ever

submitted an invoice, always in $10,000 increments, over a period of approximately seven

months. <u>Id.</u>

211.    On September 2, 2015, DaCosta sent Kagan an email in which he submitted

"change orders" dated March 1, 2015 for work he had done nearly a year before, to cover

$37,000 of the overpayment. Trial Exhibit 175 at L40.

212.    On September 2, 2015, DaCosta also submitted a "corrected" invoice to Gersh for

another $23,000, which KDC claims is outstanding. Trial Exhibit 175 at L40; T. Tr. June 24,

2019 at 53 (Gersh).

213.    In the September 2, 2015 email, DaCosta says he has "revise[d] our records as

you request." Trial Exhibit 175, Tab L40, C38. Plainly, Gersh or Kagan asked DaCosta to

submit these documents on or about September 2, 2015, over a year after substantially

completing the homes and long after DaCosta did his work.

214.    The DaCosta documentation is not credible.  The fair inference is that DaCosta

was more than paid in full for his work on the Lyman-Cutler Project, and that all of the alleged

charges over and above what he actually invoiced during the Project are false.  These charges

total $60,000.

215.    The evidence shows not only that the documentation submitted by KDC in

support of its Proof of Claim is not reliable, but strongly suggests that Kagan made no effort

during the course of construction to keep track of the expenses on each Project, but rather paid

subcontractors from whatever Project account had funds at a given time.

216.    The substantial overpayment to DaCosta strongly suggests that Kagan paid him

for work on another project with funds from Lyman-Cutler.  This inference is bolstered by

Babayan's testimony that the many projects he worked on for Kagan were "basically one

package."  T. Tr. June 18, 2019 at 39.  The Court finds that Kagan was paying for work on his

various projects without regard for which project was paying for the work.

217.    Gersh testified that before he became KDC's CFO, Brusenkova kept the books

<u>alphabetically by subcontractor</u> and did not maintain books by project.  T. Tr. June 17, 2019 at

200, 206-207 (Gersh).

218.    Failing to track the construction costs on the Project was, at minimum, grossly

negligent.  Based on the Court's findings, Kagan acted with reckless disregard for the payment

of expenses on his project and his fiduciary duties to the Plaintiffs.

219.    The evidence shows that Kagan tracked expenses by Subcontractor because that is

how he approached his business.

220.    Kagan had contemporaneously in process over 20 projects.  T. Tr. May 15, 2019 at 49 (Kagan); Trial Exhibit 141.

221.    The payments to the various subcontractors on the Lyman Cutler project are usually in round numbers, such as $10,000, and are not necessarily contemporaneous with the work performed.  For example, Babayan was paid $40,000 in $10,000 increments in November 2013 and February 2014.  Trial Exhibit 74, pages 42, 57 and 58.  The floors were not installed until July 2014.  Trial Exhibit 39 (Kagan email, July 25, 2014).

222.    The payments to Unicon, BST and V&D are also generally in $5,000 or $10,000 increments.  Trial Exhibit 175.

223.    Babayan specifically testified he worked on 17 or 18 projects for Kagan and viewed it as "basically one package."  T. Tr. June 18, 2019 at 39.

224.    DaCosta was paid $37,000 more than he billed on the Lyman-Cutler Project before Gersh went to work on the books.

225.    The Court finds based on this evidence that Kagan did not keep track of expenses by project in any organized way.  He paid for project expenses without regard for which project was paying for what work and when.  Kagan commingled payments and expenses on his various projects.  His documentation of alleged construction costs on the Lyman-Cutler project is wholly unreliable to the extent it is not knowingly false.

226.    Brusenkova credibly testified that Kagan decided how much he wanted to charge at the end of projects – he would arbitrarily increase his charges.  T. Tr. May 14, 2019 at 42-44 (Brusenkova).

227.    According to Ms. Brusenkova, Mr. Kagan began doing this after hitting ledge on a project, doubling his excavation price, and realizing the investor had no effective way to contest the higher charge.  T. Tr. May 14, 2019 at 42-44 (Brusenkova).

228.    According to Ms. Brusenkova, Mr. Kagan decided he was a "powerful man," could charge double to all his investors, and if they fought back he would lien the property.  T. Tr. May 14, 2019 at 42-44 (Brusenkova).

229.    Brusenkova's credibility is bolstered by the ferocious attack on her led by Cohen in a series of dismissed criminal charges and a civil lawsuit.  T. Tr. May 14, 2019 at 80-81 (Brusenkova).

230.    On November 20, 2015, Cohen wrote to the Middlesex District Attorney's Office, claimed that she had paid her husband to marry her and proposed that she be indicted.  T. Tr. May 13, 2019 at at 55-56 (Cohen); Trial Ex. 322.

231.    On November 30, 2015, Cohen went to the Newton Police to report an alleged crime by Brusenkova of embezzlement.  T. Tr. May 13, 2019 at 61-62 (Cohen); Trial Ex. 323. The charge did not survive the magistrate's hearing.  T. Tr. May 13, 2019 at 63 (Cohen).

232.    On February 1, 2016, Cohen again went to the police department and swore out a complaint against her for "witness intimidation" of Viktor Sergeev (who happens to be the principal of V&D Heating, one of the unpaid subs in this case).  T. Tr. May 13, 2019 at 63-65 (Cohen).  Sergeev did not attend; rather, Cohen brought along an affidavit that he had drafted. Id.  Cohen does not recall whether this charge ever even went to a clerk magistrate's hearing. Id.

233.    In April 2016, KDC, Kagan and Tatiana sued Brusenkova.  Id. at 65.

234.    Brusenkova left KDC in October 2014.  T. Tr. May 14, 2019 at 80 (Brusenkova). The evidence of serial, dismissed criminal charges and a civil lawsuit against her after the

Defendants learned that she would testify against them is abuse of process, witness intimidation and evidence of fraud by the Defendants.  T. Tr. May 14, 2019 at 61-63, 80-81 (Brusenkova).

235.    The testimony of the other investors who received substantially similar treatment by Kagan also supports the conclusion that the overstated charges against Lyman-Cutler were part of an intentional, knowing fraudulent scheme.

236.    Elena Lande credibly testified that Kagan charged her with approximately $300,000 in alleged overruns after the house was under agreement and just before the closing.  T. Tr. May 8, 2019. at 144 (Lande); Trial Ex. 169.  The aggregate charges included $440,000 by ProEx.  Trial Ex. 247.  A number of the other large alleged payables were due to the same subs as in the Lyman-Cutler alleged payables – BST Plumbing, Dream Flooring, Sergei Nikolaev and V&D Heating.  T. Tr. May 8, 2019 at 146-47 (Lande).  Cohen also threatened Lande if she did not take the "deal" she was offered.  T. Tr. May 8, 2019 at 148 (Lande); Trial Ex. 95.

237.    Mark Kayersman credibly testified that he had been "very close friends" with Kagan for years before Kagan betrayed him but since Kayserman invested in a Kagan project, they no longer speak.  T. Tr. May 13, 2019 at 120-21, 128 (Kayserman).  Construction was complete on Kayserman's project in the summer of 2013.  Id. at 126.  A few days prior to the closing of the sale of the property, Kagan sent him an invoice for $111,000 for work done a year earlier.  Id. at 126-27.  The invoice was primarily for work done by Kagan's excavation company.  Id. at 127.

238.    Vladimir Abramskiy credibly testified that Kagan also asserted a surge in the allegedly unpaid project payables against him, going from $141,900 before the property went under agreement to $408,172.77 after it went under agreement.  T. Tr. May 13, 2019 at 98-100 (Abramskiy); Trial Exs. 92, 94, 273.  Abramskiy also received the Cohen treatment of having the

demand multiply after rejecting the first demand.  Compare Trial Ex. 92 and 94.  The May 2015

demand included a general contractor fee of 15% of which Abramskiy had never heard before

and an "accrual fee" of 18% of which he had never heard before.  T. Tr. May 13, 2019 at 100-

101 (Abramskiy).  The supposed back up provided to Abramskiy consisted of a mish mash

including numerous one line KDC "invoices" referring to several of the same subs involved in

Lyman Cutler.  Trial Ex. 271.

239.    Dimitriy Zhukovskiy credibly testified that Kagan hit him with approximately

$510,000 in alleged overruns just before and even after the closing of the Hyde Avenue sale in

April 2014, when construction was completed in August or September 2013.  T. Tr. May 8, 2019

at 85-86 (Zhukovskiy).  A large amount of these alleged overruns were charges by KDC and

ProEx.  Id. at 87, 90 ($170,000 was from ProEx).

240.    In addition, despite demanding and being granted an opportunity to present

testimony from other, satisfied investors, Kagan failed to present any testimony from a single

satisfied investor in one of his other projects.  Adv. Doc. No. 292; Bankr. Doc. No. 417.  The

Court accordingly draws an adverse inference against the Kagan Parties based on the absence of

such testimony.  (In re Drumm), 524 B.R. at 373.

### X.    Total False and Unsubstantiated Claims in the Proof of Claim

241.    KDC's amended Proof of Claim asserts charges of $2,396,914.66.  Proof of Claim

Register No. 1-2.

242.    The KDC fees and overhead charges, which violate Section 5.2 of the Operating

Agreement, Kagan's fiduciary duties and the entire fairness rule, equal $777,784.41.[3]

---

[3]    KDC adjusted its numbers between the time of the June 25, 2015 Invoice, Trial Exhibit
67, and the Proof of Claim.  Claims Register No. 1-2.  In the amended Proof of Claim, KDC's
alleged general contractor fee goes up to $565,971.52, the "carrying costs advance fee" goes
down to $127,562.89, and the design fee and overhead remain constant, to yield a revised total of

243.    The ProEx profits, which violate Section 5.2 of the Operating Agreement, Kagan's fiduciary duties and the entire fairness rule, crediting ProEx with all of the checks listed on Trial Exhibit 5, equal $690,841.95.

244.    The carrying costs that Kagan was obligated to pay pursuant to Section 8.1 of the Operating Agreement, after the 23 months deadline, equal $175,515.26.  Trial Exhibit 4.

