UNITED STATES BANKRUPTCY COURT
DISTRICT OF MASSACHUSETTS - EASTERN DIVISION

```
============================  .
IN THE MATTER OF:             . Case #15-13881-FJB
                             .
LYMAN-CUTLER, LLC,            . Boston, Massachusetts
                             . Friday, October 4, 2019
       Debtor.               . 9:24 a.m.
============================  .
LYMAN-CUTLER, LLC, ALEX       . Adv. Proc. 16-01120-FJB
FILIPPOV and NICKOLAY         .
LIPETSKER,                    .
                             .
       Plaintiffs/Counterclaim .
       Defendants,            .
v.                            .
                             .
VADIM KAGAN, TATIANA KAGAN,   .
KAGAN DEVELOPMENT KDC, CORP., .
and PROEXCAVATION CORP.,      .
                             .
       Defendants/Counterclaim .
       Plaintiffs.            .
============================  .
```

TRANSCRIPT OF CLOSING ARGUMENTS:
RE: CASE NO. 15-13881-FJB:
[#167] OBJECTION TO CLAIM 9 OF CLAIMANT ALEX FILIPPOV, FILED
BY INTERESTED PARTIES TATIANA KAGAN, VADIM KAGAN, KAGAN
DEVELOPMENT KDC, CORP., PROEXCAVATION CORP.

RE: ADV. PROC. NO. 16-01120-FJB:
[#1] COMPLAINT BY LYMAN-CUTLER, LLC AGAINST VADIM KAGAN,
TATIANA KAGAN, KAGAN DEVELOPMENT KDC, CORP., PROEXCAVATION
CORP.

BEFORE THE HONORABLE FRANK J. BAILEY

APPEARANCES:
For the Debtor-Plaintiff:        PETER N. TAMPOSI, ESQ.
                                 The Tamposi Law Group, P.C.
                                 159 Main Street
                                 Nashua, NH 03060


For Plaintiffs Alex Filippov    SEAN T. CARNATHAN, ESQ.
and Nickolay Lipetsker:         O'Connor, Carnathan, and Mack,
                                LLC
                                1 Van de Graaff Drive
                                Burlington, MA 01803



<table>
<tr><td>For Defendants Tatiana Kagan,<br>Vadim Kagan, Kagan Development<br>KDC, Corp., and ProExcavation<br>Corp.:</td><td>JOHN H. PERTEN, ESQ.<br>Sheehan Phinney<br>28 State Street<br>22nd Floor<br>Boston, MA 02109<br><br>JAMES P. HARRIS, ESQ.<br>Sheehan Phinney<br>1000 Elm Street<br>17th Floor<br>Manchester, NH 03101</td></tr>
</table>

Electronic Sound Recording Operator:   ELIZABETH LOMBARD


Proceedings Recorded by Electronic Sound Recording
Transcript Produced by Certified Transcription Service
eScribers, LLC
7227 N. 16th Street, Suite #207
Phoenix, AZ 85020
973-406-2250; operations@escribers.net



(973) 406-2250 | operations@escribers.net | www.escribers.net

I N D E X

| EXHIBITS: | DESCRIPTION | I.D. | EVID. |
|---|---|---|---|
| -- | Closing Charts | 22 | |

Chalks:

| 2 | Summary of expert testimony versus actual | 153 | |
| 3 | Demonstrative re damages | 165 | |

escribers
(973) 406-2250 | operations@escribers.net | www.escribers.net

1    (At 9:24 a.m.)

2              THE COURT:  Good morning.  Be seated.

3              UNIDENTIFIED SPEAKER:  Good morning.

4              THE CLERK:  Now calling Case Number 15-13881, Lyman-

5    Cutler, LLC.  This is closing arguments on Docket Number 167,

6    objection to Claim 9 of Claimant Alex Filippov, filed by

7    interested parties Tatiana Kagan, Vadim Kagan, Kagan

8    Development KDC, Corp., and ProExcavation Corp.  This is also

9    on Docket Number 16-1120, adversary proceeding of Lyman-

10   Cutler, LLC v. Kagan.  This is the closing argument on the

11   complaint.

12             May the parties please state their names for the

13   record?

14             MR. CARNATHAN:  Good morning, Your Honor.  Sean

15   Carnathan for Alex Filippov and Nickolay Lipetsker.

16             MR. TAMPOSI:  Good morning, Your Honor.  Peter

17   Tamposi for the debtor.

18             MR. PERTEN:  Good morning, Your Honor.  John Perten

19   for Kagan Development KDC, ProExcavation Corp., Tatiana Kagan,

20   and Vadim Kagan.

21             MR. HARRIS:  Good morning, Your Honor.  James Harris

22   for the same parties.

23             THE COURT:  Okay.  Good morning, everyone.  Well,

24   welcome to the new courtroom.  The sound isn't quite as good,

25   I think, as we've been finding as in the other courtroom.  Can

1    you hear me okay?

2            IN UNISON:  Yes.

3            THE COURT:  You can?  It seems like we're having a

4    little trouble.  I haven't had too much trouble hearing

5    counsel, but we're going to close this courtroom in a couple

6    of weeks and they're going to completely redo the sound

7    system.  So we'll be better off then, but there have been a

8    few issues.

9            So we're here on closing arguments.  And I have your

10   substantial submissions here and I've read -- and perhaps not

11   as deeply as I would have liked, but I've read them.  You're

12   going to be allocated two hours each for your closing

13   arguments.  I'll ask you in a minute how you want to -- maybe

14   we did this already and then you can remind me how you want to

15   organize that.  Elizabeth is going to time you.  We will take

16   a break at about an hour into each of them; so an hour closing

17   for one side, break.  That'll be for the first break at 10:25.

18   That's because I think we should take a break, because I want

19   to make sure that we're all still crisp as we go through this

20   process.  I also have to make a phone call, so I'll go

21   downstairs and join a phone call, which should not take long,

22   or at least I'll do my best to get off it in time to get back

23   up quickly.  And then we'll start with the next counsel, which

24   I assume is going to go Plaintiff, Defendant.  Right?

25           MR. CARNATHAN:  I was under the impression that, as

1    plaintiff, I was allowed to speak last, Your Honor.

2              THE COURT:  So what I have done in the -- how would

3    you guys like to do it?

4              MR. CARNATHAN:  I was under the impression Mr. Perten

5    would close and then I would close and that would be it.

6              MR. PERTEN:  I mean, I had no preconceived notion.  I

7    would be --

8              THE COURT:  That's fine.  All right.

9              MR. PERTEN:  I would be happy to go second.  But I

10   had no preconceived notion.  And I didn't know if this Court

11   will allow the parties to do any kind of rebuttal if we're

12   still within our two-hour window, or how the Court wanted

13   to --

14             THE COURT:  Yeah, so certainly whoever goes first I

15   would allow to reserve some time to (sic) rebuttal.  And so if

16   that's going to be Mr. Perten, you go first and you tell me

17   how much time you want to reserve, and you'll consume -- I

18   mean, I'm thinking fifteen minutes, something along those

19   lines, not one hour.  So you'll go an hour and forty-five or

20   so, reserve fifteen, twenty, and then, after Mr. Carnathan

21   goes, then you'll have your chance to rebut, because you won't

22   know entirely what he's going to say, until he says it.  So

23   does that work?

24             MR. CARNATHAN:  I think that we close at Your Honor's

25   pleasure.  But if that works, then I think it's the plaintiff

1    who gets to speak last, and I would like to lead off and

2    reserve for rebuttal.

3         THE COURT:  I usually take it this way:  whoever has

4    the burden gets to, I say, start and then reserve.  And that's

5    why I was thinking Plaintiff would.  However, here we have --

6    the burdens are not as clearly -- are not as clearly laid out,

7    right, because we've got -- we're doing a number of things

8    today.

9         So is that what you'd like to do?

10         MR. CARNATHAN:  Yes.  Thank you, Your Honor.

11         THE COURT:  Okay.  I'll allow that.  Okay?  So how

12    much time do you want to reserve?

13         MR. CARNATHAN:  I'll reserve the full fifteen;

14    fifteen minutes.

15         THE COURT:  Okay.  So you go an hour and forty-five,

16    hold fifteen.

17         Mr. Perten, you go straight through two hours.

18         We'll see where we are at the very end.  I'm just

19    trying to get it right.  Right?  That's how I feel.  And so I

20    do want to keep this on some controls but, if at the very end

21    you guys want to tell me more in a very kind of laser fashion,

22    I'll show as much flexibility as I can, given the time.  Okay?

23         MR. PERTEN:  That's fine, Your Honor.  I wanted to,

24    if I could, just hand up to the Court -- I noticed that in our

25    respective requests for findings, Mr. Carnathan referred to

1    the transcript by date; I referred to the transcript by day.

2    So what I did to help the Court, just prepared -- matched the

3    days with the -- the day numbers with the dates.  So I thought

4    that --

5              THE COURT:  That's helpful.  Thank you.

6              MR. PERTEN:  -- that might be helpful to the Court.

7    Provide Mr. Carnathan his --

8              THE COURT:  Okay.  Thank you.

9              MR. PERTEN:  You can see it just --

10             THE COURT:  I do see.

11             MR. PERTEN:  I think it would provide assistance to

12   the Court.  And I also wanted to make the Court aware that Mr.

13   Kagan will be here.  He said he'd be here 9:30, and so I

14   expect him any moment.  But we can start.

15             THE COURT:  Okay.  All right.

16             MR. CARNATHAN:  I also have a set of slides that I

17   intend to refer to during my argument.  Perhaps I could have a

18   set marked for identification and provide them to the Court?

19             THE COURT:  That'd be fine.  Has Mr. Perten seen

20   them?

21             MR. CARNATHAN:  He has.

22             THE COURT:  Yes, I would like that.  Thank you.

23             Thank you.

24             Okay, whenever you're ready.

25             MR. CARNATHAN:  Thank you, Your Honor.



1          THE COURT:  Now, Elizabeth does tell me, for timing,

2     that at 10:25 she's going to have it set to go off, like moot

3     court; right?  So it'll happen at 10:25 but we're still just

4     counting to that point, and it'll be about an hour in.  So --

5     okay.

6          MR. CARNATHAN:  All right.  Thank you, Your Honor.

7          Your Honor, there's a great trial lawyer with whom

8     you may be familiar, a fellow named Michael Tigar.  He was the

9     protege of Edward Bennett Williams, tried some of the biggest

10    cases the last twenty-five years:  the Ruby Ridge trial, the

11    Oklahoma City bombing trial.  Arguably the best trial lawyer

12    of the last two generations.

13         And what Mr. Tigar recommends to a trial lawyer is

14    what he calls the principle of least contradiction, that being

15    that you want to call somebody out as not telling the truth,

16    as little as possible in your case, because, at the end of the

17    day, humans are socialized; we're pack animals, and we're

18    conditioned not to want to conclude that people are not

19    telling the truth.

20         But unfortunately, that's what people who don't tell

21    the truth rely upon in order to get away with their untruths,

22    and unfortunately this is a case where we're going to have to

23    talk about people not telling this Court the truth.  And a lot

24    of this case comes down to credibility:  who came in here and

25    told Your Honor the truth; who came in here and told Your

1    Honor the straight story about what happened here; whose

2    account matches the documents; whose account makes sense;

3    whose account comports with what we all understand is the way

4    the world works?

5         And I submit to Your Honor that the people who came

6    in here and told you the straight story were Filippov,

7    Lipetsker, Zhukovskiy, Maiden, Brusenkova, Lande, Kayserman,

8    Abramskiy.  These are the people that came in and told Your

9    Honor what really happened here.  And I submit to Your Honor

10   that Mr. Kagan did not utter a credible word to this Court.

11   The only times that he told you anything that was true was

12   when he had to, because he was confronted with a document he

13   couldn't get away from.  And other than that, on every

14   material point Mr. Kagan was not telling the truth.  And I'm

15   going to walk through all the ways that he didn't tell you the

16   truth.

17        And the same thing was true about Mr. Cohen.  Mr.

18   Cohen was not credible about anything.  He even denied

19   documents that were put in front of him.  He denied the facts

20   in the First Circuit opinion against him.  Mr. Cohen did not

21   utter a credible word in this court.  And most of the Kagan

22   parties' case comes down to Kagan and Cohen.  They're the guys

23   that, if they're not telling Your Honor the truth, then

24   nothing is real here.  And those two characters did not tell

25   Your Honor the truth about anything.



1           So I'm going to walk through that with some care here

2    today.  But I want to start with sort of an objective fact,

3    something that I think that we all agree upon, that nobody can

4    get away from.

5           And if -- Mr. Harzell, if you would put Exhibit 15 up

6    on the screen, please.

7           Well, while he does that, I'll keep talking, because

8    I don't want -- I don't want to lose my time.  Exhibit 15 is

9    the operating agreement.  And section 5.2 of the operating

10   agreement --

11          THE COURT:  If you know exhibit numbers today as you

12   hit these things, put them in your closing; if you don't, it's

13   okay.  But if you know them --

14          MR. CARNATHAN:  I should bat pretty close to a

15   thousand on that, Your Honor.

16          THE COURT:  So, the operating agreement.

17          MR. CARNATHAN:  Exhibit 15 is the operating

18   agreement.

19          THE COURT:  Thank you.

20          MR. CARNATHAN:  And this is the premise of the whole

21   deal; right?  This is what the parties signed when they formed

22   this venture.  And if we look at paragraph 5.2, which everyone

23   agrees is the premise of this whole deal, it says, "It shall

24   be Mr. Kagan's duty and obligation to construct two homes at

25   the location currently known as 77 Lyman Road in Brookline,

1   Massachusetts, in according (sic) with the plans, including

2   drawings supplied by Mr. Kagan and approved by Managing

3   Member.  The construction shall be substantially completed no

4   later than March 30, 2014.  And it is specifically understood

5   by all members that Mr. Kagan's compensation for this duty is

6   outlined in section 8.1 below."  And that's the crux of all

7   this.

8           When Filippov and Lipetsker agreed to invest in this

9   project, the whole premise of the deal was that Kagan was

10  going to build the houses, and Kagan was going to do that at

11  cost and wasn't going to charge anything for his work.  He was

12  going to get paid by getting his fifty-percent share of the

13  net profits.  And that's a baseline that no one disputes.

14          And it's super important, I think, to bear in mind

15  that that provision got added to the agreement because

16  Filippov specifically asked for it, because he was concerned

17  about, frankly, exactly what later happened.  And in Exhibit

18  14, at page 3, there's an email from Mr. Filippov in November

19  2012, before they signed the operating agreement, where

20  they're going back and forth about the terms, where he

21  specifically says that the agreement is missing an important

22  piece.  And he says, "The piece missing is the role of

23  Investor Kagan.  We have described his investment part and his

24  profit.  What is not described here at all is the reason why

25  his profit part is fifty percent at all.  While I understand

1    this is not going to happen, technically, based on the

2    language of this agreement, Dima can say, 'I'm going to have

3    nothing to do with the developer'"-- "'development'", excuse

4    me.  "'Find a developer who will do the whole thing.  And then

5    when it's all done, my share is fifty percent.  The reason

6    Kolya and I agreed to the deal is that Dima is going to take

7    care of all parts of the process, buying lots, creating

8    project ducts, building the property.  None of this is

9    mentioned in the agreement.  This needs to be corrected."

10         So Filippov was acutely aware that he was giving --

11   or agreeing, excuse me -- negotiating a term with Mr. Kagan

12   that Kagan would get fifty percent of the profits, even though

13   Filippov was putting up $2,000,000 and Kagan was only putting

14   up 250,000.  And the reason for that is Kagan was going to

15   build the houses.

16         So I submit -- and I'm going to talk a lot more about

17   this here this morning, but I submit that's all you need to

18   know about whether Mr. Kagan ever gave Filippov -- really gave

19   Filippov a copy of this KDC construction contract that we've

20   seen as Exhibit 37, because Filippov was specifically

21   concerned that Kagan would build the houses for his net profit

22   and would not go out and hire a development company and pay it

23   and then say, "I still want my fifty percent."  That was

24   specifically on his mind.

25         So there is no way that Filippov would have agreed.



1    There's no chance that Kagan could have come to him and said,

2    "Well, here's the agreement with KDC, and I'm going to pay

3    myself a fifteen-percent general-contractor fee and I'm going

4    to pay myself all these other fees, and it's going to add up

5    to 800,000 bucks" --

6          THE COURT:  Couldn't that have been said much more

7    clearly if that was really his concern?

8          MR. CARNATHAN:  In the operating agreement?

9          THE COURT:  Yes.

10          MR. CARNATHAN:  Certainly.  The operating agreement

11    is not particularly well done.  Maiden could have done a

12    better job.  But the facts in evidence point to -- where

13    there're ambiguities, all the evidence points straight to what

14    Filippov is saying about what these terms mean.

15          This agreement, frankly, has ambiguities in it; it

16    does.  But when you look at how this deal came together, when

17    you look at the other evidence, when you look at Exhibits 7,

18    8, 9, 30, 31, 32, which I'll talk about in greater detail, it

19    all points to exactly what Filippov is telling you, and it all

20    points to the fact that this KDC contract was never, ever

21    disclosed to Filippov and Lipetsker until this litigation

22    started, and it came out of nowhere.

23          THE COURT:  That's contested, right?

24          MR. CARNATHAN:  Well, absolutely.  Yeah.  And Kagan

25    claims he gave it --



1        THE COURT:  And there is at least one email, correct,

2   in which --

3        MR. CARNATHAN:  Exhibit 215.  Yes, Your Honor.

4        THE COURT:  And how do you explain that?

5        MR. CARNATHAN:  Well, I can explain it at some

6   length.

7        THE COURT:  Well, I don't want to knock you too far

8   off your --

9        MR. CARNATHAN:  Well --

10       THE COURT:  -- game here, but --

11       MR. CARNATHAN:  -- the short answer is it's a

12   forgery, Your Honor; it's not a valid document.  And I have a

13   specific list of bullet points, and I will walk through --

14       THE COURT:  All right --

15       MR. CARNATHAN:  -- why that's so.

16       THE COURT:  -- we'll get there.

17       MR. CARNATHAN:  But to circle back to the point I was

18   making; given how focused Filippov was on the fact that Kagan

19   was getting a fifty-percent share of the net profits here,

20   there is no way he would have agreed to also pay Kagan

21   hundreds of thousands of dollars -- and I'm going to tally

22   them up in a moment; it actually adds up to $1.6 million -- on

23   top of his fifty-percent net-profit share.  There's no way.

24       And this is where the entire fairness concept becomes

25   important.



1           THE COURT:  The entire what?

2           MR. CARNATHAN:  Entire fairness --

3           THE COURT:  Fairness.

4           MR. CARNATHAN:  -- where Your Honor has already ruled

5    that these are self-dealing contracts.  Right?  I mean, one

6    thing that Kagan couldn't get away from during the trial is

7    that he and his wife own KDC, he and his wife own ProEx.  He

8    actually had to admit that the profits from those companies

9    flow right into his own pockets.  To the extent that he's

10   charging additional fees and other components -- other money

11   over and above his costs, that's profit to Kagan; that's money

12   he puts in his pocket.  And so that is a self-dealing

13   arrangement.  And that's why Your Honor has already ruled that

14   they have to prove entire fairness here by clear and

15   convincing evidence.  And that means both fair dealing and

16   fair price.

17          And so they have to prove full fiduciary-level

18   disclosures to Filippov and Lipetsker and knowing consent to

19   these terms.  And there is nothing -- nothing -- in the record

20   to show that.  In fact, the only testimony that the Kagan

21   parties even cite for the proposition that Kagan made such

22   disclosures -- he cites the testimony on -- they call it day

23   17.  Can't be right.  I think I have a misstatement in my

24   notes.  It's from May 15; the day of trial is May 15.  That

25   might have been day 7.  Pages 91 and 92, lines 16 through 23.

1   And page 95, lines 2 through 23.  All that testimony says is

2   he claims he gave a copy of the contract to Filippov.  Now,

3   that's not true.  And I've already talked a little bit about

4   why that's not true, but I'll come back to it.  But even if it

5   were, that doesn't do it.  In order to do fair dealing, he's

6   got to sit down with Mr. Filippov and say, "Here's what I'm

7   going to do:  I'm going to hire my own construction company

8   and I'm going to pay it a fifteen-percent general-contractor

9   fee.  I'm going to charge you these other fees.  But that's

10  fair and here's why.  And here's how much that money's going

11  to go into my pocket.  But that's still fair.  And frankly, I

12  think you had an obligation to fit that into the construction

13  budget," which he obviously didn't do.  And that's the fair

14  dealing.  He's got to do that.

15          THE COURT:  So even if I conclude that Mr. Kagan in

16  fact, or someone on his behalf, did provide the contract to

17  your client, you say that the disclosure as it was done was

18  inadequate?

19          MR. CARNATHAN:  Totally inadequate.  He has to have

20  testified at some length, clear and convincing evidence, that

21  he made the material disclosures, and he has to have been

22  believed that he made these disclosures, that he sat down with

23  Filippov and he said, "I know we're borrowing 1.6 million for

24  house, and 200,000's for carrying costs, and the construction

25  costs are going to be 1.4 million.  But I'm going to hire my

1    own company and I'm going to pay my own company another

2    777,000 bucks.  And I know the operating agreement says I'm

3    going to do it from my share of the profits, but this KDC

4    company is somehow different than me.  And here's why this is

5    fair."  He didn't do that.  There's no testimony he ever did

6    that.  He couldn't have done that.

7              And the same thing goes for ProEx.  Remember, ProEx

8    is his own company, too; ProExcavation.  And we have this

9    completely not credible testimony about the ProEx charges.

10   And I'm going to walk through those with some care, too.  But

11   he had to make the same disclosures with ProEx.  He has to

12   have sat them down and said, "Okay, I'm not only going to hire

13   myself to be the general contractor, but I'm going to hire

14   myself to do the excavation, landscaping, and masonry.  And

15   I'm going to pay that company $916,800 and, of that sum,

16   700,000's going to go into my pockets.  And here's why that's

17   fair and here's why you should agree with that, despite the

18   operating agreement that says that I'm going to get a fifty-

19   percent share of the profit."  There's no testimony in the

20   record about that.  Zero.  Absolutely nothing.

21             THE COURT:  Of course, a lot of these costs were

22   going to be baked into the project, right, if he had done it

23   entirely without using his own entities?

24             MR. CARNATHAN:  Well, yes, the costs were supposed to

25   be baked into the project.  I mean, there was definitely a

1    construction budget -- a maximum construction budget of 1.4

2    million per house.  And the understanding going in was that

3    Mr. Kagan was going to build the houses for that sum and,

4    if -- and frankly, Filippov didn't care if he used ProEx, as

5    long as he stayed within the 1.4 million.

6              THE COURT:  Right.

7              MR. CARNATHAN:  They -- that's one of the arguments

8    we hear from the defendants repeatedly, right, that Filippov

9    didn't ask questions; he would get the checks and he didn't

10   ask for invoices and whatnot, until after they came around and

11   demanded an extra million dollars.  Well, that kind of makes

12   our point, because Filippov thought he had a flat-fee deal.

13   Kagan was going to build the homes for 1.4 million max.  As

14   long as Kagan brought it in on budget, no problem; just go do

15   your thing, Mr. Kagan; yeah, let me know how it goes.

16             And so the fact that Mr. Filippov was not demanding

17   invoices to show the different costs along the way, proves

18   that Mr. Filippov is telling you the straight scoop.  And Mr.

19   Kagan's testimony that somehow he received oral approval for

20   all these cost overruns as the project went along is also

21   totally not credible.  It makes no sense, particularly in

22   light of the fact that Mr. Filippov was so focused on the

23   finances at the outset of the project.  And I also want to

24   mention, it makes no sense in light of the fact that the first

25   evidence we have of those overruns ever being raised was in

1       May 2015, about eight months after construction's over, in the

2       form of a lawyer demand letter.  I mean, if we had -- if my

3       clients had been agreeing to this all along, why do you send a

4       lawyer demand letter?  You do that because you know you're

5       about to pick a fight.

6               But the -- I think that the documents that really

7       show Your Honor that Mr. Kagan is not credible about that are

8       probably Exhibits 26, 31, and 32.  And those are the materials

9       that show the analysis of the decision to increase the

10      construction budget from the 1.3 million that they agreed upon

11      when Filippov agreed to put his money into this deal, to the

12      1.4 million that they agreed upon at the time of the

13      construction loan.

14              And so if you look at Exhibit 26, you can see Mr.

15      Filippov raising the concern on April 13th that apparently at

16      this point Kagan has proposed that they increase the

17      construction budget and loans by $100,000 per property, and

18      Filippov saying, gee, I'm not sure that's a great idea.  Now,

19      this conversation continues for a period of weeks.  When you

20      look at Exhibits 31 and 32, in 32 Filippov is still analyzing

21      whether to increase the budget by $100,000 per home on May

22      6th, 2013.  And he's actually worried that they're going to go

23      $16,000 over budget per house.  And he's thinking, we can't do

24      that, we're going to go $16,000 over budget.

25              And you can see the back-and-forth between him and



1    Mr. Zhukovskiy.  And what happens is Mr. Zhukovskiy realizes

2    that they had double-counted some taxes.  And once they

3    accounted for the taxes and ratcheted that back, they were

4    still on target.  And at that point Mr. Filippov finally

5    decides, okay, we're going to close the loan at the 1.6 level.

6         But a man who spends the better part of a month

7    wringing his hands about increasing the construction budget by

8    $100,000, who nearly refuses to go along with it because of

9    $16,000 of potential overruns, is not a man who cavalierly

10   comes to the properties and sees Mr. Kagan and says, "Sure,

11   Mr. Kagan, spend more money on precisely every aspect of the

12   project."

13        Your Honor may recall Mr. Kagan testifying to that,

14   that they decided to spend more money on every component of

15   the construction and that Mr. Filippov agreed to that as they

16   went along.  That makes no sense in light of the documents

17   about Mr. Filippov's concerns about the cost of this project.

18   It also makes no sense in light of the fact that Mr. Kagan

19   didn't know what his construction costs were while he was

20   operating this project.  And this is one of the things that

21   they testified to, right, that Brusenkova didn't keep records

22   by project.  They didn't know what the costs of construction

23   on the project were.  She had files alphabetically by

24   subcontractor and vendor.  She didn't have a file based on

25   just the Lyman-Cutler project, where they could say, "Okay,

1    we're a million dollars into this.  Now we're going to spend

2    another 300,000."  He didn't even know.  So how could he

3    possibly have gone back to Mr. Filippov and said, "I need you

4    to approve cost overruns," when he didn't know what they were?

5              THE COURT:  The evidence was that she kept these

6    records by subcontractor or by vendor?

7              MR. CARNATHAN:  That's correct, Your Honor.  That was

8    Mr. Gersh's testimony, that she had them alphabetically by

9    subcontractor and vendor.  And I'm going to return to that

10   concept too, because they kind of made it out like Brusenkova

11   was an idiot.  I maintain that that's not the fact.  I think

12   she was maintaining them that way because that's the way Mr.

13   Kagan operated his business.  But I'm way off the track of --

14             THE COURT:  Okay.

15             MR. CARNATHAN:  -- the plan, so --

16             THE COURT:  All right.

17             MR. CARNATHAN:  -- let me come back to that one.

18             Still thinking about entire fairness.  I'd just like

19   to tally up what the profits are that Mr. Kagan says go into

20   his pockets, based on the KDC contract and these so-called

21   ProEx proposals.  And that's our first slide that we call the

22   "KDC Unfair Profit Claims".

23             And so this is just a simple tally of what things add

24   up to from the proof of claim, that are monies that are going

25   to go straight into Mr. Kagan's pockets, based on his claims.

 1   Right?  The first figure, the 777,784 --

 2        THE COURT:  Before --

 3        MR. CARNATHAN:  Excuse me.

 4        THE COURT:  Before you say any more about this, I

 5   think the right thing to do is to mark this for identification

 6   so that it's in the record, okay?

 7        MR. CARNATHAN:  Yes.  Please, Your Honor.

 8        THE COURT:  All right.  Do you have one?  So --

 9        MR. CARNATHAN:  Would you like another?

10        THE CLERK:  Yes.  Thank you.

11        THE COURT:  Call it "Closing" --

12        MR. CARNATHAN:  Closing chalks?  I mean, they're just

13   summaries of what we say the evidence shows.

14        THE COURT:  "Closing charts", for identification, by

15   page.  Okay?  So -- I'm sorry to interrupt.

16        PLAINTIFFS' EXHIBIT WAS MARKED FOR IDENTIFICATION

17        MR. CARNATHAN:  Thank you, Your Honor.

18        THE COURT:  Go ahead.

19        MR. CARNATHAN:  So we're on the first page of our

20   closing chalks; the slide titled "KDC Unfair Profit Claims".

21   The first number, the $777,784, is just a tally of the figures

22   in their proof of claim, and it consists of:  what they say

23   their general-contractor fee was -- I think that was around

24   565,000, but it's obviously not on the slide; the design fee,

25   which was 25,000; the carrying-cost fee -- I think by the time

1    we got to the proof of claim, that was about 127,000; and the

2    overhead, which I believe was 59.5.  But if you look at the

3    proof of claim, those figures add up to $777,784.  And those

4    are all new charges from KDC that are basically profit to Mr.

5    Kagan.

6          The ProEx calculation, the $690,841, that is a

7    mathematical calculation in which we tallied up the ProEx

8    proposals, if you will, that they put into the record.  And

9    those proposals add up to $916,800.  We then put into

10   evidence -- and I believe it's Exhibit 5 -- how much we were

11   able to confirm of what ProEx actually spent out of pocket on

12   this case, and it came out to about $225-odd thousand.  And

13   when you deduct the two, the 690,841.95 is how much Kagan

14   proposes that he's going to charge as his flat fee.

15         Now, I think it's super important not to lose sight

16   of the fact that not only is ProEx owned a hundred percent by

17   Mr. Kagan, but it has no employees; it's just Mr. Kagan.  And

18   so when he came in and he testified that he started ProEx

19   because he didn't want to have to use subcontractors anymore

20   and he wanted more control over things and he was going to

21   pass the savings along to his clients, that just wasn't true,

22   because ProEx operates everything through subcontractors.  All

23   the work is through subcontractors.  The only thing Mr. Kagan

24   does is hire the subcontractors.  And that's what he was

25   supposed to do under section 5.2 of Exhibit 15.  So he's

1    charging $690,000 for his work, supervising subcontractors,

2    through the ProEx proposals.  It's entirely unfair.  It's

3    frankly fraud.  And I'm going to talk more about that too.

4         The 141,191 is his administrative fee.  And I'm quite

5    confident not a word was breathed in this courtroom, during

6    the trial, about what that fee is for.  It shows up on the

7    proof of claim, sure, but we have no explanations where that

8    comes from; none.  And that's just another fee; they just

9    added it on.  And so we've got another 141,191, which is

10   completely unsupported by any evidence of the record.

11        And so the total tally there is over $1.6 million,

12   1,609,817, of money that Kagan proposes to put into his

13   pockets, based on these self-dealing contracts.  That's before

14   we even get into all the evidence of the fraud and the

15   wrongdoing.  It's really quite outrageous.

16        Now, as I understand the Kagan parties' position, one

17   of their, I guess, most vigorously asserted contentions is

18   that this all just doesn't matter, because the expert said

19   that the construction costs were fair and reasonable.  So even

20   if they didn't tell us anything, even if they blew the

21   contract by Filippov, even if they made up the contract after

22   the fact, if we'd gone out and hired a contractor to do this

23   work, it would have cost us even more, so you should be

24   grateful my charges are as low as they are.

25        Well, that's just not so, on multiple levels.  I



1     won't go back over fair dealing but, first of all, fair

2     dealing matters here.  You don't get to just reconfigure a

3     deal, make up charges after the fact, and then go back and

4     say, "Well, hey, they were pretty good prices anyway, so you

5     should just pay them."  Fair dealing matters.  And fair

6     dealing and fair price are entwined.  You have to look at the

7     deal they made.  And some arm's-length deal with some other

8     general contractor who in turn goes out and hires

9     subcontractors on an arm's-length basis, reputable

10    subcontractors, that's not the deal we made; that's not the

11    deal that Filippov and Lipetsker made.

12          So the testimony of the experts -- we're talking

13    about these arm's-length deals, where you're hiring

14    contractors on a retail basis -- really doesn't illuminate

15    this deal at all.  You've got to say to yourself, were these

16    prices fair in the context of the deal that was made?  You

17    can't come up with a whole new deal and then say, "Oh, well,

18    that was fair."

19          To use an analogy that, I don't know, strikes me as a

20    lawyer, it would be kind of like if you went out and hired in-

21    house counsel and had them work for you full time and said,

22    "Okay, I'm going to pay you 200,000 bucks a year" and, at the

23    end of year, in-house counsel comes to you and says, "Here's a

24    bill for 600,000," and you say, "You're kidding me.  I hired

25    you for 200,000 a year," and they say to you, "Well, you know,

1   if you hired WilmerHale on an hourly basis, those guys get

2   1,000 bucks an hour, so it would have cost you two million.

3   So you should be grateful that I only tripled my fee."  That's

4   kind of what we're talking about here.

5        So I maintain that the experts really don't show us

6   anything at all.  And I don't want to lose sight of the fact

7   that Kagan wasn't doing arm's-length deals with his

8   subcontractors.  And I'll talk about this in more (sic), too.

9   But what he really had was sort of this, sort of, odd

10  sweetheart deal going with these guys.  And they were really

11  working on all of his projects.  Right?  I think he had twenty

12  projects going at the same time, during this time period.  And

13  Babayan -- Erik Babayan from Dream Flooring told Your Honor

14  how it was.  And he said that he worked on eighteen --

15  seventeen or eighteen projects for Mr. Kagan and viewed them

16  all as one package.  And that's really what was going on.

17  These guys were practically on Kagan's payroll.

18        We submitted a chart as an appendix to our trial

19  brief and, when you look at it, he's paying these guys 10,000

20  here, 20,000 there, at kind of odd intervals that are

21  unrelated to the timing of the work they're doing.  And he's

22  got them working on all these different projects.  And I do

23  want to cover this more later, but they're sweetheart deals.

24  He's not paying retail.  And that's where -- one of the things

25  that Goldman found was that when Mr. Kagan did a solo project,

1    he was bringing in the per-square-foot construction cost for

2    as low as $130 a square foot.  So he clearly had arrangements

3    with these guys.

4          So then when you get a couple of experts who come in

5    and say, well, if you hired Suffolk Construction and they

6    hired real subs, or whatever, it would have been a lot more,

7    so you should be grateful that he only hammered you as hard as

8    he did --

9          THE COURT:  And what was the square foot here?

10          MR. CARNATHAN:  The number of square feet?  I think

11    it was --

12          THE COURT:  No, no, no.  The per-square-foot --

13    you're comparing it to 130, saying that that's your

14    computation as to what he was doing it for when he was --

15          MR. CARNATHAN:  What he could have done.  You know,

16    I'm sorry, I don't have the per-square-foot on this project in

17    my notes, based on what he promised and what he allegedly

18    delivered.  But it's significantly below Mr. Salmi's

19    calculation.  That I do have in my notes.

20          So let me comment for a moment about Mr. Salmi's

21    credibility.  Mr. Salmi was completely not credible.  And

22    again I hasten to add, I don't think he really matters either

23    way, because he's not talking apples to apples; he's doing

24    apples to oranges.  But even then, he comes up with $5.8

25    million to build these two houses.  Almost 3.1 for the first

1    one, right?  His first number was $3,098,160.  And then with

2    the so-called economy of scale, he was going to deliver the

3    second one at 2,771,667.  And so his per-square-foot costs

4    were between $357 and $476 a square foot.  And I -- and -- I'm

5    going to skip that.  I can't remember if it's in his report or

6    his testimony.  But 357, 476, are in there.

7         So he's got these incredibly high numbers.  And how

8    does he get there?  He does things like carry 150,000 bucks

9    for a staircase that we know Kagan paid 48,000 bucks for.  He

10   carries $1,216 a linear foot for bathroom vanities.  He

11   carried $35,640 on his estimate for closet poles.  He carried

12   $95,580 for closet cabinets.  All of his numbers were

13   inflated, if you will.

14        And I think that the most telling part of his

15   testimony was toward the end when he had to admit that he had

16   built this home in Newton, on Countryside Road, that he talked

17   about as being comparable to the Lyman-Cutler projects.  And

18   so that informed his opinion, because he'd actually built a

19   house like that, so that meant that he knew.

20        And he had to admit on cross that he couldn't tell me

21   within a million dollars what the construction costs were on

22   that house in Newton and that, in fact, the construction costs

23   could have been as low as 1.8 million on that house.  And yet,

24   the one that Lyman-Cutler bought was going to cost 3.1 million

25   to build?  It's a $1.3-million delta.  He just was incredible.

1          And I think, worst of all, when we showed him the

2     building permit for that -- it's the very same house -- he had

3     to admit that he told the City of Newton the construction

4     costs were going to be 950,000 bucks.  And that's what was in

5     the final affidavit of costs, by the owners, at the end:

6     950,000.  It didn't change.

7          So we're supposed to riff from that to a $3.1-million

8     figure on Lyman-Cutler?  It's not credible.  But there is some

9     symmetry in there, in that Kagan told the Town of Brookline

10    that the cost of construction for the Lyman-Cutler homes was

11    going to be 910,000 bucks.  So I submit that Salmi wasn't any

12    more credible than Kagan.

13         Now, Doddridge wasn't any help to Mr. Kagan either.

14    Doddridge was presented in rebuttal to show that Ms. Salmi's

15    figures were grossly inflated.  And Mr. Doddridge came to a

16    figure of $1,718,000 per house, for the construction costs.

17    Well, that's well below Kagan's alleged construction costs of

18    $1,886,571 per house.  And let's not forget that Kagan is

19    looking for over $2.1 million here on top of the 3.2 he's

20    already been paid.  So Doddridge is no help to Kagan at all.

21         And in any event, I don't think we should spend a

22    moment talking about whether charges are fair, until we figure

23    out whether they were actually incurred.  Right?  I mean, if

24    we're just pulling figures out of the air, that you never

25    paid, that you never incurred, and then saying, "Well, if I

1    had incurred them, they would have been fair, so you should

2    pay me all this money, which I will put in my pocket because I

3    never incurred these charges, because if you had hired some

4    other guy in an arm's-length deal, you would have paid

5    more" -- and that, I submit, is just wrong.

6          And so one of the things that we did is we put into

7    evidence the checks that show exactly what Mr. Kagan paid out

8    of pocket, and exactly what Mr. Kagan was reimbursed, right,

9    because everything else is -- it's hard to figure out what's

10   real here.  And that's what Mr. Goldman was telling us:  that

11   it was all not reliable.  But what we can put our finger on

12   and say this is real is we can see where the money went, we

13   can see what he took out of his pocket and paid, and we can

14   see what he was paid back and put back in his pocket.

15         And so if I could have the next slide in the chalks.

16   We call this one the summary of payments and expenditures;

17   it's page 2 of the chalks.  And we put into evidence all of

18   the checks showing what Lyman-Cutler paid to KDC, what Lyman-

19   Cutler paid to ProEx -- these are essentially payments to

20   Kagan, right, they're his companies -- and then what he paid

21   out on this project, and we tallied them up.  And this slide

22   is up through November 30th, 2014.  Okay, November 30th, 2014

23   is an important date.  November 30th, 2014 is twenty-three

24   months from the date of acquisition, and that's the date in

25   the operating agreement by which Kagan was obligated to have

1    finished the homes and sold them; otherwise he was going to

2    have to start paying the carrying costs.  And he admitted he

3    knew that.

4         And that was a specifically negotiated protection by

5    Filippov, because that was the risk that was disclosed to him

6    during that initial meeting.  They told him, there's a risk

7    here that the homes won't be sold as quickly as we projected;

8    if we do, the profit's going to go down.  And Mr. Filippov

9    said in those emails, hey, that's under your control, you're

10   going to build them, I'm going to let them list with your

11   wife, it's going to be under your control if these things get

12   sold within the twenty-three months you projected; so if that

13   doesn't happen, you pay the carrying costs after that twenty-

14   three-month date.  And Mr. Maiden in particular, who Mr. Kagan

15   said was his lawyer, testified that he specifically went over

16   that with Mr. Kagan, that he told him, I think this is harsh.

17   And Kagan said, don't worry about it, it's fine.

18        THE COURT:  Except the agreement, as I recall, did

19   permit -- it anticipated that perhaps Mr. Kagan might not

20   either be in the position to do it or might not do it, and it

21   then built in a backup here, and that was that the -- was it

22   that Mr. Filippov would then bear those?

23        MR. CARNATHAN:  That's correct, Your Honor.  But it

24   also built in that, in the event that that happened -- right,

25   because remember this was --

1           THE COURT:  Right.

2           MR. CARNATHAN:  -- this was only in the event that

3    Kagan reneged like he did.  In the event that he -- that that

4    happened, then Kagan's share of the eventual proceeds went

5    down dollar for dollar and --

6           THE COURT:  Yeah.  I remember that.

7           MR. CARNATHAN:  -- Filippov's went up.

8           THE COURT:  Yeah.

9           MR. CARNATHAN:  So that one way or another, Kagan had

10   to pay the carrying costs out of his own pocket, after

11   November 30th, 2014, whether that be through a -- Filippov

12   covers it and gets paid back later, or whether he lives up to

13   his end of the bargain and pays them.  It was coming out of

14   him.

15          So for the purposes of this chart -- this chart only

16   goes through November 30th --

17          THE COURT:  Right.

18          MR. CARNATHAN:  -- the chart that's on the screen

19   now.

20          THE COURT:  Right, this is before all that.  Yeah.

21          MR. CARNATHAN:  Right.  And so that's -- this is

22   based on Exhibits 1, 2, 3, 5, and 6.

23          And so the point here is that when construction was

24   completed, right -- we had certificates of occupancy in

25   October 2014; they listed the first property August 12th,

1    2014; construction's done.  He's been paid in full.  He's

2    reached into his pocket and he's paid out $1,690,977.28 and

3    he's been reimbursed $1,707,442.83.  So he's in fact about

4    $16,500 ahead of the game at that moment.  And that includes

5    some of these interactions where he did advance money to

6    Lyman-Cutler to cover carrying costs when there was a cashflow

7    shortfall.  But then he got reimbursed.  And when you look at

8    the flow of checks, you can see money in and out.

9         When we got to the end of construction, he was paid

10    in full.  And so the idea that he can show any construction

11    costs that he actually paid out of pocket and didn't get paid

12    back for it, is just not true.

13        Now, with that said, we know that part of the answer

14    is they're going to be, well, we incurred obligations, we've

15    got these payables that we owed, and so that's really what

16    we're talking about.  And so I'd like to take a look at that

17    Exhibit 50, the lawyer letter from May 7th, 2015.  And I think

18    it's the last page; I think it's page 4.

19        So this is May 7th, 2015.  And out of the blue,

20    Filippov and Lipetsker get this lawyer letter.  And this is

21    some eight months after construction is indubitably done.  And

22    so we've got this series of alleged payables.  And I'd like to

23    briefly walk through each one of them, and I'm planning to do

24    them in order of magnitude; we'll take the most -- the biggest

25    one first, that being ProEx.  Go figure; the biggest alleged

1  payable is to Kagan's own company, and he's allegedly owed

2  $325,000.

3         So just very briefly remember, on Exhibit 5 we show

4  that we've only been able to tally up $225,958.05 that ProEx

5  was actually out of pocket.  And if we look at Exhibit 6, we

6  know that ProEx had actually been paid, by this point,

7  $335,000.  So if we were following the dollars, the truth of

8  the matter is that at this moment ProEx had been overpaid by

9  about $109,000; it wasn't owed anything.

10         But I think the thing that is perhaps really, really

11  interesting here is that this is an alleged payable to his own

12  company, ProExcavation, and it says $325,000.  And we know

13  that, as of this moment, ProExcavation has been paid $335,000.

14  So if we add those two together, that would lead you to the

15  conclusion that ProEx had billed $660,000, right?  325,000

16  owed, 335,000 paid; it's owed 660-.

17         Well, when you look at Mr. Kagan's proposals, the

18  ones that we say he cooked up after the fact, they add up to

19  $899,000 as of May 7th, 2015.  Right?  He had -- this is

20  Exhibits 326, 327, 329; Exhibit L-174.2, at pages 173 and 175;

21  and Exhibit 174.4, at pages 200 and 203.  He had billed

22  $418,150 per house, for landscaping, masonry, and excavation.

23  He had billed 43,700 for the demolition.  And he had thrown in

24  another 9,500 per property, for snow removal.

25         Now, just as an aside, the snow-removal proposals are

1    dated March 25, 2015.  When you look at the summary sheet,

2    they went into the books on March 15th, 2015.  Not for

3    nothing, but the snow season is basically over by March 25th,

4    2015.  So these so-called proposals are being issued at the

5    end of the season; he's just deciding how much he feels like

6    charging.  There's no evidence at all that anybody ever agreed

7    to that.

8         Let me circle back to the main point.  When you add

9    those up, when you add up the $880,000 plus the $19,000 for

10   snow removal, for plowing driveways, you get a total of

11   899,000.  And he'd been paid 335,000.  So one would think, if

12   those proposals were real, if those proposals had been shared

13   with Mr. Filippov, if those proposals were somewhere to be

14   found at KDC -- or ProEx, excuse me, that the payable here

15   would be 564,000.  You would deduct what he's paid from what

16   he has billed.  And yet, it's 325-.

17        Now, what are we to conclude from that?  Can it

18   possibly be that Kagan had no idea what was owed to his own

19   company?  I submit that this is more evidence that the

20   ProExcavation proposals were made up after the fact, that they

21   did not exist as of May 7th, 2015.  And I'll talk more about

22   that down the line, too.

23        Let's look at the next biggest number.  The next

24   biggest number actually does not appear on this chart.  The

25   next biggest number is the 251,000; I think it's on page 2,

1    where Kagan says that he's put $251,000 in to cover carrying

2    costs.  We can't map that number to anything.  I don't believe

3    there was any testimony to explain where that came from, other

4    than sort of Mr. Gersh's vague assertion that he --

5                UNIDENTIFIED SPEAKER:  Excuse me --

6                MR. CARNATHAN:  -- had done some work on the books

7    and he did some more later.  But it doesn't map to anything.

8    When we go through the checks as we have done, he had, at

9    best, reached into his pocket for $175,000-odd after November

10   30th.  And in fact, if we credited him with the 16,465, it

11   should have been 159,000.  And he knew for a fact he had to

12   cover those costs, under the operating agreement.  So this

13   251,000 is out of nowhere.

14               And to make matters worse --

15               We can go to the third slide in our little packet.

16               I'm now at slide number 3, which is what we call the

17   KDC outstanding-cost-claims chart.  And what this does is it

18   compares the original demands from Mr. Kagan on May 7th, 2015

19   with what they became in that invoice -- excuse me -- that Mr.

20   Cohen sent around on June 24th, 2015 -- that's Exhibit 67 --

21   with the eventual proof of claim, and kind of looks at the

22   evolution of these claims.

23               And about six weeks later in that June invoice that

24   Mr. Cohen admits that he created, the carrying costs jump to

25   $760,771.  Now, is that jump because they realize that Mr.



 1    Kagan had gone out of pocket for more money than he said?  No.

 2    It's because Mr. Cohen came up with this new theory as a way

 3    to inflate the numbers they were demanding.  And remember they

 4    talked about how Mr. Cohen studied the operating agreement and

 5    he advised Mr. Kagan about the carrying costs, and they talked

 6    about what it meant?  And so this is pure Cohen.  This is Mr.

 7    Cohen saying, I know what we'll do, Vadim; we'll say that we

 8    didn't borrow the carrying costs, because the loan document

 9    said we couldn't, and therefore you are paying them and,

10    therefore, we're going to demand $760,000 and we're going to

11    add up these construction costs and we're going to add in

12    these fees and we're going to get this thing to $2.1 million,

13    and we're going to put the hurt on these guys until they pay

14    us money.

15           And that's this whole process here.  They were trying

16    to extort money from Filippov and Lipetsker by cooking up big

17    claims.  And that carrying-cost number, the 251-, is just out

18    of nowhere.  And the 760,000, you'll notice, went down to 665-

19    in the proof of claim because they were still kind of working

20    their angles as they went.

21           The next biggest number --

22           We can go back to, I think, Exhibit 50, that last

23    page, please.

24           The next biggest number is the KDC number,

25    $244,276.56.  So, go figure; of the million-odd dollars that

1     he's demanding, about 850- of it is going straight into his

2     pocket.  But again, there's no support anywhere for this KDC

3     payable; there's just none.  It was never explained.  Mr.

4     Gersh, again, had some tale about having worked on the books.

5     But that 244,000, based on the checks -- there's no backup at

6     all, because he had been paid in full.

7            And if we look again at the KDC outstanding-costs

8     slide --

9            Oh, I'm sorry, I think I need the subcontractor

10    slide.

11           Yeah, I'm on to the next slide, "Subcontractor

12    Outstanding Costs".

13           THE COURT:  That's page 4 of the chalk?

14           MR. CARNATHAN:  Page 4 of the chalks, yeah.

15           This is quite telling.  Look at the KDC line item.

16    The 244,000 that's allegedly owed to KDC evaporates; it's just

17    gone.  By the proof of claim, the only thing that's in there

18    is the $777,784 that is owed to KDC as these fees from the KDC

19    contract.  So in the May 7th letter, we hear nothing about the

20    KDC contract; not a word is breathed about it, and they claim

21    that's because it was soft costs.  But by the proof of claim,

22    the 244,000 that was in the May 7th letter evaporates.  It's

23    gone like a soap bubble.  It just doesn't exist anymore.  And

24    all we have are these fees that they've decided to charge.  So

25    that number also is completely made up.

1              If we look again at Exhibit 50 --

2              THE COURT:  I think you better go over that again.

3     Let me get sure I have an understanding of your point, the

4     difference between the May 7 iteration of that number and then

5     what turns up in the proof.

6              MR. CARNATHAN:  Well, in the May 7th iteration, if

7     you look at --

8              THE COURT:  I know where it comes from.  What does it

9     purport to be?

10             MR. CARNATHAN:  I was just going to point Your Honor

11    back to Exhibit --

12             THE COURT:  Go ahead.

13             MR. CARNATHAN:  -- 50 again.

14             THE COURT:  Yeah.

15             MR. CARNATHAN:  If I could have that page back, Bill.

16             So if you look at Exhibit 50, it's claiming that

17    there's $244-odd thousand owed.  And you'll notice that it's

18    presented as if it were an accounts payable, right?  He's got

19    $5,900-odd that are current; $47, a month old; 8,200 bucks

20    that are sixty days old; $230,000 that are more than ninety

21    days old.

22             THE COURT:  Right.

23             MR. CARNATHAN:  That completely disappears in the

24    subsequent iterations; it just goes away.  And instead, we get

25    that $777,000 number --



1          THE COURT:  Oh, I see.

2          THE COURT:  -- which is --

3          THE COURT:  The actual number.  Yeah.

4          MR. CARNATHAN:  The 777- is right out of that KDC

5    contract, Exhibit 37, that we say is forged and that I will

6    talk about more.

7          THE COURT:  All right --

8          MR. CARNATHAN:  And so --

9          THE COURT:  -- I see your point.

10         MR. CARNATHAN:  Okay.  And, I guess, to follow up on

11   that point, to make sure that I stitch it up, it can't

12   disappear into the construction costs either, because those go

13   down; right?  Those go down from 758,000 allegedly

14   outstanding, to 544,000 allegedly outstanding.  That's the KDC

15   outstanding-cost claims.  That's slide 3, I think.

16         Now -- and to be accurate, part of the reason that

17   these numbers keep moving is that, frankly, Cohen makes up an

18   entirely new theory in June; right?  In May they're saying,

19   okay, we've got cost overruns, so we want to be paid these

20   cost overruns.  In June they're, like, oh, no, no, no, wait,

21   I've got this idea about the carrying costs, we're going to

22   say that you never paid -- you had to pay the carrying costs

23   because you couldn't borrow them, and so we're going to put

24   the 760- here and we're going to add up the payments that you

25   received and we're going to do the math.

1             And so it becomes this whole construct that they

2     created in June 2015 in order to come up with this big number.

3     And the whole point to this was exactly what Cohen threatened

4     Arina Rudyakova with when they met at the property on May

5     16th, 2015, where he said to her, you will pay what -- in

6     substance -- I don't remember exact testimony, but roughly,

7     you will pay what we demand or we're going to put a lien on

8     this house and you're going to lose all your money.  And

9     that's the project here.

10             They were putting the hurt on Filippov and Lipetsker

11    and to force Filippov, basically, to put up the money, because

12    they knew that Lyman-Cutler didn't have any money.  Right?  By

13    May 2015, I think the checking account was down to 6,000

14    bucks.  And they send over this million-dollar demand.  And

15    Kagan says, well, I needed the money to pay my subs right

16    away.  But he also testified that he understood he was

17    advancing the money he was going to get paid at the end.  I

18    mean, you can't map any of his testimony together.  But this

19    project was a bad-faith fraudulent effort to extort money from

20    Filippov and Lipetsker.

21             The next biggest line item on that --

22             THE COURT:  You know, we're really close to the time,

23    and it seems like --

24             MR. CARNATHAN:  Sure.

25             THE COURT:  -- it's a good -- I don't want to get



1    you --

2            MR. CARNATHAN:  Certainly.

3            THE COURT:  -- in the middle of a point.  So let's

4    take that break right now.  And I'll step off.  Elizabeth can

5    tell you how much time you're in.  Okay?

6            MR. CARNATHAN:  Okay.  Thank you, Your Honor.

7            THE COURT:  And I'll be back up as soon as I can be;

8    I think that's going to be fifteen minutes, perhaps a little

9    bit more than that.  Okay?

10           All right, so we'll be in recess until we resume in a

11   few minutes.  Thank you.

12           THE CLERK:  All rise.  Court is in recess.

13                   (Off the record at 10:22 a.m.)

14                   (On the record at 10:59 a.m.)

15           THE COURT:  Court is now in session.

16           THE COURT:  Okay.  Be seated.

17           All right, Mr. Carnathan, whenever you're ready.

18           MR. CARNATHAN:  Thank you, Your Honor.

19           Time flies up here.  We're going to start collapsing

20   some things.

21           THE COURT:  Right.  That probably was a timely break

22   for everyone, so --

23           MR. CARNATHAN:  I want to focus again on my

24   overarching point that the credibility here is so important,

25   and so I'm just going to comment very briefly about some of

1    the other subcontractors but then focus on a few of the really

2    key ones.  And there was a reason for us to object to each of

3    the particular subcontractors that we did (sic).  And Your

4    Honor may recall that Mr. Gersh was sequestered during the

5    testimony of the --

6              THE COURT:  I do, yeah.

7              MR. CARNATHAN:  -- of the subs.  And that proved to

8    be very important.

9              So you may recall Mr. Gersh sort of piously

10   testifying to the hundreds of hours he spent working through

11   these proof-of-claim binders.  Might have said thousands.  At

12   least hundreds.  And he confirmed for me that there were no

13   mistakes in these binders.  And so I think we're entitled to

14   infer that, where there are false claims in the proof-of-claim

15   binders, those were intentional.

16             So, very briefly on some of the smaller issues.

17   Unicon and V&D Heating & Cooling -- that's Sergeev and

18   Ispravnikov -- those guys both have photocopied invoices.

19   Now, it's sort of like a Goldman point, right?  There may be

20   discrepancies in the case.  People make mistakes.  Weird

21   things happen; you can explain away one or two or ten or

22   twenty.  When you get up to the kind of level of discrepancies

23   that we have here, it starts to point to fraud.  And so when

24   you have two subcontractors that are just using photocopied

25   invoices -- and not just on this project; we saw some of those

1  photocopies on other projects -- that suggests that they were

2  put up to it.

3       And Unicon, strangely enough, the 65,000 they say

4  they're owed is exactly what they've been paid.  Both

5  Ispravnikov and Sergeev had to acknowledge that they had

6  represented to the city that their charges were much less; I

7  think it was 18,000 a house for Ispravnikov and Unicon, and

8  18.5 for Sergeev.  And Sergeev, not for nothing, is the guy

9  who gave an affidavit to Cohen to take down to the police

10  station to try to square out a claim against Brusenkova for

11  witness intimidation.  So those invoices, if you will, are

12  just not credible.

13       Sergey Nikolaev:  We objected to him.  He never

14  testified.  Those invoices were never admitted into evidence.

15  And if you look at the table of contents of the proof of

16  claim, the total for that was $49,320 that they just never

17  offered any evidence at all of.

18       Now, that brings me to the three subcontractors that

19  I submit were the most important.  Let's start with Stanik;

20  think it's Boris Stanik from Bst Plumbing.  Mr. Stanik, first

21  of all, with regard to his overarching invoices, testified

22  that he had to look at the plans and remember what he did to

23  come up with what to bill on this case.  So that confirms what

24  Brusenkova told us, right, that they would get to the end of a

25  project and decide what they wanted to charge, and double it

1    and just submit bills.  That's right in line with what Ms.

2    Brusenkova told us.

3         Stanik candidly admitted, I got to the end, I looked

4    at the plans, I tried to remember what I did, and I came up

5    with my bills.  And those bills are dated -- and this is weird

6    too; one's dated February 14, 2015, one's dated March 1, 2015.

7    So if construction was done months earlier, why would you go

8    to the guy and get one bill on February 14th and go get

9    another one on March 1 and then not put them in the books

10   until April 29th or 28th, based on the listing sheets and,

11   what do you call it, the audit trail?  Which just so happens

12   to be the same day that Mr. Gersh sent that email confirming

13   the listing agreements.  That's not a coincidence.  That's

14   part of this project to inflate the costs.

15        But the worst thing that Mr. Stanik said for the

16   defendants was with regard to the other bills, the materials

17   bills, that were dated in August 2015, after this dispute

18   commenced, after they had come up with the June 25 invoice.

19   They're now backfilling their claim for construction costs.

20   And he had two invoices, adding up to a total of $19,670, that

21   were purportedly for materials from Ferguson plumbing.  And

22   Mr. Stanik told us that he never bought those materials, that

23   he would get the materials and Kagan would pay for them

24   directly, and he paid for them directly.  And yet they're

25   shown as a payable on the Bst Plumbing invoice.  They're still

1   shown as outstanding and due to Bst Plumbing.

2        So we know, from Mr. Stanik's own mouth, that that

3   payable is false.  And Mr. Gersh told us he spent hundreds of

4   hours on this.  And those invoices are dated in August 2015.

5   This is after the dispute commences.  And we've got false

6   invoices, by the testimony of the guy who issued them.  He's

7   not owed that money.

8        DaCosta -- excuse me; I'm going to get to DaCosta.

9        Decor Art:  Same problem.  Right?  There is a payable

10  to Decor Art that actually went up.  Right?  In the May 7th

11  letter, it was 11,250 bucks.  In the proof of claim, it's

12  $20,870.  It went up by $17,620.  Jose Porto came in here and

13  testified that he always gets paid in a week or he walks off

14  the job, and Kagan always paid him in a week.  So he's paid in

15  full.  And we've got this $20-odd-thousand false payable on

16  the books, on the proof of claim.

17       Now, the worst one for these guys, the absolute

18  worst, was Erik Babayan from Dream Flooring.  Mr. Babayan's

19  testimony -- nothing short of incredible.  He testified that

20  he was paid in full and that he had met with Kristina

21  Brusenkova and figured out that he was paid in full and met

22  with Dan Gersh and figured out that he was paid in full.  So

23  he actually testified that he met with Dan Gersh and figured

24  out that he was paid in full.  And yet there is a payable on

25  the proof of claim, for $26,120 to Dream Flooring, which, by

1    Mr. Babayan's own testimony, is false.

2         So what are we to conclude about Mr. Gersh?  He's not

3    credible and neither are the proof-of-claim binders.  Just

4    like Mr. Goldman said -- I'm not going to walk through all the

5    things that Mr. Goldman highlighted, but this is what Mr.

6    Goldman said:  that there are so many problems with this

7    documentation, it's not reliable, it's not credible.  And your

8    only choice here is was it gross incompetence or was it fraud?

9    And the evidence is pointing to fraud.  Right?  Babayan is

10   telling you he was paid in full and he met with Gersh and he

11   figured out he was paid in full, and yet there it is on the

12   proof of claim:  a payable.

13        And to make matters worse, Babayan also testified

14   that part of it was he was overpaid on another job.  They paid

15   him 7,000 bucks on some other job.  And once he figured it all

16   out, he realized that he'd been paid in full.  And he had this

17   amazing testimony where he said that he was working on

18   seventeen or eighteen different projects for Mr. Kagan all at

19   once, and he viewed it all as one big package.  Right?  That

20   is a telling statement.  That is how Kagan was running his

21   business.  And that's why Brusenkova is keeping the books

22   alphabetically by vendor or subcontractor, because they don't

23   care what the costs are on a particular construction project.

24   That's not how he thinks about it.  He's throwing 10,000 bucks

25   to a contractor here, 20,000 there.  He's paying guys from

1    whatever project he happens to have money in the checkbook on.

2    He doesn't care.

3           And when we look at the DaCosta testimony, DaCosta

4    tells us that too.  Right?  I mean, he didn't say that but,

5    when you look at what happened, that confirms it, because what

6    we did was we made a time line and we looked at the payments

7    to DaCosta compared to the bills from DaCosta, and that's

8    included in our trial brief as an appendix.  And when you look

9    at that, for one thing, he's getting these random payments

10   that are disconnected in time from the work he did.  I think

11   DaCosta was the flooring guy, if I remember right.  No, I'm

12   sorry, the framing guy.  But -- so he's just getting -- if you

13   look at the list here, he's getting 10,000, 10,000, 10,000.

14   Kagan's just throwing him 10,000 bucks here and there, just to

15   kind of keep him happy.

16          But the really amazing thing is, when you get to the

17   end of the construction and you look at the bill that DaCosta

18   sent, because he actually sent instant bills, and you look at

19   what he's been paid, he had been overpaid by $37,000 when

20   construction ended.  And that's exactly what we've been

21   saying:  that Kagan just intermingles things; he throws money

22   around here and there.

23          So as of the conclusion of construction, he's $37,000

24   ahead of us, out of Lyman-Cutler.  And so what do they do

25   about this?  Well, in September, right, September 2nd, 2015,

1    there's this incredible email from DaCosta, where he says

2    something like -- I forget the exact language -- I've revised

3    my bills as you requested, here they are.  I'm paraphrasing,

4    but it's in the -- it's in the proof-of-claim binder.  And

5    it's a September 2 email.  So this is months after the dispute

6    has started.  And they're -- again, they're backfilling.

7         And he submits two change orders that add up to the

8    37,000 bucks that he's overpaid -- he's been overpaid.  And

9    those are backdated; I think to March 2015.  So in September

10   he sends them backdated change orders to make the billing

11   match up to what he's already been paid.  So, obviously they

12   tumbled to the fact that, heavens, we've overpaid this guy on

13   this project, we need some bills here to match that up.   And

14   then for some reason they also submit this $23,000 -- I made a

15   mistake, you owe me 23,000 bucks more.  So a guy that we've

16   overpaid on the project by 37,000 bucks, now somehow

17   miraculously is owed $23,000.  It's really quite incredible.

18        And so again, what do we conclude from this?  The

19   documentation they've submitted to support this proof of claim

20   is not credible.

21        THE COURT:  And the way you constructed that --

22        MR. CARNATHAN:  Yes, Your Honor.

23        THE COURT:  -- is -- and you're referring now to an

24   exhibit to your trial brief?  Right?

25        MR. CARNATHAN:  We have a chart attached to the trial



1    brief, and it gives you the cites to the exhibits that are in

2    the record, so you can go back and look.  I think it's --

3    looks like mostly -- Exhibit 74?  That seems like a typo.  I

4    think it's 174.  It's going to be an exhibit -- oh, I'm sorry,

5    74 is the checks.  Yeah, so if you look at the chart that's

6    attached to our trial brief, it cites you to each exhibit, in

7    the record, that's going to show you that we're right.  And it

8    just lays it out in a time line so you can see what happened.

9             THE COURT:  Okay.  I see what you did.

10            MR. CARNATHAN:  Okay.  So I submit that, when you

11   look at the Babayan testimony, the DaCosta payments, when you

12   think about the fact that they testified that they kept their

13   books alphabetically by vendor and subcontractor and didn't

14   keep track of what was going on on the project, that tells you

15   what's really going on here.  And Mr. Babayan was the most

16   candid witness; he just out-and-out flat told us, I worked on

17   seventeen or eighteen projects for Mr. Kagan, I viewed it as

18   one big package.  And plainly, Mr. Kagan did too.

19            Now, I really want to focus on the credibility of

20   Kagan, right, because a lot of this devolves to did Kagan tell

21   you anything that was true here, during the trial.  And one of

22   the things the defendants try to do is they say, well, we had

23   this respectable accountant who was doing our taxes for us,

24   and we had bookkeepers, and Kagan doesn't know much about the

25   books, he just relied on them, and so if there's mess-ups in

1     the books, it's not Kagan, it's them.

2          But that's not really true.  I mean, Mr. Gordon told

3     you -- I mean, he was the tax preparer for these guys.  He did

4     some work.  He gave them some advice.  But he never did an

5     attestation engagement of any kind.  He never compiled their

6     books.  He certainly never did an audit.  So he couldn't

7     attest to the accuracy of the books of KDC, couldn't attest to

8     the accuracy of ProEx's books, he couldn't attest to the

9     accuracy of Lyman-Cutler's books.  And he candidly admitted

10    that, even if he had done an audit, if management is doing the

11    fraud, it's really hard to catch them at it, right, because

12    management has a particular ability to cook the books.

13         So Gordon doesn't help them.  And neither really does

14    Gersh.  I mean, I've already talked about how not credible he

15    is.  But even if he were a credible bookkeeper -- I mean, he

16    testified that he wasn't there during the Lyman-Cutler

17    project, that he didn't really know anything about

18    construction.  He relied on Mr. Kagan to tell him what went

19    into these proofs of claim.  So if Kagan's not credible,

20    nothing's credible.  And Kagan is not credible.

21         Let's start with the deal about the construction

22    costs.  And we've long said, and I know Your Honor's well

23    aware, that the deal, when my clients agreed to invest in this

24    project, was that there was a $1.3-million maximum

25    construction budget and that the carrying costs were expected

1    to run about 200,000 bucks, and -- this is per home -- and

2    that Kagan was obligated to pay the carrying costs after

3    November 30th, 2014, and that was the deal.  And then around

4    the time of the construction loan, they agreed to increase

5    that by $100,000 per home, and it became 1.4.

6        But Kagan's testimony about this -- I'm not sure what

7    the word for it is.  "Bizarre"?  His testimony is that he

8    didn't present any budget to them at the outset of this

9    project, that he told them that he had no plans, that he

10   didn't know what he was going to bill, that at one point -- I

11   think he said that they presented the budget to him, and he

12   told them it was laughable.  Now, what in heaven's name would

13   a dentist or a telecom executive be doing presenting a budget

14   to a contractor?  Kagan is the fellow who had put down a

15   deposit on the land; I think he had a thousand bucks and he

16   needed an investor to close the deal to buy the land.  He's

17   the one who was looking for an investor.  He was coming to

18   Filippov to look for money.

19       And we're to believe -- and this is where the

20   testimony just makes no sense in the real world -- that having

21   been told by his contractor that, I have no plans, I don't

22   know when I'm going to build, I can't tell you when I'm going

23   to build, until you figure out how much you can borrow, I

24   won't know until the town subdivides the land, and your 1.3

25   number is laughable, Mr. Filippov said, great, here's $2

1    million, let me know how it goes.  It doesn't make any sense.

2    And it really, really doesn't match the documents.

3         If we look at Exhibit 7 -- down to thirty-nine

4    minutes.  We're going to move briskly.  Exhibit 7 is the email

5    where Kagan sends a template to Zhukovskiy that, in

6    Zhukovskiy's words, Kagan asked him to make an iPad out of it,

7    right.  And the project here was to put together a

8    presentation that he could show to Filippov to get him to

9    invest money.  And Kagan completely disavows this; he says

10   it's not his presentation; he didn't give them any of the

11   numbers, he doesn't know why Zhukovskiy was at the meeting.

12   That's nonsense.

13        We look at Exhibit 8; this is the one where

14   Zhukovskiy sends the draft presentation to Kagan, to Maiden,

15   and to Lipetsker, before they meet with Filippov to see if

16   it's what Kagan wants.  And I know we've heard a lot about how

17   Kagan doesn't do email, but the fact that he rarely responds

18   to an email doesn't mean he doesn't read them.

19        But in any event, even if he didn't read this, it

20   clearly shows that he is working on this presentation for

21   Filippov, to be shown at the October 25 meeting.  When we look

22   at Exhibit 9, it's got the $1.3 million in there as the

23   construction budget, and that then is shown as a constant in

24   all of the risk disclosures, which are on -- I'm not sure

25   which page.  There we go; the risk analysis.  The construction

1    costs were constant on here.

2         And when you look at Exhibit 7 --

3         Don't go back to it, Bill; I'm trying to speed things

4    up.

5         -- Exhibit 7 has two separate charts.  This is the

6    one that Mr. Kagan had from some prior deal.  And it has one

7    chart that discloses the risk of a lower selling price, and he

8    analyzes how the profits could come out, and it's got another

9    chart that analyzes the risk of a delayed time line.  And what

10   Mr. Zhukovskiy has done here is collapsed those two.  And in

11   Exhibit 7, the construction costs are also a constant.

12        So it's painfully apparent that Mr. Kagan is the

13   architect of this.  He's presenting to Mr. Filippov to

14   persuade him to invest money in his project.  And it makes no

15   sense to read these things any other way.  And frankly, Mr.

16   Kagan's desperation or the great lengths that he will go to to

17   deny that fact, I think, tell you everything you need to know.

18   This is not a garden-variety misunderstanding.  This is not a

19   "we talked about 1.3 and apparently we got our wires crossed."

20   He's trying to deny just fundamental reality that he really

21   can't get away from.

22        This is further confirmed in additional documents.

23   If we look at Trial Exhibit 26, this is the one where the

24   conversation is beginning about borrowing an additional

25   $100,000 per house.  And Filippov is saying, geez, I don't

1    know, I mean, the original deal was 1.5, which is -- 1.3

2    million is in construction and .2 for the carrying costs, and

3    I think we should stick to the original deal.  This confirms

4    what Filippov is saying, and completely refutes Kagan's

5    credibility.  He's just not credible.

6         And I'll skip -- oh, and I won't put them on screen,

7    because the time is running fast, but --

8         THE COURT:  Yeah, that's fine.  That's fine.

9         MR. CARNATHAN:  But Exhibits 334, 335, and 336 are

10   also devastating for Kagan's credibility about this.  He's

11   forwarding these emails to Mr. Cohen on May 14th, 2015, and he

12   forwards some more, I think, on June 3rd, 2015, and forwards

13   them again on June 22nd; I forget the exact dates; it's in a

14   later chart.  But he forwards all these emails to Mr. Cohen,

15   including one about the 1.3 and the 200,000; I think that's

16   Exhibit 336.

17        So, I mean, that tells us that Kagan knew quite well

18   what the deal was.  It tells us not only is he not credible,

19   but he's doing it on purpose.  He knows for a fact that that's

20   what the deal was, and he's given a different account in this

21   court.  He is not credible, and the construction costs are an

22   area where his testimony is just false.

23        The next point -- I mentioned it briefly; I'll

24   mention it briefly again.  He also testified that Filippov and

25   Lipetsker just agreed to all these cost overruns.  There is

1    nothing in the record of this.  There's not a single document

2    to confirm his story.  And it makes no sense.  Again, looking

3    at Exhibits 26, 32, the idea that a man who spent nearly a

4    month worrying about $100,000 per home and a possible $16,000

5    cost overrun which has come to the property, and say (sic),

6    "Vadim, you want to go a few hundred thousand over, that's

7    fine," makes no sense.  And the credible witnesses told you a

8    different story, right?  Zhukovskiy told you a different

9    story.  Lipetsker, Filippov, the people who were credible,

10   completely contradicted Mr. Kagan.

11          Another area where Mr. Kagan was not the least bit

12   credible is the Classic Homes contract.  That's the one that

13   was signed at the construction-loan closing, that everyone

14   agrees Classic Homes never did any work on this.  And in fact,

15   Mr. Kagan specifically testified that Classic Homes was

16   defunct at this point.  He had closed it down and was now

17   using KDC.  And Filippov explained that Kagan and Maiden told

18   him it was a formality and not to worry about it, it was just

19   for the bank.  And so based on what they told him, he signed

20   it.

21          Kagan claims he didn't even know he signed it.  Now,

22   who's credible here?  Are we really to believe -- I mean, I

23   understand, you go to a construction-loan closing, they put a

24   lot of documents in front of you, and you sign stuff, and out

25   you go.  But this is a contract with his own company, a

1    company that was defunct at the time.  Are we really to

2    believe that Kagan sat in that room and signed this thing

3    without looking at it and didn't know that he had just signed

4    a contract with his own company that was no longer

5    operational?  It's ridiculous.

6         Let's talk about his tale on the carrying costs.

7    Now, according to Kagan, he didn't read the operating

8    agreement.  His own lawyer -- or as Maiden said, that he went

9    over all the material at a point, so -- and I think Maiden

10   said that a couple -- three times.  But not just that.  It's

11   not just that his own lawyer contradicted him.  The documents

12   contradict him.  When you compare Exhibit 11 and Exhibit 15 --

13   and again, we'll blow through these fast -- Exhibit 11 is a

14   draft that's earlier on; I forget the date.  I think it was

15   maybe October 30ish.  And then Exhibit 15's the final.  And in

16   Exhibit 11, Mr. Kagan was obligated to pay the carrying costs

17   out of his pocket, after twenty months.  In Exhibit 15, it's

18   twenty-three months.  This is a change that favors Mr. Kagan.

19   Filippov certainly didn't put that in there.  It shows that

20   Kagan had input into this, that he knew what the terms were,

21   and he had input.

22        The same thing's true about paragraph 6.1(b)(6) on

23   page 6.  The final version has a paragraph that says, we're

24   going to retain Tatiana as the listing broker, subject to a

25   right of removal.  The first agreement -- this is a draft at

1   page -- Exhibit 11 -- doesn't say that.  This is a term that

2   Kagan obviously asked for.  I mean, there're terms in there

3   that changed, that show that he had input.

4        So the idea that he had no idea what was going on is

5   false; so too is this story about the carrying costs.  He

6   actually claimed not only that he didn't borrow the carrying

7   costs in this deal but that he never borrowed the carrying

8   costs, that he had never done that.  Why did he do that?

9   Because they had cooked up this theory with Joseph Cohen that

10  we're going to say it's illegal to borrow the carrying costs,

11  therefore he can't do it, and so now, okay, I'm going to have

12  to say I never do that.  Well, his own lawyer, Boris Maiden,

13  who's also the closing attorney on the deal, said he always

14  does it, he does it on every deal.  And Maiden confirmed that

15  they told Filippov that that's how you do it.  So why would

16  Filippov think any different?  He's got the closing attorney,

17  the guy that he understands is Kagan's attorney -- and Kagan

18  also testified that Maiden was his attorney -- telling him

19  that's how it's done.  Okay, fine, do that.

20       And not only that, but we confronted Kagan with ten

21  different operating agreements from all of his other deals, in

22  all of which he borrowed the carrying costs.  And so he had to

23  repeatedly claim that he didn't know the terms of his own

24  deals.  It wasn't at all credible.  Frankly, seemed knowingly

25  false.



1            He also claimed that he paid the carrying costs

2     during the project.  Well, that's not true either.  When you

3     look at Exhibit 43 -- that's the back-and-forth emails with

4     Filippov's wife, Arina -- you can see, month in, month out,

5     they're paying the carrying costs out of the LLC checking

6     account.  And she's telling him that.  It happens every month.

7     And it's true that at times there would be a cashflow crunch

8     and KDC would send some money over.  And we tally that up

9     in -- I forget which exhibit.  It's one of the first six

10    exhibits.  But he always got reimbursed.  So the idea that

11    he's paying the carrying costs is another Cohen construct.  It

12    does not map to what really happened.

13           Just very briefly.  For the longest time, the Kagan

14    defendants were claiming that Filippov wasn't the managing

15    member.  You can see that in the amended counterclaim, at

16    paragraphs 70 and 156.  Well, they finally abandoned that one.

17    I mean, the whole point of that one was they were trying to

18    say that Kagan was in charge of making these contracts.  But

19    Kagan admitted at the trial that he knew Filippov was the

20    managing member.  In fact, that's another reason why Kagan's

21    testimony wasn't credible was that on cross-examination he

22    admitted to understanding really all of the material terms of

23    the contract, except the carrying costs, which somehow he

24    didn't understand, because that -- he needed to not understand

25    that, to fit his presentation here.

1              Next up on the noncredibility list, Kagan claims that

2      he didn't track costs per project on ProEx but just sent flat-

3      fee bills so he could pass the cost savings on to the

4      investors.  And I talked about that a little bit earlier.

5      ProEx does all its work through subcontractors.  But it's also

6      just not true that he wasn't tracking the costs.  If we look

7      at Exhibit 5, the way that we put Exhibit 5 together was we

8      looked for the checks that said "Lyman" or -- "55 Lyman" or

9      "88", "55" on them.  And these checks are marked "55 Lyman".

10     He was tracking the costs.  So it's just not true.

11             And in fact, Goldman, you may recall, found that,

12     when you look at their general -- the ProEx general ledgers,

13     he can only find $204,000 on their general ledgers.  And

14     that's --

15             Let's not put these on screen.

16             But Exhibit 148, at page 23 through 24, and Exhibit

17     149, at page 12.  And you can see, in their general ledger,

18     they're tracking the expenses per project.  So why did they

19     tell us that he doesn't?  Because the expenses only add up to

20     a couple of hundred thousand bucks; the rest is pure Kagan

21     taking money for himself.

22             There was an assertion along the way that there's a

23     $532,763.41 receivable that ProEx needs to recover or it's

24     going to lose money.  And that was on Exhibit 305, which you

25     may recall was submitted as a single page and we had to ask

1    that it be completed during the trial.  The fact is, 305 is an

2    adjusted trial balance for 2015; it's got nothing to do with

3    the charges incurred for ProEx.  ProEx is an accrual-based

4    taxpayer.  It did the work in 2013 and 2014.  When we look at

5    what Mr. Gersh was doing in their books -- there's an email,

6    341, at 3, where he talks about playing around with KDC and

7    ProEx's books.  We know that receivables were loaded onto

8    ProEx's books in 2014.  325,000 was added as of December 31,

9    2014.  100,000 was added as of 1/1/2015.  Trial Exhibit 86

10   tells us they know the 100,000's never going to be paid.

11        The payables on the Lyman-Cutler books are all over

12   the place.  Exhibit 50 says it's 325,000.  Exhibit 84 says

13   it's 439,000.  When you add up the payables on their proof of

14   claim, it adds up to 461,000.  As I've already said, if you

15   add up what they've been paid and compare it to what they

16   allegedly billed -- I've set that page aside, but it comes out

17   to a lot more than that.  I mean, the ProEx number is all

18   nonsense.  What they spent is $225,000.  And that's giving

19   them credit for everything we could find that even remotely

20   said "Lyman" or "Cutler" on it.  The rest of it is made up.

21        Just a momentary comment on substantial completion.

22   There is no evidence, in the record, of substantial completion

23   of these homes before late July, early August, 2014.  Section

24   5.2 obligated him to substantially complete the homes by March

25   30th.  If you look at Trial Exhibit 39, the email exchange

1    about there not being floors in one of the properties in late

2    July, and Exhibit 45 where they first listed the property on

3    August 12, 2014, it makes no sense that they would have sat

4    out the selling season in 2014 and not listed the properties

5    until August, if they were substantially complete in March.

6        I want to make sure I talk about the listing

7    agreements.  And so as our baseline -- and again, in the

8    operating agreement, we had a specifically negotiated term,

9    6.1(b)(6), that said that they would list the properties with

10   Tatiana, but essentially they could remove her at any time

11   with an eighty-one-percent vote, and Filippov could remove her

12   unilaterally as the managing member, at any time after

13   December 31, 2014.  And in a moment of perhaps forced candor,

14   Kagan admitted he knew that.

15       So there's no dispute.  He knew that she could be

16   removed.  And yet, we have these two exclusive listing

17   agreements.  Trial Exhibit 45 was signed in August 2014 for a

18   term of eighteen months on a residential-home sale.  And 44

19   was signed in April 2015 -- both of them by Kagan -- for a

20   term of six months.  And they were exclusive.

21       Now, Kagan couldn't use those to thwart Filippov's

22   right to remove Tatiana, without her cooperation.  By her own

23   testimony, she would do whatever he told her to do, and

24   Century 21 didn't object.  So she could step aside; she could

25   waive a commission.  She admitted that.  And yet, when the

1    dispute began and we asked her to step aside because the

2    properties hadn't been sold, they refused.  And it wasn't

3    until we were in the bankruptcy proceeding and the contracts

4    were -- I forget the bankruptcy term.  "Avoided"?

5              THE COURT:  Rejected.

6              MR. CARNATHAN:  -- that they finally were --

7              THE COURT:  Yeah.

8              MR. CARNATHAN:  -- were rejected -- so that was part

9    of the extortionate scheme.  They were thwarting Filippov's

10   right to remove Tatiana, and they were doing it on purpose.

11   And we know, at least by inference, that Tatiana was in on

12   this.  And how do we know that?  Because of that flurry of

13   emails.  Right?  We can see this progression in the finances.

14   We can see Stanik coming up with bills in February, March,

15   2015.  We can see them starting to come up with additional

16   charges in '15.  And we know --

17             THE COURT:  Which flurry of emails?  Is that what

18   you're --

19             MR. CARNATHAN:  That's Trial Exhibits 259 through

20   268.  Some of them are text messages.  And they include text

21   messages from Tatiana, where they're saying, hey, hey, we need

22   you to sign this listing agreement, we got to get this

23   property on the market.  And this is, again, out of the blue.

24   And Filippov testified to this, that he'd never been asked to

25   sign a listing agreement before.  He's in Florida, and all of

1    a sudden they're all over him -- Tatiana and Kagan both --

2    saying, we need you to sign this, we need you to sign this.

3    And he testified that he never did.

4         But then on April 28th, 2015, Gersh sends him this

5    email saying, I'm just emailing this to let you know we've

6    signed the listing agreement, please confirm receipt of the

7    email.  And he says, confirmed.  And he admits that he knew

8    they signed it, but he didn't want to pick a fight.  But he

9    also thought, at the time, that he could remove her, because

10   that was his right.

11        So we know that Tatiana is in on this, because she's

12   part of it.  She's saying, sign, sign, sign, sign, sign.  And

13   on that same date, April 28th, all these additional charges

14   get entered into the books, and about nine days later the

15   lawyer letter hits.  And this is actually another point where

16   I think Gersh lost some real credibility.  He got up on

17   direct -- and this is after I had cross-examined Kagan and

18   established all these charges on April 28th, the same day as

19   the email.  And Gersh got up and said, oh, well, those changes

20   were all pretty minor, not much happened on April 28th, there

21   were typos -- I forget the exact words, but he testified that

22   they were trivial -- and then had to look at that audit trail

23   and admit that, yeah, no, I guess I did enter some pretty big

24   numbers on that day.  That's not a coincidence.  This is

25   another one of those "maybe you can explain away one thing,

1    maybe you can explain away two things, but, as the evidence

2    mounts up, it becomes apparent what's going on here."  And so

3    the only way that they could inflict that listing agreement

4    was through the cooperation of Tatiana.  And those exhibit

5    emails, 259 -- and text messages -- through 268, shows that

6    she knew.

7         Now, we submit that Joseph Cohen's fingerprints is

8    (sic) all over that one too.  Right?  This is a Cohen

9    construct; he's the architect of a lot of this bad faith.  And

10   one of the things that the Kagan parties tried to testify was

11   that Cohen actually wasn't involved all that heavily, he

12   didn't have anything to do with the numbers in the books, and

13   he only advised them a few hours here and there.

14        But what are the things that we know that Cohen did,

15   right, the things that we've established?  We know he drafted

16   the KDC contract.  We know he drafted the mechanic's lien.  We

17   know he drafted the mechanic's lien alone, without the

18   assistance of counsel, even though this was in June 2015 when

19   we were already in a lawsuit and they had quite capable

20   counsel.  Counsel was not involved in that.  This was pure

21   Cohen.

22        He drafted the KDC invoice.  He advised Kagan about

23   the carrying costs.  He received that flurry of emails from

24   Kagan on May 14th, 2015, right after we responded to the May

25   7th demand letter.  We know he drafted emails from Kagan.  You

1    remember the one we found; it was something like proposed

2    response from Kagan's non -- Kagan Development account.  And I

3    apologize, I forget the exhibit number.  But he admitted to

4    drafting that, but he tried -- he actually tried to claim that

5    he hadn't sent it, that he was trying to make a distinction

6    between writing it and sending it.  But we know that he drafts

7    emails for Kagan.  And I think that's important, particularly

8    when we get to Exhibit 215.

9           We know he threatened Alex and Arina at the

10   properties.  We know that he told them, pay what we demand or

11   we're going to put a lien on your house and you're going to

12   lose all your money.  We know he threatened Elena Lande.  We

13   know that he told her that she couldn't afford to lose the

14   child she was carrying, because of the stress from fighting

15   with them.

16          We know he made similar demands to Abramski.  We know

17   that he led the charge on filing a series of criminal

18   complaints against Brusenkova.  We also know -- this is

19   another Kagan noncredibility moment -- Kagan couldn't tell me

20   within a million dollars how much he had paid Cohen; if Your

21   Honor recalls that.  But he couldn't tell me within a million

22   bucks.  It was a lot of money.

23          But we did eventually find on Exhibit 304 -- I think

24   I misspoke before.  I said 305 was the one we had to complete.

25   It was actually Exhibit 304.  We found on Exhibit 304 that he

1    had been paid $70,000 in 2015 just for his work on Lyman-

2    Cutler.  And that's roughly the annual salary that Mr. Gersh

3    was earning.  So for this, an hour or two here and there, Mr.

4    Cohen got paid 70,000 bucks.

5         All right, let's talk about the KDC contract and how

6    we know that that is a fraud.  I've already mentioned that,

7    just as a matter of common sense based on the other documents,

8    there is no chance that Filippov and Lipetsker ever would have

9    agreed to this if they had seen it.  But more than that.  The

10   contract claims to be dated June 24th, 2013, and Kagan signed

11   it for both sides.  The only witnesses who came in here and

12   told Your Honor that it existed in 2013 were Kagan and Cohen.

13   And I respectfully submit that they didn't utter a credible

14   word.  None of the credible witnesses, none of the even

15   marginally credible witnesses, ever laid eyes on that contract

16   before this litigation started.  Filippov told you that.

17   Lipetsker told you that.  Brusenkova told you that.  KDC's own

18   accountant, Jason Gordon, told you that.  KDC's so-called CFO,

19   Dan Gersh, told you he had never seen it.  He actually called

20   it above his pay grade, trying to distance himself from it.

21   He's the CFO.  And so a fee to KDC is above his pay grade?

22        We established that KDC's an accrual-based taxpayer.

23   And Gordon admitted that, if it had charged a fee, it should

24   have been on the books.  It wasn't.  Gersh never entered such

25   a fee and he was never asked to.  Gersh testified that, to his

1    knowledge, KDC has never charged a fifteen-percent general-

2    contractor fee on any other project.  Brusenkova not only had

3    never seen the KDC contract; she had never seen one like it,

4    and she had never once been asked to enter a general-

5    contractor fee anywhere on KDC's books.  There are no credible

6    contemporaneous documents to confirm that it existed.

7           And I'm going to talk about Exhibit 215 next.  When

8    you look at Exhibit 27, the budget, there's no line item for a

9    general-contractor fee.  When you look at Exhibit 14, the

10   Filippov email where he says, I need this provision in the

11   agreement so that this -- basically what's happening here with

12   Exhibit 37 doesn't happen to me.

13          Boris Maiden drafted the Classic Homes contract.

14   Boris Maiden in 2013, when this contract was allegedly

15   drafted, was Kagan's lawyer and drafted all his operating

16   agreements, did his closings.  Maiden was Kagan's guy back in

17   2013, and they were friends.  And he had Cohen draft the

18   contract.  There's just no explanation as to why that makes

19   sense.  There's nothing in KDC's books or records to reflect

20   this general-contractor fee or any other one.  There's nothing

21   in the Lyman contract -- Lyman-Cutler books.  We didn't see a

22   similar contract in any of the other projects.

23          I'd like to look at the time line too.

24          So, Bill, if I could have the next chalk.

25          So the next slide in the closing chalks is the time



1  line of the KDC contract, and this is focusing on the events

2  of May and June 2015.  And so we start out May 7th and we get

3  this demand for $1,059,000.  And I've already talked a little

4  bit about how that just doesn't map to anything.  But somehow

5  that number jumps to $2,095,985 a mere six weeks later.

6           And when you look at the intervening events, they're

7  quite telling.  Right?  We've got:  May 7th, they demand

8  1,059,000.  May 13th, we reply and reject those amounts.  And

9  I hasten to add -- because we hear a lot about how we started

10  screaming fraud out of the box.  Not so.  If Your Honor looks

11  at Exhibit 54, we didn't scream fraud out of the box.  We said

12  we never authorized those charges.  The real fraud claim

13  started after we saw the mechanic's lien.

14           May 14th -- this is right after Kagan sees our

15  response -- we have this little flurry of emails to Cohen.

16  And he sends him the closing docs.  He sends him materials

17  about the deal.  May 16th, Cohen goes out to the property and

18  threatens Filippov and Arina and tells them that if they don't

19  pay, he's going to put a lien on their house and they're going

20  to lose everything.

21           May 24th, Gersh gets married.  And so he goes off on

22  his honeymoon.  And so he's not around in the first part of

23  June to help put this invoice together.

24           June 3rd, we see this other email that Kagan forwards

25  to Cohen, that appears to attach the LLC agreement.  Now, I

1    just want to note for Your Honor, at Exhibit 335 there's no

2    attachment.  We're inferring this from the language of the

3    email that's in the chain.  There's one that says, here's the

4    fully executed agreement.  But it appears that he forwarded

5    the LLC agreement to Cohen on June 3rd.

6         On June 4th, the day after receiving that email,

7    Cohen engineers an email to Filippov, saying a detailed

8    invoice is prepared; 63.  That, I believe, is the one that

9    Cohen ghost-wrote for Kagan, that actually says, "Proposed

10   response from Vadim's non-Kagan Development email" at the top.

11   Think that's the one.

12        On June 9th, Kagan submits an affidavit to the

13   Superior Court, because now we're fighting about the listing

14   agreements, in which he says that he did this project for no

15   charge, other than his share of the net profits.  Now, that

16   affidavit just can't be squared with these additional charges

17   from KDC.

18        On June 15th, Kagan -- excuse me, Gersh returns from

19   his honeymoon.  And on June 17th -- you remember we had the

20   kerfuffle about this on Exhibit 67 -- the properties page

21   shows that that is the date that that KDC contract was

22   signed -- excuse me, was printed.

23        And then the mechanic's lien is filed on June 22.

24   And on that same day, June 22, Kagan emails the documents to

25   Cohen again.  June 25, we finally see the KDC invoice.  And

1   this is why I mentioned the Gersh honeymoon; it purports to be

2   dated June 1, and so Gersh certainly wasn't around to help.

3   And the cover letter is dated June 24, but it's attached to a

4   June 25 email.

5         So when you look at the flow of what's going on here

6   of the initial demand for a million and fifty-nine, the

7   response that we're not going to pay that, the sudden flurry

8   of emails to Cohen, the dramatic change in theory, scope,

9   plan, the fact that this contract is printed on June 17th, and

10   pile that up with all the other facts that I just went

11   through:  that nobody credible had ever seen it, it wasn't in

12   the books, Gersh is trying to say it's above his pay grade,

13   it's a fair inference that this document was forged in June

14   2015 specifically to put pressure on Filippov and Lipetsker to

15   pay them what they demanded.

16         And I just want to point out at this point that even

17   if some portion of the alleged cost overruns were real -- and

18   we say they're not, but even if Your Honor thought that, well,

19   some of these might have been real, you know, maybe he went

20   over a few hundred thousand bucks, to double that, triple it,

21   to load on all these fees, to try to extort money from

22   Filippov and Lipetsker is unforgiveable.  It's bad faith, it's

23   a breach of fiduciary duty, it's fraud.  From KDC, ProEx, and

24   Tatiana's standpoint, it is a 93A violation, it is just

25   reprehensible.



1              I want to talk again about the ProEx proposals.  I

2    mentioned those earlier, that we think those too were cooked

3    up after the fact.  And to make sure I get to Exhibit 250, I'm

4    going to hustle.

5              THE COURT:  Let's just check your time.

6              Elizabeth, what --

7              MR. CARNATHAN:  I've got about nine minutes.

8              THE COURT:  Okay.  You got it.  Keep going.

9              MR. CARNATHAN:  The same concept applies to KDC.  No

10   one credible ever saw them.  Really the only person who claims

11   that they existed back in 2013 is Kagan, right?  Filippov

12   never saw them.  Lipetsker never saw them.  Brusenkova never

13   saw them.  Jason Gordon never saw them.  Dan Gersh never saw

14   them.

15             Kagan's very testimony that he prepared them isn't

16   credible -- back in 2013 isn't credible because he tried to

17   claim that he went to subcontractors and got their input,

18   presented them to Filippov and Lipetsker before the project

19   started.  Well, that's nonsense because Trial Exhibits 332 and

20   333 will show you that the foundations had already been

21   installed and inspected by August 23rd.  The demo proposal is

22   dated September 1, and the excavation and foundation proposals

23   are dated October 1.  So that wasn't true either.

24             And this really matches exactly what Brusenkova told

25   us, right?  She told us -- and I submit she was entirely



1    credible -- that Kagan, at some point in 2013, realized that

2    he could just double charge this to people and they didn't

3    have the horsepower to push back, and so that's what he

4    started doing.  That's what he did with ProEx.

5         And this brings us to the phone number issue where

6    Brusenkova told us that he didn't have that phone number, 617-

7    610-1276, that's on both of the ProEx proposals, until, I

8    think she said, February 2014.  And the documents in the

9    record, Exhibit 215 aside, confirm that.  Your Honor can look

10   at all of the documents in the record.  And we've been saying

11   this for months now, right?  Nobody's come back and

12   contradicted us.  The phone number that Kagan was using in

13   2013 was 617-828-2093.

14        And you can look at every other email in the record

15   in 2013, and it's going to have that 2093 email on it, every

16   single one.  And yet that phone number appears on the ProEx

17   proposals, which tells us that they didn't exist in 2013.

18   They made them up after the fact.

19        Now, the same thing is an issue with 2015, Exhibit

20   2015, which we say is also an outright forgery.  Mr. Filippov

21   told you that that exhibit's a complete fraud, and that he

22   never received it, even though it was sent to that Lyman-

23   CutlerLLC@gmail address that should have gone to him,

24   Lipetsker, and his wife Irene, and it didn't.

25        If I can get that one on the screen, I would like to



1    have that one up.  Maybe start by blowing up the top, please.

2         So one of the ways that this was immediately

3    identified, for us at least, or for Mr. Filippov, that this is

4    just a made-up email, is that email address,

5    vadim@kagandevelopment.com.  Again, you can look at every

6    other email on the record -- I think there may be hundreds;

7    there are certainly dozens -- Kagan never used that email

8    address.  He had kagandevelopment@gmail.com; you could look at

9    Exhibit 231 as an example for that.  And sometimes he used

10   vadim.kagan@yahoo.com; you could see Exhibit 89 as an example

11   of that.  But if you look at every other email in this record,

12   there is not another single email that's going to show Vadim

13   Kagan using that email address, not one.

14        But you know who did send emails from a

15   kagandevelopment.com domain?  Joseph Cohen.  And if you look

16   at Exhibit 53, you'll see that Cohen used -- I forget exactly

17   the construct, but the -- there we go:

18   J.Cohen@kagandevelopment.com.  Cohen used that.  But you will

19   find, if you look at every document in the record, you didn't

20   see that until 2015.  And interestingly, Cohen would -- we say

21   Cohen forged this.  Cohen added himself to Exhibit 215 as a

22   recipient, that he had that poly-savant email account.

23        Filippov testified he never heard of Joseph Cohen

24   until 2015.  Elena Lande said she had never heard of Joseph

25   Cohen until they started making demands from her.  I think

1    that was late 2014.

2         Abramski testified he had never heard of Cohen until

3    he started getting demands for money at the end of the

4    project.  And yet somehow Cohen appears on this particular

5    email.

6         The email was only offered in paper form, and it

7    was -- there's no attachment to it.  There's no attachment of

8    the contract to it.  It just suddenly adds at the top, to the

9    subject line -- it says "88 Cutler advance in G.C. agreement".

10   And when you look at the rest of the chain, all the other ones

11   just say "88 Cutler advance".  So somehow he kind of pasted

12   these things together.

13        Kagan actually testified that his former bookkeeper,

14   Ryan O'Grady, sent this thing.  But Mr. O'Grady never

15   testified.  And given the magnitude of the issue and what

16   we've been saying all this time, one would think that Mr.

17   O'Grady would come forward and testify, but he didn't.

18        I think that's an absent witness that Your Honor can

19   draw an adverse inference against them for.  That's somebody

20   that would expect to testify.  You wouldn't expect Mr. Kagan

21   to be the guy to get up and say, well, O'Grady sent it for me.

22        And then to make things especially weird, he then

23   testified that O'Grady sent it from Kagan's cell phone.

24   Right?  And so why did he have to say that?  Because of the

25   phone number issue.  When you look at the string of emails,

1    they all have the 2013 cell phone on them, you know, 617-828-

2    2903.  But when you get to the very end, the forwarding, it's

3    got the one that he didn't have that year; he's got the 617-

4    610-1276.  He didn't have that phone number in 2013.  Right?

5    This is the only document, other than those ProEx proposals

6    from 2013, that purports to show that number.

7           And so Kagan came up with this construct, I think, on

8    the spot, well, it must have been forwarded from my cell

9    phone.  But if you look at every other email on the record

10   that is sent from his cell phone, it actually says "sent from

11   cell phone" on it.  And that's not true here.

12          So when you take those facts all together, and you

13   think about Cohen's role in this, we say that this is a

14   forgery.  Certainly there's no credible evidence that anybody

15   ever got it.  The only person who testified was Kagan, and he

16   didn't even testify that he sent it; he claimed that Ryan

17   O'Grady sent it from his cell phone.  It's just not so.

18          Okay.  Two minutes.  Very briefly about Mr. Goldman.

19   I mean, Mr. Goldman testified to all manner of discrepancies

20   in the documentation, and those are more particularly gone

21   through in our findings at paragraph 166 on page 36, so I'm

22   not going to go through them now.

23          But one of the most interesting ones, I thought, was

24   he testified that they had two sets of books, that the

25   QuickBooks that were used to prepare the proof of claim were

1    not the same QuickBooks that were produced in discovery.  We

2    never heard any explanation for that.  In fact, we really

3    never heard any serious rebuttal of Goldman at all.  I mean,

4    Mr. Gersh got up and just said, well, he's wrong, but he never

5    went point by point.

6         And really the gist of Mr. Goldman's testimony, the

7    overall construct, is look, again, you could explain away a

8    few problems, but when you reach a certain level of problems,

9    you can't explain them away any more.  And he concluded that

10   the only explanations here are either gross incompetence or

11   fraud.  Neither one is a good answer for Mr. Kagan.  Even if

12   it was merely gross incompetence, that's a gross breach of his

13   fiduciary duty here.

14        But we submit that, given all of these problems, even

15   if they can explain away some of them, it all points to fraud.

16   This is on purpose.  Right?  How do we know that?  Well, the

17   sheer volume of problems.  We know it because of the sheer

18   lack of credibility of their lead people.  Kagan wasn't

19   credible.  Cohen wasn't credible.  Gersh wasn't credible.

20        We know it because of all the other things I've

21   talked about, the phone number issue, the fact that nobody had

22   seen these contracts before litigation.  We know it because of

23   the Brusenkova testimony which matches these facts exactly.

24   We know it because of the assault on Brusenkova.  Cohen led an

25   incredible assault on Brusenkova.  We know it because of

1    Cohen's criminal record.  You can infer intent from the

2    criminal record.  We know it because of the other investors

3    who all testified to similar treatment at their hands.  We

4    know it because Kagan didn't present any satisfied investors;

5    despite demanding the opportunity and being given the

6    opportunity, he didn't present any.  And you should draw an

7    adverse inference against him for that.

8          The evidence of fraud here is overwhelming, Your

9    Honor.  But even if Your Honor determines that it's gross

10   incompetence, Kagan still loses.  Thank you, Your Honor.

11          THE COURT:  Okay.  All right.  Whenever you're ready.

12          MR. PERTEN:  Good afternoon.

13          THE COURT:  Good afternoon.  Almost.

14          MR. PERTEN:  Almost.  It's hard to sit back and hear

15   all of the --

16          THE COURT:  It always -- I understand.

17          MR. PERTEN:  -- the allegations that are --

18          THE COURT:  I thought of you a few times, that I

19   remember sitting in that chair and hearing those kinds of

20   things done and --

21          MR. PERTEN:  And I think the reason that it's so

22   difficult is because I hear counsel making argument and I hear

23   no facts supporting his arguments.  And that's sort of the

24   story of this whole case, that counsel makes an argument,

25   there is no causal connection between what he ultimately

1    concludes; there is no evidence.  So I think what this Court

2    needs to do, respectfully, is focus on what the evidence is,

3    not what counsel wishes the evidence said, what he thinks he

4    might conclude.

5           A couple of introductory observations.  This case, in

6    the adversary complaint, alleges affirmative fraud for which

7    they are seeking damages.  I heard nothing in the closing

8    argument about any damages that the plaintiffs claim to have

9    suffered as a result of the conduct which my client is

10   allegedly the mastermind of.  Nothing.

11          At best, if you believe everything that they say --

12   and I'm going to suggest you can't, but if my worst-case

13   scenario -- that may go to whether my client recovers on the

14   proof of claim, but it does not go to any affirmative claim.

15   Okay?  They have not proven any damages, whatsoever, from the

16   affirmative claim.

17          You have heard me say to this Court for four years

18   now -- and I appreciate the Court's patience over the four

19   years -- this case has alleged overbilling, double billing,

20   billing from other projects to this project.  You've heard

21   that, and you've heard me stand up here; you've seen a motion

22   to dismiss, you've seen a summary judgment making the same

23   argument saying:  show me.  You can't just say it.  Show me.

24   We still haven't seen it.

25          What we've seen is counsel's attempt to interpret



 1     QuickBooks and QuickBooks entries.  And we should mention

 2     something about the QuickBooks.  We are not relying on

 3     QuickBooks entries.  Remember that QuickBooks is simply a

 4     record of the primary evidence which are the actual invoices

 5     which we have provided to this court.  And the QuickBooks,

 6     presumably, is a summary of what the actual invoices are.

 7             We have heard nothing about the binders, which

 8     invoices are false.  But more importantly, what we haven't

 9     heard -- and I think this is significant -- we haven't heard

10     what the experts say.  Did any of the experts look at those

11     invoices and say this invoice can't be accurate, this invoice

12     is absolutely not?

13             Mr. Goldman and Mr. Doddridge both testified.  Mr.

14     Goldman said I've got all sorts of questions; this invoice

15     looks phony, this one has this problem, this one has this

16     problem, similar to what counsel has just argued, you can't

17     believe this invoice, you can't believe that invoice, this

18     doesn't make any sense.

19             I asked Mr. Goldman about the next question:  did you

20     do any analysis at all to determine -- you raised a question;

21     kudos to you.  Did you do any analysis, however, to see

22     whether the charges reflected in those invoices were accurate

23     or not?  He said, no, I'm not a construction guy; I wouldn't

24     know.

25             So in other words, you want to challenge, you want to



1    say Unicon Electric overcharged, double billed, okay, you've

2    said it.  Did anybody do an analysis as to what that bill

3    should have been?  Does anybody say, well, we've got one bill,

4    that would have covered in full.  The second bill which we're

5    charging is obviously a duplicate because it should have only

6    been charged once.  You haven't heard that testimony.

7         In fact, what you've heard from Doddridge, who

8    somehow miraculously has almost disappeared, their expert, Mr.

9    Doddridge, Mr. Doddridge testified that his price for this

10   job, almost to the penny, is what Kagan actually charged.

11   Almost to the penny.  In fact, and we'll talk about that in

12   more detail, he actually came out a little higher.

13        So my question, my rhetorical question, Your Honor,

14   is if we were double billing, if we were triple billing, if we

15   were cooking the books, how is it that their own expert says

16   these numbers are entirely reasonable?  We're the dumbest

17   fraudsters in the world.  We're overcharging and charging

18   exactly what everybody expected we were supposed to charge.

19   It doesn't make any sense.  And the lack of expert testimony

20   is quite remarkable.

21        The QuickBooks, Mr. Carnathan suggested to you, well,

22   there's two sets of QuickBooks.  That's right.  We've never

23   made any bones about that.  There was an unaudited version,

24   which we provided before the litigation was provided, and then

25   Mr. Gersh went back, made edits, made changes, and there was

1    an edited version.  We've never denied that.  And in fact, Mr.

2    Goldman, their expert, testified that's what you do with

3    QuickBooks, you go back at the end, you make sure the data was

4    entered accurately, and if it isn't entered accurately, you

5    change it, you fix it.  And it would be irresponsible not to

6    do that.  We're relying on the edited version.

7           Of course there are changes between the edited and

8    unedited.  But did anybody look at those changes and say,

9    well, look, when they changed ABC contractor to $50,000 from

10   48,000, there's no way this could have been $50,000?  Did

11   anybody connect the dots?  I haven't heard it.

12          THE COURT:  Well, isn't that what -- we just heard a

13   review of the --

14          MR. PERTEN:  No.

15          THE COURT:  -- evidence -- no, but I heard a review

16   of the evidence concerning a couple of these contractors that

17   did take the stand, and the evidence -- I don't remember

18   names, but at least one of those individuals admitted that

19   he --

20          MR. PERTEN:  No.

21          THE COURT:  No?

22          MR. PERTEN:  No.  Absolutely not.  This is counsel's

23   attempt to recast and re --

24          THE COURT:  But he put up on the screen the actual

25   testimony.



1          MR. PERTEN:  No, this is what -- and again, we're

2    jumping ahead, but I'm happy to jump to there.  What counsel

3    did was look at QuickBooks, say there's an entry here, an

4    entry here, and that's different from what the guy testified

5    to on the stand, in some versions.  And he says they said

6    we've been paid in full, yet here, look, the QuickBooks says

7    there's an open account receivable, so clearly that shows

8    we're making stuff up.  That's a gross --

9          THE COURT:  I thought -- I just want to make sure I

10   have it right in my head and --

11         MR. PERTEN:  Yeah.

12         THE COURT:  -- it's your chance to rebut it.

13         MR. PERTEN:  Yeah.

14         THE COURT:  And I want to make sure you have that

15   chance.

16         MR. PERTEN:  The point --

17         THE COURT:  Go ahead.

18         MR. PERTEN:  The point being that what counsel did,

19   which his expert couldn't do, amazingly, but what counsel did

20   was look at QuickBooks and draw conclusions that his expert

21   could not draw, number one.

22         THE COURT:  I don't know.  I thought he pointed to

23   the filed proof of claim, though, and --

24         MR. PERTEN:  Yes.

25         THE COURT:  -- and saw -- and identified amounts that

1    were still presented as due.

2         MR. PERTEN:  And that's where the disconnect is.  Mr.

3    Gersh testified, and you'll see Mr. Gersh's testimony was that

4    where there is something on QuickBooks that's listed as

5    "billed", he testified at this testimony, when we were looking

6    at a QuickBooks account --

7         THE COURT:  Yeah.

8         MR. PERTEN:  Do you want to pull one of those up?

9         Can we switch --

10        THE COURT:  Switch over, Elizabeth.

11        MR. PERTEN:  There's an example of QuickBooks.  And

12   you'll see this is Decor Art.  It says "bill" on 2/12 and

13   "bill" on 5/28/15.  And Mr. Carnathan incorrectly assumed

14   that, since it says "bill" and we don't see a "pay", that's

15   open.  And that's what his chart suggests, that those are open

16   bills.

17        What Mr. Gersh said is -- and this is a quote on page

18   35 of his testimony on June 24th:  "The reason why it says

19   'bill' instead of 'bill payment', like I previously explained,

20   is because this is showing that it is now a bill that is due

21   to Kagan Development because we covered it by paying."  So

22   there were payments that were made out of pocket.  They're now

23   reflected as "bill".  He says that says it's open. He's not

24   listening to the testimony.

25        And what's significant about that, Your Honor, is Mr.



 1    Goldman, the forensic accountant, went through this with a

 2    fine-toothed comb.  None of the conclusions that Mr. Carnathan

 3    drew, none of the analysis that Mr. Carnathan drew from the

 4    QuickBooks was testified by the expert.  And why not?  Why

 5    not?  Because it simply does not hold.

 6           Again, a little out of order, but let's get this out

 7    of the way.  The first chart -- just a second.

 8           UNIDENTIFIED SPEAKER:  You want their charts?

 9           MR. PERTEN:  Their charts.

10           THE COURT:  This is --

11           MR. PERTEN:  The unfair profits, right?

12           THE COURT:  We're on the chalk here?

13           MR. PERTEN:  Yes, the chalk.

14           THE COURT:  Page 1?

15           MR. PERTEN:  Their first chalk.

16           THE COURT:  Page 1, okay.

17           MR. PERTEN:  He would suggest to you that ProEx had

18    $690,000 of profit.  That's his conclusion.  There is no

19    testimony to that.  That's counsel's conclusion.  And he says

20    because I only saw expenses of some 200ish thousand, and they

21    build X, and I only saw that, so the other has to be pure

22    profit.  If that were true, the base contracts of ProEx were

23    $880,000.  That was the three proposals.  And there were two

24    others for snow removal and maintenance, but the base

25    proposals were $880,000.

1          If 690- was pure profit, that would tell you that to

2    do this entire job was $190,000, to ProEx, $190,000.  We know,

3    A, that's impossible.  But how do we know that?  Because Mr.

4    Doddridge, even if you accept his numbers, said the work by

5    ProEx had to have been at least 321- per house.  That's

6    $642,000, by their expert; it couldn't have been done less.

7          Yet Mr. Carnathan would suggest to the Court that his

8    analysis, not his expert's, is that $690,000 is profit and

9    therefore, do the math, 880- minus 690- is what we actually

10   spent, ignoring the testimony that we don't track expenses and

11   ignoring their own expert that there is no way that the work

12   that ProEx did could have only cost 190,000.  That's their

13   expert, not my expert.

14         If we go -- if we look at the next slide, nowhere

15   does this have the money that's outstanding, right?  Nowhere

16   do we have the money that's outstanding.  It's an incomplete

17   picture.  But more importantly, look what it says.  They're

18   suggesting we've been paid in full at $1,690,000.  That's

19   their suggestion:  $1,690,000.  That would mean that the total

20   construction cost that KDC incurred, per house, was roughly

21   $800,000, $845,000.

22         THE COURT:  By that date?

23         MR. PERTEN:  The project was finished.

24         THE COURT:  It would --

25         MR. PERTEN:  Because it's in November of 2014.



```
 1              THE COURT:  That's correct.

 2              MR. PERTEN:  Right?

 3              THE COURT:  Okay, yeah.

 4              MR. PERTEN:  So if you believe this number, not only

 5     was the $1.3-million -- actually, the original estimate,

 6     according to them, would have been 2.6, right, 1.3 per house,

 7     2.6, we brought it in for 1.6.  We did it a million dollars

 8     cheaper.  And their own expert, Mr. Doddridge says, no way,

 9     this would have cost at least 1.7.  Well, how do you get to

10     this conclusion?  The data is wrong, and the experts didn't

11     say that.  And they're asking this Court to ignore the

12     experts.  So these --

13              THE COURT:  It's an interesting point.  I mean, the

14     answer might be I didn't ask him for that.  That's not a

15     conclusion I asked him for.

16              MR. PERTEN:  That might be --

17              THE COURT:  If they didn't ask the expert to do it,

18     then that's why he didn't do it.  So what do I take from that,

19     I guess is the point.

20              MR. PERTEN:  Well, I --

21              THE COURT:  At this stage -- go ahead.

22              MR. PERTEN:  I guess the short answer is, Judge, they

23     are arguing this is what the evidence shows.

24              THE COURT:  That's right.

25              MR. PERTEN:  They have argued from the outset that
```



1    the books and records, their QuickBooks, is so complicated

2    that you need an expert.  They hired an expert to review it

3    because Lipetsker, Filippov, a lay person can't do it.  They

4    have the burden.  They didn't ask the question.  And counsel

5    now is interpreting his interpretation which, again, is

6    directly contrary to what their construction expert says.  So

7    if you believe counsel's argument that the total --

8              THE COURT:  All right.

9              MR. PERTEN:  -- is 1.6, I guess we throw Doddridge

10   out the door.  I guess we throw the original 1.3 out the door

11   because these houses only cost $800,000, apparently.  So what

12   I'm suggesting is -- and we can go through these in more

13   detail, if time permits, these numbers are counsel's arguments

14   with no evidence to support them.  He's taking numbers, he's

15   drawing a conclusion, but there is nobody -- nobody other than

16   counsel who is trying to connect the dots.  These are his

17   views, his summaries, and it's not based on the evidence.

18   It's not based on the evidence.

19              The other thing I want to sort of --

20             THE COURT:  So when I go back and look at Exhibits 1,

21   2, 3, 5, and 6, they're not going to bear this out?

22             MR. PERTEN:  They're not --

23             THE COURT:  They're not going to bear this out, is

24   what you're saying?

25             MR. PERTEN:  What I'm going to --



1          THE COURT:  If they purport -- this chalk purports to

2    be drawn from those exhibits then you say they're not --

3          MR. PERTEN:  What I say is that these totals are not

4    fact.  In other words, when they say, as a fact, that the

5    profit for KDC was $690,000, nowhere in the record will you

6    find that number.

7          THE COURT:  No, I --

8          MR. PERTEN:  They're backing into that number, and

9    that number is not based in fact.

10         THE COURT:  Backing in --

11         MR. PERTEN:  And we need evidence; we don't need

12   counsel's backdoor attempt to make evidence.

13         THE COURT:  But he admits that he's constructing it

14   from those.

15         MR. PERTEN:  Yeah.

16         THE COURT:  But that's not impermissible. You just

17   say I shouldn't credit it because their own expert didn't --

18   the person who has the expertise to do it didn't do it.

19         MR. PERTEN:  Well, more than that --

20         THE COURT:  It came out differently.

21         MR. PERTEN:  More than that, and you would have to

22   ignore their own expert, Mr. Doddridge, who did.  It simply

23   doesn't make sense.

24         Another quick debunk.  You've heard that we have to

25   prove fairness by clear and convincing evidence.  I don't know

1    where that comes from.  There is no law in this Commonwealth

2    that says that.  The plaintiff cited one case, a Massachusetts

3    trial court case, that talked about clear and convincing

4    evidence.  And if you look at that case that they cited, it's

5    a case decided under Connecticut law.  It says we're going to

6    decide this under the substantive law of Connecticut, not the

7    substantive law of Massachusetts.  There is none that I could

8    find --

9            THE COURT:  Is there actually a dispute over whether

10   fiduciary duties were owed by --

11           MR. PERTEN:  There's no dispute about fiduciary

12   duties owed. What is disputed is whether or not the law

13   requires that --

14           THE COURT:  The implications of that.

15           MR. PERTEN:  -- by clear and convincing evidence.  In

16   fact, Your Honor --

17           THE COURT:  What do you say it is?

18           MR. PERTEN:  It's preponderance.  There is nothing in

19   the Massachusetts law.  In fact, Your Honor, there's a case

20   called Johnson v. Witkowski, 30 Mass. App. Ct. -- I can hand

21   this up to you.

22           THE COURT:  Have you cited this --

23           MR. PERTEN:  No, because --

24           THE COURT:  -- to me?

25           MR. PERTEN:  -- I just learned of that argument in



1    their brief.  Johnson v. Witkowski, 30 Mass. App. Ct. 697,

2    where it's an insider fiduciary claim and they said -- the

3    Court made the observation that Johnson Corrugated's new

4    wholly-owned subsidiary are subject to careful scrutiny.  They

5    said "careful scrutiny".  And that's followed by the Patel

6    case recorded -- we have a Westlaw cite, 2099 WL 1058356.  And

7    I can hand you these cases.  It talks about that, and it says

8    "while such self-interested transactions are 'subject'" --

9              THE COURT:  Where is that case out of?

10             MR. PERTEN:  That's a trial court decision out of

11   Mass.

12             THE COURT:  Trial court, the State of Massachusetts?

13             MR. PERTEN:  Correct.  "While such self-interested

14   transactions are 'subject to careful scrutiny'" -- citing to

15   Witkowski-- "the court does not agree with the plaintiff that

16   the court in Johnson raised the fiduciary's burden of proving

17   fairness to the level of clear and convincing evidence, rather

18   the court will apply the preponderance standard."

19             And there is also case law, Your Honor, that talks

20   about in a fraud case expressly rejecting clear and convincing

21   as the standard in a fraud case, and case law which I can

22   provide the Court with the citations that says we don't look

23   with favor on cases with clear and convincing evidence.

24   That's not the standard.  And again, there is not a single

25   case in Massachusetts that says we have to prove that by clear

1   and convincing evidence.

2          THE COURT:  SJC hasn't spoken on it.

3          MR. PERTEN:  Nope, and I can hand these two cases up

4   to the Court if you'd like.

5          THE COURT:  Do you have a copy for counsel?

6          MR. PERTEN:  I only have my copies.

7          THE COURT:  I think you better not then.

8          MR. PERTEN:  Okay.  So again, you have the

9   citations --

10          THE COURT:  You've cited them, but I don't want to --

11          MR. PERTEN:  Okay.

12          THE COURT:  Obviously, we can pull them up, but he

13   can't read them right now then --

14          MR. PERTEN:  Sure.

15          THE COURT:  -- and so I really shouldn't.

16          MR. PERTEN:  The Sizemore case, which is the case

17   they cited, 16 Mass. Law Rep. 182, which is the case which

18   they cite -- the only Mass. case they cite for clear and

19   convincing evidence states, "We are doing this under

20   Connecticut law".  So under Connecticut law, parties are bound

21   in a fiduciary relationship.  So that's simply not the law in

22   Massachusetts.  They're asking you to make new law first

23   impression, and I strongly urge Your Honor to resist that

24   temptation.

25          Now, there are really two fraud issues happening in

1    this case.  One, the suggestion is that we agreed to do this

2    as a fixed price of 1.3, and everything flows from the

3    argument that you've exceeded that cost without permission, if

4    you will.

5         First of all, one observation.  Under the operating

6    agreement, Section 8.1 which we've looked at and we will look

7    at in more detail, it says that Kagan is entitled to fifty

8    percent of the net proceeds of the sale, the profit.  You put

9    it all together, he gets it; fifty percent.

10        So the reality is if KDC's claim was disallowed in

11   its entirety, we would get fifty percent of whatever's left

12   over in that bank account after you deduct, presumably, the

13   trustee's commission or whatever it be.  So our worst case

14   scenario is roughly $3.4 million there, is 1.7.  Worst case,

15   if you disallow everything.  If you disallow partially, for

16   every dollar you disallowed is that one more dollar in the

17   kitty, we're going to get fifty cents.  That is the deal that

18   was struck.  That's not the deal they would like with

19   hindsight.  That is the deal that was struck.

20        So that's something to keep in mind as we look at

21   this allegation of fraud and what are we really arguing about.

22   What we're really arguing about here is that Mr. Filippov made

23   a deal that now with hindsight he doesn't like, and he's

24   looking to get out from under it, and he's looking to get out

25   from under it by concocting a conspiracy theory, but the

1    evidence -- and again, not what counsel says -- the evidence

2    simply doesn't show this.

3         We know that the parties first met in October of

4    2012.

5         J.P., can you pull up Exhibit Number 9?

6         We looked ad nauseum at the trial -- and I'll try and

7    go through it very quickly at this presentation -- in October

8    of 2012.  Note first it's entitled "Estimated financial risk".

9    This was -- Zhukovskiy titled this "Estimates".

10        Or if you could go to the next page, J.P.

11        The column to the left entitled "Project scenarios

12   and assumptions" is the portion that has that 1.3 supposedly

13   fixed cost contract.  Here's what Mr. Filippov said about that

14   at page 24 of his transcript on May 7th.  This was me asking

15   the question.

16       "Q.  Now, you understood, sir, that the project scenario

17   and assumptions are all estimates.  Isn't that correct?

18   "A.  Yes.

19       "Q.  And sir, you also understood that it says, 'Project

20   scenarios and assumptions'?  You understood that there was

21   certain assumptions built into this model, correct?

22   "A.  Yes.

23       "Q.  And you understood, sir, that an assumption is

24   something that's being accepted for purposes of the analysis,

25   but it may or may not be true?

1    "A.  Yes."

2          So this is Mr. Filippov himself saying I knew this

3    was an estimate, and why was it an estimate because everybody

4    agrees, both sides agree that in October of 2012 the property

5    hadn't been purchased, plans hadn't been drawn, the property

6    hadn't been subdivided, nobody had committed to financing,

7    there was no bank online, we had no idea how much private

8    financing was coming in, we didn't know what the lot

9    configuration would be.  So everybody knew that these were

10   estimates, and Mr. Zhukovskiy testified that he was basing

11   this largely on what happened at 10 Lyman Road, another

12   project.  They're saying it should be in that range, and Mr.

13   Maiden who was present at that meeting, he also testified.

14   And Mr. Maiden said, I remember them talking that it could be

15   somewhere between 1.3 and 1.6, and I specifically asked him

16   was there any guarantee, was there any assurance, and he said

17   absolutely not.  There were no assurances of meeting.

18          THE COURT:  I remember his testimony.

19          MR. PERTEN:  And again,

20    "Q.  Mr. Maiden, you understood these spreadsheets?

21   They're titled -- were estimates, correct?

22   "A.  Yes.

23          And he test -- and now, Mr. Maiden, if you disbelieve

24   my client of this -- their client, he's, if you will, he's got

25   no dog. That's a cliche, axe to grind, dog in the show,

1    whatever it is.  I always mix my metaphors.

2            THE COURT:  I get it.

3            MR. PERTEN:  Mr. Maiden himself --

4            THE COURT:  Whatever it is, I understand it, yeah.

5    Um-hum.

6            MR. PERTEN:  -- said that.  So what else do we know

7    from this estimated project scenario?

8            If you -- we've heard testimony about this $200,000

9    carrying cost, a figure which is also --

10           THE COURT:  Okay, so at some point Mr. Filippov

11   decides I'm going in, I'm going in.

12           MR. PERTEN:  He does.

13           THE COURT:  And so on what basis?  What's his

14   understanding at that point?

15           MR. PERTEN:  If I --

16           THE COURT:  Because it's --

17           MR. PERTEN:  If you bear with me a moment.

18           THE COURT:  I will, but bear with me on this, the

19   argument that was made to me today resonates, right, with that

20   this gentleman isn't going into this deal with an open

21   checkbook, and the fact that he was sort of quibbling or

22   worried about $16,000 certainly supports that, that this is

23   not a guy who's going in with that --

24           MR. PERTEN:  Right.

25           THE COURT:  -- with that kind of risk.



1              MR. PERTEN:  There's a couple of things that are

2     happening here.  They were looking at this project clearly,

3     they were throwing around numbers.  They were told, Mr. Maiden

4     said, "somewhere between 1.3, 1.6".  If you look at the

5     investment and profit allocation, you can see that they're

6     predicting wild returns of eighty percent, forty percent in

7     the investment and profit allocation.

8              What Mr. Filippov testified is that he understood

9     that this was a risky investment.  He understood there was no

10    guarantee that there'd be any return here.  And one cannot

11    discount the fact that there was a cultural affinity.  They

12    all had the common background.  We're looking at it, I'm

13    looking at it, you're looking at it through one set of eyes.

14             Mr. Lipetsker said look, I've done five deals with

15    Kagan.  I've made money on every one of them.  He's a good

16    guy.  Go for it.

17             THE COURT:  What's the cultural thing you're talking

18    about?  I --

19             MR. PERTEN:  There's --

20             THE COURT:  I understand there's a cultural thing

21    here because these folks are all --

22             MR. PERTEN:  They were similar.

23             THE COURT:  -- have a similar background, but I don't

24    see --

25             MR. PERTEN:  There was a level of trust because they



1   all came from the same place, were moving in the same circles.

2   That's what I'm suggesting.

3            THE COURT:  All right.

4            MR. PERTEN:  And the other interesting --

5            THE COURT:  Let me put it this way, I think losing

6   money in Russia is the same thing as losing money here.

7            MR. PERTEN:  Okay.  But again, Mr. Filippov testified

8   clearly that he understood, no guarantees here, no guaranteed

9   rate.  I could lose everything.

10            THE COURT:  He said it.  Absolutely.

11            MR. PERTEN:  He did say that.

12            THE COURT:  I read it when you filed your brief.

13   I've seen it.

14            MR. PERTEN:  We also know about the carrying cost

15   if -- this $200,000 figure, Your Honor, if you look in the

16   lower right-hand corner of the page of the estimated project

17   financials and risk analysis, that's where that $200,000

18   figure comes from.  See in the lower right-hand corner it

19   talks about carrying costs, March 2013 to August 2014, and the

20   number's 198,138; that was rounded up to $200,000.  But note

21   what that is showing.  That's fifteen months; March to August.

22   We know that the ultimate deal was twenty-three months.  So

23   going in, the 200,000 on this spreadsheet represented

24   potentially a 15-month estimate.  At twenty-three months,

25   they're $100,000 short before they even start; 100,000 because

1   if you divide 15 months into 200,000, it's roughly 13,000 a

2   month, and if you add the extra 8 months, you're at $100,000

3   short.  So where is that money going to come from?  Mr. Kagan.

4   Mr. Filippov told us very clearly he didn't put any more money

5   in.

6          Your Honor, just to sort of debunk --

7          THE COURT:  I know this -- if you're talking about

8   the initial investments here, but certainly you don't deny

9   that the agreement says that Kagan will pay the carrying costs

10  up to the date of when it's supposed to be completed?  That

11  was the agreement?

12         MR. PERTEN:  No, no, no, no.

13         THE COURT:  All right.

14         MR. PERTEN:  The agreement --

15         THE COURT:  Help me with that that -- isn't that just

16  what -- that's black and white, isn't it?

17         MR. PERTEN:  I'm sorry?

18         THE COURT:  Isn't that black and white?  Isn't that

19  what it says in the operating agreement?

20         MR. PERTEN:  No, it does not say that.

21         Can we pull up the operating agreement, number 15?

22         That section, the LLC pays the operating costs -- the

23  carrying costs, I'm sorry, for the first twenty-three months.

24         THE COURT:  Gotcha.

25         MR. PERTEN:  Kagan's obligation does not kick in

1    until after twenty-three months.

2            THE COURT:  That's what -- I'm sorry.  I actually was

3    thinking that --

4            MR. PERTEN:  Okay.

5            THE COURT:  -- and saying the other.  I get it.

6            MR. PERTEN:  Yes.

7            THE COURT:  Yep.

8            MR. PERTEN:  The LLC was supposed to, and that's in

9    Section 4.1 of the --

10           THE COURT:  I understand.

11           MR. PERTEN:  -- operating agreement.

12           THE COURT:  That's right.

13           MR. PERTEN:  Can we go back to Exhibit 9?

14           UNIDENTIFIED SPEAKER:  Sure.

15           THE COURT:  And there's no suggestion that Mr.

16   Filippov -- that the LLC didn't pay the carrying cost, is

17   there?

18           MR. PERTEN:  The evidence in Exhibit 316 shows this,

19   and the testimony show this is that Mr. Filippov and his wife

20   Arina would pay the mortgage payments, and then you'd see an

21   email to KDC saying hey we need to make the mortgage payments,

22   send some money.

23           So we were fronting the money -- KDC was fronting the

24   money for them to pay, and here's what -- again, what is the

25   evidence?  You would think -- you would think that they -- to

1    the extent that they have the burden of proving fraud, that if

2    we were putting in for carrying costs and saying hey, we

3    fronted this money for carrying costs but it's money we didn't

4    do it, did the experts say that?  Did anybody do that an

5    analysis?  Did anybody challenge Mr. Gersh when he said we

6    fronted $665,000?  Did anybody challenge that?  No.  Nobody's

7    connecting the dots because the dots are not there to connect.

8         And in fact, most tellingly, if you look at Exhibit

9    291 which was an accounting that was prepared in real time by

10   Filippov, there is over $300,000 of deposits which are listed,

11   "Kagan carrying costs".  They knew Kagan was paying the

12   carrying costs.  They want a windfall.

13        If you do the math, we spent the construction loan.

14   Everybody agrees the construction loan was spent.  If the

15   construction loan was spent, where was the money coming from?

16   From the carrying costs.  We know Filippov didn't pay it.  We

17   know Lipetsker didn't pay it.  The only person who said he

18   paid it was Kagan through KDC.

19        So the suggestion that they somehow managed to pay

20   this 665,000 of carrying costs and built the construction,

21   right, and built the properties for 800,000, the math -- it's

22   funny math, and nobody's testified to it.  Their forensic

23   accountant did not testify to that.  There is no evidence that

24   these monies that were sent for carrying costs were not

25   actually paid.  It's simply not there.

1              If we could skip to the next page of Exhibit 9,

2      please?  No, the -- no.  Next one, please.  I'm sorry.  The

3      profit.

4              UNIDENTIFIED SPEAKER:  Yeah.

5              MR. PERTEN:  Right here.

6              The Exhibit 9 which was the presentation in 2012 also

7      had a proposed construction budget.  Significantly, we see

8      here, there is no line item for carrying costs, so that was

9      certainly upfront in this initial meeting.  Nobody is talking

10     carrying costs.

11             The other really interesting thing about this is if

12     you look at the amount designated for rough electrical and

13     actual -- and finished electrical.  It adds up to roughly what

14     we build.

15             Similarly, if you add up the ProEx items:

16     foundation, landscaping, and so on and so forth, it comes out

17     to significantly more than the $190,000 the plaintiffs would

18     have you say that ProEx managed to do this.

19             But the point is when they say there was an assurance

20     that the carrying costs could be paid out of the construction

21     loan, well, certainly not in this document.  And let's move

22     forward because this is crucial, because what we see going

23     forward is repeatedly there are the allegation, because this

24     doesn't fit their narrative, of course, we've got to get out

25     from under the fact that there's no items.

1          So the testimony is well, Mr. Kagan told us this was

2    all fudged.  This was all front-end loaded.  We inflated the

3    numbers.  That's the testimony.  That's not Mr. Kagan's

4    testimony, but that's the testimony to get out from under the

5    documentation that says carrying costs can't be used.  You

6    can't use construction loans.

7          If that were true, then Mr. Filippov who negotiated

8    the construction loans knowingly -- knowingly perpetrated a

9    fraud on the bank, right.  He says I knew about it, but I was

10   okay.  Kagan said it was fine, so I just thought it was fine;

11   therefore, I can lie to the bank and subject the LLC and its

12   members to liability.

13             THE COURT:  Didn't Kagan too?

14             MR. PERTEN:  I'm sorry?

15             THE COURT:  Didn't Kagan as well?

16             MR. PERTEN:  Kagan did not say that.  They say Kagan

17   said that, but Kagan never said that.

18             THE COURT:  Oh.

19             MR. PERTEN:  He never said that at all.

20             THE COURT:  We're not -- are you talking about the

21   Classic Homes contract that was --

22             MR. PERTEN:  No, no.  We'll get to the Classic Homes.

23   I'm just talking about this document.

24             THE COURT:  I understand this but -- yeah.

25             MR. PERTEN:  So Mr. Filippov, when we get to the



1    construction loan intentionally with open eyes lies to the

2    bank and suggests that everybody was okay with that, and I

3    don't really need to follow laws if I don't need to follow, if

4    it doesn't suit my -- if somehow he's saying don't trust Kagan

5    because I was just doing what Kagan told me.  Mr. Filippov is

6    a very savvy person.  He doesn't do what anybody just tells

7    him.

8         We get to the drafting of the operating agreement,

9    and this is very telling Your Honor.  First of all, you'll

10   recall that Kagan wasn't in the loop through much of the

11   communications.  There were private communications between

12   Maiden -- private emails between Maiden and Filippov.

13   Filippov is the only one who's commenting on the drafts.  He's

14   reading this very carefully.

15        We also know that Filippov had his own accountant and

16   his own lawyer look it over, and we know that his lawyer

17   provided redlines.  You have that in the emails.  You have

18   that in Exhibit 14.

19        And if we could pull up Exhibit 14 to the -- why

20   don't we just scroll back -- keep going -- to 5:21 p.m.  Keep

21   going.  It's one of the early ones.

22        Here, we have on November 1st, "Can you please send

23   me an update so I can run it against my attorney and

24   accountant?"  So this document was heavily negotiated and

25   reviewed by Mr. Filippov, by his accountant, and by his

1   attorney.

2          If we scroll back up a bit, we see this was the email

3   where he decides he wants to be the manager.  And these are

4   now communications that are going to Kagan.  "Do you want to

5   be the manager", and if you recall it goes on to say, "I just

6   want to make sure I'm in control, so if that's what it takes",

7   and he becomes the manager.

8          Let's go to 11:23 -- 11/3 at 11:23 a.m.

9          This is the email -- here we go.

10          This is the email that Mr. Carnathan referenced where

11   Mr. Filippov said hey, I'm concerned.  There's nothing in here

12   that says Kagan is going to do the building.  Right.  There's

13   nothing in here.  I need something in there.  You're missing

14   all that and that Kagan's going to take care of all the

15   process.  You got to do an edit.  Right.  We looked at this

16   email.  Scroll up and we see the answer.  So it was 11/3.

17          We see the next email in this string, 11/5 at 2:17

18   from Filippov, "Alex, I think this does it."  Here's the new

19   paragraphs; 5.2 which is the one that says, "Kagan shall

20   construct", and 6.1(b)(6) which is the section that says,

21   "Tatiana will have the listing".

22          It doesn't -- this email string, Exhibit 14 presented

23   by the plaintiff would have you believe that the answer to

24   those questions was this 11/5/2012 email.  It's the next one

25   in the string.  But let's go to Exhibit 187 which was not

1    plaintiff's exhibit, it was one of the defendant's exhibits.

2         11/3/2012 -- scroll down, please, J.P.?

3         There's that email we just looked at at 11/3 at

4    11:23.  Actually, the next one in the line was 11/3 at 11:41;

5    twenty minutes later, roughly where Mr. Maiden says in

6    response to how do we make sure that we know who's doing the

7    construction and what the deals are, the bank has required the

8    LLC to sign the contract with Kagan Development.  Very

9    significant.  What does this tell you, that in response to Mr.

10   Filippov's concerns they make a change that says Kagan is in

11   charge of the construction process, Tatiana's going to do the

12   broker, and as far as worrying about who's going to actually

13   do the construction and what the deals are, we're going to

14   sign a contract with Kagan Development.  This is before the

15   operating agreement is signed.

16        So when Mr. Filippov comes in a says I had no idea we

17   had a contract with Kagan Development.  I didn't know who they

18   were.  I had no idea that they were doing it.  Well, here is

19   an email from counsel to him before he even signed and putting

20   him on notice that there's going to be a contract with KDC.

21   He knew it, and why was that email omitted from the string?  I

22   suggest because it doesn't fit the narrative.

23        We go further, Exhibit Number 12.

24        THE COURT:  Was there a response to that email?  Is

25   there some -- is there --



1        MR. PERTEN:  No.

2        THE COURT:  -- something else in the string or that

3    ended with --

4        MR. PERTEN:  No, that's --

5        THE COURT:  -- give me a call?

6        MR. PERTEN:  Yeah.

7        THE COURT:  It ends with, "Give me a call"?

8        MR. PERTEN:  And apparently they had a call.

9        If we then go to Exhibit 12, Mr. Kagan, if you recall

10   testified that I didn't read the operating agreement.  I

11   thought I was supposed to pay the carrying costs and I did.

12       Exhibit 12 is part of this email string between

13   Filippov and Maiden, and if you look at the top where there's

14   questions, number 1, the last -- second to the last sentence,

15   "Mr. Kagan is taking care of the carrying cost till the

16   properties are sold."  That was the understanding going in.

17   Nobody told Mr. Kagan otherwise, and he paid them.  Now they

18   suggest oh, wait, the operating agreement says something

19   different and the operating agreement does say something

20   different, and Mr. Kagan says you know what, I didn't read it,

21   but I'm bound by it as are you.  We're not arguing that.  You

22   should reform it.  They're not arguing that you should reform

23   it, but certainly the understanding was, as confirmed by Mr.

24   Filippov was that Kagan was going to be paying carrying costs.

25       So far from jamming something down his throat,



there's back-and-forth heavily negotiated with his own

counsel, and let's look very quickly at the operating

agreement itself.

A couple of important clauses.  4.1, as you know, is

the section that says -- here you go -- that there's going to

be a construction loan, and a purchase money loan to cover

carrying costs, but no event for more than twenty-three

months.  So that's the twenty-three-month obligation on the

LLC.

We also know that in fact the purchase money loan

they did borrow a little extra, and we know from looking at

the opening of the account there was roughly $58,000 after the

closing on the land purchase which was available to pay

carrying costs or whatever, and you can see that in Exhibit

291 which is the accounting.  But everybody agrees -- again,

Kagan didn't know it was there but that's -- the deal is and

he lives by the deal.  Everybody agrees that was the deal.

We'll go to next to look quickly at 5.2.  5.2 was

that section that was added to make sure that everybody

understood that Kagan's obligation was being responsible for

the construction process.

Some interesting things going on there.  It says

he'll build in accordance with the plans including drawings

supplied by Mr. Kagan and I ask Mr. Maiden whether or not

anywhere in the operating agreement there's any agreement that

1   construction costs are capped at any figure.  He said at page

2   58 on June 25th, my question was,

3        "Q.  Okay, now you would agree with me, and I think you

4   agreed with me last time, that in the operating agreement

5   there is nowhere that in that document that you drafted that

6   caps construction costs at any number; isn't that correct?

7   "A.  Correct."

8             -- was his answer.  So we have the scribe saying it's

9   not there.

10            What the plaintiff's now do is they say well, in

11   accordance with the plans including the drawings, that "plans"

12   meant that financial plan.  Well, that's not what the scribe

13   wanted.  And in fact, I asked Mr. Maiden specifically about

14   that.  I said to Mr. Maiden, Section 5.2, Mr. Maiden states,

15   "It shall be Mr. Kagan's duty and obligation to construct two

16   homes".  I quoted him, Section 5.2.

17        "Q.  Did I read that correctly?

18   "A.  Correct.

19        "Q.  And who is managing member in that sentence?

20   "A.  Mr. Filippov.

21        "Q.  And do you have an understanding of what was meant

22   by the term "plans" in that sentence?"

23             That's the point.

24   "A.  Yeah.  The actual floor plans and the site plan."

25             That's the plain reading of this.  That's a tortured

1    reading.  To now suggest that that word "plans" was supposed

2    to be so broad as to include that spreadsheet which was

3    Exhibit 9.

4         We also know in Exhibit 14 that we looked at a moment

5    ago, Mr. Filippov asked if those very plans could be attached

6    as an addendum.  He said, "I think we should attach it as an

7    addendum".  Mr. Maiden said that Mr. Kagan would have said no,

8    that there was no assurances as to price.  The fact that it

9    was never attached as an addendum in the case very clearly

10   that that was not the deal.

11        And in fact, if you look at Exhibit 14 where they

12   speak about that addendum, he also talks about -- we're too

13   far.  This is in the 11/3 email.  There we go.

14        "Also, the calculation in stages prepared by Dima

15   should be part of this agreement as an addendum.  The

16   documents might need to be tweaked to reflect the numbers."

17   Certainly, the use of the word "tweaked" suggests that

18   everybody knows those weren't final numbers because why would

19   they need to be tweaked if this was fixed?  But more

20   importantly, this is an acknowledgment by Mr. Filippov that he

21   understood that the earlier drafts did not, in fact, fix the

22   price of anything asked for it.  The answer was no.  It never

23   became an exhibit.

24        We asked the scribe, the person who has no axe to

25   grind, he agrees there's nothing in the operating agreement.



1  He specifically says the clause, "I drafted Section 5.2

2  doesn't mean that".

3         The plaintiff now has a creative -- a very creative

4  read that I would suggest that any attorney that approves this

5  which is the plans as all encompassing, there's a malpractice

6  claim that I take on a contingency, but clearly that's a

7  stretch.

8         Now, the last section of the operating agreement,

9  please, Section 8.1 is a very important section.  Mr. Kagan

10  agreed that his compensation would be pursuant to Section 8.1

11  and look what it says, "The net profits, net cash flow, and

12  net proceeds of any sale or refinancing of any property of the

13  company or upon liquidation shall be allocated among the

14  members as follows:  Filippov, forty; Lipetsker, ten; Kagan,

15  fifty".  Okay.  It doesn't say just the net profits.  They

16  keep saying the deal was the net profits.  The agreement says,

17  "net profits, net cash flow, net proceeds", we get fifty

18  percent.  And you'll recall the testimony that in that pot of

19  money we have the net proceeds from the sale of the property,

20  which was about 3.2, 3.3, and there was another $107,000 on

21  hand which Mr. Filippov says he deposited into the account.

22  So there was two sources, if you will, of money.

23         When I said at the opening, "we get fifty percent"

24  that's it.  That was the deal.  And Mr. Filippov testified

25  that he knew going on that this clause provided that Mr.



1    Kagan's had the potential to make in his words a fortune.

2    That was his word.  And he said, but you know what; I'm okay

3    with that.

4         He went in knowing that the profits were not

5    mirroring the equity interest, right -- Kagan only had a ten-

6    percent equity interest -- but that he is getting fifty

7    percent of the net proceeds of any sale, but that's not very

8    convenient because that's a bad deal with hindsight, but that

9    is the deal that he struck.

10        And in fact, if we scroll a page to 9.2 which is how

11   to deposit the assets, or how to distribute the assets upon

12   liquidation, we pay creditors.  And then it goes, "The

13   remaining assets shall next be applied to repayment of any

14   loans made by the members to the company."  Oh, shock and

15   amazement.  Mr. Filippov says he gave a loan on the day that

16   we filed bankruptcy in an attempt to take advantage of this

17   and jump ahead of creditors.

18        If you recall, there was a construction loan.  This

19   is his proof-of-claim number 9.  He claims there was a loan,

20   and he gave himself a mortgage on the day of the filing of the

21   bankruptcy petition.  That's why.  Trying to get ahead.

22        And then it says, "All assets then remaining", so

23   whatever's in the bank account, "shall be distributed to the

24   members in accordance with the respect of capital accounts

25   after -- after, not before -- after given affect to all

1   contributions, distributions, and allocations for all periods,

2   and the allocations is 8.1.  That says, "allocations".

3        So what -- read those two together.  We are allocated

4   fifty percent of the net proceeds, and that same concept is

5   carried forward in Section 9.1 that we'll distribute in

6   accordance with the capital contributions after give and

7   effect to the allocations.

8        Now, the suggestions well, that means he's going to

9   make a fortune.  That's crazy.  Who would do that?  Well,

10  again, Mr. Filippov went in knowing that he stood to make a

11  fortune.  There's nothing ambiguous about this.  It says what

12  it says.  Nobody's claimed any ambiguity here, but it doesn't

13  fit the narrative.  So their narrative, you haven't heard

14  anything about net proceeds.  You just hear about net profits

15  because it doesn't fit the narrative. So that's the operating

16  agreement.

17       Now, the -- if you could also switch back to 5.1?

18  I'm sorry, 5.2.

19       5.2, the last sentence there, it specifically

20  understood by all members that Mr. Kagan's compensation for

21  this duty is outlined in Section 8.1 below.  Note that it

22  says, "Mr. Kagan's compensation".  We looked at a moment ago

23  Exhibit 187 which was the email from Mr. Maiden saying hey, we

24  got to sign a contract with Kagan Development, and both Mr.

25  Lipetsker and Mr. Filippov understood that there was going to

1    be a construction company doing the work.  They didn't expect

2    Mr. Kagan to be up there with a hammer and nails building this

3    by himself.

4         Note that it doesn't say that Mr. Kagan or any

5    companies with which he's affiliated.  It's very specific.

6    Mr. Kagan's compensation, not -- they knew he was going to be

7    using companies.  They were told upfront.  There's no

8    suggestion this was a scrivener's error.  There's no

9    ambiguity, but it doesn't fit the narrative, so we need to

10   argue around that.

11        Okay, well, the companies that he used he owned.

12   Therefore, any money that they made should be attributable to

13   him.  That's the argument.

14        Well, again, not only does it not go with what 5.2

15   says, the other problem with that argument is that they've

16   scrupulously avoided claiming that ProEx and KDC are some sort

17   of an alter ego, or some sort of piercing the corporate veil,

18   because if that was the case, they're aiding and abetting

19   conspiracy frauds, the independent tort liabilities fail,

20   right.  They've maintained the independence.  Yet for this

21   clause, they're saying disregard the corporate formalities.

22        Well, you knew again you have this reviewed by your

23   attorney, you had this reviewed by your accountant.  That's

24   what you agreed to.  With hindsight, not a great deal for Mr.

25   Filippov.  That's why he's desperate to get out from under it.

1            The other, just an aside here too is this whole case

2    is about what the parties' duties and obligations, if you

3    will, under the operating agreement are.  In the closing

4    filings that this Court received for the first time, because

5    it's never been in any -- it's not in the complaint, it's not

6    in interrogatory answers, there's a claim for rescission.  I

7    don't know where that comes from.  But to the extent that they

8    have argued and invoked the remedies of this contract, and

9    argued that this is the deal, or they breached this; you can't

10   have it both ways.  And if it's rescission -- if it's

11   rescission the only thing that would be based on is a finding

12   that, in fact, that 1.3 was an absolute hard cost number, and

13   we know that's not true because again it's named "estimated

14   costs".

15            We also know when Mr. Zhukovskiy and Mr. Filippov

16   were negotiating in May prior to the construction loan,

17   Exhibits 31 and 32, that they both talked about the fact that

18   these were estimates.

19            And in fact, Mr. Zhukovskiy in Exhibit 31 and 32

20   which they overlap, it's an email string; specifically says on

21   a very personal note I want to underscore, "these numbers were

22   all estimates".  Everybody knew these were not hard costs.

23   There is no basis for rescission, and frankly having elected,

24   we've had filed proof of claim saying that because we paid the

25   carrying costs under the operating agreement, your equity

1    interest goes down invoking the remedy, if you will.  You

2    don't get to now say but never mind.  And all this fraud we've

3    been arguing about, never mind.  That's not what this case is

4    about.  They've made their election of remedies.  It's not in

5    the complaint.  You won't see that word in the complaint

6    anywhere.

7         What about Tatiana?  What evidence was there in this

8    case about Tatiana doing anything?  I'd suggest to the Court

9    there's virtually none.

10        The adversary complaint alleged that she failed to

11   turn over an oral offer, and -- she failed to turn over an

12   offer.  There was no evidence of that. None.  Not a scintilla

13   of evidence of that fact.

14        The allegation was she failed to market these

15   properties properly.  Where was the evidence of that?  Mr.

16   Fennell, their real estate expert, didn't testify about that.

17   There's no testimony about that.

18        And then the last part is you signed a listing

19   agreement that you didn't have any right to do and you knew.

20   There's no evidence that Tatiana ever saw the operating

21   agreement, but what there is evidence of, because Mr. Filippov

22   told you, that they knew that these listing agreements were

23   being signed.

24        In fact, both Filippov and Lipetsker testified that

25   when the properties got listed, they looked at Zillow and they

1    saw that it was listed.  In fact, Mr. Filippov found an error

2    in the listing and corrected it.  And he knew that it was

3    listed for $5.5 million.  He knew that.  Yet he comes to this

4    court and files complaints says oh, the deal was we're -- they

5    breached because it was supposed to be listed at 4.9 and you

6    never authorized 5.5.  Well, he knew it was listed at 5.5, and

7    they both testified there was never an agreement to sell at

8    4.9.  That was never the deal.

9              THE COURT:  So I just want to give the point its due.

10   I listened carefully to the closing on the issue of Tatiana,

11   and what Mr. Carnathan directed me to were some emails --

12             MR. PERTEN:  Yes.

13             THE COURT:  -- and, in particular -- and he argued

14   from those emails that she was aware that they were using --

15   "they" being the Kagan group, Kagan entities -- were using the

16   listing agreement as another point of pressure in order to try

17   to -- he used the word "extortion", you probably remember that

18   because that's --

19             MR. PERTEN:  Yes.

20             THE COURT:  -- it was --

21             MR. PERTEN:  And --

22             THE COURT:  -- that's what they're saying.  When you

23   say there's no evidence --

24             MR. PERTEN:  That's what they're saying.

25             THE COURT:  -- that Tatiana, that's what he's relying



1    on.

2         MR. PERTEN:  Except that what that evidence shows is

3    far from Tatiana -- if the evidence was I didn't know there

4    was a listing agreement, you signed something.  Nobody told us

5    about it, and now suddenly we find out about it; different

6    case.  The evidence is not only did we tell you about it, we

7    sent you a copy.  We said we wanted to sign it.  We then

8    signed it and we sent you a copy.  We said here's the copy of

9    the listing agreement that we just signed, please confirm.

10   And Mr. Filippov sent back an email saying I confirmed.

11        Tatiana sends a text, and you have all those in

12   evidence where she says I want to confirm that is okay, and

13   Mr. Filippov texted back, "I just confirmed to Dan that it's

14   okay."

15        They testified they looked on Zillow.  That was their

16   testimony.  They knew these properties were listed, and now

17   they say but, yeah, but we didn't know about the listing

18   agreement.  I'd suggest that defies credibility.  They both,

19   Mr. Filippov is a smart man.  Mr. Lipetsker's done five other

20   projects -- real estate projects.  To think that Century 21 is

21   going to list without an agreement, but it's not convenient,

22   so we're going to say we didn't know about it notwithstanding

23   that we said it's okay.

24        So I would say that that really should be a dead

25   issue.  And again, as it relates to Tatiana where there's no



1    evidence that she had anything to do with the construction,

2    anything to do with this supposedly false billing.  I mean,

3    she shouldn't be in this lawsuit.  There is nothing there.

4    And the allegations in the complaint, no evidence about an

5    offer, no evidence about bad marketing.  It simply shouldn't

6    be there.

7         Similarly, the suggestion is in the operating

8    agreement, it says that substantial completion should be by

9    March of 2014, and plaintiffs say we haven't met our burden of

10   proving that, in fact, that occurred.  Again, the problem is

11   first of all, it's not our burden, it's their burden since

12   they're alleging breach if they didn't put in evidence of

13   that.  And he said he -- Carnathan said there's no evidence.

14   We don't know.  The only thing we know is that the first

15   listing was in August, and there's an email taking about the

16   status of construction in July.  Okay, but when did

17   substantial completion occur?  We don't know.  But more

18   importantly, what damages flowed -- let's assume it was

19   late -- what damages flowed from that?  Nobody's told us about

20   any damages.  In fact, the testimony was, the understanding

21   was that they weren't going to put both houses on the market

22   at the same time.  They were going to list one, then the

23   other.

24        So even if one was done and the other wasn't, who

25   cares?  Who cares?  It wasn't going to be listed anyways.  But



1   again, Mr. Fennell, presumably, would have been the one to say

2   because it wasn't on the market, we weren't able to sell it,

3   or something -- some expert would have said that there is no

4   testimony that had these properties been on the market on

5   March 30th, 2014 that there would have been a buyer ready,

6   willing -- more likely than not -- a buyer reading, willing,

7   and able to purchase at that price at that time.

8         Again, this is another factoid without the evidence,

9   without connecting the dots.  Where is the connection?  It's

10  simply not there.

11        Your Honor, we've also --

12        THE COURT:  Why don't we -- I offered you a five-

13  minute break.  Do you want a five-minute break --

14        MR. PERTEN:  Sure, and then we have another hour.

15        THE COURT:  -- and pick up -- I really do want to be

16  finished here today by about 2:15.

17        MR. PERTEN:  All right.

18        THE COURT:  So I'm going to take a -- but I think

19  it's fair, all right.

20        MR. PERTEN:  Sure.

21        THE COURT:  So I'll give you five minutes and we'll

22  come back out.

23        MR. PERTEN:  Thank you.

24        THE COURT:  Okay?

25        THE CLERK:  All rise.  Court is in recess.



1            (Off the record at 12:55 p.m.)

2                (On the record at 1:07 p.m.)

3         THE COURT:  All right.  Be seated.  Whenever you're

4    ready.

5         MR. PERTEN:  Thank you.

6         Your Honor, the next thing that happens in the life

7    of this project is it's time to get the construction loans.

8    Mr. Filippov testified that he was the one who negotiated the

9    loans, he's the one who signed the loan documents, he's the

10   one who orchestrated with the bank, not Mr. Kagan.  So if

11   there was anybody who didn't comply with the operating

12   agreement which said that the carrying costs were supposed to

13   be part of the construction loan, it's not Mr. Kagan who is

14   negotiating those loans, it's Mr. Filippov.  But again, that

15   doesn't fit with Mr. Filippov's narrative.  So he suggests

16   that somehow it's Kagan's fault that the construction loans

17   don't allow for carrying costs.

18         The evidence was that as part of the application, if

19   you will, for the construction loans, there needed to be a

20   construction contract.  And Exhibit Number 36 is this Classic

21   Homes construction contract which was signed by Mr. Filippov,

22   and which he submitted to the bank in support of the

23   construction loans.

24         Mr. Filippov testified that he reviewed this contract

25   carefully to make sure it accurately reflected the parties'

1    deal.  What I brought up on the screen there, is look what it

2    says about contract price.  "The builder agrees to construct

3    the house according to the plans" -- that would be the same

4    plans referenced in the operating agreement.  "As

5    consideration for the builder constructing the house.  The

6    owner agrees to pay the builder's contractors and trades full

7    cost and expenses on a weekly basis."  This is a so-called

8    "cost contract".  This is not a fixed price contract.  If, in

9    fact, Mr. Filippov thought he had a fixed price contract, why

10   after reading and reviewing is he agreeing to an open-ended

11   contract?

12        You asked me what did he understand the deal was

13   going in?  He understood it was open-ended, and this -- he

14   signed this agreement, but of course this doesn't fit his

15   narrative.  So he's saying, well, yeah, I signed it, but I

16   didn't really mean it because we all knew this was a sham.

17   Everybody knew this was a sham.  The bank didn't care.

18        I didn't hear anybody from the bank testify that it

19   didn't care, and I don't know many banks that would say yes,

20   submit -- fraud, give me financial documents that you know of.

21   We're fine with that.

22        So this is his -- the one he signed open-ended.  Not

23   fixed.  And I submit to the Court that that's certainly

24   significant.  Mr. Kagan testified you know what, it was a

25   stack of documents.  Mr. --

1           THE COURT:  Let me just make sure I'm not losing

2      something here in the mix.  This is the Classic Homes

3      contract?

4           MR. PERTEN:  This is the Classic Homes contract.

5           THE COURT:  Okay.  And they both signed it, right?

6           MR. PERTEN:  They both signed it.

7           THE COURT:  All right.

8           MR. PERTEN:  They both signed it, and this is

9      consistent with what Mr. Kagan understood that the deal was

10     open-ended.  Mr. Filippov doesn't like that deal because

11     that's not -- doesn't help his story, so he's got to get out

12     from under that.  So he'll say well, you can just disregard

13     that.  Forget about us.  We're just joshing.  This isn't

14     binding.  Everybody knew it was a sham.

15          Again, if this was a sham, you have Mr. Filippov who

16     we are told is the only one credible here.  Mr. Filippov

17     admitting the bank fraud.  He went in with his eyes open.

18          THE COURT:  Who presented this --

19          MR. PERTEN:  He did.

20          THE COURT:  -- to him?

21          MR. PERTEN:  He did.

22          THE COURT:  Who presented this to him?

23          MR. PERTEN:  Maiden.

24          THE COURT:  Maiden.

25          MR. PERTEN:  Mr. Maiden testified that this was a



1       form contract that was on his computer and he filled it out.

2              Mr. Kagan testified there was a stack of documents,

3       Maiden said sign here --

4              THE COURT:  No, I remember that.

5              MR. PERTEN:  -- sign here, sign here.

6              THE COURT:  But this was -- Maiden had this

7       because --

8              MR. PERTEN:  Yes.

9              THE COURT:  -- because he had rep --

10             MR. PERTEN:  For prior projects.

11             THE COURT:  Of Mr. Kagans?

12             MR. PERTEN:  Yes.

13             THE COURT:  Right.

14             MR. PERTEN:  Yes.

15             THE COURT:  And when Kagan signed this, he saw that

16      it said, "Classic Homes".

17             MR. PERTEN:  Kagan didn't read it.  Kagan didn't read

18      it.

19             THE COURT:  He didn't read the name --

20             MR. PERTEN:  Kagan didn't read it.

21             THE COURT:  -- of his own company?

22             MR. PERTEN:  He didn't read it.  The testimony was he

23      said, sign here, sign here.  The little stickies that say,

24      "sign here" flip --

25             THE COURT:  So he obviously knew it wasn't a real



1    contract too, right?

2           MR. PERTEN:  If --

3           THE COURT:  How could --

4           MR. PERTEN:  -- if --

5           THE COURT:  Isn't that inescapable?

6           MR. PERTEN:  If he read it, but he didn't read it.

7           THE COURT:  And --

8           MR. PERTEN:  And how do we know that?  How do we know

9    that besides the fact that he says he didn't read it?  We know

10   that a week later he signs the KDC contract.  Okay.  The KDC

11   contract, which they are now claiming is a fraud, that was in

12   2015, how do we know that's not a fraud?  Let's tackle that.

13          THE COURT:  Let's tackle that, I agree, and let's

14   tackle -- I think we -- I asked this earlier but when do you

15   say Filippov knew of the KDC contract?

16          MR. PERTEN:  Yes.

17          THE COURT:  You did show me an email a little while

18   ago --

19          MR. PERTEN:  Yes.

20          THE COURT:  -- that suggested something along those

21   lines --

22          MR. PERTEN:  Yes.

23          THE COURT:  -- but go --

24          MR. PERTEN:  Yes.

25          THE COURT:  -- that I think is the critical part of



1    this.

2            MR. PERTEN:  The KDC contract is the next Exhibit 37.

3    The very last page of Exhibit 37 is the metadata.

4            UNIDENTIFIED SPEAKER:  65.

5            MR. PERTEN:  I'm sorry; 65 is the metadata that's

6    attached to the KDC contracts, right.

7            So if you scroll up, J.P., to the first page so we

8    get oriented.

9            So this is the KDC contract.

10           THE COURT:  Right.

11           MR. PERTEN:  The last page is the metadata that the

12   plaintiffs introduced.  And you will see -- look on "related

13   dates" -- "last modified, created June 24th, 2013".  So when

14   they suggest that this was created in 2015, the metadata

15   confirms that, in fact, this was created in June of 2013 which

16   is when it was signed, okay.  So that's point number one.

17           Point number two, there was the email that we looked

18   at, Exhibit 215, which is here is the copy of the GC contract.

19   Mr. Kagan testified I gave him a copy, and then we emailed it

20   after the fact.  Their position is well, that email address,

21   kagandevelopment.com they weren't using it at that point.

22   That's what they say.  And Mr. Filippov says, and I know he

23   wasn't using it.  I don't know how he would know that.  But

24   what we also know, Exhibit 324, was the Whois report which

25   says when that domain name, kagandevelopment.com was obtained,

1    and you'll see it was obtained in March of 2013.

2           So in fact, we know that domain name,

3    kagandevelopment.com was owned at that point.  We have an

4    email from that address.  We have metadata showing that the

5    dates all jive.

6           And then the fact that they say it was printed out

7    last June of 2015 absolutely it was printed out -- Mr. Cohen

8    printed it out a week before he did the mechanic's lien to

9    read it.  What does that prove?  Of course he looked at

10   because the lien is based on the contract.

11          So yeah, he printed it out, but the date of the last

12   printing doesn't tell you when the document was created.  And

13   if, in fact, this Exhibit 215 was some sort of a fraud,

14   where's that testimony?  Where's that -- where is that expert

15   who says I looked at that?  Where is somebody that says this

16   is clearly photoshopped, or -- I mean, I don't even know how

17   one would do that.  Or to the extent that this -- if you go

18   back -- look at Exhibit 215, this was also cc'd to the bank.

19   Why didn't the plaintiffs bring in a bank representative and

20   say we've searched our records, it's not there?

21          So again, it's not convenient.  It punches a hole in

22   their case, so of course they have to get out from under it.

23   So how do you do it?  You just deny it.  It wasn't there.  But

24   in fact --

25          THE COURT:  What about -- I may ask to take an



```
1    adverse inference from, I guess, your failure to call Ryan

2    somebody --

3            MR. PERTEN:  Why would I -- why would I need to call

4    him?  I have Mr. Kagan saying:  I did it.  I have the document

5    that's admitted to evidence.  I've got the metadata.  As far

6    as I'm concerned, I've met my burden.  Why would I need to

7    call Ryan O'Grady --

8            THE COURT:  Well, we're talking about -- there's

9    no -- I mean, it's a burden of -- it's a burden of persuasion

10   we're talking about now.  That's what we're talking about.

11           MR. PERTEN:  Yeah, I don't believe --

12           THE COURT:  But --

13           MR. PERTEN:  -- I don't believe that -- I think that

14   would just have been cumulative.  I think I've got Kagan's

15   testimony; I've got the document; I've got Cohen saying it was

16   in 2013; I've got the metadata saying --

17           THE COURT:  Let's talk law -- let's talk evidence,

18   though.

19           MR. PERTEN:  Sure.

20           THE COURT:  And because I know I've been asked both

21   now and I think earlier to take an adverse inference on a

22   failure to call a witness.

23           MR. PERTEN:  Um-hum.

24           THE COURT:  Are all the pieces here for that?

25           MR. PERTEN:  I believe, for adverse inference, no.
```



(973) 406-2250 | operations@escribers.net | www.escribers.net

 1    This was not an -- Ryan O'Grady is an essential witness,

 2    because what --

 3            THE COURT:  Is that what the standard is, an

 4    essential --

 5            MR. PERTEN:  Oh, yes.  I mean --

 6            THE COURT:  -- that he has to be an essential

 7    witness?

 8            MR. PERTEN:  -- that somehow this was somebody who by

 9    all logic he would have been there.  And the fact that he

10    wasn't there is somehow -- can be held against us --

11            THE COURT:  Well, this was a contested fact, a pretty

12    hotly contested fact.

13            MR. PERTEN:  Which I -- again, my position is --

14            THE COURT:  And --

15            MR. PERTEN:  -- I met that contested fact.  There was

16    no reason to bring in this additional witness who would simply

17    say, yes, that was an email I sent --

18            THE COURT:  Well, I have no idea what he'd say.

19    That's the whole point.

20            MR. PERTEN:  Well, presumably --

21            THE COURT:  I don't want to presume anything that

22    he'd say.  I --

23            MR. PERTEN:  And maybe the bank would have said we

24    never got that, if that's in fact their position.  What I'm

25    saying is that this document is in.  I have live testimony

1    from Vadim saying I handed it to them and I emailed it to

2    them.  Under those circumstances, I don't think that I have to

3    call every witness who might have --

4            THE COURT:  I agree with that.

5            MR. PERTEN:  -- looked at this or touched --

6            THE COURT:  Not every witness.  But you've got a

7    contested situation here, and you've got --

8            MR. PERTEN:  Every --

9            THE COURT:  -- both sides have been -- the principals

10   of each side have been cross-examined, and their credibility

11   has been attacked, you know?

12           MR. PERTEN:  Yeah.

13           THE COURT:  And then the question is, in a civil

14   case, do I take an adverse inference when you would be more in

15   control of that person than the other side.

16           I don't know if he still works out there or not.

17           MR. PERTEN:  He doesn't.

18           THE COURT:  He doesn't?

19           MR. PERTEN:  This also pre-supposes --

20           THE COURT:  I don't know if that's a fact --

21           MR. PERTEN:  -- he's even available.

22           THE COURT:  -- I don't know if that's -- sorry?

23           MR. PERTEN:  That pre-supposes he's even available.

24           THE COURT:  I have no --

25           MR. PERTEN:  And we don't know that.



1          THE COURT:  -- of course I don't know.

2          MR. PERTEN:  Of course not.

3          THE COURT:  But you might have put on evidence that

4    you could ask Kagan -- Mr. Kagan, I'm sorry -- could have

5    asked Mr. Kagan:  where's Ryan?  I don't know; he's

6    disappeared.

7          MR. PERTEN:  I don't --

8          THE COURT:  Then I'd know.

9          MR. PERTEN:  I don't believe the facts are here that

10   would permit the Court to draw an adverse inference.

11         THE COURT:  Okay.  All right.  That's why I'm probing

12   at the --

13         MR. PERTEN:  Simply, I don't even -- with fairness, I

14   don't even think it's close.  If I hadn't gotten this in, if

15   this document was ruled inadmissible, maybe that's a different

16   story.  But this document was admitted into evidence for its

17   full probative value.

18         To have Mr. O'Grady come in here and affirm that this

19   is an email he sent would have just been cumulative.  I don't

20   believe that I have an obligation, nor should any adverse --

21         THE COURT:  The attachment --

22         MR. PERTEN:  -- inference --

23         THE COURT:  -- wasn't there, right?

24         MR. PERTEN:  But it says, "I've included the GC

25   agreement."



```
 1              THE COURT:  I can read it.  I know what it says.

 2              MR. PERTEN:  Yeah.

 3              THE COURT:  But the attachment wasn't there.  And

 4    that --

 5              MR. PERTEN:  Yeah.

 6              THE COURT:  -- the kinds of thing --

 7              MR. PERTEN:  Because I don't have the electronic

 8    version.

 9              THE COURT:  All right.  Okay.

10              MR. PERTEN:  So the other interesting thing about the

11    KDC contract, Your Honor, just like -- and if we could bring

12    that KDC contract back up.

13              Just like the Classic Homes' contract, it's open-

14    ended.  This one is a cost-plus contract.  So his version of

15    the contract and our version of the contract are both open-

16    ended, so both parties are agreeing there was no fixed --

17    there is a fact question, and I will concede the fact

18    question.  There is a fact question as to the soft costs,

19    which is primarily what their argument is, is that we've

20    tacked on all these soft costs.  The soft costs are allowed

21    under the contract, but if there's an area of dispute, there

22    it is.  But certainly as to the hard costs, which we submitted

23    every invoice for, as to the hard costs, there really should

24    be no question that under either version of the contract,

25    we're entitled to that.
```



1          We can argue about softs costs, and I know we will,

2     but as to the hard costs, no question whatsoever.

3          Now, if you believe that we never told them about

4     this contract, we never saw this about it, let's see what else

5     you would also have to ignore.  What does the evidence tell

6     us?  We looked at the email from before the operating

7     agreement saying you're going to sign a contract with KDC.

8     That was number 187.

9          THE COURT:  That's a Maiden email?

10         MR. PERTEN:  Yes.  Okay?  We also know, because we've

11    heard the testimony and we've seen the exhibits, that every

12    check to KDC they were getting copies of in real time.

13         We also know, because the testimony was there, that

14    there was a sign on the fence that -- developed by Kagan

15    Construction, on the construction fence.  We also know that

16    all the emails are coming from kagandevelopment@gmail.com,

17    Kagan Development.  And we know this as well about ProEx,

18    right, that they're getting in real time -- we saw those

19    exhibits -- in real time they're getting copies of checks,

20    they're getting emails saying we're paying KDC this, we're

21    paying KDC that.

22         What the law says, you don't get to bury your hand in

23    the sand.  You don't get to say you have all the indicia that

24    there is a contract with a company, and they knew it was

25    Kagan's company, and then say, well, you never showed it to

1    me, I'm going to ignore this plethora of evidence, an ostrich,

2    put my head in the sand, so that I can then stand up with a

3    straight face and say I never saw the contract.

4          I would submit, where the evidence is you're told

5    beforehand there's going to be a contract, you're sent a copy

6    of the contract, and even if you didn't read it, you've got it

7    and you -- or don't remember or you threw it out, you have all

8    the indicia that this was right out in the open.  And the law

9    is pretty clear that you can't just ignore that.  You can't

10   just intentionally -- a fiduciary cannot just intentionally

11   keep himself ignorant to allow it to fit the narrative that

12   he'd like now this Court to believe, that I knew nothing about

13   KDC.  It was a shock to me that KDC had anything to do with

14   this.

15         We also know, Your Honor, that Mr. Lipetsker filed an

16   affidavit in the state court where he said the deal we struck

17   was that Kagan Development was going to build the project.

18   That's in the -- you'll see it in our statement of facts, but

19   that was his sworn affidavit.

20         Well, how did he know that?  How could he file an

21   affidavit under pains and penalties of perjury saying the deal

22   was we were going to hire KDC, and then come to this court and

23   say I don't know anything about a KDC project.  What are you

24   talking about?

25         Certainly there should be no question that we're



1    entitled to recover costs.  We can fight about soft costs, but

2    as to hard costs, there really should be no question that

3    under either version of the contract we're entitled to it.

4    That was the deal -- at least part of the deal.

5         The other thing we know is that in the adversary

6    complaint, they have pled we had a contract with KDC and they

7    didn't perform it properly; they failed to build in a good and

8    workmanlike manner.  And Mr. Filippov testified that he

9    reviewed the adversary complaint, which also mirrored what

10   they filed in state court, and that the allegations -- the

11   factual allegations were all true.  That's not a legal-counsel

12   thing.

13        We contracted with KDC -- it's paragraph 78 of the

14   adversary complaint.  And there's a count for breach of

15   contract.  Well, how do you argue we had a contract and you

16   breached it -- we had a contract that you would build -- and

17   then stand in front of the Court and say we knew nothing about

18   a contract; there is no contract?  If there is no contract,

19   then how do you sue on it?

20        And this is not an election-of-remedies thing or

21   arguing in the alternative.  Even if you say, okay, the theory

22   is arguing in the alternative, that's a factual allegation.

23   We had a contract, and it required that you build in a good

24   and workmanlike manner.  Well, how did you know that?  You

25   didn't know about the contract.  How did you know that?

1        And why is it that we were then forced to do

2    discovery on that issue and there was no evidence of any

3    substandard construction, and in fact, just before trial, they

4    waived that count?  Why?  Another inconvenient truth.  How are

5    we going to -- how are we going to prove that case and still

6    maintain that we knew nothing about the KDC contract?  It's

7    not hanging together.  We know that the allegations in the

8    complaint are just not true.

9        So we have these two construction contracts.  We then

10   get, Your Honor, to the actual loan agreement, which is

11   Exhibit 342.  And that's very significant, because that bears

12   Mr. Filippov's signature, because he's the one who negotiated

13   that.

14       Exhibit 342 specifically says at section 2.3 that the

15   loan proceeds shall be used for the construction of the

16   project.  You can't use it for carrying costs.  It's limited

17   to the project.

18       Section 3.2 says, "All advances under this agreement

19   shall be made solely for payment of a portion of the expenses

20   properly incurred in the project, all in accordance with the

21   budget."  If you recall, the budget, which was Exhibit 27,

22   doesn't have carrying costs.  So Mr. Filippov also testified,

23   yeah, I understood that under this agreement I couldn't use

24   this for carrying costs.

25       He signed it.  He's the managing member.  But it gets



1    worse than that, I would suggest, for Mr. Filippov.  Section

2    3.4.11 says, "Subject to the terms and conditions" -- it's on

3    page 6 -- "the bank shall advance up to ninety percent."  So

4    this was a construction loan for ninety percent.  We have

5    it -- so the 1.6 -- this is Filippov signing and covenanting

6    that he understood that the 1.6 budget, the loan amount, is

7    ninety percent of the proposed construction costs.  Which

8    means, at this point, by his own hand, by his own signature,

9    he's attesting to his understanding that the actual

10   construction costs are going to be at least 1.716, right?  Ten

11   percent more.  1.6 plus 160.

12           He signed this.  He didn't say wait a minute, wait a

13   minute, wait a minute, that's not accurate.  He signed it.

14   And it gets even worse than that, Your Honor.

15           If you go to Exhibit -- I'm sorry, paragraph 5.17 on

16   page 11, the argument is --

17           THE COURT:  Well, 1-5 --

18           MR. PERTEN:  5.17, which is on page 11 of Exhibit

19   342.  It says, "Transactions with affiliates.  Borrower" --

20   Lyman-Cutler -- "will not transact business with any officer,

21   director, or affiliated person or entity other than on fair

22   and reasonable terms and conditions substantially as favorable

23   to the borrower as would be obtainable by the borrower in a

24   comparable arm's-length transaction with an unaffiliated third

25   party."

1    So the allegation is KDC is clearly affiliated with

2    Kagan.  It's his company.  We have Mr. Filippov signing off

3    that the contract with the affiliated party is fair and

4    reasonable.  He said that.  Now, he says well, I didn't read

5    that; I don't know that.  Well, you signed it.  Yet, now you

6    come before this Court -- because, again, this is another

7    inconvenient fact -- I've got to get out from under this loan

8    agreement, this loan agreement where I agreed that actually it

9    was 1.716 was the preliminary estimate and that I agreed that

10   it's fair and reasonable.  And obviously the inference is how

11   would you know it's fair and reasonable unless you saw the

12   contract, right?  You're just saying it?  Which I would

13   suggest would be a problem in and of itself.

14   It's another inconvenient truth.  So what does he

15   say?  Well, Judge, we can ignore this as well, because it

16   didn't matter.  It's a sham.  I didn't read it.  I just signed

17   it, and everybody knows that these agreements don't mean

18   anything.

19   Well, we call that bank fraud.  And again, what he's

20   asking this Court to do is ignore his signature and let him

21   out from under.

22   THE COURT:  Yeah, but the -- what Mr. Kagan wants to

23   say is I don't read these things.

24   MR. PERTEN:  But he's bound by that.

25   THE COURT:  Well, I understand that.  But it's a --



1   it seems -- it's almost like Mr. Kagan should be estopped from

2   making the argument that Mr. Filippov -- these are tantamount

3   to admissions on his part, but Mr. Kagan can say -- his

4   principal argument in this case as to many of these agreements

5   is, well, I don't read them.

6        MR. PERTEN:  No.  Mr. Kagan is not trying to get out

7   from under any of the agreements.  Mr. Kagan, there's no

8   evidence that he saw this, because he didn't negotiate this.

9   So it's not Mr. Kagan saying I didn't read this.  This does

10  not bear Mr. Kagan's signature.

11       THE COURT:  I'm not talking about this, necessarily.

12  I'm talk --

13       MR. PERTEN:  Yeah.

14       THE COURT:  Several of the agreements that have been

15  presented --

16       MR. PERTEN:  Or it's a pox on both houses.

17       THE COURT:  Well, that's it.

18       MR. PERTEN:  And nobody --

19       THE COURT:  That's it.

20       MR. PERTEN:  -- and nobody gets to get out from under

21  their agreement.  And what are left with?  An open-ended

22  contract --

23       THE COURT:  Or everybody does.  I don't know.

24       MR. PERTEN:  -- an open-ended contract, and we're

25  left with an agreement that everybody's bound.  We're bound by

Page 141

1    the operating agreement; we're bound by the construction

2    contract, which is open-ended; we're bound by this.  That

3    makes my case.  It's open-ended.  We've agreed that the --

4    that the price is 1.716, at that point, per house.  We agree

5    that the contract is fair and reasonable.

6          THE COURT:  I know.  You started today with that.  I

7    didn't miss it.

8          MR. PERTEN:  I should probably mention a little bit

9    about Mr. Cohen, who has --

10          THE COURT:  Yeah, I think you should --

11          MR. PERTEN:  -- who has been described as the

12    henchman, as a crook, as a dishonest -- he's a felon.  He's

13    untrustworthy.  I'm not suggesting otherwise.  But what was

14    the evidence about Mr. Cohen and his involvement in this case?

15          Mr. Cohen's first involvement, 2013, we know he did

16    the KDC contract.  He then disappears until 2015, when the

17    project is over.  There is no evidence from anybody --

18          THE COURT:  Well, that's one way to look at it.  But

19    that's not what the plaintiff says, right?

20          MR. PERTEN:  They have no --

21          THE COURT:  Their theory is that he -- I think their

22    theory is that he was around in 2015, not in 2013, and that he

23    manufactured evidence and back-dated it.

24          MR. PERTEN:  After-the-fact.  They're suggesting that

25    the invoice that he drafted is inaccurate.  What there is no

1    evidence of is that he had anything to do with the

2    construction.  He's not a contractor.  He wouldn't know --

3              THE COURT:  No, I don't believe they say he did.

4              MR. PERTEN:  He had nothing to do with the

5    contractor's bills.  Nobody said that.  There's no evidence --

6    none of the -- none of the contractors have said that.

7              THE COURT:  No, but, sir, but what they do say --

8    react to what --

9              MR. PERTEN:  I'm sorry?

10             THE COURT:  -- I'd like to hear your reaction to --

11             MR. PERTEN:  What --

12             THE COURT:  -- what they do say about him.

13             MR. PERTEN:  Yeah, what they're saying is that Mr.

14   Cohen is a bad guy.  He can't be trusted --

15             THE COURT:  Well, that's not all.

16             MR. PERTEN:  -- which is -- I'll concede that.  He

17   can't be trusted.  But that everybody throughout the

18   project -- he was calling the shots, he was doing everything,

19   that's quite a leap of faith.

20             What Mr. Kagan testified to is that he found out

21   about this felony conviction, he found out about it when Mr.

22   Cohen testified at his deposition in 2018, that he confronted

23   Mr. Cohen in 2018 and said like why am I hearing this for the

24   first time; what is this all about?  Mr. Cohen said, oh, well,

25   it had something to do with a child custody -- child support

1   thing.  I was in a mess deep.  And he said, well, you know

2   what, I should have known about that, and he stopped using

3   him.

4          It's an -- it's a fact -- obviously I wish it didn't

5   exist.  It's not a helpful fact to me.

6          THE COURT:  But you still haven't addressed what they

7   say he did.

8          MR. PERTEN:  If he did anything.  Let's assume

9   they're correct.  If he did anything, he ginned up KDC's bill.

10          THE COURT:  Correct.  That's what they say.

11          MR. PERTEN:  If he did anything.  But let's talk

12   about --

13          THE COURT:  They say, in fact -- this is my words,

14   not theirs, but it's what I hear them trying to tell me -- is

15   that he was -- I think -- with Mr. Kagan.  He was the

16   mastermind of creating extreme pressure on the plaintiffs at a

17   critical moment, and that would then cause them to pay money

18   to get out of this thing.

19          MR. PERTEN:  Well, there's a couple of things --

20          THE COURT:  That's what they say.  And there's --

21          MR. PERTEN:  Here's my response.

22          THE COURT:  -- certainly evidence that that's the

23   case.

24          MR. PERTEN:  Here's --

25          THE COURT:  There's evidence that that's the case.

1           MR. PERTEN:  And here's --

2           THE COURT:  So I'm asking you to --

3           MR. PERTEN:  Sure.

4           THE COURT:  Yeah.

5           MR. PERTEN:  Here's my response.  First of all, there

6    is no evidence that the subcontractor invoices, what the

7    subcontractors charged, the hard costs of construction, were a

8    fraud -- that they were outrageously high, that the

9    subcontractors didn't do work that they were billing for.  You

10   haven't heard that from anybody.  Mr. Doddridge didn't say

11   that.  Mr. Goldman didn't say that.

12          So the invoices -- the underlying hard-cost invoices,

13   there's really no argument -- credible argument about that.

14          At worst -- at worst, if you believe that Mr. Cohen

15   ginned up the KDC contract, then the question is which numbers

16   were the ginned up numbers, right?  Which numbers -- I would

17   submit, even if there was no written invoice, the question is

18   what did KDC do, and did it charge a reasonable amount?

19          If we did everything on a handshake and there were no

20   invoices at all, my proof might be a little more hard, but it

21   doesn't mean I don't recover.

22          So what I'm suggesting is that the KDC -- whether

23   it's accurate or inaccurate is a bit of a sideshow for two

24   reasons.  One is, it was never paid, so there's no damages

25   from that.  At worst, it was an attempted extortion, if you

1     believe the plaintiffs.  But it failed miserably, because

2     they're much too smart for us.

3              THE COURT:  But wait a minute.  The narrative that I

4     have from them -- and again, I think there are facts to

5     support it -- are that Mr. Cohen manufactured this scheme and

6     that he executed on it, and in fact threatened someone -- I

7     don't remember who it was -- was it Brusenkova?  Somebody

8     who's at the site, as I recall, and with losing their

9     investment.

10              Maybe it was even one of the plaintiffs -- anyway,

11     that he uses this as pressure on them causing them -- and then

12     records the --

13              MR. PERTEN:  Mechanic's lien.

14              THE COURT:  -- the lien -- the mechanic's lien --

15              MR. PERTEN:  Right.

16              THE COURT:  -- which results in this bankruptcy case,

17     which results in four years of what we've been dealing with

18     here.

19              MR. PERTEN:  Well, Your Honor, with respect, I --

20              THE COURT:  Those are business torts --

21              MR. PERTEN:  No, Your Honor --

22              THE COURT:  -- that they're --

23              MR. PERTEN:  -- and let me respond --

24              THE COURT:  -- that they're --

25              MR. PERTEN:  -- to that narrative that you've just --



1          THE COURT:  Yeah, good, good, because that's what --

2          MR. PERTEN:  First of --

3          THE COURT:  -- I think they're telling me.

4          MR. PERTEN:  First of all, the plaint -- excuse me --

5   the defendants, the Kagan side of it, did not force the

6   bankruptcy -- okay -- did not force the bankruptcy.  You

7   recall there was testimony, there was no vote, there was no

8   meeting, this was a unilateral decision by Mr. Filippov and

9   Mr. Lipetsker to put this entity into bankruptcy at a time

10  when it wasn't even insolvent.

11         THE COURT:  We don't care about that here.  You

12  understand that.

13         MR. PERTEN:  So they --

14         THE COURT:  Insolvency isn't important.  They

15  needed -- they filed.  If they filed --

16         MR. PERTEN:  They filed.

17         THE COURT:  -- because they had a lien on the

18  property --

19         MR. PERTEN:  No, Your Honor --

20         THE COURT:  -- and they -- and they needed to -- in

21  bankruptcy, they could have a sale and try to sell it free and

22  clear of that lien.

23         MR. PERTEN:  They testified that the reason they

24  filed the bankruptcy was because the property wasn't moving --

25         THE COURT:  Yes.



1          MR. PERTEN:  -- they wanted to get rid of Tatiana and

2     Century 21, who signed the contract --

3          THE COURT:  Yes.

4          MR. PERTEN:  -- not -- 21 --

5          THE COURT:  Yes, yes.

6          MR. PERTEN:  -- was saying no.

7          THE COURT:  That's part of it.

8          MR. PERTEN:  That they were concerned that the loan

9     was becoming due -- was shortly to become due, and if it

10    became due, the bank would foreclose.  If the bank foreclosed,

11    Mr. Filippov's personal guaranty would be called, and he

12    didn't want to do it.  And he didn't want to pay carrying

13    costs, because Mr. Kagan had told him I'm not paying anymore

14    so you have to pay.

15         THE COURT:  Okay.

16         MR. PERTEN:  So their reasons were motivated, not by

17    what's the best for the company.  There is no testimony that

18    filing for bankruptcy somehow assisted this company or got

19    them out from under.

20         Let's look at the mechanic's lien.  The mechanic's

21    lien is an available -- it's a petitioning activity -- it's an

22    available remedy, if you will, for a contractor who has not

23    been paid.  We can argue about the soft costs.  About the hard

24    costs, for which we've given every invoice, they weren't paid.

25    They filed a mechanic's lien.  They're entitled to file a

1    mechanic's lien.

2          If they believed the mechanic's lien was improper,

3    they had some choices.  They could have bonded it off.  That's

4    allowed under the statute.  They didn't do that.

5          More importantly, at that point, bear in mind the

6    mechanic's lien didn't hit until we'd already been sued,

7    right?  They filed suit -- the mechanic's lien was in June

8    22nd, they filed suit in June 5th.  But we've now been sued

9    and we've been told you're not getting paid.

10          So we filed a mechanic's lien, as we're entitled to

11   do under the statute.  Under the statute, Section 15(a) of

12   254 -- General Laws 254, also provides for an expedited

13   hearing, if you believe this is an improper lien.  On two

14   days' notice you can get a hearing.  They didn't invoke that,

15   because they were -- and the final point on that lien which

16   had nothing to do with anything, I would submit, other than

17   their own personal concern about having to put more money in,

18   and of course, I just lost my train of thought, because that's

19   what happens --

20          THE COURT:  You said -- yeah.  Um-hum.  You're

21   telling me why the mechanic's lien wasn't the motivating

22   factor.

23          MR. PERTEN:  Yeah.  It'll come to me, but that's the

24   way it goes.  I'm not going to waste time --

25          THE COURT:  Let's just hope that's not a 3 o'clock.



1          MR. PERTEN:  Yeah.

2          THE COURT:  Okay.

3          MR. PERTEN:  It was -- of course, it was the lynchpin

4   to the whole suit, Your Honor.

5          THE COURT:  Of course.  File a letter.

6          MR. PERTEN:  Yeah, exactly.

7          THE COURT:  That's right.  Are we done here?

8          MR. PERTEN:  Yeah.

9          THE COURT:  Go ahead.

10          MR. PERTEN:  So --

11          THE COURT:  Sorry I did this to you, but --

12          MR. PERTEN:  -- anyways, the -- oh, yes.  Mr.

13   Fennell, the construction expert --

14          THE COURT:  Yes.

15          MR. PERTEN:  -- Mr. Fennell testified -- did not

16   testify that the lien had any effect on the marketability of

17   this property.  He did not testify.  What Mr. Fennell said --

18   and I -- very clearly is he said I think the property, at the

19   time it was sold -- not March 30th, when it should have been

20   substantially --

21          THE COURT:  Ready.

22          MR. PERTEN:  -- completed -- at the time it was sold,

23   I believe it was worth 5.1.  We know the trustee listed it at

24   4.5 with no objection, and sold them for 4.4.

25          Mr. Fennell was asked, well, why didn't it sell for



1    5.1, and he said:  I've been off on sale prices.  There must

2    have been something else going on here -- something else.

3           And then followed it up, you know, your appraisal --

4    what conclusion do you draw from the fact that your appraisal

5    came in at 5.1 and the home sold for 4.4?  Answer:  "That both

6    of the homes didn't meet the definition of market value and

7    that there has to be something going on that would affect the

8    selling price that significantly."  There had to be something

9    going on.

10          This is an expert.  If, in fact, you're going to tag

11   that to the mechanic's lien, shouldn't the expert -- the

12   question was never asked:  well, what something?  We have this

13   sort of nebulous, from an expert, something must have been

14   going on.  Could it have been the lien?  Maybe.  We can

15   speculate that.  Could it have been the bankruptcy?  Maybe.

16   Could it have been the price that it was listed at?  Maybe.

17          We also know that 5.1, his figure, it actually had

18   been listed at 5.1 and didn't sell at that price either.  So

19   my point being that the suggestion that we somehow -- that Mr.

20   Cohen -- bringing it back to Mr. Cohen --

21          THE COURT:  Um-hum.  Right.

22          MR. PERTEN:  -- somehow did all these nefarious acts

23   that forced them into the bankruptcy and forced them to

24   litigation, again, it's not borne out by the evidence, and

25   it's the evidence that buys -- their own expert couldn't tie

1    it to that.

2          And again, even if you disregard KDC's invoice in its

3    entirety, it's a totally bogus thing, even if there never

4    existed an invoice, then the question is what was the cost of

5    construction?  What was the reasonable cost of construction?

6    And we should talk about that as well, because the suggestion

7    is that as a fiduciary we have to prove reasonableness --

8    fairness and reasonableness.

9          Well, first, of course, we've got to get away from

10   the construction-loan agreement where they covenanted that it

11   was fair and reasonable.  We'll overlook that for now.

12         We also have to ignore the evidence that they had the

13   contract.  We also have to ignore the evidence that they

14   buried their head in the sand, if they didn't have the

15   contract, so they wouldn't know it.

16         But we also know that the predominant -- it's a

17   totality of the circumstances, and the remedy, if it was not

18   fully disclosed, is not voiding the contract.  It's not giving

19   the other side a windfall.  The remedy would be that any

20   unfair advantage would have to be disgorged.  Right?

21         So then the question becomes was this contract

22   unfair?  Well, we know at the time the contract was entered

23   into, the plans weren't finalized, it was open-ended, the

24   finished specifications happened in the field.  Everybody went

25   in with their eyes open.  They knew there was a contract.

1    We've got Lipetsker's affidavit:  I knew there was a contract.

2    We've got the complaint.  Everybody knows there's a contract.

3         The law does not require somebody to now sit down

4    with the contract and say okay, let's read section 5.1

5    together.  Do you have any questions?  Let's read section 5.2

6    together.  Do you have any questions?  That's not what the law

7    requires.

8         They had the agreement in hand or certainly knew

9    about the agreement and had in real time, all the backup, all

10   the expenses that were being charged against the -- that were

11   being charged against that contract.  And what the most

12   telling thing is was that contract unfair in some regard?  Did

13   that contract seek to charge exorbitant prices or something

14   well beyond -- assuming they didn't know about this going in?

15        Well, this is where Doddridge comes in, Your Honor.

16   And I think it's significant, Doddridge is their expert, not

17   my expert, and Doddridge's testimony was very, very helpful,

18   Your Honor.

19        I did a chalk that Mr. Carnathan has a copy of, if I

20   could hand this up --

21        THE COURT:  Sure.

22        MR. PERTEN:  -- and mark this as an exhibit?

23        THE COURT:  We have no -- we're going to mark it

24   as --

25        MR. PERTEN:  Just for identification.



1          THE COURT:  -- as a chalk for ID --

2          MR. PERTEN:  Yes.

3          THE COURT:  -- at closing.  So we'll call it Chalk

4     Number 2.  It's --

5          MR. PERTEN:  This --

6          THE COURT:  -- a two-page chalk.  Go ahead.

7          CHALK EXHIBIT 2 WAS MARKED FOR IDENTIFICATION

8          MR. PERTEN:  This is a summary of what the expert

9     says versus the actual.  Okay?  Actual hard costs -- I'm

10    leaving soft costs out, because as I said to the Court, that's

11    the area of contention.  Actual -- the binders -- what did we

12    spend?  3,773,000, which comes out to 1,886,000 per house.

13    That's actual.  What is ProEx actual?  $880,000.  There was

14    two other invoices which were snow removal and additional

15    stuff.  But the base contract, there were three invoices which

16    are exhibits in this case:  880,000.  So that's what the

17    contract said.

18         Salmi, he's at 5.8, with ProEx at 979.  Okay?  So if

19    you believe Salmi, these numbers, in fact, if you believe

20    Salmi, even with the soft costs, were reasonable, because

21    we're well below market.  Okay?  And we can talk about Salmi's

22    methodology.  We think it is sound.  We think there's nothing

23    wrong with it.  These were based on actual bids.

24         But let's pretend Salmi didn't exist.  And let's look

25    at what their expert said.  Their expert said, if you look at

1    page 2, he thinks the actual cost of these homes, hard costs,

2    should have been 1.7/1.8.  Okay?  So what does that tell you?

3    The hard-cost construction, we actually spent 1,886, their

4    expert says it should have been 1.7/1.8.  The delta is

5    $167,000.  That's what we're fighting about.

6         Was there an unfair advantage?  If you took his

7    number with nothing else, we overcharged by 167,000; less than

8    eight percent.  That's assuming we take Mr. Doddridge's number

9    unabashedly, if you will.

10         Mr. Doddridge also testified that counsel told him

11    not to add overhead.  There's an overhead and profit, and he

12    said they're distinct categories.  He said overhead is a

13    direct cost which is recoverable by the contractor, but he was

14    told not to add it, because under the operating agreement,

15    he's not entitled to it.  Under the operating agreement, his

16    compen -- we're talking the profits, perhaps.  But hard costs,

17    the insurance premiums, overhead electricity, that's overhead.

18    That's a direct cost.  He said it would be ten percent, which

19    he didn't add on because counsel said, well, don't add that

20    on.

21         If you add that ten percent, which is a direct cost

22    that would be recoverable under either version of the

23    construction contract, that would bring Doddridge's number up

24    to 1.890, so actually, he's saying that you actually got a

25    pretty good deal.  You're $4,000 -- you underpaid by 4,000 on

1   Doddridge's number.

2          He also said, well, I'm using RSMeans, which is

3   averages.

4          THE COURT:  Right.

5          MR. PERTEN:  And it's an average, so it could be

6   three to five percent, somewhere in that range.  So if we take

7   five percent, tack on another five percent, then that brings

8   his number up to 1.985, meaning that we beat that by $100,000.

9          So this is not a situation, as counsel suggested,

10  that we say that it really doesn't matter what we pay somebody

11  else.  The question is did we gain some sort of unfair

12  advantage?  Did we chisel?  Did we overcharge?  Did we double-

13  bill?

14         Doddridge, their expert, who you've heard nothing

15  about -- not surprisingly, because it doesn't fit their

16  narrative -- Doddridge himself, his numbers are almost to the

17  penny, meaning their best-case scenario is we're $167,000

18  apart.

19         Moving to the side a moment, if there was this

20  massive fraud in the case that we double-billed and triple-

21  billed, why is it that it's only 167?  We're the worst

22  fraudsters ever.

23         So Doddridge's numbers attest to the reasonableness

24  of what was actually charged under this contract.  Their

25  expert -- and that's why they don't mention it, because that's

Page 156

1   an inconvenient truth.  Forget about Salmi, throw Salmi out.

2   He's inflated.  His numbers are ridiculous, if that's what

3   they want to say.  I don't agree with that.  Their own expert

4   shot them in the foot, because what their expert stood there

5   and said is I think Salmi's number is high because of A, B, C,

6   and D.  I don't like the way he bid.  I don't like this; I

7   don't like that.

8        What he didn't do at any point was say the

9   electrician's number is way high; the plumbing guy is way

10  high.  In fact, he validated the very charges -- you were

11  looking at the chalks -- he validated the very charges that

12  they're now contesting.  And I'll give you a good example.

13       Unicon Electric, that was $65,000; it was one of the

14  ones that were copied.  And Mr. -- I don't remember which guy

15  he was -- Mr. Unicon Electric --

16       THE COURT:  Yeah.

17       MR. PERTEN:  -- told us that yeah, they were

18  identical houses.  I didn't want to write it out.  It was

19  written out longhand.  I simply Xeroxed it and changed the

20  number.  So there were two for $65,000.

21       They raise a question, well, how can that be?  This

22  must be this is more fraud.  Mr. Doddridge testified that

23  there is no way that the electricity for even one house could

24  be less than $100,000.  So their own expert has said, at a

25  minimum, electric is going to cost $200,000.  They come into

1    this Court and say, hey, looked, based on the circumstantial

2    evidence, we don't trust this, and based upon what we're

3    seeing in QuickBooks, we don't believe this invoice, because

4    the $65,000 they paid, and there's a Xerox which -- so it's a

5    total of 130-.  But how do you explain away their own expert

6    who says it actually probably should have been 200.  At 130,

7    you're getting a hell of bargain.  You couldn't possibly do it

8    at $65,000.

9          This is the inconvenient truth.  They raise

10   questions -- Mr. Goldman raised questions, but they didn't ask

11   the follow-up.  Do those questions -- what is that other

12   cliche?  Does this dog bark?  Does the horse gallop?

13   Whatever --

14          THE COURT:  You need to --

15          MR. PERTEN:  -- whatever --

16          THE COURT:  -- you need to work on your cliches.

17          MR. PERTEN:  I do need that, and my computer --

18          THE COURT:  Skills.

19          MR. PERTEN:  -- skills.

20          So where is the fraud?  Where is the

21   unreasonableness?

22          Now, that ten-percent overhead, which everybody

23   agrees we should be in, that's part of the soft costs.  That's

24   in there.  That's part of the soft costs.

25          In the chalks that you have, they said well, look,

1  their -- they put in a number for interest.  Interest isn't

2  recoverable.  Sure it is.  It's statutory.  Sure interest is

3  recoverable.

4       So they've taken numbers, they've taken assumptions.

5  Well, we want you to assume that these are all overcharges or

6  unpaid amounts.  Whether they're paid or unpaid, the invoices

7  are there.  The subcontractors that we paraded in are there.

8  They said they're real.  They said these numbers are accurate.

9       They don't like the numbers, so they're saying

10  disregard what the testimony is.

11       And I think we also need to look no further than Mr.

12  Goldman.  Remember that Mr. Goldman was their fraud examiner.

13  When we came in front of this Court on multiple occasions and

14  argued they haven't shown us fraud, they haven't shown us

15  fraud, and they said he's the guy, he's the guy that'll do it,

16  he didn't do any such thing.

17       What Mr. Goldman says -- well, two things.  First,

18  the representation is:  we need an expert.  That's the whole

19  premise of bringing in an expert.  Parsing through these books

20  and records, understanding QuickBooks, doing the analysis,

21  seeing how the money flows, that's beyond the ken of a

22  layperson, so we have an expert who's part of our case-in-

23  chief; we're going to put him in.  And they brought Mr.

24  Goldman.

25       Mr. Goldman testified I find the records unreliable.



1    That was his opinion.  I don't find these records reliable.

2    Well, that's a far cry from fraud.

3            On direct examination, Mr. Carnathan -- because that

4    wasn't the answer he was looking for -- says, "So I guess what

5    I'm looking to elicit is, what's the alternative?  If it's not

6    fraud, sir, then what is it?"

7            Answer:  "I see similar things that turn out to be

8    just incompetence."

9            So where's the fraud?  Their own expert -- now they

10   say but you know what, ignore him.  You, Judge, you can decide

11   it's fraud even though our expert couldn't do it.

12           It gets worse.

13           THE COURT:  Yeah, but that's true; isn't it?

14           MR. PERTEN:  I'm sorry?

15           THE COURT:  That's absolutely true.

16           MR. PERTEN:  If it's within the layperson?

17           THE COURT:  No, no.  What I understood him to say --

18   and clear it up if I'm wrong -- what I understood him to say

19   is I don't give the ultimate opinion of fraud in my testimony;

20   it's just not what I do.  I point out things that I see that

21   maybe a layperson can't see.

22           MR. PERTEN:  Right, but it's --

23           THE COURT:  And those things are:  this was doctored,

24   this was changed, this has the hallmark of an altered

25   document.



1          MR. PERTEN:  Right, but he was presented and rep --

2          THE COURT:  And he leaves it to me to decide --

3          MR. PERTEN:  Okay, well --

4          THE COURT:  -- whether it's fraud.

5          MR. PERTEN:  So --

6          THE COURT:  And that would require more context.

7          MR. PERTEN:  So Mr. Goldman, on cross -- because I

8    think this will address your --

9          THE COURT:  Okay, yeah, no, that's what I'm trying to

10   get at.

11         MR. PERTEN:  On cross, this is now me -- so certainly

12   you would have expected his strongest testimony to be on

13   direct, his lawyer questioning him, and he says, could be

14   incompetent, I don't know.

15         Mr. Perten -- that's me --

16         THE COURT:  Right.

17         MR. PERTEN:  -- "Mr. Goldman, before we go any

18   further, let's cut to the end," this is my first question out

19   of the box.  "You haven't formed any opinion, have you, as to

20   whether there's fraud on this project; is that correct?"

21         Answer:  "That's correct."

22         We then go on, "You haven't formed any opinion as to

23   value of the work that was performed; isn't that correct?  So

24   you've raised questions, but you didn't do any investigation

25   to find out whether these questions meant anything, whether

1    these invoices --

2    "A.  Correct.

3       "Q.  And in fact, your opinion ultimately was that this

4    may be a product of gross incompetency or it may be fraud;

5    isn't that correct?

6    "A.  Yes."

7         And then comes the question -- Your Honor, I'm sure

8    you remember, when you were trying cases, there comes a time

9    in a trial where you ask a question and then you cringe.

10        THE COURT:  Right.

11        MR. PERTEN:  You go, what did I ask, can I take that

12   question back?  This is the worst question ever.  The next one

13   is a cringe-worthy question from my perspective, but it

14   worked --

15        THE COURT:  But you're going to read it to me?

16        MR. PERTEN:  But it worked out just fine.

17        THE COURT:  Okay.

18        MR. PERTEN:  Question:  "And you're unable to say

19   which is more likely than not, not what is the ultimate

20   opinion, which is more -- fifty-one percent -- which is more

21   likely than not?"  Dumb question.  Terrible question.  Soft

22   ball; hit it out of the park, and I'm dead.

23      "Q.  "And you're unable to say which one was more likely

24   than not?  You don't know, isn't that correct?

25   A.   "No, I think they both lead to the same unreliability,



1    but I can't say between the two.

2        "Q.  Okay.  So in other words, your ultimate conclusion

3    is that you don't trust the records, but you don't know

4    whether that's innocent, uninnocent -- if that's a word -- you

5    just don't know, correct?

6    "A.  Correct.  I have no opinion."

7        So he wasn't being asked at that point to testify as

8    to the ultimate fact, because that's not the burden, right?

9    More likely than not; that was a soft ball.  I can't do it.

10       This is the guy who's pored over the books, of not

11   only this project, but five other projects.  This is the guy

12   that when we served interrogatories saying what did we do, our

13   expert will tell you.

14       How do you get from the expert, a certified fraud

15   examiner, a CPA, who has pored over these books and issued a

16   fifty-page report, or whatever it is, and he comes in to this

17   Court and says could be incompetence, could be fraud.  I can't

18   even say which is more likely than not -- which is more

19   likely.  And then say this -- we've now established fraud?

20   What is the fraud?  Which things?

21       I asked him, what about the value?  So you raised all

22   these questions.  Did you do any steps to ascertain?  And what

23   were the things that he was looking at?  Well, the fonts are

24   different.  Some of the checks are out of sequence.  Some of

25   the invoices have funky numbers.  And we paraded six guys here

1   who said, yeah, we've got two checkbooks, or we had temporary

2   checks for -- one guy says if it's materials I use a three-

3   digit, the other I do four-digit.  That's the best you can

4   have after all this?  That's not -- that's not fraud.

5        So I would suggest to this Court that there is no

6   evidence that the hard costs are manufactured.  Their expert

7   Mr. Doddridge didn't say it, because he was focused on

8   knocking down Salmi, he wasn't focused on us.  Mr. Goldman

9   didn't say it.  He just said I don't trust the records.  Well,

10  that doesn't get them over the bar for an affirmative claim of

11  fraud.  That goes to the credibility of the records, which

12  maybe has something to do with the proof of claim, but not the

13  affirmative record of fraud.

14       Carrying costs, did anybody testify?  Mr. Gersh

15  testified we did $665,000 total of carrying costs.  You saw

16  Exhibit 291, where there was over $300,000 of entries called

17  "Kagan carrying costs".  Did Mr. Goldman, who -- the

18  suggestion is money was coming in, money was going out -- did

19  he say, oh, those carrying costs are bogus?  No.  He was never

20  asked that question.  But isn't that their burden?

21       If you're going to say there's fraud, don't you have

22  to come forward?  And if the books and records don't show

23  it -- if he -- if he had said, you know what, I can't tell,

24  but based upon all these anomalies, more likely than not it's

25  fraud, I'd say that perhaps they've met their bar.  At

1     least -- it's not summary judgment, they're over the bar.

2          He didn't say that.  I threw him the soft ball:  I

3     don't know; I can't tell you.

4          THE COURT:  It's a -- you raised a very interesting

5     question and -- before the Federal Rules were changed, your

6     question, isn't this fraud -- or I guess Mr. Carnathan's

7     question, isn't this fraud, would have been objectionable, and

8     that objection would have been sustained, right, because it's

9     the ultimate question.

10         But the rules don't say your expert has to give the

11    ultimate opinion.  It's up to the trier of fact to make that

12    determination.

13         MR. PERTEN:  Yeah.  And it --

14         THE COURT:  But he may -- he may.  And probably I

15    should take something from the fact he declined.  I guess

16    that's what you're asking me to do.

17         MR. PERTEN:  That's what I'm asking you to do.

18         THE COURT:  But that's different than there's no

19    evidence that these documents were authentic or that were not

20    the product of fraud.  And you did -- I am not missing that

21    you paraded those folks here to try to explain -- to prove it

22    was incompetence, perhaps, and to give me the other inference.

23         MR. PERTEN:  Your Honor, I'm almost out of time, so I

24    just want to hit a few --

25         THE COURT:  Yeah, go right ahead.



1          MR. PERTEN:  -- points very briefly.

2          We spoke already --

3          THE COURT:  But I am going to hold you to time, and

4   you've got -- you have eight minutes.

5          MR. PERTEN:  Yeah, it goes quickly, for me.  Probably

6   not for you.  You're probably exhausted, at this point.

7          THE COURT:  No, no, no.  It's good.

8          MR. PERTEN:  The chalks and the amount of profit,

9   there's no evidence of that, that $690,000 of pure profit,

10  where that's counsel's invention.

11         I want to talk about damages.

12         THE COURT:  Yeah.

13         MR. PERTEN:  And I have another chalk.

14         THE COURT:  Let's mark that, Liz, 3.

15         THE CLERK:  Um-hum.

16         THE COURT:  Chalk Number 3 for today.

17         CHALK EXHIBIT 3 WAS MARKED FOR IDENTIFICATION

18         MR. PERTEN:  The first thing, as I alluded to up

19  front, is under section 8.1 of the operating agreement, we're

20  entitled to fifty percent.  So on the first page, the trustee

21  is currently holding -- that's from his report -- 3.5 million.

22  If there were no deductions -- and clearly there will be,

23  because he's owed a commission -- but if, for illustration

24  purposes, we get 1.7 -- if KDC's claim is disallowed in its

25  entirety, we're entitled to 1.7.

1           THE COURT:  All right, yes, I understand.

2           MR. PERTEN:  I wanted to look at KDC claim number 1,

3     the second page.  Another alternative.  Hard costs, 1.88671.

4     That's the hard cost, of which the breakdown is 578,000 is

5     still outstanding.  Nobody has come forward -- their expert

6     hasn't come forward to say that money is not legit.  So

7     $578,000 of hard costs, both contracts said this not a fixed-

8     price contract, there's no evidence that it was; we should be

9     getting that 578-, which frankly, would then reduce the fifty

10    percent on the back end, because that money would come off the

11    top.

12          Carrying costs, same thing.  You've got emails,

13    Exhibit 316, showing what the carrying -- that we were sending

14    money in.  You've got their own Exhibit 291 accounting

15    showing -- listing that we're paying carrying costs.

16          We knew from Exhibit Number 9, the first -- the

17    October of 2012, that even if those number were accurate,

18    since the carrying costs, $200,000, was based on fifteen

19    months, you were going to be $100,000 short, regardless, and

20    nobody else has testified that they paid them.  So the only

21    one who -- the only evidence as to who paid carrying costs is

22    Kagan.

23          That number was not challenged on cross-examination.

24    Mr. Gersh said -- he attested to that number in the proof of

25    claim.  That was not challenged.



1          So those two numbers:  1.244.  That's the hard costs

2     plus the carrying costs.  And I'd submit to this Court, those

3     really shouldn't be in dispute.  Now, we get --

4          THE COURT:  But --

5          MR. PERTEN:  -- to the soft costs.

6          THE COURT:  -- I think you might have just alluded to

7     this.  On your theory, what impact would the carrying-cost

8     allocation have on Mr. Kagan's LLC interest, the fifty

9     percent?

10          MR. PERTEN:  I would submit it -- I would submit it

11     would have none.

12          THE COURT:  Why?

13          MR. PERTEN:  Two reasons.  First of all, under 8.1,

14     before you get your capital accounts back, you get that fifty

15     percent.  That's what 8.1 says.  Remember, it said --

16          THE COURT:  It's right here.

17          MR. PERTEN:  -- or actually 9.2 -- section 9.2 says

18     the allocation, and you distribute capital accounts after the

19     allocations.  So first of all, that -- this money gets paid

20     first.  That's the first comment.

21          The second observation is Mr. Kagan caused the

22     carrying costs to be paid for roughly thirty months.  He paid

23     it from the get-go.  And then he stopped.

24          What their suggestion is:  he should get no credit

25     because he stopped.  I'm saying at worst, he advance paid

1    thirty months.  You don't castigate him for having --

2        THE COURT:  Forgive me if I'm tired --

3        MR. PERTEN:  -- paid up front --

4        THE COURT:  -- and I'm missing this.  I'm at the --

5    there's a provision, I'm not seeing it here, that says that

6    his allocation will be reduced --

7        MR. PERTEN:  Yes.

8        THE COURT:  -- dollar-for-dollar.

9        MR. PERTEN:  It doesn't say his allocation will be.

10   Section 8.1 of the operating agreement says that if Mr. Kagan

11   does not pay after twenty-three months --

12        THE COURT:  Right.

13        MR. PERTEN:  -- and Mr. Filippov pays, Mr. Kagan's

14   capital account will be reduced by the amount that Filippov

15   puts in.  So worst case scenario would be his $250,000 is at

16   risk, right, because that's what he put in.

17        So in theory, they could knock his --

18        THE COURT:  Whose 250?

19        MR. PERTEN:  Kagan's.

20        THE COURT:  Right.

21        MR. PERTEN:  In theory.  But section 9.2, which is

22   the liquidation --

23        THE COURT:  Yeah.

24        MR. PERTEN:  -- says that you do the allocation,

25   which is not based on percentage interest, which is not based

1    on capital account.  That is taken off -- that allocation

2    happens before there is any return of capital.  So in other

3    words, he gets his 1.7 or whatever the fifty percent is --

4              THE COURT:  Yeah.

5              MR. PERTEN:  -- and then if there is any deduction,

6    then that -- then that's where it is.  And that deduction, if

7    you will, stops at 250, because you can't -- it can't be

8    negative, right?

9              THE COURT:  Um-hum.

10             MR. PERTEN:  The operating agreement says your

11   capital account will be reduced.  At some point, if he's at

12   zero -- but what do we know about that?

13             Mr. Filippov says, oh, I put in all this money and he

14   should be reduced.  Mr. Filippov was unable to identify which

15   payments were loans versus which were capital payments.  Mr.

16   Filippov included payment of legal fees as carrying case

17   (sic).  There's roughly $70,000 of legal fees, which he adds

18   in there.  The preparation of his mortgage and note, these are

19   all monies that he says -- with hindsight -- oh, this portion

20   is carrying costs, everything else was a loan.

21             Note, the loan itself was never introduced into

22   evidence.  The promissory note -- the mortgage came in, but

23   the note itself wasn't.

24             So we don't actually know what the deal is, but we do

25   know the timing.  The mortgage was recorded on the day.  So we

1    don't think:  a) our interest gets reduced at all, because

2    they haven't proven that they have spent that, and if so, by

3    how much; b) the proof of claim for $200,000 for the loan

4    should be disallowed because there's another self-dealing

5    transaction, he signed both sides.  And if we're going to be

6    held to reasonableness, there was zero testimony as to why

7    you're making a loan to a company that doesn't need it.

8            THE COURT:  Did you object to his claim?

9            MR. PERTEN:  Yes.

10           THE COURT:  You did?

11           MR. PERTEN:  Oh, absolutely.

12           THE COURT:  Okay.

13           MR. PERTEN:  We did object to it, because again, we

14   think it's duplicative.  He deposited money into the account

15   and now he's reclassifying it as a loan.  But more

16   importantly, if there was a loan, is it reasonable?  Was it

17   fair?  He admits that we (sic) never discussed that with us.

18   That was never discussed with Kagan.

19           And why -- granting himself a mortgage, how does that

20   help the company?  Is that fair to the company?

21           After the fact, two weeks after -- or actually, he

22   said the loan was over five months -- we're going to -- I'm

23   going to grant myself a mortgage and sign on both sides of the

24   equation, which is the same thing he's yelling at us about

25   doing on KDC.  It's okay when he does it.

1          So again, we think the 200,000 goes away.

2          THE COURT:  All right.

3          MR. PERTEN:  Last thing, because I've got thirty

4     seconds, Your Honor --

5          THE COURT:  You've got thirty seconds.

6          MR. PERTEN:  On the indemnity, Mr. Carnathan says

7     there's been no evidence as to indemnity.  At the pre-trial

8     conference, we said to you, do you want us to bring in legal

9     fees -- receipts and all that, and you said no.  If there's --

10          THE COURT:  Yeah.

11          MR. PERTEN:  -- an indemnity --

12          THE COURT:  I did say that, yeah.

13          MR. PERTEN:  -- I'll do what -- an assessment of

14     damages.

15          THE COURT:  Right.

16          MR. PERTEN:  The indemnity -- we are a memb -- Kagan

17     is a member.  He's covered; clearly covered.  Tatiana,

18     everybody is working for the member.  They're all one big

19     happy family.  The only carve-out is gross misconduct, willful

20     misconduct.  Certainly as to Tatiana, there's nothing.  And I

21     would submit that as to Mr. Kagan, there's absolutely nothing

22     other than maybe he's incompetent.

23          They just don't like the narrative.  He spent what he

24     spent, and they haven't -- they have not legitimately

25     challenged any of the specific dollars.  They're just blowing

1    smoke that we don't trust this, we don't trust that.  And I'd

2    suggest you need something more than that.

3              THE COURT:  All right.

4              MR. PERTEN:  Thank you.

5              THE COURT:  Thank you very much.

6              All right, Mr. Carnathan?

7              MR. CARNATHAN:  Oh, boy, where to start?  Why don't

8    we start with the exhibit that tallies up the money in and out

9    of KDC and ProEx, the chalk.

10             THE COURT:  What exhibit is that?  Is that a chalk?

11             MR. CARNATHAN:  That's the one we marked for ID.

12   This is my chalk.  I think it's the --

13             THE COURT:  The first one?

14             MR. CARNATHAN:  -- second page -- the second page of

15   the chalk?

16             THE COURT:  The second page of Chalk 1?

17             MR. CARNATHAN:  Yeah.  So just to clear up any

18   confusion --

19             THE COURT:  Yeah.

20             MR. CARNATHAN:  -- this chalk is not suggesting that

21   the total construction costs were 1.6 or 1.7 million.  This is

22   the money in and out of KDC and ProEx.  This is money --

23             UNIDENTIFIED SPEAKER:  We need to change the monitor.

24   Thank you.

25             THE CLERK:  Sorry about that.



1          MR. CARNATHAN:  This is the actual dollars in and out

2     of Kagan, out of his two companies, KDC and ProEx.  The fact

3     is is that many of the construction costs were paid directly

4     by the LLC; many of the costs were paid directly by the LLC.

5     So all we're tallying up here is the 1.7 million bucks that

6     flowed in and out of Kagan's pockets.

7          The other 1.5 million was paid directly.  We know

8     that the full 3.2 million was spent.  So that's just a point

9     of confusion that just makes no sense at all.

10         But this becomes a very important point.  There was

11    something about there's no evidence that Kagan didn't pay the

12    carrying costs.  I mean, for heaven's sakes, these are the

13    checks that we put in.  Your Honor may recall, we fought about

14    this at some length during discovery, that we wanted all the

15    checks, we wanted all the backup they have, everything they've

16    got, to show that they paid these things.

17         And presumably they gave it to us.  And we put it

18    into evidence, not them, right?  They put in the proof-of-

19    claim binders that they say document their claim.  We're the

20    ones who put in the checks, because the checks show that they

21    didn't pay these things.

22         The checks show that the money came in and out of the

23    LLC account just like the deal was made.  And so when we think

24    about that Dream Flooring testimony and how we're allegedly

25    relying on the QuickBooks for this payable, well, to some

1    extent we are.  But we're also relying on the backup that was

2    presented.  When you look into the backup in that particular

3    tab of the proof-of-claim binder, it's going to show you

4    checks, how much was paid; and it's going to show you how much

5    they allege total billing is.  And there's a delta there that

6    is still outstanding as a payable.

7         And Mr. Perten kind of hit that at the end of his

8    closing.  He talked about the $578,000 in unreimbursed

9    construction costs that are still outstanding.  That's

10   hundreds of thousands of dollars that there's no evidence that

11   they ever paid.

12        They say they want to get paid, but they actually

13   claim that that's because they owe these people, and they're

14   going to pay them someday, if they recover in this.

15        Why don't I talk, just for a moment, about this

16   contention that Mr. Kagan gets $1.7 million, even if Your

17   Honor disallows the entire proof of claim.  I mean, let's just

18   first say I can't imagine a more inequitable result.  I mean,

19   the hutzpah of it, we're going to torture for four years with

20   $2.1 million in false claims, and then if Your Honor calls

21   them false or unsubstantiated and disallows them, well, okay,

22   we get 1.7 million.  Please.

23        But the fact is, the operating agreement doesn't say

24   that.  If you look at paragraph 8.2 that Mr. Perten never

25   read, it says, "Distribution to members shall be in accordance



1    with their respective capital contributions first."  They get

2    their money back first.  That's the only thing that makes

3    sense.

4            Why would Filippov have done this deal if he was

5    essentially making a gift to Kagan of $2 million?

6            Could I have the profit-allocation slide, Mr.

7    Harzell?

8            And so I don't lose the thought, if Your Honor looks

9    at the slides as they were coming into the deal -- if you look

10   at slide number 9, I think it's page 3, the third column over,

11   you'll see that every profit calculation that they did when

12   Kagan was trying to get Filippov to invest, shows the return

13   of capital before they calculate the net profits.

14           THE COURT:  Um-hum.

15           MR. CARNATHAN:  Kagans own darn slide there, the

16   Exhibit 7 that he sent to Zhukovskiy to prepare Exhibit 9, has

17   the same construct.  The money comes back out first.

18           Why would an investor ever put money into a

19   project -- like a single-purpose entity, right, where we're

20   talking -- we're not talking about buying a piece of IBM

21   that's going to run for the next twenty years -- we're going

22   to build two houses and sell them -- and so of course you

23   expect to get your money back.

24           I just want to show the consequences of what Mr.

25   Perten is advocating here.  And so we have something I call



1  the profit-allocation scenarios, which I think is the last

2  slide or the second-to-last slide in the chalk.

3         So this is what Mr. Perten is advocating as the deal

4  here.  And the idea is, okay, here's the actual sale numbers,

5  because the two properties sold for 8.8 million, and we have

6  3.4-odd-million in sale proceeds, and so Kagan, according to

7  Mr. Perten, should get 1.7 million of that.  And so he's going

8  to make -- setting aside his 250- capital contribution -- 1.4-

9  odd-million.  And poor Mr. Filippov is going to lose over a

10  million dollars.

11         Mr. Lipetsker, ironically, is going to make $92,000

12  on this construct, because apparently Filippov is some sort of

13  benefactor to these people.

14         But what I found really interesting is if you press

15  out to its logical consequence the consequences of what he's

16  advocating here, if they had sold the properties for the 5.25-

17  million number that they projected in Exhibit 32, when they

18  were trying to decide whether to increase the number by

19  $100,000 a house, Filippov would still lose $387,000.  And in

20  fact, if they sold the houses for 5.499 million, their best-

21  case-scenario ever, Filippov would still lose almost $200,000.

22  It's madness.  It makes no sense.  And it doesn't accord with

23  the documents.  And it doesn't accord with paragraph 8.2 of

24  the agreement that says you get your money back first.

25         I think it's actually sort of telling that they are



1    reduced to trying to use the loan documents to try to find

2    ways to avoid the consequences of the actual agreement between

3    the parties.  And one that really struck me was, I think it

4    was, 5.17, where they say that we represented to the bank that

5    we would only engage in contracts with affiliated parties on

6    fair and reasonable terms.

7            Well, okay.  The loan closing was on June 18th -- and

8    I'm going to forget what the exhibit number is -- 342.  If you

9    look at Exhibit 342, the loan closing is on June 18th.  They

10   don't even allegedly have this contract with KDC, at this

11   point.  They claim that they signed it on June 24th.  We say

12   they signed in June 2015.  But so we're estopped from denying

13   a contract that was allegedly signed a week later?

14           And frankly, that representation to the bank was true

15   at the time, as made.  Right?  Because Filippov was under the

16   impression he had a deal with Kagan to build the homes for 1.4

17   million per home, 200,000 for carrying costs.  He gets fifty

18   percent of the net profits.  And Your Honor might want to look

19   at Exhibit 31 again.  And I think it's page 3 there, too, but

20   I'm doing that one from memory.

21           You might recall Zhukovskiy's testimony, they

22   actually did a market analysis right around the time of the

23   construction loan, and said okay, let's do a thought

24   experiment; what if we hired a contractor at arm's length

25   instead of doing this deal with Mr. Kagan?  And then they

1    worked it out and they determined that that was fair to them,

2    and so they went forward with it.

3              So they actually thought about that and determined

4    that on the fifty-percent-net-profit basis, it worked out okay

5    for them.  On a market basis, it was fair.

6              The disbursement schedule -- there's this loan

7    disbursement schedule that we keep getting told doesn't have a

8    line item for the carrying costs.  Well, Maiden explained

9    that.  They're built in.  He used the word "inflated".  I'm

10   not sure that's quite right, really, but that's how they

11   thought about it.

12             But Maiden was the closing attorney, for heaven's

13   sakes.  He was the bank's closing attorney, and that's how

14   he's thinking about it.  But Zhukovskiy explained -- I think

15   this is right -- that the loan disbursement schedule is you

16   finish a certain portion of the house and you get X percentage

17   out.  And so all that's telling you is our budget is 1.6, and

18   when we finish the foundation, we get -- I forget -- five

19   percent; and when we do the siding we get X percent.  And it's

20   just telling you what percent comes out of what point in the

21   project.  It's actually not telling you that there's no

22   carrying costs in here.

23             And I want to correct something that Mr. Perten said.

24   He said that Alex admitted he knew that he couldn't borrow the

25   carrying costs.  That's totally not right.  What Mr. Filippov

1    said was that he learned during this lawsuit that he wasn't

2    supposed to borrow the carrying costs.  But he said that at

3    the time he totally thought that was how you do it, because

4    that's what Maiden and Kagan told him.

5         Let me talk about the plans for a moment.  The

6    agreement says "plans approved by the managing member".  I

7    forget the exact construct.  But we're all in agreement that

8    Kagan didn't really have any plans, so to speak, when they

9    made the deal.  He, in fact, didn't really have any full plans

10   until after the loan.  He had some plans that he submitted to

11   the bank to get the loan, but the only thing that Mr. Filippov

12   had to approve was the financial plan.  That's what was

13   presented to him.  That's what he understands.

14        He was the money guy.  He's not a contractor.  He was

15   told that this was going to be 1.3, and then they increased it

16   to 1.4.  And that's what he approved.  And he never approved

17   any more money.  That is just totally false.  That just never

18   happened.  He never, ever told Mr. Kagan you can spend more

19   than that.

20        On the carrying costs, we saw that 665 number.  Well,

21   I'd just like to remind everybody that they borrowed 200,000

22   per house for carrying costs, that's 400-.  They borrowed an

23   extra 100- when they bought the land; that's 500-.  And Kagan

24   was obligated to pay things after November 30th, 2014, that

25   was 175,000.  It actually comes out about right, Kagan

1    honoring his obligations.

2         I don't want to lose the opportunity to mention the

3    damages and the causation.  I mean, one of the things that's

4    going on here is they try to disaggregate the evidence and

5    say, well, they can't connect the damages they experienced to

6    the failure to complete the house on time; and it wasn't the

7    mechanic's lien that caused their damages.

8         I think it largely was the mechanic's lien.  But

9    we're talking about a totality.  You have to look at the

10   totality of what they did and what happened.  And so he didn't

11   finish the house on time.  There's no evidence that he

12   finished the house any earlier than July -- late July, early

13   August of 2014.  That's the only evidence in the record.

14        They didn't sell the house by the November 30 mark

15   that they were supposed to sell it by.  By May he disavowed

16   his obligation to pay the carrying costs.  Did Alex Filippov

17   want to pay the carrying costs?  No.  And he very candidly

18   said that.  Did he pay them?  Yes.  And he faithfully paid

19   them up through the bankruptcy.  After the bankruptcy.

20        He kept paying carrying costs after they filed for

21   bankruptcy to keep that loan current.  And the evidence in the

22   record, including checks and a schedule of it shows that he

23   paid -- I want to say; this is from memory -- $435,000 in

24   costs after -- over and above his initial 2 million capital

25   contribution.

1    THE COURT:  I don't want to take you off your three

2    minutes, but you're on something that is important to me, and

3    that is causation.  I think that's where you are.  And what

4    Mr. Perten was arguing was -- several times he said let's

5    assume it was an attempt at extortion -- he doesn't agree with

6    that -- but let's say it was; and it was we're the worst

7    extortioners (sic) ever -- you know, something like that, he

8    said.  What's the causation?

9    And it's your burden to prove that element, right?

10    MR. CARNATHAN:  Certainly.  Yeah.

11    THE COURT:  All right.  And so what proof do I have

12    that that is what caused the damages that your client

13    suffered?

14    MR. CARNATHAN:  Well, you infer it from the totality.

15    And he kept talking about Mr. Fennell, who said that these

16    properties were worth $5.1 million on the day that they sold,

17    and they sold for $700,000 less.  And so there had to be

18    something going on here.  There had to be something wrong.

19    What's the evidence in the record of what was going

20    on?  Well, we had these false claims against us.  We had a

21    mechanic's lien filed against us.  We were threatened with

22    dissolution.  We were stuck with listing agreements that

23    thwarted Mr. Filippov's ability to remove --

24    THE COURT:  I hear every one of those, and I'm aware

25    of them.  The only issue is why do I conclude, without having



1    someone having given me that testimony, maybe an expert, in

2    their opinion, that's what caused it?

3             MR. CARNATHAN:  Respectfully, I don't think we need

4    an expert to make that decision.  I think that that is for the

5    finder of fact.

6             THE COURT:  That's fair inference on my part?

7             MR. CARNATHAN:  Absolutely.  You look at what

8    happened here and say is it a fair inference that this

9    conduct, the wrongdoing, caused these damages?  And we say:

10   absolutely.

11            And Mr. Filippov and Mr. Lipetsker are entitled to be

12   made whole.  They get the benefit of their bargain.  And in

13   our proposed findings I walk through it with some care --

14            THE COURT:  Um-hum.

15            MR. CARNATHAN:  -- but we tried to take the projected

16   profits in that May 2013 time frame as a reasonable

17   approximation of what they expected to make, right, because

18   lost profits are always -- you can't prove them with

19   certainty, right?  You have to prove them with reasonable

20   certainty.  You have to give the Court a basis to conclude

21   them on a reasonable basis.

22            And so we've got not just Mr. Fennell, we've got the

23   other appraisals, right?  The properties were appraised at 5.3

24   as built, when they took out the construction loans.  They

25   were appraised at 5.2 in the middle of 2015, I want to say,

1    when Mr. Filippov extended the loans.  There's no doubt that

2    if Mr. Kagan hadn't blown this project sky high, if you will,

3    they should have expected to sell these properties for

4    something in the ballpark of what they were -- of what they

5    were gunning for.  And that's a reasonable inference from the

6    facts that have been presented.

7                Just the last point --

8                THE COURT:  Talk fast.

9                MR. CARNATHAN:  Yeah.  Doddridge doesn't help them at

10   all.  He's said 1.18.  That's just the so-called hard costs.

11   And if I can just pop the last chalk up on the screen, the

12   unsubstantiated charges that we have identified actually map

13   pretty closely to the difference between Doddridge and what

14   they claim is the cost overruns.  And most of these charges

15   are the nonsense of their own profits -- fees and charges.

16               I know I'm out of time.  Does the Court have

17   questions that you would like me to address before I sit down?

18               THE COURT:  I don't.  I could probably sit here for

19   the rest of the day with you.  It's an interesting case.  I

20   know parties don't like hearing that, that it's interesting to

21   us up here.

22               MR. CARNATHAN:  It's a Chinese curse, right, may you

23   live in interesting times?

24               THE COURT:  I suppose.  But I don't have other

25   questions that I'm going to pose.  So I think the case is very

```
 1    well-presented across the board.  The proposed trial briefs

 2    are really quite good.  And the arguments today were -- I

 3    think you guys hit on the themes that you needed to hit on.

 4    And it was helpful to me, I'll tell you that.

 5            So we will -- it's now in my court.

 6            MR. PERTEN:  Your Honor, I didn't know if the Court

 7    wanted -- I have our findings and rulings on a thumb drive --

 8            THE COURT:  Absolutely, I do.  I thought we had them,

 9    but we'll --

10            MR. PERTEN:  You have the exhibits, but --

11            THE COURT:  I do want them.  I would take your briefs

12    as well.

13            MR. PERTEN:  Okay, I didn't bring a -- I'll make one

14    and get it to you.

15            THE COURT:  That's fine.  Thank you for that.  Do you

16    have those as well?

17            MR. CARNATHAN:  Can we email it?  Can we email it to

18    you?

19            THE COURT:  If it's not too big.  I never know about

20    that; but you can try.  And if not, then you can send them

21    over on a thumb drive.

22            MR. CARNATHAN:  Well, the Word docs tend to be small,

23    I think.

24            THE COURT:  Say it again.  Your --

25            MR. CARNATHAN:  Word documents tend to be small.
```



1        THE COURT:  Yeah, that's beyond my scope.  But yes,

2    if you can provide the findings and rule -- proposed findings

3    and rulings -- and I think the trial briefs were helpful, so

4    if you could send them over on a thumb drive, I think that's

5    everything we need.

6        MR. CARNATHAN:  Okay.

7        THE COURT:  Thanks very much.

8        IN UNISON:  Thank you, Your Honor.

9        THE COURT:  Okay.  I'm going to --

10       THE CLERK:  All rise.  Court's in recess.

11   (End at 2:25 PM)

12                    * * * * * * * * * *

13       I certify that the foregoing is a true and accurate

14   transcript from the digitally sound-recorded record of the

15   proceedings.

16

17

18

19

20

21   /s/ Clara Rubin                          October 7, 2019
     _____

22
     ESCRIBERS LLC
23                         eScribers
                   7227 N. 16th Street, Suite #207
24                      Phoenix, AZ 85020
                          973-406-2250
25              e-mail operations@escribers.net



## $

**$1,059,000 (1)**
70:3
**$1,216 (1)**
29:10
**$1,690,000 (2)**
87:18,19
**$1,690,977.28 (1)**
34:2
**$1,707,442.83 (1)**
34:3
**$1,718,000 (1)**
30:16
**$1,886,571 (1)**
30:18
**$1.3 (1)**
54:22
**$1.3-million (3)**
29:25;52:24;88:5
**$1.6 (2)**
15:22;25:11
**$1.7 (1)**
174:16
**$100,000 (12)**
20:17,21;21:8;53:5;
55:25;57:4;99:25;
100:2;155:8;156:24;
166:19;176:19
**$107,000 (1)**
112:20
**$109,000 (1)**
35:9
**$130 (1)**
28:2
**$16,000 (5)**
20:23,24;21:9;57:4;
97:22
**$16,500 (1)**
34:4
**$167,000 (2)**
154:5;155:17
**$17,620 (1)**
47:12
**$175,000-odd (1)**
37:9
**$19,000 (1)**
36:9
**$19,670 (1)**
46:20
**$190,000 (3)**
87:2,2;103:17
**$2 (2)**
53:25;175:5
**$2,000,000 (1)**
13:13
**$2,095,985 (1)**
70:5
**$2.1 (3)**
30:19;38:12;174:20
**$20,870 (1)**
47:12

**$200,000 (8)**
97:8;99:15,17,20;
156:25;166:18;170:3;
176:21
**$204,000 (1)**
61:13
**$20-odd-thousand (1)**
47:15
**$225,000 (1)**
62:18
**$225,958.05 (1)**
35:4
**$225-odd (1)**
24:12
**$23,000 (2)**
50:14,17
**$230,000 (1)**
40:20
**$244,276.56 (1)**
38:25
**$244-odd (1)**
40:17
**$250,000 (1)**
168:15
**$251,000 (1)**
37:1
**$26,120 (1)**
47:25
**$3,098,160 (1)**
29:1
**$3.1-million (1)**
30:7
**$3.4 (1)**
94:14
**$300,000 (2)**
102:10;163:16
**$325,000 (2)**
35:2,12
**$335,000 (2)**
35:7,13
**$35,640 (1)**
29:11
**$357 (1)**
29:4
**$37,000 (2)**
49:19,23
**$387,000 (1)**
176:19
**$4,000 (1)**
154:25
**$418,150 (1)**
35:22
**$435,000 (1)**
180:23
**$47 (1)**
40:19
**$476 (1)**
29:4
**$49,320 (1)**
45:16
**$5,900-odd (1)**
40:19
**$5.1 (1)**

181:16
**$5.5 (1)**
118:3
**$5.8 (1)**
28:24
**$50,000 (2)**
83:9,10
**$532,763.41 (1)**
61:23
**$578,000 (2)**
166:7;174:8
**$58,000 (1)**
109:12
**$642,000 (1)**
87:6
**$65,000 (4)**
156:13,20;157:4,8
**$660,000 (1)**
35:15
**$665,000 (2)**
102:6;163:15
**$690,000 (5)**
25:1;86:18;87:8;
90:5;165:9
**$690,841 (1)**
24:6
**$70,000 (2)**
68:1;169:17
**$700,000 (1)**
181:17
**$760,000 (1)**
38:10
**$760,771 (1)**
37:25
**$777,000 (1)**
40:25
**$777,784 (3)**
23:21;24:3;39:18
**$800,000 (2)**
87:21;89:11
**$845,000 (1)**
87:21
**$880,000 (4)**
36:9;86:23,25;
153:13
**$899,000 (1)**
35:19
**$916,800 (2)**
18:15;24:9
**$92,000 (1)**
176:11
**$95,580 (1)**
29:12

## A

**abandoned (1)**
60:16
**ABC (1)**
83:9
**abetting (1)**
115:18
**ability (2)**

52:12;181:23
**able (4)**
24:11;35:4;121:2,7
**above (5)**
16:11;68:20,21;
72:12;180:24
**Abramski (2)**
67:16;76:2
**Abramskiy (1)**
10:8
**absent (1)**
76:18
**absolute (2)**
47:17;116:12
**absolutely (13)**
14:24;18:20;81:12;
83:22;96:17;99:10;
128:7;159:15;170:11;
171:21;182:7,10;184:8
**accept (1)**
87:4
**accepted (1)**
95:24
**accord (2)**
176:22,23
**accordance (6)**
109:23;110:11;
113:24;114:6;137:20;
174:25
**according (5)**
12:1;58:7;88:6;
123:3;176:6
**account (19)**
10:2,2,3;42:13;
56:20;60:6;67:2;75:22;
84:7;85:6;94:12;
109:12;112:21;113:23;
168:14;169:1,11;
170:14;173:23
**accountant (8)**
51:23;68:18;86:1;
102:23;105:15,24,25;
115:23
**accounted (1)**
21:3
**accounting (3)**
102:9;109:15;166:14
**accounts (4)**
40:18;113:24;
167:14,18
**accrual-based (2)**
62:3;68:22
**accuracy (3)**
52:7,8,9
**accurate (7)**
41:16;81:11,22;
138:13;144:23;158:8;
166:17
**accurately (3)**
83:4,4;122:25
**acknowledge (1)**
45:5
**acknowledgment (1)**

111:20
**acquisition (1)**
31:24
**across (1)**
184:1
**activity (1)**
147:21
**acts (1)**
150:22
**actual (18)**
41:3;81:4,6;83:24;
103:13;110:24;137:10;
138:9;153:9,9,11,13,
13,23;154:1;173:1;
176:4;177:2
**actually (48)**
15:22;16:8;20:22;
24:11;29:18;30:23;
34:11;35:5,6;36:24;
47:10,23;49:18;59:6;
65:15;66:11;67:4,25;
68:19;71:9;76:13;
77:10;82:10,12;87:9;
88:5;91:9;101:2;
102:25;107:4,12;
139:8;150:17;154:3,
24,24;155:24;157:6;
167:17;169:24;170:21;
174:12;176:25;177:22;
178:3,21;179:25;
183:12
**acutely (1)**
13:10
**ad (1)**
95:6
**add (24)**
14:4;22:23;24:3,9;
28:22;35:14,18;36:8,9;
38:11,11;41:24;50:7;
61:19;62:13,15;70:9;
100:2;103:15;154:11,
14,19,19,21
**added (6)**
12:15;25:9;62:8,9;
75:21;109:19
**addendum (5)**
111:6,7,9,12,15
**adding (1)**
46:20
**additional (8)**
16:10;55:22,24;
64:15;65:13;71:16;
130:16;153:14
**address (8)**
74:23;75:4,8,13;
127:20;128:4;160:8;
183:17
**addressed (1)**
143:6
**adds (5)**
15:22;62:14;76:8;
103:13;169:17
**adjusted (1)**

Case 16-01120   Doc 399   Filed 10/11/19   Entered 10/11/19 09:34:30   Desc Main
Document   Page 187 of 214
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

October 4, 2019

62:2

**administrative (1)**
25:4

**admissions (1)**
140:3

**admit (5)**
16:8;29:15,20;30:3;
65:23

**admits (4)**
37:24;65:7;90:13;
170:17

**admitted (14)**
32:2;45:14;46:3;
52:9;60:19,22;63:14,
25;67:3;68:23;83:18;
129:5;132:16;178:24

**admitting (1)**
124:17

**advance (5)**
34:5;76:9,11;138:3;
167:25

**advances (1)**
137:18

**advancing (1)**
42:17

**advantage (4)**
113:16;151:20;
154:6;155:12

**adversary (6)**
4:9;80:6;117:10;
136:5,9,14

**adverse (8)**
76:19;79:7;129:1,21,
25;131:14;132:10,20

**advice (1)**
52:4

**advised (3)**
38:5;66:13,22

**advocating (3)**
175:25;176:3,16

**affect (2)**
113:25;150:7

**affidavit (8)**
30:5;45:9;71:12,16;
135:16,19,21;152:1

**affiliated (5)**
115:5;138:21;139:1,
3;177:5

**affiliates (1)**
138:19

**affinity (1)**
98:11

**affirm (1)**
132:18

**affirmative (5)**
80:6,14,16;163:10,
13

**afford (1)**
67:13

**afternoon (2)**
79:12,13

**After-the-fact (1)**
141:24

**again (51)**
28:22;39:2,4,7;40:1,
2,13;43:23;50:6,18;
56:13,24;57:2;58:13;
63:7;64:23;71:25;73:1;
75:5;78:7;84:1;86:6;
89:5;92:24;93:8;95:1;
96:19;99:7;101:24;
109:15;114:10;115:14,
22;116:13;119:25;
120:10;121:1,8;
122:14;124:15;128:21;
130:13;139:6,19;
145:4;150:24;151:2;
170:13;171:1;177:19;
184:24

**against (11)**
10:20;45:10;67:18;
76:19;79:7;105:23;
130:10;152:10,11;
181:20,21

**ago (3)**
111:5;114:22;126:18

**agree (10)**
11:3;18:17;92:15;
96:4;110:3;126:13;
131:4;141:4;156:3;
181:5

**agreed (20)**
12:8;13:6,25;15:20;
20:10,11,12;21:15;
36:6;52:23;53:4;56:25;
68:9;94:1;110:4;
112:10;115:24;139:8,
9;141:3

**agreeing (4)**
13:11;20:3;123:10;
133:16

**agreement (89)**
11:9,10,16,18;12:15,
19,21;13:2,9;14:2,8,10,
15;18:2,18;31:25;
32:18;37:12;38:4;58:8,
25;63:8;64:22,25;65:6;
66:3;69:11;70:25;71:4,
5;76:9;94:6;100:9,11,
14,19,21;101:11;
105:8;107:15;108:10,
18,19;109:3,25,25;
110:4;111:15,25;
112:8,16;114:16;
116:3,25;117:19,21;
118:7,16;119:4,9,18,
21;120:8;122:12;
123:4,14;132:25;
134:7;137:10,18,23;
139:8,8;140:21,25;
141:1;151:10;152:8,9;
154:14,15;165:19;
168:10;169:10;174:23;
176:24;177:2;179:6,7

**agreements (12)**
46:13;59:21;63:7,17;

69:16;71:14;117:22;
139:17;140:4,7,14;
181:22

**agrees (10)**
11:23;57:14;96:4;
102:14;109:15,17;
111:25;123:2,6;157:23

**ahead (12)**
23:18;34:4;40:12;
49:24;84:2,17;88:21;
113:17,21;149:9;
153:6;164:25

**aiding (1)**
115:18

**air (1)**
30:24

**Alex (6)**
4:6,15;67:9;106:18;
178:24;180:16

**allegation (5)**
94:21;103:23;
117:14;136:22;139:1

**allegations (5)**
79:17;120:4;136:10,
11;137:7

**allege (1)**
174:5

**alleged (7)**
30:17;34:22,25;
35:11;72:17;80:19;
117:10

**allegedly (11)**
28:17;35:1;39:16;
41:13,14;62:16;69:14;
80:10;173:24;177:10,
13

**alleges (1)**
80:6

**alleging (1)**
120:12

**allocated (3)**
5:12;112:13;114:3

**allocation (8)**
98:5,7;167:8,18;
168:6,9,24;169:1

**allocations (5)**
114:1,2,2,7;167:19

**allow (5)**
6:11,15;7:11;122:17;
135:11

**allowed (3)**
6:1;133:20;148:4

**alluded (2)**
165:18;167:6

**Almost (10)**
28:25;79:13,14;82:8,
10,11;140:1;155:16;
164:23;176:21

**alone (1)**
66:17

**along (9)**
6:18;19:17,20;20:3;
21:8,16;24:21;61:22;

126:20

**alphabetically (4)**
21:23;22:8;48:22;
51:13

**alter (1)**
115:17

**altered (1)**
159:24

**alternative (4)**
136:21,22;159:5;
166:3

**always (7)**
47:13,14;59:13;
60:10;79:16;97:1;
182:18

**amazement (1)**
113:15

**amazing (2)**
48:17;49:16

**amazingly (1)**
84:19

**ambiguities (2)**
14:13,15

**ambiguity (2)**
114:12;115:9

**ambiguous (1)**
114:11

**amended (1)**
60:15

**among (1)**
112:13

**amount (5)**
103:12;138:6;
144:18;165:8;168:14

**amounts (3)**
70:8;84:25;158:6

**analogy (1)**
26:19

**analysis (12)**
20:9;54:25;81:20,21;
82:2;86:3;87:8;95:24;
99:17;102:5;158:20;
177:22

**analyzes (2)**
55:8,9

**analyzing (1)**
20:20

**angles (1)**
38:20

**animals (1)**
9:17

**annual (1)**
68:2

**anomalies (1)**
163:24

**anticipated (1)**
32:19

**anymore (3)**
24:19;39:23;147:13

**anyways (2)**
120:25;149:12

**apart (1)**
155:18

**apologize (1)**
67:3

**App (2)**
91:20;92:1

**apparent (2)**
55:12;66:2

**apparently (5)**
20:15;55:19;89:11;
108:8;176:12

**appear (1)**
36:24

**appears (4)**
70:25;71:4;74:16;
76:4

**appendix (2)**
27:18;49:8

**apples (3)**
28:23,23,24

**application (1)**
122:18

**applied (1)**
113:13

**applies (1)**
73:9

**apply (1)**
92:18

**appraisal (2)**
150:3,4

**appraisals (1)**
182:23

**appraised (2)**
182:23,25

**appreciate (1)**
80:18

**approval (1)**
19:19

**approve (2)**
22:4;179:12

**approved (4)**
12:2;179:6,16,16

**approves (1)**
112:4

**approximation (1)**
182:17

**April (7)**
20:15;46:10;63:19;
65:4,13,18,20

**architect (2)**
55:13;66:9

**area (4)**
56:22;57:11;133:21;
153:11

**Arguably (1)**
9:11

**argue (4)**
115:10;134:1;
136:15;147:23

**argued (6)**
81:16;88:25;116:8,9;
118:13;158:14

**arguing (4)**
88:23;94:21,22;
108:21,22;117:3;

136:21,22;181:4

**argument (18)**
4:10;8:17;79:22,24;
80:8,23;89:7;91:25;
94:3;97:19;115:13,15;
133:19;138:16;140:2,
4;144:13,13

**arguments (7)**
4:5;5:9,13;19:7;
79:23;89:13;184:2

**Arina (5)**
42:4;60:4;67:9;
70:18;101:20

**arm's (1)**
177:24

**arm's-length (6)**
26:7,9,13;27:7;31:4;
138:24

**around (12)**
19:10;23:23;37:20;
49:22;53:3;62:6;70:22;
72:2;98:3;115:10;
141:22;177:22

**arrangement (1)**
16:13

**arrangements (1)**
28:2

**Art (3)**
47:9,10;85:12

**ascertain (1)**
162:22

**aside (7)**
35:25;62:16;63:24;
64:1;74:9;116:1;176:8

**aspect (1)**
21:11

**assault (2)**
78:24,25

**asserted (1)**
25:17

**assertion (2)**
37:4;61:22

**assessment (1)**
171:13

**assets (4)**
113:11,11,13,22

**assistance (2)**
8:11;66:18

**assisted (1)**
147:18

**assume (5)**
5:24;120:18;143:8;
158:5;181:5

**assumed (1)**
85:13

**assuming (2)**
152:14;154:8

**assumption (1)**
95:23

**assumptions (4)**
95:12,17,21;158:4

**assumptions' (1)**
95:20

**assurance (2)**
96:16;103:19

**assurances (2)**
96:17;111:8

**attach (2)**
70:25;111:6

**attached (6)**
50:25;51:6;72:3;
111:5,9;127:6

**attachment (5)**
71:2;76:7,7;132:21;
133:3

**attacked (1)**
131:11

**attempt (5)**
80:25;83:23;90:12;
113:16;181:5

**attempted (1)**
144:25

**attest (4)**
52:7,7,8;155:23

**attestation (1)**
52:5

**attested (1)**
166:24

**attesting (1)**
138:9

**attorney (10)**
59:13,16,17,18;
105:23;106:1;112:4;
115:23;178:12,13

**attributable (1)**
115:12

**audit (4)**
46:11;52:6,10;65:22

**August (12)**
33:25;46:17;47:4;
62:23;63:3,5,17;73:21;
99:19,21;120:15;
180:13

**authentic (1)**
164:19

**authorized (2)**
70:12;118:6

**available (5)**
109:13;131:21,23;
147:21,22

**average (1)**
155:5

**averages (1)**
155:3

**avoid (1)**
177:2

**Avoided (2)**
64:4;115:16

**aware (5)**
8:12;13:10;52:23;
118:14;181:24

**away (16)**
9:21;10:13;11:4;
16:6;40:24;42:16;
44:21;55:21;65:25;
66:1;78:7,9,15;151:9;

157:5;171:1

**axe (2)**
96:25;111:24

---

# B

**Babayan (7)**
27:13,13;47:18;48:9,
13;51:11,15

**Babayan's (2)**
47:18;48:1

**back (46)**
5:22;12:20;15:17;
17:4;21:3;22:3,17;
26:1,3;31:14,14;33:12;
34:12;36:8;38:22;
40:11,15;43:7;51:2;
55:3;69:16;73:11,16;
74:3,11;79:14;82:25;
83:3;89:20;101:13;
105:20;106:2;114:17;
119:10,13;121:22;
128:18;133:12;150:20;
161:12;166:10;167:14;
175:2,17,23;176:24

**back-and-forth (3)**
20:25;60:3;109:1

**backdated (2)**
50:9,10

**back-dated (1)**
141:23

**backdoor (1)**
90:12

**backfilling (2)**
46:19;50:6

**background (2)**
98:12,23

**backing (2)**
90:8,10

**backup (6)**
32:21;39:5;152:9;
173:15;174:1,2

**bad (5)**
66:9;72:22;113:8;
120:5;142:14

**bad-faith (1)**
42:19

**baked (2)**
18:22,25

**balance (1)**
62:2

**ball (3)**
161:22;162:9;164:2

**ballpark (1)**
183:4

**bank (23)**
57:19;94:12;96:7;
104:9,11;105:2;107:7;
113:23;122:10,22;
123:17,18;124:17;
128:18,19;130:23;
138:3;139:19;147:10,
10;177:4,14;179:11

**bankruptcy (16)**
64:3,4;113:16,21;
145:16;146:6,6,9,21,
24;147:18;150:15,23;
180:19,19,21

**banks (1)**
123:19

**bank's (1)**
178:13

**bar (3)**
163:10,25;164:1

**bargain (3)**
33:13;157:7;182:12

**bark (1)**
157:12

**base (3)**
86:22,24;153:15

**based (23)**
13:1;21:24;22:20,25;
25:13;28:17;33:22;
39:5;46:10;57:19;68:7;
89:17,18;90:9;116:11;
128:10;153:23;157:1,
2;163:24;166:18;
168:25,25

**baseline (2)**
12:13;63:7

**basically (4)**
24:4;36:3;42:11;
69:11

**basing (1)**
96:10

**basis (10)**
26:9,14;27:1;97:13;
116:23;123:7;178:4,5;
182:20,21

**bat (1)**
11:14

**bathroom (1)**
29:10

**bear (8)**
12:14;32:22;89:21,
23;97:17,18;140:10;
148:5

**bears (1)**
137:11

**beat (1)**
155:8

**became (4)**
37:19;53:5;111:23;
147:10

**become (1)**
147:9

**becomes (6)**
15:24;42:1;66:2;
106:7;151:21;173:10

**becoming (1)**
147:9

**beforehand (1)**
135:5

**began (1)**
64:1

**beginning (1)**

55:24

**behalf (1)**
17:16

**below (5)**
12:6;28:18;30:17;
114:21;153:21

**benefactor (1)**
176:13

**benefit (1)**
182:12

**Bennett (1)**
9:9

**besides (1)**
126:9

**best (6)**
5:22;9:11;37:9;
80:11;147:17;163:3

**best- (1)**
176:20

**best-case (1)**
155:17

**better (5)**
5:7;14:12;21:6;40:2;
93:7

**beyond (2)**
152:14;158:21

**bid (1)**
156:6

**bids (1)**
153:23

**big (7)**
38:16;42:2;48:19;
51:18;65:23;171:18;
184:19

**biggest (9)**
9:9;34:24,25;36:23,
24,25;38:21,24;42:21

**bill (19)**
26:24;40:15;45:23;
46:8;49:17;53:10;55:3;
69:24;82:2,3,4;85:12,
13,14,19,20,23;143:9;
155:13

**bill' (1)**
85:19

**billed (8)**
35:15,21,23;36:16;
62:16;82:1;85:5;
155:21

**billing (8)**
50:10;80:19,20;
82:14,14;120:2;144:9;
174:5

**bills (13)**
46:1,5,5,16,17;49:7,
18;50:3,13;61:3;64:14;
85:16;142:5

**binder (2)**
50:4;174:3

**binders (7)**
44:11,13,15;48:3;
81:7;153:11;173:19

**binding (1)**

Case 16-01120   Doc 399   Filed 10/11/19   Entered 10/11/19 09:34:30   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 189 of 214
October 4, 2019

124:14
**bit (8)**
17:3;43:9;57:11;
61:4;70:4;106:2;141:8;
144:23
**Bizarre (1)**
53:7
**black (2)**
100:16,18
**blew (1)**
25:20
**blow (1)**
58:13
**blowing (2)**
75:1;171:25
**blown (1)**
183:2
**blue (2)**
34:19;64:23
**board (1)**
184:1
**bogus (2)**
151:3;163:19
**bombing (1)**
9:11
**bonded (1)**
148:3
**bones (1)**
82:23
**bookkeeper (2)**
52:15;76:13
**bookkeepers (1)**
51:24
**books (32)**
36:2;37:6;39:4;46:9;
47:16;48:21;51:13,25;
52:1,6,7,8,9,12;62:5,7,
8,11;65:14;66:12;
68:24;69:5,19,21;
72:12;77:24;82:15;
89:1;158:19;162:10,
15;163:22
**Boris (4)**
45:20;59:12;69:13,
14
**borne (1)**
150:24
**borrow (8)**
38:8;41:23;53:23;
59:6,10;109:11;
178:24;179:2
**borrowed (4)**
59:7,22;179:21,22
**Borrower (3)**
138:19,23,23
**borrowing (2)**
17:23;55:24
**both (29)**
16:15;44:18;45:4;
63:19;65:1;68:11;74:7;
81:13;96:4;114:24;
116:10,17;117:24;
118:7;119:18;120:21;

124:5,6,8;129:20;
131:9;133:15,16;
140:16;150:5;161:25;
166:7;170:5,23
**bought (3)**
29:24;46:22;179:23
**bound (7)**
93:20;108:21;
139:24;140:25,25;
141:1,2
**box (3)**
70:10,11;160:19
**boy (1)**
172:7
**breach (4)**
72:23;78:12;120:12;
136:14
**breached (3)**
116:9;118:5;136:16
**break (8)**
5:16,17,17,18;43:4,
21;121:13,13
**breakdown (1)**
166:4
**breathed (2)**
25:5;39:20
**brief (7)**
27:19;49:8;50:24;
51:1,6;92:1;99:12
**briefly (9)**
34:23;35:3;43:25;
44:16;56:23,24;60:13;
77:18;165:1
**briefs (2)**
184:1,11
**bring (6)**
128:19;130:16;
133:11;154:23;171:8;
184:13
**bringing (3)**
28:1;150:20;158:19
**brings (3)**
45:18;74:5;155:7
**briskly (1)**
54:4
**broad (1)**
111:2
**broker (2)**
58:24;107:12
**Brookline (2)**
11:25;30:9
**brought (4)**
19:14;88:7;123:1;
158:23
**Brusenkova (18)**
10:7;21:21;22:10;
45:10,24;46:2;47:21;
48:21;67:18;68:17;
69:2;73:12,24;74:6;
78:23,24,25;145:7
**Bst (3)**
45:20;46:25;47:1
**bubble (1)**

39:23
**bucks (24)**
14:5;18:2;26:22;
27:2;29:8,9;30:4,11;
40:19;42:14;47:11;
48:15,24;49:14;50:8,
15,16;53:1,15;61:20;
67:22;68:4;72:20;
173:5
**budget (21)**
17:13;19:1,1,14;
20:10,17,21,23,24;
21:7;52:25;53:8,11,13;
54:23;69:8;103:7;
137:21,21;138:6;
178:17
**build (19)**
12:10;13:15,21;19:3,
13;28:25;29:25;32:10;
53:22,23;86:21;
103:14;109:23;135:17;
136:7,16,23;175:22;
177:16
**builder (2)**
123:2,5
**builder's (1)**
123:6
**building (4)**
13:8;30:2;106:12;
115:2
**built (9)**
29:16,18;32:21,24;
95:21;102:20,21;
178:9;182:24
**bullet (1)**
15:13
**burden (13)**
7:4;89:4;92:16;
102:1;120:9,11,11;
129:6,9,9;162:8;
163:20;181:9
**burdens (1)**
7:6
**buried (1)**
151:14
**bury (1)**
134:22
**business (4)**
22:13;48:21;138:20;
145:20
**buy (1)**
53:16
**buyer (2)**
121:5,6
**buying (2)**
13:7;175:20
**buys (1)**
150:25

**C**

**cabinets (1)**
29:12

**calculate (1)**
175:13
**calculation (5)**
24:6,7;28:19;111:14;
175:11
**call (20)**
5:20,21;9:15;16:22;
22:21;23:11;31:16;
37:16;46:11;108:5,7,8;
129:1,3,7,22;131:3;
139:19;153:3;175:25
**called (4)**
68:19;91:20;147:11;
163:16
**calling (2)**
4:4;142:18
**calls (2)**
9:14;174:20
**came (23)**
9:24,25;10:5,8;
14:16,22;19:10;24:12,
18;30:15;37:3;38:2;
46:4;47:12;68:11;77:7;
82:12;90:20;99:1;
150:5;158:13;169:22;
173:22
**Can (79)**
4:25;5:3,14;7:22;8:9,
14;11:3;13:2;15:5;
20:14,25;31:11,12,13,
13;34:8,10;36:17;
37:15;38:22;43:4,7;
44:21;51:2,8;53:23;
60:4,15;61:13,17;
64:13,14,15;65:25;
66:1;74:9,14,25;75:5;
76:18;78:15;79:1;85:9;
89:12;91:20;92:7,21;
93:3,12;95:5;98:5;
100:21;101:13;104:11;
105:22,23;109:14;
124:12;130:10;133:1;
134:1;135:2;136:1;
139:15;140:3;147:23;
148:14;150:14;153:21;
156:21;159:10;161:11;
163:3;179:18;183:11;
184:17,17,20,20
**candid (1)**
51:16
**candidly (3)**
46:3;52:9;180:17
**candor (1)**
63:13
**capable (1)**
66:19
**capital (13)**
113:24;114:6;
167:14,18;168:14;
169:1,2,11,15;175:1,
13;176:8;180:24
**capped (1)**
110:1

**caps (1)**
110:6
**care (12)**
11:1;13:7;18:10;
19:4;48:23;49:2;
106:14;108:15;123:17,
19;146:11;182:13
**careful (3)**
92:4,5,14
**carefully (3)**
105:14;118:10;
122:25
**cares (2)**
120:25,25
**CARNATHAN (103)**
4:14,15;5:25;6:4,20,
24;7:10,13,25;8:7,16,
21,25;9:6;11:14,17,20;
14:8,10,24;15:3,5,9,11,
15,17;16:2,4;17:19;
18:24;19:7;22:7,15,17;
23:3,7,9,12,17,19;
28:10,15;32:23;33:2,7,
9,18,21;37:6;39:14;
40:6,10,13,15,23;41:4,
8,10;42:24;43:2,6,17,
18,23;44:7;50:22,25;
51:10;56:9;64:6,8,19;
73:7,9;82:21;85:13;
86:2,3;87:7;106:10;
118:11;120:13;152:19;
159:3;171:6;172:6,7,
11,14,17,20;173:1;
175:15;181:10,14;
182:3,7,15;183:9,22;
184:17,22,25
**Carnathan's (1)**
164:6
**carried (3)**
29:11,11;114:5
**carries (1)**
29:10
**carry (1)**
29:8
**carrying (80)**
17:24;32:2,13;33:10;
34:6;37:1,24;38:5,8;
41:21,22;52:25;53:2;
56:2;58:6,16;59:5,6,7,
10,22;60:1,5,11,23;
66:23;67:14;97:9;
99:14,19;100:9,23;
101:16;102:2,3,11,12,
16,20,24;103:8,10,20;
104:5;108:11,15,24;
109:7,14;116:25;
122:12,17;137:16,22,
24;147:12;163:14,15,
17,19;166:12,13,15,18,
21;167:2,22;169:16,
20;173:12;177:17;
178:8,22,25;179:2,20,
22;180:16,17,20

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 190 of 214
October 4, 2019

**carrying-cost (3)**
23:25;38:17;167:7
**carve-out (1)**
171:19
**Case (51)**
4:4;9:16,22,24;
10:22;24:12;44:20;
45:23;79:24;80:5,19;
91:2,3,4,5,19;92:6,9,
19,20,21,21,25;93:16,
16,17,18;94:1,13,14;
111:9;115:18;116:1;
117:3,8;119:6;128:22;
131:14;137:5;140:4;
141:3,14;143:23,25;
145:16;153:16;155:20;
168:15;169:16;183:19,
25
**case-in- (1)**
158:22
**cases (5)**
9:10;92:7,23;93:3;
161:8
**case-scenario (1)**
176:21
**cash (2)**
112:11,17
**cashflow (2)**
34:6;60:7
**castigate (1)**
168:1
**catch (1)**
52:11
**categories (1)**
154:12
**causal (1)**
79:25
**causation (3)**
180:3;181:3,8
**cause (1)**
143:17
**caused (5)**
167:21;180:7;
181:12;182:2,9
**causing (1)**
145:11
**cavalierly (1)**
21:9
**cc'd (1)**
128:18
**cell (2)**
76:23;77:1,8,10,11,
17
**cents (1)**
94:17
**Century (3)**
63:24;119:20;147:2
**certain (3)**
78:8;95:21;178:16
**certainly (22)**
6:14;14:10;43:2;
52:6;58:19;72:2;75:7;
77:14;97:22;100:8;

**103:9,21;108:23;
111:17;123:23;133:22;
135:25;143:22;152:8;
160:11;171:20;181:10
certainty (2)**
182:19,20
**certificates (1)**
33:24
**certified (1)**
162:14
**CFO (2)**
68:18,21
**chain (2)**
71:3;76:10
**chair (1)**
79:19
**chalk (22)**
39:13;69:24;86:12,
13,15;90:1;152:19;
153:1,3,6,7;165:13,16,
17;172:9,10,12,15,16,
20;176:2;183:11
**chalks (9)**
23:12,20;31:15,17;
39:14;69:25;156:11;
157:25;165:8
**challenge (3)**
81:25;102:5,6
**challenged (3)**
166:23;25;171:25
**chance (5)**
6:21;14:1;68:8;
84:12,15
**change (8)**
30:6;50:7,10;58:18;
72:8;83:5;107:10;
172:23
**changed (2)**
59:3;83:9;156:19;
159:24;164:5
**changes (4)**
65:19;82:25;83:7,8
**characters (1)**
10:24
**charge (13)**
12:11;17:9;24:14;
39:24;45:25;60:18;
67:17;71:15;74:2;
82:18;107:11;144:18;
152:13
**charged (8)**
68:23;69:1;82:6,10;
144:7;152:10,11;
155:24
**charges (19)**
18:9;24:4;25:24;
26:3;30:22;31:3;45:6;
62:3;64:16;65:13,18;
70:12;71:16;81:22;
156:10,11;183:12,14,
15
**charging (5)**
16:10;25:1;36:6;

**82:5,17
chart (13)**
27:18;33:15,15,18;
36:24;37:17;50:25;
51:5;55:7,9;56:14;
85:15;86:7
**charts (4)**
23:14;55:5;86:8,9
**cheaper (1)**
88:8
**check (2)**
73:5;134:12
**checkbook (2)**
49:1;97:21
**checkbooks (1)**
163:1
**checking (2)**
42:13;60:5
**checks (19)**
19:9;31:7,18;34:8;
37:8;39:5;51:5;61:8,9;
134:19;162:24;163:2;
173:13,15,20,20,22;
174:4;180:22
**chief (1)**
158:23
**child (3)**
67:14;142:25,25
**Chinese (1)**
183:22
**chisel (1)**
155:12
**choice (1)**
48:8
**choices (1)**
148:3
**circle (2)**
15:17;36:8
**circles (1)**
99:1
**Circuit (1)**
10:20
**circumstances (2)**
131:2;151:17
**circumstantial (1)**
157:1
**citations (2)**
92:22;93:9
**cite (4)**
16:21;92:6;93:18,18
**cited (5)**
91:2,4,22;93:10,17
**cites (3)**
16:22;51:1,6
**citing (1)**
92:14
**City (3)**
9:11;30:3;45:6
**civil (1)**
131:13
**Claim (49)**
4:6;22:24;23:22;
24:1,3;25:7;37:21;

**38:19;39:17,20,21;
45:10,16;46:19;47:11,
16,25;48:12;50:19;
52:19;59:23;62:14;
67:4;70:12;73:17;
77:25;80:8,14,14,16;
84:23;92:2;94:10;
112:6;116:6,24;
163:10,12;165:24;
166:2,25;170:3,8;
173:19;174:13,17;
177:11;183:14
Claimant (1)**
4:6
**claimed (4)**
59:6;60:1;77:16;
114:12
**claiming (4)**
40:16;60:14;115:16;
126:11
**claims (16)**
14:25;17:2;22:22,25;
23:20;37:22;38:17;
41:15;44:14;57:21;
61:1;68:10;73:10;
113:19;174:20;181:20
**Classic (11)**
57:12,14,15;69:13;
104:21,22;122:20;
124:2,4;125:16;133:13
**clause (3)**
112:1,25;115:21
**clauses (1)**
109:4
**clear (14)**
16:14;17:20;90:25;
91:3,15;92:17,20,23,
25;93:18;135:9;
146:22;159:18;172:17
**clearly (16)**
7:6,6;14:7;28:2;
54:20;84:7;98:2;99:8;
100:4;111:9;112:6;
128:16;139:1;149:18;
165:22;171:17
**CLERK (6)**
4:4;23:10;43:12;
121:25;165:15;172:25
**cliche (2)**
96:25;157:12
**cliches (1)**
157:16
**client (6)**
17:17;80:9,13;96:24,
24;181:12
**clients (3)**
20:3;24:21;52:23
**close (9)**
5:5;6:5,5,24;11:14;
21:5;42:22;53:16;
132:14
**closed (1)**
57:16

**closely (1)**
183:13
**closet (2)**
29:11,12
**closing (26)**
4:5,10;5:9,12,16;
11:12;23:11,12,14,20;
57:13,23;59:13,16;
69:25;70:16;80:7;
109:13;116:3;118:10;
153:3;174:8;177:7,9;
178:12,13
**closings (1)**
69:16
**Cohen (57)**
10:17,18,20,22;
37:20,24;38:2,4,6,7;
41:17;42:3;45:9;56:11,
14;59:9;60:11;66:8,11,
14,21;67:20;68:4,12;
69:17;70:15,17,25;
71:5,7,9,25;72:8;75:15,
16,18,20,21,21,23,25;
76:2,4;78:19,24;128:7;
129:15;141:9,14;
142:14,22,23,24;
144:14;145:5;150:20,
20
**Cohen's (4)**
66:7;77:13;79:1;
141:15
**coincidence (2)**
46:13;65:24
**collapsed (1)**
55:10
**collapsing (1)**
43:19
**column (2)**
95:11;175:10
**comb (1)**
86:2
**coming (8)**
33:13;53:17;64:14;
96:8;102:15;134:16;
163:18;175:9
**commenced (1)**
46:18
**commences (1)**
47:5
**comment (4)**
28:20;43:25;62:21;
167:20
**commenting (1)**
105:13
**commission (3)**
63:25;94:13;165:23
**committed (1)**
96:6
**common (2)**
68:7;98:12
**Commonwealth (1)**
91:1
**communications (3)**

Min-U-Script®
eScribers, LLC | (973) 406-2250
operations@escribers.net | www.escribers.net
**(5) carrying-cost - communications**

105:11,11;106:4
**companies (6)**
16:8;31:20;115:5,7,
11;173:2
**company (25)**
13:22;17:7;18:1,1,4,
8,15;35:1,12;36:19;
57:25;58:1,4;112:13;
113:14;115:1;125:21;
134:24,25;139:2;
147:17,18;170:7,20,20
**comparable (2)**
29:17;138:24
**compare (2)**
58:12;62:15
**compared (1)**
49:7
**compares (1)**
37:18
**comparing (1)**
28:13
**compen (1)**
154:16
**compensation (5)**
12:5;112:10;114:20,
22;115:6
**compiled (1)**
52:5
**complaint (12)**
4:11;80:6;116:5;
117:5,5,10;120:4;
136:6,9,14;137:8;
152:2
**complaints (2)**
67:18;118:4
**complete (5)**
62:24;63:5;67:24;
74:21;180:6
**completed (5)**
12:3;33:24;62:1;
100:10;149:22
**completely (9)**
5:6;18:9;25:10;
28:21;39:25;40:23;
54:9;56:4;57:10
**completion (4)**
62:21,22;120:8,17
**complicated (1)**
89:1
**comply (1)**
122:11
**component (1)**
21:14
**components (1)**
16:10
**comports (1)**
10:3
**computation (1)**
28:14
**computer (2)**
125:1;157:17
**concede (2)**
133:17;142:16

**concept (4)**
15:24;22:10;73:9;
114:4
**concern (3)**
14:7;20:15;148:17
**concerned (5)**
12:16;13:21;106:11;
129:6;147:8
**concerning (1)**
83:16
**concerns (2)**
21:17;107:10
**conclude (8)**
9:18;17:15;36:17;
48:2;50:18;80:4;
181:25;182:20
**concluded (1)**
78:9
**concludes (1)**
80:1
**conclusion (9)**
35:15;49:23;86:18,
19;88:10,15;89:15;
150:4;162:2
**conclusions (2)**
84:20;86:2
**concocting (1)**
94:25
**conditioned (1)**
9:18
**conditions (2)**
138:2,22
**conduct (2)**
80:9;182:9
**conference (1)**
171:8
**confident (1)**
25:5
**configuration (1)**
96:9
**confirm (7)**
24:11;57:2;65:6;
69:6;74:9;119:9,12
**confirmed (7)**
44:12;55:22;59:14;
65:7;108:23;119:10,13
**confirming (1)**
46:12
**confirms (4)**
45:23;49:5;56:3;
127:15
**confronted (3)**
10:12;59:20;142:22
**confusion (2)**
172:18;173:9
**connect (4)**
83:11;89:16;102:7;
180:5
**Connecticut (4)**
91:5,6;93:20,20
**connecting (2)**
102:7;121:9
**connection (2)**

79:25;121:9
**consent (1)**
16:18
**consequence (1)**
176:15
**consequences (3)**
175:24;176:15;177:2
**consideration (1)**
123:5
**consistent (1)**
124:9
**consists (1)**
23:22
**conspiracy (2)**
94:25;115:19
**constant (3)**
54:23;55:1,11
**construct (13)**
11:24;42:1;60:11;
66:9;75:17;77:7;78:7;
106:20;110:15;123:2;
175:17;176:12;179:7
**constructed (1)**
50:21
**constructing (2)**
90:13;123:5
**construction (96)**
12:3;13:19;17:7,12,
24;19:1,1;20:10,13,17;
21:7,15,19,22;25:19;
28:1,5;29:21,22;30:3,
10,16,17;33:23;34:9,
10,21;38:11;41:12;
46:7,19;48:23;49:17,
20,23;52:18,21,25;
53:4;54:23,25;55:11;
56:2,21;81:23;87:20;
89:6;102:13,14,15,20;
103:7,20;104:6,8;
105:1;107:7,11,13;
109:6,21;110:1,6;
113:18;115:1;116:16;
120:1,16;122:7,13,16,
19,20,21,23;134:15,15;
137:3,9,15;138:4,7,10;
141:1;142:2;144:7;
149:13;151:5,5;154:3,
23;172:21;173:3;
174:9;177:23;182:24
**construction-loan (3)**
57:13,23;151:10
**construction's (2)**
20:1;34:1
**consume (1)**
6:17
**contemporaneous (1)**
69:6
**contention (2)**
153:11;174:16
**contentions (1)**
25:17
**contents (1)**
45:15

**contested (5)**
14:23;130:11,12,15;
131:7
**contesting (1)**
156:12
**context (2)**
26:16;160:6
**contingency (1)**
112:6
**continues (1)**
20:19
**contract (108)**
13:19;14:20;17:2,16;
22:20;25:21,21;39:19,
20;41:5;57:12,25;58:4;
60:23;66:16;68:5,10,
15;69:3,13,14,18,21,
22;70:1;71:21;72:9;
76:8;95:13;104:21;
107:8,14,17,20;114:24;
116:8;122:20,21,24;
123:2,8,8,9,11;124:3,4;
125:1;126:1,10,11,15;
127:2,9,18;128:10;
133:11,12,13,14,15,15,
21,24;134:4,7,24;
135:3,5,6;136:3,6,15,
15,16,18,18,23,25;
137:6;139:3,12;
140:22,24;141:2,5,16;
144:15;147:2;151:13,
15,18,21,22,25;152:1,
2,4,11,12,13;153:15,
17;154:23;155:24;
166:8;177:10,13
**contracted (1)**
136:13
**contractor (14)**
18:13;25:22;26:8;
48:25;53:14,21;69:2,5;
83:9;142:2;147:22;
154:13;177:24;179:14
**contractors (4)**
26:14;83:16;123:6;
142:6
**contractor's (1)**
142:5
**contracts (10)**
16:5;25:13;60:18;
64:3;78:22;86:22;
127:6;137:9;166:7;
177:5
**contradict (1)**
58:12
**contradicted (3)**
57:10;58:11;74:12
**contradiction (1)**
9:14
**contrary (1)**
89:6
**contribution (2)**
176:8;180:25
**contributions (3)**

114:1,6;175:1
**control (5)**
24:20;32:9,11;106:6;
131:15
**controls (1)**
7:20
**convenient (3)**
113:8;119:21;128:21
**conversation (2)**
20:19;55:24
**conviction (1)**
142:21
**convincing (10)**
16:15;17:20;90:25;
91:3,15;92:17,20,23;
93:1,19
**cook (1)**
52:12
**cooked (3)**
35:18;59:9;73:2
**cooking (2)**
38:16;82:15
**Cooling (1)**
44:17
**cooperation (2)**
63:22;66:4
**copied (1)**
156:14
**copies (3)**
93:6;134:12,19
**copy (10)**
13:19;17:2;93:5;
119:7,8,8;127:18,19;
135:5;152:19
**corner (2)**
99:16,18
**Corp (3)**
4:8,8,19
**corporate (2)**
115:17,21
**corrected (2)**
13:9;118:2
**correctly (1)**
110:17
**Corrugated's (1)**
92:3
**cost (37)**
12:11;19:20;21:17;
22:4;25:23;27:2;28:1;
29:24;30:10;41:19,20;
56:25;57:5;61:3;72:17;
87:12,20;88:9;89:11;
94:3;95:13;97:9;99:14;
101:16;108:15;116:12;
123:7,8;151:4,5;154:1,
13,18,21;156:25;
166:4;183:14
**cost-plus (1)**
133:14
**costs (142)**
16:11;17:24,25;
18:21,24;19:17;21:19,
22;25:19;29:3,21,22;

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 192 of 214

October 4, 2019

30:4,5,16,17;32:2,13;
33:10;34:6,11;37:2,12,
24;38:5,8,11;39:12,21;
41:12,21,22;46:14,19;
48:23;52:22,25;53:2;
55:1,11;56:2,21;58:6,
16;59:5,7,8,10,22;60:1,
5,11,23;61:2,6,10;
66:23;99:19;100:9,22,
23;102:2,3,11,12,16,
20,24;103:8,10,20;
104:5;108:11,24;
109:7,14;110:1,6;
116:14,22,25;122:12,
17;133:18,20,20,22,23;
134:1,2;136:1,1,2;
137:16,22,24;138:7,10;
144:7;147:13,23,24;
153:9,10,20;154:1,16;
157:23,24;163:6,14,15,
17,19;166:3,7,12,15,
18,21;167:1,2,5,22;
169:20;172:21;173:3,
4,12;174:9;177:17;
178:8,22,25;179:2,20,
22;180:16,17,20,24;
183:10

counsel (23)
5:5,23;26:21,23;
66:18,20,20;79:22,24;
80:3;81:16;84:2,18,19;
89:4,16;93:5;95:1;
107:19;109:2;154:10,
19;155:9

counsel's (7)
80:25;83:22;86:19;
89:7,13;90:12;165:10

count (2)
136:14;137:4

counterclaim (1)
60:15

counting (1)
9:4

Countryside (1)
29:16

couple (9)
5:5;28:4;58:10;
61:20;80:5;83:16;98:1;
109:4;143:19

course (13)
18:21;83:7;103:24;
123:14;128:9,22;
132:1,2;148:18;149:3,
5;151:9;175:22

COURT (408)
4:2,23;5:3;6:2,8,10,
12,14;7:3,11,15,24;8:2,
5,6,8,10,12,12,15,18,
19,22;9:1,3,23;10:10,
21;11:11,16,19;14:6,9,
23;15:1,4,7,10,14,16;
16:1,3;17:15;18:21;
19:6;22:5,14,16;23:2,4,

8,11,14,18;28:9,12;
32:18;33:1,6,8,17,20;
39:13;40:2,8,12,14,22;
41:1,2,3,7,9;42:22,25;
43:3,7,12,15,15,16,21;
44:6;50:21,23;51:9;
56:8,21;64:5,7,17;
71:13;73:5,8;79:11,13,
16,18;80:1,17;81:5;
83:12,15,21,24;84:9,
12,14,17,22,25;85:7,
10;86:10,12,14,16;
87:7,22,24;88:1,3,11,
13,17,21,24;89:8,20,
23;90:1,7,10,13,16,20;
91:3,9,14,17,22,24;
92:3,9,10,12,12,15,16,
18,22;93:2,4,5,7,10,12,
15;96:18;97:2,4,10,13,
16,18,25;98:17,20,23;
99:3,5,10,12;100:7,13,
15,18,24;101:2,5,7,10,
12,15;104:13,15,18,20,
24;107:24;108:2,5,7;
116:4;117:8;118:4,9,
13,20,22,25;121:12,15,
18,21,24,25;122:3;
123:23;124:1,5,7,18,
20,22,24;125:4,6,9,11,
13,15,19,21,25;126:3,
5,7,13,17,20,23,25;
127:10;128:25;129:8,
12,17,20,24;130:3,6,
11,14,18,21;131:4,6,9,
13,18,20,22,24;132:1,
3,8,10,11,21,23;133:1,
3,6,9;134:9;135:12,16,
22;136:10,17;138:17;
139:6,20,22,25;140:11,
14,17,19,23;141:6,10,
18,21;142:3,7,10,12,
15;143:6,10,13,20,22,
25;144:2,4;145:3,14,
16,20,22,24;146:1,3,
11,14,17,20,25;147:3,
5,7,15;148:20,25;
149:2,5,7,9,11,14,21;
150:21;152:21,23;
153:1,3,6,10;155:4;
156:16;157:1,14,16,18;
158:13;159:13,15,17,
23;160:2,4,6,9,16;
161:10,15,17;162:17;
163:5;164:4,14,18,25;
165:3,7,12,14,16;
166:1;167:2,4,6,12,16;
168:2,4,8,12,18,20,23;
169:4,9;170:8,10,12;
171:2,5,10,12,15;
172:3,5,10,13,16,19;
175:14;181:1,11,24;
182:6,14,20;183:8,16,
18,24;184:5,6,8,11,15,

19,24

courtroom (4)
4:24,25;5:5;25:5

Court's (1)
80:18

covenanted (1)
151:10

covenanting (1)
138:5

cover (6)
27:23;34:6;37:1,12;
72:3;109:6

covered (4)
82:4;85:21;171:17,
17

covers (1)
33:12

CPA (1)
162:15

crazy (1)
114:9

created (6)
37:24;42:2;127:13,
14,15;128:12

creating (2)
13:7;143:16

creative (2)
112:3,3

credibility (11)
9:24;28:21;43:24;
51:19;56:5,10;65:16;
78:18;119:18;131:10;
163:11

credible (42)
10:10,18,21;18:9;
19:21;20:7;28:21;30:8,
12;45:12;48:3,7;50:20;
52:14,15,19,20,20;
56:5,18,21;57:7,9,12,
22;59:24;60:21;68:13,
14,15;69:5;72:11;
73:10,16,16;74:1;
77:14;78:19,19,19;
124:16;144:13

credit (3)
62:19;90:17;167:24

credited (1)
37:10

creditors (2)
113:12,17

criminal (3)
67:17;79:1,2

cringe (1)
161:9

cringe-worthy (1)
161:13

crisp (1)
5:19

critical (2)
126:25;143:17

crook (1)
141:12

cross (3)

29:20;160:7,11

crossed (1)
55:19

cross-examination (2)
60:21;166:23

cross-examined (2)
65:17;131:10

crucial (1)
103:22

crunch (1)
60:7

crux (1)
12:6

cry (1)
159:2

Ct (2)
91:20;92:1

cultural (1)
98:11,17,20

cumulative (2)
129:14;132:19

current (2)
40:19;180:21

currently (2)
11:25;165:21

curse (1)
183:22

custody (1)
142:25

cut (1)
160:18

Cutler (7)
4:5,10;31:19;62:20;
82:6;76:9,11

CutlerLLC@gmail (1)
74:23

D

DaCosta (10)
47:8,8;49:3,3,7,7,11,
17;50:1;51:11

damages (14)
80:7,8,15;120:18,19,
20;144:24;165:11;
171:14;180:3,5,7;
181:12;182:9

Dan (5)
47:22,23;68:19;
73:13;119:13

darn (1)
175:15

data (2)
83:3;88:10

date (11)
8:1;31:23,24,24;
32:14;58:14;65:13;
71:21;87:22;100:10;
128:11

dated (11)
36:1;46:5,6,6,17;
47:4;68:10;72:2,3;
73:22,23

dates (4)
8:3;56:13;127:13;
128:5

day (16)
8:1,3;9:17;16:22,24,
25;46:12;65:18,24;
71:6,24;113:15,20;
169:25;181:16;183:19

days (4)
8:3;40:20,21;65:14

days' (1)
148:14

dead (2)
119:24;161:22

deal (65)
11:21,23;12:9;13:6;
14:16;19:12;20:11;
26:3,7,7,10,11,15,16,
17;27:10;31:4;52:21,
23;53:3,16;55:6;56:1,
3,18,20;59:7,13,14;
70:17;94:17,18,19,23;
97:20;99:22;109:16,
17,17;111:10;112:16,
24;113:8,9;115:24;
116:9;118:4,8;123:1,
12;124:9,10;135:16,
21;136:4,4;154:25;
169:24;173:23;175:4,
9;176:3;177:16,25;
179:9

dealing (8)
16:15;17:5,14;26:1,
2,5,6;145:17

deals (8)
26:13;27:7,23;59:21,
24;98:14;107:7,13

debtor (1)
4:17

debunk (2)
90:24;100:6

December (2)
62:8;63:13

decide (5)
45:25;91:6;159:10;
160:2;176:18

decided (3)
21:14;39:24;91:5

decides (3)
21:5;97:11;106:3

deciding (1)
36:5

decision (4)
20:9;92:10;146:8;
182:4

declined (1)
164:15

Decor (3)
47:9,10;85:12

deduct (3)
24:13;36:15;94:12

deduction (2)
169:5,6

**deductions (1)**
165:22
**deep (1)**
143:1
**deeply (1)**
5:11
**Defendant (1)**
5:24
**defendants (5)**
19:8;46:16;51:22;
60:14;146:5
**defendant's (1)**
107:1
**defies (1)**
119:18
**definitely (1)**
18:25
**definition (1)**
150:6
**defunct (2)**
57:16;58:1
**delayed (1)**
55:9
**deliver (1)**
29:2
**delivered (1)**
28:18
**delta (3)**
29:25;154:4;174:5
**demand (10)**
20:2,4;38:10;42:7,
14;66:25;67:10;70:3,7;
72:6
**demanded (2)**
19:11;72:15
**demanding (4)**
19:16;38:3;39:1;
79:5
**demands (4)**
37:18;67:16;75:25;
76:3
**demo (1)**
73:21
**demolition (1)**
35:23
**denied (3)**
10:18,19;83:1
**dentist (1)**
53:13
**deny (4)**
55:17,20;100:8;
128:23
**denying (1)**
177:12
**deposit (2)**
53:15;113:11
**deposited (2)**
112:21;170:14
**deposition (1)**
142:22
**deposits (1)**
102:10
**described (3)**

12:23,24;141:11
**design (1)**
23:24
**designated (1)**
103:12
**desperate (1)**
115:25
**desperation (1)**
55:16
**despite (2)**
18:17;79:5
**detail (4)**
14:18;82:12;89:13;
94:7
**detailed (1)**
71:7
**determination (1)**
164:12
**determine (1)**
81:20
**determined (2)**
178:1,3
**determines (1)**
79:9
**devastating (1)**
56:10
**developed (1)**
134:14
**developer (1)**
13:4
**developer'- (1)**
13:3
**Development (12)**
4:8,19;13:22;67:2;
71:10;85:21;107:8,14,
17;114:24;134:17;
135:17

'

**'development' (1)**
13:3

**D**

**devolves (1)**
51:20
**difference (2)**
40:4;183:13
**different (16)**
18:4;19:17;27:22;
48:18;56:20;57:8,8;
59:16,21;84:4;108:19,
20;119:5;132:15;
162:24;164:18
**differently (1)**
90:20
**difficult (1)**
79:22
**digit (1)**
163:3
**Dima (3)**
13:2,6;111:14

**direct (6)**
65:17;154:13,18,21;
159:3;160:13
**directed (1)**
118:11
**directly (6)**
46:24,24;89:6;173:3,
4,7
**director (1)**
138:21
**disaggregate (1)**
180:4
**disallow (2)**
94:15,15
**disallowed (4)**
94:10,16;165:24;
170:4
**disallows (2)**
174:17,21
**disappear (1)**
41:12
**disappeared (2)**
82:8;132:6
**disappears (2)**
40:23;141:16
**disavowed (1)**
180:15
**disavows (1)**
54:9
**disbelieve (1)**
96:23
**disbursement (3)**
178:6,7,15
**disclosed (3)**
14:21;32:5;151:18
**discloses (1)**
55:7
**disclosure (1)**
17:17
**disclosures (6)**
16:18,22;17:21,22;
18:11;54:24
**disconnect (1)**
85:2
**disconnected (1)**
49:10
**discount (1)**
98:11
**discovery (3)**
78:1;137:2;173:14
**discrepancies (3)**
44:20,22;77:19
**discussed (2)**
170:17,18
**disgorged (1)**
151:20
**dishonest (1)**
141:12
**dismiss (1)**
80:22
**dispute (9)**
46:17;47:5;50:5;
63:15;64:1;91:9,11;

133:21;167:3
**disputed (1)**
91:12
**disputes (1)**
12:13
**disregard (4)**
115:21;124:12;
151:2;158:10
**dissolution (1)**
181:22
**distance (1)**
68:20
**distinct (1)**
154:12
**distinction (1)**
67:5
**distribute (3)**
113:11;114:5;167:18
**distributed (1)**
113:23
**Distribution (1)**
174:25
**distributions (1)**
114:1
**divide (1)**
100:1
**Docket (2)**
4:5,9
**docs (2)**
70:16;184:22
**doctored (1)**
159:23
**document (19)**
10:12;15:12;38:8;
57:1;72:13;75:19;77:5;
103:21;104:23;105:24;
110:5;128:12;129:4,
15;130:25;132:15,16;
159:25;173:19
**documentation (4)**
48:7;50:19;77:20;
104:5
**documents (22)**
10:2,19;20:6;21:16;
54:2;55:22;57:24;
58:11;68:7;69:6;71:24;
74:8,10;111:16;122:9;
123:20,25;125:2;
164:19;176:23;177:1;
184:25
**Doddridge (22)**
30:13,14,15,20;
81:13;82:7,9,9;87:4;
88:8;89:9;90:22;
144:10;152:15,16;
154:10;155:14,16;
156:22;163:7;183:9,13
**Doddridge's (5)**
152:17;154:8,23;
155:1,23
**dog (2)**
96:25,25;157:12
**dollar (4)**

33:5,5;94:16,16
**dollar-for-dollar (1)**
168:8
**dollars (12)**
15:21;19:11;22:1;
29:21;35:7;38:25;
67:20;88:7;171:25;
173:1;174:10;176:10
**domain (3)**
75:15;127:25;128:2
**done (24)**
6:2;13:5;14:11,11;
17:17;18:6,22;28:15;
34:1,21;37:6,8;46:7;
52:10;55:10;59:8,19;
79:20;87:6;98:14;
119:19;120:24;149:7;
175:4
**door (2)**
89:10,10
**dots (5)**
83:11;89:16;102:7,7;
121:9
**double (6)**
45:25;72:20;74:2;
80:19;82:1,14
**double- (1)**
155:12
**double-billed (1)**
155:20
**double-counted (1)**
21:2
**doubt (1)**
183:1
**down (22)**
9:24;10:22;17:6,22;
18:12;32:8;33:5;36:22;
38:18;41:13,13;42:13;
45:9;53:14;54:3;57:16;
107:2;108:25;117:1;
152:3;163:8;183:17
**downstairs (1)**
5:21
**dozens (1)**
75:7
**draft (4)**
54:14;58:14,25;
69:17
**drafted (11)**
66:15,16,17,22,25;
69:13,15,15;110:5;
112:1;141:25
**drafting (2)**
67:4;105:8
**drafts (3)**
67:6;105:13;111:21
**dramatic (1)**
72:8
**draw (6)**
76:19;79:6;84:20,21;
132:10;150:4
**drawing (1)**
89:15

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
Document    Page 194 of 214
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
October 4, 2019

**drawings (3)**
12:2;109:23;110:11

**drawn (2)**
90:2;96:5

**Dream (4)**
27:13;47:18,25;
173:24

**drew (2)**
86:3,3

**drive (2)**
184:7,21

**driveways (1)**
36:10

**ducts (1)**
13:8

**due (7)**
47:1;85:1,20;118:9;
147:9,9,10

**Dumb (1)**
161:21

**dumbest (1)**
82:16

**duplicate (1)**
82:5

**duplicative (1)**
170:14

**during (12)**
8:17;16:6;25:5;
27:12;32:6;44:4;51:21;
52:16;60:2;62:1;
173:14;179:1

**duties (3)**
91:10,12;116:2

**duty (6)**
11:24;12:5;72:23;
78:13;110:15;114:21

## E

**earlier (8)**
46:7;58:14;61:4;
73:2;111:21;126:14;
129:21;180:12

**early (3)**
62:23;105:21;180:12

**earning (1)**
68:3

**economy (1)**
29:2

**edit (1)**
106:15

**edited (3)**
83:1,6,7

**edits (1)**
82:25

**Edward (1)**
9:9

**effect (2)**
114:7;149:16

**effort (1)**
42:19

**ego (1)**
115:17

**eight (4)**
20:1;34:21;154:8;
165:4

**eighteen (5)**
27:14,15;48:18;
51:17;63:18

**eighty (1)**
98:6

**eighty-one-percent (1)**
63:11

**either (11)**
28:22;30:13;32:20;
41:12;60:2;73:23;
78:10;133:24;136:3;
150:18;154:22

**elected (1)**
116:23

**election (1)**
117:4

**election-of-remedies (1)**
136:20

**Electric (4)**
82:1;156:13,15,25

**electrical (2)**
103:12,13

**electrician's (1)**
156:9

**electricity (2)**
154:17;156:23

**electronic (1)**
133:7

**element (1)**
181:9

**Elena (2)**
67:12;75:24

**elicit (1)**
159:5

**Elizabeth (5)**
5:15;9:1;43:4;73:6;
85:10

**else (10)**
31:9;97:6;108:2;
134:4;150:2,2;154:7;
155:11;166:20;169:20

**email (61)**
12:18;15:1;46:12;
50:1;54:4,17,18;62:5,
25;65:5,7,19;69:10;
70:24;71:3,6,7,10;
72:4;74:14,15;75:4,4,6,
7,11,12,13,22;76:5,6;
77:9;101:21;106:2,9,
10,16,17,22,24;107:3,
19,21,24;108:12;
111:13;114:23;116:20;
119:10;120:15;126:17;
127:17,20;128:4;
130:17;132:19;134:6,
9;184:17,17

**emailed (2)**
127:19;131:1

**emailing (1)**
65:5

**emails (22)**
32:9;56:11,14;60:3;
64:13,17;66:5,23,25;
67:7;70:15;71:24;72:8;
75:14;76:25;105:12,
17;118:11,14;134:16,
20;166:12

**employees (1)**
24:17

**encompassing (1)**
112:5

**end (19)**
7:18,20;9:16;26:23;
29:15;30:5;33:13;34:9;
36:5;42:17;45:24;46:3;
49:17;76:3;77:2;83:3;
160:18;166:10;174:7

**ended (4)**
49:20;108:3;133:14,
16

**ends (1)**
108:7

**engage (1)**
177:5

**engagement (1)**
52:5

**engineers (1)**
71:7

**enough (1)**
45:3

**enter (2)**
65:23;69:4

**entered (5)**
65:14;68:24;83:4,4;
151:22

**entire (7)**
15:24;16:1,2,14;
22:18;87:2;174:17

**entirely (6)**
6:22;18:23;25:2;
41:18;73:25;82:16

**entirety (3)**
94:11;151:3;165:25

**entities (2)**
18:23;118:15

**entitled (13)**
44:13;94:7;95:8,11;
133:25;136:1,3;
147:25;148:10;154:15;
165:20,25;182:11

**entity (3)**
138:21;146:9;175:19

**entries (3)**
81:1,3;163:16

**entry (2)**
84:3,4

**entwined (1)**
26:6

**equation (1)**
170:24

**equity (3)**
113:5,6;116:25

**Erik (2)**

27:13;47:18

**error (2)**
115:8;118:1

**especially (1)**
76:22

**essential (3)**
130:1,4,6

**essentially (3)**
31:19;63:10;175:5

**established (4)**
65:18;66:15;68:22;
162:19

**estate (2)**
117:16;119:20

**estimate (6)**
29:11;88:5;96:3,3;
99:24;139:9

**Estimated (4)**
95:8;97:7;99:16;
116:13

**Estimates (6)**
95:9,17;96:10,21;
116:18,22

**estopped (2)**
140:1;177:12

**evaporates (2)**
39:16,22

**even (50)**
10:18;13:12;16:21;
17:4,15;22:2;25:14,19,
20,21,23;28:24;52:10,
15;54:19;57:21;62:19;
66:18;68:14;72:16,18;
74:22;77:16;78:11,14;
79:9;87:4;99:25;
107:19;120:24;128:16;
131:21,23;132:13,14;
135:6;136:21;138:14;
144:17;145:10;146:10;
151:2,3;153:20;
156:23;159:11;162:18;
166:17;174:16;177:10

**event (6)**
30:21;32:24;33:2,3;
54:19;109:7

**events (2)**
70:1,6

**eventual (2)**
33:4;37:21

**eventually (1)**
67:23

**everybody (20)**
82:18;96:3,9;102:14;
105:2;109:15,17,19;
111:18;116:22;123:17;
124:14;139:17;140:23;
142:17;151:24;152:2;
157:22;171:18;179:21

**everybody's (1)**
140:25

**everyone (3)**
4:23;11:22;43:22;
57:13

**evidence (102)**
14:12,13,17;16:15;
17:20;19:25;22:5;
23:13;24:10;25:10,14;
31:7,17;36:6,19;45:14,
17;48:9;62:22;66:1;
77:14;79:8;80:1,2,3;
81:4;83:15,16,17;
88:23;89:14,17,18;
90:11,12,25;91:4,15;
92:17,23;93:1,19;95:1,
1;101:18,25;102:23;
117:7,12,13,15,20,21;
118:23;119:2,3,6,12;
120:1,4,5,12,13;121:8;
122:18;129:5,17;
132:3,16;134:5;135:1,
4;137:2;140:8;141:14,
17,23;142:1,5;143:22,
25;144:6;150:24,25;
151:12,13;157:2;
163:6;164:19;165:9;
166:8,21;169:22;
171:7;173:11,18;
174:10;180:4,11,13,21;
181:19

**evolution (1)**
37:22

**exact (5)**
42:6;50:2;56:13;
65:21;179:7

**exactly (12)**
12:17;14:19;31:7,8;
42:3;45:4;49:20;73:24;
75:16;78:23;82:18;
149:6

**examination (1)**
159:3

**examiner (2)**
158:12;162:15

**example (4)**
75:9,10;85:11;
156:12

**excavation (3)**
18:14;35:22;73:22

**exceeded (1)**
94:3

**Except (3)**
32:18;60:23;119:2

**exchange (1)**
62:25

**exclusive (2)**
63:16,20

**excuse (10)**
13:3,11;23:3;36:14;
37:5,19;47:8;71:18,22;
146:4

**executed (2)**
71:4;145:6

**executive (1)**
53:13

**exhausted (1)**
165:6

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

Document    Page 195 of 214

October 4, 2019

**Exhibit (123)**
11:5,8,11,17;12:17;
13:20;15:3;20:14;
23:16;24:10,25;34:17;
35:3,5,20,21;37:20;
38:22;40:1,11,16;41:5;
50:24;51:3,4,6;54:3,4,
13,22;55:2,5,11,23;
56:16;58:12,12,13,15,
16,17;59:1;60:3,9;
61:7,7,16,16,24;62:9,
12,12,25;63:2,17;66:4;
67:3,8,23,25,25;69:7,8,
9,12;70:11;71:1,20;
73:3;74:9,19;75:9,10,
16,21;95:5;101:13,18;
102:8;103:1,6;105:18,
19;106:22,25;107:1,
23;108:9,12;109:14;
111:3,4,11,23;114:23;
116:19;122:20;127:2,
3,18,24;128:13,18;
137:11,14,21;138:15,
18;152:22;153:7;
163:16;165:17;166:13,
14,16;172:8,10;175:16,
16;176:17;177:8,9,19

**Exhibits (19)**
14:17;20:8,20;33:22;
35:20;51:1;56:9;57:3;
60:10;64:19;73:19;
89:20;90:2;107:1;
116:17;134:11,19;
153:16;184:10

**exhibit's (1)**
74:21

**exist (5)**
36:21;39:23;74:17;
143:5;153:24

**existed (4)**
68:12;69:6;73:11;
151:4

**exorbitant (1)**
152:13

**expect (5)**
8:14;76:20,20;115:1;
175:23

**expected (5)**
52:25;82:18;160:12;
182:17;183:3

**expedited (1)**
148:12

**expenditures (1)**
31:16

**expenses (7)**
61:18,19;86:20;
87:10;123:7;137:19;
152:10

**experienced (1)**
180:5

**experiment (1)**
177:24

**expert (51)**

25:18;82:8,15,19;
83:2;84:19,20;86:4;
87:6,11,13,13;88:8,17;
89:2,2,6;90:17,22;
117:16;121:3;128:14;
149:13;150:10,11,13,
25;152:16,17;153:8,25,
25;154:4;155:14,25;
156:3,4,24;157:5;
158:18,19,22;159:9,11;
162:13,14;163:6;
164:10;166:5;182:1,4

**expertise (1)**
90:18

**experts (8)**
26:12;27:5;28:4;
81:10,10;88:10,12;
102:4

**expert's (1)**
87:8

**explain (11)**
15:4,5;37:3;44:21;
65:25;66:1;78:7,9,15;
157:5;164:21

**explained (5)**
39:3;57:17;85:19;
178:8,14

**explanation (2)**
69:18;78:2

**explanations (2)**
25:7;78:10

**expressly (1)**
92:20

**extended (1)**
183:1

**extent (5)**
16:9;102:1;116:7;
128:17;174:1

**extort (3)**
38:16;42:19;72:21

**extortion (3)**
118:17;144:25;181:5

**extortionate (1)**
64:9

**extortioners (1)**
181:7

**extra (4)**
19:11;100:2;109:11;
179:23

**extreme (1)**
143:16

**eyes (5)**
68:15;98:13;105:1;
124:17;151:25

**F**

**face (1)**
135:3

**fact (97)**
11:2;14:20;15:18;
16:20;17:16;19:16,22,
24;21:18;22:11;24:16;

25:22;26:3;27:6;29:22;
34:3;35:18;36:20;
37:10,11;50:12;51:12;
54:17;55:17;56:19;
57:14;60:20;61:11;
62:1;72:9;73:3;74:18;
78:2,21;82:7,11;83:1;
90:4,4,9;91:16,19;
97:21;98:11;102:8;
103:25;109:10;110:13;
111:8,11,21;113:10;
116:12,17,19;117:13,
24;118:1;120:10,20;
123:9;126:9;127:15,
20;128:2,6,13,24;
130:9,11,12,15,24;
131:20;133:17,17,18;
137:3;139:7;143:4,5,
13;145:6;150:4,10;
153:19;156:10;161:3;
162:8;164:11,15;
170:21;173:2;174:23;
176:20;179:9;182:5

**factoid (1)**
121:8

**factor (1)**
148:22

**facts (10)**
10:19;14:12;72:10;
77:12;78:23;79:23;
132:9;135:18;145:4;
183:6

**factual (2)**
136:11,22

**fail (1)**
115:19

**failed (5)**
117:10,11,14;136:7;
145:1

**failure (3)**
129:1,22;180:6

**fair (33)**
16:15,16;17:5,10,11,
13;18:5,17;25:19;26:1,
1,5,5,6,16,18;30:22;
31:1;72:13;121:19;
138:21;139:3,10,11;
141:5;151:11;170:17,
20;177:6;178:1,5;
182:6,8

**fairness (9)**
15:24;16:2,3,14;
22:18;90:25;92:17;
132:13;151:8

**faith (3)**
66:9;72:22;142:19

**faithfully (1)**
180:18

**false (14)**
44:14;47:3,5,15;
48:1;56:22;59:5,25;
81:8;120:2;174:20,21;
179:17;181:20

**familiar (1)**
9:8

**family (1)**
171:19

**far (7)**
15:7;107:12;108:25;
111:13;119:3;129:5;
159:2

**fashion (1)**
7:21

**fast (3)**
56:7;58:13;183:8

**fault (1)**
122:16

**favor (1)**
92:23

**favorable (1)**
138:22

**favors (1)**
58:18

**February (4)**
46:6,8;64:14;74:8

**Federal (1)**
164:5

**fee (18)**
14:3;17:9;23:23,24,
25;24:14;25:4,6,8;
27:3;61:3;68:21,23,25;
69:2,5,9,20

**feel (1)**
7:19

**feels (1)**
36:5

**fees (11)**
14:4;16:10;17:9;
38:12;39:18,24;72:21;
169:16,17;171:9;
183:15

**feet (1)**
28:10

**fellow (2)**
9:8;53:14

**felon (1)**
141:12

**felony (1)**
142:21

**fence (2)**
134:14,15

**Fennell (8)**
117:16;121:1;
149:13,15,17,25;
181:15;182:22

**Ferguson (1)**
46:21

**few (9)**
5:8;43:11;44:1;57:6;
66:13;72:20;78:8;
79:18;164:24

**fiduciary (8)**
72:23;78:13;91:10,
11;92:2;93:21;135:10;
151:7

**fiduciary-level (1)**

16:17

**fiduciary's (1)**
92:16

**field (1)**
151:24

**fifteen (8)**
6:18,20;7:13,14,16;
43:8;99:21;166:18

**fifteen-percent (3)**
14:3;17:8;69:1

**fifty (19)**
12:25;13:5,12,23;
94:7,9,11,17;112:15,
17,23;113:6;114:4;
165:20;166:9;167:8,
14;169:3;177:17

**fifty- (1)**
18:18

**fifty-nine (1)**
72:6

**fifty-one (1)**
161:20

**fifty-page (1)**
162:16

**fifty-percent (3)**
12:12;15:19,23

**fifty-percent-net-profit (1)**
178:4

**fight (3)**
20:5;65:8;136:1

**fighting (3)**
67:14;71:13;154:5

**figure (13)**
23:1;30:8,16,22;
31:9;34:25;38:25;
53:23;97:9;99:15,18;
110:1;150:17

**figured (5)**
47:21,22,23;48:11,
15

**figures (4)**
23:21;24:3;30:15,24

**file (4)**
21:24;135:20;
147:25;149:5

**filed (18)**
4:6;71:23;84:23;
99:12;113:16;116:24;
135:15;136:10;146:15,
15,16,24;147:25;148:7,
8,10;180:20;181:21

**files (2)**
21:23;118:4

**filing (3)**
67:17;113:20;147:18

**filings (1)**
116:4

**Filippov (150)**
4:6,15;10:6;12:8,16,
18;13:10,13,18,19,20,
25;14:14,19,21;15:18;
16:18;17:2,6,23;19:4,8,
12,16,18,22;20:11,15,

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 196 of 214

October 4, 2019

18,20;21:4,15;22:3;
25:21;26:11;32:5,8,22;
33:11;34:20;36:13;
38:16;42:10,11,20;
53:18,25;54:8,15,21;
55:13,25;56:4,24;57:9,
17;58:19;59:15,16;
60:14,19;63:11;64:24;
68:8,16;69:10;70:18;
71:7;72:14,22;73:11,
18;74:20;75:3,23;89:3;
94:22;95:13;96:2;
97:10;98:8;99:7;100:4;
101:16,19;102:10,16;
104:7,25;105:5,12,13,
15,25;106:11,18;
107:16;108:13,24;
110:20;111:5,20;
112:14,21,24;113:15;
114:10,25;115:25;
116:15;117:21,24;
118:1;119:10,13,19;
122:8,14,21,24;123:9;
124:10,15,16;126:15;
127:22;136:8;137:22;
138:1,5;139:2;140:2;
146:8;168:13,14;
169:13,14,16;175:4,12;
176:9,12,19,21;177:15;
178:25;179:11;180:16;
182:11;183:1

**Filippov's (10)**
21:17;33:7;60:4;
63:21;64:9;107:10;
122:15;137:12;147:11;
181:23

**filled (1)**
125:1

**final (5)**
30:5;58:15,23;
111:18;148:15

**finalized (1)**
151:23

**finally (4)**
21:4;60:16;64:6;
71:25

**finances (2)**
19:23;64:13

**financial (4)**
95:8;110:12;123:20;
179:12

**financials (1)**
99:17

**financing (2)**
96:6,8

**find (11)**
61:13;62:19;67:23;
75:19;90:6;91:8;119:5;
158:25;159:1;160:25;
177:1

'

**'Find (1)**
13:4

---

## F

**finder (1)**
182:5

**finding (2)**
4:25;116:11

**findings (4)**
7:25;77:21;182:13;
184:7

**fine (13)**
6:8;7:23;8:19;32:17;
56:8,8;57:7;59:19;
104:10,10;123:21;
161:16;184:15

**fine-toothed (1)**
86:2

**finger (1)**
31:11

**fingerprints (1)**
66:7

**finish (3)**
178:16,18;180:11

**finished (6)**
32:1;87:23;103:13;
121:16;151:24;180:12

**first (52)**
5:17;6:14,16;10:20;
19:24;22:21;23:1,19,
21;26:1;28:25;29:1;
33:25;34:25;45:20;
58:25;60:9;63:2;70:22;
86:7,15;93:22;94:5;
95:3,8;100:23;105:9;
116:4;120:11,14;
127:7;141:15;142:24;
144:5;146:2,4;151:9;
158:17;160:18;165:18,
20;166:16;167:13,19,
20,20;172:13;174:18;
175:1,2,17;176:24

**fit (11)**
17:12;60:25;103:24;
107:22;114:13,15;
115:9;122:15;123:14;
135:11;155:15

**five (9)**
98:14;119:19;
121:21;155:6,7,7;
162:11;170:22;178:18

**five- (1)**
121:12

**five-minute (1)**
121:13

**fix (2)**
83:5;111:21

**fixed (7)**
94:2;95:13;111:19;
123:8,9,23;133:16

**fixed- (1)**
166:7

---

**flat (2)**
24:14;51:16

**flat- (1)**
61:2

**flat-fee (1)**
19:12

**flexibility (1)**
7:22

**flies (1)**
43:19

**flip (1)**
125:24

**floor (1)**
110:24

**Flooring (5)**
27:13;47:18,25;
49:11;173:24

**floors (1)**
63:1

**Florida (1)**
64:25

**flow (5)**
16:9;34:8;72:5;
112:11,17

**flowed (3)**
120:18,19;173:6

**flows (2)**
94:2;158:21

**flurry (5)**
64:12,17;66:23;
70:15;72:7

**focus (4)**
43:23;44:1;51:19;
80:2

**focused (4)**
15:18;19:22;163:7,8

**focusing (1)**
70:1

**folks (2)**
98:21;164:21

**follow (3)**
41:10;105:3,3

**followed (2)**
92:5;150:3

**following (1)**
35:7

**follows (1)**
112:14

**follow-up (1)**
157:11

**fonts (1)**
162:23

**foot (5)**
28:2,9;29:4,10;156:4

**force (3)**
42:11;146:5,6

**forced (4)**
63:13;137:1;150:23,
23

**foreclose (1)**
147:10

**foreclosed (1)**
147:10

---

**forensic (2)**
86:1;102:22

**forged (3)**
41:5;72:13;75:21

**forgery (3)**
15:12;74:20;77:14

**forget (14)**
30:18;50:2;56:13;
58:14;60:9;64:4;65:21;
67:3;75:16;124:13;
156:1;177:8;178:18;
179:7

**Forgive (1)**
168:2

**form (3)**
20:2;76:6;125:1

**formalities (1)**
115:21

**formality (1)**
57:18

**formed (3)**
11:21;160:19,22

**former (1)**
76:13

**forth (2)**
12:20;103:16

**fortune (3)**
113:1;114:9,11

**forty (2)**
98:6;112:14

**forty-five (2)**
6:19;7:15

**forward (8)**
76:17;103:22,23;
114:5;163:22;166:5,6;
178:2

**forwarded (2)**
71:4;77:8

**forwarding (2)**
56:11;77:2

**forwards (4)**
56:12,12,14;70:24

**fought (1)**
173:13

**found (9)**
27:25;36:14;61:11;
67:1,25;118:1;142:20,
21;176:14

**foundation (3)**
73:22;103:16;178:18

**foundations (1)**
73:20

**four (4)**
80:17,18;145:17;
174:19

**four-digit (1)**
163:3

**frame (1)**
182:16

**framing (1)**
49:12

**frankly (11)**
12:17;14:15;17:11;

---

19:4;25:3;41:17;55:15;
59:24;116:23;166:9;
177:14

**fraud (56)**
25:3,14;44:23;48:8,
9;52:11;68:6;70:10,11,
12;72:23;74:21;78:11,
15;79:8;80:6;92:20,21;
93:25;94:21;102:1;
104:9;117:2;123:20;
124:17;126:11,12;
128:13;139:19;144:8;
155:20;156:22;157:20;
158:12,14,15;159:2,6,
9,11,19;160:4,20;
161:4;162:14,17,19,20;
163:4,11,13,21,25;
164:6,7,20

**frauds (1)**
115:19

**fraudsters (2)**
82:17;155:22

**fraudulent (1)**
42:19

**free (1)**
146:21

**friends (1)**
69:17

**front (6)**
10:19;57:24;136:17;
158:13;165:19;168:3

**fronted (2)**
102:3,6

**front-end (1)**
104:2

**fronting (2)**
101:23,23

**fudged (1)**
104:2

**full (21)**
7:13;16:17;26:21;
34:1,10;39:6;47:15,20,
21,22,24;48:10,11,16;
82:4;84:6;87:18;123:6;
132:17;173:8;179:9

**fully (2)**
71:4;151:18

**fundamental (1)**
55:20

**funky (1)**
162:25

**funny (1)**
102:22

**further (4)**
55:22;107:23;
158:11;160:18

---

## G

**gain (1)**
155:11

**gallop (1)**
157:12

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 197 of 214
October 4, 2019

**game (2)**
15:10;34:4
**garden-variety (1)**
55:18
**gave (10)**
13:18,18;14:25;17:2;
45:9;52:4;113:15,20;
127:19;173:17
**GC (3)**
76:9;127:18;132:24
**gee (1)**
20:18
**geez (1)**
55:25
**general (7)**
18:13;26:8;61:12,12,
13,17;148:12
**general- (2)**
69:1,4
**general-contractor (5)**
14:3;17:8;23:23;
69:9,20
**generations (1)**
9:12
**gentleman (1)**
97:20
**Gersh (32)**
39:4;44:4,9;46:12;
47:3,22,23;48:2,10;
52:14;62:5;65:4,16,19;
68:2,19,24,25;70:21;
71:18;72:1,2,12;73:13;
78:4,19;82:25;85:3,17;
102:5;163:14;166:24
**Gersh's (3)**
22:8;37:4;85:3
**get-go (1)**
167:23
**gets (15)**
7:1,4;33:12;47:13;
70:21;94:9;137:25;
138:14;140:20;159:12;
167:19;169:3;170:1;
174:16;177:17
**ghost-wrote (1)**
71:9
**gift (1)**
175:5
**ginned (3)**
143:9;144:15,16
**gist (1)**
78:6
**given (9)**
7:22;15:18;56:20;
76:15;78:14;79:5;
113:25;147:24;182:1
**gives (1)**
51:1
**giving (3)**
13:10;62:18;151:18
**goes (7)**
6:14,21;18:7;19:15;
26:8;33:16;40:24;54:1;

70:17,21;106:5;
113:12;117:1;148:24;
163:11;165:5;171:1
**Goldman (26)**
27:25;31:10;44:19;
48:4,5,6;61:11;77:18,
19;78:3;81:13,14,19;
83:2;86:1;144:11;
157:10;158:12,12,17,
24,25;160:7,17;163:8,
17
**Goldman's (1)**
78:6
**Good (22)**
4:2,3,14,16,18,21,23,
24;26:4;42:25;78:11;
79:12,13;98:15;136:7,
23;146:1,1;154:25;
156:12;165:7;184:2
**Gordon (5)**
52:2,13;68:18,23;
73:13
**Gotcha (1)**
100:24
**grade (3)**
68:20,21;72:12
**grant (1)**
170:23
**granting (1)**
170:19
**grateful (3)**
25:24;27:3;28:7
**great (5)**
9:7;20:18;53:25;
55:16;115:24
**greater (1)**
14:18
**grind (2)**
96:25;111:25
**gross (8)**
48:8;78:10,12,12;
79:9;84:8;161:4;
171:19
**grossly (1)**
30:15
**group (1)**
118:15
**guarantee (2)**
96:16;98:10
**guaranteed (1)**
99:8
**guarantees (1)**
99:8
**guaranty (1)**
147:11
**guess (11)**
25:17;41:10;65:23;
88:19,22;89:9,10;
129:1;159:4;164:6,15
**gunning (1)**
183:5
**guy (24)**
31:4;45:8;46:8;47:6;

49:11,12;50:12,15;
59:17;69:16;76:21;
81:23;84:4;97:23;
98:16;142:14;156:9,
14;158:15,15;162:10,
11;163:2;179:14
**guys (15)**
6:3;7:21;10:22;27:1,
10,17,19;28:3;38:13;
44:18;47:17;48:25;
52:3;162:25;184:3

## H

**hallmark (1)**
159:24
**hammer (1)**
115:2
**hammered (1)**
28:7
**hand (9)**
7:24;91:20;92:7;
93:3;112:21;134:22;
138:8;152:8,20
**handed (1)**
131:1
**hands (2)**
21:7;79:3
**handshake (1)**
144:19
**hanging (1)**
137:7
**happen (5)**
9:3;13:1;32:13;
44:21;69:12
**happened (14)**
10:1,9;12:17;32:24;
33:4;49:5;51:8;60:12;
65:20;96:11;151:24;
179:18;180:10;182:8
**happening (3)**
69:11;93:25;98:2
**happens (7)**
21:1;46:11;49:1;
60:6;122:6;148:19;
169:2
**happy (4)**
6:9;49:15;84:2;
171:19
**hard (22)**
28:7;31:9;52:11;
79:14;116:12,22;
133:22,23;134:2;
136:2;144:7,20;
147:23;153:9;154:1,
16;163:6;166:3,4,7;
167:1;183:10
**hard-cost (2)**
144:12;154:3
**Harris (2)**
4:21,21
**harsh (1)**
32:16

**Harzell (2)**
11:5;175:7
**hasten (1)**
28:22;70:9
**head (3)**
84:10;135:2;151:14
**hear (12)**
5:1;19:8;39:19;70:9;
79:14,22,22;114:14;
123:18;142:10;143:14;
181:24
**heard (24)**
54:16;75:23,24;76:2;
78:2,3;80:7,17,20,21;
81:7,9,9;82:6,7;83:11,
12,15;90:24;97:8;
114:13;134:11;144:10;
155:14
**hearing (6)**
5:4;79:19;142:23;
148:13,14;183:20
**Heating (1)**
44:17
**heavens (1)**
50:12
**heaven's (3)**
53:12;173:12;178:12
**heavily (3)**
66:11;105:24;109:1
**held (2)**
130:10;170:6
**hell (1)**
157:7
**help (10)**
8:2;30:13,20;52:13;
70:23;72:2;100:15;
124:11;170:20;183:9
**helpful (5)**
8:5,6;143:5;152:17;
184:4
**henchman (1)**
141:12
**here's (19)**
14:2;17:6,10,10;
18:4,16,17;26:23;
53:25;71:3;95:13;
101:24;106:18;119:8;
143:21,24;144:1,5;
176:4
**hey (9)**
26:4;32:9;64:21,21;
101:21;102:2;106:11;
114:23;157:1
**high (6)**
29:7;144:8;156:5,9,
10;183:2
**higher (1)**
82:12
**highlighted (1)**
48:5
**himself (10)**
61:21;68:20;75:21;
96:2;97:3;113:20;

115:3;135:11;155:16;
170:19
**hindsight (5)**
94:19,23;113:8;
115:24;169:19
**hire (7)**
13:22;17:7,25;18:12,
13;24:24;135:22
**hired (9)**
25:22;26:20,24;27:1;
28:5,6;31:3;89:2;
177:24
**hires (1)**
26:8
**hiring (1)**
26:13
**hit (7)**
11:12;148:6;161:22;
164:24;174:7;184:3,3
**hits (1)**
65:15
**hold (3)**
7:16;86:5;165:3
**holding (1)**
165:21
**hole (1)**
128:21
**home (7)**
20:21;29:16;53:1,5;
57:4;150:5;177:17
**homes (21)**
11:24;19:13;30:10;
32:1,7;57:12,14,15;
62:23,24;69:13;
104:21,22;110:16;
122:21;124:2,4;
125:16;150:6;154:1;
177:16
**Homes' (1)**
133:13
**honeymoon (3)**
70:22;71:19;72:1
**Honor (74)**
4:14,16,18,21;6:1;
7:10,23;8:25;9:6,7,25;
10:1,5,9,9,23,25;11:15;
15:3;12;16:4,13;20:7;
21:13;22:7;23:7,17;
27:13;32:23;40:10;
43:6;18;44:4;50:22;
67:21;68:12;70:10;
71:1;72:18;74:9;76:18;
79:9,9,10;82:13;85:25;
91:16,19;92:19;93:23;
99:15;100:6;105:9;
121:11;122:6;133:11;
135:15;137:10;138:14;
145:19,21;146:19;
149:4;152:15,18;
161:7;164:23;171:4;
173:13;174:17,20;
175:8;177:18;184:6
**honoring (1)**

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 198 of 214
October 4, 2019

180:1

**Honor's (2)**
6:24;52:22

**hope (1)**
148:25

**horse (1)**
157:12

**horsepower (1)**
74:3

**hotly (1)**
130:12

**hour (9)**
5:16,16;6:19,19;
7:15;9:4;27:2;68:3;
121:14

**hourly (1)**
27:1

**hours (5)**
5:12;7:17;44:10;
47:4;66:13

**house (31)**
17:24;19:2;20:23;
26:21;29:19,22,23;
30:2,16,18;35:22;42:8;
45:7;55:25;67:11;
70:19;87:5,20;88:6;
123:3,5;141:4;153:12;
156:23;176:19;178:16;
179:22;180:6,11,12,14

**houses (11)**
12:10;13:15,21;19:3;
28:25;89:11;120:21;
140:16;156:18;175:22;
176:20

**humans (1)**
9:17

**hundred (4)**
24:16;57:6;61:20;
72:20

**hundreds (6)**
15:21;44:10,12;47:3;
75:6;174:10

**hurt (2)**
38:13;42:10

**hustle (1)**
73:4

**hutzpah (1)**
174:19

**I**

**IBM (1)**
175:20

**ID (2)**
153:1;172:11

**idea (13)**
20:18;34:10;36:18;
41:21;57:3;59:4,4;
60:10;96:7;107:16,18;
130:18;176:4

**identical (1)**
156:18

**identification (7)**

8:18;23:5,14,16;
152:25;153:7;165:17

**identified (3)**
75:3;84:25;183:12

**identify (1)**
169:14

**idiot (1)**
22:11

**ignorant (1)**
135:11

**ignore (10)**
88:11;90:22;134:5;
135:1,9;139:15,20;
151:12,13;159:10

**ignoring (2)**
87:10,11

**illegal (1)**
59:10

**illuminate (1)**
26:14

**illustration (1)**
165:23

**imagine (1)**
174:18

**immediately (1)**
75:2

**impact (1)**
167:7

**impermissible (1)**
90:16

**implications (1)**
91:14

**important (14)**
12:14,21;15:25;
24:15;31:23;43:24;
44:8;45:19;67:7;109:4;
112:9;146:14;173:10;
181:2

**importantly (6)**
81:8;87:17;111:20;
120:18;148:5;170:16

**impossible (1)**
87:3

**impression (4)**
5:25;6:4;93:23;
177:16

**improper (2)**
148:2,13

**in- (1)**
26:20

**inaccurate (2)**
141:25;144:23

**inadequate (2)**
17:18,19

**inadmissible (1)**
132:15

**include (2)**
64:20;111:2

**included (3)**
49:8;132:24;169:16

**includes (1)**
34:4

**including (5)**

12:1;56:15;109:23;
110:11;180:22

**incompetence (7)**
48:8;78:10,12;79:10;
159:8;162:17;164:22

**incompetency (1)**
161:4

**incompetent (2)**
160:14;171:22

**incomplete (1)**
87:16

**inconvenient (5)**
137:4;139:7,14;
156:1;157:9

**incorrectly (1)**
85:13

**increase (5)**
20:9,16,21;53:4;
176:18

**increased (1)**
179:15

**increasing (1)**
21:7

**incredible (5)**
29:25;47:19;50:1,17;
78:25

**incredibly (1)**
29:7

**incurred (8)**
30:23,25;31:1,3;
34:14;62:3;87:20;
137:20

**indemnity (4)**
171:6,7,11,16

**independence (1)**
115:20

**independent (1)**
115:19

**indicia (2)**
134:23;135:8

**individuals (1)**
83:18

**indubitably (1)**
34:21

**inequitable (1)**
174:18

**inescapable (1)**
126:5

**infer (3)**
44:14;79:1;181:14

**inference (15)**
64:11;72:13;76:19;
79:7;129:1,21,25;
131:14;132:10,22;
139:10;164:22;182:6,
8;183:5

**inferring (1)**
71:2

**inflate (2)**
38:3;46:14

**inflated (5)**
29:13;30:15;104:2;
156:2;178:9

**inflict (1)**
66:3

**informed (1)**
29:18

**in-house (1)**
26:23

**initial (5)**
32:6;72:6;100:8;
103:9;180:24

**innocent (1)**
162:4

**input (4)**
58:20,21;59:3;73:17

**insider (1)**
92:2

**Insolvency (1)**
146:14

**insolvent (1)**
146:10

**inspected (1)**
73:21

**installed (1)**
73:21

**instant (1)**
49:18

**instead (3)**
40:24;85:19;177:25

**insurance (1)**
154:17

**intend (1)**
8:17

**intent (1)**
79:1

**intentional (1)**
44:15

**intentionally (3)**
105:1;135:10,10

**interactions (1)**
34:5

**interest (9)**
113:5,6;117:1;158:1,
1,2;167:8;168:25;
170:1

**interested (1)**
4:7

**interesting (12)**
35:11;77:23;88:13;
99:4;103:11;109:22;
133:10;164:4;176:14;
183:19,20,23

**interestingly (1)**
75:20

**intermingles (1)**
49:21

**interpret (1)**
80:25

**interpretation (1)**
89:5

**interpreting (1)**
89:5

**interrogatories (1)**
162:12

**interrogatory (1)**

116:6

**interrupt (1)**
23:15

**intervals (1)**
27:20

**intervening (1)**
70:6

**intimidation (1)**
45:11

**into (42)**
5:16;16:9;17:11,12;
18:16,22,25;20:11;
22:1,19,25;24:8,9;
25:12,14;31:6,17;34:2;
36:2;37:9;39:1;41:12;
45:14;52:19;58:20;
65:14;90:8;95:21;
97:20;100:1;112:21;
132:16;146:9;150:23;
151:23;156:25;169:21;
170:14;173:18;174:2;
175:9,18

**introduced (2)**
127:12;169:21

**introductory (1)**
80:5

**invention (1)**
165:10

**invest (5)**
12:8;52:23;54:9;
55:14;175:12

**investigation (1)**
160:24

**investment (5)**
12:23;98:5,7,9;145:9

**investments (1)**
100:8

**Investor (4)**
12:23;53:16,17;
175:18

**investors (3)**
61:4;79:2,4

**invoice (20)**
37:19,23;46:18,25;
66:22;70:23;71:8,25;
81:11,11,14,17,17;
133:23;141:25;144:17;
147:24;151:2,4;157:3

**invoices (24)**
19:10,17;44:18,25;
45:11,14,21;46:20;
47:4,6;81:4,6,8,11,22;
144:6,12,12,20;153:14,
15;158:6;161:1;162:25

**invoke (1)**
148:14

**invoked (1)**
116:8

**invoking (1)**
117:1

**involved (2)**
66:11,20

**involvement (2)**

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 199 of 214
October 4, 2019

141:14,15
**iPad (1)**
54:6
**Irene (1)**
74:24
**ironically (1)**
176:11
**irresponsible (1)**
83:5
**Ispravnikov (3)**
44:18;45:5,7
**issue (9)**
74:5;19;76:15,25;
78:21;118:10;119:25;
137:2;181:25
**issued (3)**
36:4;47:6;162:15
**issues (3)**
5:8;44:16;93:25
**item (5)**
39:15;42:21;69:8;
103:8;178:8
**items (2)**
103:15,25
**iteration (2)**
40:4,6
**iterations (1)**
40:24

## J

**James (1)**
4:21
**jamming (1)**
108:25
**Jason (2)**
68:18;73:13
**JCohen@kagandevelopmentcom (1)**
75:18
**jive (1)**
128:5
**job (6)**
14:12;47:14;48:14,
15;82:10;87:2
**John (1)**
4:18
**Johnson (4)**
91:20;92:1,3,16
**join (1)**
5:21
**Jose (1)**
47:12
**Joseph (5)**
59:9;66:7;75:15,23,
24
**joshing (1)**
124:13
**JP (4)**
95:5,10;107:2;127:7
**Judge (3)**
88:22;139:15;159:10
**judgment (2)**
80:22;164:1

**July (5)**
62:23;63:2;120:16;
180:12,12
**jump (4)**
37:24,25;84:2;
113:17
**jumping (1)**
84:2
**jumps (1)**
70:5
**June (37)**
37:20,23;41:18,20;
42:2;46:18;56:12,13;
66:18;68:10;70:2,23,
24;71:5,6,12,18,19,23,
24,25;72:2,3,4,9,13;
85:18;110:2;127:13,
15;128:7;148:7,8;
177:7,9,11,12

## K

**Kagan (242)**
4:7,7,7,10,19,19,20;
8:13;10:10,14,21,22;
12:2,9,10,23;13:11,12,
13,14,18,21;14:1,24;
15:18,20;16:6,11,20,
21;17:15;19:3,13,14,
15;20:7,16;21:10,11,
13,18;22:13,19;24:5,
13,17,17,23;25:12,16;
27:7,15,25;29:9;30:9,
12,13,18,20;31:7,8,20,
25;32:14,16,17,19;
33:3,9;36:18;37:1,18;
38:1,5;42:15;46:23;
47:14;48:18,20;49:21;
51:17,18,20,20,24;
52:1,18,20;53:2,14;
54:5,6,9,14,16,17;55:6,
12;56:17;57:10,11,15,
17,21;58:2,7,16,18,20;
59:2,17,20;60:13,18,
19;61:1,20;63:14,19,
21;65:1,17;66:10,22,
24,25;67:2,7,19,19;
68:10,12;70:14,24;
71:9,12,18,24;73:11;
74:1,12;75:7,13;76:13,
20;77:7,15;78:11,18;
79:4,10;82:10;85:21;
94:7;98:15;100:3,9;
102:11,11,18;104:1,10,
13,15,16,16,17;105:4,
5,10;106:4,12,19;
107:8,10,14,17;108:9,
15,17,20,24;109:16,24;
111:7;112:9,14;113:5;
114:24;115:2,4;
118:15,15;122:10,13;
123:24;124:9;125:2,
15,17,17,20;127:19;

129:4;132:4,4,5;
134:14,17;135:17;
139:2,22;140:1,3,6,7,9;
142:20;143:15;146:5;
147:13;163:17;166:22;
167:21;168:10;170:18;
171:16,21;173:2,11;
174:16;175:5,12;
176:6;177:16,25;
179:4,8,18,23,25;183:2
**kagandevelopment@gmailcom (2)**
75:8;134:16
**kagandevelopmentcom (4)**
75:15;127:21,25;
128:3
**Kagans (2)**
125:11;175:15
**Kagan's (39)**
11:24;12:5;19:19;
22:25;27:17;30:17;
33:4;35:1,17;49:14;
52:19;53:6;55:16;56:4,
10;59:17;60:20;67:2;
69:15,16;73:15;76:23;
100:25;104:3;106:14;
109:20;110:15;113:1;
114:20,22;115:6;
122:16;129:14;134:25;
140:10;167:8;168:13,
19;173:6
**Kayserman (1)**
10:7
**KDC (77)**
4:8,19;13:19;14:2,
20;16:7;18:3;22:20,22;
23:20;24:4;31:18;
36:14;37:17;38:24;
39:2,7,15,16,18,18,20;
41:4,14;52:7;57:17;
60:8;62:6;66:16,22;
68:5,21;69:1,3;70:1;
71:17,21,25;72:23;
73:9;87:20;90:5;
101:21,23;102:18;
107:20;115:16;126:10,
10,15;127:2,6,9;
133:11,12;134:7,12,20,
21;135:13,13,22,23;
136:6,13;137:6;139:1;
141:16;144:15,18,22;
166:2;170:25;172:9,
22;173:2;177:10
**KDC's (9)**
68:17,18,22;69:5,19;
94:10;143:9;151:2;
165:24
**keep (14)**
7:20;11:7;21:21;
41:17;49:15;51:14;
73:8;94:20;105:20,20;
112:16;135:11;178:7;
180:21
**keeping (1)**

48:21
**ken (1)**
158:21
**kept (4)**
22:5;51:12;180:20;
181:15
**kerfuffle (1)**
71:20
**key (1)**
44:2
**kick (1)**
100:25
**kidding (1)**
26:24
**kind (15)**
6:11;7:21;19:11;
22:10;26:20;27:4,20;
37:21;38:19;44:22;
49:15;52:5;76:11;
97:25;174:7
**kinds (2)**
79:19;133:6
**kitty (1)**
94:17
**knew (40)**
29:19;32:3;37:11;
42:12;56:17;58:20;
60:19;63:14,15;65:7;
66:6;96:2,9;102:11;
104:9;107:21;112:25;
115:6,22;116:22;
117:19,22;118:2,3,6;
119:16;123:16,17;
124:14;125:25;126:15;
134:24;135:12;136:17;
137:6;151:25;152:1,8;
166:16;178:24
**knock (2)**
15:7;168:17
**knocking (1)**
163:8
**knowing (3)**
16:18;113:4;114:10
**knowingly (3)**
59:24;104:8,8
**knowledge (1)**
69:1
**known (2)**
11:25;143:2
**knows (4)**
56:19;111:18;
139:17;152:2
**Kolya (1)**
13:6
**Kristina (1)**
47:20
**kudos (1)**
81:21

## L

**L-174.2 (1)**
35:20

**lack (2)**
78:18;82:19
**laid (2)**
7:6;68:15
**land (5)**
53:15,16,24;109:13;
179:23
**Lande (1)**
10:7;67:12;75:24
**landscaping (3)**
18:14;35:22;103:16
**language (3)**
13:2;50:2;71:2
**largely (2)**
96:11;180:8
**laser (1)**
7:21
**last (21)**
6:1;7:1;9:10,12;
34:18;38:22;108:14,
14;110:4;112:8;
114:19;117:18;127:3,
11,13;128:7,11;171:3;
176:1;183:7,11
**late (5)**
62:23;63:1;76:1;
120:19;180:12
**later (12)**
12:4,17;27:23;33:12;
37:7,23;56:14;65:14;
70:5;107:5;126:10;
177:13
**laughable (2)**
53:12,25
**law (18)**
91:1,5,6,7,12,19;
92:19,21;93:17,20,20,
21,22;129:17;134:22;
135:8;152:3,6
**laws (2)**
105:3;148:12
**lawsuit (1)**
66:19;120:3;179:1
**lawyer (17)**
9:7,11,13;20:2,4;
26:20;32:15;34:17,20;
58:8,11;59:12;65:15;
69:15;105:16,16;
160:13
**lay (1)**
89:3
**layperson (3)**
158:22;159:16,21
**lays (1)**
51:8
**lead (4)**
7:1;35:14;78:18;
161:25
**leap (1)**
142:19
**learned (2)**
91:25;179:1
**least (13)**

LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

October 4, 2019

5:22;9:14;15:1;
44:12;57:11;64:11;
75:3;83:18;87:5;88:9;
136:4;138:10;164:1

**leaves (1)**
160:2

**leaving (1)**
153:10

**led (2)**
67:17;78:24

**ledger (1)**
61:17

**ledgers (2)**
61:12,13

**left (4)**
94:11;95:11;140:21,
25

**legal (3)**
169:16,17;171:8

**legal-counsel (1)**
136:11

**legit (1)**
166:6

**legitimately (1)**
171:24

**length (4)**
15:6;17:20;173:14;
177:24

**lengths (1)**
55:16

**less (5)**
45:6;87:6;154:7;
156:24;181:17

**letter (11)**
20:2,4;34:17,20;
39:19,22;47:11;65:15;
66:25;72:3;149:5

**level (5)**
21:5;44:22;78:8;
92:17;98:25

**levels (1)**
25:25

**liabilities (1)**
115:19

**liability (1)**
104:12

**lie (1)**
104:11

**lien (31)**
42:7;66:16,17;67:11;
70:13,19;71:23;128:8,
10;145:13,14,14;
146:17,22;147:20,21,
25;148:1,2,6,7,10,13,
15,21;149:16;150:11,
14;180:7,8;181:21

**lies (1)**
105:1

**life (1)**
122:6

**light (4)**
19:22,24;21:16,18

**liked (1)**

5:11

**likely (8)**
121:6;161:19,21,23;
162:9,18,19;163:24

**limited (1)**
137:16

**line (14)**
36:22;39:15;42:21;
46:1;49:6;51:8;55:9;
69:8,23;70:1;76:9;
103:8;107:4;178:8

**linear (1)**
29:10

**lines (4)**
6:19;16:25;17:1;
126:21

**Lipetsker (30)**
4:15;10:7;12:8;
14:21;16:18;26:11;
34:20;38:16;42:10,20;
54:15;56:25;57:9;68:8,
17;72:14,22;73:12,18;
74:24;89:3;98:14;
102:17;112:14;114:25;
117:24;135:15;146:9;
176:11;182:11

**Lipetsker's (2)**
119:19;152:1

**liquidation (3)**
112:13;113:12;
168:22

**list (7)**
15:13;32:10;49:13;
61:1;63:9;119:21;
120:22

**listed (15)**
33:25;63:2,4;85:4;
102:10;117:25;118:1,
3,5,6;119:16;120:25;
149:23;150:16,18

**listened (1)**
118:10

**listening (1)**
85:24

**listing (21)**
46:10,13;58:24;63:6,
16;64:22,25;65:6;66:3;
71:13;106:21;117:18,
22;118:2,16;119:4,9,
17;120:15;166:15;
181:22

**litigation (5)**
14:21;68:16;78:22;
82:24;150:24

**little (15)**
5:4;9:16;17:3;37:15;
43:8;61:4;70:3,15;
82:12;86:6;109:11;
125:23;126:17;141:8;
144:20

**live (2)**
130:25;183:23

**lives (2)**

33:12;109:17

**Liz (1)**
165:14

**LLC (15)**
4:5,10;60:5;70:25;
71:5;100:22;101:8,16;
104:11;107:8;109:9;
167:8;173:4,4,23

**load (1)**
72:21

**loaded (2)**
62:7;104:2

**loan (41)**
20:13;21:5;38:8;
53:4;102:13,14,15;
103:21;105:1;109:6,6,
10;113:15,18,19;
116:16;122:9,13;
137:10,15;138:4,6;
139:7,8;147:8;169:20,
21;170:3,7,15,16,22;
177:1,7,9,23;178:6,15;
179:10,11;180:21

**loans (13)**
20:17;104:6,8;
113:14;122:7,9,14,16,
19,23;169:15;182:24;
183:1

**location (1)**
11:25

**logic (1)**
130:9

**logical (1)**
176:15

**long (4)**
5:21;19:5,14;52:22

**longer (1)**
58:4

**longest (1)**
60:13

**longhand (1)**
156:19

**look (100)**
11:22;14:16,17,17;
20:14,20;24:2;26:6;
27:19;34:7,16;35:5,17;
36:1,23;39:7,15;40:1,7,
16;45:15,22;49:3,5,8,
13,17,18;51:2,5,11;
53:18;54:3,13,21;55:2,
23;60:3;61:6,12;62:4,
25;65:22;69:8,9,23;
70:6;72:5;74:9,14;
75:5,8,11,15,19;76:10,
25;77:9;78:7;81:10;
83:8,9;84:3,6,20;87:14,
17;89:20;91:4;92:22;
94:6,20;98:4,14;99:15;
102:8;103:12;105:16;
108:13;109:2,18;
111:11;112:11;123:1;
127:12;128:18;141:18;
147:20;153:24,25;

157:25;158:11;166:2;
174:2,24;175:9;177:9,
18;180:9;182:7

**looked (17)**
46:3;49:6;61:8;94:6;
95:6;106:15;107:3;
111:4;114:22;117:25;
119:15;127:17;128:9,
15;131:5;134:6;157:1

**looking (16)**
30:19;53:17;57:2;
58:3;85:5;94:24,24;
98:2,12,13,13;109:11;
156:11;159:4,5;162:23

**looks (5)**
37:21;51:3;70:10;
81:15;175:8

**loop (1)**
105:10

**lose (14)**
11:8;24:15;27:6;
42:8;61:24;67:12,13;
70:20;99:9;175:8;
176:9,19,21;180:2

**loses (1)**
79:10

**losing (4)**
99:5,6;124:1;145:8

**lost (3)**
65:16;148:18;182:18

**lot (12)**
9:23;13:16;18:21;
28:6;51:20;54:16;
57:24;62:17;66:9;
67:22;70:9;96:8

**lots (1)**
13:7

**low (3)**
25:24;28:2;29:23

**lower (3)**
55:7;99:16,18

**Lyman (7)**
11:25;61:8,8,9;
62:20;69:21;96:11

**Lyman- (5)**
4:4,9;31:18;68:1;
74:22

**Lyman-Cutler (13)**
21:25;29:17,24;30:8,
10;31:18;34:6;42:12;
49:24;52:16;62:11;
69:21;138:20

**Lyman-Cutler's (1)**
52:9

**lynchpin (1)**
149:3

## M

**made-up (1)**
75:4

**madness (1)**
176:22

**magnitude (2)**
34:24;76:15

**Maiden (38)**
10:7;14:11;32:14;
54:14;57:17;58:8,9;
59:12,14,18;69:13,14,
16;96:13,14,20,23;
97:3;98:3;105:12,12;
107:5;108:13;109:24;
110:13,14,14;111:7;
114:23;124:23,24,25;
125:3,6;134:9;178:8,
12;179:4

**main (1)**
36:8

**maintain (3)**
22:11;27:5;137:6

**maintained (1)**
115:20

**maintaining (1)**
22:12

**maintenance (1)**
86:24

**makes (18)**
10:2;19:11,21,24;
21:16,18;41:17;53:20;
55:14;57:2,7;63:3;
69:18;79:24;141:3;
173:9;175:2;176:22

**making (9)**
15:18;60:18;75:25;
79:22;80:22;84:8;
140:2;170:7;175:5

**malpractice (1)**
112:5

**man (3)**
21:6,9;57:3;119:19

**managed (2)**
102:19;103:18

**management (2)**
52:10,12

**manager (3)**
106:3,5,7

**Managing (7)**
12:2;60:14,20;63:12;
110:19;137:25;179:6

**manner (3)**
77:19;136:8,24

**manufactured (3)**
141:23;145:5;163:6

**many (5)**
48:6;123:19;140:4;
173:3,4

**map (6)**
37:2,7;42:18;60:12;
70:4;183:12

**March (16)**
12:4;36:1,2,3;46:6,9;
50:9;62:24;63:5;64:14;
99:19,21;120:9;121:5;
128:1;149:19

**marginally (1)**
68:15

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
Document    Page 201 of 214
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

October 4, 2019

**mark (5)**
23:5;152:22,23;
165:14;180:14
**marked (6)**
8:18;23:16;61:9;
153:7;165:17;172:11
**market (9)**
64:23;117:14;
120:21;121:2,4;150:6;
153:21;177:22;178:5
**marketability (1)**
149:16
**marketing (1)**
120:5
**married (1)**
70:21
**masonry (2)**
18:14;35:22
**Mass (5)**
91:20;92:1,11;93:17,
18
**Massachusetts (7)**
12:1;91:2,7,19;
92:12,25;93:22
**massive (1)**
155:20
**mastermind (2)**
80:10;143:16
**match (3)**
50:11,13;54:2
**matched (1)**
8:2
**matches (2)**
10:2;73:24;78:23
**material (4)**
10:14;17:21;58:9;
60:22
**materials (7)**
20:8;46:16,21,22,23;
70:16;163:2
**math (5)**
41:25;87:9;102:13,
21,22
**mathematical (1)**
24:7
**matter (5)**
25:18;35:8;68:7;
139:16;155:10
**matters (5)**
26:2,5;28:22;37:14;
48:13
**max (1)**
19:13
**maximum (2)**
19:1;52:24
**May (50)**
4:12;9:8;16:24,24;
20:1,21;21:13;34:17,
19;35:19;36:21;37:18;
39:19,22;40:4,6;41:18;
42:4,13;44:4,9,19;
47:10;56:11;61:11,25;
66:24,24;70:2,2,7,8,14,

17,21;75:6;80:13;
95:14,25,25;116:16;
128:25;161:4,4;
164:14,14;173:13;
180:15;182:16;183:22
**maybe (16)**
5:13;58:15;65:25;
66:1;72:19;75:1;
130:23;132:15;145:10;
150:14,15,16;159:21;
163:12;171:22;182:1
**mean (37)**
6:6,18;14:14;16:5;
18:25;20:2;23:12;
30:23;42:18;49:4;52:2,
3,14,15;54:18;56:1,17;
57:22;59:2;60:17;
62:17;77:19;78:3;
87:19;88:13;112:2;
120:2;123:16;128:16;
129:9;130:5;139:17;
144:21;173:12;174:17,
18;180:3
**meaning (2)**
155:8,17
**means (3)**
16:15;114:8;138:8
**meant (5)**
29:19;38:6;110:12,
21;160:25
**mechanic's (20)**
66:16,17;70:13;
71:23;128:8;145:13,
14;147:20,20,25;148:1,
2,6,7,10,21;150:11;
180:7,8;181:21
**meet (2)**
54:15;150:6
**meeting (7)**
32:6;54:11,21;96:13,
17;103:9;146:8
**memb (1)**
171:16
**Member (9)**
12:3;60:15,20;63:12;
110:19;137:25;171:17,
18;179:6
**members (7)**
12:5;104:12;112:14;
113:14,24;114:20;
174:25
**memory (2)**
177:20;180:23
**mention (6)**
19:24;56:24;81:1;
141:8;155:25;180:2
**mentioned (5)**
13:9;56:23;68:6;
72:1;73:2
**mere (1)**
70:5
**merely (1)**
78:12

**mess (1)**
143:1
**messages (3)**
64:20,21;66:5
**mess-ups (1)**
51:25
**met (10)**
42:4;47:20,21,23;
48:10;95:3;120:9;
129:6;130:15;163:25
**metadata (7)**
127:3,5,11,14;128:4;
129:5,16
**metaphors (1)**
97:1
**methodology (1)**
153:22
**Michael (1)**
9:8
**middle (2)**
43:3;182:25
**might (16)**
8:6;16:25;32:19,20;
44:11;72:19;80:4;
88:14,16;111:16;
131:3;132:3;144:20;
167:6;177:18,21
**million (44)**
15:22;17:23,25;19:2,
5,11,13;20:10,12;22:1;
25:11;27:2;28:25;
29:21,23,24;30:19;
38:12;54:1,22;56:2;
67:20,21;72:6;88:7;
94:14;118:3;165:21;
172:21;173:5,7,8;
174:16,20,22;175:5;
176:5,7,10,17,20;
177:17;180:24;181:16
**million-dollar (1)**
42:14
**million-odd (1)**
38:25
**mind (6)**
12:14;13:24;94:20;
117:2,3;148:5
**minimum (1)**
156:25
**minor (1)**
65:20
**minus (1)**
87:9
**minute (6)**
5:13;121:13;138:12,
13,13;145:3
**minutes (11)**
6:18;7:14;43:8,11;
54:4;73:7;77:18;107:5;
121:21;165:4;181:2
**miraculously (2)**
50:17;82:8
**mirrored (1)**
136:9

**mirroring (1)**
113:5
**misconduct (2)**
171:19,20
**miserably (1)**
145:1
**miss (1)**
141:7
**missing (5)**
12:21,22;106:13;
164:20;168:4
**misspoke (1)**
67:24
**misstatement (1)**
16:23
**mistake (1)**
50:15
**mistakes (2)**
44:13,20
**misunderstanding (1)**
55:18
**mix (2)**
97:1;124:2
**model (1)**
95:21
**modified (1)**
127:13
**moment (7)**
8:14;15:22;28:20;
30:22;34:4;35:8,13;
63:13;67:19;97:17;
111:4;114:22;143:17;
155:19;174:15;179:5
**momentary (1)**
62:21
**money (72)**
16:10,11;20:11;
21:11,14;25:12;31:2,
12;34:5,8;38:1,14,16;
42:8,11,12,15,17,19;
47:7;49:1,21;53:18;
54:9;55:14;60:8;61:21,
24;67:12,22;72:21;
76:3;87:15,16;98:15;
99:6,6;100:3,4;101:22,
23,24;102:3,3,15;
109:6,10;112:19,22;
115:12;143:17;148:17;
158:21;163:18,18;
166:6,10,14;167:19;
169:13;170:14;172:8,
22,22;173:22;175:2,17,
18,23;176:24;179:14,
17
**money's (1)**
17:10
**monies (3)**
22:24;102:24;169:19
**monitor (1)**
172:23
**month (7)**
21:6;40:19;57:4;
60:4,4,6;100:2

**months (24)**
20:1;31:24;32:12;
34:21;46:7;50:5;58:17,
18;63:18,20;74:11;
99:21,22,24;100:1,2,
23;101:1;109:8;
166:19;167:22;168:1,
11;170:22
**moot (1)**
9:2
**more (61)**
7:21;13:16;14:6;
21:11,14;23:4;24:20;
25:3,23;27:8,23;28:6;
30:12;31:5;36:19,21;
37:7;38:1;40:20;41:6;
43:9;50:15;56:12;
62:17;68:9;77:20;78:9;
81:8;82:12;87:17;
89:12;90:19,21;94:7,
16;100:4;103:17;
109:7;111:19;120:17;
121:6;131:14;138:11;
144:20;148:5,17;
156:22;160:6;161:19,
20,20,23;162:9,18,18;
163:24;170:15;172:2;
174:18;179:17,18
**morning (8)**
4:2,3,14,16,18,21,23;
13:17
**mortgage (8)**
101:20,21;113:20;
169:18,22,25;170:19,
23
**most (10)**
10:21;25:17;29:14;
34:24;45:19;51:15;
77:23;102:8;152:11;
183:14
**mostly (1)**
51:3
**motion (1)**
80:21
**motivated (1)**
147:16
**motivating (1)**
148:21
**mounts (1)**
66:2
**mouth (1)**
47:2
**move (2)**
54:4;103:21
**moving (4)**
41:17;99:1;146:24;
155:19
**much (22)**
5:4;6:17;7:12,22;
14:6;17:10;24:10,13;
36:5;43:5;45:6;51:24;
53:23;65:20;67:20;
96:7;105:10;145:2;

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 202 of 214

October 4, 2019

170:3;172:5;174:4,4
**multiple (2)**
25:25;158:13
**must (4)**
77:8;150:1,13;
156:22
**myself (5)**
14:3,4;18:13,14;
170:23

**N**

**nails (1)**
115:2
**name (4)**
53:12;125:19;
127:25;128:2
**named (2)**
9:8;116:13
**names (2)**
4:12;83:18
**narrative (13)**
103:24;107:22;
114:13,13,15;115:9;
122:15;123:15;135:11;
145:3,25;155:16;
171:23
**nauseum (1)**
95:6
**nearly (2)**
21:8;57:3
**nebulous (1)**
150:13
**necessarily (1)**
140:11
**need (30)**
13:17;22:3;39:9;
50:13;55:17;64:21;
65:2,2;69:10;89:2;
90:11,11;101:21;
105:3,3;106:13;
111:16,19;115:9;
129:3,6;157:14,16,17;
158:11,18;170:7;
172:2,23;182:3
**needed (7)**
42:15;53:16;60:24;
122:19;146:15,20;
184:3
**needs (3)**
13:9;61:23;80:2
**nefarious (1)**
150:22
**negative (1)**
169:8
**negotiate (1)**
140:8
**negotiated (7)**
32:4;63:8;104:7;
105:24;109:1;122:8;
137:12
**negotiating (3)**
13:11;116:16;122:14

**neither (3)**
48:3;52:13;78:11
**net (20)**
12:13;13:21;15:19;
71:15;94:8;112:11,11,
12,15,16,17,17,19;
113:7;114:4,14,14;
175:13;177:18
**net-profit (1)**
15:23
**new (8)**
4:24;24:4;26:17;
38:2;41:18;92:3;93:22;
106:18
**Newton (3)**
29:16,22;30:3
**next (28)**
5:23;31:15;36:23,23,
25;38:21,24;39:11;
42:21;56:23;61:1;69:7,
24,25;81:19;87:14;
95:10;103:1,2;106:17,
24;107:4;109:18;
113:13;122:6;127:2;
161:12;175:21
**Nickolay (1)**
4:15
**Nikolaev (1)**
45:13
**nine (2)**
65:14;73:7
**ninety (4)**
40:20;138:3,4,7
**nobody (14)**
11:3;72:11;78:21;
89:15,15;96:6;103:9;
108:17;119:4;140:18,
20;142:5;166:5,20
**Nobody's (5)**
74:11;102:6,22;
114:12;120:19
**non (1)**
67:2
**noncredibility (2)**
61:1;67:19
**None (13)**
13:8;25:8;39:3;
68:14,14;86:2,3;91:7;
117:9,12;142:6,6;
167:11
**non-Kagan (1)**
71:10
**nonsense (4)**
54:12;62:18;73:19;
183:15
**Nope (1)**
93:3
**nor (1)**
132:20
**note (10)**
71:1;95:8;99:20;
114:21;115:4;116:21;
169:18,21,22,23

**notes (3)**
16:24;28:17,19
**nothing's (1)**
52:20
**notice (4)**
38:18;40:17;107:20;
148:14
**noticed (1)**
7:24
**notion (2)**
6:6,10
**notwithstanding (1)**
119:22
**November (12)**
12:18;31:22,22,23;
33:11,16;37:9;53:3;
87:25;105:22;179:24;
180:14
**nowhere (7)**
14:22;37:13;38:18;
87:14,15;90:5;110:5
**Number (70)**
4:4,5,9;7:7;23:21;
28:10;29:1;36:23,24,
25;37:2,16;38:17,21,
24,24;39:25;40:4,25;
41:3;42:2;53:25;62:17;
67:3;70:5;74:5,6,12,
16;76:25;77:4,6;78:21;
84:21;88:4;90:6,8,9;
95:5;100:21;107:23;
108:14;110:6;113:19;
116:12;122:20;127:16,
17;134:8;153:4;154:7,
8,23;155:1,8;156:5,9,
20;158:1;165:16;
166:2,16,17,23,24;
175:10;176:17,18;
177:8;179:20
**numbers (31)**
8:3;11:11;29:7,12;
38:3;41:17;54:11;
65:24;66:12;82:16;
87:4;89:13,14;98:3;
104:3;111:16,18;
116:21;144:15,16,16;
153:19;155:16,23;
156:2;158:4,8,9;
162:25;167:1;176:4
**number's (1)**
99:20

**O**

**object (4)**
44:2;63:24;170:8,13
**objected (1)**
45:13
**objection (3)**
4:6;149:24;164:8
**objectionable (1)**
164:7
**objective (1)**

11:2
**obligated (5)**
31:25;53:2;58:16;
62:24;179:24
**obligation (8)**
11:24;17:12;100:25;
109:8,20;110:15;
132:20;180:16
**obligations (3)**
34:14;116:2;180:1
**observation (3)**
92:3;94:5;167:21
**observations (1)**
80:5
**obtainable (1)**
138:23
**obtained (2)**
127:25;128:1
**obviously (9)**
17:13;23:24;50:11;
59:2;82:5;93:12;
125:25;139:10;143:4
**occasions (1)**
158:13
**occupancy (1)**
33:24
**occur (1)**
120:17
**occurred (1)**
120:10
**o'clock (1)**
148:25
**October (8)**
33:25;54:21;58:15;
73:23;95:3,7;96:4;
166:17
**odd (2)**
27:9,20
**odd-million (1)**
176:9
**off (7)**
5:7,22;7:1;9:2;15:8;
22:13;43:4,13;47:13;
70:21;122:1;139:2;
148:3;150:1;166:10;
169:1;181:1
**offer (3)**
117:11,12;120:5
**offered (3)**
45:17;76:6;121:12
**officer (1)**
138:20
**O'Grady (9)**
76:14,14,17,21,23;
77:17;129:7;130:1;
132:18
**Oklahoma (1)**
9:11
**old (3)**
40:19,20,21
**omitted (1)**
107:21
**once (5)**

21:2;48:15,19;69:4;
82:6
**one (111)**
5:17;6:19;12:13;
15:1;16:5;19:7;21:20;
22:17;23:8;25:16;
27:16,24;29:1,3,24;
31:6,16;33:9;34:23,25;
36:11;44:21;46:8,9;
47:17;48:19;49:9;
51:18,21;53:10,17;
54:13;55:6,6,23;56:15;
57:12;60:9,16,17;63:1;
65:25,25;66:8,10;67:1,
24;69:3,20;71:3,8,11;
73:10;74:16,25;75:1,2,
13;76:16;77:3,23;
78:11;81:15,15;82:3;
83:18;84:21;85:8;91:2;
94:1,5,16;98:10,13,15;
103:2;105:13,21;
106:19,24;107:1,4;
120:22,24;121:1;
122:8,9,10;123:22;
124:16;127:16;128:17;
133:14;137:12;141:18;
144:24;145:10;156:13,
23;161:12,23;163:2;
166:21;171:18;172:11,
13;177:3,20;180:3;
181:24;184:13
**ones (7)**
35:18;44:2;76:10;
77:23;105:21;156:14;
173:20
**one's (2)**
46:6,6
**online (1)**
96:7
**only (53)**
10:11;13:13;16:20;
18:12;24:16,23;27:3;
28:7;33:2,15;35:4;
39:17;48:8;56:18;59:6,
20;61:13,19;66:3,13;
68:11;69:2;73:10;76:6;
77:5,15;78:10;82:5;
86:20,21;87:12;88:4;
89:11;93:6,18;102:17;
105:13;113:5;115:14;
116:11;119:6;120:14;
124:16;155:21;162:11;
166:20,21;171:19;
175:2;177:5;179:11;
180:13;181:25
**onto (1)**
62:7
**open (9)**
84:7;85:15,15,23;
97:20;105:1;124:17;
135:8;151:25
**open- (2)**
133:13,15

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 203 of 214
October 4, 2019

**open-ended (9)**
123:10,13,22;
124:10;140:21,24;
141:2,3;151:23
**opening (2)**
109:12;112:23
**operated (1)**
22:13
**operates (1)**
24:22
**operating (47)**
11:9,9,16,17;12:19;
14:8,10;18:2,18;21:20;
31:25;37:12;38:4;58:7;
59:21;63:8;69:15;94:5;
100:19,21,22;101:11;
105:8;107:15;108:10,
18,19;109:2,25;110:4;
111:25;112:8;114:15;
116:3,25;117:20;
120:7;122:11;123:4;
134:6;141:1;154:14,
15;165:19;168:10;
169:10;174:23
**operational (1)**
58:5
**opinion (11)**
10:20;29:18;159:1,
19;160:19,22;161:3,
20;162:6;164:11;182:2
**opportunity (3)**
79:5,6;180:2
**oral (2)**
19:19;117:11
**oranges (1)**
28:24
**orchestrated (1)**
122:10
**order (6)**
9:21;17:5;34:24;
42:2;86:6;118:16
**orders (2)**
50:7,10
**organize (1)**
5:15
**oriented (1)**
127:8
**original (5)**
37:18;56:1,3;88:5;
89:10
**ostrich (1)**
135:1
**others (1)**
86:24
**otherwise (3)**
32:1;108:17;141:13
**out (118)**
7:6;9:15;13:22;
14:22;22:10;24:11,12;
25:22;26:8,20;30:23,
24;31:7,9,13,21;33:10,
13;34:2,8,11,19;35:5;
37:13;38:1,17;41:4;

45:10;47:21,22,24;
48:11,16;49:24;51:8;
53:23;54:6;55:8;57:24;
58:17;60:4,5;62:16;
63:4;64:23;70:2,10,11,
17;72:16;82:12;85:22;
86:6,6;89:10,10,21,23;
90:20;92:9,10;94:24,
24;103:16,20,24;
104:4;115:25;119:5;
121:22;124:11;125:1;
128:6,7,8,11,22;
131:16;135:7,8;139:7,
21;140:6,20;142:20,
21;143:18;147:19;
150:24;153:10,12;
156:1,18,19;159:7,20;
160:18,25;161:16,22;
162:24;163:18;164:23;
172:8,22;173:1,2,6,22;
175:17;176:15;178:1,
4,17,20;179:25;
182:24;183:16
**out-and-out (1)**
51:16
**outlined (1)**
12:6;114:21
**outrageous (1)**
25:15
**outrageously (1)**
144:8
**outright (1)**
74:20
**outset (3)**
19:23;53:8;88:25
**Outstanding (9)**
39:12;41:14,14;47:1;
87:15,16;166:5;174:6,
9
**outstanding-cost (1)**
41:15
**outstanding-cost-claims (1)**
37:17
**outstanding-costs (1)**
39:7
**over (38)**
16:11;20:1,23,24;
24:20;25:11;26:1;
30:19;32:15;36:3;40:2;
42:14;57:6;58:9;60:8;
62:11;65:1;66:8;72:20;
80:18;85:10;91:9;
94:12;102:10;105:16;
117:11,11;141:17;
162:10,15;163:10,16;
164:1;170:22;175:10;
176:9;180:24;184:21
**overall (1)**
78:7
**overarching (2)**
43:24;45:21
**overbilling (1)**
80:19

**overcharge (1)**
155:12
**overcharged (2)**
82:1;154:7
**overcharges (1)**
158:5
**overcharging (1)**
82:17
**overhead (7)**
24:2;154:11,11,12,
17,17;157:22
**overlap (1)**
116:20
**overlook (1)**
151:11
**overpaid (7)**
35:8;48:14;49:19;
50:8,8,12,16
**overrun (1)**
57:5
**overruns (9)**
19:20,25;21:9;22:4;
41:19,20;56:25;72:17;
183:14
**overwhelming (1)**
79:8
**owe (2)**
50:15;174:13
**owed (15)**
34:15;35:1,9,16,16;
36:18;39:16,18;40:17;
45:4;47:7;50:17;91:10,
12;165:23
**own (42)**
16:7,7,9;17:7;18:1,1,
8,23;33:10;35:1,11;
36:18;47:2;48:1;57:25;
58:4,8,11;59:12,23;
63:22;68:17;82:15;
87:11;88:8;90:17,22;
105:15,16;109:1;
125:21;138:8,8;
148:17;150:25;156:3,
24;157:5;159:9;
166:14;175:15;183:15
**owned (3)**
24:16;115:11;128:3
**owner (1)**
123:6
**owners (1)**
30:5

**P**

**pack (1)**
9:17
**package (3)**
27:16;48:19;51:18
**packet (1)**
37:15
**page (44)**
12:18;17:1;23:15,19;
31:17;34:18,18;36:25;

38:23;39:13,14;40:15;
54:25;58:23;59:1;
61:16,17,25;62:16;
71:20;77:21;85:17;
86:14,16;95:10,14;
99:16;103:1;110:1;
113:10;127:3,7,11;
138:3,16,18;154:1;
165:20;166:3;172:14,
14,16;175:10;177:19
**Pages (2)**
16:25;35:20,21
**paid (76)**
12:12;29:9;30:20,25;
31:4,7,13,14,18,19,20;
33:12;34:1,2,9,9,11,11;
35:6,13,16;36:11,15;
39:6;41:19;22;42:17;
45:4;46:24;47:13,14,
14,20,21,22,24;48:10,
11,14,16;49:19;50:11;
60:1;62:10,15;67:20;
68:1,4;84:6;87:18;
102:18,25;103:20;
108:17;116:24;144:24;
147:23,24;148:9;
157:4;158:6;166:20,
21;167:19,22,22,25;
168:3;173:3,4,7,16;
174:4,11,12;180:18,23
**painfully (1)**
55:12
**pains (1)**
135:21
**paper (1)**
76:6
**paraded (3)**
158:7;162:25;164:21
**paragraph (8)**
11:22;58:22,23;
77:21;136:13;138:15;
174:24;176:23
**paragraphs (2)**
60:16;106:19
**paraphrasing (1)**
50:3
**park (1)**
161:22
**Parsing (1)**
158:19
**part (24)**
12:23,25;21:6;29:14;
34:13;41:16;46:14;
48:14;64:8;65:12;
70:22;108:12;111:15;
117:18;122:13,18;
126:25;136:4;140:3;
147:7;157:23,24;
158:22;182:6
**partially (1)**
94:15
**particular (7)**
32:14;44:3;48:23;

52:12;76:4;118:13;
174:2
**particularly (4)**
14:11;19:21;67:7;
77:20
**parties (13)**
4:7,12,22;6:11;
11:21;16:21;66:10;
93:20;95:3;133:16;
177:3,5;183:20
**parties' (4)**
10:22;25:16;116:2;
122:25
**parts (1)**
13:7
**party (2)**
138:25;139:3
**pass (2)**
24:21;61:3
**pasted (1)**
76:11
**Patel (1)**
92:5
**patience (1)**
80:18
**pay (5)**
13:22;14:2,4;15:20;
17:8;18:1,15;26:5,22;
31:2;32:13;33:10;
38:13;41:22;42:5,7,15;
46:23;53:2;58:16;
67:10;68:20,21;70:19;
72:7,12,15;85:14;
100:9;101:16,20,24;
102:16,17,19;108:11;
109:13;113:12;123:6;
143:17;147:12,14;
155:10;168:11;173:11,
21;174:14;179:24;
180:16,17,18
**payable (13)**
35:1,11;36:14;39:3;
40:18;46:25;47:3,9,15,
24;48:12;173:25;174:6
**payables (4)**
34:15,22;62:11,13
**paying (15)**
27:19,24;32:2;38:9;
48:25;60:5,11;85:21;
102:11;108:24;134:20,
21;147:13;166:15;
180:20
**payment (2)**
137:19;169:16
**payment' (1)**
85:19
**payments (11)**
31:16,19;41:24;49:6,
9;51:1;85:22;101:20,
21;169:15,15
**payroll (1)**
27:17
**pays (3)**

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 204 of 214
October 4, 2019

33:13;100:22;168:13

**penalties (1)**
135:21
**penny (3)**
82:10,11;155:17
**people (11)**
9:18,20,23;10:5,8;
44:20;57:9;74:2;78:18;
174:13;176:13
**per (21)**
19:2;20:17,21,23;
30:16,18;35:22,24;
53:1,5;55:25;57:4;
61:2,18;87:5,20;88:6;
141:4;153:12;177:17;
179:22
**percent (36)**
12:25;13:5,12,23;
18:19;24:16;94:8,9,11;
98:6,6;112:18,23;
113:6,7;114:4;138:3,4,
7,11;154:8,18,21;
155:6,7,7;161:20;
165:20;166:10;167:9,
15;169:3;177:18;
178:19,19,20
**percentage (2)**
168:25;178:16
**perform (1)**
136:7
**performed (1)**
160:23
**perhaps (9)**
5:10;8:17;32:19;
35:10;43:8;63:13;
154:16;163:25;164:22
**period (2)**
20:19;27:12
**periods (1)**
114:1
**perjury (1)**
135:21
**permission (1)**
94:3
**permit (3)**
30:2;32:19;132:10
**permits (1)**
89:13
**perpetrated (1)**
104:8
**person (9)**
73:10;77:15;89:3;
90:18;102:17;105:6;
111:24;131:15;138:21
**personal (3)**
116:21;147:11;
148:17
**perspective (1)**
161:13
**per-square-foot (4)**
28:1,12,16;29:3
**persuade (1)**
55:14

**persuasion (1)**
129:9
**Perten (282)**
4:18,18;6:4,6,9,16;
7:17,23;8:6,9,11,19;
79:12,14,17,21;83:14,
20,22;84:1,11,13,16,
18,24;85:2,8,11;86:9,
11,13,15,17;87:23,25;
88:2,4,16,20,22,25;
89:9,22,25;90:3,8,11,
15,19,21;91:11,15,18,
23,25;92:10,13;93:3,6,
8,11,14,16;96:19;97:3,
6,12,15,17,24;98:1,19,
22,25;99:4,7,11,14;
100:12,14,17,20,25;
101:4,6,8,11,13,18;
103:5;104:14,16,19,22,
25;108:1,4,6,8;118:12,
19,21,24;119:2;121:14,
17,20,23;122:5;124:4,
6,8,19,21,23,25;125:5,
8,10,12,14,17,20,22;
126:2,4,6,8,16,19,22,
24;127:2,5,11;129:3,
11,13,19,23,25;130:5,
8,13,15,20,23;131:5,8,
12,17,19,21,23,25;
132:2,7,9,13,22,24;
133:2,5,7,10;134:10;
138:18;139:24;140:6,
13,16,18,20,24;141:8,
11,20,24;142:4,9,11,
13,16;143:8,11,19,21,
24;144:1,3,5;145:13,
15,19,21,23,25;146:2,
4,13,16,19,23;147:1,4,
6,8,16;148:23;149:1,3,
6,8,10,12,15,22;
150:22;152:22,25;
153:2,5,8;155:5;
156:17;157:15,17,19;
159:14,16,22;160:1,3,
5,7,11,15,17;161:11,
16,18;164:13,17,23;
165:1,5,8,13,18;166:2;
167:5,10,13,17;168:3,
7,9,13,19,21,24;169:5,
10;170:9,11,13;171:3,
6,11,13,16;172:4;
174:7,24;175:25;
176:3,7;178:23;181:4;
184:6,10,13
**Peter (1)**
4:16
**petition (1)**
113:21
**petitioning (1)**
147:21
**phone (15)**
5:20,21;74:5,6,12,
16;76:23,25;77:1,4,9,

10,11,17;78:21
**phony (1)**
81:15
**photocopied (2)**
44:18,24
**photocopies (1)**
45:1
**photoshopped (1)**
128:16
**pick (3)**
20:5;65:8;121:15
**picture (1)**
87:17
**piece (3)**
12:22,22;175:20
**pieces (1)**
129:24
**piercing (1)**
115:17
**pile (1)**
72:10
**piously (1)**
44:9
**place (2)**
62:12;99:1
**plain (1)**
110:25
**plainly (1)**
51:18
**plaint (1)**
146:4
**Plaintiff (9)**
5:24;6:1,25;7:5;
91:2;92:15;106:23;
112:3;141:19
**plaintiffs (8)**
80:8;103:17;120:9;
127:12;128:19;143:16;
145:1,10
**PLAINTIFFS' (1)**
23:16
**plaintiff's (2)**
107:1;110:10
**plan (5)**
22:15;72:9;110:12,
24;179:12
**planning (1)**
34:23
**plans (22)**
12:1;45:22;46:4;
53:9,21;96:5;109:23;
110:11,11,22,24;111:1,
5;112:5;123:3,4;
151:23;179:5,6,8,9,10
**playing (1)**
62:6
**please (13)**
4:12;11:6;23:7;
38:23;65:6;75:1;103:2,
2;105:22;107:2;112:9;
119:9;174:22
**pleasure (1)**
6:25

**pled (1)**
136:6
**plethora (1)**
135:1
**plowing (1)**
36:10
**Plumbing (5)**
45:20;46:21,25;47:1;
156:9
**plus (3)**
36:9;138:11;167:2
**pm (3)**
105:20;122:1,2
**pocket (16)**
16:12;17:11;24:11;
31:2,8,13,14;33:10;
34:2,11;35:5;37:9;
38:1;39:2;58:17;85:22
**pockets (6)**
16:9;18:16;22:20,25;
25:13;173:6
**point (60)**
9:4;10:14;14:12;
15:17;19:12;20:16;
21:4;33:23;35:6;36:8;
40:3,10;41:9,11;42:3;
43:3,24;44:19,23;
53:10;56:23;57:16;
58:9;60:17;65:15;
72:16,16;74:1;78:5,5;
84:16,18;88:13,19;
97:10,14;103:19;
110:23;118:9,16;
127:16,17,21;128:3;
130:19;138:8;141:4;
148:5,15;150:19;
156:8;159:20;162:7;
165:6;169:11;173:8,
10;177:11;178:20;
183:7
**pointed (1)**
84:22
**pointing (1)**
48:9
**points (6)**
14:13,19,20;15:13;
78:15;165:1
**poles (1)**
29:11
**police (1)**
45:9
**poly-savant (1)**
75:22
**poor (1)**
176:9
**pop (1)**
183:11
**pored (2)**
162:10,15
**portion (5)**
72:17;95:12;137:19;
169:19;178:16
**Porto (1)**

47:12
**pose (1)**
183:25
**position (5)**
25:16;32:20;127:20;
130:13,24
**possible (2)**
9:16;57:4
**possibly (1)**
22:3;36:18;157:7
**pot (1)**
112:18
**potential (2)**
21:9;113:1
**potentially (1)**
99:24
**pox (1)**
140:16
**practically (1)**
27:17
**precisely (1)**
21:11
**preconceived (2)**
6:6,10
**predicting (1)**
98:6
**predominant (1)**
151:16
**preliminary (1)**
139:9
**premise (4)**
11:20,23;12:9;
158:19
**premiums (1)**
154:17
**preparation (1)**
169:18
**prepare (2)**
77:25;175:16
**prepared (5)**
8:2;71:8;73:15;
102:9;111:14
**preparer (1)**
52:3
**preponderance (2)**
91:18;92:18
**present (4)**
53:8;79:4,6;96:13
**presentation (7)**
54:8;10,14,20;60:25;
95:7;103:6
**presented (13)**
30:14;40:18;53:11;
73:18;85:1;106:22;
124:18,22;140:15;
160:1;174:2;179:13;
183:6
**presenting (2)**
53:13;55:13
**press (1)**
176:14
**pressure (4)**
72:14;118:16;

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 205 of 214

October 4, 2019

143:16;145:11

**presumably (5)**
81:6;94:12;121:1;
130:20;173:17

**presume (1)**
130:21

**pre-supposes (2)**
131:19,23

**pretend (1)**
153:24

**pre-trial (1)**
171:7

**pretty (8)**
11:14;26:4;65:20,23;
130:11;135:9;154:25;
183:13

**previously (1)**
85:19

**price (16)**
16:16;26:6;55:7;
82:9;94:2;111:8,22;
121:7;123:2,8,9;141:4;
150:8,16,18;166:8

**prices (4)**
26:4,16;150:1;
152:13

**primarily (1)**
133:19

**primary (1)**
81:4

**principal (1)**
140:4

**principals (1)**
131:9

**principle (1)**
9:14

**printed (6)**
71:22;72:9;128:6,7,
8,11

**printing (1)**
128:12

**prior (3)**
55:6;116:16;125:10

**private (3)**
96:7;105:11,12

**probably (9)**
20:8;43:21;118:17;
141:8;157:6;164:14;
165:5,6;183:18

**probative (1)**
132:17

**probing (1)**
132:11

**problem (7)**
19:14;47:9;81:15,16;
115:15;120:10;139:13

**problems (5)**
48:6;78:8,8,14,17

**proceeding (2)**
4:9;64:3

**proceeds (10)**
33:4;94:8;112:12,17,
19;113:7;114:4,14;

137:15;176:6

**process (6)**
5:20;13:7;38:15;
106:15;107:11;109:21

**produced (1)**
78:1

**product (2)**
161:4;164:20

**ProEx (48)**
16:7;18:7,7,9,11;
19:4;22:21;24:6,7,11,
16,18,22;25:2;31:19;
34:25;35:4,6,8,15;
36:14;61:2,5,12,23;
62:3,3,17;72:23;73:1;
74:4,7,16;77:5;86:17,
22;87:2,5,12;103:15,
18;115:16;134:17;
153:13,18;172:9,22;
173:2

**ProExcavation (6)**
4:8,19;18:8;35:12,
13;36:20

**ProEx's (3)**
52:8;62:7,8

**profit (21)**
12:24,25;13:21;
16:11;18:19;22:22;
23:20;24:4;86:18,22;
87:1,8;90:5;94:8;98:5,
7;103:3;154:11;165:8,
9;175:11

**profit-allocation (2)**
175:6;176:1

**profits (21)**
12:13;13:12;15:19;
16:8;18:3;22:19;55:8;
71:15;86:11;112:11,
15,16,17;113:4;
114:14;154:16;175:13;
177:18;182:16,18;
183:15

**profit's (1)**
32:8

**progression (1)**
64:13

**project (59)**
12:9;13:8;18:22,25;
19:20,23;21:12,17,20,
22,23,25;27:25;28:16;
31:21;42:9,19;44:25;
45:25;46:14;48:23;
49:1;50:13,16;51:14;
52:17,24;53:9;54:7;
55:14;60:2;61:2,18;
69:2;71:14;73:18;76:4;
80:20;87:23;95:11,16,
19;96:12;97:7;98:2;
99:16;122:7;135:17,
23;137:16,17,20;
141:17;142:18;160:20;
162:11;175:19;178:21;
183:2

**projected (4)**
32:7,12;176:17;
182:15

**projects (14)**
27:11,12,15,22;
29:17;45:1;48:18;
51:17;69:22;80:20;
119:20,20;125:10;
162:11

**promised (1)**
28:17

**promissory (1)**
169:22

**proof (27)**
22:24;23:22;24:1,3;
25:7;37:21;38:19;
39:17,21;40:5;45:15;
47:11,16,25;48:12;
50:19;62:13;77:25;
80:14;84:23;116:24;
144:20;163:12;166:24;
170:3;174:17;181:11

**proof-of- (1)**
173:18

**proof-of-claim (6)**
44:11,14;48:3;50:4;
113:19;174:3

**proofs (1)**
52:19

**properly (3)**
117:15;136:7;137:20

**properties (18)**
21:10;63:1,4,9;64:2;
67:10;71:20;102:21;
108:16;117:15,25;
119:16;121:4;176:5,
16;181:16;182:23;
183:3

**property (17)**
13:8;20:17;33:25;
35:24;42:4;57:5;63:2;
64:23;70:17;96:4,5;
112:12,19;146:18,24;
149:17,18

**proposal (1)**
73:21

**proposals (18)**
22:21;24:8,9;25:2;
35:17,25;36:4,12,12,
13,20;73:1,22;74:7,17;
77:5;86:23,25

**proposed (7)**
20:16;67:1;71:9;
103:7;138:7;182:13;
184:1

**proposes (2)**
24:14;25:12

**proposition (1)**
16:21

**protection (1)**
32:4

**protege (1)**
9:9

**prove (11)**
16:14,17;90:25;
92:25;128:9;137:5;
151:7;164:21;181:9;
182:18,19

**proved (1)**
44:7

**proven (2)**
80:15;170:2

**proves (1)**
19:17

**Provide (5)**
8:7,11,18;17:16;
92:22

**provided (5)**
81:5;82:24,24;
105:17;112:25

**provides (1)**
148:12

**proving (3)**
92:16;102:1;120:10

**provision (3)**
12:15;69:10;168:5

**pull (5)**
85:8;93:12;95:5;
100:21;105:19

**pulling (1)**
30:24

**punches (1)**
128:21

**purchase (4)**
109:6,10,13;121:7

**purchased (1)**
96:5

**pure (6)**
38:6;61:20;66:20;
86:21;87:1;165:9

**purport (2)**
40:9;90:1

**purportedly (1)**
46:21

**purports (3)**
72:1;77:6;90:1

**purpose (3)**
56:19;64:10;78:16

**purposes (3)**
33:15;95:24;165:24

**pursuant (1)**
112:10

**push (1)**
74:3

**put (49)**
10:19;11:5,12;20:11;
24:8,9;25:12;31:2,6,11,
14,17;37:1;38:13;
41:23;42:7,11;45:2;
46:9;53:14;54:7;56:6;
57:23;58:19;61:7,15;
67:11;70:19,23;72:14;
83:24;94:8;99:5;100:4;
120:12,21;132:3;
135:2;146:9;148:17;
158:1,23;168:16;

169:13;173:13,17,18,
20;175:18

**puts (2)**
16:12;168:15

**putting (5)**
13:13,13;42:10;
102:1;107:19

# Q

**quibbling (1)**
97:21

**quick (1)**
90:24

**QuickBooks (22)**
77:25;78:1;81:1,1,2,
3,3,5;82:21,22;83:3;
84:3,6,20;85:4,6,11;
86:4;89:1;157:3;
158:20;173:25

**quickly (6)**
5:23;32:7;95:7;
109:2,18;165:5

**quite (12)**
4:24;25:4,15;39:15;
50:17;56:17;66:19;
70:7;82:20;142:19;
178:10;184:2

**quote (1)**
85:17

**quoted (1)**
110:16

# R

**raise (2)**
156:21;157:9

**raised (7)**
19:25;81:20;92:16;
157:10;160:24;162:21;
164:4

**raising (1)**
20:15

**random (1)**
49:9

**range (2)**
96:12;155:6

**rarely (1)**
54:17

**ratcheted (1)**
21:3

**rate (1)**
99:9

**rather (1)**
92:17

**re (1)**
83:23

**reach (1)**
78:8

**reached (2)**
34:2;37:9

**react (1)**
142:8

Case 16-01120   Doc 399   Filed 10/11/19   Entered 10/11/19 09:34:30   Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document   Page 206 of 214
October 4, 2019

**reaction (1)**
142:10
**read (9)**
5:10,11;54:18,19;
55:15;58:7;93:13;
99:12;108:10,20;
110:17;112:4;114:3;
125:17,17,19,20,22;
126:6,6,9;128:9;133:1;
135:6;139:4,16,23;
140:5,9;152:4,5;
161:15;174:25
**reading (5)**
105:14;110:25;
111:1;121:6;123:10
**ready (6)**
8:24;43:17;79:11;
121:5;122:4;149:21
**real (19)**
10:24;28:6;31:10,12;
36:12;53:20;65:16;
70:12;72:17,19;102:9;
117:16;119:20;125:25;
134:12,18,19;152:9;
158:8
**reality (2)**
55:20;94:10
**realize (1)**
37:25
**realized (2)**
48:16;74:1
**realizes (1)**
21:1
**really (55)**
10:9;13:18;14:7;
20:6;25:15;26:14;27:5,
9,10,16;28:22;34:15;
35:10,10;42:22;44:1;
49:16;50:17;51:15,19;
52:2,11,13,17;54:2,2;
55:20;57:22;58:1;
60:12,22;73:10,24;
78:2,6;93:15,25;94:21,
22;103:11;105:3;
119:24;121:15;123:16;
133:23;136:2;144:13;
155:10;167:3;176:14;
177:3;178:10;179:8,9;
184:2
**reason (11)**
12:24;13:5,14;41:16;
44:2;50:14;60:20;
79:21;85:18;130:16;
146:23
**reasonable (17)**
25:19;82:16;138:22;
139:4,10,11;141:5;
144:18;151:5,11;
153:20;170:16;177:6;
182:16,19,21;183:5
**reasonableness (4)**
151:7,8;155:23;
170:6

**reasons (3)**
144:24;147:16;
167:13
**rebut (2)**
6:21;84:12
**rebuttal (5)**
6:11,15;7:2;30:14;
78:3
**recall (16)**
21:13;32:18;44:4,9;
61:11,25;105:10;
106:5;108:9;112:18;
113:18;137:21;145:8;
146:7;173:13;177:21
**recalls (1)**
67:21
**recast (1)**
83:23
**receipt (1)**
65:6
**receipts (1)**
171:9
**receivable (2)**
61:23;84:7
**receivables (1)**
62:7
**received (5)**
19:19;41:25;66:23;
74:22;116:4
**receiving (1)**
71:6
**recess (3)**
43:10,12;121:25
**recipient (1)**
75:22
**reclassifying (1)**
170:15
**recommends (1)**
9:13
**reconfigure (1)**
26:2
**record (29)**
4:13;16:19;18:20;
23:6;24:8;25:10;43:13,
14;51:2,7;57:1;62:22;
74:9,10,14;75:6,11,19;
77:9;79:1,2;81:4;90:5;
122:1,2;163:13;
180:13,22;181:19
**recorded (2)**
92:6;169:25
**records (13)**
21:21;22:6;69:19;
89:1;128:20;145:12;
158:20,25;159:1;
162:3;163:9,11,22
**recover (4)**
61:23;136:1;144:21;
174:14
**recoverable (4)**
154:13,22;158:2,3
**recovers (1)**
80:13

**redlines (1)**
105:17
**redo (1)**
5:6
**reduce (1)**
166:9
**reduced (6)**
168:6,14;169:11,14;
170:1;177:1
**refer (1)**
8:17
**referenced (1)**
106:10;123:4
**referred (2)**
7:25;8:1
**referring (1)**
50:23
**refinancing (1)**
112:12
**reflect (2)**
69:19;111:16
**reflected (3)**
81:22;85:23;122:25
**reform (2)**
108:22,22
**refused (1)**
64:2
**refuses (1)**
21:8
**refutes (1)**
56:4
**regard (3)**
45:21;46:16;152:12
**regardless (1)**
166:19
**reimbursed (4)**
31:8;34:3,7;60:10
**reject (1)**
70:8
**Rejected (2)**
64:5,8
**rejecting (1)**
92:20
**related (1)**
127:12
**relates (1)**
119:25
**relationship (1)**
93:21
**reliable (3)**
31:11;48:7;159:1
**relied (2)**
51:25;52:18
**rely (1)**
9:21
**relying (5)**
81:2;83:6;118:25;
173:25;174:1
**remaining (2)**
113:13,22
**remarkable (1)**
82:20
**remedies (2)**

116:8;117:4
**remedy (4)**
117:1;147:22;
151:17,19
**Remember (25)**
18:7;29:5;32:25;
33:6;35:3;38:3;42:6;
45:22;46:4;49:11;67:1;
71:19;79:19;81:3;
83:17;96:14,18;
118:17;125:4;135:7;
145:7;156:14;158:12;
161:8;167:15
**remind (2)**
5:14;179:21
**remotely (1)**
62:19
**removal (5)**
35:24;36:10;58:25;
86:24;153:14
**remove (5)**
63:10,11,22;64:10;
65:9;181:23
**removed (1)**
63:16
**reneged (1)**
33:3
**Rep (3)**
93:17;125:9;160:1
**repayment (1)**
113:13
**repeatedly (3)**
19:8;59:23;103:23
**reply (1)**
70:8
**report (4)**
29:5;127:24;162:16;
165:21
**reprehensible (1)**
72:25
**representation (2)**
158:18;177:14
**representative (1)**
128:19
**represented (3)**
45:6;99:23;177:4
**reputable (1)**
26:9
**requested (1)**
50:3
**requests (1)**
7:25
**require (2)**
152:3;160:6
**required (2)**
107:7;136:23
**requires (2)**
91:13;152:7
**rescission (4)**
116:6,10,11,23
**reserve (7)**
6:15,17,20;7:2,4,12,
13

**residential-home (1)**
63:18
**resist (1)**
93:23
**resonates (1)**
97:19
**respect (2)**
113:24;145:19
**respectable (1)**
51:23
**respectfully (3)**
68:13;80:2;182:3
**respective (2)**
7:25;175:1
**respond (1)**
145:23
**responded (1)**
66:24
**responds (1)**
54:17
**response (9)**
67:2;70:15;71:10;
72:7;107:6,9,24;
143:21;144:5
**responsible (1)**
109:20
**rest (4)**
61:20;62:20;76:10;
183:19
**result (2)**
80:9;174:18
**results (2)**
145:16,17
**resume (1)**
43:10
**retail (2)**
26:14;27:24
**retain (1)**
58:24
**return (4)**
22:9;98:10;169:2;
175:12
**returns (2)**
71:18;98:6
**review (3)**
83:13,15;89:2
**reviewed (5)**
105:25;115:22,23;
122:24;136:9
**reviewing (1)**
123:10
**revised (1)**
50:2
**rhetorical (1)**
82:13
**rid (1)**
147:1
**Ridge (1)**
9:10
**ridiculous (2)**
58:5;156:2
**riff (1)**
30:7

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 207 of 214
October 4, 2019

**Right (158)**
5:24;6:8;7:7,19,19;
8:15;9:3,6;11:21;
14:23;15:14;16:5,9,23;
18:22;19:6,8;21:21;
22:16;23:1,5,8;27:11;
29:1;30:23;31:8,20;
32:24;33:1,17,20,21,
24;35:15,19;40:18,22;
41:4,7,13,18;42:12,15;
43:4,10,17,21;44:19;
45:24;46:1;47:9,10;
48:9;19;49:4,11,25;
50:24;51:7,20;52:11;
54:7;57:8;58:25;63:22;
64:10,13;65:10;66:8,
15,24;68:5;70:7,14,
73:11,25;74:11;76:24;
77:4;78:16;79:11;
82:22;84:10;86:11;
87:15;88:2,6,24;89:8;
93:13;97:19,24;99:3;
100:13;101:12;102:21;
103:5;104:9;106:12,
15;113:5;115:20;
117:19;121:17,19;
122:3;124:5,7;125:13;
126:1;127:6,10;
132:11,23;133:9;
134:18;135:8;138:10;
139:12;141:19;144:16;
145:15;148:7;149:7;
150:21;151:20;155:4;
159:22;160:1,16;
161:10;162:8;164:8,
25;166:1;167:16;
168:12,16,20;169:8;
171:2,15;172:3,6;
173:18;175:19;177:15,
22;178:10,15,25;
179:25;181:9,11;
182:17,19,23;183:22
**right-hand (2)**
99:16,18
**rise (2)**
43:12;121:25
**risk (10)**
32:5,6;54:24,25;
55:7,9;95:8;97:25;
99:17;168:16
**risky (1)**
98:9
**Road (3)**
11:25;29:16;96:11
**role (2)**
12:22;77:13
**room (1)**
58:2
**rough (1)**
103:12
**roughly (10)**
42:6;68:2;87:20;
94:14;100:1;103:13;

107:5;109:12;167:22;
169:17
**rounded (1)**
99:20
**RSMeans (1)**
155:2
**Ruby (1)**
9:10
**Rudyakova (1)**
42:4
**ruled (3)**
16:4,13;132:15
**Rules (2)**
164:5,10
**rulings (1)**
184:7
**run (3)**
53:1;105:23;175:21
**running (2)**
48:20;56:7
**Russia (1)**
99:6
**Ryan (6)**
76:14;77:16;129:1,7;
130:1;132:5

## S

**sakes (2)**
173:12;178:13
**salary (1)**
68:2
**sale (9)**
63:18;94:8;112:12,
19;113:7;146:21;
150:1;176:4,6
**Salmi (9)**
28:21;30:11;153:18,
19,20,24;156:1,1;163:8
**Salmi's (5)**
28:18,20;30:14;
153:21;156:5
**same (26)**
4:22;10:17;18:7,11;
27:12;30:2;46:12;47:9;
58:22;65:13,18;71:24;
73:9;74:19;78:1;80:22;
99:1,1,6;114:4;120:22;
123:3;161:25;166:12;
170:24;175:17
**sand (3)**
134:23;135:2;151:14
**sat (4)**
17:22;18:12;58:2;
63:3
**satisfied (1)**
79:4
**savings (2)**
24:21;61:3
**savvy (1)**
105:6
**saw (21)**
44:25;70:13;73:10,

12,12,13,13,13;84:25;
86:20,21;117:20;
118:1;125:15;134:4,
18;135:3;139:11;
140:8;163:15;179:20
**saying (49)**
14:14;20:18;28:13;
30:25;38:7;41:18;
49:21;55:25;56:4;
64:21;65:2,5,12;71:7;
74:10;76:16;80:23;
89:24;96:2,12;101:5,
21;102:2;105:4;110:8;
112:16;114:23;115:21;
116:24;118:22,24;
119:10;123:15;129:4,
15,16;130:25;131:1;
134:7,20;135:21;
139:12;140:9;142:13;
147:6;154:24;158:9;
162:12;167:25
**scale (1)**
29:2
**scenario (6)**
80:13;94:14;95:16;
97:7;155:17;168:15
**scenarios (3)**
95:11,20;176:1
**schedule (4)**
178:6,7,15;180:22
**scheme (2)**
64:9;145:5
**scintilla (1)**
117:12
**scoop (1)**
19:18
**scope (1)**
72:8
**scream (1)**
70:11
**screaming (1)**
70:10
**screen (8)**
11:6;33:18;56:6;
61:15;74:25;83:24;
123:1;183:11
**scribe (3)**
110:8,12;111:24
**scrivener's (1)**
115:8
**scroll (6)**
105:20;106:2,16;
107:2;113:10;127:7
**scrupulously (1)**
115:16
**scrutiny (2)**
92:4,5
**scrutiny' (1)**
92:14
**Sean (1)**
4:14
**searched (1)**
128:20

**season (3)**
36:3,5;63:4
**seated (3)**
4:2;43:16;122:3
**second (10)**
6:9;29:3;82:4;86:7;
108:14;166:3;167:21;
172:14,14,16
**seconds (2)**
171:4,5
**second-to-last (1)**
176:2
**section (29)**
11:9;12:6;24:25;
62:23;94:6;100:22;
101:9;106:20;109:5,
19;110:14,16;112:1,8,
9,9,10;114:5,21;
137:14,18;138:1;
148:11;152:4,5;
165:19;167:17;168:10,
21
**seeing (3)**
157:3;158:21;168:5
**seek (1)**
152:13
**seeking (1)**
80:7
**seemed (1)**
59:24
**seems (4)**
5:3;42:23;51:3;
140:1
**sees (2)**
21:10;70:14
**self-dealing (4)**
16:5,12;25:13;170:4
**self-interested (2)**
92:8,13
**sell (9)**
118:7;121:2;146:21;
149:25;150:18;175:22;
180:14,15;183:3
**selling (3)**
55:7;63:4;150:8
**send (7)**
20:3;42:14;60:8;
75:14;101:22;105:22;
184:20
**sending (2)**
67:6;166:13
**sends (7)**
50:10;54:5,14;65:4;
70:16,16;119:11
**sense (19)**
10:2;19:21,24;21:16,
18;53:20;54:1;55:15;
57:2,7;63:3;68:7;
69:19;81:18;82:19;
90:23;173:9;175:3;
176:22
**sent (22)**
37:20;46:12;49:18,

18;61:2;67:5;74:22;
76:14,21,23;77:10,10,
16,17;102:24;119:7,8,
10;130:17;132:19;
135:5;175:16
**sentence (4)**
108:14;110:19,22;
114:19
**separate (1)**
55:5
**September (5)**
49:25,25;50:5,9;
73:22
**sequence (1)**
162:24
**sequestered (1)**
44:4
**Sergeev (4)**
44:17;45:5,8,8
**Sergey (1)**
45:13
**series (2)**
34:22;67:17
**serious (1)**
78:3
**served (1)**
162:12
**session (1)**
43:15
**set (5)**
8:16,18;9:2;62:16;
98:13
**sets (2)**
77:24;82:22
**setting (1)**
176:8
**seventeen (3)**
27:15;48:18;51:17
**Several (2)**
140:14;181:4
**shall (11)**
11:23;12:3;106:19;
110:15;112:13;113:13,
23;137:15,19;138:3;
174:25
**sham (5)**
123:16,17;124:14,
15;139:16
**share (8)**
12:12;13:5;15:19,23;
18:3,19;33:4;71:15
**shared (1)**
36:12
**sheer (2)**
78:17,17
**sheet (1)**
36:1
**sheets (1)**
46:10
**shock (2)**
113:14;135:13
**short (6)**
15:11;47:19;88:22;

99:25;100:3;166:19

**shortfall (1)**
  34:7
**shortly (1)**
  147:9
**shot (1)**
  156:4
**shots (1)**
  142:18
**show (29)**
  7:22;16:20;19:17;
  20:7,9;27:5;30:14;
  31:7;34:10;35:3;51:7;
  54:8;59:3;73:20;75:12;
  77:6;80:23,23;95:2;
  96:25;101:19;126:17;
  163:22;173:16,20,22;
  174:3,4;175:24
**showed (2)**
  30:1;134:25
**showing (6)**
  31:18;85:20;99:21;
  128:4;166:13,15
**shown (6)**
  46:25;47:1;54:21,23;
  158:14,14
**shows (12)**
  23:13;25:6;54:20;
  58:19;66:5;71:21;84:7;
  88:23;101:18;119:2;
  175:12;180:22
**sic (9)**
  6:15;12:1;27:8;44:3;
  57:5;66:8;169:17;
  170:17;181:7
**side (6)**
  5:17;131:10,15;
  146:5;151:19;155:19
**sides (5)**
  68:11;96:4;131:9;
  170:5,23
**sideshow (1)**
  144:23
**siding (1)**
  178:19
**sight (2)**
  24:15;27:6
**sign (23)**
  57:24;64:22,25;65:2,
  2,12,12,12,12,12;
  107:8,14;114:24;
  119:7;125:3,5,5,23,23,
  24;134:7,14;170:23
**signature (4)**
  137:12;138:8;
  139:20;140:10
**signed (40)**
  11:21;12:19;57:13,
  19,21;58:2,3;63:17,19;
  65:6,8;68:10;71:22;
  107:15,19;117:18,23;
  119:4,8,9;122:9,21;
  123:14,15,22;124:5,6,

8;125:15;127:16;
  137:25;138:12,13;
  139:5,16;147:2;170:5;
  177:11,12,13
**significant (6)**
  81:9;85:25;107:9;
  123:24;137:11;152:16
**significantly (4)**
  28:18;103:7,17;
  150:8
**signing (2)**
  138:5;139:2
**signs (1)**
  126:10
**similar (6)**
  67:16;69:22;79:3;
  81:16;98:22,23;159:7
**Similarly (2)**
  103:15;120:7
**simple (1)**
  22:23
**simply (11)**
  81:3;86:5;90:22;
  93:21;95:2;102:25;
  120:5;121:10;130:16;
  132:13;156:19
**single (5)**
  57:1;61:25;74:16;
  75:12;92:24
**single-purpose (1)**
  175:19
**sit (5)**
  17:6;79:14;152:3;
  183:17,18
**site (2)**
  110:24;145:8
**sitting (1)**
  79:19
**situation (2)**
  131:7;155:9
**six (5)**
  37:23;60:9;63:20;
  70:5;162:25
**sixty (1)**
  40:20
**Sizemore (1)**
  93:16
**SJC (1)**
  93:2
**Skills (2)**
  157:18,19
**skip (3)**
  29:5;56:6;103:1
**sky (1)**
  183:2
**slide (18)**
  22:21;23:20,24;
  31:15,21;37:15,16;
  39:8,10,11;41:15;
  69:25;87:14;175:6,10,
  15;176:2,2
**slides (2)**
  8:16;175:9

**small (2)**
  184:22,25
**smaller (1)**
  44:16
**smart (2)**
  119:19;145:2
**smoke (1)**
  172:1
**snow (5)**
  35:24;36:3,10;86:24;
  153:14
**snow-removal (1)**
  35:25
**soap (1)**
  39:23
**so-called (6)**
  22:20;29:2;36:4;
  68:18;123:7;183:10
**socialized (1)**
  9:17
**soft (14)**
  39:21;133:18,20,20;
  136:1;147:23;153:10,
  20;157:23,24;161:21;
  162:9;164:2;167:5
**softs (1)**
  134:1
**sold (14)**
  32:1,7,12;64:2;
  108:16;149:19,22,24;
  150:5;176:5,16,20;
  181:16,17
**solely (1)**
  137:19
**solo (1)**
  27:25
**somebody (8)**
  9:15;76:19;128:15;
  129:2;130:8;145:7;
  152:3;155:10
**someday (1)**
  174:14
**somehow (16)**
  18:4;19:19;50:16;
  60:23;70:4;76:4,11;
  82:8;102:19;105:4;
  122:16;130:8,10;
  147:18;150:19,22
**someone (3)**
  17:16;145:6;182:1
**sometimes (1)**
  75:9
**somewhere (4)**
  36:13;96:15;98:4;
  155:6
**soon (1)**
  43:7
**sorry (19)**
  23:15;28:16;39:9;
  49:12;51:4;100:17,23;
  101:2;103:2;104:14;
  114:18;127:5;131:22;
  132:4;138:15;142:9;

149:11;159:14;172:25
**sort (17)**
  11:2;27:9,9;37:4;
  44:9,19;79:23;89:19;
  97:21;100:6;115:16,
  17;128:13;150:13;
  155:11;176:12,25
**sorts (1)**
  81:14
**sound (3)**
  4:24;5:6;153:22
**sources (1)**
  112:22
**speak (4)**
  6:1;7:1;111:12;
  179:8
**SPEAKER (7)**
  4:3;37:5;86:8;
  101:14;103:4;127:4;
  172:23
**specific (3)**
  15:13;115:5;171:25
**specifically (16)**
  12:4,16,21;13:20,24;
  32:4,15;57:15;63:8;
  72:14;96:15;110:13;
  112:1;114:19;116:20;
  137:14
**specifications (1)**
  151:24
**speculate (1)**
  150:15
**speed (1)**
  55:3
**spend (6)**
  21:11,14;22:1;30:21;
  153:12;179:18
**spends (1)**
  21:6
**spent (14)**
  24:11;44:10;47:3;
  57:3;62:18;87:10;
  102:13,14,15;154:3;
  170:2;171:23,24;173:8
**spoke (1)**
  165:2
**spoken (1)**
  93:2
**spot (1)**
  77:8
**spreadsheet (2)**
  99:23;111:2
**spreadsheets (1)**
  96:20
**square (5)**
  28:2,9,10;29:4;45:10
**squared (1)**
  71:16
**stack (2)**
  123:25;125:2
**stage (1)**
  88:21
**stages (1)**

111:14
**staircase (1)**
  29:9
**stand (5)**
  80:21;83:17;84:5;
  135:2;136:17
**standard (4)**
  92:18,21,24;130:3
**standpoint (1)**
  72:24
**Stanik (5)**
  45:19,20,20;46:3,15,
  22;64:14
**Stanik's (1)**
  47:2
**start (13)**
  5:23;7:4;8:14;11:2;
  32:2;43:19;45:19;
  52:21;70:2;75:1;99:25;
  172:7,8
**started (11)**
  14:22;24:18;50:6;
  68:16;70:9,13;73:19;
  74:4;75:25;76:3;141:6
**starting (1)**
  64:15
**starts (1)**
  44:23
**state (4)**
  4:12;92:12;135:16;
  136:10
**statement (2)**
  48:20;135:18
**states (2)**
  93:19;110:14
**station (1)**
  45:10
**status (1)**
  120:16
**statute (3)**
  148:4,11,11
**statutory (1)**
  158:2
**stayed (1)**
  19:5
**step (3)**
  43:4;63:24;64:1
**steps (1)**
  162:22
**stick (1)**
  56:3
**stickies (1)**
  125:23
**still (21)**
  5:19;6:12;9:3;13:23;
  17:11;20:20;21:4;
  22:18;38:19;46:25;
  79:10;80:24;85:1;
  131:16;137:5;143:6;
  166:5;174:6,9;176:19,
  21
**stitch (1)**
  41:11

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 209 of 214
October 4, 2019

**stood (2)**
114:10;156:4
**stopped (3)**
143:2;167:23,25
**stops (1)**
169:7
**story (9)**
10:1;6;57:2,8,9;59:5;
79:24;124:11;132:16
**straight (8)**
7:17;10:1,6;14:13;
19:18;22:25;39:1;
135:3
**strangely (1)**
45:3
**stress (1)**
67:14
**stretch (1)**
112:7
**strikes (1)**
26:19
**string (8)**
76:25;106:17,22,25;
107:21;108:2,12;
116:20
**strongest (1)**
160:12
**strongly (1)**
93:23
**struck (5)**
94:18,19;113:9;
135:16;177:3
**stuck (1)**
181:22
**studied (1)**
38:4
**stuff (3)**
57:24;84:8;153:15
**subcontractor (8)**
21:24;22:6,9;39:9,
11;48:22;51:13;144:6
**subcontractors (17)**
24:19,22,23,24;25:1;
26:9,10;27:8;44:1,3,
24;45:18;61:5;73:17;
144:7,9;158:7
**subdivided (1)**
96:6
**subdivides (1)**
53:24
**subject (6)**
58:24;76:9;92:4,14;
104:11;138:2
**subject' (1)**
92:8
**submissions (1)**
5:10
**submit (24)**
10:5,9;13:16,17;
30:11;31:5;36:19;
45:19;46:1;50:14;
51:10;66:7;68:13;
73:25;78:14;123:20,

23;135:4;144:17;
148:16;167:2,10,10;
171:21
**submits (2)**
50:7;71:12
**submitted (6)**
27:18;50:19;61:25;
122:22;133:22;179:10
**subs (3)**
28:6;42:15;44:7
**subsequent (1)**
40:24
**subsidiary (1)**
92:4
**substance (1)**
42:6
**substandard (1)**
137:3
**substantial (5)**
5:10;62:21,22;120:8,
17
**substantially (5)**
12:3;62:24;63:5;
138:22;149:20
**substantive (2)**
91:6,7
**sudden (2)**
65:1;72:7
**suddenly (2)**
76:8;119:5
**sue (1)**
136:19
**sued (2)**
148:6,8
**suffered (2)**
80:9;181:13
**Suffolk (1)**
28:5
**suggest (14)**
80:12;86:17;87:7;
107:22;108:18;111:1;
112:4;117:8;119:18;
127:14;138:1;139:13;
163:5;172:2
**suggested (3)**
82:21;126:20;155:9
**suggesting (7)**
87:18;89:12;99:2;
141:13,24;144:22;
172:20
**suggestion (10)**
87:19;94:1;101:15;
102:19;115:8;120:7;
150:19;151:6;163:18;
167:24
**suggestions (1)**
114:8
**suggests (5)**
45:1;85:15;105:2;
111:17;122:15
**suit (4)**
105:4;148:7,8;149:4
**sum (2)**

18:15;19:3
**summaries (2)**
23:13;89:17
**summary (6)**
31:16;36:1;80:22;
81:6;153:8;164:1
**super (2)**
12:14;24:15
**Superior (1)**
71:13
**supervising (1)**
25:1
**supplied (2)**
12:2;109:24
**support (6)**
39:2;50:19;89:14;
122:22;142:25;145:5
**supporting (1)**
79:23
**supports (1)**
97:22
**suppose (1)**
183:24
**supposed (12)**
18:24;24:25;30:7;
82:18;100:10;101:8;
108:11;111:1;118:5;
122:12;179:2;180:15
**supposedly (1)**
95:12;120:2
**sure (30)**
5:19;20:18;21:10;
25:7;40:3;41:11;42:24;
53:6;54:24;63:6;73:3;
83:3;84:9,14;93:14;
101:14;106:6;107:6;
109:19;121:14,20;
122:25;124:1;129:19;
144:3;152:21;158:2,2;
161:7;178:10
**surprisingly (1)**
155:15
**sustained (1)**
164:8
**sweetheart (2)**
27:10,23
**switch (3)**
85:9,10;114:17
**sworn (1)**
135:19
**symmetry (1)**
30:9
**system (1)**
5:7

**T**

**tab (1)**
174:3
**table (1)**
45:15
**tack (1)**
155:7

**tacked (1)**
133:20
**tackle (3)**
126:12,13,14
**tag (1)**
150:10
**tale (2)**
39:4;58:6
**talk (23)**
9:23;13:16;14:18;
25:3;27:8;36:21;41:6;
58:6;63:6;68:5;69:7;
73:1;82:11;129:17,17;
140:12;143:11;151:6;
153:21;165:11;174:15;
179:5;183:8
**talked (12)**
17:3;29:16;38:4,5;
52:14;55:19;61:4;70:3;
78:21;91:3;116:17;
174:8
**talking (22)**
11:7;26:12;27:4;
28:23;30:22;34:16;
96:14;98:17;100:7;
103:9;104:20,23;
129:8,10,10;135:24;
140:11;154:16;175:20,
20;180:9;181:15
**talks (5)**
62:6;92:7,19;99:19;
111:12
**tallied (2)**
24:7;31:21
**tallies (1)**
172:8
**tally (7)**
15:21;22:19,23;
23:21;25:11;35:4;60:8
**tallying (1)**
173:5
**TAMPOSI (2)**
4:16,17
**tantamount (1)**
140:2
**target (1)**
21:4
**Tatiana (23)**
4:7,19;58:24;63:10,
22;64:10,11,21;65:1,
11;66:4;106:21;117:7,
8,20;118:10,25;119:3,
11,25;147:1;171:17,20
**Tatiana's (2)**
72:24;107:11
**tax (1)**
52:3
**taxes (3)**
21:2,3;51:23
**taxpayer (2)**
62:4;68:22
**technically (1)**
13:1

**telecom (1)**
53:13
**telling (23)**
9:15,19,23;10:14,23;
14:19;19:18;29:14;
31:10;39:15;48:10,20;
59:18;60:6;70:7;105:9;
146:3;148:21;152:12;
176:25;178:17,20,21
**tellingly (1)**
102:8
**tells (8)**
49:4;51:14;56:17,18;
62:10;70:18;74:17;
105:6
**template (1)**
54:5
**temporary (1)**
163:1
**temptation (1)**
93:24
**ten (6)**
44:21;59:20;112:14;
138:10;154:18,21
**ten- (1)**
113:5
**tend (2)**
184:22,25
**ten-percent (1)**
157:12
**term (7)**
13:11;59:1;63:8,18,
20;64:4;110:22
**terms (10)**
12:20;14:14;16:19;
58:20;59:2,23;60:22;
138:2,22;177:6
**Terrible (1)**
161:21
**test (1)**
96:23
**testified (63)**
17:20;21:21;24:18;
32:15;42:16;45:14,21;
47:13,19,23;48:13;
51:12;52:16;56:24;
57:15;59:18;64:24;
65:3,21;68:25;75:23;
76:2,13,15,23;77:15,
19,24;79:3;81:13;82:9;
83:2;84:4;85:3,5;86:4;
96:10,13,19;98:9;99:7;
102:22;108:10;112:24;
117:24;118:7;119:15;
122:8,24;123:24;
124:25;125:2;127:19;
136:8;137:22;142:20,
22;146:23;149:15;
154:10;156:22;158:25;
163:15;166:20
**testify (5)**
66:10;76:17,20;
77:16;102:23;117:16;

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 210 of 214

October 4, 2019

123:18;149:16,17;
162:7;163:14
**testifying (2)**
21:13;44:10
**testimony (67)**
16:20,22;17:1;18:5,
9,19;19:19;22:8;26:12;
29:6,15;37:3;42:6,18;
44:5;47:6,19;48:1,17;
49:3;51:11;53:6,7,20;
56:22;60:21;63:23;
73:15;78:6,23;82:6,19;
83:25;85:3,5,18,24;
86:19;87:10;96:18;
97:8;101:19;104:1,3,4,
4;112:18;117:17;
119:16;120:20;121:4;
125:22;128:14;129:15;
130:25;134:11,13;
146:7;147:17;152:17;
158:10;159:19;160:12;
170:6;173:24;177:21;
182:1
**texted (1)**
119:13
**That'd (1)**
8:19
**That'll (2)**
5:17;158:15
**theirs (1)**
143:14
**themes (1)**
184:3
**theory (11)**
38:2;41:18;59:9;
72:8;94:25;136:21;
141:21,22;167:7;
168:17,21
**there'd (1)**
98:10
**therefore (6)**
38:9,10;59:11;87:9;
104:11;115:12
**there're (2)**
14:13;59:2
**thing's (1)**
58:22
**thinking (6)**
6:18;7:5;20:23;
22:18;101:3;178:14
**third (3)**
37:15;138:24;175:10
**thirty (4)**
167:22;168:1;171:3,
5
**thirty-nine (1)**
54:3
**though (6)**
13:12;66:18;74:22;
84:23;129:18;159:11
**thought (18)**
8:3;19:12;65:9;
72:18;77:23;79:18;

84:9,22;104:10;
108:11;123:9;148:18;
175:8;177:23;178:3,
11;179:3;184:8
**thousand (8)**
11:15;24:12;40:17;
53:15;57:6;61:20;
72:20;86:20
**thousands (3)**
15:21;44:11;174:10
**threatened (5)**
42:3;67:9,12;145:6;
181:21
**threatens (1)**
70:18
**three (6)**
45:18;58:10;86:23;
153:15;155:6;181:1
**three- (1)**
163:2
**three-month (1)**
32:14
**threw (2)**
135:7;164:2
**throat (1)**
108:25
**throughout (1)**
142:17
**throw (3)**
89:9,10;156:1
**throwing (3)**
48:24;49:14;98:3
**thrown (1)**
35:23
**throws (1)**
49:21
**thumb (2)**
184:7,21
**thwart (1)**
63:21
**thwarted (1)**
181:23
**thwarting (1)**
64:9
**tie (1)**
150:25
**Tigar (2)**
9:8,13
**till (1)**
108:15
**timely (1)**
43:21
**times (6)**
10:11;58:10;60:7;
79:18;181:4;183:23
**timing (3)**
9:1;27:21;169:25
**tired (1)**
168:2
**titled (3)**
23:20;95:9;96:21
**today (8)**
7:8;11:2,11;97:19;

121:16;141:6;165:16;
184:2
**together (13)**
14:16;35:14;42:18;
54:7;61:7;70:23;76:12;
77:12;94:9;114:3;
137:7;152:5,6
**told (58)**
9:25,25;10:6,8,11;
27:13;30:3,9;32:6,16;
45:24;46:2,22;47:3;
51:16;52:2;53:9,12,21;
57:7,8,17,19;59:15;
63:23;67:10,13;68:12,
16,17,17,18,19;73:24,
25;74:6,21;98:3;100:4;
104:1;105:5;108:17;
115:7;117:22;119:4;
120:19;124:16;134:3;
135:4;147:13;148:9;
154:10,14;156:17;
178:7;179:4,15,18
**took (3)**
31:13;154:6;182:24
**top (7)**
15:23;30:19;71:10;
75:1;76:8;108:13;
166:11
**tort (1)**
115:19
**torts (1)**
145:20
**torture (1)**
174:19
**tortured (1)**
110:25
**total (10)**
25:11;36:10;45:16;
46:20;87:19;89:7;
157:5;163:15;172:21;
174:5
**totality (4)**
151:17;180:9,10;
181:14
**Totally (6)**
17:19;19:21;151:3;
178:25;179:3,17
**totals (1)**
90:3
**touched (1)**
131:5
**toward (1)**
29:15
**Town (2)**
30:9;53:24
**track (4)**
22:13;51:14;61:2;
87:10
**tracking (3)**
61:6,10,18
**trades (1)**
123:6
**trail (2)**

46:11;65:22
**train (1)**
148:18
**transact (1)**
138:20
**transaction (2)**
138:24;170:5
**transactions (3)**
92:8,14;138:19
**transcript (3)**
8:1,1;95:14
**treatment (1)**
79:3
**trial (30)**
9:7,10,11,11,13;16:6,
24;25:6;27:18;49:8;
50:24,25;51:6,21;
55:23;60:19;62:1,2,9,
25;63:17;64:19;73:19;
91:3;92:10,12;95:6;
137:3;161:9;184:1
**tried (7)**
9:9;46:4;66:10;67:4,
4;73:16;182:15
**trier (1)**
164:11
**triple (2)**
72:20;82:14
**triple- (1)**
155:20
**tripled (1)**
27:3
**trivial (1)**
65:22
**trouble (2)**
5:4,4
**true (24)**
10:11,17;17:3,4;
24:21;34:12;51:21;
52:2;58:22;60:2,7;
61:6,10;73:23;77:11;
86:22;95:25;104:7;
116:13;136:11;137:8;
159:13,15;177:14
**trust (7)**
98:25;105:4;157:2;
162:3;163:9;172:1,1
**trusted (2)**
142:14,17
**trustee (2)**
149:23;165:20
**trustee's (1)**
94:13
**truth (14)**
9:15,19,21,23,25;
10:14,16,23,25;35:7;
137:4;139:14;156:1;
157:9
**try (10)**
45:10;51:22;72:21;
95:6;118:16;146:21;
164:21;177:1;180:4;
184:20

**trying (17)**
7:19;38:15;55:3,20;
60:17;67:5;68:20;
72:12;89:16;113:21;
140:6;143:14;160:9;
161:8;175:12;176:18;
177:1
**tumbled (1)**
50:12
**turn (4)**
26:8;117:11,11;
159:7
**turns (1)**
40:5
**tweaked (3)**
111:16,17,19
**twenty (6)**
6:20;27:11;44:22;
58:17;107:5;175:21
**twenty- (1)**
32:13
**twenty-five (1)**
9:10
**twenty-three (9)**
31:23;32:12;58:18;
99:22,24;100:23;
101:1;109:7;168:11
**twenty-three-month (1)**
109:8
**two (42)**
5:12;7:17;9:12;
10:24;11:24;24:13;
27:2;28:25;35:14;
44:21,24;46:20;50:7;
55:5,10;63:16;66:1;
68:3;77:18,24;82:22;
86:23;93:3,25;110:15;
112:22;114:3;127:17;
137:9;144:23;148:13;
153:14;156:20;158:17;
162:1;163:1;167:1,13;
170:21;173:2;175:22;
176:5
**two-hour (1)**
6:12
**two-page (1)**
153:6
**typo (1)**
51:3
**typos (1)**
65:21

**U**

**ultimate (7)**
99:22;159:19;
161:19;162:2,8;164:9,
11
**ultimately (2)**
79:25;161:3
**Um-hum (8)**
97:5;129:23;148:20;
150:21;165:15;169:9;

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
Document    Page 211 of 214
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
October 4, 2019

175:14;182:14

**unabashedly (1)**
154:9
**unable (3)**
161:18,23;169:14
**unaffiliated (1)**
138:24
**unaudited (1)**
82:23
**under (42)**
5:25;6:4;24:25;32:9,
11;37:12;91:5,6;93:19,
20;94:5,24,25;103:25;
104:4;115:25;116:3,
25;124:12;128:22;
131:2;133:21,24;
135:21;136:3;137:18,
23;139:7,21;140:7,20;
147:19;148:4,11,11;
154:14,15,22;155:24;
165:19;167:13;177:15
**underlying (1)**
144:12
**underpaid (1)**
154:25
**underscore (1)**
116:21
**understands (2)**
59:17;179:13
**understood (20)**
12:4;42:16;95:16,19,
20,23;96:20;98:8,9;
99:8;109:20;111:21;
114:20,25;123:13;
124:9;137:23;138:6;
159:17,18
**unedited (1)**
83:8
**Unfair (9)**
22:22;23:20;25:2;
86:11;151:20,22;
152:12;154:6;155:11
**unforgiveable (1)**
72:22
**unfortunately (2)**
9:20,22
**Unicon (6)**
44:17;45:3,7;82:1;
156:13,15
**UNIDENTIFIED (7)**
4:3;37:5;86:8;
101:14;103:4;127:4;
172:23
**unilateral (1)**
146:8
**unilaterally (1)**
63:12
**uninnocent (1)**
162:4
**UNISON (1)**
5:2
**unless (1)**
139:11

**unpaid (2)**
158:6,6
**unreasonableness (1)**
157:21
**unreimbursed (1)**
174:8
**unrelated (1)**
27:21
**unreliability (1)**
161:25
**unreliable (1)**
158:25
**unsubstantiated (2)**
174:21;183:12
**unsupported (1)**
25:10
**untrustworthy (1)**
141:13
**untruths (1)**
9:21
**up (114)**
5:23;7:24;11:5;
13:13,14;14:4;15:22,
22;22:19,24;24:3,7,9;
25:6,21;26:3,17;28:24;
31:21,22;33:7,12;35:4,
18,18;36:9,9,20;38:2,
11,16;39:25;40:5;
41:10,11,17,24;42:2,
11;43:7,19;44:22;45:2,
23;46:4,18,20;47:10,
12;50:7,11,13;55:4;
59:9;60:8;61:1,19;
62:13,14,15,20;64:14,
15;65:16,19;66:2;
72:10;73:3;74:18;75:1,
1;76:21;77:7;78:4;
80:21;83:24;84:8;85:8;
91:21;93:3,12;95:5;
99:20;100:10,21;
103:13,15;105:19;
106:2,16;115:2;
121:15;123:1;127:7;
133:12;135:2;138:3;
143:9;144:15,16;
150:3;152:20;154:23;
155:8;159:18;164:11;
165:18;168:3;172:8,
17;173:5;180:19;
183:11,21
**update (1)**
105:23
**upfront (2)**
103:9;115:7
**upon (8)**
9:21;11:3;20:10,12;
112:13;113:11;157:2;
163:24
**urge (1)**
93:23
**use (9)**
24:19;26:19;63:21;
104:6;111:17;137:16,

23;163:2;177:1
**used (11)**
19:4;75:7,9,16,18;
77:25;104:5;115:11;
118:17;137:15;178:9
**uses (1)**
145:11
**using (12)**
18:23;44:24;57:17;
74:12;75:13;115:7;
118:14,15;127:21,23;
143:2;155:2
**usually (1)**
7:3
**utter (3)**
10:10,21;68:13

**V**

**V&D (1)**
44:17
**Vadim (6)**
4:7,20;38:7;57:6;
75:12;131:1
**vadim@kagandevelopmentcom (1)**
75:5
**vadimkagan@yahoocom (1)**
75:10
**Vadim's (1)**
71:10
**vague (1)**
37:4
**valid (1)**
15:12
**validated (2)**
156:10,11
**value (4)**
132:17;150:6;
160:23;162:21
**vanities (1)**
29:10
**veil (1)**
115:17
**vendor (5)**
21:24;22:6,9;48:22;
51:13
**venture (1)**
11:22
**version (10)**
58:23;82:23;83:1,6;
133:8,14,15,24;136:3;
154:22
**versions (1)**
84:5
**versus (2)**
153:9;169:15
**viewed (3)**
27:15;48:19;51:17
**views (1)**
89:17
**vigorously (1)**
25:17
**violation (1)**

72:24
**virtually (1)**
117:9
**voiding (1)**
151:18
**volume (1)**
78:17
**vote (2)**
63:11;146:7

**W**

**wait (6)**
41:20;108:18;
138:12,12,13;145:3
**waive (1)**
63:25
**waived (1)**
137:4
**walk (7)**
10:15;11:1;15:13;
18:10;34:23;48:4;
182:13
**walks (1)**
47:13
**wants (5)**
54:16;106:3;139:22
**waste (1)**
148:24
**way (28)**
7:3;10:3;13:25;
15:20,23;19:17;22:12,
12,13;28:23;33:9;38:2;
50:21;55:15;61:7,22;
66:3;83:10;86:7;87:11;
88:8;99:5;141:18;
148:24;156:6,9,9,23
**ways (4)**
10:15;75:2;116:10;
177:2
**week (5)**
47:13,14;126:10;
128:8;177:13
**weekly (1)**
123:7
**weeks (5)**
5:6;20:19;37:23;
70:5;170:21
**Weird (3)**
44:20;46:5;76:22
**welcome (1)**
4:24
**well-presented (1)**
184:1
**weren't (6)**
111:18;120:21;
121:2;127:21;147:24;
151:23
**Westlaw (1)**
92:6
**whatever's (2)**
94:11;113:23
**whatnot (1)**

19:10
**what's (12)**
31:9;51:15;66:2;
69:11;72:5;85:25;
97:13;98:17;147:17;
159:5;181:8,19
**whatsoever (2)**
80:15;134:2
**whenever (4)**
8:24;43:17;79:11;
122:3
**Where's (4)**
128:14,14;132:5;
159:9
**white (2)**
100:16,18
**Whois (1)**
127:24
**whole (15)**
11:20,23;12:9;13:4;
26:17;38:15;42:1,3;
60:17;79:24;116:1;
130:19;149:4;158:18;
182:12
**wholly-owned (1)**
92:4
**who's (9)**
57:22;59:13;97:23;
105:13;107:6,12;
145:8;158:22;162:10
**whose (4)**
10:1,2,3;168:18
**wife (6)**
16:7,7;32:11;60:4;
74:24;101:19
**wild (1)**
98:6
**willful (1)**
171:19
**Williams (1)**
9:9
**willing (2)**
121:6,6
**WilmerHale (1)**
27:1
**windfall (2)**
102:12;151:19
**window (1)**
6:12
**wires (1)**
55:19
**wish (1)**
143:4
**wishes (1)**
80:3
**within (7)**
6:12;19:5;29:21;
32:12;67:20,21;159:16
**without (9)**
18:23;58:3;63:22;
66:17;94:3;119:21;
121:8,9;181:25
**Witkowski (2)**

91:20;92:1
**Witkowski- (1)**
92:15
**witness (9)**
45:11;51:16;76:18;
129:22;130:1,7,16;
131:3,6
**witnesses (4)**
57:7;68:11,14,15
**WL (1)**
92:6
**word (15)**
10:10,21;25:5;39:20;
53:7;68:14;111:1,17;
113:2;117:5;118:17;
162:4;178:9;184:22,25
**words (8)**
54:6;65:21;81:25;
90:4;113:1;143:13;
162:2;169:3
**work (20)**
6:23;12:11;24:23;
25:1,23;26:21;27:21;
37:6;49:10;52:4;57:14;
61:5;62:4;68:1;87:4,
11;115:1;144:9;
157:16;160:23
**worked (7)**
27:14;39:4;51:16;
161:14,16;178:1,4
**working (7)**
27:11,22;38:19;
44:10;48:17;54:20;
171:18
**workmanlike (2)**
136:8,24
**works (3)**
6:25;10:4;131:16
**world (3)**
10:4;53:20;82:17
**worried (2)**
20:22;97:22
**worry (2)**
32:17;57:18
**worrying (2)**
57:4;107:12
**worse (5)**
37:14;48:13;138:1,
14;159:12
**worst (14)**
30:1;46:15;47:17,18;
94:13,14;144:14,14,25;
155:21;161:12;167:25;
168:15;181:6
**worst-case (1)**
80:12
**worth (2)**
149:23;181:16
**wringing (1)**
21:7
**write (1)**
156:18
**writing (1)**

67:6
**written (2)**
144:17;156:19
**wrong (6)**
31:5;78:4;88:10;
153:23;159:18;181:18
**wrongdoing (2)**
25:15;182:9

**X**

**Xerox (1)**
157:4
**Xeroxed (1)**
156:19

**Y**

**year (4)**
26:22,23,25;77:3
**years (6)**
9:10;80:17,19;
145:17;174:19;175:21
**yelling (1)**
170:24
**Yep (1)**
101:7

**Z**

**Zero (3)**
18:20;169:12;170:6
**Zhukovskiy (14)**
10:7;21:1,1;54:5,11,
14;55:10;57:8;95:9;
96:10;116:15,19;
175:16;178:14
**Zhukovskiy's (2)**
54:6;177:21
**Zillow (2)**
117:25;119:15

**1**

**1 (12)**
33:22;46:6,9;72:2;
73:22,23;86:14,16;
89:20;108:14;166:2;
172:16
**1,000 (1)**
27:2
**1,059,000 (1)**
70:8
**1,609,817 (1)**
25:12
**1,886 (1)**
154:3
**1,886,000 (1)**
153:12
**1.18 (1)**
183:10
**1.244 (1)**
167:1

**1.3 (13)**
20:10;53:24;55:19;
56:1,15;88:6;89:10;
94:2;95:12;96:15;98:4;
116:12;179:15
**1.4 (8)**
17:25;19:1,5,13;
20:12;53:5;177:16;
179:16
**1.4- (1)**
176:8
**1.5 (2)**
56:1;173:7
**1.6 (11)**
17:23;21:5;88:7;
89:9;96:15;98:4;138:5,
6,11;172:21;178:17
**1.7 (9)**
88:9;94:14;165:24,
25;169:3;172:21;
173:5;174:22;176:7
**1.7/1.8 (2)**
154:2,4
**1.716 (3)**
138:10;139:9;141:4
**1.8 (1)**
29:23
**1.88671 (1)**
166:3
**1.890 (1)**
154:24
**1.985 (1)**
155:8
**1/1/2015 (1)**
62:9
**1:07 (1)**
122:2
**10 (1)**
96:11
**10,000 (6)**
27:19;48:24;49:13,
13,13,14
**10:22 (1)**
43:13
**10:25 (3)**
5:17;9:2,3
**10:59 (1)**
43:14
**100- (1)**
179:23
**100,000 (2)**
62:9;99:25
**100,000's (1)**
62:10
**1058356 (1)**
92:6
**11 (6)**
58:12,13,16;59:1;
138:16,18
**11,250 (1)**
47:11
**11/3 (5)**
106:8,16;107:3,4;

111:13
**11/3/2012 (1)**
107:2
**11/5 (1)**
106:17
**11/5/2012 (1)**
106:24
**11:23 (3)**
106:8,8;107:4
**11:41 (1)**
107:4
**12 (5)**
61:17;63:3;107:23;
108:9,12
**12:55 (1)**
122:1
**127,000 (1)**
24:1
**12th (1)**
33:25
**13,000 (1)**
100:1
**130 (2)**
28:13;157:6
**130- (1)**
157:5
**13th (2)**
20:15;70:8
**14 (8)**
12:18;46:6;69:9;
105:18,19;106:22;
111:4,11
**141,191 (2)**
25:4,9
**148 (1)**
61:16
**149 (1)**
61:17
**14th (4)**
46:8;56:11;66:24;
70:14
**15 (11)**
11:5,8,17;16:24,24;
24:25;58:12,17;64:16;
100:1,21
**1-5 (1)**
138:17
**150,000 (1)**
29:8
**15-13881 (1)**
4:4
**156 (1)**
60:16
**159,000 (1)**
37:11
**15a (1)**
148:11
**15-month (1)**
99:24
**15's (1)**
58:15
**15th (2)**
36:2;71:18

**16 (2)**
16:25;93:17
**16,465 (1)**
37:10
**160 (1)**
138:11
**16-1120 (1)**
4:9
**166 (1)**
77:21
**167 (2)**
4:5;155:21
**167,000 (1)**
154:7
**16th (2)**
42:5;70:17
**17 (1)**
16:23
**173 (1)**
35:20
**174 (1)**
51:4
**174.4 (1)**
35:21
**175 (1)**
35:20
**175,000 (1)**
179:25
**17th (2)**
71:19;72:9
**18,000 (1)**
45:7
**18.5 (1)**
45:8
**182 (1)**
93:17
**187 (3)**
106:25;114:23;134:8
**18th (2)**
177:7,9
**190,000 (1)**
87:12
**198,138 (1)**
99:20
**1st (1)**
105:22

**2**

**2 (11)**
17:1;31:17;33:22;
36:25;50:5;56:2;89:21;
153:4,7;154:1;180:24
**2,771,667 (1)**
29:3
**2.3 (1)**
137:14
**2.6 (2)**
88:6,7
**2/12 (1)**
85:12
**2:15 (1)**
121:16

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.
Document    Page 213 of 214

October 4, 2019

**2:17 (1)**
106:17
**20,000 (2)**
27:20;48:25
**200 (2)**
35:21;157:6
**200,000 (9)**
26:22,25;53:1;56:15;
99:23;100:1;171:1;
177:17;179:21
**200,000's (1)**
17:24
**200ish (1)**
86:20
**2012 (6)**
12:19;95:4,8;96:4;
103:6;166:17
**2013 (23)**
20:22;62:4;68:10,12;
69:14,17;73:11,16;
74:1,13,15,17;77:1,4,6;
99:19;127:13,15;
128:1;129:16;141:15,
22;182:16
**2014 (24)**
12:4;31:22,22,23;
33:11,25;34:1;53:3;
62:4,8,9,23;63:3,4,13,
17;74:8;76:1;87:25;
99:19;120:9;121:5;
179:24;180:13
**2015 (41)**
20:1;34:17,19;35:19;
36:1,2,4,21;37:18,20;
42:2,5,13;46:6,6,17;
47:4;49:25;50:9;56:11,
12;62:2;63:19;64:15;
65:4;66:18,24;68:1;
70:2;72:14;74:19,20;
75:20,24;126:12;
127:14;128:7;141:16,
22;177:12;182:25
**2018 (2)**
142:22,23
**203 (1)**
35:21
**2093 (1)**
74:15
**2099 (1)**
92:6
**21 (4)**
63:24;119:20;147:2,
4
**215 (8)**
15:3;67:8;69:7;74:9;
75:21;127:18;128:13,
18
**22 (2)**
71:23,24
**22nd (2)**
56:13;148:8
**23 (3)**
16:25;17:1;61:16

**23,000 (1)**
50:15
**231 (1)**
75:9
**23rd (1)**
73:21
**24 (3)**
61:16;72:3;95:14
**244,000 (3)**
39:5,16,22
**24th (6)**
37:20;68:10;70:21;
85:18;127:13;177:11
**25 (5)**
36:1;46:18;54:21;
71:25;72:4
**25,000 (1)**
23:25
**250 (3)**
73:3;168:18;169:7
**250- (1)**
176:8
**250,000 (1)**
13:14
**251- (1)**
38:17
**251,000 (2)**
36:25;37:13
**254 (2)**
148:12,12
**259 (2)**
64:19;66:5
**25th (2)**
36:3;110:2
**26 (4)**
20:8,14;55:23;57:3
**268 (2)**
64:20;66:5
**27 (2)**
69:8;137:21
**28th (5)**
46:10;65:4,13,18,20
**2903 (1)**
77:2
**291 (4)**
102:9;109:15;
163:16;166:14
**29th (1)**
46:10
**2nd (1)**
49:25

**3**

**3 (12)**
12:18;33:22;37:16;
41:15;62:6;89:21;
148:25;165:14,16,17;
175:10;177:19
**3,773,000 (1)**
153:12
**3.1 (2)**
28:25;29:24

**3.2 (4)**
30:19;112:20;
137:18;173:8
**3.3 (1)**
112:20
**3.4.11 (1)**
138:2
**3.4-odd-million (1)**
176:6
**3.5 (1)**
165:21
**30 (5)**
12:4;14:18;91:20;
92:1;180:14
**300,000 (1)**
22:2
**304 (3)**
67:23,25,25
**305 (3)**
61:24;62:1;67:24
**30ish (1)**
58:15
**30th (11)**
31:22,22,23;33:11,
16;37:10;53:3;62:25;
121:5;149:19;179:24
**31 (8)**
14:18;20:8,20;62:8;
63:13;116:17,19;
177:19
**316 (2)**
101:18;166:13
**32 (8)**
14:18;20:8,20,20;
57:3;116:17,19;176:17
**321- (1)**
87:5
**324 (1)**
127:24
**325- (1)**
36:16
**325,000 (3)**
35:15;62:8,12
**326 (1)**
35:20
**327 (1)**
35:20
**329 (1)**
35:20
**332 (1)**
73:19
**333 (1)**
73:20
**334 (1)**
56:9
**335 (2)**
56:9;71:1
**335,000 (2)**
35:16;36:11
**336 (2)**
56:9,16
**341 (1)**
62:6

**342 (5)**
137:11,14;138:19;
177:8,9
**35 (1)**
85:18
**357 (1)**
29:6
**36 (2)**
77:21;122:20
**37 (5)**
13:20;41:5;69:12;
127:2,3
**37,000 (2)**
50:8,16
**39 (1)**
62:25
**3rd (3)**
56:12;70:24;71:5

**4**

**4 (3)**
34:18;39:13,14
**4,000 (1)**
154:25
**4.1 (2)**
101:9;109:4
**4.4 (2)**
149:24;150:5
**4.5 (1)**
149:24
**4.9 (2)**
118:5,8
**400- (1)**
179:22
**43 (1)**
60:3
**43,700 (1)**
35:23
**439,000 (1)**
62:13
**44 (1)**
63:18
**45 (2)**
63:2,17
**461,000 (1)**
62:14
**476 (1)**
29:6
**48,000 (2)**
29:9;83:10
**4th (1)**
71:6

**5**

**5 (6)**
24:10;33:22;35:3;
61:7,7;89:21
**5.1 (7)**
114:17;149:23;
150:1,5,17,18;152:4
**5.17 (3)**

**138:15,18;177:4**
**5.2 (15)**
11:9,22;24:25;62:24;
106:19;109:18,18;
110:14,16;112:1;
114:18,19;115:14;
152:5;182:25
**5.25- (1)**
176:16
**5.3 (1)**
182:23
**5.499 (1)**
176:20
**5.5 (2)**
118:6,6
**5.8 (1)**
153:18
**5/28/15 (1)**
85:13
**5:21 (1)**
105:20
**50 (6)**
34:17;38:22;40:1,13,
16;62:12
**500- (1)**
179:23
**53 (1)**
75:16
**54 (1)**
70:11
**544,000 (1)**
41:14
**55 (3)**
61:8,9,9
**564,000 (1)**
36:15
**565,000 (1)**
23:24
**578- (1)**
166:9
**578,000 (1)**
166:4
**58 (1)**
110:2
**59.5 (1)**
24:2
**5th (1)**
148:8

**6**

**6 (5)**
33:22;35:5;58:23;
89:21;138:3
**6,000 (1)**
42:13
**6.1b6 (3)**
58:22;63:9;106:20
**600,000 (1)**
26:24
**610-1276 (2)**
74:7;77:4
**617- (2)**

Case 16-01120    Doc 399    Filed 10/11/19    Entered 10/11/19 09:34:30    Desc Main
Document    Page 214 of 214
LYMAN-CUTLER, LLC, et al. v.
KAGAN, et al.

October 4, 2019

74:6;77:3
**617-828- (1)**
77:1
**617-828-2093 (1)**
74:13
**63 (1)**
71:8
**65 (2)**
127:4,5
**65,000 (1)**
45:3
**660- (1)**
35:16
**665 (1)**
179:20
**665- (1)**
38:18
**665,000 (1)**
102:20
**67 (2)**
37:20;71:20
**690- (2)**
87:1,9
**690,841.95 (1)**
24:13
**697 (1)**
92:1
**6th (1)**
20:22

---

**7**

**7 (9)**
14:17;16:25;40:4;
54:3,4;55:2,5,11;
175:16
**7,000 (1)**
48:15
**70 (1)**
60:16
**70,000 (1)**
68:4
**700,000's (1)**
18:16
**74 (2)**
51:3,5
**758,000 (1)**
41:13
**760- (1)**
41:24
**760,000 (1)**
38:18
**77 (1)**
11:25
**777- (1)**
41:4
**777,000 (1)**
18:2
**777,784 (1)**
23:1
**78 (1)**
136:13
**7th (13)**

34:17,19;35:19;
36:21;37:18;39:19,22;
40:6;47:10;66:25;70:2,
7;95:14

---

**8**

**8 (3)**
14:18;54:13;100:2
**8,200 (1)**
40:19
**8.1 (10)**
12:6;94:6;112:9,10;
114:2,21;165:19;
167:13,15;168:10
**8.2 (2)**
174:24;176:23
**8.8 (1)**
176:5
**800,000 (2)**
14:5;102:21
**84 (1)**
62:12
**850- (1)**
39:1
**86 (1)**
62:9
**88 (3)**
61:9;76:9,11
**880- (1)**
87:9
**880,000 (1)**
153:16
**89 (1)**
75:10
**899,000 (1)**
36:11

---

**9**

**9 (12)**
4:6;14:18;54:22;
95:5;101:13;103:1,6;
111:3;113:19;166:16;
175:10,16
**9,500 (1)**
35:24
**9.1 (1)**
114:5
**9.2 (4)**
113:10;167:17,17;
168:21
**9:24 (1)**
4:1
**9:30 (1)**
8:13
**91 (1)**
16:25
**910,000 (1)**
30:11
**92 (1)**
16:25
**93A (1)**

72:24
**95 (1)**
17:1
**950,000 (2)**
30:4,6
**979 (1)**
153:18
**9th (1)**
71:12