245.    The subcontractor and vendor documentation is wholly unreliable and the Court rejects it as adequate documentation of the costs of construction.  The evidence of actual payments by KDC and ProEx compared to reimbursements to KDC and ProEx shows that Kagan was reimbursed for all out of pocket costs at the close of construction.  Trial Exhibits 1-6.

246.    In addition, the evidence proves that the KDC documentation contains at least the following knowing and intentional claims for allegedly outstanding payables to subcontractors who testified that they have already been paid in full:

        a.  Dream Flooring ($26,120);

        b.  Décor Art ($20,870);

        c.  BST Plumbing ($19,670).

247.    KDC offered no evidence to support its purported $141,191.25 in additional "administrative fees and expenses."

248.    The alleged DaCosta charges above what it actually invoiced during the Project totaling $60,000 are false.

---

$777,784.41.  Compare supra ¶¶ 111-12.  The fact that KDC's numbers continued to change over time between June 25, 2015 and March 2016 confirm that Filippov could not possibly have ever approved these charges.

249.    KDC offered no evidence to support the Sergey Nikolaev charges ($24,660 x 2 =

$49,320).  See Trial Exhibit 174, Table of Contents (Tabs C3 and L4 to which Plaintiffs objected

and the documents were never offered, even though they were originally in the Exhibit binder).

250.    The documentation submitted for V&D Heating is not credible ($39,000).

251.    The documentation submitted for Unicon is not credible ($65,000).

252.    KDC has no right to recover interest on its false Proof of Claim (the Proof of

Claim asserts $233,865.39 in interest).

253.    Plaintiffs have accordingly proved that the documentation submitted by KDC

contains at least $2,299,178.26 in false, fraudulent and/or unsubstantiated charges.

254.    The Court finds that the documentation submitted by KDC as a whole is entirely

unreliable and insufficient to support its Proof of Claim. The Court further finds that the

documentation is riddled with knowing and intentional fraud.

255.    The Court rejects and disallows KDC's Proof of Claim in its entirety.

## XI.    The Financial Distress of the Debtor

256.    The Kagan Defendants conspired to inflict financial distress on the Debtor,

Lyman-Cutler, in a bad faith scheme to force Filippov and Lipetsker to pay them more money

than they were entitled to receive.

257.    Kagan knowingly and intentionally used KDC as a vehicle to assert false and

fraudulent charges well in excess of those to which he was entitled under the Operating

Agreement.

258.    Kagan knowingly and intentionally used ProEx as a vehicle to assert false and

fraudulent charges well in excess of those to which he was entitled under the Operating

Agreement.

259.    Kagan and KDC falsified books and records to create documentation to support his false charges.

260.    Tatiana aided and abetted Kagan by insisting on enforcement of the Listing Agreements, even though she admits she could have waived them at any time and did whatever Kagan told her to do.

261.    Kagan used KDC to record a false and fraudulent Mechanic's Lien against the Debtor.  Kagan personally signed the Mechanic's Lien.

262.    Kagan threatened to bring an action to dissolve the Debtor.  Trial Exhibit 71.

263.    Cohen threatened Filippov and his wife, Arina, in person at the properties.

264.    This financial distress, which the Kagan Parties knowingly and intentionally inflicted on the Plaintiffs in bad faith, directly caused Filippov and Lipetsker's decision to seek the protection of this Court in a bankruptcy petition.

## XII.   The Construction Expert Testimony

265.    The Kagan Parties presented expert testimony on the fair cost of construction from Von Salmi ("Salmi").

266.    In light of the extensive evidence of fraud and bad faith by the Kagan Parties, Salmi's opinion is not relevant.  In any event, Salmi was not credible with regard to the fair cost of construction.

267.    Salmi testified that the plans Kagan provided were insufficient to determine the cost of the job and that as a result he had to write his own specifications.  T. Tr. July 29, 2019 at 34, 76-77.  Salmi also admitted that when he was building spec homes, he would work backwards from the selling price to determine how much he could afford to spend on construction to earn a profit.  Id. at 154-55.  These admissions bolster the conclusion that Kagan

acted with reckless disregard when he quoted $1.3 million per house to Filippov and Lipetsker to induce them to invest in the project.

268.    Salmi also admitted that he had never submitted a construction budget to a bank without making a good faith effort to estimate the cost of construction.  Id. at 84.  He also admitted that "pricing from only that set of plans [supplied by Kagan] without a tremendous amount of more information would provide inaccurate figures as to the impacts of the cost of the level of finishes and items provided because they have a large variation and range in cost."  Id. These admissions bolster the conclusion that Kagan acted with reckless disregard when he quoted $1.3 million per house to Filippov and Lipetsker to induce them to invest in the project.

269.    Salmi based his specifications on Kagan's Proof of Claim documentation, which makes Salmi's opinion circular.  It assumes that Kagan used the materials presented in the Proof of Claim.  Id. at 78.  He took Kagan's characterizations of the finishes at face value and did not interview any of Kagan's subcontractors.  Id. at 79.

270.    Despite using Kagan's Proof of Claim documentation as the basis for his specifications, in a number of instances, Salmi came up with dramatically higher numbers for components of the construction, which render his opinion not credible.

271.    With the exception of the windows, Salmi obtained only one "bid" per trade to support his opinion, which bids were in 2018 prices.  Id. at 51-54.  Although Salmi worked with old friends and in one instance his own son, he also admitted he "told a white lie" to them that they were bidding on an actual project.  Id. at 51-52, 93.

272.    Salmi opined that it would have cost $3,098,160.80 to build the first of the two Lyman Cutler houses.  Id. at 64.  Applying "economy of scale," Salmi opined it would have cost $2,771,667.94.  Id. at 66.  Salmi's opinion, therefore, of the cost to build the two houses is

$5,869,828.  Id. at 66, 76.  This sum is unreasonably high and bears no relation to the actual

costs of construction.  It is not credible.

273.    Salmi also opined as to the fair value of the work purportedly done by ProEx, but

his methodology was flawed.  Kagan agreed to perform the construction for "cost" in return for a

50% share of the profits from the venture.  What an outside excavation company might charge

for the same work in 2018 dollars and including profit and overhead does not illuminate ProEx's

purported charges in any useful way.

274.    Salmi admitted that the sitework category has the widest swings in costs and can

vary as much as 30-40%.  Id. at 90.

275.    Salmi carried $283,050 for the framing alone.  Id. at 93.  After deducting the lull

allowance, that leaves $267,000 for labor, which would mean a six-man crew working five days

a week for 4.8 months.  Id. at 184 (Doddridge rebuttal testimony).  That is far too much time and

calls into question Salmi's conclusions in general.

276.    Salmi carried $2,410 for custom doors when Kagan paid $600.  Id. at 99-100.

277.    Salmi carried $150,000 for a custom pre-built staircase.  Id. at 104.  Kagan

purchased the components of the staircases for $48,000.  Id. at 105, 179.

278.    Salmi input a number of items with no back up at all, including the overhead

doors, fireplace specialties and accessories, vacuum system, water filtration, sump pump and

civil engineer.  Id at 100-101.

279.    Salmi included a quote of $1,216 per linear foot for bathroom vanities, $297 per

linear foot for closet poles and shelves, totaling $35,640 for closet poles and shelves, and $1,593

per linear foot for closet cabinets for a total of $95,580 for closet cabinets.  Id. at 106-07.  The

pictures of the closets in the record contradict Salmi's testimony that the closet cabinets were

"high-end mahogany."  Id. at 183; Trial Exhibit 46.  Salmi's figures are unreasonably high and

call into question the credibility of his overall conclusions.

280.    Although Salmi acknowledged that materials prices had increased 7.6% since the

homes were built, he did not adjust his 2018 numbers to take this increase into account.  T. Tr.

July 29, 2019 at 110.  Where Salmi admitted that 40-50% of his estimate was for materials, this

failure to adjust his number made a material difference in the conclusion.  Id. at 111.

281.    Salmi denied that labor costs have increased in the Boston area but the Court did

not find this assertion credible.  Id. at 109.

282.    Salmi's explanation of the "Salmi Profit" component of his numbers was

unpersuasive.  He testified that he reduced certain line items in his calculations to remove the

"Salmi Profit" component.  Id. at 102, 112-14.  But the column in which he calculated a total

including the "Salmi Profit" used the bids directly from the subcontractors.  Id. at 115-18.

Salmi's effort to explain this problem away was not persuasive.

283.    Salmi testified that the range of building costs in the greater Boston area for

homes such as the Lyman Cutler homes is $350-$650 per square foot and that the homes at issue

would have cost $476 per square foot, with a "best case" economy of scale cost of $357 per

square foot.  Id. at 128.  These figures, as explained by Plaintiff's Expert David Doddridge, are

unreasonably high.  Id. at 178.  Kagan has never incurred costs even close to that high on any

project in the record.  Based on the materials Kagan produced in this case and in connection with

other projects, his actual construction costs ranged from $130 to $144 per square foot when he

did not have an investor and (allegedly) $236 to $272 per square foot when he did have an

investor.  See T. Tr. May 10, 2019 at 83-85 (Goldman).

284.     Both construction experts agree that Kagan's $1.4 million budget was unreasonably low.  T. Tr. July 29, 2019 at 127-28.  This again supports the conclusion that Kagan acted with reckless disregard in quoting construction costs to Filippov and Lipetsker to induce them to invest in his project.

285.     The credibility of Salmi's opinion was eliminated altogether by his admissions concerning the home Salmi built in Newton himself in the same time frame, which he described in his report as the same size as the Lyman Cutler homes and using the comparable finishes and materials.  Id. at 129.  Salmi testified he took his experience in building this home into account in forming his opinion.  Id.

286.     But Salmi admitted that at his deposition he could not say within $1 million what the cost of construction on that home was, and claimed the range was somewhere between $1.8 million and $3.0 million.  Id.   For a 7,700 square foot home, $1.8 million would yield construction costs of under $234 per square foot, well below the range that Salmi testified to and in line with Doddridge's numbers.

287.     Salmi was also forced to admit that he represented to the City of Newton when he applied for the building permit that the construction costs would be $950,000.  Id. at 131.  Salmi was also forced to admit that the owner of the home represented that the construction cost was $950,000 in the final affidavit of costs.  Id. at 131-32.

288.     The Court notes that Kagan represented to the Town of Brookline, under oath, in his affidavits that the final cost of construction for the Lyman Cutler homes was $910,000 each.  Trial Exhibit 332, 333.

289.     Based on these facts, the Court discredits Salmi's opinion concerning the reasonable cost of the construction of the Lyman Cutler homes.

290.    Plaintiffs' construction expert, David Doddridge ("Doddridge"), more persuasively calculated that the fair cost of the construction was $1,718,000 per home.  Id. at 176.

291.    Doddridge used prices from the RS Means Construction Guide for 2014, adjusted based on his decades of experience, to calculate costs and used Bluebeam software to calculate quantities.  Id. at 163-66.  Doddridge's methodology was more objective and the figure he arrived at comported more closely with the actual construction costs.

292.    Doddridge did not include overhead and profit for the general contractor in his calculation because the Operating Agreement obligated Kagan to build the homes for a share of the profits.  Id. at 172-73.  For the same reason, he did not include overhead and profit in the components of the job that were performed by ProEx.  Id.

293.    Doddridge's figure errs on the high side and assumes that reputable sub contractors were hired in arms-length relationships.  Id. at 261.

294.    Although neither construction expert believed the construction costs for the homes would have been as low as the $1.4 million Kagan promised Filippov and Lipetsker he could build them for, Doddridge's figure more closely aligns with the facts of the case.

295.    Given Kagan's relationship with the subcontractors and his contemporaneous use of the same subs on some 20 projects as if it were one big project, it is possible he could have delivered on his deal with Filippov and Lipetsker if he had acted with integrity.  This is particularly true in light of the per square foot cost of the homes he did without an investor (between $130 and $144 per square foot).  See T. Tr. May 10, 2019 at 83-85 (Goldman).

296.    Because of the way Kagan conducted his business and the pervasive unreliability of the documentation he presented to the Plaintiffs and the Court, there is no way to reliably

determine what his actual costs of construction were. There is no reliable way to determine the "fair value" of Kagan's work, in light of his cozy subcontractor relationships.

297. The Court can, however, reliably tell that the charges asserted under the purported KDC Contract are false and fraudulent, the charges asserted through ProEx were made up without regard to Kagan's out of pocket costs and include nearly $700,000 in profits for Kagan that are contrary to the Operating Agreement, the entire fairness doctrine, and his fiduciary duty and the alleged payables due to the subcontractors include false and fraudulent claims that amounts remain outstanding to subcontractors who testified under oath that there are no such amounts due and outstanding.

298. The Court holds that in light of Kagan's egregious, knowing and intentional fraud, breach of fiduciary duty, and breach of the Operating Agreement, the "fair value" of the construction does not shield the Kagan Defendants in any way.

## <u>Conclusions of Law and Mixed Findings</u>

### I.   **Overarching Principles**

1. A fiduciary who engages in a self-dealing transaction must prove that the transaction is entirely fair. <u>See</u> <u>Coggins v. New Eng. Patriots Football Club</u>, 397 Mass. 525, 531 (1986) ("[t]he requirement of fairness is unflinching in its demand that where one stands on both sides of a transaction, he has the burden of establishing its entire fairness, sufficient to pass the test of careful scrutiny by the courts") (quoting <u>Weinberger v. UOP, Inc.</u>, 457 A.2d 701 (Del. 1983)).

2. A transaction is self-dealing if the fiduciary stands to financially benefit. <u>See</u> <u>Bergeron v. Ridgewood Sec. Corp.</u>, 610 F. Supp. 2d 113, 116 n.10 (D. Mass. 2009) (a fiduciary must prove entire fairness if he "appeared on both sides of a transaction or derived a personal benefit from a transaction in the sense of self-dealing").

3.     The contract between KDC and Lyman-Cutler upon which KDC bases its Mechanic's Lien and Proof of Claim is a self-dealing contract.  Trial Exhibit 37.  Kagan and his wife Tatiana own 100% of KDC.  Kagan purported to sign the KDC Contract for both sides of the transaction.  He stands to benefit from it.

4.     A transaction benefitting a fiduciary's spouse is an example of the type of transaction that would be subject to entire fairness review.  See, e.g., Pereira v. Cogan, 294 B.R. 449, 532 (S.D.N.Y. 2003) (loans director caused company to make to his wife subject to entire fairness); International Communications Assn., Inc. v. 258 St. Nicholas Ave. LLC, 2018 N.Y. Misc. LEXIS 531, at *14 (N.Y. Supr. Ct. Feb. 15, 2018) (payments defendant caused company to make to his wife subject to entire fairness).

5.     The Listing Agreements are self-dealing contracts.  Trial Exhibits 44 and 45. Kagan and Tatania stood to financially benefit from them.

6.     KDC's retention of ProEx is a self-dealing contract.  Kagan and Tatiana also own 100% of ProEx and so they stand to benefit financially from KDC's retention of ProEx.

7.     The entire fairness standard encompasses two basic aspects: fair dealing and fair price.  Coggins, 397 Mass. at 531.

8.     A fundamental component of "fair dealing" is that the self-interested fiduciary must make a complete and candid disclosure of all material facts and circumstances surrounding the transaction.  Weinberger, 457 A.2d at 711 (fair dealing embraces questions including how the transaction was "disclosed to the directors"); Holten v. Std. Parking Corp., 98 F. Supp. 3d 444, 459 (D. Conn. 2015) ("fair dealing includes the duty of disclosure . . . which requires a controlling shareholder who stands on both sides of a transaction to disclose fully all the material facts and circumstances surrounding the transaction") (quoting Kahn v. Lynch Communication

60

Sys., Inc., 669 A.2d 79 (Del. 1995)); Bomarko, Inc. v. International Telecharge, Inc., 794 A.2d

1161, 1180 (Del. Ch. Ct. 1999) (the fair dealing element of entire fairness "embraces the duty of

candor owed by corporate fiduciaries to disclose all material information relevant to corporate

decisions from which they may derive a personal benefit"); Carlson v. Hallinan, 925 A.2d 506,

531 (Del. Ch. Ct. 2006) (fair dealing requires directors to "disclose all material facts concerning

the transaction so that an informed decision can be made as to whether or not a transaction

should be approved"); see also Puritan Medical Ctr., Inc. v. Cashman, 413 Mass. 167, 172 (1992)

("there may be no ratification of self-dealing without full disclosure"); Demoulas v. Demoulas

Super Mkts., 424 Mass. 501, 531 (1997) ("to satisfy the duty of loyalty, a fiduciary wishing to

engage in a self-dealing transaction must disclose details of the transaction and the conflict of

interest to the corporate decisionmakers").

9.      A court does not need to find corruption or dishonesty in order to find that a self-

interested transaction was not entirely fair.  Coggins, 397 Mass. at 533.

10.     Unless a party can prove entire fairness, a self-interested transaction is

"presumptively voidable."  See Estate of Carpenter v. Dineen, 2008 Del. Ch. LEXIS 40, at *50

(Del. Ch. Ct. Mar. 26, 2008); Ramsey v. Toelle, 2008 Del. Ch. LEXIS 283, at *22 (Del. Ch. Ct.

Sept. 30, 2008) (voiding a self-dealing transaction on the part of a fiduciary "is the proper

remedy"); Sizemore v. I-R Maple Corp., 2003 Mass. Super. LEXIS 133, at *17-18 (Mass. Super.

Ct. Apr. 25, 2003) ("[a] self-dealing transaction is presumed invalid and is voidable unless the

fiduciary can prove fair dealing by clear and convincing evidence"); Geller v. Allied-Lyons PLC,

42 Mass. App. Ct. 120, 125-28 (1997) (full disclosure of all material facts regarding agreement

whereby fiduciary would receive a personal profit in connection with corporate transaction was

prerequisite for enforcement); see also Demoulas v. Demoulas Super Mkts., Inc., 1995 Mass.

Super. LEXIS 870, at *204 (Mass. Super. Ct. Aug. 2, 1995) (fiduciary contract is voidable unless it is on fair terms and all the parties manifest assent with full understanding of all relevant facts that the fiduciary knows or should know).

11.    When a transaction does not meet the entire fairness standard, the courts may fashion any form of equitable or monetary relief as may be appropriate, including disgorgement. See, e.g., Julian v. Eastern States Constr. Serv., 2008 Del. Ch. LEXIS 86, at *63 (Del. Ch. Ct. July 8, 2008).

12.    It is axiomatic that "a disloyal fiduciary may not profit from his breach." Continental Ins. Co. v. Rutledge & Co., 750 A.2d 1219, 1239 (Del. Ch. Ct. 2000) (proof that party received excess fees for performing the business of a partnership, but called those fees by another name, constituted self-dealing and required disgorgement of fees).  Accordingly, courts routinely order complete disgorgement of the fruits of a fiduciary's inequitable behavior.  See, e.g., MAZ Partners LP v. Shear (In re PHC, Inc. S'holder Litig.), 894 F.3d 419, 426 & 438 (1st Cir. 2018) (disgorgement was an "altogether fitting remedy" for controlling shareholder who breached his fiduciary duty by arranging a merger through a process that was not entirely fair). In ordering a disgorgement remedy for a fiduciary who has unjustly enriched himself, a court need not limit the disgorgement to amounts in excess of "fair" compensation; rather, the entire amount may be disgorged.  See, e.g., Valeant Pharms. Int'l v. Jerney, 921 A.2d 732, 752-53 (Del. Ch. Ct. 2007).

13.    A defendant may not attempt to use equitable principles to circumvent the doctrine of entire fairness.  See, e.g., SFF-TIR, LLC v. Stephenson, 250 F. Supp. 3d 856, 1030 (N.D. Ok. 2017) (relying on In re JCC Holding Co. S'holder Litig., 843 A.2d 713 (Del. Ch. Ct. 2003)).

14.    The covenant of good faith and fair dealing bars a party to a contract from doing anything to deny the other party the fruits of the bargain.  Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 471-72 (1991).

15.    Proof of fraud usually depends on circumstantial evidence.  United States v. Goodchild, 25 F.3d 55, 60 (1st Cir. 1994) ("Fraud is usually proven by circumstantial evidence. Direct proof of a knowing intent to defraud is rare. . . . There is no pat formula for such proof; factual circumstances may signal fraudulent intent in ways as diverse as the manifestations of fraud itself.") (citation omitted); see ABCD Holdings, LLC v. Hannon (In re Hannon), 512 B.R. 1, 16-17 (Bankr. D. Mass. 2014) (court must exercise caution ruling on summary judgment in fraud case); Beal Bank, SSB v. Pittorino, 177 F.3d 65, (1st Cir. 1999) (in fraudulent transfer case, "It is the rare case in which a transferor admits that he intended to make an impermissible transfer," but confluence of several badges of fraud may be conclusive evidence of fraudulent intent); Xerox Fin. Servs. Life Ins. Co. v. Sterman (In re Sterman), 244 B.R. 499, 504 (D. Mass. 1999) (family, friendship or other relationship may be a badge of fraud in a fraudulent transfer action).

16.    Making a statement with reckless disregard for its truth may be fraud.  Geresy v. Dommert, 2004 Mich. App. LEXIS 1397, at *24 (Mich. App. Ct. June 3, 2004) (affirming fraud judgment against contractor for recklessly underbidding construction costs).

17.    Fraud encompasses

**any deceit, artifice, trick, or design involving direct and active operation of the mind, used to circumvent and cheat another**. . . No learned inquiry into the history of fraud is necessary to establish that it is not limited to misrepresentations and misleading omissions.  Fraud is a generic term, which **embraces all the multifarious means which human ingenuity can devise and which are resorted to by one individual to gain an advantage over another by false suggestions or by the suppression of truth**.  No definite and invariable rule can be laid down as

> a general proposition defining fraud, and it includes all surprise, trick,
> cunning, dissembling, and any unfair way by which another is cheated.

McClellan v. Cantrell, 217 F.3d 890, 893 (7th Cir. 2000) (emphasis added); see In re Lawson,

791 F.3d 214, 220 (1st Cir. 2015) (actual fraud "is not limited to fraud effected by

misrepresentation"); Bailey v. Community Bank of Homewood-Flossmoor, 145 B.R. 919, 927

(Bankr. N.D. Ill. 1992) (denying debtor discharge based on actual fraud for his participation in

fabricating fraudulent mechanics' lien).

18.     By making claims for charges to which they know they are not entitled, and

encumbering the Project Properties with a false Mechanic's Lien, the Kagan Defendants

unilaterally transferred to themselves an interest in the Project Properties commensurate with

their false claim, which the Plaintiffs have battled ever since at great cost.   In re Maher, 144 F.

503,509 (D. Mass. 1906) ("In a fraudulent transfer the fraud is actual, the bankrupt has secured

an advantage for himself out of what in law should belong to his creditors, and not to him");

Cordeck Sales, Inc. v. Construction Sys., Inc., 382 Ill. App. 3d 334, 399 (Ill. App. Ct. 2008)

("[w]hen there is evidence that a lien claimant knowingly recorded a claim that contained a

substantial overcharge, the claim will be defeated on the basis of constructive fraud because the

effect of his actions is to give an appearance of a greater encumbrance on the property than that

to which he is entitled").

19.     Filing a proof of claim with a bankruptcy court that includes knowingly false

charges against the Debtor commits fraud.  See 18 U.S.C. § 152(4) (submitting false proof of

claim is a crime); see also Watson v. Stonewall Jackson Mem'l Hosp. Co. (In re Watson), 2010

Bankr. LEXIS 3736, at *7-11 (N.D.W.V. Nov. 1, 2010) (filing false proof of claim is abuse of

bankruptcy process, giving rise to contempt under 11 U.S.C. § 105(a) and sanctions under Bankr.

R. 9011).

20.     Reliance on fraudulent misrepresentations is not an element of Plaintiffs' claims

for breach of contract, breach of fiduciary duty, aiding and abetting breach of fiduciary duty,

conspiracy or violation of Chapter 93A.  UBS Financial Services, Inc. v. Aliberti, 94 Mass. App.

Ct. 180, 186 (2018) ("Breach of contract in New York (as in Massachusetts) requires (1) the

existence of a valid contract; (2) the breach of that contract; and (3) resultant damages"); New

Faith Missionary Baptist Church v. Pizziferri, 2012 Mass. App. Unpub. LEXIS 207, at *8 (Mass.

App. Ct. Feb. 23, 2012) ("reasonable reliance is not a necessary element of a c. 93A claim in all

circumstances"); Dann v. Patten, 2008 Mass. App. Unpub. LEXIS 300, at *2-3 (Mass. App. Ct.

Nov. 17, 2008) ("essential elements of breach of fiduciary duty claim are existence of fiduciary

duty, breach, damage, and causation"); see In re Parmalat Sec. Litig., 684 F. Supp. 2d 453, 481

n.173 (S.D.N.Y. 2010) ("reliance is not an element of a claim for breach of fiduciary duty under

New York law"); Medina v. Sarkisian, 2015 Cal. App. Unpub. LEXIS 6926, at *21 n.7 (Cal. Ct.

App. Sept. 29, 2015) ("Reliance is not an element of breach of fiduciary duty"); Hendricks v.

Grant Thornton Int'l, 973 S.W.2d 348, 360 (Tx. Ct. App. 1998) ("reliance is not an element of

civil conspiracy, breach of fiduciary duty, . . . , and breach of contract").

21.     Low-balling a bid and then demanding more money when the job is done is a

violation of Chapter 93A.  Hannon v. Original Gunite Aquatech Pools, Inc., 385 Mass. 813, 825

(1982).

22.     Making extortionate demands in disregard of known contractual arrangements is a

violation of Chapter 93A.  Anthony's Pier Four, Inc. v. HBC Assocs., 411 Mass. 451, 474-75

(1991); Certified Power Sys v. Dominion Energy Brayton Point, LLC, 2011 Mass. Super. LEXIS

317, at *167 (Mass. Super. Ct. Dec. 30, 2011; Arthur D. Little, Inc. v. Dooyang Corp, 147 F.3d

47, 55 (1st Cir. 1998); Community Builders v. Indian Motorcycle Assocs., 44 Mass. App. Ct.

537, 557-58 (1998); <u>Northern Sec. Ins. Co. v. R.H. Realty Trust</u>, 78 Mass. App. Ct. 691, 695-96
(2011).

23.      The standard measure of damages for breach of contract under Massachusetts law
is "expectancy" -- an award to put the Plaintiffs in as good a position as they would have been if
there had been no breach.  <u>Sullivan v. O'Connor</u>, 363 Mass. 579, 583 (1973); <u>see</u> <u>Hendricks &
Assoc., Inc. v. Daewoo Corp.</u>, 923 F.2d 209, 213 (1st Cir. 1991) (measure for breach of contract
may include lost profits); <u>Selmark Assocs. v. Erlich</u>, 467 Mass. 525, 545 (2014) ("Expectation
damages for breach of contract includes consequential damages, <i>i.e.</i>, those that cannot be
reasonably prevented and arise naturally from the breach, or which are reasonably contemplated
by the parties").

24.      The measure for breach of fiduciary duty is effectively the same.  <u>One to One
Interactive, LLC v. Landrith</u>, 76 Mass. App. Ct. 142, 147 (2010) ("injured party entitled to 'those
benefits which she reasonably expected, but has not received because of the fiduciary breach'")
(quoting <u>Brodie v. Jordan</u>, 447 Mass. 866, 871 (2006)).  Similarly, Chapter 93A provides that
"the proper measure [of damages] was the loss causally connected to those acts which were
found to be unfair and deceptive, which may exceed the contractual measure of damages.  <u>Multi
Technology, Inc. v. Mitchell Management Systems, Inc.</u>, 25 Mass. App. Ct. 333, 337-38 (1988).

25.      The Court has broad discretion to fashion a remedy for the breach of fiduciary
duty.  <u>Zimmerman v. Bogoff</u>, 402 Mass. 650 at 661 (1988) ("innocent partner is to be put as
nearly as possible in the same position which he would have occupied if there had been no
wrongdoing"); <u>see</u> <u>also</u> <u>Brodie v. Jordan</u>, 447 Mass. 866, 871 (2006) ("Courts have broad
equitable powers to fashion remedies for breaches of fiduciary duty in a close corporation");
<u>Demoulas v. Demoulas</u>, 428 Mass. 555, 581 (1998) (recognizing that "a court may . . . reform an

agreement to correct wrongdoing"); <u>Julian v. Eastern States Constr. Serv.</u>, 2008 Del. Ch. LEXIS

86, at *63 (Del. Ch. Ct. July 8, 2008) (court free to fashion appropriate remedy); <u>see</u> <u>also</u> <u>In re</u>

<u>Cumberland Farms, Inc.</u>, 249 B.R. 341, 354 (D. Mass. Bankr. 2000) ("An insider's wrongful

profit in matters such as dealing in the corporation's securities does not cause the corporation

damage. Yet, to deter such conduct, the corporation is permitted to recover the ill-gotten gain.").

26.     Plaintiffs are entitled to recover reasonably foreseeable lost profits as a

component of their damages.  <u>Hendricks & Assoc.</u>, 923 F.2d at 213.  The "difference in value"

measure of damages is well recognized.  <u>See</u>, <u>e.g.</u>, <u>Lambert v. Weyerhaeuser Co. (In re Paragon</u>

<u>Trade Brands, Inc.</u>), 324 B.R. 829, 899 (Bankr. N.D. Ga. 2005) ("difference-in-value measure of

damages . . . measures the difference between the market value of the property, as warranted, on

the date of sale and its actual value on that date, with the defect").

27.     Costs incurred attempting to mitigate the harm caused by a defendant's

wrongdoing, including the costs of a bankruptcy proceeding, are recoverable as consequential

damages.  <u>Primavera Familienstiftung v. Askin</u>, 130 F. Supp. 2d 450, 534-35 (S.D.N.Y. 2001)

(denying summary judgment and holding that plaintiffs could recover damages for liquidation

and bankruptcy-related expenses); <u>Lambert v. Weyerhaeuser Co. (In re Paragon Trade Brands,</u>

<u>Inc.</u>), 324 B.R. at 911 ("the bankruptcy costs Paragon incurred to rehabilitate itself from

Weyerhaeuser's breach are recoverable as consequential damages").

28.     Damages for the loss of use of money is a well-recognized element of damages,

particularly where a fiduciary causes the loss.  <u>See</u>, <u>e.g.</u>, <u>Arthur D. Little, Inc. v. Dooyang Corp.</u>,

147 F.3d 47, 56 (1st Cir. 1998) ("the loss of the use of money 'is precisely the type of damage we

have described as appropriately being subject to multiplication . . . under c. 93A'"); <u>Auto Flat</u>

<u>Car Crushers, Inc. v. Hanover Insurance Company</u>, 469 Mass. 813, 827 (2014) (damages for

insurer's failure to settle include loss of use of funds); <u>Chestnut Hill Dev. Corp. v. Otis Elevator Co.</u>, 739 F. Supp. 692, 702 (D. Mass. 1990) ("Customarily, construction contracts, particularly large contracts, require third-party financing. Ordinarily, delay in completion requires an extension of the term of construction financing. The interest costs incurred and the interest revenue lost during such an extended term are predictable results of the delay and are, therefore, compensable direct damages.").

## II.    The Proofs of Claim and Interests

**Proof of Claim 1-2 Kagan Development KDC Corp.**

29.    As set forth above, the KDC Proof of Claim is based upon a fraudulent contract and includes false and fraudulent charges and charges in violation of the Lyman Cutler Operating Agreement.

30.    As this Court has previously ruled, KDC was obligated to prove entire fairness in order to recover on its Proof of Claim.  Order, January 11, 2019, Adv. Doc. No. 278; Bankr. Doc. No. 409.

31.    KDC has failed to carry its burden of proof of entire fairness.

32.    KDC's Proof of Claim 1-2 is hereby <u>disallowed</u> in its entirety.  11 U.S.C. § 502(b); <u>In re Morency</u>, 2015 Bankr. LEXIS 3153, at *40 (D. Mass. Bankr. Sept. 18, 2015).

**Proof of Claim 2-1 O'Connor, Carnathan and Mack, LLC**

33.    The Debtor retained O'Connor, Carnathan and Mack, LLC ("OCM") pursuant to the authority of Filippov as Managing Member under the Operating Agreement, which retention was discussed with and approved by Lipetsker as a member of the LLC.

34.    OCM provided services to the Debtor in connection with the dispute with the Kagan Parties, including filing an action in the Massachusetts Superior Court on behalf of the Debtor.

35.    No evidence was offered to dispute the amount of OCM's invoice.

36.    OCM's Proof of Claim 2-1 is hereby <u>allowed</u> in its entirety.  11 U.S.C. § 502(b).

37.    OCM is entitled to $35,329.95 on its Proof of Claim.

**Proof of Claim 3-1 U.S. Trustee**

38.    There has been no challenge to the Proof of Claim of the U.S. Trustee

39.    The U.S. Trustee's Proof of Claim 3-1 is hereby <u>allowed</u> in its entirety.  11 U.S.C.

§ 502(a).

40.    The U.S. Trustee is entitled to $325.00 on its Proof of Claim.

**Proof of Claim 4-1 Kagan Development, KDC Corp. (Indemnification)**

41.    KDC is not an indemnified party under the Lyman Cutler Operating Agreement.

42.    KDC has not acted in good faith on behalf of the Company.  KDC has acted with

gross negligence and willful misconduct.

43.    KDC is not entitled to indemnification from the Debtor.

44.    KDC's Proof of Claim 4-1 is <u>disallowed</u> in its entirety.  11 U.S.C. § 502(b); <u>In re</u>

<u>Morency</u>, 2015 Bankr. LEXIS 3153, at *40.

**Proof of Claim 5-1 Tatiana Kagan**

45.    Tatiana is not an indemnified party under the Lyman-Cutler Operating

Agreement.

46.    Tatiana has not acted in good faith on behalf of the Company.  Tatiana has

engaged in willful misconduct.

47.    Tatiana is not entitled to indemnification from the Debtor.

48.    Tatiana's Proof of Claim 5-1 is <u>disallowed</u> in its entirety.  11 U.S.C. § 502(b); <u>In</u>

<u>re Morency</u>, 2015 Bankr. LEXIS 3153, at *40.

**Proof of Claim 6-1 Vadim Kagan**

49.    Kagan has not acted in good faith on behalf of the Company.  Kagan has been

grossly negligent and engaged in willful misconduct.

50.    Kagan is not entitled to indemnification from the Debtor.

51.    Kagan's Proof of Claim 6-1 is <u>disallowed</u> in its entirety.  11 U.S.C. § 502(b); <u>In re</u>

<u>Morency</u>, 2015 Bankr. LEXIS 3153, at *40.

**Proof of Claim 7-1 ProExcavation Corp.**

52.    ProEx is not an indemnified party under the Lyman-Cutler Operating Agreement.

53.    ProEx has been grossly negligent and engaged in willful misconduct.

54.    ProEx is not entitled to indemnification from the Debtor.

55.    ProEx's Proof of Claim 7-1 is <u>disallowed</u> in its entirety.  11 U.S.C. § 502(b); <u>In re</u>

<u>Morency</u>, 2015 Bankr. LEXIS 3153, at *40.

**Proof of Claim 8-1 Cortez Landscaping**

56.    There has been no challenge to the Proof of Claim of Cortez Landscaping.

57.    Cortez Landscaping's Proof of Claim 8-1 is <u>allowed</u> in its entirety.  11 U.S.C. §

502(a).

58.    Cortez Landscaping is entitled to $1,440.00 on its Proof of Claim.

**Proof of Claim 9-1 Alex Filippov**

59.    Filippov provided cash to the Debtor to support the mortgage asserted in Proof of

Claim 9-1.  Trial Exhibits 72, 74, 91, 325.

60.    The terms of the mortgage are entirely fair to the Debtor, Lipetsker and Kagan.

The interest rate is the same as the rate provided on Filippov's capital pursuant to the Operating

Agreement.  Trial Exhibit 75.

61.    Lipetsker also approved the mortgage to Filippov.

62.     Filippov's Proof of Claim 9-1 is <u>allowed</u> in its entirety.  11 U.S.C. § 502(b).

63.     Filippov is entitled to recover $208,333.33 on his Proof of Claim.

**Proof of Interest 10-1 Nickolay Lipetsker**

64.     Lipetsker has a membership interest in the Debtor as set forth in his Proof of
Interest.

65.     Lipetsker's Proof of Interest 10-1 is <u>allowed</u> in its entirety.  11 U.S.C. § 502(b).

**Proof of Interest 11-1 Alex Filippov**

66.     Filippov has a membership interest in the Debtor as set forth in his Proof of
Interest.

67.     Filippov's Proof of Interest 11-1 is <u>allowed</u> in its entirety.  11 U.S.C. § 502(b).

**Proof of Interest 12-1 Vadim Kagan**

68.     Pursuant to the Operating Agreement, Kagan's membership interest in the Debtor
was reduced as a consequence of his refusal to pay the carrying costs after May 7, 2015.

69.     His membership interest has been reduced to 2.89% of the Debtor as a
consequence of his breach of the Operating Agreement.

70.     Kagan's Proof of Claim 12-1 is <u>partially allowed</u> to reflect a remaining 2.89%
membership interest in the Debtor owned by Kagan.  11 U.S.C. § 502(b).

71.     However, because of the inequitable conduct by Kagan described above, the
Court holds that all interests asserted by Kagan shall be equitably subordinated pursuant to 11
U.S.C. § 510(c)(1) to the interests asserted by Filippov and Lipetsker.  As a result, Kagan is not
entitled to any distribution from the Company.

### III.     The Counts in the Amended Adversary Complaint

### Count I – Breach of Contract, Asserted by All Plaintiffs against Vadim Kagan

72.     The Debtor, Filippov, Lipetsker and Kagan are parties to the Lyman Cutler Operating Agreement.  Trial Exhibit 15.

73.     As set forth above, Kagan breached the Operating Agreement by failing to substantially complete the two homes by March 30, 2014 as required by Section 5.2, signing exclusive listing agreements with his wife, Tatiana, that he knew violated Section 6.1(b)(6), signing a contract with KDC that he knew contradicted his obligations under Section 5.2, asserting claims for cost overruns that were never approved by Filippov as Managing Member as required by Section 5.2, double billing and falsifying claims against the Company, and refusing to pay the carrying costs after May 7, 2015 as he was obligated to do under Section 8.1

74.     As a result of Kagan's breaches of the Operating Agreement, the Plaintiffs have suffered damages for which Kagan is liable, which the Court will separately outline below. Bulwer v. Mount Auburn Hospital, 473 Mass. 672, 690 (2016).

### Count II – Breach of Fiduciary Duty, Asserted by All Plaintiffs against Vadim Kagan

75.     As a member of a closely held Massachusetts LLC with only 3 members, Kagan owed a fiduciary duty to the LLC, Filippov and Lipetsker.  Zacharakis v. Melo (In re Melo), 558 B.R. 521, 551 n.23 (D. Mass. Bankr. 2016) ("[h]olders of limited liability company interests in a closely held Massachusetts LLC owe each other the same fiduciary duty that shareholders of a closely held Massachusetts corporation owe to each other").

76.     Kagan's fiduciary duty encompassed duties of due care, utmost loyalty and good faith, and full disclosure.

77.     As set forth above, Kagan breached his fiduciary duties to the Plaintiffs.

78.    As a result of Kagan's breaches of his fiduciary duties to the Plaintiffs, the

Plaintiffs have suffered damages for which Kagan is liable and the Plaintiffs are entitled to other

and further relief, which the Court will separately outline below.

**Count III – Aiding and Abetting Breach of Fiduciary Duty, All Plaintiffs against Tatiana, KDC and ProEx**

79.    As set forth above Tatiana, KDC and ProEx had knowledge of, actively

participated in and therefore aided and abetted Kagan's breaches of his fiduciary duties to the

Plaintiffs.  Baker v. Wilmer Cutler Pickering Hale & Dorr LLP, 91 Mass. App. Ct. 835, 847

(2017).

80.    Tatiana, KDC and ProEx are jointly and severally liable with Kagan for the

damages caused by Kagan's breaches of his fiduciary duties to the Plaintiffs.  FTC v. WV Univ.

Mgt, Inc., 877 F.3d 1234, 1241 (11th Cir. 2017).

**Count IV – Fraud, All Plaintiffs Against All Defendants**

81.    As set forth above, Kagan made a material misstatement by representing to

Filippov and Lipetsker that he could build each home for $1.3 million per home with reckless

disregard for the truth of that representation.

82.    Filippov and Lipetsker reasonably relied on Kagan and his representations to

them concerning the costs of construction.

83.    As a result of their reasonable reliance on Kagan, Filippov and Lipetsker suffered

substantial damages for which Kagan is liable, which the Court will outline specifically below.

84.    All of the Kagan Defendants participated in the presentation of fraudulent charges

and Listing Agreements for the purpose of extorting a settlement from Filippov and Lipetsker of

more money than Kagan was entitled to receive.

85.    The KDC Contract is a fraud.

86.    The ProEx Proposals are a fraud.

87.    Exhibit 215 is a fraud.

88.    Several of the subcontractor payables described above are fraudulent.

89.    The documentation submitted by KDC in support of its Proof of Claim contains false claims and accordingly is a fraud.

90.    The Listing Agreements were signed by Kagan with Tatiana's knowing and intentional support in full knowledge that they were a violation of the Operating Agreement for the specific purpose of thwarting Filippov's rights and as part of the scheme to force him to pay Kagan's extortionate demands and are, accordingly, a fraud.

91.    The Mechanic's Lien is a fraud.

92.    The KDC Proof of Claim is a fraud.

93.    Although Filippov and Lipetsker cannot be said to have "relied" on the KDC Contract, Mechanic's Lien or Proof of Claim in the traditional sense, by asserting fraudulent claims, recording a fraudulent Mechanic's Lien and asserting a fraudulent Proof of Claim to this Court, the Kagan Defendants effectively took a property interest away from Filippov, Lipetsker and the Debtor, which has forced them to endure years of litigation and has led to the distressesed sale of the Debtor's properties, significant lost profits and other consequential damages.

94.    As a result of the Defendants' fraud, the Plaintiffs have suffered substantial damages for which the Defendants are jointly and severally liable, which the Court will outline below.

**Count V – Conspiracy, All Plaintiffs against All Defendants**

95.     A civil conspiracy exists under Massachusetts law where defendants provided

substantial assistance to a common tortious plan, with the knowledge that such assistance was

contributing to that plan.  Kurker v. Hill, 44 Mass. App. Ct. 184, 189 (1998).

96.     Each of the Defendants Kagan, Tatiana, KDC, and ProEx participated in and

provided substantial assistance to a common tortious plan to defraud the Plaintiffs and extort

money from them.

97.     Defendants took the actions detailed above with knowledge that they were

assisting a plan to defraud the Plaintiffs and extort money from them.

98.     Each of the Kagan Defendants acted in concert to achieve the wrongdoing

described here.  Each contributed a unique "power of coercion" to the overall scheme.  Aetna

Cas. Sur. Co. v. P&B Autobody, 43 F.3d 1546, 1563-64 (1st Cir. 1994).

99.     Defendants are jointly and severally liable to the Plaintiffs for substantial

damages, which the Court will detail below.

**Count VI – Violation of Chapter 93A by the Company against Tatiana, KDC and ProEx**

100.    Pursuant to G.L. c. 93A, § 11, a person engaged in trade or commerce may bring

suit against another person engaged in trade or commerce if that other person has engaged in an

unfair method of competition or an unfair or deceptive act or practice and that conduct has

caused the plaintiff a loss of money or property.  G. L. c. 93A, § 11.  Such unfair or deceptive

conduct must have taken place primarily and substantially within Massachusetts.  Id.

101.    Extortionate conduct in violation of known contractual arrangements described

herein is a violation of Chapter 93A.  Arthur D. Little, Inc. v. Dooyang Corp, 147 F.3d 47, 55

(1st Cir. 1998); Community Builders v. Indian Motorcycle Assocs., 44 Mass. App. Ct. 537, 557-

58 (1998); Northern Sec. Ins. Co. v. R.H. Realty Trust, 78 Mass. App. Ct. 691, 695-96 (2011).

102.    KDC and ProEx's conduct in asserting false claims and filing a fraudulent

Mechanic's Lien against Lyman-Cutler in bad faith in order to force an extortionate settlement of

their original claims constitutes unfair and deceptive conduct in violation of M.G.L. ch. 93A, §

11.

103.    Tatiana's knowing and intentional participation in the assertion of the fraudulent

listing agreements as part of the extortionate scheme is unfair and deceptive conduct in violation

of M.G.L. ch. 93A, § 11.

104.    KDC's, ProEx's and Tatiana's conduct took place primarily and substantially in

the Commonwealth of Massachusetts.

105.    KDC's, ProEx's and Tatiana's conduct caused the Debtor to suffer actual losses

as detailed below.

106.    KDC, ProEx and Tatiana jointly and severally are liable for the actual losses,

treble damages and attorneys' fees for their violation of Chapter 93A.

**Count VIII – Equitable Subordination**

107.    Pursuant to 11 U.S.C. § 510(c)(1), a bankruptcy court may subordinate a claim or

interest in bankruptcy when the following three elements are present: (1) the subordinated

creditor or interest holder has engaged in some type of inequitable conduct; (2) such conduct

resulted in injury to other creditors or conferred an unfair advantage on the subordinated creditor

or interest holder; and (3) equitable subordination is not inconsistent with the provisions of the

Bankruptcy Act.  201 Forest St. LLC v. LBM Fin. LLC (In re 201 Forest St. LLC), 409 B.R.

543, 572 (D. Mass. Bankr. 2009).

108.    Defendants have engaged in inequitable conduct as set forth above.

109.    This inequitable conduct has caused Filippov and Lipetsker to suffer injury and

has conferred an unfair advantage on the Defendants.

110.    Equitable subordination in these circumstances is not inconsistent with the Bankruptcy Act.

111.    The Court rejects all of Defendants' claims as set forth below, but Kagan retains a membership interest in Lyman-Cutler and a contractual right to a 50% share of the net "profits" of the Company.

112.    The Court holds that all claims and interests asserted by Kagan shall be equitably subordinated to the claims and interests of Filippov and Lipetsker.

113.    Pursuant to the Court's broad equitable authority to enter any order necessary to remedy the wrongdoing of the Defendants, the Court further holds and orders that the damages awarded to the Debtor are not "profits" within the meaning of the Operating Agreement, that Kagan shall have no claim to any portion of such recovery, and that any recovery shall instead be divided between Filippov and Lipetsker 80/20% as set forth below.

**Damages and Other Relief**

114.    In reliance on Kagan's representations about the costs of construction and in reliance on his purported good faith, Filippov invested $2 million in the Lyman Cutler Project.

115.    In reliance on Kagan's representations about the costs of construction and in reliance on his purported good faith, Lipetsker invested $250,000 in the Lyman Cutler Project.

116.    Neither Filippov nor Lipetsker has ever received any of their investment back. The proceeds of the sale of the homes have been in escrow earning no interest during the pendency of these proceedings.

117.    Filippov is entitled to the return of his $2 million investment.

118.    Filippov is entitled to the return of the additional $235,533.95 in payments he made for carrying costs of the Debtor after Kagan refused to honor his contractual obligations on

May 7, 2015, as a return of capital (which sum takes into account that $200,000 of the funds

provided by Filippov were secured by the mortgage in allowed Proof of Claim 9-1).

119.    Lipetsker is entitled to the return of his $250,000 investment.

120.    Pursuant to Section 8.2 of the Operating Agreement, Trial Exhibit 15, Filippov

and Lipetsker are entitled to 5% per annum on their unreturned capital from November 30, 2014

to date for the loss of use of their money.

a.    Filippov's original $2 million has accrued $492,054.79 of interest at 5%

per annum since November 30, 2014 (calculated through October 31, 2019), which he is

entitled to recover.

b.    Filippov shall also receive 5% per annum on the additional $235,533.95 in

additional carrying costs he has paid, which interest shall run from January 1, 2016 (after

his last infusion of cash) for each calculation.  Trial Exhibit 72.  He is, therefore, entitled

to recover an additional $45,138.63 (calculated through October 31, 2019).

c.    Lipetsker's original $250,000 has accrued $61,506.85 of interest at 5% per

annum since November 30, 2014 (calculated through October 31, 2019), which he is

entitled to recover.

d.    The Chapter 7 Trustee is holding $3,528,723.43 in escrow, which funds

should have been returned to the LLC Members as capital long since, but for the

proceedings caused by the Defendants' wrongdoing.  The deposit of funds from the sale

of the second home occurred on March 11, 2016.  Trial Exhibit 325.  The Court hereby

deducts the $2,485,533.95 in capital already accounted for in paragraphs a-c above, and

holds that Filippov and Lipetsker are entitled to receive 5% on the remaining

$1,043,189.48, beginning March 11, 2016 (calculated through October 31, 2019) for a

total of $189,917.65.  Filippov and Lipetsker shall split these funds 80/20%.

121.    Plaintiffs are also entitled to benefit of the bargain damages.  Filippov and

Lipetsker are entitled to recover the benefit of their bargain in damages from Kagan for his fraud.

See GTE Prods. Corp. v. Broadway Elec. Supply Co., 42 Mass. App. Ct. 293, 296 (1997) ("[t]he

general rule on damages in cases . . . of intentional . . . misrepresentation is that the plaintiff is

entitled to the benefit of his bargain or 'the difference between the value of what he has received

and the actual value of what he would have received if the representations had been true'")

(quoting Rice v. Price, 340 Mass. 502 (1960)).

122.    But for the wrongdoing of the Kagan Parties, it is reasonable to conclude that the

Lyman Cutler Homes would have been sold for their fair market value.  Kagan presented 663

profit scenarios to Filippov and Lipetsker in the October 25, 2012 presentation to induce them to

invest, premised on $1.3 million construction costs and a $4.9 million selling price.  Trial Exhibit

9.  The Parties later agreed to increase the construction budget to $1.4 million and to target a

$5.25 million selling price.  Trial Exhibit 32.  As of the calculation on May 6, 2013, the Parties

projected a profit for Filippov of between $514,784 and $529,677 per house.  Trial Exhibit 32.

Lipetsker's profit would be 25% of Filippov's.  Trial Exhibit 15, § 8.1 (Filippov gets 40% of the

profit and Lipetsker 10%).  The bank appraisals reflect a fair market value of the homes as $5.3

million as of April 2013, Trial Exhibits 28 and 29, and of $5.2 million as of May 2015.  Trial

Exhibits 57 and 58.  Plaintiffs' Expert, Morgan Fennell, persuasively testified that the houses had

a fair market value of $5.1 million at the time of their sales.  T. Tr. May 14, 2019 at 101, 104.

There is no dispute that each home sold for $4.4 million.  Trial Exhibit 325.  Fennell also

persuasively testified that the large difference between the selling price of the homes and their

market values indicates that something was wrong and that outside factors were negatively

impacting the selling prices.  T. Tr. May 14, 2019 at 104-05.  The evidence at trial proves that

the outside factors were the wrongdoing of the Defendants, which proximately caused the

reduced, distressed selling prices.

123.    Based on the evidence outlined in the preceding paragraph, the Court concludes

that the evidence supports awarding Filippov and Lipetsker benefit of the bargain damages based

on the analysis at the time of the agreement to increase the construction budget and selling price

in May 2013 based upon a 23-month time to sale.  Trial Exhibit 32.  This analysis was based on

Kagan's representations and was undertaken before he and the other Defendants enacted their

scheme.  It represents the reasonable expectations of Filippov and Lipetsker in connection with

their investment in the Project.

124.    The Court awards Filippov $514,784 per house in benefit of the bargain damages

for a total benefit of the bargain award of $1,029,568 for the lost profits from the sale of the

houses.

125.    This sum shall accrue pre-judgment interest at 12% per annum from March 30,

2014 (the date of Kagan's first breach of the Operating Agreement) through the date judgment

enters.  M.G.L. c. 231, §§ 6B, 6C; see Redondo Constr. Corp. v. P.R. Highway & Transp. Auth.

(In re Redondo Constr. Corp.), 678 F.3d 115, 125 (1st Cir. 2012) ("[w]hen state-law claims . . .

are adjudicated by a federal court, prejudgment interest is normally a matter of state law");

Goodrich v. Cimline, Inc., 2018 U.S. Dist. LEXIS 121319, at *2 (D. Mass. July 20, 2018)

("[p]rejudgment interst is a substantive remedy governed by state law when state-law claims are

brought in federal court") (citations omitted).

126.    The Court awards Lipetsker $128,696 per house in benefit of the bargain damages for a total benefit of the bargain award of $257,392 for the lost profits from the sale of the houses.

127.    This sum shall accrue pre-judgment interest at 12% per annum from March 30, 2014 through the date judgment enters.  M.G.L. c. 231, §§ 6B, 6C.

128.    The Court awards Lyman Cutler all expenses incurred in connection with seeking the protection of this Court as a result of the wrongful financial pressure inflicted upon it by the Kagan Parties.

129.    Lyman-Cutler is entitled to recover:  $18,454.79 for fees it paid to Rabobank, N.A.  Trial Exhibit 325.

130.    Lyman-Cutler is entitled to recover bond fees paid to International Sureties, Ltd. of $3,910.89.  Trial Exhibit 325.

131.    Lyman-Cutler is entitled to recover the U.S. Trustee fee of $325.00.  Proof of Claim 3-1.

132.    Lyman-Cutler is entitled to recover the fees paid to the Chapter 7 Trustee.  Based on the allowed proofs of claim by Filippov and OCM, the total allowed claims equal $243,662.95.  Trustee Madoff's 5% commission is $12,183.14, which the Court also awards to Lyman-Cutler against the Kagan Parties.

133.    In summary of the above rulings, the Court awards to Filippov the following in direct, single damages against the Defendants, jointly and severally:

      a.  $2,235,533.95 in return of capital;

      b.  $689,127.54 in loss of use of money damages (which is the sum of $492,054.79, $45,138.63 and 80% of $189,917.65);

    c.  $1,029,568 in lost profits;

    d.  Which yields a total before interest of $3,954.229.49, to which

        shall be added:

        i.  12% interest on the lost profits from March 30, 2014

           through the date judgment enters; and

        ii.  5% interest on the loss of use of money damages from

           November 1, 2019 through the date judgment enters.

134.  In summary of the above rulings, the Court awards to Lipetsker the following in direct, single damages against the Defendants jointly and severally:

    a.  $250,000 in return of capital;

    b.  $99,490.38 in loss of use of money damages (which is the sum of

        $61,506.85 and 20% of $189,917.65); and

    c.  $257,392 in lost profits;

    d.  Which yields a subtotal of $606,882.38, to which shall be added

        i.  12% interest on the lost profits from March 30, 2014

           through the date judgment enters; and

        ii.  5% interest on the loss of use of money damages from

           November 1, 2019 through the date judgment enters.

135.  In summary of the above rulings, the Court awards to the Debtor $34,873.82 in direct, single damages against the Defendants jointly and severally, to which shall be added 12% interest from March 11, 2016 through the date judgment enters.

136.    Based on the fraudulent and inequitable conduct of the Kagan Defendants, the Court equitably subordinates Kagan's remaining equity interest and any share of the "profits" from Lyman-Cuter to the recovery of Filippov and Lipetsker.

137.    Based on the fraudulent and inequitable conduct of the Kagan Defendants, the Court rules in equity that any recovery by Lyman-Cutler from the Kagan Defendants shall go to Filippov and Lipetsker, to be divided between them 80%/20%.

138.    As of May 7, 2019, the Trustee held $3,528,723.43 on account for the Debtor ("Trustee Escrow").

139.    From the Trustee Escrow, the Trustee shall first pay himself $12,183.14 as his Commission.

140.    The Trustee shall submit any additional fees for approval by the Court within 14 days.  Any fees approved shall be paid next from the Trustee Escrow, but shall also be added to the damages award to the Debtor as against the Kagan Parties.

141.    The Trustee shall third pay from the Trustee Escrow $208,333.33 to Filippov on his Proof of Claim 9-1.

142.    The Trustee shall fourth pay from the Trustee Escrow $35,329.95 to OCM on its Proof of Claim 2-1.

143.    The Trustee shall fifth pay from the Trustee Escrow the U.S. Trustee $325.00 on its Proof of Claim 3-1.

144.    The Trustee shall sixth pay from the Trustee Escrow Cortez Landscaping $1,440.00 on its Proof of Claim 8-1.

145.    The Trustee shall seventh pay from the Trustee Escrow $2,235,533.95 million to Alex Filippov as a return of his capital.

146.     The Trustee shall eighth pay from the Trustee Escrow $250,000 to Nickolay Lipetsker as a return of his capital.

147.     The Trustee shall ninth pay from the Trustee Escrow any other outstanding fees or costs of the Debtor, which sums shall be added to the damages to the Debtor against the Kagan Defendants.

148.     The Trustee shall distribute any remaining funds in the Trustee Escrow (estimated to be $782,578.06 before any additional fees or expenses the Trustee pays pursuant to paragraphs 137 and 144 above) to Filippov and Lipetsker 80% to Filippov and 20% to Lipetsker.

149.     Kagan shall be individually liable to Filippov and Lipetsker for all sums still due and payable after distribution of the Trustee Escrow.

150.     Tatiana, ProEx and KDC are jointly and severally liable to Filippov and Lipetsker for all sums for which Kagan is liable.

151.     In addition, the Court awards treble damages and attorneys' fees to the Debtor against Tatiana, ProEx and KDC.

152.     The treble damages awarded against Tatiana, ProEx and KDC are calculated based on the total award of damages to the Debtor ($34,405.86), plus the total lost profits awarded ($1,286,960) multiplied by three for a total award of $3,964,097.58.

153.     To avoid a double recovery, Tatiana, ProEx and KDC shall receive a credit against this total treble damages award of the total of any funds distributed to Filippov and Lipetsker, not including (1) the return of their capital ($2,485,533.95); and (2) the payment of Filippov's Proof of Claim ($208,333.33).  In other words, Tatiana, ProEx and KDC shall receive a credit for whatever funds are distributed to Filippov and Lipetsker pursuant to paragraph 148 above.

154.    The award pursuant to chapter 93A shall accrue interest at the rate of 12% from

June 22, 2015 (the date of the false and fraudulent Mechanic's Lien) through the date judgment

enters.

155.    Plaintiffs shall submit an application for attorneys' fees within fourteen (14) days

from the date of this Order in support of a further award against ProEx, KDC and Tatiana.

156.    Plaintiffs shall submit a bill of costs within fourteen (14) days from the Date of

this Order.

### Kagan Parties' Counterclaims (Adv. Doc. 106)

**Counts I and II – Breach of Fiduciary Duty and Freezeout, by Kagan against Filippov and Lipetsker**

157.    Kagan has failed to carry his burden of proof that either Filippov or Lipetsker

breached any fiduciary duty owed to him.

158.    Kagan has failed to carry his burden of proof that he was frozen out of the LLC.

159.    The Court enters judgment against Kagan and in favor of Filippov and Lipetsker

on Counts I and II of the Counterclaim.

**Count III – Breach of Contract, Kagan v. Filippov and Lipetsker**

160.    Kagan has failed to carry his burden of proof that either Filippov or Lipetsker

breached the Lyman-Cutler Operating Agreement.

161.    The Court enters judgment against Kagan and in favor of Filippov and Lipetsker

on Count III of the Counterclaim.

**Count IV – Breach of Implied Covenant of Good Faith and Fair Dealing, Kagan v. Filippov and Lipetsker**

162.    Kagan has failed to carry his burden of proof that either Filippov or Lipetsker

breached the implied covenant of good faith and fair dealing in the Lyman-Cutler Operating

Agreement.  Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 680-81 (2011).

163.     The Court enters judgment against Kagan and in favor of Filippov and Lipetsker on Count IV of the Counterclaim.

**Counts V, VI, VII, VIII – Indemnification by All Kagan Defendants against the Debtor**

164.     KDC, ProEx and Tatiana are not indemnified parties within the meaning of Section 10.2 of the Operating Agreement.

165.     None of the Kagan Parties has acted in good faith.  All of them have acted with gross negligence and engaged in willful misconduct.

166.     None of the Kagan Parties is entitled to indemnification.

167.     The Court enters judgment against the Kagan Defendants and in favor of the Debtor on Counts V, VI, VII and VIII of the Counterclaim.

**Count IX – Breach of Contract, by KDC against the Debtor**

168.     KDC has failed to carry its burden of proof that Lyman Cutler breached an enforceable contract.

169.     KDC has failed to carry its burden of proof of entire fairness.

170.     The KDC Contract is a fraud.

171.     The Court enters judgment against KDC and in favor of the Debtor on Count IX of the Counterclaim.

**Count X – Breach of the Implied Covenant of Good Faith and Fair Dealing, KDC v. the Debtor**

172.     In the absence of any enforceable contract between the Debtor and KDC, there is no implied covenant of good faith and fair dealing.

173.     KDC has failed to carry its burden of proof of any breach of the covenant of good faith and fair dealing.

174.    The Court enters judgment against KDC and in favor of the Debtor on Count X of the Counterclaim.

## Count XI – Unjust Enrichment, KDC v. the Debtor

175.    Unjust enrichment is defined as retention of money or property of another against the fundamental principles of justice or equity and good conscience.  Santagate v. Tower, 64 Mass. App. Ct. 324, 329 (2005).  An equitable remedy for unjust enrichment is not available to a party with an adequate remedy at law.  Id.

176.    KDC had an adequate remedy at law if it established entire fairness, which it failed to do.  KDC cannot use equitable remedies where its conduct has been inequitable.

177.    KDC has failed to carry its burden of proof that it is entitled to recover against Lyman Cutler on an unjust enrichment theory.

178.    KDC has failed to carry its burden of proof of any unjust enrichment of Lyman Cutler.

179.    The Court enters judgment against KDC and in favor of the Debtor on Count XI of the Counterclaim.

## Count XII – Mechanic's Lien by KDC against the Debtor

180.    The law of mechanics' liens, codified at G.L. c. 254, § 1 et seq. contains numerous procedural requirements that will be "strictly enforced."  See E. Coast Steel Erectors, Inc. v. Ciolfi, 417 Mass. 602, 605 (1994).

181.    KDC does not have an enforceable contract with the Debtor and so cannot recover under a Mechanic's Lien.  G.L. c. 254, §§ 2, 2A.

182.    The Court enters judgment against KDC and in favor of the Debtor on Count XII of the Counterclaim.

**Count XIII – Promissory Estoppel, KDC against the Debtor**

183.    Promissory estoppel requires there to be an unambiguous promise and that the

party to whom the promise was made reasonably relied upon the representation.  Rhode Island

Hosp. Trust Nat'l Bank v. Varadian, 419 Mass. 841, 848 (1995).

184.    KDC has failed to carry its burden of proof of an enforceable promise and,

therefore, is not entitled to recover from Lyman Cutler on a promissory estoppel theory.

185.    The Court enters judgment against KDC and in favor of the Debtor on Count XIII

of the Counterclaim.

**Count XIV – Quantum Meruit, KDC against the Debtor**

186.    In order to prevail on a claim for quantum meruit, a plaintiff has to prove (1) it

conferred a measurable benefit upon the defendants; (2) that the plaintiff reasonably expected

compensation from the defendants; and (3) that the defendants accepted the benefit with the

knowledge, actual or chargeable, of the claimant's reasonable expectation.  Lei Yin v. Biogen,

Inc., 2015 U.S. Dist. LEXIS 162920, at *8-9 (D. Mass. Dec. 4, 2015) (quoting Finard & Co. v.

Sitt Asset Mgmt., 79 Mass. App. Ct. 226 (2011)).

187.    Recovery under a quantum meruit theory is derived from principles of equity and

fairness.  See Bloomenthal v. Halstrom, 1999 Mass. Super. LEXIS 132, at *15-16 (Mass. Super.

Ct. Mar. 11, 1999) (citing to Salamon v. Terra, 394 Mass. 857, 861-62 (1985) (presumption of an

expectation of payment may be rebutted by a showing of "strong self-interest in the outcome of

the transaction by the party furnishing those services")).

188.    In order to recover under a quantum meruit theory, there needs to be a reasonable

expectation of receiving payment.  See Lei Yin v. Biogen, Inc., 2015 U.S. Dist. LEXIS 162920,

at *8-9 (D. Mass. Dec. 4, 2015); Friedberg v. Hague Park Apts., 61 Va. Cir. 589, 595 (Va. Cir.

Ct. 2001) (no reasonable expectation of payment for management fees where disloyal fiduciary had already received reasonable payment for his services before collecting management fees).

189.     KDC has not acted with equity or fairness.

190.     KDC has failed to carry its burden of proof of any reasonable expectation of receiving any payment over and above the $1.4 million for construction costs and $200,000 for carrying costs agreed upon by the Parties and approved by Filippov as the Managing Member of Lyman-Cutler.

191.     KDC has failed to carry its burden of proof that it is entitled to recover from Lyman Cutler on a quantum meruit theory.

192.     The Court enters judgment against KDC and in favor of the Debtor on Count XIV of the Counterclaim.

**Count XV – Interference with Contract, Kagan against the Debtor**

193.     To prevail on a claim for tortious interference with a contract, a plaintiff must establish (1) he had a contract with a third party; (2) the defendant knowingly induced the third party to break that contract; (3) the defendant's interference, in addition to being intentional, was improper in motive or means; and (4) the plaintiff was harmed by the defendant's actions.  Psy-Ed Corp. v. Klein, 459 Mass. 697, 715-16 (2011).

194.     A party cannot tortiously interfere with its own contract.  Lyons v. Gillette, 882 F. Supp. 2d 217, 236 (D. Mass. 2012) ("a party cannot be sued for interference with its own contract or relationship"); Cardone v. Boston Reg'l Med. Ctr., Inc., 60 Mass. App. Ct. 179, 188 n.17 (2003) ("a party cannot tortiously interfere with its own contract").

195.     Filippov was the Managing Member, and Kagan has always known that to be true.  Kagan's assertion in Count XV that Filippov was not the Managing Member is knowingly and intentionally false and frivolous.  Counterclaim ¶ 156.

89

196.    Kagan has failed to carry his burden of proof that Lyman Cutler interfered with its own Operating Agreement.

197.    The Court enters judgment against Kagan and in favor of the Debtor on Count XV of the Counterclaim.

**Count XVI – Promissory Estoppel, Kagan against the Debtor, Filippov and Lipetsker**

198.    Kagan has not proved any enforceable promise by the Debtor, Filippov or Lipetsker beyond the terms of the Operating Agreement.

199.    Kagan has failed to carry his burden of proof of the breach of any promise by the Debtor, Filippov or Lipetsker.

200.    The Court enters judgment against Kagan and in favor of the Debtor, Filippov and Lipetsker on Count XVI of the Counterclaim.

**Count XVII – Conspiracy, Kagan against the Debtor, Filippov and Lipetsker**

201.    Kagan has failed to carry his burden of proof that Lyman Cutler, Filippov, and Lipetsker engaged in a conspiracy.

202.    The Court enters judgment against Kagan and in favor of the Debtor, Filippov and Lipetsker on Count XVII of the Counterclaim.

**Count XVIII – Tortious Interference with Advantageous Business Relations, Kagan against Filippov and Lipetsker**

203.    A claim for interference with advantageous business relations requires similar proof as a claim for interference with contract, except that the plaintiff must show the existence of advantageous business relationships instead of a contract.  See Curtis v. Herb Chambers I-95, Inc., 458 Mass. 674, 681 (2011).

204.    Kagan has failed to carry his burden of proof that either Filippov or Lipetsker interfered with any advantageous business relationships.

205.   The Court enters judgment against Kagan and in favor of Filippov and Lipetsker on Count XVIII of the Counterclaim.

| | |
|---|---|
| LYMAN-CUTLER, LLC, | ALEX FILIPPOV and |
| By its attorney, | NICKOLAY LIPETSKER, |
| | By their attorneys, |

| | |
|---|---|
| */s/ Peter Tamposi* | */s/ Sean T. Carnathan* |
| Peter N. Tamposi, BBO No. 639497 | Sean T. Carnathan, BBO No. 636889 |
| The Tamposi Law Group, P.C. | scarnathan@ocmlaw.net |
| 159 Main Street | Joseph P. Calandrelli, BBO No. 666128 |
| Nashua, NH 03060 | jcalandrelli@ocmlaw.net |
| T: (603) 204-5513 | O'Connor, Carnathan and Mack, LLC |
| | 1 Van de Graaff Dr. Suite 104 |
| | Burlington, MA 01803 |
| | T: 781-359-9000 |

Dated:  September 20, 2019

## Certificate of Service

I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing and paper copies will be sent to those indicated as non-registered participants on September 20, 2019.

*/s/ Sean T. Carnathan*
Sean T. Carnathan

4850-3224-9510, v. 1